# EXHIBIT 2

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

**WOLLMUTH MAHER & DEUTSCH LLP**
Paul R. DeFilippo, Esq.
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
pdefilippo@wmd-law.com

**JONES DAY**
Gregory M. Gordon, Esq.
Brad B. Erens, Esq.
Dan B. Prieto, Esq.
Amanda Rush, Esq.
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
gmgordon@jonesday.com
bberens@jonesday.com
dbprieto@jonesday.com
asrush@jonesday.com
(Admissions *pro hac vice* pending)

*PROPOSED ATTORNEYS FOR DEBTOR*

| | |
|---|---|
| In re: | Chapter 11 |
| LTL MANAGEMENT LLC,[1] | Case No.: 23-12825 (MBK) |
| Debtor. | Judge: Michael B. Kaplan |

### DECLARATION OF JOHN K. KIM
### IN SUPPORT OF FIRST DAY PLEADINGS

John K. Kim, being first duly sworn, deposes and states as follows:

1.      I am the Chief Legal Officer of LTL Management LLC, a North Carolina

limited liability company (the "Debtor") and the debtor in the above-captioned chapter 11 case. I

have held this position with the Debtor since its formation on October 12, 2021.

---

[1]      The last four digits of the Debtor's taxpayer identification number are 6622. The Debtor's address is
501 George Street, New Brunswick, New Jersey 08933.

2.          I am employed by Johnson & Johnson Services, Inc. ("J&J Services"), a non-debtor affiliate of the Debtor and a subsidiary of the Debtor's ultimate non-debtor parent company, Johnson & Johnson ("J&J").

3.          Prior to my role as the Chief Legal Officer of the Debtor, I was J&J's Assistant General Counsel, Practice Group Lead for the Product Liability Litigation Group.  In that role, I was responsible for product liability litigation globally.  I began my employment with J&J and its affiliates in 2001 as a Senior Counsel in the Litigation Group, handling a variety of cases ranging from commercial disputes and international arbitrations to product liability litigation.

4.          Prior to my employment with J&J and its affiliates, I was associated with the law firm of Simpson Thacher & Bartlett in its Litigation Group from 1989 to 2001.  There, I handled a number of complex litigation engagements, including bankruptcy proceedings, anti-trust disputes, insurance coverage arbitrations and securities actions.

5.          I earned a Juris Doctor degree from Fordham University School of Law in 1989 and a Bachelor of Arts degree from Tufts University in 1985.

6.          On the date hereof (the "Petition Date"), the Debtor filed a voluntary petition with this Court for relief under chapter 11 of the Bankruptcy Code, as well as certain motions and other pleadings (collectively, the "First Day Pleadings").  As discussed in more detail below, on October 14, 2021, the Debtor previously commenced a chapter 11 case, No. 21-30589 (Bankr. D.N.J.) (the "2021 Chapter 11 Case"), which was dismissed on April 4, 2023.  In connection with the 2021 Chapter 11 Case, I submitted various declarations in support of relief requested by the Debtor, including the *Declaration of John K. Kim in Support of First Day Pleadings* [No. 21-30589, Dkt. 5] (the "2021 First Day Declaration").  I incorporate by

reference the statements I made in my 2021 First Day Declaration and affirm that they remain true and correct.

7.     The Debtor continues to believe that the talc products manufactured and sold by its predecessors were safe and did not cause any of the harms plaintiffs have alleged. Nonetheless, the costs of litigating those claims together with the risk of extraordinarily large plaintiff verdicts and the long latency periods of the cancers alleged to be caused by the products, made the continued defense of this litigation in the tort system untenable.

8.     The Debtor is filing for bankruptcy a second time to effectuate the intent of its initial bankruptcy filing:  to fully, equitably and efficiently resolve all current and future talc-related claims.  This filing is supported by law firms on behalf of more than 60,000 thousands claimants and includes ovarian cancer and mesothelioma claims.[2]  The Debtor, J&J, the Debtor's direct parent company, and these claimants have entered into Plan Support Agreements pursuant to which the parties have agreed to work together to finalize and seek confirmation of a plan of reorganization that would fund $8.9 billion net present value to a trust for the benefit of all talc-related claims.  This amount represents an increase of $6.9 billion over the $2 billion J&J previously agreed to advance to the Debtor to establish a qualified settlement fund in the 2021 Chapter 11 Case.  Based on the breadth of claimant support, the Debtor believes it is well positioned to achieve a prompt resolution of this case.

9.     The 2021 Chapter 11 Case was dismissed on April 4, 2023 at the direction of the United States Court of Appeals for the Third Circuit (the "Third Circuit").  The Third Circuit found that the Debtor was not in financial distress due to its prior financing arrangements

---

[2]     These claimants include individuals who did not have filed claims as of the commencement of the 2021 Chapter 11 Case.

and, therefore, ruled that the filing was not in good faith.  Since that decision, the Debtor has

entered into new financing arrangements that, among other things, contain commitments for

funding consistent with the agreed plan terms reflected in the Plan Support Agreements, but also

follow the guidance provided by the Third Circuit in its dismissal opinion.  As a result of these

new arrangements, the Debtor believes that this filing satisfies the good faith filing standard

articulated by the Third Circuit in its dismissal opinion.

       10.     I submit this Declaration to support the First Day Pleadings and provide

certain information about the Debtor, its decision to commence this chapter 11 case and its

objectives for this case.  I have reviewed each of the First Day Pleadings, and it is my belief that

the relief sought therein is necessary to (a) avoid immediate and irreparable harm to the Debtor,

(b) maximize and preserve the value of the Debtor's chapter 11 estate, (c) assist in the smooth

transition of the Debtor into chapter 11 and/or (d) promote the efficient administration of this

case.

       11.     As the Chief Legal Officer, I am familiar with the Debtor's day-to-day

operations, assets, financial condition, business affairs and books and records.  Except as

otherwise indicated, all facts and statements set forth in this Declaration are based upon:  (a) my

personal knowledge; (b) information supplied to me by other members of the Debtor's

management, professionals or employees; (c) my review of relevant documents; and/or (d) my

opinion based upon my experience and knowledge of the Debtor's assets, liabilities and financial

condition.  If called upon to testify, I could and would testify to the facts and opinions set forth

herein.

       12.     Section I of this Declaration provides an overview of the Debtor's history

and corporate structure.  Section II describes the circumstances surrounding the commencement

of this case, as well as the Debtor's objectives for this case. Section III sets forth relevant facts in support of the First Day Pleadings as well as in support of the Adversary Proceeding (as defined below) filed by the Debtor.

## I.     THE DEBTOR'S HISTORY AND CORPORATE STRUCTURE

### A.     The Debtor's Predecessors and Related Restructurings

13.     The Debtor traces its roots back to Johnson & Johnson Baby Products Company ("J&J Baby Products"), a New Jersey company incorporated in 1970 as a wholly owned subsidiary of J&J.

14.     J&J, a New Jersey company incorporated in 1887, first began selling JOHNSON'S® Baby Powder in 1894, launching its baby care line of products. In 1972, J&J established a formal operating division for its baby products business, which included JOHNSON'S® Baby Powder.

15.     In 1978, consistent with J&J's policy of decentralizing its business, J&J transferred all its assets and liabilities associated with the baby products division to J&J Baby Products. This was part of a larger restructuring of J&J that included the transfer of assets and liabilities of seven principal operating divisions to wholly owned subsidiaries. To effectuate the transaction, J&J and J&J Baby Products entered into an *Agreement for Transfer of Assets and Bill of Sale*, effective January 1, 1979 (the "1979 Agreement"),[3] pursuant to which J&J transferred all assets and liabilities associated with the baby products division to J&J Baby Products. As part of the transfer, J&J Baby Products agreed to indemnify J&J for all claims relating to the baby products business, including the talc powder products. Following the

---

[3]     A copy of the 1979 Agreement is attached hereto as Annex A.

1979 Agreement, J&J no longer manufactured or sold baby products, including JOHNSON'S®

Baby Powder.

16.     In 1981, J&J Baby Products transferred all its assets, except those assets

allocated to its diaper programs, to Omni Education Corporation ("Omni"), a wholly owned

subsidiary of J&J Baby Products.  In turn, Omni assumed all liabilities of J&J Baby Products

except those liabilities related to its diaper program.  Immediately following the transaction,

J&J Baby Products merged into another subsidiary of J&J and was renamed Personal Products

Company, and Omni changed its name to Johnson & Johnson Baby Products Company.[4]

17.     In 1988, Johnson & Johnson Baby Products Company transferred all its

assets in respect of its baby products business to Johnson & Johnson Dental Products Company,

which assumed all of its liabilities and was renamed Johnson & Johnson Consumer Products,

Inc.

18.     In 1997, Johnson & Johnson Consumer Products, Inc. changed its name to

Johnson and Johnson Consumer Companies, Inc. ("J&J Consumer Companies").

19.     In 2015, J&J Consumer Companies merged with and into an affiliate,

which then merged into McNeil-PPC, Inc.  The resulting entity was renamed Johnson & Johnson

Consumer Inc. (including all former names and historical forms, "Old JJCI").

