# EXHIBIT D

1          IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF NEW JERSEY
2

                        -   -   -
3

    IN RE: JOHNSON &        :   MDL No.
4   JOHNSON TALCUM POWDER   :   16-2738
    PRODUCTS MARKETING,     :   (MAS)(RES)
5   SALES PRACTICES, AND    :
    PRODUCTS LIABILITY      :
6   LITIGATION              :

7

_____
8
            SUPERIOR COURT OF NEW JERSEY
9          LAW DIVISION, ATLANTIC COUNTY

10                      -   -   -

11  IN RE: TALC-BASED      :   Consolidated
    POWDER PRODUCTS        :   Docket No.
12  LITIGATION             :   ATL-L-2648-15
                           :
13                         :   MCL Case No.
                           :   300
14

15                      -   -   -

            January 10, 2024
16

17                      -   -   -

            Remote Oral Expert
18  deposition of JUDITH KAY WOLF, M.D.,
    conducted at the location of the witness
19  in Austin, Texas, commencing at 10:15
    a.m. Eastern, on the above date, before
20  Kimberly A. Cahill, a Federally Approved
    Registered Merit Reporter, Certified
21  Court Reporter, and Notary Public.

22                      -   -   -

23          GOLKOW TECHNOLOGIES, INC.
        877.370.3377 ph| 917.591.5672
24              deps@golkow.com

Page 2

APPEARANCES:

BEASLEY ALLEN
BY: P. LEIGH O'DELL, ESQUIRE
BY: MARGARET M. THOMPSON, ESQUIRE
218 Commerce Street
Montgomery, Alabama  36104
(334) 269-2343
leigh.odell@beasleyallen.com
margaret.thompson@beasleyallen.com
Representing the Plaintiffs

ASHCRAFT & GEREL
BY: MICHELLE A. PARFITT, ESQUIRE
1825 K Street NW
Suite 700
Washington, D.C.  20006
(202) 335-2600
Representing the Plaintiffs

GOLOMB LEGAL
BY: RICHARD M. GOLOMB, ESQUIRE
1835 Market Street
Suite 2900
Philadelphia, Pennsylvania  19103
(215) 985-9177
Representing the Plaintiffs

SHOOK, HARDY & BACON L.L.P.
BY: MARK C. HEGARTY, ESQUIRE
2555 Grand Boulevard
Kansas City, Missouri  64108
(816) 474-6550
mhegarty@shb.com
Representing the Defendants, Johnson &
Johnson and Johnson & Johnson Consumer,
Inc.

- - -

Page 3

- - -

I N D E X

- - -

Testimony of:  JUDITH KAY WOLF, M.D.

By Mr. Hegarty          25
By Ms. O'Dell          275
By Mr. Hegarty          285

- - -

E X H I B I T S

- - -

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Wolf-1 | Materials Considered List Attached as Exhibit B to the 11/15/23 2nd Amended Export Report (General) of Judith Wolf, M.D. | 71 |
| Wolf-2 | "Folder #2 General Causation Materials: Lynch Systematic Review Tables | 80 |
| Wolf-3 | Thirty-four Pages of Judith Wolf Invoices Starting with January 2017 | 107 |
| Wolf-4 | Three Pages of Judith Wolf Invoices from | 110 |

Page 4

| | | |
|---|---|---|
| | August to December 2023 | |
| Wolf-5 | Curriculum Vitae of Judith K. Wolf, M.D. | 116 |
| Wolf-6 | Notice of Oral Deposition of Judith E. Wolf, M.D. and Duces Tecum in MDL | 119 |
| Wolf-7 | 11/15/23 Second Amended Rule 26 General Expert Report of Judith Wolf, M.D. | 124 |
| Wolf-8 | 11/15/23 Amended Rule 26 Bondurant Case-Specific Expert Report of Judith Wolf, M.D. | 125 |
| Wolf-9 | 11/15/23 Amended Rule 26 Judkins Case-Specific Expert Report of Judith Wolf, M.D. | 127 |
| Wolf-10 | 11/15/23 Amended Rule 26 Gallardo Case-Specific Expert Report of Judith Wolf, M.D. | 128 |
| Wolf-11 | "Effects of Risk Factors for ovarian cancer in women with and without endometriosis Paper by Phung, et al | 142 |
| Wolf-12 | "Genital Powder Use and Risk of | 167 |

Page 5

| | | |
|---|---|---|
| | Epithelial Ovarian Cancer in the Ovarian Cancer in Women of African Ancestry Consortium" Paper by Davis, et al | |
| Wolf-13 | "Association Between the Frequent Use of Perineal Talcum Powder Products and Ovarian Cancer; a Systematic Review and Meta-analysis Paper by Woolen, et al | 192 |
| Wolf-14 | "Asbestos Exposure and Ovarian Cancer A Gynaeocological Occupational Disease: Background, Mandatory Notification, Practical Approach" Paper by Nowak, et al | 206 |
| Wolf-15 | "The effect of talc powders in phagocytes in co-culture with ovarian cancer cells Paper by Mandarino, et al | 215 |
| Wolf-16 | "Transcriptomic and epigenomic effects of insoluble particles on J774 macrophages" Paper by Emi, et al | 221 |
| Wolf-17 | "Talcum powder | 236 |



Page 6

induces malignant transformation in normal human primary ovarian epithelial cells Paper by Harper, et al

Wolf-18    PLOS ONE Reviewer    236
Comments SAED_SEPT222021_SUPPL_000100 through SAED_SEPT222021_SUPPL_000104

Wolf-19    Gynecologic    251
Oncology Reviewer Comments SAED_SEPT222021_SUPPL_000069 and SAED_SEPT222021-SUPPL_000070

Wolf-20    General Report of    266
Dr. Wolf Present with Witness

Wolf-21    Judkins    267
Case-Specific Report of Dr. Wolf Present with Witness

Wolf-22    Gallardo    268
Case-Specific Report of Dr. Wolf Present with Witness

Wolf-23    Bondurant    268
Case-Specific Report of Dr. Wolf Present with Witness

Wolf-24    Dr. Longo's    269

Page 7

Exposure Report Present with Witness

Wolf-25    Dr. Longo's MDL    269
Third Supplemental Report Present with Witness

Wolf-26    Dr. Levy's Report    269
Present with Witness

Wolf-27    Entirety of    270
Literature Dr. Wolf Brought to Deposition

Wolf-28    HHS Public Access    280
"General powder use and risk of epithelial ovarian cancer in the Ovarian Cancer in Women of African Ancestry Consortium" Paper by Davis, et al

Page 8

- - -
DEPOSITION SUPPORT INDEX
- - -

Direction to Witness Not to Answer
Page Line    Page Line    Page Line

Request for Production of Documents
Page Line    Page Line    Page Line
114 6

Stipulations
Page Line    Page Line    Page Line

Question Marked
Page Line    Page Line    Page Line

Page 9

- - -
THE COURT REPORTER:  All parties to this deposition are appearing remotely and have agreed to the witness being sworn in remotely.  Due to the nature of remote reporting, please pause briefly before speaking to ensure all parties are heard completely.

Counsel, please state your appearances for the record.

MS. O'DELL:  Leigh O'Dell from Beasley Allen for the plaintiffs.

MS. THOMPSON:  Margaret Thompson from Beasley Allen.

MS. PARFITT:  Michelle Parfitt, Ashcraft & Gerel, for the plaintiffs, MDL steering committee.

MR. GOLOMB:  Richard Golomb from Golomb Legal for the plaintiffs.

MR. HEGARTY:  Mark Hegarty

Judith Kay Wolf, M.D.

Page 10

1  for the Johnson & Johnson
2  Defendants.
3       MR. GOLOMB:  So this is
4  Richard Golomb from Golomb Legal.
5  I am a member of the plaintiffs'
6  Executive Committee in the
7  multidistrict litigation in front
8  of Judge Shipp in Trenton.  I am
9  also the de facto co-lead with Ted
10 Meadow from Beasley Allen in state
11 court in New Jersey in front of
12 Judge Porto.
13      I've had a number of
14 meet-and-confers with Susan
15 Sharko, who, along with Mark
16 Hegarty, represents Johnson &
17 Johnson.
18      What is relevant today is
19 that we have had a number of
20 conversations, e-mail
21 communications, including a
22 meet-and-confer just two nights
23 ago where we discussed
24 coordination between the

Page 11

1  multidistrict litigation and the
2  multicounty litigation in state
3  court for these expert depositions
4  beginning with Dr. Wolf today.
5       The agreement that we had in
6  principle, which was -- which was
7  agreed by Ms. Sharko, but she did
8  make clear that was subject to the
9  approval of her client and I had
10 expected to hear from her
11 yesterday -- but the agreement was
12 that to the extent that the
13 general causation expert reports
14 of these experts are, if not -- if
15 not exactly the same, close to
16 being the same, that there would
17 be coordination between the
18 multicounty litigation and the
19 multidistrict litigation for the
20 purposes of these depositions.
21      The further agreement was,
22 to the extent that an expert
23 provided something in the MCL
24 addition -- in addition to the

Page 12

1  MDL, whether that was on general
2  causation or specific causation, a
3  deposition in the MCL could be
4  taken for that limited purpose.
5       So I'm attending this
6  deposition with the understanding
7  that there was coordination, and
8  for the first time this morning
9  when I raised the issue off the
10 record, Mr. Hegarty has told me
11 that he -- and he can speak for
12 himself -- that he's communicated
13 with Ms. Sharko and that Ms.
14 Sharko says there is no such
15 agreement.
16      At 10:04 this morning, I
17 sent Ms. Sharko an e-mail and I
18 just wrote:  I'm on the Wolf
19 deposition.  Is it your position
20 that we do not have a coordination
21 agreement between NJSC, New Jersey
22 State Court, and the MDL?  She
23 responded at 10:09:  Correct, we
24 do not yet have -- do not yet have

Page 13

1  an agreement.  And then I
2  responded to that with an e-mail
3  saying:  Is that because you don't
4  have approval of your client yet
5  or is this coordination agreement
6  now off the table?  And I haven't
7  heard back from her.
8       So that's -- that's my
9  statement for the record.  I don't
10 know whether the position of Ms.
11 Sharko at this point is, despite
12 these communications that we had,
13 that she's no longer going to
14 agree or that she just technically
15 hasn't gotten the approval of her
16 client yet.
17      And this is the first -- as
18 far as I know, the first
19 deposition that would be subject
20 to this coordination agreement.
21      MR. HEGARTY:  Responding for
22 Johnson & Johnson at this
23 deposition, what Mr. Golomb said
24 with regard to Ms. Sharko's most

Judith Kay Wolf, M.D.

Page 14

recent response is what I understand as well, that there is as of yet no agreement between the plaintiffs and the Johnson & Johnson Defendants with regard to coordination of general experts between the MDL and the, as Mr. Golomb said, multicounty New Jersey litigation.

My understanding is that that agreement is still under discussion, but is not a -- but is not, as Mr. Golomb just referenced, in place yet.

So from our standpoint, that is, the Johnson & Johnson Defendants' standpoint, this deposition of Dr. Wolf is limited just to the MDL for which it was originally noticed and originally agreed upon as far as this date.

MR. GOLOMB: I have no response.

I'll just note -- I'll just

Page 15

note for the record that I did provide the MCL caption to the court reporter and at least for now -- and hopefully going forward, we'll reach an agreement, but at least for now, the MCL caption will be part of the deposition transcript.

MR. HEGARTY: And at least for now, to use Mr. Golomb's phrase, we would object, that is, the Johnson & Johnson Defendants object, to inclusion of that additional caption.

As Mr. Golomb said, perhaps if there is an agreement, it will refer back to today's deposition; but at least as of today, as of now, we object to, again, this deposition being in the New Jersey litigation and having the New Jersey caption.

I believe we also have an issue that we want to put on the

Page 16

record with regard to the materials considered list or as -- and I guess it is called for Dr. Wolf "Scientific Literature and Other Sources," list provided previously entitled -- I guess it was previously entitled "Scientific Literature and Other Sources." It's now entitled "Materials Considered" -- that was provided on November 15th, 2023 and on which I'm prepared to take this deposition about.

I think Ms. O'Dell has -- at least Ms. O'Dell's indicated off the record that there are now additional materials to add to that list and for which we have a dispute about with regard to their applicability and as it relates to this deposition.

So, Leigh, do you want to state your position and I'll state a response, provide a response?

Page 17

MS. O'DELL: Yes. I will state briefly that plaintiffs provided materials for Dr. Wolf in advance. There were materials that were not available at the time her report was served in November of 2023, namely Dr. Longo's report on the exposure analysis of plaintiffs, bellwether plaintiffs, in the MDL, as well as his November 17th MDL third supplemental report, and also Dr. Levy's report.

And I've made counsel for Johnson & Johnson aware that Dr. Wolf has reviewed those materials, she's prepared to answer questions on those today. We alerted them in advance of the deposition.

Those are the only additional materials and they've been in the possession of defendants for more than -- nearly 60 days.

Judith Kay Wolf, M.D.

Page 18

So our position is we go forward today, that the deposition will be completed, will not be held open, which is the request that counsel for Johnson & Johnson has made.

So that's the position I would take this morning. We're happy to meet and confer about that further, but considering the hour, you know, I would just say let's leave these disputes to be resolved later and continue with the deposition.

MR. HEGARTY: For the Johnson & Johnson Defendants, I note that the Special Master opinion and order number 6 from July 30th, 2021 noted or required that -- or ordered that plaintiffs and defendants shall produce at least three days before their experts' depositions all documents considered by the experts in

Page 19

forming their opinions, as well as all documents requested in the applicable notices of deposition.

The three reports that Ms. O'Dell referenced, Dr. Longo's exposure report of November 17, 2023, Dr. Longo's third supplemental report of November 17, 2023, and Dr. Levy's report of November 2023, were not disclosed to the Johnson & Johnson Defendants or their counsel three days in advance of the deposition and, in fact, the materials that we were provided included some reports and other materials, but none of the three that we are -- that I just referenced.

We were first provided notice of which of those reports that Dr. Wolf had reviewed this morning. We did get an e-mail yesterday of a reference to Dr. Levy having reviewed Dr. Longo's

Page 20

reports, without a reference to what specific reports that was in relation to. There was a -- also a comment or statement about providing an updated or amended materials considered list yesterday that was not provided. It's still not been provided.

The materials that we're talking about do pertain to three of the plaintiffs for which Dr. Wolf has case-specific opinions about. Neither I nor any other counsel to my knowledge for Johnson & Johnson certainly have reviewed those materials for purposes of today's deposition and I'm certainly not prepared to go forward and question Dr. Wolf about reports for which I have not reviewed or even seen.

So we would object to any contention that this deposition in the time we have today is limited

Page 21

-- would include those materials, that we would have to spend our time on those materials, which we again did not receive notice of until this morning.

So subject to that, we are prepared to go forward on the remain -- on what we have received notice about and what we are to prepared to discover -- what are prepared to discuss with Dr. Wolf, but certainly not those three reports.

MS. O'DELL: Mr. Hegarty, we agree to disagree and -- but I would just -- it's 9:30 and Dr. Wolf has been waiting, so I would ask that you proceed with the deposition and we'll, off the record with the assistance of, I'm sure, Judge Schneider, will try to resolve this issue.

MR. HEGARTY: Yes. And I just want to make it clear, if I

Page 22

haven't already, that we do object
to limiting this to any assertion
that we're required to cover those
three reports at today's
deposition and do intend to leave
this deposition open subject to
further discussions and ultimately
ruling by the Court as far as what
should have been done and what
should be done with regard to Dr.
Wolf's testimony as it relates to
those three additional reports.

With that, I'm ready to go
forward.

MS. O'DELL:  Well, let me
say one more thing in response to
that:  Number one, Judge Schneider
has not issued an order in
relation to these depositions and
I think we need to make that
clear.  It was not an applicable
order for these depositions.  The
Federal Rules require that you
produce the materials at the

Page 23

deposition.  We've done that in
advance as a professional
courtesy.  We gave notice
yesterday.  These reports were in
Johnson & Johnson's possession, as
I've mentioned, for nearly 60
days.

I would say further, the
order limits these depositions to
four hours; and to the degree you
wish to examine Dr. Wolf on these
additional materials, then you
should reserve time for that.  If
you choose not to ask questions
today about those materials, you
should reserve the requisite time.
There will not be additional time
for that.

MR. HEGARTY:  Thanks, Leigh.
My last comment is that with
regard to those reports being
available to the Johnson & Johnson
Defendants for now over 60 days,
they were also available to Dr.

Page 24

Wolf for that same period of time.
Counsel for plaintiffs also had
the opportunity to provide us
notice over the last 60 days of
her review of those materials and
that notice came this morning, so
I just want to make that clear as
well.

We're obviously not going to
reach an agreement or resolution
right now, but I do agree with Ms.
O'Dell that we should go forward
and take this issue up after the
deposition.

MS. PARFITT:  Mr. Hegarty,
it's 10:31 -- this is Michelle
Parfitt -- just to make sure
you're aware, we've advised the
court reporter that at 10:50
Eastern, we have to adjourn
temporarily for purposes of the
Singh hearing, so I just --

MR. HEGARTY:  Yeah, thanks,
Michelle.  I got that.  I

Page 25

understand it.  So just in 20
minutes, I guess -- is that 20
minutes -- just let us know and
we'll take a break.

MS. PARFITT:  Got it.

MR. HEGARTY:  With that, we
can now go ahead and swear in Dr.
Wolf.

- - -

JUDITH KAY WOLF, M.D., after
having been duly sworn, was
examined and testified as follows:

- - -

EXAMINATION

- - -

BY MR. HEGARTY:

Q.    Good morning, Dr. Wolf.

A.    Good morning.

Q.    Would you please tell us
your name?

A.    Judith Kay Wolf.

Q.    Dr. Wolf, my name is Mark
Hegarty and I represent the Johnson &
Johnson Defendants in this case.  We're

Judith Kay Wolf, M.D.

Page 26

¹ here today for your deposition in the In
² Re: Johnson & Johnson Talcum Powder
³ Products Marketing, Sales Practices, and
⁴ Products Liability Litigation, and in
⁵ particular, we're here today to discuss
⁶ your recent amended reports in the MDL
⁷ and determine if any of your opinions
⁸ have changed and are new since September
⁹ 2021, when you were last deposed.
¹⁰        Do you understand that
¹¹ generally?
¹²    A.   Yes.
¹³    Q.   We are also here today to
¹⁴ determine if you intend to refer to any
¹⁵ additional literature or materials that
¹⁶ were not identified as of when you were
¹⁷ last deposed and testified at your MDL
¹⁸ deposition back in September 2021.
¹⁹        Do you understand that as
²⁰ well?
²¹    A.   Yes.
²²    Q.   Are you prepared today to
²³ discuss the latest amendments to your MDL
²⁴ report, as well as any changed or new

Page 27

¹ opinions that you have?
²    A.   Yes.
³    Q.   And are you prepared today
⁴ to identify any additional literature or
⁵ materials as support for your opinions
⁶ that were not identified as of your last
⁷ deposition in September 2021?
⁸    A.   Yes.
⁹    Q.   Dr. Wolf, from where are you
¹⁰ testifying today?
¹¹    A.   Austin, Texas.
¹²    Q.   Where are you in Austin
¹³ right now?
¹⁴    A.   I am sitting in the kitchen
¹⁵ of Margaret Thompson.
¹⁶    Q.   At Margaret Thompson's home?
¹⁷    A.   At her home.
¹⁸    Q.   Is anyone with you in that
¹⁹ room?
²⁰    A.   Yes.  In the room are
²¹ Margaret Thompson and Leigh O'Dell.
²²    Q.   Did you bring any materials
²³ with you to the deposition today, that
²⁴ is, materials of which you have a hard

Page 28

¹ copy of or electronic copy of?
²    A.   Yes.  I have, to my left
³ here I'm looking, my reports and all of
⁴ my literature reviewed, considered, and
⁵ the new literature that was reviewed,
⁶ whether it was included or not in my
⁷ report.
⁸    Q.   When you say you have all
⁹ your reports, are you talking about your
¹⁰ amended -- let me start over again --
¹¹ with regard to all your reports, are you
¹² talking about your November 15, 2023
¹³ general amended report in the MDL?
¹⁴    A.   Yes, as well as the specific
¹⁵ reports for the three plaintiffs.
¹⁶    Q.   And those three plaintiffs
¹⁷ are Ms. Gallardo, Ms. Judkins, and Ms.
¹⁸ Bondurant?
¹⁹    A.   That's correct.
²⁰    Q.   You have physical copies of
²¹ those reports with you?
²²    A.   I do.
²³    Q.   You also mentioned that you
²⁴ have all of the literature reviewed and

Page 29

¹ considered.  Does that mean you have
² physical copies of all the articles on
³ your materials considered list with you?
⁴    A.   I do.
⁵    Q.   Other than the four reports
⁶ and the hard copies of all the materials
⁷ considered, the literature and other
⁸ materials on your materials considered
⁹ list, do you have any other documents
¹⁰ with you today?
¹¹    A.   I do have hard copies of the
¹² other three documents, the Longo amended
¹³ report, the Longo exposure report, and
¹⁴ Dr. Levy's report, and that is all, a
¹⁵ glass of water.
¹⁶    Q.   What are the dates of those
¹⁷ three reports?
¹⁸    A.   The two reports from Dr.
¹⁹ Longo are dated November 17th, 2023 and
²⁰ Dr. Levy's report is dated November 15th,
²¹ 2023.
²²    Q.   When did you receive those
²³ reports?
²⁴    A.   Sometime after they were

Page 30

¹ completed. I don't remember the date.
²    Q.   Are you able to recall
³ approximately how long ago from today you
⁴ received them?
⁵    A.   This is January 10th, so I
⁶ believe sometime in late November or
⁷ December.
⁸    Q.   When did you review them in
⁹ relation to receiving them?
¹⁰    A.   Sometime after I received
¹¹ them, before -- before January 1st.
¹²    Q.   How much time did you spend
¹³ reviewing each of the reports, if you can
¹⁴ break it down by report?
¹⁵    A.   I don't recall specifically.
¹⁶ Probably one to two hours per report.
¹⁷    Q.   Do you intend to rely on any
¹⁸ of those reports for purposes of your
¹⁹ opinions in this case?
²⁰    A.   Those reports, in my
²¹ opinion, affirm my opinions and support
²² my opinions. I'm not sure if that's what
²³ you're asking.
²⁴    Q.   Let me ask it in a different

Page 31

¹ way: Do you anticipate when you're on
² the stand and talking about your opinions
³ in this case, including your opinions
⁴ specific to Ms. Judkins, Ms. Galardo, and
⁵ Ms. Bondurant, specifically referencing
⁶ anything in those three reports as --
⁷    A.   Yes.
⁸    Q.   -- it relates to your
⁹ opinions?
¹⁰    A.   Yes.
¹¹    Q.   So you would specifically
¹² cite to those three reports in talking
¹³ about your opinions generally and your
¹⁴ opinions as to the three plaintiffs I
¹⁵ just mentioned.
¹⁶    A.   I would talk about them as
¹⁷ they affirm my own opinion and support my
¹⁸ opinion for each of the three plaintiffs.
¹⁹    Q.   And with regard to your
²⁰ testimony about those three reports,
²¹ we're going to look at here in a little
²² bit your four November 2023 amended
²³ reports. And in those reports, you set
²⁴ out the substance of your testimony and

Page 32

¹ you make references to particular studies
² and other materials that you rely upon.
³    Do you recall doing that in
⁴ those reports?
⁵    MS. O'DELL:  Object to the
⁶    form.
⁷    THE WITNESS:  Yes -- I'm
⁸    sorry. I hesitated because I
⁹    wasn't sure if I was supposed to
¹⁰    answer, but yes.
¹¹ BY MR. HEGARTY:
¹²    Q.   Okay. Do you anticipate
¹³ further amending those four reports to
¹⁴ specifically cite to Dr. Longo's November
¹⁵ 2023 reports and Dr. Levy's 2023 report?
¹⁶    A.   No.
¹⁷    Q.   Do you have any plans to
¹⁸ amend your report to add anything
¹⁹ additional to them as they stand now?
²⁰    A.   At this point, no, unless
²¹ some other literature is published or
²² something else that I come across that
²³ supports my opinion that I think would be
²⁴ important to include that is not already

Page 33

¹ in my current report.
²    Q.   Did you make a specific
³ request to plaintiffs' counsel for the
⁴ Longo and Levy reports from 2023?
⁵    A.   I don't recall.
⁶    Q.   Do you recall how you came
⁷ to receive them?
⁸    A.   I'm sure the plaintiffs'
⁹ attorneys provided them to me.
¹⁰    Q.   Prior to you receiving those
¹¹ reports, had you reviewed any other
¹² reports by Dr. Longo and Dr. Levy?
¹³    A.   Not by Dr. Levy. I had
¹⁴ reviewed Dr. Longo's previous reports.
¹⁵    Q.   You'd reviewed his previous
¹⁶ report, but those were not -- those
¹⁷ reports were not included in your
¹⁸ materials considered list. Are you aware
¹⁹ of that?
²⁰    MS. O'DELL:  Objection to
²¹    the form.
²²    THE WITNESS:  I'm sorry.
²³    I'm not aware of that.
²⁴ BY MR. HEGARTY:

Page 34

1    Q.   Do you recall including any
2  of Dr. Longo's reports in the -- in
3  Exhibit B to your MDL reports?
4         MS. O'DELL:  If you need to
5    look at Exhibit B, Dr. Wolf, feel
6    free to do that.
7         THE WITNESS:  Yeah, let me
8    look at that.  Sorry.  Give me a
9    minute.
10        MR. HEGARTY:  Before you
11   look at that, Dr. Wolf, can I ask
12   you another question?
13 BY MR. HEGARTY:
14    Q.   With regard to the three
15 reports we're talking about, do you
16 intend to add them to your materials
17 considered list?
18    A.   Yes.
19    Q.   Have you prepared an amended
20 materials considered list yet?
21    A.   No.
22        MR. HEGARTY:  When we take a
23   break for this call we have coming
24   up, Dr. Wolf, we can -- we can

Page 35

1    then go back to the question I
2    left outstanding as whether Dr.
3    Longo's report is on your
4    materials considered list, that
5    is, any of them.  I would like to
6    go ahead and move on, if that's
7    all right with you?
8         THE WITNESS:  Yes.
9  BY MR. HEGARTY:
10    Q.   Have we now covered all the
11 materials that you have -- I'm sorry.  Go
12 ahead.
13        MS. O'DELL:  Excuse, Mark,
14   just for a moment.  Dr. Wolf was
15   asked about Exhibit B and you made
16   representations about what was not
17   on there.  Dr. Wolf has not had
18   the opportunity to look at Exhibit
19   B to respond to your question.
20        And so I know we're going to
21   take a break in a few minutes.
22   When that happens, I would request
23   that you give Dr. Wolf the
24   opportunity to respond to that

Page 36

1  question after she's had
2  opportunity to look at Exhibit B.
3         MR. HEGARTY:  I'm going to
4  go ahead and withdraw the question
5  for now and we'll circle back to
6  it to the extent that I want to.
7         MS. O'DELL:  I will just
8  represent -- I think you've
9  overlooked Dr. Longo's reports on
10 her Exhibit B.  And so maybe
11 during the break, you'll take a
12 look at item 193 and there are a
13 couple of other references as
14 well.
15        MR. HEGARTY:  Okay.  Thank
16 you.
17 BY MR. HEGARTY:
18    Q.   Have we covered now, Dr.
19 Wolf, all of the materials that you have
20 with you at the deposition today?
21    A.   Yes.
22    Q.   Have you prepared any notes
23 or other materials for this case since
24 your last deposition in September 2021

Page 37

1  besides your amended reports, the
2  materials considered list, and the list
3  of your testimonies --
4    A.   No.
5    Q.   -- your prior testimony?
6    A.   No.
7    Q.   As I mentioned, you were
8  last deposed in the MDL in September
9  2021.  Have you gone back and reviewed
10 that testimony prior to today?
11    A.   Yes.
12    Q.   Was there any testimony from
13 that deposition you thought was
14 inaccurate or needed to be changed?
15    A.   No.
16    Q.   Have you reviewed any of
17 your other testimony in any talcum powder
18 case since September 2021?
19    A.   I believe I reviewed the
20 very first deposition for the MDL, which
21 was 2018, 2019?
22    Q.   Was there any testimony you
23 recall thinking that was inaccurate or
24 that you wanted to change from your

Judith Kay Wolf, M.D.

Page 38

1 review of that deposition?
2     A.   No.
3     Q.   Has there been any change in
4 your employment status since September
5 2021?
6     A.   Not -- not since September
7 of 2021, no.
8     Q.   Are you still working full
9 time?
10    A.   No, I'm working part-time as
11 a locums tenens provider, so multiple
12 places around the country that need help,
13 two to three weeks per month.  And I was
14 doing that in September of '21, also.
15    Q.   Have you worked in 2024?
16    A.   No, not yet.
17    Q.   Do you have plans to -- do
18 you have specific plans already to work
19 in 2024?
20    A.   Yes.
21    Q.   What specific plans do you
22 have?
23    A.   So between January and June
24 of 2024, I'll be working 12 days a month

Page 39

1 in Billings, Montana and then I also have
2 several weeks between that time period
3 where I'll be working in Green Bay,
4 Wisconsin.
5         I haven't solidified my work
6 plans the second half of 2024 yet.
7     Q.   Where will you be working in
8 Billings, Montana?
9     A.   The Billings Clinic.
10    Q.   When does that start?
11    A.   January 21st.
12    Q.   Where will you be working in
13 Green Bay?
14    A.   Bellin Hospital.
15    Q.   Is that work through
16 ComHealth?
17    A.   CompHealth, yes.
18    Q.   CompHealth.
19    A.   Yes.
20    Q.   What facilities did you work
21 at in 2022?
22    A.   2022, I worked at Hershey
23 Medical Center in Hershey, Pennsylvania.
24 I worked at Goshen Cancer Center -- or

Page 40

1 Goshen Center for Cancer Care in Goshen,
2 Indiana.  I believe I might have worked
3 at Community Health in Indianapolis one
4 or two weeks in 2022.
5         I think that's it.
6     Q.   Where did you work in 2023?
7     A.   I was still working in
8 Hershey -- at Hershey Medical Center in
9 Hershey, Pennsylvania.  I worked in
10 Community Hospital in Indianapolis
11 several weeks.  I worked in Park Nicollet
12 Hospital in Minneapolis, Minnesota and in
13 Bellin Hospital in Green Bay, Wisconsin
14 and one week at the Billings Clinic in
15 Montana.
16    Q.   Approximately how many weeks
17 in the year of 2022 did you work at those
18 -- at the facilities you listed?
19    A.   Probably about 30 to 35
20 weeks.
21    Q.   Same question as to 2023:
22 How many weeks did you work that year?
23    A.   Probably about the same.
24    Q.   Do you recall the names of

Page 41

1 any of the physicians that you reported
2 to or were your supervisors in 2022 and
3 2023?
4     A.   I'm thinking.  Many of the
5 places where I'm working, there isn't
6 really anyone I'm reporting to, because
7 they need a gynecologic oncologist, so
8 I'm not given a particular physician that
9 I'm reporting to.
10        At Goshen Center for Cancer
11 Care, there was a medical -- or a
12 surgical oncologist, first name was
13 Henry -- I can't remember his last
14 name -- who was the head of the cancer
15 center.  And I only worked at Billings
16 for one week and I met the head of the
17 cancer center, but I don't remember his
18 name.
19        At the other places, there
20 wasn't anyone I was particularly pointed
21 to that I was reporting to.
22    Q.   At the facilities you listed
23 for 2022 and 2023, were you working there
24 as a gynecologic oncologist?

Page 42

1      A.   Yes.

2      Q.   And did you perform

3  surgeries at those facilities in 2022 and

4  2023?

5      A.   Yes.

6      Q.   Approximately how many

7  surgeries did you perform on a monthly

8  basis in 2022 and 2023?

9      A.   Probably 10 to 12 surgeries

10  per month.

11      Q.   Generally, what types of

12  surgeries did you perform with regard to

13  those 10 to 12 per month?

14      A.   Laparoscopic hysterectomies

15  and staging surgeries, exploratory

16  laparotomies with hysterectomies and

17  cytoreduction, vulvar surgeries, vaginal

18  surgeries, occasionally an operation on a

19  bowel if it was involved with the cancer.

20      Q.   Apart from surgeries, what

21  types of conditions -- what types of

22  conditions have you been treating since

23  September 2021?

24      A.   Ovarian cancer, uterine

Page 43

1  cancers including endometrial cancer and

2  other types of uterine cancers like

3  sarcoma, both benign and malignant

4  ovarian masses, vulvar cancers, cervical

5  cancers, vaginal cancers, and preinvasive

6  diseases of the cervix, vagina, and

7  vulva.

8          MS. O'DELL:  Mark, excuse

9      me.  We're at 9:50 and, as we've

10      previously agreed, request we go

11      off the record so we can attend

12      the hearing before Judge Singh.

13          MR. HEGARTY:  Let's go ahead

14      and go off the record.

15          - - -

16          (A discussion off the record

17      occurred.)

18          - - -

19          (A recess was taken from

20      10:52 a.m. to 11:43 a.m.)

21          MR. HEGARTY:  We're back on

22      the record.

23  BY MR. HEGARTY:

24      Q.   Dr. Wolf, when we left off,

Page 44

1  I asked you about the questions you have

2  been treating since September 2021 and

3  you provided a list of those conditions.

4          What percentage of your work

5  since September 2021 has been caring for

6  patients with ovarian cancer?

7      A.   Probably about 20 to 30

8  percent of the time.

9      Q.   Has there been any change in

10  the type of care and treatment that you

11  have provided to your ovarian cancer

12  patients since September 2021?

13      A.   No.  I mean, some of the

14  medications used for medical treatment in

15  chemotherapy, when to use it, has changed

16  slightly, but as a whole, no.

17      Q.   Have you done any teaching

18  of other doctors regarding ovarian cancer

19  since September 2021?

20      A.   Yes.  When I was working at

21  Hershey Medical Center, there was a

22  residency program in obstetrics and

23  gynecology, so part of my duties working

24  there was teaching the residents in

Page 45

1  clinics and in the operating room on

2  ovarian cancer and all the types of

3  patients that I saw.

4          In addition, I have

5  voluntarily given some lectures to a

6  residency program in Oklahoma, don't ask

7  me the name of it, I don't recall.  A

8  friend of mine was the residency chair

9  there and they asked me to give a lecture

10  on gynecologic oncology to their

11  residents.

12      Q.   And what facility in

13  Oklahoma was that?

14      A.   Yeah, I don't remember.  It

15  was a community residency program

16  somewhere in Oklahoma.  I don't remember

17  the name of it or the city.

18      Q.   With regard to your time at

19  Hershey, what percentage of that time was

20  spent discussing with the residents

21  ovarian cancer issues?

22      A.   So they were with me when I

23  was taking care of patients, so

24  approximately the same amounts of time

Judith Kay Wolf, M.D.

1 that I was with ovarian cancer patients,
2 so 20 to 30 percent of the time.
3         It was about the specific
4 patients we were caring for most of the
5 time, but I would also specifically talk
6 to them about how common is ovarian
7 cancer, how we treat it, what the
8 symptoms are, you know, what the next
9 steps are outside of the patient's room
10 just to give them more of an education.
11     Q.   Did any of those discussions
12 ever extend to the opinions you have in
13 this case with regard to talc and ovarian
14 cancer?
15     A.   Not that I recall.
16     Q.   Did you hold any titles in
17 connection with this teaching
18 responsibility?
19     A.   No.
20     Q.   Other than treating patients
21 and being involved in counseling or
22 treating -- or educating residents, have
23 you been involved in any other
24 professional activities since September

1 of 2021?
2     A.   No.
3     Q.   Since September of 2021,
4 have you done any consulting work outside
5 of litigation consulting?
6     A.   No.
7     Q.   As to litigation, have you
8 been disclosed as an expert in any type
9 of case since September of 2021 besides
10 cases involving talcum powder and ovarian
11 cancer?
12     A.   No.
13     Q.   Have you been deposed since
14 September 2021 in any --
15     A.   No.
16     Q.   -- type of case?
17     A.   No.
18     Q.   Have you prepared any videos
19 on ovarian cancer or other subjects since
20 September of 2021, including for any law
21 firm?
22     A.   No.
23     Q.   Have you communicated with
24 any regulatory agency on any topic since

1 September of 2021?
2     A.   No.
3     Q.   Have you submitted anything
4 or provided any testimony to any
5 regulatory group or scientific
6 organization since September 2021?
7     A.   No.  I did give a talk at a
8 medical society called the Felix Rutledge
9 Society that was on misogyny and sexism
10 in gynecologic oncology.  I don't know if
11 that is something that you were -- would
12 include -- be included in what you're
13 asking about.
14     Q.   Have you attended any
15 professional organization meetings since
16 September 2021?
17     A.   Yes, that one that I
18 mentioned.  I think that's the only one
19 I've attended.
20     Q.   Other than the presentation
21 you just discussed, have you presented at
22 any meeting since September 2021?
23     A.   No.
24     Q.   Since September 2021, have

1 you drafted any publications where you
2 referred to talcum powder exposure?
3     A.   No.
4     Q.   Since September of 2021,
5 have you drafted any publications where
6 you referred to asbestos exposure and
7 ovarian cancer?
8     A.   No.
9     Q.   Do you have any works in
10 progress where there are references to
11 either talcum powder use or asbestos
12 exposure?
13     A.   No.
14     Q.   Do you have plans for any
15 such publications in 2024?
16     A.   No.
17     Q.   When you were deposed at
18 your first MDL deposition back in January
19 2019, that's five years ago, you
20 testified that you did plan to take your
21 report and write a review paper and
22 submit it for publication.
23         Do you recall saying that?
24     A.   I do, but I never did that.

Page 50

1    Q.   Do you have any plans to do
2  so in 2024?
3    A.   No.
4    Q.   Since September 2021, have
5  you given any formal presentations or
6  lectures to your peers where you are
7  standing in front of a group of your
8  physician colleagues where talcum powder
9  exposure or use was discussed?
10    A.   No.
11    Q.   Same question as to where
12  asbestos exposure was discussed.
13    A.   No.
14    Q.   Since September 2021, have
15  you given any presentations where you
16  made any reference to fibrous talc, heavy
17  metals, or fragrances?
18    A.   No.
19    Q.   Since September of 2021,
20  have you discussed in any setting the
21  opinions you have here in the MDL with
22  any of your physician colleagues or
23  peers?
24    A.   I think in general about my

Page 51

1  opinion that talc is associated with
2  ovarian cancer, I'm sure I've discussed
3  that with colleagues, not specifically
4  about the MDL, but as a risk factor and
5  something that I -- I affirm is a cause
6  of ovarian cancer.  I don't remember
7  anything specifically, but I'm sure I've
8  mentioned it.
9    Q.   Do you recall any colleague
10  -- any of the names of any colleagues
11  where you had that discussion?
12    A.   No.
13    Q.   Since September of 2021,
14  have you discussed any of your opinions
15  in the MDL with any of your patients?
16    A.   No.
17    Q.   Since September of 2021,
18  have you changed in any way your
19  communications with patients or the
20  information you gather from your patients
21  regarding talcum powder use?
22    A.   No.
23    Q.   Have you discussed since
24  September 2021 with any patient talcum

Page 52

1  powder use?
2    A.   Yes.
3    Q.   Have you done so with every
4  patient, every ovarian cancer or other
5  patient, you've interacted with or just
6  certain patients?
7    A.   My recollection is that most
8  of the ovarian cancer patients, it's
9  something I discuss.  A lot of times the
10  ovarian cancer patients have brought it
11  up and asked about it, also, so either I
12  bring it up or they have.
13         For the patients that are
14  not ovarian cancer patients, a few of
15  them may have asked about it, but I don't
16  routinely bring it up with a non-ovarian
17  cancer patient.
18    Q.   When you've had those
19  discussions, have you identified yourself
20  to your patients as an expert witness for
21  plaintiffs in the talcum powder
22  litigation?
23    A.   Generally, I do, just
24  because to be transparent with my

Page 53

1  patients.
2    Q.   Do you talk with them about
3  -- well, let me start over again.  When
4  you've had those discussions, have you
5  ever provided them with any literature or
6  reference materials?
7    A.   Not to my recollection.
8    Q.   When you've had those
9  discussions, have you referred to any
10  authorities that have an opinion contrary
11  to you who have made statements that
12  talcum powder use is not associated with
13  ovarian cancer?
14         MS. O'DELL:  Object to the
15    form.
16         THE WITNESS:  Not that I
17    recall.
18  BY MR. HEGARTY:
19    Q.   In particular, have you ever
20  referred any of your patients to the
21  NCI's PDQ where it discusses talcum
22  powder use?
23    A.   I haven't referred any of my
24  patients to the NCI's PDQ for that or

1 anything else that I recall.

2 Q. Since September of 2021,

3 have you told any patient of yours with

4 ovarian cancer that their cancer was

5 caused by their use of talcum powder?

6 A. No.

7 Q. Since September of 2021,

8 have you determined that any patient of

9 yours' ovarian cancer was caused by their

10 use of talcum powder?

11 A. I haven't determined the

12 cause of any of -- of ovarian cancer of

13 any of the patients that I've seen since

14 2021 specifically.

15 Q. With regard to the

16 facilities where you've worked since

17 September 2021, do any of their patient

18 intake forms ask about talcum powder use?

19 A. Not that I know of, but I

20 don't really look at the patient intake

21 forms. I take my own patient history and

22 that's part of the chart, but I don't

23 usually specifically look closely at it.

24 Q. As part of your taking a

1 patient's history since September 2021,

2 do you always ask about talcum powder

3 use?

4 A. For ovarian cancer patients,

5 most of the time, I do, not all of the

6 time.

7 Q. How do you determine when to

8 ask and when not to ask?

9 A. I don't have a specific

10 determination of when I do or when I

11 don't. I would say, generally, I ask

12 them all of the questions that might have

13 a risk -- might be a risk factor for them

14 getting ovarian cancer, and generally

15 talc is one of those questions, but I

16 don't have specific time when I do or I

17 don't or a reason --

18 Q. Since September of -- I'm

19 sorry to interrupt.

20 A. No, that's all.

21 Q. Since September of 2021,

22 have you advised any patient to stop

23 using talcum powder?

24 A. Yes.

1 Q. When have you advised

2 patients generally to stop using talcum

3 powder?

4 A. Well, certainly if they have

5 ovarian cancer or come to me and might

6 have ovarian cancer and have let me know

7 that they are using it, I ask them to --

8 tell them to stop.

9 And then other patients that

10 don't have ovarian cancer who've asked

11 about the risk of using talcum powder and

12 ovarian cancer, even if ovarian cancer is

13 not their concern for seeing me, I

14 recommend that they stop.

15 Q. As a matter of course, as to

16 patients who do not have ovarian cancer

17 and don't bring up the issue of talcum

18 powder use, do you tell the patients to

19 stop using talcum powder if they are

20 using it?

21 A. Yes.

22 Q. Other than what we have

23 discussed so far, have you communicated

24 with anyone outside of plaintiffs'

1 counsel in this litigation your opinions

2 in the MDL since September 2021?

3 MS. O'DELL: Objection.

4 THE WITNESS: Not that I

5 recall.

6 BY MR. HEGARTY:

7 Q. Have you communicated with

8 FDA about your opinions in the MDL since

9 September 2021?

10 A. No.

11 Q. Have you communicated with

12 any scientific group or body about your

13 opinions in the MDL since September 2021?

14 A. No.

15 Q. Has any regulatory authority

16 or scientific body reached out to you

17 about your opinions with regard to talc

18 and ovarian cancer since September 2021?

19 A. No.

20 Q. At your January 2019

21 deposition, you testified that you

22 intended to write a letter to SGO with

23 your concerns about its website not

24 listing talc as a risk factor for ovarian

Page 58

1  cancer.
2        Do you recall testifying to
3  that?
4        A.   I do recall, but I did not
5  do that.
6        Q.   Do you have any plans to do
7  so in 2024?
8        A.   No.
9        Q.   Since September 2021, have
10 you shared your opinions with regard to
11 talc and ovarian cancer in any written
12 form other than your reports in the MDL
13 or in other cases in which you have been
14 involved?
15       A.   No.
16       Q.   You testified also back in
17 2019 about communicating your views to
18 the National Ovarian Cancer Coalition.
19 Do you recall testifying to that?
20       A.   Yes, I do recall testifying
21 to that.
22       Q.   Have you had -- conveyed
23 your views to this coalition since
24 January of 2019?

Page 59

1        A.   I can't remember the date.
2  It may have been -- yeah, well, it's
3  certainly after January 2019 that I did
4  at a meeting discuss with their board my
5  opinions about talc and ovarian cancer.
6        Q.   Did you say that was in
7  January of 2022?
8        A.   I don't remember.  It was
9  after January of 2019 and I don't recall
10 if it was before September of 2021, but
11 sometime since January of 2019, I did
12 discuss it with the medical board of the
13 National Ovarian Cancer Coalition.
14       Q.   Do you recall any response
15 of any board members at that discussion?
16       A.   My recollection was that the
17 other board members didn't really want to
18 talk about it.
19       Q.   Since September of 2021,
20 have you become aware of any scientific
21 or medical group or organization who has
22 published statements that talc use can
23 cause ovarian cancer?
24       MS. O'DELL:  Objection.

Page 60

1        THE WITNESS:  Not that talc
2  use can cause ovarian cancer.  The
3  American Cancer Society lists it
4  as a possible cause and recommends
5  further investigation.
6  BY MR. HEGARTY:
7        Q.   Other than the American
8  Cancer Society, since September 2021,
9  have you become aware of any other
10 scientific or medical group or
11 organization that has made statements
12 that talc use can cause ovarian cancer or
13 is associated with ovarian cancer or
14 statements like the American Cancer
15 Society has made?
16       A.   So my -- I can't remember
17 when the Health Canada was finalized, if
18 that was before or after September '21,
19 but they do state that talc causes
20 ovarian cancer in their summary.
21       The -- yeah, the -- that's
22 what I recall.
23       Q.   Since September of 2021,
24 have you talked to any other expert that

Page 61

1  you're aware of in the MDL or other
2  litigation where there are claims of
3  talcum powder use and ovarian cancer?
4        A.   I have spoken with Dr.
5  Clarke-Pearson.  He's been on a few of
6  the phone calls that I've had with the
7  attorneys.  That's the only one -- and I
8  had dinner once with Ellen Smith, but it
9  was a social dinner.  We didn't really
10 talk much about the talcum part, just
11 those two.
12       Q.   To be more specific, since
13 September 2021, have you talked with any
14 expert about talcum powder use and
15 ovarian cancer -- let me restart that.
16       Since September 2021, have
17 you talked with either Dr. Saed, Dr.
18 McTiernan, Dr. Smith-Bindman, or Dr.
19 Longo about this litigation or talcum
20 powder and ovarian cancer?
21       MS. O'DELL:  Object to the
22       form, and I'll agreed those were
23       calls in which counsel was
24       involved and those would be

Page 62

1  protected by the work product
2  privilege, so --
3       MR. HEGARTY:  Understood.
4  My question is only whether she's
5  had discussions at this point.
6       MS. O'DELL:  I think you
7  asked her what the substance of
8  those discussions were, Mark.
9  That's the basis of my objection
10 --
11      MR. HEGARTY:  To be clear --
12 let me withdraw that question, but
13 -- and to be clear, my question
14 is, since September 2021, have you
15 had any discussions with Dr. Saed,
16 Dr. McTiernan, Dr. Smith-Bindman,
17 or Dr. Longo about any subject?
18      MS. O'DELL:  Not that -- you
19 can answer to the degree that
20 whether you've spoken to one or
21 any of them, but not as to the
22 substance, Dr. Wolf.
23      THE WITNESS:  The only one I
24 recall is a phone call, less than

Page 63

1  five minutes, with attorneys with
2  Dr. Smith-Bindman, none of the
3  others.
4  BY MR. HEGARTY:
5      Q.   When was that approximate
6  five-minute call in relation to today?
7      A.   It was yesterday.
8      Q.   Other than that one call
9  with Dr. Smith-Bindman yesterday and you
10 mentioned a previous call with Dr.
11 Clarke-Pearson, have you had any -- been
12 on any calls or had any calls with any
13 other expert with regard to the MDL or
14 any other litigation involving talcum
15 powder use and ovarian cancer?
16     A.   No.
17     Q.   You mentioned at the start
18 of our discussion that you had reviewed
19 recently two reports by Dr. Longo and a
20 report by Dr. Levy that were drafted back
21 in November 2023.
22          Besides those reports, since
23 September 2021, have you reviewed any
24 other experts' MDL or other reports in

Page 64

1  talcum powder cases?
2      A.   I'm trying to -- I'm trying
3  to remember.  Let me look at my notebook
4  here.  I...
5          (Pause.)
6          MS. O'DELL:  Explain to him
7  what you were looking at.
8          THE WITNESS:  Yeah, so I'm
9  looking in my notebook with my
10 report, which also has Dr.
11 Godleski's reports, but that was
12 before September of 2021, so the
13 answer would be no.
14 BY MR. HEGARTY:
15     Q.   Since September of 2021,
16 have you reviewed any other witness'
17 testimony in a case involving talcum
18 powder use and ovarian cancer?
19     A.   No.
20     Q.   Since September of 2021,
21 have you done any work or analysis of any
22 testing done on talcum powder for the
23 presence of asbestos?
24          MS. O'DELL:  Would you mind

Page 65

1  repeating your question, Mark?  I
2  think I missed --
3          MR. HEGARTY:  Sure.
4  BY MR. HEGARTY:
5      Q.   Since September of 2021,
6  have you done any work or analysis of any
7  testing done on talcum powder for the
8  presence of asbestos?
9          MS. O'DELL:  Object to the
10 form.
11         THE WITNESS:  Other than the
12 reports that we -- you mentioned
13 before, Dr. Longo's exposure
14 report and his third amendment
15 report, no.
16 BY MR. HEGARTY:
17     Q.   Since September of 2021,
18 have you done any work or analysis of any
19 animal testing involving talcum powder or
20 asbestos exposure?
21     A.   Not that I recall.  I don't
22 believe any of the new literature had any
23 animal testing.  There's not a good
24 animal model for ovarian cancer, so...

Page 66

1    Q.   That was going to be sort of
2 my next question.  Are you aware of any
3 animal studies conducted since September
4 2021 where the animals were exposed to
5 talc or asbestos?
6    A.   Not that I'm aware of.
7 Again, ovarian cancer in animals doesn't
8 happen very -- in very many animals.  I
9 believe guinea pigs and egg-laying hens
10 occasionally get ovarian cancer, but
11 there isn't a good model, so there isn't
12 a lot of research on animals and ovarian
13 cancer.
14    Q.   Since September of 2021,
15 have you done any medical or scientific
16 literature research specifically for
17 purposes of your testimony in this case?
18    A.   Yes.
19    Q.   Did that medical or
20 scientific literature involve using
21 online resources for medical and
22 scientific literature?
23    A.   Yes.
24    Q.   What online resources have

Page 67

1 you used since September 2021 to do
2 medical or scientific literature research
3 for purposes of your testimony in this
4 case?
5    A.   PubMed, which is from the
6 NIH.
7    Q.   Have you used any other
8 online resources or other resources to
9 conduct any medical or scientific
10 literature research for your testimony in
11 this case since September of 2021?
12    A.   So occasionally if I find a
13 paper on PubMed and there's a reference
14 in it that I'm interested in, I take it
15 directly from that reference and then
16 find the article.  I can't remember
17 specifically, but that would be the other
18 way.
19    Q.   Do you recall any of the
20 keyword searches you used to do the --
21 any medical or scientific literature
22 research since September 2021?
23    A.   Not specifically, but I
24 would imagine they would include ovarian

Page 68

1 cancer, talcum powder, risk factors,
2 causes.
3    Q.   Between September of 2021
4 and today, when did you do the medical or
5 scientific literature research we've been
6 talking about?
7    A.   Probably mostly in 2023.  I
8 don't remember the specific dates.
9    Q.   Are you aware of any medical
10 or other articles you have reviewed since
11 September 2021 that you're aware of today
12 that you know you intend to cite to when
13 discussing your opinions in this case
14 besides those listed in the body of your
15 expert reports?
16    A.   Can you ask that question
17 one more time?
18    Q.   Sure.  Are there any medical
19 or other articles or materials you have
20 reviewed since September 2021 that you're
21 aware of today and that you know you
22 intend to cite to for your -- for
23 purposes of your opinions in this case
24 besides those that are listed in the body

Page 69

1 of your expert reports from November
2 2023?
3         MS. O'DELL:  Object to
4     scope.
5         THE WITNESS:  So besides
6     those that are listed in the body
7     of my report, yes, I think there
8     are other -- other sources,
9     including the three that we've
10    mentioned earlier, that I'm -- I
11    might cite, yes.
12 BY MR. HEGARTY:
13    Q.   We talked about the three
14 you mentioned earlier, the two Longo
15 reports and the Levy report.  Are you
16 aware of any other material sitting here
17 today that you know that you will or that
18 you may specifically cite to for your
19 opinions in this case?
20    A.   I'm not aware of any that I
21 know I will cite.
22    Q.   Since September 2021, have
23 you reviewed any documents produced by
24 Johnson & Johnson for this case that you

Page 70

1  had not reviewed before?
2      A.   Not that I recall, no.
3      Q.   Same question as to a
4  company called Imerys or any other
5  entity; have you reviewed any documents
6  produced by Imerys or any other entity in
7  this case besides Johnson & Johnson since
8  September 2021 that you had not reviewed
9  before?
10     A.   No.
11     Q.   Have you done any searching
12 across Johnson & Johnson documents or any
13 other company's documents related to this
14 litigation since September 2021?
15     A.   No.
16     Q.   Besides the work we've
17 talked about so far today, have you done
18 any other work for purposes of your
19 amended reports or the opinions you
20 intend to offer since September of 2021?
21     A.   No.
22          MR. HEGARTY:  I want to mark
23 as our first exhibit today the
24 scientific -- I'm sorry -- the

Page 71

1  materials considered list that's
2  Exhibit B to your November 2023
3  report.
4              - - -
5          (Deposition Exhibit No.
6  Wolf-1, Materials Considered List
7  Attached as Exhibit B to the
8  11/15/23 2nd Amended Export Report
9  (General) of Judith Wolf, M.D.,
10 was marked for identification.)
11             - - -
12         MR. HEGARTY:  I will share
13 my screen with you --
14         THE WITNESS:  I'm just
15 getting my copy.  All right.
16         (Pause.)
17         MR. HEGARTY:  Please let me
18 know if you can see the document
19 on my screen, Dr. Wolf.
20         THE WITNESS:  I can.  Thank
21 you.
22 BY MR. HEGARTY:
23     Q.   This document, which I'll
24 designate as Exhibit No. 1, is the

Page 72

1  materials considered list which is
2  attached to Exhibit B to your November
3  2023 report.  I will scroll down through
4  it.  It goes from page 1 to page 33, with
5  the last reference to a paragraph 121.
6          Does this appear to be the
7  materials considered list that you
8  included with your November 2023 amended
9  report?
10     A.   Yes.
11     Q.   Now, with regard to this
12 list, the list previously produced, in
13 particular with your September -- with
14 your 2021 amended report, was entitled
15 "Scientific Literature and Other
16 Sources."  This list was entitled
17 "Materials Considered."
18         Why was the name of the list
19 changed, if you know?
20     A.   I don't recall.
21         MS. O'DELL:  For
22 clarification, Mark, are you
23 displaying on the screen the
24 Exhibit B from her general report

Page 73

1  or from one of the case specifics
2  --
3          MR. HEGARTY:  Thank you.
4          MS. O'DELL:  Not that it
5  matters -- not that it matters a
6  ton in terms of what you're going
7  over right now, but I just want to
8  make sure the record's clear.
9          MR. HEGARTY:  Yeah, this is
10 -- Exhibit No. 1 is from Dr.
11 Wolf's general report.
12         MS. O'DELL:  Okay.  Thank
13 you.
14 BY MR. HEGARTY:
15     Q.   Did you prepare this
16 materials considered list, Dr. Wolf?
17     A.   Yes.
18     Q.   Scrolling down this list to
19 paragraph 441, the paragraphs after 441
20 through --
21         MS. O'DELL:  Mark, it's
22 really hard to see what you're
23 doing because it's -- and I
24 recognize we're at limitations, so

1  you're going quickly, so she's
2  looking on her hard copy --
3      MR. HEGARTY:  Sure.
4      MS. O'DELL:  -- so just give
5  her a little time to catch up.
6      MR. HEGARTY:  Sure.  I think
7  my question will be clear.
8  BY MR. HEGARTY:
9      Q.   From my review of this list
10 compared to your prior list, when looking
11 at the literature list, paragraphs 441
12 through 531 are new.
13         Is that your understanding
14 as well?
15     A.   That seems about correct.
16     Q.   With regard to the articles
17 from 441 through 531, did you find all of
18 those articles yourself?
19     A.   No, some of them I found;
20 and some of them, the attorneys found and
21 shared with me.
22     Q.   With regard to those
23 articles that they found and shared with
24 you, was that at your request or did they

1  send them to you without you making a
2  request?
3      A.   I think it was both.
4      Q.   With regard to the articles
5  from 441 to 531 in Exhibit No. 1, did you
6  read the entirety of each of the articles
7  listed?
8      A.   Not every one.  Some of
9  them, I read the entire article.  Some of
10 them, I read the abstract and the results
11 and didn't -- didn't go into any further
12 detail if I didn't think it was pertinent
13 to helping me make my opinion.
14     Q.   Did you read each of the
15 articles from 441 through 531 sometime in
16 the year of 2023?
17     A.   2022 or 2023, yes.
18     Q.   Are the articles from 441 to
19 531 all new to you since September of
20 2021?
21         MS. O'DELL:  If you need to
22 look, just take a minute.
23         THE WITNESS:  Yeah, let me
24 just look.  Some of them were

1  published before 2021 and so I'm
2  sure that some of them were
3  familiar to me before.
4      Specifically looking at
5  articles 452 or 466 or 7, those
6  have a lot to do with genetics and
7  some of those are older articles
8  that I would have read previously.
9  BY MR. HEGARTY:
10     Q.   As you just referenced, a
11 number of the articles between 441 and
12 531 are focused on cancer genetics
13 including gene mutations.  Was this the
14 focus of your literature review since
15 September 2021?
16     A.   Somewhat, yes.
17     Q.   And how do articles
18 concerning cancer genetics inform your
19 opinions in this case?
20         MS. O'DELL:  Object to the
21 form.  You're talking about in --
22 you know, in general, in terms of
23 her general opinions, Mark, or are
24 you talking about something more

1  specific?
2      MR. HEGARTY:  I think it
3  would be as to any opinions that
4  you intend to offer in this case,
5  Dr. Wolf.
6      THE WITNESS:  So two of the
7  patients had genetic -- I think
8  all of my patients in the
9  bellwether cases, all of them had
10 genetic testing and this was just
11 to do a deeper dive on any
12 findings in genetics specifically
13 for anything that they had and
14 just to be aware of every new
15 mutation that might be related to
16 ovarian cancer risk.
17 BY MR. HEGARTY:
18     Q.   You cite to a number of
19 these articles from 441 to 531 in the
20 body of your report, including such
21 articles as Woolen and Phung, which we'll
22 talk about.
23         Are there any other articles
24 from 441 to 531 that you know sitting

Page 78

¹ here today you intend to specifically
² cite to when providing your opinions that
³ are not referenced in the body of your
⁴ general expert report?
⁵     A.   As I'm sitting here today,
⁶ not that I'm aware of, no.
⁷     Q.   We were provided three days
⁸ ago by counsel for plaintiffs folders
⁹ that included general causation
¹⁰ materials.  Those folders included a
¹¹ section or a part called Lynch systematic
¹² review tables.
¹³         Are you familiar with
¹⁴ reviewing something that you would
¹⁵ characterize as Lynch systematic review
¹⁶ tables?
¹⁷     A.   Not that I recall called
¹⁸ that.
¹⁹         MS. O'DELL:  Mark, those
²⁰ folders --
²¹         MR. HEGARTY:  Go ahead,
²² Leigh.
²³         MS. O'DELL:  Those folders
²⁴ were prepared by counsel to

Page 79

¹ disclose and I've named the
² folders.
³         So Lynch is the Lynch
⁴ systematic review that's published
⁵ that's on Dr. Wolf's list and
⁶ there are e-tables that were
⁷ multiple documents, and that was
⁸ just an easier way to put them in
⁹ the folder.
¹⁰         That really has nothing to
¹¹ do with Dr. Wolf.  That was a
¹² clerical choice I made.
¹³         MR. HEGARTY:  Okay.  Thank
¹⁴ you.
¹⁵         Let me show you specifically
¹⁶ the list of those folders.  I'll
¹⁷ share my screen with you again.
¹⁸         Please let me know if you
¹⁹ can see my screen, Dr. Wolf.
²⁰         THE WITNESS:  I can see your
²¹ screen.
²²         MR. HEGARTY:  And I'll
²³ designate this document as Exhibit
²⁴ No. 2.

Page 80

¹             - - -
²         (Deposition Exhibit No.
³ Wolf-2, "Folder #2 General
⁴ Causation Materials, Lynch
⁵ Systematic Review Tables", was
⁶ marked for identification.)
⁷             - - -
⁸         MR. HEGARTY:  This is a list
⁹ of materials that we were provided
¹⁰ three days ago and you can see
¹¹ from the first page I'm looking at
¹² this Lynch systematic review
¹³ tables.
¹⁴         Do you see what I'm
¹⁵ referring to?
¹⁶         THE WITNESS:  I do.
¹⁷ BY MR. HEGARTY:
¹⁸     Q.   And did you review the
¹⁹ tables from this publication by Lynch?
²⁰     A.   Yes.
²¹     Q.   I'm also going to scroll
²² down and the second page, there's a
²³ number of expert reports referenced for
²⁴ Dr. Crowley and Dr. Longo and Dr.

Page 81

¹ McTiernan from back in 2018.  There's a
² reference to a Dr. Yessian.  There's a
³ reference to Dr. Huh's testimony, to
⁴ Johns Hopkins' testimony.
⁵         Do you see where I'm looking
⁶ at Dr. Wolf?
⁷     A.   I do, yes.
⁸     Q.   Are these all materials you
⁹ have in your possession?
¹⁰     A.   I don't have hard copies of
¹¹ all of those in my possession, no.
¹²         MS. O'DELL:  Mark, just for
¹³ clarity and really an objection to
¹⁴ make sure we're clear, these
¹⁵ materials have been on Dr. Wolf's
¹⁶ reliance list, some of them in her
¹⁷ 2018 report, some of them in her
¹⁸ 2021 materials considered list.
¹⁹         And so, you know, she's been
²⁰ examined on those or that there's
²¹ been opportunity to examine her on
²² those previously and I would
²³ object to anything that's sort of
²⁴ retreading that old ground.

Page 82

1    MR. HEGARTY:  My question
2  really goes to, for example, a
3  reference to the Daubert opinion
4  or the Daubert order -- do you see
5  where I'm looking at Dr. Wolf?
6    THE WITNESS:  I do.
7  BY MR. HEGARTY:
8    Q.    -- those are not referenced
9  anywhere in your materials considered
10  list; correct?
11    MS. O'DELL:  If you're going
12  to ask -- they are.  I will
13  represent as this officer of the
14  court those are on her materials
15  list, happy to point out the
16  number --
17    MR. HEGARTY:  Sure, please.
18  Yeah, Leigh, please direct me to
19  the number where those are listed.
20    MS. O'DELL:  Yeah, if you
21  don't mind, let me see your hard
22  copy --
23    MR. HEGARTY:  No, please, I
24  mean, I don't want to -- I don't

Page 83

1  want to take time up that's
2  unnecessary.  I just could not
3  find them.
4    MS. O'DELL:  I think they're
5  -- I haven't looked at them
6  recently, but I can tell you they
7  were on there and I'm pretty sure
8  there's --
9    MS. THOMPSON:  It's 362.
10    MS. O'DELL:  Thanks.  So
11  look at number 362, you'll see the
12  Daubert opinion.
13    MR. HEGARTY:  Okay.  Thank
14  you.  What about --
15    MS. O'DELL:  363, you'll see
16  the Blount testimony -- all of
17  this has been on her list
18  previously.
19    MR. HEGARTY:  Could you
20  point me to references to Julie
21  Pier or Johns Hopkins or Dr. Huh?
22    MS. O'DELL:  Yes.  Just a
23  moment.
24    MS. THOMPSON:  Pier is in

Page 84

1  the body of her report,
2  depositions in Exhibit No. 69 on
3  materials considered.
4    MR. HEGARTY:  Margaret, that
5  is for -- oh, Julie Pier.
6    MS. THOMPSON:  Yes.
7    MR. HEGARTY:  How about Dr.
8  Huh, is he listed there in the
9  materials considered list?
10    MS. O'DELL:  I mean, Mark,
11  I'm pretty sure he is --
12  Margaret's going to help with the
13  number.
14    MS. THOMPSON:  Yeah.  410.
15    MS. O'DELL:  Number 410.
16  But just again, you know, these
17  have been on her list a long time
18  and this -- these materials were
19  produced, I believe, in relation
20  to her 2019 deposition, but for
21  sure, I'm absolutely confident,
22  they were disclosed for her 2021
23  deposition, because essentially we
24  used the same folder for

Page 85

1  convenience.
2  BY MR. HEGARTY:
3    Q.    Since September 2021, Dr.,
4  have you reviewed any of the reports or
5  testimony that are listed on the page
6  we're looking at of Exhibit 2?
7    A.    Have I re-reviewed them?
8  Not to my recollection.
9    Q.    Thank you.
10    Have you reviewed any
11  medical records for Ms. Judkins, Ms.
12  Bondurant, or Ms. Gallardo since
13  September 2021?
14    A.    Yes.
15    Q.    Have you reviewed --
16    A.    Not -- not for Ms. Bondurant
17  because she's deceased, but for Ms.
18  Judkins and Ms. Gallardo.
19    Q.    Are the records that you
20  reviewed since September 2021 identified
21  in your amended reports for Ms. Judkins
22  and Ms. Gallardo?
23    A.    Yes.
24    Q.    Other than those records

Page 86

1 referenced in your case-specific reports
2 for Ms. Judkins and Ms. Gallardo, have
3 you reviewed any other medical records
4 for those two women --
5     A.   No.
6     Q.   -- since September 2021?
7     A.   No.
8     Q.   Is there anything in the
9 additional medical records you reviewed
10 since September 2021 that you intend to
11 comment about or rely on for your
12 opinions in this case as to Ms. Judkins?
13     A.   No.
14     Q.   Same question as to Ms.
15 Gallardo.
16        MS. O'DELL:  Would you
17     repeat the questions?
18        MR. HEGARTY:  Sure.
19 BY MR. HEGARTY:
20     Q.   Is there anything in the
21 additional medical records you reviewed
22 since September 2021 for Ms. Gallardo
23 that you intend to comment about or rely
24 upon for your opinions as to her case?

Page 87

1        MS. O'DELL:  Other than what
2     she stated in her report?
3        MR. HEGARTY:  I can add that
4     if you want.
5        Other than what's in the
6     body of your report.
7        THE WITNESS:  Not other than
8     what's in the body of my report.
9 BY MR. HEGARTY:
10     Q.   Have any of your opinions
11 changed since September 2021 as to Ms.
12 Judkins?
13     A.   No.
14     Q.   Have any of your opinions
15 changed since September 2021 as to Ms.
16 Gallardo?
17     A.   No.
18     Q.   Have any of your opinions
19 changed in any way since September 2021
20 as to Ms. Bondurant?
21     A.   No.
22     Q.   Has there been any change in
23 the methodology you applied to the
24 causation issues for Ms. Judkins' case

Page 88

1 since September 2021?
2     A.   No.
3     Q.   Has there been any change in
4 the methodology you applied to the
5 causation issues for Ms. Gallardo since
6 September 2021?
7     A.   No.
8     Q.   Has there been any change in
9 the methodology you applied to the
10 causation issues for Ms. Bondurant since
11 September of 2021?
12     A.   No.
13     Q.   Has there been any change in
14 the methodology you applied to the
15 general causation opinions that you have
16 and that are set out in your reports
17 since September of 2021?
18     A.   No.
19     Q.   Have any of the methodology
20 you applied in the four reports been
21 published in any journal to your
22 knowledge?
23     A.   Since 2021?  I'm not sure
24 what you're asking.

Page 89

1     Q.   Let me limit it in that way.
2 Since September 2021, are you aware of
3 any publications that have set out or
4 describe the type of methodology you
5 applied to the three plaintiffs' cases in
6 your general opinions in this case?
7     A.   Not that --
8        MS. O'DELL:  Objection to
9     the form.  Excuse me.
10        THE WITNESS:  Sorry.  Not
11     that I've reviewed.
12 BY MR. HEGARTY:
13     Q.   Ms. Gallardo is currently 73
14 years old; is that right?  Does that
15 sound right?
16     A.   That sounds right.  I'm
17 going to get her report just --
18     Q.   Sure.  Go ahead.
19     A.   -- if you're going to ask
20 questions about her.
21     Q.   I will mark it, but I am
22 going to ask some questions about her and
23 Ms. Judkins.
24     A.   Okay.

Judith Kay Wolf, M.D.

Page 90

1    Q.   Do you have any -- I'm
2  sorry.  I'll let you get those --
3        MS. O'DELL:  Thank you.
4        THE WITNESS:  Yeah, let me
5  get the reports out.  So Judkins
6  and Gallardo; correct?
7        MR. HEGARTY:  Correct.
8        (Pause.)
9        THE WITNESS:  All right.  I
10  have them both in front of me.
11  BY MR. HEGARTY:
12    Q.   Starting with Ms. Gallardo
13  --
14    A.   Yes.
15        MS. O'DELL:  Take your time.
16  Just get situated.
17        THE WITNESS:  Okay.  Ms.
18  Gallardo.
19  BY MR. HEGARTY:
20    Q.   -- again, she is now, here
21  in 2024, 73 years old; correct?
22    A.   She was born in '52, so she
23  would be 72 years old.
24    Q.   Ms. Gallardo is now more

Page 91

1  than ten years out of her ovarian cancer
2  diagnosis; is that correct?
3    A.   Yes, that's correct.
4    Q.   Have you reviewed all of her
5  visits with her gynecologic oncologist,
6  Dr. Mutch, since September of 2021?
7    A.   Yes.
8    Q.   She has had no recurrence of
9  her cancer; correct?
10    A.   That's correct.
11    Q.   Dr. Mutch's reports state
12  that she is in good health and doing
13  well; correct?
14        MS. O'DELL:  Objection to
15    the form.  Is that a quote or are
16    you -- because if so, we need to
17    look at that.
18        MR. HEGARTY:  It's not a
19    quote.  It's my summary of my
20    review of his records.
21        THE WITNESS:  Of the records
22    that I've seen, her last visit was
23    with Dr. Mutch on May 31st, 2023
24    when she was doing well and her

Page 92

1  CA125 continued to be in the
2    normal range.
3  BY MR. HEGARTY:
4    Q.   Her records report that her
5  prior cancer diagnosis is not limiting
6  her ability to do whatever activities she
7  wants.
8        Do you recall that?
9    A.   I don't recall that
10  specifically, but --
11    Q.   Do you --
12    A.   -- she is doing well.
13    Q.   Is it your opinion that Ms.
14  Gallardo will have a reoccurrence of her
15  ovarian cancer?
16    A.   I don't know.
17    Q.   Is it your opinion that more
18  likely than not, she will have a
19  reoccurrence of her ovarian cancer?
20    A.   It's my opinion that I don't
21  know if she will have a recurrence of her
22  ovarian cancer and that's all I can say.
23    Q.   Do you recall Dr. Mutch
24  testifying that from his standpoint, she

Page 93

1  is cured and put her chance of
2  reoccurrence at less than 5 percent?  Do
3  you recall his testimony along those
4  lines?
5        MS. O'DELL:  Excuse me,
6    mark.  I'll just object.  She was
7    examined on Dr. Mutch's testimony
8    during her 2021 deposition.
9        MR. HEGARTY:  This is sort
10    of a foundational question for
11    this updated deposition.
12  BY MR. HEGARTY:
13    Q.   Do you recall him testifying
14  along those lines?
15        MS. O'DELL:  If you recall
16    and you feel comfortable answering
17    the question, you can.  If you
18    need to see the deposition, we'll
19    put it in front of you.
20        THE WITNESS:  Yeah, I don't
21    recall the details of his
22    deposition.
23  BY MR. HEGARTY:
24    Q.   Let me ask it then in a

Page 94

1 different way:  Do you have any opinion
2 as to the percent likelihood that Ms.
3 Gallardo will have a reoccurrence of her
4 ovarian cancer?
5     A.   All I can say is that I've
6 had patients recur more than ten years
7 after their diagnosis.  I am not aware of
8 clear statistics about the risk factors
9 of recurrence at ten years after
10 diagnosis versus five years or fifteen
11 years.
12            Generally, the longer the
13 patient goes, the less chance there is,
14 but there are so few ovarian cancer
15 patients who survive more than ten years
16 without a recurrence that there isn't
17 good data about what's the chance of it
18 coming back.
19            And because it may always
20 come back, we follow them usually as long
21 as they're willing to come see GYN
22 oncologists and they're alive.
23     Q.   How many patients have you
24 had that have had a reoccurrence more

Page 95

1 than ten years after their original
2 diagnosis with the same stage and type of
3 cancer that Ms. Gallardo had?
4     A.   So she had a Stage IIA.  I
5 can say, in my entire practice, I've only
6 had probably five or less patients who
7 had a Stage IIA ovarian cancer.  That's
8 quite uncommon.  And so I don't recall.
9            But there -- this is an
10 uncommon stage to find.  Most patients
11 are Stage III or IV.  And certainly --
12     Q.   Do you know -- I'm sorry to
13 interrupt.
14     A.   Certainly of my patients who
15 were Stage III or IV, I've had several
16 who were free of disease for ten years or
17 more and then recurred.
18     Q.   Do you have any opinions
19 regarding Ms. Gallardo's life expectancy?
20     A.   Well, I know that the
21 average life expectancy of women in the
22 United States is 78.  And so she's 72, so
23 that would be average, putting all women
24 together.  I don't have any specific

Page 96

1 predictions on her life expectancy.
2     Q.   Since September 2021, have
3 you had any communication with Ms.
4 Gallardo?
5     A.   No.
6     Q.   Turning next to Ms. Judkins
7 --
8     A.   Okay.
9     Q.   -- when you're ready, how
10 old is Ms. Judkins?
11     A.   Give me one minute.
12        (Pause.)
13        THE WITNESS:  Ms. Judkins
14     was born in 1956, so she's 68.
15 BY MR. HEGARTY:
16     Q.   She is now more than seven
17 years out of her diagnosis; does that
18 sound right?
19     A.   Yes.
20     Q.   Have you reviewed all of her
21 visits with her treating gynecologic
22 oncologist since September 2021?
23     A.   Yes.
24     Q.   Are those records referenced

Page 97

1 in your amended report for Ms. Judkins of
2 November 2023?
3        MS. O'DELL:  Object to the
4     form.
5        THE WITNESS:  I thought they
6     were.  I'm trying to find -- oh,
7     yes.  She was last seen in March
8     -- or excuse me -- June of 2023
9     and was found to have no evidence
10     of disease.
11 BY MR. HEGARTY:
12     Q.   Since 2021 -- or let me
13 strike that, let me make it more broad.
14        Ms. Judkins has had no
15 reoccurrence of her ovarian cancer;
16 correct?
17     A.   That's correct.
18     Q.   Is it your opinion in this
19 case that Ms. Judkins will have a
20 reoccurrence of her ovarian cancer?
21     A.   It's my opinion that I don't
22 know if she'll have a reoccurrence.
23     Q.   Does that mean it's not your
24 opinion that more likely than not she

Page 98

1 will have a reoccurrence?

2          MS. O'DELL:  Object to the
3     form.

4          THE WITNESS:  Her -- my
5     opinion is that she may or may not
6     have a recurrence.  I don't know
7     specifically for her or in a
8     patient like her, I can't quote a
9     percentage.

10          But as I stated before, we
11     usually follow these patients as
12     long as they're willing to come
13     back because they can recur late.

14 BY MR. HEGARTY:

15     Q.   Do you have any opinions
16 regarding Ms. Judkins' life expectancy?

17     A.   No, other than she's 68 and
18 the average life expectancy for women in
19 the United States I think is 78.  I don't
20 have any other opinions on her life
21 expectancy.

22     Q.   Do you have any opinions as
23 to any limitations that Ms. Gallardo's
24 prior cancer diagnosis -- that she's

Page 99

1 currently experiencing?

2          MS. O'DELL:  Did you mean
3     Ms. Judkins or Ms. Gallardo?

4          MR. HEGARTY:  I meant Ms.
5     Gallardo.  I had not asked that
6     question before.  Let me ask it
7     again.

8 BY MR. HEGARTY:

9     Q.   As to Ms. Gallardo, do you
10 have any opinions as to any way her prior
11 cancer diagnosis is currently limiting
12 her activities, the things she wants to
13 do?

14          MS. O'DELL:  Object to the
15     form.

16          THE WITNESS:  I don't know
17     specifically the answer -- I don't
18     know.

19 BY MR. HEGARTY:

20     Q.   Do you have any opinions as
21 to Ms. Judkins as whether her prior
22 ovarian cancer diagnosis is currently
23 limiting any of the activities that she
24 is doing or wants to do?

Page 100

1     A.   I don't know specifically.

2     Q.   Have you had any discussions
3 with Ms. Judkins since September 2021?

4     A.   No.

5     Q.   Ms. Gallardo had genetic
6 testing done back in 2014.  Do you recall
7 that?

8     A.   Yes.

9     Q.   As of 2024, there are more
10 expanded tests than what she had back in
11 2014; is that correct?

12     A.   There are.

13     Q.   In the last two years, have
14 you discussed gene panel testing with any
15 of your ovarian cancer patients who had
16 previous testing with a gene panel test
17 that's not -- let me start over again.

18          Since September 2021, have
19 you recommended to any patient who
20 previously had genetic testing to be
21 retested with these more expanded gene
22 panel tests?

23     A.   Not to my recollection, and
24 the only time I recall having that

Page 101

1 discussion with any patient would have
2 been a patient where only BRCA1 and 2 may
3 have been tested for prior to any of the
4 other genes.

5          But in general, the vast
6 majority of the genetically predisposed
7 patients who get ovarian cancer are BRCA1
8 or 2 and the penetrance of all of the
9 other genes that have been identified
10 since then is much lower and so unless
11 someone's family history specifically
12 points to something that they weren't
13 tested for, I don't discuss it with them.

14          I've had a few patients
15 bring it up and say they thought about
16 it, but insurance doesn't pay for them to
17 be tested again because basically it's
18 like having -- insurance thinks it's like
19 having the same test again.

20     Q.   Currently, do you have a
21 particular gene panel test for ovarian
22 cancer patients that you prefer?

23     A.   I don't have any that I
24 prefer.  It's generally what is offered

Page 102

¹ by the hospital or what is covered by the
² patient's insurance, because most of them
³ cover most of the genes that would be
⁴ related to either ovarian cancer or any
⁵ gynecologic cancers or in some cases
⁶ breast cancer.
⁷     Q.   Are you familiar with the
⁸ gene panel testing done by a company
⁹ called Myriad?
¹⁰     A.   Yes.
¹¹     Q.   Are you familiar with the
¹² gene panel testing done by a company
¹³ called Invitae?
¹⁴     A.   Yes.
¹⁵     Q.   Do you have any opinions
¹⁶ about the gene panel tests that Myriad
¹⁷ offers?
¹⁸         MS. O'DELL:  Are you talking
¹⁹     about the current test, Mark, or
²⁰     do you have --
²¹         MR. HEGARTY:  The current
²²     test, the current testing.
²³         THE WITNESS:  I don't have
²⁴     any particular opinion about any

Page 103

¹     of the companies' test.
² BY MR. HEGARTY:
³     Q.   Ms. Gallardo could have
⁴ another gene panel test today; correct?
⁵     A.   She could.
⁶     Q.   That can be done by a saliva
⁷ sample?
⁸     A.   You know, again, you're
⁹ asking me the details about the testing.
¹⁰ I know some of the companies can be
¹¹ saliva.  I don't know if all of them are
¹² saliva today.
¹³     Q.   Ms. Judkins could also be
¹⁴ retested for genetic mutations today;
¹⁵ correct?
¹⁶         MS. O'DELL:  Object to the
¹⁷     form.
¹⁸         THE WITNESS:  She could.
¹⁹     One of the whole -- one of the
²⁰     challenges for many patients is
²¹     that they've already been tested.
²²     Their insurance won't pay for
²³     another test and they're usually
²⁴     in the thousands of dollars.

Page 104

¹ BY MR. HEGARTY:
²     Q.   What did you do, Dr. Wolf,
³ to prepare for your testimony here today?
⁴     A.   So on my own, I reviewed my
⁵ reports, the specific and the general
⁶ report, some of the literature, and then
⁷ yesterday met with the attorneys for
⁸ about four to -- four or five hours, kind
⁹ of going over all the same things.
¹⁰     Q.   Besides the list you just
¹¹ provided, did you do anything else to
¹² prepare for today's deposition?
¹³         MS. O'DELL:  Objection.
¹⁴         THE WITNESS:  No.  I was
¹⁵     going to say I took a shower, but
¹⁶     that's not appropriate.
¹⁷ BY MR. HEGARTY:
¹⁸     Q.   Do you recall any of the
¹⁹ medical literature that is the first
²⁰ named author of any of the literature you
²¹ reviewed to prepare for today's
²² deposition?
²³     A.   Yeah, I mean, most -- the
²⁴ new -- new papers that I cite in my

Page 105

¹ amended report, many of them I reviewed,
² Davis, Phung, Woolen, Mandarino, Emi,
³ Harper.  Those are some of the names that
⁴ I recall.
⁵     Q.   You also mentioned that you
⁶ met with counsel for plaintiffs
⁷ yesterday.  Who did you meet with?
⁸     A.   So in person, I was with
⁹ Margaret Thompson and Leigh O'Dell, and
¹⁰ Michelle Parfitt was on Zoom for part of
¹¹ the time.
¹²     Q.   Did you have just the one
¹³ meeting to prepare for today's
¹⁴ deposition?
¹⁵     A.   Yes.
¹⁶     Q.   With regard to the fees
¹⁷ you've received for your work in the MDL
¹⁸ or otherwise since September 2021, have
¹⁹ you invoiced all of those fees to counsel
²⁰ for plaintiffs?
²¹     A.   Yes.  Yes.
²²     Q.   Have you been paid for all
²³ of the invoices that you have submitted
²⁴ since September 2021?

Page 106

1    A.    Yes, except for December of
2  '23, which I just recently submitted that
3  invoice.
4    Q.    Since September 2021, what
5  rate have you charged plaintiffs' counsel
6  for your work in the MDL?
7    A.    It was 600.  Then I asked
8  for 650 about a year ago just because
9  inflation.  Per hour.  I'm sorry.
10      MR. HEGARTY:  I'm going to
11  show you next, Dr. Wolf, the
12  invoices we were provided in
13  advance of this deposition, so
14  I'll share my screen with you
15  again.
16      THE WITNESS:  Okay.  I'm
17  just putting the medical records
18  away, two patients, part of the
19  report.  Excuse me.
20      MR. HEGARTY:  I'm going to
21  mark as Exhibit No. 3 the pages
22  we're looking at on my screen.
23          - - -
24      (Deposition Exhibit No.

Page 107

1  Wolf-3, Thirty-four Pages of
2  Judith Wolf Invoices Starting with
3  January 2017, was marked for
4  identification.)
5          - - -
6  BY MR. HEGARTY:
7    Q.    First of all, Dr. Wolf, do
8  you see my screen?
9    A.    I do.
10      MS. O'DELL:  So, Mark, this
11  is an invoice from 2017 and I
12  would object to any examination on
13  prior invoices.  This is -- she's
14  been examined on that in 20 -- her
15  deposition after her first report.
16      We provided, I believe, four
17  -- three -- three invoices for Dr.
18  Wolf via Susan.  I sent them to
19  Susan on Monday; and so if you
20  don't have them, I'm happy to
21  e-mail them to you if they didn't
22  make it to you, but they're in the
23  folder and they were provided to
24  Susan, as I indicated I would on

Page 108

1  Monday.
2      MR. HEGARTY:  I have those
3  and I was going to mark those
4  next.
5      What I really am looking for
6  is confirmation that as to the
7  invoices we were provided prior to
8  the most recent ones, the three
9  most recent ones, whether these
10  are all of Dr. Wolf's invoices for
11  her work on the MDL litigation.
12      MS. O'DELL:  You know, the
13  invoices that we previously
14  provided were in the folder we
15  gave to you and then we provided
16  invoices since August of 2023,
17  since the bankruptcy was
18  dismissed, and those are the
19  invoices.
20      And so, I mean, I don't know
21  exactly what you're showing on the
22  screen.  Certainly -- I mean,
23  she's been examined on every
24  invoice in that folder except for

Page 109

1  the ones in August to December
2  2023.
3  BY MR. HEGARTY:
4    Q.    I've scrolled down, Dr.
5  Wolf, to the invoice we were provided
6  that's dated September 1, 2021 that
7  include your August 2021 time.
8      Do you see what I'm showing
9  you?
10    A.    Yes.
11      MS. O'DELL:  And that was
12  provided before her September 2021
13  deposition, so I just -- I don't
14  -- I don't know why we're going
15  back.
16      MR. HEGARTY:  I've just
17  changed my screen and showing the
18  three invoices we were provided
19  from August to December 2023.
20  BY MR. HEGARTY:
21    Q.    Do you see these invoices on
22  your screen, Dr. Wolf?
23    A.    Mostly what I see is what's
24  blacked out.  I see August -- yes, August

Judith Kay Wolf, M.D.

Page 110

1  -- August through October, yes.

2      Q.   Do you recall that we just

3  looked at a moment ago that I marked as

4  Exhibit No. 3 an invoice from August of

5  2021?

6      A.   Yes.

7      Q.   The first page of this next

8  set of invoices, which I'll -- again,

9  I'll mark as Exhibit No. 4 -- is from

10 August, September, and October of 2023.

11      Do you see that?

12      A.   Yes.

13          - - -

14      (Deposition Exhibit No.

15  Wolf-4, Three Pages of Judith Wolf

16  Invoices from August to December

17  2023, was marked for

18  identification.)

19          - - -

20 BY MR. HEGARTY:

21      Q.   Did you invoice any work you

22 did on the talcum powder cases in the MDL

23 since -- between August of 2021 and

24 August of 2023?  In other words, are

Page 111

1  there any invoices between the last one

2  we looked at in Exhibit No. 3 and this

3  invoice?

4          MS. O'DELL:  For the MDL

5      cases?

6  BY MR. HEGARTY:

7      Q.   Are the invoices we've been

8  provided just for the MDL cases?

9          MS. O'DELL:  No.  Swan's

10      mentioned in prior invoices, so

11      that wouldn't be the case.  I'm

12      just trying to understand your

13      question.

14          MR. HEGARTY:  Well,

15      hopefully Dr. Wolf understood my

16      question, but let me ask it again.

17 BY MR. HEGARTY:

18      Q.   I'm going to jump back to

19 Exhibit No. 4 and do you recall that the

20 last invoice is from August 2021?

21      A.   Yes.

22      Q.   And I'll jump back to

23 Exhibit No. 4 where the invoices picked

24 up again with the first entry on August

Page 112

1  28th, 2023.

2          Do you see that?

3      A.   I do.

4      Q.   Did you do any work on the

5  MDL litigation, or any other litigation

6  involving talcum powder and ovarian

7  cancer, between August of 2021 and August

8  of 2023?

9      A.   There may have been one or

10 two hours of phone calls to catch up with

11 what was happening with the bankruptcy,

12 but very little.

13      Q.   Did you invoice for those

14 perhaps one or two hours of calls?

15      A.   Yes.

16      Q.   Did you invoice those in the

17 invoice we're looking at, that is, the

18 invoice from August 28, 2023 through

19 October 9, 2023?

20      A.   No.  I would have invoiced

21 them separately, but I don't remember

22 specifically the dates.

23      Q.   Do you believe that there is

24 an invoice between -- that you did

Page 113

1  invoice time between August 2021 and

2  August 2023?

3      A.   I believe there's a few

4  hours, but I don't remember the dates and

5  if there was, I invoiced them, yes.

6          MR. HEGARTY:  I don't

7      believe we've seen those and we

8      would ask those to be produced if

9      they do exist.

10          MS. O'DELL:  I will say I'm

11      not sure what those are.  I will

12      have to go look and I'll follow up

13      on that.

14          MR. HEGARTY:  Okay.  Thank

15      you.

16 BY MR. HEGARTY:

17      Q.   The exhibits -- I mean, the

18 invoices that we have in Exhibit No. 4

19 are three pages.  The first one covers

20 August 28, 2023 through October 9th,

21 2023.  The second one covers November

22 11th, 2023 to November 30, 2023.  And the

23 third covers December 10th, 2023 to

24 December 29, 2023.

Page 114

1    Dr. Wolf, are these your
2  invoices for your work that you have done
3  on talcum powder cases since August of
4  2023 --
5    A.   Yes.
6    Q.   -- through the end of
7  December 2023?
8    A.   Yes.
9    Q.   Have you been paid for all
10 of the time you've invoiced in these
11 three invoices?
12   A.   Yes.
13   Q.   Have you prepared an invoice
14 for any of the work you've done in
15 January 2024?
16   A.   No.
17   Q.   Do you recall the number of
18 hours you've spent so far in 2024 working
19 on talcum powder cases?
20   A.   No.  I -- I log them on my
21 phone, but I don't remember the number
22 offhand.
23      MS. O'DELL:  So, Mark, we've
24 been going about an hour and ten

Page 115

1  minutes.  So I don't know if, Dr.
2  Wolf, if you want a break or you
3  want to go a little bit longer.
4  It's up to you.
5     THE WITNESS:  If this is a
6  good time to break, a break would
7  be nice.
8     MR. HEGARTY:  Okay.  Let's
9  go ahead and go off the record.
10    (A recess was taken from
11 12:54 p.m. to 1:04 p.m.)
12    MR. HEGARTY:  We are back on
13 the record.
14    Dr. Wolf, I want to show you
15 next the C.V. we were provided
16 with your November 2023 amended
17 report.  I'm going to share my
18 screen with you.  Please let me
19 know if you can see my screen.
20    THE WITNESS:  I can see your
21 screen.
22    MR. HEGARTY:  I'm going to
23 mark this curriculum vitae as
24 Exhibit No. 5.

Page 116

1       - - -
2     (Deposition Exhibit No.
3  Wolf-5, Curriculum Vitae of Judith
4  K. Wolf, M.D., was marked for
5  identification.)
6       - - -
7  BY MR. HEGARTY:
8     Q.   Do you see where it has your
9  name at the top, Dr. Wolf?
10    A.   I do.
11    Q.   Do you have a copy of your
12 current curriculum vitae with you?
13    A.   Let me get it out.  I do.
14    Q.   And as you're getting it
15 out, I'm scrolling down to the very last
16 page where it -- the document lists:
17 C.V. updated 1/5/2019.
18    Do you see that?
19    MS. O'DELL:  She's -- give
20 her a moment, Mark.  I think she's
21 pulling it out of her notebook.
22    (Pause.)
23    THE WITNESS:  I see that.
24 BY MR. HEGARTY:

Page 117

1     Q.   Did you last update your
2  curriculum vitae on January 5th, 2019?
3     A.   No, I just didn't change --
4  I didn't notice that date.  It was in
5  2023 sometime, and it would have been
6  sometime after June of 2023, but before
7  September or October.
8     Q.   Does the curriculum vitae
9  that we're looking at, what you have in
10 your hand, accurately reflect and is
11 current with regard to your medical
12 education, training, and experience?
13    A.   Yes, except for the -- at
14 the very beginning, the hospitals, the
15 current hospitals have changed.  I have
16 worked at Bellin Hospital in Green Bay
17 and Billings Cancer Center in Montana.
18    Q.   Those two facilities should
19 be added in the very first page at the
20 top?
21    A.   That's correct.
22    Q.   Are you aware of any other
23 changes or additions to your curriculum
24 vitae to bring it current as of January

Page 118

1  2024?

2      A.   Not that I'm aware of.

3      Q.   Have you developed any

4  additional or new expertise since

5  September 2021?

6      A.   No.

7      Q.   Have you had any formal or

8  informal training on any subject areas

9  since September 2021?

10     A.   No.

11     Q.   Is there anything new to

12 your C.V. since September 2021 that you

13 rely upon for your opinions in this case?

14     A.   No.

15     Q.   Have you -- let me start

16 over again.

17          How many publications have

18 you had since September 2021?

19     A.   I'm going to look at my C.V.

20 There's been a couple, but I can't

21 remember -- since I'm not working in

22 academic medicine anymore, I don't

23 publish like I used to.

24     Q.   Looking over at the end of

Page 119

1  your publication list, paragraphs 97

2  through 99, are those your publications

3  since September 2021?

4      A.   As far as I'm aware, yes.

5      Q.   Thank you.

6          Since September 2021, have

7  you prepared any notes, handwritten or

8  typed notes, as part of your work on this

9  case?

10     A.   No.

11         MR. HEGARTY:  The next

12     document I'm going to show you,

13     which I'll mark as Exhibit No. 6,

14     is your Notice of Deposition.

15              - - -

16         (Deposition Exhibit No.

17     Wolf-6, Notice of Oral Deposition

18     of Judith E. Wolf, M.D. and Duces

19     Tecum in MDL, was marked for

20     identification.)

21              - - -

22         MR. HEGARTY:  Please let me

23     know, Dr. Wolf, if you can see the

24     notice on your screen.

Page 120

1          THE WITNESS:  Yes, I can.

2          MS. O'DELL:  Mark, would you

3      mind telling me the exhibit number

4      again?  I missed that.

5          MR. HEGARTY:  I'm going to

6      designate this as Exhibit 6.

7          MS. O'DELL:  Thank you.

8  BY MR. HEGARTY:

9      Q.   As you can see on the first

10 page, Dr. Wolf, this makes reference to

11 your deposition being today starting at

12 10:00 a.m. Eastern.

13          Do you see that?

14     A.   I do.

15     Q.   Have you reviewed the

16 document we're looking at, the notice of

17 your deposition in the MDL?

18     A.   Yes.

19     Q.   In particular, have you

20 reviewed the document requests that

21 accompany this notice?

22     A.   Yes.

23     Q.   Have you provided, in

24 consultation with your counsel, all of

Page 121

1  the documents that you have that are

2  referenced in those paragraphs?

3          MS. O'DELL:  Mark, I'll

4      represent that documents have been

5      provided to counsel for J & J

6      consistent with the objections

7      that we served last week.

8          MR. HEGARTY:  So, Leigh,

9      does that mean that with regard to

10     what you have produced, that

11     whatever it is that you've

12     produced would be responsive to

13     this document -- the document

14     request in the notice; correct?

15         MS. O'DELL:  There were a

16     number of objections lodged, and

17     so what I'm saying is that we have

18     provided to counsel for J & J

19     documents consistent with our

20     objections that we served.

21         MR. HEGARTY:  Okay.  Thank

22     you.

23         THE WITNESS:  Just of note,

24     I just noticed that my name is

1  incorrect on this.  My middle
2  initial is not E.  It's K.
3      MR. HEGARTY:  Sorry about
4  that.
5      THE WITNESS:  That's okay.
6  BY MR. HEGARTY:
7      Q.   Your report also provided in
8  Exhibit number C, Dr. Wolf, which
9  concerned medical-legal testimony in last
10 four years.  It referenced testimony on
11 January 7, 2019, August 30, 2021, and
12 September 13, 2021, and September 14,
13 2021.
14      Is that an accurate list of
15 the medical-legal testimony you have
16 given in the last four years?
17      A.   I just pulled it to have it
18 in front of me, and that is correct.
19      MR. HEGARTY:  Thank you.
20 I'm going to mark next the amended
21 reports we have been provided from
22 November 2021.  I'll share each of
23 those with you.
24      THE WITNESS:  The general

1  and for each of the three
2  patients?
3      MR. HEGARTY:  Yes.  Yes, Dr.
4  Wolf.
5      THE WITNESS:  All right.
6      MS. O'DELL:  Just a moment,
7  Mark.  She's going to get them in
8  front of her.
9      MR. HEGARTY:  While, Dr.
10 Wolf, you're pulling those from
11 your notebook, I'm sharing my
12 screen with you, which is the --
13 which is your Second Amended Rule
14 26 expert report with your general
15 opinions --
16      MS. O'DELL:  Do you mind
17 scrolling up to the top just
18 quickly so we can see the caption?
19 Okay.  So this document relates to
20 all cases.  Thank you.
21      MR. HEGARTY:  Yes.
22      THE WITNESS:  And I have
23 that in front of me.
24      MR. HEGARTY:  The report

1  itself is 21 pages.
2  BY MR. HEGARTY:
3      Q.   Do you see that, Dr. Wolf?
4      A.   Yes.
5      Q.   Looking at the first page,
6  is that your signature, Dr. Wolf?
7      A.   Yes, it is.
8      Q.   It is dated November 15,
9  2023?
10      A.   Yes.
11      MR. HEGARTY:  And, again,
12 for purpose of the record, I'm
13 marking as Exhibit No. 7 Dr.
14 Wolf's Second Amended Rule 26
15 general expert report dated
16 November 15, 2023.
17      - - -
18      (Deposition Exhibit No.
19 Wolf-7, 11/15/23 Second Amended
20 Rule 26 General Expert Report of
21 Judith Wolf, M.D., was marked for
22 identification.)
23      - - -
24      MR. HEGARTY:  I'm showing

1  you next -- and I'm not sure why
2  the caption's taken out, but this
3  is the --
4      MS. O'DELL:  Is this a
5  different document, Mark?
6      MR. HEGARTY:  Yeah, this is
7  the case-specific report for Ms.
8  Linda Bondurant, which I'll mark
9  as Exhibit No. 8.
10      - - -
11      (Deposition Exhibit No.
12 Wolf-8, 11/15/23 Amended Rule 26
13 Bondurant Case-Specific Expert
14 Report of Judith Wolf, M.D., was
15 marked for identification.)
16      - - -
17 BY MR. HEGARTY:
18      Q.   Do you have that report, Dr.
19 Wolf?
20      A.   I do and I see it on the
21 screen and I have the specific report in
22 front of me.
23      Q.   Does this report likewise on
24 the first page contain your signature and

Page 126

1  a date of November 15, 2023?
2      A.   Yes.
3          MS. O'DELL:  So, Mark, for
4  the record, if you'll just scroll
5  down just for a moment, is this --
6  were there redactions on this from
7  someone?
8          MR. HEGARTY:  No.  This is a
9  copy that I requested.  I don't
10  know why the caption in that copy
11  is blacked out.
12          MS. O'DELL:  Okay.
13          MR. HEGARTY:  But for
14  purposes of the actual exhibit, I
15  will make sure it has the caption
16  on it.
17          MS. O'DELL:  That's my
18  request, thank you.
19          MR. HEGARTY:  Yes.
20      The next report, which I'll
21  mark as Exhibit No. 9, is what I'm
22  sharing with you on my screen and
23  I'll scroll down to the
24  case-specific part of the report

Page 127

1  where it refers to Ms. Carter
2  Judkins.
3          Do you see that, Dr. Wolf?
4          THE WITNESS:  I do.
5          - - -
6          (Deposition Exhibit No.
7  Wolf-9, 11/15/23 Amended Rule 26
8  Judkins Case-Specific Expert
9  Report of Judith Wolf, M.D., was
10  marked for identification.)
11          - - -
12  BY MR. HEGARTY:
13      Q.   Scrolling back up to the
14  first page, is this your amended Rule 26
15  expert report dated November 15th, 2023
16  for Ms. Judkins?
17      A.   Yes.
18      Q.   And, again, that's your
19  signature on the first page?
20      A.   Yes.
21          MR. HEGARTY:  The last of
22  your amended reports for the three
23  plaintiffs that you are testifying
24  about in the MDL, which I'll mark

Page 128

1  as Exhibit No. 10, is your report
2  for Ms. Gallardo.
3          - - -
4          (Deposition Exhibit No.
5  Wolf-10, 11/15/23 Amended Rule 26
6  Gallardo Case-Specific Expert
7  Report of Judith Wolf, M.D., was
8  marked for identification.)
9          - - -
10  BY MR. HEGARTY:
11      Q.   I'll scroll down and show
12  you where you reference Ms. Gallardo.
13          Do you see the page we're
14  looking at starting at page 21 where you
15  refer to Anna Gallardo?
16      A.   Yes.
17      Q.   Scrolling back up, is the
18  document we're looking at, Exhibit No.
19  10, your amended Rule 26 expert report
20  dated November 15, 2023 as it pertains to
21  Ms. Gallardo?
22      A.   Yes.
23      Q.   As to the last three reports
24  that we went through for Ms. Bondurant,

Page 129

1  Ms. Judkins, and Ms. Gallardo, is the
2  first part of that report that refers to
3  general issues the same as your general
4  causation report that we marked a moment
5  ago?
6      A.   Yes.
7      Q.   As to the four reports that
8  we went through, are they all accurate?
9      A.   Yes, as far as I'm aware.
10  There might be some typos, but otherwise
11  they're accurate.
12      Q.   Are you aware, sitting here
13  today, of any changes or revisions that
14  you know you need to make or want to
15  make?
16      A.   No.
17      Q.   And with regard to the
18  preparation of the four reports that we
19  just marked as exhibits, were you asked
20  to do anything in the preparation of
21  those reports different than what you had
22  been asked to do for your previous MDL
23  reports?
24      A.   No.

Page 130

1    Q.   Did you approach the
2 preparation of those amended reports any
3 differently than you did in preparing the
4 prior reports for Ms. Bondurant, Ms.
5 Judkins, and Ms. Gallardo and your
6 general report?
7    A.   No.
8    Q.   Are there opinions you have
9 formed with regard to talcum powder use
10 and ovarian cancer that you know today
11 you intend to testify to that are not
12 contained in the four reports that we
13 just marked as exhibits?
14    A.   Not that I'm aware of.
15    Q.   With regard to the new
16 records -- or let me start over again.
17        With regard to the records
18 you reviewed for Ms. Judkins since
19 September 2021, was there anything in
20 those records that provide any evidence
21 that talc use caused or contributed to
22 Ms. Judkins' ovarian cancer?
23    A.   Anything new in her records?
24    Q.   Yes, Doctor.

Page 131

1    A.   Nothing -- nothing new in
2 her records.
3    Q.   Since September of 2021, has
4 Ms. Judkins been diagnosed with any
5 respiratory or -- respiratory, lung, or
6 other condition that could be attributed
7 to asbestos exposure?
8    A.   Not that was recorded in her
9 medical records that I reviewed.
10    Q.   Since September 2021, has
11 Ms. Judkins been diagnosed with any
12 condition that could be related to heavy
13 metal exposure?
14    A.   Not that I -- that was in
15 the medical records that I reviewed.
16    Q.   Since September of 2021, as
17 to the records you reviewed for Ms.
18 Gallardo, is there anything in those more
19 recent records that provide any evidence
20 that talc use caused or contributed to
21 cause her ovarian cancer?
22        MS. O'DELL:  Dr. Wolf, if
23    you need time to get to the right
24    place in your report --

Page 132

1        THE WITNESS:  So you're
2    asking about Ms. Gallardo now.
3    Nothing new in her records.
4 BY MR. HEGARTY:
5    Q.   Was there anything in her
6 records since September 2021 that
7 indicated she had any respiratory, lung,
8 or other condition that could be
9 attributed to asbestos exposure?
10    A.   Not that was in the records
11 that I reviewed.
12    Q.   In the records you reviewed
13 since September 2021, was there any
14 indication in those records that Ms.
15 Gallardo had any condition that could be
16 related to heavy metal exposure?
17    A.   No.
18    Q.   Since September 2021, have
19 you done any analysis to quantify Ms.
20 Judkins' level of exposure to talcum
21 powder?
22    A.   Analysis?  Do you mean
23 studies?
24    Q.   Done your own efforts to

Page 133

1 quantify it, done any qualitative or
2 quantitative analysis, done anything
3 specific as to Ms. Judkins since
4 September 2021 to try to quantify the
5 volume of exposure that she had to talcum
6 powder.
7        MS. O'DELL:  Object to the
8    form.  Other than what she did
9    previously?
10        MR. HEGARTY:  I'm only
11    asking since September 2021.
12        THE WITNESS:  No.
13 BY MR. HEGARTY:
14    Q.   Same question as to Ms.
15 Gallardo.
16    A.   No.
17    Q.   Same question as to Ms.
18 Bondurant.
19    A.   No.
20    Q.   And then the same question
21 as it relates to the three plaintiffs
22 concerning quantifying or otherwise
23 considering since September 2021 their
24 exposure to asbestos:  Have you done any

Page 134

<sup>1</sup> work yourself since September 2021 to
<sup>2</sup> assess any of these three plaintiffs'
<sup>3</sup> exposure to asbestos?
<sup>4</sup>         MS. O'DELL:  Object to the
<sup>5</sup>     form.
<sup>6</sup>         THE WITNESS:  No.
<sup>7</sup> BY MR. HEGARTY:
<sup>8</sup>     Q.   Since September 2021, have
<sup>9</sup> you done any type of analysis to identify
<sup>10</sup> the level of exposure to talc that has
<sup>11</sup> been determined to cause ovarian cancer?
<sup>12</sup>         MS. O'DELL:  Would you mind
<sup>13</sup>     repeating the question, please?
<sup>14</sup>         MR. HEGARTY:  Sure.
<sup>15</sup> BY MR. HEGARTY:
<sup>16</sup>     Q.   Since September 2021, have
<sup>17</sup> you done any type of analysis yourself to
<sup>18</sup> identify the level of exposure to talc
<sup>19</sup> that has been determined to cause ovarian
<sup>20</sup> cancer?
<sup>21</sup>         MS. O'DELL:  Object to the
<sup>22</sup>     form.
<sup>23</sup>         THE WITNESS:  Well, I'm not
<sup>24</sup>     sure that there's any evidence

Page 135

<sup>1</sup>     about what that level is and the
<sup>2</sup>     answer would be, no, I have not.
<sup>3</sup> BY MR. HEGARTY:
<sup>4</sup>     Q.   Since September 2021, have
<sup>5</sup> you done any analysis yourself to
<sup>6</sup> identify the level of exposure to
<sup>7</sup> asbestos that has been determined to
<sup>8</sup> cause ovarian cancer?
<sup>9</sup>         MS. O'DELL:  Object to the
<sup>10</sup>     form.
<sup>11</sup>         THE WITNESS:  No, other than
<sup>12</sup>     I think there was one new article
<sup>13</sup>     included in my amended report by
<sup>14</sup>     Nowak about showing a relationship
<sup>15</sup>     between asbestos exposure and
<sup>16</sup>     ovarian cancer, just reviewing the
<sup>17</sup>     article.  I didn't do any studies
<sup>18</sup>     of my mine.
<sup>19</sup> BY MR. HEGARTY:
<sup>20</sup>     Q.   Similar question:  Since
<sup>21</sup> September 2021, have you done any type of
<sup>22</sup> analysis yourself to identify the level
<sup>23</sup> of exposure to any heavy metals that can
<sup>24</sup> either cause or increase the risk of

Page 136

<sup>1</sup> ovarian cancer?
<sup>2</sup>         MS. O'DELL:  Object to the
<sup>3</sup>     form.
<sup>4</sup>         THE WITNESS:  No.
<sup>5</sup> BY MR. HEGARTY:
<sup>6</sup>     Q.   I want to switch gears here
<sup>7</sup> a little bit and focus on your second
<sup>8</sup> amended Rule 26 report, the general
<sup>9</sup> report, dated November 15, 2023.
<sup>10</sup>         Would you please have that
<sup>11</sup> report in front of you?
<sup>12</sup>     (Pause.)
<sup>13</sup>         THE WITNESS:  Yes, I have
<sup>14</sup>     it.
<sup>15</sup>         MR. HEGARTY:  And that
<sup>16</sup>     report for purposes of the record
<sup>17</sup>     is -- has been previously marked
<sup>18</sup>     as Exhibit No. 7 for today's
<sup>19</sup>     deposition.
<sup>20</sup> BY MR. HEGARTY:
<sup>21</sup>     Q.   Please turn first to page 2,
<sup>22</sup> the last paragraph before the section
<sup>23</sup> "Methodology."
<sup>24</sup>     A.   Yes.

Page 137

<sup>1</sup>     Q.   That last paragraph has the
<sup>2</sup> additional statement that:  I am
<sup>3</sup> recruited on a regular basis to serve in
<sup>4</sup> communities which are lacking gynecologic
<sup>5</sup> oncology care.
<sup>6</sup>         Who has recruited you since
<sup>7</sup> September of 2021 to provide gynecologic
<sup>8</sup> oncology care?
<sup>9</sup>     A.   So the locums companies, the
<sup>10</sup> one I currently work with, CompHealth, as
<sup>11</sup> well as some of the other locums
<sup>12</sup> companies, Weatherby Health, Locum
<sup>13</sup> Tenens, All Star Recruiting.  Those are
<sup>14</sup> the names I can think of off the top of
<sup>15</sup> my head.
<sup>16</sup>         On a weekly at least or more
<sup>17</sup> often basis, they reach out to me about
<sup>18</sup> positions around the country that need
<sup>19</sup> help.
<sup>20</sup>     Q.   Since September 2021, have
<sup>21</sup> you turned down any request for your
<sup>22</sup> services at any communities?
<sup>23</sup>     A.   I'm going to say yes.
<sup>24</sup> Sometimes -- and it's usually because I'm

Page 138

¹ working as much as I want to work and I
² don't want to take more work on.
³        I also currently working
⁴ with CompHealth, it's a lot of work to
⁵ get credentialed through a company and
⁶ they're good to work with and so when
⁷ other companies reach out to me, I
⁸ generally turn them down.
⁹        Or if it's something I'm
¹⁰ interested in, I might ask CompHealth if
¹¹ they know about it.
¹²    Q.   You mentioned the locations
¹³ where you have worked since September
¹⁴ 2021.  Why did you select those locations
¹⁵ to go to?
¹⁶    A.   First of all, they needed
¹⁷ help and, second of all, the schedule and
¹⁸ the time that they needed help worked
¹⁹ with me, with my schedule.
²⁰    Q.   When you go to work at those
²¹ facilities outside of where you live,
²² what do you do for accommodations?
²³    A.   The company pays for me to
²⁴ stay at a hotel, CompHealth, the company.

Page 139

¹    Q.   Thank you.
²        And you mentioned that
³ you've been contacted by other entities
⁴ like CompHealth.  Have you signed up with
⁵ or engaged with any other company since
⁶ September 2021?
⁷    A.   No.
⁸    Q.   Please turn next to page 4
⁹ of your report, the second paragraph that
¹⁰ begins "In addition to talc and asbestos
¹¹ exposure"?
¹²    A.   Yes.
¹³    Q.   You added to that paragraph
¹⁴ from your prior report a reference to the
¹⁵ 2022 Phung study.  Do you see that?
¹⁶    A.   Yes.
¹⁷    Q.   Did you find the Phung 2022
¹⁸ study yourself?
¹⁹    A.   I don't recall.
²⁰    Q.   Do you have a copy of the
²¹ Phung 2022 study with you?
²²    A.   I do.  Let me get it out.
²³ Just give us a minute.
²⁴        (Pause.)

Page 140

¹        THE WITNESS:  Okay.  I have
² the Phung paper in front of me.
³ BY MR. HEGARTY:
⁴    Q.   Do you consider this study,
⁵ the Phung study, to be a good study?
⁶        MS. O'DELL:  Object to the
⁷    form.
⁸        THE WITNESS:  I think this
⁹ -- that when I look at this --
¹⁰ excuse me -- at this paper, the
¹¹ OCAC consortium, which is the
¹² authors of this paper, are
¹³ well-known experts in GYN
¹⁴ oncology.
¹⁵        In my opinion, it was well
¹⁶ written and the methods were clear
¹⁷ and the results were stated as far
¹⁸ as I can tell correctly, so I
¹⁹ would say yes.
²⁰ BY MR. HEGARTY:
²¹    Q.   What does this study add to
²² your opinions or are new -- or present
²³ new to your opinions in this case?
²⁴    A.   I think what it adds to me

Page 141

¹ is, again, it's a group of authors, the
² OCAC group, that are well respected.  In
³ this, they state that talc causing
⁴ ovarian cancer is a well-established risk
⁵ and specifically look -- in this paper,
⁶ they're looking at the risk of
⁷ endometriosis, which is an inflammatory
⁸ process and has been associated with
⁹ increased risk of ovarian cancer, as well
¹⁰ as talc, which is an -- causes an
¹¹ inflammatory response and that, again,
¹² noting and supporting the idea that
¹³ inflammation can be a cause of ovarian
¹⁴ cancer.
¹⁵        So those three things, the
¹⁶ group that wrote it, the fact that this
¹⁷ distinguished group accepts talc as a
¹⁸ risk factor, and thirdly that
¹⁹ inflammation as a cause of ovarian cancer
²⁰ is present with both talc and
²¹ endometriosis, and then finally their
²² result that if a patient has
²³ endometriosis and has had talc exposure,
²⁴ those two things that are inflammatory

Judith Kay Wolf, M.D.

1  together increase the risk further than
2  either alone, which goes to the fact that
3  having more than one risk factor just
4  increases the risk of cancer for ovarian
5  cancer and other types of cancer.
6          MR. HEGARTY:  Thank you.
7       Before we go any further to talk
8       about this paper, I'll designate
9       it for today's deposition as
10      Exhibit No. 11.
11          - - -
12          (Deposition Exhibit No.
13      Wolf-11, "Effects of Risk Factors
14      for ovarian cancer in women with
15      and without endometriosis" Paper
16      by Phung, et al, was marked for
17      identification.)
18          - - -
19  BY MR. HEGARTY:
20      Q.   You mentioned in your
21  response, Dr. Wolf, that the authors of
22  the paper said as to talc causing ovarian
23  cancer, it is a well-established risk
24  factor.  Where are you looking -- or

1  where is that in this paper?
2      A.   I'm looking for the exact
3  wording.  In the introduction, on page 2:
4  We conducted a comprehensive study of
5  endometriosis.  Our -- and the next
6  sentence says:  Our analysis considers 10
7  well-established ovarian cancer risk
8  factors, including body mass index,
9  talcum powder, i.e., talc use, family
10  history, and so on.
11      Q.   Thank you.
12          The study states over on
13  page 964 that endometriosis --
14      A.   Sorry.  This study is pages
15  1 through 9.
16          MS. O'DELL:  964 is -- I
17      think initially it may have had
18      just no page numbers, but 964 is
19      the page with results on it; is
20      that right, Mark?
21          MR. HEGARTY:  Yeah, let me
22      try and direct it in a better way.
23  BY MR. HEGARTY:
24      Q.   Please turn to the

1  discussion section, Dr. Wolf.
2      A.   I have the discussion
3  section, okay.
4      Q.   The first line of the
5  discussion section states that
6  endometriosis is a common gynecologic
7  condition and a well-established risk
8  factor for ovarian cancer.
9          Do you agree with that
10  statement?
11      A.   Yes.
12      Q.   Looking back at your report,
13  prior to citing the Phung study, you cite
14  -- you say that as to risk factors, they
15  can act in a cumulative, additive, and/or
16  synergistic fashion.
17          Do you see where I'm
18  reading?
19      A.   I do.
20      Q.   Is it your opinion that the
21  Phung study showed that talc and
22  endometriosis act in a cumulative,
23  additive, and/or synergistic fashion?
24          MS. O'DELL:  Object to the

1  form.
2          THE WITNESS:  Well, it's my
3       opinion that in the results of
4       this study, if the patient had
5       both talc exposure and
6       endometriosis, her risk of ovarian
7       cancer was greater than if she had
8       either alone.
9  BY MR. HEGARTY:
10      Q.   Do the authors make any
11  statement in this study that talc and
12  endometriosis act in a cumulative,
13  additive, or synergistic fashion?
14      A.   I'm looking at the study.
15          (Pause.)
16          THE WITNESS:  I don't see
17      those words in the result.  I'm
18      looking at their discussion, find
19      the part where they're talking
20      about the two together.
21          I don't see those words.
22  BY MR. HEGARTY:
23      Q.   I'll circle back to that
24  here in a moment.  With regard to this

Page 146

1 paper, did you assess its strengths and
2 weaknesses?
3      A.   Yes.  I think I've clarified
4 some of the strengths.  One of the big
5 strengths is being the author group that
6 read it -- that wrote it and it seems to
7 be well designed and clearly reported.
8           The authors themselves quote
9 a limitation that endometriosis was
10 self-reported, and that's one of the
11 challenges with endometriosis is that if
12 you haven't had surgery to prove you have
13 it, it's hard to prove you have it,
14 although many women probably have been
15 told they have endometriosis without a
16 pathologic proof.
17      Q.   Following up on that
18 statement, Dr. Wolf, the study did not
19 confirm endometriosis by pathologic
20 findings; correct?
21      A.   No, as it wouldn't, as this
22 wasn't a prospective trial where people
23 who thought they had endometriosis had
24 surgery to prove they had endometriosis.

Page 147

1      Q.   Instead, it relied on
2 patients' self-reporting of
3 endometriosis; correct?
4      A.   Yes.
5      Q.   Do you accept in treating
6 patients self-reporting of endometriosis
7 as reliable?
8      A.   Yes.
9      Q.   Do you consider a patient to
10 have previously had endometriosis if they
11 reported to you that they had the
12 condition without showing you a record of
13 confirmation?
14           MS. O'DELL:  Object to the
15      form.
16           THE WITNESS:  So a
17      confirmation to absolutely say
18      someone has endometriosis, they
19      had to have had surgery.  Many
20      patients have been told by their
21      physicians that they have
22      endometriosis without surgery and
23      I would accept that, whether they
24      had surgery to prove it or not.

Page 148

1 BY MR. HEGARTY:
2      Q.   Do you consider this article
3 to be limited to presumed endometriosis
4 without confirmation?
5           MS. O'DELL:  Object to the
6      form.
7           THE WITNESS:  I wouldn't
8      classify it that way.
9 BY MR. HEGARTY:
10      Q.   Is the absence of
11 confirmation by pathology of
12 endometriosis a weakness of this study?
13      A.   The authors say that's a
14 limitation of their study.
15      Q.   Do you agree with the
16 authors?
17      A.   It's a limitation.  It
18 doesn't make it a weak study in my
19 opinion because so many women have been
20 given the diagnosis of endometriosis
21 based on symptoms; and until now, as far
22 as I know, there isn't any other way to
23 absolutely prove it.
24           But it's certainly not worth

Page 149

1 putting someone through surgery to prove
2 pathologically that they have
3 endometriosis if they have the symptoms
4 of endometriosis.
5      Q.   If a patient in this study
6 reported endometriosis and did not have
7 it, the results would be affected;
8 correct?
9      A.   It depends on how many
10 patients reported it and didn't have it.
11      Q.   Depending on that number, it
12 could affect the results of the paper;
13 correct?
14           MS. O'DELL:  Object to the
15      form.
16           THE WITNESS:  Well, I mean,
17      it's hard to say.  I mean, they
18      had the symptoms of endometriosis
19      and so then there would have been
20      some other reason that they had an
21      increased risk -- I'm not -- I'm
22      not sure what you're trying to ask
23      me.
24           If none of these patients

Page 150

1  had endometriosis, then this paper
2  probably wouldn't have been
3  written.  I mean, I'm not sure
4  what you're asking here.
5 BY MR. HEGARTY:
6      Q.   What I'm asking is, if some
7 percentage of the patients classified as
8 having endometriosis actually did not
9 have it, that can affect the odds ratios
10 or the relative risks that the study
11 reports; correct?
12      A.   If there was a significant
13 enough number of patients who did not
14 have endometriosis, it might.
15      Q.   We just talked about a
16 weakness identified by the authors was
17 not having pathologic confirmation of
18 endometriosis.  From your review of the
19 study, did it have any other weaknesses?
20      MS. O'DELL:  Objection to
21  the form.  I think Dr. Wolf's
22  testimony was a limitation --
23      THE WITNESS:  Limitation of
24  the study, not a weakness of the

Page 151

1  study.
2 BY MR. HEGARTY:
3      Q.   In your review, does the
4 paper have any limitations -- I'm sorry.
5 Let me restate that.
6           In your review of the paper,
7 does the paper have any weaknesses?
8      A.   Well, every paper has
9 strengths and weaknesses.  I can't pull
10 anything else out of this paper
11 specifically that I would say is a
12 limitation.
13      Q.   This is a case-control
14 study; correct?
15      A.   I'm just looking at --
16 excuse me -- yes, it's a case-control
17 study.
18      Q.   As such, it is subject to
19 recall bias; correct?
20      MS. O'DELL:  Objection to
21  the form.
22      THE WITNESS:  Case-control
23  studies have -- can have recall
24  bias.

Page 152

1 BY MR. HEGARTY:
2      Q.   The authors in this paper
3 did not find any cumulative, additive, or
4 synergistic effect between talc and
5 endometriosis; correct?
6      MS. O'DELL:  Objection;
7  asked and answered.
8      THE WITNESS:  They found
9  increased risk of ovarian cancer
10  when both endometriosis and talc
11  use were present compared to
12  either alone.
13 BY MR. HEGARTY:
14      Q.   Please look over in the
15 discussion section, the third paragraph
16 from the end beginning with "In
17 conclusion."
18           Do you see that paragraph?
19      MS. O'DELL:  Let me -- tell
20  us again, Mark --
21      THE WITNESS:  So just above
22  the acknowledgment, so the last
23  paragraph of the actual paper?
24      MR. HEGARTY:  Yes, the

Page 153

1  paragraph beginning "In
2  conclusion"?
3      THE WITNESS:  Yes.
4 BY MR. HEGARTY:
5      Q.   In that paragraph, the
6 authors state that they found that none
7 of the interactions that they evaluated
8 were statistically significant; correct?
9      MS. O'DELL:  Objection to
10  the form.
11      THE WITNESS:  That's what it
12  says, yes.  And the next sentence
13  says:  There is some suggestion
14  that associations for BMI, body
15  mass index, genital talc use, and
16  hormone therapy, HT, may differ
17  between women with and without
18  endometriosis.
19 BY MR. HEGARTY:
20      Q.   Focusing on the statement
21 where they say that none of the
22 interactions that we evaluated were
23 statistically significant, please turn
24 over to table 2 -- at least it's table 2

Page 154

1  in my copy -- it's the table that says
2  "Association between family history and
3  lifestyle factors and ovarian cancer risk
4  by endometriosis status."
5          Do you see that table?
6      A.   Yes.
7      Q.   In that table, as to talc
8  and endometriosis, the authors did an
9  interaction test and found no
10  statistically significant interaction;
11  correct?
12      A.   I'm looking at -- yes,
13  that's correct.
14      Q.   That means that --
15          MS. O'DELL:  Excuse me,
16  Mark.  I don't know that she was
17  finished.
18          MR. HEGARTY:  Okay.  I'm
19  sorry.
20          MS. O'DELL:  If you were,
21  Doctor, you know, fine, but I
22  thought you weren't finished.
23          THE WITNESS:  But the
24  numbers are different.  The cases

Page 155

1  and controls without endometriosis
2  who -- in the patients who had
3  genital talc use, odds ratio was
4  1.12 and for those with
5  endometriosis, it was 1.38.
6  BY MR. HEGARTY:
7      Q.   So with regard to looking at
8  statistical significance between those
9  two odds ratios, statistically, there was
10  no difference; correct?
11      A.   It was .2, which they did
12  not consider statistically significant,
13  but the interaction between those two was
14  more than any of the other risk factors.
15      Q.   Not finding statistical
16  significance means that the authors could
17  not reject the null hypothesis of no
18  interaction; correct?
19          MS. O'DELL:  Object to the
20  form.
21          THE WITNESS:  Based on the
22  statistics they used, that's
23  correct.
24  BY MR. HEGARTY:

Page 156

1      Q.   Do you mention anywhere in
2  your report that the Phung authors found
3  no statistically significant interaction
4  between talcum powder use and
5  endometriosis?
6      A.   No.  What my report states
7  is that it -- that paper, the OCAC group,
8  demonstrated a greater increased risk of
9  ovarian cancer with genital talc use and
10  endometriosis versus those without.  It
11  doesn't say statistically significant.
12      Q.   Why isn't the reader of your
13  report entitled to know that the authors
14  found no statistically significant
15  interaction between talcum powder use and
16  endometriosis?
17          MS. O'DELL:  Objection to
18  the form.
19          THE WITNESS:  That was not
20  the point of putting -- putting
21  this in.  The point of putting it
22  in was, it was another group, this
23  well-established, respected group
24  of authors, who accept that talcum

Page 157

1  powder use is a risk for ovarian
2  cancer and that both endometriosis
3  and talcum powder can cause
4  inflammation; and that
5  inflammation can cause ovarian
6  cancer, chronic inflammation can
7  cause ovarian cancer.
8          I didn't feel that it was
9  important to add the statistically
10  significant difference or the P
11  value.  Just it was that two
12  inflammatory processes increase
13  the risk more than one.
14  BY MR. HEGARTY:
15      Q.   Please look back again at
16  table number 2.  With regard to talc use,
17  it reports odds ratios below 1 for
18  nongenital talc use with and without
19  endometriosis.
20          Do you see that?
21      A.   I do.
22      Q.   Does that mean that using
23  nongenital talc protects or reduces the
24  risk against ovarian cancer in patients

1  with and without endometriosis?

2      MS. O'DELL:  Objection to

3  the form.

4      THE WITNESS:  No.  Both of

5  those numbers cross 1 and are --

6  have a sort of a broad difference

7  cross 1, so I think it is no

8  effect.

9      MS. O'DELL:  For clarity,

10  Doctor, when you say cross 1, are

11  you talking about the confidence

12  interval?

13      THE WITNESS:  Yeah, the

14  confidence intervals cross 1.

15  BY MR. HEGARTY:

16      Q.   And as far as the confidence

17  interval crossing 1, is that how you

18  distinguish the findings in nongenital

19  users versus the genital users?

20      MS. O'DELL:  Object to the

21  form.

22      THE WITNESS:  In this case,

23  it's more of the -- specifically,

24  it's two things:  It crosses 1 and

1  it's pretty broad, .49 to 1.19 for

2  those without endometriosis and

3  .39 to 1.77.

4      So it not only crosses 1,

5  which makes it, you know, less

6  likely to be significant, but it's

7  also broad around 1.

8  BY MR. HEGARTY:

9      Q.   Then for purposes of your

10  opinions as it relates to this paper and

11  genital use, are you relying on the

12  findings in those patients being

13  statistically significant?

14      MS. O'DELL:  Objection to

15  the form.

16      THE WITNESS:  Which patients

17  are you talking about?

18      MR. HEGARTY:  That is, the

19  patients with genital use of talc

20  with and without endometriosis.

21      THE WITNESS:  Am I relying

22  on what -- I'm confused what your

23  question -- I'm sorry.  I'm

24  confused by the question.

1  BY MR. HEGARTY:

2      Q.   You mentioned that you don't

3  find the results in the nongenital users

4  to establish a protective or a reduced

5  risk effect because of the lack of

6  statistical significance and the size of

7  the confidence intervals.

8      Are you relying on the

9  finding of statistical significance and

10  the confidence intervals in the genital

11  talc users with and without endometriosis

12  for purposes of your opinions in this

13  case?

14      A.   So I think they're

15  supportive of my opinions in this case

16  for talc causing ovarian cancer.  It's

17  another paper that supports it.

18      Q.   One of the authors of this

19  study is Daniel Cramer.  Do you see that

20  on the first page?

21      A.   Yep.

22      Q.   Are you aware that he has

23  been a long-time expert for plaintiffs in

24  talcum powder cases?

1      A.   Yes.

2      Q.   Have you ever spoken to him?

3      A.   No.

4      Q.   If you look at his

5  disclosure statement on the first page,

6  he reports payment for -- I'm sorry.

7      A.   Can you point me to where he

8  is on the disclosure --

9      Q.   In my copy, it's in the

10  paragraphs below the Department of

11  Epidemiology descriptions of all the

12  authors --

13      A.   Right.

14      Q.   -- do you see the section

15  where each author is reporting any

16  conflict of interest?

17      A.   Yeah, there's two paragraphs

18  there, it looks like.  Is it in the first

19  or the second, just to --

20      Q.   It is in the first and it's

21  about -- in my copy, about five lines

22  down where it refers to DWC?

23      A.   I see that now.

24      Q.   And for DWC, which I presume

Judith Kay Wolf, M.D.

Page 162

1 is Daniel W. Cramer, he reports payment
2 for expert testimony from Ferraro Law
3 Firm and Ashcraft & Gerel law firm and
4 grant funding to their institution from
5 the National Institutes of Health.
6         Do you see that?
7     A.   I do.
8     Q.   Do you know who the Ferraro
9 Law Firm is?
10     A.   I don't.
11     Q.   Do you know who the Gerel
12 law firm is?
13     A.   Yes.  I believe that's the
14 law firm that Michelle Parfitt works
15 with.  Is that right?  Yes.
16     Q.   Would you --
17     A.   I didn't know that until
18 today so -- sorry.
19     Q.   Do you consider, given Dr.
20 Cramer's history of testifying as an
21 expert for plaintiffs in talc cases, this
22 disclosure to be a proper conflict of
23 interest disclosure for him being an
24 author on this paper?

Page 163

1         MS. O'DELL:  Object to the
2     form.
3         THE WITNESS:  So as far as I
4     can tell, yes, and I'm -- and I'm
5     assuming and I'm sure that the
6     Environment and Epidemiology
7     Journal felt it was appropriate
8     and enough disclosure.
9 BY MR. HEGARTY:
10     Q.   If you were an author on
11 this study, would a disclosure that you
12 receive fees from a law firm be
13 sufficient?
14         MS. O'DELL:  Object to the
15     form.
16         THE WITNESS:  The -- yes, I
17     think that his -- his disclosure
18     is -- is -- I'm losing my words --
19     is enough, and I would follow
20     whatever the rules of the journal
21     article said that I had to
22     disclose.
23         But to me, it's clear that
24     he was an expert witness for law

Page 164

1     firms and he got grant funding
2     from the NIH.
3 BY MR. HEGARTY:
4     Q.   Is there any indication from
5 this disclosure that he received payments
6 for expert testimony in talcum powder
7 cases?
8     A.   Not in those words, no.
9     Q.   Please turn next in your
10 report, Dr. Wolf, to the section
11 "Epidemiology," which is part 5, I
12 believe on page -- at the bottom of page
13 5.
14     A.   Yes.
15     Q.   Are you there?
16     A.   I am.
17     Q.   In the first paragraph,
18 towards the end, you have -- you now
19 report two pooled analyses where your
20 previous report reported one.
21         What is the additional
22 pooled analysis you're referring to in
23 that paragraph?
24     A.   I'm looking.

Page 165

1     (Pause.)
2         MS. O'DELL:  Object to the
3     form.
4     (Pause.)
5         THE WITNESS:  I think it's
6     the O'Brien that I'm referring to
7     as the second pooled analysis --
8     or maybe the Davis one.
9     (Pause.)
10         THE WITNESS:  It's gotta be
11     either the O'Brien or the Davis.
12     I think the Davis probably because
13     it's 2021.
14 BY MR. HEGARTY:
15     Q.   Carrying on in that same
16 sentence, you revise the number of
17 meta-analysis from 7 to 10.  What are the
18 three additional meta-analysis since
19 September 2021?
20         MS. O'DELL:  Object to the
21     form.
22         THE WITNESS:  So -- well,
23     Woolen for sure.  I don't -- I
24     don't know offhand which ones I

Judith Kay Wolf, M.D.

Page 166

1    was referring to.
2  BY MR. HEGARTY:
3    Q.   Please turn next, Dr. Wolf,
4  to page 10 of your report.
5    A.   Okay.
6    Q.   The second and third
7  paragraphs, which include discussions --
8  which include discussions of the Davis
9  and Woolen papers?
10   A.   Yes.
11   Q.   First of all, you added to
12 your prior MDL report comments about the
13 Davis 2021 study.
14       Did you find the Davis study
15 yourself?
16   A.   I don't recall.
17   Q.   What does the Davis study
18 add to your opinions in this case?
19   A.   Can I get the Davis paper
20 out just --
21   Q.   Sure.  Yeah, go ahead.
22       (Pause.)
23       MR. HEGARTY:  And while Dr.
24 Wolf is looking for that, I'll

Page 167

1  designate the Davis study that
2  we'll talk about as Exhibit No.
3  12.
4            -  -  -
5        (Deposition Exhibit No.
6    Wolf-12, "Genital Powder Use and
7    Risk of Epithelial Ovarian Cancer
8    in the Ovarian Cancer in Women of
9    African Ancestry Consortium" Paper
10   by Davis, et al, was marked for
11   identification.)
12           -  -  -
13       THE WITNESS:  Okay.  I have
14   the Davis study now in front of me
15   and I have my report next to me.
16       To me, it's a more recent,
17   updated study that shows -- that
18   supports my conclusion of talc
19   powder use causing ovarian cancer,
20   both in white and black women, and
21   specifically for high-grade serous
22   cancer of the ovary, which is the
23   most common epithelial type of
24   ovarian cancer.

Page 168

1  BY MR. HEGARTY:
2    Q.   How does the Davis paper
3  support your opinions particularly as it
4  relates to high-grade serous ovarian
5  cancer?
6    A.   So just, again, supporting a
7  30 to 32 percent in this paper percentage
8  increase of high-grade serous carcinoma
9  in women who use talcum powder.
10   Q.   Did you assess the strengths
11 and weaknesses of this study?
12   A.   Yeah.  And I think one of
13 the strengths is the consortium, the
14 data, where they got their information,
15 from the Ovarian Cancer in Women of
16 African Ancestry Consortium.
17   Q.   Are there any weaknesses or
18 limitations to this study?
19   A.   I'm just looking at the
20 study again.  You know, I think that as
21 we talked about before, in cohort
22 studies, there are -- there can be recall
23 bias, which they -- the authors mention
24 in their discussion of this paper.

Page 169

1    Q.   As to this being a cohort
2  study, this is a cohort study of cases
3  and controls; correct?
4        MS. O'DELL:  Objection to
5    the form.
6  BY MR. HEGARTY:
7    Q.   In other words, it's not a
8  prospective study; correct?
9    A.   No, it's a -- it's a
10 retrospective study.
11   Q.   You state in your report
12 that the study found among
13 African-American women an increased risk
14 of ovarian cancer with genital talcum
15 powder use.
16       That increase, though, was
17 not statistically significant for all
18 subtypes; correct?
19   A.   Yes, but I believe that most
20 of the subtypes were serous and the other
21 subtypes were small numbers, so it would
22 be difficult to look at them
23 specifically.
24   Q.   As far as, though, their

Judith Kay Wolf, M.D.

Page 170

1  analysis of the risk of ovarian cancer
2  with genital talcum powder use in African
3  -- in the African-American women studied,
4  as it relates to all subtypes, they
5  cannot reject the null hypothesis of no
6  significant difference in risk; correct?
7      A.   Not --
8          MS. O'DELL:  Excuse me,
9      Mark.  Would you mind repeating
10     your question?
11         MR. HEGARTY:  Sure.
12 BY MR. HEGARTY:
13     Q.   As this study relates to the
14 African-American women studied and for
15 all subtypes, they could not reject the
16 null hypothesis of no significant
17 difference in risk between talc users and
18 non-talc users; correct?
19         MS. O'DELL:  Objection to
20     the form.  Are you talking about
21     all participants or are you
22     talking about African-American
23     participants?
24         MR. HEGARTY:  My question, I

Page 171

1  believe, was limited to
2  African-American women.
3          MS. O'DELL:  It wasn't clear
4  to me.  Okay.  Thank you.
5          THE WITNESS:  So in
6  African-American women, the odds
7  ratios for all-comers was 1.22.
8  The confidence interval did cross
9  1, 0.97 to 1.53.
10         When I'm looking at the
11 paper, table 2, the number of
12 patients, 402, had high-grade
13 serous cancers and then there was
14 22 with low grade, 51 with
15 endometrioid, 23 with clear cell,
16 40 with mucinous, and 80 with
17 others.
18         And so to look at them
19 individually, they can't, and when
20 they specifically just looked at
21 serous, it was statistically
22 significant.
23 BY MR. HEGARTY:
24     Q.   When a study cannot reject

Page 172

1  the null hypothesis because the
2  confidence interval crosses 1, that means
3  the finding could be due to chance;
4  correct?
5          MS. O'DELL:  Object to the
6      form.
7          THE WITNESS:  So that --
8      that could have -- that could
9      happen, but this number is
10     consistent with all the other
11     numbers in many of the other
12     studies which are statistically
13     significant.
14 BY MR. HEGARTY:
15     Q.   This study -- I'm sorry.  Go
16 ahead.
17     A.   And I -- and I would -- and
18 I would argue does include mucinous
19 tumors, which are not thought to be the
20 same pathologic disease as serous cancers
21 and endometrioid and clear cell, and so
22 would generally not be thought to be
23 related to the same risk factors.
24     Q.   You just mentioned over in

Page 173

1  table 2 that the study looked at
2  histotypes of ovarian cancer in
3  African-American women besides high-grade
4  serous; correct?
5      A.   Yes.
6      Q.   And in particular, it lists
7  in table 2 that they looked at patients
8  with low-grade serous, endometrioid,
9  clear cell, mucinous, and other types of
10 ovarian cancer; correct?
11     A.   Yes.
12     Q.   And with regard to the other
13 histotypes that -- besides high-grade
14 serous, the authors -- what did the
15 authors find in terms of the relative
16 risk or odds ratio?
17     A.   They didn't specifically
18 look at them individually because the
19 numbers are small; and as I mentioned,
20 for mucinous tumors, it's thought to be a
21 different pathway with different set of
22 risk factors.  It's treated differently.
23     Q.   Well, if we look over at --
24 well, strike that.

1  If we look in the results
2 section of the abstract, Dr. Wolf, the
3 authors report that in African-American
4 women, as to all other histotypes, the
5 odds ratio was 1.05 with a confidence
6 interval of .75 to 1.47; correct?
7  A.  That's what it says in the
8 abstract. I'm assuming they're looking
9 at all of those other five types combined
10 compared to serous, not individually. I
11 don't think they looked at them
12 individually, because the numbers are too
13 small to make anything of them.
14  Q.  And I'm just reading what
15 they wrote, where in the abstract they
16 wrote that as to all other histotypes
17 besides high-grade serous, the odds ratio
18 they reported was 1.05; correct?
19  A.  Yes. So that would be
20 looking at the other five histotypes
21 together, all of which had small numbers,
22 and did not have a statistical difference
23 looking at all of them together.
24  Q.  And if we just focus on

1 their findings as to all other histotypes
2 in African-American women, this 1.05 odds
3 ratio with a confidence interval of .75
4 to 1.47, do you consider that finding in
5 this paper to show an increase in risk of
6 ovarian cancer in the African-American
7 women studied for these other histotypes?
8  A.  I find --
9  MS. O'DELL: Objection.
10  Object to the form.
11  Go ahead.
12  THE WITNESS: What I find is
13  that that doesn't give me any
14  information about the other
15  histotypes because their numbers
16  are so small.
17  For instance, the clear
18  cell, there were only 23 patients.
19  That's not a big enough number to
20  see an effect.
21 BY MR. HEGARTY:
22  Q.  But if we look back over at
23 table 2, as to all the other histotypes
24 added up, they number more than 200

1 cases; correct?
2  A.  Yeah, but then it's divided
3 by 5 because it's five different
4 histotypes. So that -- that doesn't tell
5 me anything.
6  Q.  Would it be a fair statement
7 then that it's not your testimony that
8 the 1.05 finding shows an increase in
9 risk in this study of ovarian cancer with
10 talcum powder use for these other
11 histotypes studied?
12  A.  No, I --
13  MS. O'DELL: Objection to
14  the form.
15  THE WITNESS: What I would
16  say is that there's not enough
17  information to know about the
18  other histotypes in this paper --
19 BY MR. HEGARTY:
20  Q.  Do you believe that's true
21 -- I'm sorry. I'm sorry to interrupt.
22  A.  -- because the numbers of
23 individually are too small.
24  Q.  As part of your Bradford

1 Hill analysis, you considered
2 dose-response or biologic gradient;
3 correct?
4  A.  Yes.
5  Q.  You consider dose-response
6 or a biologic gradient to be an important
7 factor in the Bradford Hill analysis;
8 correct?
9  MS. O'DELL: Object to the
10  form.
11  THE WITNESS: It is one of
12  the factors, yes.
13 BY MR. HEGARTY:
14  Q.  Certainly whether there is a
15 dose-response between an exposure and a
16 disease is a consideration of whether
17 there is causation between the exposure
18 and disease; correct?
19  A.  It is one of the
20 considerations, yes.
21  Q.  Did the Davis 2022 study
22 look at dose-response or biologic
23 gradient between talc use and ovarian
24 cancer?

Page 178

1    A.    They did in a manner.  In
2  table 5, they looked at no use versus
3  less than or 20 years' use versus more
4  than 20 years' use.
5    Q.    They also looked at
6  frequency of use in table 4; correct?
7    A.    Yes.
8    Q.    Did you consider those
9  findings from table 4 and table 5 in
10  preparing your most recent amended
11  report?
12    A.    I did.
13    Q.    Do you report the Davis
14  study's findings as to dose-response or
15  biologic gradient anywhere in your
16  November 2023 report?
17    A.    I did not.  That was not
18  what I put in my report, no.
19    Q.    Why did you not discuss
20  either here or in your Bradford Hill
21  discussion about dose-response the
22  dose-response findings from the Davis
23  study?
24    MS. O'DELL:  Object to the

Page 179

1  form.
2    THE WITNESS:  So a couple of
3  things about dose-response in
4  talcum powder use and ovarian
5  cancer.  Some of the other studies
6  do show a gradient with frequency
7  or number of lifetime doses.  The
8  duration is sometimes hard to get
9  out of people, but lots of doses,
10  you assume over a long time.
11    But one of the questions
12  that I always have in my head is
13  that what is a dose?  You know, we
14  know that Tylenol comes in 325 or
15  650 milligrams or a thousand
16  milligrams.  I'm not sure what a
17  dose of talcum powder is.
18    And so I think it's a little
19  bit more challenging to show every
20  time a dose-response effect based
21  on frequency or duration of dose.
22    This study, they did not
23  find it.  Some of the other
24  studies do.  Again, what's the

Page 180

1  dose of powder?  It's not a
2  medicine.
3  BY MR. HEGARTY:
4    Q.    But you do report in your --
5  you do reference in your report studies
6  finding a dose-response; correct?
7    A.    Some of them, yes.
8    Q.    And is it not proper to show
9  -- to also reference studies like Davis
10  that show no dose-response?
11    MS. O'DELL:  Object to the
12  form.
13    THE WITNESS:  I think what I
14  wrote was proper.
15  BY MR. HEGARTY:
16    Q.    Looking over at table -- I'm
17  sorry.  Looking over at page 1663 --
18  hopefully we're on the same paging --
19    A.    We are this time.  The
20  discussion or the results?
21    Q.    Yes, the results section --
22  in the left-hand column towards the
23  bottom, the bottom two paragraphs, the
24  authors report that there was no

Page 181

1  difference in the association by
2  frequency of genital powder use or also
3  by duration of genital powder use;
4  correct?
5    A.    I see that, yes.
6    Q.    Do you agree with those
7  findings?
8    A.    I agree that that's what
9  they found in the study.
10    Q.    Do you read the study
11  results the same?
12    MS. O'DELL:  Object to the
13  form.
14    THE WITNESS:  What is the
15  question?
16  BY MR. HEGARTY:
17    Q.    Do you believe the study
18  results as to frequency and duration, as
19  the authors state, don't show a
20  dose-response?
21    A.    I'll repeat my answer that
22  in this study they found no association
23  between frequency and duration and
24  effect.

Page 182

1    Q.   And do you agree with -- do
2  you agree that that's what the data show?
3    A.   That's what I just said,
4  yes.  That's what this paper shows.
5    Q.   Looking over at table 4, it
6  refers to frequency of use as greater
7  than once a week versus less than once a
8  week.  Is that an acceptable measure of
9  looking at frequency of use as a
10  dose-response?
11       MS. O'DELL:  Objection to
12    form.
13       THE WITNESS:  So I don't
14    know what is, quote, acceptable.
15    That is what they used in this
16    study.  There's not a -- any
17    qualified standard, as it's not a
18    medication.  It's a lifestyle
19    factor, so there's no directions
20    --
21  BY MR. HEGARTY:
22    Q.   If we -- I'm sorry.
23    A.   This is what they chose to
24  look at in this study.

Page 183

1    Q.   If we focus on the
2  high-grade serous findings in table 4 in
3  African-American women, the authors did a
4  statistical comparison test and found no
5  statistically significant difference
6  between greater than once a week and less
7  than once a week use; correct?
8    A.   I'm just looking at the
9  results.  So high-grade serous,
10  African-American, less than once per
11  week, still .68.  So they did not find a
12  difference, but those women who used it
13  more than once a week did have a
14  statistically significant increased risk.
15    Q.   But in terms of the
16  comparison made for dose-response
17  purposes, a finding of .68 means that
18  statistically, there was no difference
19  between the 1.18 and the 1.34 number;
20  correct?
21    A.   That's what they found in
22  this study; but again, if you look at the
23  actual data for more than once per week,
24  it was statistically significant.

Page 184

1    Q.   If we look over at the data
2  for all subtypes in African-American
3  women where it goes --
4       MS. O'DELL:  The first
5    column, Mark?  Just to make sure
6    I'm on the right --
7       MR. HEGARTY:  Well, we're on
8    the last column, all histotypes --
9       MS. O'DELL:  All other?
10       THE WITNESS:  All other
11    histotypes.
12  BY MR. HEGARTY:
13    Q.   All other histotypes -- the
14  between less than once a week -- I'm
15  sorry.  Let me start over again.
16       Are you at the column of all
17  other histotypes in African-American
18  women?
19    A.   In table 4, yes.
20    Q.   In that table, it lists the
21  relative risk as 1.21 for less than once
22  a week and 1.02 for greater than once a
23  week; correct?
24    A.   That's what it says.  Again,

Page 185

1  this goes to the problem that we were
2  discussing before with this looking at
3  all other histotypes.  It's five
4  histotypes, all with small numbers.  I
5  don't make much of that data and, to me,
6  it makes sense why it doesn't show any
7  effect, because we're looking at 23 clear
8  cell and 22 low-grade endometrial and 40
9  mucinous and 51 endometrioid all mixed up
10  together, plus 80 others.
11       So I would say that -- I
12  don't think I can make anything from that
13  information there.
14    Q.   But just based on the odds
15  ratios reported, the risk goes down in
16  African-American women for all other
17  histotypes in women who use it more than
18  once a week; correct?
19    A.   That is not how I interpret
20  that data.  I interpret that data as,
21  it's five different histotypes, all with
22  a small amount.  I wouldn't put any
23  weight on that data there.  I would say
24  it's not important.  It doesn't answer

Judith Kay Wolf, M.D.

1 the question, so I -- I think it doesn't
2 answer the question about either
3 frequency or duration.
4     Q.   If we go in -- if we go down
5 to table 5 that looks at duration of use
6 -- are you at that table?
7     A.   I am.
8     Q.   -- looking at the odds
9 ratios reported for high-grade serous --
10    A.   Yes.
11    Q.   -- in African-American women
12 with less than 20 years' use, the rate
13 reported is 1.53, the odds ratio reported
14 for African-American women who used talc
15 for greater than 20 years was 1.19.
16        Do you see that?
17    A.   I do.
18    Q.   As you reported with regard
19 to frequency of use, does not that show
20 that the longer you use talc, the lower
21 your risk of ovarian cancer?
22    A.   No, and that's not what I
23 said about frequency either.  I said that
24 in the frequency, the more common use --

1 or more than once a week per use was
2 significantly significant.
3         In both of these cases, the
4 differences between the two were not
5 statistically significant.
6     Q.   What is your take-away from
7 the odds ratios we just talked about of
8 the relative risk being 1.53 for
9 high-grade serous in African-American
10 women for less than 20 years and 1.19 in
11 African-American women with high-grade
12 serous for talc use more than 20 years?
13 Does that not show an inverse
14 dose-response?
15    A.   No.
16    Q.   Why not?
17    A.   Because it's not -- it's not
18 statistically different.
19    Q.   Regardless, though, the
20 authors reported there was no
21 dose-response as to duration or frequency
22 for use in both African-American women
23 and white women; correct?
24    A.   That's what they found in

1 this paper.
2     Q.   And as to duration of use,
3 is that an appropriate measure of -- to
4 look at dose-response in your opinion?
5     A.   As I stated before, there
6 isn't a standard duration of use, but
7 you're talking about the 20 -- less than
8 20 years or greater than 20 years?
9 That's what they chose in this study.
10        Less than 20 years could be
11 one year, 19 years.  So I -- I don't know
12 what -- there's no standard.
13    Q.   One of the authors on the
14 paper is Patricia Moorman.  Do you know
15 her?
16    A.   I don't know her.
17    Q.   Are you aware that she is
18 also an expert in the MDL for plaintiffs?
19    A.   I am.
20    Q.   Have you ever reviewed her
21 reports in the MDL?
22    A.   I think I did in the past.
23    Q.   Looking at the -- if you
24 turn over to the authors' disclosure on

1 page 1667 --
2     A.   Okay.  I'm there.
3     Q.   Please tell me when you're
4 there.
5     A.   I am.
6     Q.   -- Dr. Moorman reports in
7 that section personal fees from law firms
8 outside the submitted work.
9         Do you see where I'm
10 reading?
11    A.   I do.
12    Q.   In your opinion, is that a
13 sufficient conflict of interest
14 disclosure regarding her expert witness
15 work for plaintiffs in talc cases?
16    A.   To me, I'm reading it that
17 she's involved in litigation and it seems
18 appropriate in this journal, Cancer
19 Epidemiology, Biomarkers & Prevention,
20 which is a good journal, thought it was
21 an adequate disclosure, so I would say
22 yes.
23    Q.   If you were an author on
24 this paper, would you be satisfied with

Page 190

1 this same disclosure for you?
2     A.   I'm not sure what I would
3 put.  I would definitely disclose that I
4 was getting fees for -- from a law firm,
5 but I don't know how I would word it, but
6 I think this is appropriate what she put.
7     Q.   Can a reader determine from
8 this disclosure that the fees that Dr.
9 Moorman received from law firms was
10 related to expert witness work in talcum
11 powder cases?
12     A.   It doesn't specifically say
13 that.
14     Q.   If you didn't -- if a
15 colleague of yours didn't know that Dr.
16 Moorman was an expert or has been an
17 expert in talcum powder cases, would they
18 in any way know that the law firm that
19 she received fees for was for talcum
20 powder cases?
21     A.   Not from this disclosure.
22 If I were reading this and I had
23 questions, I would also look at the
24 author's contributions to see what Dr.

Page 191

1 Moorman contributed, which is the very
2 next section of the paper, and it says
3 that she did review and editing of the
4 writing.
5         So she didn't -- she didn't
6 design the study.  She didn't analyze the
7 study.  She just helped review and edit
8 the paper written by Dr. Davis.
9     Q.   In your opinion, does a
10 conflict of interest disclosure depend on
11 the involvement of the author in the
12 preparation of the paper?  That is, is it
13 different based on what your
14 participation is?
15         MS. O'DELL:  Objection to
16 the form.
17         THE WITNESS:  No, but I
18 would be more concerned if
19 somebody designed the study and it
20 was funded by an outside entity
21 that might have some influence on
22 the authors.  But I don't see any
23 of that in this paper.
24         MR. HEGARTY:  We've been

Page 192

1 going about another hour and ten.
2 Why don't we go off the record.
3         MS. O'DELL:  Okay.
4         THE WITNESS:  Okay.
5         (A recess was taken from
6 2:18 p.m. to 2:33 p.m.)
7         MR. HEGARTY:  We are back on
8 the record.  We left off talking
9 about the addition to your report
10 -- the addition to your report of
11 the -- of references to the Davis
12 and Woolen study.
13         I'd like to next talk about
14 the Woolen study, which I'll
15 designate for today's deposition
16 as Exhibit No. 13.
17             -   -   -
18         (Deposition Exhibit No.
19 Wolf-13, "Association Between the
20 Frequent Use of Perineal Talcum
21 Powder Products and Ovarian
22 Cancer: a Systematic Review and
23 Meta-analysis" Paper by Woolen, et
24 al, was marked for

Page 193

1 identification.)
2             -   -   -
3 BY MR. HEGARTY:
4     Q.   Doctor, I believe you say
5 you have a copy of that study with you;
6 is that correct?
7     A.   That's correct.
8     Q.   Did you find this study
9 yourself?
10     A.   This one, I do believe I did
11 find myself, but I don't recall
12 specifically.
13     Q.   One of the authors, Rebecca
14 Smith-Bindman, is also an expert witness
15 for plaintiffs in talcum powder cases.
16 Are you aware of that?
17     A.   Yes.
18     Q.   Have you ever met Dr.
19 Smith-Bindman?
20     A.   I did meet Dr. Smith-Bindman
21 in 2021.
22     Q.   Did you meet her in
23 connection with you both testifying at
24 the Kleiner trial?

Page 194

1    A.   Yes.

2    Q.   Did you talk to her about

3  her opinions at that trial site?

4    A.   Yes.  In general, yes.

5    Q.   Did you read her -- did you

6  ever read her testimony at the Kleiner

7  trial?

8    A.   I don't remember if I did or

9  not.  No, I don't think I did.

10    Q.   Are you aware that she

11  performed the study that we're looking at

12  in Exhibit No. 13 in connection with her

13  serving as an expert witness in that

14  Kleiner case?

15    MS. O'DELL:  Objection to

16    the form; misstates the record --

17    excuse me -- misstates the

18    evidence.

19    THE WITNESS:  I'm sorry.

20    Ask the question again?

21  BY MR. HEGARTY:

22    Q.   Sure.  Are you aware that

23  she performed the study we're looking at

24  in Exhibit No. 13 as part of her work as

Page 195

1  serving as an expert in the Kleiner

2  trial?

3    MS. O'DELL:  Objection to

4    the form; misstates the evidence.

5    THE WITNESS:  I'm aware that

6    she -- no, I was not aware that

7    she did it in conjunction with

8    that -- that activity.  Are you --

9    yeah --

10  BY MR. HEGARTY:

11    Q.   Do you agree that --

12    A.   What I'm hearing you ask me

13  is did she do this study just because of

14  that trial and I'm not aware of anything

15  like that.

16    Q.   Do you agree that Dr.

17  Smith-Bindman's involvement as an expert

18  in talcum powder cases is proper to

19  disclose in a paper like this?

20    A.   It's proper to disclose that

21  she's receiving money from a law firm,

22  yes.

23    Q.   That should go in a conflict

24  of interest section; correct?

Page 196

1    A.   Yes.

2    Q.   The authors of this study

3  did use data from the O'Brien 2020 cohort

4  study; correct?

5    MS. O'DELL:  Objection to

6    the form.

7    THE WITNESS:  Can you show

8    me where you're looking at that?

9    MR. HEGARTY:  Table 2.

10    MS. O'DELL:  Can you please

11    repeat your question?

12  BY MR. HEGARTY:

13    Q.   Did the authors of this

14  study use data from the O'Brien 2020

15  cohort study?

16    A.   So it says that O'Brien did

17  not publish on daily exposure, but these

18  data were available and Dr. O'Brien

19  provided these for inclusion.

20    So this was not in her

21  previous study.  It was data from the

22  Nurses' Health Study that she had.

23    Q.   This was unpublished data,

24  as you said; correct?

Page 197

1    A.   This was unpublished data

2  from the Nurses' Health Study, yes.

3    Q.   And it was data, unpublished

4  data, that looked -- that was only as to

5  patients in the study -- or only as to

6  members in the study who used talc on a

7  daily basis; correct?

8    A.   Who reported daily use.

9    Q.   It was also only as to women

10  who had intact fallopian tubes; correct?

11    MS. O'DELL:  Objection to

12    the form.

13    THE WITNESS:  I'm just

14    looking at the eligibility.

15    MS. O'DELL:  Mark, while

16    she's looking, is Woolen marked as

17    Exhibit 11 -- is or -- 13?

18    MR. HEGARTY:  13.

19    MS. O'DELL:  Thank you.

20    THE WITNESS:  It doesn't

21    specifically say in the result --

22    or in the eligibility criteria

23    that it's women with patent

24    fallopian tubes.  I'm looking at

Judith K. Wolf, M.D.

1    the numbers to try to add them up,
2    because in the supplemental table
3    1, they looked at women both with
4    and without intact fallopian tubes
5    or genital tracts.
6    BY MR. HEGARTY:
7        Q.    But as to the results they
8    reported, if you look over at table 2 in
9    the footnote, in the footnote, note 5 --
10       A.    Oh, yes.  I'm sorry.  It
11   does say that there on the footnote, yes
12   --
13       Q.    That they included women
14   with intact fallopian tubes; correct?
15       A.    To harmonize with other
16   publications, that's correct.
17       Q.    So in the end, the data that
18   the authors used from the O'Brien 2020
19   study was a small subset of the overall
20   data; correct?
21           MS. O'DELL:  Objection.
22           THE WITNESS:  So it wasn't
23       from the O'Brien study.  It was
24       from the Nurses' Health Study --

1    it was data from the Nurses'
2    Health Study that wasn't in the
3    O'Brien study that they used.
4    BY MR. HEGARTY:
5        Q.    But in terms of the O'Brien
6    paper --
7        A.    This was not included in the
8    -- it wasn't included -- these patients
9    weren't included in the O'Brien paper.
10       Q.    But of the data that they
11   included or used from the O'Brien 2020
12   study, it was only the unpublished data
13   of women with patent tubes; correct?
14           MS. O'DELL:  Object to the
15       form.
16           THE WITNESS:  So the data in
17       this paper was from the Nurses'
18       Health Study that O'Brien had that
19       she did not put in her paper and
20       these were women who had daily use
21       of talcum powder and intact
22       fallopian tubes.
23   BY MR. HEGARTY:
24       Q.    As we see in table 2, the

1    studies that were used for purposes of
2    this paper had different measures of
3    frequency of use; correct?
4        A.    They did.
5        Q.    In the methods section, the
6    eligibility criteria was that the
7    frequency needed to be greater than two
8    times a week; correct?
9        A.    That's what they chose to
10   determine as frequent use, yes.
11       Q.    If you look over in the
12   results section, the second paragraph,
13   there, they report the range of frequent
14   talcum powder use was defined as four to
15   seven times per week.
16           Do you see that?
17           MS. O'DELL:  Objection to
18       the form.
19           THE WITNESS:  That's what
20       they found in the papers that were
21       published.
22   BY MR. HEGARTY:
23       Q.    Well, can you explain the
24   difference -- can you reconcile between

1    the methods section and the results
2    section as between greater than two and
3    four to seven per week?
4        A.    Well, four to seven is
5    greater than two.  They defined that they
6    weren't going to include any that had
7    less than two times a week and what they
8    found was, on average, the studies that
9    had two times a week or more had four to
10   seven times a week.
11           One is what they defined as
12   their minimum amount and then the results
13   are what they actually found.
14       Q.    If you look over in
15   supplemental table 1 --
16       A.    Yes, I have it in front of
17   me.
18       Q.    -- it reports that as to all
19   women with patent fallopian tubes, a
20   relative risk -- I'm sorry.  As to less
21   frequent -- let me start over again.
22           As to all women with patent
23   tubes, they reported a hazard ratio of
24   1.04 nonstatistically significant for

Page 202

1 less frequent users.
2        Do you see that?
3    A.   Say that sentence again?  I
4 wasn't following what you said.
5    Q.   Sure.  In supplemental table
6 1, as to all women with patent tubes --
7    A.   Women with patent fallopian
8 tubes, okay.
9    Q.   -- the hazard ratio was 1.04
10 nonstatistically significant.  Do you see
11 that?
12    A.   For less frequent users, I
13 see that.
14    Q.   Is that a valid conclusion
15 to apply to women who were less frequent
16 talc users?
17        MS. O'DELL:  Objection to
18    the form.
19        THE WITNESS:  That's what
20    they found in this study.  And
21    their definition of less than --
22    less frequent users was less than
23    two times a week.
24 BY MR. HEGARTY:

Page 203

1    Q.   And as to all women in table
2 2, as to less frequent talc users, the
3 odds ratio was .96 with a confidence
4 interval of .84 to 1.10.
5        Do you see that?
6        MS. O'DELL:  I'm sorry.
7    Okay.  We're back in the main
8    study at table 2?
9        MR. HEGARTY:  No, still
10    supplemental table 1.
11        MS. O'DELL:  You said table
12    2.  That's why I was confused --
13        MR. HEGARTY:  I'm sorry.
14        MS. O'DELL:  So if you don't
15    mind restating the question --
16        MR. HEGARTY:  Sure.
17        MR. O'DELL:  -- make sure
18    we're in the right place.
19 BY MR. HEGARTY:
20    Q.   Looking at supplemental
21 table 1, as to all women, the odds ratio
22 of less frequent users was .96; is that
23 correct?
24    A.   That's what it says, yes.

Page 204

1    Q.   Is that a 4 percent
2 protective or decreased effect for less
3 frequent users?
4        MS. O'DELL:  Object to the
5    form.
6        THE WITNESS:  So that's very
7    close to 1.  I would say that that
8    -- that number -- and it crosses 1
9    -- found in that -- they found a
10    nonstatistical difference,
11    either positive or negative.
12 BY MR. HEGARTY:
13    Q.   Looking at the conclusion
14 section of the abstract on page 1, the
15 authors state:  This reviews suggests an
16 increased risk of ovarian cancer
17 associated with frequent perineal powder
18 exposure of 31 to 65 percent.
19        Do you see where I'm
20 reading?
21    A.   I do.
22    Q.   Do you agree with that
23 conclusion?
24    A.   I'm just looking at their

Page 205

1 results again.
2        (Pause.)
3        THE WITNESS:  Yes, because
4    their increased risk with the
5    adjusted -- with the odds ratio
6    was 1.47, with the range of 1.31
7    to 1.65, so 31 to 65 percent.
8    That's what they found.
9 BY MR. HEGARTY:
10    Q.   And is that what you rely
11 upon for -- is that what you rely upon
12 for purposes of your opinions in this
13 case, that finding?
14    A.   That was one -- that's one
15 of the findings.  It just supports all
16 the other findings that -- that support
17 my opinion.  It's just one more piece of
18 information.
19    Q.   Please turn next to page 11,
20 the third paragraph of your report where
21 you added a reference to the Nowak
22 meta-analysis?
23    A.   Page 11 -- where is Nowak on
24 there?

Page 206

1    MS. O'DELL:  Page 11,
2  midway.
3    THE WITNESS:  Oh, okay.  I
4  see it.
5  BY MR. HEGARTY:
6    Q.   Do you have a copy of the --
7  do you have a copy of the Nowak paper?
8    A.   I'm getting it.  Give me a
9  minute here.
10    (Pause.)
11    THE WITNESS:  I have the
12  Nowak 2021 paper in front of me.
13    MR. HEGARTY:  And we'll
14  designate that paper as Exhibit 14
15  for today's deposition.
16    - - -
17    (Deposition Exhibit No.
18  Wolf-14, "Asbestos Exposure and
19  Ovarian Cancer - A Gynaecological
20  Occupational Disease.  Background,
21  Mandatory Notification, Practical
22  Approach" Paper by Nowak, et al,
23  was marked for identification.)
24    - - -

Page 207

1  BY MR. HEGARTY:
2    Q.   Did you find that study on
3  your own?
4    A.   I don't recall.
5    Q.   What did this study add to
6  your opinions in this case?
7    A.   Just another study that
8  supports asbestos can cause ovarian
9  cancer.
10    Q.   This study pertains only to
11  occupational asbestos exposure; correct?
12    A.   That's correct.
13    Q.   The data they included in
14  the study was all occupational exposure
15  to raw asbestos; correct?
16    MS. O'DELL:  Objection to
17  the form.
18    THE WITNESS:  I don't -- I
19  don't remember the word "raw."
20  That's what I'm looking for here.
21    MR. HEGARTY:  Let me
22  withdraw my question.
23  BY MR. HEGARTY:
24    Q.   Regardless of whether they

Page 208

1  used the word "raw" or not, the study
2  results are limited to data from
3  occupational exposure to women working
4  with or around asbestos; correct?
5    A.   That's correct.
6    Q.   So the involved exposure of
7  the data looked at was through inhalation
8  of asbestos; correct?
9    MS. O'DELL:  Objection to
10  the form.
11    THE WITNESS:  Well,
12  certainly it would include
13  inhalation of asbestos.
14  BY MR. HEGARTY:
15    Q.   None of the data that went
16  into the results of this paper were from
17  women using talcum powder; correct?
18    A.   That's correct.
19    Q.   Is it your opinion that any
20  level of occupational exposure to
21  asbestos increases the risk of ovarian
22  cancer as reported in this study of 1.88?
23    A.   Well, I don't know what a
24  safe level of occupational exposure would

Page 209

1  be.
2    Q.   Well, my question I think is
3  a little bit different.  Is it your
4  opinion that any level of occupational
5  exposure to asbestos increases the risk
6  of ovarian cancer to the reported odds
7  ratio in this study of 1.88?
8    A.   From this study, I don't
9  think I can answer that question and -- I
10  can't say that.
11    Q.   Can you cite to any data
12  showing that women who have used talcum
13  powder are exposed to the same levels of
14  asbestos as the women in the studies that
15  this Nowak paper considered?
16    A.   I'm not --
17    MS. O'DELL:  Excuse me.
18  Objection to the form.
19    THE WITNESS:  I'm not aware
20  of any study comparing the
21  exposure of -- the level of
22  exposure to asbestos in women
23  using talcum powder versus
24  occupational assessment exposure.

Page 210

1  I'm not aware of any.
2  BY MR. HEGARTY:
3  Q.  Given that this paper is
4  focused on occupational exposure to
5  asbestos, how does it contribute to your
6  opinions as it relates to women exposed
7  perineally to talcum powder use and
8  ovarian cancer risk?
9  MS. O'DELL:  Objection to
10  the form.
11  THE WITNESS:  So for me,
12  it's another paper that shows that
13  asbestos causes ovarian cancer and
14  I'm aware of data from Dr. Longo's
15  previous studies, from Hopkins,
16  from the FDA, that talcum powder
17  causes asbestos -- I mean causes
18  ovarian cancer.
19  So this is just another more
20  recent paper showing that asbestos
21  can cause ovarian cancer, along
22  with all the others that I've
23  cited, including the work from
24  IARC in 2012.

Page 211

1  BY MR. HEGARTY:
2  Q.  Your references that we
3  looked at earlier include a recent paper
4  on asbestos exposure and ovarian cancer
5  by a Dr. Slomovitz.  Do you recall that
6  paper?
7  A.  Yes.  That was a review
8  paper.
9  Q.  Why did you not include a
10  reference to Dr. Slomovitz's paper in the
11  body of your report?
12  A.  It's a -- it's a -- what I
13  was including here is a new study.  That
14  was not a new study.  That was a review
15  paper that I didn't feel added anything
16  more to my opinion.
17  Q.  That paper, that is, the
18  paper by Dr. Slomovitz, stated that the
19  observed statistical association between
20  asbestos and ovarian cancer is weak and
21  inconsistent.
22  Do you agree with that from
23  your general review of the data?
24  MS. O'DELL:  Excuse me,

Page 212

1  Mark.  Just give Dr. Wolf a moment
2  to get Dr. Slomovitz's paper in
3  front of her.
4  MR. HEGARTY:  Let me
5  withdraw the question because my
6  time is limited.
7  BY MR. HEGARTY:
8  Q.  Putting aside Dr.
9  Slomovitz's paper, do you agree that the
10  data on asbestos and ovarian cancer is
11  weak and inconsistent, including the data
12  from the Nowak study?
13  MS. O'DELL:  Objection to
14  the form.
15  THE WITNESS:  I do not agree
16  with that.
17  BY MR. HEGARTY:
18  Q.  You also reference in this
19  paragraph the EPA in a federal register.
20  Do you see that?
21  A.  Yes.
22  Q.  Did you find that citation
23  yourself?
24  A.  I don't -- I don't think so.

Page 213

1  I think that the attorneys found that
2  one.
3  Q.  What does the -- does that
4  federal register add to your opinions in
5  this case?
6  A.  It's just another piece of
7  information, a regulatory agency that
8  connects asbestos and ovarian cancer; and
9  in fact, in that, they required reporting
10  of any products, including talcum
11  products, that might have asbestos in
12  them as a risk.
13  Q.  Please turn next in your
14  report to page 17.
15  A.  Okay.
16  Q.  Paragraph 6, you added to
17  your citation list the Mandarino 2020
18  study and the Emi 2021 study.  Do you see
19  that?
20  A.  Page -- not on page 17.
21  MS. O'DELL:  On page --
22  THE WITNESS:  Page 15.
23  MR. HEGARTY:  I'm sorry.
24  Page 15, paragraph 6?

Page 214

1    THE WITNESS:  Yes, the Emi
2    and the Mandarino study, yes.
3    BY MR. HEGARTY:
4    Q.    Why did you add those two
5    studies to that paragraph?
6    A.    So those were two more
7    studies that look at how talcum powder
8    might -- a potential mechanism for
9    causation.  Both of them were looking at
10   activation of macrophages after exposure
11   to talcum powder.
12        Can you get the Mandarino
13   study for me, please (Indicating)?
14        MR. HEGARTY:  And can you
15   get the Mandarino and Emi papers,
16   Dr. Wolf?
17        THE WITNESS:  Yes, we're
18   working on that.  Thank you.
19        Okay.  I have both Emi and
20   Mandarino.
21        MR. HEGARTY:  So we'll talk
22   first about Mandarino, which we'll
23   mark as Exhibit No. 15 to today's
24   deposition.

Page 215

1        - - -
2        (Deposition Exhibit No.
3    Wolf-15, "The effect of talc
4    powders on phagocytes in
5    co-culture with ovarian cancer
6    cells" Paper by Mandarino, et al,
7    was marked for identification.)
8        - - -
9    BY MR. HEGARTY:
10   Q.    Did you find that study on
11   your own?
12   A.    I don't remember.
13   Q.    Had you read that study as
14   of the time of the -- as of the time you
15   prepared your 2021 amended report?
16   A.    I don't think I had.
17   Q.    The Mandarino study studied
18   mouse cells; correct?
19   A.    That's correct.
20   Q.    Do mice get ovarian cancer?
21   A.    No, but they were -- they
22   were looking at the effect on the
23   macrophages, not the -- not ovarian
24   cancer itself, so an immune response of

Page 216

1    the macrophages, and so that would be a
2    way to do it in animals.
3        There aren't very many
4    animals that naturally get ovarian
5    cancer, so there's very little studies.
6    Q.    Have you ever been involved
7    or worked on any studies involving mouse
8    cells?
9    A.    I have not.  I've used new
10   -- immunocompromised mice to give them
11   ovarian cancer and cervix cancer, but not
12   mouse cells.
13   Q.    With regard to macrophages
14   in the human body, how many are there,
15   how many macrophages does the human body
16   have?
17   A.    Oh, gosh.  I don't know the
18   number and it probably depends on what's
19   going on in the body how many macrophages
20   you have.
21        Lots.  I'll say lots.
22   Q.    In women exposed to talcum
23   powder, what percentage of macrophages
24   come into contact with talcum powder?

Page 217

1        MS. O'DELL:  Object to the
2    form.
3        THE WITNESS:  I don't know
4    that there's any data to answer
5    that question.  I'm not aware of
6    any.
7    BY MR. HEGARTY:
8    Q.    How did the authors in this
9    study measure a reaction to the
10   substances that they studied?  In other
11   words, what did they -- what was the
12   measure?
13   A.    So they looked at increased
14   production of reactive oxygen species and
15   changes in the genes of the macrophages
16   that were related to immune response.
17   Q.    The effects that they showed
18   were also true with estradiol alone;
19   correct?
20   A.    So my recollection is, the
21   effects were more prominent with talc
22   alone versus estradiol and even more
23   prominent with talc and estradiol
24   together.

Page 218

1    If you look at figure 2,
2 these are looking at reactive oxygen
3 stains in the three different cell lines,
4 either alone or with an inert substance,
5 which I think was titanium oxide.
6    With estrogen alone, you see
7 a little bit of effect. With talc, you
8 see a greater effect; and with talc and
9 estrogen together, you see the most
10 effect.
11    Q.   And with regard to how they
12 measured reactive oxygen species, they
13 were looking at changes in gene
14 expression; correct?
15    A.   This was flow cytometry, so
16 I don't think that was gene expression.
17    Q.   They did not measure
18 reactive oxygen species such as $H_2O_2$, HO,
19 and $O_2$; correct?
20    A.   I don't think that's what
21 they were looking at.
22    Q.   How does the effects that
23 the authors are showing here in
24 macrophages of mouse cells contribute to

Page 219

1 your opinions as relates to women using
2 talcum powder and ovarian cancer?
3    A.   So macrophages in general
4 are studied in all different types of
5 species because they have a very similar
6 role in humans or mice or other animals,
7 and it's a way to in this case look to
8 see does talcum powder have an effect on
9 immune response in these mice cells.
10    And so it's a surrogate
11 that's well accepted in the scientific
12 publication world or scientific research
13 world to use macrophages from mice or
14 other species as a surrogate for human
15 macrophages.
16    And so this adds evidence
17 that talcum powder exposure has an effect
18 on the immune system activating reactive
19 oxidative species and inhibiting or
20 having changes in immune surveillance.
21    Q.   One of the authors on this
22 study is Dr. Godleski. Do you see that?
23    A.   I do see that.
24    Q.   Do you know Dr. Godleski?

Page 220

1    A.   I know of him. I have never
2 met him.
3    Q.   He's also an expert in the
4 MDL for plaintiffs. Are you aware of
5 that?
6    A.   Yes.
7    Q.   In fact, you rely on his
8 expert reports for your opinions as to
9 Ms. Judkins and Ms. Gallardo; correct?
10    A.   That's correct.
11    Q.   If we turn over to his
12 expert disclosure, on page 10 under
13 "Declaration of Interest," he writes:
14 JJG has served as an independent expert
15 and provided expert testimony in talc and
16 other environmentally related litigation.
17    Do you find that to be a
18 sufficient conflict of interest
19 disclosure?
20    A.   Yes.
21    MR. HEGARTY:  Please turn
22 next to the Emi paper. I'll
23 designate that as Exhibit No. 16.
24    - - -

Page 221

1    (Deposition Exhibit No.
2 Wolf-16, "Transcriptomic and
3 epigenomic effects of insoluble
4 particles on J774 macrophages"
5 Paper by Emi, et al, was marked
6 for identification.)
7    - - -
8 BY MR. HEGARTY:
9    Q.   Did you find this paper on
10 your own?
11    A.   I don't remember.
12    Q.   What does this paper add to
13 your opinions in this case?
14    A.   So this is just another
15 paper looking at potential causation of
16 talc, talcum powder, to cause ovarian
17 cancer and it again -- it's looking at
18 proliferation -- excuse me -- changes in
19 macrophage activation primarily.
20    Q.   This study also looked at
21 mouse cells; correct?
22    A.   Yes.
23    Q.   The study also refers to DNA
24 methylation. What is that?

Judith Kay Wolf, M.D.

Page 222

1      A.   So it's changes in the DNA,
2  methylating it.
3      Q.   What does methylating it
4  mean?
5      A.   It's changing the DNA and
6  how it might react and how it might
7  change expression of genes.
8      Q.   Are you saying that it means
9  -- it is looking at mutation of DNA?  You
10  said --
11      A.   No.
12      Q.   -- changes in DNA.  What do
13  you mean?
14      A.   No, so it's not mutations --
15          MS. O'DELL:  Object to the
16      form.
17          THE WITNESS:  -- it's
18      addition of a methyl -- I'm --
19      methylation.  It's addition of --
20      it's addition to the DNA, not
21      mutation of the DNA, if that's
22      clear enough --
23  BY MR. HEGARTY:
24      Q.   Ultimately, this paper

Page 223

1  measured gene expression after exposure
2  to talc and titanium dioxide particles;
3  correct?
4      A.   Right.  So it was epigenetic
5  changes they were looking at.
6      Q.   Is it your contention that a
7  measure of gene expression can be used to
8  predict carcinogenicity?
9      A.   It's a surrogate used in
10  many studies.
11      Q.   And how is that surrogate --
12  or how can that surrogate predict
13  carcinogenicity?
14      A.   Well, if there's changes in
15  gene expression that were epigenetic
16  changes in the genes that could lead to
17  activation or deactivation of genes, that
18  can change how cells proliferate, how
19  they grow, how they might migrate, how
20  they might invade.  And so it's a
21  surrogate --
22      Q.   Do all those -- I'm sorry to
23  interrupt.  Please continue.
24      A.   No, it's a surrogate.

Page 224

1      Q.   Do all those changes you
2  just described always lead to a
3  malignancy?
4      A.   No.
5      Q.   Has there been any studies
6  showing an association between these
7  findings and ovarian cancer risk?
8          MS. O'DELL:  Object to the
9      form.
10          THE WITNESS:  I'm not aware
11      that any -- are you asking about
12      in humans?
13          MR. HEGARTY:  Yes.
14          THE WITNESS:  I'm not aware
15      that any of those studies have
16      been done.
17  BY MR. HEGARTY:
18      Q.   Is that also true as to the
19  Mandarino study, what Mandarino studied
20  in the paper we just looked at?
21          MS. O'DELL:  Objection.
22          THE WITNESS:  So there are
23      studies about macrophages and
24      macrophage activation in women

Page 225

1      with ovarian cancer, so somewhat
2      there is.
3          But the specific epigenetic
4      changes they found in this paper,
5      I'm not aware of any studies on
6      them.
7  BY MR. HEGARTY:
8      Q.   What studies -- what study
9  are you referencing --
10          MS. O'DELL:  Excuse me.  I'm
11      not sure she was finished.
12          THE WITNESS:  Yeah, and I'm
13      not referencing -- I'm thinking
14      back in my history of all the
15      papers I've ever read and I'm
16      pretty sure there's papers about
17      macrophage activation in ovarian
18      cancer, but I can't tell you the
19      name of any paper --
20  BY MR. HEGARTY:
21      Q.   In the Emi study, did the
22  titanium dioxide particles also induce
23  the same response as the talc particles?
24      A.   I'm just looking at the --

Page 226

1  at the results.
2       (Pause.)
3       THE WITNESS:  So there was
4  some changes with the titanium
5  oxide, but not as much as the
6  talc.
7  BY MR. HEGARTY:
8       Q.   In your opinion, does
9  titanium dioxide cause ovarian cancer?
10      A.   Not that I'm aware of any
11 reports of it causing ovarian cancer.
12      Q.   In a study like this, can
13 particle size have an effect on the
14 results?
15      A.   You know, this is beyond my
16 area of expertise, so I'm not going to --
17 I'm going to say I don't know the answer
18 to that question.
19      Q.   Please turn next to
20 paragraph 8 where you include a reference
21 to the Harper 2023 study.  Do you see
22 that?
23      A.   I do.
24      Q.   Do you have that paper as

Page 227

1  well?
2       A.    Well, I'm going to get it.
3       (Pause.)
4       THE WITNESS:  I have it in
5  front of me.
6  BY MR. HEGARTY:
7       Q.   And what do you rely upon in
8  this study for your opinions in this
9  case?
10      A.   So this is another paper
11 supporting causation; and in this study,
12 they actually looked at the effects on
13 surface epithelium -- human surface
14 epithelium ovarian cells that are
15 immortalized.
16      So these are not cancer
17 cells.  They're cells from the ovarian
18 surface that have been immortalized, so
19 they'll grow in culture, and it looks at
20 the effects of result of exposure to talc
21 on proliferation markers and on p53 and
22 Ki67 expression.
23      Q.   Do you agree -- I'm sorry to
24 interrupt.  Go ahead.

Page 228

1       A.   So it's just another paper
2  supporting causation.
3       Q.   Do you agree with the title
4  of this paper that this study showed that
5  talcum powder induces malignant
6  transformation in normal human primary
7  ovarian epithelial cells?
8       A.   So that's what they titled
9  the paper.  I don't have an agreement or
10 disagreement.  What they found in the
11 paper was increased expression of Ki67,
12 which is a proliferation marker, showing
13 that the cells grew in response and
14 increased expression of p53, which is
15 associated with most ovarian cancers,
16 especially the serous type.
17      And so I don't know why they
18 chose the title that they chose.  Again,
19 I'm neutral to it.  I'm looking at the
20 results.
21      Q.   Have you analyzed or
22 investigated whether a commercial
23 cellular assay kit can ever be used to
24 demonstrate malignant transformation

Page 229

1  after 72 hours?
2       A.   I haven't investigated that
3  myself.
4       Q.   Can you cite to any other
5  studies where the authors claim to have
6  achieved malignant transformation after
7  exposure to any substance in 72 hours?
8       A.   I haven't looked that up
9  myself to know if anyone else has titled
10 their papers that way.
11      Q.   Do you agree that a
12 necessary step to show the potential for
13 relevance of this paper is to conduct in
14 vivo studies in animals?
15      MS. O'DELL:  Object to the
16 form.
17      THE WITNESS:  You know, I
18 will just say that it's very
19 difficult -- so, as I mentioned,
20 not many animals get ovarian
21 cancer.  Guinea pigs sometimes do.
22 Hen -- egg-laying hens sometimes
23 do.
24      But the only other -- the

Page 230

1   most common animal models used in
2   ovarian cancer are not giving them
3   -- looking at changes of their
4   ovaries because they don't get
5   ovarian cancer.  Right?
6         And I'm not aware of any
7   studies that have looked at using
8   talc or other things in the two
9   rare animal models that there are
10  to see if it causes ovarian
11  cancer, so I would not expect that
12  to or it need to be done to
13  confirm these results.
14  BY MR. HEGARTY:
15      Q.   Have you investigated
16  whether any journals rejected this paper?
17      A.   No, I have not.  I'm not
18  sure how -- how I would find that out.
19      Q.   Have you been made aware of
20  any journals rejecting this paper?
21      A.   No.
22      Q.   Are you aware that Dr. Saed
23  has served as a paid plaintiffs' expert
24  in the MDL litigation?

Page 231

1       A.   I am.
2       Q.   Are you aware that he
3   reports in this paper that the study was
4   paid for by plaintiffs' counsel?
5       A.   I'm going to try to find --
6         MS. O'DELL:  Object to the
7   form.
8         (Pause.)
9         THE WITNESS:  Where does it
10  say that in this paper?
11        MR. HEGARTY:  If you look
12  over at the very end, under
13  conflict of interest for Dr. Saed
14  --
15        THE WITNESS:  I was looking
16  for that.  Served as a paid --
17  paid consultant.  And then
18  funding:  A portion of Dr. Saed's
19  time conducting this research was
20  paid for by the lawyers
21  representing the plaintiffs.
22  BY MR. HEGARTY:
23      Q.   Is that important
24  information to know about this article?

Page 232

1       A.   Yes, it's a piece of
2   information and it's in the article.  I
3   mean, it's -- yeah, it's published.
4       Q.   Are you aware that Dr. Saed
5   has produced peer reviewer comments in
6   connection with him publishing this
7   paper?
8         MS. O'DELL:  Object to the
9   form.
10        THE WITNESS:  What does that
11  mean?
12  BY MR. HEGARTY:
13      Q.   Well, that means, are you
14  aware that in connection with this case,
15  the MDL, Dr. Saed has provided e-mail
16  correspondence from the journals that he
17  submitted this paper to that contain
18  comments of the peer reviewers from their
19  review of the paper?  Are you aware of
20  that?
21      A.   I'm not aware of that.
22      Q.   Would those comments be
23  something you would be interested in in
24  weighing the strengths and weaknesses in

Page 233

1   consideration of this paper?
2       A.   It's hard to know because I
3   never see those for any paper that I read
4   or assess or review.
5       Q.   Well, let me show you a
6   couple of the comments from the reviewers
7   that we were provided in this litigation.
8         MS. O'DELL:  So, Mark, if
9   you're going to mark those as
10  exhibits, I would just ask that
11  you put them in the chat and --
12  rather than just limit it to
13  what's on the screen.
14        MR. HEGARTY:  I can send it
15  to you by e-mail.
16        MS. O'DELL:  Either way, but
17  I want Dr. Wolf to have the
18  opportunity to see the whole
19  document before she is asked
20  questions.
21        MR. HEGARTY:  Let's go ahead
22  and go off the record real quick.
23  I'll e-mail this.  Can I e-mail it
24  to you, Leigh?

Page 234

```
 1        MS. O'DELL:  You may.  But,
 2   I mean, I'm not saying we're going
 3   off the record.  I mean, if you're
 4   going to ask her questions and
 5   mark an exhibit, she will look at
 6   it.  If it's not that long, she'll
 7   answer your questions.  If she
 8   needs a few more minutes, then we
 9   can go off the record.
10        But I just want to -- it's
11   not clear -- if we don't have a
12   paper copy here and you show a
13   limited version -- I'm not being
14   pejorative about that, there's
15   just a limited amount of screen --
16   she can't see the whole thing and
17   I think that's important.  And
18   that's been important all day in
19   every sense.
20        So if you want to mark
21   something, just send it to me.
22   She can look at it while we're --
23   and then she'll be prepared to
24   answer your questions.
```

Page 235

```
 1        MR. HEGARTY:  Well, let's
 2   try this, because I think we can
 3   do this without sharing.
 4   BY MR. HEGARTY:
 5        Q.   Doctor, do you see the
 6   document I'm showing you on my screen?
 7        MS. O'DELL:  And, Mark,
 8   you're going to e-mail it to me?
 9        MR. HEGARTY:  Well, I tried
10   and it wasn't -- it was not going.
11        MS. O'DELL:  Yeah, if you --
12   you can e-mail it to me I think if
13   you just do share, send an e-mail.
14        MR. HEGARTY:  Oh, I know
15   that.
16        MS. O'DELL:  Okay.
17        MR. HEGARTY:  It's not
18   letting me do it.
19        MS. O'DELL:  That's -- if we
20   can't see the document, she can't
21   adequately respond to your
22   questions.
23        MR. HEGARTY:  Well, I'll let
24   her answer that if that's her
```

Page 236

```
 1   response.
 2   BY MR. HEGARTY:
 3        Q.   Doctor, do you see the
 4   document I'm showing on my screen?
 5        A.   I see the little bit that
 6   you're showing.  I would like to see the
 7   whole document.
 8        MR. HEGARTY:  Understood.
 9   I'll designate this as Exhibit No.
10   18.
11             -  -  -
12        (Deposition Exhibit No.
13   Wolf-17, "Talcum powder induces
14   malignant transformation in normal
15   human primary ovarian epithelial
16   cells" Paper by Harper, et al, was
17   marked for identification.)
18             -  -  -
19        (Deposition Exhibit No.
20   Wolf-18, PLOS ONE Reviewer
21   Comments, SAED_SEPT222021_
22   SUPPL_000100 through
23   SAED_SEPT222021_SUPPL_000104, was
24   marked for identification.)
```

Page 237

```
 1             -  -  -
 2   BY MR. HEGARTY:
 3        Q.   And as you mentioned, you
 4   have not seen reviewer comments to Dr.
 5   Saed's paper; correct?
 6        A.   I have not.
 7        Q.   I'm going to scroll down to
 8   the section under major comments.  Do you
 9   see the section I'm -- under the heading
10   "Major Comments"?
11        MS. O'DELL:  Excuse me.  I
12   object to this line of
13   questioning.  Dr. Wolf has asked
14   to see it and, Mark, you can just
15   -- you can just e-mail it to us.
16   I don't -- that's available in my
17   PDF program.  I'm sure it is for
18   you, too.
19        I actually wonder if you use
20   the little paperclip on the side
21   of your screen there, you probably
22   can e-mail it, but Dr. Wolf is
23   entitled to see it.
24        Now, you can also, which I'm
```

Judith Kay Wolf, M.D.

1   so happy for you to do this, put
2   it in the chat and you can -- put
3   it in the chat and then Dr. Wolf
4   is free to pull it up on her
5   computer and look at it and
6   certainly would be happy to answer
7   your questions.
8       MR. HEGARTY:  Leigh, I know
9   you have this document already, so
10  I think it's -- I think it's kind
11  of disingenuous for you to ask me
12  -- or present an obstacle to me
13  using this document and asking me
14  to send it to you when you have
15  this document.
16      MS. O'DELL:  Well, Mark, to
17  be perfectly fair -- and I won't
18  say you're being disingenuous.
19  I'm going to not say that.  I'm
20  going to try to just be clear --
21  there are thousands of documents
22  that have been produced in this
23  litigation, and Dr. Wolf is
24  prepared to answer your questions,

1   but this is not a document that is
2   on her materials list and if you
3   want her to answer questions about
4   it, you need to provide it.
5       That's all I'm asking.  I
6   think it's perfectly fair.
7       MR. HEGARTY:  You already
8   have a copy of it, so let's
9   continue.
10      MS. O'DELL:  No, absolutely,
11  she is not answering questions
12  about this --
13      MR. HEGARTY:  You're going
14  to instruct her not to answer?
15      MS. O'DELL:  I'm going to --
16  I'm asking you, actually, to
17  provide a copy of the document to
18  me.
19      You're super-sophisticated.
20  You're able to do that.  You can
21  do it through the chat or you can
22  send me an e-mail and we can get
23  it on Dr. Wolf's screen.  She can
24  have an opportunity to review it

1   in totality.
2       It's a five-page document,
3   single-spaced, with a lot of data
4   on it and this is a very
5   complicated subject.
6       And for you to want to put
7   up a very small amount and
8   cherry-pick the comments without
9   giving her opportunity to
10  understand the context, I just
11  think it's unfair.
12      And so, again, send it to
13  Dr. Wolf by the chat.  Send it to
14  me by e-mail, I'll get it to her,
15  happy to answer your questions.
16      MR. HEGARTY:  Let's go off
17  the record.  Let's go off the
18  record because -- let's go off the
19  record.
20          -  -  -
21      (A discussion off the record
22  occurred.)
23          -  -  -
24      MS. O'DELL:  I would like to

1   go back on the record, Kim, so I
2   can put this on the record.  Thank
3   you so much.
4       Mark, what you're asking is
5   to put a limited portion of a
6   five-page dense document before
7   Dr. Wolf and ask her something,
8   without giving her the opportunity
9   to review the document in
10  totality.  She's entitled to that.
11      This is not on her materials
12  considered list and if she's going
13  to be shown something that's not
14  on her materials considered list,
15  then that's the only fair way to
16  do it.
17      Every other study that
18  you've asked her about that's on
19  her list, she has a copy here,
20  she's been ready to go.
21      So if you want to pursue
22  this inquiry, please, you're
23  entitled to do that, but you're
24  not entitled to do it in a way

Page 242

that's unfair to Dr. Wolf and
that's point I'm making.
    MR. HEGARTY:  Well, the
procedure you're talking about is
one that's going to, for her just
to review the document, take a
half an hour to review.
    MS. O'DELL:  I don't know
that she would do that, but she's
entitled to look at it in context.
    And to be fair, you know,
we're here by Zoom.  We were
willing to be -- have you here in
person.  If we were here in
person, you would have handed Dr.
Wolf a copy of the document.
Obviously, it's more convenient
for you to do it by Zoom.  We're
happy to accommodate that.
There's no problem.
    But under those
circumstances, we need to have the
documents that are going to be
marked in their totality and --

Page 243

    MR. HEGARTY:  So it's your
position, I want to make it clear,
that if we don't provide a
document to you, either in advance
or at the deposition, that the
doctor does not have with them,
then you will instruct the doctor
not to respond to questions.
    MS. O'DELL:  That's not what
I'm saying.  And we have had many
instances in this litigation where
there's been a document that's
been subject to inquiry and the
lawyer for Johnson & Johnson has
put it in the chat if it wasn't
something the witness had before
them.
    That's so reasonable.  I'm
asking for something that has been
done consistently -- you're saying
-- you either refuse to put it in
the chat, you refuse to e-mail it,
or you're incapable.  I don't
think you're incapable.  I've been

Page 244

working with you a long time.
    And so that's the issue.
    MR. HEGARTY:  Well, I think
that's an inappropriate approach,
but if we're going to do that,
I'll e-mail those to you, but
we're -- and the review needs to
be -- needs to be off the record,
not on the record.
    MS. O'DELL:  Well, send them
to us.  She'll pull them up.  If
she needs more time, Dr. Wolf is
-- will let you know she needs
more time to review it.
    MR. HEGARTY:  Well, the
documents we are talking about
are, as you said, around five
pages.  You've seen them.  You
know that it's going to take -- if
you're insisting that she read the
entirety of it, it's going to take
several minutes.
    MS. O'DELL:  Well, Mark,
just send them and she'll look at

Page 245

and Dr. Wolf, if she believes she
needs more time, she will let you
know and we'll go off the record,
but just send them to us.
    The reason I said five pages
is that's what you had up, was a
five-page document.  I don't know
what you had pulled up.  I only
saw a small portion of it either,
have no context for it, and it's
certainly not something I have a
hard copy of it here.
    So again, provide them, Dr.
Wolf can look.  If she needs more
time, so be it.  If she doesn't,
she'll answer your questions.
    MR. HEGARTY:  Let's go off
the record and I'll e-mail those
to you.  Off the record.
    MS. O'DELL:  We'll take two
minutes.
         - - -
    (A discussion off the record
occurred.)

Page 246

1          - - -
2          (A recess was taken from
3    3:21 p.m. to 3:39 p.m.)
4          MR. HEGARTY:  We are back on
5    the record.
6          The first -- the document I
7    want to look at is the one
8    beginning with Bates number 100.
9    That's a five-page document, which
10   I'll designate as Exhibit 18.
11   BY MR. HEGARTY:
12        Q.   Do you have that document in
13   front of you?
14        A.   Yeah, that's the one that's
15   from PLOS ONE, P-L-O-S ONE?
16        Q.   Yes.  Under the comments
17   under major comments over on page 101, if
18   you look at comment number 3 --
19        A.   Yes.
20        Q.   -- do you agree with that
21   statement -- or those statements in that
22   comment?
23        A.   The abstract, the authors
24   state the finding represents a direct

Page 247

1    causation and mechanism of talcum powder
2    exposure.  Colony formation does not show
3    molecular mechanism of action.  At best,
4    it describes the end product of a
5    mechanism of action.  Please revise.
6          And did he revise it?
7    Because that was not where it was --
8        Q.   Well, let me ask it this
9    way:  Do you agree that --
10        MS. O'DELL:  Excuse, Mark.
11   I think she was continuing to
12   answer your question.
13        THE WITNESS:  Yeah.  What
14   number was it?  Number --
15        MS. O'DELL:  Number 3.
16        MR. HEGARTY:  3.
17        THE WITNESS:  Okay.
18        So colony formation is a
19   surrogate again for proliferation
20   -- it's not a surrogate for
21   proliferation, but a surrogate for
22   transformation.  So, you know, I
23   think that's a reasonable concern
24   that this reviewer offered.

Page 248

1    BY MR. HEGARTY:
2        Q.   Look next at number 4:
3    Based on the minimal amount of data
4    provided in this manuscript, the author's
5    conclusion suggesting acute exposure to
6    talc powder to ovary epithelial cells is
7    associated with ovarian cancer are
8    outrageous and not supported by the
9    manuscript's data.
10        Do you agree with that
11   statement?
12        A.   I think that's the -- that's
13   this reviewer's review and comment on the
14   paper.  I don't agree with it.
15        Q.   Does it cause you any
16   concern that a reviewer of the -- as part
17   of the peer review process found that Dr.
18   Saed's conclusions are outrageous?
19        MS. O'DELL:  Object to the
20   form.
21        THE WITNESS:  Not -- not on
22   its own.  I will tell you that
23   most papers, when you go to
24   publish them, the vast majority

Page 249

1    are rejected by the first -- first
2    journal that they're submitted to
3    and I am -- other than comments on
4    my own papers that I've submitted
5    that have either been accepted or
6    rejected, I'm not privy to what
7    other reviewers say, so I can't
8    really comment on the importance
9    of that comment.
10   BY MR. HEGARTY:
11        Q.   Will you consider that
12   comment in your weight of the paper as it
13   relates to your opinions in this case?
14        A.   I don't think it's fair to
15   because it has nothing to do with -- this
16   paper was published in a peer-reviewed
17   journal.  This is not anything that I
18   would have privy to for any of the other
19   papers that I've read or any other papers
20   that I've -- I have read for other
21   reasons in my career, so to me it's,
22   like, not relevant.
23        Q.   Look next at paragraph 5 in
24   that same section.  There's a statement

Page 250

1 in that paragraph that says:  Soft agar
2 colony formation alone in an in vitro
3 test system is not enough data to claim
4 malignant transformation.
5        Do you agree with that
6 statement?
7     A.   It supports it.  It supports
8 malignant transformation.  Personally, I
9 wouldn't claim that it caused malignant
10 transformation, but again, I can't query
11 on Dr. Harper's title for her paper.
12     Q.   Looking at another -- at a
13 couple sentences away from that, that
14 sentence reads:  To show neoplastic
15 transformation, the authors would need to
16 conduct a more diverse battery of tests
17 to show that these transformed cells
18 possess a tumor or cancer cell phenotype,
19 i.e., cancer hallmarks, as outlined by
20 Hannahan and Weinberg.
21        Do you agree with that
22 statement?
23     A.   You know what, personally, I
24 don't know what Hannahan and Weinberg is

Page 251

1 and, again, this is this reviewer's
2 opinion about the paper.
3        MR. HEGARTY:  Turn to the
4     next set of comments from
5     Gynecologic Oncology.  They are
6     Bates numbers 69 to 70, which I'll
7     mark as No. 19.
8        - - -
9        (Deposition Exhibit No.
10     Wolf-19, Gynecologic Oncology
11     Reviewer Comments,
12     SAED_SEPT222021_SUPPL_000069 and
13     SAED_SEPT222021-SUPPL_000070, was
14     marked for identification.)
15        - - -
16        MR. HEGARTY:  Do you have
17     that paper in front of you?
18        THE WITNESS:  I do.
19 BY MR. HEGARTY:
20     Q.   Looking at the section on
21 specific comments at the bottom of the
22 first page, comment number 1 says:  It is
23 now generally accepted that most
24 high-grade serous carcinoma arise from

Page 252

1 the fallopian tube fimbrial epithelial.
2        Do you agree with that
3 statement?
4     A.   So there is data to support
5 that a lot of high-grade serous cancers
6 come from the fallopian tube fimbriae,
7 but not all ovarian cancers.
8     Q.   The next statement says:
9 Hence, these studies should examine the
10 effects of talcum powder on FT, or
11 fallopian tube, cells.
12        Do you agree with that?
13     A.   It would add to the study to
14 study fallopian tube epithelial cells,
15 that's what I would agree to.
16     Q.   Turn over to the second
17 page, Bates number 70.  Comment number 3
18 --
19     A.   That starts "The reviewer
20 recommends"?
21     Q.   Yes, Doctor -- second
22 sentence says:  The correlation to IHC is
23 insufficient to draw this conclusion --
24 let me start from the beginning -- The

Page 253

1 reviewer recommends that further work be
2 undertaken to establish whether talcum
3 powder induces functional changes in
4 ovarian epithelial cells suggested by
5 malignant transformation.  The
6 correlation to IHC is insufficient to
7 draw this conclusion and thus the results
8 of this study are overinterpreted.
9        Do you agree with those
10 statements?
11        MS. O'DELL:  Object to the
12     form.
13        THE WITNESS:  So I agree
14     that the results of the study
15     support malignant transformation,
16     cell proliferation.  More data is
17     always better than less data and
18     that's what this reviewer in my
19     opinion is suggesting.
20 BY MR. HEGARTY:
21     Q.   The comment goes on to say:
22 Given that the transformed cells were not
23 subcultured or further analyzed following
24 treatment conditions to show phenotypic

Page 254

1 genetic/epigenetic or functional changes,
2 the changes seen in IHC may be explained
3 by cellular responses to treatments.
4        Do you agree with that
5 statement?
6    A.   I'm not sure what that
7 statement means.  I understand what
8 they're saying, do more tests, but I
9 don't know what they mean by cellular
10 responses to treatments.  That may be
11 beyond my expertise.
12    Q.   The next statement says:
13 Whereas durable alterations in p53
14 staining may indicate mutations as in the
15 clinical -- as in the case clinically,
16 p53 expression at a single time point
17 following treatment cannot differentiate
18 between novel mutations and a physiologic
19 response responsive to a given treatment
20 condition.
21        Do you agree with that
22 statement?
23    A.   You can have increased p53
24 expression that is either mutated or

Page 255

1 increased expression in normal p53.
2        MR. HEGARTY:  You can put
3    those documents aside, Doctor.
4        THE WITNESS:  Okay.  Thank
5    you for sending them.
6        MR. HEGARTY:  You're
7    welcome.
8 BY MR. HEGARTY:
9    Q.   If you turn next to page 18
10 of your report, the biologic gradient
11 section --
12    A.   Yes.
13    Q.   -- you added to the biologic
14 gradient section the Woolen paper which
15 we talked about earlier?
16    A.   Yes.
17    Q.   What from the Woolen paper
18 shows a dose-response?
19    A.   Can I have my -- I'm going
20 to get the Woolen paper out again.
21        (Pause.)
22        THE WITNESS:  So I believe
23    I'm referring there to the
24    supplemental table 1 where we

Page 256

1 compared less frequent users to
2 daily users.
3 BY MR. HEGARTY:
4    Q.   Well, do the authors of the
5 Woolen paper report on dose-response?
6    A.   The authors of the Woolen
7 paper were specifically looking at
8 frequent users as their -- as per their
9 definition.  And so in the supplementary
10 table, they look at less frequent users
11 versus daily users.  So in a sense, yes.
12    Q.   The authors, though, don't
13 do any kind of interaction test to
14 determine whether the odds ratios for
15 less frequent users or daily users was
16 statistically significantly different;
17 correct?
18        MS. O'DELL:  Object to the
19    form.
20        THE WITNESS:  I'm not aware
21    that they did any interaction
22    study.
23 BY MR. HEGARTY:
24    Q.   Is it your contention,

Page 257

1 though, from supplementary table 1 that
2 Woolen does show a dose-response?
3        MS. O'DELL:  Object to the
4    form; misstates the statement in
5    her report.
6        THE WITNESS:  So there's
7    definitely a difference between
8    less frequent users and daily
9    users.
10 BY MR. HEGARTY:
11    Q.   But is it your opinion from
12 that data that this paper shows a
13 dose-response?
14        MS. O'DELL:  Objection to
15    the form.
16        THE WITNESS:  Well, it's my
17    opinion that there's a difference
18    between less frequent users and
19    daily users.
20 BY MR. HEGARTY:
21    Q.   And is that your -- is that
22 what you're saying by adding the Woolen
23 paper to this part of your report?
24    A.   Yes.

Page 258

1  Q.  The Gertig 2000 study
2  reported on the NHS1 dataset; correct?
3  Do you remember that?
4       MS. O'DELL:  So, Mark, if
5  you want to talk about Gertig, she
6  just needs it in front of her.
7       MR. HEGARTY:  My question at
8  this point was only whether she
9  was aware of that finding.
10      MS. O'DELL:  I think it
11  would be fair to have it in front
12  of her since that's -- I mean,
13  that study, she hasn't been
14  examined on since 2019.
15      MR. HEGARTY:  I don't intend
16  to examine her about it.  My
17  question was simply whether you're
18  aware if Gertig 2000 reported on
19  dose-response.
20      THE WITNESS:  Oh, that was
21  not my understanding of your
22  question.  I thought you asked did
23  they report on the first part of
24  the Nurses' Health Study and the

Page 259

1  answer to that is yes --
2  BY MR. HEGARTY:
3  Q.  Gertig 2000 did report on
4  the first part of the Nurses' Health
5  Study; correct?
6  A.  Okay.  That's correct.
7  Q.  And that's data from which
8  the Woolen paper took from; correct?
9       MS. O'DELL:  Objection to
10  the form.
11      THE WITNESS:  I don't think
12  they took it specifically from the
13  paper.  It was from the dataset.
14  BY MR. HEGARTY:
15  Q.  Right.  And do you recall
16  that Gertig 2000 found no dose-response
17  -- or reported no dose-response?
18      MS. O'DELL:  Objection to
19  the form.
20      THE WITNESS:  You know, I
21  have to look at the numbers to see
22  if the numbers are the same of the
23  daily users in the Gertig paper.
24  I have the Gertig paper in front

Page 260

1  of me.  Can I -- let me get the
2  Woolen paper.  So -- I'm trying to
3  add up their numbers.
4       So the numbers are
5  different.  So the numbers
6  reported in the Gertig paper of
7  daily users is 48.  The numbers
8  extracted from the NHS1 study
9  reported in the Woolen paper are
10  157, so it's different numbers.
11  BY MR. HEGARTY:
12  Q.  What did the authors of the
13  Gertig 2000 paper report as to
14  dose-response?
15  A.  So their reports -- their
16  confidence intervals are the same, but I
17  also don't see if they did a comparison,
18  but those numbers are different and
19  smaller than in the Woolen study.  So
20  it's apples to oranges.  It's two
21  different groups of people.  One is a
22  subset of the other, I assume.
23  Q.  Understood.  Putting that
24  apples and oranges aside, just focusing

Page 261

1  on Gertig, what did the Gertig 2000 paper
2  report as to dose-response?
3       MS. O'DELL:  Object to the
4  form.
5       THE WITNESS:  So I'm looking
6  to see the actual words they use
7  because I don't see that they
8  compared between the groups of
9  never, less than once a week, one
10  to six times a week, and daily.
11  They also don't report a
12  statistical comparison.  So I'm
13  looking for the words in the
14  results.
15      (Pause.)
16      THE WITNESS:  They don't
17  really say.  They don't -- they
18  don't really say that I can see.
19  For women who reported ever, daily
20  use of talc, relative risk was
21  1.49.  Talc less than once a week
22  was 1.29 and one to six times a
23  week, 1.49, and they don't report
24  that they compared them.

Page 262

1  BY MR. HEGARTY:
2      Q.   If you're looking at the
3  background section in the results, don't
4  they report that there was no increase in
5  risk of ovarian cancer with increasing
6  frequency of use?
7      A.   Are you looking at the
8  abstract or the results?
9      Q.   I'm looking at the abstract
10 in the results part of the abstract.
11     A.   I was reading the actual
12 results.
13     Q.   My question, though, is, in
14 the results section on the very first
15 page as part of the abstract, they report
16 they found no increase in risk of ovarian
17 cancer with increasing frequency of use;
18 correct?
19     A.   That's what the abstract
20 says.  That -- I don't see that in the
21 actual results.
22     Q.   That's another way of saying
23 they found no dose-response based on
24 frequency of use; correct?

Page 263

1      MS. O'DELL:  Objection to
2      the form; misstates her testimony.
3      THE WITNESS:  What I'm
4      saying is, that says that in the
5      abstract.  It doesn't say it in
6      the results and it doesn't show
7      that they compared differences
8      either in the table or the actual
9      words of the result.
10 BY MR. HEGARTY:
11     Q.   Where you talk about Woolen
12 in the biologic gradient section, you
13 don't make a reference to Gertig 2000;
14 correct?
15     A.   I don't -- I did not cite
16 it, no.  Small numbers, again, there's
17 less than a third of the patients were
18 daily users in the Gertig paper as
19 opposed to the data that was reported in
20 the Woolen study from the Nurses' Health
21 Study.
22     Q.   Have you done any recent --
23 strike that.
24     Have you reviewed the most

Page 264

1  recent NCI PDQ from October 2023?
2      A.   I have.
3      Q.   Do you reference it anywhere
4  in your November 2023 amended report,
5  that is, the body of the report?
6      A.   I don't think I mentioned it
7  in the body of my report, no.
8      Q.   Have you done any research
9  or analysis into the creation of the NCI
10 PDQ since September 2021?
11     A.   No.
12     Q.   Have you done any research
13 or analysis into the editorial boards of
14 the NCI PDQ since September 2021?
15     A.   No --
16     MS. O'DELL:  Object to the
17     form.
18     THE WITNESS:  No, other than
19     reading the most recent PDQ.
20 BY MR. HEGARTY:
21     Q.   Have you done any other type
22 of work in this litigation with respect
23 to the NCI PDQ for ovarian cancer since
24 your September 2021 deposition besides

Page 265

1  reviewing the most recent version?
2      A.   No.
3      Q.   Have you reached out to
4  anyone on the NCI board since September
5  2021 about the PDQ for ovarian cancer?
6      A.   No.
7      Q.   Do you have any opinions
8  that you intend to offer or -- strike
9  that.
10     Do you have any opinions in
11 this case with regard to the most recent
12 NCI PDQ?
13     A.   I mean, just to me that
14 similar to what the previous ones show,
15 that they don't review all of the
16 literature.  Most of the literature that
17 they cite does show an increased risk of
18 ovarian cancer in women who use talc and
19 that their interpretation of the Woolen
20 study and the -- specifically the data
21 from the Nurses' Health Study that they
22 got, to my view, is not correct.
23     Q.   Since September 2021, have
24 you become aware of any gynecologic

Page 266

¹ oncologists who are not experts for
² plaintiffs in talcum powder cases who
³ have the same opinion that you do that
⁴ talcum powder use can cause ovarian
⁵ cancer?
⁶          MS. O'DELL:  Object to the
⁷ form.
⁸          THE WITNESS:  I have not,
⁹ but I have not asked anyone.
¹⁰          MR. HEGARTY:  With regard to
¹¹ the materials that you have with
¹² you today, Doctor, I want to
¹³ designate some of those as
¹⁴ exhibits.
¹⁵          THE WITNESS:  Okay.
¹⁶          MR. HEGARTY:  First of all,
¹⁷ the -- your general report, I want
¹⁸ to designate that as Exhibit No.
¹⁹ 20.
²⁰                    - - -
²¹          (Deposition Exhibit No.
²² Wolf-20, General Report of Dr.
²³ Wolf Present with Witness, was
²⁴ marked for identification.)

Page 267

¹                    - - -
²          MR. HEGARTY:  Your report
³ for Ms. Judkins, I want to
⁴ designate as Exhibit 21 --
⁵                    - - -
⁶          (Deposition Exhibit No.
⁷ Wolf-21, Judkins Case-Specific
⁸ Report of Dr. Wolf Present with
⁹ Witness, was marked for
¹⁰ identification.)
¹¹                    - - -
¹²          MS. O'DELL:  I don't
¹³ understand, Mark.  You've
¹⁴ previously -- you've previously
¹⁵ marked those.
¹⁶          MR. HEGARTY:  But I want to
¹⁷ mark what she -- I want to attach
¹⁸ as exhibits to this deposition the
¹⁹ materials that Dr. Wolf brought
²⁰ with her to the deposition.
²¹          MS. O'DELL:  Okay.
²²          MR. HEGARTY:  I want to
²³ designate as Exhibit No. 22 Dr.
²⁴ Wolf's specific report for Ms.

Page 268

¹ Gallardo.
²                    - - -
³          (Deposition Exhibit No.
⁴ Wolf-22, Gallardo Case-Specific
⁵ Report of Dr. Wolf Present with
⁶ Witness, was marked for
⁷ identification.)
⁸                    - - -
⁹          MR. HEGARTY:  I want to
¹⁰ designate as Exhibit No. 23 Dr.
¹¹ Wolf's report for Ms. Bondurant.
¹²                    - - -
¹³          (Deposition Exhibit No.
¹⁴ Wolf-23, Bondurant Case-Specific
¹⁵ Report of Dr. Wolf Present with
¹⁶ Witness, was marked for
¹⁷ identification.)
¹⁸                    - - -
¹⁹          MR. HEGARTY:  I want to
²⁰ designate Exhibit No. 24 Dr.
²¹ Longo's exposure report, as we
²² referred to it as.
²³                    - - -
²⁴          (Deposition Exhibit No.

Page 269

¹ Wolf-24, Dr. Longo's Exposure
² Report Present with Witness, was
³ marked for identification.)
⁴                    - - -
⁵          MR. HEGARTY:  I want to
⁶ designate as Exhibit No. 25 Dr.
⁷ Longo's November 2023 general
⁸ report.
⁹                    - - -
¹⁰          (Deposition Exhibit No.
¹¹ Wolf-25, Dr. Longo's MDL Third
¹² Supplemental Report Present with
¹³ Witness, was marked for
¹⁴ identification.)
¹⁵                    - - -
¹⁶          MR. HEGARTY:  I want to
¹⁷ designate as Exhibit No. 26 the
¹⁸ report of Dr. Levy that Dr. Wolf
¹⁹ brought with her to her
²⁰ deposition.
²¹                    - - -
²²          (Deposition Exhibit No.
²³ Wolf-26, Dr. Levy's Report Present
²⁴ with Witness, was marked for

Page 270

1    identification.)
2              - - -
3         MR. HEGARTY:  And I want to
4    designate as Exhibit 27 the
5    entirety of the literature that
6    Dr. Wolf brought with her to the
7    deposition.
8              - - -
9         (Deposition Exhibit No.
10    Wolf-27, Entirety of Literature
11    Dr. Wolf Brought to Deposition,
12    was marked for identification.)
13             - - -
14    BY MR. HEGARTY:
15        Q.   Have I covered with that
16    description and designation of exhibits
17    all the materials you brought with you to
18    the deposition, Dr. Wolf?
19        A.   Yes, I believe so.
20        MS. O'DELL:  Mark, for
21    clarification, Exhibit 25 is --
22    you referred to it as Dr. Longo's
23    general report and it should be
24    referred to as his third

Page 271

1    supplemental report, because as
2    you know, he has others.  So it's
3    his MDL third supplemental report,
4    and as I understand it, you marked
5    that as Exhibit 25.
6         MR. HEGARTY:  You're right
7    and thank you for that further
8    description, and that indeed
9    should be Exhibit No. 25.
10    BY MR. HEGARTY:
11        Q.   We talked earlier, Doctor,
12    about your preparation for this
13    deposition and your meeting with counsel.
14    Since September 2021, have you interacted
15    with any counsel for plaintiffs in the
16    MDL on a social basis?
17        A.   No -- well, no, except the
18    day that I was working on my amended
19    report, we had dinner together after we
20    were done with work.  That's the only
21    time.
22        Q.   Who did you have dinner
23    with?
24        A.   Leigh O'Dell, Margaret

Page 272

1    Thompson, and Ellen Smith.
2        Q.   Since September 2021 and
3    before yesterday, was that the only time
4    you've had a get-together with any of
5    those lawyers or any other lawyer for
6    plaintiffs in the MDL litigation?
7        A.   Yes, except there was one
8    time when I needed a Texas-licensed
9    doctor to approve that I was a physician
10    for some medical license or hospital
11    credentialing, that I met Margaret
12    outside of her exercise place and she
13    agreed to sign and be a reference.
14         And that was all.  It was a
15    two-minute visit.  She signed the piece
16    of paper for me.  That's the only other
17    time.
18        MR. HEGARTY:  Let's go off
19    the record.
20             - - -
21        (A discussion off the record
22    occurred.)
23             - - -
24        MR. HEGARTY:  We're back on

Page 273

1    the record, Kim, and we had a
2    discussion off the record where
3    I'm at my four hours; therefore,
4    I'm going to finish for today
5    given that I am at that time.
6         But going back to our
7    initial discussion on the record,
8    I'm leaving the deposition open,
9    from the J & J defendants'
10    standpoint, because of the
11    disclosure and the timing of the
12    disclosure with regard to the
13    three reports that I marked as
14    Exhibits 24, 25, and 26 -- I'm not
15    going to repeat what we talked
16    about earlier.  I'll just refer
17    back to it -- and note that we
18    will pursue additional time with
19    Dr. Wolf so that we can properly
20    cover those materials.
21         Also, as I did mention, I
22    think on the record, that because
23    this case -- this deposition does
24    involve three additional reports,

Page 274

1  case-specific reports, and I
2  needed to use some of my time for
3  those reports, that it would be
4  appropriate to extend this time to
5  accommodate for that, but I
6  understand plaintiffs' counsel's
7  position.
8       So with that, again, I will
9  conclude my questioning for now.
10      MS. O'DELL:  We've put on
11  the record extensively our
12  position on the timing.  We're
13  complying with the Court's order
14  of four-hour limit.  We'll take a
15  short break and I'll come back and
16  I have a few follow-up questions
17  for Dr. Wolf, probably about five
18  minutes, and we'll try to be
19  efficient.
20      MR. HEGARTY:  Okay.  Thank
21  you.  I'll be right back.
22      (A recess was taken from
23  4:06 p.m. to 4:14 p.m.)
24      MS. O'DELL:  Let's go back

Page 275

1  on the record.
2           - - -
3        EXAMINATION
4           - - -
5  BY MS. O'DELL:
6   Q.  Dr. Wolf, I have a few
7  questions for you in follow-up to the
8  examination by counsel for Johnson &
9  Johnson.
10      I'm going to begin by
11  referring to the reports that counsel for
12  J & J marked as, first, the exposure
13  analysis that Dr. Longo conducted on the
14  individual plaintiffs, bellwether
15  plaintiffs.
16      Is that information that you
17  needed to reach your opinions in this
18  case?
19   A.  No.  It's -- it's just
20  additional information that affirms my
21  opinion.
22   Q.  Would that also be true for
23  Exhibit 25, which is the third
24  supplemental report that Dr. Longo

Page 276

1  issued?
2   A.  Yes.
3   Q.  And as to Exhibit 26, which
4  is Dr. Levy's report regarding his
5  analysis of the particular genetic
6  testing of patients, did you review it?
7   A.  I did review it after I had
8  already completed my report and formed my
9  opinion, and it's additional information
10  that I didn't need, but that affirms the
11  opinion that I already formed and I stand
12  by my opinion.
13   Q.  And is it your practice just
14  to continue reading relevant material in
15  order to be informed as you testify in
16  this case?
17   A.  Yes --
18      MR. HEGARTY:  Objection to
19  the form.
20  BY MS. O'DELL:
21   Q.  So I'd like to ask some
22  follow-up questions about -- in
23  particular about the Davis study.
24  Turning to your report -- actually,

Page 277

1  Doctor, if you turn to your report and --
2  the general section -- there are various
3  exhibits that were marked, but I want to
4  direct you specifically to page --
5  forgive me.  Let me just turn there very
6  quickly -- it is page 9 of your report.
7  And specifically I want to direct your
8  attention to the forest plot on page 9 of
9  your report.
10      Did you report an analysis
11  of dose-response for the Davis 2021
12  study?
13   A.  Yes, for all of the studies
14  in that chart.
15   Q.  And what is -- in regard to
16  dose-response, what's included in the
17  forest plot?
18   A.  No, that they did not
19  evaluate dose-response.
20   Q.  And so to the degree it was
21  suggested that you did not note that
22  information for the data study in your
23  report, and that suggestion was made by
24  counsel for defendants, that would not

Page 278

1  have been correct.
2     A.  That's not correct.  It's in
3  the --
4         MR. HEGARTY:  I'm sorry.
5  Would you -- I was looking for the
6  Davis paper.  I didn't follow the
7  question that was asked.
8         THE WITNESS:  Did they see a
9  dose-response and the answer is
10  no, and so it's not that they
11  didn't look for it, they did not
12  see a dose-response and it's
13  reported in that.
14         And so there's a column --
15  one, two, three, four -- the fifth
16  column in the forest plot.
17         MR. HEGARTY:  Fifth column
18  in the forest plot in what paper?
19         THE WITNESS:  On page 9, in
20  my report.
21         MR. HEGARTY:  Just a second.
22  Let me pull that up.
23         MS. O'DELL:  Page 9 of her
24  general portion of her expert

Page 279

1  report, the forest plot.
2         MR. HEGARTY:  I'm getting
3  there.
4         MS. O'DELL:  Okay, Mark.
5  You marked eight copies of her
6  report --
7         MR. HEGARTY:  That's why I'm
8  having -- I want to make sure I'm
9  finding the one for -- let me pull
10  it up here.  I'm sorry.
11         MS. O'DELL:  It's the same
12  on each one.
13         MR. HEGARTY:  Okay.  You
14  said it's on page 9?  I'm sorry.
15         THE WITNESS:  Page 9.  It's
16  the fourth column, I lied.  It's
17  the fourth column dose-response
18  labeled DR, so did they look at a
19  dose-response or did they see a
20  dose-response.
21         MR. HEGARTY:  Okay.  Thank
22  you.  I'm following you now.
23         MS. O'DELL:  All right.
24  Also in regard to the Davis study,

Page 280

1  Doctor, I want to mark for your
2  deposition as Exhibit -- I believe
3  we're up to 28 -- and, Mark, I
4  will put this in the chat and so
5  you will have it -- this is the
6  public access version of the Davis
7  paper, I'll represent to you that,
8  and I'll ask Dr. Wolf about it.
9  Give me just a moment here.
10             - - -
11         (Deposition Exhibit No.
12  Wolf-28, HHS Public Access
13  "General powder use and risk of
14  epithelial ovarian cancer in the
15  Ovarian Cancer in Women of African
16  Ancestry Consortium" Paper by
17  Davis, et al, was marked for
18  identification.)
19             - - -
20         MS. O'DELL:  It should be in
21  the chat, coming up right now.
22         MR. HEGARTY:  Okay.
23         MS. O'DELL:  And I'll share
24  my screen.  And, Dr. Wolf, can you

Page 281

1  see that on your screen?
2         THE WITNESS:  I can.
3  BY MS. O'DELL:
4     Q.  And is this the HHS Public
5  Access version of the Davis paper?
6     A.  That's what it says it is,
7  yes.
8     Q.  And I'm scrolling down to
9  the first page and at the bottom, it has
10  a section called "Conflict of Interest
11  Disclosure Statement."
12         Do you see that, Doctor?
13     A.  I do.
14     Q.  And what does it say in
15  regard to Dr. Patricia Moorman?
16     A.  It says:  Patricia Moorman
17  has received compensation for work
18  related to litigation in regard to talc
19  and ovarian cancer.
20     Q.  And then I'd like for you to
21  turn now to the Woolen paper.  And
22  looking at the Woolen paper, there was a
23  suggestion by counsel for Johnson &
24  Johnson that -- in relation to Dr.

Page 282

¹ Smith-Bindman, that she had not included
² a proper disclosure in the paper.
³        Do you recall that question?
⁴        MR. HEGARTY:  Objection to
⁵    the form.
⁶        THE WITNESS:  I recall a
⁷    statement that there should be a
⁸    disclosure.
⁹ BY MS. O'DELL:
¹⁰    Q.    And do you also a recall a
¹¹ suggestion that somehow Dr. Smith-Bindman
¹² did not include information regarding her
¹³ work in litigation in the paper?  Do you
¹⁴ recall that suggestion?
¹⁵        MR. HEGARTY:  Objection to
¹⁶    the form, also misstates my
¹⁷    questioning.
¹⁸        MS. O'DELL:  I don't believe
¹⁹    it does; but, nevertheless, what
²⁰    did Dr. Smith-Bindman include in
²¹    the disclosure at the end of the
²²    paper regarding her work in
²³    litigation?
²⁴        THE WITNESS:  Under

Page 283

¹    "Conflict of Interest," it says:
²    Rebecca Smith-Bindman served as a
³    paid expert witness for the
⁴    plaintiffs in the talcum powder
⁵    litigation.
⁶ BY MS. O'DELL:
⁷    Q.    And is that crystal clear
⁸ that she served as an expert and to whom
⁹ she -- for whom she testified?
¹⁰    A.    Yes.
¹¹    Q.    And then, Doctor, I'd love
¹² for you to turn back to your report,
¹³ please, and I'll direct your attention to
¹⁴ page 8 of -- excuse me.  That's not true
¹⁵ -- it is actually page 15, paragraph 8,
¹⁶ page 15 --
¹⁷    A.    Paragraph 8.
¹⁸    Q.    -- paragraph 8 and it's a
¹⁹ paragraph that describes the in vitro
²⁰ studies that have been done in relation
²¹ to talc and related substances.
²²        Do you see that?
²³    A.    Yes.
²⁴    Q.    And, specifically, you were

Page 284

¹ asked a lot of questions about Harper
² '23.
³    A.    Yes.
⁴    Q.    And I guess my ultimate
⁵ question to you, describe -- are the
⁶ studies that you cite in this paragraph,
⁷ Shukla, Buz'Zard, Akhtar, Mandarino, Emi,
⁸ and Harper, as well as Fletcher, are the
⁹ data from those studies, in your opinion,
¹⁰ consistent?
¹¹    A.    Yes.
¹²    Q.    And why is that?
¹³    A.    They all show changes in
¹⁴ cellular proliferation and/or some other
¹⁵ activity pointing towards activating
¹⁶ cells after exposure to talc that would
¹⁷ be consistent with a causation of talc in
¹⁸ ovarian cancer.
¹⁹    Q.    And do all the studies
²⁰ demonstrate that talc or similar
²¹ substances can cause reactive oxygen
²² species or other indications of
²³ inflammation?
²⁴    A.    Yes.

Page 285

¹        MR. HEGARTY:  Objection to
²    the form.
³        MS. O'DELL:  No further
⁴    questions, Doctor.  Thank you very
⁵    much.
⁶        All right.  I think that --
⁷        MR. HEGARTY:  I can -- it
⁸    doesn't sound like I'm going to
⁹    get any follow-up.
¹⁰        MS. O'DELL:  You've got two
¹¹    minutes.
¹²        MR. HEGARTY:  All right.  I
¹³    got two minutes.
¹⁴        MS. O'DELL:  Maybe.
¹⁵        - - -
¹⁶        EXAMINATION
¹⁷        - - -
¹⁸ BY MR. HEGARTY:
¹⁹    Q.    With regard to the
²⁰ meta-analysis chart we looked at on page
²¹ 9 of your report, did you prepare that
²² chart?
²³    A.    No, that was prepared by Dr.
²⁴ Ann McTiernan and she shared it.  It was

Page 286

1 in my -- it's been in my report since the
2 beginning --
3     Q.   Where did the addition --
4 where did the addition to the Woolen
5 paper then come from?
6     A.   So the new papers were added
7 to it.  The chart has just been added to
8 as new -- new papers came in.
9     Q.   And is that chart, that is,
10 the current chart you have in your
11 report, also from Dr. McTiernan?
12     A.   Yes.
13     Q.   And did you pull that from
14 her most recent report?
15     A.   Yes.
16     Q.   And as to the publication --
17     A.   I -- yeah, I don't know if
18 it was when her report was finalized, but
19 she shared it before I completed my
20 report, yes.
21     Q.   As far as the public access
22 paper you looked at, was that the version
23 of the Moorman paper that you had with
24 you?

Page 287

1     A.   No.
2     Q.   As far as the Woolen paper
3 goes, the description that you were asked
4 about with regard to Dr. Smith-Bindman
5 was in the conflict of interest section.
6         Do you remember that?
7     A.   That's correct.
8     Q.   And that is a conflict of
9 interest that should be disclosed, that
10 is, what is disclosed for Dr.
11 Smith-Bindman; correct?
12         MS. O'DELL:  Object to the
13     form.
14         THE WITNESS:  So she
15     disclosed that she was a paid
16     witness, that, yes, she disclosed
17     it --
18 BY MR. HEGARTY:
19     Q.   And the statement as to Dr.
20 Smith-Bindman there is also true as to
21 you.  You are a -- you are a paid expert
22 witness for the plaintiffs in the talcum
23 powder litigation; correct?
24     A.   I am.

Page 288

1     Q.   And that is something that
2 anyone who is hearing your opinions
3 should be aware of; correct?
4         MS. O'DELL:  Object to the
5     form.
6         THE WITNESS:  That's what I
7     would disclose.
8 BY MR. HEGARTY:
9     Q.   And just, finally, as to Dr.
10 McTiernan's meta-analysis table that we
11 looked at, how did you get that?  Did
12 that come directly from her or did you
13 get it from some other source?
14     A.   I think that she told the
15 plaintiffs' attorneys that I could have
16 it and shared it through them.
17     Q.   Did you get it directly from
18 her?
19     A.   I don't recall.
20         MR. HEGARTY:  Thank you.
21 Those are all the questions I have
22 for the moment, subject to my
23 earlier statements.
24         MS. O'DELL:  That's it.

Page 289

1 We're off the record.
2         THE WITNESS:  Thank you.
3         - - -
4         (A discussion off the record
5 occurred.)
6         - - -
7         MR. HEGARTY:  So, Kim,
8 without responding to via e-mail,
9 we'll take a rough as well;
10 otherwise, we will -- we will
11 follow what we have in our
12 standing order.
13         (Witness excused.)
14         (Deposition adjourned at
15 approximately 4:28 p.m.)
16
17
18
19
20
21
22
23
24

Page 290

```
 1
 2                  CERTIFICATE
 3
 4
 5        I, Kimberly A. Cahill, a
 6   Federally Approved Registered Merit
     Reporter, Certified Court Reporter and
 7   Notary Public, do hereby certify that
     prior to the commencement of the
 8   examination, the witness was duly
     remotely sworn by me to testify to the
 9   truth, the whole truth and nothing but
     the truth.
10        I DO FURTHER CERTIFY that
11   the foregoing is a verbatim transcript of
     the testimony as taken stenographically
12   by me at the time, place and on the date
     hereinbefore set forth, to the best of my
13   ability.
14        I DO FURTHER CERTIFY that I
     am neither a relative nor employee nor
15   attorney nor counsel of any of the
     parties to this action, and that I am
16   neither a relative nor employee of such
     attorney or counsel, and that I am not
17   financially interested in the action.
18
19   _____
     KIMBERLY A. CAHILL, a
20   Federally Approved Registered
     Merit Reporter
21   Certified Court Reporter
     Notary Public
22   Dated:  January 13, 2024
23
24
```

Page 291

```
 1       INSTRUCTIONS TO WITNESS
 2
 3        Please read your deposition
 4   over carefully and make any necessary
 5   corrections.  You should state the reason
 6   in the appropriate space on the errata
 7   sheet for any corrections that are made.
 8        After doing so, please sign
 9   the errata sheet and date it.
10        You are signing same subject
11   to the changes you have noted on the
12   errata sheet, which will be attached to
13   your deposition.
14        It is imperative that you
15   return the original errata sheet to the
16   deposing attorney within thirty (30) days
17   of receipt of the deposition transcript
18   by you.  If you fail to do so, the
19   deposition transcript may be deemed to be
20   accurate and may be used in court.
21
22
23
24
```

Page 292

```
 1                  E R R A T A
 2
 3   PAGE  LINE  CHANGE
 4   _____ _____ _____
 5   _____ _____ _____
 6   _____ _____ _____
 7   _____ _____ _____
 8   _____ _____ _____
 9   _____ _____ _____
10   _____ _____ _____
11   _____ _____ _____
12   _____ _____ _____
13   _____ _____ _____
14   _____ _____ _____
15   _____ _____ _____
16   _____ _____ _____
17   _____ _____ _____
18   _____ _____ _____
19   _____ _____ _____
20   _____ _____ _____
21   _____ _____ _____
22   _____ _____ _____
23   _____ _____ _____
24   _____ _____ _____
```

Page 293

```
 1
 2       ACKNOWLEDGMENT OF DEPONENT
 3
 4        I,_____, do
 5   hereby certify that I have read the
 6   foregoing pages, 1 - 294, and that the
 7   same is a correct transcription of the
 8   answers given by me to the questions
 9   therein propounded, except for the
10   corrections or changes in form or
11   substance, if any, noted in the attached
12   Errata Sheet.
13
14
15   _____
16   JUDITH KAY WOLF, M.D.        DATE
17
18
19   Subscribed and sworn
20   to before me this
     _____ day of _____, 20____.
21   My commission expires:_____
22
23   _____
     Notary Public
24
```

Judith Kay Wolf, M.D.

Page 294

1    LAWYER'S NOTES

2  PAGE  LINE

3  ____  ____  _____

4  ____  ____  _____

5  ____  ____  _____

6  ____  ____  _____

7  ____  ____  _____

8  ____  ____  _____

9  ____  ____  _____

10 ____  ____  _____

11 ____  ____  _____

12 ____  ____  _____

13 ____  ____  _____

14 ____  ____  _____

15 ____  ____  _____

16 ____  ____  _____

17 ____  ____  _____

18 ____  ____  _____

19 ____  ____  _____

20 ____  ____  _____

21 ____  ____  _____

22 ____  ____  _____

23 ____  ____  _____

24 ____  ____  _____

**WORD INDEX**

**< 0 >**

**0.97**  171:9

**< 1 >**

**1**  71:24
72:4  73:10
75:5  109:6
143:15
157:17
158:5, 7, 10,
14, 17, 24
159:4, 7
171:9
172:2
198:3
201:15
202:6
203:10, 21
204:7, 8, 14
251:22
255:24
257:1  293:6
**1.02**  184:22
**1.04**  201:24
202:9
**1.05**  174:5,
18  175:2
176:8
**1.10**  203:4
**1.12**  155:4
**1.18**  183:19
**1.19**  159:1
186:15
187:10
**1.21**  184:21
**1.22**  171:7
**1.29**  261:22
**1.31**  205:6
**1.34**  183:19
**1.38**  155:5

**1.47**  174:6
175:4  205:6
**1.49**  261:21,
23
**1.53**  171:9
186:13
187:8
**1.65**  205:7
**1.77**  159:3
**1.88**  208:22
209:7
**1/5/2019**
116:17
**1:04**  115:11
**10**  1:13
42:9, 13
128:1, 19
143:6
165:17
166:4
220:12
**10:00**
120:12
**10:04**  12:16
**10:09**  12:23
**10:15**  1:19
**10:31**  24:16
**10:50**  24:19
**10:52**  43:20
**100**  246:8
**101**  246:17
**107**  3:19
**10th**  30:5
113:23
**11**  142:10
197:17
205:19, 23
206:1
**11/15/23**
3:15  4:6, 9,
12, 15  71:8
124:19
125:12

**127:7**  128:5
**11:43**  43:20
**110**  3:23
**114**  8:10
**116**  4:1
**119**  4:3
**11th**  113:22
**12**  38:24
42:9, 13
167:3
**12:54**
115:11
**121**  72:5
**124**  4:6
**125**  4:9
**127**  4:12
**128**  4:15
**13**  122:12
192:16
194:12, 24
197:17, 18
290:21
**14**  122:12
206:14
**142**  4:18
**15**  28:12
124:8, 16
126:1
128:20
136:9
213:22, 24
214:23
283:15, 16
**157**  260:10
**15th**  16:11
29:20
127:15
**16**  220:23
**16-2738**  1:4
**1663**  180:17
**1667**  189:1
**167**  4:22
**17**  19:6, 9
213:14, 20

**17th**  17:11
29:19
**18**  236:10
246:10
255:9
**1825**  2:9
**1835**  2:14
**19**  188:11
251:7
**19013**  2:15
**192**  5:5
**193**  36:12
**1956**  96:14
**1st**  30:11

**< 2 >**

**2**  3:16
79:24  80:3
85:6  101:2,
8  136:21
143:3
153:24
155:11
157:16
171:11
173:1, 7
175:23
196:9
198:8
199:24
203:2, 8, 12
218:1
**2:18**  192:6
**2:33**  192:6
**20**  25:1, 2
44:7  46:2
107:14
178:3, 4
186:12, 15
187:10, 12
188:7, 8, 10
266:19
293:20
**200**  175:24

**2000**  258:1,
18  259:3, 16
260:13
261:1
263:13
**20006**  2:10
**2012**  210:24
**2014**  100:6,
11
**2017**  3:22
107:3, 11
**2018**  37:21
81:1, 17
**2019**  37:21
49:19
57:20
58:17, 24
59:3, 9, 11
84:20
117:2
122:11
258:14
**202**  2:11
**2020**  196:3,
14  198:18
199:11
213:17
**2021**  18:19
26:9, 18
27:7  36:24
37:9, 18
38:5, 7
42:23  44:2,
5, 12, 19
47:1, 3, 9, 14,
20  48:1, 6,
16, 22, 24
49:4  50:4,
14, 19  51:13,
17, 24  54:2,
7, 14, 17
55:1, 21
57:2, 9, 13,
18  58:9

59:*10, 19*
60:*8, 23*
61:*13, 16*
62:*14*
63:*23*
64:*12, 15, 20*
65:*5, 17*
66:*4, 14*
67:*1, 11, 22*
68:*3, 11, 20*
69:*22*  70:*8,*
*14, 20*  72:*14*
75:*20*  76:*1,*
*15*  81:*18*
84:*22*  85:*3,*
*13, 20*  86:*6,*
*10, 22*  87:*11,*
*15, 19*  88:*1,*
*6, 11, 17, 23*
89:*2*  91:*6*
93:*8*  96:*2,*
*22*  97:*12*
100:*3, 18*
105:*18, 24*
106:*4*
109:*6, 7, 12*
110:*5, 23*
111:*20*
112:*7*
113:*1*
118:*5, 9, 12,*
*18*  119:*3, 6*
122:*11, 12,*
*13, 22*
130:*19*
131:*3, 10, 16*
132:*6, 13, 18*
133:*4, 11, 23*
134:*1, 8, 16*
135:*4, 21*
137:*7, 20*
138:*14*
139:*6*
165:*13, 19*

166:*13*
193:*21*
206:*12*
213:*18*
215:*15*
264:*10, 14,*
*24*  265:*5, 23*
271:*14*
272:*2*
277:*11*
**2022**  39:*21,*
*22*  40:*4, 17*
*41:2, 23*
*42:3, 8*
59:*7*  75:*17*
139:*15, 17,*
*21*  177:*21*
**2023**  4:*1*
16:*11*  17:*7*
19:*7, 9, 10*
28:*12*
29:*19, 21*
31:*22*
32:*15*  33:*4*
40:*6, 21*
41:*3, 23*
42:*4, 8*
63:*21*  68:*7*
69:*2*  71:*2*
72:*3, 8*
75:*16, 17*
91:*23*  97:*2,*
*8*  108:*16*
109:*2, 19*
110:*10, 17,*
*24*  112:*1, 8,*
*18, 19*  113:*2,*
*20, 21, 22, 23,*
*24*  114:*4, 7*
115:*16*
117:*5, 6*
124:*9, 16*
126:*1*
127:*15*

128:*20*
136:*9*
178:*16*
226:*21*
264:*1, 4*
269:*7*
**2024**  1:*13*
38:*15, 19, 24*
39:*6*  49:*15*
50:*2*  58:*7*
90:*21*
100:*9*
114:*15, 18*
118:*1*
290:*21*
**206**  5:*9*
**21**  38:*14*
60:*18*
124:*1*
128:*14*
267:*4*
**215**  2:*15*
*5:15*
**218**  2:*4*
**21st**  39:*11*
**22**  171:*14*
185:*8*
267:*23*
**221**  5:*19*
**23**  106:*2*
171:*15*
175:*18*
185:*7*
268:*10*
284:*2*
**236**  5:*24*
*6:5*
**24**  268:*20*
273:*14*
**25**  3:*6*
269:*6*
270:*21*
271:*5, 9*

273:*14*
275:*23*
**251**  6:*9*
**2555**  2:*18*
**26**  4:*8, 11,*
*14, 17*
123:*14*
124:*14, 20*
125:*12*
127:*7, 14*
128:*5, 19*
136:*8*
269:*17*
273:*14*
276:*3*
**266**  6:*13*
**267**  6:*15*
**268**  6:*18, 21*
**269**  6:*24*
*7:3, 4*
**269-2343**
*2:5*
**27**  270:*4*
**270**  7:*6*
**275**  3:*6*
**28**  112:*18*
113:*20*
280:*3*
**280**  7:*10*
**285**  3:*7*
**28th**  112:*1*
**29**  113:*24*
**2900**  2:*14*
**294**  293:*6*
**2nd**  3:*15*
71:*8*

**< 3 >**
**3**  106:*21*
110:*4*
111:*2*
246:*18*
247:*15, 16*

252:*17*
**3:21**  246:*3*
**3:39**  246:*3*
**30**  40:*19*
44:*7*  46:*2*
113:*22*
122:*11*
168:*7*
291:*16*
**300**  1:*13*
**30th**  18:*19*
**31**  204:*18*
205:*7*
**31st**  91:*23*
**32**  168:*7*
**325**  179:*14*
**33**  72:*4*
**334**  2:*5*
**335-2600**
*2:11*
**35**  40:*19*
**36104**  2:*5*
**362**  83:*9, 11*
**363**  83:*15*
**39**  159:*3*

**< 4 >**
**4**  110:*9*
111:*19, 23*
113:*18*
139:*8*
178:*6, 9*
182:*5*
183:*2*
184:*19*
204:*1*  248:*2*
**4:06**  274:*23*
**4:14**  274:*23*
**4:28**  289:*15*
**40**  171:*16*
185:*8*
**402**  171:*12*
**410**  84:*14,*
*15*

Judith Kay Wolf, M.S.

**441**  73:*19*
74:*11*, *17*
75:5, *15*, *18*
76:*11*
77:*19*, *24*
**452**  76:5
**466**  76:5
**474-6550**
2:*19*
**48**  260:7
**49**  159:*1*

**< 5 >**
**5**  93:2
115:*24*
164:*11*, *13*
176:*3*
178:2, *9*
186:5
198:9
249:*23*
**51**  171:*14*
185:9
**52**  90:22
**531**  74:*12*,
*17*  75:5, *15*,
*19*  76:*12*
77:*19*, *24*
**5th**  117:2

**< 6 >**
**6**  8:*10*
18:*18*
119:*13*
120:6
213:*16*, *24*
**60**  17:*24*
23:6, *23*
24:4
**600**  106:7
**64108**  2:*19*
**65**  204:*18*
205:7

**650**  106:8
179:*15*
**68**  96:*14*
98:*17*
183:*11*, *17*
**69**  84:2
251:6

**< 7 >**
**7**  76:5
122:*11*
124:*13*
136:*18*
165:*17*
**70**  251:6
252:*17*
**700**  2:*10*
**71**  3:*12*
**72**  90:*23*
95:22
229:*1*, *7*
**73**  89:*13*
90:*21*
**75**  174:6
175:*3*
**78**  95:22
98:*19*

**< 8 >**
**8**  125:*9*
226:20
283:*14*, *15*,
*17*, *18*
**80**  3:*16*
171:*16*
185:*10*
**816**  2:*19*
**84**  203:4
**877.370.3377**
1:*23*

**< 9 >**
**9**  112:*19*
126:*21*

143:*15*
277:6, 8
278:*19*, *23*
279:*14*, *15*
285:*21*
**9:30**  21:*16*
**9:50**  43:*9*
**917.591.5672**
1:*23*
**96**  203:*3*, *22*
**964**  143:*13*,
*16*, *18*
**97**  119:*1*
**985-9177**
2:*15*
**99**  119:2
**9th**  113:*20*

**< A >**
**a.m**  1:*19*
43:*20*
120:*12*
**ability**  92:6
290:*12*
**able**  30:2
239:*20*
**absence**
148:*10*
**absolutely**
84:*21*
147:*17*
148:*23*
239:*10*
**abstract**
75:*10*
174:2, *8*, *15*
204:*14*
246:*23*
262:*8*, *9*, *10*,
*15*, *19*  263:5
**academic**
118:*22*

**accept**
147:5, *23*
156:*24*
**acceptable**
182:8, *14*
**accepted**
219:*11*
249:5
251:*23*
**accepts**
141:*17*
**Access**  7:*10*
280:6, *12*
281:5
286:*21*
**accommodat**
**e**  242:*19*
274:5
**accommodati**
**ons**  138:22
**accompany**
120:2*1*
**accurate**
122:*14*
129:8, *11*
291:*20*
**accurately**
117:*10*
**achieved**
229:6
**acknowledg**
**ment**
152:22
293:2
**act**  144:*15*,
22  145:*12*
**action**
247:*3*, 5
290:*15*, *16*
**activating**
219:*18*
284:*15*
**activation**
214:*10*

221:*19*
223:*17*
224:24
225:*17*
**activities**
46:24  92:6
99:*12*, *23*
**activity**
195:8
284:*15*
**actual**
126:*14*
152:*23*
183:*23*
261:6
262:*11*, *21*
263:8
**acute**  248:5
**add**  16:*17*
32:*18*
34:*16*  87:*3*
140:2*1*
157:9
166:*18*
198:*1*
207:5
213:4
214:4
221:*12*
252:*13*
260:*3*
**added**
117:*19*
139:*13*
166:*11*
175:24
205:2*1*
211:*15*
213:*16*
255:*13*
286:6, *7*
**adding**
257:22

Judith Zelikoff, M.S.

| | | | | |
|---|---|---|---|---|
| **addition** | **advised** | 182:*1, 2* | 167:*10* | 264:*4* |
| 11:*24*  45:*4* | 24:*18* | 195:*11, 16* | 192:*24* | 271:*18* |
| 139:*10* | 55:*22*  56:*1* | 204:*22* | 206:*22* | **amending** |
| 192:*9, 10* | **affect** | 211:*22* | 215:*6* | 32:*13* |
| 222:*18, 19,* | 149:*12* | 212:*9, 15* | 221:*5* | **amendment** |
| *20*  286:*3, 4* | 150:*9* | 227:*23* | 236:*16* | 65:*14* |
| **additional** | **affirm** | 228:*3* | 280:*17* | **amendments** |
| 15:*14* | 30:*21* | 229:*11* | **Alabama** | 26:*23* |
| 16:*17* | 31:*17*  51:*5* | 246:*20* | 2:*5* | **American** |
| 17:*21* | **affirms** | 247:*9* | **alerted** | 60:*3, 7, 14* |
| 22:*12* | 275:*20* | 248:*10, 14* | 17:*18* | **amount** |
| 23:*12, 17* | 276:*10* | 250:*5, 21* | **alive**  94:*22* | 185:*22* |
| 26:*15*  27:*4* | **African**  5:*2* | 252:*2, 12, 15* | **all-comers** | 201:*12* |
| 32:*19*  86:*9,* | 7:*13*  167:*9* | 253:*9, 13* | 171:*7* | 234:*15* |
| *21*  118:*4* | 168:*16* | 254:*4, 21* | **ALLEN**  2:*3* | 240:*7*  248:*3* |
| 137:*2* | 170:*2* | **agreed**  9:*4* | 9:*13, 16* | **amounts** |
| 164:*21* | 280:*15* | 11:*7*  14:*21* | 10:*10* | 45:*24* |
| 165:*18* | **African-** | 43:*10* | **alterations** | **analyses** |
| 273:*18, 24* | **American** | 61:*22* | 254:*13* | 164:*19* |
| 275:*20* | 169:*13* | 272:*13* | **amend** | **analysis** |
| 276:*9* | 170:*3, 14, 22* | **agreement** | 32:*18* | 17:*9*  64:*21* |
| **additions** | 171:*2, 6* | 11:*5, 11, 21* | **Amended** | 65:*6, 18* |
| 117:*23* | 173:*3* | 12:*15, 21* | 3:*15*  4:*8, 9,* | 132:*19, 22* |
| **additive** | 174:*3* | 13:*1, 5, 20* | *12, 15*  20:*5* | 133:*2* |
| 144:*15, 23* | 175:*2, 6* | 14:*3, 11* | 26:*6*  28:*10,* | 134:*9, 17* |
| 145:*13* | 183:*3, 10* | 15:*5, 16* | *13*  29:*12* | 135:*5, 22* |
| 152:*3* | 184:*2, 17* | 24:*10*  228:*9* | 31:*22* | 143:*6* |
| **adds**  140:*24* | 185:*16* | **ahead**  25:*7* | 34:*19*  37:*1* | 164:*22* |
| 219:*16* | 186:*11, 14* | 35:*6, 12* | 70:*19*  71:*8* | 165:*7* |
| **adequate** | 187:*9, 11, 22* | 36:*4*  43:*13* | 72:*8, 14* | 170:*1* |
| 189:*21* | **agar**  250:*1* | 78:*21* | 85:*21*  97:*1* | 177:*1, 7* |
| **adequately** | **agency** | 89:*18* | 105:*1* | 264:*9, 13* |
| 235:*21* | 47:*24*  213:*7* | 115:*9* | 115:*16* | 275:*13* |
| **adjourn** | **ago**  10:*23* | 166:*21* | 122:*20* | 276:*5* |
| 24:*20* | 30:*3*  49:*19* | 172:*16* | 123:*13* | 277:*10* |
| **adjourned** | 78:*8*  80:*10* | 175:*11* | 124:*14, 19* | **analyze** |
| 289:*14* | 106:*8* | 227:*24* | 125:*12* | 191:*6* |
| **adjusted** | 110:*3*  129:*5* | 233:*21* | 127:*7, 14, 22* | **analyzed** |
| 205:*5* | **agree**  13:*14* | **Akhtar** | 128:*5, 19* | 228:*21* |
| **advance** | 21:*15* | 284:*7* | 130:*2* | 253:*23* |
| 17:*4, 19* | 24:*11* | **al**  4:*22*  5:*4,* | 135:*13* | **Ancestry** |
| 19:*13*  23:*2* | 144:*9* | *9, 15, 19, 23* | 136:*8* | 5:*3*  7:*13* |
| 106:*13* | 148:*15* | 6:*4*  7:*14* | 178:*10* | 167:*9* |
| 243:*4* | 181:*6, 8* | 142:*16* | 215:*15* | |

168:*16*
280:*16*
**and/or**
144:*15, 23*
284:*14*
**animal**
65:*19, 23, 24*
66:*3* 230:*1,
9*
**animals**
66:*4, 7, 8, 12*
216:*2, 4*
219:*6*
229:*14, 20*
**Ann** 285:*24*
**Anna**
128:*15*
**Answer** 8:*5*
17:*17*
32:*10*
62:*19*
64:*13*
99:*17*
135:*2*
181:*21*
185:*24*
186:*2*
209:*9*
217:*4*
226:*17*
234:*7, 24*
235:*24*
238:*6, 24*
239:*3, 14*
240:*15*
245:*16*
247:*12*
259:*1* 278:*9*
**answered**
152:*7*
**answering**
93:*16*
239:*11*

**answers**
293:*8*
**anticipate**
31:*1* 32:*12*
**anymore**
118:*22*
**Apart** 42:*20*
**appear** 72:*6*
**APPEARAN
CES** 2:*1*
9:*11*
**appearing**
9:*4*
**apples**
260:*20, 24*
**applicability**
16:*20*
**applicable**
19:*3* 22:*21*
**applied**
87:*23* 88:*4,
9, 14, 20*
89:*5*
**apply**
202:*15*
**Approach**
5:*14* 130:*1*
206:*22*
244:*4*
**appropriate**
104:*16*
163:*7*
188:*3*
189:*18*
190:*6*
274:*4* 291:*6*
**approval**
11:*9* 13:*4,
15*
**approve**
272:*9*
**Approved**
1:*20* 290:*5,
19*

**approximate**
63:*5*
**approximatel
y** 30:*3*
40:*16* 42:*6*
45:*24*
289:*15*
**area** 226:*16*
**areas** 118:*8*
**argue**
172:*18*
**article**
67:*16* 75:*9*
135:*12, 17*
148:*2*
163:*21*
231:*24*
232:*2*
**articles**
29:*2* 68:*10,
19* 74:*16, 18,
23* 75:*4, 6,
15, 18* 76:*5,
7, 11, 17*
77:*19, 21, 23*
**Asbestos**
5:*9* 49:*6,
11* 50:*12*
64:*23* 65:*8,
20* 66:*5*
131:*7*
132:*9*
133:*24*
134:*3*
135:*7, 15*
139:*10*
206:*18*
207:*8, 11, 15*
208:*4, 8, 13,
21* 209:*5, 14,
22* 210:*5, 13,
17, 20* 211:*4,
20* 212:*10*
213:*8, 11*

**ASHCRAFT**
2:*7* 9:*18*
162:*3*
**aside** 212:*8*
255:*3*
260:*24*
**asked** 35:*15*
44:*1* 45:*9*
52:*11, 15*
56:*10* 62:*7*
99:*5* 106:*7*
129:*19, 22*
152:*7*
233:*19*
237:*13*
241:*18*
258:*22*
266:*9*
278:*7*
284:*1* 287:*3*
**asking**
30:*23*
48:*13*
88:*24*
103:*9*
132:*2*
133:*11*
150:*4, 6*
224:*11*
238:*13*
239:*5, 16*
241:*4*
243:*19*
**assay**
228:*23*
**assertion**
22:*2*
**assess** 134:*2*
146:*1*
168:*10*
233:*4*
**assessment**
209:*24*

**assistance**
21:*20*
**associated**
51:*1* 53:*12*
60:*13*
141:*8*
204:*17*
228:*15*
248:*7*
**Association**
5:*5* 154:*2*
181:*1, 22*
192:*19*
211:*19*
224:*6*
**associations**
153:*14*
**assume**
179:*10*
260:*22*
**assuming**
163:*5* 174:*8*
**ATLANTIC**
1:*9*
**ATL-L-2648-
15** 1:*12*
**attach**
267:*17*
**Attached**
3:*14* 71:*7*
72:*2*
291:*12*
293:*11*
**attend** 43:*11*
**attended**
48:*14, 19*
**attending**
12:*5*
**attention**
277:*8*
283:*13*
**attorney**
290:*14, 16*
291:*16*

Judi ther key owolf, M.B.

**attorneys**
33:*9*  61:*7*
63:*1*  74:*20*
104:*7*
213:*1*
288:*15*
**attributed**
131:*6*  132:*9*
**August**  4:*1*
108:*16*
109:*1, 7, 19,*
*24*  110:*1, 4,*
*10, 16, 23, 24*
111:*20, 24*
112:*7, 18*
113:*1, 2, 20*
114:*3*
122:*11*
**Austin**  1:*19*
27:*11, 12*
**author**
104:*20*
146:*5*
161:*15*
162:*24*
163:*10*
189:*23*
191:*11*
**authorities**
53:*10*
**authority**
57:*15*
**authors**
140:*12*
141:*1*
142:*21*
145:*10*
146:*8*
148:*13, 16*
150:*16*
152:*2*
153:*6*
154:*8*
155:*16*

156:*2, 13, 24*
160:*18*
161:*12*
168:*23*
173:*14, 15*
174:*3*
180:*24*
181:*19*
183:*3*
187:*20*
188:*13, 24*
191:*22*
193:*13*
196:*2, 13*
198:*18*
204:*15*
217:*8*
218:*23*
219:*21*
229:*5*
246:*23*
250:*15*
256:*4, 6, 12*
260:*12*
**author's**
190:*24*
248:*4*
**available**
17:*5*  23:*22,*
*24*  196:*18*
237:*16*
**average**
95:*21, 23*
98:*18*  201:*8*
**aware**
17:*15*
24:*18*
33:*18, 23*
59:*20*  60:*9*
61:*1*  66:*2,*
*6*  68:*9, 11,*
*21*  69:*16, 20*
77:*14*  78:*6*
89:*2*  94:*7*

117:*22*
118:*2*
119:*4*
129:*9, 12*
130:*14*
160:*22*
188:*17*
193:*16*
194:*10, 22*
195:*5, 6, 14*
209:*19*
210:*1, 14*
217:*5*
220:*4*
224:*10, 14*
225:*5*
226:*10*
230:*6, 19, 22*
231:*2*
232:*4, 14, 19,*
*21*  256:*20*
258:*9, 18*
265:*24*
288:*3*

**< B >**
**back**  13:*7*
15:*17*
26:*18*  35:*1*
36:*5*  37:*9*
43:*21*
49:*18*
58:*16*
63:*20*  81:*1*
94:*18, 20*
98:*13*
100:*6, 10*
109:*15*
111:*18, 22*
115:*12*
127:*13*
128:*17*
144:*12*
145:*23*

157:*15*
175:*22*
192:*7*
203:*7*
225:*14*
241:*1*
246:*4*
272:*24*
273:*6, 17*
274:*15, 21,*
*24*  283:*12*
**Background**
5:*13*
206:*20*
262:*3*
**BACON**
2:*16*
**bankruptcy**
108:*17*
112:*11*
**based**
148:*21*
155:*21*
179:*20*
185:*14*
191:*13*
248:*3*
262:*23*
**basically**
101:*17*
**basis**  42:*8*
62:*9*  137:*3,*
*17*  197:*7*
271:*16*
**Bates**  246:*8*
251:*6*
252:*17*
**battery**
250:*16*
**Bay**  39:*3,*
*13*  40:*13*
117:*16*

**BEASLEY**
2:*3*  9:*13,*
*16*  10:*10*
**beginning**
11:*4*
117:*14*
152:*16*
153:*1*
246:*8*
252:*24*
286:*2*
**begins**
139:*10*
**believe**
15:*23*  30:*6*
37:*19*  40:*2*
65:*22*  66:*9*
84:*19*
107:*16*
112:*23*
113:*3, 7*
162:*13*
164:*12*
169:*19*
171:*1*
176:*20*
181:*17*
193:*4, 10*
255:*22*
270:*19*
280:*2*
282:*18*
**believes**
245:*1*
**Bellin**  39:*14*
40:*13*
117:*16*
**bellwether**
17:*9*  77:*9*
275:*14*
**benign**  43:*3*
**best**  247:*3*
290:*12*

**better**
143:22
253:17
**beyond**
226:15
254:11
**bias** 151:19,
24 168:23
**big** 146:4
175:19
**Billings**
39:1, 8, 9
40:14
41:15
117:17
**biologic**
177:2, 6, 22
178:15
255:10, 13
263:12
**Biomarkers**
189:19
**bit** 31:22
115:3
136:7
179:19
209:3
218:7 236:5
**black**
167:20
**blacked**
109:24
126:11
**Blount**
83:16
**BMI** 153:14
**board** 59:4,
12, 15, 17
265:4
**boards**
264:13
**body** 57:12,
16 68:14, 24
69:6 77:20

78:3 84:1
87:6, 8
143:8
153:14
211:11
216:14, 15,
19 264:5, 7
**Bondurant**
4:11 6:21
28:18 31:5
85:12, 16
87:20
88:10
125:8, 13
128:24
130:4
133:18
268:11, 14
**born** 90:22
96:14
**bottom**
164:12
180:23
251:21
281:9
**Boulevard**
2:18
**bowel** 42:19
**Bradford**
176:24
177:7
178:20
**BRCA1**
101:2, 7
**break** 25:4
30:14
34:23
35:21
36:11
115:2, 6
274:15
**breast** 102:6
**briefly** 9:8
17:2

**bring** 27:22
52:12, 16
56:17
101:15
117:24
**broad**
97:13
158:6
159:1, 7
**Brought**
7:8 52:10
267:19
269:19
270:6, 11, 17
**Buz'Zard**
284:7

**< C >**
**C.V** 115:15
116:17
118:12, 19
**CA125** 92:1
**Cahill** 1:20
290:5, 19
**call** 34:23
62:24 63:6,
8, 10
**called** 16:3
48:8 70:4
78:11, 17
102:9, 13
281:10
**calls** 61:6,
23 63:12
112:10, 14
**Canada**
60:17
**cancer** 4:20
5:1, 2, 7, 11,
18 7:12
39:24 40:1
41:10, 14, 17
42:19, 24
43:1 44:6,

11, 18 45:2,
21 46:1, 7,
14 47:11, 19
49:7 51:2,
6 52:4, 8, 10,
14, 17 53:13
54:4, 9, 12
55:4, 14
56:5, 6, 10,
12, 16 57:18
58:1, 11, 18
59:5, 13, 23
60:2, 3, 8, 12,
13, 14, 20
61:3, 15, 20
63:15
64:18
65:24 66:7,
10, 13 68:1
76:12, 18
77:16 91:1,
9 92:5, 15,
19, 22 94:4,
14 95:3, 7
97:15, 20
98:24
99:11, 22
100:15
101:7, 22
102:4, 6
112:7
117:17
130:10, 22
131:21
134:11, 20
135:8, 16
136:1
141:4, 9, 14,
19 142:4, 5,
14, 23 143:7
144:8
145:7
152:9
154:3

156:9
157:2, 6, 7,
24 160:16
167:7, 8, 19,
22, 24 168:5,
15 169:14
170:1
173:2, 10
175:6
176:9
177:24
179:5
186:21
189:18
192:22
204:16
206:19
207:9
208:22
209:6
210:8, 13, 18,
21 211:4, 20
212:10
213:8
215:5, 20, 24
216:5, 11
219:2
221:17
224:7
225:1, 18
226:9, 11
227:16
229:21
230:2, 5, 11
248:7
250:18, 19
262:5, 17
264:23
265:5, 18
266:5
280:14, 15
281:19
284:18

cancers
43:*1, 2, 4, 5*
102:*5*
171:*13*
172:*20*
228:*15*
252:*5, 7*
caption
15:*2, 7, 14,*
*22*  123:*18*
126:*10, 15*
caption's
125:*2*
carcinogenici
ty  223:*8, 13*
carcinoma
168:*8*
251:*24*
Care  40:*1*
41:*11*
44:*10*
45:*23*
137:*5, 8*
career
249:*21*
carefully
291:*4*
caring  44:*5*
46:*4*
Carrying
165:*15*
Carter
127:*1*
Case  1:*13*
25:*24*
30:*19*  31:*3*
36:*23*
37:*18*
46:*13*  47:*9,*
*16*  64:*17*
66:*17*  67:*4,*
*11*  68:*13, 23*
69:*19, 24*
70:*7*  73:*1*

76:*19*  77:*4*
86:*12, 24*
87:*24*  89:*6*
97:*19*
111:*11*
118:*13*
119:*9*
140:*23*
158:*22*
160:*13, 15*
166:*18*
194:*14*
205:*13*
207:*6*
213:*5*
219:*7*
221:*13*
227:*9*
232:*14*
249:*13*
254:*15*
265:*11*
273:*23*
275:*18*
276:*16*
case-control
151:*13, 16,*
*22*
cases  47:*10*
58:*13*  64:*1*
77:*9*  89:*5*
102:*5*
110:*22*
111:*5, 8*
114:*3, 19*
123:*20*
154:*24*
160:*24*
162:*21*
164:*7*
169:*2*
176:*1*
187:*3*
189:*15*

190:*11, 17,*
*20*  193:*15*
195:*18*
266:*2*
Case-
Specific
4:*11, 14, 17*
6:*15, 18, 21*
20:*12*  86:*1*
125:*7, 13*
126:*24*
127:*8*
128:*6*
267:*7*
268:*4, 14*
274:*1*
catch  74:*5*
112:*10*
Causation
3:*18*  11:*13*
12:*2*  78:*9*
80:*4*  87:*24*
88:*5, 10, 15*
129:*4*
177:*17*
214:*9*
221:*15*
227:*11*
228:*2*
247:*1*
284:*17*
cause  51:*5*
54:*12*
59:*23*  60:*2,*
*4, 12*  131:*21*
134:*11, 19*
135:*8, 24*
141:*13, 19*
157:*3, 5, 7*
207:*8*
210:*21*
221:*16*
226:*9*
248:*15*

266:*4*
284:*21*
caused  54:*5,*
*9*  130:*21*
131:*20*
250:*9*
causes
60:*19*  68:*2*
141:*10*
210:*13, 17*
230:*10*
causing
141:*3*
142:*22*
160:*16*
167:*19*
226:*11*
cell  171:*15*
172:*21*
173:*9*
175:*18*
185:*8*
218:*3*
250:*18*
253:*16*
cells  5:*19*
6:*3*  215:*6,*
*18*  216:*8, 12*
218:*24*
219:*9*
221:*21*
223:*18*
227:*14, 17*
228:*7, 13*
236:*16*
248:*6*
250:*17*
252:*11, 14*
253:*4, 22*
284:*16*
cellular
228:*23*
254:*3, 9*
284:*14*

Center
39:*23, 24*
40:*1, 8*
41:*10, 15, 17*
44:*21*
117:*17*
certain  52:*6*
certainly
20:*15, 18*
21:*12*  56:*4*
59:*3*  95:*11,*
*14*  108:*22*
148:*24*
177:*14*
208:*12*
238:*6*
245:*11*
CERTIFICA
TE  290:*2*
Certified
1:*20*  290:*6,*
*20*
certify
290:*6, 10, 12*
293:*5*
cervical
43:*4*
cervix  43:*6*
216:*11*
chair  45:*8*
challenges
103:*20*
146:*11*
challenging
179:*19*
chance  93:*1*
94:*13, 17*
172:*3*
change
37:*24*  38:*3*
44:*9*  87:*22*
88:*3, 8, 13*
117:*3*
222:*7*

223:*18*
292:*3*
**changed**
26:*8*, *24*
37:*14*
44:*15*
51:*18*
72:*19*
87:*11*, *15*, *19*
109:*17*
117:*15*
**changes**
117:*23*
129:*13*
217:*15*
218:*13*
219:*20*
221:*18*
222:*1*, *12*
223:*5*, *14*, *16*
224:*1*
225:*4*
226:*4*
230:*3*
253:*3*
254:*1*, *2*
284:*13*
291:*11*
293:*10*
**changing**
222:*5*
**characterize**
78:*15*
**charged**
106:*5*
**chart**  54:*22*
277:*14*
285:*20*, *22*
286:*7*, *9*, *10*
**chat**  233:*11*
238:*2*, *3*
239:*21*
240:*13*

243:*15*, *22*
280:*4*, *21*
**chemotherap**
**y**  44:*15*
**cherry-pick**
240:*8*
**choice**  79:*12*
**choose**
23:*14*
**chose**
182:*23*
188:*9*
200:*9*
228:*18*
**chronic**
157:*6*
**circle**  36:*5*
145:*23*
**circumstance**
**s**  242:*22*
**citation**
212:*22*
213:*17*
**cite**  31:*12*
32:*14*
68:*12*, *22*
69:*11*, *18*, *21*
77:*18*  78:*2*
104:*24*
144:*13*
209:*11*
229:*4*
263:*15*
265:*17*
284:*6*
**cited**  210:*23*
**citing**
144:*13*
**City**  2:*19*
45:*17*
**claim**  229:*5*
250:*3*, *9*
**claims**  61:*2*

**clarification**
72:*22*
270:*21*
**clarified**
146:*3*
**clarity**
81:*13*  158:*9*
**Clarke-**
**Pearson**
61:*5*  63:*11*
**classified**
150:*7*
**classify**
148:*8*
**clear**  11:*8*
21:*24*
22:*21*  24:*7*
62:*11*, *13*
73:*8*  74:*7*
81:*14*  94:*8*
140:*16*
163:*23*
171:*3*, *15*
172:*21*
173:*9*
175:*17*
185:*7*
222:*22*
234:*11*
238:*20*
243:*2*  283:*7*
**clearly**
146:*7*
**clerical**
79:*12*
**client**  11:*9*
13:*4*, *16*
**Clinic**  39:*9*
40:*14*
**clinical**
254:*15*
**clinically**
254:*15*
**clinics**  45:*1*

**close**  11:*15*
204:*7*
**closely**
54:*23*
**Coalition**
58:*18*, *23*
59:*13*
**co-culture**
5:*18*  215:*5*
**cohort**
168:*21*
169:*1*, *2*
196:*3*, *15*
**co-lead**  10:*9*
**colleague**
51:*9*  190:*15*
**colleagues**
50:*8*, *22*
51:*3*, *10*
**Colony**
247:*2*, *18*
250:*2*
**column**
180:*22*
184:*5*, *8*, *16*
278:*14*, *16*,
*17*  279:*16*,
*17*
**combined**
174:*9*
**come**  32:*22*
56:*5*  94:*20*,
*21*  98:*12*
216:*24*
252:*6*
274:*15*
286:*5*
288:*12*
**comes**
179:*14*
**comfortable**
93:*16*
**ComHealth**
39:*16*

**coming**
34:*23*
94:*18*
280:*21*
**commencem**
**ent**  290:*7*
**commencing**
1:*19*
**comment**
20:*4*  23:*20*
86:*11*, *23*
246:*18*, *22*
248:*13*
249:*8*, *9*, *12*
251:*22*
252:*17*
253:*21*
**Comments**
6:*5*, *10*
166:*12*
232:*5*, *18*, *22*
233:*6*
236:*21*
237:*4*, *8*, *10*
240:*8*
246:*17*
249:*3*
251:*4*, *11*, *21*
**Commerce**
2:*4*
**commercial**
228:*22*
**commission**
293:*21*
**committee**
9:*20*  10:*6*
**common**
46:*6*  144:*6*
167:*23*
186:*24*
230:*1*
**communicate**
**d**  12:*12*
47:*23*

Judith Zelikoff, M.S.

56:23  57:7,
11
communicati
ng  58:17
communicati
on  96:3
communicati
ons  10:21
13:12  51:19
communities
137:4, 22
Community
40:3, 10
45:15
companies
103:1, 10
137:9, 12
138:7
company
70:4  102:8,
12  138:5, 23,
24  139:5
company's
70:13
compared
74:10
152:11
174:10
256:1
261:8, 24
263:7
comparing
209:20
comparison
183:4, 16
260:17
261:12
compensatio
n  281:17
CompHealth
39:17, 18
137:10
138:4, 10, 24
139:4

completed
18:3  30:1
276:8
286:19
completely
9:9
complicated
240:5
complying
274:13
comprehensi
ve  143:4
computer
238:5
concern
56:13
247:23
248:16
concerned
122:9
191:18
concerning
76:18
133:22
concerns
57:23
conclude
274:9
conclusion
152:17
153:2
167:18
202:14
204:13, 23
248:5
252:23
253:7
conclusions
248:18
condition
131:6, 12
132:8, 15
144:7

147:12
254:20
conditions
42:21, 22
44:3  253:24
conduct
67:9
229:13
250:16
conducted
1:18  66:3
143:4
275:13
conducting
231:19
confer  18:9
confidence
158:11, 14,
16  160:7, 10
171:8
172:2
174:5
175:3
203:3
260:16
confident
84:21
confirm
146:19
230:13

confirmation
108:6
147:13, 17
148:4, 11
150:17
conflict
161:16
162:22
189:13
191:10
195:23
220:18
231:13

281:10
283:1
287:5, 8
confused
159:22, 24
203:12
conjunction
195:7
connection
46:17
193:23
194:12
232:6, 14
connects
213:8
consider
140:4
147:9
148:2
155:12
162:19
175:4
177:5
178:8
249:11

consideration
177:16
233:1
consideration
s  177:20
Considered
3:14  16:2,
10  18:24
20:6  28:4
29:1, 3, 7, 8
33:18
34:17, 20
35:4  37:2
71:1, 6
72:1, 7, 17
73:16
81:18  82:9
84:3, 9

177:1
209:15
241:12, 14
considering
18:10
133:23
considers
143:6
consistent
121:6, 19
172:10
284:10, 17
consistently
243:20

Consolidated
1:11
Consortium
5:3  7:14
140:11
167:9
168:13, 16
280:16
consultant
231:17
consultation
120:24
consulting
47:4, 5
Consumer
2:21
contact
216:24
contacted
139:3
contain
125:24
232:17
contained
130:12
contention
20:23
223:6
256:24

**context**
240:*10*
242:*10*
245:*10*
**continue**
18:*13*
223:*23*
239:*9*
276:*14*
**continued**
92:*1*
**continuing**
247:*11*
**contrary**
53:*10*
**contribute**
210:*5*
218:*24*
**contributed**
130:*21*
131:*20*
191:*1*

**contributions**
190:*24*
**controls**
155:*1* 169:*3*
**convenience**
85:*1*
**convenient**
242:*17*
**conversation**
s 10:*20*
**conveyed**
58:*22*
**coordination**
10:*24*
11:*17* 12:*7,
20* 13:*5, 20*
14:*6*
**copies**
28:*20* 29:*2,
6, 11* 81:*10*
279:*5*

**copy** 28:*1*
71:*15* 74:*2*
82:22
116:*11*
126:*9, 10*
139:*20*
154:*1*
161:*9, 21*
193:*5*
206:*6, 7*
234:*12*
239:*8, 17*
241:*19*
242:*16*
245:*12*
**Correct**
12:*23*
28:*19*
74:*15*
82:*10* 90:*6,
7, 21* 91:*2, 3,
9, 10, 13*
97:*16, 17*
100:*11*
103:*4, 15*
117:*21*
121:*14*
122:*18*
146:*20*
147:*3*
149:*8, 13*
150:*11*
151:*14, 19*
152:*5*
153:*8*
154:*11, 13*
155:*10, 18,
23* 169:*3, 8,
18* 170:*6, 18*
172:*4*
173:*4, 10*
174:*6, 18*
176:*1*
177:*3, 8, 18*

178:*6*
180:*6*
181:*4*
183:*7, 20*
184:*23*
185:*18*
187:*23*
193:*6, 7*
195:*24*
196:*4, 24*
197:*7, 10*
198:*14, 16,
20* 199:*13*
200:*3, 8*
203:*23*
207:*11, 12,
15* 208:*4, 5,
8, 17, 18*
215:*18, 19*
217:*19*
218:*14, 19*
220:*9, 10*
221:*21*
223:*3*
237:*5*
256:*17*
258:*2*
259:*5, 6, 8*
262:*18, 24*
263:*14*
265:*22*
278:*1, 2*
287:*7, 11, 23*
288:*3* 293:*7*
**corrections**
291:*5, 7*
293:*10*
**correctly**
140:*18*
**correlation**
252:*22*
253:*6*
**corresponde**
nce 232:*16*

**Counsel**
9:*10* 17:*14*
18:*5* 19:*12*
20:*14* 24:*2*
33:*3* 57:*1*
61:*23* 78:*8,
24* 105:*6, 19*
106:*5*
120:*24*
121:*5, 18*
231:*4*
271:*13, 15*
275:8, *11*
277:*24*
281:*23*
290:*14, 16*
**counseling**
46:*21*
**counsel's**
274:*6*
**country**
38:*12*
137:*18*
**COUNTY**
1:*9*
**couple**
36:*13*
118:*20*
179:*2*
233:*6*
250:*13*
**course**
56:*15*
**COURT**
1:*1, 6, 21*
9:*2* 10:*11*
11:*3* 12:*22*
15:*3* 22:*8*
24:*19*
82:*14*
290:*6, 20*
291:*20*
**courtesy**
23:*3*

**Court's**
274:*13*
**cover** 22:*3*
102:*3*
273:*20*
**covered**
35:*10*
36:*18*
102:*1*
270:*15*
**covers**
113:*19, 21,
23*
**Cramer**
160:*19*
162:*1*
**Cramer's**
162:*20*
**creation**
264:*9*
**credentialed**
138:*5*

**credentialing**
272:*11*
**criteria**
197:*22*
200:*6*
**cross** 158:*5,
7, 10, 14*
171:*8*
**crosses**
158:*24*
159:*4*
172:*2* 204:*8*
**crossing**
158:*17*
**Crowley**
80:*24*
**crystal**
283:*7*
**culture**
227:*19*

cumulative
144:15, 22
145:12
152:3
cured  93:1
current
33:1
102:19, 21,
22  116:12
117:11, 15,
24  286:10
currently
89:13  99:1,
11, 22
101:20
137:10
138:3
Curriculum
4:1  115:23
116:3, 12
117:2, 8, 23
cytometry
218:15
cytoreductio
n  42:17

< D >
D.C  2:10
daily
196:17
197:7, 8
199:20
256:2, 11, 15
257:8, 19
259:23
260:7
261:10, 19
263:18
Daniel
160:19
162:1
data  94:17
168:14
182:2

183:23
184:1
185:5, 20, 23
196:3, 14, 18,
21, 23  197:1,
3, 4  198:17,
20  199:1, 10,
12, 16
207:13
208:2, 7, 15
209:11
210:14
211:23
212:10, 11
217:4
240:3
248:3, 9
250:3
252:4
253:16, 17
257:12
259:7
263:19
265:20
277:22
284:9
dataset
258:2
259:13
date  1:19
14:21  30:1
59:1  117:4
126:1
290:11
291:9
293:16
dated  29:19,
20  109:6
124:8, 15
127:15
128:20
136:9
290:21

dates  29:16
68:8
112:22
113:4
Daubert
82:3, 4
83:12
Davis  5:4
7:14  105:2
165:8, 11, 12
166:8, 13, 14,
17, 19  167:1,
10, 14  168:2
177:21
178:13, 22
180:9
191:8
192:11
276:23
277:11
278:6
279:24
280:6, 17
281:5
day  234:18
271:18
293:20
days  17:24
18:22
19:13  23:7,
23  24:4
38:24  78:7
80:10
291:16
de  10:9
deactivation
223:17
deceased
85:17
December
4:1  30:7
106:1
109:1, 19
110:16

113:23, 24
114:7
Declaration
220:13
decreased
204:2
deemed
291:19
deeper
77:11
Defendants
2:20  10:2
14:5, 17
15:12
17:23
18:16, 21
19:12
23:23
25:24
273:9
277:24
defined
200:14
201:5, 11
definitely
190:3  257:7
definition
202:21
256:9
degree
23:10
62:19
277:20
demonstrate
228:24
284:20
demonstrate
d  156:8
dense  241:6
Department
161:10
depend
191:10

Depending
149:11
depends
149:9
216:18

DEPONENT
293:2
deposed
26:9, 17
37:8  47:13
49:17
deposing
291:16
deposition
1:18  4:5
7:9  8:2
9:3  12:3, 6,
19  13:19, 23
14:18  15:8,
17, 20  16:13,
21  17:19
18:2, 14
19:3, 13
20:17, 23
21:19  22:5,
6  23:1
24:14  26:1,
18  27:7, 23
36:20, 24
37:13, 20
38:1  49:18
57:21  71:5
80:2  84:20,
23  93:8, 11,
18, 22
104:12, 22
105:14
106:13, 24
107:15
109:13
110:14
116:2
119:14, 16,

*17* 120:*11,
17* 124:*18*
125:*11*
127:6
128:*4*
136:*19*
142:9, *12*
167:5
192:*15, 18*
206:*15, 17*
214:*24*
215:2
221:*1*
236:*12, 19*
243:5
251:9
264:*24*
266:*21*
267:6, *18, 20*
268:*3, 13, 24*
269:*10, 20,
22* 270:7, *9,
11, 18*
271:*13*
273:8, *23*
280:2, *11*
289:*14*
291:*3, 13, 17,
19*
**depositions**
11:*3, 20*
18:*23*
22:*19, 22*
23:9 84:2
**deps@golko
w.com** 1:*24*
**describe**
89:*4* 284:*5*
**described**
224:2
**describes**
247:*4*
283:*19*

**DESCRIPTI
ON** 3:*12*
270:*16*
271:8 287:*3*
**descriptions**
161:*11*
**design** 191:6
**designate**
71:*24*
79:*23*
120:6
142:8
167:*1*
192:*15*
206:*14*
220:*23*
236:9
246:*10*
266:*13, 18*
267:*4, 23*
268:*10, 20*
269:6, *17*
270:4
**designation**
270:*16*
**designed**
146:7
191:*19*
**despite**
13:*11*
**detail** 75:*12*
**details**
93:*21* 103:9
**determinatio
n** 55:*10*
**determine**
26:7, *14*
55:7 190:7
200:*10*
256:*14*
**determined**
54:8, *11*
134:*11, 19*
135:7

**developed**
118:*3*
**diagnosed**
131:*4, 11*
**diagnosis**
91:2 92:5
94:7, *10*
95:2 96:*17*
98:*24*
99:*11, 22*
148:*20*
**differ**
153:*16*
**difference**
155:*10*
157:*10*
158:6
170:6, *17*
174:*22*
181:*1*
183:5, *12, 18*
200:*24*
204:*10*
257:7, *17*
**differences**
187:*4* 263:7
**different**
30:*24* 94:*1*
125:5
129:*21*
154:*24*
173:*21*
176:*3*
185:*21*
187:*18*
191:*13*
200:2
209:*3*
218:*3*
219:*4*
256:*16*
260:5, *10, 18,
21*

**differentiate**
254:*17*
**differently**
130:*3*
173:*22*
**difficult**
169:*22*
229:*19*
**dinner** 61:*8,
9* 271:*19, 22*
**dioxide**
223:2
225:*22*
226:9
**direct** 82:*18*
143:*22*
246:*24*
277:4, *7*
283:*13*
**Direction**
8:*5*
**directions**
182:*19*
**directly**
67:*15*
288:*12, 17*
**disagree**
21:*15*
**disagreement**
228:*10*
**disclose**
79:*1*
163:*22*
190:*3*
195:*19, 20*
288:7
**disclosed**
19:*10* 47:8
84:*22*
287:9, *10, 15,
16*
**disclosure**
161:5, *8*

162:*22, 23*
163:8, *11, 17*
164:5
188:*24*
189:*14, 21*
190:*1, 8, 21*
191:*10*
220:*12, 19*
273:*11, 12*
281:*11*
282:2, *8, 21*
**discover**
21:*10*
**discuss**
21:*11* 26:*5,
23* 52:9
59:*4, 12*
101:*13*
178:*19*
**discussed**
10:*23*
48:*21* 50:*9,
12, 20* 51:*2,
14, 23* 56:*23*
100:*14*
**discusses**
53:*21*
**discussing**
45:*20*
68:*13* 185:2
**discussion**
14:*12*
43:*16*
51:*11*
59:*15*
63:*18*
101:*1*
144:*1, 2, 5*
145:*18*
152:*15*
168:*24*
178:*21*
180:*20*
240:*21*

245:*23*
272:*21*
273:2, *7*
289:*4*
**discussions**
22:7  46:*11*
52:*19*  53:*4,*
*9*  62:*5, 8, 15*
100:2
166:7, *8*
**Disease**
5:*12*  95:*16*
97:*10*
172:20
177:*16, 18*
206:20
**diseases**
43:*6*
**disingenuous**
238:*11, 18*
**dismissed**
108:*18*
**displaying**
72:*23*
**dispute**
16:*19*
**disputes**
18:*12*
**distinguish**
158:*18*

**distinguished**
141:*17*
**DISTRICT**
1:*1*
**dive**  77:*11*
**diverse**
250:*16*
**divided**
176:2
**DIVISION**
1:*9*

**DNA**
221:*23*
222:*1, 5, 9,*
*12, 20, 21*
**Docket**  1:*11*
**Doctor**
130:*24*
154:*21*
158:*10*
193:*4*
235:*5*
236:*3*
243:6, *7*
252:*21*
255:*3*
266:*12*
271:*11*
272:9
277:*1*
280:*1*
281:*12*
283:*11*
285:*4*
**doctors**
44:*18*
**document**
71:*18, 23*
79:*23*
116:*16*
119:*12*
120:*16, 20*
121:*13*
123:*19*
125:*5*
128:*18*
233:*19*
235:6, *20*
236:*4, 7*
238:9, *13, 15*
239:*1, 17*
240:2
241:6, *9*
242:6, *16*
243:*4, 12*

245:*7*
246:*6, 9, 12*
**Documents**
8:*8*  18:*23*
19:2  29:*9,*
*12*  69:*23*
70:*5, 12, 13*
79:*7*  121:*1,*
*4, 19*  238:*21*
242:*23*
244:*16*
255:*3*
**doing**  32:*3*
38:*14*
73:*23*
91:*12, 24*
92:*12*
99:*24*  291:*8*
**dollars**
103:*24*
**dose**  179:*13,*
*17, 21*  180:*1*
**dose-**
**response**
177:2, *5, 15,*
*22*  178:*14,*
*21, 22*  179:*3,*
*20*  180:*6, 10*
181:*20*
182:*10*
183:*16*
187:*14, 21*
188:*4*
255:*18*
256:*5*
257:2, *13*
258:*19*
259:*16, 17*
260:*14*
261:2
262:*23*
277:*11, 16,*
*19*  278:*9, 12*

279:*17, 19,*
*20*
**doses**  179:*7,*
*9*
**Dr**  6:*13, 16,*
*19, 22, 24*
7:*3, 4, 8*
11:*4*  14:*18*
16:*3*  17:*3,*
*7, 12, 15*
19:*5, 7, 9, 21,*
*23, 24*  20:*11,*
*19*  21:*11, 16*
22:*10*
23:*11, 24*
25:7, *17, 22*
27:9  29:*14,*
*18, 20*  32:*14,*
*15*  33:*12, 13,*
*14*  34:2, *5,*
*11, 24*  35:*2,*
*14, 17, 23*
36:9, *18*
43:*24*  61:*4,*
*17, 18*  62:*15,*
*16, 17, 22*
63:2, *9, 10,*
*19, 20*  64:*10*
65:*13*
71:*19*
73:*10, 16*
77:5  79:*5,*
*11, 19*  80:*24*
81:2, *3, 6, 15*
82:5  83:*21*
84:7  85:*3*
91:6, *11, 23*
92:*23*  93:*7*
104:2
106:*11*
107:7, *17*
108:*10*
109:*4, 22*
111:*15*

114:*1*
115:*1, 14*
116:*9*
119:*23*
120:*10*
122:*8*
123:*3, 9*
124:*3, 6, 13*
125:*18*
127:*3*
131:22
142:*21*
144:*1*
146:*18*
150:*21*
162:*19*
164:*10*
166:*3, 23*
174:2
189:*6*
190:8, *15, 24*
191:*8*
193:*18, 20*
195:*16*
196:*18*
210:*14*
211:5, *10, 18*
212:*1, 2, 8*
214:*16*
219:22, *24*
230:22
231:*13, 18*
232:*4, 15*
233:*17*
237:4, *13, 22*
238:*3, 23*
239:*23*
240:*13*
241:*7*
242:*1, 15*
244:*12*
245:*1, 13*
248:*17*
250:*11*

266:22
267:8, 19, 23
268:5, 10, 15, 20  269:1, 6, 11, 18, 23
270:6, 11, 18, 22  273:19
274:17
275:6, 13, 24
276:4
279:18
280:8, 24
281:15, 24
282:11, 20
285:23
286:11
287:4, 10, 19
288:9
**drafted**
49:1, 5
63:20
**draw**
252:23
253:7
**Duces**  4:6
119:18
**Due**  9:6
172:3
**duly**  25:11
290:7
**durable**
254:13
**duration**
179:8, 21
181:3, 18, 23
186:3, 5
187:21
188:2, 6
**duties**  44:23
**DWC**
161:22, 24

**< E >**

**earlier**
69:10, 14
211:3
255:15
271:11
273:16
288:23
**easier**  79:8
**Eastern**
1:19  24:20
120:12
**edit**  191:7
**editing**
191:3
**editorial**
264:13
**educating**
46:22
**education**
46:10
117:12
**effect**  5:15
152:4
158:8
160:5
175:20
179:20
181:24
185:7
204:2
215:3, 22
218:7, 8, 10
219:8, 17
226:13
**Effects**  4:18
5:21
142:13
217:17, 21
218:22
221:3
227:12, 20
252:10
**efficient**
274:19

**efforts**
132:24
**egg-laying**
66:9  229:22
**eight**  279:5
**either**  49:11
52:11
61:17
102:4
135:24
142:2
145:8
152:12
165:11
178:20
186:2, 23
204:11
218:4
233:16
243:4, 21
245:9
249:5
254:24
263:8
**electronic**
28:1
**eligibility**
197:14, 22
200:6
**Ellen**  61:8
272:1
**e-mail**
10:20
12:17  13:2
19:22
107:21
232:15
233:15, 23
235:8, 12, 13
237:15, 22
239:22
240:14
243:22
244:6

245:18
289:8
**Emi**  5:23
105:2
213:18
214:1, 15, 19
220:22
221:5
225:21
284:7
**employee**
290:14, 15
**employment**
38:4
**endometrial**
43:1  185:8
**endometrioid**
171:15
172:21
173:8  185:9
**endometriosis**  4:21
141:7, 21, 23
142:15
143:5, 13
144:6, 22
145:6, 12
146:9, 11, 15, 19, 23, 24
147:3, 6, 10, 18, 22  148:3, 12, 20  149:3, 4, 6, 18
150:1, 8, 14, 18  152:5, 10
153:18
154:4, 8
155:1, 5
156:5, 10, 16
157:2, 19
158:1
159:2, 20
160:11

**engaged**
139:5
**ensure**  9:8
**entire**  75:9
95:5
**Entirety**
7:6  75:6
244:21
270:5, 10
**entities**
139:3
**entitled**
16:6, 7, 9
72:14, 16
156:13
237:23
241:10, 23, 24  242:10
**entity**  70:5, 6  191:20
**entry**
111:24

**Environment**
163:6
**environmentally**  220:16
**EPA**  212:19
**Epidemiology**  161:11
163:6
164:11
189:19
**epigenetic**
223:4, 15
225:3
**epigenomic**
5:21  221:3
**Epithelial**
5:1  6:3
7:11  167:7, 23  228:7
236:15
248:6

252:*1, 14*
253:*4*
280:*14*
**epithelium**
227:*13, 14*
**errata**
291:*6, 9, 12,*
*15* 293:*12*
**especially**
228:*16*
**ESQUIRE**
2:*3, 4, 9, 13,*
*18*
**essentially**
84:*23*
**establish**
160:*4* 253:*2*
**estradiol**
217:*18, 22,*
*23*
**estrogen**
218:*6, 9*
**et** 4:*22* 5:*4,*
*9, 15, 19, 23*
6:*3* 7:*14*
142:*16*
167:*10*
192:*23*
206:*22*
215:*6*
221:*5*
236:*16*
280:*17*
**e-tables**
79:*6*
**evaluate**
277:*19*
**evaluated**
153:*7, 22*
**evidence**
97:*9*
130:*20*
131:*19*
134:*24*

194:*18*
195:*4*
219:*16*
**exact** 143:*2*
**exactly**
11:*15*
108:*21*
**EXAMINAT**
**ION** 25:*14*
107:*12*
275:*3, 8*
285:*16*
290:*7*
**examine**
23:*11*
81:*21*
252:*9*
258:*16*
**examined**
25:*12*
81:*20* 93:*7*
107:*14*
108:*23*
258:*14*
**example**
82:*2*
**Excuse**
35:*13* 43:*8*
89:*9* 93:*5*
97:*8*
106:*19*
140:*10*
151:*16*
154:*15*
170:*8*
194:*17*
209:*17*
211:*24*
221:*18*
225:*10*
237:*11*
247:*10*
283:*14*

**excused**
289:*13*
**Executive**
10:*6*
**exercise**
272:*12*
**Exhibit**
3:*14* 34:*3,*
*5* 35:*15, 18*
36:*2, 10*
70:*23* 71:*2,*
*5, 7, 24* 72:*2,*
*24* 73:*10*
75:*5* 79:*23*
80:*2* 84:*2*
85:*6*
106:*21, 24*
110:*4, 9, 14*
111:*2, 19, 23*
113:*18*
115:*24*
116:*2*
119:*13, 16*
120:*3, 6*
122:*8*
124:*13, 18*
125:*9, 11*
126:*14, 21*
127:*6*
128:*1, 4, 18*
136:*18*
142:*10, 12*
167:*2, 5*
192:*16, 18*
194:*12, 24*
197:*17*
206:*14, 17*
214:*23*
215:*2*
220:*23*
221:*1*
234:*5*
236:*9, 12, 19*
246:*10*

251:*9*
266:*18, 21*
267:*4, 6, 23*
268:*3, 10, 13,*
*20, 24* 269:*6,*
*10, 17, 22*
270:*4, 9, 21*
271:*5, 9*
275:*23*
276:*3*
280:*2, 11*
**exhibits**
113:*17*
129:*19*
130:*13*
233:*10*
266:*14*
267:*18*
270:*16*
273:*14*
277:*3*
**exist** 113:*9*
**expanded**
100:*10, 21*
**expect**
230:*11*
**expectancy**
95:*19, 21*
96:*1* 98:*16,*
*18, 21*
**expected**
11:*10*
**experience**
117:*12*
**experiencing**
99:*1*
**Expert** 1:*13*
4:*8, 12, 15,*
*18* 11:*3, 13,*
*22* 47:*8*
52:*20*
60:*24*
61:*14*
63:*13*

68:*15* 69:*1*
78:*4* 80:*23*
123:*14*
124:*15, 20*
125:*13*
127:*8, 15*
128:*6, 19*
160:*23*
162:*2, 21*
163:*24*
164:*6*
188:*18*
189:*14*
190:*10, 16,*
*17* 193:*14*
194:*13*
195:*1, 17*
220:*1, 8, 12,*
*14, 15*
230:*23*
278:*24*
283:*3, 8*
287:*21*
**expertise**
118:*4*
226:*16*
254:*11*
**experts**
11:*14* 14:*6*
18:*23, 24*
63:*24*
140:*13*
266:*1*
**expires**
293:*21*
**Explain**
64:*6* 200:*23*
**explained**
254:*2*
**exploratory**
42:*15*
**Export** 3:*15*
71:*8*

**exposed**
66:4
209:13
210:6
216:22
**Exposure**
5:9  7:1
17:8  19:6
29:13  49:2,
6, 12  50:9,
12  65:13, 20
131:7, 13
132:9, 16, 20
133:5, 24
134:3, 10, 18
135:6, 15, 23
139:11
141:23
145:5
177:15, 17
196:17
204:18
206:18
207:11, 14
208:3, 6, 20,
24  209:5, 21,
22, 24  210:4
211:4
214:10
219:17
223:1
227:20
229:7
247:2
248:5
268:21
269:1
275:12
284:16
**expression**
218:14, 16
222:7
223:1, 7, 15
227:22

228:11, 14
254:16, 24
255:1
**extend**
46:12  274:4
**extensively**
274:11
**extent**
11:12, 22
36:6
**extracted**
260:8

**< F >**
**facilities**
39:20
40:18
41:22  42:3
54:16
117:18
138:21
**facility**
45:12
**fact**  19:14
141:16
142:2
213:9  220:7
**facto**  10:9
**factor**  51:4
55:13
57:24
141:18
142:3, 24
144:8
177:7
182:19
**Factors**
4:20  68:1
94:8
142:13
143:8
144:14
154:3
155:14

172:23
173:22
177:12
**fail**  291:18
**fair**  176:6
238:17
239:6
241:15
242:11
249:14
258:11
**fallopian**
197:10, 24
198:4, 14
199:22
201:19
202:7
252:1, 6, 11,
14
**familiar**
76:3  78:13
102:7, 11
**family**
101:11
143:9  154:2
**far**  13:18
14:21  22:8
56:23
70:17
114:18
119:4
129:9
140:17
148:21
158:16
163:3
169:24
286:21
287:2
**fashion**
144:16, 23
145:13
**FDA**  57:8
210:16

**Federal**
22:23
212:19
213:4
**Federally**
1:20  290:5,
19
**feel**  34:5
93:16
157:8
211:15
**fees**  105:16,
19  163:12
189:7
190:4, 8, 19
**Felix**  48:8
**felt**  163:7
**Ferraro**
162:2, 8
**fibrous**
50:16
**fifteen**  94:10
**fifth**  278:15,
17
**figure**  218:1
**fimbriae**
252:6
**fimbrial**
252:1
**finalized**
60:17
286:18
**finally**
141:21
288:9
**financially**
290:16
**find**  67:12,
16  74:17
83:3  95:10
97:6
139:17
145:18
152:3

160:3
166:14
173:15
175:8, 12
179:23
183:11
193:8, 11
207:2
212:22
215:10
220:17
221:9
230:18
231:5
**finding**
155:15
160:9
172:3
175:4
176:8
180:6
183:17
205:13
246:24
258:9  279:9
**findings**
77:12
146:20
158:18
159:12
175:1
178:9, 14, 22
181:7
183:2
205:15, 16
224:7
**fine**  154:21
**finish**  273:4
**finished**
154:17, 22
225:11
**firm**  47:21
162:3, 9, 12,
14  163:12

Judith Kessworld, M.D.

190:*4, 18*
195:*21*
**firms**  164:*1*
189:7  190:*9*
**first**  12:8
13:*17, 18*
19:*19*
37:*20*
41:*12*
49:*18*
70:*23*
80:*11*
104:*19*
107:*7, 15*
110:7
111:*24*
113:*19*
117:*19*
120:9
124:5
125:*24*
127:*14, 19*
129:2
136:*21*
138:*16*
144:4
160:*20*
161:*5, 18, 20*
164:*17*
166:*11*
184:4
214:*22*
246:6
249:*1*
251:*22*
258:*23*
259:4
262:*14*
266:*16*
275:*12*
281:9
**five**  49:*19*
63:*1*  94:*10*
95:6  104:8

161:*21*
174:*9, 20*
176:*3*
185:*3, 21*
244:*17*
245:5
274:*17*
**five-minute**
63:6
**five-page**
240:2
241:6
245:7  246:9
**Fletcher**
284:8
**flow**  218:*15*
**focus**  76:*14*
136:7
174:*24*
183:*1*
**focused**
76:*12*  210:4
**Focusing**
153:*20*
260:*24*
**Folder**  3:*16*
79:9  80:*3*
84:*24*
107:*23*
108:*14, 24*
**folders**  78:*8,*
*10, 20, 23*
79:*2, 16*
**follow**
94:*20*
98:*11*
113:*12*
163:*19*
278:6
289:*11*
**Following**
146:*17*
202:4
253:*23*

254:*17*
279:*22*
**follows**
25:*12*
**follow-up**
274:*16*
275:7
276:*22*
285:9
**footnote**
198:*9, 11*
**foregoing**
290:*10*
293:6
**forest**  277:*8,*
*17*  278:*16,*
*18*  279:*1*
**forgive**
277:5
**form**  32:6
33:*21*
53:*15*
58:*12*
61:*22*
65:*10*
76:*21*  89:9
91:*15*  97:4
98:*3*  99:*15*
103:*17*
133:8
134:*5, 22*
135:*10*
136:*3*
140:7
145:*1*
147:*15*
148:6
149:*15*
150:*21*
151:*21*
153:*10*
155:*20*
156:*18*
158:*3, 21*

159:*15*
163:2, *15*
165:*3, 21*
169:5
170:*20*
172:6
175:*10*
176:*14*
177:*10*
179:*1*
180:*12*
181:*13*
182:*12*
191:*16*
194:*16*
195:4
196:6
197:*12*
199:*15*
200:*18*
202:*18*
204:5
207:*17*
208:*10*
209:*18*
210:*10*
212:*14*
217:2
222:*16*
224:9
229:*16*
231:7
232:9
248:*20*
253:*12*
256:*19*
257:*4, 15*
259:*10, 19*
261:4
263:2
264:*17*
266:7
276:*19*
282:*5, 16*

285:2
287:*13*
288:5
293:*10*
**formal**  50:*5*
118:7
**formation**
247:*2, 18*
250:2
**formed**
130:9
276:*8, 11*
**forming**
19:*1*
**forms**  54:*18,*
*21*
**forth**  290:*12*
**forward**
15:5  18:2
20:*19*  21:7
22:*14*  24:*12*
**found**  74:*19,*
*20, 23*  97:9
152:8
153:6
154:9
156:2, *14*
169:*12*
181:9, *22*
183:*4, 21*
187:*24*
200:*20*
201:*8, 13*
202:*20*
204:9
205:8
213:*1*
225:4
228:*10*
248:*17*
259:*16*
262:*16, 23*
**foundational**
93:*10*

four 23:10
29:5 31:22
32:13
88:20
104:8
107:16
122:10, 16
129:7, 18
130:12
200:14
201:3, 4, 9
273:3
278:15
four-hour
274:14
fourth
279:16, 17
fragrances
50:17
free 34:6
95:16 238:4
frequency
178:6
179:6, 21
181:2, 18, 23
182:6, 9
186:3, 19, 23,
24 187:21
200:3, 7
262:6, 17, 24
Frequent
5:6 192:20
200:10, 13
201:21
202:1, 12, 15,
22 203:2, 22
204:3, 17
256:1, 8, 10,
15 257:8, 18
friend 45:8
front 10:7,
11 50:7
90:10
93:19

122:18
123:8, 23
125:22
136:11
140:2
167:14
201:16
206:12
212:3
227:5
246:13
251:17
258:6, 11
259:24
FT 252:10
full 38:8
functional
253:3 254:1
funded
191:20
funding
162:4
164:1
231:18
further
11:21
18:10 22:7
23:8 32:13
60:5 75:11
142:1, 7
253:1, 23
271:7
285:3
290:10, 12

< G >
Galardo
31:4
Gallardo
4:17 6:18
28:17
85:12, 18, 22
86:2, 15, 22
87:16 88:5

89:13 90:6,
12, 18, 24
92:14 94:3
95:3 96:4
99:3, 5, 9
100:5
103:3
128:2, 6, 12,
15, 21 129:1
130:5
131:18
132:2, 15
133:15
220:9
268:1, 4
Gallardo's
95:19 98:23
gather
51:20
gears 136:6
gene 76:13
100:14, 16,
21 101:21
102:8, 12, 16
103:4
218:13, 16
223:1, 7, 15
General
3:16 4:8
6:13 7:10
11:13 12:1
14:6 28:13
50:24 71:9
72:24
73:11
76:22, 23
78:4, 9
80:3 88:15
89:6 101:5
104:5
122:24
123:14
124:15, 20
129:3

130:6
136:8
194:4
211:23
219:3
266:17, 22
269:7
270:23
277:2
278:24
280:13
generally
26:11
31:13
42:11
52:23
55:11, 14
56:2 94:12
101:24
138:8
172:22
251:23
genes 101:4,
9 102:3
217:15
222:7
223:16, 17
genetic 77:7,
10 100:5, 20
103:14
276:5
genetic/epige
netic 254:1
genetically
101:6
genetics
76:6, 12, 18
77:12
Genital
4:22
153:15
155:3
156:9
158:19

159:11, 19
160:10
167:6
169:14
170:2
181:2, 3
198:5
GEREL 2:7
9:18 162:3,
11
Gertig
258:1, 5, 18
259:3, 16, 23,
24 260:6, 13
261:1
263:13, 18
getting
55:14
71:15
116:14
190:4
206:8 279:2
get-together
272:4
Give 34:8
35:23 45:9
46:10 48:7
74:4 96:11
116:19
139:23
175:13
206:8
212:1
216:10
280:9
given 41:8
45:5 50:5,
15 122:16
148:20
162:19
210:3
253:22
254:19
273:5 293:8

giving
230:2
240:9  241:8
**glass**  29:15
**go**  18:1
20:18  21:7
22:13
24:12  25:7
35:1, 6, 11
36:4  43:10,
13, 14  75:11
78:21
89:18
113:12
115:3, 9
138:15, 20
142:7
166:21
172:15
175:11
186:4
192:2
195:23
227:24
233:21, 22
234:9
240:16, 17,
18  241:1, 20
245:3, 17
248:23
272:18
274:24
**Godleski**
219:22, 24
**Godleski's**
64:11
**goes**  72:4
82:2  94:13
142:2
184:3
185:1, 15
253:21
287:3

going  13:13
15:4  24:9
31:21
35:20  36:3
66:1  73:6
74:1  80:21
82:11
84:12
89:17, 19, 22
104:9, 15
106:10, 20
108:3
109:14
111:18
114:24
115:17, 22
118:19
119:12
120:5
122:20
123:7
137:23
192:1
201:6
216:19
226:16, 17
227:2
231:5
233:9
234:2, 4
235:8, 10
237:7
238:19, 20
239:13, 15
241:12
242:5, 23
244:5, 19, 21
255:19
273:4, 6, 15
275:10
285:8
**GOLKOW**
1:23

**GOLOMB**
2:13  9:21,
22  10:3, 4
13:23  14:8,
13, 22  15:15
**Golomb's**
15:10
**Good**  25:17,
18  65:23
66:11
91:12
94:17
115:6
138:6
140:5
189:20
**gosh**  216:17
**Goshen**
39:24  40:1
41:10
**gotta**  165:10
**gotten**  13:15
**grade**
171:14
**gradient**
177:2, 6, 23
178:15
179:6
255:10, 14
263:12
**Grand**  2:18
**grant**  162:4
164:1
**greater**
145:7
156:8
182:6
183:6
184:22
186:15
188:8
200:7
201:2, 5
218:8

**Green**  39:3,
13  40:13
117:16
**grew**  228:13
**ground**
81:24
**group**  48:5
50:7  57:12
59:21
60:10
141:1, 2, 16,
17  146:5
156:7, 22, 23
**groups**
260:21
261:8
**grow**
223:19
227:19
**guess**  16:3,
6  25:2
284:4
**guinea**  66:9
229:21
**GYN**  94:21
140:13
**Gynaeocologi
cal**  5:11
206:19
**Gynecologic**
6:9  41:7,
24  45:10
48:10  91:5
96:21
102:5
137:4, 7
144:6
251:5, 10
265:24
**gynecology**
44:23

**< H >**

**H2O2**
218:18
**half**  39:6
242:7
**hallmarks**
250:19
**hand**  117:10
**handed**
242:15
**handwritten**
119:7
**Hannahan**
250:20, 24
**happen**
66:8  172:9
**happening**
112:11
**happens**
35:22
**happy**  18:9
82:15
107:20
238:1, 6
240:15
242:19
**hard**  27:24
29:6, 11
73:22  74:2
81:10
82:21
146:13
149:17
179:8
233:2
245:12
**HARDY**
2:16
**harmonize**
198:15
**Harper**  6:3
105:3
226:21
236:16
284:1, 8

Judith Kay Wolf, M.S.

| | | | | |
|---|---|---|---|---|
| **Harper's** 250:*11* | 25:*6, 16, 23* 32:*11* | 120:*5, 8* 121:*8, 21* | 184:*7, 12* 191:*24* | 243:*1* 244:*3, 15* |
| **hazard** 201:*23* 202:*9* | 33:*24* 34:*10, 13, 22* 35:*9* 36:*3,* | 122:*3, 6, 19* 123:*3, 9, 21, 24* 124:*2, 11,* | 192:*7* 193:*3* 194:*21* | 245:*17* 246:*4, 11* 247:*16* |
| **head** 41:*14, 16* 137:*15* 179:*12* | *15, 17* 43:*13, 21, 23* 53:*18* 57:*6* 60:*6* | *24* 125:*6, 17* 126:*8, 13, 19* 127:*12, 21* | 195:*10* 196:*9, 12* 197:*18* | 248:*1* 249:*10* 251:*3, 16, 19* |
| **heading** 237:*9* | 62:*3, 11* 63:*4* 64:*14* | 128:*10* 132:*4* | 198:*6* 199:*4, 23* | 253:*20* 255:*2, 6, 8* |
| **Health** 40:*3* 60:*17* 91:*12* 137:*12* 162:*5* 196:*22* 197:*2* 198:*24* 199:*2, 18* 258:*24* 259:*4* 263:*20* 265:*21* | 65:*3, 4, 16* 69:*12* 70:*22* 71:*12, 17, 22* 73:*3, 9, 14* 74:*3, 6, 8* 76:*9* 77:*2, 17* 78:*21* 79:*13, 22* 80:*8, 17* 82:*1, 7, 17, 23* 83:*13, 19* 84:*4, 7* | 133:*10, 13* 134:*7, 14, 15* 135:*3, 19* 136:*5, 15, 20* 140:*3, 20* 142:*6, 19* 143:*21, 23* 145:*9, 22* 148:*1, 9* 150:*5* 151:*2* 152:*1, 13, 24* 153:*4, 19* | 200:*22* 202:*24* 203:*9, 13, 16, 19* 204:*12* 205:*9* 206:*5, 13* 207:*1, 21, 23* 208:*14* 210:*2* 211:*1* 212:*4, 7, 17* 213:*23* 214:*3, 14, 21* | 256:*3, 23* 257:*10, 20* 258:*7, 15* 259:*2, 14* 260:*11* 262:*1* 263:*10* 264:*20* 266:*10, 16* 267:*2, 16, 22* 268:*9, 19* 269:*5, 16* 270:*3, 14* |
| **hear** 11:*10* **heard** 9:*9* 13:*7* | 85:*2* 86:*18, 19* 87:*3, 9* 89:*12* 90:*7,* | 154:*18* 155:*6, 24* 157:*14* | 215:*9* 217:*7* 220:*21* | 271:*6, 10* 272:*18, 24* 274:*20* |
| **hearing** 24:*22* 43:*12* 195:*12* 288:*2* | *11, 19* 91:*18* 92:*3* 93:*9, 12, 23* 96:*15* 97:*11* | 158:*15* 159:*8, 18* 160:*1* 163:*9* | 221:*8* 222:*23* 224:*13, 17* 225:*7, 20* | 276:*18* 278:*4, 17, 21* 279:*2, 7, 13, 21* 280:*22* |
| **heavy** 50:*16* 131:*12* 132:*16* 135:*23* | 98:*14* 99:*4, 8, 19* 102:*21* 103:*2* 104:*1, 17* 106:*10, 20* | 164:*3* 165:*14* 166:*2, 23* 168:*1* 169:*6* | 226:*7* 227:*6* 230:*14* 231:*11, 22* 232:*12* | 282:*4, 15* 285:*1, 7, 12, 18* 287:*18* 288:*8, 20* 289:*7* |
| **HEGARTY** 2:*18* 3:*6, 7* 9:*24* 10:*16* 12:*10* 13:*21* 15:*9* 18:*15* 21:*14, 23* 23:*19* 24:*15, 23* | 107:*6* 108:*2* 109:*3, 16, 20* 110:*20* 111:*6, 14, 17* 113:*6, 14, 16* 115:*8, 12, 22* 116:*7, 24* 119:*11, 22* | 170:*11, 12, 24* 171:*23* 172:*14* 175:*21* 176:*19* 177:*13* 180:*3, 15* 181:*16* 182:*21* | 233:*14, 21* 235:*1, 4, 9, 14, 17, 23* 236:*2, 8* 237:*2* 238:*8* 239:*7, 13* 240:*16* 242:*3* | **held** 18:*4* **help** 38:*12* 84:*12* 137:*19* 138:*17, 18* **helped** 191:*7* **helping** |

75:*13*
**Hen**  229:*22*
**Henry**  41:*13*
**hens**  66:*9*
229:*22*
**hereinbefore**
290:*12*
**Hershey**
39:*22, 23*
40:*8, 9*
44:*21*  45:*19*
**hesitated**
32:*8*
**HHS**  7:*10*
280:*12*
281:*4*
**high-grade**
167:*21*
168:*4, 8*
171:*12*
173:*3, 13*
174:*17*
183:2, *9*
186:*9*
187:*9, 11*
251:*24*
252:*5*
**Hill**  177:*1,*
*7*  178:*20*
**history**
54:*21*  55:*1*
101:*11*
143:*10*
154:*2*
162:*20*
225:*14*
**histotypes**
173:2, *13*
174:*4, 16, 20*
175:*1, 7, 15,*
*23*  176:*4, 11,*
*18*  184:*8, 11,*
*13, 17*  185:*3,*

*4, 17, 21*
**HO**  218:*18*
**hold**  46:*16*
**home**  27:*16,*
*17*
**hopefully**
15:*4*
111:*15*
180:*18*
**Hopkins**
81:*4*  83:*21*
210:*15*
**hormone**
153:*16*
**Hospital**
39:*14*
40:*10, 12, 13*
102:*1*
117:*16*
272:*10*
**hospitals**
117:*14, 15*
**hotel**  138:*24*
**hour**  18:*11*
106:*9*
114:*24*
192:*1*  242:*7*
**hours**  23:*10*
30:*16*
104:*8*
112:*10, 14*
113:*4*
114:*18*
229:*1, 7*
273:*3*
**HT**  153:*16*
**Huh**  83:*21*
84:*8*
**Huh's**  81:*3*
**human**  6:*2*
216:*14, 15*
219:*14*
227:*13*

228:*6*
236:*15*
**humans**
219:*6*
224:*12*
**hypothesis**
155:*17*
170:*5, 16*
172:*1*
**hysterectomi**
**es**  42:*14, 16*

**< I >**
**i.e**  143:*9*
250:*19*
**IARC**
210:*24*
**idea**  141:*12*

**identification**
71:*10*  80:*6*
107:*4*
110:*18*
116:*5*
119:*20*
124:*22*
125:*15*
127:*10*
128:*8*
142:*17*
167:*11*
193:*1*
206:*23*
215:*7*
221:*6*
236:*17, 24*
251:*14*
266:*24*
267:*10*
268:*7, 17*
269:*3, 14*
270:*1, 12*
280:*18*

**identified**
26:*16*  27:*6*
52:*19*
85:*20*
101:*9*
150:*16*
**identify**
27:*4*  134:*9,*
*18*  135:*6, 22*
**IHC**  252:*22*
253:*6*  254:*2*
**IIA**  95:*4, 7*
**III**  95:*11, 15*
**imagine**
67:*24*
**Imerys**  70:*4,*
*6*

**immortalized**
227:*15, 18*
**immune**
215:*24*
217:*16*
219:*9, 18, 20*
**immunocom**
**promised**
216:*10*
**imperative**
291:*14*
**importance**
249:*8*
**important**
32:*24*
157:*9*
177:*6*
185:*24*
231:*23*
234:*17, 18*
**inaccurate**
37:*14, 23*
**inappropriat**
**e**  244:*4*
**incapable**
243:*23, 24*

**include**
21:*1*  32:*24*
48:*12*
67:*24*
109:*7*
166:*7, 8*
172:*18*
201:*6*
208:*12*
211:*3, 9*
226:*20*
282:*12, 20*
**included**
19:*15*  28:*6*
33:*17*
48:*12*  72:*8*
78:*9, 10*
135:*13*
198:*13*
199:*7, 8, 9,*
*11*  207:*13*
277:*16*
282:*1*
**including**
10:*21*  31:*3*
34:*1*  43:*1*
47:*20*  69:*9*
76:*13*
77:*20*
143:*8*
210:*23*
211:*13*
212:*11*
213:*10*
**inclusion**
15:*13*
196:*19*
**inconsistent**
211:*21*
212:*11*
**incorrect**
122:*1*
**increase**
135:*24*

Judith Zelikoff, M.D.

142:*1*
157:*12*
168:*8*
169:*16*
175:*5*
176:*8*
262:*4, 16*
**increased**
141:*9*
149:*21*
152:*9*
156:*8*
169:*13*
183:*14*
204:*16*
205:*4*
217:*13*
228:*11, 14*
254:*23*
255:*1*
265:*17*
**increases**
142:*4*
208:*21*
209:*5*
**increasing**
262:*5, 17*
**independent**
220:*14*
**INDEX**  8:*2*
143:*8*
153:*15*
**Indiana**
40:*2*
**Indianapolis**
40:*3, 10*
**indicate**
254:*14*
**indicated**
16:*15*
107:*24*
132:*7*
**Indicating**
214:*13*

**indication**
132:*14*
164:*4*
**indications**
284:*22*
**individual**
275:*14*
**individually**
171:*19*
173:*18*
174:*10, 12*
176:*23*
**induce**
225:*22*
**induces**  6:*1*
228:*5*
236:*13*
253:*3*
**inert**  218:*4*

**inflammation**
141:*13, 19*
157:*4, 5, 6*
284:*23*
**inflammator**
**y**  141:*7, 11,*
*24*  157:*12*
**inflation**
106:*9*
**influence**
191:*21*
**inform**
76:*18*
**informal**
118:*8*
**information**
51:*20*
168:*14*
175:*14*
176:*17*
185:*13*
205:*18*
213:*7*
231:*24*

232:*2*
275:*16, 20*
276:*9*
277:*22*
282:*12*
**informed**
276:*15*
**inhalation**
208:*7, 13*
**inhibiting**
219:*19*
**initial**  122:*2*
273:*7*
**initially**
143:*17*
**inquiry**
241:*22*
243:*13*
**insisting**
244:*20*
**insoluble**
5:*21*  221:*3*
**instance**
175:*17*
**instances**
243:*11*
**Institutes**
162:*5*
**institution**
162:*4*
**instruct**
239:*14*
243:*7*
**INSTRUCTI**
**ONS**  291:*1*
**insufficient**
252:*23*
253:*6*
**insurance**
101:*16, 18*
102:*2*
103:*22*
**intact**
197:*10*

198:*4, 14*
199:*21*
**intake**
54:*18, 20*
**intend**  22:*5*
26:*14*
30:*17*
34:*16*
68:*12, 22*
70:*20*  77:*4*
78:*1*  86:*10,*
*23*  130:*11*
258:*15*
265:*8*
**intended**
57:*22*
**interacted**
52:*5*  271:*14*
**interaction**
154:*9, 10*
155:*13, 18*
156:*3, 15*
256:*13, 21*
**interactions**
153:*7, 22*
**interest**
161:*16*
162:*23*
189:*13*
191:*10*
195:*24*
220:*13, 18*
231:*13*
281:*10*
283:*1*
287:*5, 9*
**interested**
67:*14*
138:*10*
232:*23*
290:*16*
**interpret**
185:*19, 20*

**interpretatio**
**n**  265:*19*
**interrupt**
55:*19*
95:*13*
176:*21*
223:*23*
227:*24*
**interval**
158:*12, 17*
171:*8*
172:*2*
174:*6*
175:*3*  203:*4*
**intervals**
158:*14*
160:*7, 10*
260:*16*
**introduction**
143:*3*
**invade**
223:*20*
**inverse**
187:*13*
**investigated**
228:*22*
229:*2*
230:*15*
**investigation**
60:*5*
**Invitae**
102:*13*
**invoice**
106:*3*
107:*11*
108:*24*
109:*5*
110:*4, 21*
111:*3, 20*
112:*13, 16,*
*17, 18, 24*
113:*1*
114:*13*

invoiced
105:*19*
112:*20*
113:*5*
114:*10*
**Invoices**
3:*21, 24*
105:*23*
106:*12*
107:*2, 13, 17*
108:*7, 10, 13,*
*16, 19*
109:*18, 21*
110:*8, 16*
111:*1, 7, 10,*
*23*  113:*18*
114:*2, 11*
involve
66:*20*
273:*24*
**involved**
42:*19*
46:*21, 23*
58:*14*
61:*24*
189:*17*
208:*6*  216:*6*
**involvement**
191:*11*
195:*17*
**involving**
47:*10*
63:*14*
64:*17*
65:*19*
112:*6*  216:*7*
**issue**  12:*9*
15:*24*
21:*22*
24:*13*
56:*17*  244:*2*
**issued**
22:*18*  276:*1*

**issues**  45:*21*
87:*24*  88:*5,*
*10*  129:*3*
**item**  36:*12*
**its**  57:*23*
146:*1*
248:*22*
**IV**  95:*11, 15*

**< J >**
**J774**  5:*22*
221:*4*
**January**
1:*13*  3:*22*
30:*5, 11*
38:*23*
39:*11*
49:*18*
57:*20*
58:*24*  59:*3,*
*7, 9, 11*
107:*3*
114:*15*
117:*2, 24*
122:*11*
290:*21*
**JERSEY**
1:*1, 6*
10:*11*
12:*21*  14:*9*
15:*20, 22*
**JJG**  220:*14*
**Johns**  81:*4*
83:*21*
**JOHNSON**
1:*1, 4*  2:*20,*
*21*  10:*1, 16,*
*17*  13:*22*
14:*4, 5, 16*
15:*12*
17:*15*  18:*5,*
*16*  19:*11*
20:*15*  23:*5,*
*22*  25:*23, 24*

26:*2*  69:*24*
70:*7, 12*
243:*14*
275:*8, 9*
281:*23, 24*
**Johnson's**
23:*5*
**journal**
88:*21*
163:*7, 20*
189:*18, 20*
249:*2, 17*
**journals**
230:*16, 20*
232:*16*
**Judge**  10:*8,*
*12*  21:*21*
22:*17*  43:*12*
**JUDITH**
1:*18*  3:*5,*
*16, 21, 23*
4:*3, 5, 9, 12,*
*15, 18*  25:*10,*
*21*  71:*9*
107:*2*
110:*15*
116:*3*
119:*18*
124:*21*
125:*14*
127:*9*
128:*7*
293:*16*
**Judkins**
4:*14*  6:*15*
28:*17*  31:*4*
85:*11, 18, 21*
86:*2, 12*
87:*12, 24*
89:*23*  90:*5*
96:*6, 10, 13*
97:*1, 14, 19*
98:*16*  99:*3,*
*21*  100:*3*

103:*13*
127:*2, 8, 16*
129:*1*
130:*5, 18, 22*
131:*4, 11*
132:*20*
133:*3*
220:*9*
267:*3, 7*
**Julie**  83:*20*
84:*5*
**July**  18:*19*
**jump**
111:*18, 22*
**June**  38:*23*
97:*8*  117:*6*

**< K >**
**Kansas**  2:*19*
**KAY**  1:*18*
3:*5*  25:*10,*
*21*  293:*16*
**keyword**
67:*20*
**Ki67**
227:*22*
228:*11*
**Kim**  241:*1*
273:*1*  289:*7*
**Kimberly**
1:*20*  290:*5,*
*19*
**kind**  104:*8*
238:*10*
256:*13*
**kit**  228:*23*
**kitchen**
27:*14*
**Kleiner**
193:*24*
194:*6, 14*
195:*1*
**know**  13:*10,*
*18*  18:*11*

25:*3*  35:*20*
46:*8*  48:*10*
54:*19*  56:*6*
68:*12, 21*
69:*17, 21*
71:*18*
72:*19*
76:*22*
77:*24*
79:*18*
81:*19*
84:*16*
92:*16, 21*
95:*12, 20*
97:*22*  98:*6*
99:*16, 18*
100:*1*
103:*8, 10, 11*
108:*12, 20*
109:*14*
115:*1, 19*
119:*23*
126:*10*
129:*14*
130:*10*
138:*11*
148:*22*
154:*16, 21*
156:*13*
159:*5*
162:*8, 11, 17*
165:*24*
168:*20*
176:*17*
179:*13, 14*
182:*14*
188:*11, 14,*
*16*  190:*5, 15,*
*18*  208:*23*
216:*17*
217:*3*
219:*24*
220:*1*
226:*15, 17*

228:*17*
229:*9*, *17*
231:*24*
233:2
235:*14*
238:8
242:8, *11*
244:*13*, *19*
245:*3*, *7*
247:22
250:*23*, *24*
254:9
259:*20*
271:2
286:*17*
**knowledge**
20:*14*  88:22

**< L >**
**L.L.P**  2:*16*
**labeled**
279:*18*
**lack**  160:5
**lacking**
137:4

**Laparoscopic**
42:*14*

**laparotomies**
42:*16*
**late**  30:6
98:*13*
**latest**  26:*23*
**LAW**  1:*9*
47:*20*
162:2, *3*, *9*,
*12*, *14*
163:*12*, *24*
189:7
190:*4*, *9*, *18*
195:*21*

**lawyer**
243:*14*
272:5
**lawyers**
231:*20*
272:5
**LAWYER'S**
294:*1*
**lead**  223:*16*
224:2
**leave**  18:*12*
22:5
**leaving**
273:8
**lecture**  45:*9*
**lectures**
45:5  50:6
**left**  28:2
35:2  43:*24*
192:8
**left-hand**
180:22
**LEGAL**
2:*13*  9:22
10:4
**LEIGH**  2:*3*
9:*12*  16:22
23:*19*
27:21
78:22
82:*18*
105:9
121:8
233:*24*
238:8
271:*24*
**leigh.odell@**
**beasleyallen.**
**com**  2:6
**letter**  57:22
**letting**
235:*18*
**level**  132:*20*
134:*10*, *18*

135:*1*, 6, 22
208:*20*, *24*
209:*4*, *21*
**levels**
209:*13*
**Levy**  19:*24*
33:*4*, *12*, *13*
63:*20*
69:*15*
269:*18*
**Levy's**  7:4
17:*13*  19:*9*
29:*14*, *20*
32:*15*
269:*23*
276:4
**LIABILITY**
1:5  26:4
**license**
272:*10*
**lied**  279:*16*
**life**  95:*19*,
*21*  96:*1*
98:*16*, *18*, *20*
**lifestyle**
154:*3*
182:*18*
**lifetime**
179:7
**likelihood**
94:2
**likewise**
125:*23*
**limit**  89:*1*
233:*12*
274:*14*
**limitation**
146:*9*
148:*14*, *17*
150:*22*, *23*
151:*12*
**limitations**
73:*24*
98:*23*

151:4
168:*18*
**limited**  12:4
14:*18*
20:*24*
148:*3*
171:*1*
208:2
212:6
234:*13*, *15*
241:5
**limiting**
22:2  92:5
99:*11*, *23*
**limits**  23:*9*
**Linda**  125:8
**Line**  8:6, *9*,
*13*  144:4
237:*12*
292:*3*  294:2
**lines**  93:*4*,
*14*  161:*21*
218:*3*
**List**  3:*14*
16:2, *5*, *18*
20:6  29:*3*,
*9*  33:*18*
34:*17*, *20*
35:*4*  37:2
44:*3*  71:*1*,
*6*  72:*1*, *7*, *12*,
*16*, *18*  73:*16*,
*18*  74:*9*, *10*,
*11*  79:*5*, *16*
80:8  81:*16*,
*18*  82:*10*, *15*
83:*17*  84:*9*,
*17*  104:*10*
119:*1*
122:*14*
213:*17*
239:2
241:*12*, *14*,
*19*

**listed**  40:*18*
41:22
68:*14*, *24*
69:6  75:7
82:*19*  84:8
85:5
**listing**  57:*24*
**lists**  60:*3*
116:*16*
173:6
184:*20*
**Literature**
7:8  16:*4*, *8*
26:*15*  27:4
28:*4*, *5*, *24*
29:*7*  32:*21*
53:5  65:22
66:*16*, *20*, 22
67:2, *10*, *21*
68:5  72:*15*
74:*11*
76:*14*
104:*6*, *19*, 20
265:*16*
270:*5*, *10*
**LITIGATIO
N**  1:*6*, *12*
10:7  11:*1*,
*2*, *18*, *19*
14:*9*  15:*21*
26:4  47:*5*,
*7*  52:22
57:*1*  61:*2*,
*19*  63:*14*
70:*14*
108:*11*
112:5
189:*17*
220:*16*
230:*24*
233:7
238:*23*
243:*11*
264:22

Judith Kay Wolf, M.D.

272:6
281:*18*
282:*13, 23*
283:*5*
287:*23*
**little**  31:*21*
74:*5*
112:*12*
115:*3*
136:*7*
179:*18*
209:*3*
216:*5*
218:*7*
236:*5*
237:*20*
**live**  138:*21*
**location**
1:*18*
**locations**
138:*12, 14*
**Locum**
137:*12*
**locums**
38:*11*
137:*9, 11*
**lodged**
121:*16*
**log**  114:*20*
**long**  30:*3*
84:*17*
94:*20*
98:*12*
179:*10*
234:6  244:*1*
**longer**
13:*13*
94:*12*
115:*3*
186:*20*
**Longo**
29:*12, 13, 19*
33:*4, 12*
61:*19*

62:*17*
63:*19*
69:*14*
80:*24*
275:*13, 24*
**Longo's**
6:*24*  7:*3*
17:*8*  19:*5,
7, 24*  32:*14*
33:*14*  34:*2*
35:*3*  36:*9*
65:*13*
210:*14*
268:*21*
269:*1, 7, 11*
270:*22*
**long-time**
160:*23*
**look**  31:*21*
34:*5, 8, 11*
35:*18*  36:*2,
12*  54:*20, 23*
64:*3*  75:*22,
24*  83:*11*
91:*17*
113:*12*
118:*19*
140:*9*
141:*5*
152:*14*
157:*15*
161:*4*
169:*22*
171:*18*
173:*18, 23*
174:*1*
175:*22*
177:*22*
182:*24*
183:*22*
184:*1*
188:*4*
190:*23*
198:*8*

200:*11*
201:*14*
214:*7*
218:*1*
219:*7*
231:*11*
234:*5, 22*
238:*5*
242:*10*
244:*24*
245:*14*
246:*7, 18*
248:*2*
249:*23*
256:*10*
259:*21*
278:*11*
279:*18*
**looked**  83:*5*
110:*3*
111:*2*
171:*20*
173:*1, 7*
174:*11*
178:*2, 5*
197:*4*
198:*3*
208:*7*
211:*3*
217:*13*
221:*20*
224:*20*
227:*12*
229:*8*
230:*7*
285:*20*
286:*22*
288:*11*
**looking**
28:*3*  64:*7,
9*  74:*2, 10*
76:*4*  80:*11*
81:*5*  82:*5*
85:*6*

106:*22*
108:*5*
112:*17*
117:*9*
118:*24*
120:*16*
124:*5*
128:*14, 18*
141:*6*
142:*24*
143:*2*
144:*12*
145:*14, 18*
151:*15*
154:*12*
155:*7*
164:*24*
166:*24*
168:*19*
171:*10*
174:*8, 20, 23*
180:*16, 17*
182:*5, 9*
183:*8*
185:*2, 7*
186:*8*
188:*23*
194:*11, 23*
196:*8*
197:*14, 16,
24*  203:*20*
204:*13, 24*
207:*20*
214:*9*
215:*22*
218:*2, 13, 21*
221:*15, 17*
222:*9*
223:*5*
225:*24*
228:*19*
230:*3*
231:*15*
250:*12*

251:*20*
256:*7*
261:*5, 13*
262:*2, 7, 9*
278:*5*
281:*22*
**looks**
161:*18*
186:*5*
227:*19*
**losing**
163:*18*
**lot**  52:*9*
66:*12*  76:*6*
138:*4*
240:*3*
252:*5*  284:*1*
**lots**  179:*9*
216:*21*
**love**  283:*11*
**low**  171:*14*
**lower**
101:*10*
186:*20*
**low-grade**
173:*8*  185:*8*
**lung**  131:*5*
132:*7*
**Lynch**  3:*18*
78:*11, 15*
79:*3*  80:*4,
12, 19*

< M >
**M.D**  1:*18*
3:*5, 16*  4:*3,
6, 9, 12, 15,
18*  25:*10*
71:*9*  116:*4*
119:*18*
124:*21*
125:*14*
127:*9*

128:*7*
293:*16*
**macrophage**
221:*19*
224:*24*
225:*17*

**macrophages**
5:*22*
214:*10*
215:*23*
216:*1, 13, 15,*
*19, 23*
217:*15*
218:*24*
219:*3, 13, 15*
221:*4*
224:*23*
**main**  203:*7*
**major**
237:*8, 10*
246:*17*
**majority**
101:*6*
248:*24*
**making**
75:*1*  242:*2*
**malignancy**
224:*3*
**malignant**
6:*1*  43:*3*
228:*5, 24*
229:*6*
236:*14*
250:*4, 8, 9*
253:*5, 15*
**Mandarino**
5:*19*  105:*2*
213:*17*
214:*2, 12, 15,*
*20, 22*  215:*6,*
*17*  224:*19*
284:*7*

**Mandatory**
5:*13*  206:*21*
**manner**
178:*1*
**manuscript**
248:*4*

**manuscript's**
248:*9*
**March**  97:*7*
**MARGARE
T**  2:*4*  9:*15*
27:*15, 16, 21*
84:*4*  105:*9*
271:*24*
272:*11*
**margaret.tho
mpson@beas
leyallen.com**
2:*6*
**Margaret's**
84:*12*
**MARK**
2:*18*  9:*24*
10:*15*
25:*22*
35:*13*  43:*8*
62:*8*  65:*1*
70:*22*
72:*22*
73:*21*
76:*23*
78:*19*
81:*12*
84:*10*
89:*21*  93:*6*
102:*19*
106:*21*
107:*10*
108:*3*
110:*9*
114:*23*
115:*23*
116:*20*

119:*13*
120:*2*
121:*3*
122:*20*
123:*7*
125:*5, 8*
126:*3, 21*
127:*24*
143:*20*
152:*20*
154:*16*
170:*9*
184:*5*
197:*15*
212:*1*
214:*23*
233:*8, 9*
234:*5, 20*
235:*7*
237:*14*
238:*16*
241:*4*
244:*23*
247:*10*
251:*7*
258:*4*
267:*13, 17*
270:*20*
279:*4*
280:*1, 3*
**Marked**
8:*13*  71:*10*
80:*6*  107:*3*
110:*3, 17*
116:*4*
119:*19*
124:*21*
125:*15*
127:*10*
128:*8*
129:*4, 19*
130:*13*
136:*17*
142:*16*

167:*10*
192:*24*
197:*16*
206:*23*
215:*7*
221:*5*
236:*17, 24*
242:*24*
251:*14*
266:*24*
267:*9, 15*
268:*6, 16*
269:*3, 13, 24*
270:*12*
271:*4*
273:*13*
275:*12*
277:*3*
279:*5*
280:*17*
**marker**
228:*12*
**markers**
227:*21*
**Market**  2:*14*
**MARKETIN
G**  1:*4*  26:*3*
**marking**
124:*13*
**MAS)(RES**
1:*4*
**mass**  143:*8*
153:*15*
**masses**  43:*4*
**Master**
18:*17*
**material**
69:*16*
276:*14*
**Materials**
3:*12, 18*
16:*2, 10, 17*
17:*3, 4, 16,*
*21*  19:*14, 16*

20:*6, 9, 16*
21:*1, 3*
22:*24*
23:*12, 15*
24:*5*  26:*15*
27:*5, 22, 24*
29:*3, 6, 8*
32:*2*  33:*18*
34:*16, 20*
35:*4, 11*
36:*19, 23*
37:*2*  53:*6*
68:*19*  71:*1,*
*6*  72:*1, 7, 17*
73:*16*
78:*10*  80:*4,*
*9*  81:*8, 15,*
*18*  82:*9, 14*
84:*3, 9, 18*
239:*2*
241:*11, 14*
266:*11*
267:*19*
270:*17*
273:*20*
**matter**
56:*15*
**matters**
73:*5*
**MCL**  1:*13*
11:*23*  12:*3*
15:*2, 6*
**McTiernan**
61:*18*
62:*16*  81:*1*
285:*24*
286:*11*
**McTiernan's**
288:*10*
**MDL**  1:*1*
4:*6*  7:*3*
9:*19*  12:*1,*
*22*  14:*7, 19*
17:*10, 11*

26:*6, 17, 23*
28:*13*  34:*3*
37:*8, 20*
49:*18*
50:*21*  51:*4,*
*15*  57:*2, 8,*
*13*  58:*12*
61:*1*  63:*13,*
*24*  105:*17*
106:*6*
108:*11*
110:*22*
111:*4, 8*
112:*5*
119:*19*
120:*17*
127:*24*
129:*22*
166:*12*
188:*18, 21*
220:*4*
230:*24*
232:*15*
269:*11*
271:*3, 16*
272:*6*
**Meadow**
10:*10*
**mean**  29:*1*
44:*13*
82:*24*
84:*10*
97:*23*  99:*2*
104:*23*
108:*20, 22*
113:*17*
121:*9*
132:*22*
149:*16, 17*
150:*3*
157:*22*
210:*17*
222:*4, 13*
232:*3, 11*

234:*2, 3*
254:*9*
258:*12*
265:*13*
**means**
154:*14*
155:*16*
172:*2*
183:*17*
222:*8*
232:*13*
254:*7*
**meant**  99:*4*
**measure**
182:*8*
188:*3*
217:*9, 12*
218:*17*
223:*7*
**measured**
218:*12*
223:*1*
**measures**
200:*2*
**mechanism**
214:*8*
247:*1, 3, 5*
**Medical**
39:*23*  40:*8*
41:*11*
44:*14, 21*
48:*8*  59:*12,*
*21*  60:*10*
66:*15, 19, 21*
67:*2, 9, 21*
68:*4, 9, 18*
85:*11*  86:*3,*
*9, 21*  104:*19*
106:*17*
117:*11*
131:*9, 15*
272:*10*

**medical-
legal**  122:*9,*
*15*
**medication**
182:*18*
**medications**
44:*14*
**medicine**
118:*22*
180:*2*
**meet**  18:*9*
105:*7*
193:*20, 22*
**meet-and-
confer**  10:*22*
**meet-and-
confers**
10:*14*
**meeting**
48:*22*  59:*4*
105:*13*
271:*13*
**meetings**
48:*15*
**member**
10:*5*
**members**
59:*15, 17*
197:*6*
**mention**
156:*1*
168:*23*
273:*21*
**mentioned**
23:*6*  28:*23*
31:*15*  37:*7*
48:*18*  51:*8*
63:*10, 17*
65:*12*
69:*10, 14*
105:*5*
111:*10*
138:*12*
139:*2*

142:*20*
160:*2*
172:*24*
173:*19*
229:*19*
237:*3*  264:*6*
**Merit**  1:*20*
290:*5, 20*
**met**  41:*16*
104:*7*
105:*6*
193:*18*
220:*2*
272:*11*
**Meta-
analysis**  5:*8*
165:*17, 18*
192:*23*
205:*22*
285:*20*
288:*10*
**metal**
131:*13*
132:*16*
**metals**
50:*17*
135:*23*
**methodology**
87:*23*  88:*4,*
*9, 14, 19*
89:*4*  136:*23*
**methods**
140:*16*
200:*5*  201:*1*
**methyl**
222:*18*
**methylating**
222:*2, 3*
**methylation**
221:*24*
222:*19*
**mhegarty@s
hb.com**  2:*20*

**mice**  215:*20*
216:*10*
219:*6, 9, 13*
**MICHELLE**
2:*9*  9:*17*
24:*16, 24*
105:*10*
162:*14*
**middle**
122:*1*
**midway**
206:*2*
**migrate**
223:*19*
**milligrams**
179:*15, 16*
**mind**  64:*24*
82:*21*
120:*3*
123:*16*
134:*12*
170:*9*
203:*15*
**mine**  45:*8*
135:*18*
**minimal**
248:*3*
**minimum**
201:*12*
**Minneapolis**
40:*12*
**Minnesota**
40:*12*
**minute**  34:*9*
75:*22*
96:*11*
139:*23*
206:*9*
**minutes**
25:*2, 3*
35:*21*  63:*1*
115:*1*
234:*8*
244:*22*

245:*21*
274:*18*
285:*11, 13*
**misogyny**
48:*9*
**missed**  65:*2*
120:*4*
**Missouri**
2:*19*
**misstates**
194:*16, 17*
195:*4*
257:*4*
263:*2*
282:*16*
**mixed**  185:*9*
**model**
65:*24*  66:*11*
**models**
230:*1, 9*
**molecular**
247:*3*
**moment**
35:*14*
83:*23*
110:*3*
116:*20*
123:*6*
126:*5*
129:*4*
145:*24*
212:*1*
280:*9*
288:*22*
**Monday**
107:*19*
108:*1*
**money**
195:*21*
**Montana**
39:*1, 8*
40:*15*
117:*17*

**Montgomery**
2:*5*
**month**
38:*13, 24*
42:*10, 13*
**monthly**
42:*7*
**Moorman**
188:*14*
189:*6*
190:*9, 16*
191:*1*
281:*15, 16*
286:*23*
**morning**
12:*8, 16*
18:*8*  19:*22*
21:*5*  24:*6*
25:*17, 18*
**mouse**
215:*18*
216:*7, 12*
218:*24*
221:*21*
**move**  35:*6*
**mucinous**
171:*16*
172:*18*
173:*9, 20*
185:*9*
**multicounty**
11:*2, 18*
14:*8*
**multidistrict**
10:*7*  11:*1,*
*19*
**multiple**
38:*11*  79:*7*
**mutated**
254:*24*
**mutation**
77:*15*
222:*9, 21*

**mutations**
76:*13*
103:*14*
222:*14*
254:*14, 18*
**Mutch**  91:*6,*
*23*  92:*23*
**Mutch's**
91:*11*  93:*7*
**Myriad**
102:*9, 16*

**< N >**
**name**  25:*20,*
*22*  41:*12, 14,*
*18*  45:*7, 17*
72:*18*
116:*9*
121:*24*
225:*19*
**named**  79:*1*
104:*20*
**names**
40:*24*
51:*10*
105:*3*
137:*14*
**National**
58:*18*
59:*13*  162:*5*
**naturally**
216:*4*
**nature**  9:*6*
**NCI**  264:*1,*
*9, 14, 23*
265:*4, 12*
**NCI's**  53:*21,*
*24*
**nearly**
17:*23*  23:*6*
**necessary**
229:*12*
291:*4*

**need**  22:*20*
34:*4*  38:*12*
41:*7*  75:*21*
91:*16*
93:*18*
129:*14*
131:*23*
137:*18*
230:*12*
239:*4*
242:*22*
250:*15*
276:*10*
**needed**
37:*14*
138:*16, 18*
200:*7*
272:*8*
274:*2*
275:*17*
**needs**  234:*8*
244:*7, 8, 12,*
*13*  245:*2, 14*
258:*6*
**negative**
204:*11*
**Neither**
20:*13*
290:*14, 15*
**neoplastic**
250:*14*
**neutral**
228:*19*
**never**  49:*24*
220:*1*
233:*3*  261:*9*
**nevertheless**
282:*19*
**NEW**  1:*1, 6*
10:*11*
12:*21*  14:*8*
15:*20, 21*
26:*8, 24*
28:*5*  65:*22*

74:*12*
75:*19*
77:*14*
104:*24*
118:*4, 11*
130:*15, 23*
131:*1*
132:*3*
135:*12*
140:*22, 23*
211:*13, 14*
216:*9*
286:*6, 8*
**NHS1**
258:2  260:8
**nice**  115:7
**Nicollet**
40:*11*
**nights**  10:*22*
**NIH**  67:*6*
164:2
**NJSC**  12:*21*
**nongenital**
157:*18, 23*
158:*18*
160:*3*
**non-ovarian**
52:*16*
**nonstatistical**
**ly**  201:*24*
202:*10*
204:*10*
**non-talc**
170:*18*
**normal**  6:*2*
92:2  228:6
236:*14*
255:*1*
**Notary**  1:*21*
290:6, *21*
293:*23*
**note**  14:*24*
15:*1*  18:*17*
121:*23*

198:9
273:17
277:21
**notebook**
64:3, 9
116:21
123:11
**noted** 18:19
291:11
293:11
**notes** 36:22
119:7, 8
294:1
**Notice** 4:3
19:20 21:4,
9 23:3
24:4, 6
117:4
119:14, 17,
24 120:16,
21 121:14
**noticed**
14:20
121:24
**notices** 19:3
**Notification**
5:14 206:21
**noting**
141:12
**novel**
254:18
**November**
16:11 17:7,
11 19:6, 8,
10 28:12
29:19, 20
30:6 31:22
32:14
63:21 69:1
71:2 72:2,
8 97:2
113:21, 22
115:16
122:22

124:8, 16
126:1
127:15
128:20
136:9
178:16
264:4 269:7
**Nowak** 5:15
135:14
205:21, 23
206:7, 12, 22
209:15
212:12
**null** 155:17
170:5, 16
172:1
**number**
10:13, 19
18:18
22:17
76:11
77:18
80:23
82:16, 19
83:11
84:13, 15
114:17, 21
120:3
121:16
122:8
149:11
150:13
157:16
165:16
171:11
172:9
175:19, 24
179:7
183:19
204:8
216:18
246:8, 18
247:14, 15
248:2

251:22
252:17
**numbers**
143:18
154:24
158:5
169:21
172:11
173:19
174:12, 21
175:15
176:22
185:4
198:1
251:6
259:21, 22
260:3, 4, 5, 7,
10, 18
263:16
**Nurses**
196:22
197:2
198:24
199:1, 17
258:24
259:4
263:20
265:21
**NW** 2:9

**< O >**
**O2** 218:19
**object**
15:11, 13, 19
20:22 22:1
32:5 53:14
61:21 65:9
69:3 76:20
81:23 93:6
97:3 98:2
99:14
103:16
107:12
133:7

134:4, 21
135:9
136:2
140:6
144:24
147:14
148:5
149:14
155:19
158:20
163:1, 14
165:2, 20
172:5
175:10
177:9
178:24
180:11
181:12
199:14
204:4
217:1
222:15
224:8
229:15
231:6
232:8
237:12
248:19
253:11
256:18
257:3
261:3
264:16
266:6
287:12
288:4
**Objection**
33:20 57:3
59:24 62:9
81:13 89:8
91:14
104:13
150:20
151:20

152:6
153:9
156:17
158:2
159:14
169:4
170:19
175:9
176:13
182:11
191:15
194:15
195:3
196:5
197:11
198:21
200:17
202:17
207:16
208:9
209:18
210:9
212:13
224:21
257:14
259:9, 18
263:1
276:18
282:4, 15
285:1
**objections**
121:6, 16, 20
**O'Brien**
165:6, 11
196:3, 14, 16,
18 198:18,
23 199:3, 5,
9, 11, 18
**observed**
211:19
**obstacle**
238:12
**obstetrics**
44:22

obviously
24:9  242:17
**OCAC**
140:11
141:2  156:7
**occasionally**
42:18
66:10  67:12

**Occupational**
5:12
206:20
207:11, 14
208:3, 20, 24
209:4, 24
210:4
**occurred**
43:17
240:22
245:24
272:22
289:5
**October**
110:1, 10
112:19
113:20
117:7  264:1
**odds**  150:9
155:3, 9
157:17
171:6
173:16
174:5, 17
175:2
185:14
186:8, 13
187:7
203:3, 21
205:5
209:6
256:14
**O'DELL**
2:3  3:6
9:12  16:14

17:1  19:5
21:14
22:15
24:12
27:21  32:5
33:20  34:4
35:13  36:7
43:8  53:14
57:3  59:24
61:21  62:6,
18  64:6, 24
65:9  69:3
72:21  73:4,
12, 21  74:4
75:21
76:20
78:19, 23
81:12
82:11, 20
83:4, 10, 15,
22  84:10, 15
86:16  87:1
89:8  90:3,
15  91:14
93:5, 15
97:3  98:2
99:2, 14
102:18
103:16
104:13
105:9
107:10
108:12
109:11
111:4, 9
113:10
114:23
116:19
120:2, 7
121:3, 15
123:6, 16
125:4
126:3, 12, 17
131:22

133:7
134:4, 12, 21
135:9
136:2
140:6
143:16
144:24
147:14
148:5
149:14
150:20
151:20
152:6, 19
153:9
154:15, 20
155:19
156:17
158:2, 9, 20
159:14
163:1, 14
165:2, 20
169:4
170:8, 19
171:3
172:5
175:9
176:13
177:9
178:24
180:11
181:12
182:11
184:4, 9
191:15
192:3
194:15
195:3
196:5, 10
197:11, 15,
19  198:21
199:14
200:17
202:17
203:6, 11, 14,

17  204:4
206:1
207:16
208:9
209:17
211:24
212:13
213:21
217:1
222:15
224:8, 21
225:10
229:15
231:6
232:8
233:8, 16
234:1
235:7, 11, 16,
19  237:11
238:16
239:10, 15
240:24
242:8
243:9
244:10, 23
245:20
247:10, 15
248:19
253:11
256:18
257:3, 14
258:4, 10
259:9, 18
261:3
263:1
264:16
266:6
267:12, 21
270:20
271:24
274:10, 24
275:5
276:20

278:23
279:4, 11, 23
280:20, 23
281:3
282:9, 18
283:6
285:3, 10, 14
287:12
288:4, 24
**O'Dell's**
16:15
**offer**  70:20
77:4  265:8
**offered**
101:24
247:24
**offers**
102:17
**offhand**
114:22
165:24
**officer**
82:13
**oh**  84:5
97:6
198:10
206:3
216:17
235:14
258:20
**Okay**  32:12
36:15
73:12
79:13
83:13
89:24
90:17  96:8
106:16
113:14
115:8
121:21
122:5
123:19
126:12

140:*1*
144:*3*
154:*18*
166:*5*
167:*13*
171:*4*
189:*2*
192:*3, 4*
202:*8*
203:*7*
206:*3*
213:*15*
214:*19*
235:*16*
247:*17*
255:*4*
259:*6*
266:*15*
267:*21*
274:*20*
279:*4, 13, 21*
280:*22*
**Oklahoma**
45:*6, 13, 16*
**old** 81:*24*
89:*14*
90:*21, 23*
96:*10*
**older** 76:*7*
**once** 61:*8*
182:*7*
183:*6, 7, 10, 13, 23*
184:*14, 21, 22* 185:*18*
187:*1*
261:*9, 21*
**oncologist**
41:*7, 12, 24*
91:*5* 96:*22*
**oncologists**
94:*22* 266:*1*
**Oncology**
6:*9* 45:*10*

48:*10*
137:*5, 8*
140:*14*
251:*5, 10*
**ones** 108:*8, 9* 109:*1*
165:*24*
265:*14*
**online**
66:*21, 24*
67:*8*
**open** 18:*4*
22:*6* 273:*8*
**operating**
45:*1*
**operation**
42:*18*
**opinion**
18:*18*
30:*21*
31:*17, 18*
32:*23* 51:*1*
53:*10*
75:*13* 82:*3*
83:*12*
92:*13, 17, 20*
94:*1* 97:*18, 21, 24* 98:*5*
102:*24*
140:*15*
144:*20*
145:*3*
148:*19*
188:*4*
189:*12*
191:*9*
205:*17*
208:*19*
209:*4*
211:*16*
226:*8*
251:*2*
253:*19*
257:*11, 17*

266:*3*
275:*21*
276:*9, 11, 12*
284:*9*
**opinions**
19:*1* 20:*12*
26:*7* 27:*1, 5* 30:*19, 21, 22* 31:*2, 3, 9, 13, 14* 46:*12*
50:*21*
51:*14* 57:*1, 8, 13, 17*
58:*10* 59:*5*
68:*13, 23*
69:*19*
70:*19*
76:*19, 23*
77:*3* 78:*2*
86:*12, 24*
87:*10, 14, 18*
88:*15* 89:*6*
95:*18*
98:*15, 20, 22*
99:*10, 20*
102:*15*
118:*13*
123:*15*
130:*8*
140:*22, 23*
159:*10*
160:*12, 15*
166:*18*
168:*3*
194:*3*
205:*12*
207:*6*
210:*6*
213:*4*
219:*1*
220:*8*
221:*13*
227:*8*
249:*13*

265:*7, 10*
275:*17*
288:*2*
**opportunity**
24:*3* 35:*18, 24* 36:*2*
81:*21*
233:*18*
239:*24*
240:*9* 241:*8*
**opposed**
263:*19*
**Oral** 1:*13*
4:*3* 119:*17*
**oranges**
260:*20, 24*
**order** 18:*18*
22:*18, 22*
23:*9* 82:*4*
274:*13*
276:*15*
289:*12*
**ordered**
18:*20*
**organization**
48:*6, 15*
59:*21* 60:*11*
**original**
95:*1* 291:*15*
**originally**
14:*20*
**outlined**
250:*19*
**outrageous**
248:*8, 18*
**outside**
46:*9* 47:*4*
56:*24*
138:*21*
189:*8*
191:*20*
272:*12*
**outstanding**
35:*2*

**ovarian**
4:*20* 5:*1, 2, 7, 11, 18* 6:*2*
7:*11, 12*
42:*24* 43:*4*
44:*6, 11, 18*
45:*2, 21*
46:*1, 6, 13*
47:*10, 19*
49:*7* 51:*2, 6* 52:*4, 8, 10, 14* 53:*13*
54:*4, 9, 12*
55:*4, 14*
56:*5, 6, 10, 12, 16* 57:*18, 24* 58:*11, 18*
59:*5, 13, 23*
60:*2, 12, 13, 20* 61:*3, 15, 20* 63:*15*
64:*18*
65:*24* 66:*7, 10, 12* 67:*24*
77:*16* 91:*1*
92:*15, 19, 22*
94:*4, 14*
95:*7* 97:*15, 20* 99:*22*
100:*15*
101:*7, 21*
102:*4*
112:*6*
130:*10, 22*
131:*21*
134:*11, 19*
135:*8, 16*
136:*1*
141:*4, 9, 13, 19* 142:*4, 14, 22* 143:*7*
144:*8*
145:*6*
152:*9*

154:*3*
156:*9*
157:*1, 5, 7,*
*24* 160:*16*
167:*7, 8, 19,*
*24* 168:*4, 15*
169:*14*
170:*1*
173:2, *10*
175:*6*
176:*9*
177:*23*
179:*4*
186:*21*
192:*21*
204:*16*
206:*19*
207:*8*
208:*21*
209:*6*
210:*8, 13, 18,*
*21* 211:*4, 20*
212:*10*
213:*8*
215:*5, 20, 23*
216:*4, 11*
219:*2*
221:*16*
224:*7*
225:*1, 17*
226:*9, 11*
227:*14, 17*
228:*7, 15*
229:*20*
230:*2, 5, 10*
236:*15*
248:*7*
252:*7*
253:*4*
262:*5, 16*
264:*23*
265:*5, 18*
266:*4*
280:*14, 15*

281:*19*
284:*18*
**ovaries**
230:*4*
**ovary**
167:*22*
248:*6*
**overall**
198:*19*
**overinterpret
ed** 253:*8*
**overlooked**
36:*9*
**oxidative**
219:*19*
**oxide** 218:*5*
226:*5*
**oxygen**
217:*14*
218:*2, 12, 18*
284:*21*

**< P >**
**p.m** 115:*11*
192:*6*
246:*3*
274:*23*
289:*15*
**p53** 227:*21*
228:*14*
254:*13, 16,*
*23* 255:*1*
**PAGE** 3:*12*
8:*6, 9, 13*
72:*4* 80:*11,*
*22* 85:*5*
110:*7*
116:*16*
117:*19*
120:*10*
124:*5*
125:*24*
127:*14, 19*
128:*13, 14*

136:*21*
139:*8*
143:*3, 13, 18,*
*19* 160:*20*
161:*5*
164:*12*
166:*4*
180:*17*
189:*1*
204:*14*
205:*19, 23*
206:*1*
213:*14, 20,*
*21, 22, 24*
220:*12*
246:*17*
251:*22*
252:*17*
255:*9*
262:*15*
277:*4, 6, 8*
278:*19, 23*
279:*14, 15*
281:*9*
283:*14, 15,*
*16* 285:*20*
292:*3* 294:*2*
**Pages** 3:*19,*
*23* 106:*21*
107:*1*
110:*15*
113:*19*
124:*1*
143:*14*
244:*18*
245:*5* 293:*6*
**paging**
180:*18*
**paid** 105:*22*
114:*9*
230:*23*
231:*4, 16, 17,*
*20* 283:*3*
287:*15, 21*

**panel**
100:*14, 16,*
*22* 101:*21*
102:8, *12, 16*
103:*4*
**Paper** 4:*22*
5:*3, 9, 15, 19,*
*22* 6:*3*
7:*14* 49:*21*
67:*13*
140:2, *10, 12*
141:*5*
142:8, *15, 22*
143:*1*
146:*1*
149:*12*
150:*1*
151:*4, 6, 7, 8,*
*10* 152:2, *23*
156:*7*
159:*10*
160:*17*
162:*24*
166:*19*
167:*9*
168:2, *7, 24*
171:*11*
175:*5*
176:*18*
182:*4*
188:*1, 14*
189:*24*
191:2, *8, 12,*
*23* 192:*23*
195:*19*
199:6, *9, 17,*
*19* 200:*2*
206:*7, 12, 14,*
*22* 208:*16*
209:*15*
210:*3, 12, 20*
211:*3, 6, 8,*
*10, 15, 17, 18*
212:2, *9*

215:*6*
220:*22*
221:*5, 9, 12,*
*15* 222:*24*
224:*20*
225:*4, 19*
226:*24*
227:*10*
228:*1, 4, 9,*
*11* 229:*13*
230:*16, 20*
231:*3, 10*
232:*7, 17, 19*
233:*1, 3*
234:*12*
236:*16*
237:*5*
248:*14*
249:*12, 16*
250:*11*
251:2, *17*
255:*14, 17,*
*20* 256:*5, 7*
257:*12, 23*
259:*8, 13, 23,*
*24* 260:*2, 6,*
*9, 13* 261:*1*
263:*18*
272:*16*
278:*6, 18*
280:*7, 16*
281:*5, 21, 22*
282:*2, 13, 22*
286:*5, 22, 23*
287:*2*
**paperclip**
237:*20*
**papers**
104:*24*
166:*9*
200:*20*
214:*15*
225:*15, 16*
229:*10*

248:*23*
249:*4, 19*
286:*6, 8*
**paragraph**
72:5 73:*19*
136:22
137:*1*
139:*9, 13*
152:*15, 18, 23* 153:*1, 5*
164:*17, 23*
200:*12*
205:20
212:*19*
213:*16, 24*
214:5
226:20
249:23
250:*1*
283:*15, 17, 18, 19* 284:6
**paragraphs**
73:*19*
74:*11*
119:*1*
121:2
161:*10, 17*
166:7
180:*23*
**PARFITT**
2:9 9:*17, 18* 24:*15, 17*
25:5
105:*10*
162:*14*
**Park** 40:*11*
**part** 15:7
44:*23*
54:22, 24
61:*10*
78:*11*
105:*10*
106:*18*
119:8

126:*24*
129:2
145:*19*
164:*11*
176:24
194:24
248:*16*
257:23
258:23
259:4
262:*10, 15*
**participants**
170:*21, 23*

**participation**
191:*14*
**particle**
226:*13*
**particles**
5:22 221:*4*
223:2
225:22, 23
**particular**
26:5 32:*1*
41:8 53:*19*
72:*13*
101:*21*
102:24
120:*19*
173:6
276:5, *23*
**particularly**
41:*20* 168:*3*
**parties** 9:*3, 9* 290:*15*
**part-time**
38:*10*
**patent**
197:23
199:*13*
201:*19, 22*
202:6, *7*
**pathologic**
146:*16, 19*

150:*17*
172:20
**pathologicall
y** 149:2
**pathology**
148:*11*
**pathway**
173:*21*
**patient**
51:*24* 52:*4, 5, 17* 54:*3, 8, 17, 20, 21*
55:22
94:*13* 98:8
100:*19*
101:*1, 2*
141:22
145:4
147:9 149:5
**patients**
44:6, *12*
45:*3, 23*
46:*1, 4, 20*
51:*15, 19, 20*
52:6, 8, *10, 13, 14, 20*
53:*1, 20, 24*
54:*13* 55:4
56:2, 9, *16, 18* 77:7, 8
94:6, *15, 23*
95:6, *10, 14*
98:*11*
100:*15*
101:7, *14, 22*
103:20
106:*18*
123:2
147:2, 6, *20*
149:*10, 24*
150:7, *13*
155:2
157:*24*
159:*12, 16,*

*19* 171:*12*
173:7
175:*18*
197:5
199:8
263:*17*
276:6
**patient's**
46:*9* 55:*1*
102:2
**Patricia**
188:*14*
281:*15, 16*
**pause** 9:7
64:5 71:*16*
90:8 96:*12*
116:22
136:*12*
139:24
145:*15*
165:*1, 4, 9*
166:22
205:2
206:*10*
226:2
227:*3*
231:8
255:*21*
261:*15*
**pay** 101:*16*
103:22
**payment**
161:6 162:*1*
**payments**
164:5
**pays** 138:*23*
**PDF** 237:*17*
**PDQ** 53:*21, 24* 264:*1, 10, 14, 19, 23*
265:5, *12*
**peer** 232:5, *18* 248:*17*

**peer-
reviewed**
249:*16*
**peers** 50:*6, 23*
**pejorative**
234:*14*
**penetrance**
101:8

**Pennsylvania**
2:*15* 39:*23*
40:9
**people**
146:22
179:9
260:*21*
**percent**
44:8 46:2
93:2 94:2
168:7
204:*1, 18*
205:7
**percentage**
44:*4* 45:*19*
98:9 150:7
168:7
216:*23*
**perfectly**
238:*17*
239:6
**perform**
42:2, 7, *12*
**performed**
194:*11, 23*
**Perineal**
5:6 192:*20*
204:*17*
**perineally**
210:7
**period** 24:*1*
39:2

person
105:8
242:14, 15
personal
189:7
Personally
250:8, 23
pertain
20:10
pertains
128:20
207:10
pertinent
75:12
ph 1:23
phagocytes
5:17 215:4
phenotype
250:18
phenotypic
253:24
Philadelphia
2:15
phone 61:6
62:24
112:10
114:21
phrase
15:11
Phung 4:22
77:21
105:2
139:15, 17,
21 140:2, 5
142:16
144:13, 21
156:2
physical
28:20 29:2
physician
41:8 50:8,
22 272:9
physicians
41:1 147:21

physiologic
254:18
picked
111:23
piece
205:17
213:6
232:1
272:15
Pier 83:21,
24 84:5
pigs 66:9
229:21
place 14:14
131:24
203:18
272:12
290:11
places
38:12 41:5,
19
Plaintiffs
2:7, 11, 16
9:14, 19, 23
10:5 14:4
17:2, 9, 10
18:20
20:11 24:2
28:15, 16
31:14, 18
33:3, 8
52:21
56:24 78:8
89:5 105:6,
20 106:5
127:23
133:21
134:2
160:23
162:21
188:18
189:15
193:15
220:4

230:23
231:4, 21
266:2
271:15
272:6
274:6
275:14, 15
283:4
287:22
288:15
plan 49:20
plans 32:17
38:17, 18, 21
39:6 49:14
50:1 58:6
please 9:7,
10 25:19
71:17
79:18
82:17, 18, 23
115:18
119:22
134:13
136:10, 21
139:8
143:24
152:14
153:23
157:15
164:9
166:3
189:3
196:10
205:19
213:13
214:13
220:21
223:23
226:19
241:22
247:5
283:13
291:3, 8

PLOS 6:5
236:20
246:15
P-L-O-S
246:15
plot 277:8,
17 278:16,
18 279:1
plus 185:10
point 13:11
32:20 62:5
82:15
83:20
156:20, 21
161:7
242:2
254:16
258:8
pointed
41:20
pointing
284:15
points
101:12
pooled
164:19, 22
165:7
portion
231:18
241:5
245:9
278:24
Porto 10:12
position
12:19
13:10
16:23 18:1,
7 243:2
274:7, 12
positions
137:18
positive
204:11

possess
250:18
possession
17:22 23:5
81:9, 11
possible
60:4
potential
214:8
221:15
229:12
POWDER
1:4, 11
4:22 5:7,
24 7:10
26:2 37:17
47:10 49:2,
11 50:8
51:21 52:1,
21 53:12, 22
54:5, 10, 18
55:2, 23
56:3, 11, 18,
19 61:3, 14,
20 63:15
64:1, 18, 22
65:7, 19
68:1
110:22
112:6
114:3, 19
130:9
132:21
133:6
143:9
156:4, 15
157:1, 3
160:24
164:6
167:6, 19
168:9
169:15
170:2
176:10

Judith Kay Wolf, M.D.

179:*4, 17*
180:*1*
181:2, *3*
190:*11, 17,*
*20* 192:*21*
193:*15*
195:*18*
199:*21*
200:*14*
204:*17*
208:*17*
209:*13, 23*
210:*7, 16*
214:*7, 11*
216:*23, 24*
219:*2, 8, 17*
221:*16*
228:*5*
236:*13*
247:*1*
248:*6*
252:*10*
253:*3*
266:2, *4*
280:*13*
283:*4*
287:*23*
**powders**
5:*17* 215:*4*
**Practical**
5:*14* 206:*21*
**practice**
95:*5* 276:*13*

**PRACTICES**
1:*5* 26:*3*
**predict**
223:*8, 12*
**predictions**
96:*1*
**predisposed**
101:*6*
**prefer**
101:*22, 24*

**preinvasive**
43:*5*
**preparation**
129:*18, 20*
130:*2*
191:*12*
271:*12*
**prepare**
73:*15*
104:*3, 12, 21*
105:*13*
285:*21*
**prepared**
16:*12*
17:*17*
20:*18* 21:*7,*
*10, 11* 26:*22*
27:*3* 34:*19*
36:*22*
47:*18*
78:*24*
114:*13*
119:*7*
215:*15*
234:*23*
238:*24*
285:*23*
**preparing**
130:*3*
178:*10*
**presence**
64:*23* 65:*8*
**Present**
6:*13, 16, 19,*
*22* 7:*1, 4, 6*
140:*22*
141:*20*
152:*11*
238:*12*
266:*23*
267:*8*
268:5, *15*
269:2, *12, 23*

**presentation**
48:*20*

**presentations**
50:5, *15*
**presented**
48:*21*
**presume**
161:*24*
**presumed**
148:*3*
**pretty** 83:7
84:*11*
159:*1*
225:*16*
**Prevention**
189:*19*
**previous**
33:*14, 15*
63:*10*
100:*16*
129:*22*
164:*20*
196:*21*
210:*15*
265:*14*
**previously**
16:6, *7*
43:*10*
72:*12* 76:*8*
81:*22*
83:*18*
100:*20*
108:*13*
133:*9*
136:*17*
147:*10*
267:*14*
**primarily**
221:*19*
**primary**
6:*2* 228:*6*
236:*15*

**principle**
11:*6*
**Prior** 33:*10*
37:5, *10*
74:*10* 92:*5*
98:*24*
99:*10, 21*
101:*3*
107:*13*
108:*7*
111:*10*
130:*4*
139:*14*
144:*13*
166:*12*
290:*7*
**privilege**
62:*2*
**privy** 249:*6,*
*18*
**Probably**
30:*16*
40:*19, 23*
42:9 44:*7*
68:*7* 95:*6*
146:*14*
150:*2*
165:*12*
216:*18*
237:*21*
274:*17*
**problem**
185:*1*
242:*20*
**procedure**
242:*4*
**proceed**
21:*18*
**process**
141:*8*
248:*17*
**processes**
157:*12*

**produce**
18:*21* 22:*24*
**produced**
69:*23* 70:*6*
72:*12*
84:*19*
113:*8*
121:*10, 12*
232:*5*
238:*22*
**product**
62:*1* 247:*4*
**Production**
8:*8* 217:*14*
**PRODUCTS**
1:*4, 5, 11*
5:*7* 26:*3, 4*
192:*21*
213:*10, 11*
**professional**
23:2 46:*24*
48:*15*
**program**
44:*22* 45:*6,*
*15* 237:*17*
**progress**
49:*10*
**proliferate**
223:*18*
**proliferation**
221:*18*
227:*21*
228:*12*
247:*19, 21*
253:*16*
284:*14*
**prominent**
217:*21, 23*
**proof**
146:*16*
**proper**
162:*22*
180:*8, 14*

195:*18*, *20*
282:2
**properly**
273:*19*
**propounded**
293:9
**prospective**
146:*22*
169:8
**protected**
62:*1*
**protective**
160:*4*  204:*2*
**protects**
157:*23*
**prove**
146:*12*, *13*,
*24*  147:*24*
148:*23*
149:*1*
**provide**
15:2  16:*24*
24:*3*
130:*20*
131:*19*
137:7
239:*4*, *17*
243:*3*
245:*13*
**provided**
11:*23*  16:*5*,
*11*  17:*3*
19:*15*, *19*
20:*7*, *8*
33:9  44:*3*,
*11*  48:*4*
53:5  78:7
80:9
104:*11*
106:*12*
107:*16*, *23*
108:*7*, *14*, *15*
109:*5*, *12*, *18*
111:8

115:*15*
120:*23*
121:*5*, *18*
122:7, *21*
196:*19*
220:*15*
232:*15*
233:7  248:*4*
**provider**
38:*11*
**providing**
20:*5*  78:*2*
**Public**  1:*21*
7:*10*  280:*6*,
*12*  281:*4*
286:*21*
290:*6*, *21*
293:*23*
**publication**
49:*22*
80:*19*
119:*1*
219:*12*
286:*16*
**publications**
49:*1*, *5*, *15*
89:*3*
118:*17*
119:2
198:*16*
**publish**
118:*23*
196:*17*
248:*24*
**published**
32:*21*
59:*22*  76:*1*
79:*4*  88:*21*
200:*21*
232:*3*
249:*16*
**publishing**
232:6

**PubMed**
67:*5*, *13*
**pull**  151:9
238:*4*
244:*11*
278:*22*
279:9
286:*13*
**pulled**
122:*17*
245:*8*
**pulling**
116:*21*
123:*10*
**purpose**
12:4  124:*12*
**purposes**
11:*20*
20:*17*
24:*21*
30:*18*
66:*17*  67:*3*
68:*23*
70:*18*
126:*14*
136:*16*
159:9
160:*12*
183:*17*
200:*1*
205:*12*
**pursue**
241:*21*
273:*18*
**put**  15:*24*
79:*8*  93:*1*,
*19*  178:*18*
185:*22*
190:*3*, *6*
199:*19*
233:*11*
238:*1*, *2*
240:6
241:*2*, *5*

243:*15*, *21*
255:2
274:*10*
280:*4*
**putting**
95:*23*
106:*17*
149:*1*
156:*20*, *21*
212:8
260:*23*

< Q >
**qualified**
182:*17*
**qualitative**
133:*1*
**quantify**
132:*19*
133:*1*, *4*
**quantifying**
133:*22*
**quantitative**
133:*2*
**query**
250:*10*
**Question**
8:*13*  20:*19*
34:*12*  35:*1*,
*19*  36:*1*, *4*
40:*21*
50:*11*  62:*4*,
*12*, *13*  65:*1*
66:2  68:*16*
70:*3*  74:7
82:*1*  86:*14*
93:*10*, *17*
99:6
111:*13*, *16*
133:*14*, *17*,
*20*  134:*13*
135:*20*
159:*23*, *24*
170:*10*, *24*

181:*15*
186:*1*, *2*
194:*20*
196:*11*
203:*15*
207:*22*
209:*2*, *9*
212:5
217:5
226:*18*
247:*12*
258:7, *17*, *22*
262:*13*
278:7
282:*3*  284:5
**questioning**
237:*13*
274:9
282:*17*
**questions**
17:*17*
23:*14*  44:*1*
55:*12*, *15*
86:*17*
89:*20*, *22*
179:*11*
190:*23*
233:*20*
234:*4*, *7*, *24*
235:*22*
238:7, *24*
239:*3*, *11*
240:*15*
243:8
245:*16*
274:*16*
275:7
276:*22*
284:*1*
285:*4*
288:*21*
293:8
**quick**
233:*22*

quickly
74:*1*
123:*18*
277:*6*
quite  95:*8*
quote  91:*15,*
*19*  98:*8*
146:*8*
182:*14*

< R >
raised  12:*9*
range  92:*2*
200:*13*
205:*6*
rare  230:*9*
rate  106:*5*
186:*12*
ratio  155:*3*
173:*16*
174:*5, 17*
175:*3*
186:*13*
201:*23*
202:*9*
203:*3, 21*
205:*5*  209:*7*
ratios  150:*9*
155:*9*
157:*17*
171:*7*
185:*15*
186:*9*
187:*7*
256:*14*
raw  207:*15,*
*19*  208:*1*
reach  15:*5*
24:*10*
137:*17*
138:*7*
275:*17*
reached

57:*16*  265:*3*
react  222:*6*
reaction
217:*9*
reactive
217:*14*
218:*2, 12, 18*
219:*18*
284:*21*
read  75:*6, 9,*
*10, 14*  76:*8*
146:*6*
181:*10*
194:*5, 6*
215:*13*
225:*15*
233:*3*
244:*20*
249:*19, 20*
291:*3*  293:*5*
reader
156:*12*
190:*7*
reading
144:*18*
174:*14*
189:*10, 16*
190:*22*
204:*20*
262:*11*
264:*19*
276:*14*
reads
250:*14*
ready  22:*13*
96:*9*  241:*20*
real  233:*22*
really  41:*6*
54:*20*
59:*17*  61:*9*
73:*22*
79:*10*
81:*13*  82:*2*
108:*5*

249:*8*
261:*17, 18*
reason
55:*17*
149:*20*
245:*5*  291:*5*
reasonable
243:*18*
247:*23*
reasons
249:*21*
Rebecca
193:*13*
283:*2*
recall  30:*2,*
*15*  32:*3*
33:*5, 6*
34:*1*  37:*23*
40:*24*  45:*7*
46:*15*
49:*23*  51:*9*
53:*17*  54:*1*
57:*5*  58:*2,*
*4, 19, 20*
59:*9, 14*
60:*22*
62:*24*
65:*21*
67:*19*  70:*2*
72:*20*
78:*17*  92:*8,*
*9, 23*  93:*3,*
*13, 15, 21*
95:*8*  100:*6,*
*24*  104:*18*
105:*4*
110:*2*
111:*19*
114:*17*
139:*19*
151:*19, 23*
166:*16*
168:*22*
193:*11*

207:*4*
211:*5*
259:*15*
282:*3, 6, 10,*
*14*  288:*19*
receipt
291:*17*
receive  21:*4*
29:*22*  33:*7*
163:*12*
received
21:*8*  30:*4,*
*10*  105:*17*
164:*5*
190:*9, 19*
281:*17*
receiving
30:*9*  33:*10*
195:*21*
recess
43:*19*
115:*10*
192:*5*
246:*2*
274:*22*
recognize
73:*24*
recollection
52:*7*  53:*7*
59:*16*  85:*8*
100:*23*
217:*20*
recommend
56:*14*
recommende
d  100:*19*
recommends
60:*4*
252:*20*
253:*1*
reconcile
200:*24*
record  9:*11*
12:*10*  13:*9*

15:*1*  16:*1,*
*16*  21:*20*
43:*11, 14, 16,*
*22*  115:*9, 13*
124:*12*
126:*4*
136:*16*
147:*12*
192:*2, 8*
194:*16*
233:*22*
234:*3, 9*
240:*17, 18,*
*19, 21*  241:*1,*
*2*  244:*8, 9*
245:*3, 18, 19,*
*23*  246:*5*
272:*19, 21*
273:*1, 2, 7,*
*22*  274:*11*
275:*1*
289:*1, 4*
recorded
131:*8*
records
85:*11, 19, 24*
86:*3, 9, 21*
91:*20, 21*
92:*4*  96:*24*
106:*17*
130:*16, 17,*
*20, 23*  131:*2,*
*9, 15, 17, 19*
132:*3, 6, 10,*
*12, 14*
record's
73:*8*
recruited
137:*3, 6*
Recruiting
137:*13*
recur  94:*6*
98:*13*

**recurred**
95:*17*
**recurrence**
91:*8*  92:*21*
94:9, *16*
98:*6*
**redactions**
126:*6*
**reduced**
160:*4*
**reduces**
157:*23*
**refer**  15:*17*
26:*14*
128:*15*
273:*16*
**reference**
19:*23*  20:*1*
50:*16*  53:*6*
67:*13*, *15*
72:*5*  81:*2*,
*3*  82:*3*
120:*10*
128:*12*
139:*14*
180:*5, 9*
205:*21*
211:*10*
212:*18*
226:*20*
263:*13*
264:*3*
272:*13*
**referenced**
14:*14*  19:*5*,
*18*  76:*10*
78:*3*  80:*23*
82:*8*  86:*1*
96:*24*
121:*2*
122:*10*
**references**
32:*1*  36:*13*
49:*10*

83:*20*
192:*11*
211:*2*
**referencing**
31:*5*  225:9,
*13*
**referred**
49:2, *6*
53:9, *20, 23*
268:*22*
270:22, *24*
**referring**
80:*15*
164:*22*
165:*6*
166:*1*
255:*23*
275:*11*
**refers**  127:*1*
129:*2*
161:*22*
182:*6*
221:*23*
**reflect**
117:*10*
**refuse**
243:*21, 22*
**regard**
13:*24*  14:*5*
16:*1, 19*
22:*10*
23:*21*
28:*11*
31:*19*
34:*14*
42:*12*
45:*18*
46:*13*
54:*15*
57:*17*
58:*10*
63:*13*
72:*11*
74:*16, 22*

75:*4*
105:*16*
117:*11*
121:*9*
129:*17*
130:*9, 15, 17*
145:*24*
155:*7*
157:*16*
173:*12*
186:*18*
216:*13*
218:*11*
265:*11*
266:*10*
273:*12*
277:*15*
279:*24*
281:*15, 18*
285:*19*
287:*4*
**regarding**
44:*18*
51:*21*
95:*19*
98:*16*
189:*14*
276:*4*
282:*12, 22*
**Regardless**
187:*19*
207:*24*
**register**
212:*19*
213:*4*
**Registered**
1:*20*  290:*5*,
*19*
**regular**
137:*3*
**regulatory**
47:*24*  48:*5*
57:*15*  213:*7*

**reject**
155:*17*
170:*5, 15*
171:*24*
**rejected**
230:*16*
249:*1, 6*
**rejecting**
230:*20*
**related**
70:*13*
77:*15*
102:*4*
131:*12*
132:*16*
172:*23*
190:*10*
217:*16*
220:*16*
281:*18*
283:*21*
**relates**
16:*20*
22:*11*  31:*8*
123:*19*
133:*21*
159:*10*
168:*4*
170:*4, 13*
210:*6*
219:*1*
249:*13*
**relation**
20:*3*  22:*19*
30:*9*  63:*6*
84:*19*
281:*24*
283:*20*
**relationship**
135:*14*
**relative**
150:*10*
173:*15*
184:*21*

187:*8*
201:*20*
261:*20*
290:*14, 15*
**relevance**
229:*13*
**relevant**
10:*18*
249:*22*
276:*14*
**reliable**
147:*7*
**reliance**
81:*16*
**relied**  147:*1*
**rely**  30:*17*
32:*2*  86:*11*,
*23*  118:*13*
205:*10, 11*
220:*7*  227:*7*
**relying**
159:*11, 21*
160:*8*
**remain**  21:*8*
**remember**
30:*1*  41:*13*,
*17*  45:*14, 16*
51:*6*  59:*1*,
*8*  60:*16*
64:*3*  67:*16*
68:*8*
112:*21*
113:*4*
114:*21*
118:*21*
194:*8*
207:*19*
215:*12*
221:*11*
258:*3*  287:*6*
**Remote**
1:*13*  9:*7*
**remotely**
9:*4, 6*  290:*8*

**reoccurrence**
92:*14, 19*
93:2  94:*3,
24*  97:*15, 20,
22*  98:*1*
**repeat**
86:*17*
181:*21*
196:*11*
273:*15*
**repeating**
65:*1*
134:*13*
170:*9*
**Report**  3:*16*
4:*9, 12, 15,
18*  6:*13, 16,
19, 22*  7:*1, 4*
17:*6, 8, 12,
13*  19:*6, 8, 9*
26:*24*  28:*7,
13*  29:*13, 14,
20*  30:*14, 16*
32:*15, 18*
33:*1, 16*
35:*3*  49:*21*
63:*20*
64:*10*
65:*14, 15*
69:*7, 15*
71:*3, 8*
72:*3, 9, 14,
24*  73:*11*
77:*20*  78:*4*
81:*17*  84:*1*
87:*2, 6, 8*
89:*17*  92:*4*
97:*1*  104:*6*
105:*1*
106:*19*
107:*15*
115:*17*
122:*7*

123:*14, 24*
124:*15, 20*
125:*7, 14, 18,
21, 23*
126:*20, 24*
127:*9, 15*
128:*1, 7, 19*
129:*2, 4*
130:*6*
131:*24*
135:*13*
136:*8, 9, 11,
16*  139:*9, 14*
144:*12*
156:*2, 6, 13*
164:*10, 19,
20*  166:*4, 12*
167:*15*
169:*11*
174:*3*
178:*11, 13,
16, 18*  180:*4,
5, 24*  192:*9,
10*  200:*13*
205:*20*
211:*11*
213:*14*
215:*15*
255:*10*
256:*5*
257:*5, 23*
258:*23*
259:*3*
260:*13*
261:*2, 11, 23*
262:*4, 15*
264:*4, 5, 7*
266:*17, 22*
267:*2, 8, 24*
268:*5, 11, 15,
21*  269:*2, 8,
12, 18, 23*
270:*23*
271:*1, 3, 19*

275:*24*
276:*4, 8, 24*
277:*1, 6, 9,
10, 23*
278:*20*
279:*1, 6*
283:*12*
285:*21*
286:*1, 11, 14,
18, 20*
**reported**
41:*1*  146:*7*
147:*11*
149:*6, 10*
164:*20*
174:*18*
185:*15*
186:*9, 13, 18*
187:*20*
197:*8*
198:*8*
201:*23*
208:*22*
209:*6*
258:*2, 18*
259:*17*
260:*6, 9*
261:*19*
263:*19*
278:*13*
**Reporter**
1:*20, 21*
9:2  15:*3*
24:*19*
290:*6, 20*
**reporting**
9:*7*  41:*6, 9,
21*  161:*15*
213:*9*
**reports**
11:*13*  19:*4,
16, 20*  20:*1,
2, 20*  21:*13*
22:*4, 12*

23:*4, 21*
26:6  28:*3,
9, 11, 15, 21*
29:*5, 17, 18,
23*  30:*13, 18,
20*  31:*6, 12,
20, 23*  32:*4,
13, 15*  33:*4,
11, 12, 14, 17*
34:*2, 3, 15*
36:*9*  37:*1*
58:*12*
63:*19, 22, 24*
64:*11*
65:*12*
68:*15*  69:*1,
15*  70:*19*
80:*23*  85:*4,
21*  86:*1*
88:*16, 20*
90:*5*  91:*11*
104:*5*
122:*21*
127:*22*
128:*23*
129:*7, 18, 21,
23*  130:*2, 4,
12*  150:*11*
157:*17*
161:*6*
162:*1*
188:*21*
189:*6*
201:*18*
220:*8*
226:*11*
231:*3*
260:*15*
273:*13, 24*
274:*1, 3*
275:*11*
**represent**
25:*23*  36:8

82:*13*
121:*4*  280:*7*
**representatio
ns**  35:*16*

**Representing**
2:*7, 11, 16,
20*  231:*21*
**represents**
10:*16*
246:*24*
**Request**  8:8
18:*4*  33:*3*
35:*22*
43:*10*
74:*24*  75:2
121:*14*
126:*18*
137:*21*
**requested**
19:2  126:*9*
**requests**
120:*20*
**require**
22:*23*
**required**
18:*19*  22:*3*
213:*9*
**requisite**
23:*16*
**re-reviewed**
85:*7*
**research**
66:*12, 16*
67:*2, 10, 22*
68:*5*
219:*12*
231:*19*
264:*8, 12*
**reserve**
23:*13, 16*
**residency**
44:*22*  45:*6,
8, 15*

residents
44:*24*
45:*11*, *20*
46:22
**resolution**
24:*10*
**resolve**
21:22
**resolved**
18:*13*
**resources**
66:*21*, *24*
67:*8*
**respect**
264:22
**respected**
141:*2*
156:*23*
**respiratory**
131:*5*  132:*7*
**respond**
35:*19*, *24*
235:*21*
243:*8*
**responded**
12:*23*  13:*2*
**Responding**
13:*21*  289:*8*
**response**
14:*1*, *23*
16:*24*
22:*16*
59:*14*
141:*11*
142:*21*
215:*24*
217:*16*
219:*9*
225:*23*
228:*13*
236:*1*
254:*19*
**responses**
254:*3*, *10*

**responsibility**
46:*18*
**responsive**
121:*12*
254:*19*
**restart**
61:*15*
**restate**
151:*5*
**restating**
203:*15*
**result**
141:22
145:*17*
197:*21*
227:20
263:*9*
**results**
75:*10*
140:*17*
143:*19*
145:*3*
149:*7*, *12*
160:*3*
174:*1*
180:*20*, *21*
181:*11*, *18*
183:*9*
198:*7*
200:*12*
201:*1*, *12*
205:*1*
208:2, *16*
226:*1*, *14*
228:20
230:*13*
253:*7*, *14*
261:*14*
262:*3*, *8*, *10*,
*12*, *14*, *21*
263:*6*

**retested**
100:*21*
103:*14*
**retreading**
81:*24*
**retrospective**
169:*10*
**return**
291:*15*
**Review**
3:*19*  5:*8*
24:5  30:*8*
38:*1*  49:*21*
74:*9*  76:*14*
78:*12*, *15*
79:*4*  80:*5*,
*12*, *18*  91:*20*
150:*18*
151:*3*, *6*
191:*3*, *7*
192:22
211:*7*, *14*, *23*
232:*19*
233:*4*
239:*24*
241:*9*
242:*6*, *7*
244:*7*, *14*
248:*13*, *17*
265:*15*
276:*6*, *7*
**reviewed**
17:*16*
19:*21*, *24*
20:*16*, *21*
28:*4*, *5*, *24*
33:*11*, *14*, *15*
37:*9*, *16*, *19*
63:*18*, *23*
64:*16*
68:*10*, *20*
69:*23*  70:*1*,
*5*, *8*  85:*4*, *10*,

*15*, *20*  86:*3*,
*9*, *21*  89:*11*
91:*4*  96:*20*
104:*4*, *21*
105:*1*
120:*15*, *20*
130:*18*
131:*9*, *15*, *20*
132:*11*, *12*
188:*20*
263:*24*
**Reviewer**
6:*5*, *9*
232:*5*
236:*20*
237:*4*
247:*24*
248:*16*
251:*11*
252:*19*
253:*1*, *18*
**reviewers**
232:*18*
233:*6*  249:*7*
**reviewer's**
248:*13*
251:*1*
**reviewing**
30:*13*
78:*14*
135:*16*
265:*1*
**reviews**
204:*15*
**revise**
165:*16*
247:*5*, *6*
**revisions**
129:*13*
**RICHARD**
2:*13*  9:*21*
10:*4*
**right**  24:*11*
27:*13*  35:*7*

71:*15*  73:*7*
89:*14*, *15*, *16*
90:*9*  96:*18*
123:*5*
131:*23*
143:*20*
161:*13*
162:*15*
184:*6*
203:*18*
223:*4*
230:*5*
259:*15*
271:*6*
274:*21*
279:*23*
280:*21*
285:*6*, *12*
**Risk**  4:*18*,
*24*  7:*11*
51:*4*  55:*13*
56:*11*
57:*24*  68:*1*
77:*16*  94:*8*
135:*24*
141:*4*, *6*, *9*,
*18*  142:*1*, *3*,
*4*, *13*, *23*
143:*7*
144:*7*, *14*
145:*6*
149:*21*
152:*9*
154:*3*
155:*14*
156:*8*
157:*1*, *13*, *24*
160:*5*
167:*7*
169:*13*
170:*1*, *6*, *17*
172:*23*
173:*16*, *22*
175:*5*

176:9
183:14
184:21
185:15
186:21
187:8
201:20
204:16
205:4
208:21
209:5
210:8
213:12
224:7
261:20
262:5, 16
265:17
280:13
**risks** 150:10
**role** 219:6
**room** 27:19, 20 45:1
46:9
**rough** 289:9
**routinely**
52:16
**Rule** 4:8, 11, 14, 17
123:13
124:14, 20
125:12
127:7, 14
128:5, 19
136:8
**Rules** 22:23
163:20
**ruling** 22:8
**Rutledge**
48:8

**< S >**
**Saed** 61:17
62:15
230:22

231:13
232:4, 15
**SAED_SEPT**
**222021** 6:6, 7, 10, 11
236:21
**SAED_SEPT**
**222021_SUP**
**PL_000069**
251:12
**SAED_SEPT**
**222021_SUP**
**PL_000104**
236:23
**SAED_SEPT**
**222021-**
**SUPPL_0000**
**70** 251:13
**Saed's**
231:18
237:5
248:18
**safe** 208:24
**SALES** 1:5
26:3
**saliva** 103:6, 11, 12
**sample**
103:7
**sarcoma**
43:3
**satisfied**
189:24
**saw** 45:3
245:9
**saying** 13:3
49:23
121:17
222:8
234:2
243:10, 20
254:8
257:22

262:22
263:4
**says** 12:14
143:6
153:12, 13
154:1
174:7
184:24
191:2
196:16
203:24
250:1
251:22
252:8, 22
254:12
262:20
263:4
281:6, 16
283:1
**schedule**
138:17, 19
**Schneider**
21:21 22:17
**Scientific**
16:4, 8
48:5 57:12, 16 59:20
60:10
66:15, 20, 22
67:2, 9, 21
68:5 70:24
72:15
219:11, 12
**scope** 69:4
**screen**
71:13, 19
72:23
79:17, 19, 21
106:14, 22
107:8
108:22
109:17, 22
115:18, 19, 21 119:24

123:12
125:21
126:22
233:13
234:15
235:6
236:4
237:21
239:23
280:24
281:1
**scroll** 72:3
80:21
126:4, 23
128:11
237:7
**scrolled**
109:4
**Scrolling**
73:18
116:15
123:17
127:13
128:17
281:8
**searches**
67:20
**searching**
70:11
**Second** 4:6
39:6 80:22
113:21
123:13
124:14, 19
136:7
138:17
139:9
161:19
165:7
166:6
200:12
252:16, 21
278:21

**section**
78:11
136:22
144:1, 3, 5
152:15
161:14
164:10
174:2
180:21
189:7
191:2
195:24
200:5, 12
201:1, 2
204:14
237:8, 9
246:16
249:24
251:20
255:11, 14
262:3, 14
263:12
277:2
281:10
287:5
**see** 71:18
73:22
79:19, 20
80:10, 14
81:5 82:4, 21 83:11, 15
93:18
94:21
107:8
109:8, 21, 23, 24 110:11
112:2
115:19, 20
116:8, 18, 23
119:23
120:9, 13
123:18
124:3
125:20

Judith Kaye Wolf, M.D.

| | | | |
|---|---|---|---|
| 127:*3* | **seen** 20:*21* | 37:*8*, *18* | 131:*3*, *10*, *16* | 251:*4* |
| 128:*13* | 54:*13* | 38:*4*, *6*, *14* | 132:*6*, *13*, *18* | 290:*12* |
| 139:*15* | 91:*22* 97:*7* | 42:*23* 44:*2*, | 133:*4*, *11*, *23* | **setting** |
| 144:*17* | 113:*7* | *5*, *12*, *19* | 134:*1*, *8*, *16* | 50:*20* |
| 145:*16*, *21* | 237:*4* | 46:*24* 47:*3*, | 135:*4*, *21* | **seven** 96:*16* |
| 152:*18* | 244:*18* | *9*, *14*, *20* | 137:*7*, *20* | 200:*15* |
| 154:*5* | 254:*2* | 48:*1*, *6*, *16*, | 138:*13* | 201:*3*, *4*, *10* |
| 157:*20* | **select** | *22*, *24* 49:*4* | 139:*6* | **sexism** 48:*9* |
| 160:*19* | 138:*14* | 50:*4*, *14*, *19* | 165:*19* | **SGO** 57:*22* |
| 161:*14*, *23* | **self-reported** | 51:*13*, *17*, *24* | 264:*10*, *14*, | **share** 71:*12* |
| 162:*6* | 146:*10* | 54:*2*, *7*, *17* | *24* 265:*4*, *23* | 79:*17* |
| 175:*20* | **self-** | 55:*1*, *18*, *21* | 271:*14* | 106:*14* |
| 181:*5* | **reporting** | 57:*2*, *9*, *13*, | 272:*2* | 115:*17* |
| 186:*16* | 147:*2*, *6* | *18* 58:*9* | **serous** | 122:*22* |
| 189:*9* | **send** 75:*1* | 59:*10*, *19* | 167:*21* | 235:*13* |
| 190:*24* | 233:*14* | 60:*8*, *18*, *23* | 168:*4*, *8* | 280:*23* |
| 191:*22* | 234:*21* | 61:*13*, *16* | 169:*20* | **shared** |
| 199:*24* | 235:*13* | 62:*14* | 171:*13*, *21* | 58:*10* |
| 200:*16* | 238:*14* | 63:*23* | 172:*20* | 74:*21*, *23* |
| 202:*2*, *10*, *13* | 239:*22* | 64:*12*, *15*, *20* | 173:*4*, *8*, *14* | 285:*24* |
| 203:*5* | 240:*12*, *13* | 65:*5*, *17* | 174:*10*, *17* | 286:*19* |
| 204:*19* | 244:*10*, *24* | 66:*3*, *14* | 183:*2*, *9* | 288:*16* |
| 206:*4* | 245:*4* | 67:*1*, *11*, *22* | 186:*9* | **sharing** |
| 212:*20* | **sending** | 68:*3*, *11*, *20* | 187:*9*, *12* | 123:*11* |
| 213:*18* | 255:*5* | 69:*22* 70:*8*, | 228:*16* | 126:*22* |
| 218:*6*, *8*, *9* | **sense** 185:*6* | *14*, *20* 72:*13* | 251:*24* | 235:*3* |
| 219:*8*, *22*, *23* | 234:*19* | 75:*19* | 252:*5* | **Sharko** |
| 226:*21* | 256:*11* | 76:*15* 85:*3*, | **serve** 137:*3* | 10:*15* 11:*7* |
| 230:*10* | **sent** 12:*17* | *13*, *20* 86:*6*, | **served** 17:*6* | 12:*13*, *14*, *17* |
| 233:*3*, *18* | 107:*18* | *10*, *22* 87:*11*, | 121:*7*, *20* | 13:*11* |
| 234:*16* | **sentence** | *15*, *19* 88:*1*, | 220:*14* | **Sharko's** |
| 235:*5*, *20* | 143:*6* | *6*, *11*, *17* | 230:*23* | 13:*24* |
| 236:*3*, *5*, *6* | 153:*12* | 89:*2* 91:*6* | 231:*16* | **sheet** 291:*7*, |
| 237:*9*, *14*, *23* | 165:*16* | 96:*2*, *22* | 283:*2*, *8* | *9*, *12*, *15* |
| 259:*21* | 202:*3* | 100:*3*, *18* | **services** | 293:*12* |
| 260:*17* | 250:*14* | 105:*18*, *24* | 137:*22* | **she'll** 97:*22* |
| 261:*6*, *7*, *18* | 252:*22* | 106:*4* | **serving** | 234:*6*, *23* |
| 262:*20* | **sentences** | 109:*6*, *12* | 194:*13* | 244:*11*, *24* |
| 278:*8*, *12* | 250:*13* | 110:*10* | 195:*1* | 245:*16* |
| 279:*19* | **separately** | 117:*7* | **set** 31:*23* | **Shipp** 10:*8* |
| 281:*1*, *12* | 112:*21* | 118:*5*, *9*, *12*, | 88:*16* 89:*3* | **SHOOK** |
| 283:*22* | **September** | *18* 119:*3*, *6* | 110:*8* | 2:*16* |
| **seeing** 56:*13* | 26:*8*, *18* | 122:*12* | 173:*21* | **short** 274:*15* |
| | 27:*7* 36:*24* | 130:*19* | | |

**show** 79:*15*
106:*11*
115:*14*
119:*12*
128:*11*
175:*5*
179:*6, 19*
180:*8, 10*
181:*19*
182:2
185:*6*
186:*19*
187:*13*
196:7
229:*12*
233:*5*
234:*12*
247:2
250:*14, 17*
253:24
257:2
263:6
265:*14, 17*
284:*13*
**showed**
144:*21*
217:*17*
228:*4*
**shower**
104:*15*
**showing**
108:*21*
109:*8, 17*
124:24
135:*14*
147:*12*
209:*12*
210:20
218:*23*
224:6
228:*12*
235:6
236:*4, 6*

**shown**
241:*13*
**shows**
167:*17*
176:8
182:*4*
210:*12*
255:*18*
257:*12*
**Shukla**
284:7
**side** 237:*20*
**sign** 272:*13*
291:*8*
**signature**
124:6
125:*24*
127:*19*
**signed**
139:*4*
272:*15*
**significance**
155:*8, 16*
160:*6, 9*
**significant**
150:*12*
153:*8, 23*
154:*10*
155:*12*
156:*3, 11, 14*
157:*10*
159:*6, 13*
169:*17*
170:*6, 16*
171:22
172:*13*
183:*5, 14, 24*
187:*2, 5*
201:*24*
202:*10*
**significantly**
187:2
256:*16*

**signing**
291:*10*
**Similar**
135:*20*
219:5
265:*14*
284:*20*
**simply**
258:*17*
**Singh** 24:*22*
43:*12*
**single**
254:*16*
**single-
spaced**
240:*3*
**site** 194:*3*
**sitting**
27:*14*
69:*16*
77:24  78:5
129:*12*
**situated**
90:*16*
**six** 261:*10,*
22
**size** 160:*6*
226:*13*
**slightly**
44:*16*
**Slomovitz**
211:*5, 18*
**Slomovitz's**
211:*10*
212:*2, 9*
**small**
169:*21*
173:*19*
174:*13, 21*
175:*16*
176:*23*
185:*4, 22*
198:*19*
240:7

245:*9*
263:*16*
**smaller**
260:*19*
**Smith** 61:*8*
272:*1*
**Smith-
Bindman**
61:*18*
62:*16*  63:*2,*
*9*  193:*14, 19,*
*20*  282:*1, 11,*
*20*  283:*2*
287:*4, 11, 20*
**Smith-
Bindman's**
195:*17*
**social** 61:*9*
271:*16*
**society** 48:*8,*
*9*  60:*3, 8, 15*
**Soft** 250:*1*
**solidified**
39:*5*
**somebody**
191:*19*
**someone's**
101:*11*
**Somewhat**
76:*16*  225:*1*
**sorry** 32:*8*
33:22  34:*8*
35:*11*
55:*19*
70:*24*
89:*10*  90:*2*
95:*12*
106:*9*
122:*3*
143:*14*
151:*4*
154:*19*
159:*23*
161:*6*

162:*18*
172:*15*
176:*21*
180:*17*
182:22
184:*15*
194:*19*
198:*10*
201:*20*
203:*6, 13*
213:*23*
223:22
227:*23*
278:*4*
279:*10, 14*
**sort** 66:*1*
81:*23*  93:*9*
158:*6*
**sound**
89:*15*
96:*18*  285:*8*
**sounds**
89:*16*
**source**
288:*13*
**Sources**
16:*5, 9*
69:8  72:*16*
**space** 291:*6*
**speak** 12:*11*
**speaking**
9:*8*
**Special**
18:*17*
**species**
217:*14*
218:*12, 18*
219:*5, 14, 19*
284:22
**specific**
12:2  20:2
28:*14*  31:*4*
33:2  38:*18,*
*21*  46:*3*

55:9, *16*
61:*12*  68:8
77:*1*  95:*24*
104:5
125:*21*
133:*3*
225:3
251:*21*
267:*24*
**specifically**
30:*15*  31:5,
*11*  32:*14*
46:5  51:*3*,
*7*  54:*14*, *23*
66:*16*
67:*17*, *23*
69:*18*  76:4
77:*12*  78:*1*
79:*15*
92:*10*  98:7
99:*17*
100:*1*
101:*11*
112:22
141:5
151:*11*
158:*23*
167:*21*
169:*23*
171:*20*
173:*17*
190:*12*
193:*12*
197:*21*
256:7
259:*12*
265:*20*
277:*4*, *7*
283:*24*
**specifics**
73:*1*
**spend**  21:2
30:*12*

**spent**  45:*20*
114:*18*
**spoken**  61:*4*
62:*20*  161:2
**stage**  95:2,
*4*, *7*, *10*, *11*,
*15*
**staging**
42:*15*
**staining**
254:*14*
**stains**  218:*3*
**stand**  31:2
32:*19*
276:*11*
**standard**
182:*17*
188:6, *12*
**standing**
50:7  289:*12*
**standpoint**
14:*15*, *17*
92:*24*
273:*10*
**Star**  137:*13*
**start**  28:*10*
39:*10*  53:*3*
63:*17*
100:*17*
118:*15*
130:*16*
184:*15*
201:*21*
252:*24*
**Starting**
3:*21*  90:*12*
107:2
120:*11*
128:*14*
**starts**
252:*19*
**state**  9:*10*
10:*10*  11:2
12:22

16:*23*  17:2
60:*19*
91:*11*
141:*3*
153:6
169:*11*
181:*19*
204:*15*
246:*24*
291:5
**stated**  87:2
98:*10*
140:*17*
188:5
211:*18*
**statement**
13:*9*  20:*4*
137:2
144:*10*
145:*11*
146:*18*
153:*20*
161:5
176:6
246:*21*
248:*11*
249:*24*
250:6, *22*
252:*3*, *8*
254:5, *7*, *12*,
*22*  257:*4*
281:*11*
282:7
287:*19*
**statements**
53:*11*
59:22
60:*11*, *14*
246:*21*
253:*10*
288:*23*
**STATES**
1:*1*  95:*22*
98:*19*

143:*12*
144:5  156:6
**statistical**
155:8, *15*
160:6, *9*
174:22
183:*4*
211:*19*
261:*12*
**statistically**
153:8, *23*
154:*10*
155:9, *12*
156:*3*, *11*, *14*
157:9
159:*13*
169:*17*
171:*21*
172:*12*
183:5, *14*, *18*,
*24*  187:5, *18*
256:*16*
**statistics**
94:8  155:22
**status**  38:4
154:4
**stay**  138:*24*
**steering**
9:*19*
**stenographic
ally**  290:*11*
**step**  229:*12*
**steps**  46:9
**Stipulations**
8:*12*
**stop**  55:22
56:2, *8*, *14*,
*19*
**Street**  2:*4*,
*9*, *14*
**strengths**
146:*1*, *4*, *5*
151:9

168:*10*, *13*
232:*24*
**strike**  97:*13*
173:*24*
263:*23*
265:8
**studied**
170:*3*, *14*
175:7
176:*11*
215:*17*
217:*10*
219:*4*
224:*19*
**studies**  32:*1*
66:*3*
132:*23*
135:*17*
151:*23*
168:22
172:*12*
179:5, *24*
180:5, *9*
200:*1*
201:8
209:*14*
210:*15*
214:5, *7*
216:5, *7*
223:*10*
224:5, *15*, *23*
225:5, *8*
229:5, *14*
230:7
252:9
277:*13*
283:*20*
284:6, *9*, *19*
**study**
139:*15*, *18*,
*21*  140:*4*, *5*,
*21*  143:*4*, *12*,
*14*  144:*13*,
*21*  145:*4*, *11*,

14  146:18
148:12, 14,
18  149:5
150:10, 19,
24  151:1, 14,
17  160:19
163:11
166:13, 14,
17  167:1, 14,
17  168:11,
18, 20  169:2,
8, 10, 12
170:13
171:24
172:15
173:1
176:9
177:21
178:23
179:22
181:9, 10, 17,
22  182:16,
24  183:22
188:9
191:6, 7, 19
192:12, 14
193:5, 8
194:11, 23
195:13
196:2, 4, 14,
15, 21, 22
197:2, 5, 6
198:19, 23,
24  199:2, 3,
12, 18
202:20
203:8
207:2, 5, 7,
10, 14  208:1,
22  209:7, 8,
20  211:13,
14  212:12
213:18
214:2, 13

215:10, 13,
17  217:9
219:22
221:20, 23
224:19
225:8, 21
226:12, 21
227:8, 11
228:4
231:3
241:17
252:13, 14
253:8, 14
256:22
258:1, 13, 24
259:5
260:8, 19
263:20, 21
265:20, 21
276:23
277:12, 22
279:24
study's
178:14
subcultured
253:23
subject
11:8  13:19
21:6  22:6
62:17
118:8
151:18
240:5
243:13
288:22
291:10
subjects
47:19
submit
49:22
submitted
48:3
105:23
106:2

189:8
232:17
249:2, 4
Subscribed
293:19
subset
198:19
260:22
substance
31:24  62:7,
22  218:4
229:7
293:11
substances
217:10
283:21
284:21
subtypes
169:18, 20,
21  170:4, 15
184:2
sufficient
163:13
189:13
220:18
suggested
253:4
277:21
suggesting
248:5
253:19
suggestion
153:13
277:23
281:23
282:11, 14
suggests
204:15
Suite  2:10,
14
summary
60:20  91:19
SUPERIOR
1:6

super-
sophisticated
239:19
supervisors
41:2
SUPPL_0000
69  6:11
SUPPL_0000
70  6:12
SUPPL_0001
00  6:6
236:22
SUPPL_0001
04  6:8
Supplementa
l  7:3  17:12
19:8  198:2
201:15
202:5
203:10, 20
255:24
269:12
271:1, 3
275:24
supplementa
ry  256:9
257:1
SUPPORT
8:2  27:5
30:21
31:17
168:3
205:16
252:4
253:15
supported
248:8
supporting
141:12
168:6
227:11
228:2
supportive
160:15

supports
32:23
160:17
167:18
205:15
207:8  250:7
supposed
32:9
sure  21:21
24:17
30:22  32:9
33:8  51:2,
7  65:3
68:18  73:8
74:3, 6
76:2  81:14
82:17  83:7
84:11, 21
86:18
88:23
89:18
113:11
125:1
126:15
134:14, 24
149:22
150:3
163:5
165:23
166:21
170:11
179:16
184:5
190:2
194:22
202:5
203:16, 17
225:11, 16
230:18
237:17
254:6  279:8
surface
227:13, 18

surgeries
42:*3*, *7*, *9*, *12*,
*15*, *17*, *18*, *20*
surgery
146:*12*, *24*
147:*19*, *22*,
*24*  149:*1*
surgical
41:*12*
surrogate
219:*10*, *14*
223:*9*, *11*, *12*,
*21*, *24*
247:*19*, *20*,
*21*
surveillance
219:*20*
survive
94:*15*
Susan
10:*14*
107:*18*, *19*,
*24*
Swan's
111:*9*
swear  25:*7*
switch  136:*6*
sworn  9:*5*
25:*11*
290:*8*
293:*19*
symptoms
46:*8*
148:*21*
149:*3*, *18*
synergistic
144:*16*, *23*
145:*13*
152:*4*
system
219:*18*
250:*3*
Systematic
3:*19*  5:*8*

78:*11*, *15*
79:*4*  80:*5*,
*12*  192:*22*

< T >
table  13:*6*
153:*24*
154:*1*, *5*, *7*
157:*16*
171:*11*
173:*1*, *7*
175:*23*
178:*2*, *6*, *9*
180:*16*
182:*5*
183:*2*
184:*19*, *20*
186:*5*, *6*
196:*9*
198:*2*, *8*
199:*24*
201:*15*
202:*5*
203:*1*, *8*, *10*,
*11*, *21*
255:*24*
256:*10*
257:*1*
263:*8*
288:*10*
Tables  3:*19*
78:*12*, *16*
80:*5*, *13*, *19*
take  16:*12*
18:*8*  24:*13*
25:*4*  34:*22*
35:*21*
36:*11*
49:*20*
54:*21*
67:*14*
75:*22*  83:*1*
90:*15*
138:*2*

242:*6*
244:*19*, *21*
245:*20*
274:*14*
289:*9*
take-away
187:*6*
taken  12:*4*
43:*19*
115:*10*
125:*2*
192:*5*
246:*2*
274:*22*
290:*11*
talc  5:*15*
46:*13*
50:*16*  51:*1*
55:*15*
57:*17*, *24*
58:*11*  59:*5*,
*22*  60:*1*, *12*,
*19*  66:*5*
130:*21*
131:*20*
134:*10*, *18*
139:*10*
141:*3*, *10*, *17*,
*20*, *23*
142:*22*
143:*9*
144:*21*
145:*5*, *11*
152:*4*, *10*
153:*15*
154:*7*
155:*3*
156:*9*
157:*16*, *18*,
*23*  159:*19*
160:*11*, *16*
162:*21*
167:*18*
170:*17*

177:*23*
186:*14*, *20*
187:*12*
189:*15*
197:*6*
202:*16*
203:*2*
215:*3*
217:*21*, *23*
218:*7*, *8*
220:*15*
221:*16*
223:*2*
225:*23*
226:*6*
227:*20*
230:*8*
248:*6*
261:*20*, *21*
265:*18*
281:*18*
283:*21*
284:*16*, *17*,
*20*
TALC-
BASED
1:*11*
TALCUM
1:*4*  5:*6*, *24*
26:*2*  37:*17*
47:*10*  49:*2*,
*11*  50:*8*
51:*21*, *24*
52:*21*
53:*12*, *21*
54:*5*, *10*, *18*
55:*2*, *23*
56:*2*, *11*, *17*,
*19*  61:*3*, *10*,
*14*, *19*  63:*14*
64:*1*, *17*, *22*
65:*7*, *19*
68:*1*
110:*22*

112:*6*
114:*3*, *19*
130:*9*
132:*20*
133:*5*
143:*9*
156:*4*, *15*, *24*
157:*3*
160:*24*
164:*6*
168:*9*
169:*14*
170:*2*
176:*10*
179:*4*, *17*
190:*10*, *17*,
*19*  192:*20*
193:*15*
195:*18*
199:*21*
200:*14*
208:*17*
209:*12*, *23*
210:*7*, *16*
213:*10*
214:*7*, *11*
216:*22*, *24*
219:*2*, *8*, *17*
221:*16*
228:*5*
236:*13*
247:*1*
252:*10*
253:*2*
266:*2*, *4*
283:*4*
287:*22*
talk  31:*16*
46:*5*  48:*7*
53:*2*  59:*18*
61:*10*
77:*22*
142:*7*
167:*2*

192:*13*
194:*2*
214:*21*
258:*5*
263:*11*
**talked**
60:*24*
61:*13, 17*
69:*13*
70:*17*
150:*15*
168:*21*
187:*7*
255:*15*
271:*11*
273:*15*
**talking**
20:*10*  28:*9,*
*12*  31:*2, 12*
34:*15*  68:*6*
76:*21, 24*
102:*18*
145:*19*
158:*11*
159:*17*
170:*20, 22*
188:*7*
192:*8*
242:*4*
244:*16*
**teaching**
44:*17, 24*
46:*17*
**technically**
13:*14*
**TECHNOLO
GIES**  1:*23*
**Tecum**  4:*6*
119:*19*
**Ted**  10:*9*
**tell**  25:*19*
56:*8, 18*
83:*6*
140:*18*

152:*19*
163:*4*
176:*4*
189:*3*
225:*18*
248:*22*
**telling**  120:*3*
**temporarily**
24:*21*
**ten**  91:*1*
94:*6, 9, 15*
95:*1, 16*
114:*24*
192:*1*
**tenens**
38:*11*
137:*13*
**terms**  73:*6*
76:*22*
173:*15*
183:*15*
199:*5*
**test**  100:*16*
101:*19, 21*
102:*19, 22*
103:*1, 4, 23*
154:*9*
183:*4*
250:*3*
256:*13*
**tested**  101:*3,
13, 17*
103:*21*
**testified**
25:*12*
26:*17*
49:*20*
57:*21*
58:*16*  283:*9*
**testify**
130:*11*
276:*15*
290:*8*

**testifying**
27:*10*  58:*2,
19, 20*  92:*24*
93:*13*
127:*23*
162:*20*
193:*23*
**testimonies**
37:*3*
**Testimony**
3:*5*  22:*11*
31:*20, 24*
37:*5, 10, 12,
17, 22*  48:*4*
64:*17*
66:*17*  67:*3,
10*  81:*3, 4*
83:*16*  85:*5*
93:*3, 7*
104:*3*
122:*9, 10, 15*
150:*22*
162:*2*
164:*6*
176:*7*
194:*6*
220:*15*
263:*2*
290:*11*
**testing**
64:*22*  65:*7,
19, 23*  77:*10*
100:*6, 14, 16,
20*  102:*8, 12,
22*  103:*9*
276:*6*
**tests**  100:*10,
22*  102:*16*
250:*16*
254:*8*
**Texas**  1:*19*
27:*11*

**Texas-
licensed**
272:*8*
**Thank**
36:*15*
71:*20*  73:*3,
12*  79:*13*
83:*13*  85:*9*
90:*3*
113:*14*
119:*5*
120:*7*
121:*21*
122:*19*
123:*20*
126:*18*
139:*1*
142:*6*
143:*11*
171:*4*
197:*19*
214:*18*
241:*2*
255:*4*
271:*7*
274:*20*
279:*21*
285:*4*
288:*20*
289:*2*
**Thanks**
23:*19*
24:*23*  83:*10*
**therapy**
153:*16*
**thing**  22:*16*
234:*16*
**things**
99:*12*
104:*9*
141:*15, 24*
158:*24*
179:*3*  230:*8*

**think**  16:*14*
22:*20*
32:*23*  36:*8*
40:*5*  48:*18*
50:*24*  62:*6*
65:*2*  69:*7*
74:*6*  75:*3,
12*  77:*2, 7*
83:*4*  98:*19*
116:*20*
135:*12*
137:*14*
140:*8, 24*
143:*17*
146:*3*
150:*21*
158:*7*
160:*14*
163:*17*
165:*5, 12*
168:*12, 20*
174:*11*
179:*18*
180:*13*
185:*12*
186:*1*
188:*22*
190:*6*
194:*9*
209:*2, 9*
212:*24*
213:*1*
215:*16*
218:*5, 16, 20*
234:*17*
235:*2, 12*
238:*10*
239:*6*
240:*11*
243:*24*
244:*3*
247:*11, 23*
248:*12*
249:*14*

258:*10*
259:*11*
264:*6*
273:*22*
285:*6*
288:*14*
**thinking**
37:*23* 41:*4*
225:*13*
**thinks**
101:*18*
**Third** 7:*3*
17:*11* 19:*7*
65:*14*
113:*23*
152:*15*
166:*6*
205:*20*
263:*17*
269:*11*
270:*24*
271:*3*
275:*23*
**thirdly**
141:*18*
**thirty**
291:*16*
**Thirty-four**
3:*19* 107:*1*
**THOMPSO
N** 2:*4* 9:*15*,
*16* 27:*15*, *21*
83:9, *24*
84:6, *14*
105:9 272:*1*
**Thompson's**
27:*16*
**thought**
37:*13* 97:*5*
101:*15*
146:*23*
154:*22*
172:*19*, *22*
173:*20*

189:*20*
258:22
**thousand**
179:*15*
**thousands**
103:*24*
238:*21*
**Three** 3:*23*
18:22 19:*4*,
*12*, *17* 20:*10*
21:*12* 22:*4*,
*12* 28:*15*, *16*
29:*12*, *17*
31:*6*, *12*, *14*,
*18*, *20* 34:*14*
38:*13* 69:*9*,
*13* 78:*7*
80:*10* 89:*5*
107:*17*
108:8
109:*18*
110:*15*
113:*19*
114:*11*
123:*1*
127:22
128:23
133:*21*
134:2
141:*15*
165:*18*
218:*3*
273:*13*, *24*
278:*15*
**time** 12:8
17:*6* 20:*24*
21:*3* 23:*13*,
*16*, *17* 24:*1*
30:*12* 38:*9*
39:*2* 44:*8*
45:*18*, *19*, *24*
46:*2*, *5*
55:*5*, *6*, *16*
68:*17* 74:*5*

83:*1* 84:*17*
90:*15*
100:*24*
105:*11*
109:*7*
113:*1*
114:*10*
115:*6*
131:*23*
138:*18*
179:*10*, *20*
180:*19*
212:*6*
215:*14*
231:*19*
244:*1*, *12*, *14*
245:*2*, *15*
254:*16*
271:*21*
272:*3*, *8*, *17*
273:5, *18*
274:2, *4*
290:*11*
**times** 52:*9*
200:8, *15*
201:*7*, *9*, *10*
202:*23*
261:*10*, *22*
**timing**
273:*11*
274:*12*
**titanium**
218:*5*
223:*2*
225:*22*
226:*4*, *9*
**title** 228:*3*,
*18* 250:*11*
**titled** 228:*8*
229:*9*
**titles** 46:*16*
**today** 10:*18*
11:*4* 15:*18*
17:*18* 18:*2*

20:*24*
23:*15* 26:*1*,
*5*, *13*, *22*
27:*3*, *10*, *23*
29:*10* 30:*3*
36:*20*
37:*10* 63:*6*
68:*4*, *11*, *21*
69:*17*
70:*17*, *23*
78:*1*, *5*
103:*4*, *12*, *14*
104:*3*
120:*11*
129:*13*
130:*10*
162:*18*
266:*12*
273:*4*
**today's**
15:*17*
20:*17* 22:*4*
104:*12*, *21*
105:*13*
136:*18*
142:*9*
192:*15*
206:*15*
214:*23*
**told** 12:*10*
54:*3*
146:*15*
147:*20*
288:*14*
**ton** 73:*6*
**top** 116:*9*
117:*20*
123:*17*
137:*14*
**topic** 47:*24*
**totality**
240:*1*
241:*10*

242:*24*
**tracts** 198:*5*
**training**
117:*12*
118:*8*
**transcript**
15:*8*
290:*10*
291:*17*, *19*

**transcription**
293:*7*
**Transcripto
mic** 5:*19*
221:*2*
**transformati
on** 6:*1*
228:*6*, *24*
229:*6*
236:*14*
247:22
250:*4*, *8*, *10*,
*15* 253:*5*, *15*
**transformed**
250:*17*
253:*22*
**transparent**
52:*24*
**treat** 46:*7*
**treated**
173:*22*
**treating**
42:*22* 44:*2*
46:*20*, *22*
96:*21* 147:*5*
**treatment**
44:*10*, *14*
253:*24*
254:*17*, *19*
**treatments**
254:*3*, *10*
**Trenton**
10:*8*

trial  146:22
193:24
194:3, 7
195:2, 14
tried  235:9
true  176:20
217:18
224:18
275:22
283:14
287:20
truth  290:8,
9
try  21:21
133:4
143:22
198:1
231:5
235:2
238:20
274:18
trying  64:2
97:6
111:12
149:22
260:2
tube  252:1,
6, 11, 14
tubes
197:10, 24
198:4, 14
199:13, 22
201:19, 23
202:6, 8
tumor
250:18
tumors
172:19
173:20
turn  136:21
138:8
139:8
143:24
153:23

164:9
166:3
188:24
205:19
213:13
220:11, 21
226:19
251:3
252:16
255:9
277:1, 5
281:21
283:12
turned
137:21
Turning
96:6  276:24
two  10:22
29:18
30:16
38:13  40:4
61:11
63:19
69:14  77:6
86:4
100:13
106:18
112:10, 14
117:18
141:24
145:20
155:9, 13
157:11
158:24
161:17
164:19
180:23
187:4
200:7
201:2, 5, 7, 9
202:23
214:4, 6
230:8
245:20

260:20
278:15
285:10, 13
two-minute
272:15
Tylenol
179:14
type  44:10
47:8, 16
89:4  95:2
134:9, 17
135:21
167:23
228:16
264:21
typed  119:8
types  42:11,
21  43:2
45:2  142:5
173:9
174:9  219:4
typos
129:10

< U >
ultimate
284:4
ultimately
22:7  222:24
uncommon
95:8, 10
understand
14:2  25:1
26:10, 19
111:12
240:10
254:7
267:13
271:4  274:6
understandin
g  12:6
14:10
74:13
258:21

Understood
62:3
111:15
236:8
260:23
undertaken
253:2
unfair
240:11
242:1
UNITED
1:1  95:22
98:19
unnecessary
83:2
unpublished
196:23
197:1, 3
199:12
update
117:1
updated
20:5  93:11
116:17
167:17
Use  4:22
5:6  7:10
15:10
44:15
49:11  50:9
51:21  52:1
53:12, 22
54:5, 10, 18
55:3  56:18
59:22  60:2,
12  61:3, 14
63:15
64:18
130:9, 21
131:20
143:9
152:11
153:15
155:3

156:4, 9, 15
157:1, 16, 18
159:11, 19
167:6, 19
168:9
169:15
170:2
176:10
177:23
178:2, 3, 4, 6
179:4
181:2, 3
182:6, 9
183:7
185:17
186:5, 12, 19,
20, 24  187:1,
12, 22  188:2,
6  192:20
196:3, 14
197:8
199:20
200:3, 10, 14
210:7
219:13
237:19
261:6, 20
262:6, 17, 24
265:18
266:4
274:2
280:13
users
158:19
160:3, 11
170:17, 18
202:1, 12, 16,
22  203:2, 22
204:3
256:1, 2, 8,
10, 11, 15
257:8, 9, 18,
19  259:23

260:7
263:18
**usually**
54:23
94:20
98:11
103:23
137:24
**uterine**
42:24  43:2

**< V >**
**vagina**  43:6
**vaginal**
42:17  43:5
**valid**  202:14
**value**
157:11
**various**
277:2
**vast**  101:5
248:24
**verbatim**
290:10
**version**
234:13
265:1
280:6
281:5
286:22
**versus**
94:10
156:10
158:19
178:2, 3
182:7
209:23
217:22
256:11
**videos**  47:18
**view**  265:22
**views**  58:17,
23

**visit**  91:22
272:15
**visits**  91:5
96:21
**Vitae**  4:1
115:23
116:3, 12
117:2, 8, 24
**vitro**  250:2
283:19
**vivo**  229:14
**volume**
133:5
**voluntarily**
45:5
**vulva**  43:7
**vulvar**
42:17  43:4

**< W >**
**waiting**
21:17
**want**  15:24
16:22
21:24  24:7
36:6  59:17
70:22  73:7
82:24  83:1
87:4  115:2,
3, 14  129:14
136:6
138:1, 2
233:17
234:10, 20
239:3
240:6
241:21
243:2
246:7
258:5
266:12, 17
267:3, 16, 17,
22  268:9, 19
269:5, 16

270:3
277:3, 7
279:8  280:1
**wanted**
37:24
**wants**  92:7
99:12, 24
**Washington**
2:10
**water**  29:15
**way**  31:1
51:18
67:18  79:8
87:19  89:1
94:1  99:10
143:22
148:8, 22
190:18
216:2
219:7
229:10
233:16
241:15, 24
247:9
262:22
**weak**
148:18
211:20
212:11
**weakness**
148:12
150:16, 24
**weaknesses**
146:2
150:19
151:7, 9
168:11, 17
232:24
**Weatherby**
137:12
**website**
57:23
**week**  40:14
41:16

121:7
182:7, 8
183:6, 7, 11,
13, 23
184:14, 22,
23  185:18
187:1
200:8, 15
201:3, 7, 9,
10  202:23
261:9, 10, 21,
23
**weekly**
137:16
**weeks**
38:13  39:2
40:4, 11, 16,
20, 22
**weighing**
232:24
**weight**
185:23
249:12
**Weinberg**
250:20, 24
**welcome**
255:7
**well**  14:2
17:10  19:1
22:15  24:8
26:20, 24
28:14
36:14  53:3
56:4  59:2
74:14
91:13, 24
92:12
95:20
111:14
134:23
137:11
140:15
141:2, 9
145:2

146:7
149:16
151:8
165:22
173:23, 24
184:7
200:23
201:4
208:11, 23
209:2
219:11
223:14
227:1, 2
232:13
233:5
235:1, 9, 23
238:16
242:3
244:3, 10, 15,
23  247:8
256:4
257:16
271:17
284:8  289:9
**well-
established**
141:4
142:23
143:7
144:7
156:23
**well-known**
140:13
**went**
128:24
129:8
208:15
**We're**  18:8
20:9  22:3
24:9  25:24
26:5  31:21
34:15
35:20  43:9,
21  73:24

81:*14*  85:*6*
106:22
109:*14*
112:*17*
117:*9*
120:*16*
128:*13, 18*
180:*18*
184:*7*
185:*7*
194:*11, 23*
203:*7, 18*
214:*17*
234:*2, 22*
242:*12, 18*
244:*5, 7*
272:*24*
274:*12*
280:*3*  289:*1*
**We've**  23:*1*
24:*18*  43:*9*
68:*5*  69:*9*
70:*16*
111:*7*
113:*7*
114:*23*
191:*24*
274:*10*
**white**
167:*20*
187:*23*
**who've**
56:*10*
**willing**
94:*21*
98:*12*
242:*13*
**Wisconsin**
39:*4*  40:*13*
**wish**  23:*11*
**withdraw**
36:*4*  62:*12*
207:*22*
212:*5*

**witness**
1:*18*  6:*14,*
*17, 20, 23*
7:*2, 4, 6*
8:*5*  9:*5*
32:*7*  33:*22*
34:*7*  35:*8*
52:*20*
53:*16*  57:*4*
60:*1*  62:*23*
64:*8, 16*
65:*11*  69:*5*
71:*14, 20*
75:*23*  77:*6*
79:*20*
80:*16*  82:*6*
87:*7*  89:*10*
90:*4, 9, 17*
91:*21*
93:*20*
96:*13*  97:*5*
98:*4*  99:*16*
102:*23*
103:*18*
104:*14*
106:*16*
115:*5, 20*
116:*23*
120:*1*
121:*23*
122:*5, 24*
123:*5, 22*
127:*4*
132:*1*
133:*12*
134:*6, 23*
135:*11*
136:*4, 13*
140:*1, 8*
145:*2, 16*
147:*16*
148:*7*
149:*16*
150:*23*

151:*22*
152:*8, 21*
153:*3, 11*
154:*23*
155:*21*
156:*19*
158:*4, 13, 22*
159:*16, 21*
163:*3, 16, 24*
165:*5, 10, 22*
167:*13*
171:*5*
172:*7*
175:*12*
176:*15*
177:*11*
179:*2*
180:*13*
181:*14*
182:*13*
184:*10*
189:*14*
190:*10*
191:*17*
192:*4*
193:*14*
194:*13, 19*
195:*5*
196:*7*
197:*13, 20*
198:*22*
199:*16*
200:*19*
202:*19*
204:*6*
205:*3*
206:*3, 11*
207:*18*
208:*11*
209:*19*
210:*11*
212:*15*
213:*22*
214:*1, 17*

217:*3*
222:*17*
224:*10, 14,*
*22*  225:*12*
226:*3*
227:*4*
229:*17*
231:*9, 15*
232:*10*
243:*16*
247:*13, 17*
248:*21*
251:*18*
253:*13*
255:*4, 22*
256:*20*
257:*6, 16*
258:*20*
259:*11, 20*
261:*5, 16*
263:*3*
264:*18*
266:*8, 15, 23*
267:*9*
268:*6, 16*
269:*2, 13, 24*
278:*8, 19*
279:*15*
281:*2*
282:*6, 24*
283:*3*
287:*14, 16,*
*22*  288:*6*
289:*2, 13*
290:*7*  291:*1*
**WOLF**
1:*18*  3:*5,*
*16, 21, 23*
4:*3, 5, 9, 12,*
*15, 18*  6:*13,*
*16, 19, 22*
7:*8*  11:*4*
12:*18*
14:*18*  16:*4*

17:*3, 16*
19:*21*
20:*12, 19*
21:*11, 17*
23:*11*  24:*1*
25:*8, 10, 17,*
*21, 22*  27:*9*
34:*5, 11, 24*
35:*14, 17, 23*
36:*19*
43:*24*
62:*22*  71:*9,*
*19*  73:*16*
77:*5*  79:*11,*
*19*  81:*6*
82:*5*  104:*2*
106:*11*
107:*2, 7, 18*
109:*5, 22*
110:*15*
111:*15*
114:*1*
115:*2, 14*
116:*4, 9*
119:*18, 23*
120:*10*
122:*8*
123:*4, 10*
124:*3, 6, 21*
125:*14, 19*
127:*3, 9*
128:*7*
131:*22*
142:*21*
144:*1*
146:*18*
164:*10*
166:*3, 24*
174:*2*
212:*1*
214:*16*
233:*17*
237:*13, 22*
238:*3, 23*

Judith Kay Wolf, M.D.

240:*13*
241:*7*
242:*1, 16*
244:*12*
245:*1, 14*
266:*23*
267:*8, 19*
268:*5, 15*
269:*18*
270:*6, 11, 18*
273:*19*
274:*17*
275:*6*
280:*8, 24*
293:*16*
**Wolf-1**  3:*12*
71:*6*
**Wolf-10**
4:*15*  128:*5*
**Wolf-11**
4:*18*  142:*13*
**Wolf-12**
4:*22*  167:*6*
**Wolf-13**  5:*5*
192:*19*
**Wolf-14**  5:*9*
206:*18*
**Wolf-15**
5:*15*  215:*3*
**Wolf-16**
5:*19*  221:*2*
**Wolf-17**
5:*24*  236:*13*
**Wolf-18**  6:*5*
236:*20*
**Wolf-19**  6:*9*
251:*10*
**Wolf-2**  3:*16*
80:*3*
**Wolf-20**
6:*13*  266:*22*
**Wolf-21**
6:*15*  267:*7*

**Wolf-22**
6:*18*  268:*4*
**Wolf-23**
6:*21*  268:*14*
**Wolf-24**
6:*24*  269:*1*
**Wolf-25**  7:*3*
269:*11*
**Wolf-26**  7:*4*
269:*23*
**Wolf-27**  7:*6*
270:*10*
**Wolf-28**
7:*10*  280:*12*
**Wolf-3**  3:*19*
107:*1*
**Wolf-4**  3:*23*
110:*15*
**Wolf-5**  4:*1*
116:*3*
**Wolf-6**  4:*3*
119:*17*
**Wolf-7**  4:*6*
124:*19*
**Wolf-8**  4:*9*
125:*12*
**Wolf-9**  4:*12*
127:*7*
**Wolf's**
22:*11*
73:*11*  79:*5*
81:*15*
108:*10*
124:*14*
150:*21*
239:*23*
267:*24*
268:*11*
**women**
4:*20*  5:*2*
7:*13*  86:*4*
95:*21, 23*
98:*18*
142:*14*

146:*14*
148:*19*
153:*17*
167:*8, 20*
168:*9, 15*
169:*13*
170:*3, 14*
171:*2, 6*
173:*3*
174:*4*
175:*2, 7*
183:*3, 12*
184:*3, 18*
185:*16, 17*
186:*11, 14*
187:*10, 11, 22, 23*  197:*9, 23*  198:*3, 13*
199:*13, 20*
201:*19, 22*
202:*6, 7, 15*
203:*1, 21*
208:*3, 17*
209:*12, 14, 22*  210:*6*
216:*22*
219:*1*
224:*24*
261:*19*
265:*18*
280:*15*
**wonder**
237:*19*
**Woolen**  5:*9*
77:*21*
105:*2*
165:*23*
166:*9*
192:*12, 14, 23*  197:*16*
255:*14, 17, 20*  256:*5, 6*
257:*2, 22*
259:*8*

260:*2, 9, 19*
263:*11, 20*
265:*19*
281:*21, 22*
286:*4*  287:*2*
**word**  190:*5*
207:*19*
208:*1*
**wording**
143:*3*
**words**
110:*24*
145:*17, 21*
163:*18*
164:*8*
169:*7*
217:*11*
261:*6, 13*
263:*9*
**work**  38:*18*
39:*5, 15, 20*
40:*6, 17, 22*
44:*4*  47:*4*
62:*1*  64:*21*
65:*6, 18*
70:*16, 18*
105:*17*
106:*6*
108:*11*
110:*21*
112:*4*
114:*2, 14*
119:*8*
134:*1*
137:*10*
138:*1, 2, 4, 6, 20*  189:*8, 15*
190:*10*
194:*24*
210:*23*
253:*1*
264:*22*
271:*20*

281:*17*
282:*13, 22*
**worked**
38:*15*
39:*22, 24*
40:*2, 9, 11*
41:*15*
54:*16*
117:*16*
138:*13, 18*
216:*7*
**working**
38:*8, 10, 24*
39:*3, 7, 12*
40:*7*  41:*5, 23*  44:*20, 23*
114:*18*
118:*21*
138:*1, 3*
208:*3*
214:*18*
244:*1*
271:*18*
**works**  49:*9*
162:*14*
**world**
219:*12, 13*
**worth**
148:*24*
**write**  49:*21*
57:*22*
**writes**
220:*13*
**writing**
191:*4*
**written**
58:*11*
140:*16*
150:*3*  191:*8*
**wrote**  12:*18*
141:*16*
146:*6*
174:*15, 16*

Judith Kay Wolf, M.D.

180:*14*

**< Y >**
**Yeah**  24:*23*
34:7  45:*14*
59:2  60:*21*
64:*8*  73:9
75:*23*
82:*18, 20*
84:*14*  90:*4*
93:*20*
104:*23*
125:*6*
143:*21*
158:*13*
161:*17*
166:*21*
168:*12*
176:2
195:*9*
225:*12*
232:*3*
235:*11*
246:*14*
247:*13*
286:*17*
**year**  40:*17,*
*22*  75:*16*
106:*8*
188:*11*
**years**  49:*19*
89:*14*
90:*21, 23*
91:*1*  94:*6,*
*9, 10, 11, 15*
95:*1, 16*
96:*17*
100:*13*
122:*10, 16*
178:*3, 4*
186:*12, 15*
187:*10, 12*
188:*8, 10, 11*
**Yep**  160:*21*

**Yessian**
81:2
**yesterday**
11:*11*
19:*23*  20:7
23:*4*  63:7,
*9*  104:7
105:7  272:*3*

**< Z >**
**Zoom**
105:*10*
242:*12, 18*