# EXHIBIT E

1

UNCERTIFIED ROUGH DRAFT


1           ROUGH DRAFT DISCLAIMER

                 - - - - -

2              IMPORTANT NOTICE

             AGREEMENT OF PARTIES

3


4    We, the party working with rough draft transcripts,

     understand that if we choose to use the rough draft

5    screen or the printout, that we are doing so with

     the understanding that the rough draft is an

6    uncertified copy.


7    We further agree not to share, give, copy, scan,

     fax or in any way distribute this rough draft in

8    any form (written or electronic) to any party.

     However, our own experts, co-counsel, and staff may

9    have LIMITED INTERNAL USE of same with the

     understanding that we agree to destroy our rough

10   draft and/or any electronic form, if any, and

     replace it with the final transcript upon its

11   completion.

12   By accepting a rough draft transcript, I am hereby

     agreeing to the above-mentioned terms, and I

13   further agree to pay for these reporting services

     that have been provided.  I also understand that

14   receipt of this rough draft will constitute an

     order for the final transcript.

15

16   CASE:        IN RE: JOHNSON & JOHNSON TALCUM POWDER

     PRODUCTS MARKETING, SALES PRACTICES, AND PRODUCTS

17   LIABILITY LITIGATION

18   WITNESS:    DANIEL CLARKE-PEARSON, M.D.

19   DATE:        January 17, 2024

20

     REPORTER'S NOTE:

21   Since this deposition has been in rough draft form,

     please be aware that there may be a discrepancy

22   regarding page and line number when comparing the

     rough draft with the final transcript.

23

24


25


                                                                    2


                        UNCERTIFIED ROUGH DRAFT


1    Also, please be aware that the uncertified rough

     draft transcript may contain untranslated steno,

2    reporter's notes in asterisks, misspelled proper

     names, incorrect or missing Q/A symbols or

3    punctuation, and/or nonsensical English word

     combinations.  All such entries will be corrected

4    on the final, certified transcript.


5              COURT REPORTER:  Christine Taylor, RPR


6


7


8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

UNCERTIFIED ROUGH DRAFT

1                DANIEL CLARKE-PEARSON,

2        having first been duly sworn, was examined

3                and testified as follows:

4                    (9:05 a.m.)

5                    EXAMINATION

6    BY MS. DAVIDSON:

7        Q.    Good morning Dr. Clarke-Pearson it's

8   night to you the up we've got a route of so I'm not

9   to go into the basics of a deposition.    But

10  basically if you need a break let me know and

11  please provide verbal answers to every question

12  okay?

13       A.    Okay.

14       Q.    Can you state your full name for the

15  record?

16       A.    Daniel Lyle Clarke-Pearson.

17       Q.    Dr. Clarke-Pearson?

18       A.    I'm at Chapel Hill North Carolina at

19   the Carolina.

20          Q.   You still reside in North Carolina?

21          A.   Yes.

22          Q.   Do you have any materials with you

23   today?

24          A.   Yes.

25          Q.   Can you please tell me what you have

                                                          4


                    UNCERTIFIED ROUGH DRAFT


1   with you?

2          A.   Oh, my.  Predominantly publications

3   that have been listed on my reports.  I have my

4   reports.  I have Dr. Long oh's reports.  I have

5    some specific epidemiology papers.  I have a

6    reviewers document of reviewers looking at paper

7    Dr. Sigh Ed wrote.  I have a list of all my

8    materials considered.  Two binders that have all

9    those -- all those publications, those papers and

10    materials adjacent to my table here.  I have

11    invoices that I've submitted since the last

12    deposition.  I believe that covers it -- covers it.

13            Q.    Who prepared the binders of

14    publications and papers?

15            A.    Our attorneys did.

16            Q.    And when you say our attorneys, who are

17   you referring to?

18          A.   Talking about Ms. O'Dell.

19          Q.   And you said you have specific epi

20   papers who put those together?

21          A.   I did.

22          Q.   Do you have any notes on those epi

23   papers?

24          A.   Yes.

25          Q.   Have you produced those notes to us?

                                                            5

                        UNCERTIFIED ROUGH DRAFT

 1          A.   Not that I'm aware of.

2          Q.   I'm going to request that those notes

3     be produced to us.  Either during a break or if

4     they are not produced to us until after the

5     deposition we don't have any notes?

6               MS. DAVIDSON:  We can't hear.

7               MS. O'DELL:  We can't.

8     BY MS. DAVIDSON:

9          Q.   We did not receive any notes that

10    Dr. Clarke—Pearson had on any epi papers.  I need

11    to ask for those to be produced, I don't know if

12    those can be produced during today's deposition?

13              MS. O'DELL:  I mean you're welcome to

14         ask him about those notes you're welcome to

15          mark the papers Dr. Clarke-Pearson be happy

16          to walk you through any notes that he has.

17          To my knowledge they're very limited.  And

18          then you can ask him about him.  Happy to

19          have those copies of those papers marked as

20          exhibits to the deposition but we will not

21          agree to hold the deposition open.

22              MS. DAVIDSON:  Well, because the

23          deposition is remote, I don't have ability

24          to see those notes to question about them

25          and I believe they should have been produced

UNCERTIFIED ROUGH DRAFT

1        before those notes are subject to production

2        under Rule 26.  So we're going to need to

3        get those I'll have to take a look and see

4        if we need to ask further questions.  So we

5        will be holding the objection open you can

6        object to that.

7            MS. O'DELL:  We will object to that and

8        certainly it was your decision there was no

9        order to do that.  Certainly could have been

10       in here if you had chosen and made the

11       election not to do that we will try to this

12       Jessica let's just proceed we aren't going

13      to agree.

14   BY MS. DAVIDSON:

15          Q.   Dr. Dr. Clarke—Pearson how did you

16   prepare for your deposition?

17          A.   It's been going on for a while.  Been

18   reviewing materials that —— that I've listed and

19   reviewed my reports, my general report as well as

20   reports from my patients I've reviewed literature

21   that I thought might be useful in this deposition.

22   I think that's the core of what I've done over the

23   last couple of weeks in preparing for this

24   deposition.

25          Q.   Did you meet with counsel to prepare

                                                                    7


                        UNCERTIFIED ROUGH DRAFT


1   for the deposition?


2          A.   I have.


3          Q.   Whom did you meet with?


4          A.   Ms. O'Dell, and Dr. Thompson.


5          Q.   When did you meet with them?


6          A.   I'm sorry again I didn't hear you.


7          Q.   When did you meet with them?


8          A.   I met with them yesterday.


9          Q.   For how long?

10          A.   Approximately five hours.

11          Q.   Have you had any other meetings with

12   them in the last few months?

13          A.   We've had a zoom meeting.  I'm not sure

14   when it was within the last two weeks.

15          Q.   How many zoom meetings?

16          A.   I believe just one.

17          Q.   And how long did that last?

18          A.   A few hours.

19          Q.   Was that also to prepare for the

20   deposition?

21          A.   Yes.

22          Q.   Have you had any other meetings calls

23   or zooms to prepare for the deposition?

24          A.   Can you give me a time frame?

25          Q.   For this deposition?


                                                    8


                    UNCERTIFIED ROUGH DRAFT


1          A.   For this deposition.  No I don't think

2   so.

3          Q.   Did you review your prior depositions

4   to prepare for this deposition?

5          A.   No, I haven't.

6          Q.   You were deposed in August 2021.  Do

7   you recall that?

8          A.    Yes.

9          Q.    When is the last time you looked at

10   that deposition testimony?

11          A.    I may have scanned it shortly after the

12   deposition when it became available to me.  That

13   would be the last time.

14          Q.    You were also deposed in 2019; correct

15   in the MDL?

16          A.    Correct.

17          Q.    And when is the last time you took a

18   look at that deposition?

19          A.    I don't recall.

20          Q.    Do you stand by all the testimony that

21   you gave in 2019?

22          A.   Yes.

23          Q.   And do you stand by all the testimony

24   that you gave in August 2021?

25          A.   Yes.

9

UNCERTIFIED ROUGH DRAFT

1          Q.   Is there any testimony from either

2   deposition that you wish to change?

3          A.   Not that I'm aware of.

4          Q.   Did Ms. O'Dell and Ms. Thompson show

5   you any documents to prepare for this deposition?

6            MS. DAVIDSON:  You can answer that

7        question if you were shown or were not shown

8        but not the substance of what was discussed

9        or what was shown.

10            THE WITNESS:  Other than one document

11        that I recall is different than documents

12        that I would have had already was the

13        journal reviewers comments about Dr. Sigh

14        Ed's paper.

15    BY MS. DAVIDSON:

16        Q.   You produced 3 invoices to us this

17    week.  Do you know that?

18          A.   I'm sorry the fire truck just went by

19     here.  Let me can you repeat that I didn't hear

20     you.

21          Q.   Are you aware that you produced 3

22     invoices to defendants this week?

23          A.   I produced invoices.  They're here I'm

24     not sure there are three.

25          Q.   All right.  Let's mark those.

                                                        10


                        UNCERTIFIED ROUGH DRAFT


1               MS. DAVIDSON:  Are you marking them all

2          as one exhibit Jessica or are you going to

3          mark them individually?

4          MS. DAVIDSON:  Asher you're marking

5      collectively.

6          MR. TRANGLE:  Right.

7          MS. DAVIDSON:  All the 3 invoices we

8      got this week.

9          MR. TRANGLE:  Correct.

10  BY MS. DAVIDSON:

11      Q.   Let's make the I the so let's mark as

12  Exhibit 2 the summary of the invoices.

13          (Exhibit 2 marked for identification.)

14  BY MS. DAVIDSON:

15      Q.   Thanks Asher.

16          So this document shows the five

17    invoices we received in the past from you and the

18    most recent three invoices and my math is kind of

19    lousy?

20          MS. O'DELL:  Jessica.

21          MS. DAVIDSON:  Both my math and my eyes

22      are lousy.

23          Dr. Clarke-Pearson so Asher if you

24      could do that thank you and then secondly

25      would you mind putting this document in the

                                              11


                    UNCERTIFIED ROUGH DRAFT

1        chat.

2               MR. TRANGLE:  Sure.  Thank you.

3    BY MS. DAVIDSON:

4          Q.   Dr. Clarke-Pearson this shows about

5    $125,000.  I'm sorry we don't where we're looking

6    at?

7               MS. DAVIDSON:  You didn't let me finish

8         Lee maybe just wait until I'm done with my

9         question.

10              MS. O'DELL:  I'm sorry, please proceed.

11              MS. DAVIDSON:  I was in the middle of

12         the question.

13   BY MS. DAVIDSON:

14          Q.   Dr. Clarke-Pearson for invoices 6, 7

15    and 8 in total this shows about $128,000.  Does

16    this reflect all the work you've done since

17    August 20 -- August I guess we'd say August 1,

18    2021?

19          A.   No.  This includes work up until

20    December 31, 2023.

21          Q.   About how many hours would you say

22    you've worked since December 31?

23          A.   Well I don't like to guess in a

24    deposition.  So I can't tell you for sure.

25          Q.   Would it be more or less than 50 hours?

12

UNCERTIFIED ROUGH DRAFT

1        A.    Probably more than 50 hours.

2        Q.    Would it be more or less than

3  100 hours?

4        A.    Probably less.

5        Q.    Okay.  So somewhere between 50 hours

6  and 100 hours of unbilled time.  When do you plan

7  to submit those bills?

8        A.    After this deposition.

9        Q.    All right.  I'm going to request on the

10  record that that invoice be produced to us.

11  Dr. Clarke—Pearson did you somewhere between

12    October and December –– October 2021 and

13    December 2023 raise your rate from 800 to $900 an

14    hour?

15            A.   Yes, I did.

16            Q.   When did you do that?

17            A.   I don't remember specifically.

18            Q.   And Dr. Clarke–Pearson what percentage

19    of your income would you say is derived from expert

20    testimony?

21            A.   Well I'm retired at this point in time

22    so my income is quite different than it was when I

23    was in practice and working at the university.  But

24    I still work at the university but on a very

25    reduced salary.  In the past my income from medical

                                                    13

                    UNCERTIFIED ROUGH DRAFT

1    legal work was approximately about 10 percent of my

2    salary.  I can't give you an exact number living on

3    social security and pension and some other

4    mandatory deductions from my retirement accounts.

5            Q.   Fair to say that now that you're

6    retired it's significantly more than 10 percent?

7            A.

8                 MS. O'DELL:  Object to the form.

9          Excuse me object to the form.

10             THE WITNESS:  It's more than 10 percent

11       yes.

12   BY MS. DAVIDSON:

13       Q.   Can you estimate about what percentage

14   it is?

15       A.   No I really can't.

16       Q.   Is it more than 25 percent?

17       A.   It may be.

18       Q.   Is it more than 50 percent?

19       A.   I don't think so.

20       Q.   So is your best estimate that it's

21   somewhere between 25 and 50 percent of your income

22    currently is from expert work?

23              MS. O'DELL:  Object to the form.

24              THE WITNESS:  I just can't give you a

25        specific number.  I'm sorry.

                                                    14


                    UNCERTIFIED ROUGH DRAFT


1    BY MS. DAVIDSON:

2              Q.   Do you know what your annual earnings

3    are from your pension?

4              MS. O'DELL:  Object.  He's not ––

5        you're not entitled to know that information

6        Jessica so I would object to the question

7           and Dr. Clarke—Pearson you don't have to

8           respond to that.

9    BY MS. DAVIDSON:

10          Q.   I am trying to determine what

11   percentage of his income comes from expert work

12   which is completely appropriate question in order

13   to determine that I need to know how much his

14   pension is?

15          MS. O'DELL:  No Jessica he's giving you

16          his best estimate of the percentage.  And

17          he's testified to that.  You're not entitled

18          to walk through, you know, his retirement

19          accounts or any of that information.  That's

20          not subject to disclosure.  What you're

21          entitled to know is how much he's been paid

22          for this work in his case which we've

23          provided that information to you and he's

24          testified to and so we would object to the

25          questions about his assets.

                                                    15

                        UNCERTIFIED ROUGH DRAFT

1    BY MS. DAVIDSON:

2          Q.   Dr. Clarke-Pearson are you refusing to

3    testify to what percentage of your income comes

4    from expert work?

5           MS. O'DELL:  So to be clear

6           Dr. Clarke-Pearson already responded to your

7           questions.  And Dr. Clarke-Pearson here to

8           answer your questions that are appropriate

9           under the rules and asking him about the

10          value of his retirement, his other assets

11          those questions are inappropriate.  So I've

12          instructed him not to answer.

13   BY MS. DAVIDSON:

14          Q.   Dr. Clarke-Pearson, do you know how

15   much your pension is per year?

16          MS. O'DELL:  Same instruction

17          Dr. Clarke-Pearson.

18    BY MS. DAVIDSON:

19          Q.   I'm asking him simply if he knows.  Do

20    you know how much your pension is per year I'm not

21    asking what it is?

22              MS. O'DELL:  I don't know what you mean

23          by the question what he is auto his pension

24          per year Jessica.  But, you know,

25          Dr. Clarke-Pearson what he knows or what he

                                                    16


                    UNCERTIFIED ROUGH DRAFT


1          doesn't know about his pension retirement et

2          cetera are not appropriate subject matter

3          for this deposition, but he has testified to

4          your questions about percentages to the best

5          of his knowledge.

6              MS. DAVIDSON:  Well he said he doesn't

7          know and therefore I'd like to know if he

8          knows his pension because if he knows his

9          pension, then he does know what percentage

10         it is.

11             MS. O'DELL:  I don't think that's what

12         he said.  He gave you his estimate.

13             MS. DAVIDSON:  He did not.

14             MS. O'DELL:  Yes, he did.

15          MS. DAVIDSON:  Can are you going to let

16      me take this deposition.

17          MS. O'DELL:  I am.  But I am --

18      absolutely --

19          MS. DAVIDSON:  Instructing --

20          MS. O'DELL:  Don't interrupt me.  Let's

21      just start off -- start the day well.

22          MS. DAVIDSON:  You're interrupting my

23      questions.

24          MS. O'DELL:  Don't interrupt me.  What

25      I said to him is he's giving you his

UNCERTIFIED ROUGH DRAFT

1        estimate of the appropriate his estimate of

2        the percentage of his current income to the

3        best of his knowledge not entitled to know

4        other information about his retirement et

5        cetera as I've stated.

6    BY MS. DAVIDSON:

7        Q.   Dr. Clarke-Pearson Ms. O'Dell has

8    represented that you told me that you told me what

9    percentage is that because I didn't hear an answer?

10        MS. O'DELL:  He gave an estimate

11        previously Dr. Clarke-Pearson if you want to

12        repeat the previous testimony you've given

13          about your best information you may about a

14          percentage, but other information they're

15          not entitled to.

16               MS. DAVIDSON:

17               THE WITNESS:  I think my response

18          within a range of court reporter might want

19          to read back what I said.

20               MS. DAVIDSON:  I'm sorry

21          Dr. Clarke-Pearson.

22               THE WITNESS:  I said I gave you a range

23          25 percent was some number you throughout

24          there I said it was probably close to that

25          the court reporter could read back

                                                        18


                    UNCERTIFIED ROUGH DRAFT


1          specifically what I said.

2     BY MS. DAVIDSON:

3          Q.   Dr. Clarke-Pearson if I ask a question

4     I am entitled to an answer rather than asking the

5     court reporter to repeat your testimony.  Are you

6     testifying that it's approximately 25 percent of

7     your income that comes currently from expert work?

8          A.   I don't know exactly what it is.

9          Q.   I understand you don't know exactly

10    what it is but is it approximately 25 percent or

11  more than 25 percent?

12          A.   I don't know.

13          Q.   Have you had to travel for this

14  litigation?

15          A.   With regard to this deposition?

16          Q.   Have you had to travel at all with

17  respect to your MDL work?

18          A.   Yes.

19              MS. O'DELL:  At any point in time

20          Jessica?  I'm just trying to understand what

21          your question is.

22  BY MS. DAVIDSON:

23          Q.    Dr. Clarke-Pearson understood the

24    question and he said yes.  When did you travel for

25    the MDL proceeding?

                                                        19

                    UNCERTIFIED ROUGH DRAFT

1               MS. O'DELL:  You're free to answer the

2          question.

3               THE WITNESS:  As best I recall I went

4          to I think we stayed in Princeton New Jersey

5          and went to federal court in the MDL case.

6          I don't know the exact dates.

7    BY MS. DAVIDSON:

8          Q.   Does counsel for -- sorry I thought you

9    were done?

10         A.   Sorry, you too.  I stopped for a

11   moment.

12              I don't recall any other travel except

13   around Chapel Hill here in North Carolina.

14         Q.   Does counsel play for plaintiffs pay

15   for your travel?

16         A.   Yes, I think so.

17         Q.   Do you have any requirements with

18   respect to travel?

19              MS. O'DELL:  Object to the form.

20              Vague.  I mean what do you mean by

21        requirements?  And I'm not sure I understand

22        the question.

23   BY MS. DAVIDSON:

24        Q.   Dr. Clarke-Pearson do you fly first

25   class?

                                                    20

                    UNCERTIFIED ROUGH DRAFT

1         A.   That is a request that's on my fee

2    schedule, yes.

3         Q.   Asher if you could put up the invoice

4    from October 14, 2021, which was part of Exhibit 1.

5    Dr. Clarke-Pearson do you know why there's

6   redactions on this invoice?

7        A.   No, I don't.

8             MS. O'DELL:  I'll represent Jessica

9        that redaction relates to a case in which

10       Dr. Clarke-Pearson's not disclosed as an

11       expert.  He consulted.  So you're not

12       entitled to that information, but certainly

13       we provided the number of hours extended as

14       well as the total bill.

15   BY MS. DAVIDSON:

16       Q.   Dr. Clarke-Pearson?

17            MS. O'DELL:  Excuse me Jessica I'm

18       sorry.

19          MS. DAVIDSON:  I'm sorry Lee.

20          MS. O'DELL:  I'm sorry there was a

21       little feedback here.  I've just asking if

22       there was something on.  Okay.  Sorry about

23       that.

24    BY MS. DAVIDSON:

25          Q.   Dr. Clarke-Pearson what are the

                                                    21


                   UNCERTIFIED ROUGH DRAFT

 1    Callahan and baker cases that are referenced on

 2    this sheet?

 3          A.   Yeah I see what you're saying.  I

4    honestly don't recall, been so focused on this case

5    that I don't recall these cases that I did a little

6    bit of work on.

7            Q.   And Dr. Clarke-Pearson in your expert

8    report submitted on November 2023 you stated that

9    your rate is the $800 per hour is that an error?

10           A.   That's an error.  Currently it's $900

11   an hour.

12           Q.   And why did you raise your rate?

13           A.   Just like other things in the economy,

14   my rate is moving with inflation I suppose, you

15   know, best way to describe it.

16          Q.   Do you do any expert work for anyone

17   other than Ms. O'Dell, Ms. Thompson and Ms. Par

18   fit?

19          A.   Yes.

20          Q.   What other expert work do you do?

21          A.   Not product liability, but other

22   medical malpractice issues.

23          Q.   Have you appeared as an expert in any

24   medical malpractice cases in the last four years?

25          A.   To the extent you mean appear by

                                                          22


                    UNCERTIFIED ROUGH DRAFT


1   deposition, court, what do you mean by that?

2          Q.    Either.

3          A.    In the last four years, I don't believe

4    I've had any depositions.  I've just been

5    consulting with attorneys.

6          Q.    In the last four years has all of your

7    expert income come from the Talc litigation?

8          A.    Can I correct what I just said a minute

9    ago to your last question.  I did have a deposition

10   recently within the past month.  Lasted for about

11   for two hours.

12         Q.    I do not believe that was disclosed

13   Leigh so I would request that you amend his

14    disclosure.  What was that deposition in?

15            A.   I'm sorry.

16            Q.   What was the case where you were

17    deposed?

18            A.   I believe it was the Albright case in

19    St. Louis.

20            Q.   What does that case involve?

21            A.   What does that case involve.

22            Q.   I'm sorry I didn't hear?

23            A.   It involves a abnormal pap smear that

24    the patient alleges was not reported to her.

25            Q.   Did the patient have cancer?

23

UNCERTIFIED ROUGH DRAFT

1          A.    She ultimately developed cancer

2    18 months after her pap smear.

3          Q.    What kind of cancer?

4          A.    Cervical cancer.

5          Q.    Were you paid $900 an hour for that

6    matter?

7          A.    Yes.  But I correct that I'm not sure I

8    may have started working with that attorney when I

9    was at $800 an hour.  I'd have to check my records

10   to be sure.  It may well be $800 an hour.

11         Q.    So in the middle of that proceeding you

12    didn't raise your rates?

13          A.

14              MS. O'DELL:  Object to the form.

15              THE WITNESS:  I stayed with the rate

16        that I offered to work for this attorney

17        when I originally was engaged.

18    BY MS. DAVIDSON:

19          Q.   In the Talc matter however you didn't

20    stay with your rate; is that correct?

21          A.   I didn't stay with the rate.  I got

22    approval from Ms. O'Dell to increase my rate.

23          Q.   Were you retained in Albright by the

24  plaintiff or the defendant?

25        A.   By the defendant.


                                                    24


                        UNCERTIFIED ROUGH DRAFT


1         Q.   Who was the defendant?

2         A.   I can't remember specifics.  It was a

3  nurse practitioner and a physician that worked in a

4  clinic affiliated with Barnes Jewish Hospital in

5  St. Louis Washington University.

6         Q.   Did you conclude that the pap smear at

7  been normal?

8         A.   I'm sorry.

9         Q.   Did you conclude that the pap smear

10   was, in fact, normal?

11          A.   No it wasn't normal.  I concluded based

12   on what I read on the pap smear report.

13          Q.   So what was the substance of your

14   expert opinion there?

15          A.   So the patient had abnormal pap smear

16   that showed some pre cancerous changes on her pap

17   smear and P H V.  Human papilloma virus high risk

18   types.  And the allegation is that the patient was

19   never informed about that.  There's evidence that

20   the nurse practitioner who obtained the pap smear

21   tried to communicate by the patient by way of

22    telephone and left the phone mess knowledge and

23    also tried to communicate by -- through their

24    medical record which is Epic through MyChart, sent

25    a message in MyChart to the patient and the patient

25

UNCERTIFIED ROUGH DRAFT

1    never responded to either one of those attempts at

2    communication.

3              MS. O'DELL:  Dr. Clarke-Pearson when

4         you say my chart do you mean your chart that

5         may be confusing.

6              THE WITNESS:  Sure my chart software

7        piece in the Epic electronic medical record

8        that communicates.

9    BY MS. DAVIDSON:

10        Q.   M capital M capital C Leigh?

11             MS. DAVIDSON:  Okay.

12    BY MS. DAVIDSON:

13        Q.   Okay.  Have you published any papers

14    related to Talc since 2021?

15        A.   No.

16        Q.   Have you made any public statements

17    concerning Talc and ovarian cancer since 2021?

18        A.   No.

19        Q.   Have you spoken in a public forum and

20    Talc and ovarian cancer in since 2021?

21        A.   I lecture I don't lecture I talk to the

22    medical students at the case base discussion.

23    Nearly every week.  As part of my teaching

24    responsibilities.  And then the course of those

25    discussions talcum powder is raised as part of a

                                                  26

                  UNCERTIFIED ROUGH DRAFT

1    discussion.

2        Q.   Do you use slides for those

3    presentations?

4        A.   No, I don't.  It's a case based

5    discussion.  The students are given a case to

6    review and about a dozen to 15 questions for them

7    to answer and then we have a zoom gathering where I

8    ask them to answer the questions that I've posed.

9    So one of the questions is what are risk factors to

10   ovarian cancer.  The student also times I'm not

11   sure what percentage sometimes bring up talcum

12   powder as run of the research in preparing for my

13   conference and other times they'll go to the point

14   of talking about tubal ligation and hysterectomy

15   being a risk reducing procedure and we then or I

16   will then say and inform them about talcum powder

17   being a risk factor as.

18          Q.    When you say is there's a case is it a

19    case of a real person?

20          A.    No, it's hypothetical case so I can get

21    main points of what I want them to learn.  So it's

22    a case I've made up.

23          Q.    Has the hypothetical plaintiff used

24    talcum powder?

25                MS. O'DELL:  Objection to form patient

                                                      27


                        UNCERTIFIED ROUGH DRAFT


1          not plaintiff.

2    BY MS. DAVIDSON:

3          Q.   Has the hypothetical?

4          A.   The hypothetical patient has ovarian

5     cancer and some of those risk factors are included

6     based you know for example the age of the patients

7     that I have hypothetically is I think in her 60s.

8     But there are many other risk factors that are not

9     part of that particular case but I ask the students

10    to expand on what other risk factors could the

11    patient possibly have.

12         Q.   My question is do you state in the case

13    that the patient used talcum powder?

14         A.   No.

15          Q.   When did you start talking about talcum

16   powder as a risk factor to medical students?

17          A.   I'm not sure I know.  When, I can't

18   give you a date.

19          Q.   Was it before or after you were

20   retained in this litigation?

21          A.   It was probably whether I was retained

22   in this litigation.  But as has been discussed in a

23   prior deposition, I became retained after I became

24   better educated about talcum powder but reviewing

25   literature at the time.

28

UNCERTIFIED ROUGH DRAFT

1          Q.    You were -- sorry?

2          A.    The literature that I was not aware of

3    to begin with.

