# EXHIBIT G






IN THE CIRCUIT COURT OF THE STATE OF OREGON
FOR THE COUNTY OF MULTNOMAH

ELAINE CHATFIELD, as
Personal Representative
of the ESTATE OF
ELSIE LOUISE GRAHAM,

    Plaintiff,

vs.    CASE NO. 21CV40522

AVON PRODUCTS, INC., et al.

    Defendants.
_____

**VERBATIM TRANSCRIPT OF PROCEEDINGS**

**TRIAL - DAY 8**

**HELD ON
MONDAY, FEBRUARY 6, 2023
9:02 A.M.**

**BEFORE
THE HONORABLE SHELLEY RUSSELL
CIRCUIT COURT JUDGE**

MULTNOMAH COUNTY COURTHOUSE, 15TH FLOOR
1200 SOUTHWEST FIRST AVENUE
PORTLAND, OREGON 97204

1542

1  APPEARANCES
2
3  For the Plaintiff:
4  Jessica Dean, Esquire
5  Jordan Blumenfeld-James, Esquire
6  DEAN OMAR BRANHAM SHIRLEY, LLP
7  302 North Market Street, Suite 300
8  Dallas, TX  75202
9  (214) 722-5990
10 (503) 907-6636 Fax
11 jbj@dobslegal.com
12 jdean@dobslegal.com
13
14 For the Defendant, Whittaker, Clark &
15 Daniels, Inc.:
16 Allen Eraut, Esquire
17 Eric Cook, Esquire
18 RIZZO BOSWORTH ERAUT PC
19 1300 SW Sixth Avenue, Suite 330
20 Portland, OR  97201
21 (503) 229-1819
22 (503) 229-0630 Fax
23 aeraut@rizzopc.com
24 kbergstrom@rizzopc.com
25

1543

1  INDEX OF EXAMINATION
2                                          Page
3  PLAINTIFF'S WITNESSES
4  STEVEN HABER, M.D.
5  Direct Examination by Ms. Dean       1546
6  Cross-Examination by Mr. Cook        1754

1544

1  EXHIBITS
2  DEFENDANT'S EXHIBITS: RETAINED BY COUNSEL
3  No.    Description                    Admitted
4  D3     AVON RAW INGREDIENT CODES       1802
5  D3     (was marked as 8024)            1802

1545

1         VERBATIM TRANSCRIPT OF PROCEEDINGS
2                   TRIAL - DAY 8
3                      HELD ON
4              MONDAY, FEBRUARY 6, 2023
5                     9:02 A.M.
6                      BEFORE
7            THE HONORABLE SHELLEY RUSSELL
8                CIRCUIT COURT JUDGE
9
10      (Jury enters.)
11      THE COURT:  Good morning.  We are back on
12 the record.  This is day 11 in the trial in the
13 State of Graham versus Whittaker, Clark & Daniel.
14      How is everybody doing this morning?  Good,
15 all rested, and ready go?  Back at it.  Okay. We're
16 going to be continuing with plaintiff's case this
17 morning.  I do have his little scheduling matter.
18 We're going to take a slightly longer lunch today
19 because of a commitment that I have over the lunch
20 hour that I will have to get to and get back from.
21 So we're going to break at 11:30 or shortly
22 thereafter this morning.  We will still take our
23 mid-morning break, but we'll make it about a 10-
24 minute break today instead of 15.  And with that,
25 please, remember to turn off your cellphones and

1754

1  please the Court, members of the jury.
2  CROSS-EXAMINATION
3  BY MR. COOK:
4      Q   Doctor, Eric Cook on behalf of Whittaker,
5  Clark & Daniels.
6      A   Mr. Cook.
7      Q   I've got a little over an hour today to
8  try and do this, and then I understand we're going
9  to try to pick up tomorrow afternoon if we don't
10 finish this afternoon, okay?
11     A   Thank you.
12     Q   I want to start first with respect to the
13 Moline 2020 article that you referenced on direct
14 examination.  You're, of course, familiar with that,
15 correct?
16     A   Yes.
17     Q   And just to give the jury some orientation
18 on that, in January 2020 the peer-reviewed Journal
19 of Occupational and Environmental Medicine published
20 an article titled Mesothelioma Associated with the
21 Use of Cosmetic Talc, correct?
22     A   Yes.
23     Q   Dr. Jacqueline Moline was the article's
24 lead author, true?
25     A   Yes.

