**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| IN RE: JOHNSON & JOHNSON TALCUM POWER PRODUCTS MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL No. 16–2738 (MAS) (RLS)<br><br>Oral Argument Requested |

**DEFENDANT JOHNSON & JOHNSON'S SUR-REPLY IN OPPOSITION
TO PLAINTIFFS' STEERING COMMITTEE'S MOTION FOR
PROTECTIVE ORDER REGARDING SUBPOENA DIRECTED AT
NORTHWELL HEALTH, INC.**

**FAEGRE DRINKER BIDDLE
& REATH LLP**
600 Campus Drive
Florham Park, NJ 07932
Tel.: (973) 549-7000

**SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP**
One Manhattan West
New York, NY 10001
Tel.: (212) 735-3000

**KING & SPALDING LLP**
1185 Avenue of the Americas
New York, NY 10036
Tel.:(212) 556-2100

*Attorneys for Defendant
Johnson & Johnson*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................. ii

INTRODUCTION ......................................................................................... 1

ARGUMENT................................................................................................. 3

    I.      The PSC's Motion Fails Because Its Own Interests Are Not
           Jeopardized. ........................................................................... 3

    II.     The Information Sought Is Relevant. .................................... 6

    III.    No Privacy Interest Is At Stake.............................................. 7

    IV.    The Subpoena Is Not Unduly Burdensome. ...................... 11

CONCLUSION ........................................................................................... 11

# TABLE OF AUTHORITIES

**Case(s)** **Page(s)**

*Aetrex Worldwide, Inc. v. Burten Distribution, Inc.*,
  2014 WL 7073466 (D.N.J. Dec. 15, 2014)........................................................5

*Arkliss v. Nissan Extended Servs. N. Am., Inc.*,
  2018 WL 10502135 (D.N.J. Aug. 16, 2018) ......................................................4

*Braintree Lab'ys, Inc. v. Novel Lab'ys, Inc.*,
  2013 WL 12170639 (D.N.J. Apr. 3, 2013).......................................................10

*Contour Data Sols. LLC v. Gridforce Energy Mgmt., LLC*,
  2022 WL 3907530 (E.D. Pa. July 25, 2022).....................................................5

*Doe v. Am. Red Cross Blood Servs., S.C. Region*,
  125 F.R.D. 646 (D.S.C. 1989)..........................................................................10

*Farnsworth v. Procter & Gamble Co.*,
  758 F.2d 1545 (11th Cir. 1985)........................................................................10

*Government Employees Insurance Co v. Koppel*
  2023 WL 5526809, at *1 (D.N.J. Aug. 28, 2023)..............................................4

*Lampshire v. Procter & Gamble Co.*,
  94 F.R.D. 58 (N.D. Ga. 1982)..........................................................................10

*Lilac Development Group v. Hess Corporation*
  2016 WL 3457012, at *3 (D.N.J. June 20, 2016) ..........................................4, 5

*Rudelli v. Eli Lilly & Co.*,
  2020 WL 13694732 (D.N.J. Nov. 13, 2020) ......................................................5

**Other Authorities**

45 C.F.R. § 164.512(e)(1)(i) ..................................................................................9

Fed. R. Evid. 401 ...................................................................................................6

Without first seeking permission as required by Local Rule 37.1(b)(3), the Plaintiffs' Steering Committee ("PSC") filed a reply brief that raised a number of new issues for the first time, necessitating a response. Defendant Johnson & Johnson ("J&J") therefore submits this sur-reply in opposition to the PSC's Motion For Protective Order Regarding Subpoena Directed At Northwell Health, Inc. ("Northwell").

## INTRODUCTION

In its Reply, the PSC mocks J&J for "excruciatingly" describing the underpinnings of Dr. Moline's Articles and for attaching "more than 1,000 pages of exhibits" to its Opposition brief. Reply 1. The PSC must resort to criticizing the *volume* of the evidence because it cannot and does not dispute what the evidence shows: that J&J has very good reason to believe that the Articles are based on a false premise. Similarly, nowhere in its blustering Reply does the PSC invoke the usual arguments that J&J's views about the Articles' falsity are "speculation" or that J&J is simply on a "fishing expedition." Perhaps that is because it can't. The Articles are not legitimate science; they are a litigation tactic.

In reality, the PSC wants to be able to exploit this same litigation tactic for itself. Not surprisingly, the PSC steadfastly has refused to commit that it will not use the Articles during trial. Instead, it provides self-serving assurances that it is "unlikely" that the Articles will come up during future trials. They don't say that

1

they will not rely on any papers that review or touch on mesothelioma—because in fact their expert reliance lists are peppered with such papers. And, most importantly here, the PSC has put forth multiple experts who rely on the Moline Articles. On that basis alone J&J should be permitted to arm itself with the truth about the Articles so it can adequately cross examine these witnesses and allow a jury to understand the Articles—and any opinions premised on them—for what they really are. The need for discovery into the likely false underpinnings of the Articles is only exacerbated when the PSC continues to play coy about its intended use of the Articles.

In order to distract from this obvious conclusion, the PSC focuses its Reply on the contention that "defendants in mesothelioma cases throughout the country have repeatedly attempted to obtain the same information and failed." Reply 2. But it cites almost exclusively to rulings on the scope of permissible cross-examination, not discovery requests—and in cases where J&J was not even a party.

As to the actual discovery order that the PSC focuses on (from the *Gref* case), the PSC notably does not describe what in fact occurred in the matter. It is simply not true that Northwell "already fought and won this same battle" in *Gref*. *See* Reply 10. To the contrary, the plaintiff in *Gref* mooted the issue by committing not to rely on the Articles, something the PSC refuses to do here. That was the *sole basis* for the court's ruling.

Similarly, while attempting to claim J&J's own expert Dr. Diette supports the PSC's position, the PSC ignores that Dr. Diette has expressly testified that he ***does not believe*** the identities of the individuals that form the basis of the Articles are confidential since they were already made public: "[M]y opinion as a researcher [is] that there is no longer any confidentiality to protect, at least for the topic of what's in that paper." Ex. 35, Diette *Pichierri* Dep. 63:12-70:5.

Finally, no privacy interest or burden is at stake. The PSC never disputes that all the individuals in the Articles already made their mesothelioma diagnoses and related medical histories public. And in its Reply, the PSC does not even attempt to support its argument that producing two short documents would be burdensome.

This Court should deny the PSC's motion.

## ARGUMENT

### I.    The PSC's Motion Fails Because Its Own Interests Are Not Jeopardized.

The PSC does not contend that any of its own interests are implicated by the subpoena. Instead, it makes a purely legal argument that it can move for a protective order even if has absolutely no interest in the outcome.

The PSC conflates two separate requirements. Just because a party has Rule 26(c) standing (because Rule 26(c) expressly mentions a "party" filing a motion, unlike Rule 45), that does not relieve the party from the separate requirement that it must show that its own interests are jeopardized. The PSC responds to this legal

truism by citing to cases that stand for the simple proposition that a party has standing under Rule 26(c) to contest relevance. But, again, such cases say nothing about the separate requirement that the moving party's own interests must also be jeopardized.

J&J provided numerous examples of cases from across the country—in addition to *Wright & Miller*—stating that a party must, at minimum, show it has *some* interest that would be jeopardized by the disclosure of information at issue in order to move for a protective order. By contrast, the PSC cites to cases where the court never addressed the issue one way or another, and thus its cases have no bearing on the question. *See Arkliss v. Nissan Extended Servs. N. Am., Inc.*, 2018 WL 10502135, at *4 (D.N.J. Aug. 16, 2018) (stating cases are "not persuasive" that "did not address the argument" at issue). The PSC does not cite a single case granting a protective order and expressly holding that the party need not have shown that its own interest would be jeopardized in some way by the disclosure.

Indeed, the issue of whose interests were at stake may never have arisen in those cases because the moving parties' interests *were* at stake. For example, in *Government Employees Insurance Co v. Koppel*, the "Koppel Defendants" sought to block a subpoena for "all criminal and investigative records from the OIFP's Medicaid Fraud Control Unit ***concerning the Koppel Defendants***." 2023 WL 5526809, at *1 (D.N.J. Aug. 28, 2023) (emphasis added). In *Lilac Development*

*Group v. Hess Corporation*, the defendant Hess Corporation similarly "stress[ed] the sensitive nature of the information ***Hess*** was providing" to the third party that was sought by the third-party subpoena. 2016 WL 3457012, at *3 (D.N.J. June 20, 2016) (emphasis added).

In fact, the PSC largely relies on cases where a motion for a protective order was *denied*. *See Koppel*, 2023 WL 5526809, at *4 ("[T]he Koppel Defendants' alternative request for a protective order is DENIED."); *Lilac Dev. Grp.*, 2016 WL 3457012, at *3 ("Defendant Hess Corporation and Speedway, LLC's motion for a protective order is DENIED."); *Aetrex Worldwide, Inc. v. Burten Distribution, Inc.*, 2014 WL 7073466, at *6 (D.N.J. Dec. 15, 2014) ("Defendant's motion for a protective order and to quash the subpoenas is hereby DENIED."); *Rudelli v. Eli Lilly & Co.*, 2020 WL 13694732, at *3 (D.N.J. Nov. 13, 2020) ("To the extent Defendant intended to move for a protective order, such request is denied."); *Contour Data Sols. LLC v. Gridforce Energy Mgmt., LLC*, 2022 WL 3907530, at *3 (E.D. Pa. July 25, 2022) ("Plaintiff's Motion is DENIED.").

Finally, even if the PSC was correct that it may assert *lack of relevance* without its own interest being jeopardized, that does not give the PSC the ability to raise the burden or privacy interests of others—two issues that made up the bulk of the PSC's initial motion. The PSC's own case makes that clear. *See Lilac Dev. Grp.*, 2016 WL 3457012, at *2 ("But Defendants do not have standing to move for a

protective order for a third-party based on the burden that subpoena will place on the third-party.").

This Court should deny the PSC's motion for a protective order where it has not claimed that it has any interest in the outcome.

## II.    The Information Sought Is Relevant.

While it attempts to shield itself from its lack of any interest by pointing to relevance, ironically, the PSC barely contends that the information at issue is not relevant. It does not dispute that the standard for relevance in the context of discovery is *even more liberal* than Rule 401 in the context of a trial. Nor does the PSC dispute that Dr. Moline's Articles could be used to support its contention that J&J's talc products were contaminated with asbestos.

Lastly, the PSC has not committed that it will not use or refer to Dr. Moline's Articles during trial. Rather, the PSC's response on this question amounts to: *Trust us, the Articles won't come up.* The PSC's refusal to make a commitment to refrain from discussing the Articles demonstrates both the Articles' relevance and should be dispositive. If the Articles may arise during trial, J&J has the right to the underlying information to be able to defend itself and demonstrate that those Articles are based on a false premise.

## III. No Privacy Interest Is At Stake.

The PSC similarly offers little-to-no support for the idea that any privacy interests are in play. The PSC does not contend that any law prohibits disclosure of the two documents at issue or the information contained therein. And critically, the PSC does not respond at all to the point that the individuals in the Articles already made public that they developed mesothelioma (and their related medical histories) since they were all plaintiffs in litigation.

Take for example the plaintiffs discussed in J&J's opposition brief that appear to match individuals in the Articles. Each filed a public complaint making their mesothelioma diagnosis public:

- **Kohr Complaint**
  "These exposures to asbestos proximately caused HELENE KOHR to develop mesothelioma."

- **Lanzo Complaint**
  "Plaintiff, Stephen Lanzo, III, contracted mesothelioma."

- **Jackson Complaint**
  "Plaintiff Doris Jackson was diagnosed with mesothelioma in November 2014."

- **Dalis Complaint**
  "Plaintiff Valerie Jo Dalis contracted mesothelioma."

- **Rimondi Complaint**
  "RICARDO RIMONDI was diagnosed with malignant mesothelioma on or about 27 September 2016."

Ex. 36, Kohr Compl. ¶ 5; Ex. 37, Lanzo Compl. ¶ 3. Ex. 38, Jackson Compl. ¶ 3;

Ex. 39, Dalis Compl. ¶ 2; Ex. 40, Rimondi Compl. ¶ 1.

Rather than taking the lack of privacy interests head on, the PSC cites a number of irrelevant rulings and depositions.

*Gref*. The PSC first points to the *Gref* case where J&J was not even a party. But the PSC's contention that "Northwell already fought and won this same battle" in *Gref* is simply not true. *See* Reply 10.

In that matter, the plaintiff withdrew all reliance on Dr. Moline's Articles— something the PSC has refused to do here. The *Gref* plaintiff wrote: "Plaintiff withdraws his experts' reliance on the Moline Article in this matter." Ex. 41, *Gref* Letter Brief (*Gref* ECF 337). The plaintiff further contended that "[s]ince Plaintiff is withdrawing reliance on the article, there can be no argument that the identity of the subjects of the Moline Article are relevant in Mr. Gref's lawsuit." *Id.*

The *Gref* order the PSC attached gave no rationale but instead referred to the reasoning given at a May 19, 2023 hearing, attaching no transcripts. *See* Reply at 10; Reply Ex. C. The bench ruling at the hearing makes clear that the magistrate judge relied exclusively on the fact that the plaintiff withdrew all reliance on the 2020 Article for reaching her conclusion: "I'm not going to give you a written decision because it's pretty clear, given [plaintiff's counsel] Mr. Kramer's statements on the record, that they're not at all using or relying on Dr. Moline's 2020 article, that there just isn't a basis to conclude that the article is relevant." Ex. 42, *Gref* May 19, 2023 Hr'g Tr. 12:14-24.

