

Mail: P.O. Box 5231, Princeton, NJ 08543-5231

Princeton Pike Corporate Center
997 Lenox Drive, Building 3
Lawrenceville, NJ 08648-2311
Tel 609.896.3600  Fax 609.896.1469
www.foxrothschild.com

Jeffrey M. Pollock
Certified by the Supreme Court of New Jersey
    as a Civil Trial Attorney
Direct Dial:  (609) 896-7660
Email Address:  jmpollock@foxrothschild.com

February 2, 2024

*Via* **PACER/ECF**

The Honorable Rukhsanah L. Singh, U.S.M.J.
Clarkson S. Fisher Building & U.S. Courthouse
402 East State Street, Courtroom 7W
Trenton, New Jersey

> Re:  *In re: Johnson & Johnson Talcum Powder Products Marketing, Sales Practices and Product Liability Litig.*, **Case No. 3:16-md-2738 (MAS)/(RLS)**

Dear Judge Singh:

Pursuant to Your Honor's text order [Dkt 28965] of yesterday's date, Mr. Brody and I have conferred and attach for the Court's review the Opinion of the Honorable John C. Porto, P.J.Civ., entered on January 31, 2024, in the related State court action.

In addition, we are attaching all Certifications that have been filed before Judge Porto, specifically:

1. Declaration of Erik Haas, dated December 5, 2022;
2. Certification of Andy Birchfield, Esq., dated January 17, 2024;
3. Certification of Ted Meadows, Esq., dated January 17, 2024;
4. Certification of James F. Conlan, dated January 17, 2024;
5. Certification of John Gasparovic, dated January 17, 2024;
6. Certification of Erik Haas, dated January 25, 2024;



The Honorable Rukhsanah L. Singh, U.S.M.J
February 2, 2024
Page 2

     7.   Certification of James Murdica, dated January 25, 2024;

     8.   Supplemental Certification of Andy Birchfield, Esq., dated January 29, 2024; and

     9.   Supplemental Certification of James F. Conlan, dated January 29, 2024.

     Lastly, we are attaching the transcripts of the January 17th and January 23rd hearings before Judge Porto as **Exhibit A and B.**

     Respectfully submitted,

     */s/  Jeffrey M. Pollock*

     JEFFREY M. POLLOCK

Encl.

cc:  All Counsel (*via* ECF)

JAN 3 1 2024

JOHN C. PORTO, P.J.Cv.

**PREPARED BY THE COURT**

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION – ATLANTIC
COUNTY

Docket No. ATL-L-2648-15
Case No.: 300

CIVIL ACTION

**INITIAL ORDER FOR AN
EVIDENTIARY HEARING**

IN RE TALC BASED POWDER PRODUCTS
LITIGATION

**THIS MATTER** being opened to the Court by Susan M. Sharko, Esq., of Faegre Drinker Biddle & Reath LLP, attorneys for Defendant, Johnson & Johnson, for an Order granting Defendants Motion for Order to Show Cause Why Beasley Allen Should Not Be Disqualified from this Litigation, and for the reasons stated in the accompanying Memorandum of Decision;

**IT IS**, on this 31st day of January, 2024, **ORDERED**:

1. An evidentiary hearing is required to determine if the Defendants met their burden regarding the disqualification of Beasley Allen.

2. All counsel are directed to meet and confer regarding the availability and scheduling for the plenary hearing including all necessary witnesses.

3. A conference via ZOOM regarding the logistics and further scheduling of the evidentiary hearing is scheduled for the week of February 12, 2024.

**IT IS FURTHER ORDERED** that service of this Order shall be deemed effectuated upon all parties upon its upload to eCourts.

HON. JOHN C. PORTO, P.J.Cv.

## PREPARED BY THE COURT

| | |
|---|---|
| IN RE TALC BASED POWDER PRODUCTS LITIGATION | SUPERIOR COURT OF NEW JERSEY ATLANTIC COUNTY LAW DIVISION |
| | Consolidated Docket No.: ATL-L-2648-15 |
| | MCL Case No.: 300 |
| | **Civil Action** |
| | **Initial Decision for Evidentiary Hearing** |

**Decided on: January 31, 2024**

> **Stephen D. Brody, Esquire, Pro Hac Vice**
> **Attorney for Johnson & Johnson and LTL Management, LLC**
> **O'Melveny & Myers, LLP**

> **Susan M. Sharko, Esquire**
> **Attorney for Johnson & Johnson and LTL Management, LLC**
> **Faegre, Drinker, Biddle & Reath, LLC**

> **Jeffery M. Pollock, Esquire**
> **Michael W. Sabo, Esquire**
> **Attorneys for Andy Birchfield and Beasley Allen**
> **Fox Rothschild, LLP**

**Porto, P.J.Cv.**

On December 8, 2023, Defendants', Johnson & Johnson's ("J&J") and LTL Management LLC (collectively, "Defendants") filed an Order to Show Cause seeking the disqualification of the law firm Beasley Allen Crow Methvin Portis & Miles, P.C. ("Beasley Allen") from this litigation.[1] This issue arises within the

---

[1] This court was informed by counsel that an identical motion was also filed in the United States District Court for the District of New Jersey.

context of the Multicounty Litigation ("MCL") matter before this court where the cases are centered on allegations that ovarian cancer was allegedly caused by J&J's talcum powder products. Beasley Allen represents a number of Plaintiffs in this MCL against the Defendants. Beasley Allen also opposed the Defendants' bankruptcy filing in the federal courts.

In their brief, Defendants focus on a former J&J attorney, James F. Conlan ("Conlan"[2]), and outline certain actions purportedly taken after Conlan stopped his representation of J&J as a partner with the Faegre Drinker law firm ("Faegre Drinker"). While a partner at Faegre Drinker, Conlan worked with a team of other J&J attorneys and possesses confidential and privileged information of J&J. Based on purported post J&J actions, as described below, the Defendants argue the disqualification of Beasley Allen is warranted in this MCL litigation. Notably, according to Conlan, those post J&J activities do not include him acting in the capacity of an attorney, but Conlan remains authorized to practice law.

After leaving Faegre Drinker in 2022, Conlan co-founded a business venture called Legacy Liability Solutions LLC ("Legacy") serving as Chief Executive Officer. In that capacity, Conlan contends he is not acting as an attorney or practicing law.[3] However, according to the Defendants, Conlan "partnered" or "allied himself" with "the primary opponent of the LTL bankruptcy plan," Beasley Allen, through one of their partners, Andy Birchfield, Esquire ("Birchfield"), to promote a proposed settlement of all talc claims that is adverse to J&J. According to the Defendants' attorney, "[i]n Conlan, Birchfield sees a windfall for Beasley Allen—an opportunity

---

[2] The court's use of the last names is for ease of reference only; no disrespect or familiarity is intended.
[3] Conlan certified he "became a non-practicing lawyer. I am active and authorized to practice law, but I do not practice law and have no clients."

to join forces with a lawyer who spent 1,600 hours representing J&J in the exact matter for which Birchfield seeks to undermine J&J's preferred resolution." Defendants further stated at oral argument they have no information that Beasley Allen put in place any types of screening or other measures to keep J&J's client confidences from being shared with attorneys that are working on this litigation.

Defendants' attorney argues "there is no question that Conlan possesses J&J's client confidences" and since Conlan is "working closely" with "J&J's current adversary" and "that action requires the disqualification of Beasley Allen from the talc litigation." According to Defendants, Beasley Allen now has access to J&J's "client confidences" that "will impact every aspect of the proceedings going forward...." In support of their motion to disqualify that law firm, Defendants cite RPC 4.4(b), RPC 1.9(b) and (c), RPC 1.10(b), RPC 1.18(b) and New Jersey Supreme Court Advisory Committee on Professional Ethics Opinion 680.[4]

On January 9, 2024, Beasley Allen filed their opposition and asserted a number of arguments disputing any basis for their disqualification. Specifically, Beasley Allen argued J&J failed to carry its "heavy burden" that Beasley Allen should be disqualified as a matter of law because in addition to there being no evidence that the law firm ever obtained J&J's confidential or privileged client information, Conlan is concededly not (and was never) an attorney at Beasley Allen. Beasley Allen's attorney posits the possible basis for J&J's motion is because Beasley Allen successfully fought for their clients in the Third Circuit regarding the bankruptcy dismissal.

---

[4] At oral argument on January 17, 2024, Defendants' counsel stated in those cases where Beasley Allen is listed as counsel, plaintiffs are also represented by three other law firms.

3

In this MCL, Beasley Allen is involved with pending litigation representing many plaintiffs against J&J involving their talc products and the law firm has an economic interest and a client interest in this litigation. Beasley Allen's attorney argues Birchfield "has not received, disseminated or shared confidential information, including trial strategy, litigation strategies, settlement practices or proprietary information belonging to J&J." In that respect, Conlan "has never shared privileged or confidential information he obtained from any of his former clients (including J&J) with Mr. Birchfield or his firm Beasley Allen." Beasley Allen's attorney also addressed the relevant provisions of RPC 1.6, RPC 1.9, RPC 1.10 and RPC 4.4 and argued "there is zero evidence in this record that Mr. Conlan shared anything with Beasley Allen" and no basis for disqualification. Counsel further noted, since the "appearance of impropriety" is no longer the law, counsel argues the Defendants' argument must fail.   Beasley Allen's attorney also contends that even J&J "doesn't believe that Mr. Conlan has acted inappropriately because they haven't pursued him here." "[T]hey have done nothing to prove that Mr. Conlan violated RPC 1.9, represents a party, [or] breached any confidentiality."

This court conducted oral argument on January 17, 2024, but also left the record open in case the court required any additional information or certifications needed for the disposition.  On January 23, 2024, the court requested supplemental information from the Defendants and provided Beasley Allen with an opportunity to address any supplemental filing.  Both parties provided supplemental information by way of additional certifications as did Conlan.

**Discussion and Analysis**

RPC's

The parties raised the following Rules of Professional conduct in their briefs and arguments in relevant part and as noted.

4

RPC 1.6 Confidentiality of Information.

(a) A lawyer shall not reveal information relating to representation of a client unless the client consents after consultation, except for (1) disclosures that are impliedly authorized in order to carry out the representation, (2) disclosures of information that is generally known, and (3) as stated in paragraphs (b), (c), and (d).

RPC 1.9 (b)(c) Duties to former clients.

(b) A lawyer shall not knowingly represent a person in the same or a substantially related matter in which a firm with which the lawyer formerly was associated had previously represented a client,

> (1) whose interests are materially adverse to that person; and

> (2) about whom the lawyer, while at the former firm, had personally acquired information protected by RPC 1.6 and RPC 1.9(c) that is material to the matter unless the former client gives informed consent, confirmed in writing. Notwithstanding the other provisions of this paragraph, neither consent shall be sought from the client nor screening pursuant to RPC 1.10 permitted in any matter in which the attorney had sole or primary responsibility for the matter in the previous firm.

(c) A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter:

> (1) use information relating to the representation to the disadvantage of the former client except as these Rules would permit or require with respect to a client, or when the information has become generally known; or

> (2) reveal information relating to the representation except as these Rules would permit or require with respect to a client.

RPC 1.10 Imputation of conflicts of interest: general rule.

(b) When a lawyer has terminated an association with a firm, the firm is not prohibited from thereafter representing a person with interests materially adverse to those of a client represented by the formerly associated lawyer and not currently represented by the firm, unless:

> (1) the matter is the same or substantially related to that in which the formerly associated lawyer represented the client; and

> (2) any lawyer remaining in the firm has information protected by RPC 1.6 and RPC 1.9(c) that is material to the matter.

(c) When a lawyer becomes associated with a firm, no lawyer associated in the firm shall knowingly represent a person in a matter in which that lawyer is disqualified under RPC 1.9 unless:

> (1) the matter does not involve a proceeding in which the personally disqualified lawyer had primary responsibility;

> (2) the personally disqualified lawyer is timely screened from any participation in the matter and is apportioned no part of the fee therefrom; and

> (3) written notice is promptly given to any affected former client to enable it to ascertain compliance with the provisions of this Rule.

RPC 1.18 Prospective Client.

(b) A lawyer subject to paragraph (a) shall not represent a client with interests materially adverse to those of a former prospective client in the same or a substantially related matter if the lawyer received information from the former prospective client that could be significantly harmful to that person in the matter, except as provided in paragraph (c).

6

RPC 4.4(b) Respect for Rights of Third Persons.

(b) A lawyer who receives a document or electronic information and has reasonable cause to believe that the document or information was inadvertently sent shall not read the document or information or, if he or she has begun to do so, shall stop reading it. The lawyer shall (1) promptly notify the sender (2) return the document to the sender and, if in electronic form, delete it and take reasonable measures to assure that the information is inaccessible.

In 2006, the so-called "appearance of impropriety" was eliminated from the Rules of Professional Conduct.  The New Jersey Supreme Court held, "the appearance of impropriety standard no longer retains any continued validity."  In re Supreme Court Advisory Committee on Professional Ethics Opinion No. 697, 188 N.J. 549, 552 (2006).  An actual conflict must be found to exist and the burden is on the Defendants to establish the existence of an actual conflict.

The initial issue before this court is: whether the Defendants met their burden for the disqualification of Beasley Allen in this MCL based on an actual conflict.

In reviewing a motion for the disqualification of counsel for an adversary, based on the RPCs, courts are required to "balance competing interests, weighing the need to maintain the highest standards of the profession against a client's right freely to choose his counsel." Twenty-First Century Rail Corp. v. N.J. Transit Corp., 210 N.J. 264, 273-74 (2012) (quoting Dewey v. R.J. Reynolds Tobacco Co., 109 N.J. 201, 218 (1988)).  "[T]o strike that balance fairly, courts are required to recognize and to consider that 'a person's right to retain counsel of his or her choice is limited in that there is no right to demand to be represented by an attorney disqualified because of an ethical requirement.'" Id. at 274 (citations omitted). "Disqualification of counsel is a harsh discretionary remedy which must be used sparingly." Dental Health Assocs. S. Jersey, P.A. v. RRI Gibbsboro, LLC, 471 N.J. Super. 184, 192

(App. Div. 2022). Additionally, disqualification motions are "viewed skeptically in light of their potential abuse to secure tactical advantage." <u>Escobar v. Mazie</u>, 460 N.J. Super. 520, 526 (App. Div. 2019) (citing <u>Dewey</u>, 109 N.J. at 218).

The New Jersey Supreme Court in <u>City of Atlantic City v. Trupos</u>, 201 N.J. 447 (2010) provided the analytical framework for courts confronted with addressing the issue of whether to disqualify attorneys pursuant to RPC 1.9. In writing for the Court, Justice Rivera-Soto stated, "the initial burden of production" for disqualification "must be borne by the party seeking disqualification." <u>Id.</u> at 462 (citations omitted). "If that burden of production or of going-forward is met, the burden shifts to the attorneys sought to be disqualified to demonstrate that the matter or matters in which he or they represented the former client are not the same or substantially related to the controversy in which the disqualification motion is brought." <u>Id.</u> at 462-63. (citations omitted.). "[T]he burden of persuasion on all elements under RPC 1.9(a) remains with the moving party, as it 'bears the burden of proving that disqualification is justified.'" <u>Id.</u> at 463. (citations omitted.). The Court further stated:

> In practice, [s]uch a motion should ordinarily be decided on the affidavits and documentary evidence submitted, <u>and an evidentiary hearing should be held only when the court cannot with confidence decide the issue on the basis of the information contained in those papers, as, for instance, when despite that information there remain gaps that must be filled</u> before a factfinder can with a sense of assurance render a determination, or when there looms a question of witness credibility. (Emphasis added.)
> [<u>Id.</u> at 463 quoting <u>Dewey</u>, 109 N.J. at 222]

Additionally, this process was reaffirmed in <u>O Builders & Associates, Inc. v. Yuna Corp. of NJ</u>, 206 N.J. 109 (2011). There, the Court held

[D]isqualification of counsel . . . will occur only when the movant, generally well-grounded in the written record, satisfies its burden of proving that the matter of the consultation and the matter then adverse are "the same or substantially related" and . . . that the information the lawyer received during the consultation is "significantly harmful" to the former prospective client in the now adverse matter.

[Id. at 127-28.]

The former client must make more than "bald and unsubstantiated assertions" that confidential information will be used. Id. at 129.

Based on this case law, an evidentiary hearing is not forbidden, but it should be the last resort.

To date, in an effort to avoid the need for an evidentiary hearing, this court followed the framework set forth in Trupos. The court received Declarations and Certifications from the Defendants and from Beasley Allen regarding their respective positions as well as from Conlan. Last week, this court received supplemental Certifications from the Defendants, on January 29, 2024, this court received a supplemental brief and supplemental Certification from Beasley Allen. Today, the court also received an additional Certification from Conlan.

In brief and for context only, the court highlights a few of the material factual disputes excerpted from the certifications filed.

The Defendants focus on Conlan and his work as an attorney for J&J up through his departure from Faegre Drinker in or about February 2022, that included Conlan's participation as an attorney for J&J "in strategic discussions... evaluat[ing] the following options for resolving this litigation...:"

(1) "structural optimization" for resolution of claims through the tort system; (2) an asbestos trust; (3) use of a

> settlement class action procedure; (4) inventory settlements with individual plaintiffs' attorneys; (5) settlement through the Imerys bankruptcy; and (6) a bankruptcy filing by LTL Management LLC. As counsel for J&J, Mr. Conlan participated in the evaluation of the strengths and weaknesses of all of these options as potential strategies for resolution of present and future talc liabilities, including the claims in this New Jersey proceeding.

[Certification of Erik Haas, pg. 4 1/25/24]

Defendants also assert the following:

> Notably, in the Spring of 2021, Mr. Conlan provided extensive advice to me and my colleagues, and engaged in negotiations on our behalf, with respect to a settlement proposal advanced by Mr. Birchfield. As Mr. Birchfield testified in his deposition taken in the LTL bankruptcy, that settlement contemplated the resolution of the ovarian talc claims for $4.2 billion. Mr. Conlan conferred with us regarding the strengths and weaknesses of utilizing a "structural optimization" strategy in lieu of the settlement format Mr. Birchfield proposed at that time.

[Ibid.]

Since Conlan is now CEO of Legacy, the Defendants argue Conlan still possesses confidential and privileged J&J information and shared that information with Birchfield to come up with a current settlement strategy for the talc ovarian cancer cases.

So, according to the Defendants, their allegations of the RPC violations arise out of the same case, but unlike in the facts in Trupos, and Twenty-First Century Rail, Conlan is not undertaking the representation of any adverse party or as an

attorney in the MCL or otherwise engaging in successive representation.  See also, Twenty-First Century Rail Corp., 210 N.J. 264.

Beasley Allen addressed the Defendants' contentions in Birchfield's initial and supplemental Certifications.  In the recent Certification, Birchfield details his efforts as the "point person for the ovarian cancer leadership team" in the Bankruptcy case that was involved in the "estimated liability process[5]".  Birchfield also certified after the Third Circuit's dismissal of LTL's Bankruptcy case, he "along with the plaintiff leadership team, prepared a settlement proposal substantially similar to the proposal that is discussed as part of the Legacy proposal that J&J provided to the Court. Legacy had no involvement in the development of the settlement proposal[6]."  Birchfield certified his "first contact with anyone at Legacy [was]… on April 27, 2023 and that was a call….[7]" His first meeting "with Legacy personnel was on May 2, 2023[8]."  Birchfield also certified to having an "interaction with Conlan[9]" after May 2, 2023.  Birchfield certified,

> [he], along with [his] partners at Beasley Allen, had extensive knowledge regarding the talc claims, the strengths and weaknesses of claims, the values of claims, J&J approaches to settlement and J&J strategies. This knowledge did not come from inside information but years of experience in every aspect of the litigation.

> [Certification of Andy D. Birchfield, pg. 4, 1/29/24]

According to Birchfield's Certifications, Conlan was "neither retained by Beasley Allen in any capacity[10]."  Birchfield also certified to not having any "personal

---

[5] Certification of Andy D. Birchfield, pg. 3, 1/29/24.
[6] Ibid.
[7] Id. at pg. 4.
[8] Ibid.
[9] Id. at pg. 5.
[10] Id. at pg. 6.

knowledge of Mr. Conlan's work with or on behalf of J&J. He has never confided in either me or Beasley Allen about his work, advice or legal analysis from his work with J&J[11]." Birchfield also denies all other contentions or accusations leveled by the Defendants in both of his Certifications filed in connection with this Order to show Cause. In Birchfield's most recent Certification, he also stated, "[t]he arc of the litigation has advanced substantially and the landscape is materially different from the time Mr. Conlan ceased work for J&J[12]."

In Conlan's Certification, he details his professional experience and that "[he] pioneered structural optimization during [his] thirty-two-year career at Sidley Austin, and long before [he] represented J&J[13]." Conlan certified, "structural optimization and disaffiliation structures, precedents and transactions, are 'not' confidential, predate substantially [his] representation of J&J, and [his] knowledge of same did not emanate in any respect from J&J[14]." Conlan also provided an explanation of how the Legacy proposal would work in in the talc liability cases[15].

An aspect that is integral to the disposition of this motion is the fact that although Conlan is not representing any client, he remains authorized to practice law. "A lawyer shall not reveal information relating to the representation of a client…." See RPC 1.6(a). "A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter: (1) use information relating to the representation to the disadvantage of the former client except as these Rules would permit or require with respect to a client, or when the information has become generally known…." See RPC 1.9(2)(c).

---

[11] Id. at pg. 5.
[12] Ibid.
[13] Certification of James F. Conlan, pgs. 1-2, dated 1/29/24.
[14] Id. at pg. 2.
[15] Id. at pg. 4.

In addition to the analytical framework outlined by the Supreme Court in Trupos, fundamentally, this court finds there are genuine and bona fide facts that are disputed in the Certifications. Based on the conflicting factual information provided by all parties, this court finds that it cannot confidently decide this issue on the basis of the information contained in the papers. Therefore, the court finds that an evidentiary hearing is necessary to determine witness credibility and if the Defendants met their burden regarding disqualification of Beasley Allen.

This court acknowledges that an attorney's disqualification "is a harsh discretionary remedy" and it "must be used sparingly." Dental Health Assocs., 471 N.J. Super. at 192. Therefore, in order for this court to discharge its responsibility under the case law, an evidentiary hearing is required and, at a minimum, the testimony of Mr. Conlan and Mr. Birchfield is required. However, the court will explore with counsel if the testimony of anyone else is necessary for the disposition of this motion.

All counsel are directed to meet and confer regarding the availability and scheduling for the plenary hearing. If all counsel agrees, the plenary hearing may be conducted via ZOOM. The court finds that a conference should be scheduled and is looking at the week of February 12, 2024 for counsel's availability.

_____
HON. JOHN C. PORTO, P.J.Cv.

Date: January 31, 2024

13

# EXHIBIT 1

**SUPERIOR COURT OF NEW JERSEY**
**LAW DIVISION, ATLANTIC COUNTY**

| | |
|---|---|
| **IN RE TALC-BASED POWDER PRODUCTS LITIGATION** | Master Docket No. ATL-L-2648-15 |
| | MCL CASE NO. 300 |
| ***Applicable to All Cases*** | CIVIL ACTION |

**DECLARATION OF ERIK HAAS**

I, Erik Haas, hereby declare and state as follows:

1. I am over the age of eighteen, of sound mind, and in all respects competent to testify. I have personal knowledge of the information contained in this Declaration and would testify completely to these facts if called to do so.

2. I am Worldwide Vice President, Litigation for Johnson & Johnson ("J&J"), a position I have held since November 2020.

3. In this position, I became familiar with work performed for J&J by attorney James Conlan of the law firm of Faegre Drinker between July 2020 and early 2022. I have also reviewed time entries submitted by Mr. Conlan for his work representing J&J.

4. From July 2020 through early 2022, Mr. Conlan represented J&J as part of a team of attorneys evaluating legal strategies for resolution of pending and future claims by plaintiffs asserting liability for illnesses allegedly caused by J&J's talc products.

1

5. Billing submitted by Mr. Conlan reflects that, during this period, Mr. Conlan billed almost 1,600 hours on the talc matter, including 1,154 hours in 2021 alone. The records reflect that Mr. Conlan billed J&J $2.24 million for this work.

6. Those same billing records show that during this time period, Mr. Conlan attended dozens of meetings and phone conferences with members of the J&J Law Department, including myself, J&J's former head of litigation, Joseph Braunreuther, former product liability lead John Kim, and current product liability head, Andrew White.

7. Mr. Conlan's time entries in the billing records also show that he communicated regularly with other members of J&J's outside counsel team on the talc matter throughout the same time period, and in May 2021, met personally as J&J's counsel with the Debtor's counsel and counsel for the Future Claims Representative in the Imerys bankruptcy over rounds of golf, dinner, and drinks.

8. At no point did J&J, or any of its officers or agents, waive attorney-client privilege as to Mr. Conlan's representation of the Company.

9. Attached as Exhibit 1 is a true and correct copy of an email that Mr. Conlan sent to me on August 23, 2022.

10. Attached as Exhibit 2 is a true and correct copy of the transcript of J&J's Q3 earnings call, held October 17, 2023.

11.     Attached as Exhibit 3 is a true and correct copy of an email from Mr. Conlan to Johnson & Johnson Treasurer Duane Van Arsdale, dated October 18, 2023.

12.     Attached as Exhibit 4 is a true and correct copy of excerpts from the transcript of the April 17, 2023 deposition of Andy Birchfield, taken in *In re: LTL Management LLC*, No. 23-12825 (Bankr. D.N.J.).

13.     Attached as Exhibit 5 is a true and correct copy of a letter from James Murdica to Mr. Conlan, dated November 5, 2023.

14.     Attached as Exhibit 6 is a true and correct copy of a letter and attachment from Mr. Conlan to the Johnson & Johnson Board of Directors, dated November 9, 2023.

15.     Attached as Exhibit 7 is a true and correct copy of an email I sent to John Gasparovic, copying Mr. Conlan and others, dated November 9, 2023.

16.     On November 15, 2023, J&J learned that Mr. Conlan and Mr. Birchfield were set to appear at a November 29, 2023 symposium hosted by Gordon Haskett Research Advisors on "JNJ: Talc Litigation & 3rd Bankruptcy" to discuss the "viability" of "J&J's potential 3rd bankruptcy," "potential settlement issues," and "how J&J could resolve the litigation outside of bankruptcy."

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 8th day of December, 2023.

_____

Erik Haas
Worldwide Vice President, Litigation
Johnson & Johnson

# EXHIBIT 1

**From:** James Conlan <james.conlan@legacyliability.com>

**Sent:** Tuesday, August 23, 2022 11:16 AM

**To:** Haas, Erik [JJCUS] <EHaas8@its.jnj.com>

**Subject:** [EXTERNAL]

> **WARNING:** This email originated from outside the company. Do not click on links unless you recognize the sender and have confidence the content is safe. If you have concerns about this email, send it as an attachment to SuspiciousEmail@ITS.JNJ.COM

Confidential

Eric, I hope you're well and enjoying the summer. I'm in NY today through tomorrow afternoon and would be delighted to buy you a coffee or a drink.

I am among those who think the likelihood of plan confirmation/injunction (for solvent non debtor affiliates) in a Texas two step bankruptcy case (particularly outside of the asbestos context) has gone from low to essentially non existent.

I would like to talk to you about a dismissal -- with Legacy taking the ownership of LTL and causing an indemnity to be issued that would provide J&J and its other affiliates with the best available protection -- sufficient to cause your auditors to remove your ASC 450 disclosure relating to talc/baby powder. J&J would have to fund LTL with cash in excess of the PV of the tort system value of all current and future talc related claims against LTL.

The capital markets, not the bankruptcy courts, are the answer to achieving closure (current and future claims) for solvent mass tort defendants.



**James F. Conlan**
Chief Executive Officer and Co-Founder
Legacy Liability Solutions
Bermuda | Dallas | Chicago | Paris
Email | james.conlan@legacyliability.com
Mobile | +312.927.7572
www.legacyliability.com

# EXHIBIT 2

Printed from MarketBeat.com

# Johnson & Johnson Q3 2023 Earnings Call Transcript

Provided by AlphaStreet
October 17, 2023

⌁ SHARE ›

→ **The Only Practical Solution to the World's Looming Energy Crisis** (Ad)

## Participants

### Corporate Executives

**Jessica Moore**
*Vice President - Investor Relations*

**Joseph J. Wolk**
*Executive Vice President, Chief Financial Officer*

**John C. Reed**
*Executive Vice President, Pharmaceuticals, R&D*

**Joaquin Duato**
*Chairman and Chief Executive Officer*

**Erik Haas**
*Worldwide Vice President of Litigation*

**Ahmet Tezel**
*Group Chairman and Global Head of MedTech Innovation and R&D*

### Analysts

**David Risinger**, *Leerink Partners*

**Matt Miksic**, *Barclays PLC*

**Chris Shibutani**, *The Goldman Sachs Group, Inc.*

**Geoff Meacham**, *Bank of America Merrill Lynch*

**Josh Jennings**, *TD Cowen*

**Chris Schott**, *J.P. Morgan*

**Larry Biegelsen**, *Wells Fargo & Company*

**Terence Flynn**, *Morgan Stanley*

**Joanne Wuensch**, *Citibank*

**Vamil Divan**, *Guggenheim Securities*

**Danielle Antalffy**, *UBS Group AG*

**Louise Chen**, *Cantor Fitzgerald*

Presentation 

Ex. 2

**Operator**

Good morning, and welcome to Johnson & Johnson's Third Quarter 2023 Earnings Conference Call. [Operator Instructions]

I would now like to turn the call over to Johnson & Johnson. You may begin.



**Jessica Moore**
*Vice President - Investor Relations at Johnson & Johnson*

Good morning. This is Jessica Moore, Vice President of Investor Relations for Johnson & Johnson. Welcome to our Company's review of the 2023 third quarter business results and full-year financial outlook.

A few logistics before we get into the details. As a reminder, you can find additional materials, including today's presentation and associated schedules on the Investor Relations section of the Johnson & Johnson website at investor.jnj.com.

Please note that this presentation contains forward-looking statements regarding, among other things, the Company's future operating and financial performance, market position and business strategy. You are cautioned not to rely on these forward-looking statements, which are based on current expectations of future events using the information available as of the date of this recording and are subject to certain risks and uncertainties that may cause the Company's actual results to differ materially from those projected. A description of these risks, uncertainties and other factors can be found in our SEC filings, including our 2022 Form 10-K, which is available at investor.jnj.com and on the SEC's website.

Additionally, several of the products and compounds discussed today are being developed in collaboration with strategic partners or licensed from other companies. This slide acknowledges those relationships.

Moving to today's agenda. I will start by reviewing the third quarter sales and P&L results for the corporation and highlights related to our two businesses. Joe Wolk, our CFO, will then provide additional business and financial commentary before sharing an overview of our cash position, capital allocation priorities and updated guidance for 2023. The remaining time will be available for your questions. Joaquin Duato, our Chairman and CEO; John Reed and Ahmet Tezel, our Innovative Medicine and MedTech R&D leaders; as well as Erik Haas, our VP of Litigation, will be joining us for Q&A. To ensure we provide enough time to address your questions, we anticipate the webcast will last approximately 60 minutes.

As a reminder, on August 23rd, 2023, Johnson & Johnson announced the final results of the exchange offer and completion of the separation of Kenvue Inc. Unless otherwise stated, the financial results and guidance highlighted today reflect the continuing operations of Johnson & Johnson. We will report the Consumer Health financial results as discontinued operations. Additionally, going forward, the Pharmaceutical segment will be referred to as Innovative Medicine.

Starting with Q3 2023 sales results. Worldwide sales were $21.4 billion for the third quarter of 2023, an increase of 6.8% versus the third quarter of 2022. Operational sales growth, which excludes the effect of translational currency, increased 6.4% as currency had a positive impact of 0.4 points. In the US, sales increased 11.1%. In regions outside the US, our reported growth was 1.6%. Operational sales growth outside the US was 0.7%, with currency positively impacting our reported OUS results by 0.9 points. It is important to note that operational sales in Europe were negatively impacted by the COVID-19 vaccine and loss of exclusivity of ZYTIGA. Excluding the net impact of acquisitions and divestitures, adjusted operational sales growth was 4.9% worldwide, 8.9% in the US, and 0.3% outside the US.

Turning now to earnings. For the quarter, net earnings were $4.3 billion and diluted earnings per share was $1.69 versus diluted earnings per share of $1.62 a year ago. Excluding after-tax intangible asset amortization expense and special items for both periods, adjusted net earnings for the quarter were $6.8 billion, and adjusted diluted earnings per share was $2.66, representing increases of 14.1% and 19.3%, respectively, compared to the third quarter of 2022. On an operational basis, adjusted diluted earnings per share increased 13.9%.

I will now comment on business sales performance. Unless otherwise stated, percentages quoted represent the operational sales change in comparison to the third quarter of 2022, and therefore, exclude the impact of currency translation.

Beginning with Innovative Medicine. Worldwide Innovative Medicine sales of $13.9 billion increased 5.1% with growth of 10.9% in the US and a decline of 2.3% outside the US. Operational sales growth increased 4.3% as currency had a positive impact of 0.8 points. Excluding COVID-19 vaccine sales, worldwide operational sales growth was 8.2% with growth of 10.9% in the US and growth of 4.3% outside the US. Sales outside the US, excluding the COVID-19 vaccine, were negatively impacted by approximately 500 basis points due to the loss of exclusivity of ZYTIGA in Europe.

ATL-L -002648-15   12/08/2023 9:16:57 PM   Pg 4 of 18   Trans ID: LCV20233584887
Case 3:16-md-02738-MAS-RLS   Document 28976   Filed 02/02/24   Page 27 of 221 PageID: 172420

Ex. 2

Innovative Medicine growth was driven by our key brands and continued uptake from recently launched products with 11 assets delivering double-digit growth. We continue to drive strong sales growth for both DARZALEX and ERLEADA with increases of 20.7% and 27%, respectively, due to continued share gains and market growth. Within immunology, we saw growth in STELARA and TREMFYA with increases of 15.8% and 21.5%, respectively. This growth was predominantly driven by favorable patient mix and market growth.

Turning to newly launched products. We continue to make progress on our launches of CARVYKTI and SPRAVATO. We are also encouraged by the early success of our launches of TECVAYLI and TALVEY, sales of which are driving the growth in other oncology. We expect to begin disclosing TECVAYLI sales in Q1 2024. Total Innovative Medicine sales growth was partially offset by the loss of exclusivity of ZYTIGA and REMICADE, along with a decrease in IMBRUVICA sales due to competitive pressures.

I'll now turn your attention to MedTech. Worldwide MedTech sales of $7.5 billion increased 10% with growth of 11.6% in the US and 8.3% outside of the US. Operational sales growth increased 10.4% as currency had a negative impact of 0.4 points. Abiomed contributed 4.6% to operational growth. Excluding the impact of acquisition and divestitures, worldwide adjusted operational sales growth was 6%. On a pro forma basis utilizing sales in the prior year from Abiomed as a standalone company, MedTech's growth for the quarter would be 6.4%.

MedTech was negatively impacted across all platforms by international sanctions in Russia worth approximately 60 basis points and volume-based procurement in China, primarily in five MedTech platforms: Spine, Trauma, Endocutters, Energy and Electrophysiology. As communicated last quarter, we saw the return to more normalized seasonality with moderate deceleration in the third quarter.

