# Exhibit 35

## 1

Volume: 1
Pages: 1-72
Exhibits: 11

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.                    SUPERIOR COURT
                                  CIVIL ACTION NO. 20-2681
_____
                               :
MARY PICHIERRI and JOHN PICHIERRI,    :
        Plaintiffs             :
vs.                            :
                               :
AVON PRODUCTS, INC., et al.,   :
        Defendants             :
_____:


ZOOM DEPOSITION OF:
GREGORY B. DIETTE, M.D., MHS

Appearing remotely from Baltimore, Maryland

Friday, June 16, 2023

10:00 a.m. - 11:43 a.m.


Christine E. Borrelli, CSR, RPR, RMR

LEXITAS LEGAL
(508) 478-9795 - (508) 478-0595 (Fax)
www.LexitasLegal.com

## 2

**Counsel, witness, and court reporter appearing remotely**

APPEARANCES:

ATTORNEYS FOR THE PLAINTIFFS:
    SIMMONS HANLY CONROY, LLC
        112 Madison Avenue
        New York, NY 10016
    BY:  DENNIS GEIER, ESQ.
        dgeier@simmonsfirm.com

ATTORNEYS FOR ESTÉE LAUDER, INC., and ESTÉE LAUDER COMPANIES, INC.:
    KING & SPALDING, LLP
        1185 Avenue of Americas - 34th Floor
        New York, NY 10036
    BY:  KEVIN HYNES, ESQ.
        khynes@kslaw.com

ATTORNEYS FOR COLGATE:

    CAMPBELL, CONROY & O'NEIL, P.C.
        20 City Square - Suite 300
        Boston, MA 02129
    BY:  ADAM A. LARSON, ESQ.
        alarson@campbell-trial-lawyers.com


In Attendance:
Jacob Figueroa, Lexitas monitor

## 3

I N D E X

WITNESS                    DIRECT  CROSS  REDIRECT  RECROSS

GREGORY B. DIETTE, M.D., MHS

    By Mr. Geier         4              64
    By Mr. Hynes                63


EXHIBIT                                        PAGE:

Exhibit 1, Notice of Deposition ......................   5
Exhibit 2, Testimony List ............................   7
Exhibit 3, Fee Schedule ..............................   7
Exhibit 4, Invoices ..................................   8
Exhibit 5, Report, 5/12/23 ...........................  11
Exhibit 6, Report, 2/24/23 ...........................  12
Exhibit 7, Report, 5/26/23 ...........................  12
Exhibit 8, Case Study ................................  26
Exhibit 9, Teschke Article, 1997 .....................  30
Exhibit 10, MMWR, 5/13/22 ............................  32
Exhibit 11, Spirtas 1994 Article .....................  52

Exhibits digitally marked and returned to counsel with transcript.

## 4

GREGORY B. DIETTE, M.D., MHS, having first been identified by the production of a driver's license, was duly sworn by the Notary and testifies as follows:

DIRECT EXAMINATION BY MR. GEIER:

Q.  Good morning, Dr. Diette.

A.  Good morning.

Q.  My name is Dennis Geier.  We've been in the same room a couple of times, but I have never had the opportunity to be the one to take your deposition.  I am going to take your deposition today.  If you have any questions, if you don't understand something I say, just let me know.  I mean, of course, any time you need a break, just speak up.  I'd be happy to do it.  Hopefully we won't be too long this morning.  Okay?

A.  Perfect, thank you.

Q.  And I heard you say that you're located in Baltimore, Maryland this morning?

A.  That's right.

Q.  And so at your home, your office, somewhere else?

A.  I'm at home.

Q.  Okay.  There anyone else in the room with you?

A.  My wife is in the house elsewhere, but not in this room.

61

Q.   And that opinion differs from the Helsinki criteria; is that fair?

MR. LARSON:  Objection to form.

MR. HYNES:  Okay.

THE WITNESS:  So, I don't find the Helsinki criteria to be very helpful.  But, you know, there is no -- there is no precision to their discussion about what kind of dose you're looking for for mesothelioma.  And I don't think that, like, in each and every fiber hypothesis makes sense.  So if somebody has got like a little, tiny bit of asbestos exposure, that doesn't mean you have to point to that and point away from spontaneous.  If they have a sufficient dose -- and I guess people can disagree what a sufficient dose is -- but if they have a significant dose, I think it makes sense to consider that as a cause.

Q.   (By Mr. Geier)  What do you use or what articles do you rely on for the sufficient -- for your sufficient dose level?

A.   Yeah, a couple -- I mean, a few different articles. I think if we are talking about, you know, chrysotile predominant, you know, I would look at the Pierce articles that have shown above 200 to 400 fiber cc years of cumulative exposure for chrysotile predominant, and that's for a no-observable-adverse-effect level.  And then for the

62

amph boles, then it would be a smaller dose than that based on the potency differences.

Q.   And are there articles that you rely on for tremolite dose response?

A.   The one that I have seen -- there's is a Finley paper that I think shows a lowest observable effect level of, I think, I ke 15 to 27 f ber cc years.

