# Exhibit 43

SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF ALAMEDA

| | |
|---|---|
| KIRK A. SMITH., <br><br> Plaintiff, <br><br> v. <br><br> ALBERTSONS COMPANIES, et al., <br><br> Defendants, | Case No. RG21 101490 <br><br> TENTATIVE RULING RE: JOINT DEFENSE MOTION IN LIMINE NO. 5 - TO EXCLUDE REFERENCE TO AND RELIANCE ON DR. MOLINE'S ARTICLE. |

Plaintiff originally designated, among its expert witnesses, Dr. Jacqueline Moline, who was one of the authors of a paper, published in the Journal of Occupational and Environmental Medicine in or about 2019, entitled "Mesothelioma Associated With the Use of Cosmetic Talc." ("the Moline Article.") (Cogrove Decl, Exh. 1.) Plaintiff has since withdrawn Dr. Moline as an expert in this case thus many of the challenges raised in this motion are moot. However, Plaintiff asserts that its other experts may properly rely on the Moline Article at trial therefore Defendants' motion to exclude the use or reliance on the Moline Article remains a pending issue.

THE EVIDENCE AT ISSUE

The Moline Article describes "33 cases of malignant mesothelioma among individual with no known asbestos exposure other than cosmetic talcum powder." The cases were referred for medico-legal evaluation, and tissue digestions were performed in 6 of the cases by Dr. Ronald Gordon, according to standard methodology. "**Results**: Asbestos of the type found in talcum powder was found in all six cases evaluated. Talcum powder usage was the only source of asbestos for all 33 cases. **Conclusions**: Exposure to asbestos-contaminated powders can cause

1

mesothelioma. Clinicians should elicit a history of talcum powder usage in all patients presenting with mesothelioma."

The Article starts out by summarizing the medical and scientific literature describing the correlation of asbestos exposure and mesothelioma, including that "[t]he presence of asbestos in talc and talcum powder products was first discussed in the medical and scientific literature since beginning in the 1940s" and briefly describes the mechanism by which talc becomes contaminated with asbestos during the mining process. The authors explain that while the relationship between occupational exposure to asbestos and mesothelioma is "well established, multiple studies have shown that not all individuals who develop mesothelioma can pinpoint exposures to asbestos" particularly among women. Therefore, the authors state, "[t]he high prevalence of unexplained or, 'idiopathic mesothelioma' among women necessitates further inquiry into potential non-occupational exposures, such as exposure to asbestos-contaminated talcum powder."

"[I]n light of these gaps in the existing literature" the authors "present 33 cases of individuals with malignant mesothelioma who were exposed to commercial talcum powder products. Of those cases, [the authors] present six in detail, where the individuals had no other known exposure to asbestos and for whom tissue studies show the presence of asbestos commonly found in talcum powder (such as tremolite and/or anthophyllite). For all 33 cases, other potential exposures to asbestos were considered, with no identified source apart from the talcum powder. The cases were referred to author J.M. for medico-legal evaluation as part of tort litigation, and tissue digestions were performed by author R.G. as part of this litigation. In every case, a pathology report confirmed the diagnosis of malignant mesothelioma." *(Ibid.)*

The article indicates that data for all 33 patients was gathered from medical records and deposition transcripts supplied by attorneys. Data "abstracted" from these records included medical diagnoses, pathology reports, and the subjects' reported clinical courses. Exposure data was "obtained from sworn testimony by the cases, which included extensive questioning

2

regarding all sources of asbestos exposure," including family occupational histories, hobbies, residences, family history of cancer, and genetic mutation data, if present. In other words, the information as to potential sources of other asbestos exposures were presumably derived from the authors' review of the deposition transcripts taken in those cases. It is unclear whether those depositions were of plaintiffs alone or included other witnesses.

