## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

**IN RE: JOHNSON & JOHNSON
TALCUM POWDER PRODUCTS
MARKETING, SALES
PRACTICES, AND PRODUCTS
LIABILITY LITIGATION**

*THIS DOCUMENT RELATES TO
ALL CASES*

**MDL No. 16-2738 (MAS) (RLS)**

---

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION OBJECTING TO SPECIAL MASTER'S OPINION RELATED TO PLAINTIFFS' RENEWED MOTION FOR LEAVE TO FILE SECOND AMENDED MASTER LONG FORM COMPLAINT

---

## TABLE OF CONTENTS

I.    Introduction...................................................................................................1

II.   Discussion......................................................................................................3

   A.   Legal Standard .........................................................................................3

   B.   Defendants' consent to the filing of a master complaint eliminates any
        contention that the proposed amendments are futile. ....................................4

      1.   If the master complaint is viewed as an operative pleading, the Special
           Master appropriately applied New Jersey law in deciding the motion to
           amend. ...............................................................................................7

      2.   If the master complaint is viewed only as an administrative summary of
           plaintiffs' claims, the Special Master's Opinion should stand as
           Defendants have failed to establish that the proposed amendments are
           futile as to all plaintiffs.........................................................................17

   C.   The Second Amended Master Complaint plausibly pleads successor
        liability claims. ........................................................................................20

      1.   The product-line exception...................................................................22

      2.   The mere continuation exception. ........................................................33

III.  Conclusion ...................................................................................................37

# TABLE OF AUTHORITIES

## Cases

*Arevalo v. Saginaw Mach. Sys., Inc.*, 344 N.J. Super. 490, 498 (App. Div. 2001) .20

*Atherton v. FDIC*, 117 S. Ct. 666 (1977)..................................................................14

*Bell v. Publix Super Markets, Inc.*, 982 F.3d 468 (7th Cir. 2020) ........................7, 8

*Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410 (3d. Cir. 1997) ........... 4, 17, 33

*Bussell v. DeWalt Prods. Corp.*, 259 N.J. Super. 499 (App. Div. 1992) ......... 26, 28

*Chrysler Corp. v. Ford Motor Co.*, 972 F. Supp. 1097 (E.D. Mich. 1997).............17

*Cort v. Ash*, 422 U.S. 66 (1975)...............................................................................14

*Dawejko v. Jorgensen Steel Co.*, 434 A.2d 106 (Pa. 1981) ....................................22

*Doe by and through Doe v. Boyertown Area School District*, 897 F.3d 515 (2018)
   ...............................................................................................................................31

*First Nat. City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611
   (1983).....................................................................................................................15

*Foman v. Davis*, 371 U.S. 178 (1962) .....................................................................19

*Garcia v. Coe Mfg. Co.*, 933 P.2d 243 (N.M. 1997) ...............................................22

*Gelboim v. Bank of Am. Corp.*, 574 U.S. 405 (2015) ..........................................5, 10

*Ginsberg v. Quest Diagnostics, Inc.*, 227 N.J. 7 (2016) ..........................................10

*Hall v. Armstrong Cork*, 103 Wn. 2d 258 (Wa. 1984) ...........................................22

*Harrison Bev. Co. v. Dribeck Importers Inc.*, 133 F.R.D. 463 (D.N.J. 1990) ........17

*Home Depot USA, Inc. v. LaFarge N. Am., Inc.*, 59 F.4th 55 (3d Cir. 2022) .........18

*In re General Motors, LLC Ignition Switch Litig.*, No. 14-2543, 2017 WL 3382071
   (S.D.N.Y. Aug. 3, 2017)................................................................................ 12, 13

*In re Harnischfeger Indus., Inc.*, 293 B.R. 650 (Bankr. D. Del. 2003) ...................15

*In re Jan. 2021 Short Squeeze Trading Litig.*, 76 F.4th 1335 (11th Cir. 2023) ..5, 10

*In re Jan. 21 Short Squeeze Trading Litig.*, 584 F. Supp. 3d 1161 (S.D. Fla. 2022) ...................................................................................................................10

*In re LTL Management, LLC*, 64 F.4th 84 (3d Cir. 2023) ...................................2, 31

*In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*, 241 F.R.D. 435 (S.D.N.Y. 2007)...................................................................................................6

*In re Nuvaring Prods. Liab. Litig.*, No. 08-1964, 2009 WL 2425391 (E.D. Mo. Aug. 6, 2006) ........................................................................................................6

*In re Propulsid Prods. Liab. Litig.*, 208 F.R.D. 133 (ED. La. 2002) .......................6

*In re Refrigerant Compressors Antitrust Litig.*, 732 F.3d 586 (6th Cir. 2013) passim
*In re Zantac Prods. Liability Litig.*, No. 20-2924, 2023 WL 2325536 (S.D. Fla. Mar. 2, 2023) .......................................................................................................9

*In re: Accutane Litig.*, 235 N.J. 229 (2018)........................................... 10, 11, 12, 16

*Instarome Fragrance & Flav. Corp. v. Zarkades*, No. 07-873, 2009 WL 931036 (D.N.J. Mar. 30, 2009)..........................................................................................16

*J.Y.C.C. v. Doe Run Res., Corp.*, 370 F. Supp. 3d 1031 (E.D. Mo. 2019)..............15

*Jackson v. Corizon Health Inc.*, No. 19-13382, 2022 WL 16575691 (E.D. Mich. Nov. 1, 2022) ......................................................................................................32

*Krys* v. *Aaron*, 106 F. Supp. 3d 472 (D.N.J. 2015) ...................................... 7, 16, 19

*Lefever v. K.P. Hovnanian Enterprises, Inc.*, 160 N.J. 307 (1999) ........................30

*Long v. Wilson*, 393 F.3d 390 (3d Cir. 2004) ..........................................................3

*McCarrell v. Hoffmann-La Roche, Inc.*, 227 N.J. 569 (2017)................................10

*McKee v. Harris-Seybold Co., Div. of Harris-Intertype Corp.*, 109 N.J. Super. 555 (Law Div. 1970) ..................................................................................................21

*Mettinger v. Glob Slicing Mach. Co.*, 153 N.J. 371 (1998)......................................23

*Nieves v. Bruno Sherman Corp.*, 86 N.J. 361 (1981) ...................................... 28, 29

*Norman v. Elkin*, 860 F.3d 111 (3d Cir. 2017) ........................................15

*P.V. ex rel. T.V. Camp Jaycee*, 197 N.J. 132 (2008) .................................10

*Pharmaceuticals Sales and Consulting Corp. v. J.W.S. Delavau Co.*, 106 F. Supp. 2d 761 (D.N.J. 2000) ........................................................................4

*Printing Mart v. Sharps Electronics*, 116 N.J. 739 (1989)......................................21

*Pub. Serv. Elec. & Gas Co. v. Cooper Indus., LLC*, __ F. Supp. 3d __ (D.N.J. 2023)........................................................................34

*Ramirez v. Amsted Indus., Inc.*, 86 N.J. 332 (1981) ........................................ passim

*Randle v. AC Assets Servs. LLC*, No. 19-1074, 2022 WL 2680079 (W.D.N.Y. July 12, 2022)........................................................................15

*Ray v. Alad Corp.*, 19 Cal. 3d 22 (1977) ........................................ 22, 28

*Roselink Invs., L.L.C. v. Shenkman*, 386 F. Supp. 2d 209 (S.D.N.Y. 2004) ...........15

*Saez v. S&S Corrugated Paper Mach. Co.*, 302 N.J. Super. 545 (App. Div. 1997) ........................................................................25

*Selected Risks Ins. Co. v. Bruno*, 718 F.2d 67 (3d Cir. 1983) ................................31

*Singleton v. Wulff*, 428 U.S. 106 (1976))................................................31

*Tyco Int'l, Ltd. v. Kozlowski*, 756 F. Supp. 2d 553 (S.D.N.Y. 2010) .....................15

