# EXHIBIT E

John C. Garde, Esq. (N.J. Attorney ID #014171986)
**McCARTER & ENGLISH, LLP**
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102
(973) 622-4444
*Attorneys for Defendant Kevnue Inc.*

| | |
|---|---|
| CATHERINE FORBES, Individually and as Personal Representative of the ESTATE OF KIMBERLY NARANJO,<br><br>        Plaintiff,<br><br>v.<br><br>JOHNSON & JOHNSON, et al.,<br><br>        Defendants. | SUPERIOR COURT OF NEW JERSEY LAW DIVISION: MIDDLESEX COUNTY DOCKET NO.: MID-L-006108-21 AS<br><br>CIVIL ACTION ASBESTOS LITIGATION<br><br>**NOTICE OF MOTION FOR A PROTECTIVE ORDER TO PRECLUDE THE DEPOSITIONS OF CHRISTOPHER ANDREW AND PINTO ADHOLA** |
| JUSTIN BERGERON and KATHRYN BERGERON,<br><br>        Plaintiff,<br><br>v.<br><br>JOHNSON & JOHNSON, et al.,<br><br>        Defendants. | SUPERIOR COURT OF NEW JERSEY LAW DIVISION: MIDDLESEX COUNTY DOCKET NO.: MID-L-002089-23 AS<br><br>CIVIL ACTION ASBESTOS LITIGATION<br><br>**NOTICE OF MOTION FOR A PROTECTIVE ORDER TO PRECLUDE THE DEPOSITIONS OF CHRISTOPHER ANDREW AND PINTO ADHOLA** |

     **PLEASE TAKE NOTICE** that on November 17, 2023 or on a date to be set by the court,

McCarter & English, LLP counsel, for Defendant Kenvue Inc., will move before the Superior

Court of New Jersey, Law Division, Middlesex County, 56 Paterson Street, New Brunswick, New

Jersey 08903 for a Protective Order to preclude the Depositions of Christopher Andrew and Pinto

Adhola.

1

ME1 46430917v.1

  **PLEASE TAKE FURTHER NOTICE** that in support of this application, Defendant will rely upon the Memorandum of Law, Certification of John C. Garde, Esq. with attached exhibits, and the proposed form of Order.

  **PLEASE TAKE FURTHER NOTICE** that in accordance with R. 1:6-2(a), a proposed form of Order is submitted herewith.

  **PLEASE TAKE FURTHER NOTICE** that service of this motion has been made by hand-delivery to Superior Court of New Jersey, Middlesex County Clerk's Office; the Honorable Ana C. Viscomi; and overnight and electronic mail to Plaintiff's counsel.

Dated: October 20, 2023

John C. Garde, Esq.
A Member of the Firm

2

John C. Garde, Esq. (N.J. Attorney ID #014171986)
**McCARTER & ENGLISH, LLP**
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102
(973) 622-4444
*Attorneys for Defendant Kevnue Inc.*

| | |
|---|---|
| CATHERINE FORBES, Individually and as Personal Representative of the ESTATE OF KIMBERLY NARANJO, <br><br>       Plaintiff, <br><br> **v.** <br><br><br> JOHNSON & JOHNSON, et al., <br><br><br>      Defendants. | SUPERIOR COURT OF NEW JERSEY LAW DIVISION: MIDDLESEX COUNTY DOCKET NO.: MID-L-006108-21 AS <br><br> CIVIL ACTION ASBESTOS LITIGATION <br><br> **[PROPOSED] ORDER** |
| JUSTIN BERGERON and KATHRYN BERGERON, <br><br>       Plaintiff, <br><br> **v.** <br><br><br> JOHNSON & JOHNSON, et al., <br><br><br>      Defendants. | SUPERIOR COURT OF NEW JERSEY LAW DIVISION: MIDDLESEX COUNTY DOCKET NO.: MID-L-002089-23 AS <br><br> CIVIL ACTION ASBESTOS LITIGATION <br><br> **[PROPOSED] ORDER** |

  **THIS MATTER** having come before the Court on Defendant Kenvue Inc.'s motion for a

Protective Order to preclude the depositions of Christopher Andrew and Pinto Adhola, and the Court

having reviewed the moving and opposition papers, if any, and for good cause shown:

  **IT IS ON THIS _____DAY OF _____, 2023,**

  **ORDERED**, that the motion of Defendant Kenvue Inc. for a Protective Order to preclude the

depositions of Christopher Andrew and Pinto Adhola is **GRANTED**;

ME1 46430918v.1

**AND IT IS FURTHER ORDERED**, that a copy of the within Order shall be served on all

counsel within seven (7) days of its receipt by movant's counsel.

_____
Honorable Ana C. Viscomi, J.S.C.

___ Opposed

___ Unopposed

ME1 46430918v.1

John C. Garde, Esq. (N.J. Attorney ID #014171986)
**McCARTER & ENGLISH, LLP**
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102
(973) 622-4444
*Attorneys for Defendant Kenvue Inc.*

| | |
|---|---|
| CATHERINE FORBES, Individually and as Personal Representative of the ESTATE OF KIMBERLY NARANJO,<br><br>          Plaintiff,<br><br>v.<br><br><br>JOHNSON & JOHNSON, et al.,<br><br><br>          Defendants. | SUPERIOR COURT OF NEW JERSEY LAW DIVISION: MIDDLESEX COUNTY DOCKET NO.: MID-L-006108-21 AS CIVIL ACTION ASBESTOS LITIGATION<br><br>**CERTIFICATION OF JOHN C. GARDE, ESQ. IN SUPPORT OF MOTION TO FOR A PROTECTIVE ORDER TO PRECLUDE THE DEPOSITIONS OF CHRISTOPHER ANDREW AND PINTO ADHOLA** |
| JUSTIN BERGERON and KATHRYN BERGERON,<br><br>          Plaintiff,<br><br>v.<br><br><br>JOHNSON & JOHNSON, et al.,<br><br><br>          Defendants. | SUPERIOR COURT OF NEW JERSEY LAW DIVISION: MIDDLESEX COUNTY DOCKET NO.: MID-L-002089-23 AS CIVIL ACTION ASBESTOS LITIGATION<br><br>**CERTIFICATION OF JOHN C. GARDE, ESQ. IN SUPPORT OF MOTION TO FOR A PROTECTIVE ORDER TO PRECLUDE THE DEPOSITIONS OF CHRISTOPHER ANDREW AND PINTO ADHOLA** |

JOHN C. GARDE, ESQ., being of full age, hereby certifies and states as follows:

1. I am an attorney-at-law of the State of New Jersey, and a Partner with McCarter & English, LLP, attorneys for Defendant Kenvue Inc., in the above captioned action.

2. I am one of the attorneys charged with handling this case. I am fully familiar with the facts contained in this Certification.

1

ME1 46430916v.1

3.      I make this Certification in support of the Motion for a protective order to preclude the depositions of Christopher Andrew and Pinto Adhola.

4.      Attached as Exhibit A is a true and correct copy of the Declaration of Donald McGraw, dated September 18, 2023.

5.      Attached as Exhibit B are true and correct copies of excerpts of the transcript of the September 28, 2023 Deposition of Donald McGraw, taken in the above captioned matters.

6.      Attached as Exhibit C are true and correct copies of excerpts of the transcript of the August 14, 2023 Deposition of Thibaut Mongon, taken in the above captioned matters.

7.      Attached as Exhibit D are true and correct copies of excerpts of the transcript of the August 16, 2023 Deposition of Paul Ruh, taken in the above captioned matters.

8.      Attached as Exhibit E a true and correct copy of the Notice of Christopher Andrew's Deposition, dated October 10, 2023, in the above captioned matters.

9.      Attached as Exhibit F is a true and correct copy of Notice of Pinto Adhola's Deposition, dated October 10, 2023, in the above captioned matters.

Dated: October 20, 2023

John C. Garde

ME1 46430916v.1

John C. Garde, Esq. (N.J. Attorney ID #014171986)
**McCARTER & ENGLISH, LLP**
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102
(973) 622-4444
*Attorneys for Defendant Kevnue Inc.*

| | |
|---|---|
| CATHERINE FORBES, Individually and as Personal Representative of the ESTATE OF KIMBERLY NARANJO,<br><br>      Plaintiff,<br><br>v.<br><br>JOHNSON & JOHNSON, et al.,<br><br>      Defendants. | SUPERIOR COURT OF NEW JERSEY LAW DIVISION: MIDDLESEX COUNTY DOCKET NO.: MID-L-006108-21 AS<br><br>CIVIL ACTION ASBESTOS LITIGATION |
| JUSTIN BERGERON and KATHRYN BERGERON,<br><br>      Plaintiff,<br><br>v.<br><br>JOHNSON & JOHNSON, et al.,<br><br>      Defendants. | SUPERIOR COURT OF NEW JERSEY LAW DIVISION: MIDDLESEX COUNTY DOCKET NO.: MID-L-002089-23 AS<br><br>CIVIL ACTION ASBESTOS LITIGATION |

---

### DEFENDANT KENVUE INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR A PROTECTIVE ORDER TO PRECLUDE THE DEPOSITIONS OF CHRISTOPHER ANDREW AND PINTO ADHOLA

---

John C. Garde, Esq. (014171986)
**McCARTER & ENGLISH, LLP**
100 Mulberry Street
Newark, New Jersey 07102
973-639-2032
jgarde@mccarter.com
Attorneys for Defendant Kenvue Inc.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 2

I.    Plaintiffs Have Nothing Left to Learn About the Who, When, and Where of the Transactions. ................................................................................................................. 2

II.   Plaintiffs Know All There Is to Know to Support Their Theory of Purported Successor Liability. .................................................................................................... 5

ARGUMENT ..................................................................................................................... 7

CONCLUSION .................................................................................................................. 9

ME1 46430921v.1

# TABLE OF AUTHORITIES

**Cases**

*Capital Partners, Inc. v. Twin City Fire Ins. Co.*, 310 F.R.D. 523 (S.D. Fla. 2015) ..................... 8

*Elizabeth City v. Hartz Elizabeth, Inc.*, 2016 WL 7388635 (N.J. Tax Ct. Dec. 19, 2016) ............. 8

*Horizon Blue Cross Blue Shield of New Jersey v. State*, 425 N.J. Super. 1 (App. Div. 2012) ....... 7

*In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 2013 WL 5274296 (N.D. Ill. Sept. 18, 2013) ................................................................................................................................. 8

*Kerr v. Able Sanitary & Env't Servs., Inc.*, 295 N.J. Super. 147 (App. Div. 1996) .............. 1, 7, 8

*Memory Bowl v. N. Pointe Ins. Co.*, 280 F.R.D. 181 (D.N.J. 2012) ............................................. 9

*Otsuka Pharm. Co., Ltd. v. Sandoz, Inc.*, 2008 WL 11510413 (D.N.J. Oct. 14, 2008) ................. 9

*Roadbuilders Mach. & Supply Co. v. Sandvik Mining & Constr. USA, LLC*, 2023 WL 3790691 (D. Kan. June 2, 2023) ................................................................................................................ 8

**Rules**

N.J. Ct. R. 4:10-2 .................................................................................................................... 1, 7

ME1 46430921v.1

Defendant Kenvue Inc. moves for a protective order to preclude the depositions of Christopher Andrew and Pinto Adhola pursuant to Rules 4:10-2 and 4:10-3.

