# EXHIBIT 1

**FOX ROTHSCHILD LLP**
**Formed in the Commonwealth of Pennsylvania**
By:    Jeffrey M. Pollock, Esq. (015751987)
        Michael W. Sabo, Esq. (306252019)
Princeton Pike Corporate Center
997 Lenox Drive, Building 3
Lawrenceville, New Jersey 08648
(609) 896-3600
*Attorneys for Andy Birchfield and Beasley Allen*

| | |
|---|---|
| IN RE TALC-BASED POWDER PRODUCTS LITIGATION | SUPERIOR COURT OF NEW JERSEY LAW DIVISION, ATLANTIC COUNTY<br><br>Consolidated Docket No. ATL-L-2648-15<br><br>MCL Case No. 300<br><br>Civil Action<br><br>**SUPPLEMENTAL CERTIFICATION OF ANDY D. BIRCHFIELD, JR., ESQ. IN SUPPORT OF BEASLEY ALLEN'S OPPOSITION TO J&J'S ORDER TO SHOW CAUSE** |

I, ANDY D. BIRCHFIELD, Jr., ESQ., certify:

1. I make this supplemental certification based on personal knowledge and in further opposition to Defendants Johnson & Johnson and LTL Management, LLC (collectively, J&J)'s Order to Show Cause Seeking to Disqualify Beasley Allen Crow Methvin Portis & Miles, P.C. (Beasley Allen) from this litigation.

2. Beasley Allen partners serve on many litigation leadership committees in federal and state courts, including representing a member of the LTL Tort Claimants Committee.

**Beasley Allen Gained Significant Knowledge Over Its Ten (10) Year Intense Participation in New Jersey Talc Litigation**

3. Beasley Allen opened its first talc case against J&J in 2013 and filed its first talc lawsuit against J&J in January 2014.

4. Beasley Allen tried its first talc lawsuit on behalf of an ovarian cancer victim in 2016 obtaining a seventy-two (72) million dollar verdict.

5. Between 2016 and 2021 when J&J filed its first bankruptcy petition, Beasley Allen had twelve (12) trials against J&J involving ovarian cancer victims.

6. Beasley Allen was integrally involved in New Jersey talc litigation long before I, or any member of Beasley Allen, ever met Mr. Conlan or anyone with Legacy, which did not occur until late April 2023.

7. In 2016, my law partner at Beasley Allen, Ted Meadows, served as co-lead counsel as this Court, with Judge Nelson Johnson presiding, conducted a weeks-long *Kemp* hearing.[1]

8. In October 2016, my law partner at Beasley Allen, Leigh O'Dell, was appointed co-lead counsel of the Plaintiffs' Steering Committee in *In re: Johnson & Johnson Talcum Powder Products Marketing, Sales Practices, and Products Liablility Litigation*, MDL No. 16-2738 (MAS)/(RLS) (D.N.J.). As co-lead counsel, Leigh O'Dell has responsibility for more than pending 50,000 cases.

9. In October 2021, J&J filed its first bankruptcy petition and the United States Trustee appointed a Beasley Allen client to the *In re LTL Management LLC* Tort Claimants Committee (TCC), with me, Leigh O'Dell, and Ted Meadows serving as representatives.

10. Extensive discovery was undertaken in LTL Management LLC (LTL-1) in

---

[1] J&J's adverse ruling was reversed. *See Carl v. Johnson & Johnson*, 464 N.J. Super. 446 (App. Div. 2020) (reversing the trial court and holding that plaintiffs' experts' methodologies were sound and there was sufficient evidence to support claims that J&J's Baby Powder can cause ovarian cancer despite J&J's continued claim of "junk science").

preparation for a Motion to Dismiss trial. Leigh O'Dell, Ted Meadows, and I were actively involved in every aspect of the trial preparation.

11. In LTL-1, Judge Michael Kaplan ordered mediation. I led the team effort on behalf of ovarian cancer victims to reach a mediated resolution. With mediators involved, there was in-depth discussion of the value of talc claims from both sides. This mediation effort continued for approximately a year.

