AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of New Jersey

| | | |
|---|---|---|
| IN RE: JOHNSON & JOHNSON TALCUM POWDER | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.  3:16-md-2738-MAS-RLS |
| PRODUCTS MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION | ) | |
| *Defendant* | ) | |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:        Michael S. Huncharek, 10 Sasanqua Circle, Columbia, SC 29209

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:    All communications and documents set forth in Schedule A.

| Place: McGowan, Hood, Felder & Phillips, LLC, 1517 Hampton St, Columbia, SC 29201 (or other mutually agreed location or by email or other electronic means) | Date and Time: 04/05/2024 12:00 pm |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:    03/20/2024

|  CLERK OF COURT | | |
|---|---|---|
| | OR | s/ Michelle Parfitt |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* Plaintiffs' Steering Committee, Michelle Parfitt, Esq., Co-Lead Counsel , who issues or requests this subpoena, are:

1825 K Street NW, Suite 700, Washington, DC 20006, mparfitt@ashcraftlaw.com, (703) 824-4762

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.  3:16-md-2738-MAS-RLS

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏  I served the subpoena by delivering a copy to the named person as follows: _____

_____     _____

on *(date)* _____ ; or

❏  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3)** *Quashing or Modifying a Subpoena.*
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**SCHEDULE A**
**ATTACHMENT TO MICHAEL S. HUNCHAREK SUBPOENA**

**DEFINITIONS**

The following definitions apply to the Notice of Deposition and are deemed to be incorporated into each subject matter and document requested and listed below. To the extent a term commonly in use in the cosmetic and/or personal care product industry or in use in the medical community is not defined herein, it shall be understood to be consistent with the meaning commonly ascribed to that term in the cosmetic and/or personal care product industry.

1.      "Defendants" refers to Defendants Johnson & Johnson, Johnson & Johnson Consumer Inc. f/k/a Johnson & Johnson Consumer Companies, Inc., Imerys Talc America, Inc. f/k/a Luzenac America, Inc., and the Personal Care Products Council f/k/a the Cosmetic, Toiletry, and Fragrance Association (both collectively and individually) as well as all of their partners, directors, officers, employees, servants, agents, attorneys, joint venturers, third-party contractors or other representatives, including all corporations and entities affiliated with Defendants.  The term "Defendant" shall also include all predecessor business entities, as well as any predecessor's partners, directors, officers, employees, servants, agents, attorneys, joint venturers, third-party contractors or other representatives.   The term "Defendant" shall also include all foreign subsidiaries or foreign parent companies, as well as any foreign subsidiaries' or parent companies' partners, directors, officers, employees, servants, agents, attorneys, joint venturers or other representatives.

2.      The term "Raw Talcum Powder" refers to any raw, processed, and/or packaged talc used in, or intended for use in, the Johnson's Baby Powder and/or Shower to Shower line of products, whether on a permanent, interim, or trial basis, and includes any talc derived from the

1

same mine or ore body as talc used in or intended for use in the Johnson's Baby Powder and/or Shower to Shower line of products.

3.    The term "Heavy Metals" refers to any of the following: nickel, mercury, lead, manganese, copper, cobalt, chromium, magnesium, cadmium, aluminum, and arsenic.

4.    The term "Accessory Minerals" refers to any of the following free crystalline, silica, including quartz, cristobalite, and tridymite; and mica.

5.    The term "CRE" is used to refer to the Center for Regulatory Effectiveness and all of their partners, directors, officers, employees, servants, agents, attorneys, joint venturers, third-party contractors or other representatives, including any corporations and entities affiliated with CRE.

6.    The term "PCPC" is used to refer to the Personal Care Products Council f/k/a the Cosmetic, Toiletry, and Fragrance Association and all of their partners, directors, officers, employees, servants, agents, attorneys, joint venturers, third-party contractors or other representatives, including any corporations and entities affiliated with PCPC.

7.    The term "CTFA" is used to refer to the Cosmetic, Toiletry, and Fragrance Association and all of their partners, directors, officers, employees, servants, agents, attorneys, joint venturers, third-party contractors or other representatives, including any corporations and entities affiliated with CTFA.

