# EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

---

IN RE JOHNSON & JOHNSON TALCUM POWDER PRODUCTS, MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION

16-MD-2738-MAS-RLS

STATUS CONFERENCE

---

CLARKSON S. FISHER BUILDING & U.S. COURTHOUSE
402 East State Street, Trenton, New Jersey 08608
September 6, 2023
Commencing at 9:59 a.m.

B E F O R E: THE HONORABLE MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE

THE HONORABLE RUKHSANAH L. SINGH
UNITED STATES MAGISTRATE JUDGE

A P P E A R A N C E S:

FOR PLAINTIFFS:

ASHCRAFT & GERAL
BY: MICHELLE A. PARFITT, ESQUIRE
BY: JAMES GREEN, ESQUIRE

BEASLEY ALLEN
BY: P. LEIGH O'DELL, ESQUIRE

COHEN PLACITELLA & ROTH
BY: CHRISTOPHER PLACITELLA, ESQUIRE
BY: JUSTIN PLACITELLA, ESQUIRE

Proceedings recorded by mechanical stenography
Transcript produced by computer-aided transcription

Shannan Gagliardi, Official Court Reporter
shannan_gagliardi@njd.uscourts.gov
(609)851-2750

GOLOMB SPIRT & GRUNFELD
BY: RICHARD GOLOMB, ESQUIRE

MOTLEY RICE
BY: DANIEL LAPINSKI, ESQUIRE

GRANT & EISENHOFER
BY: SINDHU DANIEL, ESQUIRE

MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN
BY: VICKI MANIATIS, ESQUIRE

NAPOLI SHKOLNIK
BY: CHRIS LoPALO, ESQUIRE

FOR DEFENDANT JOHNSON & JOHNSON:

FAEGRE DRINKER BIDDLE & REATH
BY: SUSAN M. SHARKO, ESQUIRE
BY: ERIC FRIEDMAN, ESQUIRE

SHOOK HARDY & BACON
BY: KATHLEEN FRAZIER, ESQUIRE

SKADDEN ARPS
BY: ALLISON BROWN, ESQUIRE

KING & SPALDING
BY: KRISTEN FOURNIER, ESQUIRE

JOHNSON & JOHNSON
BY: ANDREW C. WHITE, ESQUIRE

FOR DEFENDANT PCPC:

SEYFARTH SHAW
BY: DAVID KATZENSTEIN, ESQUIRE
BY: RENÉE APPEL, ESQUIRE

FOR DEFENDANT PTI:

HARDIN KUNDLA McKEON & POLETTO
BY: JANET POLETTO, ESQUIRE

And then third, a list of dispositive motions that are pending.

If there are any discrepancies, when the Court reviews the joint submission, we'll follow up with counsel. But I'd like for you folks to meet-and-confer and e-file a joint submission by next week, a week from today, which would be about September -- I have to look at my calendar here, September 12. Let's have them on September 12.

The next item I have is a scheduling order. Counsel submitted proposed forms of scheduling orders. The proposed scheduling orders are identical with the exception of paragraph 8, which addresses dispositive and Daubert motions.

Plaintiffs' version of paragraph 8 reads as follows: Quote, dispositive motions, including any Daubert motions relating to case-specific and general expert opinions not previously addressed by the Court's April 27, 2020 Daubert opinion, shall be filed by May 6, 2024.

Defendant's version of that same paragraph 8 reads as follows: Quote, dispositive motions, including Daubert motions, shall be filed by May 6, 2024, closed quote.

I've reviewed your written submissions regarding this. Is there anything else you need to briefly add for the record? And, again, you folks have done a really comprehensive job setting forth your respective positions, but I do want to afford you an opportunity in case there's something additional

that you want to put on the record.

So let me hear from plaintiffs' counsel.

MS. PARFITT: Thank you, Your Honor.

