1                  SUPERIOR COURT OF NEW JERSEY
                    LAW DIVISION - ATLANTIC COUNTY
2                  Docket No. ATL-L-2648-15

3

    IN RE: TALC-BASED POWDER      : CIVIL ACTION
4    PRODUCTS LITIGATION           : CASE NO. 300

5

6                      -  -  -
             TRANSCRIPT OF PLENARY HEARING
7                 (VOLUME I)
                      -  -  -
8

9    PLACE:       ATLANTIC COUNTY CIVIL COURTHOUSE
              1201 BACHARACH BOULEVARD
10             ATLANTIC CITY, NEW JERSEY

11   DATE:        MARCH 25, 2024

12   BEFORE:     THE HONORABLE JOHN C. PORTO, P.J.Cv.
              THE HONORABLE RUKHSANAH L. SINGH
13            U.S. DISTRICT COURT MAGISTRATE

14

15

16

17

18

19

20                      -  -  -

21   Stenographically reported and transcribed by:

22       Constance E. Perks, CRR, CCR, CRC, RSA
         NJ CCR License #30XI00142900
23

24        GOLKOW LITIGATION SERVICES, LLC
       ph 877.370.3377  |  fax 917.591.5672
25           deps@golkow.com

```
 1                    A P P E A R A N C E S:

 2
     FOX ROTHSCHILD LLP
 3   BY: JEFFREY M. POLLOCK, ESQUIRE
         MICHAEL W. SABO, ESQUIRE
 4   Princeton Pike Corporate Center
     997 Lenox Drive
 5   Lawrenceville, New Jersey 08648
     609.896.3600
 6   jpollock@foxrothschild.com
     msabo@foxrothschild.com
 7   Representing Andy D. Birchfield, Jr., Beasley Allen

 8
     O'MELVENY & MYERS LLP
 9   BY:  STEVE BRODY, ESQUIRE
     1625 Eye Street, NW
10   Washington, DC 20006
     202.383.5300
11   sbrody@omm.com
     Representing Johnson & Johnson, LTL Management, LLC
12

13   ALSO PRESENT:

14   Erik Haas, Johnson & Johnson
     World Wide Vice President, Litigation
15

16   PASHMAN STEIN WALDER HAYDEN
     Michael S. Stein, Esquire
17   Roger Plawker, Esquire
     Representing James F. Conlan
18

19

20

21

22

23

24

25
```

```
1                          -   -   -
                        EXAMINATION
2                          -   -   -

3
     WITNESS:  ERIK HAAS                        PAGE
4
     Direct ................................    9
5
     Cross ................................     94
6
     Redirect..............................     180
7

8    WITNESS:  JAMES MURDICA

9    Direct................................     202

10   Cross.................................     241

11   Redirect..............................     278

12   Recross...............................     283

13

14
                          -   -   -
15                   E X H I B I T S
                          -   -   -
16   NUMBER                                     PAGE

17   P-1 ..................................     128

18   P-2 ..................................     129

19

20

21

22

23

24

25
```

```
 1                 (Hearing commenced at 9:38 a.m.)
 2                 THE COURT:  Good morning, everyone.
 3     Please be seated.  This is In Re: Talc-Based Powder
 4     Products Litigation, MCL Case No. 300,
 5     ATL-L-2648-15.
 6                 Can I have the appearance of
 7     plaintiffs' counsel.
 8                 MR. POLLOCK:  Good morning, Your
 9     Honor.  Jeff Pollock and Mike Sabo on behalf of
10     plaintiffs.
11                 THE COURT:  And defense counsel?
12                 MR. BRODY:  Good morning, Your Honor.
13     Steve Brody for Johnson & Johnson and LTL
14     Management, LLC, and with me this morning is Erik
15     Haas from Johnson & Johnson.
16                 MR. HAAS:  Good morning, Your Honors.
17                 THE COURT:  And I said, you know,
18     "plaintiff."  I know this is a little different, but
19     this is plaintiffs' counsel moving, and the party
20     with the burden is defense counsel, Johnson &
21     Johnson.
22                 How are we going to be addressing
23     questions?  Is it going to be one attorney,
24     Mr. Brody and Mr. Pollock, or is it going to be a
25     number of attorneys making -- questioning witnesses?
```

```
 1                     MR. BRODY:  Your Honor, on our side,
 2     I am the only person who will be questioning
 3     witnesses.
 4                     THE COURT:  Okay.  Mr. Pollock?
 5                     MR. POLLOCK:  Same thing here, Your
 6     Honor.
 7                     THE COURT:  Okay.  I just wanted to
 8     be clear.
 9                     Mr. Golomb, I'm going to address your
10     matter towards the end.  All right?  Let me get
11     right into this today.
12                     MR. GOLOMB:  Yes, sir.
13                     Just one thing, Your Honor.  Michael
14     Stein is here and he is Mr. Conlan's attorney.
15                     MR. STEIN:  Thank you.  Good morning,
16     Your Honor.  Michael Stein, in case you need an
17     appearance, and my partner, Roger Plawker, of
18     Pashman Stein Walder Hayden on behalf of Mr. Conlan.
19                     THE COURT:  Thank you.  A very good
20     morning to you.  Thank you for entering your
21     appearances.
22                     Anyone else wish to address the Court
23     in that manner?  Okay.
24                     Judge Singh, anything?
25                     JUDGE SINGH:  No, nothing from me.
```

```
 1                    THE COURT:  All right.

 2                    Mr. Brody, would you call your first

 3     witness.

 4                    MR. BRODY:  Thank you, Your Honor.

 5     The defendants call Erik Haas.

 6                    THE COURT:  And I do have, and Judge

 7     Singh has -- we received from Fox the exhibit book

 8     that we have.  We have seen these before, so I just

 9     want to let everyone know we have the notebooks with

10     the exhibits in there.

11                    MR. BRODY:  Okay.  That's Exhibits 1

12     through 18?

13                    THE COURT:  Yes.

14                    MR. BRODY:  Yeah, those are the

15     agreed-upon hearing exhibits that Mr. Pollock and I

16     have discussed, and, you know, we've agreed,

17     obviously, questioning may stray beyond those 18

18     exhibits.

19                    THE COURT:  Okay.  And subject to any

20     objections, of course, right?

21                    MR. BRODY:  Of course.

22                    Mr. Haas.

23                    THE WITNESS:  Yes, Your Honor.

24                    MR. POLLOCK:  Your Honor, before we

25     start, that last comment concerned me a little bit.
```

1   And obviously I realize, as questioning counsel, he

2   has latitude.  I -- this is your courtroom.  I'm

3   addressing two Courts.  I am concerned about scope.

4   And I normally don't like to object over much,

5   because you don't want to stop the flow of the

6   witness's testimony and I respect that.

7                However, the issue here is whether

8   they should be disqualified based upon RPC 1.6.

9   There are a lot of other issues we could get into,

10  so I will be objecting on the basis of scope, is my

11  anticipation, especially in light of that last

12  comment.

13               I don't know if the Court wants to

14  address that, but that is of concern to me.

15               The other last issue is, we will

16  stipulate that Mr. Conlan had access and possession

17  to privileged information while he worked at J&J.

18  We don't doubt it.  I don't know what that is, but I

19  have no doubt that he had it.  If that moves things

20  along, we will stipulate to that fact right now.

21               THE COURT:  Okay.  And that's why I

22  said, subject to objections.  I can't read --

23               MR. POLLOCK:  Yes, sir.

24               THE COURT:  -- and Judge Singh can't

25  read anyone's mind.  We're not there yet.  But I

1    want to keep the scope tight, and I don't want it to

2    go too far afield.  I think it's a limited issue; is

3    there an actual conflict of interest here.  We've

4    addressed it.  And to the extent we go beyond those,

5    you may be hearing, without objection, you may be

6    hearing from Judge Singh and myself.

7                    MR. BRODY:  Of course.  And our

8    questioning is very focused on the issue before the

9    Court.  I will just say there are many more ethical

10   rules at stake here than simply Rule 1.6.  And there

11   are multiple ethical rules that have been violated

12   here.  We will talk about those in summation, after

13   witnesses testify, but this is much broader and a

14   than a simple 1.6 issue.

15                   THE COURT:  Okay.

16                   Mr. Haas.

17                   THE WITNESS:  Yes, Your Honor.

18                   THE COURT:  Thank you for waiting for

19   us.  Please raise your right hand.  Tell me your

20   name and spell your last name.

21                   THE WITNESS:  Erik Haas, H-A-A-S.

22                        -  -  -

23                   ERIK HAAS, having been duly sworn,

24   was examined and testified as follows:

25                        -  -  -

```
 1                    THE COURT:  Thank you.  You may be
 2    seated.
 3                    THE WITNESS:  Thank you, Your Honor.
 4                    THE COURT:  Mr. Brody.
 5                    MR. BRODY:  Thank you.
 6                         -   -   -
 7                    DIRECT EXAMINATION
 8                         -   -   -
 9    BY MR. BRODY:
10         Q.       Mr. Haas, I guess maybe we can -- I
11    know you're kind of behind the screen there, so I'm
12    going to move my left here so that I can see you a
13    little better.
14                    Who are you employed by, Mr. Haas?
15         A.       Johnson & Johnson.
16         Q.       And what is your position at Johnson
17    & Johnson?
18         A.       I am the worldwide vice president
19    responsible for litigation on behalf of Johnson &
20    Johnson.
21         Q.       Can you tell the Court what your
22    responsibilities are in that role?
23         A.       Yes.  In that role, I oversee any
24    litigation brought by Johnson & Johnson, or brought
25    against Johnson & Johnson.  I also actively
```

1      participate in the litigations, where necessary and

2      appropriate, and make appearances as required, and

3      I'm also responsible in connection with responding

4      to any external inquiries, either from Congress or

5      from the investor community for the external

6      environment.

7              Q.      Who do you report to in that role?

8              A.      I report to the general counsel.

9              Q.      Okay.  And the general counsel, I

10     understand, sits on the executive committee that is

11     the seniormost executives at J&J?

12             A.      That is correct.

13             Q.      In that role, do you ever see the

14     talc litigation?

15             A.      I do.

16             Q.      Does that include the litigation

17     pending in the State MCL in New Jersey and the

18     Federal MDL in Trenton?

19             A.      Yes, it does.

20             Q.      How long have you been overseeing the

21     talc litigation?

22             A.      In terms of my oversight

23     responsibilities, I took over the actual oversight

24     responsibilities in March 2021, when my predecessor

25     in that role, Joseph Braunruether, retired from that

1    role.

2                    I started at Johnson & Johnson in

3    November of 2020.  At that time, I had -- well,

4    prior to that time, I had been outside counsel for

5    Johnson & Johnson on a series of litigations,

6    including those that involved talc litigation.  So I

7    had some involvement with talc litigation going into

8    the role.

9                    When I began working at Johnson &

10   Johnson as worldwide vice president in 2020, I was

11   involved in the talc litigation, but my oversight

12   responsibilities became -- started in March of 2021,

13   when Mr. Braunruether left.

14        Q.        And just for the benefit of the

15   Court, you said that before you started at Johnson &

16   Johnson in November of 2020, you were outside

17   counsel for J&J.  Where were you working at the

18   time?

19        A.        I was partner a Patterson Beklnap

20   Webb & Tyler.  I represented Johnson & Johnson for

21   almost 30 years.

22        Q.        All right.  Are you familiar with the

23   work that James Conlan did for J&J as outside

24   counsel on the talc litigation?

25        A.        I am intimately familiar with the

1    work that Mr. Conlan did.

2          Q.      How did you become familiar with that

3    work?

4          A.      When I started in November 2020, I

5    almost immediately was contacted by Mr. Conlan when

6    he learned that I had started in that role.  And

7    when I mentioned Mr. Braunruether previously, he was

8    the associate general counsel.  My position was to

9    transition into his position.  We were combining two

10   roles into one.  So it was clear at some point I

11   would be taking over the litigation of the talc

12   matters.

13                And he contacted me.  I spoke with

14   him at that time.  And then, during the entire

15   course of his tenure as outside counsel for Johnson

16   & Johnson, I communicated with him regularly.  We

17   had weekly standing calls, which were standing calls

18   of the outside counsel teams that represented

19   Johnson & Johnson with respect to the talc matters.

20                And you can appreciate, because the

21   talc matter is the largest litigation risk of

22   Johnson & Johnson, we had a number of firms that

23   were representing the company in connection with the

24   talc litigation.  A number of bankruptcy firms, a

25   number of the tort liability firms, and a number of

1    consulting firms.

2                        So we would have weekly calls where

3    we would collectively discuss the strategy for

4    litigating and adjudicating the talc litigation.  So

5    Mr. Conlan routinely participated in those calls.

6                        I also had many, many, many

7    individual direct calls with Mr. Conlan during his

8    tenure as outside counsel for Johnson & Johnson.

9    And that ran from July of 2020 through March 28 of

10   2022.  I had direct communications, direct emails,

11   calls, dinners, lunch.  So we were continuously

12   communicating with respect to all aspects of the

13   cases at that time.

14   BY MR. BRODY:

15        Q.        And you mentioned July of 2020, until

16   spring of 2022.  Is that the period where Mr. Conlan

17   was outside counsel for J&J?

18        A.        That is correct.

19        Q.        And have you also reviewed billing

20   entries that Mr. Conlan submitted over the course of

21   that time period?

22        A.        I did.  So the period --

23                  MR. POLLOCK:  Objection, Your Honor.

24   Best evidence rule, hearsay, and speculation.  These

25   documents have not been produced.  He is not an

1    expert witness, he is not -- no summary has been

2    provided.  1006 does not apply, the best evidence

3    rule.  I can't cross-examine him on what I don't

4    have.  So this testimony regarding what is in the

5    billing records is pure, raw hearsay.

6              MR. BRODY:  Your Honor, the question

7    was simply if he had reviewed the billing records.

8              THE COURT:  I'll overrule the

9    objection.

10             MR. BRODY:  Thank you.

11             THE COURT:  You may continue.

12             THE WITNESS:  Yes, I did review the

13   billing records for the entire time that Mr. Conlan

14   was engaged by Johnson & Johnson.

15   BY MR. BRODY:

16        Q.    Did Mr. Conlan's representation of

17   Johnson & Johnson include work related to the cases

18   that are pending here in this New Jersey MCL?

19        A.    Yes.

20        Q.    Did it include work related to the

21   cases that are pending in the federal talc MDL?

22        A.    Yes.

23        Q.    Before I ask you specific questions

24   about the work that Mr. Conlan did for Johnson &

25   Johnson, I want to first say -- I'm going to be

1    asking you a series of questions.  I don't want you

2    to reveal the substance of any of the analysis that

3    Mr. Conlan did, the substance of any analysis that

4    he was privy to, that he may have discussed with

5    you, with other lawyers at Johnson & Johnson, with

6    other outside counsel for J&J, because that is

7    privileged information.

8                So I do want you to be careful.  I'll

9    remind you throughout that I'm only looking for

10   yeses and nos, and that I don't want to get into

11   that substance specifically.

12        A.        Understood.

13        Q.        You have described in certifications

14   submitted to this Court, both this Court and Judge

15   Singh have seen the types of issues that Mr. Conlan

16   worked on at a high level.  And I want to talk about

17   some of those issues with you today while you're on

18   the stand.

19                First of all, I want to talk about

20   resolution of cases in the tort system.  Can you

21   give the Court some general examples -- at this

22   point, not specific to the talc litigation -- but

23   some general examples of how cases in a mass tort

24   like the talc litigation are resolved through the

25   tort system?

```
 1                    MR. POLLOCK:  Your Honor, objection;
 2       scope.
 3                    MR. BRODY:  It's a preliminary
 4       question, Your Honor, which will very quickly lead
 5       to a question about Mr. Conlan's work.
 6                    THE COURT:  I'm going to overrule the
 7       objection.  But I think it does go beyond the scope.
 8       If you're just giving context, if you're going to
 9       question Mr. Haas with regard to context, I think --
10       candidly, I think Judge Singh and I can take, you
11       know, judicial notice with regard to how these cases
12       are settled, but we'll give you some latitude.
13                    MR. BRODY:  Thank you.  I think it
14       will be helpful for the Court, Your Honor.
15                    THE WITNESS:  And I think I can move
16       things along by answering it, both in terms of what
17       typically happened and what Mr. Conlan specifically
18       was involved in.
19                    In general terms, without getting
20       into privileged information, the talc litigation,
21       for the most part in the tort system is resolved
22       through litigation because, by the nature of what
23       the tort is, it is what is known as a latency tort.
24                    So that you have claimants that
25       allegedly were exposed to talc powder currently, but
```

1    their disease state may not manifest for years.  And

2    so those are the types of claims that typically

3    cannot be resolved through your standard class, or

4    other types of settlements that you would do in a

5    tort system.

6              So the main way to resolve cases in

7    the tort system is through litigation, and we

8    discuss those weekly on the calls that we have with

9    our collective outside counsel group, of which

10   Mr. Conlan participated and was an active

11   participant.

12             With that said, we also discussed

13   other potential ways to resolve matters outside of

14   the bankruptcy system and the court system.  So that

15   would include individual settlement agreements,

16   portfolio settlement agreements, what is known as a

17   divisional merger followed by a spin-off, a

18   divisional merger followed by a bankruptcy, and

19   other types of what are known as structural

20   optimization transactions, where you cabin the

21   liability in an entity and then remove that entity

22   from the corporate hierarchy.

23             And each of those topics were

24   discussed, debated, critiqued, the strengths and

25   benefits of them, the risks of those, the pros and

1   cons of those were debated at great length during

2   the calls that we had on a weekly basis, and

3   individually with Mr. Conlan.

4   BY MR. BRODY:

5        Q.    And so Mr. Conlan was a part of those

6   discussions?

7        A.    Mr. Conlan was an integral part of

8   the outside counsel team.

9        Q.    And did that include discussions --

10  and again, I want you to limit this.  Do not

11  disclose the substance of it.  But did it include

12  discussions of the advantages and disadvantages of

13  potential resolution through the tort system

14  compared to other options that may have been

15  available to Johnson & Johnson?

16       A.    Yes.  It involved the --

17            MR. POLLOCK:  Your Honor, which

18  entity, as to whether this is Imerys or LTL, because

19  I don't know what context this arose in and the

20  witness has not clarified where this discussion

21  occurred.  I have no documents to review.  So I

22  think I'm entitled to at least know --

23            THE COURT:  Fair question.

24            MR. POLLOCK:  -- which bankruptcy is

25  it related to.

1          MR. BRODY:  Your Honor, the question

2     was not specific to any particular bankruptcy.  It

3     was a question about whether Mr. Conlan was part of

4     discussion of the advantages and disadvantages of a

5     resolution through the tort system, compared to all

6     of the other options that were potentially on the

7     table at Johnson & Johnson.

8          THE COURT:  Can you limit that to

9     LTL, Johnson & Johnson.

10          MR. BRODY:  Let me ask Mr. Haas the

11     question.

12     BY MR. BRODY:

13     Q.     Was that -- were those comparisons

14     limited to Imerys?

15     A.     No, they were not limited to Imerys

16     or LTL.  So it wasn't limited to where Johnson &

17     Johnson and its affiliates were third-party debtors

18     in the Imerys context or when we were a debtor in

19     the LTL bankruptcy.

20          Quite to the contrary, from the very

21     first conversation I had and throughout the entire

22     time Mr. Conlan was representing Johnson & Johnson,

23     we had repeated discussions, many, many discussions

24     over whether and to what extent the cases should be

25     resolved in bankruptcy, or completely outside of

```
 1   bankruptcy in a number of different ways, through
 2   what he referred to as structural optimization, but
 3   involved what I had mentioned earlier, divisional
 4   mergers that could be followed by spinoffs, where
 5   basically you sell the entity that takes on the
 6   liability, or divisional mergers that would be
 7   followed by bankruptcy, or combinations of the both.
 8              And that with the other aspects of --
 9   speaking in very general terms, it didn't
10   necessarily mean one or the other.  There could have
11   been combinations in terms of you could cabin some
12   liability, you put other liabilities into a
13   bankruptcy.  It could depend upon the disease state,
14   for example, mesothelioma versus cancer claims.
15              So each of those iterations were
16   mapped out and were discussed with respect to what
17   would the benefits be of one versus the other; when
18   would you want to do one versus the other; how would
19   you go about doing one versus the other; who would
20   you approach to do one versus the other.  So those
21   were the types of conversations we had, without
22   getting into the specifics.
23        Q.    And when you say "who would you
24   approach," can you tell the Court what you mean by
25   that?
```

1          A.          There are just a few of the counsels

2     that were involved in these discussion sitting in

3     the courtroom today.  If we were to bring them all

4     in, we would need a courtroom ten-fold the size of

5     this.  There were many, many counsel involved in the

6     talc litigation, which reflects why we had so many

7     firms involved.

8                    And so part of the strategic issue

9     was, who do you approach and when.  Each of the

10    different litigations had someone that was, or a

11    group of individuals who were taking lead.  So, for

12    example, the Imerys bankruptcy had a torts claimants

13    committee, which is a series of ten, about ten

14    individuals that were appointed by the U.S. Trustee.

15    Each of those were represented individually by

16    counsel.

17                    Those counsel -- those individual

18    claimants were appointed by the U.S. Trustee to

19    represent that class of claimants in the Imerys

20    case.  And so those counsels took the lead in that

21    particular situation.

22                    Same thing in LTL.  In the MDL, you

23    had a different set of leadership.  The MCL,

24    different.  A lot of it overlapped.  There was a

25    great deal of overlap.  For example, Beasley Allen

1    had a primary role, I would say, in each one of

2    those constituents.  But depending upon which group

3    or which litigation you were dealing with, that

4    then, in turn, dictated who were the individuals

5    that would be leading.

6              So, strategically, you had to figure

7    out who to speak to first.  And, for example, when

8    you're talking bankruptcy, you also had another

9    group of individuals, those that represented the

10   future claim representatives, right, the future

11   claimants, because you have classes of current

12   claimants and futures, and then you have different

13   classes of creditors.  So you have to figure out how

14   to go about addressing those.

15             So it was a multidimensional spectrum

16   of claimants and interests and counsel that

17   represented them.  So, strategically, there were

18   many calls that had to be made in order to assess

19   who to approach and when.

20        Q.     And do those assessments inform

21   Johnson & Johnson's decisionmaking on the talc

22   litigation?

23        A.     Yes.

24        Q.     And was Mr. Conlan privy to how those

25   assessments impacted Johnson & Johnson's decisions

1    in the talc litigation?

2         A.      Yes.

3              MR. POLLOCK:  Objection, Your Honor.

4    How do I conceivably know what Johnson & Johnson

5    considered when there's an entire board of people,

6    the general counsel is involved.  I've got no

7    records.  I have to object -- again, object on

8    hearsay.  I have no basis with which to know what

9    Mr. Conlan's role was.

10             THE COURT:  Mr. Brody.

11             MR. BRODY:  Your Honor, this witness,

12   we've established, was in charge of the talc

13   litigation.  I can ask him a predicate question.

14   BY MR. BRODY:

15        Q.      Do you -- do you have firsthand

16   knowledge of whether these assessments informed the

17   Johnson & Johnson decisionmaking on the talc

18   litigation?

19        A.      I have absolute knowledge, because it

20   was my decision.  I made the decisions with respect

21   to talc litigation.  If there's any issue that we

22   would like to discuss today as to ultimately why it

23   was made, the buck stops here.

24        Q.      All right.  And so, going back to my

25   question, because I don't know I got your answer

1    before the objection was made.

2                    Did the assessments that you've been

3    speaking about inform Johnson & Johnson's

4    decisionmaking on the talc litigation?

5         A.       Yes, they did.

6         Q.       And was Mr. Conlan privy to not only

7    those assessments but how those assessments informed

8    Johnson & Johnson's decisionmaking?

9         A.       Yes.  And in that regard, I would say

10   he was very, very active and had very strong points

11   of view and communicated them very strongly.  Not

12   only to me, but to the outside counsel group.

13        Q.       Would you ever share those

14   assessments with opposing counsel in the talc

15   litigation?

16        A.       Absolutely not.

17        Q.       Why not?

18        A.       If I were to share the internal

19   deliberations with both inhouse counsel and outside

20   counsel with our adversaries, it necessarily would

21   provide us with a strategic disadvantage.  It was

22   would be an unfair advantage, because the other side

23   would understand what we see as the risk/benefits,

24   the pro/cons, the advantages and the disadvantages.

25   It would present an unfair advantage.  And I think,

1    in my view, it would fundamentally undermine the

2    adversarial process and completely contravene all

3    interest in justice.

4              So, no, I do not believe it would be

5    appropriate, and I mean under any circumstances, to

6    communicate those confidential communications, or

7    the nature of what we were discussing to our

8    adversary.

9         Q.    You heard Mr. Pollock in one of his

10   objections mention the Imerys bankruptcy.  I want to

11   ask you just a few questions about that.

12             Are you familiar with the bankruptcy

13   proceedings involving Imerys?

14        A.    Yes.

15        Q.    And very briefly, can you explain to

16   the Court what the Imerys bankruptcy is?

17        A.    Imerys was a company that extracted

18   and mined talc in the United States and supplied a

19   number of companies with that talc, including

20   Johnson & Johnson for Johnson & Johnson's Baby

21   Powder.

22             In I believe 2019, Imerys filed a

23   Chapter 11 case because it was facing talc claims.

24   Those talc claims were the same talc claims for the

25   same harm that Johnson & Johnson was facing, because

1    those claims were asserted against both Johnson &

2    Johnson and Imerys as a supplier.

3              As a consequence, in that bankruptcy,

4    Johnson & Johnson had indemnification claims against

5    Imerys, Imerys had indemnification claims against

6    Johnson & Johnson.  But it was -- they were the same

7    claims.

8              Now, Imerys was the debtor that filed

9    a Chapter 11 case, and because of the interest in

10   Johnson & Johnson in ensuring that there's a fair

11   determination and adjudication of those claims,

12   whether through bankruptcy or not, Johnson & Johnson

13   participated in the Imerys bankruptcy, and both as a

14   -- in instances as an objector, and in other

15   instances as a third-party debtor, because under the

16   bankruptcy code there are rights that are attributed

17   to third-party debtors, including the ability to

18   participate in a plan for the resolution of the

19   bankruptcy and for the complete release of the talc

20   claims.

21        Q.    Was Mr. Conlan involved in issues

22   related to the Imerys bankruptcy when he was

23   representing Johnson & Johnson as its outside

24   counsel?

25        A.    Yes, he was intimately involved.  He

```
1    commented quite extensively.  He was involved in
2    drafting and commenting on submissions to the
3    bankruptcy court in connection with the Imerys
4    bankruptcy.
5           Q.     And --
6           A.     He did everything an outside counsel
7    would do with respect to the Imerys bankruptcy.
8           Q.     Are you familiar with the tort
9    claimants committee in the Imerys bankruptcy?
10          A.     Generally.  And I think I mentioned
11   this earlier, the Imerys tort claimants committee is
12   a committee of, I believe, if ten claimants, ten or
13   11 claimants that were appointed by the U.S. Trustee
14   in order to represent that class of tort claimants.
15                 Each of the claimants is represented
16   by a firm, a counsel.  And so that outside counsel
17   for those claimants -- well, the counsel for the
18   claimants were the representatives of those torts
19   claimants in connection with the bankruptcy.
20          Q.     And are you aware of whether
21   Mr. Conlan was privy to the development of Johnson &
22   Johnson's negotiating strategy for resolution of
23   talc claims with the tort claimants committee, or
24   the TCC, in the Imerys bankruptcy?
25          A.     He was actively involved and he
```

1    actively participated in communications with the TCC

2    for Imerys, which included Beasley Allen as one of

3    the firms that represented the -- a claimant on the

4    torts claimants committee, and Beasley Allen took a

5    lead role with respect to the torts claimants

6    committee.

7                And in addition to the discussions

8    with the torts claimants committee, Mr. Conlan had

9    conversations with the counsel for the debtor,

10   that's Jeff Bjork of Latham Watkins, and he had

11   conversations with counsel for the future claims

12   representative, that was James Patton, to the best

13   of my recollection.

14        Q.      Can you explain to the Court what the

15   role of the future claimants representative is or

16   was in the Imerys bankruptcy?

17        A.      Yes.  So in the bankruptcy setting,

18   when you're dealing with a mass tort like this --

19   not all mass torts have this characteristics, but it

20   has -- the future claims for the reasons I stated

21   earlier, because the latency period goes on for some

22   period of time.  You may have claimants today who

23   have been exposed, but have not yet incurred any

24   disease state.  As a consequence, their claims do

25   not really ripen until such a time as they have that

1    disease state.

2                     So those claims could come at some

3    point in the future, notwithstanding the bankruptcy

4    is designed to get a contemporaneous resolution.

5                     So, in connection with bankruptcy,

6    there are provisions and rules that allow for the

7    resolution of both current and future claims, but in

8    order for it to be fair, those future claimants have

9    to be represented by their own counsel.  And that's

10   the future -- and an expert, and that's the future

11   claims representative, and the future claims

12   representative counsel.

13        Q.       In his communications with the TCC

14   and the future claims representative in the Imerys

15   bankruptcy, was Mr. Conlan negotiating on behalf of

16   J&J?

17        A.       He was.

18        Q.       And were you communicating with him

19   throughout that period regarding J&J's positions in

20   those negotiations?

21        A.       Extensively.

22        Q.       And did that include discussion of

23   what J&J could and could not do, would and would not

24   do to resolve the cases that are pending here in New

25   Jersey and in the federal MDL?

1          A.          Yes, it did, as well as the timing,

2     who to speak with and when, the amount of claims --

3     the amount to which we would be willing to pay to

4     resolve those claims, both on an aggregate basis and

5     a per claim basis, because oftentimes the settlement

6     could depend on both, because the per claim basis

7     also oftentimes requires an assessment of what were

8     the anticipated criteria of the future claimants in

9     terms of age, disease state, severity of disease

10    states, length of exposure.

11          All of those factors would go into

12    assessing how much on a per claim basis would be or

13    should be made available to the future claimants, as

14    well as the current claimants.  And that was all

15    built into what's called the settlement matrix.  And

16    so not all settlements use the settlement matrix,

17    but as part of our discussions, that was one of the

18    considerations.

19          Q.          And did Mr. Conlan and his team,

20    during that period, engage in significant work

21    related to evaluation of settlement matrices that

22    were being considered in connection with resolution

23    of the talc claims?

24          A.          To the extent --

25          MR. POLLOCK:  Your Honor, can I get

1    clarification.  When it says "and his team," the

2    question here is what did Mr. Conlan do.  I don't

3    know who the team is.  Is the team everyone else who

4    is working on the case, like Weil Gotshal and Jones

5    Day.  I don't know -- I need to know what Mr. Conlan

6    was doing specifically, Your Honor.

7                    THE COURT:  That's a fair objection.

8                    MR. BRODY:  See, and I can clarify,

9    Your Honor.  That's fine.  So let me just limit it

10   to Mr. Conlan.

11   BY MR. BRODY:

12       Q.      Was Mr. Conlan engaged in the

13   evaluation of settlement matrices that were being

14   considered as part of the potential resolution of

15   the cases in the MCL and the MDL?

16       A.      Yes, he was extensively involved and

17   he touted his vast experience in the mass tort

18   space.

19       Q.      Did that require that he have access

20   to confidential Johnson & Johnson information?

21       A.      It did.

22       Q.      And did he participate in privileged

23   and confidential discussions of -- you know,

24   including evaluation of proposals that may have been

25   going back and forth involving these settlement

1    matrices?

2         A.      Yes, he did.  He had extensive

3    communications with the team and strident opinions

4    on the issues.

5         Q.      Are you familiar with TDP values in

6    the Imerys bankruptcy?

7         A.      Tort distribution procedures, yes.

8         Q.      Was Mr. Conlan involved in evaluation

9    of --

10        A.      Or trust distribution.

11        Q.      Trust distribution.  Yes.

12                Was Mr. Conlan also involved in

13   evaluation of proposed TDP claim values in the

14   Imerys bankruptcy?

15        A.      Yes, he was.  He commented

16   extensively on that, as well.

17        Q.      And was he part of the J&J team --

18   and when I say "J&J team," I'm talking about the

19   inhouse counsel who were involved, as well as his

20   co-counsel from the other firms representing J&J,

21   was he involved in that evaluation?

22        A.      Yes.  He participated in the calls

23   where he deliberated on those issues, he commented,

24   critiqued, debated each of those issues extensively.

25        Q.      Did that include an evaluation of the

1    proposed claim values and whether Johnson & Johnson

2    believed they were too high, too low, without

3    getting into specifics?

4         A.        Absolutely.  And it goes to what I

5    said earlier, both the aggregate amount and the per

6    claim amount.

7                   And if I may just digress for a

8    minute here.  That was important generally speaking

9    because Johnson & Johnson at court does not believe

10   these claims have any merit.  And this is all a

11   matter of record that came out in the bankruptcy, so

12   I not revealing any confidence at this point.

13                  But we elected to enter into

14   settlement agreements because the facts that are now

15   a matter of the record in the LTL bankruptcy

16   demonstrated, and notwithstanding that we were

17   winning the vast majority of cases, to try the cases

18   that existed at the time the first bankruptcy was

19   filed would have taken 3,800 years, and the

20   calculation of the expenses, not the judgments, but

21   the expenses that it would have cost in order for us

22   to get a resolution over that time frame was $190

23   billion.

24                  So in the best interest of our

25   constituents, our patients, our doctors, our nurses,

```
 1    our employers -- our employees, our investors, a

 2    settlement was in the best interest of all parties,

 3    and, in particular, with respect to the claimants,

 4    too.  Because the claimants had come to the cases

 5    with a view that there was some harm that they were

 6    caused by our product, because that's what they were

 7    advised by counsel on the other side of the table,

 8    and this was the only way, if we were to enter into

 9    the settlement agreement, it was the only way to get

10    funds to those claimants during their lifetime.  And

11    it's the only way to do that while you're also

12    reserving amounts for the future claims that exist.

13              Because at the time we were

14    contemplating these bankruptcies, the entity that

15    actually owned this risk, it was Johnson & Johnson

16    Consumer, Inc., was in the red.  That company, in

17    and of itself, could have gone into bankruptcy,

18    before this so called two-step, before the

19    divisional mergers, that company could have gone

20    into bankruptcy because in 2020, it was in the red

21    solely because of the talc claims.

22              So we contemplated these settlements

23    because it was in the best interest, in our view, of

24    all constituents.

25              THE COURT:  Let me interrupt.  You
```

1    know, keeping us focused.  So we have a team of

2    lawyers, and ten times the amount of this courtroom,

3    referring to the team.  Where does Mr. Conlan,

4    Mr. Haas, fit in this team?  Is there a hierarchy of

5    attorneys?  You know, I want to get us back to --

6    and I appreciate the context, but where does

7    Mr. Conlan fit in this team of outside counsel?  Is

8    there a hierarchy?

9              THE WITNESS:  I think you could look

10   at some of his public statements, including a recent

11   one in the November 2nd --

12             THE COURT:  The Bloomberg article?

13             THE WITNESS:  Yeah, as to what he

14   touted himself to be, which was the premier

15   bankruptcy expert that ran Sidley's bankruptcy

16   department and mass tort department for 20-some odd

17   years and had more knowledge in this area in the

18   resolution of the mass torts than anyone else on the

19   planet.

20             So he came to the team with that

21   perspective, and communicating that expertise, and

22   he brought that to these calls.

23             And when I say he was actively

24   involved and he had strong opinions, that is why.

25   So on every issue that would come up, like which is

1    the right forum, when should we bring a claim, who

2    should we approach, how should we structure it,

3    Mr. Conlan would bring his expertise to that matter

4    and give his very strident opinions on what should

5    be done, and critique what were the views of other

6    very learned counsel, whether Weil Gotshal, Skadden,

7    or the other firms, Orrick.  We had myriad

8    significant firms on these cases.

9              So when you ask for his role, he was

10   a central figure in strategic decisionmaking in

11   connection with this team, throughout the entire

12   process when he was -- and the entire time frame he

13   was engaged.

14   BY MR. BRODY:

15        Q.    And Mr. Haas, when you talk about the

16   team and these weekly calls, I assume you didn't

17   have all of your talc litigation outside counsel on

18   these weekly calls?

19        A.    No, because we had counsel throughout

20   the country.  There are cases that are tried

21   literally in almost every state in the country.  And

22   so we have individual tort local counsel throughout.

23              But we had a team that was comprised

24   of the firms that worked on the large matters, the

25   MDL, the MCL, and coordinating counsel, and

1    representatives of the litigants throughout the

2    country.

3              So what we tried to bring together is

4    every perspective, so that when we're trying to

5    decide which is the best avenue to resolve the

6    biggest liability for Johnson & Johnson, we would

7    have the impact from counsel representing all of the

8    different constituents.

9         Q.    And you said Mr. Conlan was a member

10   who joined those weekly calls.

11        A.    Yes.

12        Q.    And would you consider that to be the

13   core team that was evaluating these issues?

14        A.    Yes, the core team of premier counsel

15   that were bringing to bear the best advice they had

16   in order to help us resolve these matters, both

17   through litigation or resolution outside of

18   litigation.

19        Q.    And who else at Johnson & Johnson --

20   and I'm referring to inhouse counsel now, was

21   involved in those calls?

