Page 1

1          SUPERIOR COURT OF NEW JERSEY
           LAW DIVISION - ATLANTIC COUNTY
2          Docket No. ATL-L-2648-15

3

    IN RE: TALC-BASED POWDER        : CIVIL ACTION
4   PRODUCTS LITIGATION             : CASE NO. 300

5

6                   -   -   -
           TRANSCRIPT OF PLENARY HEARING
7                 (VOLUME II)
                    -   -   -

8

9   PLACE:      ATLANTIC COUNTY CIVIL COURTHOUSE
                1201 BACHARACH BOULEVARD
10              ATLANTIC CITY, NEW JERSEY
11  DATE:       APRIL 10, 2024
12  BEFORE:     THE HONORABLE JOHN C. PORTO, P.J.Cv.
                THE HONORABLE RUKHSANAH L. SINGH
13              U.S. DISTRICT COURT MAGISTRATE

14

15

16

17

18

19

20                  -   -   -

21   Stenographically reported and transcribed by:

22        Constance E. Perks, CRR, CCR, CRC, RSA
             NJ CCR License #30XI00142900

23

24        GOLKOW LITIGATION SERVICES, LLC
          ph 877.370.3377  |  fax 917.591.5672

25              deps@golkow.com

```
                                              Page 2

 1                    A P P E A R A N C E S:

 2

     FOX ROTHSCHILD LLP
 3   BY: JEFFREY M. POLLOCK, ESQUIRE
         MICHAEL W. SABO, ESQUIRE
 4   Princeton Pike Corporate Center
     997 Lenox Drive
 5   Lawrenceville, New Jersey 08648
     609.896.3600
 6   jpollock@foxrothschild.com
     msabo@foxrothschild.com
 7   Representing Andy D. Birchfield, Jr., Beasley Allen

 8

     O'MELVENY & MYERS LLP
 9   BY:  STEVE BRODY, ESQUIRE
     1625 Eye Street, NW
10   Washington, DC 20006
     202.383.5300
11   sbrody@omm.com
     Representing Johnson & Johnson, LTL Management, LLC

12

13   ALSO PRESENT:

14   Erik Haas, Johnson & Johnson
     World Wide Vice President, Litigation

15

16

17

18

19

20

21

22

23

24

25
```

Page 3

- - -

EXAMINATION

- - -

| WITNESS:  JAMES F. CONLAN | PAGE |
|---|---|

Direct ................................  7

Cross ..................................  158

Redirect ...............................  209

Recross ................................  223

WITNESS:  ANDREW BIRCHFIELD

Direct .................................  226

- - -

E X H I B I T S

- - -

| NUMBER | DESCRIPTION | ID | EVD |
|---|---|---|---|
| D-3 | Depositions Upon Written Questions of Mediators | 6 | 181 |
| J&J 1 | Privilege Log | 248 | |

Page 4

1                    (Hearing commenced at 9:37 a.m.)

2                    THE COURT:  Thank you. Good morning.

3    Please be seated.  We have our LiveStream, and we'll

4    continue with our LiveStream.

5                    This is a continuation of the Johnson

6    & Johnson Talcum Powder Product Litigation, Master

7    Docket ATL-L-2648-15, Case Number 15.  This is a

8    continuation of our motions.

9                    Can we have the appearance of counsel

10   for Beasley Allen.

11                   MR. POLLOCK:  Good morning, Your

12   Honor -- Honors, I apologize.  Jeff Pollock and Mike

13   Sabo, my colleague, and my witness, or my client,

14   Andy Birchfield is here on behalf of Beasley Allen.

15                   THE COURT:  Thank you.  Good morning.

16                   Counsel for Johnson & Johnson.

17                   MR. BRODY:  Good morning, Your

18   Honors.  Steve Brody from O'Melveny & Myers for

19   Johnson & Johnson and LLT Management.

20                   THE COURT:  Thank you.

21                   MR. HAAS:  Good morning, Your Honors.

22   Erik Haas from Johnson & Johnson.

23                   THE COURT:  Good morning.

24                   I have dispensed with "plaintiff" and

25   "defendant" in this circumstance.

Page 5

1                    MR. POLLOCK:  Thank you.

2                    THE COURT:  All right.  So we had

3    Mr. Haas and Mr. Murdica testify previous.  Do we

4    have another witness on behalf of Johnson & Johnson?

5                    MR. BRODY:  So, Your Honor, at this

6    point, you know, we believe we have met the burden

7    through the testimony of Mr. Haas and Mr. Murdica to

8    show that disqualification is warranted under the

9    New Jersey Rules of Professional Conduct, including

10   Rules 1.6, 1.9 and 1.10, 5.3, 8.3, and 8.4.

11                   But I know that Your Honor indicated

12   in your order that you issued on January 30th that

13   you felt it was important to hear from both

14   Mr. Conlan and Mr. Birchfield, and because they are

15   both here, we are willing to call them to give each

16   side the opportunity to ask them questions and to

17   allow the Court to have the record that Your Honor

18   indicated you felt you needed to have in order to

19   decide the motion.

20                   THE COURT:  Thank you.

21                   MR. BRODY:  So, for that reason, we

22   will call Mr. Conlan first.

23                   THE COURT:  All right.

24                   Mr. Conlan?

25                   MR. POLLOCK:  Can we address, with

Page 6

```
 1    the Court's permission, one technical issue, which

 2    is we had a couple documents.  We had the -- Judge

 3    Singh had issued an order regarding the mediators

 4    issuing written questions to interrogatories, or

 5    whatever you want to call it.  And we also had, I

 6    believe, a submission on the KCIC privileged

 7    documents.

 8                 Do we want to simply mark those all

 9    for identification, or how would Your Honors like to

10    proceed?

11                 THE COURT:  Judge Singh?

12                 JUDGE SINGH:  We can mark them.

13                 THE COURT:  We can mark them for

14    identification purposes.

15                 MR. POLLOCK:  I'll just -- Mr. Brody?

16                 MR. BRODY:  D-3.

17                       -  -  -

18                 (Exhibit D-3, marked for

19    identification.)

20                       -  -  -

21                 MR. BRODY:  Thank you.

22                 I'm ready for Mr. Conlan.

23                 THE COURT:  Okay.  Mr. Conlan, please

24    come forward.

25                 Mr. Conlan, good morning.  Before you
```

Page 7

```
 1   are seated, please raise your right hand, state your

 2   name, and spell your last name.

 3                   THE WITNESS:  James F. Conlan,

 4   C-O-N-L-A-N.

 5                            -  -  -

 6                   JAMES F. CONLAN, having been duly

 7   sworn, was examined and testified as follows:

 8                   THE COURT:  Thank you.  You may be

 9   seated.

10                            -  -  -

11                      DIRECT EXAMINATION

12                            -  -  -

13   BY MR. BRODY:

14        Q.      Good morning, Mr. Conlan.

15        A.      Good morning.

16        Q.      I see you have a binder with you up

17   there.  Is that the binder with hearing exhibits?

18        A.      Yes.

19        Q.      You represented Johnson & Johnson in

20   its talc litigation when you were a partner at the

21   Faegre Drinker law firm, correct?

22        A.      Yes, bankruptcy related.

23        Q.      From July 2020 until early 2022,

24   correct?

25        A.      Correct.
```

Page 8

1          Q.        And at the time you started
2     representing Johnson & Johnson in the talc
3     litigation, the cases pending here in Atlantic City
4     and in the MDL in Trenton were active, correct?
5          A.        Yes.
6          Q.        That was about -- you started about,
7     I guess, a year and a half, not quite a year and a
8     half, before the LTL bankruptcy filing, right?
9          A.        Correct.
10          Q.        All right.  And I assume you agree,
11     because Mr. Pollock and counsel for Beasley Allen
12     has stated it, that you had privileged and
13     confidential discussions with Johnson & Johnson when
14     you were representing the company as outside
15     counsel, correct?
16               MR. POLLOCK:  Your Honor, objection;
17     leading.  He's a nonparty.
18               THE COURT:  You can rephrase.
19     Objection sustained.
20               MR. BRODY:  Your Honor, respectfully,
21     he is clearly adverse to Johnson & Johnson.
22               THE COURT:  Well, he has not
23     demonstrated that, Mr. Brody, so I will provide you
24     with that opportunity.  If the need arises, the
25     Court will not foreclose you from asking leading

                                                    Page 9

1    questions.

2              MR. BRODY:  Fair enough.  I think we

3    can get there, Your Honor.

4    BY MR. BRODY:

5         Q.     So, Mr. Conlan, I take it that -- let

6    me just ask you.  Do you -- do you disagree with

7    Mr. Pollock's statement, and I'm going to read it to

8    you, from a January 17th, 2024 hearing in this

9    courtroom:  "Did he have confidential discussions

10   with J&J?  The record appears crystal clear that he

11   did."

12             You would agree with that, right?

13        A.     Yes.

14        Q.     All right.  And I take it you

15   communicated regularly with J&J's inhouse counsel,

16   correct, while you were representing the company?

17        A.     I don't know what "regularly" means.

18   I can go through -- yeah, frequently.

19        Q.     All right.  Frequently.  Including

20   Mr. Haas, who is the worldwide head of litigation at

21   Johnson & Johnson, right?

22        A.     I did communicate with Mr. Haas.

23        Q.     With Joe Braunruether, who previously

24   led litigation worldwide for Johnson & Johnson?

25        A.     I did communicate with

Page 10

1    Mr. Braunruether.

2         Q.      With John Kim, who was the product

3    liability lead during the time that you were

4    representing the company as outside counsel?

5         A.      I did communicate with Mr. Kim.

6         Q.      With Andrew White, who has

7    responsibilities for managing the talc litigation,

8    correct?

9         A.      I did communicate with Mr. White.

10        Q.      As well as other outside counsel for

11   Johnson & Johnson, including Mr. Murdica?

12        A.      I did.

13        Q.      Attorneys at Weil Gotshal, including

14   Diane Sullivan and Ronit Berkovich?

15        A.      I did.

16        Q.      Attorneys at Orrick, including James

17   Stengel?

18        A.      I did.

19        Q.      You billed Johnson & Johnson for your

20   time, correct?

21        A.      I did.

22        Q.      And when you did work for Johnson &

23   Johnson, did you record your time accurately?

24        A.      I believe so.

25        Q.      I assume you accurately describe the

Page 11

 1  work that you did for the company?

 2       A.       I believe so.

 3       Q.       And I take it that you accurately

 4  recorded the amount of time that you spent billing

 5  them -- doing work with the company; fair?

 6       A.       I believe so.

 7       Q.       And you then provided your time

 8  entries to the Faegre Drinker law firm so that

 9  Faegre Drinker could bill Johnson & Johnson for the

10  time you spent on the talc matter, right?

11       A.       I believe so.

12       Q.       All right.  Fair to say you billed

13  more time to Johnson & Johnson for the talc matter

14  than you billed to any other client during the time

15  you were a partner at Faegre Drinker?

16       A.       Than any other one client, that would

17  be true.

18       Q.       All right.  So, we know you

19  represented Johnson & Johnson in the talc litigation

20  for a period of 20, 21 months, while you were at

21  Faegre Drinker.  We know that you communicated

22  regularly -- frequently, to use your word -- with

23  Mr. Haas, Mr. White, Mr. Braunruether, Mr. Kim, and

24  the other outside counsel.

25                I'm going to ask you some questions

Page 12

1   about what you were doing while you were outside

2   counsel for Johnson & Johnson, but I do want to

3   caution you, I'm going to be asking you questions

4   about whether you looked at, whether you evaluated

5   certain issues.  I'm not going to ask you to reveal

6   the substance of any recommendation that you made,

7   of any analysis you received, because those are

8   privileged.

9               You understand that, right?

10       A.     I do.

11       Q.     And you understand that that's the

12  company's privilege, correct?

13       A.     I understand.

14       Q.     All right.  And so, if I ask you --

15  and just so we're on the same page, I want to make

16  sure we're on the same page.  So I could ask you a

17  question like, Did you analyze different resolution

18  options available to Johnson & Johnson in the summer

19  of 2021?  I'm not looking for you to tell me what

20  you concluded or what somebody else said about a

21  particular option.  I'm just looking for yes or no,

22  did you do that, for that type of question.

23               Is that clear?

24       A.     I understand.

25               MR. POLLOCK:  Your Honor, I object to

Page 13

1   the entire line of questioning proposed.  Yuna gives

2   them the Hobson's choice; put up or shut up.  Show

3   me the documents so that we can inquire.  You got

4   billing sheets; show them to me.  You got time

5   entries; show them to me.  You've got actual memos;

6   show them to me.

7                    I know that we've had this discussion

8   before, but I have to raise it again, because now he

9   intentionally wants to go through a series of

10  discussions.  But I can't test the proposition, and,

11  respectfully, neither can you.

12                   THE COURT:  Unless we ask for in

13  camera review.  So, should the need arise,

14  Mr. Pollock, I'm going to overrule the objection,

15  but I understand the nature of the objection.

16                   To the extent there's some

17  substantive aspects that Mr. Conlan needs to review,

18  Mr. Brody, we'll hear them.  All right?

19                   MR. BRODY:  Yes, we will, and --

20                   THE COURT:  To answer, you know, yes

21  or no in that context, I understand the nature of

22  the question, but, you know, to have an adequate

23  ability to test the substance, we may need to see

24  some in camera review.

25                   So I will leave that avenue open for

Page 14

1    the Court.

2                    MR. BRODY:  Absolutely, Your Honor,

3    and we're prepared to proceed that way, if it

4    becomes necessary.

5                    I will just say, I mean, we didn't

6    hear it, but that sounded like another best evidence

7    rule, a 1002 objection.  And I think the law is

8    fairly clear that that's not a valid best evidence

9    rule objection.

10                    Testimony about events, even if there

11   are documents that may corroborate those events,

12   testimony is primary evidence, not secondary

13   evidence, and both New Jersey caselaw, as well as

14   commentaries on the New Jersey rule, which is

15   identical to the federal rule, confirm that.

16                    THE COURT:  I don't disagree with

17   you.

18                    Mr. Pollock?

19                    MR. POLLOCK:  Two very brief points

20   and I'll get out of your way.

21                    One, the record was closed and we

22   decided the record was closed, and I -- obviously,

23   it's your courtroom, Your Honors, you can do what

24   you see fit.  Obviously, I will object to reopening

25   the record because I prepared my case with a case

Page 15

1    that J&J filed.  I didn't want to have -- and we

2    talked and had this exact discussion remotely, not

3    in this courtroom, and you were in the other room,

4    but the discussion was, We'll be here until August

5    if we go through this back and forth.

6              So I just -- I don't want to waive my

7    objection, but you can tell me, Hey, I'm the Judge.

8    You can do what you want to do.  I understand that.

9              THE COURT:  That's quite all right.

10   That's okay.

11             MR. POLLOCK:  The second thing is --

12             THE COURT:  You need to protect your

13   record.

14             MR. POLLOCK:  The second point I

15   would raise is, I disagree strongly with my

16   colleague here.  I think the best evidence rule is

17   precisely at play.  I'm not talking about whether a

18   copy of the check is fake.  I'm not talking about

19   whether the contract is really the true and

20   authentic contract.

21             You're talking, is by his established

22   testimony, 1600 hours and plus and change, if you

23   were to ask him what did he do on March 31st,

24   September 1, what did you do in July, how the hell

25   do I ever test that?  I can't.  Without the

Page 16

1  document, I can't do it.

2            So I think the best evidence rule in

3  this case specifically and clearly applies.  With

4  that being said, you understand my objection.

5            THE COURT:  I do.  But let's hear the

6  -- you know, I didn't hear any questions yet.

7  Obviously, if Mr. Conlan understands the question

8  and can answer the question without a document,

9  we'll see.

10           So, but you may proceed, Mr. Brody.

11           MR. BRODY:  Right.

12           And if I may, I just feel the need

13  briefly to respond, because we've heard over and

14  over again, you know, Oh, the record is closed.

15  Well, we're actually -- we're in an evidentiary

16  hearing, and this hearing, as well as the testimony

17  that the Court received on March 25th, is an

18  important part of the record, and obviously it is

19  something the Court indicated it needed.

20           It's also the case that, subsequent

21  to the time that we argued the motion before Your

22  Honor, Judge Porto, on January 17th, and before

23  Judge Singh on February 7th, that we, through this

24  privilege log that has been marked as a hearing

25  exhibit and that Ms. Sharko submitted, Judge Porto,

Page 17

1    to you, and appears on the MDL docket, you know,

2    through that, we have discovered a significant

3    amount of additional information that could not have

4    been part of the record at that prior time.

5                    But I'm ready to proceed.

6                    THE COURT:  Please, yeah.

7    BY MR. BRODY:

8         Q.        So, let's start with some of the

9    things that may not be tied to, you know, something

10   like the Imerys bankruptcy, in particular, but more

11   broadly.  And then I want to focus in on some of the

12   other things you did when you were outside counsel

13   for Johnson & Johnson.

14                   So, you participated in with the J&J

15   litigation team analysis of litigation events and

16   their potential impact on global resolution of the

17   talc cases for J&J, didn't you?

18        A.        Yes, in context of the Imerys North

19   America bankruptcy case.

20        Q.        You looked at potential structures

21   for all-in settlements to achieve J&J's objectives,

22   correct?

23        A.        Yes.

24                   MR. POLLOCK:  Continuing objection to

25   leading, Your Honor.

Page 18

```
 1                    THE COURT:  Thank you.

 2                    MR. BRODY:  I'll just rephrase it.

 3                    THE COURT:  Okay.

 4   BY MR. BRODY:

 5        Q.    Were you privy to J&J's thinking on

 6   methods to justify expectations for the future

 7   incidence of ovarian cancer claims?

 8        A.    Can you repeat that, or explain it?

 9        Q.    Sure.  Let me ask it -- let me ask it

10   this way.

11               Were you privy to, did you have the

12   opportunity to discuss, analyze Johnson & Johnson's

13   thinking, views, including of the inhouse counsel

14   and the outhouse counsel team -- outside counsel

15   team -- methods to justify the teams' expectations

16   for future incidence of ovary cancer claims?

17                    MR. POLLOCK:  Objection; ambiguous,

18   Your Honor.

19                    THE COURT:  Well, did you understand

20   the question, Mr. Conlan?

21                    THE WITNESS:  Yes, but I -- this way.

22               The desire to cut off future claims

23   as opposed to current claims is the key to virtually

24   every mass tort bankruptcy for a co-defendant and

25   for the company in bankruptcy.
```

Page 19

```
 1                As for what percentage of claims,
 2    what the value of the futures were, all that, no.
 3    That's just not my area.  My area was methods to
 4    capture futures.  Currents are easy; futures, not so
 5    easy.
 6    BY MR. BRODY:
 7         Q.     And as part of the discussions that
 8    you engaged in, you were a party to consideration of
 9    whether J&J expected the incidence of future talc
10    claims to go up or go down, weren't you?
11                   MR. POLLOCK:  Objection; hearsay.
12                   THE COURT:  Mr. Brody?
13                   MR. BRODY:  I'm just asking if he
14    participated in discussions.  I'm not asking him for
15    the truth of any matters asserted.  In fact, I don't
16    want him to reveal matters asserted in those
17    discussions.
18                   THE COURT:  The objection is
19    overruled.
20                   MR. BRODY:  Thank you.
21                   THE WITNESS:  I don't recall being
22    party to discussions on whether futures would go up
23    or go down.
24    BY MR. BRODY:
25         Q.     And do you -- well, let me ask it
```

```
                                          Page 20
 1   this way:  Do you recall receiving communications
 2   containing analysis of that?
 3           A.      I don't recall that.
 4           Q.      Okay.  Let's see if we can refresh
 5   your recollection.
 6                   MR. BRODY:  And we're going to have
 7   to do this in camera, Your Honor.  We're already at
 8   that point.  I have copies for you.  Mr. Conlan can
 9   look at it, and I can ask him if it refreshes his
10   recollection.
11                   THE COURT:  And have a copy for
12   Mr. Pollock.
13                   MR. BRODY:  I can't give it to
14   Mr. Pollock if it's in camera, because we have a
15   privilege waiver issue here.
16                   MR. POLLOCK:  This is precisely the
17   problem that Yuna predicted, Your Honor.  Hobson --
18   she had a choice.  Second paragraph, Rivera-Soto is
19   saying it right below Hobson's choice.  Either put
20   up or shut up.  Put the documents in, or don't.
21   Because you -- that client refused to put in the
22   communications into the record.  And obviously, as
23   you both know, the crucible of cross-examination is
24   critical here.
25                   So I -- I'm not -- not only do not
```

Page 21

1  have the document, do not understand it, not only

2  forget the fact that the record is closed, now I'm

3  not going to be able to see it.

4                  THE COURT:  Why don't we, with the

5  objection, why don't we continue on with another

6  line of questioning, and Judge Singh and I will

7  address this during a break.  Okay?  Can you --

8                  MR. BRODY:  Sure.

9                  THE COURT:  -- bifurcate your line of

10 questioning, Mr. Brody?

11                 MR. BRODY:  Sure.  We can set that

12 question aside for now.  I don't know how far we're

13 going to get, but I can do that for now.

14                 THE COURT:  Okay.

15 BY MR. BRODY:

16     Q.     So you would agree that -- let me

17 just ask you this, since I want to stay away from

18 leading questions, if I can.

19                 Did you engage in privileged and

20 confidential analysis of future claimants

21 allocations and models that would be needed to

22 derive a settlement outcome for the talc claims for

23 Johnson & Johnson?

24     A.     Analysis?

25     Q.     Correct.

Page 22

1          A.      No.  Certainly, I was present when
2    other people who were in that area talked about it,
3    but that's just not my area.
4          Q.      Did you bill for it?  You may not
5    have done it.  Did you bill for it?
6          A.      Did I bill for the fact that I was
7    sitting there when it was discussed, someone else's
8    area?  I probably did.
9          Q.      So somebody else was analyzing
10   futures claimants allocations and models to derive
11   settlement outcomes for J&J in a privileged and
12   confidential setting, and you were sitting there?
13         A.      Yeah.  Imagine a bunch of people
14   sitting at computer screens.  It's COVID.  And
15   people are only talking when their area of expertise
16   is implicated, so.
17         Q.      And you're -- and you're there and
18   you're listening?
19         A.      Yes.
20         Q.      And --
21         A.      Trying to listen.
22         Q.      And you're taking it all in.  It's a
23   privileged and confidential setting.  You're not
24   inviting people in from the outside here, right?
25         A.      Correct, right.

Page 23

1          Q.      And you're billing for that time?

2          A.      Yes.

3          Q.      And your billing is accurate?

4          A.      I believe so.

5                  MR. BRODY:  So, we're at another one

6     of those situations, Your Honor, where -- I mean, if

7     -- if the Court can receive in camera the billing

8     records, we're now at a point on cross-examination

9     where those billing records are very relevant for

10    impeachment purposes, because we have a situation

11    where Mr. Conlan just testified that he didn't bill

12    for analysis.

13                 THE COURT:  But he was there, and he

14    was billing for his time.  I mean, I'm not --

15                 MR. BRODY:  Right.

16                 THE COURT:  Yeah, I can let

17    Mr. Conlan explain that, but that's -- that's the

18    nature of the profession; isn't it, Mr. Brody?

19                 MR. BRODY:  Well, if -- if I were

20    going to bill a client for time spent analyzing

21    models, I would have actually conducted the

22    analysis.  If I merely attended a call where people,

23    different people were discussing potential

24    resolutions of something, I would bill for, you

25    know, "Attend team meeting where resolutions are

Page 24

1  discussed."  I wouldn't bill as if I had done the

2  analysis.

3             THE COURT:  Unless your retainer

4  agreement said otherwise; am I right?  If your

5  retainer agreement provided for an aspect of

6  billing, and Mr. Conlan hypothetically billed in the

7  manner that the retainer agreement provided for,

8  doesn't that comport with our understanding of

9  billing for the clients?

10             MR. BRODY:  I -- I'm having trouble

11  envisioning a retainer that said you can bill for

12  analyzing things --

13             THE COURT:  I'm not saying --

14             MR. BRODY:  -- that you didn't

15  analyze.

16             THE COURT:  I'm not saying it

17  existed.  I'm not saying it existed or didn't.  But

18  wouldn't that play a part of the consideration here?

19             MR. BRODY:  I -- let me just ask this

20  is question.

21  BY MR. BRODY:

22        Q.    Mr. Conlan, did you feel that you

23  could bill Johnson & Johnson for analyzing things

24  that you didn't analyze?

25             MR. POLLOCK:  Your Honor, I have an

Page 25

1  objection, and I would ask for a two-minute break,

2  where I think I may have a solution to this problem,

3  but I need to confer with Mr. Birchfield for one

4  second, because, obviously, this is going to lead

5  to, What was the retainer agreement?  What were the

6  billing practices?  What were the billing protocols?

7  And now we're going to have more privilege

8  objections.

9            I think I may have a solution.  If

10  you'll give me two minutes, I think I can find a

11  solution to this.

12            THE COURT:  Okay.  But I'm going to

13  overrule the objection.  I'm going to hear

14  Mr. Conlan answer that question first.

15            MR. POLLOCK:  Okay.  Go ahead.

16            THE WITNESS:  Can you repeat the

17  question?

18            MR. BRODY:  Sure.

19  BY MR. BRODY:

20       Q.     The question was:  When you were

21  doing work for Johnson & Johnson, did you bill the

22  company for analyzing things that you didn't

23  analyze?

24       A.     I really don't know how to answer

25  that question.  If it was a four-hour conference

Page 26

1    call and there were ten different types of experts,

2    or three in various areas, I would sit there and

3    listen to see if anything that was relevant to my

4    expertise came up.

5              Q.    So, is that a yes, you would bill

6    Johnson & Johnson for analyzing futures claimants

7    allocations and models when you didn't do the

8    analysis?

9                   MR. POLLOCK:  Objection, Your Honor,

10   it's argumentative, when it's not supposed to be

11   leading, and asked and answered.

12                  When you get a second, I would like

13   to have a one-minute break just to talk to Andy real

14   briefly.

15                  THE COURT:  And maybe Judge Singh and

16   I not leave the room.  All right?  Can you do the

17   break without us leaving the --

18                  MR. POLLOCK:  Absolutely.  I just

19   need one minute in the hallway.

20                  THE COURT:  I'm going to overrule the

21   objection.

22                  Mr. Conlan, did you understand that

23   question posed by Mr. Brody?

24                  THE WITNESS:  Not really, to be frank

25   with you, because, again, they are lengthy calls,

Page 27

1   there are people who have subject matter expertise

2   in particular buckets, all of whom are listening for

3   issues that might be relevant to their subject

4   matter, listening to see if one of them comes up,

5   for example, that's bankruptcy relevant.  But the

6   entire call would be billed.

7   BY MR. BRODY:

8          Q.        So, my question was whether that's a

9   yes, you did at times bill Johnson & Johnson for

10  things like analyzing future claims allocations and

11  models to derive settlement outcomes when you did

12  not actually do that?

13                  MR. POLLOCK:  Objection, Your Honor,

14  argumentative.  He's asked and answered the question

15  twice now.

16                  THE COURT:  I'll overrule the

17  objection.

18                  Do you understand that question,

19  Mr. Conlan?

20                  THE WITNESS:  I billed for the entire

21  time of the call, even if only five minutes

22  implicated anything that was in my subject matter

23  expertise.

24                  THE COURT:  Okay.  Let's stop there.

25  We'll take our break.  Let's go off the record.

Page 28

1    Judge Singh and I will remain on the bench here.

2                    MR. POLLOCK:  Real briefly, Your

3    Honor.  Thank you.

4                    (Brief pause.)

5                    MR. POLLOCK:  Your Honor, I have a

6    proposal.

7                    THE COURT:  Did we go back on the

8    record?

9                    MR. POLLOCK:  I'm sorry.  I have a

10   proposal that might solve the dilemma we've got,

11   which is that we will stipulate, consistent with

12   Mr. Conlan's last three answers, basically; that,

13   yes, I billed for the phone calls, I did hear these

14   issues, I was there monitoring the discussions, I

15   billed my time.

16                    So that -- that solves, to some

17   degree, the need to get into infinite detail and

18   repeat each time, "Were you there?  Did you hear

19   this?"

20                    Where I maintain my objection is that

21   if there's going to be more specificity as to what,

22   exactly, did he do with it, I want to see the

23   timesheets.  I want to see exactly what he did.  I

24   have no doubt -- I will stipulate that he -- and I

25   haven't even seen these timesheets, so I'm

Page 29

1    stipulating to something I haven't even seen before.

2    I hope Fox's malpractice policy covers that one.

3                    But the reality is, I will stipulate

4    that he billed accurately, honestly, truthfully, and

5    that he heard whatever he heard, and that he did

6    whatever he did.  I don't think I can go any further

7    than that.

8                    THE COURT:  Mr. Brody?

9                    MR. BRODY:  So, a couple things, Your

10   Honor.

11                   First of all, the use of the

12   documents, for example, showing billing entries to

13   Mr. Conlan would be on impeachment purposes -- for

14   impeachment purposes or to refresh his recollection.

15   It's not as if they are being offered into evidence.

16                   But, you know, given the stipulation,

17   you know, I wonder if what we ought to do, if the

18   stipulation is that Mr. Conlan billed accurately,

19   that his billing records are correct, that they

20   accurately describe what he did, we should make

21   those a part of the record in conjunction with that

22   stipulation.

23                   It will have to be submitted in

24   camera, and it will only be the Court that is

25   reviewing those billing records.

Page 30

1                   But that seems to be, one, a

2      solution, that the Court receives them as evidence

3      and as part of the record in camera for purposes of

4      the disqualification motion.  It will also have the

5      benefit of shortening this cross-examination

6      considerably.

7                   THE COURT:  Without hearing -- and

8      just for our record, you know, my statements with

9      regard to retainer agreements, I'm not making

10     anybody's argument.  I'm just letting counsel know

11     that there are other parameters at play here,

12     possibly, with regard to billing.

13                  With regard to having the Court just

14     look at the documents, Mr. Brody, in camera, without

15     Mr. Pollock, the Court has trouble with that,

16     because there's no basis for any appropriate

17     objection.

18                  Candidly, I would like to have heard

19     about this prior to coming here today.  We could

20     have addressed it in maybe a manner where a

21     confidentiality agreement could have been entered,

22     considered, for counsel's or attorney's eyes only.

23     I want to make sure, in protecting our record,

24     subject to any appeal, which is likely, but we

25     don't -- you know, we don't decide cases based on

Page 31

1    appeals.  If they happen, they happen.  We make the

2    best record that we can.

3                    So, that's my thoughts, Mr. Brody and

4    Mr. Pollock, with regard to that.

5                    MR. BRODY:  And so I wonder, Your

6    Honor, just if -- if the stipulation that was

7    proposed that the billing records are accurate, that

8    they accurately describe what Mr. Conlan did, and

9    for how long he did it, as he's testified, that he

10   felt his billing records were accurate and the time

11   was accurate, if that, you know, solves the

12   question, it's -- it would be submitted by

13   stipulation.

14                   And it's obviously -- I mean,

15   frankly, we're getting into now one of the reasons

16   why New Jersey law recognizes a presumption of

17   shared confidences in this situation.

18                   THE COURT:  Got it, yeah.

19                   MR. BRODY:  Because you get into this

20   exact scenario, where, you know, I have material

21   that is privileged, but is, as you see right now,

22   important to the examination of a witness that the

23   Court has said it wants to hear from before deciding

24   a motion.

25                   THE COURT:  Well, we're here to

Page 32

1    determine whether J&J confidences were shared by

2    Mr. Conlan to Mr. Birchfield.  That's what our focus

3    here is.

4                    The fact that Mr. Conlan has

5    testified he had privileged and confidential

6    information, he billed, he billed for his time, his

7    bills, to the best of his recollection, were

8    accurate for his time, the Court accepts that

9    stipulation, and that's consistent with the

10   testimony here.

11                   I'm not making any credibility

12   argument at this point, but it's consistent with

13   what I'm hearing today.

14                   MR. BRODY:  Right.  And I just -- the

15   next question, though, is, you know, yes, he was

16   exposed to privileged and confidential information;

17   it's what kinds of privileged and confidential

18   information that ultimately becomes important, given

19   the arguments that we've heard from Beasley Allen

20   throughout, you know, the course of the Courts'

21   consideration of these motions.

22                   And so can I -- I know Mr. Conlan has

23   -- or Mr. Pollock, excuse me, hasn't responded to my

24   proposal.  But, given the stipulation that he has

25   proposed that this material is accurate, I would ask

Page 33

1   that the Court receive these, you know, frankly, as

2   evidence, in camera, and it's -- we're in a

3   situation here where in order to avoid any charge of

4   privilege waiver, I don't know that there's another

5   solution where we could hand these over to, you

6   know, Johnson & Johnson's -- one of Johnson &

7   Johnson's opponents, adversaries, counsel for

8   numerous plaintiffs in this litigation.

9                   THE COURT:  Mr. Pollock?

10                  MR. POLLOCK:  Two thoughts.  One,

11  Mr. Brody keeps rewriting what my stipulation was.

12  I stipulated that, as I said from the very first

13  time I met you, Your Honor, that I have no doubt

14  that Jim Conlan had access to confidential and

15  privileged --

16                  THE COURT:  He just testified to

17  that.  The fact that you acknowledge it, we heard

18  that in court today.

19                  MR. POLLOCK:  Right.  So that's my

20  story and I'm sticking with it.

21                  Two, the fact is that I also said

22  that the -- Mr. Conlan was quite clear each time

23  Mr. Brody questioned him, Did you have access to the

24  formula for Coca-Cola, did you have access, you

25  know, to the formula for whatever.  His answer was,

Page 34

1    Yeah, but remember, my role is here, it ain't this

2    whole thing.  I'm listening, I've got my antenna up,

3    I'm listening for the piece that relates to me.  I

4    have no doubt that that was discussed.  He's been

5    very clear.

6                    And so the fact -- and what Mr. Brody

7    keeps on saying is that the timesheets are what

8    you're going to focus on.  So I would beg you, if

9    you're going to do this, which obviously I have no

10   problem with, that you remember that Mr. Conlan has

11   stuck with the same story three times consistently.

12                    Lastly, I would point out that Yuna

13   O Builders 109 is right on point at page 129.  I'm

14   sure you both read it.  But, in that, they faced

15   precisely this problem.  And the question was, If

16   defendant's submissions vaguely claimed only

17   information concerning pending and business-related

18   matters.

19                    So let's assume we get more specific.

20   It's super secret discussions regarding how Mr. Haas

21   has a brilliant theory for how I'm going to, you

22   know, terminate all the plaintiffs' claims.

23   Whatever it is, right?  One, the crucible of

24   cross-examination fails.  That's what these --

25   that's what Justice Rivera-Soto writing for the

Page 35

1    Court was addressing, is that you've got to put up,

2    my language, put up or shut up.  You either put it

3    out there, or you don't.

4              So, providing it to you in court, and

5    you're both intelligent readers, doesn't really

6    solve my problem.  I've got to represent Beasley

7    Allen and Andy Birchfield, who committed years and

8    years to this case.  So I would respectfully submit

9    that's not what the Supreme Court expects.  It's not

10   what they accept.

11             And I have already given the essence

12   of what he really -- Mr. Brody really wants.  Yes, I

13   did it on the first day.  Jim Conlan knew -- he

14   listened to all kinds of confidential stuff.  I

15   don't doubt it at all.  The question is, Did he

16   share it?  And when it comes to the "did he share

17   it" part, I'm going to be very laser focused because

18   it has to be significantly harmful.  Trupos, "it has

19   to be significantly harmful."

20             So it's not enough to jump around and

21   wave and say there were confidential discussions, we

22   were talking about the formula for Coca-Cola, we

23   have all this other stuff.  You have to show me the

24   goods.  What, exactly, is it that Jim Conlan learned

25   in these discussions that was disclosed, and that

Page 36

1    issue we're not addressing.

2              So I really think we're in a sideshow

3    over here regarding did he have confidential

4    information.  He's conceded it, I've conceded it.

5    The only one fighting it, apparently, is J&J.

6              THE COURT:  Thank you, Mr. Pollock.

7              Mr. Brody, why don't we really -- I

8    understand you have your case.  Why don't we cut to

9    the chase and focus topically.  Reserve, you know,

10   put aside the in camera issues.  Why don't you focus

11   topically on what exactly J&J believes that

12   Mr. Conlan knew and then ultimately shared with

13   Mr. Birchfield.

14             MR. BRODY:  Fair enough, Your Honor.

15   Let me frame questions that way, see where we get.

16   Reserving, of course --

17             THE COURT:  Absolutely.

18             MR. BRODY:  -- the right to, you

19   know, come back to this issue of the billing

20   records, as well as -- as may be relevant.  I mean,

21   there are certainly -- and this is just a

22   snapshot -- an extraordinary number of privileged

23   and confidential communications that speak to the

24   scope of the work that Mr. Conlan did as outside

25   counsel for J&J.

Page 37

1              But I will --

2              THE COURT:  Why don't you paint that

3  picture for us.

4              MR. BRODY:  Certainly.

5  BY MR. BRODY:

6      Q.     You learned, Mr. Conlan, as outside

7  counsel for the company how Johnson & Johnson

8  evaluated the viability of the claims under

9  different legal regimes, didn't you?

10     A.     Could you explain what you mean,

11  "under different legal regimes"?

12     Q.     Sure.  You learned how J&J analyzed

13  whether the validity of claims associated with a

14  latent tort in terms of things like limitations,

15  ability to accurately plead that kind of claim might

16  differ from jurisdiction to jurisdiction, thereby

17  impacting the evaluation of the number of viable

18  future claims that would be associated with this

19  particular mass tort?

20     A.     I don't recall that.  What I recall,

21  to help answer that question, is that J&J thought

22  all of the claims were unfounded in science and

23  fact.  And the only distinctions I ever heard was

24  there's a diagnosis from the --

25     Q.     I don't -- I don't want you to -- I

Page 38

1    don't want you to say what you heard.

2            A.      Okay.

3            Q.      I -- I'm -- and again, you know,

4    we're in a situation where it's the company's

5    privilege.  The company has not waived that

6    privilege.

7                    MR. POLLOCK:  Your Honor, objection.

8    You can't take the part of the answer you want and

9    not the part of the answer you don't want.

10                    THE COURT:  I don't disagree.

11                    MR. BRODY:  The -- he was proceeding

12   to answer a different question.  The question was --

13                    THE COURT:  Well, I don't -- I don't

14   necessarily know that, because you asked from

15   jurisdiction to jurisdiction and different legal

16   regimes.  And I think Mr. Conlan -- I'm not making

17   any argument, but what I understood the testimony

18   was, was going in a direction of how those

19   jurisdictional issues impacted his work.

20                    MR. BRODY:  He had gone already, Your

21   Honor, in a different direction at that point.

22                    THE COURT:  Okay.

23                    MR. BRODY:  As to shifting from where

24   my limitations are with a client, how might that

25   differ from jurisdiction to jurisdiction, how that

Page 39

1    might impact the incidence of future claims to, you

2    know, what was J&J's view the science and what is

3    J&J's view of the science underlying the talc claim,

4    which is a completely different question.

5                    THE COURT:  Okay.  Well --

6                    MR. POLLOCK:  I respectfully don't

7    know what he was going to say because I didn't get

8    to hear him.  And Mr. Haas gave incredibly long

9    allocutions of like a page-and-a-half answers, and

10   now we're going to cut Mr. Conlan down to the three

11   lines, and when Mr. Brody doesn't like it, he's

12   going to cut him off.  I will have a standing

13   objection on this point.

14                   THE COURT:  Well, I'm going to make

15   sure.  I'm going to ask the witness, as I did

16   before, you know, I permitted the long answers to go

17   because it was in context.  So I want to make sure

18   that Mr. Conlan has the ability.

19                   If the question addresses an issue

20   that, perhaps, goes into the attorney-client

21   privilege, Mr. Brody, counsel needs to be careful.

22   But I want to permit the witness to be able to

23   answer the question so that we can resolve this

24   issue.

25                   MR. BRODY:  Certainly, Your Honor.

Page 40

1    And this was a case where I think the question was

2    focused, the answer was not, which is why I needed

3    to stop Mr. Conlan, and to do so based on the

4    privilege objection.

5                        THE COURT:  Okay.

6    BY MR. BRODY:

7           Q.       So, you engaged during the time that

8    you were representing Johnson & Johnson, Mr. Conlan,

9    in discussions concerning legal arguments -- and

10   this is a yes or no -- that might be advanced on

11   claim validity, right?

12                       MR. POLLOCK:  Objection.  Mr. Conlan,

13   if you can answer it yes or no, you can answer it

14   that way, but it's the Court's purview, not

15   Mr. Brody's, to direct you how to answer.

16                       THE WITNESS:  No, not that I recall.

17   May I expand?

18                       THE COURT:  Let's hear that,

19   Mr. Conlan.

20                       THE WITNESS:  Okay.  I'm not a

21   products liability lawyer.  I'm not a personal

22   injury lawyer.  I've never brought a case.  I've

23   never defended a case.  It's not my area.  I'm a --

24   I was a restructuring lawyer.  And so, if others

25   were talking about that, it was lost on me.  It was

Page 41

1    solely -- my role is how to use proceedings to

2    capture not just currents, but futures.

3                    But I will say, in these all-hands

4    meetings, a significant number of what -- the items

5    that were being discussed were just not in my area.

6    And, frankly, the items I would discuss were not in

7    the area of lots of other people on those calls.

8    BY MR. BRODY:

9        Q.       So your testimony is that you were

10   exposed to all this privileged and confidential

11   information; you just didn't understand it?

12                   MR. POLLOCK:  Objection.

13                   THE WITNESS:  On some of it, that

14   would be true.

15   BY MR. BRODY:

16       Q.       And if somebody was talking about --

17                   THE COURT:  I'll overrule the

18   objection.

19   BY MR. BRODY:

20       Q.       And if somebody was going to -- was

21   talking about how do we determine whether a certain

22   portion of the future claims that are being

23   predicted as part of this model, this settlement

24   model, you know, how is -- how is the law in

25   different jurisdictions going to impact the validity

Page 42

1    of the future claims, you just didn't understand

2    that, but you were on the calls?

3           A.      Yeah.  I certainly don't recall that.

4           Q.      All right.

5                   MR. BRODY:  This is another -- I'll

6    move forward, Your Honor, but I'm going to mark this

7    point, as well, because this is another area where I

8    believe we should be able to, without waiving

9    privilege showing the document merely to Mr. Conlan,

10   use a privileged document to refresh his

11   recollection as to the yes or no portion of this

12   question.

13                  But I'll move forward, given the

14   Courts' preference that we see where we can get to

15   and come back to this.

16                  THE COURT:  Also, keep in mind, if

17   the Court receives material in camera, it's

18   generally reviewed and a determination is made

19   whether it remains in camera or it should be

20   distributed.

21                  So, you know, keep in mind,

22   Mr. Brody, that that's also an option.  And I'm not

23   saying that happens, will happen, but that's, you

24   know, a consideration when the Court receives in

25   camera material.

Page 43

1              MR. POLLOCK:  And if it does refresh

2    the witness' recollection, the standard practice is,

3    at that point, now that document is admitted into

4    evidence.  You have now -- you have used a document

5    to refresh their recollection.  I've never heard of

6    a Court saying, I've refreshed your recollection,

7    but I'm still going to keep it in the super secret

8    box, because it's now a part of the record.

9              So I think the whole argument is

10   self-defeating.

11             MR. BRODY:  I don't -- I don't think

12   that's -- I don't think that's an objection,

13   frankly.

14             THE COURT:  You may continue,

15   Mr. Brody.

16             MR. BRODY:  All right.  Thank you.

17   BY MR. BRODY:

18        Q.     Why don't we -- why don't we talk

19   about it, since you brought it up, Mr. Conlan, why

20   don't we talk about the Imerys bankruptcy.  Okay?

21        A.     Okay.

22        Q.     As a starting point, you would agree

23   that the ovarian cancer claims against Johnson &

24   Johnson arise out of the same nucleus of operative

25   facts as the ovarian claims against the Imerys

Page 44

1   debtors, correct?

2          A.       Some of them.   There were claims

3   against the Imerys debtors that related to other

4   products that were not manufactured by Johnson &

5   Johnson, like Colgate-Palmolive.

6          Q.       So, the answer -- but the answer to

7   my question was -- and my question, Mr. Conlan, was

8   focused on the ovarian cancer claims, and so --

9   against Johnson & Johnson.   And the ovarian cancer

10  claims against Johnson & Johnson arise out of the

11  same nucleus of operative facts as the claims

12  against the Imerys debtors related to -- from people

13  who used Johnson & Johnson products; fair?

14         A.       With that clarification, yes.

15         Q.       All right.   And thank you.   I

16  understand the distinction you were making, and I'm

17  glad we could get on the same page with that one.

18                  At the time, let's say, in connection

19  with that, sticking with Imerys, you were privy to

20  privileged and confidential analysis of factors

21  impacting the potential for a channeling injunction

22  through the Imerys bankruptcy, correct?

23                  MR. POLLOCK:   Can I have a standing

24  objection, Judge, because I don't want to interrupt

25  the flow.

Page 45

1                 THE COURT:  That's fine.

2                 MR. POLLOCK:  Thank you.

3                 THE WITNESS:  I don't know what you

4    mean by factors affecting the channeling injunction.

5    BY MR. BRODY:

6         Q.      You were on multiple teams, meetings,

7    calls with the Weil Gotshal team, correct?

8         A.      Correct.

9         Q.      And the Weil Gotshal team analyzed

10   the potential for J&J to secure a channeling

11   injunction through the Imerys bankruptcy for the

12   talc claims, correct?

13        A.      May I expand just to make sure I'm

14   answering accurately?

15        Q.      You may.  And any time I ask you a

16   question, if you need a clarification or you have

17   questions, just let me know.

18        A.      Sure.  During the course of the

19   Imerys North America bankruptcy, J&J -- this is

20   public -- J&J attempted what's called a bolt-on,

21   meaning to bolt on a J&J reorganization plan to the

22   Imerys plan, in an effort to utilize the Imerys

23   bankruptcy to resolve the claims against it.

24   Importantly, not just current, but futures.  And so,

25   in that context, Mr. Brody, yes, the bolt-on effort.

Page 46

1          Q.      Right.  And you participated in

2     numerous calls with both the inhouse and the outside

3     counsel teams devoted to that subject, correct?

4          A.      Yes, and even lawyers for the tort

5     claimants committee who were part of the bolt-on

6     effort.

7          Q.      And you, in connection with that,

8     received detailed analysis that had been prepared by

9     the Weil Gotshal team, correct?

10         A.      I probably did.

11         Q.      And that detailed analysis was

12    privileged and confidential analysis that was

13    prepared for discussion with the Johnson & Johnson

14    legal team, correct?

15         A.      I would assume, but I don't recall.

16         Q.      Without revealing the substance, and

17    I'm going to ask if you do recall this, some of the

18    issues that were discussed were the potential for a

19    channeling injunction to include not just ovarian

20    claims, but mesothelioma claims, correct?

21         A.      Yes.  That's what the bolt-on plan

22    publicly said.

23         Q.      And -- but internally you were part

24    of discussions of "What's our strategy for getting

25    there?  How do we achieve that?"  Right?

Page 47

1              MR. POLLOCK:  Objection.

2              THE COURT:  The nature of your

3    objection, Mr. Pollock?

4              MR. POLLOCK:  Again, he's asking

5    about what J&J discussed with him.  I've got no

6    documents to back it up, other than the plan, so I

7    don't know how I would test this proposition.  He's

8    got billing records, timesheets, memos, documents,

9    communications, Weil Gotshal documents, all kinds of

10   stuff.  I ain't seen none of it.  It's not here.

11             And they've had the opportunity.

12   Both have asked him, Is the record closed?  He said

13   yes.  So now I'm suddenly being asked, were these

14   things generally discussed.  I don't want to beat a

15   dead horse, but it concerns me deeply because that's

16   not what Yuna is contemplating.

17             THE COURT:  Well, we're testing

18   Mr. Conlan's memory with regard to what was

19   discussed.  So I'm going to overrule the objection.

20             Do you need the question rephrased or

21   repeated?

22             THE WITNESS:  I would appreciate

23   that, yes.

24             MR. BRODY:  Sure.  Let me just ask it

25   again.

Page 48

1    BY MR. BRODY:

2          Q.      You were involved in discussions of

3    strategies to achieve the objective of a bolt-on

4    settlement in the Imerys bankruptcy?

5          A.      Yes.

6          Q.      You were involved in discussion of

7    the impact of settlement matrices on the potential

8    for plaintiffs' attorneys' support for a bolt-on

9    settlement in the Imerys bankruptcy, weren't you?

10         A.      Can you expand on that, or explain

11   it?

12         Q.      Sure.  You -- let me just ask you

13   this:  You were involved in the discussion of

14   settlement matrices as a part of an Imerys bolt-on

15   resolution?

16         A.      Not the numbers.  I didn't get into

17   the numbers, for example.  I don't even know if this

18   is the right word, but the cells that are on a

19   matrix, what each of them means, no.  It's not my

20   area.  But what a bankruptcy court could do in a

21   bolt-on was something where I did have expertise.

22         Q.      And you were involved in meetings,

23   discussions, back and forth of -- that included, and

24   maybe, you know, it wasn't your area, so you weren't

25   the one speaking up, but discussions of where do we

Page 49

1   -- where do we value these; how do we value these;

2   and how do we get this to the point where it's going

3   to drive this to a total number that's going to be

4   okay not just for us, but potentially to gain the

5   support of the plaintiffs' attorneys that we need

6   support from.

7           A.      I don't recall that.  I do recall the

8   ultimate number that was ascribed in the public

9   pleadings of the bolt-on plan.

10              MR. BRODY:  We're going to have to --

11  I'm circling it, Your Honor.  We're going to have to

12  put a pin in that one, too.

13              THE COURT:  Okay.

14              MR. BRODY:  Again, for impeachment or

15  refreshing recollection purposes.

16              THE COURT:  Okay.

17  BY MR. BRODY:

18          Q.      You were involved in discussions of

19  how a matrix would have to value claims in order to

20  achieve participation sufficient for J&J to meet its

21  resolution objectives?

22          A.      No.  Everybody in my industry at that

23  time would have known that you need 75 percent-plus

24  votes in favor of the plan by current claimants.

25          Q.      I think the question, Mr. Conlan, was

Page 50

1   a little different than that.

2          A.      Okay.

3          Q.      My question was:  You were involved

4   in discussions of how a matrix would have to value

5   claims, what the claim values would have to be in

6   order to achieve that 75 percent?

7          A.      That was Mr. Murdica's area, and I

8   just deferred to what he said would have to occur in

9   order for the plan to garner 75 percent-plus of yes

10  vote from the current claimants.

11         Q.      And you and Mr. Murdica discussed

12  that, didn't you?  You have deferred to him.  You

13  had those conversations with him, didn't you?

14         A.      I don't recall having discussions

15  with Mr. Murdica as to how much money has to go for

16  particular type of claims to garner a 75 percent-

17  plus vote for current claimants in favor of a plan.

18  I knew.  That's my area.  75 percent-plus required

19  approval.  But it's not 75-percent-plus by cell.

20  It's 75 percent-plus of all current claimants have

21  to vote for the plan in order for the Court to

22  approve it.

23         Q.      And so the answer to my question is,

24  no, sitting here today, you don't recall talking

25  with Mr. Murdica about strategies to achieve that?

```
                                           Page 51
```

1            MR. POLLOCK:  Objection; asked and

2    answered.  Also, it was rephrased --

3            THE COURT:  Well, he said he deferred

4    to him, so I'm going to overrule the objection.  He

5    deferred to Mr. Murdica.

6            So specifically, then, Mr. Conlan.

7            THE WITNESS:  Discussing

8    Mr. Murdica's strategy to get the claimants to vote

9    yes, I wouldn't call it a discussion.  Mr. Murdica

10   thought he could achieve it.

11   BY MR. BRODY:

12       Q.      And so he just said, Hey, Jim Conlan,

13   here's my strategy for achieving this; and you said,

14   Okay, Jim, that sounds like an okay strategy to me?

15       A.      Yeah, it will come down to the vote.

16       Q.      All right.  So he -- he said, Here's

17   my strategy, and you said, All right, that's --

18   thank you for sharing your thinking with me on this.

19   I now know your strategy, Mr. Murdica.

20       A.      I don't think I used those words.

21       Q.      In sum and substance?

22       A.      In sum and substance, Mr. Murdica

23   negotiated, as I understood it, a matrix with the

24   tort claimants committee, or some members of the

25   tort claimants committee that they collectively

Page 52

1    thought would achieve a 75 percent yes vote by

2    current claimants, and my response to that was,

3    Okay.

4        Q.        And you said you talked to him about

5    the progress of those negotiations, correct?

6        A.        Only in the most generic terms.

7    Like, I'm working on this plaintiffs' lawyer.  Okay.

8    This plaintiffs' lawyer's votes are important.

9    Okay.  But no, not the type of claim, or the value

10   of claims, or that level of detail.  It just wasn't

11   my area.

12       Q.        So you understood, then, which

13   plaintiffs' lawyers Mr. Murdica felt were important?

14       A.        Yes.

15       Q.        And he discussed with you his

16   progress with the plaintiffs' lawyers that he felt

17   were important, didn't he?

18       A.        Sometimes.

19       Q.        And --

20       A.        I would describe it more as just name

21   dropping to describe how the discussions that he was

22   having were going.

23       Q.        You also addressed the importance of

24   coming up with a settlement matrix that was going to

25   be sufficient to, and the factors that would go into

Page 53

1    that, without disclosing any of them.  You discussed

2    that with the Weil Gotshal team, as well, didn't

3    you, on these meetings that you would have with the

4    -- with the J&J team?

5            A.       The importance of coming up with a

6    settlement that would achieve a 75 percent-plus yes

7    vote, I don't even know that we would need to

8    discuss that.  In the world of bankruptcy, that's

9    just an obvious pillar.

10           Q.       That wasn't my question.

11           A.       Okay.

12           Q.       My question was whether -- was that

13   you also had discussions with the Weil Gotshal team

14   about how a deal would have to be structured in

15   order to try to get that 75 percent participation,

16   right?

17           A.       Sorry, I don't know what you mean by

18   how it would have to be structured.

19           Q.       Could there be -- for example, you

20   engaged in discussions, including, and without

21   revealing whether anybody thought this was a good

22   idea or a bad idea, the advantages or disadvantages

23   to Johnson & Johnson of an estimation process, as

24   part of an Imerys resolution, didn't you?

25           A.       Not in context, if we're talking

Page 54

1    about the $4.2 billion bolt-on settlement.  If

2    you're talking about separate and apart from that...

3         Q.      Let me just -- let me ask it

4    open-ended.  Did you ever have those discussions

5    with the Weil Gotshal team?

6         A.      Which discussions?  About estimation?

7         Q.      About the advantages or disadvantages

8    to Johnson & Johnson of an estimation process as

9    part of a resolution of its talc liabilities.

10        A.      We did discuss what if Imerys, not

11   with our participation, but sought an estimation of

12   the claims against itself, what implication that

13   would have for Johnson & Johnson.

14        Q.      All right.  And so -- and those were

15   privileged and confidential discussions that you had

16   with the Weil Gotshal team and the inhouse team at

17   Johnson & Johnson, correct?

18        A.      Yes.

19        Q.      You discussed with them the -- and

20   again, without revealing which way you came down on

21   it, or the substance of it -- the advantages and

22   disadvantages of an opt-in settlement matrix,

23   correct?

24        A.      Yes.

25        Q.      You analyzed the opt-out component;

Page 55

1    fair?

2         A.      What do you mean "analyze"?  I

3    apologize.  What do you mean analyze the opt-out

4    component?

5         Q.      You billed for analyzing the opt-out

6    component of a potential resolution?

7         A.      May I expand to respond to that?

8         Q.      I don't want you to reveal privileged

9    information.  I don't want to say -- you can say --

10   you can tell me what you did, but I don't want you

11   to say, Here are the factors that were important to

12   J&J, here's what I recommended.

13        A.      Can I, in so doing, describe what is

14   a basic restructuring concept?

15                THE COURT:  Basic.

16                THE WITNESS:  Basic.

17                THE COURT:  Sure.

18                THE WITNESS:  Yeah.  You need 75

19   percent approval of current claimants.  If all

20   current claimants have the ability to opt out, the

21   argument would be you didn't meet the 75 percent.

22   You basically gave them an opportunity to say yes,

23   or I'm going back to the tort system.  And as

24   Mr. Murdica testified on the 25th, one of the

25   questions was, Could we do that and just bind the

Page 56

```
 1   futures.  And so, from a restructuring lawyer
 2   standpoint, that comes from the restructuring world,
 3   the law of the restructuring world.  It's not J&J
 4   confidential information.
 5              MR. POLLOCK:  Your Honor, may I be
 6   heard for a second?  If Mr. Brody is going to go
 7   through timesheet after timesheet without date,
 8   without time, without reference, obviously, I have
 9   my standing objection.  But I also would like to get
10   us back to what are we talking about here.  What,
11   specifically, is the issue that Jim Conlan learned
12   that he then purportedly conveyed to Andy
13   Birchfield.
14              Because I have already stipulated
15   that Jim Conlan did a lot of stuff, he's a smart
16   guy, and he billed for it.  Okay.  Agreed.  I'm
17   stipulating to timesheets I haven't even seen.  I've
18   done that.  Don't tell my partners.  But, on this
19   one, what I am concerned about is, what exactly is
20   the nexus between what Jim Conlan knew, because
21   that's what we're here for, right, and what he
22   conveyed to Andy Birchfield/Beasley Allen.
23              And I would like, respectfully, to be
24   focused on that issue.  Otherwise, we'll be here all
25   day with timesheets I haven't seen.
```

Page 57

1                    THE COURT:  Mr. Brody, any thoughts?

2    I know what you're doing.  I think Judge Singh and I

3    both know what you're doing.  You're saying, you did

4    this, this, this, and this.  I got it.  And then he

5    did something else with it, with someone else,

6    perhaps.  All right?

7                    How much more time do you need with

8    regard to this, because I think the testimony is

9    clear - again, not making any credibility findings -

10   this privileged information had to do with

11   bankruptcy, had to do with restructuring, had to do

12   with J&J, had to do with Imerys.  When are we going

13   to get the segue, the bridge, so to speak, with

14   regard to whatever else happened with that

15   information?

16                    MR. BRODY:  We're going to get to the

17   bridge in about 20 minutes, I hope.

18                    THE COURT:  Okay.  All right.

19                    MR. BRODY:  But, Your Honor, I do

20   think -- I do think these things are important, and

21   it's important to -- I mean, it's 1600 hours of work

22   for which Mr. Conlan billed $2.24 million, and --

23   but it's important to establish the scope of that

24   work, the breadth of that work, which was every

25   single aspect of this, of the talc litigation, of

Page 58

1    resolution strategies.  It's every single aspect of

2    it that he was exposed to during that time frame.

3                    THE COURT:  Okay.  I'm hearing it.

4    We both hear it, Judge Singh and I.  And I know what

5    you're doing.  Just keep an eye on, you know,

6    whatever you want the Court to review, if you raise

7    it again with regard to in camera, and we'll address

8    that at that point.

9                    MR. BRODY:  Yep.  Absolutely.

10   BY MR. BRODY:

11        Q.      You analyzed, Mr. Conlan, the -- how

12   to value opt-outs for Johnson & Johnson?

13                    MR. POLLOCK:  This is in Imerys?

14                    MR. BRODY:  Yes.

15                    THE WITNESS:  How to value opt-outs,

16   people who opted out under the Imerys/J&J bolt-on

17   plan?

18   BY MR. BRODY:

19        Q.      Correct.

20        A.       I don't recall how we would value the

21   opt-outs.  As I recall, I thought the approach was

22   to just assign a dollar per claim, which is a fairly

23   simple, albeit crude, approach that has been adopted

24   in bankruptcy courts over the years, rather than

25   trying to assign a value to the claim that votes yes

Page 59

1    or no.

2          Q.      You billed J&J for analyzing the

3    value of opt-outs, didn't you?

4          A.      Yeah.  Well, again, when you say the

5    value of opt-outs, you mean the amount of opt-outs,

6    the percentage?  I --

7          Q.      The -- you -- you -- you analyzed,

8    first of all, you -- you -- let's start with the

9    approach.  You analyzed the approach to valuing

10   opt-outs, correct?

11         A.      I'm not trying to be difficult.  I

12   don't understand what analyzing the approach to the

13   value of opt-outs is asking.

14         Q.      Well, you just spoke generically

15   about one approach to valuing opt-outs --

16         A.      Right.

17         Q.      -- which is a dollar per claim,

18   right?

19         A.      Correct.

20         Q.      So, in that sense, without disclosing

21   any recommendation that you may have made to the

22   company or any analysis that you may have been privy

23   to, privileged and confidential analysis, you

24   certainly engaged in analysis of valuing opt-outs,

25   didn't you?

Page 60

```
 1          A.          It wouldn't surprise me if you said

 2     that we described the opt-outs, again, in context of

 3     what it means to have a 75 percent yes vote.  For

 4     example, whether somebody votes yes, but opts out,

 5     whether that counts towards the 75 percent, which is

 6     a bankruptcy law question.

 7          Q.          And you were involved in discussion

 8     of issues like that related to a potential opt-out

 9     or opt-in settlement matrix, both, while you were

10     doing privileged and confidential work for Johnson &

11     Johnson, correct?

12          A.          That -- that sounds believable to me,

13     as I think back.

14          Q.          You were engaged, or you were

15     exposed, certainly, to different settlement matrices

16     that Johnson & Johnson developed internally during

17     the period where the Imerys bankruptcy was pending,

18     correct?

19               MR. POLLOCK:  Objection.  Same

20     objection.  I can't evaluate a matrix I can't see.

21               THE COURT:  Do you understand the

22     question, Mr. Conlan?

23               THE WITNESS:  I think I do.

24               THE COURT:  I will overrule the

25     objection.  I understand the nature of your
```

Page 61

1    objection, Mr. Pollock.

2                    THE WITNESS:  What I knew was there

3    were settlement discussions going back and forth

4    between Jim Murdica, this is in Imerys, and the tort

5    claimants committee, and individual lawyers on the

6    tort claimants committee.  As for studying or

7    understanding any of that, it wasn't my area.

8    BY MR. BRODY:

9         Q.      You were -- you received, you

10    reviewed --

11        A.      You mean exposed to it?

12        Q.      Yeah, you reviewed them, didn't you?

13        A.      No, I would not say I reviewed them.

14    I would say I was exposed to them, but it wasn't my

15    area to analyze them and say, Oh, you have this

16    right, or this wrong, or this is curious.

17        Q.      Did you bill for analyzing it?

18        A.      I billed for the time when I was on

19    calls with people.  Usually, quite frankly, a lot of

20    them were all-hands calls, where lots of people were

21    on them in case their expertise was implicated by

22    that call.

23        Q.      And so you would exposed on those

24    privileged and confidential calls and meetings to

25    J&J's and its outside counsels' thinking about these

Page 62

1    settlement matrices that were being exchanged

2    internally during that time period, correct?

3          A.      Exposed.

4          Q.      These were settlement matrices that

5    -- settlement matrices are standard in mass tort

6    resolution discussions, right?

7          A.      From the mass tort bankruptcies I've

8    been involved in, yes.  But I have not, frankly,

9    ever been involved in them outside of a bankruptcy.

10         Q.      And you -- I mean, you've said you're

11   not a -- you're not a product liability lawyer,

12   but --

13         A.      Correct.

14         Q.      -- you have done a lot of work over

15   the years related to mass torts, right?

16         A.      In context of restructuring.

17         Q.      Right.  Where things like, as you've

18   just said, settlement matrices come into play,

19   correct?

20         A.      Correct.

21         Q.      And settlement matrices ultimately,

22   based on number of claimants and where everybody

23   thinks the plaintiffs fall on the matrix, are going

24   to drive, in combination with other factors, the

25   total number, right?

```
                                             Page 63

 1                 MR. POLLOCK:  Objection;

 2      argumentative, leading.  He's testifying.

 3                 THE COURT:  I'm going to overrule the

 4      objection.  I don't think it's argumentative.

 5                 Do you understand the question?

 6                 THE WITNESS:  I think I do, and I

 7      think I can answer it this way, in context.

 8                 THE COURT:  I don't think it's

 9      leading, either.

10                 THE WITNESS:  Okay.  In context of a

11      mass tort bankruptcy, the, if you will, resolution

12      lawyers, like Mr. Murdica, engage with their

13      opposite number, if you will, among the tort

14      claimants, and sometimes the futures reps experts.

15      They come up with the guts of a resolution, if one

16      is achieved.

17                 Those, then, are processed into what

18      are called trust distribution procedures, which is

19      how the company, in its bankruptcy plan, will bring

20      life to that agreement; what the procedures will be,

21      and how.  The bankruptcy lawyers drive the

22      confirmation process, but the resolution lawyers

23      drive the trust distribution procedures and the

24      matrix from which they spring.

25                 So, yes, I was exposed, frankly, over
```

Page 64

1    decades to that.  But I never made it my business to

2    understand, nor frankly do I think I could have, the

3    subject matter of those matrices any more than the

4    resolution lawyers could understand in detail what

5    the bankruptcy lawyers were doing.

6    BY MR. BRODY:

7           Q.      So you were both exposed to them and

8    you engaged in discussions with Mr. Murdica about

9    his progress on getting key important -- what he

10   viewed as key important plaintiffs' lawyers to be on

11   board with them, right?

12               MR. POLLOCK:  Objection; leading,

13   argumentative.

14               THE COURT:  Well, I think it is

15   leading.  Did you, I think would be an appropriate

16   framing of the question.

17               THE WITNESS:  I heard Mr. Murdica say

18   things to me, like, I think I have so-and-so, or I

19   talked to so-and-so.  He didn't say how, or why, or

20   what the number was.  Frankly, Mr. Murdica used me

21   as a sounding board on the bankruptcy law, which he

22   didn't understand, and how it worked.  The opposite

23   was true.  I didn't understand what he was doing.

24   BY MR. BRODY:

25           Q.      So you had -- I'm just trying to

Page 65

1    understand.  So are you saying that you had

2    discussions with Mr. Murdica about claim values and

3    settlement matrices and estimation of future claims,

4    and you just didn't understand what he was telling

5    you?

6         A.    I don't think I had substantive

7    discussions on those numerical concepts and those

8    numerical negotiations with Mr. Murdica.  It was

9    just not -- it was beyond my capabilities.

10        Q.    One of the things you did do is you

11   analyzed the potential for claim values to contain

12   risk to J&J, right?

13        A.    Could you explain that question a

14   little more?

15        Q.    Sure.  You know what a settlement

16   matrix, a settlement grid looks like, right?

17        A.    I do.

18        Q.    You know what a settlement matrix and

19   grid looks like when you're talking about the talc

20   litigation, right?

21        A.    They look the same to me, in asbestos

22   or herbicides or whatever it is.

23        Q.    Right.  You have different ages of

24   claimants?

25        A.    There's like an X and a Y axis with

Page 66

1   cells, is how I would describe it.

2          Q.      Disease state, age?

3          A.      Yes.

4          Q.      All right.  And you -- you, frankly,

5   analyzed the feasibility of values in settlement

6   matrices to contain risk to Johnson & Johnson?

7                  MR. POLLOCK:  Objection; compound.

8                  THE WITNESS:  I don't understand the

9   question.  I understand --

10                 THE COURT:  Overruled.  If you could

11  repeat the question.

12                 THE WITNESS:  Yeah.

13                 MR. BRODY:  Sure.

14  BY MR. BRODY:

15         Q.      While you were representing Johnson &

16  Johnson as its outside counsel, you analyzed

17  settlement grids and claim values for their

18  potential to contain risk to Johnson & Johnson?

19         A.      That's not the language construct of

20  restructuring.  The language construct of

21  restructuring is that if a bolt-on plan, like the

22  one that J&J filed in Imerys North America, if it

23  garnered 75 percent approval from current claimants

24  and the futures rep didn't object, that would have

25  given the Court power to channel the claims against

Page 67

1    J&J to a trust.  If that's what you mean by contain

2    the risk, yes.

3            Q.       And you billed for that, didn't you?

4            A.       Yes.  Explaining how a channeling

5    injunction works, yes.

6            Q.       You billed for analyzing grid

7    tightness?

8            A.       I don't recall using those words, but

9    you're obviously looking at something where those

10   words are.

11           Q.       You, without revealing the substance

12   of any of your analysis, you analyzed approaches to

13   diagnosis requirements for settlement participation,

14   didn't you?

15                    MR. POLLOCK:  Can I get a

16   clarification?  Is this part of a narrative of a

17   time entry, or is this the entire time entry?

18   Because I would like to know, since he is --

19   Mr. Conlan has testified, I sat in during this.  I

20   want to know if Mr. Brody is taking out line by line

21   or a series of issues.  I think I'm entitled to at

22   least that representation, if it's not by line.

23                    THE COURT:  How about a time frame

24   with regard to this.

25                    MR. BRODY:  Sure.

Page 68

1                THE COURT:  Because we're talking

2    about 21 months that Mr. Conlan worked for Faegre

3    Drinker.

4                MR. BRODY:  Happy to, Your Honor.

5                THE COURT:  Can we get the time

6    frame.

7                MR. BRODY:  Yes.

8    BY MR. BRODY:

9         Q.     Let's say, Mr. Conlan, on the time

10   period of fall of 2021, and before the LTL

11   bankruptcy filing.  You analyzed approaches to

12   diagnosis requirements for settlement participation,

13   didn't you?

14               MR. POLLOCK:  Your Honor, again, my

15   problem is this.  I don't have the document.  I do

16   believe the best evidence rule does apply.  I want

17   to know from Mr. Brody, if he is going to continue

18   to do this, is that the entire time entry, which may

19   have been two paragraphs long, or is it, Hey, this

20   little snippet over here.  I've got to -- he's

21   entitled to know and I'm entitled to know what's

22   exactly here.

23               THE COURT:  Let me ask you this.  Let

24   me just slow it down.  Did you bill weekly?

25   Monthly?  How did you bill J&J when you worked at

Page 69

```
 1  Faegre Drinker; do you recall?
 2                  THE WITNESS:  Yeah.  My practice over
 3  decades as a restructuring lawyer was to, every few
 4  days, go back and try to summarize what it was I
 5  did.  And sometimes it was event driven, like
 6  attended this call.  Sometimes it was a combination
 7  of event driven and just what I was thinking about
 8  at that time, and why I was thinking about it.
 9                  THE COURT:  Thank you.
10                  So, are these excerpts from
11  timesheets from that time frame, or is it the full
12  entry?
13                  MR. BRODY:  Well, the question -- I
14  have the full -- I have the full entries.
15                  THE COURT:  Right.  But are you
16  questioning him on the full entry or excerpts from
17  the entry?
18                  MR. BRODY:  It depends on --
19                  THE COURT:  Okay.
20                  MR. BRODY:  -- the entry.  The
21  question, you know, wasn't necessarily tied to a
22  billing entry.  The question was did he analyze
23  approaches in the fall.
24                  THE COURT:  Yeah, I understand.  I
25  understood that.  I wanted to get an understanding,
```

Page 70

1    though, because we're talking about referencing

2    billing.  How did Mr. Conlan bill, does he remember,

3    about that time frame.  So with regard to entries,

4    would you let us know if it's a singular entry that

5    you're looking at, addressing.  I think that's --

6                    MR. BRODY:  Sure.

7                    THE COURT:  -- within the confines of

8    where we are right now, or is it an excerpt from a

9    billing entry at that time frame.

10                   MR. BRODY:  Sure.

11   BY MR. BRODY:

12        Q.    Mr. Conlan, you -- just for the

13   benefit of the Court, when you billed J&J for work

14   on the talc litigation, you created -- and tell me

15   if this is right, you created a single billing entry

16   for each day, right?

17        A.    Yes.

18        Q.    Okay.  So, basically, we call that --

19   basically, it's a block billing, right?

20        A.    Yes, I've heard it referred to as

21   that, yes.  Daily billing, block billing.

22        Q.    Right.  So if you do, you know, two

23   things one day, you might describe two things and

24   then put down seven hours?

25        A.    Yeah, or add "analyze," because it

Page 71

1    was a long day.

2              Q.       I don't understand that.

3              A.       Okay.  If you spent seven or eight

4    hours on a particular client's objectives in

5    connection with the Imerys North America bankruptcy,

6    the time report that you typed up yourself or

7    transcribed, your assistant, might list a couple of

8    items that day and then a generic catch-all, because

9    you knew how much time you had spent that day

10   thinking about those problems.

11             Q.       I'm struggling with this idea of a

12   generic catch-all to capture time spent thinking, as

13   opposed to the time entry that -- I mean, is there a

14   difference between that and a time entry that

15   accurately reflects what you did?

16             A.       I don't think so.  By definition, if

17   you're spending seven or eight hours, I at least

18   typically didn't list the 15 things I did that day.

19   I might list a few of them, and then have a more

20   generic catch-all that describes the remaining 13.

21             Q.       All right.

22             A.       This is the hypothetical.

23             Q.       So going back to the question I

24   asked, which was not about billing records, I simply

25   asked you whether you analyzed approaches to

Page 72

1    diagnosis requirements for settlement participation

2    in the fall of 2021.

3        A.      I don't recall that.  I will tell you

4    what I do recall.

5        Q.      Fair enough.

6        A.      If you would like to hear it.

7                One of the questions, but I don't

8    want to get into anything that's confidential, so

9    you can stop me, I'm trying to self regulate here,

10   is the question of whether or not a -- whether it

11   was Imerys or whether it was J&J on a bolt-on, which

12   was the spring of '21, not the autumn of '21,

13   whether or not it could or should pay, offer to pay

14   claimants where there was no diagnosis, or whether

15   diagnosis should be a requirement in order to pay.

16       Q.      Okay.  And you were then exposed -- I

17   mean, you participated in discussions of that issue

18   with the J&J team, right?

19       A.      I was exposed to discussions of that

20   issue.

21       Q.      Right.  Privileged and confidential

22   discussions of that issue, correct?

23       A.      I would assume so.

24       Q.      You mentioned Imerys TDP values; do

25   you recall that?

Page 73

1          A.      Yes.  No, the TDPs.

2          Q.      Yes.  The TDPs, exactly.  And you

3    were certainly part of the J&J team that analyzed

4    those Imerys TDPs, correct?

5          A.      I was exposed to the TDPs.  I wasn't

6    the drafter of the TDPs.  Again, not my expertise.

7                  THE COURT:  For our record, what is

8    TDP?

9                  THE WITNESS:  Trust distribution

10   procedure.

11   BY MR. BRODY:

12         Q.      And you were aware the trust

13   distribution procedures come with -- they come with

14   claim values, right?

15         A.      Yes.

16         Q.      And one of the things that happened

17   in those discussions, again, without revealing any

18   of the substance, is the J&J team evaluated

19   arguments for and against the validity of the TDPs

20   in the Imerys plan, correct?

21         A.      I don't recall it that way.  The way

22   I recall it, which was typical of most bankruptcy

23   cases, is you have an agreement with the -- a group

24   of claimants, the tort claimants committee, and the

25   TDPs get drafted together because there is agreement

Page 74

1    between the tort claimants committee and the debtor,

2    between the tort claimants committee and J&J, and

3    how you're going to implement that, the trust

4    distribution procedure is a common effort.

5             Q.       But if one party proposes TDPs that

6    another party, somebody like a J&J, thinks are

7    inflated, or maybe thinks are too low, that party,

8    then, is going to engage in, and you were privy to,

9    analysis of TDPs proposed as part of the Imerys

10   plan, including J&J's arguments as to the accuracy,

11   validity, feasibility of the those TDPs, correct?

12            A.       I'm sure there was back and forth on

13   the drafting of the TDPs.  I'm sure I was exposed to

14   it.  I don't recall it.

15            Q.       It was extensive, wasn't it?

16            A.       It always is, so I assume it was.

17            Q.       All right.  And you were -- you were

18   on -- you got every meeting invite, didn't you, for

19   the -- for the --

20            A.       I don't know if I got every meeting

21   invite, but I got a lot.

22                     MR. POLLOCK:  Objection.  How can he

23   conceivably know how many meeting invites there were

24   and whether he was on them.  I don't have any

25   records to show how many meeting invites there were.

```
                                            Page 75

 1                 THE COURT:  Well, Mr. Conlan did, I

 2    think, answer the question with regard to whether he

 3    knew or he didn't know whether or not he was

 4    invited.  If he was invited, he went to those.  If

 5    he could attend, he was there.

 6                 MR. POLLOCK:  I agree, but Mr. Brody

 7    then says, You were invited to all of them.

 8    [Overtalking]

 9                 THE COURT:  Do you know if you were

10    invited to all of those meetings?

11                 THE WITNESS:  I don't know.

12                 THE COURT:  Okay.

13    BY MR. BRODY:

14         Q.      But you were invited to a lot of

15    them?

16         A.      I was invited to a lot of them.

17         Q.      And you joined a lot of them, didn't

18    you?

19         A.      I did.  They were all-hands.  It's an

20    all-hands approach.

21         Q.      Right.  And so you were -- you were

22    exposed -- I think as you said, there were different

23    people with different expertise on those calls and

24    meetings?

25         A.      That's right.
```

Page 76

1          Q.        So you were exposed to the thinking

2     of the people with every single different discipline

3     of expertise?

4          A.        Correct.

5          Q.        Sticking with the Imerys bankruptcy,

6     you analyzed the strength of estimates of numbers of

7     future claimants, didn't you?

8                    MR. POLLOCK:  Again, Your Honor, I

9     want to have a standing request.  If he's going to

10    read excerpts from a timesheet, I want the entire

11    excerpt read into the record.  I want to know

12    exactly what the billing statement is.

13                   Because if we're going to cherry-pick

14    this little clause here and that little clause

15    there, it -- I don't know how the witness answers

16    that that's what he focused on, because to me -- the

17    narrative always is, You had these discussions, is

18    that what you did, but it may well be it was part of

19    a whole series of things.  I don't know, and we

20    don't know, and you don't know.

21                   THE COURT:  Any thoughts, Mr. Brody?

22                   MR. BRODY:  Again, I'm asking -- I'm

23    asking for testimony.  And the question was, did he

24    -- did he do that analysis as outside counsel for

25    J&J.

Page 77

```
 1                    THE COURT:  At what time frame?
 2                    MR. BRODY:  During the Imerys
 3     bankruptcy in the spring of 2021.
 4                    THE COURT:  Okay.
 5                    MR. POLLOCK:  But it's not just --
 6     he's not just asking for testimony.  He's arguing by
 7     saying, Did you have discussion regarding these
 8     concepts.  But the fact is, it goes on for pages.
 9                    THE COURT:  Well, what -- let me
10     explain what I believe --
11                    MR. POLLOCK:  Yes, sir.
12                    THE COURT:  -- Mr. Brody is doing.
13             Mr. Brody is looking to elicit
14     testimony from Mr. Conlan.  He obviously has records
15     that he wants to receive -- have the Court receive
16     in camera.  What he then wants to do is, depending
17     on the Court's decision with regard to those in
18     cameras, then confront whether they are consistent,
19     inconsistent with regard to the testimony.
20             So I'm going to permit Mr. Brody to
21     do that.
22                    MR. POLLOCK:  Understood.
23                    THE COURT:  So, I'm not delving into
24     strategy, but it's clear as day to both Judge Singh
25     and I that's what's going on here.
```

Page 78

1                      Am I correct?
2                      MR. BRODY:  You are correct.
3                      THE COURT:  Okay.
4                      MR. BRODY:  Yes.
5                      THE COURT:  So even someone on my
6     level, I'm not the sharpest knife in the drawer,
7     Mr. Brody, I can understand that.
8                      MR. BRODY:  I'm not -- I'm not going
9     to comment, Your Honor.  I think --
10                     THE COURT:  That's my self-effacing
11    comment.
12                     MR. BRODY:  I -- I think you're -- I
13    think you're doing fine.
14                     THE COURT:  Okay.
15    BY MR. BRODY:
16        Q.      So, the question, Mr. Conlan, was:
17    Did you, in the spring of 2021, during the pendency
18    of the Imerys bankruptcy, engaged in the -- engaged
19    in analysis of the strength of claims from future
20    claimants?  Right?
21        A.      I don't know how to answer that
22    without explaining what was going on, and that may
23    result in me saying things you don't want me to say.
24        Q.      Well, at that time --
25                     THE COURT:  Can you break the

Page 79

1    question down?

2    BY MR. BRODY:

3          Q.        Let me ask you this:  At that time,

4    J&J was, internally, in March of 2021, working on a

5    proposed term sheet, right?

6          A.        In what particular month is this?

7          Q.        March of 2021.

8          A.        I remember the 4.2 bolt-on was in the

9    spring, so that would be consistent with that time

10   frame.

11         Q.        And J&J was working on a term sheet,

12   correct?

13         A.        I don't remember precisely, but that

14   would be consistent with that.

15         Q.        And you were, around that time,

16   actively engaged on J&J's behalf in negotiations

17   with the -- with counsel for the future claimants in

18   the Imerys bankruptcy, right?

19         A.        Yes, I do recall that.

20         Q.        Yes.  During that time period,

21   correct?

22         A.        Yes.

23         Q.        And in connection with that, or

24   otherwise, you engaged in analysis of the strength

25   of claims from future claimants in the Imerys

Page 80

1    bankruptcy, didn't you?

2         A.      I think analysis is overstated, if I

3    may.  In virtually every situation I've ever been

4    involved in, the futures reps experts come up with

5    numbers like this.  The current claimants

6    representatives come up with numbers like this,

7    because there's a bit of a -- conflict is the wrong

8    word, but the currents don't want to preserve a lot

9    for futures, the futures want to make sure that

10   their claimants in the future get the same as

11   currents got in the past.  And so it is a battle of

12   experts and, frankly, exaggeration often has been my

13   experience.

14            So, the idea that I can -- that I can

15   analyze whether the futures reps experts are going

16   too high, I don't have the underlying ability to do

17   that, but my experience is they typically do go too

18   high and the currents go too low.

19        Q.      And you were a part of privileged and

20   confidential discussions of arguments that J&J

21   developed related to whether the estimates were too

22   high or too low, right?

23        A.      I don't recall that.  I will note

24   that you can't confirm a plan and get a channeling

25   injunction unless the futures rep says yes, for

Page 81

1   whatever his or her reasons are.  So it's not like

2   -- it's not a litigation and a battle.  You either

3   persuade them or you don't.

4          Q.      And one of the things you were trying

5   to do was persuade the futures rep that it would be

6   a good idea to participate in the deal?

7          A.      Yes.

8          Q.      And in connection with that, you had

9   privileged and confidential discussions with

10  Mr. Haas and others at Johnson & Johnson, correct?

11         A.      About what the futures rep said to me

12  and what I would say to them, yes.

13         Q.      And about -- about how the company

14  wanted to respond to positions that the futures rep

15  was taking, right?

16         A.      I would assume so.  I don't recall

17  that exactly.

18         Q.      You -- you communicated with Mr. Haas

19  in multiple ways.  You communicated with Mr. Haas by

20  email, right?

21         A.      I'm sure I did.

22         Q.      You communicated with Mr. Haas on the

23  phone?

24         A.      I'm sure I did.

25         Q.      You met with him in person?

Page 82

1          A.      Occasionally.  It was COVID.

2          Q.      Yeah.  And we were -- you know,

3    Mr. Braunruether -- by the way, Mr. Braunruether had

4    basically Mr. Haas' job before he had his current

5    job, even though the titles may have been a little

6    different, right?

7          A.      Yes, right.

8          Q.      Mr. Braunruether retired, I believe,

9    end of February, March 1st, 2021.  Is that

10   consistent with your recollection?

11         A.      That sounds about right.

12         Q.      Right.  And so, from that point

13   forward, when you needed to have a strategy

14   discussion with somebody at J&J, you typically

15   reached out to Mr. Haas, didn't you?

16         A.      Again, it was a grouping of people.

17   I would reach out to Mr. Haas.  But occasionally, I

18   would reach out to someone at Weil.  Occasionally, I

19   would reach out to Mr. Stengel.  Occasionally, I

20   would reach out to Mr. Murdica.  Occasionally, I

21   would reach out, when it was appropriate, to counsel

22   to the tort claimants committee.  All of those

23   things.

24         Q.      Right.  And you bring up the tort

25   claimants committee.  You engaged on J&J's behalf in

Page 83

1    discussions with at least Natalie Ramsey, counsel to

2    the tort claimants committee in the Imerys

3    bankruptcy, correct?

4         A.    Yes.

5         Q.    And when you were doing that, you

6    were -- I mean, you -- you were communicating then

7    on the back end with Mr. Haas about those

8    discussions that you were having, correct?

9         A.    Yes.

10        Q.    So --

11        A.    Mr. Haas or one of his -- one of the

12   people in his law department.

13        Q.    Okay.  Like Mr. White?

14        A.    For example, yes.

15        Q.    Mr. Kim?

16        A.    Yes.

17        Q.    And you were doing that in order to,

18   you know, develop, Okay, what's the strategy, what's

19   next in terms of our contact with, whether it's the

20   futures rep, counsel to the TCC, as to how are we

21   going to get our deal done?

22        A.    How are we going to get them to yes.

23        Q.    Yes.  How are we going to get them to

24   yes.  But not just get them to yes; get them to yes

25   at a number and within a structure that works for

Page 84

1   J&J, right?

2           A.      At least the latter.  The numbers

3   were not my area.

4           Q.      Right.  But you -- you couldn't just,

5   you know, get them to yes at any old number.  You

6   had to -- the idea was, how do we get them to yes at

7   a number that is going to be acceptable to J&J,

8   right?

9           A.      That was Mr. Murdica's area.  What

10  J&J would find acceptable was Mr. Murdica's area.

11          Q.      And you and Mr. Murdica, I believe,

12  were sort of the -- sort of the one-two negotiating

13  team for J&J.  You two were the two who were out

14  there having the discussions, right?

15          A.      No, I don't think I was the

16  negotiating team, or part of a two-person

17  negotiating team on the amount of money.

18          Q.      I was -- I was talking as to the

19  entire package, Are we going to get this deal done.

20  It was you and Mr. Murdica, right?

21          A.      Again, on the bankruptcy structuring

22  side, like getting the futures rep over the issues

23  that the futures rep was having on the difference

24  between how futures would be treated and currents,

25  that's a bankruptcy issue.

Page 85

1          Q.       And as to that futures question, you

2    mentioned that oftentimes discussions of things like

3    value of futures claims, it comes down to a battle

4    of experts, right?  That was your phrase.

5          A.       Yes, but in the end, the futures rep

6    says yes or they say no.  It isn't like you beat

7    them and their expert.  They either say yes or no.

8          Q.       And even beyond a -- even beyond, you

9    know, just a battle of experts, it's -- it's you,

10   while you were outside counsel for Johnson &

11   Johnson, while you were the company's lawyer, you

12   were exposed to privileged and confidential analysis

13   of exactly that, those futures values undertaken on

14   a privileged and confidential basis by experts that

15   J&J had retained as consultants to advise it

16   internally, correct?

17         A.       I'm sure I was exposed to it.

18         Q.       All right.  The -- you mentioned the

19   TCC in the Imerys bankruptcy.  That TCC had a

20   negotiating subcommittee, didn't it?

21         A.       That's my recollection.

22         Q.       And Leigh O'Dell and Ted Meadows from

23   Beasley Allen were on the TCC's negotiating

24   subcommittee, weren't they?

25         A.       That doesn't surprise me.  I don't

Page 86

1    remember dealing with them.  I remember dealing with

2    counsel for the tort claimants committee.  So the

3    lawyers, who happen to be personal injury lawyers,

4    weren't the bankruptcy lawyers, obviously.  Those

5    were lawyers from Willkie Farr, and also Natalie

6    Ramsey.

7           Q.     Right.  And as we said, Ms. Ramsey

8    was counsel to the TCC, correct?

9           A.     Yes.

10          Q.     You -- did you ever meet with

11   Ms. Ramsey personally during those negotiations?

12          A.     I'm sure I had.  I did.

13          Q.     Same with counsel for the futures

14   rep?

15          A.     Yes.

16          Q.     I think you even played golf with the

17   futures rep as part of your negotiating on J&J's

18   behalf?

19          A.     I'm not a golfer.  I may have ridden

20   in a golf cart while they were.  I skied with them,

21   for example.  I did every year.

22          Q.     Okay.  Fair enough, fair enough.

23                 In the process, you analyzed

24   settlement dynamics and leverage points around

25   voting on the Imerys plan, right?

Page 87

1          A.      Yes.

2                  MR. POLLOCK:  Same objection to the

3      document completeness.  If you're going to quote

4      from the timesheet, I would like to see the

5      timesheet or know if it's the entire narrative.

6                  THE COURT:  Mr. Brody?

7                  MR. BRODY:  Your Honor, I asked him

8      if he analyzed settlement dynamics and leverage

9      around voting on the plan, and he said yes.

10                 THE COURT:  I would like a time

11     frame.  I mean, obviously, we're getting

12     recollection from Mr. Conlan, so I'm going to

13     overrule the objection, but at least for context for

14     our record --

15                 MR. BRODY:  Sure.

16                 THE COURT:  -- providing us with a

17     time frame.

18                 MR. BRODY:  Sure.

19     BY MR. BRODY:

20          Q.      Let me just ask you, what time period

21     were you engaged in analysis of settlement dynamics

22     surrounding voting on the Imerys plan?

23          A.      My guess is that it would have been

24     winter of 2021 and over into the spring of 2021,

25     because as I recall, the Imerys bolt-on plan, which

Page 88

1    didn't end up going through, was in the spring of

2    '21.  So that's how I think of that time period.

3            Q.        Fair enough.  And as you said, it

4    didn't go through, correct?

5            A.        Correct.

6            Q.        And it became clear, I think, that

7    negotiations had stalled by summer of '21?

8            A.        Yes.

9            Q.        And, at that time, you engaged in

10   privileged and confidential communications with

11   Mr. Haas evaluating alternatives to the Imerys

12   bolt-on settlement, correct?

13           A.        Yes.

14           Q.        Now, ultimately, J&J took the path of

15   filing the LTL bankruptcy petition in October of

16   2021, correct?

17           A.        That's my recollection.

18           Q.        You were still a partner at Faegre

19   Drinker at that time, correct?

20           A.        I was.

21           Q.        You looked at the -- without, again,

22   disclosing the substance of anything, but you -- you

23   analyzed that as a potential resolution, correct?

24           A.        I think I'm --

25           Q.        Just a yes or no.

Page 89

1                    MR. POLLOCK:  Can we get a time
2    frame, Your Honor?
3                    THE WITNESS:  Yeah.  Not before it
4    was filed.
5                    MR. POLLOCK:  I would like a date.  I
6    would like a date of the time entry.  I would like
7    to know the date or time it was done.
8                    THE COURT:  Post October 2021.
9                    MR. POLLOCK:  The reason is -- well,
10   I don't want to get in -- I don't want to put the
11   argument -- [overtalking] I would like to know
12   whether -- what this was being -- I would like to
13   know when this is being discussed.
14                    THE COURT:  Why don't you rephrase
15   the question, Mr. Brody.
16                    MR. BRODY:  Well, I think -- I think,
17   if we have the record, the answer was not before
18   October of 2021.  So I think we do have the time
19   frame.
20                    THE WITNESS:  May I explain?  I want
21   to be careful, but...
22                    THE COURT:  You need some
23   elaboration?
24                    THE WITNESS:  Yes.
25                    THE COURT:  Okay.  The Court will

Page 90

1    permit Mr. Conlan to ask for elaboration.

2              THE WITNESS:  And I will try to stick

3    with what's public.

4              THE COURT:  And I think after this

5    question, we'll take a break.

6              MR. POLLOCK:  Fair enough.

7              THE WITNESS:  Jones Day created the

8    Texas Two-Step, and it filed Bestwall, a Texas

9    Two-Step, in North Carolina in 2017.  Jones Day

10   filed DBMP, a Texas Two-Step, in 2020 in North

11   Carolina.  Jones Day filed Aldrich Pump/Murray

12   Boiler, a Texas Two-Step, also in 2020 in North

13   Carolina.

14              I did discuss with J&J what I thought

15   of what Jones Day had been doing in these Texas

16   Two-Step cases in North Carolina and the viability

17   of them, and the obstacles and the opportunities.

18              THE COURT:  Let's take our break.

19   We'll come back here in, let's say, 10 minutes.

20              MR. POLLOCK:  Thank you, Your Honor.

21              THE COURT:  11:30.  Thanks.  We'll go

22   off the record.

23              (A recess was taken.)

24              THE COURT:  Please be seated.  You

25   may continue, Mr. Brody.

Page 91

1              MR. BRODY:  Thank you, Your Honor.
2      BY MR. BRODY:
3          Q.      Mr. Conlan, before we broke, you
4      indicated you were having discussions about what you
5      referred to as the Texas Two-Step strategy in the
6      summer of 2021.  Do you recall that?
7          A.      I don't think it's the summer of --
8      I'm sorry, 2021?
9          Q.      Yes.
10         A.      Yes.
11         Q.      You were actually having privileged
12     and confidential discussions with Mr. Haas,
13     Mr. White, and Mr. Kim long before that, weren't
14     you?
15         A.      With respect to what Jones Day had --
16     was doing, had done, was in the process of doing in
17     North Carolina, yes.
18         Q.      With respect to the potential for a
19     Texas Two-Step bankruptcy to serve as a potential
20     resolution of J&J's talc liabilities, irrespective
21     of whether Jones Day was involved, you were engaged
22     in privileged and confidential discussions of that
23     issue with J&J's senior inhouse counsel team as
24     early as the fall of 2020, weren't you?
25         A.      I don't recall it in the fall of

Page 92

1    2020, but because the Texas Two-Steps were quite

2    famous, and three of them were pending in North

3    Carolina, all Jones Day cases, the inventor of the

4    Texas Two-Step, I do recall J&J -- again, I'm trying

5    to answer the question, but contained.

6         Q.      Maybe -- maybe do it this way, then.

7    I'll just ask you:  Do you recall, without revealing

8    any of the substance, having discussions about it

9    with the inhouse counsel team at Johnson & Johnson

10   well before summer of 2021?

11              MR. POLLOCK:  Your Honor, just a

12   quick point of clarification, which I've got to ask.

13   Are you talking -- when you said "about it," is that

14   about whether J&J --

15              THE COURT:  Texas Two-Step.

16              MR. POLLOCK:  -- is going to file in

17   LTL, or about whether the Texas Two-Step in general?

18   That point is critical, and without seeing the

19   document and what was discussed, I really need to

20   know.  Was it about whether J&J was going to file in

21   LTL or just about the Texas Two-Step in general?

22              THE COURT:  Fair.

23              Mr. Brody, who is or what is "it"?

24   BY MR. BRODY:

25         Q.      The Texas Two-Step as a resolution

Page 93

1  for J&J.

2          A.      Yes, as -- well, I would say in

3  general, particularly, what do you think of what

4  Greg Gordon is doing in North Carolina.

5          Q.      And that was well before -- and you

6  testified before the break, that was summer of 2021.

7  You were involved in privileged and confidential

8  discussions of that issue with Johnson & Johnson

9  well before the summer of 2021, right?

10         A.      To my recollection, and I'm filling

11  in details here, is, at that point, the impression I

12  had was Jones Day was pitching that.

13         Q.      That wasn't my question.

14         A.      Okay.  I'm sorry.

15         Q.      My question was whether you had

16  discussions with senior leadership in the J&J law

17  department about that issue prior to the summer of

18  2021?

19                 MR. POLLOCK:  Again, that issue, Your

20  Honor, I really need to know --

21                 MR. BRODY:  The Texas Two-Step.

22                 MR. POLLOCK:  -- whether J&J is going

23  to file LTL, or whether is the Texas Two-Step in

24  general.  The distinction for me is critical.

25                 THE WITNESS:  About the Texas

Page 94

1    Two-Step in general and what Greg Gordon was doing

2    in North Carolina.

3    BY MR. BRODY:

4         Q.      Prior to the summer of 2021, correct?

5         A.      That wouldn't surprise me because --

6         Q.      In fact, you -- you analyzed whether

7    a, we'll call it, a Texas Two-Step bankruptcy filing

8    was appropriate to resolve J&J's talc claims?

9              MR. POLLOCK:  Your Honor, objection.

10   If we're going to ask that question, I want to know

11   what his analysis was, and asking again for

12   attorney-client privileged communication.  I know

13   where they're driving.  You can't have half the

14   story.  I need to hear the echo.

15             THE COURT:  Mr. Brody?

16             MR. BRODY:  Your Honor, he can

17   clearly answer the question, did he engage in that

18   analysis and did he discuss the analysis of the

19   potential for a Texas Two-Step bankruptcy with

20   inhouse counsel at J&J.

21             THE COURT:  I'm going to overrule the

22   objection.  You can answer the question, Mr. Conlan.

23             And just for our record, I'm going to

24   permit Mr. Conlan -- Mr. Conlan is being alleged to

25   have done certain things here, and I want to permit

Page 95

1   the record to reflect to the extent possible the

2   ability for Mr. Conlan to address specifically what

3   he is being alleged to have done.  I'm not taking --

4               MR. POLLOCK:  I understand.

5               THE COURT:  I'm not making anybody's

6   argument, Mr. Pollock and Mr. Brody, but I want to

7   have the individual who is the subject of this,

8   along with Mr. Birchfield, that opportunity to

9   address specifically, now that we're honing in on

10  it, Mr. Brody.

11              MR. BRODY:  Of course.

12              THE COURT:  All right.  Mr. Conlan.

13              THE WITNESS:  Yes.  What I discussed

14  was the weaknesses and the strengths of what Jones

15  Day was doing in North Carolina and, in particular,

16  reminding everyone that it doesn't work unless 75

17  percent-plus of claimants vote yes; and that that is

18  a difficult thing to achieve in the context of a

19  solvent company bankruptcy.

20  BY MR. BRODY:

21       Q.      And you participated in meetings,

22  privileged and confidential discussions in meetings

23  with Mr. Haas, Mr. White, and Mr. Kim on exactly

24  that subject, correct?

25       A.      Yes.

Page 96

1          Q.      And in the context, you also talked
2     to them about structural optimization, didn't you?
3          A.      And disaffiliation.
4          Q.      Right.  You were doing a soup-to-nuts
5     privileged and confidential analysis of options that
6     J&J might have to resolve its talc liabilities?
7          A.      Yeah.  Mechanisms and options.
8          Q.      Correct.  Throw everything on the
9     table and let's talk about strengths and weaknesses
10    of each one, right?
11         A.      Correct.
12         Q.      And in connection with structural
13    optimization, that included comparisons between
14    structural optimization and alternative options,
15    correct?
16         A.      Not to be difficult here, structural
17    optimization and disaffiliation.  Structural
18    optimization alone doesn't get you to where you need
19    to be.  Structural optimization and disaffiliation.
20         Q.      Right.  So I understand what you're
21    trying to say.  My question -- and I'll add the
22    words for you.  That's fine.
23                 You were engaging in analysis of the
24    advantages and disadvantages of structural
25    optimization and disaffiliation compared to other

Page 97

1    options that the company might have for resolution

2    of its talc liabilities, correct?

3            A.        Correct.

4                    MR. POLLOCK:  Can I get a point in

5    time?  Can I get a point in time when this occurred?

6                    THE COURT:  Mr. Brody?

7                    MR. BRODY:  And I'll -- that's --

8    that's fine.

9    BY MR. BRODY:

10           Q.        You were having these discussions

11   with the inhouse team at Johnson & Johnson

12   throughout the time that you were outside counsel to

13   the company, correct?

14           A.        Certainly, for a portion of the time,

15   I was.

16           Q.        You -- you raised the issue with

17   Mr. Braunruether, as well, correct?

18           A.        I assume I did.

19           Q.        You raised the issue as early as

20   August 2020, a month after you got to Faegre

21   Drinker, correct?

22           A.        That wouldn't surprise me to know

23   that, yes.

24           Q.        You raised it multiple additional

25   times through the fall of 2020, specifically with

Page 98

1    Mr. White, didn't you?

2         A.    Yes.

3         Q.    You raised it with Mr. White,

4    Mr. Haas, Mr. Braunruether, Mr. Kim in the winter of

5    2020-21, right?

6         A.    I don't remember each specific

7    instance, but I wouldn't be surprised by that, so.

8         Q.    And then take Mr. Braunruether out of

9    that group at the beginning of March of 2021, but

10   through the spring and, as you've said, the summer

11   of 2021, as well, right?

12        A.    Yes.

13        Q.    Into the -- into the -- and those

14   discussions that you were having, those privileged

15   and confidential discussions continued into the fall

16   of 2021, didn't they?

17        A.    Well, just to quibble on one point.

18   What I was doing was referring to all the companies

19   that didn't file bankruptcy and had achieved

20   finality using structural optimization and

21   disaffiliation.

22        Q.    And you were comparing structural

23   optimization and disaffiliation as an option for

24   Johnson & Johnson to other options that were on the

25   table and part of those privileged and confidential

Page 99

1    discussions, correct?

2         A.    Yes, including the fact that it

3    doesn't require a vote of the claimants, so you

4    don't need a yes vote, let alone 75 percent.

5         Q.    So one of the things that those

6    discussions included was conditions that would need

7    to be addressed and satisfied for J&J to pursue

8    structural optimization and disaffiliation as a

9    resolution strategy, correct?

10        A.    I would assume so, yes.

11        Q.    How J&J's corporate structure might

12   or might not lend itself to a resolution through

13   structural optimization and disaffiliation, correct?

14        A.    Not correct.  Every single entity in

15   a family of any group of companies can be

16   structurally optimized.

17        Q.    So, are you denying that you

18   discussed with the inhouse counsel team at J&J

19   issues related to J&J's corporate structure and how

20   J&J's corporate structure might or might not lend

21   itself to structural optimization and disaffiliation

22   as a resolution for talc liabilities?

23        A.    Incorrect.  I described how you could

24   structurally optimize all of the liable entities.

25   The second part, where you said "or not," I don't

Page 100

1    remember an "or not."  I don't recall saying you

2    couldn't structurally optimize this entity, but you

3    could this.  The approach was you could structurally

4    optimize any of the entities in the family.

5            Q.      And so what you were doing is you

6    were having discussions with the inhouse counsel

7    team at Johnson & Johnson about -- let's just -- and

8    I don't want to get into privileged information

9    here --

10           A.      I understand.

11           Q.      -- but as to -- I'll leave off the

12   "or not."

13           A.      Okay.

14           Q.      -- as to how J&J's corporate

15   structure might lend itself to a structural

16   optimization and disaffiliation resolution of its

17   talc liabilities?

18           A.      Yes.  Correct.

19           Q.      In connection with those discussions

20   of structural optimization and disaffiliation and

21   other options, the full panoply of resolution

22   options that had to be considered, in that

23   privileged and confidential context, you gained

24   confidential information about how J&J felt the

25   passage of time might impact the company's

Page 101

1    negotiating position, didn't you?

2            A.      I don't recall that.  How the passage

3    of time would change --

4            Q.      Correct.

5            A.      -- the options?

6            Q.      Correct.

7            A.      I don't recall that.

8                    MR. BRODY:  We'll put a pin in that

9    one, Your Honor.

10                   MR. POLLOCK:  Again, same objection,

11   Judge.  If I can't see the document, I can't

12   question it.

13   BY MR. BRODY:

14           Q.      You --

15                   MR. BRODY:  I mean, Your Honor,

16   again, I -- I think Your Honor understands, you

17   know, why I asked to put a pin in that.  And this is

18   a situation where this is cross-examination.  I'm

19   asking Mr. Conlan questions about what he did, what

20   confidential information he was exposed to.  He's

21   just indicated, in this instance, he doesn't recall.

22   The document would be to refresh his recollection or

23   to impeach.  It's not a situation where it is

24   offering it.

25                   Obviously, we would have to do that

Page 102

1    in an in camera context because we don't want to

2    waive privilege as to the question.

3                   But just in response to Mr. Pollock,

4    I -- I think the Court does understand why I've

5    asked that the Court to put a pin in that.

6                   THE COURT:  We do.

7                   MR. BRODY:  Thank you.

8                   THE COURT:  And Judge Singh and I,

9    we're gong to come back.  We're going to address

10   that after our lunch break.

11                  MR. BRODY:  Okay.  Thank you.

12                  MR. POLLOCK:  Several responses.

13   One, we're not at cross.  There's been no

14   demonstration that he, the witness, Mr. Conlan, is

15   adverse to J&J.  So there's been no hostility, he

16   hasn't been lying under oath, and there is nothing

17   here indicating he is adverse.  He is a non-party.

18   So I disagree with the starting point.

19                  The second thing is, I think an hour

20   and 20 minutes ago, even accounting for the

21   10-minute break, we were to get to the point, I

22   thought, which is what information specifically did

23   Mr. Conlan share with Mr. Birchfield.

24                  What J&J is doing is building an

25   appellate record.  The appellate record is he knew a

                                                    Page 103

1    lot of stuff, Jim is an important guy.  And I've

2    stipulated, an hour and 35 minutes ago, he knew

3    confidential information.  Judge Porto, I was

4    talking to you on the phone by video, and I told him

5    right up front he knew confidential information.

6                     If we're going to get this done, at

7    some point, I think I'm entitled to know what

8    specifically did Mr. Conlan know that he shared with

9    Mr. Birchfield.  We've now been at it for 20

10   minutes, because that turned into an hour and 20

11   minutes.

12                    THE COURT:  That was a Zoom.  That

13   was our Zoom conference.

14                    MR. POLLOCK:  Yes, sir.

15                    MR. BRODY:  Just in response,

16   that's -- you know, the standard here is not, Is

17   Mr. Conlan going to come in and confess on the

18   witness stand I shared Eric Haas' --

19                    THE COURT:  You didn't ask him that

20   question, yet, though, Mr. Brody.

21                    MR. BRODY:  Right, but that's -- but

22   that's not the standard.  I mean, I just -- I think

23   it's important.  In every fifth objection, we hear

24   from Mr. Pollock that, you know, what we have to --

25   what we have to get to with the standard for

Page 104

1    disqualification is, you know, basically, does --

2    does Mr. Conlan confess that, you know, yes, I told

3    Andy Birchfield about what Eric Haas said about the

4    three conditions that would be -- that would have to

5    occur if the company were to consider structural

6    optimization as an option.

7                    That is, frankly, not the standard,

8    and the reason it is not is because in situations

9    where you have a lawyer like Mr. Conlan, who was

10   outside counsel for Johnson & Johnson, who then gets

11   into an arrangement where he's working with

12   Mr. Birchfield and Beasley Allen, if both sides

13   could simply, Beasley Allen and Mr. Conlan, say,

14   Well, I deny that I ever shared any confidential

15   information, you would never have a situation where

16   there would be disqualification.  Fortunately --

17                    THE COURT:  We got it.

18                    MR. BRODY:  Yeah.  Fortunately, the

19   rules don't require it.

20                    MR. POLLOCK:  Your Honors, I couldn't

21   disagree more strongly.  That is exactly what the

22   Supreme Court said in 188, 1 -- 549, exactly what

23   they say in Trupos.  You can't -- what they're

24   doing, and this is why this whole thing should stop

25   right now, is they're saying it must be imbued with,

Page 105

1    that inherently there's some discussion of.  They

2    have to show an actual disclosure.

3                    THE COURT:  What I meant was, I

4    understand J&J's position and I understand Beasley's

5    Allen --

6                    MR. POLLOCK:  Yes, Your Honor.

7                    THE COURT:  -- Beasley Allen's

8    position.

9                    MR. POLLOCK:  Thank you, Your Honor.

10                   THE COURT:  Ultimately.  But, you

11   know, the Court has to make its determination.  But

12   I would like to get us -- now, I understand the

13   foundation, you have to build a house with a

14   foundation.  But, Mr. Brody, not that I'm asking you

15   to abbreviate your presentation here, but I think,

16   you know, getting into the central issue here might

17   be appropriate.

18                   And it was an hour and 20 minutes ago

19   because Mr. Brody said, you know, I'll give you 20

20   minutes.  So, I'm not rushing people, but I want to

21   get, you know, right to the heart of the matter.

22                   MR. BRODY:  Yeah, and I apologize for

23   the passage of time, Your Honor.  It's -- but it is

24   important, and it's, as you --

25                   THE COURT:  Well, that ties in with

Page 106

1    your question to Mr. Conlan.

2                    MR. BRODY:  Yes.

3                    THE COURT:  So I get that.

4                    MR. BRODY:  Yes.

5                    THE COURT:  Okay.

6    BY MR. BRODY:

7          Q.      You were exposed to confidential

8    information about how J&J felt that the passage of

9    time might impact trial risk associated with both

10   ovarian cancer and mesothelioma claims, correct?

11         A.      I'm struggling with "exposed."  It's

12   certainly the case that whenever you're estimating

13   liabilities, for example, for a structural

14   optimization, if the settlement trajectory shows up,

15   or the judgments show up, you would say, Gee, we

16   should have done it earlier before the trajectory

17   moved up.

18                    But that's not because someone told

19   me that.  That's just the reality of structural

20   optimization and disaffiliation.  Conversely, it

21   could go the other way.  The judgments could start

22   to come in for the mass tort defendant, in which

23   case the settlement models that the auditors, for

24   example, used to come up with a number at which they

25   could disaffiliate would go down.  So the passage of

Page 107

1    time changes the datapoints.

2         Q.    And it might -- it sounds then to me

3    like it might then be important to have a sense of

4    whether you expected that would go up or go down in

5    the future?

6         A.    If you could see the future, I

7    suppose.

8         Q.    Yeah.  And nobody can see the future,

9    but we can certainly try to predict the future based

10   on the knowledge, experience, and expertise we have

11   with a certain mass tort, a certain type case, a

12   certain area of the law, right?

13              MR. POLLOCK:  Objection; vague and

14   ambiguous, argumentative.  I'm not sure what it goes

15   to.

16              THE COURT:  Did you understand the

17   question, Mr. Conlan?

18              THE WITNESS:  I didn't.

19              THE COURT:  Okay.

20   BY MR. BRODY:

21        Q.    We -- you said we can't be certain

22   what the future is going to hold, but we can try to

23   predict it, right?

24        A.    You can try.  But when you're doing

25   structural optimization and disaffiliation and

Page 108

1    you're saying this amount of money will cover

2    current and future claims, you live with the record

3    as it exists at that point.

4         Q.       And if you are thinking about the

5    potential timing at which it might be advisable to

6    pursue structural optimization and disaffiliation as

7    a strategy, you would want to factor in what's my

8    prediction about how the passage of time is going to

9    impact the amount of money that would be necessary

10   to fund the disaffiliated entity with, right?

11        A.       Yes, in theory, the trajectory.

12        Q.       Correct.  And you were exposed to

13   J&J's thinking on what that trajectory was going to

14   look like in the future, right?

15        A.       I was exposed to J&J's thinking that

16   they didn't think these claims were legitimate.  I

17   didn't -- I wasn't exposed to whether J&J thought it

18   was going to win a trial, lose a trial.  I just --

19   that wasn't my area.

20        Q.       I'm not talking about, Okay, this

21   case is going to trial on this date and here's how

22   we think it's going to come out.  You were exposed

23   to J&J's inhouse counsels' thinking about how the

24   passage of time would impact that trajectory during

25   the course of the work that you did as outside

Page 109

 1   counsel for the company, correct?

 2          A.      I don't recall J&J or being exposed

 3   to J&J saying the trajectory is this way or that

 4   way, we want to do a structural optimization sooner

 5   or later, or -- I don't recall that.  I have heard

 6   companies say that in my -- over my years, in

 7   deciding whether and when they want to do a

 8   structural optimization.

 9          Q.      So this is another instance where you

10   would, on that point, not recalling it, you would

11   want to see a document to refresh your recollection

12   on that?

13          A.      Sure.

14          Q.      All right.

15                  MR. BRODY:  Another one, Your Honor.

16                  MR. POLLOCK:  Same objection.

17   BY MR. BRODY:

18          Q.      So, you left the Faegre Drinker law

19   firm in March of 2022 while the first LTL bankruptcy

20   was pending, correct?

21          A.      Yeah.  I think it was March 1.

22                  [LiveStream announcement.]

23                  THE COURT:  That's okay.  That's just

24   the LiveStream.

25                  THE WITNESS:  Yeah.  Into February,

Page 110

1    beginning of March.

2    BY MR. BRODY:

3         Q.        All right.  You started --

4         A.        Of 2022.

5         Q.        -- Legacy Liability Solutions,

6    correct?

7         A.        Correct.

8         Q.        You are the CEO?

9         A.        I am.

10        Q.        I take it you will admit that ethical

11   rules would have prohibited you from taking a job

12   with Beasley Allen at that time to work on the talc

13   litigation?

14        A.        Yes.

15        Q.        Whether you joined the firm as an

16   attorney or in any other way, correct?

17        A.        Correct.

18        Q.        And you understand that you could not

19   have been retained by Beasley Allen as an expert

20   witness or a consultant on the talc litigation,

21   right?

22        A.        That would be my understanding, yes.

23        Q.        No matter how deep your knowledge of

24   structural optimization and disaffiliation, correct?

25        A.        Correct.

Page 111

1          Q.          In any event, you started Legacy, and

2     in that role you met with Andy Birchfield of Beasley

3     Allen on May 2nd of last year, didn't you?

4          A.          That sounds right.

5          Q.          You didn't tell J&J you were going to

6     meet with Mr. Birchfield, did you?

7          A.          Not specifically, but the background

8     here is really important.  On January 30, 2023, the

9     Third Circuit Court of Appeals, in a 58-page

10    decision by Justice Thomas Ambro, ruled quite

11    publicly that the LTL bankruptcy filing was not in

12    good faith, and ordered Judge Kaplan to dismiss it

13    when they returned it to him.

14                     On February 2nd, 2023 --

15         Q.          Can I ask you to pause there.  You're

16    looking at a document.  Can you tell me what you're

17    looking at?

18         A.          I'm looking at the email proposal

19    that we sent to Eric Haas and to the CEO of J&J,

20    Mr. Duato, on February 2nd, 2023, before we ever met

21    or engaged with Mr. Birchfield or anyone else.

22         Q.          Okay.  So my question, Mr. Conlan,

23    respectfully, was you didn't tell J&J that you were

24    going to meet with Mr. Birchfield before you met

25    with him on May 2nd, did you?

Page 112

1          A.        That's what I'm responding to.

2    Paragraph 6 of this email to Mr. Haas and Mr. Duato

3    says:  Legacy reserves the right, in its discretion,

4    to negotiate settlements with interested asbestos-

5    plaintiff law firms of some or all of the pending

6    claims filed by such firms, all such settlements to

7    become effective at closing of the Legacy proposal.

8                    That was an email sent at, well,

9    almost 9 o'clock in the evening on February 1.  It's

10   a February 2 proposal.  It's to Mr. Haas and it's to

11   the CEO of J&J, Mr. Joaquin Duato.  And that last

12   part is paragraph 6.

13                   So, no, I don't think your question

14   is accurate.  Your question is not accurate.

15         Q.        So your testimony is, because you had

16   a paragraph 6 in a February email that said Legacy

17   reserves the right, that you -- yeah, that if its

18   proposal were accepted, that that somehow was a

19   disclosure that you were going to meet with

20   Mr. Birchfield on May 2nd?  I'm having trouble

21   following the logic here.

22         A.        Yeah.  What I'm saying is, on

23   February 22nd, 2023, we send the first proposal to

24   Mr. Haas and Mr. Duato in which we lay out what a

25   Legacy proposal would look like, and in the final

Page 113

1  paragraph of that letter, we say, "We reserve the

2  right to meet with."  In other words, we're telling

3  you we may meet with --

4        Q.      If the proposal is accepted?

5        A.      No, not necessarily.

6        Q.      Right?

7        A.      No, it doesn't -- it doesn't work

8  like that.  Structural optimization and

9  disaffiliation is a process.

10        Q.      If the proposal is accepted by J&J?

11              MR. POLLOCK:  Objection, Your Honor;

12  argumentative, asked and answered, and, frankly,

13  incorrect.

14              THE COURT:  Well, I want some clarity

15  with regard to -- you've asked Mr. Conlan questions,

16  Mr. Conlan responded.  So what are you now

17  addressing to Mr. Conlan, I guess in reply,

18  Mr. Brody?

19              MR. BRODY:  I'm asking him if it's

20  his position that paragraph 6 that he is reading

21  from, and I would love to get a copy of what he's

22  reading from because I don't --

23              THE COURT:  Well, we all have --

24              THE WITNESS:  Your client has a copy

25  of it and the CEO of your client --

Page 114

1                    THE COURT:  What's the exhibit number

2      for that?

3                    MR. BRODY:  It's not in the record.

4      This is -- Mr. Conlan says the record is closed --

5      or Mr. Pollock says the record is closed, but now

6      he's having witnesses bring documents in.

7                    THE COURT:  I thought this was part

8      of what was in our books.

9                    MR. POLLOCK:  No, Your Honor, it's

10     not, but the -- I was going to mark this as P-3 for

11     identification.  I did not intend to introduce it

12     into the record.  I was advised of the document two

13     days ago, and Mr. Conlan has raised the issue.

14                    But for Mr. Brody to now argue that

15     the record is closed is laughable, given the fact

16     that he is reading for hours from transcripts

17     regarding timesheets.  So I think that is -- that

18     ship has sailed, apparently.

19                    If the Court would like a copy, I

20     have a copy.  But again, I was only planning to mark

21     it for identification purposes.

22                    THE COURT:  I don't need to see it

23     because Mr. Brody asked Mr. Conlan.  At least at

24     this point, I don't think we need to see it.

25     Mr. Brody asked Mr. Conlan what was he referring to.

Page 115

1                   MR. POLLOCK:  So the Court does not
2     want a copy?
3                   THE COURT:  Not at this point, no.
4                   MR. POLLOCK:  Yes, Your Honor.
5     BY MR. BRODY:
6          Q.       So, Mr. Conlan, I'm -- I'm really,
7     now having looked at the document, I'm struggling
8     even more with this idea that somehow that paragraph
9     6 was you telling J&J that you were going to meet
10    with Mr. Birchfield on May 2nd of 2023.  And I'll
11    tell you why I'm confused, and you can tell me if I
12    shouldn't be.
13         A.       Okay.
14         Q.       All right?  Because what you have
15    brought with you today is a letter on Legacy
16    Liability Solutions letterhead, dated February 2nd,
17    2023, which says, "This is a proposal for Agreement
18    between Legacy Liability Solutions and Johnson &
19    Johnson.  Legacy and J&J will agree as follows."
20                  Are you with me so far?
21         A.       I am.
22         Q.       And then there are six parts to it,
23    right?
24         A.       Yes.
25         Q.       So, if J&J agrees, you'll enter into

Page 116

1    a transaction, a structural optimization and

2    disaffiliation transaction with J&J.

3                 Are you still with me?

4         A.     I am.

5         Q.     And as part of that, after J&J funds

6    and disaffiliates the entity that is acquired by

7    Legacy, you're proposing that Legacy, then, will

8    reserve the right, in its discretion, to negotiate

9    settlements with interested plaintiff law firm of

10   some or all pending claims filed by those firms.

11        A.     No.  During and after closing is what

12   it says in paragraph 6.  And what I was responding

13   to is the idea that J&J had no idea, was not on

14   notice, was surprised, isn't consistent with the

15   written record.

16        Q.     And J&J explicitly rejected your

17   proposal, correct?

18        A.     No.  We got no response.  No "yes,"

19   no "no," no "maybe."  No confidentiality objection.

20   Nothing.

21        Q.     So your position is that paragraph 6

22   was notice that you were -- you were going to go

23   out -- you, J&J's former lawyer, were going to go

24   out and meet with Mr. Birchfield, even if J&J did

25   not accept your proposal, correct?

Page 117

1          A.        There's no mention of Mr. Birchfield

2     in that letter.

3          Q.        I agree.

4          A.        The concept is, we're once again,

5     we're telling you how this works, the Third Circuit

6     has just told you no more on the bankruptcy, and so

7     we're offering a solution that didn't require a

8     vote, doesn't require a bankruptcy.  We're telling

9     you how the solution works.  And in paragraph 6,

10    we're referencing the fact that in doing this with

11    you -- and it won't happen over night.  It's not a

12    quick transaction -- that we reserve the right to

13    engage with plaintiffs' counsel to understand, for

14    example, the size of the risk that we would be

15    taking.

16         Q.        So what it -- what it says is J&J --

17    Legacy and J&J will agree.  This is your proposal,

18    right?

19         A.        Uh-huh.

20         Q.        And the proposal is, "Legacy and J&J

21    will agree as follows," right?

22         A.        In the ultimate transaction, the

23    way --

24         Q.        I just -- my question --

25         A.        Okay.

Page 118

1          Q.        -- was different.  My question was,

2     you made a proposal, and in your proposal, you

3     proposed that "Legacy and J&J will agree as

4     follows," correct?

5          A.        Correct, over --

6          Q.        And -- and you proposed that J&J and

7     Legacy would agree to six things, didn't you?  I'm

8     just reading the letter.

9          A.        You have to understand that I --

10         Q.        There's a -- there's a colon.

11         A.        That is not the way a structural

12    optimization and disaffiliation works.

13         Q.        That wasn't my question, Mr. Conlan.

14    My question was, you sent -- you sent a letter to

15    Joaquin Duato and Eric Haas, and the letter proposes

16    that Legacy and J&J agree to six things, correct?

17         A.        We were outlining how a structural

18    optimization and disaffiliation would work.

19         Q.        It says, "This is a proposal for

20    Agreement between Legacy Liability Solutions and

21    Johnson & Johnson.  Legacy and J&J will agree as

22    follows," colon.  Correct?

23         A.        Yes, that's what this says.

24         Q.        And then there were six -- six things

25    listed there, right?

Page 119

1          A.       Yes.

2          Q.       And J&J didn't agree with it, did

3    they?

4          A.       They didn't say anything in response

5    to it.

6          Q.       Right.  They didn't agree, did they?

7                   MR. POLLOCK:  Objection.

8                   THE WITNESS:  They didn't say

9    anything in response to it.

10                  THE COURT:  Overruled.

11   BY MR. BRODY:

12         Q.       Do you -- do you often, in entering

13   into a business transaction with somebody, send them

14   a proposal that they agree to something, and if you

15   don't hear back from them treat that as agreement?

16         A.       No.

17         Q.       J&J didn't agree to any of that, did

18   they?

19         A.       Or disagree, or object.  Silence.

20         Q.       There was -- there was no -- come on,

21   Mr. Conlan.  There was no agreement.

22                  MR. POLLOCK:  Objection;

23   argumentative, Your Honor.  Asked and answered.

24                  THE COURT:  Yeah, I think we -- well,

25   it's repetitive.  I think we had an answer from

Page 120

1    Mr. Conlan.

2              MR. BRODY:  Fair enough, Your Honor.

3    Fair enough.

4    BY MR. BRODY:

5         Q.      So, I will say, you know, we haven't

6    heard -- we have done a lot of briefing on this.  We

7    -- you, I think, submitted three different -- two

8    certifications and one declaration.  Maybe the first

9    declaration and the first certification were the

10   same, but two different submissions in the state

11   court, a submission in the federal court.

12              You didn't mention this as the

13   purported justification for going to Mr. Birchfield,

14   did you?

15        A.      Until I sat here and listened to the

16   testimony on March 25 about the shock and horror of

17   learning that late -- much later that we would talk

18   with plaintiffs' counsel in order to size it, I

19   didn't think it was relevant.

20        Q.      And all of a sudden, a proposal that

21   said J&J and Legacy will agree to these six things

22   that J&J never agreed to was an indication that --

23   that a former lawyer was going to go talk to

24   plaintiffs' counsel in the talc litigation?

25              MR. POLLOCK:  Objection;

Page 121

1    argumentative, asked and answered for the fourth

2    time.

3                    THE COURT:  Well, it was -- it was

4    asked.  I don't know if necessarily it was

5    argumentative.  I'll permit the question in terms of

6    finality.

7                    Are you able to answer that question,

8    Mr. Conlan?

9                    THE WITNESS:  Could you repeat it?

10                   MR. BRODY:  Sure.

11   BY MR. BRODY:

12        Q.      I'm just -- I'm just asking -- it's

13   -- it's -- so, all of a sudden -- I guess I'm just

14   going to -- I'm just going to leave it at this.

15                   Your purported justification for not

16   -- first of all, you didn't tell J&J that you were

17   going to meet with Mr. Birchfield on May 2nd; we

18   know that, right?

19        A.      Correct.

20        Q.      Correct.  But your purported excuse,

21   justification, I guess, for that is that you sent a

22   six-item proposal to J&J in February of last year,

23   that they did not agree to, that should have told

24   them that their former on the talc litigation was

25   going to go out and meet with plaintiffs' counsel in

                                                    Page 122

1    the talc litigation?

2                    MR. POLLOCK:  Objection.

3    BY MR. BRODY:

4         Q.    That's -- that's the excuse?

5                    MR. POLLOCK:  Objection.

6                    THE COURT:  Basis of your objection?

7                    MR. POLLOCK:  He needs no excuse.

8    The fact is, he's business man at this point, so

9    what is the -- if there's an allegation that he had

10   some --

11                   THE COURT:  I'll strike "excuse."  We

12   don't have a jury here.  It's the justification,

13   that that letter was your -- and Mr. Brody's

14   question was that was his --

15                   THE WITNESS:  I wouldn't say it was a

16   justification.  It was letting them know that this

17   was a possibility.

18   BY MR. BRODY:

19        Q.    You didn't ask J&J for a waiver.

20        A.    Is that a question?

21        Q.    Yeah.

22        A.    Yeah.  I don't think a waiver would

23   have even made sense.  One, we're not averse.  It's

24   an offer.  They get to say no.  Number one.

25        Q.    They never said yes to your February

Page 123

1    2nd --

2                    MR. POLLOCK:  Your Honor, Your Honor,

3    he's still answering the question.  Mr. Brody is

4    cutting him off.

5                    MR. BRODY:  Fair enough.  I

6    apologize.

7                    MR. POLLOCK:  Let him answer, sir.

8                    THE COURT:  I agree.  So let

9    Mr. Conlan finish his response.

10                    THE WITNESS:  It's not adverse.  They

11   get to say no.  It's a consensual transaction.

12   Number one.

13                    Number two, I'm not a practicing

14   lawyer.  I'm here on behalf of Legacy offering a

15   consensual transaction to which they get to say no.

16   And if they say no, nothing happens.

17   BY MR. BRODY:

18        Q.      I take it you would agree with me

19   that your obligations to your clients, from the time

20   you were practicing law, do not end simply because

21   you have stopped practicing law?

22        A.      I agree that my obligations as a

23   former practicing lawyer include not to share

24   confidential information or to use confidential

25   information.

Page 124

1          Q.       And they go -- they go further than

2     that.  You have a fiduciary duty to your former

3     clients, as well.  You understand that, right?

4          A.       I believe I complied with each of my

5     ongoing responsibilities as a former lawyer.

6          Q.       All right.  Well, let's talk about

7     that a little more.

8               You have never, at any point in time,

9     gotten a waiver from Johnson & Johnson to

10    communicate with Mr. Birchfield or anyone else from

11    Beasley Allen about the talc litigation, right?

12         A.       It wouldn't even have made any sense

13    to me to ask for a waiver.

14         Q.       So you didn't ask?

15         A.       I did not.

16         Q.       And you never got one?

17         A.       Because I never asked for one.  It

18    wouldn't have made any sense for me to ask for one.

19         Q.       And after this May 2nd meeting, you

20    exchanged communications, written communications

21    with Mr. Birchfield and other members of the Beasley

22    Allen law firm, correct?

23         A.       Written communications?  We

24    communicated, yes, and I'm sure some of it was in

25    writing.

Page 125

1          Q.      By talking -- did you talk -- did you

2     talk on the phone?

3          A.      Yes, but --

4          Q.      You had -- you had additional --

5                  MR. POLLOCK:  Can he complete -- Your

6     Honor.

7          Q.      -- in person meetings --

8                  MR. POLLOCK:  Mr. Brody, please let

9     him answer the question.

10                 THE COURT:  Well --

11                 MR. POLLOCK:  He's answering the

12    question.

13                 THE COURT:  We're all not helping

14    ourselves, so.  But he asked the question.  Please

15    let Mr. Conlan -- as I indicated on the 25th, let

16    the witness provide a response.

17                 MR. BRODY:  Sure.

18    BY MR. BRODY:

19         Q.      You -- you talked on the phone?

20         A.      It's important for context.

21                 MR. BRODY:  Your Honor --

22                 THE COURT:  Well, could you answer

23    that question first.

24                 THE WITNESS:  Yes.

25    BY MR. BRODY:

Page 126

1          Q.      All right.  And you had additional
2     in-person meetings, correct?
3          A.      I'm sure we did.
4          Q.      All right.  You had a -- you had a
5     meeting again two weeks later on May 16th of last
6     year, right?
7          A.      May I add this?
8          Q.      I'd like to get an answer to my
9     question.
10               THE COURT:  You will have an
11    opportunity.
12               THE WITNESS:  Okay.
13               THE COURT:  I'm sure Mr. Pollock is
14    going to give you that opportunity.
15               THE WITNESS:  I understand.
16               MR. POLLOCK:  Just to be clear, Your
17    Honor, the reason he is struggling is this occurs
18    during the mediation privilege.  Therefore, he is
19    struggling to answer the question.  That point has
20    not been brought out.
21               THE COURT:  Okay.  But you're going
22    to have an opportunity, Mr. Pollock.
23               MR. POLLOCK:  Yes, Your Honor.
24               THE COURT:  Thank you.
25    BY MR. BRODY:

Page 127

1          Q.        Yeah, and I -- I'm not asking you to
2     reveal the substance of those communications because
3     I understand that the plaintiffs steering committee
4     has taken the position, and it has been recognized
5     by Judge Schneider, that its communications with you
6     during that time period are covered by the mediation
7     privilege.  So I don't want to -- I don't want you
8     to talk about the substance of any of those
9     communications --
10          A.        Okay.
11          Q.        -- because of their assertion of the
12     mediation privilege.  I'm just asking you:  You had
13     more meetings, right?
14          A.        Yes, but it wasn't with
15     Mr. Birchfield alone.  It was arranged by
16     Mr. Molton.
17          Q.        It included Leigh O'Dell, correct?
18          A.        I believe Leigh O'Dell was there.
19          Q.        And the meetings included Ted Meadows
20     from Beasley Allen, correct?
21          A.        I think so.
22          Q.        And just a yes or no, because Beasley
23     Allen and the other lawyers on the plaintiffs
24     steering committee in the MDL have asserted their
25     mediation privilege claim, you received copies of

Page 128

1   plaintiffs' counsels' analysis of claim values for

2   the talc litigation, didn't you?

3           A.      It wasn't just me at the meeting.

4   Scott Gilbert was there.  It is possible that there

5   was communications coming from plaintiffs' counsel

6   to us.  Certainly there was ultimately the matrix,

7   which came from the Beasley Allen firm.

8           Q.      What you were trying to do, and in

9   looking at all of these communications in engaging

10  in this collaboration with Beasley Allen, was to

11  position Legacy with Beasley Allen to get J&J to go

12  not with its preferred resolution of talc

13  liabilities through the LTL bankruptcy, but with

14  what you referred to as the Legacy toggle, right?

15                  MR. POLLOCK:  Your Honor, objection

16  to the word "collaboration," and second of all, that

17  they were "working with."  There's been no proof of

18  either.

19                  THE COURT:  Thank you.

20                  Mr. Brody, do you do you want to

21  address that?

22                  MR. BRODY:  Sure.  I -- I mean, I

23  don't need to go much further than the quote from

24  Mr. Pollock in the March 25th, page 83 of the

25  transcript.  "They were working together, yes," he

Page 129

1  said.

2              THE COURT:  So they were working

3  together.  How about that term?

4              MR. BRODY:  They were working

5  together.

6              THE COURT:  Okay.

7  BY MR. BRODY:

8       Q.      You were working -- what you were

9  doing was working with Beasley Allen to try to

10  position Legacy with Beasley Allen to get J&J to go

11  not with its preferred resolution of the talc

12  liabilities through the LTL bankruptcy, but with

13  what you referred to as the Legacy toggle, right?

14              MR. POLLOCK:  Objection, Your Honor.

15              THE COURT:  And the basis of your

16  objection, Mr. Pollock?

17              MR. POLLOCK:  Because, again, the

18  questions is loaded.  The fact is, yes, they are in

19  a mediation.  Is that working with?  They're having

20  discussions.  Is that working with?  Is that

21  conspiracy?  Is that collaborating?

22              THE COURT:  Well, I don't think it

23  was established through Mr. Conlan's testimony that

24  that was mediation.

25              MR. POLLOCK:  I know, and that's what

Page 130

1    concerns me, because the lack of context is killing

2    me here.

3                    THE COURT:  Well, why don't we -- why

4    don't you preface -- was that your question?  Why

5    don't you preface, is that during -- was that during

6    the mediation, Mr. Conlan?

7                    THE WITNESS:  I don't -- I don't know

8    when the entire mediation is going on.  I don't know

9    the time span.  The only -- we had a fairly limited

10   participation from a timing perspective in the

11   mediation.

12                   THE COURT:  So then your question --

13   I'll overrule the objection, but -- so if I don't

14   find that that's during the mediation --

15                   MR. BRODY:  Yes.

16                   THE COURT:   -- and that doesn't cover

17   it --

18   BY MR. BRODY:

19        Q.      What you were trying to do,

20   Mr. Conlan, was position Legacy with Beasley Allen

21   during the time you were working with them to get

22   J&J to go not with its preferred resolution of talc

23   liabilities through the LTL bankruptcy, but with

24   what you referred to as the Legacy toggle, right?

25        A.      No.  What we were trying to do is

Page 131

1    size the liability as part of the deciding whether

2    we wanted to take the talc-liable entities of J&J.

3    We don't need the approval of the plaintiffs'

4    lawyer.  We don't need a yes vote.  We don't need a

5    no objection.  We don't need any of that.  The one

6    yes we do need is from J&J.

7           Q.      And you were trying to get a yes from

8    J&J, correct?

9           A.      Of course.

10          Q.      And you were trying to get a yes from

11   J&J even though you knew that the resolution J&J

12   wanted was a planned confirmation in the LTL

13   bankruptcy, correct?

14          A.      Not correct.  J&J, on January 30th,

15   2023, was told by the Third Circuit Court of Appeals

16   that the case had to be dismissed as lacking good

17   faith.  Another one was filed immediately in the

18   wake of it and dismissed on July 28th.

19                  What we were attempting to do is

20   offer a path to J&J, if it chose it, to obtain the

21   finality that it was seeking but never did obtain.

22          Q.      And you were trying to do that before

23   the bankruptcy was dismissed, weren't you?

24          A.      Before the second bankruptcy was

25   dismissed?

Page 132

1          Q.          Correct.  Before the second

2     bankruptcy was dismissed.

3          A.          That's correct.

4          Q.          At a time when you knew that J&J was

5     trying to achieve plan confirmation in that

6     bankruptcy proceeding, correct?

7          A.          From public records, yes.

8          Q.          Yes.  And so you knew that what you

9     were trying to get to was not what the company

10    wanted at that point in time, right?

11         A.          No.  What I knew the company wanted

12    was finality.  It was trying to get to a 75 percent-

13    plus vote, and it wasn't getting there, by public

14    information.

15         Q.          And so what you were doing was trying

16    to position yourself to take advantage of that; is

17    that fair?

18         A.          Take advantage of it?

19         Q.          And so if -- I mean, look, while the

20    -- while the bankruptcy was pending, you understand

21    that Mr. Birchfield, along with others, was trying

22    to get the bankruptcy dismissed, right?

23         A.          I was generally aware of what was

24    being filed publicly.  Some of the plaintiffs'

25    lawyers were opposing it, some of them were

Page 133

1    supporting it.

2          Q.      Mr. Birchfield was opposing it,

3    correct?

4          A.      That's my understanding.

5          Q.      You knew that.  You were talking to

6    him at the time, right?

7          A.      Yes.

8          Q.      Right.  And you knew that

9    Mr. Birchfield was opposed to J&J's preferred

10   resolution, which was confirmation of the $8.9

11   billion bankruptcy plan in the LTL 2, right?

12         A.      Yes.

13         Q.      All right.  And, at that time, you

14   were trying to position yourself to engage in -- in

15   what you called a Legacy toggle, right?

16         A.      I don't remember -- the concept of a

17   toggle is, J&J can say yes to this whenever it

18   wants; and if it says yes, there's no bankruptcy.

19   There just isn't one.

20         Q.      Are you denying that you refer to

21   this as the Legacy toggle?

22         A.      No, I'm not denying that.  Others use

23   that word "toggle," which I think is kind of an

24   unusual phrase, because it's not a plan of

25   reorganization, it's not something that the

Page 134

1   bankruptcy court approves; it's an offer, a

2   consensual transaction to J&J that says would you

3   like to do this.

4          Q.      And you were -- you were trying to do

5   that through the tort claimants committee that was

6   appointed in the LTL bankruptcy, weren't you?

7          A.       Trying to have that offer be made to

8   J&J?

9          Q.       Trying to work with the tort

10  claimants committee to advance your Legacy toggle

11  while J&J was seeking plan confirmation of it's $8.9

12  billion bankruptcy plan?

13         A.       I just don't agree with the

14  characterization.  We were trying to size the

15  liability as part of deciding whether we wanted to

16  take the talc-liable entities, if J&J agreed to it.

17  We were not seeking a yes vote from the claimants.

18  We were not seeking to have them say no to J&J.  We

19  were offering a consensual alternative.

20         Q.       You were pursuing an alternative that

21  would have brought administrative and management

22  fees to Legacy, if Legacy had handled it, correct?

23         A.       Yes.

24         Q.       The ability for Legacy to maintain

25  any spread, if there happened to be a spread,

Page 135

1  between the amount that the disaffiliated entity was

2  funded with and the amount that the talc liabilities

3  were ultimately resolved for, correct?

4          A.      Not correct.  One of the features --

5  and, in fact, we offered this to J&J when we meet

6  with them on September 11, 2023, after the second

7  LTL bankruptcy is dismissed -- are mechanisms to

8  allow J&J, in the wake of accepting our deal, to

9  recapture through what we call adverse event cover,

10  so that if the claims end up being less than what

11  the auditors required, J&J can participate in that,

12  so.

13          Q.      And you'll still make money, right?

14          A.      Yes.

15          Q.      All right.  And that's what you

16  wanted.  You wanted to make money?

17          A.      Correct.

18          Q.      If the plan had been confirmed in the

19  bankruptcy, you wouldn't have made money, would you?

20          A.      Correct.

21          Q.      And if J&J doesn't go with the Legacy

22  toggle, it doesn't make money, does it; that you

23  don't make money, Legacy doesn't make money?

24          A.      Correct.  By the way, you said if it

25  doesn't go with.  There is no toggle.  J&J -- LTL is

Page 136

1    not in bankruptcy, so if LTL wanted to do a

2    transaction -- sorry.

3                     Should I answer?

4                     THE COURT:  I don't hear any

5    objection, so yeah.

6                     THE WITNESS:  If LTL and J&J entered

7    into the transaction today, there's no toggle.  They

8    would just enter into the transaction.

9    BY MR. BRODY:

10          Q.     But you -- but you did refer to it as

11   the Legacy toggle, right, during the bankruptcy?

12          A.     I may have.  I don't think I came up

13   with that phrase, but...

14          Q.     Who came up with that?  Was that

15   Mr. Birchfield that came up with that?

16          A.     I think it may have been David

17   Molton.

18          Q.     All right.  And toggle means we're

19   switching.  We're not going to go with what J&J

20   wants, we're going to go with what Legacy wants?

21          A.     No.  I think what David Molten meant

22   when he used the phrase "toggle," which is something

23   Jessica Boelter from White & Case as J&J's counsel

24   in the LTL case often used, and in other cases that

25   we worked together on, is that J&J could take the

Page 137

1  Legacy option, and if it did, the bankruptcy would

2  just go away.

3              But if J&J didn't take the Legacy

4  option, then the tort claimants would proceed with

5  whatever they were going to do.  Vote in favor, vote

6  against, do whatever they were going to do.  Confirm

7  their own plan.

8       Q.      During May of last year, while you

9  were, unbeknownst to J&J, communicating with

10  Mr. Birchfield, you reached out to Mr. Haas to

11  propose this -- to try to get him to agree to

12  discuss this Legacy toggle proposal with you, right?

13      A.      Yeah, reaching out to Mr. Haas was a

14  fairly continuous process.  When you say "May," I'm

15  trying to -- you're saying May of 2023?

16      Q.      Correct.

17      A.      Yeah, that wouldn't surprise me.

18      Q.      And during the time that you were

19  engaged in what the plaintiffs steering committee

20  says are confidential privileged discussions with

21  Mr. Birchfield, right?

22      A.      Yes.

23      Q.      You didn't tell Mr. Haas that you

24  were talking to Mr. Birchfield, right?

25      A.      I don't recall telling Mr. Haas that.

Page 138

1    I didn't think I needed to.

2         Q.       And you didn't?

3         A.       And I didn't.

4         Q.       He rejected your outreach, correct?

5         A.       I don't think they -- I don't recall

6    "rejected."  They certainly didn't say yes.

7         Q.       J&J was going through the LTL, was

8    going through bankruptcy at that point in time,

9    right?

10        A.       Right.

11        Q.       Now, ultimately, Judge Kaplan

12   announced that he was dismissing the second LTL

13   bankruptcy on July 28th of last year, right?

14        A.       That sounds correct.

15        Q.       You sent an email to Mr. Haas the

16   same day, didn't you?

17        A.       I think I did.

18        Q.       And you were pitching structural

19   optimization and disaffiliation with Legacy, right?

20        A.       Again, yes.

21        Q.       All right. You didn't tell him at

22   that time, when you reached out to him, that you had

23   been meeting with Mr. Birchfield and other lawyers

24   from Beasley Allen since the beginning of May, did

25   you?

Page 139

1          A.       I don't think I did, no.

2          Q.       That you had been communicating with

3    them throughout last year's LTL bankruptcy

4    proceeding?

5          A.       Again, when you say "LTL," LTL would

6    later be called what's called LTL 1.  The Third

7    Circuit ordered its dismissal on January 30, 2023.

8          Q.       I'm talking about last summer's

9    mediation.

10          A.       Yeah.  Then Judge Kaplan finally

11    dismisses it.  And a few hours later, LTL files

12    again.  It's called LTL 2.  That case is brief.  It

13    goes from, I don't know, April-May 2023 until

14    July 28th, when Judge Kaplan dismisses it.

15          Q.       And so if I can get an answer to my

16    question.

17          A.       Yes.

18          Q.       You didn't tell Mr. Haas that you had

19    been communicated with Mr. Birchfield and others

20    from Beasley Allen throughout the pendency of the

21    mediation that took place during the course of what

22    you referred to as LTL 2, correct?

23          A.       I don't think I did.

24          Q.       All right.  Now, you ultimately met

25    with Mr. Haas on September 11th of last year, right?

Page 140

1           A.      Yes.

2           Q.      And it was you and Mr. Dachille?

3           A.      Dachille, yes.

4           Q.      Dachille.  Apologies to Mr. Dachille.

5    He is Legacy's chief investment officer?

6           A.      He is.

7           Q.      And you met with Duane Van Arsdale,

8    J&J's treasurer, right?

9           A.      Yes.

10          Q.      Along with Mr. Haas and Mr. White,

11   correct?

12          A.      Correct.

13          Q.      In the meeting, you did not reveal to

14   them that you had been communicating with

15   Mr. Birchfield and Beasley Allen, did you?

16          A.      Again, don't -- I didn't reveal it

17   during that meeting.  Going all the way back to

18   February 2nd, 2023, we, frankly, thought we put them

19   on notice that as part of our model, we need to size

20   the liabilities, but ultimately it's up to the

21   auditors.

22          Q.      And that's the February 2nd letter

23   where you -- you proposed that J&J and Legacy agree

24   to something, and J&J never responded and never said

25   we agree?

Page 141

1          A.       Or objected.

2          Q.       Right.  And it says the -- and that

3    was just where you said "Legacy reserves the right

4    to negotiate settlements with interested

5    asbestos-plaintiff law firms," right?

6          A.       Yeah.

7          Q.       "To become effective at closing,"

8    right?

9          A.       Right.

10         Q.       And is that -- and the closing that

11   that's referring to is the signing of a definitive

12   agreement, embodying the terms of the letter,

13   correct?

14         A.       No.  It's the ultimate acquisition of

15   the talc-liable entities after the auditors have

16   concluded that they will disaffiliate the entities.

17   That's when closing occurs.  Closing is at the very

18   end.  It's not at the beginning.

19         Q.       All right.  So that we don't get too

20   far off track here, I don't want us to go too far

21   down the road.

22         A.       I understand.

23         Q.       But you didn't at that September 11th

24   meeting tell Mr. Van Arsdale, Mr. Haas, or Mr. White

25   that you had been meeting with Mr. Birchfield and

Page 142

1    Beasley Allen lawyers for what was four months at

2    that point in time, right?

3            A.       On again, off again, that's right.

4            Q.       Okay.  To make sure it's clear --

5            A.       They're not in bankruptcy anymore at

6    that point.

7            Q.       I didn't ask you whether they were in

8    bankruptcy.

9            A.       Okay.  I'm just...

10           Q.       So that's a yes, you didn't tell

11   them?

12           A.       Correct.

13           Q.       All right.  Following the meeting,

14   Mr. Van Arsdale told you that -- told you and

15   Mr. Dachille that J&J wasn't interested in your

16   proposal, correct?

17           A.       Well, he said more than that.  But,

18   yes.  I think it's all attached as Exhibit 3 to

19   Mr. Haas' affidavit.

20           Q.       Right.  J&J's third quarter earnings

21   call was October 17th of last year, correct?

22           A.       I don't remember that precisely, but

23   that wouldn't surprise me in terms of the quarter.

24           Q.       You were -- I mean, you were aware of

25   it when it was going on, right?

Page 143

1          A.       I'm generally aware of quarterly

2    earnings calls, yes.

3          Q.       Yeah.  And you were aware of what

4    Mr. Haas stated about the company's intentions with

5    respect to its talc liabilities on that earnings

6    call?

7          A.       I was told by others what Mr. Haas

8    said during the call.

9          Q.       And then you reached out to Mr. Van

10   Arsdale the very next day, didn't you?

11         A.       I don't remember the exact date, and

12   it certainly wasn't because of the earnings call.

13         Q.       Open up the notebook you have in

14   front of you and turn to tab 4.

15         A.       Okay.

16         Q.       You recognize that as an email you

17   sent to Mr. Van Arsdale, correct?

18         A.       This is the one dated October 18th?

19         Q.       Correct.

20         A.       Yeah.

21         Q.       All right.  And you wrote that,

22   right?

23         A.       Yes.

24         Q.       All right.  And what you said there

25   was that you were -- "to further enhance our

Page 144

1    solution... Legacy has the support of lead counsel

2    for the OC"  -- that's ovarian cancer, right?

3         A.     Yes.

4         Q.      -- "Claimants (including Andy

5    Birchfield) for an MDL opt-in settlement matrix with

6    Legacy that will require (and is expected to garner)

7    a 95 percent opt-in of current OC Claimants."

8              Right?

9         A.     Yes.

10        Q.      And you indicated that Mr. Dachille

11   and you and Mr. Birchfield were prepared to meet

12   with Mr. Van Arsdale and his team in person to

13   discuss the terms of the matrix, right?

14        A.     Yes.

15        Q.      As part of the Legacy proposal,

16   correct?

17        A.     Correct.

18        Q.      And you were truthful with Mr. Van

19   Arsdale in that email, right?

20        A.     Yes.

21        Q.      And you knew that Mr. Birchfield was

22   ready, willing, and able to come in with you to talk

23   about the settlement matrix, right?

24        A.     Yes.

25        Q.      And to talk about the resolution that

Page 145

1    you were proposing, correct?

2         A.    Right.

3         Q.    Because you had already discussed

4    that with Mr. Birchfield, right?

5         A.    I wouldn't offer that he would come

6    without confirming that he would come.

7         Q.    Right.  And he was okay with it,

8    right?

9              MR. POLLOCK:  Objection; okay with

10   "it."

11             THE COURT:  The matrix.  And could

12   you --

13   BY MR. BRODY:

14        Q.    He was okay with -- he was okay with

15   coming in with you to meet with J&J, right?

16        A.    Yes, right.

17        Q.    And I take it he probably -- he

18   probably authorized you to say yes -- say -- I mean,

19   I'm sure he authorized you to represent to J&J that

20   he was willing to come in, right?

21        A.    Yes.

22        Q.    All right.  Mr. Van Arsdale did not

23   accept your offer, did he?

24        A.    Mr. Van Arsdale I don't think

25   responded.  But one of the things that's important

Page 146

1    to understand is the email immediately proceeding

2    this --

3            Q.      I'm sorry.  There's no question.

4                    The question was just what

5    Mr. Arsdale -- Mr. Van Arsdale never -- he didn't

6    accept your offer, did he?

7                    MR. POLLOCK:  Your Honor, again, we

8    have allowed long narrative responses from Mr. Haas.

9    Goose/gander should apply.  If you want to do it

10   step by step, we'll do it step by step.

11                   THE COURT:  Well, I'm waiting,

12   really, for a response.

13                   Did Mr. Van Arsdale ever respond?

14                   THE WITNESS:  Not to this email.

15                   THE COURT:  Okay.

16                   MR. BRODY:  All right.

17   BY MR. BRODY:

18           Q.      So, he didn't accept your offer to

19   come in with Mr. Birchfield; fair?

20           A.      He didn't respond.

21           Q.      He -- he didn't -- he didn't accept

22   the offer; fair?

23           A.      Or reject.  He just didn't respond.

24           Q.      All right.  Two weeks later, you

25   pitched this structural optimization and

Page 147

1  disaffiliation idea in the media by writing a piece

2  published by Bloomberg, didn't you?

3          A.      Yes.

4          Q.      And if you turn to tab 15 of your

5  binder, that is the -- could you just confirm that

6  is a copy of it?

7                  THE COURT:  And topically, again,

8  Mr. Brody, why don't we finish with this line of

9  questioning on this Bloomberg article, and then

10  we'll take our lunch break.

11                 MR. BRODY:  Fair enough.

12                 THE WITNESS:  Yes.

13  BY MR. BRODY:

14          Q.      You there?

15          A.      I'm there.

16          Q.      You wrote that, right?

17          A.      I did.

18          Q.      On the first page, it says, "Legacy

19  Liability Solutions CEO James Conlan, former Sidley

20  Austin restructuring chair, proposes an alternative

21  to the Texas Two-Step that provides finality to

22  companies and relief to injured plaintiffs," right?

23          A.      Yes.

24          Q.      No mention of the fact that you were

25  a partner at Faegre Drinker, correct?

Page 148

1          A.      Not in this article, no.

2          Q.      No mention of the fact that you

3    represented J&J in the talc litigation, including in

4    its analysis of bankruptcy as a settlement option,

5    correct?

6          A.      Just one clarification.  You keep

7    saying "in the talc litigation."  It was only with

8    respect to the bankruptcy issues.  That was the

9    Imerys North America bankruptcy, and then briefly in

10   the LTL 1 bankruptcy.  Not the talc litigation.

11         Q.      Those -- those bank -- those

12   bankruptcy --

13         A.      You do it as a subcomponent part.

14         Q.      Those bankruptcy proceedings were

15   efforts to resolve the talc litigation, correct?

16         A.      Yes.

17         Q.      Including all of the pending claims

18   here in Atlantic City, and all of the pending claims

19   in the MDL in Trenton, correct?

20         A.      Yes.

21         Q.      All right.  And you didn't disclose

22   the fact that you had represented Johnson & Johnson

23   in the talc matters -- I'll say "matters," if it

24   makes it easier for you.  You didn't disclose in

25   this article that you had represented Johnson &

Page 149

1    Johnson in the talc matters as outside counsel, did

2    you?

3            A.      No.

4            Q.      Were you trying to hide the fact that

5    you had been a partner at Faegre Drinker?

6            A.      No.

7            Q.      That you had represented J&J in the

8    talc litigation?

9            A.      Was I trying to hide that fact?

10           Q.      Right.

11           A.      No.

12           Q.      That you had done 1600 hours of work

13   for the company on the talc matters?

14           A.      Correct.

15           Q.      You were not trying to hide it?

16           A.      Correct, that -- that I had done 1600

17   hours, no, I was not trying to hide the fact that I

18   had done 1600 hours.

19                   MR. BRODY:  Your Honor, you indicated

20   you wanted to break here.

21                   THE COURT:  Yes.

22                   MR. POLLOCK:  Before we break, can I

23   just get an idea of how much longer we have to go,

24   because I had hoped we would finish today.  It

25   sounds like we may not.

Page 150

1              MR. BRODY:  I have very few

2      additional questions for Mr. Conlan.

3              THE COURT:  Okay.

4              MR. POLLOCK:  Thank you.

5              THE COURT:  Thank you.  Are we going

6      to be able to get to Mr. Birchfield today?

7              MR. BRODY:  Oh, absolutely.

8      Absolutely.  I'll cut down and really see if we

9      can -- I mean, it depends on what Mr. Pollock has

10     for Mr. Conlan, but --

11             THE COURT:  Sure.

12             MR. BRODY:  -- I would expect we will

13     be able to get to and through Mr. Birchfield.

14             MR. POLLOCK:  At least twenty

15     minutes.

16             THE COURT:  I want to stick to our

17     time frame of leaving here at 4:30.

18             MR. BRODY:  Absolutely.

19             MR. POLLOCK:  Excellent.

20             THE COURT:  Okay.

21             MR. POLLOCK:  Thank you.

22             THE COURT:  Mr. Conlan, you're still

23     under oath.  Okay?

24             THE WITNESS:  Yes.

25             (A recess was taken.)

Page 151

1                    THE COURT:  Thank you.  Please be

2    seated.  Back on the record.  All counsel is here.

3    Mr. Conlan is on the witness stand.

4                    Mr. Brody, you're going to be closing

5    up, you know, wrapping up, so to speak.

6                    What I'm going to do is, the Court is

7    going to address the in camera, at this point,

8    issues.  The Court is not inclined to accept any

9    documents for an in camera review, except if there

10   are any allegations of perjury, not saying that

11   there are.  But, Mr. Brody, if J&J wants to review

12   and redact any particular documents, it may do so in

13   a manner that could be shared with Mr. Pollock, and

14   it would be limited to Mr. Pollock's eyes only.

15                    So, look at it.  If you think there's

16   attorney-client -- and we have all seen redacted

17   attorney -- you know, the timesheets with regard to

18   that.  That's how we're going to address the in

19   camera review, Mr. Brody.

20                    MR. BRODY:  Okay.  Thank you, Your

21   Honor.

22                    THE COURT:  You're welcome.

23                    Mr. Brody, you may continue.

24                    MR. BRODY:  Thank you.  And I'll be

25   able to wrap this up very quickly, I think.

Page 152

1    BY MR. BRODY:

2          Q.      So, Mr. Conlan, we left off, I had

3    asked you questions about the November 2nd

4    publication that you authored that is at tab 15,

5    right?

6          A.      Yes.

7          Q.      All right.  A week later, on

8    November 9th, you sent a letter to Johnson &

9    Johnson's board of directors, right?

10          A.      Yes.

11          Q.      And you if you would turn to tab 7 in

12    the notebook you have there.

13          A.      I'm there.

14          Q.      All right.  And that's the letter

15    that you wrote?

16          A.      Yes.

17          Q.      In that letter, you attached what you

18    said was a minimum $19 billion price tag to your

19    proposal, correct?

20                  MR. POLLOCK:  Objection.

21                  THE WITNESS:  Well, I said 19 billion

22    or such greater amount as determined by the

23    auditors, PwC.

24    BY MR. BRODY:

25          Q.      Right.  So that's a minimum of 19

Page 153

1    billion, 19 billion or greater, right?

2            A.      Yes.

3            Q.      All right.  And you attached a

4    settlement matrix as an exhibit to the letter that

5    you wrote, correct?

6            A.      Yes.

7            Q.      And that was the settlement matrix

8    that you referred to in Hearing Exhibit 4, the email

9    that you wrote to Mr. Van Arsdale on October 18th,

10   2023?

11           A.      I believe so, yes.

12           Q.      So about three weeks earlier --

13           A.      Yes.

14           Q.      -- correct?

15                   In your letter, you told the Johnson

16   & Johnson board that before you sent the matrix to

17   J&J, Legacy's proposal had been reviewed and was

18   supported by leadership counsel on both the federal

19   MDL and in state court cases across the country,

20   right?

21           A.      Yeah.  I'm looking for the exact

22   language, but that sounds right.

23           Q.      Well, it's on the first page.  I'll

24   let you find it.

25           A.      Okay.

Page 154

1          Q.      Second paragraph.

2          A.      Right.

3          Q.      It's on page 1.

4          A.      I'm looking for it on page 1. I

5    thought it was on page 2.

6          Q.      It's the paragraph that starts "put

7    simply."

8          A.      Okay.

9                  MR. POLLOCK:  It's Plenary 62.

10                 THE WITNESS:  Right.  Yes.

11   BY MR. BRODY:

12         Q.      And that was true, right?

13         A.      Yes.

14         Q.      That plaintiffs' counsel reviewed

15   that settlement matrix before you shared it with

16   J&J, correct?

17         A.      Yes.  We got it from --

18         Q.      And you knew that they --

19         A.      We got it from Beasley Allen.

20         Q.      Beasley Allen.  Okay.  So when you

21   refer to "plaintiffs' counsel," you're referring to

22   Beasley Allen?

23         A.      I am.

24         Q.      All right.  And you knew that Beasley

25   Allen supported it because you had discussed it with

Page 155

1  them, correct?

2          A.      Yes.

3          Q.      All right.  And you had been

4  communicating with Mr. Birchfield for over six

5  months by November 9th, 2023, correct?

6          A.      Yeah, on and off.

7          Q.      Yeah.  And you didn't get a waiver

8  from J&J for any of that, did you?

9                  MR. POLLOCK:  Objection.  It assumes

10 facts in evidence -- not in evidence, that he had to

11 get a waiver, so I object to it.

12                 THE COURT:  Well, he just asked.  He

13 asked the question.

14                 MR. POLLOCK:  Okay.

15                 THE COURT:  So I'll overrule the

16 objection, but --

17                 THE WITNESS:  Right.  The same answer

18 as before.  I didn't think I needed one, including

19 because I wasn't practicing law and it was a

20 proposal, it was consensual.

21 BY MR. BRODY:

22         Q.      And you didn't get a waiver?

23         A.      Correct.

24         Q.      And didn't ask for one?

25         A.      Correct.

Page 156

1          Q.      And you hadn't disclosed to J&J that
2    you were communicating with Mr. Birchfield until
3    that October 18th email that you sent to Mr. Van
4    Arsdale, right?
5          A.      Other than the reference in the
6    February 2nd proposal.
7          Q.      Right, the document we saw.
8                  By the way, this -- this proposal,
9    you -- this February 2nd letter, you brought a copy
10   of this with you to court in the hearing exhibit
11   binder, right?
12         A.      Yes.
13         Q.      Right.  And Mr. Pollock had copies of
14   it ready to hand to me, already marked with an
15   exhibit sticker, right?
16         A.      I don't know what --
17                 THE COURT:  To the extent you know.
18                 THE WITNESS:  I don't know, but
19   Mr. Pollock did have a copy.
20   BY MR. BRODY:
21         Q.      Did you meet with Mr. Pollock in
22   preparation for your testimony today?
23         A.      With my counsel, yes.
24         Q.      And with Mr. Pollock?
25         A.      Yes.

Page 157

1          Q.       By the way, not only did you never

2     tell J&J before -- let's put this aside -- before

3     the 18th of October that you were meeting with

4     Mr. Birchfield, you never told the mediators in the

5     LTL 2 bankruptcy that you had previously represented

6     J&J on the talc matters, did you?

7                    MR. POLLOCK:  Your Honor, objection.

8     Asking directly mediation-privileged communications.

9     And this is what the mediators -- I don't know how

10    you can answer that question without violating the

11    privilege.

12    BY MR. BRODY:

13         Q.       Well, let me ask you this.

14    Mr. Conlan, mediators were not aware in LTL 2 that

15    you had previously represented Johnson & Johnson in

16    the talc matters, were they?

17         A.       Not that I'm aware of.

18                  MR. BRODY:  All right.  Thank you.

19                  That's all I have.

20                  THE COURT:  Okay.  Mr. Pollock.

21                  MR. POLLOCK:  Your Honor --

22                  MR. BRODY:  Oh, yeah, one -- yeah,

23    one -- just one housekeeping matter.

24                  Mr. Pollock had asked that this

25    document be marked for identification purposes as

Page 158

1    Plaintiff's 3.  We would just ask the Court to

2    receive it as part of the -- actually, as evidence

3    in the record.

4                    THE COURT:  Mr. Pollock?

5                    MR. POLLOCK:  No objection.

6                    THE COURT:  All right.  So that will

7    be -- I can't believe we're going to ask that

8    question with regard to that particular document,

9    since it was prominently featured at this point in

10   questioning Mr. Conlan.

11                   MR. POLLOCK:  We've got all day, so

12   I'm going to go for it.

13                   THE COURT:  So that will be -- if we

14   can have a copy at the point when you close,

15   Mr. Pollock, that will be marked into evidence.

16                   MR. POLLOCK:  If Your Honors are

17   dying for a copy, I can give you one right now.

18                   THE COURT:  No.

19                   MR. POLLOCK:  Okay.  Proceed?

20                   THE COURT:  You may proceed.

21                   MR. POLLOCK:  Thank you.

22                   With the Courts' permission, I may

23   both sit and stand, depending upon where my

24   eyesight's at.  Okay?

25                   THE COURT:  At your pleasure.  If you

                                                    Page 159

1   want to use the podium, or --

2                   MR. POLLOCK:  No, I'm good.

3                   THE COURT:  Okay.

4                   MR. POLLOCK:  I have a condition

5   called dry eye, and I -- well, my -- I have no

6   prenup tears, so I've got enough issues, as my life

7   partner said, for my -- for myself.

8                         -  -  -

9                   CROSS EXAMINATION

10                        -  -  -

11  BY MR. POLLOCK:

12        Q.      All right.  Structural optimization

13  and disaffiliation.  You heard me ask Mr. Haas

14  whether that would work, and he did not like the

15  idea.  He said, I think, and I'm going to slaughter

16  it, but one, it doesn't account for futures, it

17  doesn't account -- the auditors don't like it, and

18  there was some other problems with it.

19                  Do you agree with Mr. Haas that your

20  approach, the Legacy approach, would not work?

21        A.      I do not agree with Mr. Haas.

22        Q.      Can you please explain to the Court

23  why you think Mr. Haas got it wrong?

24        A.      Yes.  Structural optimization and

25  disaffiliation of solvent mass tort companies,

Page 160

1    entities that are, themselves, liable, the entire

2    point and purpose is that it does capture future

3    claims, as well as current claims.

4                    The entities, themselves, that are

5    liable contractually or in tort are acquired by us,

6    so the entities that remain don't have liability in

7    the tort system or contractually.  By definition,

8    therefore, it captures all current and all future

9    claims.  That's, quite frankly, the main purpose of

10    it.

11                    Number two, at the time that we

12    acquire those, in this case talc-liable group of

13    entities, the auditors, and this is a condition to

14    us being willing to do it, have to agree that those

15    entities we're acquiring are adequately or more than

16    adequately funded.

17                    Why do they need to do that?  Because

18    in order to remove the noncash charge from the

19    financials of those companies, the auditors must so

20    conclude.  That way, there is no fraudulent transfer

21    risk, there is no unlawful dividend risk.  And the

22    auditors are tough, but when they say there's enough

23    money there to remove the noncash charge, there's

24    enough money there to remove the noncash charge.

25                    And so we can't and are not

                                                    Page 161

1    interested in acquiring companies, unless the

2    company agrees, that's number one; and number two,

3    the auditors are comfortable removing the noncash

4    charge.

5                    I know that's a lot of complicated

6    talk, but it's the core of it.

7         Q.         So, bear in mind, I'm a simple

8    country lawyer, so I don't -- this stuff is beyond

9    me.

10                   When you talk about "noncash charge,"

11   can you spell that out a little bit because, I

12   apologize, I'm not getting it. I don't know what it

13   means.

14        A.         I can.  In the United States, and I

15   can refer to outside the United States, GAAP,

16   generally-accepted accounting principles, is what

17   rules accounting standards.  It's largely what rules

18   what the SEC says you must put in your financials.

19                   Under a particular provision, which

20   is GAAP ASC 450, a public company must take a

21   noncash charge, meaning set up a provision for the

22   probable and estimable amount of a contingent

23   liability.

24                   So, when you look at, really, any

25   public company that has a mass tort liability that

Page 162

1  is current and future, they have a number, and that

2  number is provided by a combination of their

3  actuaries and their auditors to give the world

4  notice that there's a problem here, so that

5  investors can take it into account, for example, in

6  deciding how much they'll pay for the stock.

7            In order to remove that noncash

8  charge, the auditors have to conclude not only that

9  the entities that are liable are no longer owned by

10  the group, but they were adequately funded at the

11  time that they were disaffiliated, so that it won't

12  come back on the company.

13            In the United States, it's called

14  GAAP ASC 450, and there's an equivalent in Europe.

15       Q.       And in order to fill this noncash

16  charge, GAAP, whatever you just said, do you have to

17  have some clarity as to what the number is that

18  you're ultimately looking at, the auditors are

19  looking at?

20       A.       Sum is an important modifier.  The

21  auditors look at all the datapoints.  So, for

22  example, in the case of J&J, what the auditors would

23  look at is how many people had already agreed to

24  accept the $8.9 billion plan; the fact that the

25  attorneys general, from what I read, are close to

Page 163

1    agreeing to a resolution; the fact that mesothelioma

2    claimants are, in significant number, agreeing to a

3    resolution.  They would also be impacted by the fact

4    that there's a potential settlement for current

5    ovarian claimants.

6                Those are all datapoints that the

7    auditors would take into account in deciding what

8    the amount is that has to be, essentially, put into

9    the entities that are disaffiliated in order for

10   them to remove the noncash charge.

11               They don't have certainty, by

12   definition, because they are coming up with a

13   number, but the -- and the number isn't certain

14   because it's current and futures.

15        Q.       Is structural optimization and

16   disaffiliation a J&J confidence?

17        A.       In no way, shape, or form.

18               MR. POLLOCK:  And, Your Honor, I've

19   got a time table I'm going to share with the Court.

20   I thought we could do this together.  I may

21   periodically ask -- I may periodically ask

22   Mr. Conlan and Mr. Birchfield to share with me,

23   because I think the timing -- and you and I talked

24   about this, Judge Porto, we talked about it -- that

25   the timing of events is really important.  And I

Page 164

1    would like to just break briefly from my line of

2    questioning.

3                    So I've got a chart that lays out --

4    I'm not asking about the Beasley Allen time frame,

5    but as far as the Jim Conlan time frame -- and

6    you're welcome to stand up, sir, if you're -- with

7    your permissions, Your Honors, if he wants to walk

8    around, I assume that's okay.

9                    THE COURT:  Yeah, if he wants to

10   approach the easel.

11                   MR. POLLOCK:  Yeah.

12                   THE COURT:  That's fine.

13                   MR. POLLOCK:  Yeah.  So I'm

14   nearsighted.  I can't see far.

15   BY MR. POLLOCK:

16        Q.       So this one's June 19 -- June 1988.

17   Is that about when you started at Sidley?

18        A.       Yes.

19        Q.       And did you spend your entire time at

20   Sidley until roughly May 2020?

21        A.       Yes.

22        Q.       And then did you make a mistake and

23   decide to go back to the practice of law at another

24   law firm?

25        A.       Well, I didn't leave the practice of

Page 165

1    law.  I went from Sidley to Faegre Drinker.

2          Q.     Okay.  And how long did you stay with

3    Sidley and Faegre -- go to Faegre?

4          A.     I was there about 20 months.

5          Q.     Okay.  So that would be from roughly

6    June 2020 to when?

7          A.     To February-March 2022.

8          Q.     Okay.  I don't have a mark down

9    there, but we can mark those in.

10                MR. POLLOCK:  Mike, you can play

11   Vanna White, if you want to, and write some of these

12   in as he goes through.

13                With Your Honors' permission, what I

14   may do is have Mike just kind of write in the time

15   frames to help the witness, to do that, rather than

16   have the witness do it.

17                THE COURT:  Perfect.  Whatever is --

18   whichever is easier.

19                MR. POLLOCK:  I'm just trying to move

20   it along.

21   BY MR. POLLOCK:

22          Q.     So, if you can write in the time

23   period you left, that would be great.  What was the

24   date again, Jim?

25          A.     I leave Sidley in June of 2020 --

Page 166

1          Q.      Yeah.

2          A.      -- having been there since the summer

3    of 1988.  Hard to believe that long.  And I was at

4    Faegre Drinker about 20 months, from June 2020 to

5    February-March 2022.

6                  MR. POLLOCK:  So, Mike, if you can

7    just circle the period for Faegre, whatever Jim

8    said, and just call that "Faegre," that would be

9    great.  Okay.

10   BY MR. POLLOCK:

11         Q.      The -- Jim, if you could tell us,

12   looking at this chart -- it's just a demonstrative,

13   it's not going into evidence, unless the Court

14   directs otherwise.

15                 During what time period did you talk

16   about structural optimization and disaffiliation?

17   During what time did you work on -- when you were at

18   Sidley and Faegre, did you talk historically about

19   it?  When did you actually work on that concept?

20         A.      I began the process of structurally

21   optimizing companies that came before disaffiliation

22   in about 2009 and 2010, and it was in the context of

23   the big companies who had asbestos liabilities,

24   initially, and who wanted to remove the existential

25   threat that asbestos would eat all of the entities

Page 167

1    in the family of companies, rather than just

2    potentially the entities that were, themselves,

3    liable.

4                    So, if you could imagine a company

5    with 500 entities and there were four that were

6    actually liable for asbestos.  In the tort system or

7    contractually, the goal was to structurally optimize

8    those four, removing all the operating assets, but

9    making sure they were adequately capitalized with

10   liquid funds so that they could operate in the tort

11   system, but they -- you would contain the liability

12   at that level.

13        Q.    So that's my beginning date, but when

14   did you start working on that?

15        A.    2009.

16        Q.    Okay.  Just say 2009, disaffiliation,

17   I can't even spell it, as start date.

18                    Mr. Brody had asked you -- I'm going

19   to skip for one second.  Mr. Brody had asked you

20   about a proposal, which I think is at Exhibit 7.

21   Yeah, Exhibit 7.  And it's got a cell chart -- no,

22   I'm sorry, it's Exhibit -- where is the cell chart?

23   I apologize.

24                    THE COURT:  It is 7.  That's the

25   Legacy letter, November 9th.

                                                    Page 168

1              MR. POLLOCK:  Yeah.  Was that the

2    cell chart one?  Okay.

3    BY MR. POLLOCK:

4         Q.      At last page -- yeah, the last page

5    of it.  So it's Plenary 67.  Can you look at Plenary

6    67?

7         A.      Yes.

8         Q.      We had talked about -- I forgot the

9    word already.  When we were talking about

10   quantifications, specification, what did we use,

11   that word?  You used a strange word for it.  It

12   wasn't disaffiliation, it wasn't association.  When

13   you were talking about the GAAP issue, you needed to

14   quantify the risk, there is -- anyway, you had said

15   the arbitrators -- the auditors need a specific

16   number, they need something to be happy with?

17        A.      Yeah.  They need to come up with

18   their view of how much money needs to be in the

19   liable entities at the time that they're acquired,

20   for example, by a Legacy, in order for the auditors

21   to remove the noncash charge from the financials.

22        Q.      Oh, that's what I was looking for,

23   yeah, "noncash charge."  I apologize.

24              With regard to the approach that you

25   had, you're talking about structural optimization

Page 169

1    and disaffiliation, is it fair for me to say it's

2    somewhat like Spandex, that you can -- whether the

3    number is $20 billion, $30 billion dollars, $12

4    billion, assuming that's a fair number, anything,

5    whatever the number is, it is, and that your

6    approach would work based upon that number, assuming

7    it's not too small.

8           A.      Correct.

9           Q.      And the matrix that's attached, which

10   is on 67, have you seen that -- you've seen that

11   matrix before?

12          A.      Yes.

13          Q.      And you attached it to your letter?

14          A.      Yes.

15          Q.      Have you seen other matrices?

16          A.      In my life?

17          Q.      In this matter.  In this matter, the

18   -- the -- in discussions with Beasley Allen, in

19   discussions with J&J, have you seen other matrices?

20          A.      Yes.  I've been exposed to other

21   matrices.

22          Q.      And would it be fair to say that you

23   at Legacy are agnostic as to what the number is

24   because your approach is roughly the same; whether

25   it's $15 billion or $30 billion, it doesn't really

Page 170

1    matter a whole lot?

2         A.    Or -- correct, or whether it's talc

3    or asbestos or herbicides or pesticides or PFAS, to

4    name a few.

5         Q.    At what point in time did you first

6    -- and you can look at the time chronology, if you

7    would like.

8              And, Mike, I'll ask you to mark this

9    one on.

10             When did you first hear about a $19

11   billion number?  Where did that come from; do you

12   know?

13        A.    The 19 billion?

14        Q.    Yes, sir.

15        A.    It came from us, from Legacy.  It was

16   January 30, 2023.  I alluded to this earlier.  The

17   Sixth Circuit -- sorry, the Third Circuit issued its

18   opinion, the 58-page opinion, finding that the J&J

19   filing, the LTL filing was not in good faith.

20             That afternoon or late morning, the

21   market capitalization of J&J, the value of all of

22   its stock, declined $18 billion.  And what that said

23   to us is that the market, and we're big believers in

24   the market, that the market didn't think the

25   liability was 18; the market thought it was 18 more

Page 171

1    than what it thought it was the day before.

2                    Because the liability was there,

3    obviously, before, but the market traded the stock

4    down $18 billion.  It recovered some later in that

5    day, but it was clear the market really didn't like

6    this liability, which is common.  The market really

7    doesn't like contingent liabilities for public

8    companies.

9                    Our own view was that the market was

10   exaggerating the liability, but the market clearly

11   thought it was a big number.

12                   That's why, on February 2nd, just a

13   couple of days later, the number that's in that

14   letter adds up to 17.6.  It was 16 from J&J and 1.6

15   from us.  17.6.

16                   And again, there's a variety of

17   factors that go into that.  One is what the market

18   thinks.  Another, and I'm going to try to keep this

19   interesting, is the discount rate used to determine

20   the PV of the liabilities is extremely important.

21   What that means is that as interest rates go up --

22   for example, on the 10-year today, it's between 4.3

23   and 4.4, the yield on the US 10-year obligation.  As

24   that number goes up, the liability goes down because

25   as the PV of the liabilities goes down, the higher

Page 172

1    the discount rate goes up.

2                   So, frankly, as interest rates rise,

3    the PV of the liability declines.  So, as we all

4    know in America today, that 10-year yield has been

5    moving all over the place, mostly up in the last two

6    years.

7                   So it's not as simple as just looking

8    at the market.  It's not as simple as just looking

9    at where the yield on the 10-year is.  It's looking

10   at a variety of factors.  Probably the least

11   interesting is what the experts think it is, because

12   that's not the world we live in.

13        Q.       Mr. Brody asked you some questions

14   right before we broke for lunch, and I don't have

15   the transcript, but I'll do the best I can.

16                   You were trying to position yourself

17   for the Legacy toggle.  Hold on.  You wanted to make

18   money, and he specifically was pointing to you,

19   meaning, I think, Legacy, not you individually,

20   although I'm sure you would --

21        A.       It would be both.

22        Q.       And he also said -- I can't remember

23   the other one, but in any event, that -- am I

24   correct in understanding that the proposal you're

25   making would financially benefit Legacy?

Page 173

1              A.      Yes.

2              Q.      And that part of the Legacy proposal

3    is premised upon the fact that if you buy these

4    liabilities from J&J, you'll be holding onto them

5    for a little bit and that you make some interest on

6    that money?

7              A.      That's correct.  To be specific?

8              Q.      Yes.

9              A.      I mentioned the 10-year yield today

10   at 4.3 to 4.4.  We would absolutely expect, could

11   virtually guarantee, that we would make 1.6 to 1.7

12   percent more than that by simply investing in AA

13   Corporate, so almost no risk, just matching the

14   durations.

15             Q.      And to be clear, that money is part

16   of Legacy's investment proposal and structure

17   because that's how you make -- hopefully, you take

18   on risk and you make money?

19             A.      Correct.  We hope.

20             Q.      But if you make money, that doesn't

21   -- look, let's assume you hold onto the money for

22   five years as opposed to one year.  That doesn't

23   increase the payout to the talc claimants, correct?

24             A.      Our incentive is to hold onto the

25   money as long as possible, to pay the claimants

                                          Page 174

1    within the [bronze] propriety.  You know, not pay

2    them soon, but pay them over time.  Why?  Because

3    we're making that 1.6 to 1.7 percent spread.

4                    On the other hand, we're a rational

5    defendant.  We're not going to hold on and get

6    popped in judgments.  So it's the same kind of

7    balance that a company has when it's defending a

8    mass tort.

9         Q.     Mr. Brody mentioned -- and I'm

10   switching gears here for a second.  I'm sorry, but

11   I'll be jumping around a little bit.  He mentioned

12   that you and Mr. Murdica were leading, at one point,

13   when he was talking about, I believe, the Imerys

14   matter.

15                   To put that in context, were you

16   leading at any point in time the J -- J&J's efforts

17   in bankruptcy, or were there other firms like Weil

18   Gotshal and Jones Day that were really leading the

19   charge.  What's was your --

20                   MR. BRODY:  I'm just going to object,

21   because I think the question misstates what my

22   question was to Mr. Conlan.

23                   THE COURT:  Why don't you create a

24   question that you would like Mr. Conlan -- I don't

25   want to say the record is mischaracterizing the

Page 175

 1    question, unless we get a read-back at some point,

 2    which I don't know that we can.  But I understand

 3    the objection.

 4                    Why don't you make the question your

 5    own, Mr. Pollock.

 6                    MR. POLLOCK:  Sure.

 7    BY MR. POLLOCK:

 8        Q.      If I were to say that you, Jim

 9    Conlan, have led J&J's bankruptcy efforts during the

10    time that you were at Faegre, would that be a true

11    statement?

12        A.      That would not be a true statement.

13        Q.      Were there other people, other law

14    firms that were, in your view, far more

15    significantly involved on behalf of J&J?

16        A.      Yes.  And narrowing first to the

17    subject matter of the bankruptcy, lead counsel, far

18    and away, lead counsel for J&J in the Imerys North

19    America bankruptcy was Weil Gotshal, a very capable

20    and big player in the world of the bankruptcy.

21                    In LTL 1, it was Jones Day, as

22    counsel for LTL, and it was White & Case as counsel

23    for J&J in the LTL bankruptcy.  Again, that's just

24    bankruptcy.  Jim Murdica is resolution counsel.  Jim

25    Stengel and others were litigation counsel.  There

Page 176

1    were a variety of different roles.

2                    But in the world of bankruptcy, our

3    role, I -- it was Weil Gotshal for Imerys, it was

4    Jones Day for LTL, and it was White & Case for

5    Johnson & Johnson in the LTL bankruptcy.

6         Q.       Did Jones Day show you the LTL filing

7    before it, J&J, filed it?

8         A.       May I answer that?

9                    THE COURT:  Yeah, sure.

10                   THE WITNESS:  No.

11   BY MR. POLLOCK:

12        Q.       You mentioned that you've had a long

13   career at Sidley.  Can you walk the Court briefly

14   through what your evolution was.  I don't want to

15   know what your first memo was, that kind of thing.

16   I'm talking about -- I want to get to the point

17   where you're -- did you ever get a role of

18   leadership?  Did you ever get a role that was

19   significant at Sidley while you were there?

20        A.       Yes, over time.

21        Q.       What roles -- can you tell me

22   approximately what -- I want to hit the highlights

23   of your career.  If your mother was here, what were

24   the best things that Jim Conlan did at Sidley, what

25   would you tell her?

Page 177

1      A.      Well, I'll just describe it in terms
2  of milestones.  I graduate from law school from the
3  University of Iowa in 1988.  I had been a summer
4  associate at Sidley the year before, so then I
5  joined in 1988 as a first-year associate, and I
6  immediately joined the bankruptcy group.  You had to
7  pick a group right away at Sidley.
8              Eight years later, I became a partner
9  at Sidley, along with a lot of other people.  I
10  don't remember what precisely the year was.  I
11  became vice chairman of the restructuring practice.
12      Q.      When was that, Jim?
13      A.      I would say that was like -- I became
14  partner in 1996.  I think vice chair of the
15  restructuring practice was probably in 2002, 2003.
16  I'm kind of going by what my age was.
17              Shortly thereafter, I became co-chair
18  of the firm-wide bankruptcy practice.  Thereafter, I
19  became chairman of the firm-wide bankruptcy
20  practice.  And I suppose other things is I went on
21  to the executive committee.
22      Q.      When was that?
23      A.      I think it was about 2005.
24      Q.      And did you remain on the executive
25  committee until you departed?

Page 178

1          A.       Until shortly before.

2          Q.       And during that time period, did you

3     have discussions with other lawyers and other law

4     firms about potentially merging with Sidley?

5          A.       Yes.

6          Q.       And did you commit to those people

7     that you would keep those discussions confidential?

8          A.       Yes.

9          Q.       And did they have to reveal to you

10    how their practice was going, how their group was

11    behaving, what kind of monetary income they were

12    making, what their billing rates were, all kinds of

13    sensitive information that were confidential to

14    those law firms?

15         A.       Yes.

16         Q.       And did you keep -- did you commit to

17    keeping that information confidential?

18         A.       Always.

19         Q.       And did you do so?

20         A.       Pardon me.

21         Q.       Did you do so?

22         A.       I did.

23         Q.       And did you also get the joy of

24    dealing with problem partners and people who had

25    issues, affairs, and got accused of alcoholism, that

Page 179

1    kind of thing?

2          A.      Yes.

3          Q.      And did you have -- did you commit to

4    keeping those things confidential, as well?

5          A.      I did.

6          Q.      And did you do so?

7          A.      I did.

8          Q.      Has anybody ever accused you at any

9    point in time from your work at Sidley that you

10   broached those confidences, you -- the fact that

11   told something that you shouldn't have told out of

12   school?

13         A.      Not that I recall.

14         Q.      There was a discussion regarding

15   mediation, and I would like to get this a little

16   clearer in my head, if I can.  I don't know if you

17   can do this without documents.

18                 Do you know approximately when the

19   mediation efforts were that involved the documents

20   that Mr. Brody was asking about?  He was asking

21   about did you send drafts back and forth.  Do you

22   know when the mediation was?

23         A.      I don't know how long the mediation

24   went.  Legacy was involved, I recall, as follows:

25                 In May of 2023, Scott Gilbert, who is

Page 180

1  a part of Legacy and a long-time colleague, you

2  might say, or someone who is very familiar with Eric

3  Green, was talking to Eric Green.  Eric Green was

4  exploring Scott's new role at Legacy.  He's a senior

5  officer.  And Scott was explaining how Legacy works,

6  and undoubtedly promoting it in some respects, as

7  well, to Eric Green.

8            As a result of that conversation,

9  sometime in May of 2023, Scott, and Scott alone, had

10  a meeting with the mediators.

11       Q.     Who are the mediators?

12       A.     Mr. Green, Mr. Russo, and then Fouad,

13  who is really Eric Green's right-hand person.

14       Q.     Okay.

15       A.     And they had a that meeting.  I

16  wasn't in that meeting, but I had the impression it

17  went a few hours, and it was a video.  And in the

18  wake of that, there was a desire to have a more full

19  meeting.

20            MR. BRODY:  I'm sorry.  We are going

21  to get into what the mediators wanted.  I'm in a

22  situation here where the plaintiffs steering

23  committee has claimed mediation privilege over all

24  of its communications, and now we're getting into --

25  if we're talking about May, we're talking about

Page 181

1    during the mediation.

2                    And I don't know if we should be

3    going down the road of what did the mediators want,

4    especially in a situation where the mediators have

5    indicated that they believed questions about what

6    they wanted are things that they can't disclose.

7                    THE COURT:  Thank you, Mr. Brody.

8                    Mr. Pollock?

9                    MR. POLLOCK:  I actually have no

10   problem with that objection.  I -- I can move on.

11                   THE COURT:  Okay.

12                   MR. BRODY:  Yes.  The -- just to

13   update the Court as to, as the Court is aware, the

14   mediators responded to Deposition on Written

15   Questions.  They answered one of the questions --

16   well, two, really.  They answered one of the four

17   substantive questions without objection, and all

18   three of them indicated that at no point were they

19   aware during the course of the LTL 2 mediation that

20   Mr. Conlan had been counsel for J&J on the talc

21   litigation.

22                   MR. POLLOCK:  On that one, Judge, the

23   mediators said what the mediators said.  I would

24   like the record to simply be they were asked upon

25   the direction of Judge Singh to answer questions in

Page 182

1    writing.  They did so.  Whatever it said, it said.

2    I would rather not have it characterized by me or

3    Mr. Brody.  It says what it says.

4                    And we should -- we should -- should

5    we pose -- I assume we should mark those.  But we've

6    already agreed to mark those into identification,

7    right?

8                    Are you moving them into evidence, or

9    not?

10                   MR. BRODY:  I have no objection to

11   them being part of the record.

12                   MR. POLLOCK:  Let's move them into

13   evidence.

14                   THE COURT:  That's fine.  Okay.

15                   MR. POLLOCK:  Can I move on?

16                   THE COURT:  Yes.

17   BY MR. POLLOCK:

18        Q.       The mediation continued for

19   approximately how long?

20        A.       I don't know.

21        Q.       Okay.

22        A.       We met on June 1 --

23        Q.       All right.

24        A.       -- of 2023.

25        Q.       And during the course of this, with

Page 183

1    the mediators, Mr. Green, [Mr.] Fouad, right, and

2    then there was a Mr. Russo --

3         A.    Yes.

4         Q.        -- with those three guys, would it be

5    fair to say that you had discussions -- that you

6    learned information, without describing what the

7    information was, from Beasley Allen and other

8    members of the talc claimants committee that was

9    confidential?

10        A.    I suppose so, yeah.

11        Q.    And did they learn some stuff from

12   you that was confidential?

13        A.    No.  It was just the tedium of

14   structural optimization and disaffiliation that the

15   mediators wanted to understand in detail.

16        Q.    Did the mediators advise you that, or

17   did you already know, that what you discussed, as

18   Mr. Brody has pointed out, in mediation is

19   confidential?

20        A.    I'm sure they did.

21        Q.    And did you ever violate that

22   confidence?

23        A.    No.

24        Q.    Have you ever been accused of

25   violating that confidence?

Page 184

1          A.      No, not that I'm aware of.

2          Q.      Mr. Brody asked a number of questions

3    about -- give me one second.  I apologize.

4                  Jim, can we agree that you have never

5    -- have you ever served as an expert witness for the

6    plaintiffs?

7          A.      No, I have never.

8          Q.      Have you ever served as an expert for

9    Beasley Allen?

10         A.      No.

11         Q.      After leaving Sidley and then Faegre,

12   have you ever been employed by Beasley Allen?

13         A.      No.

14         Q.      As far as your position, once you

15   formed Legacy, you have been accused of being a

16   side-switching lawyer.  Do you believe that you are

17   a side-switching lawyer?

18         A.      No.  I'm not practicing law, for one

19   thing.

20         Q.      And let me ask you the core question.

21   At Legacy, are you working against J&J?

22         A.      No.  Quite frankly, I would say we're

23   working, trying to help them to obtain finality,

24   give them an option to obtain finality.

25         Q.      Now, Mr. Brody's response to that, as

Page 185

1    you heard today during direct/cross, was that you

2    are working against them because we would like the

3    $9 billion and not the $19 billion number.  So

4    here's my question for you.

5                    Mr. Haas has said, I believe he said

6    it on the first day, that he wants a fair and

7    reasonable settlement for the plaintiffs so that

8    they were not overcompensated, not undercompensated,

9    but a fair and reasonable number.

10                    Did you hear that testimony during

11   the first day?

12        A.       I believe so.

13        Q.       So, is it fair to say that Mr. Haas

14   wants that result, but he only wants it if the

15   number is $9 billion?

16        A.       I don't know.

17                    MR. BRODY:  It's argumentative and --

18                    THE COURT:  Well, I don't necessarily

19   know if he can -- if Mr. Conlan can put himself in

20   the mind of Mr. Haas.  So, to the extent there's an

21   objection, I don't want Mr. Conlan to speculate.

22                    So why don't you rephrase the

23   question.

24                    MR. POLLOCK:  Yeah, I'll be glad to.

25                    MR. BRODY:  For the record, Your

Page 186

1    Honor, I'll add a foundation objection to that.

2                    THE COURT:  Okay.

3                    MR. BRODY:  Thank you.

4                    MR. POLLOCK:  Bear with me one second

5    here.  I'm moving quickly.

6    BY MR. POLLOCK:

7            Q.      Once -- if Legacy were to -- if J&J

8    were to say, You know what, I'm going to go ahead

9    and sell these liabilities or transfer these

10   liabilities to Legacy.  So I want you to assume that

11   has happened.  Understand my question?  Let's assume

12   that has happened.

13                   Do you believe that your interest and

14   the talc claimants committee's interest are aligned

15   at that point?  Do you have the same interest?

16           A.      No, we would be opposed.

17           Q.      Why would you be opposed?

18           A.      Because our economics at Legacy,

19   having acquired the talc-liable entities, it's not

20   required.  It's not acquiring the liabilities; it's

21   acquiring talc-liable entities.  I know I'm being

22   particular about that, but it's important.  We're

23   acquiring the boxes, themselves, that are liable in

24   the tort system, or contractually.

25                   Once we own those entities, our

                                        Page 187

1    objective is to hold onto the cash as long as

2    possible to make that spread, 1.6 percent in a

3    perfectly-matched structure, and we certainly don't

4    want to pay people who can't take it from us.

5    Judgment and settlement, just like any other mass

6    tort defendant would look at it.

7          Q.      The words that J&J have used at times

8    during Mr. Haas' and Mr. Murdica's questioning was

9    that the conversations that you had with

10   Mr. Birchfield and with Beasley Allen were

11   inherently imbued with confidential information;

12   that it's in your neurons, I think as Mr. Murdica --

13   Mr. Murdica's words; that you could not have ever

14   kept that information separate and apart, what you

15   learned from your time period at J&J and what you

16   discussed with Beasley Allen.

17                 Do you agree that your conversations

18   were ever inherently imbued with or that you -- that

19   it was in your neurons and you had to have divulged

20   that information?

21         A.      No, I do not agree that I was imbued

22   or that my neurons were imbued.

23         Q.      So there's a point in time when

24   Mr. Murdica writes you a nasty-gram.  Let me find it

25   here real quickly.  It's on Barnes & Thornburg

Page 188

1   letterhead, and I think it's Exhibit 6.  Yeah, it's

2   Exhibit 6.

3               So, he writes a letter, and he

4   says -- and can you pull that up so you have it

5   front of you, sir?

6        A.     Okay.  I have it.

7        Q.     He says in the last paragraph on the

8   first page, "You learned highly-privileged

9   confidential information about J&J and LTL

10  strategies from the attorney-client relationship."

11              Do you see that?

12       A.     I do.

13       Q.     Now, LTL 1, and then LTL 2, as you've

14  testified on direct from Mr. Brody, work -- did not

15  work effectively for J&J, correct?

16       A.     Correct.

17       Q.     And the bankruptcy court disagreed

18  with J&J that that was a valid approach, right?

19       A.     Well, yes.  I mean, L -- what's

20  called LTL 1, it was the Third Circuit that said

21  cannot stay in bankruptcy, not a good faith filing;

22  and then, ultimately, Judge Kaplan executes by

23  dismissing.  LTL files again, it's called LTL 2,

24  somewhere around April 2023; and on July 28th, 2023,

25  Judge Kaplan dismisses again on the grounds that

Page 189

1    they are not distressed.

2          Q.      And you responded.  Is -- other than

3    learning about LTL, which is what he seems to be

4    complaining about here, and I'm going to read the

5    whole paragraph.  "You learned highly-privileged

6    information about J&J and LTL strategies from the

7    attorney-client relationship.  And while publicly

8    disparaging your own strategies" -- let me stop

9    there.

10               Was that your own strategy to file

11   LTL?

12               MR. BRODY:  I'm going to object on

13   privilege grounds, based on what his -- his

14   strategies were or were not while he was outside

15   counsel for the company.

16               MR. POLLOCK:  Your Honor, let me

17   rephrase, if you don't mind.

18               THE COURT:  Sure.

19   BY MR. POLLOCK:

20         Q.     Did you ever propose to J&J that they

21   file something like LTL?

22               MR. BRODY:  Same objection, Your

23   Honor.

24               MR. POLLOCK:  They've accused him of

25   it, and they've testified to it, but if he wants to

Page 190

1    -- if he wants to object, I will stand on the

2    objection and note that the record is now devoid of

3    that fact.

4                    THE COURT:  Okay.

5    BY MR. POLLOCK:

6        Q.      Did you respond to Mr. Murdica's

7    letter?

8        A.      I did.

9        Q.      And did you respond on or about

10   November 5, 2023, and tell him -- and what did you

11   say that in letter?

12                    MR. BRODY:  The response contains

13   privileged information of Johnson & Johnson, Your

14   Honor.  We object to reading the response.  I assume

15   it could probably be redacted in some form or

16   another, if it hasn't been.  And not knowing what

17   he's going to say, I have to object.

18                    THE COURT:  Hold that thought.  Let's

19   go back and revisit Mr. Murdica's letter to

20   Mr. Conlan.  And in his -- the letter to Mr. Conlan

21   from Mr. Murdica was that you're criticizing your

22   own strategy.

23                    I had sustained that objection.  I'm

24   reconsidering.  I'm not sustaining that -- I'm not

25   sustaining that objection.  I'm overruling that

Page 191

1    objection, because it's in the letter from

2    Mr. Murdica.

3                    MR. POLLOCK:  Yes, sir.

4                    THE COURT:  So you can ask that

5    question again, and hold that question -- that

6    objection, Mr. Brody.

7                    MR. BRODY:  Certainly.

8                    THE COURT:  Okay?

9                    It's revealed in the letter.  So to

10   the extent there was an attorney-client privilege,

11   that's deemed waived by Mr. Murdica.

12   BY MR. POLLOCK:

13       Q.    So, Mr. Conlan, I'm going to try

14   again.  With regard to Exhibit 6, I'm going to ask a

15   simple question.  Did you propose the LT -- what

16   became LTL to Johnson & Johnson?

17       A.    Did I propose the Texas Two-Step?

18       Q.    Yes.

19                    THE WITNESS:  Am I able to answer

20   that?

21                    THE COURT:  Yes, you are.

22                    THE WITNESS:  No.

23   BY MR. POLLOCK:

24       Q.    Mr. Murdica --

25       A.    To be clear, we talked about all of

```
                                                    Page 192
 1    the options.
 2            Q.      Understood.
 3            A.      I think your question is, did I
 4    recommend that option above others.
 5            Q.      Did you recommend it at all?
 6            A.      There were options.  They had pros
 7    and cons.  There were certainly ones that I thought
 8    were better than others.
 9            Q.      Fair enough, sir.
10                    When Mr. Murdica claims that you have
11    breached a confidence, did you write back to him on
12    November 5, 2023, and advise that you had not
13    breached a confidence?
14                    MR. BRODY:  I'll let him -- I mean, a
15    yes or no to that will not implicate privilege, but
16    I just object to going beyond that.
17                    THE COURT:  But Mr. Conlan is being
18    accused of breaching that confidence, so I'm going
19    to permit Mr. Conlan to answer yes or no.
20                    MR. BRODY:  Yeah, and that's what I
21    was saying.  No objection to a yes or no answer,
22    Your Honor.
23                    THE WITNESS:  I did object to that.
24    BY MR. POLLOCK:
25            Q.      Did you disagree with him?
```

Page 193

1          A.       Yes.

2          Q.       And did he ever write back to you and

3    say, No, here's all the reasons why you broached a

4    confidence, or, in fact, here's the proof you

5    broached a confidence, or the fact is that since you

6    broached this confidence, you should be ashamed of

7    yourself?  Anything of that nature?

8          A.       No.  We did have brief communication

9    about trying to get together, but it was

10   nonsubstantive.

11         Q.       If you could go to Exhibit 4, please.

12   What I want to do is start at the end.  That would

13   be Plenary Hearing 26.  Let me know when you're

14   ready.

15         A.       Okay.  I'm there.

16         Q.       Are you good to go?

17         A.       Yes.

18         Q.       Excellent.

19                  So, the first one is Doug Dachille to

20   Robert Huffines --

21         A.       Huffines.

22         Q.       -- and Duane Van Arsdale and Jim

23   Conlan.  Do you see that?

24         A.       I do.

25         Q.       And it says, "Thank you for the

Page 194

1    introduction," right?

2         A.       Yes.

3         Q.       And the introduction, what did you

4    understand the introduction to be?

5         A.       Mr. Huffines wrote to Mr. Van Arsdale

6    saying, You ought to meet with these guys.

7         Q.       And if you look at the next document

8    above -- these emails -- emails go in reverse, so

9    you have to start from the end.  That's why I'm

10   starting from the end.

11        A.       Understood.

12        Q.       So the next one is August 21.  Duane

13   Van Arsdale to Doug Dachille, Eric Haas, Jim Conlan,

14   Andrew White.  Do you see that?

15        A.       I do.

16        Q.       And it says, "Thanks for the note and

17   nice to meet you as well.  I copied Erik Haas and

18   Andrew White who will also join the discussion."

19   And then it goes on from there.

20               Was the discussion a discussion

21   between Legacy and J&J?

22        A.       Yes.

23        Q.       And was it, the discussion, as you

24   understood it, going to be about the Legacy

25   Liability Solutions proposal?

Page 195

1          A.      Yes.

2          Q.      And did alarm bells go off at that

3     point in time, whether it was threats and sanctions,

4     and criticisms and claims, anything like we're

5     seeing today that you, as Legacy Liability

6     Solutions, were reaching out to J&J?

7          A.       Not at all.  And Mr. Dachille is not

8     a lawyer, and -- he's the chief investment officer

9     of Legacy, and he was essentially one of the primary

10    movers here.  There was no request for a

11    confidentiality agreement and there was no

12    objection.

13         Q.      And at this point, was it -- did you

14    believe it was clear to everyone you and your

15    colleague was there as solely and exclusively for

16    Legacy Liability Solutions; you were not there for

17    -- as a J&J representative?

18         A.      I was not there for --

19         Q.      That Legacy Liability Solutions has

20    its goal and J&J has its goal?

21         A.      Yes.

22         Q.      And your hope was that if you could

23    sell/promote the Legacy Liability Solutions, you

24    would make money, J&J would get it off its balance

25    sheets, everybody would walk away happy; is that the

Page 196

1  idea?

2          A.      Yes.

3          Q.      But you were completely -- no one

4  complained at that point in time, to be clear, that

5  you were now, having been a former Faegre lawyer,

6  you were now working on behalf of Legacy Liability

7  Solutions selling a proposal to J&J?

8          A.      No one complained.

9          Q.      And Mr. Haas knew about that?

10          A.      Yes.

11          Q.      At the top -- I'm going to skip

12  forward to Plenary 23.  Everyone's been asked about

13  this one, so I don't want you to feel excluded.

14                 So, it's Wednesday, October 18, 2023.

15  Jim Conlan to Van Arsdale, Doug Dachille, Erik Haas,

16  Andrew White, and Doug something.   I can't read it.

17          A.      Dachille.

18          Q.      Yeah, it is.  I -- it's crossed out.

19  I apologize.  To Doug Dachille.

20                 It says that "Andrew Birchfield, Doug

21  Dachille, and I are prepared to meet with you."

22                 It's the last -- the penultimate

23  paragraph there.  Do you see that?

24          A.      I do.

25          Q.      Did you ever tell -- did you believe

Page 197

1   at that point in time, when you wrote this letter,

2   this email, that you and Andy were conspiring under

3   the cover of darkness about how to come up with a

4   proposal that would take -- that would destroy J&J's

5   approach?

6           A.      No.  The opposite.  If you go back to

7   the message that is directly below it --

8           Q.      Yes, sir.

9           A.      -- or before it, would be the way to

10  describe it, is the message from Mr. Van Arsdale to

11  which this is a response.

12              In the message from Mr. Van Arsdale

13  dated October 6, 2023, 12:43 p.m., he says, "Hi Doug

14  and Jim, Thank you for the follow-up note to our

15  discussion a few weeks ago.  To close the loop, we

16  have discussed both internally," and this is the big

17  language, "and with our auditors, and at this time,

18  we do not have an interest in pursuing this

19  strategy.  While unlikely, we will let you know if

20  this perspective changes in the future.  Thanks

21  again for your time and thoughts."

22              We looked at that language,

23  particularly the auditors, and thought to ourselves

24  and discussed it, that J&J, because they said it and

25  Mr. Haas testified to it, actually had discussed

Page 198

1    this with PricewaterhouseCoopers; and we thought

2    either PricewaterhouseCoopers didn't understand it

3    or it wasn't conveyed correctly, because it didn't

4    make any sense to suggest that the auditors were

5    saying it couldn't be done.

6              What did make sense to us is that the

7    auditors were saying, It's going to be tricky, it

8    could be a high number, it could be a big range.

9    And so the follow-on email is to say, We think we

10   can help you with the range.  We think we can help

11   you with your auditors.

12         Q.    So, if I look at -- if I look at that

13   one and I look at Exhibit 7 -- and I don't want you

14   to have to put your fingers in both places, but

15   Exhibit 7 is going back to the Legacy proposal of

16   November 9.

17         A.    Yes.

18         Q.    So, you've got a proposal from Legacy

19   and you've got this matrix at the end, on the last

20   page?

21         A.    Yes.

22         Q.    Would you agree with my

23   characterization that this is like peanut butter and

24   chocolate; they're good together, but they're two

25   different things, meaning that it was the Legacy

Page 199

1  proposal for the first several pages, it is the

2  matrix, which is the Beasley Allen proposal -- let

3  me stop there.

4                    Would you agree with that

5  characterization?

6        A.        I would agree with it.  And just to

7  put a fine point on it, the Legacy proposal isn't

8  dependent on agreeing with Beasley Allen or

9  dependent on having that kind of a settlement.  It's

10  just a datapoint for the auditors to look at.  We

11  would have gone forward, provided all the other

12  numbers worked, without any agreement from the

13  lawyers at Beasley Allen or the plaintiffs' lawyers

14  generally.

15                    The whole point, if there's a single

16  point I would like to convey, is companies beat

17  their heads against the wall trying to get the

18  claimants to agree by 75 percent-plus, and they

19  often fail.  The beauty of this structure is it

20  doesn't require the plaintiffs' lawyers to vote or

21  agree at all.  It does require the auditors to come

22  up with a number.  It does require the company to

23  agree.  So it flips it.  It flips it, quite frankly,

24  and gives all the power to the company.

25        Q.        As to the actual value on page 1,

Page 200

1    which is Plenary Exhibit 62, it says 19 [b]illion or

2    such greater amount as determined.

3              Do you see that?

4        A.      I do.

5        Q.      So that is not a determination that

6    Beasley Allen makes, correct?

7        A.      No.

8        Q.      So they have a proposed structure at

9    the end, wherever this thing is on page 67.  But

10   that is not a Legacy Liability's document, correct?

11       A.      Correct.  And at least what we

12   understand this to be, the matrix, is it's only

13   current ovarian cancer claimants.  It's not

14   mesothelioma claimants.  It's not attorney general

15   claimants.  It's not future mesothelioma claimants

16   or future ovarian cancer claimants.  All components

17   of those are captured by Legacy's acquisition of the

18   talc-liable entities.

19              And when we come up with a number at

20   Legacy of 19, we're looking at that number and how

21   much it will grow, and how that growth will match

22   against the claims, sort of like an insurance

23   company.

24       Q.      You heard some testimony during

25   Mr. Haas' testimony on day one and Mr. Murdica's

Page 201

1   testimony, I found the same, in the afternoon,

2   that -- at page 56 for Mr. Haas -- it was egregious

3   that Jim was communicating with talc claimants

4   committee and Andy.  Mr. Haas says it was the first

5   time, was October 18, 2023.  He also then says he

6   was shocked -- this is page 53 to 54 of the

7   transcript.  If you want to see it, I can show you.

8   Mr. Murdica then parrots the language, shocked and

9   appalled, page 238.

10              At any point in time, did you ever

11  disclose a single J&J confidence to Andy Birchfield?

12       A.       Absolutely not.

13       Q.       As far as what you knew, from your

14  work at Faegre on behalf of J&J, is that at all

15  relevant, other than that they're related because

16  they involved talc somehow, was it related at all to

17  your proposal for Legacy today?

18       A.       No.  There is nothing in our

19  proposal -- which, by the way, would be different

20  today, because factors have moved around, including

21  interest rates, some claims have been settled.

22              What is required for the Legacy

23  proposal has nothing to do with any confidential

24  information I've obtained.  In fact, this structure,

25  this type of proposal has been made to lots of

Page 202

1   companies about whom -- I don't have any

2   confidential information.  It's the same structure.

3        Q.      And if we go to the document of

4   February 2, 2023, which is the document that closes

5   with the language Mr. Brody's asked you about

6   multiple times, and I'll -- to give him credit, he

7   points out, "This is a proposal for agreement

8   between Legacy Liability Solutions and Johnson &

9   Johnson.  Legacy and J&J will agree as follows."

10              As Mr. Brody has noted, it has six

11  points.  The sixth point is, "Legacy reserves the

12  right, in its discretion, to negotiate settlements

13  with interested asbestos-plaintiff law firms of some

14  or all pending claims filed by such firms.  All such

15  settlements to become effective at closing."

16              You have seen that sentence before,

17  correct?

18        A.      Yes.

19        Q.      Did Mr. Haas or Mr. Duato ever write

20  back to you and say, You can't do that.  You're a

21  former J&J lawyer.  We own you.  You were at Faegre.

22  Did they ever complain to you?

23        A.      No.

24        Q.      With regard to the -- bear with me

25  one second.

Page 203

1                    MR. POLLOCK:  There was no objection,

2      I think, to Exhibit 4.  So that you -- you had --

3      oh, is that -- can we admit that now into evidence

4      so it can be -- I can deal with that as a

5      housekeeping matter, if you want me to.

6                    MR. BRODY:  I don't know which was

7      Exhibit 4.

8                    MR. POLLOCK:  I'll deal with it

9      later.  I can't remember for certain, so I'll go

10     back to it.

11                   Judge, if you could, I -- I think I

12     may actually be done.  Can you give me three minutes

13     just to talk with my client and prepare my notes?

14                   THE COURT:  Sure.

15                   MR. POLLOCK:  I promised to keep it

16     brief, and I'm trying to do so.  Okay?

17                   THE COURT:  We'll stay on the record.

18                   MR. POLLOCK:  I apologize.

19                   THE COURT:  That's okay.

20                   (Brief pause.)

21                   MR. POLLOCK:  Your Honors, I have no

22     further questions of Mr. Conlan.

23                   THE COURT:  Thank you.

24                   Judge Singh, do you have any

25     questions?

Page 204

1              JUDGE SINGH:  I do not.

2              THE COURT:  I have a couple

3   questions.

4              After the quarterly call, Mr. Conlan,

5   the J&J stock went down what, what dollar value?

6              THE WITNESS:  Yeah.  It wasn't the

7   quarterly call, Your Honor.  It was on January 30,

8   2023.

9              THE COURT:  Oh, after Ambro's --

10  Judge Ambro's decision?

11             THE WITNESS:  Correct.  So, that day,

12  the Judge Ambro in the Third Circuit issued its

13  opinion, and when it issued its opinion, the value

14  of all of J&J's stock, which I refer to as market

15  cap, declined $18 billion that day.  It bounced

16  around some, but it declined substantially.

17             THE COURT:  And Legacy got its total

18  value for a possible settlement from that market

19  move?

20             THE WITNESS:  That was one of the

21  important market elements, other interest rates.

22             THE COURT:  And other interest rates.

23             Now, when you testified, when

24  Mr. Brody was questioning you, you testified you

25  were involved in several team meetings, all-hands

```
                                            Page 205
 1   meetings, and your focus was on the bankruptcy.

 2                  THE WITNESS:  Yes, sir.

 3                  THE COURT:  And other aspects about

 4   the valuation, the tort valuation may have been

 5   discussed, probably was discussed, but you didn't

 6   really focus on that because that wasn't your area.

 7                  THE WITNESS:  Not my area.  However,

 8   I would add, when J&J filed and it became public,

 9   the bolt-on settlement offer, that was 4.2.  So I

10   and everyone was aware of that.

11                  THE COURT:  Now, you had said,

12   though, going back, your focus was on the bankruptcy

13   and the restructuring, et cetera.  When you go to

14   Legacy, you then become involved in the tort

15   analysis, right?

16                  So, what happened from when you were

17   with Faegre, looking at the bankruptcy and the

18   structuring, the Imerys bankruptcy?  You didn't

19   focus it on the tort liability valuation, but at

20   Legacy, you did.  How -- where did that change come

21   from?

22                  THE WITNESS:  Yeah.  So, Legacy is

23   comprised of a lot of people.  One of the people is

24   sitting in the courtroom back there, John

25   Gasparovic.
```

Page 206

1            Mr. Gasparovic, could you raise your

2     arm?

3            Mr. Gasparovic, for example, was the

4     general counsel of five companies, two public

5     companies.  One of those was BorgWarner.  Who's

6     going to write that up there?  BorgWarner was

7     afflicted by an asbestos problem, as you may recall.

8     I think everybody knows that.

9            While Mr. Gasparovic was the general

10    counsel, he wanted to cabin, contain that asbestos

11    liability so that it wouldn't eat the entire

12    company.  And so I structurally optimized BorgWarner

13    while I was -- while Mr. Gasparovic was the general

14    counsel.

15            Some years later, those entities

16    called -- we named them Morse TEC -- were

17    disaffiliated in a sale to Enstar.  Mr. Gasparovic

18    brings that expertise to Legacy.

19            Scott Gilbert, a very prominent

20    insurance and insurance restructuring lawyer, joins

21    Legacy.  He brings that dimension to it.

22            Doug Dachille is the CIO of Legacy.

23    He's formerly the CIO of AIG.  And in his prior

24    life, the hedge fund he created, which is merged

25    into AIG, he managed $8 billion worth of the

Page 207

1   asbestos liabilities of the so-called 524(g) trusts

2   of prior bankruptcy proceedings.

3               And so all of those elements were

4   brought together to create Legacy.

5               What do I bring?  I bring the

6   expertise of a bankruptcy lawyer which watched

7   companies struggle, often ineffectively, to try to

8   get the plaintiffs' lawyers to agree by 75 percent-

9   plus in number to a solution that will resolve their

10  current and future liabilities.

11              And my view after, well, there had to

12  be a better way, another way that wouldn't hand so

13  much power to the plaintiffs' lawyers and give the

14  company what it, frankly, needs and deserves, which

15  is an option that allows it to say:  I can get rid

16  of current and future liabilities without having to

17  go to the bankruptcy court, without having to beg

18  the plaintiffs' lawyers, and I just -- I have to

19  agree to the amount, and I have to get my auditors

20  to agree, so it becomes a transaction, not a

21  litigation.

22              THE COURT:  So the settlement

23  authority, then, hypothetically, not with the

24  company - in this case, J&J - all similar authority

25  rests with Legacy?  Is that --

Page 208

1                    THE WITNESS:  Precisely.

2                    THE COURT:  -- how the structure is?

3                    THE WITNESS:  Precisely.

4                    THE COURT:  Because then, also, I was

5      going to ask, without 75 percent and without the

6      involvement of J&J, how you get them then to settle,

7      the structure is J&J provides you with the authority

8      to settle?

9                    THE WITNESS:  They essentially are

10     selling us the liable entities.

11                   THE COURT:  And the authority.

12                   THE WITNESS:  And the authority.

13                   THE COURT:  What happens if interest

14     rates go down?  You have -- you know, you have a

15     1-and-a-half percent on top of the existing interest

16     rate that you're making money on, and you said the

17     tort liability goes down proportionate to when the

18     interest rates go up.

19                   THE WITNESS:  Right.

20                   THE COURT:  What happens if the

21     interest rates go down?

22                   THE WITNESS:  Right.  And this is

23     Mr. Dachille's department.  We make sure they are

24     closely matched, including duration, so that if

25     interest rates go down, which would result in the

Page 209

1  liability going up, the value of our portfolio will

2  also go up, because we have matched AA Corporates.

3           So it's a no -- a very, very low risk

4  structure, like an insurance company, so that the

5  assets, the AA Corporates, are tightly matched

6  against the liabilities.  And if they both move up,

7  fine; if they both move down, fine.  But you don't

8  want one to move up and the other to move down.

9           THE COURT:  All right.

10           Judge Singh?

11           JUDGE SINGH:  I don't have anything.

12           THE COURT:  Mr. Pollock, any

13  questions before we turn to Mr. Brody, based on the

14  Court's questions?

15           MR. POLLOCK:  No, Your Honors.  Thank

16  you.

17           THE COURT:  You're welcome.

18           Mr. Brody?

19           MR. BRODY:  Thank you, Your Honor,

20  and I'll try to be brief so that we can moving

21  forward.

22                    -  -  -

23           REDIRECT EXAMINATION

24                    -  -  -

25  BY MR. BRODY:

Page 210

1    Q.    So, Mr. Conlan, you were asked about

2  Weil Gotshal's role in the Imerys bankruptcy.  Do

3  you recall those questions by Mr. Pollock?

4    A.    I do.

5    Q.    And you frequently, in the course of

6  your discussions with the inhouse team at J&J,

7  discussed and addressed your views on Weil Gotshal's

8  analysis, didn't you?

9    A.    Yes.

10    Q.    And you discussed with them your

11  views on Jones Day's analysis, right?

12    A.    I don't recall that.  For example, or

13  to illustrate, in the Imerys North America

14  bankruptcy case, during the pendency of that, I was

15  part of the team, if you will, the all-hands team

16  that would work on what was happening there.

17        I don't recall any such effort during

18  the LTL case, of which I was a part.

19    Q.    I'm -- and maybe my question was a

20  little imprecise.  You said, Well, the LTL

21  bankruptcy, that was Jones Day.  And you discussed

22  your views on the Texas Two-Step with inhouse

23  counsel at J&J, correct?

24    A.    I discussed my views of what Jones

25  Day was doing in North Carolina, and the pros and

Page 211

1    cons of it, and what they had to achieve, what the

2    risks were, before LTL --

3         Q.      Right.  You discussed the risks and

4    benefits to J&J in a privileged and confidential

5    setting, correct?

6         A.      Yes.

7         Q.      All right.  You indicated that

8    whether the structural optimization and

9    disaffiliation approach works depends on the amount,

10   right?

11        A.      Yeah.  Particularly, the auditors.

12        Q.      Right, exactly, because you said you

13   have to get the auditors on board with the amount,

14   or it's not going to work, you're going to be, you

15   know, potentially at risk for something like a

16   fraudulent transfer on allocation.

17        A.      We -- two things.  One, we just

18   wouldn't do it; and number two, the company wouldn't

19   either, because it wouldn't remove the noncash

20   charge.

21        Q.      And the -- so whether the number

22   works depends on whether you, you know, drill down

23   and gotten to a number that is big enough, right?

24        A.      Are you talking about the auditors?

25        Q.      I'm talking about whether -- whether

Page 212

1    a structural optimization and disaffiliation is

2    going to successfully resolve liabilities, is

3    ultimately going to depend on whether that number is

4    that is used to capitalize the disaffiliated entity

5    is high enough?

6         A.    Well, it's resolved for the company

7    no matter what, because once the auditors remove the

8    noncash charge --

9         Q.    But it's not -- but it's not resolved

10    if the auditors won't do that; that's your --

11        A.    Correct.

12        Q.    -- testimony, right?

13        A.    That is correct.

14        Q.    And so you have to have a number that

15    is going to reflect things like -- and you listed

16    some of them in response to Mr. Pollock's question

17    --  futures, values of current claims; in the talc

18    context, whether it's ovarian or ovarian plus the

19    mesothelioma claims.  All of that is going to have

20    to get wrapped into that deal, right?

21        A.    All of those things would be taken

22    into account by the auditors.

23        Q.    Right, exactly.  And by the way,

24    Beasley Allen was okay with the $19 billion number;

25    you shared that with them before you sent the letter

Page 213

1    to the board of directors, right?

2          A.      I didn't ask them if they were okay

3    with it.  We didn't need their vote.

4          Q.      They were okay -- well, you told J&J

5    that they were okay with the proposal, right?

6                  MR. POLLOCK:  Objection.

7    BY MR. BRODY:

8          Q.      In your letter, you told -- you

9    told --

10                  THE COURT:  Based on the letter that

11    he --

12    BY MR. BRODY:

13          Q.      You told the board of directors on

14    November 9th, 2023, that your proposal had the

15    support of outside counsel.

16                  MR. POLLOCK:  Your Honor, the

17    document says what it says.  That's the best

18    evidence.  It says $19 billion, other numbers as

19    justified by J&J's auditors.  So, to me, the -- I

20    think if we're going to get into this language

21    again, it has to be precise.

22                  THE COURT:  Right.

23                  What's the exhibit, Mr. Brody, you're

24    referring to?

25                  MR. BRODY:  It's Hearing Exhibit 7.

Page 214

1  BY MR. BRODY:

2       Q.      Let me ask you this.

3               THE COURT:  So the second paragraph?

4               MR. BRODY:  You know, we -- yeah.

5  Well, first and second.

6               THE WITNESS:  I think I can answer

7  it.

8  BY MR. BRODY:

9       Q.      Let me ask you a different question

10  since we're now a little bit back and forth beyond

11  it.

12              The factors that we were talking

13  about that have to go into a number, right, analysis

14  of the value of claims, is certainly going to be

15  something that you would expect that an auditor

16  might be interested in; fair?

17       A.      I think that's one of the factors,

18  given my experience, auditors look at.

19       Q.      Right, or if the -- if it were the

20  case, damages analysis, something like that?

21       A.      Is one of the factors the auditors

22  will look at.

23       Q.      Yeah.

24       A.      Settlements.

25       Q.      Anticipated incidence of future

Page 215

1    claims?

2            A.        Is one of the factors the auditors

3    would look at.

4            Q.        Right.  And Beasley Allen shared its

5    confidential work product on those very topics with

6    you last year, didn't they?

7            A.        Beasley Allen did share some

8    privileged information with some of the people in

9    Legacy.

10           Q.        Yeah, including you.

11           A.        I don't recall receiving it.  But I

12   can tell you this.  You asked the question whether

13   they were okay.  They were okay with structural

14   optimization and disaffiliation.  Not that we needed

15   them to be okay, because we don't need the yes vote.

16   That's the whole point.

17                     On the second question, the 19

18   billion or such greater amount as the auditors

19   require has to cover everything.  It has to cover

20   current and future meso, it has to cover current and

21   future ovarian, it has to cover attorney general

22   costs, it has to cover defense costs.  All of those

23   things have to be included.

24           Q.        And so -- so, Beasley Allen shared

25   all of that, all of that information -- I mean, you

Page 216

1    don't recall specifically what you looked at and

2    when, but you do recall that Beasley Allen shared

3    its privileged and confidential work product on

4    things like claim values, damages, futures, with

5    Legacy, right?

6                    MR. POLLOCK:  Objection, Your Honor.

7    We're talking about mediation-confidential

8    information.  How can he answer that question?

9                    THE COURT:  I don't know if that was

10   covered in the mediation.  Is that a topic that was

11   covered in the mediation?

12                   MR. BRODY:  It's straight from the

13   privilege log that's been supplied to us.

14                   MR. POLLOCK:  The mediation privilege

15   log.  He's asking about the merits and substance of

16   mediation privilege logs.

17                   MR. BRODY:  I'm simply asking whether

18   that was provided to -- by Beasley Allen to Legacy.

19                   MR. POLLOCK:  He is not.  He is

20   asking about the details that were discussed, that

21   Judge Schneider, sitting behind us in the

22   courtroom --

23                   THE COURT:  I'll sustain the

24   objection.

25                   MR. BRODY:  All right.  I'll make it

Page 217

1    clear.

2    BY MR. BRODY:

3        Q.    That was provided to -- that

4    information was provided to you, without getting

5    into the substance of it.

6                THE COURT:  Judge Singh has a

7    question.

8                JUDGE SINGH:  Okay.  Yeah, if you

9    don't mind.  I just want to go back to the line of

10   questioning about your testimony that you didn't

11   need the consent of Beasley Allen or other

12   plaintiffs.

13               If we turn to Exhibit 7, on page 2,

14   it's labeled Plenary Hearing 63, the second

15   paragraph under Details of Proposal.

16               THE WITNESS:  I'm sorry.  I'm sorry,

17   Your Honor.  Exhibit 7?

18               JUDGE SINGH:  Yes.

19               THE WITNESS:  Okay.

20               JUDGE SINGH:  I'm sorry, I'm going

21   fast.

22               THE WITNESS:  I'm on Exhibit 7 now.

23   Sorry.

24               JUDGE SINGH:  Okay.  In the second

25   paragraph under Details of Proposal, it says, "To

Page 218

1    provide enhanced certainty to PwC in its

2    determination, it is important to note that Leading

3    Counsel in the MDL have agreed to support an opt-in

4    settlement with Legacy," et cetera.

5                    Do you see that language?

6                    THE WITNESS:  I do, yes.

7                    JUDGE SINGH:  So what was the

8    important piece of this?  Why is that important to

9    PwC?

10                    THE WITNESS:  Yeah.  So when the

11   auditor, PwC, is looking at how much money has to be

12   in the talc-liable entities for them to remove the

13   noncash charge -- they don't like removing it,

14   they're a conservative group of people -- but to

15   remove it, they want to have all of the data that

16   will help them assess the range of potential

17   liabilities; and, frankly, they want to make sure

18   there's enough money to meet the high end of the

19   range, because they don't want to be criticized

20   later if it were to turn out that there's not enough

21   money.

22                    And so the potential of settlement,

23   even if they're just potential, is an important

24   datapoint.  The $8.9 billion settlement, which

25   didn't garner enough support, would be relevant,

Page 219

1    also.  The fact that that many people were willing

2    to support that is an important datapoint.

3                   JUDGE SINGH:  But here this

4    references an agreement, that there's -- "Leading

5    Counsel in the MDL have agreed."  So there's

6    something more than just a datapoint in terms of

7    what was negotiated --

8                   THE WITNESS:  Yeah, it --

9                   JUDGE SINGH:  -- previously; is that

10   correct?

11                  THE WITNESS:  Yes.  So the concept

12   from Beasley Allen was its belief, or you could say

13   its agreement, that it would support, not that it

14   could deliver it, but that it would support

15   something like this.  It wasn't -- they didn't have

16   the authority, we didn't have the authority to enter

17   into the agreement.  But an auditor who is saying,

18   Is it this big or is it this big, in coming up,

19   frankly, taking off the high end of the range, which

20   hopefully they would do, and lower it down to this,

21   all of these potentials for resolution help them

22   take the high end of the range off.

23                  Again, it's not settlement.  We're

24   just taking the liable entities and they're agreeing

25   that the liable entities have enough funds in them

Page 220

1    that J&J can be removed from the picture.

2                    JUDGE SINGH:  Okay.  Thank you.

3    BY MR. BRODY:

4        Q.        And so, post-bankruptcy, post-

5    mediation, you were having discussions, I think as

6    you testified, with Mr. Birchfield about the

7    settlement matrix that I think you said is his

8    settlement matrix that was attached to your letter

9    to the J&J board, right?

10       A.        Yes.

11       Q.        Right.  And this was after, I think

12   you've said, that they had previously -- Beasley

13   Allen had previously sent you related privileged and

14   confidential work product, right?

15       A.        Sent people at Legacy privileged

16   information.

17       Q.        Right.  And even after the mediation,

18   as you were having these discussions with

19   Mr. Birchfield -- I mean, you were asked about J&J

20   not raising an objection when you reached out to

21   Mr. Van Arsdale or when he wrote back and included

22   you on an email that was dated August 21st of last

23   year; you remember that, right?

24       A.        Can you draw me to it?

25       Q.        It's part of Hearing Exhibit 4.

Page 221

1          A.      Okay.

2          Q.      Mr. Pollock asked you, Well, did J&J,

3   you know, raise any alarm bells --

4          A.      Yes, I'm sorry.

5          Q.      -- and you -- you, you know, no, we

6   don't want you talking about structural

7   optimization.

8          A.      Correct.

9          Q.      But you didn't tell them you were

10  working with Mr. Birchfield, did you?

11         A.      I didn't call it to their attention,

12  no.

13         Q.      Right.  And when you went in and you

14  met with them on September 11th, you didn't tell

15  them you were working with Mr. Birchfield at that

16  time, either, did you?

17         A.      I did not call it to their attention,

18  no.

19         Q.      And it was only -- it was only on

20  October 18th that you did that, right?

21         A.      Correct.

22         Q.      Right.  And during that time period,

23  that's when you were having the discussions with

24  Mr. Birchfield and Beasley Allen about the

25  settlement matrix and what kind of support are we

Page 222

1    going to get for a settlement matrix so that I can

2    represent to Johnson & Johnson that I have the

3    support and that I'm confident that I'm going to get

4    the support, right?

5         A.       There's two components.  One is it's

6    helping us assess whether we want to take this and

7    at what price; and number two, it's helping the

8    auditors take the high end of the range off in

9    coming up with the number at which they'll remove

10   the noncash charge.

11              Neither happens unless J&J says --

12   sorry.  Structural optimization and disaffiliation

13   don't happen unless J&J says yes and the auditors

14   agree and provide a number.  Otherwise, nothing goes

15   anywhere.

16        Q.       And my question was a little

17   different.  My question was, actually, you were,

18   during this time period, having discussions about

19   the matrix and whether you were going to get that 95

20   percent support with Mr. Birchfield and Beasley

21   Allen, correct?

22        A.       I wouldn't call it discussions.

23   Mr. Birchfield said, I think I could get 95 percent

24   for this.  We didn't negotiate it.  We didn't -- it

25   was nothing like that.

Page 223

1          Q.        And this is -- it is the matrix, it

2    has claim values, right?

3          A.        Yeah, for what we understand to be

4    current ovarian cancer claimants.  Not meso, not

5    futures, not the attorney general claims.

6          Q.        And your testimony, if I understand

7    it, is that they shared their privileged and

8    confidential attorney work product with you, right?

9          A.        That's my understanding.

10         Q.        But you, when you were having your

11   discussions with them, walled off everything you

12   learned in 20 months representing Johnson & Johnson

13   in one part of your brain so that you wouldn't

14   disclose client confidences from the other part of

15   your brain when you were having discussions with

16   Mr. Birchfield; is that your testimony?

17         A.        Correct.

18               MR. BRODY:  Thank you.  That's all I

19   have.

20               THE COURT:  Mr. Pollock?

21               MR. POLLOCK:  One question.

22                       -  -  -

23               RECROSS EXAMINATION

24                       -  -  -

25   BY MR. POLLOCK:

Page 224

1          Q.        Everything you learned, let's just
2    pick on that last phrase, tell me one thing,
3    whatever it is, that you learned while working for
4    J&J that was directly relevant, that was necessary
5    for you to propose the Legacy Liability Solution.
6    I'd like to know one thing that's --
7                    MR. BRODY:  I'm sure --
8                    THE COURT:  With the exception of
9    attorney-client privilege.
10                   MR. POLLOCK:  Actually, Your Honor,
11   I'm even including that.  The fact is, this is --
12   this goes to the significantly harmful element, Your
13   Honor.  I need to know, tell me the one thing,
14   because right now I'm seeing a lot of nothing.  I'm
15   seeing that --
16                   THE COURT:  Well, I'm permitting the
17   -- what's your -- any objection, Mr. Brody?
18                   MR. BRODY:  Yeah.  The objection is
19   it is privileged.  Tell me one thing you learned
20   that would be relevant to this, and obviously what
21   he learned was privileged.
22                   MR. POLLOCK:  Let me take it step by
23   step.  How about this.
24   BY MR. POLLOCK:
25          Q.        Is there anything, just a yes or no,

Page 225

1    is there anything that you learned while you were at

2    J&J that was absolutely necessary for you to perform

3    your function as the CEO of Legacy making a proposal

4    on behalf of Legacy Liability Solutions; just yes or

5    no?

6            A.        No.

7                      MR. POLLOCK:  Excellent.  I'm done.

8                      THE COURT:  Okay.  We're going to

9    continue.  I would look to see if we were going to

10   take a break.

11                     Mr. Conlan, you can step down.

12                     We'll go a little bit further.

13                     Mr. Brody, did you want to have

14   Mr. Birchfield come up?

15                     MR. BRODY:  Yeah.  I will call

16   Mr. Birchfield, unless the Court thinks it would

17   easier to take a recess, a natural recess now and

18   not interrupt the flow.

19                     THE COURT:  No, I think we'll play it

20   by ear.

21                     Thank you, Mr. Conlan.

22                     Mr. Birchfield, please come forward.

23                     Before you're seated, Mr. Birchfield,

24   please raise your right hand, tell me your name, and

25   spell your last name.

Page 226

1              THE WITNESS:  Andy Birchfield,

2    B-I-R-C-H-F-I-E-L-D.

3                     -  -  -

4              ANDY BIRCHFIELD, having been duly

5    sworn, was examined and testified as follows:

6              THE COURT:  Thank you.  You may be

7    seated.

8                     -  -  -

9                  DIRECT EXAMINATION

10                    -  -  -

11   BY MR. BRODY:

12        Q.     Mr. Birchfield, do you have a copy of

13   the hearing exhibits there with you?

14        A.     I do.

15        Q.     All right.  Do you have anything else

16   besides the hearing exhibits there?

17        A.     I have my pen.

18        Q.     I just meant in the notebook, but

19   that's okay.  Whatever you have in your coat is all

20   right.

21        A.     Notes on some times.

22        Q.     Okay.  Notes for today?

23        A.     Yes.

24        Q.     All right.  Well, let me --

25        A.     If I get into dates, I have some

Page 227

1   notes.

2          Q.       If you refer to your notes, we'll

3   talk about them.  Okay?

4          A.       Okay.

5          Q.       You knew in 2020 that James Conlan

6   was representing Johnson & Johnson in the talc

7   matters, correct?

8          A.       I knew -- I knew that Mr. Murdica had

9   told me that Jim Conlan was working -- he was

10  working with, he was having dinner with, at a ski

11  resort with the FCRs pertaining to the Imerys -- the

12  Imerys proposal that we were working together, that

13  Mr. Murdica and I were working together on.  I knew

14  -- I knew from Mr. Murdica that extent.  But that

15  was it.

16         Q.       Right.  And so you understood that

17  Mr. Conlan was acting on behalf of J&J, correct?

18                  MR. POLLOCK:  Just to be clear, this

19  is direct, can I get a time, a point in time,

20  because I need to know when he's working on what.

21                  THE COURT:  Sure.

22                  Mr. Brody?

23                  MR. BRODY:  The question was in 2020.

24                  MR. POLLOCK:  2020.

25                  THE WITNESS:  In 2020, Mr. Murdica

Page 228

1    and I had made a proposal to the -- to the Imerys

2    TCC, and part of that proposal was dependent on the

3    FCR support.  And so Mr. Murdica told me -- that was

4    the extent.  Mr. Murdica told me that Mr. Conlan was

5    at a conference, a bankruptcy conference.  They were

6    -- he would be skiing and having dinner with the

7    FCR, FCR's counsel to try to gain support for that

8    proposal.

9                   MR. BRODY:  Okay.  And I guess

10   counsel for Beasley Allen is going to update their

11   chart in realtime during my examination?

12                  MR. POLLOCK:  I'll do it later.  I

13   apologize.  I'll do it later.

14                  MR. BRODY:  I don't know how they

15   want to do this, but --

16                  THE COURT:  Well, it's not -- it's

17   not in evidence, so you can just continue,

18   Mr. Brody.

19                  MR. BRODY:  Thank you.

20   BY MR. BRODY:

21        Q.      And again, just so the record is

22   clear, Mr. Birchfield, you knew that Mr. Conlan was

23   acting on behalf of J&J at the time, correct?

24        A.      I knew what Mr. Murdica had told me.

25        Q.      All right.  And that's what

Page 229

1    Mr. Murdica told you, right?

2         A.      Yeah.

3         Q.      All right.  Mr. Conlan was at the

4    Faegre Drinker law firm at the time, right?

5         A.      That's what I've heard today.

6         Q.      And you knew that Faegre Drinker was

7    lead counsel for J&J in the MDL in Trenton, correct?

8         A.      I knew Ms. Sharko was lead counsel in

9    the MDL and that she was with Faegre.

10        Q.      And that she was also lead counsel

11   here, in Atlantic City, correct?

12        A.      Yes.

13        Q.      All right.  And in 2020, the cases

14   that were pending against Johnson & Johnson, both

15   here in Atlantic City and in Trenton, were active,

16   correct?

17        A.      Were active?  I'm sorry.

18        Q.      Yes, active.

19        A.      Yes.

20        Q.      Because that was before the

21   bankruptcy stay that followed the LTL petition

22   filing in October of 2021, right?

23        A.      Yes.

24        Q.      And 2021 was when you proposed to J&J

25   through Mr. Murdica to settle all ovarian cancer

Page 230

1    talc claims, current and future, through the Imerys

2    bankruptcy for $3.25 billion, correct?

3         A.      No.

4         Q.      Do you recall giving a deposition in

5    April of last year, Mr. Birchfield?

6         A.      I do.

7              MR. BRODY:  If I may approach to hand

8    him --

9              THE COURT:  Could you share it with

10   Mr. Pollock first?

11             MR. BRODY:  Of course.

12             MR. POLLOCK:  I thought it was

13   Plenary Exhibit 29.  Isn't it?  Are we talking about

14   a different deposition?

15             MR. BRODY:  I've got the whole thing

16   here.

17             MR. POLLOCK:  Okay.  I object to

18   using the -- I've got -- they entered the document,

19   they produced the records, they put up what they

20   wanted.  They have Exhibit 5.  I don't know why

21   we're going beyond the exhibits, and [-] the record.

22   I now have to prepare for this, read it on the fly.

23             THE COURT:  Well --

24             MR. BRODY:  It's a page, Your Honor.

25   It's --

Page 231

1                THE COURT:  Well, go ahead.

2                MR. BRODY:  Thank you.  May I

3   approach?

4                THE COURT:  You may.

5                MR. BRODY:  Would the Court like a

6   copy?

7   BY MR. BRODY:

8        Q.     Mr. Birchfield, I've handed you a

9   copy of the transcript of your deposition from

10  April 17th, 2023.  Do you have that?

11       A.     I do.

12       Q.     If you would, turn to page 65, line

13  24.  Are you there?

14       A.     Yes.

15       Q.     And it carries over to the next page.

16  If you turn to the top of page 66, you were asked:

17                "Based on your review of the

18  document, Mr. Birchfield, does this refresh your

19  recollection that in September of 2020, you proposed

20  to Johnson & Johnson, through its representative,

21  Mr. James Murdica, to settle all ovarian cancer

22  claims, both current and future, through the Imerys

23  bankruptcy for a total of $3.25 billion?"

24                And your answer was:

25                "So, I submitted this -- I submitted

Page 232

1    -- I submitted this proposal.  That is true."

2                    That was your response, correct?

3         A.      That is my response that I submitted

4    this proposal, but the proposal --

5                    Q.      And --

6                    MR. POLLOCK:  Your Honor, I got

7    sandbagged with a document at the last second, a

8    page I've never read, and a witness I cannot prepare

9    because I didn't know he was going to go, when

10   they've actually produced the document as Exhibit 5.

11   I would beg you, give him some latitude to answer

12   the question, because Mr. Brody wants to steamroll

13   this thing.  This is not the Brody hearing.  We get

14   to hear from the witness.

15                    THE COURT:  True, but that was a

16   question that was posed on March 25th.

17                    MR. POLLOCK:  No, sir.  The fact is

18   it was --

19                    THE COURT:  The settlement --

20                    MR. POLLOCK:  No, this is --

21                    THE COURT:  The settlement number

22   of --

23                    MR. BRODY:  Yes.

24                    THE COURT:  -- I remember

25   specifically --

Page 233

1              MR. POLLOCK:  Correct.

2              THE COURT:  -- came from Mr. Haas'

3     testimony that was with regard to the settlement

4     drew some reaction.  So that's not a number that was

5     really hidden.  At least it wasn't hidden from me,

6     Mr. Pollock.

7              MR. POLLOCK:  Your Honor, Mr. Haas

8     testified that he thought Andy had reneged on a

9     deal, and he --

10             THE COURT:  That number.

11             MR. POLLOCK:  He quoted directly from

12    the transcript, at that point in time.  Now we're

13    going to a completely different section of the

14    transcript, which I have not had the opportunity to

15    prepare this witness on.

16             I'm just simply asking for a little

17    bit of latitude.  Mr. Birchfield is trying to

18    explain the answer.  But if you don't want to give

19    it to me, it's your courtroom, Judge, respectfully.

20             THE COURT:  Well, you asked the

21    question, Is that the number?

22             MR. BRODY:  I -- I asked -- yes.

23             THE COURT:  "Was that your response?"

24             MR. BRODY:  I asked --

25             THE COURT:  That's the response.

Page 234

1                    MR. BRODY:  Correct, that it's --

2                    THE COURT:  So that's the response

3     from Mr. Birchfield at this point.

4                    THE WITNESS:  That's correct.

5                    MR. BRODY:  And if --

6                    THE COURT:  It can be addressed.

7                    MR. BRODY:  Yes, Your Honor.  And if

8     there's some, you know, additional explanation that

9     Mr. Pollock thinks needs to be made about that --

10                   THE COURT:  Counsel is entitled to

11    the answer to the question.  I mean, it works on

12    both sides.  So if it needs further explanation, I'm

13    sure you'll have an opportunity.

14                   MR. BRODY:  Yeah.  And it's -- it's

15    -- you know, frankly, it's -- it's impeachment.

16    It's not, you know -- it's -- it's his own

17    testimony.

18                   THE COURT:  Continue.

19                   MR. BRODY:  Thank you.

20                   THE WITNESS:  Judge Porto?

21                   MR. BRODY:  Now --

22                   THE COURT:  I don't want you to

23    address me -- Mr. Birchfield --

24                   THE WITNESS:  Yes, sir.

25                   THE COURT:  -- you're a witness.

Page 235

1                    THE WITNESS:  I understand.

2                    THE COURT:  You don't direct any

3      questions to the Court.

4                    THE WITNESS:  I understand.

5                    THE COURT:  You direct to counsel, if

6      there's anything.  So your focus is with regard to

7      counsel.  Thank you.

8                    THE WITNESS:  Yes.  Yes, Your Honor.

9      BY MR. BRODY:

10         Q.       So, Mr. Birchfield, September of

11     2020, at that time, I take it, in your view, there

12     may be others, but the two big differences in the

13     talc matters at large between September of 2020 and

14     the time of the LTL 2 bankruptcy proceeding last

15     year, were the number of filed claims and the fact

16     that J&J had proceeded with the bankruptcy; is that

17     fair?

18         A.       There were multiple, there were

19     multiple differences between September '20 and

20     today.

21         Q.       All right.  Do you --

22         A.       And --

23         Q.       I'm sorry.  Go ahead.

24         A.       So, but this is not -- this is not a

25     proposal to settle all claims for 3.25 billion.  I

Page 236

1    answered the question that that was the proposal

2    that I submitted, but I did not agree that that was

3    a proposal to settle all current and future talc

4    claims, ovarian cancer claims in the Imerys

5    bankruptcy for 3.25.

6        Q.    Well, we'll let the record of your

7    testimony today and your prior testimony, you know,

8    stand for the words that are going to be written on

9    the transcript.

10            My question was actually about the

11   big differences, or any differences, big differences

12   between the litigation at that time, September of

13   2020, and as of the time of the LTL 2 bankruptcy

14   proceeding last year.  And, in your view, the -- the

15   two big differences are simply the total number of

16   filed claims and the fact that, as of last year,

17   J&J/LTL was in bankruptcy, right?

18       A.    Those are two big factors.  Those are

19   not the only big factors.

20       Q.    Those -- those are -- you would agree

21   those are the big differences, right?

22            MR. POLLOCK:  Objection; asked and

23   answered.

24            THE WITNESS:  Those are two of the

25   differences.

Page 237

```
1                    THE COURT:  I'll overrule the
2      objection.
3      BY MR. BRODY:
4           Q.      All right.  Do you recall giving a
5      second deposition in the LTL bankruptcy proceeding
6      in May of last year?
7           A.      I do.
8                    MR. BRODY:  Your Honor, may approach?
9                    THE COURT:  Yes.
10                   MR. BRODY:  Thank you.
11                   MR. POLLOCK:  Your Honor, again, I
12     object.  This was not part of the record.  It was
13     not even a partial part of the record.  This is a
14     brand new document being given to me on the fly,
15     which they obviously had in advance.  I object to
16     its use.
17                   THE COURT:  To the extent it's going
18     to be for impeachment --
19                   MR. BRODY:  It's for impeachment,
20     Your Honor, yes.
21     BY MR. BRODY:
22          Q.      Mr. Birchfield, this is a copy of a
23     transcript of a deposition you gave on May 30th of
24     last year, correct?
25          A.      Yes.
```

Page 238

1          Q.        And if you would turn to page 101 of

2     that transcript.  Are you there?

3          A.        Almost.  Yes.

4          Q.        And the question:  "Just following up

5     on your testimony that the situation is much

6     different today, the world has changed, other than

7     the number of change -- number of filed and unfiled

8     claims, had there been any other developments

9     pertinent to the talc litigation that you think

10    would raise the settlement amount?"

11                   Your answer was:  "There may be

12    others, but the two big differences were the total

13    number of filed claims in September 2020 and J&J's

14    filing of bankruptcy, the debtor's filing of

15    bankruptcy."

16                   And that was your testimony on

17    May 30th of last year, correct?

18         A.        Yeah.

19                   MR. POLLOCK:  Your Honor, I object

20    under the doctrine of completeness.  The question

21    and line on this actually starts at page 100 --

22                   THE COURT:  I'm going to give you an

23    opportunity, Mr. Pollock, to address that on --

24                   MR. POLLOCK:  Fair enough.

25                   THE COURT:  -- cross-examination, for

Page 239

1    completeness.

2              Go ahead.

3              MR. BRODY:  Thank you, Your Honor.

4    BY MR. BRODY:

5         Q.       Putting the September 2020 proposal

6    aside, you've made additional settlement proposals

7    to Johnson & Johnson as part of the tort claimant

8    committee in the LTL bankruptcy, correct?

9         A.       I have.

10        Q.       In fact, you led the team effort on

11   behalf of ovarian cancer plaintiffs to reach a

12   mediated resolution of talc claims against J&J in

13   the first LTL bankruptcy, correct?

14        A.       I did.

15        Q.       And you have stated that there was

16   in-depth discussion of the value of talc claims from

17   both sides within the context of that mediation,

18   correct?

19        A.       That would be true.

20        Q.       All right.

21        A.       You're asking me if I've said that.

22   I'm sure that I have.  I don't recall saying that,

23   but it's --

24        Q.       Do you have -- do you have --

25        A.       -- certainly true.

Page 240

1          Q.      You have your hearing exhibit binder

2     there?

3          A.      I do.

4          Q.      And if you would turn to tab 16.  Are

5     you there?

6          A.      I am.

7          Q.      You recognize that document as a

8     certification that you prepared, correct?

9          A.      I do.

10          Q.      And if you would turn to paragraph 11

11     of your certification, you wrote, or you signed the

12     statement:  "With mediators involved, there was

13     in-depth discussion of the value of the talc -- of

14     talc claims from both sides."

15                  Correct?

16          A.      True.

17          Q.      All right.  But notwithstanding

18     discussion of your position in the mediation

19     context, the amount that you think would be

20     reasonable compensation for ovarian cancer claimants

21     is something that you consider to be confidential

22     attorney work product, correct?

23                  MR. POLLOCK:  Your Honor, I object.

24     I need a time frame, because this has been going on

25     for four years, the facts have changed.  So if we're

Page 241

1  going to have a discussion regarding what they are

2  worth, I'd like to know what time that discussion

3  occurred.

4              THE COURT:  That's a fair question.

5              MR. BRODY:  The question was I don't

6  think specific at all to time frame, Your Honor.  It

7  was simply --

8              THE COURT:  Do you have a time frame?

9              MR. BRODY:  It was simply if he

10  considers that to be an attorney work product.  I

11  don't think --

12             THE COURT:  At any time.

13             MR. BRODY:  Yeah.  I don't there's a

14  temporal component to that.

15             THE COURT:  Overruled.

16             THE WITNESS:  And I just want to make

17  sure I understand.  You're asking me, if the -- if

18  the value -- how I would value a claim, a

19  plaintiff's claim, if that is attorney-client work

20  product?

21  BY MR. BRODY:

22      Q.     I'm asking you if the amount you

23  think would be reasonable compensation for ovarian

24  cancer claimants is something you consider to be

25  confidential attorney work product?

Page 242

1          A.      It can be.

2          Q.      It's not something you would

3    disclose, is it?

4          A.      Well, no, we have talked.  I mean, we

5    have talked.  We talked in open court about factors

6    that would come into play in evaluating what a

7    reasonable -- you know, what reasonable settlement

8    values would be for, you know, for claimants.

9          Q.      You still have the copy of your

10   May 30th deposition there?  It's the smaller one.

11         A.      Yes.

12         Q.      If you would turn to page 94, line

13   14.  Are you there?

14         A.      Yes.

15         Q.      You were asked:

16                 "And you won't tell us what amount

17   you think would be reasonable compensation for

18   ovarian cancer claimants, correct?"

19                 And Ms. O'Dell objects on the basis

20   that it's been asked and answered, and says, "It's

21   protected by Rule 408.  It's protected by the

22   attorney-client work product privilege, and I would

23   instruct the witness not to answer."

24                 And if you go to the next page, you

25   were asked whether you would accept that

Page 243

1  instruction, and you say, "My lawyer's instruction,

2  yes."

3              That was your testimony, correct?

4       A.     That is my testimony.

5       Q.     All right.  Similarly, Beasley

6  Allen's view of what amount on average any

7  resolution of its filed claims must be is

8  confidential and protected attorney work product,

9  correct?

10      A.     It can be.

11      Q.     All right.  And so you didn't take

12 issue when Ms. O'Dell objected on that basis to that

13 same question when you were asked that question in

14 the course of the second LTL bankruptcy proceeding

15 when you were deposed on May 30th of last year,

16 right?

17      A.     I did not.  I followed the advice of

18 counsel.

19      Q.     In other words, Beasley Allen's

20 assessment of case values and injuries is its work

21 product, right?

22              MR. POLLOCK:  Objection.

23              THE WITNESS:  It can be.

24 BY MR. BRODY:

25      Q.     And when you do that kind of

Page 244

1    assessment, that kind of assessment is based on

2    confidential client information?

3         A.      It can be, yes.

4         Q.      Damages analysis, as well, you

5    consider that to be work product?

6         A.      It can be.

7         Q.      Based on confidential client

8    information?

9         A.      It can be.

10        Q.      All right.  And because you're trying

11   to draw this distinction, saying "it can be," and

12   I'm taking from that, and I'm going to -- I'm going

13   to go with you here, sometimes it's not.  Why don't

14   you tell me why it is that you are couching your

15   answers.

16        A.      Well, if I'm -- if I'm arguing before

17   a jury, I'm going to put forward, in closing

18   argument, I'm going to put forward the information

19   in the analysis and make a recommendation about, you

20   know, what that value is.  But -- but there is a

21   process in getting there, so it depends on the

22   context.  It depends on, you know, what the setting

23   is.  You would -- you would discuss those factors in

24   mediation, you would discuss those, you know, in

25   court, in court proceedings.

Page 245

1              So, to say that it is, you know, that

2    it's protected attorney-client privilege just as a

3    blanket statement is more than I could -- more than

4    I could just embrace.

5          Q.      Well, clearly, if you were standing

6    in this courtroom and you were talking to a jury

7    over there and you presented the jury with a number,

8    you're telling the jury, Here's what we want you to

9    give to --

10              THE COURT:  You can't suggest that in

11    New Jersey.  You can't suggest a number.

12              MR. BRODY:  All right.  If you were

13    not in this courtroom.

14              THE COURT:  Hypothetically, and I'm

15    just telling you, so if anybody is looking at the

16    record, you can't suggest a number.

17    BY MR. BRODY:

18          Q.      All right.  So we're taking you out

19    of this courtroom, okay?  We're taking you -- we're

20    taking you to a jurisdiction where you're presenting

21    that information to the jury, to go with your --

22    your hypothetical.  And, you know, when you do that,

23    you're telling the jury, Here's -- here's what we

24    think you should award to my client, right?

25          A.      Yes.

Page 246

1      Q.      Right.  And that's very different

2   than the internal analysis that goes on that makes

3   you arrive at a place where you have an opinion, you

4   know, here's what I think this case, you know, might

5   really be worth, in the settlement context or

6   potentially in any other context, right?

7      A.      I think so.  I'm not sure I follow.

8      Q.      Well, I mean, it -- it -- it's

9   clearly attorney work product to you to the extent

10  that you followed Ms. O'Dell's instruction and

11  objection in your deposition in the LTL bankruptcy

12  proceeding and refused to answer that question,

13  right?

14     A.      Right, but there -- right, that is

15  true, but there are -- there are different -- there

16  are different contexts.  What are -- what are we

17  talking about?  Are you talking about the, you know,

18  the value of an individual claimant?  Are you

19  talking about the value of all ovarian cancer

20  claimants?  Are you talking about the value of, you

21  know, of all the claimants that were part of the LTL

22  bankruptcy plan?  Are you talking about the value in

23  the context of litigation?  Are you talking about in

24  the context of a bankruptcy proceeding?

25                  There are a lot of multiple variables

Page 247

1    that would come into play.  And so, I -- I don't --

2    I don't know.  I don't -- I honestly don't remember

3    the full lead-up to, you know, to Ms. O'Dell's

4    objection and me following her instruction, so I

5    can't answer more than that.

6            Q.      All right.  So your -- your testimony

7    is, yes, you know, our -- our analysis of claim

8    values is our work product, but we might present

9    that work product in a certain forum if we decided

10   that it would be helpful to us or necessary, you

11   know, for example, for the purposes of making an

12   argument to a jury?

13               MR. POLLOCK:  Objection.  He didn't

14   -- Mr. -- he never said he would provide his work

15   product.  He said he would provide a number.  And

16   there may be a big difference, because one is

17   attorney-client privilege, how do you get to the

18   number, versus the number.  So the word "work

19   product" to me is very laden here, because obviously

20   it has relevance in the attorney-client work product

21   scenario.

22               THE COURT:  Could you rephrase the

23   question, Mr. Brody?

24               MR. BRODY:  Sure, I'll rephrase the

25   question.

Page 248

1    BY MR. BRODY:

2         Q.      Fair to say that you would assess, in

3    circumstances, whether the information was

4    confidential attorney work product based on client

5    confidences that you felt needed to be protected, or

6    not, you would -- you would make that assessment as

7    a lawyer?

8         A.      I would.

9         Q.      All right.  Fair enough.

10                You agree, though, with Mr. Conlan

11   that Beasley Allen sent its work product to Legacy,

12   correct?

13        A.      We did -- we did provide some work

14   product to Legacy.

15        Q.      All right.  And some of that work

16   product is described on a privilege log that was

17   provided to Johnson & Johnson in connection with a

18   third-party subpoena that was served in the MDL,

19   correct?

20        A.      Yeah.

21                MR. BRODY:  All right.  If I may

22   approach with a copy of the log.

23                THE COURT:  Are you familiar with

24   that, Mr. Pollock?

25                MR. POLLOCK:  I am.

Page 249

1                THE COURT:  Okay.  You may approach.

2                MR. BRODY:  Thank you.

3                MR. POLLOCK:  Are we marking this for

4    identification?

5                MR. BRODY:  We can.

6                THE COURT:  What number are we on

7    with regard to -- is it D-1, J&J 1?  How are we

8    marking?

9                MR. BRODY:  We can make this J&J 1.

10                        -   -   -

11                (J&J 1, marked for identification.)

12                        -   -   -

13   BY MR. BRODY:

14        Q.     We tried to make it as big as

15   possible.  So for orienting you, the entries run

16   across the page and then they're continued on the

17   back side, because there are so many columns on the

18   chart.  So if you, just to orient you, if you look

19   at number 1, document 1 runs all the way across, and

20   then it continues.  You see the doc number on the

21   next page, continues across through the description.

22                Are you with me?

23        A.     I am.

24        Q.     So, if you would, why don't we

25   start -- and they go in order as they were numbered

Page 250

1    on the privilege log.

2                    If you turn to document number 165.

3    Are you there?

4         A.    Yes.   Document 165.

5         Q.    Correct.   You got it?

6         A.    Yes.

7         Q.    And that's -- the date there is

8    May 7th 2023, correct?

9         A.    Yes.

10         Q.    The author is Leigh O'Dell, correct?

11         A.    Yes.

12         Q.    And if you look at the description

13    for document 165 on the next page, it's described as

14    "An ovarian cancer leadership memo to Legacy

15    discussing ovarian cancer case values, injuries, and

16    damages analysis," correct?

17         A.    Yes.

18         Q.    And that's one of the items of work

19    product that Beasley Allen sent to Legacy, correct?

20         A.    That would be my understanding.

21         Q.    All right.   And the next document,

22    166, is the same thing, correct?

23         A.    Yes.

24         Q.    And -- all right.   And if you would

25    turn to document 234, as another example.   Tell me

Page 251

1    when you're there.

2           A.      Document 234, I'm there.

3           Q.      All right.  That's a document that

4    you're the author of, correct?

5           A.      Yes.

6           Q.      And the date on that is May 15th,

7    2023, correct?

8           A.      Yes.

9           Q.      And if you carry it over to the next

10   page, it says "Draft attachment regarding ovarian

11   cancer claim values," correct?

12          A.      Correct.

13          Q.      And that's another one of the work

14   product documents that you sent over to Legacy,

15   right?

16          A.      I presume so.

17          Q.      The fact that you shared your work

18   product with Mr. Conlan last year is not a fact that

19   is disclosed in any of the certifications that you

20   filed in this case, is it?

21          A.      No.

22          Q.      By the way, it's not just amounts,

23   it's number of claims.  You consider, for example,

24   your sources of information used to identify what

25   you believe to be the potential number of future

Page 252

1    talc claims against Johnson & Johnson to be

2    confidential and protected work product, right?

3          A.      I mean, it could be, yes.

4          Q.      All right.  If you would -- you still

5    have the May 30th deposition?

6          A.      Yes.

7          Q.      If you would turn to page 78.

8          A.      Page 73.

9          Q.      I'm sorry, 78.

10         A.      78.

11         Q.      And you were quoted -- the question

12   was, "You note later in that paragraph," you were

13   being asked about a document, "in addition, any

14   resolution must factor in at least 20,000 future

15   claims.  Do you see that?"

16                 You said, "I do."

17                 "QUESTION:  Do you know where this --

18   where you got that figure?"

19                 There's an objection, and Ms. O'Dell

20   says, "You may not answer where you got the

21   information provided.  You can answer yes or no, but

22   beyond that is protected by the attorney-client work

23   product privilege, and I would instruct you not to

24   answer."

25                 And your response was, "I do know

Page 253

1   where I got that information.  It would be work

2   product."

3                   That was your answer, correct?

4         A.      About the total number of future

5   claimants --

6         Q.      That's right.

7         A.      -- where I got that number, yes.

8         Q.      All right.  After the second --

9                   MR. BRODY:  So, we're at a bit of a

10  transition point here, Your Honor, and I don't know

11  if you were going to take a break this afternoon.

12                  THE COURT:  Yeah, I wanted to see

13  if this is a good natural spot to take a break,

14  Mr. Brody?

15                  MR. BRODY:  Yes.

16                  MR. POLLOCK:  I want to at least know

17  how -- are we finishing today, or are we going --

18  how long are you going to take?

19                  THE COURT:  Well, that would be my

20  next question.

21                  MR. BRODY:  Again, I certainly

22  hope --

23                  THE COURT:  All right.

24                  MR. BRODY:  -- I would be done

25  examining Mr. Birchfield before 4:30, and it's just

Page 254

1   a question of how long Mr. Pollock may have --

2                   THE COURT:  Okay.

3                   MR. BRODY:  -- and then what would

4   come after that.

5                   THE COURT:  If we don't finish today,

6   we've got to continue.  And that's the bottom line.

7                   MR. BRODY:  Right.

8                   THE COURT:  Okay.  Let's take a

9   break.  We'll go 10.  Go off the record.

10                  (A recess was taken.)

11                  THE COURT:  Mr. Brody.

12                  MR. BRODY:  Thank you.

13  BY MR. BRODY:

14       Q.      Mr. Birchfield, are you ready?

15       A.      Yes.

16       Q.      After the second LTL bankruptcy

17  filing, you, Ms. O'Dell, and Mr. Meadows from

18  Beasley Allen served as representatives of a Beasley

19  Allen client appointed to serve on the tort

20  claimants committee in that bankruptcy, correct?

21       A.      Yes.

22       Q.      And that also involved mediation,

23  correct?

24       A.      It did.

25       Q.      And you mentioned that fact in the

Page 255

1   January 29th certification, not the mediation, but

2   the fact that you and Ms. O'Dell and Mr. Meadows

3   served as representatives on the TCC in the

4   certification you submitted on January 29th,

5   correct?

6          A.      Correct.

7          Q.      When you described your role in the

8   second LTL bankruptcy, you did not disclose in that

9   certification that you were engaged in

10  communications and discussions with Mr. Conlan

11  throughout the course of that mediation, correct?

12         A.      In the certification, I said -- I

13  said when we had our first encounter, you know, with

14  -- with Legacy, and when we had our first meeting.

15  That -- I said that.  I didn't talk about the

16  mediation or -- or anything further.

17         Q.      Right.  And you didn't disclose that

18  you had subsequent communications where you provided

19  that your -- your work product and that the

20  discussions went on beyond May 2nd of 2023; that's

21  just not in your certification, right?

22                MR. POLLOCK:  Objection to the phrase

23  "work product."  There's no proof of it.  I would

24  like to see what it is.  I don't know what we're

25  talking about.

Page 256

1                    THE COURT:  Mr. Brody?

2                    MR. BRODY:  I was just referring to

3       his prior testimony, Your Honor.

4                    THE COURT: Okay.  Mr. Birchfield's --

5                    MR. BRODY:  Yes.

6                    THE COURT:  -- testimony.  Okay.

7                    MR. BRODY:  Right.

8       BY MR. BRODY:

9            Q.     That's -- that's not in your

10      certification, right?

11           A.     That's not in my certification.

12           Q.     All right.  What is in your

13      certification is a statement that your first contact

14      with Legacy in connection with the J&J talc

15      litigation was in April of last year, right?

16           A.     Correct.

17           Q.     And that your first meeting with

18      anyone from Legacy was on May 2nd of last year,

19      correct?

20           A.     Correct.

21           Q.     And you met Mr. Conlan that day, too,

22      didn't you?

23           A.     On May 2nd, yes.  That's right.

24           Q.     All you said about your interactions

25      with Mr. Conlan in your certification was that you

Page 257

1   met him for the first time on May 2nd, 2023, right?

2        A.      Correct.

3        Q.      And again, as I think you said, it

4   doesn't say anything about your original

5   communications with him, right?

6        A.      Correct.

7        Q.      Or any subsequent meetings with him

8   after May 2nd, 2023, correct?

9        A.      No.  It just discussing our initial

10  contact.  That's correct.

11       Q.      Right.  And I'm going back to that

12  first meeting on May 2nd, 2023.  You didn't contact

13  anyone at Johnson & Johnson to tell them that you

14  were going to be speaking with Mr. Conlan, did you?

15       A.      I did not.

16       Q.      You didn't tell any of Johnson &

17  Johnson's outside counsel, either, did you?

18       A.      No.

19       Q.      So there was no sort of, you know,

20  Hey, guys, I've got this meeting set up with James

21  Conlan.  I know he represented you guys in the talc

22  matter.  Are you okay with that?

23              You never went to J&J with any sort

24  of request like that, right?

25              MR. POLLOCK:  Objection;

Page 258

1    argumentative.  Because he's trying to make a

2    closing during the middle of questioning.

3                    MR. BRODY:  Your Honor --

4                    THE COURT:  I'm going to overrule the

5    objection.

6                    MR. BRODY:  Thank you.

7                    THE COURT:  Do you understand the

8    question, Mr. Birchfield?

9                    THE WITNESS:  I think so, Your Honor.

10                   I did not -- I did not mention, but

11   there were a lot of things that I didn't mention in

12   the certification.  I was just merely stating, you

13   know, that we -- when the contact began.  And this

14   was a meeting with -- with Legacy who had an

15   alternative, you know, path that we were exploring

16   through the mediation process.  That -- it was a

17   meeting with Legacy, a vendor, and I did not -- but

18   I did not -- I didn't -- I didn't disclose that to

19   J&J.  It never crossed my mind.

20   BY MR. BRODY:

21        Q.      Right.  It never crossed your mind to

22   go to J&J and say, Hey, I'm going to have a meeting

23   with your former outside counsel on the talc matters

24   and are you guys okay with that?

25        A.      The only thing that I knew about, you

Page 259

1  know, Jim Conlan, you know, at that point, was the,

2  you know, the one thing that Jim Murdica had told me

3  in the fall of late, you know, 2020, that he was

4  working with the -- with the FCR.  That -- that was

5  it.

6         Q.      And then, so you -- you certainly

7  didn't ask Mr. Conlan, Hey, do you have a waiver

8  that allows you, a former J&J lawyer on the talc

9  matters, to talk to me, Andy Birchfield,

10  representative on the TCC?

11         A.      I certainly did not.  I mean, in this

12  context, a meeting with a vendor, Legacy, who has an

13  alternative path, that there was nothing that

14  suggested a waiver would be in order.

15         Q.      And to the extent you know, nobody

16  else from Beasley Allen asked Mr. Conlan that,

17  either, right?

18         A.      No, not to my knowledge.

19         Q.      Including Ms. O'Dell, right?

20         A.      Including Ms. O'Dell.

21         Q.      Who is co-lead counsel for the

22  plaintiffs in the MDL, right?

23         A.      Correct.

24         Q.      You just said that -- you referred to

25  Legacy as a, did I get that right, as a vendor?

Page 260

1          A.      Yes.

2          Q.      And that's something that appears

3    in the certification that you submitted on

4    January 29th, doesn't it?

5          A.      Probably so.

6          Q.      If you want to take a look, your

7    certification is tab 16, and it's paragraph 19.

8          A.      It's consistent with my testimony.

9          Q.      You said you just -- you always

10   viewed Legacy as a vendor who, I guess, had a

11   creative solution to a difficult problem based on

12   their collective experience in similar transactions.

13         A.      Correct.

14         Q.      Legacy is not the only company that

15   acquires and manages mass tort liabilities, is it?

16         A.      It's not.  To my understanding, it is

17   not.

18         Q.      There are others like Enstar Group?

19         A.      Correct.

20         Q.      I don't know how to pronounce it,

21   Dellikas -- Delkidas Group [phonetic].

22         A.      I haven't had any dealings with them,

23   but I would -- I understand that they would be --

24   they would be another competitor in this area.

25         Q.      Global Risk?

Page 261

1          A.       Sounds right.

2          Q.       R&O Legacy?

3          A.       I don't know that name, but...

4          Q.       You didn't -- you didn't partner with

5    any of those companies, though, did you?

6          A.       I didn't partner with any of those

7    companies.  I wouldn't consider, you know, our

8    engagement with Legacy as a -- as partnering, you

9    know, either.

10         Q.       All right.  Well, I'll use your word,

11   "engagement."  You didn't enter into an engagement

12   with any of those other companies, right?

13         A.       I didn't talk with any of those --

14   those other companies.  I don't have an engagement,

15   you know, with -- with Legacy.  You know, I mean, we

16   did -- obviously, we did talk and we worked through

17   mediation, a mediation process together.  I have not

18   talked with any of the -- any of the other companies

19   that you named.

20         Q.       Right.  You didn't -- you didn't go

21   to a single -- not just the ones I named, you didn't

22   go to a single other company that acquires and

23   manages tort liabilities, any of the companies in

24   Legacy's field, and ask them, Hey, can you help us

25   out here, we're -- we're looking for somebody to

Page 262

1    work with in this -- this talc realm?

2         A.      I did not do that. I did not reach

3    out to Legacy.

4         Q.      You -- you spoke to Legacy?

5         A.      I did.

6         Q.      You continued to speak with them

7    after the first meeting?

8         A.      I did.

9         Q.      You continued to speak with

10   Mr. Conlan after the first meeting?

11        A.      Yes.

12        Q.      You sent him the documents that we

13   see on the privilege log after the first meeting,

14   right?

15        A.      Yes.

16        Q.      And you never went to any other

17   company and said, Hey, can you guys do this; right?

18        A.      No.

19        Q.      All right.  You chose to partner with

20   -- I will not use "partner," since you objected to

21   that.  You chose to work with the one that had

22   Johnson & Johnson's former lawyer from the talc

23   matters as its CEO, didn't you?

24        A.      Legacy came to us.  They came to us

25   and they laid out this proposal that would be a path

Page 263

1    to the finality that we understood that J&J had been

2    seeking; finality outside of bankruptcy.

3                    So Legacy came to us, so we -- we

4    explored that option and we explored that option

5    through the mediation process and beyond.

6            Q.      You say Legacy came to you.  You

7    wanted Legacy, didn't you?

8            A.      No, not -- not at the beginning.

9                    So Legacy -- Legacy came to us.

10   Legacy came to us with this proposal, and a

11   proposal, a path that would give J&J, you know,

12   finality.

13                   I became -- I became concerned about

14   -- about Legacy and about this path, whether it is

15   with Legacy or with -- or with another entity.  So

16   when -- when Legacy first talked with us, when they

17   first talked with us, you know, alarm bells were

18   going off in my mind.  Not -- not for, you know, any

19   client confidences from J&J, but as -- but I quickly

20   came to understand that this is an -- this is an

21   offer.  This would be an offer, and Legacy or one of

22   its competitors could engage in this transaction

23   without us.  And so it was a -- it was a serious

24   concern.

25                   Then I saw it as a potential

Page 264

1    opportunity.  As I've explored more on behalf of the

2    plaintiff leadership, as we explored this more, and

3    we vetted this, and saw it as a, you know, as an

4    opportunity, and an opportunity that was before us

5    in this -- in the second bankruptcy, in the

6    mediation that Judge Kaplan had ordered, is that we

7    began to explore that option.

8                    But it was not something where we

9    were seeking -- we were seeking out, you know,

10   Legacy or any of its competitors.

11        Q.      So you -- you took advantage of what

12   you saw as an opportunity, correct?

13        A.      Yes.

14        Q.      And you took advantage of that

15   opportunity with Legacy, a company whose CEO had

16   represented Johnson & Johnson as its outside counsel

17   in the talc matters, correct?

18                    MR. POLLOCK:  Objection to the phrase

19   "advantage."

20                    THE COURT:  Can you rephrase the

21   question?

22                    MR. BRODY:  Sure.

23   BY MR. BRODY:

24        Q.      You recognized it as an opportunity

25   and you proceeded to work with Legacy, a company

Page 265

1  whose CEO was previously outside counsel for Johnson

2  & Johnson on the talc matters?

3        A.        It is true that we explored this with

4  Legacy.  It is true that, you know, that Jim Conlan

5  is the CEO of Legacy, and it is true that Jim Conlan

6  worked with Faegre while Faegre was representing

7  J&J.

8                  None of that, none of that was on the

9  table.  None of that was part of the, you know, part

10  of the evaluation of this process.  We did not -- we

11  did not need any of the information that -- that Jim

12  Conlan would have had as a lawyer.  That's -- that's

13  the reason that --

14        Q.        I'm sorry.  I didn't mean to cut you

15  off.

16        A.        That's the reason we put in the -- I

17  put in my certification when the first contact with

18  Legacy was.  Because, by that point, by May 2nd of

19  2023, late April when we had the first contact from

20  anyone from Legacy, by that point, we had been in

21  the -- we had been in the talc litigation for ten

22  years.

23                  So we had gone through mediation, we

24  had gone through an estimation process, we had tried

25  12 cases, we had extensive, extensive understanding

Page 266

1    of the, you know, the claims and the claims value.

2    We had extensive understanding of J&J's approaches

3    to the litigation and their approaches to

4    settlement.  We had gone through -- we had gone

5    through one bankruptcy and we were in the middle of

6    a second.

7         Q.    And so what you did is, you made

8    clear that you wanted to include Legacy in the

9    upcoming mediation that you anticipated to be part

10    of the LTL 2 proceeding, correct?

11        A.    We did want Legacy to be part of that

12   mediation because Legacy offered -- offered a path

13   to give J&J the finality that it had been telling us

14   that it must have, and had been telling the Court

15   that they could only get it through bankruptcy,

16   which we knew not to be true.  Legacy provided a

17   win/win.

18        Q.    You didn't come out of that May 2nd

19   meeting and tell Mr. Conlan to take a hike, right?

20        A.    I did not.

21        Q.    You told him you wanted him in the

22   mediation, right?

23        A.    I don't know that coming out of that

24   -- out of that meeting.  I mean, at some point, you

25   know, there was a discussion about Legacy being

Page 267

1    involved in the mediation, you know, process.  I
2    can't -- I can't say that it was the day after, or
3    right out of that meeting, or even at that meeting.
4    I can't say.  But we did -- we did want Legacy to be
5    involved in the -- in the mediation process.
6         Q.      And in fact, I mean the plaintiffs
7    steering committee has filed a brief in the MDL
8    arguing in order to keep its communications with
9    Mr. Conlan confidential, that it made clear, counsel
10   made clear that it wanted to include Mr. Conlan's
11   company, Legacy, right?
12        A.      We did.
13        Q.      Right.  And -- and as I said, you
14   didn't -- you didn't tell him after that meeting,
15   you know, no, not interested, we don't want to work
16   with you guys, right?
17        A.      We did not.
18        Q.      You told him you wanted him, that you
19   felt he had a role, right?
20        A.      No.  We -- we considered, we
21   considered, you know, after that meeting that the
22   Legacy option was still a viable, you know, a viable
23   option that would give J&J what we understood J&J,
24   you know, to want, and that was the finality.  They
25   wanted the talc liability off its books.  This was a

Page 268

1  way, a way that we could get there.  We were

2  exploring multiple paths to get reasonable values

3  for our clients.

4         Q.      And if you -- my question was, I

5  think, a lot simpler than that, and a little

6  different.  You felt that Mr. Conlan and Legacy had

7  a role to play in the mediation, correct?

8         A.      Yes, I thought that they had a role

9  to play as a -- presenting an option.

10        Q.      Right.  And they were, as far as you

11 were concerned, authorized to play that role.  You

12 didn't -- you wanted them, right?

13        A.      I did not -- I didn't ask that they

14 be excluded from the mediation.  I did not.  I did

15 want -- I did want the mediators to, you know, to

16 hear from Legacy.  I did.  I did that for me,

17 personally, and that was providing leadership.

18        Q.      And they did what you wanted.  Legacy

19 -- Legacy did what you wanted, right?

20             MR. POLLOCK:  Objection.  When you

21 say "did what you wanted," can I seek clarification,

22 Your Honor?

23             THE COURT:  Did you understand the

24 question?

25             THE WITNESS:  No, I mean --

Page 269

1                    THE COURT:  Okay.

2                    MR. BRODY:  I'm happy -- I'm happy to

3      clarify it, Your Honor.

4                    THE COURT:  Overruled.

5      BY MR. BRODY:

6          Q.      Legacy, you said that -- that you

7      wanted Legacy to communicate with the mediators,

8      right?

9          A.      I did want -- I did want Legacy to

10     communicate with the mediators.

11         Q.      And they did what you wanted them to

12     do, right?

13         A.      They did communicate with the

14     mediators.

15         Q.      Right.  They -- yes, they did what

16     you wanted them to do, right?

17                    MR. POLLOCK:  Objection.  And so I --

18     I -- with this "do what you wanted them to do," the

19     problem is the mediators are having discussions,

20     you're talking about discussion with a third party.

21                    THE COURT:  Mr. Birchfield answered

22     the question.  He said they did what he wanted them

23     to do.

24                    MR. BRODY:  Fair enough, Your Honor.

25     BY MR. BRODY:

Page 270

1          Q.       Again, without telling Johnson &
2     Johnson, correct?
3          A.       I did not -- I did not tell Johnson &
4     Johnson.  I anticipated that Johnson & -- that
5     Johnson & Johnson would engage in the mediation that
6     Judge Kaplan ordered the parties to do, and that if
7     the mediators viewed Legacy as a viable option, that
8     that would be part of the mediation process in the
9     next few days.
10               But J&J did not engage in the
11    mediation process.  But it wasn't that we were
12    trying to keep that from J&J.  I thought that -- I
13    thought Legacy -- I thought Legacy's involvement in
14    the mediation would be front and center with the --
15    with all of the parties.
16         Q.       So the answer to my question is no,
17    you didn't -- you didn't disclose that to J&J.  You
18    didn't disclose the fact that you felt that Legacy
19    had a role to play in the mediation and that you
20    would authorize them to play that role?
21         A.       I did not.
22         Q.       Okay.  We talked about some of the
23    documents authored by Ms. O'Dell and by you that you
24    sent over to Legacy that appear on the privilege
25    log.

Page 271

1              Do you know who -- you do know, I

2    expect, who Niall Davies is?

3         A.    I do.

4         Q.    He is or was a project manager at

5    Beasley Allen last year during the course of the

6    mediation, correct?

7         A.    Correct.

8         Q.    And he also sent over various

9    documents to the mediators, right?

10        A.    He sent -- he sent some documents

11   that were part of the mediation process.  I don't

12   know if he sent anything directly to, you know, to

13   the mediators.  I don't -- I don't recall.

14        Q.    All right.  If you can take a look at

15   the privilege log, if you still have it up there

16   with you, and I want you to take a look at document

17   315.

18        A.    315, I'm sorry?

19        Q.    Yes, 315.  We'll just take a look at

20   one of them.

21        A.    Okay.

22        Q.    Are you there?

23        A.    Yes.

24        Q.    And you see that on May 12th,

25   Mr. Davies sent over, and it carries over to the

Page 272

1  next page, a draft -- a draft QSF, qualifications

2  for the Legacy ovarian cancer proposal, right?

3          A.      Right.

4          Q.      And you were providing information to

5  Legacy to work to develop that proposal with Legacy,

6  correct?

7          A.      No, that's not correct.

8          Q.      All right.  You just randomly asked

9  Mr. Davies to send over information?  I mean, there

10  must have been a reason for it.

11          A.      We sent the information, but that was

12  -- that was based on qualifications, client

13  qualifications that had been, you know, that had

14  been developed before any contact with, you know,

15  with Legacy.  So it was -- it was providing

16  information.  It wasn't developing with Legacy, you

17  know, the -- the criteria.

18          Q.      Well, one of the things you did

19  develop with Legacy was a term sheet for the Legacy

20  ovarian cancer claim proposal, right?

21          A.      No.

22          Q.      Why don't you take a look at 381.

23  Tell me when you're there.

24          A.      381.  I'm there.

25          Q.      It's a seven-page document.  You're

Page 273

1    the author, correct?

2            A.      Correct.

3            Q.      And date on that is May 12th, 2023,

4    right?

5            A.      Yes.

6            Q.      And if you flip to the next page,

7    that's a draft term sheet for the Legacy ovarian

8    cancer proposal, correct?

9            A.      Yes.

10           Q.      By the way, that draft term sheet

11   went back and forth and back and forth numerous

12   times, didn't it?

13           A.      It went back -- back and forth

14   several times.

15           Q.      All right.  Take a look --

16           A.      That was not a --

17           Q.      Take a look at --

18                   MR. POLLOCK:  Your Honor, can he

19   please finish answering the question?

20   BY MR. BRODY:

21           Q.      That's -- that's -- why don't we take

22   a look at 103.  Tell me when you're there.

23           A.      103.  I'm there.

24           Q.      And if you take a look at 103, this

25   is something that Mr. Conlan sent to Jonathan

Page 274

1    Terrell at KCIC, and it's an email from ovarian

2    cancer counsel forwarding the draft term sheet and

3    protocol for ovarian cancer claims administration,

4    right?

5            A.      Yes.

6            Q.      And if we go forward in time, and

7    there are a lot of them, so I don't want to stop on

8    all of them, but why don't we take a look at 330.

9    Tell me when you're there.

10           A.      I'm there.

11           Q.      And this is a document from you,

12   right?

13           A.      Yes.

14           Q.      It's dated June 7th, 2023?

15           A.      Yes.

16           Q.      And if you flip over to the next

17   page, this is email from ovarian cancer counsel,

18   that's you, ovarian cancer counsel, right?

19           A.      Yes.

20           Q.      To Legacy, attaching edits to

21   proposed ovarian cancer claims term sheet, correct?

22           A.      Yes.

23           Q.      And I don't want to go through every

24   -- every entry, but you'll agree that that wasn't

25   the only time that drafts were going back and forth,

Page 275

1    was it?

2        A.        There were, you know, as I recall,

3    there were a couple back and forth on the term

4    sheets.  I mean, one of the things that you see in

5    the privilege log is that if there -- if there were

6    emails that were the same email, different people,

7    it's in here multiple times.  It's the same -- the

8    same document.

9                But, yes, there were back -- there

10   were emails back and forth on the term sheet.  But

11   that is not a term sheet that was developed with

12   Legacy.

13               So the -- the plaintiffs' leadership

14   had developed a term sheet.  We had a term sheet

15   that we had all agreed on in -- in March, late March

16   of 2023, and that is -- that's before the LTL 1

17   bankruptcy is officially dismissed and the second

18   bankruptcy is -- is filed.

19               So we, as the ovarian cancer

20   leadership committee, had developed a -- we had

21   developed a term sheet with the terms and had

22   offered to provide that to J&J in an in-person

23   meeting with Mr. Haas and Liz Forminard.  So we had

24   offered to do that.  That's in late March of 2003.

25               So that, the term sheet, the term

Page 276

1    sheet that is here is not a term sheet that was

2    developed with Legacy.  It was already developed,

3    so --

4         Q.    Fair, fair enough.  And so what was

5    happening here was there were communications going

6    back and forth between you and Legacy, including

7    Mr. Conlan, exchanging edits to that term sheet,

8    right?

9         A.    The back and forth with that term

10   sheet was with Scott Gilbert.  There weren't any

11   changes to the term sheet, other than, you know,

12   typos and grammatical -- grammatical issue, because

13   Scott Gilbert is a stickler for that.

14              But the term sheet was not developed.

15   It was -- it was a term sheet that we had already

16   developed as an ovarian cancer committee.  We were

17   providing it to -- to Legacy and to KCIC so that

18   they could -- so that they could -- they could test

19   that with claimant data.

20         Q.    So let me make sure I understand.  So

21   you -- you wanted to get them the term sheet.  And

22   then, in the process, there was some back and forth.

23   You were -- you were fixing things, you were making

24   edits.  I imagine that you're getting down to a

25   pretty granular level at that point; fair?

Page 277

1          A.       Well, granular level in grammatics

2     and typos.  But the term sheet was -- the term sheet

3     was our work term sheet, and it's what we had --

4     what we had developed, you know, through -- we had

5     developed, you know, through mediation in LTL 1.  We

6     had, you know, developed, you know, that in the wake

7     of the Third Circuit's -- the Third Circuit's

8     dismissal order on January the 30th.  We had been --

9     we had been putting together proposals inside of

10    bankruptcy -- inside bankruptcy proposal, as well as

11    -- as well as outside options.  At that point, we

12    had that term sheet together.

13         Q.       And then all of that was shared with

14    Legacy for what you -- and I take it that the -- the

15    plaintiffs steering committee was accurate in its

16    description of documents in the privilege log that

17    it provided in order to assert privilege claims over

18    documents that had been identified by KCIC; fair?

19         A.       I would assume so.

20         Q.       And so if the privilege log reflects

21    that those communications regarding the term sheet

22    went back and forth numerous times over a period of

23    21 days between May 18th and June 8th, that that

24    would be accurate, right?

25         A.       I don't have any reason to doubt the

Page 278

1    accuracy of the privilege log.

2         Q.      Okay.  And then the reason that you

3    were engaged in this back and forth was so that

4    Legacy could see, Okay, here's what we have

5    developed.  "We," the plaintiffs in the talc

6    litigation, counsel representing plaintiffs in the

7    talc litigation.  Here's what we have developed.

8    And you said you -- they -- Legacy could then sort

9    of test that against their claim values, was what

10   you said, right?

11        A.      No.  I said that KCIC -- KCIC, the

12   claims administrator, you know, entity that Legacy

13   had brought in to -- I don't -- I don't know the

14   official business relationship, but that KCIC could

15   take the -- see the claims criteria and they could

16   process some claims data to see, you know, if that

17   -- if it works and how efficient it would be.  That

18   -- that is -- that's a part of a process with any

19   claims administration group that you're going to,

20   you know, be utilizing in a mass settlement.  So

21   they were -- so that was the -- you know, that was

22   the -- that was the purpose of providing them with

23   the -- with the term sheet, which included the

24   claims criteria.

25        Q.      And it wasn't just KCIC.  It was also

Page 279

1    Legacy that was sending drafts back and forth,

2    wasn't it?

3            A.      That Legacy was sending drafts back

4    and forth --

5            Q.      Legacy was commenting on the draft

6    term sheet?

7            A.      Yes, grammatical-type stuff.  That's

8    what I'm -- that's what --

9            Q.      Well, it was -- it was -- it was

10   deeper than grammatical.  It wasn't just, Oh, you

11   know, here's, three weeks -- three weeks later, we

12   found another typo, without revealing any of the

13   substance.  It went deeper than just there should be

14   a semicolon here, right?

15           A.      There -- I do not recall a single

16   substantive change that was made by Legacy to, you

17   know, to the term sheet that we had, that we had

18   proposed.

19           Q.      So you went back and forth over the

20   course of three weeks on typos, that's your -- and

21   grammatical issues?

22           A.      I think that's an unfair

23   characterization because you -- in the -- we could

24   go back and forth in two hours and have really

25   serious substantive, you know, discussions.  But you

Page 280

1    could go over a period of three weeks and not have,

2    you know, any substantive changes.  It's just a

3    matter of timing.

4                    The details, the substantive details

5    of this term sheet had been developed by -- by us.

6    You know, similar term sheets had been shared, you

7    know, through the mediation process with J&J.  There

8    were not substantive issues to be dealt with with

9    Legacy.

10          Q.       So Legacy was -- Legacy was reviewing

11   -- I'm just trying to bring this to a close.  You

12   guys developed the term sheet, you share it with

13   Legacy, right?

14          A.       We did.

15          Q.       And you say to Legacy, Do you think

16   this is going -- actually, I'm not even going to

17   ask, because there's a mediation privilege claim.

18   So I was going to ask you about what you said to

19   Legacy about the term sheet, but I'm not going to --

20   I'm not going to ask at this point, because I don't

21   want to invade the mediation privilege that's been

22   asserted.

23                    Well, let me ask you this.  In

24   addition to exchanging drafts of the term sheet, in

25   addition to providing the work product that you

Page 281

1   identified earlier, you also had Zoom meetings to go

2   over proposed claims administration processes,

3   right, without disclosing the substance of the

4   processes?

5           A.      We did.  That's part of what I just

6   described with KCIC, processing claims data.

7           Q.      You had additional meetings,

8   in-person meetings, after May 2nd of last year,

9   right?

10          A.      We did.

11          Q.      And you discussed term sheet issues,

12  right?

13          A.      No, no.  We -- I don't recall ever

14  discussing any term sheet issues with -- with anyone

15  other than, you know, Scott Gilbert back on the, you

16  know, the grammar and style, style issues.

17                  I mean, we discussed it.  We

18  discussed it in the essence of, you know, being able

19  to, you know, describe for them and for KCIC how it

20  would work, what would be, you know, what would be,

21  you know, valid claims, what would be, you know,

22  excluded claims, what would be the, you know, the

23  medical records that would be necessary to identify

24  those claims.

25          Q.      And so what you were doing was you

Page 282

1    were engaging in close collaboration and strategy

2    communications regarding how to consider, conduct,

3    participate in, initiate, and/or continue to mediate

4    with J&J regarding this proposal, right?

5                    MR. POLLOCK:  Objection to

6    "collaboration."   I'm not sure what that means, but

7    if --

8                    THE COURT:  Do you understand the

9    question, Mr. Birchfield?

10                    THE WITNESS:  I mean, I don't -- I

11   don't know what he means by "collaboration."

12                    THE COURT:  Can you rephrase the

13   question?

14   BY MR. BRODY:

15        Q.     Well, let me ask you this.  You're

16   aware that -- well, plaintiffs in this litigation

17   may have decided -- you know, they have asserted

18   mediation privilege, so these documents are not

19   available.  They have been kept confidential from

20   Johnson & Johnson.

21                    You understand that Judge Schneider

22   reviewed the documents in camera, correct?

23        A.     I do.

24        Q.     And you understand that after his in

25   camera review, Judge Schneider found that the

Page 283

1   documents include close collaboration and strategy

2   communications regarding how to consider, conduct,

3   participate in, initiate, and/or continue to mediate

4   with J&J regarding plaintiffs' proposal to resolve

5   the talc cases, right?

6           A.      Am I aware that he made that finding?

7   Is that what you're asking?

8           Q.      Yes.

9           A.      Yes.

10          Q.      He didn't get it wrong, did he?

11          A.      I think that you could -- I think

12  that you could describe that as, you know,

13  collaboration.

14          Q.      All right.

15          A.      Okay.  Since --

16          Q.      Thank you.  That's -- that's --

17  that's fine.  He also found --

18          A.      He has since said we -- we may

19  collaborate on --

20          Q.      I'm sorry.  You've answered,

21  Mr. Birchfield, and I'm --

22                  MR. POLLOCK:  Your Honor, this is --

23  this is --

24                  MR. BRODY:  It's taking longer than --

25                  MR. POLLOCK:  He was asked whether

Page 284

1    Judge Schneider had it right, and Mr. Brody is again

2    cutting him off.  So the question -- to me, the

3    question is on that phrase.  There was a whole bunch

4    of phrases in there.  Does Judge Schneider have it

5    right.

6                    MR. BRODY:  Well, let me --

7                    THE COURT:  You're -- you're asking

8    for his opinion?  You're asking for Mr. Birchfield's

9    opinion?

10                   MR. BRODY:  Let me -- let me -- let

11   me ask -- let me ask this question.

12                   THE COURT:  Okay.

13                   MR. BRODY:  Because I -- I believe,

14   Judge Porto, I believe I got an answer, so.

15   BY MR. BRODY:

16        Q.     He found that there were regular

17   communications with Birchfield.  That's you, right?

18        A.     Yes.

19        Q.     And other counsel for plaintiffs

20   regarding the foregoing matters, including when and

21   how to present the settlement proposal to J&J in the

22   context of the mediation, correct?

23        A.     He did.

24        Q.     He also found that the communications

25   included consideration of what mediator to use, and

Page 285

1    he found that it included the role to be played by

2    the mediator in the discussions, right?

3         A.     Yes, he made that finding.

4         Q.     In other words, the -- the dynamics

5    of the mediation; fair?

6         A.     He did make that finding.

7         Q.     And your communication and -- and you

8    agree with me, that's sort of a mediation dynamics

9    issue, isn't it?

10        A.     About which mediator to use?

11        Q.     Which mediator to use and -- and

12   when.

13        A.     I don't recall -- I don't recall any

14   of that, you know, taking place here.  Judge

15   Kaplan -- Judge Kaplan appointed.  He entered an

16   order appointing the mediators.  That's -- that's

17   who was used.  I don't -- I don't recall anything --

18   I don't recall any --

19        Q.     Did he --

20        A.     -- discussions beyond that.

21        Q.     You understand that none of the

22   mediators were aware that Mr. Conlan previously

23   worked for Johnson & Johnson as outside counsel on

24   the talc matters, right?

25        A.     I -- I saw their -- their answers to

Page 286

 1   the interrogatories, or --
 2          Q.      And that's it.  So that's a yes,
 3   you're aware of that, correct?
 4          A.      I am aware of that now.
 5          Q.      All right.  Your communications with
 6   Mr. Conlan did not end when the second LTL
 7   bankruptcy was dismissed, did they?
 8          A.      They did not.
 9          Q.      And you continued to discuss the
10   Legacy proposal with Mr. Conlan and others at
11   Legacy, correct?
12          A.      We discussed the proposal, meaning in
13   the sense that we had -- we had -- we worked through
14   the, you know, the Legacy approach, the, you know,
15   structural optimization and disaffiliation.  You
16   know, we had provided, you know, Legacy with a --
17   with a term sheet, including a, you know, a matrix
18   that, you know, that -- that we would support.  So,
19   I mean, that was in place.
20                  So, yes, I did have a follow-up, you
21   know, conversation with Mr. Conlan, as he testified
22   today.  I mean, would I be willing to -- would I be
23   willing to meet with J&J, J&J executives, Mr. Haas,
24   to walk through, you know, the grid and how, you
25   know, I believe that would be received by plaintiffs

Page 287

1  across the country, and how, you know, I believe

2  that it would garner the 95 percent voluntary

3  opt-in/out.

4             We did have discussions.  Mr. Conlan

5  and I did have discussions about will you still --

6  would you still support -- would you -- you know,

7  this -- this term sheet with this matrix, would you

8  be willing to meet with J&J executives.  So, yes, we

9  did have conversations.

10        Q.      So you sat down and you talked about

11  the matrix, you talked about some of the things that

12  you had laid out with ovarian cancer counsel in the

13  work product documents we saw.  And that's -- that's

14  sort of the -- the nuts and bolts of the matrix, is

15  assessment of claim values, injuries, damages

16  analysis.  It all -- it all gets wrapped up in

17  there, doesn't it?

18             MR. POLLOCK:  Objection; compound.

19  If you could break that down, it would be helpful.

20             THE COURT:  And we're coming close to

21  4:30, too.

22  BY MR. BRODY:

23        Q.      My question, Mr. Birchfield, is

24  simply, all those -- all those factors get wrapped

25  up into a claims matrix, right?

Page 288

1            MR. POLLOCK:  Objection to the word

2   "work product" in the last few questions, since he's

3   not going to rephrase.

4            MR. BRODY:  I just did rephrase.

5            MR. POLLOCK:  I thought you said "all

6   those factors," which would include work product,

7   which is what I'm objecting to.  That's why I was

8   asking for a clarification.

9            MR. BRODY:  Assessment of claims

10  value -- let me ask it this way.  I -- I'm happy to

11  rephrase, Your Honor.

12  BY MR. BRODY:

13       Q.     Assessments of claim values, damages

14  analysis, injuries, all of that gets wrapped up into

15  a claims matrix, doesn't it?

16       A.     A claims matrix would include -- it

17  would include settlement values, so the value of the

18  claims in the settlement context.  It would include,

19  you know, the -- an analysis of the injuries.  What

20  injuries are going to be, you know, included or not.

21  It would include -- it would include the assessment

22  of risk factors, and, you know, should there be, you

23  know, reductions or deductions for risk factors, and

24  if so, to what degree.

25                 All of that, all of those factors and

Page 289

1    others are included in, you know, included in a

2    matrix.

3             Q.        Right.  And the discussions that you

4    were having with Mr. Conlan included discussions of

5    why do you think that we could get a 95 percent

6    opt-in to this kind of settlement matrix, right?

7             A.        No.

8             Q.        All right.  You just -- you just --

9    so let me ask it this way.  I mean, you just said,

10   and correct me if I'm wrong, you just said that

11   after the bankruptcy ended, you and Mr. Conlan

12   talked about, Well, what kind of support are we

13   going to get for this proposal, right?

14            A.        No.  I mean, not after the -- you

15   know, we had this discussion early on in, you know,

16   in the interaction, in the mediation process, when

17   we laid out our term sheet and our matrix.  We -- we

18   told -- we told, you know, Legacy, I'm sure we told

19   the mediators, that, you know, that we would -- we

20   were confident that we would garner 95 percent

21   participation, voluntary participation in an

22   opt-out/opt-in settlement program.  So we had those

23   -- we had those discussions.

24                      That's not something that I

25   discussed, you know, with Mr. -- with Mr. Conlan.

Page 290

1                     MR. BRODY:  Your Honor, we -- we are

2       at 4:30.

3                     THE COURT:  And you need more time.

4       How much more time do you need, Mr. Brody?

5                     MR. BRODY:  I probably have 30

6       minutes.

7                     THE COURT:  Okay.  And we're not

8       going to continue today.  We're going to have to

9       look at another day.  And obviously, I don't want to

10      look to you, Mr. Pollock, and say can you get things

11      done in seven minutes.  So I think that's fair for

12      you, after 30 more minutes of Mr. Brody, for

13      whatever examination time that you need.

14                    MR. POLLOCK:  I promise you I'll only

15      need 1/10th of what he's using.

16                    THE COURT:  Well, I'm not -- I'm not

17      going to hold you to it.

18                    MR. POLLOCK:  Okay.

19                    THE COURT:  So we're going to adjourn

20      today.  We're going to look at our calendars one

21      more time.  Perhaps 30 minutes, more or less,

22      perhaps 10 minutes.  I don't know, Mr. Pollock, but

23      when we come back, we'll do that.  So let's all look

24      at our calendars one more time.  We'll do what we

25      did before, and we'll send an email out.  All right?

Page 291

1                    MR. POLLOCK:  And tomorrow does not

2      work, I assume.

3                    THE COURT:  Tomorrow doesn't work,

4      no.

5                    MR. POLLOCK:  Okay.  Thank you.

6                    THE COURT:  Well, what we're also

7      looking at anticipating is written closings.  So

8      counsel is looking at provision of getting the

9      transcripts, and then providing written closings to

10     the Court.

11                   MR. BRODY:  We can -- we can do that.

12     Judge Singh had entered an order requesting

13     simultaneous submission of briefs from each side two

14     weeks after the conclusion of the hearing, and then

15     replies a week after that.

16                   THE COURT:  Fair.

17                   JUDGE SINGH:  It can still apply.

18                   THE COURT:  Yeah, I think that's -- I

19     think that's a good time period, assuming we get the

20     transcript in that time period.

21                   MR. BRODY:  We were also prepared,

22     Your Honor, I know that, Judge Porto, you had asked

23     for us to just close --

24                   THE COURT:  Well, I --

25                   MR. BRODY:  -- at the end.

Page 292

1              THE COURT:  -- thought so, too.  But

2    maybe, you know, in terms of getting a, you know, a

3    full aspect, whatever closings are necessary.

4              MR. BRODY:  Yeah.

5              THE COURT:  That's Judge Singh and I

6    were conferring today about that.

7              MR. POLLOCK:  Can we -- it's nothing

8    unique, since I've been doing this for 35 years now.

9    Can we file with both Courts the same brief at the

10   same time.

11             THE COURT:  Yes, that's -- that's

12   exactly what we anticipated.

13             MR. POLLOCK:  Excellent.

14             JUDGE SINGH:  And one clean-up for

15   our docket that I can't quite recall.  If the

16   transcripts from these proceedings are not being

17   filed on the docket, please ensure that they are

18   filed on our docket so that the record is complete.

19             MR. POLLOCK:  Absolutely.

20             JUDGE SINGH:  Thank you.

21             THE COURT:  All right, everyone?

22             MR. POLLOCK:  Thank you, Your Honors.

23             THE COURT:  Thanks so much.  Take

24   care.  We're adjourned.  We can off the record.

25             (The hearing adjourned at 4:31 p.m.)

Page 293

1                 C E R T I F I C A T I O N

2

3           I, CONSTANCE E. PERKS, CCR, CRR, CRC, RSA, a

4     Certified Court Reporter and Notary Public in and

5     for the State of New Jersey, do hereby certify the

6     foregoing was prepared in full compliance with the

7     current Transcript Format for Judicial Proceedings,

8     and is a true and accurate transcript to the best of

9     my knowledge and ability.

10

11

12

13

14

15

16

17           _____

18           Constance E. Perks, CCR, CRR, CRC, RSA

19           Notary Public and Certified Court

20           Reporter of the State of New Jersey

21           NJ CCR License #30XI00142900

22

23           Date:  April 12, 2024

24

25

[& - 2003]                                                                                              Page 1

| & |
| --- |
| **&**   2:8,11,14 4:6<br>4:16,18,19,22<br>5:4 7:19 8:2,13<br>8:21 9:21,24<br>10:11,19,22<br>11:9,13,19 12:2<br>12:18 17:13<br>18:12 21:23<br>24:23 25:21<br>26:6 27:9 33:6<br>33:6 37:7 40:8<br>43:23 44:4,9,10<br>44:13 46:13<br>53:23 54:8,13<br>54:17 58:12<br>60:10,16 66:6<br>66:15,18 81:10<br>85:10 92:9 93:8<br>97:11 98:24<br>100:7 104:10<br>115:18 118:21<br>124:9 136:23<br>148:22,25<br>152:8 153:16<br>157:15 175:22<br>176:4,5 187:25<br>190:13 191:16<br>202:8 222:2<br>223:12 227:6<br>229:14 231:20<br>239:7 248:17<br>252:1 257:13<br>257:16 262:22<br>264:16 265:2 |

270:1,3,4,5
282:20 285:23

| 0 |
| --- |
| **08648**   2:5 |

| 1 |
| --- |
| **1**   3:16 15:24<br>104:22 109:21<br>112:9 139:6<br>148:10 154:3,4<br>175:21 182:22<br>188:13,20<br>199:25 208:15<br>249:7,7,9,11,19<br>249:19 275:16<br>277:5<br>**1.10**   5:10<br>**1.6**   5:10 171:14<br>173:11 174:3<br>187:2<br>**1.7**   173:11<br>174:3<br>**1.9**   5:10<br>**1/10th**   290:15<br>**10**   1:11 90:19<br>102:21 171:22<br>171:23 172:4,9<br>173:9 254:9<br>290:22<br>**100**   238:21<br>**1002**   14:7<br>**101**   238:1<br>**103**   273:22,23<br>273:24<br>**109**   34:13 |

**11**   135:6 240:10
**11:30**   90:21
**11th**   139:25
141:23 221:14
**12**   169:3 265:25
293:23
**1201**   1:9
**129**   34:13
**12:43**   197:13
**12th**   271:24
273:3
**13**   71:20
**14**   242:13
**1454**   293:16
**15**   4:7 71:18
147:4 152:4
169:25
**158**   3:5
**15th**   251:6
**16**   171:14 240:4
260:7
**1600**   15:22
57:21 149:12
149:16,18
**1625**   2:9
**165**   250:2,4,13
**166**   250:22
**16th**   126:5
**17.6.**   171:14,15
**17th**   9:8 16:22
142:21 231:10
**18**   170:22,25,25
171:4 196:14
201:5 204:15
**181**   3:15

**188**   104:22
**18th**   143:18
153:9 156:3
157:3 221:20
277:23
**19**   152:18,21,25
153:1 164:16
170:10,13
185:3 200:1,20
212:24 213:18
215:17 260:7
**1988**   164:16
166:3 177:3,5
**1996**   177:14
**1st**   82:9

| 2 |
| --- |
| **2**   112:10 133:11<br>139:12,22<br>154:5 157:5,14<br>181:19 188:13<br>188:23 202:4<br>217:13 235:14<br>236:13 266:10<br>**2.24**   57:22<br>**20**   11:20 57:17<br>102:20 103:9<br>103:10 105:18<br>105:19 165:4<br>166:4 169:3<br>223:12 235:19<br>**20,000**   252:14<br>**20006**   2:10<br>**2002**   177:15<br>**2003**   177:15<br>275:24 |

**[2005 - 549]**                                                    Page 2

| | | | |
|---|---|---|---|
| **2005** 177:23 | 153:10 155:5 | **28th** 131:18 | **30xi00142900** |
| **2009** 166:22 | 170:16 179:25 | 138:13 139:14 | 1:22 293:21 |
| 167:15,16 | 180:9 182:24 | 188:24 | **315** 271:17,18 |
| **2010** 166:22 | 188:24,24 | **29** 230:13 | 271:19 |
| **2017** 90:9 | 190:10 192:12 | **29th** 255:1,4 | **31st** 15:23 |
| **202.383.5300** | 196:14 197:13 | 260:4 | **330** 274:8 |
| 2:10 | 201:5 202:4 | **2nd** 111:3,14 | **35** 103:2 292:8 |
| **2020** 7:23 90:10 | 204:8 213:14 | 111:20,25 | **381** 272:22,24 |
| 90:12 91:24 | 231:10 250:8 | 112:20 115:10 | |
| 92:1 97:20,25 | 251:7 255:20 | 115:16 121:17 | **4** |
| 164:20 165:6 | 257:1,8,12 | 123:1 124:19 | **4** 143:14 153:8 |
| 165:25 166:4 | 265:19 273:3 | 140:18,22 | 193:11 203:2,7 |
| 227:5,23,24,25 | 274:14 275:16 | 152:3 156:6,9 | 220:25 |
| 229:13 231:19 | **2024** 1:11 9:8 | 171:12 255:20 | **4.2** 54:1 79:8 |
| 235:11,13 | 293:23 | 256:18,23 | **4.2.** 205:9 |
| 236:13 238:13 | **209** 3:6 | 257:1,8,12 | **4.3** 171:22 |
| 239:5 259:3 | **21** 11:20 68:2 | 265:18 266:18 | 173:10 |
| **2020-21** 98:5 | 72:12,12 88:2,7 | 281:8 | **4.4** 171:23 |
| **2021** 12:19 | 194:12 277:23 | | **4.4.** 173:10 |
| 68:10 72:2 77:3 | **21st** 220:22 | **3** | **408** 242:21 |
| 78:17 79:4,7 | **223** 3:7 | **3** 3:15 6:16,18 | **450** 161:20 |
| 82:9 87:24,24 | **226** 3:10 | 114:10 142:18 | 162:14 |
| 88:16 89:8,18 | **22nd** 112:23 | 158:1 | **4:30** 150:17 |
| 91:6,8 92:10 | **23** 196:12 | **3.25** 230:2 | 253:25 287:21 |
| 93:6,9,18 94:4 | **234** 250:25 | 231:23 235:25 | 290:2 |
| 98:9,11,16 | 251:2 | **3.25.** 236:5 | **4:31** 292:25 |
| 229:22,24 | **238** 201:9 | **30** 111:8 139:7 | |
| **2022** 7:23 | **24** 231:13 | 169:3,25 | **5** |
| 109:19 110:4 | **248** 3:16 | 170:16 204:7 | **5** 190:10 192:12 |
| 165:7 166:5 | **25** 120:16 | 290:5,12,21 | 230:20 232:10 |
| **2023** 111:8,14 | **25th** 16:17 | **300** 1:4 | **5.3** 5:10 |
| 111:20 112:23 | 55:24 125:15 | **30th** 5:12 | **500** 167:5 |
| 115:10,17 | 128:24 232:16 | 131:14 237:23 | **524** 207:1 |
| 131:15 135:6 | **26** 193:13 | 238:17 242:10 | **53** 201:6 |
| 137:15 139:7 | **2648-15** 1:2 4:7 | 243:15 252:5 | **54** 201:6 |
| 139:13 140:18 | | 277:8 | **549** 104:22 |

**[56 - acquisition]**    Page 3

**56**  201:2
**58**  111:9 170:18

**6**

**6**  3:15 112:2,12
112:16 113:20
115:9 116:12
116:21 117:9
188:1,2 191:14
197:13
**609.896.3600**
2:5
**62**  154:9 200:1
**63**  217:14
**65**  231:12
**66**  231:16
**67**  168:5,6
169:10 200:9

**7**

**7**  3:4 152:11
167:20,21,24
198:13,15
213:25 217:13
217:17,22
**73**  252:8
**75**  49:23 50:6,9
50:16,18,19,20
52:1 53:6,15
55:18,21 60:3,5
66:23 95:16
99:4 132:12
199:18 207:8
208:5
**78**  252:7,9,10
**7th**  16:23 250:8
274:14

**8**

**8**  206:25
**8.3**  5:10
**8.4.**  5:10
**8.9**  133:10
134:11 162:24
218:24
**83**  128:24
**877.370.3377**
1:24
**8th**  277:23

**9**

**9**  112:9 185:3
185:15 198:16
**917.591.5672**
1:24
**94**  242:12
**95**  144:7 222:19
222:23 287:2
289:5,20
**997**  2:4
**9:37**  4:1
**9th**  152:8 155:5
167:25 213:14

**a**

**a.m.**  4:1
**aa**  173:12 209:2
209:5
**abbreviate**
105:15
**ability**  13:23
37:15 39:18
55:20 80:16
95:2 134:24

293:9
**able**  21:3 39:22
42:8 121:7
144:22 150:6
150:13 151:25
191:19 281:18
**above**  192:4
194:8
**absolutely**  14:2
26:18 36:17
58:9 150:7,8,18
173:10 201:12
225:2 292:19
**accept**  35:10
116:25 145:23
146:6,18,21
151:8 162:24
242:25
**acceptable**  84:7
84:10
**accepted**
112:18 113:4
113:10 161:16
**accepting**  135:8
**accepts**  32:8
**access**  33:14,23
33:24
**account**  159:16
159:17 162:5
163:7 212:22
**accounting**
102:20 161:16
161:17
**accuracy**  74:10
278:1

**accurate**  23:3
31:7,10,11 32:8
32:25 112:14
112:14 277:15
277:24 293:8
**accurately**
10:23,25 11:3
29:4,18,20 31:8
37:15 45:14
71:15
**accused**  178:25
179:8 183:24
184:15 189:24
192:18
**achieve**  17:21
46:25 48:3
49:20 50:6,25
51:10 52:1 53:6
95:18 132:5
211:1
**achieved**  63:16
98:19
**achieving**  51:13
**acknowledge**
33:17
**acquire**  160:12
**acquired**  116:6
160:5 168:19
186:19
**acquires**
260:15 261:22
**acquiring**
160:15 161:1
186:20,21,23
**acquisition**
141:14 200:17

[acting - albeit]                                                                    Page 4

**acting** 227:17
  228:23
**action** 1:3
**active** 8:4
  229:15,17,18
**actively** 79:16
**actual** 13:5
  105:2 199:25
**actually** 16:15
  23:21 27:12
  91:11 158:2
  166:19 167:6
  181:9 197:25
  203:12 222:17
  224:10 232:10
  236:10 238:21
  280:16
**actuaries** 162:3
**add** 70:25
  96:21 126:7
  186:1 205:8
**addition** 252:13
  280:24,25
**additional** 17:3
  97:24 125:4
  126:1 150:2
  234:8 239:6
  281:7
**address** 5:25
  21:7 58:7 95:2
  95:9 102:9
  128:21 151:7
  151:18 234:23
  238:23
**addressed**
  30:20 52:23

**99:7** 210:7
  234:6
**addresses** 39:19
**addressing** 35:1
  36:1 70:5
  113:17
**adds** 171:14
**adequate** 13:22
**adequately**
  160:15,16
  162:10 167:9
**adjourn** 290:19
**adjourned**
  292:24,25
**administration**
  274:3 278:19
  281:2
**administrative**
  134:21
**administrator**
  278:12
**admit** 110:10
  203:3
**admitted** 43:3
**adopted** 58:23
**advance** 134:10
  237:15
**advanced** 40:10
**advantage**
  132:16,18
  264:11,14,19
**advantages**
  53:22 54:7,21
  96:24
**adversaries**
  33:7

**adverse** 8:21
  102:15,17
  123:10 135:9
**advice** 243:17
**advisable** 108:5
**advise** 85:15
  183:16 192:12
**advised** 114:12
**affairs** 178:25
**affecting** 45:4
**affidavit**
  142:19
**afflicted** 206:7
**afternoon**
  170:20 201:1
  253:11
**age** 66:2 177:16
**ages** 65:23
**agnostic** 169:23
**ago** 102:20
  103:2 105:18
  114:13 197:15
**agree** 8:10 9:12
  21:16 43:22
  75:6 115:19
  117:3,17,21
  118:3,7,16,21
  119:2,6,14,17
  120:21 121:23
  123:8,18,22
  134:13 137:11
  140:23,25
  159:19,21
  160:14 184:4
  187:17,21
  198:22 199:4,6

**199:18,21,23**
  202:9 207:8,19
  207:20 222:14
  236:2,20
  248:10 274:24
  285:8
**agreed** 56:16
  120:22 134:16
  162:23 182:6
  218:3 219:5
  275:15
**agreeing** 163:1
  163:2 199:8
  219:24
**agreement** 24:4
  24:5,7 25:5
  30:21 63:20
  73:23,25
  115:17 118:20
  119:15,21
  141:12 195:11
  199:12 202:7
  219:4,13,17
**agreements**
  30:9
**agrees** 115:25
  161:2
**ahead** 25:15
  186:8 231:1
  235:23 239:2
**aig** 206:23,25
**ain't** 34:1 47:10
**alarm** 195:2
  221:3 263:17
**albeit** 58:23

**[alcoholism - answer]**

Page 5

| | | | |
|---|---|---|---|
| **alcoholism** 178:25 | 254:18,19 259:16 271:5 | 108:1,9 135:1,2 152:22 161:22 | **analyzed** 37:12 45:9 54:25 |
| **aldrich** 90:11 | **allen's** 105:7 | 163:8 200:2 | 58:11 59:7,9 |
| **aligned** 186:14 | 243:6,19 | 207:19 211:9 | 65:11 66:5,16 |
| **allegation** 122:9 | **allocation** 211:16 | 211:13 215:18 238:10 240:19 | 67:12 68:11 71:25 73:3 76:6 |
| **allegations** 151:10 | **allocations** 21:21 22:10 | 241:22 242:16 243:6 | 86:23 87:8 88:23 94:6 |
| **alleged** 94:24 95:3 | 26:7 27:10 | **amounts** 251:22 | **analyzing** 22:9 23:20 24:12,23 |
| **allen** 2:7 4:10 | **allocutions** 39:9 | **analysis** 12:7 | 25:22 26:6 |
| 4:14 8:11 32:19 | **allow** 5:17 | 17:15 20:2 | 27:10 55:5 59:2 |
| 35:7 56:22 | 135:8 | 21:20,24 23:12 | 59:12 61:17 |
| 85:23 104:12 | **allowed** 146:8 | 23:22 24:2 26:8 | 67:6 |
| 104:13 105:5 | **allows** 207:15 | 44:20 46:8,11 | **andrew** 3:9 |
| 110:12,19 | 259:8 | 46:12 59:22,23 | 10:6 194:14,18 |
| 111:3 124:11 | **alluded** 170:16 | 59:24 67:12 | 196:16,20 |
| 124:22 127:20 | **alternative** | 74:9 76:24 | **andy** 2:7 4:14 |
| 127:23 128:7 | 96:14 134:19 | 78:19 79:24 | 26:13 35:7 |
| 128:10,11 | 134:20 147:20 | 80:2 85:12 | 56:12,22 104:3 |
| 129:9,10 | 258:15 259:13 | 87:21 94:11,18 | 111:2 144:4 |
| 130:20 138:24 | **alternatives** | 94:18 96:5,23 | 197:2 201:4,11 |
| 139:20 140:15 | 88:11 | 128:1 148:4 | 226:1,4 233:8 |
| 142:1 154:19 | **ambiguous** | 205:15 210:8 | 259:9 |
| 154:20,22,25 | 18:17 107:14 | 210:11 214:13 | **announced** |
| 164:4 169:18 | **ambro** 111:10 | 214:20 244:4 | 138:12 |
| 183:7 184:9,12 | 204:12 | 244:19 246:2 | **announcement** |
| 187:10,16 | **ambro's** 204:9 | 247:7 250:16 | 109:22 |
| 199:2,8,13 | 204:10 | 287:16 288:14 | **answer** 13:20 |
| 200:6 212:24 | **america** 17:19 | 288:19 | 16:8 25:14,24 |
| 215:4,7,24 | 45:19 66:22 | **analyze** 12:17 | 33:25 37:21 |
| 216:2,18 | 71:5 148:9 | 18:12 24:15,24 | 38:8,9,12 39:23 |
| 217:11 219:12 | 172:4 175:19 | 25:23 55:2,3 | 40:2,13,13,15 |
| 220:13 221:24 | 210:13 | 61:15 69:22 | 44:6,6 50:23 |
| 222:21 228:10 | **amount** 11:4 | 70:25 80:15 | 63:7 75:2 78:21 |
| 248:11 250:19 | 17:3 59:5 84:17 | | 89:17 92:5 |

94:17,22
119:25 121:7
123:7 125:9,22
126:8,19 136:3
139:15 155:17
157:10 176:8
181:25 191:19
192:19,21
214:6 216:8
231:24 232:11
233:18 234:11
238:11 242:23
246:12 247:5
252:20,21,24
253:3 270:16
284:14
**answered** 26:11
27:14 51:2
113:12 119:23
121:1 181:15
181:16 236:1
236:23 242:20
269:21 283:20
**answering**
45:14 123:3
125:11 273:19
**answers** 28:12
39:9,16 76:15
244:15 285:25
**antenna** 34:2
**anticipated**
214:25 266:9
270:4 292:12
**anticipating**
291:7

**anybody** 53:21
179:8 245:15
**anybody's**
30:10 95:5
**anymore** 142:5
**anyway** 168:14
**apart** 54:2
187:14
**apologies** 140:4
**apologize** 4:12
55:3 105:22
123:6 161:12
167:23 168:23
184:3 196:19
203:18 228:13
**appalled** 201:9
**apparently**
36:5 114:18
**appeal** 30:24
**appeals** 31:1
111:9 131:15
**appear** 270:24
**appearance** 4:9
**appears** 9:10
17:1 260:2
**appellate**
102:25,25
**applies** 16:3
**apply** 68:16
146:9 291:17
**appointed**
134:6 254:19
285:15
**appointing**
285:16

**appreciate**
47:22
**approach** 58:21
58:23 59:9,9,12
59:15 75:20
100:3 159:20
159:20 164:10
168:24 169:6
169:24 188:18
197:5 211:9
230:7 231:3
237:8 248:22
249:1 286:14
**approaches**
67:12 68:11
69:23 71:25
266:2,3
**appropriate**
30:16 64:15
82:21 94:8
105:17
**approval** 50:19
55:19 66:23
131:3
**approve** 50:22
**approves** 134:1
**approximately**
176:22 179:18
182:19
**april** 1:11
139:13 188:24
230:5 231:10
256:15 265:19
293:23
**arbitrators**
168:15

**area** 19:3,3
22:2,3,8,15
40:23 41:5,7
42:7 48:20,24
50:7,18 52:11
61:7,15 84:3,9
84:10 107:12
108:19 205:6,7
260:24
**areas** 26:2
**argue** 114:14
**argued** 16:21
**arguing** 77:6
244:16 267:8
**argument**
30:10 32:12
38:17 43:9
55:21 89:11
95:6 244:18
247:12
**argumentative**
26:10 27:14
63:2,4 64:13
107:14 113:12
119:23 121:1,5
185:17 258:1
**arguments**
32:19 40:9
73:19 74:10
80:20
**arises** 8:24
**arm** 206:2
**arranged**
127:15
**arrangement**
104:11

[arrive - attorney's]                                                    Page 7

arrive  246:3
arsdale  140:7
  141:24 142:14
  143:10,17
  144:12,19
  145:22,24
  146:5,5,13
  153:9 156:4
  193:22 194:5
  194:13 196:15
  197:10,12
  220:21
article  147:9
  148:1,25
asbestos  65:21
  112:4 141:5
  166:23,25
  167:6 170:3
  202:13 206:7
  206:10 207:1
asc  161:20
  162:14
ascribed  49:8
ashamed  193:6
aside  21:12
  36:10 157:2
  239:6
asked  26:11
  27:14 38:14
  47:12,13 51:1
  71:24,25 87:7
  101:17 102:5
  113:12,15
  114:23,25
  119:23 121:1,4
  124:17 125:14

152:3 155:12
155:13 157:24
167:18,19
172:13 181:24
184:2 196:12
202:5 210:1
215:12 220:19
221:2 231:16
233:20,22,24
236:22 242:15
242:20,25
243:13 252:13
259:16 272:8
283:25 291:22
asking  8:25
  12:3 19:13,14
  47:4 59:13
  76:22,23 77:6
  94:11 101:19
  105:14 113:19
  121:12 127:1
  127:12 157:8
  164:4 179:20
  179:20 216:15
  216:17,20
  233:16 239:21
  241:17,22
  283:7 284:7,8
  288:8
aspect  24:5
  57:25 58:1
  292:3
aspects  13:17
  205:3
assert  277:17

asserted  19:15
  19:16 127:24
  280:22 282:17
assertion
  127:11
assess  218:16
  222:6 248:2
assessment
  243:20 244:1,1
  248:6 287:15
  288:9,21
assessments
  288:13
assets  167:8
  209:5
assign  58:22,25
assistant  71:7
associate  177:4
  177:5
associated
  37:13,18 106:9
association
  168:12
assume  8:10
  10:25 34:19
  46:15 72:23
  74:16 81:16
  97:18 99:10
  164:8 173:21
  182:5 186:10
  186:11 190:14
  277:19 291:2
assumes  155:9
assuming  169:4
  169:6 291:19

atl  1:2 4:7
atlantic  1:1,9
  1:10 8:3 148:18
  229:11,15
attached
  142:18 152:17
  153:3 169:9,13
  220:8
attaching
  274:20
attachment
  251:10
attempted
  45:20
attempting
  131:19
attend  23:25
  75:5
attended  23:22
  69:6
attention
  221:11,17
attorney  39:20
  94:12 110:16
  151:16,17
  188:10 189:7
  191:10 200:14
  215:21 223:5,8
  224:9 240:22
  241:10,19,25
  242:22 243:8
  245:2 246:9
  247:17,20
  248:4 252:22
attorney's
  30:22

[attorneys - bankruptcy]                                    Page 8

**attorneys**  10:13
  10:16 48:8 49:5
  162:25
**auditor**  214:15
  218:11 219:17
**auditors**  106:23
  135:11 140:21
  141:15 152:23
  159:17 160:13
  160:19,22
  161:3 162:3,8
  162:18,21,22
  163:7 168:15
  168:20 197:17
  197:23 198:4,7
  198:11 199:10
  199:21 207:19
  211:11,13,24
  212:7,10,22
  213:19 214:18
  214:21 215:2
  215:18 222:8
  222:13
**august**  15:4
  97:20 194:12
  220:22
**austin**  147:20
**authentic**  15:20
**author**  250:10
  251:4 273:1
**authored**  152:4
  270:23
**authority**
  207:23,24
  208:7,11,12
  219:16,16

**authorize**
  270:20
**authorized**
  145:18,19
  268:11
**autumn**  72:12
**available**  12:18
  282:19
**avenue**  13:25
**average**  243:6
**averse**  122:23
**avoid**  33:3
**award**  245:24
**aware**  73:12
  132:23 142:24
  143:1,3 157:14
  157:17 181:13
  181:19 184:1
  205:10 282:16
  283:6 285:22
  286:3,4
**axis**  65:25

**b**

**b**  3:12 200:1
  226:2
**bacharach**  1:9
**back**  15:5 28:7
  36:19 42:15
  47:6 48:23
  55:23 56:10
  60:13 61:3 69:4
  71:23 74:12
  83:7 90:19
  102:9 119:15
  140:17 151:2

  162:12 164:23
  175:1 179:21
  190:19 192:11
  193:2 197:6
  198:15 202:20
  203:10 205:12
  205:24 214:10
  217:9 220:21
  249:17 257:11
  273:11,11,13
  273:13 274:25
  275:3,9,10
  276:6,9,22
  277:22 278:3
  279:1,3,19,24
  281:15 290:23
**background**
  111:7
**bad**  53:22
**balance**  174:7
  195:24
**bank**  148:11
**bankruptcies**
  62:7
**bankruptcy**
  7:22 8:8 17:10
  17:19 18:24,25
  27:5 43:20
  44:22 45:11,19
  45:23 48:4,9,20
  53:8 57:11
  58:24 60:6,17
  62:9 63:11,19
  63:21 64:5,21
  68:11 71:5
  73:22 76:5 77:3

  78:18 79:18
  80:1 83:3 84:21
  84:25 85:19
  86:4 88:15
  91:19 94:7,19
  95:19 98:19
  109:19 111:11
  117:6,8 128:13
  129:12 130:23
  131:13,23,24
  132:2,6,20,22
  133:11,18
  134:1,6,12
  135:7,19 136:1
  136:11 137:1
  138:8,13 139:3
  142:5,8 148:4,8
  148:9,10,12,14
  157:5 174:17
  175:9,17,19,20
  175:23,24
  176:2,5 177:6
  177:18,19
  188:17,21
  205:1,12,17,18
  207:2,6,17
  210:2,14,21
  220:4 228:5
  229:21 230:2
  231:23 235:14
  235:16 236:5
  236:13,17
  237:5 238:14
  238:15 239:8
  239:13 243:14
  246:11,22,24

**[bankruptcy - billed]**                                      Page 9

254:16,20
255:8 263:2
264:5 266:5,15
275:17,18
277:10,10
286:7 289:11
**barnes** 187:25
**based** 1:3 30:25
40:3 62:22
107:9 169:6
189:13 209:13
213:10 231:17
244:1,7 248:4
260:11 272:12
**basic** 55:14,15
55:16
**basically** 28:12
55:22 70:18,19
82:4 104:1
**basis** 30:16
85:14 122:6
129:15 242:19
243:12
**battle** 80:11
81:2 85:3,9
**bear** 161:7
186:4 202:24
**beasley** 2:7
4:10,14 8:11
32:19 35:6
56:22 85:23
104:12,13
105:7 110:12
110:19 111:2
124:11,21
127:20,22

128:7,10,11
129:9,10
130:20 138:24
139:20 140:15
142:1 154:19
154:20,22,24
164:4 169:18
183:7 184:9,12
187:10,16
199:2,8,13
200:6 212:24
215:4,7,24
216:2,18
217:11 219:12
220:12 221:24
222:20 228:10
243:5,19
248:11 250:19
254:18,18
259:16 271:5
**beasley's** 105:4
**beat** 47:14 85:6
199:16
**beauty** 199:19
**beg** 34:8 207:17
232:11
**began** 166:20
258:13 264:7
**beginning** 98:9
110:1 138:24
141:18 167:13
263:8
**behalf** 4:14 5:4
79:16 82:25
86:18 123:14
175:15 196:6

201:14 225:4
227:17 228:23
239:11 264:1
**behaving**
178:11
**belief** 219:12
**believable**
60:12
**believe** 5:6 6:6
10:24 11:2,6,11
23:4 42:8 68:16
77:10 82:8
84:11 124:4
127:18 153:11
158:7 166:3
174:13 184:16
185:5,12
186:13 195:14
196:25 251:25
284:13,14
286:25 287:1
**believed** 181:5
**believers**
170:23
**believes** 36:11
**bells** 195:2
221:3 263:17
**bench** 28:1
**benefit** 30:5
70:13 172:25
**benefits** 211:4
**berkovich**
10:14
**best** 14:6,8
15:16 16:2 31:2
32:7 68:16

172:15 176:24
213:17 293:8
**bestwall** 90:8
**better** 192:8
207:12
**beyond** 65:9
85:8,8 161:8
192:16 214:10
230:21 252:22
255:20 263:5
285:20
**bifurcate** 21:9
**big** 166:23
170:23 171:11
175:20 197:16
198:8 211:23
219:18,18
235:12 236:11
236:11,15,18
236:19,21
238:12 247:16
249:14
**bill** 11:9 22:4,5
22:6 23:11,20
23:24 24:1,11
24:23 25:21
26:5 27:9 61:17
68:24,25 70:2
**billed** 10:19
11:12,14 24:6
27:6,20 28:13
28:15 29:4,18
32:6,6 55:5
56:16 57:22
59:2 61:18 67:3
67:6 70:13

**[billing - brody]**                                                Page 10

**billing** 11:4
  13:4 23:1,3,7,9
  23:14 24:6,9
  25:6,6 29:12,19
  29:25 30:12
  31:7,10 36:19
  47:8 69:22 70:2
  70:9,15,19,21
  70:21 71:24
  76:12 178:12
**billion** 54:1
  133:11 134:12
  152:18,21
  153:1,1 162:24
  169:3,3,4,25,25
  170:11,13,22
  171:4 185:3,3
  185:15 204:15
  206:25 212:24
  213:18 215:18
  218:24 230:2
  231:23 235:25
**bills** 32:7
**bind** 55:25
**binder** 7:16,17
  147:5 156:11
  240:1
**birchfield** 2:7
  3:9 4:14 5:14
  25:3 32:2 35:7
  36:13 56:13,22
  95:8 102:23
  103:9 104:3,12
  111:2,6,21,24
  112:20 115:10
  116:24 117:1

120:13 121:17
124:10,21
127:15 132:21
133:2,9 136:15
137:10,21,24
138:23 139:19
140:15 141:25
144:5,11,21
145:4 146:19
150:6,13 155:4
156:2 157:4
163:22 187:10
196:20 201:11
220:6,19
221:10,15,24
222:20,23
223:16 225:14
225:16,22,23
226:1,4,12
228:22 230:5
231:8,18
233:17 234:3
234:23 235:10
237:22 253:25
254:14 258:8
259:9 269:21
282:9 283:21
284:17 287:23
**birchfield's**
256:4 284:8
**bit** 80:7 161:11
173:5 174:11
214:10 225:12
233:17 253:9
**blanket** 245:3

**block** 70:19,21
**bloomberg**
  147:2,9
**board** 64:11,21
  152:9 153:16
  211:13 213:1
  213:13 220:9
**boelter** 136:23
**boiler** 90:12
**bolt** 45:20,21
  45:25 46:5,21
  48:3,8,14,21
  49:9 54:1 58:16
  66:21 72:11
  79:8 87:25
  88:12 205:9
**bolts** 287:14
**books** 114:8
  267:25
**borgwarner**
  206:5,6,12
**bottom** 254:6
**boulevard** 1:9
**bounced**
  204:15
**box** 43:8
**boxes** 186:23
**brain** 223:13,15
**brand** 237:14
**braunruether**
  9:23 10:1 11:23
  82:3,3,8 97:17
  98:4,8
**breached**
192:11,13

**breaching**
  192:18
**breadth** 57:24
**break** 21:7 25:1
  26:13,17 27:25
  78:25 90:5,18
  93:6 102:10,21
  147:10 149:20
  149:22 164:1
  225:10 253:11
  253:13 254:9
  287:19
**bridge** 57:13,17
**brief** 14:19 28:4
  139:12 193:8
  203:16,20
  209:20 267:7
  292:9
**briefing** 120:6
**briefly** 16:13
  26:14 28:2
  148:9 164:1
  176:13
**briefs** 291:13
**brilliant** 34:21
**bring** 63:19
  82:24 114:6
  207:5,5 280:11
**brings** 206:18
  206:21
**broached**
  179:10 193:3,5
  193:6
**broadly** 17:11
**brody** 2:9 4:17
  4:18 5:5,21

**[brody - build]**                                                                 Page 11

| | | | |
|---|---|---|---|
| 6:15,16,21 7:13 | 79:2 87:6,7,15 | 154:11 155:21 | 237:21 239:3,4 |
| 8:20,23 9:2,4 | 87:18,19 89:15 | 156:20 157:12 | 241:5,9,13,21 |
| 13:18,19 14:2 | 89:16 90:25 | 157:18,22 | 243:24 245:12 |
| 16:10,11 17:7 | 91:1,2 92:23,24 | 167:18,19 | 245:17 247:23 |
| 18:2,4 19:6,12 | 93:21 94:3,15 | 172:13 174:9 | 247:24 248:1 |
| 19:13,20,24 | 94:16 95:6,10 | 174:20 179:20 | 248:21 249:2,5 |
| 20:6,13 21:8,10 | 95:11,20 97:6,7 | 180:20 181:7 | 249:9,13 253:9 |
| 21:11,15 23:5 | 97:9 101:8,13 | 181:12 182:3 | 253:14,15,21 |
| 23:15,18,19 | 101:15 102:7 | 182:10 183:18 | 253:24 254:3,7 |
| 24:10,14,19,21 | 102:11 103:15 | 184:2 185:17 | 254:11,12,13 |
| 25:18,19 26:23 | 103:20,21 | 185:25 186:3 | 256:1,2,5,7,8 |
| 27:7 29:8,9 | 104:18 105:14 | 188:14 189:12 | 258:3,6,20 |
| 30:14 31:3,5,19 | 105:19,22 | 189:22 190:12 | 264:22,23 |
| 32:14 33:11,23 | 106:2,4,6 | 191:6,7 192:14 | 269:2,5,24,25 |
| 34:6 35:12 36:7 | 107:20 109:15 | 192:20 202:10 | 273:20 282:14 |
| 36:14,18 37:4,5 | 109:17 110:2 | 203:6 204:24 | 283:24 284:1,6 |
| 38:11,20,23 | 113:18,19 | 209:13,18,19 | 284:10,13,15 |
| 39:11,21,25 | 114:3,14,23,25 | 209:25 213:7 | 287:22 288:4,9 |
| 40:6 41:8,15,19 | 115:5 119:11 | 213:12,23,25 | 288:12 290:1,4 |
| 42:5,22 43:11 | 120:2,4 121:10 | 214:1,4,8 | 290:5,12 |
| 43:15,16,17 | 121:11 122:3 | 216:12,17,25 | 291:11,21,25 |
| 45:5,25 47:24 | 122:18 123:3,5 | 217:2 220:3 | 292:4 |
| 48:1 49:10,14 | 123:17 125:8 | 223:18 224:7 | **brody's**  40:15 |
| 49:17 51:11 | 125:17,18,21 | 224:17,18 | 122:13 184:25 |
| 56:6 57:1,16,19 | 125:25 126:25 | 225:13,15 | 202:5 |
| 58:9,10,14,18 | 128:20,22 | 226:11 227:22 | **broke**  91:3 |
| 61:8 64:6,24 | 129:4,7 130:15 | 227:23 228:9 | 172:14 |
| 66:13,14 67:20 | 130:18 136:9 | 228:14,18,19 | **bronze**  174:1 |
| 67:25 68:4,7,8 | 145:13 146:16 | 228:20 230:7 | **brought**  40:22 |
| 68:17 69:13,18 | 146:17 147:8 | 230:11,15,24 | 43:19 115:15 |
| 69:20 70:6,10 | 147:11,13 | 231:2,5,7 | 126:20 134:21 |
| 70:11 73:11 | 149:19 150:1,7 | 232:12,13,23 | 156:9 207:4 |
| 75:6,13 76:21 | 150:12,18 | 233:22,24 | 278:13 |
| 76:22 77:2,12 | 151:4,11,19,20 | 234:1,5,7,14,19 | **buckets**  27:2 |
| 77:13,20 78:2,4 | 151:23,24 | 234:21 235:9 | **build**  105:13 |
| 78:7,8,12,15 | 152:1,24 | 237:3,8,10,19 | |

**[builders - certainly]**                                   Page 12

| | | | |
|---|---|---|---|
| **builders** 34:13 | 61:20,24 75:23 | **capture** 19:4 | **caselaw** 14:13 |
| **building** 102:24 | 143:2 | 41:2 71:12 | **cases** 8:3 17:17 |
| **bunch** 22:13 | **camera** 13:13 | 160:2 | 30:25 73:23 |
| 284:3 | 13:24 20:7,14 | **captured** | 90:16 92:3 |
| **burden** 5:6 | 23:7 29:24 30:3 | 200:17 | 136:24 153:19 |
| **business** 34:17 | 30:14 33:2 | **captures** 160:8 | 229:13 265:25 |
| 64:1 119:13 | 36:10 42:17,19 | **care** 292:24 | 283:5 |
| 122:8 278:14 | 42:25 58:7 | **career** 176:13 | **cash** 187:1 |
| **butter** 198:23 | 77:16 102:1 | 176:23 | **catch** 71:8,12 |
| **buy** 173:3 | 151:7,9,19 | **careful** 39:21 | 71:20 |
| **c** | 282:22,25 | 89:21 | **caution** 12:3 |
| **c** 1:12 2:1 7:4 | **cameras** 77:18 | **carolina** 90:9 | **ccr** 1:22,22 |
| 226:2 293:1,1 | **cancer** 18:7,16 | 90:11,13,16 | 293:3,18,21 |
| **cabin** 206:10 | 43:23 44:8,9 | 91:17 92:3 93:4 | **cell** 50:19 |
| **calendars** | 106:10 144:2 | 94:2 95:15 | 167:21,22 |
| 290:20,24 | 200:13,16 | 210:25 | 168:2 |
| **call** 5:15,22 6:5 | 223:4 229:25 | **carries** 231:15 | **cells** 48:18 66:1 |
| 23:22 26:1 27:6 | 231:21 236:4 | 271:25 | **center** 2:4 |
| 27:21 51:9 | 239:11 240:20 | **carry** 251:9 | 270:14 |
| 61:22 69:6 | 241:24 242:18 | **cart** 86:20 | **central** 105:16 |
| 70:18 94:7 | 246:19 250:14 | **case** 1:4 4:7 | **ceo** 110:8 |
| 135:9 142:21 | 250:15 251:11 | 14:25,25 16:3 | 111:19 112:11 |
| 143:6,8,12 | 272:2,20 273:8 | 16:20 17:19 | 113:25 147:19 |
| 166:8 204:4,7 | 274:2,3,17,18 | 35:8 36:8 40:1 | 225:3 262:23 |
| 221:11,17 | 274:21 275:19 | 40:22,23 61:21 | 264:15 265:1,5 |
| 222:22 225:15 | 276:16 287:12 | 106:12,23 | **certain** 12:5 |
| **called** 45:20 | **candidly** 30:18 | 107:11 108:21 | 41:21 94:25 |
| 63:18 133:15 | **cap** 204:15 | 131:16 136:23 | 107:11,11,12 |
| 139:6,6,12 | **capabilities** | 136:24 139:12 | 107:21 163:13 |
| 159:5 162:13 | 65:9 | 160:12 162:22 | 203:9 247:9 |
| 188:20,23 | **capable** 175:19 | 175:22 176:4 | **certainly** 22:1 |
| 206:16 207:1 | **capitalization** | 207:24 210:14 | 36:21 37:4 |
| **calls** 26:25 | 170:21 | 210:18 214:20 | 39:25 42:3 |
| 28:13 41:7 42:2 | **capitalize** 212:4 | 243:20 246:4 | 59:24 60:15 |
| 45:7 46:2 61:19 | **capitalized** | 250:15 251:20 | 73:3 97:14 |
| | 167:9 | | 106:12 107:9 |

[certainly - claims]                                                    Page 13

| | | | |
|---|---|---|---|
| 128:6 138:6 | 46:19 67:4 | **circuit** 111:9 | 65:24 66:23 |
| 143:12 187:3 | 80:24 | 117:5 131:15 | 72:14 73:24,24 |
| 191:7 192:7 | **characterizati...** | 139:7 170:17 | 74:1,2 76:7 |
| 214:14 239:25 | 134:14 198:23 | 170:17 188:20 | 78:20 79:17,25 |
| 253:21 259:6 | 199:5 279:23 | 204:12 | 80:5,10 82:22 |
| 259:11 | **characterized** | **circuit's** 277:7 | 82:25 83:2 86:2 |
| **certainty** | 182:2 | 277:7 | 95:17 99:3 |
| 163:11 218:1 | **charge** 33:3 | **circumstance** | 134:5,10,17 |
| **certification** | 160:18,23,24 | 4:25 | 137:4 144:4,7 |
| 120:9 240:8,11 | 161:4,10,21 | **circumstances** | 163:2,5 173:23 |
| 255:1,4,9,12,21 | 162:8,16 | 248:3 | 173:25 183:8 |
| 256:10,11,13 | 163:10 168:21 | **city** 1:10 8:3 | 186:14 199:18 |
| 256:25 258:12 | 168:23 174:19 | 148:18 229:11 | 200:13,14,15 |
| 260:3,7 265:17 | 211:20 212:8 | 229:15 | 200:15,16 |
| **certifications** | 218:13 222:10 | **civil** 1:3,9 | 201:3 223:4 |
| 120:8 251:19 | **chart** 164:3 | **claim** 37:15 | 240:20 241:24 |
| **certified** 293:4 | 166:12 167:21 | 39:3 40:11 50:5 | 242:8,18 |
| 293:19 | 167:22 168:2 | 52:9 58:22,25 | 246:20,21 |
| **certify** 293:5 | 228:11 249:18 | 59:17 65:2,11 | 253:5 254:20 |
| **cetera** 205:13 | **chase** 36:9 | 66:17 73:14 | **claimed** 34:16 |
| 218:4 | **check** 15:18 | 127:25 128:1 | 180:23 |
| **chair** 147:20 | **cherry** 76:13 | 216:4 223:2 | **claims** 18:7,16 |
| 177:14,17 | **chief** 140:5 | 241:18,19 | 18:22,23 19:1 |
| **chairman** | 195:8 | 247:7 251:11 | 19:10 21:22 |
| 177:11,19 | **chocolate** | 272:20 278:9 | 27:10 34:22 |
| **change** 15:22 | 198:24 | 280:17 287:15 | 37:8,13,18,22 |
| 101:3 205:20 | **choice** 13:2 | 288:13 | 39:1 41:22 42:1 |
| 238:7 279:16 | 20:18,19 | **claimant** 239:7 | 43:23,25 44:2,8 |
| **changed** 238:6 | **chose** 131:20 | 246:18 276:19 | 44:10,11 45:12 |
| 240:25 | 262:19,21 | **claimants** | 45:23 46:20,20 |
| **changes** 107:1 | **chronology** | 21:20 22:10 | 49:19 50:5,16 |
| 197:20 276:11 | 170:6 | 26:6 46:5 49:24 | 52:10 54:12 |
| 280:2 | **cio** 206:22,23 | 50:10,17,20 | 65:3 66:25 |
| **channel** 66:25 | **circle** 166:7 | 51:8,24,25 52:2 | 78:19 79:25 |
| **channeling** | **circling** 49:11 | 55:19,20 61:5,6 | 85:3 94:8 |
| 44:21 45:4,10 | | 62:22 63:14 | 106:10 108:2 |

**[claims - comment]**                                        Page 14

108:16 112:6
116:10 135:10
148:17,18
160:3,3,9
192:10 195:4
200:22 201:21
202:14 212:17
212:19 214:14
215:1 223:5
230:1 231:22
235:15,25
236:4,4,16
238:8,13
239:12,16
240:14 243:7
251:23 252:1
252:15 266:1,1
274:3,21
277:17 278:12
278:15,16,19
278:24 281:2,6
281:21,22,24
287:25 288:9
288:15,16,18
**clarification**
44:14 45:16
67:16 92:12
148:6 268:21
288:8
**clarify** 269:3
**clarity** 113:14
162:17
**clause** 76:14,14
**clean** 292:14
**clear** 9:10
12:23 14:8

33:22 34:5 57:9
77:24 88:6
126:16 142:4
171:5 173:15
191:25 195:14
196:4 217:1
227:18 228:22
266:8 267:9,10
**clearer** 179:16
**clearly** 8:21
16:3 94:17
171:10 245:5
246:9
**client** 4:13
11:14,16 20:21
23:20 38:24
39:20 94:12
113:24,25
151:16 188:10
189:7 191:10
203:13 223:14
224:9 241:19
242:22 244:2,7
245:2,24
247:17,20
248:4 252:22
254:19 263:19
272:12
**client's** 71:4
**clients** 24:9
123:19 124:3
268:3
**close** 158:14
162:25 197:15
280:11 282:1
283:1 287:20

291:23
**closed** 14:21,22
16:14 21:2
47:12 114:4,5
114:15
**closely** 208:24
**closes** 202:4
**closing** 112:7
116:11 141:7
141:10,17,17
151:4 202:15
244:17 258:2
**closings** 291:7,9
292:3
**coat** 226:19
**coca** 33:24
35:22
**cola** 33:24
35:22
**colgate** 44:5
**collaborate**
283:19
**collaborating**
129:21
**collaboration**
128:10,16
282:1,6,11
283:1,13
**colleague** 4:13
15:16 180:1
195:15
**collective**
260:12
**collectively**
51:25

**colon** 118:10,22
**columns** 249:17
**combination**
62:24 69:6
162:2
**come** 6:24
36:19 42:15
51:15 62:18
63:15 73:13,13
80:4,6 90:19
102:9 103:17
106:22,24
108:22 119:20
144:22 145:5,6
145:20 146:19
162:12 168:17
170:11 197:3
199:21 200:19
205:20 225:14
225:22 242:6
247:1 254:4
266:18 290:23
**comes** 27:4
35:16 56:2 85:3
**comfortable**
161:3
**coming** 30:19
52:24 53:5
128:5 145:15
163:12 219:18
222:9 266:23
287:20
**commenced**
4:1
**comment** 78:9
78:11

**commentaries**
14:14
**commenting**
279:5
**commit**    178:6
178:16 179:3
**committed**    35:7
**committee**    46:5
51:24,25 61:5,6
73:24 74:1,2
82:22,25 83:2
86:2 127:3,24
134:5,10
137:19 177:21
177:25 180:23
183:8 201:4
239:8 254:20
267:7 275:20
276:16 277:15
**committee's**
186:14
**common**    74:4
171:6
**communicate**
9:22,25 10:5,9
124:10 269:7
269:10,13
**communicated**
9:15 11:21
81:18,19,22
124:24 139:19
**communicating**
83:6 137:9
139:2 140:14
155:4 156:2
201:3

**communication**
94:12 193:8
285:7
**communicati...**
20:1,22 36:23
47:9 88:10
124:20,20,23
127:2,5,9 128:5
128:9 157:8
180:24 255:10
255:18 257:5
267:8 276:5
277:21 282:2
283:2 284:17
284:24 286:5
**companies**
98:18 99:15
109:6 147:22
159:25 160:19
161:1 166:21
166:23 167:1
171:8 199:16
202:1 206:4,5
207:7 261:5,7
261:12,14,18
261:23
**company**    8:14
9:16 10:4 11:1
11:5 18:25
25:22 37:7 38:5
59:22 63:19
81:13 95:19
97:1,13 104:5
109:1 132:9,11
149:13 161:2
161:20,25

162:12 167:4
174:7 189:15
199:22,24
200:23 206:12
207:14,24
209:4 211:18
212:6 260:14
261:22 262:17
264:15,25
267:11
**company's**
12:12 38:4
85:11 100:25
143:4
**compared**
96:25
**comparing**
98:22
**comparisons**
96:13
**compensation**
240:20 241:23
242:17
**competitor**
260:24
**competitors**
263:22 264:10
**complain**
202:22
**complained**
196:4,8
**complaining**
189:4
**complete**    125:5
292:18

**completely**
39:4 196:3
233:13
**completeness**
87:3 238:20
239:1
**compliance**
293:6
**complicated**
161:5
**complied**    124:4
**component**
54:25 55:4,6
241:14
**components**
200:16 222:5
**comport**    24:8
**compound**    66:7
287:18
**comprised**
205:23
**computer**
22:14
**conceded**    36:4
36:4
**conceivably**
74:23
**concept**    55:14
117:4 133:16
166:19 219:11
**concepts**    65:7
77:8
**concern**    263:24
**concerned**
56:19 263:13
268:11

[concerning - conlan]                                                        Page 16

**concerning**
  34:17 40:9
**concerns**   47:15
  130:1
**conclude**
  160:20 162:8
**concluded**
  12:20 141:16
**conclusion**
  291:14
**condition**   159:4
  160:13
**conditions**   99:6
  104:4
**conduct**   5:9
  282:2 283:2
**conducted**
  23:21
**confer**   25:3
**conference**
  25:25 103:13
  228:5,5
**conferring**
  292:6
**confess**   103:17
  104:2
**confidence**
  163:16 183:22
  183:25 192:11
  192:13,18
  193:4,5,6
  201:11
**confidences**
  31:17 32:1
  179:10 223:14
  248:5 263:19

**confident**   222:3
  289:20
**confidential**
  8:13 9:9 21:20
  22:12,23 32:5
  32:16,17 33:14
  35:14,21 36:3
  36:23 41:10
  44:20 46:12
  54:15 56:4
  59:23 60:10
  61:24 72:8,21
  80:20 81:9
  85:12,14 88:10
  91:12,22 93:7
  95:22 96:5
  98:15,25
  100:23,24
  101:20 103:3,5
  104:14 106:7
  123:24,24
  137:20 178:7
  178:13,17
  179:4 183:9,12
  183:19 187:11
  188:9 201:23
  202:2 211:4
  215:5 216:3,7
  220:14 223:8
  240:21 241:25
  243:8 244:2,7
  248:4 252:2
  267:9 282:19
**confidentiality**
  30:21 116:19
  195:11

**confines**   70:7
**confirm**   14:15
  80:24 137:6
  147:5
**confirmation**
  63:22 131:12
  132:5 133:10
  134:11
**confirmed**
  135:18
**confirming**
  145:6
**conflict**   80:7
**confront**   77:18
**confused**
  115:11
**conjunction**
  29:21
**conlan**   3:3 5:14
  5:22,24 6:22,23
  6:25 7:3,6,14
  9:5 13:17 16:7
  18:20 20:8
  23:11,17 24:6
  24:22 25:14
  26:22 27:19
  29:13,18 31:8
  32:2,4,22 33:14
  33:22 34:10
  35:13,24 36:12
  36:24 37:6
  38:16 39:10,18
  40:3,8,12,19
  42:9 43:19 44:7
  49:25 51:6,12
  56:11,15,20

57:22 58:11
60:22 67:19
68:2,9 70:2,12
75:1 77:14
78:16 87:12
90:1 91:3 94:22
94:24,24 95:2
95:12 101:19
102:14,23
103:8,17 104:2
104:9,13 106:1
107:17 111:22
113:15,16,17
114:4,13,23,25
115:6 118:13
119:21 120:1
121:8 123:9
125:15 130:6
130:20 147:19
150:2,10,22
151:3 152:2
157:14 158:10
163:22 164:5
174:22,24
175:9 176:24
181:20 185:19
185:21 190:20
190:20 191:13
192:17,19
193:23 194:13
196:15 203:22
204:4 210:1
225:11,21
227:5,9,17
228:4,22 229:3
248:10 251:18

[conlan - core]                                                      Page 17

255:10 256:21
256:25 257:14
257:21 259:1,7
259:16 262:10
265:4,5,12
266:19 267:9
268:6 273:25
276:7 285:22
286:6,10,21
287:4 289:4,11
289:25
**conlan's** 28:12
47:18 129:23
267:10
**connection**
44:18 46:7 71:5
79:23 81:8
96:12 100:19
248:17 256:14
**cons** 192:7
211:1
**consensual**
123:11,15
134:2,19
155:20
**consent** 217:11
**conservative**
218:14
**consider** 104:5
240:21 241:24
244:5 251:23
261:7 282:2
283:2
**considerably**
30:6

**consideration**
19:8 24:18
32:21 42:24
284:25
**considered**
30:22 100:22
267:20,21
**considers**
241:10
**consistent**
28:11 32:9,12
77:18 79:9,14
82:10 116:14
260:8
**consistently**
34:11
**conspiracy**
129:21
**conspiring**
197:2
**constance** 1:22
293:3,18
**construct** 66:19
66:20
**consultant**
110:20
**consultants**
85:15
**contact** 83:19
256:13 257:10
257:12 258:13
265:17,19
272:14
**contain** 65:11
66:6,18 67:1
167:11 206:10

**contained** 92:5
**containing** 20:2
**contains** 190:12
**contemplating**
47:16
**context** 13:21
17:18 39:17
45:25 53:25
60:2 62:16 63:7
63:10 87:13
95:18 96:1
100:23 102:1
125:20 130:1
166:22 174:15
212:18 239:17
240:19 244:22
246:5,6,23,24
259:12 284:22
288:18
**contexts** 246:16
**contingent**
161:22 171:7
**continuation**
4:5,8
**continue** 4:4
21:5 43:14
68:17 90:25
151:23 225:9
228:17 234:18
254:6 282:3
283:3 290:8
**continued**
98:15 182:18
249:16 262:6,9
286:9

**continues**
249:20,21
**continuing**
17:24
**continuous**
137:14
**contract** 15:19
15:20
**contractually**
160:5,7 167:7
186:24
**conversation**
180:8 286:21
**conversations**
50:13 187:9,17
287:9
**conversely**
106:20
**convey** 199:16
**conveyed** 56:12
56:22 198:3
**copied** 194:17
**copies** 20:8
127:25 156:13
**copy** 15:18
20:11 113:21
113:24 114:19
114:20 115:2
147:6 156:9,19
158:14,17
226:12 231:6,9
237:22 242:9
248:22
**core** 161:6
184:20

[corporate - couple]    Page 18

**corporate**  2:4
  99:11,19,20
  100:14 173:13
**corporates**
  209:2,5
**correct**  7:21,24
  7:25 8:4,9,15
  9:16 10:8,20
  12:12 17:22
  21:25 22:25
  29:19 44:1,22
  45:7,8,12 46:3
  46:9,14,20 52:5
  54:17,23 58:19
  59:10,19 60:11
  60:18 62:2,13
  62:19,20 72:22
  73:4,20 74:11
  76:4 78:1,2
  79:12,21 81:10
  83:3,8 85:16
  86:8 88:4,5,12
  88:16,19,23
  94:4 95:24 96:8
  96:11,15 97:2,3
  97:13,17,21
  99:1,9,13,14
  100:18 101:4,6
  106:10 108:12
  109:1,20 110:6
  110:7,16,17,24
  110:25 116:17
  116:25 118:4,5
  118:16,22
  121:19,20
  124:22 126:2

127:17,20
131:8,13,14
132:1,3,6 133:3
134:22 135:3,4
135:17,20,24
137:16 138:4
138:14 139:22
140:11,12
141:13 142:12
142:16,21
143:17,19
144:16,17
145:1 147:25
148:5,15,19
149:14,16
152:19 153:5
153:14 154:16
155:1,5,23,25
169:8 170:2
172:24 173:7
173:19,23
188:15,16
200:6,10,11
202:17 204:11
210:23 211:5
212:11,13
219:10 221:8
221:21 222:21
223:17 227:7
227:17 228:23
229:7,11,16
230:2 232:2
233:1 234:1,4
237:24 238:17
239:8,13,18
240:8,15,22

242:18 243:3,9
248:12,19
250:5,8,10,16
250:19,22
251:4,7,11,12
253:3 254:20
254:23 255:5,6
255:11 256:16
256:19,20
257:2,6,8,10
259:23 260:13
260:19 264:12
264:17 266:10
268:7 270:2
271:6,7 272:6,7
273:1,2,8
274:21 282:22
284:22 286:3
286:11 289:10
**correctly**  198:3
**corroborate**
  14:11
**costs**  215:22,22
**couching**
  244:14
**counsel**  4:9,16
  8:11,15 9:15
  10:4,10 11:24
  12:2 17:12
  18:13,14,14
  30:10 33:7
  36:25 37:7
  39:21 46:3
  66:16 76:24
  79:17 82:21
  83:1,20 85:10

86:2,8,13 91:23
92:9 94:20
97:12 99:18
100:6 104:10
109:1 117:13
120:18,24
121:25 128:5
136:23 144:1
149:1 151:2
153:18 154:14
154:21 156:23
175:17,18,22
175:22,24,25
181:20 189:15
206:4,10,14
210:23 213:15
218:3 219:5
228:7,10 229:7
229:8,10
234:10 235:5,7
243:18 257:17
258:23 259:21
264:16 265:1
267:9 274:2,17
274:18 278:6
284:19 285:23
287:12 291:8
**counsel's**  30:22
**counsels**  61:25
  108:23 128:1
**country**  153:19
  161:8 287:1
**counts**  60:5
**county**  1:1,9
**couple**  6:2 29:9
  71:7 171:13

[couple - courthouse]                                                    Page 19

| | | | |
|---|---|---|---|
| 204:2 275:3 | 51:3 55:15,17 | 136:4 145:11 | 226:6 227:21 |
| **course**   32:20 | 57:1,18 58:3,6 | 146:11,15 | 228:16 230:9 |
| 36:16 45:18 | 60:21,24 63:3,8 | 147:7 149:21 | 230:23 231:1,4 |
| 95:11 108:25 | 64:14 66:10,25 | 150:3,5,11,16 | 231:5 232:15 |
| 131:9 139:21 | 67:23 68:1,5,23 | 150:20,22 | 232:19,21,24 |
| 181:19 182:25 | 69:9,15,19,24 | 151:1,6,8,22 | 233:2,10,20,23 |
| 210:5 230:11 | 70:7,13 73:7 | 153:19 155:12 | 233:25 234:2,6 |
| 243:14 255:11 | 75:1,9,12 76:21 | 155:15 156:10 | 234:10,18,22 |
| 271:5 279:20 | 77:1,4,9,12,15 | 156:17 157:20 | 234:25 235:2,3 |
| **court**   1:1,13 4:2 | 77:23 78:3,5,10 | 158:1,4,6,13,18 | 235:5 237:1,9 |
| 4:15,20,23 5:2 | 78:14,25 87:6 | 158:20,25 | 237:17 238:22 |
| 5:17,20,23 6:11 | 87:10,16 89:8 | 159:3,22 | 238:25 241:4,8 |
| 6:13,23 7:8 | 89:14,22,25,25 | 163:19 164:9 | 241:12,15 |
| 8:18,22,25 | 90:4,18,21,24 | 164:12 165:17 | 242:5 244:25 |
| 13:12,20 14:1 | 92:15,22 94:15 | 166:13 167:24 | 244:25 245:10 |
| 14:16 15:9,12 | 94:21 95:5,12 | 174:23 176:9 | 245:14 247:22 |
| 16:5,17,19 17:6 | 97:6 102:4,5,6 | 176:13 181:7 | 248:23 249:1,6 |
| 18:1,3,19 19:12 | 102:8 103:12 | 181:11,13,13 | 253:12,19,23 |
| 19:18 20:11 | 103:19 104:17 | 182:14,16 | 254:2,5,8,11 |
| 21:4,9,14 23:7 | 104:22 105:3,7 | 185:18 186:2 | 256:1,4,6 258:4 |
| 23:13,16 24:3 | 105:10,11,25 | 188:17 189:18 | 258:7 264:20 |
| 24:13,16 25:12 | 106:3,5 107:16 | 190:4,18 191:4 | 266:14 268:23 |
| 26:15,20 27:16 | 107:19 109:23 | 191:8,21 | 269:1,4,21 |
| 27:24 28:7 29:8 | 111:9 113:14 | 192:17 203:14 | 282:8,12 284:7 |
| 29:24 30:2,7,13 | 113:23 114:1,7 | 203:17,19,23 | 284:12 287:20 |
| 30:15 31:18,23 | 114:19,22 | 204:2,9,17,22 | 290:3,7,16,19 |
| 31:25 32:8 33:1 | 115:1,3 119:10 | 205:3,11 | 291:3,6,10,16 |
| 33:9,16,18 35:1 | 119:24 120:11 | 207:17,22 | 291:18,24 |
| 35:4,9 36:6,17 | 120:11 121:3 | 208:2,4,11,13 | 292:1,5,11,21 |
| 37:2 38:10,13 | 122:6,11 123:8 | 208:20 209:9 | 292:23 293:4 |
| 38:22 39:5,14 | 125:10,13,22 | 209:12,17 | 293:19 |
| 40:5,18 41:17 | 126:10,13,21 | 213:10,22 | **court's**   6:1 |
| 42:16,17,24 | 126:24 128:19 | 214:3 216:9,23 | 40:14 77:17 |
| 43:6,14 45:1 | 129:2,6,15,22 | 217:6 223:20 | 209:14 |
| 47:2,17 48:20 | 130:3,12,16 | 224:8,16 225:8 | **courthouse**   1:9 |
| 49:13,16 50:21 | 131:15 134:1 | 225:16,19 | |

[courtroom - deal]                                                      Page 20

**courtroom** 9:9
  14:23 15:3
  205:24 216:22
  233:19 245:6
  245:13,19
**courts** 32:20
  42:14 58:24
  158:22 292:9
**cover** 108:1
  130:16 135:9
  197:3 215:19
  215:19,20,21
  215:22
**covered** 127:6
  216:10,11
**covers** 29:2
**covid** 22:14
  82:1
**crc** 1:22 293:3
  293:18
**create** 174:23
  207:4
**created** 70:14
  70:15 90:7
  206:24
**creative** 260:11
**credibility**
  32:11 57:9
**credit** 202:6
**criteria** 272:17
  278:15,24
**critical** 20:24
  92:18 93:24
**criticisms**
  195:4

**criticized**
  218:19
**criticizing**
  190:21
**cross** 3:5 20:23
  23:8 30:5 34:24
  101:18 102:13
  159:9 185:1
  238:25
**crossed** 196:18
  258:19,21
**crr** 1:22 293:3
  293:18
**crucible** 20:23
  34:23
**crude** 58:23
**crystal** 9:10
**curious** 61:16
**current** 18:23
  45:24 49:24
  50:10,17,20
  52:2 55:19,20
  66:23 80:5 82:4
  108:2 144:7
  160:3,8 162:1
  163:4,14
  200:13 207:10
  207:16 212:17
  215:20,20
  223:4 230:1
  231:22 236:3
  293:7
**currents** 19:4
  41:2 80:8,11,18
  84:24

**cut** 18:22 36:8
  39:10,12 150:8
  265:14
**cutting** 123:4
  284:2

**d**

**d** 2:7 3:15 6:16
  6:18 226:2
  249:7
**dachille** 140:2,3
  140:4,4 142:15
  144:10 193:19
  194:13 195:7
  196:15,17,19
  196:21 206:22
**dachille's**
  208:23
**daily** 70:21
**damages**
  214:20 216:4
  244:4 250:16
  287:15 288:13
**darkness** 197:3
**data** 218:15
  276:19 278:16
  281:6
**datapoint**
  199:10 218:24
  219:2,6
**datapoints**
  107:1 162:21
  163:6
**date** 1:11 56:7
  89:5,6,7 108:21
  143:11 165:24

167:13,17
  250:7 251:6
  273:3 293:23
**dated** 115:16
  143:18 197:13
  220:22 274:14
**dates** 226:25
**david** 136:16
  136:21
**davies** 271:2,25
  272:9
**day** 35:13 56:25
  70:16,23 71:1,8
  71:9,18 77:24
  90:7,9,11,15
  91:15,21 92:3
  93:12 95:15
  138:16 143:10
  158:11 171:1,5
  174:18 175:21
  176:4,6 185:6
  185:11 200:25
  204:11,15
  210:21,25
  256:21 267:2
  290:9
**day's** 210:11
**days** 69:4
  114:13 171:13
  270:9 277:23
**dbmp** 90:10
**dc** 2:10
**dead** 47:15
**deal** 53:14 81:6
  83:21 84:19
  135:8 203:4,8

[deal - devoid]                                                          Page 21

212:20 233:9
**dealing** 86:1,1
  178:24
**dealings** 260:22
**dealt** 280:8
**debtor** 74:1
**debtor's** 238:14
**debtors** 44:1,3
  44:12
**decades** 64:1
  69:3
**decide** 5:19
  30:25 164:23
**decided** 14:22
  247:9 282:17
**deciding** 31:23
  109:7 131:1
  134:15 162:6
  163:7
**decision** 77:17
  111:10 204:10
**declaration**
  120:8,9
**declined** 170:22
  204:15,16
**declines** 172:3
**deductions**
  288:23
**deemed** 191:11
**deep** 110:23
**deeper** 279:10
  279:13
**deeply** 47:15
**defeating** 43:10
**defendant** 4:25
  18:24 106:22

174:5 187:6
**defendant's**
  34:16
**defended** 40:23
**defending**
  174:7
**defense** 215:22
**deferred** 50:8
  50:12 51:3,5
**definition**
  71:16 160:7
  163:12
**definitive**
  141:11
**degree** 28:17
  288:24
**deliver** 219:14
**delkidas** 260:21
**dellikas** 260:21
**delving** 77:23
**demonstrated**
  8:23
**demonstration**
  102:14
**demonstrative**
  166:12
**deny** 104:14
**denying** 99:17
  133:20,22
**departed**
  177:25
**department**
  83:12 93:17
  208:23
**depend** 212:3

**dependent**
  199:8,9 228:2
**depending**
  77:16 158:23
**depends** 69:18
  150:9 211:9,22
  244:21,22
**deposed** 243:15
**deposition**
  181:14 230:4
  230:14 231:9
  237:5,23
  242:10 246:11
  252:5
**depositions**
  3:15
**deps** 1:25
**depth** 239:16
  240:13
**derive** 21:22
  22:10 27:11
**describe** 10:25
  29:20 31:8
  52:20,21 55:13
  66:1 70:23
  177:1 197:10
  281:19 283:12
**described** 60:2
  99:23 248:16
  250:13 255:7
  281:6
**describes** 71:20
**describing**
  183:6
**description**
  3:14 249:21

250:12 277:16
**deserves**
  207:14
**desire** 18:22
  180:18
**destroy** 197:4
**detail** 28:17
  52:10 64:4
  183:15
**detailed** 46:8
  46:11
**details** 93:11
  216:20 217:15
  217:25 280:4,4
**determination**
  42:18 105:11
  200:5 218:2
**determine** 32:1
  41:21 171:19
**determined**
  152:22 200:2
**develop** 83:18
  272:5,19
**developed**
  60:16 80:21
  272:14 275:11
  275:14,20,21
  276:2,2,14,16
  277:4,5,6 278:5
  278:7 280:5,12
**developing**
  272:16
**developments**
  238:8
**devoid** 190:2

**[devoted - discussion]**                                                    Page 22

**devoted**  46:3
**diagnosis**  37:24
  67:13 68:12
  72:1,14,15
**diane**  10:14
**differ**  37:16
  38:25
**difference**
  71:14 84:23
  247:16
**differences**
  235:12,19
  236:11,11,11
  236:15,21,25
  238:12
**different**  12:17
  23:23 26:1 37:9
  37:11 38:12,15
  38:21 39:4
  41:25 50:1
  60:15 65:23
  75:22,23 76:2
  82:6 118:1
  120:7,10 176:1
  198:25 201:19
  214:9 222:17
  230:14 233:13
  238:6 246:1,15
  246:16 268:6
  275:6
**difficult**  59:11
  95:18 96:16
  260:11
**dilemma**  28:10
**dimension**
  206:21

**dinner**  227:10
  228:6
**direct**  3:4,10
  7:11 40:15
  185:1 188:14
  226:9 227:19
  235:2,5
**direction**  38:18
  38:21 181:25
**directly**  157:8
  197:7 224:4
  233:11 271:12
**directors**  152:9
  213:1,13
**directs**  166:14
**disadvantages**
  53:22 54:7,22
  96:24
**disaffiliate**
  106:25 141:16
**disaffiliated**
  108:10 135:1
  162:11 163:9
  206:17 212:4
**disaffiliates**
  116:6
**disaffiliation**
  96:3,17,19,25
  98:21,23 99:8
  99:13,21
  100:16,20
  106:20 107:25
  108:6 110:24
  113:9 116:2
  118:12,18
  138:19 147:1

  159:13,25
  163:16 166:16
  166:21 167:16
  168:12 169:1
  183:14 211:9
  212:1 215:14
  222:12 286:15
**disagree**  9:6
  14:16 15:15
  38:10 102:18
  104:21 119:19
  192:25
**disagreed**
  188:17
**discipline**  76:2
**disclose**  148:21
  148:24 181:6
  201:11 223:14
  242:3 255:8,17
  258:18 270:17
  270:18
**disclosed**  35:25
  156:1 251:19
**disclosing**  53:1
  59:20 88:22
  281:3
**disclosure**
  105:2 112:19
**discount**
  171:19 172:1
**discovered**  17:2
**discretion**
  112:3 116:8
  202:12
**discuss**  18:12
  41:6 53:8 54:10

  90:14 94:18
  137:12 144:13
  244:23,24
  286:9
**discussed**  22:7
  24:1 34:4 41:5
  46:18 47:5,14
  47:19 50:11
  52:15 53:1
  54:19 89:13
  92:19 95:13
  99:18 145:3
  154:25 183:17
  187:16 197:16
  197:24,25
  205:5,5 210:7
  210:10,21,24
  211:3 216:20
  281:11,17,18
  286:12 289:25
**discussing**
  23:23 51:7
  250:15 257:9
  281:14
**discussion**  13:7
  15:2,4 46:13
  48:6,13 51:9
  60:7 77:7 82:14
  105:1 179:14
  194:18,20,20
  194:23 197:15
  239:16 240:13
  240:18 241:1,2
  266:25 269:20
  289:15

**discussions**
8:13 9:9 13:10
19:7,14,17,22
28:14 34:20
35:21,25 40:9
46:24 48:2,23
48:25 49:18
50:4,14 52:21
53:13,20 54:4,6
54:15 61:3 62:6
64:8 65:2,7
72:17,19,22
73:17 76:17
80:20 81:9 83:1
83:8 84:14 85:2
91:4,12,22 92:8
93:8,16 95:22
97:10 98:14,15
99:1,6 100:6,19
129:20 137:20
169:18,19
178:3,7 183:5
210:6 220:5,18
221:23 222:18
222:22 223:11
223:15 255:10
255:20 269:19
279:25 285:2
285:20 287:4,5
289:3,4,23
**disease** 66:2
**dismiss** 111:12
**dismissal** 139:7
277:8
**dismissed**
131:16,18,23

131:25 132:2
132:22 135:7
275:17 286:7
**dismisses**
139:11,14
188:25
**dismissing**
138:12 188:23
**disparaging**
189:8
**dispensed** 4:24
**disqualification**
5:8 30:4 104:1
104:16
**distinction**
44:16 93:24
244:11
**distinctions**
37:23
**distressed**
189:1
**distributed**
42:20
**distribution**
63:18,23 73:9
73:13 74:4
**district** 1:13
**dividend**
160:21
**division** 1:1
**divulged**
187:19
**doc** 249:20
**docket** 1:2 4:7
17:1 292:15,17
292:18

**doctrine** 238:20
**document** 16:1
16:8 21:1 42:9
42:10 43:3,4
68:15 87:3
92:19 101:11
101:22 109:11
111:16 114:12
115:7 156:7
157:25 158:8
194:7 200:10
202:3,4 213:17
230:18 231:18
232:7,10
237:14 240:7
249:19 250:2,4
250:13,21,25
251:2,3 252:13
271:16 272:25
274:11 275:8
**documents** 6:2
6:7 13:3 14:11
20:20 29:12
30:14 47:6,8,9
114:6 151:9,12
179:17,19
251:14 262:12
270:23 271:9
271:10 277:16
277:18 282:18
282:22 283:1
287:13
**doing** 11:5 12:1
25:21 55:13
57:2,3 58:5
60:10 64:5,23

77:12 78:13
83:5,17 90:15
91:16,16 93:4
94:1 95:15 96:4
98:18 100:5
102:24 104:24
107:24 117:10
129:9 132:15
210:25 281:25
292:8
**dollar** 58:22
59:17 204:5
**dollars** 169:3
**doubt** 28:24
33:13 34:4
35:15 277:25
**doug** 193:19
194:13 196:15
196:16,19,20
197:13 206:22
**draft** 251:10
272:1,1 273:7
273:10 274:2
279:5
**drafted** 73:25
**drafter** 73:6
**drafting** 74:13
**drafts** 179:21
274:25 279:1,3
280:24
**draw** 220:24
244:11
**drawer** 78:6
**drew** 233:4
**drill** 211:22

[drinker - entities]                                          Page 24

**drinker**  7:21
  11:8,9,15,21
  68:3 69:1 88:19
  97:21 109:18
  147:25 149:5
  165:1 166:4
  229:4,6
**drive**  2:4 49:3
  62:24 63:21,23
**driven**  69:5,7
**driving**  94:13
**dropping**  52:21
**dry**  159:5
**duane**  140:7
  193:22 194:12
**duato**  111:20
  112:2,11,24
  118:15 202:19
**duly**  7:6 226:4
**duration**
  208:24
**durations**
  173:14
**duty**  124:2
**dying**  158:17
**dynamics**  86:24
  87:8,21 285:4,8

**e**

**e**  1:22 2:1,1
  3:12 226:2
  293:1,3,18
**ear**  225:20
**earlier**  106:16
  153:12 170:16
  281:1

**early**  7:23
  91:24 97:19
  289:15
**earnings**
  142:20 143:2,5
  143:12
**easel**  164:10
**easier**  148:24
  165:18 225:17
**easy**  19:4,5
**eat**  166:25
  206:11
**echo**  94:14
**economics**
  186:18
**edits**  274:20
  276:7,24
**effacing**  78:10
**effective**  112:7
  141:7 202:15
**effectively**
  188:15
**efficient**  278:17
**effort**  45:22,25
  46:6 74:4
  210:17 239:10
**efforts**  148:15
  174:16 175:9
  179:19
**egregious**  201:2
**eight**  71:3,17
  177:8
**either**  20:19
  35:2 63:9 81:2
  85:7 128:18
  198:2 211:19

221:16 257:17
  259:17 261:9
**elaboration**
  89:23 90:1
**element**  224:12
**elements**
  204:21 207:3
**elicit**  77:13
**else's**  22:7
**email**  81:20
  111:18 112:2,8
  112:16 138:15
  143:16 144:19
  146:1,14 153:8
  156:3 197:2
  198:9 220:22
  274:1,17 275:6
  290:25
**emails**  194:8,8
  275:6,10
**embodying**
  141:12
**embrace**  245:4
**employed**
  184:12
**encounter**
  255:13
**ended**  54:4
  289:11
**engage**  21:19
  63:12 74:8
  94:17 117:13
  133:14 263:22
  270:5,10
**engaged**  19:8
  40:7 53:20

59:24 60:14
  64:8 78:18,18
  79:16,24 82:25
  87:21 88:9
  91:21 111:21
  137:19 255:9
  278:3
**engagement**
  261:8,11,11,14
**engaging**  96:23
  128:9 282:1
**enhance**  143:25
**enhanced**  218:1
**enstar**  206:17
  260:18
**ensure**  292:17
**enter**  115:25
  136:8 219:16
  261:11
**entered**  30:21
  136:6 230:18
  285:15 291:12
**entering**  119:12
**entire**  13:1 27:6
  27:20 67:17
  68:18 76:10
  84:19 87:5
  130:8 160:1
  164:19 206:11
**entities**  99:24
  100:4 131:2
  134:16 141:15
  141:16 160:1,4
  160:6,13,15
  162:9 163:9
  166:25 167:2,5

[entities - excluded]                                    Page 25

168:19 186:19
186:21,25
200:18 206:15
208:10 218:12
219:24,25
**entitled** 67:21
68:21,21 103:7
234:10
**entity** 99:14
100:2 108:10
116:6 135:1
212:4 263:15
278:12
**entries** 11:8
13:5 29:12
69:14 70:3
249:15
**entry** 67:17,17
68:18 69:12,16
69:17,20,22
70:4,9,15 71:13
71:14 89:6
274:24
**envisioning**
24:11
**equivalent**
162:14
**eric** 103:18
104:3 111:19
118:15 180:2,3
180:3,7,13
194:13
**erik** 2:14 4:22
194:17 196:15
**especially**
181:4

**esquire** 2:3,3,9
**essence** 35:11
281:18
**essentially**
163:8 195:9
208:9
**establish** 57:23
**established**
15:21 129:23
**estimable**
161:22
**estimates** 76:6
80:21
**estimating**
106:12
**estimation**
53:23 54:6,8,11
65:3 265:24
**et** 205:13 218:4
**ethical** 110:10
**europe** 162:14
**evaluate** 60:20
**evaluated** 12:4
37:8 73:18
**evaluating**
88:11 242:6
**evaluation**
37:17 265:10
**evd** 3:14
**evening** 112:9
**event** 69:5,7
111:1 135:9
172:23
**events** 14:10,11
17:15 163:25

**everybody**
49:22 62:22
195:25 206:8
**everyone's**
196:12
**evidence** 14:6,8
14:12,13 15:16
16:2 29:15 30:2
33:2 43:4 68:16
155:10,10
158:2,15
166:13 182:8
182:13 203:3
213:18 228:17
**evidentiary**
16:15
**evolution**
176:14
**exact** 15:2
31:20 143:11
153:21
**exactly** 28:22
28:23 35:24
36:11 56:19
68:22 73:2
76:12 81:17
85:13 95:23
104:21,22
211:12 212:23
292:12
**exaggerating**
171:10
**exaggeration**
80:12
**examination**
3:1 7:11 20:23

23:8 30:5 31:22
34:24 101:18
159:9 209:23
223:23 226:9
228:11 238:25
290:13
**examined** 7:7
226:5
**examining**
253:25
**example** 27:5
29:12 48:17
53:19 60:4
83:14 86:21
106:13,24
117:14 162:5
162:22 168:20
171:22 206:3
210:12 247:11
250:25 251:23
**excellent**
150:19 193:18
225:7 292:13
**except** 151:9
**exception** 224:8
**excerpt** 70:8
76:11
**excerpts** 69:10
69:16 76:10
**exchanged** 62:1
124:20
**exchanging**
276:7 280:24
**excluded**
196:13 268:14
281:22

[exclusively - factors]                                              Page 26

exclusively
  195:15
excuse  32:23
  121:20 122:4,7
  122:11
executes  188:22
executive
  177:21,24
executives
  286:23 287:8
exhibit  6:18
  16:25 114:1
  142:18 153:4,8
  156:10,15
  167:20,21,22
  188:1,2 191:14
  193:11 198:13
  198:15 200:1
  203:2,7 213:23
  213:25 217:13
  217:17,22
  220:25 230:13
  230:20 232:10
  240:1
exhibits  7:17
  226:13,16
  230:21
existed  24:17
  24:17
existential
  166:24
existing  208:15
exists  108:3
expand  40:17
  45:13 48:10
  55:7

expect  150:12
  173:10 214:15
  271:2
expectations
  18:6,15
expected  19:9
  107:4 144:6
expects  35:9
experience
  80:13,17
  107:10 214:18
  260:12
expert  85:7
  110:19 184:5,8
expertise  22:15
  26:4 27:1,23
  48:21 61:21
  73:6 75:23 76:3
  107:10 206:18
  207:6
experts  26:1
  63:14 80:4,12
  80:15 85:4,9,14
  172:11
explain  18:8
  23:17 37:10
  48:10 65:13
  77:10 89:20
  159:22 233:18
explaining  67:4
  78:22 180:5
explanation
  234:8,12
explicitly
  116:16

explore  264:7
explored  263:4
  263:4 264:1,2
  265:3
exploring  180:4
  258:15 268:2
exposed  32:16
  41:10 58:2
  60:15 61:11,14
  61:23 62:3
  63:25 64:7
  72:16,19 73:5
  74:13 75:22
  76:1 85:12,17
  101:20 106:7
  106:11 108:12
  108:15,17,22
  109:2 169:20
extensive  74:15
  265:25,25
  266:2
extent  13:16
  95:1 156:17
  185:20 191:10
  227:14 228:4
  237:17 246:9
  259:15
extraordinary
  36:22
extremely
  171:20
eye  2:9 58:5
  159:5
eyes  30:22
  151:14

eyesight's
  158:24

f

f  3:3 7:3,6
  226:2 293:1
faced  34:14
fact  19:15 21:2
  22:6 32:4 33:17
  33:21 34:6
  37:23 77:8 94:6
  99:2 114:15
  117:10 122:8
  129:18 135:5
  147:24 148:2
  148:22 149:4,9
  149:17 162:24
  163:1,3 173:3
  179:10 190:3
  193:4,5 201:24
  219:1 224:11
  232:17 235:15
  236:16 239:10
  251:17,18
  254:25 255:2
  267:6 270:18
factor  108:7
  252:14
factors  44:20
  45:4 52:25
  55:11 62:24
  171:17 172:10
  201:20 214:12
  214:17,21
  215:2 236:18
  236:19 242:5

[factors - fine]                                                    Page 27

244:23 287:24
288:6,22,23,25
**facts**  43:25
44:11 155:10
240:25
**faegre**  7:21
11:8,9,15,21
68:2 69:1 88:18
97:20 109:18
147:25 149:5
165:1,3,3 166:4
166:7,8,18
175:10 184:11
196:5 201:14
202:21 205:17
229:4,6,9 265:6
265:6
**fail**  199:19
**fails**  34:24
**fair**  9:2 11:5,12
36:14 44:13
55:1 72:5 86:22
86:22 88:3 90:6
92:22 120:2,3
123:5 132:17
146:19,22
147:11 169:1,4
169:22 183:5
185:6,9,13
192:9 214:16
235:17 238:24
241:4 248:2,9
269:24 276:4,4
276:25 277:18
285:5 290:11
291:16

**fairly**  14:8
58:22 130:9
137:14
**faith**  111:12
131:17 170:19
188:21
**fake**  15:18
**fall**  62:23 68:10
69:23 72:2
91:24,25 97:25
98:15 259:3
**familiar**  180:2
248:23
**family**  99:15
100:4 167:1
**famous**  92:2
**far**  21:12
115:20 141:20
141:20 164:5
164:14 175:14
175:17 184:14
201:13 268:10
**farr**  86:5
**fast**  217:21
**favor**  49:24
50:17 137:5
**fax**  1:24
**fcr**  228:3,7
259:4
**fcr's**  228:7
**fcrs**  227:11
**feasibility**  66:5
74:11
**featured**  158:9
**features**  135:4

**february**  16:23
82:9 109:25
111:14,20
112:9,10,16,23
115:16 121:22
122:25 140:18
140:22 156:6,9
165:7 166:5
171:12 202:4
**federal**  14:15
120:11 153:18
**feel**  16:12 24:22
196:13
**fees**  134:22
**felt**  5:13,18
31:10 52:13,16
100:24 106:8
248:5 267:19
268:6 270:18
**fiduciary**  124:2
**field**  261:24
**fifth**  103:23
**fighting**  36:5
**figure**  252:18
**file**  92:16,20
93:23 98:19
189:10,21
292:9
**filed**  15:1 66:22
89:4 90:8,10,11
112:6 116:10
131:17 132:24
176:7 202:14
205:8 235:15
236:16 238:7
238:13 243:7

251:20 267:7
275:18 292:17
292:18
**files**  139:11
188:23
**filing**  8:8 68:11
88:15 94:7
111:11 170:19
170:19 176:6
188:21 229:22
238:14,14
254:17
**fill**  162:15
**filling**  93:10
**final**  112:25
**finality**  98:20
121:6 131:21
132:12 147:21
184:23,24
263:1,2,12
266:13 267:24
**finally**  139:10
**financially**
172:25
**financials**
160:19 161:18
168:21
**find**  25:10
84:10 130:14
153:24 187:24
**finding**  170:18
283:6 285:3,6
**findings**  57:9
**fine**  45:1 78:13
96:22 97:8
164:12 182:14

199:7 209:7,7
283:17
**fingers** 198:14
**finish** 123:9
147:8 149:24
254:5 273:19
**finishing**
253:17
**firm** 7:21 11:8
109:19 110:15
116:9 124:22
128:7 164:24
177:18,19
229:4
**firms** 112:5,6
116:10 141:5
174:17 175:14
178:4,14
202:13,14
**first** 5:22 25:14
29:11 33:12
35:13 59:8
109:19 112:23
120:8,9 121:16
125:23 147:18
153:23 170:5
170:10 175:16
176:15 177:5
185:6,11 188:8
193:19 199:1
201:4 214:5
230:10 239:13
255:13,14
256:13,17
257:1,12 262:7
262:10,13

263:16,17
265:17,19
**fit** 14:24
**five** 27:21
173:22 206:4
**fixing** 276:23
**flip** 273:6
274:16
**flips** 199:23,23
**flow** 44:25
225:18
**fly** 230:22
237:14
**focus** 17:11
32:2 34:8 36:9
36:10 205:1,6
205:12,19
235:6
**focused** 35:17
40:2 44:8 56:24
76:16
**follow** 197:14
198:9 246:7
286:20
**followed**
229:21 243:17
246:10
**following**
112:21 142:13
238:4 247:4
**follows** 7:7
115:19 117:21
118:4,22
179:24 202:9
226:5

**foreclose** 8:25
**foregoing**
284:20 293:6
**forget** 21:2
**forgot** 168:8
**form** 163:17
190:15
**format** 293:7
**formed** 184:15
**former** 116:23
120:23 121:24
123:23 124:2,5
147:19 196:5
202:21 258:23
259:8 262:22
**formerly**
206:23
**forminard**
275:23
**formula** 33:24
33:25 35:22
**forth** 15:5
48:23 61:3
74:12 179:21
214:10 273:11
273:11,13
274:25 275:3
275:10 276:6,9
276:22 277:22
278:3 279:1,4
279:19,24
**fortunately**
104:16,18
**forum** 247:9
**forward** 6:24
42:6,13 82:13

196:12 199:11
209:21 225:22
244:17,18
274:6
**forwarding**
274:2
**fouad** 180:12
183:1
**found** 201:1
279:12 282:25
283:17 284:16
284:24 285:1
**foundation**
105:13,14
186:1
**four** 25:25
142:1 167:5,8
181:16 240:25
**fourth** 121:1
**fox** 2:2
**fox's** 29:2
**foxrothschild...**
2:6,6
**frame** 36:15
58:2 67:23 68:6
69:11 70:3,9
77:1 79:10
87:11,17 89:2
89:19 150:17
164:4,5 240:24
241:6,8
**frames** 165:15
**framing** 64:16
**frank** 26:24
**frankly** 31:15
33:1 41:6 43:13

**[frankly - go]** Page 29

61:19 62:8
63:25 64:2,20
66:4 80:12
104:7 113:12
140:18 160:9
172:2 184:22
199:23 207:14
218:17 219:19
234:15
**fraudulent**
160:20 211:16
**frequently** 9:18
9:19 11:22
210:5
**front** 103:5
143:14 188:5
270:14
**full** 69:11,14,14
69:16 100:21
180:18 247:3
292:3 293:6
**function** 225:3
**fund** 108:10
206:24
**funded** 135:2
160:16 162:10
**funds** 116:5
167:10 219:25
**further** 29:6
124:1 128:23
143:25 203:22
225:12 234:12
255:16
**future** 18:6,16
18:22 19:9
21:20 27:10

37:18 39:1
41:22 42:1 65:3
76:7 78:19
79:17,25 80:10
107:5,6,8,9,22
108:2,14 160:2
160:8 162:1
197:20 200:15
200:16 207:10
207:16 214:25
215:20,21
230:1 231:22
236:3 251:25
252:14 253:4
**futures** 19:2,4
19:4,22 22:10
26:6 41:2 45:24
56:1 63:14
66:24 80:4,9,9
80:15,25 81:5
81:11,14 83:20
84:22,23,24
85:1,3,5,13
86:13,17
159:16 163:14
212:17 216:4
223:5

**g**

**g** 207:1
**gaap** 161:15,20
162:14,16
168:13
**gain** 49:4 228:7
**gained** 100:23

**gander** 146:9
**garner** 50:9,16
144:6 218:25
287:2 289:20
**garnered** 66:23
**gasparovic**
205:25 206:1,3
206:9,13,17
**gears** 174:10
**gee** 106:15
**general** 92:17
92:21 93:3,24
94:1 162:25
200:14 206:4,9
206:13 215:21
223:5
**generally** 42:18
47:14 132:23
143:1 161:16
199:14
**generic** 52:6
71:8,12,20
**generically**
59:14
**getting** 31:15
46:24 64:9
84:22 87:11
105:16 132:13
161:12 180:24
217:4 244:21
276:24 291:8
292:2
**gilbert** 128:4
179:25 206:19
276:10,13
281:15

**give** 5:15 20:13
25:10 105:19
126:14 158:17
162:3 184:3,24
202:6 203:12
207:13 232:11
233:18 238:22
245:9 263:11
266:13 267:23
**given** 29:16
32:18,24 35:11
42:13 66:25
114:15 214:18
237:14
**gives** 13:1
199:24
**giving** 230:4
237:4
**glad** 44:17
185:24
**global** 17:16
260:25
**go** 9:18 13:9
15:5 19:10,10
19:22,23 25:15
27:25 28:7 29:6
39:16 50:15
52:25 56:6 69:4
80:17,18 88:4
90:21 106:21
106:25 107:4,4
116:22,23
120:23 121:25
124:1,1 128:11
128:23 129:10
130:22 135:21

[go - grammatics]                                                          Page 30

| | | | |
|---|---|---|---|
| 135:25 136:19 | 25:13 26:20 | 158:12 159:15 | **golf** 86:16,20 |
| 136:20 137:2 | 28:21 34:8,9,21 | 163:19 166:13 | **golfer** 86:19 |
| 141:20 149:23 | 35:17 38:18 | 167:18 171:18 | **golkow** 1:24 |
| 158:12 164:23 | 39:7,10,12,14 | 174:5,20 | **golkow.com** |
| 165:3 171:17 | 39:15 41:20,25 | 177:16 178:10 | 1:25 |
| 171:21 186:8 | 42:6 43:7 46:17 | 180:20 181:3 | **gong** 102:9 |
| 190:19 193:11 | 47:19 49:2,3,10 | 186:8 189:4,12 | **good** 4:2,11,15 |
| 193:16 194:8 | 49:11 51:4 | 190:17 191:13 | 4:17,21,23 6:25 |
| 195:2 197:6 | 52:22,24 55:23 | 191:14 192:16 | 7:14,15 53:21 |
| 202:3 203:9 | 56:6 57:12,16 | 192:18 194:24 | 81:6 111:12 |
| 205:13 207:17 | 61:3 62:23 63:3 | 196:11 198:7 | 131:16 159:2 |
| 208:14,18,21 | 68:17 71:23 | 198:15 205:12 | 170:19 188:21 |
| 208:25 209:2 | 74:3,8 76:9,13 | 206:6 208:5 | 193:16 198:24 |
| 214:13 217:9 | 77:20,25 78:8 | 209:1 211:14 | 253:13 291:19 |
| 225:12 231:1 | 78:22 80:15 | 211:14 212:2,3 | **goods** 35:24 |
| 232:9 235:23 | 83:21,22,23 | 212:15,19 | **goose** 146:9 |
| 239:2 242:24 | 84:7,19 87:3,12 | 213:20 214:14 | **gordon** 93:4 |
| 244:13 245:21 | 88:1 92:16,20 | 217:20 222:1,3 | 94:1 |
| 249:25 254:9,9 | 93:22 94:10,21 | 222:19 225:8,9 | **gotshal** 10:13 |
| 258:22 261:20 | 94:23 102:9 | 228:10 230:21 | 45:7,9 46:9 |
| 261:22 274:6 | 103:6,17 | 232:9 233:13 | 47:9 53:2,13 |
| 274:23 279:24 | 107:22 108:8 | 236:8 237:17 | 54:5,16 174:18 |
| 280:1 281:1 | 108:13,18,21 | 238:22 240:24 | 175:19 176:3 |
| **goal** 167:7 | 108:22 111:5 | 241:1 244:12 | **gotshal's** 210:2 |
| 195:20,20 | 111:24 112:19 | 244:12,17,18 | 210:7 |
| **goes** 39:20 77:8 | 114:10 115:9 | 253:11,17,18 | **gotten** 124:9 |
| 107:14 139:13 | 116:22,23 | 257:11,14 | 211:23 |
| 165:12 171:24 | 120:13,23 | 258:4,22 | **graduate** 177:2 |
| 171:24,25 | 121:14,14,17 | 263:18 274:25 | **gram** 187:24 |
| 172:1 194:19 | 121:25 126:14 | 276:5 278:19 | **grammar** |
| 208:17 222:14 | 126:21 130:8 | 280:16,16,18 | 281:16 |
| 224:12 246:2 | 136:19,20 | 280:19,20 | **grammatical** |
| **going** 9:7 11:25 | 137:5,6 138:7,8 | 288:3,20 | 276:12,12 |
| 12:3,5 13:14 | 140:17 142:25 | 289:13 290:8,8 | 279:7,10,21 |
| 20:6 21:3,13 | 150:5 151:4,6,7 | 290:17,19,20 | **grammatics** |
| 23:20 25:4,7,12 | 151:18 158:7 | | 277:1 |

[granular - herbicides]    Page 31

**granular**
  276:25 277:1
**great**  165:23
  166:9
**greater**  152:22
  153:1 200:2
  215:18
**green**  180:3,3,3
  180:7,12 183:1
**green's**  180:13
**greg**  93:4 94:1
**grid**  65:16,19
  67:6 286:24
**grids**  66:17
**grounds**  188:25
  189:13
**group**  73:23
  98:9 99:15
  160:12 162:10
  177:6,7 178:10
  218:14 260:18
  260:21 278:19
**grouping**  82:16
**grow**  200:21
**growth**  200:21
**guarantee**
  173:11
**guess**  8:7 87:23
  113:17 121:13
  121:21 228:9
  260:10
**guts**  63:15
**guy**  56:16 103:1
**guys**  183:4
  194:6 257:20
  257:21 258:24

262:17 267:16
280:12

**h**

**h**  3:12 226:2
**haas**  2:14 4:21
  4:22 5:3,7 9:20
  9:22 11:23
  34:20 39:8
  81:10,18,19,22
  82:4,15,17 83:7
  83:11 88:11
  91:12 95:23
  98:4 103:18
  104:3 111:19
  112:2,10,24
  118:15 137:10
  137:13,23,25
  138:15 139:18
  139:25 140:10
  141:24 142:19
  143:4,7 146:8
  159:13,19,21
  159:23 185:5
  185:13,20
  187:8 194:13
  194:17 196:9
  196:15 197:25
  200:25 201:2,4
  202:19 233:2,7
  275:23 286:23
**half**  8:7,8 39:9
  94:13 208:15
**hallway**  26:19
**hand**  7:1 33:5
  156:14 174:4

180:13 207:12
225:24 230:7
**handed**  231:8
**handled**  134:22
**hands**  41:3
  61:20 75:19,20
  204:25 210:15
**happen**  31:1,1
  42:23 86:3
  117:11 222:13
**happened**
  57:14 73:16
  134:25 186:11
  186:12 205:16
**happening**
  210:16 276:5
**happens**  42:23
  123:16 208:13
  208:20 222:11
**happy**  68:4
  168:16 195:25
  269:2,2 288:10
**hard**  166:3
**harmful**  35:18
  35:19 224:12
**head**  9:20
  179:16
**heads**  199:17
**hear**  5:13 13:18
  14:6 16:5,6
  25:13 28:13,18
  31:23 39:8
  40:18 58:4 72:6
  94:14 103:23
  119:15 136:4
  170:10 185:10

232:14 268:16
**heard**  16:13
  29:5,5 30:18
  32:19 33:17
  37:23 38:1 43:5
  56:6 64:17
  70:20 109:5
  120:6 159:13
  185:1 200:24
  229:5
**hearing**  1:6 4:1
  7:17 9:8 16:16
  16:16,24 30:7
  32:13 58:3
  153:8 156:10
  193:13 213:25
  217:14 220:25
  226:13,16
  232:13 240:1
  291:14 292:25
**hearsay**  19:11
**heart**  105:21
**hedge**  206:24
**hell**  15:24
**help**  37:21
  165:15 184:23
  198:10,10
  218:16 219:21
  261:24
**helpful**  247:10
  287:19
**helping**  125:13
  222:6,7
**herbicides**
  65:22 170:3

**hey** 15:7 51:12
68:19 257:20
258:22 259:7
261:24 262:17
**hi** 197:13
**hidden** 233:5,5
**hide** 149:4,9,15
149:17
**high** 80:16,18
80:22 198:8
212:5 218:18
219:19,22
222:8
**higher** 171:25
**highlights**
176:22
**highly** 188:8
189:5
**hike** 266:19
**historically**
166:18
**hit** 176:22
**hobson** 20:17
**hobson's** 13:2
20:19
**hold** 107:22
172:17 173:21
173:24 174:5
187:1 190:18
191:5 290:17
**holding** 173:4
**honestly** 29:4
247:2
**honing** 95:9
**honor** 4:12 5:5
5:11,17 8:16,20

9:3 12:25 14:2
16:22 17:25
18:18 20:7,17
23:6 24:25 26:9
27:13 28:3,5
29:10 31:6
33:13 36:14
38:7,21 39:25
42:6 49:11 56:5
57:19 68:4,14
76:8 78:9 87:7
89:2 90:20 91:1
92:11 93:20
94:9,16 101:9
101:15,16
105:6,9,23
109:15 113:11
114:9 115:4
119:23 120:2
123:2,2 125:6
125:21 126:17
126:23 128:15
129:14 146:7
149:19 151:21
157:7,21
163:18 186:1
189:16,23
190:14 192:22
204:7 209:19
213:16 216:6
217:17 224:10
224:13 230:24
232:6 233:7
234:7 235:8
237:8,11,20
238:19 239:3

240:23 241:6
253:10 256:3
258:3,9 268:22
269:3,24
273:18 283:22
288:11 290:1
291:22
**honorable** 1:12
1:12
**honors** 4:12,18
4:21 6:9 14:23
104:20 158:16
164:7 165:13
203:21 209:15
292:22
**hope** 29:2 57:17
173:19 195:22
253:22
**hoped** 149:24
**hopefully**
173:17 219:20
**horror** 120:16
**horse** 47:15
**hostility** 102:15
**hour** 25:25
102:19 103:2
103:10 105:18
**hours** 15:22
57:21 70:24
71:4,17 114:16
139:11 149:12
149:17,18
180:17 279:24
**house** 105:13
**housekeeping**
157:23 203:5

**huffines** 193:20
193:21 194:5
**huh** 117:19
**hypothetical**
71:22 245:22
**hypothetically**
24:6 207:23
245:14

## i

**idea** 53:22,22
71:11 80:14
81:6 84:6 115:8
116:13,13
147:1 149:23
159:15 196:1
**identical** 14:15
**identification**
6:9,14,19
114:11,21
157:25 182:6
249:4,11
**identified**
277:18 281:1
**identify** 251:24
281:23
**ii** 1:7
**illion** 200:1
**illustrate**
210:13
**imagine** 22:13
167:4 276:24
**imbued** 104:25
187:11,18,21
187:22

**imerys** 17:10
  17:18 43:20,25
  44:3,12,19,22
  45:11,19,22,22
  48:4,9,14 53:24
  54:10 57:12
  58:13,16 60:17
  61:4 66:22 71:5
  72:11,24 73:4
  73:20 74:9 76:5
  77:2 78:18
  79:18,25 83:2
  85:19 86:25
  87:22,25 88:11
  148:9 174:13
  175:18 176:3
  205:18 210:2
  210:13 227:11
  227:12 228:1
  230:1 231:22
  236:4
**immediately**
  131:17 146:1
  177:6
**impact** 17:16
  39:1 41:25 48:7
  100:25 106:9
  108:9,24
**impacted** 38:19
  163:3
**impacting**
  37:17 44:21
**impeach**
  101:23
**impeachment**
  23:10 29:13,14

49:14 234:15
  237:18,19
**implement** 74:3
**implicate**
  192:15
**implicated**
  22:16 27:22
  61:21
**implication**
  54:12
**importance**
  52:23 53:5
**important** 5:13
  16:18 31:22
  32:18 52:8,13
  52:17 55:11
  57:20,21,23
  64:9,10 103:1
  103:23 105:24
  107:3 111:8
  125:20 145:25
  162:20 163:25
  171:20 186:22
  204:21 218:2,8
  218:8,23 219:2
**importantly**
  45:24
**imprecise**
  210:20
**impression**
  93:11 180:16
**incentive**
  173:24
**incidence** 18:7
  18:16 19:9 39:1
  214:25

**inclined** 151:8
**include** 46:19
  123:23 266:8
  267:10 283:1
  288:6,16,17,18
  288:21,21
**included** 48:23
  96:13 99:6
  127:17,19
  215:23 220:21
  278:23 284:25
  285:1 288:20
  289:1,1,4
**including** 5:9
  9:19 10:11,13
  10:16 18:13
  53:20 74:10
  99:2 144:4
  148:3,17
  155:18 201:20
  208:24 215:10
  224:11 259:19
  259:20 276:6
  284:20 286:17
**income** 178:11
**inconsistent**
  77:19
**incorrect** 99:23
  113:13
**increase** 173:23
**incredibly** 39:8
**indicated** 5:11
  5:18 16:19 91:4
  101:21 125:15
  144:10 149:19
  181:5,18 211:7

**indicating**
  102:17
**indication**
  120:22
**individual** 61:5
  95:7 246:18
**individually**
  172:19
**industry** 49:22
**ineffectively**
  207:7
**infinite** 28:17
**inflated** 74:7
**information**
  17:3 32:6,16,18
  34:17 36:4
  41:11 55:9 56:4
  57:10,15 100:8
  100:24 101:20
  102:22 103:3,5
  104:15 106:8
  123:24,25
  132:14 178:13
  178:17 183:6,7
  187:11,14,20
  188:9 189:6
  190:13 201:24
  202:2 215:8,25
  216:8 217:4
  220:16 244:2,8
  244:18 245:21
  248:3 251:24
  252:21 253:1
  265:11 272:4,9
  272:11,16

[inherently - j&j]                                                    Page 34

**inherently**
105:1 187:11
187:18
**inhouse** 9:15
18:13 46:2
54:16 91:23
92:9 94:20
97:11 99:18
100:6 108:23
210:6,22
**initial** 257:9
**initially** 166:24
**initiate** 282:3
283:3
**injunction**
44:21 45:4,11
46:19 67:5
80:25
**injured** 147:22
**injuries** 243:20
250:15 287:15
288:14,19,20
**injury** 40:22
86:3
**inquire** 13:3
**inside** 277:9,10
**instance** 98:7
101:21 109:9
**instruct** 242:23
252:23
**instruction**
243:1,1 246:10
247:4
**insurance**
200:22 206:20
206:20 209:4

**intelligent** 35:5
**intend** 114:11
**intentionally**
13:9
**intentions**
143:4
**interaction**
289:16
**interactions**
256:24
**interest** 171:21
172:2 173:5
186:13,14,15
197:18 201:21
204:21,22
208:13,15,18
208:21,25
**interested**
112:4 116:9
141:4 142:15
161:1 202:13
214:16 267:15
**interesting**
171:19 172:11
**internal** 246:2
**internally**
46:23 60:16
62:2 79:4 85:16
197:16
**interrogatories**
6:4 286:1
**interrupt** 44:24
225:18
**introduce**
114:11

**introduction**
194:1,3,4
**invade** 280:21
**inventor** 92:3
**investing**
173:12
**investment**
140:5 173:16
195:8
**investors** 162:5
**invite** 74:18,21
**invited** 75:4,4,7
75:10,14,16
**invites** 74:23,25
**inviting** 22:24
**involved** 48:2,6
48:13,22 49:18
50:3 60:7 62:8
62:9 80:4 91:21
93:7 175:15
179:19,24
201:16 204:25
205:14 240:12
254:22 267:1,5
**involvement**
208:6 270:13
**iowa** 177:3
**irrespective**
91:20
**issue** 6:1 20:15
36:1,19 39:19
39:24 56:11,24
72:17,20,22
84:25 91:23
93:8,17,19
97:16,19

105:16 114:13
168:13 243:12
276:12 285:9
**issued** 5:12 6:3
170:17 204:12
204:13
**issues** 12:5 27:3
28:14 36:10
38:19 46:18
60:8 67:21
84:22 99:19
148:8 151:8
159:6 178:25
279:21 280:8
281:11,14,16
**issuing** 6:4
**item** 121:22
**items** 41:4,6
71:8 250:18

**j**

**j** 174:16
**j&j** 3:16 9:10
15:1 17:14,17
19:9 22:11 32:1
36:5,11,25
37:12,21 45:10
45:19,20,21
47:5 49:20 53:4
55:12 56:3
57:12 58:16
59:2 65:12
66:22 67:1
68:25 70:13
72:11,18 73:3
73:18 74:2,6

**[j&j - johnson]** Page 35

| | | | |
|---|---|---|---|
| 76:25 79:4,11 | 155:8 156:1 | 284:21 286:23 | **jim**  33:14 35:13 |
| 80:20 82:14 | 157:2,6 162:22 | 286:23 287:8 | 35:24 51:12,14 |
| 84:1,7,10,13 | 163:16 169:19 | **j&j's**  9:15 | 56:11,15,20 |
| 85:15 88:14 | 170:18,21 | 17:21 18:5 39:2 | 61:4 103:1 |
| 90:14 92:4,14 | 171:14 173:4 | 39:3 61:25 | 164:5 165:24 |
| 92:20 93:1,16 | 175:15,18,23 | 74:10 79:16 | 166:7,11 175:8 |
| 93:22 94:20 | 176:7 181:20 | 82:25 86:17 | 175:24,24 |
| 96:6 99:7,18 | 184:21 186:7 | 91:20,23 94:8 | 176:24 177:12 |
| 100:24 102:15 | 187:7,15 188:9 | 99:11,19,20 | 184:4 193:22 |
| 102:24 106:8 | 188:15,18 | 100:14 105:4 | 194:13 196:15 |
| 108:17 109:2,3 | 189:6,20 | 108:13,15,23 | 197:14 201:3 |
| 111:5,19,23 | 194:21 195:6 | 116:23 133:9 | 227:9 259:1,2 |
| 112:11 113:10 | 195:17,20,24 | 136:23 140:8 | 265:4,5,11 |
| 115:9,19,25 | 196:7 197:24 | 142:20 174:16 | **joaquin**  112:11 |
| 116:2,5,13,16 | 201:11,14 | 175:9 197:4 | 118:15 |
| 116:24 117:16 | 202:9,21 204:5 | 204:14 213:19 | **job**  82:4,5 |
| 117:17,20 | 205:8 207:24 | 238:13 266:2 | 110:11 |
| 118:3,6,16,21 | 208:6,7 210:6 | **james**  3:3 7:3,6 | **joe**  9:23 |
| 119:2,17 | 210:23 211:4 | 10:16 147:19 | **john**  1:12 10:2 |
| 120:21,22 | 213:4 220:1,9 | 227:5 231:21 | 205:24 |
| 121:16,22 | 220:19 221:2 | 257:20 | **johnson**  2:11 |
| 122:19 128:11 | 222:11,13 | **january**  5:12 | 2:11,14,14 4:5 |
| 129:10 130:22 | 224:4 225:2 | 9:8 16:22 111:8 | 4:6,16,16,19,19 |
| 131:2,6,8,11,11 | 227:17 228:23 | 131:14 139:7 | 4:22,22 5:4,4 |
| 131:14,20 | 229:7,24 | 170:16 204:7 | 7:19,19 8:2,2 |
| 132:4 133:17 | 235:16 236:17 | 255:1,4 260:4 | 8:13,13,21,21 |
| 134:2,8,11,16 | 239:12 249:7,9 | 277:8 | 9:21,21,24,24 |
| 134:18 135:5,8 | 249:11 256:14 | **jeff**  4:12 | 10:11,11,19,19 |
| 135:11,21,25 | 257:23 258:19 | **jeffrey**  2:3 | 10:22,23 11:9,9 |
| 136:6,19,25 | 258:22 259:8 | **jersey**  1:1,10 | 11:13,13,19,19 |
| 137:3,9 138:7 | 263:1,11,19 | 2:5 5:9 14:13 | 12:2,2,18,18 |
| 140:23,24 | 265:7 266:13 | 14:14 31:16 | 17:13,13 18:12 |
| 142:15 145:15 | 267:23,23 | 245:11 293:5 | 21:23,23 24:23 |
| 145:19 148:3 | 270:10,12,17 | 293:20 | 24:23 25:21,21 |
| 149:7 151:11 | 275:22 280:7 | **jessica**  136:23 | 26:6,6 27:9,9 |
| 153:17 154:16 | 282:4 283:4 | | 33:6,6 37:7,7 |

40:8,8 43:23,24
44:4,5,9,9,10
44:10,13,13
46:13,13 53:23
53:23 54:8,8,13
54:13,17,17
58:12,12 60:10
60:11,16,16
66:6,6,15,16,18
66:18 81:10,10
85:10,11 92:9,9
93:8,8 97:11,11
98:24,24 100:7
100:7 104:10
104:10 115:18
115:19 118:21
118:21 124:9,9
148:22,22,25
149:1 152:8
153:15,16
157:15,15
176:5,5 190:13
190:13 191:16
191:16 202:8,9
222:2,2 223:12
223:12 227:6,6
229:14,14
231:20,20
239:7,7 248:17
248:17 252:1,1
257:13,13,16
262:22 264:16
264:16 265:1,2
270:1,2,3,4,4,5
270:5 282:20
282:20 285:23

285:23
**johnson's** 18:12
33:6,7 152:9
257:17 262:22
**join** 194:18
**joined** 75:17
110:15 177:5,6
**joins** 206:20
**jonathan**
273:25
**jones** 90:7,9,11
90:15 91:15,21
92:3 93:12
95:14 174:18
175:21 176:4,6
210:11,21,24
**joy** 178:23
**jpollock** 2:6
**jr** 2:7
**judge** 6:2,11,12
15:7 16:22,23
16:25 21:6
26:15 28:1
44:24 57:2 58:4
77:24 101:11
102:8 103:3
111:12 127:5
138:11 139:10
139:14 163:24
181:22,25
188:22,25
203:11,24
204:1,10,12
209:10,11
216:21 217:6,8
217:18,20,24

218:7 219:3,9
220:2 233:19
234:20 264:6
270:6 282:21
282:25 284:1,4
284:14 285:14
285:15 291:12
291:17,22
292:5,14,20
**judgment**
187:5
**judgments**
106:15,21
174:6
**judicial** 293:7
**july** 7:23 15:24
131:18 138:13
139:14 188:24
**jump** 35:20
**jumping**
174:11
**june** 164:16,16
165:6,25 166:4
182:22 274:14
277:23
**jurisdiction**
37:16,16 38:15
38:15,25,25
245:20
**jurisdictional**
38:19
**jurisdictions**
41:25
**jury** 122:12
244:17 245:6,7
245:8,21,23

247:12
**justice** 34:25
111:10
**justification**
120:13 121:15
121:21 122:12
122:16
**justified** 213:19
**justify** 18:6,15

**k**

**kaplan** 111:12
138:11 139:10
139:14 188:22
188:25 264:6
270:6 285:15
285:15
**kcic** 6:6 274:1
276:17 277:18
278:11,11,14
278:25 281:6
281:19
**keep** 42:16,21
43:7 58:5 148:6
171:18 178:7
178:16 203:15
267:8 270:12
**keeping** 178:17
179:4
**keeps** 33:11
34:7
**kept** 187:14
282:19
**key** 18:23 64:9
64:10

**[killing - language]**                                      Page 37

| | | | |
|---|---|---|---|
| **killing** 130:1 | 30:10,25 31:11 | 183:17 185:16 | 279:11,17,25 |
| **kim** 10:2,5 | 31:20 32:15,20 | 185:19 186:8 | 280:2,6,7 |
| 11:23 83:15 | 32:22 33:1,4,6 | 186:21 193:13 | 281:15,16,18 |
| 91:13 95:23 | 33:25 34:22 | 197:19 203:6 | 281:19,20,21 |
| 98:4 | 36:9,19 38:3,14 | 208:14 211:15 | 281:21,22 |
| **kind** 37:15 | 39:2,7,16 41:24 | 211:22 214:4 | 282:11,17 |
| 133:23 165:14 | 42:21,24 45:3 | 216:9 221:3,5 | 283:12 285:14 |
| 174:6 176:15 | 45:17 47:7 | 224:6,13 | 286:14,14,16 |
| 177:16 178:11 | 48:17,24 51:19 | 227:20 228:14 | 286:16,17,18 |
| 179:1 199:9 | 53:7,17 57:2,3 | 230:20 232:9 | 286:21,24,25 |
| 221:25 243:25 | 58:4,5 65:15,18 | 234:8,15,16 | 287:1,6 288:19 |
| 244:1 289:6,12 | 67:18,20 68:17 | 236:7 241:2 | 288:20,22,23 |
| **kinds** 32:17 | 68:21,21 69:21 | 242:7,8 244:20 | 289:1,15,15,18 |
| 35:14 47:9 | 70:4,22 74:20 | 244:22,24 | 289:19,25 |
| 178:12 | 74:23 75:3,9,11 | 245:1,22 246:4 | 290:22 291:22 |
| **knew** 35:13 | 76:11,15,19,20 | 246:4,17,21 | 292:2,2 |
| 36:12 50:18 | 76:20 78:21 | 247:2,3,7,11 | **knowing** |
| 56:20 61:2 71:9 | 82:2 83:18 84:5 | 252:17,25 | 190:16 |
| 75:3 102:25 | 85:9 87:5 89:7 | 253:10,16 | **knowledge** |
| 103:2,5 131:11 | 89:11,13 92:20 | 255:13,24 | 107:10 110:23 |
| 132:4,8,11 | 93:20 94:10,12 | 257:19,21 | 259:18 293:9 |
| 133:5,8 144:21 | 97:22 101:17 | 258:13,15 | **known** 49:23 |
| 154:18,24 | 103:7,8,16,24 | 259:1,1,2,3,15 | **knows** 206:8 |
| 196:9 201:13 | 104:1,2 105:11 | 260:20 261:3,7 | **l** |
| 227:5,8,8,13,14 | 105:16,19,21 | 261:9,15,15 | |
| 228:22,24 | 120:5 121:4,18 | 263:11,17,18 | **l** 1:2,12 4:7 7:4 |
| 229:6,8 258:25 | 122:16 129:25 | 264:3,9 265:4,9 | 188:19 226:2 |
| 266:16 | 130:7,8 139:13 | 266:1,23,25 | **labeled** 217:14 |
| **knife** 78:6 | 151:5,17 | 267:1,15,21,22 | **lack** 130:1 |
| **know** 5:6,11 | 156:16,17,18 | 267:24 268:15 | **lacking** 131:16 |
| 9:17 11:18,21 | 157:9 161:5,12 | 271:1,1,12,12 | **laden** 247:19 |
| 13:7,20,22 16:6 | 170:12 172:4 | 272:13,14,17 | **laid** 262:25 |
| 16:14 17:1,9 | 174:1 175:2 | 275:2 276:11 | 287:12 289:17 |
| 20:23 21:12 | 176:15 179:16 | 277:4,5,6,6 | **language** 35:2 |
| 23:25 25:24 | 179:18,22,23 | 278:12,13,16 | 66:19,20 |
| 29:16,17 30:8 | 181:2 182:20 | 278:20,21 | 153:22 197:17 |

[language - legacy]                                                    Page 38

| | | | |
|---|---|---|---|
| 197:22 201:8 | 116:23 120:23 | 174:12,16,18 | 135:23 136:11 |
| 202:5 213:20 | 123:14,23 | 218:2 219:4 | 136:20 137:1,3 |
| 218:5 | 124:5 131:4 | **learn** 183:11 | 137:12 138:19 |
| **large** 235:13 | 161:8 184:16 | **learned** 35:24 | 140:23 141:3 |
| **largely** 161:17 | 184:17 195:8 | 37:6,12 56:11 | 144:1,6,15 |
| **laser** 35:17 | 196:5 202:21 | 183:6 187:15 | 147:18 159:20 |
| **lastly** 34:12 | 206:20 207:6 | 188:8 189:5 | 167:25 168:20 |
| **late** 120:17 | 248:7 259:8 | 223:12 224:1,3 | 169:23 170:15 |
| 170:20 259:3 | 262:22 265:12 | 224:19,21 | 172:17,19,25 |
| 265:19 275:15 | **lawyer's** 52:8 | 225:1 | 173:2 179:24 |
| 275:24 | 243:1 | **learning** 120:17 | 180:1,4,5 |
| **latent** 37:14 | **lawyers** 46:4 | 189:3 | 184:15,21 |
| **latitude** 232:11 | 52:13,16 61:5 | **leave** 13:25 | 186:7,10,18 |
| 233:17 | 63:12,21,22 | 26:16 100:11 | 194:21,24 |
| **laughable** | 64:4,5,10 86:3 | 121:14 164:25 | 195:5,9,16,19 |
| 114:15 | 86:3,4,5 127:23 | 165:25 | 195:23 196:6 |
| **law** 1:1 7:21 | 132:25 138:23 | **leaving** 26:17 | 198:15,18,25 |
| 11:8 14:7 31:16 | 142:1 178:3 | 150:17 184:11 | 199:7 200:10 |
| 41:24 56:3 60:6 | 199:13,13,20 | **led** 9:24 175:9 | 200:20 201:17 |
| 64:21 83:12 | 207:8,13,18 | 239:10 | 201:22 202:8,9 |
| 93:16 107:12 | **lay** 112:24 | **left** 109:18 | 202:11 204:17 |
| 109:18 112:5 | **lays** 164:3 | 152:2 165:23 | 205:14,20,22 |
| 116:9 123:20 | **lead** 10:3 25:4 | **legacy** 110:5 | 206:18,21,22 |
| 123:21 124:22 | 144:1 175:17 | 111:1 112:3,7 | 207:4,25 215:9 |
| 141:5 155:19 | 175:18 229:7,8 | 112:16,25 | 216:5,18 218:4 |
| 164:23,24 | 229:10 247:3 | 115:15,18,19 | 220:15 224:5 |
| 165:1 175:13 | 259:21 | 116:7,7 117:17 | 225:3,4 248:11 |
| 177:2 178:3,14 | **leadership** | 117:20 118:3,7 | 248:14 250:14 |
| 184:18 202:13 | 93:16 153:18 | 118:16,20,21 | 250:19 251:14 |
| 229:4 | 176:18 250:14 | 120:21 123:14 | 255:14 256:14 |
| **lawrenceville** | 264:2 268:17 | 128:11,14 | 256:18 258:14 |
| 2:5 | 275:13,20 | 129:10,13 | 258:17 259:12 |
| **lawyer** 40:21 | **leading** 8:17,25 | 130:20,24 | 259:25 260:10 |
| 40:22,24 52:7 | 17:25 21:18 | 133:15,21 | 260:14 261:2,8 |
| 56:1 62:11 69:3 | 26:11 63:2,9 | 134:10,22,22 | 261:15 262:3,4 |
| 85:11 104:9 | 64:12,15 | 134:24 135:21 | 262:24 263:3,6 |

263:7,9,9,10,14
263:15,16,21
264:10,15,25
265:4,5,18,20
266:8,11,12,16
266:25 267:4
267:11,22
268:6,16,18,19
269:6,7,9 270:7
270:13,18,24
272:2,5,5,15,16
272:19,19
273:7 274:20
275:12 276:2,6
276:17 277:14
278:4,8,12
279:1,3,5,16
280:9,10,10,13
280:15,19
286:10,11,14
286:16 289:18

**legacy's** 140:5
153:17 173:16
200:17 261:24
270:13

**legal** 37:9,11
38:15 40:9
46:14

**legitimate**
108:16

**leigh** 85:22
127:17,18
250:10

**lend** 99:12,20
100:15

**lengthy** 26:25

**lenox** 2:4

**letter** 113:1
115:15 117:2
118:8,14,15
122:13 140:22
141:12 152:8
152:14,17
153:4,15 156:9
167:25 169:13
171:14 188:3
190:7,11,19,20
191:1,9 197:1
212:25 213:8
213:10 220:8

**letterhead**
115:16 188:1

**letting** 30:10
122:16

**level** 52:10 78:6
167:12 276:25
277:1

**leverage** 86:24
87:8

**liabilities** 54:9
91:20 96:6 97:2
99:22 100:17
106:13 128:13
129:12 130:23
135:2 140:20
143:5 166:23
171:7,20,25
173:4 186:9,10
186:20 207:1
207:10,16
209:6 212:2

218:17 260:15
261:23

**liability** 10:3
40:21 62:11
110:5 115:16
115:18 118:20
131:1 134:15
147:19 160:6
161:23,25
167:11 170:25
171:2,6,10,24
172:3 194:25
195:5,16,19,23
196:6 202:8
205:19 206:11
208:17 209:1
224:5 225:4
267:25

**liability's**
200:10

**liable** 99:24
131:2 134:16
141:15 160:1,5
160:12 162:9
167:3,6 168:19
186:19,21,23
200:18 208:10
218:12 219:24
219:25

**license** 1:22
293:21

**life** 63:20 159:6
169:16 206:24

**likely** 30:24

**limitations**
37:14 38:24

**limited** 130:9
151:14

**line** 13:1 21:6,9
67:20,20,22
147:8 164:1
217:9 231:12
238:21 242:12
254:6

**lines** 39:11

**liquid** 167:10

**list** 71:7,18,19

**listed** 118:25
212:15

**listen** 22:21
26:3

**listened** 35:14
120:15

**listening** 22:18
27:2,4 34:2,3

**litigation** 1:4,24
2:14 4:6 7:20
8:3 9:20,24
10:7 11:19
17:15,15 33:8
57:25 65:20
70:14 81:2
110:13,20
120:24 121:24
122:1 124:11
128:2 148:3,7
148:10,15
149:8 175:25
181:21 207:21
236:12 238:9
246:23 256:15
265:21 266:3

278:6,7 282:16
**little** 50:1 65:14
68:20 76:14,14
82:5 124:7
161:11 173:5
174:11 179:15
210:20 214:10
222:16 225:12
233:16 268:5
**live** 108:2
172:12
**livestream** 4:3
4:4 109:22,24
**liz** 275:23
**llc** 1:24 2:11
**llp** 2:2,8
**llt** 4:19
**loaded** 129:18
**log** 3:16 16:24
216:13,15
248:16,22
250:1 262:13
270:25 271:15
275:5 277:16
277:20 278:1
**logic** 112:21
**logs** 216:16
**long** 31:9 39:8
39:16 68:19
71:1 91:13
146:8 165:2
166:3 173:25
176:12 179:23
180:1 182:19
187:1 253:18
254:1

**longer** 149:23
162:9 283:24
**look** 20:9 30:14
65:21 108:14
112:25 132:19
151:15 161:24
162:21,23
168:5 170:6
173:21 187:6
194:7 198:12
198:12,13
199:10 214:18
214:22 215:3
225:9 249:18
250:12 260:6
271:14,16,19
272:22 273:15
273:17,22,24
274:8 290:9,10
290:20,23
**looked** 12:4
17:20 88:21
115:7 197:22
216:1
**looking** 12:19
12:21 67:9 70:5
77:13 111:16
111:17,18
128:9 153:21
154:4 162:18
162:19 166:12
168:22 172:7,8
172:9 200:20
205:17 218:11
245:15 261:25
291:7,8

**looks** 65:16,19
**loop** 197:15
**lose** 108:18
**lost** 40:25
**lot** 56:15 61:19
62:14 74:21
75:14,16,17
80:8 103:1
120:6 161:5
170:1 177:9
205:23 224:14
246:25 258:11
268:5 274:7
**lots** 41:7 61:20
201:25
**love** 113:21
**low** 74:7 80:18
80:22 209:3
**lower** 219:20
**lt** 191:15
**ltl** 2:11 8:8
68:10 88:15
92:17,21 93:23
109:19 111:11
128:13 129:12
130:23 131:12
133:11 134:6
135:7,25 136:1
136:6,24 138:7
138:12 139:3,5
139:5,6,11,12
139:22 148:10
157:5,14
170:19 175:21
175:22,23
176:4,5,6

181:19 188:9
188:13,13,20
188:23,23
189:3,6,11,21
191:16 210:18
210:20 211:2
229:21 235:14
236:13,17
237:5 239:8,13
243:14 246:11
246:21 254:16
255:8 266:10
275:16 277:5
286:6
**lunch** 102:10
147:10 172:14
**lying** 102:16

### m

**m** 2:3
**made** 12:6
42:18 59:21
64:1 118:2
122:23 124:12
124:18 134:7
135:19 201:25
228:1 234:9
239:6 266:7
267:9,10
279:16 283:6
285:3
**magistrate** 1:13
**main** 160:9
**maintain** 28:20
134:24

**[make - mean]** Page 41

**make** 12:15
29:20 30:23
31:1 39:14,17
45:13 80:9
105:11 135:13
135:16,22,23
135:23 142:4
164:22 172:17
173:5,11,17,18
173:20 175:4
187:2 195:24
198:4,6 208:23
216:25 218:17
241:16 244:19
248:6 249:9,14
258:1 276:20
285:6
**makes** 148:24
200:6 246:2
**making** 30:9
32:11 38:16
44:16 57:9 95:5
167:9 172:25
174:3 178:12
208:16 225:3
247:11 276:23
**malpractice**
29:2
**man** 122:8
**managed**
206:25
**management**
2:11 4:19
134:21
**manager** 271:4

**manages**
260:15 261:23
**managing** 10:7
**manner** 24:7
30:20 151:13
**manufactured**
44:4
**march** 15:23
16:17 79:4,7
82:9 98:9
109:19,21
110:1 120:16
128:24 165:7
166:5 232:16
275:15,15,24
**mark** 6:8,12,13
42:6 114:10,20
165:8,9 170:8
182:5,6
**marked** 6:18
16:24 156:14
157:25 158:15
249:11
**market** 170:21
170:23,24,24
170:25 171:3,5
171:6,9,10,17
172:8 204:14
204:18,21
**marking** 249:3
249:8
**mass** 18:24
37:19 62:5,7,15
63:11 106:22
107:11 159:25
161:25 174:8

187:5 260:15
278:20
**master** 4:6
**match** 200:21
**matched** 187:3
208:24 209:2,5
**matching**
173:13
**material** 31:20
32:25 42:17,25
**matrices** 48:7
48:14 60:15
62:1,4,5,18,21
64:3 65:3 66:6
169:15,19,21
**matrix** 48:19
49:19 50:4
51:23 52:24
54:22 60:9,20
62:23 63:24
65:16,18 128:6
144:5,13,23
145:11 153:4,7
153:16 154:15
169:9,11
198:19 199:2
200:12 220:7,8
221:25 222:1
222:19 223:1
286:17 287:7
287:11,14,25
288:15,16
289:2,6,17
**matter** 11:10
11:13 27:1,4,22
64:3 105:21

110:23 157:23
169:17,17
170:1 174:14
175:17 203:5
212:7 257:22
280:3
**matters** 19:15
19:16 34:18
148:23,23
149:1,13 157:6
157:16 227:7
235:13 258:23
259:9 262:23
264:17 265:2
284:20 285:24
**mdl** 8:4 17:1
127:24 144:5
148:19 153:19
218:3 219:5
229:7,9 248:18
259:22 267:7
**meadows** 85:22
127:19 254:17
255:2
**mean** 14:5 23:6
23:14 31:14
36:20 37:10
45:4 53:17 55:2
55:3 57:21 59:5
61:11 62:10
67:1 71:13
72:17 83:6
87:11 101:15
103:22 128:22
132:19 142:24
145:18 150:9

[mean - michael]                                                        Page 42

188:19 192:14
215:25 220:19
234:11 242:4
246:8 252:3
259:11 261:15
265:14 266:24
267:6 268:25
272:9 275:4
281:17 282:10
286:19,22
289:9,14
**meaning** 45:21
161:21 172:19
198:25 286:12
**means** 9:17
48:19 60:3
136:18 161:13
171:21 282:6
282:11
**meant** 105:3
136:21 226:18
**mechanisms**
96:7 135:7
**media** 147:1
**mediate** 282:3
283:3
**mediated**
239:12
**mediation**
126:18 127:6
127:12,25
129:19,24
130:6,8,11,14
139:9,21 157:8
179:15,19,22
179:23 180:23

181:1,19
182:18 183:18
216:7,10,11,14
216:16 220:5
220:17 239:17
240:18 244:24
254:22 255:1
255:11,16
258:16 261:17
261:17 263:5
264:6 265:23
266:9,12,22
267:1,5 268:7
268:14 270:5,8
270:11,14,19
271:6,11 277:5
280:7,17,21
282:18 284:22
285:5,8 289:16
**mediator**
284:25 285:2
285:10,11
**mediators** 3:15
6:3 157:4,9,14
180:10,11,21
181:3,4,14,23
181:23 183:1
183:15,16
240:12 268:15
269:7,10,14,19
270:7 271:9,13
285:16,22
289:19
**medical** 281:23
**meet** 49:20
55:21 86:10

111:6,24
112:19 113:2,3
115:9 116:24
121:17,25
135:5 144:11
145:15 156:21
194:6,17
196:21 218:18
286:23 287:8
**meeting** 23:25
74:18,20,23,25
124:19 126:5
128:3 138:23
140:13,17
141:24,25
142:13 157:3
180:10,15,16
180:19 255:14
256:17 257:12
257:20 258:14
258:17,22
259:12 262:7
262:10,13
266:19,24
267:3,3,14,21
275:23
**meetings** 41:4
45:6 48:22 53:3
61:24 75:10,24
95:21,22 125:7
126:2 127:13
127:19 204:25
205:1 257:7
281:1,7,8
**members** 51:24
124:21 183:8

**memo** 176:15
250:14
**memory** 47:18
**memos** 13:5
47:8
**mention** 117:1
120:12 147:24
148:2 258:10
258:11
**mentioned**
72:24 85:2,18
173:9 174:9,11
176:12 254:25
**merely** 23:22
42:9 258:12
**merged** 206:24
**merging** 178:4
**merits** 216:15
**meso** 215:20
223:4
**mesothelioma**
46:20 106:10
163:1 200:14
200:15 212:19
**message** 197:7
197:10,12
**met** 5:6 33:13
81:25 111:2,20
111:24 139:24
140:7 182:22
221:14 256:21
257:1
**methods** 18:6
18:15 19:3
**michael** 2:3

**[middle - necessarily]**                                                Page 43

**middle**  258:2
  266:5
**mike**  4:12
  165:10,14
  166:6 170:8
**milestones**
  177:2
**million**  57:22
**mind**  42:16,21
  161:7 185:20
  189:17 217:9
  258:19,21
  263:18
**minimum**
  152:18,25
**minute**  25:1
  26:13,19
  102:21
**minutes**  25:10
  27:21 57:17
  90:19 102:20
  103:2,10,11
  105:18,20
  150:15 203:12
  290:6,11,12,21
  290:22
**mischaracteri...**
  174:25
**misstates**
  174:21
**mistake**  164:22
**model**  41:23,24
  140:19
**models**  21:21
  22:10 23:21
  26:7 27:11

  106:23
**modifier**
  162:20
**molten**  136:21
**molton**  127:16
  136:17
**monetary**
  178:11
**money**  50:15
  84:17 108:1,9
  135:13,16,19
  135:22,23,23
  160:23,24
  168:18 172:18
  173:6,15,18,20
  173:21,25
  195:24 208:16
  218:11,18,21
**monitoring**
  28:14
**month**  79:6
  97:20
**monthly**  68:25
**months**  11:20
  68:2 142:1
  155:5 165:4
  166:4 223:12
**morning**  4:2,11
  4:15,17,21,23
  6:25 7:14,15
  170:20
**morse**  206:16
**mother**  176:23
**motion**  5:19
  16:21 30:4
  31:24

**motions**  4:8
  32:21
**move**  42:6,13
  165:19 181:10
  182:12,15
  204:19 209:6,7
  209:8,8
**moved**  106:17
  201:20
**movers**  195:10
**moving**  172:5
  182:8 186:5
  209:20
**msabo**  2:6
**multiple**  45:6
  81:19 97:24
  202:6 235:18
  235:19 246:25
  268:2 275:7
**murdica**  5:3,7
  10:11 50:11,15
  50:25 51:5,9,19
  51:22 52:13
  55:24 61:4
  63:12 64:8,17
  64:20 65:2,8
  82:20 84:11,20
  174:12 175:24
  187:12,24
  190:21 191:2
  191:11,24
  192:10 201:8
  227:8,13,14,25
  228:3,4,24
  229:1,25
  231:21 259:2

**murdica's**  50:7
  51:8 84:9,10
  187:8,13 190:6
  190:19 200:25
**murray**  90:11
**myers**  2:8 4:18

**n**

**n**  2:1 7:4,4
  293:1
**name**  7:2,2
  52:20 170:4
  225:24,25
  261:3
**named**  206:16
  261:19,21
**narrative**  67:16
  76:17 87:5
  146:8
**narrowing**
  175:16
**nasty**  187:24
**natalie**  83:1
  86:5
**natural**  225:17
  253:13
**nature**  13:15
  13:21 23:18
  47:2 60:25
  193:7
**nearsighted**
  164:14
**necessarily**
  38:14 69:21
  113:5 121:4
  185:18

**necessary** 14:4
  108:9 224:4
  225:2 247:10
  281:23 292:3
**need** 8:24 13:13
  13:23 15:12
  16:12 25:3
  26:19 28:17
  45:16 47:20
  49:5,23 53:7
  55:18 57:7
  89:22 92:19
  93:20 94:14
  96:18 99:4,6
  114:22,24
  128:23 131:3,4
  131:4,5,6
  140:19 160:17
  168:15,16,17
  213:3 215:15
  217:11 224:13
  227:20 240:24
  265:11 290:3,4
  290:13,15
**needed** 5:18
  16:19 21:21
  40:2 82:13
  138:1 155:18
  168:13 215:14
  248:5
**needs** 13:17
  39:21 122:7
  168:18 207:14
  234:9,12
**negotiate** 112:4
  116:8 141:4

  202:12 222:24
**negotiated**
  51:23 219:7
**negotiating**
  84:12,16,17
  85:20,23 86:17
  101:1
**negotiations**
  52:5 65:8 79:16
  86:11 88:7
**neither** 13:11
  222:11
**neurons** 187:12
  187:19,22
**never** 40:22,23
  43:5 64:1
  104:15 120:22
  122:25 124:8
  124:16,17
  131:21 140:24
  140:24 146:5
  157:1,4 184:4,7
  232:8 247:14
  257:23 258:19
  258:21 262:16
**new** 1:1,10 2:5
  5:9 14:13,14
  31:16 180:4
  237:14 245:11
  293:5,20
**nexus** 56:20
**niall** 271:2
**nice** 194:17
**night** 117:11
**nj** 1:22 293:21

**non** 102:17
**noncash** 160:18
  160:23,24
  161:3,10,21
  162:7,15
  163:10 168:21
  168:23 211:19
  212:8 218:13
  222:10
**nonparty** 8:17
**nonsubstantive**
  193:10
**north** 17:18
  45:19 66:22
  71:5 90:9,10,12
  90:16 91:17
  92:2 93:4 94:2
  95:15 148:9
  175:18 210:13
  210:25
**notary** 293:4
  293:19
**note** 80:23
  190:2 194:16
  197:14 218:2
  252:12
**notebook**
  143:13 152:12
  226:18
**noted** 202:10
**notes** 203:13
  226:21,22
  227:1,2
**notice** 116:14
  116:22 140:19
  162:4

**notwithstandi...**
  240:17
**november**
  152:3,8 155:5
  167:25 190:10
  192:12 198:16
  213:14
**nucleus** 43:24
  44:11
**number** 3:14
  4:7 36:22 37:17
  41:4 49:3,8
  62:22,25 63:13
  64:20 83:25
  84:5,7 106:24
  114:1 122:24
  123:12,13
  160:11 161:2,2
  162:1,2,17
  163:2,13,13
  168:16 169:3,4
  169:5,6,23
  170:11 171:11
  171:13,24
  184:2 185:3,9
  185:15 198:8
  199:22 200:19
  200:20 207:9
  211:18,21,23
  212:3,14,24
  214:13 222:7,9
  222:14 232:21
  233:4,10,21
  235:15 236:15
  238:7,7,13
  245:7,11,16

[number - offer]                                                                    Page 45

247:15,18,18
249:6,19,20
250:2 251:23
251:25 253:4,7
**numbered**
249:25
**numbers**  48:16
48:17 76:6 80:5
80:6 84:2
199:12 213:18
**numerical**  65:7
65:8
**numerous**  33:8
46:2 273:11
277:22
**nuts**  96:4
287:14
**nw**  2:9

**o**

**o**  7:4 34:13
293:1
**o'clock**  112:9
**o'dell**  85:22
127:17,18
242:19 243:12
250:10 252:19
254:17 255:2
259:19,20
270:23
**o'dell's**  246:10
247:3
**o'melveny**  2:8
4:18
**oath**  102:16
150:23

**object**  12:25
14:24 66:24
119:19 155:11
174:20 189:12
190:1,14,17
192:16,23
230:17 237:12
237:15 238:19
240:23
**objected**  141:1
243:12 262:20
**objecting**  288:7
**objection**  8:16
8:19 13:14,15
14:7,9 15:7
16:4 17:24
18:17 19:11,18
21:5 25:1,13
26:9,21 27:13
27:17 28:20
30:17 38:7
39:13 40:4,12
41:12,18 43:12
44:24 47:1,3,19
51:1,4 56:9
60:19,20,25
61:1 63:1,4
64:12 66:7
74:22 87:2,13
94:9,22 101:10
103:23 107:13
109:16 113:11
116:19 119:7
119:22 120:25
122:2,5,6
128:15 129:14

129:16 130:13
131:5 136:5
145:9 152:20
155:9,16 157:7
158:5 175:3
181:10,17
182:10 185:21
186:1 189:22
190:2,23,25
191:1,6 192:21
195:12 203:1
213:6 216:6,24
220:20 224:17
224:18 236:22
237:2 243:22
246:11 247:4
247:13 252:19
255:22 257:25
258:5 264:18
268:20 269:17
282:5 287:18
288:1
**objections**  25:8
**objective**  48:3
187:1
**objectives**
17:21 49:21
71:4
**objects**  242:19
**obligation**
171:23
**obligations**
123:19,22
**obstacles**  90:17
**obtain**  131:20
131:21 184:23

184:24
**obtained**
201:24
**obvious**  53:9
**obviously**  14:22
14:24 16:7,18
20:22 25:4
31:14 34:9 56:8
67:9 77:14 86:4
87:11 101:25
171:3 224:20
237:15 247:19
261:16 290:9
**oc**  144:2,7
**occasionally**
82:1,17,18,19
82:20
**occur**  50:8
104:5
**occurred**  97:5
241:3
**occurs**  126:17
141:17
**october**  88:15
89:8,18 142:21
143:18 153:9
156:3 157:3
196:14 197:13
201:5 221:20
229:22
**offer**  72:13
122:24 131:20
134:1,7 145:5
145:23 146:6
146:18,22
205:9 263:21

**[offer - optimized]**                                                  Page 46

263:21
**offered**  29:15
 135:5 266:12
 266:12 275:22
 275:24
**offering**  101:24
 117:7 123:14
 134:19
**officer**  140:5
 180:5 195:8
**official**  278:14
**officially**
 275:17
**oftentimes**  85:2
**oh**  16:14 61:15
 150:7 157:22
 168:22 203:3
 204:9 279:10
**okay**  6:23 15:10
 18:3 20:4 21:7
 21:14 25:12,15
 27:24 38:2,22
 39:5 40:5,20
 43:20,21 49:4
 49:13,16 50:2
 51:14,14 52:3,7
 52:9 53:11
 56:16 57:18
 58:3 63:10
 69:19 70:18
 71:3 72:16
 75:12 77:4 78:3
 78:14 83:13,18
 86:22 89:25
 93:14 100:13
 102:11 106:5

107:19 108:20
109:23 111:22
115:13 117:25
126:12,21
127:10 129:6
142:4,9 143:15
145:7,9,14,14
146:15 150:3
150:20,23
151:20 153:25
154:8,20
155:14 157:20
158:19,24
159:3 164:8
165:2,5,8 166:9
167:16 168:2
180:14 181:11
182:14,21
186:2 188:6
190:4 191:8
193:15 203:16
203:19 212:24
213:2,4,5
215:13,13,15
217:8,19,24
220:2 221:1
225:8 226:19
226:22 227:3,4
228:9 230:17
245:19 249:1
254:2,8 256:4,6
257:22 258:24
269:1 270:22
271:21 278:2,4
283:15 284:12
290:7,18 291:5

**old**  84:5
**omm.com**  2:11
**once**  117:4
 184:14 186:7
 186:25 212:7
**one's**  164:16
**ones**  192:7
 261:21
**ongoing**  124:5
**open**  13:25 54:4
 143:13 242:5
**operate**  167:10
**operating**
 167:8
**operative**  43:24
 44:11
**opinion**  170:18
 170:18 204:13
 204:13 246:3
 284:8,9
**opponents**  33:7
**opportunities**
 90:17
**opportunity**
 5:16 8:24 18:12
 47:11 55:22
 95:8 126:11,14
 126:22 233:14
 234:13 238:23
 264:1,4,4,12,15
 264:24
**opposed**  18:23
 71:13 133:9
 173:22 186:16
 186:17

**opposing**
 132:25 133:2
**opposite**  63:13
 64:22 197:6
**opt**  54:22,25
 55:3,5,20 58:12
 58:15,21 59:3,5
 59:5,10,13,15
 59:24 60:2,8,9
 144:5,7 218:3
 287:3 289:6,22
 289:22
**opted**  58:16
**optimization**
 96:2,13,14,17
 96:18,19,25
 98:20,23 99:8
 99:13,21
 100:16,20
 104:6 106:14
 106:20 107:25
 108:6 109:4,8
 110:24 113:8
 116:1 118:12
 118:18 138:19
 146:25 159:12
 159:24 163:15
 166:16 168:25
 183:14 211:8
 212:1 215:14
 221:7 222:12
 286:15
**optimize**  99:24
 100:2,4 167:7
**optimized**
 99:16 206:12

[optimizing - paragraph]    Page 47

**optimizing**
  166:21
**option** 12:21
  42:22 98:23
  104:6 137:1,4
  148:4 184:24
  192:4 207:15
  263:4,4 264:7
  267:22,23
  268:9 270:7
**options** 12:18
  96:5,7,14 97:1
  98:24 100:21
  100:22 101:5
  192:1,6 277:11
**opts** 60:4
**order** 5:12,18
  6:3 33:3 49:19
  50:6,9,21 53:15
  72:15 83:17
  120:18 160:18
  162:7,15 163:9
  168:20 249:25
  259:14 267:8
  277:8,17
  285:16 291:12
**ordered** 111:12
  139:7 264:6
  270:6
**orient** 249:18
**orienting**
  249:15
**original** 257:4
**orrick** 10:16
**ought** 29:17
  194:6

**outcome** 21:22
**outcomes** 22:11
  27:11
**outhouse** 18:14
**outlining**
  118:17
**outreach** 138:4
**outs** 58:12,15
  58:21 59:3,5,5
  59:10,13,15,24
  60:2
**outside** 8:14
  10:4,10 11:24
  12:1 17:12
  18:14 22:24
  36:24 37:6 46:2
  61:25 62:9
  66:16 76:24
  85:10 97:12
  104:10 108:25
  149:1 161:15
  189:14 213:15
  257:17 258:23
  263:2 264:16
  265:1 277:11
  285:23
**ovarian** 18:7
  43:23,25 44:8,9
  46:19 106:10
  144:2 163:5
  200:13,16
  212:18,18
  215:21 223:4
  229:25 231:21
  236:4 239:11
  240:20 241:23

242:18 246:19
  250:14,15
  251:10 272:2
  272:20 273:7
  274:1,3,17,18
  274:21 275:19
  276:16 287:12
**ovary** 18:16
**overcompens...**
  185:8
**overrule** 13:14
  25:13 26:20
  27:16 41:17
  47:19 51:4
  60:24 63:3
  87:13 94:21
  130:13 155:15
  237:1 258:4
**overruled**
  19:19 66:10
  119:10 241:15
  269:4
**overruling**
  190:25
**overstated** 80:2
**overtalking**
  75:8 89:11
**own** 137:7
  171:9 175:5
  186:25 189:8
  189:10 190:22
  202:21 234:16
**owned** 162:9

|  | **p** |
| --- | --- |

**p** 2:1,1 114:10
**p.j.cv.** 1:12
**p.m.** 197:13
  292:25
**package** 84:19
**page** 3:3 12:15
  12:16 34:13
  39:9 44:17
  111:9 128:24
  147:18 153:23
  154:3,4,5 168:4
  168:4 170:18
  188:8 198:20
  199:25 200:9
  201:2,6,9
  217:13 230:24
  231:12,15,16
  232:8 238:1,21
  242:12,24
  249:16,21
  250:13 251:10
  252:7,8 272:1
  272:25 273:6
  274:17
**pages** 77:8
  199:1
**paint** 37:2
**palmolive** 44:5
**panoply** 100:21
**paragraph**
  20:18 112:2,12
  112:16 113:1
  113:20 115:8
  116:12,21

[paragraph - period]    Page 48

117:9 154:1,6
188:7 189:5
196:23 214:3
217:15,25
240:10 252:12
260:7
**paragraphs**
68:19
**parameters**
30:11
**pardon**  178:20
**parrots**  201:8
**part**  16:18 17:4
19:7 24:18
29:21 30:3
35:17 38:8,9
41:23 43:8 46:5
46:23 48:14
53:24 54:9
67:16 73:3 74:9
76:18 80:19
84:16 86:17
98:25 99:25
112:12 114:7
116:5 131:1
134:15 140:19
144:15 148:13
158:2 173:2,15
180:1 182:11
210:15,18
220:25 223:13
223:14 228:2
237:12,13
239:7 246:21
265:9,9 266:9
266:11 270:8

271:11 278:18
281:5
**partial**  237:13
**participate**
81:6 135:11
282:3 283:3
**participated**
17:14 19:14
46:1 72:17
95:21
**participation**
49:20 53:15
54:11 67:13
68:12 72:1
130:10 289:21
289:21
**particular**
12:21 17:10
27:2 37:19
50:16 71:4 79:6
95:15 151:12
158:8 161:19
186:22
**particularly**
93:3 197:23
211:11
**parties**  270:6
270:15
**partner**  7:20
11:15 88:18
147:25 149:5
159:7 177:8,14
261:4,6 262:19
262:20
**partnering**
261:8

**partners**  56:18
178:24
**parts**  115:22
**party**  19:8,22
74:5,6,7 102:17
248:18 269:20
**passage**  100:25
101:2 105:23
106:8,25 108:8
108:24
**past**  80:11
**path**  88:14
131:20 258:15
259:13 262:25
263:11,14
266:12
**paths**  268:2
**pause**  28:4
111:15 203:20
**pay**  72:13,13,15
162:6 173:25
174:1,2 187:4
**payout**  173:23
**peanut**  198:23
**pen**  226:17
**pendency**  78:17
139:20 210:14
**pending**  8:3
34:17 60:17
92:2 109:20
112:5 116:10
132:20 148:17
148:18 202:14
229:14
**penultimate**
196:22

**people**  22:2,13
22:15,24 23:22
23:23 27:1 41:7
44:12 58:16
61:19,20 75:23
76:2 82:16
83:12 105:20
162:23 175:13
177:9 178:6,24
187:4 205:23
205:23 215:8
218:14 219:1
220:15 275:6
**percent**  49:23
50:6,9,16,18,19
50:20 52:1 53:6
53:15 55:19,21
60:3,5 66:23
95:17 99:4
132:12 144:7
173:12 174:3
187:2 199:18
207:8 208:5,15
222:20,23
287:2 289:5,20
**percentage**
19:1 59:6
**perfect**  165:17
**perfectly**  187:3
**perform**  225:2
**period**  11:20
60:17 62:2
68:10 79:20
87:20 88:2
127:6 165:23
166:7,15 178:2

[period - plus]                                                    Page 49

187:15 221:22
222:18 277:22
280:1 291:19
291:20
**periodically**
163:21,21
**perjury** 151:10
**perks** 1:22
293:3,18
**permission** 6:1
158:22 165:13
**permissions**
164:7
**permit** 39:22
77:20 90:1
94:24,25 121:5
192:19
**permitted**
39:16
**permitting**
224:16
**person** 81:25
84:16 125:7
126:2 144:12
180:13 275:22
281:8
**personal** 40:21
86:3
**personally**
86:11 268:17
**perspective**
130:10 197:20
**persuade** 81:3
81:5
**pertaining**
227:11

**pertinent** 238:9
**pesticides** 170:3
**petition** 88:15
229:21
**pfas** 170:3
**ph** 1:24
**phone** 28:13
81:23 103:4
125:2,19
**phonetic**
260:21
**phrase** 85:4
133:24 136:13
136:22 224:2
255:22 264:18
284:3
**phrases** 284:4
**pick** 76:13
177:7 224:2
**picture** 37:3
220:1
**piece** 34:3
147:1 218:8
**pike** 2:4
**pillar** 53:9
**pin** 49:12 101:8
101:17 102:5
**pitched** 146:25
**pitching** 93:12
138:18
**place** 1:9
139:21 172:5
246:3 285:14
286:19
**places** 198:14

**plaintiff** 4:24
112:5 116:9
141:5 202:13
264:2
**plaintiff's**
158:1 241:19
**plaintiffs** 33:8
34:22 48:8 49:5
52:7,8,13,16
62:23 64:10
117:13 120:18
120:24 121:25
127:3,23 128:1
128:5 131:3
132:24 137:19
147:22 154:14
154:21 180:22
184:6 185:7
199:13,20
207:8,13,18
217:12 239:11
259:22 267:6
275:13 277:15
278:5,6 282:16
283:4 284:19
286:25
**plan** 45:21,22
46:21 47:6 49:9
49:24 50:9,17
50:21 58:17
63:19 66:21
73:20 74:10
80:24 86:25
87:9,22,25
132:5 133:11
133:24 134:11

134:12 135:18
137:7 162:24
246:22
**planned** 131:12
**planning**
114:20
**play** 15:17
24:18 30:11
62:18 165:10
225:19 242:6
247:1 268:7,9
268:11 270:19
270:20
**played** 86:16
285:1
**player** 175:20
**plead** 37:15
**pleadings** 49:9
**please** 4:3 6:23
7:1 17:6 90:24
125:8,14 151:1
159:22 193:11
225:22,24
273:19 292:17
**pleasure**
158:25
**plenary** 1:6
154:9 168:5,5
193:13 196:12
200:1 217:14
230:13
**plus** 15:22
49:23 50:9,17
50:18,19,20
53:6 95:17
132:13 199:18

**[plus - posed]**                                                              Page 50

207:9 212:18
**podium**  159:1
**point**  5:6 15:14
20:8 23:8 32:12
34:12,13 38:21
39:13 42:7 43:3
43:22 49:2 58:8
82:12 92:12,18
93:11 97:4,5
98:17 102:18
102:21 103:7
108:3 109:10
114:24 115:3
122:8 124:8
126:19 132:10
138:8 142:2,6
151:7 158:9,14
160:2 170:5
174:12,16
175:1 176:16
179:9 181:18
186:15 187:23
195:3,13 196:4
197:1 199:7,15
199:16 201:10
202:11 215:16
227:19 233:12
234:3 253:10
259:1 265:18
265:20 266:24
276:25 277:11
280:20
**pointed**  183:18
**pointing**  172:18
**points**  14:19
86:24 202:7,11

**policy**  29:2
**pollock**  2:3 4:11
4:12 5:1,25
6:15 8:11,16
12:25 13:14
14:18,19 15:11
15:14 17:24
18:17 19:11
20:12,14,16
24:25 25:15
26:9,18 27:13
28:2,5,9 30:15
31:4 32:23 33:9
33:10,19 36:6
38:7 39:6 40:12
41:12 43:1
44:23 45:2 47:1
47:3,4 51:1
56:5 58:13
60:19 61:1 63:1
64:12 66:7
67:15 68:14
74:22 75:6 76:8
77:5,11,22 87:2
89:1,5,9 90:6
90:20 92:11,16
93:19,22 94:9
95:4,6 97:4
101:10 102:3
102:12 103:14
103:24 104:20
105:6,9 107:13
109:16 113:11
114:5,9 115:1,4
119:7,22
120:25 122:2,5

122:7 123:2,7
125:5,8,11
126:13,16,22
126:23 128:15
128:24 129:14
129:16,17,25
145:9 146:7
149:22 150:4,9
150:14,19,21
151:13 152:20
154:9 155:9,14
156:13,19,21
156:24 157:7
157:20,21,24
158:4,5,11,15
158:16,19,21
159:2,4,11
163:18 164:11
164:13,15
165:10,19,21
166:6,10 168:1
168:3 175:5,6,7
176:11 181:8,9
181:22 182:12
182:15,17
185:24 186:4,6
189:16,19,24
190:5 191:3,12
191:23 192:24
203:1,8,15,18
203:21 209:12
209:15 210:3
213:6,16 216:6
216:14,19
221:2 223:20
223:21,25

224:10,22,24
225:7 227:18
227:24 228:12
230:10,12,17
232:6,17,20
233:1,6,7,11
234:9 236:22
237:11 238:19
238:23,24
240:23 243:22
247:13 248:24
248:25 249:3
253:16 254:1
255:22 257:25
264:18 268:20
269:17 273:18
282:5 283:22
283:25 287:18
288:1,5 290:10
290:14,18,22
291:1,5 292:7
292:13,19,22
**pollock's**  9:7
151:14 212:16
**popped**  174:6
**portfolio**  209:1
**portion**  41:22
42:11 97:14
**porto**  1:12
16:22,25 103:3
163:24 234:20
284:14 291:22
**pose**  182:5
**posed**  26:23
232:16

[position - privileged]                                                   Page 51

| | | | |
|---|---|---|---|
| **position** 101:1 105:4,8 113:20 116:21 127:4 128:11 129:10 130:20 132:16 133:14 172:16 184:14 240:18 | **practice** 43:2 69:2 164:23,25 177:11,15,18 177:20 178:10 | 240:8 291:21 293:6 | 256:3 |
| **positions** 81:14 | **practices** 25:6 | **present** 2:13 22:1 247:8 284:21 | **privilege** 3:16 12:12 16:24 20:15 25:7 33:4 38:5,6 39:21 40:4 42:9 102:2 126:18 127:7 127:12,25 157:11 180:23 189:13 191:10 192:15 216:13 216:14,16 224:9 242:22 245:2 247:17 248:16 250:1 252:23 262:13 270:24 271:15 275:5 277:16 277:17,20 278:1 280:17 280:21 282:18 |
| **possibility** 122:17 | **practicing** 123:13,20,21 123:23 155:19 184:18 | **presentation** 105:15 | |
| **possible** 95:1 128:4 173:25 187:2 204:18 249:15 | **precise** 213:21 | **presented** 245:7 | |
| | **precisely** 15:17 20:16 34:15 79:13 142:22 177:10 208:1,3 | **presenting** 245:20 268:9 | |
| **possibly** 30:12 | | **preserve** 80:8 | |
| **post** 89:8 220:4 220:4 | **predict** 107:9 107:23 | **president** 2:14 | |
| **potential** 17:16 17:20 23:23 44:21 45:10 46:18 48:7 55:6 60:8 65:11 66:18 88:23 91:18,19 94:19 108:5 163:4 218:16,22,23 251:25 263:25 | **predicted** 20:17 41:23 | **presume** 251:16 | |
| | **prediction** 108:8 | **presumption** 31:16 | |
| | **preface** 130:4,5 | **pretty** 276:25 | |
| | **preference** 42:14 | **previous** 5:3 | |
| | **preferred** 128:12 129:11 130:22 133:9 | **previously** 9:23 157:5,15 219:9 220:12,13 265:1 285:22 | **privileged** 6:6 8:12 12:8 21:19 22:11,23 31:21 32:5,16,17 33:15 36:22 41:10 42:10 44:20 46:12 54:15 55:8 57:10 59:23 60:10 61:24 72:21 80:19 81:9 85:12,14 88:10 91:11,22 93:7 94:12 95:22 96:5 |
| **potentially** 49:4 167:2 178:4 211:15 246:6 | **premised** 173:3 | **price** 152:18 222:7 | |
| | **prenup** 159:6 | **pricewaterho...** 198:1,2 | |
| **potentials** 219:21 | **preparation** 156:22 | **primary** 14:12 195:9 | |
| **powder** 1:3 4:6 | **prepare** 203:13 230:22 232:8 233:15 | **princeton** 2:4 | |
| **power** 66:25 199:24 207:13 | | **principles** 161:16 | |
| | **prepared** 14:3 14:25 46:8,13 144:11 196:21 | **prior** 17:4 30:19 93:17 94:4 206:23 207:2 236:7 | |

**[privileged - proposal]**                                                    Page 52

98:14,25 100:8
100:23 137:20
157:8 188:8
189:5 190:13
211:4 215:8
216:3 220:13
220:15 223:7
224:19,21
**privy** 18:5,11
44:19 59:22
74:8
**probable**
161:22
**probably** 22:8
46:10 145:17
145:18 172:10
177:15 190:15
205:5 260:5
290:5
**problem** 20:17
25:2 34:10,15
35:6 68:15
162:4 178:24
181:10 206:7
260:11 269:19
**problems** 71:10
159:18
**procedure**
73:10 74:4
**procedures**
63:18,20,23
73:13
**proceed** 6:10
14:3 16:10 17:5
137:4 158:19
158:20

**proceeded**
235:16 264:25
**proceeding**
38:11 132:6
139:4 146:1
235:14 236:14
237:5 243:14
246:12,24
266:10
**proceedings**
41:1 148:14
207:2 244:25
292:16 293:7
**process** 53:23
54:8 63:22
86:23 91:16
113:9 137:14
166:20 244:21
258:16 261:17
263:5 265:10
265:24 267:1,5
270:8,11
271:11 276:22
278:16,18
280:7 289:16
**processed**
63:17
**processes** 281:2
281:4
**processing**
281:6
**produced**
230:19 232:10
**product** 4:6
10:2 62:11
215:5 216:3

220:14 223:8
240:22 241:10
241:20,25
242:22 243:8
243:21 244:5
246:9 247:8,9
247:15,19,20
248:4,11,14,16
250:19 251:14
251:18 252:2
252:23 253:2
255:19,23
280:25 287:13
288:2,6
**products** 1:4
40:21 44:4,13
**profession**
23:18
**professional**
5:9
**program**
289:22
**progress** 52:5
52:16 64:9
**prohibited**
110:11
**project** 271:4
**prominent**
206:19
**prominently**
158:9
**promise** 290:14
**promised**
203:15
**promote**
195:23

**promoting**
180:6
**pronounce**
260:20
**proof** 128:17
193:4 255:23
**proportionate**
208:17
**proposal** 28:6
28:10 32:24
111:18 112:7
112:10,18,23
112:25 113:4
113:10 115:17
116:17,25
117:17,20
118:2,2,19
119:14 120:20
121:22 137:12
142:16 144:15
152:19 153:17
155:20 156:6,8
167:20 172:24
173:2,16
194:25 196:7
197:4 198:15
198:18 199:1,2
199:7 201:17
201:19,23,25
202:7 213:5,14
217:15,25
225:3 227:12
228:1,2,8 232:1
232:4,4 235:25
236:1,3 239:5
262:25 263:10

[proposal - question]                                                    Page 53

263:11 272:2,5
272:20 273:8
277:10 282:4
283:4 284:21
286:10,12
289:13
**proposals**  239:6
277:9
**propose**  137:11
189:20 191:15
191:17 224:5
**proposed**  13:1
31:7 32:25 74:9
79:5 118:3,6
140:23 200:8
229:24 231:19
274:21 279:18
281:2
**proposes**  74:5
118:15 147:20
**proposing**
116:7 145:1
**proposition**
13:10 47:7
**propriety**  174:1
**pros**  192:6
210:25
**protect**  15:12
**protected**
242:21,21
243:8 245:2
248:5 252:2,22
**protecting**
30:23
**protocol**  274:3

**protocols**  25:6
**provide**  8:23
125:16 218:1
222:14 247:14
247:15 248:13
275:22
**provided**  11:7
24:5,7 162:2
199:11 216:18
217:3,4 248:17
252:21 255:18
266:16 277:17
286:16
**provides**
147:21 208:7
**providing**  35:4
87:16 268:17
272:4,15
276:17 278:22
280:25 291:9
**provision**
161:19,21
291:8
**public**  45:20
49:8 90:3 132:7
132:13 161:20
161:25 171:7
205:8 206:4
293:4,19
**publication**
152:4
**publicly**  46:22
111:11 132:24
189:7
**published**
147:2

**pull**  188:4
**pump**  90:11
**purported**
120:13 121:15
121:20
**purportedly**
56:12
**purpose**  160:2
160:9 278:22
**purposes**  6:14
23:10 29:13,14
30:3 49:15
114:21 157:25
247:11
**pursue**  99:7
108:6
**pursuing**
134:20 197:18
**purview**  40:14
**put**  13:2 20:19
20:20,21 35:1,2
35:2 36:10
49:12 70:24
89:10 101:8,17
102:5 140:18
154:6 157:2
161:18 163:8
174:15 185:19
198:14 199:7
230:19 244:17
244:18 265:16
265:17
**putting**  239:5
277:9
**pv**  171:20,25
172:3

**pwc**  152:23
218:1,9,11

**q**

**qsf**  272:1
**qualifications**
272:1,12,13
**quantifications**
168:10
**quantify**
168:14
**quarter**  142:20
142:23
**quarterly**  143:1
204:4,7
**question**  12:17
12:22 13:22
16:7,8 18:20
21:12 24:20
25:14,17,20,25
26:23 27:8,14
27:18 31:12
32:15 34:15
35:15 37:21
38:12,12 39:4
39:19,23 40:1
42:12 44:7,7
45:16 47:20
49:25 50:3,23
53:10,12 60:6
60:22 63:5
64:16 65:13
66:9,11 69:13
69:21,22 71:23
72:10 75:2
76:23 78:16

**[question - really]**

Page 54

79:1 85:1 89:15
90:5 92:5 93:13
93:15 94:10,17
94:22 96:21
101:12 102:2
103:23 106:1
107:17 111:22
112:13,14
117:24 118:1
118:13,14
121:5,7 122:14
122:20 123:3
125:9,12,14,23
126:9,19 130:4
130:12 139:16
146:3,4 155:13
157:10 158:8
174:21,22,24
175:1,4 184:20
185:4,23
186:11 191:5,5
191:15 192:3
210:19 212:16
214:9 215:12
215:17 216:8
217:7 222:16
222:17 223:21
227:23 232:12
232:16 233:21
234:11 236:1
236:10 238:4
238:20 241:4,5
243:13,13
246:12 247:23
247:25 252:11
252:17 253:20

254:1 258:8
264:21 268:4
268:24 269:22
270:16 273:19
282:9,13 284:2
284:3,11
287:23
**questioned**
33:23
**questioning**
13:1 21:6,10
69:16 147:9
158:10 164:2
187:8 204:24
217:10 258:2
**questions**  3:15
5:16 6:4 9:1
11:25 12:3 16:6
21:18 36:15
45:17 55:25
72:7 101:19
113:15 129:18
150:2 152:3
172:13 181:5
181:15,15,17
181:25 184:2
203:22,25
204:3 209:13
209:14 210:3
235:3 288:2
**quibble**  98:17
**quick**  92:12
117:12
**quickly**  151:25
186:5 187:25
263:19

**quite**  8:7 15:9
33:22 61:19
92:1 111:10
160:9 184:22
199:23 292:15
**quote**  87:3
128:23
**quoted**  233:11
252:11

**r**

**r**  2:1 226:2
293:1
**r&o**  261:2
**raise**  7:1 13:8
15:15 58:6
206:1 221:3
225:24 238:10
**raised**  97:16,19
97:24 98:3
114:13
**raising**  220:20
**ramsey**  83:1
86:6,7,11
**randomly**
272:8
**range**  198:8,10
218:16,19
219:19,22
222:8
**rate**  171:19
172:1 208:16
**rates**  171:21
172:2 178:12
201:21 204:21
204:22 208:14

208:18,21,25
**rather**  58:24
165:15 167:1
182:2
**rational**  174:4
**reach**  82:17,18
82:19,20,21
239:11 262:2
**reached**  82:15
137:10 138:22
143:9 220:20
**reaching**
137:14 195:6
**reaction**  233:4
**read**  9:7 34:14
76:10,11
162:25 175:1
189:4 196:16
230:22 232:8
**readers**  35:5
**reading**  113:20
113:22 114:16
118:8 190:14
**ready**  6:22 17:5
144:22 156:14
193:14 254:14
**real**  26:13 28:2
187:25
**reality**  29:3
106:19
**really**  15:19
25:24 26:24
35:5,12,12 36:2
36:7 92:19
93:20 111:8
115:6 146:12

**[really - referring]**                                   Page 55

150:8 161:24
163:25 169:25
171:5,6 174:18
180:13 181:16
205:6 233:5
246:5 279:24
**realm** 262:1
**realtime** 228:11
**reason** 5:21
89:9 104:8
126:17 265:13
265:16 272:10
277:25 278:2
**reasonable**
185:7,9 240:20
241:23 242:7,7
242:17 268:2
**reasons** 31:15
81:1 193:3
**recall** 19:21
20:1,3 37:20,20
40:16 42:3
46:15,17 49:7,7
50:14,24 58:20
58:21 67:8 69:1
72:3,4,25 73:21
73:22 74:14
79:19 80:23
81:16 87:25
91:6,25 92:4,7
100:1 101:2,7
101:21 109:2,5
137:25 138:5
179:13,24
206:7 210:3,12
210:17 215:11

216:1,2 230:4
237:4 239:22
271:13 275:2
279:15 281:13
285:13,13,17
285:18 292:15
**recalling**
109:10
**recapture**
135:9
**receive** 23:7
33:1 77:15,15
158:2
**received** 12:7
16:17 46:8 61:9
127:25 286:25
**receives** 30:2
42:17,24
**receiving** 20:1
215:11
**recess** 90:23
150:25 225:17
225:17 254:10
**recognize**
143:16 240:7
**recognized**
127:4 264:24
**recognizes**
31:16
**recollection**
20:5,10 29:14
32:7 42:11 43:2
43:5,6 49:15
82:10 85:21
87:12 88:17
93:10 101:22

109:11 231:19
**recommend**
192:4,5
**recommendat...**
12:6 59:21
244:19
**recommended**
55:12
**reconsidering**
190:24
**record** 5:17
9:10 10:23
14:21,22,25
15:13 16:14,18
17:4 20:22 21:2
27:25 28:8
29:21 30:3,8,23
31:2 43:8 47:12
73:7 76:11
87:14 89:17
90:22 94:23
95:1 102:25,25
108:2 114:3,4,5
114:12,15
116:15 151:2
158:3 174:25
181:24 182:11
185:25 190:2
203:17 228:21
230:21 236:6
237:12,13
245:16 254:9
292:18,24
**recorded** 11:4
**records** 23:8,9
29:19,25 31:7

31:10 36:20
47:8 71:24
74:25 77:14
132:7 230:19
281:23
**recovered**
171:4
**recross** 3:7
223:23
**redact** 151:12
**redacted**
151:16 190:15
**redirect** 3:6
209:23
**reductions**
288:23
**refer** 133:20
136:10 154:21
161:15 204:14
227:2
**reference** 56:8
156:5
**references**
219:4
**referencing**
70:1 117:10
**referred** 70:20
91:5 128:14
129:13 130:24
139:22 153:8
259:24
**referring** 98:18
114:25 141:11
154:21 213:24
256:2

[reflect - require]                                                    Page 56

**reflect** 95:1
  212:15
**reflects** 71:15
  277:20
**refresh** 20:4
  29:14 42:10
  43:1,5 101:22
  109:11 231:18
**refreshed** 43:6
**refreshes** 20:9
**refreshing**
  49:15
**refused** 20:21
  246:12
**regard** 30:9,12
  30:13 31:4
  47:18 57:8,14
  58:7 67:24 70:3
  75:2 77:17,19
  113:15 151:17
  158:8 168:24
  191:14 202:24
  233:3 235:6
  249:7
**regarding** 6:3
  34:20 36:3 77:7
  114:17 179:14
  241:1 251:10
  277:21 282:2,4
  283:2,4 284:20
**regimes** 37:9
  37:11 38:16
**regular** 284:16
**regularly** 9:15
  9:17 11:22

**regulate** 72:9
**reject** 146:23
**rejected** 116:16
  138:4,6
**related** 7:22
  34:17 44:3,12
  60:8 62:15
  80:21 99:19
  201:15,16
  220:13
**relates** 34:3
**relationship**
  188:10 189:7
  278:14
**relevance**
  247:20
**relevant** 23:9
  26:3 27:3,5
  36:20 120:19
  201:15 218:25
  224:4,20
**relief** 147:22
**remain** 28:1
  160:6 177:24
**remaining**
  71:20
**remains** 42:19
**remember** 34:1
  34:10 70:2 79:8
  79:13 86:1,1
  98:6 100:1
  133:16 142:22
  143:11 172:22
  177:10 203:9
  220:23 232:24
  247:2

**reminding**
  95:16
**remotely** 15:2
**remove** 160:18
  160:23,24
  162:7 163:10
  166:24 168:21
  211:19 212:7
  218:12,15
  222:9
**removed** 220:1
**removing** 161:3
  167:8 218:13
**reneged** 233:8
**reopening**
  14:24
**reorganization**
  45:21 133:25
**rep** 66:24 80:25
  81:5,11,14
  83:20 84:22,23
  85:5 86:14,17
**repeat** 18:8
  25:16 28:18
  66:11 121:9
**repeated** 47:21
**repetitive**
  119:25
**rephrase** 8:18
  18:2 89:14
  185:22 189:17
  247:22,24
  264:20 282:12
  288:3,4,11
**rephrased**
  47:20 51:2

**replies** 291:15
**reply** 113:17
**report** 71:6
**reported** 1:21
**reporter** 293:4
  293:20
**represent** 35:6
  145:19 222:2
**representation**
  67:22
**representative**
  195:17 231:20
  259:10
**representatives**
  80:6 254:18
  255:3
**represented**
  7:19 11:19
  148:3,22,25
  149:7 157:5,15
  257:21 264:16
**representing**
  2:7,11 8:2,14
  9:16 10:4 40:8
  66:15 223:12
  227:6 265:6
  278:6
**reps** 63:14 80:4
  80:15
**request** 76:9
  195:10 257:24
**requesting**
  291:12
**require** 99:3
  104:19 117:7,8
  144:6 199:20

**[require - right]**                                           Page 57

199:21,22
215:19
**required**  50:18
135:11 186:20
201:22
**requirement**
72:15
**requirements**
67:13 68:12
72:1
**reserve**  36:9
113:1 116:8
117:12
**reserves**  112:3
112:17 141:3
202:11
**reserving**  36:16
**resolution**
12:17 17:16
48:15 49:21
53:24 54:9 55:6
58:1 62:6 63:11
63:15,22 64:4
88:23 91:20
92:25 97:1 99:9
99:12,22
100:16,21
128:12 129:11
130:22 131:11
133:10 144:25
163:1,3 175:24
219:21 239:12
243:7 252:14
**resolutions**
23:24,25

**resolve**  39:23
45:23 94:8 96:6
148:15 207:9
212:2 283:4
**resolved**  135:3
212:6,9
**resort**  227:11
**respect**  91:15
91:18 143:5
148:8
**respectfully**
8:20 13:11 35:8
39:6 56:23
111:23 233:19
**respects**  180:6
**respond**  16:13
55:7 81:14
146:13,20,23
190:6,9
**responded**
32:23 113:16
140:24 145:25
181:14 189:2
**responding**
112:1 116:12
**response**  52:2
102:3 103:15
116:18 119:4,9
123:9 125:16
146:12 184:25
190:12,14
197:11 212:16
232:2,3 233:23
233:25 234:2
252:25

**responses**
102:12 146:8
**responsibilities**
10:7 124:5
**restructuring**
40:24 55:14
56:1,2,3 57:11
62:16 66:20,21
69:3 147:20
177:11,15
205:13 206:20
**rests**  207:25
**result**  78:23
180:8 185:14
208:25
**retained**  85:15
110:19
**retainer**  24:3,5
24:7,11 25:5
30:9
**retired**  82:8
**returned**
111:13
**reveal**  12:5
19:16 55:8
127:2 140:13
140:16 178:9
**revealed**  191:9
**revealing**  46:16
53:21 54:20
67:11 73:17
92:7 279:12
**reverse**  194:8
**review**  13:13
13:17,24 58:6
151:9,11,19

231:17 282:25
**reviewed**  42:18
61:10,12,13
153:17 154:14
282:22
**reviewing**
29:25 280:10
**revisit**  190:19
**rewriting**  33:11
**rid**  207:15
**ridden**  86:19
**right**  5:2,23 7:1
8:8,10 9:12,14
9:19,21 11:10
11:12,18 12:9
12:14 13:18
15:9 16:11
20:19 22:24,25
23:15 24:4
26:16 31:21
32:14 33:19
34:13,23 36:18
40:11 42:4
43:16 44:15
46:1,25 48:18
51:16,17 53:16
54:14 56:21
57:6,18 59:16
59:18 61:16
62:6,15,17,25
64:11 65:12,16
65:20,23 66:4
69:15 70:8,15
70:16,19,22
71:21 72:18,21
73:14 74:17

| | | | |
|---|---|---|---|
| 75:21,25 78:20 | 144:2,8,13,19 | 236:21 237:4 | 287:25 289:3,6 |
| 79:5,18 80:22 | 144:23 145:2,4 | 239:20 240:17 | 289:8,13 |
| 81:15,20 82:6,7 | 145:7,8,15,16 | 243:5,11,16,21 | 290:25 292:21 |
| 82:11,12,24 | 145:20,22 | 244:10 245:12 | **rise** 172:2 |
| 84:1,4,8,14,20 | 146:16,24 | 245:18,24 | **risk** 65:12 66:6 |
| 85:4,18 86:7,25 | 147:16,22 | 246:1,6,13,14 | 66:18 67:2 |
| 93:9 95:12 96:4 | 148:21 149:10 | 246:14 247:6 | 106:9 117:14 |
| 96:10,20 98:5 | 152:5,7,9,14,25 | 248:9,15,21 | 160:21,21 |
| 98:11 103:5,21 | 153:1,3,20,22 | 250:21,24 | 168:14 173:13 |
| 104:25 105:21 | 154:2,10,12,24 | 251:3,15 252:2 | 173:18 209:3 |
| 107:12,23 | 155:3,17 156:4 | 252:4 253:6,8 | 211:15 260:25 |
| 108:10,14 | 156:7,11,13,15 | 253:23 254:7 | 288:22,23 |
| 109:14 110:3 | 157:18 158:6 | 255:17,21 | **risks** 211:2,3 |
| 110:21 111:4 | 158:17 159:12 | 256:7,10,12,15 | **rivera** 20:18 |
| 112:3,17 113:2 | 172:14 177:7 | 256:23 257:1,5 | 34:25 |
| 113:6 115:14 | 180:13 182:7 | 257:11,24 | **road** 141:21 |
| 115:23 116:8 | 182:23 183:1 | 258:21 259:17 | 181:3 |
| 117:12,18,21 | 188:18 194:1 | 259:19,22,25 | **robert** 193:20 |
| 118:25 119:6 | 202:12 205:15 | 261:1,10,12,20 | **role** 34:1 41:1 |
| 121:18 124:3,6 | 208:19,22 | 262:14,17,19 | 111:2 176:3,17 |
| 124:11 126:1,4 | 209:9 210:11 | 266:19,22 | 176:18 180:4 |
| 126:6 127:13 | 211:3,7,10,12 | 267:3,11,13,16 | 210:2 255:7 |
| 128:14 129:13 | 211:23 212:12 | 267:19 268:10 | 267:19 268:7,8 |
| 130:24 132:10 | 212:20,23 | 268:12,19 | 268:11 270:19 |
| 132:22 133:6,8 | 213:1,5,22 | 269:8,12,15,16 | 270:20 285:1 |
| 133:11,13,15 | 214:13,19 | 271:9,14 272:2 | **roles** 176:1,21 |
| 135:13,15 | 215:4 216:5,25 | 272:3,8,20 | **ronit** 10:14 |
| 136:11,18 | 220:9,11,14,17 | 273:4,15 274:4 | **room** 15:3 |
| 137:12,21,24 | 220:23 221:13 | 274:12,18 | 26:16 |
| 138:9,10,13,19 | 221:20,22 | 276:8 277:24 | **rothschild** 2:2 |
| 138:21 139:24 | 222:4 223:2,8 | 278:10 279:14 | **roughly** 164:20 |
| 139:25 140:8 | 224:14 225:24 | 280:13 281:3,9 | 165:5 169:24 |
| 141:2,3,5,8,9 | 226:15,20,24 | 281:12 282:4 | **rsa** 1:22 293:3 |
| 141:19 142:2,3 | 227:16 228:25 | 283:5,14 284:1 | 293:18 |
| 142:13,20,25 | 229:1,3,4,13,22 | 284:5,17 285:2 | **rukhsanah** |
| 143:21,22,24 | 235:21 236:17 | 285:24 286:5 | 1:12 |

[rule - selling]                                                                Page 59

| | | | |
|---|---|---|---|
| **rule**  14:7,9,14 | 137:15 148:7 | 180:9 206:19 | 36:15 42:14 |
| 14:15 15:16 | 151:10 192:21 | 276:10,13 | 60:20 87:4 |
| 16:2 68:16 | 194:6 198:5,7 | 281:15 | 101:11 107:6,8 |
| 242:21 | 219:17 239:22 | **scott's**  180:4 | 109:11 114:22 |
| **ruled**  111:10 | 244:11 | **screens**  22:14 | 114:24 150:8 |
| **rules**  5:9,10 | **says**  75:7 80:25 | **seated**  4:3 7:1,9 | 164:14 188:11 |
| 104:19 110:11 | 85:6 112:3 | 90:24 151:2 | 193:23 194:14 |
| 161:17,17 | 114:4,5 115:17 | 225:23 226:7 | 196:23 200:3 |
| **run**  249:15 | 116:12 117:16 | **sec**  161:18 | 201:7 218:5 |
| **runs**  249:19 | 118:19,23 | **second**  15:11 | 225:9 249:20 |
| **rushing**  105:20 | 133:18 134:2 | 15:14 20:18 | 252:15 253:12 |
| **russo**  180:12 | 137:20 141:2 | 25:4 26:12 56:6 | 255:24 262:13 |
| 183:2 | 147:18 161:18 | 99:25 102:19 | 271:24 275:4 |
| | 182:3,3 188:4,7 | 128:16 131:24 | 278:4,15,16 |
| **s** | 193:25 194:16 | 132:1 135:6 | **seeing**  92:18 |
| **s**  2:1 3:12 | 196:20 197:13 | 138:12 154:1 | 195:5 224:14 |
| **sabo**  2:3 4:13 | 200:1 201:4,5 | 167:19 174:10 | 224:15 |
| **sailed**  114:18 | 213:17,17,18 | 184:3 186:4 | **seek**  268:21 |
| **sale**  206:17 | 217:25 222:11 | 202:25 214:3,5 | **seeking**  131:21 |
| **sanctions**  195:3 | 222:13 242:20 | 215:17 217:14 | 134:11,17,18 |
| **sandbagged** | 251:10 252:20 | 217:24 232:7 | 263:2 264:9,9 |
| 232:7 | **sbrody**  2:11 | 237:5 243:14 | **seems**  30:1 |
| **sat**  67:19 | **scenario**  31:20 | 253:8 254:16 | 189:3 |
| 120:15 287:10 | 247:21 | 255:8 264:5 | **seen**  28:25 29:1 |
| **satisfied**  99:7 | **schneider** | 266:6 275:17 | 47:10 56:17,25 |
| **saw**  156:7 | 127:5 216:21 | 286:6 | 151:16 169:10 |
| 263:25 264:3 | 282:21,25 | **secondary** | 169:10,15,19 |
| 264:12 285:25 | 284:1,4 | 14:12 | 202:16 |
| 287:13 | **school**  177:2 | **secret**  34:20 | **segue**  57:13 |
| **saying**  20:19 | 179:12 | 43:7 | **self**  43:10 72:9 |
| 24:13,16,17 | **science**  37:22 | **section**  233:13 | 78:10 |
| 34:7 42:23 43:6 | 39:2,3 | **secure**  45:10 | **sell**  186:9 |
| 57:3 65:1 77:7 | **scope**  36:24 | **see**  7:16 13:23 | 195:23 |
| 78:23 100:1 | 57:23 | 14:24 16:9 20:4 | **selling**  196:7 |
| 104:25 108:1 | **scott**  128:4 | 21:3 26:3 27:4 | 208:10 |
| 109:3 112:22 | 179:25 180:5,9 | 28:22,23 31:21 | |

**[semicolon - show]**                                                          Page 60

**semicolon**
  279:14
**send** 112:23
  119:13 179:21
  272:9 290:25
**sending** 279:1,3
**senior** 91:23
  93:16 180:4
**sense** 59:20
  107:3 122:23
  124:12,18
  198:4,6 286:13
**sensitive**
  178:13
**sent** 111:19
  112:8 118:14
  118:14 121:21
  138:15 143:17
  152:8 153:16
  156:3 212:25
  220:13,15
  248:11 250:19
  251:14 262:12
  270:24 271:8
  271:10,10,12
  271:25 272:11
  273:25
**sentence**
  202:16
**separate** 54:2
  187:14
**september**
  15:24 135:6
  139:25 141:23
  221:14 231:19
  235:10,13,19

  236:12 238:13
  239:5
**series** 13:9
  67:21 76:19
**serious** 263:23
  279:25
**serve** 91:19
  254:19
**served** 184:5,8
  248:18 254:18
  255:3
**services** 1:24
**set** 21:11
  161:21 257:20
**setting** 22:12,23
  211:5 244:22
**settle** 208:6,8
  229:25 231:21
  235:25 236:3
**settled** 201:21
**settlement**
  21:22 22:11
  27:11 41:23
  48:4,7,9,14
  52:24 53:6 54:1
  54:22 60:9,15
  61:3 62:1,4,5
  62:18,21 65:3
  65:15,16,18
  66:5,17 67:13
  68:12 72:1
  86:24 87:8,21
  88:12 106:14
  106:23 144:5
  144:23 148:4
  153:4,7 154:15

  163:4 185:7
  187:5 199:9
  204:18 205:9
  207:22 218:4
  218:22,24
  219:23 220:7,8
  221:25 222:1
  232:19,21
  233:3 238:10
  239:6 242:7
  246:5 266:4
  278:20 284:21
  288:17,18
  289:6,22
**settlements**
  17:21 112:4,6
  116:9 141:4
  202:12,15
  214:24
**seven** 70:24
  71:3,17 272:25
  290:11
**several** 102:12
  199:1 204:25
  273:14
**shape** 163:17
**share** 35:16,16
  102:23 123:23
  163:19,22
  215:7 230:9
  280:12
**shared** 31:17
  32:1 36:12
  103:8,18
  104:14 151:13
  154:15 212:25

  215:4,24 216:2
  223:7 251:17
  277:13 280:6
**sharing** 51:18
**sharko** 16:25
  229:8
**sharpest** 78:6
**sheet** 79:5,11
  272:19 273:7
  273:10 274:2
  274:21 275:10
  275:11,14,14
  275:21,25
  276:1,1,7,10,11
  276:14,15,21
  277:2,2,3,12,21
  278:23 279:6
  279:17 280:5
  280:12,19,24
  281:11,14
  286:17 287:7
  289:17
**sheets** 13:4
  195:25 275:4
  280:6
**shifting** 38:23
**ship** 114:18
**shock** 120:16
**shocked** 201:6
  201:8
**shortening** 30:5
**shortly** 177:17
  178:1
**show** 5:8 13:2,4
  13:5,6 35:23
  74:25 105:2

**[show - sorry]**                                                    Page 61

106:15 176:6
201:7
**showing** 29:12
42:9
**shows** 106:14
**shut** 13:2 20:20
35:2
**side** 5:16 84:22
184:16,17
249:17 291:13
**sides** 104:12
234:12 239:17
240:14
**sideshow** 36:2
**sidley** 147:19
164:17,20
165:1,3,25
166:18 176:13
176:19,24
177:4,7,9 178:4
179:9 184:11
**signature**
293:16
**signed** 240:11
**significant** 17:2
41:4 163:2
176:19
**significantly**
35:18,19
175:15 224:12
**signing** 141:11
**silence** 119:19
**similar** 207:24
260:12 280:6
**similarly** 243:5

**simple** 58:23
161:7 172:7,8
191:15
**simpler** 268:5
**simply** 6:8
71:24 104:13
123:20 154:7
173:12 181:24
216:17 233:16
236:15 241:7,9
287:24
**simultaneous**
291:13
**singh** 1:12 6:3
6:11,12 16:23
21:6 26:15 28:1
57:2 58:4 77:24
102:8 181:25
203:24 204:1
209:10,11
217:6,8,18,20
217:24 218:7
219:3,9 220:2
291:12,17
292:5,14,20
**single** 57:25
58:1 70:15 76:2
99:14 199:15
201:11 261:21
261:22 279:15
**singular** 70:4
**sir** 77:11
103:14 123:7
164:6 170:14
188:5 191:3
192:9 197:8

205:2 232:17
234:24
**sit** 26:2 158:23
**sitting** 22:7,12
22:14 50:24
205:24 216:21
**situation** 23:10
31:17 33:3 38:4
80:3 101:18,23
104:15 180:22
181:4 238:5
**situations** 23:6
104:8
**six** 115:22
118:7,16,24,24
120:21 121:22
155:4 202:10
**sixth** 170:17
202:11
**size** 117:14
120:18 131:1
134:14 140:19
**ski** 227:10
**skied** 86:20
**skiing** 228:6
**skip** 167:19
196:11
**slaughter**
159:15
**slow** 68:24
**small** 169:7
**smaller** 242:10
**smart** 56:15
**snapshot** 36:22
**snippet** 68:20

**solely** 41:1
195:15
**solution** 25:2,9
25:11 30:2 33:5
117:7,9 144:1
207:9 224:5
260:11
**solutions** 110:5
115:16,18
118:20 147:19
194:25 195:6
195:16,19,23
196:7 202:8
225:4
**solve** 28:10
35:6
**solvent** 95:19
159:25
**solves** 28:16
31:11
**somebody**
12:20 22:9
41:16,20 60:4
74:6 82:14
119:13 261:25
**somewhat**
169:2
**soon** 174:2
**sooner** 109:4
**sorry** 28:9
53:17 91:8
93:14 136:2
146:3 167:22
170:17 174:10
180:20 217:16
217:16,20,23

**[sorry - stop]**                                                    Page 62

221:4 222:12
229:17 235:23
252:9 265:14
271:18 283:20
**sort** 84:12,12
200:22 257:19
257:23 278:8
285:8 287:14
**soto** 20:18
34:25
**sought** 54:11
**sounded** 14:6
**sounding** 64:21
**sounds** 51:14
60:12 82:11
107:2 111:4
138:14 149:25
153:22 261:1
**soup** 96:4
**sources** 251:24
**span** 130:9
**spandex** 169:2
**speak** 36:23
57:13 151:5
262:6,9
**speaking** 48:25
257:14
**specific** 34:19
98:6 168:15
173:7 241:6
**specifically**
16:3 51:6 56:11
95:2,9 97:25
102:22 103:8
111:7 172:18
216:1 232:25

**specification**
168:10
**specificity**
28:21
**speculate**
185:21
**spell** 7:2 161:11
167:17 225:25
**spend** 164:19
**spending** 71:17
**spent** 11:4,10
23:20 71:3,9,12
**spoke** 59:14
262:4
**spot** 253:13
**spread** 134:25
134:25 174:3
187:2
**spring** 63:24
72:12 77:3
78:17 79:9
87:24 88:1
98:10
**stalled** 88:7
**stand** 103:18
151:3 158:23
164:6 190:1
236:8
**standard** 43:2
62:5 103:16,22
103:25 104:7
**standards**
161:17
**standing** 39:12
44:23 56:9 76:9
245:5

**standpoint** 56:2
**start** 17:8 59:8
106:21 167:14
167:17 193:12
194:9 249:25
**started** 8:1,6
110:3 111:1
164:17
**starting** 43:22
102:18 194:10
**starts** 154:6
238:21
**state** 7:1 66:2
120:10 153:19
293:5,20
**stated** 8:12
143:4 239:15
**statement** 9:7
76:12 175:11
175:12 240:12
245:3 256:13
**statements** 30:8
**states** 161:14
161:15 162:13
**stating** 258:12
**stay** 21:17
165:2 188:21
203:17 229:21
**steamroll**
232:12
**steering** 127:3
127:24 137:19
180:22 267:7
277:15
**stengel** 10:17
82:19 175:25

**stenographic...**
1:21
**step** 90:8,9,10
90:12,16 91:5
91:19 92:4,15
92:17,21,25
93:21,23 94:1,7
94:19 146:10
146:10,10,10
147:21 191:17
210:22 224:22
224:23 225:11
**steps** 92:1
**steve** 2:9 4:18
**stick** 90:2
150:16
**sticker** 156:15
**sticking** 33:20
44:19 76:5
**stickler** 276:13
**stipulate** 28:11
28:24 29:3
**stipulated**
33:12 56:14
103:2
**stipulating** 29:1
56:17
**stipulation**
29:16,18,22
31:6,13 32:9,24
33:11
**stock** 162:6
170:22 171:3
204:5,14
**stop** 27:24 40:3
72:9 104:24

**[stop - support]**                                                Page 63

189:8 199:3
274:7
**stopped**  123:21
**story**  33:20
34:11 94:14
**straight**  216:12
**strange**  168:11
**strategies**  48:3
50:25 58:1
188:10 189:6,8
189:14
**strategy**  46:24
51:8,13,14,17
51:19 77:24
82:13 83:18
91:5 99:9 108:7
189:10 190:22
197:19 282:1
283:1
**street**  2:9
**strength**  76:6
78:19 79:24
**strengths**  95:14
96:9
**strike**  122:11
**strongly**  15:15
104:21
**structural**  96:2
96:12,14,16,17
96:19,24 98:20
98:22 99:8,13
99:21 100:15
100:20 104:5
106:13,19
107:25 108:6
109:4,8 110:24

113:8 116:1
118:11,17
138:18 146:25
159:12,24
163:15 166:16
168:25 183:14
211:8 212:1
215:13 221:6
222:12 286:15
**structurally**
99:16,24 100:2
100:3 166:20
167:7 206:12
**structure**  83:25
99:11,19,20
100:15 173:16
187:3 199:19
200:8 201:24
202:2 208:2,7
209:4
**structured**
53:14,18
**structures**
17:20
**structuring**
84:21 205:18
**struggle**  207:7
**struggling**
71:11 106:11
115:7 126:17
126:19
**stuck**  34:11
**studying**  61:6
**stuff**  35:14,23
47:10 56:15
103:1 161:8

183:11 279:7
**style**  281:16,16
**subcommittee**
85:20,24
**subcomponent**
148:13
**subject**  27:1,3
27:22 30:24
46:3 64:3 95:7
95:24 175:17
**submission**  6:6
120:11 291:13
**submissions**
34:16 120:10
**submit**  35:8
**submitted**
16:25 29:23
31:12 120:7
231:25,25
232:1,3 236:2
255:4 260:3
**subpoena**
248:18
**subsequent**
16:20 255:18
257:7
**substance**  12:6
13:23 46:16
51:21,22 54:21
67:11 73:18
88:22 92:8
127:2,8 216:15
217:5 279:13
281:3
**substantially**
204:16

**substantive**
13:17 65:6
181:17 279:16
279:25 280:2,4
280:8
**successfully**
212:2
**sudden**  120:20
121:13
**suddenly**  47:13
**sufficient**  49:20
52:25
**suggest**  198:4
245:10,11,16
**suggested**
259:14
**sullivan**  10:14
**sum**  51:21,22
162:20
**summarize**
69:4
**summer**  12:18
88:7 91:6,7
92:10 93:6,9,17
94:4 98:10
166:2 177:3
**summer's**
139:8
**super**  34:20
43:7
**superior**  1:1
**supplied**  216:13
**support**  48:8
49:5,6 144:1
213:15 218:3
218:25 219:2

[support - talk]                                                    Page 64

| | | | |
|---|---|---|---|
| 219:13,14 | 234:13 239:22 | **tag**  152:18 | 110:12,20 |
| 221:25 222:3,4 | 241:17 246:7 | **take**  9:5,14 11:3 | 120:24 121:24 |
| 222:20 228:3,7 | 247:24 264:22 | 27:25 38:8 90:5 | 122:1 124:11 |
| 286:18 287:6 | 276:20 282:6 | 90:18 98:8 | 128:2,12 |
| 289:12 | 289:18 | 110:10 123:18 | 129:11 130:22 |
| **supported** | **surprise**  60:1 | 131:2 132:16 | 131:2 134:16 |
| 153:18 154:25 | 85:25 94:5 | 132:18 134:16 | 135:2 141:15 |
| **supporting** | 97:22 137:17 | 136:25 137:3 | 143:5 148:3,7 |
| 133:1 | 142:23 | 145:17 147:10 | 148:10,15,23 |
| **suppose**  107:7 | **surprised**  98:7 | 161:20 162:5 | 149:1,8,13 |
| 177:20 183:10 | 116:14 | 163:7 173:17 | 157:6,16 |
| **supposed**  26:10 | **surrounding** | 187:4 197:4 | 160:12 170:2 |
| **supreme**  35:9 | 87:22 | 219:22 222:6,8 | 173:23 181:20 |
| 104:22 | **sustain**  216:23 | 224:22 225:10 | 183:8 186:14 |
| **sure**  12:16 18:9 | **sustained**  8:19 | 225:17 235:11 | 186:19,21 |
| 21:8,11 25:18 | 190:23 | 243:11 253:11 | 200:18 201:3 |
| 30:23 34:14 | **sustaining** | 253:13,18 | 201:16 212:17 |
| 37:12 39:15,17 | 190:24,25 | 254:8 260:6 | 218:12 227:6 |
| 45:13,18 47:24 | **switching** | 266:19 271:14 | 230:1 235:13 |
| 48:12 55:17 | 136:19 174:10 | 271:16,19 | 236:3 238:9 |
| 65:15 66:13 | 184:16,17 | 272:22 273:15 | 239:12,16 |
| 67:25 70:6,10 | **sworn**  7:7 | 273:17,21,24 | 240:13,14 |
| 74:12,13 80:9 | 226:5 | 274:8 277:14 | 252:1 256:14 |
| 81:21,24 85:17 | **system**  55:23 | 278:15 292:23 | 257:21 258:23 |
| 86:12 87:15,18 | 160:7 167:6,11 | **taken**  90:23 | 259:8 262:1,22 |
| 107:14 109:13 | 186:24 | 127:4 150:25 | 264:17 265:2 |
| 121:10 124:24 | | 212:21 254:10 | 265:21 267:25 |
| 125:17 126:3 | **t** | **talc**  1:3 7:20 | 278:5,7 283:5 |
| 126:13 128:22 | **t**  3:12 293:1,1 | 8:2 10:7 11:10 | 285:24 |
| 142:4 145:19 | **tab**  143:14 | 11:13,19 17:17 | **talcum**  4:6 |
| 150:11 167:9 | 147:4 152:4,11 | 19:9 21:22 39:3 | **talk**  26:13 |
| 172:20 175:6 | 240:4 260:7 | 45:12 54:9 | 43:18,20 96:9 |
| 176:9 183:20 | **table**  96:9 | 57:25 65:19 | 120:17,23 |
| 189:18 203:14 | 98:25 163:19 | 70:14 91:20 | 124:6 125:1,2 |
| 208:23 218:17 | 265:9 | 94:8 96:6 97:2 | 127:8 144:22 |
| 224:7 227:21 | | 99:22 100:17 | 144:25 161:6 |

**[talk - testimony]**                                                          Page 65

| | | | |
|---|---|---|---|
| 161:10 166:15 | **tcc** 83:20 85:19 | 141:24 142:10 | 286:17 287:7 |
| 166:18 203:13 | 85:19 86:8 | 157:2 166:11 | 289:17 |
| 227:3 255:15 | 228:2 255:3 | 176:21,25 | **terminate** |
| 259:9 261:13 | 259:10 | 190:10 196:25 | 34:22 |
| 261:16 | **tcc's** 85:23 | 215:12 221:9 | **terms** 37:14 |
| **talked** 15:2 | **tdp** 72:24 73:8 | 221:14 224:2 | 52:6 83:19 |
| 22:2 52:4 64:19 | **tdps** 73:1,2,4,5 | 224:13,19 | 121:5 141:12 |
| 96:1 125:19 | 73:6,19,25 74:5 | 225:24 242:16 | 142:23 144:13 |
| 163:23,24 | 74:9,11,13 | 244:14 250:25 | 177:1 219:6 |
| 168:8 191:25 | **team** 17:15 | 257:13,16 | 275:21 292:2 |
| 242:4,5,5 | 18:14,15 23:25 | 266:19 267:14 | **terrell** 274:1 |
| 261:18 263:16 | 45:7,9 46:9,14 | 270:3 272:23 | **test** 13:10,23 |
| 263:17 270:22 | 53:2,4,13 54:5 | 273:22 274:9 | 15:25 47:7 |
| 287:10,11 | 54:16,16 72:18 | **telling** 65:4 | 276:18 278:9 |
| 289:12 | 73:3,18 84:13 | 113:2 115:9 | **testified** 7:7 |
| **talking** 15:17 | 84:16,17 91:23 | 117:5,8 137:25 | 23:11 31:9 32:5 |
| 15:18,21 22:15 | 92:9 97:11 | 245:8,15,23 | 33:16 55:24 |
| 35:22 40:25 | 99:18 100:7 | 266:13,14 | 67:19 93:6 |
| 41:16,21 50:24 | 144:12 204:25 | 270:1 | 188:14 189:25 |
| 53:25 54:2 | 210:6,15,15 | **temporal** | 197:25 204:23 |
| 56:10 65:19 | 239:10 | 241:14 | 204:24 220:6 |
| 68:1 70:1 84:18 | **teams** 18:15 | **ten** 26:1 265:21 | 226:5 233:8 |
| 92:13 103:4 | 45:6 46:3 | **term** 79:5,11 | 286:21 |
| 108:20 125:1 | **tears** 159:6 | 129:3 272:19 | **testify** 5:3 |
| 133:5 137:24 | **tec** 206:16 | 273:7,10 274:2 | **testifying** 63:2 |
| 139:8 168:9,13 | **technical** 6:1 | 274:21 275:3 | **testimony** 5:7 |
| 168:25 174:13 | **ted** 85:22 | 275:10,11,14 | 14:10,12 15:22 |
| 176:16 180:3 | 127:19 | 275:14,21,25 | 16:16 32:10 |
| 180:25,25 | **tedium** 183:13 | 275:25 276:1,7 | 38:17 41:9 57:8 |
| 211:24,25 | **tell** 12:19 15:7 | 276:9,11,14,15 | 76:23 77:6,14 |
| 214:12 216:7 | 55:10 56:18 | 276:21 277:2,2 | 77:19 112:15 |
| 221:6 230:13 | 70:14 72:3 | 277:3,12,21 | 120:16 129:23 |
| 245:6 246:17 | 111:5,16,23 | 278:23 279:6 | 156:22 185:10 |
| 246:17,19,20 | 115:11,11 | 279:17 280:5,6 | 200:24,25 |
| 246:22,23 | 121:16 137:23 | 280:12,19,24 | 201:1 212:12 |
| 255:25 269:20 | 138:21 139:18 | 281:11,14 | 217:10 223:6 |

[testimony - thornburg]                                              Page 66

| | | | |
|---|---|---|---|
| 223:16 233:3 | 292:20,22 | **think** 9:2 14:7 | 174:21 177:14 |
| 234:17 236:7,7 | **thanks** 90:21 | 15:16 16:2 25:2 | 177:23 187:12 |
| 238:5,16 243:3 | 194:16 197:20 | 25:9,10 29:6 | 188:1 192:3 |
| 243:4 247:6 | 292:23 | 36:2 38:16 40:1 | 198:9,10 203:2 |
| 256:3,6 260:8 | **theory** 34:21 | 43:9,11,12 | 203:11 206:8 |
| **testing** 47:17 | 108:11 | 49:25 51:20 | 213:20 214:6 |
| **texas** 90:8,8,10 | **thing** 15:11 | 57:2,8,20,20 | 214:17 220:5,7 |
| 90:12,15 91:5 | 34:2 95:18 | 60:13,23 63:4,6 | 220:11 222:23 |
| 91:19 92:1,4,15 | 102:19 104:24 | 63:7,8 64:2,14 | 225:19 238:9 |
| 92:17,21,25 | 176:15 179:1 | 64:15,18 65:6 | 240:19 241:6 |
| 93:21,23,25 | 184:19 200:9 | 67:21 70:5 | 241:11,23 |
| 94:7,19 147:21 | 224:2,6,13,19 | 71:16 75:2,22 | 242:17 245:24 |
| 191:17 210:22 | 230:15 232:13 | 78:9,12,13 80:2 | 246:4,7 257:3 |
| **thank** 4:2,15,20 | 250:22 258:25 | 84:15 86:16 | 258:9 268:5 |
| 5:1,20 6:21 7:8 | 259:2 | 88:2,6,24 89:16 | 279:22 280:15 |
| 18:1 19:20 28:3 | **things** 17:9,12 | 89:16,18 90:4 | 283:11,11 |
| 36:6 43:16 | 24:12,23 25:22 | 91:7 93:3 | 289:5 290:11 |
| 44:15 45:2 | 27:10 29:9 | 101:16 102:4 | 291:18,19 |
| 51:18 69:9 | 37:14 47:14 | 102:19 103:7 | **thinking** 18:5 |
| 90:20 91:1 | 57:20 62:17 | 103:22 105:15 | 18:13 51:18 |
| 102:7,11 105:9 | 64:18 65:10 | 108:16,22 | 61:25 69:7,8 |
| 126:24 128:19 | 70:23,23 71:18 | 109:21 112:13 | 71:10,12 76:1 |
| 150:4,5,21 | 73:16 76:19 | 114:17,24 | 108:4,13,15,23 |
| 151:1,20,24 | 78:23 81:4 | 119:24,25 | **thinks** 62:23 |
| 157:18 158:21 | 82:23 85:2 | 120:7,19 | 74:6,7 171:18 |
| 181:7 186:3 | 94:25 99:5 | 122:22 127:21 | 225:16 234:9 |
| 193:25 197:14 | 118:7,16,24 | 129:22 133:23 | **third** 111:9 |
| 203:23 209:15 | 120:21 145:25 | 136:12,16,21 | 117:5 131:15 |
| 209:19 220:2 | 176:24 177:20 | 138:1,5,17 | 139:6 142:20 |
| 223:18 225:21 | 179:4 181:6 | 139:1,23 | 170:17 188:20 |
| 226:6 228:19 | 198:25 211:17 | 142:18 145:24 | 204:12 248:18 |
| 231:2 234:19 | 212:15,21 | 151:15,25 | 269:20 277:7,7 |
| 235:7 237:10 | 215:23 216:4 | 155:18 159:15 | **thomas** 111:10 |
| 239:3 249:2 | 258:11 272:18 | 159:23 163:23 | **thornburg** |
| 254:12 258:6 | 275:4 276:23 | 167:20 170:24 | 187:25 |
| 283:16 291:5 | 287:11 290:10 | 172:11,19 | |

[thought - told]                                                    Page 67

| | | | |
|---|---|---|---|
| **thought** 37:21 | 23:1,14,20 | 187:23 195:3 | 136:7 149:24 |
| 51:10 52:1 | 27:21 28:15,18 | 196:4 197:1,17 | 150:6 156:22 |
| 53:21 58:21 | 31:10 32:6,8 | 197:21 201:5 | 171:22 172:4 |
| 90:14 102:22 | 33:13,22 40:7 | 201:10 221:16 | 173:9 185:1 |
| 108:17 114:7 | 44:18 45:15 | 221:22 222:18 | 195:5 201:17 |
| 140:14 154:5 | 49:23 56:8 57:7 | 227:19,19 | 201:20 226:22 |
| 163:20 170:25 | 58:2 61:18 62:2 | 228:23 229:4 | 229:5 235:20 |
| 171:1,11 | 67:17,17,23 | 233:12 235:11 | 236:7 238:6 |
| 190:18 192:7 | 68:5,9,18 69:8 | 235:14 236:12 | 253:17 254:5 |
| 197:23 198:1 | 69:11 70:3,9 | 236:13 240:24 | 286:22 290:8 |
| 230:12 233:8 | 71:6,9,12,13,14 | 241:2,6,8,12 | 290:20 292:6 |
| 268:8 270:12 | 77:1 78:24 79:3 | 257:1 274:6,25 | **together** 73:25 |
| 270:13,13 | 79:9,15,20 | 290:3,4,13,21 | 128:25 129:3,5 |
| 288:5 292:1 | 87:10,17,20 | 290:24 291:19 | 136:25 163:20 |
| **thoughts** 31:3 | 88:2,9,19 89:1 | 291:20 292:10 | 193:9 198:24 |
| 33:10 57:1 | 89:6,7,18 97:5 | **times** 27:9 | 207:4 227:12 |
| 76:21 197:21 | 97:5,12,14 | 34:11 97:25 | 227:13 261:17 |
| **threat** 166:25 | 100:25 101:3 | 187:7 202:6 | 277:9,12 |
| **threats** 195:3 | 105:23 106:9 | 226:21 273:12 | **toggle** 128:14 |
| **three** 26:2 | 107:1 108:8,24 | 273:14 275:7 | 129:13 130:24 |
| 28:12 34:11 | 110:12 121:2 | 277:22 | 133:15,17,21 |
| 39:10 92:2 | 123:19 124:8 | **timesheet** 56:7 | 133:23 134:10 |
| 104:4 120:7 | 127:6 130:9,21 | 56:7 76:10 87:4 | 135:22,25 |
| 153:12 181:18 | 132:4,10 133:6 | 87:5 | 136:7,11,18,22 |
| 183:4 203:12 | 133:13 137:18 | **timesheets** | 137:12 172:17 |
| 279:11,11,20 | 138:8,22 142:2 | 28:23,25 34:7 | **told** 103:4 |
| 280:1 | 150:17 160:11 | 47:8 56:17,25 | 104:2 106:18 |
| **throw** 96:8 | 162:11 163:19 | 69:11 114:17 | 117:6 121:23 |
| **tied** 17:9 69:21 | 164:4,5,19 | 151:17 | 131:15 142:14 |
| **ties** 105:25 | 165:14,22 | **timing** 108:5 | 142:14 143:7 |
| **tightly** 209:5 | 166:15,17 | 130:10 163:23 | 153:15 157:4 |
| **tightness** 67:7 | 168:19 170:5,6 | 163:25 280:3 | 179:11,11 |
| **time** 8:1 10:3 | 174:2,16 | **titles** 82:5 | 213:4,8,9,13 |
| 10:20,23 11:4,7 | 175:10 176:20 | **today** 30:19 | 227:9 228:3,4 |
| 11:10,13,14 | 178:2 179:9 | 32:13 33:18 | 228:24 229:1 |
| 13:4 16:21 17:4 | 180:1 187:15 | 50:24 115:15 | 259:2 266:21 |

**[told - two]**                                                                 Page 68

267:18 289:18
289:18,18
**tomorrow**
291:1,3
**took**  88:14
139:21 264:11
264:14
**top**  196:11
208:15 231:16
**topic**  216:10
**topically**  36:9
36:11 147:7
**topics**  215:5
**tort**  18:24
37:14,19 46:4
51:24,25 55:23
61:4,6 62:5,7
63:11,13 73:24
74:1,2 82:22,24
83:2 86:2
106:22 107:11
134:5,9 137:4
159:25 160:5,7
161:25 167:6
167:10 174:8
186:24 187:6
205:4,14,19
208:17 239:7
254:19 260:15
261:23
**torts**  62:15
**total**  49:3 62:25
204:17 231:23
236:15 238:12
253:4

**tough**  160:22
**towards**  60:5
**track**  141:20
**traded**  171:3
**trajectory**
106:14,16
108:11,13,24
109:3
**transaction**
116:1,2 117:12
117:22 119:13
123:11,15
134:2 136:2,7,8
207:20 263:22
**transactions**
260:12
**transcribed**
1:21 71:7
**transcript**  1:6
128:25 172:15
201:7 231:9
233:12,14
236:9 237:23
238:2 291:20
293:7,8
**transcripts**
114:16 291:9
292:16
**transfer**  160:20
186:9 211:16
**transition**
253:10
**treasurer**  140:8
**treat**  119:15
**treated**  84:24

**trenton**  8:4
148:19 229:7
229:15
**trial**  106:9
108:18,18,21
**tricky**  198:7
**tried**  249:14
265:24
**trouble**  24:10
30:15 112:20
**true**  11:17
15:19 41:14
64:23 154:12
175:10,12
232:1,15
239:19,25
240:16 246:15
265:3,4,5
266:16 293:8
**trupos**  35:18
104:23
**trust**  63:18,23
67:1 73:9,12
74:3
**trusts**  207:1
**truth**  19:15
**truthful**  144:18
**truthfully**  29:4
**try**  53:15 69:4
90:2 107:9,22
107:24 129:9
137:11 171:18
191:13 207:7
209:20 228:7
**trying**  22:21
58:25 59:11

64:25 72:9 81:4
92:4 96:21
128:8 130:19
130:25 131:7
131:10,22
132:5,9,12,15
132:21 133:14
134:4,7,9,14
137:15 149:4,9
149:15,17
165:19 172:16
184:23 193:9
199:17 203:16
233:17 244:10
258:1 270:12
280:11
**turn**  143:14
147:4 152:11
209:13 217:13
218:20 231:12
231:16 238:1
240:4,10
242:12 250:2
250:25 252:7
**turned**  103:10
**twenty**  150:14
**twice**  27:15
**two**  14:19 25:1
25:10 33:10,21
68:19 70:22,23
84:12,13,13,16
90:8,9,10,12,16
91:5,19 92:1,4
92:15,17,21,25
93:21,23 94:1,7
94:19 114:12

[two - valuation]                                                    Page 69

120:7,10
123:13 126:5
146:24 147:21
160:11 161:2
172:5 181:16
191:17 198:24
206:4 210:22
211:17,18
222:5,7 235:12
236:15,18,24
238:12 279:24
291:13
**type**   12:22
50:16 52:9
107:11 201:25
279:7
**typed**   71:6
**types**   26:1
**typical**   73:22
**typically**   71:18
80:17 82:14
**typo**   279:12
**typos**   276:12
277:2 279:20

**u**

**u.s.**   1:13
**uh**   117:19
**ultimate**   49:8
117:22 141:14
**ultimately**
32:18 36:12
62:21 88:14
105:10 128:6
135:3 138:11
139:24 140:20

162:18 188:22
212:3
**unbeknownst**
137:9
**under**   5:8 37:8
37:11 58:16
102:16 150:23
161:19 197:2
217:15,25
238:20
**undercompen...**
185:8
**underlying**
39:3 80:16
**understand**
12:9,11,13,24
13:15,21 15:8
16:4 18:19 21:1
26:22 27:18
36:8 41:11 42:1
44:16 59:12
60:21,25 63:5
64:2,4,22,23
65:1,4 66:8,9
69:24 71:2 78:7
95:4 96:20
100:10 102:4
105:4,4,12
107:16 110:18
117:13 118:9
124:3 126:15
127:3 132:20
141:22 146:1
175:2 183:15
186:11 194:4
198:2 200:12

223:3,6 235:1,4
241:17 258:7
260:23 263:20
268:23 276:20
282:8,21,24
285:21
**understanding**
24:8 61:7 69:25
110:22 133:4
172:24 223:9
250:20 260:16
265:25 266:2
**understands**
16:7 101:16
**understood**
38:17 51:23
52:12 69:25
77:22 192:2
194:11,24
227:16 263:1
267:23
**undertaken**
85:13
**undoubtedly**
180:6
**unfair**   279:22
**unfiled**   238:7
**unfounded**
37:22
**unique**   292:8
**united**   161:14
161:15 162:13
**university**
177:3
**unlawful**
160:21

**unusual**   133:24
**upcoming**
266:9
**update**   181:13
228:10
**use**   11:22 29:11
41:1 42:10
123:24 133:22
159:1 168:10
237:16 261:10
262:20 284:25
285:10,11
**used**   43:4 44:13
51:20 64:20
106:24 136:22
136:24 168:11
171:19 187:7
212:4 251:24
285:17
**using**   67:8
98:20 230:18
290:15
**usually**   61:19
**utilize**   45:22
**utilizing**   278:20

**v**

**vague**   107:13
**vaguely**   34:16
**valid**   14:8
188:18 281:21
**validity**   37:13
40:11 41:25
73:19 74:11
**valuation**   205:4
205:4,19

[value - want]                                                    Page 70

**value**   19:2 49:1
  49:1,19 50:4
  52:9 58:12,15
  58:20,25 59:3,5
  59:13 85:3
  170:21 199:25
  204:5,13,18
  209:1 214:14
  239:16 240:13
  241:18,18
  244:20 246:18
  246:19,20,22
  266:1 288:10
  288:17
**values**   50:5
  65:2,11 66:5,17
  72:24 73:14
  85:13 128:1
  212:17 216:4
  223:2 242:8
  243:20 247:8
  250:15 251:11
  268:2 278:9
  287:15 288:13
  288:17
**valuing**   59:9,15
  59:24
**van**   140:7
  141:24 142:14
  143:9,17
  144:12,18
  145:22,24
  146:5,13 153:9
  156:3 193:22
  194:5,13
  196:15 197:10

  197:12 220:21
**vanna**   165:11
**variables**
  246:25
**variety**   171:16
  172:10 176:1
**various**   26:2
  271:8
**vendor**   258:17
  259:12,25
  260:10
**versus**   247:18
**vetted**   264:3
**viability**   37:8
  90:16
**viable**   37:17
  267:22,22
  270:7
**vice**   2:14
  177:11,14
**video**   103:4
  180:17
**view**   39:2,3
  168:18 171:9
  175:14 207:11
  235:11 236:14
  243:6
**viewed**   64:10
  260:10 270:7
**views**   18:13
  210:7,11,22,24
**violate**   183:21
**violating**
  157:10 183:25
**virtually**   18:23
  80:3 173:11

**volume**   1:7
**voluntary**
  287:2 289:21
**vote**   50:10,17
  50:21 51:8,15
  52:1 53:7 60:3
  95:17 99:3,4
  117:8 131:4
  132:13 134:17
  137:5,5 199:20
  213:3 215:15
**votes**   49:24
  52:8 58:25 60:4
**voting**   86:25
  87:9,22

**w**

**w**   2:3
**waiting**   146:11
**waive**   15:6
  102:2
**waived**   38:5
  191:11
**waiver**   20:15
  33:4 122:19,22
  124:9,13 155:7
  155:11,22
  259:7,14
**waiving**   42:8
**wake**   131:18
  135:8 180:18
  277:6
**walk**   164:7
  176:13 195:25
  286:24

**wall**   199:17
**walled**   223:11
**want**   6:5,8 12:2
  12:15 15:1,6,8
  17:11 19:16
  21:17 28:22,23
  30:23 37:25
  38:1,8,9 39:17
  39:22 44:24
  47:14 55:8,9,10
  58:6 67:20
  68:16 72:8 76:9
  76:10,11 78:23
  80:8,9 89:10,10
  89:20 94:10,25
  95:6 100:8
  102:1 105:20
  108:7 109:4,7
  109:11 113:14
  115:2 127:7,7
  128:20 141:20
  146:9 150:16
  159:1 165:11
  174:25 176:14
  176:16,22
  181:3 185:21
  186:10 187:4
  193:12 196:13
  198:13 201:7
  203:5 209:8
  217:9 218:15
  218:17,19
  221:6 222:6
  225:13 228:15
  233:18 234:22
  241:16 245:8

**[want - witness]**                                                    Page 71

253:16 260:6
266:11 267:4
267:15,24
268:15,15
269:9,9 271:16
274:7,23
280:21 290:9
**wanted**   69:25
81:14 131:2,12
132:10,11
134:15 135:16
135:16 136:1
149:20 166:24
172:17 180:21
181:6 183:15
206:10 230:20
253:12 263:7
266:8,21
267:10,18,25
268:12,18,19
268:21 269:7
269:11,16,18
269:22 276:21
**wants**   13:9
31:23 35:12
77:15,16
133:18 136:20
136:20 151:11
164:7,9 185:6
185:14,14
189:25 190:1
232:12
**warranted**   5:8
**washington**
2:10

**watched**   207:6
**wave**   35:21
**way**   14:3,20
18:10,21 20:1
36:15 40:14
54:20 63:7
73:21,21 82:3
92:6 106:21
109:3,4 110:16
117:23 118:11
135:24 140:17
156:8 157:1
160:20 163:17
197:9 201:19
207:12,12
212:23 249:19
251:22 268:1,1
273:10 288:10
289:9
**ways**   81:19
**we've**   13:7
16:13 28:10
32:19 103:9
158:11 182:5
254:6
**weaknesses**
95:14 96:9
**wednesday**
196:14
**week**   152:7
291:15
**weekly**   68:24
**weeks**   126:5
146:24 153:12
197:15 279:11
279:11,20

280:1 291:14
**weil**   10:13 45:7
45:9 46:9 47:9
53:2,13 54:5,16
82:18 174:17
175:19 176:3
210:2,7
**welcome**
151:22 164:6
209:17
**went**   75:4
165:1 177:20
179:24 180:17
204:5 221:13
255:20 257:23
262:16 273:11
273:13 277:22
279:13,19
**whichever**
165:18
**white**   10:6,9
11:23 83:13
91:13 95:23
98:1,3 136:23
140:10 141:24
165:11 175:22
176:4 194:14
194:18 196:16
**wide**   2:14
177:18,19
**willing**   5:15
144:22 145:20
160:14 219:1
286:22,23
287:8

**willkie**   86:5
**win**   108:18
266:17,17
**winter**   87:24
98:4
**witness**   3:3,9
4:13 5:4 7:3
18:21 19:21
25:16 26:24
27:20 31:22
39:15,22 40:16
40:20 41:13
43:2 45:3 47:22
51:7 55:16,18
58:15 60:23
61:2 63:6,10
64:17 66:8,12
69:2 73:9 75:11
76:15 89:3,20
89:24 90:2,7
93:25 95:13
102:14 103:18
107:18 109:25
110:20 113:24
119:8 121:9
122:15 123:10
125:16,24
126:12,15
130:7 136:6
146:14 147:12
150:24 151:3
152:21 154:10
155:17 156:18
165:15,16
176:10 184:5
191:19,22

**[witness - yeah]**                                                                 Page 72

| | | | |
|---|---|---|---|
| 192:23 204:6 | 108:25 110:12 | 129:20 130:21 | **written**  3:15 |
| 204:11,20 | 113:7 118:18 | 167:14 184:21 | 6:4 116:15 |
| 205:2,7,22 | 134:9 149:12 | 184:23 185:2 | 124:20,23 |
| 208:1,3,9,12,19 | 159:14,20 | 196:6 221:10 | 181:14 236:8 |
| 208:22 214:6 | 166:17,19 | 221:15 224:3 | 291:7,9 |
| 217:16,19,22 | 169:6 179:9 | 227:9,10,12,13 | **wrong**  61:16 |
| 218:6,10 219:8 | 188:14,15 | 227:20 259:4 | 80:7 159:23 |
| 219:11 226:1 | 201:14 210:16 | **works**  67:5 | 283:10 289:10 |
| 227:25 232:8 | 211:14 215:5 | 83:25 117:5,9 | **wrote**  143:21 |
| 232:14 233:15 | 216:3 220:14 | 118:12 180:5 | 147:16 152:15 |
| 234:4,20,24,25 | 223:8 240:22 | 211:9,22 | 153:5,9 194:5 |
| 235:1,4,8 | 241:10,19,25 | 234:11 278:17 | 197:1 220:21 |
| 236:24 241:16 | 242:22 243:8 | **world**  2:14 53:8 | 240:11 |
| 242:23 243:23 | 243:20 244:5 | 56:2,3 162:3 | |
| 258:9 268:25 | 246:9 247:8,9 | 172:12 175:20 | **x** |
| 282:10 | 247:14,18,20 | 176:2 238:6 | **x**  3:12 65:25 |
| **witnesses**  114:6 | 248:4,11,13,15 | **worldwide**  9:20 | **y** |
| **wonder**  29:17 | 250:18 251:13 | 9:24 | **y**  65:25 |
| 31:5 | 251:17 252:2 | **worth**  206:25 | **yeah**  9:18 17:6 |
| **word**  11:22 | 252:22 253:1 | 241:2 246:5 | 22:13 23:16 |
| 48:18 80:8 | 255:19,23 | **wrap**  151:25 | 31:18 34:1 42:3 |
| 128:16 133:23 | 262:1,21 | **wrapped** | 51:15 55:18 |
| 168:9,11,11 | 264:25 267:15 | 212:20 287:16 | 59:4 61:12 |
| 247:18 261:10 | 272:5 277:3 | 287:24 288:14 | 66:12 69:2,24 |
| 288:1 | 280:25 281:20 | **wrapping** | 70:25 82:2 89:3 |
| **words**  51:20 | 287:13 288:2,6 | 151:5 | 96:7 104:18 |
| 67:8,10 96:22 | 291:2,3 | **write**  165:11,14 | 105:22 107:8 |
| 113:2 187:7,13 | **worked**  64:22 | 165:22 192:11 | 109:21,25 |
| 236:8 243:19 | 68:2,25 136:25 | 193:2 202:19 | 112:17,22 |
| 285:4 | 199:12 261:16 | 206:6 | 119:24 122:21 |
| **work**  10:22 | 265:6 285:23 | **writes**  187:24 | 122:22 127:1 |
| 11:1,5 25:21 | 286:13 | 188:3 | 136:5 137:13 |
| 36:24 38:19 | **working**  52:7 | **writing**  34:25 | 137:17 139:10 |
| 57:21,24,24 | 79:4,11 104:11 | 124:25 147:1 | 141:6 143:3,20 |
| 60:10 62:14 | 128:17,25 | 182:1 | 153:21 155:6,7 |
| 70:13 95:16 | 129:2,4,8,9,19 | | 157:22,22 |

164:9,11,13
166:1 167:21
168:1,4,17,23
176:9 183:10
185:24 188:1
192:20 196:18
204:6 205:22
211:11 214:4
214:23 215:10
217:8 218:10
219:8 223:3
224:18 225:15
229:2 234:14
238:18 241:13
248:20 253:12
291:18 292:4
**year** 8:7,7
86:21 111:3
121:22 126:6
137:8 138:13
139:25 142:21
171:22,23
172:4,9 173:9
173:22 177:4,5
177:10 215:6
220:23 230:5
235:15 236:14
236:16 237:6
237:24 238:17
243:15 251:18
256:15,18
271:5 281:8
**year's** 139:3
**years** 35:7,8
58:24 62:15
109:6 172:6

173:22 177:8
206:15 240:25
265:22 292:8
**yep** 58:9
**yield** 171:23
172:4,9 173:9
**yuna** 13:1
20:17 34:12
47:16

**z**

**zoom** 103:12,13
281:1

New Jersey Rules Governing Civil Practice

Part IV, Rule 4:14

Depositions Upon Oral Examination


4:14-5. Submission to Witness; Changes; Signing

If the officer at the taking of the deposition is a
certified shorthand reporter, the witness shall not
sign the deposition. If the officer is not a
certified shorthand reporter, then unless reading
and signing of the deposition are waived by
stipulation of the parties, the officer shall
request the deponent to appear at a stated time for
the purpose of reading and signing it. At that time
or at such later time as the officer and witness
agree upon, the deposition shall be submitted to
the witness for examination and shall be read to or
by the witness, and any changes in form or
substance which the witness desires to make shall
be entered upon the deposition by the officer with
a statement of the reasons given by the witness for
making them. The deposition shall then be signed by
the witness. If the witness fails to appear at the
time stated or if the deposition is not signed by
the witness, the officer shall sign it and state on
the record the fact of the witness' failure or

refusal to sign, together with the reason, if any,

given therefor; and the deposition may then be used

as fully as though signed, unless on a motion to

suppress under R. 4:16-4(d) the court holds that

the reasons given for the refusal to sign require

rejection of the deposition in whole or in part.

DISCLAIMER: THE FOREGOING CIVIL PROCEDURE RULES

ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.

THE ABOVE RULES ARE CURRENT AS OF APRIL 1,

2019. PLEASE REFER TO THE APPLICABLE STATE RULES

OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.