

faegredrinker.com

**Susan M. Sharko**
Partner
susan.sharko@faegredrinker.com
973-549-7350 direct

**Faegre Drinker Biddle & Reath LLP**
600 Campus Drive
Florham Park, New Jersey 07932
+1 973 549 7000 main
+1 973 360 9831 fax

***Via ECF***

May 8, 2024

Honorable Rukhsanah L. Singh, U.S. Magistrate Judge
United States District Court- District of NJ
Clarkson S. Fisher Building & U.S. Courthouse
402 East State Street, Court Room 7W
Trenton, NJ 08608

***Re:    In re: Johnson & Johnson Talcum Powder Products
Marketing, Sales Practices and Products Liability Litigation -
MDL 2738***

Dear Magistrate Judge Singh:

I write on behalf of the Johnson & Johnson Defendants to provide a copy of the transcript of the May 3, 2024, continued plenary hearing regarding disqualification of Beasley Allen.  This is the transcript produced by the court reporter retained jointly by the parties.   The official transcript prepared through the audio recording in the court room is not yet available.

Thank you for your consideration of these matters.

Respectfully,

/s/ *Susan M. Sharko*
Susan M. Sharko
**FAEGRE DRINKER BIDDLE & REATH LLP**

SMS/scg
Encl: (1)
Cc: All counsel of record (via ECF)

Page 1

1              SUPERIOR COURT OF NEW JERSEY
               LAW DIVISION - ATLANTIC COUNTY
2              Docket No. ATL-L-2648-15

3

      IN RE: TALC-BASED POWDER      : CIVIL ACTION
4     PRODUCTS LITIGATION           : CASE NO. 300

5

6                    -   -   -
             TRANSCRIPT OF PLENARY HEARING
7                  (VOLUME III)
                     -   -   -

8

9   PLACE:      ATLANTIC COUNTY CIVIL COURTHOUSE
                1201 BACHARACH BOULEVARD
10              ATLANTIC CITY, NEW JERSEY
11  DATE:       MAY 3, 2024
12  BEFORE:     THE HONORABLE JOHN C. PORTO, P.J.Cv.
                THE HONORABLE RUKHSANAH L. SINGH
13              U.S. DISTRICT COURT MAGISTRATE

14

15

16

17

18

19

20                   -   -   -

21     Stenographically reported and transcribed by:
22        Constance E. Perks, CRR, CCR, CRC, RSA
              NJ CCR License #30XI00142900

23

24        GOLKOW LITIGATION SERVICES, LLC
         ph 877.370.3377  |  fax 917.591.5672
25             deps@golkow.com

Page 2

1                    A P P E A R A N C E S:

2

    FOX ROTHSCHILD LLP
3   BY: JEFFREY M. POLLOCK, ESQUIRE
            AUSTIN HILTON, ESQUIRE
4   Princeton Pike Corporate Center
    997 Lenox Drive
5   Lawrenceville, New Jersey 08648
    609.896.3600
6   jpollock@foxrothschild.com
    ahilton@foxrothschild.com
7   Representing Andy D. Birchfield, Jr., Beasley Allen

8

    O'MELVENY & MYERS LLP
9   BY:  STEPHEN D. BRODY, ESQUIRE
    1625 Eye Street N.W.
10  Washington, DC 20006
    202.383.5300
11  sbrody@omm.com
    Representing Johnson & Johnson, LTL Management, LLC

12

13  ALSO PRESENT:

14  Erik Haas, Johnson & Johnson
    World Wide Vice President, Litigation

15

16

17

18

19

20

21

22

23

24

25

Page 3

1                              -   -   -
                          EXAMINATION
2                              -   -   -
3
     WITNESS:   ANDY BIRCHFIELD                PAGE
4
     Cross ...............................    22
5
     Redirect ............................    86
6
     Recross .............................    138
7
     Further Redirect ....................    147
8
9
10                             -   -   -
                     E X H I B I T S
11                             -   -   -
12   NUMBER              DESCRIPTION           ID    EVD
13   J&J 1A          Transcript Excerpt       147
14   J&J 1B          Transcript Excerpt       147
15
16
17
18
19
20
21
22
23
24
25

                                        Page 4

1                    (Hearing commenced at 9:38 a.m.)

2                    THE COURT:  Thank you.  Good morning,

3    everyone.  Please be seated.  Very nice to see

4    everyone.

5                    This is In Re: Talc, In Re: Johnson &

6    Johnson Talc-Based Products Litigation, Docket No.

7    ATL-L-2648-15, and MDL Case 2738, MCL Case 300.

8                    May I have the appearance of counsel.

9    We'll start with Mr. Pollock.

10                   MR. POLLOCK:  Good morning, Your

11   Honor.  How are you?

12                   THE COURT:  Fine, thank you.  Good to

13   see you.

14                   MR. POLLOCK:  I'm here on behalf of

15   Mr. Birchfield and the Beasley Allen law firm, and

16   I'm joined with my associate, Austin Hilton.

17                   MR. BRODY:  Thank you.  Good morning,

18   everyone.

19                   And Mr. Brody.

20                   MR. BRODY:  Good morning, Your Honor.

21   Steve Brody from O'Melveny & Myers for Johnson &

22   Johnson and LLT Management LLC.

23                   THE COURT:  Thank you.  Good morning

24   to you.

25                   Mr. Haas.

Page 5

1                    MR. HAAS:  Good morning, Your Honors.
2     Erik Haas on behalf of Johnson & Johnson.
3                    THE COURT:  Thank you.  Good morning
4     to you.
5                    We've been together so many times.
6     We have a continuation of your client's testimony,
7     Mr. Pollock.  We've got the correspondence.  We've
8     got the attorney's eyes only material.  And anything
9     to address before we go forward with the testimony?
10                    MR. POLLOCK:  I think there's two
11    preliminary matters, and I -- you know, the Courts,
12    Courts -- the Courts can run this any way they want.
13    One is the admission of P-5.
14                    P-5 was the document that was the
15    response from Mr. Conlan.  The issue that -- we
16    tried to work it out as counsel.  We could not.
17    Opposing counsel is objecting to the statement by
18    Mr. Conlan, he did not recommend.  There was
19    testimony on this point.  I submitted the
20    correspondence.  At some point, we need to address
21    that issue.  It doesn't need to be addressed now.
22    If you want to, we can, but it's completely up to
23    you and to my opposing counsel.
24                    The second one is the belated
25    submission of timesheets in a redacted format.  And

Page 6

```
1   I have -- I don't know whether you want to hear oral

2   argument on this now, or do you want formal

3   submissions, but I object to it.  I object to it

4   because I asked for it prior to these hearings.  I

5   objected to it because Yuna says that you can

6   produce it in camera, but it didn't say you can

7   produce it in camera after three witnesses, three

8   key witnesses have taken the stand and left; and, in

9   particular, Mr. Conlan, who they are attacking.

10                  If they had wanted -- they've had

11  these documents.  They prepared an Excel sheet.  So,

12  if you want me to, I can prepare a formal response,

13  but I understand the Court didn't invite submission

14  of these documents, and I read the transcript and

15  I'm sure you know what you said.

16                  But to me, this is completely

17  violative of due process as far as Mr. Conlan's

18  rights, and I don't represent him, but the fact is,

19  by the implication, if you will, they're saying the

20  two of us are hooked together.

21                  So I would like to know, does the

22  Court want oral argument right now?  Does it want to

23  have briefing later on?  How would Your Honors like

24  to proceed, because I do object to their admission.

25                  THE COURT:  Let's hear from Mr. Brody
```

Page 7

1    first.  And then what we can do is -- I'm not so

2    sure about oral arguments now.  Maybe let's start

3    with the testimony.  Judge Singh and I will confer,

4    after we hear from counsel, and then we will render

5    our thoughts and decision on that issue.  Okay?

6                    Mr. Brody.

7                    MR. BRODY:  Certainly, Your Honor.

8    And as Your Honors are aware, after the lunch break

9    on April 10th, the Court indicated that Johnson &

10   Johnson would be entitled to make an in camera

11   attorneys' eyes only submission with redactions

12   where we felt redactions needed to be made in order

13   to maintain privilege, really as impeachment of

14   instances where Mr. Conlan testified to things that

15   are flatly contradicted by the record of what he did

16   as J&J's counsel, J&J's outside counsel on the talc

17   litigation on these very matters over the course of

18   20 months where he represented the company.  And so

19   that's what we did.

20                    I think that -- I don't think there's

21   an objection to the submission of impeachment

22   evidence that would be proper.  I do think that if

23   Mr. Pollock wants to, in the briefing that Your

24   Honors have indicated that you wish to receive from

25   the parties after the conclusion of this hearing, if

Page 8

1  he wants to argue as to how that should or should

2  not be considered by the Court, and the weight that

3  it should be given as impeachment, he is certainly

4  entitled to do that, and the briefing will give him

5  the opportunity to do that, and the Court then will

6  have an opportunity to decide how, based on

7  briefing, it wants to consider those materials and

8  the extent to which it believes those materials are

9  material to its evaluation of Mr. Conlan's

10  credibility and his testimony overall.

11              THE COURT:  Well, our record is not

12  closed, and there's not been any decision on closing

13  the record.  So, you know, keeping in mind we also

14  have a confrontation issue, right, with regard to

15  certain material, and it's -- I'm going to suggest

16  to you that Judge Singh and I, perhaps, anticipated

17  this argument, that maybe there's another way to

18  address this, Mr. Brody and Mr. Pollock.

19              So let's start with the testimony.

20  Judge Singh and I will confer, and we'll address

21  counsel.  All right?

22              MR. POLLOCK:  Thank you.

23              MR. BRODY:  Understood.

24              THE COURT:  With the testimony today

25  of Mr. Birchfield, can you give us at least an

Page 9

1  understanding or a heads-up with regard to time

2  frame?  This is a continuation, candidly, of

3  Mr. Birchfield's testimony.  Are we going to be all

4  day?

5              MR. BRODY:  No, I don't think we're

6  going to be all day.  And I was looking back at the

7  transcript from April 10th and I saw that I told the

8  Court at 4:30 p.m. that day that I thought I had 30

9  minutes left.  It might be 40.  But I'm going to try

10 to hold close to what I said on the 10th.

11             THE COURT:  It just gives us an idea

12 of about where our day is.  Okay.

13             MR. BRODY:  Obviously, how long we're

14 here then will depend on what Mr. Pollock raises

15 with Mr. Birchfield and any redirect that I may

16 have.

17             THE COURT:  Thank you, Mr. Brody.

18             Mr. Pollock, any thoughts?  We don't

19 have a time -- you know, we don't have a stop watch

20 on everybody.  Just to give us an idea.

21             MR. POLLOCK:  I acknowledge the fact

22 that I respect both judges have been patient and

23 you've committed the time to this hearing.  I do

24 thank you for that.  I understand we also want to

25 get this job done, and I respect that, too.

Page 10

1                     It did not miss me that yesterday

2    Mr. Haas went out on national press on the news and

3    attacked Mr. Birchfield and his firm on the same

4    vein he's attacking him here today; that this is

5    self-interest, that this is just a big pay day for

6    Beasley Allen, et cetera.

7                     I'm also very mindful that with

8    regard to the -- one of the things they are directly

9    attacking is whether Beasley Allen should maintain

10   its position on the talc claimants committee and

11   should it be involved in the future.

12                    I have to take this job seriously,

13   because I respect and I know the Beasley Allen firm

14   is committed to what it is doing.  I have to allay

15   any concerns you have that that firm is not out

16   there for a pay day.  They are out there to protect

17   their clients.  Mr. Birchfield will explain that on

18   the stand.  And, respectfully, it takes whatever

19   time it takes.  I will do it as quickly as I can.

20                    But, obviously, we were very patient

21   with Mr. Haas, who talked ad nauseam in narrative.

22   And I, therefore, I don't want to waste your time,

23   but I also -- I can't commit to a specific time

24   frame.  I will do it as quickly and efficiently as I

25   can.  But as you both understand, this is a very

Page 11

```
 1   serious matter for a firm that is completely
 2   committed to its clients, and I have to protect
 3   them.
 4               THE COURT:  This Court -- I didn't
 5   see any comments, and I will have Judge Singh
 6   address it, too.  This Court has no position with
 7   regard to Mr. Birchfield or J&J.  The decision here
 8   with regard to this decision is going to be based on
 9   the facts and the facts only.  Whatever is going on
10   in the litigation and whatever the comments are, pro
11   or against any of the firms have no bearing,
12   Mr. Pollock, Mr. Brody, on this Court's decision on
13   this particular issue, or even going forward, should
14   we have any substantive issues.
15               We have a trial coming up in
16   September, although it's not with Beasley Allen.
17   But under no circumstances have I heard or thought
18   anything that would cause this Court to recuse
19   itself or to issue an adverse decision related to
20   either J&J or Beasley Allen.
21               MR. POLLOCK:  Right.  So, Judge, just
22   to -- and look, you have both dealt with me for a
23   long time now.  I am pretty straight to the point.
24   The real question is 1.6.  You and I talked about
25   that; was there a disclosure.  There's been zero
```

Page 12

1    evidence of a disclosure.  None.  There's been not
2    even one proffer that there's a disclosure.
3                   So my firm belief is the real reason
4    that J&J is pursuing this nonsense is that they
5    believe that they can attack in the news, in the
6    press, every place in the world, and especially
7    before a federal court, and perhaps in state court,
8    they can attack the Beasley Allen firm and say this
9    firm has got to go, it's a problem child, it
10   shouldn't be here.  And that is -- it is absolutely
11   crystal clear to me that's what's going on.
12                  So I do understand that's the
13   decision you're making here today, Judge Porto.
14   You're here to decide whether a motion to disqualify
15   should be granted, but you're also both smart enough
16   to know this case has a life.  And the fact is,
17   Mr. Murdica is out there beating the band trying to
18   collect plaintiffs' lawyers so that Mr. Haas can get
19   to his 70 or 75 percent of the people, which he
20   announced in the national press yesterday.  They are
21   playing this whole process for time.
22                  So I do agree that we are here on a
23   very specific little matter and, frankly, shouldn't
24   be here at all, in my humble view, but I also am
25   quite aware that there's a broader spectrum.  And

Page 13

1   that's why I have to go into some detail with regard

2   to the commitment the Beasley Allen firm has, the

3   fact that it did not need any information,

4   whatsoever, from Jim Conlan, because they knew far

5   more than Jim Conlan would ever have known regarding

6   any of these matters.  I have to be able to develop

7   that theme.

8                    THE COURT:  Okay.  And Judge Singh?

9                    JUDGE SINGH:  No, I would like to

10  comment.  I do appreciate the concerns.  It is

11  patently evident that there are things going on

12  between the parties in the media.  That is not what

13  is before the Court.  I echo Judge Porto's comments

14  in that regard.

15                    What is before the Court is, at least

16  in the MDL motion, the order, the request for the

17  entry of an order to show cause as to the

18  disqualification.  We are here to hear the evidence.

19  Although we are asking in terms of managing our

20  expectations for today's time frame, I don't believe

21  Judge Porto or I have any intent on limiting the

22  testimony without actually hearing what will be

23  presented on the front end as to what Mr. Birchfield

24  intends to testify in response to your examination.

25                    But I would like to take this

Page 14

1    opportunity to again remind the parties that we are

2    here to determine this particular issue, based off

3    of the record presented, not only the declarations

4    and certifications previously submitted, but also

5    the hours of testimony that both Judge Porto and I

6    have had the opportunity to hear.

7                    So thank you, Judge Porto.

8                    THE COURT:  You're welcome.

9                    MR. POLLOCK:  Thank you.

10                    MR. BRODY:  And if I may briefly

11    respond on behalf of Johnson & Johnson and Mr. Haas.

12                    Mr. Haas -- and first of all, I think

13    that the events of this week, frankly, are relevant

14    to the disqualification issue that is before the

15    Court, because they speak to the ongoing prejudice

16    to Johnson & Johnson of having Beasley Allen and

17    Mr. Birchfield and Ms. O'Dell both representing

18    plaintiffs in the litigation, in the MDL, in the MCL

19    on a going-forward basis as evidenced by the events

20    this week, where Johnson & Johnson announced a

21    proposed plan that would resolve these cases.

22                    It was immediately criticized in the

23    press by Mr. Birchfield and by Ms. O'Dell, by the

24    Beasley Allen firm.  I mean, within an hour or so of

25    when it was announced.  And Mr. Haas responded to

Page 15

1    the statements that were made first by

2    Mr. Birchfield.

3              And so it's -- but, as a whole, it's

4    something that we will likely get into to a degree

5    today because it is directly relevant to how the

6    parties are positioned, where Beasley Allen and

7    Mr. Birchfield are positioned with the benefit of

8    their relationship that they have, as Judge

9    Schneider referred to as a collaboration, with

10   Mr. -- with Mr. Conlan over a long period of time,

11   unbeknownst to Johnson & Johnson last year.

12             And it creates what is not just a 1.6

13   issue, and I understand why Mr. Pollock repeatedly

14   refers to this as a narrow 1.6 issue, but it's a 1.9

15   issue, it's a Rule 5.3 issue, it's a Rule 8.4 issue.

16   It is much broader than where Mr. Pollock wants to

17   put it.  But all of this, including the events of

18   this week, are relevant to that question and to the

19   Court's evaluation of what is the right answer going

20   forward and what has to happen here.

21             MR. POLLOCK:  May I respond, Your

22   Honor?

23             THE COURT:  Sure.  But let's keep in

24   mind that this Court, you know, we all live in the

25   world, these Courts live in the real world.  We

Page 16

```
 1   understand what's going on, and we can focus on what
 2   is at issue here.  And I can assure you, whatever is
 3   out there is not going to affect this Court's
 4   decision with regard to the underlying issue of
 5   disqualification.
 6               MR. POLLOCK:  I understand, Your
 7   Honor.  And I'm not arguing, I'm not quibbling at
 8   all.  The only point I would make on that is what
 9   you say and how you say it is going to have
10   ramifications and reverberations down the road,
11   right, because the fact is these -- this transcript,
12   these hearings, these discussions, I promise you
13   Mr. Birchfield and his firm will be seeing it for
14   years, and Mr. Haas and Mr. Brody or someone else
15   will be using it as a lever for years to come.  So
16   how we articulate it is going to be important.
17               If you will, I would like to step
18   back for one second.  When we first talked, years
19   ago, it was literally last year, we were talking
20   about Trupos, we were talking about Yuna, O
21   Builders, et cetera.  And when you -- I spent, I
22   don't know, 20 years, 15 years on the ethics
23   committee and another 10 on the character and
24   fitness committee.  When someone is being attacked,
25   where someone is being accused of an ethical
```

Page 17

1    violation, it usually is referred to the ethics

2    committee.  That's what those people do.  That's

3    what I did for years.

4              And, typically, the person who is

5    being accused or being challenged or being -- being

6    attacked is told exactly what it is they're alleged

7    to have done.  They're told with precision, This is

8    the five funds you should not have taken; this was

9    the alcoholism and drug, which unfortunately is half

10   the matters we deal with.  It was a specific

11   allegation of negligence and miscarriage, or

12   something along those lines.

13             In this case, it has been a constant

14   morphing.  I had to -- with Mr. Brody's first oral

15   argument before you, Judge Porto, was there is no

16   ethical violation, no RPC on point that we can find.

17   None.

18             Judge Singh, you asked the question

19   pointedly:  Do I need to find an RPC violation to

20   disqualify?  Answer from Mr. Brody:  No.

21             He and I disagree vehemently on this

22   point.  And by the way, I think the Supreme Court of

23   New Jersey is squarely in my corner on this one.

24   Once you got rid of the appearance of impropriety,

25   which they did in 1984, under the Pollock

Page 18

 1   Commission --

 2                    THE COURT:  1993?

 3                    MR. POLLOCK:  I'm sorry.  '93, I

 4   apologize.

 5                    Once they came out with that one, at

 6   that point, the reality is that we shouldn't be here

 7   because I understand you want to do a credibility

 8   determination.  If that's what we're focused on,

 9   then the credibility can be determined by, Is Andy

10   an honest guy?  Is Andy's firm committed to his

11   clients?  You know, Why are they opposing the

12   bankruptcy?  If you want to, you can get into all of

13   those issues.

14                    But what Mr. Brody now is saying is

15   let's just try all the issues right here.  I'm ready

16   to do it.  If that's what we want to do, I'm ready

17   to do it, and we will proceed.  But I just think

18   that what the Supreme -- the reason the Supreme

19   Court said you should decide it on the papers,

20   unless -- and you grabbed onto this, Judge Porto,

21   and I'm not criticizing you, but you appropriately

22   said:  Hey, I got some issues.  I want to look at

23   credibility.

24                    It's not supposed to be a free for

25   all.  Now I'm looking at RPC 1.6, sharing of

Page 19

```
 1   confidential information.  Somehow I'm now looking
 2   at 1.9 and 1.10.  I've got other rules I haven't
 3   even looked at yet that Mr. Brody is now
 4   articulating.  I have never in my 35 years of
 5   practice seen an ethics matter, which this is
 6   becoming, alleged where someone is not told, This is
 7   what you're accused of doing.  And that is a real
 8   problem here.
 9                  So I -- if we want to have the scope
10   be broad, Mr. Brody is arguing that this week's
11   discussion showed that, you know, that Mr. Haas is a
12   great guy and Beasley Allen is a bad guy.  How is
13   that conceivably relevant in any way to the question
14   of whether Mr. Conlan shared confidential
15   information with my client.  Isn't that the issue
16   we're here before you.
17                  THE COURT:  That's what Judge Singh
18   and I believe the issue is.
19                  MR. POLLOCK:  So to me, if we go
20   miles and miles beyond that, it has ramifications --
21                  THE COURT:  I haven't seen it go that
22   far, and I don't think --
23                  MR. POLLOCK:  He just argued he wants
24   to do it.
25                  THE COURT:  I didn't hear that yet.
```

Page 20

1    But, you know, it squarely is:  Did Mr. Conlan share

2    confidential information with Beasley Allen?  You

3    know, if I were to write a decision today, I would

4    say, The issue before this Court is:  Did Mr. Conlan

5    share confidential Johnson & Johnson information

6    with Beasley Allen.

7                    MR. POLLOCK:  I'm with you.

8                    THE COURT:  And I would then start

9    with the, as we did in law school:  rules, analysis,

10   conclusion.

11                   MR. POLLOCK:  Yup.

12                   THE COURT:  Credibility based on the

13   seven factors that are found, candidly, in our

14   evidence rules, consistency, et cetera, does it make

15   sense.  And understandably, I was also thinking

16   about this on my way in, is you have the charge

17   where "is false in one false in all," does that come

18   into play with regard to credibility.

19                   So I think, and I will turn the dais,

20   the bench over to Judge Singh, but that's the issue

21   that we're here for.  That's it.

22                   Judge Singh?

23                   JUDGE SINGH:  I don't disagree.  And

24   you are all familiar with federal court standards

25   for motions for disqualification, as well.  So we

Page 21

1    are looking at the same issue and the ramifications

2    thereof.

3                    MR. BRODY:  Absolutely.  And the

4    questioning that I -- the 30, 40 minutes that I have

5    is focused on wrapping up the rest of that and,

6    hopefully, giving the Court what it needs in order

7    to evaluate the questions that it's going to have to

8    evaluate here.

9                    It's -- you know, certainly, this is

10   not an appearance of impropriety case; this is a

11   case of actual impropriety.  And we are looking

12   forward, based on the record that has been

13   developed, to setting that out, and in the briefing

14   that the Court has asked for, and explaining

15   precisely why it is that you have actual

16   impropriety, you have actual violations of the

17   ethical rules, and why it is that disqualification

18   is required here.

19                    MR. POLLOCK:  Thank you, Your Honors.

20                    THE COURT:  All right.  Thank you.

21                    Mr. Birchfield, we'll administer the

22   oath one more time, today, May 3rd, 2024.

23                    Mr. Birchfield, please raise your

24   right hand, tell us your name, and spell your last

25   name, sir.

Page 22

```
 1                    THE WITNESS:  Andy Birchfield,
 2      B-I-R-C-H-F-I-E-L-D.
 3                         -  -  -
 4                    ANDY BIRCHFIELD, having been duly
 5      sworn, was examined and testified as follows:
 6                         -  -  -
 7                    THE COURT:  Thank you.  You may be
 8      seated.
 9                    Mr. Brody.
10                         -  -  -
11                    CROSS EXAMINATION
12                         -  -  -
13      BY MR. BRODY:
14           Q.      Good morning, Mr. Birchfield.
15           A.      Good morning.
16           Q.      You recall providing testimony on
17      April 10th about a draft term sheet that was
18      exchanged between your firm and Legacy?
19           A.      Yes.
20           Q.      All right.  And we had looked at --
21      we had given you a copy of the full privilege log
22      that was prepared by the plaintiffs steering
23      committee asserting mediation privilege over
24      documents that we had subpoenaed from KCIC.
25                    Do you recall that?
```

Page 23

1          A.      Yes.

2          Q.      All right.  I have prepared, and if I

3   may approach, an excerpt of that to make it a little

4   easier to talk about the term sheet.  I'm happy to

5   give you the full privilege log, as well.  I see you

6   didn't bring a copy of it up with you.  But I

7   prepared an excerpt with the references to the term

8   sheet taken directly from that, which I thought

9   would make it easier.

10                  If I may approach?

11                  THE COURT:  You may approach.  Did

12  you share that with Mr. Pollock?

13                  MR. POLLOCK:  Yes, I have a copy,

14  Your Honor.

15  BY MR. BRODY:

16          Q.      And I can give you a bigger one,

17  which has larger font, if you think it would be

18  helpful.

19          A.      I'll use this.  Let me try.

20          Q.      Now, we're going to take this in

21  chronological order.  We have sorted the spreadsheet

22  that the PSC provided to us and we put it in

23  chronological order here.

24                  So, going in chronological order,

25  starting at the top, the first time we see your name

Page 24

1   is on May 12th of last year, right?  It's the second

2   entry.

3          A.      The second entry on here is May 12th,

4   yes.

5          Q.      And you're listed as the author,

6   correct?

7          A.      Correct.

8          Q.      And you're listed as the author of a

9   Draft Term Sheet for Legacy Ovarian Cancer Claim

10  Proposal, right?

11         A.      That's correct.

12         Q.      All right.  And then if you -- if you

13  continue just below the two entries with your name,

14  you see that on the 16th of May, Mr. Conlan --

15              MR. POLLOCK:  I think -- mine is May

16  24th.  On the top.  Okay.  Got it.

17  BY MR. BRODY:

18         Q.      The document number for the  record

19  is 111.  Do you see it?

20         A.      Yes.

21         Q.      And so on the 16th, Mr. Conlan

22  forwarded the proposal to KCIC, right?

23         A.      I see that entry.

24         Q.      And the plaintiffs steering committee

25  has asserted mediation privilege over that

Page 25

1    communication, as well, right?

2         A.      Yes.

3         Q.      Because your position is that the

4    mediation privilege covers Mr. Conlan's

5    communications with KCIC in this instance, right?

6         A.      I presume so.

7         Q.      As well as what you wrote in your

8    communications with Mr. Conlan, correct?

9         A.      Yes.

10        Q.      And there are a number of emails back

11   and forth addressing the term sheet.  And then, if

12   we go down into the green, which gets us to

13   May 24th, which is about 12 days after your name

14   first appears, we see your name again, right?  It's

15   number 20 in the document number column.

16        A.      Yes.

17        Q.      And that's May 24th, 2023, correct?

18        A.      Yes.

19        Q.      And that's, again, the Draft Term

20   Sheet for Legacy Ovarian Cancer Claim Proposal,

21   right?

22        A.      Yes.

23        Q.      But this time, what was on the 12th

24   of May a seven-page document has grown to eight

25   pages, hasn't it, if you look at the page count

Page 26

1  column?

2          A.      I see that entry on here.

3          Q.      Right.  And then it looks like there

4  are a number of copies of it.  You know, we see

5  document 42, document 135.  They're all eight pages,

6  right?

7          A.      That -- that's the entries here, yes.

8          Q.      All right.  Now, if you flip over to

9  the next page and we move forward to June 7th, it's

10 highlighted in green at the bottom.  Do you see

11 that?

12         A.      Yes.

13         Q.      And you see the document number 45?

14         A.      Yes.

15         Q.      That document, document number 45,

16 you're the author of that, right?

17         A.      I'm listed as the author, yes.

18         Q.      That's a Draft Term Sheet for Legacy

19 Ovarian Cancer Claim Proposal, correct?

20         A.      Yes.

21         Q.      And by that point, which is another

22 two weeks exactly after the May 24th version, it had

23 grown to 10 pages, hadn't it?

24         A.      The -- the entry here is 10 pages.

25 That is correct.

Page 27

1          Q.        Right.

2          A.        I don't --

3          Q.        And exact same description, Draft

4     Term Sheet for Legacy Ovarian Cancer Claim Proposal,

5     correct?

6          A.        Yes.  I can't say that that is the --

7     you know, that the term sheet grew to 10 pages.

8     That's a general description.  That's the number of

9     pages that's in the entry.  I haven't -- I haven't

10    reviewed any of it to see what that, you know, what

11    that transmission was.

12               But the essence of that term sheet as

13    I described previously, that was our term sheet.  It

14    was a term sheet that had been prepared before,

15    before the dismissal of LTL 1, as we were -- and

16    before the filing of J&J's second bankruptcy.  We

17    had prepared a term sheet.  We had prepared a term

18    sheet and offered to meet and present that term

19    sheet --

20         Q.        And that's -- and Mr. Birchfield, I

21    think you're getting very far afield from my

22    question.

23               THE COURT:  Let him complete his

24    thought, Mr. Brody.

25               MR. BRODY:  Sure.

Page 28

1              THE WITNESS:   And as I've testified
2    previously, that term sheet was prepared and there
3    were no substantive changes in any discussions with
4    -- with Legacy regarding that term sheet.
5              Scott Gilbert --
6    BY MR. BRODY:
7         Q.     That's -- I think that's -- and just
8    on that point, on conversations, we actually see a
9    reference to a conversation that you had with Legacy
10   and KCIC.  It's document 118.  It's the same date,
11   June 7th, 2023.  It's just three or four lines below
12   the entry we were looking at.  And there's a
13   reference to a KCIC and Legacy discussion of
14   conversation with ovarian cancer counsel regarding
15   comments on draft ovarian cancer term sheet, right?
16        A.     Right.
17        Q.     As well as discussing additional
18   ovarian cancer resolution proposal details, right?
19        A.     That is -- that's what the entry
20   says, and --
21        Q.     Yeah.  And ovarian cancer counsel
22   did, I mean, as you just mentioned in your prior
23   answer, have discussions with Legacy about the term
24   sheet, correct?
25        A.     We discussed the term sheet and we

Page 29

1    provided the draft term sheet to KCIC, and there

2    were discussions about the -- how the term sheet

3    would be applied.  The terms of that agreement would

4    be applied in a claims administration process.  That

5    was the role of KCIC.

6          Q.      You didn't just provide it to KCIC.

7    You also provided it to Mr. Conlan, because as we

8    saw, he forwarded on May 16th the draft term sheet.

9    He was the one who forwarded it to KCIC, right?

10         A.      Correct, because KCIC is the claims

11   administrator who was working with -- working with

12   Legacy, that Legacy had brought in.

13         Q.      And then you all got together and you

14   discussed it.  And over the course of the next

15   three, four weeks, as we see from the privilege log,

16   the page count grew from seven to eight and then to

17   10 pages, right?

18                 MR. POLLOCK:  Objection;

19   argumentative, assumes facts not in -- not in

20   evidence.  The document actually could be red-lined.

21   We have no idea why it went from four to eight to

22   10.  We have no clue where it came from.

23                 THE COURT:  Well, I'm going to

24   overrule the objection.  But why don't you clarify

25   with your questions, Mr. Brody, how it grew, why it

Page 30

1   grew, and maybe get testimony from Mr. Birchfield
2   who will provide background with regard to the
3   length of this particular document.
4                   MR. BRODY:  Sure.
5                   THE COURT:  I don't think it's
6   argumentative, but, you know, address the question
7   then.
8                   MR. BRODY:  Sure.
9   BY MR. BRODY:
10          Q.      Based on the privilege log, the page
11  count for what is described as that proposal started
12  at seven pages, became eight pages, and then became
13  10 pages; right?
14          A.      The entries on this privilege log do
15  change, just as you said.  That does not -- that
16  does not tell me that the term sheet, itself, is
17  being changed in any respect.  So I can acknowledge
18  that that's what the entries say.
19          Q.      Now, if I --
20          A.      I can't go beyond that.
21          Q.      -- understood your testimony on April
22  10th, the last time we were here, your position is
23  that it was just, and I'm going to use your words
24  from the transcript, grammatical type stuff that was
25  addressed in the back and forth, right?

Page 31

1        A.        That's correct.  There were no

2   substantive changes.

3        Q.        Right.  And you were willing to say

4   that, but you're asserting that the substance of the

5   term sheet, itself, is privileged, so we can't see

6   it; right?

7        A.        If you want to see the term sheet,

8   I'll be glad to show you the term sheet.  What I'm

9   not willing to do here -- I was prepared, I was

10  prepared on behalf of the ovarian cancer committee

11  to present that term sheet to J&J, to the general

12  counsel, Ms. Forminard and Mr. Haas, about two weeks

13  before the second bankruptcy petition was filed.

14             We made that offer.  We were prepared

15  to -- to share that term sheet.  That is -- that is

16  not an issue.  But what we were not prepared to do

17  was to eviscerate the mediation privilege and just

18  say -- because this is -- this is covered in the

19  mediation process.  That's why we asserted the

20  privilege.  It's not that the term sheet is

21  secretive.  This was a term sheet that would have

22  gone to J&J.  We were prepared to present it to J&J.

23       Q.        So you asserted the mediation

24  privilege over the version that is described as the

25  seven-page version of the term sheet, over the

Page 32

1    eight-page version of the term sheet, over what is

2    described as the 10-page page count version of the

3    term sheet, over the discussions that the ovarian

4    cancer counsel had with Legacy about the term sheet;

5    you have asserted mediation privilege over all of

6    that, right?

7                    MR. POLLOCK:  Objection; it's

8    argumentative.  This is a -- this is a closing

9    argument made in the middle of questioning.  Does he

10   really -- he knows the mediation privilege has been

11   asserted.  He's already stipulated that the page

12   count is the page count.  So it's inappropriate for

13   counsel to be making an argument to the Court like

14   this is a jury.

15                   THE COURT:  Mr. Brody.

16                   MR. BRODY:  I just asked him if he's

17   asserting mediation privilege as to all the

18   different versions of the term sheet, as well as the

19   discussions that were had with Mr. Conlan --

20                   MR. POLLOCK:  We're asserting the

21   mediation privilege.

22                   MR. BRODY:  -- about the term sheet.

23   That's the question.

24                   THE COURT:  Across all three

25   documents?

Page 33

```
 1                    MR. POLLOCK:  Your Honor, Judge
 2    Schneider has ruled on these issues.  We are
 3    asserting the mediation privilege.  I'll answer for
 4    the witness.  We're standing by it.
 5                    THE COURT:  Okay.  Notwithstanding
 6    that Mr. Birchfield said he was prepared to share
 7    that document with J&J?
 8                    MR. POLLOCK:  He was prepared to
 9    provide a document to J&J.  He didn't say which one.
10    He said he was going to provide a term sheet to J&J.
11    You've got multiple variations, you've got comments
12    of counsel.  I would doubt that J&J would provide us
13    with a draft that has all their mark-ups.  We're
14    certainly willing and able right now to provide a
15    term sheet to them, if that's what they want.  But
16    I'm not going to give him a mediation-privileged
17    protected document.
18                    THE COURT:  Okay.  So the privilege
19    was asserted then, Mr. Brody.
20                    MR. BRODY:  Yes.  And I think
21    Mr. Pollock just frankly made my point.  So why
22    don't we talk about something that was happening at
23    the same time these term sheets were going back and
24    forth.
25    BY MR. BRODY:
```

Page 34

1          Q.        The whole time that you were sending

2    term sheets back and forth to Legacy and to KCIC,

3    you and the tort claimants committee were trying to

4    get the LTL 2 bankruptcy dismissed, right?

5          A.        Yes.  I'm just trying to -- trying to

6    get the timing right.  I mean, we -- we had -- we

7    did not engage.  We didn't have any discussions with

8    -- with Legacy until after, until after the second

9    bankruptcy petition, you know, was filed.

10                   So while -- so, yes, the mediate --

11   the -- Judge Kaplan ordered mediation after LTL 2

12   was filed, and that's the period when we were having

13   discussions with Legacy.

14         Q.        Right.  And if I -- let me make this

15   simpler, if you will allow me to do it this way.

16                   If I told you that the claimants

17   committee filed its motion to dismiss the bankruptcy

18   on April 24th of last year, would you disagree with

19   me?

20         A.        No.

21         Q.        All right.  And then, as we saw, at

22   least from the documents on the privilege log, the

23   first version of the term sheet that you sent over

24   to Legacy was on May 12th, while that was pending?

25         A.        Correct.

Page 35

1          Q.        Now, you knew, of course, that
2    Johnson & Johnson wanted plan confirmation in the
3    bankruptcy proceeding, right?  That was  Johnson &
4    Johnson's objective, correct?
5          A.        Right.
6          Q.        And then you filed a motion to
7    dismiss, correct?
8          A.        Yes.  I mean, I didn't.  The TCC did,
9    but I'm part of that.
10         Q.        You're part of that, right?  I'm
11   putting you in with the TCC, because you were part
12   of the TCC?
13         A.        Yes.
14         Q.        You didn't want the plan to come up
15   for a vote, right?
16         A.        We -- no, we did not want J&J's plan
17   to come up for a vote.  We were prepared --
18         Q.        Neither did --
19              MR. POLLOCK:  Your Honor, he keeps on
20   doing this.  I want him to answer the question,
21   please.
22              THE COURT:  Well, so does this Court.
23   So go ahead, Mr. Birchfield.
24              THE WITNESS:  So we were -- we were
25   preparing at the -- at the same time that we were

Page 36

1   moving forward with our motion to dismiss, we were

2   also preparing an alternative plan to be presented.

