SUPERIOR COURT OF NEW JERSEY
LAW DIVISION: CIVIL PART
ATLANTIC COUNTY
DOCKET NO.: ATL-L-2648-15
A.D. # _____

```
                          )
IN RE: JOHNSON AND JOHNSON)        TRANSCRIPT
TALCUM-BASED POWDER       )            OF
PRODUCTS LITIGATION       )         HEARING
                          )
```

Place: Atlantic County Civil Crt.
1201 Bacharach Blvd.
Atlantic City, NJ 08401

Date: March 25, 2024
**MORNING SESSION**

BEFORE:

HONORABLE JOHN C. PORTO, J.S.C. AND
RUKHSANAH L. SINGH, U.S.M.J.

TRANSCRIPT ORDERED BY:

JEFFREY M. POLLOCK, ESQ., (Fox Rothschild)

APPEARANCES:

JEFFREY M. POLLOCK, ESQ., AND
MICHAEL SABO, ESQ., (Fox Rothschild, L.L.P.)
Attorneys for Plaintiff

STEVE BRODY, ESQ., (O'Melveny & Myers, L.L.P.)
Attorney for J&J and L.T.L. Mngt.

*(Appearances continued)

Transcriber: Nitsa Carrozza
PHOENIX TRANSCRIPTION
796 Macopin Road
West Milford, NJ 07480
(862) 248-0670

Audio Recorded
Recording Opr: Heather Canale

APPEARANCES CONTINUED:

        RICHARD M. GOLOMB, ESQ., (Golomb Law)
        Attorney for Plaintiff

        MICHAEL S. STEIN, ESQ., AND
        ROGER PLAWKER, ESQ., (Pashman Stein Walder Hayden,
        P.C.)
        Attorneys for Mr. Conlon

3

<u>I N D E X</u>

Colloquy/Housekeeping..........................4,141

<u>PAGE</u>

<u>PLENARY HEARING:</u>

| WITNESSES FOR | <u>DIRECT</u> | <u>CROSS</u> | <u>REDIRECT</u> | <u>RECROSS</u> |
|---|---|---|---|---|
| <u>THE DEFENDANT:</u> | | | | |
| E. Haas | 9 | 87 | | |
| by the Court | 83 | | | |

| <u>EXHIBITS:</u> | <u>Ident.</u> | <u>Evid.</u> |
|---|---|---|
| Ex4 E-mail | 61 | |
| Ex7 Plenary Hearing 67 | 82 | |
| Ex1 Plenary Hearing 001 | | 91 |
| Ex13 Haas certification | | 95 |
| P-1 Bell Report | 118 | |
| P-2 Mullin Report | 118 | |

Colloquy                                                    4

1          (Proceeding commenced at 9:38:03 a.m.)

2              COURT OFFICER:  All rise for Judge Rukhsanah

3    Singh and Judge John Porto.

4              THE COURT:  Thank you.  Good morning,

5    everyone, please be seated.

6              MR. BRODY:  Good morning.

7              MR. POLLOCK:  Good morning.

8              THE COURT:  All right, this is In Re: Talc-

9    Based Powder Products Litigation, M.C.L. Case Number

10   300, ATL-L-2648-15.  Can I have the appearance of

11   Plaintiff's Counsel?

12             MR. POLLOCK:  Good morning, Your Honor.  Jeff

13   Pollock and Mike Sabo on behalf of Plaintiff.

14             THE COURT:  And Defense Counsel?

15             MR. BRODY:  Yes, good morning, Your Honor.

16   Steve Brody for Johnson and Johnson and L.T.L.

17   Management, L.L.C. and with me this morning is Erik

18   Haas from Johnson and Johnson.

19             MR. HAAS:  Good morning, Your Honors.

20             THE COURT:  Thank you, good morning.  And I

21   said, you know, Plaintiff, I know this is a little

22   different but this is Plaintiff's Counsel, the movant,

23   and the party with the burden is Defense Counsel,

24   Johnson and Johnson.

25             How are we going to be addressing questions?

1    Is there going to be one attorney, Mr. Brody, Mr.

2    Pollock, or is it going to be a number of attorneys

3    making -- questioning witnesses?

4           MR. BRODY:  Your Honor, on our side, I am the

5    only person who will be questioning the witnesses.

6           THE COURT:  Okay and Mr. Pollock?

7           MR. POLLOCK:  And the same thing here, Your

8    Honor.

9           THE COURT:  Okay.  I just wanted to be clear.

10   Mr. Golomb, I'm going to address your matter toward the

11   end, all right?  Let me get right into this today.

12          MR. GOLOMB:  Yes, sir.

13          MR. POLLOCK:  I would note one thing, Your

14   Honor.  Michael Stein is here and he is Mr. Conlon's

15   attorney.

16          MR. STEIN:  Thank you.  Good morning, Your

17   Honor, Michael Stein and in case you need an

18   appearance, and my partner Roger Plawker from Pashman,

19   Stein, Walder and Hayden, on behalf of Mr. Conlon.

20          THE COURT:  Thank you, a very good morning to

21   you.

22          MR. STEIN:  Same to you.

23          MR. PLAWKER:  Same.

24          THE COURT:  Thank you for entering your

25   appearances.  Anyone else with to address the Court in

Colloquy                                    6

1    that manner?  Okay, Judge Singh, anything?

2              JUDGE SINGH:  No, nothing for me.

3              THE COURT:  All right.  Now, Mr. Brody, do

4    you want to call your first witness?

5              MR. BRODY:  Thank you, Your Honor.  The

6    Defendants call Eric Hass.

7              THE COURT:  And I do have and Judge Singh

8    has, we received from Fox, the exhibit book that we

9    have.  We've seen these before, so I just want to --

10             MR. BRODY:  Yes.

11             THE COURT:  You know, just let everyone know

12   we have the notebooks with the exhibits in there.

13             MR. BRODY:  Okay and that's exhibits 1

14   through 18?

15             THE COURT:  Yes.

16             MR. BRODY:  Yeah, those are the agreed upon

17   hearing exhibits that Mr. Pollock and I have discussed

18   and you know, we have agreed, obviously, questioning

19   may stray beyond those 18 exhibits.

20             THE COURT:  Okay and it's subject to any

21   objections, of course, right?

22             MR. BRODY:  Of course.

23             THE COURT:  Mr. Haas?

24             E. HAAS:  Yes, Your Honor?

25             MR. POLLOCK:  Your Honor, before we start,

1    that last comment concerns me a little bit and

2    obviously, I realize, as questioning counsel, he has

3    latitude.  This is your courtroom, I'm addressing two

4    courts.  I am concerned about scope and I normally

5    don't like to object over much because you don't want

6    to stop flow of the witness' testimony and I respect

7    that.

8            However, the issue here is whether they

9    should be disqualified based upon R.P.C. 1.6.  There

10   are a lot of other issues we could get into.  So I will

11   be objecting on the basis of scope, is my anticipation,

12   especially in light of that last comment.  I don't know

13   if the Court wants to address that but that is a

14   concern to me.

15           The other last issue is, we will stipulate

16   that Mr. Conlon had access and possession to privileged

17   information while he worked at J and J.  We don't doubt

18   it.  I don't know what that is but I have no doubt that

19   he had it.  If that moves things along, we will

20   stipulate to that fact right now.

21           THE COURT:  Okay and well, Mr. Pollock,

22   that's why I said, subject to objections.  I can't read

23   --

24           MR. POLLOCK:  Yes, sir.

25           THE COURT:  Judge Singh can't read anyone's

1      minds.  We're not there yet but I want to keep the

2      scope tight and I don't want to go too far afield.  I

3      think it's a limited issue.  Is there an actual

4      conflict of interest here?

5              We've addressed it and to the extent we, you

6      know, go beyond those, you may be hearing -- without an

7      objection, you may be hearing from Judge Singh and

8      myself.

9              MR. POLLOCK:  Of course and our questioning

10     is very focused on the issue before the Court.  I will

11     just say, there are many more ethical rules at stake

12     here than simply Rule 1.6 and there are multiple

13     ethical rules that have been violated here.  We'll talk

14     about those in summation, after witnesses testify but

15     this is much broader than a simple 1.6 issue.

16              THE COURT:  Okay.  Mr. Haas?

17              E. HAAS:  Yes, Your Honor?

18              THE COURT:  Thank you for awaiting us.

19     Please raise your right hand.  Tell me your name and

20     spell your last name?

21              MR. HAAS:  Erik Haas, H-A-A-S.

22     E R I K    H A A S, DEFENDANT WITNESS, SWORN

23              THE COURT:  Thank you, you may be seated.

24              THE WITNESS:  Thank you, Your Honor.

25              THE COURT:  Mr. Brody?

E. Haas - Direct                                                    9

1          MR. BRODY:  Thank you.

2     DIRECT EXAMINATION BY MR. BRODY:

3          Q     Mr. Haas, I guess maybe we can -- you're kind

4     of behind the screen there.  So I'm going to move to my

5     left here so that I can see you a little better.  Who

6     are you employed by, Mr. Haas?

7     A     Johnson and Johnson.

8          Q     And what is your position at Johnson and

9     Johnson?

10    A     I am the Worldwide Vice President, responsible for

11    litigation on behalf of Johnson and Johnson.

12         Q     Can you tell the Court what your

13    responsibilities are in that role?

14    A     Yes, in that role, I oversee any litigation

15    brought by Johnson and Johnson or brought against

16    Johnson and Johnson.  I also actively participate in

17    the litigations, where necessary and appropriate to

18    make appearances, as required and I'm also responsible,

19    in connection with responding to any external

20    inquiries, for example, from Congress or from the

21    investor community for the external environment.

22         Q     Who do you report to in that role?

23    A     I report to the General Counsel.

24         Q     Okay and the General Counsel, I understand,

25    sits on the executive committee that is the senior-most

1    executives at J and J?

2    A    That is correct.

3        Q    In that role, do you ever see the top

4    litigation?

5    A    I do.

6        Q    Does that include the litigation pending in

7    the State M.C.L. in New Jersey and in the Federal

8    M.D.L. in Trenton?

9    A    Yes, it does.

10       Q    How long have you been overseeing the top

11   litigation?

12   A    In terms of my oversight responsibilities, I took

13   over the actual oversight responsibilities in March

14   2021, when my predecessor, who that role, Joseph

15   Braunreuther, retired from that role.  I started at

16   Johnson and Johnson in November of 2020.

17       At that time, I had -- well, prior to that time, I

18   had been outside counsel for Johnson and Johnson on a

19   series of litigations, including those that involved

20   Talc Litigation.  So I had some involvement with Talc

21   Litigation going into the role.

22       When I began working at Johnson and Johnson and

23   the head (indiscernible) Vice President in 2020, I was

24   involved in the Talc Litigations but my oversight

25   responsibilities became -- started in March of 2021,

E. Haas - Direct                        11

1    when Mr. Braunreuther left.

2         Q    And just for the benefit of the Court, you

3    said that before you started at Johnson and Johnson in

4    November of 2020, you were outside counsel for J and J;

5    where were you working at the time?

6    A    I was a partner at Patterson, Belnap, Webb and

7    Tyler (phonetic), I had represented Johnson and Johnson

8    for almost 30 years.

9         Q    All right.  Are you familiar with the work

10   that James Conlon did for J and J, as outside counsel,

11   on the Talc Litigation?

12   A    I am intimately familiar with the work that Mr.

13   Conlon did.

14        Q    How did you become familiar with that work?

15   A    When I started in November 2020, I almost

16   immediately was contacted by Mr. Conlon when he learned

17   that I had started in that role.  And when I mentioned

18   Mr. Braunreuther previously, he was the Associate

19   General Counsel.  My position was to transition into

20   his position, we were combining two roles into one.

21        So it was clear, at some point, I would be taking

22   over the litigation of the Talc matters.  And he

23   contacted me, I spoke with him at that time.  And then

24   during the entire course of his tenor as outside

25   counsel for Johnson and Johnson, I communicated with

1    him regularly.

2         We had weekly standing calls, which were extending

3    calls of the outside counsel teams that represented

4    Johnson and Johnson with respect to the Talc matters.

5    And you can appreciate because the Talc matters is the

6    largest litigation risk of Johnson and Johnson, we had

7    a number of firms that were representing the company in

8    connection with the Talc Litigation.

9         A number of bankruptcy firms, a number of -- the

10   tort liability firms, a number of consulting firms.  So

11   we would have weekly calls where we would collectively

12   discuss the strategy for litigating and adjudicating

13   the Talc Litigation.  So Mr. Conlon routinely

14   participated in those calls.

15        I also had many, many, many individual direct

16   calls with Mr. Conlon during his tenor as outside

17   counsel for Johnson and Johnson and that ran from July

18   of 2020 through March 28th of 2022 and I had direct

19   communications, direct e-mails, calls, dinners, lunch.

20   So we were continuously communicating with respect to

21   all aspects of the cases at that time.

22        Q    And you mentioned July of 2020 until Spring

23   of 2022.  Is that the period where Mr. Conlon was

24   outside counsel for J and J?

25   A    That is correct.

E. Haas - Direct                                    13

1       Q    And have you also reviewed billing entries

2    that Mr. Conlon submitted over the course of that time

3    period?

4    A    I did.  So the period --

5              MR. POLLOCK:  Objection, Your Honor.  Best

6    Evidence Rule, hearsay, speculation.  These documents

7    have not been produced.  He is not an expert witness,

8    there are no summaries provided, 1,000 (indiscernible)

9    does not apply, the Best Evidence Rule.  I can't cross

10   examine on what I don't have.  So his testimony

11   regarding what is in the billing records is pure, raw,

12   hearsay.

13             MR. BRODY:  Your Honor, the question was

14   simply if he had reviewed the billing records.

15             THE COURT:  Overrule the objection.

16             MR. BRODY:  Thank you.

17             THE COURT:  Please continue.

18             THE WITNESS:  Yes, I did review the billing

19   records for the entire time that Mr. Conlon was engaged

20   by Johnson and Johnson.

21   BY MR. BRODY:

22       Q    Did Mr. Conlon's representation of Johnson

23   and Johnson include work related to the cases that are

24   pending here in this New Jersey M.C.L.?

25   A    Yes.

E. Haas - Direct                              14

1          Q    Did it include work related to the cases that

2    are pending in the Federal Talc M.D.L.?

3    A    Yes.

4          Q    Before I ask you specific questions about the

5    work that Mr. Conlon did for Johnson and Johnson, I

6    want to first say, I'm going to be asking you a series

7    of questions.  I don't want you to reveal the substance

8    of any of the analysis that Mr. Conlon did, the

9    substance of any analysis that he was privy to, that he

10   may have discussed with you, with other lawyers at

11   Johnson and Johnson, with other outside counsel for J

12   and J because that is privileged information.

13         So I do want you to be careful.  I'll remind you

14   throughout that I'm only looking for yes's and no's and

15   that I don't want to get into that substance

16   specifically.

17   A    Understood.

18         Q    You have described in certifications

19   submitted to this Court that this Court and Judge Singh

20   have seen, the types of issues that Mr. Conlon worked

21   on at a high level and I want to talk about some of

22   those issues with you today while you're on the stand.

23         First of all, I want to talk about resolution of

24   cases in the tort system.  Can you give the Court some

25   general examples and at this point, not specific to the

1   Talc Litigation but some general examples of how cases

2   in a mass tort like the Talc Litigation are resolved

3   through the tort system?

4           MR. POLLOCK:  Your Honor, objection on scope.

5           MR. BRODY:  It's a preliminary question, Your

6   Honor, which will very quickly lead to a question about

7   Mr. Conlon's work.

8           THE COURT:  I'm going to overrule the

9   objection but I think it does go beyond the scope.  If

10  you could just give him context, if you're going to

11  question Mr. Haas with regard to context.  I think,

12  candidly, I think Judge Singh and I can take judicial

13  notice with regard to how these cases are settled but

14  we'll give you some latitude.

15          MR. POLLOCK:  Thank you, I think it will be

16  helpful to the Court, Your Honor.

17          THE WITNESS:  And I think I can move things

18  along by answering it both in terms of what typically

19  happens but what Mr. Conlon specifically was involved

20  in.  In general terms, without getting into privileged

21  information.  You know, the Talc Litigation, for the

22  most part in the tort system, is resolved through

23  litigation.

24          Because by nature of what the tort is, it is

25  what is known as a latency tort.  So that, you have

1       claimants that allegedly were exposed to Talc Powder

2       currently but their disease state may not manifest for

3       years.  And so those are the types of claims that

4       typically, cannot be resolved for your standard class

5       or other types of settlements that you would do in a

6       tort system.

7            So the main way to resolve cases in a tort

8       system is through litigation and we discuss those

9       weekly on the calls that we have with our collective

10      outside counsel group, of which Mr. Conlon participated

11      and was an active participant.  With that said, we also

12      discussed other potential ways to resolve matters

13      outside of the bankruptcy system and the tort system.

14           So that would include: individual settlement

15      agreements, portfolio settlement agreements, what is

16      known as a divisional merger, followed by a spin-off, a

17      divisional merger followed by a bankruptcy and other

18      types of what are known as structural optimization

19      transactions where you cabin the liability in an entity

20      and then remove that entity from the corporate

21      hierarchy.

22           And each of those topics were discussed,

23      debated, critiqued, the strengths and benefits of them,

24      the risks of those, the pros and cons of those were

25      debated at great length during the calls that we had on

E. Haas - Direct                                    17

1    a weekly basis and individually with Mr. Conlon.

2    BY MR. BRODY:

3        Q    And so Mr. Conlon was a part of those

4    discussions?

5    A    Mr. Conlon was an integral part of the outside

6    counsel team.

7        Q    And did that include discussions -- and

8    again, I want you to limit this, not disclose the

9    substance of it but did it include discussions of the

10   advantages and disadvantages of potential resolution

11   through the tort system compared to other options that

12   may have been available to Johnson and Johnson?

13   A    Yes --

14           MR. POLLOCK:  Your Honor, can I get clarity

15   as to whether this is Amyris or L.T.L.?  Because I

16   don't know what the context this arose in and the

17   witness does not clarify where this discussion

18   occurred.  I have no documents to review.  So I think

19   I'm entitled to at least know --

20           THE COURT:  Fair question.

21           MR. POLLOCK:  -- which bankruptcy is it

22   related it?

23           THE COURT:  Mr. Brody?

24           MR. BRODY:  Your Honor, the question was not

25   specific to any particular bankruptcy.  It was a

1    question about whether Mr. Conlon was a part of

2    discussion of the advantages and disadvantages of a

3    resolution through the tort system, compared to all of

4    the other options that were potentially on the table

5    for Johnson and Johnson.

6              THE COURT:  Wouldn't that go to L.T.L.,

7    Johnson and Johnson?

8              MR. BRODY:  It -- well, let me ask Mr. Haas a

9    question.

10   BY MR. BRODY:

11       Q    Were those comparisons limited to Amyris?

12       A    No, they were not limited to Amyris or L.T.L.  So

13   it wasn't limited to where Johnson and Johnson and its

14   affiliates were third-party debtors in the Amyris

15   context or when we were a debtor in the L.T.L.

16   bankruptcies.  Quite to the contrary.

17       From the very first conversation I had and

18   throughout the time Mr. Conlon was representing Johnson

19   and Johnson, we had repeated discussions, many, many

20   discussions, over whether and to what extent these

21   cases should be resolved.  In bankruptcy or completely

22   outside of bankruptcy, in a number of different ways,

23   through what he referred to as structural optimization.

