```
                              SUPERIOR COURT OF NEW JERSEY
                              LAW DIVISION:  CIVIL PART
                              ATLANTIC COUNTY
                              DOCKET NO.:  ATL-L-2648-15
                              A.D. #_____

                         )
IN RE: JOHNSON AND JOHNSON)        TRANSCRIPT
TALCUM-BASED POWDER       )           OF
PRODUCTS LITIGATION       )         HEARING
                         )

                         Place: Atlantic County Civil Crt.
                                1201 Bacharach Blvd.
                                Atlantic City, NJ 08401

                         Date: March 25, 2024
                               AFTERNOON SESSION

BEFORE:

     HONORABLE JOHN C. PORTO, J.S.C. AND
     RUKHSANAH L. SINGH, U.S.M.J.

TRANSCRIPT ORDERED BY:

     JEFFREY M. POLLOCK, ESQ.,
     (Fox Rothschild)

APPEARANCES:

     JEFFREY M. POLLOCK, ESQ.,
     MICHAEL SABO, ESQ.
     (Fox Rothschild)
     Attorney for Birchfield

     STEVEN BRODY, ESQ.,
     Attorney for Johnson & Johnson, LTL




                         Transcriber:  Sharon Conover
                         PHOENIX TRANSCRIPTION
                         796 Macopin Road
                         West Milford, NJ 07480
                         (862) 248-0670

                         Audio Recorded
                         Recording Opr:  Heather Canale
```

APPEARANCES CONTINUED:

     RICHARD M. GOLOMB, ESQ., (Golomb Law)
     Attorney for Plaintiff

     MICHAEL S. STEIN, ESQ., AND
     ROGER PLAWKER, ESQ., (Pashman Stein Walder Hayden,
     P.C.)
     Attorneys for Mr. Conlon

2

<u>I N D E X</u>

|  | <u>Direct</u> | <u>Cross</u> | <u>Redirect</u> | <u>Recross</u> |
|---|---|---|---|---|
| <u>WITNESSES FOR<br>JOHNSON & JOHNSON:</u> | | | | |
| Erik Haas | | 3 | 25 | |
| James Murdica | 44 | 78 | 111 | 115 |

Haas - Cross                                            3

1              (Hearing continued at 1:50 p.m.)

2              THE COURT:  Thank you, please be seated.  We

3    will continue all counsel is present.  Mr. Haas, you're

4    still under oath.  Mr. Pollock.

5    CROSS EXAMINATION CONTINUES BY MR. POLLOCK:

6         Q    Mr. Haas, if you could go to the binder to

7    exhibit two, that would be wonderful.  Let me know when

8    you're there.

9         A    I am there.

10        Q    Yes, sir.  So, in exhibit two, it's an email

11   from Jim Conlan to you.  Correct?

12        A    That is correct.

13        Q    And he -- that document is dated August 23,

14   2022.  Correct?

15        A    That is correct.

16        Q    And it says in the second paragraph, I am

17   among those who think the likelihood of a planned

18   confirmation injunction, skipping the part in the Texas

19   Step Case has gone from low to essentially nonexistent.

20   Do you see that portion?

21        A    Yes, I see that.

22        Q    And there's nothing in there that reflects

23   that that communication originated from or was shared

24   from Mr. Birchfield (phonetic).  Correct?

25        A    No, that's exactly what I testified on direct that

1    Mr. Conlan concealed from and did not disclose to us

2    that he had been having conversation with Beasley Allen

3    as early as April 2023 regarding alternatives to

4    resolve the Talc litigation and was engaged in

5    discussions on proposals to submit to the media news.

6        Q    Fair enough.  But there's nothing in this

7    document that demonstrates in any way that Mr. Conlan

8    and Mr. Birchfield were discussing whether the LTL

9    Texas Two Step was a good idea?

10   A    That's again, that's exactly what I testified on

11   direct that we had no disclosure whatsoever from Mr.

12   Conlan or Mr. Birchfield regarding their alliance and

13   the fact that they were working together without our

14   knowledge, consent, or waiver.

15       Q    So, if Mr. Conlan has switched tasks, he went

16   to Legacy after he left Faegre.  Correct?

17   A    He did go to Legacy after he left Faegre Drinker.

18   When you say he switched tasks, he's now in a different

19   role.  He opened up a business where he's purporting to

20   go out and pitch the Legacy structured optimization

21   model as I understand it.

22       Q    I couldn't say it better myself.  So, he goes

23   from being a lawyer at Faegre to being a businessman at

24   a company that he formed called Legacy.  Right?

25   A    Right.  And when --

1          Q    Excellent.  So, when he's at -- and in that

2     role he's not serving as legal counsel for any of

3     Beasley Allen's clients.  Is he?

4     A    I cannot opine on that one way or the other.

5          Q    Let me try it this way.  You have not facts,

6     whatsoever, to support that he was representing Beasley

7     Allen's clients.  Right?

8     A    In a legal capacity, again, I can't opine on that

9     one way or the other.  I can opine that he is -- or I

10    can state factually that he is addressing the same

11    matters and the same issues that he addressed when he

12    was our counsel.

13         Q    But, I'm asking not about what -- your

14    opinion is it's the same subject matter.  I disagree,

15    because neither one of us have facts in front of us

16    that they are the same subject matter.  But I am going

17    to put that aside.  I would ask you to do the same.

18    A    I disagree with that  --

19         Q    I'm asking simply about --

20    A    -- position, so I am not going to put that aside.

21         Q    Mr. Haas, I'm asking about the role that he

22    played once he went to Legacy, was he representing a

23    client?

24    A    Again --

25              MR. BRODY:  I object.  That's been asked and

Haas - Cross                                              6

1    answered, I think on two previous times now.

2              THE COURT:  Mr. Pollock, are you suggesting

3    re-asking the question that you did not get a

4    satisfactory answer to your question?

5              MR. POLLOCK:  Well the only reason is I'm

6    asking a pretty basic question, and I'm getting a lot

7    of, it must be, or it could be, or therefore.  If you

8    think the answer is already in the record, Your Honor,

9    I do not want to waste your time.

10             THE COURT:  I think I cutoff Mr. Haas, so

11   want do you pose that question again and we'll hear Mr.

12   Haas's testimony.

13   BY MR. POLLOCK:

14        Q    When Mr. Conlan switched from being at Faegre

15   to Legacy Solution, isn't it true he did not have a

16   client in the LTL litigation?

17   A    If I'm understanding your question, Mr. Conlan

18   stopped representing LTL as a current representation in

19   March 2022, that didn't put an end to his ethical

20   obligations to LTL or J&J which are continuing.  So, in

21   that respect he did have a client.

22        Q    Let me try it this way.  A lawyer who

23   represents a client in New Jersey has to have an IOLTA

24   account.  They have to have an account that is required

25   by the Rules of Professional Conduct.  When Mr. Conlan

1   switches from being a Faegre lawyer to being a business

2   guy at Legacy, isn't it true as a Legacy guy, no longer

3   a Faegre guy, he no longer has to have an IOLTA account

4   because he does not have a client in New Jersey?

5   A    Again, I wouldn't have the foundation to say what

6   account he has.  I can -- the question again is whether

7   or not he has ongoing obligations to LTL and J&J as his

8   client, the answer is yes.

9       I can't -- sir, I can't sit here and tell you

10   whether Mr. Conlan kept his account up to date.

11              MR. POLLOCK:  Your Honor, I'm not asking

12   whether he had an ongoing duty of confidentiality,

13   which is what Judge Singh asked me about before.  I've

14   conceded that he does.  I am asking whether he has a

15   client, because that is -- you have accused my client

16   of violating RPCs.  And the RPCs require that Mr.

17   Conlan have a client at the time he's at Legacy.

18              So, I'm asking the simple question, do you

19   have any evidence --

20              THE WITNESS:  I gave you that simple answer

21   to that very question, because you're asking my view on

22   whether he has a client.  And my answer is yes he does,

23   because he has an ongoing obligation to LTL and J&J.

24   I've answered that three times, sir.

25       Q    Excellent.  So it's your view?

1

2    A     You asked me for my view and I gave you the view

3    three times.

4          Q    Fair enough.  That's your view.  Correct?  If

5    you go to exhibit four, please.  Let me know when

6    you're ready.

7    A    I'm at exhibit four, sir.

8          Q    Excellent.  Exhibit four, October 18th, this

9    is an email from James Conlan to Dwayne VanArsdale,

10   Doug Dachille, and to you and to Andrew White.

11   Correct?

12   A    Yes.

13         Q    That document says, Legacy has the support of

14   lead counsel for the OC claimants, including Andy

15   Birchfield.  Do you see that?

16   A    I do, sir.

17         Q    And it goes on and says, Andy Birchfield,

18   Doug Dachille and I are prepared to meet with you.

19   Correct?

20   A    That is correct.

21         Q    But it doesn't say what the Legacy proposal

22   is, or what's being suggested to J&J.  Does it?

23   A    I disagree.  He starts the paragraph by saying,

24   thank you for our efforts to evaluate our proposal, to

25   further enhance our solution.  So this email is written

1   in terms of an enhancement of the proposal that he has

2   provided and it's conveying that purportedly for the

3   first time he's now going out and obtained the support

4   of Andy Birchfield, when in fact what was undisclosed

5   and concealed was that he had been working with Mr.

6   Birchfield since April of 2023.  So I disagree with

7   you.

8        Q    So, there is a proposal attached to this?  I

9   asked you whether there was a proposal here.

10  A    You said there was no proposal.  You didn't ask me

11  whether there was a proposal attached.

12       Q    Fine.  Is there a proposal attached to this

13  document?

14  A    That's a different question.  There is not a

15  proposal attached to this email.

16       Q    Excellent.  But there is on November 7th of

17  -- exhibit seven, I apologize, November 9, 2023,

18  Plenary Hearing 62.  Let me know when you're there.

19  A    I'm at exhibit seven.

20       Q    Correct.  So, that has a proposal from

21  Legacy.  Right?

22  A    No.  It has a settlement matrix.

23       Q    Okay.  It has a settlement matrix.  There's

24  also a lot of discussion about how Legacy would purport

25  to transfer the liabilities from J&J to Legacy.  Right?

Haas - Cross                                     10

1    A    And there was this -- and if you're talking in

2    terms of proposal, there likewise was in connection

3    with the first meeting a deck that was provided.

4         Q    Okay.

5    A    So, if there's a distinction that you're trying to

6    draw between a proposal, sir, I'm just not

7    understanding that distinction if you're trying to make

8    one.

9         Q    I'm not that smart.  All I'm asking is on

10   exhibit four, we've agreed there's no proposal

11   attached.  On exhibit seven, this document has a matrix

12   and it has a series of colloquy, right, a discussion

13   regarding what Legacy would propose to do.  Can we

14   agree on that?

15   A    Yes, we can agree on that.

16        Q    Excellent.  And that Mr. Birchfield is not

17   part of -- he's not referred to as the CEC, it's not

18   his proposal.  There's nothing there that he proposes.

19   Right?

20   A    If your position is that when they're referring to

21   the leadership counsel on the -- both the federal MDL

22   and state court cases, if your suggestion is that

23   doesn't refer to Mr. Birchfield, I would disagree

24   because that's the same language that was utilized in

25   the previous example, exhibit that we just looked at

1      that referred to Mr. Birchfield as that person.

2           Q    Okay.

3      A    So, I disagree with that proposal -- with that

4      position.

5           Q    So, let me clean this up.  Exhibit four,

6      there's no proposal attached.  We've agreed on that.

7      So we can agree that Mr. Birchfield did not make a

8      proposal on exhibit four.  Right?

9      A    I disagree, sir.  I disagree with that for the

10     reason previously stated, which was there was a

11     proposal in the email, the previous one references a

12     proposal.  So, I disagree with your proposition there.

13          Q    Great.  Where in exhibit four does it say

14     proposal?  Show it to me please?

15     A    The very first sentence, I just read it.

16          Q    Thank for your efforts to evaluate our

17     proposal.  Who is our --

18     A    Right.

19          Q    But is there a proposal attached?

20     A    He's referring back to the previously made

21     proposal, which is -- was provided in a PowerPoint

22     format.  So, I disagree sir.

23          Q    Okay.  But you don't have the proposal here

24     today.  You've not produced it in this record.  Right?

25     A    Are you saying what -- are you saying it's in the

1    binder here today?

2        Q    You -- there is no -- I thought we had

3    agreed, apparently not, that in exhibit four there is

4    no proposal attached?

5    A    Now, you're asking me a different question, sir.

6    I'm not trying to be difficult.  You're saying whether

7    -- you first asked me whether it references a proposal.

8    It does.  It says effort our proposal.  Then you

9    acknowledge that's in the first sentence.  Now, you're

10   asking whether it was attached.  We previously agreed,

11   I did not dispute that there was not a proposal.

12       Q    Excellent.  What is the proposal?  What is

13   the proposal, on exhibit four what was that proposal?

14   A    It was the proposal that Mr. Conlan presented on

15   September 11th.

16       Q    Excellent.  And Mr. Conlan prepared the

17   exhibit seven, November 9 proposal.  Right?

18   A    Again, I disagree with your proposition because

19   in-between the 11th of September and November 9th, Mr.

20   Conlan disclosed for the first time that Mr. Birchfield

21   is working with him, and he purports in exhibit four to

22   say, oh I'm going to address the issue you asked in the

23   September 11th meeting which is what was the dollar

24   amount that you're purporting to say would be

25   sufficient for a divisional merger to be effective.  He

1    says, now I've got that because I've got Andy

2    Birchfield.  So, he's saying he went out and

3    supplemented it, or in his words to further enhanced

4    it, but what he actually did is to be working on that

5    same thing without telling us since April.  Then you go

6    to the 7th, and he uses the same language to refer to

7    Legacy's principle –- the support he would have from

8    the leadership counsel on both the federal MDL and

9    state court cases.

10        So, I disagree with your proposition that Mr.

11   Birchfield is not referenced in there.  That's the

12   continuity.  It was the September 11th presentation to

13   the April 18th supplement and disclosure for the first

14   time of Mr. Birchfield's role to the November 9th

15   presentation where he circumvented me, so that he could

16   go directly to the board of directors with a

17   proposition that now includes the proposal that Mr.

18   Birchfield had and that he also had represented at the

19   Mass Tort's Made Perfect on I believe it was October

20   12th.

21        Q    On September –- exhibit six, November 5, can

22   you show me where in this document it says this is a

23   proposal or anything that was recommended by Andy

24   Birchfield or Beasley Allen?

25        A    Exhibit six?

1          Q    Exhibit six.

2               MR. SABO:  I don't think you mean exhibit

3     six.

4          Q    I'm sorry, I apologize.  Exhibit seven.

5     A    Sir, I've said this repeatedly, so I will repeat

6     it one more time.

7          Q    Go ahead.

8     A    It's the -- where the document makes reference to

9     Legacy's proposal has been reviewed and supported by

10    leadership counsel at both the federal MDL and state --

11         Q    Where are you looking at exhibit seven, I'm

12    sorry?  Where are you on exhibit seven?

13    A    Sir, let me direct you to the second paragraph

14    last sentence.

15         Q    Okay.

16    A    Legacy's proposal has been reviewed and supported

17    by leadership counsel on both the federal and --

18         Q    Got it.

19    A    -- MDL and in state court cases across the

20    country.  And as I indicated that's the same language

21    that was utilized in exhibit four to reference Mr.

22    Birchfield.  There's no evidence or dispute in the

23    record that he's not referring to Mr. Birchfield.  So

24    when you're asking is it my position, this is referring

25    to Mr. Birchfield, yes, it is.  Because not only is the

1    language the same, not only does it follow on the heels

2    of the October 18th correspondence, first time

3    introducing Mr. Birchfield as further enhancing the

4    proposal with an amount, but it's also consistent with

5    the amounts that Mr. Birchfield was saying at the

6    October 17th Mass Tort's Made Perfect Seminar.

7          Q    Move on briefly to Exhibit three, please.

8    Tell me when you're ready.

9    A    I'm on exhibit three, sir.  Thank you.

10         Q    So, this is a J&J earnings call for the

11   quarter three 2023.  When these calls take place, do

12   you participate in the entire call?

13   A    There is no set position for these calls for a

14   litigation update.  So, depending upon the

15   circumstances and depending upon the questions,

16   perhaps, that we get in advance of an earnings call, I

17   may or may not participate.  I believe because of the

18   July 28th, 2023 dismissal we had received some

19   inquiries, and so for that reason we scheduled the time

20   for me to give, I think, a pre-statement and then an

21   oral statement.

22         Q    Do you make every effort at J&J to be

23   accurate in your quarterly calls?

24   A    I do, sir, thank you.

25         Q    Excellent.  If you can go to Plenary Hearing

Haas - Cross                              16

1     10.   This is a statement from Joseph Wolk, W-O-L-K,

2     bottom of the page.   Let me know when you're ready.

3              He says last sentence, "Due to higher

4     interest rates earned our earnings are now expected

5     interest income in the range of $300 million to $400

6     million."  Do you see that?