20.     Following these intercompany transactions, Old JJCI became responsible

for all claims alleging that JOHNSON'S® Baby Powder and other talc-containing products

cause cancer or other diseases.  Old JJCI also was obligated to indemnify J&J for all claims

relating to the talc products.

---

[4]       In 1989, Personal Products Company changed its name to McNeil-PPC, Inc.

21.     Old JJCI also became responsible for all claims alleging that Shower to

Shower products, which contained talc, cause cancer or other diseases.  Before J&J's

decentralization, Shower to Shower products were marketed by a division of J&J, the Johnson &

Johnson Domestic Operating Company division.  Consistent with J&J's decentralization efforts

and its transition to a holding company, effective January 1, 1978, J&J transferred all assets and

liabilities related to Shower to Shower products to Personal Products Company, a wholly owned

subsidiary of J&J, and Personal Products Company thereafter assumed operational responsibility

for the Shower to Shower products.

22.     The operational responsibilities, liabilities and assets related to Shower to

Shower products were transferred from Personal Products Company to Johnson & Johnson Baby

Products Company by early 1987.

23.     In 2012, Old JJCI sold the assets and liabilities related to certain products,

including the Shower to Shower products, to Valeant Pharmaceuticals International, Inc.

("Valeant").  Thereafter, in 2019, Old JJCI and Valeant (now known as Bausch Health

Companies Inc. ("Bausch")) entered into an indemnification agreement.  Pursuant to that

indemnification agreement, Old JJCI agreed to indemnify Valeant for any liability arising from

Shower to Shower products and for certain other regulatory actions arising out of the

manufacture, use or sale of Shower to Shower products, as set forth more fully in the agreement.

24.     In 2021, Old JJCI implemented a corporate restructuring (the "2021

Corporate Restructuring"), which was completed on October 12, 2021.  As a result of that

restructuring:  Old JJCI ceased to exist and two new entities were created:  (a) the Debtor, which

was initially formed as a Texas limited liability company and then converted into a North

Carolina limited liability company; and (b) another entity, which was initially formed as a Texas

limited liability company and then merged into a New Jersey corporation that was its direct

parent (as well as the direct parent of the Debtor), whereupon this entity changed its name to

Johnson & Johnson Consumer Inc. ("New JJCI").  In the 2021 Corporate Restructuring, the

Debtor was allocated certain of Old JJCI's assets and became solely responsible for the

talc-related liabilities of Old JJCI, and New JJCI was allocated all other assets of Old JJCI and

became solely responsible for all other liabilities of Old JJCI.

26.        Old JJCI implemented the 2021 Corporate Restructuring to facilitate a

chapter 11 filing by the Debtor that would permit the Debtor to fully resolve current and future

talc-related claims through a plan of reorganization without subjecting the entire Old JJCI

enterprise to a bankruptcy proceeding.  As I will discuss in more detail below, the Debtor in fact

filed for chapter 11 relief in the Western District of North Carolina on October 14, 2021, two

days after the completion of the 2021 Corporate Restructuring.

### B.     New JJCI/Holdco

26.        New JJCI operated its business following the 2021 Corporate

Restructuring.  This included the manufacture and sale of a broad range of products used in the

baby care, beauty, oral care, wound care and women's health care fields, as well as over-the-

counter pharmaceutical products (collectively, the "Consumer Business").  In December 2022,

New JJCI changed its name to Johnson & Johnson Holdco (NA) Inc., a New Jersey Corporation

("Holdco"), and in early January 2023, Holdco transferred its Consumer Business assets to its

parent entity.

27.        Holdco is the direct parent of the Debtor, and the Debtor is the direct

parent of Royalty A&M LLC ("Royalty A&M"), a North Carolina limited liability company.

Holdco is a holding company with ownership interests in various subsidiaries.  The most

substantial of Holdco's ownership interests are held through its wholly owned subsidiary Apsis

SAS (France) ("Apsis"). Apsis owns (through its wholly owned subsidiary Johnson & Johnson

Holding GmbH (Germany)) a 36.1% ownership interest in GH Biotech Holdings Limited

(Ireland) ("GH Biotech"). GH Biotech holds ownership interests, either directly or through

wholly owned subsidiaries, in four entities, Janssen Sciences Ireland Unlimited Company,

Janssen Irish Finance Unlimited Company, C Consumer Products Denmark ApS, and Impulse

Dynamics (71% interest). Apsis also owns, either directly or indirectly, interests in various

limited risk distributors (which distribute J&J products in foreign countries), a German-based

subsidiary that manufactures 3D-printed titanium interbody implants for spinal fusion surgery,

and various other subsidiaries. A chart depicting the Debtor's corporate structure is attached

hereto as Annex B.

28.    As of the date of this declaration, Holdco has access to approximately

$400 million in cash through J&J's cash management system.

### C.    The Debtor

29.    The Debtor was formed to manage and defend thousands of talc-related

claims and to oversee the operations of its subsidiary, Royalty A&M. Royalty A&M owns a

portfolio of royalty revenue streams, including royalty revenue streams based on third-party sales

of CLOROX®, ECOLAB®, ESSITY®, LACTAID®, MYLANTA® / MYLICON®,

ROGAINE®, SPARTAN® and TENA® products. It reviews royalty monetization opportunities

in the healthcare industry and seeks to grow its business by financing and/or reinvesting the

income from the existing royalty revenue streams into both the acquisition of additional external

royalty revenue streams as well as financings to third parties secured by similar royalty streams.

In June 2022, Royalty A&M entered into a royalty purchase agreement whereby it acquired

rights to certain royalty streams from a third-party.

30. The Debtor also has cash, interests as payee under a funding agreement, which I describe in more detail below, and certain insurance coverage rights.

**D.**     **J&J**

31. The Debtor's ultimate parent company, J&J, is a holding company that through its operating subsidiaries conducts business in virtually all countries in the world, focused primarily on products related to human health and well-being. J&J is a global innovator and leader in public health and has been at the forefront of healthcare innovation for over 130 years. That innovation includes novel oncology, immunology and vaccine products, including its COVID-19 vaccine that it developed and supplied at non-profit pricing.

**E.**     **Previous Financing Arrangements**

32. As described above, Old JJCI and its affiliates engaged in multiple restructurings through the years, including the 2021 Corporate Restructuring. The 2021 Corporate Restructuring was effectuated through a series of steps, which I described in detail in my 2021 First Day Declaration. _See_ 2021 First Day Decl. ¶¶ 22-27. A key component of the 2021 Corporate Restructuring was a funding agreement between the Debtor, on the one hand, and J&J and New JJCI on the other (the "2021 Funding Agreement"). The primary purpose of the 2021 Funding Agreement was to facilitate the resolution of talc-related claims through a chapter 11 filing by the Debtor. The 2021 Funding Agreement obligated New JJCI and J&J, on a joint and several basis, to provide funding, up to the full value of New JJCI, for, among other things, (a) the administrative costs of the Debtor's chapter 11 case and (b) a trust that would satisfy current and future talc claims, in both situations to the extent that any cash distributions received by the Debtor from Royalty A&M were insufficient to pay such costs and further, in the case of the funding of a trust, the Debtor's other assets are insufficient to provide that funding.

-10-

33.     In connection with the 2021 Funding Agreement, New JJCI and J&J entered into a commitment and loan agreement, dated October 12, 2021 (the "2021 Commitment and Loan Agreement"), pursuant to which New JJCI and J&J agreed that (a) New JJCI would be the primary obligor under the 2021 Funding Agreement, (b) upon the request of New JJCI, J&J would make revolving credit loans to New JJCI, with the proceeds of the loans to be used by New JJCI solely to satisfy its obligations under the 2021 Funding Agreement, and (c) if New JJCI failed to make any payment to the Debtor required by the 2021 Funding Agreement and instead J&J made such payment under the 2021 Funding Agreement, New JJCI would reimburse J&J for that payment and, if it failed to do so, the amount New JJCI owed would be deemed to be financed with a loan from J&J.

### F.     Other Agreements

34.     To ensure that the Debtor had access to services it needs to effectively operate its business, in connection with the 2021 Corporate Restructuring, the Debtor entered into a services agreement and a secondment agreement with J&J Services, which agreements I described in my 2021 First Day Declaration. Id. ¶¶ 29-30.  Likewise, I described similar agreements that Royalty A&M entered into with J&J Services and the Debtor, respectively, and an intercompany loan facility agreement with J&J. Id. ¶ 30.  As a result of these agreements, the Debtor and Royalty A&M have been able to operate their respective businesses efficiently and effectively.

-11-

## II. EVENTS LEADING TO THE COMMENCEMENT OF THIS CASE AND THE DEBTOR'S OBJECTIVES FOR ITS CHAPTER 11 REORGANIZATION

### A. Cosmetic Talc Litigation and Its Associated Costs and Burdens

35.     I described the history of the cosmetic talc litigation and the significant costs and burdens associated with it in my 2021 First Day Declaration, which I incorporate herein by reference.  See 2021 First Day Decl. ¶¶ 31-45.