4          Q.    You were retained in this litigation in

5    2018; correct?

6          A.    I believe so yes.

7          Q.    Is it your testimony that you discussed

8    talcum powder as a risk factor for ovarian cancer

9    with medical students before 2018?

10              MS. O'DELL:  Jessica I object to this

11          questioning the purpose of this deposition

12          is to ask questions about what's occurred

13          since his last deposition, August 2021.  He

14          was asked questions about what he was

15          telling students and others in 2018 --

16          before 2018 in his first deposition.  And so

17          we just ask you to focus on activity after

18          August 2021.

19     BY MS. DAVIDSON:

20          Q.   Dr. Clarke-Pearson you can answer the

21     question?

22          A.   I don't.

23               MS. O'DELL:  Would you repeat or have

24          Jessica please I'm not sure remember it

25          Dr. Clarke-Pearson may not either.

29

UNCERTIFIED ROUGH DRAFT

1            MS. DAVIDSON:  Court reporter can you

2        repeat my question.

3        (The reporter read the last question.)

4            THE WITNESS:  I don't recall when I

5        started talk to medical students about

6        talcum powder per se.

7            MS. O'DELL:  You guy can we go off the

8        record just for a moment we need to check

9        the power cord for Dr. Clarke-Pearson, so

10        let's go off the record.

11        (Recess taken from 9:37 a.m. until 9:38 a.m.)

12            Q.   Dr. Clarke-Pearson have you made any

13    public statements about asbestos and ovarian cancer

14    since August 2021?

15            A.   Not that I'm aware of.

16            Q.   Have you spoken in any public forum

17    about ovarian cancer since August 2021?

18            A.   No.

19            Q.   Do you recall giving a speech at Duke

20    earlier this year entitled reflections on

21    gynecologic oncology at Duke lessons learned?

22            A.   Yes.

23          Q.   Did you mention Talc during this

24    lecture?

25          A.   Lecture had nothing to do with ovarian

                                                    30


                        UNCERTIFIED ROUGH DRAFT


1    cancer.

2          Q.   Is it your testimony that you didn't

3    address ovarian cancer in that lecture?

4          A.   We may have talked about the research

5    that was done at Duke over the 50 years that I was

6    reviewing.  I'm sure there was some discussion

7    about notation of clinical trials that we

8    participated in that we have looked at other

9    treatments -- new treatments for ovarian cancer.

10   I'm not aware I had any discussion about risk

11   factors for ovarian cancer including tall talcum

12   powder.

13       Q.   Did you discuss the B R 1 gene in that

14   lecture?

15       A.   I may have.   That was some discovery

16   that some of my colleagues at Duke made.   So that

17   was the contribution to what Duke had contributed

18   had made to the oncology.

19       Q.   Did you mention 12 genetic variants

20   known to increase the risk of developing epithelial

21   ovarian cancer in that lecture?

22         A.   I don't recall, no.

23         Q.   Did you mention asbestos in that

24   lecture?

25         A.   I don't believe I did.


                                                        31


                        UNCERTIFIED ROUGH DRAFT


1          Q.   Do you have any forthcoming speeches or

2    presentations that relate to talcum powder?

3          A.   Not that I'm aware of.

4          Q.   Are you working on any materials or

5    studies that pertain to asbestos or talcum powder?

6        A.   No.

7        Q.   Do you still see patients?

8        A.   No, I don't.

9        Q.   When did you stop seeing patients?

10       A.   Approximately March of 2020.

11       Q.   March 2020?

12       A.   Yes.

13       Q.

14       A.   I may have continued.  I'm not sure the

15   exact end date of the last time I interacted with a

16   patient in the clinical setting.  It may have been

17   a few months later.  We were doing Zoom virtual

18   visits with patients after March of 2020.  I can't

19    remember exactly when my last zoom session was with

20    a patient.

21        Q.    Do you still teach any classes?

22        A.    Yes I teach medical students like I've

23    talked about before.  I also teach residents and

24    fellows in gynecologic oncology and residents in

25    obstetrics and gynecology at UNC.

                                                        32

                    UNCERTIFIED ROUGH DRAFT

1         Q.    As part of training residents you don't

2    see patients with them?

3         A.    I stopped doing clinical work when I

4    was -- when the pandemic hit, and I had a medical

5    condition which we don't need to talk about that

6    put me at high risk to develop COVID, and I was --

7    decided to stop doing clinical work.  I was in my

8    70s and felt like I had given it a good run in the

9    time that I provided care for patients and decided

10   it was time to stop the clinical work interacting

11   with patients.

12        Q.  So how do you train residents?

13        A.  I give lectures.  I do case base

14   discussions, I mentor them.  I've done some

15   collaboration with 134 publications that they were

16   working on.  So that's sort of training them.  Not

17    teaching them how to do surgery.  I do actually now

18    that you brought that up on a consistent basis

19    every 6 weeks case face to face with residents in

20    simulation lab to teach them how to do Hispanic

21    recollect me.

22         Q.   In August 2021 when you saw patients

23    was that erroneous?

24         A.   That would have been a mistake if

25    that's what I said.

                                                        33


                    UNCERTIFIED ROUGH DRAFT


 1         Q.   Do you when you speak to med students

2    about Talc being a risk factor for ovarian cancer,

3    do you tell the med students that you are a paid

4    expert for experts in Talc litigation?

5            A.    That doesn't come up sometimes it does

6    it.

7            Q.    What do you mean by sometimes it does?

8            A.    Sometimes sorry -- sometimes I will

9    happen to bring that up in part of the

10   conversation.

11           Q.    Do you have a practice of always

12   letting students know that you're an expert in Talc

13   litigation if the subject of Talc comes up?

14          A.   No, I don't.

15          Q.   Do you tell residents that Talc is the

16   a risk factor for ovarian cancer?

17          A.   Item he not sure I've had that

18   discussion with the residents.

19          Q.   Is it still the case that you have

20   never told a patient that their ovarian cancer was

21   caused by talc use?

22          A.   I'm sorry, I didn't hear your question.

23          Q.   Is it still the case that you have

24   never told a patient that their ovarian cancer was

25   caused by talc use?

34

UNCERTIFIED ROUGH DRAFT

1          MS. O'DELL:  Object to form.

2          THE WITNESS:  Yes, I think I've said

3      that before.  I haven't seen patients since

4      then, so I wouldn't have had that

5      conversation.

6  BY MS. DAVIDSON:

7          Q.   Is there a way to know today in 2024

8  whether a woman who used talcum powder and

9  developed ovarian cancer would knot E not have

10  developed ovarian cancer if she had not used Talc?

11          MS. O'DELL:  You're coming in very

12          faintly.  Our speaker has not moved, but

13          you're coming in very faintly.  So would you

14          mind repeating the question.

15   BY MS. DAVIDSON:

16          Q.   Court reporter, can you repeat the

17   question just so we make sure it's worded exactly

18   the same?

19          (The reporter read the last question.)

20              MS. O'DELL:  Object to the form.

21              THE WITNESS:  I'm not sure seems like

22          almost a double negative question you're

23          asking me.  Can you make restate it in some

24          way.

25    BY MS. DAVIDSON:


                                                        35


                        UNCERTIFIED ROUGH DRAFT


1            Q.   If a woman used talcum powder and

2    developed ovarian cancer, is there a methodology

3    cal way to know that she would not have developed

4    that ovarian cancer if she had not used Talc?

5            MS. O'DELL:  Object to the form.

6       Double negative.

7            THE WITNESS:  I know if she used talcum

8       powder she would be at higher risk and I

9       would talcum powder to be a cause as part of

10          the caution for her ovarian cancer.  If she

11          didn't use talcum powder she could still

12          ovarian cancer of course.

13   BY MS. DAVIDSON:

14          Q.   You testified in August 2021 that you

15   reached out to multiple people at ACOG to encourage

16   them to issue a statement about talc use and

17   ovarian cancer.  Do you recall that?

18          A.   Yes, I do.

19          Q.   Have you reached out to ACOG since

20   then?

21          A.   Yes, I have.  I also reached to the

22    society of gynecologic oncology leadership.

23         Q.   Let's mark as Exhibit 3 an October 15,

24    2021, an e-mail from the Maureen Phipps,

25    Christopher Zahn.  Who are Maureen Phipps and

                                                            36


                      UNCERTIFIED ROUGH DRAFT


1    Christopher Zahn?

2         A.   Can I get the e-mails.

3         Q.   Asher is going to put it up on the

4    screen.

5              Do you know without looking at the

6    e-mail who Maureen Phipps and Christopher Zahn are?

7         A.   Maureen Phipps is obstetrician

8    gynecologist who was at that point CEO of American

9    obstetrics and gynecology.  Christopher Zahn I'm

10   not sure of exact title he was let's just say the

11   vice president for clinical affairs I worked with

12   him on several committees.  Then I was active with

13   ACOG leadership myself.

14           Q.   Do you recall an article that you sent

15   them in October 15, 2021?

16           A.   I'm sorry I'm looking at my e-mail

17   here.

18           Q.   It's up on the screen.

19           A.   It's small.  Let me look at this.

20          Q.   Here Asher you can make it bigger.

21   Asher can you center it please?

22          MR. TRANGLE:  It's centered on my

23   screen.

24          MS. DAVIDSON:  For me the writing on

25   the right is cut off maybe not for hoarse.

                                                    37

                    UNCERTIFIED ROUGH DRAFT

1          THE WITNESS:  I can see it.  I would

2   have to go to link to be sure what this is.

3   But I think it was indicating that the FDA

4   had found asbestos in Johnson & Johnson baby

5          powder.

6    BY MS. DAVIDSON:

7          Q.   This is a link to an article from Yahoo

8    finance; correct?

9          A.   I see there's Yahoo https://
linkprotect.cudasvc.com/url?
a=https%3a%2f%2ffinance.com&c=E,1,Dj1GTV7hssq2DGzwJvBpTI452lBT9628ngTQ
Wus8diXvdjsu2gaqw04gKrz05TVjmPFrWDPkq0r8KHiMXfhFz0RGYYvnb2gk8QhsA—
F2hF0p3J1T906g&typo=1 news

10   I'm not sure exacts 8 what it said.

11         Q.   Asher can we mark the article as

12   Exhibit 4?

13              (Exhibit 4 marked for identification.)

14              MS. O'DELL:  Just for the record

15              Jessica was the e—mail that was displayed on

16              the screen is that Exhibit 3 and that the

17          only portion of Exhibit 3 is that e-mail.

18              MS. DAVIDSON:  I marked that as

19          Exhibit 3 we'll be going back to it.

20              MS. O'DELL:  I wanted to make sure that

21          was only document included in Exhibit 3.  Do

22          I understand that correctly?  Do I

23          understand that correctly?  Jessica there

24          was one page shown on the screen gentleman

25          when we go back to we'll check.  Asher.

                                                    38


                    UNCERTIFIED ROUGH DRAFT


1              MR. TRANGLE:  It's all one PDF, the

2          production from you.

3               MS. DAVIDSON:  We're going to Leigh I

4          thought the Dr. Clarke-Pearson would know

5          what article he had sent since he didn't

6          know we need to pull up the article go back.

7               MS. O'DELL:  More than fine.  We just

8          saw one page if it was a multiple page

9          exhibit I wanted to understand that.

10              MS. DAVIDSON:  Okay.

11              MS. O'DELL:  Fair enough.

12              MS. DAVIDSON:  Asher putting every

13         exhibit in the chat Leigh I will.

14              MR. TRANGLE:  It's whatever you sent

15          the whole PDF that I guys is the whole

16          exhibit.

17              MS. O'DELL:  Thank you Asher that was

18          my question.

19              MS. DAVIDSON:  Asher Yahoo finance yes

20          please.

21              MR. TRANGLE:  Adding it now.

22     BY MS. DAVIDSON:

23              Q.   Dr. Clarke-Pearson you testified a

24     minute ago that you thought the article was about

25     the FDA is that what the article is about can you

UNCERTIFIED ROUGH DRAFT

1    read can you read the headline?

2         A.   Certainly.  It says J&J puts Talc

3    liabilities into bankruptcy.

4         Q.   Why would you have sent ACOG an article

5    about J&J putting Talc liabilities into bankruptcy?

6         A.   Because I wanted to make sure that ACOG

7    was J&J was put into bankruptcy that J&J's baby

8    powder had been found to have asbestos in it and

9    that ACOG should think about why J&J is going into

10   bankruptcy at this point in time.

11        Q.   Would you consider this to be a

12   scientific article?

13          A.   No it's a news report.

14          Q.   Was it your idea to send this specific

15   article?

16          A.   Yes.

17          Q.   Or is this the lawyers?

18          A.   My idea.

19          Q.   Did anyone tell you to send this

20   article to ACOG?

21          A.   No.  I've been trying to communicate

22   with ACOG and SGO as you know previously on other

23   topics related to Talc and ovarian cancer that is

24   one more attempt at communicating with them.

25          Q.   Did you consider sending ACOG a

                                                      40

                    UNCERTIFIED ROUGH DRAFT

1    scientific article about Talc and ovarian cancer as

2    opposed to news article about J and J's bankruptcy?

3              MS. O'DELL:  Objection to form.

4              THE WITNESS:  I believe in the past I

5         have sent them scientific articles.

6    BY MS. DAVIDSON:

7          Q.   What scientific articles had you sent

8    them in the past?

9          A.   I would have to go back to my e-mails

10    to answer your question.

11           Q.

12           A.    As you might be aware, I if it's all

13    part of the same exhibit, my communication on

14    February 14 to ACOG and SGO has a link to

15    demonstrate 31 to 65 percent increased risk of

16    ovarian cancer in women with baby powder used twice

17    a week.  That link is a scientific article.

18           Q.    Who wrote that article?

19           A.    I would have to pull that up to see the

20    link.

21           Q.    Do you know if that article was written

22    by the paid plaintiffs expert?

23          A.   I don't know you'll have to tell me who

24     the article was written by.

25          Q.   Do you know if you told ACOG was

                                                              41


                         UNCERTIFIED ROUGH DRAFT


1     written by a paid plaintiffs expert?

2          A.   Most articles usually have a disclosure

3     on them explains who -- any financial or conflict

4     of interest.

5          Q.   My question is did you tell ACOG that

6     the author of the paper was a plaintiffs expert?

7               MS. O'DELL:  Object to form.

8                THE WITNESS:  What I told ACOG is on

9          the e-mail.  I told them nothing more.

10   BY MS. DAVIDSON:

11          Q.   In other words, you did not tell ACOG

12   that the article was by a plaintiffs lawyer;

13   correct?

14                MS. O'DELL:  Object to the form.

15                THE WITNESS:  I didn't specifically say

16          is that in this in that e-mail, no.

17   BY MS. DAVIDSON:

18          Q.   Is it your testimony that this article

19   from Reuters references an FDA finding of asbestos?

20          MS. O'DELL:  Are you talking about

21      Exhibit 4?

22          MS. DAVIDSON:  I am.  I believe you

23      said a minute ago that you sent to ACOG

24      because you wanted them to know about the

25      FDA finding of asbestos in one lot of

                                                    42

                    UNCERTIFIED ROUGH DRAFT

1       Johnson's baby powder.  So is it your

2       recollection that this article references

3       that.

4           MS. O'DELL:  So just for a moment, just

5       stop you for a moment there Jessica I think

6        Asher indicated he was going to put the

7        article in the chat.  He's not done that

8        yet.  So Asher if you don't mind doing that

9        the Exhibit 4 in the chat let's see I don't

10       have it in mine.  So I have only the chart

11       that was previously marked regarding

12       Dr. Clarke-Pearson's invoices.  So if you

13       wouldn't mind maybe putting it up again

14       maybe that's all I'm seeing at the point it

15       just appeared and so you've got a question

16       about what was said in the article then

17       Dr. Clarke-Pearson can pull it up in the

18          chat and look at the article and be able to

19          review it.  So Dr. Pier if you need

20          assistance opening the article in the chat

21          we're happy to do that.

22                MS. DAVIDSON:  Asher --

23                MR. TRANGLE:  Yeah.

24                MS. DAVIDSON:  Can you put it back on

25          the screen I will or coach the witness.

43

UNCERTIFIED ROUGH DRAFT

1                MS. O'DELL:  I am not.

2                MR. TRANGLE:  I'll put it back.

3                MS. O'DELL:  I am not.  If there's an

4         article been marked been questions about

5         substance in the article he's entitled to

6         review it not just what's on the screen.  So

7         if you Dr. Clarke-Pearson you can open the

8         chat and at the bottom and once you open the

9         chat then you'll be able to open that

10        article and then review it if you need to

11        and then you're welcome to respond to

12        Ms. Davidson's questions.

13                MS. DAVIDSON:  Thank you for your

14        colloquy Leigh.

15                THE WITNESS:  All right.  Okay.

16    BY MS. DAVIDSON:

17         Q.   Dr. Pier the question was you testified

18    earlier that you sent this article to ACOG because

19    you wanted ACOG to know that the FDA had found

20    asbestos in Talc.  I'm wondering is it your

21    testimony that this article references that?

22         A.   Actually I think I answered your

23    question once I saw what the article was.  So I was

24    mistaken.  This article talks about Talc the J and

25    J putting Talc liabilities in to bankruptcy.

                                                      44


                    UNCERTIFIED ROUGH DRAFT

1          Q.   It doesn't mention FDA's finding

2    purported finding of Talc in one lot of --

3               MS. O'DELL:  Object.

4    BY MS. DAVIDSON:

5          Q.   I'm in the middle of my question,

6    Dr. Clarke-Pearson.  I request that you don't

7    interrupt me and let me finish my question.

8               To your knowledge having reviewed now

9    this article which I believe is in front of you

10   there is no reference to any FDA purported finding

11   of Talc at any Johnson's baby powder; correct?

12              MS. O'DELL:  Object to the form.

13              THE WITNESS:  I haven't rule I asked

14          the link be opened up so I could see what

15          the article publication was.  Now that I've

16          got the publication in was in front of me I

17          can read it for you.  So I was miss spoken

18          if, in fact, this doesn't say that FDA found

19          Talc.  I would have to reread this article

20          it's been awhile.  What I was referencing

21          earlier in this brief conversation was

22          another link you were asked if I had sent

23          scientific articles to ACOG and I was

24          referencing a e-mail that I sent on

25          February 14, 2022.  This is a link to a

45

UNCERTIFIED ROUGH DRAFT

1        scientific publication.

2   BY MS. DAVIDSON:

3        Q.    And that scientific publication was

4   co- authored by plaintiffs expert; correct?

5        A.    You'll have to tell me which expert

6   you're talking about.

7        Q.    Do you know whether that article was co

8   authored by a plaintiffs expert?

9        A.    I need to pull that article up and look

10  at all the authors to be to answer your question.

11          Q.   We're going to talk about that article

12    later.  So just to be clear are you -- are you

13    correcting your earlier testimony that you shared

14    this with ACOG in order to share information about

15    the FDA?

16               MS. O'DELL:  Object to the form.

17               THE WITNESS:  If you would like me to

18          reread this article from Reuters and be sure

19          of what I'm saying, then we can take the

20          time to read it.  Otherwise I think what I

21          was trying to do was to alert ACOG to this

22          article let them read it and be aware of

23          what J and J was doing.

24    BY MS. DAVIDSON:

25         Q.    Do medical associations typically make

46

UNCERTIFIED ROUGH DRAFT

1    scientific decisions based on whether a company has

2    put its a subsidiary into bankruptcy?

3         A.    I think medical organizations make

4    decisions based on lots of things that are not

5    specifically scientific public opinion,

6    legislation, other information that organizations

7    are able to acquire.  ACOG being concerned about

8    women's health.  SGO being concerned about moving

9    with ovarian cancer and preventing ovarian cancer.

10    I would use some of this information as part of

11    their decision makings.

12         Q.    Is it your opinion that the can fact

13    that lawsuits have been filed against a company

14    supports should support public health decisions?

15             MS. O'DELL:  Object to the form.

16             THE WITNESS:  Can I try to rephrase

17        what you asking me.  Are you saying that

18        medical organizations would make decisions

19        based on the fact that the lawsuit was

20        filed?

21    BY MS. DAVIDSON:

22          Q.   Or in this case based on the fact

23     according to this article that tense of thousands

24     of lawsuits were filed, correct.

25              MS. O'DELL:  Object to the form.


                                                    47


                        UNCERTIFIED ROUGH DRAFT


1               THE WITNESS:  If that's what it says in

2               this article.  You know, tense of thousands.

3               So would a medical organization make a

4               decision based on that only.  No of course

5               not.  But it's just a piece of information

6               that they can use as they consider, go

7        through a full evaluation of the issue.

8   BY MS. DAVIDSON:

9        Q.   Are you an expert on bankruptcy?

10       A.   No, I'm not.

11       Q.   Did anyone at ACOG respond to this

12  e-mail?

13       A.   I believe we sent you an e-mail

14  response.

15       Q.   Asher do you want to go back to

16  Exhibit 3 and put up ACOG's response?

17            MR. TRANGLE:  I don't think I saw a

18       response for this one.

19          Q.   Dr. Clarke-Pearson did ACOG send a

20   response that you did not provide to us in

21   discovery?

22          A.   I'm looking at the e-mails that I have

23   in front of me which you have the same e-mails.  I

24   don't -- I don't recall.  I could not find a e-mail

25   response from ACOG on that topic -- on this

                                                          48


                          UNCERTIFIED ROUGH DRAFT


1   particular e-mail.

2          Q.   There's a redacted e-mail at the top of

3   this e-mail.  Is that simply you forwarding this

4   e-mail to counsel?

5                MS. O'DELL:  I would represent that

6           that is the case, that's a communication

7           with counsel and that's the reason it was

8           redacted.

9     BY MS. DAVIDSON:

10          Q.   So sitting here today do you know

11    whether ACOG responded to this e-mail or not?

12          A.   I don't have any evidence that ACOG

13    responded.

14          Q.   Are you familiar with two papers that

15    were published by a woman named O'Brien?

16          A.   Yes, you want to be specific about

17   which two papers.

18          Q.   Are you aware of two papers by a woman

19   named O'Brien with respect to ovarian cancer?

20               MS. O'DELL:  Object to the form.

21               THE WITNESS:  These two papers that

22          she's been a co author on.

23   BY MS. DAVIDSON:

24          Q.   Have you sent any of the O'Brien papers

25   to either ACOG or SGO?

                                                    49


                    UNCERTIFIED ROUGH DRAFT


 1          A.   Not that I'm aware of.

2      Q.   Why not?

3      A.   Because if I started sending every

4  paper that came out I would be sending papers

5  outline the time.  So I have not sent though to or

6  any others that have come out.

7      Q.   Is it your opinion that the Yahoo

8  finance article about J&J's bankruptcy has more

9  scientific value than the O'Brien publications

10  about Talc and ovarian cancer?

11          MS. O'DELL:  Object to the form

12      misstates his testimony.

13          THE WITNESS:  The Reuters article is

14      not a scientific article.  I think I said

15          that.

16    BY MS. DAVIDSON:

17          Q.   Is it your opinion that the Reuters

18    article is more relevant to ACOG's analysis of the

19    Talc issue than the published O'Brien papers?

20                MS. DAVIDSON:  Object to the form.

21                THE WITNESS:  They are two different

22          issues.

23    BY MS. DAVIDSON:

24          Q.   What do you mean by that?

25                MS. O'DELL:  I'm sorry I didn't hear

UNCERTIFIED ROUGH DRAFT

1          that please restate the question.

2    BY MS. DAVIDSON:

3          Q.   I just asked him to explain what he

4    means by that?

5               MS. O'DELL:  You're coming in very

6          faint.

7               THE WITNESS:  Very faint.

8               MS. O'DELL:  Jessica I think it may be

9          either if you don't mind getting closer to

10         microphone.

11              MS. DAVIDSON:  I am so close I'm like

12         3 inches away from my microphone.

13          MS. O'DELL:  Thank you for that, but --

14          MS. DAVIDSON:  Can't get closer.

15          MS. O'DELL:  We can hear Christine

16      fine.  So I think it's something on your

17      setup because Christine comes in loud and

18      clear when she's spoken.  So if you don't

19      remind repeating that, that would be

20      helpful.

21  BY MS. DAVIDSON:

22      Q.   I just asked Dr. Clarke-Pearson what he

23  meant by what he said?

24      A.   Now I've lost track of what we were

25    talking about.  We were talking about Reuters

51

UNCERTIFIED ROUGH DRAFT

1    article.

2            Q.   I was asking you whether you believe

3    that the Reuters article is more relevant to ACOG's

4    assess of the Talc add ovarian cancer issue than

5    the O'Brien publications?

6            MS. O'DELL:  Object to the form.

7            THE WITNESS:  So my answer is it's a

8        piece of information that I would say it's

9        more relevant than the whole picture of

10              talcum powder causing ovarian cancer.  It

11              was a point a point in time that I felt was

12              important to point out to ACOG.

13    BY MS. DAVIDSON:

14              Q.   And you did not feel it was important

15    to share the O'Brien papers with ACOG is that

16    correct?

17                   MS. O'DELL:  Object to the form.

18                   THE WITNESS:  There's a lot of papers

19              that I could have shared with ACOG above and

20              beyond the O'Brien paper.  I chose not to

21              continue to deluge them with papers showing

22              talcum powder causing ovarian cancer.

23    BY MS. DAVIDSON:


24            Q.   Is that what the O'Brien papers show?


25            A.   I'd have to look at the O'Brien paper


                                                          52


                    UNCERTIFIED ROUGH DRAFT


1    to answer your question.


2            Q.   And when you sent this on October 15,


3    2021, was that before or after O'Brien published


4    any of her papers with respect to Talc and ovarian


5    cancer?


6            A.   Again I don't know without seeing the


7    papers and dates of publication.

8         Q.    All right.  Let's move to the

9    valentine's e-mail to ACOG, February 14, 2022.

10   Were any of the O'Brien papers about Talc and

11   ovarian cancer published before February 14, 2022?

12             MS. O'DELL:  Object to the form vague

13        Dr. O'Brien has published a number of

14        papers.  And so the questions are clear.

15             MS. DAVIDSON:  Leigh.

16             MS. O'DELL:  Let me just finish I would

17        say further Dr. Clarke-Pearson was examined

18        about the O'Brien paper extensively in his

19        August 2021 deposition and as you know

20        Jessica this is a deposition to update his

21          testimony on any new materials since

22          August 2021.

23    BY MS. DAVIDSON:

24          Q.   Dr. Clarke-Pearson, when you sent these

25    papers, this paper this link to ACOG in

                                                        53

                        UNCERTIFIED ROUGH DRAFT

1    February 14, 2022, was that before or after O'Brien

2    had published papers relating to Talc and ovarian

3    cancer?

4          A.   I don't know the exact dates that

5    O'Brien published in this specific paper you're

6    referring to which she has co authored and authored

7    a number of papers.  So some of those papers were

8    before this valentine's day 2022 e-mail that I

9    submitted.

10        Q.   Why did you decide to share this --

11   this link which is the Woolen article with ACOG and

12   not the O'Brien papers?

13        MS. O'DELL:  Object to the form.

14        THE WITNESS:  I think this paper I mean

15        it's a powerful paper.  It says that protect

16        use greater than two times a week based on

17        their analysis increases the risk of ovarian

18          cancer significantly.