1755

1      Q   The article analyzed medical records and
2  deposition transcripts for 33 anonymous individuals
3  diagnosed with mesothelioma for whom Dr. Molina had
4  conducted a medical legal evaluation as part of tort
5  litigation, correct?
6      A   That's my understanding.
7      Q   And you understood that she had actually
8  been retained by plaintiffs' lawyers in talc
9  litigation and that that was the underlying cases
10 that she used for her study, correct?
11         MS. DEAN:  Your Honor, objection.  It's
12 misleading.  There's plaintiffs' lawyers and they're
13 pointing to me.  I think -- I've never hired her.  I
14 very much read her papers, but I think that's really
15 confusing.
16         THE COURT:  Sustained.
17         MR. COOK:  Okay.  I'll rephrase it without
18 waving my hands, Your Honor.
19     Q   (BY MR. COOK)  You understand that Dr.
20 Moline had been retained by plaintiffs' lawyers in
21 talc litigation and those cases were the basis of
22 her 33 cases in the 2020 publication, correct?
23     A   I'm -- I may have -- I don't really know
24 much about her, but I think I may have heard that
25 that was the case --

1756

1      Q   Okay.
2      A   -- yes.
3      Q   Do you understand that she's been retained
4  in cases in which Ms. Dean was the plaintiff's
5  lawyer?
6      A   No.
7      Q   Okay.  The article itself claimed to be
8  the first large case series to identify cosmetic
9  talcum powder contaminated with asbestos as the
10 cause of malignant mesothelioma in cosmetic talc
11 users, correct?
12     A   Yes, I believe that's correct.
13     Q   Did you know that Dr. Moline testified to
14 Congress about her findings?
15     A   No.
16     Q   Now, with respect to the study itself, it
17 makes a very clear claim that there's no exposure or
18 no potential exposures to asbestos other than from
19 cosmetic talc, correct?
20     A   I don't think that they identified any
21 other substantial exposures.  I don't recall the
22 exact wording.
23     Q   Okay.  Would you agree -- and I can give
24 you a copy of article, if that helps you, sir.
25     A   Okay.

1757

1      Q   If you look right at the objective, that
2  might refresh your recollection, sir, the very top
3  line.
4      A   Okay.
5      Q   All right.  Would it be significant to you
6  if we were able to find out the names of those
7  individuals and track down that they had been
8  exposed to asbestos and it was not from cosmetic
9  talc?
10     A   If you want to show me something, I would
11 be happy to look at that.  That doesn't mean that on
12 all of the cases or -- and it doesn't exonerate
13 other exposures, but sure, I would be happy to look
14 at something if you wanted to show it to me.
15     Q   Absolutely.  So -- and let me just check
16 first.  Let's lay a little foundation.  You would
17 agree that it would be significant and contrary to
18 the representations in the article if, in fact,
19 there were individuals in that study that had sworn
20 to exposures to asbestos that did not involve
21 cosmetic talc, true?
22     A   No.
23     Q   Okay.
24     A   Because testifying that someone had an
25 exposure doesn't mean that you had an exposure.  So