A case where the plaintiff has withdrawn all reliance on Dr. Moline's Articles says nothing about J&J's arguments here, which continue to go unrebutted.[1]

***Lashley Trial Ruling.*** The PSC also provides lengthy quotations of a mid-trial ruling in *Lashley* regarding the appropriate scope of cross examination of Dr. Moline. Again, such a ruling has no bearing on J&J's entitlement to discovery here. That case did not even involve J&J and the PSC does not explain what arguments were or were not presented to the judge. What's more, and critically, that trial occurred in 2020 shortly after the Dr. Moline's original Article first became available—well before the *Bell* ruling and other new information came to light revealing that the premise of the 2020 Article likely is not true.

Plaintiffs' reference to other mid-trial rulings regarding the scope of cross examination of Dr. Moline are similarly not relevant to the discovery question at issue here. *See* Reply at 11. And even if these sorts of rulings were relevant, courts have prohibited plaintiffs from relying on Dr. Moline's Articles because defendants "have been obstructed from meaningfully cross-examining Dr. Moline and obtaining

---

[1] The PSC also quotes Northwell's arguments regarding HIPAA from *Gref,* perhaps in an attempt to avoid the fact it never actually addressed HIPAA in its motion and also in order to raise the specter of HIPAA without developing any genuine argument on the topic. Again, the individuals referred to in the Articles are not Dr. Moline or Northwell's *patients*, which is why the plaintiffs in *Bell* (where a highly redacted version of one of the two documents sought was produced) conceded the information was not HIPAA-protected. In any event, even material that is actually covered by HIPAA may be disclosed "[i]n response to an order of a court." 45 C.F.R. § 164.512(e)(1)(i).

discovery that might challenging the finding and conclusions of the Article." Ex. 43, *Smith* Order. Another court adopting that same ruling stated that "there is a serious question as to whether the studies are based upon reliable and rigorous scientific methods." Ex. 44, *Thomas* Order.

**New Case Law.** In two perfunctory parentheticals, the PSC cites new case law for the first time in its Reply. *See* Reply 9. These out-of-circuit cases from over 35 years ago have no bearing on the issue this Court confronts.

In *Farnsworth*, the information sought was "of a highly personal nature" including "sexual practices, contraceptive methods, pregnancy histories, menstrual activity, tampon usage, and douching habits." *Farnsworth v. Procter & Gamble Co.*, 758 F.2d 1545, 1546 (11th Cir. 1985). The study participants were not all plaintiffs who already publicly revealed their medical condition—as with the Articles here. And there was no evidence in that case that the underlying facts reported in the study were simply false, which is precisely the situation here. *Lampshire* was an earlier ruling involving the same study and suffers from the same flaws. *Lampshire v. Procter & Gamble Co.*, 94 F.R.D. 58, 60 (N.D. Ga. 1982).[2]

---

[2] The cases the PSC cites in a footnote are even less relevant. Reply 9 n.13. *Doe* did not involve a study at all, but a request to identify "the HIV positive donor whose blood was transfused into Jane Doe during an operation on January 9, 1985." *Doe v. Am. Red Cross Blood Servs., S.C. Region*, 125 F.R.D. 646, 647 (D.S.C. 1989). In *Braintree*, the relevant documents *were produced*, and the only question is whether information would be filed under seal—a completely different inquiry. *Braintree Lab'ys, Inc. v. Novel Lab'ys, Inc.*, 2013 WL 12170639, at *1 (D.N.J. Apr. 3, 2013).

***Dr. Diette Testimony***. Finally, the PSC misleadingly quotes an excerpt of a deposition transcript of Dr. Diette without providing his full views on the topic. Dr. Diette expressly testified that he ***does not believe*** the subjects of Dr. Moline's article have confidentiality: "[M]y opinion as a researcher [is] that there is no longer any confidentiality to protect, at least for the topic of what's in that paper." Ex. 35, Diette *Pichierri* Dep. 63:12-70:5.

## IV.    The Subpoena Is Not Unduly Burdensome.

While the PSC originally argued that the subpoena would represent an undue burden on Northwell, it does not contest in its Reply that seeking production of only two documents is a burden at all. For this reason as well, which the PSC now appears to concede, its motion should be denied.

## CONCLUSION

The information sought by the subpoena is unquestionably relevant. No privacy interests are implicated. All the plaintiffs in the Articles voluntarily made their mesotheliomas public. And producing two documents is no burden at all. A protective order is therefore not warranted.

The real issue on this motion is that disclosure of the two documents threatens to expose the falsity of the Articles relied upon by the PSC's experts, and the sort of litigation tactics at play across these cases. That is why the PSC is fighting a battle to block this basic discovery.

This Court should deny Plaintiffs' Motion for a Protective Order.


Dated: January 31, 2024                    Respectfully submitted,


                                           _Susan Sharko_
                                           Susan M. Sharko
                                           **FAEGRE DRINKER
                                           BIDDLE & REATH LLP**

                                           Allison M. Brown
                                           Jessica Davidson
                                           **SKADDEN, ARPS, SLATE,
                                           MEAGHER & FLOM LLP**

                                           Kristen R. Fournier
                                           **KING & SPALDING LLP**

                                           *Attorneys for Defendant*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| IN RE: JOHNSON & JOHNSON TALCUM POWER PRODUCTS MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL No. 16–2738 (MAS) (RLS) |

**DECLARATION OF SUSAN M. SHARKO IN SUPPORT OF
DEFENDANT JOHNSON & JOHNSON'S SUR-REPLY IN OPPOSITION
TO PLAINTIFFS' STEERING COMMITTEE'S MOTION FOR
PROTECTIVE ORDER REGARDING SUBPOENA DIRECTED AT
NORTHWELL HEALTH, INC.**

I, Susan M. Sharko, declare as follows:

I am an attorney of the state of New Jersey and a partner with the law firm Faegre Drinker Biddle & Reath LLP, counsel for Defendant Johnson & Johnson in the above-captioned matter. The facts stated in this Declaration are true of my own personal knowledge. I submit this Declaration in Support of Defendant Johnson & Johnson's Sur-Reply To Plaintiffs' Steering Committee's Motion For A Protective Order Regarding The Subpoena Directed At Northwell Health, Inc.

1.      Attached hereto as **Exhibit 35** is a true and correct copy of an excerpt of Dr. Gregory Diette's deposition on June 16, 2023 in *Mary Pichierri and Jon Pichierri v. Avon Products, Inc., et al*., No. 20-2681 (Mass. Super. Ct., Middlesex Cnty.).

2.      Attached hereto as **Exhibit 36** is a true and correct copy of an excerpt of Plaintiff Harvey Kohr's complaint in *Kohr v. Brenntag North America, Inc., et al*., No. 2016L008842 (Ill. Cir. Ct., Cook Cnty.).  Although this complaint was filed on a public docket without redaction and has since been filed without redaction as an exhibit to motions filed by both plaintiffs and defendants in courts around the country, including New Jersey state courts, the complaint has been redacted here solely to comply with the Court's Electronic Case Filing Policies and Procedures, Rule 17.

3.      Attached hereto as **Exhibit 37** is a true and correct copy of an excerpt of Plaintiff Stephen Lanzo's complaint in *Lanzo v. Cyprus Amax Minerals Co., et al.*, No. MID-L-7385-16 AS (N.J. Super. Ct., Middlesex Cnty.).  Although this complaint was filed on a public docket without redaction and has since been filed without redaction as an exhibit to motions filed by both plaintiffs and defendants in courts around the country, including New Jersey state courts, the complaint has been redacted here solely to comply with the Court's Electronic Case Filing Policies and Procedures, Rule 17.

2

4.      Attached hereto as **Exhibit 38** is a true and correct copy of an excerpt of Plaintiff Doris Jackson's complaint in *Jackson v. Colgate-Palmolive Co.*, No. 1:15-cv-01066-TFH (D.D.C. July 7, 2015).

5.      Attached hereto as **Exhibit 39** is a true and correct copy of an excerpt of Plaintiff Valerie Jo Dalis' complaint in *Dalis v. Brenntag North America, Inc., et al.*, No. MID-L-4821-15AS (N.J. Super. Ct., Middlesex Cnty.)   Although this complaint was filed on a public docket without redaction and has since been filed without redaction as an exhibit to motions filed by both plaintiffs and defendants in courts around the country, including New Jersey state courts, the complaint has been redacted here solely to comply with the Court's Electronic Case Filing Policies and Procedures, Rule 17.

6.      Attached hereto as **Exhibit 40** is a true and correct copy of an excerpt of Plaintiff Ricardo Rimondi's complaint in *Rimondi v. BASF Catalysts LLC, et al.*, No. MID-2912-17AS (N.J. Super. Ct., Middlesex Cnty).   Although this complaint was filed on a public docket without redaction and has since been filed without redaction as an exhibit to motions filed by both plaintiffs and defendants in courts around the country, including New Jersey state courts, the complaint has been redacted here solely to comply with the Court's Electronic Case Filing Policies and Procedures, Rule 17.

7.      Attached hereto as **Exhibit 41** is a true and correct copy of a letter from Plaintiff Brian Joseph Gref on May 1, 2023 in *Gref v. Am. Int'l Indus., et al*., 20-cv-05589 (ECF 337).

8.      Attached hereto as **Exhibit 42** is a true and correct copy of the transcript of the hearing on May 19, 2023 in *Gref v. Am. Int'l Indus., et al*., 20-cv-05589 (S.D.N.Y. May 19, 2023).

9.      Attached hereto as **Exhibit 43** is a true and correct copy of an Order on April 8, 2022 in *Smith v. Albertsons Companies, et al*., No. RG21 101490 (Super. Ct. Ca., Alameda Cnty.).

10.     Attached hereto as **Exhibit 44** is a true and correct copy of an Order on January 25, 2024 in *Thomas v. Avon Products, Inc. et al*., No. 23CV032324 (Super. Ct. Ca., Alameda Cnty.).

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: January 31, 2024

Susan M. Sharko

# Exhibit 35

1

Volume: 1
Pages: 1-72
Exhibits: 11

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.                    SUPERIOR COURT
                                  CIVIL ACTION NO. 20-2681
_____
                          :
MARY PICHIERRI and JOHN PICHIERRI,  :
          Plaintiffs      :
vs.                       :
                          :
AVON PRODUCTS, INC., et al.,  :
          Defendants      :
_____:


ZOOM DEPOSITION OF:
GREGORY B. DIETTE, M.D., MHS

Appearing remotely from Baltimore, Maryland

Friday, June 16, 2023

10:00 a.m. - 11:43 a.m.


Christine E. Borrelli, CSR, RPR, RMR

LEXITAS LEGAL
(508) 478-9795 - (508) 478-0595 (Fax)
www.LexitasLegal.com

---

2

**Counsel, witness, and court reporter appearing remotely**

APPEARANCES:

ATTORNEYS FOR THE PLAINTIFFS:
    SIMMONS HANLY CONROY, LLC
        112 Madison Avenue
        New York, NY 10016
    BY: DENNIS GEIER, ESQ.
        dgeier@simmonsfirm.com

ATTORNEYS FOR ESTÉE LAUDER, INC., and ESTÉE LAUDER COMPANIES, INC.:
    KING & SPALDING, LLP
        1185 Avenue of Americas - 34th Floor
        New York, NY 10036
    BY: KEVIN HYNES, ESQ.
        khynes@kslaw.com

ATTORNEYS FOR COLGATE:

    CAMPBELL, CONROY & O'NEIL, P.C.
        20 City Square - Suite 300
        Boston, MA 02129
    BY: ADAM A. LARSON, ESQ.
        alarson@campbell-trial-lawyers.com


In Attendance:
Jacob Figueroa, Lexitas monitor

---

3

I N D E X

WITNESS                    DIRECT  CROSS  REDIRECT  RECROSS

GREGORY B. DIETTE, M.D., MHS

        By Mr. Geier        4              64
        By Mr. Hynes              63


EXHIBIT                                        PAGE:

Exhibit 1, Notice of Deposition ....................   5
Exhibit 2, Testimony List ..........................   7
Exhibit 3, Fee Schedule ............................   7
Exhibit 4, Invoices ................................   8
Exhibit 5, Report, 5/12/23 .........................  11
Exhibit 6, Report, 2/24/23 .........................  12
Exhibit 7, Report, 5/26/23 .........................  12
Exhibit 8, Case Study ..............................  26
Exhibit 9, Teschke Article, 1997 ...................  30
Exhibit 10, MMWR, 5/13/22 ..........................  32
Exhibit 11, Spirtas 1994 Article ...................  52
_____
Exhibits digitally marked and returned to counsel with
transcript.
_____

---

4

    GREGORY B. DIETTE, M.D., MHS, having first been
identified by the production of a driver's license, was duly
sworn by the Notary and testifies as follows:

    DIRECT EXAMINATION BY MR. GEIER:

    Q.  Good morning, Dr. Diette.
    A.  Good morning.
    Q.  My name is Dennis Geier.  We've been in the same
room a couple of times, but I have never had the opportunity
to be the one to take your deposition.  I am going to take
your deposition today.  If you have any questions, if you
don't understand something I say, just let me know.  I mean,
of course, any time you need a break, just speak up.  I'd be
happy to do it.  Hopefully we won't be too long this morning.
Okay?
    A.  Perfect, thank you.
    Q.  And I heard you say that you're located in
Baltimore, Maryland this morning?
    A.  That's right.
    Q.  And so at your home, your office, somewhere else?
    A.  I'm at home.
    Q.  Okay.  There anyone else in the room with you?
    A.  My wife is in the house elsewhere, but not in this
room.

61

Q.   And that opinion differs from the Helsinki criteria; is that fair?

MR. LARSON:  Objection to form.

MR. HYNES:  Okay.