The Interventional Solutions franchise delivered operational growth of 48.1%, which includes $311 million related to Abiomed. This reflects growth in Abiomed patient procedures in the high-teens and continued strong adoption of Impella 5.5 technology in Surgery. Electrophysiology is a major contributor to this growth with a double-digit increase of 20.3%. This reflects strong growth in all regions, including Europe, driven by our global market-leading portfolio, including the most recently launched QDOT RF ablation and OPTRELL Mapping Catheters. Operational growth of 3.2% in Surgery was driven primarily by procedure recovery and strength of our biosurgery and wound closure portfolios. Growth was partially offset by the impacts of volume-based procurement in China and supply challenges.

Global growth of 5.4% in Vision was driven by price actions in Contact Lenses and Other, as well as strength of new products, including ACUVUE OASYS 1-Day family of products in Contact Lenses and TECNIS Eyhance, our monofocal intraocular lens in surgical vision. Growth of Contact Lenses was partially offset by strategic portfolio choices and supply challenges although these continue to improve. Global Vision growth was negatively impacted by 100 basis points due to the Blink divestiture.

Orthopaedics' operational growth of 2.6% reflects procedure growth, success of recently launched products, such as the global expansion of our VELYS Digital Solutions and expansion in ambulatory surgical centers, partially offset by the impacts of volume-based procurement in China in Spine and Trauma.

Now, turning to our consolidated statement of earnings for the third quarter of 2023. I'd like to highlight a few noteworthy items that have changed compared to the same quarter of last year. Cost of products sold margin was flat due to favorable patient mix and lower COVID-19 vaccine supply network related exit costs in the Innovative Medicine business, partially offset by commodity inflation, unfavorable product mix, and restructuring related to excess inventory costs in the MedTech business.

Selling, marketing and administrative margins deleveraged 40 basis points, driven by increased expenses across the enterprise. We continue to invest strategically in research and development at competitive levels, investing $3.4 billion or 16.2% of sales this quarter. R&D was leveraged by 120 basis points, primarily driven by portfolio prioritization, partially offset by higher milestone payments in the Innovative Medicine business. Additionally, IPR&D impairments were $206 million in the third quarter of 2023.

Interest income was $182 million in the third quarter of 2023 as compared to $99 million of income in the third quarter of 2022. The increase in income was driven by higher interest rates earned on cash balances, partially offset by higher interest rates on debt balances.

The other income and expense line was an expense of $499 million in the third quarter of 2023 compared to an expense of $226 million in the third quarter of 2022. This was primarily driven by higher unrealized mark-to-market losses on public securities, partially offset by the lower COVID-19 vaccine-related exit costs and lower litigation expense.

Restructuring in the third quarter was $158 million, primarily related to the Innovative Medicine restructuring program announced in the first quarter.

Regarding taxes in the quarter, our effective tax rate was 17.4% versus 16.7% in the same period last year. This increase was primarily driven by a non-deductible, non-recurring pretax charge that occurred in the current quarter. Excluding special items, the effective tax rate is 15.6% versus 15.9% in the same period last year.

As a result of the completion of the exchange offer, Johnson & Johnson is presenting the Consumer Health business financial results as discontinuing operations, including a gain of approximately $21 billion. I encourage you to review our upcoming third quarter 10-Q filing for additional details on specific tax and separation-related matters.

Lastly, I'll direct your attention to the box section of the slide, where we have also provided our income before tax, net earnings, and earnings per share, adjusted to exclude the impact of intangible amortization expense and special items.

Now, let's look at adjusted income before tax by segment. In the third quarter of 2023, our adjusted income before tax for the enterprise as a percentage of sales increased from 35.3% to 37.6%, primarily driven by favorable patient mix in Innovative Medicine, partially offset by unfavorable product mix and commodity inflation in MedTech. Innovative Medicine margins improved from 41.4% to 45.4%, primarily driven by favorable patient mix and R&D portfolio prioritization. MedTech margins declined from 25% to 24.7%, primarily driven by commodity inflation and unfavorable product mix, partially offset by a divestiture gain.

This concludes the sales and earnings portion of the Johnson & Johnson third quarter results. I'm now pleased to turn the call over to Joe Wolk. Joe?

**Joseph J. Wolk**
*Executive Vice President, Chief Financial Officer at Johnson & Johnson*

Thank you, Jessica; and thanks, everyone, for joining us today. This quarter's call marks a new era for Johnson & Johnson with a sharpened focus on Innovative Medicine and MedTech. What has remained consistent is our credo and our commitment to patients. We are privileged to build upon our 137-year legacy of tackling the world's most complex healthcare challenges and helping patients with serious unmet health needs around the world. As we look forward, we are well-positioned to grow our business and innovate across the spectrum of healthcare. We are excited about what's ahead and what we can achieve in the future.

Before we dive into our performance, I want to briefly touch upon other items important to our business. The first is a brief recap of the Kenvue separation, which was formerly completed during the quarter. The transaction was executed within our targeted timeframe and under budget, while generating significant cash and value for our shareholders. Through the separation, we raised $13.2 billion in cash proceeds to the Kenvue debt offering and IPO.

We've reduced Johnson & Johnson's outstanding share count by 191 million shares or approximately 7% without the use of cash and in a tax-free manner. We maintained our current quarterly dividend per share, and we've retained approximately 180 million shares of Kenvue's stock that provides cash proceeds for future flexibility. We will see the full impact to EPS of the share reduction in 2024.

Another item warranting comment is the Inflation Reduction Act. We continue to believe the IRA's price setting provisions are damaging to innovation and will prevent the delivery of transformative therapies and cures to patients. As we await adjudication of legal proceedings initiated by us and others, we did submit all requested information in compliance with CMS's drug price setting scheme to continue supporting patients' access to our medicines that help them stay healthy and live longer.

Moving to segment highlights in the quarter. As Jessica previously shared, our teams delivered strong results in the third quarter, while continuing to advance our pipeline to enhance future growth. Within the Innovative Medicine business, two important regulatory milestones were announced during the quarter. Specifically, we received European Commission approval for a reduced biweekly dosing frequency for TECVAYLI for eligible patients with relapsed and refractory multiple myeloma. And US FDA and European Commission approval of TALVEY, a first-in-class bispecific therapy for the treatment of patients with heavily pretreated multiple myeloma.

Regarding clinical data, we are excited to have an unprecedented seven late-breaking abstracts, including three featured in the Presidential Symposium being presented at the European Society of Medical Oncology Meeting this weekend. Highlights will include the results from all three Phase 3 studies of RYBREVANT in lung cancer, including MARIPOSA, MARIPOSA-2, and PANTHEON. Additionally, updated data from the SunRISe-1 study of TAR-200 in non-muscle invasive bladder cancer will be shared, as well as the first-ever data of TAR-210 in patients with FGFR mutations. We also look forward to presenting Phase 2 data for Nipocalimab in rheumatoid arthritis at the American College of Rheumatology Annual Meeting in November, and have already launched a Phase 2 combination study in RA.

Lastly, we plan to initiate multiple clinical development programs for our Targeted Oral Peptide JNJ-2113. This includes the initiation of the ANTHEM Phase 2b study in ulcerative colitis, which will begin this month, and the Phase 3 clinical program titled ICONIC for adults with moderate-to-severe plaque psoriasis, expected to begin in November.

Moving to MedTech. Notable highlights in the quarter include significant advancements in electrophysiology across our Cardiac Ablation platform. We received FDA clearance from multiple Atrial Fibrillation Ablation products in our portfolio to be used in a workflow without fluoroscopy. This FDA indication is unique to Johnson & Johnson, and is a significant advancement, where caregivers and patients are not exposed to harmful fluoroscopy-related radiation during their cardiac ablation procedures. It also allows for the removal of heavy-lead protective equipment that may lead to orthopedic complications for care teams.

In Pulsed Field Ablation, we have completed our clinical trial in Europe and submitted for CE Mark for our VARIPULSE Catheter. We expect the completion for our US VARIPULSE study to occur in the fourth quarter. We are also simultaneously advancing clinical studies for two additional Pulsed Field Ablation catheters, the STSF Dual Energy Catheter, capable of delivering both PF and RF energy through the same device; and OMNYPULSE, a large-tip focal catheter.

Beyond Electrophysiology, we have completed enrollment in the Abiomed Impella ECP clinical study, a landmark pivotal trial designed to demonstrate the safety and efficacy of the Impella ECP during high-risk PCI procedures. Impella ECP is the world's smallest heart pump and the only heart pump compatible with small pore access and closure techniques. While not a clinical advancement, we have also taken steps in the quarter to improve MedTech's future margin profile, implementing a restructuring program designed to simplify and focus the operations of our Orthopedic business. As part of this two-year program, we expect to exit certain markets and product lines across that business.

We anticipate some short-term modest revenue disruption in Orthopedics of approximately $250 million in total over the next two years given the market and product line exits. But believe these actions will improve our ability to meet demand resulting in accelerated growth and enhanced profitability. The program is expected to be completed by the end of 2025 with total program costs estimated to be between $700 million and $800 million.

Let's now turn to cash and capital allocation. We ended the third quarter with approximately $24 billion of cash and marketable securities and approximately $30 billion of debt for a net debt position of $6 billion. Free cash flow year-to-date through the third quarter was approximately $12 billion, up from the $5 billion we reported year-to-date in the second quarter of 2023.

Our capital allocation priorities remain unchanged. We will continue to execute a strategic and disciplined approach, utilizing our strong credit profile and robust free cash flow generation to prioritize continued investment in our business, increasing dividends on an annual basis, executing strategic business development initiatives for inorganic growth, and executing share repurchases when appropriate.

Moving on to our 2023 guidance update. Based on the strong results delivered in the quarter and the first nine months of this year, balanced with planned investments in the fourth quarter, we are raising the ranges for full-year sales and EPS guidance. We now expect operational sales growth for the full year 2023 to be in the range of 8.5% to 9.0%, or up $600 million at the midpoint in the range of $84.4 billion to $84.8 billion on a constant currency basis and adjusted operational sales growth in the range of 7.2% to 7.7%.

Just a reminder, our sales guidance continues to exclude any COVID-19 vaccine revenue. While we do not speculate on future currency movements, utilizing the euro spot rate as of last week at $1.06, we now anticipate an incremental negative currency impact of $400 million, resulting in a full-year impact of negative 1% or $800 million.

Looking across the P&L. Adjusted pre-tax operating margin is still expected to improve by approximately 50 basis points versus prior year, driven by stronger margin profile and business mix. Net other income is also being maintained ranging from $1.7 billion to $1.9 billion. Due to higher interest rates earned on our cash, we now expect net interest income in the range of

$300 million to $400 million.

And finally, based on current tax law, our estimate for the effective tax rate for 2023 will be between 15.0% and 15.5%. These revised estimates translate to an increase in our adjusted operational earnings per share guidance by $0.10 at the midpoint. Our new range is $10.02 to $10.08, or 12.5% growth at the midpoint and adjusted reported earnings per share in the range of $10.07 to $10.13, or 13% growth at the midpoint.

Since January, we've been able to increase our guidance throughout the year for a cumulative impact of $3 billion on operational sales and $0.25 on adjusted operational earnings per share, which includes absorbing $0.10 for our licensing deal with Cellular Biomedicine Group announced in the second quarter of 2023.

Now, I appreciate that many of you are turning your attention to 2024, and our teams are actively finalizing our plans for next year. With that context, allow me to provide some preliminary perspectives for you to consider.

For Innovative Medicine, we remain confident in our ability to deliver growth from key brands and anticipate continued progress from our newly launched products, all advancing our robust pipeline with many exciting data readouts, filings and approvals ahead of us. This includes data presentations and regulatory submissions for TREMFYA in IBD, presenting data from our Phase 3 study of Nipocalimab in Myasthenia Gravis, and readouts from two Phase 3 ERLEADA trials in early-stage prostate cancer. We do not expect the entry of STELARA biosimilars in the United States during 2024. However, as a reminder, STELARA does have a composition of matter patent expiry in mid-2024 in Europe.

For MedTech, we expect our commercial capabilities and continued adoption of recently launched products across all MedTech businesses will continue to drive our growth and improve competitiveness, while continuing to advance our pipeline programs, including innovation in Pulsed Field Ablation, Abiomed and Surgical Robotics. We expect procedures in 2024 to remain consistent with elevated 2023 levels.

With respect to tax, as you may be aware, the European Union member states are in the process of enacting the EU's Pillar 2 Directive, which generally provides for a 15% minimum tax rate as established by the OECD Pillar 2 Framework. The first EU effective date for certain aspects of the law is January 1st, 2024. As a result, we currently estimate it up to a 1% tax rate increase in 2024. In addition, the US Treasury's current perspective on Pillar 2 will be harmful as it relates to the treatment of US incentives for innovation and will result in US-based multinational companies paying more tax revenue to foreign governments.

Regarding share count given the Kenvue separation, the full benefit of the approximately $191 million net share reduction in Johnson & Johnson shares outstanding from the exchange offer will be reflected in our 2024 financials.

And, finally, while we don't speculate on future currency impact, utilizing the current euro spot rate would yield an approximate $0.15 negative currency impact on 2024 full-year adjusted earnings per share.

We are pleased with our strong performance during the first nine months of this year and have positive momentum as we move into 2024. We look forward to sharing more about the strength of our business, promise of our Innovative Medicine and MedTech pipelines, and the long-term strategy of Johnson & Johnson at our upcoming enterprise business review on December 5th at the New York Stock Exchange. More information, including an overview of the day's schedule, will be shared shortly. We hope you will be able to join us either in person or on the available webcast.

I want to conclude my remarks by thanking our teams around the world for their continued hard work and unwavering commitment to excellence on behalf of our patients. We are confident that our strategy will position us to deliver long-term growth and create significant value for our shareholders.

With that, it's my pleasure to turn to Kevin and begin the Q&A portion of the call.

### Is Gold Really Boring? (Ad)

Many investors perceive gold as a "boring" investment. But according to MoneyWeek, that's a good thing. Gold helps investors sleep soundly as it preserves wealth and creates a hedge against inflation. Today, there's a unique way to invest in gold, with real advantages over coins and mining stocks.

See why this could be a huge untapped gold

## Questions and Answers



**Operator**

Thank you. [Operator Instructions] Our first question is coming from David Risinger from Leerink Partners. Your line is now live.

**David Risinger** 
*Analyst at Leerink Partners*

Thanks very much for taking my question, and congrats on the strong financial performance. So, my question is on benchmarking MARIPOSA results, please. Could you share your thoughts on key considerations, including AstraZeneca's recent FLAURA2 results, which included a nine-month PFS benefit? Thanks very much.


**John C. Reed**
*Executive Vice President, Pharmaceuticals, R&D at Johnson & Johnson*

Hi. John Reed here. It's great to join the call. This is my first time as a newcomer to J&J. And before I answer your question, David, I would just like to say I have to tell you I'm really enjoying being a new member of the J&J team. I've really been impressed with the culture inspired by our credo with the caliber of our talent, our people here at J&J, and with a really strong performance of the pipeline.

We've already launched two NMEs this year, AKEEGA for prostate cancer and TALVEY for myeloma continuing our tradition in bringing new therapies and those agents and we're positioned to deliver an average of more than two NMEs per year between now and the close of the decade 2030. So, the pipeline is very robust, and it's exciting to be here and to be a part of it.

So, on to your question, the data will be presented at ESMO in a Presidential session. So, we are embargoed until then. Abstracts will be available on Wednesday. I can only say that the RYBREVANT-Lazertinib combo did perform well head-to-head against Osimertinib. Our regimen is a chemo-free option for patients, which we think is important, and we'll present those data at ESMO.


**Operator**

Thank you. Next question today coming from Matt Miksic from Barclays. Your line is now live.

**Matt Miksic** 
*Analyst at Barclays*

Hi. Thanks so much for taking the question. So, I think most folks may look at the Orthopedic results in medical devices maybe being a little bit softer-than-expected. And I know that's not everything by a long shot for J&J. But given the expectations were for kind of continued strength heading into Q3, if you could talk maybe a little bit about your comment on more traditional seasonality and thoughts on the sustainability of that strength, as well as the sort of divestiture and sort of realignment plan, Joe, that you described? Thanks.


**Joaquin Duato**
*Chairman and Chief Executive Officer at Johnson & Johnson*

So, thank you for the question. And, yeah, I mean, our results in Orthopedics were 2.6% growth overall. And part of it, as you mentioned, is driven by seasonality. As we have commented, we are in a journey of improvement in Orthopedics. We want to be number one and number two in every segment we compete. And that is a place where we are not there yet, but we are very confident that we are going to continue to make improvements by investing and by growing in the highest growth segments.

We have made improvements in our portfolio. For example, on the Knees side. We have a more complete portfolio now on the Revision side, on the Cementless side. We are launching now our VELYS Orthopedics, total robot -- total knee surgery replacement in Europe. And we already have about 30,000 procedures that have been performed with our VELYS robotic system.

Overall, we are increasing our penetration also in the ASCs, which is a fast-growing segment, and we see our performance continue to improve in the US and globally. In this particular quarter, we also had some impact due to the impact of value-based procurement in China and also because of the impact of the Russia sanctions that was mentioned already in the prepared remarks.

So, overall, in Orthopedics, we are determined to continue our journey of improvement. We are focusing in having the right portfolio. We have a very strong team in the field. And, as Joe has announced, and Joe can comment on that, we have a plan to be able to continue to improve our margins in Orthopedics.



**Joseph J. Wolk**
*Executive Vice President, Chief Financial Officer at Johnson & Johnson*

Yeah. Just very quickly, Matt. Thanks for the question. With respect to the restructuring program that we announced specifically in Orthopedics, we're looking to exit those less profitable markets and product lines. So, we'll have some, clearly, inventory write-downs as a result of that. Over the next two years, there will be some modest revenue disruption, but we actually do think these actions not only accelerate growth going forward, but will improve profitability.

**Operator**

Thank you. Next question is coming from Chris Shibutani from Goldman Sachs. Your line is now live.

**Chris Shibutani**
*Analyst at The Goldman Sachs Group*


Great. Thank you very much. Can you provide us with some insight into updates on the talc litigation process? And then, secondly, if you could just comment, Joe, you used the word voracious last time with your appetite for business development opportunities. How does that word stand still in terms of your appetite on the fore? Thank you.



**Joseph J. Wolk**
*Executive Vice President, Chief Financial Officer at Johnson & Johnson*

Hey. So, Erik, why don't I turn it over to you to discuss the talc litigation matter, and then I'll come back and answer Chris's second question?



**Erik Haas**
*Worldwide Vice President of Litigation at Johnson & Johnson*

Great. Thanks, Joe. The short answer is that we continue to pursue the four-pronged strategy that we communicated back in July. So, let me quickly summarize those four-prongs and highlight the selling and development and perhaps anticipate some follow-up questions about talc.

So, the first prong, we are pursuing the appeal through to the Supreme Court to the United States of the July ruling by the New Jersey Bankruptcy Court that dismissed LTL's bankruptcy case. Notably, our appeal recently was joined by council representing the vast majority of the talc claimants. Also, thereafter, the Bankruptcy Court certified the case for a direct appeal to the Third Circuit bypassing the District Court, because the Bankruptcy Court found that the appeal raises matters of significant public interest, the resolution of which would materially advance the progress of the case, and we fully agree with that assessment.

On the merit, the appeal challenges both the validity, as well as the application of the novel standard that was imposed by the Third Circuit that requires a showing of, quote, immediate financial distress, to proceed with the bankruptcy case. That immediate financial distress requirement, which the Third Circuit did not specifically define is nowhere in the bankruptcy code, and is contrary to the standards that are implied by other Circuits. Moreover, under any reasonable interpretation of that standard, we believe the record has fully established that LTL faced immediate financial distress due to the large volume of talc claims that were asserted against it.

In terms of timing, the Third Circuit could rule at any moment whether it will take the direct appeal or not. If it does, we expect briefing to take place over the next couple of months with a decision in the early-2024 timeframe. And because we do anticipate the Third Circuit primarily affirm the application of its standards, we will immediately, thereafter, request the Supreme Court to resolve the Circuit split and decide if the Third Circuit's novel approach is an appropriate standard for deciding a motion to dismiss, we do not think it is. We hope to squeeze the serve petition to the Supreme Court into the first term in 2024. But if not, we will raise it in the second term.

The second prong of our strategy involves working with the council, representing the vast majority of the talc claimants, more than we had previously, that were along with us, along with the -- and in addition to the future claims' representatives. And together with the council and the future claims representatives, we're pursuing a consensual resolution of the talc claims through another bankruptcy. And that is exactly what the Bankruptcy Court, the New Jersey Bankruptcy Court urged and strongly recommended that we do, and its decision that actually dismissed the case. And the New Jersey Court made those recommendations having found that LTL had made remarkable progress towards an equitable and efficient resolution to-date. So, we are continuing on in that process.

In terms of timing on the second prong, the consensual resolution is on the same trajectory as the initial bankruptcy plan with a vote expected in the next six months to determine whether the requisite supermajority of claimants support the plan.

Third, while those negotiations are proceeding, we will continue to vigorously defend the meritless talc claims in the tort system. As you may have seen just this last week, we had a significant favorable ruling in that regard with the New Jersey's Appellate Court in the Barden case, reversing a $223 million verdict against the company. The Appellate Court reversed because it determined the opinions of the leading plaintiff's experts were unsound, were unscientific, and were unsubstantiated. And it is that baseless nature of those expert opinions why we have prevailed in the vast majority of the cases that have been tried to-date.

In terms of timing of the litigation, there are two additional mesothelioma cases that we expect will be tried this year with more to come in 2024. As with the Barden case, it's important to keep in mind that the ultimate resolution of those matters often is determined at the Appellate level, not at the trial level, which is the place and which occurs in the forms that the plaintiff lawyers choose.

Finally, we will aggressively challenge the abuses of the judicial system by the mass tort claims, Barden and its experts with their own affirmative litigation. We mentioned last time that we brought two actions against the plaintiff as far as lead experts for defaming our talc products with publications premised, unknowingly false propositions, and those are moving forward. They've been fully briefed with respect to the initial case motions. And in terms of timing, we expect a ruling shortly from the Federal District Court in New Jersey whether those matters may proceed to the discovery phase.

So, that's a quick summary. I'd be happy to answer any follow-up questions you may have regarding the strategy.

**Joseph J. Wolk**
*Executive Vice President, Chief Financial Officer at Johnson & Johnson*

Great. Thank you, Erik. Chris, regarding your second question, if J&J had a nickel for every time voracious was quoted back to me since the second quarter earnings, we probably could have taken up guidance even a little bit more. And while that's often associated with wanting or devouring great quantities, I think it's really the second definition in Webster's, where having a very eager approach to an activity is the construct in which I meant that term in the second quarter.

So, I could have said that five years ago, 10 years ago, my predecessors could have said that. We routinely, almost weekly meet on new opportunities that may complement our existing portfolio or our future pipeline in both MedTech and Innovative Medicines, and the current moment is no different. In fact, we're in a very good position given the low levels of net debt, the cash we were able to raise to fulfill one of our capital allocation priorities, which you're probably very, very familiar with at this point in time.

But we're not going to compromise on our principles in making sure that it's a strategic fit. So, it fits into the scientific expertise, the commercial capabilities with a global reach that will add value to that asset in our hands versus someone else. And we're going to make sure that we're disciplined in that approach financially by ensuring that we have a return that's commensurate with the risk that we're bearing on behalf of shareholders.

So, we'd much rather have an okay deal pass us by than make a bad deal. And that's kind of the principles that we live into. There's no deal that's too big given our credit rating, as well as our financial strength and annual cash flow generation. But, as you know, we've had great success doing smaller earlier stage deals as well. We're agnostic with respect to whether it'd be -- the next one being MedTech or Innovative Medicines, we are simply looking for the best-qualified deal that meets both strategic and financial parameters.

So, hopefully, that answers your question. Next question, Kevin?



**Operator**

Our next question is coming from Geoff Meacham from Bank of America. Your line is now live.

**Geoff Meacham**
*Analyst at Bank of America Merrill Lynch*



Hey, guys. Good morning. Thanks so much for the questions. I'll stick with one. So, on CARVYKTI, can you talk about the commercial backdrop just with respect to new centers or prescribers? And related on manufacturing, you guys have any update on the vector constraints and maybe when that could be relieved? Thank you so much.



**Joaquin Duato**
*Chairman and Chief Executive Officer at Johnson & Johnson*

Thank you, Geoff. And as you have seen in the progression quarter-over-quarter of CARVYKTI, we continue to have, on one hand, strong demand, and on the other hand, a progress in our manufacturing. We're also very encouraged by the data that came out with CARTITUDE-4 that eventually, we make CARVYKTI also a medicine in earlier lines of therapy.

So, when it comes to our manufacturing progress, I'm going to let John explain what are we doing in order to be able to supply the strong demand that we are seeing in CARVYKTI to-date. Overall, what you can expect, Geoff, is that you will continue to see quarter-over-quarter improvement in 2023 into also 2024.



**John C. Reed**
*Executive Vice President, Pharmaceuticals, R&D at Johnson & Johnson*

Yeah. To follow up on Joaquin's comments, we've been progressively adding more and more capacity that's included at our original launch site in New Jersey, but we are close to having an additional manufacturing site up and rolling in Europe, in Belgium. And also, have recently increased our capacity by using some excess capacity that Novartis had to further bolster the number of slots that we can accommodate.

One of the traditionally rate-limiting components of the therapy has been the lentivirus component. And there, we've made really outstanding progress in-house, mastering that technology, increasing the scale at our factory in Switzerland. And we're in the process -- we're building -- and I think it will be available next year, another factory in the Netherlands to support the lentivirus component, which has sometimes been one of the rate-limiting aspects. So, altogether, the capacity continues to ramp up, and we continue to perfect the technology, I would say. Same thing with the number of centers that are qualified to administer the therapy and we're also making progress on the number of countries where CARVYKTI will be available.

So, very excited, obviously, about the momentum with that, really best-in-class CAR therapy. The CARTITUDE-4 data, as you know, showed unprecedented progression-free survival benefit, a hazard ratio of 0.26, overall response rate of 99%, 86% complete response, very durable for a one-and-done therapy that was well tolerated. The Grade 3 or above cytokine release syndrome was only 1.1%. So, this is really, I think, now emerging as the preferred second-line therapy. And we hope to do more, such as bringing the front line as a possible alternative to stem cell transplant.

**Joaquin Duato**
*Chairman and Chief Executive Officer at Johnson & Johnson*

And, Geoff, to your point, in multiple myeloma and new product launches, we are also very encouraged by the launch of TECVAYLI and also the recent approval of TALVEY. The progression of these medicines is exceeding our internal expectations. And we already have about 2,000 healthcare professionals in the US that are REMS certified to be able to administer

TECVAYLI and TALVEY. So, very encouraging progress in these two medicines in multiple myeloma, and we expect to be able to break out TECVAYLI sales beginning in 2024.

Ex. 2



**Operator**

Thank you. Next question is coming from Josh Jennings from TD Cowen. Your line is now live.

**Josh Jennings**
*Analyst at TD Cowen*

Hi. Good morning. Thanks for taking the questions. I was hoping to ask on STELARA and the biosimilar competition in the US now expected in 2025. That's not new news. But wanted to check on how beneficial is the extra year for the Innovative Medicine business's defense strategy. I guess, focusing on just the potential for TREMFYA to take share from slorent [Phonetic] psoriasis and psoriatic arthritis and inflammatory bowel disease indications. And this timing should provide more confidence in the potential to hit the constant currency revenue target set for 2025 for the pharma unit? Thanks.

**Joaquin Duato**
*Chairman and Chief Executive Officer at Johnson & Johnson*

Thank you for the question. Certainly, we have always been very confident in being able to hit our $57 billion target in 2025 for pharma.

As I have explained before, there are a number of factors there. The first one and most important is the growth that we're having in our key assets: TREMFYA, ERLEADA, UPTRAVI, our long-acting injectables and, especially, DARZALEX. We continue to have a tremendous trajectory gaining share in first-line. We are encouraged, as I just commented, by the launches of CARVYKTI, the progression of SPRAVATO, and also the recent launches too also in multiple myeloma of TECVAYLI and TALVEY.

And looking into 2024, the remainder of the year, and also into 2025, we have some very exciting news in our pipeline. Some of them have been already commented. For example, the first chemo-free regimen as first-line in EGFR mutated non-small lung cancer. We will be presenting the data of MARIPOSA at ESMO, and that potentially will be a filing and an approval in 2025. This would be a new standard of therapy in this line of therapy in this very important need for patients.

We also continue to be encouraged by the progress in our TARIS drug delivery platform. You are also going to see data being presented at ESMO. Very important for us. In two existing products, we will be presenting data on TREMFYA in IBD, both in Crohn's and in ulcerative colitis for a potential approval later in 2024. That's going to be a very significant growth driver for TREMFYA.

Take into consideration that in the STELARA case, IBD represents 75% of the sales. So, we still have a lot of growth in front of us with TREMFYA as we do also in ERLEADA in which we will present data in localized high-risk prostate cancer. We're also going to be able to present some data of Nipocalimab in Myasthenia Gravis end of this year. So, all in all, very good news for our pipeline in 2024 and 2025. Certainly, the entrance of the biosimilars in 2025 in the US is another factor that builds our confidence that we are going to be able to meet the $57 billion.

For me, the most important thing now is to look forward and to think about the growth profile of our Innovative Medicine group into the second half of the decade. We have a number of growth drivers that are already there, that I've described, but also the strength of our pipeline, both in immunology, in oncology, and in neuroscience profiles us as a strong company, as a strong growth profile into the second half of the decade. And that's part of what we will be looking forward to discussing with you in our upcoming enterprise business review, focusing on what is going to be the growth profile in the second half of the decade.



**Operator**

Thank you. Next question is coming from Chris Schott from J.P. Morgan. Your line is now live.

**Chris Schott**
*Analyst at J.P. Morgan*

ATL-L -002648-15   12/08/2023 9:16:57 PM   Pg 13 of 18   Trans ID: LCV20233584887
Case 3:16-md-02738-MAS-RLS   Document 28976   Filed 02/02/24   Page 36 of 221 PageID: 172429

Ex. 2

Great. Thanks so much for the question. And, maybe, Joe, just a little bit more color on 2024. I appreciate the details you provided. Seems like a year of another healthy topline growth. But can you just give us some directional color on margins next year? I know there are some dissynergies with Kenvue this year. I'm just trying to get a sense of how you think about margin progression here as you kind of balance some of these kind of the pipeline opportunities and some of these topline growth initiatives versus kind of dropping that to the bottom line. So, just any directional color would be appreciated. Thanks.



**Joseph J. Wolk**
*Executive Vice President, Chief Financial Officer at Johnson & Johnson*

Yeah. Sure, Chris. Thanks for the question. So, first off, we're very pleased with the margin progress that we've been able to make in 2023. I think, we started the year to roughly flat to now improving by 50 basis points. A lot of that has really gone -- is directly attributable to the efforts of many people in the organization, who really took the opportunity to look at our infrastructure as a two-segment company versus a three-segment company.

So, the dissynergies that we warned about and talked about early on in the Kenvue separation process really haven't come to manifest. In fact, as we look out to 2024, we see minimal to almost no impact from dissynergies from the separation. We are in the process of finalizing our business plans for 2024. I'd like to get a little bit better assessment of how the clinical development pipeline is shaping up, what the investments are required there. But we're a larger company, we take the opportunity to look each and every year at efficiencies. So, we're not in a position to give you margin guidance right now. But I would expect that something similar to, you know, where we started this year would not be a bad starting point for next year.

Again, it's going to depend on the investments that the R&D teams from both MedTech and Innovative Medicines can bring forth. And we'll, obviously, look to accelerate bringing some of these great products to patients sooner if we have that opportunity.



**Operator**

Thank you. The next question is coming from Larry Biegelsen from Wells Fargo. Your line is now live.

**Larry Biegelsen**
*Analyst at Wells Fargo & Company*

Good morning. Thanks for taking the question. Joe, just -- could you just clarify what you meant by flat procedures in 2024 in MedTech? Are you assuming -- does that mean flat in MedTech growth? And just for my question, can you talk about what you're seeing with bariatrics for GLP-1 this is and how you're thinking about the potential impact of GLP-1s across your device business, long term, especially in cardio and ortho? Thank you.



**Joseph J. Wolk**
*Executive Vice President, Chief Financial Officer at Johnson & Johnson*

So, I'll give the second half of that question to Joaquin, but thanks for the clarifying question with respect to market growth. We are not suggesting flat market in MedTech next year. What we do is -- are foreseeing right now based on what we know today is the elevated levels, the market overall being 5% to 7% versus what traditionally has been maybe 4% to 6%. We see that same 5% to 7% next year.

Joaquin?

**Joaquin Duato**
*Chairman and Chief Executive Officer at Johnson & Johnson*

Thank you. And thank you, Larry. And taking a step back, we see the evolution of our MedTech business in a very positive way. One of our key goals for us is to be a top-tier grower in MedTech. When I look at the results of MedTech this year, we are delivering on that. Our growth in the quarter, pro forma was 6.4% when you compare with Abiomed as a stand-alone company. And when you look at our pro forma growth year-to-date in MedTech is 7.9%. So, very pleased with the performance

of our MedTech business. And we have expectations to continue our progression into 2024 in part fueled by the procedural growth that we see and also by our continued improvement in our execution and the launch of new products. Some of them we can discuss later. For example, we will be launching our first PFA catheter in Europe into 2024.

And when it comes to GLP-1s, it's good for patients to have new options for treatment, especially in obesity, which at times has been a stigmatized disease in which patients were not looking for treatment due to the stigmatization of that. Certainly, as you commented, we're seeing some impact in our bariatric business in the short term as some patients are reconsidering surgery, expecting to get treatment. But, overall, when we talk to surgeons, bariatric surgeons, what they see is a complementary role of surgery and GLP-1s. And many of them comment on the fact that they could see a tailwind for bariatric surgery down the road, given this complementary nature, the increased awareness about obesity, more patients seeking treatment. And many of the patients, about 30% of them, are not going to be tolerating these medications. So, there would be another funnel for our bariatric business.

In the rest of our MedTech business, at this point, we continue to see robust procedure increase, and we don't anticipate that change -- that thing -- that then changing in the foreseeable future.

 **Operator**

Thank you. Next question is coming from Terence Flynn from Morgan Stanley. Your line is now live.

**Terence Flynn** 
*Analyst at Morgan Stanley*

Great. Thanks so much for taking the question. I was just wondering if you could elaborate a little bit more, John, on Nipocalimab in RA. I know, we're going to see the full data here at ACR. But is this a drug that you see potentially working in a broad population, or is there a biomarker subset group that's more likely to respond? And then, how are you thinking about Phase 3 plans here in this indication? Thank you.

 **John C. Reed**
*Executive Vice President, Pharmaceuticals, R&D at Johnson & Johnson*

Yeah. Thanks for the question, and we look forward to sharing those data at the ACR in November in San Diego. We're looking at Nipo as either a monotherapy combined with the precision medicine strategy or as a combination for a broad population, where we aim to combine with an anti-TNF agent. And we see those two mechanisms as being very complementary, reducing the levels of autoantibodies with Nipo and then inhibiting inflammatory mechanisms with the TNF. That so-called DAISY study, the Phase 2 is underway now, and we'll test that combination. So that, in general, has been the way we're looking at RA, not only for Nipo, but other agents in our pipeline, where we see the future being monotherapies that are targeted in a precision medicine way or broad therapies that are combos that can bring together synergistic mechanisms in a safe way. We're excited to be launching the DAISY program to look at that combo. And we're hoping that that will bring deeper, more durable remissions for patients as we bring those new mechanisms together.