Q.   And what about anthophyllite?

A.   Anthophyllite is hard to come by.  I have seen some studies that seem to suggest that maybe it doesn't cause cancer, and some that do.  But I can't get a good potency difference relative to chrysotile.

Q.   Dr. Diette, I think I'm done, but if you would just bear with me for a minute or two to just scroll through my notes real quick.

A.   Yeah, of course.

Q.   All right.  Just like one or two more questions.  We spoke a little bit about the EPA earlier.  Just as kind of a follow-up to that, their current position is there is no safe level of asbestos exposure; correct?

A.   I haven't read a document that says that in a while, but I think -- I mean, generally I have seen statements like that, that there is no known safe level.

Q.   And based on what you just told me about, the Pierce and the Finley article, you disagree with that opinion;

63

correct?

A.   Well, I do.  I think that there are levels that have not been shown to raise the risk, which is a little different. It's the converse of whether somebody has demonstrated a safe level.

MR. GEIER:  I have no further questions.  Thank you, Dr. Diette.

MR. HYNES:  I have some follow-up.

CROSS-EXAMINATION BY MR. HYNES:

Q.   Hi, Dr. Diette.  I have one follow-up.

A.   Okay.

Q.   Earlier on in today's questioning, counsel for Mrs. Pichierri asked you several questions about the Moline and Emory case series, do you recall that?

A.   I do.

Q.   And then following those questions he asked several questions regarding medical and scientific studies involving patients who were human research subjects.  Do you recall that?

A.   I do.

Q.   And, in your view, are the Moline and Emory case series articles of the type that fall into that category of medical or scientifically helping patients who are human

64

research subjects?

MR. GEIER:  Object to form.

THE WITNESS:  Yeah, they're patients for the sake of the study.  They're plaintiffs, right?  And I think -- in my opinion, I think that their protections for confidentiality have already been violated, if it's a violation, or at least given up voluntarily by filing a case in court.  So the information that's in there, in my view, is already potentially public about each and every one of the people there.  So I don't know about what, like, the fact that it's been bundled up into a study of plaintiffs, you know, make them qualified to have, you know, the typical protections.

MR. HYNES:  Thank you.  No further questions.

REDIRECT EXAMINATION BY MR. GEIER:

Q.   Dr. Diette, just to follow up on that.  Mesothelioma cases generally result in litigation; is that your understanding?

MR. LARSON:  Objection.

THE WITNESS:  I am the wrong person to ask, I think, but, I mean, I have certainly seen, you know, multiple cases that are part of litigation.

Q.   (By Mr. Geier)  Well, you gave an opinion that

65

because they filed a case they waived their protected rights,
and that's a legal opinion; correct?

   A.   It's not.

   MR. LARSON:  Objection.

   THE WITNESS:  It's not a legal opinion.  It's my
opinion as a researcher, as a researcher who conducts
human subject research, and understanding what the
protections are for confidentiality and what it would
means is if you already put that information out in the
public, there is nothing to protect.

   Q.   (By Mr. Geier)  Well, internal review boards review
these types of articles and have opinions; correct?

   A.   In the Moline papers, they did.  I don't know if I
saw a statement in the other paper about an IRB.

   Q.   And do you believe it's your opinion that can trump
what the IRB's opinion is regarding it being human research?

   MR. LARSON:  Objection.

   MR. HYNES:  Form.

   THE WITNESS:  I mean, I don't have to agree with an
IRB.  I mean, it's part of the process of doing research,
right, which is that there's a back-and-forth in general.
It's not -- you know, they are not dictators and, you
know, they have some sets of rules that they use, but it
doesn't mean that they have applied them correctly.  And
I don't know in this case, like, you know, what IRB's

66

opinions were, but I'm just saying in general, I
certainly wouldn't be bound to agree with what they said.

   Q.   (By Mr. Geier)  Well, you just testified that you
disagree with them, so like --

   MR. HYNES:  Objection.  That a misstatement of the
testimony.

   MR. LARSON:  Objection.

   THE WITNESS:  Yeah, I didn't say I disagree with
them because I don't know what the IRB's opinions are.
If we're talking about the Moline papers, I just know
that there was a sentence in there stating they had gone
through review, but I have no idea what their opinions
are.

   Q.   (By Mr. Geier)  Well, what is the basis of your
opinion, if it's not a legal opinion, that by the plaintiffs
putting forward their medical diagnosis in court makes it that
their privilege in published medical literature is waived?

   A.   Yeah, so privilege sounds like a legal term.  I'm
just saying there is no confidentiality to protect at that
point.  I mean, there may be.  If there's other information in
the paper that's got nothing to do with the court case, for
example, then I wouldn't say it's absolute, right?  I wouldn't
say that, you know, it would be okay to talk about somebody's
gallbladder disease if it wasn't part of the case.  But I
think once their date of birth and their name and their

67

diagnosis and their exposure circumstances are out there, they
are out there.

   Q.   There is no difference to you being in a published
medical journal versus being in a court?

   A.   Not in this case.  I mean, if it hadn't gone to
court, in my opinion as a researcher, right -- not a legal
opinion, but my opinion as a researcher, that there is no
longer any confidentiality to protect, at least for the topic
of what's in that paper.