Although the Article purports to cover 33 cases, it only describes in detail the individuals (all women) in six cases. Information as to the six women include their age, occupation, events leading to the diagnosis of mesothelioma, medical treatment following diagnosis, and a short description of how and to what extent the patient was exposed to talcum powder. Additionally, for each of the six subjects, the Article describes results from pathology analyses and electron microscope analyses (EMAs) of tissue. The results of tissue digestion on each of the six women are also presented. The authors conclude that the paper "provides the first large case series to identify cosmetic talcum powder contaminated with asbestos as the cause of malignant mesothelioma in cosmetic talc users" and "evidence that mesothelioma cases once considered idiopathic may be attributable to asbestos-contaminated cosmetic talcum powder usage."

Defendants seek to preclude the Moline Article on several grounds, as follows:

1.  Dr. Moline lacks qualification to opine that the talcum powders described in the cases cited in the Moline Article were contaminated with asbestos.

Preliminarily, Defendants assert that Dr. Moline is not qualified to render the opinion that each of the 33 individuals in the Moline Article were exposed to asbestos from cosmetic talcum powder because it is undisputed that she does not possess the expertise in minerology, geology, or any other field that would enable her to render such opinion.

2.  The Moline Paper is "pure litigation opinion" and not valid science.

Defendants argue that "[i]t is generally accepted that case-controlled epidemiological studies are the starting point for evaluating general causation" and Dr. Moline has herself testified in other cases that epidemiology is the "gold standard" for determining whether a

substance is capable of causing a particular disease. (Cosgrove Decl., Exh. 4 and 5.) The Moline Article is a case study. It is not epidemiology. Dr. Moline apparently has admitted in other cases that there has not been a single epidemiological study showing a causal link between cosmetic grade talc and mesothelioma. She further admits that prior to her paper, no regulatory authority has ever concluded that cosmetic talcum powder causes mesothelioma. Defendants argue that the Moline Article is not based on science but merely generated from and for litigation.

3. Dr. Moline's refusal to provide case-specific information as to the 33 cases in the study has deprived Defendants of meaningful cross-examination.

According to Defendants, in other cases Dr. Moline has refused to answer questions posed by the defense attorneys seeking case-specific information regarding the 33 subjects of the study, including refusing to reveal the identity of the individuals in the study, refusing to identify the states in which any of the 33 cases was filed, and refusing to name the law firms who referred the cases in the study to her. When shown reports she has authored (presumably in the course of acting as an expert witness in litigation), she has refused to confirm whether those reports are related to any of the 33 cases in her study. Dr. Moline concedes that she never obtained consent from any of the 33 individuals discussed in the Moline Article prior to including them in the Article. She refuses to provide this information on the grounds of privacy and HIPAA concerns.

Additionally, Dr. Moline is unable to state the total number of cases from which she selected her 33 cases or how many cases she excluded. Her selection criteria did not involve an evaluation of the location of the tumor or pathological classification. According to Defendants, Dr. Moline only relied and used data from her own litigation reports and Dr. Gordon's tissue digestions but ignored all of the testing and other, arguably contrary, opinions rendered by defense experts in these 33 cases.

The Court finds merit in Defendants' argument that they have been obstructed from meaningfully cross-examining Dr. Moline and obtaining discovery that might challenge the

4

findings and conclusions of the Article. And as Dr. Moline has now been withdrawn as a testifying expert in this action, she is not subject to cross-examination.

Notwithstanding the foregoing, the Court finds Dr. Moline's reliance on HIPAA in refusing to provide information as to the source of the case-specific data she has relied on is without merit. By the same token, the Court does not find Defendants' citation to the Eleventh Circuit opinion in *Murphy v. Dulay* (11th Cir. 2014) 768 F.3d 1360 to be on point. The Eleventh Circuit held that "when an individual executes a valid HIPAA authorization, he waives all HIPAA protection as to health information covered by the authorization, including the protections against litigation-related disclosures. (*Id.* at 1374.) However, Dr. Moline did not obtain HIPAA waivers from her subjects; rather she became privy to the medical records and personal information on each subject as a result of her retention in their legal cases. Hence it cannot be said that the subjects of the Moline Article knowingly "waived HIPPA protection."