*Woodrick v. Jack J. Burke Real Est., Inc.*, 306 N.J. Super. 61 (App. Div. 1997) ........................................................................ passim

## Statutes

28 U.S.C. § 1407 ........................................................................5

Tex. Bus. Orgs. Code Ann §10.008 ................................................ 29, 31

iv

**Rules**

Fed. R. Civ. P. 12(b)(6)......................................................................4, 6

Fed. R. Civ. P. 15(a)...........................................................................3

**Treatises**

"product line," *Collins Dictionary*, https://www.collinsdictionary.
Com/us/dictionary/nglish/product-line (last accessed September 14, 2023) .......27

Curtis W. Hoff, *The New Texas Business Corporation Act Merger Provisions*, 21
St. Mary's L.J. 109 (St. Mary's Law Journal 1989)............................................30

Larry Kramer, *Choice of Law in Complex Litig.*, 71 N.Y.U. L. Rev. 547 (1996)...10

Restatement (Second) Conflict of Laws § 6 ............................................................11

Restatement (Second) of Conflict of Laws § 301 ....................................................14

Restatement (Second) of Conflict of Laws § 302............................................ 14, 16

Symeon C. Symeonides, Choice of Law in the American Courts in 2020: Thirty-
Fourth Annual Survey, 69 Am. J. Comp. L. 177 (2021)......................................14

v

## I.    Introduction

On August 14, 2023, the Plaintiffs' Steering Committee ("PSC") filed a Renewed Motion for Leave to File a Second Amended Master Long Form Complaint ("SAMC"). ECF No. 26636.[1] The PSC sought to update the First Amended Master Long Form Complaint by adding new factual allegations and new causes of action for (1) assumption of duty, (2) aiding and abetting, (3) acting in concert, and (4) spoliation. The SAMC also names the newly created entities, Johnson & Johnson Holdco (NA), Inc. ("Holdco"), LTL Management LLC ("LTL"), Kenvue, Inc. ("Kenvue"), as well as Janssen Pharmaceuticals, Inc. ("Janssen"), as defendants.[2]

The SAMC contains over 1,000 paragraphs of factual contentions. The motion was referred to the Special Master who, after extensive briefing and lengthy oral argument, granted the motion except for that part which sought to add an independent cause of action for spoliation. The Special Master found that the SAMC plausibly pleads that the New J&J Defendants are successors in interest to Johnson & Johnson Consumer Inc. ("Old JJCI"). Opinion and Special Master Order No. 17 (Deciding Plaintiffs' Motion to Amend) ECF No. 28902 ("Op.").

---

[1] Copies of the SAMC—clean and redlined—are attached as **Exhibits A** and **B**, respectively.

[2] Together, Holdco, LTL, Janssen, and Kenvue are referred to as the "New J&J Defendants."

The Special Master held that the SAMC plausibly pleads that Defendants allocated Old JJCI's talc-related liabilities and certain limited assets from Old JJCI to LTL Management, LLC, through a divisional merger under Texas law. The Special Master also found that the divisional merger resulted in Old JJCI allocating all its other assets and liabilities to Holdco. Op. at 8. After the divisional merger, Holdco continued "operating the business formerly held by [Old JJCI]" without any interruption. *In re LTL Management, LLC*, 64 F.4th 84, 97 (3d Cir. 2023). Holdco did so until January 2023, when it transferred what had been Old JJCI's consumer business to Janssen. Op. at 8. Janssen, in turn, transferred the enterprise to Kenvue, which continues to operate Old JJCI's consumer health business to this day, just as Old JJCI had before the corporate restructuring. *Id.*

Defendants' objection to the Special Master's decision—that it was improperly decided under New Jersey law because the Special Master did not conduct a 50-state analysis or otherwise accept Defendants' arguments that Texas and/or Delaware law should govern—ignores the fundaments of multidistrict litigation and the purpose of master pleadings. Moreover, Defendants' attempt to confuse and muddle the analysis with wordplay about the purpose of the master complaint here—whether it is an "operative" or "administrative" summary of plaintiffs' claims—in no way casts doubt on the Special Master's decision. Either the master complaint is the operative pleading, in which case the Special Master

properly found the motion to amend should be considered under New Jersey law,

Op. at 11-18, or the master complaint is an administrative summary of plaintiffs'

claims, in which case the Special Master properly found that Defendants failed to

satisfy the futility requirements as to the claims of all plaintiffs in opposing the

PSC's motion to amend.[3]

For all these reasons, as detailed below, Defendants' Objection lacks merit

and the Special Master's decision granting the PSC leave to file the SAMC (as to

be modified to remove the independent claim for spoliation) should be affirmed.

## II.    Discussion

### A. Legal Standard

Leave to amend pleadings "shall be freely given when justice so requires."

Fed. R. Civ. P. 15(a). Leave should be granted in the absence of undue delay, bad

faith, or dilatory motive, repeated failure to cure deficiencies in previous

amendments, undue prejudice, or futility of the amendment. *Long v. Wilson*, 393

F.3d 390, 400 (3d Cir. 2004).

The Special Master found no evidence that the PSC's motion was filed in

bad faith, with a dilatory motive, or that there have been repeated failures to cure

---

[3] As discussed below on pages 35 to 36, Kenvue acknowledged in the state court proceedings in New Jersey that "Plaintiffs have all the facts they need on successor liability."

any deficiencies. Op. at 4-5. The Special Master also found no merit to Defendants' undue delay argument. Op. at 5. Defendants have not raised any of these issues in their Objection to the Special Master's ruling and any such arguments must be considered abandoned, as a result.

Defendants only remaining argument is that the successor liability claims pleaded against the New J&J Defendants are futile. When assessing futility, courts apply the same standard for determining legal sufficiency as they do under Rule 12(b)(6). *See Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d. Cir. 1997) (applying 12(b)(6) standard when assessing "futility."). This requires that the allegations in the proposed pleading be accepted as true and viewed in the light most favorable to amendment. *Id.* at 1420. Given this standard, "courts place a heavy burden on opponents who wish to declare a proposed amendment futile." *Pharmaceuticals Sales and Consulting Corp. v. J.W.S. Delavau Co.*, 106 F. Supp. 2d 761, 764 (D.N.J. 2000). Applying this standard, the Special Master aptly found that Defendants could not satisfy their heavy burden to establish futility and that the SAMC should be allowed. Op. at 15-18.

### B. Defendants' consent to the filing of a master complaint eliminates any contention that the proposed amendments are futile.

As the Supreme Court has recognized, parties in MDL proceedings "may elect to file a 'master complaint' and a corresponding 'consolidated answer,' which

supersede prior individual pleadings." *Gelboim v. Bank of Am. Corp.*, 574 U.S. 405, 413 n.3 (2015) (citing *In re Refrigerant Compressors Antitrust Litig.*, 732 F.3d 586, 590-92 (6th Cir. 2013)). When that is the case, "the transferee court may treat the master pleadings as merging the discrete actions for the duration of the MDL pretrial proceedings." *Id.* But when "the master complaint is not meant to be a pleading with legal effect but only an administrative summary of the claims brought by all the plaintiffs[,]" no merger occurs. *Id.*

When the master complaint is regarded as an operative pleading, the law of the transferee state, *i.e.*, the state where the MDL proceedings are pending, applies to pretrial matters before remand.[4] Therefore, if the master complaint here is of the operative variety, New Jersey's choice-of-law rules apply (as the Special Master found here). Op. at 11; *see In re Jan. 2021 Short Squeeze Trading Litig.*, 76 F.4th 1335, 1345-46 (11th Cir. 2023) (citing *Gelboim*, 574 U.S. at 413 n.3).[5]

---

[4] Following remand, "choice of law determinations shall be made in accordance with the law of the jurisdiction that would apply to the action had the matter been initially filed in the Original District." Op. at 9 (citing CMO No. 2). CMO No. 2, in turn, does not address what law should apply to challenges to a master complaint which does not name individual plaintiffs. The Special Master's decision is therefore consistent with CMO No. 2.