## INTRODUCTION

Plaintiffs have served notices of depositions for two Kenvue in-house counsel: Christopher Andrew, Head of Corporate Law & Transactions, and Pinto Adhola, Assistant Corporate Secretary. But Plaintiffs already have the full, detailed, picture of the mechanics of the Kenvue spinoff. They took the depositions of Kenvue's CEO (Thibaut Mongon), Kenvue's CFO (Paul Ruh), Janssen's Vice President of Group Finance for Worldwide Pharmaceuticals (Darren Snellgrove), and a corporate representative (Donald McGraw). Mr. McGraw also provided Plaintiffs with a declaration precisely outlining the steps of the relevant transactions. Moreover, in connection with the LTL bankruptcy, Defendants have produced thousands of pages of documents related to those same transactions, all of which Plaintiffs have access to.

The facts surrounding those transactions have been established and are not in dispute, even if the parties do not agree on the *legal significance* of those facts. If Plaintiffs believe some material gap in their knowledge exists, then they should at least *try* other forms of discovery first. But they have not served even a single interrogatory.

These depositions are unreasonably cumulative or duplicative under Rule 4:10-2(g). And because the proposed deponents are attorneys, good cause for a protective order is presumed. *Kerr v. Able Sanitary & Env't Servs., Inc.*, 295 N.J. Super. 147, 158 (App. Div. 1996). Plaintiffs bear the burden of showing that the information they seek is "unlikely to be available by other less oppressive means." *Id.* They cannot meet that burden.

This Court should issue a protective order precluding the depositions of Mr. Andrew and Mr. Adhola.

## BACKGROUND

Plaintiffs have undergone substantial discovery regarding the Kenvue spinoff. Donald McGraw, associate tax counsel for Johnson & Johnson, provided Plaintiffs with a declaration explaining in excruciating detail the various actions taken to effectuate the corporate transactions. Ex. A, McGraw Decl. He summarized the transactions, *id.* at ¶¶ 4–5, and listed out 14 steps by which JJCI's responsibility for consumer products transferred to Kenvue, *id.* at ¶¶ 7(a)–(n). He then was deposed as a corporate representative, where Plaintiffs' counsel asked him questions on these topics for *eight hours*. Ex. B, McGraw Dep.

Plaintiffs now know all that there is to know about the mechanics of the transactions—who was involved, when they were involved, and where the entities were created, and where their stock was transferred. There is nothing left to learn here.

## I.    Plaintiffs Have Nothing Left to Learn About the Who, When, and Where of the Transactions.

Mr. McGraw made abundantly clear for Plaintiffs the various entities, stock transfers, and time periods relevant to the transactions that led to LTL's and Kenvue's creation. He explained that:

1.  "[L]ong before the Kenvue Transactions, Janssen owned shares of the subsidiary-Johnson & Johnson Consumer Inc. ('JJCI 1') – that operated the U.S. consumer health business." Ex. A, McGraw Decl ¶ 4.

2.  "In mid-October 2021, JJCI 1 was merged out of existence in connection with an internal corporate restructuring, in which two new companies were created. The first new company was named LTL Management LLC ('LTL')." *Id.*

    "Pursuant to the restructuring, LTL became solely responsible for JJCI 1's liabilities arising from North American talc-related claims against it (other than claims for which the exclusive remedy is provided under a workers' compensation statute or similar laws), and the defense of those claims ('Talc-Related Liabilities')." *Id.*

ME1 46430921v.1

3.     "The second new company was named Johnson & Johnson Consumer Inc., which subsequently changed its name to Johnson & Johnson Holdco (NA), Inc. ('Holdco/JJCI 2')." *Id.*

4.     "As part of the Kenvue Transactions, the U.S. consumer health business was transferred by Holdco/JJCI 2 to a newly formed, wholly-owned subsidiary, Johnson & Johnson Consumer Inc. ('JJCI 3')." *Id.* at ¶ 5

5.     "Subsequently, JJCI 3 was transferred by Holdco/JJCI 2 to Janssen which, in turn consolidated its ownership of JJCI 3 and another subsidiary under a holding company that was then transferred by Janssen to a series of other Johnson & Johnson companies and ultimately to Kenvue." *Id.*

"In connection with the Kenvue Transactions, Janssen directly 'owned' JJCI 3 for less than 24 hours and had no day-today involvement in the operations of the U.S. consumer business during that time period." *Id.*

With respect to these last two steps involving the transfer from JJCI 2 to Kenvue, Mr.

McGraw provided an even more granular chronology with every minute detail of the transactions:

a.     "Janssen formed new subsidiary companies, including JNTL Holdings 2, Inc. (completed February 2022)." Ex. A, McGraw Decl. ¶ 7(a); Ex. B, McGraw Dep. 104:10–105:16.

b.     "Holdco/JJCI 2 formed a new subsidiary company, a Nevada corporation named Johnson & Johnson Consumer Inc. ('JJCI 3') (completed June 1, 2022)." Ex. A, McGraw Decl. ¶ 7(b).

c.     "Janssen transferred [an] employee[] to JJCI 3 in exchange for no consideration (completed January 1, 2023)." Ex. A, McGraw Decl. ¶ 7(c); Ex. B, McGraw Dep. 117:20–118:13 (clarifying a single employee was transferred).

d.     "Janssen transferred 100% of the legal title of the Fort Washington, Pennsylvania property to JJCI 3 in exchange for nominal consideration of $10 (completed January 2, 2023)." Ex. A, McGraw Decl. ¶ 7(d); Ex. B, McGraw Dep. 119:9–18.

e.     "JJCI 3 changed its corporate domicile to Delaware (completed January 3, 2023)." Ex. A, McGraw Decl. ¶ 7(e).

f.     "HoldCo/JJCI 2 distributed 100% of the shares of JJCI 3 to Janssen (completed February 3, 2023)." Ex. A, McGraw Decl. ¶ 7(f); Ex. B, McGraw Dep. 69:3-13 120:6–18, 125:3–6. 145:6-9.

g.     "Janssen contributed Pevisone IP to JJCI 3 in exchange for additional paid in capital (completed February 3, 2023)." Ex. A, McGraw Decl. ¶ 7(g); Ex. B, McGraw Dep. 126:1–14.

ME1 46430921v.1

h.   "Janssen contributed 100% of the shares of JJCI 3 and other consumer health subsidiaries to JNTL Holdings 2, Inc. in exchange for additional paid in capital (completed February 3, 2023)." Ex. A, McGraw Decl. ¶ 7(h); Ex. B, McGraw Dep. 126:1–14.

i.   "Janssen distributed 100% of the shares of JNTL Holdings 2, Inc. to DePuy Synthes, Inc. (completed February 3, 2023)." Ex. A, McGraw Decl. ¶ 7(i); Ex. B, McGraw Dep. 126:1–14, 164:13–165:2.

j.   "DePuy Synthes, Inc. contributed 100% of the shares of various consumer health subsidiaries to JNTL Holdings 2, Inc. in exchange for additional paid in capital (completed April 3, 2023)." Ex. A, McGraw Decl. ¶ 7(j); Ex. B, McGraw Dep. 168:5–14.

k.   "DePuy Synthes, Inc. distributed 100% of the shares of JNTL Holdings 2, Inc. to Johnson & Johnson International (completed April 3, 2023)." Ex. A, McGraw Decl. ¶ 7(k); Ex. B, McGraw Dep. 181:3–7.

l.   "Johnson & Johnson International contributed 100% of the shares of various consumer health subsidiaries to JNTL Holdings 2, Inc. in exchange for additional paid in capital (completed April 3, 2023)." Ex. A, McGraw Decl. ¶ 7(l); Ex. B, McGraw Dep. 191:10–21.

m.   "Johnson & Johnson International distributed 100% of the shares of JNTL Holdings 2, Inc. to Johnson & Johnson (completed April 3, 2023)." Ex. A, McGraw Decl. ¶ 7(m); Ex. B, McGraw Dep. 191:10–21.

n.   "Johnson & Johnson transferred (i) 100% of its rights to any consumer health IP agreements, contracts and licenses to Kenvue Inc. in exchange for no consideration and (ii) 100% of its ownership in various consumer health subsidiaries to Kenvue Inc. in exchange for additional paid in capital ( completed April 4, 2023)." Ex. A, McGraw Decl. ¶ 7(n).

All this occurred "to facilitate the business purposes of the global separation of the consumer health business." Ex. B, McGraw Dep. at 220:25–221:19; *see also id.* at 91:8–12, 106:22–107:6, 125:3–16, 150:18–151:10, 160:8–161:3, 169:2–170:14, 261:1–23. With that, there cannot be anything more Plaintiffs need to learn about the mechanics of how the Kenvue spinoff was accomplished.

ME1 46430921v.1

## II.     Plaintiffs Know All There Is to Know to Support Their Theory of Purported Successor Liability.

In addition to exploring every nook and cranny of the Kenvue transactions with Mr. McGraw—and through the thousands of pages of documents Defendants produced beforehand—Plaintiffs also spent significant time asking Mr. Mongon (Kenvue's CEO) and Mr. Ruh (Kenvue's CFO) questions about Kenvue's business. Misguided and legally incorrect as it may be, Plaintiffs now also have all the information they need, and more, for their successor-liability theory.

*Employees transferred to Kenvue.* Plaintiffs also argued that for purposes of successor liability they needed to establish what employees transferred to Kenvue. Kenvue's CEO testified that "most" of the "employees of Consumer Health transferred from Johnson & Johnson to Kenvue" with only "some exceptions" and that "all the employees involved in the manufacturing and marketing of Johnson's Baby Powder transferred from Johnson & Johnson to Kenvue." Ex. C, Mongon Dep. at 44:11–19, 45:17–21. Kenvue's CFO similarly testified that "as it related to the manufacture and sale of Johnson's Baby Powder," he was not aware of anything of the consumer health business "left behind" at Johnson & Johnson. Ex. D, Ruh Dep. 62:15–18.

*Manufacturing assets transferred to Kenvue.* Plaintiffs also argued that a critical fact for successor liability was whether the manufacturing processes were transferred to Kenvue. Kenvue's CEO testified that "all the manufacturing assets involved in the Johnson's Baby Powder transferred from Johnson & Johnson to Kenvue" and are "part of the new Kenvue base." Ex. C, Mongon Dep. at 45:22–25. He explained that there was no "interruption or disruption to the business linked" to the Kenvue transactions. *Id.* at 158:21–159:14. Kenvue's CFO also testified that "when that transfer took place" nothing "operationally had changed as it related to the sale, and marketing, and manufacturing of Johnson's Baby Powder." Ex. D, Ruh Dep. 44:1–5.