12. In addition to the court-appointed mediators, Judge Kaplan appointed Kenneth Feinberg to serve as a Rule 706 expert for the purpose of preparing a report to the Court of the estimated liability for talc claims. I served as the point person for the ovarian cancer leadership team for this estimation process. The entire team worked closely with Mr. Feinberg in this process. This process necessarily involved the back and forth of the parties regarding the strength and weaknesses of the cases.

13. On January 30, 2023, the Third Circuit issued its decision that LTL-1 must be dismissed. The bankruptcy court issued the order of dismissal on April 4, 2023.

14. Following the Third Circuit decision and before the actual dismissal order was entered on April 4, 2023, I, along with the plaintiff leadership team, prepared a settlement proposal substantially similar to the proposal that is discussed as part of the Legacy proposal that J&J provided to the Court. Legacy had no involvement in the development of the settlement proposal.

15. On April 4, 2023, just hours after the order was entered to dismiss LTL-1, J&J filed its second bankrupty petition. With the second filing, J&J proposed a plan that would have offered unreasonably low values to cancer victims. Immediately I, along with others, voiced opposition on the basis that under the proposal, cancer victims would not receive fair compensation.

16. The United States Trustee appointed a Beasley Allen client to serve on the TCC for

LTL-2 with me, Leigh O'Dell and Ted Meadows serving as representatives.

17. My first contact with anyone at Legacy was on April 27, 2023 and that was a call that was facilitated by counsel for the TCC.

18. The first meeting with Legacy personnel was on May 2, 2023.

19. Before meeting anyone from Legacy, I, along with my partners at Beasley Allen, had extensive knowledge regarding talc claims, the strengths and weaknesses of claims, the values of claims, J&J approaches to settlement, and J&J litgation strategies. This knowledge did not come from inside information but years of experience involved in every aspect of the litigation. I have always viewed Legacy as a vendor who was talking with all parties about a creative solution to a difficult problem based on their collective experience in similar transactions. I have never viewed Legacy as an ally or an adversary.

20. Because of Beasley Allen's intense years-long participation and experience in the talcum powder litigation, it has gained a great deal of knowledge, including the value of talcum powder claims and the parties' claims and defenses.

21. Contrary to Mr. Hass' assertion, there is no "structural optimization strategy." The structural optimization model is a Legacy proposal—as discussed in the Bloomberg Law article—which J&J is free to accept or reject.

22. In paragraph 9 of his opening Declaration, Erik Haas states as follows:

> "Notably, in the Spring of 2021, Mr. Conlan provided extensive advice to me and my colleagues, and engaged in negotiations on our behalf, with respect to a settlement proposal advanced by Mr. Birchfield. As Mr. Birchfield testified in his deposition taken in the LTL bankruptcy, that settlement contemplated the resolution of the ovarian talc claims for $4.2 billion. Mr. Conlan conferred with us regarding the strengths and weaknesses of utilizing a "structural optimization" strategy in lieu of the settlement format Mr. Birchfield proposed at that time."

Mr. Haas' statements are false. I never met Mr. Conlan, and to the best of my memory had never

had any interaction with Mr. Conlan before May 2, 2023. J&J repeatedly states that I knew that Mr. Conlan represented J&J and even states: "In fact, Birchfield was negotiating potential resolution of the same cases when Conlan was on the other side of the table advising J&J." J&J Opening Br. at 2. The only information provided to me regarding Mr. Conlan's representation of J&J was that Mr. Conlan was interacting with the Future Claims Representative (FCR) in the Imerys bankruptcy proceeding. That information was provided to me by Mr. Murdica in 2020.

23. In regards to the $4.2 billion settlement proposal referenced by Mr. Haas, there are several key points that are pertinent to the matter before the Court. First, I never negotiated or discussed the stated proposal with Mr. Conlan. Second, the terms of the referenced proposal differ in substantial ways from any settlement proposals being discussed or considered today – three years later. Third, the number of claims has increased by nearly 5-fold since the time of that proposal, due in large measure, in my experienced opinion, due to missteps by J&J in handling the talc litigation. Fourth, at the time of the settlement proposal referenced by Mr. Haas, J&J was threatening but had not yet exercised the threat of bankruptcy, which would at a minimum ensure a delay of litigation. The circumstances today are materially different. J&J has now attempted two bankruptcy proceedings and failed twice. The arc of the litigation has advanced substantially and the landscape is materially different from the time Mr. Conlan ceased work for J&J.