8.    The term "Imerys" or "Imerys Defendants" is used to refer to Imerys Talc America, Inc. f/k/a Luzenac America, Inc. and all of their partners, directors, officers, employees, servants, agents, attorneys, joint venturers, third-party contractors or other representatives, including any corporations and entities affiliated with Imerys and/or Luzenac.

9.      The term "Johnson & Johnson" or "Johnson & Johnson Defendants" is used to refer to Johnson & Johnson and/or Johnson & Johnson Consumer Inc. f/k/a Johnson & Johnson Consumer Companies, Inc. and all of their partners, directors, officers, employees, servants, agents, attorneys, joint venturers, third-party contractors or other representatives, including any corporations and entities affiliated with Johnson & Johnson.

10.     The term "RTM" is used to refer to Rio Tinto Mineral and all of their partners, directors, officers, employees, servants, agents, attorneys, joint venturers, third-party contractors or other representatives, including any corporations and entities affiliated with RTM.

11.     The term "TIPTF" is used to refer to Talc Interested Party Task Force and all of their partners, directors, officers, employees, servants, agents, attorneys, joint venturers, third-party contractors or other representatives, including any corporations and entities affiliated with TIPTF.

12.     The term "CIR" is used to refer to the Cosmetic Ingredient Review and all of their partners, directors, officers, employees, servants, agents, attorneys, joint venturers, third-party contractors or other representatives, including any corporations and entities affiliated with the CIR.

13.     The term "NTP" is used to refer to the National Toxicology Program and all of their partners, directors, officers, employees, servants, agents, attorneys, joint venturers, third-party contractors or other representatives, including any corporations and entities affiliated with the NTP.

14.     The term "IARC" is used to refer to the International Agency for Research on Cancer and all of its partners, directors, officers, employees, servants, agents, attorneys, joint venturers, third-party contractors or other representatives.

15.     The term "WHO" is used to refer to the World Health Organization and all of its partners, directors, officers, employees, servants, agents, attorneys, joint venturers, third-party contractors or other representatives.

16.     The term "RoC" is used to refer to the "Report on Carcinogens," which is a congressionally mandated, science-based, public health document that the NTP prepares for the U.S. Department of Health and Human Services Secretary.

17.     The term "ISRTP" is used to refer to the International Society of Regulatory Toxicology and Pharmacology and all of their partners, directors, officers, employees, servants, agents, attorneys, joint venturers, third-party contractors or other representatives, including any corporations and entities affiliated with the ISRTP.

18.     The term "CTPA" is used to refer to the Cosmetic, Toiletry & Perfumery Association and all of their partners, directors, officers, employees, servants, agents, attorneys, joint venturers, third-party contractors or other representatives, including any corporations and entities affiliated with the CTPA.

19.     The term "MBS" is used to refer to Multinational Business Services, Inc. and all of their partners, directors, officers, employees, servants, agents, attorneys, joint venturers, third-party contractors or other representatives, including any corporations and entities affiliated with MBS.

20.     The term "MLS" is used to refer to Multinational Legal Services, Inc. and all of their partners, directors, officers, employees, servants, agents, attorneys, joint venturers, third-party contractors or other representatives, including any corporations and entities affiliated with MLS.

21.     The term "SFDA" is used to refer to the Chinese State Food and Drug Administration and all of its partners, directors, officers, employees, servants, agents, attorneys, joint venturers, third-party contractors or other representatives, including any corporations and entities, public or private, affiliated with it.

22.     The term "ACS" is used to refer to the American Cancer Society and all of its partners, directors, officers, employees, servants, agents, attorneys, joint venturers, third-party contractors or other representatives, including any corporations and entities affiliated with it.

23.     The term "XRD" is used to refer to X-Ray Diffraction as a method for testing substances for the presence of asbestos and/or asbestiform materials, and/or amphibole materials.

24.     "Documents" and "Documentation" means paper and electronic writings, drawings, graphs, charts, photographs, phono-records, and other data compilations from which information can be obtained and translated through electronic means. If a document was prepared in several copies and if additional copies were thereafter made, and if any such copies were not identical or are no longer identical by reason of notation or modification of any kind whatsoever, including notations on the front or back of any pages thereof, then each such copy must be produced. Consistent with the above definition, the term document shall include, without limitation, any computer-generated, computer-stored, or otherwise maintained or reproduced communication or representation, any data compilation in any form, whether composed of letters, words, numbers, pictures, sounds, bytes, e-mails, electronic signals or impulses, electronic data, active files, deleted files, file fragments, or any combination thereof.