Yes. What I wanted to emphasize for the Court is the fact that Judge Wolfson, eloquently, during the course of her Daubert order and certainly the period leading up to the actual Daubert order, the Daubert proceeding, we had eight days of hearing, as you're well aware. And each one of the five representative experts that were examined had an opportunity not only to be cross-examined by defendants, but, frankly, Judge Wolfson.

And in going back, and I think we all take a trip down memory lane as we come into the court today, what I found most interesting is I think Judge Wolfson was very prescient with regard to her understanding of what it was that each one of those experts would need to do. And she emphasized the methodology. She emphasized the fact that she understood that there would be ongoing science. Science doesn't stop; it is dynamic. And today, there could be something written about talc.

But what she was very careful to say and to examine the experts on was the methodology and reliability of their opinions and the validity of their opinions. And more importantly, in light of new rule coming up December 1, Federal Rule 702, it's interesting because the addition for the new

rules seem to suggest applying those methodologies and those principles to the facts of the case.

And Judge Wolfson, on page 119 of her order, was very specific with regard to how, in fact, our experts had indeed complied with that particular provision, that they not only used reliable scientific and admissible methodology, but they applied it to the specific facts of this case.

So I think that was something that would be very important. She was very clear that there was not -- even with new science, if opinions changed, that would be relevant. But if we're just talking about new works that reaffirm, and indeed in this particular case, any science since the time of the briefing for the Daubert proceeding and post the issuing of the Court's order, Health Canada, O'Brien, the O'Brien study, which is really emphasized by the defendants that it is a new study. That study was actually submitted to Judge Wolfson post-Daubert hearing, pre-Daubert order.

Health Canada, which was really the most significant systematic analysis, has been done by an agency that was very much in accord with what the plaintiffs' experts had testified to and submitted their reports on.

All that to say that it was very clear to the Court that she had considered relevant science and also considered the fact that there would be new science, but we weren't going to come back and redo Daubert on those individuals where she

had done extensive, extensive analysis and reviewed not only qualifications but, frankly, their methodology and process, her arriving at their conclusions, which are very much, again, in sync with, I think, what the new rules expect of the Court and its gatekeeping role.

So that's the discrepancy, I believe, between the parties, that we not go back and do that which we spent years developing. If the experts had looked at a new article, I can assure the Court in this particular case all new science, any new science has only further affirmed and confirmed the opinions of our experts on general causation, and there is really nothing new.

What was new back in '20 was actually at least in the hands of the judge, and anything that's come from that, even in 2021, have been studies -- one other study, the Smith-Bindman and Woolen study, which looked at one issue that was hotly debated, shall I say, during the course of the Daubert proceedings. And that was, do you see increased risk with increased duration, increased frequency. And indeed, that study was then performed in 2021 by Woolen and Smith-Bindman, and they concluded that with increased use and duration of the product, there was an increased risk in developing ovarian cancers.

So the only thing I would add to what's already been put is that I believe the methodologies have been sharply and

astutely and critically examined by Judge Wolfson, and there would be no need to go back and do a redo of those Daubert proceedings. And I think that's what the counsel have a dispute about.

We don't want to redo. We're moving forward. There's nothing new that can't bear cross-examination. They will have ample opportunity to examine our experts on any new studies. They can ask whether or not that's changed opinion. Again, I confirm to the Court that it has not. It's only further strengthened their opinions. But they have an opportunity. That's what cross-examination is about.

And if I can read to the Court, and I thought this was just, again, a very important part. The judge, on page 119 of her order, said: The Court finds that the opinions of the plaintiffs' general causation experts are admissible under Daubert, subject to the limitations on certain testimony as set forth above. The experts reliably applied each factor of the Bradford Hill analysis.

And then she says: Where, as here -- and this goes to the new rules. They go into effect on the first of December. Where, as here, the causation experts' opinions are based on facts, a reasonable investigation, including documented findings, and traditional technical/mechanical expertise, and the experts provide a reasonable link between the information and procedures they use and the conclusions

reached, the Daubert requirements are met.