22        A.    So there was my -- the main

23   participants in the calls from the Johnson & Johnson

24   litigation team were myself, Joe Braunruether,

25   Andrew White, and John Kim.

1          Q.        And you mentioned Mr. Braunruether

2     was the worldwide head of litigation immediately

3     preceding you?

4          A.        His title was actually the associate

5     general counsel.  There was a separate worldwide

6     head vice president at that time.  When I started,

7     the two roles were combined.

8          Q.        Okay.  And Mr. White, what is

9     Mr. White's role at Johnson & Johnson?

10         A.        Mr. White is currently the product

11    leader, the group product leader for product

12    liabilities.

13         Q.        Okay.  And what about Mr. Kim?

14         A.        Mr. Kim held that role before

15    Mr. White.

16         Q.        Okay.  So these are senior members of

17    the law department at Johnson & Johnson?

18         A.        Yes.

19         Q.        The analysis that we were talking

20    about of claim values, of settlement matrices, do

21    you consider the analysis that Mr. Conlan was

22    involved in to be privileged and confidential?

23         A.        Absolutely.

24         Q.        And would you ever share that with

25    your opposing counsel in the talc litigation?

1          A.          Absolutely not.

2          Q.          All right.  You mentioned that you

3     spoke to Mr. Conlan at various times about

4     structural optimization, right?

5          A.          Uh-huh.

6          Q.          Did you consider your discussions

7     with him to be privileged and confidential?

8          A.          Yes, I did.

9          Q.          And was it discussed within the

10    context of evaluating different options to resolve

11    the cases that are pending here in this MCL and in

12    the federal MDL?

13         A.          Yes.  And to be clear, that is what I

14    considered privileged.  The concept of structural

15    optimization, per se, in like the concept of

16    bankruptcy, right; it's a concept.  Within that

17    there are iterations and various different ways to

18    go about doing it.

19                      Structural optimization is just

20    basically the concept of taking liability and

21    putting it into a particular entity within your

22    organization.  Then there's many different things

23    you can do with that.  You can go to bankruptcy with

24    it, you can spin it off, you can spin part of it

25    off.  So there's many different ways you can

 1    structurally optimize.

 2              One of the things you can consider as

 3    a goal is to actually continue to hold onto that

 4    enterprise, but just not make it part of your

 5    consolidated financial statements.

 6              So it's a tool, and that tool has

 7    many iterations.  But what is important are the

 8    strategic considerations of how do you go about

 9    doing that, with whom and at which amounts you set

10    as a valuation that you're going to need to fund

11    that enterprise in order to make it a non-fraudulent

12    transfer, when you put the liabilities in there.  So

13    there are many, many strategic considerations, all

14    of which have risks and benefits, and pluses and

15    minuses, because it's also in the context of a broad

16    err question of "are you going to get comprehensive

17    resolution.

18              So even if you do that outside of a

19    bankruptcy, if you do not have a bankruptcy piece to

20    that, you will never get comprehensive and final

21    resolution absent there being a portion that is

22    resolved through bankruptcy that addresses future

23    claims.  Because in structural optimizations, you

24    will not know until those future claims come in what

25    is the magnitude of those claims.

1        Q.       Was Mr. Conlan involved in

2    discussion, privileged and confidential discussion

3    of methods to estimate the potential value of those

4    future claims?

5        A.       Yes.  Both at the aggregate level and

6    at the per claim level, and the criteria that go

7    into how you set your per claim amounts, as well as

8    what exceptions there may be to that analysis.  So

9    what circumstances would the values be increased and

10   in what circumstances would the values be decreased.

11       Q.       And was that for both the ovarian

12   cancer claims and the mesothelioma claims?

13       A.       Yes, sir.

14       Q.       And was he involved in analysis of

15   legal arguments with the potential to impact the

16   number and viability of future claims?

17       A.       Yes.

18       Q.       Did the inhouse team share with

19   Mr. Conlan its views on whether the passage of time

20   might increase or decrease the value of those future

21   claims?

22       A.       Absolutely.

23       Q.       Whether it might increase or decrease

24   the amount that Johnson & Johnson would be forced to

25   pay to get the finality that you talked about?

1          A.      Yes.

2          Q.      Do you consider that to be privileged

3     and confidential?

4          A.      I did, and I do.

5          Q.      Was he involved in discussions of how

6     the risk of trial activity for ovarian cancer and

7     mesothelioma claims would change or would not change

8     over time?

9          A.      Yes.

10         Q.      Do you consider that to be privileged

11    and confidential?

12         A.      I do.

13         Q.      Was Mr. Conlan also involved,

14    shifting gears slightly, in privileged and

15    confidential discussion of the LTL Management, LLC,

16    bankruptcy filing?

17         A.      Yes.

18              MR. POLLOCK:  Objection, Your Honor.

19    Can I get a point in time, please?  This could be

20    important.

21              THE COURT:  I agree.

22              Can we have some clarity with regard

23    to some time frame, Mr. Brody?

24    /

25    /

```
 1                    MR. BRODY:  Sure.  I'll just ask

 2       Mr. Haas.

 3       BY MR. BRODY:

 4            Q.       During what time period was he

 5       involved in discussions of -- why don't we start

 6       with before the bankruptcy filing.  If I recall

 7       correctly, the bankruptcy filing was in October of

 8       2021, right?

 9            A.       October 13, 2021.

10                    Mr. Conlan was involved in all the

11       discussions regarding the potential for bringing a

12       bankruptcy in which Johnson & Johnson was the

13       debtor, which essentially led to the filing of the

14       LTL bankruptcy.  So that's the time frame, 2021,

15       when we were first negotiating in attempt to get a

16       resolution to the Imerys bankruptcy as a third-party

17       debtor.  When that failed, then the consideration

18       was, was there an option to file our own bankruptcy.

19                    And so those deliberations continued

20       through 2021, up until October '21.  Mr. Conlan was

21       intimately involved in all of those discussions, in

22       all the considerations that went into those, and

23       ultimate determination.  And thereafter, he was

24       involved in the advice, strategy, deliberations and

25       communications regarding how to effectuate that
```

1    bankruptcy, once filed.

2         Q.       And did that include discussions with

3    you?

4         A.       Absolutely, it did.  Direct

5    communications, email communications, communications

6    on group calls, and, you know, one-on-one

7    conversations, dinner conversations, lunch

8    conversations.

9         Q.       Were Mr. White and Mr. Kim involved

10   in those conversations?

11        A.       Absolutely.

12        Q.       What about the rest of the core

13   outside counsel team that you spoke about?

14        A.       Yes.

15        Q.       Did that include evaluation of the

16   potential value of pending talc claims?

17        A.       Yes, they did, both the aggregate

18   level and per claim level.

19        Q.       And potential number of future

20   claims?

21        A.       Yes.

22        Q.       And how the bankruptcy filing

23   compared to other resolutions, potential resolutions

24   that were available to J&J?  And again, these are

25   all just I want a yes or a no without any substance.

```
 1           A.      Significant discussions in that

 2   regard.

 3           Q.      Of how Johnson & Johnson viewed the

 4   bankruptcy option compared to the structural

 5   optimization?

 6           A.      Yes.  And in connection with

 7   variations of the concept of structural optimization

 8   in different contexts.

 9           Q.      Now, shortly after, a few months

10   after the October 2021 LTL filing, Mr. Conlan left

11   Faegre Drinker, right?

12           A.      I'm sorry, can you ask that question

13   again.

14           Q.      Yeah, sure.  End of February of 2022,

15   Mr. Conlan left Faegre Drinker, right?

16           A.      I learned of Mr. Conlan's departure

17   in an email on, I believe it was March 28th, '22,

18   2022.

19           Q.      Okay.  And what did you learn at that

20   time?

21           A.      Mr. Conlan told me that he was

22   resigning from Faegre Drinker and starting a

23   business called Legacy Liability, or something like

24   that.

25           Q.      Okay.  Was this while the LTL
```

1    bankruptcy was still pending?

2             A.       Yes.

3             Q.       Did J&J have support for resolution

4    of its talc liabilities through the LTL bankruptcy

5    process?

6             A.       I'm sorry, can you ask that question

7    again.

8             Q.       Sure.

9                      Did J&J have support from claimants

10   for resolution of its talc liabilities --

11            A.       Yes.

12            Q.       -- through the LTL bankruptcy

13   process?

14            A.       Yes.  So Johnson & Johnson had the

15   support of the vast majority of counsel -- let me

16   state that differently.

17                     Johnson & Johnson had support for

18   counsel representing the vast majority of the

19   claimants in the LTL bankruptcy.  This is a matter

20   of record; that in the hearing that was had in the

21   summer of 2023, before Judge Kaplan in the

22   bankruptcy court, one of questions he had was:  What

23   was the support for the bankruptcy from the

24   claimants at that time, before a vote was taken, and

25   what was the opposition to the bankruptcy from the

1    clamant's perspective.  He asked for evidence to be

2    submitted and he made findings in that regard.

3              The evidence in that regard showed

4    that counsel representing 70 percent of the

5    claimants were supporting our bankruptcy and 20

6    percent were opposing the bankruptcy.

7         Q.    Can you tell me, you know, was

8    Mr. Birchfield opposing it?

9         A.    Mr. Birchfield led the small minority

10   of law firms that opposed at the bankruptcy.

11        Q.    Do you know why?

12             MR. POLLOCK:  Your Honor, there's

13   ovarian cancer claims and there's also mesothelioma

14   claims.

15             THE COURT:  Limit it to ovarian

16   cancer.

17             MR. POLLOCK:  Well, the problem is I

18   don't know which group we're talking about.  And

19   when he says the majority, I don't know if -- I can

20   deal with it on cross, if you like.  But frankly, it

21   seems to me that if you're going to say 70 percent,

22   I'd like to know how that 70 percent was gotten.

23             THE COURT:  And I think that's a fair

24   question and objection.  So I'll sustain the

25   objection.

```
 1                    Can you focus us back in?

 2                    MR. BRODY:  Sure, I can -- I can ask.

 3   BY MR. BRODY:

 4        Q.     Mr. Haas, why don't you explain what

 5   you were referring to with the 70 percent?

 6        A.     So, it's both.  The evidence in the

 7   record --

 8                    THE COURT:  Meso and ovarian.

 9                    THE WITNESS:  Yes.  In terms of

10   numbers, there are far, far, far more ovarian cancer

11   claims than there are mesothelioma claims.  But the

12   analysis that the Court requested and that we have

13   done pertain to both.

14   BY MR. BRODY:

15        Q.     What was the -- and the question I

16   had asked you before that was:  Do you know why

17   Mr. Birchfield opposed it?

18        A.     Mr. Birchfield gave a deposition in

19   the bankruptcy proceeding before Judge Kaplan, and

20   in that deposition he testified --

21                    THE COURT:   Is that the deposition

22   portion, the same one I have?

23                    MR. BRODY:  Yes.

24                    THE COURT:  Okay.

25                    THE WITNESS:  He testified that in
```

1    addition to the 40 percent contingency fee that he

2    would obtain from any resolution with these

3    claimants, he also was entitled to up to 12 percent

4    for his work in and Beasley Allen's work on the

5    plaintiff's steering committee in the MDL, which

6    would entitle him to the common benefit fee.

7              So it's a 40 percent contingency fee,

8    plus 12 percent of any resolution that was had

9    through the MDL proceedings.

10             That common benefit fee was not

11    available in the plan that LTL was advancing in the

12    LTL bankruptcy.

13    BY MR. BRODY:

14        Q.      And what was the end result of the

15    LTL bankruptcy?

16        A.      On July 28th, 2023, Judge Kaplan

17    issued a decision dismissing the bankruptcy, and

18    that decision currently is on appeal.  The Third

19    Circuit took an expedited appeal directly to the

20    appeal going around the District Court.

21        Q.      Did you hear from Mr. Conlan at the

22    time Judge Kaplan announced that decision on

23    July 28th?

24        A.      The very day that the bankruptcy was

25    dismissed on July 28th, 2023, Mr. Conlan reached out

1    to me.

2           Q.      Okay.  And what did he reach out to

3    you to ask, to say?

4           A.      Mr. Conlan reached out to me to

5    propose that we have discussions to engage in a

6    structural optimization transaction.

7           Q.      What was the next time you heard from

8    Mr. Conlan after that?

9           A.      The next time I heard from Mr. Conlan

10   I believe it was on August 21st, 2023.

11          Q.      Okay.  Did he have a request or an

12   ask at that time?

13          A.      Yeah.  He had reached out to our

14   treasurer, so he went around me to our treasurer,

15   and he had asked our treasurer for a meeting in

16   order to present that same structural optimization

17   proposal to the treasurer.

18          Q.      And did you agree to set that meeting

19   up?

20          A.      At that time, having circumvented me

21   in going to the business directly, I felt it

22   incumbent upon me, therefore, to allow me to be at

23   it, so I did.

24          Q.      Okay.  Do you recall when that

25   meeting took place?

```
 1              A.       It took place on September 11, 2023.

 2              Q.       Who attended?

 3              A.       To my recollection, it was myself, it

 4    was the treasurer of Johnson & Johnson, Andrew White

 5    in the litigation department, the practice group

 6    leader for product liability, Mr. Conlan, and

 7    Mr. Doug Dachille, who I believe is the CIO of

 8    Mr. Conlan's firm.

 9              Q.       And what happened at the meeting?

10              A.       Mr. Conlan and his colleague made a

11    presentation with respect to the structural

12    optimization approach that he was proposing at that

13    time.  We had discussion regarding that proposal.

14                       The question I repeatedly asked was,

15    How was it to be funded, because what was

16    contemplated by that particular structural

17    optimization transaction was that there would be a

18    divisional merger.  You would take the liability,

19    put it into a new entity, and then sell that entity

20    off to another party -- in this place, he was

21    contemplating Legacy -- and/or fund that entity as a

22    J&J entity with sufficient funds to cover the talc

23    liability.

24                       Now, of course, that begs the

25    question, what would be then, enough about the
```

1    funds, in order to ensure that (A) if we keep it on

2    J&J books, it would then become de-consolidated,

3    which was the advantage Mr. Conlan was positing, or

4    how much would we have to pay in order to sell it to

5    Legacy and make it a separate entity.

6                    And at that point, the basic

7    proposition from his perspective was, Well,

8    whichever way you do it, Legacy would run the entire

9    claim administration process in the resolution of

10   the claims, and, therefore, earn its fee from a

11   management fee that it would then charge to the

12   enterprise that would take on these claims, and get

13   the spread to the extent they were able to resolve

14   it for anything less than funding.

15           Q.      What happened after that meetings?

16           A.      Well, because the primary issue that

17   was discussed was whether and to what extent there

18   had to be funding for that particular transaction,

19   and we had pushed Mr. Conlan and his colleagues on

20   that.  The rejoinder that we got was, Well, you have

21   to ask your auditor.

22                    And, therefore, it became incumbent

23   upon me to have a conversation with my auditor on

24   the same topic.  I did, and my auditor said that in

25   no circumstances would this be a viable transaction

1    that we would recognize or allow to be consolidated.

2              So we responded to Mr. Conlan and

3    said it was not a viable transaction, we had no

4    interest in proceeding.

5         Q.    Okay.  Was that the last you heard

6    from Mr. Conlan about the Legacy proposal?

7         A.    No, it wasn't.

8         Q.    When was the next time you heard from

9    Mr. Conlan after conveying that it wouldn't work?

10        A.    I believe it was on September 28th.

11   There was a communication from his CIO, Doug

12   Dachille, to the treasurer again.

13        Q.    Okay.  And did J&J respond to that?

14        A.    J&J rejected that interest -- that

15   inquiry again.

16        Q.    All right.  Judge Porto and Judge

17   Singh are both aware of the fact, and it's in the

18   record, that Johnson & Johnson third quarter

19   earnings call took place on October 17th of 2023.

20   There was a copy of the transcript of that call, and

21   your comments about the talc litigation are in the

22   record here.  So I don't need to go into that.

23              But I want to ask you, after that

24   October 17th earnings call, did you again hear from

25   Mr. Conlan?

1          A.          We heard from Mr. Conlan the very

2     next day.

3          Q.          All right.  And if you turn to --

4     it's Tab 4 in the hearing binder you have, my first

5     question for you is if that's the next-day

6     communication that you're referring to?

7          A.          Yes, this is the communication that

8     Mr. Conlan sent to the treasurer of our company,

9     Duane Van Arsdale, on October 18th, copying a number

10    of people, including myself and my colleague, Andrew

11    White.

12         Q.          Okay.  In this communication,

13    Mr. Conlan says that Legacy has the support of lead

14    counsel for the OC, ovarian cancer claimants,

15    including Andy Birchfield, for an MDL opt-in

16    settlement matrix with Legacy.

17                     And then he goes on to say that,

18    "Andy Birchfield, Doug Dachille, and I are prepared

19    to meet with you and your team in person to share

20    and discuss the terms of such matrix as part of the

21    Legacy acquisition."

22                     Are you with me?

23         A.          I see what you're referring to.

24         Q.          What was your reaction to that?

25         A.          Quite frankly, I had a number of

```
 1    reactions, but the short of is we were utterly
 2    shocked and appalled that our former counsel was
 3    conferring with our adversary, and the lead
 4    adversary that was opposing the proposal that we had
 5    on the table at that time to get a comprehensive and
 6    final resolution, that our former counsel was
 7    working with that lead counsel for the claimants to
 8    oppose our transaction by proposing an alternative
 9    transaction based upon the same matter and the same
10    issues that he had represented us extensively for 21
11    months.
12                So, I mean, my reaction was utter
13    shock and awe.  I viewed this to be an egregious
14    violation of Mr. Conlan's ethical obligations to
15    J&J, as well as Mr. Birchfield's ethical
16    obligations, and I reached out to counsel in order
17    to begin the process of assessing what is the
18    appropriate recourse for that interaction.
19                In addition to that, you know,
20    looking at this, at that point in time, our
21    understanding was this was the first time Mr. Conlan
22    had engaged with Mr. Birchfield on this alliance
23    where they are now working together to thwart our
24    proposal, because the way I read it at the time was,
25    "To further enhance our solution and to address the
```

1    potential auditor concerns."

2                   So that this is written in a way to

3    suggest that this is reactive to the response that

4    we just gave to Mr. Conlan.  So he is writing to us

5    and he's telling us, Well, you raised a concern and

6    now I'm going to join forces with your adversary to

7    address the issue that you had raised.

8                   And notwithstanding whether it

9    addressed the issue, which it didn't, the manner and

10   mode which it did what egregious, in our view, and

11   my view, and a blatant violation of his ethical

12   obligations.

13        Q.      And was this the first time, October

14   18th of 2023, that you learned that Mr. Conlan was

15   working with Mr. Birchfield?

16        A.      Yes, it does.  And Judge, obviously,

17   I highlighted that point because we now know it

18   wasn't true.  But I'm telling you contemporaneously

19   at the time, and given the way this was written,

20   that is exactly what it was conveying to us; that

21   suddenly Mr. Conlan had said, Oh, well, let me go

22   out and now contact the other side and start working

23   against you.

24                   That's egregious.  We now know it's

25   even more egregious because it wasn't the first

1     time.

2            Q.      Well, that was going to be my next

3     question for you.  Have you since come to learn that

4     Mr. Conlan and Mr. Birchfield were working together

5     throughout the pendency of the mediation that was

6     taking place in the LTL bankruptcy in the summer of

7     2023?

8                    MR. POLLOCK:  Objection, Your Honor.

9     This goes with the best evidence rule.  There is no

10    evidence that this ever occurred.  All I have is

11    rank speculation from Mr. Haas as to discussions he

12    wasn't even a part of.  How do I possibly

13    cross-examine when they have not produced a single

14    scrap of paper in the record to support any of

15    Mr. Haas' hypothesis.  All I have is rage from him.

16    I get it.  He's angry.

17                    But I'm entitled to documents, and I

18    can't oppose him -- I can't oppose a witness when he

19    has not produced the documents.  [U] squarely says

20    you've got a Hobson's choice; produce it or don't.

21                    I'm deeply concerned about where this

22    testimony is going, because there's no evidence,

23    whatsoever, to support it.

24                    THE COURT:  Mr. Brody.

25                    MR. BRODY:  Well, Your Honor, first

1     of all --

2                    THE COURT:  Obviously, this is a

3     credibility determination to the extent that there's

4     no document before the Court.

5                    MR. BRODY:  Let me ask Mr. Haas.

6                    THE COURT:  I'll overrule the

7     objection, and give you that opportunity, but there

8     is no documentation.  I think we cleared that

9     earlier in one of our conferences, right?

10                    MR. BRODY:  Certainly, Your Honor.

11    BY MR. BRODY:

12         Q.     Let me -- let ask you, Mr. Haas, when

13    did you first learn that Mr. Conlan and Beasley

14    Allen were working -- first of all, I don't know if

15    I got an answer to the prior question before the

16    objection, so let me ask that one again just for the

17    record.

18                    Have you since come to learn that

19    Mr. Conlan and Mr. Birchfield were working together

20    throughout the pendency of the mediation that was

21    taking place in the LTL bankruptcy in the summer,

22    spring and summer of 2023?

23         A.     Yes, I have.

24         Q.     When did you first learn that?

25         A.     About two weeks ago.

1          Q.        How did you come to learn that?

2          A.        By the filings by the plaintiff's

3     steering committee in the multidistrict litigation,

4     where they presented a privilege log which had

5     entries in it indicating that as early as April

6     20th, 2023, Mr. Conlan is communicating with Beasley

7     Allen regarding settlement proposals to make to a

8     mediator with respect to a structural optimization

9     proposal.

10               And then, thereafter, the privilege

11     log indicates myriad communications, myriad, one

12     after another after another after another since

13     April 2023 concerning these very same issues and the

14     very same matter that he represented us as legal

15     counsel on and that now, for the first time in

16     October 2023, was coming to light.

17          Q.        Did Mr. Conlan ever tell you that he

18     was communicating directly with Mr. Birchfield

19     during the LTL mediation?

20          A.        He never once mentioned that he was

21     communicating with Mr. Birchfield or the other

22     members of Beasley Allen, which, per the privilege

23     log they produced, demonstrate that he was having

24     myriad communications not just with Mr. Birchfield,

25     but with other members of Beasley Allen, made no

 1    mention of that.

 2                    And, indeed, he communicated with me

 3    on May 10, 2023, shortly after he began working with

 4    Mr. Birchfield, and, in that respect, never once

 5    mentioned that he had now entered into this alliance

 6    with Mr. Birchfield.  Never asked for my consent on

 7    behalf of J&J to work with Mr. Birchfield on the

 8    same matter, on the same issues.  Never asked for a

 9    waiver as to whether or not he should be able to

10    work on the same matter and the same issues that he

11    represented Johnson & Johnson on throughout 2021

12    into 2022.

13        Q.    Has he ever come to you at any point

14    in time and asked for a waiver?

15        A.    Not once.

16        Q.    Has Johnson & Johnson ever given him

17    a waiver?

18        A.    Not once.

19        Q.    You mentioned other members of

20    Beasley Allen whose communications are included on

21    that privilege log.  Can you tell me who?

22        A.    Ms. Leigh O'Dell -- Leigh O'Dell,

23    Mr. Ted Meadows, and there's other individuals at

24    the firm that, you know, their names and their email

25    addresses are listed, but I don't know their

1    particular...

2                    MR. BRODY:  Judge Porto, that

3    privilege log actually is now on the docket in the

4    federal MDL, and we would ask that this Court take

5    judicial notice of that privilege log and its

6    contents pursuant to Rule 201(b)(4).

7                    THE COURT:  I can do that.  Judge

8    Singh, any thoughts?  I have not seen it.

9                    MR. POLLOCK:  Excuse me, Judge.

10                    THE COURT:  Sure.

11                    MR. POLLOCK:  I'm sorry.  Before you

12    deliberate, before Judge Singh and before you,

13    Mr. Brody has repeatedly been asked:  Are we

14    complete?  Is the record done?  And the answer is

15    yes.  Now, suddenly, we're going to go outside the

16    record.  It's obviously in the Court's discretion.

17                    THE COURT:  Have you seen that

18    privilege log?

19                    MR. POLLOCK:  I have not seen the

20    privilege log, but I frankly don't really care

21    because -- well, I care deeply about this case.

22    Fine, they had discussions.  I have no doubt that

23    they did.  There's been no evidence as to what was

24    discussed.  And I'm not sure how they would get into

25    it because it's mediation privileged.

1               But to be honest with you, I think

2       that the -- now chime in and say, Hey, we're going

3       to keep on expanding this, keep on expanding this.

4       At some time, Beasley Allen and Andy Birchfield are

5       entitled to a determination whether the motion for

6       disqualification is going to be granted or not.

7               And you and Judge Singh asked

8       pointedly:  Is the record complete?  And Mr. Brody

9       said, pointedly, yes.  I was surprised by the

10      answer.  But he said pointedly said yes.  He didn't

11      say, I want more stuff in there.

12              And to me, if we open this, there's

13      another set of documents that could also come in,

14      because Judge Schneider ruled upon those.  We could

15      keep on expanding those.  But at some point, we've

16      got to reach the hard point where we make a

17      decision, and I'm relying upon representation that

18      was made to the Court that we're done.

19              MR. BRODY:  Your Honor, this

20      privilege log was just provided by the plaintiff

21      steering committee in the MDL about two and a half

22      weeks ago.  It was a shock to us to learn that there

23      were communications going on back and forth between

24      Mr. Birchfield and Mr. Conlan for a period of --

25      starting in late April of -- starting in late April,

```
 1    and the extent -- of 2023, and the extent of those

 2    communications.

 3                   And it's certainly a fact that is

 4    directly relevant to the disqualification motion.

 5    It's been filed in court.  It is on the docket in

 6    the MDL.  And, obviously, Your Honor, under

 7    201(b)(4), you can take judicial notice of the

 8    records of court proceedings throughout the state of

 9    New Jersey, federal court or state court.

10                   MR. POLLOCK:  May I respond briefly,

11    Judge?

12                   THE COURT:  Let me see if Judge Singh

13    has some thoughts.

14                   JUDGE SINGH:  Interesting, because

15    the privilege log is on the public docket in the

16    MDL, and as I understand it, Judge Schneider has

17    ruled in regards to those documents are to be

18    maintained as privileged.  However, the fact of the

19    communications within the log, it's hard to close

20    that once it's already on the docket.

21                   I personally would think that it is

22    part of the record.  It's something that the Court

23    could consider, at least in the context of my

24    review, but I defer to Judge Porto.

25                   THE COURT:  And I agree, but what
```

```
 1    troubles me is Mr. Pollock has not seen that.  And

 2    when we talk about the record being open, the record

 3    being closed, I'm just worrying about that today.  I

 4    didn't get any indication that that was a

 5    possibility two weeks ago.

 6                    MR. POLLOCK:  Your Honor, actually,

 7    this was referenced in Mr. Birchfield's supplemental

 8    certification.  So this is not shocking news.

 9                    THE COURT:  No, but the fact is it is

10    in the context that I don't know what we're talking

11    about.

12                    MR. POLLOCK:  I agree completely.  So

13    I'm prepared to proceed.  I do not want to delay the

14    deliberations.  The mere fact that I have not

15    reviewed them does not stop me right now, because,

16    frankly, with the mediation privilege, these

17    documents are going to be inadmissible, anyway.

18    They're non-discoverable in New Jersey law.

19                    So the fact that they communicated,

20    I'll stipulate to it.  They communicated.

21                    THE COURT:  I will take judicial

22    notice.

23                    MR. BRODY:  And, Your Honor, let me

24    just --

25    BY MR. BRODY:
```

1        Q.        Let me just ask you this question,

2   Mr. Haas, as a follow-up.  Did it -- I mean, did it

3   surprise you to learn two weeks ago that these

4   communications had been going on back and forth

5   throughout May, June, July and August of last year?

6        A.        I think what I said was I was shocked

7   and appalled.  And yes, it surprised me.  It

8   surprised me that someone who had purported to have

9   the caliber of standing in the bar that Mr. Conlan

10   did would engage in this behavior; that

11   Mr. Birchfield would further foster, facility, and

12   engage in that conduct.  This is the most egregious

13   breach of ethical obligations that I have ever heard

14   of, ever seen.

15                So, yeah, it surprised me, it shocked

16   me, it disappointed me, quite frankly, in many

17   respects with respect to Mr. Conlan in terms of his

18   standing as a lawyer, and as, quite frankly, a

19   trusted advisor of mine for a good part of the time

20   we worked together.

21        Q.        Are you aware that the plaintiffs

22   steering committee in the MDL has taken the position

23   that its communications with Mr. Conlan are

24   confidential and protected by mediation privilege?

25        A.        I'm aware of them taking that

1     position.

2            Q.       That their communications should

3     remain secret from J&J?

4            A.       Yes, they have taken that position.

5            Q.       Would you have taken steps, if you

6     had known at the time, to prevent Mr. Conlan from

7     working with Mr. Birchfield, Ms. O'Dell and others

8     at Beasley Allen during the course of the LTL

9     mediation?

10           A.       I think we would be exactly where we

11    are today, but we would have been there a lot

12    earlier, because I would have taken immediate action

13    had I known this was occurring.  And quite frankly,

14    I think that this would be an issue that would have

15    been adjudicated in the context of the bankruptcy

16    court, because to have someone side switch in a

17    matter dealing with the same issues, the very same

18    issues that we have extensively adjudicated,

19    deliberated, considered, communicated is egregious.

20           Q.       Turning back to Hearing Exhibit 4,

21    that was the October 18th email, how did J&J, other

22    than you indicated that you started working with

23    counsel at what you could do about the fact that

24    Mr. Birchfield -- that you learned at that time, for

25    the first time, that Mr. Birchfield was working with

1      Mr. Conlan, as to the substance of the proposal,

2      what did Johnson & Johnson do?  How did Johnson &

3      Johnson respond?

4              A.      Well, in terms of whether or not we

5      were going to sit down with Mr. Birchfield and

6      Conlan and talk about a proposal, that clearly was

7      inappropriate and was rejected.

8              Q.      All right.  Fast forward to two weeks

9      later, and if you would turn to -- it's tab 15 in

10     the binder.  And I'll ask you if you recognize this

11     document.

12             A.      This is a document that is an article

13     that Mr. Conlan secured publication for on

14     November 2nd, 2023, and that got significant pick-up

15     in the press.

16                     And in this article, Mr. Conlan

17     begins by stating that he is a former Sidley Austin

18     restructuring chair and that he's proposing an

19     alternative to the Texas Two-Step that provides

20     finality to the company and relief to injured

21     plaintiffs.

22                     And from the outset, what struck me

23     when I read that very first line, that he did not

24     mention Faegre Drinker, which is the company he was

25     working at, the law firm he was working at when he

 1   was representing Johnson & Johnson.  And that

 2   omission immediately struck me as telling.

 3               And as you read through the rest of

 4   the article, I think it becomes evident why.

 5   Because in this article, he takes positions directly

 6   at --

 7               MR. POLLOCK:  This is narrative

 8   testimony.  I recognize that is direct examination.

 9   But to me, if I wanted a lecture, I could listen to

10   it.  I think there's -- otherwise, it's just

11   literally plug and play here.  I think there should

12   be questioning, with all due respect, but it's your

13   courtroom.

14               THE COURT:  Mr. Brody?

15   BY MR. BRODY:

16       Q.      Mr. Haas, were you --

17               THE COURT:  I don't -- you know,

18   there are some aspects where a narrative is

19   certainly appropriate, but if we could have direct

20   testimony guided by questions.

21               MR. BRODY:  Your Honor, I'll just ask

22   two questions, and I think we can address this.

23               THE COURT:  Sure.  And I'm not

24   suggesting anything is improper.  We have an

25   objection, and if we could refocus, and then have

1    the questions directly.

2                    MR. BRODY:  Of course.  Absolutely.

3    BY MR. BRODY:

4         Q.      Were you upset when you saw this?

5         A.      I was upset.

6         Q.      Why were you upset?

7         A.      Because if you look at the second

8    paragraph, it pertains to not only other companies,

9    but to LTL.

10                   So Mr. Conlan is purporting to write

11   as a Sidley partner, disregarding the time frame

12   that he represented LTL, and he's writing an opinion

13   piece about LTL that then addresses the matters and

14   the issues that he worked on for us.

15                   And, you know, that second -- that

16   paragraph at the top there, where he says these are

17   a list of failed attempts to engage in this

18   restructuring, and he lists Best Wall, DBMP, Aldrich

19   Pump/Murray Boiler.  We know from the outset those

20   aren't failed attempts.  Those other entities are

21   going forward with this very restructuring that we

22   had in LTL.

23                   The only difference between the two

24   is in the Fourth Circuit, where they are moving

25   forward, the ability to move forward with that

```
 1    transaction was being appealed up to the Fourth

 2    Circuit, but the bankruptcy courts have endorsed it,

 3    while, in the Third Circuit, given the new standard

 4    the Third Circuit imposed, LTL is now appealing the

 5    decision to dismiss.  That is a circuit split, which

 6    ultimately will be resolved by the higher courts.

 7                    But it is important to note there

 8    that this is an inaccurate statement from the outset

 9    framing the issue.  But what is more important, as

10    it goes on in the article, that he actually takes a

11    position with respect to what the company's,

12    including LTL, positions were, what the companies

13    believed.

14                    He's representing in the article what

15    we believed, that based upon his communications with

16    us, while he was our counsel, and this was a part of

17    his alliance with Mr. Birchfield, who came out the

18    same day with a press release supporting it.

19                    So this is part and parcel of the

20    facilitation of attempt to come up with a competing

21    proposal to thwart the proposal that we were having

22    discussions on at this very time.

23                    And Judges, just for a little

24    context, so after the April -- July --

25                    MR. POLLOCK:  Your Honor, again, if
```

```
 1    we could have some questioning, it would be helpful

 2    for a break, as opposed to a narrative.

 3                    THE COURT:  I believe that's

 4    appropriate.

 5                    So why don't you guide the

 6    questioning again, Mr. Brody.

 7                    MR. BRODY:  Sure.

 8    BY MR. BRODY:

 9         Q.    Mr. Haas, you explained why this was

10    upsetting to you and why it was a concern to you.

11    If you would, please, explain, you know, did you see

12    this in the context of the overall effort by

13    Mr. Conlan and Mr. Birchfield to advance their

14    proposal as something other than the bankruptcy

15    proposal that you had indicated publicly on October

16    17th of last year that the company preferred?

17         A.    Yes.  So, earlier, Mr. Brody made

18    reference to the October 17th statements that I

19    made.

20                    THE COURT:  Call.

21                    THE WITNESS:  Call.

22                    On that call, I made a statement

23    about what our strategy was following the July 28th,

24    2023, dismissal by Judge Kaplan.

25                    What I explained on the call was we
```

```
 1    had a multistep strategy to move forward in order to
 2    obtain a clean and final resolution of the talc
 3    claims.  The first one we already discussed, which
 4    is appealing this circuit split now up to the higher
 5    court.
 6                    The second proposal which I made
 7    publicly, the second pathway that I explained
 8    publicly, was to pursue a resolution, a consensual
 9    resolution through bankruptcy again.
10                    Now, why was that?  In the July 28,
11    2023 decision by Judge Kaplan, he found that the
12    parties, LTL and the majority of claimants that were
13    supporting the plan, had made, his terms, remarkable
14    progress towards getting an equitable and final
15    resolution.  And then, he thereafter strongly
16    recommended and urged the parties to continue to
17    pursue that resolution through another bankruptcy.
18                    So I made clear on the earnings call
19    that that is exactly what we intended to do, with
20    the same amount that we were proposing through the
21    prior bankruptcy.
22                    THE COURT:  The $9.9 billion.
23                    THE WITNESS:  It was 8.9.
24                    THE COURT:  8.9.
25                    THE WITNESS:  Yes.  And this proposal
```

1    that was being proposed by Mr. Conlan with

2    Mr. Birchfield contemplated a $19 billion resolution

3    and was attempting to garner support through these

4    articles to oppose, to thwart our ability to get a

5    resolution.

6              So that is why I viewed this as part

7    of the alliance between the two in order to thwart

8    our efforts for a comprehensive resolution, because

9    Mr. Birchfield doesn't want a resolution in

10   bankruptcy because of the conflict we previously

11   discussed.

12   BY MR. BRODY:

13        Q.    And just for the record, you referred

14   to a contemporaneous publication or a near

15   contemporaneous publication the same day by

16   Mr. Birchfield.  Do you recognize that as what is

17   behind tab 18 in the binder?

18        A.    Yes, I do.

19        Q.    All right.

20        A.    And this was picked up by a number of

21   different media outlets.

22        Q.    And then moving ahead, you mentioned

23   the $19 billion that was attached to the

24   Birchfield/Conlan proposal.  When did you first

25   learn that there was a $19 billion price tag

1    attached to their proposal?

2          A.        On November 19th, notwithstanding our

3    repeated rejections of the proposal --

4          Q.        November 9th, I believe.

5          A.        Excuse me.  Quite correct.

6                    On November 9th, notwithstanding that

7    we had repeatedly rejected Mr. Conlan's proposals

8    over the course of the years, but also through the

9    -- since the dismissal of the bankruptcy, on the

10   9th, he circumvented not only me, but then he

11   circumvented the treasurer and he sent a

12   correspondence directly to our CEO.