3   And we had asked the Court, if the Court denied our

4   motion to dismiss, we -- we wanted to present an

5   alternative plan.  And that -- that would have been

6   voted on, had the -- had the judge -- had Judge

7   Kaplan not dismissed the bankruptcy and had allowed

8   us to move forward with a competitive plan.

9   BY MR. BRODY:

10          Q.      I guess Mr. Conlan didn't want the

11   bankruptcy plan to come up for a vote, either, did

12   he?

13                  MR. POLLOCK:  Objection; asks for

14   speculation as to what Mr. Conlan wanted.  He's not

15   here to testify.

16                  THE COURT:  Unless Mr. Birchfield

17   knows.

18                  THE WITNESS:  I don't know.

19   BY MR. BRODY:

20          Q.      But you heard Mr. Conlan testify on

21   April 10th that if the Legacy proposal was accepted,

22   he and Legacy would stand to make money, correct?

23          A.      Yes.

24          Q.      Right.  And that's not something that

25   he would be able to take advantage of if J&J's

Page 37

1    preferred resolution through a plan confirmation in

2    the bankruptcy court had been accomplished, correct?

3         A.    That's true only if you accept the

4    version of the plan that J&J put forward.  A

5    bankruptcy plan that did include an option for the

6    Legacy toggle, I believe as he testified to

7    previously, that would have been -- that would have

8    been part of a bankruptcy plan.  It would have

9    included an option.  It would have included in the

10   alternative plan that we were putting forward.  That

11   was part of the discussions that were going on at

12   that time.

13        Q.    And your alternative was -- was not

14   what J&J put forth, was it?

15        A.    No.  It is very clear that what --

16   what I want on behalf of my clients, which is a fair

17   and reasonable compensation plan, is not what J&J

18   wants, and we are opposed to that.  It is not --

19        Q.    And so --

20        A.    -- that we're opposed to bankruptcy,

21   period.  Because in the very beginning, before --

22   before J&J filed its first bankruptcy, we were

23   working toward a resolution.  We were working toward

24   a resolution that would have included a bankruptcy

25   component.

Page 38

```
 1                   When J&J filed its first bankruptcy,
 2     I was pushing, as Mr. Haas knows, I was pushing --
 3                   MR. BRODY:  We -- we're so far afield
 4     of my question.
 5                   THE COURT:  I'm going to let him
 6     complete the testimony.  I'm not going to have a
 7     filibuster, so to speak.
 8                   But go ahead, Mr. Birchfield.
 9                   THE WITNESS:  It's not that we were
10     opposed to bankruptcy, period.  Not at the
11     beginning, because we were trying, we were trying to
12     negotiate.  Before the LTL motion to dismiss, we
13     were negotiating a plan in bankruptcy.  It was only
14     after it became very clear that we would not be able
15     to get reasonable compensation for our clients as
16     long as J&J had the weapon of a bankruptcy plan.
17     That's when we became adamant that --
18                   THE COURT:  And I think that's a good
19     place to stop, Mr. Birchfield.
20                   Go ahead, Mr. Brody.
21                   MR. BRODY:  Thanks.
22     BY MR. BRODY:
23          Q.     So Mr. Birchfield, I think, even
24     after all of that, that we are on the same page
25     here, is that this Legacy toggle that you talked
```

Page 39

1  about was not what J&J was proposing and not what

2  J&J wanted to accomplish through the LTL 2

3  bankruptcy, correct?

4        A.      They did not want to -- they did not

5  want to do the -- they didn't want to pay the added

6  amount that would be necessary.  But what J&J was

7  saying at that point was that they wanted finality.

8  They are looking for finality.  They are taking the

9  position it would only be achieved through

10 bankruptcy, which is false.  And the Legacy -- the

11 Legacy option was a way for J&J to get finality

12 without -- without coercing claimants into a

13 bankruptcy plan.

14       Q.      That was -- that was -- I mean, let's

15 -- you understand that J&J would object to the use

16 of the word "coerce" being attached to that, right?

17       A.      No.

18       Q.      And you understand -- I mean, come

19 on, Mr. Birchfield.  J&J -- you know J&J proposed an

20 $8.9 billion resolution of the claims through the

21 LTL 2 bankruptcy that it wanted claimants to be able

22 to vote on, right?

23       A.      That is true.

24       Q.      And you did not want claimants to be

25 able to vote on that, did you?

Page 40

1          A.          It's not that I was opposed to
2   claimants voting.  It is -- and it's not --
3          Q.          That's why you --
4                    MR. POLLOCK:  Your Honor, please.
5                    THE COURT:  Hold on, Mr. Birchfield.
6                    MR. POLLOCK:  He's answering
7   the questions.
8                    THE COURT:  Let me hear the full
9   testimony based on that question first.  Do you
10  remember the question, Mr. Birchfield?
11                   THE WITNESS:  That I'm opposed --
12  that I'm opposed to claimants voting.
13                   THE COURT:  Right.
14                   THE WITNESS:  We're not opposed to a
15  vote that would be a fair vote.  We are opposed --
16  we are opposed to a plan that would essentially
17  stuff the ballot box in order to coerce the more
18  serious and legitimate claimants to accept
19  unreasonable values.
20  BY MR. BRODY:
21         Q.          You didn't want the claimants who
22  would have a right to vote on the plan to be able to
23  vote on the plan; that's why you wanted to dismiss
24  the bankruptcy, right?
25                   MR. POLLOCK:  Objection, Your Honor.

```
                                        Page 41
 1   Asked and answered twice now.
 2                THE COURT:  Well, I don't know if he
 3   answered, if I've heard the answer to that question.
 4                Mr. Birchfield.
 5                THE WITNESS:  There were multiple
 6   reasons that we were opposing a bankruptcy.
 7   BY MR. BRODY:
 8        Q.     And that was one of them, right?
 9        A.     No.  We were -- we were opposing a
10   vote as J&J had constructed in that plan, yes.
11        Q.     Right.
12                THE COURT:  Let us get back to our
13   central issue, Mr. Brody.  I know it appears you're
14   trying to lay some groundwork here, but let's not
15   lose focus of what our issue is as regards to the
16   allegations against Mr. Conlan.
17                MR. BRODY:  Of course.
18   BY MR. BRODY:
19        Q.     So, Mr. Birchfield, before we
20   recessed on April 10, you started testifying about
21   your willingness in the fall of last year to join
22   Mr. Conlan to present a proposed settlement matrix
23   to J&J.  Do you recall that testimony?
24        A.     Yes.  Mr. Conlan had asked me if I
25   would --
```

Page 42

```
 1        Q.       It's just a yes.  I just asked you if
 2   you recall that testimony.  That's all I asked.
 3        A.       Would I be -- he -- would I be
 4   willing to join with him --
 5        Q.       It's a yes or no.
 6                 MR. POLLOCK:  Your Honor.
 7                 MR. BRODY:  I'm just --
 8                 MR. POLLOCK:  It's not a yes or no.
 9                 MR. BRODY:  -- orienting him.
10                 MR. POLLOCK:  If he needs to give you
11   a narrative response, he gives you a narrative.  I
12   think it can be a brief answer, but Mr. Brody keeps
13   on clipping off his answers because he doesn't like
14   the answer.
15                 THE COURT:  Well, I don't necessarily
16   know if Mr. Brody likes or dislikes the answer.  But
17   focusing-wise, what's your response to that question
18   or your testimony, Mr. Birchfield?
19                 THE WITNESS:   Will you repeat the
20   question?
21   BY MR. BRODY:
22        Q.       Sure.  My question was simply:  Do
23   you recall, before we recessed on April 10th,
24   beginning to talk about your willingness to join
25   Mr. Conlan to present a proposed settlement matrix
```

Page 43

1    to Johnson & Johnson in the fall of last year?  Do
2    you recall that testimony?

3          A.      I do not recall that testimony
4    specifically.  I did agree to meet with J&J to
5    explain the matrix.

6          Q.      And we -- we received a lot of
7    testimony on it, so I don't want to spend too much
8    time on it, but we see your willingness reflected
9    and disclosed to J&J for the first time on October
10   18th of last year in an email from Mr. Conlan that's
11   in your binder as Hearing Exhibit 4.

12                 You -- you can take a look at it.

13                 THE COURT:  Do you have that binder,
14   Mr. Birchfield?

15                 THE WITNESS:  I do.  I do, Your
16   Honor.

17                 THE COURT:  Okay.

18                 THE WITNESS:  So, Mr. Brody, may I
19   ask, what is the question?  I mean, are you asking
20   me, because you're saying that that's the first time
21   that he disclosed --

22                 MR. BRODY:  I'm asking you --

23                 THE WITNESS:  -- and I can't answer
24   that.

25   BY MR. BRODY:

Page 44

1          Q.      I'm asking you if you're familiar

2    with that, that exhibit.

3          A.      I mean, yes, I am familiar with the

4    exhibit, you know, since this -- since it's been

5    filed, Exhibit Number 4.

6          Q.      Now, October 18th of last year, that

7    was shortly after the Mass Torts Made Perfect

8    conference that took place in Las Vegas last fall,

9    right?

10         A.      That sounds right.

11         Q.      And you heard Mr. Murdica mention

12   that he had actually attended that conference last

13   fall.  He testified to that on March 25th, right?

14         A.      I know that he was in Las Vegas.  I'm

15   not sure that he attended the conference, but he was

16   there.

17         Q.      All right.  And the conference was

18   October 10th to the 12th of last year, last fall's

19   version?

20         A.      That sounds about right.  I don't

21   recall specifically.

22         Q.      And this is something that happens

23   regularly, right, this conference?

24         A.      Yes.  There would be an annual --

25   annual meeting.

Page 45

1         Q.       And it's a conference where
2    plaintiffs' lawyers come together from around the
3    country to talk about things like the talc
4    litigation, right?
5         A.       Yes.
6         Q.       You -- you pitched the Legacy
7    proposal to other talc plaintiffs' lawyers at the
8    Mass Torts Made Perfect meeting last year, didn't
9    you?
10        A.       No.
11        Q.       You discussed it with them?
12        A.       I may have had discussions about an
13   option that would give J&J finality, yes.
14        Q.       Right.  An option involving
15   structural optimization and disaffiliation, correct?
16        A.       Yes.
17        Q.       Because you were trying to garner
18   support for the proposal that you had been
19   discussing with Mr. Conlan?
20        A.       No.  I mean --
21        Q.       Was Mr. Conlan there, by the way, at
22   Mass Torts Made Perfect last year?
23        A.       Not that I know of.
24        Q.       All right.  Going back to the Hearing
25   Exhibit 4, you see that Mr. Conlan there offered

Page 46

1  that you, Doug Dachille, and he were prepared to

2  meet with J&J's treasurer in person to share and

3  discuss the terms of a matrix, right?

4          A.      Yes.

5          Q.      And that's a matrix that, I take it

6  from your testimony, that you developed, right?

7          A.      Yes.  I mean, I developed it along

8  with the ovarian cancer negotiating group, yes.

9          Q.      And shared it with Mr. Conlan and

10 Legacy, right?

11         A.      Yes.

12         Q.      And, you know, at the end of the day,

13 based on an anticipated number of claimants and the

14 values assigned to claims in a matrix, the math has

15 to work if that matrix is going to be associated

16 with a total dollar figure, right?

17                 MR. POLLOCK:  Objection; vague.

18                 THE COURT:  Vague?

19                 MR. POLLOCK:  Vague.  I don't know

20 what that means, that it has to work as to a total

21 dollar figure.

22                 THE WITNESS:  Well, I mean,

23 obviously, if the total number of claimants that

24 are, you know, that are submitted and are expected

25 to receive compensation under that grid, if it

Page 47

1    exceeds -- if it exceeds the total amount of the

2    acquisition by a significant number, then it

3    wouldn't work.  That's -- that is true.

4    BY MR. BRODY:

5         Q.      Right, right.  So if -- yeah, you

6    can't -- you can't put together a claims matrix

7    where, you know, every claim's worth a million

8    dollars, you have a hundred claims, and your funding

9    it at $10 million.  You just can't do that, right?

10        A.      That's right.

11        Q.      All right.  Mr. Conlan was, of

12   course, being honest, I think, as he testified with

13   his offer to have you come in.  You were ready,

14   willing, and able to come in and talk about the

15   claims matrix, right?

16        A.      I was.

17        Q.      In connection with the proposal that

18   Mr. Conlan was making to Johnson & Johnson for

19   structural optimization and disaffiliation, right?

20        A.      Yes.

21        Q.      You had been actually in discussions

22   with Mr. Conlan for months, at that point, right?

23        A.      If you look at the time of our first

24   discussion, our first discussion was in -- the first

25   time I ever met him.  It was in May.  May 2nd.  So

Page 48

1  it had been months, true, it had been months between

2  May and October.

3         Q.      Yeah, five and a half months?

4         A.      Yeah.

5         Q.      The day that email was sent was the

6  day after Johnson & Johnson's third quarter earnings

7  call.  You're aware of that, right?

8         A.      I'm aware that -- I'm aware that

9  Mr. Haas made statements on October the 17th, and I

10 can see the date of this, this letter on October the

11 18th, yes.

12        Q.      Right.  And you knew -- I mean, you

13 certainly knew that what was being proposed through

14 Legacy was not what Mr. Haas had announced on the

15 earnings call as any part of the company's preferred

16 course through the bankruptcy process, right?

17        A.      Is the -- is the Legacy proposal a

18 bankruptcy proposal?  No, it's not.

19        Q.      Right.

20        A.      What -- what we had understood --

21        Q.      And --

22                MR. POLLOCK:  Hold on, please.

23                THE WITNESS:  -- was that J&J was

24 looking for finality, but we're -- and that was what

25 we were making this proposal for.  I mean, that's

Page 49

1    what -- that's why I agreed to submit a, you know, a

2    matrix, and that's why I, you know, offered, you

3    know, for the -- you know, to have Legacy considered

4    as part of a mediation, as part of a bankruptcy, you

5    know, toggle point.  Because this was a -- this

6    would be a way that J&J could have gotten finality

7    without -- without having a coercive bankruptcy plan

8    in place.

9                You know, this would be -- this

10   matrix, this proposal would be an opt-in proposal,

11   so the claimants would -- and their counsel would

12   look at the settlement grid, they would look at the

13   terms of that grid, and they would choose; do we

14   want to voluntarily participate, or not.

15   BY MR. BRODY:

16        Q.      The proposal that was being made by

17   Mr. Conlan and this settlement matrix it was

18   attached to was not a bankruptcy proposal; it was a

19   tort system proposal, wasn't it?

20        A.      Yes.

21        Q.      And the -- did -- I assume Mr. Conlan

22   had -- had told you that J&J had told him that it

23   did not believe the deal that he was proposing would

24   actually provide finality?

25        A.      No.

Page 50

1       Q.      Did you -- did you miss that part of
2   his testimony from April 10th?
3       A.      You're asking me if he told me that,
4   that -- you're asking me --
5       Q.      I'm asking you -- well, let me ask
6   you, did you know -- did you know that before April
7   10th of this year?
8       A.      That J&J had told Mr. Conlan that the
9   Legacy option would not give them finality?
10      Q.      That's right.
11      A.      Okay.  No.
12      Q.      Let's take a look at Hearing Exhibit
13  7.
14      A.      I'm there.
15      Q.      So this is the more detailed letter
16  from Mr. Conlan that actually attaches the
17  settlement matrix, right?
18      A.      Yes.
19      Q.      And that's the settlement matrix that
20  you were prepared to come in and talk about with J&J
21  jointly with Mr. Conlan and Mr. Dachille, right?
22      A.      I would have been talking about the
23  matrix.  I would have gone in with Mr. Conlan and
24  Mr. Dachille if J&J had made that invitation, yes.
25      Q.      And this letter includes a $19

Page 51

1  billion total price tag that is associated with a

2  tort system resolution that tacks on your matrix,

3  right?

4          A.      Yes.  I see -- I see that it is a --

5  it is a -- it has a $19 billion number or such

6  greater number as the, you know, the accountants,

7  Pricewaterhouse, would determine is necessary to

8  clear the noncash charge.  I see the number.

9          Q.      And he indicated that the proposal

10 had been reviewed and was supported by leadership

11 counsel on both the federal MDL and in state court

12 cases across the country.  Do you see that?  It's on

13 page 1.  The paragraph starts, "Put simply..."

14         A.      Yes.

15         Q.      And that was true, right?

16         A.      I had not seen -- I had not seen this

17 proposal.  What I had, what we -- what I had

18 discussed with him is that we would support a -- a

19 Legacy option being presented to J&J.  It is -- this

20 is a -- this would be an offer that J&J would have

21 to accept.

22                 If J&J -- if J&J were to accept, you

23 know, this -- this option, then I would support -- I

24 would support a -- a settlement agreement that

25 incorporates this matrix that's attached as

Page 52

1   Exhibit A.

2          Q.      And you knew that -- I mean, I

3   certainly I expect you knew that it was supported

4   not just by you, but you had talked about it with

5   other -- other plaintiffs' counsel; fair?

6          A.      I have -- I knew that this would be

7   supported because for four years, every day, every

8   day, I had been working toward a resolution.  So I

9   talked to -- I talked to plaintiffs' lawyers about

10  various options, and I have a high level of

11  confidence that based on not only -- not only, you

12  know, my work, but, you know, all of the members of

13  the executive committee, all of the members of the

14  TCC on the ovarian cancer side, we had been working

15  on this intensely for a long time.

16                 So I -- I knew --

17         Q.      And so --

18         A.      -- that it would be supported.

19         Q.      And so Mr. Conlan was telling the

20  truth when he wrote to J&J's board that Legacy's

21  proposal has been reviewed and is supported by

22  leadership counsel on both the federal MDL and in

23  state court cases across the country, right?

24         A.      I had not reviewed this proposal.  I

25  had not seen this, this letter or this proposal as

Page 53

```
 1   it is written.  I had not seen that until you filed

 2   it.  But I did -- I did provide the matrix and I did

 3   -- I did say that I would support that, and we have

 4   leadership roles in both the MDL and state court, in

 5   state court litigations across the country.

 6           Q.      And you -- you were on board with the

 7   statement that we saw from Mr. Conlan on October

 8   18th that lead counsel for the ovarian cancer

 9   claimants, including Andy Birchfield, for an MDL

10   opt-in settlement matrix with Legacy would be

11   expected to garner a 95 percent opt-in of current

12   ovarian cancer claimants, right?

13           A.      Yes, I told him that.

14           Q.      Yeah, you -- that was going to be my

15   next question.  That's what you told him, correct?

16           A.      Yes.

17           Q.      All right.  You were familiar -- by

18   the way, at the same time all of this was going on,

19   you publicly advocated for Mr. Conlan's proposal,

20   right?

21           A.      So, that may be a -- that may be a

22   bit of a stretch.  I mean, he -- he did, he did

23   publish the structural optimization and -- in a

24   op-ed piece, and I did, I did issue a press release

25   that would have -- that said I think that this is a
```

Page 54

1   -- this would be a win/win because it would give, at

2   that point -- at that point I thought that J&J truly

3   was looking for a way to get finality.  And -- and

4   that would be a win for J&J, but we -- the

5   plaintiffs were also looking for fair and reasonable

6   compensation, you know, and -- and the right to

7   choose, and not a coercive plan.

8         Q.      So, you know, you referred to a press

9   release that you issued and to a piece that

10  Mr. Conlan had written.  We have -- and we looked at

11  it with Mr. Conlan.  The piece that he wrote is in

12  your binder as Hearing Exhibit 15, if you could just

13  verify that's what you were referring to.

14        A.      Yes.

15        Q.      And that was the one that was titled

16  Time to Ditch the Texas Two-Step for a New Mass Tort

17  Strategy, right?

18        A.      Yes.

19        Q.      And if you turn to Hearing Exhibit

20  18, you express support for Mr. Conlan's article the

21  very same day, right?

22        A.      That's true.

23        Q.      And your press release was titled Key

24  Lawyer in Johnson & Johnson Talc Litigation Supports

25  Call to Rethink Legal Strategies in Light of Failure

Page 55

1   of Texas Two-Step, right?

2          A.      Yes.

3          Q.      And it indicates, "Leading mass tort

4   lawyer, Andy Birchfield" -- that's you?

5          A.      Yeah.

6          Q.      -- "of the Beasley Allen law firm is

7   expressing strong support for a thought-provoking

8   article in Bloomberg Law authored by James Conlan, a

9   seasoned expert in corporate restructuring and the

10  former global practice leader of Sidley Austin's

11  worldwide restructuring practice," right?

12         A.      Yes.

13         Q.      You didn't disclose that Mr. Conlan

14  had represented J&J in the talc litigation, did you?

15                 MR. POLLOCK:  Objection;

16  argumentative.

17                 THE COURT:  I don't find that

18  argumentative, Mr. Pollock.

19                 THE WITNESS:  I -- I didn't --

20                 THE COURT:  Please answer the

21  question, Mr. Birchfield.

22                 THE WITNESS:  I did not say -- I

23  didn't say anything about, you know, him working at

24  Faegre.  This was -- this was -- the main point was

25  the structural optimization and disaffiliation,

Page 56

1    which he had developed while he was at Sidley, you

2    know, at Sidley Austin.

3                   At this, you know, at this point, you

4    know, the only thing I knew about --

5    BY MR. BRODY:

6        Q.       That's -- that's -- that's -- that's

7    fine.  No, you've -- that's -- and I think you

8    indicated that you didn't refer to the fact that he

9    had been at Faegre Drinker, did you?

10       A.       I did not.

11       Q.       All right.  You didn't disclose the

12   fact that you had been -- you know, you had met him

13   and had been working with him for six months to the

14   day at this point, right?

15       A.       At this point, I had -- I had met him

16   six months prior.

17       Q.       Right.  And just two weeks before

18   this, he had offered that he and you and

19   Mr. Dachille would go into J&J to pitch this idea?

20       A.       Yes.  On November -- on October the

21   18th, the letter you just showed me.

22       Q.       And somebody reading your press

23   release wouldn't have known that, correct?

24       A.       Somebody reading this press --

25   there's nothing said in there about -- about an

Page 57

```
1    offer to, you know, to meet with J&J.  That's true.
2           Q.      You knew, however, at the time that
3    you wrote this that this was the Texas -- the
4    structural optimization and resolution through the
5    tort system that was being pitched was adverse to
6    J&J's preferred resolution through the bankruptcy
7    process that had been announced by Mr. Haas on
8    October 17th, just a couple of weeks before, right?
9           A.      I mean, I had -- Mr. Haas has made
10   clear that his preference is bankruptcy, period.
11          Q.      And so what both you and Mr. Conlan
12   advocated in your dual November 2nd public
13   statements was adverse to what J&J wanted, right?
14          A.      I didn't know that.  I thought J&J
15   wanted finality.  I know that Mr. Haas, you know,
16   preferred bankruptcy.  What -- what I had put I had
17   learned through, you know, through all of this
18   process, through two mediations, estimation process.
19   I had learned that J&J -- I had heard over and over
20   again J&J is looking for finality.  They believed
21   that finality could only be achieved through
22   bankruptcy.  That was --
23          Q.      And you were advocating something
24   else?
25          A.      I was -- I was looking for -- I was
```

Page 58

1   looking for a way to give J&J what it said it

2   wanted, and getting our clients what we believed

3   they deserved.  And that's -- that's why, you know,

4   when -- when Mr. Conlan presented, you know, a path

5   that would offer finality to a company that had been

6   done and you -- I had come to see that that had --

7   that had viability.

8                  And so -- so I -- I have submitted a

9   matrix that would be part of that proposal to see if

10  that proposal would be accepted -- acceptable to

11  J&J.

12       Q.     And what you -- what you said is that

13  plaintiffs' lawyers shared Mr. Conlan's vision of

14  what you called a win/win solution where claimants

15  can pursue their claims in the tort system, right?

16       A.     Yes.

17       Q.     It would certainly be a win for you,

18  right?

19                  MR. POLLOCK:  Objection.

20                  THE WITNESS:  A win for me is a win

21  for our clients, period.

22  BY MR. BRODY:

23       Q.     The tort system resolution and your

24  firm's position on the MDL PSC, you stand to get

25  money from a common benefit fund in the MDL if

Page 59

1    there's a tort system resolution, correct?

2           A.       That would be up to -- that would be

3    up to the court.  That would be up to the MDL court.

4    But it is also true that common benefit, you know,

5    funds are available in bankruptcy proceedings, too.

6           Q.       Not in the J&J bankruptcy proposal,

7    correct?

8           A.       I haven't -- I haven't seen, you

9    know, the -- I haven't seen the TDP, you know, for

10   -- for the next, but I'm sure that that's the -- I'm

11   sure that that's the case, based on everything that

12   I have -- I have heard so far.

13          Q.       So you were opposed to it, and you're

14   not familiar with the terms of it?

15          A.       Oh, I'm familiar with the terms

16   enough to know what the claimants would get or

17   possibly could get.  I know the upper limits of what

18   the claimants could get under the J&J proposal

19   because I know it states in there, you know, in

20   their proposal and what they have rolled out what

21   the total amount would be.  And I know what the -- I

22   have a very good idea of what the total number of

23   claimants are.  So I know it falls far short of what

24   claimants would be -- would be a reasonable and fair

25   settlement for claimants.

Page 60

1          Q.      With all due respect, Mr. Birchfield,

2     I don't -- I don't think you answered my question.

3     And my question was simply -- well, let me -- I'll

4     rephrase it so that I can be sure we're on the same

5     page.

6                  Are you so unfamiliar with the terms

7     of the bankruptcy proposal that you were opposing

8     and seeking to dismiss that you're not aware of

9     whether money from that proposal would go into the

10    MDL common benefit fund or not?

11         A.      I know the -- I know the terms that

12    J&J put forward in their proposal, and that proposal

13    did not -- did not provide for common benefit fees.

14         Q.      Right.  And you were also generally

15    familiar with the terms of the MDL order

16    establishing the common benefit fund, aren't you?

17         A.      I am.

18         Q.      And pursuant to the common benefit

19    order that Judge Wolfson entered in the federal MDL,

20    up to 12 percent, 10 percent fee and 2 percent cost,

21    of any amount recovered on talc claims in the MDL is

22    assigned to a common benefit fund, correct?

23         A.      No.  Up to -- up to 10 percent fees

24    and up to 2 percent costs could be.  That's --

25         Q.      And that's exactly what I said,

Page 61

1   right?

2          A.      I'm not so sure.  There are other

3   provisions, so it's not a -- it's not determined.  I

4   mean, this is a -- you know, this is a -- an order

5   that is entered to provide holdbacks on an interim

6   basis.  At the end of the day, the Court, the

7   Article III judge would make that determination

8   about what the appropriate amount is.

9          Q.      Your general understanding, though,

10  just -- just so we're clear, I don't think this is

11  that complicated, is that the range of fees that

12  could be contributed to the common benefit fund is

13  anywhere from 8 percent to 12 percent of the gross

14  recovery amount, depending upon whether or not the

15  individual firms were early participants or not,

16  right?

17         A.      It would be -- it would be 6 percent

18  fees to 10 percent fees and 2 percent cost.

19         Q.      For a total of 8 to 12 percent,

20  correct?

21         A.      Yes.

22         Q.      All right.

23         A.      Not fees, but fees and costs.

24         Q.      And that separate and apart from that

25  8 to 12 percent, the fees that you, Beasley Allen,

Page 62

1    otherwise charge your talc clients is a 40 percent
2    contingency fee, correct?
3            A.      It's not -- it's not truly separate
4    and apart because the, you know, the common benefit
5    fees -- the common benefit fees are deducted from
6    the contingency fees.
7            Q.      All right.  So let's just talk about
8    the common benefit fees.  Okay?
9            A.      Okay.
10           Q.      We're talking about --
11                   MR. POLLOCK:  Your Honor --
12   BY MR. BRODY:
13           Q.      -- 8 to 12 percent?
14                   THE COURT:  Sure.
15                   MR. POLLOCK:  We're here on RPCs 1.6,
16   1.10.
17                   THE COURT:  You have a relevancy
18   question, right?
19                   MR. POLLOCK:  He had this whole
20   discussion in the press.
21                   THE COURT:  I don't need to catch up,
22   Mr. Pollock.
23                   Mr. Brody, how is this relevant with
24   regard to the conflict, the alleged conflict with
25   Mr. Conlan?

Page 63

1              MR. BRODY:  It's relevant to the

2     motivations for Mr. Birchfield to, you know, in

3     violation of the ethical rules, align himself with

4     Mr. Conlan without paying mind to the ethical rules,

5     without disclosing to J&J that he was working with

6     its former outside counsel from Faegre Drinker.

7              All of it goes to why it is -- and it

8     frankly goes to credibility, as well -- why it is

9     that Mr. Birchfield would so recklessly align

10    himself with one of J&J's former outside lawyers on

11    the very same matter.

12             MR. POLLOCK:  There's no proffer that

13    Mr. Conlan and Mr. Birchfield are sharing fees.

14    There's no proffer there's an agreement between

15    Mr. Birchfield and Mr. Conlan to share fees.  What

16    this is has nothing to do, zero to do with what's

17    before you.

18             This is Mr. Haas' effort to try and

19    get a sound byte in the national press so he can

20    attack Beasley Allen on a different matter outside

21    this courtroom, which is that they're greedy buggers

22    who are simply trying to make money.  That's his

23    argument, and it's a wonderful argument.

24             Andy has a great argument in

25    response:  I'm not.  I'm trying to get a fair and

Page 64

1    reasonable compensation for my clients.  And he'll

2    have the opportunity to answer that.

3                   But respectfully, Your Honor, this is

4    -- if we're going to try the Beasley Allen law firm,

5    then we ought to get all the facts up here.  Let's

6    just go do it.  But if we're here to try the ethics

7    issue as a basis for disqualification, this is so

8    far remote, so prejudicial, we should cut it off

9    right now.

10                   THE COURT:  I don't know if it's

11   prejudicial.  I don't know if it's remote.  I think

12   there's some relevancy, Mr. Brody.  We can't really

13   -- you know, we understand, and the Court can take

14   judicial notice of the common benefit fund.  We all

15   know that.  We know that plaintiffs' attorneys, you

16   know, have a percentage that's built into any

17   recovery.

18                   But let's get it back focused to

19   whether Mr. Conlan, or not, shared confidential J&J.

20   So, you know, to the extent J&J is trying to suggest

21   there's motivation here, or not, I think it gets a

22   little bit remote with regard to relevancy and why

23   we're here.

24                   So I don't know if you want to adjust

25   your questions, fine-tune your questions, but I

Page 65

```
 1    don't think -- and I don't think that's really on
 2    point with why we're here.
 3                   MR. BRODY:  I think I can wrap this
 4    line of questions up with two, just two simple
 5    questions.
 6                   THE COURT:  It's clear.  I don't
 7    think there's any secret here.  J&J wanted
 8    something, "X"; the plaintiff, including
 9    Mr. Birchfield, wanted "Y."  To the extent there's a
10    difference of opinion, the Courts accept that.  You
11    know, but we really want to get back to where is
12    Mr. Conlan, and then the issue before this Court.
13                   MR. BRODY:  And I'm happy to --
14    actually, I can wrap it up with a single question.
15    BY MR. BRODY:
16         Q.    Just in terms of the common benefit
17    fund, Mr. Birchfield, the difference in terms of
18    amounts that would come into the common benefit fund
19    via an $8.9 billion resolution -- if it's an $8.9
20    billion resolution in the tort system and the money
21    is going into the common benefit fund, 12 percent of
22    that is more than a billion dollars, right?
23         A.    Are you asking me to do the math?  I
24    mean, are you asking me if your math is correct?
25         Q.    Yes.
```

Page 66

1                    THE COURT:  Do you need a calculator?

2                    THE WITNESS:  Maybe so.  Are you

3     saying 12.9 --

4                    MR. POLLOCK:  Can we take judicial

5     notice that whatever the math is --

6                    THE COURT:  It's a lot of money.

7     It's a lot of money.

8     BY MR. BRODY:

9          Q.      And if you go to 19 billion, it's

10    double-plus, right?

11         A.      That's typically not the way that

12    common benefit funds work.  You -- typically, what

13    courts have done over decades with common benefit is

14    that the -- the larger, you know, the larger the

15    recovery, depending on the lodestar and the amount

16    of hours that are put in, you know, those numbers,

17    the percentage would be reduced.

18                    But if you're asking me if the math,

19    if 12 percent of 8.9 is less than 12 percent of 19

20    billion, the answer is yes.

21                    THE COURT:  Now, let me just address.

22    You know, obviously, if that focuses on the MDL and

23    any award by the District Court judge, that is

24    prognosticating.  There's been no determination.

25    And I will have Judge Singh, if Judge Singh would

Page 67

1    like to address that, go ahead.

2                    JUDGE SINGH:  Just to be abundantly

3    clear, to the extent there's any proffer of what

4    would be recoverable under the common benefit order

5    entered in the MDL, the Court is not making any

6    preliminary findings as to what may or may not be

7    awarded on the back end.

8                    I do understand and appreciate some

9    of these points were raised in the parties' briefing

10   on the application, at least in federal court, as to

11   the potential import of the common benefit order.

12   The Court will consider those arguments or not

13   consider it, as appropriate, based off of the

14   ethical standard.

15                   Notwithstanding, I also recognize

16   there is the request in the federal court

17   application for the [prima] relief as applicable to

18   the plaintiffs' steering committee.  To the extent

19   this may or may not be relevant to that alternative

20   relief, it will be addressed by the Court.

21                   MR. BRODY:  Thank you, Your Honor.

22   BY MR. BRODY:

23        Q.    Mr. Birchfield, you know who the

24   attorney Allen Smith is, right?

25        A.    I do.

Page 68

1          Q.      And you have a co-counsel

2    relationship with the Allen Smith law firm, right?

3          A.      Yes.

4          Q.      As a general matter, speaking not

5    limited to Allen Smith at this point, the majority

6    of your talc claims are obtained or referred to you

7    through co-counsel relationships, right?

8          A.      Yes.  I mean, the vast majority of,

9    you know, the claims that -- where we represent

10   claimants, we have co-counsel agreements.

11         Q.      Among them, Allen Smith has a

12   litigation financing arrangement, correct?

13         A.      I understand that Allen Smith and

14   probably a number of the co-counsel would have

15   litigation funding agreements.

16         Q.      And at some point, I believe Fortress

17   was financing some of the Allen Smith claims?

18               MR. POLLOCK:  Objection, Your Honor.

19   Relevance as to what Allen Smith is doing regarding

20   a litigation funding matter where the question is,

21   Did Jim Conlan share confidential information with

22   Beasley Allen.

23               So we're asking for hearsay as to the

24   relationship regarding whatever this funding group

25   is, what discussions they had.  We don't have the

Page 69

1  term sheets and conditions here, and we are far

2  afield on relevancy because there's been no proof

3  that litigation funding is relevant to

4  Mr. Birchfield's decisions.

5              So I would -- I object to this on

6  relevance.

7              THE COURT:  Thank you.

8              Mr. Brody?

9              MR. BRODY:  It goes to the same

10  point, Your Honor.  And these are just, you know,

11  three preliminary questions, and I have about four

12  more questions after that on this issue.  But it

13  goes to -- it goes to the, you know, what is driving

14  Mr. Birchfield and what drove Mr. Birchfield to --

15              THE COURT:  Allegedly.

16              MR. BRODY:  -- to take advantage of

17  the --

18              THE COURT:  We've made no findings.

19              MR. BRODY:  Right.  But to, you know,

20  join forces with Mr. Conlan over a period of over

21  six months last year to engage in strategies that he

22  knew and Mr. Conlan knew were adverse to what J&J

23  preferred.

24              THE COURT:  I will sustain the

25  objection with regard to the litigation from the

Page 70

1     agreements.

2                     MR. BRODY:  Fair enough.

3                     THE COURT:  On relevance.

4                     MR. BRODY:  Fair enough.

5     BY MR. BRODY:

6          Q.     So, Mr. Birchfield, the -- your

7     position is that -- first of all, you couldn't have

8     hired Jim Conlan to be a lawyer at Beasley Allen to

9     work on the talc cases, right?

10         A.     I never made -- I mean, never made

11    any effort to hire him.  I mean, that's the whole

12    point.  I mean, he came to us as an vendor.

13         Q.     But you -- you couldn't have done

14    that, right?

15         A.     Wouldn't have -- would not have done

16    that, because if we're going to hire him, we would

17    have found out more about his involvement, the

18    length of this work.  And at that point, we would

19    not have hired him.

20         Q.     I'm -- I'm kind of struggling with

21    your answer.  Are you telling me you think there

22    might be a circumstance where it would be okay to

23    hire somebody who had been outside counsel for your

24    opponent to work on the same matter?

25         A.     Not without a waiver.

Page 71

1      Q.     Huh?

2      A.     Not without a -- no, I would not.

3  What I was saying is, you know, that what has come

4  out in this courtroom was much different than

5  anything I ever knew, because Jim Conlan was working

6  behind the scenes.  The only thing that I knew was

7  what Jim Murdica had told me, and that was that he

8  had worked with an FCR on a proposal that Jim

9  Murdica and I were working together to try to get

10  the Imerys TCC to sign off on.

11      Q.     And we've -- we've covered that.  I

12  don't want to -- I don't want to go back to that.

13  But you acknowledge, no matter what his role was, if

14  he's outside counsel for J&J on the talc litigation,

15  you can't hire him as a lawyer at Beasley Allen to

16  work on the talc litigation, right?

17              MR. POLLOCK:  Objection; asked and

18  answered.

19              THE WITNESS:  Agreed.

20              THE COURT:  I'll permit the question.

21  But go ahead.

22  BY MR. BRODY:

23      Q.     And you can't hire him as an expert

24  witness, right?