24       But involved what I had mentioned earlier;

25   divisional mergers that could be followed by spin-offs,

1    where basically, you sell the entity that takes on the

2    liability or divisional mergers that would be followed

3    by bankruptcy or combinations of the both.

4         And that was the other aspects of, speaking in

5    very general terms; it didn't necessarily mean one or

6    the other.  There could have been combinations in terms

7    of, you cabin some liability, you put other liabilities

8    into a bankruptcy.  It could depend upon the disease

9    state, for example, Mesothelioma versus cancer claims.

10        So each of those iterations were mapped out and

11   were discussed with respect to, what would the benefits

12   be of one versus the other.  When would you want to do

13   one versus the other, how would you go about doing one

14   versus the other, who would you approach to do one

15   versus the other?

16        So those were the types of conversations we had,

17   without getting into the specifics.

18        Q    And when you say, who would you approach; can

19   you tell the Court what you mean by that?

20   A    There are just a few of the counsel that were

21   involved in these discussions sitting in the courtroom

22   today.  If we were to bring them all in, we would need

23   a courtroom tenfold the size of this.  There were many,

24   many counsel involved in the Talc Litigation, which

25   reflects why we had so many firms involved.

1          And so part of the strategic issue was, who do you

2     approach and when?  Each of the different litigations

3     had someone who was or a group of individuals who were

4     taking lead.  So for example, the Amyris bankruptcy had

5     a Torts Claimants Committee, which is a series of ten,

6     about ten individuals, who were coronated by the U.S.

7     Trustee.  Each of those were represented individually

8     by Counsel.

9          Those individual claimants were appointed by the

10    U.S. Trustee to represent that class of claimants in

11    the Amyris case.  And so those counsels took the lead

12    in that particular situation.  Same thing in L.T.L.  In

13    the M.D.L., you had a different set of leadership.  The

14    M.C.L., different.  A lot of it overlapped.  There was

15    a great deal that overlapped.

16         For example, Beasley Allen had a primary role, I

17    would say, in each one of those constituents but

18    depending upon which group or which litigation you were

19    dealing with, that then, in turn, dictated who were the

20    individuals that would be leading.  So strategically,

21    you had to figure out who to speak to first.

22         And for example, when you're talking bankruptcy,

23    you also had another group of individuals, those that

24    represented the future claim representatives, right,

25    the future claimants.  So you have classes of current

1    claimants and futures and then you have different

2    classes of creditors.  So you have to figure out how to

3    go about addressing those.

4         So it was a multi-dimensional spectrum of

5    claimants and interests and counsel that represented

6    them.  So strategically, there were many calls that had

7    to be made in order to assess who to approach and when.

8         Q    And do those assessments inform Johnson and

9    Johnson's decision making on the Talc Litigation?

10   A    Yes.

11        Q    And was Mr. Conlon privy to how those

12   assessments impacted Johnson and Johnson's decisions in

13   the Talc Litigation?

14   A    Yes.

15             MR. POLLOCK:  Objection, Your Honor.  How do

16   I conceivably know what Johnson and Johnson considered

17   when there's an entire board of people, the General

18   Council is involved, I have no records.  I have to

19   again object on hearsay.  I have no basis to know what

20   Mr. Conlon's role was.

21             MR. BRODY:  Your Honor, this witness, we've

22   established, was in charge of the Talc Litigation.  I

23   can ask him a predicate question.

24   BY MR. BRODY:

25        Q    Do you have first-hand knowledge of whether

1    these assessments informed Johnson and Johnson's

2    decision making on the Talc Litigation?

3    A    I have absolute knowledge because it's my

4    decision.  I made the decisions with respect to Talc

5    Litigation.  If there's any issue that you would like

6    to discuss today as to ultimately why it was made, the

7    buck stops here.

8        Q    Right.  So going back to my question because

9    I don't know that you got your answer before the

10   objection was made.  Did the assessments that you've

11   been speaking about inform Johnson and Johnson's

12   decision making on the Talc Litigation?

13   A    Yes, they did.

14       Q    And was Mr. Conlon privy to not only those

15   assessments but how those assessments informed Johnson

16   and Johnson's decision making?

17   A    Yes and in that regard, I would say he was very,

18   very active and had very strong points of view and

19   communicated them very strongly, not only to me but to

20   the outside counsel group?

21       Q    Would you ever share those assessments with

22   opposing counsel in the Talc Litigation?

23   A    Absolutely not.

24       Q    Why not?

25   A    If I were to share the internal deliberations with

1    both in-house counsel and outside counsel, with our

2    adversaries, it necessarily would provide us with a

3    strategic disadvantage.  It would be an unfair

4    advantage because the other side would understand what

5    we see as the risk benefits, the pro-cons, the

6    advantages, the disadvantages.

7         It would present an unfair advantage and I think,

8    in my view, it would fundamentally undermine the

9    adversarial process and completely contravene all

10   interest in justice.  So no, I do not believe it would

11   be appropriate, under any circumstances, to communicate

12   those confidential communications or the nature of what

13   we were discussion to our adversaries.

14        Q    Now, you heard Mr. Pollock in one of his

15   objections mention the Amyris bankruptcy.  I want to

16   ask you just a few questions about that.  Are you

17   familiar with the bankruptcy proceedings involving

18   Amyris?

19   A    Yes.

20        Q    And very briefly, can you explain to the

21   Court what the Amyris bankruptcy is?

22   A    Amyris was a company that extracted mined talc in

23   the United States and supplied a number of companies

24   with that talc, including for Johnson and Johnson, for

25   Johnson and Johnson's Baby Powder.  And I believe in

1    2019, Amyris filed a Chapter 11 case because it was

2    facing talc claims.

3         Those talc claims were the same talc claims, for

4    the same harm that Johnson and Johnson was facing

5    because those claims were asserted against both Johnson

6    and Johnson and Amyris as a supplier.  As a

7    consequence, in that bankruptcy, Johnson and Johnson

8    had indemnification claims against Amyris.  Amyris had

9    indemnification claims against Johnson and Johnson but

10   they were the same claims.

11        Now, Amyris was the debtor that filed the Chapter

12   11 case and because of the interest of Johnson and

13   Johnson in ensuring that there is a fair determination

14   and adjudication of those claims, whether through

15   bankruptcy or not, Johnson and Johnson participated in

16   the Amyris bankruptcy and both as a -- in instances as

17   an objector and in other instances as a third-party

18   debtor.

19        Because under the bankruptcy code, there are

20   rights that are attributed to third-party debtors,

21   including the ability to participate in a plan for the

22   resolution of the bankruptcy and for the complete

23   release of the talc claims.

24        Q    Was Mr. Conlon involved in issues related to

25   the Amyris bankruptcy when he was representing Johnson

E. Haas - Direct                                25

1    and Johnson as its outside counsel?

2    A    Yes, he was intimately involved.  He commented

3    quite extensively, he was involved in drafting and

4    commenting on submissions to the Bankruptcy Court, in

5    connection with the Amyris bankruptcy.  He did

6    everything an outside counsel would do with respect to

7    the Amyris bankruptcy.

8         Q    All right, are you familiar with the Tort

9    Claimants Committee in the Amyris bankruptcy?

10   A    Generally and I think I mentioned this earlier.

11   The Amyris Tort Claims Committee is a committee of, I

12   believe, ten claimants, ten or eleven claimants, that

13   were appointed by the U.S. Trustee, in order to

14   represent that class of tort claimants.  Each of the

15   claimants is represented by a firm, a counsel.

16        And so that outside counsel for those claimants,

17   well the counsel for the claimants, were the

18   representatives of those tort claimants in connection

19   with the bankruptcy.

20        Q    And are you aware of whether Mr. Conlon was

21   privy to the development of Johnson and Johnson's

22   negotiating strategy for resolution of talc claims with

23   the Tort Claimant's Committee or the T.C.C., in the

24   Amyris bankruptcy?

25   A    He was actively involved and he actively

1    participated in communications with the T.C.C. for

2    Amyris, which included Beasley Allen, which was one of

3    the firms that represented a claimant on the Tort

4    Claimant's Committee.  And Beasley Allen took a lead

5    role with respect to the Tort Claimant's Committee.

6         And in addition to discussions with the Tort

7    Claimant's Committee, Mr. Conlon had conversations with

8    the counsel for the debtor, that's Jeff Bjork at Latham

9    and Watkins and he had conversations with counsel for

10   the future claims representative, that was James

11   Patent, to the best of my recollection.

12        Q    Could you explain to the Court what the role

13   of the future claimants representative is or was in the

14   Amyris bankruptcy?

15   A    Yes, so in the bankruptcy setting, when you're

16   dealing with a mass tort like this, not all mass torts

17   have this characteristic but it has future claims

18   because of the reasons I've stated earlier.  Because

19   the latency period goes on for some period of time, you

20   may have claimants today who have been exposed but have

21   not yet incurred any disease state.

22        As a consequence, their claims cannot really ripen

23   until such a time as they have that disease state.  So

24   those claims could come at some point in the future,

25   notwithstanding that bankruptcy is designed to get a

1    contemporaneous resolution.

2         So in connection with bankruptcy, there are

3    provisions and rules that allow for the resolution of

4    both current and future claims but in order for it to

5    be fair, those future claimants have to be represented

6    by their own counsel and that's the future and an

7    expert and that's the future claims representative and

8    the future claims representative counsel.

9         Q    In his communications with the T.C.C. and the

10   future claims representative in the Amyris bankruptcy,

11   was Mr. Conlon negotiating on behalf of J and J?

12   A    He was.

13        Q    And were you communicating with him

14   throughout that period regarding J and J's positions in

15   those negotiations?

16   A    Extensively.

17        Q    And did that include discussion of what J and

18   J could and could not do, would and would not do, to

19   resolve the cases that are pending here in New Jersey

20   and in the Federal M.D.L.?

21   A    Yes, it did, as well as, the timing, who to speak

22   with and when, the amount of claims -- the amount to

23   which we would be willing to pay to resolve those

24   claims both on an aggregate basis and a per claim basis

25   because often times, the settlement could depend on

E. Haas - Direct                                    28

1    both.

2        There's a per claim basis often times required an

3    assessment of, what were the anticipated criteria of

4    the future claimants?  In terms of: age, disease state,

5    severity of disease state, length of exposure.  All

6    those factors would go into assessing how much on a per

7    claim basis would be or should be made available to the

8    future claimants, as well as the current claimants.

9        And that was all built into what's called the

10   settlement matrix.  So not all settlements use a

11   settlement matrix but as part of our discussions, that

12   was one of the considerations.

13       Q    And did Mr. Conlon and his team, during that

14   period, engage in significant work related to

15   evaluation of settlement matrices that were being

16   considered, in connection with resolution of the Talc

17   claims?

18            MR. POLLOCK:  Your Honor, objection.  I would

19   like clarification, when he says, "And his team."  The

20   question here is, what did Mr. Conlon do?  I don't know

21   who the team is.  Is the team everybody else who was

22   working on the case, like Weil Gotshal and Jones Day?

23   I don't know -- I need to know what Mr. Conlon was

24   doing specifically, Your Honor.

25            THE COURT:  That's a fair objection.

1            MR. BRODY:  Yeah and I can clarify, Your

2       Honor.

3            THE COURT:  Sure.

4       BY MR. BRODY:

5       Q    That's fine but let me just limit it to Mr.

6       Conlon.  Was Mr. Conlon engaged in the evaluation of

7       settlement matrices that were being considered as part

8       of the potential resolution of the cases in the M.C.L.

9       and the M.D.L.?

10      A    Yes, he was extensively involved and he touted his

11      vast experience in the mass tort field.

12      Q    Did that require that he have access to

13      confidential Johnson and Johnson information?

14      A    It did.

15      Q    And did he participate in privileged and

16      confidential discussions of -- you know, including

17      evaluation of proposals that may have been going back

18      and forth involving these settlement matrices?

19      A    Yes, he did.  That extensive -- he had extensive

20      communications with the team and strident opinions on

21      the issues.

22      Q    Are you familiar with T.D.P. values in the

23      Amyris bankruptcy?

24      A    Tort distribution procedures, yes.

25      Q    Okay.  Was Mr. Conlon involved in evaluation

1    of --

2    A    Or trust distribution procedures, sorry.  Thank

3    you.

4         Q    Trust distribution.  Yes.  Was Mr. Conlon

5    also involved in evaluation of proposed T.D.P. claim

6    values in the Amyris bankruptcy?

7    A    Yes, he was.  He commented extensively on that, as

8    well.

9         Q    And was he part of the J and J team?  And

10   when I say J and J team, I'm talking about the in-house

11   counsel who were involved, as well as his co-counsel

12   from the other firms representing J and J; was he

13   involved in that evaluation?

14   A    Yes, he participated in the calls where we

15   deliberated on those issues.  He commented, critiqued,

16   debated, each of those issues, extensively with the

17   team.

18        Q    Did that include an evaluation of the

19   proposed claim values and whether Johnson and Johnson

20   believed they were too high, too low, without getting

21   into specifics?

22   A    Absolutely and it goes to what I was saying

23   earlier.  It's both the aggregate amount and the per-

24   claim amount.  And if I may just digress for a minute

25   here.  That was important, generally speaking because

1    Johnson and Johnson at cord does not believe these

2    claims have any merit.

3         And this is all a matter of the record that came

4    out in the bankruptcy, so I'm not revealing any

5    confidences at this point.  But we elected to enter

6    into settlement agreements because the facts that are

7    now a matter of the record in the L.T.L. bankruptcy

8    demonstrated that notwithstanding that we were winning

9    the vast majority of cases, to try the cases that

10   existed at the time the first bankruptcy was filed

11   would have taken 3,800 years.

12        And the calculation of the expenses, not the

13   judgements but the expenses that would have cost in

14   order for us to get a resolution over that time frame

15   was $190 billion.  So in the best interest of our

16   constituents are patients, are doctors, are nurses, are

17   employers, employees, are investors.  A settlement was

18   in the best interest of all parties and in particular,

19   with respect to the claimants too.

20        Because the claimants had come to the cases with a

21   view that there was some harm that they were caused by

22   our product because that's what they were advised by

23   counsel on the other side of the table.  And this was

24   the only way, if we were to enter into the settlement

25   agreement, it was the only way to get funds to those

1    claimants during their lifetime.

2            And it's the only way to do that while you're also

3    reserving amounts for the future claims that exist.

4    Because at the time we were contemplating these

5    bankruptcies, the entity that actually owned this risk,

6    it's called Johnson and Johnson Consumer, Inc., was in

7    the red.  That company, in it of itself, could have

8    gone into bankruptcy before this so-called two-step,

9    before the divisional mergers.

10           That company could have gone into bankruptcy

11   because in 2020, it was in the red solely because of

12   the talc claims.  So we contemplated the settlements

13   because it was in the best interest, in our view, of

14   all constituents.

15                   THE COURT:  Let me interrupt.

16                   MR. BRODY:  Sure.

17                   THE COURT:  You know, and keeping us focused.

18   We have a team where and ten times the amount of this

19   courtroom which are going to be the team.  Where does

20   Mr. Conlon, Mr. Haas, fit into this team?  Is there a

21   hierarchy of attorneys?  Just, you know, I want to get

22   us back to -- and I appreciate the context but where

23   does Mr. Conlon fit in this team of outside counsel?

24   Is there a hierarchy?

25                   THE WITNESS:  I think you could look at some

E. Haas - Direct                                                    33

1    of his public statements, including a recent one on

2    November 2nd --

3              THE COURT:  The Bloomberg article?

4              THE WITNESS:  Yeah, as to what he touted

5    himself to be, which was the premier bankruptcy expert

6    that ran Sidley's Bankruptcy Department and Mass Tort

7    Department for 20-some-odd years and had more knowledge

8    in this area in the resolution and mass torts than

9    anyone else on the planet.

10             So he came to the team with that perspective

11   and communicating that expertise and he brought that to

12   these calls.  And when I say that he was actively

13   involved and he had strong opinions, that is why.  So

14   on every issue that would come up, it was like which is

15   the right forum, when should we bring a claim, who

16   should we approach, how should we structure it?

17             Mr. Conlon would bring his expertise to that

18   matter and give his very strident opinions on what

19   should be done and critique what were the views of

20   other very learned counsel, whether it's Weil Gotshal,

21   Skadden or the other firms.  And we had a myriad of

22   significant firms on these cases.

23             So when you ask for his role, he was a

24   central figure in strategic decision making, in

25   connection with this team, throughout the entire

1    process and the entire time frame he was engaged.

2    BY MR. BRODY:

3         Q    And Mr. Haas, when you talk about the team

4    and these weekly calls.  I assume you didn't have all

5    of your Talc Litigation outside counsel on these weekly

6    calls?

7    A    No because we have counsel throughout the country.

8    There are cases that are tried, literally, in almost

9    every state in the country.  And so we have individual

10   tort, local counsel throughout.  But we had a team that

11   was comprised of the firms that worked on the large

12   matters, the M.D.L., the M.C.L. and coordinating

13   counsel and representatives of the litigants throughout

14   the country.

15        So what we tried to bring together is every

16   perspective so when we're trying to decide which is the

17   best avenue to reside, the biggest liability for

18   Johnson and Johnson, we would have the impact from

19   counsel representing all the different constituents.

20        Q    And you said Mr. Conlon was a member who

21   joined those weekly calls?

22   A    Yes.

23        Q    And would you consider that to be the core

24   team that was evaluating these issues?

25   A    Yes, the core team of premier counsel that were

1    bringing to bear the best advice they had in order to

2    help us resolve these matters, both through litigation

3    or resolution outside of litigation.

4         Q    And who else at Johnson and Johnson and I'm

5    referring to in-house counsel now, was involved in

6    those calls?

7    A    So there was -- the main participants in the calls

8    form the Johnson and Johnson litigation team were:

9    myself, Joe Braunreuther, Andrew White and John Kim.

10        Q    And you mentioned that Mr. Braunreuther was

11   the Worldwide Head of Litigation immediately preceding

12   you?

13   A    His title was actually the Associate General

14   Counsel.  There was a separate Worldwide Head of Vice

15   President at that time.  When I started, the two roles

16   were combined.

17        Q    Okay and Mr. White, what is Mr. White's role

18   at Johnson and Johnson?

19   A    Mr. White is currently the Product Leader, the

20   Group Product Leader for Product Liabilities.

21        Q    All right and what about Mr. Kim?

22   A    Mr. Kim held that role before Mr. White.

23        Q    Okay, so these are senior members of the Law

24   Department at Johnson and Johnson?

25   A    Yes.

E. Haas - Direct                                    36

1          Q    The analysis that we were talking about of

2     claim values, of settlement matrices.  Do you consider

3     the analysis that Mr. Conlon was involved in, to be

4     privileged and confidential?

5     A    Absolutely.

6          Q    And would you ever share that with your

7     opposing counsel in the Talc Litigation?

8     A    Absolutely not.

9          Q    All right.  Now, you mentioned that you spoke

10    to Mr. Conlon at various times about structural

11    optimization; right?

12    A    (indiscernible)

13         Q    Did you consider your discussions with him to

14    be privileged and confidential?

15    A    Yes, I did.

16         Q    And was it discussed within the context of

17    evaluating different options to resolve the cases that

18    are pending here in the M.C.L. and the federal M.D.L.?

19    A    Yes and to be clear, that is what I considered

20    privileged.  The concept of structural optimization,

21    per say, is like the concept of bankruptcy, right, it's

22    a concept.  Within that, there are iterations and

23    various different ways to go about doing that.

24         Structural optimization is just basically the

25    concept of taking liability and putting it into a

1    particular entity within your organization and then

2    there's many different things you can do with that.