7     A     Sir, no I don't see it.

8        Q     The bottom of the page looking across the

9     P&L, adjusted pre-tax operating margin is still

10    expected to improve by approximately 50 basis points

11    versus prior year, driven by stronger margin profile

12    and business mix.   Net other income is also being

13    maintained ranging from $1.7 billion to $1.9 billion.

14    Due to higher interest rates earned on cash, now it's

15    expected an interest income in the range of $300

16    million to $400 million.

17             Do you see that?

18    A     I see the text that you're referring to.

19       Q     You see it?

20    A     I see it.

21       Q     Do you believe it's accurate?

22    A     (no response).

23       Q     Do you believe it's accurate?

24    A     I believe that Mr. Wolk is making an accurate

25    statement.   I don't know what context you're trying to

1    put it in, because it is not in anyway related to or

2    inconsistent with my prior testimony.

3         Q    Fair enough.  If you go to page Plenary

4    Hearing 14, this is Erik Haas, Worldwide Vice President

5    of Litigation at J&J, which is you, I assume.  If we

6    can go to the top right-hand side there on page 14.

7    You talk about a four-prong strategy, I believe it is.

8    A    Yes.

9         Q    And the second prong is consensual

10   resolution.  Consensual resolution, you mentioned again

11   in the second full paragraph in terms of timing on the

12   second prong, the consensual resolution.  And then you

13   refer to it again in the next paragraph, it says third,

14   while those negotiations are proceeding.

15         Do you see the section, the words I'm

16   referring to, consensual resolution, consensual

17   resolution and describing those as negotiations?

18   A    Yes.

19        Q    So, isn't it true that one of the things that

20   you were attempting to do was to encourage the world to

21   come and negotiate with J&J to try and resolve the

22   claims against it for the talc?

23   A    I don't think I would put it that way.  I think

24   what I was doing was as consistent with what was

25   disclosed and is in the record in the bankruptcy court,

1        we were working on a resolution plan that had the

2        support of the counsel representing the vast majority

3        of the claimants and we were further refining that plan

4        consistent with Judge Kaplan's recommendation in his

5        July 28th, 2023 Opinion, where he explicitly urged and

6        recommended us to continue to do so, because we had

7        made, in his words, remarkable success in proceeding to

8        a consensual resolution and what we were endeavoring to

9        do is to continue down that path through a proposed

10       bankruptcy.

11            I can get into more detail if you would like, but

12       what effectively the plan is involving is bringing more

13       claimants and counsel for claimants voluntarily into

14       the deal, and determining whether and to what extent we

15       should let others passthrough that do not want to

16       participate because in the end we want a consensual

17       deal.  We do not want to go back to a circumstance, we

18       have a situation where we have a lot of objectors.  We

19       didn't think we were going to get them the last time

20       because of the majority had voted in favor of it.  But

21       that is the goal.  The goal is to obtain finality for

22       both future and current claimants in a fair and

23       equitable resolution.  So, that's what I was referring

24       to.  It flows exactly from what was done in the

25       bankruptcy, but Judge Kaplan recognized and the

1    laudable goals that we were seeking to achieve.

2         Q    So you were willing to negotiate within the

3    bankruptcy context only.  Is that right?

4    A    Sir, that is demonstratively false based upon the

5    record in this case and the record in the bankruptcy

6    case.  There is evidence demonstrating that we were

7    negotiating with Mr. Birchfield as early as Fall of

8    2020, where he was seeking $3.25 billion for an ovarian

9    only deal.  We negotiated in the Spring of 2021, again

10   with Mr. Birchfield, the TCC in Imerys (phonetic), the

11   FCR, we were told we had a deal done by the TCC in

12   Imerys for $4.2 billion, in the end they weren't able

13   to deliver on that.

14        We negotiate in the bankruptcy case for the $8.9

15   billion resolutions.  Again, we were told by the

16   mediators in that deal that is now a matter of record

17   that the TCC including Mr. Birchfield were in favor of

18   that and at the last minute they backed out.  So, that

19   is demonstratively untrue.  We have negotiated outside

20   the bankruptcy.  We have negotiated inside the

21   bankruptcy.  We've negotiated settlements where

22   appropriate.  We are endeavoring to do the best to get

23   a comprehensive and final resolution that is in the

24   best interest of all claimants so that we can put this

25   matter behind us, so we can stop wasting money on

1    attorney's fees that can otherwise be spent to saving

2    people's lives.

3         Q    Excellent.  With regard to the $3.25 billion

4    and the $4.2 billion, I think those are the right

5    numbers, is that right, 3.25 and 4.2 billion you

6    mentioned?

7    A    Yes, sir.

8         Q    Excellent.  Do you have a single email to

9    confirm those?

10   A    To confirm?

11        Q    That either number was the number that Mr.

12   Birchfield ever agreed to?

13   A    Yes, they're in the record in the bankruptcy.

14        Q    So, you have emails from Andy Birchfield

15   saying that he agreed to accept $3.25 or $4.2 billion?

16   A    I examined Mr. Birchfield with respect to those at

17   his deposition.  So, I --

18             MR. POLLOCK:  Your Honor, I want an answer to

19   my question.  I'm tired of --

20   A    I'm trying to --

21             MR. POLLOCK:  I want an answer to my

22   question.

23             MR. BRODY:  Mr. Haas is trying to answer the

24   question.

25             THE COURT:  I'm going to let Mr. Haas answer

1    the question.  And then Mr. Pollock, you tell me if

2    that was responsive to your question.

3              MR. POLLOCK:   I asked if there's an email.

4    A    You're focusing on email, what I was trying to

5    explain before you interrupted me, sir, is if you look

6    at Mr. Birchfield's deposition, you will see the

7    documentation that supports the very proposition that I

8    stated.  It's in the record.  So you can look at it and

9    you can decide whether or not it supports it or not.

10        But there's documents -- the very agreement itself

11   has Mr. Birchfield all over it.  It says Mr. Birchfield

12   and Beasley Allen.  It's all in that document.  So,

13   look at the exhibits.  I refer you to the exhibits.

14   Okay.

15        Q    I did read the transcript and I've read the

16   exhibits.  If you believed that you had a deal, why

17   didn't you move to enforce the next day?

18   A    Which deal ware you talking about?

19        Q    If you really believed you had a deal for

20   $4.2 billion with Andy Birchfield, listen to my

21   question please for once.  If you believed you had a

22   deal for $4.2 billion and that was the deal, I got this

23   done, why didn't you move to enforce immediately?

24   A    Let me explain exactly what happens here.  Let me

25   explain.  The TCC in --

1          MR. POLLOCK:  Your Honor, this is exactly why

2     I don't want a narrative answer.  I want an answer to

3     my question.

4          THE COURT:  Mr. Haas, why would you not have

5     gone and enforce the settlement?

6          THE WITNESS:  Because he's misconstruing what

7     I said.  What I said is in the bankruptcy -- in respect

8     to the $4.2 billion settlement, the Tort Claimant's

9     Committee Steve Barron and the other members of the TCC

10    represented to us that the deal was done, which

11    subsequently they came back and told, after they told

12    us the deal was done, they said they couldn't deliver

13    it because the FCR wasn't participating.  So, that is

14    why we never ended up getting a final signed document,

15    which you need to enforce it.  What we had was the

16    representation that the deal was done.

17          The same thing with the $8.9 billion, we had

18    the representation that the deal was done on Sunday

19    night, and then on a Thursday, we received the

20    statement that it had been retracted.  So, if I had an

21    enforceable deal, yes sir, of course I would enforce

22    it.  If they had --

23    BY MR. POLLOCK:

24     Q    But you didn't enforce it.  Correct?  You did

25    not enforce it?

1    A    Please don't interrupt me.  If I had --

2         Q    No, sir, to be honest with you, there's a

3    process here.  The process is not that you get -- this

4    is not the Erik Haas show.  You get to answer

5    questions when I ask them.  Your counsel can object.

6    But the fact is this is not the time -- this is not the

7    time for you, Erik Haas, to deliberate on the law.  I'm

8    frankly entitled to an answer.

9              MR. BRODY:  Your Honor, if --

10             THE COURT:  Mr. Haas did provide an answer to

11   your question.  So, your second question was with

12   regard to, so you didn't proceed with a motion to

13   enforce?

14             MR. POLLOCK:  Correct.

15             MR. BRODY:  And Your Honor, Mr. Haas was

16   answering the question and I would ask that if Mr.

17   Pollock has an objection he direct the objection to the

18   Court so that the Court can rule on it and not tell Mr.

19   Haas what he can or can't say.  Mr. Haas is trying to

20   answer his questions.

21             You know, I've let this line of questioning

22   go but it seems we're --

23             THE COURT:  I think everybody knows what the

24   order is.  We're getting some latitude here.  I want to

25   move things along.  But Mr. Pollock, your question to

Haas - Cross                                    24

1    Mr. Haas is, so you didn't move to enforce the

2    settlement?

3            MR. POLLOCK:  Correct, that was all I asked.

4            THE COURT:  And I think the answer was yes,

5    he did not move to --

6            MR. POLLOCK:  Excellent, I'm prepared to move

7    on, Judge.

8            THE COURT:  Mr. Haas, I'm not taking

9    anybody's position or substituting myself.  I'm just

10   trying to move things along as to what the Court's

11   hearing.

12           MR. POLLOCK:  Understood and I appreciate

13   Your Honor.  Your Honor, I have no further questions at

14   this time.

15           THE COURT:  Thank you.  Redirect?

16           MR. BRODY:  Yes.

17           THE COURT:  Oh wait.  Judge Singh, do you

18   have any questions for Mr. Haas?  I don't have any

19   questions.

20           MR. BRODY:  I do have some redirect, Your

21   Honor, and I'll try to be brief and I want to try to

22   focus us back on the issues that we believe are

23   important to the disqualification question before the

24   Court.

25   REDIRECT EXAMINATION BY MR. BRODY:

1          Q    The first thing I want to ask you, Mr. Haas,

2     your testimony about the kinds of issues and privilege

3     and confidential communications that Mr. Conlon was

4     privied to, exposed to, a part of while he was outside

5     counsel for Johnson & Johnson is that based on your

6     personal knowledge?

7     A    Yes, sir.

8          Q    And how did you acquire that personal

9     knowledge?

10    A     Through group calls, through individual calls from

11    Mr. Conlan, through individual emails with Mr. Conlan,

12    going out to dinner, going out to lunch with Mr.

13    Conlan.  Group calls where we had deliberations among

14    the entire outside counsel group.

15         So, it was one interaction after the other

16    throughout for the entire time that he was retained by

17    Johnson & Johnson.  He was an integral part of our

18    outside counsel group that worked with our internal

19    counsel group to develop and implement the strategies

20    for both the litigation, adjudication, and a resolution

21    of the talc claims.

22         Q    And you've talked about the outside counsel

23    team.  But did you have one-on-one direct

24    communications with Mr. Conlan about privileged and

25    confidential strategic considerations related to the

1    litigation pending her and in the MDL?

2    A    I had many one-on-one conversations with him and

3    in addition he prepared memorandum that he directed

4    solely to me to provide his commentary on other

5    counsel's positions, not just with respect to

6    structural optimization but with all aspects of the

7    litigation to express his particular views and take

8    some of those issues.

9            MR. POLLOCK:  Your Honor, motion to strike

10   under the best evidence rule again.  I mean, I've asked

11   for any of those documents.  There's not here.  He's

12   testifying now directly about memorandum, the first

13   time I've heard about it, even though I've asked on

14   direct and on cross -- direct and cross, this is the

15   first time I'm hearing this memorandum.  I move to

16   strike under the best evidence rule.  It's not here.

17           THE COURT:  Well with regard to the

18   testimony, I think under our scenario here, I can have

19   that considered as part of the weight of the evidence,

20   if there's no evidence with regard to the testimony,

21   so.

22           MR. POLLOCK:  Agreed.

23   BY MR. BRODY:

24       Q    Mr. Haas, let me just ask you, so these --

25   you know, memos that were prepared by Mr. Conlan for

1    you, and for you and the in-house J&J team alone, did

2    you then have discussions with Mr. Conlan, and again,

3    because the privilege concerns, without getting into

4    the substance, did you have discussions with Mr. Conlan

5    about the strategies that were discussed in those

6    memorandum?

7    A    I did.  I had many discussions with him about

8    them.  I, at the time, played great heed to his views.

9    They influenced our strategic thinking vis-a-vis the

10   other counsel, vis-a-vis our -- the amounts, the

11   timing, how we would go about approaching our counter-

12   parties, in which forum, in which structure.  So, yes

13   they did.

14        Q    Did you also have one-on-one discussions with

15   Mr. Conlan about resolutions that the company was

16   seeking to negotiate through the Imerys bankruptcy?

17   A    Yes.

18        Q    Why were you having those one-on-one

19   conversations with Mr. Conlan?

20   A    Because as I indicated on my direct, consistent

21   with what is in the record about his own view of his

22   expertise, Mr. Conlan held himself out as a preeminent

23   expert in bankruptcy law and the resolution in Mass

24   Tort's Liability.

25        Q    During the Imerys bankruptcy was Mr. Conlan

1      negotiating on J&J's behalf directly with counsel for

2      the TCC?

3      A     Yes, he was.

4            Q     Was he directing -- was he negotiating,

5      excuse me, on J&J's behalf directly with the future

6      claimants' representative?

7      A     Yes, future claimants' representative counsel,

8      yes.

9                 MR. POLLOCK:  Can we just get clarification

10     is that Imerys or LTL?

11                MR. BRODY:   The question was about the

12     Imerys bankruptcy.

13                MR. POLLOCK:  Imerys, okay, thank you.

14           Q     And did you have discussions with him during

15     that time period about J&J's negotiating strategy?

16     A     Yes, I did.  By the way, to the question, he also

17     had the same discussions and conveyed the same issues

18     with the respect to the LTL FCR.

19           Q     Okay.  That's the FCR and the LTL bankruptcy?

20     A     Yes, future claims representative.

21           Q     Okay.  Were those discussions, again without

22     revealing any of the substance of J&J's negotiating

23     strategy, but were those discussions about Johnson &

24     Johnson's negotiating strategy, in your view, germane

25     to the issues that Johnson & Johnson was attempting to

Haas - Redirect                            29

1   negotiate in the LTL bankruptcy in the summer of 2023?

2   A    Yes.  Just again, those issues were germane to the

3   entire time frame from 2020 when I started to today.

4   Again, when we were in bankruptcy because of the

5   automatic stay, everything else was frozen and much of

6   the time in the automatic -- and we were in bankruptcy

7   we were fighting the motion to dismiss twice.  The

8   first time we prevailed the second time it was

9   dismissed.

10       And as a consequence there has been little

11   progression forward with respect to those issues.  So,

12   we're effectively still struggling and dealing with how

13   to come up with a comprehensive and final resolution

14   for the talc claims.  So, the same issues were

15   applicable then as now, and the conversations we had

16   shed light on our thinking with respect to

17   strategically what, when, why, how we would engage in

18   that process.

19       Q    I take it those are not the kinds of

20   strategic discussions and considerations you would ever

21   share with your opposing counsel?

22   A    Absolutely not, for the reasons I've stated

23   previously, fundamentally undermines the adversarial

24   process.

25       Q    If you can turn to exhibit four in the

1    binder, Mr. Haas.

2    A    Yes, I'm there.

3         Q    There was a suggestion that somehow there's

4    not a proposal associated with this email of October

5    18th.  If you can turn to the second page of that

6    document.  Do you see there's a -- the October 18th

7    email is replying to an email of September 28th from

8    Douglas Dachille.  Do you see that?

9    A    I do.

10        Q    And does the September 28th email from

11   Douglas Dachille set out the proposal?

12   A    Yes, it summarizes the proposal that in fact was

13   discussed as I testified in the September 11th meeting.

14   So, we had the September 11th meeting.  You can look

15   down this series of email change to bring it back to

16   August 21st when it was first solicited.

17        So, Douglas Dachille reached out to a contact,

18   through our treasurer.  Our treasurer responded, copied

19   us.  We set up the September 11th meeting where the

20   proposal was presented.  Doug Dachille responds on

21   September 28th with respect to that proposal.  Then on

22   the 18th Mr. Conlan purports to say that for the time

23   he's enhancing that proposal with input from Mr.

24   Birchfield, but it's the same proposal.  That's why

25   when I was responding to Mr. Pollock's questions I was

1    referring to the first sentence that said proposal.

2    It's all the same proposal.

3         Q    But, as you've explained, I take it, the only

4    thing that was new or the things that were new in the

5    October 18th email were the mention of a settlement

6    matrix, and the explanation that had already been

7    shared with Mr. Birchfield and he supported it and Mr.

8    Birchfield was ready to come in with Mr. Conlan to talk

9    about the matrix?

10   A    That's correct.

11        Q    All right.  You were asked some questions

12   about whether Mr. Conlan is now a businessman and no

13   longer a lawyer.  You were also asked some questions

14   about Rule 1.9 of the Rules of Professional Conduct.

15   Rule 1.9(c) provides that a lawyer who has formerly

16   represented a client in a matter shall not thereafter

17   use information relating to the representation to the

18   disadvantage of the former client, or reveal

19   information relating to the representation.