36.     At the time of the filing of the 2021 Chapter 11 Case, the Debtor was besieged by talc claims premised largely on the false allegation that Johnson's Baby Powder contained asbestos and caused cancer.  Notwithstanding that these claims have no valid scientific basis, a few blockbuster plaintiff verdicts in plaintiff-friendly jurisdictions fueled a boom in talc claims, causing Old JJCI to incur astronomical costs:  nearly $1 billion in defense costs on account of cosmetic talc litigation, most of which has been spent in only the five years immediately before the filing of the 2021 Chapter 11 Case; and over $3.5 billion in indemnity payments, primarily over the same time period.

37.     Although Old JJCI prevailed in most of the claims brought, including securing unanimous defense verdicts in six of the eight claims tried to verdict during the 12 months prior to the 2021 Chapter 11 Case, the costs of this litigation and the intermittent extreme plaintiff verdicts made the litigation of these cases in the tort system for the next 50 years or more (as claimants seek to do) untenable, unsustainable and inequitable.

38.     In addition to the thousands of talc claims pending in the United States as of the 2021 Chapter 11 Case, Old JJCI, J&J, Johnson & Johnson Inc. ("J&J Canada"), a federal corporation incorporated under the laws of Canada, and Bausch are named defendants in one certified class action, three proposed class actions and one individual action in four Canadian provinces (Alberta, British Columbia, Ontario and Quebec).  The certified class action and the

proposed class actions commenced in Alberta, British Columbia, Ontario and Quebec are

brought on behalf of classes (or proposed classes) of Canadian individuals who allege injury or

damages arising from the use or purchase of talc-containing products manufactured, marketed

and/or sold by Old JJCI, J&J, J&J Canada or Bausch.  The individual action was commenced in

British Columbia by an individual who likewise alleges injury arising from the use of

talc-containing products manufactured or sold by Old JJCI, J&J or J&J Canada.  Although

subject to a stay of proceedings arising from the recognition of the 2021 Chapter 11 Case in

Canada in December 2021, 12 additional Ontario-based Canadian claims were served in March

2022 and 26 additional British Columbia-based claims were filed in January and February 2023.

   39.  Furthermore, the States of Mississippi[5] and New Mexico[6] filed actions

against Old JJCI, J&J and certain other parties alleging that Old JJCI and J&J are liable for

claims in connection with the sale, promotion and marketing of talc-containing products,

including making misrepresentations about the safety of the talc products sold by Old JJCI.  The

attorneys general of other states had initiated investigations in their respective states against

Old JJCI and J&J related to the marketing, promotion and sale of the talc products, all based on

allegations of unfair business practices and consumer protection violations similar to those at

issue in the New Mexico and Mississippi actions.  Specifically, the attorneys general for the

states of Arizona, North Carolina, Texas and Washington issued civil investigative demands, and

the Maryland attorney general has issued an Administrative Subpoena for Consumer Protection.

---

[5]  See State of Mississippi ex rel. Hood v. Johnson & Johnson, et al., No. G2014-0001207, in the First
Judicial District Court for the County of Hinds, Mississippi.

[6]  See State of New Mexico ex rel. Balderas v. Johnson & Johnson, et al., No. D-101-CV-2020-00013, in the
First Judicial District Court for the County of Santa Fe, New Mexico.

40.     In the 2021 Chapter 11 Case, forty member states and one district formed an ad hoc committee of states holding consumer protection claims against the Debtor.  The ad hoc committee alleged that its members "hold consumer protection claims that are significant, encompassing civil penalties that, based on the statutory maximum per violation, could in principle run into the trillions of dollars."  See *Motion of the Ad Hoc Committee of States Holding Consumer Protection Claims Seeking Relief With Respect to the Order Establishing Mediation Protocol*, No. 21-30589, Dkt. 1939 ¶ 1.  The Debtor disputes these claims.

41.     On February 8, 2018, a securities action was filed in the United States District Court for the District of New Jersey against certain non-debtor individuals and affiliates of the Debtor.[7]  The central issue in the Securities Action is whether the defendants knew of, concealed and made false or misleading statements regarding the allegation that Old JJCI's talc products contained asbestos or caused cancer.  The defendants in the Securities Action maintain (as does the Debtor) that the talc products were safe and free from asbestos.  Although the Debtor is not a defendant, there is substantial overlap between the claims in the Securities Action and the talc-related claims against the Debtor.

42.     Due to the long alleged latency periods for mesothelioma and ovarian cancer, cosmetic talc litigation against the Debtor is anticipated to continue for decades more, as are the extraordinary costs of defending and resolving the tens of thousands of expected claims. Plaintiff experts estimate that the latency period for mesothelioma can run as long as 60 years and have begun to allege extended latency periods for ovarian cancer allegedly caused by asbestos exposure.  As a result, even though Old JJCI stopped selling its talc-based JOHNSON'S® Baby Powder in North America in 2020, individuals who develop mesothelioma

---

[7]     See Hall v. Johnson & Johnson, No. 3:18-cv-01833 (D.N.J) (the "Securities Action").

in 2080 and beyond could sue the Debtor, potentially drawing out the litigation to the end of this century.

43.     As of the filing of the 2021 Chapter 11 Case, there were almost 40,000 plaintiffs asserting ovarian cancer claims against the Debtor, including almost 36,000 plaintiffs with claims pending in a federal multi-district litigation in New Jersey, and more than 3,800 plaintiffs with claims in multiple state court jurisdictions across the country.  These claims were all stayed during the pendency of the 2021 Chapter 11 Case.

44.     In addition to the ovarian cancer claims, approximately 470 mesothelioma cases were pending against the Debtor as of the filing of the 2021 Chapter 11 Case.  These claims, like the ovarian cancer claims, spanned the U.S. with cases pending in New Jersey, California, Illinois, Missouri, New York and Ohio, and were stayed during the pendency of the 2021 Chapter 11 Case.

45.     The Debtor believes that, absent the 2021 Chapter 11 Case, thousands of additional ovarian cancer and mesothelioma cases would have been filed against it.  Moreover, absent this case, the Debtor expects thousands of additional cases would have been filed for decades to come.

**B.      The Debtor's Insurance Coverage and Related Litigation**

46.     The Debtor believes it has insurance coverage for its talc-related liability. In particular, the Debtor has access to certain primary and excess liability insurance policies that cover, among other things, defense and/or indemnity costs related to talc bodily injury claims, subject to the terms of the policies.[8]

---

[8]     The policies that cover the Debtor were issued to J&J as the Named Insured.  Those policies cover the period when Old JJCI was operated as a business unit of J&J, as well as during the period when Old JJCI was a subsidiary of J&J.

47.     I provided a general overview of the Debtor's insurance coverage in my 2021 First Day Declaration, which I incorporate herein by reference.  <u>See</u> 2021 First Day Decl. ¶¶ 46-52.  In total, the limits of solvent primary and excess insurance policies issued to J&J by third-party insurers that potentially cover talc-related liabilities are in excess of $1.95 billion.

48.     Prior to the 2021 Chapter 11 Case, J&J and Old JJCI tendered talc-related claims to the third-party insurers.  Since then, none of those insurers has acknowledged its coverage obligations, defended Old JJCI or J&J, paid any costs of defense, or indemnified J&J or Old JJCI for settlements or judgments.  Instead, the third-party insurers have asserted coverage defenses.

49.     In May 2019, certain of the Debtor's third party insurers filed a lawsuit against Old JJCI and J&J, and their captive insurance affiliate, Middlesex Insurance Company ("<u>Middlesex</u>"), in the Superior Court of Middlesex County (Docket No. MID-L-003563-19) (the "<u>NJ Coverage Action</u>"), seeking a declaratory judgment regarding the parties' respective obligations under the plaintiff insurers' policies including, in particular, the plaintiff insurers' duties to pay defense and indemnity costs to, among other things, Old JJCI.  The insurer plaintiffs filed a Second Amended Complaint on June 22, 2020.  J&J, Old JJCI and Middlesex filed answers to the Second Amended Complaint on July 31, 2020, and asserted counterclaims, as well as cross-claims against certain defendants.  Aetna Casualty and Surety Company ("<u>Travelers</u>")[9] and certain other insurers filed cross-claims against J&J, Old JJCI and Middlesex, to which J&J, Old JJCI and Middlesex responded later in 2020.

---

[9]     Aetna Casualty and Surety Company is now part of Travelers Insurance Company.

50.     In the 2021 Chapter 11 Case, certain insurers filed motions to lift the automatic stay to permit the NJ Coverage Action to proceed.  This Court denied those motions but permitted certain third-party discovery to occur.  The NJ Coverage Action remains pending.

## C.     Retailers and Third Party Indemnities

51.     Old JJCI had relationships with various retailers who sold Old JJCI's talc-containing products (collectively, the "Retailers").  Old JJCI agreed to indemnify the Retailers for claims related to the sale of Old JJCI's talc-containing products, and these contractual indemnities were allocated to the Debtor in the 2021 Corporate Restructuring.  In addition, to the extent a Retailer is held liable for a claim arising out of the products manufactured and/or sold by Old JJCI, and not by independent actions of the Retailers, certain state laws could require the Debtor to indemnify the Retailers for these liabilities.