19   BY MS. DAVIDSON:

20          Q.   Are you aware that the link to this

21   which is the Woolen paper let's mark that as

22   Exhibit 5 Asher.

23              MS. O'DELL:  If you want to get the

24          Woolen paper you can read that.  We have it.

25   BY MS. DAVIDSON:

                                                    54

                   UNCERTIFIED ROUGH DRAFT

1          Q.   Are you aware a that the Woolen

2    meta-analysis that you sent to ACOG was based on a

3    meta-analysis that was prepared for this

4    litigation?

5              MS. O'DELL:  I object to the form.

6              THE WITNESS:  I was not aware it has

7         anything to do with the litigation.

8    BY MS. DAVIDSON:

9         Q.  Are you familiar with any of the names

10   of the authors of this paper?

11        A.  Well, Smith—Bindman I know has been an

12   expert for the plaintiff I do not know her.  The

13   other two authors I don't know at all.

14        Q.  Is there a convention in published

15   papers have the most senior's names last?

16          A.    I'm sorry senior person's name last.

17          Q.    Uh-huh?

18          A.    It's a convention that is usually used,

19    but I think that's agreement amongst all the

20    authors.  There's only three authors in this paper.

21          Q.    Let's mark O'Brien 2020 as Exhibit 6.

22                (Exhibit 6 marked for identification.)

23    BY MS. DAVIDSON:

24          Q.    This is a pooled analysis correct

25    Dr. Clarke-Pearson?

                                                            55

                   UNCERTIFIED ROUGH DRAFT

1          A.    Let me take a moment to pull it up.

2          Q.    It's on the screen.  And if you look

3    at?

4          A.    Well first of all it's so small I can't

5    read it and.

6          Q.    There you go?

7                MS. O'DELL:  Plus happy to respond to a

8    appropriate questions but he was examined at

9    length on the O'Brien paper in his 2021

10    deposition and this deposition is for

11    purposes of you inquiring about materials

12    disclosed that are new since August of 2021

13    and so I object to any examination that goes

14          into the details of O'Brien.

15    BY MS. DAVIDSON:

16          Q.   Dr. Clarke-Pearson this was a pooled

17    analysis correct if you look under design it says

18    data was pooled?

19               MS. O'DELL:  Feel free to review the

20          paper until you're prepared to answer

21          questions Dr. Clarke-Pearson.

22               THE WITNESS:  I'm having a hard time

23          finding it specifically.

24    BY MS. DAVIDSON:

25          Q.   Can you please look at it on the screen

56

UNCERTIFIED ROUGH DRAFT

1    so we can move on because I have limited time here

2    today?

3              MS. O'DELL:  Would you mind repeating

4         your question and/or ask Christine if you

5         would read it back.

6    BY MS. DAVIDSON:

7         Q.   Dr. Clarke-Pearson this is a pooled

8    analysis of cohort studies; correct?

9         A.   I see that in the abstract yes.

10        Q.   Thank you.

11        A.   Sorry.

12          Q.   If you look at the authors are you

13    familiar with any of these authors?

14          A.   Actually Dr. Callenwitz, I believe if

15    he's from Florida, I know him.  We've done a little

16    bit of work together on morcellation and uterine

17    sarcoma and fibroids.  O'Brien I'm only familiar

18    with because she has a number of publications.  The

19    other authors I'm looking at on the screen I'm not

20    familiar with or don't know them.

21          Q.   Are any of them plaintiffs experts to

22    your knowledge in this litigation?

23          A.   Not that I know of.

24          Q.   Are any of them NIH scientists?


25          A.   I'm not sure what their affiliation is.



                                                            57



                         UNCERTIFIED ROUGH DRAFT


1           Q.   You're not familiar with


2    Dr. Wentzensen?


3           A.   Sorry.


4           Q.   Wentzensen the senior author?


5           A.   I'm not aware of what Dr. Wentzensen's


6    is aside from being a M.D. Ph.D.


7           Q.   And you didn't send this to ACOG;


8    correct?

9          A.   I'm sorry would you repeat that.

10         Q.   You did not send this article to ACOG;

11   correct?

12         A.   No.  That's correct.

13         Q.   Can we mark as Exhibit 7 Wentzensen

14   O'Brien 2021.

15              (Exhibit 7 marked for identification.)

16   BY MS. DAVIDSON:

17         Q.   Please put it up on the screen Asher

18   and send it in the chat.

19              MS. O'DELL:  The same objection to the

20         Wentzensen O'Brien article that article was

21         referenced and included on the materials

22          list in Dr. Clarke-Pearson's July 2021

23          report.  He was examined on it during his

24          August 2, 0212, deposition at pages 15 pages

25          21, 86, 278 through 286.  That was on --

                                                      58


                    UNCERTIFIED ROUGH DRAFT


1   BY MS. DAVIDSON:

2           Q.   High re?

3               MS. O'DELL:  That was on August 26

4           deposition and.

5               MS. DAVIDSON:  Instead of derail why

6           don't you wait to hear my questions to

7          determine why they actually are repeating

8          prior questions.

9               MS. O'DELL:  Let me finish.

10              MS. DAVIDSON:  You've now objected to

11         every single question I've asked.  It's very

12         clear you're trying to drain the clock.

13              It's extremely unprofessional behavior.  So

14         why don't you wait until my question and

15         then decide if you want to object to it.

16              Asher, are you putting it on the screen.

17              MR. TRANGLE:  Yes.

18              MS. O'DELL:  Excuse me.

19              MS. DAVIDSON:  If you to object, please

20          object.  Stop wasting hours and hours of

21          this deposition.

22               MS. O'DELL:  I'm entitled to state

23          the -- excuse me, let me finish.  I'm

24          entitled to basis excuse me please let me

25          finish you've done that in a very

                                                    59


                    UNCERTIFIED ROUGH DRAFT


 1          professional and courteous way but the

 2          purposes of these depositions are quite

 3          clear and it's very clear that you want to

 4          re tread ground that was previously covered

5          and I'm entitled to note my objection for

6          the record which I've done so.  So if you

7          have a high level question about O'Brien and

8          Wentzensen ask it and let's move on but we

9          are going to object and get the judge on the

10         phone for any detailed retreading of old

11         material that's what I'm trying to convey to

12         you.

13             MS. DAVIDSON:  I am going to have to

14         reserve the right to go beyond 7 hours

15         because Leigh you are clearly filibustering

16         and trying to fill as much of this with your

17        objections.  Asher, can you please ––

18            Stop interrupting me.

19            MS. O'DELL:  The amount of the time for

20        the deposition is four hours just be clear

21        on that.  That's what the order says.

22        That's what we'll be available for today.

23    BY MS. DAVIDSON:

24        Q.   Dr. Clarke-Pearson can you read to me

25    Dr. Wentzensen and Dr. O'Brien's titles here?

                                                    60

UNCERTIFIED ROUGH DRAFT

1        A.   Titles on the –– so Wentzensen from the

2    division cancer epidemiology genetics national

3    cancer institute, national institutes of health.

4    And O'Brien is epidemiology branch, national

5    institute of environmental health sciences,

6    research triangle park.

7         Q.   Is either of them an expert in this

8    litigation?

9         A.   Not that I'm aware of.

10        Q.   Did you send there document to ACOG or

11   SGO?

12        A.   No.

13        Q.   Let's go off the record.

14   (Recess taken from 10:20 a.m. until 10:35 a.m.)

15          MS. O'DELL:  So counsel for Johnson and

16          Johnson seeks to extend this deposition

17          beyond four hours.  The plaintiffs position

18          is that that is supplemental deposition only

19          on materials that are new and

20          Dr. Clarke—Pearson's report since August of

21          2021.  And we submit that the deposition

22          should be limited to four hours and we will

23          stop the deposition at that time.

24          MS. DAVIDSON:  The court's Asher what's

25          the date of the court's order.

61

UNCERTIFIED ROUGH DRAFT

1          MR. TRANGLE:  101023.

2          MS. DAVIDSON:  The court owes order of

3      10102023 explicitly states that general

4      causation expert sub mental depositions will

5      be four hours if the general causation

6      expert also has specific conditions it will

7      be 7 hours or 14 hours.  The order could not

8      be clearer.  This order was issued in

9      October 2023 so it clearly contemplated

10     supplemental reports.  Dr. Clarke-Pearson

11     has amended his case specific opinions.  He

12     has also added case specific materials to

13          his materials considered.  If you end the

14          deposition after hour hours you are in

15          violation of the order.

16                  MS. O'DELL:  We disagree.

17                  MS. DAVIDSON:  All with opinions the go

18          less key that wasn't in the original report

19          there are material updates related to

20          Dr. Clarke-Pearson's case specific opinions

21          if this deposition ends after hour hours as

22          opposed to 14 you are in violation of the

23          court's order let's continue with the

24          deposition.

25          MS. O'DELL:  We disagree with that

                                                    62

                    UNCERTIFIED ROUGH DRAFT

1          position.  No new opinions about

2          Dr. Godleski and others, but let's proceed.

3          And that took two minutes.

4    BY MS. DAVIDSON:

5          Q.   Dr. Clarke-Pearson I'd like to mark

6    your second amended report from 11/15/2023 as

7    Exhibit 8?

8               (Exhibit 8 marked for identification.)

9    BY MS. DAVIDSON:

10         Q.   If we could turn to page 6 Asher?

11              MR. TRANGLE:  Page 6.

12              MS. DAVIDSON:  Uh-huh.

13   BY MS. DAVIDSON:

14          Q.   Dr. Clarke-Pearson, is it -- Asher

15   that's not on the screen that's all the way to the

16   right?

17              MR. TRANGLE:  Can you guys see it.

18              MS. DAVIDSON:  No.

19   BY MS. DAVIDSON:

20          Q.   Is it your opinion Dr. Clarke-Pearson

21   that Harper and Saed have demonstrated that

22   exposure to Johnson's baby powder cell

23    proliferation and malignant transformation in

24    normal ovarian epithelial cells?

25          A.   Yes that's what they say in their

                                                            63

                    UNCERTIFIED ROUGH DRAFT

1    paper.

2          Q.   I'm not asking you what they in your

3    paper.  You say in your report that they have

4    demonstrated this.  Is it your opinion that they

5    demonstrated these things?

6          A.   That is my opinion, yes.

7          Q.   Who is Dr. Saed?

8          A.    He's a translational research scientist

9    as best I understand at Wayne State University

10   cancer center there.

11         Q.    Is a plaintiffs expert in this

12   litigation?

13         A.    I believe so.

14         Q.    Had you ever heard of him prior to this

15   litigation?

16         A.    He's written a review article and -- in

17   the gynecologic and journal of pretty consistently

18   I'm not sure when he wrote that article so I aware

19   of him from research he's done outside of this

20   litigation.

21        Q.    Have you ever sited Dr. Sigh Ed in any

22    of your non-litigation work?

23              MS. DAVIDSON:  Object to the form.

24              THE WITNESS:  I'm sorry, cited him in

25        what situation?

                                                        64

                    UNCERTIFIED ROUGH DRAFT

1    BY MS. DAVIDSON:

2        Q.    Any non-litigation work?

3        A.    No.  I don't think I've written

4    anything that would require a citation about him or

5    by him.

6          Q.    Had you heard of his lab before you

7   were involved in this litigation?

8          A.    I'm not sure what you mean by heard of

9   his lab.  I was aware of he had written a review

10  article and he was a scientist I would assume he

11  has a lab.

12         Q.    Have you taken any steps to assess the

13  re liabilities of his conclusions or findings in

14  the paper that we've marked as Exhibit 8?

15              MS. O'DELL:  She's just object to the

16              form and Dr. Clarke-Pearson's report I

17              believe is Exhibit 8 I'm not sure you've

18              marked the paper.

19    BY MS. DAVIDSON:

20         Q.   Have you taken any steps to assess the

21    reliabilities of Dr. Saed's conclusions or findings

22    in Harper 2023?

23         A.   You're referencing the Harper paper as

24    the lead author.

25         Q.   Correct the one we just talked about?


                                                    65


                    UNCERTIFIED ROUGH DRAFT


1          A.   The technique that they used to --

2     thank you Margaret.  The technique that they used

3     to assess proliferation and identify malignant

4    transformation is a commercial technique and I'm

5    aware that technique is to be used in assessing

6    other chemicals and products as to their

7    carcinogenicity the chance it cause cancer.  So

8    it's technique that's used in laboratories.

9          Q.   What technique is that that you're

10   referring to?

11         A.   Well let me turn to their paper to give

12   you the name of it.  I'm sorry I'm skimming the

13   material section here to try to identify.

14         Q.   I believe you testified that technique

15   they used was one you're familiar with.  What

16    technique is that?

17              A.    No I didn't say I was familiar with it.

18    I said I read about it enough to understand that

19    it's used more than just in his laboratory to

20    identify a products things that could cause cancer.

21              Q.    Where else have you read about the

22    technique used by Dr. Sigh Ed?

23              MS. O'DELL:  He's trying to review the

24              paper and answer your question Jessica if

25              you'll just give him a moment.

                                                            66

                    UNCERTIFIED ROUGH DRAFT

1    BY MS. DAVIDSON:

2          Q.   Dr. Clarke-Pearson if you need to

3     review the article I'd like to go off the record

4     this was listed in your materials reviewed.  If you

5     want to read the article I'd like to go off the

6     record are you planning to before answering?

7          A.   I'm trying to specifically find this

8     technique that they describe in their materials.

9     So I've seen the -- I'm sorry I don't have the

10    name.  But the technique is described in the

11    company that manufactures it website.

12         Q.   Dr. Clarke-Pearson what are you doing

13    now?

14          A.   I'm looking for the rest of this paper

15   so I can see if I can help us understand what the

16   name of the methodology is that he is's using.

17          Q.   Well, I don't have all day here.

18          A.   I understand.

19          Q.   Although I am entitled to 14 hours.

20   Your counsel in tends to cut this deposition off

21   prematurely.  So if you don't know what technique

22   he used let's move on.

23          A.   Okay.

24          Q.   Do you know where else you read about

25   this technique?

67

UNCERTIFIED ROUGH DRAFT


1          A.   I've looked it up on the website of the

2     company that makes -- manufactures this technique.

3          Q.   Have you ever heard of Minerva before?

4          A.   A November a.

5          Q.   Minerva?

6          A.   Minerva.

7          Q.

8          A.   The publication.

9          Q.   Uh-huh.

10         A.   It's a scientific rear reviewed

11    publication.  I'm not sure I've heard of it per se.

12   It's not something I would usually read.

13          Q.   When was the last time you read an

14   article published in this journal?

15          A.   Probably I've never read an article

16   published in this journal.

17          Q.   Have you ever submitted an article to

18   journal?

19          A.   No.

20          Q.   Are you aware of a any ground breaking

21   scientific developments ever be being published in

22   this journal?

23                MS. O'DELL:  Object to the form.

24          THE WITNESS:  I don't have an opinion

25       on that.

                                                        68

                      UNCERTIFIED ROUGH DRAFT

1    BY MS. DAVIDSON:

2          Q.   Do you know of any ground breaking

3    scientific developments that were ever published in

4    Minerva?

5          MS. O'DELL:  Object to the form asked

6       and answered.

7          THE WITNESS:  Again I don't have an

8       opinion.

9    BY MS. DAVIDSON:

10          Q.   I don't know what that means is that a

11   yes or no?

12          A.   It means I don't know.

13          Q.   Have you ever cited a seize from

14   Minerva in your professional work?

15              MS. DAVIDSON:  Objection asked and

16       answered.

17              THE WITNESS:  Not that I'm aware of.

18   BY MS. DAVIDSON:

19          Q.   What's your basis for saying that

20   Harper and Saed demonstrated that Johnson's baby

21   powder causes p53 mutations?

22          A.    Based on the what they say in their

23    paper.

24          Q.    Did you independently evaluate whether

25    that is an accurate statement?


                                                            69


                        UNCERTIFIED ROUGH DRAFT


1          A.    I did not do any independent

2    investigation on that topic, no.

3          Q.    Did you do any independent

4    investigation on the validity of Harper and Saed's

5    claim that they have shown that exposure to

6    Johnson's baby powder causes p53 mutations cell

7    proliferation or malignant transformation?

8          A.   I didn't do any separate investigation,

9    though I read the paper.

10         Q.   Did you discuss the paper with anyone

11   in the field before making the statement?

12   A.   No.

13              MS. O'DELL:  Object to the form.

14              THE WITNESS:  No, I didn't.

15   BY MS. DAVIDSON:

16         Q.   I take it from your statements earlier

17   today about the materials you reviewed in

18   preparation for your deposition that you you're

19   wear that their was rejected by numerous journals

20   is that correct?

21          MS. O'DELL:  I'm sorry you cut out

22          there for a minute they were rejected by.

23   BY MS. DAVIDSON:

24          Q.   By several publications; is that

25   correct?

                                                          70

                     UNCERTIFIED ROUGH DRAFT

1          A.

2          MS. O'DELL:  Object to the form.

3          THE WITNESS:  I've seen a reviewers or

4          maybe more than reviewers list of comments

5          about a paper.  I'm not sure it's

6          specifically this paper.

7   BY MS. DAVIDSON:

8          Q.   Do you know which publications rejected

9   this paper?

10         A.   Let me go to the -- what I was given.

11  Looks like the start of this says plus one.

12  Several reviewers and comments.  Minor comments.

13  What I have looks like it's all review from plus

14  one.

15         Q.   Do you know whether projected sciences

16  rejected this paper?

17         A.   Not aware of that.

18          Q.   Do you know whether this paper was

19   submitted to gynecologic oncology?

20          A.   I don't know.

21          Q.   Do you know whether gynecologic

22   oncology rejected this paper?

23          A.   I don't know.

24          Q.   What the gynecologic oncology?

25          A.   It's a peer reviewed publication that

                                                        71


                        UNCERTIFIED ROUGH DRAFT


 1   deals with gynecologic oncology topics both

 2   clinical and translational research.

3        Q.  Have you --

4        A.  It's --

5            MS. O'DELL:  Let me finish.

6            THE WITNESS:  It's a publication of the

7   society of gynecologic oncologists.

8   BY MS. DAVIDSON:

9        Q.  Have you published papers there before?

10       A.  Yes.

11       Q.  Have you been on the editorial board?

12       A.  Yes.

13       Q.  Have you been a peer reviewer?

14       A.  Yes.

15          Q.    Have you been a peer reviewer for

16    multiple journals?

17          A.    Yes.

18          Q.    What is a peer reviewer do?

19          A.    A peer reviewer is asked to review the

20    manuscript that's been submitted.  Evaluate it for

21    its content 230 lack of a better word, offer any

22    criticism, any suggestions for improvement, and

23    ultimately submit those comments which then usually

24    go back to both the editor of the journal and --

25    and the author of the manuscript.

                                                          72


                    UNCERTIFIED ROUGH DRAFT

1           Q.    At gynecologic oncology have you ever

2    been responsible for selecting peer reviewers?

3           A.    No, I have not.

4           Q.    Do you know how gynecologic oncology

5    selects peer reviewers?

6           A.    Well having been on the editorial board

7    I have some general idea that the peer reviewers

8    there's a lengthy list of possible peer reviewers

9    that have -- people have agreed to participate as a

10   peer reviewer.  And then the editor I've never been

11   an editor of G Monday the to pick out peer

12   reviewers.  I think I just answered that question

13     for you.  The editor then goes through the panel of

14     possible reviewers and picks out a few usually two

15     or three to review the paper and submit and sends

16     that to the reviewer.  The editor would look at the

17     poor reviewers and select peer reviewers that are

18     most appropriate to review that particular paper.

19     So a paper I might submit on a clinical issues

20     would not be reviewed by scientists.  Likewise a

21     clinician like myself would not necessarily be

22     asked to review a translational research paper.  So

23     the editor tries to match the reviewer with the

24     content and of that paper.

25             Q.   So for a paper like Dr. Saed's, what

73

UNCERTIFIED ROUGH DRAFT

1    sort of peer reviewers would gynecologic oncology

2    look for?

3         A.   I would think they would pick peer

4    reviewers laboratory research.

5         Q.   Okay.  Dr. Clarke-Pearson, do you know

6    whether it's biologically possible to show

7    malignant cell transformation in 72 hours?

8         A.   That is what this paper says and that

9    is what the manufacturer of the technique that they

10   used says.

11          Q.   If Dr. Saed found malignant cell

12    transformation after 72 hours of exposure to talc,

13    would that be a revolutionary finding?

14               MS. O'DELL:  Object to the form.

15               THE WITNESS:  Not that I'm aware of.

16    BY MS. DAVIDSON:

17          Q.   What do you mean by that?

18          A.   What do you mean by revolutionary

19    finding?

20          Q.   Would that be a huge scientific

21    development for a scientist to find that exposure

22    to Talc can cause malignant cell transformation

23   after 72 hours?


24            MS. O'DELL:  Object to the form.


25            THE WITNESS:  Based on what I


                                                        74


                    UNCERTIFIED ROUGH DRAFT


1            understand about this technique, technique


2            is used to identify products that cause


3            cancer.  So if this transformation is


4            considered malignant then that's what that


5            technique is showing.


6   BY MS. DAVIDSON:


7            Q.   Can you identify any other situations


8   where this technique has shown malignant

9    transformation?

10          A.   I have not done a literature review on

11   the use of this technique.

12          Q.   You previously testified that it would

13   require 50 years of chronic inflammation or some

14   period of decades to for ovarian cancer to -- for

15   Talc exposure to cause ovarian cancer.  Do you

16   recall testifying to that effect?

17          A.

18          MS. O'DELL:  Object to the form Jessica

19      is there specific testimony that you're

20      referring to Dr. Clarke-Pearson testified

21          over three days and a Daubert hearing.  I'm

22          asking what testimony you're beginning give

23          us page and line be happy to.

24                    MS. DAVIDSON:  Thank you.

25                    MS. O'DELL:  Leigh put that in front

                                                          75


                         UNCERTIFIED ROUGH DRAFT


1           of.

2                     MS. DAVIDSON:  Leigh, I'm taking the

3           deposition.

4                     MS. O'DELL:  I understand that and

5           you're obstruction is really getting out of

6          control.

7    BY MS. DAVIDSON:

8              Q.   Dr. Clarke-Pearson do you recall

9    offering that testimony?

10             MS. O'DELL:  Let me just state my

11        objection very briefly.  That's not a

12        quotation of Dr. Clarke-Pearson.  If you had

13        like to put in front of him specific

14        testimony I think that would be appropriate

15        before you ask that question.

16   BY MS. DAVIDSON:

17             Q.   Dr. Clarke-Pearson do you recall ever

18   testifying that it would require chronic

19   inflammation for a period of decades for exposure

20   to Talc to cause ovarian cancer?

21        A.   I think in general I'm not sure I

22   testified but I believe that it does take time with

23   chronic inflammation in the situation with Talc to

24   expose the ovary to talcum powder to result in

25   transformation the number of mutations that are

76

UNCERTIFIED ROUGH DRAFT

1   required toll result in clinical evidence of

2   ovarian cancer.

3        Q.   Why would it take 50 years of chronic

4    inflammation to get malignant trans four 23

5    Dr. Saed was able to demonstrate malignant trans

6    force after 72 hours?

7              MS. O'DELL:  He said decades not 50

8         gears misstates his testimony.  Object to

9         the form.

10             You may answer, Doctor.

11             THE WITNESS:  I think I would de four

12        to Dr. Saed and other scientists that are

13        more familiar with this technique in terms

14        of explaining how they a chief malignant

15        transformation.

16    BY MS. DAVIDSON:

17          Q.    But so are you just taking it on that

18    Dr. Saed actually demonstrated malignant

19    transformation?

20              MS. O'DELL:  Object to the form.

21              THE WITNESS:  I have investigated the

22         technique they used the used in other

23         situations to identify carcinogenicity of

24         products like talcum powder.

25    BY MS. DAVIDSON:

                                                      77


                    UNCERTIFIED ROUGH DRAFT


1          Q.    But sitting here today you can't

2    identify any other situations where this technique

3    has shown carcinogenicity; correct?

4              A.   I would defer to the scientists that

5    have done this kind of work.

6              MS. O'DELL:  Object.

7    BY MS. DAVIDSON:

8              Q.   Let's mark the peer review comments on

9    Harper 2023 as Exhibit 9.

10             (Exhibit 9 marked for identification.)

11             MR. TRANGLE:  Is there a page you want

12        me to go to?

13             MS. DAVIDSON:  Let's go to the

14          gynecologic oncology reviewers.

15   BY MS. DAVIDSON:

16          Q.   If we could go to sentence that begins

17   as presented.

18              MS. O'DELL:  Give us a Bates Number no

19          that particular page.

20              MR. TRANGLE:  This is page 69.

21              MS. O'DELL:  Okay thank you.

22   BY MS. DAVIDSON:

23          Q.   Can you center as presented ton screen

24   Asher?

25              MR. TRANGLE:  It's kind of hard.

78

UNCERTIFIED ROUGH DRAFT


1                THE WITNESS:  I don't think I have

2        that.

3                MS. O'DELL:  So -- you may have a copy.

4    BY MS. DAVIDSON:

5        Q.   Dr. Clarke-Pearson, could you read the

6    first two sentences of the paragraph that begins as

7    presented out loud?

8        A.   Certainly.  What it says as presented

9    the manuscript presents several major issues that

10   warrant the attention prior to publication.

11   Primary concern is reliance on single commercial

12    assay for assessment transformation has not been

13    established in the literature.

14         Q.   Okay.

15         A.   Yeah.

16         Q.   I was just asking to read two sense

17    Dr. Clarke-Pearson this states that technique used

18    by Dr. Saed has not been established in the

19    literature; correct?

20         A.   That's what it says, yes.

21         Q.   Do you disagree with that?

22         A.   I don't disagree with what it says, no.

23         Q.   So it your testimony that that the --

24    that this commercial assay for assessment of

25    transformation has been established in the

79

UNCERTIFIED ROUGH DRAFT

1    literature?

2                MS. O'DELL:  Objection form.

3                THE WITNESS:  I'm not aware of whether

4          it has or hasn't been established.  I

5          haven't done that review.

6    BY MS. DAVIDSON:

7          Q.   But you are offering the opinion that

8    Dr. Saed has demonstrated malignant transformation;

9    correct?

10          A.   Yes.

11          Q.   Does it give you pause that the

12   commercial assay he used has not been established

13   in the literature as a reliable means for

14   assessment of transformation?

15               MS. DAVIDSON:  Object to the form.

16               MS. O'DELL:  Object to the form.

17               THE WITNESS:  I am not aware of what I

18          read to you reviewer who semester to be

19          anonymous offering the been about the

20          reviewed established in the literature that

21          I read to you.

22    BY MS. DAVIDSON:

23         Q.   And your experience does gynecologic

24    oncology have credentialed and capable peer

25    reviewers?

                                                        80

                    UNCERTIFIED ROUGH DRAFT

1              MS. O'DELL:  Object to the form.

2              THE WITNESS:  I'm not sure what you

3    mean by credentialed.

4    BY MS. DAVIDSON:

5         Q.   What has been your experience about the

6    caliber of reviewers for gynecologic oncology?

7              MS. O'DELL:  Object to the form if you

8          have any.

9                    THE WITNESS:  I mean it depends on what

10         the reviewer is being asked to do and what

11         their qualifications are so I don't know who

12         this reviewer is or what their

13         qualifications are.