1758

1 that doesn't mean that someone did, if they believed
2 that they did.
3   Q   Okay. If someone swore under penalty of
4 perjury that they were exposed to asbestos, that
5 wouldn't be significant to you?
6   A   In -- with regard to what? I mean, people
7 can not know that they had exposures and/or they
8 think that they had exposures and that they weren't.
9 It can go both ways. But just because someone
10 believes that they did doesn't mean that they did.
11 And just because -- and if someone believes that
12 they didn't doesn't mean that they didn't.
13   Q   All right. Let's walk through -- let me
14 show you this, sir. This is a federal court order
15 in the Bell case. Are you familiar with that?
16       MS. DEAN: Your Honor, may we approach?
17       (In camera discussion from 3:33 p.m. to
18 3:41 p.m.)
19       THE COURT: We're going to move on?
20       MR. COOK: Yes, Your Honor. Just one
21 foundational question.
22   Q   Have you talked to Ms. Dean about the Bell
23 decision?
24   A   Who?
25   Q   Have you talked to Ms. Dean about the Bell

1759

1 decision that I handed you?
2   A   No.
3   Q   Okay. All right. Doctor, can you explain
4 to the jury the importance of peer review?
5   A   Well, peer review is where if someone
6 publishes a paper, the paper is submitted to peers
7 who review the paper and maybe check it factually or
8 whatever, and then ideally it improves the quality
9 of studies that are published.
10   Q   All right. You talked a fair amount today
11 about cosmetic talc. Have you subjected your
12 opinions on cosmetic talc to peer review?
13   A   I've never published on peer review on
14 cosmetic talc.
15   Q   Have you designed an epidemiology study
16 that's been accepted for peer review?
17   A   No. I mean, I've -- I did my -- my
18 publication on mesothelioma was subject to peer
19 review, but it was not -- it was a -- just a case
20 series, not a cohort to control study.
21   Q   How many publications do you have on
22 mesothelioma, sir?
23   A   Just the two.
24   Q   Two. Okay. You've never designed an
25 exposure analysis that was accepted for peer review,

1760

1 true?
2   A   Right. I don't do those.
3   Q   You talked about exposure today with the
4 jury, correct?
5   A   Right. But I don't do any sort of studies
6 to try to do an exposure analysis.
7   Q   Okay. And dose array construction, that's
8 not something that you do?
9   A   No, not from a -- typically from a
10 qualitative. I do, as a pulmonologist, look at
11 exposures from how -- the nature of the exposure,
12 the intensity, the duration, that sort of thing.
13   Q   Okay. You've never designed a toxicology
14 study that was accepted for peer review, true?
15   A   Right. I've not done what.
16   Q   Okay. The jury heard a lot about
17 background or ambient exposures to asbestos. Do you
18 agree that asbestos is a naturally-occurring
19 mineral?
20   A   Yes.
21   Q   Mined all over the world?
22   A   Well, in a number of places. I'm not sure
23 it's all over, but yes, it's certainly a number of
24 places across the world.
25   Q   Okay. Dr. Brody talked about how it's in

1761

1 the air we breathe. Would you agree it's also in
2 the water that we drink?
3   A   There may be some in certain waters. I
4 mean, not in all water, but in certain waters there
5 may be some fibers and they may again be like the
6 background where it's small, small, short fiber.
7   Q   And you, of course, are familiar with the
8 Agency for Toxic Substances and Disease Registry,
9 correct?
10   A   Yes.
11   Q   And you're familiar specifically with the
12 Toxicological Profile for Asbestos from September
13 2001, correct?
14   A   I am.
15   Q   And I'll put it on the Elmo to help you,
16 but I'll give you the page number as well.
17       MR. COOK: If I can have the Elmo, please.
18   Q   (BY MR. COOK) It's going to be page 151,
19 if you want to look at it yourself, sir.
20       Are you ready, sir?
21   A   Yes.
22   Q   Okay. In 2001, the ATSDR wrote, "Fibers
23 in water arise mainly by erosion of natural deposits
24 of asbestos or by corrosion of fibers from pipes
25 made with asbestos containing cement."