THE WITNESS:  So, I don't find the Helsinki criteria to be very helpful.  But, you know, there is no -- there is no precision to their discussion about what kind of dose you're looking for for mesothelioma.  And I don't think that, like, in each and every f ber hypothesis makes sense.  So if somebody has got like a little, tiny bit of asbestos exposure, that doesn't mean you have to point to that and point away from spontaneous.  If they have a sufficient dose -- and I guess people can disagree what a sufficient dose is -- but if they have a significant dose, I think it makes sense to consider that as a cause.

Q.   (By Mr. Geier)  What do you use or what articles do you rely on for the sufficient -- for your sufficient dose level?

A.   Yeah, a couple -- I mean, a few different articles. I think if we are talking about, you know, chrysotile predominant, you know, I would look at the Pierce articles that have shown above 200 to 400 fiber cc years of cumulative exposure for chrysotile predominant, and that's for a no-observable-adverse-effect level.  And then for the

62

amph boles, then it would be a smaller dose than that based on the potency differences.

Q.   And are there articles that you rely on for tremolite dose response?

A.   The one that I have seen -- there's is a Finley paper that I think shows a lowest observable effect level of, I think, I ke 15 to 27 f ber cc years.

Q.   And what about anthophyllite?

A.   Anthophyllite is hard to come by.  I have seen some studies that seem to suggest that maybe it doesn't cause cancer, and some that do.  But I can't get a good potency difference relative to chrysotile.

Q.   Dr. Diette, I think I'm done, but if you would just bear with me for a minute or two to just scroll through my notes real quick.

A.   Yeah, of course.

Q.   All right.  Just like one or two more questions.  We spoke a little bit about the EPA earlier.  Just as kind of a follow-up to that, their current position is there is no safe level of asbestos exposure; correct?

A.   I haven't read a document that says that in a while, but I think -- I mean, generally I have seen statements like that, that there is no known safe level.

Q.   And based on what you just told me about, the Pierce and the Finley article, you disagree with that opinion;

63

correct?

A.   Well, I do.  I think that there are levels that have not been shown to raise the risk, which is a little different. It's the converse of whether somebody has demonstrated a safe level.

MR. GEIER:  I have no further questions.  Thank you, Dr. Diette.

MR. HYNES:  I have some follow-up.

CROSS-EXAMINATION BY MR. HYNES:

Q.   Hi, Dr. Diette.  I have one follow-up.

A.   Okay.

Q.   Earlier on in today's questioning, counsel for Mrs. Pichierri asked you several questions about the Moline and Emory case series, do you recall that?

A.   I do.

Q.   And then following those questions he asked several questions regarding medical and scientific studies involving patients who were human research subjects.  Do you recall that?

A.   I do.

Q.   And, in your view, are the Moline and Emory case series articles of the type that fall into that category of medical or scientifically helping patients who are human

64

research subjects?

MR. GEIER:  Object to form.

THE WITNESS:  Yeah, they're patients for the sake of the study.  They're plaintiffs, right?  And I think -- in my opinion, I think that their protections for confidentiality have already been violated, if it's a violation, or at least given up voluntarily by filing a case in court.  So the information that's in there, in my view, is already potentially public about each and every one of the people there.  So I don't know about what, like, the fact that it's been bundled up into a study of plaintiffs, you know, make them qualified to have, you know, the typical protections.

MR. HYNES:  Thank you.  No further questions.

REDIRECT EXAMINATION BY MR. GEIER:

Q.   Dr. Diette, just to follow up on that.  Mesothelioma cases generally result in litigation; is that your understanding?

MR. LARSON:  Objection.

THE WITNESS:  I am the wrong person to ask, I think, but, I mean, I have certainly seen, you know, multiple cases that are part of litigation.

Q.   (By Mr. Geier)  Well, you gave an opinion that

65

because they filed a case they waived their protected rights, and that's a legal opinion; correct?

A.   It's not.

MR. LARSON:  Objection.

THE WITNESS:  It's not a legal opinion.  It's my opinion as a researcher, as a researcher who conducts human subject research, and understanding what the protections are for confidentiality and what it would means is if you already put that information out in the public, there is nothing to protect.

Q.   (By Mr. Geier)  Well, internal review boards review these types of articles and have opinions; correct?

A.   In the Moline papers, they did.  I don't know if I saw a statement in the other paper about an IRB.

Q.   And do you believe it's your opinion that can trump what the IRB's opinion is regarding it being human research?

MR. LARSON:  Objection.

MR. HYNES:  Form.

THE WITNESS:  I mean, I don't have to agree with an IRB.  I mean, it's part of the process of doing research, right, which is that there's a back-and-forth in general.  It's not -- you know, they are not dictators and, you know, they have some sets of rules that they use, but it doesn't mean that they have applied them correctly.  And I don't know in this case, like, you know, what IRB's

66

opinions were, but I'm just saying in general, I certainly wouldn't be bound to agree with what they said.

Q.   (By Mr. Geier)  Well, you just testified that you disagree with them, so like --

MR. HYNES:  Objection.  That a misstatement of the testimony.

MR. LARSON:  Objection.

THE WITNESS:  Yeah, I didn't say I disagree with them because I don't know what the IRB's opinions are.  If we're talking about the Moline papers, I just know that there was a sentence in there stating they had gone through review, but I have no idea what their opinions are.

Q.   (By Mr. Geier)  Well, what is the basis of your opinion, if it's not a legal opinion, that by the plaintiffs putting forward their medical diagnosis in court makes it that their privilege in published medical literature is waived?

A.   Yeah, so privilege sounds like a legal term.  I'm just saying there is no confidentiality to protect at that point.  I mean, there may be.  If there's other information in the paper that's got nothing to do with the court case, for example, then I wouldn't say it's absolute, right?  I wouldn't say that, you know, it would be okay to talk about somebody's gallbladder disease if it wasn't part of the case.  But I think once their date of birth and their name and their

67

diagnosis and their exposure circumstances are out there, they are out there.

Q.   There is no difference to you being in a published medical journal versus being in a court?

A.   Not in this case.  I mean, if it hadn't gone to court, in my opinion as a researcher, right -- not a legal opinion, but my opinion as a researcher, that there is no longer any confidentiality to protect, at least for the topic of what's in that paper.

Q.   So would that be the case for the Roggli medical/legal articles as well?

A.   Well, I don't know.  I mean, I'd have to go back and look at those articles, but I don't know that those participants need to have protections either.  I don't know if there's any issues there or not.

Q.   Did you review Dr. Moline's article to see if there is any information that is not part of the case in it?

MR. LARSON:  Objection.

THE WITNESS:  Well, I think unless she is willing to reveal who they are, which I think would be a fair thing to do, I think it would be hard to do that other than to try to cross-check, you know, certain cases that look similar.  But I think, you know, until she is forthcoming about who the participants are, then I think it's hard to do.

68

Q.   (By Mr. Geier)  Do you understand that it's her position that she can't be forthcoming about who the participants are?

A.   I have seen her testify to that.

Q.   And she's given a rationale for that; right?

A.   She's given her rationale.  I don't happen to agree with it.  I think that -- well, I just don't agree with her.

Q.   And the reason why you don't agree with it is because they were plaintiffs in litigation?

A.   Because --

MR. LARSON:  Objection.

THE WITNESS:  -- they are in litigation, because she's regurgitating her own opinions that she expressed in court in this paper and asking people to believe that the information in there is correct, and she doesn't appear willing to let people cross-check that and see whether it was correct or not.

Q.   (By Mr. Geier)  Well, we just -- I'm sorry.  I didn't mean to cut you off.

A.   No.  I'm just saying, like, if the proposition here is that no one believed in all 33 cases that there was any alternative exposure, then I think it would be fair to prove that, right?  And to look at least at what is available in the legal records, not go digging around in some additional medical records, look at what is available in the legal cases

**69**

so people can determine if that's a true thing or not.  And then if it's true that there's people who have had radiation therapy, for example, to allow people to see whether somebody had some other exposure that wasn't even asbestos that may have been causative of the mesothelioma.

Q.   But using your example of radiation, if someone had radiation exposure and it wasn't part of the case, wouldn't that undercut your position that it waived --

A.   No.  I think very specifically the information that is part of the case is what should be available, not all information under all circumstances.  So if it is known through the medical records in one of these cases that the person had therapeutic radiation and if it's of a type and a dose that could cause mesothelioma, I think that ought to be in the paper and that people ought to be able to see that.

Q.   How does that impact your opinion regarding the 2023 article where there are mixed-use cases?

A.   It does because I still think we don't know what -- the people that she has said didn't have mixed use, we don't have what the information is about those other people either.

Q.   And it's your position that, you know, HIPAA and the other privilege protections don't apply in this circumstance?

MR. LARSON:  Objection.

MR. HYNES:  Objection.

THE WITNESS:  So HIPAA is a law, and I would leave

**70**

that to the lawyers to sort out.  I'm not a lawyer.  But in my personal opinion as a researcher, what I said already makes sense to me; that the information that is already out there in the public domain ought to be available for people who are interested in this paper.

MR. GEIER:  Okay.  Thank you.  I have no more questions.

MR. HYNES:  I think we're done.

COURT REPORTER:  Counsel, would anyone like a copy of this transcript?

MR. HYNES:  We will.  Whatever our standing order is for depos in this case.

MR. GEIER:  Same for us.  And I don't have your email, could you give it to me so that I can give you the exhibits?

MR. LARSON:  Same for me, thanks.

(Deposition concluded at 11:43 a.m.)

**71**

CERTIFICATE OF COURT REPORTER

I, Christine E. Borrelli, Registered Merit Reporter and Certified Court Reporter, a Notary Public, in and for the Commonwealth of Massachusetts, do certify that the deposition of GREGORY B. DIETTE, M.D., MHS, taken on Friday, June 16, 2023, was stenographically reported by me; that the witness provided satisfactory evidence of identification as prescribed by Executive Order 455(03-13) issued by the Governor of the Commonwealth of Massachusetts, before being sworn by me, pursuant to Superior Judicial Order 144; that the transcript produced by me is a true and accurate record of the proceedings; that I am neither counsel for, related to, nor employed by any of the parties to the above action; and further that I am not a relative or employee of any attorney or counsel employed by the parties thereto, nor financially or otherwise interested in the outcome of the action.

Christine E. Borrelli
Notary Public
MA CSR No. 102893

My Commission Expires:
December 28, 2023

**72**

SIGNATURE PAGE/ERRATA SHEET

WITNESS:  GREGORY B. DIETTE, M.D., MHS

CASE:      MARY PICHIERRI, et al. vs. AVON PRODUCTS, INC., et al.

PAGE     LINE          CHANGE OR CORRECTION AND REASON

I, GREGORY B. DIETTE, M.D., MHS, have read the transcript of my deposition taken Friday, June 16, 2023, except for any corrections or changes noted above, I hereby subscribe to the transcript as an accurate record of the statements made by me.

Signed under the pains and penalties of perjury.

_____  DATE:_____
Gregory B. Diette, M.D., MHS

# Exhibit 36

15-0697 TGM/ae

Firm I.D. No: 90200

STATE OF ILLINOIS    )
                                )  §
COUNTY OF COOK    )

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

| | |
|---|---|
| HARVEY KOHR, Individually, and as Executor/Trustee of the Estate of HELENE KOHR, Deceased,<br><br>    Plaintiff,<br><br>  vs.<br><br>**BRENNTAG NORTH AMERICA, INC.,** Individually, and as Successor to MINERAL PIGMENT SOLUTIONS, INC., as Successor to WHITTAKER, CLARK & DANIELS, INC.; **BRENNTAG SPECIALTIES, INC.,** Individually, and as Successor to MINERAL PIGMENT SOLUTIONS, INC., as Successor to WHITTAKER, CLARK & DANIELS, INC.; **COLGATE-PALMOLIVE COMPANY; COTY, INC.; IMERYS TALC AMERICA, INC.,** Individually, and as Successor to RIO TINTO, a whiolly owned subsidiary of LUZENAC INC., and as Successor to CYPRUS AMAX MINERALS CO. a/k/a CYPRUS MINES, WINDSOR MINERALS, INC., METROPOLITAN TALC CO., INC., CHARLES MATHIEU, INC., and RESOURCES PROCESSORS, INC.; **CYPRUS AMAX MINERALS CO.,** a/k/a CYPRUS MINES, Individually, and as Successor to WINDSOR MINERALS, INC., METROPOLITAN TALC CO., INC., CHARLES MATHIEU, INC., and RESOURCES PROCESSORS, INC.; **MCCRONE ASSOCIATES, INC.; THE MCCRONE GROUP, INC.; PFIZER, INC.; R.J. REYNOLDS TOBACCO COMPANY,** and **WHITTAKER CLARK & DANIELS, INC.,**<br><br>    Defendants. | IN RE: ASBESTOS LITIGATION<br><br>NO:  **2016L008842 CALENDAR/ROOM J1 TIME 00:00 Asbestos** |

PLAINTIFF'S COMPLAINT AT LAW

COUNT 1

  NOW COMES the Plaintiff, HARVEY KOHR, Individually and as Executor/Trustee of the Estate of

HELENE KOHR, deceased, by and through his attorneys, COONEY & CONWAY and LEVY KONIGSBERG LLP,

and states as follows:

NATURE OF THE ACTION AND BACKGROUND

1.      Plaintiff, HARVEY KOHR, Individually and as Executor/Trustee of the Estate of HELENE

KOHR, deceased, brings this action due to defendants' tortious acts which proximately caused HELENE

KOHR to be exposed to asbestos and to suffer and die from malignant mesothelioma.