 **Operator**

Thank you. Next question is coming from Joanne Wuensch from Citibank. Your line is now live.

**Joanne Wuensch**
*Analyst at Citibank*

Good morning, and thank you for taking the questions. Is it possible to give us a little bit more detail on a couple of things? You mentioned headwinds from VBP. And I'm just curious if there's: A, a way to quantify it; and B, a way to say if it's at least better or worse or the same as it has been in the last couple of quarters? And then, similarly, in other aspects of China, we've been hearing a lot about anticorruption policies, etc. If you could comment on that, that would be great. Thank you.

 **Joaquin Duato**
*Chairman and Chief Executive Officer at Johnson & Johnson*

Thank you, Joanne. And, first, let me say that China for us is a key market and a market in which we are, you know, delivering growth now, and we are going to continue to deliver a strong growth into 2024. So, it's a key growth driver for us.

So, on one hand, certainly, VBP represents a headwind in price. And, on the other hand, it also represents an opportunity as you can expand quality products, medical technologies into more patients. So, there are a number of MedTech platforms now currently undergoing VBP headwinds; Electrophysiology, Spine, Trauma and Endocutters and Energy. And these effects will last during 2023 and part of 2024. We have already anniversary our large joints, VBP. So, at this point, we have about 80% of our platforms that have been already affected by VBP. Again, as we look into 2024, we expect to continue to deliver a strong growth in China, and China remaining a key part of our growth.

When it comes to the question that you were asking on anticorruption side, we have a strong culture of compliance in our business. And, at this point, we may see some limitations related to physician and surgeon access, but we are not seeing any material impact in any part of our business due to that, and we'll continue to monitor the situation. Overall, as I said, we'll continue to see China as a key driver of our growth, and also as a key source of innovation moving into the future.



**Operator**

Thank you. Next question is coming from Vamil Divan from Guggenheim Securities. Your line is now live.

**Vamil Divan**
*Analyst at Guggenheim Securities*

Great. Thanks for taking my questions. I just want to maybe dive a little deeper on the immunology side. I appreciate the comments you made there. Already for the quarter the performance was very strong for several of your products there. So, I'm just curious if there were any sort of one-time items there that we should be aware of. It sounded like there's a lot about patient mix and market growth that you are sort of commenting on. I'm curious if you can just highlight getting into store stocking or sort of one-time pricing adjustments that we should take into account as we look at future quarters? Thank you.



**Joaquin Duato**
*Chairman and Chief Executive Officer at Johnson & Johnson*

Thank you. We are very pleased with the performance of our immunology business, especially we're pleased with the performance of TREMFYA with 25.1% growth in the quarter, which shows our ability to drive growth there. As I said before, TREMFYA currently is now indicated in psoriatic arthritis and psoriasis as an analog in the case of STELARA, that represents about 25% of the sales. So, with the upcoming readouts, filing, and potential approvals of ulcerative colitis and Chron's disease, we expect to have significant growth in TREMFYA. We talk about TREMFYA as a $5 billion product earlier in our Analyst Day in 2021. Now, you can see clearly that we're going not only to meet that, but to clearly exceed that benchmark for TREMFYA.

So, when it comes to STELARA, we had also a very robust growth of close to 16%. In that case, there is a prior period adjustment in the quarter a year ago that represents about 600 basis points. So, you should take that into consideration when you think about the STELARA growth.

We are very pleased overall, as I said, with our immunology portfolio. Overall, our immunology portfolio in the quarter grew 12.4%, which is very strong considering that we also have headwinds there of REMICADE biosimilars. And we remain very excited about the immunology portfolio as a key driver for J&J. Our Innovative Medicines are going to be bringing significant improvements there in IBD with TREMFYA, as I'd recall. But, also, staying there, we have our targeted oral peptide, which is going to be – presenting some data soon that we already presented data in psoriasis. And, also, we have the combination of Guselkumab and Golimumab in IBD, which has presented also groundbreaking results. So, very encouraged about our immunology portfolio and the ability to drive growth in the second half of the decade more to be seen in our EBR later in the year.



**Operator**

Thank you. Next question is coming from Danielle Antalffy from UBS. Your line is now live.

**Danielle Antalffy**
*Analyst at UBS Group*

Hey. Good morning, everyone. Thanks so much for taking the question. Ahmet, I wanted to actually bring you into the conversation here and ask about some of the innovation in MedTech and, you know, specifically, you guys have an Ottava Day coming up. And just curious what you can say about: A, what we can expect to see, obviously, appreciating you're not going to totally open the kimono and front run the day; but B, and probably most importantly, sort of where you see Ottava ultimately fitting into the robotics landscape and helping contribute to a continued move higher robotics penetration? Thanks so much.

**Ahmet Tezel**
*Group Chairman and Global Head of MedTech Innovation and R&D at Johnson & Johnson*

So first of all, thank you for the question. Similar to John, this is my first call as well. So really excited to be here, equally excited to be leading a team of talented scientists, engineers, and physicians as we do a lot smarter, less invasive and more personalized solutions for our patients.

So with respect to Ottava, we have made great progress on the platform. The team is really focused on combining a really differentiated architecture based on its software and hardware together with our best-in-class instruments, and we believe that combination of a differentiated architecture with instruments is going to enable us to have high value from day one.

Now, we will have more updates on Ottava next month, as you mentioned. And at that time, we will provide a lot more detail. But the one point I'll make is that even today, robotic-assisted surgery penetration is in single digits. So there's still a lot of growth left in that segment. And we're really excited because Ottava brings a lot of differentiation. So we're very excited that we can make a big kind of path -- we can open our path and growth there in that segment as well.

**Joaquin Duato**
*Chairman and Chief Executive Officer at Johnson & Johnson*

Danielle, if I may interject here on Ottava, I've been in touch with multiple surgeons around the world. And one common -- comment that I find is that they all want. They are all rooting for Johnson & Johnson to come into the robotic surgical space. They want to have the service and the support that they have accustomed doing decades with our Ethicon business and they also want to be able to utilize the advanced instruments with whom they have grown. So what I see in the surgical space is that the surgeons want to have alternatives and they are all looking forward to having Johnson & Johnson play an important role in robotic surgery.

**Jessica Moore**
*Vice President - Investor Relations at Johnson & Johnson*

Thank you, Danielle. We have time for one last question.

**Operator**

Thank you. Our final question today is coming from Louise Chen from Cantor Fitzgerald. Your line is now live.

**Louise Chen**
*Analyst at Cantor Fitzgerald*

Hi. Thanks for taking my question. I wanted to ask you on the FLAURA2 result, if they impacted at all your thinking on your market opportunity for MARIPOSA? And why or why not? Thank you.

**John C. Reed**
*Executive Vice President, Pharmaceuticals, R&D at Johnson & Johnson*

No, I don't think it influences, because it's really important to pay attention not only to progression-free survival, but also overall survival, as well as the PFS to the survival on the second line of therapy. Unfortunately, with today's therapies, almost all lung cancer patients will eventually relapse. They will need a second-line therapy. And we think chemo was best reserved

for that circumstance, where the patient now has failed the frontline targeted therapies.

So I would really say, pay attention to overall survival, pay attention to that progression-free survival to endpoint because these are going to be, I think, really things that matter in terms of what the long-term outcome is for patients with EGF receptor mutant lung cancer. The -- we -- we believe based on the data we'll present in the Presidential session at ESMO that the combination of RYBREVANT, our bispecific antibody, the first bispecific ever approved for a solid tumor indication incidentally, fully human, as well as the third-generation small molecule oral EGF receptor Lazertinib, which is brain penetrant, I remind. We believe that, that will become the new frontline standard of care for EGF receptor mutant lung cancer and offer patients durable remissions that are achieved in a chemo-free regimen.



**Operator**

Thank you.



**Jessica Moore**
*Vice President - Investor Relations at Johnson & Johnson*

Thank you and thanks to everyone for your questions and your continued interest in our Company. We apologize to those that we couldn't get to because of time, but don't hesitate to reach out to the Investor Relations team with any remaining questions you may have.

I will now turn the call back to Joaquin for some brief closing remarks.

**Joaquin Duato**
*Chairman and Chief Executive Officer at Johnson & Johnson*

Thank you, Jess, and thank you to all of you for joining us today. I'm proud to present today the company's performance. This is the first quarter that we report as a new J&J, focused in health care innovation, in MedTech, and in Pharmaceuticals. And I believe this -- this new J&J has a better foundation to continue to drive growth for the next decade.

We are achieving strong results in 2023 with our 7.5% adjusted operational growth in the quarter. It's the second quarter in a row that we have a -- beat and raise of our guidance. And we continue to believe that we're going to have a very strong finish into 2023. And that reads well for a strong 2024 too. We have a dedicated team both in Innovative Medicines and in MedTech. And we think we are very well positioned, as I said, to carry the momentum that you are seeing in 2023 into 2024.

Finally, we are looking forward to engaging all of you at enterprise business review on December 5th. Thank you very much and enjoy the rest of your day.



**Operator**

[Operator Closing Remarks]

Powered by

AlphaStreet

# More Earnings Resources from MarketBeat

## As Featured By:

BARRON'S   Entrepreneur   Forbes   Inc.   Investing.com   Nasdaq   PRAIRIE business   Seeking Alpha

**Empowering Individual Investors**

345 N Reid Place, Suite 620, Sioux Falls, SD 57103
contact@marketbeat.com
(844) 978-6257

**ABOUT MARKETBEAT**

About

Editorial Guidelines

Press Room

Help and How-To

Careers

Contact

**POPULAR TOOLS**

Stock Lists

Compare Stocks

Dividend Calculator

My MarketBeat

Stock Screener

**FINANCIAL CALENDARS**

Analyst Ratings

Dividends

Earnings

Insider Trades

Stock Market Holidays

**TERMS & INFO**

Advertising

Accessibility Statement

Do Not Sell My Information

Privacy Policy

RSS Feeds

Terms of Service

© American Consumer News, LLC dba MarketBeat® 2010-2023. All rights reserved.

© 2023 Market data provided is at least 10-minutes delayed and hosted by Barchart Solutions. Information is provided 'as-is' and solely for informational purposes, not for trading purposes or advice, and is delayed. To see all exchange delays and terms of use please see **Barchart's disclaimer**.

# EXHIBIT 3

| From: | James Conlan |
|---|---|
| To: | Van Arsdale, Duane [JJCUS] |
| Cc: | Douglas Dachille; Doug Dachille; Haas, Erik [JJCUS]; White, Andrew [JJCUS] |
| Subject: | [EXTERNAL] Re: Legacy Liability Solution |
| Date: | Wednesday, October 18, 2023 4:21:12 AM |

---

**WARNING:** This email originated from outside the company. Do not click on links unless you recognize the sender and have confidence the content is safe. If you have concerns about this email, report it by clicking on the "Report Suspicious Email" button in the Outlook toolbar above.

---

Duane,

Thank you for your efforts to evaluate our proposal. To further enhance our solution and to address potential auditor concerns, Legacy has the support of lead counsel for the OC Claimants (including Andy Birchfield) for an MDL opt-in settlement matrix with Legacy that will require (and is expected to garner) a 95% opt-in of current OC Claimants. The establishment of a settlement matrix should greatly reduce the uncertainty surrounding the estimation of future claims and the associated challenges of determining the quantum of funding necessary for your auditors to remove the non-cash charge for J&J's current and future talc related liabilities.

Andy Birchfield, Doug Dachille, and I are prepared to meet with you, and your team, in person to share and discuss the terms of such matrix as part of the Legacy acquisition.

Thank you again for your time and consideration.



**James F. Conlan**
Chief Executive Officer and Co-Founder
Legacy Liability Solutions
Bermuda | Dallas | Chicago | Paris
Email | james.conlan@legacyliability.com
Mobile | +312.927.7572
www.legacyliability.com

On Oct 6, 2023, at 12:43 PM, Van Arsdale, Duane [JJCUS]
<DVanArs@its.jnj.com> wrote:

Hi Doug and Jim,

Thank you for the follow-up note to our discussion a few weeks ago.

To close the loop, we have discussed both internally and with our auditors, and at this time, we do not have an interest in pursuing this strategy.  While unlikely, we will let you know if this perspective changes in the future.

Thanks again for your time and thoughts.

Duane

---

**From:** Douglas Dachille <ddachille@non-canonical.com>
**Sent:** Thursday, September 28, 2023 10:16 PM
**To:** Van Arsdale, Duane [JJCUS] <DVanArs@its.jnj.com>
**Cc:** James Conlan <james.conlan@legacyliability.com>; Doug Dachille <doug.dachille@legacyliability.com>
**Subject:** [EXTERNAL] Re: RE:

> **WARNING:** This email originated from outside the company. Do not click on links unless you recognize the sender and have confidence the content is safe. If you have concerns about this email, report it by clicking on the "Report Suspicious Email" button in the Outlook toolbar above.

# Hi Duane,

I wanted to thank you for arranging our meeting and for the time you and your colleagues afforded Jim and myself to outline the components of a transaction which we believe could provide J&J with legal finality to its talc liabilities, comparable to what it hoped to achieve through bankruptcy.

As Jim explained, our solution will relieve J&J of both its current and future talc liabilities in the tort system, as well as talc-related claims made against it by Imerys, Cyprus and other third parties (e.g. retailers). It should be noted that bankruptcy would not have resolved direct talc claims against affiliates of LTL, but the Legacy Liability solution will.

To achieve that outcome, Legacy will acquire LTL plus all other legal entities in the J&J corporate family that have any current or future talc liability in the tort system or contractually. This will require a further structural optimization (e.g. divisional merger) of J&J and likely other J&J affiliates. Once this additional structural optimization work is completed, and Legacy becomes the owner of all J&J entities with talc liabilities, J&J will no longer have any liability in the tort system or contractually for talc.

The transfer of ownership of the talc liable entities to Legacy, and the

disaffiliation of those entities from J&J, requires that such entities have assets at the time of transfer that equal or exceed the best estimate of the projected current and future talc claims. By doing so, there can be no fraudulent transfer or unlawful dividend. As a closing condition for the acquisition transaction by Legacy, J&J auditors must reach the foregoing conclusion in order for the ASC 450 non-cash charge to be removed from the financial statements of J&J.

Importantly, any talc claimant who disagrees with the above will lack standing to assert any "avoidance" theories, as all talc claims will continue to be paid in the ordinary course.

In addition to the legal construct of our proposed transaction, we briefly outlined a number of the other considerations  - tax, investment management, creditor issues, claims management, fees and expenses and the use of reinsurance in the form of an adverse development cover as a way for J&J to participate in the favorable development of claims prospectively relative to the original projections which determined the funding amount at inception. We would be happy to provide additional documentation which specifically addresses each of these issues in more detail.

Certainly the most important issues to address with respect to our proposal are the legal ones, but the relevant legal conclusions are quite clear.  Please contact either Jim or myself if there is any additional information we can provide to assist with the internal vetting process that our proposal provides J&J finality with respect to all of its talc-related liabilities.

Regards,
Doug

ATL-L -002648-15   12/08/2023 9:16:57 PM   Pg 5 of 6   Trans ID: LCV20233584887
Case 3:16-md-02738-MAS-RLS   Document 28976   Filed 02/02/24   Page 46 of 221 PageID: 172439

Ex. 3

**From:** Van Arsdale, Duane [JJCUS] <DVanArs@its.jnj.com>
**Sent:** Monday, August 21, 2023 6:12 PM
**To:** Douglas Dachille <ddachille@non-canonical.com>
**Cc:** James Conlan <james.conlan@legacyliability.com>; Haas, Erik [JJCUS] <EHaas8@its.jnj.com>; White, Andrew [JJCUS] <AWhite23@ITS.JNJ.com>; Rockaway, Darlene [JJCUS] <DRockawa@its.jnj.com>
**Subject:** RE:

Hi Doug,

Thanks for the note and nice to meet you as well.  I have copied Erik Haas and Andrew White who will also join the discussion.

I will ask Darlene (copied here) to coordinate and propose a few dates for us to get together in the near future.  We'll be back in touch shortly.

Thank you,
Duane

**From:** Douglas Dachille <ddachille@non-canonical.com>
**Sent:** Monday, August 21, 2023 4:41 PM
**To:** Huffines, Robert <robert.huffines@jpmorgan.com>
**Cc:** Van Arsdale, Duane [JJCUS] <DVanArs@its.jnj.com>; James Conlan <james.conlan@legacyliability.com>
**Subject:** [EXTERNAL] Re:

**WARNING:** This email originated from outside the company. Do not click on links unless you recognize the sender and have confidence the content is safe. If you have concerns about this email, report it by clicking on the "Report Suspicious Email" button in the Outlook toolbar above.

Thank you Robert for the introduction.

Duane,

Nice to meet you. Jim and I would we happy to meet with you in person at your earliest convenience.

Best regards,
Doug

Sent from my iPad

On Aug 21, 2023, at 4:18 PM, Huffines, Robert <robert.huffines@jpmorgan.com> wrote:

Duane - As I mentioned to you and Joe I'd like to introduce you to Doug & James.

Over to you all to connect.

Thanks. Let me know if I can be of help.

Robbie

Sent with BlackBerry Work
([www.blackberry.com](www.blackberry.com))

This message is confidential and subject to terms at: [https://www.jpmorgan.com/emaildisclaimer](https://www.jpmorgan.com/emaildisclaimer) including on confidential, privileged or legal entity information, malicious content and monitoring of electronic messages. If you are not the intended recipient, please delete this message and notify the sender immediately. Any unauthorized use is strictly prohibited.

# EXHIBIT 4 - Excerpt

```
                                              Page 1

 1

 2       UNITED STATES BANKRUPTCY COURT OF NEW JERSEY
                     Case No. 23-12825
 3    - - - - - - - - - - - - - - - - - -  x
      In re:                                 :
 4                                           :
      LTL MANAGEMENT LLC,                     :
 5                                           :
                             Debtor,   :
 6    - - - - - - - - - - - - - - - - - -x
      LTL MANAGEMENT LLC,                     :
 7                                           :
                             Plaintiff,   :
 8                                           :
                   v.                        :
 9                                           :
      THOSE PARTIES LISTED ON APPENDIX A :
10    TO COMPLAINT and JOHN AND JANE DOES:
      1-1000,                                :
11                                           :
                             Defendants. :
12    - - - - - - - - - - - - - - - - - -x
13                             April 17, 2023
                               1:12 p.m.
14                             7 Times Square
                               New York, NY
15
16
17
18
19
20            VIDEOTAPED AND REMOTE DEPOSITION UPON
21    ORAL EXAMINATION OF ANDY BIRCHFIELD, ESQ., held
22    at the above-mentioned time and place, before
23    Randi Friedman, a Registered Professional
24    Reporter, within and for the State of New York.
25
```

```
                                            Page 2

 1                      A. Birchfield, Esq.
 2      APPEARANCES:
 3                 OTTERBOURG, P.C.
                   Attorneys for Proposed counsel for the
 4                 official committee of talc claimants
 5                 230 Park Avenue
                   New York, New York 10169
 6
                   BY:  RICHARD G. HADDAD, ESQ.
 7
 8
                   GOLOMB SPIRT GRUNFELD
 9                 Attorneys for TCC
10                 1835 Market Street, Suite 2900
                   Philadelphia, Pennsylvania 19103
11
                   BY:  RICHARD M. GOLOMB, ESQ.
12
13
                   LEVIN PAPANTONIO RAFFERTY
14                 Attorneys for William Henry
15                 316 South Baylen Street
                   Pensicola, Florida 32502
16
                   BY:  CHRISTOPHER V. TISI, ESQ.
17
18
                   BEASLEY ALLEN
19                 Attorneys for Alishia Landrum
20                 218 Commerce Street
                   Montgomery Alabama 36104
21
                   BY:  LEIGH O'DELL, ESQ.
22
23
24
25      (Appearances continued.)
```

```
                                              Page 3

  1                      A. Birchfield, Esq.
  2        (Appearances continued.)
  3                 COHEN, PLACITELLA & ROTH
                    Attorneys for Estate of Kimberly
  4                 Naranjo
  5                 127 Maple Avenue
                    Red Bank, New Jersey 07701
  6
                    BY:  CHRISTOPHER PLACITELLA, ESQ.
  7
  8
                    JOHNSON & JOHNSON
  9                 Attorneys for Johnson & Johnson
 10                 1 Johnson & Johnson Plaza
                    New Brunswick, New Jersey 08933
 11
                    BY:  ERIC HAAS, ESQ.
 12
 13
                    SKADDEN ARPS SLATE MEAGHER & FLOM, LLP
 14                 Attorneys for LTL Management
 15                 One Manhattan West
                    New York, New York 10001
 16
                    BY:  ALLISON BROWN, ESQ.
 17
 18
                    WHITE & CASE, LLP
 19                 Attorneys for Johnson & Johnson
 20                 555 South Flower Street, Sute 2700
                    Los Angeles, California 90071
 21
                    BY:  GREGORY STARNER, ESQ.
 22                      KATHRYN KUETHMAN, ESQ.
 23
 24
 25        (Appearances continued.)
```

```
                                              Page 4

 1                    A. Birchfield, Esq.

 2        (Appearances continued.)

 3

                  KLEHR HARRISON HARVEY BRANZBURG, LLP
 4                Attorneys for Andy Birchfield, Esq.
 5                10000 Lincoln Drive East, Suite 201
                  Marlton, New Jersey 08053
 6

                  BY:  CAROL ANN SLOCUM, ESQ.
 7
                          *  *  *
 8

 9

10

11

12

13

14

15

16

17

18

19

20    ALSO PRESENT:

21                Paul Baker - Videographer
                  Jerry Curran - Concierge
22                Ted Meadows, Esq.
                  Jim Murdica, Esq.

23

24

25
```

Page 5

1                        A. Birchfield, Esq.

2                          STIPULATIONS

3              IT IS HEREBY STIPULATED AND AGREED, by

4      and among counsel for the respective parties

5      hereto, that the filing, sealing and

6      certification of the within deposition shall be

7      and the same are hereby waived;

8                IT IS FURTHER STIPULATED AND AGREED

9      that all objections, except as to form of the

10     question, shall be reserved to the time of the

11     trial;

12               IT IS FURTHER STIPULATED AND AGREED

13     that the within deposition may be signed before

14     any Notary Public with the same force and effect

15     as if signed and sworn to before the Court.

16                          *  *  *

17

18

19

20

21

22

23

24

25

Page 6

```
1                    A. Birchfield, Esq.

2                    MR. VIDEOGRAPHER:  Good afternoon.    13:12:46

3         We are going on the record at 1:12 p.m.        13:12:47

4         Eastern Daylight Time on Monday, April 17th,   13:12:51

5         2023.                                           13:12:54

6                    Please note that the microphones     13:12:56

7         are sensitive and may pick up whispering and   13:12:58

8         private conversation.  Please mute all          13:13:02

9         cellphones at this time.                        13:13:04

10                    This is Media Unit 1 of the          13:13:05

11        video-recorded deposition of Andy Birchfield    13:13:06

12        in the matter of LTL Management LLC, filed      13:13:08

13        in the United States Bankruptcy Court,          13:13:13

14        District of New Jersey, Case No. 23-12825.      13:13:14

15        This deposition is being held at Brown          13:13:21

16        Rudnick LLP, located at 7 Times Square, New     13:13:23

17        York, New York.                                 13:13:26

18                    My name is Paul Baker and I am the   13:13:28

19        videographer.  The court reporter is Randi      13:13:29

20        Friedman, and we are both from Veritext.        13:13:31

21        Appearances have been noted on the              13:13:34

22        stenographic record.                            13:13:36

23                    Will the court reporter please      13:13:38

24        swear in the witness.                           13:13:47

25                                                         13:13:47
```

```
                                              Page 7

  1              A. Birchfield, Esq.

  2                 * * *                    13:13:47

  3              ANDY BIRCHFIELD, the witness  13:13:47

  4     herein, having been duly sworn, was examined  13:13:47

  5     and testified as follows:           13:13:47

  6                 * * *                    13:13:47

  7              EXAMINATION                 13:13:47

  8   BY MR. HAAS:                           13:13:47

  9      Q     Mr. Birchfield, good afternoon.  13:13:48

 10      A     Good afternoon.              13:13:50

 11      Q     My name is Eric Haas, on behalf of  13:13:50

 12   Johnson & Johnson.  We've met before; correct?  13:13:53

 13      A     Yes.                         13:13:56

 14      Q     Mr. Birchfield, you're a lawyer;  13:13:56

 15   right?                                13:13:58

 16      A     Yes.                         13:13:58

 17      Q     Are you affiliated with any law firm?  13:13:59

 18      A     Beasley Allen Law Firm in Montgomery,  13:14:01

 19   Alabama.                              13:14:03

 20      Q     Any other law firms?         13:14:05

 21      A     No.                          13:14:06

 22      Q     Mr. Birchfield, which of the Beasley  13:14:08

 23   Allen partners have been involved in talc  13:14:10

 24   litigation or recovery of talc-related claims  13:14:14

 25   against Johnson & Johnson or its affiliation?  13:14:18
```

1              A. Birchfield, Esq.

2      A      You're going to test my memory here.    13:14:22

3    Certainly Leigh O'Dell and Ted Meadows.  We have    13:14:24

4    had over the course of the last nine years, had a    13:14:27

5    number of law partners that have been involved as    13:14:34

6    well.  David Dearing, Ryan Beatty.  We've had a    13:14:36

7    former law partner, Daniel Mason Ward, was    13:14:42

8    involved.  Maybe other law partners that have    13:14:46

9    been involved as well, but those are the ones    13:14:52

10   that I can think of off the top of my head.    13:14:55

11     Q      Okay.  Thank you.    13:14:57

12            When I refer to talc-related    13:14:58

13   litigation or talc claims or talc litigation,    13:15:00

14   I'll be referring to the talc litigation against    13:15:03

15   Johnson & Johnson and its affiliates; okay?    13:15:07

16     A      Yes.    13:15:10

17     Q      How many individuals with talc claims    13:15:10

18   do you and/or Beasley Allen currently represent?    13:15:13

19     A      It would be approximately 11,300.    13:15:19

20     Q      Now, Mr. Birchfield, of any of those    13:15:32

21   11,300 individuals, are any of them claimants who    13:15:35

22   have not yet filed their claims in any court?    13:15:42

23     A      Yes.  There would be roughly -- my    13:15:46

24   best understanding is approximately 100 that    13:15:52

25   would have been -- would have been retained    13:15:55

```
                                              Page 9

 1                   A. Birchfield, Esq.

 2    and -- during the time of the pendency of      13:16:00

 3    bankruptcy, and not filed.                     13:16:03

 4        Q     Why were they not filed?             13:16:06

 5        A     Because of the pendency of the       13:16:07

 6    bankruptcy.                                    13:16:08

 7        Q     In other words, because there was an 13:16:09

 8    automatic stay --                              13:16:10

 9        A     Automatic stay.                      13:16:11

10        Q     -- that precluded you from filing    13:16:11

11    those claims?                                  13:16:14

12        A     Yes.                                 13:16:14

13        Q     Okay.  Of the 11,300 claims that     13:16:15

14    Beasley Allen represents, how many of those have 13:16:23

15    been filed in the multi-district litigation    13:16:26

16    pending in New Jersey?                         13:16:29

17        A     I couldn't give you a precise number. 13:16:33

18    Approximately 5,000.                           13:16:35

19        Q     So of the 11,200 claims that are     13:16:47

20    filed --                                       13:16:51

21        A     Let me back up.                      13:16:52

22        Q     Would you like to correct that?      13:16:54

23        A     I think it would probably be closer to 13:16:55

24    6,000.  My best estimate.                      13:16:57

25        Q     Okay.  So of the 11,200 claims that  13:17:03
```

```
                                              Page 10
 1                    A. Birchfield, Esq.
 2     you said are filed, how many of those --    13:17:06
 3         A     No.  I'm sorry.                    13:17:10
 4         Q     Okay.                              13:17:11
 5         A     So you asked how many claimants we 13:17:12
 6     represent.                                   13:17:14
 7         Q     Right.  And you said --            13:17:14
 8         A     11,300.                            13:17:15
 9         Q     Okay.                              13:17:17
10         A     And you asked how many cases we have 13:17:18
11     that would be ready to be filed or would be filed 13:17:22
12     if -- but for the stay, and that's approximately 13:17:24
13     100.  You know, there are -- you know, there are 13:17:28
14     additional claims that are unfiled claims, but 13:17:31
15     would not be -- would not necessarily be cases to 13:17:34
16     be filed, you know, in the immediate term.    13:17:37
17         Q     What is the distinction you're making 13:17:42
18     between claims that are not files and claims that 13:17:45
19     are not ready to be filed in the immediate near 13:17:48
20     term?                                         13:17:51
21              MS. SLOCUM:  I'm going to object    13:17:51
22         and instruct the witness to the extent it 13:17:53
23         calls for work product, don't answer the 13:17:54
24         question.                                 13:17:57
25              THE WITNESS:  I will follow the     13:18:03
```

ATL-L -002648-15  12/08/2023 9:16:57 PM  Pg 12 of 33  Trans ID: LCV20233584887
Case 3:16-md-02738-MAS-RLS  Document 28976  Filed 02/02/24  Page 59 of 221 PageID: 172452

Ex. 4 - EXCERPT

```
                                              Page 11

   1                A. Birchfield, Esq.

   2        advice of my counsel.                 13:18:04

   3   BY MR. HAAS:                               13:18:04

   4        Q    Okay.  So let me just be clear then.  13:18:05

   5   Of the 11,300 claims that you testified that   13:18:08

   6   Beasley Allen represents, how many of those have  13:18:14

   7   not yet been filed with any court?         13:18:17

   8        A    So there would be approximately, you  13:18:21

   9   know, 5,000 claims that are -- that are unfiled  13:18:23

  10   claims.                                    13:18:28

  11        Q    So of the 5,000 that are unfiled, 100  13:18:31

  12   have not been filed due to the automatic stay?  13:18:36

  13        A    Right.                           13:18:39

  14        Q    And the remaining 4,900 are not filed  13:18:39

  15   for some other reason?                     13:18:45

  16        A    Correct.                         13:18:46

  17        Q    Do those 4,900 other claims constitute  13:19:01

  18   viable claims?                             13:19:06

  19                MS. SLOCUM:  Objection.  Instruct  13:19:08

  20        the witness to the extent it requires work  13:19:09

  21        product to be divulged, do not answer the  13:19:12

  22        question.                             13:19:16

  23                MR. HAAS:  There has been      13:19:17

  24        extensive inquiry about claims in this  13:19:18

  25        litigation by the group that Mr. Birchfield  13:19:21
```

Page 12

1              A. Birchfield, Esq.

2         is a part, so I am inquiring as to which    13:19:24

3         claims are viable claims and fall within the  13:19:27

4         bucket of claims that he believes are      13:19:30

5         associated with his views of the case.     13:19:37

6              MS. SLOCUM:  And that requires him    13:19:39

7         to disclose work product, his analysis of    13:19:40

8         the claims and -- or his firm's analysis and  13:19:43

9         determination of what is viable.         13:19:47

10   BY MR. HAAS:                              13:19:49

11      Q    Mr. Birchfield, let me ask it this      13:19:49

12   way:                                    13:19:51

13              Do the 4,900 claims that are not filed  13:19:52

14   for some other reason other than the automatic   13:19:56

15   stay represent claims that are not supportive LTL  13:19:57

16   bankruptcy claims?                         13:20:08

17      A    Okay.  Let me -- a couple of things I    13:20:09

18   need to correct there.                       13:20:11

19              First of all, in regards to the -- you  13:20:13

20   know, the 4,900, I was giving you approximate    13:20:15

21   numbers.                                 13:20:19

22              In regards to, you know, an LTL plan,   13:20:20

23   I haven't seen an LTL plan.  I have seen, you     13:20:24

24   know, the term sheet that has been proposed, and,  13:20:29

25   you know, I'm not aware of any of the -- any of   13:20:35

```
                                                      Page 13

  1                    A. Birchfield, Esq.

  2    those claims that, you know, would be outside of   13:20:40

  3    what is -- what's referenced in that -- in the     13:20:44

  4    term sheet.  But, you know, I would not -- I       13:20:48

  5    would not recommend filing some of the types of    13:20:54

  6    claims that are referenced in the term sheet.      13:20:57

  7        Q    Okay.  So let me try walking through      13:21:05

  8    this one more time, see if we understand what      13:21:08

  9    we're talking about here.                          13:21:10

 10            So you have 11,300 claims that you         13:21:11

 11    contend that Beasley Allen represents; correct?    13:21:14

 12        A    Yes.                                      13:21:18

 13        Q    Of those, 6,000 claims are actually       13:21:20

 14    filed in the MDL?                                  13:21:22

 15        A    Approximately.                            13:21:24

 16        Q    5,000 are unfiled claims?                 13:21:25

 17        A    Correct, approximately.                   13:21:28

 18        Q    Of the 5,000, 100 are claims that you     13:21:30

 19    say would be filed but for the automatic stay?     13:21:33

 20        A    Right.                                    13:21:36

 21        Q    And the other 4,900 balance represents    13:21:37

 22    claims that you are not sure whether or not they   13:21:41

 23    would be filed?                                    13:21:45

 24        A    That's correct.  I mean, first of all,    13:21:48

 25    I am not personally reviewing these cases and      13:21:53
```

Page 14

```
 1                    A. Birchfield, Esq.

 2    making these decisions, so there are lawyers at    13:21:57

 3    Beasley Allen that review these cases.  There's    13:22:01

 4    staff that collect the medical records.  So I'm    13:22:04

 5    not -- I'm not personally reviewing these 5,000    13:22:07

 6    cases and making decisions.                        13:22:11

 7        Q    So focusing on the 4900 claims, has       13:22:13

 8    anyone at Beasley Allen reviewed those claims and  13:22:17

 9    determined whether they will be filed?             13:22:20

10                MS. SLOCUM:  Objection.  I'm going     13:22:21

11        to again instruct not to answer based on       13:22:22

12        work product.                                  13:22:25

13                MR. HAAS:  It's a question of          13:22:25

14        whether.  I'm not getting into any             13:22:26

15        attorney-client privilege or work product     13:22:28

16        information.  Has anyone done it, so let's     13:22:29

17        start --                                       13:22:32

18                MS. SLOCUM:  No.  You asked            13:22:33

19        whether anybody has determined them to be      13:22:34

20        viable.  That was your question.               13:22:36

21                MR. HAAS:  I didn't ask that.          13:22:39

22    BY MR. HAAS:                                       13:22:39

23        Q    Has anyone done an analysis to            13:22:40

24    determine whether they can be filed?               13:22:42

25        A    So for all of the cases that Beasley      13:22:46
```

ATL-L-002648-15  12/08/2023 9:16:57 PM  Pg 16 of 33  Trans ID: LCV20233584887
Case 3:16-md-02738-MAS-RLS  Document 28976  Filed 02/02/24  Page 63 of 221 PageID: 172456