   Q.   So would that be the case for the Roggli
medical/legal articles as well?

   A.   Well, I don't know.  I mean, I'd have to go back and
look at those articles, but I don't know that those
participants need to have protections either.  I don't know if
there's any issues there or not.

   Q.   Did you review Dr. Moline's article to see if there
is any information that is not part of the case in it?

   MR. LARSON:  Objection.

   THE WITNESS:  Well, I think unless she is willing to
reveal who they are, which I think would be a fair thing
to do, I think it would be hard to do that other than to
try to cross-check, you know, certain cases that look
similar.  But I think, you know, until she is forthcoming
about who the participants are, then I think it's hard to
do.

68

   Q.   (By Mr. Geier)  Do you understand that it's her
position that she can't be forthcoming about who the
participants are?

   A.   I have seen her testify to that.

   Q.   And she's given a rationale for that; right?

   A.   She's given her rationale.  I don't happen to agree
with it.  I think that -- well, I just don't agree with her.

   Q.   And the reason why you don't agree with it is
because they were plaintiffs in litigation?

   A.   Because --

   MR. LARSON:  Objection.

   THE WITNESS:  -- they are in litigation, because
she's regurgitating her own opinions that she expressed
in court in this paper and asking people to believe that
the information in there is correct, and she doesn't
appear willing to let people cross-check that and see
whether it was correct or not.

   Q.   (By Mr. Geier)  Well, we just -- I'm sorry.  I
didn't mean to cut you off.

   A.   No.  I'm just saying, like, if the proposition here
is that no one believed in all 33 cases that there was any
alternative exposure, then I think it would be fair to prove
that, right?  And to look at least at what is available in the
legal records, not go digging around in some additional
medical records, look at what is available in the legal cases

69

so people can determine if that's a true thing or not.  And then if it's true that there's people who have had radiation therapy, for example, to allow people to see whether somebody had some other exposure that wasn't even asbestos that may have been causative of the mesothelioma.

Q.   But using your example of radiation, if someone had radiation exposure and it wasn't part of the case, wouldn't that undercut your position that it waived --

A.   No.  I think very specifically the information that is part of the case is what should be available, not all information under all circumstances.  So if it is known through the medical records in one of these cases that the person had therapeutic radiation and if it's of a type and a dose that could cause mesothelioma, I think that ought to be in the paper and that people ought to be able to see that.

Q.   How does that impact your opinion regarding the 2023 article where there are mixed-use cases?

A.   It does because I still think we don't know what -- the people that she has said didn't have mixed use, we don't have what the information is about those other people either.

Q.   And it's your position that, you know, HIPAA and the other privilege protections don't apply in this circumstance?

MR. LARSON:  Objection.

MR. HYNES:  Objection.

THE WITNESS:  So HIPAA is a law, and I would leave

70

that to the lawyers to sort out.  I'm not a lawyer.  But in my personal opinion as a researcher, what I said already makes sense to me; that the information that is already out there in the public domain ought to be available for people who are interested in this paper.

MR. GEIER:  Okay.  Thank you.  I have no more questions.

MR. HYNES:  I think we're done.

COURT REPORTER:  Counsel, would anyone like a copy of this transcript?

MR. HYNES:  We will.  Whatever our standing order is for depos in this case.

MR. GEIER:  Same for us.  And I don't have your email, could you give it to me so that I can give you the exhibits?

MR. LARSON:  Same for me, thanks.

(Deposition concluded at 11:43 a.m.)

71

CERTIFICATE OF COURT REPORTER

I, Christine E. Borrelli, Registered Merit Reporter and Certified Court Reporter, a Notary Public, in and for the Commonwealth of Massachusetts, do certify that the deposition of GREGORY B. DIETTE, M.D., MHS, taken on Friday, June 16, 2023, was stenographically reported by me; that the witness provided satisfactory evidence of identification as prescribed by Executive Order 455(03-13) issued by the Governor of the Commonwealth of Massachusetts, before being sworn by me, pursuant to Superior Judicial Order 144; that the transcript produced by me is a true and accurate record of the proceedings; that I am neither counsel for, related to, nor employed by any of the parties to the above action; and further that I am not a relative or employee of any attorney or counsel employed by the parties thereto, nor financially or otherwise interested in the outcome of the action.

_____

Christine E. Borrelli
Notary Public
MA CSR No. 102893

My Commission Expires:
December 28, 2023

72

SIGNATURE PAGE/ERRATA SHEET

WITNESS:  GREGORY B. DIETTE, M.D., MHS

CASE:     MARY PICHIERRI, et al. vs. AVON PRODUCTS, INC.,
          et al.

| PAGE | LINE | CHANGE OR CORRECTION AND REASON |
|------|------|----------------------------------|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

I, GREGORY B. DIETTE, M.D., MHS, have read the transcript of my deposition taken Friday, June 16, 2023, except for any corrections or changes noted above, I hereby subscribe to the transcript as an accurate record of the statements made by me.

Signed under the pains and penalties of perjury.

_____  DATE:_____
Gregory B. Diette, M.D., MHS