While it is acknowledged that privacy interests in relevant medical records is waived when a plaintiff puts her medical condition into issue in the litigation, there remains the question of whether a Plaintiff has also waived all privacy rights to the use of the medical records and information contained therein, outside of the litigation, absent said information becoming public record. In this regard, it is unknown to what extent the medical information and data relied upon in the Moline Article is public record as a result of pleadings filed or testimony given in depositions or in open court during the litigation of the 33 cases.

In any event, the issue presented to the Court – not directly addressed by Defendants' motion – is whether the Moline Article may be relied upon and used by other experts in rendering opinion at trial.

Plaintiff argues that under *People v. Sanchez* (2016) 63 Cal.4th 665 ("*Sanchez*"), the California Supreme Court clarified the limits to which an expert can relate and rely on hearsay, specifically drawing a distinction between expert testimony relating to case-specific facts asserted in hearsay statements and expert testimony relating hearsay which is part of the expert's

5

general knowledge in the expert's field of expertise. (*Id.* at 676). Hence, Plaintiff argues that *Sanchez* prohibits an expert from testifying to case specific facts if they are outside the expert's personal knowledge and do not fall under an exception to the hearsay rule or have not been independently established by competent evidence. (*Id.* at 6760677.) Here, Plaintiff argues, none of his experts will be attempting to introduce case specific facts in relying upon the Moline Article and the article is not specific to Mr. Smith.

The Court believes that Plaintiff misses the mark in citing to *Sanchez*. This is not a *Sanchez* issue. All experts must comply with *Sanchez's* limitation on how much they can discuss about the contents of hearsay documents they rely upon in direct examination. That rule does not apply to cross-examination. A party cross-examining an expert witness may ask questions regarding the specific contents in the reliance materials, and in cross-examination may display before the jury statements or data discussed in the article, which the expert in direct examination is prohibited from doing.

As the Court has expressed to counsel previously, it is the Court's view that an expert witness must provide the materials he or she specifically used or relied upon to arrive at his or her opinions in the case. In Dr. Moline's case that could have required her to produce the litigation files she relied upon in the Article, notwithstanding her claims of privacy. In this instance, Plaintiff counsel has avoided the issue by withdrawing her as an expert so she is not available to be called as a witness by the defense at this time or cross-examined at trial.

Plaintiff argues that defendants are not placed in any different situation than in any other case where an expert relies upon hearsay articles and studies conducted by others. In such instances, the testifying expert may be wholly unable to attest to the reliability of the reported data but, as a general rule, the methodology employed by the researcher and all of the data is contained in the article. This is so readers of the article can determine whether the study is based upon reliable and rigorous scientific methods. In this case, the authors are relying upon opinion and data collected by others. In other words, the authors have not conducted any research of

6

their own; they are simply relying upon hearsay information and/or data; this is hearsay within hearsay. Further, it is unclear whether the Moline Article was peer-reviewed. Plaintiff does not indicate it was peer-reviewed and Defendants provide some deposition testimony that suggests it may not be a peer-reviewed article.

In this case there is no way of determining which documents, medical records, or other materials that the authors of the Moline Article were provided and what data from those materials they chose to include or omit from the study. The court notes that the source materials are unidentified litigation documents, with the exception of the tissue digestions performed on six of the 33 subjects. Although the Moline Article contends that there are 33 cases that were part of this study, only six cases are actually discussed in any detail and it is unknown what the exact criteria was used in selecting the six cases discussed or the 33 alluded to out of an unknown larger universe of potential cases.

For the reasons set forth above, the Court finds that it is not "of a type" reasonably relied upon by experts in the field and GRANTS Defendants' Joint Motion in Limine No. 5 excluding any expert from using or relying upon the Moline Article in rendering opinion in this action.

Dated: April 7, 2022

Jo-Lynne Q. Lee, Judge

7