[5] In this regard, the Special Master's decision is consistent with the purpose of 28 U.S.C. § 1407, "which is aimed at eliminating 'delay, confusion, conflict, inordinate expense and inefficiency' during the pretrial period." *See In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*, 241 F.R.D. 435, 439 (S.D.N.Y.

If, on the other hand, the master complaint is regarded as an administrative, procedural device (as Defendants contend), "each individual complaint retains its separate legal existence." *Refrigerant*, 731 F.3d at 590. In that case, Defendants' plaintiff-specific choice-of-law arguments are premature and cannot serve as a basis to deny the PSC's motion for leave to amend the master long-form complaint. *See id.*[6] Defendants, after all, cannot establish that the proposed successor liability claims are futile in all cases, as the Special Master found that plaintiffs can assert successor liability claims against the New J&J Defendants under both the product-line and mere continuation exceptions. Op. at 15.

Either way—whether the SAMC is regarded as operative or not— Defendants' objection fails, and the proposed amendment should be allowed, as the Special Master found.

---

2007) (finding that law of the transferee court should apply to pretrial motions to dismiss).

[6] *See also In re Nuvaring Prods. Liab. Litig.*, No. 08-1964, 2009 WL 2425391, *2 (E.D. Mo. Aug. 6, 2006) ("[T]he filing of the master consolidated complaint in this action was simply meant to be an administrative tool to place in one document all of the claims at issue in this litigation. Neither Plaintiffs . . . nor I . . . contemplated that Rule 12(b) motion practice would be pursued . . . against the master complaint."); *In re Propulsid Prods. Liab. Litig.*, 208 F.R.D. 133, 142 (ED. La. 2002) ("[T]he master complaint [filed in this case] should not be given the same effect as an ordinary complaint. Instead, it should be considered only as an administrative device to aid efficiency and economy.").

**1.  If the master complaint is viewed as an operative pleading, the Special Master appropriately applied New Jersey law in deciding the motion to amend.**

The Special Master found that because the parties consented to the filing of a master complaint in these MDL proceedings, the transferee court should be regarded as the forum court in considering the motion to amend. Op. at 11. In claiming that the Special Master erred, Defendants argue that while it consented to the filing of the master complaint, they did so only for the purpose of "streamlin[ing] the litigation" and "not obviating threshold choice-of-law questions regarding the viability of claims in this litigation[.]" Defs' Br., pg. 14-15. The Special Master did not, however, find that the filing of a master long form complaint obviates any choice-of-law questions. Instead, the Special Master correctly found that choice of law issues, if any, can be appropriately argued in individual cases after remand. Op. at 12 (citing *Krys* v. *Aaron*, 106 F. Supp. 3d 472 (D.N.J. 2015)).

Courts employ a "pragmatic" approach to determine whether a master complaint should be regarded as an operative pleading. *Bell v. Publix Super Markets, Inc.*, 982 F.3d 468, 490 (7th Cir. 2020) (citing *Refrigerant*, 731 F.3d at 591). That approach focuses "on the behavior of the district court and the parties[.]" *Id.* As the Sixth Circuit has observed, this approach "holds the court and the parties to their actions to prevent them from springing traps by treating a

7

consolidated complaint as the real complaint" in one instance and as an administrative summary in others. *Id.* This pragmatic approach considers: "(1) how the plaintiffs labeled the new complaint, (2) whether the plaintiffs served the defendants with the new complaint instead of the original pleadings, (3) whether key deadlines were set in relation to the new complaint, (4) whether the court entertained motions to dismiss the consolidated complaint, and (5) whether the parties and the court looked solely to the allegations in the consolidated complaint when arguing and deciding such motions." *Id.* This last factor is regarded as "perhaps [the] most important." *Id.* (quoting *Refrigerant*, 731 F.3d at 591).

Implicit within the Special Master's decision is a finding that the master complaint is of the operative variety. Several of the above pragmatic factors support that finding.

First, Defendants stipulated and agreed to file answers to the master complaint, the timing of which was set in relation to the filing of the master complaint. ECF No. 74, ¶ 7; ECF No. 131, ¶¶ 1, 2 ECF No.148, ¶¶ 1, 2.

Second, the form of the short form complaint, which the parties agreed on, incorporate the master long form complaint and supersede any previously filed individual complaints.[7] ECF No. 148, ¶ 7; ECF No. 257, ¶¶ 1, 2.

Third, and perhaps most significantly, in distinguishing between the choice-of-law analysis necessary to resolve the motion to amend and challenges to individual plaintiffs' claims on remand, the Special Master stressed that "plaintiffs are seeking to amend a Master Complaint that does not name a specific plaintiff." Op. at 8-9. Overlooking that distinction, J&J asks this Court to examine the proposed SAMC for its sufficiency, arguing that leave to amend should be denied because the SAMC "could not withstand a motion to dismiss." Defs' Br., pgs. 8-9. By looking to the master complaint and not plaintiffs' individual short form complaints, Defendants have treated the master complaint as "a real complaint" with "legal effect" thereby making it "an operative pleading." *See Refrigerant*, 731 F.3d at 591.

Given Defendants' treatment of the master complaint as the operative pleading, the Special Master properly found that New Jersey's choice-of-law rules

---

[7] In *In re Zantac Prods. Liability Litig.*, the district court observed that the use of short form complaints presents "no barrier to the conclusion that, at least during the pendency of this MDL, the individual cases have merged through their usage of master pleadings" as short form complaints are merely used to "provide a small amount of Plaintiff-specific information and incorporate select counts in the master pleadings." No. 20-2924, 2023 WL 2325536, *26 (S.D. Fla. Mar. 2, 2023).

9

govern the motion to amend. Op. at 10 (citing *In re Jan. 21 Short Squeeze Trading Litig.*, 584 F. Supp. 3d 1161, 1179 (S.D. Fla. 2022), *aff'd*, 76 F.4th 1335, 1345-46 (11th Cir. 2023) (citing *Gelboim*, 574 U.S. at 413 n.3). Applying New Jersey's choice-of-law rules, the Special Master also correctly found that New Jersey's substantive law should govern determination of the motion to amend. Op. at 11. The Special Master's decision should therefore be affirmed as Defendants cannot establish as a matter of law that plaintiffs' successor liability claims fail under New Jersey law. Op. at 15.

New Jersey's choice-of-law jurisprudence strives "to structure rules that will lead to predictable and uniform results that are fair and just and that will meet the reasonable expectations of the parties." *McCarrell v. Hoffmann-La Roche, Inc.*, 227 N.J. 569, 573 (2017). A court must therefore determine "the most equitable method of resolving choice-of-law questions." *Ginsberg v. Quest Diagnostics, Inc.*, 227 N.J. 7, 18 (2016). Courts do that in New Jersey by using the most significant relationship test. *P.V. ex rel. T.V. Camp Jaycee*, 197 N.J. 132, 142-43 (2008).

As the New Jersey Supreme Court has recognized, there is a "consensus . . . that ordinary choice-of-law practices should yield in suits consolidating large numbers of claims and that courts should apply a single law in such cases[.]" *In re: Accutane Litig.*, 235 N.J. 229 (2018) (quoting Larry Kramer, *Choice of Law in Complex Litig.*, 71 N.Y.U. L. Rev. 547, 547 (1996)). In *Accutane*, the New Jersey

10

Supreme Court instructed that in cases involving aggregate litigation with multiple parties and potentially the laws of many states, New Jersey courts have the discretion to apply one state's substantive laws. That discretion, the New Jersey Supreme Court explained, should be guided by factors set forth in Section 6 of the Restatement (Conflicts), which include:

a) the needs of the interstate and international systems;
b) the relevant policies of the forum;
c) the relevant policies of other interested states and the relative interests of those states in determination of the particular issue;
d) the protection of justified expectations;
e) the basic policies underlying the particular field of law;
f) certainty, predictability and uniformity of result, and
g) ease in the determination and application of the law to be applied.