ME1 46430921v.1

***Goodwill, trademarks, and marketing.*** Plaintiffs argued that Kenvue's "goodwill" from the brand was a relevant consideration. Kenvue's CEO testified that Kenvue has the "right to use the Johnson's trademark going forward" under "a trademark agreement with Johnson & Johnson. *Id.* at 46:1–12. He also explained that the "Johnson's Baby brand is part of the Kenvue portfolio." *Id.* at 46:10–15. And he testified that "[t]he marketing capabilities were transferred" from Consumer Health to Kenvue. *Id.* at 45:1-2; *see also* Ex. D, Ruh Dep. 62:5–7 (agreeing that "[a]ll of the marketing assets follow and go into Kenvue.").

***Sales of Johnson's Baby Powder.*** Plaintiffs' argued that sales of Johnson's Baby Powder were relevant to the "product line exception" for successor liability. Kenvue's CEO and CFO both made clear what was already obvious from the public announcement before Kenvue's creation that sales of talc-based Johnson's Baby Powder were discontinued in the United States: "Kenvue does not sell and has never sold talc-based Johnson's Baby Powder in the U.S." Ex. C, Mongon Dep. at 164:13–20; *see also id.* at 158:13–15; Ex. D, Ruh Dep. at 93:15–19 (same). Kenvue's CEO also explained that as of now, neither Kenvue nor any Johnson & Johnson entity currently manufactures talc-based baby powder *anywhere* in the world—Kenvue "is just manufacturing the cornstarch variant of baby powder." Ex. C, Mongon Dep. at 52:10–53:17.

Plaintiffs have all the facts they need on successor liability, even if Kenvue disagrees about the outcome of the *legal analysis* of those facts. Yet despite receiving thousands of pages of documents and spending dozens of hours of questioning of multiple witnesses, Plaintiffs proceeded to notice the depositions of Kenvue's in-house counsel Christopher Andrew and Pinto Adhola. Exhs. E–F. Mr. Andrew is Kenvue's Head of Corporate Law & Transactions, and Mr. Adhola is an Assistant Corporate Secretary. Defendants now move to preclude those depositions.

ME1 46430921v.1

## ARGUMENT

The depositions Plaintiffs seek are duplicative, and good cause exists for a protective order—which is presumed when deponents are attorneys.

Rule 4:10-2(g) provides that the court may limit the scope of discovery if "the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive," or if "the burden or expense of the proposed discovery outweighs its likely benefit." To aid in enforcement of those limits, Rule 4:10-3 provides for the issuance of protective orders. It states in relevant part that "[u]pon motion by a party or by the person from whom discovery is sought, and for good cause shown the court may make any order which justice requires to protect a party from annoyance, embarrassment, oppression, or undue burden of expense," including "[t]hat the discovery may not be had" and "[t]hat the discovery may be had only by a method of discovery other than that selected by the party seeking discovery." Rule 4:10-3.

In short, "the frequency or extent of use of the discovery methods otherwise permitted may be limited by the court if it determines that the discovery sought is unreasonably cumulative or duplicative, or the burden or expense of the proposed discovery outweighs its likely benefit." *Horizon Blue Cross Blue Shield of New Jersey v. State*, 425 N.J. Super. 1, 29 (App. Div. 2012).

Plaintiffs are requesting the depositions of two attorneys. A "request to depose a party's attorney itself constitutes presumptive 'good cause' for a protective order under R. 4:10–3(a)." *Kerr*, 295 N.J. Super. at 158. In that circumstance, the party seeking the deposition "must demonstrate that the propriety and need for the deposition outweigh the possible disruptive or burdensome effects that the prospective deposition will have on the underlying litigation." *Id.* "Hence, to overcome the presumptive 'good cause' . . . the party requesting the deposition must show that the information sought is relevant to the underlying action and is unlikely to be available

7

by other less oppressive means."[1] *Id.* at 158–59. Indeed, courts around the country frequently prohibit depositions of in-house counsel, particularly whether the information sought can be acquired in other ways. *See, e.g.*, *Roadbuilders Mach. & Supply Co. v. Sandvik Mining & Constr. USA, LLC*, 2023 WL 3790691, at *7 (D. Kan. June 2, 2023); *Sun Capital Partners, Inc. v. Twin City Fire Ins. Co.*, 310 F.R.D. 523, 528–29 (S.D. Fla. 2015); *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 2013 WL 5274296, at *2–3 (N.D. Ill. Sept. 18, 2013).

Plaintiffs cannot meet their burden to show that the information they seek is unlikely to be available by other means. These depositions are wholly unnecessary given the extensive testimony and documents Plaintiffs already have obtained concerning the Kenvue transactions and related facts, as outlined above. Through Mr. Mongon's, Mr. McGraw's, and Mr. Ruh's depositions, Plaintiffs possess the key facts of all the entities' involvement in the Kenvue transactions. While the parties may disagree about the legal significance of those facts, Plaintiffs cannot plausibly argue they lack information they believe may be relevant to their claims. Beyond amounting to oppressive, harassing discovery, any further "[m]eandering expeditions" into these issues through depositions of two of Kenvue's in-house counsel would be pointless. *Elizabeth City v. Hartz Elizabeth, Inc.*, 2016 WL 7388635, at *3 (N.J. Tax Ct. Dec. 19, 2016).

Additionally, the other discovery tools at Plaintiffs' disposal—interrogatories, requests for admission, and requests for production—all represent far less burdensome methods of filling in

---

[1] Courts consider four factors when evaluating the propriety and need for the deposition of an attorney: "(1) the relative quality of the information purportedly in the attorney's knowledge, and the extent to which the proponent of the deposition can demonstrate the attorney possesses such information; (2) the availability of the information from other sources that are less intrusive into the adversarial process, i.e., the extent to which all other reasonable alternatives have been pursued to no avail; (3) the extent to which the deposition may invade work product immunity or attorney-client privilege; and (4) the possible harm to the party's representational rights by its attorney if called upon to give deposition testimony, i.e., the extent to which the deposition will affect attorney preparation or participation on behalf of the client." *Kerr*, 295 N.J. Super. at 158.

8

any gaps Plaintiffs believe exist with respect to the Kenvue transactions. And yet, Plaintiffs have made *no effort whatsoever* to even *attempt* those other avenues for obtaining additional discovery. *See Memory Bowl v. N. Pointe Ins. Co.*, 280 F.R.D. 181, 186–87 (D.N.J. 2012) (granting protective order because the information at issue could "can be obtained through less burdensome means, including stipulation, requests for admission and document production"). They have not issued a single interrogatory or request for admission.

Nor have Plaintiffs even attempted to meet and confer with Defendants regarding any purported factual deficiency in the previously produced documents, or with Mr. Mongon's, Mr. Ruh's, or Mr. McGraw's sworn testimony. Defendants should not be forced to present another two witnesses to testify on the same issues Plaintiffs have explored at length already. *Cf. Otsuka Pharm. Co., Ltd. v. Sandoz, Inc.*, 2008 WL 11510413, at *1 (D.N.J. Oct. 14, 2008) (granting defendant's motion for protective order precluding depositions of three employees because their testimony "would be duplicative" of topics to be addressed at another employee's deposition).

Depositions of Mr. Andrew's and Mr. Adhola's are not warranted. At this point, the repeated requests for depositions on the same topics without even attempting other forms of discovery suggests merely an attempt at harassment.

## CONCLUSION

This Court should issue a protective order precluding the depositions of Christopher Andrew and Pinto Adhola.

Dated: October 20, 2023

**McCARTER & ENGLISH, LLP**
Attorneys for Defendant
Kenvue, Inc.

By: _____
John C. Garde
Member of the Firm

9

John C. Garde, Esq. (N.J. Attorney ID #014171986)
**McCARTER & ENGLISH, LLP**
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102
(973) 622-4444
*Attorneys for Defendant Kevnue Inc.*

| | |
|---|---|
| CATHERINE FORBES, Individually and as Personal Representative of the ESTATE OF KIMBERLY NARANJO,<br><br>               Plaintiff,<br>v.<br><br><br>JOHNSON & JOHNSON, et al.,<br><br><br>               Defendants. | SUPERIOR COURT OF NEW JERSEY LAW DIVISION: MIDDLESEX COUNTY DOCKET NO.: MID-L-006108-21 AS<br><br>CIVIL ACTION<br>ASBESTOS LITIGATION<br><br>**CERTIFICATION OF SERVICE** |
| JUSTIN BERGERON and KATHRYN BERGERON,<br><br>               Plaintiff,<br>v.<br><br><br>JOHNSON & JOHNSON, et al.,<br><br><br>               Defendants. | SUPERIOR COURT OF NEW JERSEY LAW DIVISION: MIDDLESEX COUNTY DOCKET NO.: MID-L-002089-23 AS<br><br>CIVIL ACTION<br>ASBESTOS LITIGATION<br><br>**CERTIFICATION OF SERVICE** |

I, Brenda C. Sherman, of full age, certifies as follows:

      1.     I am employed as a paralegal by McCarter & English, LLP, attorneys for

Defendant, Kenvue Inc. in this matter.

      2.     On October 20, 2023, I caused to be e-filed a Motion For a Protective Order to

Preclude the Depositions of Christopher Andrew and Pinto Adhola for Defendant Kenvue Inc.,

1

ME1 46430919v.1

Memorandum of Law in Support of Motion, Certification of John C. Garde, Esq., with exhibits, and proposed form of Order on the Clerk and all parties of record via eCourts.

3.      I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated: October 20, 2023                          _/s/ **Brenda C. Sherman**_____
                                                Brenda C. Sherman

1

ME1 46430919v.1

# EXHIBIT A

## DECLARATION OF DONALD McGRAW

I declare under penalty of perjury that the following is true and correct:

1.  My name is Donald McGraw. I have been a member of the Tax Counsel Group of Johnson & Johnson since November 2016. I am over twenty-one years of age and of sound mind. I am competent to affirm all of the matters set out in this Declaration. Unless otherwise stated, all matters herein are within my personal knowledge.

2.  I submit this Declaration to provide information regarding a series of internal corporate transactions completed over a period of 18 months which resulted in the separation of Johnson & Johnson's global consumer health business and the creation of a new publicly traded corporation, Kenvue Inc. (to which such business was transferred), including (i) the chronology of events culminating in the transfer; (ii) the reasons for the structure of the transfer; and (iii) individuals and/or entities involved in the transfer. I will refer to these transactions as the "Kenvue Transactions."

3.  I understand that it has been claimed that Janssen Pharmaceutical, Inc. ("Janssen") had a significant role in the Kenvue Transactions, including that Janssen directly transferred the U.S. consumer health business to Kenvue, and more broadly, that Janssen operated the consumer health business. However, as explained below, these claims are incorrect.