**Beasley Allen Has Never Retained or Otherwise Engaged Mr. Conlan In Any Capacity**

24. As stated in my prior certification, Beasley Allen has never received any privileged or confidential information belonging to J&J.

25. I have no personal knowledge of Mr. Conlan's work with or on behalf of J&J. He has never confided in either me or Beasley Allen about his work, advice or legal analysis from his work with J&J.

26. My understanding and belief is that Mr. Conlan works for Legacy Liability Solutions, which is an independent business offering innovative solutions to companies with major mass tort liabilities.

27. J&J has stated repeatedly that Mr. Conlan is a "side switching lawyer." I am aware that Mr. Conlan is a former lawyer, but Mr. Conlan has never been retained by Beasley Allen in any capacity. Beasley Allen has never retained Mr. Conlan, has never paid him any compensation—nor has Beasley Allen been asked to at any time. Mr. Conlan has never represented any plaintiffs in the talcum powder cases against J&J. Mr. Conlan has never "partnered" with, associated with, or allied with Beasley Allen in any way in representing any of Beasley Allen's clients. All interactions with Mr. Conlan and Legacy were arm's length interactions with a business that offers a solution to the issue that J&J has publicly and falsely stated could only be addressed in bankruptcy.

28. Mr. Brody, counsel for J&J, argued on January 23, 2024 that Mr. Conlan served as "a lawyer, an expert, or a former employee or a witness" on behalf of Beasley Allen or its clients. That is false. Mr. Conlan has not served as a lawyer, expert, witness, or employee of Beasley Allen in this or any other matter. *See* Tr. at 10:16-24.

29. Mr. Brody also asserted on January 17, 2024 that Mr. Conlan and Beasley Allen are "jointly pursuing a resolution that was adverse" to J&J. That is false. At no point have I or any of my colleagues at Beasley Allen worked jointly with Mr. Conlan or Legacy in pursuing any claim against J&J. *See* Tr. at 7 to 8.

30. Mr. Brody also stated on January 17, 2024 that "they" (meaning Beasley Allen and Mr. Conlan) are trying to obtain a result "$10 billion higher." Respectfully, there is no "they." Mr. Brody's statement is false in that it implies that Beasley Allen worked with Mr. Conlan to

arrive at a value to be proposed to J&J for resolution of the current and future pending talcum powder exposure claims in which J&J is a defendant. *See* Tr. at 7:10-25.

31. J&J has stated that Beasley Allen reached out to Mr. Conlan. This is false.

32. Mr. Brody argues that Mr. Conlan is an expert, consultant or advisor that served for Beasley Allen. This is false. Mr. Conlan has never served as an expert, consultant, or advisor to Beasley Allen. Mr. Conlan has never been retained by Beasley Allen, nor has Beasley Allen requested Mr. Conlan's advice.

### Mr. Conlan Has Never Shared Any Confidential Information with Beasley Allen

33. It is my understanding based on J&J's filings with the Court that Mr. Conlan left Faegre Drinker in 2022. Beasley Allen and I had no association with Legacy or Mr. Conlan at that time, and, to the best of my knowledge, I met Mr. Conlan for the first time on May 2, 2023.

34. At no point has Mr. Conlan discussed with me or my Beasley Allen team J&J's litigation strategy, including proposed settlement values or what J&J believed to be reasonable or fair to settle its talcum powder liability. Mr. Conlan has never shared with me or my colleagues at Beasley Allen any memoranda, emails, work product, litigation values, risk retention, or any other such information belonging to J&J.

35. At no point has Beasley Allen conspired with Mr. Conlan against J&J. Beasley Allen represents its clients in arms-length transactions, and it has not done so with any unfair advantage or insight from Mr. Conlan. Nor have I shared any client confidences with Mr. Conlan.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated: January 29, 2024

_____
ANDY D. BIRCHFIELD, Jr., ESQ.