25.     "Scientific Study" shall mean, without limitation, all scientific studies, internal reports, scientific reporting to FDA, or any other government or regulatory entity, peer-reviewed literature, replicated studies, medical studies, medical research, epidemiological studies,

toxicology studies, genetic studies, dosimetry studies, animal studies, radiation studies, journal articles, scholarly studies, internal investigations, scientific testing, pre-market testing, post-market surveillance, experiments, experimental results, raw data collected, and all other scientific research and reporting conducted, funded, and/or sponsored by you and/or at your behest, in whole or in part.

26.    The term "Communication(s)" and/or "Correspondence" shall mean and include every manner or means of correspondence, disclosure, transfer, or exchange, and every correspondence, disclosure, transfer or exchange of information, whether orally, electronically or by documents, or whether face-to-face, by telephone, mail, email, text messaging, instant messaging, facsimile, personal delivery, overnight delivery, or otherwise.

27.    "Meeting" refers to, without limitation, any assembly, convocation, encounter or contemporaneous presence of two or more persons for any purpose, whether planned or scheduled in advance, including written exchanges through internet/web based chat, including AOL Instant Messenger$^{TM}$, or similar programs, electronic "bulletin board" programs, or internet/web based video chat, including Skype$^{TM}$, or similar programs.

28.    The term "Identify," when used in reference to a person, means to state that person's full name, name of his or her employer, job title or position, and that person's last known residence and/or business addresses, telephone numbers, and e-mail addresses.

29.    The term "Identify," when used in reference to a document, means to state the title of the document, its date, its author, its serial or identification number (if any), and its bates number (if previously produced in this lawsuit).

30.    The term "Identify", when used in reference to an object, means to state the generic and proprietary name of the object, its version or edition (if applicable), title of the document, its

date, its author, its serial or identification number (if any), and the date it was created (if available) with sufficient specificity so that the object (or a reasonable facsimile of it) can be positively identified.

31.     The term "Date" means exact day, month and year, if ascertainable, or the best available approximations, including any relationship to other known events (designate whether exact or approximate).

32.     The term "Person" refers to, without limitation, any and every natural individual, each and every association, partnership, joint venture, corporation, professional corporation, trust and any and every other identifiable entity.

33.     The term "Employee" includes, without limitation, any current or former officer, director, executive, manager, secretary, staff member, messenger, agent, independent contractor, and/or other person who is or was employed by you or who provided services to you under an independent contractor arrangement.

34.     The use of the singular herein shall be deemed to include the plural and vice versa; and the use of one gender shall include the other, as appropriate in the context.  The past tense includes the present tense where the clear meaning is not distorted by change of tense.

35.     The term(s) "Disease" and/or "Diseases" shall mean and refer to health conditions including ovarian cancer, malignant and non-malignant tumors.

36.     The term "TIPTF" is used to refer to Talc Interested Party Task Force and all of their partners, directors, officers, employees, servants, agents, attorneys, joint venturers, third-party contractors or other representatives, including any corporations and entities affiliated with TIPTF.

37.     The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery requests all responses that might otherwise be construed to be outside of its scope.

38.     "Related to," or "regarding," mean, without limitation, discuss, describe, reflect, deal with, pertain to, analyze, evaluate, estimate, constitute, study, survey, project, assess, record, summarize, criticize, report, comment, or otherwise involve, in whole or in part.

39.     The term "Concerning" means referring to, relating to, describing, regarding, evidencing, or constituting; and each such term shall be deemed synonymous to the others where used herein.

40.     "Regulatory Agency" is used to refer to any domestic or foreign governmental body, entity, department, or division that oversees, monitors, or regulates cosmetic and/or personal care products, including but not limited to the Food and Drug Administration (FDA) and the Consumer Product Safety Commission (CPSC).

41.     The term "Asbestos" is used to refer to any matter, substance, material, product (or component thereof) containing asbestos, asbestiform materials (including non-regulated fibers such as winchite and richterite), transition fibers, cleavage fragments, and/or nonasbestiform asbestos materials, regardless of the fiber type, form, or percentage (including less than 1%), as well as chrysotile, amphiboles, amosite, crocidolite, tremolite, anthophyllite, and/or actinolite.