And she was, again, very clear to say that my rulings as to the five experts apply to all those other experts that were in those same disciplines, and we need not go back.

Certainly, an expert that has not gone forward with the Daubert proceeding, the Court will have to address that. But with regard to going back and redoing what we were doing over the last seven years seems to be an unnecessary delay when Judge Wolfson had done such a, I think, masterful job with regard to that examination.

So with that, Your Honor, I'll sit down unless you have any questions.

THE COURT: Before you sit, just one question.

MS. PARFITT: Of course.

THE COURT: Do you believe that this new contemplated rule, or Evidence Rule 702, does it have any impact on Judge Wolfson's opinion? Do you think it makes it vulnerable?

MS. PARFITT: I think she was there. As I said, I think she was prescient with regard to that. Page 119 is almost in sync, the new rules, and the only change is the expert opinion reflects a reliable application of the principle and methods to the facts of the case, exactly what she said these experts did on page 119.

The old rule, still the existing rule for us, is the expert has reliably applied the principles and methods to the

facts. In this case, our experts did just that. And she found that the expert opinions reflect a reliable application of the principles and methods, and they were examined on that.

So I think it's very much in sync. I don't know that she made that distinction. Perhaps she was even more cautious, cautious than many during -- back in 2020, not knowing what was -- what the world would look like.

So I think that it's -- it certainly changes nothing with regard to those experts. In fact, I think they are in lockstep with any new rules that would be contemplating of an expert.

THE COURT: Do you also think that Judge Wolfson kept open the door -- let me see if I have the exact language. I know she referred to it. She says in that same opinion that if the supplemental reports impact my Daubert decisions made in this opinion, I may amend my rulings at a later time.

MS. PARFITT: If I can respond, any amendment to the expert reports of those individual experts that have already undergone a Daubert process, extensive Daubert process and briefing, what we will be doing is simply supplementing any additional literature that they may have read, which one would expect.

Let's say we have a trial a year from now. Your Honor would expect those experts to continue to keep in lockstep with any new science, good or bad. In this particular

case, that's exactly what these experts have done, continued to monitor the literature and make sure they keep pace and they understand literature on both sides of the fence.

And in this case, she anticipated that, but I think her written statement is if it changes, if their methodologies would change. Their methodologies have not changed. The methodologies that they employed from looking at all the science four years ago is precisely the same methodology that they're employing when they review any new science.

That is to say she examined that methodology in these processes, and that's what was critical for her. Whether or not they come up with different conclusions, that's not -- that's not the relevant inquiry. The relevant inquiry is whether or not they employed reliable and valid scientific methodology, and she found that they passed that.

And so, therefore, we would share with the Court that that's what they will continue to do. So if they look at another article, they're employing the same methodologies that she approved and the same methodologies that she found admissible. They would just review articles and they would just add that to their arsenal, so to speak, of articles and would report on it. But it has not changed opinions, and certainly new articles coming up would not change their methodologies, again, which were exhaustively examined by her.

I know you weren't there, Judge, but it was really

interesting, you know, having sat through a lot of Daubert -- participated in a lot of Daubert proceedings. Sometimes the judge is very active and sometimes they're not. In this case, I would think she was very active. She had read everything, had a lot of questions. She was inquisitive, asked good questions of both sides. Some that were difficult to answer, some that were much easier to answer.

But I would assume by the fact that the methodologies employed, that has not changed. There's no reason to go have a new Daubert proceeding. If you want to inquire about a new study, what they have to say about it, that's fair. But to have another Daubert proceeding to determine whether or not they're applying appropriate methodologies, that's not changed. It's stagnant.

But they did it the right way in the beginning, and that was key to the judge. Were they applying proper methodology? Should they be permitted to walk into this courtroom and share with the judge and jury their opinions? Do they have that right? And she acted as the gatekeeper, and I think she took her responsibilities very seriously and wise.