13                   And in that correspondence, he

14   purported to say the board, quote, must consider

15   this proposal, and in that he described the proposal

16   that he had developed with Mr. Birchfield that was

17   demanding a $19 billion payment to Legacy in order

18   to resolve the talc claims by taking them off of the

19   company's books through this structural optimization

20   move, which we had already been advised would not

21   work.

22         Q.        And if you would, in the binder, if

23   you could, just refer to the document at tab 7, and

24   let me know if that is the communication that you're

25   referring to.

```
1          A.      Yes.  This is the document I was
2     referring to, and --
3          Q.      Now, let me -- let me preface it with
4     a question, first of all.
5          A.      Sure.
6          Q.      The document indicates in the second
7     paragraph -- this is the letter from Mr. Conlan, is
8     it?
9          A.      Yes, it is.
10         Q.      And it attaches at the last page a
11    proposed settlement matrix.  Do you see that?
12         A.      Yes.
13         Q.      Is this the first time the settlement
14    matrix associated with the Conlan/Birchfield
15    proposal had been shared with you?
16         A.      It was.
17         Q.      If you turn back to the first page of
18    the document, there's an indication in the second
19    paragraph of Mr. Conlan's letter:  "Importantly,
20    Legacy's proposal has been reviewed and supported by
21    leadership counsel on both the federal MDL and in
22    state court cases across the country."
23                 Do you see that?
24         A.      Yes.
25         Q.      So, what was your reaction to the
```

     1    fact that you were being told that this proposal had

     2    been shared by Mr. Conlan and Mr. Birchfield with

     3    plaintiffs' counsel, your opposing counsel, before

     4    your former lawyer brought it to you?

     5              MR. POLLOCK:  Objection, Your Honor.

     6              The document doesn't state that on

     7    its face.  It doesn't say Mr. Conlan shared this

     8    with anyone -- Mr. Birchfield shared this with

     9    anyone.

    10              THE COURT:  Mr. Brody?

    11              I see the sentence.

    12              MR. BRODY:  I'll just ask.

    13    BY MR. BRODY:

    14         Q.    What was your reaction to this?

    15         A.    Again, I found this completely

    16    remarkable because this is -- this is a further

    17    disclosure of just how far the communications

    18    between Mr. Conlan and Mr. Birchfield had gone and

    19    what the considerations were.

    20              When you go to the final page that

    21    Mr. Brody just referred to, the settlement menu

    22    matrix, which involved a per claim analysis, and

    23    across the top and along the columns on the side,

    24    you will see the various criteria that go into the

    25    development of the per claims amounts.

1              And there's a huge amount of

2      deliberation and consideration that goes into that.

3      And the idea that Mr. Conlan, our former counsel,

4      who had engaged in discussions of the pluses and

5      minuses, of the strength and weaknesses, of the

6      disadvantages and advantages of different offers to

7      us, and where we stood to be in a better position,

8      where we stood to be in a more challenging position,

9      was egregious.

10             I mean, he is effectively taking our

11     inside perspective and providing it to the alliance

12     with Mr. Birchfield so that they can thwart our

13     offer.  It's really beyond the pale.  And the idea

14     that our counsel is now our primary adversary and

15     aligned with the lead adversary in the talc

16     litigations, which they purport to be in each of

17     these forums, it's just amazing.  And I really, I'm

18     almost at a loss of words about how upsetting this

19     was when we saw this and how upsetting it was for

20     the organization.

21             MR. POLLOCK:  Your Honor, I move to

22     strike all the testimony regarding Andrew Birchfield

23     as there's zero support anywhere from Mr. Haas that

24     Mr. Birchfield had anything to do with this

25     communication.

1              He keeps on railing against my

2       client, as he is entitled to.  He can dislike him as

3       much as he wants.  I'm entitled to proof.  There is

4       no evidence that Mr. Birchfield's ever had any

5       participation in this document.

6              MR. BRODY:  Your Honor, Mr. Haas has

7       just testified that two weeks, three weeks prior to

8       when this document was sent, he got a communication

9       from Mr. Conlan saying that he had developed a

10      settlement matrix, and that Mr. Conlan and

11      Mr. Birchfield were prepared to come in together and

12      discuss it.  And this follow-up communication says

13      specifically that the proposal has been reviewed by

14      leadership counsel in the federal MDL and the state

15      court.

16             It's not, you know -- that's -- I

17      don't think it's a valid objection.  It's a subject

18      for cross-examination, and I'm sure that Mr. Pollock

19      can ask Mr. Haas questions about it.

20             THE COURT:  I'm going to overrule the

21      objection and it will be subject to

22      cross-examination.

23             MR. BRODY:  Thank you.

24             THE COURT:  We've been going about an

25      hour and a half now.  Is anybody looking for a

```
 1    break?
 2                    MR. BRODY:  I just -- if possible,
 3    Your Honor, I have about four or five more
 4    questions.
 5                    THE COURT:  That's fine.  But I think
 6    it was an appropriate time to ask that question.
 7                    MR. BRODY:  Certainly.  And we can
 8    break now, if you --
 9                    THE COURT:  No, I'm not going to
10    break the momentum.  But you may continue.
11                    MR. BRODY:  Sure.
12    BY MR. BRODY:
13         Q.     Mr. Haas, I want to draw your
14    attention to the sentence that starts at the bottom
15    of the first page of this November 9th letter, with
16    the word "indeed."  He wrote:  "Indeed, even if such
17    plan were confirmed, it simply cannot free J&J of
18    its direct liability."
19                    Do you see that?
20         A.     I do.
21         Q.     And was that something that caused
22    you concern?
23         A.     Judges, he's speaking to the plan
24    that we're proposing.  Here's our former counsel,
25    who provided advice on that very issue, inconsistent
```

 1    with what he's saying here, but he's basically

 2    taking a position with respect to a plan that we are

 3    currently proposing that has been deliberated

 4    extensively over the course of a time frame in which

 5    he was our counsel, and now he's going out and

 6    opining that it will never work.  This is our

 7    advocate advocating against us.

 8         Q.    Have you learned, Mr. Haas, that not

 9    only was this something that was being advanced

10    through the Bloomberg article and the press release

11    that we saw from November 2nd, in the media, but

12    also that it was being advanced with the investment

13    community?

14         A.    So immediately after receiving this,

15    I sent an email to Mr. Conlan's firm, saying:  Stop

16    it.  You're breaching your ethical obligations.

17    Ignored.

18              On the 15th of November, I believe

19    that was the right date, we received notice that

20    Mr. Birchfield and Mr. Conlan were then attending an

21    investor conference, the Gordon Haskett Conference,

22    in which they were going to present this very

23    portfolio.

24              MR. POLLOCK:  Objection; it's

25    speculation as to what they were going to present.

```
 1                    THE COURT:  Sustained.
 2   BY MR. BRODY:
 3         Q.        Did you -- I'm sorry.  Did you, at
 4   that time, come to have an understanding of what
 5   they were going to present?
 6         A.        We were advised that Mr. Birchfield
 7   and Mr. Conlan were making a proposal at an investor
 8   conference, the Gordon Haskett Conference, regarding
 9   the resolution of the talc claim.
10                    MR. POLLOCK:  Same objection, Your
11   Honor.  "We were advised."  Rank hearsay.
12                    THE COURT:  I agree.  Sustained.
13                    MR. BRODY:  That's fine, Your Honor.
14   BY MR. BRODY:
15         Q.        Mr. Haas, I want to -- I want to,
16   before we conclude, I want to bring you back to last
17   summer.  What was going on in the LTL bankruptcy
18   last summer when Mr. Conlan was engaged in these
19   what they say are privileged communications with
20   Mr. Birchfield and Ms. O'Dell and others at Beasley
21   Allen?
22         A.        There was extensive motion practice
23   on the motion to dismiss that Mr. Beasley --
24   Mr. Birchfield was leading.  There was extensive
25   discovery with respect to that motion practice;
```

1    ultimately culminated in a week-long hearing on a

2    motion to dismiss, followed by extensive posttrial

3    findings of facts and conclusions of law.

4              Suffice it to say, there were myriad

5    opportunities for either Mr. Conlan or

6    Mr. Birchfield to disclose the alliance that they

7    had formed at that time, and not once, not once in

8    any of those motions, submissions, discoveries,

9    including the deposition of Mr. Birchfield for -- in

10   the week-long intensive hearing followed by full

11   briefing on the motion to dismiss did they ever

12   disclose that Mr. Conlan was working with

13   Mr. Birchfield.  And Mr. Conlan never approached me

14   for a waiver, or anyone at my firm, and never once

15   asked for consent to engage in that relationship.

16   Not once.  There were untold opportunities to do so,

17   and he never did.

18        Q.    And is it concerning to you now to

19   know that while Johnson & Johnson was engaged in

20   mediation with the TCC in the LTL bankruptcy that

21   your former lawyer, Mr. Conlan, was communicating

22   directly, collaborating directly with Mr. Birchfield

23   and his firm on the other side of that mediation?

24              MR. POLLOCK:  Objection to the word

25   "collaborating," again, this conspiracy, cover the

1    darkness.  They were either working -- they were

2    working together, yes, but there's no proof of

3    anything else beyond the fact that they were

4    communicating.

5                    THE WITNESS:  I can answer --

6                    THE COURT:  It may be a choice of

7    words.

8                    MR. BRODY:  It may be a choice of

9    words, and, Your Honor, we will definitely get to

10   collaborating today.

11   BY MR. BRODY:

12       Q.        But for now, I'll just ask you:

13   Knowing now what you know from the privilege claims

14   that have been asserted by the plaintiffs steering

15   committee and what you know about the work

16   communications that were going on on the other -- in

17   secret on the other side of that mediation, is that

18   a concern to you?

19       A.        I go back to what I said earlier.

20   This fundamentally undermines the entire judicial

21   process.  It provides an unfair advantage to an

22   adversary in an adversarial system.  The

23   conversations that being had by the disclosures in

24   the privilege log and based upon the declaration

25   submitted by Mr. Birchfield indicated they involved

1    the same matters and the same issues for which

2    Mr. Conlan was representing us.

3                Having those communications by their

4    very nature is a violation of his duties to us,

5    because those conversations necessarily are imbued

6    with the confidential work product privileged

7    information we conveyed to Mr. Conlan and had

8    extensive discussion and deliberation on.

9                And so I go back to the core

10   principle:  It contravenes the judicial process;

11   it's contrary to the interest of justice; and it

12   fundamentally undermines the adversarial system.

13        Q.    Was Mr. Conlan privy to privileged

14   and confidential information about J&J's negotiating

15   strategy in its attempt to resolve the litigation

16   pending in New Jersey and in the MDL that you

17   believe would be directly relevant to the LTL

18   bankruptcy mediation that went on last summer?

19                MR. POLLOCK:  Your Honor, I object.

20   There's been multiple efforts at the settlement.

21   There was an effort within Imerys, there was an

22   effort within LTL, then there was LTL 2, there's

23   been mediation before people.  I have no clue what

24   time period we're asking about.

25                THE COURT:  Well, it was last summer.

1      Any particular time period?

2                      MR. POLLOCK:  Was that the only time

3      period?

4                      THE COURT:  Yeah, that was the time

5      period.

6                      MR. BRODY:  My question --

7                      THE COURT:  Right?

8                      MR. BRODY:  I can rephrase it.  I can

9      rephrase it.

10                     THE COURT:  All right.

11     BY MR. BRODY:

12         Q.      My question is:  Based on your

13     knowledge of the privileged and confidential

14     communications that Mr. Conlan was exposed to,

15     whether it be talking about potential resolution

16     through the tort system, resolution through the

17     Imerys bankruptcy, resolution through MDL, are those

18     confidential and privileged discussions that he was

19     involved in relevant to the mediation that took

20     place last summer?

21                     MR. POLLOCK:  Your Honor, again, same

22     objection.  Multiple discussions regarding the MDL

23     -- I can't remember what the litany was, it's that

24     long.

25                     I am entitled, when my client is

1    accused of having violated the rules of professional

2    conduct, to some facts.  That's what [Trupo] says.

3    I'm entitled to some facts.  I would like to know

4    what discussions, what date, what year, where were

5    they, what happened, because right now I have no

6    clue.  When I'm attacking a boogie man, I can't do

7    it if I don't know what it looks like.

8                    THE WITNESS:  I can -- I can answer

9    the --

10                   THE COURT:  Well, I understood the

11   question.  Mr. Haas, you understand the question.

12                   THE WITNESS:  Yes.

13                   THE COURT:  So I'm overruling the

14   objection.  But, you know, the time frame is last

15   summer.  So is it June, July, August?  July?  June?

16   August?  What, in terms of summer --

17   BY MR. BRODY:

18       Q.      So my question is:  Is the privileged

19   and confidential information that Mr. Conlan learned

20   during the 20 months that he represented J&J

21   relevant to the mediation discussions that were

22   going on in May, June, and July of last year, in the

23   LTL bankruptcy?

24                   MR. POLLOCK:  This is precisely my

25   objection, Your Honor.  He is morphing time frames.

1    He is not talking about after Mr. Conlan formed

2    Legacy.  Mr. Brody is asking about all of the stuff

3    that you learned beforehand, whatever that time

4    period was, is it relevant to what's occurring now.

5                  And if that is true, if that's really

6    his question, which I think it is, I would like to

7    know which one.  Imerys?  LTL?  Which discussions?

8    Where did they occur?  What was discussed?  Because

9    I have no idea how to value relevance.  [U] says

10   clearly, you've got a Hobson's choice.  Put the

11   documents in, or tell us what the discussions are,

12   or you don't have the argument.

13                  But they want to have the best of

14   both worlds.  They want to say I'm not going to give

15   you the facts, but it's generally true we talked

16   about some stuff, and it's relevant to now.  I want

17   to know, if we're going to go here, and this is our

18   big windup, I want to know exactly what was

19   discussed and when.

20                  THE COURT:  Well, one of the points

21   raised in one of the certifications, and I think it

22   was from either -- I think it was probably

23   Mr. Birchfield saying whatever Mr. Conlan learned,

24   it's now dated.

25                  MR. POLLOCK:  Correct.

```
 1                      THE COURT:  Right?

 2                      MR. POLLOCK:  Yes, sir.  That's

 3      exactly my point.

 4                      THE COURT:  And that -- well, and

 5      now, I think -- and I'm not making anybody's

 6      argument here, but Mr. Brody is now saying, is it

 7      now relevant in contrary to the dated statement.

 8                      So I'm going to overrule the

 9      objection.  You can ask that question.

10                      Do you understand the question?

11                      THE WITNESS:  I do, Judge, and I

12      think I can answer it, because I think it goes

13      exactly to that point.  Because what we were

14      discussing through that time frame when Mr. Conlan

15      was representing Johnson & Johnson is relevant to

16      each of the mediations and to what currently is

17      going on now, because it's the same issues, and the

18      same deliberations that were pertinent during the

19      time frame when he was counsel are pertinent now.

20      Because what form, what structure, what are the

21      advantages and disadvantages of both, how do you

22      value the claims both from the current claims and

23      the future.  They're the same claims.

24                      And keep in mind the one thing that's

25      significant here in terms of timing is that time
```

1    flows during the time from when the bankruptcies

2    were in place from October 2021 through July 28th,

3    2023, because of the automatic stay.

4                    So all of those factors that were

5    discussed are highly pertinent to the resolutions

6    throughout that period and the discussions

7    throughout that period, and as they are today.

8                    And so, it is forum, when, who,

9    aggregate claim amount, per claim amount, factors to

10   consider, how to value future claims, you know, the

11   timing of future claims, what factors go into

12   whether or not future claims are going to escalate

13   or deescalate.

14                   All of those things were the subject

15   of many conversations with Mr. Conlan and his views

16   that he expressed and that he commented on and that

17   we conveyed to him are just as pertinent in those

18   mediations that happened each time because the same

19   issues came up as they are to this day.  So they're

20   squarely relevant to the issues.

21                   And it's an unfair advantage for him

22   to have any conversations, communications on those

23   issues with Mr. Birchfield to develop a

24   countervailing proposal because necessarily imbued

25   in the conversations, no matter how they are

1    communicated, are our views.  And that is really --

2    that is why this is fundamentally undermining the

3    integrity of the process.

4              MR. BRODY:  Thank you, Mr. Haas.

5    That's all I have, Your Honor.

6              THE COURT:  We'll take a break.

7    Judge Singh and I may have some questions.  I

8    generally like to ask questions before we go to

9    cross-examination so that counsel can direct it or

10   address it, and then Mr. Pollock will have an

11   opportunity on cross.

12             MR. POLLOCK:  Thank you, Your Honors.

13             (A recess was taken.)

14             THE COURT:  We have a few questions.

15   Where is Mr. Haas?  Mr. Haas, you're still under

16   oath.

17             THE WITNESS:  Yes, sir.

18             THE COURT:  Judge Singh.

19             JUDGE SINGH:  Oh, yes.  Thank you.

20             We wanted to direct your attention to

21   the exhibit that was talked about earlier, Exhibit

22   7, I believe it is, the November 9th, 2023 letter.

23             THE WITNESS:  Yes, Your Honor.

24             JUDGE SINGH:  And we're curious about

25   the attached matrix.  Has the categories within this

1    proposed matrix come up in prior mediation,

2    settlement discussions, et cetera?

3                    THE WITNESS:  Yes, Your Honor, they

4    have.  The age, the disease state, the severity of

5    the disease state, the length at which the disease

6    has had -- each one of these has, if you go across

7    the top and along the column on the left, each one

8    of these are different criteria that have come up

9    repeatedly in every single one of the settlement

10   discussions we've had going back to, I would say,

11   the 2020 discussions.  And there's a reference in

12   the papers about a Beasley Allen proposal in the

13   fall of 2020.  I think it was a 3.5-- 3.25 billion

14   dollar proposal for an ovarian settlement.  It was a

15   grid that had these criteria and others.

16                   Again, in the spring of 2021, there

17   was another proposal, same types of criteria.  And

18   what oftentimes is this will be the base criteria

19   and then you will have additional considerations

20   when it's drafted up that will speak to other

21   factors that will increase or decrease the amount,

22   such as familial history of the cancer, genetic

23   issues that are -- the individual claimant may or

24   may not have, time limitations that may or may not

25   impact, depending on the statute of limitations.

1    But those other ones are always layered on when you

2    get to the final drafting of the documents.

3                    But to answer your question, yes.

4                    JUDGE SINGH:  Okay.  Thank you.

5                    Judge Porto.

6                    THE COURT:  When did this matrix,

7    when was this developed?

8                    THE WITNESS:  Well, this particular

9    matrix, the numbers here are different than the

10   numbers.  The matrix concept is not new to this

11   particular tort, but the considerations and what

12   numbers are to go in were discussed from the outset

13   of Mr. Conlan's representation.

14                   THE COURT:  Specifically, which

15   numbers?

16                   THE WITNESS:  Which numbers?

17                   THE COURT:  All the numbers?  A

18   particular category of numbers?

19                   THE WITNESS:  Both the aggregate and

20   the individuals.  Okay.  And that, Your Honor, that

21   is a very good question, because oftentimes the

22   aggregate number drives the individuals.  And there

23   are components of that that have to be taken into

24   account, whether or not you're just contemplating

25   futures, just contemplating current, or a

1    combination of both.

2                    THE COURT:  So when you say within

3    the time frame that Mr. Conlan was with Faegre

4    Drinker, that -- those 18 months, or whatever it

5    was, 21 months.

6                    THE WITNESS:  Yes.

7                    THE COURT:  That was there.

8                    THE WITNESS:  Yes, Your Honor.

9                    THE COURT:  And so we can trace that

10   origination to that particular time.

11                   THE WITNESS:  You can trace the

12   schedules and numbers in schedules.  And they're

13   going to vary because of the advice of counsel that

14   was given.  Clearly, these aren't our numbers,

15   because this is the 19 billion dollar number.

16   Right?

17                   THE COURT:  Right.

18                   Judge Singh?

19                   JUDGE SINGH:  Nothing further.

20                   THE COURT:  Okay.  Mr. Brody,

21   anything to follow up on the Courts' questions.

22                   MR. BRODY:  Nothing on follow-up,

23   Your Honor.

24                   THE COURT:  Thank you.

25                   Mr. Pollock?

```
 1                    MR. POLLOCK:  Your Honor, if it's
 2   okay with you, I may sit for part of this, only
 3   because I've got -- it's easier for me to read my
 4   documents, and there's no lectern.
 5                    THE COURT:  That's quite all right.
 6                    MR. POLLOCK:  That's fair enough?
 7                    THE COURT:  Yup.  You can move the
 8   podium, too, if you want.
 9                    MR. POLLOCK:  I don't want to screw
10   up your electronics and then have the court marshall
11   throw me out and I get in trouble.
12                    THE COURT:  No, I think it's not --
13   it's not operative, but it's your option.
14                    MR. POLLOCK:  I can do it from here,
15   Judge.
16                         -   -   -
17                    CROSS EXAMINATION
18                         -   -   -
19   BY MR. POLLOCK:
20        Q.     Mr. Haas, as you probably know, my
21   name is Jeff Pollock.  I met you beforehand.
22                    Mr. Conlan you described an a central
23   figure, but isn't it true he never entered an
24   appearance in either LTL or in Imerys?
25        A.     I don't they think there's an
```

1    inconsistency with those two statements.

2              Q.      Mr. Haas --

3              A.      Well, you prefaced it.  So if your

4    question is whether he made an appearance --

5              Q.      Yes, sir.

6              A.      -- I am not aware if he has made an

7    appearance, quite frankly.  I know that he commented

8    on submissions in the proceedings.  So I'm not sure,

9    frankly, to answer your question.

10             Q.      I can tell you from information and

11   belief, he never entered an appearance in either

12   case.  Do you have any reason to believe that's not

13   true?

14             A.      I stand on my answer.  Not to

15   quibble, I just do not know whether he made an

16   appearance.  I can tell you based upon his work, he

17   commented on submissions to the Court in both of

18   those matters.  So, you know, oftentimes, I would

19   expect someone doing so to make an appearance.  I

20   just -- sir, I just cannot say one way or the other

21   whether he had.

22             Q.      Fair enough.  You also mentioned you

23   had weekly standing calls with Mr. Conlan; do you

24   remember that testimony?

25             A.      We had weekly standing group calls,

1    many of which -- most of which Mr. Conlan

2    participated in.

3            Q.        But you did not provide a single

4    document to support that statement, did you?

5            A.        I don't think that's correct.  We do

6    have submitted, I believe, you'll have to ask my

7    counsel, but the time records that Mr. Conlan,

8    himself.

9            Q.        Actually, I want to ask you about

10   that.  You have how many lawyers representing you,

11   approximately?

12           A.        Are you talking --

13                     MR. BRODY:  Objection.

14           A.        -- J&J or --

15                     THE COURT:  Hold on.  Hold on,

16   Mr. Haas, there's an objection.

17                     MR. BRODY:  I just object.  It's

18   unclear whether he's asking about the entire talc

19   litigation or with respect to this disqualification

20   issue.

21                     THE WITNESS:  And internally --

22                     THE COURT:  With regard to?  What's

23   it in regard to?

24                     MR. POLLOCK:  I rephrase the

25   question.

 1    BY MR. POLLOCK:

 2         Q.        In the last four years, you have

 3    retained as J&J multiple lawyers to represent J&J in

 4    the LTL and Imerys matter, correct?

 5         A.        Yes, sir.

 6         Q.        And your legal spend is well over

 7    $500 million in legal defense costs alone, correct?

 8         A.        Yes, sir.

 9         Q.        In fact, it's over a billion dollars,

10    isn't it?

11         A.        Yes, sir.  And that's one of the

12    reasons why the entity that was responsible,

13    Johnson & Johnson Consumer, Inc., was in the red.

14         Q.        So you have an army of paralegals,

15    associates, and legal counsel at your fingertips,

16    correct?

17         A.        I don't know if I would characterize

18    it that way, but we have a lot of legal

19    representation on the talc claims at large.

20         Q.        And in your initial certification,

21    you talk about the review of -- it's your first

22    exhibit.  You talk about -- it's Exhibit 1.  You

23    talk about you became familiar with Mr. Conlan's

24    work by review of the timesheets and documents and

25    things.  Do you recall giving that certification?

1        A.        My statement was actually broader

2    than that.  My statement was I am familiar with

3    Mr. Conlan's work from his participation in weekly

4    calls, from his direct interactions with me, both

5    through emails and communications, and I also

6    reviewed the records that showed that he had billed

7    almost 1600 hours to our firm.

8        Q.        When you sign a certification under

9    oath attempting to disqualify counsel, do you

10   understand that that certification has to be

11   truthful, accurate, and complete?

12       A.        When I sign any certification, sir, I

13   answer that truthfully and accurately to the best of

14   my ability.

15       Q.        And it's complete, right?  You would

16   not leave out information by way of omission, right?

17       A.        I think that's kind of a vague

18   statement.  Whenever I certify a statement, I

19   attempt to certify the statements therein as

20   accurately as possible.

21       Q.        Excellent.

22                 Paragraph 3, page 1:  "I became

23   familiar with work performed for J&J by Attorney

24   James Conlan of the law firm of Faegre Drinker

25   between July '20 and early 2022."

```
 1                   Do you see that sentence?

 2          A.      First of all, I -- what date was

 3     that?

 4          Q.      It's Exhibit 1.  It's Plenary Hearing

 5     001 at the bottom.  Paragraph 3.  I'm just asking

 6     about that one sentence:  "I became familiar with

 7     work performed for J&J by the James Conlan of the

 8     law firm of Faegre Drinker between July 2020 and

 9     early 2022."

10                   Do you see that?

11          A.      Yes.  That's exactly what I said,

12     sir.  I said -- there's two different sentences.

13     One said "I became familiar," the other -- and for

14     the reasons I stated --

15                   MR. POLLOCK:  With respect, Your

16     Honor, this is your court, I -- I would really like

17     to conduct my questions as opposed to getting a

18     narrative each time.

19                   THE COURT:  Sure.  And so, Mr. Haas,

20     if you can direct your answer to the specifics asked

21     in the questions asked.

22                   THE WITNESS:  I believe his first

23     question was, did I become familiar by reading the

24     time entries.  There's two different sentences.

25                   THE COURT:  Well, he's asking about
```

1    the sentence now.

2    BY MR. POLLOCK:

3        Q.      You wrote the sentence, right?  You

4    reviewed it and you signed it, right?

5        A.      I did.  And so, if the question is,

6    Is the first sentence accurate, the first sentence

7    is accurate.

8        Q.      Excellent.

9                And you were comfortable signing that

10   certification and submitting it to the Court,

11   correct?

12       A.      That is correct.

13       Q.      Now, what's -- if you look at the

14   next paragraph 5, you say:  "Billing submitted by

15   Mr. Conlan reflects that, during this period,

16   Mr. Conlan billed almost 1,600 hours on the talc

17   matter, including 1,154 hours in 2021 alone.  The

18   records reflect that Mr. Conlan billed J&J 2.24

19   million for this work."

20               Do you see that?

21       A.      Yes, sir.

22       Q.      Have I read it accurately?

23       A.      To the best of my recollection.

24       Q.      But you have not produced a single

25   one of those documents here today; isn't that

1    correct?

2          A.      Are you asking whether or not we

3    produced the billing records?

4          Q.      Yes.  The billing records were not

5    submitted to this Court.

6          A.      The billing records, to the best of

7    my understanding, are available for the Court's in

8    camera review, if the Court so chooses to review

9    them.

10         Q.      And they were not provided to the

11   Court in camera, were they, sir?

12         A.      You'll have to ask my counsel.

13         Q.      Excellent.

14                 Paragraph 6, "Those same billing

15   records show that during this time period,

16   Mr. Conlan attended dozens of meetings and phone

17   calls with members of the J&J Law Department,

18   including myself, J&J'S former head of litigation,

19   Joseph Braunruether, former products liability lead,

20   John Kim, and current product liability head, Andrew

21   White."

22                 Do you see the sentence to which I

23   refer?

24         A.      Yes.

25         Q.      So, in each case, you refer to

1    billing records, right?  You refer to documents you

2    reviewed.  "I became familiar with," paragraph 3;

3    "billing records submitted," paragraph 5; "those

4    same billing records," paragraph 6.

5                    Each case you're talking about your

6    knowledge from a review of the documents, "I became

7    familiar with," as opposed to your testimony today,

8    where you say "I had weekly calls, direct emails,

9    matrices, billing statements, in-person meetings."

10                   Why the significant change in tone

11   from your first certification, which talks about "I

12   learned about Mr. Conlan through this reading of his

13   bills," as opposed to the testimony today, which is

14   "I knew because I talked to him personally about

15   this all the time"?

16        A.      There is no change in tone, sir.

17        Q.      Okay.

18        A.      The testimony today, as here, the

19   testimony is about what I did.  So I am attesting to

20   what the documents show here, and today I am

21   attesting to what my experiences were working with

22   Mr. Conlan.  There's no inconsistency with the two.

23   They are consistent, and they corroborate each

24   other.

25                   So there's no -- so there is no shift

1    in substance or tone or matter.  They're absolutely

2    100 percent aligned.

3         Q.      Let's look at paragraph 7.  "Conlan's

4    time entries and the billing entries show that he

5    communicated regularly."  So it's not just the

6    effort you made; it's what he did.  If you're

7    talking about what Mr. Conlan did in paragraph 7,

8    and you're saying this based upon time entries.

9              Isn't that true, sir?

10        A.      The time entries corroborate what he

11   did.

12        Q.      And you don't say, at that point in

13   time, in your certification, you never said, "I

14   personally sat down with Jim Conlan.  I personally

15   worked with this guy."  What you say is, Time

16   entries indicate these things, correct?

17        A.      In this particular paragraph, the

18   series of paragraphs, sir, I am referring to the

19   time records, which corroborate my positions with

20   respect to what Mr. Conlan did, and I don't think

21   anybody contests that.

22        Q.      So your later certification is far

23   different.  There you've got -- let me just find it

24   for a second here.

25              It's Exhibit 13, sir.  Tell me when

1    you're ready.

2              A.      Is there a particular paragraph?

3              Q.      Yes, sir.  Paragraph 3.  "I worked

4    directly with Attorney Conlan of Faegre Drinker when

5    Mr. Conlan represented J&J in this matter that is

6    being litigated before this Court and elsewhere.  I

7    worked with Mr. Conlan from the time I joined J&J in

8    November 2020 to February 2022, when Mr. Conlan left

9    Faegre."  Correct?  Have I read it correctly?

10             A.      Have you read it correctly?  Yes,

11   sir.

12             Q.      I'm asking you a question.

13             A.      I thought you were asking whether you

14   read it correctly.

15             Q.      Yes.

16             A.      I said yes.

17             Q.      Excellent.  I'm sorry.  I didn't hear

18   you.

19                     The $19 billion number that you

20   mentioned, your testimony was that Mr. Conlan and

21   Mr. Birchfield conspired, met together, worked

22   together, a particular phrase, was something that

23   they presented was inconsistent with what J&J wants,

24   right?  $19 billion is not what J&J would like to

25   see?

1  A.  So we're off the declaration?  We're

2 onto the letter?

3  Q.  We're off the declaration.

4  A.  Okay.

5  Q.  So you testified towards the end of

6 Mr. Brody's direct, he asked you about the $19

7 billion number, and I believe that the sum of your

8 testimony was that you believed that Mr. Conlan and

9 Mr. Birchfield conspired to drive this matter to the

10 $19 billion number.  Is that correct?

11  A.  I'm just not understanding your

12 question.

13  Q.  Sure.  Mr. Conlan -- you testified

14 for Mr. Brody, when Mr. Brody was asking you

15 questions on direct -- do you recall that?

16  A.  I recall answering questions about

17 the 19 billion, yes, sir.

18  Q.  Right.  And isn't it your belief,

19 your testimony, that the $19 billion number was

20 something that Mr. Birchfield and Mr. Conlan

21 contrived, that they came up with that number?

22  A.  Mr. Birchfield and Mr. Conlan,

23 together, presented at -- the proposal for the $19

24 billion alternative resolution that was at odds with

25 the proposal that we had offered, and, indeed, was

1    an attempt to -- and Mr. Birchfield has made no

2    secret of this -- thwart our offer and derail our

3    attempt to resolve the case for $8.9 billion

4    pursuant to our prior proposal.

5         Q.    So, put simply, J&J proposes 8.9

6    billion; you believe Mr. Conlan and Mr. Birchfield

7    are proposing roughly 19 billion?

8         A.    That's what Mr. Birchfield has said

9    in different forms, including the Mass Tort Made

10   Perfect, or Mass Tort Gone Wild, whatever it's

11   referred to, and the correspondence that has been

12   set forth into the record.

13        Q.    Okay.  I would really like to get a

14   yes or no to this one.  It's a pretty simple

15   question.

16              Am I correct J&J wants the 8.9

17   billion; you believe Mr. Conlan and Mr. Birchfield

18   want the 19 billion?

19        A.    Yes, sir.

20              MR. BRODY:  Objection, Your Honor.

21   It's been asked and answered.

22              THE WITNESS:  Yeah, I just --

23              THE COURT:  Well, to the extent I

24   think Mr. Pollock wants a more direct answer, I will

25   overrule the objection.

 1                    THE WITNESS:  The answer to that

 2    question is yes, sir.

 3    BY MR. POLLOCK:

 4          Q.        Excellent.

 5                    When you talk about the matrix, and

 6    the matrix that we're talking here is the one --

 7    Exhibit 7, it's the last page.  It's Plenary Hearing

 8    67, sir.

 9                    Is it your testimony that Mr. Conlan

10    got that matrix from J&J?

11          A.        Mr. Conlan -- that's not -- again,

12    this goes to exactly the issue we just talked to the

13    Judges.  The numbers in this matrix obviously are

14    different than the matrices that Mr. Conlan debated,

15    consulted on, conferred with, and discussed with us.

16                    My point was in that testimony, sir,

17    is that the very nature of having those

18    conversations with Mr. Birchfield about the factors

19    that go into this matrices, and whether and to what

20    extent certain numbers should be offered and certain

21    others should not be was imbued by the privileged

22    communications that we had with Mr. Conlan.

23                    Every time Mr. Conlan and

24    Mr. Birchfield sit down and talk about anything to

25    do with this proposal, those conversations

1    necessarily implicate the attorney-client

2    privileged, work-product-protected, and confidential

3    communications that he had with us on the very same

4    topic.  So that's my position.

5            Q.        Understood.  If you could answer my

6    question, it would be great.

7            A.        And I did.

8            Q.        If you would, sir.  I'm going to ask

9    the questions.  I really need you to answer my

10   questions.  Otherwise, we will be here a long day.

11                     This is paragraph -- page -- Exhibit

12   7, Plenary Hearing 67.  There is a chart.  It's a

13   matrix.  Do you see it?

14           A.        You're talking to -- about the

15   exhibit --

16           Q.        Yes.

17           A.        -- or the Legacy chart?

18           Q.        Yes.  That chart was not prepared by

19   J&J, correct?  That chart with these numbers was not

20   prepared by J&J.

21           A.        That is true, sir.

22           Q.        Excellent.

23                     We can go back to the beginning of

24   Exhibit 7.  At no point -- in fact, look at the

25   entirety of the document.  At no point in this

1    document anywhere does it indicate that a copy of

2    this document went to Andy Birchfield, does it?

3              A.       Does the letter state that?

4              Q.       Yes.

5              A.       No.

6              Q.       Wonderful.

7                       If you look at paragraph one, page

8    7 -- 62 -- Plenary Hearing 62.  I'll give you both

9    cites.  It's the exhibit and the cite number.  It's

10   the second to last sentence.  It says:  "For Legacy

11   to enter into this transaction, the acquired talc

12   liable entities of J&J would be required to hold

13   assets with a present value of $19 billion, or such

14   greater amount as determined by J&J's independent

15   auditors to remove from J&J's financial statements

16   the noncash charge for talc-related liabilities."

17                      Do you see the sentence to which I

18   refer?

19             A.       Yes, sir.

20             Q.       Now, you spoke earlier with Mr. Brody

21   about going to an auditor.  Pricewaterhouse is the

22   auditor, correct?

23             A.       Yes, sir.

24             Q.       Who did you speak with at

25   Pricewaterhouse?

```
1          A.        Steven Johnson.

2          Q.        And when you spoke with Steven

3   Johnson, approximately what month was it?

4          A.        It was approximately -- it was

5   sometime between the September 11th meeting that we

6   had with Mr. Birchfield and Doug Dachille, with our

7   treasurer, and the response to -- that we received

8   from Doug Dachille on September 28th.  So it would

9   have been in that time frame, sir.

10         Q.        And Mr. Haas, you've lived through

11  this every day.  I'm parachuting in for one motion.

12  I want to make sure I've got this right.  When you

13  say -- you mentioned a couple of dates.  These are

14  all in 2023, the dates you just gave me?

15         A.        Yes, they are.

16         Q.        Okay.  I apologize for that.

17         A.        No, no.

18         Q.        What exactly did the auditors say in

19  response?  Did they give you a written document, or

20  it was only an oral response?

21         A.        There was no written document.  There

22  was an oral response.

23         Q.        Did they give you an email?

24         A.        There was no written document.  It

25  was an oral response.
```

```
 1          Q.      Okay.  And I didn't mean to quibble

 2    with you on this, because I didn't know if they had

 3    written a memo, or if you're saying it was just a

 4    discussion, and that's all you had.

 5          A.      Yes, sir.

 6          Q.      Who was on the phone call with you

 7    when you had that discussion?

 8                  MR. BRODY:  Your Honor, I'm just

 9    going to object.  I think we're getting outside the

10    scope of what we're here for today.

11                  THE COURT:  Thank you.

12                  Mr. Pollock?

13                  MR. POLLOCK:  They opened the door to

14    the auditor's review on direct examination, which

15    they didn't need to do.  I've been objecting on

16    scope from the very outset, so I would like a little

17    bit of leeway, but I'll move on quickly after I get

18    this answer.

19                  THE COURT:  I'll overrule the

20    objection.  You know, the door is open.  You may

21    pursue it.  I don't know -- I'll follow your

22    questions, Mr. Pollock.

23                  MR. POLLOCK:  And I intend to move as

24    quickly as I can.  As you know, on cross, I'm

25    picking pieces and moving forward, so it may not be
```

 1    the smoothest work ever, but I will do what I can.