25      A.     I would not hire him as an expert

Page 72

```
 1   witness, no.
 2          Q.      Right.  But you couldn't.  The ethics
 3   rules would prohibit you from doing that, right?
 4          A.      Right.
 5          Q.      Right.  But just -- your position is
 6   that entering into a relationship with him as CEO of
 7   Legacy to design a resolution of the talc litigation
 8   was just fine, right?
 9                  MR. POLLOCK:  Objection.
10                  THE WITNESS:  This proposal --
11                  THE COURT:  Hold on.
12                  MR. POLLOCK:  To design a resolution,
13   because that -- we're going to see this in briefs, I
14   promise you, for months to come.
15                  THE COURT:  Suggests facts that are
16   not in evidence.
17                  MR. POLLOCK:  Exactly.
18                  THE COURT:  Okay.
19                  MR. POLLOCK:  He can answer the
20   question.
21                  THE COURT:  I think it's more of a
22   hypothetical than a factual question.  Why don't you
23   rephrase the question, Mr. Brody.
24   BY MR. BRODY:
25          Q.      Sure.  Your position is that the work
```

Page 73

1   you did with Mr. Conlan as CEO of Legacy is just

2   fine, right?

3         A.      I didn't get any confidential

4   information from Mr. Conlan.  What -- what would

5   happen -- understanding the nature of this proposal

6   makes that crystal clear, because if -- for this

7   proposal to go anywhere, it has to be acceptable to

8   J&J.  They can do it without my participation, and

9   that was a big concern.

10              But if the proposal were accepted,

11   then Legacy is standing in the shoes of J&J.  They

12   are our adversary every -- every bit as much as J&J

13   is now.  They have all of the talc liability.

14   That's -- that's the nature of it.  So I went into

15   -- into these discussions knowing that.

16              THE COURT:  Let me ask a question,

17   Mr. Brody.

18              MR. BRODY:  Of course.

19              THE COURT:  Mr. Birchfield, you said

20   you didn't get any confidential information from

21   Conlan regarding J&J.  That's your testimony, right?

22              THE WITNESS:  Yes, sir.

23              THE COURT:  So to the extent that you

24   know you didn't get any confidential information, so

25   Mr. Conlan didn't say, "Hey, by the way,

Page 74

1   Mr. Birchfield, I have this information regarding

2   J&J," he never came to you in that with regard,

3   right?

4                    THE WITNESS:  Right.

5                    THE COURT:  But he -- he could have

6   told you information that he got from J&J?  I mean,

7   you're not discounting that; am I right?  You

8   wouldn't know that?

9                    THE WITNESS:  I wouldn't know.

10                   THE COURT:  You wouldn't know, if he

11  came to you and said, "Mr. Birchfield," and I'm --

12                   THE WITNESS:  Yes.

13                   THE COURT:  -- referring to you as

14  "Mr. Birchfield" -- "Mr. Birchfield, if you do X, Y

15  and Z, why don't you consider that and convey that

16  to the plaintiffs' committee."

17                   To the extent he got that information

18  from J&J, but didn't tell you that, you wouldn't

19  know that, right?  I'm not trying to set you up.

20                   THE WITNESS:  Right.

21                   THE COURT:  Unless he said, "Hey,

22  Mr. Birchfield, this is what J&J is doing.  Here's

23  what they're thinking.  I worked there for 22

24  months.  This is the information I got, X, Y and Z."

25                   He could have just came to you and

Page 75

1    said, "Mr. Birchfield, why don't you propose X, Y
2    and Z to your clients and the plaintiffs'
3    committee."
4                     THE WITNESS:  He did not.  He did
5    not.  He did not do that.  The discussion, all the
6    discussions, you know, with Mr. Conlan were, and the
7    other Legacy people, were focused on the -- this
8    proposal of structural optimization and
9    disaffiliation.
10                    And so, you know, we didn't -- in
11   that proposal, we didn't need -- we didn't need any
12   information from them, except as to how structural
13   optimization and disaffiliation would work.  And,
14   frankly, you know, our big concern was, What are --
15   what are the traps?  Are there minefields here that
16   we must -- that we must avoid?
17                    Legacy --
18                    THE COURT:  And money drove -- money
19   drives any settlement, right?  So you had 8.9
20   billion, you got 19 billion.  And so to the extent
21   any plan would work, it's fund -- it's fund-driven.
22                    THE WITNESS:  It is fund-driven.
23   Absolutely.  You know, the focus, you know, from our
24   perspective was what -- what would give our clients
25   reasonable compensation, period.  So if we -- if we

Page 76

1    put together a structure, if we put together a

2    structure and a settlement fund that would provide

3    our clients with reasonable compensation, the common

4    benefit will take care of itself.  Other issues will

5    take care of itself.

6                    That was the goal.  That was the

7    driver, to, you know, to get a resolution plan that

8    would be acceptable to J&J.  And that's where the

9    finality came in.

10                    THE COURT:  Thank you,

11   Mr. Birchfield.

12                    Judge Singh?

13                    JUDGE SINGH:  Nothing.  Thank you.

14                    THE COURT:  Thank you.

15                    I didn't mean to sidetrack, but I

16   wanted to follow up with regard to that question.

17                    MR. BRODY:  It's quite all right.

18   BY MR. BRODY:

19        Q.    Mr. Birchfield, you would agree with

20   me that --

21                    THE COURT:  Hold on.  Mr. Placitella

22   has something from --

23                    MR. PLACITELLA:  Your Honor, someone

24   just sent me a note that they could hear Mr. Haas'

25   questions or information being provided to Mr. Brody

Page 77

1    over the --

2                    JUDGE SINGH:   The mic.

3                    MR. HAAS:   Your Honor, I --

4                    MR. PLACITELLA:   So I just want to

5    let everybody know.

6                    MR. HAAS:   Thank you.

7                    THE COURT:   Thank you,

8    Mr. Placitella.

9                    MR. HAAS:   Thank you, Chris.

10                   Your Honor --

11                   THE COURT:   And that is probably the

12   case with regard to that transponder that's in front

13   of you, Mr. Haas.

14                   MR. HAAS:   Thank you very much, Your

15   Honor.  But I am completely confident that anything

16   I said to my counsel I have no problem sharing up to

17   this point in this courtroom.  So it's okay.

18                   THE COURT:   So keep that in mind.

19   You also have with your microphones, there's a mute

20   button so that we can't hear.  And you can also, I'm

21   going to tell you, Mr. Pollock, Mr. Brody, that the

22   green light, if you touch it, it becomes a red

23   light.

24                   So thank you, sir.

25                   MR. PLACITELLA:   So pardon me.

Page 78

```
 1                    THE COURT:  That's quite all right.
 2       I think that's important to know, and everybody
 3       needs to know.
 4                    MR. BRODY:  I definitely didn't know.
 5       Thank you.
 6       BY MR. BRODY:
 7            Q.    It would certainly help, if you were
 8       trying to come up with a number that J&J would agree
 9       to, to have somebody who had been on the inside,
10       wouldn't it?
11                    MR. POLLOCK:  Objection; speculative,
12       hypothetical.
13                    THE COURT:  No, I disagree.
14       Objection overruled.  To the extent that
15       Mr. Birchfield understands the question and can not
16       speculate.
17                    THE WITNESS:  Not at -- not at that
18       point in time.  I mean, at that point in time, by
19       the time I first ever met Jim Conlan, we had been --
20       we had been negotiating, started negotiations,
21       started negotiations with Mr. Murdica in April of
22       2020.
23       BY MR. BRODY:
24            Q.    Okay.
25            A.    And I had been focused on mediate --
```

Page 79

1          Q.     I -- I'm sorry, Mr. Birchfield.  My

2   question -- my question was just if you wanted to

3   come up with a number that J&J would agree to, it

4   would help to have somebody who had been on the

5   inside, wouldn't it?

6               MR. POLLOCK:  Your Honors, I

7   understand Mr. Brody wants a yes or no.

8   Mr. Birchfield is explaining that he already knows

9   all this stuff, anyway.  If he's going to ask that

10  question, I respectfully beg you, let my client

11  answer the question.  Because Mr. Brody can't just

12  do it the way he wants to do it, because he wants a

13  short and fast, snappy answer.  The truth -- we're

14  here to get the truth.  I respectfully beg that

15  Mr. Birchfield be able to give his response.

16              THE COURT:  Thank you.

17              If you were responding to that

18  question, but with regard to -- more directly,

19  though, Mr. Birchfield.

20              THE WITNESS:  At that point in time,

21  we had a very good idea of what J&J would willingly

22  pay under those circumstances.  They put it on the

23  table.  They had -- they had done that through the

24  -- through the $8.9 billion, you know, proposal that

25  they had rolled out.  We had -- that was after a

Page 80

1    year-long, a year-long mediation.

2              So, no.  What we were looking for was

3    a way, because the whole -- the whole idea was that

4    J&J needed finality.  They needed finality.  You saw

5    the bankruptcy plan.  The bankruptcy plan would not

6    pay, would not pay reasonable compensation to our

7    clients.  And so we were looking for a way to give

8    J&J the finality so we could get it.

9    BY MR. BRODY:

10             Q.     So I take it that's a no, you

11   disagree, it wouldn't be helpful to have somebody

12   who had been on the inside if you wanted to come up

13   with a number that J&J would agree to, and so you

14   just tossed 19 billion out there when you knew that

15   J&J proposed 8.9?

16             A.     I did not toss out the 19 billion.

17   The $19 billion number is Jim Conlan and Legacy's

18   number.  And that is a -- that's what he testified

19   to.  He testified as to how he got to that number.

20   And that would be for all talc liability for all

21   time, taking on all of J&J's talc liability.

22             That was not the number -- that's not

23   a number for the ovarian cancer claims.  The ovarian

24   cancer claims were a piece of that overall proposal,

25   but only a piece.

1        Q.        And you don't know whether that

2    number is based on confidential discussions he had

3    with J&J, do you?

4        A.        He testified that it is not, and --

5        Q.        Well, he testified to a lot of

6    things.  You don't know, do you?

7        A.        If you're suggesting that J&J had

8    told them internally that that's the number that --

9    I would find that surprising.  But I don't have any

10   way of knowing.

11       Q.        All right.  Fair enough.  Let's wrap

12   this up.

13                 You know that on Wednesday morning,

14   J&J announced a proposed plan of reorganization by

15   LLT Management LLC for the comprehensive and final

16   resolution of all claims and future claims related

17   to ovarian cancer arising from cosmetic talc

18   litigation against it and its affiliates in the

19   United States, right?

20       A.        Yes.

21       Q.        And you know that the announced plan

22   provides for a three-month solicitation period

23   during which ovarian claimants are informed of its

24   terms and will have the opportunity to vote for or

25   against the plan, right?

Page 82

1        A.        I understand that that's a provision

2    of the proposal.

3        Q.        And that was announced on Wednesday

4    morning, right?

5        A.        Yes.

6        Q.        By 8:26 a.m. on Wednesday morning,

7    the same day, you had issued a press release stating

8    your opposition to it, right?

9        A.        Yes.

10        Q.        And on -- you will probably remember

11    this, but I'm quoting what was attributed to you in

12    that press release.  "We believe any bankruptcy

13    based on this solicitation and vote will be found

14    fraudulent and filed in bad faith under the

15    Bankruptcy Code.  On behalf of our clients who

16    deserve better, we are blowing the whistle on this

17    cynical legal tactic and will resist it at every

18    turn."

19                  That was your statement, right?

20        A.        Yes.

21        Q.        And Ms. O'Dell also made a statement

22    in opposition, correct?

23        A.        Yes.

24        Q.        And she was quoted as saying, "The

25    company is afraid of a legitimate vote among those

Page 83

 1    who are truly sick and the families of the deceased
 2    who have been battling J&J's obstruction and bad
 3    faith for years and who are supported by numerous
 4    scientific studies showing that talc contains
 5    asbestos and other known cancer-causing
 6    ingredients."
 7                  That's what Ms. O'Dell stated, right?
 8         A.       Yes.
 9         Q.       So you are both out in the media
10    resisting J&J's latest plan to resolve its talc
11    liabilities, right?
12         A.       Yes.
13         Q.       You even sent an open letter to the
14    legal community on the same day, right?
15         A.       That's right.
16         Q.       And you did that under the Mass Torts
17    Made Perfect organization logo, didn't you?
18         A.       It was a joint letter with Mike
19    Papantonio.
20         Q.       And you don't just want to, as you
21    stated there, you don't merely want to challenge
22    J&J's proposed resolution as filed in bad faith,
23    although, frankly, nothing has been filed, as you
24    indicated, but you also want to try to galvanize
25    claimant opposition to J&J's plan, right?

Page 84

1          A.      Yes.

2          Q.      And you're urging people to be united

3     in opposition to the J&J plan, right?

4          A.      Yes.

5          Q.      So, I mean, really, nothing has

6     changed since last summer when you were opposing the

7     J&J LTL 2 plan; you're still opposing the way in

8     which J&J wants to resolve these claims, right?

9                   MR. POLLOCK:   Objection, Your Honor.

10    Again, relevance.   What does the challenge to a plan

11    today have to do with a question of disclosure a

12    year ago?   I don't see any connection.

13                  MR. BRODY:   Your Honor, he answered

14    the question "yes," and that was my last question.

15                  MR. POLLOCK:   Your Honor, I still

16    object to it.   I, frankly, I don't know what --

17    Mr. Brody said he would be done in half an hour.

18    Now it's now two hours.   At this rate, we'll be here

19    all day.

20                  THE COURT:   I'm sustaining the

21    objection.

22                  MR. BRODY:   That's fine.   I have

23    nothing further.

24                  THE COURT:   Thank you.

25                  Judge Singh, do you want to take a

Page 85

1    break?

2                    JUDGE SINGH:  Yeah, we can take a

3    break.

4                    THE COURT:  Okay.  May we take 10

5    minutes, everyone?

6                    MR. POLLOCK:  That's fine, Your

7    Honor.  What time would you like to reconvene?

8                    THE COURT:  25 after 11.  I'm using

9    that clock.  I know we all haven't synchronized, but

10   we'll take 10 minutes.

11                   (A recess was taken.)

12                   THE COURT:  Thank you.  Please be

13   seated.

14                   Mr. Birchfield, come on back.  You're

15   still under oath, sir.

16                   THE WITNESS:  Yes, sir.

17                   THE COURT:  And Mr. Pollock, you have

18   some questions?

19                   MR. POLLOCK:  I do, Your Honor --

20   Honors.  I apologize.

21                   THE COURT:  We're going to wait for

22   Mr. Brody.  Okay.

23                   MR. POLLOCK:  It would be so much

24   faster without him.

25                   MR. BRODY:  Apologies.

Page 86

1                    THE COURT:  It's quite all right.

2                    Just for the record, you were pretty

3    close to our time.  But go ahead, Mr. Pollock.

4                    MR. POLLOCK:  Yes, Your Honor.

5                         -  -  -

6                    REDIRECT EXAMINATION

7                         -  -  -

8    BY MR. POLLOCK:

9        Q.     Mr. Birchfield, what I would like to

10   do is start with the --

11                   MR. POLLOCK:  And Your Honors, this

12   goes to the question as to whether Mr. Conlan had

13   significantly -- had significantly harmful

14   information.  Yuna.  So that's what I'm focused on

15   here.

16   BY MR. POLLOCK:

17       Q.     Mr. Birchfield, can you please walk

18   me through what Beasley Allen first -- when did it

19   first become involved in talc litigation against

20   J&J?

21       A.     It began in 2013.  In 2013, you know,

22   is when we -- when we opened our first case and

23   began investigating the talc issues against J&J.

24       Q.     And do you know what that first case

25   was, by chance?

Page 87

1          A.      I don't.

2          Q.      And do you know when they had their

3    first verdict?

4          A.      Okay.  So the first trial was in

5    2016.  In February of 2016, we had the Fox trial.

6    That was a $72 million verdict.

7          Q.      And is there another one called

8    Ristesund, R-I-S-T-E-S-U-N-D?  Have you heard of

9    that one?

10         A.      Ristesund, yes.

11         Q.      And when was that one, sir?

12         A.      So it was in 2016, as well.  So we

13   had, in 2016, we had three, three verdicts; the $72

14   million verdict, a, I believe, a $55 million

15   verdict, and a $70 million verdict in -- in 2016.

16         Q.      And in 2000 -- was Leigh O'Dell ever

17   appointed as co-lead of the MDL?

18         A.      Yes.

19         Q.      When did that occur?

20         A.      That would have been in 2016, as

21   well.  I believe it would be December of 2016.

22                 MR. POLLOCK:  I'm going to skip a few

23   just for brevity, Your Honors.

24         Q.      Slemp, there's a matter called Slemp.

25   Have you heard of that one?

Page 88

1          A.      Yes.

2          Q.      What was Slemp?

3          A.      Slemp was an ovarian cancer trial.  I

4    believe that was a $110 million verdict.

5          Q.      And do you know approximately what

6    year that was?

7          A.      I believe that was 2017.  Three in --

8    in 20 -- in 2016, we had three verdicts, three

9    favorable plaintiffs' verdicts.  And then in the

10   beginning of 2017, we had a Daniels case that was a

11   defense verdict.  And then we had the Slemp -- Slemp

12   trial, ovarian cancer trial.  I believe that was a

13   $110 million verdict.  And then those cases were --

14   those cases, the verdicts were vacated based on the

15   Bristol-Myers-Squibb case out the Supreme Court.

16   The verdicts were vacated on personal jurisdiction,

17   but those cases are -- those cases still ready to be

18   retried.

19              I'm sorry.

20         Q.      Were there any Daubert challenges,

21   Iqbal, Twombly, Kuhmo Tire challenges as to expert

22   qualifications during the course of these trials?

23         A.      Yes.  I mean, every -- I mean, every

24   trial, you know, you would have -- maybe not

25   Daubert.  I mean, you had -- I mean, in -- in --

Page 89

1    preceding these trials, you know, the courts would

2    weigh under the local state standard.  So, in New

3    Jersey, it would be Kemp.  In California, which

4    was --

5                    THE COURT:  Accutane now.

6                    THE WITNESS:  Accutane now?  Okay.

7    All right.

8                    THE COURT:  Just for our record, Kemp

9    Accutane Daubert.

10                   MR. POLLOCK:  Thank you, Your Honor.

11                   THE WITNESS:  There is Sargon.  You

12   know, there was a -- in 2017, after the Slemp case,

13   we have tried the Echeverria case in California.

14   There was a Sargon hearing, you know, there.

15   BY MR. POLLOCK:

16        Q.      What's a Sargon hearing?  I missed

17   that one.

18        A.      It's the -- it's the equivalent of

19   the Accutane here, but in California.  The state

20   court equivalent of a Daubert, you know, proceeding.

21        Q.      And can you describe for the Court

22   the team, the Beasley Allen team that works on --

23   what's your role within the talc stuff that you do?

24   What's your title?

25        A.      I'm the section head for the mass

Page 90

```
 1   tort section.  Our firm is divided into -- into

 2   sections, and I head up our mass tort section.  And

 3   so we have a, you know, a pretty -- pretty large

 4   team, 30 something lawyers, you know, in the mass

 5   tort section, and a, you know, a staff, a large

 6   staff.

 7                  And so I'm -- I manage, I supervise,

 8   and -- and, you know, since 2020, I have been

 9   hands-on in the, you know, in the talc.  Before

10   that, I didn't -- I was not the one that tried any

11   of those cases, so -- and so Ted Meadows, you know,

12   tried, and Jerry Beasley, our senior partner, tried

13   the first Fox case in 2016.

14                  But, I mean, I would be -- I was

15   involved and learning the case, learning the

16   details, I mean, and supervising, but I was -- I had

17   other things prior to April of 2020.

18                  And at that point, at that point, I

19   had my first meeting, you know, with Mr. Murdica,

20   who testified here.  And at that point, you know, we

21   began, you know, pursuing resolution.  So we had a

22   number of -- a number of trials we had gone through.

23                  I'm sorry, I'll stop.  But we had

24   gone through a number of trials up to that point.

25   My role prior to April 2020 was more of a
```

Page 91

1   supervisory, you know, role within the section.

2          Q.      Is there -- did there come a point in

3   time when you weren't just representing clients for

4   Beasley Allen, but you also had a leadership role

5   among the torts bar at large?

6          A.      Yes.  That would have been -- well, I

7   mean, officially, it would have been in the MDL.  So

8   the -- before, before 2016, there was no -- there

9   was no MDL formed.  Once the MDL was formed, Judge

10  Wolfson appointed Leigh O'Dell, my law partner, as

11  co-lead, along with Michelle Parfitt from Ashcraft

12  Gerel.  She appointed the, you know, the committee.

13              And so Leigh and Michelle, Ms. O'Dell

14  and Ms. Parfitt, served as co-lead counsel.  And so

15  we had a leadership role nationally in that regard.

16              There's coordinated litigation here

17  in New Jersey, and, you know, Ted Meadows and

18  Mr. Placitella and Mr. Golomb, you know, were

19  instrumental there.  I don't think there's an

20  official order, just -- just that role.

21          Q.      And do you, do you, as chair of the

22  department, do you view your role as of the time --

23  I think you mentioned 2016 -- that your role

24  vis-a-vis the other plaintiffs' law firms, that you

25  owe their clients a duty of loyalty, too; that

Page 92

1    you're there to protect their joint interests?

2          A.      Yes.  I mean, our view, our view --

3    and when I say "our view," it's shared by

4    Ms. O'Dell, and it's our -- our firm approach.  And

5    there is -- there are differences in how, you know,

6    how firms would approach the leadership roles in

7    MDLs.

8               But, I mean, my first -- my first MDL

9    leadership role was in Vioxx before Judge Eldon

10   Fallon and, you know, in that -- it was -- it was

11   instilled then.  You know, you've got a duty to all

12   the plaintiffs.  There are -- there are -- there are

13   a number of times when leadership have resolved

14   their own cases, and that could be -- you know, we

15   would never abandon our role as leadership.  We have

16   a fiduciary duty, in my view, to all of the, you

17   know, all of the plaintiffs that are pending in the

18   MDL, the lawyers and the plaintiffs.

19         Q.      I would like to address to the Court

20   what you learned, and I'm going to skip all the way

21   up to 2021.  I'm going to go right to this point

22   right here, when Mr. Conlan joins Faegre.  So let's

23   call it sometime in 2020.  I would like you to

24   briefly describe what you learned.

25               MR. POLLOCK:  And the premise, Your

Page 93

1    Honors, for my question is, What did Mr. Conlan know

2    that he didn't already know?  That's really what I'm

3    getting to.   All right?

4         Q.      So, Andy, if you could walk through,

5    what did you learn from 2013 to 2020 regarding the

6    natures of the claims, the types of claims, value of

7    the claims, matrices?  Just go for it.

8              THE COURT:  I think Mr. Brody wants

9    to address the Court, Mr. Pollock.

10              MR. BRODY:  Well, first, I'm going to

11   object to the question as calling for a narrative.

12   You know, it's -- you know, what did you learn about

13   six, seven, eight, nine things.  I think the

14   question should be more focused.

15              You know, generally, I'm all in favor

16   of counsel framing things for the Court when they're

17   going to go into a certain area and ask questions,

18   but I think what we're hearing from Mr. Pollock is

19   argument, and I think that it's improper to offer

20   argument during the examination of Mr. Birchfield.

21              So I would object to the continued

22   framing arguments.

23              THE COURT:  Could you rephrase the

24   question --

25              MR. POLLOCK:  Of course.

Page 94

1                    THE COURT:   -- Mr. Pollock with

2    regard to what you're exactly -- the testimony you

3    want to elicit from Mr. Birchfield.

4                    MR. POLLOCK:   Absolutely.

5    BY MR. POLLOCK:

6         Q.       Mr. Birchfield, the challenge here

7    today is that you obtained information that was

8    confidential to J&J and that you got it from

9    Mr. Conlan.   That is the allegation that's been

10   brought against you.

11                   I would like to know, what did you

12   know before, regarding these claims, what did you

13   know before you met Jim Conlan?

14        A.       Before I ever met Jim Conlan, we had

15   extensive, extensive knowledge and understanding

16   about the nature of these claims, as well as the --

17   as well as what J -- how J&J would evaluate these,

18   you know, these claims.

19                   And we gained that because there is

20   -- there, in my view, you know, there -- you learn

21   to strengthen the weaknesses of the cases through

22   trials.   And so we had tried multiple, multiple

23   trials before -- before we ever -- before I ever

24   met, you know, Jim Conlan.

25                   Before I ever met, you know, Legacy,

Page 95

1    Jim Conlan, or anyone at Legacy, we had gone through

2    multiple Daubert-like, you know, hearings.  We had

3    gone through the MDL in front of Judge Wolfson.  So,

4    I mean, that was extensive briefing and expert

5    reports and live testimony.  And we had the, you

6    know, we had the Daubert decision, you know, from

7    Judge Wolfson.

8                   We had gone through, you know, a

9    similar type proceeding in front of Judge Nelson

10   Johnson, both here and up on appeal to the -- to the

11   Appellate Court.

12                  And then, beyond that, we, you know,

13   we had -- I had extensive negotiations, you know, on

14   behalf of, you know, ovarian cancer claimants with,

15   you know, with Jim Murdica.  And so I had, I believe

16   -- I believe the first matrix, you know, that I

17   provided, you know, to -- to J&J through Jim

18   Murdica, I believe that was as early as May of 2020.

19                  And so we had -- we had been

20   evaluating, you know, how, how can -- how can we put

21   together a structure for global resolution.  We had

22   been working on that for a long time, a long time

23   before I ever met, you know, anyone -- Jim Conlan or

24   anyone from, you know, from Legacy.

25                  You know, we -- we negotiated.  We

Page 96

```
 1    negotiated, you know, toward a, you know, private

 2    global -- when I say "private," I mean through the,

 3    you know, through a global deal for all claimants,

 4    but not part of any bankruptcy.  We did that.

 5              And then there was a proposal that

 6    was a bolt-on to the -- to the Imerys bankruptcy.

 7    And so we had negotiated that.

 8              All of that, all of that requires,

 9    you know, an in-depth understanding of the nature of

10    the claims.  What are, you know, what are truly

11    compensable claims, what are the claims that are

12    supported by the -- by the science and the medicine,

13    and what's not.

14              It also requires an understanding of

15    how many claims.  What is the -- what's the total,

16    you know, universe of claims.  You know, you need to

17    know that, unless it's just purely a, you know, a

18    pay-as-you-go type proposal.  You need to know what

19    are the number of claims.

20              And so we had -- we had worked very

21    closely with, you know, firms across the country to,

22    you know, to assess that, to get a handle on what

23    the total number of claims, you know, were.  All of

24    that was done, all of that was done before -- before

25    J&J filed its first bankruptcy.
```

Page 97

```
 1                    Then, when J&J filed its first
 2     bankruptcy in October of 2021, at first -- at first,
 3     I, on behalf of, you know, our ovarian cancer team,
 4     I was pushing -- I was pushing for resolution in --
 5     in that bankruptcy, in that bankruptcy context.  And
 6     now I look back and -- and I see that that was, you
 7     know, that that was a mistake.
 8                    We had, at that point, you know,
 9     there was meso -- there were mesothelioma lawyers
10     that were representing clients on the TCC, and they
11     were saying, No, you -- you can't, you can't.  We've
12     had experience with bankruptcy.  We've had
13     experience with the Texas Two-Step.  It -- it will
14     not work.  They will -- you cannot get reasonable
15     resolution in the bankruptcy context.
16                    I resisted that and I was pushing for
17     resolution in the bankruptcy context at the
18     beginning of LTL 1.
19                    But then after we got -- so, through
20     that process, you know, in the -- the LTL 1, you
21     know, was filed in North Carolina.  It was
22     transferred to Judge Kaplan here in New Jersey.
23     Judge Kaplan, you know, urged mediation.  That
24     didn't -- that didn't happen, I mean, not officially
25     before the motion to dismiss hearing.  But we -- but
```

Page 98

1   we did engage.  We were trying to reach a
2   resolution.
3                   Once Judge Kaplan denied the motion
4   to dismiss, when he denied that motion to dismiss,
5   he ordered mediation, and he ordered -- he ordered
6   Judge Joel Schneider and Gary Russo to serve as
7   mediators.  And so --
8                   THE COURT:  And I think that's, you
9   know -- I'm sorry, Mr. Birchfield.  I think that
10  gets us to where we were --
11                  THE WITNESS:  Sure.
12                  THE COURT:  -- to the crux of your
13  question; what did he know at that time frame.
14                  MR. POLLOCK:  Correct.  I think
15  you're -- I think you're right, Your Honor.
16  BY MR. POLLOCK:
17        Q.      Imerys.  I know that everyone else
18  probably knows more than I do.  What was the Imerys
19  bankruptcy?
20        A.      Imerys -- Imerys is a mining company.
21  They were a supplier to J&J.  So Imerys and Cyprus
22  were suppliers.  They both filed bankruptcies.  The
23  Imerys bankruptcy was filed in, I think, February of
24  2019.  And, you know, and Beasley Allen, Leigh
25  O'Dell, you know, Ted Meadows,  we served -- we

Page 99

1    represented a member of that Imerys tort claimants

2    committee, as well.  There's a Cyprus -- Cyprus

3    filed bankruptcy, as well, but that was primarily

4    for mesothelioma.  We didn't -- we did not have a

5    client on that committee.

6            Q.      During the course of the Imerys

7    bankruptcy, did you have discussions with J&J

8    regarding potential resolution of the talc claims?

9            A.      We did.

10           Q.      And over what time period did you

11   have those discussions?

12           A.      I believe that would have been in --

13   it would have been the fall of 2020 and up through

14   the spring of 2021, roughly.

15           Q.      And the -- were there -- was there a

16   settlement matrix that you ever shared with anyone

17   at that point in time?

18           A.      Yes.  I mean, there was a settlement

19   matrix that was, you know, that was developed and --

20   as part of that process, as well.

21           Q.      And when you say the settlement

22   matrix was developed, is this something that you

23   worked on with the talc claimants committee?

24           A.      Yeah, I mean, it is something that we

25   -- that was, you know, presented, you know, to the,

Page 100

1    you know, to the tort claimants committee.  I'm just

2    -- I'm just hesitant here because there are very,

3    very strict rules about what's -- what goes on

4    within the, you know, tort claimants committees in

5    these bankruptcies.

6            Q.       Fair enough.  On the -- I lost my

7    train of thought.  Sorry.  During the course of time

8    you were working on Imerys, did you gain insight as

9    to what you believed were the settlement values that

10   were -- that J&J was looking for?  Do you know

11   anything about their settlement position?

12           A.       Well, yes.  I mean, through the --

13   through the course of, you know, through the course

14   of negotiations, you know, we were given, you know,

15   pretty, you know, clear picture of at least what

16   they were, you know, they were saying that they

17   would be willing to pay at that point.

18           Q.       And if I were to pick the time, I

19   have on the calendar up here, the clock up here,

20   2019 roughly is when Imerys starts, and they have

21   2024 as Imerys ongoing.  I don't know if that's

22   accurate.

23                    Were the number of claims, as you

24   understood them, changing, the number of claimants

25   and the number of types of claims changing between

Page 101

1    2019 and 2023 in Imerys?

2            A.      I'm having a little -- a little

3    difficulty, you know, teasing out, you know,

4    Imerys --

5            Q.      Sure.

6            A.      -- because, you know, because I can't

7    really speak to Imerys on --

8            Q.      Let me try to -- try it over again,

9    and ask a different question because I probably

10   screwed it up.

11                   I apologize, Judges.  I'm not a talc

12   guy.  I just -- I live a decent life.  I have not

13   done this talc claim, so I apologize if I botched

14   it.

15                   Let me make the question broader.  If

16   I look at the number of talc claims regarding J&J

17   just generally between 2019 and 2022-23, do you

18   believe there was a change in the number and value

19   of those claims?

20           A.      There was a -- there was a

21   significant, you know, change in the, you know, in

22   the number, in the total number of claims.  I mean,

23   that -- that is true.  And, I mean, there are -- you

24   know, there were factors that, you know, any lawyer

25   would weigh in, you know, impacting, you know, the

Page 102

1    value or a reasonable settlement value, you know, of

2    those claims.  Those factors would -- would change,

3    you know, over, you know, over time, as well.

4              But, I mean, over the course of, you

5    know, over the course of this litigation, over the

6    last, you know, the ten years, there have been,

7    there have been, you know, milestones that have

8    impacted the, you know, the total number of -- the

9    total number of claims.

10        Q.      So if we could go to something that

11   I'm dying to get into because I love numbers.  We're

12   going to go to Exhibit 7, sir.  This is one that

13   Mr. Brody was asking you about.  Let me know when

14   you're there.

15        A.      I'm there.

16        Q.      And Exhibit 7 has a proposal from

17   James Conlan, Doug Dachille, and John Gasparovic,

18   and I'm looking at Plaintiff's -- Plenary Hearing

19   66.

20        A.      Okay.

21        Q.      And that has a matrix then at the

22   end, at 67.

23        A.      Yes.

24        Q.      So I want to focus, first of all, on

25   the letter.

Page 103

1           Am I correct in understanding that
2  you had not seen this document nor a draft of it
3  until you -- this litigation began?
4           A.      That's right.  I mean, the first time
5  I saw this letter was when this motion was filed.
6           Q.      And if we go back to the email that
7  Mr. Brody was asking you about, which is Exhibit 4,
8  am I -- is it fair to -- am I correct in
9  understanding that you did not get a cc on this
10 document, either?
11          A.      I did not.
12          Q.      Now, if we -- if we go to -- and I'm
13 worried about timing here, but we'll get into it.
14 On Exhibit 6, which is Plenary Exhibit -- it's the
15 Exhibit 7, it's the last page of the document.  It's
16 the matrix there.
17          Could you walk us through -- first of
18 all who created this matrix?
19          A.      I did, in -- in conjunction with the
20 leadership committee on the talc claims.
21          Q.      So there's been a lot of questions,
22 comment about the matrix.  There's been oral
23 argument about the matrix.  Since you're the author
24 of it, you might be the one to say.
25          What -- can you explain this Court to

Page 104

1    the matrix [sic], what is this telling -- what is

2    this telling the receiver?  What is it -- what are

3    you trying to describe?

4           A.       And so this, this -- the way that

5    this would work is that if a -- and this is -- this

6    is not, you know, uncommon.  We've developed, you

7    know, similar type, you know, matrices in other --

8    other litigations, you know.  We developed a similar

9    one in Vioxx in the early, you know, mid 2000s.

10                   But the way that this would work is a

11   client -- claimant, client, would -- would be able

12   to identify, okay, when was I diagnosed, how old was

13   I when I was diagnosed.  And so -- and then what was

14   the, you know, what was the injury, what stage.  Was

15   I diagnosed with stage 4.  You know, if I was

16   diagnosed with stage 4 when I'm 55 years old, then

17   you would -- you would see, you know, that that is

18   -- that would -- the allocation there would be

19   500,000.  531,995.  That -- that's how it would

20   work.

21                   And then, you know, there would be --

22   a term sheet would provide, you know, qualification

23   criteria, you know, and -- and that's a -- that's a

24   key component, and that's -- that is a -- that's a

25   primary, a significant reason, you know, for our

Page 105

1    opposition, and especially our opposition to this,

2    you know, this last proposal.

3                    What we would base our, you know, any

4    -- any settlement on would be the, you know, the

5    claims that are -- the claims that are supported by

6    the medicine and the science for the ovarian cancer,

7    you know, claimants.  The type of cancer, the

8    subtypes that are supported by the science.  You're

9    talking about, you know, the epithelial ovarian

10   cancer.  It can be the fallopian tube or peritoneal

11   cancers.  All the same.

12                   But if you meet that criteria, you

13   have the appropriate, you know, subtype, then you

14   would be qualified here.  And so you -- that's how

15   the matrix would work.

16       Q.       So when I was talking to Mr. Conlan,

17   I think I talked about peanut butter and chocolate,

18   Reese's cups, because it was almost lunch.  The --

19   part of the deal in Exhibit 7 is a Jim Conlan thing,

20   and the attachment is an Andy Birchfield thing.

21                   Is that -- do you believe that's a

22   fair statement?

23       A.       Yes.  I mean, the matrix -- the

24   matrix is -- is -- that's -- that's definitely us.

25   You know, I mean me on behalf of the -- of the team,

Page 106

1    the ovarian cancer team.

2          Q.      Did you ever haggle --

3                  THE COURT:  Let me ask a question,

4    Mr. Pollock, I apologize.

5                  MR. POLLOCK:  Yes, of course.

6                  THE COURT:  So the total funding of

7    this matrix is $19 billion?

8                  THE WITNESS:  No, sir.

9                  THE COURT:  What's the total funding

10   of the matrix, if you know?

11                 THE WITNESS:  Looking at -- well, so,

12   in order to determine that, I mean, I can tell you

13   -- I can tell you what --

14                 THE COURT:  But it's more than $19

15   million.

16                 THE WITNESS:  No, sir.

17                 THE COURT:  $19 billion.

18                 THE WITNESS:  No, sir.  It would be

19   -- it would be less than the 19 billion.

20                 So, the 19 billion that -- that Mr.

21   -- the Legacy proposal includes, that -- that is a

22   proposal for Legacy to acquire an entity with all of

23   J&J's talc liability for all of time.  So that would

24   include -- it would include the current ovarian

25   cancer claims, it would include the future ovarian

Page 107

1    cancer claims, it would include -- at the time that

2    this proposal was made, it would have included the

3    mesothelioma, present and future, it would have

4    included the attorney generals, you know, actions.

5                    And so you had the, you know, two,

6    two states that were litigating, but you also had an

7    ad hoc group of 42 states.  So all -- you know,

8    essentially, all the states, you know, had claims.

9    It would have included all, all of that, any

10   talc-related liability from J&J.

11                   And so, you know, most of the -- most

12   of those buckets are fairly easy to model.  Talc, I

13   mean, asbestos, mesothelioma, that litigation has

14   been going on for decades, so there are easy ways to

15   model how many claims you will have each year.  It's

16   much more difficult with ovarian cancer.

17                   That's why, you know, for a Legacy

18   proposal, they needed -- they needed information

19   from us.  We didn't need information from them.

20   They needed information from us.

21                   THE COURT:  Thank you.

22                   I wanted -- I apologize.  I didn't

23   want to get too far afield because I wanted to stay

24   -- I wanted to make sure my question was addressed

25   on the current question that you were posing.