3    You can go to bankruptcy with it, you can spin it off,

4    you can spin part of it off.  So there's many different

5    ways you can structurally optimize.

6         One of the things you can consider as a goal is to

7    actually continue to hang on to that enterprise but

8    just not make it part of your consolidated financial

9    statements.  So it's a tool and that tool has many

10   iterations but what is important are the strategic

11   considerations of how you go about doing that, with

12   whom, at which amounts you set as the valuation, that

13   you're going to need to fund that enterprise in order

14   to make it a non-fraudulent transfer when you put the

15   liabilities in there.

16        So there are many, many strategic considerations,

17   all of which have risks and benefits and pluses and

18   minuses because it's also in the context of a broader

19   question of; are you going to get comprehensive

20   resolution?

21        So even if you do that outside of a bankruptcy, if

22   you do not have a bankruptcy piece to that, you will

23   never get comprehensive and final resolution, absence

24   there being a portion that is resolved through

25   bankruptcy that addresses future claims.  Because the

1      structural optimizations, you will not know until those

2      future claims come in, what is the magnitude of those

3      claims.

4           Q    Was Mr. Conlon involved in discussion,

5      privileged and confidential discussion of methods to

6      estimate the potential value of those future claims?

7      A    Yes, both at the aggregate level and at the per-

8      claim level and the criteria that go into how you set

9      the per-claim amounts, as well as what exceptions there

10     may be to that analysis.  So what circumstances would

11     the values be increased and what circumstances would

12     the values be decreased.

13          Q    And was that for both the ovarian cancer

14     claims and Mesothelioma claims?

15     A    Yes.

16          Q    Was he involved in analysis of legal

17     arguments with the potential to impact the number and

18     viability of future claims?

19     A    Yes.

20          Q    Did the in-house team share with Mr. Conlon

21     its views on whether the passage of time might increase

22     or decrease the value of those future claims?

23     A    Absolutely.

24          Q    Whether it might increase or decrease the

25     amount that Johnson and Johnson would be forced to pay

E. Haas - Direct                            39

1    to get the finality that you talked about?

2    A    Yes.

3         Q    Do you consider that to be privileged and

4    confidential?

5    A    I do and I do.

6         Q    Was he involved in discussions of how the

7    risk of trial activity for ovarian cancer and

8    Mesothelioma claims would change or would not change

9    over time?

10   A    Yes.

11        Q    Do you consider that to be privileged and

12   confidential?

13   A    I do.

14        Q    Was Mr. Conlon also involved, shifting gears

15   slightly, in privileged and confidential discussion of

16   the L.T.L. Management, L.L.C. bankruptcy filing?

17   A    Yes, it was.

18             MR. POLLOCK:  Objection, Your Honor.  Could I

19   get a point in time, please?  This could be important.

20             THE COURT:  I agree.  Could we have some

21   clarity with regard to some time frame, Mr. Brody?

22             MR. BRODY:  Sure, I'll just ask Mr. Haas.

23   BY MR. BRODY:

24        Q    During what time period was he involved in

25   discussions of, why don't we start with before the

1    bankruptcy filing.  If I'm recalling correctly, the

2    bankruptcy filing was in October of 2021; right?

3    A    Yes, October 14th, 2001.  Mr. Conlon was involved

4    in all the discussions regarding the potential for

5    bringing a bankruptcy in which Johnson and Johnson was

6    the debtor, which eventually led to the filing of the

7    L.T.L. bankruptcy.

8         So that's the time frame, 2021, when we were first

9    negotiating in an attempt to get a resolution through

10   the Amyris bankruptcy as a third-party debtor.  When

11   that failed, then the consideration was, was there an

12   option to file our own bankruptcy?  And so, those

13   deliberations continued through 2021, up until October

14   '21.

15        Mr. Conlon was intimately involved in all of those

16   discussions and all the considerations that went into

17   those, that ultimate determination.  And thereafter, he

18   was involved in the advice, strategy, deliberations and

19   communications regarding how to effectuate that

20   bankruptcy once filed.

21   Q    And did that include discussions with you?

22   A    Absolutely, they did.  Direct communications, e-

23   mail communications, communications on group calls and

24   you know, one-on-one conversations, dinner

25   conversations, lunch conversations.

1          Q    Okay, were Mr. White and Mr. Kim involved in

2    those conversations?

3    A    Absolutely.

4          Q    What about the rest of the core, outside

5    counsel team, that you spoke about?

6    A    Yes.

7          Q    Did that include evaluation of the potential

8    value of pending talc claims?

9    A    Yes, they did, both at the aggregate level and the

10   per-claim level.

11         Q    And the potential number of future claims?

12   A    Yes.

13         Q    Of how the bankruptcy filing compared to

14   other resolutions, potential resolutions that were

15   available to J and J and again, these are all just -- I

16   want a yes or a no without any substance.

17   A    Significant discussions in that regard.

18         Q    Of how Johnson and Johnson viewed the

19   bankruptcy option compared to structural optimization?

20   A    Yes and in connection with variations of the

21   concept of structural optimization in different

22   contexts.

23         Q    Now, shortly after, a few months after the

24   October 2021 L.T.L. filing, Mr. Conlon left Faegre

25   Drinker; right?

1    A    I'm sorry, could you ask that question again?

2         Q    Yes, sure.  End of February 2022, Mr. Conlon

3    left Faegre Drinker; right?

4    A    Yeah, I learned of Mr. Conlon's departure in an e-

5    mail on, I believe it was March 28th, 2022.

6         Q    Okay and what did you learn at that time?

7    A    Mr. Conlon told me that he was resigning from

8    Faegre Drinker and starting a business called Legacy

9    and Liability, something like that.

10        Q    Okay.  Was this while the L.T.L. bankruptcy

11   was still pending?

12   A    Yes.

13        Q    Did J and J have support for resolution of

14   its talc liabilities through the L.T.L. bankruptcy

15   process?

16   A    I'm sorry, can you ask that question again?

17        Q    Sure.  Did J and J have support from

18   claimants for resolution of its talc liabilities --

19   A    Yes.

20        Q    -- through the L.T.L. bankruptcy process?

21   A    Yes, yes.  So Johnson and Johnson had the support

22   of the vast majority of counsel -- let me state that

23   differently.  Johnson and Johnson had support for

24   counsel representing the vast majority of claimants in

25   the L.T.L. bankruptcy.

1          This is a matter of record that -- in the hearing

2     that was had in the Summer of 2023 before Judge Kaplan

3     in the (indiscernible) bankruptcy court.  One of the

4     questions he had was, what was the support for the

5     bankruptcy, for the claimants at that time, before a

6     vote was taken and what was the opposition to the

7     bankruptcy from the claimant's perspective?

8          He asked for evidence to be submitted and then he

9     made findings in that regard.  The evidence in that

10    regard showed that counsel representing 70 percent of

11    the claimants were supporting our bankruptcy and 20

12    percent were opposing the bankruptcy.

13         Q    And can you tell me, you know, was Mr.

14    Birchfield opposing it?

15    A    Mr. Birchfield led the small minority of law firms

16    that opposed the bankruptcy.

17         Q    Do you know why?

18              MR. POLLOCK:  Your Honor, there's ovarian

19    cancer claims and there's also Mesothelioma claims.

20              THE COURT:  Limit it to ovarian cancer?

21              MR. POLLOCK:  Well the problem is, I don't

22    know which group we're talking about here when he says

23    the majority.  I have no break and I could deal with it

24    on cross if you'd like but frankly, it seems to me that

25    if we're going to say 70 percent, I would like to know

1    how that 70 percent was gotten.

2              THE COURT:  Right and I think that's a fair

3    question to object, so I'll sustain the objection.  Can

4    you focus back in?

5              THE WITNESS:  I can --

6    BY MR. BRODY:

7        Q    Sure, I can ask Mr. Haas, what were you

8    referring to with the 70 percent?

9    A    It's both.  So it's both.  The evidence in the

10   record --

11             THE COURT:  Meso and ovarian?

12             THE WITNESS:  Involved Meso and -- yeah.  In

13   terms of numbers, there are far, far more ovarian

14   cancer claims than there are Mesothelioma claims but

15   the analysis that the Court requested and that was done

16   pertained to both.

17   BY MR. BRODY:

18       Q    All right.  What was the -- and the question

19   I had asked you before that was, do you know why Mr.

20   Birchfield opposed it?

21   A    Mr. Birchfield gave a deposition in the bankruptcy

22   proceeding before Judge Kaplan and in that deposition,

23   he testified that --

24             THE COURT:  That's a deposition transcript

25   portion, that thing I have?

E. Haas - Direct                          45

1          MR. BRODY:  You have portions, yes.

2          THE WITNESS:  Yeah.

3          THE COURT:  Okay.

4          THE WITNESS:  He testified that, in addition

5    to the 40 percent contingency fee that he would obtain

6    from any resolution with his claimants, he also was

7    entitled to up top 12 percent for his work and Beasley

8    Allen's work on the Plaintiff's Steering Committee in

9    the M.D.L., which would entitle to him to the common

10   benefit B.

11         So it's 40 percent contingency fee, plus 12

12   percent of any resolution that was had through the

13   M.D.L. proceedings.  That common benefit B was not

14   available in the plan that L.T.L. was advancing in the

15   L.T.L. bankruptcy.

16   BY MR. BRODY:

17   Q    And what was the end result of the L.T.L.

18   bankruptcy?

19   A    On July 28th, 2023, Judge Kaplan issued the

20   decision dismissing the bankruptcy and that decision

21   currently is on appeal.  The Third Circuit took an

22   expedited appeal directly to the (indiscernible) going

23   around the district court.

24   Q    Did you hear from Mr. Conlon at the time that

25   Judge Kaplan announced that decision on July 28th?

E. Haas - Direct                                    46

1    A     The very day that the bankruptcy was dismissed on

2    July 28th, 2023, Mr. Conlon reached out to me.

3         Q     Okay and what did he reach out to you to ask,

4    say?

5    A     Mr. Conlon reached out to me to propose that we

6    have discussions to engage in a structural optimization

7    transaction.

8         Q     Okay, when was the next time you heard from

9    Mr. Conlon after that?

10   A     The next time I heard from Mr. Conlon, I believe,

11   was on August 21st, 2023.

12        Q     Okay and did he have a request or an ask at

13   that time?

14   A     Yeah, he had reached out to our Treasurer, so he

15   went around me to our Treasurer, and he had asked our

16   Treasurer for a meeting in order to present that same

17   structural optimization proposal to the Treasurer.

18        Q     And did you agree to set that meeting up?

19   A     At that time, having circumvented me and gone to

20   the business directly, I thought it was incumbent upon

21   me, therefore, to allow a meeting to be had, so I did.

22        Q     Okay.  Do you recall when that meeting took

23   place?

24   A     It took place on September 11th, 2023.

25        Q     Who attended?

E. Haas - Direct                                47

1    A    To my recollection, it was myself, it was the

2    Treasurer of Johnson and Johnson, Andrew White in the

3    Litigation Department, the Practice Group Leader for

4    Product Liability, Mr. Conlon and Mr. Doug Dachille,

5    who I believe is the C.I.O. of Mr. Conlon's firm.

6         Q    And what happened at the meeting?

7    A    Mr. Conlon and his colleague made a presentation

8    with respect to the structural optimization approach

9    that he was proposing at that time.  We had discussion

10   regarding that proposal.  The question I repeatedly

11   asked was, how was it to be funded?

12        Because what was being contemplated by that

13   particular structural optimization transaction was

14   that, there would be a divisional merger.  We would

15   take the liability, put it into a new entity and then

16   sell that entity off to another party.  In this place,

17   he was contemplating Legacy.

18        And or fund that entity as a J and J entity with

19   sufficient funds to cover the talc liability.  Now, of

20   course that begs the question; what would be then the

21   amount of funds in order to ensure that, A, if we keep

22   it on J and J's books, it becomes then de-consolidated,

23   which was the advantage Mr. Conlon was positing.  Or

24   how much we would have to pay in order to sell it to

25   Legacy to make it a separate entity.

1          And at that point, the basic proposition from his

2     perspective was, well, whichever way you do it, Legacy

3     would run the entire claim administration process and

4     the resolution of the claims and therefore, earn its

5     fee from a management fee that it would then charge to

6     the enterprise that would take on these claims.  And

7     get the spread to the extent they were able to resolve

8     it for anything less than the funding.

9          Q    What happened after the meeting?

10    A    Well, because the primary issue that was discussed

11    was whether and to what extent there had to be funding

12    for that particular transaction and we had pushed Mr.

13    Conlon and his colleague on that.  The rejoinder that

14    we got was, well, you have to ask your auditor and

15    therefore, it became incumbent upon me to have a

16    conversation with my auditor on the same topic.

17         I did, and my auditor said that under no

18    circumstances would this be a viable transactions that

19    we would recognize or allow to be de-consolidated.  So

20    we responded to Mr. Conlon, said that it was not a

21    viable transaction and we had no interest in

22    proceeding.

23         Q    Okay.  Was that the last you heard from Mr.

24    Conlon about the Legacy proposal?

25    A    No, it wasn't.

1      Q    When was the next time you heard from Mr.

2   Conlon, after conveying that it wouldn't work?

3   A    I believe it was on September 28th.  There was a

4   communication from his C.I.O., Doug Dachille, to the

5   Treasurer again.

6      Q    Okay and did J and J respond to that?

7   A    J and J rejected that inquiry again.

8      Q    All right.  Judge Porto and Judge Singh are

9   both aware of the fact and it's in the record that the

10  Johnson and Johnson third quarter earnings call took

11  place on October 17th of 2023.  There's a copy of the

12  transcript of that call and your comments about the

13  Talc Litigation are in the record here, so I don't need

14  to go into that.

15      But I want to ask you, after that October 17th

16  earnings call, did you again hear from Mr. Conlon?

17  A    We heard from Mr. Conlon the very next day.

18      Q    All right and if you turn to, it's Tab 4 in

19  the hearing binder you have.  My first question for you

20  is, if that's the next day communication that you're

21  referring to?

22  A    Yes, this is the communication that Mr. Conlon

23  sent to the Treasurer of our company, Dwayne Denarsdell

24  (phonetic), on October 18th, copying a number of

25  people, including myself and my colleague, Andrew

1    White.

2         Q    Okay.  In this communication, Mr. Conlon says

3    that Legacy has the support of a lead counsel for the

4    O.C., ovarian cancer claimants, including Andrew

5    Birchfield, for an M.D.L. option settlement matrix with

6    Legacy.  And then he goes on to say that Andy

7    Birchfield, Doug Dachille and I are prepared to meet

8    with you and your team in-person to share and discuss

9    the terms of such matrix as part of the Legacy

10   acquisition.  Are you with me?

11   A    I see what you're referring to.

12        Q    What was your reaction to that?

13   A    Quite frankly, we had a number of reactions but

14   the short of it is, we were utterly shocked and

15   appalled that our former counsel was conferring with

16   our adversary, the lead adversary that was opposing the

17   proposal that we had on the table at that time, to get

18   a comprehensive and final resolution.

19        That, our former counsel was working with that

20   lead counsel for the claimants, to oppose our

21   transaction, by proposing an alternative transaction,

22   based upon the same matter and the same issues that he

23   had represented us extensively for 21 months.

24        So I mean, my reaction was utter shock and awe,

25   that I viewed this to be an egregious violation of Mr.

1    Conlon's ethical obligations to J and J, as well as Mr.

2    Birchfield's ethical obligations.  And I reached out to

3    counsel, in order to begin the process of assessing,

4    what is the appropriate recourse for that interaction.

5         In addition to that, you know, looking at this.

6    At that point in time, our understanding was, this was

7    the first time Mr. Conlon had engaged with Mr.

8    Birchfield on this alliance where they are now working

9    together to thwart our proposal because the way I read

10   it at the time was, to further enhance our solution to

11   address the potential auditor concern.

12        So this is written in a way to suggest that this

13   is reactive to the response that we just gave to Mr.

14   Conlon.  So he's writing to us and he's telling us;

15   well, you raised a concern and now I'm going to join

16   forced with your adversary to address the issue that

17   you had raised.

18        And notwithstanding whether it addressed the issue

19   which it didn't, the manner and mode of which it did

20   was egregious, in our view and in my view, and was a

21   blatant violation of his ethical obligations.

22        Q    And was this the first time, October 18th of

23   2023, that you learned that Mr. Conlon was working with

24   Mr. Birchfield?

25        A    Yes, it does and Judge, obviously, I highlighted

1   that point because we now know it wasn't true but I'm

2   telling you, contemporaneously at the time and given

3   the way this was written, that is exactly what it was

4   conveying to us.

5       That suddenly, Mr. Conlon had said, well, let me

6   go out and now contact the other side and start working

7   against you.  That's egregious.  We now know it's even

8   more egregious because it wasn't the first time.

9       Q    Well, that was going to be my next question

10  for you.  Have you since come to learn that Mr. Conlon

11  and Mr. Birchfield were working together throughout the

12  pendency of the mediation that was taking place in the

13  L.T.L. bankruptcy in the Summer of 2023?

14            MR. POLLOCK:  Objection, Your Honor.  This

15  goes with the Best Evidence Rule.  There is no evidence

16  that this ever occurred.  All I have is rank

17  speculation from Mr. Haas as to discussions he was not

18  even a part of.  How do I possibly cross examine when

19  they have not produced a single scrap of paper in the

20  record to support any of Mr. Haas' hypothesis?

21            All I have is rage from him, I get it, he's

22  angry but I'm entitled to documents and I can't oppose

23  a witness when he has not produced the documents that

24  UNA squarely says, you have a Hobson's choice, produce

25  it or don't.  I am deeply concerned about where this

E. Haas - Direct                                     53

1    testimony is going because there's no evidence

2    whatsoever to support it.

3                 THE COURT:  Mr. Brody.

4                 MR. BRODY:  Your Honor, well first of all,

5    Mr. Haas --

6                 THE COURT:  I believe this is a credibility

7    determination, to the extent that there's no document

8    and the Court permits the questions to go forward.

9                 MR. BRODY:  Well, let me ask Mr. Haas, I

10   mean.

11                THE COURT:  I'll overrule the objection, I'll

12   give you that opportunity but there is no

13   documentation.  I think we cleared that earlier in one

14   of our conversations.

15                MR. BRODY:  Certainly, Your Honor.

16   BY MR. BRODY:

17        Q    Let me ask you, Mr. Haas, when did you first

18   learn that Mr. Conlon and Beasley Allen were working --

19   first of all, I don't know if I got an answer to the

20   prior question before the objection, so let me ask that

21   one again, just for the record.

22           Have you since come to learn that Mr. Conlon and

23   Mr. Birchfield were working together throughout the

24   pendency of the mediation that was taking place in the

25   L.T.L. bankruptcy in the Spring and Summer of 2023?

E. Haas - Direct                                    54

1    A    Yes, I have.

2         Q    When did you first learn that?

3    A    About two weeks ago.

4         Q    And how did you come to learn that?

5    A    By the filings, by the Plaintiff's Steering

6    Committee, in the multi-district litigation, where they

7    presented a privilege log which had entries in it

8    indicating that as early as April 20th, 2023, Mr.

9    Conlon is communicating with Beasley Allen regarding

10   settlement proposals to make to a mediator, with

11   respect to a structural optimization proposal.

12        And then thereafter, the privilege log indicates

13   myriad communications, myriad, one after another, after

14   another, after another, since April 2023, concerning

15   these very same issues and the very same matter that he

16   represented us as legal counsel on and that now, for

17   the first time in October 2023, is coming to light.