20             Is -- since you were asked, in your view, has

21   Mr. Conlan violated that?

22   A    Yes, and I believe I did testify to that in

23   response to Mr. Pollock's question, because as a lawyer

24   your responsibilities do not end when that

25   representation ends.  You have a continuing ongoing

1    obligation.  That is an explicit provision of the rule.

2         Q    To put it differently, once you have

3    represented a client in a matter, even if you leave the

4    practice of law you can't switch sides.  Right?

5    A    In the way -- the vernacular that I used, once you

6    have the client, you always have the client.  Because

7    that entity, in this case, Johnson & Johnson was and is

8    Mr. Conlan's clients with respect to his duties and his

9    ethical obligations.

10        Q    You were also asked a number of questions

11   about well, is this notebook or are these all the

12   communications between Mr. Conlan and Mr. Birchfield.

13   Do you recall those questions?

14   A    Yes.

15        Q    Did -- when was it that you first came to

16   learn of the existence of extensive written

17   communications directly between Mr. Conlan and Mr.

18   Birchfield beginning in April of last year?

19   A    As I testified, it was a couple of weeks ago when

20   I first saw what Mr. Birchfield and the PSC had

21   submitted into the federal court in the MDL with the

22   privilege log where they disclosed myriad communication

23   after communication by, between, and with Mr. Conlan,

24   Beasley Allen and specifically with Mr. Birchfield,

25   prior to ever asking us for our consent, requesting a

 1    waiver, or even disclosing the existence of those

 2    communications.

 3         Q    To this day, have they asked you for a

 4    waiver?

 5    A    Never.

 6         Q    Did Mr. Birchfield ever reach out to you to

 7    say that he had been approached by Mr. Conlan?

 8    A    Never.

 9         Q    Anyone from Beasley Allen?

10    A    Never.

11         Q    Anyone from the PSC?

12    A    Never.

13         Q    In your position as the worldwide head of

14    litigation for Johnson & Johnson, to your knowledge did

15    they approach anyone on the in-house or the outside

16    counsel team to disclose that before you got the email

17    from Mr. Conlan on October 18th?

18    A    No, they didn't.  There's only one person in

19    Johnson & Johnson authorized to give the waivers,

20    that's me.

21         Q    And more broadly, did they ever -- to your

22    knowledge, as worldwide head of litigation, did anyone

23    even disclose prior to that date that Mr. Conlan was

24    working with Mr. Birchfield and other members of the

25    Beasley Allen firm?

Haas - Redirect                              34

1    A     No.

2         Q    Have you, Mr. Haas, had an opportunity to

3    review a decision issued by the Special Master Judge

4    Schneider in the MDL --

5    A     Yes.

6         Q    -- last week?

7    A     I have.

8              MR. POLLOCK:  Objection, Your Honor, beyond

9    the scope, outside the record.  This is direct

10   examination.

11             THE COURT:  What's the -- I'm sustaining

12   that.  That is outside the record, outside cross

13   examination.

14             MR. BRODY:  Your Honor, it's going to go

15   directly to -- well let me set it up.

16             THE COURT:  What's the problem?

17             MR. BRODY:  I will put it within the scope

18   directly –

19             THE COURT:  Okay.

20             MR. BRODY:  -- with a couple of questions,

21   Your Honor.

22   BY MR. BRODY:

23        Q    Mr. Haas, do you recall being asked questions

24   about whether you had any evidence that Mr. Birchfield

25   and Mr. Conlan had formed an alliance?

1    A    Yes.

2         Q    All right.

3              MR. BRODY:   If I may approach, Your Honor?

4              THE COURT:   With what?

5              MR. BRODY:   With a copy of the order.

6              THE COURT:   Would you share it with Mr.

7    Pollock?

8              MR. POLLOCK:   I object to this entire thing.

9    If you look at exhibit 16, which is Andy's

10   certification of January 29, paragraph 23, he addresses

11   directly that he had communications with Mr. Conlan.

12   He isn't hiding it.  And Mr. Haas is saying oh, I just

13   learned about it two weeks ago.  That's not true.  The

14   fact is they knew about this as of January 29.  Now

15   suddenly we're going to try to expand the record.  I

16   have no opportunity, unless I'm going to start cross

17   examining the special master who is here in the room,

18   I'm going to start questioning everybody on the

19   documents.  I have no clue where this came from, what

20   the validity of it is, or why it's relevant here today.

21             Mr. Brody gave his word to Judge Singh and to

22   you, the record is closed, we're done.  So, I

23   vehemently object to suddenly now opening the record

24   up, because what's going to be the end point.

25             THE COURT:   Well I did sustain your

1      objection, Mr. Pollock.  But I did offer Mr. Brody an

2      opportunity to proffer what's that for.

3                  MR. POLLOCK:  Understood, Your Honor.

4                  THE COURT:  That's the Special Master's

5      decision.

6                  MR. POLLOCK:  Judge, this is your courtroom,

7      or Your Honor's courtroom, I'm trying to figure out how

8      the linguistics of that work.  Whatever you decide is

9      fine with  me, but I had to state the objection.

10                  THE COURT:  Certainly.

11                  MR. BRODY:  So, since it was (indiscernible)

12      Mr. Haas, if you would --

13                  THE COURT:  What's the proffer, Mr. Brody

14      with respect to the Special Master's --

15                  MR. BRODY:  Well, if I may approach, first so

16      that he has a copy.

17                  THE COURT:  Well I want to hear what your

18      proffer is first.

19                  MR. BRODY:  Sure, that the -- that the

20      special master's decision describing the substance of

21      those documents after his in-camera review supports the

22      existence of an alliance between the two.  And it goes

23      directly to the point that Mr. Pollock was trying to

24      make on cross examination that there is no evidence

25      that Mr. Haas has seen of an alliance between the two.

1    It goes directly to that.

2           THE COURT:  How does that then differ from

3    what Mr. Birchfield was saying, I had communications

4    with Mr. Conlan?

5           MR. BRODY:  Because the only thing that Mr.

6    Birchfield said in his declaration was to the best of

7    my knowledge, I met Mr. Conlan for the first time on

8    May 2nd, 2023.  There is no additional information, no

9    disclosure as to the extent of the conversations, the

10   fact that there are emails going back and forth a

11   period of months, that according to the privilege log

12   they are exchanging claim matrices, estimates of

13   ovarian cancer case values and claiming that those

14   communications between Mr. Birchfield, Ms. Odell, and

15   Mr. Conlan, are privileged, so that J&J can't see them.

16          So an --

17          MR. POLLOCK:  Your Honor, these are -- I

18   apologize.

19          MR. BRODY:  -- extraneous statement in a

20   declaration that says I met Mr. Conlan for the first

21   time on May 2nd, 2023 doesn't tell us anything about

22   what was going on.  And to the extent we know or have

23   an inkling of what was going on and what's in the

24   documents that they have said are privileged, they're

25   privileged communications with Johnson & Johnson's

1     former opposing counsel.  We do have a very good idea.

2                THE COURT:  Well we did find that that's part

3     of the record.  That's part of the federal record.

4     That's part here.  I can take judicial notice of that,

5     of the existence.

6                MR. BRODY:  And Your Honor, you can also take

7     judicial notice of the special master, order number 21

8     in the MDL.

9                THE COURT:  My concern is I'm not going any

10    further to say why wasn't that brought out in direct?

11    Why wasn't it addressed earlier?  Because we are

12    getting somewhat out of the scope of where we were

13    today, where I anticipated being today.

14                MR. BRODY:  Well I think it's directly within

15    the scope of the questions about you know, what --

16                THE COURT:  What exactly does Mr. Haas have?

17                MR. BRODY:  What do you have?  Look at the

18    notebook.

19                THE COURT:  That's not lost on us.

20                MR. POLLOCK:  Your Honor, this is all

21    privileged mediation protected communications.  So, if

22    we're going to throw aside the mediation privilege,

23    which I thought was pretty stark in New Jersey, we are

24    cutting new ground.  And to me, with all due respect to

25    Judge Schneider who is sitting behind me, he has his

1    own opinions.  He's entitled to his own views.  But

2    frankly, unless he made an express finding that Andy,

3    Andy Birchfield conspired, which I don't think he did,

4    with Mr. Conlan, I don't -- these are all protected

5    communications.  Now we're going to crack open the

6    privilege.  They have asserted the privilege multiple

7    times.

8              THE COURT:  We are not cracking open

9    anything, other than we have the privilege log and we

10   have a document -- a decision by the Special Master.

11             MR. POLLOCK:  So, but where does this go?

12   Once we take this first step --

13             THE COURT:  Well I am going to permit the

14   question and I'm going to permit you to reopen some

15   aspect of your direct with regard to this decision.

16   But we're not breaching, addressing, conflicting or

17   doing anything with regard to the mediation privilege.

18             MR. BRODY:  Absolutely, Your Honor.  And I am

19   not suggesting that we --

20             THE COURT:  That (indiscernible) here that

21   there's a myriad of reasons why that exists.

22             MR. BRODY:  And I am not suggesting that we

23   should do that.  And I'm not going that direction.

24   BY MR. BRODY:

25        Q    Mr. Haas, I'll just -- I'll just ask you,

Haas - Redirect                                40

1      you've read the Special Master's decision.  Right?

2      A    Yes, I have.

3          Q    And you've read his conclusions based on his

4      in-camera review of the documents.  Correct?

5      A    Yes.

6          Q    And so, you understand that he indicated that

7      subjects covered in the privileged documents include

8      close collaboration and strategy communications

9      regarding how to consider, conduct, participate in,

10     initiate, and/or continue to mediate with J&J regarding

11     plaintiff's proposal.  Right?

12     A    Yes.

13         Q    Referring to close collaboration and strategy

14     communications between Conlan and Legacy on the one

15     hand and Beasley Allen on the other.  Right?

16     A    That's correct.

17         Q    He indicated that subjects covered in the

18     documents include regular communications with

19     Birchfield and other counsel for plaintiffs regarding

20     the foregoing matters including when and how to present

21     the settlement proposal to J&J in the context of

22     mediation.  Are you familiar with that finding?

23     A    Yes, I am familiar with the finding.

24         Q    My question to you in response to the

25     questions you've got on cross examination is does that

1    suggest to you that they had formed an alliance, or to

2    use the words from the order were collaborating?

3            MR. POLLOCK:  Your Honor, I object to whether

4    --

5    A    The way --

6            MR. POLLOCK:  Let me object, please.  I

7    object because when it says the question, does it

8    suggest to you, with due respect to the Court, I don't

9    care what it suggests to Mr. Haas.  What I care about

10   are the facts.  Is there a fact that there was a

11   confidential disclosure in this case.  And to me, he's

12   allowed his own opinions, I've got my opinions.  I

13   don't think the court should really care of either one.

14   I want to know what the facts are.  I do think we

15   should be limited to what the facts are, because that's

16   what Trupo says, what are the facts?

17           THE COURT:  Well ultimately, that question is

18   to be resolved by the Court.

19           MR. POLLOCK:  Correct.

20           MR. BRODY:  So let me -- actually, Your

21   Honor, I can rephrase the question -

22           THE COURT:  Sure.  I sustain the objection.

23           MR. BRODY:  -- directly in the context of

24   what Mr. Haas was asked by Mr. Pollock.

25   BY MR. BRODY:

1        Q    Do you consider this to be --

2             THE COURT:  Mr. Haas.

3        Q    Mr. Haas.

4             THE COURT:  By Mr. Pollock, yeah.

5             MR. BRODY:  My point was I'm going to

6    rephrase the question within the context of what Mr.

7    Pollock asked of Mr. Haas.

8             THE COURT:  Sure, okay.

9             MR. BRODY:  Apologies if I'm mixing names up.

10            THE COURT:  That's okay.  I just wanted to

11   make sure of who you were speaking of.

12            MR. BRODY:  Yeah, no I'm going to put the

13   questions in the context of the questions that Mr.

14   Pollock asked Mr. Haas.

15   BY MR. BRODY:

16        Q    Mr. Haas, is this close collaboration and

17   these communications weren't disclosed to you at the

18   time they were being made between your former counsel

19   and Mr. Birchfield's firm to put it in the context of

20   the words used by Mr. Pollock, evidence of an alliance

21   between your former counsel and the Beasley Allen firm?

22   A    They are.  And to put it in context of when the

23   entire line of questioning was presented, they do show

24   evidence of alliance.  It was not disclosed.  It was

25   concealed.  And it's the type of collaboration that

1    fundamentally undermines the adversarial process by

2    communicating with Mr. Birchfield on and have that

3    alliance, on the very issues that are at the heart of

4    the matters that we were adjudicating and seeking to

5    resolve; and the very issues that were being debated,

6    critiqued, discussed by and between us and outside

7    counsel that presents an unfair advantage to our

8    adversaries, and thwarts our ability and is thwarting

9    today our ability to get a final effective and

10   equitable resolution of this case for all claimants as

11   well as for J&J.

12        Q    Thank you, Mr. Haas.  Those are my redirect

13   questions.

14             THE COURT:  Okay.  Any questions, Judge

15   Singh?  I don't have any questions.  Mr. Pollock.

16             MR. POLLOCK:  No, Your Honor.  Thank you very

17   much and I appreciate your patience, Mr. Haas.

18             THE COURT:  Okay.  Thank you.  You may step

19   down.  Mr. Brody, your next witness.

20             MR. BRODY:  We call James Murdica, Your

21   Honor.

22             THE COURT:  Okay.  Mr. Murdica, before you

23   have a seat, please raise your right hand, tell me your

24   name, spell your last name.

25             MR. MURDICA:  James Murdica, M-U-R-D-I-C-A.

 1    J A M E S   M U R D I C A, DEFENDANT'S WITNESS, SWORN.

 2              THE COURT:  Thank you, have a seat.

 3    DIRECT EXAMINATION BY MR. BRODY:

 4         Q    Mr. Murdica, Judge Porto, Judge Singh, I

 5    know we covered a lot of ground in Mr. Haas's

 6    examination and I'm going to try to avoid repeating

 7    anything that you've already heard.

 8              Mr. Murdica, what's your current occupation?

 9    A    I'm an attorney.

10         Q    And where do you work?

11    A    I work at Barnes & Thornburg.

12         Q    How long have you been there?

13    A    I've been there seven years.

14         Q    And in the time that you've been working at

15    Barnes & Thornburg, have you represented Johnson &

16    Johnson?

17    A    The entire time.

18         Q    As outside counsel?

19    A    As outside counsel, correct.

20         Q    Do you represent Johnson & Johnson in talc

21    litigation?

22    A    I do.

23         Q    And does your representation of J&J include

24    advising the company with respect to claims that are

25    pending in this State Court MCL proceeding?

1    A    It does.  My role in talc is primarily as

2    resolution counsel, advising on that.  And during the

3    pendency of the LTL bankruptcies I was the lead outside

4    counsel responsible for the mediations.

5        Q    Okay.  And does your representation of J&J

6    also just so the record is complete, include advising

7    the company as to the cases that are pending the

8    federal MDL?

9    A    Very much so.

10       Q    Who do you correspond with at Johnson &

11   Johnson as part of your work on the talc litigation?

12   A    I report to Andrew White and to Erik Haas.

13       Q    All right.  I'm going to be asking you some

14   questions about the work that you have done on the talc

15   litigation and the work that Mr. Conlan did as counsel

16   for J&J on the talc litigation.  I'm going to give you

17   the same caution that I gave to Mr. Haas.  I don't want

18   you to go into the substance of any of the privileged

19   and confidential communications that you have had with

20   the company.  So, I want to keep things on a high yes

21   or no level when we are getting to substantive issues,

22   because those conversations are privileged.  Do you

23   understand that?

24   A    I understand.

25       Q    All right.  Through your representation of

1    Johnson & Johnson in the talc litigation, did you work

2    with Mr. Conlan while he was representing the company?

3    A    I did.

4         Q    Did you work with him directly?

5    A    I worked with him directly, yes.

6         Q    Can you explain at a general level what

7    issues you worked on with Mr. Conlan?

8    A    Yes.  Early in 2020, I --

9              MR. POLLOCK:  Can I just get a clarification

10   here, sir or Your Honor, whether we're talking Imerys

11   or LTL, because we're apparently going to cover a long

12   time period.

13             MR. BRODY:  Your Honor, it was a general

14   question as to what types of issues.  We'll get into

15   specifics but it was not limited to one thing or

16   another.

17             THE COURT:  It involved Imerys and LTL?

18             THE WITNESS:  Ultimately, yes Your Honor.  I

19   was going to start with when I began in this role with

20   talc in 2020.

21             THE COURT:  As resolution counsel?

22             THE WITNESS:  Yes, Your Honor.

23             THE COURT:  Okay.  Mr. Brody?

24        Q    You can proceed to answer the question.

25   A    I was asked to take this role on by Johnson &

1    Johnson in early 2020 by Mr. Haas's predecessor Mr.

2    Braunreuther (phonetic) who he testified about.  From

3    that time on, I was very involved daily in talc

4    resolution, having conversations with various

5    plaintiff's counsel.

6        Sometime in the summer of 2020 Mr. Conlan was

7    hired by Braunreuther.  Mr. Braunreuther asked me to

8    work closely with Mr. Conlan on resolution.  From that

9    point on, Mr. Conlan and I worked very closely, to the

10   point that we were speaking almost every day in the

11   late summer and fall of 2020, email, phone calls,

12   everything I did with respect to resolution, I either

13   incorporated Mr. Conlan or ran by Mr. Conlan.