52.     Claims asserted against the Retailers for their sale of Old JJCI products are virtually identical to the claims asserted against Old JJCI.  I believe these claims against Retailers are generally brought to defeat removal to federal court based on diversity jurisdiction and the Retailers are often dismissed before trial without payment.

53.     Old JJCI would periodically accept from Retailers tenders of talc-related claims related to the sale of its products.  When a Retailer was sued on a claim related to Old JJCI's talc-containing products, the Retailer would notify Old JJCI by submitting a tender request.  Old JJCI would then determine whether to accept the Retailer's tender of its defense and indemnify the Retailer pursuant to a tender agreement (each, a "Tender Agreement").  Since the commencement of the talc-related litigation, Old JJCI has agreed to indemnify and assume the defense of nearly 790 talc-related claims against the Retailers pursuant to Tender Agreements.

-17-

54.　　In addition, Old JJCI agreed to indemnify certain other transaction counterparties for liability arising from talc-containing products sold by Old JJCI.　For example, in 2005, Old JJCI entered into an asset purchase agreement with Pharma Tech Industries, Inc. ("PTI" and subsequently PTI Royston, LLC) pursuant to which Old JJCI sold a manufacturing plant (where various products, including certain talc-containing products, were bottled) to PTI, which continued to operate the facility and manufacture certain talc products until early 2020.　In connection with the asset sale, Old JJCI and PTI entered into a manufacturing and supply agreement, which was subsequently amended and restated.　Under the manufacturing and supply agreement, Old JJCI agreed to indemnify, and has indemnified, PTI and its affiliates for certain claims related to talc products.　The claims against PTI are generally identical to and based on the claims against Old JJCI.

55.　　Further, pursuant to an indemnification agreement, Old JJCI agreed to indemnify Valeant (now Bausch) and its affiliates (including Bausch Health Americas, Inc. f/k/a Valeant Pharmaceuticals International and Bausch Health US, LLC f/k/a Valeant Pharmaceuticals North America LLC f/k/a Valeant Pharmaceuticals North America) for personal injury and products liability actions arising from alleged exposure to "Shower to Shower" products and for certain other regulatory actions arising out of the manufacture, use or sale of "Shower to Shower" products, as set forth more fully in the agreement.[10]　The claims against Valeant (now Bausch) are generally identical to the claims asserted against Old JJCI.

---

[10]　　It is my understanding that "Shower to Shower" products sold in the U.S. and Canada no longer include talc.　Like Johnson's Baby Powder, Johnson's Medicated Powder sold in the U.S. and Canada no longer contains talc as of 2020.

### D.      Chapter 11 Cases of Talc Suppliers

56.      In February 2019, Old JJCI's talc supplier, Imerys Talc America, Inc. and

two of its affiliates, Imerys Talc Vermont, Inc. and Imerys Talc Canada, Inc.

(collectively, "Imerys") filed voluntary petitions under chapter 11 of the Bankruptcy Code in the

United States Bankruptcy Court for the District of Delaware (the "Imerys Bankruptcy").  Imerys

has potential liability for personal injury claims arising from exposure to talc it sold to

customers, including Old JJCI.  In its bankruptcy case, Imerys has contended that it has claims

against Old JJCI and J&J for indemnification and joint insurance proceeds, claims alleged to be

in the billions of dollars.  Old JJCI and J&J had settlement discussions with Imerys and other

parties to permanently resolve talc claims against them.  Those discussions ended in May 2021

with no resolution.

57.      In July 2021, Imerys Talc America, Inc. and Imerys Talc Vermont, Inc.

filed an adversary proceeding against Old JJCI and J&J in the Imerys Bankruptcy seeking

declaratory judgments with respect to certain indemnification obligations allegedly owed by

Old JJCI and J&J to Imerys.  The Debtor and J&J thereafter filed a motion to dismiss the

adversary proceeding.  In October 2021, the Debtor filed a notice of bankruptcy filing and stay of

proceedings clarifying that the automatic stay arising upon the filing of the 2021 Chapter 11

Case applied to this adversary proceeding.  No further activity has taken place in this adversary

proceeding since the filing of the 2021 Chapter 11 Case.

58.      In May 2020, Imerys, its parent Imerys S.A., the tort claimants' committee

and the future claimants' representative (collectively, the "Imerys Plan Proponents") filed a plan

of reorganization and a related disclosure statement. The Plan Proponents subsequently filed

numerous amendments to the plan and disclosure statement.  A hearing on the Plan Proponent's

disclosure statement was held in January 2021, and the court entered an order approving the

disclosure statement, permitting Imerys to proceed with soliciting votes on the plan.

59.     In March 2021, Old JJCI and J&J voted to reject the plan and opted out of

the consensual releases in the plan.  In April 2021, the Plan Proponents announced that the plan

had received the requisite number of accepting votes to confirm the plan.  Old JJCI and J&J

challenged certain portions of the vote based on improprieties that had been discovered and

sought to disqualify those votes.  In October 2021, the Imerys bankruptcy court issued a ruling

deeming thousands of votes as withdrawn.  In October 2021, Imerys cancelled the confirmation

hearing on the plan. The Imerys Bankruptcy remains pending.

60.     Cyprus Mines Corporation and its parent company (together, "Cyprus"),

which had owned certain Imerys talc mines, filed in the Imerys Bankruptcy an adversary

proceeding against Old JJCI, J&J, Imerys Talc America, Inc. and Imerys Talc Vermont, Inc.

seeking a declaration of indemnity rights under certain contractual agreements.  Old JJCI and

J&J denied that any indemnification was owed, and filed a motion to dismiss the adversary

complaint.  In February 2021, Cyprus Mines Corporation filed its own voluntary petition for

relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the

District of Delaware and filed a disclosure statement and plan of reorganization.  The Cyprus

plan contemplates a settlement with Imerys and talc claimants where Cyprus would make a

monetary contribution to a trust established under the Imerys plan in exchange for an injunction

against talc claims asserted against it and certain protected parties.  Cyprus has not yet sought

approval of its disclosure statement and plan.  In October 2021, the Debtor filed a notice of

bankruptcy filing and stay of proceedings clarifying that the automatic stay arising upon the

filing of the 2021 Chapter 11 Case applies to the Cyprus adversary proceeding.  The Cyprus

chapter 11 case remains pending and no further activity has taken place in the Cyprus adversary

proceeding since the filing of the 2021 Chapter 11 Case.

**E.**     **The 2021 Chapter 11 Case**

61.     The Debtor commenced the 2021 Chapter 11 Case on October 14, 2021 by

filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States

Bankruptcy Court for the Western District of North Carolina (the "NC Bankruptcy Court").  The

Debtor also commenced an adversary proceeding against talc claimants seeking (a) a declaration

that the automatic stay applied to and (b) a preliminary injunction enjoining, claims against the

Debtor's affiliates, including J&J and New JJCI, as well as the Debtor's insurers and third-party

retailers and other indemnified parties, a group referred to as the "Protected Parties."  After

discovery and a two-day evidentiary hearing, on November 15, 2021, the NC Bankruptcy Court

entered an order determining that the automatic stay applied to, and also preliminarily enjoining,

the commencement or continuation of talc claims against the Protected Parties for 60 days

(i.e., until January 14, 2022), subject to modification or extension by this Court.

62.     On November 16, 2021, the NC Bankruptcy Court entered an order

transferring the 2021 Chapter 11 Case to the District of New Jersey, which referred the case to

this Court.

63.     After transfer, the official committee of talc claimants (the "TCC") and

two plaintiff law firms [No. 21-30589, Dkts. 632, 766, 1003] moved to dismiss the 2021

Chapter 11 Case as a bad-faith filing.  On February 25, 2022, following months of discovery and

a five-day trial to address the motions to dismiss and the Debtor's adversary proceeding to enjoin

the talc claims, this Court issued an opinion denying the motions to dismiss [No. 21-30589,

Dkt. 1572] (the "Dismissal Opinion")[11] and a separate opinion granting the stay and injunctive

relief requested by the Debtor (the "PI Opinion") [Adv. Pro. No. 21-3032, Adv. Dkt. 184].[12]

   64. Following the completion of the dismissal and stay litigation in this Court,

the Court entered orders establishing a process to mediate the terms of a plan of reorganization.[13]

Pursuant to the Mediation Order, the Debtor and J&J engaged in a series of negotiations with the

Debtor's key constituencies, including the TCC, the Future Claimants' Representative

(the "FCR"), state attorneys general and the Debtor's insurers.  In support of those efforts, the

Debtor obtained Court approval to enter into an expense reimbursement agreement with an ad

hoc committee of state attorneys general to facilitate their participation in the mediation.  Despite

the efforts of the mediators and the various constituents, at the time of the Third Circuit's ruling,

no agreement had yet been reached on the terms of a plan to consensually resolve the 2021

Chapter 11 Case.

   65. During this same time period and primarily for the purpose of facilitating

the parties' mediation efforts, the Debtor proposed a process to estimate the aggregate value of

the talc claims asserted against it.  The Court later authorized an estimation, ruling that "the need

for transparency and to preserve the integrity of the bankruptcy process and the system requires a

---

[11] On March 2, 2022, the Court entered an order denying the motions to dismiss [No. 21-30589, Dkt. 1603] (the "Dismissal Order").