14   BY MS. DAVIDSON:

15                    Q.   Have you done any work that would

16   enable to you disagree with what this reviewer

17   wrote?

18                    MS. O'DELL:  Object to the form.

19                    THE WITNESS:  I have not done any work

20        on that topic, no.

21   BY MS. DAVIDSON:

22        Q.   The rear goes on to appropriate 125 dis

23   cal tests would were not thus the data are

24   difficult to interpret.  Do you see disagree with

25   that statement?

                                                    81

                    UNCERTIFIED ROUGH DRAFT

1        A.   So let me back up from this.  This is a

2   review I'm not sure when it was done, this paper

3   was not published in GYN oncology.  These were

4   comments submitted to authors and in general it's

5    been my experience as author myself of 250 some odd

6    peer reviewed papers that the comments that I've

7    received back from a reviewer after submitting a

8    manuscript are these that I would evaluate and

9    decide whether I warrant to add those edits to and

10    corrections if you will.  Thin case though what

11    you're reading about statistics.  Dr. Saed was

12    basically it was suggested that he do something

13    more with statistics.  So this isn't a review of

14    the paper that is sitting in front of me that was

15    published in Minerva.  These are comments about a

16    manuscript prior to publication that was probably

17    edited.  You and I would have to go through this

18    manuscript and see whether he made those changes

19    that are being suggested by this reviewer.  But

20    these comments are not necessarily comments that

21    would apply to the current manuscript that was

22    published in a peer review publication.

23         Q.    To your knowledge, did Dr. Saed make

24    any changes to his statistical tests?

25         A.    I would have to look at this reviewers

                                                          82

                    UNCERTIFIED ROUGH DRAFT

1    comments and then go to Dr. Saed's -- actually

2    Dr. Harper's paper and see whether those changes

3    were made.

4              Q.    If Dr. Saed did not make changes to his

5    statistical tests would that concern you?

6              MS. O'DELL:  Objection.

7              THE WITNESS:  Yes I would think that he

8         take to heart those suggestions now he may

9         disagree with those discussions and not make

10        those changes and he would have to offer up

11        why he didn't make the changes maybe he is

12        perfectly confident and secure and certainty

13        that he has done and that this reviewer

14        could be wrong.

15   BY MS. DAVIDSON:

16          Q.   Did you wind reducer he also said the

17    results of this study are overinterpreted, do you

18    have any reason to disagree with the GYN oncology

19    reviewer that the results of this study are

20    overinterpreted?

21              MS. O'DELL:  Directing us to where

22         please I'm not seeing it on the screen I may

23         be over.

24    BY MS. DAVIDSON:

25          Q.   Asher, if you can put it up on the

                                                            83

UNCERTIFIED ROUGH DRAFT

1    screen.  Dr. Clarke-Pearson, can you respond to my

2    statement?  Do you disagree -- to my question.

3           Do you disagree with the statement that

4    the results of this study are overinterpreted?

5           MS. O'DELL:  Object to the form.

6           THE WITNESS:  I will take that you're

7           reading this from somewhere on the screen is

8           it overinterpreted, that's that reviewer's

9           opinion.

10   BY MS. DAVIDSON:

11          Q.   I'm asking juror opinion right do you

12   disagree with that comment?

13          A.    This comment is being made about a

14    manuscript that was not published what we have the

15    published manuscript the probably different than

16    what this reviewer is commenting on.

17          Q.    Do you have reason to believe that

18    Dr. Saed made changes to the results of his study

19    that this SGO reviewer said were overinterpreted?

20          A.    Do I have reason to believe I think

21    common sense would be the author submits a paper

22    for publication and goes through the peer review

23    process and the reviewer returns comments that the

24    author would then respond to those comments.

25          Q.    The reviewer told Dr. Saed stated that

84

UNCERTIFIED ROUGH DRAFT

1    the use of the word malignant was I were proper

2    6789 did Dr. Saed final paper use the word

3    malignant transformation?

4                MS. O'DELL:  Object to the form Jessica

5            that's on the page displayed on the screen

6            Asher would you mind discussing where that

7            ease stated.

8    BY MS. DAVIDSON:

9            Q.   Dr. Clarke-Pearson did the final paper

10   state that the authors had found malignant

11    transformation?

12         A.   Yes it did.

13         Q.   Do you believe the statement that the

14    authors had found malignant transformation is

15    overinterpreted?

16              MS. O'DELL:  Object to the form.

17              THE WITNESS:  No I don't believe it's

18         overinterpreted.

19    BY MS. DAVIDSON:

20         Q.   What's your basis for that?

21         A.   That this is work that was done with

22    assay that once again is used to identify compounds

23    that cause cancer and that the transformation of

24    these benign cells to malignant cells is

25    established by this assay.

85

UNCERTIFIED ROUGH DRAFT

1          Q.   As that ever been shown in

2    peer-reviewed literature?

3              MS. O'DELL:  Objection form.  Asked and

4        answered.

5              THE WITNESS:  I have not done any

6        further research on that topic.

7    BY MS. DAVIDSON:

8          Q.   So the only research you did was

9    looking at the assay manufacturers website is that

10   correct?

11                MS. O'DELL:  Object to the form.

12                THE WITNESS:  Yes.

13   BY MS. DAVIDSON:

14           Q.   The gynecologic oncology reviewer also

15   said that the doze of talcum powder is extremely

16   high 7 page 70 do you have an opinion as to dose of

17   whether talcum powder was extremely high?

18                MS. O'DELL:  Do you have please where

19           it says that.

20                MR. TRANGLE:  This is the bottom

21      reviewer number 2.

22  BY MS. DAVIDSON:

23          Q.   Doctor do you have an opinion as to

24  whether or not the dose of talcum powder was

25  extremely high?

86

UNCERTIFIED ROUGH DRAFT

1          A.   So I researcher can use whatever dose

2   if you will that they choose to explore.  Is this

3   extremely high compared to what my thrive on a

4   women's ovaries after using talcum powder maybe so.

5   I don't know no sure.  So this is the

6   interpretation this is the opinion of this

7    reviewer.  I don't know what the reviewer bases his

8    opinion on what's high what's low what's

9    reasonable.

10        Q.   This reducer states that the data are

11   premature restricted to two cell lines and really

12   offer no significant mechanistic insight do you

13   disagree with that statement?

14        A.   Well premature I don't agree with it at

15   all because I mean the first time somebody

16   publishes something that's oftentimes considered

17   premature, it's new information.  So it comes out

18   first, then would be in some people's minds

19    premature.  Obviously additional research needs to

20    be done to establish certain findings.  Restricted

21    to two cell lines well he used two cell lines.

22    More work needs to be done to get a third, fourth,

23    fifth cell line.  And mechanistic insight I think

24    there's mechanistic insight not only in this paper

25    but in many others before that talcum powder

87

UNCERTIFIED ROUGH DRAFT

1    created oxygen reactivity nitrogen species causes

2    secondary to the inflammation that talcum powder

3    causes which then causes ultimately going down

4    through the whole chain malignant transformation.

5           Q.   You can believe that can all happen

6    within 72 hours?

7                MS. O'DELL:  Object to the form.

8                THE WITNESS:  I believe that's what

9           that technique is showing in this particular

10          lab laboratory model, yes.

11   BY MS. DAVIDSON:

12          Q.   And again that opinion is solely on the

13   assay company's website and not any published

14   scientific literature; correct?

15               MS. O'DELL:  Object to the form.

16               THE WITNESS:  And what is in this

17         publication.

18    BY MS. DAVIDSON:

19         Q.   You testified a minute ago that you

20    don't know how the peer reviewer decided the dose

21    of talcum powder was extremely high.  If you look

22    at this comment he specifically states I calculated

23    to be 263 M M for the lower dose which is unlikely

24    to ever replicate physiological dosing.  Did you

25    calculate a what the dose of talcum powder was in

                                                    88


                    UNCERTIFIED ROUGH DRAFT


 1    this experiment?

2          A.   No, I did not.

3          Q.   Do you have any reason to believe this

4    is in accurate?

5               MS. O'DELL:  Object to the form.

6               THE WITNESS:  No.

7    BY MS. DAVIDSON:

8          Q.   Would this dose ever replicate

9    physiological dosing?

10              MS. O'DELL:  Objection form.

11              THE WITNESS:  John what physiological

12         dosing is.  Many times in pharmaceutical

13         evaluation of drugs when we talk about dose

14         response and toxicity the drug is given to,

15          you know, in a laboratory setting to animals

16          or otherwise at a variety of doses and in

17          some situations defined what the maximum

18          dose is researchers will go beyond what is,

19          you know, excessively high dose and it's

20          recognized that that dose results in see ver

21          toxicity and therefore that pharmaceutical

22          product dosing is dropped down to where it's

23          safe.  So I don't know it's not unreasonable

24          to use a high dose when you're investigating

25          the toxicity of a particular drug.

UNCERTIFIED ROUGH DRAFT


1    BY MS. DAVIDSON:


2         Q.    This isn't a drug though.  Do you know

3    whether Dr. Saed used excessively high dose or not?


4         A.    He used -- I don't know how you define

5    excessively high dose.


6         Q.    It was your term?


7         A.    It was the dose he used.


8              MS. O'DELL:  Let him finish.


9    BY MS. DAVIDSON:


10        Q.    It was your term.


11             Do you have an opinion as to the

12    whether or not the dose he used was excessively

13    high?

14              A.   I don't -- it's the dose the dose is

15    what it was.

16              Q.   Do you disagree with this peer reviewer

17    it was extremely high?

18              MS. O'DELL:  Object to the form.

19              THE WITNESS:  I don't have on opinion

20        about this peer reviewers comments.

21    BY MS. DAVIDSON:

22              Q.   This peer reviewer states that the use

23    of IHC to determine p53 mutation status is not very

24    sensitive.  Do you disagree with that statement?

25              MS. O'DELL:  Object to the form.


                                                        90


                        UNCERTIFIED ROUGH DRAFT


1               THE WITNESS:  I don't disagree with

2        what you read.  IHC is used to detect p53

3        mutations, both wild type and malignant

4        transformation.

5    BY MS. DAVIDSON:

6        Q.   Is IHC sensitive to detecting p53

7    mutation?

8        A.   Yes.

9        Q.   And what's your opinion for that based

10   on?

11          A.   Extensive personal experience with

12   pathologists sustaining with IHC to p53 mutations

13   in ovarian cancers in humans women that I've taken

14   care of.

15          Q.   The author says that the high dosing

16   was a major experimental flaw.  Did you disagree

17   with that?

18          MS. O'DELL:  I'm sorry Jessica where

19       are you reading.

20          MS. DAVIDSON:  Right there.

21   BY MS. DAVIDSON:

22          Q.   Did you disagree that the dosing was a

23   major experimental flaw?

24           MS. O'DELL:  Object to the form.

25           THE WITNESS:  No as I said before,


91


UNCERTIFIED ROUGH DRAFT


1        often times in investigating the dosing of a

2        particular drug or a product in this case

3        the researcher will run a gamut of different

4        doses to evaluate that particular -- the

5        reaction of the response of cells to those

6        tissue in this case to that product in this

7        case talcum powder.

8    BY MS. DAVIDSON:

9         Q.   So you disagree with this author's

10   statements that it's a major experimental flaw?

11        A.   Yes.

12        Q.   Let's move on the PLOS1 peer review

13   comments.  The PLOS1 reviewer states quote page 101

14   Asher it was not clear or explained how an acute

15   72-hour exposure to Talc powder leads to cell

16   transformation.  Do you believe that it was clear

17   or explained in the manuscripted in the article how

18   an acute 72-hour exposure to talc powder leads to

19   cell transformation?

20          MS. O'DELL:  Doctor if you need to

21      refer to the paper.

22          THE WITNESS:  I'm not sure where we

23      are.

24          MR. TRANGLE:  It's number 2 here under

25      major comments in the middle of the screen.


                                                    92


                    UNCERTIFIED ROUGH DRAFT


1           MS. O'DELL:  Thank you.

2   BY MS. DAVIDSON:

3           Q.   My question is do you believe it's

4   clear in the paper how an acute 72-hour exposure to

5   talcum powder leads to cell transformation?

6           MS. O'DELL:  What's your question.

7           THE WITNESS:  So I'm not sure again I'd

8      have to reread the paper to answer your

9      question about whether it's been explained.

10     Oftentimes in the explanation about a in the

11     evaluation of the results of a paper, that

12     occurs in the discussion section.  And, you

13     know, authors choose to discuss certain

14     points and disregard other points.  They

15     can't -- a discussion section could go on

16     forever and forever.  So it was if it was

17     not explained it's not necessarily

18          surprising to me.

19      BY MS. DAVIDSON:

20          Q.   How can a peer reviewer evaluate the

21      validity of a scientific paper if it's not

22      explained?

23          A.   I'm sorry you faded out on me there.

24          Q.   How can a peer reviewer evaluate the

25      validity of a scientific article if it's not

                                                    93


                    UNCERTIFIED ROUGH DRAFT

1    properly explained?

2                MS. O'DELL:  Object to the form.

3                 THE WITNESS:  Because peer reviewers

4            should have the acumen, if you will, to

5            understand what going on not have to have

6            everything explained to them in the

7            discussion -- in the specific paper.

8    BY MS. DAVIDSON:

9            Q.   So are you saying that fault here with

10   the peer reviewers and not the paper?

11                MS. O'DELL:  I don't remember.

12                THE WITNESS:  The peer reviewers may or

13           may not have understood the explanation for

14           the acute 72 hour exposure.  We don't what

15           did the peer reviewer knows.  The peer

16          reviewer was asking as I read this to have

17          an explanation.  Doesn't mean the peer

18          reviewers doesn't no maybe the other readers

19          should have an explanation so they can

20          understand.  This is the typical peer review

21          process where the peer reviewer offers up

22          suggestions about how one how they that

23          reviewer might suggest that the paper be

24          enhanced or changed to be more useful.

25     BY MS. DAVIDSON:

                                                       94


                    UNCERTIFIED ROUGH DRAFT

1          Q.   Dr. Clarke-Pearson do you believe it

2   was clear and explained in the article how an acute

3   72-hour exposure to talcum powder leads to cell

4   transformation?

5          A.   I don't think there was annex planning

6   in the article.  I'm not sure it's required in the

7   just because this peer reviewer says it wasn't

8   explained doesn't mean it has to be the in article.

9          Q.   Can you major comment number 4?

10         A.   Based on the minimal amount of a data

11   provided in this manuscript the authors conclusion

12   suggests acute exposure talcum powder Talc powder

13   to ovarian epithelial cells associated with ovarian

14   cancer or outrages and not supported by the

15   manuscript's data.

16        Q.   Have you ever received a comment from a

17   peer reviewer suggesting that any article you wrote

18   was outrageous?

19             MS. O'DELL:  Object to the form.

20             THE WITNESS:  I've had some pretty

21        unhappy comments from peer reviewers I'm not

22        sure anybody used the word outrageous.  I've

23        been unhappy sometimes when I received peer

24        reviewers comments back that are you know

25        strongly negative and.

95

UNCERTIFIED ROUGH DRAFT


1   BY MS. DAVIDSON:


2          Q.   But nobody?


3          A.   Have to just deal with that.


4          Q.   Nobody used the word outrages; correct?


5          A.   I'm sorry I talked over you.


6          Q.   I said nobody ever called your work out


7   rage us correct?


8               MS. O'DELL:  Object to the form.


9               THE WITNESS:  I don't recall that.


10  BY MS. DAVIDSON:

11          Q.    Do you disagree with the statement?

12          A.    Yes, I think that's a little overstated

13   in terms of the emotions that are involved in with

14   this comment.  I think I would have been I was not

15   happy with the way this paper was written I would

16   have been professional about it and outrageous goes

17   little bit communication with a colleague.

18          Q.    Do you think the authors conclusions

19   suggesting acute exposure of talc powder to ovarian

20   epithelial cells is associated ovarian cancer are

21   valid?

22          A.    That's what we've been talking about,

23   yes.

24          Q.   And that view is based again no the

25     peer reviewed bit you are but based solely on the


                                                        96


                        UNCERTIFIED ROUGH DRAFT


1     assay society company's website; correct?


2                   MS. O'DELL:  Objection to form.


3                   THE WITNESS:  Yes.


4     BY MS. DAVIDSON:


5          Q.   If we could continue the reviewer


6     states that the authors would need to conduct a


7     more diverse battery of tests to show that the


8     so-called transformed cells pose a tumor or cancer

9    cell pheno type do you disagree with that?

10         A.   This is a first of its kind paper.  We

11   talked about premature the word re Pratt you are

12   and I was saying this is now the first time this

13   has been published.  In this format.  And yes

14   additional research additional studies should be

15   done.

16         Q.   But you wrote in your report that they

17   demonstrated p53 mutation cell proliferation and

18   malignant transformation?

19         A.   Yes in this in this experiment and

20   doing more experiments with more cell lines maybe

21   different doses would be perfectly appropriate to

22   continue this line of investigation in the

23   laboratory.

24          Q.   But it's your opinion that they have

25   already demonstrated that exposure to Johnson's

97

UNCERTIFIED ROUGH DRAFT

1   baby powder causes p53 mutations cell proliferation

2   and malignant transformation in overall epithelial

3   cells; correct?

4          MS. O'DELL:  Object to the form

5       misstates his testimony.

6   BY MS. DAVIDSON:

7      Q.   I literally just read from his report?

8      A.   Yes and what I'm saying is I am

9  commenting with regard to this specific paper that

10  more research can be done and should be done I

11  think to continue to confirm or not confirm these

12  findings.  But these findings are what they are.

13      Q.   If we can move on to next reviewer.

14  This reviewer states that all claims from malignant

15  transformation should be changed to cell

16  transformation, do you agree with that comment?

17          MS. O'DELL:  Why are you reading from

18      please.

19          MR. TRANGLE:  This is number 5 at the

20          end of number 5 right above number.

21  BY MS. DAVIDSON:

22          Q.   Call claims for malignant

23  transformation should be changed to cell

24  transformation do you disagree with that statement?

25          A.   That's a suggestion of the reviewer.  I

                                                        98


                    UNCERTIFIED ROUGH DRAFT

1  think that Dr. Harper need to take that under

2  consideration and make a decision as to whether he

3  should or shouldn't make that change that reviewer

4  is suggesting.

5          Q.   Did they make that change?

6          A.   I believe they tuck with malignant

7    transformation.

8          Q.   Is cell transformation sufficient to

9    show malignancy?

10         A.   No it's a process moving towards

11   malignancy.

12         Q.   Okay.  Page 104.  Another peer reviewed

13   comment?

14              MS. O'DELL:  So.

15   BY MS. DAVIDSON:

16         Q.   The problems with the submission or too

17    numerous to count and the science methodology and

18    data cannot be trusted do you see that statement?

19              MS. O'DELL:  Just a moment please.

20              Asher would you mind putting that in the

21              chat.  We don't have access to that page.

22              MR. TRANGLE:  Sure.

23    BY MS. DAVIDSON:

24              Q.   Dr. Clarke-Pearson do you see the

25    sentence that says the problems with the submission

                                                         99

                    UNCERTIFIED ROUGH DRAFT

1    or too numb outside to count and the science

2   methodology and data cannot be trusted?

3           MS. O'DELL:  Object to the form.  I

4       think give him a moment to read what's being

5       shown not the whole page is not being shown

6       just to make sure he has it available to

7       him.

8           THE WITNESS:  I've read that that's

9       what this reviewer is saying.

10  BY MS. DAVIDSON:

11      Q.   Do you disagree with the reviewer's

12  statements?

13      A.   I think that reviewer statement is just

14  a big overview of details that he's included in the

15    prior comments and so one would really need to go

16    back and address each one of those comments and

17    this is again -- this is a reviewers comments

18    Dr. Harper would have taken in my opinion those

19    comments and reevaluated his manuscript and

20    adjusted the manuscript to not necessarily follow

21    what the reviewer says but to consider what the

22    reviewer is suggesting or saying and rewrite the

23    manuscript as much as he needed to.

24         Q.   Did Dr. Saed or Harper address any of

25    these comments to your knowledge?

                                                    100

UNCERTIFIED ROUGH DRAFT

1            MS. O'DELL:  Object to the form.

2            THE WITNESS:  The way they would

3      address the comments would be to go back to

4      their original manuscript which you and I

5      don't have I don't have it maybe you do, and

6      compare that manuscript with the manuscript

7      that got published see where the differences

8      are in that.  Those differences probably

9      would reflect at least some of the comments

10      that these reviewers have been make.

11   BY MS. DAVIDSON:

12            Q.   Sitting here today to do you know

13    whether Dr. Saed made any changes to the paper to

14    address these comments?

15            A.   I have no knowledge one way or the

16    other on that topic.

17            Q.   Have you ever received poor reviewer

18    comments saying that your science cannot be

19    trusted?

20            MS. O'DELL:  Objection.

21            THE WITNESS:  I'm not sure that would

22        be the terminology that would be that I've

23        seen but I've seen significant questions

24        about papers that I've submitted to asking

25          me to expand or validate and comment or redo

                                                                101


                            UNCERTIFIED ROUGH DRAFT


1          the statistics.

2     BY MS. DAVIDSON:

3          Q.   But nobody's ever said that your

4     science cannot be trusted; correct?

5               MS. O'DELL:  Object to form misstates

6          the document.

7     BY MS. DAVIDSON:

8          Q.   That's correct; right?

9               MS. O'DELL:  Object to the form.

10          Misstates the document does not sigh

11          science.

12                  THE WITNESS:  You know nobody's ever

13          said that to me or written that to me.

14    BY MS. DAVIDSON:

15          Q.    Thank you.  Let's go off the record.

16     (Recess taken from 11:23 a.m.  until 11:34 a.m.)

17          Q.    Dr. Clarke-Pearson before we left on

18    our break we were talking about peer reviewed

19    comments that were submitted with respect to

20    Dr. Saed's paper and just to recap there were two

21    peer reviewers for gynecologic oncology -- two peer

22    reviewers for PLOS1 and there were also two peer

23   reviewers for reproductive scientists.  Is that

24   correct?

25                MS. O'DELL:  Object to the form.  I

102

UNCERTIFIED ROUGH DRAFT

1        don't know that all those documents have

2        been shown to Dr. Clarke-Pearson.  So not

3        sure that's a fair question.

4   BY MS. DAVIDSON:

5        Q.   I believe it was all part of the same

6   exhibit.  Asher if you want to run through and show

7   on this?

8                MR. TRANGLE:  Happy to.

9    BY MS. DAVIDSON:

10           Q.   So we can agree there are peer reviewed

11    comments from three publications and multiple

12    reviewers for each publication.

13                You don't have these with you Leigh?

14                MS. O'DELL:  I have some of these pages

15           but I don't have all of these pages.  As you

16           know the production for Dr. Saed was pretty

17           extensive.  So I do not have everything.

18                MR. TRANGLE:  I put it in the chat when

19           I first displayed it.  It's all one PDF so

20           here it says two experts.

21    BY MS. DAVIDSON:

22            Q.    Do you see Dr. Clarke-Pearson where

23    gynecologic oncology says your paper has an at

24    least two experts in the field?

25            A.    Yes.

103

UNCERTIFIED ROUGH DRAFT

1            Q.    Okay.  Let's move on to the next so

2    that's GYN oncology you agree there were two peer

3    reviewers; correct?

4            A.    Yes.

5            Q.    PLOS1.  The it says both reviewers have

6    raised serious concerns about the experimental

7    designs and analyses of the interpretation of the

8    findings; is that correct?

9         A.

10         Q.    Asher you should learn how to

11    highlight?

12         A.    Yes, I see that.

13         Q.    So there were two peer reviewers for

14    PLOS1; correct?

15         A.    That's what it looks like, yes.

16         Q.    So that's four reviewers total so far;

17    correct?

18        A.    Yes.

19              Q.    And are you aware that reproductive

20    scientists also rejected this paper?

21        A.    I was not aware of that.

22        Q.    All right.  Will you now --

23              MS. O'DELL:  Would you mind letting us

24        know what the Bates Number is at the bottom

25        of this document.

                                                    104


                    UNCERTIFIED ROUGH DRAFT


1              MR. TRANGLE:  Sure.  It's the same --

2         it's the same prefix and it ends in 128.

3              MS. O'DELL:  Thank you.  Because what

4          you put in the chat is a 284-page document

5          so --

6                MS. DAVIDSON:  I can put in the chat

7          the number.

8                MS. O'DELL:  I just want to make sure

9          we understood what we're seeing because I'm

10         not sure that Dr. Clarke-Pearson been shown

11         this page previously.

12               THE WITNESS:  No, I have not seen this

13         one.

14    BY MS. DAVIDSON:

15         Q.   Dr. Clarke-Pearson are you now aware of

16    that reproductive science also rejected this paper?

17         A.    That's what I see on the screen, yes.

18         Q.    Also had peer reviewers; correct?

19         A.    Yes.

20         Q.    And is it typical to have two peer

21    reviewers for each journal that sort of standard

22    operating journal?

23         A.    I think I said earlier in the

24    conversation between you and me that sometimes 2

25    sometimes 3.

                                                      105


                    UNCERTIFIED ROUGH DRAFT

1          Q.   Got it.  At so he 6 peer reviewers felt

2   a that paper was not suitable for publication;

3   correct?

4          A.   Yes.

5          Q.   How many of these peer reviewed

6   comments had you read before you wrote your 2023

7   report?

8          A.

9               MS. O'DELL:  Object to the form.

10              THE WITNESS:  I have not before I wrote

11  my November 15, 2023, report.

12  BY MS. DAVIDSON:

13         Q.   ; correct.

14          A.   I had seen any of these comments.

15          Q.   When did you first see these comments?

16          A.   I believe it was yesterday.

17          Q.   Are you familiar with paper called

18   Mandarino 2020?

19          A.   Yes.

20          Q.   Let's mark that as Exhibit 10.

21               (Exhibit 10 marked for identification.)

22          Q.   If we could go back to your expert

23   report which is Exhibit 8, you added citations to

24   Mandarino; correct?

25          A.   Yes this is a new publication.

106

UNCERTIFIED ROUGH DRAFT

1        Q.   What does Mandarino say that supports

2    your opinion here?

3        A.   That talcum powder is macrophages to

4    produce increased reactive oxygen species.  We

5    talked about that before.  And changes in gene and

6    expression that could promote otogenic environment.

7        Q.   You look like you're reading from

8    something.  What are you reading from?

9        A.   Reading from my report.

10       Q.   Do you recognize any of the names of

11   the authors of this paper?

12        A.   Let me look.  Yes.

13        Q.   Which name do you recognize?

14        A.   Dr. Godleski.

15        Q.   Can you turn the declaration of

16    interest.  Do you see the declaration of interest?

17        A.   Yes, I do it's on the last page before

18    references.

19        Q.   Can you read the second sentence in the

20    declaration of interest?

21        A.   JJG S serve as an independent expert

22    and provided expert testimony in Talc and other

23    environmentally related litigation.

24        Q.    Who's JJG?


25        A.    I presume it's Dr. Godleski.


                                                    107


                        UNCERTIFIED ROUGH DRAFT


1        Q.    And Dr. Godleski is a plaintiffs


2   expert; correct?