1806

1  time today, but this is Avon Code 0747. And I want
2  to look at this specific date in a couple entries of
3  September 20th, 1971, to illustrate a point.
4      If we go back here to one of the later
5  entries, what we see is where Whittaker is actually
6  an approved vendor for Avon Code 0768 --
7      A   Right. These --
8      Q   -- on that same date, September 20th,
9  1971, right?
10     A   Right. Because that was from North
11 Carolina. That's the 2450.
12     Q   And then what we see on that same date for
13 Avon Code 0810, the approved vendor is Charles
14 Mathieu, correct?
15     A   Right. But this was the 4602.
16     Q   Right. And so what we see, though, is
17 Avon, when they're looking at the approved vendor,
18 they're differentiating between Charles Mathieu and
19 Whittaker, Clark & Daniels as far as the approved
20 vendor, correct?
21     A   Yes.
22         MR. COOK: All right. Your Honor, this
23 might be a good point to stop for the day before I
24 go into another topic, if we could.
25         THE COURT: All right. Members of the

1807

1  jury, we'll adjourn for the day and we'll return
2  tomorrow morning. Please be here -- are you all
3  able to be here by 845? We'll start a little bit
4  earlier to make up for a little bit of the time we
5  lost today. We're going to start at 8:45 tomorrow.
6  Thank you. I appreciate that. We're going to
7  adjourn for the day. Please do not discuss the case
8  with anyone or do any research. Keep your notepads
9  on the chairs. Thank you, everybody.
10     (Jury exits.)
11         THE COURT: So what we will try to do
12 tomorrow morning is start a little bit early, 15
13 minutes early, and we can take an hour lunch
14 tomorrow, if that will help make up for some of the
15 time that was lost today. And I'll let you all out.
16 But you did want to put at least one issue on the
17 record?
18         MR. COOK: If I may, Your Honor.
19         MS. DEAN: Is it okay if Dr. Haber leaves?
20         THE COURT: Yes.
21         THE WITNESS: Thank you, Your Honor.
22     (Witness excused.)
23         MR. ERAUT: Your Honor, before we get to
24 that, I would like to remark the Exhibit reference
25 of D3 as 8024, just to keep with consistency.

1808

1          THE COURT: 8024?
2          MR. ERAUT: Yes, Your Honor.
3          THE REPORTER: I'm sorry, Mr. Eraut. What
4  was the first, the initial number?
5          MR. ERAUT: Remark exhibit referenced as
6  D3 as 8024.
7      (Defendant's Exhibit No. D3 was remarked
8  as 8024 marked for identification.)
9          THE COURT: So D3 is 8024.
10         MR. COOK: I just want to put on the
11 record a short paraphrase of what occurred during
12 the sidebar. Prior to that on the record there was
13 an objection with respect to use of the Bell
14 decision. The cite for that is 2022 U.S. District,
15 LEXIS 199 180. It's from the United States District
16 Court for the Middle District of North Carolina,
17 decided September 13th, 2022.
18     I think the article -- or, excuse me --
19 the opinion itself lays out many of the reasons
20 here. The Moline 2020 case series was raised on
21 direct examination with the jury and represented as
22 a publication in which there were no exposures to
23 asbestos other than from cosmetic talc.
24     The Bell decision specifically found one
25 of the individuals that was in the Moline case

1809

1  series had actually, while represented by counsel --
2  and I'll read it specifically. This is from page 16
3  of the decision -- "Mrs. Bell nonetheless made
4  statements to the Industrial Commission while
5  represented by counsel that she has sustained an
6  occupational disease caused by exposure to asbestos
7  during employment with Hoechst Celanese Corporation
8  and Pillowtex Corporation. The alleged occupational
9  disease was mesothelioma."
10     The Court went on to note several other
11 issues which are set forth in the opinion itself and
12 we raised with the Court. I won't lay those out
13 now, as it's already in the written decision. But
14 the Court overruled -- excuse me -- the Court
15 sustained the objection and did not permit
16 additional questioning with respect to the Bell
17 decision, which we note our exception to. Thank
18 you.
19         THE COURT: And, Ms. Dean, did you want to
20 add anything to that?
21         MS. DEAN: Within a minute or less, first,
22 there was just a threshold issue about hearsay. This
23 is a hearsay document quoting additional layers of
24 hearsay. And when asked if there was an exception,
25 none was offered. And under Rule 703 or 706 hearsay