2.      HELENE KOHR was born on                      1934. She died a painful death from

mesothelioma, an asbestos-caused cancer, at the age of 81 on January 18, 2016. She was survived by

her husband of nearly 60 years, HARVEY KOHR, her three children, SHERYL SALZMAN, BETH KAIM, and

ELISA KOHR, and her six grandchildren.

3.      HELENE KOHR and her family lived in Chicago, Illinois up through approximately 1967

before moving to Skokie, Illinois for the remainder of her life. HARVEY KOHR continues to reside in

Skokie, Illinois.

4.      HELENE KOHR was, at various times, a stay-at-home mother and also held a job outside

the home, including as an office manager for an adhesive tape company from 1974 until the early 1990s.

Her work did not cause her to be exposed to asbestos. Her husband, HARVEY KOHR, worked in sales

and, during certain years, was an office manager for certain law offices and a salesman for stereo/audio

equipment. His work did not involve any asbestos exposure and therefore did not result in his wife being

exposed to asbestos.

5.      HELENE KOHR'S only exposures to asbestos came from two sources: (1) her smoking of

Kent cigarettes with the asbestos-containing Micronite filter from approximately 1952 through 1956;

and (2) her near lifelong use of cosmetic talc products that contained asbestos. These exposures to

asbestos proximately caused HELENE KOHR to develop mesothelioma, a cancer solely caused by

asbestos, and proximately caused pain and suffering, wrongful death and survival damages set forth in

this Complaint.

been committed by the Talc Defendants in this Complaint.

7.   Defendant MCCRONE's participation in the conspiracy with, and aiding and abetting

of the tortious conduct of, the Talc Defendants was a proximate cause, or substantial factor, in causing

HELENE KOHR'S the asbestos-related injuries of HELENE KOHR.

8.   Each Talc Defendant is also jointly and severally liable for the conduct alleged herein

under an aiding and abetting theory because each Talc Defendant provided substantial assistance and

encouragement to the other Talc Defendants and McCrone in carrying out the tortious conduct alleged

herein.

WHEREFORE, Plaintiff, HARVEY KOHR, Individually and as Executor/Trustee of the Estate of

HELENE KOHR, deceased, demands judgment against the Defendants, in an amount in excess of

jurisdictional amount, plus costs.


Respectfully submitted,

COONEY AND CONWAY

By: _____

Attorneys for Plaintiff


Timothy G. Martin
**COONEY AND CONWAY**
Attorneys for Plaintiff
120 N. LaSalle Street, 30th Floor
Chicago, IL 60602
Firm I.D. No.: 90200
tmartin@cooneyconway.com
-and-
**LEVY KONIGSBERG, LLP**
Donald P. Blydenburgh, Esq. (NY Id. No. 4399432)
Jerome H. Block, Esq. (NY Id. No. 3997245)
800 Third Avenue, 11th Floor
New York, NY 10022
Telephone: (212) 605-6200

# Exhibit 37

SZAFERMAN, LAKIND,
 BLUMSTEIN & BLADER , P.C.
By Robert E. Lytle, Esq. (NJ ID# 046331990)
101 Grovers Mill Road, Suite 200
Lawrenceville, N.J. 08648
(609) 275-0400

*RECEIVED & FILED*
*2016 DEC 23  A 10:51*
*TORT CIVIL DIV.*
*MIDDLESEX VICINAGE*

LEVY KONIGSBERG, LLP
By: Moshe Maimon, Esq. (NJ ID No.042691986)
101 Grovers Mill Road, Suite 200
Lawrenceville, N.J. 08648
(609) 720-0400

Attorneys for Plaintiffs

| | |
|---|---|
| STEPHEN LANZO, III and KENDRA LANZO, <br><br>                  Plaintiffs, <br><br>       v. <br><br>CYPRUS AMAX MINERALS COMPANY, individually and as successor-in-interest to American Talc Company, Metropolitan Talc Company, Inc., Charles Mathieu, Inc., Resource Processors, Inc. and Windsor Minerals, Inc.; CYPRUS MINERAL CO., individually and as successor-in-interest to American Talc Company, Metropolitan Talc Company, Inc., Charles Mathieu, Inc., Resource Processors, Inc. and Windsor Minerals, Inc.; IMERYS TALC AMERICA, INC., f/k/a Luzenac America, Inc., individually and as successor-in-interest to Windsor Minerals, Inc.; JOHNSON & JOHNSON; JOHNSON & JOHNSON CONSUMER COMPANIES, INC.; WHITTAKER CLARK & DANIELS, INC., individually and as successor-in-interest to American Talc | SUPERIOR COURT OF NEW JERSEY LAW DIVISION, MIDDLESEX COUNTY <br><br>DOCKET NO.: MID-L-     -16AS <br><br>    <u>Civil Action – Asbestos</u> <br>            <u>Litigation</u> <br><br>    MID-L- 7385-16 *AS* <br><br><br><br><br>   COMPLAINT, JURY DEMAND, DEMAND <br>    FOR ANSWERS TO STANDARD <br>      INTERROGATORIES AND <br>  DESIGNATION OF TRIAL COUNSEL |

2315995.1

Company, Metropolitan Talc
Company, Inc., Charles
Mathieu, Inc., and Resource
Processors, Inc.; John Doe
Corporations 1-50;
John Doe Corporations 51-100,

                    Defendants.

    Plaintiffs, Stephen Lanzo, III and Kendra Lanzo, by way of complaint against Defendants allege and say:

<u>**PARTIES - PLAINTIFFS**</u>

    1.   Plaintiffs, Stephen Lanzo, III and Kendra Lanzo, are husband and wife residing at ███████████ Verona, NJ 07044.

    2.   Since his birth in 1972, Plaintiff, Stephen Lanzo, regularly and frequently used and was exposed to asbestos-containing Johnson & Johnson talc powder products, the use of which generated dust and exposed him to respirable asbestos fibers. Stephen Lanzo's exposure to respirable asbestos fiber from asbestos-containing talc products, manufactured, sold and supplied by the defendants (and their predecessors in interest) proximately caused his mesothelioma.

    3.   As a direct and proximate result of the above exposures, Plaintiff, Stephen Lanzo, III, contracted mesothelioma and has suffered, and continues to suffer, from other various diverse injuries and attendant complications.

2315995.1

2

not aware of any non-party who should be joined in this action pursuant to R. 4:28 or who is subject to joiner pursuant to R. 4:29-1 (b) because of potential liability to any party on the basis of the same facts.

I further certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are wilfully false that I am subject to punishment.

SZAFERMAN, LAKIND,
BLUMSTEIN & BLADER , P.C.
Attorneys for Plaintiffs

By:

Robert E. Lytle, Esq.

Dated: December 22, 2016

LEVY KONIGSBERG, LLP
Attorneys for Plaintiffs

By:

Moshe Maimon, Esq.

Dated: December 22, 2016

2315995.1                                14

# Exhibit 38

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Doris Jackson, | : | CIVIL ACTION NO. |
| 4708 Piney Branch Road, N.W., | : | |
| Washington, DC 20011 | : | JURY TRIAL DEMANDED |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | |
| | : | |
| COLGATE-PALMOLIVE COMPANY, | : | |
| **Serve:  Corp. Guarantee & Trust Co.** | : | |
| **1150 Connecticut Ave., NW, Suite 900** | : | |
| **Washington, DC 20036** | : | |
| Defendant. | | |

### CIVIL ACTION COMPLAINT
### and Demand for Jury Trial

Plaintiff Doris Jackson sues the above-named Defendant for compensatory and punitive damages and alleges as follows:

### PARTIES

1.      Plaintiff Doris Jackson is a citizen and resident of the city of Washington, District of Columbia.

2.      Defendant, COLGATE-PALMOLIVE COMPANY, was and is a company incorporated under the laws of the State of Delaware with its principal place of business in New York. At all times material hereto, COLGATE-PALMOLIVE COMPANY developed, manufactured, marketed, distributed and/or sold asbestos-containing products including, but not limited to, asbestos-containing Cashmere Bouquet Talc Powder.  COLGATE-PALMOLIVE COMPANY has done and does business in Washington, District of Columbia.

1

3. Plaintiff brings this action for monetary damages as a result of Plaintiff Doris Jackson contracting an asbestos-related disease. Plaintiff Doris Jackson was diagnosed with mesothelioma in November 2014.

4. Plaintiff Doris Jackson was wrongfully exposed to and inhaled, ingested or otherwise absorbed asbestos fibers, an inherently dangerous toxic substance, as described below:

(a) Plaintiff Doris Jackson used asbestos-containing Cashmere Bouquet Talc Powder from the 1950s to the 1990s.

5. At all times pertinent hereto, the Defendant acted through its duly authorized agents, servants and employees, who were then and there acting in the course and scope of their employment and in furtherance of business of said Defendant.

6. At all material times, the Defendant manufactured, distributed, sold, supplied, and/or otherwise placed into the stream of commerce asbestos-containing products either directly or indirectly to Plaintiff Doris Jackson or to such other entities so that these products were caused to be used by Plaintiff Doris Jackson.

## JURISDICTION AND VENUE

7. This Court has personal jurisdiction over the Defendant because the Defendant is duly licensed to do business in Washington, District of Columbia, and/or at all material times is or has been engaged in business in Washington, District of Columbia.

8. Pursuant to 28 U.S.C.A. §1391, venue is proper in this judicial district because a substantial part of the events or omissions occurred in the District of Columbia.

9. Further, this Court has jurisdiction over the parties pursuant to 28 U.S.C.A. §1332 because the parties to the suit are completely diverse in that the Defendant is not a citizen of the

WHEREFORE, Plaintiff prays for judgment against the Defendant for actual and punitive damages, lost wages and special damages in an amount to be determined by the trier of fact, in excess of $75,000.00 plus interest as provided by law and the costs of this action.

**PLAINTIFF REQUESTS TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

This 7th day of July 2015.

           **BROWN & GOULD, LLP**

           */s/ Daniel A. Brown*
           Daniel A. Brown (Bar No. 444772)
           Eileen M. O'Brien (Bar No. 483451)
           7316 Wisconsin Avenue, Suite 200
           Bethesda, MD  20814
           Tel: 301-718-4548
           dbrown@brownandgould.com
           eobrien@brownandgould.com

           **ATTORNEYS FOR THE PLAINTIFF**

13

# Exhibit 39

SZAFERMAN LAKIND BLUMSTEIN & BLADER, P.C.
101 Grovers Mill Road, Suite 200
Lawrence Township, NJ 08648
(609) 275-0400
Robert E. Lytle (NJ ID No. 046331990)

SIMON GREENSTONE PANATIER BARTLETT, P.C.
3780 Kilroy Airport Way, Suite 540
Long Beach, California 90866
(562) 590-3400
By: Leah Kagan (NJ ID No. 013602009)

Attorneys for Plaintiffs

| | |
|---|---|
| **VALERIE JO DALIS** and **NICHOLAS J. DALIS,** | SUPERIOR COURT OF NEW JERSEY LAW DIVISION-MIDDLESEX COUNTY |
| Plaintiffs, | |
| v. | DOCKET NO. |
| **BRENNTAG NORTH AMERICA, INC.** (sued individually and as successor-in-interest to MINERAL PIGMENT SOLUTIONS, INC. as successor-in-interest to WHITTAKER, CLARK & DANIELS, INC.); | CIVIL ACTION ASBESTOS LITIGATION |
| **BRENNTAG SPECIALTIES, INC.** f/k/a MINERAL PIGMENT SOLUTIONS, INC. as a successor-in-interest to WHITTAKER, CLARK & DANIELS, INC.; | ORIGINAL COMPLAINT AND DEMAND FOR TRIAL BY JURY |
| **COLGATE-PALMOLIVE COMPANY** (sued individually and as successor-in-interest to THE MENNEN COMPANY); | |
| **CONAIR CORPORATION;** | |
| **CYPRUS AMAX MINERALS COMPANY** (sued as successor to SIERRA TALC COMPANY and UNITED TALC COMPANY); | |

1768908.1

**WHITTAKER CLARK & DANIELS, INC.,**

**JOHN DOE CORPORATIONS 1-50**
(fictitious);

Defendants.

Plaintiffs, by way of Complaint against Defendants, upon information and belief allege as follows:

**PARTIES -- PLAINTIFFS**

1.      Plaintiffs, Valerie Jo Dalis and Nicholas J. Dalis, reside at ██████████ San Jose, California 95110.

2.      From approximately 1965 to 1972, Plaintiff Valerie Jo Dalis was exposed to asbestos from her and her co-workers' use of Mennen Shave Talc and Conair Hair Dryers while employed as a student and hair dresser at various beauty shops in San Jose, California. Plaintiff Valerie Jo Dalis was further exposed to asbestos through her personal use of Cashmere Bouquet talcum powder products from approximately 1957 to the 1990s. Plaintiff Valerie Jo Dalis' regular and frequent use of Mennen Shave Talc, Conair Hair Dryers, and Cashmere Bouquet talcum powder generated dust and exposed Plaintiff Valerie Jo Dalis to respirable asbestos fibers.

As a direct and proximate result of the above exposures, Plaintiff Valerie Jo Dalis contracted mesothelioma and has suffered, and continues to suffer, from other various diverse injuries and attendant complications.

3.      Plaintiffs bring this action on behalf of themselves.

4.      Plaintiffs claim damages as a result of:

     _x_   loss of consortium (per quod)

     _x_   loss of services

     _x_   economic loss

     _x_   pain and suffering

-2-

## CERTIFICATION

I hereby certify that to my knowledge the within matter in controversy is not the subject of

any other action pending in any court or of a pending arbitration proceeding, and that no other action

or arbitration proceeding is contemplated with the exception of a possible workers' compensation

claim.  I have no knowledge at this time of any non-party who should be joined in this action.