Ex. 4 - EXCERPT

Page 15

1              A. Birchfield, Esq.

2    Allen has, you know, has taken in, we would -- we    13:22:50

3    would obtain medical records, we would do an         13:22:55

4    evaluation, you know, of those claims.  And that     13:22:59

5    would have been done for the vast majority of        13:23:05

6    those claims.  I cannot say that it has been done    13:23:08

7    for every claim.  If we got a case in last week,     13:23:11

8    you know, it may not have happened.  But for the     13:23:15

9    vast majority of the claims, we have -- we           13:23:17

10   obtained the medical records and we're in the        13:23:23

11   process of evaluating those claims.                  13:23:25

12       Q    Okay.  So to circle back, you have as       13:23:27

13   of this time 6,100 claims that you have              13:23:32

14   determined that will or have been filed in court?    13:23:38

15       A    Approximately.  I'm giving you              13:23:46

16   approximate numbers.                                 13:23:47

17       Q    Approximately.  Okay.  6,100.  Okay.        13:23:48

18            Now starting with the very first claim      13:23:53

19   that Beasley Allen was engaged with respect to,      13:23:58

20   when was that?                                       13:24:02

21       A    If you want a precise date, I can't         13:24:06

22   give you that.                                       13:24:08

23       Q    Round terms.                                13:24:09

24       A    I believe that to have been in the          13:24:11

25   2013 time frame.                                     13:24:13

```
                                                    Page 16

 1                    A. Birchfield, Esq.

 2         Q     Okay.  You indicated that there are   13:24:16

 3     approximately 6,000 claims in the MDL.  By what  13:24:20

 4     time frame had Beasley Allen been retained with  13:24:25

 5     respect to those 6,000 claims?                   13:24:28

 6         A     Well, it would have been -- it would   13:24:32

 7     have been before October of '21.  I can't say.  I 13:24:35

 8     can't say when the last case was retained and was 13:24:39

 9     filed in the MDL, but I know it would have been   13:24:43

10     before October of '21.                           13:24:45

11         Q     And just for a general sense,          13:24:47

12     Mr. Birchfield, what was the time frame in which 13:24:49

13     you acquired those 6,000 claims between 2013 and 13:24:52

14     2021, in general terms?                          13:24:56

15         A     I really can't answer that question.   13:25:03

16         Q     When were the majority of the claims   13:25:04

17     obtained by?                                     13:25:08

18         A     I can't answer that question.  We have 13:25:09

19     been taking, you know, cases, you know, from     13:25:13

20     lawyers throughout the -- you know, throughout   13:25:18

21     this period, but I can't tell you, you know -- I  13:25:20

22     can't tell you, you know, how many were in 2014  13:25:24

23     versus '15 versus '16.  I don't know that.       13:25:27

24         Q     Did you have the majority of the       13:25:31

25     claims by 2018?                                  13:25:33
```

```
                                                     Page 17

 1                     A. Birchfield, Esq.

 2        A     I can't say.  Probably, but I can't    13:25:39

 3     give you a definitive answer.                   13:25:41

 4        Q     Did you have the majority of claims by 13:25:42

 5     2019?                                           13:25:43

 6        A     Probably so, but I can't say           13:25:47

 7     definitively.                                   13:25:49

 8        Q     Did you obtain any claims in '20 and   13:25:50

 9     '21 of the 6,000 that were filed in the MDL?    13:25:51

10        A     I can't say definitively, but I would  13:25:57

11     certainly think so.                             13:25:59

12        Q     So is it fair to say that you obtained 13:26:03

13     the majority of the claims that have been filed 13:26:05

14     in the MDL by no later than 2019?               13:26:07

15                MS. SLOCUM:  Objection.              13:26:10

16                THE WITNESS:  When you say           13:26:11

17        "majority," I mean, you're talking about     13:26:12

18        more than 50 percent, I would just have to   13:26:14

19        guess, but I would think most of those cases 13:26:18

20        had been retained by then, but I don't know  13:26:22

21        definitively.                                13:26:24

22     BY MR. HAAS:                                    13:26:25

23        Q     So with respect to the 6,000 claims    13:26:28

24     that have been filed in the MDL, those cases are 13:26:31

25     currently stayed; correct?                      13:26:36
```

```
                                                    Page 18

 1                    A. Birchfield, Esq.

 2        A     Yes.                               13:26:38

 3        Q     They have been since October 2021;  13:26:38

 4    correct?                                     13:26:40

 5        A     Except for a very brief --          13:26:41

 6        Q     Two hours?                         13:26:43

 7        A     Yes.                               13:26:43

 8        Q     And you're aware from your          13:26:45

 9    participation in the MDL that in September of  13:26:47

10    2020, Judge Wolfson ordered the formation of --  13:26:51

11    an administration of a common benefit fund for  13:26:54

12    the payment of fees and expenses incurred in  13:26:58

13    connection with the MDL correct?             13:27:01

14        A     I'm aware that a common benefit fee  13:27:03

15    order was entered.  I couldn't give you the date.  13:27:06

16        Q     Sometime around the September 2020  13:27:11

17    time frame?                                  13:27:13

18        A     I don't dispute that.  I don't know.  13:27:16

19        Q     It was sometime before the LTL      13:27:18

20    bankruptcy was commenced in October of 2021;  13:27:21

21    correct?                                     13:27:24

22        A     Yes.                               13:27:24

23        Q     And you're generally familiar with the  13:27:25

24    terms of that agreement?                     13:27:27

25        A     Yes.                               13:27:28
```

Page 19

1                    A. Birchfield, Esq.

2       Q     Okay.  So pursuant to the common          13:27:29

3   benefit order that Judge Wolfson entered, up to     13:27:36

4   12 percent of any amount recovered on talc claims   13:27:39

5   in the MDL is assigned to a common benefit;         13:27:42

6   right?                                              13:27:47

7       A     Could be, yes.  My understanding is        13:27:48

8   it's -- 10 percent fee is 2 percent cost.           13:27:51

9       Q     Right.  So let's say, for example, in     13:27:55

10  the MDL, if the settlement was obtained for         13:27:58

11  $8.9 billion, the common benefit fund would be up   13:28:02

12  to $1.068 billion, which is 12 percent; right?      13:28:07

13              MS. SLOCUM:  Objection.  You're         13:28:12

14      asking him to speculate as to a settlement      13:28:12

15      in the MDL which did not occur.                 13:28:15

16              MR. HAAS:  I'm asking him to            13:28:18

17      answer the question of whether or not he        13:28:19

18      would agree that if there's a settlement in     13:28:20

19      the MDL, which is a gross recovery amount in    13:28:21

20      the MDL, up to 12 percent of that would go      13:28:25

21      into the common benefit fund, and that          13:28:30

22      number is, I'll represent for the record, is    13:28:32

23      1.068 billion.                                  13:28:33

24              MS. SLOCUM:  Objection.  The           13:28:38

25      court's order states what it is, okay.          13:28:39

```
                                                          Page 20

 1                  A. Birchfield, Esq.

 2                  MR. HAAS:  No.  If you want to        13:28:42

 3          object, object.  If you want to instruct him  13:28:43

 4          not to answer, do so.                         13:28:45

 5      BY MR. HAAS:                                      13:28:46

 6          Q     Answer the question.                    13:28:47

 7          A     When you say up to that amount, I       13:28:48

 8      would agree with that.  It would not be that      13:28:50

 9      amount because there are -- there were different  13:28:53

10      provisions where firms could agree early on and   13:29:00

11      there would be a lesser percentage.  So it's not  13:29:04

12      12 percent across the board.                      13:29:07

13          Q     You're referring to, let's say,         13:29:08

14      Paragraph 24 of the order, which states that if   13:29:09

15      you participate early on, the contribution        13:29:11

16      percentage would be 8 percent, not 12 percent;    13:29:15

17      right?  Is that what you're referring to?         13:29:19

18          A     I'm not sure of the paragraph.  I       13:29:20

19      didn't review it, you know -- I didn't review it  13:29:22

20      for this deposition.  I'm not disputing that.     13:29:26

21      I'm talking to you in terms of -- I'm testifying  13:29:28

22      in terms of in my general understanding of the    13:29:31

23      common benefit.                                   13:29:34

24          Q     So your general understanding is that   13:29:36

25      the range of fees that could be contributed to    13:29:38
```

Page 21

1            A. Birchfield, Esq.

2   the common benefit fund is anywhere from        13:29:41

3   8 percent to 12 percent of the gross recovery   13:29:44

4   amount, depending upon whether or not the       13:29:48

5   individual firms were early participation or not? 13:29:51

6       A     Yes.                                   13:29:56

7       Q     So that would be anywhere between      13:29:56

8   $712 million or $1.068 billion for 8.9 gross     13:29:58

9   recovery amount; right?                          13:30:05

10      A     I'm trusting your math.  I can't do    13:30:08

11  that in my head.                                 13:30:11

12      Q     Okay.                                  13:30:11

13      A     Not quickly, anyway.                   13:30:12

14      Q     And that gross recovery amount that is 13:30:14

15  put into the common benefit fund is then provided 13:30:19

16  to those firms that provide common benefit work  13:30:25

17  product for the MDL; correct?                    13:30:30

18      A     As a general rule, you know, that is   13:30:34

19  true.  I mean, typically what would happen when a 13:30:36

20  court enters a common benefit assessment award   13:30:39

21  like this, then there would be, you know, a      13:30:42

22  determination, you know, at the back end about,  13:30:45

23  you know, the amount -- the amount of the overall 13:30:50

24  pot, the overall common benefit fund amount.  And 13:30:54

25  then that amount would be overseen by, you know,  13:31:00

ATL-L -002648-15  12/08/2023 9:16:57 PM  Pg 23 of 33  Trans ID: LCV20233584887
Case 3:16-md-02738-MAS-RLS  Document 28976  Filed 02/02/24  Page 70 of 221 PageID:
172463

Ex. 4 - EXCERPT

Page 22

```
 1              A. Birchfield, Esq.

 2    an Article III judge to determine, you know, what   13:31:04

 3    is an appropriate, you know, allocation of those    13:31:07

 4    funds.  And that's -- you know, that is the         13:31:09

 5    typical way, you know, that from my experience      13:31:13

 6    the common benefit fees are -- you know, are        13:31:16

 7    handled.                                            13:31:19

 8              So the first determination is, okay,      13:31:19

 9    the order is entered, and the order is entered      13:31:22

10    to -- you know, as an approximation of what would   13:31:25

11    be necessary, the court at the end would            13:31:29

12    determine if that is appropriate, and if so, then   13:31:34

13    begin the allocation process among the lawyers      13:31:37

14    who did the work on behalf of the other             13:31:39

15    claimants.                                          13:31:42

16        Q    And the allocation of that amount          13:31:45

17    among the lawyers that did the work depends upon    13:31:47

18    what common benefit work they did; correct?         13:31:51

19        A    Yes.                                       13:31:54

20        Q    Okay.  And the plaintiff steering          13:31:54

21    committee that's in the MDL is tasked with the      13:31:58

22    responsibility of identifying who should do that    13:32:02

23    common benefit work; right?                         13:32:04

24        A    As a general -- as a general              13:32:06

25    principle, yes.                                      13:32:08
```

```
                                           Page 23

 1                 A. Birchfield, Esq.

 2        Q     And Beasley Allen sits on that         13:32:09

 3   plaintiff steering committee; correct?           13:32:11

 4        A     Correct.                               13:32:13

 5        Q     And Beasley Allen to date, you would  13:32:14

 6   agree with me, has performed the vast majority of 13:32:19

 7   the common benefit work product incurred,        13:32:22

 8   according to Beasley Allen, the largest          13:32:24

 9   percentage of the common benefit expenses; right? 13:32:28

10              MS. SLOCUM:  Objection.  That's       13:32:30

11         requiring work product.                    13:32:32

12              MR. HAAS:  No, it's not.  It's a       13:32:35

13         fact.                                       13:32:36

14   BY MR. HAAS:                                      13:32:36

15        Q     Go ahead, you can answer.             13:32:37

16              MS. SLOCUM:  Objection still           13:32:38

17         stands.                                     13:32:38

18   BY MR. HAAS:                                      13:32:39

19        Q     You can answer.                        13:32:39

20        A     I'm not trying to avoid or be evasive 13:32:42

21   here in any way.  I mean, has Beasley Allen done, 13:32:46

22   you know, a substantial amount of the, you know,  13:32:50

23   the work in the MDL?  Yes.  Sitting here, me      13:32:53

24   personally, I cannot give you an answer about how 13:32:59

25   much, you know, Beasley Allen has done, you know, 13:33:01
```

```
                                                       Page 24

 1                    A. Birchfield, Esq.

 2    versus, you know, Ashcraft & Gerel or Levin      13:33:05

 3    Papantonio and Mr. Tisi versus Mr. Golomb.  So to 13:33:08

 4    say vast majority, I think, is more than --      13:33:14

 5    that's farther than I can go at this point.      13:33:16

 6         Q     Beasley Allen tracks those amounts;   13:33:18

 7    right?                                           13:33:20

 8         A     Beasley Allen -- Beasley Allen tracks, 13:33:23

 9    you know, the work that we do for the, you know, 13:33:26

10    for the MDL.                                     13:33:30

11         Q     Do you provide any reports?           13:33:31

12         A     I don't.                              13:33:33

13         Q     Do you know whether Beasley Allen     13:33:34

14    does?                                            13:33:35

15         A     I'm not sure.  I mean, Ms. O'Dell is  13:33:36

16    co-lead and --                                   13:33:41

17         Q     Do you have --                        13:33:43

18         A     She's co-lead of the MDL.             13:33:43

19         Q     You're the head of the mass torts     13:33:45

20    litigation practice at Beasley Allen, are you    13:33:47

21    not?                                             13:33:47

22         A     I am.                                 13:33:49

23         Q     Do you have any sense of whether or   13:33:49

24    not Beasley Allen has a claim to be the largest  13:33:50

25    percentage of the common benefit fund based on   13:33:54
```

```
                                                    Page 25

 1                    A. Birchfield, Esq.

 2    fees and work done to date?                   13:33:57

 3        A    That would be the determination of -- 13:34:00

 4    of an Article III judge if it is administered  13:34:03

 5    through the MDL court.                         13:34:07

 6        Q    Based upon the work done to date, is  13:34:09

 7    it Beasley Allen's position that it has        13:34:11

 8    undertaken the largest percentage of the common 13:34:16

 9    benefit work and incurred the largest percentages 13:34:20

10    of the expenses to date?                       13:34:23

11              MS. SLOCUM:  Objection.  Asked and   13:34:24

12        answered.                                  13:34:24

13              MR. HAAS:  No, it's not.             13:34:25

14    BY MR. HAAS:                                   13:34:25

15        Q    You can answer.                       13:34:26

16              MS. SLOCUM:  He did.  He             13:34:26

17        already --                                 13:34:27

18              MR. HAAS:  That was not asked.  He   13:34:28

19        can answer.                                13:34:29

20              MS. SLOCUM:  He answered.            13:34:30

21    BY MR. HAAS:                                   13:34:31

22        Q    You can answer.  Go ahead.            13:34:32

23        A    If you're asking my opinion as we sit 13:34:33

24    here today, my opinion is probably so.         13:34:35

25        Q    Yeah.                                 13:34:38
```

```
                                                    Page 26

 1                    A. Birchfield, Esq.

 2        A     But I can't say that definitively.    13:34:39

 3        Q     You're the lead plaintiff counsel in  13:34:40

 4    the MDL, aren't you?                            13:34:40

 5        A     We're co-lead.                        13:34:43

 6        Q     You're not going to go to the court   13:34:45

 7    and say, "No, no, no, we're not entitled to the 13:34:46

 8    biggest percentage"?                            13:34:48

 9        A     But the difference in what you're     13:34:51

10    asking and what I am saying is you're not --    13:34:52

11    you're saying are you entitled to that.         13:34:56

12        Q     No, I understand the process, that you 13:34:59

13    have to basically make your submission.  The    13:35:01

14    ultimate determination is made by the           13:35:04

15    administrator.  I get that.  My question is     13:35:06

16    whether with respect to the work done to date   13:35:09

17    that would qualify you in the threshold inquiry 13:35:10

18    is whether or not Beasley Allen has done most of 13:35:15

19    the work and incurred most of the expenses from 13:35:17

20    your perspective.                               13:35:19

21        A     So first of all, it would not be -- in 13:35:24

22    my view, it would not be an administrator.  It  13:35:26

23    would be an Article III judge that would make the 13:35:29

24    determination.  And I do think Beasley Allen --  13:35:31

25    you could take the position that we've done the  13:35:35
```

ATL-L -002648-15  12/08/2023 9:16:57 PM  Pg 28 of 33  Trans ID: LCV20233584887
Case 3:16-md-02738-MAS-RLS  Document 28976  Filed 02/02/24  Page 75 of 221 PageID:
172468
Ex. 4 - EXCERPT

Page 27

| 1 | A. Birchfield, Esq. | |
|---|---|---|
| 2 | majority of the work.  Probably so. | 13:35:39 |
| 3 | Q     If the Article III judge, in your view | 13:35:43 |
| 4 | as the proper determiner, in the end allocates a | 13:35:44 |
| 5 | portion of that 700 million to over a billion | 13:35:50 |
| 6 | dollars worth of common benefit fees and expenses | 13:35:55 |
| 7 | to Beasley Allen, that would be on top of the | 13:36:01 |
| 8 | attorney fees that you otherwise would be | 13:36:03 |
| 9 | entitled to get; correct? | 13:36:05 |
| 10 | A     Partially. | 13:36:10 |
| 11 | Q     Because there's a participation | 13:36:13 |
| 12 | percentage that you pay? | 13:36:15 |
| 13 | A     Yeah, because part of the fees would | 13:36:17 |
| 14 | be paid, you know, out of the -- you know, of the | 13:36:18 |
| 15 | attorneys' fees portion.  And so a substantial | 13:36:22 |
| 16 | amount of the, you know, the common benefit, you | 13:36:27 |
| 17 | know, fund would be, you know, based on our | 13:36:29 |
| 18 | attorneys' fees.  So you cannot -- it would be | 13:36:33 |
| 19 | inappropriate to say that that is on top of the | 13:36:35 |
| 20 | attorneys' fees. | 13:36:39 |
| 21 | Q     Because under the order you are deemed | 13:36:40 |
| 22 | a participating attorney or participating counsel | 13:36:42 |
| 23 | in the common benefit fund agreement; correct? | 13:36:47 |
| 24 | A     Yes. | 13:36:49 |
| 25 | MS. SLOCUM:  Objection. | 13:36:49 |

```
                                                    Page 28

 1                  A. Birchfield, Esq.

 2    BY MR. HAAS:                                  13:36:50

 3         Q     So to summarize, Beasley Allen would  13:36:51

 4    be entitled to a share of the common benefit fund  13:36:56

 5    and a portion of its attorney fees that it    13:36:59

 6    otherwise charged; right?                     13:37:04

 7         A     If the court made that determination,  13:37:07

 8    yes.                                          13:37:09

 9         Q     Okay.  And the fees you otherwise   13:37:10

10    charge is a 40 percent contingency fee; correct?  13:37:11

11         A     As a general rule, that's true.    13:37:15

12         Q     Yes.  So it's fair to say that in   13:37:17

13    terms of the relative economic incentives,    13:37:23

14    because Beasley Allen is entitled to those     13:37:29

15    amounts from the common benefit fund outside of  13:37:32

16    bankruptcy, but not entitled to those amounts   13:37:34

17    inside a bankruptcy, that Beasley Allen has an   13:37:38

18    economic incentive to resolve the cases outside  13:37:41

19    of bankruptcy; correct?                       13:37:46

20                  MS. SLOCUM:  Objection.         13:37:47

21                  THE WITNESS:  No.  Our interest --  13:37:48

22         our interest is getting fair values for our  13:37:54

23         clients, period.  And that is our goal.  And  13:37:56

24         I have been steadfast.  I have been       13:38:02

25         steadfast on the position that we are not --  13:38:06
```

Page 29

1           A. Birchfield, Esq.

2       that I have urged, you know, everyone on our    13:38:09

3       side and we have -- we have maintained the      13:38:12

4       position we are not going to have the common    13:38:15

5       benefit, you know, fee issue become a           13:38:18

6       barrier to getting reasonable resolution,       13:38:21

7       fair values for our clients.                    13:38:26

8   BY MR. HAAS:                                         13:38:27

9       Q    We'll come back to that in a moment,       13:38:27

10  but you understand that as a general matter in      13:38:29

11  bankruptcy you would not be entitled to any         13:38:34

12  portion of a common benefit fund that you would     13:38:36

13  be entitled outside of bankruptcy; correct?         13:38:39

14      A    No, I do not.                              13:38:42

15           MS. SLOCUM:  Object.  The witness          13:38:44

16      is not here to testify to bankruptcy law.       13:38:45

17           MR. HAAS:  He can answer the               13:38:47

18      question.  If you want to instruct him not      13:38:47

19      to answer --                                    13:38:49

20           MS. SLOCUM:  Don't answer the              13:38:50

21      question.                                       13:38:50

22  BY MR. HAAS:                                         13:38:51

23      Q    Is it your view, Mr. Birchfield, that      13:38:51

24  as a general proposition you are entitled to the    13:38:53

25  common benefit fee in bankruptcy?                   13:38:56

```
                                                    Page 30

 1                  A. Birchfield, Esq.

 2                  MS. SLOCUM:  Objection.  Again,    13:38:59

 3          I'll instruct the witness not to answer.  13:39:00

 4          He's not here to testify as to --         13:39:02

 5                  MS. O'DELL:  Please don't          13:39:06

 6          interrupt.                                 13:39:07

 7                  MR. HAAS:  I understand he has his 13:39:07

 8          motivation for participating or not        13:39:08

 9          participating in the proposed              13:39:10

10          reorganization, and that's what I'm        13:39:12

11          inquiring as to.                           13:39:16

12      BY MR. HAAS:                                   13:39:16

13          Q     You can answer the question.         13:39:16

14                  MS. SLOCUM:  No.  I'm instructing  13:39:17

15          the witness not to answer.  He's not here to 13:39:17

16          testify as to bankruptcy law on a plan that 13:39:20

17          hasn't been filed.                         13:39:22

18                  MR. HAAS:  A plan has been filed.  13:39:23

19      BY MR. HAAS:                                   13:39:28

20          Q     Again, Mr. -- I'll ask it one more   13:39:28

21      time.  If your counsel is going to instruct you 13:39:33

22      not to answer, we can address it later.  I     13:39:34

23      usually ask at least three times.  If I don't get 13:39:37

24      it on the third time, I move on.               13:39:39

25          A     I can't answer.  You said you wanted 13:39:41
```

Page 130

| | | |
|---|---|---|
| 1 | A. Birchfield, Esq. | |
| 2 | notwithstanding the fact that Beasley Allen has | 15:58:32 |
| 3 | litigated on behalf of talc claimants for | 15:58:35 |
| 4 | decades, you have never record a dime for talc | 15:58:37 |
| 5 | claimants in litigation; correct? | 15:58:40 |
| 6 | MS. SLOCUM:  Objection, form. | 15:58:42 |
| 7 | THE WITNESS:  We haven't litigated | 15:58:43 |
| 8 | for decades; okay.  The litigation is | 15:58:44 |
| 9 | approximately ten years.  That's a decade. | 15:58:51 |
| 10 | So that is true, but it's not decades. | 15:58:52 |
| 11 | And -- but we have not -- you know, J&J has | 15:58:57 |
| 12 | not -- has not settled with Beasley Allen | 15:59:00 |
| 13 | any of our claims. | 15:59:06 |
| 14 | BY MR. HAAS: | 15:59:09 |
| 15 | Q     And you have lost every single one of | 15:59:10 |
| 16 | the cases you tried, either at trial or on | 15:59:11 |
| 17 | appeal; correct? | 15:59:13 |
| 18 | A     No.  That's a mischaracterization.  I | 15:59:15 |
| 19 | mean, when you -- when you say that, you know, | 15:59:17 |
| 20 | that a verdict is vacated on personal | 15:59:23 |
| 21 | jurisdictional grounds, that is not losing on the | 15:59:26 |
| 22 | merits.  Those are still valid claims. | 15:59:28 |
| 23 | Q     Mr. Birchfield, in the entire | 15:59:30 |
| 24 | decade plus time -- | 15:59:34 |
| 25 | MR. PLACITELLA:  Referee.  One | 15:59:36 |

Page 143

```
 1              A. Birchfield, Esq.
 2       we get reasonable compensation.  Reasonable   16:26:46
 3       values for our clients.                       16:26:49
 4   BY MS. BROWN:                                     16:26:51
 5       Q    Sure, and I understand your position.    16:26:51
 6   I'm just talking about kind of what has happened  16:26:52
 7   to date, and you would believe that to date,      16:26:55
 8   every client whose case Beasley Allen has taken   16:26:57
 9   to a trial has gone home with $0 --               16:27:02
10              MS. SLOCUM:  Objection.                16:27:05
11   BY MS. BROWN:                                     16:27:06
12       Q    -- right?                                16:27:07
13              MS. SLOCUM:  Asked and answered,       16:27:08
14       like, about 15 times now.                     16:27:08
15              THE WITNESS:  So Beasley Allen --      16:27:10
16       for the cases that have gone to trial, none   16:27:12
17       of those -- you know, none of the verdicts,   16:27:14
18       the favorable verdicts, none of those have    16:27:16
19       been paid.  None of the defense verdicts      16:27:19
20       have been paid.  So it is true there have     16:27:21
21       been no payments on the 11 or 12 plaintiffs   16:27:24
22       that Beasley Allen represents that have gone  16:27:29
23       to trial to date.                             16:27:31
24   BY MS. BROWN:                                     16:27:32
25       Q    I want to ask you some questions, sir,   16:27:33
```

# EXHIBIT 5

 **BARNES & THORNBURG** LLP

One North Wacker Drive
Suite 4400
Chicago, IL 60606
(312) 357-1313
www.btlaw.com

James F. Murdica
Partner
(312) 214-4869
JMurdica@btlaw.com

November 5, 2023

Mr. James Conlan
Legacy Liability Solutions LLC
161 N. Clark Street, Suite 1700
Chicago, IL 60601

   **RE: Bloomberg Law**

Dear Jim:

  I write on behalf of Johnson & Johnson ("J&J") to express concern regarding the confidentiality of J&J's legal strategy known to you and learned by you in a privileged attorney-client relationship with J&J.  As you know, while a partner at Faegre Drinker Biddle Reath ("FDBR") in 2020 and 2021, you represented J&J and LTL Management, Inc. ("LTL") regarding strategies for resolution of its talc liabilities, including various bankruptcy options and proposed structural optimizations.  Indeed, you attended—with me—many high level meetings with J&J in-house counsel regarding talc bankruptcy and settlement strategies in addition to weekly strategy calls with J&J in-house and outside counsel.  There can be little doubt that the content shared and discussed during all of these meetings is privileged, and accordingly protected from disclosure.

  It has come to J&J's attention that on November 2, 2023 Bloomberg published an article you wrote entitled "Time to Ditch the Texas Two-Step for a New Mass Tort Strategy."  In that article, you discuss the LTL bankruptcy and what "the companies believed" certain strategies would accomplish.  With respect to LTL, you learned this information through the attorney-client relationship with J&J.  Moreover, you also wrote that a resolution strategy you recommended as J&J legal counsel and in which you assisted executing as J&J counsel is "a disaster," and that a service marketed by your new business enterprise "is the right answer."

  While we appreciate that you would like to promote your post-legal career business ventures—and, indeed, J&J met with you regarding those ventures two months ago—J&J requests you leave J&J and LTL out of any future publications.  You learned highly privileged information about J&J and LTL strategies from the attorney-client relationship.  And while publicly disparaging your own legal strategies that you recommended to J&J might be permissible if J&J or LTL were not included in the article, J&J believes that criticizing your former client for implementing a strategy you recommended as their counsel is not appropriate either.

Mr. James Conlan
Legacy Liability Solutions, LLC
November 5, 2023
Page 2


      Please cease and desist from further similar publications, and be mindful of the highly confidential and strategic information you learned from J&J while in an attorney-client relationship.


Sincerely,

Jim Murdica

# EXHIBIT 6



November 9, 2023


The Board of Directors
Johnson & Johnson
One Johnson & Johnson Plaza
New Brunswick, NJ 08933


Dear Members of the Board,


Legacy Liability Solutions LLC ("Legacy") proposes to acquire LTL and all the talc liable J&J affiliates in a transaction that will: (1) result in the disaffiliation of such entities from J&J, and (2) remove the non-cash charge for all the talc liabilities from J&J's balance sheet. For Legacy to enter into this transaction, the acquired talc liable entities of J&J would be required to hold assets with a present value of **$19.0 Billion,** or such greater amount as determined by J&J's independent auditor to remove from J&J's financial statements the non-cash charge for talc related liabilities.


Put simply, Legacy's proposal would resolve all of J&J's **current and future** talc related liabilities. Importantly, Legacy's proposal has been reviewed and is supported by leadership counsel on both the federal MDL and in state court cases across the country.


## Background to the Proposal


As you appreciate, J&J's Board must carefully evaluate Legacy's proposal and compare it to all other alternatives.


**Finality**


The word that describes your objective is "Finality". Finality means protection not only from the current talc claims (50,000+) but so-called future claims. Achievement of a confirmed Chapter *11* bankruptcy plan (with a channeling injunction) has many hurdles and is neither the most likely nor the fastest means to provide J&J finality. Indeed, even

if such a plan were confirmed, it simply cannot free J&J of its direct liability. Comparatively, Legacy's proposal is far more certain, is much faster, and **will free J&J of all liabilities including for direct claims against J&J.**

**Restoration of Shareholder Varue**

The J&J business is truly impressive and is a tribute to management and this Board. On October 17, J&J announced positive third quarter results, beating analyst estimates top to bottom, and even surprised investors by raising guidance for the full year. However, the uncertainty regarding the ultimate resolution of the contingent talc related liabilities has resulted in the capital markets imposing a significant discount to the intrinsic value of J&J shareholder equity. We expect the economic impact of the Legacy proposal to J&J will be significantly less than what is currently reflected in your market capitalization caused by those same talc liabilities. Your investment bankers and capital markets experts will of course advise you on that.

**Details of Proposal**

A critical factor of this transaction to achieving the desired finality, is a determination by your independent auditors (PricewaterhouseCoopers LLP) of the amount required to remove the non-cash charge on J&J's financial statements for the talc related liability. Legacy requires that the J&J entities with talc liability hold current assets of $19.0 Billion in present value, or such greater amount as determined by PwC.

To provide enhanced certainty to PwC in its determination, it is important to note that Leading Counsel in the MDL have agreed to support an opt-in settlement with Legacy, post-acquisition, on the terms described in the accompanying matrix (marked "Exhibit"). Leading Counsel in the MDL believe that the matrix settlement will enjoy 95% plus opt in and the matrix settlement is conditioned on achievement of the 95% opt in. Such a settlement should greatly reduce the tail of the distribution of future claims and projections considered by PwC in determining the amount of assets required to remove all talc related charges from J&J's financial statements.

As a result-of structural optimization in the form of a Texas divisive merger, much of J&J's talc liability is contained within LTL. J&J's counsel will structurally optimize all other affiliates (including J&J) with talc related liability, and those additional structurally optimized entities will become subsidiaries of LTL. Legacy will acquire 100% of the equity in LTL which will have assets of a value equal to $19 Billion in present value, or such great-er amount as determined by PwC.

We believe we can achieve closing in 90 days or less. We will go as fast as J&J and its professionals are able.

## Resources and Capabilities

The individuals running Legacy have led the world in (and quite literally invented) structural optimization and disaffiliation of solvent companies with mass tort liabilities. See, for example, the optimization of BorgWarner and ITT and the disaffiliation of their asbestos liabilities (BorgWarner/Morse-tee), and (ITT/Intelco). See also the optimization of Mine Safety Appliances and disaffiliation of the entities with coal dust related liabilities. John Gasparovic, one of Legacy's principals, was the Chief Legal Officer of BorgWarner and spear-headed the optimization. Notably, PwC was the independent auditor for BorgWarner and presided over removal of BorgWarner's contingent liability for asbestos.

### Asset Management

Our Chief Investment Officer, Doug Dachille is the former CIO of AIG and the investment management firm he founded, First Principles, was a fixed income manager for six of the largest 524(9) asbestos trusts at the direction of Cambrfdge Associates. Prudent investment guidelines, a minimum liquidity requirement equal to six months of projected claims and a capital adequacy standard will be established to ensure the entity has sufficient financial resources to satisfy its projected future claims obligations and a minimal risk of shortfall. These protections are critical to safeguard the claims paying capacity of LTI's assets. As one of the most experienced asset-liability investors in the world, Doug will ensure that claimants can be paid in full well into the future by taking a prudent and conservative investment approach.

The Legacy team has access to some of the most sophisticated asset management firms serving the insurance, pension, and institutional client segments. It is Legacy's intention to enter into an asset management agreement with New England Asset Management under which it will manage over 50% of LTI's assets.

- **New England Asset Management: will** serve as the investment manager of the liquid high credit quality assets for the investment portfolios of the acquired entities. In addition, **NEAM will** provide financial and ALM/risk management reporting, including capital stress testing to enable Legacy to dynamically manage the investment portfolio to preserve its claim payment capacity through investment cycles over the long-teTITI horizon.

ATL-L -002648-15   12/08/2023 9:16:57 PM  Pg 5 of 7   Trans ID: LCV20233584887
Case 3:16-md-02738-MAS-RLS   Document 28976   Filed 02/02/24   Page 88 of 221 PageID: 172481

Ex. 6

- **Legacy Liability Solutions: will** establish investment management agreements with a select group of best-in-class asset managers with expertise and origination capabilities in specific asset classes including fixed income and alternative investments.

**Strategic Logistics Partner**

Given the importance of managing litigation for decades into the future, Legacy has partnered with KCIC to provide responsive and technologically sophisticated management for the long term.

KCIC is a nationally recognized industry leader in providing logistics, claims and litigation management services through efficient use of technology to mass tort defendants. Built to last for the foreseeable future, KCIC is staffed at the senior level with industry veterans. KCIC is headquartered in Washington DC with offices in Chicago and Phoenix.

Bringing decades of industry experience, KCIC has established an outsized reputation not only in a range of expert consulting services, but in deploying leading-edge technology to create innovative solutions for clients.

KCIC currently provides full-service litigation and claims management services to over 50 individual asbestos defendants, including some of the very largest, equipping KCIC to take on the challenge of LTL.

Since its founding in 2002, and much earlier in the experience of its senior leadership team, KCIC has been deeply immersed in all aspects of business dispute resolution and mass tort litigation. KCIC's services include:

- Management consulting
- Design and implementation of custom technology solutions
- Claims administration and insurer billing
- Insurance coverage litigation and settlement
- Economic modeling and forensic accounting
- Data normalization, migration, and analytics
- Forecasting of products liabilities
- Expert testimony

ATL-L -002648-15   12/08/2023 9:16:57 PM   Pg 6 of 7   Trans ID: LCV20233584887
Case 3:16-md-02738-MAS-RLS   Document 28976   Filed 02/02/24   Page 89 of 221 PageID: 172482

Ex. 6

**Next Steps**

We propose an in person meeting with the J&J Board (or a subcommittee), and its professionals, in the coming days to provide even greater detail in an effort to aid you in your comparison of our proposal to all other alternatives availabfe to J&J. Together, after our in-person meeting, we will sign an appropriate confidentiality agreement. Thereafter, we will agree on a very specific, staged, action plan to reach closing.

Balancing risks, r.ewards, and probability -0f outcome, we believe the Board will conclude that the Legacy proposal is the clear winner in appropriately enhancing shareholder value.