*Accutane*, 235 N.J. at 261-62 (quoting Restatement (Second) Conflict of Laws § 6(2)).

The *Accutane* Court explained that while the place of injury is ordinarily presumed to be the state with the most significant relationship, that presumption can be overcome. *Id.* at 261. In multi-county litigation proceedings, New Jersey's analogue to federal MDLs, the Supreme Court found that the two most significant Restatement factors are factors f. ("certainty, predictability, and uniformity of result") and g. ("ease in determination and application of the law to be applied."). *Id.* at 263. The Supreme Court explained that in such proceedings, the "fortuity of the place where the individual plaintiffs reside" and "where the injury occurred"

11

should be removed from the equation. *Id.* at 263. The Supreme Court accordingly found that New Jersey had the most significant relationship in a products liability case because the alleged conduct causing the injury—the manufacturing and labeling of Accutane—happened in New Jersey.

Applying the *Accutane* framework to this matter, the Special Master found that "[n]ot only is New Jersey the forum state, but Holdco and Janssen are also New Jersey corporations and Holdco, Kenvue, and Janssen have their principal places of business in the state." Op. at 11-12. As a result, the Special Master found that New Jersey has the "most significant relationship," and that New Jersey law governs the motion to amend. Op. at 11. And that makes sense. The successor liability claims here concern the manufacturing and sale of talcum powder products by Old JJCI—a New Jersey corporation headquartered in New Jersey.

Defendants attempt to avoid this outcome by citing *In re General Motors, LLC Ignition Switch Litig.*, No. 14-2543, 2017 WL 3382071 (S.D.N.Y. Aug. 3, 2017). In that case, the court held that the filing of the consolidated complaint did not affect what choice-of-law rules should apply to the plaintiffs' claims. *Id.* at *1. But it did so only in the context of a motion for partial summary judgment of the successor liability claims of "a subset of Plaintiffs" from just sixteen jurisdictions. *Id.* As the court observed, a "master complaint has a built-in shelf life; absent some sort of consensual resolution of Plaintiffs' claims in this District, the Court will

12

eventually remand each Plaintiff's claims to the district in which he or she first filed those claims[.]" *Id.* at *8. When that happens, the court reasoned, "it would defy logic . . . for the transferor courts to apply New York choice-of-law rules rather than the choice-of-law rules of their home states." *Id.*

Defendants' objection to the Special Master's ruling on the motion to amend equally defies logic. Unlike the defendant in the *GMC Ignition Switch Litigation*, Defendants have not moved for summary judgment on the successor liability claims of certain plaintiffs from certain jurisdictions. Instead, Defendants have taken the preemptive—and, indeed, premature—action of opposing the PSC's motion to amend the master complaint across the board so that no plaintiff could assert successor liability claims against Holdco, Janssen, and Kenvue. That they have done so at this stage of the proceedings with no allowance made for those plaintiffs whose jurisdictions have favorable successor liability laws makes this matter distinguishable from the *GMC Ignition Switch Litigation* and reveals Defendants' overreach. What is particularly revealing is that while Defendants fault the Special Master for not conducting a 50-state choice-of-law analysis, Defendants neither asked the Special Master to conduct such an analysis nor have undertaken to perform such analysis to show why such an analysis would reach a different result.

13

Nor have Defendants addressed New Jersey's "most significant relationship" framework, which most jurisdictions now employ in some form.[8] Instead, Defendants urge this Court to apply the "internal affairs doctrine." Under that doctrine, the law of the state of incorporation normally determines issues relating to the ***internal*** affairs of a corporation. *See Atherton v. FDIC*, 117 S. Ct. 666, 673 (1977). This choice-of-law rule is fair to a corporation and its shareholders, directors, and officers as they have entered into voluntary relationships with each other as it achieves the need for certainty and predictability of results while generally protecting the justified expectations of parties with interests in the corporation. *See* Restatement (Second) of Conflict of Laws § 302, Comments a & e (1971);[9] *see also cf. Cort v. Ash*, 422 U.S. 66, 84 (1975). At any rate, the internal affairs doctrine does not apply when the rights of third parties ***external*** to the corporation are at issue. [10] *See* Restatement (Second) of Conflict of Laws § 301.

---

[8] *See* Symeon C. Symeonides, Choice of Law in the American Courts in 2020: Thirty-Fourth Annual Survey, 69 Am. J. Comp. L. 177, 194 (2021).

[9] Defendants cite Section 302 of the Restatement in claiming that the "state-of-incorporation approach is favored." Defs' Br., pg. 15. Defendants overlook that in Comment A, the Restatement contrasts the internal affairs doctrine as expressed in Section 302 with Section 301, which provides that the "rights and liabilities of a corporation with respect to a third person that arise from a corporate act of a sort that can likewise be done by an individual are determined by the same choice-of-law principles as are applicable to non-corporate parties."

[10] Defendants cite one unpublished decision from New York for the argument that a majority of states would apply the law of the successor's state of incorporation.

14

This is because a person claiming to have been injured by a product manufactured by a corporation can hardly be thought to have entered a voluntary relationship with that corporation to further the corporation's goals. *See First Nat. City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 636 (1983). Defendants thus greatly overreach in arguing that the internal affairs doctrine applies here to plaintiffs' personal injury claims against Holdco, Janssen, and Kenvue, as the doctrine "extends only to 'those matters which are peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders[.]'" *See Norman v. Elkin*, 860 F.3d 111, 122 (3d Cir. 2017). The internal affairs doctrine consequently does not apply here because plaintiffs are not

---

Defs' Br., pg. 15 (citing *Randle v. AC Assets Servs. LLC*, No. 19-1074, 2022 WL 2680079, *2 n.2 (W.D.N.Y. July 12, 2022)). That decision, however, does not stand for that proposition. Instead, *Randle* addresses only New York law and, moreover, is contrary to several published decisions from New York courts, which uniformly limit the so-called internal affairs doctrine to only those cases involving the internal affairs of corporations. *See Tyco Int'l, Ltd. v. Kozlowski*, 756 F. Supp. 2d 553, 560 (S.D.N.Y. 2010) (finding internal affairs doctrine inapplicable in cases involving "the commission of a tort"); *Roselink Invs., L.L.C. v. Shenkman*, 386 F. Supp. 2d 209, 225 (S.D.N.Y. 2004) ("Creditors' claims at issue here are tort claims regarding the rights of "third parties external to the corporation" as they are not brought by shareholders, officers or directors, nor are they brought derivatively on behalf of the corporation. Therefore, the "internal affairs doctrine" is inapplicable here."). *See also J.Y.C.C. v. Doe Run Res., Corp.*, 370 F. Supp. 3d 1031, 1044 (E.D. Mo. 2019) ("As the case does not involve any disputes about the internal affairs of the various defendants, the internal affairs doctrine is not applicable to this action"); *In re Harnischfeger Indus., Inc.*, 293 B.R. 650, 662 (Bankr. D. Del. 2003) (noting that the internal affairs doctrine "of course . . . does not apply simply because a corporation is a transaction party" as "[d]ifferent conflicts principles apply . . . where the rights of third parties external to the corporation are at issue").

officers, directors, or shareholders of Defendants; they are external third parties asserting personal injury claims.

But even if the internal affairs doctrine did apply (and it does not), it contains an exception where "some other state has a more significant relationship to the occurrence and the parties." *Instarome Fragrance & Flav. Corp. v. Zarkades*, No. 07-873, 2009 WL 931036, *14 (D.N.J. Mar. 30, 2009). When that is the case, the factors of Section 6 of the Restatement (Second) of Conflicts "are used to evaluate the significance of a relationship, with respect to a particular issue, to the potentially interested states[.]" *Id.* (citing Restatement (Second) of Conflicts of Laws § 302 cmt. b); *see also Krys*, 106 F. Supp. 3d at 485 ("because the internal affairs doctrine 'is not without exception,' the Court will proceed in its choice-of-law analysis to determine whether, despite this presumption, New Jersey has a more significant relationship to the disputed corporate actions").  Those are the same factors the New Jersey Supreme Court considered in *Accutane*.