4.  Janssen has had no day-to-day involvement in the operation of the U.S. consumer health business during my time at Johnson & Johnson, and to the best of my understanding, at any time. Rather, long before the Kenvue Transactions, Janssen owned shares of the subsidiary – Johnson & Johnson Consumer Inc. ("JJCI 1") – that operated the U.S. consumer health business. In mid-October 2021, JJCI 1 was merged out of existence in connection with an internal corporate restructuring, in which two new companies were created. The first new company was named LTL Management LLC ("LTL"). Pursuant to the restructuring, LTL became solely responsible for JJCI 1's liabilities arising from North American talc-related claims against it (other than claims for which the exclusive remedy is provided under a workers' compensation statute or similar laws), and the defense of those claims ("Talc-Related Liabilities"). The second new company was named Johnson & Johnson Consumer Inc., which subsequently changed its name to Johnson & Johnson Holdco (NA), Inc. ("Holdco/JJCI 2").

5.  In November 2021, Johnson & Johnson announced its intention to separate its global consumer health business, creating a new publicly traded company. The Kenvue Transactions effectuated that planned separation. The hundreds of individual steps comprising the Kenvue Transactions (including many outside the United States) consolidated the global consumer health business in various subsidiaries that were subsequently transferred to Kenvue Inc. for purposes of facilitating the ultimate separation of the global consumer health business from Johnson & Johnson. As part of the Kenvue Transactions, the U.S. consumer health business was transferred by Holdco/JJCI 2 to a newly formed, wholly-owned subsidiary, Johnson & Johnson

Consumer Inc. ("JJCI 3").  Subsequently, JJCI 3 was transferred by Holdco/JJCI 2 to Janssen which, in turn consolidated its ownership of JJCI 3 and another subsidiary under a holding company that was then transferred by Janssen to a series of other Johnson & Johnson companies and ultimately to Kenvue.  In connection with the Kenvue Transactions, Janssen directly "owned" JJCI 3 for less than 24 hours and had no day-to-day involvement in the operations of the U.S. consumer business during that time period.

6.  As a general matter, the Kenvue Transactions were structured and executed to comply with tax, regulatory and legal requirements, prevent disruption of operations and to effectuate the business transfer in a cost-effective and tax-efficient manner.  The specific reasons why the Kenvue Transactions were structured and executed in the way they were cannot be disentangled from legal advice requested and received by Johnson & Johnson.  By submitting this declaration, neither I nor the Company intends to waive such privileges.  Rather, my statements are made in an effort solely to provide factual information.

7.  Set out below is an abbreviated chronology of the Kenvue Transactions that addresses Janssen's principal involvement, with a focus on the transfer of the U.S. consumer health business.

    a.  Janssen formed new subsidiary companies, including JNTL Holdings 2, Inc. (completed February 2022);

    b.  Holdco/JJCI 2 formed a new subsidiary company, a Nevada corporation named Johnson & Johnson Consumer Inc. ("JJCI 3") (completed June 1, 2022);

    c.  Janssen transferred employees to JJCI 3 in exchange for no consideration (completed January 1, 2023);

    d.  Janssen transferred 100% of the legal title of the Fort Washington, Pennsylvania property to JJCI 3 in exchange for nominal consideration of $10 (completed January 2, 2023);

    e.  JJCI 3 changed its corporate domicile to Delaware (completed January 3, 2023);

    f.  HoldCo/JJCI 2 distributed 100% of the shares of JJCI 3 to Janssen (completed February 3, 2023);

    g.  Janssen contributed Pevisone IP to JJCI 3 in exchange for additional paid in capital (completed February 3, 2023);

    h.  Janssen contributed 100% of the shares of JJCI 3 and other consumer health subsidiaries to JNTL Holdings 2, Inc. in exchange for additional paid in capital (completed February 3, 2023);

    i.  Janssen distributed 100% of the shares of JNTL Holdings 2, Inc. to DePuy Synthes, Inc. (completed February 3, 2023);

    j.  DePuy Synthes, Inc. contributed 100% of the shares of various consumer health subsidiaries to JNTL Holdings 2, Inc. in exchange for additional paid in capital (completed April 3, 2023);

    k.  DePuy Synthes, Inc. distributed 100% of the shares of JNTL Holdings 2, Inc. to Johnson & Johnson International (completed April 3, 2023);

    l.  Johnson & Johnson International contributed 100% of the shares of various consumer health subsidiaries to JNTL Holdings 2, Inc. in exchange for additional paid in capital (completed April 3, 2023);

    m.  Johnson & Johnson International distributed 100% of the shares of JNTL Holdings 2, Inc. to Johnson & Johnson (completed April 3, 2023); and

    n.  Johnson & Johnson transferred (i) 100% of its rights to any consumer health IP agreements, contracts and licenses to Kenvue Inc. in exchange for no consideration and (ii) 100% of its ownership in various consumer health subsidiaries to Kenvue Inc. in exchange for additional paid in capital (completed April 4, 2023).

8. Stated a different way, Janssen received 100% of the shares of the subsidiary that held the consumer health business on February 3, 2023, and *on the same day*, transferred such shares to another Johnson & Johnson subsidiary company, DePuy Synthes, Inc. ("DePuy Synthes"). Later, on April 4, 2023, after several additional steps, Johnson & Johnson transferred 100% of its interests in various consumer health subsidiaries (including JJCI 3) to Kenvue.

9. I have attached as Exhibit A to my Declaration a 20-page slide deck that provides additional detail (includes pictorials) of these and other steps in the Kenvue Transactions related to Janssen's involvement.

10. In addition, attached as Exhibit B to my Declaration are transactional documents (e.g., share distribution agreements) that correspond to the steps described in Exhibit A.

11. As a general matter, individuals in the Johnson & Johnson law department and tax department (as well as outside legal and tax advisors) had primary involvement in developing and executing the structure of Kenvue Transactions (including the transfer of the subsidiary operating the U.S. consumer health business to Janssen and the almost immediate transfer of such subsidiary from Janssen to DePuy Synthes). In addition, the agreements and other documents provided in Exhibit B reflect the identities of individuals who were involved in specific transactional steps.

Executed this 18 day of September, 2023 in *Belle Mead*, *New Jersey*.

DONALD McGRAW

# EXHIBIT B

Page 1

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION - MIDDLESEX COUNTY
DOCKET NO. MID-L-6108-21 AS
- - -

CATHERINE FORBES, Individually and:
as Personal Representative of the :
ESTATE OF KIMBERLY NARANJO,      :    CIVIL ACTION
                     Plaintiff:
          v.                     :    ASBESTOS
JOHNSON & JOHNSON, et al.,       :    LITIGATION
                     Defendants:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION - MIDDLESEX COUNTY
DOCKET NO. MID-L-2089-23 AS
- - -

JUSTIN BERGERON and KATHRYN       :
BERGERON, h/w                     :    CIVIL ACTION
                     Plaintiffs:
          v.                      :    ASBESTOS
KENVUE, INC., et al.              :    LITIGATION
                     Defendants:
- - -

VIDEOCONFERENCE VIDEOTAPED DEPOSITION OF
DONALD McGRAW
September 28, 2023
- - -


REPORTED BY:  Wendy L. Walinski, RPR, NJ CCR


- - -


MAGNA LEGAL SERVICES
(866) 624-6221
www.MagnaLS.com

Page 69

1   happened, Holdco's assets would have been

2   non-consumer health assets.

3          Q.      Okay.  So if we go to -- I'm going to

4   go to Judge Kaplan.  This is Exhibit Kenvue 19.7.

5   This is Judge Kaplan's decision.

6                  In early January 2023, Holdco spun

7   off its consumer health business assets to its

8   parent entity, Janssen Pharmaceuticals.  Is that

9   true?

10          A.      No.  Holdco distributed ownership in

11  JJCI3 in other subsidiaries, but consumer health

12  business assets were never directly held by Janssen

13  Pharm.

14          Q.      So do you know why Johnson & Johnson

15  or LTL never took exception to this statement --

16                  MS. BROWN:  Objection to the form.

17  BY MR. PLACITELLA:

18          Q.      -- since you work for -- since you

19  work for Johnson & Johnson?

20                  MS. BROWN:  I object to the form of

21  the question.

22                  THE WITNESS:  I -- I don't, and I

23  don't want to speculate, but stock --

24  BY MR. PLACITELLA:

25          Q.      Okay.



Page 91

1                    THE WITNESS:  Taking into account the

2      assumption you've asked me to make, the operational

3      assets -- the consumer health operational assets of

4      JJCI2 and the subsidiaries completely were

5      transferred to JJCI3.  So on that assumption, it

6      would be included in that transfer.

7      BY MR. PLACITELLA:

8            Q.         Okay.  All right.  Now, what was the

9      business purpose for the transfer from JJCI2 to

10     JJCI3?

11           A.         To facilitate the global separation

12     of the consumer health business.

13           Q.         And why would that facilitate the

14     separation as you described it?

15           A.         Because you have equity interests in

16     subsidiaries conducting consumer health business.

17     Ultimately the shareholdings of Janssen Pharm in

18     those subsidiaries needs to be distributed up the

19     ownership chain and ultimately transferred to Kenvue

20     Inc. so that Kenvue Inc. can then be separated as

21     part of the global separation.

22           Q.         And the decisions that were made to

23     transfer JJCI2 to JJCI3, were they made in the State

24     of New Jersey?

25                    MS. BROWN:  Objection to the form.



Page 104

1                    MR. PLACITELLA:  -- 60 --

2                    MS. BROWN:  Sorry.  63.2.

3                    I'll object particularly to the

4     title:  Evidence & Admissions.

5                    MR. PLACITELLA:  Okay.  You can

6     object.

7     BY MR. PLACITELLA:

8          Q.       63.2 we already went through.  63.3

9     we went through.

10                    All right.  So let me start with

11    63.4.  All right?  Am I correct that in February

12    2022, Janssen formed a new subsidiary JNTL Holdings

13    Inc. 2 -- 2, Inc.?

14         A.       Yes.  JNTL -- yeah.  Janssen formed

15    JNTL Holdings 2.

16         Q.       Okay.  And what was the business

17    purpose for that?

18                    MS. BROWN:  Objection to the form.

19                    THE WITNESS:  Sorry.  Yeah.  I mean,

20    ultimately formed as a holding company to

21    consolidate the consumer health subsidiaries that

22    were going to need to transfer up the chain so we

23    have a singular entity transfer, and again, all of

24    the internal reorganization steps were undertaken

25    for the business purpose of facilitating the global



Page 105

1    separation.

2    BY MR. PLACITELLA:

3           Q.      So it was -- the reason you formed a

4    new subsidiary under Janssen called JTNL Holdings 2,

5    Inc. (sic) was to facilitate the ultimate transfer

6    to Kenvue of the consumer health business?