42.     Unless otherwise indicated, the "Relevant Period" for the information sought is 1982 to the present.

## **INSTRUCTIONS**

1.     In responding to this Request, you are required to produce all Documents known or reasonably available to you, regardless of whether such Documents are in your possession,

custody, or control or in the possession, custody, or control of your agents, consignees, representatives or investigators, including your attorneys or their agents, employees, representatives, or investigators.

2.      If any of the Documents or information Requested cannot be produced in full, you are required to specify, to the extent possible, the reasons for your inability to produce the remainder, and the approximate date when you expect to produce such Documents, if at all.

3.      If any Request is deemed to call for the production of privileged or otherwise protected information or materials, you must provide the following information in a written response, designating and identifying those Documents or information withheld from production on grounds of privilege:

(a)      The reason for withholding the Document or information;
(b)      A statement of the legal basis for the claim of privilege, work product or other ground for non-disclosure;
(c)      A brief description of the Document, including:
   i.    The date of the Document;
   ii.   The number of pages, attachments, and appendices;
   iii.  The name(s) of its author(s) or preparer(s) and identification by employment and title of each such person;
   iv.   The name of each person who was sent, shown, or copied on the Document, or has had access to or custody of the Document, together with an identification of each such person;
   v.    The present custodian; and
   vi.   The subject matter of the Document, and in the case of any Document relating or referring to a meeting or conversation, identification of such meeting or conversation, in sufficient detail to enable the Court to determine the propriety of any claim of privilege.

4.      Failure to properly identify any withheld Documents may result in the waiver of any right to assert a privilege later.

5.      This Request imposes a continuing obligation upon you.  If after producing Documents or information responsive to this Demand additional information or Documents become available to you, you are required to produce such additional Documents or information.

6.      With respect to each Document Requested that has been lost, destroyed, or otherwise disposed of since its preparation or receipt, you shall provide the following information separately as to each such Document:

(a)    A general description of the subject matter, author, recipient(s), date;
(b)    The identity of each person who has received a copy or had an opportunity to receive a copy thereof;
(c)    The last custodian of the Document or copies thereof; and
(d)    The full particulars or circumstances whereby the Document was disposed of, destroyed, or otherwise lost.

7.      All Documents produced in response to these Requests shall be either:

(a)    Organized and labeled to correspond with the number of the specific Request to which the Documents are responsive, or
(b)    Produced in the order and in the manner that they are kept in the usual course of business.

8.      All Documents requested shall include all Documents and information that relate in whole or in part to the relevant time period, or to events or circumstances during such relevant time period, even though dated, prepared or generated or received prior to relevant time period.

9.      All documents are to be produced in accordance with Case Management Order No. 5 (Protocol For Production Of Document and ESI), attached hereto.

## SCHEDULE A – DOCUMENTS TO BE PRODUCED

1. Please produce Your current resume and/or *curriculum vitae*.

2. Please produce any Communications with any of the following individuals, entities, or their representatives or agents, concerning talcum powder and ovarian cancer, and/or the adulteration of Raw Talcum Powder with Asbestos, Heavy Metals, or other Accessory Minerals:

   a. Robert Glenn;

   b. Ridgeway Hall;

   c. Crowell & Moring;

   d. CRE;

   e. William G. Kelly Jr.;

   f. Michael Huncharek;

   g. Meta-Analysis Research Group;

   h. Johnson & Johnson;

   i. Imerys;

   j. PCPC;

   k. CTFA;

   l. IMA-NA; and

   m. John Bailey.

3. Please produce any and all Communications with any scientific journal or other publication regarding any article you have published, or sought to have published relating to talcum powder and ovarian cancer, and/or the adulteration of Raw Talcum Powder with Asbestos, Heavy Metals, or other Accessory Minerals

11

4.  Please produce any and all Documents, including contracts, retainer agreements, letters of retainer, or other evidence of employment or work, between you and any of the following entities talcum powder and ovarian cancer, and/or the adulteration of Raw Talcum Powder with Asbestos, Heavy Metals, or other Accessory Minerals

    a.  Crowell & Moring;

    b.  PCPC;

    c.  CTFA;

    d.  Meta-Analysis Research Group;

    e.  Johnson & Johnson;

    f.  Imerys; and

    g.  IMA-NA.