THE COURT: Okay.

MS. PARFITT: Any other questions?

THE COURT: No. I think we're good. Let me hear from defense counsel.

Wait, is there something else?

MS. PARFITT: Yeah. And counsel reminds me that, certainly, if they change their mind and said, oh, I was wrong, there is no causation, certainly that would be permitted. I assure the Court that's not happening. That's the Perry Mason difference, right? That doesn't happen in our world.

Thank you. And I stand ready to answer any other questions.

THE COURT: Thank you, Ms. Parfitt.

Ms. Sharko.

MS. SHARKO: So the problem with plaintiffs' proposed language is that it would handcuff the Court and handcuff counsel to a hearing that took place in 2019, to reports that were written in 2019, to an opinion based on the law as it existed in 2020, and to a different rule. And we think that that's inappropriate.

A practical solution here is to adopt the defense language, which has no reference to the Daubert opinion. And then when we make our Rule 702 challenges on specific causation and other issues, if the plaintiffs think that we are not following what Chief Judge Wolfson would have done based on 2019 science and 2020 law, they can raise that in their opposition, we can respond, and you will rule on that. But you shouldn't foreclose any arguments on 702 that may have been raised before.

Now, there have been new articles. We cited some of

them in our papers. The O'Brien paper was submitted to Chief Judge Wolfson, but she specifically said I'm not going to consider that, I haven't heard from the experts on that. So she let people send in literature, but she didn't consider that. And there were other -- there have been other publications since 2019. I'm certain that there will continue to be publications up until the next time we argue these issues and maybe thereafter. So the science is moving.

And then as to the law, I disagree with Ms. Parfitt there. When you look at the committee notes for the new rule amendment, they say, quote, many courts have held that critical questions of the sufficiency of an expert's basis and the application of the expert's methodology are questions of weight and not admissibility. These rulings are an incorrect application of Rule 702 and 104(a).

And the advisory committee notes go on from there.

And that's one of the key issues here. When one looks at Judge Wolfson's opinion, she uses the word "weight" 55 times. Now, am I going to reargue each of those 55 things? I don't think so. But I'd like to have that opportunity depending on the facts, depending on the circumstances, depending on the expert's opinion.

So that's all we're asking, that we leave it open and we deal with it when the moment arises.

THE COURT: Thank you. So at this point, I'm going

to reserve on this issue. I'm going to take a look at all of this and I'll be making a decision on that. I have another item that's relevant to this. I'm going to table it for a little bit further in our discussion today, but we will keep moving.

I want to next talk with you about the bellwether trials. In both proposed scheduling orders, replies to dispositive and Daubert motions are due on June 26, 2024. Now, of course, the Court will need some time to decide the motions. The proposed forms of scheduling order do not contain any figure at paragraph 11, and at paragraph 12, the proposed forms of scheduling orders provide that plaintiff shall serve the final list of trial experts for the first bellwether trial 60 days prior to the date of the first trial.

So based on the dates that counsel jointly proposed, it appears that the earliest the parties will be prepared to proceed to a bellwether trial will be either late 2024 or early 2025; is that correct? Is that what you're anticipating?

MS. O'DELL: Your Honor, depending on the number of motions that are filed -- Leigh O'Dell for the Plaintiffs' Steering Committee for the record.

But depending on the number of motions filed, depending on the Court's schedule, what we had hoped, from the plaintiffs' perspective, is that the trial would occur in the fall of next year, that we would not spill over into 2025.

kind of documents what we've talked about here today, but the sooner you can respond with some of the outstanding items, the sooner we can get going in terms of coming up with a more comprehensive plan for moving forward.

It was a pleasure meeting all of you. Have a great day.

THE DEPUTY CLERK: All rise.

(Proceedings adjourned at 11:00 a.m.)

CERTIFICATION

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/S/Shannan Gagliardi, RDR, CRR 9/6/2023

Court Reporter/Transcriber