 2                    THE COURT:  That's all right.  You're

 3    just saying that's your style.

 4                    MR. POLLOCK:  Thank you, sir.

 5    BY MR. POLLOCK:

 6         Q.    What did you discuss?

 7         A.    We discussed the proposal set forth

 8    by Legacy.

 9         Q.    And what was their analysis?  You

10    said it didn't work, it was a bad idea.  What --

11    they said it would never go forward.  I can't

12    remember your exact words.

13                    Why did Pricewaterhouse think it was

14    a bad idea?

15         A.    To my recollection, there was a

16    number of challenges with it.  First and foremost,

17    it -- because of the very nature of the talc claims

18    we were facing that had a future component, there

19    was no way, with any certainty, particularly given

20    the adjudications that had happened up to that

21    point, be able to, outside a bankruptcy setting,

22    ensure you got finality with respect to the future

23    claims.

24                    Because there's -- unlike bankruptcy,

25    where you have channeling injunctions that can

1    channel by court order future claims to the trust,

2    you don't have that in the MDL.  So that was issue

3    number one.

4                    Issue number two, we were in a

5    litigation where Mr. Birchfield was leading an

6    opposition to the bankruptcy proposal that we had

7    set forth.

8                    And my recollection that another

9    concern of the auditors was that there would no way

10   to reasonably estimate the value in which you could

11   actually avoid a fraudulent chancery motion in that

12   context, given the nature, the particular nature of

13   the allegations that were being made

14   contemporaneously.

15                   And so a reasoned auditor wouldn't be

16   in a position to certify the fairness of a -- an

17   amount for the purposes of divesting a -- the talc

18   liability into a particular entity at that point in

19   time.

20                   So, sir, to the best of my

21   recollection, those were the issues that were

22   addressed.  I think there were some other issues

23   with respect to credibility of the entity that we

24   addressed in certain terms.

25                   My recollection is that there was

1    some historical knowledge of Legacy's intent, or

2    Mr. Conlan's intent to do this before that were

3    looked at with askance by the auditor.

4        Q.    Do you know why?

5        A.    I'm sorry, what?

6        Q.    Do you know why?

7        A.    Do I know why?  I'm giving you my

8    best recollection, sir.

9        Q.    I understand that.  Fair enough.

10            You mentioned that, at one point,

11   that if J&J -- and I forget the exact line of

12   questioning -- that J&J, at least a portion of it,

13   could be in the red.

14            Do you recall using that word earlier

15   today?

16       A.    Yes.  What I said specifically was

17   the entity, Johnson & Johnson Consumer, Inc., was

18   the entity responsible for the talc liabilities in

19   the United States prior to any of these divisional

20   mergers and prior to going into the bankruptcy.

21            In 2020, the entire enterprise was in

22   a loss position as a consequence of the talc

23   litigation, notwithstanding that it had a whole line

24   of other valid and viable business opportunities.

25            That is essentially what eventually

```
 1    led to doing the divisional merger, which is called,

 2    sort of demeaningly, the Two-Step, because the

 3    divisional merger takes the talc liabilities, puts

 4    it into a different entity, and this is what the

 5    other circuit, the Fourth Circuit cases said is

 6    appropriate and have allowed to go forward.

 7              What we did is we funded it with more

 8    recourse than they had when it was -- the talc

 9    liabilities would have had when they were at JJCI

10    with a separate funding agreement.  And that is why,

11    in our view, it was an appropriate transaction, and

12    that if we had stayed in the Fourth Circuit where we

13    filed, it would have been allowed to go forward.

14              Different standard, Third Circuit.

15    Now we're going to address it on appeal.

16         Q.   So you've made this argument twice

17    now, that the Fourth Circuit got it right, the Third

18    Circuit got it wrong.  But the fact is, courses for

19    courses, facts matter, correct?

20         A.   Can you ask that again?

21         Q.   Let me try it this way.

22              In the Third Circuit's opinion, 64

23    F.4 84 at -- I'll find the page here in a second.

24    It's the court -- the Third Circuit found

25    specifically:  J&J has an exceptionally strong
```

1    balance sheet.  At the time of LTL's filing, J&J had

2    well over 400 billion in equity with a triple A

3    rating, 31 billion in just cash and marketable

4    securities.

5                    Isn't it true that those facts are

6    not in the cases that were filed in the Fourth

7    Circuit; they don't have an exceptionally strong

8    balance sheet like J&J?

9         A.      Actually --

10                MR. BRODY:  Your Honor --

11                THE WITNESS:  Actually, the way I can

12   answer that --

13                MR. BRODY:  Before you do, I just --

14   we're -- I would object, Your Honor.  We're getting,

15   I think, now, far afield of focusing on the issues

16   that we're here for today.

17                MR. POLLOCK:  Your Honor, I could not

18   disagree more strongly.  He has argued twice now on

19   the record:  Whoa is me; poor J&J; we can't afford

20   it; if I were only in the Fourth Circuit, I would be

21   able to get away with this.

22                And the Third Circuit squarely said

23   it was not in good faith.

24                THE WITNESS:  No, wait.

25                MR. POLLOCK:  As general -- let me

```
 1    finish.  As general counsel, or assistant general

 2    counsel, whatever it is, the fact is the Third

 3    Circuit has said that they have an exceptionally

 4    strong balance sheet.

 5              So, to me, to play to the news, to

 6    play to Your Honors and argue that we're going to go

 7    bankrupt if we cut the deal that their own experts,

 8    which I will get to in a minute, support, I'm

 9    entitled to make the argument because he's made the

10    counterargument, repeatedly over my objection

11    regarding scope, we shouldn't be going here.

12              THE COURT:  Well, the Fourth Circuit

13    was brought up, the Third Circuit, and difference of

14    opinion, and whether the Supreme Court is going to

15    resolve that split.  Clearly, we heard it.  Not

16    necessarily heard Mr. Haas say that J&J can't afford

17    it, et cetera, that was the tact that the company

18    decided to take.

19              You addressed it.  It was raised on

20    direct.  I'm going to permit Mr. Pollock to address

21    those concerns.  But let's keep it focused --

22              MR. POLLOCK:  I got it.

23              THE COURT:  -- with regard to why

24    we're here.  I mean, Judge Singh and I are very

25    familiar with what happened in the Fourth Circuit,
```

1    what happened in the Third Circuit.  Judge Ambro's

2    decision runs through this decision, the author of

3    the Third Circuit.

4                    So if can get back to how that plays

5    in and addresses why we're here, Mr. Pollock, I

6    think we would be all better suited.  But I'll give

7    you that opportunity to address it.

8                    THE WITNESS:  And, Your Honor, I can

9    squarely address this issue, discussion, quite

10   clearly and shortly and succinctly.

11                   THE COURT:  Do you need the question

12   rephrased?

13                   THE WITNESS:  No, I got it.

14                   You're misreading the decision and

15   you're wrong on the facts because, first of all, the

16   J&J wherewithal in the context of the Third Circuit

17   decision that came down in January of 2023 concerned

18   whether and to what extent they would be able to

19   fund pursuant to the funding agreement, which I had

20   mentioned.  That was J&J providing supplementary

21   funding.  It has nothing to do with whether the

22   entity, JJCI, could have gone into bankruptcy alone

23   because it was red.

24                   And, in fact, that's why we say that

25   our transaction was extraordinarily in good faith.

1    What happened in that decision, the Third Circuit

2    said because in its view there was an imminent

3    financial distress because of that particular

4    backstop, then the bankruptcy proceeding of the new

5    entity, LTL, could not go forward.

6              In the Fourth Circuit, there is, in

7    fact, a backstop by viable healthy parent companies,

8    too.  In those cases, though, the Court didn't apply

9    an imminent financial distress standard.  The Court

10   in the Fourth Circuit looked to whether and to what

11   extent the bankruptcy proceeding provided a

12   reasonable way to resolve the mass tort liability

13   that involved a future component and said this was

14   an appropriate use of the bankruptcy process.

15             And in the Fourth Circuit, the first

16   question is whether there's subjective bad faith,

17   and the second question is whether there's objective

18   futility.  And in both cases, the Fourth Circuit

19   said, no, there is no subjective bad faith, and yes

20   -- and no, there is no objective futility because of

21   the funding agreement.  So it actually worked in

22   their favor, so that's the relevant facts.

23             In the Third Circuit, because they

24   didn't apply this subjective bad faith standard --

25   and, in fact, the Third Circuit noted in the

```
 1    decision that was no subjective bad faith, and the
 2    Bankruptcy Court has found that there's no
 3    subjective bad faith by J&J.
 4              So what the Court actually held was,
 5    by doing the right thing -- and the Court noted that
 6    in the footnote -- I believe it's footnote 27, for
 7    those who people who might want to remind me -- that
 8    it was kind of ironic that by doing the right thing
 9    and providing the funding, they couldn't meet this
10    new standard of imminent financial distress.
11              But my view on what the difference is
12    in the Third Circuit from the Fourth Circuit were
13    entirely correct and accurate, and I believe you're
14    misconstruing the Third Circuit's decision.
15              MR. POLLOCK:  Your Honor, did he
16    mention that they would be in the red?  I believe
17    the Third Circuit, at page 106 --
18              THE COURT:  JJCI --
19              THE WITNESS:  JJCI.
20              THE COURT:  -- would be in the red.
21              MR. POLLOCK:  Well, the Third Circuit
22    talks about Old Consumer and New Consumer.  So they
23    are looking at it differently than the way Mr. Haas
24    is looking at it.
25              My only point is really simple.  The
```

1    Third Circuit looked at it and said you've got 31

2    billion in cash in marketable securities.  That is

3    not being in the red.

4                    But, if you will, I will move on.

5                    THE WITNESS:  I can explain, Your

6    Honor.  That -- you're right.  You hit it.  They

7    ditched the new entity that has the funding

8    agreement that he's referring to, and there's a

9    distinction, obviously, between the Old and --

10                   THE COURT:  Just as a footnote here

11   that those company differentials played a large

12   measure in motions before our courts, so that's not

13   foreign to us, Mr. Haas.

14                   THE WITNESS:  Thank you.  Thank you,

15   Your Honors.

16   BY MR. POLLOCK:

17        Q.     You're familiar with two people,

18   Mr. Mullin and Mr. Bell.

19                   UNIDENTIFIED:  We can't hear you like

20   we did earlier.

21                   THE WITNESS:  Should I -- I can try

22   moving it over here, if that helps.  Does that help

23   you guys?  It may be off.

24                   COURT CLERK:  It's fine.  It's fine.

25                   THE COURT:  It looks fine from our

1    technical standpoint.

2              COURT CLERK:  Yeah, I'm fine.

3    They're not microphones you can hear through the

4    building.  It's -- they're just microphones for me.

5              THE COURT:  Okay.

6              THE WITNESS:  I'll try to speak into

7    this --

8              THE COURT:  Try to project to voice,

9    Mr. Haas.

10             THE WITNESS:  Yes, certainly.

11   BY MR. POLLOCK:

12        Q.       You mentioned earlier in your

13   testimony that you thought Mr. Conlan and

14   Mr. Birchfield were conspiring or working together

15   against you to get the $19 billion number, correct?

16        A.       I'm not sure I used that word, but

17   that's the essence of what my opinion is.

18        Q.       Fair enough.

19             Are you familiar with Charles H.

20   Mullin and Gregory K. Bell?

21        A.       Yes, sir.

22        Q.       And they are both experts, right?

23        A.       Yes, they are.

24        Q.       And they're both experts retained by

25   J&J, correct?

1          A.        Yes, they are.

2          Q.        And they are both experts who

3    provided expert reports to Michael Kaplan, Judge of

4    the Bankruptcy Court, right?

5          A.        Yes, they are.

6          Q.        And as Mr. Bell says, that the top --

7    the range to resolve -- and this is page 4 --

8    resolve to 11 to 21 billion dollars --

9          A.        Sir, what are you referring to?

10          Q.        I'm referring to the Bell report at

11    page 4.  It's the Bell report of June 7th, 2023.

12          A.        What tab is that?

13          Q.        You read that at the time of the

14    document --

15                    MR. BRODY:  He has a copy of it?

16                    MR. POLLOCK:  I do not.  You've seen

17    this.  I'm not required to give you a copy of the

18    document, sir.

19    BY MR. POLLOCK:

20          Q.        Are you telling me here today that

21    you did not review this report at some point in your

22    life?

23          A.        Sir, I'm not telling you that --

24                    MR. BRODY:  That's a different

25    question.

 1          A.          -- one way or the other.  I don't

 2    know what report you're referring to, and I do not

 3    know the context of the statement, and I would

 4    appreciate it if I could at least get a copy.

 5          Q.          So you're telling me that as the

 6    person in charge of products liability for J&J, when

 7    there's are a submission by two experts going to

 8    Michael Kaplan, Judge Kaplan, that you did not

 9    know -- you did not review those reports before they

10    were submitted to the Court?

11          A.          I didn't testify to that, sir.

12          Q.          I didn't -- I didn't ask you what --

13    you keep on reframing my questions.  I'm asking you

14    a simple question:  Are you telling me you did not

15    review those reports before they were filed with

16    Judge Kaplan?

17                 MR. BRODY:  Your Honor, that's a

18    separate question from the question he asked

19    previously.

20                 THE COURT:  Well, it was.  What's the

21    question you want to ask?

22                 MR. POLLOCK:  I will ask a brand new

23    and clean one.

24    BY MR. POLLOCK:

25          Q.          You're familiar with these two

1    gentlemen, Mr. Mullin and Mr. Bell, correct?

2         A.      Yes.  They are both experts of

3    Johnson & Johnson who provided, to your point,

4    expert reports in connection with different motions

5    at different times in the proceeding.  So, I'm not

6    sure which motion -- which expert reports you're

7    referring to.  But they both have submitted expert

8    reports in connection with the proceedings and cases

9    before Judge Kaplan.

10        Q.      And you care deeply about this case,

11   don't you?

12        A.      The...

13        Q.      LTL matter.

14        A.      I -- I fundamentally feel very

15   strongly about the talc claims because having had --

16   every dime that does not go to doing what we do in

17   the regular course of business, Mr. Pollock, which

18   is saving people's lives, is a dime that could have

19   been used to save another person's life.

20              And I think anyone who has faced

21   that, and faced the diseases that we attempt to cure

22   on a daily basis, would feel as strongly as I do

23   about this case because, in my view, the talc

24   litigation is entirely unwarranted, unmerited, and

25   is depriving the company from the funds that it can

1    be using to actually save lives.

2             So I care deeply about this case

3    because our number one principal and our credo is to

4    do what's right for patients.

5        Q.      Excellent.

6             So you care deeply about the case,

7    and the fact is every day you delay, J&J earns

8    interest on the money it has not paid, correct?

9             MR. BRODY:  Your Honor, are we going

10   to -- I'm going to object, Your Honor.  Is this

11   going to turn into an examination about the

12   potential -- we're -- it seems like this is now a

13   hearing about the fairness of one particular

14   settlement offer or another, as opposed to the

15   issues the Court is facing on disqualification.

16            MR. POLLOCK:  Judge, they address

17   directly Mr. Brody -- Mr. Birchfield, and they made

18   the point, pointedly, during direct examination that

19   Andy's sole motive was:  I could get a few more

20   shekels, I could get a few more dimes if we went

21   this way, and I make more money.

22            That came out of this witness' mouth.

23   That's exactly what he did.  He was doing it to

24   attack my client's credibility.  And Mr. Brody

25   instigated it by saying, going, What happened in

1    that testimony.  I'm entitled to respond, Your

2    Honor.

3                    THE COURT:  I'll overrule the

4    objection.  You can go down that road, Mr. Pollock.

5    Remember, we're not a jury.

6                    MR. POLLOCK:  I understand.

7                    THE COURT:  And there are -- you

8    know, we can discern.  So I think you've made your

9    point with regard to the difference of whatever fees

10   may be available to your client in bankruptcy versus

11   the MDL or MCL.

12                   MR. POLLOCK:  Fair enough.

13                   THE COURT:  Okay.

14   BY MR. POLLOCK:

15       Q.     Let me close with one last point,

16   then.  Isn't it true that your own experts, Mr. Bell

17   and Mr. Mullin, opined that the range of resolution

18   that was reasonable would be somewhere between 11

19   and 21 billion dollars?

20       A.     No, that's not right.

21       Q.     Okay.  So you're saying these reports

22   are not correct?

23       A.     I'm saying, you don't understand what

24   the reports say, and you are erroneously

25   characterizing the reports.

1          Q.      I will let the reports speak for

2     themselves.

3                  You heard the number 11 to 21 billion

4     dollars, haven't you, in these reports?

5          A.      You're talking about --

6                  THE COURT:  Could you mark for the

7     record, at least for identification --

8                  MR. POLLOCK:  Absolutely.  I will

9     mark for identification the June 7, 2023, Bell

10    report, which is on page 4.  And I'll mark it for

11    identification.

12                 What would you like it marked as,

13    Judge?  Plaintiff's?

14                 THE COURT:  Why don't you go P-1.

15                 MR. POLLOCK:  P-1.

16                      -   -   -

17                 (P-1, marked for identification.)

18                      -   -

19    BY MR. POLLOCK:

20         Q.      And it says the Mullin report also

21    estimates the total present value --

22                 MR. BRODY:  Your Honor, I'm sorry.

23                 THE COURT:  Mr. Brody.

24                 MR. BRODY:  If he's going to be

25    reading from the report for his questioning, I think

```
 1    I should get a copy, and I think Mr. Haas should

 2    have a copy, as well.

 3                    MR. POLLOCK:  Well, there's nothing

 4    in the court rules, respectfully, Your Honor, that

 5    requires me to give him a copy.

 6                    THE COURT:  For cross-examination,

 7    no.  But I'm just looking at, what are we marking

 8    for identification purposes?  So P-1 is the 6/7/23

 9    Bell report.

10                    MR. POLLOCK:  And P-2 would be the

11    June 7th Charles H. Mullin report, and that is at

12    pages 3 and 44.  And I'll give Mr. Brody my own

13    copy.

14                            -   -   -

15                    (P-2, marked for identification.

16                            -   -   -

17                    THE COURT:  What is the Mullin

18    report?

19                    MR. POLLOCK:  It's the Mull --

20    Charles Mullin, M-U-L-L-I-N, not E-N, June 7, 2023,

21    filed with Judge Kaplan, and I'm referring

22    specifically to page 3 and to page 44.

23                    THE COURT:  So your questioning

24    Mr. Haas on those reports.  He hasn't seen those, or

25    at least his familiarity is not as clear today as it
```

```
 1    was, perhaps, when he saw it.

 2                    So let's have the -- you're going to

 3    ask him questions --

 4                    MR. POLLOCK:  Yes, sir.

 5                    THE COURT:  -- with regard to those

 6    two exhibits?

 7                    MR. POLLOCK:  And my only question is

 8    this.  Actually, he didn't say he hasn't seen them,

 9    so I'm not quibbling with you, but I --

10    BY MR. POLLOCK:

11        Q.    Mr. Haas, am I correct that these

12    reports you reviewed before they were filed with the

13    Court?

14        A.    If you're referring to -- I would --

15    for the purposes of moving along, Your Honor, I

16    review most of the expert reports that get

17    submitted, so I would presume I did.  I don't know

18    which specific ones he's referring to, because there

19    were quite a few submitted by --

20                    UNIDENTIFIED ATTORNEY:  We can't hear

21    you.

22                    THE WITNESS:  So there were quite a

23    few submitted by those two experts in this context.

24                    THE COURT:  Well, you know, in all

25    deference to those folks in the crowd, as long as
```

1    the Court can hear, if you could project your voice,

2    that is what's most important.  We're not playing to

3    any audience, everyone.  You're entitled -- you can

4    reconfigure your seat, if you want to hear, but, you

5    know, that's -- the microphones are and our

6    acoustics are what they are.

7              So please continue, Mr. Haas.

8              THE WITNESS:  And Your Honor, just if

9    I may respond to the other question, which I think

10   the record might be a little confused on whether I

11   responded.

12             He asked whether J&J's earning

13   interest on monies that are not otherwise paid out.

14   We are not earning interest on monies that are not

15   otherwise paid out.  We are investing our monies

16   into research and development to create new drugs.

17             So there's no money sitting aside

18   that we're earning interest on for the purposes of

19   avoiding a settlement payment.  So that statement is

20   entirely incorrect.

21             What we are doing is incurring

22   hundreds of millions of dollars a year litigating

23   the talc case.  That isn't judgments.  We have

24   one -- or there has been two cases tried this year,

25   they're both mistrialed, and so -- on the grounds

1     that they haven't gotten a unanimous verdict.

2                    So they have not won a single case

3     this year, but we are spending hundreds of millions

4     of dollars on pure expenses of litigating these

5     cases, which aren't otherwise going to research and

6     development for new client -- new drugs for the

7     patients.

8     BY MR. POLLOCK:

9          Q.      And if you continue to litigate, it

10    could be the difference between nine billion dollars

11    and 19 billion dollars, right?  Your hope is that

12    you can save 10 billion dollars and litigate this

13    matter successfully and resolve it at 9 billion?

14         A.      No, sir.  I testified on direct that

15    the evidence in the record in the bankruptcy is that

16    if we were to litigate these cases at the rate we

17    were litigating at the time of the first bankruptcy,

18    it would take 3,800 years to get through the cases,

19    thereby depriving most claimants of any recovery,

20    whatsoever.

21                    And the cost of the -- the pure

22    expense of litigating those cases, not paying

23    judgments, but the expense alone would be $190

24    billion.  So that would be expenses that go to

25    lawyers that don't go to patients.

```
 1          Q.      So it sounds like $20 billion would

 2    be a good deal?

 3          A.      That is not the logical conclusion

 4    one would draw from that statement.

 5          Q.      Fair enough.  Let me move on.

 6                  Weil Gotshal, Jones Day.  Am I

 7    correct that Weil Gotshal and Jones Day were your

 8    primary lawyers in the Imerys and LTL matter; Jones

 9    Day with regard to the LTL approach of the Texas

10    Two-Step?

11          A.      Primary lawyer.  So, Jones Day was

12    the bankruptcy counsel of record for the LTL

13    matters; Weil Gotshal was the bankruptcy counsel of

14    record for the Imerys and Cyprus matters, I believe.

15                  In terms of primary counsel, again,

16    it goes to your question earlier.  We had Orrick

17    counsel, we had Faegre Drinker counsel, we had

18    Skadden counsel, we had King & Spalding counsel, we

19    had other counsel, all that participated in these

20    calls, and each were there because they contributed

21    significant value to the deliberations.

22                  So, when you say "primary," it's --

23    those two were the ones that were responsible for

24    submissions into each court.  But each and every one

25    of those people on that call provided significant
```

1    input and advice with respect to those matter.

2                    And on the bankruptcy issue, sir, and

3    on the mass torts issue, Mr. Conlan purported to be

4    the premier expert in the world, and it's in writing

5    in the submissions that are in the record that that

6    was his position.

7            Q.      If I were to look at it from a

8    billable spend, am I correct that the numbers spent

9    for J&J for legal counsel at Weil Gotshal on Imerys

10   would dwarf anything spent by Mr. Conlan?

11           A.      On a per-lawyer basis, I'm not sure

12   that's true, but on an aggregate basis, I would say

13   yes.

14           Q.      So the total spend, the total amount

15   spent, hundreds of millions of dollars to Weil

16   Gotshal, roughly two million bucks to Mr. Conlan?

17           A.      I will have to check the actual

18   numbers to give you that answer.  I think your prior

19   statement was probably more the --

20           Q.      Excellent.

21           A.      -- most --

22           Q.      And with regard to Jones Day, Jones

23   Day was the one who proposed and was driving the LTL

24   to the Texas Two-Step, correct?

25           A.      No.

```
 1          Q.      Who was driving it?

 2          A.      Me.

 3          Q.      Okay.  Who -- are you a bankruptcy

 4   expert?

 5          A.      I do not purport to be a bankruptcy

 6   expert, but I am the one who is responsible at J&J,

 7   first and foremost, for the concept; and secondly,

 8   for the decision whether to file; and thirdly, how

 9   to go about structuring that filing with the advice

10   of Mr. Conlan sitting right behind you.

11          Q.      And didn't Mr. Conlan actually tell

12   you at any point in time he did not think the LTL

13   Texas Two-Step was a good idea?

14          A.      Actually, quite to the contrary --

15                  MR. BRODY:  Object --

16                  THE WITNESS:  I'm sorry.

17                  MR. BRODY:  I'm going to object, Your

18   Honor, because if we're going to ask about the

19   substance of communications --

20                  MR. POLLOCK:  Fair enough.

21                  MR. BRODY:  -- between Mr. Conlan and

22   Mr. Haas while Mr. Conlan was representing J&J as

23   outside counsel, that is privileged, and I have a

24   privilege objection to that question.

25                  THE COURT:  Sustained.
```

1              MR. POLLOCK:  Okay.  Fair enough.

2       BY MR. POLLOCK:

3              Q.      You have provided no emails, and no

4       billing records, no photos, anything showing

5       Mr. Conlan and Mr. Birchfield working together, have

6       you, other than what you have in the record here

7       today?

8              A.      Other than what's in the record, have

9       we provided anything into the record, no.

10             Q.      No.  Let me put it this is way.  You

11      have -- you said, in your initial certification --

12      it's Exhibit 1, if you want to see it -- you say you

13      have reviewed.  When you say you have reviewed, is

14      it you personally reviewed, or is it the "royal we"

15      have reviewed, and these other people review them

16      and report up to you?

17             MR. BRODY:  I'm sorry.  What are you

18      referring to, please?

19             MR. POLLOCK:  Exhibit 1.

20             THE COURT:  The declaration.

21             MR. BRODY:  Which part, though?

22      BY MR. POLLOCK:

23             Q.      On the declaration, "I became

24      familiar," "billing submitted," "reflects," "time

25      entries reflect," paragraph 5, "these billings

1     sent," "records show."

2                    They are all written in the passive.

3     So the question I'm asking you, sir:  Who actually

4     reviewed the documents?

5           A.     I reviewed them.

6           Q.     So how do you actually get the

7     billing records?

8           A.     I asked Mr. White, who is sitting in

9     the back of the courtroom, who is in charge of the

10    billing records for the product liability group to

11    supply them to me, and he did.

12          Q.     And did you also ask for all emails

13    and memoranda that Mr. Conlan had written?

14          A.     In connection with this matter?

15          Q.     Yes, sir.

16          A.     I do not know whether I made that

17    specific request.  I do recall asking for records

18    that he had provided, and communications, memo.  I'm

19    not exactly sure how I phrased it, sir.  The gist of

20    it was, I did ask for documents that Mr. Conlan had

21    sent and drafted.

22          Q.     Did you reach out to the law firms

23    that you worked with, Jones Day, Weil Gotshal,

24    Faegre, and ask them, Hey, do you have any documents

25    regarding what Mr. Conlan worked on while he was at

1    Faegre Benson -- or Faegre Drinker?

2          A.      I don't believe I -- I certainly did

3    not do that.  I don't believe anyone did, no.

4          Q.      Okay.  And so with regard -- and you

5    have produced to the Court here all the documents

6    you have regarding any communications between

7    Mr. Conlan and Mr. Birchfield, correct?

8          A.      I don't know that I could say that

9    specifically, because he might have been on

10   submissions to the Court, where they are both on

11   there.  I don't think that would be -- I don't think

12   that was the purpose of the submissions.

13              The purpose of the submissions were

14   designed to provide an indication of what Mr. Conlan

15   did to demonstrate that he worked on the same

16   matters and the same issues that he's now taking

17   positions with Mr. Birchfield that are averse to

18   J&J.

19              So, the intent wasn't to do a

20   comprehensive dump of every document that the two

21   might have been on.  So I would expect, sir, quite

22   frankly, I would expect that there are documents

23   that involve transmission of court documents, for

24   example.

25              But the answer is no, that wasn't the

```
 1    objective of this selection.

 2         Q.      You've used -- and I don't have your

 3    exact words, so I apologize.  It's either

 4    "conspire," "work together," or, you know, "joining

 5    forces against J&J."  It's all the same concept.

 6              If you had any proof that Mr. Conlan

 7    had disclosed confidential and privileged

 8    information to Mr. Birchfield, am I correct you

 9    would have produced it to the Court for the hearing

10    today?

11         A.      Sir, I think I addressed this on

12    direct, which is to say the record demonstrates that

13    as early as April 20th, 2023, Mr. Conlan and the

14    Beasley Allen law firm were having myriad

15    discussions relating to a settlement proposal and

16    including a structured optimization proposal; first,

17    for discussion with the mediators, and thereafter

18    for presentation in connection with opposing our

19    plans.

20              So the record demonstrates that.  The

21    record demonstrates that the proposals have the same

22    and implicate the same matters and the same issues

23    that Mr. Conlan represented us and gave us advice on

24    and had communications with inside counsel and

25    outside counsel.
```

```
1                    And as I testified, those

2       conversations necessarily are imbued with

3       Mr. Conlan's confidential, privileged, and work

4       product information that he obtained from Johnson &

5       Johnson.  So I disagree with your proposition.

6              Q.      Excellent.

7                    So with regard to -- we'll go to

8       "necessarily imbued" in a second.  Let's assume for

9       the sake of argument that Mr. Conlan understands RPC

10      1.9, and that he understands he has an ongoing duty

11      to keep and maintain confidences that belong to J&J.

12      I just want you to assume that for one second.

13                   What facts do you have in your

14      possession, custody, or control that he ever shared

15      any of those confidences with Mr. Birchfield or

16      Beasley Allen?  I understand your theories.  I

17      understand your concerns.  What facts do you have?

18             A.      I just told you that.

19             Q.      The facts --

20             A.      I just told you -- I just told you

21      the facts that I have.  In the very nature of the

22      communication, the very nature of the position where

23      the two are collaborating on the same issues, where

24      you have a side-switching counsel who is now working

25      with our adversary on the same matters and the same
```

1    issues.

2                        And I fundamentally disagree with

3    your proposition which is embedded in your question,

4    as to what is the requisite showing under the rule

5    of 1.9, as well.

6                        But fundamentally, I've already

7    answered your question.

8         Q.    Okay.  So I am correct in

9    understanding that the totality of the facts that

10   you have in your possession, custody, and control,

11   that Mr. Conlan ever shared anything that was a

12   secret J&J piece of information is in the binder in

13   front of you?

14                       MR. BRODY:  Objection.

15                       THE WITNESS:  Once again, no.

16                       MR. BRODY:  Sorry.

17                       It mischaracterizes his testimony,

18   but he can answer.

19                       THE WITNESS:  That would be no.  That

20   mischaracterizes my testimony.

21   BY MR. POLLOCK:

22        Q.    Okay.  So what other documents you

23   got?

24        A.    I just told you that it's both --

25   it's based upon my testimony and the documentation

1    and the nature of the relationship, and I just

2    walked through with you, as I did on direct, what

3    was the basis for my view of the nature of the

4    relationships which necessarily had demonstrated an

5    egregious breach of Mr. Conlan and Mr. Birchfield's

6    ethical obligations.

7                    You can't have someone who is sitting

8    on that side of the table walk to that side of the

9    table and say, Oh, I didn't tell them anything, but

10   I'm going to work with him against you on that side

11   of the table.  That's an egregious side-switching

12   violation of the ethics.

13                   So if you're asking my opinion

14   because you --

15          Q.    I'm asking you for facts, sir.

16          A.    You're presenting me with a

17   hypothetical, sir.

18          Q.    Sir, I'm asking for facts.

19          A.    Sir, you've presented me with a

20   hypothetical.

21          Q.    I did not.  I'm asking --

22          A.    If you ask that, I won't answer.

23          Q.    -- for facts.  That was two questions

24   ago.  So, go ahead.  I'm asking for facts.

25                   THE COURT:  Calm down here.  All

 1   right.

 2                    Pose your question, Mr. Pollock.

 3                    MR. POLLOCK:  Yes, sir.

 4   BY MR. POLLOCK:

 5        Q.      You say "necessarily imbued."  You

 6   have used that phrase several times today,

 7   "necessarily imbued."

 8                    Necessarily imbued, is that another

 9   word for the appearance of impropriety, it looks

10   wrong, it doesn't sound right?

11        A.      No.

12        Q.      Excellent.

13                    What's the different between

14   "necessarily imbued," which I have never seen in the

15   ethics rules, and the "appearance of impropriety"?

16   What's the distinction?

17        A.      It's a distinction that I, in

18   answering questions that were posed to me, which you

19   asked, as to why the -- Mr. Conlan's and

20   Mr. Birchfield's conduct is improper.

21                    My point simply is, is when you're

22   having conversations that concern the same matter

23   and the same issues that Mr. Conlan had years of

24   discussions with me about, and with my team and with

25   the J&J team and with outside counsel, and to go and

1    have conversations about the same issues with my

2    adversary undermines the entire adversarial process,

3    because no matter how he construes it, his

4    communications must contain our privileged work

5    product and attorney-client communications because

6    he can't separate that out in his neurons.

7              Any single view that he espouses,

8    necessarily, yes, is imbued with the conversations

9    we've had.

10       Q.     You have no evidence, sir, that he

11    was ever -- Mr. Conlan ever worked for Beasley

12    Allen, right?

13       A.     At --

14       Q.     He was never an associate or partner

15    at Beasley Allen.

16       A.     I have no evidence that Mr. Conlan

17    was an associate or partner at Beasley Allen.

18       Q.     Excellent.

19              You have no evidence that he ever was

20    retained by Beasley Allen?

21       A.     No, I have no evidence that he

22    actually received a pay check from Mr. Birchfield,

23    if that's what you mean by --

24       Q.     Or he had a written agreement from

25    Beasley Allen.  "I'm going to hire you, Mr. Conlan.

```
 1    You're a great lawyer.  You worked at Sidley Austin

 2    for 32 years.  I'm hiring you."  You've got no such

 3    document, correct?

 4          A.      I have no such document.  The

 5    position we have taken very consistently is that he

 6    is collaborating, he's joined forces with, he's

 7    worked with, all the ad -- you know, adjectives

 8    you've used in order to prepare and present and

 9    advocate for a settlement resolution that is

10    directly adverse to that of his former client.

11          Q.      Even though your own experts are

12    saying that number sounds pretty good to us?

13          A.      That is entirely false, unfounded,

14    lacks foundation, and misconstrues the evidence in

15    the record.

16          Q.      You should be on this side.  I mean,

17    the -- if you're going to object, sir.  I'm asking

18    you questions.  I don't need -- Mr. Brody is very

19    capable of objecting.

20                  MR. BRODY:  Your Honor.

21                  THE COURT:  But I think Mr. Haas, if

22    he doesn't understand the question, is explaining

23    why he doesn't understand the question.

24                  MR. POLLOCK:  Fair enough.

25                  MR. BRODY:  Yeah, and I would move to
```

1    strike the commentary, Your Honor, because Mr. Haas

2    was answering the question.

3                   THE COURT:  Judge Singh and I are

4    able to separate that type of information.

5    BY MR. POLLOCK:

6         Q.     One of your assumptions, sir, is that

7    he was a lawyer representing a client when he went

8    to Legacy Solutions.  Isn't that core to your

9    analysis?

10        A.     No, it's not.

11        Q.     So, because RPC 1.9 says, A lawyer

12   who has represented a client in the matter shall not

13   thereafter represent.  So you've just -- isn't it

14   true that he has to be a lawyer representing a party

15   in the dispute?

16        A.     No, that's not true.

17        Q.     Excellent.

18        A.     That's not true because your

19   obligations, your ethical obligations as a lawyer do

20   not stop when an engagement ends.  You own them for

21   life, Mr. Pollock.

22        Q.     Well, let's just be really clear on

23   this.  When you say "you own them for life," you're

24   talking about RPC 1.6.  You're talking about --

25        A.     I'm talking about --

 1          Q.          -- confidentiality of information,

 2     correct?

 3          A.          No, no.  I'm trying not engage in an

 4     argument.  So I will succinctly say no, and then

 5     I'll reserve --

 6                      THE COURT:  Well, let's hear the

 7     question.

 8                      Mr. Pollock.

 9     BY MR. POLLOCK:

10          Q.          Okay.  So RPC 1.6 talks about a

11     lawyer's ongoing duty to maintain confidences.  Are

12     you familiar with that rule?