Page 108

1              MR. POLLOCK:  Your Honors, this is

2     your courtroom, and I respect that, and we're here

3     to answer your questions.  You're the audience, so

4     we're here to -- you can jump in any time you want.

5     BY MR. POLLOCK:

6         Q.      Is it fair to say that you were --

7     you never haggled with Jim Conlan over the values in

8     your matrix; your values are your values?

9         A.      That is -- that is true.  I mean,

10    this is a -- this is the product of a matrix that --

11    this wasn't our first.  You know, this wasn't our

12    first matrix.  This wasn't our opening demand in

13    this litigation.

14              Before we got to this, you know, this

15    matrix, it had been compromised -- we had

16    compromised from -- you know, through two rounds of

17    mediation.  I mean, to some extent, J&J really

18    didn't engage in the mediation in LTL 2, but we had

19    engaged in negotiations through LTL 1, and then

20    even, you know, following the dismissal.

21              So, and as I mentioned earlier, we

22    had -- we had -- we had put together a matrix.  We,

23    the ovarian cancer, you know, team, had put together

24    a matrix very similar to this, and a term sheet in

25    March of 2023 that we offered to present to J&J in a

1    meeting with Mr. Haas and Ms. Forminard, their

2    general counsel.  And -- but they declined that

3    meeting.  But that was put together.  This matrix is

4    -- it's a compromised matrix through years of

5    negotiation, but this was our matrix.

6         Q.      To put a point on it, you weren't

7    compromising with Jim Conlan?

8         A.      No, no, we were not.  We were not

9    haggling, we were not discussing, we were not

10   negotiating the matrix.

11        Q.      So to quote from the language of RPC

12   1.6, first line, "A lawyer shall not reveal

13   information relating to representation of a client

14   unless the client consents," and it does go on from

15   there.

16             Under oath, to the best of your

17   knowledge and belief, at any point in time, did

18   Mr. Conlan ever reveal to you any information that

19   he had learned while at J&J?

20        A.      No.

21        Q.      Sitting here today, I recognize it's

22   impossible to look behind the black screen of what

23   Mr. Conlan learned during the course of his

24   representation of J&J at Faegre.  Is there anything

25   you can think of that he would have learned, having

Page 110

 1    heard his testimony, that was conceivably relevant

 2    to your position of representing clients in Beasley

 3    Allen?

 4              A.      Not at that point in time.  By the

 5    time I met him, there would have been -- there would

 6    have been nothing that I can think of.

 7              Q.      Have you seen a single document,

 8    record, anything here that Mr. Conlan shared any J&J

 9    confidences with you?

10              A.      No.

11                 MR. BRODY:  I'm going to object to

12    that, Your Honor.  Really, he's asking for an

13    opinion on the evidence.

14                 THE COURT:  Are you asking for an

15    opinion or a fact, Mr. Pollock?

16                 MR. POLLOCK:  I'm asking for the

17    factual question.  He's being accused of having

18    received information --

19                 THE COURT:  To the extent he knows.

20                 MR. POLLOCK:  And he said he did not.

21                 THE COURT:  Right.

22                 Mr. Brody?

23                 But I think the Court's questions

24    earlier on the basis of your questions, Mr. Brody,

25    is, you know, candidly, he -- he may not know.

Page 111

```
 1                    MR. BRODY:  Exactly.  Exactly, Your

 2   Honor.

 3                    THE COURT:  So his testimony is "no."

 4                    MR. POLLOCK:  We can address this

 5   later.  I think his testimony is more that.  I think

 6   it's, "I know I didn't receive anything," and it's

 7   also, "No, I can't think of anything that he could

 8   have shared with me that was relevant."

 9                    Because -- you know, let's -- so

10   let's -- let me drill down on this a little bit, if

11   you would.

12                    THE COURT:  Go ahead.

13   BY MR. POLLOCK:

14        Q.     He's at Faegre until -- I can't

15   remember, sorry.

16                    THE COURT:  March 2023.

17   BY MR. POLLOCK:

18        Q.     March '23.  So during -- can you

19   describe briefly for the Court the changes in the

20   number of tort claims, asbestos claims that are out

21   there between June 2020 and February -- I'm sorry,

22   March 2023.  Can you describe what the evolution or

23   change is, if there's any?

24        A.     Well, yes, there were -- there was a

25   significant -- I mean, there was a significant
```

Page 112

1    increase in the total number of claims.  And I am --

2    I mean, I apologize.  This is -- this is just --

3    there's so much that's mixed in here, and I just --

4    I want to be -- I want to be clear.

5              From our perspective, you talk about

6    two different things.  You talk about the total

7    number of compensable claims versus the total number

8    of claims.  And so to answer your question, I really

9    need to know what are you -- what are you asking me.

10        Q.    Let me break it out.

11        A.    Okay.

12        Q.    That's a fair comment.

13             So at what -- and you know the dates

14   better than I do.  LTL was filed, according to me,

15   on October 2021.  LTL is dismissed on January of

16   2023.  Does that sound about right?

17        A.    Yeah.  The Third Circuit -- the Third

18   Circuit issued its opinion on January the 30th,

19   2023.

20        Q.    Okay.

21        A.    It was the mandate issue that was

22   technically dismissed by Judge Kaplan on April the

23   4th of 2023.

24        Q.    And so -- and you live in this world;

25   I visit it.  The number of claims out there, did

                                    Page 113

1    that change significantly as the result of the Third

2    Circuit's rejection of the LTL plan?

3           A.      I wouldn't say that there was -- I

4    wouldn't say that there was a significant number of

5    change, changes as a result of the Third Circuit.  I

6    mean, there were -- along the scope of this

7    litigation, you know, there had been some key events

8    that have, you know, caused spikes in the number of

9    claims, in the number of claims -- and in the number

10   of claims, you know, filed.  And, you know, some

11   were, you know, were verdicts.  You know, some were,

12   you know, the, you know, the US Supreme Court's

13   decision in Ingham, you know, the Daubert rulings.

14              And, but the biggest, the biggest,

15   you know, spike in the total number of claims came

16   as a result of the, you know, the LTL filing.  And

17   that's -- and that's -- that's a major concern from

18   our perspective because we have -- we've always

19   looked at, you know, the -- what are the compensable

20   claims.

21              And so Ms. O'Dell and Ms. Parfitt,

22   you know, as part of the MDL that communicate with

23   lawyers, they communicated, and they have over the

24   course of these years, indicate -- telling them, you

25   know, this is what, you know, this is what the

Page 114

1    science shows, these are the types of cases that are

2    supported by the science, just these -- just this

3    finite group.

4                    But then, when J&J filed its second

5    bankruptcy, they brought in all these other claims,

6    these other gynecological cancers that are not --

7    not supported to date by the scientific literature.

8    You know, so cervical cancer cases, uterine cancer

9    cases, vaginal cancer cases, you know, other types

10   of cases.  They're serious injuries; they're just

11   not linked.

12                   But the -- in the second bankruptcy

13   and the third that is proposed, that's what --

14   they're bringing those claims in.  They're bringing

15   those claims in and would have them vote.  They

16   wouldn't vote.  And vote on the plan that, if

17   passed, would then force these unreasonably low

18   values on the -- on the meritorious claims, the

19   claims that are supported by the science.

20        Q.        Let me switch gears for a second

21   here.  With regard to expert, Mr. Brody intimated in

22   the first day before Judge Porto that Mr. Conlan --

23   he was citing a case from the District Court of New

24   Jersey that he was an expert.

25                   Did you ever retain Jim Conlan as an

Page 115

1   expert?

2                   MR. BRODY:  I'm going to object to

3   the characterization of my argument from January

4   17th because it is inaccurate.

5                   THE COURT:  Well, you will have an

6   opportunity to address that.  I certainly know our

7   records reflect what it is.

8                   But go ahead, Mr. Pollock.

9                   MR. POLLOCK:  And I'm not going to

10  quibble.

11  BY MR. POLLOCK:

12          Q.      But did you ever retain him as an

13  expert?

14          A.      No.

15          Q.      Did you ever seek advice from him

16  regarding how to prosecute or pursue your claims

17  against J&J?

18          A.      No.

19          Q.      A side-switching lawyer was another

20  argument that was raised.  Did you ever retain

21  Mr. Conlan?

22          A.      No.  I mean, I -- from the very

23  beginning of, you know, of any interaction with Jim

24  Conlan or Legacy, I recognized, I recognized the,

25  you know, the role that they would play, and they

Page 116

1    would be standing in the shoes of J&J.  They would
2    be our adversary.
3                    I mean, any claim, any -- the
4    proposal that we put forward, the proposal that is
5    in here, it is a -- it's an opt-in proposal.
6    Clients would voluntarily choose to accept the
7    settlement, or not.  And if -- if the -- if the
8    settlement, if they chose not to, then -- or if the
9    settlement proposal didn't meet the threshold of 95
10   percent, Legacy would be litigating on -- they would
11   have full -- full responsibility, full liability.
12   We would be litigating against them.
13                   So I approached this, our team, you
14   know, approached this with that understanding and
15   that appreciation.  They would be our -- they would
16   be the adversary.  They would be on the opposite
17   side of the V from us, if J&J chose to sell off
18   its -- all of its talc liability to Legacy or to
19   whoever.
20        Q.       Mr. Brody has argued repeatedly that
21   there was an alliance between you and Jim Conlan to
22   work against J&J.  Do you agree that you were ever
23   in an alliance with Mr. Conlan to work against the
24   interest of J&J?
25        A.       No.

Page 117

1          Q.       Why not?

2          A.       As I just said, I mean, that -- you

3     know, this was -- this was not -- it was not against

4     J&J.  It's against -- it's against the proposal that

5     Mr. Haas has said is his preferred method, in his

6     preferred bankruptcy, but is not opposed to, you

7     know, to J&J.  I think this is -- I think that

8     getting rid of the talc liability would actually be

9     in the best interest of J&J.

10         Q.       Did you ever sit down with Jim Conlan

11    and say, "Jim, I got an idea.  We can get more money

12    out of J&J this way."  Was that ever one of the

13    discussions you had?

14         A.       No.

15         Q.       And so when I look at Exhibit 4, it

16    says from Jim Conlan to Duane Van Arsdale, Doug

17    Dachille, Erik Haas, and Andrew White.  It says:

18    "Duane, Thank you for your efforts to evaluate our

19    proposal."

20                  Whose proposal is it?

21         A.       It's Legacy's proposal.

22         Q.       And that's a proposal that you had

23    not seen before it was sent to J&J, correct?

24         A.       Correct.

25         Q.       And at the end, it says Doug -- "Andy

                                    Page 118

1    Birchfield, Doug Dachille, and I are prepared to

2    meet with you."

3                    Did you -- did you ever take from

4    that sentence that the idea, or did -- was it your

5    belief that you two were going to link up, that is,

6    you and Legacy, were going to link up and go attack

7    J&J and take them for everything they're worth?

8         A.        No, not at all.

9         Q.        What was your understanding of what

10   the meeting was about?

11        A.        The meeting was to, as I understood

12   it, at least as, you know, the invitation to me,

13   would I join, would be for me to talk about the

14   matrix and how it would provide a measure of

15   certainty, you know, that the auditors, the external

16   auditors, Pricewaterhouse, would be able to, you

17   know, to factor in, because they would have to give

18   -- they would have to give sign-off on the -- they

19   would have to sign off on the GAAP procedure, the

20   ASC 450.  They would have to sign off on that to

21   remove the noncash charge from J&J to get the talc

22   liability off of J&J's books.

23                    And the -- and the uncertainty around

24   the ovarian cancer case liability would be a factor

25   that would provide a -- you know, could provide a

Page 119

1    wide range.  And they, as external auditors, to

2    cover themselves, they'd have to -- they'd have to,

3    you know, go on the highest end.  This would provide

4    some measure of certainty about what the ovarian

5    cancer liability, you know, could -- could be

6    resolved for.

7                    And so, you know, to explain that,

8    and for, you know, for Legacy people to explain the,

9    you know, structural optimization and disaffiliation

10   and how that would benefit J&J.  That was, you know,

11   that was my understanding.  My role would have been

12   to talk about the matrix, to talk about the values

13   in the matrix, and what that would add up to.

14                   And, Judge Porto, you asked me about

15   the value, and before I -- before I got to that, you

16   asked about is it more than the 19 billion.  This --

17   this matrix, the matrix value here, before there

18   are, you know, before there are any reductions for

19   risk factors based on, you know, what we know about

20   the universe, universe of the claims, the value of

21   this would be approximately, you know, a 300,000

22   case average for -- for the legitimate, you know,

23   claims.

24                   The claims, when I say "legitimate,"

25   I don't mean to disparage any cancer victim, but

Page 120

1    there are -- there are cases, there are the ovarian

2    cancer, the epithelial ovarian cancer, the certain

3    subtypes that are supported by the science.

4                    If it's limited to that, this, you

5    know, this grid would be a 300,000 case average.  We

6    know that.  We can't look at this grid and determine

7    that, but we know, because we have worked on this

8    for a long time, we know what a reasonable

9    projection of how many claimants would fall into

10   each of those boxes, so we can -- we can make that

11   calculation of what this, you know, what this grid

12   would -- would average.

13                   And that's -- that's what we have

14   done.  But it is based on the -- a much smaller

15   universe of the total number of claims, because J&J

16   is now saying that the total number of current

17   claimants is 100,000.  You know, we -- we would say

18   that the total number of claimants that meet the

19   true qualifying criteria are significantly less than

20   that.

21        Q.        On topics -- you got questioned today

22   regarding common benefit.  Page 49, lines 10 through

23   11, 12, Mr. Haas threw out, "the common benefit fee

24   was not available in the plan that LTL was

25   advancing."  Page 49.

Page 121

1              MR. BRODY:  Page 49 of what?

2              MR. POLLOCK:  Page 49 -- I apologize,

3    Steve.  It's Eric Haas' direct on March 25.

4              MR. BRODY:  Okay.

5              MR. POLLOCK:  You can -- you can take

6    my copy.

7              MR. BRODY:  That's all right.  I have

8    one.

9    BY MR. POLLOCK:

10        Q.      "That common benefit fee was not

11   available on the plan that LTL was advancing in the

12   LTL bankruptcy."

13              Here it is, Steve.

14              And you were questioned about it

15   today.  Do you agree with Mr. Haas that you are not

16   entitled to -- I'm sorry.  Let me try it this way.

17              Was the driving factor for you, at

18   any point in time, in regarding the LTL bankruptcy

19   that you would not get common benefit?

20        A.      Absolutely not.

21        Q.      Why not?  What's Mr. Haas got wrong?

22        A.      Well, I mean, first of all, I mean,

23   there is no principle that you cannot -- you cannot

24   -- that a bankruptcy court cannot award common

25   benefit fees.

Page 122

1                   But the thing that is so frustrating

2       here is that, you know, that we have resisted

3       overtures, we've resisted overtures to negotiate the

4       common benefit fee.  We're not going to do that.  We

5       are firmly committed that we will -- we will look

6       out for the best interest of our clients.  If we --

7       if we take care of getting reasonable compensation

8       for our clients, the common benefit fee will take

9       care of itself.  We're not going to put that ahead

10      of the -- of the clients and clients' interest.

11                  The reason -- the reason that we are

12      opposing bankruptcy is because of the values that

13      are being offered in bankruptcy.  If you look at the

14      proposal, if you look at the proposal that they had

15      in LTL 2, if you look at the proposal that they

16      rolled out on Wednesday, the -- they have a payment

17      schedule, a payment schedule that would be $4.34

18      billion that would be available during the first

19      seven years.

20                  So that would be for your current

21      claimants.  Current claimants would be paid within

22      that.  They're saying there's 100,000, 100,000

23      claimants.  That would be a 43,000 [point 4]

24      average, case average.

25                  Now, there would be a range there,

Page 123

1   but you cannot -- you -- at that total number, even

2   if you were to limit it to the -- to the truly

3   compensable cases, you cannot get to fair values for

4   the claimants here.  We know.  We know because we

5   have been looking at this for a long time.

6               What are the elements that would go

7   into a reasonable compensation for, you know, the

8   claimants.  One, you have the medical costs.  The

9   medical costs for especially someone in their 50s or

10  younger that's diagnosed with a stage 4, those

11  easily exceed a million dollars just in the -- just

12  in the medical costs.

13              And if you have -- if you look at the

14  matrix, I mean, there -- there are stage 1 cases,

15  and go up to 80 years old or so.  The cost for

16  treating someone, you know, that's 80 and diagnosed

17  with stage 1, that's in the tens of thousands.  It's

18  much lower.

19              But we know that the weighted average

20  across this -- across this entire spectrum would be

21  about $224,000 average case value.  The numbers that

22  they are putting forward in this bankruptcy, in

23  their bankruptcy, you know, proposal would be truly

24  pennies on the dollar.

25              THE COURT:  And that's -- you know,

Page 124

1    there's no objection by Mr. Brody, but, you know, in

2    terms of where we are, things get a little bit far

3    afield from your question.  But certainly that's the

4    testimony, but --

5                    MR. POLLOCK:  I'll move it along.

6                    THE COURT:  -- I want to get us back

7    to what he knew with regard to Mr. Conlan, what

8    Mr. Conlan may or may not have --

9                    MR. POLLOCK:  Your Honor, I'm going

10   to move it along.  There was one direct -- part of

11   their theory in the case was to argue that Andy is a

12   bad guy and he's not credible.  And one of the

13   points Mr. Haas made at direct solicitation of

14   Mr. Brody's testimony was that the bias here is

15   because Andy is looking for a pay day, and that the

16   way the pay day works is that you get -- you don't

17   get common benefit in bankruptcy.

18                    So I will move it along.  I do need

19   to address it one more time because he squarely

20   addressed it during the course of direct and I need

21   to respond.

22                    THE COURT:  Yes, you do.

23                    MR. POLLOCK:  But I -- but I also

24   understand loudly and clearly we want to get this

25   done today.  I think we are going to.  I just need

Page 125

```
 1    -- if you give me a little bit more leeway, I'd
 2    appreciate it.
 3                    THE COURT:  Go right ahead.
 4    BY MR. POLLOCK:
 5          Q.      So if I -- if you go back to your
 6    binder of exhibits, page 5, exhibit -- I'm sorry.
 7    Exhibit 5, I'm looking at page 29.  It's Plenary
 8    Exhibit 56.
 9          A.      Yes.
10          Q.      Let me know when you're ready.
11          A.      What page in the book?
12          Q.      It's Plenary Exhibit 56, Exhibit 5.
13          A.      Yes, I'm there.
14          Q.      Okay.  So before you go and read
15    that, let me just ask you.  Mr. Haas has argued that
16    you admitted that you are not entitled to common
17    benefit before.  Do you agree that you ever admitted
18    that you were not entitled to common benefit?
19          A.      No.
20          Q.      Let's --
21                    MR. BRODY:  I'm just going to object
22    and ask for a reference.
23                    THE COURT:  Tell him the page number.
24    I think it's, what, page -- line 9?
25                    MR. POLLOCK:  Yeah.  I have lines 9
```

1   through 14.

2            THE COURT:  I thought so.  Okay.

3   BY MR. POLLOCK:

4        Q.     So lines 9 through 14.  "We'll come

5   back --" this is a questioning of you in -- you were

6   deposed before, correct?

7        A.     Yes.

8        Q.     And you were deposed on or about

9   April 17th, 2023?

10       A.     Yes.

11       Q.     And you were asked the following

12  question by Mr. Haas:

13            "QUESTION:  We'll come back to that

14  in a moment, but you understand as a general matter

15  in bankruptcy, you would not be entitled to any

16  portion of a common benefit fund that you would be

17  entitled to outside of bankruptcy; correct?"

18            Answer, line A, answer, I have, "No,

19  I do not."

20            Is that the answer you gave?

21       A.     It is.

22       Q.     And do you stand by that answer

23  today?

24       A.     Yes.

25       Q.     There was also a question regarding a

Page 127

1    -- bear with me one second.  I'm sorry, Judge.

2                      I'm going to go to -- you were handed

3    a transcript of April 17, 2023, last time we were

4    here, and the -- and in particular, Mr. Haas had

5    argued during the first day that you had backed out

6    of the deal.

7                      Do you recall having that testimony

8    from Mr. Haas?

9         A.      I recall that testimony --

10                     MR. BRODY:  Objection;

11   mischaracterizes the testimony.

12                     THE COURT:  It's not that we're going

13   to base our evidence -- any evidence decision or

14   make a fact finding on the question.  So I remember

15   the question, Judge Singh, I'm sure, remembers that

16   question, because it drew a reaction, candidly, from

17   what I recall, you know, from many individuals.

18                     So why don't you synthesize the

19   question down.

20                     MR. POLLOCK:  Sure.

21                     THE COURT:  I got -- I got your

22   point, Mr. Brody, but --

23                     MR. BRODY:  Thank you.

24                     THE COURT:  Yeah.

25                     MR. POLLOCK:  I thought this might be

Page 128

1    -- if you want me to go spend the time for 10

2    minutes, I can find the exact quote.  I think the

3    sum and substance of what I just said is absolutely

4    right.

5              Mr. Haas accused Andy of having

6    backed out of the deal in the Imerys bankruptcy, and

7    said, We had a deal at 3.5 million dollars --

8    billion dollars, and you backed out.  And I'm

9    simply, since this is cross -- this is, you know,

10   this is redirect, I'm allowed some latitude, I

11   believe.  If you want me to find the exact quote, I

12   will find the exact quote, but it's going to take me

13   10 minutes to do it.

14             THE COURT:  Can you help, Mr. Brody?

15             MR. BRODY:  Well, I think the problem

16   is trying to build a characterization of Mr. Haas'

17   testimony into the question.  If he can just ask him

18   questions about the deal, I think we can get to

19   where we're going.

20             THE COURT:  And that's a fair

21   characterization.  Do you remember that question

22   with regard to, purportedly --

23             THE WITNESS:  Yes.

24             THE COURT:  -- the deal and something

25   happened to that deal?

Page 129

```
 1                    THE WITNESS:  Yes.  But there are --
 2     but there are two separate deals.
 3                    THE COURT:  All right.
 4                    MR. POLLOCK:  Let me -- let me run
 5     with it, Andy.
 6                    THE COURT:  Go right ahead.
 7                    MR. POLLOCK:  And Judge Porto will
 8     tell me if I screw it up.  Okay?  Is that fair?
 9                    THE COURT:  That's fair, but --
10                    MR. POLLOCK:  Judges have been doing
11     that to me --
12                    THE COURT:  -- I just hear the
13     question.
14                    MR. POLLOCK:  Judges have been doing
15     that to me for years.  I've gotten used to it.
16     BY MR. POLLOCK:
17          Q.     I'm looking at the April 17, 2023
18     trans -- exhibit that -- transcript that Mr. Brody
19     was kind enough to provide to us last time.  So I'm
20     going to go to page 61 of that transcript, line 9.
21                    (As read):  Do you recall that August
22     and September of 2020, you had further discussions
23     with Johnson & Johnson's counsel regarding a
24     proposal to settle all ovarian cancer claims through
25     the Imerys bankruptcy?
```

Page 130

1                    And there's a whole host of

2        objections.

3            A.       Uh-huh.

4            Q.       Apparently, they were pretty excited

5        that day.

6                    And then it goes on again at page 63,

7        line 24.  (As read):  On September 25, 2020 -- on

8        September 5, 2020, you made a proposal to

9        Mr. Murdica on behalf of J&J in this role -- on

10       behalf of J&J to settle all the ovarian cancer

11       claims, both current and future, for $3.25 billion,

12       right?  And that's page 64.

13                   Again, a mountain of objections.

14                   And at page 74, and I'll have a

15       question soon, (as read):  And you did -- you did

16       not represent to J&J -- this is line 3 -- in

17       connection with this settlement offer of 3.25

18       billion that you had spoken to each and every one of

19       the clients regarding the proposed offer, correct?

20                   Your answer, line 8:  I did not.  I

21       did not make that representation.

22                   (As read):  And do you not require as

23       an element of your offer that you and two of the

24       other participating law firms were required to get

25       an affidavit or to represent to Johnson & Johnson

Page 131

1    that they had spoken to every one of their clients

2    regarding their proposed -- proposal, correct?

3                    There's objections.

4                    Answer:  We never got -- we never got

5    to that point.

6                    What did you mean when you said, "We

7    never got to that point"?  What's going on?

8         A.        I mean, this was -- this was a

9    proposal, you know, that was made.  It was -- it was

10   not for 3 point --

11        Q.        Whose proposal, Andy?  Help me out.

12        A.        I made the proposal.

13        Q.        Okay.

14        A.        It was a -- it was a term sheet and

15   -- that was made, you know, to J&J.  I was

16   questioned about that term sheet in my deposition.

17   And it was characterized as being a $3.25 billion

18   proposal for all ovarian cancer claims, present and

19   future.

20                   And so -- and through that colloquy

21   and what Mr. Brody asked me about on April the 10th,

22   I think, when we were here, was you -- "Did you

23   submit it?"  I did submit that proposal.  What I was

24   objecting to is, it is not a $3.25 billion proposal.

25   That was only a portion of the settlement proposal

Page 132

1    then.  That -- that was it.  So that was --

2          Q.      So what's the total value?  What's

3    the real number and how do I break it up?

4          A.      So it --

5          Q.      Can you explain it to the Court,

6    please?

7          A.      Okay.  That was a -- that was a

8    proposal that would have been, testing my memory,

9    but I believe that the total would have been --

10   would have been 5.5 to in the 6 range, depending on

11   how you count the present value, because it was --

12   it was a -- it would have provided a 10-year payout,

13   you know, for futures in that regard.  But that was

14   a proposal in September of 2020, when the total

15   universe of claims, current claims, was much, much

16   smaller.

17              But that's not -- that's not what

18   Mr. -- that's not the proposal that Mr. Haas has

19   accused me of reneging on.  That was a -- and in the

20   hearing, in the hearing last time on April the 10th,

21   that was -- there was -- probably what you saw in

22   the reaction was that there was a shift.  And

23   Mr. Haas didn't say on April the 10th that I

24   reneged; he said that he received communication from

25   the mediators that the committee would accept it.

Page 133

1    And that's a different position than had been taken

2    previously.

3                   But that -- but those are two

4    separate -- two separate proposals.  There -- I

5    was asked in my deposition about that proposal in

6    September of 2020.  It was presented as a 3.25

7    billion -- in my deposition, it was presented as a

8    $3.25 billion deal, which it was not.  That's one.

9                   And then later, you know, there was

10   a -- you know, there was an Imerys proposal, and

11   then there was a mediators' proposal.  So we're

12   talking about different -- different steps along the

13   way, different agreements.  But it was the -- it was

14   the mediator's proposal that I was initially accused

15   of reneging on.  And then -- then it was purported

16   that the mediators said that the committee would

17   agree.

18        Q.     If we go on to one last question on

19   page 94, the same transcript of April 17, 2023,

20   lines 12 to 17, let's call it.

21                "MR. HAAS:  So does that clarify,

22   Mr. Birchfield, that --

23                "ANSWER:  This is the proposal.  It

24   was made in September of 2020.  The world has

25   changed since September of 2020 in multiple ways

Page 134

1    that would impact the proposal."

2                      And it goes on from there.

3                      Can you describe for the Court --

4    just to put this in context, this transcript is

5    created April 17th, 2023, and it's in the

6    bankruptcy, apparently.

7                      How had the world changed between

8    September of 2020 and April 17 of 2023?

9         A.       Well, in the -- in the scope of the,

10   you know, talc litigation, so in September of -- in

11   September of 2020, there had not been a, you know, a

12   bankruptcy filing.  You know, there had been an

13   effort to do a bolt-on.

14                     But the -- you know, but the number

15   of claims, the number of claims had increased, you

16   know, dramatically between September 2020 and -- and

17   then the time that deposition was given in April of

18   2023.  So the number of claims had shifted, you

19   know, dramatically.  Plus there was the, you know,

20   the introduction, you know, by J&J in their

21   bankruptcy proposal, their LTL proposal on April the

22   4th of 2023, that these -- all these other cancers

23   should be included, as well.  So the -- so that

24   impacted, you know, matters.

25                     But perhaps the -- one of the

Page 135

1    bigger -- another big, you know, shift is, you know,

2    we had gone through -- we had gone through the, you

3    know, the threat of a -- of a J&J bankruptcy.  You

4    know, you're going to be in bankruptcy; your claims

5    are going to be on hold for years; and then, you

6    know -- and, you know, clients are going to die;

7    you're going to -- the delay is going to cause

8    significant problems.

9                    We had -- we had been through that.

10   We had gone through LTL 1, we had gone through the

11   motion to dismiss trial, we had gone through the

12   appeal to the Third Circuit, and the Third Circuit

13   had dismissed the bankruptcy for lack of financial

14   distress.

15                   So there was -- that was a

16   significant change.  We, at that point, you know,

17   even though they had filed their second bankruptcy

18   on the strength of the Third Circuit, there was a

19   significant change in the risk that we thought we

20   were facing.

21        Q.       So, subject to any questions the

22   Court may have, I have one last question for you,

23   Mr. Birchfield.

24                   You opposed the bankruptcy matter,

25   the bankruptcy filing that J&J had proposed.  Why

Page 136

1    did you propose -- why did you oppose that on behalf

2    of the talc claimants committee and Beasley Allen?

3            A.        When you say "the bankruptcy filing,"

4    you're talking about LTL 2 --

5            Q.        Yes, sir.

6            A.        -- their second, you know --

7            Q.        Yes, sir.

8            A.        -- their second bankruptcy filing.

9                      The reason that we opposed, you know,

10   that bankruptcy is because it would not provide, it

11   would not provide reasonable compensation, you know,

12   to the claimants.  And the matrix, you know, the

13   matrix values that we -- that we put forward, that's

14   now public, J&J made public with this, with this

15   filing, those reflect reasonable values for

16   legitimate claims.  And we are -- we are adamantly

17   opposed to a bankruptcy or any -- or any supplement

18   from a solvent defendant that would force a claimant

19   to accept -- accept value.  Even reasonable, what we

20   would conclude to be reasonable values.  They

21   shouldn't be forced to take that.

22                     But certainly, you know, certainly,

23   they should not be forced to take unreasonably low

24   values.  That's the only reason.  The interest of

25   the client is the only reason that we have opposed

Page 137

1  these bankruptcies and continue to oppose these

2  bankruptcies.

3              MR. POLLOCK:  Your Honors, do you

4  have any questions?

5              THE COURT:  Judge Singh?

6              JUDGE SINGH:  I don't.

7              THE COURT:  I don't have any

8  questions, either.

9              MR. POLLOCK:  Thank you, Judges.

10             THE COURT:  Why don't we take our

11  lunch break, 45 minutes.  All right?

12             Mr. Brody, how long will it take you?

13             MR. BRODY:  20, 20 minutes, maybe.

14             THE COURT:  Okay.  All right.  And

15  we're hearing from Judge Singh's calendar with

16  regard to supplemental briefing.  When we return,

17  we'll address the objections on Exhibit 5, and with

18  regard to the confidential client information.

19  Okay?

20             MR. BRODY:  Yes, Your Honor.  Thank

21  you.

22             THE COURT:  All right.  And we can go

23  off the record.

24             (A recess was taken.)

25             THE COURT:  Counsel, thank you.

Page 138

```
 1    Please be seated.  We're going to go back on the
 2    record and reconvene.
 3                    Mr. Brody, what did you say, you have
 4    five questions left?
 5                    MR. BRODY:  Not many more than that,
 6    actually.
 7                    THE COURT:  Okay.  All right.
 8                    MR. BRODY:  So.
 9                    THE COURT:  Probably is a little bit
10    more, but I was -- I was downplaying the questions a
11    little.
12                    MR. BRODY:  No, it's not many -- it's
13    not many more than that.
14                    THE COURT:  And Mr. Birchfield,
15    you're still under oath, sir.
16                    THE WITNESS:  Yes, sir.
17                             -  -  -
18                     RECROSS EXAMINATION
19    BY MR. BRODY:
20         Q.     Mr. Birchfield, you talked about some
21    of the trials, the talc trials that the Beasley
22    Allen firm has had.  Do you recall that testimony?
23         A.     Yes.
24         Q.     It's -- and you talked about some
25    verdicts that came in, in 2016.  I think you
```

Page 139

1    mentioned three in particular?

2         A.    Yes.

3         Q.    None of those are still standing

4    after the appeal, right?

5         A.    None of the -- none of the verdicts

6    are standing, that's true.

7         Q.    Right.

8         A.    Those cases are -- they vacate -- the

9    verdicts were vacated, and the trials are pending,

10   awaiting retrial.

11        Q.    And it's basically fair to say that

12   since 2013, when Beasley Allen started representing

13   talc plaintiffs, Beasley Allen has tried only 13

14   cases, not recovered a dime for claimants, and has

15   not settled any of the cases, right?

16        A.    I mean, the point of -- the point

17   that you're going to make is excepted, it's not

18   true, I mean, that we haven't collected a dime.  We

19   did have a co-counsel agreement in the -- for a

20   plaintiff in the Ingham case.

21             But it is true that we have been in

22   this litigation and we have -- we have a

23   longstanding and continued commitment to this

24   litigation, even though we haven't been -- haven't

25   been paid a dime.  That's true.

Page 140

1          Q.       Right.  So it is fair to say that
2     since 2013, Beasley Allen has tried only 13 cases,
3     not recovered a dime for claimants, and not settled
4     any of the cases?
5               MR. POLLOCK:  Objection; compound,
6     asked and answered.
7               THE COURT:  Why don't you break that
8     question up.  And you did ask the question.  What is
9     different about that question, Mr. Brody?
10              MR. BRODY:  Well, there were a bunch
11    of qualifications that preceded it.  I was just
12    trying to make sure the record is clean.
13              THE COURT:  That's fine.  Why don't
14    you address each of those points.  All right,
15    Mr. Birchfield?
16              THE WITNESS:  Yes.
17    BY MR. BRODY:
18         Q.       That's fine.
19              So, since 2013, Beasley Allen has
20    tried only 13 cases, right?
21         A.       We have had -- we have had 13 cases
22    go to trial.  I mean, some of those cases are cases
23    that were our cases, some we were helping other --
24    other law firms, but -- but yes.
25         Q.       Beasley Allen has not recovered a

Page 141

1    dime for the claimants?

2          A.      Not true.  Claimant.

3          Q.      Fair enough.  And has not settled any

4    of the cases, right?

5          A.      We have not settled any of the cases.

6          Q.      All right.  Do you have a copy of

7    your April 2023 deposition in front of you up there?

8          A.      I do not.

9          Q.      All right.  I'll give you a copy.

10                 MR. BRODY:  If I may approach, Your

11    Honor.

12                 THE COURT:  You may.

13                 Do you have a copy of that,

14    Mr. Pollock?

15                 MR. POLLOCK:  I do not.

16                 MR. BRODY:  I'll give you a copy.

17    It's the one you were reading from earlier.

18                 MR. POLLOCK:  Okay.  Is it the same

19    big fat thing?

20                 MR. BRODY:  Yeah.

21                 MR. POLLOCK:  Okay.  Then I probably

22    have it.

23                 THE COURT:  It's not one of the

24    exhibits, either?

25                 MR. POLLOCK:  I'm sure I have it.

Page 142

1    Thank you.

2                    MR. BRODY:  Yeah.  I think it's in

3    the exhibits, as well.  It's --

4                    MR. POLLOCK:  Thank you.  We're good.

5                    MR. BRODY:  It's within the excerpt

6    that in the exhibits, as well.

7    BY MR. BRODY:

8         Q.        So if I could turn to page 58, line

9    20.  Are you there?

10        A.        Yes.

11        Q.        And you were asked the question:  "So

12   since 2013, with respect to the 11,300 claims that

13   Beasley Allen represents, Beasley Allen has tried

14   only 11 cases --" there have been two in Florida

15   this year in addition to that, right?

16        A.        That's correct.

17        Q.        "-- not recovered a dime for

18   claimants, and not settled any of the cases; is that

19   fair?"  And your answer was:  "That's basically

20   fair."  Correct?

21        A.        Correct, that's basically --

22        Q.        That was -- that's -- all right.  You

23   can set that aside.

24                    The -- you were asked questions by

25   Mr. Pollock about whether a contribution to the MDL

Page 143

1    common benefit fund could be part of a bankruptcy

2    resolution.  Do you recall those questions?

3         A.      Yes.

4         Q.      And you understand, however, that a

5    contribution to the MDL common benefit fund was not

6    part of J&J's proposed bankruptcy resolution, right?

7         A.      I understand that, yes.

8         Q.      All right.  You talked about a

9    settlement matrix that you shared with J&J during

10   the course of the Imerys bankruptcy.  Do you recall

11   that testimony?

12        A.      Yes.

13        Q.      You were not privy to Johnson &

14   Johnson's internal privileged and confidential

15   discussions of that settlement matrix, were you?

16        A.      No.

17        Q.      The last thing I want to ask you

18   about, you -- the last thing I want to ask you

19   about, you indicated that as a result of your

20   leadership position, that you, at times, are

21   representing not only your own clients' interests,

22   but the interests of clients of other lawyers,

23   right?

24        A.      No.  We have a -- what I said is that

25   we view -- we view our role as a leadership role in

Page 144

1   the MDL as having a fiduciary duty to the other

2   claimants and their counsel.

3          Q.      Fair.  And that was going to be my

4   next question.  You indicated that you have duties

5   to them, right?

6          A.      Right.

7          Q.      And one of the things you talked

8   about with respect to the Legacy proposal that you

9   testified about was this idea that Legacy, if the

10  proposal were accepted, would be adverse to you and

11  your clients, right?

12         A.      Yes.

13         Q.      That they would then hold the entity

14  that had talc liabilities --

15         A.      Right.

16         Q.      -- and, in essence, they would be on

17  the other side of the V from where you were, right?

18         A.      Yes, that's right.

19         Q.      Now, if -- if I may, I just -- just

20  to reorient ourselves from April 10th, if I may

21  approach with another excerpt from the privilege

22  log.

23                 THE COURT:  You may.

24                 MR. BRODY:  This just makes it easier

25  from sorting through the whole big thing.