18        Q    Did Mr. Conlon ever tell you that he was

19   communicating directly with Mr. Birchfield during the

20   L.T.L. mediation?

21   A    He never once mentioned that he was communicating

22   with Mr. Birchfield or the other members of Beasley

23   Allen, which per the privilege log they produced,

24   demonstrate that he was having myriad communications

25   not just with Mr. Birchfield but with other members of

E. Haas - Direct                                    55

1    Beasley Allen.  Made no mention of that.

2         And indeed, he communicated me on May 10th, 2023,

3    shortly after he began working with Mr. Birchfield and

4    in that respect, never once mentioned that he had now

5    entered into this alliance with Mr. Birchfield, never

6    asked for my consent on behalf of J and J to work with

7    Mr. Birchfield, on the same matter, on the same issues.

8         Never asked for a waiver as to whether or not he

9    should be able to work on the same matter and the same

10   issues that he represented Johnson and Johnson on

11   throughout 2021 into 2022.

12        Q    Has he ever come to you at any point in time

13   and asked for a waiver?

14   A    Not once.

15        Q    Has Johnson and Johnson ever given him a

16   waiver?

17   A    Not once.

18        Q    You mentioned other members of Beasley Allen

19   whose communications are included on that privilege

20   log; can you tell me who?

21   A    Ms. Laila O'Dell (phonetic), Mr. Ted Meadows and

22   there's other individuals at the firm that, their names

23   and their e-mail addresses are listed but I don't know

24   them in particular.

25             MR. BRODY:  Okay.  Judge Porto, that

1    privilege log is actually now on the docket in the

2    federal M.D.L. and we would ask that this Court take

3    judicial notice of that privilege log and its contents,

4    pursuant to Rule 201:B-4.

5             THE COURT:  I get it.  Judge Singh, any

6    thought?  I have not seen it --

7             MR. POLLOCK:  Can I be heard, Your Honor?

8             THE COURT:  Sure.

9             MR. POLLOCK:  I'm sorry, before you

10   deliberate.  The -- before Judge Singh and before you,

11   Mr. Brody has repeatedly been asked, are we complete,

12   is the record done?  And the answer is yes.  Now,

13   suddenly, we're going to go outside the record.  It's

14   obviously in the Court's discretion.  I understand --

15            THE COURT:  Have you seen that privilege log?

16            MR. POLLOCK:  I have not seen the privilege

17   log but I frankly don't really care because while I

18   care deeply about this case, fine, they had

19   discussions.  I have no doubt that they did.  There has

20   been no evidence as to what was discussed and I'm not

21   sure how they would get into it because it's mediation

22   privileged.

23            But to be honest with you, I think that the

24   -- to now try and say, hey, we're going to keep on

25   expanding this, keep on expanding this.  At some time,

1    Beasley Allen and Andy Birchfield are entitled to a

2    determination, whether the motion for disqualification

3    is going to be granted or not.

4              And you -- Judge Singh asked pointedly, is

5    the record complete?  And Mr. Brody said, pointedly,

6    yes.  I was surprised by the answer but he pointedly

7    said yes.  He didn't say, I want more stuff in there.

8    And to me, if we open this, there is another set of

9    documents that could also come in because Judge Snyder

10   ruled upon those.

11             We could just keep on expanding this but at

12   some point, we have to reach the hard point where we

13   make a decision and I'm relying upon representation

14   that was made to the Court that we're done.

15             MR. BRODY:  Your Honor, this privilege log

16   was just provided by the Plaintiff Steering Committee,

17   in the M.D.L., about two and a half weeks ago.  It was

18   a shock to us, to learn that there were communications

19   going on, back and forth, between Mr. Birchfield and

20   Mr. Conlon, for a period of, starting at late-April of

21   -- starting in late-April of 2023 and the extent of

22   those communications.

23             And it is certainly a fact that is directly

24   relevant to the disqualification motion.  It's been

25   filed in court, it is on the docket in the M.D.L. and

1      obviously, Your Honor under 201:B-4, you can take

2      judicial notice of the records and court proceedings

3      throughout the State of New Jersey, federal court or

4      state court.

5              MR. POLLOCK:  May I respond briefly, Judge?

6              THE COURT:  Well, hold on.  Let me see if

7      Judge Singh has some thoughts.

8              JUDGE SINGH:  No, it's interesting because

9      the privilege log is on the public docket in the M.D.L.

10     and it's, as I understand it, Judge Snyder has ruled in

11     regards to those documents are to be maintained as

12     privileged, however, the fact of the communications

13     within the law, it's hard to close that once it's

14     already on the docket.

15             I personally would think it is part of the

16     record and something that the Court could consider, at

17     least in the context of my review but I defer to Judge

18     Porto as to your comfort level.

19             THE COURT:  And I agree but what troubles me

20     is, Mr. Haas has not seen that.  And when we talk about

21     the record being open, the record being closed.  I'm

22     just learning about that today.  I didn't get any

23     indication that, that was a possibility, two weeks ago.

24             MR. POLLOCK:  Your Honor, actually, this

25     referenced in Mr. Birchfield's supplemental

 1    certification.  So this is not shocking news but the --

 2              THE COURT:  No but the fact is, it is in the

 3    context of, I don't know what we're talking about.

 4              MR. POLLOCK:  I agree completely.  So I'm not

 5    prepared to proceed, I do not want to delay the

 6    deliberations.  The mere fact that I have not reviewed

 7    them does not stop me right now because frankly, under

 8    the mediation privilege, these documents are going to

 9    be inadmissible anyway.

10              They are non-discoverable under New Jersey

11    Law.  So the fact that they communicated, I'll

12    stipulate to it, they communicated.

13              THE COURT:  And I will take judicial notice

14    of that being on the docket.

15              MR. BRODY:  And -- yeah and Your Honor, let

16    me just ask this question to Mr. Haas, as a follow-up.

17    BY MR. BRODY:

18         Q    Did it -- I mean, did it surprise you to

19    learn two weeks ago that these communications had been

20    going on back and forth throughout May, June, July and

21    August of last year?

22    A    I think what I said was, I was shocked and

23    appalled and yes, it surprised me.  It surprised me

24    that someone who had purported to have the caliper of

25    standing in the bar that Mr. Conlon did, would engage

1    in this behavior.

2        That Mr. Birchfield would further foster,

3    facilitate and engage in that conduct, is the most

4    egregious breach of ethical obligations I have ever

5    heard of, ever seen.  So yeah, it surprised me, it

6    shocked me, it disappointed me, quite frankly, in many

7    respects, with respect to Mr. Conlon, in terms of his

8    standing as a lawyer.  And as, quite frankly, a trusted

9    advisor of mine for a good part of the time we worked

10   together.

11       Q    Are you aware that the Plaintiff Steering

12   Committee in the M.D.L. has taken the position that

13   it's communications with Mr. Conlon are confidential

14   and protected by a mediation privilege?

15   A    I'm aware that they've taken that position.

16       Q    That their communications should remain

17   secret from J and J?

18   A    Yes, they've taken that position.

19       Q    Would you have taken steps, if you had known

20   at the time, to prevent Mr. Conlon from working with

21   Mr. Birchfield, with Ms. O'Dell and others at Beasley

22   Allen, during the course of the L.T.L. mediation?

23   A    I think we would be exactly where we are today but

24   we would have been there a lot earlier because I would

25   have taken immediate action, had I known this was

E. Haas - Direct                              61

1    occurring.

2        And quite frankly, I think this would be an issue

3    that would have been adjudicated in the context of the

4    bankruptcy court because to have someone side-switch in

5    a matter where you're dealing with the same issues, the

6    very same issues, that we have extensively adjudicated,

7    deliberated, considered, communicated, is egregious.

8        Q    Turning back to Hearing Exhibit 4, that was

9    the October 18th e-mail.  How did J and J, other than

10   you indicated that you started looking with counsel

11   about what you could do about the fact that Mr.

12   Birchfield, that you weren't at that time, for the

13   first time, that Mr. Birchfield was working with Mr.

14   Conlon, as to the substance of the proposal.  What did

15   Johnson and Johnson do, how did Johnson and Johnson

16   respond?

17   A    Well, in terms of whether or not we were going to

18   sit down with Mr. Birchfield and Conlon to talk about a

19   proposal, that clearly was inappropriate and was

20   rejected.

21       Q    Fast-forward to two weeks later and if you

22   would turn to, it's Tab 15 in the binder.  And I'll ask

23   you if you recognize this document?

24   A    This is a document that is an article that Mr.

25   Conlon secured publication for on November 2nd, 2023

E. Haas - Direct                                    62

1    and that got significant pick-up in the press.  And in

2    this article, Mr. Conlon begins by stating that, he is

3    a former Austin (indiscernible) structuring chair and

4    that he's proposing an alternative to the Texas Two-

5    Step that provides finality to the company and relief

6    to injured plaintiffs.

7         And from the outset, what struck me when I read

8    that very first line, that he did not mention Faegre

9    Drinker, which is the company he was working at, the

10   law firm he was working at, when he was representing

11   Johnson and Johnson and that omission immediately

12   struck me as telling.

13        And as you read through the rest of the article, I

14   think it becomes evident why because in this article,

15   he takes positions directly adverse --

16             MR. POLLOCK:  Your Honor, this is narrative

17   testimony.  I recognize this is direct examination but

18   to me, if I wanted a lecture, I could listen to it.

19   Otherwise, it's literally just plug and play here.  I

20   think there should be questioning, with all due

21   respect, it's your courtroom.

22             THE COURT:  Mr. Brody?

23             MR. BRODY:  Mr. Haas --

24             THE COURT:  I don't -- you know, there are

25   some aspects where a narrative is certainly appropriate

E. Haas - Direct                                    63

1      but if we could have direct testimony, guided by

2      questions.

3              MR. BRODY:  Your Honor, I'll just ask two

4      questions and I think we can address this.

5              THE COURT:  Sure and I'm not suggesting, you

6      know, anything is improper.  You know, we have an

7      objection and if we could refocus and then have the

8      question direct the witness.

9              MR. BRODY:  Yeah, of course, Your Honor.  No,

10     absolutely.

11     BY MR. BRODY:

12         Q    Were you upset when you saw this?

13     A    I was upset.

14         Q    Why were you upset?

15     A    Because if you look at the second paragraph, it

16     pertains not only to other companies but L.T.L.  So Mr.

17     Conlon is purporting to write as a Sidley partner,

18     disregarding the time frame that he represented the

19     L.T.L. and he's writing an opinion piece about L.T.L.

20     that then addresses the matters and the issues that he

21     worked on for us.

22         And that second paragraph, at the top there where

23     he says, these are a list of failed attempts to engage

24     in this restructuring and he lists Bestwell, D.P.M.P.,

25     L-Didge Pump, Murray Boiler.  I would note from the

 1    outset, those aren't failed attempts.  Those other

 2    entities are going forward with this very restructuring

 3    that we had in L.T.L.

 4         The only difference between the two is, they're in

 5    the Fourth Circuit, where they are moving forward.  And

 6    the ability to move forward with that transaction is

 7    being appealed up to the Fourth Circuit but the

 8    bankruptcy courts have endorsed it.  While in the Third

 9    Circuit, given the new standard the Third Circuit

10    imposed, L.T.L. is now appealing the motion -- the

11    decision to dismiss.

12         That's a circuit split, which ultimately will be

13    resolved by the higher courts.  But it is important to

14    note there that, this is an inaccurate statement from

15    the outset, framing the issue.  But what's more

16    important as it goes on in the article is he actually

17    takes position with respect to what the companies,

18    including L.T.L.'s positions were, what the companies

19    believed.

20         He's representing in an article what we believed.

21    That's based upon his communications with us, while he

22    was our counsel.  And this was a part of his alliance

23    with Mr. Birchfield, who came out the same day with a

24    press release supporting it.

25         So this is part and parcel of the facilitation of

E. Haas - Direct                                    65

1    attempts to come out with a competing proposal to

2    thwart the proposal that we were having discussions on

3    at this very time.

4        And Judge, it's just for a little context.  So

5    after the July --

6                MR. POLLOCK:  Your Honor, again, if we could

7    have some questioning, it would be helpful for a break,

8    as opposed to a narrative.

9                THE COURT:  I think that's appropriate.  So

10   why don't you guide the questioning again, Mr. Brody.

11               MR. BRODY:  Sure.

12   BY MR. BRODY:

13       Q    Mr. Haas, you explained why this was

14   upsetting to you and why it was a concern to you.  If

15   you would, please explain, you know, did you see this

16   in the context of the overall effort by Mr. Conlon and

17   Mr. Birchfield to advance their proposal as something

18   other than the bankruptcy proposal that you had

19   indicated publically on October 17th of last year, that

20   the company preferred?

21       A    Yes.  So earlier, Mr. Brody made reference to the

22   October 17th earning statement that I made.

23               THE COURT:  Call.

24               THE WITNESS:  Earning call, very good, Judge.

25   On that call, I made a statement about what our

1    strategy was following the July 28th, 2023 dismissal by

2    Judge Kaplan.  What I explained on the call was, we had

3    a multi-step strategy to move forward in order to

4    obtain a complete and final resolution of the talc

5    claims.

6                 The first one we already discussed which was

7    appealing the circuit split now up to the higher

8    courts.  The second proposal, which I made publically,

9    the second pathway that I explained publically, was to

10   pursue a resolution, a consensual resolution, through

11   bankruptcy again.

12                Now, why was that?  In the July 28th, 2023

13   decision by Judge Kaplan, he found that the parties,

14   L.T.L. and the majority of claimants that were

15   supporting the plan, had made, in his terms, remarkable

16   progress toward getting a equitable and final

17   resolution.

18                And then, he thereafter, strongly recommended

19   and urged the parties to continue to pursue that

20   resolution through another bankruptcy.  So I made clear

21   on the earnings call that, that is exactly what I

22   intended to do, with the same amount that we were

23   proposing through the prior bankruptcy --

24                THE COURT:  $9.9 million?

25                THE WITNESS:  It was 8.9, yeah.

1          THE COURT:  8.9.

2          THE WITNESS:  Yeah and this proposal that was

3      being proposed by Mr. Conlon with Mr. Birchfield,

4      contemplated a $19 billion resolution and was

5      attempting to garner support through these articles to

6      oppose, to thwart, our ability to get a resolution.

7          So that is why I viewed this as part of the

8      alliance between the two, in order to thwart our

9      efforts for a comprehensive resolution because Mr.

10     Birchfield doesn't want a resolution and bankruptcy for

11     the conflict that we've previously discussed.

12     BY MR. BRODY:

13     Q    And just for the record, you referred to a

14     contemporaneous publication or near-contemporaneous

15     publication the same day by Mr. Birchfield.  Do you

16     recognize that as what is behind Tab 18 in the binder?

17     A    Yes, I do.

18     Q    All right.

19     A    And this was picked up by a number of different

20     media outlets.

21     Q    And then moving ahead, you mentioned the $19

22     billion that was attached to the Birchfield-Conlon

23     proposal.  When did you first learn that there was a

24     $19 billion price tag attached to their proposal?

25     A    On November 19th, notwithstanding our repeated

1    rejections of the proposal that --

2         Q    November 9th, I believe.

3    A    Excuse me, quite correct.  November 9th,

4    notwithstanding that we had repeatedly rejected Mr.

5    Conlon's proposals over the course of years but also

6    through the iterative requests since the dismissal of

7    the bankruptcy.  On the 9th, he circumvented not only

8    me but then he circumvented the Treasurer and he sent a

9    correspondence directly to our C.E.O.

10        And in that -- correspondence, he purported to say

11   the Board, quote, "Must consider this proposal," and in

12   that, he described the proposal that he had developed

13   with Mr. Birchfield that was demanding a $19 billion

14   payment to Legacy in order to resolve the talc claims

15   by taking them off of the company's books through this

16   structural optimization move, which we had already been

17   advised would not work.

18        Q    And if you would, in the binder, if you

19   could, just refer to the Document 7 and let me know if

20   that's the communication you're referring to?

21   A    Yes, this is the document I was referring to and

22   --

23        Q    Now, let me preface it with a question, first

24   of all.

25   A    Sure.

E. Haas - Direct                                    69

1      Q    The -- the document indicates in the second

2   paragraph -- this is a letter from Mr. Conlon; is it?

3   A    Yes, it is.

4      Q    And it attaches, at the last page, a proposed

5   settlement matrix; do you see that?

6   A    Yes.

7      Q    Is this the first time the settlement matrix

8   associated with the Conlon-Birchfield proposal had been

9   shared with you?

10  A    It was.

11     Q    Okay, all right.  If you turn back to the

12  first page of the document, there's an indication in

13  the second paragraph of Mr. Conlon's letter that,

14  "Importantly, Legacy's proposal has been reviewed and

15  supported by leadership counsel on both the Federal

16  M.D.L. and in State Court cases across the country."

17  Do you see that?

18  A    Yes.

19     Q    So what was your reaction to the fact that

20  you were being told that, this proposal had been shared

21  by Mr. Conlon and Mr. Birchfield with Plaintiff's

22  Counsel, your opposing counsel, before your former

23  lawyer brought it to you?

24          MR. POLLOCK:  Objection, Your Honor, the

25  document doesn't state that, on its face.  It doesn't

1    say Mr. Conlon shared this with anybody -- Mr.

2    Birchfield shared this with anyone.

3             THE COURT:  Mr. Brody?  I see the sentence.

4             MR. BRODY:  I'll just ask --

5             THE COURT:  Yeah.

6    BY MR. BRODY:

7        Q    What was your reaction to this?

8        A    My -- again, I found this completely remarkable

9    because this is a further disclosure of just how far

10   the communications between Mr. Conlon and Mr.

11   Birchfield had gone and what the considerations were.

12       If you go to the final page that Mr. Brody just

13   referred to, the settlement matrix, which involves a

14   per claim analysis and across the top and along the

15   columns on the side, you'll see the various criteria

16   that go into the development of the per claims amounts.

17       And there's a huge amount of deliberation and

18   consideration that goes into that and the idea that Mr.

19   Conlon, our former counsel who had engaged in

20   discussions of the pluses and minuses, of the strengths

21   and the weaknesses, of the disadvantages and the

22   advantages of different offers to us and where we stood

23   to be in a better position, where we stood to be in a

24   more challenging position, is egregious.

25       I mean, he is effectively taking our inside

1    perspective and providing it to the alliance with Mr.

2    Birchfield so that they can thwart our offer.  It's

3    really beyond the pale.  And the idea that our counsel

4    is now our primary adversary and aligned with the lead

5    adversary in the Talc litigations, which they purport

6    to be in each of these forums, it's just amazing.

7         And I really, I am almost at a loss of words about

8    how upsetting this was when we saw this and how

9    upsetting it was for the organization.

10              MR. POLLOCK:  Your Honor, I move to strike

11   all the testimony regarding Andrew Birchfield, as there

12   is zero support anywhere from Mr. Haas that Mr.

13   Birchfield had anything to do with this communication.

14   He keeps on railing on my client, as he's entitled to

15   do.

16              He can dislike him as much as he wants.  I'm

17   entitled to proof.  There is no evidence that Mr.

18   Birchfield ever had any participation in this document.

19              THE COURT:  Mr. Brody?

20              MR. BRODY:  Your Honor, Mr. Haas has just

21   testified to two weeks, three weeks, prior to when this

22   document was sent.  He got a communication from Mr.

23   Conlon saying that he had developed a settlement matrix

24   and that Mr. Conlon and Mr. Birchfield were prepared to

25   come in together and discuss it.