14       Q    So you communicated by phone, I take it?

15   A    Every day.

16       Q    Over email?

17   A    Yes.

18       Q    In-person?

19   A    When possible, yes.  It was the end of COVID at

20   that point in time.

21       Q    And I think you indicated that you frequently

22   would communicate daily with Mr. Conlan?

23   A    That's correct.

24       Q    Were you involved in communications involving

25   Mr. Conlan and other members of the J&J team?

Murdica - Direct                    48

1    A    I was.  As Mr. Haas described, we had weekly calls

2    throughout the course of that year and throughout the

3    time that Mr. Conlan became involved.  And the weekly

4    call would include the head of Weil, because they were

5    handling the Imerys aspect, eventually somebody from

6    Jones Day because they were handling the other

7    bankruptcy aspect that became LTL, somebody from King

8    and Spaulding, because they were national counsel for

9    the Mesothelioma claims, somebody from Chicardi because

10   they were national counsel for the ovarian claims,

11   myself and Mr. Conlan.  Internally at that point in

12   time they would include Joe Braunreuther, the Deputy

13   General Counsel of J&J, Don Kim, who had Mr. White's

14   role at the time, and sometimes Mr. White, usually Mr.

15   White.

16        Beyond that, that was just a standing weekly call.

17   Mr. Conlan, myself, and Mr. Braunreuther, and usually

18   Mr. Kim had regular separate calls to coordinate the

19   high-level strategy on resolution, because Mr. Conlan

20   and I were the ones that were in charge of the overall

21   strategy and what we were doing really with resolution

22   and trying to get a resolution, originally with Mr.

23   Birchfield, outside of the Imerys bankruptcy and then

24   utilizing the Imerys bankruptcy and so on.

25        Q    All right.  Can you -- so you mentioned the

1    Imerys bankruptcy.  With respect to your communications

2    with Mr. Conlan, how was Mr. Conlan involved in the

3    Imerys bankruptcy?

4    A    So, like I said with regard to resolution, Mr.

5    Conlan is a bankruptcy expert, but also a mass tort

6    resolution expert.  So, Mr. Conlan and I worked hand-

7    in-hand throughout the time.  He knew all of the

8    bankruptcy, I didn't.  He also had connections to the

9    future claims representative and the future claims

10   representative's counsel and I didn't.  He knew all of

11   the bankruptcy lawyers representing the debtor and the

12   Tort Claimants Committee in Imerys, because he had

13   worked with them for a long time.  In fact, the

14   debtor's counsel I believe was one of his mentees, I

15   think he told me while he was at the Sidley firm.

16        Q    All right.  As part of his work, was Mr.

17   Conlan involved in the legal teams' evaluation, the

18   confidential and privileged evaluation of potential

19   resolutions of J&J's talc litigation through the Imerys

20   bankruptcy?

21   A    He was, both through the Imerys bankruptcy and

22   before that when we were negotiating with Mr.

23   Birchfield for an initial resolution.  Mr. Conlan -- I

24   would forward Mr. Conlan or incorporate him in

25   everything I was doing, so for example even before we

1    considered utilizing the Imerys bankruptcy he was

2    seeing draft proposals with Mr. Birchfield and helping

3    me with them, commenting on them, et cetera.

4              MR. POLLOCK:  Your Honor, I'm going to raise

5    the same objection that I raised with Mr. Haas

6    regarding documents, communications, records, and

7    things.  You -- I understand that you understand my

8    concern.  I am not going to -- I don't want to

9    interrupt the flow, but obviously you understand I have

10   a continuing objection under the best evidence rule,

11   under the fact that this is hearsay, it doesn't fall

12   within 1006, it doesn't fall within 701.  So, to me I

13   object to it.  But I don't want to keep interrupting.

14   I don't want silence to acquiescence.

15             THE COURT:  You have to make your record and

16   my prior ruling with regard to documents in the

17   documents continue.

18             MR. POLLOCK:  Yes, sir.  I'm going to sit

19   down and shut up as long as I can, only because I don't

20   want interrupt the flow, but please understand that I

21   have an ongoing objection.  Is that fair?

22             THE COURT:  That's fair.

23             MR. POLLOCK:  Thank you, sir.

24             THE COURT:  You're welcome.

25   BY MR. BRODY:

Murdica - Direct                          51

1          Q    Let me ask you this question, did -- was Mr.

2   Conlan involved in evaluation of terms, resolution

3   terms specifically proposed by Beasley Allen?

4   A    He was.

5          Q    What was Beasley Allen's role in the Imerys

6   bankruptcy?

7   A    Beasley Allen represented one of the claimants on

8   the Tort Claimants Committee in the Imerys bankruptcy.

9          Q    Okay.  Were members of the Beasley Allen firm

10  part of the TCC negotiating committee in the Imerys

11  bankruptcy?

12  A    They were.  To my understanding, as was

13  represented to me, the TCC in the Imerys appointed a

14  negotiating committee and Lee Odell and Ted Meadows

15  were two of the representatives on the negotiating

16  committee that we worked with the most.

17         Q    Was that at the time when Mr. Conlan was

18  counsel for J&J?

19  A    Yes, it was.

20         Q    All right.  Did you tell anyone at Beasley

21  Allen during the Imerys bankruptcy that Mr. Conlan was

22  working as counsel for J&J on the talc litigation?

23  A    Yes, they knew that from me telling them but also

24  from seeing Mr. Conlan on phone calls and Zooms and

25  alike.

1        Q    All right.  Who did you tell that Mr. Conlan

2    was working as counsel for J&J on the talc litigation?

3    A    I certainly would've told Andy, and Lee and Ted

4    would've at least seen him on the Zooms as we were

5    negotiating a deal we almost -- you know we came very

6    close on in February of 2021.

7        Q    All right.  When, to the best of your

8    recollection did you first inform, you referred to

9    Andy, I'm assuming you're referring to Mr. Birchfield.

10   A    Yes, Mr. Birchfield.

11       Q    When did you first tell Mr. Birchfield that

12   Mr. Conlan was representing J&J at the top of the page?

13   A    I don't remember exactly, but it would've been

14   sometime in the fall of 2020.

15       Q    Okay.  He has submitted a certification in

16   this case that says it was in 2020, is that consistent

17   with your recollection?

18   A    Yes.

19       Q    All right.  Were you negotiating with Mr.

20   Birchfield, negotiating resolutions with Mr. Birchfield

21   at that time?

22   A    Yes, we started -- Mr. Birchfield and I started

23   negotiating resolution, I believe in April 2020.  And

24   there were iterations from April 2020 right through

25   2022/2023.

1      Q    When you refer to iterations, you're talking

2    to iterations of resolution proposals?

3    A    Yes, there were several beginning in 2020.

4      Q    And throughout the course of those various

5    iterations, after Mr. Conlan came on board as a member

6    of J&J's outside counsel team was he involved in

7    internal privileged and confidential discussions of how

8    the company would respond to and negotiate those

9    different iterations?

10   A    Yes, as I said before, Mr. Conlan and I were the

11   main people running the strategy, evaluating the

12   settlement options.  And we were the only ones having

13   the highest level conversations with the Deputy General

14   Counsel.

15     Q    And did that include, without revealing any

16   of the substance the discussion of the specific terms

17   that had been proposed by Beasley Allen?

18   A    Absolutely.

19     Q    And again, let me ask you this, did any of

20   the proposals from Beasley Allen that you were

21   discussing in that privileged and confidential context

22   include things like settlement matrixes?

23   A    They did.

24     Q    And did you and Mr. Conlan engage in analysis

25   of the values in those matrices, the structure of those

1    matrices, claims, procedures, things like that

2    associated with them?

3    A    We did, as did other parts of the team.  We

4    ultimately had questions for our experts on them, to

5    get to weigh in on that.  Yes, we did.

6        Q    When you refer to experts, are you referring

7    to consultants who were retained confidentially to

8    provide confidential communications about things like

9    claim values?

10   A    That's correct.

11       Q    About things like the potential number of

12   future claimants.

13   A    That's another thing that they were retained for,

14   yes.

15       Q    Okay.  Did you in that period consider with

16   Mr. Conlan proposals from Beasley Allen regarding the

17   potential number and value of future claims?

18   A    We did, yes.

19       Q    And was Mr. Conlan privied to confidential

20   work performed by J&J's litigation consultants related

21   to that?

22   A    He was.  Mr. Conlan was my closest confidant on

23   all of this from the first written Beasley Allen

24   proposal, which he had and we discussed and went back

25   and forth with Mr. Birchfield and his firm and that

Murdica - Direct                                55

1    process continued over months.

2         Q    And through that process, did Mr. Conlan

3    learn how J&J assessed the strengths and weaknesses of

4    the Beasley Allen proposals?

5    A    He did.  He learned that.  He learned the way J&J

6    thinks about talc claims, how they value them.  He

7    learned perhaps more importantly the way I work,

8    because I still am in charge of resolution for talc.

9    We learned every strategy I had about who to go to, who

10   not to go to, all the strategic options we should

11   consider, everything I learned over my 15 years of

12   being J&J's main outside resolution counsel.  He was

13   literally somebody that I talked every day about this.

14        Q    I think you indicated that you regularly

15   shared with him communications that you received from

16   Beasley Allen?

17   A    Yes, I forwarded them immediately.

18        Q    Did you and Mr. Conlan discuss them?

19   A    Yes.

20        Q    Did you include in those discussions how to

21   respond to them?

22   A    Yes, many times I needed his advice because there

23   were bankruptcy questions in addition to all of the

24   settlement questions, as well.  So, I couldn't do it

25   without him.

1        Q    Did you consider those communications and

2    those discussions to be privileged and confidential?

3    A    The most privileged and most important

4    communications I ever had for J&J.

5        Q    Would you ever share them with your opposing

6    counsel?

7    A    Never.

8        Q    Why not?

9    A    Because it would be so disadvantageous for

10   somebody trying to deal with resolution to hand their

11   play book over to the other side.

12       Q    Did your strategy discussions with Mr. Conlan

13   include things like how to participate in, how to

14   initiate, how to continue negotiations with different

15   parties on the other side of the litigation?

16              MR. POLLOCK:  Objection, leading.

17              THE COURT:  Sustained.

18       Q    Let me ask you this,  you mentioned that you

19   talked about sort of the ins and outs of settlement,

20   the who to go to, what to propose, are those things

21   that you discussed with Mr. Conlan?

22   A    Yes.

23       Q    Did those discussions include along the way,

24   throughout the time you were working with Mr. Conlan

25   confidential discussions of how much the company might

Murdica - Direct                              57

1    be willing to pay to resolve the talc litigation?

2    A    Absolutely, it was an important part of the

3    conversation.

4         Q    Did it include things as detailed, as for

5    example, the future's only settlement in the Imerys?

6              MR. POLLOCK:  Your Honor, can we have a point

7    in time because the last one was a broad question.

8    This time it's Imerys.  I would like to get a point in

9    time to know which case I'm talking about.  Because I

10   can't measure what information is confidential if I

11   don't know which case it is and the time frame we're

12   talking about.

13             THE COURT:  Sure.  Mr. Brody, give a date.

14        Q    Sure.  Did there come a time when you and Mr.

15   Conlan were engaged in discussion of a potential

16   future's only settlement?

17   A    Yes.  In the fall of 2020 Mr. Birchfield proposed

18   an outside of bankruptcy settlement for the existent

19   tort claimants and inside of bankruptcy future's

20   settlement.

21        Q    Was Mr. Conlan involved in the evaluation of

22   that?

23   A    That was, yeah, that was in the period of time

24   when I was working with Mr. Conlan every day to

25   evaluate proposals like that and we certainly worked on

Murdica - Direct                                    58

1    that one extensively together.

2         Q    Was Mr. Conlan, in addition to yourself

3    negotiating directly with the other side during that

4    period?

5    A    Yes, he was talking primarily with the TCC's

6    counsel and the FCR and the FCR's counsel, which of

7    course were the most important parts of trying to get a

8    future's only settlement in the bankruptcy.  I didn't

9    have those relationships like that.

10        Q    In the process of evaluating the potential

11   for a future's only settlement, in the bankruptcy, was

12   Mr. Conlan involved in confidential evaluation of what

13   J&J might be willing to pay for such a settlement?

14   A    Yes.

15        Q    Did that include review of information

16   prepared by J&J confidential consultants in the

17   litigation?

18   A    Yes, and my firm as well, which was also analyzing

19   that.

20        Q    Do you consider that work that you were doing

21   at the time relevant to what is going on in the talc

22   litigation today?

23   A    It's the same issues relevant to resolution today.

24   Where, obviously, as you heard from Mr. Haas we're

25   still actively trying to resolve this.  We still have a

1    plan.  We still have great support for a plan.  All of

2    the issues are the same.  All of the issues remain

3    relevant and all of the insight that we had back then

4    is as important now as it was then.

5         Q    And are you looking, I mean at the end of the

6    day, are you looking for what ultimately will be a

7    negotiated, and when you talk about that and you talk

8    about that being important, are you talking about it

9    being important to a negotiated resolution?

10   A    I am not sure I understand the distinction that

11   you're drawing.  But every conversation that we had

12   back then evaluating at first, just an outside

13   bankruptcy settlement, then a half-in/half-out

14   settlement.  Then the Imerys settlement, then

15   ultimately LTL is all still relevant to our thinking

16   today, our approach today and the resolution that we're

17   working on still today.  That's what I would be doing

18   if I wasn't sitting here testifying.

19        Q    Have you been involved as outside counsel for

20   Johnson & Johnson in the development of proposals that

21   J&J has come up with to potentially resolve on a global

22   basis the talc litigation?

23   A    Yes, I have.

24        Q    During the time that Mr. Conlan was working

25   as outside counsel for Johnson & Johnson was he

Murdica - Direct                    60

1       involved in those discussions as well?

2       A    Yes, he was.

3            Q    Did those discussions to your recollection

4       during the time that Mr. Conlan was working as outside

5       counsel for Johnson & Johnson involved the company's

6       evaluation of settlement matrices to come up with those

7       proposals?

8       A    Yes, it did.

9            Q    And just to provide a little more detail for

10      the benefit of the Court, what -- when you talk about,

11      and just generally a settlement matrix in the context

12      of a mass tort settlement, what are you talking about?

13      A    Given the number of claimants, you're talking

14      about an initial rough way to evaluate them, what are

15      their age?  What's their disease state?  Is their

16      cancer stage 1, 2, 3, or 4, things like that.  So

17      literally a grid with different base values based on

18      some very, very, very basic facts about the claimants.

19           Q    And the work that you did with settlement

20      matrices back in that time period when Mr. Conlan was

21      serving as outside counsel for Johnson & Johnson

22      2020/2021, is the review and analysis of that

23      information germane to the issues that you're dealing

24      with in the top litigation today?

25      A    It is.  Back at that time, we had a -- we had a

1    Barnes & Thornburg created settlement matrix.  We had a

2    Beasley Allen created settlement matrix.  We had a

3    settlement matrix created by the Imerys Tort Claimants

4    Committee that they put in their trusts distribution

5    procedures.  And Mr. Conlan had all of those and we

6    were evaluating all of those, comparing and

7    contrasting.  So, Mr. Conlan knows all of my thoughts,

8    all of the company's thoughts on those three proposals.

9    Indeed, we heard testimony earlier about the most

10   recent matrix put forward by the Legacy company, which

11   you know, is an iteration of Beasley -- you know, Andy

12   Birchfield and Beasley Allen's settlement matrix.

13        Q    All right.  In all of that time, I just want

14   to get a sense for the benefit of the Court, of how

15   involved Mr. Conlan was in the discussions about issues

16   surrounding claim values, number of future claims,

17   value of future claims, value of present claims, how

18   involved was he?

19             MR. POLLOCK:  Objection.  First of all, it's

20   compound.  But second of all, I really at this point

21   want details.  I want to know what discussions occurred

22   when.  Mr. Murdica can keep on testifying, obviously,

23   but I am concerned that I can't question about what I

24   don't understand.  He had discussions about settlement

25   matrices.  What discussions, when, where, who was

1    involved?  All of these things.

2              THE COURT:  I appreciate Mr. Pollock, your

3    understanding or lack of understanding, what I'm

4    interested in is does this witness understand the

5    question?  To the extent we can get a time frame, Mr.

6    Brody?

7              MR. BRODY:  Yeah, we it was an initial

8    question and then we were going to zero in a couple of

9    things.

10             MR. POLLOCK:  Just to be clear, Your Honor,

11   it's your courtroom and again I respect that greatly,

12   but it's beyond time frame.  It goes to the merits, the

13   substance, because you're talking four years where

14   Imerys, LTL,  you're talking a massive upset with the

15   Third Circuit, you've got all of these facts coming in

16   at one time.  I'm being told that there were

17   discussions regarding each one of these concepts.  I

18   had no clue what those are.  There's nothing in the

19   record to support it.  I am not doubting that these

20   discussions occurred.  I'm sure Mr. Murdica is telling

21   the truth.  But I can't measure what I can't see or

22   don't understand.  There's no records to support that

23   testimony at all.