[12] On March 4, 2022, the Court entered an *Order (I) Declaring That Automatic Stay Applies to Certain Actions Against Non-Debtors and (II) Preliminarily Enjoining Certain Actions* [Adv. Pro. No. 21-3032, Adv. Dkt. 187] (the "PI Order").

[13] On March 18, 2022, the Court entered an Order Establishing Mediation Protocol [No. 21-30589, Dkt. 1780] and on May 16, 2022, it entered an Amended Order Establishing Mediation Protocol No. 21-3058, Dkt. 2300] (as amended, the "Mediation Order").  Pursuant to the Mediation Order, the Court appointed the Honorable Joel Schneider and Gary Russo as co-mediators.  On May 27, 2022, the Court entered an order [No. 21-30589, Dkt. 2370] appointing Judge Donald Steckroth as a third mediator.

reasonable effort to estimate the debtor's aggregate liability for both present and future claims

for both ovarian and meso diseases." <u>See</u> July 28, 2022 Hr'g Tr., 4:13-17.

      66.     The Court also indicated that it would appoint an expert (the "<u>Court</u>

<u>Expert</u>") under Rule 706 of the Federal Rules of Evidence to prepare and file a report containing

his or her opinions on the estimation of the current and future talc claims. <u>See</u> <u>id.</u> at 7:6-10. On

August 15, 2022, the Court entered an order appointing Kenneth R. Feinberg, Esq. as the Court

Expert [No. 21-30589, Dkt. 2881].

      67.     Following his appointment, the Court Expert gathered information from

claimants, the Debtor and J&J, engaged in discussions with the TCC, the FCR and the Debtor

and J&J, and retained counsel and an economic consulting firm. At the time of the Third Circuit

decision, no report had been filed by the Court Expert.

      68.     The TCC and two plaintiff law firms, on behalf of talc claimants they

represented, filed notices of appeal from the Dismissal Opinion, the Dismissal Order, the

PI Opinion and the PI Order. They also filed motions requesting that this Court certify its orders

for direct appeal to the Third Circuit. On April 4, 2022, this Court granted the motions for direct

appeal [No. 21-30589, Dkt. 1955; Adv. Pro. No. 21-3032, Dkt. 231]. Thereafter, the Third

Circuit accepted the direct appeal, and granted the appellants' motion to consolidate their appeals

and to expedite the case. The parties briefed the issues and argued the matters before the Third

Circuit on September 19, 2022.

     **F.**     **<u>Third Circuit Panel Opinion Dismissing the 2021 Chapter 11 Case</u>**

      69.     On January 30, 2023, a panel of the Third Circuit issued an opinion

directing this Court to dismiss the 2021 Chapter 11 Case on the basis that it was not filed in good

faith. <u>See</u> <u>In re LTL Mgmt., LLC</u>, 58 F.4th 738 (3d Cir. 2023) <u>as</u> <u>amended</u> <u>by</u> 2023 WL

2726441 (3d Cir. Mar. 31, 2023) (the "<u>Third Circuit Panel Opinion</u>"). Although the Third

Circuit panel recognized that the Debtor "inherited massive liabilities" and faced "thousands" of future claims, it concluded that the Debtor was not in financial distress before the filing.  Third Cir. Panel Op., 762-63.

70.     On February 13, 2023, the Debtor filed a petition for rehearing and rehearing en banc with the Third Circuit.  See In re LTL Mgmt. LLC, No. 22-2003 (3d Cir. Feb. 13, 2023), Dkt. 153.  On March 22, 2023, the Third Circuit entered an order denying the Debtor's petition for rehearing.  That same day, the Debtor filed a motion seeking a stay of the Third Circuit's mandate pending appeal to the United States Supreme Court.  The Third Circuit entered an order denying the stay motion on March 31, 2023, and, on the dame day, issued its mandate directing this Court to dismiss the 2021 Chapter 11 Case.  This Court subsequently entered an order dismissing the 2021 Chapter 11 Case on April 4, 2023.  See No. 21-30589, Dkt. 3938.

**G.      Plan Support Agreements**

71.     Throughout the 2021 Chapter 11 Case, the Debtor participated in court ordered mediation with the Debtor's key constituencies to negotiate a potential consensual resolution of the case.  Despite a multitude of discussions with various parties and the efforts of the mediators, no agreement was reached prior to the Third Circuit's decision to dismiss the 2021 Chapter 11 Case.

72.     Following that ruling, however, and with the assistance of the mediators and the encouragement of this Court, negotiations continued between the Debtor and J&J, and various plaintiff law firms.  Those negotiations ultimately culminated in an agreement with thousands of claimants on a broad outline of terms for a plan of reorganization, including financial terms, that, if confirmed and consummated, would fully resolve all the Debtor's liability for talc-related claims.  That agreement has been memorialized in a series of plan

-24-

support agreements (collectively, the "Plan Support Agreements") that have been executed and

delivered by counsel on behalf of over 60,000 claimants and signed by the Debtor, Holdco and

J&J.[14]

73.     The Plan Support Agreements provide, among other things, that the

Debtor, J&J, Holdco and the claimants will work together to finalize, file and seek confirmation

of a plan of reorganization that provides for the establishment of a trust funded in the amount of

$8.9 billion on a net present value basis.  The Plan Support Agreements further provide that a

plan containing the terms to which the parties have agreed must be filed by May 14, 2023, or as

soon thereafter as is feasible.

74.     While there are additional issues that the parties will need to address, the

Plan Support Agreements represent significant progress towards a consensual resolution of the

Debtor's current and future talc claims.  The Debtor believes the terms of the plan contemplated

by the Plan Support Agreements are equitable and in the best interests of all parties, including

current and future talc claimants.  Indeed, I understand that the proposed settlement amount of

$8.9 billion by the Debtor and J&J would be the largest settlement amount in any asbestos

bankruptcy case and one of the largest settlements of personal injury claims in history.

**H.     The Decision to File This Case**

75.     The filing of this second chapter 11 case has the support of thousands of

claimants.  That support is evidenced by their entry into the Plan Support Agreements.

76.     This filing also has the continuing support of Holdco and J&J, who have

agreed to enter into new financing arrangements with the Debtor that facilitate the confirmation

---

[14]     A copy of a form Plan Support Agreement (without exhibits) is attached hereto as Annex C.

and consummation of a plan of reorganization containing the terms described in the Plan Support
Agreements.

77.     In view of the substantial support of talc claimants, Holdco and J&J for
both the filing of this case and the material terms of a plan, and taking into account the excessive
cost, burden, uncertainty and anticipated decades-long duration of the cosmetic talc litigation, the
Debtor determined that the filing of a second chapter 11 case in this Court was prudent,
necessary and in the best interests of all constituents.  The Debtor continues to believe, as do
Holdco and J&J, that chapter 11 proceedings are the only method through which the Debtor and
talc claimants can fully, equitably and permanently resolve all current and future talc-related
claims.

### *Termination of 2021 Funding Agreement and Entry Into New Agreements*

78.     The Third Circuit found that the Debtor was not in financial distress as a
result of its rights under the 2021 Funding Agreement.  That determination defeated the
fundamental purpose of that agreement, which purpose was to facilitate the Debtor's goal of
resolving all current and future talc claims pursuant to section 524(g) of the Bankruptcy Code.
The Third Circuit determined it had the exact opposite effect; i.e., that it required dismissal of the
2021 Chapter 11 Case.  As a result, the Debtor believes there was a material risk that the 2021
Funding Agreement was no longer enforceable because it had become void or voidable.  To
eliminate that risk and secure funding terms consistent with the terms set forth in the Plan
Support Agreements, the Debtor, J&J and Holdco have entered into new financing arrangements.
These new arrangements, among other things, (a) address the guidance provided by the Third
Circuit in its dismissal opinion, (b) facilitate confirmation and consummation of a plan of
reorganization containing the terms supported by thousands of claimants whose counsel have

executed and delivered the Plan Support Agreements and (c) do not adversely affect the interests of talc claimants.

79.     The Debtor, J&J and Holdco effectuated these new financing arrangements by entering into three new agreements.  The Debtor, J&J and Holdco entered into a termination and substitution agreement (the "T&S Agreement") by which the 2021 Funding Agreement and a related intercompany loan were terminated and the parties, in substitution therefor, agreed to enter into two new agreements.[15]  Simultaneously with their entry into the T&S Agreement, the Debtor, J&J and Holdco then entered into these two new agreements: Holdco and the Debtor entered into a new funding agreement (the "2023 Funding Agreement") and the Debtor, Holdco and J&J entered into a separate support agreement (the "J&J Support Agreement").[16]

80.     The 2023 Funding Agreement is similar to the 2021 Funding Agreement. It imposes no repayment obligation on the Debtor and is not a loan.  It obligates Holdco to provide funding to the Debtor to pay for costs and expenses of the Debtor incurred in the normal course of its business (a) at any time when there is no bankruptcy case and (b) during the pendency of any chapter 11 case filed by the Debtor, including the costs of administering the chapter 11 case, in both situations to the extent that any cash distributions received by the Debtor from Royalty A&M are insufficient to pay those costs and expenses.  In addition, the 2023 Funding Agreement requires Holdco to fund amounts necessary (a) to satisfy the Debtor's talc-related liabilities at any time when there is no bankruptcy case and (b) in the event of a

---

[15]     A copy of the T&S Agreement is attached hereto as Annex D.