3        A.    Yes.


4        Q.    Does this declaration make clear that


5   Dr. Godleski testifies on behalf of plaintiffs?


6        A.    He says he give us expert testimony in


7   Talc and other environmental related litigation.


8        Q.    Okay.  My question was does this --

9   does this declaration of interest make clear that

10   Dr. Godleski testifies on behalf of plaintiffs?

11        A.   I see what you're saying.  It doesn't

12   say plaintiff, no.

13        Q.   In fact, it says he's an independent

14   expert; correct?

15        A.   Yes.

16        Q.   How do you understand the term

17   independent expert?

18             MS. O'DELL:  Object to the form.

19             THE WITNESS:  I'm not sure I understand

20   what independent expert means.

21   BY MS. DAVIDSON:

22          Q.    Is it your opinion that this paper

23    shows this carcinogenic properties of Talc?

24          A.    Well as I said in my report just maybe

25    paraphrase it working with macrophages exposed to

                                                            108

                        UNCERTIFIED ROUGH DRAFT

1    talc, the macrophages in that environment increase

2    production of reactive oxygen species.  It changed

3    the genes in the macrophages and decreased immune

4    surveillance all of which could, would increase the

5    risk of the patient developing cancer or the cancer

6    progressing because of decreased immune

7   surveillance of the macrophages that had been

8   damaged by talcum powder.

9        Q.   Dr. Clarke-Pearson thank you for that

10   if you could try to answer my directly I'd

11   appreciate it since we are limited in our time?

12        A.   Okay.

13        Q.   Although there's a clear

14   misunderstanding as to how we're limited in our

15   time, I want to make clear again that based on the

16   court's ruling I do have 14 hours with you.

17             Dr. Clarke-Pearson, do you believe the

18   study shows the carcinogenic properties of Talc yes

19   or no?

20          MS. O'DELL:  Object to form.  Asked and

21      answered.

22          You may answer it in the fashion you'd

23      like.

24          THE WITNESS:  I think I think it's

25      demonstrating mechanisms that lead to

                                                    109

                    UNCERTIFIED ROUGH DRAFT

1      malignant transformation.

2  BY MS. DAVIDSON:

3          Q.   The authors state that their study did

4  not investigate the carcinogenic properties of Talc

5    per stay; correct?

6              A.   They say changes this is in are

7    abstract changes in expression of macrophage genes

8    pertinent in cancer development and immuno

9    surveillance.

10             Q.   Do the authors explicitly state their

11   study did not investigate the carcinogenic study of

12   Talc?

13             MS. O'DELL:  Objection.

14             THE WITNESS:  I'd have to reread.  Do

15        you have a sentence you want to show me that

16        says that?

17    BY MS. DAVIDSON:

18          Q.

19                MR. TRANGLE:  On the screen very bottom

20          right-hand corner last sentence on the page.

21                THE WITNESS:  Study we did not

22          investigate carcinogenic properties of Talc

23          per se.  Yes that's what he says.

24    BY MS. DAVIDSON:

25          Q.    You disagree with the authors on that?

                                                    110

                    UNCERTIFIED ROUGH DRAFT

1                MS. O'DELL:  Object to the form.

2                THE WITNESS:  I disagree no, I don't

3          disagree with the authors that's what they

4          said they weren't -- no I mean I don't

5          disagree with them.

6    BY MS. DAVIDSON:

7          Q.   Did the authors investigate whether the

8    activity this they discovered would involve an

9    increased likelihood of tumor growth?

10         A.   They say what they found were changes

11   I'm quoting from them pertinent in cancer

12   development doesn't say it caused cancer

13   development these are steps leading up top cancer

14   development they are identifying in their research

15    project.

16         Q.   So this paper does not show the

17    initiation of cancer in ovarian cells from Talc

18    correct?

19              MS. O'DELL:  Objection.

20              THE WITNESS:  Would you repeat the I

21         can.

22    BY MS. DAVIDSON:

23         Q.   This paper does not show the initiation

24    of cancer in ovarian cells from Talc; correct?

25         A.   That's my understanding.  That's

                                                  111

UNCERTIFIED ROUGH DRAFT

1    correct.

2            Q.    And the authors also did not show

3    whether talc has any effect on phagocytes in

4    humans?

5            A.    Any effect on what.

6            Q.    Phagocytes in humans?

7                  MS. O'DELL:  Object to the form.

8                  THE WITNESS:  Phagocytes in humans

9    you're saying.

10   BY MS. DAVIDSON:

11           Q.    Uh-huh.

12           A.    Not this model that they're using.

13    They weren't using human cells, as I recall.

14              Q.   And they didn't test whether Talc has

15    any kind of mutagenic or transform active effect on

16    human cells of any kind; correct?

17              MS. O'DELL:  Object to the form.

18              THE WITNESS:  That's correct.  They

19         used an animal model that's common in

20         laboratory research.

21    BY MS. DAVIDSON:

22              Q.   In fact, used rodent cells; right?

23              A.   I'd have to look at the specific I know

24    they weren't human cells.

25          Q.   Did the authors determine whether the

                                                        112

                    UNCERTIFIED ROUGH DRAFT

1   changes they found were unique to Talc?

2                MS. O'DELL:  Would you mind repeating

3           the question, please?  I couldn't hear it.

4           I'm sorry.  Would you mind repeating the

5           question, please?  I'm sorry, I couldn't

6           hear that.

7   BY MS. DAVIDSON:

8           Q.   The authors determine whether the

9   changes they found are unique to talc?

10          A.   They were unique to talc when they

11    compared it with other products such as titanium

12    objection tied and urban air son dense diesel part

13    sells.

14            Q.    If we could turn to page 9 sentence

15    beginning we also did not aim?

16                MR. TRANGLE:  The bottom of the left

17        column.

18    BY MS. DAVIDSON:

19            Q.    Can you read the sentence that begins

20    we also did not aim.

21                Asher if you could highlight it?

22        A.    I see it.

23          Q.    Can you read that sentence aloud?


24          A.    So we did not —— let me look it we did


25    not aim to determine whether the changes we found


                                                    113


                        UNCERTIFIED ROUGH DRAFT


 1    are unique to Talc.  The focus of our experiments


 2    was to demonstrate whether Talc is inert with


 3    ephasotized in a high estrogen milieu.


 4               That was their intent.


 5          Q.    So they did not aim to determine


 6    whether the changes were unique to Talc; correct?


 7               MS. O'DELL:  Objection to form.

8            THE WITNESS:  Well there may be other

9        products that could cause similar changes.

10        The products that they used that I just

11        identified including titanium objection side

12        did not cause the same changes that Talc

13        did.

14    BY MS. DAVIDSON:

15        Q.   And did this study examine Gene

16    expression levels or mutations?

17        A.   I think it looked at Gene expression

18    models.

19        Q.   Is a change in Gene expression the same

20    as inducing a mutation?

21          A.   No.

22          Q.   Do changes in Gene expression levels

23   always lead to cancer genesis?

24          A.   No.

25          Q.   Did this study use already malignant

                                                      114

                        UNCERTIFIED ROUGH DRAFT

1    cancer cells?

2           A.   I believe they did.

3           Q.   Okay.  Let's move on to Exhibit 11,

4    2021?

5           A.   I'm sorry what are you doing.

6          Q.    Exhibit 11 put on I'm 2021?

7                (Exhibit 11 marked for identification.)

8    BY MS. DAVIDSON:

9          Q.    Emi 21 transcriptomic and epigenomic

10   effects of insoluble particles on J774 of

11   macrophages.  Are you familiar with that paper?

12               MS. O'DELL:  Let me get it in front of

13        him.  Okay.

14   BY MS. DAVIDSON:

15         Q.    Dr. Clarke-Pearson you cited this paper

16   in your paper; correct in your supplemental report?

17         A.    Yes.

18         Q.    Why?

19          A.   Because it again is a new in vitro

20   research paper that shows the effect of talcum

21   powder on cell proliferation immuno response

22   signaling immuno surveillance it poptociceal.  So

23   all those things that can lead to ovarian cancer.

24          Q.   Does the study examine effects on human

25   ovarian cells?

                                                      115

                    UNCERTIFIED ROUGH DRAFT

1          A.   Let me just double-check.

2               No I think it's again a muring model, a

3   mass model.

4         Q.   And what type of cell does it look at?

5              MS. O'DELL:  Object to the form asked

6         and answered.

7              THE WITNESS:  Well, they were

8         chromosomally female cells which is relevant

9         to women getting ovarian cancer.  And widely

10        used in macrophage and phagocyte --

11        phagocyte model cell lines.

12   BY MS. DAVIDSON:

13        Q.   It discusses the effects of

14   macrophages?

15        A.   Yes.

16        Q.    Are those ovarian cells?

17        A.    No these are the macrophages part of

18   the immune system that is stimulated by reactive

19   oxygen species in chronic inflammation.

20        Q.    What did Emi find about titanium

21   dioxide?

22              MS. O'DELL:  Objection.  Form.

23   BY MS. DAVIDSON:

24        Q.    Do you recall whether this paper found

25   the titanium dioxide also leads to gene expression

                                              116


                    UNCERTIFIED ROUGH DRAFT


1   and transcription in phagocytes?

2          A.   I'd have to reread it.  I believe it

3   does to a lesser degree.

4          Q.   Does that surprise you?

5          A.   Not necessarily.  I mean it's a foreign

6   body as well, that can simulate an inflammatory

7   response but apparently not as much as talcum

8   powder.

9          Q.   So both talcum powder and supposed

10   control titanium dioxide led to changes in

11   phagocytes correct?

12              MS. O'DELL:  Sob re I didn't here it.

13   BY MS. DAVIDSON:

14          Q.   Did you get the question?

15       (The reporter read back the last question.)

16          A.   And my answer is question.

17          Q.   Does M E say anything about cancer

18    genesis?

19              MS. O'DELL:  Object to the form.

20              THE WITNESS:  Not that I recall.

21    BY MS. DAVIDSON:

22          Q.   And again it doesn't use human cells;

23    correct?

24          A.   No it doesn't.  It uses mouse cells.

25          Q.   Doesn't use ovarian cells; correct?

117

UNCERTIFIED ROUGH DRAFT

1          A.    That's correct.

2          Q.    And it's exogenic expression, not

3   malignancy; correct?

4                MS. O'DELL:  Object to the form.

5                THE WITNESS:  It identifies gene

6          expression yes.

7   BY MS. DAVIDSON:

8          Q.    So this paper does not examine whether

9   Talc causes mutations; correct?

10                MS. O'DELL:  Objection form.

11                THE WITNESS:  It doesn't identify

12          mutations you're correct.

13    BY MS. DAVIDSON:

14          Q.    So how does the study support your

15    opinion that Talc causes ovarian cancer?

16          A.    Would you repeat that question.

17          Q.

18    (The reporter read back the last question.)

19          Q.

20          A.    Right so those are all studies showing

21    mechanisms that result from chronic inflammation

22    caused by Talc.  And those properties that are

23    induced, that inflammation reactive oxygen species

24    immune alterations, alterations apoptosis, many

25    other things are all components of what results in


                                                        118


                            UNCERTIFIED ROUGH DRAFT


1     the development of ovarian cancer caused by Talc.

2              Q.   Is it still your opinion that the

3     mechanism by which Talc allegedly cause his ovarian

4     cancer is through inflammation?

5              A.   Absolutely.

6              Q.   If we can mark as Exhibit 12 Fong 2022.

7     In your report you cite this paper, Fong 2022.  Do

8     you recall that?

9              A.   I do.

10          Q.   Do you know who the authors were of

11   this paper?

12          A.   It's a consortium there's multiple

13   authors.

14          Q.   Do you recognize the name Daniel

15   Kramer?

16          A.   I'm sorry, what about.

17          Q.   Do you recognize that name?

18          A.   Yes.

19          Q.   How do you recognize his name?

20          A.   He's been involved with several peer

21   reviewed publications regarding talcum powder

22    causing ovarian cancer.

23          Q.    Is a he plaintiffs expert in this

24    litigation?

25          A.    I believe he has been.


                                                    119


                    UNCERTIFIED ROUGH DRAFT


1           Q.    If we could turn to his disclosure.

2           A.    Where is that at the end of the paper?

3           Q.    Asher putting up on the screen?

4                 MS. O'DELL:  Published version.

5     BY MS. DAVIDSON:

6           Q.

7            MS. DAVIDSON:  I'm going to read his

8       disclosure.

9  BY MS. DAVIDSON:

10            Q.   D W C reports payments for expert

11  testimony from Ferraro law firm and Ashcraft and

12  Gerel law firm.  Do you see that?

13            A.   I just found it, yes.

14            Q.   Does this sentence state whether

15  Dr. Kramer is an expert for plaintiffs or for

16  defendants?

17            MS. O'DELL:  Object to the form.

18            THE WITNESS:  He doesn't he doesn't say

19       plaintiff or defendant.

20   BY MS. DAVIDSON:

21        Q.   Does it say that he's an expert in Talc

22   litigation?

23        A.   No says he's an expert working with

24   these two law firms and also with grant funding

25   from NIH.

                                                    120

UNCERTIFIED ROUGH DRAFT

1        Q.   Someone reading this disclosure would

2   not know that Dr. Kramer is an expert for

3   plaintiffs in Talc litigation; correct?

4             MS. O'DELL:  Object to the form.

5                    THE WITNESS:  I don't have an opinion

6            about what people would know.

7    BY MS. DAVIDSON:

8            Q.   Does this sentence make clear that

9    Dr. Kramer is an expert for plaintiffs in Talc

10   litigation?

11           A.   No.

12           Q.   Thank you.  Let's move on to mark as

13   Exhibit 13 Woolen 2022 we've talked about this

14   paper; correct?

15           A.   Yes.

16                (Exhibit 13 marked for identification.)

17   BY MS. DAVIDSON:

18          Q.    This is the paper that you sent to ACOG

19   and SGO; correct?

20          A.    Yes.

21          Q.    Following those submissions by you to

22   ACOG and SGO did they change any of their public

23   statements with respect to Talc?

24          A.    I'm not aware of any changes.

25          Q.    Following your submissions to ACOG and

                                                        121


                    UNCERTIFIED ROUGH DRAFT


1   SGO have they issued any statements suggesting that

2   Talc is a risk factor for ovarian cancer?

3          A.   Not that I'm aware of.

4          Q.   Okay.  Have you read Dr. Smith buy

5    men's reports in this litigation?

6          A.   Her report?

7          Q.   Uh-huh.

8          A.   I have not read her expert report, no.

9          Q.   And as a result you're not aware that

10   Dr. Smith-Bindman the meta-analysis that led to

11   Woolen paper in her litigation report is that

12   correct?

13               MS. O'DELL:  Object to the form

14          misstates the evidence.

15              THE WITNESS:  I'm not aware.

16    BY MS. DAVIDSON:

17              Q.   Were you aware that Dr. Smith-Bindman

18    did meta-analysis for this litigation before this

19    paper was published?

20              A.   I was not aware.

21              Q.   Were you aware that Dr. Woolen received

22    Dr. Smith-Bindman's litigation report before

23    setting out to do the study?

24              MS. O'DELL:  Objection form.

25              THE WITNESS:  I was not aware of that.

                                                    122


                    UNCERTIFIED ROUGH DRAFT

1   BY MS. DAVIDSON:

2           Q.   And you were not aware of the 9 of the

3   11 studies in this paper had already been the

4   subject of a litigation meta-analysis; correct?

5           MS. O'DELL:  Objection to the form.

6           THE WITNESS:  I was not aware of that

7   either.

8   BY MS. DAVIDSON:

9           Q.   Are you familiar with the term post hoc

10  analysis?

11          A.   Somewhat, yes.

12          Q.   What does that mean?

13          A.   It means after the study has been done,

14   somebody not necessarily the primary researcher but

15   somebody could have access to the database and

16   reanalyze the database for asking another question

17   that might be contained in the data that's there.

18          Q.   Do you do post hoc analyses raise any

19   issue with respect to scientific in egg tee?

20          MS. O'DELL:  Object to the form.

21          THE WITNESS:  No I think scientific

22      integrity obviously ties back to publication

23      otherwise if it's just sitting on somebody's

24      desk it's not -- doesn't mean anything.  So

25      that integrity goes through the peer

123

UNCERTIFIED ROUGH DRAFT

1        reviewed process before it gets published

2        and identifying, you know, in the manuscript

3        that it's a post hoc analysis is important

4        for full disclosure.

5    BY MS. DAVIDSON:

6        Q.   Is the a reliability of a meta-analysis

7    contingent on proper selection of studies and data

8    sets?

9            MS. O'DELL:  Objection.

10           THE WITNESS:  I would say yes.

11   BY MS. DAVIDSON:

12           Q.   Did Woolen 2022 include the prospective

13   data from a O'Brien 2020 fold analysis?

14           MS. O'DELL:  Objection form.

15           THE WITNESS:  It obtained it -- I had

16       included information supplied by O'Brien

17       from the Minerva study one that as I

18       understand it had not been published

19       previously.

20   BY MS. DAVIDSON:

21           Q.   Do you know why Woolen 2022 did not

22   include prospective data from O'Brien 2020

23    published?

24              MS. O'DELL:  Objection to form the data

25         in 2020 is different than the data that was

                                        124

UNCERTIFIED ROUGH DRAFT

1         supplied by O'Brien for this Woolen paper.

2    BY MS. DAVIDSON:

3         Q.   Do you know what the reason for that

4    is?

5         A.   Because O'Brien hadn't published

6    previously on daily exposure in the previously

7    published national health study -- national health

8    study participants.

9          Q.   Did O'Brien 20220 use the term frequent

10    exposure?

11          A.   I have to go back to O'Brien 2020.

12          Q.   Why don't we mark O'Brien 2020 I think

13    we did actually?

14               MR. TRANGLE:  We did.

15          Q.   O'Brien 2020 was Exhibit 6 let's put

16    that up Asher we want to move things along we'll

17    come back to this.

18    BY MS. DAVIDSON:

19          Q.   If you could turn -- Dr. Clarke-Pearson

20    if you could look up on the screen just to move

21   things along.  Do you see where it says exposure.

22   Exposures in the abstract?

23          A.   Looking at the abstract.

24          Q.   Do you see on the screen the word

25   exposures?

                                                           125

                      UNCERTIFIED ROUGH DRAFT

1           A.   There's lots of words on the screen.

2           Q.   There's addressing on the screen?

3           A.   I got I can't okay.

4           Q.   Can you read what it says?

5           A.   Yeah says exposures ever Lang term

6    greater than 20 years and frequent.  Greater than

7    once a week.

8         Q.   Okay.  So?

9         A.   Once a week.

10              MS. O'DELL:  I don't think he was

11         finished.

12    BY MS. DAVIDSON:

13         Q.   So before Woolen was ever published

14    O'Brien had defined the term frequent is that

15    correct?

16              MS. O'DELL:  Object to the form.

17         A.   I think it's.

18              MS. O'DELL:  Object to the form you may

19      answer.

20   BY MS. DAVIDSON:

21      Q.   Doctor --

22      A.   I --

23          MS. O'DELL:  Let him finish his answer,

24      please, Jessica.

25   BY MS. DAVIDSON:

                                                126


                    UNCERTIFIED ROUGH DRAFT


1      Q.   Dr. Clarke-Pearson, I just was going to

2   repeat the question because there was so much

3   chatter by Leigh.  Before --

4          A.   Okay.  Go ahead.

5          Q.   Before Dr. Woolen published her

6     meta-analysis Dr. O'Brien in her paper had defined

7     the term frequent as greater or equal to one week

8     is that correct?

9               MS. O'DELL:  Object to the form.

10    BY MS. DAVIDSON:

11         Q.   Once a week?

12              MS. O'DELL:  Object to the form.

13              THE WITNESS:  I believe that's what the

14         report in this 2020 paper, yes.

15    BY MS. DAVIDSON:

16         Q.   Does Dr. Woolen explain anywhere in her

17   paper why she decided to deviate from Dr. O'Brien's

18   definition of the word frequent?

19           MS. O'DELL:  Objection to form.

20           THE WITNESS:  Well she I mean frequent

21       can have many definitions.  And Dr. Woolen

22       has chosen the definition that slightly

23       different than the did he have nation that

24       Dr. O'Brien used in the 2020 paper.

25   BY MS. DAVIDSON:

                                           127


                    UNCERTIFIED ROUGH DRAFT


 1           Q.   How many of the papers we can go back

2    to Woolen Asher.  How many of the papers sited in

3    Woolen involved two days per week of use?

4              A.   As I review -- as I see Table 2 it

5    would appear that all those papers would be at

6    least two days per week.

7              Q.   Do any of them involve two or three

8    days per week of use?

9              MS. O'DELL:  Object to form.

10             THE WITNESS:  Not that I see in the

11         column on Table 2.

12   BY MS. DAVIDSON:

13             Q.   Do any of them involve 4 days a week of

14    use?

15              MS. O'DELL:  Objection to the form.

16              THE WITNESS:  They could.

17    BY MS. DAVIDSON:

18        Q.   Which would that be?

19        A.   Four days -- four days per week for

20    example Chang 25 times per month.  That's almost --

21    that's almost daily if you exclude her men men's

22    central period during that month.  So that would be

23    every day of that month the patient in the Chang

24    studies were exposed.  So that's 4 or 5 or 6 days

25    per week.

UNCERTIFIED ROUGH DRAFT

1          Q.   Are I any of them limited to just four

2   days per week?

3          A.

4               MS. O'DELL:  Objection to the form.

5               THE WITNESS:  Mills has 4 to 7 times

6   per week.

7   BY MS. DAVIDSON:

8          Q.   Do you know if Dr. Woolen used the data

9   from mills for four times per week?

10         A.   I have no reason to think she didn't.

11         Q.   When you said excluded men's truly

12     period Asher please turn off your screen.  When you

13     said excluded -- excluding menstrual period what

14     did you mean by that?

15          A.   What did I mean.

16          Q.   Uh-huh?

17          A.   Well, most women in this study were pre

18     menopausal.  And likely in my humble opinion having

19     a men's central period once a month.  So if we look

20     at 30 days per month on an average month, several

21     of those days when the patients having menstrual

22     period those women may or may not be using tall

23     couple powder during that time.  But 25 times per

24     month is not necessarily 30 times per month like

25    every day but 25 times per month would expose the


                                                             129


                      UNCERTIFIED ROUGH DRAFT


1    patient to and answer your question four times per

2    peek.

3           Q.   That would be much more than four times

4    per week; correct?

5           A.   It could be.

6           Q.   Well, if you take 30 and you divide it

7    to 25 that's almost every day; right?

8           A.   25 out of 30 is almost every day yes.

9           Q.   I was asking if you're aware of any

10   data they used based on use only four days a week?

11          A.   I didn't understand your question that

12   way could you repeat it now.

13          Q.   Are you aware of any data used by

14   Woolen that involved use of just four days per

15   week?

16          A.   Woolen defined frequent use as two or

17   more times per week.  So four times per week is

18   greater than two times per week so she included

19   patients that had four times per week.

20          Q.   Which of the underlying papers used by

21   Woolen involved use just 2 to 4 times per week?

22          MS. O'DELL:  Objection to form.

23          THE WITNESS:  I'm not aware of any of

24     those papers that were just two times per

25     week.

                                             130

UNCERTIFIED ROUGH DRAFT

1   BY MS. DAVIDSON:

2        Q.

3        A.   All of them were more than all of them

4   were more than two times per week.

5        Q.   Are you aware of any papers that are

6   were just three times a week?

7        A.

8              MS. O'DELL:  Object to form.

9              THE WITNESS:  No.

10   BY MS. DAVIDSON:

11        Q.   Are you aware of any papers that were

12   just four times per week?

13        A.   I think you just asked me that

14   question.

15        Q.   Your answer was not clear?

16        A.   My answer was that four times per week

17   is in the mills study.

18        Q.   Dr. Clarke-Pearson, why would a woman

19   who has her period not use talcum powder?

20          A.   It's a personal preference.  I mean I

21   don't know I'm not a woman and I've used talcum

22   powder.  Never been around anybody that I can

23   personally say used talcum powder to give me just

24   informal answer.  So I mean obviously I'm aware of

25   studies where women have used on peroneal pad when

                                                    131

                    UNCERTIFIED ROUGH DRAFT

1    they're having their period.

2          Q.   I just wanted to understand the basis

3    for your statement earlier that about taking out

4    the time that woman has her period?

5          A.   I think exposure to talcum powder is

6    more likely when the patient not having her period

7    when the reproductive tract doesn't have blood

8    flowing out of it.  So talcum powder can ascend to

9    the ovary and tubes.

10          Q.   So is it your opinion that talcum

11   powder is less likely to ascend a woman's genital

12   tract when she has her period?

13          A.   Yes.

14          Q.   All right.  Let's go off the record for

15   five minutes.

16    (Recess taken from 12:13 p.m. until 12:23 p.m.)

17          Q.   Dr. Clarke-Pearson, would it have been

18    more accurate for the Woolen paper to have defined

19    frequent outside as four days or more of use given

20    what you saw in Table 2?

21              MS. O'DELL:  Object to the form.

22    BY MS. DAVIDSON:

23         Q.   Table 1 sorry.  Was it wait?

24              MS. O'DELL:  Object to the form.

25    BY MS. DAVIDSON:

                                                      132

                        UNCERTIFIED ROUGH DRAFT

1         Q.   Let me just make sure?

2              MR. TRANGLE:  It's 2.

3            MS. DAVIDSON:  Asher can you put it

4        back on up to the let me re-ask the again.

5    BY MS. DAVIDSON:

6            Q.   Based on our review before the break of

7    Table 2 would it have been more accurate to define

8    this study as looking at use of four days or more

9    per week?

10           MS. O'DELL:  Object to the form.

11           THE WITNESS:  So now you're sounding

12       exactly like the peer reviewers make it

13       should be looked at differently.  My answer

14       to you is this is what Dr. Woolen chose to

15       use greater than two times per week.  She

16          could have looked at it four times per week.

17   BY MS. DAVIDSON:

18          Q.   But Dr. Clarke—Pearson, she did look at

19   it as only four times per week or more.  We

20   concluded before the break that Table 2 does not

21   show any data for use between two and four days a

22   week; right?

23          MS. O'DELL:  Object to the form.

24          THE WITNESS:  Between two and four days

25   peer week.  No I mean you had asked me about

                                                  133

                    UNCERTIFIED ROUGH DRAFT

1          four days a week.  I cited the mills paper.

2   BY MS. DAVIDSON:

3          Q.   Right.  So Dr. Clarke-Pearson, the

4   Woolen paper does not use any data for two or three

5   days per week of use; correct?

6              MS. O'DELL:  Objection to the form.

7              THE WITNESS:  It used two or greater

8   days per week.

9   BY MS. DAVIDSON:

10         Q.   Two or three?

11         A.   Two or three.

12             MS. O'DELL:  Object.

13          THE WITNESS:  It would have included

14      three two or more days peer we can would

15      include three.

16  BY MS. DAVIDSON:

17          Q.   If someone used if there were papers

18  that reported on Talc use for two or three times

19  per week was that covered in Table 2?

20          MS. O'DELL:  Object to the form.

21          THE WITNESS:  Those patients would be

22      included in Table 2.

23  BY MS. DAVIDSON:

24          Q.   Patients who only used Talc two or

25  three days a week are included in Table 2?

134

UNCERTIFIED ROUGH DRAFT

1          A.   Two or more days per week are included

2    in Table 2.