**1810**

1  documents can be relied on, but this witness
2  exclusively indicated he had not.
3      And so I think on the hearsay level this
4  was a black and white issue. But there's also
5  layers of concern under 403, the relevance is
6  attenuated. The fact that someone believed or a
7  lawyer even believed that a client was exposed
8  doesn't mean an occupational medicine doctor with
9  training was somehow inaccurate in her statement
10 that she was not.
11     And then there's all of this extra layers
12 of bringing in what the Industrial Board and the
13 North Carolina law permits, why the claim was
14 denied, which is undue confusion of time and
15 prejudice. One of the things explicitly noted by
16 counsel that he wanted to state is that her lawyer
17 allowed her to file this. What a lawyer in North
18 Carolina did in a different matter is truly
19 problematic.
20     The last thing I'll note is Dr. Haber
21 indicated that by now there are literally hundreds
22 or well over 275 case series reports. The idea that
23 whatever relevance this has is significant given the
24 number of other cases I think is undermined by the
25 number of other cases.

**1811**

1      MR. COOK: And if I could just very
2  briefly in response to that note, you know, Ms. Dean
3  has raised a number of those. Thirty-three of those
4  come from the Moline 2020 case series. There are
5  additional ones that Dr. Moline has raised. And
6  then Dr. Emory, there are similar concerns with
7  respect to Dr. Emory's publication that there are
8  with Dr. Moline's, that there are individuals
9  included in those studies that had exposures to
10 asbestos which are not identified in the study, and
11 the authors are claiming that it's only exposure to
12 cosmetic talc.
13     We think the examination with respect to
14 Bell, what we have is one individual that we've been
15 able to find out their name and what their -- what
16 their testimony was under, and we found 100 percent
17 of those individuals had sworn to an alternative
18 exposure to asbestos. And we think that's something
19 that's relevant, highly relevant, and should be
20 considered by the jury. Thank you.
21     THE COURT: And the objection is still
22 sustained. Mr. Cook, any time you walk over by your
23 Elmo --
24     MR. COOK: Yes.
25     THE COURT: -- we get this really --

**1812**

1      MR. COOK: Weird echo?
2      THE COURT: -- resonant, weird echo. Is
3  there a microphone on the Elmo?
4      MR. COOK: Is there?
5      THE COURT: Is there a way to turn it off?
6      MR. COOK: Apparent there is.
7      THE COURT: Okay. Yeah, if we can figure
8  that out. All right. Anything else we need to put
9  on the record?
10     MS. DEAN: Whittaker, Clark & Daniels
11 filed an answer and we filed a motion to strike --
12     THE COURT: I saw that.
13     MS. DEAN: -- on their affirmative
14 defenses. I don't think that needs to be heard at
15 this time, but I want to make the Court aware that
16 that's out there.
17     THE COURT: I think all of those issues
18 probably get ironed out depending on what jury
19 instructions we give, so -- and the jury will not be
20 seeing the Complaint and the Answer. That's my
21 understanding.
22     MS. DEAN: Then we got in to WCD what we
23 think is an accurate depiction of where we are with
24 jury instructions. We're just waiting to hear back
25 and have that for you.

**1813**

1      THE COURT: Great. All right. So with
2  that, have a good night and see you early tomorrow.
3      (Proceedings adjourned at 4:49 p.m.)

1814

1      CERTIFICATE
2
3      I, Margaret R. Golden, do hereby certify that I
4  reported all proceedings adduced in the foregoing matter
5  and that the foregoing transcript pages constitutes a full,
6  true, and accurate record of said proceedings to the best
7  of my ability.
8
9      I further certify that I am neither related to
10 counsel or any part to the proceedings nor have any
11 interest in the outcome of the proceedings.
12
13     IN WITNESS HEREOF, I have hereunto set my hand this
14 20th day of February, 2023.
15
16
17
18
19
20 /S/ Margaret R. Golden
21 Georgia License No. 5409-06355-5897-1392
22
23
24
25