SZAFERMAN LAKIND
BLUMSTEIN & BLADER, P.C.

By: _____
Robert Lytle
New Jersey Bar No. 046331990
101 Grovers Mill Road, Suite 200
Lawrence Township, NJ 08648
(609) 275-0400

And

SIMON GREENSTONE PANATIER BARTLETT, PC

By: _____
Leah Kagan
New Jersey Bar No. 013602009
3780 Kilroy Airport Way, Suite 540
Long Beach, CA 90806
(562) 590-3400  FAX (562) 590-3412

ATTORNEYS FOR PLAINTIFFS

Dated: August 11, 2015

1768908.1

# Exhibit 40

**THE LANIER LAW FIRM PLLC**
Nahid A. Shaikh, Esq.
Attorney ID No. 112002014
126 East 56th Street, 6th Floor
New York, New York 10022
Tel.: (212) 421-2800
*Attorneys for Plaintiffs*

---

**RICARDO RIMONDI** and **PILAR RIMONDI**,

Plaintiffs,

vs.

**BASF CATALYSTS LLC** (as successor to Engelhard
    Corp., Engelhard Minerals & Chemicals Corp.,
    and Minerals & Chemicals Corp.);
**BRENNTAG SPECIALTIES INC.** (individually, as
    successor to, and formerly known as Mineral
    & Pigment Solutions Inc., and Whittaker, Clark
    & Daniels Inc.);
**CYPRUS AMAX MINERALS CO.** (individually, doing
    business as, and as successor to Metropolitan
    Talc Co. Inc., and Charles Mathieu Inc.);
**GEORGIA-PACIFIC LLC;**
**IMERYS TALC AMERICA INC.** (f/k/a Luzenac
    America Inc.);
**JOHNSON & JOHNSON;**
**JOHNSON & JOHNSON CONSUMER INC.** (f/k/a
    Johnson & Johnson Consumer Companies
    Inc.);
**PERSONAL CARE PRODUCTS COUNCIL** (f/k/a
    Cosmetic,    Toiletry,    and    Fragrance
    Association);
**RIO TINTO LTD.** (individually, doing business as
    and as successor to Talco e Grafite Val
    Chisone, Societa Talco e Grafite Val, Luzenac
    Val Chisone, Rio Tinto Minerals Group,
    Luzenac Val Chisone, Rio Tinto Plc, Luzenac
    America Inc., Luzenac Inc., Luzenac Group, Rio
    Tinto Talc Ltd., Luzenac Group, Imerys
    Minerals Delaware Inc., United Sierra Talc Co.,
    and Talco Val Chisone);
**WHITTAKER, CLARK & DANIELS INC.;**

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION MIDDLESEX COUNTY

DOCKET NO.:

CIVIL ACTION
ASBESTOS LITIGATION

**COMPLAINT,**
**DEMAND FOR TRIAL BY JURY, AND**
**DEMAND FOR ANSWERS TO INTERROGATORIES**

Date Served: _5/25/17_
Company Served: _____

_J+J/JJCI_
_20170446520_
Personal Service          KMG

1203757_1

JOHN DOE CORPORATIONS 1-25,

Defendants.

Plaintiffs, by way of complaint against Defendants, upon information and belief, allege as follows:

**PARTIES**

1.     Plaintiffs, RICARDO RIMONDI and PILAR RIMONDI, his spouse, reside at

Brentwood, New York. RICARDO RIMONDI was exposed to asbestos[1] directly and indirectly from asbestos-containing products between 1960 and approximately 2010. As a direct and proximate result of his exposure to asbestos, RICARDO RIMONDI was diagnosed with malignant mesothelioma on or about 27 September 2016.

2.     Defendants are corporations or other business entities organized under the laws of the various states of the United States that were and/or are doing business in the State of New Jersey and/or were and/or are participating in a conspiracy[2] and/or concert-of-action that was or is located or conducted in New Jersey and/or had effects in New Jersey, including, but not limited to, the violation within the state of its laws and regulations. Defendants, except for Personal Care Products Council, mined, milled, processed, imported, converted, compounded, designed, manufactured, marketed, supplied, distributed, sold, used and/or otherwise placed in the stream of commerce asbestos-containing products.

3.     Defendant BASF CATALYSTS LLC (as successor to Engelhard Corp., Engelhard Minerals & Chemicals Corp., and Minerals & Chemicals Corp.) is a corporation with a principal place of business in

[1] As used throughout this complaint, the term "asbestos" shall be interpreted in the broadest sense and include, without limitation, non-regulated and non-commercial forms of asbestos (including non-fibrous asbestos), cleavage fragments, and transition/transitional fibers, without limitation as to particular fiber size, dimension or ratio.

[2] *See, e.g., Ficus v. Combus Fin. AG*, 2004 U.S. Dist. LEXIS 29844 at *17 (D.N.J. July 22, 2004); *Everest Nat'l Ins. Co. v. Sutton*, 2007 U.S. Dist. LEXIS 65398, 2007 WL 2572438 (D.N.J. Sept. 4, 2007); *In re Bulk [Extruded] Graphite Prods. Antitrust Litig.*, 2004 U.S. Dist. LEXIS 29586 at *26 (D.N.J. Oct. 26, 2004); *Vist Fin. Corp. v. Tartaglia*, No. 08-CV-4116 (DMC), 2010 WL 2776832 at *5 (D.N.J. July 14, 2010); and *State, Dep't of Treasury, Div. of Inv. ex rel. McCormac v. Qwest Commc'ns Int'l Inc.*, 387 N.J. Super. 487, 502, 904 A.2d 786, 794 (App. Div. 2006).

1203757_1

**·CERTIFICATION**

I hereby certify that to my knowledge the within matter in controversy is not the subject of any other action pending in any court or of a pending arbitration proceeding, and that no other action or arbitration proceeding is contemplated with the exception of a possible workers' compensation claim. I have no knowledge at this time of any non-party over which the Court would have personal jurisdiction that should be joined in this action.

THE LANIER LAW FIRM PLLC
*Attorneys for Plaintiffs*

By: _Nahid Shaikh_
Nahid A. Shaikh, Esq.

Dated: 16 May 2017

1203757_1

# Exhibit 41

SIMMONS HANLY CONROY
A NATIONAL LAW FIRM

SIMMONSFIRM.COM
(800) 479-9533

*From the desk of:*
*James M. Kramer, Esq.*

May 1, 2023

<u>VIA ECF</u>
Hon. Valerie Figueredo
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, NY 10007-1312

      **Re.**    *Gref v. Am. Int'l Indus.*, et al., 20-cv-05589

Dear Judge Figueredo,

      Plaintiff writes regarding AII's motion to compel the identities of the subjects of Dr. Moline's article "Mesothelioma Associated with the Use of Cosmetic Talc" Journal of Occupational Medicine, Vol. 62, No. 1, Jan. 2020 ("Moline Article"). Plaintiff has significant concerns that this issue is creating an inordinate delay in the trial of a living mesothelioma case. These concerns are exacerbated by fears of either side appealing this Court's order, no matter Your Honor's decision.

      In order to alleviate those concerns, Plaintiff withdraws his experts' reliance on the Moline Article in this matter. This resolves the issue before Your Honor because AII's rationale for requiring Dr. Moline to produce the information is that "Dr Moline Cannot use her study offensively as reliance material then refuse to answer questions about it based on alleged privileges." Def. Br. at 12. To be clear, neither Dr. Moline nor any of Mr. Gref's experts will use this article offensively in this matter. The mootness of the issue is further underscored by Mr. Thackston asking me whether I would "stipulate that none of his experts will mention [the article]" at oral argument regarding the subpoena of Dr. Emory in this matter in the Eastern District of Virginia. (Relevant Portions from Transcript *Peninsula Pathology Associates v. American International Inc.*, 4:22mcl at 20:13-17 attached as Exhibit "A"). Since Plaintiff is withdrawing reliance on the article, there can be no argument that the identity of the subjects of the Moline Article are relevant in Mr. Gref's lawsuit.

      Additionally, Plaintiff agrees to produce Dr. Moline for a limited, three-hour deposition on her dose calculations as well as on any relevant literature she has authored and intends to rely on since she was last deposed.[1]

---

[1] Defendants' initial request to further depose Dr. Moline rested on their belief that they did not receive ample opportunity to explore Dr. Moline's opinions regarding the doses of asbestos Plaintiff's exposure would have exposed him to via Defendants' talc products. With the issue of the identities of the human subjects now mooted, these

*We stand for our clients.*

| HEADQUARTERS | NEW YORK | CHICAGO | SAN FRANCISCO | LOS ANGELES | ST. LOUIS |
|---|---|---|---|---|---|
| One Court Street | 112 Madison Avenue | 230 W. Monroe | 455 Market | 100 N. Sepulveda Blvd. | 231 S. Bemiston |
| Alton, IL 62002 | New York, NY 10016 | Suite 2221 | Suite 1150 | Suite 1350 | Suite 525 |
| TEL: (618) 259-2222 | TEL: (212) 784-6400 | Chicago, IL 60606 | San Francisco, CA 94105 | El Segundo, CA 90245 | St. Louis, MO 63105 |
| FAX: (618) 259-2251 | FAX: (212) 213-5949 | TEL: (312) 759-7500 | TEL: (415) 536-3986 | TEL: (310) 322-3555 | TEL: (800) 479-9533 |
| | | FAX: (312) 759-7516 | FAX: (415) 537-4120 | FAX: (310) 322-3655 | |

SIMMONS HANLY CONROY
A NATIONAL LAW FIRM

SIMMONSFIRM.COM
(800) 479-9533

Because there is no longer a dispute before the Court regarding the Moline Article or the continuation of Dr. Moline's deposition, Plaintiff respectfully requests that AII's motion to continue the deposition of Dr. Moline and its motion to enforce the subpoena be denied as moot. We thank the Court for its time and energy in hearing this issue.

Respectfully yours,

James M. Kramer

cc:     All Counsel of Record (via ECF)

---

calculations, along with any other reliance information Dr. Moline has accumulated, are now the only relevant topics to be explored.

*We stand for our clients.*

| HEADQUARTERS | NEW YORK | CHICAGO | SAN FRANCISCO | LOS ANGELES | ST. LOUIS |
|---|---|---|---|---|---|
| One Court Street | 112 Madison Avenue | 230 W. Monroe | 455 Market | 100 N. Sepulveda Blvd. | 231 S. Bemiston |
| Alton, IL 62002 | New York, NY 10016 | Suite 2221 | Suite 1150 | Suite 1350 | Suite 525 |
| TEL: (618) 259-2222 | TEL: (212) 784-6400 | Chicago, IL 60606 | San Francisco, CA 94105 | El Segundo, CA 90245 | St. Louis, MO 63105 |
| FAX: (618) 259-2251 | FAX: (212) 213-5949 | TEL: (312) 759-7500 | TEL: (415) 536-3986 | TEL: (310) 322-3555 | TEL: (800) 479-9533 |
| | | FAX: (312) 759-7516 | FAX: (415) 537-4120 | FAX: (310) 322-3655 | |

# Exhibit 42

```
                    UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF NEW YORK


BRIAN JOSEPH GREF,                 : Docket #20-cv-05589

                      Plaintiff,   :

      -against-                    :

AMERICAN INTERNATIONAL
INDUSTRIES, et al,                 : New York, New York
                                     May 19, 2023

                      Defendants.

-------------------------------:

                      PROCEEDINGS BEFORE
               THE HONORABLE VALERIE FIGUEREDO
               UNITED STATES MAGISTRATE JUDGE



APPEARANCES:

For Plaintiff:        SIMMONS HANLY CONROY
                      BY:  JAMES M. KRAMER, ESQ.
                      112 Madison Avenue, 7th Floor
                      New York, New York 10016


For Defendant:        K&L Gates, LLP
                      BY:  NATHAN A. HUFF, ESQ.
                      430 Davis Drive, Suite 400
                      Morrisville, North Carolina 27560
```

```
APPEARANCES (CONTINUED):

For Defendant:        Lathrop GPM, LLP
                      BY:  NEIL SCHONERT, ESQ.
                           KURT W. GREVE, ESQ.
                      7701 Forsyth Boulevard
                      Pierre Laclede Center
                      Suite 500
                      Clayton, Missouri 63105



                      HAWKINS PARNELL YOUNG, LLP
                      BY:  ALFRED J. SARGENTE, ESQ.
                      600 Lexington Avenue, 8th Floor
                      New York, New York 10022


Transcription Service: Marissa Mignano Transcription
                       Phone:  (631) 813-9335
                       E-mail:marissamignano@gmail.com



Proceedings recorded by electronic sound recording;
Transcript produced by transcription service
```

INDEX

E X A M I N A T I O N S

| Witness | Direct | Cross | Re-Direct | Re-Cross |
|---------|--------|-------|-----------|----------|
| None | | | | |

E X H I B I T S

| Exhibit Number | Description | ID | In | Voir Dire |
|----------------|-------------|-----|-----|-----------|
| None | | | | |

```
 1              THE COURT:  Hi, everyone.  This is Brian
 2    Joseph Gref v. American International Industries,
 3    20-cv-5589.  Just because of the number of people on
 4    the call, I'm just going to limit.  If counsel who,
 5    I guess, intend to speak can introduce themselves.
 6    So I'm going to start off with counsel for the
 7    plaintiffs.
 8              I understand Mr. Kramer is on the line; is
 9    that correct?
10              MR. KRAMER:  That is correct, Your Honor.
11    Good afternoon.
12              THE COURT:  Good afternoon.  And then for
13    Northwell Health, I understand Mr. Nathan Huff is on
14    the line.
15              MR. HUFF:  Good afternoon, Your Honor.
16    That's correct.
17              THE COURT:  Okay.  And then for American
18    International Industries, Mr. Sargente, will you be
19    speaking or is there someone else that should be
20    identified?
21              MR. SARGENTE:  I believe one of the other
22    attorneys for AII will be primarily the speaker.
23              THE COURT:  And could either or both of
24    those attorneys just identify yourself, please.
25              MR. SCHONERT:  Hi, Your Honor.  This is
```

1   Neil Schonert with Lathrop, and Kurt Greve is on the

2   line as well.