**James F. Conlan**
Chief Executive Officer and Co-Founder
Legacy Liability Solutions
Dallas I Chicago I Washington
Email I james.conlan@legacyliability.com

Office  I +312.291.4619
rv1obile I +312.927.7572
www.legacyliability.com

Cc: Douglas A. Dachille
    JohnJ. G-asparpvic.

| Age Group | Death, Stage IV, Stage III w/Recurrence | Stage III without Recurrence | Stage II and I with Recurrence | Stage II without Recurrence | Stage I without Recurrence | Stage IV and III Borderline | Stage II and I Borderline |
|---|---|---|---|---|---|---|---|
| Under 45 | $1,000,000 | $628,721 | $435,268 | $265,997 | $169,271 | $96,726 | $64,484 |
| 45-49 | $822,173 | $534,413 | $369,978 | $226,098 | $143,880 | $82,217 | $54,812 |
| 50-54 | $628,721 | $408,669 | $282,924 | $172,898 | $110,026 | $62,872 | $41,915 |
| 55-59 | $531,995 | $345,796 | $239,398 | $146,299 | $93,099 | $53,199 | $35,466 |
| 60-64 | $386,905 | $251,488 | $174,107 | $106,399 | $67,708 | $38,691 | $25,794 |
| 65-69 | $290,179 | $188,616 | $130,580 | $79,799 | $50,781 | $29,018 | $19,345 |
| 70-74 | $241,816 | $157,180 | $108,817 | $66,499 | $42,318 | $24,182 | $16,121 |
| 75-79 | $174,107 | $113,170 | $78,348 | $47,880 | $30,469 | $17,411 | $11,607 |
| 80+ | $116,072 | $75,446 | $52,232 | $31,920 | $20,313 | $11,607 | $7,738 |
| Average Claim Value | $520,462 | $365,674 | $281,032 | $171,231 | $111,108 | $86,147 | $52,675 |

Ex. 6

EXHIBIT 7

| | |
|---|---|
| **From:** | Haas, Erik [JJCUS] |
| **To:** | John Gasparovic |
| **Cc:** | Van Arsdale, Duane [JJCUS]; White, Andrew [JJCUS]; James F. Conlan; doug.dachille@legacyliability.com; John J. Gasparovic; Forminard, Elizabeth [JJCUS] |
| **Subject:** | RE: [EXTERNAL] Re: Legacy Proposal |
| **Attachments:** | image001.png |

John,

Please cease any further communications with our executives, and direct any further correspondence concerning your proposals to my attention.

Also, our outside counsel has provided notice to Mr. Conlon regarding his conflicting positions and disclosure of attorney client privileged communications in breach of his ethical obligations. We expect that he will respect his duties going forward.

Best regards, Erik

---

**From:** John Gasparovic <jjgasparovic@gmail.com>
**Sent:** Thursday, November 9, 2023 10:48 AM
**To:** joaquinduato <joaquinduato@its.jnj.com>; jduato@its.jnj.com; Jduato2@its.jnj
**Cc:** Van Arsdale, Duane [JJCUS] <DVanArs@its.jnj.com>; Haas, Erik [JJCUS] <EHaas8@its.jnj.com>; White, Andrew [JJCUS] <AWhite23@ITS.JNJ.COM>; James F. Conlan <james.conlan@legacyliability.com>; doug.dachille@legacyliability.com; John J. Gasparovic <john.gasparovic@legacyliability.com>
**Subject:** [EXTERNAL] Re: Legacy Proposal

Mr. Duato,

Please see the attached proposal.



**John J. Gasparovic**
Executive Chairman
Legacy Liability Solutions
Dallas | Chicago | Washington
Email | john.gasparovic@legacyliability.com
Mobile | +1.330.573.7781
www.legacyliability.com

# EXHIBIT 2

2

**FOX ROTHSCHILD LLP**
**Formed in the Commonwealth of Pennsylvania**
By: Jeffrey M. Pollock, Esq. (015751987)
    Michael W. Sabo, Esq. (306252019)
Princeton Pike Corporate Center
997 Lenox Drive, Building 3
Lawrenceville, New Jersey 08648
(609) 896-3600
*Attorneys for Andy Birchfield and Beasley Allen*

|  |  |
|---|---|
| IN RE TALC-BASED POWDER PRODUCTS LITIGATION | **SUPERIOR COURT OF NEW JERSEY LAW DIVISION, ATLANTIC COUNTY**<br><br>Consolidated Docket No. ATL-L-2648-15<br><br>MCL Case No. 300<br><br>Civil Action<br><br>Return Date: January 17, 2024<br><br>**CERTIFICATION OF ANDY D. BIRCHFIELD, JR., ESQ. IN SUPPORT OF BEASLEY ALLEN'S OPPOSITION TO J&J'S ORDER TO SHOW CAUSE** |

I, ANDY D. BIRCHFIELD, Jr., ESQ., certify:

## Personal Qualifications, Accolades, and Basis of Knowledge

1.    I make this certification based on personal knowledge and in opposition to

Defendants Johnson & Johnson and LTL Management, LLC (collectively, J&J)'s Order to Show

Cause Seeking to Disqualify Beasley Allen Crow Methvin Portis & Miles, P.C. (Beasley Allen)

from this litigation.

2.    I attended Faulkner University's Thomas Goode Jones School of Law from 1988

through 1991, and I graduated with my juris doctor *magna cum laude* in 1991.

3.    I am a member in good standing of the Alabama State Bar. I am admitted to practice

153178860.1

law in the State of Alabama, the United States District Court for the Northern, Middle, and Southern Districts of Alabama, the United States District Court for the Eastern District of Louisiana, the United States Court of Appeals for the Eleventh Circuit, the United States Court of Appeals for the Fifth Circuit, and the United States Supreme Court.

4.  I have significant trial experience in both state and federal court, and my practice encompasses a wide range of legal matters including personal injury and civil rights cases. For the past 25 years, however, my practice has focused primarily on mass tort product liability litigation.

5.  I joined the firm Beasley Allen in 1996 and have worked as an attorney at the firm since that time. At Beasley Allen, I manage the firm's Mass Torts Section, which includes approximately 132 people, including attorneys and staff. The section has successfully resolved claims for thousands of clients in the Vioxx, Bextra/Celebrex, Actos, Xarelto, Baycol, Rezulin, PPA, Ephedra, Transvaginal mesh, and other litigations. *See, e.g., In re Vioxx Prod. Liab. Litig.*, 802 F. Supp. 2d 740, 779 (E.D. La. 2011) (MDL Docket No. 1567) (the Court noting that "Birchfield provided the leadership necessary to bring this complex litigation to a successful and efficient resolution. Andy Birchfield's commitment to the litigation from beginning to end is unmatched; he played crucial roles in MDL leadership, bellwether trials, settlement negotiations, and administration."); *Estep v. Pharmacia & Upjohn Co. (In re Testosterone Replacement Therapy Prods. Liab. Litig.)*, 67 F. Supp. 3d 952, 957 (N.D. Ill. 2014) (MDL Docket No. 2545); *In re Bextra and Celebrex Marketing Sales Practices and Product Liability Litig.*, 495 F. Supp. 2d 1027, 1029 (N.D. Cal. 2007) (MDL Docket No. 1699); *Hester v. Bayer Corp.*, 206 F.R.D. 683 (M.D. Ala. 2001). Our firm has pending litigation against J&J involving J&J's talcum powder-based products that has been going on for over 10 years.

6.  I have never represented J&J or LTL, nor has Beasley Allen ever represented J&J or LTL.

153178860.1

7.      At no point in time has Mr. Conlan ever been a member, partner, employee, or counsel at Beasley Allen.

8.      I am also a member of the American Association for Justice and the Montgomery Trial Lawyers Associations. I have served as president of the the Alabama Young Lawyers, as well as on numerous task forces and committees of the Alabama State Bar. I have served on the Committee for Character and Fitness of Alabama, which assesses those attributes with respect to applicants for admission to the Bar.

### J&J's Baseless Allegations and My Thirty Years of Ethical Conduct and Compliance with the Attorney Rules of Professional Conduct

9.      I am aware of and have complied with the Rules of Professional Conduct, including R.P.C. 1.6 Confidentiality of Information. This Rule states from the outset R.P.C. 1.6(a) "A lawyer shall not reveal information relating to representation of a client . . . ." The attorney-client privilege is the bedrock of client communications and I have understood this—and acted accordingly—since I took and passed the bar exam. Similarly, I have at all relevant times been aware of and complied with R.P.C. 1.9(a) and 1.9(c), which govern an attorney's professional and ethical obligations to former clients.

10.     Since I graduated law school over thirty (30) years ago, I have always diligently followed the Rules of Professional Conduct (including R.P.C. 1.6, and 1.9).

11.     At no time have I ever violated a client's confidences or attorney-client privilege. I have never received, disseminated, or shared confidential information, including trial strategy, litigation strategies, settlement practices, or proprietary information (if any) that I learned from any client. Specifically, I refer here to R.P.C. 1.9 Duties to Former Clients—which prohibits a lawyer from representing a new client "in the same or substantially related matter in which that client's interests are materially adverse to the interests of the former client . . .."

153178860.1

ATL-L-002648-15   01/09/2024 4:25:34 PM   Pg 4 of 4   Trans ID: LCV202475816

12.     Mr. Conlan has never shared privileged or confidential information he obtained from any of his former clients (including J&J) with me or my firm Beasley Allen.

I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are false, I am subject to punishment.

Dated: January **8**, 2024

_____

ANDY D. BIRCHFIELD, Jr., ESQ.

153178860.1

# EXHIBIT 3

**FOX ROTHSCHILD LLP**
**Formed in the Commonwealth of Pennsylvania**
By:    Jeffrey M. Pollock, Esq. (015751987)
          Michael W. Sabo, Esq. (306252019)
Princeton Pike Corporate Center
997 Lenox Drive, Building 3
Lawrenceville, New Jersey 08648
(609) 896-3600
*Attorneys for Andy Birchfield and Beasley Allen*

| | |
|---|---|
| IN RE TALC-BASED POWDER PRODUCTS LITIGATION | SUPERIOR COURT OF NEW JERSEY LAW DIVISION, ATLANTIC COUNTY<br><br>Consolidated Docket No. ATL-L-2648-15<br><br>MCL Case No. 300<br><br>Civil Action<br><br>Return Date: January 17, 2024<br><br>**CERTIFICATION OF TED MEADOWS, ESQ. IN SUPPORT OF BEASLEY ALLEN'S OPPOSITION TO J&J'S ORDER TO SHOW CAUSE** |

I, TED MEADOWS, ESQ., certify:

**Personal Qualifications, Accolades, and Basis of Knowledge**

1.      I make this certification based on personal knowledge and in opposition to Defendants Johnson & Johnson and LTL Management, LLC (collectively, J&J)'s Order to Show Cause Seeking to Disqualify Beasley Allen Crow Methvin Portis & Miles, P.C. (Beasley Allen) from this litigation.

2.      I attended the Cumberland School of Law, and graduated in 1991.

3.      I am a member in good standing of the State Bars of Alabama, Texas, Mississippi, Minnesota, West Virginia, the District of Columbia, and various federal courts around the country.

4.      I have significant litigation experience in both state and federal court, and my practice encompasses a wide range of legal matters including personal injury and product liability cases. For the past 20 years, however, my practice has focused primarily on mass tort product liability litigation with the last 10 years focusing on representing ovarian cancer victims against J&J in courts around the country.  In the last 8 years, I have served as co-lead counsel in eleven (11) such ta;c trials and assisted in preparation for many other talc trials.

5.      I joined the law firm Beasley Allen in 2001 and have worked as a principal attorney since 2002. At Beasley Allen, I work in the firm's Mass Torts Section, which includes approximately 132 people, including attorneys and staff. The section has successfully resolved claims for thousands of clients in the Vioxx, Bextra/Celebrex, Actos, Xarelto, Baycol, Rezulin, PPA, Ephedra, Transvaginal mesh, and other litigations. *See, e.g.*, *Young v. Mentor Worldwide LLC*, 312 F. Supp. 3d 765 (E.D. Ark. 2018) (litigation involving ObTape to treat urinary incontinence); *Krueger v. Wyeth, Inc.*, 310 F.R.D. 468 (S.D. Cal. 2015) (class action litigation involving hormone replacement therapy); *In re Vioxx Prods. Liab. Litig.*, 802 F. Supp. 2d 740, 780 (E.D. La. 2011) (Judge Eldon E. Fallon noting that "Beasley Allen took a lead role in the preparation and presentation of the Trial Package.").  I personally served on the Plaintiffs' Steering Committee in the Prempro Multi-District breast cancer litigation which lasted for more than ten (10) years.

6.      I also served as lead co-counsel in *Carl v. Johnson & Johnson*, 464 N.J. Super. 446, (App. Div. 2020), where the Superior Court of New Jersey—Appellate Division reversed the trial court and held that plaintiffs' experts' methodologies were sound and there was sufficient evidence to support claims that J&J's Baby Powder causes ovarian cancer. Our firm has pending litigation against J&J involving their talcum powder-based products that has been going on for over ten (10) years.

7.      I have never represented J&J or LTL, nor has Beasley Allen ever represented J&J or LTL.

## J&J's Baseless Allegations and My Thirty Years of Ethical Conduct and Compliance with the Attorney Rules of Professional Conduct

8.      I am aware of and have complied with the Rules of Professional Conduct, including R.P.C. 1.6 Confidentiality of Information. This Rule states from the outset R.P.C. 1.6(a) "A lawyer shall not reveal information relating to representation of a client . . . ." The attorney-client privilege is the bedrock of client communications and I have understood this—and acted accordingly—since I took and passed the bar exam. Similarly, I have at all relevant times been aware of and complied with R.P.C. 1.9(a) and 1.9(c), which govern an attorney's professional and ethical obligations to former clients.

9.      Since I graduated law school more than thirty (30) years ago, I have always diligently followed the Rules of Professional Conduct (including R.P.C. 1.6, and 1.9).

10.     At no time have I ever violated a client's confidences or attorney-client privilege. I have never received, disseminated, or shared confidential information, including trial strategy, litigation strategies, settlement practices, or proprietary information (if any) that I learned from any client. Specifically, I refer here to R.P.C. 1.9 Duties to Former Clients—which prohibits a lawyer from representing a new client "in the same or substantially related matter in which that client's interests are materially adverse to the interests of the former client . . .."

11.     Mr. Conlan has never shared privileged or confidential information he obtained from any of his former clients (including J&J) with me or my firm Beasley Allen.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are false, I am subject to punishment.

Dated: January _8_, 2024

TED MEADOWS, ESQ.

3

# EXHIBIT 4

**FOX ROTHSCHILD LLP**
**Formed in the Commonwealth of Pennsylvania**
By:     Jeffrey M. Pollock, Esq. (015751987)
          Michael W. Sabo, Esq. (306252019)
Princeton Pike Corporate Center
997 Lenox Drive, Building 3
Lawrenceville, New Jersey 08648
(609) 896-3600
*Attorneys for Andy Birchfield and Beasley Allen*

| | |
|---|---|
| IN RE TALC-BASED POWDER PRODUCTS LITIGATION | SUPERIOR COURT OF NEW JERSEY LAW DIVISION, ATLANTIC COUNTY |
| | Consolidated Docket No. ATL-L-2648-15 |
| | MCL Case No. 300 |
| | Civil Action |
| | Return Date: January 17, 2024 |
| | **CERTIFICATION OF JAMES F. CONLAN IN SUPPORT OF BEASLEY ALLEN'S OPPOSITION TO J&J'S ORDER TO SHOW CAUSE** |

I, JAMES F. CONLAN, certify:

<u>**Personal Qualifications and Basis of Knowledge**</u>

1.      I  make  this  certification  based  on  personal  knowledge  and  in  opposition  to

Defendants Johnson & Johnson and LTL Management, LLC (collectively, J&J)'s Order to Show

Cause Seeking to Disqualify Beasley Allen Crow Methvin Portis & Miles, P.C. (Beasley Allen)

from this litigation.

2.      I received my juris doctor in 1988 from the University of Iowa College of Law.

3.      Since my graduation from law school in 1988, I have had several law firm jobs. I

served as Global Practice Leader of Sidley Austin's world-wide Restructuring Practice where I

practiced for 32 years. Most recently I served as a Partner and Global Co-Head of Restructuring at Faegre Drinker Biddle & Reath, LLP until 2022.

4. During my tenure as Partner and Global Co-Head of Restructuring at Faegre Drinker Biddle & Reath, LLP, I represented J&J.

5. In March of 2022, I co-founded Legacy Liability Solutions LLC  (Legacy). I currently serve as the Chief Executive Officer of Legacy.

6. In March of 2022, I became a non-practicing lawyer. I am active and authorized to practice law, but I do not practice law and have no clients.

7. At no point in time have I ever been a member, partner, employee or counsel at Beasley Allen.

### J&J's Baseless Allegations and My Thirty-Five Years of Ethical Conduct and Compliance with the Attorney Rules of Professional Conduct

8. I am well aware of the Rules of Professional Conduct, including RPC 1.6 Confidentiality of Information. This Rule states from the outset: "A lawyer shall not reveal information relating to representation of a client . . . ."  The attorney-client privilege is the bedrock of client communications and I have understood this—and acted accordingly—since I took and passed the bar exam.  Similarly, I have at all relevant times been aware of and complied with RPC 1.9(a) and 1.9(c), which govern an attorney's professional and ethical obligations to former clients.

9. Consistent with the Rules of Professional Conduct, I have never disclosed to Mr. Birchfield or any member of his firm, Beasley Allen, any confidential information belonging to J&J—nor that of any other client from my previous years of practice.

10. Moreover, neither Legacy nor I have any J&J privileged or confidential information that is required for Legacy to consensually transact with J&J to solve J&J's current and future talc liability (with finality); the Legacy model applies similarly to all solvent mass tort defendants.

2

I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are false, I am subject to punishment.

Dated:  January __8__ 2024

_____
JAMES F. CONLAN
Chief Executive Officer
Legacy Liability Solutions LLC

# EXHIBIT 5

**FOX ROTHSCHILD LLP**
**Formed in the Commonwealth of Pennsylvania**
By:     Jeffrey M. Pollock, Esq. (015751987)
        Michael W. Sabo, Esq. (306252019)
Princeton Pike Corporate Center
997 Lenox Drive, Building 3
Lawrenceville, New Jersey 08648
(609) 896-3600
*Attorneys for Andy Birchfield and Beasley Allen*

|  |  |
|---|---|
| IN RE TALC-BASED POWDER PRODUCTS LITIGATION | SUPERIOR COURT OF NEW JERSEY LAW DIVISION, ATLANTIC COUNTY |
|  | Consolidated Docket No. ATL-L-2648-15 |
|  | MCL Case No. 300 |
|  | Civil Action |
|  | Return Date: January 17, 2024 |
|  | **CERTIFICATION OF JOHN GASPAROVIC IN SUPPORT OF BEASLEY ALLEN'S OPPOSITION TO J&J'S ORDER TO SHOW CAUSE** |

I, JOHN J. GASPAROVIC, certify:

1.      I make this certification based on personal knowledge and in opposition to Defendants Johnson & Johnson and LTL Management, LLC (collectively, J&J)'s Order to Show Cause Seeking to Disqualify Beasley Allen Crow Methvin Portis & Miles, P.C. (Beasley Allen) from this litigation.

2.      I am co-Founder and the Executive Chairman of Legacy Liability Solutions LLC (Legacy).

3.      I have held multiple Chief Legal Officer positions of companies (including public companies) with mass tort exposure. Over my forty-one (41) year career, I have served as the Chief

Legal Officer of Exide Technologies, BorgWarner Inc., Federal-Mogul Corporation, Roadway Corporation and Guardian Automotive. While I was serving as Chief Legal Officer, I worked with James Conlan to structurally optimize both BorgWarner and Exide Technologies.

4.     I am well aware of the Rules of Professional Conduct governing lawyer conduct, including R.P.C. 1.6, Confidentiality of Information.

5.     I am well aware of the ethical obligations of an attorney, including the duty to maintain client confidences after a representation has concluded and after an attorney moves to other employment.

6.     At no time has James Conlan disclosed any of J&J's confidential or privileged information to me or Legacy.

7.     Legacy has never possessed and therefore never could disclose to Mr. Birchfield or any member of his firm, Beasley Allen, any confidential information belonging to J&J.

8.     Moreover, neither Legacy nor Conlan has any J&J privileged or confidential information that is required for Legacy to consensually transact with J&J to solve J&J's current and future talc liability (with finality); the Legacy model applies similarly to solvent mass tort defendants.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are false, I am subject to punishment.

Dated: Janaury **8** , 2024

_JOHN J. GASPAROVIC_
Executive Chairman
Legacy Liability Solutions LLC

# EXHIBIT 6

## SUPERIOR COURT OF NEW JERSEY
## LAW DIVISION, ATLANTIC COUNTY

| | |
|---|---|
| **IN RE TALC-BASED POWDER PRODUCTS LITIGATION**<br><br>*Applicable to All Cases* | Master Docket No.<br>ATL-L-2648-15<br><br>MCL CASE NO. 300<br><br>CIVIL ACTION |

## CERTIFICATION OF ERIK HAAS

I, Erik Haas, hereby declare and certify as follows:

1.      I am over the age of eighteen, of sound mind, and in all respects competent to testify.  I have personal knowledge of the information contained in this Certification and would testify completely to these facts if called to do so.

2.      I am Worldwide Vice President, Litigation for Johnson & Johnson ("J&J"), a position I have held since November 2020.

3.      In this position, I worked directly with attorney James Conlan of the law firm of Faegre Drinker when Mr. Conlan represented J&J in this matter that is being litigated before this Court (and elsewhere).  I worked with Mr. Conlan from the time I joined J&J in November 2020 through February 2022, when Mr. Conlan left Faegre Drinker.  I also am familiar with the work Mr. Conlan performed for J&J before I joined—from the time he was retained in July 2020 through October 2020—from my contemporaneous discussions with my colleagues who retained

and worked with Mr. Conlan, the documents I reviewed when I joined, and my review of Mr. Conlan's billing records for his work for J&J.

4.      As I indicated in my prior declaration, from July 2020 through early 2022, Mr. Conlan represented J&J as part of a team of attorneys evaluating legal strategies for resolving pending and future claims advanced by plaintiffs asserting liability for illnesses allegedly caused by J&J's talc products, including the plaintiffs in this matter.  Mr. Conlan spent almost 1,600 hours on the matter for J&J, for which he billed $2.24 million.

5.      Throughout his engagement as outside counsel for J&J, Mr. Conlan was intimately and extensively involved in the same matter—and with respect to the same issues—that he thereafter partnered on with counsel who was and is adverse to J&J in the matter: Andy Birchfield of the Beasley Allen firm.  As discussed further below, during Mr. Conlan's tenure as J&J's counsel, I had innumerable communications with Mr. Conlan—as did my colleagues at J&J and our outside counsel engaged on the matter—wherein the most sensitive attorney-client privileged, work-product protected and confidential information concerning the issues was shared, discussed and debated.  Those communications concerned the merits of and strategy for litigating the claims at issue, and under what circumstances, on what terms and with whom J&J should or would consider settling or otherwise resolving the claims.  On many occasions, those issues were

deliberated in the context of the particular resolution structure that Messrs. Conlan and Birchfield have since advocated for as an adverse alternative to J&J's proposed resolution—by which the two expressly seek to extract $10 billion more than J&J has offered.

6.      As part of his representation of J&J, Mr. Conlan participated in weekly strategy meetings and teleconferences that regularly included me, J&J's former head of litigation Joseph Braunreuther, former product liability lead John Kim, and current product liability head Andrew White, along with lead outside counsel for the Company.  He also communicated with me, other members of the J&J Law Department, and lead outside counsel on this litigation, including trial counsel, by email, phone, videoconference, and over dinner.

7.      These meetings, teleconferences, videoconferences, and email communications addressed all aspects of J&J's strategy for resolution of the talc litigation.  To weigh various strategies for resolving the talc litigation, these discussions included J&J's evaluation of the strengths and weaknesses of the plaintiffs' claims and J&J's defenses in the underlying talc litigation—including the cases in this MCL proceeding—and strategy and likely outcomes should individual cases proceed to trial.  In all, Mr. Conlan was privy to almost two years of confidential communications about the claims, defenses, and potential settlement options for cases in this litigation.

3

8.      As to settlement options, as counsel for J&J, Mr. Conlan participated in strategic discussions where J&J Law Department leadership and its outside counsel team evaluated the following options for resolving this litigation:  (1) "structural optimization" for resolution of claims through the tort system; (2) an asbestos trust; (3) use of a settlement class action procedure; (4) inventory settlements with individual plaintiffs' attorneys; (5) settlement through the Imerys bankruptcy; and (6) a bankruptcy filing by LTL Management LLC.  As counsel for J&J, Mr. Conlan participated in the evaluation of the strengths and weaknesses of all of these options as potential strategies for resolution of present and future talc liabilities, including the claims in this New Jersey proceeding.

9.      Notably, in the Spring of 2021, Mr. Conlan provided extensive advice to me and my colleagues, and engaged in negotiations on our behalf, with respect to a settlement proposal advanced by Mr. Birchfield.  As Mr. Birchfield testified in his deposition taken in the LTL bankruptcy, that settlement contemplated the resolution of the ovarian talc claims for $4.2 billion.  Mr. Conlan conferred with us regarding the strengths and weaknesses of utilizing a "structural optimization" strategy in lieu of the settlement format Mr. Birchfield proposed at that time.

10.     Generally speaking, structural optimization is a resolution strategy that involves the formation, funding and divestiture of an entity that holds certain liabilities, which are subject to managed resolutions in the tort system.  The

viability and suitability of the strategy depends on many considerations that turn on confidential, privileged and protected positions.

11.     Throughout the time he was engaged as counsel for J&J, Mr. Conlan participated in confidential strategic discussions to consider why structural optimization was and was not in J&J's interest.  Those discussions included confidential evaluation of how much J&J would be willing to spend to resolve present and future talc liabilities and which resolution options best achieved J&J's objectives.  Mr. Conlan's work not only involved internal discussions concerning all talc settlement strategies and evaluation of the strengths and weaknesses in plaintiffs' claims, but also active involvement in negotiation of potential resolutions.

12.     Structural optimization through the tort system is the resolution vehicle on which Mr. Conlan has now partnered with Andy Birchfield.  As counsel for Beasley Allen admitted (with Mr. Birchfield at his side) during the January 17, 2024 hearing in this matter that I attended, Mr. Conlan and Mr. Birchfield "did work together to come up with a strategy to try to resolve or settle disputes."  That "strategy" was packaged and presented in a structural optimization model, which is one of the resolutions that Mr. Conlan evaluated with me, my colleagues at J&J, and J&J's outside counsel team when he was representing J&J on this matter.

13.     Messrs. Birchfield and Conlan have expressly promoted their structural optimization strategy as an alternative to J&J's pending resolution—and they have together advocated that J&J should be compelled to contribute $19 billion to effectuate the model.  That is an amount that is many times the $4.2 billion resolution that Mr. Birchfield proposed in the settlement discussions in 2021, and more than twice the amount that J&J has offered in bankruptcy.  As designed, Mr. Birchfield alliance with J&J's former counsel is impeding J&J's efforts to secure an equitable, final and comprehensive resolution of the talc claims.

I declare and certify under penalty of perjury that the foregoing is true and correct.

Executed this 25th day of January, 2024.

_____
Erik Haas
Worldwide Vice President, Litigation
Johnson & Johnson

# EXHIBIT 7

**SUPERIOR COURT OF NEW JERSEY
LAW DIVISION, ATLANTIC COUNTY**

| | |
|---|---|
| **IN RE TALC-BASED POWDER PRODUCTS LITIGATION** | Master Docket No. ATL-L-2648-15 |
| | MCL CASE NO. 300 |
| *Applicable to All Cases* | CIVIL ACTION |

## CERTIFICATION OF JAMES MURDICA

I, James Murdica, hereby declare and certify as follows:

1.      I am over the age of eighteen, of sound mind, and in all respects competent to testify. I have personal knowledge of the information contained in this Declaration and would testify completely to these facts if called to do so.

2.      I am a partner at the law firm Barnes & Thornburg, where I am the Chairman of the Product Liability and Mass Torts practice.

3.      I have represented Johnson & Johnson ("J&J") since late 2019 as outside counsel for claims by plaintiffs asserting liability for illnesses allegedly caused by J&J's talc products, including the plaintiffs in this matter.

4.      In this position, I worked directly with attorney James Conlan of the law firm of Faegre Drinker when he represented J&J in this matter between July 2020 and February 2022.

1

5.      Mr. Conlan represented J&J as part of a team of attorneys evaluating legal strategies for resolution of pending and future claims by plaintiffs asserting liability for illnesses allegedly caused by J&J's talc products.

6.      I attended many meetings and weekly strategy calls with J&J's in-house and other outside counsel regarding the Company's talc liabilities, where I and J&J's other counsel, including Mr. Conlan, frequently discussed strategies for resolution of the Company's talc liabilities, including the claims in this proceeding.

7.      During those strategy calls, we engaged in privileged and confidential conversations with J&J involving my and J&J's strategic thinking related to all of its options for resolving its talc liabilities—including, as I wrote to Mr. Conlan on November 5, 2023, "various bankruptcy options and proposed structural optimizations." Structural optimization is the same settlement model that Mr. Conlan is now advocating through his partnership with Mr. Birchfield.

8.      On November 5, 2023, I wrote a letter to Mr. Conlan on behalf of J&J expressing J&J's concerns that Mr. Conlan was improperly disclosing J&J's confidences that he learned in the course of his privileged attorney-client relationship with the Company. A true and correct copy of that letter is attached as Exhibit 1. The letter was written in direct response to an article Mr. Conlan had authored, published by Bloomberg, entitled "Time to Ditch the Texas Two-Step for a New Mass Tort Strategy."

2

9.      In that article, Mr. Conlan discussed the LTL bankruptcy and what "the companies believed" certain strategies would accomplish. I pointed out that with respect to LTL, Mr. Conlan had learned this information through his attorney-client relationship with J&J. I also pointed out that Mr. Conlan had written that a resolution strategy he considered as J&J legal counsel was "a disaster," and that a service marketed by his new business enterprise, Legacy Liability Solutions, "is the right answer."

10.     In the letter, I reminded Mr. Conlan that he "attended—with me—many high level meetings with J&J in-house counsel regarding talc litigation settlement strategies in addition to weekly strategy calls with J&J in-house and outside counsel." These assertions in my letter were based on Mr. Conlan's participation in confidential strategy discussions while he represented J&J in this litigation.

11.     In my letter, I further emphasized that "[t]here can be little doubt that the content shared and discussed during all of these meetings is privileged, and accordingly protected from disclosure."

12.     In the letter's conclusion, I asked that Mr. Conlan "be mindful of the highly confidential and strategic information you learned from J&J while in an attorney-client relationship."

13.     Unfortunately, based on subsequent events, Mr. Conlan was not mindful or protective of the confidential and strategic information he learned while he represented J&J.  Instead, Mr. Conlan continued his alliance with Andy Birchfield and the Beasley Allen law firm to jointly advocate for a resolution of J&J's talc claims utilizing a structural optimization model.  That alliance is demonstrated by Mr. Conlan's November 9, 2023 letter to J&J's Board of Directors and the subsequent investor seminar advertised by Gordon Haskett Research Advisors, where he presented jointly with Mr. Birchfield to the investment community as they pursued their structural optimization resolution for J&J's talc liabilities.

14.     Mr. Conlan's alliance with Mr. Birchfield regarding a structural optimization model to resolve J&J's talc claims necessarily implicated the confidential, privileged and protected communications between Mr. Conlan and J&J and its outside counsel, including myself.  Those communications informed the strategic discussions that Mr. Conlan had and initiatives he developed with Mr. Birchfield to utilize the same model, to address that same talc claims, in connection with the same matters that were the subject of Mr. Conlan's engagement by J&J.

4

I declare and certify under penalty of perjury that the foregoing is true and correct.

Executed this 25th day of January, 2024.

James Murdica
Partner, Barnes & Thornburg, LLP

5

# EXHIBIT 1


**BARNES &
THORNBURG LLP**

One North Wacker Drive
Suite 4400
Chicago, IL 60606
(312) 357-1313
www.btlaw.com

James F. Murdica
Partner
(312) 214-4869
JMurdica@btlaw.com

November 5, 2023

Mr. James Conlan
Legacy Liability Solutions LLC
161 N. Clark Street, Suite 1700
Chicago, IL 60601

   **RE: Bloomberg Law**

Dear Jim:

   I write on behalf of Johnson & Johnson ("J&J") to express concern regarding the confidentiality of J&J's legal strategy known to you and learned by you in a privileged attorney-client relationship with J&J.  As you know, while a partner at Faegre Drinker Biddle Reath ("FDBR") in 2020 and 2021, you represented J&J and LTL Management, Inc. ("LTL") regarding strategies for resolution of its talc liabilities, including various bankruptcy options and proposed structural optimizations.  Indeed, you attended—with me—many high level meetings with J&J in-house counsel regarding talc bankruptcy and settlement strategies in addition to weekly strategy calls with J&J in-house and outside counsel.  There can be little doubt that the content shared and discussed during all of these meetings is privileged, and accordingly protected from disclosure.

   It has come to J&J's attention that on November 2, 2023 Bloomberg published an article you wrote entitled "Time to Ditch the Texas Two-Step for a New Mass Tort Strategy."  In that article, you discuss the LTL bankruptcy and what "the companies believed" certain strategies would accomplish.  With respect to LTL, you learned this information through the attorney-client relationship with J&J.  Moreover, you also wrote that a resolution strategy you recommended as J&J legal counsel and in which you assisted executing as J&J counsel is "a disaster," and that a service marketed by your new business enterprise "is the right answer."

   While we appreciate that you would like to promote your post-legal career business ventures—and, indeed, J&J met with you regarding those ventures two months ago—J&J requests you leave J&J and LTL out of any future publications.  You learned highly privileged information about J&J and LTL strategies from the attorney-client relationship.  And while publicly disparaging your own legal strategies that you recommended to J&J might be permissible if J&J or LTL were not included in the article, J&J believes that criticizing your former client for implementing a strategy you recommended as their counsel is not appropriate either.

Ex. 1

Mr. James Conlan
Legacy Liability Solutions, LLC
November 5, 2023
Page 2

      Please cease and desist from further similar publications, and be mindful of the highly confidential and strategic information you learned from J&J while in an attorney-client relationship.

Sincerely,

Jim Murdica

**BARNES & THORNBURG** LLP

# EXHIBIT 8

**FOX ROTHSCHILD LLP**
**Formed in the Commonwealth of Pennsylvania**
By:      Jeffrey M. Pollock, Esq. (015751987)
         Michael W. Sabo, Esq. (306252019)
Princeton Pike Corporate Center
997 Lenox Drive, Building 3
Lawrenceville, New Jersey 08648
(609) 896-3600
*Attorneys for Andy Birchfield and Beasley Allen*

| | |
|---|---|
| IN RE TALC-BASED POWDER PRODUCTS LITIGATION | SUPERIOR COURT OF NEW JERSEY LAW DIVISION, ATLANTIC COUNTY |
| | Consolidated Docket No. ATL-L-2648-15 |
| | MCL Case No. 300 |
| | Civil Action |
| | **SUPPLEMENTAL CERTIFICATION OF ANDY D. BIRCHFIELD, JR., ESQ. IN SUPPORT OF BEASLEY ALLEN'S OPPOSITION TO J&J'S ORDER TO SHOW CAUSE** |

I, ANDY D. BIRCHFIELD, Jr., ESQ., certify:

1.      I make this supplemental certification based on personal knowledge and in further opposition to Defendants Johnson & Johnson and LTL Management, LLC (collectively, J&J)'s Order to Show Cause Seeking to Disqualify Beasley Allen Crow Methvin Portis & Miles, P.C. (Beasley Allen) from this litigation.