Rather than address the Section 6 factors, Defendants argue that Texas and Delaware law should apply because the divisional merger occurred in Texas and Kenvue is a Delaware corporation. Defendants' attempt to manufacture a relationship between those states and plaintiffs' claims falls short considering that all three corporations—Holdco, Janssen, and Kenvue—are today headquartered in New Jersey and their common predecessor was incorporated and headquartered in

16

New Jersey. *See Chrysler Corp. v. Ford Motor Co.*, 972 F. Supp. 1097, 1102 (E.D. Mich. 1997) ("The reasons for applying the local law of the state of incorporation carry less weight when the corporation has little or no contact with this state other than the fact that it was incorporated there."). Other than the post-divisional merger incorporation of Holdco and Kenvue in Texas and Delaware, respectively, Defendants have identified no connection between the plaintiffs' claims and those states, other than the individual claims of a subset of plaintiffs whose injuries arose in Texas and Delaware. Any relationship between plaintiffs' claims and Texas and Delaware is therefore tenuous, at best. For that reason, the internal affairs doctrine does not compel a different result here.

> **2. If the master complaint is viewed only as an administrative summary of plaintiffs' claims, the Special Master's Opinion should stand as Defendants have failed to establish that the proposed amendments are futile as to all plaintiffs.**

As the Special Master noted, Defendants' primary—if not sole—argument here is that the proposed amendment of the long form complaint is futile. This is a high bar and one that Defendants cannot clear. To establish that a proposed amendment is "clearly" futile, *Harrison Bev. Co. v. Dribeck Importers Inc.*, 133 F.R.D. 463, 468 (D.N.J. 1990), Defendants must establish that dismissal of the would-be claims would be appropriate under Rule 12(b)(6). *Burlington Coat Factory*, 114 F.3d at 1434. To do this, Defendants must show that no plaintiff could plausibly assert successor liability claims against Holdco, Janssen, and

17

Kenvue. If any plaintiff could assert such claims, the amendment should be allowed. Otherwise, a plaintiff that could legally assert such claims would be barred from doing so because others may not. If Defendants' argument is accepted—that amendment of the master complaint should be denied because the law in some jurisdictions may not allow for successor liability claims against Holdco, Janssen, and Kenvue—plaintiffs from jurisdictions with favorable laws would be disadvantaged and their rights diminished. Because the Third Circuit has warned against allowing MDL consolidation to "diminish" the rights of any party, *Home Depot USA, Inc. v. LaFarge N. Am., Inc.*, 59 F.4th 55, 62 (3d Cir. 2022), the amendment to the master complaint should be allowed. Defendant's argument is moreover contrary to CMO No. 2 and the Short Form Complaint agreed to by the parties.[11]

Conversely, allowing the amendment would in no way diminish the rights of the New J&J Defendants. In his Opinion, the Special Master emphasized that the

---

[11] When the master long form complaint is considered alongside the "Short Form Complaint and Jury Demand" as first adopted in CMO No. 2, the overreach of Defendants' argument that the motion to amend should be denied across the board is readily apparent. As drafted and agreed to by the parties, the Short Form Complaint embodies a recognition that while the claims brought by the individual plaintiffs largely overlap, there is variation among them, such that some plaintiffs may assert the successor liability claims against the New J&J Defendants while others do not. Defendants' arguments here are inconsistent with that design and CMO No. 2.

"only issue addressed and decided is what state's law applies to deciding the motion to amend." Op. at 12. To that end, the Special Master noted that in *Krys*, this Court found that the MDL court's choice-of-law ruling was not binding because it occurred before discovery and "the factual inquiry necessary for the choice of law analysis was inappropriate or impossible at the motion to dismiss stage when little or no discovery has taken place." Op. at 12-13 (quoting *Krys*, 106 F. Supp. 3d at 480-81). The *Krys* Court accordingly found that the MDL court's ruling at the pleading stage was at most, "preliminary" and not the law of the case. *Id.* (quoting *Krys*, 106 F. Supp. 3d at 481). As the Special Master reasoned, the ruling on the motion to amend is likewise not the "law of the case" and not dispositive of what law should apply in the individual cases on remand. Op. at 13.

Because the Special Master's ruling on the motion to amend is not a final determination on the choice-of-law issue for any individual case, Defendants cannot credibly argue that the amendment would diminish their rights. By contrast, if the decision of the Special Master is overruled, no plaintiff could pursue successor liability claims against Holdco, Janssen, and Kenvue, no matter how deserving. That would diminish plaintiffs' rights. And so, because leave to amend should be "freely given," *Foman v. Davis*, 371 U.S. 178, 182 (1962), the Special Master correctly concluded that the amendment should be allowed as Defendants cannot establish futility.

19

In either case—whether the master complaint be considered "operative" or "administrative"—the result here is the same: the Opinion of the Special Master should be affirmed.

### C. The Second Amended Master Complaint plausibly pleads successor liability claims.

The Special Master also correctly concluded that the SAMC plausibly pleads successor liability claims against Holdco, Janssen, and Kenvue under the product-line and mere continuation exceptions.[12] Op. at 15. In accord with that ruling, two New Jersey state courts have considered the issue and found that the New J&J Defendants can be held liable as successors to Old JJCI. **Exhibit C** (*Nesko v. Johnson & Johnson*, Case No. 300 ("*Nesko* Order"); **Exhibit D** (*Pressler et al. v. Kenvue Inc.*, Case No. MID-L001944-23 ("*Pressler* Order")).[13] As the New Jersey state courts have recognized, successor liability often cannot be determined on the

---

[12] As the Special Master observed, "[u]nder New Jersey law, a corporation 'cannot avoid liability for the product it manufactured by simply transferring all . . . operations, assets, and accompanying obligations' to another corporation." Op. at 16 (quoting *Arevalo v. Saginaw Mach. Sys., Inc.*, 344 N.J. Super. 490, 498, 501-02 (App. Div. 2001)).

[13] Defendants cite the order in *LaSalle v. Am. Int'l Indus.*, No. 23-2-08165-0SEA (Wash. Super. Ct.), dismissing Holdco and Kenvue. Opp. at 2. Unlike the instant matter, plaintiffs' allegations in *LaSalle* were not robust, leading to short consideration by the court. The fact that two New Jersey courts and the Special Master have found that the plaintiffs have plausibly pled the New J&J Defendants' successor liability confirms that amendment should be permitted.

pleadings as it requires a full record developed through appropriate discovery. *See* **Exhibit C** (citing *Printing Mart v. Sharps Electronics*, 116 N.J. 739 (1989)).

Traditionally, when "one company sells or otherwise transfers all its assets to another company, the latter is not liable for the debts and liabilities of the transferor, including those arising out of the latter's tortious conduct." *McKee v. Harris-Seybold Co., Div. of Harris-Intertype Corp.*, 109 N.J. Super. 555, 561 (Law Div. 1970), *aff'd*, 118 N.J. Super. 480 (App. Div. 1972). New Jersey courts have carved out several exceptions to this rule.

Like many other jurisdictions, New Jersey recognizes the four traditional exceptions to the general rule of successor non-liability. Those are when: "(1) the purchasing corporation expressly or impliedly agrees to assume such debts and liabilities; (2) the transaction amounts to a consolidation or merger of the seller and purchaser; (3) the purchasing corporation is merely a continuation of the selling corporation; or (4) the transaction is entered into fraudulently in order to escape responsibility for such debts and liabilities." *Woodrick v. Jack J. Burke Real Est., Inc.*, 306 N.J. Super. 61, 73 (App. Div. 1997). Like those of several other jurisdictions, New Jersey courts also recognize a fifth exception in products liability cases: the product-line exception. *Ramirez v. Amsted Indus., Inc.*, 86 N.J. 332, 358 (1981).