7                  MS. BROWN:  Objection to the form.

8                  THE WITNESS:  All internal

9    reorganization steps taken -- undertaken in the

10   context of the Kenvue transactions were undertaken

11   to facilitate the ultimate end state goal, which was

12   the separation of the consumer health business.

13   BY MR. PLACITELLA:

14          Q.      So the answer is yes, I guess?

15          A.      Based on how I stated it, I would

16   agree with how I stated it, yes.

17          Q.      Okay.  And who made this decision?

18                 MS. BROWN:  Objection to the form,

19   scope.

20   BY MR. PLACITELLA:

21          Q.      Who made the decision to form the new

22   subsidiary JT -- JNTL Holdings 2, Inc. in February

23   2022?

24          A.      Yeah.  I mean, the decision to -- to

25   set up the company, so I mean, like the design of



Page 106

1    the plan to separate the consumer health business

2    started with the tax function as informed by legal.

3    That's your starting point, and then you have to

4    make sure that how you've designed ultimately

5    doesn't raise any commercial issues, interfere with

6    operations, regulatory, other aspects, and so that's

7    when you get into all of those discussions with

8    subject matter experts to confirm you can --

9            Q.      Who --

10           A.      -- you can implement.

11           Q.      Who ultimately made the decision?

12                   MS. BROWN:  Objection to the form,

13   scope.

14                   THE WITNESS:  I mean, it's -- it's

15   tough to respond to a question as to decision;

16   right?  I mean, the design of the step plan, as I

17   noted, started with tax.  We then talked to subject

18   matter experts and legal to ensure that how that

19   step plan was designed doesn't create issues, and

20   then ultimately it would be implemented.

21   BY MR. PLACITELLA:

22           Q.      Well, who ultimately signed off and

23   said, yes, you can do this?

24                   MS. BROWN:  Objection to the form,

25   scope.



Page 107

1              THE WITNESS:  I mean, ultimately it

2    was all to facilitate the consumer health separation

3    globally, so I -- I mean, no one's signing off on

4    like the specific step, like yes, this is it.

5    You're undertaking all of this to facilitate the

6    business purpose of the global separation.

7    BY MR. PLACITELLA:

8         Q.      Well, I just want to know, who made

9    the -- who ultimately made this step decision?

10   Somebody made the decision to do it because

11   documents were executed; correct?

12              MS. BROWN:  Objection to the form and

13   the scope.

14              THE WITNESS:  Documents were

15   executed, yes, and -- and Janssen would have signed

16   the documents it needed to in its capacity as the

17   entity forming a new subsidiary.  That would have

18   been the extent of Janssen's involvement, is signing

19   those.  Ultimately like the decision to set up the

20   step plan worked out how I've just set it out twice.

21              We design the plan.  We make sure

22   that there's no issues with how it's implemented,

23   and then it's implemented.

24   BY MR. PLACITELLA:

25         Q.      So did you make the decision or



Page 117

```
 1          Q.      Right.

 2          A.      It's not a separate legal entity.

 3          Q.      Okay.

 4          A.      It's a name change of an existing

 5   entity.

 6          Q.      That's fine.  It's not important.  I

 7   just wanted to make sure we were on the same page.

 8   All right.

 9          A.      Yeah.  I just wanted to make sure

10   we're clear.  Yeah.

11          Q.      So -- okay.  We did this 63.6 before.

12   Do you recall that, the first time around?  So --

13          A.      I remember you --

14          Q.      Yeah.

15          A.      -- putting up the exhibit.

16          Q.      Okay.  This is the name change that

17   we discussed on 63.7; correct?  It happened --

18          A.      That is a -- yeah.  That's an exhibit

19   showing a name change, yeah.

20          Q.      Okay.  Now, according to your

21   affidavit, on January 1, 2023, Janssen transferred

22   employees to JJCI3; correct?

23          A.      An employee.

24          Q.      Only one employee?

25          A.      Yeah.  That's -- that's my
```



Page 118

1    recollection.

2           Q.      Okay.  Because your "c." says:

3    Janssen transferred employees.

4                   So that should be employee?

5           A.      Should be -- should be employee, yes.

6           Q.      Okay.  And who was that employee?

7           A.      I -- I don't recall her name.  My

8    recollection is it was a Janssen employee engaged in

9    some aspect -- commercial aspect of

10   pharmaceutical -- the pharmaceutical business that

11   ultimately made a decision to -- to take an

12   opportunity with the -- the consumer health

13   organization as part of the separation.

14          Q.      Okay.  That's not a big deal for

15   purposes of our discussion, is it?

16          A.      I don't see why it would be.

17          Q.      Okay.  I was just wondering why you

18   put it in.

19                  Okay.  Let me go to the next.

20          A.      Yeah.  Completeness; right?

21          Q.      Okay.

22          A.      I mean, we've got an ordering of

23   steps.

24          Q.      Okay.

25          A.      I looked at your inquiries, and I



Page 119

```
 1   wanted to make sure that we were complete --

 2           Q.       Okay.

 3           A.       -- and factually accurate in our

 4   response.

 5           Q.       All right.  So to be fair then, on

 6   63.9, I've got to take out the guy and leave in the

 7   gal; right?

 8           A.       I -- yeah.  I believe that's right.

 9           Q.       Okay.  And then you say on the next

10   day, January 2nd, 2023, you transferred a factory

11   from Janssen to JJCI Delaware; right?

12           A.       Legal -- legal title deed.

13           Q.       Okay.  And what was the business

14   purpose for that?

15                    MS. BROWN:  Objection to the form.

16                    THE WITNESS:  It was -- it was a site

17   that ultimately the consumer health organization

18   would own.

19   BY MR. PLACITELLA:

20           Q.       What were they making at -- in -- at

21   the Fort Washington, Pennsylvania property at the

22   time?

23           A.       I -- I don't specifically know.

24           Q.       Okay.  All right.  And just so we're

25   clear, because we -- I think we skipped a step,
```



Page 120

1   JJCI3 changed its domicile to Delaware.  We went

2   through that before, and that's in 7 e. of your

3   affidavit; correct?

4         A.      Yes.  We did go through that before,

5   and that is 7 e., correct.

6         Q.      Yeah.  All right.  So then we come to

7   February 3rd, 2023, and according to your affidavit,

8   Holdco distributed 100 percent of its shares of

9   JJCI3, that being the consumer health business, to

10  Janssen; correct?

11        A.      Holdco distributed JJCI3 -- shares of

12  JJCI3 to Janssen.

13        Q.      100 percent though; right?

14        A.      Yes, 100 percent.  Yes.

15        Q.      100 percent?  And JJ -- JJCI3 was the

16  consumer health business at the time; correct?

17        A.      Yes.  JJCI3 operated the consumer

18  health business in the U.S. at the time.

19        Q.      Okay.  And is this set -- is this

20  step also set forth in your step plan?

21        A.      Yes.  And it's in -- yes.  It's in

22  what I've attached to my declaration.

23        Q.      All right.  And in the step plan,

24  does the step plan actually set forth the reasons

25  for doing each step?



Page 125

1    transfer of the subsidiaries to Kenvue.

2    BY MR. PLACITELLA:

3         Q.       Okay.  So on February 3rd, 2023,

4    Holdco 2 -- Holdco transferred 100 percent of the

5    shares of JJCI3 to Janssen?  Are you with me?

6         A.       Uh-huh.  Yes.

7         Q.       What was the -- what was the business

8    purpose for that transaction?

9                  MS. BROWN:  Objection to the form.

10                 THE WITNESS:  The business purpose of

11   Holdco's distribution of JJCI3 to Janssen?

12   BY MR. PLACITELLA:

13        Q.       Yes.

14        A.       To facilitate the global separation,

15   and the global separation was undertaken for a

16   variety of business purposes.

17        Q.       How does that facilitate the global

18   separation?

19        A.       Because you've -- you've announced

20   globally that you're separating the consumer health

21   business.  You have Janssen that has equity

22   ownership in a subsidiary operating the consumer

23   health business.  Ultimately that subsidiary needs

24   to be transferred to the Kenvue organization as part

25   of the separation.



Page 126

```
 1          Q.      All right.  So what you did was
 2    because Janssen already owned Holdco, what you
 3    basically did is you took all of the ownership
 4    interest in JJCI3 and moved it over to Janssen;
 5    right?
 6          A.      Yes.  So yeah.
 7          Q.      So --
 8          A.      So let me just make sure I respond
 9    correctly.  So yes.  Janssen owned JJCI2/Holdco.
10    JJCI2/Holdco formed JJCI3 and transferred assets
11    thereto.  JJCI2/Holdco distributed JJCI3 to Janssen
12    and Janssen in turn distributed JJCI3 -- or sorry --
13    contributed to a holding company JNTL and
14    distributed up the chain.
15          Q.      Yeah.  I'm not there yet.
16          A.      Okay.  Sorry.  Apologies.  Yeah.
17    Sorry.
18          Q.      So I'm just trying to make sure we
19    get it.  So what happens at this stage --
20          A.      Yep.
21          Q.      -- on February 3rd, 2023, is that
22    Holdco no longer owns any interest in JJCI3;
23    correct?
24          A.      Yeah.  I'm sorry.  Let me just get
25    my -- let me get my step plan up.  As of -- and
```



Page 145

1  reorganization didn't have like a material impact to

2  the like, you know, publicly available financial

3  statements that would need to be shared with, you

4  know, investors to inform.

5  BY MR. PLACITELLA:

6      Q.     Okay.  So let me just -- so February

7  3rd, 2023 Janssen is now the owner of JJCI; correct?

8      A.        February 3rd, 2023, Janssen Pharm is

9  now the owner of JJCI3.

10     Q.     Right.  And if JJCI3 is making baby

11 powder, Janssen is the owner of the company making

12 baby powder; right?

13            MS. BROWN:  Objection to form, scope.

14            THE WITNESS:  Are you asking a

15 hypothetical?

16 BY MR. PLACITELLA:

17     Q.     Well, at one -- let's -- make the

18 assumption that the evidence will show that JJCI3

19 was manufacturing and marketing baby powder on

20 February 3rd, 2023.

21            Janssen would be the owner of that

22 operation; right?

23            MS. BROWN:  Objection, form, scope.

24            THE WITNESS:  Yeah.  On -- on your

25 assumption, Janssen would not -- and not the owner



Page 150

1          A.        With -- so with respect to the U.S.

2     separation steps, again, I couldn't -- I couldn't

3     speak to the location of all of our advisors at the

4     time of supporting the design, but I can speak to

5     that I was present in New Jersey and what role I

6     played in that.

7          Q.        Okay.  And what about legal counsel

8     who was your counterpart?

9          A.        Are you -- external counsel or -- or

10    are you referring to Ankur?

11         Q.        Ankur, right.

12         A.        Yeah.  My -- I believe he's in --

13    yeah.  He's in New Jersey.