5.  Any and all Documents, including handwritten notes, typed notes, memoranda, or reports, which you created during, in anticipation of, or following the IARC review of talc.

6.  Any and all Documents, including handwritten notes, typed notes, memoranda, or reports, which you created during, in anticipation of, or following any conference call or meeting in which you took part relating to talcum powder and ovarian cancer, and/or the adulteration of Raw Talcum Powder with Asbestos, Heavy Metals, or other Accessory Minerals

7.  Please produce the final versions and any drafts or revisions of, the following papers and reports:

    a.  Perineal Talc Use and Ovarian Cancer: A Critical Review;

    b.  Perineal Application of Cosmetic Talc and Risk of Invasive Epithelial Ovarian Cancer: A Meta-Analysis of 11,933 Subjects from Sixteen Observational Studies;

    c.   Talc and Ovarian Cancer: A Critical Review;

    d.   Comments on: Citizens Petition to the Commissioner of the Food and Drug Administration Seeking a Cancer Warning on Cosmetic Talc Products; and

    e.   Use of Cosmetic Talc on Contraceptive Diaphragms and Risk of Ovarian Cancer: A Meta-Analysis of Nine Observational Studies.

8. To the extent not produced in responses to Request No. 7 above, please produce in native format, any and all papers, reports, or studies, including drafts thereof, whether published or unpublished, related to talcum powder and ovarian cancer, and/or the adulteration of Raw Talcum Powder with Asbestos, Heavy Metals, or other Accessory Minerals

9. Any and All Communications with any Regulatory Agency or representative thereof, including but not limited to the FDA, related to talcum powder and ovarian cancer, and/or the adulteration of Raw Talcum Powder with Asbestos, Heavy Metals, or other Accessory Minerals

10. Any and all Communications with Kathy Wille of Johnson & Johnson relating to talcum powder and ovarian cancer, and/or the adulteration of Raw Talcum Powder with Asbestos, Heavy Metals, or other Accessory Minerals Any and all documents related to Public Health Service GrantK07-CA104231, which provided partial funding for the study "Perineal talc use and Ovarian Cancer: A Critical Review.

11. Any and all documents pertaining to the Marshfield Medical Research Foundation (Marshfield, WI) which provided partial funding for the study entitled "Perineal Application of Cosmetic Talc and Risk of Invasive Epithelial Ovarian Cancer: A Meta-Analysis of 11,933 Subjects from Sixteen Observational Studies.

12. Any and all communications with the Marshfield Medical Research Foundation (Marshfield, WI) or any representative thereof, with respect any funding provided for the study entitled "Perineal Application of Cosmetic Talc and Risk of Invasive Epithelial Ovarian Cancer: A Meta-Analysis of 11,933 Subjects from Sixteen Observational Studies.

13. Any and all IRS for 1099's, IRS for W-2's, or other IRS forms showing any income earned from the following entities:

    a. Johnson & Johnson;

    b. Imerys;

    c. PCPC;

    d. CTFA;

    e. Crowell & Moring;

    f. IMA-NA; and

    g. Meta-Analysis Research Group.

14. Any and all research proposals or other proposals for work, including drafts or revisions thereto, submitted to the following entities related to talcum powder and ovarian cancer, and/or the adulteration of Raw Talcum Powder with Asbestos, Heavy Metals, or other Accessory Minerals

    a. Johnson & Johnson;

    b. Imerys;

    c. PCPC;

    d. CTFA;

    e. IMA-NA; and

    f. Crowell & Moring.

14

15. Any and all documents concerning the American Health Foundation that relate to talcum powder and ovarian cancer, and/or the adulteration of Raw Talcum Powder with Asbestos, Heavy Metals, or other Accessory Minerals.

16. Please produce any and all Communications with Lemar Wheeler related to talcum powder and ovarian cancer, and/or the adulteration of Raw Talcum Powder with Asbestos, Heavy Metals, or other Accessory Minerals.

17. To the extent not already produced in response to requests contained herein, please produce any and all communications between you and the *European Journal of Cancer Prevention* and its advisory board, editors, writers, employees, agents, or servants concerning the article entitled "Perineal Talc Use and Ovarian Cancer: A Critical Review".