13          A.          I'm familiar with the rule, sir.

14          Q.          Excellent.

15                      And in this case, when I asked you

16     whether Mr. Conlan shared information with

17     Mr. Birchfield, you immediately went to 1.9, duties

18     to former clients, and that requires him to have

19     been counsel.  And then I asked you whether he was a

20     lawyer representing a client in the matter, and I

21     proffered to you he was not.

22                      Isn't it true he is a businessman

23     representing the interest of Legacy Solutions?

24          A.          So you have a large amount of preface

25     to the question, and I fundamentally disagree with

1    your interpretation of the ethical laws, sir.

2            Q.      Okay.

3            A.      If your question is whether or not

4    our position is whether Mr. Conlan is acting as an

5    attorney or not in his current role, the answer is

6    it doesn't matter.  I don't have the foundation to

7    say whether he purports to.

8                    But if you're asking whether that is

9    dispositive of my position, of our position, the

10   answer is no.

11           Q.      Well, you asked -- you accused him of

12   being a side-switching lawyer.  Those were your

13   words.  But in this case, he's a businessman at

14   Legacy Solutions after he walked out the door at

15   Faegre.

16                   So I want to know:  How can he be a

17   side-switching lawyer if he is not representing a

18   client in the matter, other than himself?

19           A.      He is a lawyer that has continuing

20   obligations, who has switched sides and is now

21   working with an adversary on the same matter and the

22   same issues for which he provided legal advice,

23   confidential advice, obtained privileged and work

24   product information.  That is a side-switching

25   lawyer, in my view.

```
 1          Q.       And other than the documents you have

 2   in the record today, you have no -- and your

 3   testimony that you have given with your opinions,

 4   you've got no other evidence that Mr. Conlan ever

 5   shared a J&J confidence with Mr. Birchfield,

 6   correct?

 7                   MR. BRODY:  Objection, Your Honor.

 8   We have been through this subject three times now.

 9                   THE COURT:  It's been posed.  I mean,

10   you know, to the extent there's a different answer

11   that you're looking for, Mr. Pollock.

12                   MR. POLLOCK:  I'm prepared to move

13   on, Your Honor.

14                   THE COURT:  Okay.

15   BY MR. POLLOCK:

16          Q.       Alliances.  You talk about alliances

17   and joining forces.  That's what you talked about

18   with Mr. Birchfield and Mr. Conlan.  Isn't it true

19   that the second Mr. Birchfield or the talc creditor

20   claimants committee signs a deal, that it -- let me

21   do it this way.

22                   Isn't it true that the second that --

23   if J&J were to sell the liabilities to Legacy and

24   Legacy were to buy them, isn't it true, at that

25   moment, Mr. Birchfield, Beasley Allen, the entire
```

1    talc credit claimants committee suddenly becomes

2    adverse to Legacy?

3            A.       First of all, I don't understand your

4    hypothetical, and I -- from what I do understand, I

5    disagree.  But I'm not really sure of your

6    hypothetical.

7            Q.       Sure.  Let me clear it up.

8                     Legacy Solutions proposed to buy the

9    claims from J&J, correct?

10           A.       Legacy Solutions has proposed a

11   number of different resolutions that it terms

12   broadly with -- it falls broadly within the bucket

13   of what they call structural optimization.  And that

14   can involve, fundamentally, and we've been over this

15   a little bit, but it involves putting the talc

16   liability into another entity and providing some

17   funding for it.

18                    But then, what happens next, whether

19   or not you take that entity to put it into

20   bankruptcy, whether you put ovarian claims only into

21   bankruptcy and not the mesothelioma claims, whether

22   or not you even do anything with bankruptcy, whether

23   or not you take it and you basically sell it so that

24   it is a standalone entity with, still, exposure from

25   the future claimants is an option.

1          So there are a number of different

2  alternatives that can come into play, each of which

3  we had many discussions with Mr. Conlan about the

4  risks/benefits, costs, pros/cons, advantages and

5  disadvantages while he was our counsel.

6          And so, in coming up with a Legacy

7  proposal, you know, when he came to us, he proposed

8  a number of alternatives within the concept of this

9  structured optimization, sir.

10          So, I hope that answers your

11  question.  I'm not exactly sure where you're going.

12      Q.      I don't think it answers my question

13  even remotely, but I'll ask it again.

14          If we look at Exhibit 7 -- could you

15  pull that up, please?

16      A.      Yes, sir.

17      Q.      Let me know when you're ready.

18      A.      I'm looking at number 7.

19      Q.      Wonderful.

20          First paragraph, second sentence:

21  "For Legacy to enter into this transaction, the

22  acquired talc liabilities of J&J would be required

23  to hold assets with a present value of $19 billion,

24  or such greater amount as determined by J&J's

25  auditors remove from J&J's financial statements the

```
 1    noncash charge for talc related liabilities."

 2                    Do you see that sentence?

 3          A.        I do, sir.

 4          Q.        In plain English, doesn't that mean

 5    if Legacy buys that -- those claims, the

 6    talc-related liabilities, that that would come off,

 7    if it worked, it would come off of J&J's balance

 8    sheets, right?

 9          A.        Okay.  First, to be clear, this is

10    not the only proposal.  You have to go back to

11    the --

12          Q.        I'm asking about --

13          A.        You're switching from your prior

14    question.

15          Q.        Sir, I'm asking about this proposal.

16          A.        Okay.

17          Q.        I'm asking about page --

18          A.        Sir, if you're talking about this --

19          Q.        -- that's in front of you.

20          A.        -- and the question is whether or not

21    this will work --

22          Q.        No, that is not the question.

23                    Isn't the proposal that once they pay

24    -- if they buy the liabilities for roughly $19

25    billion, that, at that point, it would remove from
```

1    J&J's financial statements the noncash charge for

2    talc-related liabilities?  That's Legacy's idea.

3            A.       And you're asking me whether that

4    works?

5            Q.       I'm asking whether that's what Legacy

6    proposed to you on November 9, 2023.

7            A.       That's the words are on this page.

8            Q.       Excellent.

9                     And they proposed it to you, correct?

10           A.       They sent this to the CEO of Johnson

11   & Johnson.  But, yes, if you're saying "you" at

12   large Johnson & Johnson, that is the particular

13   offer they're stating at this particular point in

14   time.

15           Q.       And if J&J were to accept this deal,

16   the Legacy proposal, the minute that J&J accepts the

17   Legacy proposal, now Legacy, Mr. Conlan, suddenly

18   become adverse to the talc claimants committee;  do

19   they not?

20           A.       No, that's wrong.

21           Q.       Why is that wrong?

22           A.       I can explain why that's wrong.

23                    So, a part of the proposal here is

24   whether and to what extent this is a means of

25   providing compensation to the lawyers that are the

1    ones that are overseeing the talc claims.  So,

2    particularly, the sort of nefarious aspect of this

3    and the $19 billion is it's not all going to

4    claimants.

5              First and foremost, Mr. Conlan's

6    proposal involves him taking all sorts of managing

7    fees.  So this is a compensation structure, number

8    one.  Number two, he retains in this proposal a

9    spread of anything that is paid out versus not paid

10   out.  So, of the 19 billion, say that's 8.9 gets

11   paid out, he gets to keep the rest.  Secondly.

12             Thirdly, there's no grounds to say

13   that this is going to work, because you can -- just

14   as in the bankruptcy, you can have objecting

15   claimants.  So, at any point in time, a claimant can

16   object to this on the grounds that it's not a viable

17   transaction, which is, again, a concern raised by

18   the auditors.

19             So I would disagree wholeheartedly in

20   many respects to everything you've said.

21             THE COURT:  I think this would be a

22   good time to take our lunch break.

23             MR. POLLOCK:  Wonderful.

24             THE COURT:  All right?

25             MR. POLLOCK:  How long would you

1     like, Judge?  I just -- I apologize.

2                    THE COURT:  Let's come back in an

3     hour.

4                    JUDGE SINGH:  Perfect.

5                    THE COURT:  All right.

6                    MR. POLLOCK:  Thank you, Your Honor.

7                    (A recess was taken.)

8                    THE COURT:  All right.  We will

9     continue.  All counsel are present.

10                   Mr. Haas, you're still under oath.

11                   THE WITNESS:  Yes, sir.

12                   THE COURT:  Mr. Pollock.

13    BY MR. POLLOCK:

14         Q.    Mr. Haas, if you could go to the

15    binder, Exhibit 2, that would be wonderful.  Let me

16    know when you are there.

17         A.    I am there.

18         Q.    Yes, sir.  So Exhibit 2, it's an

19    email from Jim Conlan to you, correct?

20         A.    That is correct.

21         Q.    And he -- that document is dated

22    August 23, 2022, correct?

23         A.    That is correct.

24         Q.    And it says in the second paragraph,

25    (as read):  I am among those who think the

1    likelihood of a plan confirmation/injunction,

2    skipping a part, in a Texas Two-Step case has gone

3    from low to essentially nonexistent.

4              Do you see that portion?

5         A.    Yes, I see that.

6         Q.    And there's nothing in there that

7    reflects that that communication originated from or

8    was shared from Mr. Birchfield, correct?

9         A.    No, that's exactly what I testified

10   on direct; that Mr. Conlan concealed from, did not

11   disclose to us that he had been having conversations

12   with Beasley Allen since as early as April of 2023

13   regarding alternatives to resolve the talc

14   litigation, and was engaged in discussions on

15   proposals to submit to the mediators.

16        Q.    Fair enough.  But there's nothing in

17   this document that demonstrates in any way that

18   Mr. Conlan and Mr. Birchfield were discussing

19   whether the LTL Texas Two-Step was a good idea.

20        A.    That's, again, that's exactly what I

21   testified on direct; that we had no disclosure,

22   whatsoever, from Mr. Conlan or Mr. Birchfield

23   regarding their alliance and the fact that they were

24   working together without our knowledge, consent, or

25   waiver.

1          Q.          So if Mr. Conlan switched hats, he

2     went to Legacy, right, from -- after he left Faegre,

3     correct?

4          A.          He did go to Legacy after he left

5     Faegre Drinker.  When you say he switched hats, he's

6     now in a different role.  He opened up a business

7     where he is purporting to go out and pitch for

8     Legacy structured optimization models, as I

9     understand it.

10         Q.          Couldn't say it better myself.

11                     So he goes from being a lawyer at

12    Faegre to being a businessman at a company he formed

13    called Legacy, right?

14         A.          Right.

15         Q.          Excellent.

16                     And he -- so -- and in that role, he

17    is not serving as legal counsel for any of Beasley

18    Allen's clients, is he?

19         A.          I cannot opine on that one way or

20    the other.

21         Q.          Let me try it this way.  You have no

22    facts, whatsoever, to support that he was

23    representing Beasley Allen's clients, right?

24         A.          In a legal capacity, again, I can't

25    opine on that one way or the other.  I can opine

1    that he is, or I can state factually that he is

2    addressing the same matters and the same issues that

3    he addressed when he was our counsel.

4         Q.    But I'm asking not about what -- your

5    opinion is it's the same subject matter.  I disagree

6    because neither one of us have facts in front of

7    them that they are the same subject matter.  But I'm

8    going to put that aside.  I'd ask you to do the

9    same.

10        A.    I'm not going to --

11        Q.    Mr. Haas, I'm asking about the role

12   that he played once he went to Legacy.  Was he

13   representing a client?

14        A.    Again --

15             MR. BRODY:  Objection.  That's been

16   asked and answered two previous times now.

17             THE COURT:  Mr. Pollock, are you

18   reasking a question because you did not get a

19   satisfactory answer to your question?

20             MR. POLLOCK:  Well, the only reason

21   I'm asking a pretty basic question, and I'm getting

22   a lot of "it must be," or "it could be," or

23   "therefore."

24             If you think the answer is already in

25   the record, Your Honor, I do not want to waste your

1     time.

2                    THE COURT:  No.  I think I cut off

3     Mr. Haas, so why don't you pose that question again

4     and let's hear Mr. Haas' testimony.

5     BY MR. POLLOCK:

6          Q.     When Mr. Conlan switched from being

7     at Faegre to Legacy Solutions, isn't it true he did

8     not have a client in the LTL litigation?

9          A.     If I'm understanding your question,

10    Mr. Conlan stopped representing LTL as a current

11    representation in March 2022.  That didn't put an

12    end to his ethical obligations to LTL or J&J, which

13    are continuing.  So, in that respect, he did have a

14    client.

15         Q.     Let me try it this way.  A lawyer who

16    represents a client in New Jersey has to have an

17    IOLTA account.  They have to have an account.  That

18    is required by the Rules of Professional Conduct.

19                When Mr. Conlan switches from being a

20    Faegre lawyer to being a business guy at Legacy,

21    isn't it true, as a Legacy guy, no longer a Faegre

22    guy, he no longer has to have an IOLTA account

23    because he does not have a client in New Jersey?

24         A.     Again, I wouldn't have the foundation

25    to say what account he has.  I can -- the question,

```
1    again, is whether or not he has ongoing obligations
2    to LTL and J&J as his client, the answer is yes.
3                    I can't -- sir, I can't sit here and
4    tell you whether Mr. Conlan kept his account up to
5    date.
6                    MR. POLLOCK:  Your Honor, I'm not
7    asking whether he had an ongoing duty of
8    confidentiality, which is what Judge Singh asked me
9    about before.  I've conceded that he does.  I'm
10   asking whether he has a client.
11   BY MR. POLLOCK:
12        Q.        Because that's -- you have accused my
13   client of violating RPCs, and the RPCs require that
14   Mr. Conlan have a client at the time he's at Legacy.
15   So I'm asking the simple question.
16        A.        And I gave you the simple answer to
17   that.  I gave you that simple answer to that very
18   question, because you're asking my view on whether
19   he has a client.  And my answer is, yes, he does --
20        Q.        Excellent.
21        A.        -- because he has an ongoing
22   obligation to LTL and J&J.  I've answered that three
23   times, sir.
24        Q.        So it's your view.
25        A.        You asked me for my view, and I gave
```

1    you the view three times.

2         Q.      Fair enough.  That's your view,

3    correct?

4                 If you go to Exhibit 4, please.  Let

5    me know when you're ready.

6         A.      I'm at Exhibit 4, sir.

7         Q.      Excellent.

8                 Exhibit 4, October 18th, this is an

9    email from James Conlan to Duane Van Arsdale, Doug

10   Dachille, and to you and to Andrew White, correct?

11        A.      Yes.

12        Q.      That document says, "Legacy has the

13   support of lead counsel for of the OC claimants,

14   including Andy Birchfield."

15                Do you see that?

16        A.      I do, sir.

17        Q.      And it goes on and says, "Andy

18   Birchfield, Doug Dachille and I are prepared to meet

19   with you."  Correct?

20        A.      That is correct.

21        Q.      But it doesn't say what the Legacy

22   proposal is or what's being suggested to J&J, does

23   it?

24        A.      I disagree.

25        Q.      Okay.

1          A.        He ends the paragraph by saying,

2     "Thank you for your efforts to evaluate our proposal

3     to further enhance our solution."

4                   So this email is written in terms of

5     an enhancement of the proposal that he has provided

6     and it's conveying that, purportedly, for the first

7     time, he has now gone out and obtained support of

8     Andy Birchfield, when, in fact, what was undisclosed

9     and concealed was that he had been working with

10    Mr. Birchfield since April of 2023.

11                  So I disagree with you.

12         Q.        So there is a proposal attached to

13    this?  I asked you whether there was a proposal

14    here.

15         A.        You said there was a proposal.

16         Q.        Is there a proposal --

17         A.        You didn't ask me whether there was

18    a proposal attached --

19         Q.        Is there a proposal attached to this

20    document?

21         A.        That's a different question.  There's

22    not a proposal attached to this email.

23         Q.        Excellent.

24                  But there is, on November 7, 2000 --

25    Exhibit 7, I apologize, November 9, 2023, Plenary

1    Rehearing 62.  Let me know when you're there.

2         A.      I'm at Exhibit 7.

3         Q.      Correct.  So that has a proposal from

4    Legacy, right?

5         A.      No.  It has a settlement matrix.

6         Q.      Okay.  It has a settlement matrix.

7    There's also a lot of discussion about how Legacy

8    would purport to transfer the liabilities from J&J

9    to Legacy, right?

10        A.      And there was this -- and if you're

11   talking in terms of proposal --

12        Q.      Yep.

13        A.      -- there likewise was, in connection

14   with the first meeting, a deck that was provided.

15        Q.      Okay.

16        A.      So if there's a distinction you're

17   trying to draw between a proposal, sir, I'm just not

18   understanding that distinction, if you're trying to

19   make one.

20        Q.      I'm not that smart.  All I'm asking

21   is, on Exhibit 4, we have agreed there's no proposal

22   attached.  On Exhibit 7, this document has a matrix

23   and it has a series of colloquy, right, a discussion

24   regarding what Legacy would propose to do.

25                Can we agree on that?

1        A.        Yes, we can agree on that.

2        Q.        Excellent.

3                  And then Mr. Birchfield is not part

4    of the -- he's not referred to as a cc, it's not his

5    proposal, there's nothing there that he proposes;

6    right?

7        A.        If your position is that when they're

8    referring to the leadership counsel on the -- both

9    the federal MDL and state court cases, if your

10   suggestion is that doesn't refer to Mr. Birchfield,

11   I would disagree, because that's the same language

12   that was utilized in the previous example, exhibit

13   that we just looked at that referred to

14   Mr. Birchfield as that person.

15                 So I disagree with that proposal --

16   with that --

17       Q.        So let me clean this up.  Exhibit 4,

18   there's no proposal attached.  We've agreed on that.

19   So we can agree that Mr. Birchfield did not make a

20   proposal on Exhibit 4, right?

21       A.        So I disagree, sir.  We already -- I

22   disagree with that for the reason previously stated,

23   which was there was a proposal in the email, the

24   previous one, references of proposals.

25                 So I disagree with your proposition

1    there.

2         Q.      Great.  Where in Exhibit 4 does it

3    say "proposal"?  Show it to me, please.

4         A.      The very first sentence.  I just read

5    it.

6         Q.      "Thank you for your efforts to our

7    proposal."  Is there a proposal attached?

8         A.      He's referring back to the

9    previously-made proposal, which is -- was provided

10   in a PowerPoint format.  So I disagree, sir.

11        Q.      Okay.  But you don't have the

12   proposal here, today, right?  You have not produced

13   it in this record, right?

14        A.      Are you saying what -- are you saying

15   it's in the binder here, today?

16        Q.      But you -- there is no -- I thought

17   we'd agreed, apparently not, that in Exhibit 4 there

18   is no proposal attached.

19        A.      Now you're asking me a different

20   question, sir.  I'm not trying to be difficult.

21   Your saying whether -- you first asked me whether it

22   references a proposal.  It does.  It says "effort,"

23   "our proposal."  And you acknowledged that's in the

24   first sentence.  Now you're asking whether it was

25   attached.  We've previously agreed, I did not

1    dispute, that there was not a --

2          Q.      What is the proposal?  In Exhibit 4,

3    what was that proposal?

4          A.      It was the proposal that Mr. Conlan

5    presented on September 11th.

6          Q.      Excellent.

7                  And Mr. Conlan prepared the Exhibit 7

8    -- Exhibit 7, the November 9 proposal, right?

9          A.      Again, I disagree with your

10   proposition because in between the 11th of September

11   and November 9th, Mr. Conlan disclosed for the first

12   time that Mr. Birchfield is working with him.

13                 And he purports in Exhibit 4 to say,

14   Oh, I'm going to address the issue you asked in the

15   September 11th meeting, which is what was the dollar

16   amount that you're purporting to say would be

17   sufficient for a divisional merger to be effective.

18   He says, Now I've got that because I've got Andy

19   Birchfield.

20                 So he's saying he went out and

21   supplemented it, or, in his words, to further

22   enhance it.  But what he actually did is, he'd been

23   working on that same thing without telling us since

24   April.  And then you go to the 7th, and he uses the

25   same language to refer to Legacy's -- the support

1    that he would have from the leadership counsel on

2    both the federal MDL and state court cases.

3                    So I disagree with your proposition

4    that Mr. Birchfield is not referenced in here.

5    That's the continuity.  It was the September 11th

6    presentation to the April 18th supplement and

7    disclosure for the first time of Mr. Birchfield's

8    role to the November 9th presentation where he

9    circumvented me so that he could go directly to the

10   board of directors with a proposition that now

11   includes the proposal that Mr. Birchfield had and

12   that he also had represented as the Mass Torts Made

13   Perfect on, I believe it was, October 12th.

14        Q.      On exhibit -- Exhibit 6, November 5,

15   can you show me where in this document it says this

16   is a proposal or anything that was recommended by

17   Andy Birchfield for Beasley Allen?

18        A.      Exhibit 6?

19        Q.      Exhibit 6.

20                    MR. BRODY:  I don't think it's in

21   Exhibit 6.

22                    MR. POLLOCK:  I'm sorry.  I

23   apologize.  Exhibit 7.  Thank you.

24                    THE WITNESS:  Sir, I have said this

25   repeatedly, so I will repeat it one more time.

```
 1    BY MR. POLLOCK:

 2            Q.      Go ahead.

 3            A.      It's the -- where the document makes

 4    reference to Legacy's proposal has been reviewed and

 5    supported by leadership counsel of both the federal

 6    MDL and state --

 7            Q.      Where are you looking on Exhibit 7,

 8    I'm sorry?  Where are you looking on Exhibit 7?

 9            A.      Sir, let me direct you to the second

10    paragraph, last sentence.

11            Q.      Okay.

12            A.      "Legacy's proposal has been reviewed

13    and is supported by leadership counsel on both --"

14            Q.      Got it.

15            A.      " -- the federal MDL and in state

16    court cases across the country."

17                    And, as I indicated, that's the same

18    language that was utilized in Exhibit 4 to reference

19    Mr. Birchfield.

20                    There's no evidence or dispute in the

21    record that he's not referring to Mr. Birchfield.

22    So when you're asking, do I -- is it my position

23    this is referring to Mr. Birchfield; yes, it is,

24    because not only is the language the same, not only

25    does it follow along the heels of the October 18th
```

```
1    correspondence the first time introducing

2    Mr. Birchfield as further enhancing the proposal

3    with an amount, it's also consistent with the

4    amounts that Mr. Birchfield was saying at the

5    October 17th Mass Torts Made Perfect seminar.

6           Q.      I will move on briefly to Exhibit 3,

7    please.

8                   Tell me when you are ready.

9           A.      I'm on Exhibit 3, sir.  Thank you.

10          Q.      So this is a J&J earnings call for

11   the Quarter 3 2023.

12                  When these calls take place, do you

13   participate in the entire call?

14          A.      There is no set position for these

15   calls for a litigation update.  So, depending upon

16   the circumstances and depending upon the questions,

17   perhaps, that we get in advance of an earnings call,

18   I may or may not participate.

19                  I believe, because of the July 28th,

20   2023 dismissal, we had received some inquiries.  And

21   so, for that reason, we scheduled a time for me to,

22   I think, give a pre-statement and then an oral

23   statement.

24          Q.      Do you make every effort at J&J to be

25   accurate in your quarterly calls?
```

```
 1          A.      I do, sir.  Thank you.

 2          Q.      Excellent.

 3                  If you can go to Plenary Hearing 10,

 4  this is a statement from Joseph Wolk, W-O-L-K, at

 5  the bottom of the page.  Let me know when you're

 6  ready.

 7                  He says, last sentence, Due to higher

 8  interest rates earned -- our earnings are -- now

 9  expect net interest income in the range of $300

10  million to $400 million.

11          A.      Yes, sir.

12          Q.      Do you see that?

13          A.      No, I don't see it.

14          Q.      The bottom of the page, "Looking

15  across the P&L.  Adjusted pre-tax operating margin

16  is still expected to improve by approximately 50

17  basis points versus prior year, driven by stronger

18  margin profile and business mix.  Net other income

19  is also being maintained ranging from $1.7 billion

20  to $1.9 billion.  Due to higher interest rates

21  earned on cash, we now expect net interest income in

22  the range of $300 million to $400 million."

23                  Do you see that?

24          A.      I see the text that you're referring

25  to.
```

1          Q.       You see it?

2          A.       I see it.

3          Q.       Is it accurate?  Do you believe it's

4   accurate?

5          A.       I believe that Mr. Wolk is making an

6   accurate statement.  I don't know what context

7   you're trying to put it in, because it's not in any

8   way related to or inconsistent with my prior

9   testimony.

10         Q.       Fair enough.  If you go to page

11  Plenary Hearing 14, this is Erik Haas, Worldwide

12  Vice President of Litigation at J&J, which is you, I

13  assume.

14                  And if we can go to the top of the

15  right-hand side there, on page 14, you talk about a

16  four-prong strategy, I believe it is?

17         A.       Yes.

18         Q.       And the third -- the second prong is

19  consensual resolution.  Consensual resolution you

20  mention again in the second full paragraph in terms

21  of timing on the second prong, the consensual

22  resolution, and then you refer to it again in the

23  third -- the next paragraph, it says, "Third, while

24  those negotiations are proceeding..."

25                  Do you see the section, the words I'm

```
1    referring to, the consensual resolution, consensual

2    resolution, and describing those as negotiations?

3         A.      Yes.

4         Q.      So isn't it true that one of the

5    things you were attempting to do was to encourage

6    the world to come and negotiate with J&J to try and

7    resolve the claims against it for the talc?

8         A.      I don't think I would put it that

9    way.  I think what I was doing was, as consistent

10   with what was disclosed and is in the record in the

11   bankruptcy court, we were working on a resolution

12   plan that had the support of the counsel

13   representing the vast majority of the claimants, and

14   we were further refining that plan consistent with

15   Judge Kaplan's recommendation in his July 28th, 2023

16   opinion, where he explicitly urged and recommended

17   us to continue to do so, because we had made, in his

18   words, remarkable success in proceeding to a

19   consensual resolution.

20              And what we were endeavoring to do is

21   to continue down that path through a proposed

22   bankruptcy.  And I can get into more detail, if you

23   would like, but what effectively the plan is

24   involving is bringing more [participants] and

25   counsel for claimants voluntarily into the deal, and
```

1   determining whether and to what extent we should let

2   others pass through that do not want to participate

3   because, in the end, we want a consensual deal.  We

4   do not want to go back to a circumstance where we

5   have a situation where we have a lot of objectors.

6   We didn't think we were going get them the last time

7   because the majority had voted in favor of it.

8             But that is the goal.  The goal is to

9   obtain finality for both future and current

10   claimants in a fair and equitable resolution, sir.

11  So that's what I was referring to.  It flows exactly

12  from what was done in the bankruptcy, what Judge

13  Kaplan recognized in the law-of-the-vote goals that

14  we are seeking to achieve.

15      Q.     So you were willing to negotiate

16  within the bankruptcy context only; is that right?

17      A.     Sir, that is demonstratively false

18  based upon the record in this case.  In the record

19  in the bankruptcy case, there is evidence

20  demonstrating that we were negotiating with

21  Mr. Birchfield as early as fall of 2020, where he

22  was seeking $3.25 billion for an ovarian-only deal.

23            We negotiated in the spring of 2021,

24  again with Mr. Birchfield, the TCC and Imerys, the

25  FCR.  We were told we had a deal done, but -- by the

1      TCC in Imerys for $2.4 billion.  And, in the end,

2      they weren't able to deliver on that.

3                     We negotiated in the bankruptcy case

4      for the $8.9 billion resolution.  Again, we were

5      told by the mediators in that deal, that is now a

6      matter of record, that the TCC, including

7      Mr. Birchfield, were in favor of that; and, at the

8      last minute, they backed out.

9                     So that is demonstratively untrue.

10     We've negotiated outside of bankruptcy, we've

11     negotiated inside of bankruptcy, we've negotiated

12     settlements where appropriate.  We are endeavoring

13     to do the best to get a comprehensive and final

14     resolution that's in the best interest of all

15     claimants so that we can put this matter behind us,

16     so we can stop wasting money on attorneys' fees that

17     could otherwise be spent to saving people's lives.

18          Q.     Excellent.

19                     With regard to the 3.25 billion, the

20     4.2 billion -- I think those are the right numbers.

21     Is that right, 3.25 and 4.2 billion, you mentioned?

22          A.     Yes, sir.

23          Q.     Excellent.

24                     Do you have a single email to confirm

25     those?

1          A.          To confirm?

2          Q.          That either number was the number

3     that Mr. Birchfield ever agreed to?

4          A.          Yes.  They are in the record, in the

5     bankruptcy.

6          Q.          So you have emails from Andy

7     Birchfield saying that he agreed to accept 3.25

8     billion or 4.2 billion?

9          A.          I examined Mr. Birchfield with

10    respect to those at his deposition, so I --

11                    MR. POLLOCK:  Your Honor, I want an

12    answer to my question.

13                    THE WITNESS:  I am trying to answer.

14                    MR. POLLOCK:  I want an answer to my

15    question.

16                    MR. BRODY:  Mr. Haas is trying to

17    answer.

18                    THE WITNESS:  I'm trying to give you

19    an answer.

20                    THE COURT:  I will let Mr. Haas

21    answer the question.  And then, Mr. Pollock, you

22    tell me if that was responsive to your question.

23                    THE WITNESS:  You're focusing on --

24    BY MR. POLLOCK:

25          Q.          Where is this email that --

```
1              A.        You're focusing on email, and what I

2      was trying to explain before you interrupted me,

3      sir, is that if you look at his dep --

4      Mr. Birchfield's deposition, you will see the

5      documentation that supports the very proposition

6      that I stated.  It's in the record.

7                        So you can look at it and you can

8      decide whether or not this supports or not, but

9      there's documents -- the very agreement, itself, has

10     Mr. Birchfield all over it.  It says Mr. Birchfield,

11     and Beasley Allen.  It's all in that document.  So

12     look at the exhibits.  I refer you to the exhibits.

13     Okay?

14            Q.        I did read the transcript and I've

15     read the exhibits.  If you believed you had a deal,

16     why didn't you move to enforce the next day?

17            A.        Which deal are you talking about?

18            Q.        If you believed --

19            A.        Which deal are you talking about,

20     sir?

21            Q.        -- you had a deal for $4.2 billion

22     with Andy Birchfield -- listen to my question,

23     please, for once.

24                        If you had believed you had a deal

25     for $4.2 billion and that was the deal, I can -- I
```

1    got this done, why didn't you move to enforce

2    immediately?

3            A.        Let me explain exactly what happened

4    to you.  Let me explain.  The TCC --

5                    MR. POLLOCK:  Your Honor, this is

6    exactly why I don't want an narrative answer.  I

7    want an answer to my question.

8                    THE COURT:  Mr. Haas, why would you

9    not have gone and enforced the settlement?

10                   THE WITNESS:  Because he is

11   misconstruing what I said.  Okay?  So, the -- what I

12   said is, in the bankruptcy -- in the -- in respect

13   to the $4.2 billion settlement, the torts claimants

14   committee, Steve Baron and the other members of the

15   TCC represented to you us that the deal was done.

16                   What subsequently they came back and

17   told us, after they told us the deal was done, they

18   said they couldn't deliver because the FCR wasn't

19   participating.

20                   So that is why we never ended up

21   getting a final signed document, which you need to

22   enforce.  What we had was a representation the deal

23   was done.  And the same thing with the 8.9 billion.

24   We had the representation that the deal was done on

25   a Sunday night, and then, on a Thursday we received

```
 1    the statement that it had been retracted.

 2                   So if I had an enforceable deal, yes,

 3    sir, of course I would enforce it.

 4    BY MR. POLLOCK:

 5         Q.      But you did not enforce it, correct?

 6         A.      But if they had --

 7         Q.      You did not enforce it.

 8         A.      Sir, please don't -- please don't

 9    interrupt me.  If I had --

10         Q.      I -- no.  I'm -- to be honest with

11    you, there's a process here.  The process is that

12    not you get -- this is not the Erik Haas show.  You

13    get to answer questions when I ask them.  Your

14    counsel can object.  But the fact is, it is not a

15    time -- this is not the time for you, Erik Haas, to

16    deliberate on the law.  And frankly, you can answer

17    the --

18                   MR. BRODY:  Your Honor.

19                   THE COURT:  Mr. Haas has provided an

20    answer to your question.  And so your second

21    question was with regard to, So you didn't proceed

22    with a motion to enforce?

23                   MR. POLLOCK:  Correct.

24                   MR. BRODY:  Your Honor, Mr. Haas was

25    answering the question, and I would ask that if
```

1    Mr. Pollock has an objection, he direct the

2    objection to the Court so the Court can rule on it,

3    and not tell Mr. Haas what he can or cannot say.

4    Mr. Haas is trying to answer his questions.

5              You know, I've let this line of

6    questioning go, but it's --

7              THE COURT:  I think everybody knows

8    what the order is.  We've given some latitude here

9    because I want to move things along, but Mr. --

10             Mr. Pollock, your question was to

11   Mr. Haas, is:  So you didn't move to enforce the

12   settlement?

13             MR. POLLOCK:  Correct.  That was all

14   I asked.

15             THE COURT:  And I think that the

16   answer was, yes, he did not move to --

17             MR. POLLOCK:  Excellent.  I'm

18   prepared to move on, sir.

19             THE COURT:  Mr. Haas, I'm not --

20             THE WITNESS:  Thank you.

21             THE COURT:  I'm not taking anybody's

22   position or substituting myself.  I'm just trying to

23   move things along as to what the Court's hearing.

24             MR. POLLOCK:  Understood.  And I

25   appreciate it, Your Honor.

```
 1                    Your Honor, I have no further
 2      questions at this time.
 3                    THE COURT:  Thank you.
 4                    Any redirect?  Oh, wait.
 5                    Judge Singh, do you have any
 6      questions for Mr. Haas?
 7                    JUDGE SINGH:  I don't have any
 8      questions for Mr. Haas.
 9                    MR. BRODY:  I do have some redirect,
10      Your Honor, and I will try to be -- I will try to be
11      brief and I want to try to focus us back on the
12      issues that we believe are important to the
13      disqualification question before the Court.
14                    REDIRECT EXAMINATION
15      BY MR. BRODY:
16           Q.     And the first thing I want to ask
17      you, Mr. Haas:  Your testimony about the kinds of
18      issues and privileged and confidential
19      communications that Mr. Conlan was privy to, exposed
20      to, a part of while he was outside counsel for
21      Johnson & Johnson, is that based on your personal
22      knowledge?
23           A.     Yes, sir.
24           Q.     And how did you acquire that personal
25      knowledge?
```

```
 1          A.       Through group calls, through

 2    individual calls from Mr. Conlan, through individual

 3    emails from Mr. Conlan, going out to dinner, going

 4    out to lunch with Mr. Conlan, group calls where we

 5    had deliberations among the entire outside counsel

 6    group.

 7                   So it was one interaction after the

 8    other for the entire time that he was retained by

 9    Johnson & Johnson.  He was an integral part of our

10    outside counsel group that worked with our internal

11    counsel group to develop and implement the

12    strategies for both the litigation, adjudication and

13    a resolution of the talc claims.

14          Q.       And you talked about the outside

15    counsel team.  But did you have one-on-one direct

16    communications with Mr. Conlan about privileged and

17    confidential strategic considerations related to the

18    litigation pending here and in the MDL?

19          A.       I had many one-on-one conversations

20    with him, and, in addition, he prepared memorandum

21    that he directed solely to me to provide his

22    commentary on other counsels' positions, not just

23    with respect to structural optimization, but all

24    aspects of the litigation, to express his particular

25    views and takes on those issues.
```

1           MR. POLLOCK:  Your Honor, I move to

2      strike on the best evidence rule again.  I mean,

3      I've asked for any other document that is not here.

4      He is testifying now directly about memoranda.  This

5      is the first time I've heard about it, even though I

6      asked on direct and on cross -- in direct and cross.

7      This is the first I'm hearing of memoranda.

8                I move to strike under the best

9      evidence rule.  It's not here.

10          THE COURT:  Well, with regard to the

11     testimony, I think under our scenario here --

12          MR. POLLOCK:  Yes, sir.

13          THE COURT:  -- I can -- I can have

14     that and consider that as part of the weight of the

15     evidence.  There's no evidence here --

16          MR. POLLOCK:  Yes, Your Honor.

17          THE COURT:  -- with regard to the

18     testimony.

19          MR. POLLOCK:  Agreed.

20     BY MR. BRODY:

21          Q.    Mr. Haas, let me just -- let me just

22     ask you.  So these, you know, memos that were

23     prepared by Mr. Conlan for you, and for you and the

24     inhouse J&J team alone, did you then have

25     discussions with Mr. Conlan -- and again, because of

1    the privilege concerns, without getting into the

2    substance -- did you have discussions with

3    Mr. Conlan about the strategies that were discussed

4    in those memoranda?

5         A.    I did.  I had many discussions with

6    him about them.  I, at the time, paid great heed to

7    his views.  They influenced our strategic thinking

8    vis-a-vis the other counsel, vis-a-vis what we were

9    doing in the case, vis-a-vis our -- the amounts, the

10   timing, how we would go about approaching our

11   counterparties, in which form, in which structure.

12   So, yes, they did.

13        Q.    Did you also have one-on-one

14   discussions with Mr. Conlan about resolutions that

15   the company was seeking to negotiate through the

16   Imerys bankruptcy?

17        A.    Yes, sir.

18        Q.    Why were you having those one-on-one

19   conversations with Mr. Conlan?