Page 145

1    BY MR. BRODY:

2         Q.      We pulled out from that entries that

3    -- and we talked about some of these on April 10th,

4    where Ms. O'Dell shared an ovarian cancer leadership

5    memo with Legacy discussing ovarian cancer case

6    values, injuries, and damages analysis.

7                   Do you see that?

8         A.      Yes.

9         Q.      Your ovarian cancer claim values, as

10   well as claim estimation report methodology.

11                  Do you see that?

12        A.      Yes.

13        Q.      And then we talked about Niall

14   Davies, who is listed on here, sharing draft QSF

15   qualifications for the Legacy ovarian cancer

16   proposal.

17                  Do you see that?

18        A.      I do.

19        Q.      And Mr. Davies -- is he still with

20   the Beasley Allen firm?

21        A.      He is.

22        Q.      All right.  And he was at the time,

23   correct?

24        A.      Yes.

25        Q.      Right.  And so you gave somebody

Page 146

1    you've identified as a potential future adversary

2    your analysis of case values, injuries, and your

3    damages analysis, if I'm reading this correctly.

4    Right?

5              A.      Okay.

6              Q.      Yes?

7              A.      Yes.

8              Q.      All right.

9                      MR. POLLOCK:   Thank you.   That's all

10   I have.

11                     THE COURT:   Thank you.

12                     Mr. Pollock, anything in follow-up?

13                     MR. POLLOCK:   Sure.

14                     Using the last document, which we --

15   I don't think it's marked for identification.   Do we

16   want to give it a number, or what do we want to do?

17                     MR. BRODY:   Sure.   I believe the

18   privilege log was marked as J&J 1.

19                     THE COURT:   Right.

20                     MR. BRODY:   So maybe the excerpt that

21   I used earlier today could be J&J 1A, and this

22   excerpt can be J&J 1B, if that's okay.

23                     THE COURT:   Fair.

24                     Mr. Pollock, any thoughts?

25                     MR. POLLOCK:   It works for me.

Page 147

1                    THE COURT:   A and B.

2                         -   -   -

3                    (Exhibit J&J 1A, transcript excerpt,

4       marked for identification.)

5                    (Exhibit J&J 1B, transcript excerpt,

6       marked for identification.)

7                         -   -   -

8                    FURTHER REDIRECT

9       BY MR. POLLOCK:

10           Q.      On whatever you said just -- 1B, the

11      one you've got in front of you, that one, can we

12      agree that the -- these documents were subjected to

13      a mediator -- I'm sorry.  The mediation privilege is

14      claimed, correct?

15           A.      Pardon me -- yes.

16           Q.      They were submitted for review by

17      Judge Schneider, correct?

18           A.      Yes.

19           Q.      And Judge Schneider reviewed them and

20      decided they were privileged, too, correct?

21           A.      Yes.  I mean, he entered his order,

22      yes.

23           Q.      And his order says they are

24      privileged, right?

25           A.      Yeah.  That's right.

Page 148

1        Q.        Okay.   Do you believe Judge Schneider

2    is capable?

3        A.        I do.

4        Q.        Do you think he understands the

5    players in the game?

6        A.        I do.

7        Q.        Fair enough.

8                  So Mr. Brody got into the question of

9    how you have tried 13 cases, and some of them are

10   somebody else's cases, some of them are your cases.

11   Let's just call it 13, make it simple.   I'm a simple

12   guy.   So let's call it 13 cases.   And you have not

13   collected a significant amount on the -- I am having

14   a hard time reconciling this, because I'm looking at

15   the numbers that are being offered in settlement,

16   and they're different with zero value.

17                 So how do you value the claims?   What

18   do you think the value of these claims is, in broad

19   brush?   Why are you pursuing -- let me ask it

20   differently.   Why are you pursuing it?

21                 THE COURT:   And you're talking about

22   current claims, future claims, or claims with merit

23   as --

24                 MR. POLLOCK:   Good point.   Let me go

25   back, since I slaughtered this question, and I'm

Page 149

1    going to try and clean it up.  I'll do it the right

2    way.

3    BY MR. POLLOCK:

4         Q.       Beasley Allen, you said, is trying to

5    get reasonable and fair value for its clients.  You

6    testified to that before, right?

7         A.       Yes.

8         Q.       What are the claims that you think

9    are the ones you are pursuing today?  Can you

10   describe that category of claims?

11        A.       I mean, the claims that we are -- you

12   know, the claims that we are pursuing are the

13   ovarian cancer claims.  I mean, that's the

14   leadership role that Beasley Allen has, pertains to

15   the ovarian cancer claims.  I do think that Beasley

16   Allen has one, maybe two meso claims.  But our focus

17   is and has been since 2014 for the -- for the

18   ovarian cancer claims.

19        Q.       And we've heard about the -- if I get

20   it off by a little bit, I'm wrong -- 3.2 billion --

21   3.52 [sic] billion in Imerys.  We've heard about the

22   7.9 billion that is J&J's preferred plan.  Is that

23   the -- to address the ovarian cancer claims?  Is

24   that what -- that's what -- is that what those

25   numbers are targeted at?

Page 150

1        A.       Yes.  So there have been -- there

2   have been multiple, you know, multiple proposals,

3   term sheets that have been, you know, that have been

4   proffered through the course of the -- the course of

5   these last four years, and including the proposal

6   that we talked about in September of 2020 that was

7   presented as a 3.25.  But that was just one slice.

8   It's not a -- it wasn't a 3.25.  That was one

9   proposal in 2020.

10              The number of claims was much

11  different.  The number of claims was much different

12  then.  We have the -- not the 7.9, but the 8.9, you

13  know, billion dollar proposal that was part of the

14  LTL 2 bankruptcy that was for both the ovarian

15  cancer currents and the futures, mesothelioma

16  currents and futures, and all the attorney generals

17  actions.

18              But the only -- I mean, our position,

19  whether we have been -- you know, whether it was in

20  the, you know, the earliest proposal in 2020 or part

21  of the Imerys -- Imerys deal, or negotiations, the

22  mediation in the bankruptcy, it has always been to

23  get reasonable settlement values for our claimants

24  and for our clients, and that's -- that's it.

25        Q.       And do you believe in good faith that

Page 151

1    the claims you have -- are pursuing on behalf of

2    Beasley Allen and the MDL, the talc claimants

3    committee, the groups you work with, do you believe

4    those claims have merit?

5             A.      Yes, absolutely.

6             Q.      And do you intend to pursue them?

7             A.      Yes.

8                     MR. POLLOCK:  I have no further

9    questions.

10                    THE COURT:  Thank you.

11                    You may step down, Mr. Birchfield.

12                    Let's quickly address -- yes?

13                    MR. BRODY:  With the Court's

14   permission, I would like to ask Mr. Haas to -- the

15   Court to allow Mr. Haas to take the stand to answer

16   five or so questions about the document that was

17   brought and offered as P-3 by Mr. Conlan.

18                    MR. POLLOCK:  Your Honor, absolutely

19   not.  We have been patient to a fare-thee-well on

20   your end and our end.  To suddenly allow Mr. Haas

21   the megaphone once again, there's nothing in that

22   document that could not have been addressed before,

23   and there's no reason we should be addressing it

24   now.

25                    Mr. Haas knew about this document, he

Page 152

1   received this document, so there's no reason he

2   couldn't have addressed it before.  The fact that

3   they withheld it and now they're saying we now want

4   to address it, that's ludicrous.

5            At some point, there has to be an

6   end, Your Honors.  I respectfully submit this should

7   be it.

8            THE COURT:  Well, Judge Singh and I

9   will discuss that separately.  Counsel may be

10  seated.  The initial question we want to address is

11  what was contained in the correspondence that we

12  received this week.

13           Regarding Exhibit 5 and objections,

14  J&J has objections.  To the extent, you know, J&J

15  has any objections, we would receive that document

16  with J&J's objections.

17           Mr. Pollock, Mr. Brody, any thoughts?

18           MR. POLLOCK:  So the only -- there's

19  one word that is objected to.  The one word is

20  "recommend," I think it is.  And you had already

21  ruled, Judge Porto, that "Did Jim Conlan recommend

22  the Texas Two-Step?"  He says, "I did not."

23           And so, to me, it is -- if that's the

24  only objection they've got, that word "recommend,"

25  because that would be attorney advice.  But that,

Page 153

1    the attorney advice -- I'll even agree --

2                    THE COURT:  But that's out.  You

3    know, that was out as part of our record.

4                    MR. POLLOCK:  I agree.  That's why

5    under the -- I'll even, since I'm a generous guy,

6    I'll agree to a partial waiver, if you want.  As to

7    that document, the privilege, whatever there is, is

8    waived.  But that's gone.

9                    THE COURT:  Mr. Brody?

10                   MR. BRODY:  Well, I don't --

11                   THE COURT:  Because that was part of

12   the testimony.

13                   MR. BRODY:  It was part of the

14   testimony, but I don't think there was -- I don't

15   think the Court's waiver holding as to the question

16   that was posed to Mr. Conlan about the Texas

17   Two-Step and his recommendation was so broad as to

18   encompass the entirety of the November 5th email.

19                   There can't be a -- there certainly

20   can't be a waiver of anything in there by

21   Mr. Pollock because it's J&J's privilege.  And we

22   had proposed two very minor redactions, as the Court

23   saw.  I think the Court saw both a redacted and

24   unredacted version.  We tried to be as narrow as

25   possible based on objections that we think we should

Page 154

1    still be able to maintain.

2                    Obviously, the Court has seen that.

3    The Court understands what its ruling was,

4    understands the scope of its waiver ruling, and so

5    we -- you know, obviously, the Court can make a

6    decision on which version will come into the record.

7                    THE COURT:  I think we're going to

8    stand by we'll accept it with the J&J

9    recommendations.

10                    JUDGE SINGH:  The redactions.

11                    THE COURT:  Redactions.

12                    MR. BRODY:  Thank you.

13                    THE COURT:  And then --

14                    JUDGE SINGH:  The objections to the

15    attorney's eyes only materials.

16                    THE COURT:  Right.

17                    What are your thoughts with regard to

18    those records, then, Mr. Pollock, because they don't

19    really address -- they're not any issue with regard

20    to credibility or impeachment as it relates to

21    Mr. Birchfield.  It goes -- really, it's impeaching

22    Mr. Conlan.  And Mr. Conlan has counsel, and I

23    didn't see any objection from -- I mean, I don't

24    think Judge Singh did -- with regard to any

25    objection from Mr. Conlan's attorney.

Page 155

1           MR. POLLOCK:  Mr. Conlan's counsel
2    doesn't have it.  It wasn't served on him.  So he
3    didn't -- with all due respect, Judge, that's
4    unfair.  He is -- they have not been given the
5    opportunity to be heard.
6                 But remember, Andy is being tied part
7    and parcel under -- under the broad application of
8    RPC 1.6, which addresses an attorney, meaning
9    Mr. Conlan, disclosing information.
10                But to me, the -- it is blatantly
11   unfair, and certainly it goes to credibility at a
12   minimum.  It has to go to credibility, these
13   documents, at a minimum, that J&J had these records.
14   Mr. Haas' certification is, We've got an incredible
15   computer system, everything gets shoved in there, we
16   had this stuff months ago.
17                So why did they wait until Jim Conlan
18   is off the stand, when they have a legion of
19   lawyers, a billion dollars to blow on defense, and,
20   yet, they sandbag Jim Conlan with this document
21   after he's off the stand and back home.  That's
22   outrageous.  The confrontation clause, he's got an
23   ethics hearing in Ohio, or in Illinois, wherever he
24   lives.
25                THE COURT:  Iowa.

Page 156

1              MR. POLLOCK:  Whatever.  All the
2    same.  It's west of the Mississippi.  But the bottom
3    line is the -- the fact is that he has no chance to
4    rebut it himself.
5              Second of all, I strongly, incredibly
6    disagree.  When you look at 99 percent of the
7    documents, "I don't recall"; "I don't remember"; "I
8    can't really -- that's not the way I remember it."
9    There's only a few where they say there's something.
10              And then, when we look at the
11   redactions, the redactions are, "I have incredibly
12   detailed discussions regarding... blank"; "In fact,
13   here's a memo from me regarding... blank."
14              So how does this Court ever make any
15   sense out of what was allegedly discussed, because
16   while it's true, under Yuna, they had the choice of
17   putting it in, I think that they have to actually
18   make their case.  And right now, all it says is,
19   Yes, Jim -- what I conceded with you, Judge Porto,
20   on the very first day.  Jim Conlan was a lawyer at
21   Faegre.  He worked on super secret J&J stuff.  I've
22   never denied it.  He was a lawyer who gave advice.
23              But how do I, representing Andy
24   Birchfield, ever confront the question, "Did Jim
25   Conlan learn anything during the course of that

Page 157

1    representation that is disclosed"?  That's not been

2    proven at all.  But even if it was, was it

3    significantly harmful?  And I have to rely on both

4    prongs, right?  I'm not giving up the second part of

5    Yuna.

6                    So it worries me deeply about

7    admitting these documents after the fact, at the end

8    of the hearing, once Mr. Haas and Murdica and Conlan

9    are gone, and suddenly I get these documents.  I

10   object to their introduction.

11                   THE COURT:  Mr. Brody?

12                   I mean, they go directly to

13   Mr. Conlan's testimony.

14                   MR. BRODY:  They go directly to

15   Mr. Conlan's testimony --

16                   THE COURT:  Has anyone provided it to

17   Mr. Conlan's attorney?

18                   MR. BRODY:  -- and to the credibility

19   -- well, it's attorneys' eyes, attorneys' eyes only,

20   and so --

21                   MR. POLLOCK:  They were not.

22                   MR. BRODY:  We followed the Court's

23   instruction.

24                   Now, as Your Honors know, I sought to

25   offer them while Mr. Conlan was on the stand, and

Page 158

1    the Court's decision was, No, let's wait.  And, you

2    know, when you go through the transcript, you will

3    see the number of places where, in response to his

4    testimony, you know, I said, Well, here's another

5    place where I would bring a document out now, if

6    permitted.

7                    The Court's preference was announced

8    after the lunch break on April 10th, was if -- if

9    there are areas where you believe that he perjured

10   himself and you have that impeachment, you know,

11   provide that impeachment.  We have submitted that

12   impeachment in camera and attorneys' eyes only at

13   the Court's direction.

14                   You know, as to the question that

15   Mr. Pollock asked, Well, how does the Court make

16   sense of what was submitted, of what the documents

17   show or don't show, that's really an argument about

18   the weight that Mr. Pollock believes the Court

19   should give those documents.

20                   And, certainly, I expect the parties

21   will be making arguments about the weight the Courts

22   should give all the documents that have been

23   provided and are part of the record, including, you

24   know, including documents like Plaintiff's P-3 that

25   Mr. Conlan brought with him to his testimony on

Page 159

1    April 10th.

2                    And so the answer to that one is

3    easy.  You know, the answer to the objection is, you

4    know, we -- we sought to offer these while

5    Mr. Conlan was on the stand as impeachment.  We

6    followed Court's direction.  We are submitting --

7                    THE COURT:  Well, there was also a

8    concern about the waiver of the privilege, also.

9    That was, you know, critical with the Court's

10   thoughts in that regard.  It wasn't that we had

11   blanketly said don't disclose them; it's just we

12   were concerned about the privilege.

13                   MR. BRODY:  Right.  And the Court

14   addressed that in its invitation that we make

15   redactions.  And obviously, as Your Honor said, even

16   with redactions, you -- you submit them, and I may

17   find that, you know, there has been a waiver or not

18   a waiver.  You made that point during the hearing on

19   April 10th.

20                   And so that's where we stand.  We

21   followed the Court's direction, and we submitted the

22   materials.  They are impeachment materials.  And I

23   am sure that we will have arguments from Mr. Pollock

24   and Beasley Allen as to the weight that the Court

25   should give them.

Page 160

1                    THE COURT:  All right.  I think Judge

2     Singh and I would like to just discuss briefly with

3     regard to that, with regard to P-3.

4                    MR. BRODY:  Yes.

5                    THE COURT:  And then we for your eyes

6     only privileged materials.

7                    MR. BRODY:  Sure.

8                    THE COURT:  We'll take five.  We'll

9     go off the record.

10                    (A recess was taken.)

11                    THE COURT:  Counsel, the Courts are

12    going to maintain its position with regard to the

13    attorney eyes only privileged material, argue the

14    weight, you know, how much, you know, but maintain

15    the privilege that's been asserted.  Okay?  So you

16    can reference, but maintain the privilege.  That

17    goes to the weight with regard to the issue here.

18                    As it relates to, what, P-5, the

19    Court does not require or need any additional

20    testimony.

21                    MR. BRODY:  Thank you, Your Honor.

22                    THE COURT:  All right?

23                    MR. BRODY:  Thank you, Your Honor.

24                    THE COURT:  You're welcome.

25                    JUDGE SINGH:  Just one federal court

Page 161

1    footnote as to the attorneys' eyes only submission.

2    To the extent the parties address something

3    substantive that has been submitted with that

4    designation, we anticipate it will be appropriately

5    filed under seal on the federal court's docket

6    pursuant to our local civil rule.

7                    THE COURT:  And the same thing with

8    the regard to eCourts.

9                    MR. BRODY:  Thank you, Your Honors.

10                   And as to the briefing, just to

11   confirm, two weeks simultaneous submission, and then

12   replies seven days after that.

13                   JUDGE SINGH:  Correct.

14                   THE COURT:  That's correct.

15                   MR. BRODY:  Thank you.

16                   THE COURT:  Counsel, thank you.

17                   MR. POLLOCK:  Thank you, Your Honors.

18                   THE COURT:  You're welcome.

19                   (Proceedings concluded at 1:43 p.m.)

20

21

22

23

24

25

Page 162

1                    C E R T I F I C A T I O N

2

3           I, CONSTANCE E. PERKS, CCR, CRR, CRC, RSA, a

4     Certified Court Reporter and Notary Public in and

5     for the State of New Jersey, do hereby certify the

6     foregoing was prepared in full compliance with the

7     current Transcript Format for Judicial Proceedings,

8     and is a true and accurate transcript to the best of

9     my knowledge and ability.

10

11

12

13

14

15

16

17     _____

18     Constance E. Perks, CCR, CRR, CRC, RSA

19     Notary Public and Certified Court

20     Reporter of the State of New Jersey

21     NJ CCR License #30XI00142900

22

23     Date:  May 6, 2024

24

25

[& - 2023]                                                              Page 1

| & | | | |
|---|---|---|---|
| **&**   2:8,11,14 4:5<br>4:21,21 5:2 7:9<br>14:11,16,20<br>15:11 20:5 35:2<br>35:3 43:1 47:18<br>48:6 54:24<br>129:23 130:25<br>143:13 | **10th**   7:9 9:7,10<br>22:17 30:22<br>36:21 42:23<br>44:18 50:2,7<br>131:21 132:20<br>132:23 144:20<br>145:3 158:8<br>159:1,19 | **17**   127:3 129:17<br>133:19,20<br>134:8<br>**17th**   48:9 57:8<br>115:4 126:9<br>134:5<br>**18**   54:20<br>**18th**   43:10 44:6 | **2000s**   104:9<br>**2013**   86:21,21<br>93:5 139:12<br>140:2,19<br>142:12<br>**2014**   149:17<br>**2016**   87:5,5,12 |

[& - 2023]                                                              Page 1

**&**

**&**   2:8,11,14 4:5
4:21,21 5:2 7:9
14:11,16,20
15:11 20:5 35:2
35:3 43:1 47:18
48:6 54:24
129:23 130:25
143:13

**0**

**08648**   2:5

**1**

**1**   27:15 51:13
97:18,20
108:19 123:14
123:17 135:10
146:18
**1.10.**   19:2 62:16
**1.6**   15:12,14
18:25 62:15
109:12 155:8
**1.6.**   11:24
**1.9**   15:14 19:2
**10**   16:23 26:23
26:24 27:7
29:17,22 30:13
32:2 41:20 47:9
60:20,23 61:18
85:4,10 120:22
128:1,13
132:12
**100,000**   120:17
122:22,22

**10th**   7:9 9:7,10
22:17 30:22
36:21 42:23
44:18 50:2,7
131:21 132:20
132:23 144:20
145:3 158:8
159:1,19
**11**   85:8 120:23
142:14
**11,300**   142:12
**110**   88:4,13
**111**   24:19
**118**   28:10
**12**   25:13 60:20
61:13,19,25
62:13 65:21
66:19,19
120:23 133:20
**12.9**   66:3
**1201**   1:9
**12th**   24:1,3
25:23 34:24
44:18
**13**   139:13 140:2
140:20,21
148:9,11,12
**135**   26:5
**138**   3:6
**14**   126:1,4
**1454**   162:16
**147**   3:7,13,14
**15**   16:22 54:12
**1625**   2:9
**16th**   24:14,21
29:8

**17**   127:3 129:17
133:19,20
134:8
**17th**   48:9 57:8
115:4 126:9
134:5
**18**   54:20
**18th**   43:10 44:6
48:11 53:8
56:21
**19**   50:25 51:5
66:9,19 75:20
80:14,16,17
106:7,14,17,19
106:20 119:16
**1984**   17:25
**1993**   18:2
**1:43**   161:19
**1a**   3:13 146:21
147:3
**1b**   3:14 146:22
147:5,10

**2**

**2**   34:4,11 39:2
39:21 60:20,24
61:18 84:7
108:18 122:15
136:4 150:14
**20**   7:18 16:22
25:15 88:8
137:13,13
142:9
**2000**   87:16
**20006**   2:10

**2000s**   104:9
**2013**   86:21,21
93:5 139:12
140:2,19
142:12
**2014**   149:17
**2016**   87:5,5,12
87:13,15,20,21
88:8 90:13 91:8
91:23 138:25
**2017**   88:7,10
89:12
**2019**   98:24
100:20 101:1
101:17
**202.383.5300**
2:10
**2020**   78:22 90:8
90:17,25 92:23
93:5 95:18
99:13 111:21
129:22 130:7,8
132:14 133:6
133:24,25
134:8,11,16
150:6,9,20
**2021**   92:21 97:2
99:14 112:15
**2022-23**   101:17
**2023**   25:17
28:11 101:1
108:25 111:16
111:22 112:16
112:19,23
126:9 127:3
129:17 133:19

**[2023 - accept]**

134:5,8,18,22
141:7
**2024**   1:11 21:22
100:21 162:23
**22**   3:4 74:23
**224,000**   123:21
**23**   111:18
**24**   130:7
**24th**   24:16
25:13,17 26:22
34:18
**25**   85:8 121:3
130:7
**25th**   44:13
**2648-15**   1:2 4:7
**2738**   4:7
**29**   125:7
**2nd**   47:25
57:12

**3**

**3**   1:11 130:16
131:10 151:17
158:24 160:3
**3.2**   149:20
**3.25**   130:11,17
131:17,24
133:6,8
**3.25.**   150:7,8
**3.5**   128:7
**3.52**   149:21
**30**   9:8 21:4 90:4
**300**   1:4 4:7
**300,000**   119:21
120:5

**30th**   112:18
**30xi00142900**
1:22 162:21
**35**   19:4
**3rd**   21:22

**4**

**4**   43:11 44:5
45:25 103:7
104:15,16
117:15 122:23
123:10
**4.34**   122:17
**40**   9:9 21:4 62:1
**42**   26:5 107:7
**43,000**   122:23
**45**   26:13,15
137:11
**450**   118:20
**49**   120:22,25
121:1,2
**4:30**   9:8
**4th**   112:23
134:22

**5**

**5**   5:13,14 125:6
125:7,12 130:8
137:17 152:13
160:18
**5.3**   15:15
**5.5**   132:10
**500,000**   104:19
**50s**   123:9
**531,995**   104:19
**55**   87:14 104:16

**56**   125:8,12
**58**   142:8
**5th**   153:18

**6**

**6**   61:17 103:14
132:10 162:23
**609.896.3600**
2:5
**61**   129:20
**63**   130:6
**64**   130:12
**66**   102:19
**67**   102:22

**7**

**7**   50:13 102:12
102:16 103:15
105:19
**7.9**   149:22
150:12
**70**   12:19 87:15
**72**   87:6,13
**74**   130:14
**75**   12:19
**7th**   26:9 28:11

**8**

**8**   61:13,19,25
62:13 130:20
**8.4**   15:15
**8.9**   39:20 65:19
65:19 66:19
75:19 79:24
80:15 150:12
**80**   123:15,16

**86**   3:5
**877.370.3377**
1:24
**8:26**   82:6

**9**

**9**   125:24,25
126:4 129:20
**917.591.5672**
1:24
**93**   18:3
**94**   133:19
**95**   53:11 116:9
**99**   156:6
**997**   2:4
**9:38**   4:1

**a**

**a.m.**   4:1 82:6
**abandon**   92:15
**ability**   162:9
**able**   13:6 33:14
36:25 38:14
39:21,25 40:22
47:14 79:15
104:11 118:16
154:1
**absolutely**
12:10 21:3
75:23 94:4
121:20 128:3
151:5,18
**abundantly**
67:2
**accept**   37:3
40:18 51:21,22
65:10 116:6

Golkow Technologies,
A Veritext Division

[accept - allen]                                                    Page 3

132:25 136:19
136:19 154:8
**acceptable**
58:10 73:7 76:8
**accepted**  36:21
58:10 73:10
144:10
**accomplish**
39:2
**accomplished**
37:2
**accountants**
51:6
**accurate**
100:22 162:8
**accused**  16:25
17:5 19:7
110:17 128:5
132:19 133:14
**accutane**  89:5,6
89:9,19
**achieved**  39:9
57:21
**acknowledge**
9:21 30:17
71:13
**acquire**  106:22
**acquisition**
47:2
**action**  1:3
**actions**  107:4
150:17
**actual**  21:11,15
21:16
**actually**  13:22
28:8 29:20

44:12 47:21
49:24 50:16
65:14 117:8
138:6 156:17
**ad**  10:21 107:7
**adamant**  38:17
**adamantly**
136:16
**add**  119:13
**added**  39:5
**addition**  142:15
**additional**
28:17 160:19
**address**  5:9,20
8:18,20 11:6
30:6 66:21 67:1
92:19 93:9
111:4 115:6
124:19 137:17
140:14 149:23
151:12 152:4
152:10 154:19
161:2
**addressed**  5:21
30:25 67:20
107:24 124:20
151:22 152:2
159:14
**addresses**  155:8
**addressing**
25:11 151:23
**adjust**  64:24
**administer**
21:21
**administration**
29:4

**administrator**
29:11
**admission**  5:13
6:24
**admitted**
125:16,17
**admitting**
157:7
**advancing**
120:25 121:11
**advantage**
36:25 69:16
**adversary**
73:12 116:2,16
146:1
**adverse**  11:19
57:5,13 69:22
144:10
**advice**  115:15
152:25 153:1
156:22
**advocated**
53:19 57:12
**advocating**
57:23
**affect**  16:3
**affidavit**
130:25
**affiliates**  81:18
**afield**  27:21
38:3 69:2
107:23 124:3
**afraid**  82:25
**ago**  16:19 84:12
155:16

**agree**  12:22
43:4 76:19 78:8
79:3 80:13
116:22 121:15
125:17 133:17
147:12 153:1,4
153:6
**agreed**  49:1
71:19
**agreement**  29:3
51:24 63:14
139:19
**agreements**
68:10,15 70:1
133:13
**ahead**  35:23
38:8,20 67:1
71:21 86:3
111:12 115:8
122:9 125:3
129:6
**ahilton**  2:6
**alcoholism**  17:9
**align**  63:3,9
**allay**  10:14
**allegation**
17:11 94:9
**allegations**
41:16
**alleged**  17:6
19:6 62:24
**allegedly**  69:15
156:15
**allen**  2:7 4:15
10:6,9,13 11:16
11:20 12:8 13:2

| | | | |
|---|---|---|---|
| 14:16,24 15:6 | **andrew** 117:17 | **anticipate** | 141:10 144:21 |
| 19:12 20:2,6 | **andy** 2:7 3:3 | 161:4 | **approached** |
| 55:6 61:25 | 18:9 22:1,4 | **anticipated** | 116:13,14 |
| 63:20 64:4 | 53:9 55:4 63:24 | 8:16 46:13 | **appropriate** |
| 67:24 68:2,5,11 | 93:4 105:20 | **anyway** 79:9 | 61:8 67:13 |
| 68:13,17,19,22 | 117:25 124:11 | **apart** 61:24 | 105:13 |
| 70:8 71:15 | 124:15 128:5 | 62:4 | **appropriately** |
| 86:18 89:22 | 129:5 131:11 | **apologies** 85:25 | 18:21 161:4 |
| 91:4 98:24 | 155:6 156:23 | **apologize** 18:4 | **approximately** |
| 110:3 136:2 | **andy's** 18:10 | 85:20 101:11 | 88:5 119:21 |
| 138:22 139:12 | **announced** | 101:13 106:4 | **april** 7:9 9:7 |
| 139:13 140:2 | 12:20 14:20,25 | 107:22 112:2 | 22:17 30:21 |
| 140:19,25 | 48:14 57:7 | 121:2 | 34:18 36:21 |
| 142:13,13 | 81:14,21 82:3 | **apparently** | 41:20 42:23 |
| 145:20 149:4 | 158:7 | 130:4 134:6 | 50:2,6 78:21 |
| 149:14,16 | **annual** 44:24 | **appeal** 95:10 | 90:17,25 |
| 151:2 159:24 | 44:25 | 135:12 139:4 | 112:22 126:9 |
| **alliance** 116:21 | **answer** 15:19 | **appearance** 4:8 | 127:3 129:17 |
| 116:23 | 17:20 28:23 | 17:24 21:10 | 131:21 132:20 |
| **allocation** | 33:3 35:20 41:3 | **appears** 25:14 | 132:23 133:19 |
| 104:18 | 42:12,14,16 | 41:13 | 134:5,8,17,21 |
| **allow** 34:15 | 43:23 55:20 | **appellate** 95:11 | 141:7 144:20 |
| 151:15,20 | 64:2 66:20 | **applicable** | 145:3 158:8 |
| **allowed** 36:7 | 70:21 72:19 | 67:17 | 159:1,19 |
| 128:10 | 79:11,13 108:3 | **application** | **area** 93:17 |
| **alternative** | 112:8 126:18 | 67:10,17 155:7 | **areas** 158:9 |
| 36:2,5 37:10,13 | 126:18,20,22 | **applied** 29:3,4 | **argue** 8:1 |
| 67:19 | 130:20 131:4 | **appointed** | 124:11 160:13 |
| **amount** 39:6 | 133:23 142:19 | 87:17 91:10,12 | **argued** 19:23 |
| 47:1 59:21 | 151:15 159:2,3 | **appreciate** | 116:20 125:15 |
| 60:21 61:8,14 | **answered** 41:1 | 13:10 67:8 | 127:5 |
| 66:15 148:13 | 41:3 60:2 71:18 | 125:2 | **arguing** 16:7 |
| **amounts** 65:18 | 84:13 140:6 | **appreciation** | 19:10 |
| **analysis** 20:9 | **answering** 40:6 | 116:15 | **argument** 6:2 |
| 145:6 146:2,3 | **answers** 42:13 | **approach** 23:3 | 6:22 8:17 17:15 |
| | | 23:10,11 92:4,6 | 32:9,13 63:23 |

63:23,24 93:19
93:20 103:23
115:3,20
158:17
**argumentative**
29:19 30:6 32:8
55:16,18
**arguments**   7:2
67:12 93:22
158:21 159:23
**arising**   81:17
**arrangement**
68:12
**arsdale**   117:16
**article**   54:20
55:8 61:7
**articulate**
16:16
**articulating**
19:4
**asbestos**   83:5
107:13 111:20
**asc**   118:20
**ashcraft**   91:11
**aside**   142:23
**asked**   6:4 17:18
21:14 32:16
36:3 41:1,24
42:1,2 71:17
119:14,16
126:11 131:21
133:5 140:6
142:11,24
158:15
**asking**   13:19
43:19,22 44:1

50:3,4,5 65:23
65:24 66:18
68:23 102:13
103:7 110:12
110:14,16
112:9
**asks**   36:13
**asserted**   24:25
31:19,23 32:5
32:11 33:19
160:15
**asserting**   22:23
31:4 32:17,20
33:3
**assess**   96:22
**assigned**   46:14
60:22
**associate**   4:16
**associated**
46:15 51:1
**assume**   49:21
**assumes**   29:19
**assure**   16:2
**atl**   1:2 4:7
**atlantic**   1:1,9
1:10
**attached**   39:16
49:18 51:25
**attaches**   50:16
**attachment**
105:20
**attack**   12:5,8
63:20 118:6
**attacked**   10:3
16:24 17:6

**attacking**   6:9
10:4,9
**attended**   44:12
44:15
**attorney**   67:24
107:4 150:16
152:25 153:1
154:25 155:8
157:17 160:13
**attorney's**   5:8
154:15
**attorneys**   7:11
64:15 157:19
157:19 158:12
161:1
**attributed**
82:11
**audience**   108:3
**auditors**   118:15
118:16 119:1
**august**   129:21
**austin**   2:3 4:16
56:2
**austin's**   55:10
**author**   24:5,8
26:16,17
103:23
**authored**   55:8
**available**   59:5
120:24 121:11
122:18
**average**   119:22
120:5,12
122:24,24
123:19,21

**avoid**   75:16
**awaiting**
139:10
**award**   66:23
121:24
**awarded**   67:7
**aware**   7:8
12:25 48:7,8,8
60:8

## b

**b**   3:10 22:2
147:1
**bacharach**   1:9
**back**   9:6 16:18
25:10 30:25
33:23 34:2
41:12 45:24
64:18 65:11
67:7 71:12
85:14 97:6
103:6 124:6
125:5 126:5,13
138:1 148:25
155:21
**backed**   127:5
128:6,8
**background**
30:2
**bad**   19:12
82:14 83:2,22
124:12
**ballot**   40:17
**band**   12:17
**bankruptcies**
98:22 100:5

**[bankruptcies - billion]** Page 6

137:1,2
**bankruptcy**
 18:12 27:16
 31:13 34:4,9,17
 35:3 36:7,11
 37:2,5,8,20,22
 37:24 38:1,10
 38:13,16 39:3
 39:10,13,21
 40:24 41:6
 48:16,18 49:4,7
 49:18 57:6,10
 57:16,22 59:5,6
 60:7 80:5,5
 82:12,15 96:4,6
 96:25 97:2,5,5
 97:12,15,17
 98:19,23 99:3,7
 114:5,12 117:6
 121:12,18,24
 122:12,13
 123:22,23
 124:17 126:15
 126:17 128:6
 129:25 134:6
 134:12,21
 135:3,4,13,17
 135:24,25
 136:3,8,10,17
 143:1,6,10
 150:14,22
**bar**   91:5
**base**   105:3
 127:13
**based**   1:3 4:6
 8:6 11:8 14:2

20:12 21:12
30:10 40:9
46:13 52:11
59:11 67:13
81:2 82:13
88:14 119:19
120:14 153:25
**basically**
 139:11 142:19
 142:21
**basis**   14:19
 61:6 64:7
 110:24
**battling**   83:2
**bear**   127:1
**bearing**   11:11
**beasley**   2:7
 4:15 10:6,9,13
 11:16,20 12:8
 13:2 14:16,24
 15:6 19:12 20:2
 20:6 55:6 61:25
 63:20 64:4
 68:22 70:8
 71:15 86:18
 89:22 90:12
 91:4 98:24
 110:2 136:2
 138:21 139:12
 139:13 140:2
 140:19,25
 142:13,13
 145:20 149:4
 149:14,15
 151:2 159:24

**beating**   12:17
**becoming**   19:6
**beg**   79:10,14
**began**   86:21,23
 90:21 103:3
**beginning**
 37:21 38:11
 42:24 88:10
 97:18 115:23
**behalf**   4:14 5:2
 14:11 31:10
 37:16 82:15
 95:14 97:3
 105:25 130:9
 130:10 136:1
 151:1
**belated**   5:24
**belief**   12:3
 109:17 118:5
**believe**   12:5
 13:20 19:18
 37:6 49:23
 68:16 82:12
 87:14,21 88:4,7
 88:12 95:15,16
 95:18 99:12
 101:18 105:21
 128:11 132:9
 146:17 148:1
 150:25 151:3
 158:9
**believed**   57:20
 58:2 100:9
**believes**   8:8
 158:18

**bench**   20:20
**benefit**   15:7
 58:25 59:4
 60:10,13,16,18
 60:22 61:12
 62:4,5,8 64:14
 65:16,18,21
 66:12,13 67:4
 67:11 76:4
 119:10 120:22
 120:23 121:10
 121:19,25
 122:4,8 124:17
 125:17,18
 126:16 143:1,5
**best**   109:16
 117:9 122:6
 162:8
**better**   82:16
 112:14
**beyond**   19:20
 30:20 95:12
**bias**   124:14
**big**   10:5 73:9
 75:14 135:1
 141:19 144:25
**bigger**   23:16
 135:1
**biggest**   113:14
 113:14
**billion**   39:20
 51:1,5 65:19,20
 65:22 66:9,20
 75:20,20 79:24
 80:14,16,17
 106:7,17,19,20

119:16 122:18
128:8 130:11
130:18 131:17
131:24 133:7,8
149:20,21,22
150:13 155:19
**binder** 43:11,13
54:12 125:6
**birchfield** 2:7
3:3 4:15 8:25
9:15 10:3,17
11:7 13:23
14:17,23 15:2,7
16:13 21:21,23
22:1,4,14 27:20
30:1 33:6 35:23
36:16 38:8,19
38:23 39:19
40:5,10 41:4,19
42:18 43:14
53:9 55:4,21
60:1 63:2,9,13
63:15 65:9,17
67:23 69:14,14
70:6 73:19 74:1
74:11,14,14,22
75:1 76:11,19
78:15 79:1,8,15
79:19 85:14
86:9,17 93:20
94:3,6 98:9
105:20 118:1
133:22 135:23
138:14,20
140:15 151:11
154:21 156:24