E. Haas - Direct                                      72

1              And this follow-up communication says

2      specifically that the proposal has been reviewed by

3      leadership counsel in the Federal M.D.L. and the State

4      Court.  It's not, you know, that's a -- I don't think

5      it's a valid objection.  It's a subject for cross

6      examination and I'm sure that Mr. Pollock can ask Mr.

7      Haas questions about that.

8              THE COURT:  I'm going to overrule the

9      objection.  It will be subject to cross examination.

10             MR. BRODY:  Thank you.

11             THE COURT:  Which, we're going on about an

12     hour and a half now.  Is anybody looking for a break?

13             MR. BRODY:  I just, if possible, Your Honor,

14     I have about four or five more questions total.

15             THE COURT:  That's fine but I think it was an

16     appropriate time to ask that question.

17             MR. BRODY:  Certainly.  We can break now, if

18     you prefer.

19             THE COURT:  No, I'm not going to break the

20     momentum but you may continue.

21             MR. BRODY:  Sure.

22     BY MR. BRODY:

23        Q    Mr. Haas, I want to draw your attention to a

24     sentence that starts at the bottom of the first page of

25     this November 9th letter.  With the word indeed.  He

E. Haas - Direct                                    73

1   wrote, "Indeed, if such a plan were confirmed, it

2   simply cannot free J and J of its direct liability."

3   Do you see that?

4   A    I do.

5        Q    And was that something that caused you

6   concern?

7   A    He's speaking to the plan that we're proposing.

8   There is our former counsel who provided advice on that

9   very issue, inconsistent with what he's saying here but

10  he's basically taking a position with respect to a plan

11  we are currently proposing that has been deliberated

12  extensively over the course of the time frame in which

13  he was our counsel and now he's going out and opining

14  that it will never work.  This is our advocate,

15  advocating against us.

16       Q    Have you learned, Mr. Haas, that not only is

17  this something that was being advanced through the

18  Bloomberg article and the press release that we saw

19  from November 2nd in the media but also that, it was

20  being advanced with the investment community?

21  A    So immediately after receiving this, I sent an e-

22  mail to Mr. Conlon's firm saying; stop it, you're

23  breaching your ethical obligations.  Ignored.

24       On the 15th of November, I believe that was the

25  right date, we received notice that Mr. Birchfield and

E. Haas - Direct                                74

1    Mr. Conlon were then pending an investor conference,

2    the Gordon Haskett Conference, in which they were going

3    to present this very proposal.

4            MR. POLLOCK:  Objection, speculation as to

5    what they were going to present.

6            THE COURT:  Sustained.

7    BY MR. BRODY:

8        Q    I'm sorry, did you at that time come to have

9    an understanding of what they were going to present?

10   A    We were advised that Mr. Birchfield and Mr. Conlon

11   were making a proposal at an investor conference, the

12   Gordon Haskett Conference, regarding the resolution of

13   the talc claims.

14           MR. POLLOCK:  Same objection, Your Honor.  We

15   were advised.  Rank hearsay, I move to strike.

16           THE COURT:  I agree, I sustain the objection.

17           MR. BRODY:  That's fine, Your Honor.

18   BY MR. BRODY:

19       Q    Mr. Haas, before we conclude, I want to bring

20   you back to last summer.  What was going on in the

21   L.T.L. bankruptcy last summer when Mr. Conlon was

22   engaged in these, what they say are, privileged

23   communications with Mr. Birchfield and Ms. O'Dell and

24   others at Beasley Allen?

25   A    There was extensive motion practice.  The motion

1    to dismiss that Mr. Beasley -- Mr. Birchfield was

2    leading.  There was extensive discovery with respect to

3    that, motion practice.  It ultimately culminated in a

4    week-long hearing on a motion to dismiss, followed by

5    extensive post-trial findings of fact and conclusions

6    of law.

7         I suffice it to say there were myriad

8    opportunities for either Mr. Conlon or Mr. Birchfield

9    to disclose the alliance that they had formed at that

10   time and not once, not once in any of those motions,

11   submissions, discoveries, including the deposition of

12   Mr. Birchfield or in the week-long intensive hearing

13   followed by a full briefing on the motion to dismiss,

14   did they ever disclose that Mr. Conlon was working with

15   Mr. Birchfield.

16        And Mr. Conlon never approached me for a waiver or

17   anyone at my firm and never once asked for consent to

18   engage in that relationship, not once.  There were

19   untold opportunities to do so and he never did.

20        Q    And is it concerning to you now to know that

21   while Johnson and Johnson was engaged in mediation with

22   the T.C.C. in the L.T.L. bankruptcy, that your former

23   lawyer Mr. Conlon was communicating directly,

24   collaborating directly, with Mr. Birchfield and his

25   firm, on the other side of that mediation?

E. Haas - Direct                          76

1          MR. POLLOCK:  Objection to the word

2     collaborating.  Again, it is conspiracy either in the

3     cover of darkness.  They were working together, yes but

4     there's no proof of anything else beyond the fact that

5     they were communicating.

6          THE WITNESS:  I can answer without

7     (indiscernible)

8          THE COURT:  May be a choice of word?

9     BY MR. BRODY:

10    Q    It may be a choice of word and Your Honor, we

11    will definitely get to collaborating today but for now,

12    I'll just ask you.  Knowing now what you know from the

13    privilege claims that have been asserted by the

14    Plaintiff Steering Committee and what you know about

15    the work, communications, that were going on, in

16    secret, on the other side of that mediation; is that a

17    concern to you?

18    A    I go back to what I said earlier.  This

19    fundamentally undermines the entire judicial process.

20    It provides an unfair advantage to an adversary in an

21    adversarial system.  The conversations that were being

22    had by the disclosures in the privilege log and based

23    upon the declaration submitted by Mr. Birchfield,

24    indicated they involve the same matters and the same

25    issues for which Mr. Conlon was representing us.

E. Haas - Direct                          77

1          Having those communications, by their very nature,

2     is a violation of his duties to us because those

3     conversations necessarily are imbued with the

4     confidential work product, privileged information we

5     conveyed to Mr. Conlon and at extensive discussion and

6     deliberation.

7          So I go back to the core principal, it contravenes

8     the judicial process, it's contrary to the interest of

9     justice and it fundamentally undermines the adversarial

10    system.

11         Q    Was Mr. Conlon privy to privileged and

12    confidential information about J and J's negotiating

13    strategy, in its attempt to resolve the litigations

14    pending in New Jersey and in the M.D.L., that you

15    believe would be directly relevant to the L.T.L.

16    bankruptcy mediation that went on last summer?

17              MR. POLLOCK:  Your Honor, I object.  There

18    has been multiple efforts at a settlement.  There was

19    an effort within Amyris, there was an effort within

20    L.T.L., then there was L.T.L.2, there's been mediation

21    before people.  I have no clue what time period we're

22    asking about --

23              THE COURT:  Well, it was last summer.  Any

24    particular time --

25              MR. POLLOCK:  Is that the only time period?

E. Haas - Direct                                78

1          THE COURT:  Yeah, that was the time period.

2          MR. BRODY:  My question --

3          THE COURT:  Right, was that it?

4          MR. BRODY:  I can rephrase it, Your Honor.

5          THE COURT:  Okay.

6     BY MR. BRODY:

7          Q    My question is, based on your knowledge of

8     the privileged and confidential communications that Mr.

9     Conlon was exposed to, whether it be talking about

10    potential resolution for the tort system, resolution

11    through the Amyris bankruptcy, resolution through

12    M.D.L., are those confidential and privileged

13    discussions that he was involved in relevant to the

14    mediation that took place last summer?

15         MR. POLLOCK:  Your Honor, again, same

16    objection.  Multiple discussions regarding M.D.L.  I

17    can't even remember what the litany was, it was that

18    long.  I am entitled, when my client is accused of

19    having violated the Rules of Professional Conduct, to

20    some facts.

21         That's what _True-Post_ says, I'm entitled to

22    some facts.  I would like to know what discussions,

23    what date, what year, where were they, what happened?

24    Because right now, I have no clue, I'm attacking a

25    boogeyman.  I can't do it if I don't know what it looks

1    like.

2              THE WITNESS:  I can answer without

3    (indiscernible)

4              THE COURT:  Well, I understood the question.

5    Mr. Haas, you understand the question.

6              THE WITNESS:  Yes, sir.

7              THE COURT:  So I'm overruling the objection

8    but you know, the time frame is last summer.  So is it

9    June, July, August?  July, June, August, what's, in

10   terms of summer?

11   BY MR. BRODY:

12        Q    My question is, is the privileged and

13   confidential information that Mr. Conlon learned during

14   the 20 months that he represented J and J relevant to

15   the mediation discussions that were going on in May,

16   June and July of last year, in the L.T.L. bankruptcy?

17             MR. POLLOCK:  This is precisely my objection,

18   Your Honor.  He is morphing time frames.  He is not

19   talking about after Mr. Conlon formed Legacy.  He is --

20   Mr. Brody is asking about all this stuff you learned

21   beforehand, whatever that time period was, is it

22   relevant to what's occurring now.

23             And if that's true, if that's really his

24   question which I think it is, I would like to know

25   which one, Amyris, L.T.L.?  Which discussions, where

1    did they occur, what was discussed?  Because I have no

2    idea how to value relevance.  UNA says clearly, you

3    have a Hobson's choice.  Put the documents in or tell

4    us what the discussions are or you don't have the

5    argument.

6            What they want to do is have the best of both

7    worlds.  They want to say, I'm not going to give you

8    the facts but it's generally true, we talked about some

9    stuff and it's relevant to now.  I want to know, if

10   we're going to go here and this is our big wind-up, I

11   would like to know exactly what was discussed and when.

12           THE COURT:  Well, one of the points raised in

13   one of the certifications, I think it was probably Mr.

14   Birchfield saying, whatever Mr. Conlon learned, it's

15   now dated.

16           MR. POLLOCK:  Correct.

17           THE COURT:  Right?

18           MR. POLLOCK:  Yes, sir, that's exactly my

19   point.

20           THE COURT:  Well and now -- and I'm not

21   making anybody's argument here but Mr. Brody is now

22   saying, is it now irrelevant in contrary to the dated

23   statement?  So I'm going to overrule the objection.

24   You can ask that question.  Do you understand that

25   question (indiscernible)

1          THE WITNESS:  I do, Judge and I think I can

2     answer it because I think it goes exactly to that

3     point.  Because what we were discussing through that

4     time frame when Mr. Conlon was representing Johnson and

5     Johnson, is relevant to each of the mediations and to

6     what currently is going on now because it's the same

7     issues and the same deliberations that were pertinent

8     during the time frame when he was counsel are pertinent

9     now.

10          Because what form, what structure, what are

11     the advantages and disadvantages of both?  What -- how

12     do you value the claims, both from the current claims

13     and the future?  Those same claims -- and keep in mind,

14     the one thing that is significant here in terms of

15     timing is that time froze during the time frame the

16     bankruptcies were in place, October of 2021 through

17     July 28th, 2023 because of the automatic stay.

18          So all of those factors that were discussed

19     are highly pertinent to the resolutions throughout that

20     period and the discussions throughout that period and

21     as they are today.  And so it is: forum, when, who,

22     aggregate claim amount, per claim amount, factors to

23     consider, how to value future claims, you know, the

24     timing of future claims, what factors go into whether

25     or not future claims are going to escalate or de-

Colloquy                                          82

1    escalate.

2              All of those things were the subject of many

3    conversations with Mr. Conlon and his views that he

4    expressed and that he commented on and that we conveyed

5    to him, are just as pertinent in those mediations that

6    happened each time because the same issues came up as

7    they are to this day.

8              So they are squarely relevant to the issues

9    and it is an unfair advantage for him to have any

10   conversations, communications, on those issues, with

11   Mr. Birchfield to develop a counter-veiling proposal

12   because necessarily imbued in those conversations, no

13   matter how he communicates, are our views.  And that

14   really, that is why this is fundamentally undermining

15   the integrity of the process.

16             MR. BRODY:  Thank you, Mr. Haas.  That's all

17   I have, Your Honor.

18             THE COURT:  We'll take a break.  Judge Singh

19   and I may have some questions.  I generally like to ask

20   questions before we go to cross examination so that

21   counsel can direct it or address it and then Mr.

22   Pollock will have an opportunity to conduct cross, all

23   right?

24             MR. POLLOCK:  Thank you, Your Honor, honors.

25             COURT OFFICER:  All rise.

1          THE COURT:  All right, we'll go off the

2     record.  Take 15?

3          MR. POLLOCK:  Yes, sir.

4          THE COURT:  All right and no discussions, Mr.

5     Haas, with counsel regarding your testimony.

6          THE WITNESS:  Yes, sir.

7          THE COURT:  Thank you.

8     (Off the record at 11:20:10 a.m., back on the record at

9                    11:40:28 a.m.)

10          COURT OFFICER:  All rise.

11          THE COURT:  Thank you, all, please be seated.

12     We have a few questions.  Where is Mr. Haas.  Mr. Haas,

13     you're still under oath.

14          THE WITNESS:  Yes, sir.

15          THE COURT:  Ms. Singh?

16     VOIR DIRE EXAMINATION BY THE COURT:

17     Q    Oh, yes, thank you.  We wanted to direct your

18     attention to the exhibit that was talked about earlier.

19     Exhibit 7, I believe it is, the November 9th, 2023

20     letter?

21     A    Yes, Your Honor.

22     Q    And we're curious about the attached matrix.

23     Has the categories within this proposed matrix come up

24     in prior mediations, settlement discussions, et cetera?

25     A    Yes, Your Honor, they have.  The age, the disease

E. Haas - Voir Dire                                      84

1    state, the severity of the disease state, the length at

2    which the disease has been -- had.  Each one of these

3    has, if you go across the top and along the column on

4    the left, each one of these are different criteria that

5    have come up repeatedly, in every single one of the

6    settlement discussions we've had, going back to I would

7    say the 2020 discussions.

8         And there's a reference in the papers about a

9    Beasley Allen proposal in the Fall of 2020.  I believe

10   it was a 3.5, a $3.25 billion proposal for an ovarian

11   settlement.  There was a grid that had these criteria

12   and others.  Again, in the Spring of 2021, there was

13   another proposal, same types of criteria.

14        What often times is, this will be the base

15   criteria and then you'll have additional considerations

16   when it's drafted up.  I will speak to other factors

17   that will increase or decrease the amount, such as

18   familial history of cancer, genetic issues that the

19   individual claimant may or may not have, time

20   limitations that may or may not impact the running of

21   the statute of limitations.

22        But those other ones are always layered on when

23   you get to the final drafting of the documents but to

24   answer your question, yes.

25             THE COURT:  Okay, thank you.  Judge Porto?

 1    BY THE COURT:

 2        Q    This matrix, when was this developed?

 3    A    Well, this particular matrix, the numbers here are

 4    different than the numbers.  The matrix concept is not

 5    new to this particular tort but the considerations and

 6    what numbers are to go in were discussed from the

 7    outset of Mr. Conlon's representation right through.

 8        Q    Specifically, which numbers?

 9    A    Which numbers?

10        Q    All the numbers, a particular category of

11    numbers?

12    A    Oh, both the aggregate and the individuals, okay

13    and that, Your Honor, that is a very good question

14    because often times, the aggregate number drives the

15    individuals.  And there are components of that, that

16    have to be taken into account, whether or not you're

17    just contemplating futures, just contemplating current

18    or a combination of both.

19        Q    So when you say within the time frame that

20    Mr. Conlon was with Faegre Drinker, those 18 months or

21    whatever it was, 21 months --

22    A    Yes.

23        Q    -- that was there?

24    A    Yes, Your Honor.

25        Q    And so we can trace that origination to that

E. Haas - Voir Dire                              86

1    particular time?

2    A    You can trace the schedules and numbers in

3    schedules and they're going to vary because of the

4    advice of counsel that was given.  Clearly, these

5    aren't our numbers because this is a $19 billion

6    number, right?

7                THE COURT:  Right.  Judge Singh?

8                JUDGE SINGH:  Nothing further, thank you.

9                THE COURT:  Okay, Mr. Brody, anything to

10   follow up on the Court's questions?

11               MR. BRODY:  Nothing to follow up, Your Honor.

12               THE COURT:  Thank you.  Mr. Pollock?

13               MR. POLLOCK:  Your Honor, is it okay with

14   you, I know I sit for part of this only because it's

15   easier for me to read my documents and there's no

16   lectern.

17               THE COURT:  That's quite all right.

18               MR. POLLOCK:  Is that fair enough?

19               THE COURT:  Yep.

20               MR. POLLOCK:  Okay.

21               THE COURT:  You can move the podium too, if

22   you --

23               MR. POLLOCK:  Yeah, I didn't want to screw up

24   your electronics and then have the Court Marshall throw

25   me out and I get in trouble, so.

E. Haas - Cross                                          87

1               THE COURT:  No, I think it's not operative

2          but your option.

3               MR. POLLOCK:  Okay, I can do it from here,

4          Judge.

5      CROSS EXAMINATION BY MR. POLLOCK:

6          Q    Mr. Haas, as you probably know, my name is

7      Jeff Pollock, I met you beforehand.  Mr. Conlon, you

8      described as a central figure but isn't it true, he

9      never entered an appearance in either L.T.L. or in

10     Amyris?

11     A    I don't think there's an inconsistency with those

12     two statements.

13         Q    Mr. Haas, I'm simply asking --

14     A    So the -- well, you prefaced it.  So if your

15     question is whether he made an appearance?

16         Q    Yes, sir.

17     A    I am not aware if he has made an appearance, quite

18     frankly.  I know that he has commented on submissions

19     in the proceeding.  So I'm not sure, quite frankly, to

20     answer your question.

21         Q    I can tell you from information and belief,

22     he never entered an appearance in either case; do you

23     have any reason to believe that's not true?

24     A    I stand on my answer, not to fight, not to

25     quibble, I just do not know whether he actually made an

E. Haas - Cross                                          88

1    appearance.  I can tell you, based upon his work, he

2    commented on submissions to the Court in both of those

3    matters.

4            So you know, often times, I would expect someone

5    who is doing so to make an appearance.  I just, sir, I

6    just cannot say one way or another whether or not.

7       Q    Fair enough.  You also mentioned you had

8    weekly standing calls with Mr. Conlon; do you recall

9    that testimony?

10   A    We had weekly standing group calls, many of which,

11   most of which, Mr. Conlon participated in.

12       Q    But you did not provide a single document to

13   support that statement; did you?

14   A    I don't think that's correct.  We do have

15   submitted, I believe, you'll have to ask my Counsel,

16   but the time records by Mr. Conlon himself.

17       Q    Actually, I want to ask you about that.  You

18   have how many lawyers representing you, approximately?

19   A    Are you talking about --

20            MR. BRODY:  Objection on (indiscernible)

21            MR. POLLOCK:  On J and J and --

22            THE COURT:  Hold on, Mr. Pollock, there's an

23   objection.

24            MR. POLLOCK:  All right.

25            MR. BRODY:  I just objected, it's unclear

E. Haas - Cross                                     89

1    whether he's asking about the entire Talc Litigation or

2    with respect to this disqualification issue.

3              THE COURT:  With regard to --

4              MR. POLLOCK:  I'll reframe the question.

5              THE COURT:  Okay.

6    BY MR. POLLOCK:

7         Q    Over the last four years, you have retained

8    as J and J multiple lawyers to represent J and J in the

9    L.T.L. and Amyris matter; correct?

10   A    Yes, sir.

11        Q    And your legal spend is well over $500

12   million in legal defense costs alone; correct?

13   A    Yes, sir.

14        Q    And in fact, it's over a billion dollars;

15   isn't it?