24        Q    Let me ask this question.

25             THE COURT:  Do you have a document?

Murdica - Direct                          63

1          Q     I think maybe for everybody's benefit if I

2     could ask Mr. Murdica, throughout the period that Mr.

3     Conlan was working as outside counsel for Johnson &

4     Johnson was the --

5                THE COURT:   2020?

6                MR. BRODY:   July 2020 to the end of February

7     2022.

8                MR. POLLOCK:   Thank you, Your Honor.

9          Q     Was the company internally, in a privileged

10    and confidential context, evaluating claim values or

11    present claims, potential number of future claims and

12    the potential value of future claims in the talc

13    litigation?

14    A     That's been the case since early 2020 until the

15    present case.

16         Q     So, that was during the entire time that Mr.

17    Conlan was outside counsel for the company.  Right?

18    A     That's correct.

19         Q     And how involved was he in those discussions?

20    A     I'll try to put a finer detail on it for Mr.

21    Pollock.  From the time that Mr. Conlan started working

22    on talc, which was sometime in, I believe August of

23    2020.  He became very involved, to the point that we

24    were having daily conversations.  And Mr. Pollock it

25    was first about your client's outside bankruptcy

1    proposal.

2              THE COURT:  Could you address the Court, and

3    not directly address Mr. Pollock?

4              THE WITNESS:  I'm sorry, I was trying to

5    answer his questions.  It was first about an outside

6    bankruptcy proposal which was a conversation we were

7    having until about September 2020 to the best of my

8    recollection.  At that point in time, we pivoted to

9    trying to do something in the Imerys bankruptcy.  And

10   at that point in time, Mr. Birchfield and I were all

11   aligned on this and we could not get the approval of

12   the full Tort Claimants Committee in the Imerys

13   bankruptcy.

14             So, then we continued to pivot and tried to

15   find an agreement that would work for a majority of the

16   TCC in Imerys so that we could get the votes to move

17   the plan forward.  We came -- throughout this whole

18   time I'm working very close with Mr. Conlan because

19   he's now working for J&J and it's the two of us who are

20   in charge of trying to get this resolution done.

21             At that point, we just keep modifying our

22   proposal until by February of 2021 we were very close.

23   And I remember it very specifically, I remember where I

24   was because Joe Braunreuther was retiring on March 1st.

25   We were trying to get this deal done and approved by

1    the TCC before he left the company because he worked so

2    hard on it with myself and Mr. Conlan.  It turned out

3    that even though we were literally on the one yard

4    line, we thought that we would get it done, we didn't

5    get it done.  Mr. Haas had been involved since the

6    fall, since he came to J&J, but now he took over duties

7    for talc.

8              By April 15th of 2021 we had a deal with the

9    Imerys TCC which you heard about.  He was asking about

10   well why didn't you enforce it?  There was -- we were

11   led to believe that future claims representative had

12   signed off on it.  It turned out that it was only the

13   Tort Claimant's Committee itself and it -- as well.

14             So during that entire time, Mr. Conlan and I

15   were working hand-in-hand every day to try to deliver

16   this for the company and report it to Mr. Braunreuther

17   and Mr.  Haas.

18   BY MR. BRODY:

19        Q    During the period you mentioned around April

20   of 2021, when you were trying to get this across the

21   finish line, did J&J create a term sheet for what was

22   being discussed and what you thought you were going to

23   be able to get across the line?

24        A    Yes, we had a term sheet that was signed off on by

25   the Imerys TCC and the counsel for the Imerys TCC.

1      Q    Prior to providing that term sheet to the

2  TCC, was Mr. Conlan involved with you in privileged and

3  confidential discussions of what that term sheet would

4  look like?

5  A    Absolutely.

6      Q    Did that include, by the way, both ovarian

7  cancer and Mesothelioma claim?

8  A    I believe so.

9      Q    All right.  Did the proposal that was

10 developed, that you were involved in the confidential

11 discussions on, involve a presentation of a settlement

12 group?

13 A    It did, yes.

14     Q    Were you involved in the creation and

15 evaluation of that grid?

16 A    I was.

17     Q    Was Mr. Conlan?

18 A    Mr. Conlan was involved in all aspects of the

19 proposal and then following April, it was April 15th,

20 2021 that we got TCC approval, Mr. Conlan was working

21 on resolving any other issues that the future claims

22 representative had to deliver the rest of the

23 settlement.  I know that he had many conversations with

24 counsel and with the FCR over the next couple of months

25 after that to try to get that agreement.

1          Q    So, Judge Porto and Judge Singh have heard a

2     bit from Mr. Haas about how Mr. Conlan was personally

3     involved in negotiating with the TCC and the FCR, in

4     the Imerys bankruptcy.  Just so that the record is

5     clear on this, can you explain in that respect what his

6     role was?

7     A    Yes, like I said, he was my counterpart for -- as

8     resolution and bankruptcy counsel, because he was also

9     bankruptcy lawyer, to try to deliver the settlement.

10    So, when we were negotiating again, this was early

11    2021, a lot was still done by Zoom, he had

12    relationships with long-standing relationships with at

13    least one of the Tort Claimants Committee lawyers in

14    Imerys, so he would appear on those.  He would

15    negotiate separately and then he would negotiate with

16    the future claims representative and the future claims

17    representative counsel because they had been in many

18    bankruptcies together and had a longstanding

19    relationship.

20         Q    And was this one of the time periods early

21    2021 when you were having daily or near daily

22    communications with Mr. Conlan?

23    A    Yes, really that remained the case from when he

24    started working for J&J until about, until very shortly

25    after the bankruptcy filing in LTL.  So to put a time

1    frame on it, after I would say October -- after the end

2    of October 2021 I didn't work with Mr. Conlan on a

3    daily basis anymore.

4          Q    Okay.  So pretty much up through the filing

5    of LTL?

6    A    And a couple of weeks beyond it, because we were

7    working on potential mediation options within LTL at

8    that point.

9          Q    Okay.  At the time that you and Mr. Conlan

10   were talking in early 2021, when he was engaged in

11   conversations with representatives or counsels for the

12   TCC and the FCR in the Imerys bankruptcy, did you and

13   he discuss negotiating strategies?

14   A    Of course.

15         Q    And you talked about imparting to him, you

16   know, what you knew from your experience which pre-

17   dated his in attempting to negotiate resolutions of the

18   -- of the talc litigation for Johnson & Johnson.  Did

19   that come into play in those discussions that you were

20   having with him?

21   A    Well, it did, because it wasn't just talc.  A lot

22   of the lawyers in the talc litigation were lawyers that

23   I resolved other mass torts with.  This wasn't the

24   first mass tort I've worked as J&J resolution counsel.

25   In fact, Judge Porto, you may or may not remember I

                          Murdica - Direct                    69

 1    resolved the hernia mesh MCL before you a year and a

 2    half ago.

 3               THE COURT:  Mesh.

 4        Q    At some point in July of 2021, do you recall

 5    negotiations with the TCC and the FCR over the Imerys

 6    plan becoming stalled?

 7    A    I didn't hear you on the time frame, but yes in

 8    the middle of 2021, we were making no further progress

 9    with the FCR as far as I could tell.

10        Q    Right.  I'm sorry, I referenced in my

11    question July of 2021.  Does that sound right?

12    A    That sounds right.  Yes.

13        Q    Did you consider strategies for J&J in

14    response to those negotiations becoming stalled?

15    A    Of course.  We were constantly working on

16    resolutions.

17        Q    Was Mr. Conlan involved in those discussions

18    as well?

19    A    He was, at that point, yes.

20        Q    Do you consider those discussions at that

21    time period as privileged and confidential discussions

22    that are relevant to what is going on in the talc

23    litigation today in 2024?

24    A    Very much so, we were in a similar position that

25    we were outside of bankruptcy.  At that point, we were

1    considering a bankruptcy filing.  And we were

2    discussing all of our options that we had on the table,

3    which is very much where we find ourselves today.  It's

4    the same situation.

5         Q    Now were you involved in mediation in the LTL

6    bankruptcy?

7    A    I was.  I was the lead for Johnson & Johnson in

8    the LTL bankruptcy mediation.

9         Q    Do you consider the privileged and

10   confidential communications that you had with Mr.

11   Conlan while he was outside counsel to Johnson &

12   Johnson to be relevant to what you were dealing with in

13   the LTL bankruptcy mediation?

14   A    Yes, because the mediation was dealing with --

15   it's the same thing, it's dealing with resolution we

16   were trying to resolve it in mediation.

17        Q    Now, you're aware that at some point in time,

18   as we've discussed Mr. Conlan left the law firm of

19   Faegre Drinker.  Right?

20   A    Yes.

21        Q    And at the time he left do you know whether

22   the LTL bankruptcy was pending?

23   A    It would've been, yes.

24        Q    Okay.  And is that a time period in which you

25   were involved in attempting to negotiate a resolution

1    within the bankruptcy structure?

2    A    Yes, that was mediation in LTL-1.

3         Q    All right.  Were you also involved in

4    mediation in LTL-2?

5    A    I was, same role.

6         Q    Did you know at the time that Mr. Conlan was

7    communicating directly with Mr. Birchfield and other

8    members of the Beasley Allen Firm about the talc

9    litigation?

10   A    I had no idea.  Like, Mr. Haas, I found out for

11   the first time two weeks ago that not only, had that

12   been going on since April, that it was allegedly

13   related to the mediation but as the lead mediation

14   representative for J&J, I could tell you that I never

15   heard a single thing about that until we got the

16   privilege log two weeks ago.  And I was kind of

17   dumbfounded and I was in close contact with the

18   mediators throughout the mediation, of course, because

19   that was my job.  And to my knowledge, the mediators

20   didn't know either.

21        Q    Okay.  When you learned this a couple of

22   weeks ago, were you concerned?

23   A    I was extremely concerned.  In my career, I've

24   never seen anything like that.

25        Q    All right.

Murdica - Direct                                72

1    A    It would be as if, I, having negotiated the

2    Prolene settlement while it's still pending and while

3    we're trying to get to the 95% decided to quit and go

4    become a consultant for the Plemming Firm.  It's

5    unimaginable to me that that could happen.

6         Q    We've -- and just for the benefit of the

7    Court in terms of your participation that you're

8    referring to in mediation during the LTL, bankruptcy,

9    the second time around, what time frame was that?

10   A    That would've been in the May 2023 until it was --

11   until the bankruptcy was dismissed in July of 2023 time

12   frame.

13        Q    Okay.  Now we've talked about when Mr. Haas

14   first learned via the October 18th, 2023 email that he

15   got from Mr. Conlan, when he first learned that Mr.

16   Birchfield was working with Mr. Conlan on this

17   settlement matrix.  When did you first learn that Mr.

18   Conlan and Mr. Birchfield were collaborating?

19   A    I think --

20             MR. POLLOCK:  Objection to the use of

21   collaborating.

22             MR. BRODY:  Your Honor, it's just a question.

23   He can tell me if I've gotten something wrong and it's

24   open for cross.

25             THE COURT:  I'll overrule the objection.

Murdica - Direct                          73

1    A    To the best of my recollection I learned a few

2    hours before that, because I was in Las Vegas at the

3    Mass Torts Made Perfect Conference and numerous

4    plaintiff's lawyers came up to me and started telling

5    me about how the talc was going to settle via this

6    Legacy plan that Andy was working on, because I -- I

7    was told that he was telling people that at the

8    conference.  I heard about it and I immediately asked

9    Mr. Haas what could possibly be going on, because it's

10   the first time I heard of it.

11        Q    So, all throughout the mediation process did

12   anybody ever come to you and say, we're working with

13   Jim Conlan on the plaintiff's side?

14   A    No, I talked to Mr. Birchfield about it after

15   that, in October, but not during mediation process.

16        Q    All right.  So, it was roughly you said a few

17   hours earlier on October 18th that you first learned of

18   this collaboration between Mr. Birchfield and Mr.

19   Conlan?

20   A    It may have been the night before but I learned it

21   via other people coming up to me because they all know

22   that I'm responsible for resolution of talc and saying,

23   hey I heard this is settling and you know, they were

24   told that we would have a resolution by November.

25        Q    Okay.  So, the Court has heard a bit about

1      the article that was published by Bloomberg that Mr.

2      Conlan wrote on November 2nd of 2023, and that's at

3      exhibit, I think it's 15 in the binder that you have in

4      front of you?

5      A      Yes.

6           Q      And if you turn to tab six, there's a letter

7      that you wrote there.

8      A      Yes.

9           Q      And you wrote this letter to Mr. Conlan?

10     A      I did.

11          Q      Okay.  Why did you write this letter to Mr.

12     Conlan?

13     A      Well, a couple of reasons.  One, I was asked to

14     communicate with Mr. Conlan on it, but I felt compelled

15     to because I read the article and I thought that the

16     article was talking about the LTL bankruptcy, and I was

17     afraid that Mr. Conlan was disclosing privileged

18     information.  So, I haven't read this probably since I

19     wrote it.  But, I essentially asked him to stop.

20          Q      Okay.  And it was -- I guess, we know from

21     Mr. Haas's testimony and from the exhibits that are in

22     the record that it was just four days after you wrote

23     that letter that Mr. Conlan sent his letter to the

24     board of directors.  Right?

25     A      That's right.

1          Q    Did you review the letter at the time, that

2     he sent to the board of directors?

3     A    It eventually made it's way to me, likely via Mr.

4     White or Mr. Haas, and I did read it.

5          Q    In the letter Mr. Conlan represented that he

6     had already discussed the proposal with lead counsel

7     for the talc plaintiffs.  Right, and that's tab -- it

8     should be tab seven.

9     A    Right.

10         Q    Did you have any idea that Mr. Conlan had

11    been working with Mr. Birchfield for six months at that

12    point?

13    A    No, my presumption at that point was that sometime

14    after the dismissal of LTL-2 they had talked and that's

15    why I heard at that conference in Las Vegas, on October

16    18th or 17th, that this was something they were working

17    on together.

18         I assume the same thing on November 9th, it wasn't

19    until two weeks ago when we got that privileged log

20    that I realized that they had been working closely

21    together for more than six months and I believe there

22    were hundreds of entries on the privilege log that we

23    can't see but it -- there was a lot of collaboration,

24    or contact, or whatever word you want to use.

25         Q    Mr. Birchfield never disclosed that to you?

Colloquy                                      76

1   A    To the best of my knowledge, no and I was

2   genuinely shocked and surprised when I learned that, so

3   I can't imagine I ever would've known.

4        Q    No one else from Beasley Allen disclosed that

5   to you?

6   A    No.

7        Q    Nobody else on the plaintiff's side of the V

8   in this litigation disclosed that to you?

9   A    I truly had no idea and I definitely, I was also

10  shocked to see that it was claimed to be part of a

11  mediation because it never came up in the mediation.

12       Q    All right.  Thank you, Mr. Murdica.

13            THE COURT:  Thank you.

14            MR. POLLOCK:  Can we take a five-minute

15  break?

16            THE COURT:  We're going to take a ten-minute

17  break.

18              (Recess taken from 3:26 to 3:40)

19            THE COURT:  You may be seated.  Everyone may

20  be seated.  Cross examination, Mr. Pollock?

21            MR. POLLOCK:  Yes, Your Honor.

22            THE COURT:  You may be seated.

23            THE WITNESS:  Thank you.

24            MR. POLLOCK:  May I ask the Court and

25  opposing counsel a critical question, it is currently

Colloquy                                        77

1    3:41, let's assume I move quickly, done by 4:15, and

2    then I assume Mr. Brody who is a capable lawyer may

3    have some redirect.  That's going to put us around

4    4:30, 5:00 or so.

5           THE COURT:  I would prefer not to go passed

6    4:30.  I don't want to go passed five o'clock.  But it

7    looks like we're not going to finish today.

8           MR. POLLOCK:  So, can we reconvene tomorrow?

9           THE COURT:  I don't necessarily know Judge

10   Singh's schedule accommodates that.  Mine doesn't.  I

11   don't think we were really planning on consecutive

12   days.  But --

13          MR. POLLOCK:  Okay.  It's so much fun

14   together.

15          THE COURT:  Pardon?

16          MR. POLLOCK:  It's so much fun together.

17          THE COURT:  Well it is and I've spent the

18   last four weeks in this particular courtroom on another

19   matter, on another mesh matter.

20          Why don't we put our heads together.  We'll

21   leave today, we can't do consecutive days.  But we'll

22   have to look at our calendars, Judge Singh and I are

23   going to have to look at our calendars also and we'll

24   tell you the week of the 15th of April I have speaking

25   commitments.  We have a Civil Chancery seminar

1    statewide that week, and I'm doing something at the

2    Boardwalk seminar.  So that week is out.  We'll put our

3    heads together Mr. Pollock and Mr. Brody.

4              MR. POLLOCK:  Thank you, Your Honor.

5              THE COURT:  Okay.

6              MR. POLLOCK:  Okay, I'm ready to proceed,

7    Judge.

8              THE COURT:  Sure.

9    CROSS EXAMINATION BY MR. POLLOCK:

10        Q    Mr. Haas, we have met before, my name is

11   Jeff.

12             MR. SABO:  Murdica.

13        Q    I'm sorry, Murdica.  The other guy.  I just

14   gave you a pay raise.  I'm sorry.  Mr. Murdica, I

15   apologize, I'm still Jeff or Mr. Pollock, whatever you

16   want.  You mentioned before a term sheet and I think it

17   was in the Imerys matter.  Do you recall the term sheet

18   discussion?