[16]     A copy of the 2023 Funding Agreement (without its Schedule 2 that includes confidential bank account information) is attached as Annex E and a copy of the J&J Support Agreement is attached hereto as Annex F. The summaries of the terms of the T&S Agreement, the 2023 Funding Agreement and the J&J Support Agreement in this Declaration are provided for the convenience of the Court and parties in interest and are qualified in all respects by the more detailed terms contained in those agreements.

chapter 11 filing by the Debtor, to provide the funding for a trust created pursuant to a plan of

reorganization for the Debtor that contains the terms agreed to in the Plan Support Agreement, as

such terms may be amended or supplemented with the consent of the parties, in both situations to

the extent that any cash distributions received by the Debtor from Royalty A&M are insufficient

to pay such costs and expenses and further, in the case of the funding of a trust, the Debtor's

other assets are insufficient to provide that funding.

81.     The J&J Support Agreement is subject to the approval of the Court and is

operative only in the chapter 11 case.  It obligates J&J to provide the trust funding Holdco is

required to provide under the 2023 Funding Agreement but only if Holdco fails to provide the

funding.  In return, Holdco is obligated to reimburse J&J for any amounts it pays to the trust on

Holdco's behalf, and any amounts that are not reimbursed by Holdco will be deemed to be

financed with a loan from J&J to Holdco.  The Debtor is obligated to use commercially

reasonable efforts to obtain final Court approval of the J&J Support Agreement and to cause a

plan of reorganization containing the terms reflected in the Plan Support Agreements to become

effective, in both cases as soon as reasonably practicable.  The Debtor has the right to enforce

J&J's obligation under the J&J Support Agreement.

82.     The Debtor believes that these new financing arrangements resolve the

concerns that led the Third Circuit to conclude that the 2021 Chapter 11 Case should be

dismissed.  J&J's support is only available in bankruptcy and only if approved by this Court.

Holdco is the sole obligor under the 2023 Funding Agreement.  As I noted above, Holdco

transferred its consumer health business, which represented a substantial portion of its assets, in

early January 2023.  This Court previously found that Old JJCI was in financial distress, and that

was at a time when it was operating its consumer health business.  The performance of J&J's

Consumer Health division, of which Old JJCI was a primary part, had swung from a profit to a
loss due to the costs of the talc litigation.

83.     Since then, Holdco has transferred its consumer health business. As a
result, not only was J&J's balance sheet not available to the Debtor prior to this filing, but
Holdco's assets, which were prior to this filing (and are) available through the 2023 Funding
Agreement, no longer include the consumer health business. The Debtor believes that its pre-
filing financial condition is sufficiently distressed to satisfy the standard established by the Third
Circuit.

84.     Nonetheless, the Debtor's new financing arrangements do not harm talc
claimants for at least two reasons. First, the 2023 Funding Agreement and the J&J Support
Agreement (subject to Court approval) are available in this case to ensure that the Debtor has the
capability to fund a trust consistent with the terms of the Plan Support Agreements. Second, the
2023 Funding Agreement is also available to fund the Debtor's talc liabilities and related costs
outside bankruptcy. The Debtor has the financial support it needs to implement the plan outlined
in the Plan Support Agreements.

85.     Bankruptcy is the only forum where the Debtor and the claimants can
fully, equitably and permanently resolve all talc-related claims. This second chapter 11 filing
and the proposed plan are in the best interests of all parties, including the Debtor and all current
and future talc claimants.

### *The Debtor's Objectives for this Case*

86.     The Debtor's goal in this chapter 11 case is to finalize, obtain
confirmation of and ultimately consummate a plan of reorganization containing the terms agreed
to in the Plan Support Agreements. This plan would, among other things, (a) establish and fund
a trust with $8.9 billion on a net present value basis to resolve and pay all current and future talc-

related claims, including all ovarian cancer claims and all mesothelioma claims, and (b) provide

for the issuance of an injunction that will permanently protect the Debtor, its affiliates and

certain other parties from further talc-related claims arising from products manufactured and/or

sold by Old JJCI, or for which Old JJCI may otherwise have had legal responsibility, pursuant to

sections 524(g) and/or 105(a) of the Bankruptcy Code.

87.     The Debtor is prepared to immediately engage in good faith negotiations

to finalize the terms of a plan of reorganization consistent with the terms set forth in the Plan

Support Agreements and file a plan by May 14, 2023, as required by the Plan Support

Agreements.  The Debtor will also continue to seek the support of other claimants and

constituents, including the FCR, state attorneys general and the Debtor's insurers, in an effort to

achieve a fully consensual plan.  Given the unprecedented monetary contribution the Debtor and

J&J are prepared to make to resolve the Debtor's liability for all talc-related claims, the Debtor is

confident that a consensual resolution of this chapter 11 case is achievable and in the best

interests of all parties.

## III.     FIRST DAY PLEADINGS AND ADVERSARY PROCEEDING

88.     Concurrently with the filing of this chapter 11 case, the Debtor filed First

Day Pleadings requesting various forms of relief.  In addition, the Debtor has filed an adversary

proceeding seeking injunctive and declaratory relief, as well as an ex parte temporary restraining

order (the "Adversary Proceeding").

89.     The Debtor will move for entry of orders scheduling expedited hearings

on the First Day Pleadings and the Adversary Proceeding.[17]  The Debtor requests that the Court

---

[17]     Capitalized terms used below in the descriptions of the First Day Pleadings and the Adversary Proceeding
and not otherwise defined herein have the meanings given to them in the applicable First Day Pleadings
and the Adversary Proceeding filings.

conduct an administrative hearing (the "First Day Hearing") as soon after the commencement of

its chapter 11 case as the Court's schedule will permit, at which the Court will hear and consider

the First Day Pleadings. The Debtor also anticipates that the Court will consider the relief

requested in the Adversary Proceeding at a later time. The First Day Pleadings that the Debtor

anticipates will be heard at the First Day Hearing are described in Sections III.A-III.C. The

Adversary Proceeding is described in Section III.D.

90.     Generally, the purposes of the First Day Pleadings and the Adversary

Proceeding are to: (a) obtain authorization for the continued use of the Debtor's bank account;

(b) establish procedures for the smooth and efficient administration of this chapter 11 case; and

(c) protect the Debtor's ability to negotiate and ultimately effectuate a section 524(g)

reorganization under chapter 11. I have reviewed each of the First Day Pleadings and the

Adversary Proceeding filings, including the exhibits thereto, and I believe that the relief sought

in each of the First Day Pleadings and the Adversary Proceeding is tailored to meet the goals

described above and, ultimately, will be critical to the Debtor's ability to achieve a successful

reorganization.

### A.     The Case Administration Motions

*Appointment of Claims and Noticing Agent*

91.     The Debtor will seek the entry of an order appointing Epiq Corporate

Restructuring, LLC ("Epiq") as claims and noticing agent in this chapter 11 case. I understand

that Epiq may, among other things: (a) prepare and serve all notices required in the Debtor's

chapter 11 case, including the notice of the commencement of this case and the meeting of

creditors pursuant to section 341 of the Bankruptcy Code; and (b) maintain the official claims

register. Epiq previously served as the Debtor's claims, noticing and ballot agent in the 2021

Chapter 11 Case. The Debtor submits, based on, among other things, Epiq's prior work in the

2021 Chapter 11 Case, that Epiq's rates are competitive and reasonable given Epiq's quality of

services and knowledge regarding the Debtor's creditors and the Court's processes.

### *List of the Top Law Firms With Talc Claims Against the Debtor in Lieu of the List of the 20 Largest Unsecured Creditors and Notice Procedures for Talc Claimants*

92.     I understand that the Top 20 List primarily would be used by the United

States Trustee to understand the types and amounts of unsecured claims against the debtor and

thus evaluate prospective candidates to serve on an official committee in the debtor's case.  I

further understand that an official committee of talc claimants is expected to be appointed.

Because committees in mass tort chapter 11 cases typically consists of plaintiff law firms acting

on behalf of individual talc claimants, the Debtor will seek authority to file and provide

the United States Trustee with a list of the 18 law firms with the most significant representations

of parties with talc claims against the Debtor based on the volume of claims or other related

factors (a "Top Talc Counsel List"), in lieu of listing the individual talc claimants with the

largest unsecured claims against the Debtor on a "Top 20" list of unsecured creditors.

The Debtor believes that providing the United States Trustee with a Top Talc Counsel List

would better facilitate the United States Trustee's evaluation of members of an official

committee of talc claimants.