3          Q.   Where in Table 2 can if you point me to

4    patients who used Talc either two days a week or

5    three days a week?

6          A.   So I think what you're trying to say is

7    specifically only two days per week or only three

8    days per week.  Is that what you're trying to say?

9          Q.   Correct, sir.

10         A.   I see so there's no specific

11    identification of that sort of patient.

12         Q.   So wouldn't be more accurate if this

13    paper stated that it defined frequent use as four

14    or more days per week?

15              MS. O'DELL:  Object to the form.

16              THE WITNESS:  They could have but they

17         chose to use greater than two days we are

18         per week.

19    BY MS. DAVIDSON:

20         Q.   Where are the data for two or three

21    days per week?

22              MS. O'DELL:  Objection.  Form.

23              THE WITNESS:  This is greater than two

24          days per week.  All these studies, the 11

25          studies of patients that receive that use

                                                                    135

                          UNCERTIFIED ROUGH DRAFT

1          talcum powder two or more days per week.

2   BY MS. DAVIDSON:

3               Q.   But, in fact, the only data are people

4   who use Talc four or more days per week correct?

5               MS. O'DELL:  Object to the form.

6               THE WITNESS:  I think that probably

7          would be correct.

8   BY MS. DAVIDSON:

9          Q.   Do you know if there are data available

10   anywhere from any of these studies that would

11   reflect two or three days per week of use?

12          A.   Not that I know of in these stubbed

13   studies, no.

14          Q.   Would you be surprised to learn that

15   some of these studies do include data for use that

16   correlates to two or three days per week?

17              MS. O'DELL:  Object to the form.

18              THE WITNESS:  If they use two or three

19       days per week then they would have been

20       using two or more days per week which would

21          be included in this analysis.

22   BY MS. DAVIDSON:

23          Q.   So it's your testimony that if any of

24   the studies listed in able 2 provided data for two

25   days per week of use they would have been included

                                                136

                    UNCERTIFIED ROUGH DRAFT

1   here; correct?

2                MS. O'DELL:  Objection form.

3                THE WITNESS:  Two or more days per week

4   would be included in this study, yes.

5   BY MS. DAVIDSON:

6          Q.   Are you aware that when it came to

7    O'Brien the Woolen authors only used data for

8    patent women?

9          A.    I didn't hear whole question.

10         Q.    Are you aware that the Woolen authors

11   only used data for patent women from the N H S 1

12   study?

13         A.    Yes.   That was harmonized with many of

14   the other studies of the other ten where the

15   authors chose to only focus on patients that had

16   patent fallopian tubes and intact uterus.

17         Q.    Can you point to a single one of those

18   tone studies that focus on patent women?

19          A.    Individual to go back to those studies

20    and look at them I know some in there.

21          Q.    So it's testimony that some of those

22    ten studies are reported in Table 2 only for patent

23    women?

24          A.    That included only patency, yes.

25          Q.    How many of the ten?

                                                        137


                        UNCERTIFIED ROUGH DRAFT


1           A.    I don't know I'd just told you I'd have

2     to go back and look at them.  That's why they

3     harmonized.  You wouldn't harmonize with patients

4    didn't have patency and report it under footnote

5    number 5.

6            Q.   Would it surprise you that not a single

7    one of those ten other studies actually was

8    restricted to women with patent reproductive

9    tracts?

10            MS. O'DELL:  Objection to form.

11            THE WITNESS:  Again I would have to

12        look at those study.

13    BY MS. DAVIDSON:

14            Q.   Would it surprise you if it were the

15    case that not one of those ten studies was limited

16    to women with patent reproductive tracts?

17          MS. O'DELL:  Objection to the form.

18          THE WITNESS:  I don't know because I

19     would have to look at the studies again.

20  BY MS. DAVIDSON:

21          Q.   But you testified a few moments ago

22  that it was done to harmonize with these other ten.

23  Is that still your testimony?

24          A.   That's what the author said in footnote

25  number 5.

                                                    138


                    UNCERTIFIED ROUGH DRAFT


1          Q.   Do you know if that's accurate?

2          A.   I believe it is.

3          Q.   What is that belief based on?

4          A.   My understanding is that some of these

5   other studies one through 10 included -- focused

6   only on patients with patent fallopian tubes.

7          Q.   What's that understanding based on?

8          A.   On having previously read these papers.

9   I at that time this moment cannot tell you which

10  papers have patency as their criteria.

11         Q.   Do you have an opinion as to whether

12  it's some, most, of those ten?

13         A.   I'd have to review those papers.

14         Q.   If none of the studies in 1 through 10

15   is restricted to women with patent reproductive

16   tracts would that footnote that we just looked at

17   about harmonization be inaccurate?

18              MS. O'DELL:  Object.

19              THE WITNESS:  Hypothetical question if

20         none of them had patency.

21   BY MS. DAVIDSON:

22         Q.   If none of those ten studies is limited

23   to patency, then is footnote number 5 about

24   harmonization accurate?

25              MS. O'DELL:  Object to form.

UNCERTIFIED ROUGH DRAFT

1            THE WITNESS:  Hypothetical case yes.

2        But I don't know why they would say

3        harmonize if there were none had patency as

4        part of their criteria okay.

5    BY MS. DAVIDSON:

6        Q.   Okay.  Could we look at the data that

7    are listed here for Wu.  On line 10?

8        A.   I see it.

9        Q.   Great, Asher.  Asher has mastered

10   highlighting.  Excellent.

11       A.   Yeah, that's terrific.

12          Q.   Let's do that going forward, Asher.  I

13    was going to ask you on a break to chat with

14    paralegal and figure it out, and we're glad you've

15    mastered that important skill that they do not

16    teach in law school.

17               Dr. Clarke-Pearson we're look at the Wu

18    study right that's a case controlled study from

19    2009 you read that study before; correct?

20          A.   Yes.

21          Q.   And the data provided here for Wu says

22    greater than 30 times per month; correct?

23          A.   Yes.

24          Q.   And so how many times we are week is

25    that?

140

UNCERTIFIED ROUGH DRAFT

1          A.    Well assuming that there's a 30 to

2    31 days a month it seems like it would be every

3    day.

4          Q.    Correct.  Do you know whether Wu do you

5    recall from your review of that paper where it also

6    provided you can leave that Asher are you familiar

7    whether Wu also provided data with respect to women

8    who used Talc ten times per month?

9                MS. O'DELL:  Object to the question or

10          to one we need to get the paper in front of

11          Dr. Clarke-Pearson.  Wu is a study that was

12          produced sometime ago.  It was involved or

13          was cited in his first report and he was

14          examined it on his first deposition.  Wait a

15          moment and we'll put it in front of.

16     BY MS. DAVIDSON:

17          Q.   I would like to note for the record

18     that Ms. O'Dell is my object about a study that's

19     included in a paper that's in your current report.

20          Dr. ?

21          MS. O'DELL:  That's not the basis of my

22          objection.  I'm saying this is not a memory

23        test and he is entitled to see a study that

24        he's being asked about specific questions

25        about the data that's all.  And just give a

141

UNCERTIFIED ROUGH DRAFT

1        moment he's happy to answer your questions.

2        But we just need to get the study in front

3        of him.

4   BY MS. DAVIDSON:

5        Q.   Dr. Clarke-Pearson do you know

6   whether -- what are you looking at right now?

7        A.   I'm looking at the paper trying to

8  find.

9          Q.   Which paper?

10         A.   The information that you're asking me

11  about with regard.

12         Q.   Which paper?

13         A.   With regard to utilization what's that.

14         Q.   Which paper are you looking at?

15         A.   The Wu paper is that.

16         Q.   Because we're doing this video I

17  appreciate you if you look at isn't up on the

18  screen.

19         A.   Oh, certainly this is Wu 2015.

```
20        Q.   Do you have an --


21        A.   You want to me it.


22        Q.   Do you have notes on Wu 2015?


23        A.   No, I don't.


24        Q.   Okay.  Do you know whether?


25        A.   2009.
```

                                                           142


                          UNCERTIFIED ROUGH DRAFT


```
1         Q.   Do you know whether Wu provided there's


2    a lot of movement in the room?


3         A.   I'm being handed copy of is the paper


4    you wanted to talk about which is 2009.


5         Q.   Dr. Clarke-Pearson, do you know whether
```

6  Wu 2009 provided data from multiple time periods of

7  use?

8          A.   I don't recall.

9          Q.   Do you know whether they provided data

10  for multiple frequencies of use?

11          A.   I'm looking at a table that says yes.

12  Be happy to look at that table with you if you

13  like.

14          Q.   Dr. Clarke-Pearson if somebody uses a

15  product ten times a month per more how many days a

16  week is that?

17          A.   You're averaging this out so that would

18    be probably on average 3 days per week.

19         Q.    So that would be more than two days;

20    right?

21         A.    Yes.

22         Q.    So if the Wu study had provided data

23    for use ten times per month, that would have

24    satisfied the Woolen criteria of more than two

25    times per week; correct?

143

UNCERTIFIED ROUGH DRAFT

1              MS. O'DELL:  Object to form.

2              THE WITNESS:  I think we just averaged

3        that out.  So ten times per month so ten --

4        ten out of 30, let's call a month 30 days.

5        So that's one out of three days so that

6        would be two or three times per week.

7    BY MS. DAVIDSON:

8        Q.  So if Wu had reported data for use ten

9    times or more per month that would have satisfied

10   the frequent definition used by Woolen; correct?

11            MS. O'DELL:  Objection.  Form.

12            THE WITNESS:  I believe it would.

13   BY MS. DAVIDSON:

14       Q.  But Woolen only used the date for 30

15   times or more per month; correct?

16          A.    That's what I think I recall from

17    the -- the table you had up earlier.

18          Q.    We can put Table 2 back up.  Do you

19    know why Woolen would have used data for 30 times

20    per month as opposed to data for ten times per

21    month?

22          A.    I can only speculate as to what

23    Dr. Woolen was thinking maybe ten times per month

24    didn't satisfy her criteria for greater than two

25    times per month or per week.

                                                    144

                    UNCERTIFIED ROUGH DRAFT

1          Q.   We've done the math and two times per

2    month is more than two times per week; correct?

3               MS. O'DELL:  Object to form.

4               THE WITNESS:  That's on average.

5    BY MS. DAVIDSON:

6          Q.   Just the same way that 30 times per

7    month on average is once a day; correct?

8          A.   That's correct.

9          Q.   Let's move on.

10              Do you know how Woolen came to the

11   conclusion that two timings a week reflects

12   frequent use?

13         A.   No, I don't.

14          Q.   Are you aware that in

15   Dr. Smith-Bindman's expert report she also defined

16   regular use and she defined that as three times a

17   per week?

18               MS. O'DELL:  Object to form.

19               THE WITNESS:  You called it -- I'm

20        sorry, I don't recall.  She called it what,

21        did you say?

22   BY MS. DAVIDSON:

23          Q.   Are you aware that Dr. Smith-Bindman

24   meta-analysis for the litigation was based on

25   defined regular use as three times per week?

145

UNCERTIFIED ROUGH DRAFT

1           MS. O'DELL:  Objection.

2           THE WITNESS:  I think I already

3       indicated I hadn't read her report, so I

4       don't recall that.

5   BY MS. DAVIDSON:

6       Q.   And therefore you also don't know why

7   she changed her exposure metric from three times

8   per week to two times per week; correct?

9           MS. O'DELL:  Objection to form.

10          THE WITNESS:  So you're saying Woolen

11          paper because Ms. Bindman is a co—author had

12          something to do with the definition.  I

13          don't have any opinion about that.  I'm

14          speculating.

15     BY MS. DAVIDSON:

16          Q.   Let me ask you another question.  If we

17     could look at Table 1 of Woolen 2022.  Do you know

18     what the Newcastle Ottawa scale is?

19          A.   Only vaguely this is a metric a tool if

20     you will that bio statisticians use.  In general my

21     own view is that it's sort of talks about the

22     strength of a study.  Grades the strength of a

23     study so as you'll see in the far left hand there's

24  a column there that has a total score, but that's

25  about as much as I can tell you.

146

UNCERTIFIED ROUGH DRAFT

1        Q.   Do you recall any other publication

2   that you've reviewed for purposes of this

3   litigation that uses the Newcastle Ottawa score --

4   scale?

5        A.   Can I check on one.

6        Q.   Sure.  Which one are you checking on?

7        A.   I'm looking at Lynch.

8             That may not be correct so I'm not

9    aware of the studies that have used that.

10         Q.   Sorry.  I didn't mean to interrupt you.

11    Sometimes it's hard to tell when you're done.

12         A.   I understand.  I'm not aware of other

13    studies that have used the Newcastle scale, but ...

14         Q.   Do you recall a meta—analysis called

15    Taher?

16         A.   Maher?

17         Q.   Taher.

18         A.   Taher, yes.

19         Q.   Do you recall whether they used the

20    Newcastle Ottawa scale?

21         A.   That's a memory test, I don't recall.

22          Q.    Asher why don't we put that up on the

23    screen.  Wait a minute.  Let me just look at my

24    numbers.  I believe Taher or Taher I don't know

25    would be Exhibit 14.


                                                    147


                        UNCERTIFIED ROUGH DRAFT


1                (Exhibit 14 marked for identification.)

2    BY MS. DAVIDSON:

3          Q.    So we're marking at Exhibit 14?

4          A.    Did you get it for me marching Brett.

5                MS. O'DELL:  Give me a moment Jessica

6          to put the Taher paper in front of him.

7          Obviously he was examined on the Taher paper

8          during his 2019 deposition and at least and

9          possibly the 2021 deposition.

10   BY MS. DAVIDSON:

11          Q.   Asher can you put the Taher paper up or

12   is this the Taher paper that's up?

13               MS. DAVIDSON:

14               MR. TRANGLE:  This is it.

15   BY MS. DAVIDSON:

16          Q.   Can you turn to page 1 go back to that.

17   Taher, critical review of the association between

18   perineal use of talcum powder and risk of ovarian

19    cancer.  It's a meta-analysis.  Do you recall this

20    paper?

21         A.   I do.

22         Q.   Okay.  This is Exhibit 14 and if we

23    could turn to page 90.  It says the quality of

24    included study his with assessed using the

25    Newcastle Ottawa scale does that refresh your

                                                    148


                        UNCERTIFIED ROUGH DRAFT

1    recollection?

2         A.   Yes.  Yes.

3         Q.   Have you I take it since you did 23409

4    recall that that you have not compared the Woolen

5   papers scores for the underlying studies with the

6   Taher papers scores for the underlying studies; is

7   that correct?

8          A.   That's correct I have not compared.

9          Q.   Would it surprise you to know that the

10  Woolen paper rated every single component case

11  controlled study higher on the Newcastle Ottawa

12  scale than Taher did?

13         A.   I don't know if there's anything that

14  surprises me.  I mean there's differences of

15  opinion about quality which are -- which are not

16  quantitative but qualitative evaluations of papers.

17          Q.   Do you know why Woolen would have

18   scored every single study higher than Taher did?

19               MS. O'DELL:  Objection to the form.

20               THE WITNESS:  I don't know I only be

21          conjecting -- only be guessing.

22   BY MS. DAVIDSON:

23          Q.   And so do you know -- do you know how

24   many of the nine case controlled studies listed

25   here were rated higher than Woolen than by Taher?

                                                    149


                    UNCERTIFIED ROUGH DRAFT


 1               MS. O'DELL:  Object to form.

2                    THE WITNESS:  I don't know I'd have to

3          put the two studies side by side.

4    BY MS. DAVIDSON:

5          Q.   Do you recall that Taher said that

6    these case controlled studies provided only a week

7    evidence?

8                    MS. O'DELL:  Object to form.

9    BY MS. DAVIDSON:

10         Q.   If we could turn to that Asher?

11              Can you read the Asher has highlighted

12   in yellow Taher?

13         A.   Sure.  Using grade pro for the

14   assessment, the certainty of the evidence was

15   classified as very low.

16           Q.   Did Woolen agree with that in her

17   paper?

18           A.

19               MS. O'DELL:  Object to the form.

20   BY MS. DAVIDSON:

21           Q.   In their paper the in the Smith paper?

22           A.   I don't know if she commented on it.

23   I'm not sure what grade pro is.

24           Q.   Do you disagree with Taher that the

25   certainty of the evidence is very low?

                                                    150

UNCERTIFIED ROUGH DRAFT

1              MS. O'DELL:  Object to the form.

2              THE WITNESS:  That's what he says.  I

3       don't -- I don't agree or disagree.

4    BY MS. DAVIDSON:

5              Q.   Okay.  If Woolen had used all women

6    from N H S one instead of the just patent women do

7    you know if it would have affected the results of

8    the paper?

9              A.   I'm not aware of that data, so I don't

10   know how it would have affected the results.

11             Q.   What's the typical age when the woman

12   gets a tubal ligation?

13          A.   Typical age.  Well once she's decided

14   she doesn't want to have anymore children one.  I

15   would have to -- I don't know the data from my

16   experiences as a gynecologist.  I would say

17   somewhere between 35 and 40.

18          Q.   And do you know what the typical age is

19   when women start using Talc?

20          A.   My understanding in the teenage years

21   once they start having periods.

22          Q.   So if you are only looking at patent

23   women, you're probably excluding a lot of women who

24   could have used talc for upwards of a decade or

25    two; correct?


                                                    151


                        UNCERTIFIED ROUGH DRAFT


1                MS. O'DELL:  Objection to form.


2                THE WITNESS:  Yes.


3    BY MS. DAVIDSON:


4        Q.   And does just to be clear, you would be


5    excluding women who have used talc for a decade or


6    two before their tubal ligation; right?


7        A.   Yes, from the time of teenage years


8    until whenever had their tubes tied.


9        Q.   Okay.  If we could go back to the Wu

10   paper?

11        A.   I'm sorry the Wu paper.

12        Q.   Uh-huh.  We were talking about on the

13   Wu paper if we could go to Table 3?

14        A.   Oh, I'm sorry one second.

15        Q.   Table 2 sorry.  Table 2 of the Wu

16   paper?

17        A.   Yes.

18        Q.   Which we're going to mark as Exhibit 15

19   because I never marked Wu.

20             (Exhibit 15 marked for identification.)

21             For women who used Talc greater than

22   ten but less than 30 times a month, is the

23    statistical -- is the association identified by Wu

24    statistically significant?

25              MS. O'DELL:  Objection, form.  20

                                                    152

                    UNCERTIFIED ROUGH DRAFT

1         years, greater than 10, less than 30 times a

2         month, is that the line?  Thank you.

3              THE WITNESS:  I'm sorry.  Was your

4         question statistically significant.

5    BY MS. DAVIDSON:

6         Q.   Correct.

7         A.   And the answer is no it -- overlaps

8    one.

9              Q.   Of all the associations listed here,

10   for different periods of use how many are

11   statistically significant?

12             A.   So greater than 20 years and greater

13   than 30 times per month is statistically

14   significant.

15             Q.   So only one is statistically

16   significant; correct?

17             A.   If you go up to --

18             Q.   I just mean in this section.  In this

19   section that looks at frequency and duration.

20             A.   Just frequency and duration, not the

21    lines above it?

22            Q.    Correct.

23            A.    Yes, then that's -- one second.  Well

24    then if you go down they're statistically

25    significant increased greater than 200 times per

                                                    153

                        UNCERTIFIED ROUGH DRAFT

1     month or per year.

2             Q.    I'm looking at --

3             MS. O'DELL:  Please don't interrupt.

4             Jessica, it may be difficult to understand

5             Doctor.  If you're not hearing him, let us

6        know, but he wasn't finished with his

7        answer.  And if you'd kindly let him finish,

8        I think the record will be clear.

9    BY MS. DAVIDSON:

10        Q.   Dr. Clarke-Pearson I'm just talking

11   about the subsection that says frequency and

12   duration of talc use, not total times.  If you just

13   look at the subsection entitled frequency and

14   duration of Talc use, there are one, two, three,

15   four five -- there are six point estimates there;

16   correct?

17        A.   Yes.

18          Q.   And one, two, and four of those six

19    involve use of at least two times per week because

20    four of those 66 involve use of greater than ten

21    times per month the second one the third one the

22    fifth one and the 6th one.  Asher be great if you

23    high light them.  So --

24               MS. O'DELL:  Finished with your answer?

25          Object to form.


                                                    154


                     UNCERTIFIED ROUGH DRAFT


1    BY MS. DAVIDSON:

2          Q.   So if you see the four that are

3    highlighted, we've highlighted the four point

4    estimates from Wu that involve use on average of

5    more than two days per week; correct?

6         A.   Yes.

7         Q.   And of those four only one is

8    statistically significant; correct?

9         A.   Yes.

10        Q.   And of those four the one with the

11   highest relative risks is the one that was used by

12   Woolen in her paper; correct?

13        A.   I believe so.

14        Q.   Okay.  Thank you.  You can take that

15   down.

16              Is there a scientific definition for

17    frequent use of Talc?

18              MS. O'DELL:  Objection to form.  Asher

19         if you would please put Wu in the chat I

20         would appreciate it thank you.

21              THE WITNESS:  To answer your question,

22         Ms. Davidson I'm not aware of any specific

23         definition of what was -- I'm sorry what was

24         your term frequent use?

25    BY MS. DAVIDSON:


                                              155


                    UNCERTIFIED ROUGH DRAFT

1          Q.   Yeah.  That was a subjective decision

2   by the authors how to define frequent use; correct?

3               MS. O'DELL:  Objection.

4               THE WITNESS:  Yes, I have no problem

5          with that at all.

6   BY MS. DAVIDSON:

7          Q.   I'm just asking you was a subjective

8   decision by the authors I'm not asking whether you

9   had a problem with it?

10              MS. O'DELL:  Objection to form.

11              THE WITNESS:  Yes that's a decision by

12         the authors.

13  BY MS. DAVIDSON:

14          Q.    Thank you.  And nowhere in their paper

15    do they explain how they came to that decision;

16    correct?

17          A.    Not that I'm aware of.  A reviewer

18    might have asked them to do that if they felt that

19    was important.

20          Q.    Do you know how much the sample size

21    would have increased if the authors had not limited

22    the N H S one data to patent women?

23          A.    No, I don't.

24          Q.    Do you know if it would have doubled?

25          A.    I don't know.

156

UNCERTIFIED ROUGH DRAFT

1        Q.   Do you know if it would have tripled?

2             MS. O'DELL:  Doctor, just let us know

3    when you get --

4        A.   I would have to go back to the original

5    Bryant paper to answer your question.

6        Q.   What's the N C P I D Q?

7        A.   What is it?

8        Q.   Uh-huh?

9        A.   It's a publication that the NCI puts

10   out for information as my recollection is they have

11   a version for hey people and a version for

12    physicians.

13            Q.   Do you know if the NCI -- when is the

14    last file you looked at the NCIPDQ?

15            A.   Probably whichever.

16            Q.   When is the last time you looked at

17    NCIPDQ with respect to ovarian cancer?

18            A.   Yesterday.

19            Q.   Do you recall whether it addresses

20    Woolen?

21            A.   I would have to look and see.  They

22    have references it's not all inclusive.

23            Q.   But you don't recall even though you

24    looked at it yesterday even if it addresses Woolen?

25        A.    So it has 14 references of Woolen is

157

UNCERTIFIED ROUGH DRAFT

1    not in there, no.

2        Q.

3        A.    It didn't cite penocolappy there either

4    so --

5        Q.    I'm confused.  Dr. Clarke-Pearson,

6    because this deposition is on Zoom, I've asked you

7    multiple times, I'm asking you again, if you are

8    looking at a document that is not up on the screen,

9   you need to let me know.

10          A.   I wasn't aware that was a rule.  I've

11   got --

12          Q.   I asked you before.

13          A.   I'm sorry, I missed it.

14   BY MS. O'DELL:

15          Q.   Are you looking at a document now --

16   are you looking at a document now to respond to my

17   question?

18              MS. O'DELL:  Just a moment please

19          Dr. Clarke-Pearson is free to look at what

20          he would like to respond to the questions.

21              MS. DAVIDSON:  And I'm free to know

22          what he is looking at.

23               MS. O'DELL:  And he's telling you

24          Jessica.

25               MS. DAVIDSON:  He didn't -- I didn't --


                                              158


                    UNCERTIFIED ROUGH DRAFT


1                MS. O'DELL:  Excuse me, number one,

2           please don't interrupt me.  Number two,

3           please be respectful of Dr. Clarke-Pearson

4           who happens been most courteous despite the

5           tone of your questions.  So let's just

6           proceed you got a question about here and

7       available to answer them.

8              MS. DAVIDSON:  Thank you Leigh for your

9       colloquy.

10  BY MS. O'DELL:

11         Q.  Dr. Clarke-Pearson I was asking you

12  whether the NCIPDQ references Woolen and it sounded

13  like you were looking at.  What were you looking

14  at?

15         A.  I'll hold it up for you.  It's NCIPDQ.

16         Q.  And that the version you looked at

17  yesterday?

18         A.  Yes.

19         Q.  Okay.  Can we mark as Tab 10 the N C --

20    I'm sorry as Exhibit 16 the NCIPDQ on ovarian

21    cancer?

22              (Exhibit 10 marked for identification.)

23    BY MS. O'DELL:

24        Q.   Can you go to the top please Asher.

25             Dr. Clarke-Pearson is this the same

                                                        159

                    UNCERTIFIED ROUGH DRAFT

1    NCIPDQ document that you looked at yesterday?

2        A.   I believe it is.  At the top of mine it

3    says October 4, 2023.

4        Q.   Okay.  If we could move down to where

5    it references ours is October 16, 2023, so is that

6    the different from the one you looked at?

7                MS. O'DELL:  Is that on page 27 Asher

8         just so we can.

9                MS. DAVIDSON:  I can't hear you Leigh.

10                MS. O'DELL:  Is that on page 22 or 27

11         so we follow along with where you are.

12                MS. DAVIDSON:  I'm trying to determine

13         if Dr. Clarke-Pearson is looking at the same

14         document on the screen.  Do we know the

15         answer to that?

16                MS. O'DELL:  He can answer.  I believe

17        that to be the case.  But he's got it in

18        front of him.

19            THE WITNESS:  Everything I see so far

20        looks like what I have in front of me.

21   BY MS. O'DELL:

22        Q.   If we could go to the sentence that

23   begins the meta-analysis.  Asher are you going to

24   use your new highlighting skills.  A meta-analysis

25   of ten case controlled studies can you highlight

                                              160

                 UNCERTIFIED ROUGH DRAFT

 1   that Asher.  It disappeared.  I don't know what

 2   happened.  Technical glitch.

3                MR. TRANGLE:  It's like a printed

4          document.

5    BY MS. O'DELL:

6                Q.   Just point to where the sentence is.

7    You see where it a meta-analysis of ten case

8    controlled studies in a highly selected subset

9    analysis of one prospective cohort study found in

10   association among women who use perineal talc at

11   least twice a week.  And then it's followed by

12   footnote 10.

13                Do you see that on the screen doctor>

14   I think it would be easier if you looked on the

15   screen?

16           A.   Okay.  I'll look at the screen.  So a

17   meta-analysis 16 study --

18           Q.   No.  The third sentence of that

19   paragraph.

20           A.   The -- show me which sentence.

21              MS. DAVIDSON:  Right there, Asher.

22           There is a way to highlight something like

23           this.  Please on our next break ask someone.

24           A.   A meta-analysis of ten case controlled

25   study, is that where you are.