3           THE COURT:  Okay.  Based on our prior

4   conferences, I think those were generally the three

5   entities that engaged in the discussion.  If there's

6   anyone else who at any other point wants to chime

7   in, you're more than welcome to do so.  I just ask

8   that you identify, make an appearance right now.  So

9   if there's anyone else who wants to make an

10  appearance.

11          MR. MARINO:  Good afternoon, Your Honor.

12  Kevin Marino, Marino, Tortorella & Boyle, for

13  Dr. Moline.  I don't know if I'll be called on to

14  speak, but I wanted you to know I'm on the line.

15          THE COURT:  Oh, yes, I'm sorry, Mr. Marino,

16  that I missed you, but I do recall from the prior

17  conferences.  Thank you.

18          Okay.  So this is really intended to be a

19  very short conference.  I think the reason I asked

20  for the parties to get on this, I just wanted to get

21  on the record and just really get crystal clear what

22  plaintiffs mean when they say in their letter from

23  May 1st at ECF 337 that they're withdrawing

24  Dr. Moline's reliance on the Moline article.

25          And so, Mr. Kramer, if you just want to

1  explain what you mean when you say that, I'd like to

2  just get that on the record.

3         MR. KRAMER:  Certainly, Your Honor.  And I

4  think to get this as crystal clear as I possibly

5  can, and keeping in mind Your Honor's willingness to

6  keep this brief, the record and Your Honor may

7  benefit from just a history of how we got here.  And

8  just to remind the Court of who this case is about,

9  I represent Brian Gref, who's currently 40 years

10 old.  He was diagnosed with a fatal cancer,

11 mesothelioma, back in November of 2019.

12        We filed this case in a New York City

13 asbestos litigation in July of 2020.  It was removed

14 by Johnson & Johnson to the Southern District on

15 July 20th, 2020, after which all discovery took

16 place.  And as Your Honor is acutely aware, we are

17 now in our sixth month of litigating the issue of

18 the subpoena to reveal the identity of the

19 confidential human subjects at the heart of

20 Dr. Moline's 2020 article.

21        As Your Honor is also aware, back in

22 November, before this issue came to light, I and

23 others from my office had met and conferred with

24 defendants in this case to discuss issues

25 surrounding any possible continuation of

1    Dr. Moline's deposition, which had already gone

2    seven and a half hours as of last fall.  At that

3    point, we had come to an understanding that any

4    continuation would be on her dose calculations,

5    which she began to testify about in her deposition.

6         It was only after that meet and confer

7    where we were surprised with AII's application to

8    reveal the identity of the article, which is not

9    something that was met and conferred about, not

10   something that was discussed, and yet became now the

11   central issue of six months of discovery litigation.

12        Now, we made the determination after we

13   appeared before Your Honor to discuss this issue

14   further a month or so ago that our duty to our

15   client, who is dying from a fatal cancer, needs to

16   go forward.  We, therefore, on May 3rd, wrote to

17   Your Honor in our letter stating that because this

18   particular article is merely one of many, many

19   articles in the medical and scientific literature

20   connecting not only asbestos to this cancer, but low

21   levels of asbestos to the cancer, it is among

22   articles discussing fiber levels released by

23   asbestos in cosmetic talc in which Dr. Moline had no

24   hand in writing or researching.

25        And with that in mind and considering the

```
 1    statement made on November 2020 made by AII in
 2    Docket Number 263, its initial motion to compel on
 3    page five, wherein they state that Dr. Moline is
 4    entitled to keep this information confidential
 5    should she decide not to testify about the article
 6    or the cases therein upon direct examination, we
 7    decided to take AII at its word, and we are
 8    withdrawing Dr. Moline's reliance on this particular
 9    article.  We are withdrawing the minimal reliance,
10    as stated in our other experts' reports on this
11    particular article.
12         And we do not intend to address them on
13    direct examination with any of our experts.  We do
14    not intend to have Dr. Moline discuss the cases on
15    direct examination.  Which thereby, according to, I
16    think, AII's own reasoning, moots the entire issue.
17    We can move forward with discovery and get a trial
18    date for this living plaintiff.
19         So that's where we are, Your Honor.  And,
20    as you may have seen, we filed last night a motion
21    for discovery sanctions against AII because -- and
22    we were not parties to the Bell litigation.  Your
23    Honor is aware that this entire issue stems from a
24    false premise based on a false narrative that there
25    is any connection between a so-called allegation of
```

```
1    asbestos at Ms. Bell's workplace and her
2    mesothelioma, which has led us down this wild goose
3    chase for six months.
4            It has now been uncovered through discovery
5    in other cases that the entire premise of that has
6    been false.  And there's been an attempt to persuade
7    this Court to unravel and reveal confidential
8    information based on nothing.  AII's own experts
9    agree, after reviewing the same exact information as
10   Dr. Moline did in the Bell case, that there was
11   nothing to connect Ms. Bell to any occupational
12   exposure there, therefore no controversy --
13           MR. GREVE:  Excuse me, Mr. Kramer --
14           MR. KRAMER:  I'm still speaking.
15           MR. GREVE:  Your Honor, would you like me
16   to object now before he is done?
17           MR. KRAMER:  No, no, no.
18           MR. GREVE:  I mean, I'm just -- we're
19   talking now about a motion that's not properly
20   before the Court for this hearing.  It was filed
21   last night.
22           MR. KRAMER:  No, I think -- I'm still
23   talking.
24           MR. GREVE:  I think Mr. Kramer understands
25   that the level of misrepresentations here are quite
```

```
1    extreme.
2          MR. KRAMER:  Well, we look forward to the
3    full argument on that.  I only raise it now, Your
4    Honor, because --
5          MR. GREVE:  To summarize --
6          MR. KRAMER:  Wait a minute, wait a minute.
7    Your Honor, Your Honor --
8          MR. HUFF:  I don't understand why he's
9    still speaking over Mr. Kramer.  I don't understand
10   it.
11         THE COURT:  So I'm just going to chime in a
12   minute.  To just interrupt, I really don't want to
13   spend any more of your time or my time on this.  And
14   the reason for the conference was really to get on
15   the record exactly what Mr. Kramer meant by he was
16   going to withdraw his reliance.
17         Mr. Kramer, I just want to confirm, because
18   I'm familiar with Dr. Moline's expert report and I
19   know she cites to the article.  Despite the
20   citation, there won't be any direct -- she cites to
21   it, I believe, in a footnote.
22         But despite the citation, you don't intend
23   to have her discuss it in any way; is that correct?
24         MR. KRAMER:  That is correct.  And we have
25   offered -- I'm sorry, Your Honor.
```

```
 1              THE COURT:  No, no, go ahead.
 2              MR. KRAMER:  I was saying, and we're
 3     offering her to get to the heart -- to get back to
 4     what was initially the request to continue her
 5     deposition, we feel that it's fair to offer three
 6     hours to further explore the dose calculations that
 7     she discussed.  And, as we also mentioned, because
 8     now we are six months beyond where we had expected
 9     to be in this case, she has authored other articles
10     or one other article in particular.  We feel that is
11     fair game.  We would amend her expert disclosure to
12     include reliance on that as well.
13              THE COURT:  Reliance on a different
14     article?
15              MR. KRAMER:  Correct.
16              THE COURT:  Okay.  And then you had also
17     briefly stated that you had other experts that also
18     relied on this 2020 Dr. Moline article; is that
19     true?
20              MR. KRAMER:  That is true.
21     Dr. Finkelstein --
22              THE COURT:  Then on the -- no, go ahead.
23     Go ahead.
24              MR. KRAMER:  Dr. Finkelstein references the
25     article very minimally in his report.  He has
```

1   already been deposed in this case.  He will not rely

2   upon the article on direct.  And Dr. Zhang, who is

3   our pathologist, who really will only be talking

4   about diagnosis in this case, will not be relying

5   upon it.  We were not going to ask him about it on

6   direct, either.

7          THE COURT:  Okay.  So just to keep this

8   moving along, everyone's aware, you know, the party

9   issuing the subpoena has to demonstrate that there's

10  the information -- on a motion to quash, I'm sorry,

11  the defendants bear the burden of demonstrating that

12  the information sought is relevant and material to

13  the claims of the case.

14         I'm not going to give you a written

15  decision because it's pretty clear, given

16  Mr. Kramer's statements on the record, that they're

17  not at all using or relying on Dr. Moline's 2020

18  article, that there just isn't a basis to conclude

19  that the article is relevant.  And for the reasons

20  we've discussed at length at two conferences, the

21  burden on Northwell Health here, there's no way

22  defendants can overcome the showing of burden if

23  there's no relevance hook.  And if Dr. Moline is not

24  relying on her article, there is no relevance hook.

25         MR. GREVE:  Your Honor, counsel for AII.

1            May I be heard on that?

2            THE COURT:  Sure.

3            Is this Mr. Greve?

4            MR. GREVE:  Yes, Your Honor.  And let me

5    make sure I understand -- if I understood the Court

6    correctly.

7            Is the Court of the opinion at this moment

8    in time that the issue is moot because Mr. Kramer

9    has expressed his disclaimer of the Moline 2020

10   article in any form or fashion?  Did I understand

11   that correctly?

12           THE COURT:  Yeah.  I mean, it's more than

13   just mootness; right?  Under the analysis, we look

14   at the burden on Northwell Health and the relevancy

15   of the information.  You know, at one point

16   previously, I think from the prior two conferences,

17   I might have alluded to the belief that I thought it

18   was relevant because this was -- you know,

19   Dr. Moline is the causation expert, and this was one

20   of the articles she was relying on to show the

21   causal link between the mesothelioma and the

22   exposure to cosmetic talcum powder.

23           If she's no longer relying on this article

24   in any way, which, from Mr. Kramer's assertions,

25   that's what it sounds like or that's what it's being

1    represented to be on the record, then there's no

2    longer a basis for defendants to claim the

3    information is relevant.  And we're not just talking

4    about any information.  Again, we're talking about

5    HIPAA-protected information, information that's

6    protected under the common rule.

7         And for the many reasons Northwell Health

8    has outlined in their letter, it would be burden --

9    unduly burdensome for them to produce that

10   information.  Now, if the information had been

11   relevant, I think there's arguments to be made that

12   the calculation is different.  But right now, if

13   they're not relying on the article in any way,

14   there's no relevancy hook.

15        MR. GREVE:  And, Your Honor, if I can

16   address them not relying on it in any way, again,

17   like we've seen before, they say this, but then what

18   does that really mean?  The Moline 2023 article, the

19   new article that they would like to supplement and

20   make part of the Gref case, incorporates by

21   reference the Moline 2020 article.  It is a

22   continuation of that work.

23        So the representation that there's nothing

24   in any way that would connect what's going to happen

25   in the future to the 2020 article that was subject

1    to the subpoena is absolutely false.  It will be

2    part of it.  And, Your Honor, when plaintiffs make

3    the statement that, oh, we won't use this on direct

4    or we won't use this affirmatively, well, they can

5    still talk.

6           The ultimate opinion that Dr. Moline has

7    that she wants to express is that the cosmetic talc

8    is a cause of pleural or peritoneal mesothelioma.

9    That's the ultimate opinion.  And she can mention

10   this without even mentioning the article name.  But

11   you can't unring this bell.  This is the foundation

12   of her opinion, and it starts with Moline 2020,

13   which is then incorporated into the new article,

14   Moline 2023.

15          And while plaintiffs have made some

16   affirmatives that there may be 500-some-odd

17   referenced articles, as you illustrate or as you

18   asked Mr. Kramer or one of the attorneys on the

19   other side in the last hearing, it ultimately boils

20   down to Emery and Moline for the proposition of any

21   type of cosmetic talc being associated with

22   mesothelioma.  And they need this article.  They

23   need this bridge because they don't have any

24   large-scale, peer-reviewed scientific

25   epidemiological studies to support their position.

1           In fact, that information proves the

2    opposite.  Miners and millers who milled this stuff

3    and mined this stuff didn't get mesothelioma.  And

4    that's why this article was created to begin with.

5    And so if we were just looking at the cross

6    examination aspect of this, it's not as simple to

7    say, oh, well, she's not going to rely on it.  It's

8    part of her foundational opinion.  It's actually

9    referenced in this new article.

10          And then when we cross over to the next

11   level of when we challenge this expert in a Daubert

12   process, the underpinning the foundation of her

13   initial opinion is always going to be at issue here.

14   And the fact that one of Moline's 33 has been

15   established to be suspect, you know, for lack of a

16   better word, but definitely there is significant

17   evidence of alternate exposure that should have been

18   considered by Dr. Moline.  Okay?

19          At the very least, she should have

20   recognized it.  She should have considered it.  And

21   so that goes to her methodology.  And that was

22   something that was talked about extensively in the

23   *Bell* opinion, that when we were dealing with the

24   expert challenge here, her foundation, how she came

25   to this conclusion, her methodology, all of this is

1    going to be significant.  This goes to Dr. Moline's

2    bias, and it goes to her credibility.