2.      Beasley Allen partners serve on many litigation leadership committees in federal and state courts, including representing a member of the LTL Tort Claimants Committee.

## Beasley Allen Gained Significant Knowledge Over Its Ten (10) Year Intense Participation in New Jersey Talc Litigation

3.    Beasley Allen opened its first talc case against J&J in 2013 and filed its first talc lawsuit against J&J in January 2014.

4.    Beasley Allen tried its first talc lawsuit on behalf of an ovarian cancer victim in 2016 obtaining a seventy-two (72) million dollar verdict.

5.    Between 2016 and 2021 when J&J filed its first bankruptcy petition, Beasley Allen had twelve (12) trials against J&J involving ovarian cancer victims.

6.     Beasley Allen was integrally involved in New Jersey talc litigation long before I, or any member of Beasley Allen, ever met Mr. Conlan or anyone with Legacy, which did not occur until late April 2023.

7.    In 2016, my law partner at Beasley Allen, Ted Meadows, served as co-lead counsel as this Court, with Judge Nelson Johnson presiding, conducted a weeks-long *Kemp* hearing.[1]

8.    In October 2016, my law partner at Beasley Allen, Leigh O'Dell, was appointed co-lead counsel of the Plaintiffs' Steering Committee in *In re: Johnson & Johnson Talcum Powder Products Marketing, Sales Practices, and Products Liablility Litigation*, MDL No. 16-2738 (MAS)/(RLS) (D.N.J.). As co-lead counsel, Leigh O'Dell has responsibility for more than pending 50,000 cases.

9.    In October 2021, J&J filed its first bankruptcy petition and the United States Trustee appointed a Beasley Allen client to the *In re LTL Management LLC* Tort Claimants Committee (TCC), with me, Leigh O'Dell, and Ted Meadows serving as representatives.

10.    Extensive discovery was undertaken in LTL Management LLC (LTL-1) in

---

[1] J&J's adverse ruling was reversed. *See Carl v. Johnson & Johnson*, 464 N.J. Super. 446 (App. Div. 2020) (reversing the trial court and holding that plaintiffs' experts' methodologies were sound and there was sufficient evidence to support claims that J&J's Baby Powder can cause ovarian cancer despite J&J's continued claim of "junk science").

preparation for a Motion to Dismiss trial. Leigh O'Dell, Ted Meadows, and I were actively involved in every aspect of the trial preparation.

11.     In LTL-1, Judge Michael Kaplan ordered mediation. I led the team effort on behalf of ovarian cancer victims to reach a mediated resolution. With mediators involved, there was in-depth discussion of the value of talc claims from both sides. This mediation effort continued for approximately a year.

12.     In addition to the court-appointed mediators, Judge Kaplan appointed Kenneth Feinberg to serve as a Rule 706 expert for the purpose of preparing a report to the Court of the estimated liability for talc claims. I served as the point person for the ovarian cancer leadership team for this estimation process. The entire team worked closely with Mr. Feinberg in this process. This process necessarily involved the back and forth of the parties regarding the strength and weaknesses of the cases.

13.     On January 30, 2023, the Third Circuit issued its decision that LTL-1 must be dismissed. The bankruptcy court issued the order of dismissal on April 4, 2023.

14.     Following the Third Circuit decision and before the actual dismissal order was entered on April 4, 2023, I, along with the plaintiff leadership team, prepared a settlement proposal substantially similar to the proposal that is discussed as part of the Legacy proposal that J&J provided to the Court. Legacy had no involvement in the development of the settlement proposal.

15.     On April 4, 2023, just hours after the order was entered to dismiss LTL-1, J&J filed its second bankrupty petition. With the second filing, J&J proposed a plan that would have offered unreasonably low values to cancer victims. Immediately I, along with others, voiced opposition on the basis that under the proposal, cancer victims would not receive fair compensation.

16.     The United States Trustee appointed a Beasley Allen client to serve on the TCC for

LTL-2 with me, Leigh O'Dell and Ted Meadows serving as representatives.

17.     My first contact with anyone at Legacy was on April 27, 2023 and that was a call that was facilitated by counsel for the TCC.

18.     The first meeting with Legacy personnel was on May 2, 2023.

19.     Before meeting anyone from Legacy, I, along with my partners at Beasley Allen, had extensive knowledge regarding talc claims, the strengths and weaknesses of claims, the values of claims, J&J approaches to settlement, and J&J litgation strategies. This knowledge did not come from inside information but years of experience involved in every aspect of the litigation. I have always viewed Legacy as a vendor who was talking with all parties about a creative solution to a difficult problem based on their collective experience in similar transactions. I have never viewed Legacy as an ally or an adversary.

20.     Because of Beasley Allen's intense years-long participation and experience in the talcum powder litigation, it has gained a great deal of knowledge, including the value of talcum powder claims and the parties' claims and defenses.

21.     Contrary to Mr. Hass' assertion, there is no "structural optimization strategy." The structural optimization model is a Legacy proposal—as discussed in the Bloomberg Law article—which J&J is free to accept or reject.

22.     In paragraph 9 of his opening Declaration, Erik Haas states as follows:

"Notably, in the Spring of 2021, Mr. Conlan provided extensive advice to me and my colleagues, and engaged in negotiations on our behalf, with respect to a settlement proposal advanced by Mr. Birchfield. As Mr. Birchfield testified in his deposition taken in the LTL bankruptcy, that settlement contemplated the resolution of the ovarian talc claims for $4.2 billion. Mr. Conlan conferred with us regarding the strengths and weaknesses of utilizing a "structural optimization" strategy in lieu of the settlement format Mr. Birchfield proposed at that time."

Mr. Haas' statements are false. I never met Mr. Conlan, and to the best of my memory had never

had any interaction with Mr. Conlan before May 2, 2023. J&J repeatedly states that I knew that Mr. Conlan represented J&J and even states: "In fact, Birchfield was negotiating potential resolution of the same cases when Conlan was on the other side of the table advising J&J." J&J Opening Br. at 2. The only information provided to me regarding Mr. Conlan's representation of J&J was that Mr. Conlan was interacting with the Future Claims Representative (FCR) in the Imerys bankruptcy proceeding. That information was provided to me by Mr. Murdica in 2020.

23.     In regards to the $4.2 billion settlement proposal referenced by Mr. Haas, there are several key points that are pertinent to the matter before the Court. First, I never negotiated or discussed the stated proposal with Mr. Conlan. Second, the terms of the referenced proposal differ in substantial ways from any settlement proposals being discussed or considered today – three years later. Third, the number of claims has increased by nearly 5-fold since the time of that proposal, due in large measure, in my experienced opinion, due to missteps by J&J in handling the talc litigation. Fourth, at the time of the settlement proposal referenced by Mr. Haas, J&J was threatening but had not yet exercised the threat of bankruptcy, which would at a minimum ensure a delay of litigation. The circumstances today are materially different. J&J has now attempted two bankruptcy proceedings and failed twice. The arc of the litigation has advanced substantially and the landscape is materially different from the time Mr. Conlan ceased work for J&J.

**Beasley Allen Has Never Retained or Otherwise Engaged Mr. Conlan In Any Capacity**

24.     As stated in my prior certification, Beasley Allen has never received any privileged or confidential information belonging to J&J.

25.     I have no personal knowledge of Mr. Conlan's work with or on behalf of J&J. He has never confided in either me or Beasley Allen about his work, advice or legal analysis from his work with J&J.

26.     My understanding and belief is that Mr. Conlan works for Legacy Liability Solutions, which is an independent business offering innovative solutions to companies with major mass tort liabilities.

27.     J&J has stated repeatedly that Mr. Conlan is a "side switching lawyer." I am aware that Mr. Conlan is a former lawyer, but Mr. Conlan has never been retained by Beasley Allen in any capacity. Beasley Allen has never retained Mr. Conlan, has never paid him any compensation—nor has Beasley Allen been asked to at any time. Mr. Conlan has never represented any plaintiffs in the talcum powder cases against J&J. Mr. Conlan has never "partnered" with, associated with, or allied with Beasley Allen in any way in representing any of Beasley Allen's clients. All interactions with Mr. Conlan and Legacy were arm's length interactions with a business that offers a solution to the issue that J&J has publicly and falsely stated could only be addressed in bankruptcy.

28.     Mr. Brody, counsel for J&J, argued on January 23, 2024 that Mr. Conlan served as "a lawyer, an expert, or a former employee or a witness" on behalf of Beasley Allen or its clients. That is false. Mr. Conlan has not served as a lawyer, expert, witness, or employee of Beasley Allen in this or any other matter. *See* Tr. at 10:16-24.

29.     Mr. Brody also asserted on January 17, 2024 that Mr. Conlan and Beasley Allen are "jointly pursuing a resolution that was adverse" to J&J. That is false.  At no point have I or any of my colleagues at Beasley Allen worked jointly with Mr. Conlan or Legacy in pursuing any claim against J&J. *See* Tr. at 7 to 8.

30.     Mr. Brody also stated on January 17, 2024 that "they" (meaning Beasley Allen and Mr. Conlan) are trying to obtain a result "$10 billion higher." Respectfully, there is no "they." Mr. Brody's statement is false in that it implies that Beasley Allen worked with Mr. Conlan to

arrive at a value to be proposed to J&J for resolution of the current and future pending talcum powder exposure claims in which J&J is a defendant. *See* Tr. at 7:10-25.

31.     J&J has stated that Beasley Allen reached out to Mr. Conlan. This is false.

32.     Mr. Brody argues that Mr. Conlan is an expert, consultant or advisor that served for Beasley Allen. This is false. Mr. Conlan has never served as an expert, consultant, or advisor to Beasley Allen. Mr. Conlan has never been retained by Beasley Allen, nor has Beasley Allen requested Mr. Conlan's advice.

### Mr. Conlan Has Never Shared Any Confidential Information with Beasley Allen

33.     It is my understanding based on J&J's filings with the Court that Mr. Conlan left Faegre Drinker in 2022.  Beasley Allen and I had no association with Legacy or Mr. Conlan at that time, and, to the best of my knowledge, I met Mr. Conlan for the first time on May 2, 2023.

34.     At no point has Mr. Conlan discussed with me or my Beasley Allen team J&J's litigation strategy, including proposed settlement values or what J&J believed to be reasonable or fair to settle its talcum powder liability. Mr. Conlan has never shared with me or my colleagues at Beasley Allen any memoranda, emails, work product, litigation values, risk retention, or any other such information belonging to J&J.

35.     At no point has Beasley Allen conspired with Mr. Conlan against J&J. Beasley Allen represents its clients in arms-length transactions, and it has not done so with any unfair advantage or insight from Mr. Conlan. Nor have I shared any client confidences with Mr. Conlan.

I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated: January 29, 2024

_____
ANDY D. BIRCHFIELD, Jr., ESQ.

# EXHIBIT 9

## SUPERIOR COURT OF NEW JERSEY
## LAW DIVISION, ATLANTIC COUNTY

**IN RE TALC-BASED POWDER
PRODUCTS LITIGATION**

Master Docket No.
ATL-L-2648-15

**MDL CASE NO. 300**

*Applicable to All Cases*

CIVIL ACTION

---

### CERTIFICATION OF JAMES F. CONLAN

---

I declare as follows including in response to the declarations of Mr. Haas and

Mr. Murdica dated Jan 26, 2024:

1.      During my representation of J&J from July 2020 through February 2022, while at

Faegre Drinker, I learned nothing from J&J with respect to structural optimization or disaffiliation

of mass tort liable entities;

2.      Structural optimization and disaffiliation structures, precedents and transactions are

"not" confidential, predate substantially my representation of J&J, and my knowledge of same did

not emanate in any respect from J&J.

3.      I pioneered structural optimization during my thirty-two-year career at Sidley

Austin, and long before I represented J&J. <u>See</u>  www.legacyliability.com.  While at Sidley Austin,

in 2015 I structurally optimized Borg Warner with Mr. Gasparovic (the co-founder and Chairman

of Legacy).  The Borg Warner optimized entity (Morse TEC) was subsequently disaffiliated in

2019 via a transfer of Morse TEC to Enstar.  J&J's auditors (PriceWaterhouseCoopers, "PwC")

were the auditors for Borg Warner and concluded that the disaffiliation of the structurally

optimized asbestos liable entity via transfer to Enstar resulted in the removal of the GAAP contingent liability charge from the financials of Borg Warner -- i.e. "finality."   Similarly, while at Sidley Austin, in 2016 I structurally optimized ITT and the optimized entity (Intelco) was disaffiliated in mid-2021 in a transfer of the optimized entities to Delticus.

4.       Other public structural optimizations and disaffiliation transactions/precedents include Mine Safety Appliances, Crane Industries, and SPX.  Companies with whom Legacy competes in the acquisition of structurally optimized mass tort liable entities include Enstar Group, Delticus Group, Global Risk, FARA, and R&Q Legacy.   Again, structural optimization and disaffiliation structures, precedents and transactions, are "not" confidential, predate substantially my representation of J&J, and my knowledge of same did not emanate in any respect from J&J.

5.       The Legacy Liability option, built on acquisition of structurally optimized mass tort liable entities, applies equally to asbestos, PFAS, talc, PCB's, herbicides, and pesticides.

6.       J&J is not "compelled" to accept, and has not accepted, Legacy's proposal.

7.       The Legacy option would not "settle" J&J's talc liabilities, but instead would remove all talc liable entities (and thereby the talc liability), with "finality" from J&J and J&J's financials.

8.       The Legacy option does not require a vote by, or approval of, talc claimants or a Future Claims Representative.

9.       Mr. Murdica again attaches and refers to his November 5, 2023 letter to me but fails again to include my response.

10.     The Legacy proposal to the J&J Board of Directors dated November 9, 2023 was not informed by anything I learned from J&J.  The November 9, 2023 Legacy proposal did not reflect, and does not require, any J&J confidential information.

11.     Legacy would acquire all structurally optimized J&J entities with current and future talc liability, provided PwC concludes (as PwC did with respect to Borg Warner-Morse TEC) that such entities are sufficiently capitalized to allow PwC to remove the contingent liability charge from J&J's financials under GAAP ASC 450.  Post acquisition, all such current and future talc-related claims would be resolved by Legacy via settlement or judgment in the tort system.

12.     The Legacy option harnesses: (i) the role and power of corporate structure and accounting standards (rather than a bankruptcy court order) to achieve finality; and (ii) the ability to enhance after-tax net investment earnings through reduced investment income taxation and administrative and operating expense efficiencies, when compared to bankruptcy trusts.

13.     Legacy remains willing to consensually transact with J&J to acquire all of the talc liable, structurally optimized, J&J entities, provided such entities are sufficiently capitalized including as demonstrated by a PwC determination that it will remove the talc charge from J&J's financials.

Executed this 29th day January, 2024

James F. Conlan

Legacy Liability Solutions LLC

# EXHIBIT A

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION: CIVIL PART
ATLANTIC COUNTY
DOCKET NO.: ATL-L-2648-15
A.D. # _____

```
                                 )
IN RE: JOHNSON AND JOHNSON)          TRANSCRIPT
TALCUM-BASED POWDER       )             OF
PRODUCTS LITIGATION       )           MOTION
                                 )
```

Place: Atlantic County Civil Crt.
       1201 Bacharach Blvd.
       Atlantic City, NJ 08401

Date: January 17, 2024

BEFORE:

   HONORABLE JOHN C. PORTO, J.S.C.

TRANSCRIPT ORDERED BY:

   SEAN C. GARRETT, ESQ., (Faegre Drinker Biddle &
   Reath, L.L.P.)

APPEARANCES:

   JEFFREY M. POLLOCK, ESQ., (Fox Rothschild, L.L.P.)
   Attorney for Plaintiff

   TED MEADOWS, ESQ., AND
   ANDY BIRCHFIELD, ESQ., (Beasley Allen)
   Attorneys for Plaintiff

*(Appearances continued)

Transcriber:  Nitsa Carrozza
PHOENIX TRANSCRIPTION
796 Macopin Road
West Milford, NJ 07480
(862) 248-0670

Audio Recorded
Recording Opr: Bashu Dev

APPEARANCES CONTINUED:

RICHARD M. GOLOMB, ESQ., (Golomb Law)
Attorney for Plaintiff

SUSAN M. SHARKO, ESQ. AND
SEAN C. GARRETT, ESQ., (Faegre Drinker Biddle &
Reath, L.L.P.)
Attorneys for Defendant

ERIK HASS, ESQ., (World Wide Vice President,
Litigation, Johnson and Johnson)
Attorney for J and J

STEVE BRODY, ESQ., (O'Melveny & Myers)
Attorney for Defendant

I N D E X

                                                              PAGE
Colloquy/Housekeeping............................4,63


ORDER TO SHOW CAUSE:

ARGUMENTS:                                          PAGE
BY: Mr. Brody                                  6,48,60
BY: Mr. Pollock                                  24,55

1          (Proceeding commenced at 1:59:33 p.m.)

2               COURT OFFICER:  All rise.

3               THE COURT:  Thank you, counsel.  All right,

4     January 17th, 2024.  This is Judge John Porto.  This is

5     <u>Johnson and Johnson Talcum Powder Products Litigation</u>,

6     Master docket, ATL-2648-15, is the case number.  May I

7     have the appearance of plaintiffs' counsels?

8               MR. POLLOCK:  Jeff Pollock, Fox Rothschild,

9     on behalf of the Beasley Allen Firm, Your Honor.

10              THE COURT:  Thank you.

11              MR. BIRCHFIELD:  Andy Birchfield with Beasley

12    Allen.

13              THE COURT:  Thank you.

14              MR. MEADOWS:  Ted Meadows on behalf of

15    plaintiffs and with Beasley Allen.

16              THE COURT:  Thank you.

17              MR. GOLOMB:  Richard Golomb, Golomb Legal, on

18    behalf of plaintiffs.

19              THE COURT:  Good morning or good afternoon

20    and counsel for the defendants?

21              MS. SHARKO:  Thank you, Susan Sharko from

22    Faegre, Drinker, for the defendants and I have with me

23    Erik Hass, who is the World Wide Vice President of

24    Litigation for Johnson and Johnson.

25              MR. HASS:  Good afternoon, Judge.

1              THE COURT:  Good afternoon.

2              MS. SHARKO:  My Associate, Sean Garrett, who

3        you know and --

4              MR. BRODY:  Good afternoon, Your Honor, Steve

5        Brody, on behalf of the defendants.

6              THE COURT:  Thank you, good afternoon to

7        everyone.  Everyone may be seated.  This is defendants'

8        motion for an order to show cause as to why Beasley

9        Allen should not be disqualified from this litigation.

10        I've reviewed the materials, the motion, the reply, the

11        opposition, as well as the attachments.  I'll have a

12        few questions.

13              This is not a plenary hearing.  I know there

14        were a few questions with regard to whether there's a

15        plenary hearing.  I think the -- I find that the Trupos

16        decision really says that a plenary hearing is only if

17        there needs to be some further clarification.  So and

18        we have our agenda with regard to our case management

19        conference.

20              So Ms. Sharko, this is your motion.  You

21        wanted to provide, did I hear, use I.T.?  You wanted to

22        show some -- use our technology here in the courtroom?

23              MS. SHARKO:  Yes, Mr. Brody will argue the

24        motion and we do have a Powerpoint first.

25              THE COURT:  Okay.

1              MS. SHARKO:  Thank you.

2              MR. BRODY:  Yeah, so --

3              THE COURT:  Mr. Brody?

4              MR. BRODY:  Sure.  I'm going to start by

5    making sure everybody has copies.  Your Honor.

6              THE COURT:  Thank you.

7              MR. BRODY:  And we are going to try to run

8    this through the Zoom.  I think we're all set

9    (indiscernible)  So I thought, Your Honor, it would be

10   helpful today to really give an overview of the facts

11   that are undisputed and why it is that those undisputed

12   facts are so compelling in this case and why they

13   require disqualification of the Beasley Allen Firm from

14   future proceedings.  Disqualification from representing

15   plaintiffs as we move forward.

16          Those facts, the undisputed facts, we know

17   that those facts are undisputed based on what we've

18   seen in terms of the opposition from Beasley Allen.

19   Your Honor, having read the papers, is very familiar

20   with the fact that James Conlon, who previously worked

21   as an attorney with the Faegre Drinker Firm, spent

22   approximately 1,600 hours over the course of 20 months,

23   it's an extraordinary amount of time, as part of the

24   core legal team, representing Johnson and Johnson, with

25   respect to this litigation, with respect to the Talc

1    Litigation.

2              And not just with respect to the Talc

3    Litigation but strategies for resolution of that

4    litigation, strategies that involve an evaluation of

5    the strengths and weaknesses of the cases, looking at

6    different potential resolutions, likely outcomes, doing

7    that with the highest levels of the J and J Law

8    Department and the core legal team representing the

9    company.

10             We also know and Beasley Allen has not denied

11   this and disputed this, that Beasley Allen is aware

12   that Mr. Conlon was a member of J and J's legal team

13   with respect to the Talc Litigation.  We know that they

14   are jointly pursuing a resolution that was adverse to

15   Johnson and Johnson.  It is, as Your Honor knows from

16   the papers, a resolution that they proposed that is

17   more than twice, more than $10 billion higher, than

18   what the company is seeking to resolve this litigation

19   for and has sought to resolve the litigation for

20   through the bankruptcy process.

21             We also know that they are attempting to push

22   this through the tort system, not through the

23   bankruptcy process, that they know that J and J

24   prefers.  And in fact, J and J has been clear on that.

25   Mr. Hass, during the October 17th earnings call, third-

1    quarter earnings call that the company had, made that

2    clear to the company's investors that this is the

3    company's preferred course of resolution.

4         What is being pursued jointly by Conlon and

5    Beasley Allen is directly adverse to that. And we also

6    know because we haven't seen any evidence of this in

7    any of the declarations, certifications, that were

8    submitted by Beasley Allen, that Beasley Allen has not

9    put in place any types of screening or other measures

10   to keep J and J's client confidences from being shared

11   with attorneys who are working on this litigation.

12        So what's the response? And I think that a

13   good way to talk about why disqualification is required

14   here is to take a look at Beasley Allen's response.

15   The first thing we see from them is; well, we never

16   officially hired Mr. Conlon. He's not working as a

17   lawyer at our firm, we didn't hire him as, you know, a

18   special counsel to our firm and therefore, for that

19   reason, disqualification is not appropriate here.

20        They argue, as a result, there is no

21   technical violation of a rule of professional conduct

22   such as Rule 1.9 or Rule 1.10 that could serve as a

23   basis for qualification but the law in New Jersey and

24   elsewhere and this is not a surprise, doesn't get

25   caught up in the question of; well, was there a

1    technical violation of a rule of professional conduct

2    such as 1.9 and 1.10 that would require

3    disqualification.

4              It's not the case, as Beasley Allen suggests,

5    that they can align itself with J and J's former lawyer

6    and jointly pursue with him a resolution adverse to J

7    and J without consequence, merely because they hadn't

8    officially hired him to be a member of the law firm.

9    We see the reasons for that, the core ethical

10   principles that are involved in things like the Kennedy

11   decision.

12             The highest standards of profession are the

13   maintenance of client confidentiality and the need to

14   ensure that protected client information is not used to

15   the detriment of a former client.  And attorney may not

16   use information obtained from a client to the detriment

17   of that client.  We see that as a bedrock principle of

18   New Jersey practice and it is found within all sorts of

19   the ethical rules.

20             4.4, 1.6, 1.9, 1.10, 1.18, throughout the

21   ethical rules, the need to protect client confidences

22   and not have a situation where proceedings occur as

23   they will in this litigation if Beasley Allen is

24   permitted to continue representing plaintiffs here,

25   where one side has access to the other side's client

1    confidences.  Something that will impact every aspect

2    of the proceedings going forward, whether it is a

3    global settlement discussion, settlement discussions of

4    individual cases or evaluations of the strengths and

5    weaknesses of individual cases brought by Talc

6    plaintiffs.

7         It's no answer, again, for Beasley Allen to

8    say; well, we didn't technically hire Mr. Conlon.  New

9    Jersey has addressed that, as well.  This is the New

10   Jersey Supreme Court Advisory Committee on Professional

11   Ethics Opinion 680, "It is well established that an

12   attorney may not do indirectly that which is prohibited

13   directly," and that's the key point here.  You can't

14   get around it simply by saying; well, we don't have a

15   formal employment relationship with Mr. Conlon, the guy

16   who spent 1,600 working as a core member of the J and J

17   legal team on this very matter.

18        And so I do want to talk about some of the

19   case law that has been addressed analogous situations

20   because I think it's important and I think it's

21   important to go a little deeper into the facts of those

22   cases and these are cited in our briefs but I mean,

23   let's take the Cordy case as a starting point.  I mean,

24   we sort of have the punch line here which is the

25   ultimate decision that was reached there but the facts

1    are also important.

2              This is a case where it involved a bicycle

3    accident on a railroad crossing and the Plaintiff

4    entered into what it thought was a retention agreement

5    with an expert on bicycle accidents.  And that expert,

6    you know, he was sent a $3,000 retainer.  Was sent a

7    binder of materials which had been assembled by the

8    Plaintiff's Counsel.  Did 28 hours of work on the

9    matter and then announced that he didn't want to

10   continue with the engagement.  And so, he sent back the

11   retainer and he said, I'm not going to be your expert

12   here.

13             He was then approached by the other side.

14   The other side, much like Beasley Allen knew here that

15   Mr. Conlon had been J and J's lawyer, knew that this

16   expert had been approached by Plaintiff's Counsel,

17   retained and disclosed the expert.  There was a motion

18   not only to disqualify the expert but to disqualify the

19   defendants, lawyers and the defendants' law firm and

20   the Court observed first.

21             There is no specific rule of professional

22   conduct that has been violated by this particular

23   situation but that doesn't mean that you can, to use

24   the words of the ethics committee, that doesn't mean

25   you can do indirectly what you would be barred from

1    doing directly.

2         This was also a case where the defendants'

3    counsel denied that any confidential information had

4    been conveyed from this expert to defense counsel.  And

5    we'll talk a little bit about the presumption that

6    courts apply and how courts treat self-serving denials

7    like that.

8         The Court did so in this case and said, no,

9    that doesn't help you because -- and this was the

10   reason, because the fairness and integrity of the

11   judicial process and the plaintiff's interest in a

12   trial free from the risk that confidential information

13   has been unfairly used against him, outweighs

14   defendant's interest in continuing to be represented by

15   the lawyers that have reached out and contacted the

16   expert.

17        Very similar in the M.M.R. Wallace case,

18   which is also cited in our papers.  In that case, a

19   former employee of the plaintiff had worked as a member

20   of the plaintiff's legal team.  This was a dispute

21   between -- it was a lawsuit brought by a subcontractor

22   against a contractor, a business dispute about the

23   terms of that arrangement.  And after the conclusion of

24   this time when this former employee had been working as

25   a member of the legal team, defense counsel reached out

1    to that employee and interviewed the employee.

2              The, you know, same type of situation.  This

3    is not a case where somebody was hired to be a member

4    of a law firm or an attorney and I think Beasley Allen

5    would concede this.  It's not a case where, say, James

6    Conlon gets hired by Beasley Allen and starts working

7    as a member of the legal team representing Talc

8    plaintiffs.  This was an interview with a former

9    employee that happened to be a member of the team,

10   assisting counsel, in the pursuit of the litigation

11   between the subcontractor and the contractor.

12             And the -- the point and the key point here

13   is that, that poor principle, that protection of client

14   confidences and the need to have a proceeding free from

15   a situation where one side has access to the other

16   side's confidential information.  In this case,

17   strategies that go really to the core, the heart of the

18   litigation, whether or not a side-switching attorney is

19   hired by opposing counsel or whether opposing counsel

20   acquired confidential information from the attorney by

21   other means, disqualification is required.

22             This is from the M.M.R. Wallace decision.

23   There can be do doubt that the spirit of the ethical

24   norms adhered to in this district, if not the letter of

25   the rules of professional conduct themselves, precludes

1    an attorney from acquiring, inadvertently or otherwise,

2    confidential or privileged information about his

3    adversaries' litigation strategy, exactly what has

4    happened here.

5           Shadow Traffic, another of the cases we cite

6    in our briefs, involved a situation where the

7    plaintiff's counsel had conducted an interview with

8    experts from Deloitte with four individuals.  It was

9    about a one hour long interview and they had, in the

10   course of that interview, they indicated, shared their

11   thoughts about the litigation with this group.  They

12   ultimately decided not to hire the experts from

13   Deloitte.

14           It was a cost issue and ultimately, I

15   believe, subsequently, defendant's counsel from the law

16   firm of Latham and Watkins, went out and retained the

17   same expert from Deloitte.  Again, they had not been

18   hired by the plaintiff's side.  Plaintiffs had just

19   conducted a one hour interview with them and had some

20   follow-up phone conversations around the time of that

21   interview but the Court said; you can't do that.

22           You can't go out and create a situation where

23   it is very likely that confidential information is

24   going to be provided to you that reveals the other

25   side's strategies.  And the Court disqualified Latham

1    and Watkins, the decision was upheld by the Court of

2    Appeal in California for the reason and it's the same

3    thing we've been talking about, to implement the

4    important public policy of protecting against the

5    disclosure of confidential information and the

6    potential exploitation of such information by an

7    adversary.

8              And I prepared just a little table because I

9    think it's really striking when you look at what we

10   have in this case, when you compare it to courts that

11   have disqualified counsel based on the acquisition of

12   and exposure to confidential information.  Here, you

13   have a situation where James Conlon billed 1,600 hours

14   of time to J and J for work on this very matter.

15             Compare and contrast that to the expert in

16   the Cordy case, Greene, who spent 28 hours and had

17   received a binder of material prepared by counsel for

18   the plaintiff.  Or Shadow Traffic, where you have a one

19   hour interview, meeting, with the potential experts,

20   where strategies, views of the litigation, might have

21   been discussed.

22             Here, you have 16 (sic) hours, countless

23   meetings, phone calls, communications, with senior

24   members of the J and J Law Department and the core team

25   representing J and J in this litigation as to some of

1    the most important issues that are going to impact the

2    cases going forward.

3              So the -- really, the second and it's the

4    only other real substantive argument we've seen from

5    Beasley Allen is, well, Conlon and Birchfield and Mr.

6    Meadows, all deny that confidential information was

7    conveyed, despite the closeness of the relationship

8    that we've seen and the alliance between Conlon and the

9    Beasley Allen Firm.

10             Well, court-after-court embraces, recognizes,

11   a presumption.  That, in situations like this,

12   confidential information was disclosed.  And you know,

13   frankly, putting aside a legal presumption as a

14   practical matter, just being realistic, it is

15   impossible to envision a world where Mr. Conlon could

16   be pursuing a settlement strategy in the top

17   litigation.  Litigation that he worked on, was a part

18   of, strategized about for a period of 20 months with

19   the senior people at J and J and not have some of that

20   come across and be communicated.

21             I mean, just as a realistic and practical

22   matter but you know, that's the reason why there is

23   this presumption that confidential information was

24   disclosed.  That was see in case-after-case, for the

25   same reason what courts have done is rejected self-

1    serving denials like we have seen here.  And you know,

2    some of the reasons are articulated in the cases that

3    we've cited, the cases that address situations like the

4    situation here.

5              And by the way, I think it is worth pointing

6    out, Your Honor.  I mean, we've been through the cases

7    that have been cited by Beasley Allen in opposition to

8    disqualification.  And as you go through them, you

9    know, one-after-another, the most striking thing about

10   them is, none of them have anything to do with the

11   situation we see here.  You have cases that are

12   analyzing; well, was the subsequent matter that's at

13   issue substantially related to the prior matter?

14   That's not at issue here.  Nobody is going to say that

15   the Talc Litigation is not related to the Talc

16   Litigation.  It is the same matter.

17             Cases like the LaSerto (phonetic) case that

18   is cited where the question is, should a criminal

19   lawyer be able to continue representing certain

20   criminal defendants in a situation where that lawyer

21   gave advice to employees of a company that was engaged

22   in a fraud scheme that allowed the scheme to be

23   perpetuated for an additional ten months and convinced

24   certain employees to continue participating in the

25   fraud scheme which involved making phone calls to time

1    share owners.  You know, can that lawyer keep

2    representing defendants in the criminal proceeding?

3    Nothing to do with what we're talking about here.

4         The cases that we've cited do address

5    specifically situations that are directly analogous,

6    though, not as egregious as what we've seen here.  And

7    they all come down in the same place.  Again, this is

8    on self-serving denials, this is from M.M.R. Wallace.

9    "Even their undeniable interest in preserving any

10   tactical advantage they may have garnered, the Court

11   does not find availing counsel's assertion that no

12   confidential and or privileged information was

13   consciously or unconsciously revealed."

14        Same thing in Cordy and this is again, the

15   bicycle accident expert.  "The expert Greene did

16   receive confidential information from the plaintiff's

17   firm.  He was privy to their trial strategy, although,

18   he and defense counsel denied that he ever divulged it

19   to his new employer.  Their protestations are

20   unavailing."

21        You could substitute Conlon and Beasley Allen

22   into this language from the Cordy decision based on the

23   facts here and it would be difficult to find any reason

24   to protest doing so.  I mean, the Court could write;

25   here, Conlon did receive confidential information from

1    J and J, we know that to be true.  He was privy to

2    their trial strategy, we know that to be true.

3    Although he and Beasley Allen deny that he ever

4    divulged it, their protestations are unavailing to

5    believe Conlon.  You can just substitute his name, did

6    not and will not remember and ultimately use that

7    information, even subliminally, defies common sense and

8    human nature.  It's exactly the case here.

9            Even more so than the expert Greene and

10   again, this is important.  You know, with this expert

11   Greene, we were talking about 28 hours and a notebook.

12   With Conlon, we're talking about 1,600 for which he

13   billed $2.24 million to Johnson and Johnson, on the

14   Talc Litigation.  We're talking about a member of a

15   core team of people that was tasked with looking at

16   potential resolutions, evaluating potential

17   resolutions, evaluating the strengths and weaknesses of

18   these cases and we're talking about, you know, not just

19   a one hour meeting.  We're talking about dozens of

20   meetings, countless phone calls, communications, over

21   the course of a 20 month period.

22           So what about Beasley Allen?  I think it is

23   important to recognize the financial interest that is

24   undoubtedly driving Beasley Allen here.  It's a

25   financial interest and you have before you, Mr.

1    Birchfield's deposition testimony, sworn deposition

2    testimony, you know, recognizing what is offered by the

3    common benefit fund order in the M.D.L.

4         An order which, by the way, sweeps in

5    participating counsel in cases that are pending before

6    Your Honor and provides a situation where, of those

7    participating counsel, those who participated and

8    availed themselves of the work of the -- of the -- that

9    was being done by the Plaintiff Steering Committee, are

10   putting in 8 to 12 percent of any settlement money into

11   that common benefit fund.

12        You know, we're talking about, you know, even

13   with that $8.9 billion resolution that J and J wanted

14   to push through, through the bankruptcy, the second

15   bankruptcy process, we're talking about potentially a

16   billion dollars that is going to be divided,

17   essentially, by the Plaintiff Steering Committee, on

18   which Beasley Allen is a member and that's creating an

19   enormous financial interest on the part of Beasley

20   Allen to pursue this resolution with Conlon that brings

21   in the cases and directly impacts this litigation.