### 1.  The product-line exception.

Under the product line exception, when a "corporation acquires all or substantially all the manufacturing assets of another corporation . . . and undertakes essentially the same manufacturing operation as the [predecessor] corporation, the purchasing corporation is strictly liable for injuries caused by defendants in units of the same product line, even if previously manufactured and distributed by the selling corporation or its predecessor." *Ramirez*, 86 N.J. at 358.[14]

In adopting the product line exception, the New Jersey Supreme Court rejected the "narrow application" given by some courts to successor liability so that, for example, no liability is imposed where the purchasing corporation paid for the acquired assets principally in cash." *Id.* at 342. As the Court observed, "[s]trict interpretation of the traditional corporate law approach leads to a narrow application of the exceptions to non-liability, and places unwarranted emphasis on the form rather than the practical effect of a particular corporate transaction." *Id.* at 341-42. And that, according to the Court, is "inconsistent with the developing

---

[14] Other transferor states within this MDL recognize a similar product line exception. *See for example Hall v. Armstrong Cork*, 103 Wn. 2d 258, 263-64 (Wa. 1984); *Ray v. Alad Corp.*, 19 Cal. 3d 22, 34 (1977); *Dawejko v. Jorgensen Steel Co.*, 434 A.2d 106, 111 (Pa. 1981); *Garcia v. Coe Mfg. Co.*, 933 P.2d 243, 249 (N.M. 1997).

principles of strict products liability and unresponsive to the interests of persons injured by defective products in the stream of commerce." *Id.* at 342.

There are, as the Court recognized in *Ramirez*, several additional justifications for imposing liability under the product line exception:

> (1) The virtual destruction of the plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business, (2) the successor's ability to assume the original manufacturer's risk-spreading role, and (3) the fairness of requiring the successor to assume a responsibility for defective products that was a burden necessarily attached to the original manufacturer's goodwill being enjoyed by the successor in the continued operation of the business.

*Id.* at 349. According to the Court, "[n]o unfairness inheres in imposing successor liability on a corporation that purchases assets after an injury has occurred" as the successor has the benefit of the predecessor's goodwill, presumably considered the existence of the predecessor's liabilities before acquiring its assets, and "is in the best position to spread the risk of liability among consumers by raising its prices." *Mettinger v. Glob Slicing Mach. Co.*, 153 N.J. 371, 386 (1998).

The justifications for the product line exception recognized in *Ramirez* and its progeny are particularly apt here. Because of the "Texas Two Step" divisional merger, Old JJCI's existence by plan and design ceased completely, with virtually all its assets transferred to New JJCI/Holdco (and later to Janssen and Kenvue), with its talc-related liabilities going to LTL. As the former and current owners of

Old JJCI's manufacturing assets, Holdco, Janssen and Kenvue could and can assess the likely cost of present and pending talc litigation and respond accordingly with cost-spreading tactics. In continuing to manufacture and sell both the talc- and cornstarch-based Johnson's® Baby Powder, the successor corporations have also enjoyed and profited from Old JJCI's goodwill.[15] Fairness dictates that while the successor corporations enjoy and profit from the goodwill, they should also shoulder Old JJCI's talc-related liabilities.

Defendants argue that the product-line exception does not apply because they have not manufactured the talcum powder-based formulation of Johnson's Baby Powder for sale in the United States.[16] Defs' Br., pgs. 19, 25. That is a distinction without a difference. As Defendants admit, they have continued manufacturing the talcum powder-based formulation for sale outside the United

_____

[15] Addressing Defendants' argument that no goodwill was transferred to Holdco, Janssen, and Kenvue, the Special Master found that this "is a fact question" not appropriately addressed at this juncture. Op. at 17. Plaintiffs have sufficiently alleged that New J&J Defendants have continued to use and profit from the Johnson's® trademark and branding. SAMC, ¶¶ 61-67. Kenvue's disclosures to the Securities and Exchange Commission confirm that Kenvue is the same company and sells the same iconic, lucrative brands that Old JJCI once did: "Our cosmetic products include…Johnson's Baby Powder…." *Id.*, ¶ 61. The New J&J Defendants have thus not only continued manufacturing Johnson's® Baby Powder but have exploited Old JJCI's goodwill.

[16] In the New Jersey state court proceedings, plaintiffs' counsel presented evidence that the New J&J Defendants have continued manufacturing the talcum powder-based formulation for sale in the United States.

States. That is more than enough for the product-line exception to apply. After all, it is not even necessary for them to continue manufacturing any product in the Johnson's Baby Powder product line for the product-line exception to apply under New Jersey law. As the Appellate Division recognized in *Saez v. S&S Corrugated Paper Mach. Co.*, 302 N.J. Super. 545, 553 (App. Div. 1997), the product-line exception can apply even though the successor never manufactures the product-line; it is enough that the successor obtained the "right to manufacture and market" it. But here, the New J&J Defendants not only obtained the right to manufacture and market the talc-based formulation internationally and domestically, they continue to do so abroad.

Defendants' claim that international talcum powder sales do not count finds no support under New Jersey law. It is just the opposite. As recognized in *Ramirez*, there are only two requirements for the product-line exception to apply: first, that "corporation acquires all or substantially all the manufacturing assets of another corporation," and second, that it "undertakes essentially the same manufacturing operation as the [predecessor] corporation[.]" *Ramirez*, 86 N.J. at 358. The product-line exception does not have territorial requirements mandating that the successor corporation continue manufacturing the product line for sale in a certain jurisdiction. *Id.* at 338 (finding product-line exception applicable when product was manufactured outside New Jersey); *Nieves v. Bruno Sherman Corp.*, 86 N.J.

25

361, 365 (1981) (same); *Bussell v. DeWalt Prods. Corp.*, 259 N.J. Super. 499, 506 (App. Div. 1992) (same).

A requirement that the successor corporation continue the manufacture of the product-line for sale in a specific territory is also an anathema to the various justifications for the product-line exception. As the New Jersey Supreme Court explained, those justifications include "the successor's ability to assume the manufacturer's risk-spreading role" and "the fairness of requiring the successor to assume a responsibility for defective products that was a burden necessarily attached to the original manufacturer's goodwill being enjoyed by the successor in the continued operation of the business." *Ramirez*, 86 N.J. at 349. Therefore, whether Defendants continued the manufacture of talcum powder domestically is of no moment.

In any event, the product-line exception only requires that the successor manufacture "essentially the same line of products as the predecessor." Op. at 13 (quoting *Ramirez*, 86 N.J. at 347, 358). Because "the word 'essentially' does not mean 'identically[,]'" *Bussell v. DeWalt Prods. Corp.*, 259 N.J. Super. 499, 518 (App. Div. 1992) (quoting *Ramirez*, 86 N.J. at 358), Defendants can be held liable for injuries arising because of the talcum powder-based formulation even though they allegedly only manufacture the reformulated, cornstarch-based version of Johnson's Baby Powder for domestic sale. This is because Defendants need not

26

have manufactured the same version of the product, but merely a product in the same product-line.[17] What matters is that while the cornstarch- and talcum powder-based formulations use different base component ingredients, they serve the same function, serve the same market, are sold in the same stores, and use the same trademark, branding, esthetic features, and goodwill. The two formulations are, thus, part of the same product-line, as the Special Master found.[18] Op. at 16 ("the SM agrees with plaintiffs that they have sufficiently alleged that the new defendants continued manufacturing and marketing the Johnson's Baby Powder product-line, a reformulated product that is functionally the same and serves the same purpose, uses the same name, and is marketed to the same audience, as defendants' historical baby powder.").

Defendants' argument that the product-line exception does not apply because the "transaction that formed Holdco did not eliminate plaintiffs' effective

---

[17] *See* "product line," *Collins Dictionary*, https://www.collinsdictionary. Com/us/dictionary/27nglish/product-line (last accessed September 14, 2023) ("A product line is a group of related products produced by one manufacturer, for example, products that are intended to be used for similar purposes or to be sold in similar types of stores.").