14         Q.        Okay.  Was any risk analysis

15    performed by Janssen as it related to accepting the

16    stock distribution of JJCI3 on February 3rd, 2023?

17         A.        None that I'm aware of.

18         Q.        Okay.  Okay.  Okay.  Next.  After

19    that, on the same day, Janssen distributed 100

20    percent of the stock of JJCI3 to JTNL Holdings,

21    Inc.; is that fair?

22         A.        Yes, it did.

23         Q.        Okay.  And what was the business

24    purpose for that?

25                   MS. BROWN:  Objection, form, scope.



Page 151

1                     THE WITNESS:  I answered that

2     question earlier.  You want me to answer again?

3     BY MR. PLACITELLA:

4          Q.        In as brief a way as you can.

5          A.        All internal reorganization steps

6     were undertaken to facilitate the business purposes

7     of the global separation of the consumer health

8     business.  This also facilitated the transfer of

9     JJCI3 and another consumer health subsidiary holding

10    company as a singular entity transfer.

11         Q.        Okay.  Now, on -- we know that JTNL

12    Holdings (sic) existed since June of 2022; correct?

13         A.        Yeah.  J -- J -- JNTL Holdings 2 was

14    a newly formed company.  I believe -- yeah.  I

15    believe it was June based on my declaration.  That's

16    right.

17         Q.        All right.  And --

18         A.        I'm sorry.  That's the wrong entity.

19         Q.        -- on February 2nd, 2023, how much

20    was JTNL Holdings worth?

21         A.        As of February 2nd?  I -- I -- I

22    would not know offhand.

23         Q.        Did it conduct any business at all?

24         A.        JNTL Holdings 2 is -- was a holding

25    company.  No.  It did not conduct operations



Page 160

1    corporation; correct?  It had its own identity;

2    correct?

3              A.      Yeah.  Yeah.

4              Q.      It didn't have to do any of this;

5    correct?

6              A.      Yeah.  I -- I mean, the -- in --

7    yeah.  The board could have not given the consent.

8              Q.      Right.  But Johnson & Johnson really

9    was dictating the steps that were happening here and

10   they went to Janssen, and they said, this is what we

11   want you to do?  Isn't that in effect what happened?

12              MS. BROWN:  Objection --

13              THE WITNESS:  That's --

14              MS. BROWN:  -- to the form.

15              THE WITNESS:  I mean, look, the --

16   the decision to separate the consumer health

17   business globally was made at the enterprise level.

18   The internal reorganization steps performed all over

19   the world were undertaken to facilitate the business

20   purposes of that global separation.  So the

21   enterprise -- overarching enterprise view in the

22   separation of the consumer health business is known

23   because it was publicly available, and as a material

24   decision, it was known to the board of Janssen and

25   its officers, but no one's compelling the officers



Page 161

1    to do something or not.  The officers would perform

2    their functions exercising their understanding of

3    their fiduciary duties.

4    BY MR. PLACITELLA:

5         Q.       Did you ever have a -- since you were

6    the one who was part of the architect of this plan,

7    did you ever have any interaction with anybody at

8    Janssen about this plan?

9         A.       I -- I wouldn't call myself the

10   architect of the plan.  I would call myself the

11   internal representative tax counsel that was

12   supporting the legal entity's separation work

13   stream.

14               The plan is the result of input from

15   external advisors, tax, legal, and taking into

16   account inputs from subject matter experts to make

17   sure that we're not interfering with operations.

18   And then I -- I myself did not have discussions

19   directly with the board or officers of Janssen.

20        Q.       Okay.  Who -- who at

21   Johnson & Johnson had discussions with the board at

22   Janssen to -- so they would understand the

23   transaction and the reasons for the transaction?

24               MS. BROWN:  Objection to the form,

25   beyond the scope.



Page 164

1    yes on February 3rd.

2         Q.      Okay.  And what was the business of

3    DePuy Synthes on February 3rd, 2023?

4              MS. BROWN:  Objection to the form.

5              THE WITNESS:  Yeah.  I mean, it --

6    again, just in my capacity as associate counsel,

7    they're -- they're involved in the -- the med/tech

8    business.

9    BY MR. PLACITELLA:

10        Q.      Did they have anything to do with

11   consumer health at all?

12        A.      No.

13        Q.      So what was the business reason

14   specifically why Janssen distributed 100 percent of

15   the JNTL stock to DePuy on February 3rd, 2023?

16             MS. BROWN:  Objection to the form.

17             THE WITNESS:  Yeah.  I mean, the

18   internal reorganization steps were undertaken to

19   facilitate the business purposes of the global

20   separation.

21   BY MR. PLACITELLA:

22        Q.      Well, why did you do this step,

23   though?  What was the purpose?

24        A.      DePuy is 100 percent shareholder of

25   Janssen, so Janssen's distributed JNTL Holdings up



Page 165

1    to DePuy, who's received those shares in its

2    capacity as shareholder.

3         Q.       Okay.  So -- so at this point in

4    time, if we were doing an org chart, DePuy would

5    actually be above Janssen?  They were -- they were

6    the owner of Janssen?

7         A.       Yeah.  Yeah.  I mean even before

8    this, yeah.

9         Q.       Okay.  And what -- what power or

10   authority did they have as the owner of Janssen over

11   Janssen?

12            MS. BROWN:  Objection, form, scope.

13            THE WITNESS:  I mean, without

14   speculating as to specifics, whatever -- whatever

15   power and authority a shareholder would have in

16   their capacity as such.

17   BY MR. PLACITELLA:

18        Q.       So you don't know?

19            MS. BROWN:  Objection.  He just

20   answered it.

21            THE WITNESS:  I mean, whatever powers

22   a shareholder would have in their capacity as such.

23   That's not going to be anything operationally

24   related that's going to be in your capacity as

25   owning equity.



Page 168

1        Q.        Right.

2        A.        So not the next day.

3        Q.        I'm sorry.  My mistake.  Let me

4    rephrase the question.

5                  On April 3rd, 2023, DePuy contributes

6    100 percent of shares of various consumer health

7    subsidiaries to JNTL Holdings; correct?

8        A.        Correct.

9        Q.        Okay.  What -- what health

10   subsidiaries?

11       A.        I -- I think the specific

12   subsidiaries would probably -- or no.  Not probably.

13   Would be in the transfer documentation, but it

14   should be like a variety of foreign subsidiaries.

15       Q.        So what was the reason for doing

16   that, to consolidate all the foreign subsidiaries

17   into JNTL 2?

18       A.        Yeah.  I mean, again, every -- every

19   step in the transaction, all the internal

20   organizations again facilitate the global consumer

21   health separation and the business purposes

22   associated with that global consumer health

23   separation.  But yes, the transfer did result in the

24   consolidation of various consumer health

25   subsidiaries, foreign and domestic, under JNTL



Page 169

1   Holdings 2.

2          Q.        All right.  So we're going through

3   this, and I know that's your answer.  But each thing

4   we're going through has a specific step and a

5   specific purpose; right?

6                  MS. BROWN:  Objection, form.

7                  THE WITNESS:  Each -- each step we're

8   going through is --

9   BY MR. PLACITELLA:

10         Q.        Each -- each transaction that

11  we're -- that's specified in your affidavit has a

12  specific purpose for the overall separation; true?

13         A.        All -- all the steps are being

14  implemented to facilitate the global separation.

15         Q.        Well --

16         A.        So we have subsidiaries, foreign and

17  domestic, conducting consumer health business.

18         Q.        Okay.

19         A.        Those subsidiaries ultimately need to

20  be transferred to the Kenvue organization for

21  purposes of the external separation, so --

22         Q.        Well, let me --

23                  MS. BROWN:  No.

24  BY MR. PLACITELLA:

25         Q.        Go ahead.



Page 170

```
 1         A.       -- the exact -- the exact mechanics

 2  of that just depends on -- on the facts of the

 3  specific transaction.  What you're seeing

 4  consistently across these steps is you've got

 5  entities, such as DePuy and Janssen, that have

 6  nothing to do with consumer health business

 7  operations.

 8              DePuy is med/tech.  Janssen is pharm,

 9  but they are shareholders of a subsidiary conducting

10  consumer health operations and so we have to

11  separate that out to facilitate the external

12  separation and so you're seeing transfers of equity

13  in subsidiaries that are down a chain of ownership

14  up -- up the chain of ownership.

15         Q.       Right.  So now -- what happens now,

16  what -- if this transaction didn't take place, that

17  is the transfer of the stocks from DePuy to JTNL

18  Holdings, how would that have impacted the ability

19  to effect the separation?

20              MS. BROWN:  I object to the form and

21  beyond the scope.

22              THE WITNESS:  So you're -- so you're

23  asking a hypothetical if DePuy was unable -- sorry.

24  If Janssen was unable to transfer to DePuy or DePuy

25  was unable to transfer thereon to its shareholder?
```



Page 181

1   consideration was not paid by J & J International in

2   exchange for the shares.

3          Q.      All right.  And is this up the chain?

4   Is Johnson & Johnson International the parent of

5   DePuy?

6          A.      Johnson & Johnson International is,

7   yes, 100 percent owner of DePuy.

8          Q.      Now -- give me one second.  You state

9   in 7 l. of your certification, which I diagramed out

10  on 63.16 that Johnson & Johnson International

11  contributed 100 percent of the shares of various

12  consumer health subsidiaries to JNTL Holdings 2,

13  Inc.

14                 Do you see that?

15         A.      Yes.

16         Q.      What consumer health subsidiaries did

17  they contribute?

18         A.      It would -- should be principally

19  consumer health subsidiaries operating outside the

20  U.S. or U.S. holding companies that owned those

21  foreign subsidiaries.

22         Q.      All right.  So what is happening here

23  then is that Johnson & Johnson International is

24  contributing the ownership of the foreign health --

25  the foreign subsidiaries and consolidating them in



Page 191

1    scope.

2             THE WITNESS:  I -- I mean, it --

3    again, if those interests were all directly

4    transferred via separate transfer agreements, you're

5    going to have to have those executed by officers or

6    boards of all of the respective affiliates.  So it

7    would -- it would make the process less efficient

8    and more burdensome.

9    BY MR. PLACITELLA:

10            Q.      Okay.  Let me go to the next -- so --

11   well, let's just make sure we've got the dates down

12   right.  This transfer of shares of the international

13   subsidiaries, that happens on April 3rd, 2023;

14   right?

15            A.      Correct.

16            Q.      Okay.  Then according to paragraph

17   7 m. of your affidavit, on the same day, Johnson &

18   Johnson International distributes all of its shares

19   in JNTL Holdings, Inc. 2 to Johnson & Johnson;

20   correct?

21            A.      Correct, on April 3rd.

22            Q.      All right.  Was that for

23   consideration?

24            A.      Cash -- it was a distribution, so

25   cash consideration was not paid down.



Page 220

1                      THE WITNESS:  I don't have personal

2       knowledge of what was disclosed to the bankruptcy

3       court or the -- the third circuit.