18. Please produce any and all communications between you and the Johnson & Johnson Defendants regarding any of the following articles or reports:

    a. Perineal Talc Use and Ovarian Cancer: A Critical Review;

    b. Perineal Application of Cosmetic Talc and Risk of Invasive Epithelial Ovarian Cancer: A Meta-Analysis of 11,933 Subjects from Sixteen Observational Studies;

    c. Talc and Ovarian Cancer: A Critical Review;

    d. Comments on: Citizens Petition to the Commissioner of the Food and Drug Administration Seeking a Cancer Warning on Cosmetic Talc Products; and

    e. Use of Cosmetic Talc on Contraceptive Diaphragms and Risk of Ovarian Cancer: A Meta-Analysis of Nine Observational Studies.

19. Please produce any and all communications between you and the Imerys Defendants regarding any of the following articles or reports:

    a. Perineal Talc Use and Ovarian Cancer: A Critical Review;

15

b. Perineal Application of Cosmetic Talc and Risk of Invasive Epithelial Ovarian Cancer: A Meta-Analysis of 11,933 Subjects from Sixteen Observational Studies;

c. Talc and Ovarian Cancer: A Critical Review;

d. Comments on: Citizens Petition to the Commissioner of the Food and Drug Administration Seeking a Cancer Warning on Cosmetic Talc Products; and

e. Use of Cosmetic Talc on Contraceptive Diaphragms and Risk of Ovarian Cancer: A Meta-Analysis of Nine Observational Studies.

20. Please produce any and all Communications between you and the PCPC Defendants regarding any of the following articles and reports:

a. Perineal Talc Use and Ovarian Cancer: A Critical Review;

b. Perineal Application of Cosmetic Talc and Risk of Invasive Epithelial Ovarian Cancer: A Meta-Analysis of 11,933 Subjects from Sixteen Observational Studies;

c. Talc and Ovarian Cancer: A Critical Review;

d. Comments on: Citizens Petition to the Commissioner of the Food and Drug Administration Seeking a Cancer Warning on Cosmetic Talc Products; and

e. Use of Cosmetic Talc on Contraceptive Diaphragms and Risk of Ovarian Cancer: A Meta-Analysis of Nine Observational Studies.

21. To the extent not already produced in response to requests contained herein, please produce any communications with Crowell and Moring, or any of its employees, agents, servants, or representatives, regarding the following articles or reports:

a. Perineal Talc Use and Ovarian Cancer: A Critical Review;

b. Perineal Application of Cosmetic Talc and Risk of Invasive Epithelial Ovarian Cancer: A Meta-Analysis of 11,933 Subjects from Sixteen Observational Studies;

16

    c.   Talc and Ovarian Cancer: A Critical Review;

    d.   Comments on: Citizens Petition to the Commissioner of the Food and Drug Administration Seeking a Cancer Warning on Cosmetic Talc Products; and

    e.   Use of Cosmetic Talc on Contraceptive Diaphragms and Risk of Ovarian Cancer: A Meta-Analysis of Nine Observational Studies.

22. Please produce all communications between you and Joshua Muscat PhD MPH concerning any of the following articles or reports:

    a.   Perineal Talc Use and Ovarian Cancer: A Critical Review;

    b.   Perineal Application of Cosmetic Talc and Risk of Invasive Epithelial Ovarian Cancer: A Meta-Analysis of 11,933 Subjects from Sixteen Observational Studies;

    c.   Talc and Ovarian Cancer: A Critical Review;

    d.   Comments on: Citizens Petition to the Commissioner of the Food and Drug Administration Seeking a Cancer Warning on Cosmetic Talc Products; and

    e.   Use of Cosmetic Talc on Contraceptive Diaphragms and Risk of Ovarian Cancer: A Meta-Analysis of Nine Observational Studies.

23. Please produce any and all Communications between you and any of the following entities, including any of their agents, servants, members, or representatives, regarding any citizens petition submitted to the FDA seeking a cancer warning on talc products:

    a.   Johnson & Johnson;

    b.   PCPC;

    c.   Imerys;

    d.   IMA-NA;

    e.   Robert Glenn;

17

    f.   John Bailey; and

    g.   Crowell & Moring.