20        A.    Because, as I indicated on my direct,

21   consistent with what is in the record about his own

22   view of his expertise, Mr. Conlan held himself out

23   as a preeminent expert in bankruptcy law and the

24   resolution of mass torts liability.

25        Q.    During the Imerys bankruptcy, was

1    Mr. Conlan negotiating on J&J's behalf directly with

2    counsel for the TCC?

3          A.       Yes, he was.

4          Q.       Was he directing -- was he

5    negotiating, excuse me, on J&J's behalf directly

6    with the future claimants representative?

7          A.       The future claimants representative

8    counsel, yes.

9                MR. POLLOCK:  Just for clarification,

10   is that Imerys or LTL?

11               MR. BRODY:  The question was about --

12               THE COURT:  Imerys.

13               MR. POLLOCK:  Imerys.  Okay.  Thank

14   you.

15   BY MR. BRODY:

16         Q.       And did you have discussion with him

17   during that time period about J&J's negotiating

18   strategy?

19         A.       Yes, I did.  And by the way, to the

20   question, he also had the same discussions and

21   conveyed the same issues with respect to the LTL

22   FCR.

23         Q.       Okay.  That's the FCR in the LTL

24   bankruptcy?

25         A.       Yes.  Future claims representative.

1          Q.        Were those discussions about -- and

2    again, without revealing any of the substance of

3    J&J's negotiating strategy -- but were those

4    discussions about Johnson & Johnson's negotiating

5    strategy, in your view, germane to the issues that

6    Johnson & Johnson was attempting to negotiate in the

7    LTL bankruptcy in the summer of 2023?

8          A.        Yes.  And just, again, those issues

9    were germane to the entire time frame, from 2020,

10   when I started, to today.

11               Again, when we were in bankruptcy,

12   because of the automatic stay, everything else was

13   frozen, and much of the time in the automatic -- and

14   when we were in bankruptcy, we were fighting the

15   motion to dismiss twice.  And the first time we

16   prevailed, the second time it was dismissed.

17               And, as a consequence, there has been

18   little progression forward with respect to those

19   issues.  So we're effectively still struggling and

20   dealing with how to come up with a comprehensive and

21   final resolution for the talc claims.

22               So the same issues were applicable

23   then as now, and the conversations we had shed light

24   on our thinking with respect to strategically what,

25   when, why, how we would engage in that process.

1          Q.          And I take it those are not the kinds

2     of strategic discussions and considerations you

3     would ever share with your opposing counsel?

4          A.          Absolutely not, for the reasons I've

5     stated previously.  It fundamentally undermines the

6     adversarial process.

7          Q.          If you could turn to Exhibit 4 in the

8     binder, Mr. Haas.

9          A.          Yes, I'm there.

10          Q.          There was a suggestion that somehow

11     there's not a proposal associated with this email of

12     October 18th.  If you could turn to the second page

13     of that document.

14               Do you see there's a -- the October

15     18th email is replying to an email of September 28th

16     from Douglas Dachille.  Do you see that?

17          A.          I do.

18          Q.          And does the September 28th email

19     from Douglas Dachille set out the proposal?

20          A.          Yes.  Well, it summarizes the

21     proposal that, in fact, was discussed, as I've

22     testified, in the September 11th meeting.

23               So we had the September 11th meeting.

24     And then you can look down this series of, kind of,

25     that email chain to bring it back to August 21st,

1    when it was first solicited.

2                    So, Douglas Dachille reached out

3    through a contact to our treasurer.  Our treasurer

4    responded, copied us.  We set up the September 11th

5    meeting where the proposal was presented.  Doug

6    Dachille responds on September 28th with respect to

7    that proposal.

8                    Then, on the 18th, Mr. Conlan

9    purports to say that he's, for the first time, he's

10   enhancing that proposal with input from

11   Mr. Birchfield, but it's the same proposal.  That's

12   why when I was responding to Mr. Pollock's questions

13   I was referring to the first sentence that said

14   proposal.  It's all the same proposal.

15        Q.       But, as you've explained, I take it

16   the only thing that was new, or the things that were

17   new, in the October 18th email were the mention of a

18   settlement matrix and the explanation that had

19   already been shared with Mr. Birchfield, and he

20   supported it, and Mr. Birchfield was ready to come

21   in with Mr. Conlan to talk about the matrix?

22        A.       That's correct.

23        Q.       All right.  You were asked some

24   questions about whether Mr. Conlan is now a

25   businessman and no longer a lawyer, and you were

1      also asked some questions about Rule 1.9 of the

2      Rules of Professional Conduct.

3                    Rule 1.9(c) provides that a lawyer

4      who has formerly represented a client in a matter

5      shall not thereafter use information relating to the

6      representation to the disadvantage of the former

7      client, or reveal information relating to the

8      representation.

9                    Since you were asked, in your view,

10     has Mr. Conlan violated that?

11          A.      Yes.  And I believe I did testify to

12     that in response to Mr. Pollock's questioning,

13     because, as a lawyer, your responsibilities do not

14     end when that representation ends.  You have a

15     continuing, ongoing obligation.  That is an explicit

16     provision of the rule.

17          Q.      To put it differently, once you have

18     represented a client in a matter, even if you leave

19     the practice of law, you can't switch sides; right?

20          A.      Well, and in the way -- in the way --

21     in the vernacular that I used, once you have the

22     client, you always have the a client, because that

23     entity - in this case, Johnson & Johnson - was and

24     is Mr. Conlan's client with respect to his duties

25     and his ethical obligations.

1      Q.      You were also asked a number of

2  questions about, Well, is this notebook -- are these

3  all the communications between Mr. Conlan and

4  Mr. Birchfield.  Do you recall those questions?

5      A.      Yes.

6      Q.      Did -- when was it that you first

7  came to learn of the existence of extensive written

8  communications directly between Mr. Conlan and

9  Mr. Birchfield beginning in April of last year?

10      A.      As I testified, it was a couple of

11  weeks ago, when I first saw what Mr. Birchfield and

12  the PSC had submitted in connection -- into the

13  federal court in the MDL with the privilege log,

14  where they disclosed myriad communication after

15  communication by, between, and with Mr. Conlan,

16  Beasley Allen, and specifically with Mr. Birchfield,

17  prior to ever asking us for our consent, requesting

18  a waiver, or even disclosing the existence of those

19  communications.

20      Q.      To this day, have they asked you for

21  a waiver?

22      A.      Never.

23      Q.      Did Mr. Birchfield ever reach out to

24  you to say that he had been approached by

25  Mr. Conlan?

```
 1          A.      Never.

 2          Q.      Anyone from Beasley Allen?

 3          A.      Never.

 4          Q.      Anyone from the PSC?

 5          A.      Never.

 6          Q.      In your position as the worldwide

 7   head of litigation for Johnson & Johnson, to your

 8   knowledge, did they approach anyone on the inhouse

 9   or the outside counsel team to disclose that before

10   you got the email from Mr. Conlan on October 18th?

11          A.      No, they didn't.  There's only one

12   person in Johnson & Johnson authorized to give the

13   waivers.  That's me.

14          Q.      And more broadly, did they ever -- to

15   your knowledge, as worldwide head of litigation, did

16   anyone even disclose prior to that date that

17   Mr. Conlan was working with Mr. Birchfield and other

18   members of the Beasley Allen firm?

19          A.      No.

20          Q.      Have you, Mr. Haas, had an

21   opportunity to review an decision by the Special

22   Master, Judge Schneider, in the MDL --

23          A.      Yes, I did.

24          Q.      -- last week?

25          A.      Yeah.
```

```
 1                    MR. POLLOCK:  Objection, Your Honor;

 2   beyond the scope, outside the record.  This is

 3   direct examination.

 4                    THE COURT:  What's the -- I'm

 5   sustaining that.  That is outside the record,

 6   outside cross-examination.

 7                    MR. BRODY:  Your Honor, it's going to

 8   go directly to -- well, let me -- let me --

 9                    THE COURT:  What's the problem?

10                    MR. BRODY:  I'll put it within the

11   scope directly --

12                    THE COURT:  Okay.

13                    MR. BRODY:  -- with a couple of

14   questions, Your Honor.

15   BY MR. BRODY:

16        Q.    Mr. Haas, do you recall being asked

17   questions about whether you had any evidence that

18   Mr. Birchfield and Mr. Conlan had formed an

19   alliance?

20        A.    Yes.

21        Q.    All right.

22                    MR. BRODY:  If I may approach, Your

23   Honor?

24                    THE COURT:  With what?

25                    MR. BRODY:  With a copy of the order.
```

```
 1                    THE COURT:  Could you share it with

 2   Mr. Pollock.

 3                    MR. BRODY:  Yes.

 4                    MR. POLLOCK:  I object to this entire

 5   thing on -- if you look at Exhibit 16, which is

 6   Andy's certification of January 29, paragraph 23.

 7   He addresses directly that he had communications

 8   with Mr. Conlan.  He isn't hiding it.  And Mr. Haas

 9   is saying, Oh, I just learned about it two weeks

10   ago.  That's not true.  The fact is they knew about

11   this as of January of '23 -- January 29.

12                    Now, suddenly, we're going to try and

13   expand the record.  I have no opportunity, unless

14   I'm going to start cross-examining the Special

15   Master, who is here in the room, I'm going to start

16   questioning everybody on the documents.  I have no

17   clue where this came from, what the validity of it

18   is, or why it's relevant here today.

19                    And Mr. Brody gave his word to Judge

20   Singh and to you, the record is closed, we're done.

21   So I vehemently object to now suddenly opening the

22   record up, because what's going to be the end point.

23                    THE COURT:  Well, I did sustain your

24   objection, Mr. Pollock.

25                    MR. POLLOCK:  Yes, sir.
```

 1                     THE COURT:  And I did offer Mr. Brody

 2      an opportunity to proffer what that's for.

 3                     MR. POLLOCK:  Understood, Your Honor.

 4                     THE COURT:  And that's the Special

 5      Master's decision.

 6                     MR. POLLOCK:  Judge, this is your

 7      courtroom, Your Honors' courtroom.  I'm trying to

 8      figure out the linguistics to that word.  Whatever

 9      you decide is fine with me, but I have a to state

10      the objection.

11                     THE COURT:  Very well.

12      BY MR. BRODY:

13          Q.     So, since it was mentioned, Mr. Haas,

14      if you would --

15                     THE COURT:  Well, what's the proffer,

16      Mr. Brody, with regard to the Special Master's --

17                     MR. BRODY:  Well, if I may approach

18      first so that he has a copy.

19                     THE COURT:  Well, let me hear what

20      your proffer is first.

21                     MR. BRODY:  Sure.  That the Special

22      Master's decision describing the substance of those

23      documents after his in camera review supports the

24      existence of an alliance between the two, and it

25      goes directly to the point that Mr. Pollock was

 1    trying to make on cross-examination that there is no

 2    evidence that Mr. Haas has seen of an alliance

 3    between the two.  It goes directly to that.

 4              THE COURT:  How does that, then,

 5    differ from what Mr. Birchfield was saying, that I

 6    had communications with Mr. Conlan?

 7              MR. BRODY:  Because the only thing

 8    Mr. Birchfield said in his declaration was:  To the

 9    best of my knowledge, I met Mr. Conlan for the first

10    time on May 2nd, 2023.

11              There is no additional information,

12    no disclosure as to the extent of the conversations,

13    the fact that there are emails going back and forth

14    for a period of months; that, according to the

15    privilege log, they are exchanging claim matrices,

16    estimates of ovarian cancer case values, and

17    claiming that those communications between

18    Mr. Birchfield and Ms. O'Dell and Mr. Conlan are

19    privileged, so that J&J can't see them.

20              MR. POLLOCK:  Your Honor.

21              MR. BRODY:  So an extraneous

22    statement in a declaration that says, "I met

23    Mr. Conlan for the first time on May 2nd, 2023,"

24    doesn't -- doesn't tell us anything about what was

25    going on.

```
 1                    And to the extent we know or have an

 2     inkling of what was going on and what's in the

 3     documents that they have said are privileged,

 4     they're privileged communications with Johnson &

 5     Johnson's former opposing counsel, we do have --

 6                    THE COURT:  Well, we did find that's

 7     part of the record.  That's part of the federal

 8     record, that's part here.  I can take judicial

 9     notice of that, of the existence.

10                    MR. BRODY:  And, Your Honor, you can

11     also take judicial notice of the Special Master

12     Order No. 21 in the MDL.

13                    THE COURT:  But my concern is, and

14     I'm not going any further than to say why -- you

15     know, why wasn't that brought up in direct, why

16     wasn't it addressed earlier, because we are getting

17     somewhat out of the scope where we are today, where

18     I anticipated being today.

19                    MR. BRODY:  Well, I think it's

20     directly within the scope of the questions about,

21     you know --

22                    THE COURT:  What exactly does

23     Mr. Haas have --

24                    MR. BRODY:  What do you -- what do

25     you have; look at the notebook.
```

```
 1                    THE COURT:  That's not lost on us.
 2                    MR. POLLOCK:  Your Honor, this is all
 3      privileged mediation-protected communications.  So
 4      if we're going to throw aside the mediation
 5      privilege, which I thought was pretty stark in New
 6      Jersey, we are cutting new ground.  And to me, with
 7      all due respect to Judge Schneider, who is sitting
 8      behind me, and he has his own opinions, he's
 9      entitled to his own views, but frankly, unless he
10      made an express finding that Andy Birchfield
11      conspired, which I don't think he did, with
12      Mr. Conlan, these are all protected communications,
13      and now we're going to crack open the privilege.
14      They have asserted the privilege multiple times.
15                    THE COURT:  We are not cracking open
16      anything, other than we have the privilege log and
17      we have a document, a decision by the Special
18      Master.
19                    MR. POLLOCK:  So where -- but where
20      does this go?  Once we take this --
21                    THE COURT:  We're not going to -- I'm
22      going to permit the questioning.
23                    MR. POLLOCK:  Fair enough.
24                    THE COURT:  I'm going to permit you
25      to reopen some aspect of your direct with regard to
```

1    this decision, but we're not breaching, addressing,

2    conflicting, or doing anything with regard to the

3    mediation privilege.

4                    MR. BRODY:  Absolutely, Your Honor,

5    and I'm not suggesting --

6                    THE COURT:  That is sacrosanct here.

7    There's a myriad reasons why that exists.

8                    MR. BRODY:  And I'm not suggesting

9    that we should do that, and I'm not going in that

10   direction, so.

11   BY MR. BRODY:

12        Q.      Mr. Haas, I'll just ask -- I'll just

13   ask you.  You've read the Special Master's decision;

14   is that right?

15        A.      Yes, I have.

16        Q.      And you have read his conclusions

17   based on his in camera review of the documents,

18   correct?

19        A.      Yes.

20        Q.      And so you understand that he

21   indicated that subjects covered in the privileged

22   documents include close collaboration and strategy

23   communications regarding how to consider, conduct,

24   participate in, initiate, and/or continue to mediate

25   with J&J regarding plaintiffs' proposal, right?

1          A.       Yes.

2          Q.       Referring to close collaboration and

3    strategy communications between Conlan and Legacy on

4    the one hand and Beasley Allen on the other, right?

5          A.       That's correct.

6          Q.       He indicated that subjects covered in

7    the documents include regular communications with

8    Birchfield and other counsel for plaintiffs

9    regarding the foregoing matters, including when and

10   how to present the settlement proposal to J&J in the

11   context of mediation.

12                  Are you familiar with that finding?

13         A.       Yes, I'm familiar with the finding.

14         Q.       And my question to you in response to

15   the questions that you got on cross-examination is:

16   Does that suggest to you that they had formed an

17   alliance, or to use the words from the order, were

18   collaborating?

19                  MR. POLLOCK:  Your Honor, I object

20   to --

21                  THE WITNESS:  When he --

22   [indiscernible overtalking].

23                  MR. POLLOCK:  Let me object, please.

24                  I object because when it says -- the

25   question is, "Does it suggest to you," with due

1    respect to the Court, I don't care what it suggests

2    to Mr. Haas.  What I care about are the facts.  Is

3    there a fact that there was a confidential

4    disclosure in this case?

5              And to me -- he's allowed his own

6    opinions.  I've got my opinions.  I don't think the

7    Court really should care about either.  I want to

8    know what the facts are.  And I do think we should

9    be limited to what the facts are, because that's

10   what [Trupo] says:  What are the facts?

11             THE COURT:  Well, ultimately, that

12   question is to be resolved by the Court.

13             MR. POLLOCK:  Correct.

14             MR. BRODY:  So let me -- let me --

15   Your Honor, I can rephrase the question and

16   directly --

17             THE COURT:  I'll sustain the

18   objection.

19             MR. BRODY:  -- directly in the

20   context of what Mr. Haas was asked by Mr. Pollock.

21   BY MR. BRODY:

22        Q.    Do you consider this --

23             THE COURT:  Mr. Haas.

24             MR. BRODY:  Mr. Haas.

25             THE COURT:  You said Mr. Pollock.

```
 1                    MR. BRODY:  Yeah, no.  I -- my point
 2   was I -- I'm going to rephrase the question within
 3   the context of what Mr. Pollock asked --
 4                    THE COURT:  Sure.
 5                    MR. BRODY:  -- of Mr. Haas.
 6                    THE COURT:  Okay.
 7                    MR. BRODY:  My apologies if I -- if
 8   I'm mixing names.
 9                    THE COURT:  That's okay.
10                    MR. BRODY:  But...
11                    THE COURT:  I just wanted to make
12   sure of who you were speaking about.
13                    MR. BRODY:  Yeah, no, and I'm going
14   to put the question in the context of the questions
15   that Mr. Pollock asked Mr. Haas.
16   BY MR. BRODY:
17        Q.        Mr. Haas, if this close collaboration
18   and these communications weren't disclosed to you at
19   the time they were being made between your former
20   counsel and Mr. Birchfield's firm, to put it in the
21   context of the words used by Mr. Pollock, evidence
22   of an alliance between your former counsel and the
23   Beasley Allen firm?
24        A.        They are.  And to put it in context
25   of when the entire line of questioning was
```

```
 1    presented, they do show evidence of alliance; it was
 2    not disclosed; it was concealed; and it's a type of
 3    collaboration that fundamentally undermines the
 4    adversarial process by communicating with
 5    Mr. Birchfield on and having that alliance on the
 6    very issues that are at the heart of the matters
 7    that we were adjudicating and seeking to resolve and
 8    the very issues that were being debated, critiqued,
 9    discussed by and between us and outside counsel,
10    that presents an unfair advantage to our adversaries
11    and thwarts our ability, and is thwarting today, our
12    ability to get a final, effective, and equitable
13    resolution of this case for all claimants, as well
14    for J&J.
15                 MR. BRODY:  Thank you, Mr. Haas.
16    Those are my redirect questions.
17                 THE COURT:  Thank you.
18                 Any questions, Judge Singh?
19                 JUDGE SINGH:  No.
20                 THE COURT:  Thank you.
21                 I don't have any questions.
22                 Mr. Pollock?
23                 MR. POLLOCK:  No, Your Honor.  Thank
24    you very much.  And I appreciate your patience,
25    Mr. Haas, and I thank you.
```

```
 1                    THE WITNESS:  Thank you, sir.
 2                    THE COURT:  Thank you, Mr. Haas.  You
 3        may step down.
 4                    Mr. Brody, your next witness.
 5                    MR. BRODY:  I call James Murdica,
 6        Your Honor.
 7                    THE COURT:  Mr. Murdica, before
 8        you're seated, please raise your right hand, tell me
 9        your name, and please spell your last name.
10                    THE WITNESS:  James Murdica,
11        M-U-R-D-I-C-A.
12                    JAMES MURDICA, having been duly
13        sworn, was examined and testified as follows:
14                         -   -   -
15                    DIRECT EXAMINATION
16                         -   -   -
17        BY MR. BRODY:
18             Q.     So, Mr. Murdica, Judge Porto, Judge
19        Singh, I know we covered a lot of ground in
20        Mr. Haas' examination, and I'm going to try to avoid
21        repeating anything that you you've already heard.
22                    Mr. Murdica, what is your current
23        occupation?
24             A.     I'm an attorney.
25             Q.     And where do you work?
```

1          A.        I work at Barnes & Thornburg.

2          Q.        Okay.  And how long have you been

3     there?

4          A.        I've been there seven years.

5          Q.        And in the time that you have working

6     at Barnes & Thornburg, have you represented Johnson

7     & Johnson?

8          A.        The entire time.

9          Q.        As outside counsel?

10         A.        As outside counsel, correct.

11         Q.        Do you represent Johnson & Johnson in

12    the talc litigation?

13         A.        I do.

14         Q.        And does your representation of J&J

15    include advising the company with respect to claims

16    that are pending in this state court MCL proceeding?

17         A.        It does.  My role in talc is

18    primarily as resolution counsel, advising on that.

19    And during the pendency of the LTL bankruptcies, I

20    was the lead outside counsel responsible for the

21    mediations.

22         Q.        Okay.  And does your representation

23    of J&J also, just so the record is complete, include

24    advising the company as to the cases that are

25    pending in the federal MDL?

```
 1          A.      Very much so.

 2          Q.      Who do you correspond with at Johnson

 3     & Johnson as part of your work on the talc

 4     litigation?

 5          A.      I report to Andrew White and to

 6     Erik Haas.

 7          Q.      All right.  I'm going to be asking

 8     you some questions about the work you have done on

 9     the talc litigation and the work that Mr. Conlan did

10     as counsel for J&J on the talc litigation.  I'm

11     going to give you the same cautions that I gave to

12     Mr. Haas.  I don't want you to go into the substance

13     of any of the privileged and confidential

14     communications that you have had with the company.

15     So I want to keep things on a high, yes or no level,

16     when we are getting into substantive issues, because

17     those conversations are privileged.

18                  Do you understand that?

19          A.      I understand.

20          Q.      All right.

21                  Through your representation of

22     Johnson & Johnson in the talc litigation, did you

23     work with Mr. Conlan while he was representing the

24     company?

25          A.      I did.
```

```
 1              Q.       Did you work with him directly?

 2              A.       I worked with him directly, yes.

 3              Q.       Can you explain at a general level

 4     what issues you worked on with Mr. Conlan?

 5              A.       Yes.  Early in 2020 --

 6                       MR. POLLOCK:  Judge, can I just get a

 7     clarification here, sir, Your Honor, whether it was

 8     on Imerys or LTL, because we're apparently going to

 9     cover a long time period.

10                       MR. BRODY:  Your Honor, it was a --

11                       THE COURT:  Sure.

12                       MR. BRODY:  It was a general question

13     as to what types of issues.  We'll get into

14     specifics, but it was not limited to one thing or

15     another.

16                       THE COURT:  It involved Imerys and

17     LTL?

18                       THE WITNESS:  Ultimately, yes, Your

19     Honor.  I was going to start with when I began in

20     this role with talc in 2020.

21                       THE COURT:  As resolution counsel?

22                       THE WITNESS:  Yes, Your Honor.

23                       THE COURT:  Okay.

24                       Mr. Brody.

25     BY MR. BRODY:
```

1          Q.        You can proceed to answer the

2    question.

3          A.        I was asked to take this role on by

4    Johnson & Johnson in early 2020, by Mr. Haas'

5    predecessor, Mr. Braunruether, who he testified

6    about.

7                    From that time on, I was very

8    involved daily in talc resolution, having

9    conversations with plaintiffs -- various plaintiffs'

10   counsel.

11                   Sometime in the summer of 2020,

12   Mr. Conlan was hired by Mr. Braunruether.

13   Mr. Braunruether asked me to work closely with

14   Mr. Conlan on resolution.

15                   From that point on, Mr. Conlan and I

16   worked very closely, to the point that we were

17   speaking almost every day in the late summer and

18   fall of 2020.  Email, phone calls, everything I did

19   with respect to resolution I either incorporated

20   Mr. Conlan or ran by Mr. Conlan.

21         Q.        So you communicated by phone, I take

22   it?

23         A.        Every day.

24         Q.        Over email?

25         A.        Yes.

1          Q.        In person?

2          A.        When possible, yes.  It was -- we had

3     COVID at that point in time.

4          Q.        And I think you indicated that you

5     frequently would communicate daily with Mr. Conlan?

6          A.        That's correct.

7          Q.        Were you involved in communications

8     involving Mr. Conlan and other members of the J&J

9     team?

10         A.        I was.  As Mr. Haas described, we had

11    weekly calls throughout the course of that year, and

12    throughout the time Mr. Conlan became involved.  And

13    the weekly call would include the Weil -- the head

14    of Weil, because they were handling the Imerys

15    aspect; eventually, somebody from Jones Day, because

16    they were handling the other bankruptcy aspect that

17    became LTL; somebody from King & Spalding, because

18    they were national counsel for the mesothelioma

19    claims; somebody from Shook Hardy, because they were

20    national counsel for the ovarian claims; myself and

21    Mr. Conlan.

22                   And internally, at that point in

23    time, they would include Joe Braunruether, the

24    deputy general counsel of J&J; John Kim, who had

25    Mr. White's role at the time; and sometimes

1    Mr. White, usually Mr. White.

2                Beyond that, that was just the

3    standing weekly call, Mr. Conlan, myself, and

4    Mr. Braunruether, and usually Mr. Kim had regular

5    separate calls to coordinate the high-level strategy

6    and resolution, because Mr. Conlan and I were the

7    ones that were in charge of the overall strategy and

8    what we were doing, really, with the resolution and

9    trying to get a resolution, originally with

10   Mr. Birchfield, outside of the Imerys bankruptcy,

11   and then utilizing the Imerys bankruptcy, and so on.

12       Q.      Can you -- so you mentioned the

13   Imerys bankruptcy.  With respect to your

14   communications with Mr. Conlan, how was Mr. Conlan

15   involved in the Imerys bankruptcy?

16       A.      So, like I said, with regard to

17   resolution, Mr. Conlan is a bankruptcy expert, but

18   also a mass tort resolution expert.  And so

19   Mr. Conlan and I worked hand-in-hand throughout the

20   time.  He knew all the bankruptcy; I didn't.

21               He also had connections to the FCR,

22   the future claims representative, and the future

23   claims representative's counsel, and I didn't.  And

24   he knew all the bankruptcy lawyers representing the

25   debtor and the torts claimants committee in Imerys

1    because he worked with them for a long time.  In

2    fact, the debtor's counsel, I believe, was one of

3    his mentees, I think he told me, while he was at the

4    Sidley firm.

5         Q.      All right.  As part of his work, was

6    Mr. Conlan involved in the legal team's evaluation,

7    confidential and privileged evaluation of potential

8    resolutions of J&J's talc litigation through the

9    Imerys bankruptcy?

10        A.      He was, both through the Imerys

11   bankruptcy and before that, when we were negotiating

12   with Mr. Birchfield for an initial resolution.  Mr.

13   Conlan -- I would forward Mr. Conlan or incorporate

14   him in everything I was doing.

15              So, for example, even before we

16   considered utilizing the Imerys bankruptcy, he was

17   seeing draft proposals with Mr. Birchfield and

18   helping me with them and commenting on them, et

19   cetera.

20              MR. POLLOCK:  Your Honor, I've got to

21   raise the same objection I raised with Mr. Haas

22   regarding documents, communications, records and

23   things.  I understand that -- you understand my

24   concern.  I don't want to interrupt the flow, but

25   obviously you understand I have a continuing

1    objection under the best evidence rule, under the

2    fact this is rank hearsay, it doesn't fall within

3    1006, it doesn't fall within 701.

4               So, I object to it, but I don't want

5    to keep on interrupting, but I don't my silence to

6    be acquiescence.

7               THE COURT:  You have to make your

8    record, and my prior ruling with regard to

9    documents/no documents continues.

10              MR. POLLOCK:  Yes, sir.  And I -- I'm

11    going to sit down and shut up as long as I can, only

12    because I don't want to interrupt the flow.  But

13    please understand I have an ongoing objection.  Is

14    that fair?

15              THE COURT:  That's fair.

16              MR. POLLOCK:  Thank you, sir.

17              THE COURT:  You're welcome.

18    BY MR. BRODY:

19        Q.     So let me -- let me ask you this

20    question.  Was Mr. Conlan involved in evaluation of

21    terms, resolution terms specifically proposed by

22    Beasley Allen?

23        A.     He was.

24        Q.     What was Beasley Allen's role in the

25    Imerys bankruptcy?

1        A.        Beasley Allen represented one of the

2    claimants on the tort claimants committee in the

3    Imerys bankruptcy.

4        Q.        Okay.  Were members of the Beasley

5    Allen firm part of the TCC negotiating committee in

6    the Imerys bankruptcy?

7        A.        They were.  They, to my

8    understanding, as was represented to me, the TCC in

9    the Imerys bankruptcy appointed a negotiation

10   committee, and Leigh O'Dell and Ted Meadows were two

11   of the representatives on the negotiating committee

12   that we worked with the most.

13       Q.        And was that at the time when

14   Mr. Conlan was counsel for J&J?

15       A.        Yes, it was.

16       Q.        All right.  Did you tell anyone at

17   Beasley Allen during the Imerys bankruptcy that

18   Mr. Conlan was working as counsel for J&J on the

19   talc litigation?

20       A.        Yes.  They knew that from me telling

21   them, but also from seeing Mr. Conlan on phone calls

22   and Zooms and the like.

23       Q.        All right.  Who did you tell that

24   Mr. Conlan was working as counsel for J&J on the

25   talc litigation?

```
1              A.        I certainly would have told Andy, and

2     Leigh and Ted I know would have at least seen him on

3     the Zooms as we were negotiating a deal we almost --

4     you know, we came very close on in February of 2021.

5              Q.        All right.  When, to the best of your

6     recollection, did you first inform -- you referred

7     to Andy.  I assume you're referring to

8     Mr. Birchfield?

9              A.        Yes, Mr. Birchfield.

10             Q.        When did you first tell

11    Mr. Birchfield that Mr. Conlan was representing J&J

12    on the talc litigation?

13             A.        I don't remember exactly, but it

14    would have been sometime in the fall of 2020.

15             Q.        Okay.  He had submitted a

16    certification in this case that says it was in 2020.

17    Is that consistent with your recollection?

18             A.        Yes.

19             Q.        All right.  Were you negotiating with

20    Mr. Birchfield, negotiating resolutions with

21    Mr. Birchfield at that time?

22             A.        Yes.  We started -- Mr. Birchfield

23    and I started negotiating a resolution, I believe in

24    April 2020, and there were iterations from April

25    2020 right through, you know, 2022, 2023.
```

1          Q.       And when you refer to "iterations,"

2     you're talking to iterations of resolution

3     proposals?

4          A.       Yes.   There were several beginning in

5     2020.

6          Q.       And throughout the course of those,

7     you know, various iterations -- after Mr. Conlan

8     came on board as a member of J&J's outside counsel

9     team, was he involved in internal privileged and

10    confidential discussions of how the company would

11    respond to and negotiate those different iterations?

12         A.       Yes.   As I said before, Mr. Conlan

13    and I were the main people running the strategy and

14    evaluating the settlement options, and we were the

15    only ones having the highest level conversations

16    with the deputy general counsel.

17         Q.       And did that include, without

18    revealing any of the substance, discussion of the

19    specific terms that had been proposed by Beasley

20    Allen?

21         A.       Absolutely.

22         Q.       And again -- well, let me ask you

23    this:  Did any of the proposals from Beasley Allen

24    that you were discussing in that privileged and

25    confidential context include things like settlement

1    matrices?

2              A.       They did.

3              Q.       And did you and Mr. Conlan engage in

4    analysis of the values in those matrices, the

5    structure of those matrices, claims procedures,

6    things like that associated with them?

7              A.       We did, as did other parts of the

8    team, and we ultimately had questions for our

9    experts on them to get to weigh in on that.  Yes, we

10   did.

11             Q.       And when you refer to experts, are

12   you referring to consultants who were retained

13   confidentially to provide confidential

14   communications about things like claim values?

15             A.       That's correct.

16             Q.       About things like the potential

17   number of future claimants?

18             A.       That's another thing they were

19   retained for, yes.

20             Q.       Okay.  Did you, in that period,

21   consider with Mr. Conlan proposals from Beasley

22   Allen regarding the potential number and value of

23   future claims?

24             A.       We did, yes.

25             Q.       And was Mr. Conlan privy to

1    confidential work performed by J&J's litigation

2    consultants related to that?

3           A.      He was.  Mr. Conlan was my closest

4    confidante on all of this, from the first written

5    Beasley Allen proposal, which I -- which he had, and

6    we discussed and went back and forth with with

7    Mr. Birchfield and his firm, and that process

8    continued over months.

9           Q.      And through that process, did

10   Mr. Conlan learn how J&J assessed the strengths and

11   weaknesses of the Beasley Allen proposals?

12          A.      He did.  He learned that, he learned

13   the way J&J thinks about talc claims, how they value

14   them.  He learned, perhaps more importantly, the way

15   I work, because I still am in charge of resolution

16   for talc.  He learned every strategy I had about who

17   to go to, who not to go to.  All the different

18   strategic options we should consider, everything I

19   learned over my 15 years of being J&J's main outside

20   resolution counsel.  He was literally somebody I had

21   talked to every day about this.

22          Q.      I think you indicated you regularly

23   shared with him communications that you received

24   from Beasley Allen?

25          A.      Yes, I forwarded them immediately.

1          Q.        Did you and Mr. Conlan discuss them?

2          A.        Yes.

3          Q.        Did you include in those discussions

4     how to respond to them?

5          A.        Yes.  And many times I needed his

6     advice because there were bankruptcy questions in

7     addition to all the settlement questions, as well,

8     so I couldn't do it without him.

9          Q.        Did you consider those communications

10    and discussions to be privileged and confidential?

11         A.        The most privileged and most

12    important communications I've ever had for J&J.

13         Q.        Would you ever share them with your

14    opposing counsel?

15         A.        Never.

16         Q.        Why not?

17         A.        Because it would be so

18    disadvantageous for somebody trying to deal with

19    resolution to hand their playbook over to the other

20    side.

21         Q.        Did your strategy discussions with

22    Mr. Conlan include things like how to participate

23    in, how to initiate, how to continue negotiations

24    with different parties on the other side of the

25    litigation?

```
 1                    MR. POLLOCK:  Objection; leading.

 2                    THE COURT:  Sustained.

 3    BY MR. BRODY:

 4          Q.     Let me ask you this:  You mentioned

 5    that you talked about, sort of, the ins and outs of

 6    settlement, the who to go to, what to propose.  Are

 7    those things you discussed with Mr. Conlan?

 8          A.     Yes.

 9          Q.     Did those discussions include, along

10    the way, throughout the time you were working with

11    Mr. Conlan, confidential discussions of how much the

12    company might be willing to pay to resolve the talc

13    litigation?

14          A.     Absolutely.  It was an important part

15    of the conversation.

16          Q.     Did it include things as detailed,

17    for example, the futures-only settlement in the

18    Imerys?

19          A.     That was --

20                    MR. POLLOCK:  Your Honor, can I --

21    can we get a point in time, because we've gone --

22    the last one was a broad question.  This time it's

23    Imerys.  I would like to get a point in time and

24    know what case I'm talking about, because I can't

25    measure which information is confidential if I don't
```

1    know which case it is and what time period we're

2    talking about.

3                    THE WITNESS:  Sure.  I can explain

4    that.

5                    THE COURT:  Mr. Brody, are you --

6    well, let Mr. Brody pose that question.

7                    MR. BRODY:  Sure.

8    BY MR. BRODY:

9         Q.    Did there come a time when you and

10   Mr. Conlan were engaged in discussion of a potential

11   futures-only settlement?

12        A.    Yes.  In the fall of 2020,

13   Mr. Birchfield proposed an outside-of-bankruptcy

14   settlement for the existing tort claimants and an

15   inside-of-bankruptcy futures settlement.

16        Q.    Was Mr. Conlan involved in the

17   evaluation of that?

18        A.    That was -- yeah, that was in the

19   period of time where I was working with Mr. Conlan

20   every day to evaluate proposals like that, and we

21   certainly worked on that one extensively together.

22        Q.    And was Mr. Conlan, in addition to

23   yourself, negotiating directly with the other side

24   during that period?

25        A.    Yes.  He was talking primarily with

1    the TCC's counsel and the FCR and the FCR's counsel,

2    which, of course, were the most important parts of

3    trying to get a futures-only settlement in the

4    bankruptcy.  I didn't have those relationships at

5    the time.

6           Q.    In the process of evaluating the

7    potential for a futures-only settlement in the

8    bankruptcy, was Mr. Conlan involved in confidential

9    evaluation of what J&J might be willing to pay for

10   such a settlement?

11          A.    Yes.

12          Q.    Did that include a review of

13   information prepared by J&J's confidential

14   consultants in the litigation?

15          A.    Yes, and -- and my firm, as well,

16   which was also analyzed.

17          Q.    Did you consider that work that you

18   were doing at the time relevant to what is going on

19   in the talc litigation today?

20          A.    It's the same issues relevant to

21   resolution today, whereas, obviously, as you heard

22   from Mr. Haas, we're still actively trying to

23   resolve this.  We still have a plan.  We still have

24   great support for a plan.  All of the issues are the

25   same.  All of the issues remain relevant, and all of

1    the insight that we had back then is as important

2    now as it was then.

3         Q.       And are you looking -- I mean, at the

4    end of the day, are you looking for what ultimately

5    will be negotiated, and when you talk about that and

6    you talk about that being important, are you talking

7    about it being important to a negotiated resolution?