**birchfield's** 9:3
69:4
**bit** 53:22 64:22
73:12 111:10
124:2 125:1
138:9 149:20
**black** 109:22
**blank** 156:12
156:13
**blanketly**
159:11
**blatantly**
155:10
**bloomberg**
55:8
**blow** 155:19
**blowing** 82:16
**board** 52:20
53:6
**bolt** 96:6
134:13
**book** 125:11
**books** 118:22
**botched** 101:13
**bottom** 26:10
156:2
**boulevard** 1:9
**box** 40:17
**boxes** 120:10
**break** 7:8 85:1
85:3 112:10
132:3 137:11
140:7 158:8
**brevity** 87:23
**brief** 42:12

**briefing** 6:23
7:23 8:4,7
21:13 67:9 95:4
137:16 161:10
**briefly** 14:10
92:24 111:19
160:2
**briefs** 72:13
**bring** 23:6
158:5
**bringing**
114:14,14
**bristol** 88:15
**broad** 19:10
148:18 153:17
155:7
**broader** 12:25
15:16 101:15
**brody** 2:9 4:17
4:19,20,21 6:25
7:6,7 8:18,23
9:5,13,17 11:12
14:10 16:14
17:20 18:14
19:3,10 21:3
22:9,13 23:15
24:17 27:24,25
28:6 29:25 30:4
30:8,9 32:15,16
32:22 33:19,20
33:25 36:9,19
38:3,20,21,22
40:20 41:7,13
41:17,18 42:7,9
42:12,16,21
43:18,22,25

47:4 49:15 56:5
58:22 62:12,23
63:1 64:12 65:3
65:13,15 66:8
67:21,22 69:8,9
69:16,19 70:2,4
70:5 71:22
72:23,24 73:17
73:18 76:17,18
76:25 77:21
78:4,6,23 79:7
79:11 80:9
84:13,17,22
85:22,25 93:8
93:10 102:13
103:7 110:11
110:22,24
111:1 114:21
115:2 116:20
121:1,4,7 124:1
125:21 127:10
127:22,23
128:14,15
129:18 131:21
137:12,13,20
138:3,5,8,12,19
140:9,10,17
141:10,16,20
142:2,5,7
144:24 145:1
146:17,20
148:8 151:13
152:17 153:9
153:10,13
154:12 157:11
157:14,18,22

[brody - changed]                                                    Page 8

159:13 160:4,7
160:21,23
161:9,15
**brody's**   17:14
124:14
**brought**   29:12
94:10 114:5
151:17 158:25
**brush**   148:19
**buckets**   107:12
**buggers**   63:21
**build**   128:16
**builders**   16:21
**built**   64:16
**bunch**   140:10
**butter**   105:17
**button**   77:20
**byte**   63:19

**c**

**c**   1:12 2:1 22:2
162:1,1
**calculation**
120:11
**calculator**   66:1
**calendar**
100:19 137:15
**california**   89:3
89:13,19
**call**   48:7,15
54:25 92:23
133:20 148:11
148:12
**called**   58:14
87:7,24

**calling**   93:11
**camera**   6:6,7
7:10 158:12
**cancer**   24:9
25:20 26:19
27:4 28:14,15
28:18,21 31:10
32:4 46:8 52:14
53:8,12 80:23
80:24 81:17
83:5 88:3,12
95:14 97:3
105:6,7,10
106:1,25 107:1
107:16 108:23
114:8,8,9
118:24 119:5
119:25 120:2,2
129:24 130:10
131:18 145:4,5
145:9,15
149:13,15,18
149:23 150:15
**cancers**   105:11
114:6 134:22
**candidly**   9:2
20:13 110:25
127:16
**capable**   148:2
**care**   76:4,5
122:7,9
**carolina**   97:21
**case**   1:4 4:7,7
12:16 17:13
21:10,11 59:11
77:12 86:22,24

88:10,15 89:12
89:13 90:13,15
114:23 118:24
119:22 120:5
122:24 123:21
124:11 139:20
145:5 146:2
156:18
**cases**   14:21
51:12 52:23
70:9 88:13,14
88:17,17 90:11
92:14 94:21
114:1,8,9,9,10
120:1 123:3,14
139:8,14,15
140:2,4,20,21
140:22,22,23
141:4,5 142:14
142:18 148:9
148:10,10,12
**catch**   62:21
**category**
149:10
**cause**   11:18
13:17 135:7
**caused**   113:8
**causing**   83:5
**cc**   103:9
**ccr**   1:22,22
162:3,18,21
**center**   2:4
**central**   41:13
**ceo**   72:6 73:1
**certain**   8:15
93:17 120:2

**certainly**   7:7
8:3 21:9 33:14
48:13 52:3
58:17 78:7
115:6 124:3
136:22,22
153:19 155:11
158:20
**certainty**
118:15 119:4
**certification**
155:14
**certifications**
14:4
**certified**   162:4
162:19
**certify**   162:5
**cervical**   114:8
**cetera**   10:6
16:21 20:14
**chair**   91:21
**challenge**   83:21
84:10 94:6
**challenged**   17:5
**challenges**
88:20,21
**chance**   86:25
156:3
**change**   30:15
101:18,21
102:2 111:23
113:1,5 135:16
135:19
**changed**   30:17
84:6 133:25
134:7

**changes** 28:3
31:2 111:19
113:5
**changing**
100:24,25
**character**
16:23
**characterizati...**
115:3 128:16
128:21
**characterized**
131:17
**charge** 20:16
51:8 62:1
118:21
**child** 12:9
**chocolate**
105:17
**choice** 156:16
**choose** 49:13
54:7 116:6
**chose** 116:8,17
**chris** 77:9
**chronological**
23:21,23,24
**circuit** 112:17
112:18 113:5
135:12,12,18
**circuit's** 113:2
**circumstance**
70:22
**circumstances**
11:17 79:22
**citing** 114:23
**city** 1:10

**civil** 1:3,9 161:6
**claim** 24:9
25:20 26:19
27:4 101:13
116:3 145:9,10
**claim's** 47:7
**claimant** 83:25
104:11 136:18
141:2
**claimants**
10:10 34:3,16
39:12,21,24
40:2,12,18,21
46:13,23 49:11
53:9,12 58:14
59:16,18,23,24
59:25 68:10
81:23 95:14
96:3 99:1,23
100:1,4,24
105:7 120:9,17
120:18 122:21
122:21,23
123:4,8 136:2
136:12 139:14
140:3 141:1
142:18 144:2
150:23 151:2
**claimed** 147:14
**claims** 29:4,10
39:20 46:14
47:6,8,15 58:15
60:21 68:6,9,17
80:23,24 81:16
81:16 84:8 93:6
93:6,7 94:12,16

94:18 96:10,11
96:11,15,16,19
96:23 99:8
100:23,25
101:16,19,22
102:2,9 103:20
105:5,5 106:25
107:1,8,15
111:20,20
112:1,7,8,25
113:9,9,10,15
113:20 114:5
114:14,15,18
114:19 115:16
119:20,23,24
120:15 129:24
130:11 131:18
132:15,15
134:15,15,18
135:4 136:16
142:12 148:17
148:18,22,22
148:22 149:8
149:10,11,12
149:13,15,16
149:18,23
150:10,11
151:1,4
**clarify** 29:24
133:21
**clause** 155:22
**clean** 140:12
149:1
**clear** 12:11
37:15 38:14
51:8 57:10

61:10 65:6 67:3
73:6 100:15
112:4
**clearly** 124:24
**client** 19:15
79:10 99:5
104:11,11
109:13,14
136:25 137:18
**client's** 5:6
**clients** 10:17
11:2 18:11
37:16 38:15
58:2,21 62:1
64:1 75:2,24
76:3 80:7 82:15
91:3,25 97:10
110:2 116:6
122:6,8,10,10
130:19 131:1
135:6 143:21
143:22 144:11
149:5 150:24
**clipping** 42:13
**clock** 85:9
100:19
**close** 9:10 86:3
**closed** 8:12
**closely** 96:21
**closing** 8:12
32:8
**clue** 29:22
**code** 82:15
**coerce** 39:16
40:17

**coercing** 39:12
**coercive** 49:7
  54:7
**collaboration**
  15:9
**collect** 12:18
**collected**
  139:18 148:13
**colloquy**
  131:20
**column** 25:15
  26:1
**come** 16:15
  20:17 35:14,17
  36:11 39:18
  45:2 47:13,14
  50:20 58:6
  65:18 71:3
  72:14 78:8 79:3
  80:12 85:14
  91:2 126:4,13
  154:6
**coming** 11:15
**commenced**
  4:1
**comment** 13:10
  103:22 112:12
**comments** 11:5
  11:10 13:13
  28:15 33:11
**commission**
  18:1
**commit** 10:23
**commitment**
  13:2 139:23

**committed** 9:23
  10:14 11:2
  18:10 122:5
**committee**
  10:10 16:23,24
  17:2 22:23
  24:24 31:10
  34:3,17 52:13
  67:18 74:16
  75:3 91:12 99:2
  99:5,23 100:1
  103:20 132:25
  133:16 136:2
  151:3
**committees**
  100:4
**common** 58:25
  59:4 60:10,13
  60:16,18,22
  61:12 62:4,5,8
  64:14 65:16,18
  65:21 66:12,13
  67:4,11 76:3
  120:22,23
  121:10,19,24
  122:4,8 124:17
  125:16,18
  126:16 143:1,5
**communicate**
  113:22
**communicated**
  113:23
**communication**
  25:1 132:24
**communicati...**
  25:5,8

**community**
  83:14
**company** 7:18
  58:5 82:25
  98:20
**company's**
  48:15
**compensable**
  96:11 112:7
  113:19 123:3
**compensation**
  37:17 38:15
  46:25 54:6 64:1
  75:25 76:3 80:6
  122:7 123:7
  136:11
**competitive**
  36:8
**complete** 27:23
  38:6
**completely**
  5:22 6:16 11:1
  77:15
**compliance**
  162:6
**complicated**
  61:11
**component**
  37:25 104:24
**compound**
  140:5
**comprehensive**
  81:15
**compromised**
  108:15,16
  109:4

**compromising**
  109:7
**computer**
  155:15
**conceded**
  156:19
**conceivably**
  19:13 110:1
**concern** 73:9
  75:14 113:17
  159:8
**concerned**
  159:12
**concerns** 10:15
  13:10
**conclude**
  136:20
**concluded**
  161:19
**conclusion** 7:25
  20:10
**conditions** 69:1
**confer** 7:3 8:20
**conference**
  44:8,12,15,17
  44:23 45:1
**confidence**
  52:11
**confidences**
  110:9
**confident** 77:15
**confidential**
  19:1,14 20:2,5
  64:19 68:21
  73:3,20,24 81:2
  94:8 137:18

| | | | |
|---|---|---|---|
| 143:14 | 94:24 95:1,23 | constructed | correct 24:6,7 |
| confirm 161:11 | 102:17 105:16 | 41:10 | 24:11 25:8,17 |
| confirmation | 105:19 108:7 | contained | 26:19,25 27:5 |
| 35:2 37:1 | 109:7,18,23 | 152:11 | 28:24 29:10 |
| conflict 62:24 | 110:8 114:22 | contains 83:4 | 31:1 34:25 35:4 |
| 62:24 | 114:25 115:21 | context 97:5,15 | 35:7 36:22 37:2 |
| confront | 115:24 116:21 | 97:17 134:4 | 39:3 45:15 |
| 156:24 | 116:23 117:10 | contingency | 53:15 56:23 |
| confrontation | 117:16 124:7,8 | 62:2,6 | 59:1,7 60:22 |
| 8:14 155:22 | 151:17 152:21 | continuation | 61:20 62:2 |
| conjunction | 153:16 154:22 | 5:6 9:2 | 65:24 68:12 |
| 103:19 | 154:22 155:9 | continue 24:13 | 82:22 98:14 |
| conlan 5:15,18 | 155:17,20 | 137:1 | 103:1,8 117:23 |
| 6:9 7:14 13:4,5 | 156:20,25 | continued | 117:24 126:6 |
| 15:10 19:14 | 157:8,25 | 93:21 139:23 | 126:17 130:19 |
| 20:1,4 24:14,21 | 158:25 159:5 | contradicted | 131:2 142:16 |
| 25:8 29:7 32:19 | conlan's 6:17 | 7:15 | 142:20,21 |
| 36:10,14,20 | 8:9 25:4 53:19 | contributed | 145:23 147:14 |
| 41:16,22,24 | 54:20 58:13 | 61:12 | 147:17,20 |
| 42:25 43:10 | 154:25 155:1 | contribution | 161:13,14 |
| 45:19,21,25 | 157:13,15,17 | 142:25 143:5 | correctly 146:3 |
| 46:9 47:11,18 | connection | conversation | correspondence |
| 47:22 49:17,21 | 47:17 84:12 | 28:9,14 | 5:7,20 152:11 |
| 50:8,16,21,23 | 130:17 | conversations | cosmetic 81:17 |
| 52:19 53:7 | consents | 28:8 | cost 60:20 |
| 54:10,11 55:8 | 109:14 | convey 74:15 | 61:18 123:15 |
| 55:13 57:11 | consider 8:7 | coordinated | costs 60:24 |
| 58:4 62:25 63:4 | 67:12,13 74:15 | 91:16 | 61:23 123:8,9 |
| 63:13,15 64:19 | considered 8:2 | copies 26:4 | 123:12 |
| 65:12 68:21 | 49:3 | copy 22:21 23:6 | counsel 4:8 |
| 69:20,22 70:8 | consistency | 23:13 121:6 | 5:16,17,23 7:4 |
| 71:5 73:1,4,21 | 20:14 | 141:6,9,13,16 | 7:16,16 8:21 |
| 73:25 75:6 | constance 1:22 | corner 17:23 | 28:14,21 31:12 |
| 78:19 80:17 | 162:3,18 | corporate 2:4 | 32:4,13 33:12 |
| 86:12 92:22 | constant 17:13 | 55:9 | 49:11 51:11 |
| 93:1 94:9,13,14 | | | 52:5,22 53:8 |

[counsel - criticized]                                                      Page 12

| | | | |
|---|---|---|---|
| 63:6 68:1,7,10 | 14:15 15:23,24 | 95:11 98:8,12 | **court's** 11:12 |
| 68:14 70:23 | 17:22 18:2,19 | 103:25 106:3,6 | 15:19 16:3 |
| 71:14 77:16 | 19:17,21,25 | 106:9,14,17 | 110:23 113:12 |
| 91:14 93:16 | 20:4,8,12,24 | 107:21 110:14 | 151:13 153:15 |
| 109:2 129:23 | 21:6,14,20 22:7 | 110:19,21 | 157:22 158:1,7 |
| 137:25 139:19 | 23:11 27:23 | 111:3,12,16,19 | 158:13 159:6,9 |
| 144:2 152:9 | 29:23 30:5 | 114:23 115:5 | 159:21 161:5 |
| 154:22 155:1 | 32:13,15,24 | 121:24 123:25 | **courthouse** 1:9 |
| 160:11 161:16 | 33:5,18 35:22 | 124:6,22 125:3 | **courtroom** |
| **count** 25:25 | 35:22 36:3,3,16 | 125:23 126:2 | 63:21 71:4 |
| 29:16 30:11 | 37:2 38:5,18 | 127:12,21,24 | 77:17 108:2 |
| 32:2,12,12 | 40:5,8,13 41:2 | 128:14,20,24 | **courts** 5:11,12 |
| 132:11 | 41:12 42:15 | 129:3,6,9,12 | 5:12 15:25 |
| **country** 45:3 | 43:13,17 46:18 | 132:5 134:3 | 65:10 66:13 |
| 51:12 52:23 | 51:11 52:23 | 135:22 137:5,7 | 89:1 158:21 |
| 53:5 96:21 | 53:4,5 55:17,20 | 137:10,14,22 | 160:11 |
| **county** 1:1,9 | 59:3,3 61:6 | 137:25 138:7,9 | **cover** 119:2 |
| **couple** 57:8 | 62:14,17,21 | 138:14 140:7 | **covered** 31:18 |
| **course** 7:17 | 64:10,13 65:6 | 140:13 141:12 | 71:11 |
| 29:14 35:1 | 65:12 66:1,6,21 | 141:23 144:23 | **covers** 25:4 |
| 41:17 47:12 | 66:23 67:5,10 | 146:11,19,23 | **crc** 1:22 162:3 |
| 48:16 73:18 | 67:12,16,20 | 147:1 148:21 | 162:18 |
| 88:22 93:25 | 69:7,15,18,24 | 151:10,15 | **created** 103:18 |
| 99:6 100:7,13 | 70:3 71:20 | 152:8 153:2,9 | 134:5 |
| 100:13 102:4,5 | 72:11,15,18,21 | 153:11,22,23 | **creates** 15:12 |
| 106:5 109:23 | 73:16,19,23 | 154:2,3,5,7,11 | **credibility** 8:10 |
| 113:24 124:20 | 74:5,10,13,21 | 154:13,16 | 18:7,9,23 20:12 |
| 143:10 150:4,4 | 75:18 76:10,14 | 155:25 156:14 | 20:18 63:8 |
| 156:25 | 76:21 77:7,11 | 157:11,16 | 154:20 155:11 |
| **court** 1:1,13 4:2 | 77:18 78:1,13 | 158:15,18 | 155:12 157:18 |
| 4:12,23 5:3 | 79:16 84:20,24 | 159:7,13,24 | **credible** 124:12 |
| 6:13,22,25 7:9 | 85:4,8,12,17,21 | 160:1,5,8,11,19 | **criteria** 104:23 |
| 8:2,5,11,24 9:8 | 86:1 88:15 89:5 | 160:22,24,25 | 105:12 120:19 |
| 9:11,17 11:4,4 | 89:8,20,21 | 161:7,14,16,18 | **critical** 159:9 |
| 11:6,18 12:7,7 | 92:19 93:8,9,16 | 162:4,19 | **criticized** 14:22 |
| 13:8,13,15 14:8 | 93:23 94:1 | | |

**criticizing**
18:21
**cross** 3:4 22:11
128:9
**crr** 1:22 162:3
162:18
**crux** 98:12
**crystal** 12:11
73:6
**cups** 105:18
**current** 53:11
106:24 107:25
120:16 122:20
122:21 130:11
132:15 148:22
162:7
**currents**
150:15,16
**cut** 64:8
**cynical** 82:17
**cyprus** 98:21
99:2,2

**d**

**d** 2:7,9 22:2
87:8
**dachille** 46:1
50:21,24 56:19
102:17 117:17
118:1
**dais** 20:19
**damages** 145:6
146:3
**daniels** 88:10
**date** 1:11 28:10
48:10 114:7

162:23
**dates** 112:13
**daubert** 88:20
88:25 89:9,20
95:2,6 113:13
**davies** 145:14
145:19
**day** 9:4,6,8,12
10:5,16 46:12
48:5,6 52:7,8
54:21 56:14
61:6 82:7 83:14
84:19 114:22
124:15,16
127:5 130:5
156:20
**days** 25:13
161:12
**dc** 2:10
**deal** 17:10
49:23 96:3
105:19 127:6
128:6,7,18,24
128:25 133:8
150:21
**deals** 129:2
**dealt** 11:22
**decades** 66:13
107:14
**deceased** 83:1
**december**
87:21
**decent** 101:12
**decide** 8:6
12:14 18:19

**decided** 147:20
**decision** 7:5
8:12 11:7,8,12
11:19 12:13
16:4 20:3 95:6
113:13 127:13
154:6 158:1
**decisions** 69:4
**declarations**
14:3
**declined** 109:2
**deducted** 62:5
**deeply** 157:6
**defendant**
136:18
**defense** 88:11
155:19
**definitely** 78:4
105:24
**degree** 15:4
**delay** 135:7
**demand** 108:12
**denied** 36:3
98:3,4 156:22
**department**
91:22
**depend** 9:14
**depending**
61:14 66:15
132:10
**deposed** 126:6
126:8
**deposition**
131:16 133:5,7
134:17 141:7

**deps** 1:25
**depth** 96:9
**describe** 89:21
92:24 104:3
111:19,22
134:3 149:10
**described** 27:13
30:11 31:24
32:2
**description**
3:12 27:3,8
**deserve** 82:16
**deserved** 58:3
**design** 72:7,12
**designation**
161:4
**detail** 13:1
**detailed** 50:15
156:12
**details** 28:18
90:16
**determination**
18:8 61:7 66:24
**determine** 14:2
51:7 106:12
120:6
**determined**
18:9 61:3
**develop** 13:6
**developed**
21:13 46:6,7
56:1 99:19,22
104:6,8
**diagnosed**
104:12,13,15
104:16 123:10

[diagnosed - drive]                                                                     Page 14

123:16
**die** 135:6
**difference**
65:10,17
**differences**
92:5
**different** 32:18
63:20 71:4
101:9 112:6
133:1,12,12,13
140:9 148:16
150:11,11
**differently**
148:20
**difficult** 107:16
**difficulty** 101:3
**dime** 139:14,18
139:25 140:3
141:1 142:17
**direct** 121:3
124:10,13,20
**direction**
158:13 159:6
159:21
**directly** 10:8
15:5 23:8 79:18
157:12,14
**disaffiliation**
45:15 47:19
55:25 75:9,13
119:9
**disagree** 17:21
20:23 34:18
78:13 80:11
156:6

**disclose** 55:13
56:11 159:11
**disclosed** 43:9
43:21 157:1
**disclosing** 63:5
155:9
**disclosure**
11:25 12:1,2
84:11
**discounting**
74:7
**discuss** 46:3
152:9 160:2
**discussed** 28:25
29:14 45:11
51:18 156:15
**discussing**
28:17 45:19
109:9 145:5
**discussion**
19:11 28:13
47:24,24 62:20
75:5
**discussions**
16:12 28:3,23
29:2 32:3,19
34:7,13 37:11
45:12 47:21
68:25 73:15
75:6 81:2 99:7
99:11 117:13
129:22 143:15
156:12
**dislikes** 42:16
**dismiss** 34:17
35:7 36:1,4

38:12 40:23
60:8 97:25 98:4
98:4 135:11
**dismissal** 27:15
108:20
**dismissed** 34:4
36:7 112:15,22
135:13
**disparage**
119:25
**disqualification**
13:18 14:14
16:5 20:25
21:17 64:7
**disqualify**
12:14 17:20
**distress** 135:14
**district** 1:13
66:23 114:23
**ditch** 54:16
**divided** 90:1
**division** 1:1
**docket** 1:2 4:6
161:5
**document** 5:14
24:18 25:15,24
26:5,5,13,15,15
28:10 29:20
30:3 33:7,9,17
103:2,10,15
110:7 146:14
151:16,22,25
152:1,15 153:7
155:20 158:5
**documents**
6:11,14 22:24

32:25 34:22
147:12 155:13
156:7 157:7,9
158:16,19,22
158:24
**doing** 10:14
19:7 35:20
68:19 72:3
74:22 129:10
129:14
**dollar** 46:16,21
123:24 150:13
**dollars** 47:8
65:22 123:11
128:7,8 155:19
**double** 66:10
**doubt** 33:12
**doug** 46:1
102:17 117:16
117:25 118:1
**downplaying**
138:10
**draft** 22:17
24:9 25:19
26:18 27:3
28:15 29:1,8
33:13 103:2
145:14
**dramatically**
134:16,19
**drew** 127:16
**drill** 111:10
**drinker** 56:9
63:6
**drive** 2:4

[driven - exactly]                                                                Page 15

**driven** 75:21,22
**driver** 76:7
**drives** 75:19
**driving** 69:13
  121:17
**drove** 69:14
  75:18
**drug** 17:9
**dual** 57:12
**duane** 117:16
  117:18
**due** 6:17 60:1
  155:3
**duly** 22:4
**duties** 144:4
**duty** 91:25
  92:11,16 144:1
**dying** 102:11

**e**

**e** 1:22 2:1,1
  3:10 22:2 87:8
  162:1,3,18
**earlier** 108:21
  110:24 141:17
  146:21
**earliest** 150:20
**early** 61:15
  95:18 104:9
**earnings** 48:6
  48:15
**easier** 23:4,9
  144:24
**easily** 123:11
**easy** 107:12,14
  159:3

**echeverria**
  89:13
**echo** 13:13
**ecourts** 161:8
**ed** 53:24
**efficiently**
  10:24
**effort** 63:18
  70:11 134:13
**efforts** 117:18
**eight** 25:24
  26:5 29:16,21
  30:12 32:1
  93:13
**either** 11:20
  36:11 103:10
  137:8 141:24
**eldon** 92:9
**element** 130:23
**elements** 123:6
**elicit** 94:3
**else's** 148:10
**email** 43:10
  48:5 103:6
  153:18
**emails** 25:10
**encompass**
  153:18
**engage** 34:7
  69:21 98:1
  108:18
**engaged** 108:19
**entered** 60:19
  61:5 67:5
  147:21

**entering** 72:6
**entire** 123:20
**entirety** 153:18
**entitled** 7:10
  8:4 121:16
  125:16,18
  126:15,17
**entity** 106:22
  144:13
**entries** 24:13
  26:7 30:14,18
  145:2
**entry** 13:17
  24:2,3,23 26:2
  26:24 27:9
  28:12,19
**epithelial** 105:9
  120:2
**equivalent**
  89:18,20
**eric** 121:3
**erik** 2:14 5:2
  117:17
**especially** 12:6
  105:1 123:9
**esquire** 2:3,3,9
**essence** 27:12
  144:16
**essentially**
  40:16 107:8
**establishing**
  60:16
**estimation**
  57:18 145:10
**et** 10:6 16:21
  20:14

**ethical** 16:25
  17:16 21:17
  63:3,4 67:14
**ethics** 16:22
  17:1 19:5 64:6
  72:2 155:23
**evaluate** 21:7,8
  94:17 117:18
**evaluating**
  95:20
**evaluation** 8:9
  15:19
**evd** 3:12
**events** 14:13,19
  15:17 113:7
**everybody** 9:20
  77:5 78:2
**evidence** 7:22
  12:1 13:18
  20:14 29:20
  72:16 110:13
  127:13,13
**evidenced**
  14:19
**evident** 13:11
**eviscerate**
  31:17
**evolution**
  111:22
**exact** 27:3
  128:2,11,12
**exactly** 17:6
  26:22 60:25
  72:17 94:2
  111:1,1

**examination**
  3:1 13:24 22:11
  86:6 93:20
  138:18
**examined**  22:5
**exceed**  123:11
**exceeds**  47:1,1
**excel**  6:11
**except**  75:12
**excepted**
  139:17
**excerpt**  3:13,14
  23:3,7 142:5
  144:21 146:20
  146:22 147:3,5
**exchanged**
  22:18
**excited**  130:4
**executive**  52:13
**exhibit**  43:11
  44:2,4,5 45:25
  50:12 52:1
  54:12,19
  102:12,16
  103:7,14,14,15
  105:19 117:15
  125:6,7,8,12,12
  129:18 137:17
  147:3,5 152:13
**exhibits**  125:6
  141:24 142:3,6
**expect**  52:3
  158:20
**expectations**
  13:20

**expected**  46:24
  53:11
**experience**
  97:12,13
**expert**  55:9
  71:23,25 88:21
  95:4 114:21,24
  115:1,13
**explain**  10:17
  43:5 103:25
  119:7,8 132:5
**explaining**
  21:14 79:8
**express**  54:20
**expressing**  55:7
**extensive**  94:15
  94:15 95:4,13
**extent**  8:8
  64:20 65:9 67:3
  67:18 73:23
  74:17 75:20
  78:14 108:17
  110:19 152:14
  161:2
**external**  118:15
  119:1
**eye**  2:9
**eyes**  5:8 7:11
  154:15 157:19
  157:19 158:12
  160:5,13 161:1

-----
**f**
-----

**f**  22:2 162:1
**facing**  135:20

**fact**  6:18 9:21
  12:16 13:3
  16:11 56:8,12
  110:15 127:14
  152:2 156:3,12
  157:7
**factor**  118:17
  118:24 121:17
**factors**  20:13
  101:24 102:2
  119:19
**facts**  11:9,9
  29:19 64:5
  72:15
**factual**  72:22
  110:17
**faegre**  55:24
  56:9 63:6 92:22
  109:24 111:14
  156:21
**failure**  54:25
**fair**  37:16 40:15
  52:5 54:5 59:24
  63:25 70:2,4
  81:11 100:6
  103:8 105:22
  108:6 112:12
  123:3 128:20
  129:8,9 139:11
  140:1 141:3
  142:19,20
  144:3 146:23
  148:7 149:5
**fairly**  107:12
**faith**  82:14 83:3
  83:22 150:25

**fall**  41:21 43:1
  44:8,13 99:13
  120:9
**fall's**  44:18
**fallon**  92:10
**fallopian**
  105:10
**falls**  59:23
**false**  20:17,17
  39:10
**familiar**  20:24
  44:1,3 53:17
  59:14,15 60:15
**families**  83:1
**far**  6:17 13:4
  19:22 27:21
  38:3 59:12,23
  64:8 69:1
  107:23 124:2
**fare**  151:19
**fast**  79:13
**faster**  85:24
**fat**  141:19
**favor**  93:15
**favorable**  88:9
**fax**  1:24
**fcr**  71:8
**february**  87:5
  98:23 111:21
**federal**  12:7
  20:24 51:11
  52:22 60:19
  67:10,16
  160:25 161:5
**fee**  60:20 62:2
  120:23 121:10

122:4,8

**fees** 60:13,23
61:11,18,18,23
61:23,25 62:5,5
62:6,8 63:13,15
121:25

**felt** 7:12

**fiduciary** 92:16
144:1

**figure** 46:16,21

**filed** 31:13 34:9
34:12,17 35:6
37:22 38:1 44:5
53:1 82:14
83:22,23 96:25
97:1,21 98:22
98:23 99:3
103:5 112:14
113:10 114:4
135:17 161:5

**filibuster** 38:7

**filing** 27:16
113:16 134:12
135:25 136:3,8
136:15

**final** 81:15

**finality** 39:7,8
39:11 45:13
48:24 49:6,24
50:9 54:3 57:15
57:20,21 58:5
76:9 80:4,4,8

**financial**
135:13

**financing** 68:12
68:17

**find** 17:16,19
55:17 81:9
128:2,11,12
159:17

**finding** 127:14

**findings** 67:6
69:18

**fine** 4:12 56:7
64:25 72:8 73:2
84:22 85:6
140:13,18

**finite** 114:3

**firm** 4:15 10:3
10:13,15 11:1
12:3,8,9 13:2
14:24 16:13
18:10 22:18
55:6 64:4 68:2
90:1 92:4
138:22 145:20

**firm's** 58:24

**firmly** 122:5

**firms** 11:11
61:15 91:24
92:6 96:21
130:24 140:24

**first** 7:1 14:12
15:1 16:18
17:14 23:25
25:14 34:23
37:22 38:1 40:9
43:9,20 47:23
47:24,24 70:7
78:19 86:18,19
86:22,24 87:3,4
90:13,19 92:8,8

93:10 95:16
96:25 97:1,2,2
102:24 103:4
103:17 108:11
108:12 109:12
114:22 121:22
122:18 127:5
156:20

**fitness** 16:24

**five** 17:8 48:3
138:4 151:16
160:8

**flatly** 7:15

**flip** 26:8

**florida** 142:14

**focus** 16:1
41:15 75:23
102:24 149:16

**focused** 18:8
21:5 64:18 75:7
78:25 86:14
93:14

**focuses** 66:22

**focusing** 42:17

**follow** 76:16
146:12

**followed**
157:22 159:6
159:21

**following**
108:20 126:11

**follows** 22:5

**font** 23:17

**footnote** 161:1

**force** 114:17
136:18

**forced** 136:21
136:23

**forces** 69:20

**foregoing** 162:6

**formal** 6:2,12

**format** 5:25
162:7

**formed** 91:9,9

**former** 55:10
63:6,10

**forminard**
31:12 109:1

**forth** 25:11
30:25 33:24
34:2 37:14

**fortress** 68:16

**forward** 5:9
11:13 14:19
15:20 21:12
26:9 36:1,8
37:4,10 60:12
116:4 123:22
136:13

**forwarded**
24:22 29:8,9

**found** 20:13
70:17 82:13

**four** 28:11
29:15,21 52:7
69:11 150:5

**fox** 2:2 87:5
90:13

**foxrothschild...**
2:6,6

**frame** 9:2
10:24 13:20

98:13
**framing** 93:16
93:22
**frankly** 12:23
14:13 33:21
63:8 75:14
83:23 84:16
**fraudulent**
82:14
**free** 18:24
**front** 13:23
77:12 95:3,9
141:7 147:11
**frustrating**
122:1
**full** 22:21 23:5
40:8 116:11,11
116:11 162:6
**fund** 58:25
60:10,16,22
61:12 64:14
65:17,18,21
75:21,21,22
76:2 126:16
143:1,5
**funding** 47:8
68:15,20,24
69:3 106:6,9
**funds** 17:8 59:5
66:12
**further** 3:7
84:23 129:22
147:8 151:8
**future** 10:11
81:16 106:25
107:3 130:11

131:19 146:1
148:22
**futures** 132:13
150:15,16

**g**

**gaap** 118:19
**gain** 100:8
**gained** 94:19
**galvanize** 83:24
**game** 148:5
**garner** 45:17
53:11
**gary** 98:6
**gasparovic**
102:17
**gears** 114:20
**general** 27:8
31:11 61:9 68:4
109:2 126:14
**generally** 60:14
93:15 101:17
**generals** 107:4
150:16
**generous** 153:5
**gerel** 91:12
**getting** 27:21
58:2 93:3 117:8
122:7
**gilbert** 28:5
**give** 8:4,25 9:20
23:5,16 33:16
42:10 45:13
50:9 54:1 58:1
75:24 79:15
80:7 118:17,18

125:1 141:9,16
146:16 158:19
158:22 159:25
**given** 8:3 22:21
100:14 134:17
155:4
**gives** 9:11
42:11
**giving** 21:6
157:4
**glad** 31:8
**global** 55:10
95:21 96:2,3
**go** 5:9 12:9 13:1
19:19,21 25:12
30:20 35:23
38:8,20 56:19
60:9 64:6 66:9
67:1 71:12,21
73:7 86:3 92:21
93:7,17 96:18
102:10,12
103:6,12
109:14 111:12
115:8 118:6
119:3 123:6,15
125:3,5,14
127:2 128:1
129:6,20
133:18 137:22
138:1 140:22
148:24 155:12
157:12,14
158:2 160:9
**goal** 76:6

**goes** 63:7,8
69:9,13,13
86:12 100:3
130:6 134:2
154:21 155:11
160:17
**going** 8:15 9:3
9:6,9 11:8,9,13
12:11 13:11
14:19 15:19
16:1,3,9,16
21:7 23:20,24
29:23 30:23
33:10,16,23
37:11 38:5,6
45:24 46:15
53:14,18 64:4
65:21 70:16
72:13 77:21
79:9 85:21
87:22 92:20,21
93:10,17
102:12 107:14
110:11 115:2,9
118:5,6 122:4,9
124:9,25
125:21 127:2
127:12 128:12
128:19 129:20
131:7 135:4,5,6
135:7,7 138:1
139:17 144:3
149:1 154:7
160:12
**golkow** 1:24

**golkow.com**
1:25
**golomb** 91:18
**good** 4:2,10,12
4:17,20,23 5:1
5:3 22:14,15
38:18 59:22
79:21 142:4
148:24 150:25
**gotten** 49:6
129:15
**grabbed** 18:20
**grammatical**
30:24
**granted** 12:15
**great** 19:12
63:24
**greater** 51:6
**greedy** 63:21
**green** 25:12
26:10 77:22
**grew** 27:7
29:16,25 30:1
**grid** 46:25
49:12,13 120:5
120:6,11
**gross** 61:13
**groundwork**
41:14
**group** 46:8
68:24 107:7
114:3
**groups** 151:3
**grown** 25:24
26:23

**guess** 36:10
**guy** 18:10 19:12
19:12 101:12
124:12 148:12
153:5
**gynecological**
114:6

**h**

**h** 3:10 22:2
**haas** 2:14 4:25
5:1,2 10:2,21
12:18 14:11,12
14:25 16:14
19:11 31:12
38:2 48:9,14
57:7,9,15 63:18
76:24 77:3,6,9
77:13,14 109:1
117:5,17
120:23 121:3
121:15,21
124:13 125:15
126:12 127:4,8
128:5,16
132:18,23
133:21 151:14
151:15,20,25
155:14 157:8
**haggle** 106:2
**haggled** 108:7
**haggling** 109:9
**half** 17:9 48:3
84:17
**hand** 21:24

**handed** 127:2
**handle** 96:22
**hands** 90:9
**happen** 15:20
73:5 97:24
**happened**
128:25
**happening**
33:22
**happens** 44:22
**happy** 23:4
65:13
**hard** 148:14
**harmful** 86:13
157:3
**he'll** 64:1
**head** 89:25 90:2
**heads** 9:1
**hear** 6:1,25 7:4
13:18 14:6
19:25 40:8
76:24 77:20
129:12
**heard** 11:17
36:20 41:3
44:11 57:19
59:12 87:8,25
110:1 149:19
149:21 155:5
**hearing** 1:6 4:1
7:25 9:23 13:22
43:11 45:24
50:12 54:12,19
89:14,16 93:18
97:25 102:18
132:20,20

137:15 155:23
157:8 159:18
**hearings** 6:4
16:12 95:2
**hearsay** 68:23
**help** 78:7 79:4
128:14 131:11
**helpful** 23:18
80:11
**helping** 140:23
**hesitant** 100:2
**hey** 18:22 73:25
74:21
**high** 52:10
**highest** 119:3
**highlighted**
26:10
**hilton** 2:3 4:16
**hire** 70:11,16
70:23 71:15,23
71:25
**hired** 70:8,19
**hoc** 107:7
**hold** 9:10 40:5
48:22 72:11
76:21 135:5
144:13
**holdbacks** 61:5
**holding** 153:15
**home** 155:21
**honest** 18:10
47:12
**honor** 4:11,20
7:7 15:22 16:7
23:14 33:1
35:19 40:4,25