16   A    Yes, sir and that's one of the reasons why the

17   entity that was responsible, Johnson and Johnson

18   Consumer, Inc., was in the red.

19        Q    So you have an army of paralegals, associates

20   and legal counsel at your fingertips; correct?

21   A    I don't know if I would characterize it that way

22   but we have a lot of legal representation on the talk

23   claims writ large.

24        Q    And in your initial certification, you talk

25   about a review of -- it's your first exhibit.  You talk

1    about, it's Exhibit 1.  You talk about, you became

2    familiar with Mr. Conlon's work by review of the time

3    sheets and documents and things; do you recall giving

4    that certification?

5    A    My statement was actually broader than that.  My

6    statement was, I am familiar with Mr. Conlon's work

7    from his participation in weekly calls, from his direct

8    interactions with me both through e-mails and

9    communications.  And I also reviewed the records that

10   showed he had billed almost 1,600 hours to our firm.

11        Q    When you sign a certification under oath

12   attempting to disqualify counsel, do you understand

13   that that certification has to be truthful, accurate

14   and complete?

15   A    When I sign any certification, sir, I answer that

16   truthfully and accurately, to the best of my ability.

17        Q    And it's complete, right?  You would not

18   leave out information by way of omission; right?

19   A    I think that's kind of a vague statement.

20   Whenever I certify a statement, I attempt to certify

21   the statements therein as accurately as possible.

22        Q    Excellent.  Paragraph 3, page 1, "I became

23   familiar with work performed for J and J by Attorney

24   James Conlon of the Law Firm of Faegre Drinker, between

25   July '20 and early 2022."  Do you see that sentence?

1    A    First of all, what --

2         Q    Page -- Exhibit 1, it's Plenary Hearing 001

3    at the bottom.  Paragraph 3.  I'm just asking about

4    that one sentence, "I became familiar with work

5    performed for J and J by Attorney James Conlon, of the

6    Law Firm of Faegre Drinker, between July 2020 and early

7    2022."  Do you see that?

8    A    Yes, that's exactly what I said, sir.  I said,

9    there's two different sets of --

10        Q    What --

11   A    One said I became familiar and for the reasons I

12   state --

13            MR. POLLOCK:  With all due respect, sir.

14   Your Honor, this is your court.  I would really like to

15   conduct my questioning as opposed to getting a

16   narrative each time.

17            THE COURT:  Sure.  So Mr. Haas, if you could

18   direct your answer to the specifics as to the questions

19   asked.

20            THE WITNESS:  I believe his first question

21   was, did I become familiar by reading the time entry

22   (indiscernible) there's two different sentences.

23            MR. POLLOCK:  Actually, I'm asking you simply

24   --

25            THE COURT:  Well, he's asking about the

E. Haas - Cross                                      92

1    sentence now.

2                THE WITNESS:  Okay.

3    BY MR. POLLOCK:

4        Q    I'm asking, you wrote this sentence, right?

5    You reviewed it and you signed it; right?

6    A    I did and so if the question is, is the first

7    sentence accurate, the first sentence is accurate.

8        Q    Excellent and you were comfortable signing

9    that certification, submitting it to the Court;

10   correct?

11   A    That is correct.

12       Q    Now if you look at the next Paragraph 5, you

13   say, "Billing submitted by Mr. Conlon reflects that

14   during this period, Mr. Conlon billed almost 1,600

15   hours on the Talc matter, including 1,154 hours in 2021

16   alone.  The records reflect that Mr. Conlon billed J

17   and J $2.24 million for this work."  Do you see that?

18   A    Yes, sir.

19       Q    Have I read it accurately?

20   A    To the best of my recollection --

21       Q    But you have not produced a single one of

22   those documents here today; isn't that correct?

23   A    Are you asking whether or not we produced the

24   billing records?

25       Q    Yes, the billing records were not submitted

1    to this Court.

2    A    The billing records, to the best of my

3    understanding, are available for the Court's in-camera

4    review if the Court so chooses to review them.

5         Q    And they were not provided to the Court in-

6    camera; were they, sir?

7    A    You'll have to ask my Counsel that.

8         Q    Excellent.  Paragraph 6, "Those same billing

9    records show that during this time period, Mr. Conlon

10   attended dozens of meetings and phone calls with

11   members of the J and J Law Department, including

12   myself.  J and J's former Head of Litigation, Joseph

13   Braunreuther, Former Products Liability Lead, John Kim

14   and current Product Liability Head, Andrew White."  Do

15   you see the sentence to which I refer?

16   A    Yes.

17        Q    So in each case, you refer to billing

18   records; right?  You refer to documents you reviewed.

19   "I became familiar with," Paragraph 3, "Billing records

20   submitted," Paragraph 5, "Those same billing records,"

21   Paragraph 6.

22        Each case, you're talking about your knowledge

23   from a review of the documents, "I became familiar

24   with," as opposed to your testimony today where you

25   say; I had weekly calls, direct e-mails, matrices,

1    billing statements, in-person meetings.

2         Why the significant change in tone from your first

3    certification which talks about, I learned about Mr.

4    Conlon through the reading of his bills as opposed to

5    the testimony today which is, I know it because I

6    talked to him personally about this all the time?

7    A    There is no change in tone, sir.

8         Q    Okay.

9    A    The testimony today, as here, the testimony is

10   about what I did.  So I am attesting to what the

11   documents show here and today, I am attesting to what

12   my experiences were working with Mr. Conlon.  There is

13   no inconsistency with the two.  They are consistent and

14   they corroborate each other.  So there is no shift in

15   substance or tone or matter.  They are absolutely, 100

16   percent aligned.

17        Q    Let's look at Paragraph 7.  Conlon's time

18   entries and the billing entries show that he

19   communicated regularly.  So it's not just the effort

20   you made, it's what he did.  You're talking about what

21   Mr. Conlon did in Paragraph 7.  And you're saying this

22   based upon time entries; isn't that true, sir?

23   A    The time entries corroborate what he did.

24        Q    Correct and you don't say -- at that point in

25   time, in your certification, you never said; I

1    personally sat down with Jim Conlon, I've personally

2    worked with this guy.  What you say is, time entries

3    indicate these things; correct?

4    A    In this particular paragraph, the series of

5    paragraphs, sir, I am referring to the time records,

6    which corroborates my positions with respect to what

7    Mr. Conlon did and I don't think anybody can test that.

8        Q    So your later certification is far different.

9    There, you got -- let me just find it for a second

10    here.  It's Exhibit 13, sir.  Tell me when you're

11    ready.

12    A    Is there a particular paragraph?

13        Q    Yes, sir, Paragraph 3.  "I worked directly

14    with Attorney Conlon of Faegre Drinker when Mr. Conlon

15    represented J and J in this matter that is being

16    litigated before this Court and elsewhere.  I worked

17    with Mr. Conlon from the time I joined J and J in

18    November 2020, through February 2022 when Mr. Conlon

19    left Faegre," correct?  Have I read that correctly?

20    A    Have you read it correctly, yes.

21        Q    Yes, sir.  I'm asking you a question.

22    A    I thought you were asking me whether you read it

23    correctly.

24        Q    Yes.

25    A    I said yes.

1          Q    Excellent, I'm sorry, I didn't hear you.  The

2     $19 billion number that you mention, your testimony was

3     that Mr. Conlon and Mr. Birchfield conspired, met

4     together, worked together, pick your phrase, was

5     something that they presented was inconsistent with

6     what J and J wants; right?  The $19 billion is not what

7     J and J would like to see?

8     A    So we're off the declaration, we're onto the

9     letter?

10         Q    We're off the declaration.

11    A    Okay.

12         Q    So you testified towards the end of Mr.

13    Brody's direct.  He asked you about the $19 billion

14    number and I believe that the sum of your testimony was

15    that you believe Mr. Conlon and Mr. Birchfield

16    conspired to drive this matter to the $19 billion

17    number; is that correct?

18    A    I'm just not understanding your question, I --

19         Q    Sure.  Mr. Conlon, you testified for Mr.

20    Brody, when Mr. Brody was asking you questions on

21    direct; do you recall that?

22    A    I recall answering questions about the 19 billion.

23    Yes, sir.

24         Q    Right and isn't it your belief, your

25    testimony, that the $19 billion number was something

E. Haas - Cross                                    97

1      that Mr. Birchfield and Mr. Conlon contrived, that they

2      came up with that number?

3      A    Mr. Birchfield and Mr. Conlon together presented

4      the proposal for the $19 billion alternative resolution

5      that was at odds with the proposal that we had offered

6      and indeed, was an attempt to -- and Mr. Birchfield has

7      made no secret of this, thwart our offer and derail our

8      attempt to resolve the case for $8.9 billion, pursuant

9      to our prior proposal.

10          Q    So put simply, J and J proposes 8.9 billion.

11     You believe Mr. Conlon and Mr. Birchfield are proposing

12     roughly 19 billion?

13     A    That's what Mr. Birchfield has said in different

14     forms, including the mass tort made perfect, or mass

15     tort gone wild, whatever it's referred to, and the

16     correspondence that has been set forth into the record.

17          Q    Okay, I would really like to get a yes or no

18     to this one because it's a pretty simple question.  Am

19     I correct, J and J wants the 8.9 billion.  You believe,

20     Mr. Conlon and Mr. Birchfield was the 19 billion?

21     A    Yes, sir.

22          MR. BRODY:  Objection, Your Honor, it's been

23     asked and answered.

24          THE WITNESS:  Yeah, I just --

25          THE COURT:  Well, to the extent I think Mr.

1   Pollock wants a more direct answer, I'll overrule the

2   objection.

3            THE WITNESS:  Yeah, the answer to that

4   question is yes, sir.

5   BY MR. POLLOCK:

6        Q    Excellent.  When you talk about the matrix

7   and the matrix that we're talking here is the one, it's

8   Exhibit 7, it's the last page.  It's Plenary Hearing

9   67, sir.  Is it your testimony that Mr. Conlon got that

10  matrix from J and J?

11  A    Mr. Conlon -- again, this goes to exactly the

12  issue we just talked to the judges.  The numbers in

13  this matrix are obviously different than the matrices

14  that Mr. Conlon debated, consulted on, conferred with

15  and discussed with us.

16       My point was, in that testimony sir, is that, the

17  very nature of having those conversations with Mr.

18  Birchfield about the factors that go into these

19  matrices and whether and to what extent certain numbers

20  should be offered and certain others should not be, was

21  imbued by the privileged communications that we had

22  with Mr. Conlon.

23       Every time Mr. Conlon and Mr. Birchfield sit down

24  and talk about anything to do with this proposal, those

25  conversations necessarily implicate the attorney-client

1    privilege work product protected and confidential

2    communications that he had with us on the very same

3    topic.  So that's my position.

4        Q    Understood.  If you could answer my question,

5    that would be great.

6    A    But I did --

7        Q    If you would, sir, I'm going to ask the

8    questions.  I really need you to answer my questions,

9    otherwise, we'll be here a long day.  This is Exhibit

10   7, Plenary Hearing 67.  There is a chart, it is a

11   matrix; do you see it?

12   A    Are you talking about the exhibit --

13       Q    Yes.

14   A    -- or the Legacy chart?

15       Q    Yes.  That chart was not prepared by J and J;

16   correct?  That chart with these numbers was not

17   prepared by J and J?

18   A    That is true, sir.

19       Q    Excellent.  If we could go back to the

20   beginning of Exhibit 7.  At no point -- in fact, if you

21   look at the entirety of the document.  At no point in

22   this document anywhere does it indicate that a copy of

23   this document went to Andy Birchfield; does it?

24   A    Does the letter state that?

25       Q    Yes.

1    A    No.

2         Q    Wonderful.  If you look at Paragraph 1, page

3    7, 62, Plenary Hearing Exhibit 2.  I'll give you both

4    cites, it's the exhibit and the cite number.  It's the

5    second to last sentence.

6         It says, "For Legacy to enter into this

7    transaction, the acquired talc liable entities of J and

8    J will be required to hold assets with the present

9    value of $19 billion or such greater amount, as

10   determined by J and J's independent auditors to remove

11   from J and J's financial statements the non-cash charge

12   for talc related liabilities."  Do you see the sentence

13   to which I refer?

14   A    Yes, sir.

15        Q    Now you spoke earlier with Mr. Brody about

16   going to an auditor.  Price Lauderhaus (phonetic) is

17   the Auditor; correct?

18   A    Yes, sir.

19        Q    Who do you speak with at Price Lauderhaus?

20   A    Steven Johnson.

21        Q    And when you spoke to Steven Johnson,

22   approximately what month was it?

23   A    It was approximately -- it was sometime between

24   the September 11th meeting we had with Mr. Birchfield

25   and Doug Dachille, with our Treasurer and the response

1    to -- that we received from Doug Dachille on September

2    28th.  So it would have been in that time frame, sir.

3         Q    And Mr. Haas, you've lived through this every

4    day.  I am parachuting in for one motion, so let me

5    make sure I got this right.  When you say -- you

6    mentioned a couple of dates.  These are all in 2023,

7    the dates you just gave?

8    A    Yes, they are.

9         Q    Okay, I apologize for that.  What exactly did

10   the auditor say in response?  Did they give you a

11   written document or there was only an oral response?

12   A    There was no written document, there was an oral

13   response.

14        Q    Did they give you an e-mail?

15   A    There was no written document, there was an oral

16   response.

17        Q    Okay and I didn't mean to pick with you.  I

18   didn't know if they had written a memo or if you said

19   it was just a discussion and that's all you had?

20   A    Yes, sir.

21        Q    Who was on the phone call with you when you

22   had that discussion?

23             MR. BRODY:  Your Honor, I'm just going to

24   object.  I think we're getting outside the scope of

25   what we're here for today.

1            THE COURT:  Thank you.  Mr. Pollock?

2            MR. POLLOCK:  They opened the door to the

3    auditor's review on direct examination, which they

4    didn't need to do.  I've been objecting on scope from

5    the very outset.  So I would like a little bit of

6    leeway but I'll move on quickly after I get this

7    answer.

8            THE COURT:  I'll overrule the objection.  You

9    know, the door is open and he may pursue it.  I mean, I

10   don't know -- I'll follow your questions, Mr. Pollock.

11           MR. POLLOCK:  Okay and I intend to move as

12   quickly as I can.  As you know, on cross, I'm picking

13   pieces and moving forward.  So it may not be the

14   smoothest work ever.  I'll do what I can.

15           THE COURT:  Right, Judge Singh, that's your

16   style?

17           MR. POLLOCK:  Thank you, sir.

18   BY MR. POLLOCK:

19       Q    What did you discuss?

20   A    Well, we discussed the proposal set forth by

21   Legacy.

22       Q    And what was their analysis?  You said it

23   didn't work, that it was a bad idea, that they said

24   they would never go for it.  I can't remember your

25   exact words.  Why did Price Lauderhaus think that it

E. Haas - Cross                                103

1    was a bad idea?

2    A    My recollection, there were a number of challenges

3    with it.  First and foremost, it goes to the very

4    nature of the talc (indiscernible) had a future

5    component.

6         There was no way with any certainty, especially

7    given the adjudications that had happened up to that

8    point, to be able to, outside a bankruptcy setting,

9    ensure you got finality with respect to the future

10   claims.  Because there's, unlike bankruptcy where you

11   have the channel injunctions, I can channel by Court

12   order future claims to the trust.  You don't have that

13   in the M.D.L., so that was issue number one.

14        Issue number two, we were in a litigation where

15   Mr. Birchfield was leading an opposition to the

16   bankruptcy proposal that we had set forth and my

17   recollection that another concern of the auditors was

18   that there would be no way to reasonably estimate the

19   value in which you could actually avoid a fraudulent

20   (indiscernible) motion, in that context, given the

21   nature, the particular nature of the allegations that

22   were being made contemporaneously.

23        And so a reasoned auditor wouldn't be in a

24   position to certify the fairness of a -- an amount for

25   the purposes of divesting the talc liability into a

1    particular entity at that point in time.  So sir, to

2    the best of my recollection, those were the issues that

3    were addressed.

4        I think there were some other issues with respect

5    to credibility of the entity that we addressed in

6    certain terms.  My recollection is that, there was some

7    historical knowledge of Legacy's attempt or Mr.

8    Conlon's attempt to do this before that were looked at

9    with the scans by the auditor.

10       Q    Do you know why?

11   A    I'm sorry, what?

12       Q    Do you know why?

13   A    Do I know why?  I'm giving you my best

14   recollection, sir.

15       Q    I understand that, fair enough.  You

16   mentioned that, at one point, that if J and J had --

17   and I forget the exact line of questioning.  That J and

18   J, at least a portion of it could be in the red.  Do

19   you recall using that word earlier today?

20   A    Yes.  What I said specifically was, the entity,

21   Johnson and Johnson Consumer, Inc., was the entity

22   responsible for the talc liabilities in the United

23   States prior to any of these divisional mergers and

24   prior to going into the bankruptcy.  And in 2020, the

25   entire enterprise was in a lost position, as a

1     consequence of the Talc Litigation, notwithstanding

2     that it had a whole line of other valid and viable

3     business opportunities.

4         That is essentially, what eventually led to doing

5     the divisional merger, which is called so demeaningly

6     the Two-Step because the divisional merger takes the

7     Talc liabilities, puts it into a different entity and

8     this is what the other circuit, the Fourth Circuit

9     cases said is appropriate and I'm glad to go forward.

10        What we did is, we funded it with more recourse

11    than they had when it was -- the Talc liabilities would

12    have had when they were at J.J.C.I. with a separate

13    funding agreement.  And that is why, in our view, it

14    was an appropriate transaction and that, if we had

15    stayed in the Fourth Circuit where we filed, it would

16    have been allowed to go forward.  Different standard,

17    Third Circuit, now we're going to address it on appeal.

18        Q    So you made this argument twice now that the

19    Fourth Circuit got it right, the Third Circuit got it

20    wrong.  But the fact is, courses for courses, facts

21    matter; correct?  Here, let me try it this way.  In the

22    Third Circuit's opinion, 64 F.4th 84 at -- I'll find

23    the page here in a second.

24        "The Third Circuit found specifically, J and J has

25    an exceptionally strong balance sheet.  At the time of

E. Haas - Cross                                    106

 1    L.T.L.'s filing, J and J has well over $400 billion in

 2    equity with a Triple-A rating, $31 billion in just cash

 3    and marketable securities."  Isn't it true that those

 4    facts are not in the cases that were filed in the

 5    Fourth Circuit?  They don't have an exceptionally

 6    strong balance sheet like J and J.

 7              MR. BRODY:  Your Honor --

 8              THE WITNESS:  Wait, I can answer that.

 9              MR. BRODY:  Before you do, I'm going to

10    object, Your Honor.  We're getting, I think now, far

11    afield of focusing on the issues that we are here for

12    today.

13              MR. POLLOCK:  Your Honor, I could not

14    disagree more strongly.  He has argued twice now on the

15    record, woe is me, poor J and J, we can't afford it.

16    If I were only in the Fourth Circuit, I would be able

17    to get away with this and the Third Circuit squarely

18    said, it was not in good faith.

19              THE WITNESS:  No --

20              MR. POLLOCK:  Let me finish.  As General

21    Counsel or Assistant General Counsel, whatever he is,

22    the fact is, the Third Circuit has said, they have an

23    exceptionally strong balance sheet.  So to me, to play

24    to the news, to play to Your Honors and argue that

25    we're going to go bankrupt if we cut the deal that

1    their own experts, which I'll get to in a minute,

2    support.

3              I'm entitled to make the argument because he

4    has made the counter-argument, repeatedly, over my

5    objection regarding scope, we shouldn't be going here.