19   A    I believe Mr. Pollock, you're referring to my

20   testimony about the April 15th, 2021 term sheet in the

21   Imerys matter.

22        Q    Correct.

23   A    Is that right?  Okay.

24        Q    Am I correct in understanding that that

25   document was not fully executed?

1    A     There were no signatures on it, however, it was

2    represented by counsel to the Tort Claimants Committee

3    that those terms had the support of the Tort Claimants

4    Committee and in fact, we even exchanged example

5    scenarios because there was a refund portion of it and

6    everything.  While it wasn't signed, because the FCR

7    hadn't signed off on it, it was agreed to by a majority

8    of the Tort Claimants Committee and their counsel.

9         Q     Excellent.  With regard to your own work,

10   there's a thing called Thomson Reuters, which allows me

11   to be snoopy and look at what people do as lawyers.

12   And it indicates that you spend about 66.9%, which is

13   pretty precise by the way, of your matters for J&J.

14   And then it has McKesson and Walgreens, and some other

15   folks at 4.8 and 3%, give or take 5%.  Does that sound

16   about right, that over half your work is for J&J?

17   A     I don't think you're data is right.  I haven't

18   represented McKesson in at least a decade.  However,

19   way more than half of my work is for J&J.

20        Q     Excellent.  You actually knew Mr. Haas, now I

21   get the names right, I got it wrong before, from the

22   fact that you both worked together at Patterson,

23   Belknap, Webb & Tyler.  Correct?

24   A     That's correct, we were both partners at Patterson

25   Belknap.

1          Q     Excellent.

2                MR. POLLOCK:  If you don't mind if I sit

3     down, Judge?

4                THE COURT:  That's fine.

5          Q     Getting to the core question before the

6     Court, which is RPC 1.6, are you familiar with Rule of

7     Professional Conduct 1.6?

8     A     I don't know the exact terms of it, but I know

9     that rules are at issue.

10         Q     So, the Rule of Professional Conduct 1.6 and

11    it's more wordy than I say, is that you cannot disclose

12    confidential information.  That concept is pretty

13    basic, right?

14    A     It seems it to me.

15         Q     So, especially as a lawyer.  Right?

16    A     Especially as a resolution lawyer.

17         Q     Excellent as a resolution lawyer.  Can we

18    agree that other than the records before us, you do not

19    have any email from Mr. Conlan to Mr. Birchfield, you

20    don't have any memos from Mr. Conlan to Mr. Birchfield,

21    you don't have any photos of Mr. Conlan and Birchfield

22    in compromising positions.  You've got nothing out

23    there that discloses -- that they disclosed

24    confidential information belonging to J&J?

25    A     Mr. Pollock the only way I could answer that is

1       that in the last two weeks, I've seen a privilege log

2       that has hundreds of logged emails that are between Mr.

3       Conlan and Mr. Birchfield and it says the subject

4       matters and the subject matters included a claimant

5       grid and all of the very confidential information that

6       we were talking about.  And I can tell you, as somebody

7       whose done almost exclusively Mass Tort resolution for

8       the last decade that it would be impossible to jump and

9       talk to the other side and separate in my brain

10      everything that I've learned by representing J&J to

11      suddenly be pure of mind and not disclose confidential

12      information.  I can't think of any possible way that's

13      the case.

14          Q    So since you went to the hypothetical, I'm

15      going to go hypothetical, let's assume you left

16      tomorrow and you decided to become something else.  You

17      were going to decide, you were going to start your own

18      talc business -- that's probably a bad choice these

19      days.  You're going to choose something else, a steel

20      business, you're going to do anything else.

21      A    Yes, sir.

22          Q    Isn't it true that when Mr. Conlan -- if I

23      take that same paradigm and I apply it to Mr. Conlan,

24      he switched out completely, he spent 32 years with

25      Sidley and Austin.  Right, about?

1    A    I heard that testimony.

2         Q    Okay.  So, he spent a long time at Sidley and

3    Austin.  Then he went to Faegre.  Right?

4    A    Right.

5         Q    And at that point he decided had enough, I'm

6    starting my own company Legacy.  Right?

7    A    Right.

8         Q    So, he goes to Legacy and Legacy is a

9    completely different deal.  Legacy the idea is I've got

10   Warren Buffet, Napollo investing, and all of these

11   fancy guys behind me.  What I'm going to do is go out

12   and buy the kind of mass tort claim that you have

13   yourself, that you address in your professional career.

14   Right?

15   A    Well I know that's what he did.  And I know that

16   they've pitched that idea about talc to J&J and I know

17   that he pitched that same idea to J&J, I believe when

18   he was working for J&J as one of the options.

19        Q    And there are other companies who compete

20   with Legacy.  Right?  There are other entities that J&J

21   has communicated with over the past four years, about

22   possibly trying to sell out, pass off, whatever you

23   want to call it, it's liabilities in order to get it

24   off the spreadsheet.  Correct?

25   A    I understand, and that's why to me it was

1    particularly shocking that Legacy with our former

2    counsel is the one that they would choose to talk to if

3    they were really trying to talk to a company that did

4    that during the mediation.

5        Q    But J&J never got a single offer from any

6    other company like Legacy gave an offer which, to the

7    documents that you referred to, Legacy is the only one

8    who said I got a proposal for you.

9    A    I don't know if that's the case.  But I know to my

10   knowledge we never solicited a proposal from any such

11   company.

12       Q    But you do know that other companies have

13   approached J&J or J&J's had discussions with them and

14   Legacy is the only one that said we think we have a

15   viable way of doing this?

16   A    I don't know that other companies have approached

17   J&J.  That probably would've been a better question for

18   Mr. Haas.  But I can tell you, the only one I know

19   about is Legacy, because of course, we didn't solicit

20   that.

21       Q    So, when Mr. Conlan is sitting in his new

22   role and his new role is I am going to potentially --

23   and we can actually go through it if it makes you more

24   comfortable sir, let me find it here more quickly while

25   I fumble.  It's going to be exhibit seven.

1    A    Yes, sir.

2         Q    And Mr. Haas, you were involved in LTL.

3    Right?

4    A    Murdica.

5         Q    I'm sorry.  I apologize.

6    A    That's okay.

7         Q    Mr. Murdica, you were involved in the LTL.

8    Right?

9    A    I was the lead counsel for the mediation in that.

10        Q    Excellent.  So, the two experts I talked

11   about before, you're familiar with their opinions.

12   Correct?

13   A    I have consulted with Mr. Mullin, as I testified

14   on direct regarding some of the settlement information

15   and claims information when I was working with Mr.

16   Conlan.  I don't believe that I reviewed his report or

17   the other expert that you mentioned.

18        Q    Lead counsel and you didn't read the expert

19   reports?

20   A    Lead counsel for the resolution, for the

21   mediation.  I am not litigation counsel in talc.

22        Q    I apologize.  Fair enough.  Now I cleared up

23   my misunderstanding.  I'll represent to you that in

24   those documents they indicate that the range for

25   resolution for J&J and this is J&J's expert is between

1      $12 and $21 billion.  The -- in this case, on the

2      document that Legacy has $19 billion or such greater

3      amount as determined by J&J's independent auditors.

4              So, is there any reason in your mind to

5      believe that Legacy was working with your experts?

6      A    I have no reason to believe, I don't know

7      otherwise that Legacy was working with our experts.

8      And I heard you ask Mr. Haas those questions.  I'm not

9      sure where those numbers came from.  I certainly

10     wouldn't subscribe to them.  I know from having this

11     role that talc can settle for the amount that was on

12     the table, but for the TCC who were the objecting party

13     in LTL-2.

14          Q    So, the $19 billion, do you believe that that

15     was a contrivance by Andy Birchfield?

16     A    I have no idea where that came from, but I know

17     that that's not what it takes to resolve talc

18     litigation.

19          Q    Okay.  So, it's not what J&J wants.  It's not

20     what you believe is the right number.  Correct?

21     A    No, I'm referring to the work that I actually did,

22     which was to get the lawyers representing the talc

23     claimants to negotiate with me and come up with an

24     agreed plan, and come up with the number.  It's not a

25     dispute.  It's the actual amount of money that it would

Murdica - Cross                              86

1     have taken at that time to resolve the talc claims if

2     the claims had been -- if it had been brought to a

3     vote, unfortunately it was not brought to a vote,

4     because there was opposition by your client and others

5     in the bankruptcy.

6          Q    Mr. Murdica, you have better knowledge of the

7     case than I do, so I'm going to have to back you up a

8     little tiny bit there.

9     A    Sure.

10         Q    You said at the time and there was a vote,

11    are you talking Imerys or are we talking LTL?

12    A    So, we can talk about anyone you want.  I was

13    referring to LTL-2.

14         Q    Okay.

15    A    The difference between the first bankruptcy and

16    the second is that in the second bankruptcy we filed

17    along with the support of more than 60,000 -- along

18    with the support of the lawyers representing more than

19    60,000 claimants.  And I know from the settlement

20    communications that I had, that there was far more

21    support than that.  All we had to do was be able to get

22    to a bankruptcy vote, which we were not able to do

23    because the objectors prevented that.

24         Q    Were two of the people you spoke with Mr.

25    Andre and Mr. Nokawati (phonetic)?

1    A    Those are two of many, yes.

2         Q    And those two had big chunks of -- a big hunk

3    of cases.  Right?

4    A    Approximately 5,000 and 20,000 claimants

5    respectively.

6         Q    So, 25,000 let's call it.  It's a pretty big

7    number.  Right?

8    A    It is.  It's about a quarter of the claims that I

9    expect to vote, when there ultimately is a resolution

10   vote.

11        Q    And you understood when you Mr. Andre and Mr.

12   Nokawati that they were members of the Talc Claimant's

13   Committee.  Correct?

14   A    So, they weren't in the second bankruptcy, because

15   they had -- they had joined to support the plan put

16   forward in the second bankruptcy.  They were not

17   included on the Tort Claimants Committee.

18        Q    Okay.  What role did they play in the second

19   LTL?

20   A    Well, they actually testified in favored of the

21   plan prior to the dismissal.  They represented their

22   claimants on -- there was an *ad hoc* committee of

23   supporting counsel and what they had to do in addition

24   to supporting the plan, is that Judge Kaplan ordered

25   that they not only tell all of their clients that they

1    were being represented by them in the bankruptcy, but

2    that Mr. Nokawati and Mr. Andre were supporting the

3    plan forward in the bankruptcy because Judge Kaplan

4    wanted to make sure that all of the claimants that were

5    in support of the plan had an understanding that their

6    counsel was making that representation.

7         Q    So, let me wind this back for a second, LTL-

8    1, they were on the Tort Claimants Committee then.

9    Correct?

10   A    You're referring to Mr. Andre and Mr. Nokawati,

11   yes.

12        Q    Yes.

13   A    They were.

14        Q    And you spoke to them at that point in time

15   when they were on the Tort Claimants Committee for LTL-

16   1?

17   A    I spoke to them before they were on the committee.

18   I spoke to them after they were on the committee and

19   while they were on the committee because that was my

20   job and they were part of the bankruptcy mediation in

21   the first bankruptcy.

22        Q    Excellent.  And I want to focus on LTL-1, not

23   LTL-2.  Fair enough.  Do you understand where I'm

24   focusing?

25   A    I'll answer whatever you ask me as long as my

Murdica - Cross                                              89

1    counsel doesn't object.

2         Q    I appreciate it, sir.  So, during the course

3    of LTL-1, you understood that they were on the Tort

4    Claimants Committee and you understood that Tort

5    Claimants Committee had put a number on this over the

6    $9 billion that J&J wanted to resolve this matter at.

7    Correct?

8    A    At various points, I think you heard Mr. Haas's

9    testimony earlier, that at some point -- I believe it

10   was June of 2022, through mediation and I don't want to

11   violate the mediation privilege that you were

12   referencing earlier, but there was a -- the Sunday

13   night deal that Mr. Haas was referring to with the Tort

14   Claimants Committee that we understood was a deal for

15   $8.9 billion.

16        Q    Correct, and that's what -- and that -- I'm

17   sorry.  So, let's assume that that's right, with regard

18   to that number, you understood that the other members

19   of the Tort Claimants Committee did not want the $9

20   billion, let's call it 8.9, I'll call it $9 billion

21   just for shorthand.  They did not want the $9 billion.

22   They thought it should be higher.  Correct?

23   A    So my understanding at that time, and what you

24   heard Mr. Haas testify to and what I understood from

25   the mediators is that $8.9 billion got the majority of

1    the Tort Claimants Committee which -- that's how it

2    works.  So, the majority were in support at that time.

3         Q    And the -- so if Mr. Birchfield was to say

4    that the Tort Claimants Committee wanted the $19

5    billion number, and that there was not the majority of

6    people that wanted the $19 billion number you believe

7    that would be false testimony?

8    A    Yes, particularly because nobody was saying $19

9    billion at the time.  What you have to understand, Mr.

10   Pollock, is this was a negotiation that literally has

11   gone on in phases for years and keeps turning and

12   morphing as different things happen in the efforts to

13   resolve.  But there was no one in June of 2022 saying

14   that it took $19 billion to resolve this, nobody.  So

15   that would be a lie.

16        Q    Fair enough.  Let me move onto your exhibit

17   14 if you don't mind.  It's going to be exhibit 14, and

18   I'm going to be referring -- you're welcome to any

19   document I refer you to review the entire document,

20   should you so desire.  I'm going to point you to the

21   portion that I care about just to move things along.

22   Understood?

23   A    Yes, sir.

24        Q    Paragraph eight, you say on November 5, 2023

25   I wrote a letter to Mr. Conlan on behalf of J&J

1    expressing J&J's concerns that Mr. Conlin was

2    improperly discerning J&J's confidences that he learned

3    in the course of his privileged attorney/client

4    relationship with the company.  Do you see that?

5    A    I do.

6         Q    Now, you then write a letter and it's exhibit

7    six, I thought about this ahead of time, exhibit six.

8    And this is your letter to Mr. Conlin, saying Dear Jim,

9    you learned -- and I'm looking at the last paragraph,

10   first page, you learned highly privileged information

11   about J&J and LTL strategies from the attorney/client

12   relationship and will publish the disparaging your own

13   legal strategy that you recommended to J&J might be

14   permissible if J&J or LTL were not included in the

15   article.

16         Do you see that?

17   A    I do.

18         Q    Now, is it your position that it was Mr.

19   Conlin's idea to use the Texas Two Step and LTL?

20   A    Yes, that was one of the options that he presented

21   to myself and Mr. Haas.

22         Q    So, prior to LTL being filed, it's your

23   position that he suggested we use the Texas Two Step?

24         MR. BRODY:  Objection, Your Honor.  I just if

25   the question is was Mr. Conlan involved in discussions

1    of the idea, yes or no, that's fine.  But if we get

2    into the specifics of what was Mr. Conlan's position on

3    it, what was the back and forth, the substance of the

4    evaluation --

5             THE COURT:  I don't think that's where Mr.

6    Pollock is going.

7             MR. BRODY:  All right.  I have privileged

8    objection if that's where it goes.

9             THE COURT:  Sure.  Am I right, Mr. Pollock?

10            MR. POLLOCK:  You are right, I think.

11   Q    Here's the issue I've got, it says your own

12   legal strategy, that's the phrase you used.

13   A    Yes.

14       Q    Am I correct that you're saying that filing

15   of LTL was Jim Conlan's legal strategy?

16   A    To the best of my recollection and I recently seen

17   an email written by Mr. Conlan --

18            MR. BRODY:  I'm sorry.  I don't want you to

19   -- Mr. Murdica --

20            THE COURT:  No attorney/client privilege

21   disclosure.

22            THE WITNESS:  Okay.

23   Q    How about this, a yes or no --

24            MR. BRODY:  I don't want you to go into the

25   substance of a communication that Mr. Conlan made on

Murdica - Cross                                    93

1    this while he was counsel for J&J.  I apologize for

2    cutting you off.

3         Q    How about a yes or no?

4    A    A Two Step bankruptcy is one of the options that

5    Mr. Conlan suggested multiple times to resolve our talc

6    liability.

7         Q    I just want to be clear on one thing, is this

8    before it was filed or after it was filed?

9    A    Before it was filed.

10        Q    Thank you, sir.  With regard to there's a --

11   in this letter you wrote, this actually comes out of

12   your certification which is, I had it here a second

13   ago, let's try 14.  Someone just yelled it at me, so

14   it's got to be right.

15   A    It is.

16        Q    Exhibit 14, in exhibit 14, you say -- I think

17   I just had the damn thing.  I'm sorry.

18             That he proposed -- I'm sorry, I'm struggling

19   here.

20   A    You were on paragraph eight before.

21        Q    Paragraph seven, it's paragraph seven, I

22   think.  Right?  No.

23             THE COURT:  Paragraph eight was a letter that

24   Mr. Murdica addressed to Mr. Conlan.

25             MR. POLLOCK:  Yeah, I'm sorry, I'm struggling

1    here Judge.  I apologize.