93.     The Debtor also will seek Court approval for certain notice procedures

relating to individuals (collectively, the "Talc Claimants") who are claimants in talc-related

personal injury lawsuits or other proceedings involving the Debtor, including to (a) serve all

notices, mailings, filed documents and other communications relating to its chapter 11 case,

including, without limitation, pleadings, in any contested matter or otherwise, seeking relief that

could directly impact Talc Claimants' rights and obligations in this chapter 11 case, on Talc

Claimants in care of their counsel (collectively, the "Talc Firms") at such counsel's address, as

further described in the Motion; and (b) list the names, addresses and other contact information, as applicable, of the Talc Firms in any creditor or service lists, including the creditor matrix provided to the Court or filed in this case, in lieu of listing the contact information of individual Talc Claimants. To date, the Debtor has communicated solely with the Talc Firms regarding the talc-related claims against the Debtor. The Debtor in many cases cannot be sure that it has the current addresses (or any addresses) for the Talc Claimants. Further, consistent with the rules of professional conduct, communicating with an adversary in litigation generally is conducted through counsel. The Debtor therefore believes that providing notice to Talc Claimants through the Talc Firms, in accordance with past practice, is much more reliable and consistent with the rules of professional conduct.

94.     The notice procedures proposed in the Motion provide for an effective and appropriate noticing process for the Talc Claimants. Further, implementing the proposed Notice Procedures would alleviate the administrative burden and expense of gathering current contact information for each of the Talc Claimants, which, in many cases, is not readily available or is difficult to verify. The Debtor has access to the names and addresses of the counsel for the Talc Claimants (including counsel of record in pending lawsuits), but the names and addresses of a significant number of individual Talc Claimants themselves are not readily available. It would be extremely burdensome, costly and time-consuming for the Debtor to attempt to obtain this information. In addition, any contact information for the individual Talc Claimants the Debtor has or is able to obtain may be outdated and unreliable. Consequently, providing notice in this chapter 11 case in accordance with the Notice Procedures will be more efficient and reliable than providing notice to the individual Talc Claimants directly.

*Extension of Time to File Schedules*

95.     The Debtor believes it will need a brief period of additional time, beyond

the time period allotted under the Bankruptcy Code, to assemble all of the information necessary

to complete and file the required schedules of assets and liabilities and statement of financial

affairs (collectively, the "Schedules").  The Debtor will need the additional time because of

(a) the size and complexity of this chapter 11 case and (b) the volume of materials that must be

compiled and reviewed to complete the Schedules.  Although the Debtor previously submitted

Schedules in the 2021 Chapter 11 Case, the Debtor must update those schedules to reflect the

most current information given the passage of time and new developments since October

14, 2021.  Like the 2021 Chapter 11 Case, this chapter 11 case will involve tens of thousands of

claimants and other parties in interest, and it is my understanding that the Debtor would need to

collect, review and assemble a substantial amount of information to complete the Schedules.

96.     Given (a) the large number of claimants and (b) the critical matters that

the Debtor and its professionals were required to address prior to the commencement of this

chapter 11 case, the Debtor was not in a position to complete the Schedules by the Petition Date,

even with the assistance of professionals.  The Debtor further estimates that, with the many

critical matters to be addressed in the early days of this case, the Debtor will require more than

14 days after the Petition Date to complete the Schedules.

97.     The additional time requested is important to help ensure that

the Schedules are as accurate as possible.  Given the volume of information that is provided in

the Schedules, and the fact that the information must be accurate as of the Petition Date,

additional time to complete the Schedules will help ensure that the relevant information is fully

collected and evaluated and can be incorporated into the relevant filings.  Rushing to complete

the Schedules soon after the Petition Date, on the other hand, could compromise their

-34-

completeness. Accordingly, the Debtor will seek to extend the deadline by which it must file its

Schedules by an additional 30 days, through and including May 18, 2023, without prejudice to

the Debtor's right to seek a further extension for cause.

**B.**     <u>Request to Continue Using Bank Account and Related Relief</u>

98.     The Debtor will seek approval of the continued use of its prepetition bank

account, as well as authority to open and close bank accounts during the chapter 11 case,

as necessary or appropriate. In the ordinary course of business, the Debtor maintains a bank

account at Bank of America in Charlotte, North Carolina (the "<u>Bank Account</u>"). All payments

and other funds that are received by the Debtor are deposited into that account, including cash

payments from Holdco under the 2023 Funding Agreement. The Bank Account also serves as a

disbursement account and is used to pay all of the Debtor's costs and expenses, including

professional fees.

99.     In addition, the Debtor will request authority for Bank of America and any

other bank to charge, and the Debtor to pay or honor, both prepetition and postpetition service

and other fees, costs, charges and expenses to which a bank may be entitled under the terms of

and in accordance with its contractual arrangements with the Debtor. Further, the Debtor will

request that the Court authorize Bank of America and any other bank to charge back returned

items to the Bank Account in the ordinary course of business. The Debtor requires this relief to

minimize disruption to its Bank Account and to assist in accomplishing a smooth transition to,

and operation in, chapter 11.

100.     The Bank Account is insured by the United States through the Federal

Deposit Insurance Corporation (the "<u>FDIC</u>") and is maintained at Bank of America, a large,

well-known and well-capitalized institution, which is also a depository approved by the United

States Trustee.

101.    To protect against the possible inadvertent payment of prepetition claims, the Debtor will advise Bank of America not to honor checks issued prior to the Petition Date, except as otherwise expressly permitted by an order of the Court and directed by the Debtor. The Debtor has the capacity to draw the necessary distinctions between prepetition and postpetition obligations and payments without closing the Bank Account and opening a new one.

### C.    Request to be Appointed Foreign Representative

102.    The Debtor will seek entry of an order authorizing it to act as the foreign representative on behalf of the Debtor's estate in any judicial or other proceedings in Canada to provide an effective mechanism to protect and maximize the value of the Debtor's assets and estate.

103.    The Debtor, as the proposed Foreign Representative (as defined below), will shortly seek ancillary relief in Canada on behalf of behalf of the Debtor's estate pursuant to the Companies' Creditors Arrangement Act (Canada), R.S.C. 1985, c. C-36 as amended (the "CCAA") in the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court").  In the ancillary proceeding (the "Canadian Proceeding"), the Debtor (as Foreign Representative) would request that the Canadian Court recognize the chapter 11 case as a "foreign main proceeding" under the applicable provisions of the CCAA in order to, among other things, ensure that the protections of the automatic stay are enforced with respect to the Canadian Actions and so that such ancillary relief that the Canadian Court may otherwise consider appropriate can be obtained.

104.    To commence the Canadian Proceeding, the Debtor or another third party needs authority to act as the "foreign representative" on behalf of the Debtor's estate (the "Foreign Representative").  I understand that for the Debtor to be recognized as the Foreign Representative of the Debtor's estate in the Canadian Proceeding, and thereby apply to have the

chapter 11 case recognized by the Canadian Court, this Court must enter the Order authorizing

the Debtor to act as the Foreign Representative in the Canadian Proceeding.  I understand that if

the Order is granted, the Debtor will be able to file the Order with the Canadian Court as the

instrument authorizing the Debtor to act as the Foreign Representative pursuant to section 46 of

the CCAA.

### D.  **Adversary Proceedings**

***Motion for an Order (I) Declaring That the Automatic Stay Applies or Extends to
Certain Actions Against Non-Debtors, (II) Preliminarily Enjoining Such Actions and
(III) Granting a Temporary Restraining Order Ex Parte Pending a Hearing on a
Preliminary Injunction***

105.    Contemporaneously herewith, the Debtor has filed a complaint and related

motion, which seek a declaration that section 362(a) of the Bankruptcy Code prohibits, or is

extended to prohibit, the commencement or continuation of talc-related actions against the

Protected Parties[18] while the chapter 11 case remains pending.  The Debtor also requests a

preliminary injunction under section 105(a) of the Bankruptcy Code.  The injunction will enjoin

the prosecution of actions outside of the chapter 11 case on account of the same talc claims that

exist against the Debtor in the chapter 11 case.  Finally, the Debtor also seeks a temporary

restraining order, entered ex parte, to immediately effectuate the requested declaratory or

injunctive relief pending a final hearing on the motion.  I have read the complaint, and I declare

under penalty of perjury that the factual allegations therein are true and correct.

106.    The defendants sought to be enjoined in the Adversary Proceeding

(collectively, the "Defendants") are all named plaintiffs in talc-related lawsuits against the

---

[18]    As defined in the Debtor's motion, the Protected Parties are:  (a) Old JJCI; (b) certain of the Debtor's non-
debtor affiliates set forth on Appendix B to the complaint, including J&J and Holdco; and (c) third party
retailers who sold Old JJCI's talc-containing products and other third parties whom the Debtor has
indemnified contractually, as listed on Appendix B to the complaint.

Debtor or for which the Debtor is responsible or alleged to be responsible, and John and Jane

Does 1 to 1000. The Defendants, who are listed on Appendix A to the complaint, would be

enjoined from prosecuting actions outside of the chapter 11 case seeking to hold a Protected

Party liable on account of any "Debtor Talc Claim" while the chapter 11 case remains pending.

"<u>Debtor Talc Claims</u>" means, collectively, any talc-related claim against the Debtor, including

all claims relating in any way to talc or talc-containing materials that formerly were asserted

against (or that could have been asserted against) Old JJCI[19] on any theory of liability (whether

direct, derivative, joint and several, successor liability, vicarious liability, fraudulent or voidable

transfer or conveyance, alter ego or otherwise).