                                                    161

UNCERTIFIED ROUGH DRAFT

1          Q.   Uh-huh.

2          A.   I see the arrow now.  And highly subset

3    analysis of one prospective co heart study found in

4    association or the 1.4 to 7 statistically

5    significant by a woman who used perineal talc at

6    least twice a week.

7          Q.   Followed by footnote 10?

8          A.   10 uh-huh.

9          Q.   What is footnote 10 refer to?

10         A.   You'll have to show me.

11         Q.   Oh, okay.

12         A.   I would presume it's Woolen, but I'm

13    not sure.

14             Q.   Is that correct.  Does this say here

15    testimony as to whether the NCIPDQ addresses?

16             A.   Yes it changes my testimony.  This PDQ

17    version doesn't include Woolen.

18             Q.   The one you looked at yesterday does

19    not?

20             A.   Apparently not.

21             Q.   Can you look at footnote 10 at the one

22    you looked at Ned?

23             A.   I'm sorry.  Ask the question again.

24             Q.   Can you look at the hard copy of the

25    one you looked at yesterday and see inspect there

162

UNCERTIFIED ROUGH DRAFT

1    was a footnote 10 addressing Woolen?

2          A.   Actually it is here I'm sorry.

3          Q.   Okay.  So we are looking at the same

4    one and there was just a mistake?

5          A.   Yes my oversight.

6          Q.   Okay.  Let's go back to the top where

7    we were talking about Woolen.  The authors refer to

8    a highly selective subset analysis of one

9    prospective cohort study what are they referring to

10   there?

11          A.   Once again they're talking about

12   Woolen.

13          Q.   When the authors say highly selected

14   subset of one prospective cohort study, what does

15   that refer to?

16          A.   That's the interpretation of whoever

17   wrote this P D Q.

18          Q.   It says a meta-analysis of ten case

19   controlled studies and a highly selected subset

20   analysis of one prospective cohort study.  What

21   does that phrase a highly selected subset analysis

22   of one prospective cohort study refer to?

23          A.    Refers to Woolen just like I said.


24          Q.    Woolen is the highly selected subset


25   analysis of one prospective cohort study?



                                                    163



                        UNCERTIFIED ROUGH DRAFT


 1               MS. O'DELL:  Objection to form.


 2               THE WITNESS:  Yes because the


 3          meta-analysis the ten case controlled


 4          studies wouldn't include Woolen because


 5          Woolen doesn't include only case controlled


 6          studies, it includes the cohort study as


 7          well.

8    BY MS. O'DELL:

9         Q.    Which prospective cohort study is the

10    phrase referring to?

11        A.    Prospective cohort study would be the

12    data from O'Brien that's included in the Woolen

13    study.

14        Q.    Why does NCI state that it's a highly

15    selected subset analysis?

16        A.    I'm not sure why they use those terms

17    it's a subset analysis that's been performed it

18    went through a peer reviewed process published in a

19    reputable journal.

20        Q.    The authors go on to state the subset

21    analysis of the prospective study was inconsistent

22    with the main findings of the original report.  Do

23    you see that sentence?

24          A.   Yes.

25          Q.   What does that refer to?

                                                              164

                    UNCERTIFIED ROUGH DRAFT

1          A.   It was referring back to whatever

2    number 11 is which is O'Brien study.

3          Q.   Can we go back up, Asher?

4          A.   In 2020.

5          Q.   What do the authors mean by Asher

6    something weird has happened.  Can you go back to

7    the paragraph we were on.  What did the authors

8    mean when they say the subset analysis of the

9    prospective study was inconsistent with the main

10   findings of the original report?

11        A.   The data that's in the -- in Woolen is

12   different than the data that was in the original

13   O'Brien.  So ten has different data than 11 those

14   references.

15        Q.   And what is inconsistent?

16             MS. O'DELL:  Objection to form.

17             THE WITNESS:  I'm sorry, what did what

18        consist of?

19    BY MS. O'DELL:

20        Q.    What do the authors mean can you tell

21    me what's inconsistent how is did subset analysis

22    inconsistent with the main findings of O'Brien?

23        A.    Well, that's the authors interpretation

24    I wouldn't say it's inconsistent.  They are two

25    different data sets and O'Brien submitted to Woolen

                                                        165


                    UNCERTIFIED ROUGH DRAFT

1    data from the original nurse's health study that

2    specifically addressed frequency of use in patients

3    with patent two so it's not inconsistent it's just

4    different.

5              Q.   The author says it's inconsistent with

6    the main findings of the original report.  What

7    were the main findings of O'Brien 2020?

8                  MS. O'DELL:  Objection.

9                  THE WITNESS:  I'd have to look at

10             O'Brien 2020 but I think there was increased

11             risk of talcum powder increased risk of

12             ovarian cancer in patients that used talcum

13             powder that had patent tubes.

14   BY MS. O'DELL:

15             Q.   Was that the main finding of the

16    report?

17                    MS. O'DELL:  Objection to form.

18                    THE WITNESS:  That's my recollection.

19    BY MS. O'DELL:

20            Q.   Because of the structure of this

21    analysis, the results should be interpreted with

22    care.  What do the authors mean by that?

23            A.   I think all interpretations should be

24    undertaken with care they're just advising take a

25    look at it.

                                              166

                    UNCERTIFIED ROUGH DRAFT

 1            Q.   Based on this discussion has Woolen

2   changed the N C I P D Q's views about the potential

3   relationship between Talc and ovarian cancer?

4          A.   Apparently it hasn't changed NIH NCI

5   view.  Clearly it's incomplete analysis by NIH.

6   They have many references that are missing.  They

7   didn't do their own meta-analysis of their own

8   evaluation they're citing some papers in a

9   meta-analysis.

10          Q.   Have you ever reached out to NCI or NIH

11   to share your views about Talc and ovarian cancer?

12          A.   No, I have not.

13          Q.   Have you ever reached out to O'Brien or

14    Wentzensen to share your views about Talc or

15    ovarian cancer?

16         A.   No.

17         Q.   Do you have any reason to doubt the

18    ability of O'Brien and Wentzensen as scientists or

19    epidemiologists?

20              MS. O'DELL:  Object to the form.

21              THE WITNESS:  I think there's a number

22         of comments that have been published in

23         letter to the editor outlining a number of

24         criticisms about that publication.

25    BY MS. O'DELL:

167

UNCERTIFIED ROUGH DRAFT

1        Q.   Have any of the letters that have been

2    published criticizing O'Brien and Wentzensen been

3    written by someone who is not a plaintiffs expert

4    in the litigation?

5            MS. O'DELL:  Object to the form.

6            THE WITNESS:  I know that Dr. Kramer

7        who's a plaintiffs expert has written a

8        fairly lengthy letter to the editor outlines

9        a number of issues that he would contend are

10       incorrect and should be changed and altered

11       in the interpretation.  I think there are

12          other authors that have authored other

13          papers not aware of names and whether

14          they're involved with plaintiffs legal

15          actions or not.

16   BY MS. O'DELL:

17          Q.  Would it surprise you to know that

18   nobody has written alert to editor with respect to

19   O'Brien and Wentzensen who is not a plaintiffs'

20   expert in this litigation?

21          MS. O'DELL:  Objection asked and

22          answered.

23          THE WITNESS:  I would just have to see

24        all the letters.

25   BY MS. O'DELL:

                                                            168

                        UNCERTIFIED ROUGH DRAFT

1        Q.   I see.  Are you aware sitting here

2   today of anybody who's not a plaintiffs experts in

3   the litigation who has written alert with respect

4   to O'Brien or Wentzensen's?

5             MS. O'DELL:  Object to form.  He stated

6        he doesn't know who's written the letter or

7        whether they're in litigation or not.

8   BY MS. O'DELL:

9        Q.   Leigh, you have just coached the

10    witness.  I appreciate it.  Please stop doing it.

11              Dr. Clarke—Pearson sitting here today

12    are you aware of anyone who is not an expert for

13    plaintiffs in Talc litigation who has written any

14    letters involving any publication also about Talc

15    by O'Brien and Wentzensen?

16              MS. O'DELL:  Objection to form.

17              THE WITNESS:  As I said before, I would

18         have to go back and look at what's been

19         published in letter to the editor before I

20         could answer your question.

21    BY MS. O'DELL:

22          Q.   Do you have any views about Dr. O'Brien

23   or Dr. Wentzensen's abilities as a scientist?

24          A.   Scientist, I think none of us are

25   perfect.


                                                        169


                    UNCERTIFIED ROUGH DRAFT


1           Q.   Hmm?

2           A.   I said none of us are perfect.  I'm

3    sure they're not either.

4           Q.   Do you know anything about either

5    Dr. O'Brien or Dr. Wentzensen's professional

6    reputation?

 7          A.   I don't.  I think I said already I

 8     didn't know anything about them.

 9          Q.   Are you aware that a federal court

10     excluded Dr. Smith-Bindman's meta-analysis in a

11     Talc that a state court excluded Dr. Smith-Bindman

12     meta-analysis in a Talc case?

13               MS. O'DELL:  Objection.

14               THE WITNESS:  I was not aware of that,

15          no.

16     BY MS. O'DELL:

17          Q.   Instance you're not aware of that I

18     take it you didn't review that opinion?

19               MS. O'DELL:  Object to the form.

20          THE WITNESS:  I didn't know there was

21     an opinion.

22  BY MS. O'DELL:

23          Q.   Are you familiar with Dr. McTiernan?

24          A.   Yes.

25          Q.   Who's she?

                                              170


                    UNCERTIFIED ROUGH DRAFT

1          A.   She is epidemiologist.

2          Q.   Does your view that new scientist

3     perfect extend to Dr. Saed and Dr. Smith-Bindman as

4     well?

5             MS. O'DELL:  I'm sorry I didn't would

6         you please repeat it.

7    BY MS. O'DELL:

8         Q.   Court reporter?

9      (The reporter read back the last question.)

10             A.   Yes I just said that all of us —— none

11   of us are perfect.

12         Q.   Can you point to in Dr. Saed's paper

13   Harper 2023?

14             A.   Can I point to any what.

15        Q.   Flaws?

16             MS. O'DELL:  Object to form.

17             THE WITNESS:  Flaws.

18  BY MS. O'DELL:

19          Q.    Uh-huh?

20          A.    Not at this point in time, no.

21          Q.    Can you point to any flaws in Woolen?

22              MS. O'DELL:  Object to form.

23              THE WITNESS:  No.

24  BY MS. O'DELL:

25          Q.

                                                    171


                    UNCERTIFIED ROUGH DRAFT


1          A.    There are limitations that are cited by

2  the authors in their papers.  I don't call those

3    flaws.

4           Q.    You included a forest plot in your

5    amended expert report; is that correct?

6           A.    I did.

7           Q.    How did you get that forest plot?

8           A.    It was supplied by Dr. McTiernan it was

9    an updated forest plot similar to, but updated from

10   the one I used in the previous report.

11          Q.    Who provided it to you?

12          A.    My attorney.

13          Q.    Did you independently examine the

14   forest plot for accuracy before putting it in your

15    report?

16        A.    I reviewed it.  I didn't go case by --

17    paper by paper to re look at the numbers.

18        Q.    Did you check if it was missing any

19    studies?

20        A.    I'm sorry.

21        Q.    Did you check if it was missing any

22    studies?

23        A.    I think at the date and time when I

24    received it which I don't recall exactly, I thought

25    it was up to date.

172

UNCERTIFIED ROUGH DRAFT

1          Q.   Are you aware that a federal court

2   excluded Dr. McTiernan's opinions as unreliable in

3   the Zantac litigation?

4               MS. O'DELL:  Object to form.

5               THE WITNESS:  No I wasn't.

6   BY MS. O'DELL:

7          Q.   Are you aware that Dr. McTiernan has

8   testified that she followed the same scientific

9   methodology in Zantac as she did in Talc?

10               MS. O'DELL:  Object to the form.

11               THE WITNESS:  Not aware of her

12          testimony.

13    BY MS. O'DELL:

14          Q.    Are you aware of any independent

15    scientist not retained by plaintiffs in this

16    litigation who has concluded that Talc use uses

17    ovarian cancer?

18          A.    I'm sorry who.

19          Q.    Are you aware of any independent

20    scientist not retained by plaintiffs in this

21    litigation who has concluded that Talc use causes

22    ovarian cancer?

23          A.    Well we can look at forest plot you're

24    looking at right here and see a number of the case

25    controlled studies that are all -- that are

173

UNCERTIFIED ROUGH DRAFT

1   statistically significant.  Those as I believe are

2   all independent scientists that are published.

3   Those case controlled studies then go on to

4   meta-analysis all of which statistically

5   significant.  I'm not aware of them being

6   plaintiffs defendants either.

7            Q.   Did any of those authors state that

8   their studies did any of those authors state in

9   their papers that they've concluded that Talc use

10  causes ovarian cancer?

11          A.   I think they showed a statistical

12   significant increase risk of developing ovarian

13   cancer because of the use of talcum powder.

14          Q.   That was not my question.

15               MS. O'DELL:  Jessica let him finish.

16   BY MS. O'DELL:

17          Q.   Dr. Clarke-Pearson, can you please

18   answer my question.  Are you aware of any of the

19   scientist not retained by plaintiffs in this

20   litigation who has stated that Talc use can cause

21   ovarian cancer?

22               MS. O'DELL:  Object to the form.

23          THE WITNESS:  So the word you're using

24      is cause, is that where we're pivoting.

25   BY MS. O'DELL:

174

UNCERTIFIED ROUGH DRAFT

1       Q.    Correct?

2       A.    I'm not sure -- I would have to reread

3    these papers to know whether they were somehow

4    screening those papers to see whether they use the

5    word cause.  Clearly come up with a finding that is

6    statistically associated with the development of

7    ovarian cancer which to me means cause.

8       Q.    So is it your testimony that any time

9    there's an association that means cause?

10              MS. O'DELL:  Object to the form.

11              THE WITNESS:  No.

12   BY MS. O'DELL:

13         Q.   I think that's what you just said you

14   said statistically association which to me means

15   cause; correct?

16         A.   I think a lot of people would interpret

17   it as cause.

18         Q.   Again sitting here today you can't

19   identify a single independent scientist not

20   retained by plaintiffs in this litigation who has

21   stated that Talc use causes ovarian cancer;

22   correct?

23              MS. O'DELL:  Object to the form.

24              THE WITNESS:  Not that I can recall to

25        answer your question.

                                                        175

                    UNCERTIFIED ROUGH DRAFT

1   BY MS. O'DELL:

2              Q.   Are you aware of any published paper in

3   the scientific literature by an independent

4   scientist who not a paid expert in this litigation

5   that includes that Talc use causes ovarian cancer?

6              MS. O'DELL:  Object to form asked and

7          answered also re treads ground that was

8          previously covered in prior depositions.

9          And so if you have a question about a

10         specific paper that has been included in

11         Dr. Clarke-Pearson's report since July of

12         2021, you know, then I would ask you to

13         direct your questions to those publications,

14         not a re review of everything he has looked

15         at over the course of this six year

16         litigation.

17     BY MS. O'DELL:

18         Q.   Leigh this is ongoing effort by you to

19    strike this deposition?

20            MS. O'DELL:  It is not it is to state

21        my objection ton the record.

22    BY MS. O'DELL:

23            Q.   I will keep any flee Dr. Clarke—Pearson

24    sitting here today are you aware of any published

25    literature any published paper in this scientific

                                                          176

                        UNCERTIFIED ROUGH DRAFT

1    literature by an independent scientist who not a

2    paid expert in this litigation that reaches the

3    conclusion that Talc use cause causes ovarian

4      cancer?

5              A.   Not aware of that, no.

6              Q.   Are you aware of any single scientific

7      body in the United States that has included that

8      Talc use cause ovarian cancer?

9              A.   So a number of scientific bodies have

10     identified asbestos as causing ovarian cancer.  We

11     know that asbestos is in ovarian cancer in

12     Johnson's baby powder.  So in many ways I view baby

13     powder with asbestos as a carcinogen that causes

14     ovarian cancer.

15             Q.   Do you have --

16             A.   So there are a number of scientific

17    organizations that have identified asbestos as

18    causing ovarian cancer included IARC, EPA, and

19    others.

20         Q.   Are you aware of a single scientific

21    body in the United States has stated that cosmetic

22    Talc use causes ovarian cancer?

23         MS. O'DELL:  Object to the form asked

24         and answered.

25         THE WITNESS:  I will go to IARC for one

                                        177

                    UNCERTIFIED ROUGH DRAFT

1         that says the that the source of Talc

2          outside of mining and industrial exposure is

3          most likely secondary to cosmetic exposure.

4     BY MS. O'DELL:

5          Q.    Again I'm going to ask the question are

6     you aware of a single scientific body in the United

7     States that has stated that cosmetic Talc use

8     causes ovarian cancer?

9               MS. O'DELL:  Objection form.  Asked and

10          answered.

11              THE WITNESS:  Cosmetic Talc Johnson's

12          baby powder has asbestos in it.  Asbestos

13          causes ovarian cancer.  Many organizations

14          at the highest level of our government and

15          scientific community have identified

16          asbestos as causing ovarian cancer.

17  BY MS. O'DELL:

18          Q.   Can you identify a single scientific

19  body in the United States that has stated cosmetic

20  Talc causes ovarian cancer?

21               MS. O'DELL:  Objection to form.  The

22          question was just asked Dr. Clarke-Pearson

23          give his answer.  Dr. Clarke-Pearson, you're

24          welcome to respond again but if you if it's

25          the same answer previously again you can so

UNCERTIFIED ROUGH DRAFT

1        say that.

2    BY MS. O'DELL:

3            Q.   Leigh you're pattern of obstructing

4    this deposition and coaching the witness.

5    Dr. Clarke—Pearson with all due respect you are not

6    answering the question I asked.

7            My question is whether there is any

8    United States scientific body, any scientific body

9    in the United States that has stated that cosmetic

10   Talc use causes ovarian cancer?

11           MS. O'DELL:  Objection to form.  Asked

12          and answered.  Please do not badger

13          Dr. Clarke-Pearson or be disrespectful.

14              THE WITNESS:  If you're focusing only

15          on the term Talc then I'm not aware of that.

16          But Talc has asbestos in it.

17    BY MS. O'DELL:

18          Q.   Dr. Clarke-Pearson do you have an

19    opinion as to what percentage of Johnson's baby

20    powder that's been sold in this country contained

21    asbestos?

22          A.   Relying on Dr. Longo's analysis it's

23    more likely than not and in some cases for example

24    Chinese Talc nearly all of it is.  At least fibrous

25    Talc if not other asbestos.

                                                                    179


                              UNCERTIFIED ROUGH DRAFT


1         Q.    So it's your opinion?


2         A.    Fibers.


3         Q.    Do you have an opinion as to what


4    percentage of Johnson's baby powder sold in the


5    United States over the last 50 years contains


6    asbestos?


7              MS. O'DELL:  Objection asked and


8         answered you may respond.


9              THE WITNESS:  Dr. Long oh's data goes

10          back and the sources of talcum powder for

11          Johnson's baby powder from three different

12          sources over three different time periods

13          that has different levels of as talcum as I

14          lead all of which are in excess of

15          50 percent.

16     BY MS. O'DELL:

17          Q.   All of your opinions about whether or

18     not Johnson's baby powder contains asbestos based

19     on Dr. Longo's report?

20          A.   No.   The FDA found asbestos brought it

21     off the shelf.

22          Q.    How many lots of Johnson's baby powder

23    did the FDA find asbestos in?

24          A.    I think Johnson & Johnson took one lot

25    of 3,000 bottles off the shelf based on the

                                                        180

                        UNCERTIFIED ROUGH DRAFT

1    analysis.

2          Q.    FDA found asbestos in one lot of

3    Johnson's baby powder?

4          A.    Yes.

5          Q.    And was that a trades level or a sub

6    trades level?

7              MS. O'DELL:  Object to the form.

8              THE WITNESS:  I don't know how to

9        define a trades level.

10   BY MS. O'DELL:

11        Q.   Because you're not expert on asbestos;

12   right?

13              MS. O'DELL:  Objection.

14              THE WITNESS:  I'm not sure what you

15        mean by —— I know what asbestos does to

16        women that have ovaries.

17   BY MS. O'DELL:

18        Q.   Dr. Clarke—Pearson, can you point to me

19   to any epidemiological studies showing that the

20    level of asbestos to which a woman is allegedly

21    exposed from talcum powder can cause ovarian

22    cancer?

23              MS. O'DELL:  Objection to form.

24         Incomplete hypothetical.

25              THE WITNESS:  I'm unaware of any

                                                    181


                    UNCERTIFIED ROUGH DRAFT


1         threshold if you will or minimum amount of

2         asbestos that would or would not cause

3         ovarian cancer.

4    BY MS. O'DELL:

5          Q.    Is sit your opinion that talcum powder

6    that does not contain asbestos causes ovarian

7    cancer?

8          A.    I'm not aware of any talcum powder

9    based on the data that I've seen that doesn't

10   contain asbestos.

11         Q.    If a woman to use cosmetic Talc that

12   doesn't contain asbestos would she be at increased

13   of ovarian cancer?

14         A.    I would think that evidence shows that

15   if you make the hypothetical there's no asbestos in

16   it then the talcum powder and the all a if you

17   had's have been done and hypothetically that those

18    patients were exposed those women were exposed to

19    talcum powder that didn't have asbestos they still

20    had a higher risk of ovarian cancer caused by

21    talcum powder.

22            Q.   Do you believe that the mechanism by

23    which talcum powder can cause ovarian cancer is the

24    same for talcum powder that contains asbestos and

25    talcum powder that doesn't contain asbestos?

                                                    182

                    UNCERTIFIED ROUGH DRAFT

1            MS. O'DELL:  Objection to question this

2        is re treading ground that was covered in I

3          believe it was January or February 2019

4          almost concluded and Dr. Clarke-Pearson

5          already answered the questions.

6     BY MS. O'DELL:

7          Q.   Can doctor because Dr. Moss he dial it

8     takes twice as long to ask every question court

9     reporter?

10          MS. O'DELL:  That's incorrect you know

11          I'm just what you stated is an error on the

12          record.  Please ask your question.

13     (The reporter read back the last question.)

14          A.   Yes.

15          Q.   Okay.  Let's go off the record.

16     (Recess taken from 1:23 p.m. until 1:25 p.m.)

17   BY MS. DAVIDSON:

18          Q.   So number 1 court's order is very clear

19   that case specific experts align deposed for I'm

20   going to read the order exactly.

21          MS. O'DELL:  Dr. Clarke-Pearson has

22          already been deposed for 14 hours --

23          MS. DAVIDSON:  You're literally --

24          you're literally interrupting me.

25          MS. O'DELL:  On his case specific

                                                        183

                    UNCERTIFIED ROUGH DRAFT

1          opinions and that occurred in August of --

2               MS. DAVIDSON:  You're interrupting me,

3          Leigh.  You literally interrupted me

4          mid-sentence.

5               MS. O'DELL:  Well --

6               MS. DAVIDSON:  According to order as I

7          was saying before I was interrupted

8          depositions of experts who address case

9          specific issues to individual plaintiffs in

10          addition to providing new or supplemental

11          reports on general causation shall be

12          limited to a total of one day, seven hours.

13          If the expert issues case specific reports

14          in three or more cases, in which case the

15          deposition is limited to two days, 14 hours

16          of testimony time.  This order was issued

17          several months ago.  If you guys to be in

18          violation of the order, we will take it up

19          with the Court.  I would like also like to

20          point out --

21              MS. O'DELL:  Our position is Jessica

22          just to be clear we are not in violation of

23          the order because Dr. Clarke-Pearson has

24          already sat for two days, seven hours each,

25          for his case specific opinions.  The purpose

184

UNCERTIFIED ROUGH DRAFT

1        of the deposition today was to examine him

2        on any new references or any new -- in his

3        report that was served November 2023 or any

4        new opinions that he might have.  He's been

5        available today.  That deposition is limited

6        to four hours.  That's how we understand the

7        order and that's how we're proceeding.

8        That's how we proceeded previously with the

9        depositions of these experts including last

10       week.  So I just -- that's our position.  We

11          can agree to disagree.  But today just so

12          you're clear and you understand, we've been

13          on the record for 3 hours and 39 minutes,

14          and there's 21 minutes left.

15              MS. DAVIDSON:  I understand that you

16          have decided not to fulfill the court's

17          order and that's your prerogative.  We will

18          take it up with the court and make very

19          clear to the court that we read the ruling

20          into the record.  And you chose not to

21          follow it.  Leigh, I would also like to

22          raise with you before we get into this

23          tomorrow that Dr. Moorman, we were never

24          served with her 2021 report, and so we are

25          entitled to eight hours, four hours on her

                                                         185


                        UNCERTIFIED ROUGH DRAFT


1           2021 report and four hours on her 2023

2           report.

3                 MS. O'DELL:  I'm going to let Michelle

4           respond to that.

5                MS. DAVIDSON:  I'm going to give you

6           the heads up.

7                MS. O'DELL:  We should be off the

8           record though for that.

9           MS. DAVIDSON:  We can go off the

10          record.

11          MS. O'DELL:  Before we do that, I would

12          just ask since we are going to stop at four

13          hours today, can we proceed with the

14          remaining 21 minutes?

15          MS. DAVIDSON:  I need a break.

16          MS. O'DELL:  And then conclude.  You

17          need a break?  You're saying you need a

18          break.

19          MS. DAVIDSON:  I need a break.

20          MS. O'DELL:  If you cannot continue for

21        21 minutes --

22            MS. DAVIDSON:  I need a break.

23            MS. O'DELL:  We will be available in

24        15 minutes to -- certainly want you to have

25        a break.  And then we'll come back in

                                                    186


                        UNCERTIFIED ROUGH DRAFT


1        15 minutes at 1:30 and you can finish.

2            MS. DAVIDSON:  It's 1:28.  It's 1:28.

3        1:30 would be in two minutes.

4            MS. O'DELL:  I'm sorry.  1:45 is what I

5        meant to say.

6        (Recess taken from 1:28 p.m. until 1:52 p.m.)

7    BY MS. DAVIDSON:

8         Q.   Dr. Clarke-Pearson, are you familiar

9    with Talc pleurodesis?

10        A.   Yes.

11        Q.   You testified earlier that you believed

12   that cosmetic Talc is virtually all contaminated

13   with asbestos; correct?

14        A.   Yes.

15        Q.   Is that your opinion about

16   pharmaceutical Talc as well?

17        A.   I don't have an opinion about

18   pharmaceutical grade Talc.

19          Q.    Have you reviewed the literature on

20    Talc pleurodesis?

21          A.    No, I have not reviewed the literature

22    I'm familiar with the technique having used it on

23    patients that I've taken care of.

24          Q.    When you used that procedure on

25    patients that you've taken care of do you believe

                                                    187


                        UNCERTIFIED ROUGH DRAFT


1    that you injected asbestos into their lungs?

2              MS. O'DELL:  Object to the form.

3              THE WITNESS:  I'm not sure what's in

4          the pharmaceutical grade of Talc.

5   BY MS. DAVIDSON:

6          Q.   Has IARC addressed whether pleurodesis

7   can cause cancer?

8               MS. O'DELL:  Objection.  Form.

9               THE WITNESS:  I'm not familiar that

10         they have the IARC documents are quite

11         extensive so I may have missed something.