3         And their withdrawal of the "we won't

4    mention this on direct" is illusory.  This topic is

5    going to come up.  And despite Mr. Kramer's

6    representations that they weren't going to use this

7    in any form or fashion, it is being used in a form

8    and fashion.  It's directly referenced in the new

9    article that he wants to insert into this exact

10   matter at this late point in time, an article that

11   has the exact same problems as Moline 2020.

12        We haven't asked any of their experts about

13   Moline 2023 and that article.  We haven't talked to

14   anyone about that.  And the discovery that will

15   ensue and will result from us trying to understand

16   the provenance, the history, the foundation for the

17   Moline 2023 hearing, that's going to take an

18   extensive amount of time.

19        And so as plaintiffs are just saying,

20   "Judge, we just want to substitute in this other

21   article; it's really no big deal," it's a huge deal.

22   And the substitution, as I mentioned before, even

23   references the 2021 that they're trying to disclaim

24   reliance on.  It makes no sense.  And it's just not

25   something that will be manageable at trial because

1    there will always be a way for them to get this

2    information in.  And at the same time, they will

3    have run out the clock in terms of any discovery

4    that can be done on this that would reveal the true

5    nature and potential bias of the foundation of

6    these, quote/unquote, test subjects.

7            THE COURT:  Either Mr. Marino or

8    Mr. Kramer, this 2023 article, is it a different

9    scientific study with different individuals?

10           MR. KRAMER:  It has different individuals

11   incorporated within it.

12           Just to frame this correctly, Your Honor --

13   this is Mr. Kramer.  The original article dealt with

14   33 patients of which none of them had any known

15   exposures to asbestos.  The new article actually

16   addresses the very issue that defendants claim they

17   were so interested in because it identifies

18   individuals with both cosmetic talc exposure and

19   other exposures to asbestos-containing products and

20   comes to the same conclusion.

21           So I'm not sure exactly how this would blow

22   open all sorts of credibility issues and issues of

23   discovery.  But, briefly, Your Honor, just to reset

24   the table here of what we're actually here to

25   discuss, we're not here to discuss Daubert.  We're

1    not here to discuss motions for summary judgment.

2    And, respectfully, Your Honor, you're not here to

3    discuss what may happen at the trial after motions

4    in limine or when the trial judge decides how

5    information can be used.

6         We're here on a discovery issue and we've

7    now, I think as Your Honor has already alluded to,

8    given adequate representation such that the

9    relevancy issue is now completely obliterated.

10   Should AII or others wish to raise something about

11   this issue in a Daubert challenge, they're more than

12   free to.  In fact, they could use this affirmation

13   however they want in a Daubert motion.  So they can

14   still do whatever they plan to do regarding

15   foundation.

16        That has nothing to do with whether or not

17   this article should now still be used despite their

18   representations that, even if we withdrew it, that

19   would nullify the issue.  As to credibility, again,

20   there is a disclaimer in every single article on

21   this subject where Dr. Moline tells the world, the

22   publishing world, exactly where she got the

23   information.  So credibility is something that can

24   still be explored on the stand.

25        And as to whether this topic is going to

1    come up, well, it's not going to be coming up

2    through us.  If they choose to somehow insert this,

3    then -- you know, and the door is open, that's on

4    them.  But we have made our affirmation.  We have

5    made our representation to Your Honor.  It's now on

6    the record, and we intend to obviously abide by it

7    in any directive that either Your Honor or the trial

8    judge may give.

9            THE COURT:  Okay.  So I think, Mr. Kramer,

10   I agree, the reliability of Dr. Moline's methodology

11   or her credibility in terms of any scientific method

12   she used for this 2020 article is certainly

13   something that is explored at a Daubert motion or

14   hearing, not here.

15           So, again, for the reasons I've already

16   indicated, I'm going to grant Northwell Health's

17   motion to quash or to modify the subpoenas because I

18   believe they were willing to comply with some

19   aspects of it.  I will enter an order indicating

20   that.  But the reasoning will be the reasons I gave

21   on the record just now.

22           MR. GREVE:  Your Honor, if I may ask one

23   question.  I understand the Court's ruling, but on

24   the issue of mootness, if an underlying dispute

25   between two parties is capable of repetition yet

1    evading review, would that mean it's not moot?

2         THE COURT:  So, just to be clear, I'm not

3    finding that it's moot.  I'm finding that defendants

4    have not established that the information they seek

5    is relevant to their claims here now, and that given

6    the very minimal relevance we're talking about,

7    which is basically that the 2020 article is somehow

8    incorporated into a new article involving new

9    individuals that she published in 2023, and given

10   Mr. Kramer's indications that the 2020 article will

11   not be used offensively in any way by plaintiffs.

12        Again, because defendants haven't shown

13   that the information they're seeking is relevant to

14   their claims, and Northwell Health has made an ample

15   showing that it will be unduly burdensome for them

16   to disclose the identities of these individuals.  So

17   that's the basis of my reasoning that the undue

18   burden on Northwell outweighs any potential

19   relevancy here.  It's not mootness.

20        MR. GREVE:  Okay.  I understand,

21   Your Honor.

22        And then one last point of clarification.

23   So if discovery was allowed and the remaining 32

24   individuals were also identified and also determined

25   to have alternate exposures to asbestos that were

1    not disclosed by Dr. Moline, similar to that of

2    Mrs. Bell, that would not be relevant or sufficient

3    enough relevance to garner that type of discovery.

4         Do I understand that correctly?

5         MR. KRAMER:  Your Honor, I think this is

6    now going into an advisory opinion based on a

7    hypothetical that, frankly, I don't even understand.

8    I don't think it's even appropriate to ask the Court

9    that.

10         MR. GREVE:  Well, let me see if I can -- my

11    question, Your Honor, is:  We're saying that there

12    hasn't been an establishment of this being relevant

13    in light of Northwell's concerns and plaintiff's

14    concerns.  And ultimately, what we're trying to find

15    out is if Dr. Moline made material

16    misrepresentations of fact regarding alternate

17    exposure to known asbestos for the other 32

18    individuals, similar to what was done in the Bell

19    instance.

20         Is it the Court's opinion that that

21    information is not something that a defendant would

22    be entitled to, nor would it have any significance

23    in terms of carrying its burden on this motion?

24         THE COURT:  No.  I mean, I don't think I'm

25    at all suggesting that.  I'm saying that within the

1    context of the information you seek for the 2020

2    article, the basis for the relevancy determination

3    was that she was relying on the 2020 article in her

4    expert opinion and she was using it affirmatively to

5    establish that causation nexus.

6          But if they're no longer relying on it,

7    that's the reason it's no longer relevant, the

8    reason you've no longer shown that it's relevant to

9    the claims here.  Your issue about the material

10    misrepresentations, that's certainly something you

11    could bring up on a Daubert challenge completely

12    unrelated to whether she's relying or using the 2020

13    article.

14          MR. GREVE:  And, Your Honor, one thing, as

15    the new article has been interjected, I think there

16    was a representation that Mr. Gref was not part of

17    the 2020 Moline article.

18          Is there any representation that

19    Plaintiff Gref is not included in the new Moline

20    2023 article?

21          MR. HUFF:  Your Honor, this is Nate Huff

22    for Northwell.  At the appropriate time, I had a

23    clarification I just wanted to make before you issue

24    your ruling.  So whenever you're ready to hear from

25    us on that, we're happy to proceed.

1          THE COURT:  Well, Mr. Huff, I don't know if

2     now is a good time.  Feel free to chime in.

3          MR. HUFF:  Sure.

4          So there have also been -- in the course of

5     the various briefing on our motion to modify, there

6     had also been a pair of cross motions to compel that

7     basically and entirely incorporated by reference all

8     of the same arguments.  In other words, they weren't

9     raising new grounds.  It was just an alternate, a

10    repackaging of the same arguments.  And so we just

11    flag that for you in case it's also your intent to

12    simultaneously deny those cross motions to compel.

13         And then you had also noted that there were

14    some aspects of the subpoenas to which Northwell was

15    willing to comply -- or with which Northwell was

16    willing to comply.  We just wanted to note for the

17    record that, with regard to those aspects, we have

18    made a document production already back at the

19    outset.  And so with the Court's ruling, we would

20    view our role in responding to the subpoenas to be

21    complete.

22         THE COURT:  Okay.  Mr. Huff, thanks for the

23    clarification.  I found the cross motion to compel

24    at 281, but the analysis would still be the same.

25         MR. HUFF:  Yes, Your Honor, we agree with

1    that because it's the exact same argument.  It's

2    just fully incorporated.  We just wanted to flag

3    that just because those are also hanging out there.

4            THE COURT:  Yes, I appreciate it.  The

5    written order will close out all those motions.

6    And, again, it's for the reasons I've indicated on

7    the record.  So there won't be a written decision.

8            MR. HUFF:  Yes, Your Honor.

9            THE COURT:  Is there anything else from

10   anyone else?

11           MR. GREVE:  Yes, Your Honor.  Kurt Greve

12   with AII.

13           In terms of the logistics associated with

14   this order and the introduction of -- I guess, is

15   the Court going to allow Mr. Kramer to substitute in

16   additional reliance material, specifically the

17   Moline 2023 article?  Because if the Court's

18   inclined not to allow that additional

19   supplementation, then that would alleviate the need

20   for going back and redeposing every single expert in

21   this case on that subject matter.

22           And, obviously, the amount of time that we

23   would need to spend with Dr. Moline would be

24   significant, considering this is a brand new

25   article.  The provenance is obviously going to come

 1    into question, the foundations are going to be to

 2    questioned, and we're ultimately going to be

 3    relitigating the exact same issues that we did with

 4    Moline 2020.  Understanding they're now saying

 5    they're not going to use it in any way, that we

 6    would have the same questions for Moline 2023.

 7         So while plaintiff has made some references

 8    to attempting to do that, is the Court inclined to

 9    allow them to supplement their disclosures and their

10    discovery and allow this new article to come in,

11    which would basically reset expert discovery in the

12    entire case?

13         MR. KRAMER:  Well, Your Honor, I disagree

14    with that representation -- this is Jim Kramer --

15    that it would reset discovery in the entire case.

16    And I also disagree that they would be entitled or

17    have shown any need or entitlement to any

18    information in 2023.  But I wanted to insert that

19    just so that the record is clear.

20         MR. GREVE:  Well, Your Honor, we definitely

21    would need to know if Brian Gref is included in the

22    Moline 2023 article.  That would be extremely

23    relevant to the Gref case.

24         THE COURT:  So I'm just going to chime in a

25    minute because, until this conference, the 2023

1    article was never at all discussed by the parties.

2    So this might be a situation where it would make

3    sense for the parties to meet and confer and decide

4    what's going on with the 2023 article before you

5    want my involvement, particularly because it's an

6    issue you just raised.

7         So that's why, Mr. Greve, I can't tell you

8    either way what my ruling is on the 2023 article

9    because this is really something that was not at all

10   within the scope of what we've been talking about

11   until a few minutes ago.

12        MR. GREVE:  Understood.

13        THE COURT:  If there's nothing further,

14   then the issue of the 2023 article, you can

15   certainly meet and confer and send us a letter.  I

16   will say, though, at this point, with the other

17   motion for sanctions that just got filed, if your

18   goal is to try to get this case moving along, the

19   additional motions are only going to slow you down,

20   for obvious reasons.

21        Thank you, everyone.

22        MR. KRAMER:  Understood, Your Honor.  Thank

23   you.

24        MR. GREVE:  Thank you, Your Honor.  Have a

25   good weekend.

```
1                  C E R T I F I C A T E

2

3        I, Marissa Mignano, certify that the foregoing

4   transcript of proceedings in the case of

5   BRIAN JOSEPH GREF v. AMERICAN INTERNATIONAL

6   INDUSTRIES, et al., Docket #1:20-cv-05589, was

7   prepared using digital transcription software and is

8   a true and accurate record of the proceedings.

9

10

11   Signature  __Marissa Mignano_____

12                  Marissa Mignano

13

14   Date:     May 23, 2023

15

16

17

18

19

20

21

22

23

24

25
```

# Exhibit 43

SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF ALAMEDA

**FILED**
ALA~~~~ ~~~ITY
APR 0 8 2022
CLERK OF THE SUPERIOR COURT
By _____ Deputy

| | |
|---|---|
| KIRK A. SMITH., | Case No. RG21 101490 |
| Plaintiff, | |
| v. | TENTATIVE RULING RE: JOINT DEFENSE MOTION IN LIMINE NO. 5 - TO EXCLUDE REFERENCE TO AND RELIANCE ON DR. MOLINE'S ARTICLE. |
| ALBERTSONS COMPANIES, et al., | |
| Defendants, | |

Plaintiff originally designated, among its expert witnesses, Dr. Jacqueline Moline, who was one of the authors of a paper, published in the Journal of Occupational and Environmental Medicine in or about 2019, entitled "Mesothelioma Associated With the Use of Cosmetic Talc." ("the Moline Article.") (Cogrove Decl, Exh. 1.) Plaintiff has since withdrawn Dr. Moline as an expert in this case thus many of the challenges raised in this motion are moot. However, Plaintiff asserts that its other experts may properly rely on the Moline Article at trial therefore Defendants' motion to exclude the use or reliance on the Moline Article remains a pending issue.

THE EVIDENCE AT ISSUE

The Moline Article describes "33 cases of malignant mesothelioma among individual with no known asbestos exposure other than cosmetic talcum powder." The cases were referred for medico-legal evaluation, and tissue digestions were performed in 6 of the cases by Dr. Ronald Gordon, according to standard methodology. "**Results**: Asbestos of the type found in talcum powder was found in all six cases evaluated. Talcum powder usage was the only source of asbestos for all 33 cases. **Conclusions**: Exposure to asbestos-contaminated powders can cause

1

mesothelioma. Clinicians should elicit a history of talcum powder usage in all patients presenting with mesothelioma."