22        So how close has that relationship been?  I

23   don't think you need to look much past the October

24   18th, 2023 e-mail that Mr. Conlon sent to J and J's

25   treasurer.  This was the day after Mr. Hass announced

1    on the earnings call the company's intention to

2    continue to proceed through the bankruptcy process, a

3    process by the way which would eliminate the common

4    benefit fund payments that Beasley Allen would

5    otherwise realize a share of.

6            And this was where Mr. Conlon revealed that

7    he had the support of what he calls lead counsel for

8    the O.C. claimants, the ovarian cancer claimants,

9    including Andy Birchfield, for an M.D.L. opt-in

10   settlement matrix.  A matrix, you have this in the

11   materials, Your Honor, it's Exhibit 6 to the Hass

12   declaration, that values different cases and attaches

13   different numbers to different cases in a settlement

14   matrix.

15           Conlon had gone out to Beasley Allen to get

16   Beasley Allen's support before taking it to J and J.

17   And then this is the most striking part of this.  Andy

18   Birchfield, Doug Dachille -- Doug Dachille is the

19   Senior Vice President and Chief Investment Officer at

20   Legacy Liability Solutions, that's Mr. Conlon's

21   business and I are prepared to meet with you and your

22   team.  Beasley Allen, Andy Birchfield and James Conlon,

23   J and J's former lawyer, jointly proposing that they

24   would come in and pitch the settlement matrix and walk

25   through it and pitch their solution which they knew to

1    be adverse, to J and J's preferred resolution to the

2    company.

3              But it didn't stop there and as Your Honor

4    saw from the various exhibits that have been submitted

5    with the briefing on this, there have been joint

6    efforts to advance their case through the media, to

7    undermine the company's preferred resolution through

8    coordinated releases of commentary.  Commentary

9    criticizing the company's preferred resolution and at

10   the same time, promoting their own resolution, the one

11   from which both Conlon and Beasley Allen stand to

12   benefit significantly financially.

13             Coming back to the company yet again on

14   November 9th, providing that settlement matrix and

15   attaching a $19 billion price tag to the resolution

16   that they were advancing, again, adverse to the

17   company's interests.  And ultimately, not content to

18   take their case to the media, taking their case

19   directly to investors through a joint presentation

20   investment seminar presentation, through Gordon Haskett

21   Advisors, with what was billed as two experts.  James

22   Conlon, apparently an expert by virtue of his prior

23   representation of Johnson and Johnson and Andy

24   Birchfield, no doubt an expert as a result of the fact

25   that he is adverse to J and J in Talc Litigation.

1          Against these facts, there is no question

2     that disqualification is required if there is going to

3     be any fairness to these proceedings for J and J going

4     forward and for that reason, we would ask the Court to

5     disqualify Beasley Allen.  We noted in our reply brief,

6     this will not leave those plaintiffs without

7     representation.

8          In all of the cases where Beasley Allen is

9     listed as counsel on the Court's docket for plaintiffs,

10    they are represented by three other law firms,

11    including the Segal Weiss Firm.  It is not a situation

12    where all of the sudden, you're going to have a large

13    number of plaintiffs who are not represented in this

14    M.C.L., that will not be the case.  What will be the

15    case is fairness and integrity with preservation, using

16    the words of the Baldonado (phonetic) Court,

17    preservation of a fair and just litigation process will

18    be maintained.  Thank you, Your Honor.

19         THE COURT:  Thank you, Mr. Brody.  Mr.

20    Pollock?

21         MR. POLLOCK:  Yes, Your Honor.  Thank you for

22    making time to hear us today.

23         THE COURT:  You're welcome and you'll have as

24    much (indiscernible) time as Mr. Brody did.  I will

25    have questions, though, afterwards.

1            MR. POLLOCK:  I'm ready for your questions

2      whenever you are, Judge, but I wish I had the courtesy

3      of their Powerpoint beforehand so I could have reviewed

4      it but I think I'm pretty good, so I'm going to go

5      forward.  What is stunning about the papers submitted

6      by J and J and by opposing counsel's argument today is,

7      he did not even mention the words, "Appearance of

8      impropriety," he didn't mention them.

9            And in 1984 when the <u>Cordy</u> decision was being

10     drafted by Magistrate Judge Kugler, which he

11     specifically says, there is no rule on-point.  The

12     reason is 1.9 and 1.10 didn't exist yet.  The Pala

13     (phonetic) condition had not, at that point, adopted

14     that rule.  So the only rule was 1.7 and counsel is

15     entitled to his own argument, he is not entitled to his

16     own facts.

17            And in the <u>Cordy</u> decision and I'm going to

18     refer you to page 581, there is no question that Greene

19     performed services for Brown.  He entered into a

20     contract, he paid, he learned their litigation

21     strategy, he reviewed their investigation, he rendered

22     some kind of oral opinion.  So it's a lot more than

23     this scant Powerpoint presentation that he just

24     provided saying he spent 28 hours.  He did a lot more.

25            Judge Kugler made those findings, he had an

1    investigation, he found those facts.  There are no such

2    facts here.  So what does counsel propose?  Counsel

3    says, well, you can't rely upon some certifications

4    from counsel.  The problem is, the Supreme Court of New

5    Jersey has said that's exactly what you're supposed to

6    do.

7            And they said unequivocally that, this is a

8    motion to disqualify and this is <u>Trupos</u>, as you

9    identified at 463 and <u>O Builder's, Yuna</u>, which is 206

10   <u>N.J.</u> at 117.  Both come to the same conclusion.  Yes,

11   because of the appearance of impropriety standard, we

12   don't want, unless absolutely necessary and you

13   articulated it up-front, Judge.  We don't want a

14   factual inquiry into the record because the fact is, we

15   have to balance these things.

16           If you do go there, what you uncover, the

17   whole series of issues.  But the Court had a choice in

18   1984 and they follow the American Law Institute's

19   guidance, they follow what Jeff Hazard had to say from

20   the University of Pennsylvania and they made the bold

21   choice to adopt the appearance of impropriety.  That's

22   the standard and that's why the Kugler decision -- and

23   by the way, I don't know what Connecticut law is and I

24   don't know what California law is.

25           I honestly don't know.  I do know New Jersey

1    law.  And I don't know whether Connecticut has adopted

2    or rejected the appearance of impropriety, I don't know

3    how they got there.  This is a New Jersey law issue.

4    This is a New Jersey law determination and the Supreme

5    Court of New Jersey is pretty clear; you are supposed

6    to do exactly what we've submitted.

7            J and J by the way, has an entire legion of

8    counsel, they have phalanxes of associates.  There is

9    no reason, if they had the proofs, counsel makes the

10   argument repeatedly that Mr. Conlon knew all -- he was

11   running the entire J and J defense.  He knew everything

12   about that case.  There's not one iota of proof in this

13   record and they could have deduced it, there's not one

14   iota of proof that any of that is true.

15           We have no idea what Mr. Conlon did.  We know

16   he spent 1,300, 1,600 hours, he know it cost something,

17   I have no idea but the fact is, this is their motion

18   and the Supreme Court of New Jersey has been very

19   clear.  We decide the motion based upon the papers

20   presented.  The arguments of counsel are just the

21   arguments of counsel.  If they wanted to educe those

22   proofs, obviously they felt strongly about it, they

23   have the opportunity to put that proof on the record

24   right now and to establish it.  They have failed.

25           On the counter balance, I've provided you two

1    certifications, one from Mr. Conlon, a lawyer who is no

2    longer practicing and from Mr. Birchfield, as well as

3    from Mr. Birchfield's partner.  All three of them say

4    and he calls it a self-serving set of papers.  I'm

5    sorry, I'm missing it because the Supreme Court of New

6    Jersey has said repeatedly that this is to be decided

7    on the papers.

8         So how else would I do it?  I think when you

9    talk about self-serving papers; they had the

10   opportunity to prove it, they have failed.  And they

11   warp Judge Kugler's decision in Cordy out of any

12   proportional reality in order to emphasize the point.

13   And by the way, if you look at Kevin Michael's book,

14   which I'm sure you may have and you look at the Cordy

15   decision, that case was decided before the appearance

16   of impropriety was adopted.

17        And if we adopt the rule that J and J wants

18   right now, we should just tell the Supreme Court of New

19   Jersey, you got it wrong.  That, the appearance of

20   impropriety is still the standard -- is no longer the

21   -- we're going to apply the same standard to judges, to

22   you, as you apply to me.  And frankly, that's just not

23   the rule, that's not the choice they made and it's not

24   up to J and J, with all due respect, to rewrite the

25   rules.

1          The Supreme Court has also said and this is

2   <u>Yuna</u>, 206 <u>N.J.</u> at 130, that disqualification is an

3   application to be granted sparingly and only in the

4   most extreme circumstances.  And in this case, I do

5   think it's worthwhile noting that they made the exact

6   same application in the Federal District Court.  And

7   the reason is, as the Supreme Court found and there are

8   several decisions directly on-point.

9          One is from Justice Patterson.  This is, I

10   can't pronounce it, <u>Dimitrakopoulos</u>, 237 <u>N.J.</u> 91 at

11   108.  The entire controversy doctrine embodies the

12   principle that the adjudication of legal controversies

13   should occur in one litigation and one court.  You

14   don't get two bites at the apple.

15          That's not just the only time they've said

16   it, <u>Joel versus Morrocco</u>, 147 <u>N.J.</u> at 546.  The entire

17   controversy doctrine seeks to further these objective

18   requiring that whenever possible, the adjudication of a

19   legal controversy should occur in one litigation and

20   only one court, citing <u>Cogdale</u>, which is part of the

21   three cases that lead up to the entire controversy

22   doctrine.

23          Why is that relevant here?  You don't have to

24   rule based upon the entire controversy but you know we

25   have a judicial shortage in New Jersey, we have a

1    judicial shortage in the Federal Court.  In that case

2    and the case with regard to Crispin versus Volkswagen,

3    the Supreme Court referred the lawyer to the Ethics

4    Committee for filing multiple actions based upon the

5    same thing.  Now here, they did one thing different.

6    They actually said, by the way, we're filing.  But

7    still, we've had to brief the matter twice but it also

8    does reflect on the credibility of J and J and having

9    pursued a hyper-aggressive tactic.

10        Counsel also made the point, well, Beasley

11   Allen Firm is going to make money out of this and

12   therefore, that obviously means they're biased.  That

13   may be true that they have an interest in the case.

14   Obviously, they would not be pursuing it if they did

15   not.  But the Third Circuit of the United States Court

16   of Appeals squarely and soundly and completely rejected

17   B.A.S.F.'s effort to try -- I'm sorry, wrong case, J

18   and J.'s effort, to try and wipe out his liabilities by

19   reforming the corporation and shoving things over into

20   one little entity and then bankrupting that entity, the

21   L.T.L.

22        J and J has shown in abundance that they will

23   strike out after anyone.  I represented Doctor Moline

24   who they tried to knock out.  They are not trying to

25   knock out the entire Beasley Allen Firm.  And

1    obviously, if they do that here, it would have an

2    impact under imputed disqualification in the Federal

3    District Court, as well.

4             So why are they so (indiscernible) the

5    Beasley Allen Firm?  I'm not inside of J and J, they

6    have no shared with me their information but since

7    counsel made his speculation, I'm going to make mine.

8    You know why, because Beasley Allen was successful.

9    They fought for their clients and the Third Circuit

10   agreed with them.

11            The Third Circuit Court of Appeals, which is

12   in the business, by and large, of approving bankruptcy

13   opinions.  The rate of bankruptcy approvals is

14   phenomenally high but in this case, they happened to

15   get a judge who actually knew the bankruptcy code and

16   actually had been a bankruptcy judge in Delaware.  And

17   the Third Circuit squarely and completely rejected

18   Judge Kaplan's effort and J and J's effort to use

19   L.T.L. to bankrupt the matter, to bankrupt the entity.

20            So when you look at it, my view is; does

21   Beasley Allen have an economic interest?  Sure, so does

22   J and J.  I can't decide that issue, I can't evaluate

23   who is more financially interested.  What I can do is

24   address the ethics rules and that's what I would like

25   to do.  The burden is a heavy burden, this is -- with

1     regard to doing it.  The motion is, as you and I just

2     discussed, should be decided on the papers.

3              With regard to the whole review, _Trupos_ I

4     think is pretty clear.  The papers, the ones provided

5     to you today, unless you find extraordinary

6     circumstances, are to be the ones you decide and right

7     now, we have complied squarely with the ethics rules.

8     I also look at R.P.C. 1.9 and 1.10.  These are the

9     rules that adopt the appearance of impropriety.

10             So I thought it might make sense -- I don't

11    have a fancy Powerpoint, I didn't realize that's what I

12    was supposed to do but I would like to go through 1.9

13    and 1.10 with you briefly.  1.6, confidential

14    information.  There is zero evidence in this record

15    that Mr. Conlon shared anything with the Beasley Allen

16    Firm.  There is no such beast.

17             And the fact is, to now find based upon

18    counsel's eloquent argument that it must have occurred

19    under the cover of darkness and when the two of them

20    are sweating it out, trying to figure out how to stick

21    it to J and J, that they must have shared that

22    information.  That is a fancy way of saying, the

23    appearance of impropriety.  That's not the rule, so

24    that argument fails.  And by the way, I don't know why

25    Connecticut found the way it found and I don't really

1    care, I don't practice in Connecticut.  So the fact is,

2    I do care deeply about New Jersey Law.

3           With regard to 1.9 and 1.10, these rules were

4    adopted by the Supreme Court of New Jersey after

5    careful deliberation.  They went through not only the

6    commission but then they actually went through

7    extensive argument and there was debate and

8    disagreement and as you know, there have been multiple

9    opinions afterwards.

10          Duties to clients, 1.9, "A lawyer who is

11   representing a client shall not thereafter."  Well, Mr.

12   Conlon is now a lawyer representing anyone in this

13   case.  He has his own firm, Legacy but the fact is,

14   even J and J apparently doesn't believe that Mr. Conlon

15   has acted inappropriately because they haven't pursued

16   him here.

17          They haven't brought a claim against Mr.

18   Conlon here, they have done nothing to prove that Mr.

19   Conlon violated R.P.C. 1.9, represents a party,

20   breached any confidentiality.  They have no problem

21   throwing rocks and stones at the Beasley Allen Firm but

22   I think that's really only because the Beasley Allen

23   Firm has done what it's supposed to do on behalf of its

24   client.

25          It's protected their interest, vigorously, at

1    the risk of tremendous debate before the Third Circuit.

2    Because obviously, there were people who wanted to take

3    the deal and run and there was the Beasley Allen Firm

4    and others who thought they should fight it through.

5    It's not up to me to decide whether that was the right

6    move or wrong move but I don't think there's an

7    evidence that the Beasley Allen Firm did anything other

8    than it pulled the highest standard of the law to do

9    what they thought was right on behalf of their clients.

10         It doesn't matter to me if J and J disagrees.

11   They are allowed to disagree but the Beasley Allen Firm

12   is allowed to go (indiscernible) and the Third Circuit,

13   obviously -- and by the way, J and J tried to go en

14   banc and it failed.  So clearly, the Third Circuit did

15   look at the issue thoroughly.

16         Unlike the Cordy decision which was decided

17   prior to this, in rule R.P.C. 1.10, it has a two-part

18   test and that two-part test is important here, under

19   1.10(b-1).  The matter has to be the same or

20   substantially related and any lawyer in the firm had

21   information protected.  There's no proof here that Mr.

22   Conlon shared information that was protected.

23         Did Mr. Conlon arguably have that

24   information?  Absolutely, there's no doubt.  He worked

25   for J and J, I assume he's a quality guy, I've never

34

1     met him.  He's at a decent firm, don't doubt that

2     either but it's not up to us, it's not our burden and

3     they bear, as the Supreme Court has said, a heavy

4     burden.

5           J and J has a heavy burden, in order to

6     fulfill what it wants to do, which is knock out the

7     Beasley Allen Firm.  And they can't carry that burden,

8     not on this record and not with these proofs because

9     they have failed.  Bear with me for one second, Your

10    Honor, I'm sorry.

11          THE COURT:  Sure.

12          MR. POLLOCK:  The -- counsel also mentioned

13    the idea of the side-switching lawyer.  And obviously,

14    that gets into two rules, 4.7, 1.9, 1.10 and a couple

15    others, I guess.  There's no indication here that Mr.

16    Conlon ever shared the information.  What he has argued

17    vehemently, upside-down and backwards is, well, it must

18    have occurred, it smells wrong, it doesn't sound right

19    because Conlon was working with Birchfield to try to

20    work up this deal.

21          So let's be clear, there's nothing in the

22    record as to what Mr. Conlon and Mr. Birchfield's roles

23    are other than that they communicated.  By the way, Mr.

24    Conlon also communicated with J and J.  There's nothing

25    in the record that -- to support Counsel's argument

1    that Andy Birchfield and the Beasley Allen Firm intend

2    to buy out some interest here.

3            There's rather the indication that Mr. Conlon

4    had an idea on behalf of his firm, Legacy Solutions,

5    which is a firm that apparently works on resolving

6    disputes which I thought the Court wanted to promote

7    but there's no proof here that there was any

8    information shared that was inside baseball.  Nothing

9    that J and J shared with Conlon that went to Mr.

10   Birchfield.

11           There hasn't been, in all the fancy

12   Powerpoint and the argument today, there's been no

13   showing that there was some super secret discussion.

14   Everything that my opposing counsel points out is, yes,

15   Mr. Birchfield did have discussions with different news

16   groups after they had a meeting, by the way, so did J

17   and J.

18           The reason being is, that the investors and

19   the stock guys are always looking at; where is the

20   world going?  They are allowed to have those

21   discussions, I'm sure they will happen all the time.

22   In this kind of litigation, it simply occurs.  There

23   was nothing there that shows that he had any inside

24   information that he was not allowed to reveal or that

25   he got from Mr. Conlon that was protected.  So I don't

1    understand how the side-switching lawyer works.

2         I do think that when you look at -- although

3    credibility should not, I believe, should be decided

4    respectfully, Your Honor, on the papers before you, I

5    don't believe that when you look at the credibility of

6    the entities because opposing counsel made multiple

7    attacks on Mr. Birchfield, on the Beasley Allen Firm, I

8    do think it's very significant that the entire

9    controversy doctrine literally is being litigated twice

10   here.

11        They are going to get two bites at the apple.

12   That's -- so you're not going to have one court, you

13   have two.  I do think that affects their credibility.

14   I do think that affects their credibility and all of

15   their efforts, they have failed to put up any proofs

16   whatsoever that the information Mr. Conlon was working

17   on -- and I have no idea what specifically he did.  I

18   don't know what he did with those 1,300 or 1,600 hours.

19        There's been no showing on this record that,

20   that information was directly relevant to what Mr.

21   Birchfield is discussing today.  And what the Supreme

22   Court has been very clear on is that Your Honor, you

23   have the opportunity and unfortunately the

24   responsibility, to engage in a detailed fact-finding

25   evaluation.

1    So let's go back to Judge Kugler and the

2    decision in Cordy.  He actually made a specific fact-

3    finding on that record because at that point in time,

4    under R.P.C. 1.7, he was doing the best he could, it

5    was the only option he had.  When the Supreme Court of

6    New Jersey made the choice which opposing counsel

7    refuses to recognize, that the appearance of

8    impropriety governs the standard today.

9         At that point, they came also out with a rule

10    that barring exceptional circumstances, the

11    determination whether counsel should be disqualified

12    which is an extraordinary remedy looking at Yuna, the

13    fact is, it needed to be decided on the papers before

14    you.  Do you have the right to do more?  Sure, you do.

15    But the fact is, right now, this is a high stakes

16    litigation.  The reality is, counsel from both sides

17    are capable and confident.  If they had the proofs,

18    they would have put them on the table already.

19         Looked at a different way, what would we do?

20    Will we start grilling Mr. Conlon and the inside

21    lawyers at J and J, what they discussed and what

22    strategies they had and what their strategies are today

23    and the same thing?  To me, it would turn the entire

24    process into a farce and it would completely derail

25    either going forward or settling.  I just don't see how

1    that inquiry, even if you were (indiscernible) I would

2    respectfully argue that it makes no sense, it doesn't

3    get you anywhere and by the way, it's also not the law.

4            If you'll bear with me one second, Your

5    Honor, I think I may be done.  Unless -- of course, if

6    you have any questions for me.  Your Honor, I think

7    I've addressed the core issues I have.  If you have any

8    questions for me, Your Honor.

9            THE COURT:  I do, Mr. Pollock and I'm going

10   to follow up and you may be seated.

11           MR. POLLOCK:  Yes, sir.

12           THE COURT:  You've been standing a long time.

13   The Trupos case we've been talking about is the City of

14   Atlantic City, back here, versus Trupos, 201 New Jersey

15   447, 2010 decision.  Notably, in the True Post

16   decision, it was a law firm's representation of

17   plaintiffs in the defense of tax appeal.  So factually

18   distinguishable but bearing alm with regard to

19   disqualification of counsel.

20           And the Court in that case was looking at

21   R.P.C. 1.9(a).  And what I wanted to start with is,

22   they give you the law and they say in practice, such a

23   motion should ordinarily be decided on the affidavits

24   and documentary evidence submitted and an evidentiary

25   hearing should be held only when the Court cannot with

1        confidence decide the issue on the basis of the

2        information contained in those papers.

3               As for instance, when despite that

4        information, there remain gaps that must be filled

5        before a fact-finder can, with a sense of assurance,

6        render a determination or when there looms a question

7        of witness credibility.

8               And the Trupos Supreme Court decision cites,

9        Dewey and Dewey was a case that was the basis for this

10       Trupos decision, Dewey versus R.J. Reynolds Tobacco.

11       It said, despite this Court having previously having

12       determined that the Reardon versus Marlayne, Inc.,

13       three-part test for determining disqualification of

14       counsel appearing inverse to a former counsel no longer

15       controls and that came out of -- that flows from the

16       Dewey case.

17               So I say that because J and J says in their

18       papers, says today that there's some undisputed

19       information.  Now, I've had the opportunity to read the

20       three certifications today.  Mr. Conlon -- if I refer

21       to Mr. Conlon as Conlon, no disrespect, just shorthand

22       with regard to speaking as I would normally say if I

23       was writing any decision.

24               And I take it and there are a number of

25       questions that I have that informs whether these are

1    uncontested facts.  So Mr. Conlon joined Faegre Drinker

2    June 1, 2020 as a partner in the financing and

3    restructuring practice.  I think he says that in his

4    certification, so that's not disputed, correct?

5         MR. POLLOCK:  No, sir.

6         THE COURT:  And then by July 2020, Mr. Conlon

7    begins representing J and J as a part of a team,

8    evaluating legal strategies for resolution of pending

9    and future Talc claims.  Is that undisputed?

10        MR. POLLOCK:  I believe that's undisputed,

11   Your Honor.

12        THE COURT:  Okay and then he billed 1,600

13   hours on this case, the equivalent of what he equates

14   to 2.24 million.  And these are all Talc cases, Mr.

15   Pollock?

16        MR. POLLOCK:  Based upon what I understand, I

17   don't have the billing records.  That's what I

18   understand from the certifications, sir.

19        THE COURT:  Okay.  I'm going to say yes, with

20   a question mark because look, I'm asking, I'm trying to

21   see where our record is.

22        MR. POLLOCK:  Your Honor, I simply don't want

23   to ever lie to you.  I don't have the documents, I

24   haven't reviewed them but that's my understanding.

25        THE COURT:  And that's how I take it.

1          MR. POLLOCK:  Yes, sir.

2          THE COURT:  I don't want you to think I'm --

3     these are not trick questions and I'm not here to set

4     anybody up.  I'm trying to see what I need to do in

5     light of Trupos.  Did Mr. Conlon's work for J and J

6     address consideration of Talc claims, including

7     resolution in the tort system, the Amyris bankruptcy

8     and in internal bankruptcy, if you know?

9          MR. POLLOCK:  I don't.

10         THE COURT:  Okay.  Did Mr. Conlon meet

11    personally as J and J's counsel with debtors counsel

12    and counsel for the future claims representative in the

13    Amyris bankruptcy, over rounds of golf, dinner, drinks,

14    in May 2021, if you know?

15         MR. POLLOCK:  I have no personal knowledge,

16    Your Honor.

17         THE COURT:  Okay and or during negotiations

18    for resolution through the Amyris -- am I saying that

19    right, Amyris?

20         UNIDENTIFIED MALE:  Amyris.

21         UNIDENTIFIED MALE:  Amyris.

22         THE COURT:  Amyris, Amyris, Amyris

23    proceeding, if you know?

24         MR. POLLOCK:  Again, Your Honor, I have no

25    spoken with Mr. Conlon, I have reviewed a certification

1        from him.  I have no personal knowledge of his

2        activities.

3               THE COURT:  And these are, as I said, I look

4        at what J and J submitted in support of the motion as

5        undisputed.  I'm just making sure if they are, seeing

6        what's disputed, what isn't disputed.

7               MR. POLLOCK:  Yes, Your Honor.

8               THE COURT:  Did Mr. Conlon review and

9        evaluate numerous communications from Mr. Birchfield?

10              MR. POLLOCK:  I honestly don't know, Your

11       Honor.  If you want me to confer with my client, I can

12       do so.  I don't know if Mr. Conlon did.

13              THE COURT:  I don't see that addressed in

14       your certification.  That's why I posed that one.

15              UNIDENTIFIED MALE:  I don't know, Your Honor.

16              THE COURT:  Okay, okay and did Mr. Conlon

17       also advise J and J regarding the potential resolution

18       of Talc claims to a bankruptcy filing by L.T.L.

19       effectuated on 10-14-21, do you know that?

20              MR. POLLOCK:  Your Honor, I don't know but I

21       would note there's a critical question within the

22       question, if you don't mind.  Which is that, obviously,

23       J and J formed L.T.L. in order to bankrupt it.  That's

24       what they did.  I do not know -- so timing could be

25       very important, right, because the fact is, I don't

1    know -- and then Judge Kaplan accepted that

2    proposition, the Third Circuit rejected it.

3              So I would only throw out there that I

4    honestly don't know what Mr. Conlon did but to me, it

5    might be very important as to prejudice, if you will

6    because that's kind of what we're looking into is; has

7    J and J been prejudiced as to when those discussions

8    occurred?  I still don't think any of this arises to

9    the appearance of impropriety but you've heard my

10   argument.

11             THE COURT:  And I accept that.  In the run-up

12   to L.T.L.'s bankruptcy filing in 2021, did Mr. Conlon

13   attend, in parentheses, "Dozens,", of meetings and

14   participate, in parentheses, "Innumerable," phone

15   conferences with J and J's World Wide V.P. for

16   Litigation, Erik Hass and former Head of Litigation,

17   Joseph Braunreuther and other attorneys working for J

18   and J on Talc litigation, if you know?

19             MR. POLLOCK:  I have no personal knowledge of

20   his personal actions with J and J.

21             THE COURT:  And Mr. Hass is here and Mr.

22   Braunreuther is here.  Am I pronouncing those names

23   correctly?

24             MR. HASS:  Mr. Braunreuther, he's not here.

25             THE COURT:  Okay.

1        MR. HASS:  He's the former -- individual that

2    I formerly had in my decision.

3        THE COURT:  Okay, thank you, Mr. Hass.  Did

4    Mr. Conlon communicate regularly with J and J team

5    leaders via e-mail and participate in and was he privy

6    to communications with J and J's other outside counsel,

7    if you know?

8        MR. POLLOCK:  Same answer, Judge.  I have no

9    idea what he discussed with J and J.

10       THE COURT:  Okay.  There's no dispute, then,

11   that Mr. Conlon possesses J and J's confidential

12   information regarding this multi-county litigation.

13   The M.D.L.'s and the Federal Court and this is a M.C.L.

14       MR. POLLOCK:  Your Honor, I honestly don't

15   know that, that is true.  Because the fact is, J and J

16   -- was -- did he have confidential discussions with J

17   and J?  The record appears crystal clear that he did.

18   They shot their wad.  They took the shot at the L.T.L.

19   bankruptcy and the fact is, was that Mr. Conlon's role?

20   I don't know.

21       And the other thing, the supposition here is

22   that; what happened after that?  Again, I don't know.

23   So to me, it's very clear, I think it's crystal clear

24   he had confidential discussions.  He was their counsel,

25   I would expect those discussions were confidential.

1    But the fact-sensitive inquiry I would argue here is,

2    did he have discussions that are really germane to the

3    work that he did with Mr. Birchfield?  There's no proof

4    that he did.

5              THE COURT:  Did Mr. Conlon travel to attend

6    meetings with J and J's outside attorneys, New York,

7    Miami, Los Angeles?

8              MR. POLLOCK:  I don't know, Your Honor.

9              THE COURT:  Okay and did Mr. Conlon

10   participate in any analysis and discussion of J and J's

11   objective with in-house and outside counsel for more

12   than a year and a half?

13             MR. POLLOCK:  Again, Your Honor, same as

14   before.  I don't know if it happened and if so, I don't

15   know if it's relevant.

16             THE COURT:  Okay and Mr. Conlon left Faegre

17   Drinker in 2002 to launch a business venture called

18   Legacy Liability Solutions.  I think he says that in

19   his certification?

20             MR. POLLOCK:  Yes, sir.

21             THE COURT:  Does Mr. Conlon have, through

22   this new company, "An alliance," in parentheses, with

23   Mr. Birchfield so as to pursue resolution of those Talc

24   cases?

25             MR. POLLOCK:  Your Honor, I believe the

1    answer is, they've had discussions and the highest goal

2    of the bar.  You've encouraged, I'm sure Your Honor,

3    countless people to resolve and to settle their

4    disputes.

5         My understanding is that they did work

6    together to come up with a strategy to try and resolve

7    or settle disputes.  I don't know that, that

8    necessarily, is a bad thing.  I thought the Court

9    promoted it but there's no proof that Mr. Conlon ever

10   shared any confidential inside baseball regarding what

11   J and J believed at that point in time.

12        THE COURT:  Yeah, I'm not suggesting anything

13   is improper.  I mean, I came here, just for our record,

14   with an open mind.  I read the papers, read the cases,

15   looked at the exhibits and I heard what counsel had to

16   say.

17        MR. POLLOCK:  Yes, Your Honor.

18        THE COURT:  That's my standard operatis,

19   that's how I address motions.

20        MR. POLLOCK:  And I respect that.

21        THE COURT:  And can you tell me what purpose

22   or role Mr. Conlon and his new company are serving with

23   either Mr. Birchfield or Beasley Allen or both?

24        MR. POLLOCK:  I don't know that they're

25   having any role right now because I believe that this

1    motion has kind of put the stop and progress in any

2    direction.  So I believe right now, they are focused on

3    deciding what to do and how to proceed.

4            THE COURT:  Is there any document that

5    memorialized any relationship or business relationship

6    with Beasley Allen or Mr. Birchfield?

7            MR. POLLOCK:  Andy?

8            MR. BIRCHFIELD:  No, Your Honor.

9            THE COURT:  Nothing, okay.  Is Legacy

10   Liability Solutions licensed to do business in New

11   Jersey?

12           MR. POLLOCK:  I honestly don't know, Your

13   Honor.

14           THE COURT:  Okay.  I think plaintiffs agree,

15   Beasley Allen could not hire Mr. Conlon as an attorney

16   to work on Talc cases unless there was some type of

17   screening.  He could work at the firm there would need

18   to be some walling off of any of his attorney

19   responsibilities --

20           MR. POLLOCK:  I think under R.P.C. 1.9 and

21   1.10, imputed disqualification, that would be correct,

22   that you would need some kind of waiver.

23           THE COURT:  Okay.  Mr. Brody, I was just

24   addressing what was proffered to me as undisputed.  So

25   that's why I posed those questions.  I don't have

1    questions for J and J other than; what does J and J

2    have in reply to what Mr. Pollock indicated with regard

3    to how we process, how the Supreme Court instructed its

4    trial courts to process these types of questions.

5          MR. BRODY:  Sure and then I can respond -- I

6    want to respond to a few of the points that were argued

7    by Mr. Pollock.

8          THE COURT:  Please.

9          MR. BRODY:  I think, you know, a starting

10   point here is, and this was at the outset of the

11   argument that was made.  Was that, we should read more

12   into the Cordy decision and the relationship with the

13   expert than just 28 hours.  And the point was made

14   that, in the course of 28 hours, you know, enough work

15   was done to establish not only the fact that the expert

16   Greene had confidential information but that, that

17   confidential information must have been conveyed in the

18   subsequent retention by the defendant's counsel.

19         That just makes the case here because again,

20   we're not talking about 28 hours, we're talking about

21   1,600 hours and it is undisputed on the record before

22   the Court that, that 1,600 hours included in-depth

23   evaluation of various settlement strategies.  It is

24   undisputed on the record that it involved actually

25   participating in settlement discussions and

1    negotiations around the various avenues that the

2    company was exploring.

3            That necessarily includes, as evidenced by

4    the fact that these involved Mr. Hass and Mr.

5    Braunreuther, we're talking about the World Wide Vice

6    President for Litigation for Johnson and Johnson here

7    when we're talking about these discussions that are

8    going on.  So this is a case that goes well, well

9    beyond a mere appearance of impropriety, this is a case

10   where we have actual impropriety.

11           And I was really struck by, in response to

12   Your Honor's questions, the statement from Mr. Pollock

13   and I think this captures why disqualification is the

14   only remedy on the record before the Court.  With

15   respect to Conlon and Beasley Allen, we heard they

16   worked together to come up with a strategy to resolve

17   the cases.

18           J and J's former lawyer and lawyers

19   representing plaintiffs adverse to J and J in this

20   litigation, got together and worked together to develop

21   a strategy that is adverse to J and J.  They did this

22   with J and J's former counsel, a former counsel who was

23   privy to almost two years worth of high-level

24   discussions at the company.

25           On those facts, there's nowhere the Court can

1    go but to disqualification in order to maintain the

2    fairness and the integrity of these proceedings.  So

3    this is far more than just a mere appearance of

4    impropriety.

5            There is absolutely an appearance of

6    impropriety here, there is actual impropriety and

7    again, this is a situation where courts do not allow,

8    do not condone, efforts -- to use again the words of

9    Ethics Opinion 680, efforts to do indirectly what

10   counsel would be prohibited from doing directly,

11   whether it's a side-switching lawyer, a side-switching

12   expert, a side-switching former employee or someone who

13   was a lawyer and left the practice of law to form a

14   business.

15           The analysis is the same in every one of

16   those cases and it is not a situation where somebody

17   who has been involved in those kinds of discussions,

18   who has just the extraordinary amount of time at the

19   center of everything at J and J on this very

20   litigation, can set that aside.

21           Again, coming back to counsel's focus on

22   Greene, the expert in the Cordy case and his 28 hours.

23   The Cordy Court said, to believe that Greene did not

24   and will not remember and ultimately use that

25   information, even subliminally, defied common sense and

1    human nature.  And it would defy common sense and human

2    nature to suggest here that, in the words of Mr.

3    Pollock, Conlon and Birchfield worked together to come

4    up with a strategy to resolve the cases.

5              Again, a strategy adverse to J and J and then

6    reached out to jointly pitch a meeting where they were

7    coming together with the Chief Investment Officer from

8    Legacy Liability Solution and pitch their settlement

9    matrix to J and J, it would defy common sense and human

10   nature to suggest that, that is proper, that that could

11   be done without a betrayal of confidential information.

12             And to suggest that given that alignment,

13   even if it were to stop today, that we can move forward

14   and have a fair and just proceeding here while Beasley

15   Allen is on the other side of the bead from J and J,

16   the ethical rules just don't allow it and court-after-

17   court has disqualified counsel in circumstances far

18   less egregious than those we have here.