[18] Defendants contend that the two formulations are not part of the same product line because "plaintiffs' whole theory of the case is that cornstarch has long served as a safer alternative." Defs' Br., pg. 19. Were that correct (and it is not), a product that injures a plaintiff and its alternative safer design could not be part of the same product-line even though they serve the same function and the same market. There is no basis in the law for such a narrow definition of the "product-line".

27

remedies" similarly misses the point. While the *Ramirez* court noted that one rationale for the product-line exception is the "virtual destruction of the plaintiffs' remedies against the original manufacturer," the court did not adopt the "'*Ray*-total-destruction-rationale' as a strict requirement for the imposition of successor liability." *Bussell*, 259 N.J. Super. at 520. But even if it did, Defendants confuse the "original manufacturer," meaning Old JJCI, with Holdco and LTL. Because Old JJCI has ceased existence, Op. at 7, the "virtual destruction" requirement would be satisfied if there were such a requirement.

It is also of no moment that Holdco and LTL could conceivably satisfy Old JJCCI's talc-related liabilities. What matters is that because of the divisional merger, Old JJCI cannot. The New Jersey Supreme Court's *Nieves* decision confirms this. In that case, Defendant Harris Corporation ("Harris") made the same argument Defendants make here. As the New Jersey Supreme Court noted, Harris argued that the "virtual destruction of the plaintiff's remedies against the original manufacturer" justification for successor liability "is concerned solely with finding one viable, extant corporate defendant that has succeeded to the manufacturing operation of the original manufacturer." *Nieves v. Bruno Sherman Corp.*, 86 N.J. 361, 370 (1981). The New Jersey Supreme Court rejected this argument. As it explained, Harris misinterpreted "the underlying purpose of this justification" as the concern is not so much "with the availability of one particular viable successor

28

as it [is] with the ***unavailability of the original manufacturer by reason of its divestiture of assets and dissolution***." *Id.* at 371 (emphasis added). Under New Jersey law, the fact that LTL acquired Old JJCI's talc-related liabilities in the divisional merger does not affect whether successor liability can be imposed on Holdco, Janssen, and Kenvue.[19] *Id.*

Defendants' continued insistence that only LTL can be held liable for Old JJCI's talc-related liabilities also reflects a fundamental misunderstanding (or misreading) of Texas's divisional merger statute (Tex. Bus. Orgs. Code Ann §10.008) and successor liability law more generally. As Defendants acknowledge, Section 10.008 provides that "all liabilities and obligations of each organization that is a party to the merger are allocated to one or more of the surviving or new organizations in the manner provided by the plan of merger." Tex. Bus. Orgs. Code Ann § 10.008(a)(3). From this provision, Defendants argue that because the talc-related liabilities were allocated to LTL, neither Holdco, Janssen, nor Kenvue can

---

[19] Whether New JJCI, Janssen, and Kenvue can seek indemnification from LTL because it had assumed Old JJCI's talc-related liabilities is an issue to be decided amongst the various corporations; it does not limit plaintiffs' rights as to any particular corporation. *Nieves*, 86 N.J. at 370.

be held liable for Old JJCI's talc liabilities. Defs' Br., pg. 21-22. This is not how Texas' successor liability exceptions read or work.[20]

A defendant can be held liable as a successor if that defendant has assumed the predecessor's liabilities. *Woodrick.*, 306 N.J. Super. at 73. When a defendant has not assumed the liabilities of its predecessor, the other exceptions to successor non-liability, such as the product-line and mere continuation exceptions, can be used to impose successor liability. Indeed, the New Jersey Supreme Court has rejected the notion that a successor corporation can evade successor liability by disclaiming its predecessor's liabilities, as Defendants seek to do here. *See Lefever v. K.P. Hovnanian Enterprises, Inc.*, 160 N.J. 307, 319 (1999) (finding disclaimers

---

[20] Had the Texas Legislature intended to limit the use of the "except as otherwise provided . . . by law" provision, it would have written the statute to express that intent. But it did not. On the contrary, "while the [divisional merger statute's] provisions permitting multiple surviving entities in a merger were intended to provide corporations with greater flexibility in structuring acquisition and restructuring transactions, they were not intended to have any material effect on the existing rights of creditors of the parties to a merger." *See* Curtis W. Hoff*, The New Texas Business Corporation Act Merger Provisions*, 21 St. Mary's L.J. 109 (St. Mary's Law Journal 1989). As noted in that article, "[t]o reflect this intent, the Legislature adopted an amendment to Article 5.15 of the TBCA which specifically states that 'nothing contained in Part 5 of this Act shall ever be construed as affecting, nullifying or repealing the Anti-trust laws or as abridging any right or rights of any creditor under existing laws." *Id.* at 122. Given this provision, creditors "will continue to possess all the rights available to [them] under law and contract" with "all laws protecting the rights of creditors with respect to fraudulent conveyances, preferences and insolvency [remaining] in force and apply[ing]." *Id.* at 124-25.

of liability ineffective "when other principles of law require the imposition of liability"); *Woodrick*, 306 N.J. Super. at 310-11, 314.

Defendants argue that successor liability laws do not apply because the divisional merger proceeded under Tex. Bus. Orgs. Code Ann § 10.008. But Texas's corporate laws do not allow the entities surviving a divisional merger to circumvent the successor liability laws of other states. As the Third Circuit observed in *LTL Management*, no entity created in a divisional merger is "'liable for the debt or other obligation' allocated to any other new entity" "[e]xcept as otherwise provided by law or contract." *Id.* at 95 (quoting Tex. Bus. Orgs. Code Ann § 10.008(a)(4)).[21] Citing the Third Circuit's Opinion in *LTL*, the Superior

---

21 Defendants cite an order in *Yandell v. Johnson & Johnson*, No. 23STCV11850 (Cal. Super. Ct.), wherein the court observed: "[I]f . . . New Consumer actually held those liabilities and then merged with Janssen Pharmaceuticals, Inc., Johnson & Johnson Holdco (NA) Inc., and Kenvue Inc., making those three Defendants now liable, one would expect the Third Circuit to have mentioned that." Defs' Br., pgs. 20-21. The California state court's supposition about what the Third Circuit would have done is contrary to "the general rule that a federal appellate court does not consider an issue not passed upon below." *Selected Risks Ins. Co. v. Bruno*, 718 F.2d 67, 69 (3d Cir. 1983) (citing *Singleton v. Wulff*, 428 U.S. 106, 120 (1976)); *see also Doe by and through Doe v. Boyertown Area School District*, 897 F.3d 515, 517 (2018) (Jordan, J., dissenting) ("There is a good reason why we avoid wading into fraught waters without needing to and without careful legal analysis supporting the conclusions we reach. Dicta are often dangerous. Because they are unmoored from any concrete set of facts and are frequently the product of judicial musing rather than adversarial presentations from parties with a vested interest in exploring issues in detail, dicta can be ill-informed. All too often, they can short-circuit the legal process and end up substituting mere assertion for reason.").

Court in *Nesko v. Johnson & Johnson*, Docket No. ATL-L-741-23 (Law Div. MCL 2023), found that "the Texas Code does not contemplate that a corporation that was not assigned liabilities in the merger [can] evade liability when required under the laws of other states." Exhibit C. In *Jackson v. Corizon Health Inc.*, a Michigan district court likewise recognized that "[w]hatever Texas may have to say about successor liability following a divisional merger, Michigan has its own rules." No. 19-13382, 2022 WL 16575691, *10-11 (E.D. Mich. Nov. 1, 2022). As these decisions show, a corporation can choose how to allocate its assets and liabilities among the corporations surviving a divisional merger. But that choice does not allow a surviving corporation not allocated the liabilities to escape liability imposed under the laws of other states.

Ultimately, the Special Master found that plaintiffs have sufficiently alleged:

- "that the new defendants continued manufacturing and marketing the Johnson's Baby Powder product-line, a reformulated product that is functionally the same and serves the same purpose, uses the same name, and is marketed to the same audience, as defendants' historical baby powder"; and
- "that the new defendants continue to use and profit from Johnson's trademark, branding and goodwill."