4       BY MR. PLACITELLA:

5            Q.      Okay.  In the interest of being

6       candid with the court, do you think that this is

7       something that should have been disclosed to the

8       court, all of these transactions?

9                      MS. BROWN:  Objection to many forms

10      and also to the scope.

11                     THE WITNESS:  I mean, I'm -- I'm here

12      to bring clarity to factual statements, not to

13      provide an opinion on appropriateness of actions

14      that I don't have knowledge of.

15      BY MR. PLACITELLA:

16           Q.      Okay.  Before Janssen took over the

17      assets or acquired the ownership of JJCI3, did it

18      conduct a risk analysis?

19                     MS. BROWN:  Objection to the form.

20                     THE WITNESS:  Yeah.  So, again, JJCI

21      didn't acquire the assets.  I see that you corrected

22      that statement, as well.  No, not with respect to

23      the -- the ownership in JJCI3, which it acquired.

24      BY MR. PLACITELLA:

25           Q.      Okay.  And the business purpose of



Page 221

1    these various transactions was to consolidate

2    control of all of the companies under

3    Johnson & Johnson to effect a separation; true?

4              MS. BROWN:  Objection to the form.

5              THE WITNESS:  I wouldn't use

6    consolidated -- consolidate control.  I would say

7    that the internal reorganization steps were intended

8    to facilitate the business purposes of the global

9    separation of the consumer health business.  The --

10   the business purposes -- the global separation of

11   the consumer health business were publicly announced

12   I think in like November of '21.  It includes

13   various purposes about focusing management at the

14   respective sectors, unlocking innovation on the

15   med/tech, pharm side, better serving, you know,

16   patients, customers on the consumer side and, you

17   know, reducing competition for allocation of -- of

18   capital and resources and acknowledging the virgin

19   markets of the business.

20   BY MR. PLACITELLA:

21        Q.      I'm sorry.  What was my question?

22              MS. BROWN:  Objection.

23              THE COURT REPORTER:  Sorry about

24   that.

25   BY MR. PLACITELLA:



Page 261

1          Q.        And can you help us understand

2     briefly what Janssen's knowledge and Janssen's role

3     would have been?

4          A.        Yeah.  Briefly, Janssen, no

5     engagement in the planning of the global consumer

6     health separation or the internal reorganization

7     steps implementing the business purpose of that

8     global separation.  Janssen, no involvement in any

9     of the operations of the consumer health business

10    conducted by JJCI.  Janssen's involvement in the

11    Kenvue transactions, extremely limited, and it's

12    principally in its capacity as a shareholder of what

13    we've referred to as JJCI2/Holdco and subsequently

14    JJCI3.

15              And in relation to those steps,

16    Janssen's involvement would have been extremely

17    limited once again to essentially executing a board

18    resolution approving the transfer of the shares and

19    an officer executing the transaction -- transaction

20    documentation necessary to implement it.  After

21    that, once the shares were beyond Janssen,

22    everything we talked about above Janssen, absolutely

23    no knowledge from the company.

24         Q.        And, for example, Mr. McGraw, in

25    counsel's notice of the PMK deposition for a Janssen



Page 326

1                         CERTIFICATE

2

3               I, Wendy L. Walinski, a Notary Public

4    and Certified Shorthand Reporter of the State of New

5    Jersey, do hereby certify that prior to the

6    commencement of the examination, DONALD McGRAW was

7    duly sworn by me to testify to the truth, the whole

8    truth and nothing but the truth.

9               I DO FURTHER CERTIFY that the

10   foregoing is a verbatim transcript of the testimony

11   as taken stenographically by and before me at the

12   time, place and on the date hereinbefore set forth,

13   to the best of my ability.

14               I DO FURTHER CERTIFY that I am

15   neither a relative nor employee nor attorney nor

16   counsel of any of the parties to this action, and

17   that I am neither a relative nor employee of such

18   attorney or counsel, and that I am not financially

19   interested in the action.

20       *Wendy L. Walinski*
         _____

21       WENDY L. WALINSKI, CCR

         Notary Number:  2203614

22       Notary Expiration:  8/3/27

         CCR Number:  XI02025

23       Dated:  October 8, 2023

24

25



# EXHIBIT C

Page 1

SUPERIOR COURT OF NEW JERSEY.

MIDDLESEX COUNTY

DOCKET NO. MID-L-006108-21.

MID-L-002089-23

KIMBERLY NARANJO                    )    VIDEOTAPED

(MID-L-006108-21)                   )

JUSTIN BERGERON, et al              )    DEPOSITION UPON

(MID-L-002089-23),                  )

                                    )    ORAL EXAMINATION

            Plaintiff,              )

                                    )         OF

    - vs -                          )

                                    )     THIBAUT MONGON

KENVUE, INC., et al

            Defendant.

- - - - - - - - - - -

                    TRANSCRIPT OF DEPOSITION,
        taken by and before KARA HACKETT,
        Professional Reporter and Notary Public, at
        the LAW OFFICES OF FAEGRE, DRINKER, BIDDLE &
        REATH, 105 College Road East, Suite 300,
        Princeton, New Jersey, on August 14, 2023,
        commencing at 9:00 a.m.



Page 44

1        Q.   What exactly was transferred from Johnson &

2   Johnson to Kenvue?

3            MS. FOURNIER:  Objection.

4

5   BY MR. PLACITELLA:

6        Q.   As part of the spinoff?

7        A.   The brands, some employees, some manufacturing

8   and distribution sites.

9        Q.   Well, were all of the employees manufacturing?

10  Well, let me start one at a time?

11           Were all the employees of Consumer Health

12  transferred from Johnson & Johnson to Kenvue as part of

13  this transaction?

14       A.   Most of them.

15       Q.   Which ones weren't?

16           MS. FOURNIER:  Objection.

17           THE WITNESS:  You may have some exceptions.

18  I'm not aware, but people who were dedicated to Consumer

19  Health were transferred to Kenvue.

20

21  BY MR. PLACITELLA:

22       Q.   What about the marketing assets and the

23  marketing distribution employees, were they all

24  transferred from Consumer Health to Kenvue?

25           MS. FOURNIER:  Objection.



Page 45

1          THE WITNESS:  The marketing capabilities were

2    transferred.

3    BY MR. PLACITELLA:

4          Q.   Okay.  What about the manufacturing

5    capabilities?

6          A.   Most of them were.

7          Q.   Which ones weren't?

8          A.   Some sites are used by other Johnson & Johnson

9    segments and, so we have a manufacturing agreement,

10   transitional manufacturing agreement with these sites in

11   our Separation Agreement because they are not

12   transferred to Kenvue, but they continue to produce for

13   Kenvue.

14         Q.   Okay.  So let's just focus on the Johnson's

15   Baby Powder brand?

16         A.   Uh-huh.

17         Q.   You're with me?  Were all the employees

18   involved in the manufacturing and marketing of Johnson's

19   Baby Powder transferred from Johnson & Johnson to

20   Kenvue?

21         A.   I think so, yes.

22         Q.   And what about, were all the manufacturing

23   assets involved in the Johnson's Baby Powder transferred

24   from Johnson & Johnson to Kenvue?

25         A.   They were part of the new Kenvue base, yes.



Page 52

1      A.    Absolutely.

2      Q.    Did the physical location of any of the

3   manufacturer or marketing assets --

4            MR. PLACITELLA:  I don't know what that is.

5            THE VIDEOGRAPHER:  It's on Zoom.

6            MR. PLACITELLA:  If you're on Zoom, could you

7   mute yourself, please?

8

9   BY MR. PLACITELLA:

10     Q.    Well, let me narrow the question.  Does the

11  physical location of any of the assets used in the

12  manufacturer or marketing -- and marketing of Johnson's

13  Baby Powder change after Kenvue took over those

14  operations?

15           MS. FOURNIER:  Objection.

16           THE WITNESS:  The manufacturing and marketing,

17  it depends on the geography.  So if you take

18  manufacturing, Johnson & Johnson had announced in 2022

19  that in 2023 we would transition from talc-based baby

20  powder to cornstarch baby powder worldwide.  And so the

21  manufacturing has stopped in 2023.  And so now the

22  Johnson's Baby Powder variant is based on cornstarch, is

23  manufactured on a different line.

24

25  BY MR. PLACITELLA:



Page 53

1        Q.   But at the time -- I'm just talking about the

2    time of the transfer, the day before and the day after.

3    Did the manufacturing and the marketing assets change at

4    all?

5             MS. FOURNIER:  Objection to form.

6             THE WITNESS:  So I cannot talk about the exact

7    day, but I can tell you that the manufacturing of

8    talc-based baby powder has ceased this year.  So what

9    Kenvue is doing is just manufacturing the cornstarch

10   variant of baby powder.

11            For the marketing and sales, it varies by

12   geography.  In some countries, we have the same office

13   location, if you will.  That was the Johnson & Johnson

14   Consumer Health Office location.  In other countries, we

15   moved out of the former Johnson & Johnson Consumer

16   Health premise to a new office location at Kenvue.  So

17   it varies by country, by geography.

18

19   BY MR. PLACITELLA:

20       Q.   Okay.  Let me ask the question a different

21   way?

22            Was it Kenvue that ceased the manufacture of

23   talc-based baby powder worldwide, or was it Johnson &

24   Johnson?

25       A.   It was announced by Johnson & Johnson.



Page 158

 1   entity?

 2        A.   It depends.  As I said earlier, in some

 3   buildings that are occupied by Kenvue today, used to be

 4   J&J offices.  In other geographies, we moved to a new

 5   office.  So it depends on the geography.

 6        Q.   Are talc-based baby powders the same product

 7   as cornstarch-based baby powders?

 8        A.   No, it's a different formulation.

 9        Q.   Are you aware of any allegations that

10   cornstarch-based baby powder contains asbestos as a

11   contaminant?

12        A.   No.

13        Q.   Has Kenvue ever sold talc-based baby powders

14   in the United States and Canada?

15        A.   No.

16        Q.   The other products of J&J Consumer that Kenvue

17   took on, has Kenvue continued all of those products?

18        A.   Not all of them.  Certain products have been

19   discontinued and new products have been launched since

20   the IPO.

21        Q.   You were asked a question about the day before

22   the IPO and the day after the IPO about the business.

23   And you gave an answer that operationally, it was the

24   same.  Do you remember that question and answer?

25             MR. PLACITELLA:  Objection.  Leading.



Page 159

1          THE WITNESS:  Yes, this morning.  Yes.

2

3    BY MS. FOURNIER:

4          Q.   Can you just explain what you mean by

5    "operationally, it was the same"?

6          A.   Between the two days, between before and

7    after.

8          Q.   Exactly?

9          A.   If you take an external view on the

10   operations, there was no interruption between the day

11   before the IPO and the day after the IPO.  So I'm very

12   proud and I'm very proud of the teams who have worked in

13   such a way, there has been no interruption or disruption

14   to the business linked to this separation.