24. Please produce any Documents and/or reports, including drafts thereof, prepared for Crowell & Moring related to talcum powder and ovarian cancer, and/or the adulteration of Raw Talcum Powder with Asbestos, Heavy Metals, or other Accessory Minerals

25. Please produce Documents showing any and all reimbursement payments, including those for travel, expenses, lodging, food, or entertainment, received by you from any of the following entities concerning work performed related to talcum powder and ovarian cancer, and/or the adulteration of Raw Talcum Powder with Asbestos, Heavy Metals, or other Accessory Minerals:

    a.   Johnson & Johnson;

    b.   Imerys;

    c.   PCPC;

    d.   IMA-NA; and

    e.   Crowell & Moring.

26. Please produce, any and all Documents, including notes and drafts, related to the report written in 2002 entitled "Assessing the epidemiologic literature on the carcinogenicity of talc.

27. Please produce, any and all Communications, related to the report written in 2002 entitled "Assessing the epidemiologic literature on the carcinogenicity of talc.

28. Please produce, any and all Documents showing all compensation received for any work performed related to the report written in 2002 entitled "Assessing the epidemiologic literature on the carcinogenicity of talc.

29. Please produce, any and all Documents, including notes and drafts, related to any update, whether actual or proposed, of the report written in 2002 entitled "Assessing the epidemiologic literature on the carcinogenicity of talc.

30. Please produce any and all documents, notes, memoranda, or meeting minutes related to any meeting between you and any Regulatory Agency, or representative of any Regulatory Agency, related to talcum powder and ovarian cancer, and/or the adulteration of Raw Talcum Powder with Asbestos, Heavy Metals, or other Accessory Minerals

31. To the extent not already produced in response to requests contained herein, please produce any and all Documents relating to your role as an industry observer in the IARC review of talc.

32. To the extent not already produced in response to requests contained herein, please produce any and all Communications relating to your role as an industry observer in the IARC review of talc.

33. To the extent not already produced in response to requests contained herein, please produce any and all communications between you and any of the following entities, or their representatives, agents, servants, or members, related to the IARC review of talc, including any Communications in your role as an industry observer:

    a.  Johnson & Johnson;

    b.  Dr. Gunter Oberdorster;

    c.  Imerys;

    d.  PCPC;

    e.  CTFA;

    f.  IMA-NA;

     g.  IMA-Europe;

     h.  EUROTALC;

     i.  Robert Glenn; and

     j.  John Bailey.

34. Any and all communications between you and Michelle Wyart-Remy, Mark Ellis, and/or Dr. Roger Doome, regarding talcum powder and ovarian cancer, and/or the adulteration of Raw Talcum Powder with Asbestos, Heavy Metals, or other Accessory Minerals

35. Any Documents or Communications showing any grants, honoraria, scholarships, donations, or remuneration of any kind made to the Universeity of Pennsylvania and/or the University of Pennsylvania School of Medicine made by any of the following entities:

     a.  Johnson & Johnson;

     b.  Imerys;

     c.  PCPC;

     d.  CTFA;

     e.  Crowell & Moring.

36. Please produce any and all Documents and Communications that discuss, refer to, explain, reflect, touch upon, or concern the methodologies employed by any scientific study cited in the following articles or reports:

     a.  Perineal Talc Use and Ovarian Cancer: A Critical Review;

     b.  Perineal Application of Cosmetic Talc and Risk of Invasive Epithelial Ovarian Cancer: A Meta-Analysis of 11,933 Subjects from Sixteen Observational Studies;

     c.  Talc and Ovarian Cancer: A Critical Review;

d.  Comments on: Citizens Petition to the Commissioner of the Food and Drug Administration Seeking a Cancer Warning on Cosmetic Talc Products; and

e.  Use of Cosmetic Talc on Contraceptive Diaphragms and Risk of Ovarian Cancer: A Meta-Analysis of Nine Observational Studies

37. Please produce any peer reviewer comments received by you for any of the following articles:

a.  Perineal Talc Use and Ovarian Cancer: A Critical Review;

b.  Perineal Application of Cosmetic Talc and Risk of Invasive Epithelial Ovarian Cancer: A Meta-Analysis of 11,933 Subjects from Sixteen Observational Studies;

c.  Talc and Ovarian Cancer: A Critical Review; and

d.  Use of Cosmetic Talc on Contraceptive Diaphragms and Risk of Ovarian Cancer: A Meta-Analysis of Nine Observational Studies.