8         A.       I'm not sure I understand the

9    distinction that you're drawing, but every

10   conversation that we had back then evaluating at

11   first just an outside-of-bankruptcy settlement, then

12   a half-in/half-out settlement, then the Imerys

13   settlement, and then ultimately to LTL, is all still

14   relevant to our thinking today, our approach today,

15   and the resolution that we're working on, still,

16   today.  That's what I would be doing if I wasn't

17   sitting here testifying.

18        Q.       Have you been involved as outside

19   counsel for Johnson & Johnson in the development of

20   proposals that J&J has come up with to potentially

21   resolve on a global basis the talc litigation?

22        A.       Yes, I have.

23        Q.       During the time that Mr. Conlan was

24   working as outside counsel for Johnson & Johnson,

25   was he involved in those discussions, as well?

1          A.        Yes, he was.

2          Q.        Did those discussions, to your

3     recollection, during the time that Mr. Conlan was

4     working as outside counsel for Johnson & Johnson,

5     involve the company's evaluation of settlement

6     matrices to come up with those proposals?

7          A.        Yes, it did.

8          Q.        And just to provide a little more

9     detail for the benefit of the Court, what -- when

10    you talk about, just generally, a settlement matrix

11    in the context of a mass tort settlement, what are

12    you talking about?

13         A.        Given the number of claimants, you're

14    talking about an initial rough way to evaluate them;

15    what are their age, what's their disease state, was

16    their cancer stage 1, 2, 3 or 4.  Things like that.

17    So, literally, a grid with different face values

18    based on some very, very basic facts about the

19    claimants.

20         Q.        And the work that you did with

21    settlement matrices back in that time period, when

22    Mr. Conlan was serving as outside counsel for

23    Johnson & Johnson, 2020-2021, is the review and

24    analysis of that information germane to the issues

25    that you're dealing with in the talc litigation

1    today?

2         A.      It is.  Back at that time, we had a

3    Barnes & Thornburg-created settlement matrix, we had

4    a Beasley Allen-created settlement matrix, we had a

5    settlement matrix created by Imerys torts claimants

6    committee that they put in their trust distribution

7    procedures.  So we -- and Mr. Conlan had all of

8    those, and we were evaluating all of those and

9    comparing and contrasting.  And so Mr. Conlan knows

10   all of my thoughts, all of the company's thoughts on

11   those three proposals.

12              And, indeed, we heard testimony

13   earlier about the most recent matrix put forward by

14   the Legacy company, which, you know, is an iteration

15   of the Beasley -- you know, Andy Birchfield and

16   Beasley Allen's settlement matrix.

17        Q.      All right.  In all of that time --

18   and I just want to get a sense for the benefit of

19   the Court of how involved Mr. Conlan was in the

20   discussions about issues surrounding claim values,

21   number of future claims, value of future claims,

22   value of present claims.  How involved was he?

23              MR. POLLOCK:  Objection.  I -- first

24   of all, it's compound.  But second of all, I really,

25   at this point, want details.  I want to know what

 1    discussions occurred when.

 2                    Mr. Haas -- Mr. Murdica, I'm sorry,

 3    can keep on testifying, obviously, but I'm concerned

 4    that I can't question about what I don't understand.

 5    He had discussions about settlement matrices.  What

 6    discussions?  When?  Where?  Who was involved?

 7                    THE COURT:  Well --

 8                    MR. POLLOCK:  All of these things.

 9                    THE COURT:  I appreciate,

10    Mr. Pollock, your understanding or your lack of

11    understanding.  What I'm interested in is, does this

12    witness understand the question.

13                    To the extent we can get a time

14    frame, Mr. Brody.

15                    MR. BRODY:  Well, we're going to get

16    -- yeah, I was going to ask an initial question, and

17    then we were going to zero in on a couple of things.

18                    THE COURT:  Okay.

19                    MR. POLLOCK:  Just to be clear, Your

20    Honor, and it's your courtroom and, again, I respect

21    that greatly.  It's beyond time frame.  It goes to

22    merits, the substance, because you're talking four

23    years where Imerys, LTL, you're talking a massive

24    upset with the Third Circuit.  You've got all of

25    these facts coming in at one time, and I'm being

1    told that there were discussions regarding each one

2    of these concepts, but I have no clue what those are

3    and there's nothing in the record to support it.

4                    I'm not disputing that discussions

5    occurred.  I'm sure Mr. Murdica is telling the

6    truth, but I can't measure what I can't see or

7    understand.  There's no records to support that

8    testimony, at all.

9                    THE COURT:  Can we get a time frame?

10                   MR. BRODY:  I think, you know, maybe

11   for everybody's benefit, if I could ask Mr. Murdica.

12   BY MR. BRODY:

13        Q.       Throughout the period that Mr. Conlan

14   was working as outside counsel for Johnson &

15   Johnson, was --

16                   THE COURT:  2020 to February 2022.

17                   MR. BRODY:  July 2020 to the end of

18   February 2022.

19                   MR. POLLOCK:  Thank you, Your Honor.

20   BY MR. BRODY:

21        Q.       Was the -- was the company

22   internally, in a privileged and confidential

23   context, evaluating claim values, present claims,

24   potential number of future claims, and the potential

25   value of future claims in the talc litigation?

```
1              A.         That's been the case since early 2020

2    until the present.

3              Q.         So that was during the entire time

4    that Mr. Conlan was outside counsel for the company,

5    right?

6              A.         That's correct.

7              Q.         And how involved was he in those

8    discussions?

9              A.         I'll try to put a finer detail on it

10   for Mr. Pollock.

11                        From the time Mr. Conlan started

12   working on talc, which was sometime in, I believe,

13   August 2020, he became very involved, to the point

14   we were having daily conversations.

15                        And Mr. Pollock, it was first about

16   your client's outside-of-bankruptcy proposal --

17                        THE COURT:  Mr. Murdica, could you

18   address the Court --

19                        THE WITNESS:  Oh, yes.

20                        THE COURT:  -- and not directly

21   address Mr. Pollock.

22                        THE WITNESS:  I'm sorry.  I was

23   trying to answer his questions.

24                        It was first about an

25   outside-of-bankruptcy proposal, which was a
```

1    conversation we were having until about September of

2    2020, to the best of your of my recollection.  At

3    that point in time, we pivoted to trying to do

4    something in the Imerys bankruptcy.  And at that

5    point, at that point in time, Mr. Birchfield and I

6    were all aligned on this and we could not get the

7    approval of the full tort claimants committee in the

8    Imerys bankruptcy.

9              So then we continued to pivot and try

10   to find an agreement that would work for the

11   majority of the TCC in Imerys so that we could get

12   the votes to move the plan forward.  We came -- and

13   throughout this whole time, I'm working very close

14   with Mr. Conlan because he's now working for J&J and

15   it's the two of us that are in charge of trying to

16   get this resolution done.

17             At that point, we just keep modifying

18   our proposal until -- by February of 2021, we were

19   very close.  And I remember -- I remember it very

20   specifically.  I remember where I was, because Joe

21   Braunruether was retiring on March 1st, and we were

22   trying to get this deal done, you know, done and

23   approved by the TCC before he left the company

24   because he worked so hard on it with myself and

25   Mr. Conlan.

1          It turned out that even though we

2     were literally on the one yard line, we thought we

3     would get it done, we didn't get it done.

4          Mr. Haas had been involved since the

5     fall, since he came to J&J, but now he took over

6     duties for talc.  By April 15 of 2021, we had a deal

7     with the Imerys TCC, which you heard about.  He was

8     asked about, Well, why didn't you enforce it.  There

9     was -- we were led to believe that the future claims

10    representative had signed off on it.  It turned out

11    it was only the tort claimants committee, itself,

12    and we needed the FCR approval, as well.

13          So, during that entire time,

14    Mr. Conlan and I were working hand-in-hand everyday

15    to try to deliver this for the company, and

16    reporting to Mr. Braunruether and Mr. Haas.

17          I hope that clears it up.

18     Q.     And during the period you mentioned

19    around April of 2021, when you were trying to get

20    this across the finish line, did J&J create a term

21    sheet for what was being discussed and what you

22    thought you were going to be able to get across the

23    line?

24     A.     Yes, we had a term sheet that was

25    signed off on by the Imerys TCC and the counsel for

1    the Imerys TCC.

2          Q.      Prior to providing that term sheet to

3    the TCC, was Mr. Conlan involved with you in

4    privileged and confidential discussions of what that

5    term sheet would look like?

6          A.      Absolutely.

7          Q.      And did that include, by the way,

8    both ovarian cancer and mesothelioma claimants?

9          A.      I believe so.

10         Q.      All right.  Did the proposal that was

11   developed that you were involved with the

12   confidential discussions on involve a presentation

13   of a settlement grid?

14         A.      Yeah -- it did, yes.

15         Q.      Were you involved in the creation and

16   evaluation of that grid?

17         A.      I was.

18         Q.      Was Mr. Conlan?

19         A.      Mr. Conlan was involved in all

20   aspects of the proposal.  And then, following April,

21   it was April 15th, 2021, that we got TCC approval,

22   Mr. Conlan was working on resolving any issues that

23   the future claims representative had to, you know,

24   deliver the rest of the settlement.  And I know that

25   he had many conversations with counsel and with the

1    FCR over the next couple of months after that to try

2    to get that agreement.

3          Q.      So, Judge Porto and Judge Singh have

4    heard of it from Mr. Haas about how Mr. Conlan was

5    personally involved in negotiating with the TCC and

6    the FCR in the Imerys bankruptcy.

7                 Just so that the record is clear on

8    this, can you explain in that respect what his role

9    was?

10         A.      Yes.  Like I said, he was my

11   counterpart as resolution and bankruptcy counsel,

12   because he was also a bankruptcy lawyer, to try to

13   deliver the settlement.

14                And so, when we were negotiating --

15   again, this was early 2021, a lot was still done by

16   Zoom -- he had relationships with, longstanding

17   relationships with at least one of the tort

18   claimants committee lawyers in Imerys, and so he

19   would appear on those, he would negotiate, you know,

20   separately, and then he would negotiate with the

21   future claims representative and the future claims

22   representative counsel because they had been in many

23   bankruptcies together and had a longstanding

24   relationship.

25         Q.      And was this one of the time periods,

1    early 2021, when you were having daily or near-daily

2    communications with Mr. Conlan?

3             A.       Yes.  Really, that remained the case

4    from when he started working for J&J, until about --

5    until very shortly after the bankruptcy filing in

6    LTL.  So, to put a time frame on it, after, I would

7    say, October -- after the end of October of 2021, I

8    didn't work with Mr. Conlan on a daily basis

9    anymore.

10            Q.       Okay.  So pretty much up through the

11   filing of LTL?

12            A.       And a couple of weeks beyond it,

13   because we were working on potential mediation

14   options within LTL at that point.

15            Q.       Okay.  At the time that you and

16   Mr. Conlan were talking in early 2021, when he was

17   engaged in conversations with representatives or

18   counsel for the TCC and the FCR in the Imerys

19   bankruptcy, did you and he discuss negotiating

20   strategies?

21            A.       Of course.

22            Q.       And you talked about imparting to

23   him, you know, what you knew from your experience,

24   which predated his, in attempting to negotiate

25   resolutions of the talc litigation for Johnson &

1    Johnson, did that come into play in those

2    discussions that you were having with him?

3            A.      It did, because it wasn't just talc.

4    A lot of the lawyers in the talc litigation were

5    lawyers that I resolved other mass torts with.  This

6    wasn't the first mass tort I've worked as J&J

7    resolution counsel on.

8                    In fact, Judge Porto, you may or may

9    not remember I resolved the hernia mesh MCL before

10   you a year and a half ago.

11                   THE COURT:  Physiomesh.

12                   THE WITNESS:  Physiomesh -- well, no,

13   no.  Hernia -- Proceed, Proceed.

14   BY MR. BRODY:

15           Q.      At some point in July of 2021, do you

16   recall negotiations with the TCC and the FCR over

17   the Imerys plan becoming stalled?

18           A.      I didn't hear you on the time frame,

19   but, yes.  In the middle of 2021, we were making no

20   further progress with the FCR, as far as I could

21   tell.

22           Q.      Right.  And I -- I'm sorry, I

23   referenced in my question July of 2021.

24           A.      That sounds --

25           Q.      Does that sound right?

```
 1          A.       Yes.

 2          Q.       Did you consider strategies for J&J

 3    in response to those negotiations becoming stalled?

 4          A.       Of course.  We -- we're constantly

 5    working on resolution.

 6          Q.       Was Mr. Conlan involved in those

 7    discussions, as well?

 8          A.       He was, at that point, yes.

 9          Q.       Do you consider those discussions at

10    that time period as privileged and confidential

11    discussions that are relevant to what is going on in

12    the talc litigation today, in 2024?

13          A.       Very much so.  We were in a similar

14    position.  We were outside of bankruptcy.  At that

15    point, we were considering a bankruptcy filing, and

16    we were discussing all of our options that we had on

17    the table, which is very much where we find

18    ourselves today.  It's the same situation.

19          Q.       Now, were you involved in mediation

20    in the LTL bankruptcy?

21          A.       I was.  I was the lead for Johnson &

22    Johnson in the LTL bankruptcy mediation.

23          Q.       Do you consider the privileged and

24    confidential communications that you had with

25    Mr. Conlan while he was outside counsel to Johnson &
```

1    Johnson to be relevant to what you were dealing with

2    in the LTL bankruptcy mediation?

3         A.      Yes, because the mediation was

4    dealing with -- it's the same thing.  It's dealing

5    with resolution.  We were trying to resolve it in

6    mediation.

7         Q.      Now, you're aware that at some point

8    in time, as we discussed, Mr. Conlan left the law

9    firm of Faegre Drinker, right?

10        A.      Yes.

11        Q.      And at the time he left, do you know

12   whether the LTL bankruptcy was pending?

13        A.      It would have been, yes.

14        Q.      Okay.  And is that a time period in

15   which you were involved in attempting to negotiate a

16   resolution within the bankruptcy structure?

17        A.      Yes.  That was mediation in LTL 1.

18        Q.      All right.  And were you also

19   involved in mediation in LTL 2?

20        A.      I was.  Same role.

21        Q.      Did you know at the time that

22   Mr. Conlan was communicating directly with

23   Mr. Birchfield and other members of the Beasley

24   Allen firm about the talc litigation?

25        A.      I had no idea.  Like Mr. Haas, I

1    found out for the first time two weeks ago that not

2    only had that been going on since April, that it was

3    allegedly related to the mediation, but as the lead

4    mediation representative for J&J, I can tell you

5    that I never heard a single thing about that until

6    we got the privilege log two weeks ago.  And I was

7    kind of dumbfounded, and I was in close contact with

8    the mediators throughout the mediation, of course,

9    because that was my job, and to my knowledge, the

10   mediators didn't know, either.

11        Q.    When you learned this a couple of

12   weeks ago, were you concerned?

13        A.    I was extremely concerned.  I -- in

14   my career, I have never seen anything like that.  It

15   would be as if I, having negotiated the Prolene

16   settlement, while it's still pending and while we're

17   trying to get to the 95 percent, decided to quit and

18   go become a consultant for the Fleming firm.  It's

19   -- I -- it's unimaginable to me that that could

20   happen.

21        Q.    And just for the benefit of the

22   Court, in terms of your participation that you're

23   referring to, in mediation, during the LTL

24   bankruptcy, the second time around, what time frame

25   was that?

1          A.      That would have been in the May 2023,

2    until it was -- until the bankruptcy was dismissed

3    in the July of 2023 time frame.

4          Q.      Okay.  Now, we've talked about when

5    Mr. Haas first learned via the October 18th, 2023

6    email that he got from Mr. Conlan, when he first

7    learned that Mr. Birchfield was working with

8    Mr. Conlan on the settlement matrix.

9              When did you first learn that

10   Mr. Conlan and Mr. Birchfield were collaborating?

11         A.      I --

12             MR. POLLOCK:  Objection to the use of

13   "collaborating."

14             MR. BRODY:  Your Honor, it's just a

15   question.  He can tell me if I've gotten something

16   wrong, and it's --

17             THE COURT:  I'll overrule the

18   objection.

19             THE WITNESS:  To the best of my

20   recollection, I learned a few hours before that

21   because I was in Las Vegas at the Mass Torts Made

22   Perfect conference, and numerous plaintiffs' lawyers

23   came up to me and started telling me about how the

24   talc was going to settle via this Legacy plan that

25   Andy was working on, because I was told that he was

1    telling people that at the conference.  I heard

2    about it and I immediately asked Mr. Haas what could

3    possibly be going on, because that was the first

4    time I heard of it.

5    BY MR. BRODY:

6         Q.    So all throughout the mediation

7    process, did anybody ever come to you and say, We're

8    working with Jim Conlan on the plaintiffs' side?

9         A.    No.  I talked to Mr. Birchfield about

10   it after that, in October, but not during the

11   mediation process.

12        Q.    All right.  So it was roughly, you

13   said, a few hours earlier on October 18th that you

14   first learned of this collaboration between

15   Mr. Birchfield and Mr. Conlan?

16        A.    It may have been the night before,

17   but I learned it via other people coming up to me,

18   because they all know that I'm responsible for

19   resolution of talc, and saying, Hey, I heard this is

20   settling and, you know, they were told that we would

21   have a resolution by November.

22        Q.    So the Court has heard a bit about

23   the article that was published by Bloomberg that

24   Mr. Conlan wrote on November 2nd of 2023, and that's

25   at -- I think it's Exhibit 15 in the binder that you

1   have in front of you.

2          A.      Yes.

3          Q.      And if you turn to tab 6, there's a

4   letter that you wrote there?

5          A.      Yes.

6          Q.      And you wrote this letter to

7   Mr. Conlan?

8          A.      I did.

9          Q.      Why did you write this letter to

10  Mr. Conlan?

11         A.      I -- well, a couple of reasons.  One,

12  I was asked to communicate with Mr. Conlan on it,

13  but I felt compelled to because I had read the

14  article and I thought that the article was talking

15  about the LTL bankruptcy, and I was afraid that

16  Mr. Conlan was disclosing privileged information.

17  And so, I haven't read this probably since I wrote

18  it, but I essentially asked him to stop.

19         Q.      Okay.  And it was, I guess we know

20  from Mr. Haas' testimony and from the exhibits that

21  are in the record that it was just four days after

22  you wrote that letter that Mr. Conlan sent his

23  letter to the board of directors, right?

24         A.      That's right.

25         Q.      Did you review the letter that, at

1    the time, that he sent to the board of directors?

2           A.       It eventually made its way to me,

3    likely via Mr. White and Mr. Haas, and I did read

4    it.

5           Q.       In the letter, Mr. Conlan represented

6    that he had already discussed the proposal with lead

7    counsel for the talc claimants, right; and that's

8    tab -- should be tab 7?

9           A.       Right.

10          Q.       Did you have any idea that Mr. Conlan

11   had been working with Mr. Birchfield for six months

12   at that point?

13          A.       No.  My presumption at that point was

14   that sometime after the dismissal of LTL 2, they had

15   talked, and that's why I heard at that conference in

16   Las Vegas in -- on October 18th or 17th, that this

17   was something they were working on together.  And

18   when I -- I assumed the same thing on November 9th.

19   It wasn't until two weeks ago when we got that

20   privilege log that I realized they had been working

21   closely together for more than six months.  And I

22   believe there were hundreds of entries on the

23   privilege log that we can't see, but there were --

24   there was a lot of collaboration or contact, or

25   whatever word you want to use.

1        Q.        Mr. Birchfield never disclosed that

2    to you?

3        A.        To the best of my knowledge, no.  And

4    I was genuinely shocked and surprised when I learned

5    that, so I can't imagine I ever would have known.

6        Q.        Nobody else from Beasley Allen

7    disclosed that you?

8        A.        No.

9        Q.        Nobody else on the plaintiffs' side

10    of the V in this litigation ever disclosed that to

11    you?

12        A.        I truly had no idea, and I definitely

13    -- I was also shocked to see that it was claimed to

14    be part of the mediation, because it never came up

15    in the mediation.

16                 MR. BRODY:  Thank you, Mr. Murdica.

17                 THE COURT:  Thank you.

18                 MR. POLLOCK:  Can we take a

19    five-minute break?

20                 THE COURT:  We're going to take a

21    ten-minute break.

22                 MR. POLLOCK:  Thank you, Judge.

23                 (A recess was taken.)

24                 THE COURT:  Cross-examination,

25    Mr. Pollock?

```
 1                    MR. POLLOCK:  Yes, Your Honor.

 2                    THE COURT:  You may be seated.

 3                    THE WITNESS:  Thank you.

 4                    MR. POLLOCK:  Can I ask the Court and

 5      opposing counsel a critical question.  It is

 6      currently 3:41.  Let's assume I move quickly and I'm

 7      done by 4:15, and then I assume Mr. Brody, who is a

 8      capable lawyer, may have some redirect.  That's

 9      going to put us around 4:30, 5 o'clock, or so.

10                    THE COURT:  We're not going to go --

11      well, I prefer not to go past 4:30.  I don't want to

12      go past 5 o'clock.  But it looks like we're not

13      going to finish today.

14                    MR. POLLOCK:  So can we reconvene

15      tomorrow?

16                    THE COURT:  I don't necessarily know

17      if Judge Singh's schedule accommodates that.  Mine

18      doesn't.  I don't think we were really planning on

19      consecutive days, Mr. Pollock, Mr. Brody.  But we

20      can --

21                    MR. POLLOCK:  It's so much fun

22      together.

23                    THE COURT:  Pardon?

24                    MR. POLLOCK:  It's so much fun

25      together.
```

```
 1                    THE COURT:  Well, it is, and I've

 2    spent the last four weeks in this particular

 3    courtroom on another matter.

 4                    MR. POLLOCK:  Yes.

 5                    THE COURT:  On another mesh matter.

 6                    So why don't we put our heads

 7    together.  We'll leave today.  We can't be

 8    consecutive days.  We're all going to have to look

 9    at our calendars.  Judge Singh and I are going to

10    have to look at our calendars, also.

11                    I will tell you the week of the 15th

12    of April, I have speaking commitments.  We have a

13    Civil Chancery seminar, statewide, and it's

14    scheduled that week, and I'm doing something at the

15    Boardwalk seminar, so that week is out.  But we'll

16    all put our heads together, Mr. Pollock, Mr. Brody.

17                    MR. POLLOCK:  Thank you, Your Honor.

18                    MR. BRODY:  Okay.

19                    MR. POLLOCK:  I'm ready to proceed,

20    Judge.

21                    THE COURT:  Sure.

22                         -  -  -

23                    CROSS EXAMINATION

24                         -  -  -

25    BY MR. POLLOCK:
```

```
 1              Q.        Mr. Haas, we have met before.  My

 2       name is Jeff --

 3              A.        Mr. Murdica.

 4              Q.        I'm sorry.

 5                        THE COURT:  Mr. Murdica.

 6              Q.        The other guy.  I just gave you a pay

 7       raise.  Sorry.  Mr. Murdica, I apologize.  I'm still

 8       Jeff, or Mr. Pollock, whatever you want.

 9                        You mentioned before a term sheet,

10       and I think it was in the Imerys matter.  Do you

11       recall the term sheet discussion?

12              A.        I -- I believe, Mr. Pollock, you're

13       referring to my testimony about the April 15th, 2021

14       term sheet in the Imerys matter.

15              Q.        Correct.

16              A.        Is that right?  Okay.

17              Q.        Am I correct in understanding that

18       document was not fully executed?

19              A.        There were no signatures on it;

20       however, it was represented by counsel to the tort

21       claimants committee that those terms had the support

22       of the tort claimants committee, and, in fact, we

23       even exchanged example scenarios because there was a

24       refund portion of it and everything.  Well, it

25       wasn't signed because the FCR hadn't signed off on
```

```
1    it.  It was agreed to by the majority of the tort

2    claimants committee and their counsel.

3              Q.       Excellent.

4                       With regard your own work, there's a

5    thing called Thomson Reuters which allows me to be

6    snoopy and look at what people do as lawyers, and it

7    indicates that you spend about 66.9 percent -- it's

8    pretty precise, by the way -- of your matters for

9    J&J.  And then it has McKesson, and Walgreens, and

10   some other folks at, like, 4.8 and 3 percent.

11                      Give or take 5 percent, does that

12   sound about right, that over half your work is for

13   J&J?

14             A.       I don't -- I don't think your data is

15   right.  I haven't represented McKesson in at least a

16   decade.  However, way more than half of my work is

17   for J&J.

18             Q.       Excellent.

19                      And you actually knew Mr. Haas -- and

20   now I get the names right.  I got it wrong before --

21   from the fact that you both worked together at

22   Patterson Belknap Webb & Tyler, correct?

23             A.       That's correct.  We were both

24   partners at Patterson Belknap.

25             Q.       Excellent.
```

```
 1                   MR. POLLOCK:  You don't mind if I sit

 2    down, do you, Your Honor?

 3                   THE COURT:  That's all right.

 4    BY MR. POLLOCK:

 5         Q.        Getting to the core question before

 6    the Court, which is RPC 1.6, are you familiar with

 7    Rule of Professional Conduct 1.6?

 8         A.        I don't know the exact terms of it,

 9    but I know the rules that are at issue.

10         Q.        So the Rule of Professional Conduct

11    1.6, and it's more wordy than I say, it is that you

12    cannot disclose confidential information.  That

13    concept is pretty basic, right?

14         A.        Seems it to me.

15         Q.        Especially as a lawyer, right?

16         A.        Especially as a resolution lawyer.

17         Q.        Excellent.  As a resolution lawyer.

18                   Can we agree that other than the

19    records before us, you do not have any email from

20    Mr. Conlan to Mr. Birchfield, you don't have any

21    memos from Mr. Conlan to Mr. Birchfield, you don't

22    have any photos of Mr. Conlan and Birchfield in

23    compromising positions, you've got nothing out there

24    that discloses a -- they disclosed confidential

25    information belonging to J&J?
```

1          A.          Mr. Pollock, the only way I can
2     answer that is that, in the last two weeks, I've
3     seen a privilege log that has hundreds of logged
4     emails between Mr. Conlan and Mr. Birchfield, and it
5     says the subject matters, and the subject matters
6     included a claimant grid and all of the very
7     confidential information we were talking about.  And
8     I can tell you, as somebody who has done almost
9     exclusively mass tort resolution for the last
10    decade, that it would be impossible to jump and talk
11    to the other side and separate in my brain
12    everything that I've learned by representing J&J, to
13    suddenly be pure of mind and not disclose
14    confidential information.  I can't think of any
15    possible way that's the case.
16          Q.          So since you went to the
17    hypothetical, I'm going to go hypothetical.
18               Let's assume you left tomorrow and
19    you decided to become something else.  You were
20    going to decide -- you were going to start your own
21    talc business, you were going to start -- oh, that's
22    probably a bad choice these days.  You were going to
23    choose something else, a steel business.  You were
24    going to do anything else.
25          A.          Yes, sir.

```
 1            Q.         Isn't it true that when Mr. -- if I

 2      take that same paradigm and I apply it to

 3      Mr. Conlan, he switched out completely.  He spent 32

 4      years at Sidley & Austin, right, about?

 5            A.         I heard that testimony.

 6            Q.         Okay.  So he spent a long time at

 7      Sidley & Austin.  Then went to Faegre, right?

 8            A.         Right.

 9            Q.         And at that point, he decided:  I've

10      had enough.  I'm starting my own company, Legacy.

11      Right?

12            A.         Right.

13            Q.         So he goes to Legacy, and Legacy is a

14      completely different deal.  Legacy, the idea is,

15      I've got Warren Buffet and Apollo Investing and all

16      these fancy guys behind me.  What I'm going to do is

17      go out and buy the kind of mass tort claims that you

18      have yourself, that you address in your professional

19      career, right?

20            A.         Well, I -- I know that's what he did,

21      and I know that they pitched that idea about talc to

22      J&J, and I know that he pitched that same idea to

23      J&J, I believe when he was working for J&J.  That's

24      one of the options.

25            Q.         And there are other companies who
```

1    compete with Legacy, right?  There are other

2    entities that J&J has communicated with over the

3    past four years about possibly trying to sell out,

4    pass off, whatever you want to call it, its

5    liabilities in order to get them off the

6    spreadsheets, right?

7         A.    I understand that, and that's why, to

8    me, it was particularly shocking that Legacy, with

9    our former counsel, is the one that they would

10   choose to talk to if they were really trying to talk

11   to a company that did that during the mediation.

12        Q.    But J&J never got a single offer from

13   any other company like Legacy gave an offer which --

14   to the document that you referred to, Legacy is the

15   only one who said, I've got a proposal for you.

16        A.    I don't know if that's the case, but

17   I know we didn't -- to my knowledge, we never

18   solicited a proposal from any such company.

19        Q.    But you do know that other companies

20   have approached J&J or J&J has had discussions with

21   them, and Legacy is the only one that said, We think

22   we have a viable way of doing this.

23        A.    I don't know that other companies

24   ever approached J&J.  That probably would have been

25   a better question for Mr. Haas.  But I can tell you

1    the only one I know about is Legacy because, of

2    course, we didn't solicit them.

3         Q.      So when Mr. Conlan is sitting in his

4    new role --

5         A.      Yes.

6         Q.      -- and his new role is, I am going to

7    -- and we can actually go through it, if it makes

8    you more comfortable, sir.  Let me find it real

9    quickly while I fumble.  It's going to be Exhibit 7.

10        A.      Yes, sir.

11        Q.      And, Mr. Haas, you were involved in

12   LTL, right?

13        A.      Mr. Murdica.

14        Q.      I'm sorry.  God.  I apologize.

15        A.      It's okay.

16        Q.      Mr. Murdica, you were involved in

17   LTL, right?

18        A.      I was the lead counsel for the

19   mediation.

20        Q.      Excellent.

21               So the two experts I talked about

22   before, you are familiar with their opinions,

23   correct?

24        A.      I have consulted with Mr. Mullin, as

25   I testified on direct, regarding some of the

1    settlement information and claims information when I

2    was working with Mr. Conlan.  I don't believe that

3    I've reviewed his report or the other expert that

4    you mentioned.

5         Q.      Lead counsel, and you didn't review

6    the expert reports?

7         A.      Lead counsel for the resolution, for

8    the mediation.  I'm not litigation counsel intel.

9         Q.      I apologize.  Fair enough.  Now I've

10   cleared up my misunderstanding.

11              I will represent to you that in those

12   documents, they indicate that the range for

13   resolution for J&J -- and this is J&J's expert -- is

14   between 12 and 21 billion dollars.  In this case, on

15   the document, Legacy has $19 billion, or such

16   greater amount as determined by J&J's independent

17   auditors.

18              So, is there any reason in your mind

19   to believe that Legacy was working with your

20   experts?

21        A.      I had no reason to believe, I don't

22   know otherwise, that Legacy was working with our

23   experts.  And I heard you ask Mr. Haas those

24   questions, and I'm not sure where those numbers came

25   from.  I certainly wouldn't subscribe to them.  I

1    know from having this role that talc can settle for

2    the amount that was on the table, but for the TCC,

3    who were the objecting party in LTL 2.

4         Q.    So the $19 billion, do you believe

5    that that was a contrivance by Andy Birchfield?

6         A.    I have no idea where that came from,

7    but I know that that's not what it takes to resolve

8    talc litigation.

9         Q.    Okay.  So, it's not what J&J wants,

10   it's not what you believe is the right number,

11   correct?

12        A.    No.  I'm referring to the work I

13   actually did, which was to get the lawyers

14   representing the talc claimants to negotiate with me

15   and come up with an agreed plan and come up with a

16   number.  It's not a dispute; it's the actual amount

17   of money that it would have taken at that time to

18   resolve the talc claims, if the claims had been --

19   if it had been brought to a vote.

20             Unfortunately, it was not brought to

21   a vote because there was opposition by your client

22   and others in the bankruptcy.

23        Q.    Mr. Murdica, you have better

24   knowledge of the case than I do, so I'm going to

25   have to back you up a little teeny bit there.

1          A.          Sure.

2          Q.          You said "at the time" and there was

3     "a vote."   Are we talking Imerys or are we talking

4     LTL?

5          A.          So, we can talk about anyone you

6     want.  I was referring to LTL 2.  The difference

7     between the first bankruptcy and the second is that

8     in the second bankruptcy, we filed along with the

9     support of more than 60,000 claim -- along with the

10    support of the lawyers representing more than 60,000

11    claimants.  And I know from the settlement

12    communications that I had that there was far more

13    support than that.  All we had to do was be able to

14    get to a bankruptcy vote, which we were not able to

15    do because the objectors prevented that.

16         Q.          Were two of the people you spoke with

17    Mr. Onder and Mr. Nachawati?

18         A.          Those are two of many, yes.

19         Q.          And those two had big chunks of -- a

20    big hunk of cases, right?  Legal term.

21         A.          Approximately 5,000 and 20,000

22    claimants, respectively.

23         Q.          So 25,000, let's call it.  It's a

24    pretty big number, right?

25         A.          It is.  It's about a quarter of the

1    claims that I expect to vote when there ultimately

2    is a resolution vote.

3            Q.      And you understood when you spoke to

4    Mr. Onder and Mr. Nachawati that they were members

5    of talc claimants committee, correct?

6            A.      So, they weren't in the second

7    bankruptcy because they had -- they had joined to

8    support the plan put forward in the second

9    bankruptcy.  They were not included on the tort

10   claimants committee.

11           Q.      Okay.  What role did they play in the

12   second LTL?

13           A.      Well, they actually testified in

14   favor of the plan prior to the dismissal, and they

15   represented their claimants on -- there was an ad

16   hoc committee of supporting counsel, and what they

17   had to do in addition to supporting the plan was

18   that Judge Kaplan ordered that they not only tell

19   all of their clients that they were being

20   represented by them in the bankruptcy, but that

21   Mr. Nachawati and Mr. Onder were supporting the plan

22   forwarded in the bankruptcy, because Judge Kaplan

23   wanted to make sure that all of the claimants that

24   were in support of the plan had an understanding

25   that their counsel was making that representation.

1      Q.      So let me run this back for a second.

2   LTL 1, they were on the tort claims committee then,

3   correct?

4      A.      You're referring to Mr. Onder and

5   Mr. Nachawati?  Yes, they were.

6      Q.      Yes.  And you spoke to them at that

7   point in time when they were on the tort claimants

8   committee for LTL 1?

9      A.      I spoke to them before they were on

10   the committee, I spoke to them after they were on

11   the committee, and while they were on the committee,

12   because that was my job and they were part of the

13   bankruptcy mediation in the first bankruptcy.

14      Q.      Excellent.  And I want to focus on

15   LTL 1, not LTL 2; fair enough?  Do you understand

16   where I'm --

17      A.      I'll answer whatever you ask me, as

18   long as my counsel doesn't object.

19      Q.      I appreciate it, sir.

20              So, during the course of LTL 1, you

21   understood that they were on the tort claimants

22   committee and you understood that the tort claimants

23   committee had put a number on this over the $9

24   billion that J&J wanted to resolve this matter at,

25   correct?

```
 1              A.        At various points, I think you heard
 2      Mr. Haas' testimony earlier, that at some -- I
 3      believe it was June of 2022, through mediation, and
 4      I don't want to violate the mediation privilege that
 5      you were referencing earlier, but there was a --
 6      that the Sunday night deal that Mr. Haas was
 7      referring to with the tort claimants committee that
 8      we understood was a deal for $8.9 billion.
 9              Q.        Correct.  And that's what -- and that
10      -- I'm sorry?  So let's assume that that's right.
11              With regard to that number, you
12      understood that the other members of the tort
13      claimants committee did not want the $9 billion,
14      let's call it -- 8.9, let's call it 9 billion just
15      for shorthand -- they did not want the $9 billion,
16      they thought the number should be higher, correct?
17              A.        So my understanding at that time,
18      what I -- what you heard Mr. Haas testify to and
19      what I understood from the mediators, is that 8.9
20      billion got the majority of the tort claimants
21      committee, which -- and that's how it works.  So the
22      majority were in support at that time.
23              Q.        And the -- so if the tort -- if
24      Mr. Birchfield was to say that the tort claimants
25      committee wanted the $19 billion number and that it
```

1   was not the majority of people that wanted the $19

2   billion number, you would believe that would be

3   false testimony?

4        A.     Yes.  Particularly because nobody was

5   saying $19 billion at the time.  What you have to

6   understand, Mr. Pollock, is this was a negotiation

7   that literally has gone on in phases for years and

8   keeps churning and working as different things

9   happen in the efforts to resolve.  But there was no

10  one in June of 2022 saying that it took $19 billion

11  to resolve this.  Nobody.  So that would be a lie.

12       Q.     Fair enough.  Let me move on to your

13  Exhibit 14, if you don't mind.  And it's going to be

14  Exhibit 14 and I'm going to be referring -- you're

15  welcome with any document I refer you to to review

16  the entire document, if you so desire.  I'm going to

17  point you to the portion I care about just to move

18  things along.