[honor - instance]                                                    Page 20

42:6 43:16
62:11 64:3
67:21 68:18
69:10 76:23
77:3,10,15 84:9
84:13,15 85:7
85:19 86:4
89:10 98:15
110:12 111:2
124:9 137:20
141:11 151:18
159:15 160:21
160:23
**honorable** 1:12
1:12
**honors** 5:1 6:23
7:8,24 21:19
79:6 85:20
86:11 87:23
93:1 108:1
137:3 152:6
157:24 161:9
161:17
**hooked** 6:20
**hopefully** 21:6
**host** 130:1
**hour** 14:24
84:17
**hours** 14:5
66:16 84:18
**huh** 71:1 130:3
**humble** 12:24
**hundred** 47:8
**hypothetical**
72:22 78:12

**i**

**idea** 9:11,20
29:21 56:19
59:22 79:21
80:3 117:11
118:4 144:9
**identification**
146:15 147:4,6
**identified** 146:1
**identify** 104:12
**iii** 1:7 61:7
**illinois** 155:23
**imerys** 71:10
96:6 98:17,18
98:20,20,21,23
99:1,6 100:8,20
100:21 101:1,4
101:7 128:6
129:25 133:10
143:10 149:21
150:21,21
**immediately**
14:22
**impact** 134:1
**impacted** 102:8
134:24
**impacting**
101:25
**impeaching**
154:21
**impeachment**
7:13,21 8:3
154:20 158:10
158:11,12
159:5,22

**implication**
6:19
**import** 67:11
**important**
16:16 78:2
**impossible**
109:22
**improper** 93:19
**impropriety**
17:24 21:10,11
21:16
**inaccurate**
115:4
**inappropriate**
32:12
**include** 37:5
106:24,24,25
107:1
**included** 37:9,9
37:24 107:2,4,9
134:23
**includes** 50:25
106:21
**including** 15:17
53:9 65:8 150:5
158:23,24
**incorporates**
51:25
**increase** 112:1
**increased**
134:15
**incredible**
155:14
**incredibly**
156:5,11

**indicate** 113:24
**indicated** 7:9
7:24 51:9 56:8
83:24 143:19
144:4
**indicates** 55:3
**individual**
61:15
**individuals**
127:17
**information**
13:3 19:1,15
20:2,5 68:21
73:4,20,24 74:1
74:6,17,24
75:12 76:25
86:14 94:7
107:18,19,20
109:13,18
110:18 137:18
155:9
**informed** 81:23
**ingham** 113:13
139:20
**ingredients**
83:6
**initial** 152:10
**initially** 133:14
**injuries** 114:10
145:6 146:2
**injury** 104:14
**inside** 78:9 79:5
80:12
**insight** 100:8
**instance** 25:5

**instances** 7:14
**instilled** 92:11
**instruction**
  157:23
**instrumental**
  91:19
**intend** 151:6
**intends** 13:24
**intensely** 52:15
**intent** 13:21
**interaction**
  115:23
**interest** 10:5
  116:24 117:9
  122:6,10
  136:24
**interests** 92:1
  143:21,22
**interim** 61:5
**internal** 143:14
**internally** 81:8
**intimated**
  114:21
**introduction**
  134:20 157:10
**investigating**
  86:23
**invitation**
  50:24 118:12
  159:14
**invite** 6:13
**involved** 10:11
  86:19 90:15
**involvement**
  70:17

**involving** 45:14
**iowa** 155:25
**iqbal** 88:21
**issue** 5:15,21
  7:5 8:14 11:13
  11:19 14:2,14
  15:13,14,15,15
  15:15 16:2,4
  19:15,18 20:4
  20:20 21:1
  31:16 41:13,15
  53:24 64:7
  65:12 69:12
  112:21 154:19
  160:17
**issued** 54:9
  82:7 112:18
**issues** 11:14
  18:13,15,22
  33:2 76:4 86:23

**j**

**j** 94:17
**j&j** 3:13,14
  11:7,20 12:4
  31:11,22,22
  33:7,9,10,12
  37:4,14,17,22
  38:1,16 39:1,2
  39:6,11,15,19
  39:19 41:10,23
  43:4,9 45:13
  48:23 49:6,22
  50:8,20,24
  51:19,20,22,22
  54:2,4 55:14

56:19 57:1,13
57:14,19,20
58:1,11 59:6,18
60:12 63:5
64:19,20 65:7
69:22 71:14
73:8,11,12,21
74:2,6,18,22
76:8 78:8 79:3
79:21 80:4,8,13
80:15 81:3,7,14
84:3,7,8 86:20
86:23 94:8,17
95:17 96:25
97:1 98:21 99:7
100:10 101:16
107:10 108:17
108:25 109:19
109:24 110:8
114:4 115:17
116:1,17,22,24
117:4,7,9,12,23
118:7,21
119:10 120:15
130:9,10,16
131:15 134:20
135:3,25
136:14 143:9
146:18,21,22
147:3,5 152:14
152:14 154:8
155:13 156:21
**j&j's** 7:16,16
27:16 35:16
36:25 46:2
52:20 57:6

63:10 80:21
83:2,10,22,25
106:23 118:22
143:6 149:22
152:16 153:21
**james** 55:8
102:17
**january** 112:15
112:18 115:3
**jeffrey** 2:3
**jerry** 90:12
**jersey** 1:1,10
2:5 17:23 89:3
91:17 97:22
114:24 162:5
162:20
**jim** 13:4,5
68:21 70:8 71:5
71:7,8 78:19
80:17 94:13,14
94:24 95:1,15
95:17,23
105:19 108:7
109:7 114:25
115:23 116:21
117:10,11,16
152:21 155:17
155:20 156:19
156:20,24
**job** 9:25 10:12
**joel** 98:6
**john** 1:12
102:17
**johnson** 2:11
2:11,14,14 4:5
4:6,21,22 5:2,2

**[johnson - know]**

7:9,10 14:11,11
14:16,16,20,20
15:11,11 20:5,5
35:2,2,3 43:1,1
47:18,18 48:6
54:24,24 95:10
129:23 130:25
130:25 143:13

**johnson's** 35:4
48:6 129:23
143:14

**join** 41:21 42:4
42:24 69:20
118:13

**joined** 4:16

**joins** 92:22

**joint** 83:18 92:1

**jointly** 50:21

**jpollock** 2:6

**jr** 2:7

**judge** 7:3 8:16
8:20 11:5,21
12:13 13:8,9,13
13:21 14:5,7
15:8 17:15,18
18:20 19:17
20:20,22,23
33:1 34:11 36:6
36:6 60:19 61:7
66:23,25,25
67:2 76:12,13
77:2 84:25 85:2
91:9 92:9 95:3
95:7,9 97:22,23
98:3,6 112:22
114:22 119:14

127:1,15 129:7
137:5,6,15
147:17,19
148:1 152:8,21
154:10,14,24
155:3 156:19
160:1,25
161:13

**judges** 9:22
101:11 129:10
129:14 137:9

**judicial** 64:14
66:4 162:7

**jump** 108:4

**june** 26:9 28:11
111:21

**jurisdiction**
88:16

**jury** 32:14

## k

**kaplan** 34:11
36:7 97:22,23
98:3 112:22

**kcic** 22:24
24:22 25:5
28:10,13 29:1,5
29:6,9,10 34:2

**keep** 15:23
77:18

**keeping** 8:13

**keeps** 35:19
42:12

**kemp** 89:3,8

**key** 6:8 54:23
104:24 113:7

**kind** 70:20
129:19

**knew** 13:4 35:1
48:12,13 52:2,3
52:6,16 56:4
57:2 69:22,22
71:5,6 80:14
124:7 151:25

**know** 5:11 6:1
6:15,21 8:13
9:19 10:13
12:16 15:24
16:22 18:11
19:11 20:1,3
21:9 26:4 27:7
27:10 30:6 34:9
36:18 39:19
41:2,13 42:16
44:4,14 45:23
46:12,19,24
47:7 49:1,2,3,3
49:5,9 50:6,6
51:6,23 52:12
52:12 54:6,8
55:23 56:2,3,4
56:12 57:1,14
57:15,15,17
58:3,4 59:4,9,9
59:16,17,19,19
59:21,23 60:11
60:11 61:4 62:4
63:2 64:10,11
64:13,15,15,16
64:20,24 65:11
66:14,16,22
67:23 68:9

69:10,13,19
71:3 73:24 74:8
74:9,10,19 75:6
75:10,14,23,23
76:7 77:5 78:2
78:3,4 79:24
81:1,6,13,21
84:16 85:9
86:21,24 87:2
88:5,24 89:1,12
89:14,20 90:3,4
90:5,8,9,11,19
90:20,21 91:1
91:12,17,18
92:5,10,11,14
92:17 93:1,2,12
93:12,15 94:11
94:12,13,18,20
94:24,25 95:2,6
95:6,8,12,13,14
95:15,16,17,20
95:23,24,25
96:1,1,3,9,10
96:16,16,17,17
96:18,21,22,23
97:3,7,8,20,21
97:23 98:9,13
98:17,24,25
99:19,25,25
100:1,4,10,13
100:14,14,15
100:16,21
101:3,3,6,21,21
101:24,24,25
101:25 102:1,3
102:3,5,6,7,8

102:13 104:6,7
104:7,8,9,14,15
104:17,21,22
104:23,25
105:2,3,4,7,9
105:13,25
106:10 107:4,5
107:7,8,11,17
108:11,14,16
108:20,23
110:25,25
111:6,9 112:9
112:13 113:7,8
113:10,10,11
113:11,12,12
113:13,15,16
113:19,22,25
113:25 114:8,9
115:6,23,25
116:14 117:3,7
118:12,15,17
118:25 119:3,5
119:7,8,9,10,18
119:19,19,21
119:22 120:5,6
120:7,8,11,17
122:2 123:4,4,7
123:16,19,23
123:25 124:1
125:10 127:17
128:9 131:9,15
132:13 133:9
133:10 134:10
134:11,12,14
134:16,19,19
134:20,24

135:1,1,3,4,6,6
135:16 136:6,9
136:11,12,22
149:12 150:2,3
150:13,19,20
152:14 153:3
154:5 157:24
158:2,4,10,14
158:24 159:3,4
159:9,17
160:14,14
**knowing**   73:15
81:10
**knowledge**
94:15 109:17
162:9
**known**   13:5
56:23 83:5
**knows**   32:10
36:17 38:2 79:8
98:18 110:19
**kuhmo**   88:21

**l**

**l**   1:2,12 4:7 22:2
**lack**   135:13
**language**
109:11
**large**   90:3,5
91:5
**larger**   23:17
66:14,14
**las**   44:8,14
**latest**   83:10
**latitude**   128:10

**law**   1:1 4:15
20:9 55:6,8
64:4 68:2 91:10
91:24 130:24
140:24
**lawrenceville**
2:5
**lawyer**   54:24
55:4 70:8 71:15
101:24 109:12
115:19 156:20
156:22
**lawyers**   12:18
45:2,7 52:9
58:13 63:10
90:4 92:18 97:9
113:23 143:22
155:19
**lay**   41:14
**lead**   53:8 87:17
91:11,14
**leader**   55:10
**leadership**
51:10 52:22
53:4 91:4,15
92:6,9,13,15
103:20 143:20
143:25 145:4
149:14
**leading**   55:3
**learn**   93:5,12
94:20 156:25
**learned**   57:17
57:19 92:20,24
109:19,23,25

**learning**   90:15
90:15
**leeway**   125:1
**left**   6:8 9:9
138:4
**legacy**   22:18
24:9 25:20
26:18 27:4 28:4
28:9,13,23
29:12,12 32:4
34:2,8,13,24
36:21,22 37:6
38:25 39:10,11
45:6 46:10
48:14,17 49:3
50:9 51:19
53:10 72:7 73:1
73:11 75:7,17
94:25 95:1,24
106:21,22
107:17 115:24
116:10,18
118:6 119:8
144:8,9 145:5
145:15
**legacy's**   52:20
80:17 117:21
**legal**   54:25
82:17 83:14
**legion**   155:18
**legitimate**
40:18 82:25
119:22,24
136:16
**leigh**   87:16
91:10,13 98:24

**length** 30:3
70:18
**lenox** 2:4
**letter** 48:10
50:15,25 52:25
56:21 83:13,18
102:25 103:5
**level** 52:10
**lever** 16:15
**liabilities** 83:11
144:14
**liability** 73:13
80:20,21
106:23 107:10
116:11,18
117:8 118:22
118:24 119:5
**license** 1:22
162:21
**life** 12:16
101:12
**light** 54:25
77:22,23
**likely** 15:4
**likes** 42:16
**limit** 123:2
**limited** 68:5
120:4
**limiting** 13:21
**limits** 59:17
**line** 65:4 109:12
125:24 126:18
129:20 130:7
130:16,20
142:8 156:3

**lined** 29:20
**lines** 17:12
28:11 120:22
125:25 126:4
133:20
**link** 118:5,6
**linked** 114:11
**listed** 24:5,8
26:17 145:14
**literally** 16:19
**literature** 114:7
**litigating** 107:6
116:10,12
**litigation** 1:4,24
2:14 4:6 7:17
11:10 14:18
45:4 54:24
55:14 68:12,15
68:20 69:3,25
71:14,16 72:7
81:18 86:19
91:16 102:5
103:3 107:13
108:13 113:7
134:10 139:22
139:24
**litigations** 53:5
104:8
**little** 12:23 23:3
64:22 101:2,2
111:10 124:2
125:1 138:9,11
149:20
**live** 15:24,25
95:5 101:12
112:24

**lives** 155:24
**llc** 1:24 2:11
4:22 81:15
**llp** 2:2,8
**llt** 4:22 81:15
**local** 89:2 161:6
**lodestar** 66:15
**log** 22:21 23:5
29:15 30:10,14
34:22 144:22
146:18
**logo** 83:17
**long** 9:13 11:23
15:10 38:16
52:15 80:1,1
95:22,22 120:8
123:5 137:12
**longstanding**
139:23
**look** 11:22
18:22 25:25
43:12 47:23
49:12,12 50:12
97:6 101:16
109:22 117:15
120:6 122:5,13
122:14,15
123:13 156:6
156:10
**looked** 19:3
22:20 54:10
113:19
**looking** 9:6
18:25 19:1 21:1
21:11 28:12
39:8 48:24 54:3

54:5 57:20,25
58:1 80:2,7
100:10 102:18
106:11 123:5
124:15 125:7
129:17 148:14
**looks** 26:3
**lose** 41:15
**lost** 100:6
**lot** 43:6 66:6,7
81:5 103:21
**loudly** 124:24
**love** 102:11
**low** 114:17
136:23
**lower** 123:18
**loyalty** 91:25
**ltl** 2:11 27:15
34:4,11 38:12
39:2,21 84:7
97:18,20
108:18,19
112:14,15
113:2,16
120:24 121:11
121:12,18
122:15 134:21
135:10 136:4
150:14
**ludicrous** 152:4
**lunch** 7:8
105:18 137:11
158:8

| m | | | |
|---|---|---|---|
| **m** 2:3 | **making** 12:13 | 49:17 50:17,19 | 143:5 144:1 |
| **made** 7:12 15:1 | 32:13 47:18 | 50:23 51:2,25 | 151:2 |
| 31:14 32:9 | 48:25 67:5 | 53:2,10 58:9 | **mdls** 92:7 |
| 33:21 44:7 45:8 | 158:21 | 95:16 99:16,19 | **meadows** 90:11 |
| 45:22 48:9 | **manage** 90:7 | 99:22 102:21 | 91:17 98:25 |
| 49:16 50:24 | **management** | 103:16,18,22 | **mean** 14:24 |
| 57:9 69:18 | 2:11 4:22 81:15 | 103:23 104:1 | 28:22 34:6 35:8 |
| 70:10,10 82:21 | **managing** | 105:15,23,24 | 39:14,18 43:19 |
| 83:17 107:2 | 13:19 | 106:7,10 108:8 | 44:3 45:20 46:7 |
| 124:13 130:8 | **mandate** | 108:10,12,15 | 46:22 48:12,25 |
| 131:9,12,15 | 112:21 | 108:22,24 | 52:2 53:22 57:9 |
| 133:24 136:14 | **march** 44:13 | 109:3,4,5,10 | 61:4 65:24 68:8 |
| 159:18 | 108:25 111:16 | 118:14 119:12 | 70:10,11,12 |
| **magistrate** 1:13 | 111:18,22 | 119:13,17,17 | 74:6 76:15 |
| **main** 55:24 | 121:3 | 123:14 136:12 | 78:18 84:5 |
| **maintain** 7:13 | **mark** 33:13 | 136:13 143:9 | 88:23,23,25,25 |
| 10:9 154:1 | **marked** 146:15 | 143:15 | 90:14,16 91:7 |
| 160:12,14,16 | 146:18 147:4,6 | **matter** 11:1 | 92:2,8 95:4 |
| **major** 113:17 | **mass** 44:7 45:8 | 12:23 19:5 | 96:2 97:24 |
| **majority** 68:5,8 | 45:22 54:16 | 63:11,20 68:4 | 99:18,24 |
| **make** 7:10 16:8 | 55:3 83:16 | 68:20 70:24 | 100:12 101:22 |
| 20:14 23:3,9 | 89:25 90:2,4 | 71:13 87:24 | 101:23 102:4 |
| 34:14 36:22 | **material** 5:8 | 126:14 135:24 | 103:4 105:23 |
| 61:7 63:22 | 8:9,15 160:13 | **matters** 5:11 | 105:25 106:12 |
| 101:15 107:24 | **materials** 8:7,8 | 7:17 13:6 17:10 | 107:13 108:9 |
| 120:10 127:14 | 154:15 159:22 | 134:24 | 108:17 111:25 |
| 130:21 139:17 | 159:22 160:6 | **mcl** 4:7 14:18 | 112:2 113:6 |
| 140:12 148:11 | **math** 46:14 | **mdl** 4:7 13:16 | 115:22 116:3 |
| 154:5 156:14 | 65:23,24 66:5 | 14:18 51:11 | 117:2 119:25 |
| 156:18 158:15 | 66:18 | 52:22 53:4,9 | 121:22,22 |
| 159:14 | **matrices** 93:7 | 58:24,25 59:3 | 123:14 131:6,8 |
| **makes** 73:6 | 104:7 | 60:10,15,19,21 | 139:16,18 |
| 144:24 | **matrix** 41:22 | 66:22 67:5 | 140:22 147:21 |
| | 42:25 43:5 46:3 | 87:17 91:7,9,9 | 149:11,13 |
| | 46:5,14,15 47:6 | 92:8,18 95:3 | 150:18 154:23 |
| | 47:15 49:2,10 | 113:22 142:25 | 157:12 |

**meaning** 155:8
**means** 46:20
**measure**
    118:14 119:4
**media** 13:12
    83:9
**mediate** 34:10
    78:25
**mediation**
    22:23 24:25
    25:4 31:17,19
    31:23 32:5,10
    32:17,21 33:3
    33:16 34:11
    49:4 80:1 97:23
    98:5 108:17,18
    147:13 150:22
**mediations**
    57:18
**mediator**
    147:13
**mediator's**
    133:14
**mediators** 98:7
    132:25 133:11
    133:16
**medical** 123:8,9
    123:12
**medicine** 96:12
    105:6
**meet** 27:18
    43:4 46:2 57:1
    105:12 116:9
    118:2 120:18
**meeting** 44:25
    45:8 90:19

109:1,3 118:10
    118:11
**megaphone**
    151:21
**member** 99:1
**members** 52:12
    52:13
**memo** 145:5
    156:13
**memory** 132:8
**mention** 44:11
**mentioned**
    28:22 91:23
    108:21 139:1
**merely** 83:21
**merit** 148:22
    151:4
**meritorious**
    114:18
**meso** 97:9
    149:16
**mesothelioma**
    97:9 99:4 107:3
    107:13 150:15
**met** 47:25
    56:12,15 78:19
    94:13,14,24,25
    95:23 110:5
**method** 117:5
**methodology**
    145:10
**mic** 77:2
**michelle** 91:11
    91:13
**microphones**
    77:19

**mid** 104:9
**middle** 32:9
**mike** 83:18
**miles** 19:20,20
**milestones**
    102:7
**million** 47:7,9
    87:6,14,14,15
    88:4,13 106:15
    123:11 128:7
**mind** 8:13
    15:24 63:4
    77:18
**mindful** 10:7
**mine** 24:15
**minefields**
    75:15
**minimum**
    155:12,13
**mining** 98:20
**minor** 153:22
**minutes** 9:9
    21:4 85:5,10
    128:2,13
    137:11,13
**miscarriage**
    17:11
**mischaracteri...**
    127:11
**missed** 89:16
**mississippi**
    156:2
**mistake** 97:7
**mixed** 112:3
**model** 107:12
    107:15

**moment** 126:14
**money** 36:22
    58:25 60:9
    63:22 65:20
    66:6,7 75:18,18
    117:11
**month** 81:22
**months** 7:18
    47:22 48:1,1,3
    56:13,16 69:21
    72:14 74:24
    155:16
**morning** 4:2,10
    4:17,20,23 5:1
    5:3 22:14,15
    81:13 82:4,6
**morphing**
    17:14
**motion** 12:14
    13:16 34:17
    35:6 36:1,4
    38:12 97:25
    98:3,4 103:5
    135:11
**motions** 20:25
**motivation**
    64:21
**motivations**
    63:2
**mountain**
    130:13
**move** 26:9 36:8
    124:5,10,18
**moving** 36:1
**multiple** 33:11
    41:5 94:22,22

95:2 133:25 150:2,2

**murdica** 12:17 44:11 71:7,9 78:21 90:19 95:15,18 130:9 157:8

**mute** 77:19

**myers** 2:8 4:21 88:15

**n**

**n** 2:1 87:8 162:1

**n.w.** 2:9

**name** 21:24,25 23:25 24:13 25:13,14

**narrative** 10:21 42:11,11 93:11

**narrow** 15:14 153:24

**national** 10:2 12:20 63:19

**nationally** 91:15

**nature** 73:5,14 94:16 96:9

**natures** 93:6

**nauseam** 10:21

**necessarily** 42:15

**necessary** 39:6 51:7

**need** 5:20,21 13:3 17:19

62:21 66:1 75:11,11 96:16 96:18 107:19 112:9 124:18 124:20,25 160:19

**needed** 7:12 80:4,4 107:18 107:18,20

**needs** 21:6 42:10 78:3

**negligence** 17:11

**negotiate** 38:12 122:3

**negotiated** 95:25 96:1,7

**negotiating** 38:13 46:8 78:20 109:10

**negotiation** 109:5

**negotiations** 78:20,21 95:13 100:14 108:19 150:21

**neither** 35:18

**nelson** 95:9

**never** 19:4 70:10,10 74:2 92:15 108:7 131:4,4,7 156:22

**new** 1:1,10 2:5 17:23 54:16 89:2 91:17

97:22 114:23 162:5,20

**news** 10:2 12:5

**niall** 145:13

**nice** 4:3

**nine** 93:13

**nj** 1:22 162:21

**noncash** 51:8 118:21

**nonsense** 12:4

**north** 97:21

**notary** 162:4 162:19

**note** 76:24

**notice** 64:14 66:5

**notwithstandi...** 33:5 67:15

**november** 56:20 57:12 153:18

**number** 3:12 24:18 25:10,15 25:15 26:4,13 26:15 27:8 44:5 46:13,23 47:2 51:5,6,8 59:22 68:14 78:8 79:3 80:13,17,18,19 80:22,23 81:2,8 90:22,22,24 92:13 96:19,23 100:23,24,25 101:16,18,22 101:22 102:8,9 111:20 112:1,7

112:7,25 113:4 113:8,9,9,15 120:15,16,18 123:1 125:23 132:3 134:14 134:15,18 146:16 150:10 150:11 158:3

**numbers** 66:16 102:11 123:21 148:15 149:25

**numerous** 83:3

**o**

**o** 16:20 162:1

**o'dell** 14:17,23 82:21 83:7 87:16 91:10,13 92:4 98:25 113:21 145:4

**o'melveny** 2:8 4:21

**oath** 21:22 85:15 109:16 138:15

**object** 6:3,3,24 39:15 69:5 84:16 93:11,21 110:11 115:2 125:21 157:10

**objected** 6:5 152:19

**objecting** 5:17 131:24

**objection** 7:21 29:18,24 32:7

[objection - ovarian]

36:13 40:25
46:17 55:15
58:19 68:18
69:25 71:17
72:9 78:11,14
84:9,21 124:1
127:10 140:5
152:24 154:23
154:25 159:3
**objections**
130:2,13 131:3
137:17 152:13
152:14,15,16
153:25 154:14
**objective**  35:4
**obstruction**
83:2
**obtained**  68:6
94:7
**obviously**  9:13
10:20 46:23
66:22 154:2,5
159:15
**occur**  87:19
**october**  43:9
44:6,18 48:2,9
48:10 53:7
56:20 57:8 97:2
112:15
**offer**  31:14
47:13 51:20
57:1 58:5 93:19
130:17,19,23
157:25 159:4
**offered**  27:18
45:25 49:2

56:18 108:25
122:13 148:15
151:17
**official**  91:20
**officially**  91:7
97:24
**oh**  59:15
**ohio**  155:23
**okay**  7:5 9:12
13:8 24:16 33:5
33:18 43:17
50:11 62:8,9
70:22 72:18
77:17 78:24
85:4,22 87:4
89:6 102:20
104:12 112:11
112:20 121:4
125:14 126:2
129:8 131:13
132:7 137:14
137:19 138:7
141:18,21
146:5,22 148:1
160:15
**old**  104:12,16
123:15
**omm.com**  2:11
**once**  17:24 18:5
91:9 98:3
151:21 157:8
**ones**  149:9
**ongoing**  14:15
100:21
**op**  53:24

**open**  83:13
**opened**  86:22
**opening**  108:12
**opinion**  65:10
110:13,15
112:18
**opponent**  70:24
**opportunity**
8:5,6 14:1,6
64:2 81:24
115:6 155:5
**oppose**  136:1
137:1
**opposed**  37:18
37:20 38:10
40:1,11,12,14
40:15,16 59:13
117:6 135:24
136:9,17,25
**opposing**  5:17
5:23 18:11 41:6
41:9 60:7 84:6
84:7 122:12
**opposite**  116:16
**opposition**  82:8
82:22 83:25
84:3 105:1,1
**opt**  49:10 53:10
53:11 116:5
**optimization**
45:15 47:19
53:23 55:25
57:4 75:8,13
119:9
**option**  37:5,9
39:11 45:13,14

50:9 51:19,23
**options**  52:10
**oral**  6:1,22 7:2
17:14 103:22
**order**  7:12
13:16,17 21:6
23:21,23,24
40:17 60:15,19
61:4 67:4,11
91:20 106:12
147:21,23
**ordered**  34:11
98:5,5,5
**organization**
83:17
**orienting**  42:9
**ought**  64:5
**outrageous**
155:22
**outside**  7:16
63:6,10,20
70:23 71:14
126:17
**ovarian**  24:9
25:20 26:19
27:4 28:14,15
28:18,21 31:10
32:3 46:8 52:14
53:8,12 80:23
80:23 81:17,23
88:3,12 95:14
97:3 105:6,9
106:1,24,25
107:16 108:23
118:24 119:4
120:1,2 129:24

**[ovarian - piece]**

130:10 131:18
145:4,5,9,15
149:13,15,18
149:23 150:14
**overall** 8:10
80:24
**overrule** 29:24
**overruled**
78:14
**overtures** 122:3
122:3
**owe** 91:25
**own** 92:14
143:21

**p**

**p** 2:1,1 5:13,14
151:17 158:24
160:3,18
**p.j.cv.** 1:12
**p.m.** 9:8 161:19
**page** 3:3 25:24
25:25 26:9
29:16 30:10
31:25 32:1,2,2
32:11,12 38:24
51:13 60:5
103:15 120:22
120:25 121:1,2
125:6,7,11,23
125:24 129:20
130:6,12,14
133:19 142:8
**pages** 25:25
26:5,23,24 27:7
27:9 29:17

30:12,12,13
**paid** 122:21
139:25
**papantonio**
83:19
**papers** 18:19
**paragraph**
51:13
**parcel** 155:7
**pardon** 77:25
147:15
**parfitt** 91:11,14
113:21
**part** 35:9,10,11
37:8,11 48:15
49:4,4 50:1
58:9 96:4 99:20
105:19 113:22
124:10 143:1,6
150:13,20
153:3,11,13
155:6 157:4
158:23
**partial** 153:6
**participants**
61:15
**participate**
49:14
**participating**
130:24
**participation**
73:8
**particular** 6:9
11:13 14:2 30:3
127:4 139:1

**parties** 7:25
13:12 14:1 15:6
67:9 158:20
161:2
**partner** 90:12
91:10
**passed** 114:17
**patently** 13:11
**path** 58:4
**patient** 9:22
10:20 151:19
**pay** 10:5,16
39:5 79:22 80:6
80:6 96:18
100:17 124:15
124:16
**paying** 63:4
**payment**
122:16,17
**payout** 132:12
**peanut** 105:17
**pending** 34:24
92:17 139:9
**pennies** 123:24
**people** 12:19
17:2 75:7 84:2
119:8
**percent** 12:19
53:11 60:20,20
60:20,23,24
61:13,13,17,18
61:18,19,25
62:1,13 65:21
66:19,19
116:10 156:6

**percentage**
64:16 66:17
**perfect** 44:7
45:8,22 83:17
**period** 15:10
34:12 37:21
38:10 57:10
58:21 69:20
75:25 81:22
99:10
**peritoneal**
105:10
**perjured** 158:9
**perks** 1:22
162:3,18
**permission**
151:14
**permit** 71:20
**permitted**
158:6
**person** 17:4
46:2
**personal** 88:16
**perspective**
75:24 112:5
113:18
**pertains** 149:14
**petition** 31:13
34:9
**ph** 1:24
**pick** 100:18
**picture** 100:15
**piece** 53:24
54:9,11 80:24
80:25

[pike - position]

Page 30

**pike** 2:4
**pitch** 56:19
**pitched** 45:6
    57:5
**place** 1:9 12:6
    38:19 44:8 49:8
    158:5
**places** 158:3
**placitella** 76:21
    76:23 77:4,8,25
    91:18
**plaintiff** 65:8
    139:20
**plaintiff's**
    102:18 158:24
**plaintiffs** 12:18
    14:18 22:22
    24:24 45:2,7
    52:5,9 54:5
    58:13 64:15
    67:18 74:16
    75:2 88:9 91:24
    92:12,17,18
    139:13
**plan** 14:21 35:2
    35:14,16 36:2,5
    36:8,11 37:1,4
    37:5,8,10,17
    38:13,16 39:13
    40:16,22,23
    41:10 49:7 54:7
    75:21 76:7 80:5
    80:5 81:14,21
    81:25 83:10,25
    84:3,7,10 113:2
    114:16 120:24

121:11 149:22
**play** 20:18
    115:25
**players** 148:5
**playing** 12:21
**please** 4:3
    21:23 35:21
    40:4 48:22
    55:20 85:12
    86:17 132:6
    138:1
**plenary** 1:6
    102:18 103:14
    125:7,12
**plus** 66:10
    134:19
**point** 5:19,20
    11:23 16:8
    17:16,22 18:6
    26:21 28:8
    33:21 39:7
    47:22 49:5 54:2
    54:2 55:24 56:3
    56:14,15 65:2
    68:5,16 69:10
    70:12,18 77:17
    78:18,18 79:20
    90:18,18,20,24
    91:2 92:21 97:8
    99:17 100:17
    109:6,17 110:4
    121:18 122:23
    127:22 131:5,7
    131:10 135:16
    139:16,16
    148:24 152:5

159:18
**pointedly** 17:19
**points** 67:9
    124:13 140:14
**pollock** 2:3 4:9
    4:10,14 5:7,10
    7:23 8:18,22
    9:14,18,21
    11:12,21 14:9
    15:13,16,21
    16:6 17:25 18:3
    19:19,23 20:7
    20:11 21:19
    23:12,13 24:15
    29:18 32:7,20
    33:1,8,21 35:19
    36:13 40:4,6,25
    42:6,8,10 46:17
    46:19 48:22
    55:15,18 58:19
    62:11,15,19,22
    63:12 66:4
    68:18 71:17
    72:9,12,17,19
    77:21 78:11
    79:6 84:9,15
    85:6,17,19,23
    86:3,4,8,11,16
    87:22 89:10,15
    92:25 93:9,18
    93:25 94:1,4,5
    98:14,16 106:4
    106:5 108:1,5
    110:15,16,20
    111:4,13,17
    115:8,9,11

121:2,5,9 124:5
124:9,23 125:4
125:25 126:3
127:20,25
129:4,7,10,14
129:16 137:3,9
140:5 141:14
141:15,18,21
141:25 142:4
142:25 146:9
146:12,13,24
146:25 147:9
148:24 149:3
151:8,18
152:17,18
153:4,21
154:18 155:1
156:1 157:21
158:15,18
159:23 161:17
**portion** 126:16
    131:25
**porto** 1:12
    12:13 13:21
    14:5,7 17:15
    18:20 114:22
    119:14 129:7
    152:21 156:19
**porto's** 13:13
**posed** 153:16
**posing** 107:25
**position** 10:10
    11:6 25:3 30:22
    39:9 58:24 70:7
    72:5,25 100:11
    110:2 133:1

[position - proposal]                                                    Page 31

143:20 150:18
160:12
**positioned**  15:6
15:7
**possible**  153:25
**possibly**  59:17
**potential**  67:11
99:8 146:1
**powder**  1:3
**practice**  19:5
55:10,11
**preceded**
140:11
**preceding**  89:1
**precisely**  21:15
**precision**  17:7
**preference**
57:10 158:7
**preferred**  37:1
48:15 57:6,16
69:23 117:5,6
149:22
**prejudice**  14:15
**prejudicial**
64:8,11
**preliminary**
5:11 67:6 69:11
**premise**  92:25
**prepare**  6:12
**prepared**  6:11
22:22 23:2,7
27:14,17,17
28:2 31:9,10,14
31:16,22 33:6,8
35:17 46:1
50:20 118:1

162:6
**preparing**
35:25 36:2
**present**  2:13
27:18 31:11,22
36:4 41:22
42:25 107:3
108:25 131:18
132:11
**presented**
13:23 14:3 36:2
51:19 58:4
99:25 133:6,7
150:7
**president**  2:14
**press**  10:2 12:6
12:20 14:23
53:24 54:8,23
56:22,24 62:20
63:19 82:7,12
**presume**  25:6
**pretty**  11:23
86:2 90:3,3
100:15 130:4
**previously**  14:4
27:13 28:2 37:7
133:2
**price**  51:1
**pricewaterho...**
51:7 118:16
**prima**  67:17
**primarily**  99:3
**primary**  104:25
**princeton**  2:4
**principle**
121:23

**prior**  6:4 28:22
56:16 90:17,25
**private**  96:1,2
**privilege**  7:13
22:21,23 23:5
24:25 25:4
29:15 30:10,14
31:17,20,24
32:5,10,17,21
33:3,18 34:22
144:21 146:18
147:13 153:7
153:21 159:8
159:12 160:15
160:16
**privileged**  31:5
33:16 143:14
147:20,24
160:6,13
**privy**  143:13
**pro**  11:10
**probably**  68:14
77:11 82:10
98:18 101:9
132:21 138:9
141:21
**problem**  12:9
19:8 77:16
128:15
**problems**  135:8
**procedure**
118:19
**proceed**  6:24
18:17
**proceeding**
35:3 89:20 95:9

**proceedings**
59:5 161:19
162:7
**process**  6:17
12:21 29:4
31:19 48:16
57:7,18,18
97:20 99:20
**produce**  6:6,7
**product**  108:10
**products**  1:4
4:6
**proffer**  12:2
63:12,14 67:3
**proffered**  150:4
**prognosticating**
66:24
**prohibit**  72:3
**projection**
120:9
**promise**  16:12
72:14
**prongs**  157:4
**proof**  69:2
**proper**  7:22
**proposal**  24:10
24:22 25:20
26:19 27:4
28:18 30:11
36:21 45:7,18
47:17 48:17,18
48:25 49:10,10
49:16,18,19
51:9,17 52:21
52:24,25 53:19
58:9,10 59:6,18

[proposal - questioned]                                                    Page 32

59:20 60:7,9,12
60:12 71:8
72:10 73:5,7,10
75:8,11 79:24
80:24 82:2 96:5
96:18 102:16
105:2 106:21
106:22 107:2
107:18 116:4,4
116:5,9 117:4
117:19,20,21
117:22 122:14
122:14,15
123:23 129:24
130:8 131:2,9
131:11,12,18
131:23,24,25
132:8,14,18
133:5,10,11,14
133:23 134:1
134:21,21
144:8,10
145:16 150:5,9
150:13,20
**proposals**  133:4
150:2
**propose**  75:1
136:1
**proposed**  14:21
39:19 41:22
42:25 48:13
80:15 81:14
83:22 114:13
130:19 131:2
135:25 143:6
153:22

**proposing**  39:1
49:23
**prosecute**
115:16
**protect**  10:16
11:2 92:1
**protected**  33:17
**proven**  157:2
**provide**  29:6
30:2 33:9,10,12
33:14 49:24
53:2 60:13 61:5
76:2 104:22
118:14,25,25
119:3 129:19
136:10,11
158:11
**provided**  23:22
29:1,7 76:25
95:17 132:12
157:16 158:23
**provides**  81:22
**providing**
22:16
**provision**  82:1
**provisions**  61:3
**provoking**  55:7
**psc**  23:22 58:24
**public**  57:12
136:14,14
162:4,19
**publicly**  53:19
**publish**  53:23
**pulled**  145:2
**purely**  96:17

**purported**
133:15
**purportedly**
128:22
**pursuant**  60:18
161:6
**pursue**  58:15
115:16 151:6
**pursuing**  12:4
90:21 148:19
148:20 149:9
149:12 151:1
**pushing**  38:2,2
97:4,4,16
**put**  15:17 23:22
37:4,14 47:6
51:13 57:16
60:12 66:16
76:1,1 79:22
95:20 108:22
108:23 109:3,6
116:4 122:9
134:4 136:13
**putting**  35:11
37:10 123:22
156:17