6              THE COURT:  Well, the Fourth Circuit was

7    brought up, the Third Circuit and difference of opinion

8    and you know, whether the Supreme Court is going to

9    resolve that split.  Yeah, clearly, we heard it.  I

10   haven't necessarily heard Mr. Haas say that J and J

11   can't afford it, et cetera.  That was the tactic the

12   company decided to take.

13             He addressed it, it was raised on direct.

14   I'm going to permit Mr. Pollock to address those

15   concerns but let's keep it focused.

16             MR. POLLOCK:  I got it.

17             THE COURT:  With regard to why we're here.  I

18   mean, Judge Singh and I are very familiar with what

19   happened in the Fourth Circuit, what happened in the

20   Third Circuit, Judge Ambrose's decision (indiscernible)

21   decision.  The author of the Third Circuit.  So if we

22   could get back to how that plays in and it addresses

23   why we're here, Mr. Pollock, I think we would be all

24   better suited.  But I'll give you that opportunity to

25   address it.

1          THE WITNESS:  Yeah and Your Honor, I can

2     squarely address this issue --

3          THE COURT:  Okay.

4          THE WITNESS:  -- this question quite clearly

5     and shortly and succinctly.

6          THE COURT:  Do you need the question

7     rephrased?

8          THE WITNESS:  No, I got it.  You're

9     misreading the decision and you're wrong on the facts

10     because first of all, the J and J wherewithal in the

11     context of the Third Circuit decision that came down in

12     January of 2023 concerned whether and to what extent

13     they would be able to fund, pursuant to the Funding

14     Agreement, which I had mentioned.

15          That was J and J providing supplementary

16     funding, it has nothing to do with whether the entity,

17     J.J.C.I., could have gone into bankruptcy alone because

18     it was red.  And in fact, that's why we say that our

19     transaction was extraordinarily in good faith.

20          What happened in that decision, the Third

21     Circuit said, because in its view, there was an

22     imminent financial distress because of that particular

23     backstop, then the bankruptcy proceeding of the new

24     entity L.T.L. could not go forward.

25          In the Fourth Circuit, there is, in fact, a

1    backstop by viable, healthy parent companies too.   In

2    those cases, though, the Court didn't apply an imminent

3    financial distress standard.   The Court (indiscernible)

4    and the Fourth Circuit looked to whether and to what

5    extent the bankruptcy proceeding provided a reasonable

6    way to resolve the mass tort liability that involved

7    the future components.   That, this was an appropriate

8    use of the bankruptcy process.

9            In the Fourth Circuit, the first question is

10   whether there is subjective bad faith and the second

11   question is whether there's objective futility.   And in

12   both cases, the Fourth Circuit said, no, there is no

13   subjective bad faith and no, there is no objective

14   futility because of the Funding Agreement.   So it

15   actually worked in their favor.   So that's the relevant

16   facts.

17           In the Third Circuit, because it didn't apply

18   the subjective bad faith standard, in fact, the Third

19   Circuit noted in the decision that there was no

20   subjective bad faith and the bankruptcy court has found

21   that there's no subjective bad faith by J and J.   So

22   what the Court actually held was, by doing the right

23   thing -- and the Court noted that in the footnote.

24           I believe it's Note 27, for those people who

25   might want to remind me, that it was kind of ironic

E. Haas - Cross                                    110

1      that by doing the right thing and providing the

2      funding, it couldn't meet this new standard of imminent

3      financial distress.  But my view on what the difference

4      is in the Third Circuit for the Fourth Circuit were

5      entirely correct and accurate and I believe you're

6      misconstruing the Third Circuit's decision.

7                MR. POLLOCK:  Your Honor, he mentioned that

8      they would be in the red.  I believe the Third Circuit,

9      at page 106 --

10               THE COURT:  J.J.C.I.

11               THE WITNESS:  J.J.C.I.

12               THE COURT:  They would be in the red.

13               MR. POLLOCK:  It -- well the Third Circuit

14     talks about old consumer and new consumer.  So they are

15     looking at it differently than the way Mr. Haas is

16     looking at it.  My only point is really simple.  The

17     Third Circuit looked at it and said, you've got 31

18     billion in cash and marketable securities.  That is not

19     being in the red.  But if you will, I'll move on.

20               THE WITNESS:  Sure, I can explain, Your

21     Honor.  You hit it, you hit it.  It's the new entity

22     that has the Funding Agreement that he's referring to

23     and there's a distinction, obviously, between the --

24               THE COURT:  Just as a footnote here, those

25     company differentials played a large measure in motions

E. Haas - Cross                          111

1        before our courts.

2                    THE WITNESS:  Yeah.

3                    THE COURT:  So that's not foreign to us, Mr.

4        Haas.

5                    THE WITNESS:  Thank you, thank you, Your

6        Honor.

7                    MR. POLLOCK:  You're familiar with two

8        people, Mr. Mullin and Mr. Bell?

9                    THE COURT:  (indiscernible) the microphone,

10       the witness' microphone is off?

11                   UNIDENTIFIED MALE:  I can't hear.  I can't

12       hear what he's saying from over here.

13                   THE WITNESS:  Should I -- I can try moving it

14       over here, if that helps.  Does that help you guys?  It

15       may be off.

16                   THE COURT:  It looks fine from our technical

17       standpoint.

18                   COURT CLERK:  Yeah, I'm fine.  They're not

19       microphones you can hear through the building.  They're

20       just microphones from --

21                   THE COURT:  Okay, all right, just project

22       your voice, Mr. Haas.

23                   THE WITNESS:  I'll try to speak into this if

24       it helps.  Yes, sir.

25                   MR. POLLOCK:  Thank you.

E. Haas - Cross                                    112

1              COURT CLERK:  Yep.

2       BY MR. POLLOCK:

3              Q    You mentioned earlier in your testimony that

4       you thought Mr. Conlon and Mr. Birchfield were

5       conspiring or working together against you to get the

6       19 billion number; correct?

7       A    I'm not sure I used those words but that's the

8       essence of what my opinion is.

9              Q    Fair enough.  Are you familiar with Charles

10      H. Mullin and Gregory K. Bell?

11      A    Yes.

12             Q    And they're both experts; right?

13      A    Yes, they are.

14             Q    And they are both experts retained by J and

15      J; correct?

16      A    Yes, they are.

17             Q    And they are both experts who provided expert

18      reports to Michael Kaplan, Judge of the Bankruptcy

19      Court; right?

20      A    Yes, they are.

21             Q    And as Mr. Bell says, that the range to

22      resolve -- this is page 4, would resolve to 11 to $21

23      billion.

24      A    Sir, what are you referring to?

25             Q    I'm referring to the Bell report at page 4,

E. Haas - Cross                                113

1    it's the Bell report of June 7th, 2023.  You read that

2    --

3    A    What tab is it?

4              MR. POLLOCK:  It's not in the documents.

5              MR. BRODY:  Do you have a copy of it?

6    BY MR. POLLOCK:

7    Q    I do not.  You've seen this -- I'm not

8    required to give you a copy of the document, sir.  Are

9    you telling me here today, you did not review this

10   report at some point in your life?

11             MR. POLLOCK:  That's a different question,

12   Your Honor.

13             THE COURT:  Well --

14             THE WITNESS:  Sir, I'm not telling you that

15   one way or the other.  I don't know what report you're

16   referring to and I do not know the context of the

17   statement and I would appreciate if I could at least

18   get a copy.

19   BY MR. POLLOCK:

20   Q    So you're telling me that as the person in

21   charge of Products Liability for J and J, when there

22   are a submission by two experts, going to Michael

23   Kaplan, Judge Kaplan, that you did not know, you did

24   not review those reports before they were submitted to

25   the Court?

1    A    Yeah, I didn't testify to that, sir.  I said --

2         Q    I didn't ask you -- I didn't ask you -- you

3    keep on reframing my questions.  I'm asking you a

4    simple question.  Are you telling me you did not review

5    those reports before they were filed with Judge Kaplan?

6              MR. BRODY:  Your Honor, that's a separate

7    question than the question he asked previously which

8    was --

9              THE COURT:  Well, it was.  What's the

10   question you want to ask Mr. Haas, Mr. Pollock?

11             MR. POLLOCK:  All right, I'll ask a brand new

12   and clean one.

13   BY MR. POLLOCK:

14        Q    You're familiar with these two gentlemen, Mr.

15   Mullin and Mr. Bell; correct?

16   A    Yes, they are both experts of Johnson and Johnson

17   who provided, to your point, expert reports in

18   connection with different motions, at different times

19   during the proceeding.  So I'm not sure which expert

20   reports you're referring to.  But they both have

21   submitted expert reports in connection with the

22   proceedings and cases before Judge Kaplan.

23        Q    And you care deeply about this case; don't

24   you?

25   A    The --

1          Q    L.T.L. matter?

2     A    I fundamentally feel very strongly about the talc

3     claims because having had -- every dime that does not

4     go to doing what we do in the regular course of

5     business, Mr. Pollock, which is saving people's lives,

6     is a dime that could have been used to save another

7     person's life.

8          And I think anyone who has faced that and faced

9     the diseases that we attempt to cure on a daily basis

10    would feel as strongly as I do about this case because

11    in my view, the Talc Litigation is entirely

12    unwarranted, unmerited and is depriving the company

13    from the funds that it can be using to actually save

14    lives.

15         So I care deeply about this case because our

16    number one principle and our credo is to do what's

17    right for patients.

18         Q    Excellent.  So you care deeply about the case

19    and the fact is, every day you delay, J and J earns

20    interest on the money it has not paid; correct?

21              MR. BRODY:  Your Honor, are we going to --

22    I'm going to object, Your Honor.  Is this going to turn

23    into an examination about the potential -- I mean, it

24    seems like this is now a hearing about the fairness of

25    one particular settlement offer or another as opposed

E. Haas - Cross                                116

1    to the issues that the Court is facing on

2    disqualification.

3              MR. POLLOCK:  Judge, they address directly

4    Mr. Brody.  Mr. Birchfield and they made the point,

5    pointedly, during direct examination, that Andy's sole

6    motive was; I could get a few more shekels, I could get

7    a few more dimes, if we went this way and I make more

8    money.  That came out of this witness' mouth.

9         That's exactly what he did.  He was going it to

10   attack my client's credibility and Mr. Brody instigated

11   it by saying, going, what happened in that testimony?

12   I'm entitled to respond, Your Honor.

13             THE COURT:  Overrule the objection.  He can

14   go down that road, Mr. Pollock.  Remember, we're not a

15   jury.

16             MR. POLLOCK:  I understand that.

17             THE COURT:  And you know, we can discern.  So

18   I think you've made your point with regard to the

19   difference of whatever fees may be available to your

20   client.

21             MR. POLLOCK:  Got it.

22             THE COURT:  And bankruptcy versus the M.D.L.

23   or M.C.L.

24             MR. POLLOCK:  Fair enough.

25             THE WITNESS:  Wait but --

E. Haas - Cross                              117

1    BY MR. POLLOCK:

2         Q    Let me close with one last point, then.

3    Isn't it true that your own experts, Mr. Bell and Mr.

4    Mullin, opined that the range of resolution that was

5    reasonable would be somewhere between 11 and $21

6    billion?

7    A    No, that's not right.

8         Q    Okay and so you're saying these reports are

9    not correct, they're not accurate?

10   A    No, I'm saying you don't understand what the

11   reports say and you're erroneously characterizing the

12   reports.

13        Q    I'll let the reports speak for themselves.

14   You've heard the number 11 to $21 billion; haven't you,

15   in these reports?

16   A    You're talking about --

17             THE COURT:  Could you mark for the record, at

18   least for identification?

19             MR. POLLOCK:  Absolutely.  I'll mark for

20   identification the June 7, 2023 Bell Report, which is

21   on page 4 and I'll mark it for identification.  What

22   would you like it marked as, Judge, Plaintiff's?

23             THE COURT:  Why don't you go P-1.

24             MR. POLLOCK:  P-1 and it says, the Mullin

25   Report also estimates the total present value of the --

1              MR. BRODY:  Your Honor -- I'm sorry

2        (indiscernible)

3              THE COURT:  Hold on --

4              MR. BRODY:  Mr. Pollock, I'm sorry.  If he's

5        going to be reading from the report for his

6        questioning, I think I should get a copy and I think

7        Mr. Haas should have a copy, as well.

8              THE COURT:  Well --

9              MR. POLLOCK:  Your Honor, nothing in the

10       court rules especially requires me to give them a copy

11       of my documents.

12             THE COURT:  For cross examination, no but I'm

13       just looking at, what are we marking for identification

14       purposes?

15             MR. POLLOCK:  Fine.

16             THE COURT:  So you get the P-1 is the 6-7-23

17       Bell Report.

18             MR. POLLOCK:  And P-2 would be the June 7

19       Charles H. Mullin Report and that is at pages 3 and 44

20       and I'll give Mr. Brody my own copy.

21             THE COURT:  (indiscernible) what is the

22       Mullin Report?

23             MR. POLLOCK:  It's Charles Mullin, M-U-L-L-I-

24       N, not E-N, June 7, 2023, file with Judge Kaplan and

25       I'm referring specifically to page 3 and to page 44.

1          THE COURT:  So you're questioning Mr. Haas on

2      those reports.  He hasn't seen those or at least, his

3      familiarity is as not clear today as perhaps when he

4      saw it.  So what's -- you're going to ask him questions

5      with regard to those two exhibits?

6      BY MR. POLLOCK:

7          Q    Yes and my only question is this -- actually,

8      he doesn't say he hasn't seen them.  So I'm not

9      quiveling with you but I don't -- Mr. Haas, am I

10     correct that these reports you reviewed before they

11     were filed with the Court?

12     A    If you're referring to the -- I would -- for the

13     purposes of moving along, Your Honor, I review most of

14     the expert reports that get submitted so I would

15     presume I did.  I don't know which specific ones he is

16     referring to because there are quite a few --

17          UNIDENTIFIED MALE:  I can't hear you.

18          THE WITNESS:  So there were quite a few

19     submitted by those two experts in this context.

20          THE COURT:  So you know, all deference to

21     folks in the crowd.  As long as the Court can hear, if

22     you can project your voice.

23          THE WITNESS:  I'm sorry.

24          THE COURT:  That's what's most important.

25     We're not playing to any audience (indiscernible)

1    you're entitled -- you can reconfigure your seat, if

2    you want to hear but you know, that's -- the

3    microphones are and our acoustics are what they are.

4    So, please continue, Mr. Haas.

5          THE WITNESS:  And Your Honor, if I may just

6    respond to the other question which I think the record

7    might be a little confused about whether I responded.

8    He asked whether J and J's earning interest on monies

9    that are not otherwise paid out.  We are not earning

10   interest on monies that are not otherwise paid out.

11         We are investing our monies into research and

12   development to create new drugs.  So there's no money

13   sitting aside that we're earning interest on for the

14   purposes of avoiding a settlement payment.  So that

15   statement is entirely incorrect.  What we are doing is

16   incurring hundreds of millions of dollars a year

17   litigating the Talc case, that isn't judgements.

18         I mean, we have one -- or there has been two

19   cases tried this year, they are both mistries.  So on

20   the grounds that they haven't got a unanimous verdict.

21   So they have not won a single case this year but we are

22   spending hundreds of millions of dollars on pure

23   expenses of litigating these cases, which aren't

24   otherwise going to the research and development for new

25   drugs for patients.

E. Haas - Cross                                    121

1    BY MR. POLLOCK:

2         Q    And if you continue to litigate, it could be

3    the different between $9 billion and $19 billion;

4    right?  Your hope is that you could save $10 billion

5    and litigate this matter successfully and resolve it at

6    9 billion?

7    A    No, sir.  I testified on direct that the evidence

8    on the record, in the bankruptcy is that, if we were to

9    litigate these cases at the rate we were litigating, at

10   the time we filed the first bankruptcy, it would take

11   3,800 years to get through the cases, thereby depriving

12   most claimants of any recovery whatsoever.

13        And the cost of the pure expense of litigating

14   those cases, not paying judgements but the expense

15   alone would be $190 billion.  So that would be expenses

16   that go to lawyers, that don't go to patients.

17        Q    So settling at $20 billion would be a good

18   deal?

19   A    That is not the logical conclusion one would draw

20   from that statement.

21        Q    Fair enough, let me move on.  Weil Gotshal,

22   Jones Day.  Am I correct that Weil Gotshal and Jones

23   Day were your primary lawyers in the Amyris and L.T.L.

24   matter, Jones Day with regard to the L.T.L. approach of

25   the Texas Two-Step?

E. Haas - Cross                              122

1   A    Primary -- so Jones Day was the bankruptcy counsel

2   of record for the L.T.L. matters, Weil Gotshal was the

3   bankruptcy counsel of record for the Amyris and Cyprus

4   matters, I believe.  And in terms of primary counsel,

5   again, it goes to your question earlier.  We had

6   Traurig counsel, we had Faegre Drinker counsel, we had

7   Skadden Counsel, we had King and Spalding counsel.

8        We had other counsel, all that participated in

9   these calls and each were there because they

10  contributed significant value to the deliberations.  So

11  when you say primary, it's -- those two were the ones

12  that were responsible for submissions into each court

13  but each and every one of those people on that call

14  provided significant input and advice with respect to

15  those matters.

16       And on the bankruptcy issues, sir, and on the mass

17  torts issue, Mr. Conlon purported to be the premier

18  expert in the world and it's in writing, in the

19  submissions that are in the record that, that was his

20  position.

21       Q    If I were to look at it from a billable

22  spend, am I correct that the numbers spent for J and J,

23  for legal counsel at Weil Gotshal, on Amyris, would

24  dwarf anything spent by Mr. Conlon?

25  A    On a per lawyer basis, I'm not sure that's true

1    but on an aggregate basis, I would say yes.

2         Q    So the total spend, the total amount spent,

3    hundreds of millions of dollars to Weil Gotshal,

4    roughly 2 million bucks to Mr. Conlon?

5    A    I will have to check the actual numbers to give

6    you that -- I think your prior statement was probably

7    (indiscernible)

8         Q    Excellent and with regard to Jones Day.

9    Jones Day was the one who proposed and who was driving

10   the L.T.L., the Texas Two-Step; correct?

11   A    No.

12        Q    Who was driving it?

13   A    Me.

14        Q    Okay.  Are you a bankruptcy expert?

15   A    I do not purport to be a bankruptcy expert but I

16   am the one who is responsible at J and J, first and

17   foremost for the concept and secondly, for the decision

18   whether to file and thirdly, how to go about

19   structuring that filing, with the advice of Mr. Conlon

20   sitting right behind you.

21        Q    And didn't Mr. Conlon actually tell you that,

22   at any point in time, he did not think the L.T.L. Texas

23   Two-Step was a good idea?

24             MR. BRODY:  I'm going to object --

25             THE WITNESS:  Actually, quite to the -- oh.

1          MR. BRODY:  I'm going to --

2          THE COURT:  Hold on, Mr. Haas.

3          MR. BRODY:  Sorry.  I'm going to object, Your

4     Honor because if we're going to ask about the substance

5     of communications --

6          MR. POLLOCK:  Fair enough.

7          MR. BRODY:  -- between Mr. Conlon and Mr.

8     Haas while Mr. Conlon was representing J and J's

9     outside counsel, that's privileged and I have a

10    privilege objection to that question.

11         THE COURT:  Sustained.

12         MR. POLLOCK:  Okay, fair enough.

13    BY MR. POLLOCK:

14         Q    You have provided no e-mails and no billing

15    records, no photos, anything, showing Mr. Conlon and

16    Mr. Birchfield working together; have you, other than

17    what you have in the record here today?