2              THE COURT:  Take your time.

3         Q    Yes, paragraph eight.  So, paragraph eight

4    and when you signed this certification the

5    certification which is exhibit 12 you were attempting

6    to be truthful, accurate, and complete.  Right?

7    A    Of course.

8         Q    And in paragraph eight you mentioned that you

9    wrote a letter, Mr. Conlan wrote a letter, I wrote a

10   letter to Mr. Conlan, that's exhibit six.  But you

11   don't include Mr. Conlan's response, do you?

12   A    I didn't include Mr. Conlan's response.  He

13   responded something to the effect of, Jim, you should

14   call me, because this would be a really great option

15   for J&J.

16        Q    Wasn't it a little stronger than that, that

17   he completely disagreed with the characterizations that

18   you made?

19   A    If you show it to me, I'm happy to testify about

20   it.  What I specifically remember is that he wrote me

21   back, and he said something, at least part of it said

22   Jim give me a call and then we texted it about setting

23   up a call and then it never happened, because I was in

24   court the next day, or somehow our wires got crossed.

25   But I never ended up speaking to him.

1          Q    So, you don't believe that when he responded

2     to your letter of November 5, two days later that he

3     directly controverted the argument that he had violated

4     the attorney/client privilege?

5     A    He very well may have, Mr. Pollock.  If you show

6     it to me, I'll tell you.  I'm sure that's his position.

7          Q    But you don't recall?

8     A    I don't.  What I remember is that I was going to

9     talk to him and it didn't happen.

10         Q    In hindsight, do you think it would've been

11    worthwhile telling the Court that while this is your

12    letter of November 5, that Mr. Conlan refuted that

13    position and disagreed with you?

14    A    Mr. Pollock, I don't understand why it's very

15    clear to everybody here that Mr. Birchfield and Mr.

16    Conlan are saying that there's no violation here.

17    You've been saying it over and over.

18         Q    Right, but this is simultaneously at the same

19    time, it's contemporaneous with the statement.  It's

20    two days later.  He directly controverts what you have

21    to say and yet you choose to leave that one out.  Why?

22    A    I didn't choose to leave it out, Mr. Pollock.  Had

23    I know at the time -- when I wrote this letter, it was

24    just to get him to stop the things that he was doing.

25    Had I known at that time that he had been working with

1    Mr. Birchfield for six months, the letter would've been

2    very different.

3         Q    You mentioned that -- you and Mr. Haas both

4    have mentioned that Mr. Conlan and Mr. Birchfield were

5    working together for a while, they were working

6    together for six months.  Hadn't Mr. Conlan been

7    meeting with people at J&J off and on for months before

8    that on behalf of Legacy attempting to present a

9    resolution that might take the liabilities for talc off

10   of the J&J balance sheets?

11   A    Mr. Pollock, not with me.  But I heard Mr. Haas's

12   testimony about one meeting.  And I also heard that it

13   was never disclosed during any meeting that he was

14   working with Mr. Birchfield and they had been doing so

15   for six months.

16        Q    Well you reviewed the emails -- the binder

17   here, the evidence record is pretty thin.  I assume,

18   being a capable lawyer at Barnes and Thornburg you

19   reviewed these documents in advance of appearing here

20   today.  Right?

21   A    I can't say that I reviewed all of them, but I

22   reviewed my declaration that you just referenced.

23        Q    Okay.  Well, if we go to exhibit four, this

24   is Jim Conlan to VanArsdale, Douglas Dachille and some

25   other folks on October 18, 2023.  Trailing is a series

Murdica - Cross                                    97

1      of other communications, right, October 6th, 2023;

2      behind that September 8, 2023; we go back to August 21,

3      2023, so we've got a series of communications between

4      Plenary Hearing 23 and Plenary Hearing 27, where Mr.

5      Conlan is working with the board at J&J or members of

6      the leadership let's say of J&J.  Correct?

7      A    So, I was not on any of these, Mr. Pollock.  And I

8      don't know, I mean that's your characterization of

9      them.  I heard Mr. Haas's testimony and I see what's in

10     the documents and I don't see them working

11     collaboratively with the board or anything like that.

12     I see a couple of sparse communications and ultimately

13     a rejection.

14         Q    So, let's take them one-by-one.  Plenary

15     Hearing 26, this is from Dwayne VanArsdale to James

16     Conlan -- to Doug Dachille with a cc to James Conlan,

17     thanks for the note and nice to meet you as well.  I've

18     copied Erik Haas and Andrew White who would also like

19     to join the discussion.  I'll ask Darlene, copied here,

20     to coordinate and propose a few dates to get us

21     together in the future.  We'll get back to you shortly.

22     Do you see that?

23     A    Mr. Pollock, I see that and it looks to me like

24     somebody at JP Morgan was perhaps doing a favor for Mr.

25     VanArsdale making the introduction to somebody at J&J

1    and then J&J writing back, nice to meet you.  That's

2    all I see.

3         Q    And you see James Conlan, Legacy Liability.

4    Right?

5    A    Correct.

6         Q    It's in the third -- it's a cc there.

7    A    Yes.

8         Q    No one at J&J set off fireworks, alarms, you

9    called the FBI, called the Ethics Committee and said

10   wait a minute, James Conlan is working on this matter.

11   Isn't that correct, no one said a word?

12   A    As far as I know that's correct, although Mr.

13   Conlan had suggested in addition to the two step

14   bankruptcy this was one of the menu of options that he

15   provided for us strategically while he was working for

16   us too.  So for him to suggest that now, not in the

17   context of working with plaintiffs, I imagine it wasn't

18   surprising.  But again, I was not on these.

19        Q    So, it was okay, I know you keep on looking

20   at Mr. Haas, but with regard to this --

21   A    Actually, I'm not looking at Mr. Haas.  I'm

22   looking at you and I'm looking at Mr. Birchfield.

23        Q    Fair enough.  With regard to the statement

24   here, all he's doing is reaching out saying we would

25   like to talk.  J&J understands quite clearly he is no

Murdica - Cross                                    99

1    longer at Faegre.  Mr. Haas has already testified to

2    that.  He is now working for Legacy Liability.  That's

3    his -- that's his position.  He has an email Legacy

4    Liability.  Did anyone at J&J, have you ever heard said

5    oh my God, Jim Conlan is still involved in asbestos on

6    behalf of Legacy Liability?

7    A    Are you talking about in August of 2021?

8         Q    I'm asking in August of 2021, did anybody

9    ever say oh my God, he's still involved in asbestos?

10   A    I did not hear that.

11        Q    I'm sorry, 2023.  I apologize.

12   A    Mr. Pollock again, I did not hear that in August

13   of 2023.

14        Q    Excellent.

15   A    As you can see I am not on these emails.

16        Q    You're not.  That's true.  But you were, as

17   you pointed out earlier talking routinely with Erik

18   Haas.  You were going to partner at Patterson Belknap

19   with Mr. Conlan.  You had worked with Mr. Conlan all

20   the time.  You worked with him regularly and discussed

21   all kinds of issues.  And yet, you're telling me on

22   August 21, Plenary Hearing 26; August 24; September

23   28th, all the way through to what is it, October 18, on

24   Plenary 2023, at no point did anyone ever say from J&J

25   Mr. Conlan it's outrageous that you have started your

1    own business to try and resolve disputes?

2    A    I would say you would have to ask Mr. Conlan.  But

3    I can tell you in my role the first time I heard about

4    Legacy being involved with talc to the best of my

5    recollection was as I described in Las Vegas on October

6    17th, 2023.

7         Q    All right.  And you talked about earlier

8    about the mediation documents that were going back and

9    forth.  There is -- is there any information -- do you

10   have any facts, whatsoever, other than the fact that

11   Mr. Conlan and Mr. Birchfield were communicating, do

12   you have any information in your possession, custody or

13   control to establish that they exchanged J&J's

14   confidential information?

15   A    Yes, as I testified earlier, Mr. Pollock, if you

16   take a look at that privilege log it has descriptions

17   of what the documents are.  And the descriptions are

18   negotiations about claims matrices and other things

19   that were the exact subject of what Mr. Conlan and I

20   worked on together while he was representing J&J.  And

21   as I told you, I can tell you as somebody who does this

22   every day, there is no way to separate what you learn

23   from a client and then suddenly have it magically

24   disappear while you're advising somebody else on a plan

25   that might work for Legacy.  It's just not real.

1        Q    So you're saying the facts between 2021 and

2   2024 completely stale, no additional plaintiffs, no

3   additional change in the legal landscape, no changes

4   whatsoever.  It's the same discussion you were having

5   in 2021 as you were having in 2024 regarding J&J's talc

6   liability.

7   A    I think you mean 2023 and Mr. Pollock, even though

8   the filed claim numbers have increased, those claims

9   already existed, they were just on file.  It literally

10  is the same thing we were doing back when Mr. Conlan

11  was engaged, nothing has changed.  He had insight to

12  all of my strategy, all of Erik's strategy, all of Mr.

13  White's strategy, Joe Braunreuther's strategy.  But the

14  J&J executive suite and everything we were thinking,

15  and our strategy to deal with talc.

16       Q    You mentioned when you were testifying on

17  direct that there were multiple matrices, those are the

18  words that you used.  And am I correct that there were

19  matrices that you and Mr. Conlan prepared apparently or

20  discussed, that there were matrices that Andy prepared

21  and discussed.  There were matrices proposed by the

22  Talc Claimants Committee.  There were all kinds of

23  matrices flying all around.  Is that true?

24  A    Well no, there weren't all kinds of them.  There

25  were three specifically that I remember.  There was one

                              Murdica - Cross                        102

1     created by Mr. Birchfield.  There was one created by

2     myself and my partner, Kendra Lounsberry, and there was

3     one created by the Imerys Tort Claimants Committee

4     through their proposed trust distribution procedures.

5     Those are the three that we were discussing at the

6     time.

7         Q    And those matrices changed over time as the

8     numbers changed.  Right?

9     A    They don't change over time as the numbers change,

10    they -- there were different concepts as to what

11    categories should things be broken down into and what

12    values, and what claims are we going to value or not

13    value at all.

14        Q    And you have -- in this matter, did you

15    review the filing that was made to disqualify Mr.

16    Birchfield before it was filed?  Did you review these

17    documents?

18    A    That I --

19            MR. BRODY:  Your Honor, I'm sorry, but asking

20    J&J's outside counsel whether he reviewed something and

21    was involved in the work product that went into a

22    brief, I think is one, protected by work product, and

23    two, it's completely irrelevant to the issue that we're

24    talking about here.

25            THE COURT:  Well I think his response is if

1    he reviewed it, yes or no.  That's not work product.

2              MR. BRODY:  That's fine, yes or no, I think

3    is fine.  I agree with that, Your Honor.

4    BY MR. POLLOCK:

5         Q    So, yes or no, did you review the filing

6    before it was made?

7         A    Unfortunately, Your Honor, I can't give a yes or

8    no.  I honestly can't remember.  It's possible.  I am

9    not sure.

10        Q    Excellent.  The Legacy Liability portion

11   which is exhibit seven, has a matrix at the end.

12        A    Yes.

13        Q    Wait until you're there, Mr. Haas -- Murdica.

14   Murdica.  I'll get it right by the end of your

15   testimony.

16        A    No worries.

17        Q    By the end -- with regard to that chart --

18        A    Yes.

19        Q    -- do you know if that was a J&J document?

20   Did J&J prepare this document?

21        A    Originally?

22        Q    No, this document the one right here, the one

23   that's Plenary Hearing 67.  That's the only one I care

24   about, was that one prepared by J&J?

25        A    I created a matrix in 2020 that looks identical to

Murdica - Cross                                    104

1    this but for the values.

2         Q    Okay.  So the values matter.  This document,

3    with these values, at this number, am I correct this is

4    not a J&J document?  This document.

5    A    I can't answer it better than I did.  I -- to the

6    best of my recollection I have seen this -- the column

7    at the top, that's stage four, stage three with

8    recurrence and the age groups.  It's something I

9    originally worked on with Mr. Birchfield, but we

10   created a matrix just like this.  This very well maybe

11   what we were using back in 2020 that Mr. Conlan weighed

12   in on.

13        Q    So a Honda looks a lot like a Ford.  They

14   both have four wheels.  They have doors.  They have

15   windows.  They have an engine.  They have everything.

16   I want to know is this document a J&J, not some

17   variation, I want to know if this document, the one

18   that they're complaining about so bitterly, you heard

19   Mr. Haas, I got it right this time, complain bitterly

20   that that was a privileged and confidential super

21   secret information.  I want to know under oath sir, is

22   that document the one specifically right in front of

23   you, is that a J&J document?

24   A    So, Mr. Pollock, I think what you heard is that

25   everything that Mr. Conlan learned about the way we

1    view a matrix like this for talc, is what's problematic

2    that is being shared.  I can't tell you for certain

3    that this is our document.  I know it's not our values.

4    But what I would suggest, and I guess we'll get to hear

5    from them, is I would ask Mr. Birchfield and Mr. Conlan

6    how this document came together, because it is

7    certainly has the same categories as the ones that we

8    were negotiating back in 2020.

9         Q    So, let's talk about that.  During Imerys and

10   during LTL, didn't all the charts pretty much have the

11   same things, how are you, what kind of condition do you

12   got, and what are the numbers we're starting to play

13   with.  Right?  Isn't every -- you've done, I don't

14   know, vaginal mesh, I don't know what else you've done,

15   doesn't every matrix look the same thing.  You look at

16   age group, you look at what the exposure is, you look

17   at the risk factor is, whether they can have children

18   or not and you create a matrix.  I don't think it's

19   rocket science.

20        So, I'm trying to figure out what is unique

21   about this chart that is so privileged to J&J?

22   A    Well Mr. Pollock, first of all every tort is

23   different.  And so, I've never settled a tort with a

24   matrix that looks like this before.

25        Q    Okay.

Murdica - Cross                                          106

1      A    And I've settled over 30.  Okay.  So, that's --

2      that premise I can't agree with.  What's concerning

3      about this to me as resolution counsel, is that it was

4      generated, if I had to guess from our document, or if

5      not from negotiations between Mr. Conlan and Mr.

6      Birchfield using a Birchfield document.  I guess we'll

7      find out when they testify.  But the fact that our

8      counsel who had all the information about the way we

9      view this is then proposing this back to us, now

10     sitting on the other side with our adversary, it

11     certainly concerned me and I can understand why it

12     concerned J&J.

13          Q    Sitting on the other side with our adversary.

14     This is Jim Conlan's document.  It is Legacy's

15     document.  Where does it say anywhere that Andy

16     Birchfield crafted this document?  Show me.  I want you

17     to show me.  This is important to me, sir.

18     A    I hear you --

19          Q    I want to know exactly where it says that

20     Andy Birchfield had some role in this?

21     A    I heard your testimony that it's Mr. Conlan's

22     document.  I haven't heard that under oath, if Mr.

23     Conlan created this, then he created it from J&J's

24     documents.

25          Q    Crystal clear to be fair to you, Mr. Murdica,

1    this letter from Legacy Solutions of November 9, 2023

2    signed by Mr. Conlan, I guess it's a stamped signature

3    on Plenary 66 is Mr. Conlan's letter.  No doubt about

4    it.  There's a chart attached.  I have no idea who

5    created it.  The question is do you?

6    A    Well, I don't.  But I'm surprised you don't.  And

7    I'm telling you this contains J&J's confidential

8    thinking, there's no question in my mind.  And the fact

9    that you don't know who created it as the counsel tells

10   me that you know where this really came from and it

11   came from us.

12        Q    I've been accused of worse things.

13   A    Through the confidential relationship with Mr.

14   Conlan.

15        Q    Let me ask you this.  With regard to the

16   confidential information, tell me everything in here

17   that is super, secret, confidential J&J information.

18   Here it is, Plenary 67, what exactly in it is so

19   secret?

20   A    If you want me to go through the whole thing now

21   --

22        Q    I want you to go through this document on

23   Plenary 67, what you just said this contains, J&J's

24   confidential information.  I didn't think this was a

25   J&J document, but if it is I would like to know what in

1    it was J&J's confidential information?

2    A    Mr. Pollock this exhibit, I guess at this point

3    only you probably know where it came from.  But I can

4    tell you that J&J had a version that is very similar to

5    this that was shared with Mr. Conlan, and it was

6    debated with Mr. Conlan, it was part of our privileged,

7    highly confidential strategic discussions about talc

8    resolution.  The fact that for six months plaintiffs

9    were negotiating or talking to Mr. Conlan, nobody

10   disclosed it to us, it was allegedly part of a talc

11   mediation that I was in charge of, that nobody ever

12   told me or the mediators about, and then it gets

13   proposed to us well, everybody knows because Mr. Haas

14   announced it at an investor meeting that we were

15   working on another plan, and this is contrary to it by

16   the objectors is extremely concerning and it doesn't

17   take a rocket scientist to see the problem with that.

18        Q    So which number on here, there's $1 million,

19   $822,000, there's death stage four, death stage three,

20   which column, which words are J&Js, which did they

21   create?