107.     As I discussed above, the Debtor commenced the chapter 11 case to

equitably and permanently resolve all current and future talc-related claims against it

through the consummation of a plan of reorganization containing the terms reflected in the

Plan Support Agreements. The relief sought by this Adversary Proceeding is critical to the

Debtor's ability to achieve that purpose. Without the requested declaration or injunction,

claimants would be permitted to commence or restart litigation in other forums asserting the

exact same talc claims the Debtor is seeking to resolve in this chapter 11 case. As further

explained in the motion, permitting the Defendants to litigate the Debtor Talc Claims against the

Protected Parties elsewhere while the Debtor simultaneously works to reorganize by resolving

the same claims in its chapter 11 case pursuant to the Bankruptcy Code would (a) defeat the

purpose of the Debtor's bankruptcy case, (b) result in irreparable harm to the Debtor's estate,

(c) undermine and circumvent the purposes and spirit of the automatic stay and (d) divert the

---

[19]     For the avoidance of doubt, Debtor Talc Claims include all talc personal injury claims and other talc-related claims allocated to the Debtor from Old JJCI in the documents implementing the 2021 Corporate Restructuring. The Debtor Talc Claims do not include talc-related claims for which the exclusive remedy is provided under workers' compensation statutes and similar laws.

Debtor from its reorganization efforts. Such litigation would undermine a central aim of the plan terms that have been agreed to by thousands of claimants, which is to treat all similarly situated claimants in an equivalent manner.

108. The commencement or continued prosecution of the Debtor Talc Claims against the Protected Parties risks significant, immediate and irreversible harm to the Debtor and its estate. It would create chaos across mass-tort proceedings nationwide, as litigation over tens of thousands of talc claims resumes, all of which may come grinding to a halt if this Court grants the Debtor's motion. Approximately 1,000 individually set ovarian cancer claims (not subject to docket-wide coordination procedures) are pending in various state courts outside of the federal MDL and consolidated state proceedings in California and New Jersey. An additional 470 mesothelioma claims are pending in state courts across the country—in 44 courts, across 25 different states. None of those cases is coordinated, and many are filed on specialized, asbestos-specific accelerated dockets. Each is in the process of suddenly springing back into activity and proceeding towards trial absent extension of the stay or issuance of a preliminary injunction. Many of the cases have proceeded in the interim against other defendants and without the Debtor's involvement, but suddenly, the Debtor would be thrown into the mix— potentially significantly impacting the progress, scope and nature of the cases.

109. There are also at least 20 mesothelioma cases now on the eve of trial or that could be set for trial imminently (in the next 60 days), all of which would demand significant investment in expedited, catch-up discovery, expert witness engagement, trial lawyer time, and other resources. And this machinery does not run itself. Addressing these matters will require the time and attention of key Debtor personnel, diverting estate resources away from

reorganization efforts.  These negative effects on the Debtor's estate will only compound as new

Debtor Talc Claims are filed against the Protected Parties.

110.     <u>Hernandez-Valadez v. Johnson & Johnson, et.al</u>, Case No. 22CV012759

(the "<u>Valadez Case</u>"), a mesothelioma case venued in the Superior Court of the State of

California, Alameda County, should be stayed for all the same reasons that every individual,

talcum powder personal injury matter pending across the country should be stayed.  But in light

of recent, unequivocal statements by counsel to Valadez that leave no doubt he intends to put the

2021 Chapter 11 Case—and indeed the bankruptcy system itself—on trial during the Valadez

Case, the risk of permitting the Valadez Case to proceed in the tort system at the very same time

that the Debtor and thousands of claimants work towards a consensual resolution of this

Chapter 11 Case in this Court are acute.

111.     The Debtor is a defendant in the Valadez Case, which was therefore

automatically stayed as to the Debtor by the filing of this chapter 11 case.  But it is critical to the

Debtor's restructuring efforts that the Valadez Case also be stayed as to the Debtor's

co-defendant, J&J.  In the next two weeks, the parties are scheduled to undertake 24 depositions

of fact witnesses, persons most knowledgeable and experts.  These depositions include the

continued deposition of the Debtor's person most knowledgeable on a number of topics, some of

which indicate that counsel to Valadez will press for irrelevant and, in some instances, privileged

information regarding a wide range of topics related to the 2021 Chapter 11 Case and the

involvement of both specific members of the J&J legal department and various executive-level

personnel to address the same.  Beyond these depositions, the parties are embroiled in significant

evidentiary disputes over the possible spoliation of key testing materials by the plaintiff's testing

expert and whether or not to proceed with genetic testing of the plaintiff (as advocated by certain
of his own expert witnesses).

112.    These activities have served as a distraction to some of the very same
counsel and witnesses involved in this chapter 11 case over the past two months and, if allowed
to proceed as to J&J, will continue to do so and drain the Debtor's resources during this
chapter 11 case.  More significantly, findings in the Valadez Case could jeopardize the success
of this chapter 11 case by undermining the terms of the plan set forth in the Plan Support
Agreements, contradicting findings by this Court, and threatening the delicate balance now in
place as both the Debtor and claimants work to resolve all talc claims on an equitable and
permanent basis.  Permitting one talc claimant to proceed to an accelerated trial on the merits of
his talc claim, while thousands of other talc claimants work towards a full, equitable and final
resolution of all talc claims, risks undermining the Debtor's reorganizational efforts.

113.    These concerns are heightened because counsel to Valadez has
unabashedly made clear his intention to put the 2021 Chapter 11 Case on trial during the course
of the trial.  According to a March 6 letter to the Alameda County court,[20] Trailblazer Studios, "a
production company based in Raleigh, NC, which focuses on documentary filmmaking and post-
production services for premium platforms like Netflix, Hulu, National Geographic, Disney +
and ESPN," contacted the trial judge in the Valadez Case seeking permission to film the trial.
Trailblazers, and its counsel in a letter dated March 21,[21] clarified that Trailblazers intends to
produce a for-profit documentary "focused on the ongoing talc bankruptcy saga," and hopes to

---

[20]    A copy of the March 6, 2023 letter from Trailblazers is attached hereto as <u>Annex G</u>.

[21]    A copy of the March 21, 2023 letter from Trailblazers' counsel is attached hereto as <u>Annex H</u>.

include an "unknown" amount of Valadez Case trial footage, to be released at an "unknown" time, to "unknown" media outlets, in that documentary.

114. Given the inevitable distraction of allowing a production company into the courtroom, let alone the well-known and documented prejudicial impact of such activities, defendants promptly opposed Trailblazers' request. In response, counsel to Valadez stated that "Defendants' **bad-faith bankruptcy** and infliction of **further harm** upon mesothelioma victims . . . is a 'matter of public interest'" such that the Court should permit the trial to be recorded by a production company. See Pl.'s Resp. to Defs.' Opp. to Trailblazer Studios' Req. to Record T. Proceedings, at 2-3 (Mar. 23, 2023) (emphasis added).[22] I believe that counsel to Valadez has every intention of turning the Valadez trial into a referendum on the 2021 Chapter 11 Case and the Debtor's reorganization efforts generally. Permitting such a "trial within a trial" to proceed about the propriety of the 2021 Chapter 11 Case, including the rulings by this Court and the Third Circuit, at the exact same time and on a parallel track to the efforts underway in this Court, at the same time that the Debtor pursues confirmation of a plan that contains the terms in the Plan Support Agreements, will harm the Debtor and its estate, including the talc claimants.

115. The Valadez Case highlights the critical need for an immediate, ex parte temporary restraining order to avoid exacerbating the very rush to the courthouse that the motion seeks to prevent.

116. Without immediate injunctive relief, the Debtor will be compelled to pull key estate resources away from its reorganization efforts to focus on the Valadez Case and all other ongoing litigation, hampering the Debtor's reorganization efforts from the outset. Absent immediate and specific relief, I believe developments in the Valadez Case risk undermining

---

[22]     A copy of the plaintiff's response is attached hereto as Annex I.

support for a plan in this Chapter 11 Case.  For example, an extreme verdict (i) could make it more difficult for the Debtor to obtain additional support for the proposed plan, and (ii) would potentially result in substantially different treatment of Valadez's claim than all other talc claims under a plan with the terms contained in the Plan Support Agreements.  I further believe that litigants will immediately take all measures available to them to circumvent the protections of the automatic stay through coordinated efforts in proceedings against the Protected Parties with the goal of defeating the purpose of this chapter 11 case and a potential fair and equitable resolution for the benefit of thousands of talc claimants.  A denial of the Debtor's request for a temporary restraining order pending a final hearing on the Debtor's request for declaratory and/or injunctive relief would thus cause the very harm that the Debtor seeks to prevent by the motion and the complaint.

## CONCLUSION

117.    For all the reasons described herein, in the First Day Pleadings and in the filings in the Adversary Proceeding, I respectfully request that the Court grant the relief requested in each of the First Day Pleadings and enter the temporary restraining order requested in the Adversary Proceeding.

Dated:  April 4, 2023              */s/ John K. Kim*
                                   John K. Kim

NAI-1535638438

-43-