12  BY MS. DAVIDSON:

13         Q.   Do you know whether pharmaceutical

14  grade Talc and cot met I can Talc can come from the

15  same mines?

16         A.   I don't know.

17          Q.   Are you aware that the FDA tested Talc

18   in 2010, 2019, 2021 and 2022 and on all of those

19   occasions found no asbestos?

20               MS. O'DELL:  Object to the form.

21               THE WITNESS:  I was not aware of that,

22        no.

23   BY MS. DAVIDSON:

24          Q.   Do you think the FDA was wrong in 2010

25   when it found no asbestos in Talc?

                                                    188


                     UNCERTIFIED ROUGH DRAFT


1                MS. O'DELL:  Object to the form.

2               THE WITNESS:  I have no opinion about

3          that.  I have I don't know to what extent

4          they tested, what extent they used.  I don't

5          know how many samples they tested.  So I

6          don't have an opinion about that.

7    BY MS. DAVIDSON:

8               Q.   Do you have an opinion -- do you

9    believe the FDA was wrong in 2019 when it tested

10   cosmetic Talc and found no asbestos?

11              MS. DAVIDSON:  Objection form.

12              THE WITNESS:  I can only believe what

13         the FDA reported.

14   BY MS. DAVIDSON:

15          Q.   Do you believe the FDA was wrong in

16   2021 when it tested cosmetic Talc and found no

17   asbestos?

18          A.   I wasn't aware there was testing at

19   that point in time.

20          Q.   Do you believe the FDA was wrong in

21   2022 when it tested cosmetic Talc and found no

22   asbestos?

23              MS. O'DELL:  Objection.  Form.

24              THE WITNESS:  Once again, I wasn't

25       aware that they tested.

189

UNCERTIFIED ROUGH DRAFT


1   BY MS. DAVIDSON:


2          Q.   Are you aware the lawyers didn't


3   provide you with those testing results?


4          MS. O'DELL:  Objection.  Form.


5          THE WITNESS:  No.


6   BY MS. DAVIDSON:


7          Q.   Would it have been relevant to your


8   opinion to know that the FDA tested cosmetic talc


9   four times and didn't find asbestos?


10          MS. O'DELL:  Objection to form.


11          THE WITNESS:  No.

12    BY MS. DAVIDSON:

13          Q.    That wouldn't be relevant to your

14    opinions?

15          A.    No.

16          Q.    Did Duke or UNC perform pleurodesis?

17          A.    Have I asked that to be done on my

18    patients?  Yes.

19          Q.    Have you ever suggested to Duke or to

20    UNC that they stopped performing pleurodesis

21    because of the risk of injecting asbestos into

22    patients?

23          A.    No most of my patients that needed

24    pleurodesis were dying of ovarian cancer I was

25    trying to give them some relief from respiratory

190

UNCERTIFIED ROUGH DRAFT

1    distress.

2            Q.    So wouldn't mattered to you if that

3    procedure put into someone's --

4            MS. O'DELL:  Objection to form.

5    BY MS. DAVIDSON:

6            Q.    -- asbestos into someone's lungs?

7            A.    I knew latency period for Talc and

8    cause cancer was years and these women had months

9    and days to live.  So, no, I didn't.  Wasn't really

10   a consideration.

11        Q.   Is it your opinion that pleurodesis

12   would be a proper procedure even if it injected

13   asbestos into people's lungs?

14             MS. O'DELL:  Objection to form.

15             THE WITNESS:  Depends upon the

16        circumstances.

17   BY MS. DAVIDSON:

18        Q.   Have you ever told U N CV or Duke

19   you're concerned that the pleurodesis procedure is

20   injecting a asbestos into people's lungs?

21             MS. O'DELL:  Object to form.

22             THE WITNESS:  I don't know it's

23          injecting Talc -- that the pleurodesis is

24          injecting asbestos into the lungs.

25   BY MS. DAVIDSON:


                                              191


                    UNCERTIFIED ROUGH DRAFT


1          Q.    When?

2          A.    I don't have any data on that topic.

3          Q.    When you did you come to the opinion

4   that most Talc cosmetic Talc contains asbestos?

5                MS. O'DELL:  Objection form.

6                THE WITNESS:  When I started seeing

7          Dr. Long oh's reports in particular.

8    BY MS. DAVIDSON:

9         Q.   As a scientist, you believe your job is

10   to evaluate all the relevant evidence; right?

11        A.   Yes.  That's part of the comprehensive

12   differential diagnosis.  Go ahead.

13        Q.   Are you aware that defendants have an

14   expert named Mac Sanchez from RJ Lee who has

15   rebutted Dr. Longo's report?

16             MS. O'DELL:  Objection to form.

17             THE WITNESS:  Not aware I have not seen

18        or not aware of another expert.

19   BY MS. DAVIDSON:

20          Q.    Have you asked plaintiffs lawyers to

21     give you all the relevant evidence about asbestos

22     testing?

23                MS. O'DELL:  Objection to form.

24                THE WITNESS:  I have not asked for

25         that.

                                                    192

                    UNCERTIFIED ROUGH DRAFT

1      BY MS. DAVIDSON:

2          Q.    Would it have been relevant to your

3      opinion to review Mr. Sanchez's report?

4                MS. O'DELL:  Objection.

5      BY MS. DAVIDSON:

6          Q.   Responding to Mr. Long oh owes testing

7   for asbestos?

8              MS. O'DELL:  Objection form.

9              THE WITNESS:  Might have been relevant.

10         I wasn't aware there was anybody else

11         offering opinions.

12   BY MS. DAVIDSON:

13         Q.   You'd agree if there's available

14   science refuting Dr. Long oh's or rebutting

15   Dr. Long oh's opinions that would be relevant to

16   you for review in reaching a conclusion with

17   respect to asbestos and talc; correct?

18          MS. O'DELL:  Objection to form

19      misstates record.

20          THE WITNESS:  Certainly.

21  BY MS. DAVIDSON:

22          Q.  Dr. Clarke-Pearson, you attached to

23  your 111502023 expert report and amended list of

24  materials considered; correct?

25          A.  Yes.

                                              193

                UNCERTIFIED ROUGH DRAFT

1           Q.  Was that a list you created or did the

2   lawyers create that for you?

3          A.    They created it after we collaborated

4    and came up with a list of references that I was

5    using.

6          Q.    Did you read all the documents that are

7    listed on that materials reviewed list?

8          A.    I have scanned many of them looked at

9    their abstracts.  Read some of them in quite

10   detail.

11         Q.    How did you decide which -- when to

12   just read the abstract and when to read an article

13   in full?

14                MS. O'DELL:  Just say two things for

15                the record.  Jessica number 1 are you asking

16          about the recently added references because

17          he's been examined at length about the

18          references that were or materials that were

19          included in his list in his November 2018

20          report and then second I want to make sure

21          that you had the updated list of materials

22          that were provided three days before

23          Dr. Clarke-Pearson's deposition.

24     BY MS. DAVIDSON:

25          Q.    I would like to state for the record

                                                        194


                         UNCERTIFIED ROUGH DRAFT

1    this is another example of you obstructing and

2    filibustering the deposition because my question

3    very clearly referred to 11/15/2023 reliance list.

4              MS. O'DELL:  You asked him a global

5              question about everything on the list.  He's

6              previously been asked that question and he's

7              testified to it.  And as you know this is a

8              update deposition.  This is not a retread of

9              everything.  And the second I'm just asking

10             did you receive in the drop box the updated

11             materials list I just wanted to make sure we

12             were communicating and Dr. Clarke-Pearson

13             had in front of him the list that you're

14          talking about.

15     BY MS. DAVIDSON:

16          Q.   It is now 2:00.  I will put the list up

17     after your hearing.  But I will not end this

18     deposition in the middle of question.  So I need an

19     answer to this question that's pending before we

20     take our break for your hearing.

21               Dr. Clarke-Pearson, did you how did you

22     decide with respect to the materials on your

23     amended reliance list, how did you decide when to

24     read an article in full or when to just read the

25     abstract?

195

UNCERTIFIED ROUGH DRAFT

1        A.   Good question.  First of all, when I

2  did my search I would look at the title and see if

3  it was all relevant to what I was looking for and

4  then if it was then I would open that document up

5  usually PubMed and the scan can go straight to them

6  then in the abstract and if it was something I

7  wanted more detail on, give you the whole paper.

8        Q.   Okay.  It's 2 o'clock I know you guys a

9  have a hearing.  We'll reconvene when I hear from

10  you.

11      (Recess taken from 2:01 p.m. until 3:43 p.m.)

12   BY MS. DAVIDSON:

13          Q.   Dr. Clarke-Pearson, how did you

14   identify the new studies that are listed on your

15   supplemental reliance list?

16          A.   Well, a combination I think we talked

17   about searching PubMed in particular actually use

18   Google once in a while to search for key words Talc

19   being a keyword.  Ovarian cancer and Talc being a

20   combination that I would use on PubMed.  So

21   identified a number that way as time goes on.  As

22   times's gone on since the last deposition.  I've

23   also been sent to references, papers from

24   Ms. O'Dell.


25           Q.   Is there away for me to know which


196


UNCERTIFIED ROUGH DRAFT


1   items on your second amended reliance list you


2   found on your own and which were sent to you by


3   Ms. O'Dell?


4           A.   Oh, man I've looked at them for so many


5   times I can't tell you where who identified which.


6   Sorry.


7           Q.   You testified in 2021 that you're not


8   relying on company documents to support your

9    opinions; is that correct?

10         A.

11              MS. O'DELL:  Object to the form.

12              THE WITNESS:  Yes, that's correct.

13   BY MS. DAVIDSON:

14         Q.   Is that still the case?

15         A.   Yes.

16              MS. O'DELL:  Object to form.

17   BY MS. DAVIDSON:

18         Q.   Did you add any company documents to

19   your second amended reliance list?

20         A.   I don't recall.

21         Q.   If you could look at Item 121 it's put

22   that up on the screen Asher.  We're marking your

23   second supplemental reliance list as Exhibit 17 and

24   let's go to Item 121?

25             MR. TRANGLE:  121 okay.

                                                  197


                    UNCERTIFIED ROUGH DRAFT


 1   BY MS. DAVIDSON:

 2        Q.   And at 121 says JNJTalc C001465273.  Do

 3   you recall adding that to your supplemental

 4   reliance list?

 5        A.   I —— I don't, no.

 6             MS. O'DELL:  If you're identifying ——

7          excuse me, if you're identifying something

8          by Bates Number which obviously there are

9          hundreds of combinations of Bates numbers

10         which would be difficult for anyone to

11         remember much less in relation to all of the

12         things that Dr. Clarke Dr. Clarke-Pearson

13         reviewed if there's a specific document you

14         could pull it up and he could identify it by

15         something other than the Bates Number.

16             MS. DAVIDSON:  Well, Leigh, I have

17         asked --

18             MS. O'DELL:  Seems to be unfair way to

19          try to identify document for him.

20                  MS. DAVIDSON:  Leigh, I've asked you

21          multiple times today to please keep your

22          objections to objections to form.  Your

23          testimony is not called for here.  You're

24          not the witness.  And it is inappropriate

25          under federal law that you continue to try

                                                    198

                        UNCERTIFIED ROUGH DRAFT

1          to testify and tell the witness what to say.

2   BY MS. DAVIDSON:

3                  Q.  Dr. Clarke-Pearson, correct that you

4   stated that you don't recall what this document is;

5    right?

6           A.   I don't even what -- you've talked

7    about Document 121.

8           Q.   121 yes?

9           A.   Yes I don't know what that is.

10          Q.   Asher could you please mark as Exhibit

11   18 document bates number J N J Talc 001465273 which

12   is a March 17, 2020, comprehensive review.

13   Dr. Clarke-Pearson, do you recall 24 document now

14   that it's in front of you?

15          A.   I just see a title so far on the

16   document.

17          Q.   Is the title familiar to you?

18               MS. O'DELL:  I think I would request

19          you put it in the chat so Dr. Clarke—Pearson

20          can see the document.

21    BY MS. DAVIDSON:

22          Q.   Is this title familiar to up

23    Dr. Clarke—Pearson?

24          A.   Vaguely am I not allowed to see the

25    document.

                                            199


                        UNCERTIFIED ROUGH DRAFT


1           Q.   You absolutely can?

2          A.   Okay.  Bring it on.

3          Q.   Asher you want to go to the next page

4    it's a big document?

5               MR. TRANGLE:  It's taking awhile to up

6          load to the chat should be added.

7    BY MS. DAVIDSON:

8          Q.   255 pages if you could go to the next

9    page.  Perhaps this will refresh

10   Dr. Clarke-Pearson's recollection.  Does this

11   refresh your recollection Dr. Clarke-Pearson as to

12   whether you've reviewed this entire document.

13         A.   I'm sorry I don't recall this document.

14         Q.   Do you know how you -- do you know how

15   you received this document?

16        A.   I believe it would be through my

17   attorneys.

18        Q.   Did they -- did you ask them for this

19   document and/or did they provide it to without

20   being asked?

21        A.   I think they provided it to me.

22        Q.   Are you relying on this document in

23   forming your opinions?

24        A.   No.

25        Q.   Okay.  Dr. Clarke-Pearson, if we could

                                                    200

UNCERTIFIED ROUGH DRAFT

1    go back to your expert report, page 13?

2        A.   Yes.

3        Q.   To your the section of your report on

4    the response.  If you could put that up on the

5    screen Asher.  Do the I'm Mandarino papers talk

6    about dose response?

7        A.   Talk about dose response in terms of

8    the cell biology modification by exposure to

9    different exposures us to Talc, yes.

10       Q.   Did Emi involve different exposure

11   metrics?

12       A.   I believe it did.  I'd have to go back

13    and take a look at it.

14            Q.    If Emi did not involve multiple

15    exposure metrics would it be relevant biological

16    dose response?

17            MS. O'DELL:  Objection.

18            THE WITNESS:  Is that a hypothetical

19    question.

20    BY MS. DAVIDSON:

21            Q.    You can answer it as a hypothetical if

22    you Emi involved a single short term exposure you

23    are or a different exposure dosages sure?

24            A.    May I look at Emi for a minute.

25        Q.    Sure.


                                        201


                    UNCERTIFIED ROUGH DRAFT


1         A.    Thank you.


2         Q.    If you'd like I can.  If we could put


3    Emi page 1068 up on the screen.  Off footnote 40.


4              Can you see that sentence that says we


5    believe we are the first to show.  We believe we


6    are the first to show a single short term exposure


7    in vote re to part tell us can be linked to


8    epigenome wide DNA methylation changes.


9              Do you see that?

10          A.   Yes, I do.

11          Q.   Does a single short term exposure you

12   are tell you anything about dose response?

13          A.   Shows about exposure doesn't show about

14   dose.

15          Q.   Do you know why you cited Emi under

16   your dose response section of your supplemental

17   report?

18          A.   Yes, I believe if you look at Figure 5,

19   you'll see a bar graph that shows dose response.

20          Q.   Is that relevant to your Bradford Hill

21   analysis which relates to epidemiology?

22                MS. O'DELL:  Object to form.

23          THE WITNESS:  The question you're

24          asking me has to do with the dose response

25          and the experimental -- in an experiment

                                                    202

UNCERTIFIED ROUGH DRAFT

1          that uses Talc.

2     BY MS. DAVIDSON:

3          Q.   In the Bradford hill criteria does the

4     dose response biological gradient consideration go

5     to experimental studies or does it go to

6     epidemiological studies?

7          A.   Well as I have my title in my report

8    here it's buy logic gradient/dose response which I

9    interpret to go beyond just talking about dose

10   response in humans to looking at issues that

11   overlap with experiment which is also in the

12   Bradford hill criteria.

13        Q.   So do the Bradford hill criteria

14   suggest that under dose response you should

15   consider experimental evidence or is there a

16   separate consideration for experimental evidence?

17             MS. O'DELL:  Object to form.

18             THE WITNESS:  I think that there's a

19        separate issue that -- a separate criteria

20        in Bradford hill that I understand it that

21          talks about experiments, so doing

22          experiments support the impact causation of

23          talcum powder causing ovarian cancer those

24          are experiments in the laboratory in those

25          laboratory experiments there is a gradient

                                              203

                    UNCERTIFIED ROUGH DRAFT

1          and dose response in these studies.  So I

2          included it in both places.

3   BY MS. DAVIDSON:

4          Q.   Okay.  Asher can you go back to

5   Figure 5.  Can you show me Dr. Clarke-Pearson on

6   Figure 5 where it would suggest that there were

7   different amounts of Talc?

8           A.   Well I can't do that for you right now.

9   Maybe -- maybe I'm quoting the wrong figure.  Maybe

10  it's Figure 6 is probably the one that we should

11  look at.

12          Q.   So looking at Figure 5 which you

13  identified earlier that does not show different

14  amounts of Talc?

15          A.   I think I was mistaken.  It's actually

16  Figure 6.

17          Q.   Can you explain to me how Figure 6

18     shows different amounts of Talc?

19          A.   I guess it's the effect of estrogen I'm

20     mistaken I'm sorry.

21          Q.   Again does the Emi paper support your

22     opinion that there's a dose dependent effect of

23     talcum powder on molecular changes associated with

24     carcinogenesis?

25          MS. O'DELL:  I'm sorry, would you mind

                                                  204

                         UNCERTIFIED ROUGH DRAFT

1          repeating the last bit.  Jessica, you

2          trailed off.

3          MS. DAVIDSON:  Court Reporter, did you

4        get it.

5        (The reporter read back the last question.)

6        A.   Give me one moment.  I would like to

7    look at the Harper paper again.

8        Q.   We're talking about the Emi paper, not

9    the Harper paper?

10        A.   You asked if there's any paper.

11        Q.   I said does the Emi paper, E-M-I?

12        A.   Okay.  That's not what I heard.

13        Q.   I heard any, A-N-Y?

14        A.   Emi paper, I cannot identify a dose.

15        Q.   So was that en error in your report?

16          A.    Apparently so.

17          Q.    Did Davis 2021 find a dose response?

18          A.    Let me turn to Davis 20 2 1.

19          Q.    Okay.

20                MS. O'DELL:  So we're starting another

21          area of inquiry.  Christine, how long have

22          you been going.

23                THE REPORTER:  14 minutes.

24                MS. O'DELL:  So that's over 4 hours.

25          All right.  Jessica, you understand our

                                                              205


                          UNCERTIFIED ROUGH DRAFT

1            position on four hours.  And so in terms of

2            further inquiry today you know you've

3            exceeded your time limit.  I think we've

4            given you a little extra time so that's our

5            position.

6                MS. DAVIDSON:  Are you instructing

7            Dr. Clarke-Pearson not to answer the pending

8            question?

9                MS. O'DELL:  There was no pending

10           question.  You asked him to look at Davis he

11           was pulling Davis.

12                MS. DAVIDSON:  I asked whether Davis

13           identified a dose response.

14          MS. O'DELL:  I'll allow him to answer

15          that question and then and then the

16          deposition for today will be concluded.

17          THE WITNESS:  There is some dose

18          response demonstrated here in frequency of

19          general powder use in whites I'm sorry

20          correct me I'm wrong on is that.

21              I would say that I don't see that.

22  BY MS. DAVIDSON:

23          Q.  Asher can we put Davis 2021 on the

24  screen has that been marked?

25          MR. TRANGLE:  It's not.

206

UNCERTIFIED ROUGH DRAFT


1          MS. O'DELL:  It's not marked and you

2      had a question pending.  I loud him to

3      answer that question he responded and.

4          MS. DAVIDSON:  He did not respond.

5          MS. O'DELL:  You're over four hours

6      Jessica bottom line.

7          MS. DAVIDSON:  For the tenth time you

8      are in violation of the order which makes

9      very clear that I get 14 hours number 1.

10     Which I am not even going to ask I was got

11     number 2nd did not finish he was in the

12          middle of answering whether Davis found a

13          first he did he then he went sure I don't

14          think he's done.  I was going to help him

15          out by pointing him to the discussion in

16          Davis dose response so that he could answer

17          the question accurately.  If you'd like to

18          leave his inaccurate answer on the record,

19          that's your prerogative.  We will go to

20          court.

21              MS. O'DELL:  Well, you made your

22          position clear.  You're going to court

23          anyway.  I believe he answered your

24          question.  You're inquiry today was limited

25          to four hours that's our position going to


                                                        207


                       UNCERTIFIED ROUGH DRAFT


1           maintain that.  I recognize we have a

2           disagreement so be it the court will have to

3           deal with that.  In terms of your further

4           inquiry, I think your questions are

5           concluded for the day.  I have three small

6           areas I'll follow up on.

7                  MS. DAVIDSON:  Wait.  Your position is

8           that you're now going to follow up with

9          questions with Dr. Clarke—Pearson and not

10         going to allow me to ask rebuttal to those

11         questions, is that your position?

12              MS. O'DELL:  That's correct.  You know,

13         we have a time limit, Jessica.

14              MS. DAVIDSON:  Yes, we do, and an order

15         14 hours.

16              MS. O'DELL:  It's four hours.

17              MS. DAVIDSON:  That's false.

18              MS. O'DELL:  Let me finish, Jessica.

19         It's not wrong.

20              MS. DAVIDSON:  False.

21              MS. O'DELL:  He's already ——

22          MS. DAVIDSON:  False.


23          MS. O'DELL:  -- been through 14 hours


24     on his case specific opinions.


25          MS. DAVIDSON:  I understand that ruling


                                        208


                  UNCERTIFIED ROUGH DRAFT


1      is from 2023.  I mean you're just continuing


2      to say false statements.


3          MS. O'DELL:  You're interrupting.  Your


4      rudeness.  Please don't interrupt me.


5          MS. DAVIDSON:  You have the entire day,


6      A, telling me that I only have 4 hours for a

7        14-hour deposition and then with very long

8        speaking objections to every question in

9        order to filibuster my time.  So please

10       don't me tell me I was being rude.

11            MS. O'DELL:  That is not accurate and

12       you know that.  So I'm going to follow up on

13       three small areas and then the deposition

14       will be concluded for today.

15                  EXAMINATION

16   BY MS. O'DELL:

17            Q.   So Dr. Clarke-Pearson I have a few

18   questions for you.  First what was marked

19   previously as Exhibit 4 I believe was a Yahoo

20    article that you sent to leadership at ACOG and SGO

21    do you recall that discussion?

22            A.    Yes, I do.

23            Q.    And only a portion of this article was

24    put on the screen for you to see at that time.  Now

25    we've had that printed.  And I will mark it for

                                                    209

                        UNCERTIFIED ROUGH DRAFT

1    purposes of the record if it's not already -- it's

2    already been marked, excuse me, Exhibit 4.

3                   And I'd like for you to look at this

4    article Dr. Clarke-Pearson and specifically look at

5    page 3 of this exhibit.  Do you see that?

6         A.   Yes.

7         Q.   At the bottom.  And does this article

8    reference that Johnson's baby powder and other Talc

9    products contained asbestos and caused cancer does

10   it state that?

11        A.   In this article says Johnson & Johnson

12   baby powder on other Talc powder contain asbestos

13   and cause cancer which the company denies.

14        Q.   And when you were referred to this

15   article as referencing asbestos earlier is that --

16   is that what you were referring to?

17          A.    Yes.


18          Q.


19                MS. DAVIDSON:  Objection.


20    BY MS. O'DELL:


21          Q.    Now if you would Dr. Clarke-Pearson,


22    would you the Woolen study in front of you, if you


23    don't have it?


24          A.    I have it.


25          Q.    And just for purposes of the record,


                                              210


                    UNCERTIFIED ROUGH DRAFT


1    that study was previously marked as I believe it


2    was Exhibit 13.  And I would ask you if you would

3    turn to Table 2 of the study?

4            A.   Okay.  I have not.

5            Q.   And, Dr. Clarke-Pearson, what is the

6    title of Table 2?

7            A.   Process Table 2 publications included

8    in this systematic review most frequent perineal

9    talcum powder reported from each study was

10   abstracted.

11           Q.   And so did Dr. Woolen and others make

12   clear that the data they extracted from the studies

13   she included would be the data from those studies

14   that was the most frequent application?

15          A.    That's what it says, yes.

16          Q.    And so when you were asked questions

17    about Wu and different levels of exposure you are

18    that were included in that study, wouldn't the

19    greatest exposure characterized in Wu be the

20    appropriate data to have included in the Woolen

21    meta-analysis?

22          A.    That's what it says in Table 2.  I

23    don't recall the table that exactly in Wu but it

24    was as I recall greater than 20 years in a lot

25    of -- we can pull that up if you want.  It seemed

211

UNCERTIFIED ROUGH DRAFT

1    like that was the highest level, yes.

2              Q.    And also in regard to Woolen do you

3    have a supplemental tables in front of you for

4    Woolen?

5              A.    Yes.

6              Q.    And I would like to direct you to

7    supplemental table number 1?

8              A.    I have it.

9              Q.    And in this table supplemental Table 1,

10   did Woolen and others report the data not only from

11   women with patent fallopian tubes but all women?

12             A.    Yes.  On the first -- the top part of

13    the table is all women and nonusers less frequent

14    users an daily users.

15         Q.    And what was the adjusted hazard ratio

16    for daily users of all women?

17         A.    Adjusted was 1.27 with a conference

18    interval of 1.09.

19         Q.    And that was statistically significant?

20         A.    Yes.

21         Q.    And in terms of studies that were

22    included in Woolen, let me ask you specifically

23    regarding women with patent tubes.  You were asked

24    some questions about that.  Do women who have

25    hysterectomies or tubal ligation have a patent

212


UNCERTIFIED ROUGH DRAFT


1    reproductive tract?

2         A.   No I mean this is —— you take out the

3    uterus no way for talcum powder to get to tube so

4    the tubes really aren't functional if the tubes

5    have been tied then they're not patent either.

6         Q.   So for study that excluded in the

7    exposed cases women the hysterectomies or tubal

8    ligation, that would essentially be only included

9    women in the cases who have patent tracts?

10        A.   If you take out those that have had

11    hysterectomies and tubal ligations, then the

12    remaining patients all this patent tubes.

13          Q.   Nothing further, Doctor.  Thank you.

14          A.   Thank you.

15               MS. DAVIDSON:  Before we go off the

16          record, I'm asking you again am I allowed to

17          ask follow-up questions on that.  You're not

18          going to let me do that.

19               MS. O'DELL:  You know, Jessica, I --

20               MS. DAVIDSON:  You're continuing to

21          be --

22               MS. O'DELL:  I'm quite confident that

23          when it comes to that point in time when we

24          are examining expert witnesses on behalf

25          of -- as on behalf of the plaintiffs hearing

                                                          213

                         UNCERTIFIED ROUGH DRAFT

1           committee I'm examining the witness who is a

2           defense expert that you will hold me to the

3           minute and second.  And we've given you very

4           clear notice about what we feel the ground

5           rules are here under the order.  And further

6           we have given you additional minutes and

7           we're not going to give any further.

8          MS. DAVIDSON:  You are continuing to

9          violate the order.  And in violating the

10          order, not only are you preventing me from

11          having the time that I'm entitled to, but

12          you are also enabling your witness to

13          prepare further for the line of questioning

14          that has begun which is highly

15          inappropriate.  And we will raise this with

16          the court.  Thank you.  We'll go off the

17          record.

18                    4:09 p.m.

19

20

21

22

23

24

25