The Article starts out by summarizing the medical and scientific literature describing the correlation of asbestos exposure and mesothelioma, including that "[t]he presence of asbestos in talc and talcum powder products was first discussed in the medical and scientific literature since beginning in the 1940s" and briefly describes the mechanism by which talc becomes contaminated with asbestos during the mining process. The authors explain that while the relationship between occupational exposure to asbestos and mesothelioma is "well established, multiple studies have shown that not all individuals who develop mesothelioma can pinpoint exposures to asbestos" particularly among women. Therefore, the authors state, "[t]he high prevalence of unexplained or, 'idiopathic mesothelioma' among women necessitates further inquiry into potential non-occupational exposures, such as exposure to asbestos-contaminated talcum powder."

"[I]n light of these gaps in the existing literature" the authors "present 33 cases of individuals with malignant mesothelioma who were exposed to commercial talcum powder products. Of those cases, [the authors] present six in detail, where the individuals had no other known exposure to asbestos and for whom tissue studies show the presence of asbestos commonly found in talcum powder (such as tremolite and/or anthophyllite). For all 33 cases, other potential exposures to asbestos were considered, with no identified source apart from the talcum powder. The cases were referred to author J.M. for medico-legal evaluation as part of tort litigation, and tissue digestions were performed by author R.G. as part of this litigation. In every case, a pathology report confirmed the diagnosis of malignant mesothelioma." *(Ibid.)*

The article indicates that data for all 33 patients was gathered from medical records and deposition transcripts supplied by attorneys. Data "abstracted" from these records included medical diagnoses, pathology reports, and the subjects' reported clinical courses. Exposure data was "obtained from sworn testimony by the cases, which included extensive questioning

2

regarding all sources of asbestos exposure," including family occupational histories, hobbies, residences, family history of cancer, and genetic mutation data, if present. In other words, the information as to potential sources of other asbestos exposures were presumably derived from the authors' review of the deposition transcripts taken in those cases. It is unclear whether those depositions were of plaintiffs alone or included other witnesses.

Although the Article purports to cover 33 cases, it only describes in detail the individuals (all women) in six cases. Information as to the six women include their age, occupation, events leading to the diagnosis of mesothelioma, medical treatment following diagnosis, and a short description of how and to what extent the patient was exposed to talcum powder. Additionally, for each of the six subjects, the Article describes results from pathology analyses and electron microscope analyses (EMAs) of tissue. The results of tissue digestion on each of the six women are also presented. The authors conclude that the paper "provides the first large case series to identify cosmetic talcum powder contaminated with asbestos as the cause of malignant mesothelioma in cosmetic talc users" and "evidence that mesothelioma cases once considered idiopathic may be attributable to asbestos-contaminated cosmetic talcum powder usage."

Defendants seek to preclude the Moline Article on several grounds, as follows:

1.      Dr. Moline lacks qualification to opine that the talcum powders described in the cases cited in the Moline Article were contaminated with asbestos.

Preliminarily, Defendants assert that Dr. Moline is not qualified to render the opinion that each of the 33 individuals in the Moline Article were exposed to asbestos from cosmetic talcum powder because it is undisputed that she does not possess the expertise in minerology, geology, or any other field that would enable her to render such opinion.

2.      The Moline Paper is "pure litigation opinion" and not valid science.

Defendants argue that "[i]t is generally accepted that case-controlled epidemiological studies are the starting point for evaluating general causation" and Dr. Moline has herself testified in other cases that epidemiology is the "gold standard" for determining whether a

3

substance is capable of causing a particular disease. (Cosgrove Decl., Exh. 4 and 5.)  The Moline Article is a case study.  It is not epidemiology.  Dr. Moline apparently has admitted in other cases that there has not been a single epidemiological study showing a causal link between cosmetic grade talc and mesothelioma.  She further admits that prior to her paper, no regulatory authority has ever concluded that cosmetic talcum powder causes mesothelioma.  Defendants argue that the Moline Article is not based on science but merely generated from and for litigation.

       3.      Dr. Moline's refusal to provide case-specific information as to the 33 cases in the study has deprived Defendants of meaningful cross-examination.

According to Defendants, in other cases Dr. Moline has refused to answer questions posed by the defense attorneys seeking case-specific information regarding the 33 subjects of the study, including refusing to reveal the identity of the individuals in the study, refusing to identify the states in which any of the 33 cases was filed, and refusing to name the law firms who referred the cases in the study to her.  When shown reports she has authored (presumably in the course of acting as an expert witness in litigation), she has refused to confirm whether those reports are related to any of the 33 cases in her study.  Dr. Moline concedes that she never obtained consent from any of the 33 individuals discussed in the Moline Article prior to including them in the Article.  She refuses to provide this information on the grounds of privacy and HIPAA concerns.

Additionally, Dr. Moline is unable to state the total number of cases from which she selected her 33 cases or how many cases she excluded.  Her selection criteria did not involve an evaluation of the location of the tumor or pathological classification. According to Defendants, Dr. Moline only relied and used data from her own litigation reports and Dr. Gordon's tissue digestions but ignored all of the testing and other, arguably contrary, opinions rendered by defense experts in these 33 cases.

The Court finds merit in Defendants' argument that they have been obstructed from meaningfully cross-examining Dr. Moline and obtaining discovery that might challenge the

4

findings and conclusions of the Article. And as Dr. Moline has now been withdrawn as a testifying expert in this action, she is not subject to cross-examination.

Notwithstanding the foregoing, the Court finds Dr. Moline's reliance on HIPAA in refusing to provide information as to the source of the case-specific data she has relied on is without merit. By the same token, the Court does not find Defendants' citation to the Eleventh Circuit opinion in *Murphy v. Dulay* (11th Cir. 2014) 768 F.3d 1360 to be on point. The Eleventh Circuit held that "when an individual executes a valid HIPAA authorization, he waives all HIPAA protection as to health information covered by the authorization, including the protections against litigation-related disclosures. (*Id.* at 1374.) However, Dr. Moline did not obtain HIPAA waivers from her subjects; rather she became privy to the medical records and personal information on each subject as a result of her retention in their legal cases. Hence it cannot be said that the subjects of the Moline Article knowingly "waived HIPPA protection."

While it is acknowledged that privacy interests in relevant medical records is waived when a plaintiff puts her medical condition into issue in the litigation, there remains the question of whether a Plaintiff has also waived all privacy rights to the use of the medical records and information contained therein, outside of the litigation, absent said information becoming public record. In this regard, it is unknown to what extent the medical information and data relied upon in the Moline Article is public record as a result of pleadings filed or testimony given in depositions or in open court during the litigation of the 33 cases.

In any event, the issue presented to the Court – not directly addressed by Defendants' motion – is whether the Moline Article may be relied upon and used by other experts in rendering opinion at trial.

Plaintiff argues that under *People v. Sanchez* (2016) 63 Cal.4th 665 ("*Sanchez*"), the California Supreme Court clarified the limits to which an expert can relate and rely on hearsay, specifically drawing a distinction between expert testimony relating to case-specific facts asserted in hearsay statements and expert testimony relating hearsay which is part of the expert's

5

general knowledge in the expert's field of expertise. (*Id.* at 676). Hence, Plaintiff argues that *Sanchez* prohibits an expert from testifying to case specific facts if they are outside the expert's personal knowledge and do not fall under an exception to the hearsay rule or have not been independently established by competent evidence. (*Id.* at 6760677.) Here, Plaintiff argues, none of his experts will be attempting to introduce case specific facts in relying upon the Moline Article and the article is not specific to Mr. Smith.

The Court believes that Plaintiff misses the mark in citing to *Sanchez*. This is not a *Sanchez* issue. All experts must comply with *Sanchez's* limitation on how much they can discuss about the contents of hearsay documents they rely upon in direct examination. That rule does not apply to cross-examination. A party cross-examining an expert witness may ask questions regarding the specific contents in the reliance materials, and in cross-examination may display before the jury statements or data discussed in the article, which the expert in direct examination is prohibited from doing.

As the Court has expressed to counsel previously , it is the Court's view that an expert witness must provide the materials he or she specifically used or relied upon to arrive at his or her opinions in the case. In Dr. Moline's case that could have required her to produce the litigation files she relied upon in the Article, notwithstanding her claims of privacy. In this instance, Plaintiff counsel has avoided the issue by withdrawing her as an expert so she is not available to be called as a witness by the defense at this time or cross-examined at trial.

Plaintiff argues that defendants are not placed in any different situation than in any other case where an expert relies upon hearsay articles and studies conducted by others. In such instances, the testifying expert may be wholly unable to attest to the reliability of the reported data but, as a general rule, the methodology employed by the researcher and all of the data is contained in the article. This is so readers of the article can determine whether the study is based upon reliable and rigorous scientific methods. In this case, the authors are relying upon opinion and data collected by others. In other words, the authors have not conducted any research of

6

their own; they are simply relying upon hearsay information and/or data; this is hearsay within hearsay. Further, it is unclear whether the Moline Article was peer-reviewed. Plaintiff does not indicate it was peer-reviewed and Defendants provide some deposition testimony that suggests it may not be a peer-reviewed article.

In this case there is no way of determining which documents, medical records, or other materials that the authors of the Moline Article were provided and what data from those materials they chose to include or omit from the study. The court notes that the source materials are unidentified litigation documents, with the exception of the tissue digestions performed on six of the 33 subjects. Although the Moline Article contends that there are 33 cases that were part of this study, only six cases are actually discussed in any detail and it is unknown what the exact criteria was used in selecting the six cases discussed or the 33 alluded to out of an unknown larger universe of potential cases.

For the reasons set forth above, the Court finds that it is not "of a type" reasonably relied upon by experts in the field and GRANTS Defendants' Joint Motion in Limine No. 5 excluding any expert from using or relying upon the Moline Article in rendering opinion in this action.

Dated:  April 9, 2022

Jo-Lynne Q. Lee, Judge

7

# Exhibit 44

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA
## Rene C. Davidson Courthouse

| | |
|---|---|
| Jill Thomas<br>　　　　　Plaintiff/Petitioner(s)<br>　　　　　vs.<br>AVON PRODUCTS, INC. et al<br>　　　　　Defendant/Respondent (s) | No.　　23CV032324<br><br>Date:　　01/25/2024<br>Time:　　3:22 PM<br>Dept:　　22<br>Judge:　　Brad Seligman<br><br>ORDER : Defendant Joint MILs |

3. (Moline articles): Grant. The issue, as Judge Lee explained in her Smith Order, is not Sanchez, but whether an expert may reasonably rely on the Moline articles. Here, unlike many academic articles, the methodology used and the source material reviewed by Moline cannot be determined and thus there is a serious question as to whether the studies are based upon reliable and rigorous scientific methods.

4. (Plaintiff life events): Grant as unopposed.

Dated :  01/25/2024

Brad Seligman / Judge

---

ORDER : Defendant Joint MILs                                           Page 1 of 1

| SUPERIOR COURT OF CALIFORNIA COUNTY OF ALAMEDA | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Rene C. Davidson Courthouse<br>1225 Fallon Street, Oakland, CA 94612 | **FILED**<br>Superior Court of California<br>County of Alameda<br>01/26/2024<br>Chad Finke, Executive Officer / Clerk of the Court<br>By: _____ Deputy<br>B. Mercado |
| PLAINTIFF/PETITIONER:<br>Jill Thomas | |
| DEFENDANT/RESPONDENT:<br>AVON PRODUCTS, INC. et al | |

| **CERTIFICATE OF ELECTRONIC SERVICE CODE OF CIVIL PROCEDURE 1010.6** | CASE NUMBER:<br>23CV032324 |
|---|---|

I, the below named Executive Officer/Clerk of Court of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served one copy of the General Order (Court Order: Defendant Joint MILs) entered herein upon each party or counsel of record in the above entitled action, by electronically serving the document(s) from my place of business, in accordance with standard court practices.


David Lee Amell
Maune, Raichle, Hartley, French & Mudd
damell@mrhfmlaw.com

Evanthia M Spanos
Spanos | Przetak, APLC
espanos@spanos-przetak.com


FARAH NICOL
Polsinelli LLP
fnicol@polsinelli.com

Fred B. Lee
GORDON REES SCULLY MANSUKHANI, LLP
flee@grsm.com


Gary D. Sharp
gsharp@foleymansfield.com

John Rohan Brydon
Demler, Armstrong & Rowland, LLP
alm@darlaw.com


Leonard M. Tavera
ltavera@semperlawgroup.com

Michael E. Sandgren
Husch Blackwell LLP
michael.sandgren@huschblackwell.com


Monica Renee Brownewell Smith
Barnes & Thornburg LLP
mbrownewell@btlaw.com

Nicole Brown Yuen
nyuen@foleymansfield.com

Chad Finke, Executive Officer / Clerk of the Court

Dated: 01/26/2024          By:

B. Mercado, Deputy Clerk


**CERTIFICATE OF ELECTRONIC SERVICE
CODE OF CIVIL PROCEDURE 1010.6**

| SHORT TITLE: THOMAS vs AVON PRODUCTS, INC., et al. | CASE NUMBER: 23CV032324 |
|---|---|

Nicole Elisabet Gage
TUCKER ELLIS LLP
nicole.gage@tuckerellis.com

Ryan Edward Cosgrove
ryan.cosgrove@nelsonmullins.com

Sarah E Gilson
Maune Raichle Hartley French & Mudd, LLC
sgilson@mrhfmlaw.com

William Choi
Barnes & Thornburg LLP
william.choi@btlaw.com

**ADDITIONAL PAGE – CERTIFICATE OF MAILING**          Page **2** of **2**