19             THE COURT:  Do you believe the Court needs a

20   plenary hearing or what it heard today is enough to

21   resolve the decision?

22             MR. BRODY:  I believe that, what is before

23   the Court today is more than enough to disqualify

24   Beasley Allen.  However, if the Court were to believe

25   that a plenary hearing would be helpful, we stand ready

1     to present evidence to the Court in that setting.

2              THE COURT:  My concern is on plenary hearings

3     is, to not be a vehicle for the disclosure of any

4     confidential communications.  So my thought is and I'm

5     going to weigh this -- I'm not going to render a

6     decision today but I'm going to render a decision by

7     the end of the week with regard to either a final

8     decision on the motion or with further proceedings.

9              Because it is the initial burden of

10    production is that the lawyers for whom

11    disqualification is sought formerly represented their

12    clients adverse and that present litigation is

13    materially adverse to the former clients must be bourne

14    by, in this instance, J and J.

15             If that burden of production or of going

16    forward has met the burden shift then to the attorneys

17    sought to be disqualified -- there was a burden

18    shifting in the L.A.D. CEPA case, you know, counsel is

19    familiar with the McDonald-Douglas shifting but

20    nonetheless, if that burden of production or of going

21    forward has met that burden shifts, the attorney sought

22    to be disqualified to demonstrate that the matter or

23    matters in which he or they represented the former

24    client are not the same or substantially related to the

25    controversy in which the disqualification motion is

1    brought.   Trupos cites Avocent Redman Corporation

2    versus Rose Electronics, 491 F. Supp. 2d., page 1,000,

3    District Court in Washington, 2007.

4           Interesting that we're citing -- you know,

5    we're looking at California and Connecticut cases and

6    our Supreme Court cites to a District Court in

7    Washington.  I'm not criticizing, I'm just pointing out

8    where our Court was looking.  And then the burden of

9    persuasion on all the elements under R.P.C. 1.9(a)

10   remains with J and J, the party.  The moving party

11   bears the burden of proving disqualification is

12   justified.

13          I don't have any affidavits from J and J and

14   could you explain to me, Mr. Brody, why?

15          MR. BRODY:  You do have the declaration from

16   Mr. Hass --

17          THE COURT:  Right.

18          MR. BRODY:  -- which speaks to the -- the --

19   well one, it speaks to the full extent of Mr. Conlon's

20   access to the substance of his discussions, issues that

21   he was involved in, his activities on behalf of the

22   company, goes into detail on that.

23          It also speaks specifically to the

24   communications that Mr. Conlon made, the

25   representations that were made, about his alliance with

1    Mr. Birchfield and the Beasley Allen Firm.  So I would

2    argue that you do have a lot of detail, as well as the

3    authentication of relevant exhibits from Mr. Hass in

4    his declaration.

5         THE COURT:  I think Mr. Pollock said but

6    disagrees that, they are not directly relevant with our

7    cases here, that information.  Now, I'm not putting

8    words in Mr. Pollock's mouth, I'll give him an

9    opportunity to explain that but that's what I

10   understood.  Not germane.

11        MR. BRODY:  Yeah, I think you only have to

12   look at the text of the declaration to see just how

13   germane it is.  I mean, it includes and again, this is

14   undisputed, a recounting of exactly the full extent and

15   incredible extent to which Mr. Conlon was involved in

16   these issues.

17        The fact that he was part of the core team.

18   The fact that he attended dozens of meetings with

19   senior members of the Law Department on this

20   litigation.  The fact that he was front and center and

21   you asked him about, you know, the negotiations

22   surrounding a potential resolution through the Amyris

23   bankruptcy.  That is also undisputed and that is

24   recounted in Mr. Hass' declaration, as well.

25        So I think when you look at it and you go

1    through it paragraph-by-paragraph, there is a level of

2    detail there that establishes without a doubt that it

3    -- his work was germane to what is going on in this

4    M.C.L. right now and I don't think there is any dispute

5    as to that.

6              THE COURT:  Thank you, Mr. Brody.  Mr.

7    Pollock?

8              MR. POLLOCK:  Thank you, Your Honor and I

9    appreciate your patience.

10             THE COURT:  You're welcome.

11             MR. POLLOCK:  Two points I would make.  One

12   with regard to Trupos and I'm looking specifically at

13   201 N.J. at 463.  A determination of whether counsel

14   should be disqualified is an issue of law, subject to

15   DeNovo plenary appeal.  He also then -- I also will

16   cite to Yuna, which is 206 N.J. at 118.

17             After defendant sought and was granted leave

18   to appeal from that interlocutory (indiscernible)

19   order, the Appellate Division in an unpublished

20   decision procuring affirm the denial of defendant's

21   motion to disqualify, noting that motions for

22   disqualification should ordinarily be decided on

23   certifications and documentary evidence.

24             So and Judge, I'm not challenging you at all

25   in your authority.  You have the right to do what you

1    see is fit and I'm sure you will but I do believe that

2    if we, on the facts you have today, what J and J says

3    is Mr. Birchfield spent -- Mr. Conlon, I'm sorry, spent

4    a lot of time on this matter, 1,300 hours, $2 million

5    worth or whatever it was.

6         What specifically did he do on January 13th,

7    2021?  I have no clue.  What did he do on the following

8    day, I have no idea.  What there is, this basically is

9    a; hey, he worked on the matter for J and J.  Did it

10   involve the L.T.L. bankruptcy filings, what did it

11   involve?  I have no clue and neither does anybody else

12   because in these documents which is what the Supreme

13   Court has said in both Yuna and Trupos, there is no

14   record here to support their decision.

15        Again, Judge Porto, this is your courtroom

16   and I respect that and if you want to have a plenary

17   hearing, you have the right to order it but I do

18   question; how would we proceed?  At this point, am I

19   going to be grilling the J and J Head of Litigation or

20   somebody, walking through timesheet-after-timesheet?  I

21   mean, I can't imagine the number of litigation

22   objections, there will be an attorney-client work

23   product and everything else.

24        And also, why is it relevant?  Because at

25   this point, we keep on going back to Cordy, we keep on

1    going to these other cases, which is fine. Cordy was

2    decided without the appearance of impropriety. That

3    rule was a game changer. It was a significant decision

4    for the Supreme Court of New Jersey to make.

5         Prior to Cordy, I'll admit, we probably would

6    lose because the fact is, on that fact pattern, you

7    would look at it and you would say, you know what, it

8    smells right and that's really their argument. It must

9    be the case, it must be the case that something

10   transpired here. The problem is, in weighing the

11   balance and you know this, Judge, because you've

12   practiced for a long time.

13        You have a balance, the needs of the client

14   to be represented by the lawyer of its choosing. The

15   needs to protect client confidence of J and J, which I

16   respect, by the way. So you have this balancing going

17   on and it's very clear; unless there is a clear,

18   articulated violation of the rules of professional

19   conduct, then the answer is, the only finding on these

20   papers must be that the Beasley Allen Firm remains and

21   they can go forward and litigate as God intended.

22        The last thing I'll point out is that 1.9 and

23   1.10 were not lightly written, they were heavily

24   negotiated. And 1.9 says, "A lawyer who has

25   represented a client." That's not Beasley Allen, they

1    never represented J and J.  Ask Mr. Conlon.  So if they

2    have an issue, go after Mr. Conlon, which notably, they

3    have not done, which is kind of odd.

4              So then you go to 1.10 and as you pointed,

5    imputed disqualification.  A lawyer is associated with

6    a firm if they have confidential information -- I agree

7    with your interpretation.  We should not hire and will

8    not hire Mr. Conlon.  He is not going to be an employee

9    of Beasley Allen.

10             The fact is but the rules were written for

11   specifically that purpose and they were knowingly.  It

12   doesn't say that you can't -- you know, when you talk

13   about the whole idea of who you can interview in the

14   control group test, let's get outside of where we are

15   right now.  Who can I talk to?  Well, I can talk to

16   anyone who is not within the control group under R.P.C.

17   1.4 and 1.6.

18             Mr. Conlon, is he in that control group?  I

19   haven't seen anything saying he is.  I haven't seen any

20   effort by J and J to define him as a person that I

21   cannot talk to.  Classic example is, I'm suing Goodyear

22   Tire and I want to go talk to a mechanic.  How good are

23   those Goodyear tires?  Unless Goodyear puts that guy

24   within the control group, which they had the ability to

25   do but to this day, they have not done it.

1          So on those facts, all of that just speaks

2     volumes that this is a make-work argument.  And

3     therefore, with all due respect Judge, I would urge the

4     Court to rule on the papers that are before it, not the

5     papers that could have been before it and since they

6     failed to carry their heavy burden and it's being

7     written for strategic purposes, they don't like the

8     Beasley Allen Firm.

9          They are allowed to dislike the Beasley Allen

10    Firm but the fact is, that's not a basis for

11    disqualifying it.  Unless you have any further

12    questions, Your Honor, I'll rest.

13         THE COURT:  I don't know, so Mr. Pollock, I

14    shouldn't keep the record open?

15         MR. POLLOCK:  Your Honor, it's your courtroom

16    and I respect any decision you make.  If you want the

17    record open, you can but the fact is, I do believe what

18    the Supreme Court urges is that, unless there is a

19    nagging question and I'm sure there's a million

20    different issues.  What did Conlon do in 2019, how did

21    he do in law school, what role did he play in -- I have

22    no idea and I don't really care.

23         What I do care about is one narrow window.

24    The window where Conlon had an idea of trying to

25    resolve this dispute.  Mr. Birchfield, according to the

1    e-mail, had to communicate with him and so did J and J.

2    That's the one narrow window I'm looking at because I

3    don't care what he did before.

4          Unless there is some real evidence that he

5    shared that information inappropriately that he had

6    with Andy Birchfield and the Beasley Allen Firm and

7    there's no proof that he did.

8          THE COURT:  Thank you, Mr. Pollock.

9          MR. POLLOCK:  Thank you, Your Honor.

10         THE COURT:  Mr. Brody?

11         MR. BRODY:  If I may and I'll be brief, Your

12   Honor --

13         THE COURT:  We don't have a stopwatch,

14   Counsel.

15         MR. BRODY:  So first of all, I'm surprised to

16   hear reference to questions about a control group.

17   Clearly, the Hass declaration makes clear that Mr.

18   Conlon was meeting with people at the highest levels of

19   the Law Department.  And if there is to be -- if this

20   case were decided based on a control group test, that

21   is clearly met.

22         Again, what we're hearing, as the core

23   argument and this is actually what we started with

24   earlier this afternoon, is Beasley Allen's insistence,

25   Mr. Pollock's insistence that; well, because Beasley

1    Allen hasn't hired Mr. Conlon, J and J's former lawyer,

2    as a member of the firm, that somehow, it doesn't rise

3    to a technical violation of 1.9 of 1.10.

4         And therefore, it's okay for Beasley Allen to

5    continue representing plaintiffs in a situation where

6    the law presumes rightly that J and J's client

7    confidences have been compromised, have been shared

8    with Beasley Allen, by virtue of what we heard.  Was,

9    the Beasley Allen Firm and Mr. Conlon joining together

10   to form a strategy, to try to pursue a resolution of

11   these cases that is adverse to J and J and that they

12   know is adverse to J and J.  In a situation where

13   Beasley Allen was well aware that Mr. Conlon was J and

14   J's lawyer.

15        And if you look at all of these cases, all of

16   the courts that have looked at them, these analogous

17   situations, similar situations.  Again, none of them as

18   egregious as what we have here but every single one has

19   said in that situation, where counsel knows that it is

20   approaching somebody, whether it's a lawyer, an expert,

21   former employee, who possesses confidential information

22   of the opposing side, that's where disqualification

23   comes in.

24        Now -- and that's where the law presumes that

25   confidential information has been conveyed because it's

1    quite simply impossible to imagine that it would not

2    have been.  It's a situation, really, where -- you

3    know, when you look at some of the cases where courts

4    have said -- and there is some question, by the way,

5    under New Jersey Law as to whether that presumption is

6    even rebuttable or whether it remains to this day an

7    irrebuttable presumption.  But even assuming that the

8    Court were to find that it would be impossible to rebut

9    that presumption, that hasn't happened here.

10          Again, blanket denials without explanation,

11   without detail, are insufficient to rebut the

12   presumption that confidential information was conveyed.

13   You know, that's what screening is for and frankly,

14   that's why we have screening as a way to avoid these

15   kinds of situations where -- and again, I go back to

16   Kennedy.

17          The highest standards of the profession are

18   the maintenance of client confidentiality and the need

19   to ensure that protected client information is not used

20   to the detriment of a former client.  And that's what

21   we have here, an extraordinary situation where a core

22   member of J and J's legal team is aligned with its

23   opposing counsel, pursuing a strategy that is adverse

24   to the company.

25          And I think that on that record, there is

1    nowhere else for the Court to go, if Your Honor is to

2    maintain the fairness to J and J, the integrity of

3    these proceedings for J and J, on a going forward

4    basis.

5         THE COURT:  Thank you.  I'm going to relook

6    at all the certifications again.  I want to go back and

7    look at the answers to my questions, material, not

8    material, and I'm going to issue on Friday, whether the

9    record is closed.  I'm tending to not -- find I don't

10   need a plenary hearing.

11        As I said, this Court is not going to be a

12   vehicle to air any additional -- or any client

13   confidences for plaintiff or defendant.  I'm not

14   suggesting there were but this is not -- that's not

15   what plenary hearings are for.  So I'm going to

16   analyze, I'm going to reread Trupos again and I'm going

17   to reread -- I may go back and listen to our transcript

18   again and then issue a decision on where I'm going

19   Friday because I don't find it's fair that I give a

20   bench decision, like in Trupos, and then I'm going to

21   supplement.

22        I don't -- I've never -- in other divisions

23   I've done it, Criminal Division I've done it with

24   regard to suppression hearings but that's not what I'm

25   going to do here.  So I'm going to let you know by

1     Friday, about 3 o'clock, what I'm going to do.  I'm

2     going to hold the record open at this point.

3          I don't want any submissions unless I find

4     that there is a gap in some submissions.  Because you

5     know, what I find interesting, is what is presented in

6     those certifications and then maybe what causes this

7     Court to think if there's any gaps, as Trupos says.  So

8     I'm not looking for gaps but I'm going to be looking

9     for gaps because I'm going to try to resolve the case,

10    as Trupos says, without a plenary hearing.

11         So I'm going to close our oral argument

12    today.  Why don't we take a couple minutes because we

13    have a case management conference and counsel can be

14    excused, unless you want to stick around and hear it.

15         MR. POLLOCK:  I just have one question for

16    you, Judge.

17         THE COURT:  Yes, sir.

18         MR. POLLOCK:  I'm sorry that you're going to

19    have to listen to this oral argument all over again.

20    My --

21         THE COURT:  That's why we have Courtsmart.

22         MR. POLLOCK:  We can jointly pay for a bottle

23    of scotch or something to ease your pain.  Would you

24    like a copy -- would you like the matter transcribed

25    and in a transcript so you can read it?  I don't know

65

```
 1    how we do that but I'm sure we can get it done.

 2              THE COURT:  That would be great.  Instead of

 3    listening, you know, I can flip back and forth, as

 4    opposed to going back.  That's a great suggestion.

 5              MR. POLLOCK:  Okay.

 6              THE COURT:  So if you do that, I'm not going

 7    to cause counsel to go and get an expedited.  So maybe

 8    not Monday.  You let me know how soon you can turn

 9    around, not a 30 day transcript?

10              MR. POLLOCK:  No, it will be a dirty, quick

11    cut transcript.  We'll get it done, we'll figure it

12    out.

13              THE COURT:  Okay.  Ms. Sharko?

14              MS. SHARKO:  Yes, we traditionally have

15    requested expedited transcripts of the case management

16    conferences but expedited means like a week or more, as

17    a practical matter.

18              THE COURT:  Can you maybe get it to me in a

19    week?

20              MS. SHARKO:  We will ask that they do it.

21              THE COURT:  Is it Connie, does Connie do your

22    transcripts?

23              MR. POLLOCK:  I think you have phenomenal

24    powers, Judge.  My guess is, you can make it happen.

25              MS. SHARKO:  If you can make it happen,
```

 1    Counsel will pay for it.

 2              THE COURT:  Okay, can you get it to me by

 3    next Wednesday?

 4              MS. SHARKO:  We'll get it to you as soon as

 5    they'll give it to us.

 6              THE COURT:  Perfect, okay, excellent.

 7              MR. POLLOCK:  Thank you, Judge.

 8              THE COURT:  Before we go, I think we had

 9    counsel appearing on Zoom, right, for our -- does

10    counsel want to enter their appearances or will that be

11    for the case management conference?

12              UNIDENTIFIED MALE:  I think there's -- yeah,

13    Mr. Placitella is on.  He may want to enter his

14    appearance.

15              MR. PLACITELLA:  Yeah, hello, Your Honor, I

16    can enter my appearance at the case management

17    conference.

18              THE COURT:  Okay, I just wanted -- I didn't

19    want to leave without giving all counsel an

20    opportunity.  Thank you, everyone.

21              MR. POLLOCK:  And you're still not shaving?

22              THE COURT:  For the arguments.  We'll take

23    five.

24              MR. POLLOCK:  Thank you, Judge.

25              THE COURT:  You're welcome.  Have a good rest

1    of the day.

2         (Proceeding concluded at 3:28:04 p.m.)

3                   *  *  *  *  *

4

5

6

7

8

9                   CERTIFICATION

10        I, Nitsa Carrozza, the assigned transcriber, do

11   hereby certify the foregoing transcript of proceedings

12   on CourtSmart, timestamp from 01:59:33 p.m. to 03:28:04

13   p.m., is prepared to the best of my ability and in full

14   compliance with the current Transcript Format for

15   Judicial Proceedings and is a true and accurate non-

16   compressed transcript of the proceedings, as recorded.

17
18        /s/ Nitsa Carrozza                AD/T 639
19        Nitsa Carrozza                    AOC Number
20
21
22     Phoenix Transcription LLC            01/19/2024
23        Agency Name                       Date

# EXHIBIT B

```
                              SUPERIOR COURT OF NEW JERSEY
                              LAW DIVISION:  CIVIL PART
                              ATLANTIC COUNTY
                              DOCKET NO.:  ATL-L-2648-15
                              A.D. #_____

                         )
IN RE: JOHNSON AND JOHNSON)        TRANSCRIPT
TALCUM-BASED POWDER       )            OF
PRODUCTS LITIGATION       )        CONFERENCE
                         )
```

Place: Atlantic County Courthouse
       (Heard Via Zoom)


Date: January 23, 2024

BEFORE:

     HONORABLE JOHN PORTO, J.S.C.

TRANSCRIPT ORDERED BY:

     JEFFREY M. POLLOCK, ESQ.,
     (Fox Rothschild)

APPEARANCES:

     JEFFREY M. POLLOCK, ESQ.,
     (Fox Rothschild)
     Attorney for Birchfield

     STEVEN BRODY, ESQ.,
     Attorney for Johnson & Johnson, LTL

Transcriber:  Sharon Conover
PHOENIX TRANSCRIPTION
796 Macopin Road
West Milford, NJ 07480
(862) 248-0670

Audio Recorded
Recording Opr:  Catherine Mauro

I N D E X

Conference.......................................3

1          (Hearing commenced at 3:30 p.m.)

2          THE COURT:  Good afternoon, counsel.

3          MR. BRODY:  I apologize, Your Honor.  I was

4     in the Zoom but for some reason it would not let me

5     turn my camera on and it would not let me unmute.  I

6     don't know what the issue was there.

7          THE COURT:  That's quite all right.  I

8     appreciate you, Mr. Brody being available as well as

9     Mr. Pollock.  Short notice, but as I indicated I

10    weighed following -- let me the case and I'll let you

11    know what I'm looking for.  In RE:  Talc Based Powder

12    Products Litigation Master of docket number ATL-L-2648-

13    15, MCL case number 300.  May I have the appearance of

14    plaintiff's counsel?

15         MR. POLLOCK:  Jeff Pollock for Mr. Andy

16    Birchfield.

17         THE COURT:  Thank you, Mr. Pollock.  Mr.

18    Brody.

19         MR. BRODY:  Steve Brody for defendant Johnson

20    & Johnson and LTL Management, LLC.

21         THE COURT:  Thank you.  And this is in

22    conjunction with and subsequent to our oral argument we

23    had last Wednesday, the 17th of January regarding

24    Johnson & Johnson and LTL Management LLC's motion to

25    disqualify Beasley Allen.

1          We had oral argument.  I got a copy of the

2     transcript.  I've reviewed all of the case law.  I'm

3     focusing, candidly on New Jersey State case law as well

4     as district court.  I'm not looking at any out-of-state

5     cases.  So, just want to let you know where I'm

6     focusing in on.

7          During oral argument and this is relating to

8     the disqualification, and I'm trying to do this as the

9     Trupos case said on the papers.  And Yuna also said and

10    adopted that same process.  The O Builders & Associates

11    versus Yuna Corporation of New Jersey 206 N.J. 109.

12    And I'm going to be focusing on page 129 of that

13    decision.  When I reviewed this transcript, counsel for

14    Beasley Allen, Mr. Pollock raised the point and I made

15    note of it, and also commented again in the review of

16    the transcript.

17          Notably, did Mr. Conlin (phonetic) have

18    discussions that are really germane to the work he did

19    with Birchfield, Mr. Birchfield.  And he intimated that

20    perhaps Conlin's role with J&J was limited to simply

21    the filing of the bankruptcy involving the LTL.

22          So what specifically, what I'm looking for

23    then Mr. Brody and again I'm trying to keep it as best

24    I can contained on the papers is, so what I'm looking

25    for is what specifically was Conlin working on, again a

1    shorthand reference I mean no disrespect or

2    familiarity, what was Conlin working on during those

3    1,600 hours with Faeger Drinker and is it substantially

4    similarly germane to any work with Birchfield?

5         Can you provide a certification in that

6    regard, Mr. Brody?

7         MR. BRODY:  Absolutely, Your Honor.  We --

8    Mr. Haas certainly provide that certification based on

9    his personal involvement with the work that Mr. Conlin

10   did.  And in particular can certify that Mr. Conlin

11   were involved in the evaluation of all of potential

12   resolution strategies for the Talc Litigation at the

13   highest level for the company.

14        So, the exact matter that is before Your

15   Honor  was subject of the work that Mr. Conlin was

16   doing as part of the senior J&J team.  Now obviously,

17   when you're talking about potential resolutions, you're

18   looking at all options including bankruptcy, including

19   as Your Honor knows a potential resolution through the

20   Imerys bankruptcy, as well as resolution through the

21   Tort System.

22        So, it is an all encompassing evaluation of

23   potential resolutions that included evaluation and

24   discussion of the -- and I do have to say high level,

25   strengths and weaknesses of the underlying cases, and

1   how that would intercept and impact the company's

2   strategies for the ultimately resolution, what it had

3   hoped would be the ultimate resolution of the

4   litigation.

5          THE COURT:   Now, it's no secret that J&J

6   desires to pursue the resolution through bankruptcy.

7   So one of the points that Mr. Conlin raised in his

8   certification, and I'm going by memory right now, is

9   that there's nothing that he derived from J&J that has

10  any basis on what Legacy is doing.

11         So we don't have any documentation, it's not

12  like Trupos or Yuna to the extent that there is no

13  documentation that I can look at.   We're looking at

14  inferential.   So what I'm trying to do Mr. Brody and

15  Mr. Pollock is this is a distinguishable case from all

16  the other cases I feel from what counsel cited and that

17  came up in the Court's research that involve a former

18  attorney, involving a former client, involving a former

19  attorney that is no longer practicing law who is

20  deriving -- who co-founds a company, the Legacy

21  Company, and is now trying to formulate a settlement

22  that doesn't involve the bankruptcy.   It involves the

23  capital markets, I think Mr. Conlin says.

24         So that's what I'm trying to do.   Mr.

25  Pollock, anything to add?

1          MR. POLLOCK:  No, Your Honor.  The only

2    points that I would raise, and I think I follow

3    analytically where you're going, that there's one issue

4    I also did raise during oral argument, is that timing

5    may matter, because Mr. Conlin was working at a

6    specific window in time, and the fact is we're now at a

7    different window in time.  I think that's another way

8    of, if you will, of addressing the issue you're hitting

9    which is how overlapping are these?

10         There's one other issue which I wish I

11   responded to, and I'm not trying to reargue the motion,

12   but I did miss this one last time and it may be

13   relevant.  Mr. Brody argued at length that Mr. Conlin

14   -- Mr. Birchfield reached out to Mr. Conlin, that they

15   were arm-in-arm and they were working together.  There

16   is zero proof that that is true.  I think Your Honor

17   stated it better, Legacy had an idea or thing to sell,

18   which is a resolution.  I believe that the truth is

19   that Legacy reached out to both, Conlin and to

20   Birchfield, and to J&J.

21         My point being that the inference was led and

22   I missed this one in oral argument and I should've

23   addressed it, and I think I want to address if there's

24   a responsive paper from J&J, that there is nothing in

25   the record that Birchfield reached out to Conlin and

1    said, hey let's go stick it to J&J.

2              I think that is relevant because it goes to

3    the question of was Conlin doing something if you will,

4    with his kind of like one of the points you're hitting,

5    or was Birchfield, Beasley Allen behind that too?

6              THE COURT:  I don't disagree with you, Mr.

7    Pollock.  And I think it is the overlap in time.  He

8    leaves in March 2022 and I think it's August 2022 that

9    these events coalesce.

10             MR. POLLOCK:  Correct.

11             THE COURT:  Mr. Brody.

12             MR. BRODY:  Right.  I mean, yeah -- yes, Your

13   Honor, thank you.  In response, I think that the timing

14   issue here doesn't have a legal analysis at all.  And

15   it doesn't change the, for lack of a better word, the

16   wrongfulness of the alliance we see between Mr.

17   Birchfield and Mr. Conlin.  If you look at the various

18   exhibits that were included with the declaration from

19   Mr. Haas, what you see is a progression in time.

20   Where, first of all, Mr. Conlin spends that 1,600 hours

21   over a period of months with the senior J&J team

22   evaluating resolutions.

23             After he left Faeger Drinker he initially

24   reached out to J&J to talk about one avenue proposed

25   resolution, again the same matter, the very same issue,

1    how can we resolve this litigation.  What's the width

2    he can go to value these cases correctly to attain a

3    resolution, whether it's through the bankruptcy process

4    or otherwise.  He was rebut by J&J and that's when the

5    alliance with Mr. Birchfield started, whether

6    Birchfield reached out to Conlin or Conlin reached out

7    to Birchfield first, frankly is not relevant to the

8    disqualification inquiry.  What's relevant is the fact

9    that -- and there's no denying that Mr. Birchfield and

10   Beasley Allen were well aware that Mr. Conlin had

11   represented J&J in the same matter.  I mean this is

12   frankly, under case law not even a close call.  This is

13   the exact same litigation and it's the exact subject

14   matter for which Mr. Conlin represented J&J.  And the

15   law does not afford a lawyer the ability to, in essence

16   switch sides, partner with the side that was previously

17   his opposing counsel in the litigation and then just

18   say, well I'm going to somehow compartmentalize the

19   privilege, confidential portions of this in my brain,

20   and only use non-confidential, non-privileged material.

21   And in this case, I think is a perfect example of why

22   that is, because we're talking about somebody who had

23   an inside view of the way and participated in

24   discussions that were going directly to the way the

25   company thought about the pluses and minuses, strengths

1     and weaknesses, of different strategies.

2            Again, we're talking about all potential

3     avenues, including resolution through the Tort System,

4     which is what Beasley Allen and Mr. Conlin have been

5     promoting and pursuing, resolution versus J&J wishes,

6     but which they specifically know that we're all

7     onboard, we're together on this.  And we heard from Mr.

8     Pollock at the hearing that they did get together to

9     formulate what they hoped would be, for them a

10    favorable resolution strategy.

11           That's the real problem here.  That's the

12    heart of the issue is that J&J's former lawyer is

13    working as J&J's opposing counsel on the same matter

14    that he spent an extraordinary amount of time

15    representing J&J.

16           I don't think there are any cases, whether

17    New Jersey State cases you know, there's a long line of

18    them that has been cited by each side, and the District

19    of New Jersey cases.  Every case that speaks to a

20    situation where somebody switched sides, whether it was

21    a lawyer, an expert, or a former employee or a witness,

22    reached the conclusion that the only way to guarantee

23    the continued fairness of the proceedings is through

24    disqualification.

25           THE COURT:  Mr. Pollock?

1           MR. POLLOCK:  Your Honor, I feel like right

2      now we are getting into the entire motion.  Mr. Conlin

3      is not a side-switching lawyer.  He is not counsel

4      here.  He is not entered an appearance here.  I notice

5      Mr. Brody now changes his position dramatically.

6           Initially the argument before you was, that

7      Mr. Birchfield and Beasley Allen firm reached to Conlin

8      basically to gain inside information on how to approach

9      J&J.  Now for the first time, his position is well we

10     first reached out to J&J and had a discussion with J&J.

11     I really don't think it's either here nor there.  The

12     reality is that I believe that the papers that are

13     before you are bereft of any indication, any truth that

14     Mr. Conlin shared as a consultant, as an investment guy

15     with the Beasley Allen firm any information.  In fact,

16     the only record in front of you is that it did not

17     occur.  What Mr. Brody's argument boils down to is one

18     simple thing, it stinks.  It must smell.  There must

19     have been those discussions.

20          And that is code for the appearance of

21     impropriety, which the Supreme Court of New Jersey has

22     squarely and completely rejected.  So therefore, that's

23     why the Court has said as you indicated a few minutes

24     ago, Your Honor, you look at the papers you got, not

25     the papers that Mr. Brody wished he had submitted, or

12

1    that he could not have submitted.

2         I wait Your Honor's correction.  If you want

3    us to do continued briefing, I take it that you're

4    acting as to the highest level of the judiciary Judge,

5    trying to get it right.  I think that's where you're

6    coming from.  If you would tell us what you need, I am

7    sure that Mr. Brody and I will be glad to provide you

8    with anything you want.  But I don't think it's really

9    a good use of your time since you studied the case law

10   and the facts, to rehash the arguments that you've

11   already heard, because I think you understand them.

12        THE COURT:  Thank you, Mr. Pollock.  I didn't

13   -- I try not to cut people off.  I want to give

14   everybody an opportunity, so that's why, I don't feel I

15   need any re-argument.

16        The other point, I wanted to make Mr. Brody

17   is about the closest in the record is when Mr. Murdica,

18   Jim Murdica writes to Mr. Conlin regarding the

19   Bloomsburg article.  And he says, cease and desist, and

20   you've disclosed, you've criticized, don't mention your

21   prior clients, you've criticized prior clients, and

22   you've revealed client confidences.  Again, I'm going

23   by memory.

24        What exactly, if you can also place in that

25   certification, what exactly were, I didn't look at the

1    article, I know it's online.  I'm not doing it.  I want

2    to get that article from counsel for J&J and LTL, so

3    that everyone sees it.  What exactly is the

4    attorney/client -- because it's out there, what's the

5    attorney/client information that Mr. Conlin revealed?

6    We can all see if there's criticism or not.  And then

7    Mr. Pollock -- Mr. Brody however fast you can get that

8    into me, Mr. Pollock, I'm going to provide Beasley

9    Allen with an opportunity to address what's sent to me

10   from Mr. Brody.  Okay.

11             MR. POLLOCK:  Understood, Your Honor.

12             MR. BRODY:  Certainly, Your Honor.  I can

13   definitely -- we can have Mr. Haas prepare a

14   certification based on his personal knowledge of the

15   discussions that Mr. Conlin was privied to as counsel

16   for J&J.  As you know, from the introduction last week,

17   Mr. Haas (indiscernible) was involved in dozens of

18   meetings and phone conferences with Mr. Conlin over the

19   course of time.  So we can also address the letter that

20   Mr. Murdica wrote to Mr. Conlin on November 5th of last

21   year, which unfortunately was an effort to cease and

22   desist that was not headed by Mr. Conlin or frankly Mr.

23   Birchfield.  As you know from what's in the record

24   there, a coordinated effort to push their resolution,

25   the one adverse to the company's interests went on well

1    after that.

2         THE COURT:  Well I saw the -- I saw the

3    emails to was it Daegel?  And I saw all -- I went

4    through all of the exhibits, and all the certifications

5    as well as Mr. Haas's declaration.

6         Anything else?  I apologize again getting

7    counsel short notice, I appreciate you being available.

8    Anything else you're looking for for me, time line?

9    Candidly, I'm trying to get this decision out as soon

10   as I can, again and Mr. Pollock and Mr. Brody, I'm

11   trying to get it right, you know based on my

12   instructions.  I certainly understand, you know, any

13   appeals.  That certainly comes with the territory.

14   That's okay.  I just want to let you know.  I've been

15   here a while, it's okay.  Everybody has their rights.

16        MR. BRODY:  Your Honor, no problem at all.

17   And certainly, I have actually been in touch with Mr.

18   Haas today.  I let him know that you were asking for

19   this and he immediately, it's very important to the

20   company, he immediately said that he would be available

21   to join the Zoom or to join by phone, either one as

22   needed today.

23        But based on that, we can certainly give you

24   the certification within the next few days, certainly

25   by Thursday.  And as we do so, I think it will make it

1  clear that this is a situation where what Mr. Conlin

2  was working on for the company is 100% germane to what

3  he has now partnered with Mr. Birchfield about.

4  THE COURT: I'm still reserving the right

5  under Trupos and Dewey if there's any gaps. So I'm

6  trying to do the best I can on paper to make sure there

7  are no gaps. I'm looking at it. So I'm not telling

8  you there won't be a plenary hearing. But I will also

9  issue a decision. I will tell you if a plenary hearing

10  is not needed.

11  So, I don't keep anybody guessing. I'll let

12  you know, my staff will let you know if a written

13  decision is coming out. So, two days Mr. Brody. Mr.

14  Pollock, obviously you got to take a look at it, how

15  about Monday. Is that okay? You get the weekend.

16  MR. POLLOCK: I think, Your Honor, I think

17  that Monday works. I have a trial starting on Monday,

18  but I believe I can get it done. If I need more time

19  I'll beg. But I think the answer is Monday probably

20  works.

21  THE COURT: Now, look I'm not trying to

22  inconvenience anybody, Mr. Pollock. You know,

23  everybody has their work. I'm trying to balance. So

24  you let me know if you need more time, same thing Mr.

25  Brody.

16

1          MR. BRODY:  Of course.  Thank you.

2          THE COURT:  Again, Mr. Brody, Mr. Pollock,

3     thank you for being available.  I appreciate it.

4     Thanks so much.  Have a good rest of the day, everyone.

5     Thank you.

6          (Conference concluded at 3:57 p.m.)

7                         * * * *

8

9

10

11

12     CERTIFICATION

13          I, Sharon Conover, the assigned transcriber, do

14     hereby certify the foregoing transcript of proceedings

15     on CourtSmart, Index No. from 3:35:52 to 3:57:04, is

16     prepared to the best of my ability and in full

17     compliance with the current Transcript Format for

18     Judicial Proceedings and is a true and accurate non-

19     compressed transcript of the proceedings, as recorded.

20

21

22
23     ____/s/ Sharon Conover____        ___AD/T 625___
24          Sharon Conover                 AOC Number
25
26
27     ___Phoenix Transcription LLC___    ___01/24/24___
28          Agency Name                      Date
29