Op. at 16. From these allegations, the Special Master reasonably found that the SAMC adequately and plausibly pleads that Holdco, Kenvue and Jannsen are liable under the product-line exception. *Id.*

32

In reaching that conclusion, the Special Master noted that Defendants raised several factual issues that are premature and not appropriately considered at this stage of the proceedings. *Id.* at 16-17. As the Special Master recognized in considering the motion to amend, the futility of an amendment is assessed using the same standard use to evaluate a Rule 12 motion to dismiss. Op. at 5 (citing *Burlington Coat*, 114 F.3d at 1434). This requires that the allegations of the SAMC be accepted as true and viewed in the light most favorable to amendment. *Burlington Coat*, 114 F.3d at 1420. Defendants' various arguments for why the product-line exception does not apply are no more appropriate now. The Special Master's decision should therefore be affirmed.

### 2.  The mere continuation exception.

Because the "de facto merger" and "mere continuation" exceptions to "the general rule of non-liability tend to overlap, with much of the same evidence being relevant to each determination, these exceptions are often treated in unison" and referred to as the "mere continuation" exception. *Woodrick*, 306 N.J. Super. at 73. In determining whether a particular transaction amounts to a *de facto* consolidation or mere continuation of the predecessor's business operations under the successor's name, four factors are relevant: "(i) continuity of management, personnel, physical location, assets, and general business operations; (ii) a cessation of ordinary business and dissolution of the predecessor as soon as

practically and legally possible; (iii) assumption by the successor of the liabilities ordinarily necessary for the uninterrupted continuation of the business of the predecessor; and (iv) continuity of ownership/shareholders." *Id.*

Not all four factors need to be present for the mere continuation exception to apply. *Id.* What matters is that the "the facts show that the intent was for the successor to assume all the benefits and burdens of the predecessor's business, with the successor becoming a 'new hat' for the predecessor." *Id.* at 74.[22]

The Special Master found all four mere continuation factors satisfied here. Op. at 15-16. As he observed, the "new JJCI Defendants are simply old JJCI reconstituted[,]" considering that "plaintiffs allege that the new J&J Defendants

---

[22] As to this mere continuation claim, Defendants argue that successor liability cannot be imposed on the New J&J Defendants because plaintiffs can obtain recourse against LTL. This argument conflates LTL with Old JJCI: the New J&J Defendants are successors to Old JJCI, not LTL. Furthermore, while Holdco and Janssen continue to exist, Holdco does so only as a "barren, corporate shell" making Holdco's continued existence no impediment to imposing successor liability on Janssen and Kenvue. *See Pub. Serv. Elec. & Gas Co. v. Cooper Indus., LLC*, __ F. Supp. 3d __ (D.N.J. 2023) (slip op. at 9). While Janssen also continues to exist, that too is no impediment to finding Kenvue liable as a successor to Old JJCI given that "Janssen is a pharmaceutical company that does not currently hold any of the assets previously belonging to Holdco." Defs' Br., pg. 30. As to Kenvue, Defendants' argument thus "places unwarranted emphasis on the form rather than the practical effect of" the corporate transactions at issue here. *See Ramirez*, 86 N.J. 341-42. That is, while Old JJCI's corporate form changed, with its manufacturing assets and operations going from Holdco, to Janssen, and finally to Kenvue, today it is Kenvue that is the new hat of Old JJCI. Successor liability may be fairly imposed on Kenvue too, as a result. *Id.* (rejecting narrow application of the mere continuation exception).

function the same as Old JJCI, manufacture the same product, have the same

leadership and ownership, and use the same Johnson's Baby Powder brand and

manufacturing assets." Op. at 15. The Special Master further observed that

> plaintiffs allege that [Kenvue's] SEC registration filing
> states that it sells Johnson's Baby Powder in the United
> States (SAMC ¶¶ 67, 61), that Kenvue "acknowledges
> itself as the company responsible for the manufacture of
> Johnson's Baby Powder" (¶ 58), that Kenvue
> acknowledges it is responsible for all liabilities resulting
> from exposure to talc outside the United States or Canada
> (¶ 59), that Kenvue is responsible individually and as
> successor to all predecessor entities involving in the
> manufacturing, marketing and sale of asbestos-containing
> talc (¶ 60), that Kenvue seeks to benefit from the historical
> sale of Johnson's Baby Powder (¶¶ 62, 67), that even today
> it is possible to buy talc-based Johnson's Baby Powder
> online (¶ 64), that Kenvue lists Johnson's as one of its
> "iconic brands" (¶ 65), and that Kenvue continues to
> market the reformulated line of Johnson's baby products
> "under the trusted Johnson's brand name" (¶ 67).

Op. at 15-16.

While Defendants claim that these allegations are unfounded, that argument,

according to the Special Master, is not appropriately considered at the motion to

amend stage. Op. 16-17. The Special Master was correct. Defendants' argument

also conflicts with one Kenvue made in the New Jersey multi-county litigation

proceedings. In seeking a protective order, Kenvue argued, "Plaintiffs have all the

facts they need on successor liability." Exhibit E.  According to Kenvue, those facts

include:

- Kenvue's CEO's testimony "that 'most' of the 'employees of Consumer Health transferred from Johnson & Johnson to Kenvue' with only 'some exceptions' and that 'all the employees involved in the manufacturing and marketing of Johnson's Baby Powder transferred from Johnson & Johnson to Kenvue.'"

- Kenvue's CFO's testimony that "'as it related to the manufacture and sale of Johnson's Baby Powder,' he was not aware of anything of the consumer health business 'left behind' at Johnson & Johnson."

- Kenvue's CEO's testimony that "all the manufacturing assets involved in the Johnson's Baby Powder transferred from Johnson & Johnson to Kenvue' and are 'part of the new Kenvue base."

- Kenvue's CEO's testimony that "there was no 'interruption or disruption to the business linked' to the Kenvue transactions."

- Kenvue's CFO's testimony "that 'when that transfer took place' nothing 'operationally had changed as it related to the sale, and marketing, and manufacturing of Johnson's Baby Powder."

- Kenvue's CEO's testimony that Kenvue "'has the right to use the Johnson's trademark going forward' under 'a trademark agreement with Johnson & Johnson" and that the "Johnson's Baby brand is part of the Kenvue portfolio."

- Kenvue's CEO's testimony that "'[t]he marketing capabilities were transferred' from Consumer Health to Kenvue."

Exhibit E, pgs. 5-6. Defendants' argument here on the mere continuation exception thus falls flat as they are contrary to the standards governing motions to amend and even the position taken by Kenvue in the state court proceedings.

## III.   Conclusion

For all these reasons, Special Master Order No. 17 should be affirmed and

the amendment to the master long form complaint allowed.

Dated:        February 6, 2024                    Respectfully submitted,

*/s/ Michelle A. Parfitt*
Michelle A. Parfitt
ASHCRAFT & GEREL, LLP
1825 K Street, NW, Suite 700
Washington, DC 20006
Tel: 202-335-2600
mparfitt@ashcraftlaw.com

*/s/ P. Leigh O'Dell*
P. Leigh O'Dell
BEASLEY, ALLEN, CROW, METHVIN
PORTIS & MILES, P.C.
218 Commerce St.
Montgomery, AL 36104
Tel: 334-269-2343
leigh.odell@beasleyallen.com

***Plaintiffs' Co-Lead Counsel***

*/s/ Christopher M. Placitella*
Christopher M. Placitella
COHEN, PLACITELLA & ROTH, P.C.
127 Maple Ave.
Red Bank, NJ 07701
Tel: 732-747-9003
clpacitella@cprlaw.com

***Plaintiffs' Liaison Counsel***

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 6, 2024, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the CM/ECF participants registered to receive services in this MDL.

Respectfully submitted,


*/s/ Michelle A. Parfitt*
Michelle A. Parfitt