15         Q.   And is that because Kenvue is the same exact

16   company as JJCI?

17         A.   As I said this morning, Kenvue is a different

18   company from JJCI or J&J Consumer Health.

19         Q.   And then, just one more question, switching

20   gears a little.  You were asked some questions this

21   morning by Mr. Placitella about the indemnity that is

22   provided to Kenvue from J&J.  Do you recall that series

23   of questions?

24         A.   I do.

25         Q.   Is there a particular public filing or



Page 164

1    to retain 90 percent of the shares of Kenvue?

2         A.   No, that's exactly what this exchange offer is

3    about.

4         Q.   To decrease their share?  Is there anybody

5    from Johnson & Johnson on the Kenvue board, by the way,

6    now?

7         A.   Yes.

8         Q.   Who?

9         A.   Two.  Joe Wolk and Peter Fasolo.

10        Q.   Okay.  And how many people on the board in

11   total?

12        A.   Eleven.

13        Q.   Should the S4 -- given what we saw on the

14   Internet, should the S4 be amended to say Kenvue never

15   intentionally sold Johnson's Baby Powder in these

16   markets?  Is that the fair way to say it?

17             MS. FOURNIER:  Objection.

18             THE WITNESS:  No, it's not.  Kenvue does not

19   sell and has never sold talc-based Johnson's Baby Powder

20   in the U.S.

21

22   BY MR. PLACITELLA:

23        Q.   How much talc-based baby powder is still on

24   the shelves in U.S. stores?

25             MS. FOURNIER:  Objection.



Page 171

1                 C E R T I F I C A T I O N

2

3

4             I, Kara Hackett, Professional Court

5     Reporter and Notary Public, do hereby certify that the

6     foregoing is a true and accurate transcript of the

7     stenographic notes taken by me in the aforementioned

8     matter.

9

10                          - - -

11

12

13

14

15

16

17

18

19                          *Kara Hackett*

20

21         DATE:          August 14, 2023

22                        Kara Hackett

23                        Court Reporter

24

25



# EXHIBIT D

Page 1

SUPERIOR COURT OF NEW JERSEY.

MIDDLESEX COUNTY

DOCKET NO. MID-L-006108-21

MID-L-002089-23

KIMBERLY NARANJO                )    VIDEOTAPED

(MID-L-006108-21)               )

JUSTIN BERGERON, et al          )    DEPOSITION UPON

(MID-L-002089-23,               )

                                )    ORAL EXAMINATION

       Plaintiff,               )

                                )           OF

   - vs -                       )

                                )     PAUL RUH

KENVUE, INC., et al,            )

                                )

       Defendant.               )

- - - - - - - - - - -


             TRANSCRIPT OF DEPOSITION,

     taken by and before KARA HACKETT,

     Professional Reporter and Notary Public, at

     the LAW OFFICES OF FAEGRE, DRINKER, BIDDLE &

     REATH, 105 College Road East, Suite 300,

     Princeton, New Jersey, on August 16, 2023,

     commencing at 9:00 a.m.



Page 44

1      Q.   Do you know that when that transfer took

2  place, whether anything operationally had changed as it

3  related to the sale, and marketing, and manufacturing of

4  Johnson's Baby Powder?

5      A.   Not operationally, no.

6      Q.   Okay.  Before you said that you -- we've been

7  going for about an hour.  How do -- you just tell me

8  when this might be a good time to break?

9           MS. FOURNIER:  Okay.

10          MR. PLACITELLA:  Okay.

11          THE VIDEOGRAPHER:  Time is 10:06 a.m.  We're

12  now going off the record.

13

14          (At this time, a short break was taken.)

15

16          THE VIDEOGRAPHER:  It is approximately 10:20

17  a.m.  We are now going back on the record.

18

19          MS. FOURNIER:  And Chris, just before you get

20  started, I have copies for you of the update that you

21  requested.

22          MR. PLACITELLA:  I found it online, I think.

23          MS. FOURNIER:  Okay, thanks.

24          MR. PLACITELLA:  My guy tell me there's

25  nothing again.  Thanks.  Ready?



Page 62

1    were actually shared.

2         Q.   Shared, okay.  Did all of the manufacturing

3    assets go, unless they were shared?

4         A.   Yes.

5         Q.   All of the marketing assets follow and go into

6    Kenvue?

7         A.   Yes.

8         Q.   What was left behind of the consumer health

9    sector after the separation of Kenvue?  And when I say

10   left behind, I mean in J&J?

11        A.   Everything under the Consumer Health sector

12   was transferred over.  So anything related to the

13   assets, people, plants okay, the brands.  And for that,

14   we pay the consideration of close to $8 billion.

15        Q.   So as it related to the manufacture and sale

16   of Johnson's baby powder, was anything left behind?

17             MS. FOURNIER:  Objection.

18             THE WITNESS:  Not that I'm aware of, no.

19

20   BY MR. PLACITELLA:

21        Q.   Did Kenvue employ -- could Kenvue employ any

22   of its own consultants as part of the negotiating the

23   separation?

24             MS. FOURNIER:  Objection.

25             THE WITNESS:  No, they were employed by



Page 93

1    Kenvue?

2         MS. FOURNIER:  Objection.

3         THE WITNESS:  No.

4

5    BY MR. PLACITELLA:

6         Q.   Let me just read it again to be clear.  It

7    says, we may be subject to additional claims related to

8    the sale of talc-based Johnson Baby Powder in markets

9    where we presently sell this product, as well as

10   additional claims related to the sale of talc-based

11   Johnson Baby Powder and markets where we have

12   discontinued this product.

13              Is that what you said?

14        A.   That's what I said.  Yes.

15        Q.   So you said that Kenvue discontinued the

16   product sale in The United States and Canada.

17              That's what it says.  Right?

18        A.   Kenvue never sold talc-based Johnson's baby

19   powder -- talc-based Johnson's Baby powder.

20        Q.   Kenvue itself in The United States?

21        A.   Yes.

22        Q.   Have you spoke to Mr. Mongon since yesterday?

23        A.   I have not about this.

24        Q.   And why do you use the word "we"?

25        A.   It's short form for Kenvue.



Page 145

1                    C E R T I F I C A T I O N

2

3          I, Kara Hackett, Professional Court Reporter

4    and Notary Public, do hereby certify that the foregoing

5    is a true and accurate transcript of the stenographic

6    notes taken by me in the aforementioned matter.

7

8                              - - -

9

10

11

12

13

14

15

16

17                              *Kara Hackett*

18

19          DATE:          August 16, 2023

20                         Kara Hackett

21                         Court Reporter

22

23

24

25



# EXHIBIT E

**COHEN, PLACITELLA & ROTH, P.C.**
CHRISTOPHER M. PLACITELLA (ID# 02778-1981)
127 Maple Avenue
Red Bank, NJ 07701
(732) 747-9003
*Attorneys for Plaintiffs*

| | |
|---|---|
| **CATHERINE FORBES, Individually and as Personal Representative of the ESTATE OF KIMBERLY NARANJO,** | SUPERIOR COURT OF NEW JERSEY LAW DIVISION: MIDDLESEX COUNTY |
| Plaintiff | DOCKET NO. MID-L-6108-21 AS |
| vs. | CIVIL ACTION |
| **JOHNSON & JOHNSON,** *et al.*, | ASBESTOS LITIGATION |
| Defendants | |
| **JUSTIN BERGERON and KATHRYN BERGERON, h/w** | SUPERIOR COURT OF NEW JERSEY LAW DIVISION: MIDDLESEX COUNTY |
| Plaintiffs | DOCKET NO: MID-L-2089-23 AS CIVIL ACTION |
| vs. | |
| **KENVUE, INC.,** *et al.* | ASBESTOS LITIGATION |
| Defendants | |

### NOTICE OF VIDEOTAPED DEPOSITON OF CHRIS ANDREW

TO:   John C. Garde, Esq.
        McCarter & English, LLP
        Four Gateway Center,
        100 Mulberry St.
        Newark, NJ 07102

**PLEASE TAKE NOTICE**, that in accordance with *R.* 4:14-2(c), videotaped testimony will

be taken by deposition upon oral examination of a Chris Andrew, Head of Corporate Law &

Transactions of Defendant **Kenvue, Inc.** ("Kenvue" or "Defendant") before a person authorized

by the laws of the State of New Jersey to administer oaths on **Tuesday, October 24, 2023,** at 127

Maple Ave,  Red Bank New Jersey, beginning at 10:00 a.m. and continuing day to day until completed, with respect to all matters relevant to the subject matter involved in this action.

**COHEN, PLACITELLA & ROTH, P.C.**
*Attorneys for Plaintiffs*

_____
Christopher M. Placitella
*For the Firm*

Dated: October 10, 2023

# EXHIBIT F

**COHEN, PLACITELLA & ROTH, P.C.**
CHRISTOPHER M. PLACITELLA (ID# 02778-1981)
127 Maple Avenue
Red Bank, NJ 07701
(732) 747-9003
*Attorneys for Plaintiffs*

| | |
|---|---|
| **CATHERINE FORBES, Individually and as Personal Representative of the ESTATE OF KIMBERLY NARANJO,** | SUPERIOR COURT OF NEW JERSEY LAW DIVISION: MIDDLESEX COUNTY |
| Plaintiff | DOCKET NO. MID-L-6108-21 AS |
| vs. | CIVIL ACTION |
| **JOHNSON & JOHNSON,** *et al.*, | ASBESTOS LITIGATION |
| Defendants | |
| **JUSTIN BERGERON and KATHRYN BERGERON, h/w** | SUPERIOR COURT OF NEW JERSEY LAW DIVISION: MIDDLESEX COUNTY |
| Plaintiffs | DOCKET NO:  MID-L-2089-23 AS CIVIL ACTION |
| vs. | |
| **KENVUE, INC.,** *et al.* | ASBESTOS LITIGATION |
| Defendants | |

## NOTICE OF VIDEOTAPED DEPOSITON OF PINTO ADHOLA

TO:   John C. Garde, Esq.
        McCarter & English, LLP
        Four Gateway Center,
        100 Mulberry St.
        Newark, NJ 07102

**PLEASE TAKE NOTICE**, that in accordance with *R.* 4:14-2(c), videotaped testimony will

be taken by deposition upon oral examination of a Pinto Adhola, Assistant Corporate Secretary

representative of Defendant **Kenvue, Inc.** ("Kenvue" or "Defendant") before a person authorized

by the laws of the State of New Jersey to administer oaths on **Monday, October 23, 2023,** at 127

Maple Ave,  Red Bank New Jersey, beginning at 10:00 a.m. and continuing day to day until

completed, with respect to all matters relevant to the subject matter involved in this action.

                                        **COHEN, PLACITELLA & ROTH, P.C.**
                                        *Attorneys for Plaintiffs*

                                        _____
                                        Christopher M. Placitella
                                        *For the Firm*

Dated: October 10, 2023