38. To the extent not already produced in response to a request contained herein, please produce any Communications between you and any collaborators on the following articles:

a.  Perineal Talc Use and Ovarian Cancer: A Critical Review;

b.  Perineal Application of Cosmetic Talc and Risk of Invasive Epithelial Ovarian Cancer: A Meta-Analysis of 11,933 Subjects from Sixteen Observational Studies;

c.  Talc and Ovarian Cancer: A Critical Review; and

d.  Use of Cosmetic Talc on Contraceptive Diaphragms and Risk of Ovarian Cancer: A Meta-Analysis of Nine Observational Studies.

39. To the extent not already produced in response to a request contained herein, please produce any Communications between you and any member of the TIPTF regarding the following articles:

      a.  Perineal Talc Use and Ovarian Cancer: A Critical Review;

      b.  Perineal Application of Cosmetic Talc and Risk of Invasive Epithelial Ovarian Cancer: A Meta-Analysis of 11,933 Subjects from Sixteen Observational Studies;

      c.  Talc and Ovarian Cancer: A Critical Review; and

      d.  Use of Cosmetic Talc on Contraceptive Diaphragms and Risk of Ovarian Cancer: A Meta-Analysis of Nine Observational Studies.

40. To the extent not already produced in response to a request contained herein, please produce any Communications between you and the CIR, including any member of the CIR Expert Panel related to the following articles:

      a.  Perineal Talc Use and Ovarian Cancer: A Critical Review;

      b.  Perineal Application of Cosmetic Talc and Risk of Invasive Epithelial Ovarian Cancer: A Meta-Analysis of 11,933 Subjects from Sixteen Observational Studies;

      c.  Talc and Ovarian Cancer: A Critical Review; and

      d.  Use of Cosmetic Talc on Contraceptive Diaphragms and Risk of Ovarian Cancer: A Meta-Analysis of Nine Observational Studies.

41. To the extent not already produced in response to a request contained herein, please produce any Communications between you the NTP related to the following articles:

      a.  Perineal Talc Use and Ovarian Cancer: A Critical Review;

      b.  Perineal Application of Cosmetic Talc and Risk of Invasive Epithelial Ovarian Cancer: A Meta-Analysis of 11,933 Subjects from Sixteen Observational Studies;

      c.  Talc and Ovarian Cancer: A Critical Review; and

      d.  Use of Cosmetic Talc on Contraceptive Diaphragms and Risk of Ovarian Cancer: A Meta-Analysis of Nine Observational Studies.

42. To the extent not already produced in response to a request contained herein, please produce any Communications between you and the ISRTP concerning the following articles:

    a. Perineal Talc Use and Ovarian Cancer: A Critical Review

    b. Perineal Application of Cosmetic Talc and Risk of Invasive Epithelial Ovarian Cancer: A Meta-Analysis of 11,933 Subjects from Sixteen Observational Studies;

    c. Talc and Ovarian Cancer: A Critical Review; and

    d. Use of Cosmetic Talc on Contraceptive Diaphragms and Risk of Ovarian Cancer: A Meta-Analysis of Nine Observational Studies.

43. To the extent not already produced in response to a request contained herein, please produce any Communications between you and any public relations groups, consulting groups, consulting companies, or consulting agencies, including but not limited to Denzenhall Resources, Nichols Denzenhall, The Weinberg Group, and The Center for Regulatory Effectiveness, concerning the following articles:

    a. Perineal Talc Use and Ovarian Cancer: A Critical Review;

    b. Perineal Application of Cosmetic Talc and Risk of Invasive Epithelial Ovarian Cancer: A Meta-Analysis of 11,933 Subjects from Sixteen Observational Studies;

    c. Talc and Ovarian Cancer: A Critical Review; and

    d. Use of Cosmetic Talc on Contraceptive Diaphragms and Risk of Ovarian Cancer: A Meta-Analysis of Nine Observational Studies.

44. To the extent not already produced in response to a request contained herein, please produce any Communications between you and any public relations groups, consulting groups, consulting companies, or consulting agencies, including but not limited to

Denzenhall Resources, Nichols Denzenhall, The Weinberg Group, and The Center for Regulatory Effectiveness concerning talcum powder and ovarian cancer, and/or the adulteration of Raw Talcum Powder with Asbestos, Heavy Metals, or other Accessory Minerals.

45. Please produce any and all documents showing the nature and extent of your relationship with Meta-Analysis Research Group.