19              Understood?

20       A.     Yes, sir.

21       Q.     Okay.  Paragraph 8, you say:  "On

22  November 5, 2023, I wrote a letter to Mr. Conlan on

23  behalf of J&J expressing J&J's concerns that

24  Mr. Conlan was improperly disclosing J&J's

25  confidences that he learned in the course of his

```
1    privileged attorney-client relationship with the

2    Company."

3                    Do you see that?

4          A.     I do.

5          Q.     Now, you then write a letter, and

6    it's Exhibit 6 -- and I thought about this ahead of

7    time -- Exhibit 6, and this is your letter to

8    Mr. Conlan, saying, "Dear Jim:  You learned --" and

9    I'm looking at the last paragraph, first page --

10   "You learned highly privileged information about J&J

11   and LTL strategies from the attorney-client

12   relationship.  And while publicly disparaging your

13   own legal strategy that you recommended to J&J might

14   be permissible if J&J or LTL were not included in

15   the article..."

16                   Do you see that?

17         A.     I do.

18         Q.     Now, is it your position that it was

19   Mr. Conlan's idea to use the Texas Two-Step in LTL?

20         A.     Yes, that was one of the options that

21   he presented to myself and Mr. Haas.

22         Q.     So, prior to LTL being filed, it's

23   your position that he suggested we use the Texas

24   Two-Step?

25         A.     I --
```

```
 1                        MR. BRODY:  Objection, Your Honor.  I

 2    just -- if the question is, Was Mr. Conlan involved

 3    in discussions of the idea, yes or no, that's fine.

 4    But if we get into the specific of what was

 5    Mr. Conlan's position on it, what was the back and

 6    forth, the substance of the evaluation --

 7                        THE COURT:  I don't think that's

 8    where Mr. Pollock is going.

 9                        MR. BRODY:  All right.  I just have a

10    privilege objection, if that's where it goes.

11                        THE COURT:  Sure.

12                        Am I right, Mr. Pollock?

13                        MR. POLLOCK:  You are right, I think.

14    BY MR. POLLOCK:

15         Q.     I mean, here's the issue I've got.

16    It says "your own legal strategy."  That's what you

17    -- that's the phrase you used.

18         A.     Yes.

19         Q.     Am I correct that you're saying that

20    the filing of LTL was Jim Conlan's legal strategy?

21         A.      To the best of my recollection, and

22    I've recently seen an email written by Mr. Conlan --

23                        MR. BRODY:  I'm sorry, I don't want

24    you to -- if you're, Mr. Murdica --

25                        THE COURT:  No attorney-client
```

1    privilege disclosed.

2                    MR. BRODY:  Yeah, I don't want you

3    to --

4                    MR. POLLOCK:  Yes or no.

5                    MR. BRODY:  I don't want you to go

6    into the substance of a communication that

7    Mr. Conlan made on this while he was counsel for

8    J&J.  I apologize for cutting you off.

9    BY MR. POLLOCK:

10             Q.      How about a yes or no?

11             A.      A two-step bankruptcy is one of the

12   options that Mr. Conlan suggested multiple times to

13   resolve our talc liability.

14             Q.      And I just want to be clear on one

15   thing.  Is this before it was filed or after it was

16   filed?

17             A.      Before it was filed.

18             Q.      Thank you, sir.

19                     With regard to -- in this letter you

20   wrote, you -- this actually comes out of your

21   certification, which is -- I had it here a second

22   ago -- 14.  Let's turn to 14.  Someone's just yelled

23   it at me, so it's got to be right.

24             A.      It is.

25             Q.      Okay.  Exhibit 14.  In Exhibit 14,

```
1     you say -- I just had the damn thing.  I'm sorry.

2     -- that he proposed -- I'm sorry.  I'm still

3     struggling.

4           A.      You were on paragraph 8.

5           Q.      Paragraph 7.  It's paragraph 7, I

6     think, right? No.

7                   THE COURT:  Paragraph 8 was the

8     letter that Mr. Murdica addressed to Mr. Conlan.

9                   MR. POLLOCK:  Yeah, I'm sorry I'm

10    struggling here, Judge.  I apologize.

11                  THE COURT:  Take your time.

12    BY MR. POLLOCK:

13          Q.      Yeah, paragraph 8.  So paragraph 8 --

14    and when you signed the certification, the

15    certification which is Exhibit 12, you were

16    attempting to be truthful, accurate, and complete,

17    right?

18          A.      Of course.

19          Q.      And in paragraph 8, you mentioned

20    that Mr. Conlan -- you wrote a letter, Mr. Conlan

21    wrote a letter, I wrote a letter to Mr. Conlan.

22    That's Exhibit 6.  But you don't include

23    Mr. Conlan's response, do you?

24          A.      I didn't include Mr. Conlan's

25    response.  He responded something to the effect of,
```

1    Jim, you should call me because this would be a

2    really great option for J&J.

3          Q.      Wasn't it a little stronger than

4    that, that he completely disagreed with the

5    characterizations that you made?

6          A.      If you show it to me, I'm happy to

7    testify about it.  I do -- what I specifically

8    remember is that he wrote me back, and he said

9    something -- at least part of it said, "Jim, give me

10   a call," and then we texted about setting up a call,

11   and then it never happened, because I was in court

12   the next day.  I forget.  Somehow our wires got

13   crossed, but I never ended up speaking to him.

14         Q.      So you don't believe that when he

15   responded to your letter of November 5, two days

16   later, that he directly controverted the argument

17   that he violated the attorney-client privilege?

18         A.      He very well may have, Mr. Pollock.

19   If you show it to me, I'll tell you.  I'm sure

20   that's his position.

21         Q.      But you don't recall?

22         A.      I don't.  What I remember is that I

23   was going to talk to him, and it didn't happen.

24         Q.      In hindsight, do you think it would

25   have been worthwhile telling the Court that while

1    this is your letter of November 5, that Mr. Conlan

2    refuted that position and disagreed with you?

3          A.      Mr. Pollock, I don't understand why.

4    It's very clear to everybody here that

5    Mr. Birchfield and Mr. Conlan are saying that

6    there's no violation here.  You have been saying it

7    over and over.

8          Q.      Right, but this is simultaneously, at

9    the same time, it's contemporaneous with the

10   statement, it's two days later, and he directly

11   controverts what you have to say; and, yet, you

12   chose to leave that one out.  Why?

13         A.      I didn't choose to leave it out,

14   Mr. Pollock.  And had I known at the -- when I wrote

15   this letter, it was just to get him to stop the

16   things that he was doing.  Had I known at that time

17   that he had been working with Mr. Birchfield for six

18   months, the letter would have been very different.

19         Q.      Well, you mentioned that -- you and

20   Mr. Haas both have mentioned that Mr. Conlan and

21   Mr. Birchfield were working together for a while,

22   they were working together for six months.  Hadn't

23   Mr. Conlan been meeting with people at J&J off and

24   on for months before that on behalf of Legacy,

25   attempting to present a resolution that might take

1      the liabilities off the J&J balance sheets?

2            A.      Mr. Pollock, not with me.  But I

3      heard Mr. Haas' testimony about one meeting, and I

4      also heard that it was never disclosed during any

5      meeting that he was working with Mr. Birchfield and

6      they had been doing so for six months.

7            Q.      Well, you reviewed the emails -- the

8      binder here of the evidence record is pretty thin.

9      I assume, being a capable lawyer at Barnes &

10     Thornburg, you reviewed these documents in advance

11     of appearing here today, right?

12           A.      I can't say that I reviewed all of

13     them, but I reviewed my declaration that you just

14     referenced.

15           Q.      Okay.  Well, if we go to Exhibit 4.

16     This is Jim Conlan to Van Arsdale, and Douglas

17     Dachille, and some other folks, on October 18, 2023.

18                   Trailing is a series of other

19     communications, right?  October 6, 2023.  Behind

20     that is September 8, 2023.  We go back to August 21,

21     2023.  So you've got a series of communications

22     between Plenary Hearing 23 and Plenary Hearing 27,

23     where Mr. Conlan is working with the board at J&J,

24     or members of the leadership, let's say, of J&J,

25     correct?

1          A.          So, I was not on any of these,

2     Mr. Pollock, and I don't know -- I mean, that's your

3     characterization of them.  I heard Mr. Haas'

4     testimony, and I see what's in the documents, and I

5     don't see them working collaboratively with the

6     board or anything like that.  I see a couple sparse

7     communications and ultimately a rejection.

8          Q.          So let's take them one by one.

9          A.          Okay.

10          Q.          Plenary Hearing 26, this did from Van

11     Arsd -- Duane Van Arsdale to James Conlan -- or to

12     Doug Dachille, with a cc to James Conlan.

13               (As read):  Thanks for the note and

14     nice to meet you as well.  I have copied Erik Haas

15     and Andrew White who would also like to join the

16     discussion.  I will ask Darlene (copied here) to

17     coordinate and propose a few dates to get us -- to

18     get us together in the future.  We'll be back to you

19     shortly.

20               Do you see that?

21          A.          Yeah, Mr. Pollock, I see that, and it

22     looks like to me like somebody at JP Morgan was

23     perhaps doing a favor for Mr. Van Arsdale making the

24     introduction to somebody at J&J, and then J&J

25     writing back, Nice to meet you.  That's all I see.

```
 1              Q.        And you see James Conlan, Legacy
 2    Liability, right?
 3              A.        Correct.
 4              Q.        It's in the third -- it's in the cc
 5    there.
 6              A.        Yes.
 7              Q.        No one at J&J set off fireworks,
 8    alarms, you know, call the FBI, call the rules --
 9    the ethics committee, and said, Wait a minute, James
10    Conlan is working on this matter; isn't that
11    correct?  No one said a word?
12              A.        As far as I know, that's correct,
13    although Mr. Conlan had suggested, in addition to
14    the two-step bankruptcy, this was one of the menu of
15    options he provided for us strategically while he
16    was working for us, too.  So for him to suggest that
17    now, not in the context of working with plaintiffs,
18    I imagine it wasn't surprising.  But, again, I was
19    not on these.
20              Q.        So it was okay -- I know you keep on
21    looking at Mr. Haas, but with regard to this --
22              A.        Actually, I'm not looking at
23    Mr. Haas.  I'm looking at you and I'm looking at
24    Mr. Brody.
25              Q.        Fair enough.
```

1                    With regard to the statement here,

2    all he is doing is reaching out, saying, We would

3    like to talk.  J&J understands quite clearly he is

4    no longer at Faegre.  Mr. Haas has already testified

5    to that.  He is now working for Legacy Liability.

6    That's his position.  He has an email, Legacy

7    Liability.

8                    Did anyone at J&J, that you ever

9    heard, say, Oh, my God, Jim Conlan is still involved

10   in asbestos on behalf of Legacy Liability?

11        A.       Are you talking about in August of

12   2021?

13        Q.       I'm asking, in August of 2021, did

14   anybody ever say, Oh, my God, he's still involved in

15   asbestos?

16        A.       I did not hear that.

17        Q.       I'm sorry.  2023.

18        A.       Mr. Pollock, again, I did not hear

19   that in August of 2023.  As you can see, I'm not on

20   these emails.

21        Q.       You're not.  That's true.  But you

22   were, as you pointed out earlier, testified you

23   talked routinely with Erik Haas.  You had been a

24   partner at Patterson Belknap with Mr. Conlan.  You

25   had worked with Mr. Conlan all the time.  You had

1    worked with him regularly and discussed all kind of

2    issues.

3                    And you're telling me, on August 21,

4    Plenary Hearing 26, August 24, September 28th, all

5    the way through to, what is it, October 18 on

6    Plenary 2023, at no point did anyone ever say, from

7    J&J, Mr. Conlan, it's outrageous that you have

8    started your own business to try and resolve

9    disputes?

10        A.        I would say you have to ask

11   Mr. Conlan.  But I can tell you, in my role, the

12   first time I heard about Legacy being involved with

13   talc, to the best of my recollection, was as I

14   described, in Las Vegas on October 17th, 2023.

15        Q.        And you talked earlier about the

16   mediation documents were going back and forth.  Is

17   there any information -- do you have any facts,

18   whatsoever, other than the fact that Mr. Conlan and

19   Mr. Birchfield were communicating, do you have any

20   information in your possession, custody, or control

21   to establish that they exchanged J&J's confidential

22   information?

23        A.        Yeah, as I testified earlier,

24   Mr. Pollock, if you take a look at that privilege

25   log, it has descriptions of what the documents are.

1    And the descriptions are negotiations about claims

2    matrices and other things that were the exact

3    subject of what Mr. Conlan and I worked on together

4    while he was representing J&J.

5                    And as I told you, I can tell you

6    this as somebody who does this every day, there is

7    no way to separate what you learned from a client

8    and then suddenly have it magically disappear while

9    you're advising somebody else on a plan that might

10   work for Legacy.  It's just not realistic to --

11       Q.    So you're saying the facts between 20

12   -- I'm sorry.  The facts between 2021 and 2024,

13   completely stale, no additional plaintiffs, no

14   additional change in the legal landscape, no

15   changes, whatsoever, it's the same discussion you

16   were having in 2021 as you were having in 2024

17   regarding J&J talc liability?

18       A.    I think you mean 2023, and -- and

19   Mr. Pollock, even though the filed claim numbers

20   have increased, those claims already existed.  They

21   were just unfiled.  I mean, it literally is the same

22   thing we were doing back when Mr. Conlan was

23   engaged.  Nothing has changed.  He had insight into

24   all of my strategy, all of Erik's strategy, all of

25   Mr. White's strategy, Joe Braunruether's strategy,

1    the J&J executive suite, and everything we were

2    thinking and our strategy to deal with talc.

3          Q.      You mentioned when you were

4    testifying on direct that there were multiple

5    matrices.  Those were the words you used.  And am I

6    correct that there were matrices that you and/or

7    Mr. Conlan prepared, apparently, or discussed; that

8    there were matrices that Andy prepared and

9    discussed; there were matrices proposed by the talc

10   claimants committee.  There were all kinds of

11   matrices flying all around.  Is that true?

12         A.      Well, no, there weren't all kinds of

13   them.  There were three specifically that I

14   remember.  There was one created by Mr. Birchfield,

15   there was one created by myself and my partner

16   Kendra Lounsberry, and there was one created by the

17   Imerys tort claimants committee through their

18   proposed trust distribution procedures.

19                 Those are the three that we were

20   discussing at the time.

21         Q.      And those matrices changed over time

22   as the numbers changed, right?

23         A.      They don't change over time as the

24   number change.  They -- there were different

25   concepts as to what category should things be broken

1    down into, and what values, and what claims are we

2    going to value or not value at all.

3           Q.     And you have in the -- in this

4    matter, did you review the filing that was made to

5    disqualify Mr. Birchfield before it was filed?  Did

6    you review these documents?

7                 MR. BRODY:  Your Honor, sorry, but

8    asking J&J's outside counsel whether he reviewed

9    something and was involved in the work product that

10   went into a brief, I think is, one, protected by

11   work product; and two, it's completely irrelevant to

12   the issue that we're talking about here.

13                THE COURT:  Well, I think the

14   response is, if he reviewed it, yes or no.  That's

15   not a work product --

16                MR. BRODY:  Fine.  Yes or no, I

17   think, is fine.  I agree with that, Your Honor.

18   BY MR. BRODY:

19          Q.     So, yes or no, did you review the

20   filing before it was made?

21          A.     Unfortunately, Your Honor, I can't

22   give a yes or no.  I honestly can't remember.  It's

23   possible.  I'm not sure.

24          Q.     Excellent.

25                 The Legacy Liability portion, which

1    is Exhibit 7, has a matrix at the end.

2              A.      Yes.

3              Q.      I'll wait until you're there,

4    Mr. Haas -- Mr. Murdica.  Murdica.  I'll get it

5    right by the end of your testimony.

6              A.      No worries.

7              Q.      By the end -- with regard to that

8    chart --

9              A.      Yes.

10             Q.      -- do you know if that was a J&J

11   document?  Did J&J prepare this document?

12             A.      Originally?

13             Q.      No.  This document, the one right

14   here.  The one that's Plenary Hearing 67.  That's

15   the only one I care about.

16             A.      So I --

17             Q.      Was that one prepared by J&J?

18             A.      I created a matrix in 2020 that looks

19   identical to this, but for the values.

20             Q.      Okay.  So the values matter.  This

21   document, with these values, at this number, am I

22   correct this is not a J&J document; this document?

23             A.      I can't answer it better than I did.

24   This -- to the best of my recollection, I have seen

25   these -- this -- the column at the top, that's Stage

1    IV, Stage III with Recurrence, that and the age

2    groups, it's something I originally worked on with

3    Mr. Birchfield.  But we created a matrix just like

4    this.  This very well may be what we were using back

5    in 2020 that Mr. Conlan weighed in on.

6         Q.     So a Honda looks a lot like a Ford.

7    They both have four wheels, they have doors, they

8    have windows, they have an engine, they have

9    everything.  I want to know, is this document a J&J

10   -- not some variation.  I want to know if this

11   document, the one that they're complaining about so

12   bitterly -- you heard Mr. Haas -- I got it right

13   this time -- complain bitterly that that was a

14   privileged and confidential, super secret

15   information.

16              I want to know under oath, sir, is

17   that document, the one specifically right in front

18   of you, is that a J&J document?

19        A.     So, Mr. Pollock, I think what you

20   herd is that everything that Mr. Conlan learned

21   about the way we view a matrix like this for talc is

22   what's problematic that is being shared.  I can't

23   tell you for certain that this was our document.  I

24   know it's not our values.  But I -- what I would

25   suggest, and I guess we'll get to hear from them, is

1    I would ask Mr. Birchfield and Mr. Conlan how this

2    document came together, because it certainly has the

3    same categories as the ones that we were negotiating

4    back in 2020.

5         Q.    So let's talk about that.  During

6    Imerys and during LTL, didn't all the charts pretty

7    much have the same things:  How old are you, what

8    kind of condition do you got, and what are the

9    numbers we're starting to play with.  Right?  Isn't

10   every -- you've done, I don't know, Phen Fen,

11   vaginal mesh, I don't know what else you have done.

12   Doesn't every matrix look like the same thing?  You

13   look at age group, you look at what the exposure is,

14   you look at the risk factors, you look at, you know,

15   whether they can have children or not, and you

16   create a matrix.

17              They really -- I don't think it's

18   rocket science.  So I'm trying to figure out what is

19   unique about this chart that is so privileged to

20   J&J?

21         A.    Well, Mr. Pollock, first of all,

22   every tort is different.  And so I have never

23   settled a tort with a matrix that looks like this

24   before.

25         Q.    Okay.

1          A.         And I have settled over 30.  Okay?

2    So that -- that premise I can't agree with.

3                     What's concerning about this to me as

4    resolution counsel is that it was generated, if I

5    had to guess, from our document.  Or, if not, from

6    negotiations between Mr. Conlan and Mr. Birchfield

7    using a Birchfield document.  I guess we'll find out

8    when they testify.

9                     But the fact that our counsel who had

10   all of the information about the way we view this is

11   then proposing this back to us, now sitting on the

12   other side with our adversary, it certainly

13   concerned me, and I could understand why it

14   concerned J&J.

15        Q.         "Sitting on the other side with our

16   adversary."  This is Jim Conlan's document.  It is

17   Legacy's document.  Where does it say anywhere that

18   Andy Birchfield crafted this document?  Show me.

19   This is important to me, sir.

20        A.         I hear your testimony --

21        Q.         I want to know.  Show me where it

22   says that Andy Birchfield had some role in this.

23        A.         I hear your testimony that it's

24   Mr. Conlan's document.  I haven't heard that under

25   oath.  If Mr. Conlan created this, then he created

```
1     it from our -- from J&J's document.
2          Q.     No.  I'll be crystal clear and be
3     fair to you, Mr. Murdica.  This letter from Legacy
4     Solutions on November 9, 2023, signed by Mr. Conlan,
5     I guess it's a stamp signature on Plenary 66, is
6     Mr. Conlan's letter.  No doubt about it.  There's a
7     chart attached.  I have no idea who created it.  The
8     question is, do you?
9          A.     Well, I don't, but I'm surprised you
10    don't.  And I'm telling you, this contains J&J's
11    confidential thinking.  There's no question in my
12    mind.  And the fact that you don't know who created
13    it as the counsel tells me that you know where it
14    really came from, and it came from us.
15         Q.     Well, let me ask --
16         A.     Through the confidential relationship
17    with Mr. Conlan.
18         Q.     Let me ask you this:  With regard to
19    the confidential information, tell me everything in
20    here that is super secret confidential J&J
21    information.  Here it is, Plenary 67.  What exactly
22    in it is so secret?
23         A.     If you want me to go through the
24    whole thing, I can.
25         Q.     I want you to go through this
```

1    document on Plenary 67.  What -- you just said this

2    contains J&J's confidential information.  I didn't

3    think it was a J&J document, but if it is, I would

4    like to know what in it was J&J's confidential

5    information.

6              A.    Mr. Pollock, this exhibit, I guess at

7    this point only you probably know where it came

8    from.  But I can tell you that J&J had a version

9    that is very similar to this, that was shared with

10   Mr. Conlan, that was debated with Mr. Conlan, it was

11   part of our privileged, highly-confidential

12   strategic discussions about talc resolution.

13              The fact that for six months

14   plaintiffs were negotiating or talking to

15   Mr. Conlan, nobody disclosed it to us, it was

16   allegedly part of the talc mediation that I was in

17   charge of, that nobody ever told me or the mediators

18   about, and then it gets proposed to us.

19              Well, everybody knows because

20   Mr. Haas announced it at an investor meeting that we

21   were working on another plan, and this is contrary

22   to it by the objectors, is extremely concerning and

23   it doesn't take a rocket scientist to see the

24   problem with that.

25              Q.    So which number on here?  There's a

1    million dollars, 822,000, there's Death Stage IV,

2    Death Stage III.  Which column, which words are

3    J&J's?  Which did they create?

4         A.    I could tell you that if I went back

5    and looked at our matrix, but I believe the first

6    column of the age divisions, the under 45, all the

7    way down to 80-plus, and the different -- the top

8    column breaking the cancers down into different

9    stages, and I'm guessing the inter-relational values

10   between the numbers, in proportion.  Even though the

11   numbers are not the same, the number proportions may

12   be the same as our internal thinking on this.

13        Q.    Was the one million in the top

14   left-hand corner, was that a J&J number?

15        A.    What I'm telling you is, no, it

16   wasn't, but proportionally to the other numbers in

17   the other columns and the way they relate to each

18   other percentage-wise, it looks the same as what I

19   created back in 2020 when I was working with

20   Mr. Conlan and we were internally trying to figure

21   out the way we view this.

22              And if I went back to the chart, if I

23   went to my email now and I looked it up and I did

24   some math calculations, this may include our

25   proportions from our own sampling of plaintiffs'

1    claims and our own view of it, which, again, would

2    be extremely concerning.

3          Q.      Mr. Murdica, it may include a lot of

4    things.  I want to know for a fact what does it

5    include.  Under oath today, what information here --

6    you mentioned the first column, that it has J&J's

7    time groups -- age groups, correct?

8          A.      I can't answer the question any

9    better, Mr. Pollock.  I'm more concerned about this

10   now than I was when I came up here.

11         Q.      Wonderful.  I'm trying to --

12   Mr. Murdica, I really want to know one thing.  You

13   said it has J&J's confidential information.  I want

14   to know, for the last time, what precisely was

15   confidential J&J information.

16                 MR. BRODY:  Your Honor, this has been

17   asked and answered I think three times already now.

18                 MR. POLLOCK:  I haven't gotten an

19   answer yet, Judge.

20                 MR. BRODY:  Mr. Murdica has even

21   stated that he's answered the question as best he

22   can.

23                 THE COURT:  I heard an answer.

24                 Judge Singh?

25                 MR. POLLOCK:  Fair enough.  I'll move

1    on.

2                        Actually, Your Honor, I have no

3    further questions.  Thank you.

4                        THE COURT:  You're welcome.

5                        UNIDENTIFIED:  Mr. Birchfield, pardon

6    me.

7                        THE COURT:  Excuse me.  You're a

8    spectator, and it's your attorney.  I don't want

9    anymore interruptions.  You can have a seat.

10                        UNIDENTIFIED:  May I pass him a note,

11   Judge?

12                        THE COURT:  You can pass notes, and

13   you've passed several notes.  Thank you.

14                        Mr. Brody.

15                        MR. BRODY:  Thank you, Your Honor.

16                              -   -   -

17                        REDIRECT EXAMINATION

18   BY MR. BRODY:

19           Q.      So, Mr. Murdica, I just want to ask

20   you very few questions here on redirect.

21                        You were asked a number of questions

22   about what's in your binder at tab 4, if you can

23   turn to that.

24           A.      Yes.

25           Q.      Are you there?

```
 1              A.        Yes.

 2              Q.        And you were directed to the

 3   communications that predated October 18th, 2023.

 4                        Do you recall those questions?

 5              A.        I do.

 6              Q.        And you were asked, Well, at that

 7   time, at the time that these communications

 8   predating October 18th, 2023 were going back and

 9   forth, well, no one at J&J called the ethics

10   committee, was the question you were asked, right?

11              A.        Right.

12              Q.        At that point in time, prior to

13   October 18th, 2023, when these communications were

14   being made, did you know that Mr. Birchfield was

15   involved in Mr. Conlan proposal?

16              A.        I had no idea.

17              Q.        Do you know -- did anybody at J&J

18   ever tell you that they knew, at that point in time,

19   that Mr. Birchfield was involved?

20              A.        No.  And I heard Mr. Haas' testimony

21   that he had no idea.

22              Q.        All right.  And so, at that point in

23   time, would there have been any reason for J&J to be

24   concerned about Mr. Conlan sharing confidences with

25   Mr. Birchfield?
```

1          A.          There would be no reason to think

2     that that was happening.

3          Q.          If you turn to the first page of that

4     document.

5          A.          Yes.

6          Q.          You know, you were asked a series of

7     questions relatedly about the settlement matrix,

8     which is appended to what we have as Hearing

9     Exhibit 7, right?

10          A.          Right.

11          Q.          And if you look at the first page of

12     the email that's Exhibit 4, it says, "Andy

13     Birchfield, Doug Dachille, and I are prepared to

14     meet with you and your team in person  to share and

15     discuss the terms of such matrix as part of the

16     Legacy acquisition."

17                    And does that suggest to you that

18     this settlement matrix is something that had been

19     discussed with Mr. Birchfield?

20          A.          It does.

21          Q.          As to the settlement matrix,

22     itself -- excuse me, the water is not helping here.

23                    Turning to the settlement matrix,

24     itself, when you were working with Mr. Conlan, when

25     he was outside counsel for Johnson & Johnson, was he

1    involved in privileged and confidential discussions

2    of the types of talc claims that might be considered

3    as viable for settlement purposes?

4        A.    Mr. Conlan was involved in all of the

5    settlement discussions, including an evaluation of

6    Mr. Birchfield's proposal, which included all of

7    these things.

8        Q.    And was he involved in privileged and

9    confidential discussion of what the company viewed

10   as the correct, appropriate categories of claims for

11   purposes of settlement?

12       A.    Like I -- like I said, he was

13   involved in evaluation of every aspect of the plan.

14       Q.    And I don't want to limit it to a

15   negotiated settlement, but just the -- the

16   categories of claims that should be part of a

17   resolution, speaking more broadly, whatever that

18   resolution was of the talc claims?

19       A.    He would necessarily be, he had to

20   be, because it was part of dealing with the future

21   claims representative and evaluating the plan.

22       Q.    Was he involved in privileged and

23   confidential discussions of how the company thought

24   values in a settlement matrix like this should

25   translate into an overall resolution number?

1          A.          Yes.

2          Q.          And was he involved in privileged and

3   confidential discussions of what the company

4   believed the values of the different types of claims

5   that appear on a matrix like this should be for

6   purposes of settlement?

7          A.          The settlement matrix originally

8   proposed by Mr. Birchfield was part of the plan that

9   Mr. Conlan and I were negotiating, so all of it was

10  included in that.

11         Q.          And was he specifically involved in

12  privileged and confidential discussions of how -- of

13  what J&J believed different values should be for

14  purposes of a resolution of the talc claims?

15         A.          He was involved specifically in the

16  amount of claimants we expected in the present and

17  the future; and, hence, the way that translated into

18  the values in that grid.

19         Q.          And was that -- was that information

20  that you considered to be privileged and

21  confidential?

22         A.          Of course.

23         Q.          Would you ever share the information

24  that was discussed internally when talking about how

25  the company thought values should translate into the

```
 1    aggregate amount, values on a settlement matrix

 2    should translate into the aggregate amount of a

 3    resolution, the categories of claims that should be

 4    part of a resolution, what types of claims should be

 5    deemed as viable claims for purposes of a

 6    resolution, and the values of individual types of

 7    claims for purposes of a resolution, all of that

 8    privileged and confidential analysis, is that

 9    something that you would ever share with opposing

10    counsel?

11         A.    No.  All I would share with opposing

12    counsel on those fronts is something final that we

13    were willing to agree to that would be our proposal.

14    Not our internal deliberations and what we thought

15    about things, of course.

16              MR. BRODY:  Thank you, Mr. Murdica.

17    That's all I have.

18              THE COURT:  Mr. Pollock?

19              MR. POLLOCK:  On certain redirect,

20    Your Honor.

21                       -   -   -

22              RECROSS EXAMINATION

23    BY MR. POLLOCK:

24         Q.    You're resolution counsel for J&J,

25    right?
```

```
 1          A.      Yes, sir.

 2          Q.      And in that capacity, you had

 3    discussions that were confidential on settlement

 4    communications with Mr. Birchfield, right?

 5          A.      I did.

 6          Q.      And you would not disclose those

 7    confidential communications because you were going

 8    to honor the confidentiality provision, correct?

 9          A.      I was forced to disclose some of them

10    in the bankruptcy because of Mr. Birchfield and his

11    colleagues' own motions to force me to, and to

12    depose me.

13          Q.      Okay.

14          A.      But no, I -- up until then, I always

15    kept every settlement conversation confidential.

16          Q.      Excellent.

17                  So, and I don't know if you even know

18    about the other ones, so I'm going to let it go for

19    now.  I'm just going to stick with the general rule

20    that you would abide by the -- your word that you

21    would keep settlement communications confidential,

22    right?

23          A.      Yes, sir.

24          Q.      Excellent.

25                  If that's true, why is it not
```

1    possible for Mr. Conlan, who is in the business

2    capacity of trying to buy out liabilities to keep --

3    to partition himself and keep those things

4    confidential when he works for Legacy Liability

5    Solutions?

6          A.      Because when you learn client

7    confidences and then you go do something in the same

8    tort, on the same matter, you can't partition in

9    your mind everything that you learned.

10         Q.      But you did that with Andy.

11         A.      I didn't do that with Andy.

12         Q.      You learned -- you learned things

13   that were confidential regarding settlement

14   communications with him; and yet, you said, I'm

15   going to keep this confidential, I'm not going to

16   disclose it to anybody else.  You could do that,

17   right?

18         A.      I'm working on the side -- I'm still

19   in the same role I was always in, working on the

20   same side, in the same tort.  And unfortunately, as

21   I pointed out, Mr. Pollock, Mr. Birchfield forced me

22   to disclose confidential communications in this tort

23   by noticing my deposition and having me deposed by

24   eight different lawyers, twice.

25         Q.      With regard to the Exhibit 7, if we

```
 1    could go back to that for one moment, Plenary

 2    Hearing 67, and we're almost done with this one, I

 3    promise you.  Let me know when you're ready, sir.

 4    It's Exhibit 7, Plenary 67.

 5              A.      Okay.

 6              Q.      Tell me when you're ready.

 7              A.      I have it.

 8              Q.      Excellent.

 9                      So, it's your testimony that this is

10    not a document Mr. Conlan prepared, correct?

11                      MR. BRODY:  Objection, Your Honor.

12    That's outside the scope of my redirect.

13                      THE COURT:  Mr. Pollock?

14                      MR. POLLOCK:  Your Honor, discovery

15    questioning has been pretty broad all day.  I've got

16    three more questions, and I'm done.

17                      THE COURT:  I'll permit you to ask

18    that question.  It's not a different topic.  It's

19    certainly not a topic that was addressed by

20    Mr. Brody.

21                      Go ahead, Mr. Murdica.

22                      MR. POLLOCK:  You whacked me with the

23    rule book.

24    BY MR. POLLOCK:

25              Q.      But let me ask you this.  Is it fair
```

1    to say that you -- are you saying this is not a

2    document Mr. Conlan prepared?

3              A.      I am not saying that.  You originally

4    seemed to suggest that it was a document Mr. Conlan

5    prepared, then you said you don't know who prepared

6    it, and I'm suggesting that you should ask your

7    client who prepared it.  But, to me, it looks like a

8    J&J settlement matrix that I created in 2020,

9    internally.

10             Q.      Okay.  So it's a J&J document, not a

11   Mr. Conlan document?

12             A.      I can't tell you that for sure.  The

13   only way I could do it would be to take this and

14   compare it to what's in my email from the fall of

15   2020 and tell you.

16                     But, like I said, I'm more concerned

17   about this now than I was before you started asking

18   me about it, because now I have some real questions

19   about whether or not this was our document.

20             Q.      Fair enough.  Last question, and I'll

21   leave you be at this time.

22                     Are you -- oh, I'm sorry.  With

23   regard -- there was a grid.  Are you familiar with

24   the LTL 2 filing?

25             A.      The LTL 2 initial filing with the

1    support of the 60,000 claimants counsel.

2         Q.    Yes, sir.  And there was a grid

3    attached to that filing, and it looked a lot like

4    Plenary Exhibit 67, didn't it?

5         A.    I couldn't tell you.  Do you have it?

6         Q.    So, I don't have it in front of me.

7    But have you reviewed it, or not?

8         A.    I don't think so.  I'm not sure what

9    you're referring to, and I can't remember.  It was a

10   year ago.

11        Q.    Let me put it differently.  If

12   Plenary Exhibit 67 looks a lot like the grid that

13   was attached in the LTL 2 filings, which I represent

14   to you it does, any reason to believe this is a

15   super secret J&J filing that they just published it

16   on the bankruptcy court docket?

17        A.    Sir, unless you show it to me, I have

18   no idea what you're talking about.  I don't recall a

19   grid, and I can't compare it.  It's kind of like I

20   would like to be able to compare that exhibit now to

21   the grid we created internally to one Mr. Birchfield

22   sent me as a proposal.  There's a lot of things I'd

23   like to do with that now, and I have no idea what

24   you're talking about.

25        Q.    Fair enough, sir.  Last question and

 1    I will leave you be.

 2              Were you aware that it was the

 3    mediators in the LTL 2 -- the LTL matter that

 4    requested that Mr. Conlan participate?

 5         A.      Mr. Conlan never participated in a

 6    mediation, to my knowledge.  The first time I

 7    learned that Mr. Conlan was allegedly involved in a

 8    mediation was two weeks ago, when we found out that

 9    they've been having communications since of April

10    2023.  That was the first time.

11              The mediators never told me that he

12    was involved.  I have since contacted the mediators,

13    and my understanding is that they didn't know that

14    this was going on, but maybe I'm wrong on that.  I

15    certainly never knew, J&J never knew, and we never

16    saw Mr. Conlan at any mediation.

17         Q.      So you are -- you cannot answer the

18    question whether the mediators asked that Mr. Conlan

19    participate in trying to reach a resolution; is that

20    correct?

21         A.      I suggest you ask them.  I don't

22    know.

23              MR. BRODY:  Objection, Your Honor.

24    Mr. Murdica just answered that question.

25              THE COURT:  Mr. Pollock, one more

```
 1    time.

 2    BY MR. POLLOCK:

 3         Q.      Last question.  Am I correct that you

 4    cannot answer the question, sir, whether the

 5    mediators in LTL asked that Mr. Conlan participate

 6    in the mediation process?

 7         A.      That would be news to me.  I suggest

 8    you ask the mediators.

 9              MR. POLLOCK:  Fair enough, sir.

10              Your Honors, I  thank you very much.

11              Mr. Murdica, I'll get it right by the

12    end.

13              THE WITNESS:  You did.

14              MR. POLLOCK:  Thank you for your

15    patience and time.

16              THE WITNESS:  Thank you.

17              THE COURT:  Thank you, Mr. Pollock.

18    Thank you, Mr. Brody.

19              THE WITNESS:  Thank you, Your Honor.

20              THE COURT:  Mr. Murdica, you may step

21    down.

22              (Witness excused.)

23              THE COURT:  I'm going to ask counsel

24    to meet and confer and give us a few dates and share

25    those dates with us.  All right?
```

```
 1                    MR. BRODY:  Of course.

 2                    THE COURT:  And Judge Singh and I

 3     will collaborate together and we'll merge our

 4     calendars with what is available for counsel.

 5                    Everyone is excused.

 6                    (Hearing adjourned at 4:34 p.m.)

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                C E R T I F I C A T I O N

2

3          I, CONSTANCE E. PERKS, CCR, CRR, CRC, RSA, a

4    Certified Court Reporter and Notary Public in and

5    for the State of New Jersey, do hereby certify the

6    foregoing was prepared in full compliance with the

7    current Transcript Format for Judicial Proceedings,

8    and is a true and accurate transcript to the best of

9    my knowledge and ability.

10

11

12

13

14          _____

15          Constance E. Perks, CCR, CRR, CRC, RSA

16          Notary Public and Certified Court

17          Reporter of the State of New Jersey

18          NJ CCR License #30XI00142900

19

20          Date:  March 27, 2024

21

22

23

24

25