**q**

**qsf**  145:14
**qualification**
104:22
**qualifications**
88:22 140:11
145:15
**qualified**
105:14

**qualifying**
120:19
**quarter**  48:6
**question**  11:24
15:18 17:18
19:13 27:22
30:6 32:23
35:20 38:4 40:9
40:10 41:3
42:17,20,22
43:19 53:15
55:21 60:2,3
62:18 65:14
68:20 71:20
72:20,22,23
73:16 76:16
78:15 79:2,2,10
79:11,18 84:11
84:14,14 86:12
93:1,11,14,24
98:13 101:9,15
106:3 107:24
107:25 110:17
112:8 124:3
126:12,13,25
127:14,15,16
127:19 128:17
128:21 129:13
130:15 133:18
135:22 140:8,8
140:9 142:11
144:4 148:8,25
152:10 153:15
156:24 158:14
**questioned**
120:21 121:14

131:16
**questioning** 21:4 32:9 126:5
**questions** 21:7 29:25 40:7 64:25,25 65:4,5 69:11,12 76:25 85:18 93:17 103:21 108:3 110:23,24 128:18 135:21 137:4,8 138:4 138:10 142:24 143:2 151:9,16
**quibble** 115:10
**quibbling** 16:7
**quickly** 10:19 10:24 151:12
**quite** 12:25 76:17 78:1 86:1
**quote** 109:11 128:2,11,12
**quoted** 82:24
**quoting** 82:11

**r**

**r** 2:1 22:2 87:8 162:1
**raise** 21:23
**raised** 67:9 115:20
**raises** 9:14
**ramifications** 16:10 19:20 21:1
**range** 61:11 119:1 122:25 132:10
**rate** 84:18
**reach** 98:1
**reaction** 127:16 132:22
**read** 6:14 125:14 129:21 130:7,15,22
**reading** 56:22 56:24 141:17 146:3
**ready** 18:15,16 47:13 88:17 125:10
**real** 11:24 12:3 15:25 19:7 132:3
**reality** 18:6
**really** 7:13 32:10 64:12 65:1,11 84:5 93:2 101:7 108:17 110:12 112:8 154:19 154:21 156:8 158:17
**reason** 12:3 18:18 104:25 122:11,11 136:9,24,25 151:23 152:1
**reasonable** 37:17 38:15 54:5 59:24 64:1 75:25 76:3 80:6 97:14 102:1 120:8 122:7 123:7 136:11 136:15,19,20 149:5 150:23
**reasons** 41:6
**rebut** 156:4
**recall** 22:16,25 41:23 42:2,23 43:2,3 44:21 127:7,9,17 129:21 138:22 143:2,10 156:7
**receive** 7:24 46:25 111:6 152:15
**received** 43:6 110:18 132:24 152:1,12
**receiver** 104:2
**recess** 85:11 137:24 160:10
**recessed** 41:20 42:23
**recklessly** 63:9
**recognize** 67:15 109:21
**recognized** 115:24,24
**recommend** 5:18 152:20,21 152:24
**recommendat...** 153:17
**recommendat...** 154:9
**reconciling** 148:14
**reconvene** 85:7 138:2
**record** 7:15 8:11,13 14:3 21:12 24:18 86:2 89:8 110:8 137:23 138:2 140:12 153:3 154:6 158:23 160:9
**records** 115:7 154:18 155:13
**recoverable** 67:4
**recovered** 60:21 139:14 140:3,25 142:17
**recovery** 61:14 64:17 66:15
**recross** 3:6 138:18
**recuse** 11:18
**red** 29:20 77:22
**redacted** 5:25 153:23
**redactions** 7:11 7:12 153:22 154:10,11 156:11,11 159:15,16

**redirect** 3:5,7
    9:15 86:6
    128:10 147:8
**reduced** 66:17
**reductions**
    119:17
**reese's** 105:18
**refer** 56:8
**reference** 28:9
    28:13 125:22
    160:16
**references** 23:7
**referred** 15:9
    17:1 54:8 68:6
**referring** 54:13
    74:13
**refers** 15:14
**reflect** 115:7
    136:15
**reflected** 43:8
**regard** 8:14 9:1
    10:8 11:7,8
    13:1,14 16:4
    20:18 30:2
    62:24 64:22
    69:25 74:2
    76:16 77:12
    79:18 91:15
    94:2 114:21
    124:7 128:22
    132:13 137:16
    137:18 154:17
    154:19,24
    159:10 160:3,3
    160:12,17
    161:8

**regarding** 13:5
    28:4,14 68:19
    68:24 73:21
    74:1 93:5 94:12
    99:8 101:16
    115:16 120:22
    121:18 126:25
    129:23 130:19
    131:2 152:13
    156:12,13
**regards** 41:15
**regularly** 44:23
**rejection** 113:2
**related** 11:19
    81:16 107:10
**relates** 154:20
    160:18
**relating** 109:13
**relationship**
    15:8 68:2,24
    72:6
**relationships**
    68:7
**release** 53:24
    54:9,23 56:23
    82:7,12
**relevance** 68:19
    69:6 70:3 84:10
**relevancy**
    62:17 64:12,22
    69:2
**relevant** 14:13
    15:5,18 19:13
    62:23 63:1
    67:19 69:3
    110:1 111:8

**relief** 67:17,20
**rely** 157:3
**remember**
    40:10 82:10
    111:15 127:14
    128:21 155:6
    156:7,8
**remembers**
    127:15
**remind** 14:1
**remote** 64:8,11
    64:22
**remove** 118:21
**render** 7:4
**reneged** 132:24
**reneging**
    132:19 133:15
**reorganization**
    81:14
**reorient** 144:20
**repeat** 42:19
**repeatedly**
    15:13 116:20
**rephrase** 60:4
    72:23 93:23
**replies** 161:12
**report** 145:10
**reported** 1:21
**reporter** 162:4
    162:20
**reports** 95:5
**represent** 6:18
    68:9 130:16,25
**representation**
    109:13,24
    130:21 157:1

**represented**
    7:18 55:14 99:1
**representing**
    2:7,11 14:17
    91:3 97:10
    110:2 139:12
    143:21 156:23
**represents**
    142:13
**request** 13:16
    67:16
**require** 130:22
    160:19
**required** 21:18
    130:24
**requires** 96:8
    96:14
**resist** 82:17
**resisted** 97:16
    122:2,3
**resisting** 83:10
**resolution**
    28:18 37:1,23
    37:24 39:20
    51:2 52:8 57:4
    57:6 58:23 59:1
    65:19,20 72:7
    72:12 76:7
    81:16 83:22
    90:21 95:21
    97:4,15,17 98:2
    99:8 143:2,6
**resolve** 14:21
    83:10 84:8
**resolved** 92:13
    119:6

**respect**  9:22,25
   10:13 30:17
   60:1 108:2
   142:12 144:8
   155:3
**respectfully**
   10:18 64:3
   79:10,14 152:6
**respond**  14:11
   15:21 124:21
**responded**
   14:25
**responding**
   79:17
**response**  5:15
   6:12 13:24
   42:11,17 63:25
   79:15 158:3
**responsibility**
   116:11
**rest**  21:5
**restructuring**
   55:9,11
**result**  113:1,5
   113:16 143:19
**retain**  114:25
   115:12,20
**rethink**  54:25
**retrial**  139:10
**retried**  88:18
**return**  137:16
**reveal**  109:12
   109:18
**reverberations**
   16:10

**review**  147:16
**reviewed**  27:10
   51:10 52:21,24
   147:19
**rid**  17:24 117:8
**right**  6:22 8:14
   8:21 11:21
   15:19 16:11
   18:15 21:20,24
   22:20 23:2 24:1
   24:10,12,22
   25:1,5,14,21
   26:3,6,8,16
   27:1 28:15,16
   28:18 29:9,17
   30:13,25 31:3,6
   32:6 33:14 34:4
   34:6,14,21 35:3
   35:5,10,15
   36:24 39:16,22
   40:13,22,24
   41:8,11 44:9,10
   44:13,17,20,23
   45:4,14,24 46:3
   46:6,10,16 47:5
   47:5,9,10,11,15
   47:19,22 48:7
   48:12,16,19
   50:10,17,21
   51:3,15 52:23
   53:12,17,20
   54:6,17,21 55:1
   55:11 56:11,14
   56:17 57:8,13
   58:15,18 60:14
   61:1,16,22 62:7

   62:18 64:9
   65:22 66:10
   67:24 68:2,7
   69:19 70:9,14
   71:16,24 72:2,3
   72:4,5,8 73:2
   73:21 74:3,4,7
   74:19,20 75:19
   76:17 78:1
   81:11,19,25
   82:4,8,19 83:7
   83:11,14,15,25
   84:3,8 86:1
   89:7 92:21,22
   93:3 98:15
   103:4 110:21
   112:16 121:7
   125:3 128:4
   129:3,6 130:12
   137:11,14,22
   138:7 139:4,7
   139:15 140:1
   140:14,20
   141:4,6,9
   142:15,22
   143:6,8,23
   144:5,6,11,15
   144:17,18
   145:22,25
   146:4,8,19
   147:24,25
   149:1,6 154:16
   156:18 157:4
   159:13 160:1
   160:22

**rights**  6:18
**risk**  119:19
   135:19
**ristesund**  87:8
   87:10
**road**  16:10
**role**  29:5 71:13
   89:23 90:25
   91:1,4,15,20,22
   91:23 92:9,15
   115:25 119:11
   130:9 143:25
   143:25 149:14
**roles**  53:4 92:6
**rolled**  59:20
   79:25 122:16
**rothschild**  2:2
**roughly**  99:14
   100:20
**rounds**  108:16
**rpc**  17:16,19
   18:25 109:11
   155:8
**rpcs**  62:15
**rsa**  1:22 162:3
   162:18
**rukhsanah**
   1:12
**rule**  15:15,15
   161:6
**ruled**  33:2
   152:21
**rules**  19:2 20:9
   20:14 21:17
   63:3,4 72:3
   100:3

**[ruling - shared]**                                                                                    Page 36

**ruling**   154:3,4
**rulings**   113:13
**run**   5:12 129:4
**russo**   98:6

**s**

**s**   2:1 3:10 87:8
    87:8
**sandbag**   155:20
**sargon**   89:11
    89:14,16
**saw**   9:7 29:8
    34:21 53:7 80:4
    103:5 132:21
    153:23,23
**saying**   6:19
    18:14 39:7
    43:20 66:3 71:3
    82:24 97:11
    100:16 120:16
    122:22 152:3
**says**   6:5 28:20
    117:16,17,25
    147:23 152:22
    156:18
**sbrody**   2:11
**scenes**   71:6
**schedule**
    122:17,17
**schneider**   15:9
    33:2 98:6
    147:17,19
    148:1
**school**   20:9
**science**   96:12
    105:6,8 114:1,2

114:19 120:3
**scientific**   83:4
    114:7
**scope**   19:9
    113:6 134:9
    154:4
**scott**   28:5
**screen**   109:22
**screw**   129:8
**screwed**   101:10
**seal**   161:5
**seasoned**   55:9
**seated**   4:3 22:8
    85:13 138:1
    152:10
**second**   5:24
    16:18 24:1,3
    27:16 31:13
    34:8 114:4,12
    114:20 127:1
    135:17 136:6,8
    156:5 157:4
**secret**   65:7
    156:21
**secretive**   31:21
**section**   89:25
    90:1,2,5 91:1
**sections**   90:2
**see**   4:3,13 11:5
    23:5,25 24:14
    24:19,23 25:14
    26:2,4,10,13
    27:10 28:8
    29:15 31:5,7
    43:8 45:25
    48:10 51:4,4,8

51:12 58:6,9
    72:13 84:12
    97:6 104:17
    145:7,11,17
    154:23 158:3
**seeing**   16:13
**seek**   115:15
**seeking**   60:8
**seen**   19:5,21
    51:16,16 52:25
    53:1 59:8,9
    103:2 110:7
    117:23 154:2
**self**   10:5
**sell**   116:17
**sending**   34:1
**senior**   90:12
**sense**   20:15
    156:15 158:16
**sent**   34:23 48:5
    76:24 83:13
    117:23
**sentence**   118:4
**separate**   61:24
    62:3 129:2
    133:4,4
**separately**
    152:9
**september**
    11:16 129:22
    130:7,8 132:14
    133:6,24,25
    134:8,10,11,16
    150:6
**serious**   11:1
    40:18 114:10

**seriously**   10:12
**serve**   98:6
**served**   91:14
    98:25 155:2
**services**   1:24
**set**   74:19
    142:23
**setting**   21:13
**settle**   129:24
    130:10
**settled**   139:15
    140:3 141:3,5
    142:18
**settlement**
    41:22 42:25
    49:12,17 50:17
    50:19 51:24
    53:10 59:25
    75:19 76:2
    99:16,18,21
    100:9,11 102:1
    105:4 116:7,8,9
    130:17 131:25
    143:9,15
    148:15 150:23
**seven**   20:13
    25:24 29:16
    30:12 31:25
    93:13 122:19
    161:12
**share**   20:1,5
    23:12 31:15
    33:6 46:2 63:15
    68:21
**shared**   19:14
    46:9 58:13

64:19 92:3
99:16 110:8
111:8 143:9
145:4
**sharing** 18:25
63:13 77:16
145:14
**sheet** 6:11
22:17 23:4,8
24:9 25:11,20
26:18 27:4,7,12
27:13,14,17,18
27:19 28:2,4,15
28:24,25 29:1,2
29:8 30:16 31:5
31:7,8,11,15,20
31:21,25 32:1,3
32:4,18,22
33:10,15 34:23
104:22 108:24
131:14,16
**sheets** 33:23
34:2 69:1 150:3
**shift** 132:22
135:1
**shifted** 134:18
**shoes** 73:11
116:1
**short** 59:23
79:13
**shortly** 44:7
**shoved** 155:15
**show** 13:17
31:8 158:17,17
**showed** 19:11
56:21

**showing** 83:4
**shows** 114:1
**sic** 104:1
149:21
**sick** 83:1
**side** 52:14
115:19 116:17
144:17
**sidetrack** 76:15
**sidley** 55:10
56:1,2
**sign** 71:10
118:18,19,20
**signature**
162:16
**significant** 47:2
101:21 104:25
111:25,25
113:4 135:8,16
135:19 148:13
**significantly**
86:13,13 113:1
120:19 157:3
**similar** 95:9
104:7,8 108:24
**simple** 65:4
148:11,11
**simpler** 34:15
**simply** 42:22
51:13 60:3
63:22 128:9
**simultaneous**
161:11
**singh** 1:12 7:3
8:16,20 11:5
13:8,9 17:18

19:17 20:20,22
20:23 66:25,25
67:2 76:12,13
77:2 84:25 85:2
127:15 137:5,6
152:8 154:10
154:14,24
160:2,25
161:13
**singh's** 137:15
**single** 65:14
110:7
**sir** 21:25 73:22
77:24 85:15,16
87:11 102:12
106:8,16,18
136:5,7 138:15
138:16
**sit** 117:10
**sitting** 109:21
**six** 56:13,16
69:21 93:13
**skip** 87:22
92:20
**slaughtered**
148:25
**slemp** 87:24,24
88:2,3,11,11
89:12
**slice** 150:7
**smaller** 120:14
132:16
**smart** 12:15
**smith** 67:24
68:2,5,11,13,17
68:19

**snappy** 79:13
**solicitation**
81:22 82:13
124:13
**solution** 58:14
**solvent** 136:18
**somebody**
56:22,24 70:23
78:9 79:4 80:11
145:25 148:10
**soon** 130:15
**sorry** 18:3 79:1
88:19 90:23
98:9 100:7
111:15,21
121:16 125:6
127:1 147:13
**sorted** 23:21
**sorting** 144:25
**sought** 157:24
159:4
**sound** 63:19
112:16
**sounds** 44:10
44:20
**speak** 14:15
38:7 101:7
**speaking** 68:4
**specific** 10:23
12:23 17:10
**specifically**
43:4 44:21
**spectrum** 12:25
123:20
**speculate** 78:16

**speculation**
36:14
**speculative**
78:11
**spell** 21:24
**spend** 43:7
128:1
**spent** 16:21
**spike** 113:15
**spikes** 113:8
**spoken** 130:18
131:1
**spreadsheet**
23:21
**spring** 99:14
**squarely** 17:23
20:1 124:19
**squibb** 88:15
**staff** 90:5,6
**stage** 104:14,15
104:16 123:10
123:14,17
**stand** 6:8 10:18
36:22 58:24
126:22 151:15
154:8 155:18
155:21 157:25
159:5,20
**standard** 67:14
89:2
**standards**
20:24
**standing** 33:4
73:11 116:1
139:3,6

**start** 4:9 7:2
8:19 20:8 86:10
**started** 30:11
41:20 78:20,21
139:12
**starting** 23:25
**starts** 51:13
100:20
**state** 12:7 51:11
52:23 53:4,5
89:2,19 162:5
162:20
**stated** 83:7,21
**statement** 5:17
53:7 82:19,21
105:22
**statements** 15:1
48:9 57:13
**states** 59:19
81:19 107:6,7,8
**stating** 82:7
**stay** 107:23
**steering** 22:22
24:24 67:18
**stenographic...**
1:21
**step** 16:17
54:16 55:1
97:13 151:11
152:22 153:17
**stephen** 2:9
**steps** 133:12
**steve** 4:21
121:3,13
**stipulated**
32:11

**stop** 9:19 38:19
90:23
**straight** 11:23
**strategies** 54:25
69:21
**strategy** 54:17
**street** 2:9
**strength** 135:18
**strengthen**
94:21
**stretch** 53:22
**strict** 100:3
**strong** 55:7
**strongly** 156:5
**structural**
45:15 47:19
53:23 55:25
57:4 75:8,12
119:9
**structure** 76:1
76:2 95:21
**struggling**
70:20
**studies** 83:4
**stuff** 30:24
40:17 79:9
89:23 155:16
156:21
**subject** 135:21
**subjected**
147:12
**submission**
5:25 6:13 7:11
7:21 161:1,11
**submissions**
6:3

**submit** 49:1
131:23,23
152:6 159:16
**submitted** 5:19
14:4 46:24 58:8
147:16 158:11
158:16 159:21
161:3
**submitting**
159:6
**subpoenaed**
22:24
**substance** 31:4
128:3
**substantive**
11:14 28:3 31:2
161:3
**subtype** 105:13
**subtypes** 105:8
120:3
**suddenly**
151:20 157:9
**suggest** 8:15
64:20
**suggesting** 81:7
**suggests** 72:15
**sum** 128:3
**summer** 84:6
**super** 156:21
**superior** 1:1
**supervise** 90:7
**supervising**
90:16
**supervisory**
91:1

**supplement**
  136:17
**supplemental**
  137:16
**supplier**  98:21
**suppliers**  98:22
**support**  45:18
  51:18,23,24
  53:3 54:20 55:7
**supported**
  51:10 52:3,7,18
  52:21 83:3
  96:12 105:5,8
  114:2,7,19
  120:3
**supports**  54:24
**supposed**  18:24
**supreme**  17:22
  18:18,18 88:15
  113:12
**sure**  6:15 7:2
  15:23 27:25
  30:4,8 42:22
  44:15 59:10,11
  60:4 61:2 62:14
  72:25 98:11
  101:5 107:24
  127:15,20
  140:12 141:25
  146:13,17
  159:23 160:7
**surprising**  81:9
**sustain**  69:24
**sustaining**
  84:20

**switch**  114:20
**switching**
  115:19
**sworn**  22:5
**synchronized**
  85:9
**synthesize**
  127:18
**system**  49:19
  51:2 57:5 58:15
  58:23 59:1
  65:20 155:15

**t**

**t**  3:10 87:8
  162:1,1
**table**  79:23
**tacks**  51:2
**tactic**  82:17
**tag**  51:1
**take**  10:12
  13:25 23:20
  36:25 43:12
  46:5 50:12
  64:13 66:4
  69:16 76:4,5
  80:10 84:25
  85:2,4,10 118:3
  118:7 121:5
  122:7,8 128:12
  136:21,23
  137:10,12
  151:15 160:8
**taken**  6:8 17:8
  23:8 85:11
  133:1 137:24

  160:10
**takes**  10:18,19
**talc**  1:3 4:5,6
  7:16 10:10 45:3
  45:7 54:24
  55:14 60:21
  62:1 68:6 70:9
  71:14,16 72:7
  73:13 80:20,21
  81:17 83:4,10
  86:19,23 89:23
  90:9 99:8,23
  101:11,13,16
  103:20 106:23
  107:10,12
  116:18 117:8
  118:21 134:10
  136:2 138:21
  139:13 144:14
  151:2
**talk**  23:4 33:22
  42:24 45:3
  47:14 50:20
  62:7 112:5,6
  118:13 119:12
  119:12
**talked**  10:21
  11:24 16:18
  38:25 52:4,9,9
  105:17 138:20
  138:24 143:8
  144:7 145:3,13
  150:6
**talking**  16:19
  16:20 50:22
  62:10 105:9,16

  133:12 136:4
  148:21
**targeted**  149:25
**tcc**  35:8,11,12
  52:14 71:10
  97:10
**tdp**  59:9
**team**  89:22,22
  90:4 97:3
  105:25 106:1
  108:23 116:13
**teasing**  101:3
**technically**
  112:22
**ted**  90:11 91:17
  98:25
**tell**  21:24 30:16
  74:18 77:21
  106:12,13
  125:23 129:8
**telling**  52:19
  70:21 104:1,2
  113:24
**ten**  102:6
**tens**  123:17
**term**  22:17
  23:4,7 24:9
  25:11,19 26:18
  27:4,7,12,13,14
  27:17,17,18
  28:2,4,15,23,25
  29:1,2,8 30:16
  31:5,7,8,11,15
  31:20,21,25
  32:1,3,4,18,22
  33:10,15,23

**[term - time]** Page 40

| | | | |
|---|---|---|---|
| 34:2,23 69:1 104:22 108:24 131:14,16 150:3 **terms** 13:19 29:3 46:3 49:13 59:14,15 60:6 60:11,15 65:16 65:17 81:24 124:2 **testified** 7:14 22:5 28:1 37:6 44:13 47:12 80:18,19 81:4,5 90:20 144:9 149:6 **testify** 13:24 36:15,20 **testifying** 41:20 **testimony** 5:6,9 5:19 7:3 8:10 8:19,24 9:3 13:22 14:5 22:16 30:1,21 38:6 40:9 41:23 42:2,18 43:2,3 43:7 46:6 50:2 73:21 94:2 95:5 110:1 111:3,5 124:4,14 127:7 127:9,11 128:17 138:22 143:11 153:12 153:14 157:13 157:15 158:4 158:25 160:20 | **testing** 132:8 **texas** 54:16 55:1 57:3 97:13 152:22 153:16 **thank** 4:2,12,17 4:23 5:3 8:22 9:17,24 14:7,9 21:19,20 22:7 67:21 69:7 76:10,13,14 77:6,7,9,14,24 78:5 79:16 84:24 85:12 89:10 107:21 117:18 127:23 137:9,20,25 142:1,4 146:9 146:11 151:10 154:12 160:21 160:23 161:9 161:15,16,17 **thanks** 38:21 **thee** 151:19 **theme** 13:7 **theory** 124:11 **thereof** 21:2 **thing** 56:4 71:6 105:19,20 122:1 141:19 143:17,18 144:25 161:7 **things** 7:14 10:8 13:11 45:3 81:6 90:17 93:13,16 112:6 124:2 144:7 | **think** 5:10 7:20 7:20,22 9:5 14:12 17:22 18:17 19:22 20:19 23:17 24:15 27:21 28:7 30:5 33:20 38:18,23 42:12 47:12 53:25 56:7 60:2 61:10 64:11,21 65:1,1 65:3,7 70:21 72:21 78:2 91:19,23 93:8 93:13,18,19 98:8,9,14,15,23 105:17 109:25 110:6,23 111:5 111:5,7 117:7,7 124:25 125:24 128:2,15,18 131:22 138:25 142:2 146:15 148:4,18 149:8 149:15 152:20 153:14,15,23 153:25 154:7 154:24 156:17 160:1 **thinking** 20:15 74:23 **third** 48:6 112:17,17 113:1,5 114:13 135:12,12,18 | **thought** 9:8 11:17 23:8 27:24 54:2 55:7 57:14 100:7 126:2 127:25 135:19 **thoughts** 7:5 9:18 146:24 152:17 154:17 159:10 **thousands** 123:17 **threat** 135:3 **three** 6:7,7 28:11 29:15 32:24 69:11 81:22 87:13,13 88:7,8,8 139:1 **threshold** 116:9 **threw** 120:23 **tied** 155:6 **time** 9:1,19,23 10:19,22,23 11:23 12:21 13:20 15:10 21:22 23:25 25:23 30:22 33:23 34:1 35:25 37:12 43:8,9,20 47:23 47:25 52:15 53:18 54:16 57:2 78:18,18 78:19 79:20 80:21 85:7 86:3 91:3,22 95:22 |

**[time - two]**                                                    Page 41

| | | | |
|---|---|---|---|
| 95:22 98:13 | **told** 9:7 17:6,7 | **transcript** 1:6 | 139:18,21,25 |
| 99:10,17 100:7 | 19:6 34:16 | 3:13,14 6:14 | 141:2 156:16 |
| 100:18 102:3 | 49:22,22 50:3,8 | 9:7 16:11 30:24 | 162:8 |
| 103:4 106:23 | 53:13,15 71:7 | 127:3 129:18 | **truly** 54:2 62:3 |
| 107:1 108:4 | 74:6 81:8 | 129:20 133:19 | 83:1 96:10 |
| 109:17 110:4,5 | **took** 44:8 | 134:4 147:3,5 | 123:2,23 |
| 120:8 121:18 | **top** 23:25 24:16 | 158:2 162:7,8 | **trupos** 16:20 |
| 123:5 124:19 | **topics** 120:21 | **transferred** | **truth** 52:20 |
| 127:3 128:1 | **tort** 34:3 49:19 | 97:22 | 79:13,14 |
| 129:19 132:20 | 51:2 54:16 55:3 | **transmission** | **try** 9:9 18:15 |
| 134:17 145:22 | 57:5 58:15,23 | 27:11 | 23:19 63:18 |
| 148:14 | 59:1 65:20 90:1 | **transponder** | 64:4,6 71:9 |
| **times** 5:5 92:13 | 90:2,5 99:1 | 77:12 | 83:24 101:8,8 |
| 143:20 | 100:1,4 111:20 | **traps** 75:15 | 121:16 149:1 |
| **timesheets** 5:25 | **torts** 44:7 45:8 | **treasurer** 46:2 | **trying** 12:17 |
| **timing** 34:6 | 45:22 83:16 | **treating** 123:16 | 34:3,5,5 38:11 |
| 103:13 | 91:5 | **trial** 11:15 87:4 | 38:11 41:14 |
| **tire** 88:21 | **toss** 80:16 | 87:5 88:3,12,12 | 45:17 63:22,25 |
| **title** 89:24 | **tossed** 80:14 | 88:24 135:11 | 64:20 74:19 |
| **titled** 54:15,23 | **total** 46:16,20 | 140:22 | 78:8 98:1 104:3 |
| **today** 8:24 10:4 | 46:23 47:1 51:1 | **trials** 88:22 | 128:16 140:12 |
| 12:13 15:5 20:3 | 59:21,22 61:19 | 89:1 90:22,24 | 149:4 |
| 21:22 84:11 | 96:15,23 | 94:22,23 | **tube** 105:10 |
| 94:7 109:21 | 101:22 102:8,9 | 138:21,21 | **tune** 64:25 |
| 120:21 121:15 | 106:6,9 112:1,6 | 139:9 | **turn** 20:19 |
| 124:25 126:23 | 112:7 113:15 | **tried** 5:16 89:13 | 54:19 82:18 |
| 146:21 149:9 | 120:15,16,18 | 90:10,12,12 | 142:8 |
| **today's** 13:20 | 123:1 132:2,9 | 94:22 139:13 | **twice** 41:1 |
| **together** 5:5 | 132:14 | 140:2,20 | **two** 5:10 6:20 |
| 6:20 29:13 45:2 | **touch** 77:22 | 142:13 148:9 | 24:13 26:22 |
| 47:6 71:9 76:1 | **toward** 37:23 | 153:24 | 31:12 54:16 |
| 76:1 95:21 | 37:23 52:8 96:1 | **true** 37:3 39:23 | 55:1 56:17 |
| 108:22,23 | **train** 100:7 | 47:3 48:1 51:15 | 57:18 65:4,4 |
| 109:3 | **trans** 129:18 | 54:22 57:1 59:4 | 84:18 97:13 |
| **toggle** 37:6 | **transcribed** | 101:23 108:9 | 107:5,6 108:16 |
| 38:25 49:5 | 1:21 | 120:19 139:6 | 112:6 118:5 |

**[two - violation]**

129:2 130:23
133:3,4 142:14
149:16 152:22
153:17,22
161:11
**twombly** 88:21
**type** 30:24 95:9
96:18 104:7
105:7
**types** 93:6
100:25 114:1,9
**typically** 17:4
66:11,12

**u**

**u** 87:8
**u.s.** 1:13
**uh** 130:3
**unbeknownst**
15:11
**uncertainty**
118:23
**uncommon**
104:6
**under** 11:17
17:25 46:25
59:18 67:4
79:22 82:14
83:16 85:15
89:2 109:16
138:15 153:5
155:7,7 156:16
161:5
**underlying**
16:4

**understand**
6:13 9:24 10:25
12:12 15:13
16:1,6 18:7
39:15,18 64:13
67:8 68:13 79:7
82:1 124:24
126:14 143:4,7
**understandably**
20:15
**understanding**
9:1 61:9 73:5
94:15 96:9,14
103:1,9 116:14
118:9 119:11
**understands**
78:15 148:4
154:3,4
**understood**
8:23 30:21
48:20 100:24
118:11
**unfair** 155:4,11
**unfamiliar** 60:6
**unfortunately**
17:9
**united** 81:19
84:2
**universe** 96:16
119:20,20
120:15 132:15
**unreasonable**
40:19
**unreasonably**
114:17 136:23

**unredacted**
153:24
**upper** 59:17
**ups** 33:13
**urged** 97:23
**urging** 84:2
**use** 23:19 30:23
39:15
**used** 129:15
146:21
**using** 16:15
85:8 146:14
**usually** 17:1
**uterine** 114:8

**v**

**v** 116:17 144:17
**vacate** 139:8
**vacated** 88:14
88:16 139:9
**vaginal** 114:9
**vague** 46:17,18
46:19
**value** 93:6
101:18 102:1,1
119:15,17,20
123:21 132:2
132:11 136:19
148:16,17,18
149:5
**values** 40:19
46:14 100:9
108:7,8,8
114:18 119:12
122:12 123:3
136:13,15,20

136:24 145:6,9
146:2 150:23
**van** 117:16
**variations**
33:11
**various** 52:10
**vast** 68:8
**vegas** 44:8,14
**vehemently**
17:21
**vein** 10:4
**vendor** 70:12
**verdict** 87:3,6
87:14,15,15
88:4,11,13
**verdicts** 87:13
88:8,9,14,16
113:11 138:25
139:5,9
**verify** 54:13
**version** 26:22
31:24,25 32:1,2
34:23 37:4
44:19 153:24
154:6
**versions** 32:18
**versus** 112:7
**viability** 58:7
**vice** 2:14
**victim** 119:25
**view** 12:24
91:22 92:2,2,3
92:16 94:20
143:25,25
**violation** 17:1
17:16,19 63:3

| | | | |
|---|---|---|---|
| **violations** 21:16 | 39:4,5,5,24 | 80:3,7 81:10 | **welcome** 14:8 |
| **violative** 6:17 | 40:21 43:7 | 84:7 92:20 | 160:24 161:18 |
| **vioxx** 92:9 | 49:14 64:24 | 104:4,10 | **went** 10:2 |
| 104:9 | 65:11 71:12,12 | 117:12 121:16 | 29:21 73:14 |
| **vis** 91:24,24 | 77:4 83:20,21 | 124:16 133:13 | **west** 156:2 |
| **vision** 58:13 | 83:24 84:25 | 149:2 156:8 | **whatsoever** |
| **visit** 112:25 | 94:3 102:24 | **ways** 107:14 | 13:4 |
| **volume** 1:7 | 107:23 108:4 | 133:25 | **whistle** 82:16 |
| **voluntarily** | 112:4,4 124:6 | **we've** 5:5,7,7 | **white** 117:17 |
| 49:14 116:6 | 124:24 128:1 | 69:18 71:11,11 | **wide** 2:14 119:1 |
| **vote** 35:15,17 | 128:11 143:17 | 97:11,12 104:6 | **willing** 31:3,9 |
| 36:11 39:22,25 | 143:18 146:16 | 113:18 122:3 | 33:14 42:4 |
| 40:15,15,22,23 | 146:16 152:3 | 149:19,21 | 47:14 100:17 |
| 41:10 81:24 | 152:10 153:6 | 155:14 | **willingly** 79:21 |
| 82:13,25 | **wanted** 6:10 | **weaknesses** | **willingness** |
| 114:15,16,16 | 35:2 36:4,14 | 94:21 | 41:21 42:24 |
| **voted** 36:6 | 39:2,7,21 40:23 | **weapon** 38:16 | 43:8 |
| **voting** 40:2,12 | 57:13,15 58:2 | **wednesday** | **win** 54:1,1,4 |
| **w** | 65:7,9 76:16 | 81:13 82:3,6 | 58:14,14,17,20 |
| | 79:2 80:12 | 122:16 | 58:20 |
| **wait** 85:21 | 107:22,23,24 | **week** 14:13,20 | **wise** 42:17 |
| 155:17 158:1 | **wants** 7:23 8:1 | 15:18 152:12 | **wish** 7:24 |
| **waived** 153:8 | 8:7 15:16 19:23 | **week's** 19:10 | **withheld** 152:3 |
| **waiver** 70:25 | 37:18 79:7,12 | **weeks** 26:22 | **witness** 3:3 |
| 153:6,15,20 | 79:12 84:8 93:8 | 29:15 31:12 | 22:1 28:1 33:4 |
| 154:4 159:8,17 | **washington** | 56:17 57:8 | 35:24 36:18 |
| 159:18 | 2:10 | 161:11 | 38:9 40:11,14 |
| **walk** 86:17 93:4 | **waste** 10:22 | **weigh** 89:2 | 41:5 42:19 |
| 103:17 | **watch** 9:19 | 101:25 | 43:15,18,23 |
| **want** 5:12,22 | **way** 5:12 8:17 | **weight** 8:2 | 46:22 48:23 |
| 6:1,2,12,22,22 | 17:22 19:13 | 158:18,21 | 55:19,22 58:20 |
| 9:24 10:22 18:7 | 20:16 34:15 | 159:24 160:14 | 66:2 71:19,24 |
| 18:12,16,22 | 39:11 45:21 | 160:17 | 72:1,10 73:22 |
| 19:9 31:7 33:15 | 49:6 53:18 54:3 | **weighted** | 74:4,9,12,20 |
| 35:14,16,20 | 58:1 66:11 | 123:19 | 75:4,22 78:17 |
| 36:10 37:16 | 73:25 79:12 | | 79:20 85:16 |

**[witness - zero]**                                               Page 44

89:6,11 98:11
106:8,11,16,18
128:23 129:1
138:16 140:16
**witnesses**  6:7,8
**wolfson**  60:19
91:10 95:3,7
**wonderful**
63:23
**word**  39:16
152:19,19,24
**words**  30:23
**work**  5:16
46:15,20 47:3
52:12 66:12
70:9,18,24
71:16 72:25
75:13,21 97:14
104:5,10,20
105:15 116:22
116:23 151:3
**worked**  71:8
74:23 96:20
99:23 120:7
156:21
**working**  29:11
29:11 37:23,23
52:8,14 55:23
56:13 63:5 71:5
71:9 95:22
100:8
**works**  89:22
124:16 146:25
**world**  2:14 12:6
15:25,25
112:24 133:24

134:7
**worldwide**
55:11
**worried**  103:13
**worries**  157:6
**worth**  47:7
118:7
**wrap**  65:3,14
81:11
**wrapping**  21:5
**write**  20:3
**written**  53:1
54:10
**wrong**  121:21
149:20
**wrote**  25:7
52:20 54:11
57:3

**x**

**x**  3:10 65:8
74:14,24 75:1

**y**

**y**  65:9 74:14,24
75:1
**yeah**  28:21 47:5
48:3,4 53:14
55:5 85:2 99:24
112:17 125:25
127:24 141:20
142:2 147:25
**year**  15:11
16:19 24:1
34:18 41:21
43:1,10 44:6,18
45:8,22 50:7

69:21 80:1,1
84:12 88:6
107:15 132:12
142:15
**years**  16:14,15
16:18,22,22
17:3 19:4 52:7
83:3 102:6
104:16 109:4
113:24 122:19
123:15 129:15
135:5 150:5
**yesterday**  10:1
12:20
**younger**  123:10
**yuna**  6:5 16:20
86:14 156:16
157:5
**yup**  20:11

**z**

**z**  74:15,24 75:2
**zero**  11:25
63:16 148:16

New Jersey Rules Governing Civil Practice

Part IV, Rule 4:14

Depositions Upon Oral Examination


4:14-5. Submission to Witness; Changes; Signing

If the officer at the taking of the deposition is a
certified shorthand reporter, the witness shall not
sign the deposition. If the officer is not a
certified shorthand reporter, then unless reading
and signing of the deposition are waived by
stipulation of the parties, the officer shall
request the deponent to appear at a stated time for
the purpose of reading and signing it. At that time
or at such later time as the officer and witness
agree upon, the deposition shall be submitted to
the witness for examination and shall be read to or
by the witness, and any changes in form or
substance which the witness desires to make shall
be entered upon the deposition by the officer with
a statement of the reasons given by the witness for
making them. The deposition shall then be signed by
the witness. If the witness fails to appear at the
time stated or if the deposition is not signed by
the witness, the officer shall sign it and state on
the record the fact of the witness' failure or

refusal to sign, together with the reason, if any, given therefor; and the deposition may then be used as fully as though signed, unless on a motion to suppress under R. 4:16-4(d) the court holds that the reasons given for the refusal to sign require rejection of the deposition in whole or in part.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.