18    A    Other than what's in the record, have we provided

19    anything into the record?  No.

20         Q    No, let me put it this way.  You have -- you

21    said, in your initial certification, it's Exhibit 1 if

22    you want to see it.  You say, you've reviewed.  When

23    you say, you've reviewed, is it that you've personally

24    reviewed or is it the royal, we've reviewed and you've

25    had other people review the report up to you?

1          MR. BRODY:  I'm sorry, what are you referring

2     to?

3          MR. POLLOCK:  Exhibit 1.

4          THE COURT:  The declaration.

5          MR. BRODY:  Which part, though?

6     BY MR. POLLOCK:

7          Q    The declaration, "I became familiar,"

8     "Billings submitted," reflects, "Time entries reflect,"

9     Paragraph 5, "These billing records show."  They are

10    all written in the passive.  So I'm asking you, sir,

11    who actually reviewed the documents?

12    A    I reviewed them.

13         Q    So how did you actually get the billing

14    records?

15    A    I asked Mr. White who is sitting in the back of

16    the courtroom, who is in charge of the billing records

17    for the Product Liability Group, to provide them to me,

18    and he did.

19         Q    And did you also ask for all e-mails and

20    memoranda that Mr. Conlon had written?

21    A    In connection with this matter?

22         Q    Yes, sir?

23    A    I do not know whether I made that specific

24    request.  I do recall asking for records that he had

25    provided and communications from them.  I'm not exactly

1    sure how I framed it, sir, that's all.  The gist of it

2    was, I did ask for documents that Mr. Conlon had sent

3    and drafted.

4        Q    Did you reach out to the law firms that you

5    work with, Jones Day, Weil Gotshal, Faegre and ask

6    them; hey do you have any documents regarding what Mr.

7    Conlon worked on while he was at Faegre Drinker?

8    A    I don't believe I -- I certainly did not do that,

9    I don't believe anyone did, no.

10       Q    Okay and so with regard -- and you've

11   produced to the Court here all the documents you have

12   regarding any communications between Mr. Conlon and Mr.

13   Birchfield; correct?

14   A    I don't know that I could say that specifically

15   because he might have been on submissions to the Court,

16   where they are both on there.  I don't think that was

17   the purpose of the submissions.  The purpose of the

18   submissions were designed to provide an indication of

19   what Mr. Conlon did to demonstrate that he worked on

20   the same matters and the same issues that he's now

21   taking positions with Mr. Birchfield that are adverse

22   to J and J.

23       So the intent wasn't to do a comprehensive dump of

24   every document that the two might have been on.  So I

25   would expect, sir, quite frankly, I would expect that

E. Haas - Cross                                127

1    there are documents that involve transmission of court

2    documents, for example but the answer is, no, that was

3    not the objective of this (indiscernible)

4        Q    You used -- and I don't have your exact

5    words, so I apologize.  It's either conspire, work

6    together or you know, joining forces against J and J,

7    it's all the same concept.  If you had any proof that

8    Mr. Conlon had disclosed confidential and privileged

9    information to Mr. Birchfield, am I correct, you would

10   have produced it to the Court for the hearing today?

11   A    Sir, I think I addressed this on direct which is

12   to say, the record demonstrates that as early as April

13   20th, 2023, Mr. Conlon and the Beasley Allen Law Firm

14   were having myriad discussions relating to a settlement

15   proposal and including a structural optimization

16   proposal.

17       First, for discussion with the mediators and

18   thereafter, for presentation in connection with

19   opposing our plans.  So the record demonstrates that.

20   The record demonstrates that the proposals have the

21   same and implicate the same matters and the same issues

22   that Mr. Conlon represented us and gave us advice on

23   and had communications with inside counsel and outside

24   counsel.

25       And as I testified, those conversations

1    necessarily are imbued with Mr. Conlon's confidential,

2    privileged and work product information that he

3    obtained from Johnson and Johnson, so I disagree with

4    your proposition.

5        Q    Excellent.  So with regard to -- we'll go to

6    necessarily imbued for a second.  Let's assume, for the

7    sake of argument, that Mr. Conlon understands RPC-1.9.

8    Now, he understands he has an ongoing duty to keep and

9    maintain confidences that belong to J and J.  I just

10   want you to assume that for one second.

11       What facts do you have, in your possession,

12   custody or control, that he ever shared any of those

13   confidences with Mr. Birchfield or Beasley Allen?  I

14   understand your theories, I understand your concerns.

15   What facts do you have?

16   A    I just told you them --

17       Q    Excellent, so those are all the facts you've

18   got?

19   A    I just told you the facts that I have and the very

20   nature of the communication, the very nature of the

21   position, where the two are collaborating on the same

22   issues, where you have a side-switching counsel who is

23   now working with our adversary on the same matters and

24   the same issues.  And I fundamentally disagree with

25   your proposition which is embedded in your question, as

1     is to what is the requisite showing under Rule 1.9, as

2     well?  But fundamentally, I've already answered your

3     question.

4          Q    Okay.  So I am correct in understanding that

5     the totality of the facts that you have in your

6     possession, custody and control, that Mr. Conlon ever

7     shared anything that was a secret J and J piece of

8     information, is in the binder in front of you?

9     A    Once again, no.

10              MR. BRODY:  My objection is -- sorry, it

11    mischaracterizes his testimony but he can answer.

12              THE WITNESS:  That would be no, that

13    mischaracterizes my testimony.

14    BY MR. POLLOCK:

15         Q    All right, so what other documents do you

16    have?

17    A    I just told you that it's based upon my testimony

18    and the documentation and the nature of the

19    relationship and I just walked through with you, as I

20    did on direct, what was the basis for my view of the

21    nature of the relationships which necessarily had

22    demonstrated an egregious breach of Mr. Conlon and Mr.

23    Birchfield's ethical obligations.

24         You can't have someone who is sitting on that side

25    of the table, walk to that side of the table and say,

1   oh I didn't tell him anything but I'm going to work

2   with him against you on that side of the table.  That's

3   an egregious side-switching violation of the ethics.

4   So if you're asking my opinion because --

5               MR. POLLOCK:  I'm not asking your opinion.

6   I'm asking for facts, sir.

7               THE WITNESS:  Because -- you presented me

8   with a hypothetical --

9               MR. POLLOCK:  Sir, I'm asking you for facts.

10              THE WITNESS:  Sir, you presented me with a

11  hypothetical -- and if you want that, I will answer it.

12              MR. POLLOCK:  I did not, I'm asking for

13  facts.  Those were two different -- that was two

14  questions ago.  Go ahead, I'm asking you for facts.

15              THE COURT:  Calm down.  All right, pose your

16  question, Mr. Pollock.

17              MR. POLLOCK:  Yes, sir.

18  BY MR. POLLOCK:

19       Q    You say, necessarily imbued.  You've used

20  that phrase several times today, necessarily imbued.

21  When I -- necessarily imbued.  Is that another word

22  for, the appearance of impropriety; it looks wrong, it

23  doesn't sound right?

24  A    No.

25       Q    Excellent.  What is the difference between

E. Haas - Cross                                    131

1    necessarily imbued, which I've never seen in the ethics

2    rules, and the appearance of impropriety; what is the

3    distinction?

4    A    The distinction that I -- in answering questions

5    that were posed to me, that you asked, as to why the --

6    Mr. Conlon and Mr. Birchfield's conduct is improper.

7    My point simply is, is when you're having conversations

8    that concern the same matter and the same issues that

9    Mr. Conlon had years of discussions with me about and

10   with my team and with the J and J team and with outside

11   counsel.

12       And to go and have conversations about the same

13   issues with my adversary, undermines the entire

14   adversarial process because no matter how he construes

15   it, his communications must contain our privileged work

16   product and attorney-client communications because he

17   can't separate that out in his neurons.  Any single

18   view that he espouses, necessarily, yes, is imbued with

19   the conversations we've had.

20       Q    You have no evidence, sir, that he was ever,

21   Mr. Conlon, ever worked for Beasley Allen; right?

22   A    (indiscernible)

23       Q    He was never an associate or partner at

24   Beasley Allen?

25   A    I have no evidence that Mr. Conlon was an

1    associate or partner at Beasley Allen.

2         Q    Excellent.  You have no evidence that he was

3    ever retained by Beasley Allen?

4    A    No, I have no evidence that he actually received a

5    paycheck from Mr. Birchfield, if that's what you mean

6    by retained.

7         Q    Or he had a written agreement for Beasley

8    Allen.  I'm going to hire you, Mr. Conlon, you're a

9    great lawyer, you worked for Sidley and Austin for 32

10   years, I'm hiring you.  You have no such document;

11   correct?

12   A    I have no such document.  The position we've taken

13   very consistently is that he is collaborating, he has

14   joined forces with, he's worked with, all the

15   adjectives you've used, in order to prepare and to

16   present and advocate for a settlement resolution that

17   is directly adverse to that of his former client.

18        Q    Even though your own experts are saying, that

19   number sounds pretty good to us?

20   A    That is entirely false, unfounded, lacks

21   foundation, it misconstrues the evidence in the record.

22             MR. POLLOCK:  You should be on this side.  I

23   mean, because if you're going to object, sir.  I'm

24   asking you questions.  I don't need -- Mr. Brody is

25   quite capable of objecting.

E. Haas - Cross                                    133

1          MR. BRODY:  Your Honor, I move to --

2          THE COURT:  All right, I think, Mr. Haas, if

3    he doesn't understand the question, he's explaining why

4    he doesn't understand the question.

5          MR. POLLOCK:  Fair enough.

6          MR. BRODY:  Yeah and I would move to strike

7    the commentary, Your Honor, because Mr. Haas was

8    answering a question and --

9          THE COURT:  Well, Judge Singh and I are able

10   to separate that type of information.

11         MR. BRODY:  Thank you.

12   BY MR. POLLOCK:

13     Q    One of your assumptions, sir, is that he was

14   a lawyer representing a client when he went to Legacy

15   Solutions; isn't that core to your analysis?

16   A    No, it's not.

17     Q    Because RPC-1.9 says, a lawyer who has

18   represented a client in the matter shall not thereafter

19   represent.  So isn't it true that he has to be a lawyer

20   representing a party in the dispute?

21   A    No, that's not true.

22     Q    Excellent and --

23   A    That's not true because your obligations, your

24   ethical obligations as a lawyer, do not stop when an

25   engagement ends.  You own then for life, Mr. Conlon.

1          Q    Well, let's just be really clear on this.

2     When you say you own them for life, you're talking

3     about RPC-1.6, confidentiality of information; correct?

4     A    I'm talking about -- no, no, I try not to engage

5     in an argument.  So I will succinctly say no and then I

6     will reserve --

7               THE COURT:  Well, let's hear the question.

8     Mr. Pollock?

9     BY MR. POLLOCK:

10         Q    Okay, so RPC-1.6 talks about a lawyer's

11    ongoing duty to maintain confidences.  Are you familiar

12    with that rule?

13    A    I'm familiar with the rule, sir.

14         Q    Excellent and in this case, when I asked you

15    whether Mr. Conlon shared information with Mr.

16    Birchfield, you only really went to 1.9, duties to

17    former clients and that requires him to have been

18    counsel.  And then I asked you whether he was a lawyer

19    representing a client in the matter and I proffered

20    you, he's not.  Isn't it true, he is a businessman

21    representing the interest of Legacy Solutions?

22    A    So you have a large amount of preface to the

23    question and I fundamentally disagree with your

24    interpretation of the ethical laws, sir.

25         Q    Okay.

E. Haas - Cross                                    135

1    A    If your question is whether or not our position is

2    whether Mr. Conlon is acting as an attorney or not in

3    his current role, the answer is, it doesn't matter.  I

4    don't have the foundation to say whether he purports to

5    but if you're asking whether that is dispositive of my

6    position, of our position, the answer is no.

7         Q    Well, you accused him of being a side-

8    switching lawyer.  Those were your words.  But in this

9    case, he is a businessman at Legacy Solutions after he

10   walked out the door at Faegre.  So I want to know, how

11   can he be a side-switching lawyer if he is not

12   representing a client in the matter, other than

13   himself?

14   A    He is a lawyer that has continuing obligations,

15   who has switched sides and is now working with an

16   adversary on the same matter and the same issues for

17   which he provided legal advice, confidential advice,

18   obtained privileged and work product information.  That

19   is a side-switching lawyer, in my view.

20        Q    And other than the documents you have in the

21   record today, you have no -- and your testimony you

22   have given with your opinions, you have no other

23   evidence that Mr. Conlon ever shared a J and J

24   confidence with Mr. Birchfield; correct?

25             MR. BRODY:  Objection, Your Honor.  We've

E. Haas - Cross                                    136

1     been through this, I think, three times now.

2               THE WITNESS:  Three times, four times.

3               THE COURT:  It's been posed.  To the extent

4     there's a different answer you were looking for, Mr.

5     Pollock?

6               MR. POLLOCK:  I'm prepared to move on, Your

7     Honor.

8               THE COURT:  Okay.

9     BY MR. POLLOCK:

10         Q     Alliances.  You talk about alliances and

11    joining forces.  That's what you talked about with Mr.

12    Birchfield and Mr. Conlon.  Isn't it true that the

13    second Mr. Birchfield or the Talc Claimant's Committee

14    signs a deal that -- let me throw it this way.

15         Isn't it true that the second that -- if J and J

16    were to sell the liabilities to Legacy and Legacy were

17    to buy them, isn't it true, at that moment, Mr.

18    Birchfield, Beasley Allen, the entire Talc Claimant's

19    Committee suddenly becomes adverse to Legacy?

20         A     First of all, I don't understand your hypothetical

21    and from what I do understand, I disagree but I'm not

22    really sure your hypothetical --

23         Q     Sure, let me clear it up.  Legacy Solutions

24    proposed to buy the claims from J and J; correct?

25         A     Legacy Solution has proposed a number of different

E. Haas - Cross                                137

1      resolutions that it terms broadly -- it falls broadly

2      within the bucket of what they call structural

3      optimization and that could involve -- fundamentally,

4      we've been over this a little bit but it involves

5      putting the Talc Liability into another entity and

6      providing some funding for it.

7          But then, what happens next, whether or not you

8      take that entity and put it into a bankruptcy, whether

9      you put ovarian claims only into bankruptcy and not the

10     Mesothelioma claims, whether or not you even do

11     anything with bankruptcy, whether or not you take it

12     and you basically sell it so that it is a standalone

13     entity, with still exposure from the future claimants,

14     is an option.

15         So there are a number of different alternatives

16     that can come to play, each of which, we had many

17     discussions with Mr. Conlon about the risks, benefits,

18     costs, pros, cons, advantages and disadvantages, while

19     he was our counsel.  And so, in coming up with a Legacy

20     proposal, you know, when he came to us, he proposed a

21     number of alternatives within the concepts of this

22     structural optimization.

23         So I hope that answers your question.  I'm not

24     exactly sure where you're going.

25         Q    I don't think it answers my question even

1    remotely but I'll ask it again.  If we look at Exhibit

2    7, could you pull that up, please?

3    A    Yes, sir.

4         Q    Tell me when you're ready?

5    A    I'm looking at Number 7.

6         Q    Wonderful, first paragraph, second sentence,

7    "For Legacy to enter into this transaction, the

8    acquired Talc liabilities of J and J would be required

9    to hold assets, with a present value of $19 billion or

10   such greater amount as determined by J and J's auditors

11   to remove from J and J's financial statements the non-

12   cash charge for talc-related liabilities."  Do you see

13   that sentence?

14   A    I do, sir.

15        Q    In plain English, doesn't that mean, if

16   Legacy buys those claims, the talc-related liabilities,

17   that would come off, if it worked, it would come off of

18   J and J's balance sheets; right?

19   A    Okay, first, to be clear, this is not the only

20   proposal.  You have to go back to the --

21        Q    I'm asking about this proposal, sir.

22   A    -- switching from your prior question.

23        Q    Sir, I'm asking about this proposal.

24   A    Okay.

25        Q    I'm asking about page -- Exhibit 7, the one

1    in front of you.

2    A    So you're talking about (indiscernible) and the

3    question is whether or not this will work?

4        Q    No, that is not the question.  Isn't the

5    proposal that, once they pay -- if they buy the

6    liabilities for roughly $19 billion, then at that

7    point, it would remove from J and J's financial

8    statements the non-cash charge for talc-related

9    liabilities; that's Legacy's idea?

10   A    And you're asking me whether that works?

11       Q    I'm asking whether that's what Legacy

12   proposed to you on November 9, 2023?

13   A    That's what the words are on this page.

14       Q    Excellent and they proposed it to you;

15   correct?

16   A    They sent this to the C.E.O. of Johnson and

17   Johnson but yes, if you're saying you writ

18   (indiscernible) Johnson and Johnson, that is the

19   particular offer they're stating at this particular

20   point in time.

21       Q    And if J and J were to accept this deal, the

22   Legacy proposal, the minute that J and J accepts the

23   Legacy proposal, now Legacy, Mr. Conlon, suddenly

24   becomes adverse to the Talc Claimant's Committee; do

25   they not?

1    A    No, that's wrong.

2         Q    Why is that wrong?

3    A    I can explain that.  So part of the proposal here

4    is whether and to what extent this is a means of

5    providing compensation to the lawyers that are the ones

6    that are overseeing the Talc claims.  So particularly,

7    the sort of nefarious aspect of this, in the $19

8    billion, is it's not all going to claimants.

9         First and foremost, Mr. Conlon's proposal involves

10   him taking all sorts of management fees.  So this is a

11   compensation structure, number one.  Number two, he

12   retains in his proposal a spread of anything that is

13   paid out versus not paid out.  So of the 19 billion,

14   let's say if 8.9 gets paid out, he gets to keep the

15   rest, that's secondly.

16        Thirdly, there's no grounds to say that this is

17   going to work because you can, just as in a bankruptcy,

18   you can have objecting claimants.  So at any point in

19   time, a claimant can object to this on the grounds that

20   it's not a viable transaction, which is again, a

21   concern raised by the auditors.  So I would disagree

22   wholeheartedly, in many respects of everything you

23   said.

24             THE COURT:  I think this would be a good time

25   to take our lunch break.

Colloquy                                    141

1                    MR. POLLOCK:  Wonderful.

2                    THE COURT:  All right?

3                    MR. POLLOCK:  How long would you like, Judge,

4          or judges, I apologize.

5                    THE COURT:  How -- we'll come back in an

6          hour, all right?

7                    JUDGE SINGH:  Okay.

8                    MR. POLLOCK:  Thank you, Your Honor.

9                    THE COURT:  All right, thanks.  Take a break,

10         go off the record, thank you.

11                   COURT OFFICER:  All rise.

12                      (Off the record at 12:49:08 p.m.)

13                           (Lunch recess)

14         (Continuation of day's proceeding on afternoon session)

15                            *  *  *  *

16

17

18

19

20

21

22

23

24

25

1                              CERTIFICATION

2

3            I, Nitsa Carrozza, the assigned transcriber, do

4       hereby certify the foregoing transcript of proceedings

5       on CourtSmart, timestamp from 09:38:03 a.m. to 12:49:08

6       p.m., is prepared to the best of my ability and in full

7       compliance with the current Transcript Format for

8       Judicial Proceedings and is a true and accurate non-

9       compressed transcript of the proceedings, as recorded.

10
11          /s/ Nitsa Carrozza                    AD/T 639
12             Nitsa Carrozza                     AOC Number
13
14
15        Phoenix Transcription LLC               03/28/2024
16             Agency Name                           Date
17
18
19
20
21