22   A    I could tell you that if I went back and looked at

23   our matrix.  But I believe the first column of the age

24   divisions, the under 45 all the way down to 80 plus and

25   the different the top column, breaking the cancers down

1    into different stages and I'm guessing the inter-

2    relational values between the numbers in proportion,

3    even though the numbers aren't the same, the number

4    proportions may be the same as our internal thinking on

5    this.

6         Q    Was the $1 million in the top left-hand

7    corner, was that a J&J number?

8    A    What I'm telling you is no it wasn't, but

9    proportionally to the other numbers in the other

10   columns and they way they relate to each other

11   percentage-wise it looks the same as what I created

12   back in 2020 when I was working with Mr. Conlan and

13   when we were internally trying to figure out the way we

14   viewed this.  And if I went back to the chart, if I

15   went to my email now and I looked it up and I did some

16   math calculations, this may include our proportions

17   from our own sampling of plaintiff's claims and our own

18   view of it.

19        Q    It may include a lot of things.

20   A    That is extremely concerning.

21        Q    Mr. Murdica, it may include a lot of things.

22   I want to know for a fact what does it include.  Under

23   oath today, what information here, you've mentioned the

24   first column that it has J&J's time -- age groups.

25   Correct?  Those are J&J's age groups?

Murdica - Cross                                    110

1    A    I can't answer the question any better, Mr.

2    Pollock.  I am more concerned about this now than I was

3    when I came up here.

4        Q    Wonderful.  I'm trying to -- Mr. Murdica, I

5    really want to know one thing.  You've said it has

6    J&J's confidential information.  I want to know for the

7    last time what precisely was confidential J&J

8    information?

9            MR. BRODY:  Your Honor, this has been asked

10   and answered, I think three times already now.

11           MR. POLLOCK:  I haven't gotten an answer yet,

12   Judge.

13           MR. BRODY:  Mr. Murdica has stated that he's

14   answered the question as best as he can.

15           THE COURT:  I heard an answer.

16           MR. POLLOCK:  Fair enough, I'll move on.

17   Actually, Your Honor, I have no further questions,

18   thank you.

19           THE COURT:  You're welcome.

20           UNIDENTIFIED MALE:  You're closing --

21           THE COURT:  Excuse me, you're a spectator.  I

22   don't want anymore interruptions.  You can have a seat.

23           UNIDENTIFIED MALE:  Can I pass him a note,

24   Judge?

25           THE COURT:  You can pass notes.  You have

Murdica - Redirect                                    111

1    passed several notes.  Thank you.  Mr. Brody?

2                MR. BRODY:  Thank you, Your Honor.

3    REDIRECT EXAMINATION BY MR. BRODY:

4         Q    So, Mr. Murdica, I just want to ask you very

5    few questions here on redirect.  You were asked a

6    number of questions about what's in your binder at tab

7    four, if you could turn to that?

8    A    Yes.

9         Q    You there?

10   A    Yes.

11        Q    And you were directed to the communications

12   that pre-dated October 18th, 2023.  Do you recall those

13   questions?

14   A    I do.

15        Q    And you were asked well, at that time, at the

16   time that these communications pre-dating October 18th,

17   2023 were going back and forth, well no one at J&J

18   called the Ethics Committee, was the question that you

19   were asked.  Right?

20   A    Right.

21        Q    At that point in time, prior to October 18th,

22   2023 when these communications were being made, did you

23   know that Mr. Birchfield was involved in Mr. Conlan's

24   proposal?

25   A    I had no idea.

Murdica - Redirect                            112

1        Q    Do you know -- did anybody at J&J ever tell

2   you that they knew at that point in time that Mr.

3   Birchfield was involved?

4   A    No, and I heard Mr. Haas's testimony that he had

5   no idea either.

6        Q    All right.  So, at that point in time would

7   there have been any reason for J&J to be concerned

8   about Mr. Conlan sharing confidences with Mr.

9   Birchfield?

10  A    There would be no reason to think that that was

11  happening.

12       Q    If you turn to the first page of that

13  document.

14  A    Yes.

15       Q    You know, you were asked a series of

16  questions relatedly about the settlement matrix which

17  is appended to what we have as hearing exhibit seven.

18  Right?

19  A    Right.

20       Q    If you look at the first page of the email

21  that's exhibit four, it says Andy Birchfield, Doug

22  Dachille and I are prepared to meet with you and your

23  team in person to share and discuss the terms of such

24  matrix as part of the Legacy acquisition.

25       Q    Does that suggest to you that this settlement

Murdica - Redirect                    113

1    matrix is something that had been discussed with Mr.

2    Birchfield?

3    A    It does.

4         Q    As to the settlement matrix itself, excuse

5    me, the water is not helping here, turning to the

6    settlement matrix itself, when you were working with

7    Mr. Conlan when he was outside counsel for Johnson &

8    Johnson, was he involved in privileged and confidential

9    discussions of the type of the types of talc claims

10   that might be considered as viable for settlement

11   purposes?

12   A    Mr. Conlan was involved in all of the settlement

13   discussions including an evaluation of Mr. Birchfield's

14   proposal which included all of these things.

15        Q    And was he involved in privileged and

16   confidential discussion of what the company viewed as

17   the correct, appropriate categories of claims for

18   purposes of settlement?

19   A    Like I said, he was involved in evaluation of

20   every aspect of the plan.

21        Q    And I don't want to limit it to a negotiated

22   settlement, but just the categories of claims then

23   should be part of a resolution, speaking more broadly,

24   whatever that resolution was of the talc claims?

25   A    Necessarily he had to be, because it was part of

Murdica - Redirect                          114

1    dealing with the future claims representative and

2    evaluating the plan.

3         Q    Was he involved in privileged and

4    confidential discussions of how the company thought

5    values in a settlement matrix like this should

6    translate into an overall resolution number?

7    A    Yes.

8         Q    And was he involved in privileged and

9    confidential discussions of what the company believed

10   the values of the different types of claims that appear

11   on a matrix like this should be for purposes of

12   settlement?

13   A    The settlement matrix originally proposed by Mr.

14   Birchfield was part of the plan that Mr. Conlan and I

15   were negotiating.  So, all of it was included in that.

16        Q    And was he specifically involved in

17   privileged and confidential discussions of how -- of

18   what J&J believed different values should be for

19   purposes of a resolution of the talc claims?

20   A    He was involved specifically in the amount of

21   claimants we expected in the present and the future,

22   and hence the way that translated into the values in

23   that grid.

24        Q    All right.  Was that -- was that information

25   that you considered to be privileged and confidential?

Murdica - Redirect                    115

1    A    Of course.

2        Q    Would you ever share the information that was

3    discussed internally when talking about how the company

4    thought values should translate into the aggregate

5    amount, values on a settlement matrix should translate

6    into the aggregate amount of a resolution, the

7    categories of claims that should be part of a

8    resolution, what types of claims should be deemed as

9    viable claims for purposes of a resolution, and the

10   values of individual types of claims for purposes of a

11   resolution, all of that privileged and confidential

12   analysis is that you would ever share with opposing

13   counsel?

14   A    No, all I would share with opposing counsel on

15   those fronts is something final that we were willing to

16   agree to that would be our proposal, not our internal

17   deliberations and what we thought about things, of

18   course.

19       Q    Thank you, Mr. Murdica.

20           MR. BRODY:  That's all I have.

21           THE COURT:  Mr. Pollock?

22           MR. POLLOCK:  Short redirect, Your Honor.

23   RECROSS EXAMINATION BY MR. POLLOCK:

24       Q    You mentioned that you were resolution for

25   J&J.  Right?

1    A    Yes, sir.

2         Q    And in that capacity you had discussions that

3    were confidential on settlement communications with

4    Andy Birchfield.  Right?

5    A    I did.

6         Q    And you would not disclose those confidential

7    communications because you are going to honor the

8    confidentiality provision.  Correct?

9    A    I was forced to disclose some of them in the

10   bankruptcy because Mr. Birchfield and his colleagues

11   own motions to force me to and to depose me.  But no,

12   up until then, I always kept every settlement confident

13   -- conversation confidential.

14        Q    Excellent.  So, and I didn't even know about

15   the other ones, so I'll let it go for now.  I'm going

16   to stick with the general rule that you would abide by

17   the -- your word that you would keep settlement

18   communications confidential.  Right?

19   A    Yes, sir.

20        Q    Excellent.  If that's true, why is it not

21   possible for Mr. Conlan who is in the business capacity

22   of trying to buy out liabilities to keep, partition

23   himself and keep those things confidential when he

24   works for Legacy Liability Solutions?

25   A    Because when you learn client confidences and then

1    you go do something in the same tort, on the same

2    matter, you can't partition in your mind everything

3    that you learned.

4         Q    But you did that with Andy.

5    A    I didn't do that with Andy.

6         Q    You learned things that were confidential

7    regarding settlement communications with him, and yet

8    you said I'm going to keep this confidential, I'm not

9    going to disclose it to anyone else.  You could do

10   that.  Right?

11   A    I'm working on the same side -- I'm still in the

12   same role that I was always in, working on the same

13   side in the same tort.  And unfortunately, as I pointed

14   out, Mr. Pollock, Mr. Birchfield forced me to disclose

15   confidential communications in this tort by noticing my

16   deposition and having me deposed by eight different

17   lawyers twice.

18        Q    With regard to the exhibit seven, if we would

19   go back to that for one moment, Plenary Hearing 67,

20   we're almost done with this one, I promise you.  Let me

21   know when you're ready, sir.  It's exhibit seven,

22   Plenary 67.

23   A    Okay.

24        Q    Let me know when you're ready.

25   A    I have it.

Murdica - Recross                          118

1        Q    Excellent.  So, it's your testimony that this

2    is not a document Mr. Conlan prepared.  Correct?

3              MR. BRODY:  Objection, Your Honor, that's

4    outside the scope of my redirect.

5              THE COURT:  Mr. Pollock?

6              MR. POLLOCK:  Your Honor, the questioning has

7    been pretty broad all day.  I've got three more

8    questions and I'm done.

9              THE COURT:  Okay.  I will permit you to ask

10   that question.  It's not a different topic.  It's

11   certainly not a topic that was addressed by Mr.

12   Pollock, though.

13             MR. POLLOCK:  Understood that completely.

14             THE COURT:  Go ahead, Mr. Murdica.

15             MR. POLLOCK:  You whacked me with the rule

16   book.

17   BY MR. POLLOCK:

18        Q    But let me ask you this, is it fair to say --

19   are you saying that this is not a document Mr. Conlan

20   prepared?

21   A    I am not -- I am not saying that.  You originally

22   seem to suggest that it was a document that Mr. Conlan

23   prepared.  Then you said you don't know who prepared

24   it.  And I'm suggesting that you should ask your client

25   who prepared it.  But to me it looks like a J&J

Murdica - Recross                              119

1   settlement matrix that I created in 2020 internally.

2       Q    Okay.  So it's J&J document, not a Mr. Conlan

3   document?

4   A    I can't tell you that for sure.  The only way I

5   could do it is to take this and compare it to what's in

6   my email from the fall of 2020 and tell you.  But, like

7   I said, I'm more concerned about this now than I was

8   before you started asking me about it, because now I

9   have some real questions about whether or not this was

10  our document.

11      Q    Fair enough.  Last question and I'll leave

12  you be at this time.  Are you -- I'm sorry.  With

13  regard -- there was a grid -- are you familiar with the

14  LTL-2 filing?

15  A    The LTL-2 initial filing with the support of the

16  60,000 claimants counsel.

17      Q    Yes, sir.  And there was a grid attached to

18  that filing and it looked a lot like Plenary Exhibit

19  67.  Didn't it?

20  A    I couldn't tell you.  Do you have it?

21      Q    So, I don't have it in front of me.  But you

22  viewed it or no?

23  A    I don't think -- I am not sure what you're

24  referring to, and I can't remember.  It was a year ago.

25      Q    Let me put it differently, if Plenary exhibit

1    67 looks a lot like the grid that was attached in the

2    LTL-2 filing, which is what I represent to you it does,

3    any reason to believe this is a super-secret J&J filing

4    because they just published it on the bankruptcy court

5    docket?

6    A    Sir, unless you show it to me I have no idea what

7    you're talking about.  I don't recall a grid and I

8    can't compare it.  It's kind of like I would like to be

9    able to compare that exhibit now to -- to the grid we

10   created internally to one Mr. Birchfield sent me as a

11   proposal.  There's a lot of things I would like to do

12   with that now and I have no idea what you're talking

13   about.

14       Q    Fair enough, sir.  Last question and I'll

15   leave you be.  Were you aware that it was the mediators

16   in the LTL-2 -- LTL matter that requested that Mr.

17   Conlan participate?

18   A    Mr. Conlan never participated in the mediation to

19   my knowledge.  The first time I learned that Mr. Conlan

20   was allegedly involved in the mediation was two weeks

21   ago when we found out that they've been having

22   communications since April of 2023.  That was the first

23   time.  The mediators never told me that he was

24   involved.  I've since contacted the mediators.  And my

25   understanding is that they didn't know that this was

Murdica - Recross                           121

1    going on.  But maybe I'm wrong on that.  I certainly

2    never knew.  J&J never knew.  And we never saw Mr.

3    Conlan at any mediation.

4         Q    So you cannot answer the question whether the

5    mediators asked that Mr. Conlan participate in trying

6    to reach resolution.  Is that correct?

7              MR. BRODY:  Objection.

8    A    I suggest you ask them, I don't know.

9              MR. BRODY:  Mr. Murdica just answered that

10   question.

11             THE COURT:  Mr. Pollock, one more time.

12        Q    Last question.  Am I correct, you cannot

13   answer the question, sir, whether the mediators in LTL

14   asked that Mr. Conlan participate in the mediation

15   process?

16   A    That would be news to me.  I suggest you ask the

17   mediators.

18        Q    Fair enough sir.

19             MR. POLLOCK:  Your Honors, I thank you very

20   much.  Mr. Murdica, I'll get it right by the end, I

21   thank you for your patience and time.

22             THE WITNESS:  You did.  Thank you.

23             THE COURT:  Thank you, Mr. Murdica.  You may

24   step down.  I'm going to ask counsel meet and confer

25   and give us a few dates and share those dates with us.

Colloquy                              122

1    And we'll -- Judge Singh and I will collaborate

2    together and we'll merge our calendars with what's

3    available for counsel.  Everyone is excused.  Mr.

4    Golomb, Ms. Sharko, I think we have just administrative

5    matter am I right, on our underlying non-motion

6    related.

7              MR. POLLOCK:  Are you okay if I clear up

8    Judge while you do that?

9              THE COURT:  Go right ahead.  Is Mr.

10   Placitella also involved, Mr. Golomb?

11             MR. GOLOMB:  I don't know.

12             MR. POLLOCK:  I think he's the primary

13   culprit.

14             THE COURT:  Same docket number, L-2648-15 MCL

15   case 300.  May I have your appearance, Mr. Golomb?

16             MR. GOLOMB:  Yeah, Richard Golomb for the

17   plaintiffs.

18             MR. PLACITELLA:  Christopher Placitella.

19             THE COURT:  Ms. Sharko?

20             MS. SHARKO:  Susan Sharko.

21             THE COURT:  Yes.

22             MR. GOLOMB:  It's just an administrative

23   matter, the third amended CMO-8 which is the scheduling

24   order for the 15 cases in the pool had a deadline of

25   March 22nd for the amended complaints that we filed.

Colloquy                              123

1    Some of amended complaints were filed and there was a

2    deficiency notice on the docket saying that a motion

3    needs to be filed.

4              THE COURT:  I don't need a motion.

5              MS. SHARKO:  So, the third amended CMO-9 and

6    when Mr. Golomb brought this to my attention and asked

7    me if I was the person who (indiscernible) ECF I

8    assured him that my colleague --

9              THE COURT:  It was probably automatic.

10             COURT CLERK:  I have well-trained

11   (indiscernible).

12             MR. GOLOMB:  I figured that.  That's why I

13   just wanted to bring to the Court's attention.

14             MS. SHARKO:  So, what I told Mr. Golomb is

15   that those complaints that were timely filed, I

16   stipulate that they're timely filed.  And I suggested

17   that an easy fix might be for him to prepare a consent

18   order which says that under third amended CMO-9 the

19   following 15 cases are authorized to file amended

20   complaints.

21             THE COURT:  I'm going to sign that order

22   stating that on the record.  Send that consent order

23   and we'll address that right away.

24             MR. GOLOMB:  Thank you, Your Honor.

25             THE COURT:  You're welcome.  Thanks.  Thanks

Colloquy                                    124

1     everyone.  Have a very nice evening.

2               MR. PLACITELLA:  Thank you.

3               MS. SHARKO:  Thank you.

4               (Hearing day concluded at 4:37 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

125

<u>CERTIFICATION</u>

I, Sharon Conover, the assigned transcriber, do hereby certify the foregoing transcript of proceedings on CourtSmart, Index No. from 1:50:53 to 4:37:26, is prepared to the best of my ability and in full compliance with the current Transcript Format for Judicial Proceedings and is a true and accurate non-compressed transcript of the proceedings, as recorded.


_/s/ Sharon Conover_                AD/T 625
Sharon Conover                     AOC Number


Phoenix Transcription LLC          03/28/24
Agency Name                        Date