SUPERIOR COURT OF NEW JERSEY
LAW DIVISION: CIVIL PART
ATLANTIC COUNTY
DOCKET NO.: ATL-L-2648-15
A.D. # _____

|  |  |
|---|---|
| ) | |
| IN RE: JOHNSON AND JOHNSON) | TRANSCRIPT |
| TALCUM-BASED POWDER        ) | OF |
| PRODUCTS LITIGATION        ) | MOTION |
| ) | |

Place: Atlantic County Civil Crt.
1201 Bacharach Blvd.
Atlantic City, NJ 08401

Date: April 10, 2024
**MORNING SESSION**

BEFORE:

HONORABLE JOHN C. PORTO, J.S.C. AND
RUKHSANAH L. SINGH, U.S.M.J.

TRANSCRIPT ORDERED BY:

SEAN GARRETT, ESQ., (Faegre Drinker)

APPEARANCES:

JEFFREY M. POLLOCK, ESQ., AND
MICHAEL SABO, ESQ., (Fox Rothschild, L.L.P.)
Attorneys for Plaintiff

ANDY BIRCHFIELD, ESQ., (Beasley Allen)
Attorney for Plaintiff

*(Appearances continued)

Transcriber: Nitsa Carrozza
PHOENIX TRANSCRIPTION
796 Macopin Road
West Milford, NJ 07480
(862) 248-0670

Audio Recorded
Recording Opr: Jennifer Walker

APPEARANCES CONTINUED:

        STEVE BRODY, ESQ., (O'Melveny & Myers, L.L.P.)
        Attorney for J&J and L.T.L. Mngt.

        ERIK HAAS, ESQ., (Johnson & Johnson W.W.V.P.L.)
        Attorney for Johnson & Johnson

<u>I N D E X</u>

<u>PAGE</u>
Colloquy/Housekeeping..........................4,136

<u>MOTION TO DISQUALIFY:</u>

| <u>WITNESSES FOR</u> | <u>DIRECT</u> | <u>CROSS</u> | <u>REDIRECT</u> | <u>RECROSS</u> |
|---|---|---|---|---|
| <u>THE DEFENDANT:</u> | | | | |
| J. Conlan | 6 | | | |

1          (Proceeding commenced at 9:37:00 a.m.)

2          THE COURT:  Good morning, please be seated.

3    We're going to livestream, continue with our

4    livestream.  This is the continuation of the Johnson

5    and Johnson Talcum Powder Product Litigation, master

6    docket ATL-L-2648-15, Case Number 15.  This is a

7    continuation of our motion.  Can we have the appearance

8    of counsel for Beasley Allen?

9          MR. POLLACK:  Good morning, Your Honor,

10   Honors, I apologize.  Jeff Pollack and Mike Sabo, my

11   colleague and my witness or my client, Andy Birchfield

12   is here, on behalf of Beasley Allen.

13         THE COURT:  Thank you, good morning.  Counsel

14   for Johnson and Johnson?

15         MR. BRODY:  Good morning, Your Honor, Steve

16   Brody from O'Melveny and Meyers, for Johnson and

17   Johnson and L.T.L. Management.

18         THE COURT:  Thank you.

19         MR. HAAS:  Good morning, Your Honor, Erik

20   Haas with Johnson and Johnson.

21         THE COURT:  Good morning.  I dispensed with

22   Plaintiff and Defendant in this circumstance, so.

23         MR. BRODY:  Thank you.

24         THE COURT:  All right.  So we had Mr. Haas

25   and Mr. Murdica testify previous.  Do we have another

1    witness on behalf of Johnson and Johnson?

2              MR. BRODY:  So Your Honor, at this point, you

3    know, we believe we have met the burden through the

4    testimony of Mr. Haas and Mr. Murdica, to show that the

5    disqualification is warranted under the New Jersey

6    Rules of Professional Conduct, including rules 1.6, 1.9

7    and 1.10, 5.3, 8.3 and 8.4.

8              But I know that Your Honor indicated in your

9    order that you issued on January 30th that you felt it

10   was important to hear from both Mr. Conlan and Mr.

11   Birchfield and because they are both here, we are

12   willing to call them, to give each side the opportunity

13   to ask them questions and to allow the Court to have

14   the record that Your Honor indicated you felt you

15   needed to have in order to decide the motion.

16             THE COURT:  Thank you.

17             MR. BRODY:  And so for that reason, we will

18   call Mr. Conlan first.

19             THE COURT:  All right, Mr. Conlan?

20             MR. POLLACK:  Can we just address, with the

21   Court's permission, one technical issue which is, we

22   had a couple of documents.  We had -- Judge Singh had

23   issued an order regarding the mediators issuing written

24   questions to interrogatories or whatever you want to

25   call it and we also had, I believe, a submission on a

1    K.C.I.C. privilege documents.  Do we want to simply

2    mark those all for identification or how would Your

3    Honor like to proceed?

4                THE COURT:  Judge Singh?

5                JUDGE SINGH:  We can mark them.

6                THE COURT:  We can mark them for

7    identification purposes.

8                MR. POLLACK:  Okay, fair enough.

9                COURT CLERK:  Thank you.

10                MR. POLLACK:  I'll go with Mr. Brody.

11                MR. BRODY:  Great, thank you.  I'm ready for

12    Mr. Conlan.

13                THE COURT:  Okay, Mr. Conlan, please come

14    forward.  Mr. Conlan, good morning.  Before you are

15    seated, please raise your right hand, state your full

16    name and spell your last name?

17                J. CONLAN:  James F. Conlan, C-O-N-L-A-N.

18    J A M E S   F.   C O N L A N, DEFENDANT WITNESS, SWORN

19                THE COURT:  Thank you, you may be seated.

20                MR. BRODY:  Good morning, Mr. Conlan.

21                THE WITNESS:  Good morning.

22    DIRECT EXAMINATION BY MR. BRODY:

23        Q    I see you have a binder with you up there.

24    Is that the binder with hearing exhibits?

25        A    Yes.

1          Q    All right.  You represented Johnson and

2    Johnson in its Talc Litigation when you were a partner

3    at the Faegre Drinker Law Firm; correct?

4    A    Yes, bankruptcy-related.

5          Q    From July 2020 until early 2022; correct?

6    A    Correct.

7          Q    And at the time you started representing

8    Johnson and Johnson in the Talc Litigation, the cases

9    pending here in Atlantic City and in the M.D.L. in

10   Trenton were active; correct?

11   A    Yes.

12         Q    That was, you started about I guess a year

13   and a half, not quite year and a half, before the

14   L.T.L. bankruptcy filing; right?

15   A    Correct.

16         Q    All right and I assume you agree because Mr.

17   Pollack, the Counsel for Beasley Allen has stated it,

18   that you had privileged and confidential discussions

19   with Johnson and Johnson when you were representing the

20   company as an outside counsel; correct?

21              MR. POLLACK:  Your Honor, objection, leading.

22   He is a non-party.

23              THE COURT:  You can rephrase.

24              MR. BRODY:  Thank you.

25              THE COURT:  Objection sustained.

1          MR. BRODY:  Your Honor, respectfully, he is

2     clearly adverse to Johnson and Johnson.

3          THE COURT:  Well, he has not demonstrated

4     that, Mr. Brody.  So I'll provide you with that

5     opportunity, if the need arises, the Court will not

6     foreclose you from asking leading questions.

7          MR. BRODY:  Fair enough, I think we can get

8     there, Your Honor.

9     BY MR. BRODY:

10         Q    So Mr. Conlan, I take it that -- well, let me

11    just ask you, do you disagree with Mr. Pollack's

12    statement and I'm going to read it to you, from a

13    January 17th, 2024 hearing in this courtroom.  Did he

14    have confidential discussions with J and J?  The record

15    appears crystal clear that he did.  You would agree

16    with that; right?

17    A    Yes.

18         Q    All right and I take it, you communicated

19    regularly with J and J's in-house counsel; correct,

20    while you were representing the company?

21    A    I don't know what regularly means.  I can go

22    through -- yeah, frequently.

23         Q    All right, frequently, including Mr. Haas,

24    who is the World-Wide Head of Litigation at Johnson and

25    Johnson; right?

J. Conlan - Direct                                    9

1    A    I did communicate with Mr. Haas.

2         Q    With Joe Braunreuther, who previously led

3    litigation worldwide for Johnson and Johnson?

4    A    I did communicate with Mr. Braunreuther.

5         Q    With John Kim, who was the product liability

6    lead during the time that you were representing the

7    company as outside counsel?

8    A    I did communicate with Mr. Kim.

9         Q    With Andrew White, who has responsibilities

10   for managing the Talc Litigation; correct?

11   A    I did communicate with Mr. White.

12        Q    As well as other outside counsel for Johnson

13   and Johnson, including Mr. Murdica?

14   A    I did.

15        Q    Attorneys at Weil Gotshal, including Diane

16   Sullivan and Ronit Berkovich?

17   A    I did.

18        Q    Attorneys at Orrick, including James Stengel?

19   A    I did.

20        Q    You billed Johnson and Johnson for your time;

21   correct?

22   A    I did.

23        Q    And when you did work for Johnson and

24   Johnson, did you record your time accurately?

25   A    I believe so.

1         Q    I assume you accurately described the work

2    that you did with the company?

3    A    I believe so.

4         Q    And I take it that you accurately recorded

5    the amount of time that you spent billing -- doing work

6    for the company; fair?

7    A    I believe so.

8         Q    And you then provided your time entries to

9    the Faegre Drinker Law Firm so that Faegre Drinker

10   could bill Johnson and Johnson for the time you spent

11   on the Talc Matter; right?

12   A    I believe so.

13        Q    All right.  Fair to say you billed more time

14   to Johnson and Johnson for the Talc Matter than you

15   billed to any other client during the time that you

16   were a partner at Faegre Drinker?

17   A    Than any other one client, that would be true.

18        Q    All right.  So we know you represented

19   Johnson and Johnson in the Talc Litigation for a period

20   of 20-21 months, while you were at Faegre Drinker.  We

21   know that you communicated regularly, frequently, to

22   use your word, with Mr. Haas, Mr. White, Mr.

23   Braunreuther, Mr. Kim, the other outside counsel.

24        I'm going to ask you some questions about what you

25   were doing while you were outside counsel for Johnson

1    and Johnson.  But I do want to caution you, I'm going

2    to be asking you questions about whether you looked at,

3    whether you evaluated certain issues.  I'm not going to

4    ask you to reveal the substance of any recommendations

5    you made, of any analysis you received because those

6    are privileged.  You understand that; right?

7    A    I do.

8         Q    And you understand that, that's the company's

9    privilege; correct?

10   A    I understand.

11        Q    All right and so if I ask you -- and just so

12   that we're on the same page, I want to make sure we're

13   on the same page.  So I could ask you a question like,

14   did you analyze different resolution options available

15   to Johnson and Johnson in the summer of 2021.

16        I'm not looking for you to tell me what you

17   concluded or what somebody else said about a particular

18   option.  I'm just looking for yes or no, did you do

19   that, for that type of question.  Is that clear?

20   A    I understand.

21             MR. POLLACK:  Your Honor, I object to the

22   entire line of questioning proposed.  Yuna gives him a

23   Hobson's choice; put up or shut up.  Show me the

24   documents, we can inquire.  You got billing sheets,

25   show them to me, you got time entries, show them to me,

1    you've got actual memos, show them to me.

2            I know that we've had this discussion before

3    but I have to raise it again because now he

4    intentionally wants to go through a series of

5    discussions but I can't test the proposition and

6    respectfully, neither can you.

7            THE COURT:  Unless we ask for in-camera

8    review.  So should the need arise, Mr. Pollock.  I'm

9    going to overrule the objection but I understand the

10   nature of the objection.  To the extent there are some

11   substantive aspects that Mr. Conlan needs to review,

12   Mr. Brody will hear, right?

13           MR. BRODY:  Yeah, we will and --

14           THE COURT:  So to answer, you know, yes or no

15   in that context, I understand the nature of the

16   question but you know, to have an adequate ability to

17   test the substance, we may need to see some in-camera

18   review.  So I'm going to leave that avenue open for the

19   Court.

20           MR. BRODY:  Absolutely, Your Honor.  We're

21   prepared to proceed that way, if it becomes necessary.

22   And I will just say, I mean, we didn't hear it but that

23   sounded like another Best Evidence Rule 10-02 objection

24   and I think the law is fairly clear that, that's not a

25   valid Best Evidence Rule objection testimony about

J. Conlan - Direct                         13

1    events, even if there are documents that may

2    corroborate those events, testimony is primary

3    evidence, not secondary evidence and both New Jersey

4    case law, as well as commentaries on the New Jersey

5    Rule which is identical to the Federal Rule confirm

6    that.

7              THE COURT:  I don't disagree with you.  Mr.

8    Pollack?

9              MR. POLLACK:  Two very brief points and I'll

10   get out of your way.  One, the record was closed and we

11   decided the record was closed.  And obviously, it's

12   your courtroom, Your Honor, so you can do what you see

13   fit.  Obviously, I will object to re-opening the record

14   because I prepared my case for the case that J and J

15   filed.

16             I didn't want to have -- and we talked, had

17   this exact discussion remotely, not in this courtroom,

18   I think you were in the other room but the discussion

19   was; we'll be here until August if we go through this

20   back and forth.  So I just don't want to waive my

21   objection but you can tell me hey, I'm the Judge.  You

22   get to do what you want to do, I understand that.

23             THE COURT:  That's quite all right, that's

24   okay.

25             MR. POLLACK:  The second --

1          THE COURT:  You need to protect your record.

2          MR. POLLACK:  The second point I would raise

3    is, I disagree strongly with my colleague here.  I

4    think the Best Evidence Rule is precisely at play.  I'm

5    not talking about whether a copy of the check is fake,

6    I'm not talking about whether the contract is really

7    the true and authentic contract.  You're talking, by

8    his established testimony, 16 hours plus and change.

9          If you were to ask him, what did he do on

10   March 31st, September 1, what did you do in July?  How

11   the hell do I ever test that?  I can't, without the

12   document, I can't do it.  So I think the Best Evidence

13   Rule, in this case, specifically and clearly applies.

14   With that being said, you understand my objection.

15         THE COURT:  I do.  Let's hear, you know, I

16   didn't hear any questions yet.  Obviously, if Mr.

17   Conlan understands the question and can answer the

18   question without a document, we'll see.  But you may

19   proceed, Mr. Brody.

20         MR. BRODY:  Right and if I may, I just feel

21   the need briefly to respond because we've heard over

22   and over again, oh the record is closed.  Well

23   actually, we're in an evidentiary hearing and this

24   hearing, as well as the testimony that the Court

25   received on March 25th, is an important part of the

1    record and obviously, it is something that the Court

2    indicated it needed.

3            It is also the case that subsequent to the

4    time that we argued the motion before Your Honor, Judge

5    Porto, on January 17th and before Judge Singh on

6    February 7th, that we, through this privilege log that

7    has been marked as a hearing exhibit and that Ms.

8    Sharko submitted, Judge Porto, to you and appears on

9    the M.D.L. docket.

10           You know, through that, we have discovered a

11   significant amount of additional information that could

12   not have been part of the record at that prior time but

13   I am ready to proceed.

14           THE COURT:  Please, yep.

15   BY MR. BRODY:

16       Q    So let's start with some of the things that

17   may not be tied to, you know, something like the Imerys

18   bankruptcy in particular but more broadly -- and then I

19   want to focus in on some of the other things you did

20   when you were outside counsel for Johnson and Johnson.

21   So you participated in, with the J and J Litigation

22   Team, analysis of litigation events and their potential

23   impact on global resolution of the Talc cases for J and

24   J; didn't you?

25       A    Yes, in context of the Imerys North America

1    bankruptcy case.

2         Q    You looked at potential structures for all-in

3    settlements to achieve J and J's objectives; correct?

4    A    Yes.

5              MR. POLLACK:  Continued objection to leading,

6    Your Honor.

7              THE COURT:  Thank you.

8              MR. BRODY:  I'll just rephrase it.

9              THE COURT:  Okay.

10   BY MR. BRODY:

11        Q    Were you privy to J and J's thinking on

12   methods to justify expectations for the future

13   incidents of ovarian cancer claims?

14   A    Can you repeat that or explain it?

15        Q    Sure, let me ask it this way.  Were you privy

16   to, did you have the opportunity, to discuss, analyze,

17   Johnson and Johnson's thinking, views, including of the

18   in-house counsel and the out-house counsel team,

19   outside counsel team, methods to justify the team's

20   expectations for future incidents of ovarian cancer

21   claims?

22             MR. POLLACK:  Objection, ambiguous, Your

23   Honor.

24             THE COURT:  Well, did you understand the

25   question, Mr. Conlan?

1          THE WITNESS:  Yes but this way, the desire to

2     cut off future claims as opposed to current claims is

3     the key to virtually every mass tort bankruptcy, for

4     the co-defendant and for the company in bankruptcy.  As

5     for what percentage of claims, what the value of the

6     future were and all that, no.  That's just not my area.

7     My area was, methods to capture futures.  Currents are

8     easy, future is not so easy.

9     BY MR. BRODY:

10         Q    And as part of the discussions that you

11    engaged in, you were a party to consideration of

12    whether J and J expected the incidents of future Talc

13    claims to go up or go down; weren't you?

14              MR. POLLACK:  Objection, hearsay.

15              THE COURT:  Mr. Brody?

16              MR. BRODY:  Just asking if he participated in

17    discussions.  I'm not asking for the truth of any of

18    the matters asserted, in fact, I don't want him to

19    reveal matters asserted in those discussions --

20              THE COURT:  The objection is overruled.

21              MR. BRODY:  Thank you.

22              THE WITNESS:  I don't recall being party to

23    discussions on whether futures would go up or go down.

24    BY MR. BRODY:

25         Q    And do you -- well, let me ask it this way.

1    Do you recall receiving communications containing

2    analysis of that?

3    A    I don't recall that.

4            MR. BRODY:  All right, let's see if we can

5    refresh your recollection and we're going to have to do

6    this in-camera, Your Honor, we're already at that

7    point.  I have copies for you.  Mr. Conlan can look at

8    it and I can ask him if it refreshes his recollection.

9            THE COURT:  And how about a copy for Mr.

10    Pollack?

11            MR. BRODY:  I can't give it to Mr. Pollack if

12    it's in-camera because we have a privilege waiver issue

13    here.

14            MR. POLLACK:  This is precisely the problem

15    that Yuna predicted, Your Honor.  She had a choice.

16    Second paragraph (indiscernible) Hobson's choice.

17    Either put up or shut up, put the documents in or

18    don't.  Because you -- that client refused to put the

19    communications into the record and obviously, as you

20    both know, the crucible of cross examination is

21    critical here.

22            So I not only not have the document, not

23    understand it, not only forget the fact that the record

24    is closed, now I'm not going to be able to see it.

25            THE COURT:  Why don't we -- with the

1    objection, why don't you continue on another line of

2    questioning and Judge Singh and I will address this

3    during a break, okay?

4              MR. BRODY:  Sure.

5              THE COURT:  Can you bifurcate your line of

6    questioning, Mr. Brody?

7              MR. BRODY:  Sure, we can set that question

8    aside for now.  I don't know how far we're going to get

9    but I can do that for now.

10             THE COURT:  Okay.

11   BY MR. BRODY:

12        Q    So you would agree that -- let me just ask

13   you this, since I want to stay away from leading

14   questions, if I can.  Did you engage in privileged and

15   confidential analysis of future claimants' allocations

16   and models that would be needed to derive a settlement

17   outcome for the Talc claims for Johnson and Johnson?

18   A    Analysis?

19        Q    Correct.

20   A    No.  Certainly, I was present when other people

21   who were in that area talked about it but that's just

22   not my area.

23        Q    Did you bill for it?  You may not have done

24   it but did you bill for it?

25   A    Did I bill for the fact that I was sitting there

J. Conlan - Direct                    20

1    while it was discussed, someone else's area?  I

2    probably did.

3         Q    So somebody else was analyzing futures,

4    claimants, allocations and models, to derive settlement

5    outcomes for J and J in a privileged and confidential

6    setting and you were sitting there?

7    A    Yeah.  Imagine a bunch of people sitting at

8    computer screens.  It's COVID and people are only

9    talking up when their area of expertise is implicated.

10        Q    And you're there and you're listening?

11   A    Yes, trying to listen.

12        Q    And -- and you're taking it all in.  It's a

13   privileged and confidential setting.  You're not

14   inviting people in from the outside here; right?

15   A    Correct.

16        Q    Right and you're billing for that time?

17   A    Yes.

18        Q    And your billing is accurate?

19   A    I believe so.

20             MR. BRODY:  So we're at another one of those

21   situations, Your Honor, where, I mean, if the Court can

22   receive in-camera the billing records.  We are now at a

23   point on cross examination where those billing records

24   are very relevant for impeachment purposes because we

25   have a situation where Mr. Conlan just testified that

 1    he didn't bill for analysis.

 2              THE COURT:  But he was there and he was

 3    billing for him time.

 4              MR. BRODY:  Right.

 5              THE COURT:  I mean, I'm not -- I can let Mr.

 6    Conlan explain that but that's -- that's the nature of

 7    the profession; isn't it, Mr. Brody?

 8              MR. BRODY:  Well, if -- if I were going to

 9    bill a client for time spent analyzing models, I would

10    have actually conducted the analysis.  If I merely

11    attended a call where people, different people, were

12    discussing potential resolutions of something, I would

13    bill for, you know, a ten team meeting where

14    resolutions are discussed.  I wouldn't bill as if I had

15    done the analysis because that wouldn't be accurate.

16              THE COURT:  Unless your retainer agreement

17    said otherwise, am I right?

18              MR. BRODY:  I --

19              THE COURT:  If your retainer agreement

20    provided for an aspect of billing and Mr. Conlan,

21    hypothetically, billed in the manner that the retainer

22    agreement provided for, wouldn't that comport with our

23    understanding of billing for the clients?

24              MR. BRODY:  I am having trouble envisioning a

25    retainer that said, you can bill for analyzing things

1    that you didn't analyze.

2              THE COURT:  I'm not saying it existed -- I'm

3    not saying it existed or didn't but wouldn't that play

4    a part of the consideration here?

5    BY MR. BRODY:

6        Q    I -- let me just ask this question.  Mr.

7    Conlan, did you feel that you could bill Johnson and

8    Johnson for analyzing things that you didn't analyze?

9              MR. POLLACK:  Your Honor, I have an objection

10   and I would ask for a two minute break, where I think I

11   may have a solution to this problem but I need to

12   confer with Mr. Birchfield for one second because

13   obviously, this is going to lead to: what was the

14   retainer agreement, what were the billing practices,

15   what were the billing protocols and now we're going to

16   have more privilege objections.  I think I may have a

17   solution, if you'll give me two minutes, I think I can

18   make (indiscernible)

19             THE COURT:  Okay but I'm going to overrule

20   the objection.  I'm going to hear Mr. Conlan answer

21   that question first.

22             MR. POLLACK:  Okay, fair enough.

23             THE WITNESS:  Could you repeat the question?

24   BY MR. BRODY:

25       Q    Sure.  The question was, when you were doing

1    work for Johnson and Johnson, did you bill the company

2    for analyzing things that you didn't analyze?

3    A    I really don't know how to answer that question.

4    If it was a four hour conference call and there were

5    ten different types of experts, or three, in various

6    areas, I would sit there and listen to see if anything

7    that was relevant to my expertise came up.

8         Q    So is that a yes, you would bill Johnson and

9    Johnson for analyzing futures claimants allocations and

10   models when you didn't do the analysis?

11             MR. POLLACK:  Objection, Your Honor, it's

12   argumentative, when it's not supposed to be leading and

13   asked and answered.  Could I -- when you get a second,

14   I would like to have a one minute break just to talk to

15   Andy real briefly.

16             THE COURT:  And maybe Judge Singh and I not

17   leave the room, all right?  Can we do the break without

18   us leaving?  Okay.

19             MR. POLLACK:  Absolutely, I just need one

20   minute in the hallway.

21             THE COURT:  Okay, I'm going to overrule the

22   objection.  Mr. Conlan, did you understand that

23   question posed by Mr. Brody?

24             THE WITNESS:  I -- not really, to be frank

25   with you because again, they're lengthy calls, they're

1    people who have subject matter expertise in particular

2    buckets, all of whom are listening for issues that

3    might be relevant to their subject matter, listening to

4    see if one of them comes up, for example, that is

5    bankruptcy-relevant but the entire call would be

6    billed.

7    BY MR. BRODY:

8        Q    So my question was, whether that's a yes, you

9    did at times bill Johnson and Johnson for things like

10   analyzing future claims, allocations and models to

11   derive settlement outcomes, when you did not actually

12   do that?

13           MR. POLLACK:  Objection, Your Honor,

14   argumentative.  He's asked and answered the question

15   twice now.

16           THE COURT:  Overrule the objection.  Do you

17   understand that question, Mr. Conlan?

18           THE WITNESS:  I billed for the entire time of

19   the call, even if only five minutes implicated anything

20   that was in my subject matter expertise.

21           THE COURT:  Okay, let's stop there, we'll

22   take our break.  Let's go off the record.  Judge Singh

23   and I will remain on the bench, okay?

24           MR. POLLACK:  I just need a real brief

25   minute, Your Honor, thank you.

1          (Off the record, back on the record)

2          MR. POLLACK:  So I have a proposal that might

3     solve the dilemma we've got.  Which is, that we will

4     stipulate, consistent with Mr. Conlan's last three

5     answers basically, that yes, I billed for the phone

6     calls, I did hear these issues, I was there monitoring

7     the discussions, I billed my time.

8          So that solves, to some degree, the need to

9     get into infinite detail and repeat each time, were you

10    there, did you hear this?  Where I maintain my

11    objection is that, if there is going to be more

12    specificity as to what exactly did he do with it, I

13    want to see the time sheets, I want to see exactly what

14    he did.

15         But I have no doubt, I will stipulate -- and

16    I haven't seen these time sheets so I'm stipulating to

17    something I haven't seen before.  Hope Fox's

18    malpractice policy covers that one but the reality is,

19    I will stipulate that he billed accurately, honestly,

20    truthfully and that he heard whatever he heard and that

21    he did whatever he did.  I don't think I can go any

22    farther than that.

23         THE COURT:  Mr. Brody?

24         MR. BRODY:  So a couple of things, Your

25    Honor.  First of all, the use of the documents, for

1    example, showing billing entries to Mr. Conlan, would

2    be on impeachment -- for impeachment purposes or to

3    refresh his recollection.  It's not as if they're being

4    offered into evidence.

5            But given the stipulation, you know, I wonder

6    if what we ought to do, if the stipulation is that Mr.

7    Conlan billed accurately, that his billing records are

8    correct, that they accurately describe what he did, we

9    should make those part of the record, in conjunction

10   with that stipulation.

11           It will have to be submitted in-camera and it

12   will only be the Court that is reviewing those billing

13   records but that seems to be, one, a solution that the

14   Court received as evidence and as part of the record,

15   in-camera for purposes of the disqualification motion.

16   It would also have the benefit of shortening this cross

17   examination considerably.

18           THE COURT:  Without hearing him and just for

19   our record, you know, my statements with regard to

20   retainer agreements.  I'm not making anybody's

21   argument.  I'm just letting counsel know that there are

22   other parameters at play here possibly with regard to

23   billing.

24           With regard to having the Court just look at

25   the documents, Mr. Brody, in-camera, without Mr.

1    Pollack.  I -- the Court has trouble with that because

2    there is no basis for any appropriate objection.

3    Candidly, I would like to have heard about this prior

4    to coming here today.  We could have addressed it in

5    maybe a manner where a confidentiality agreement could

6    have been entered, considered, for counsel's, for

7    attorneys' eyes only.

8            So I want to make sure, in protecting our

9    record, subject to any appeal which is likely but you

10   know, we don't decide cases based on appeals.  If they

11   happen, they happen, we make the best record that we

12   can.  So that's my thoughts, Mr. Brody and Mr. Pollack,

13   with regard to that.

14           MR. BRODY:  So I wonder, Your Honor, just, if

15   the stipulation that was proposed that, the billing

16   records are accurate, that they accurately describe

17   what Mr. Conlan did and for how long he did it, as he's

18   testified.  That he felt his billing records were

19   accurate and the time is accurate.

20           If that, you know, solves the question, it's

21   -- it would be submitted by stipulation.  It's

22   obviously -- I mean, frankly, we're getting into now

23   one of the reasons why New Jersey Law recognizes a

24   presumption of shared confidences in this situation.

25           THE COURT:  Got it, yep.

1          MR. BRODY:  Because you get into this exact

2     scenario where, you know, I have material that is

3     privileged but is, as you see right now, important to

4     the examination of a witness that the Court has said it

5     wants to hear from before deciding our motion.

6          THE COURT:  Well, we're here to determine

7     whether J and J confidences were shared by Mr. Conlan

8     to Mr. Birchfield.  That's what our focus here is.  The

9     fact that Mr. Conlan has testified, he had privileged

10    and confidential information.  He billed, he billed for

11    his time,  Those bills, to the best of his

12    recollection, were accurate for his time.

13         The Court accepts that stipulation and that's

14    consistent with the testimony here.  I'm not making any

15    credibility findings at this point but it's consistent

16    with what I'm hearing today.

17         MR. BRODY:  Right and I just -- the next

18    question, though, is yes, he was exposed to privileged

19    and confidential information.  It's what kinds of

20    privileged and confidential information that ultimately

21    becomes important, given the arguments that we've heard

22    from Beasley Allen throughout, you know, the course of

23    the Court's consideration of these motions.

24         So and I know Mr. Conlan has -- Mr. Pollack,

25    excuse me, hasn't responded to my proposal but given

J. Conlan - Direct                          29

1    the stipulation that he has proposed that this material

2    is accurate, I would ask that the Court receive these,

3    frankly, as evidence, in-camera.

4           And it's -- you know, we're in a situation

5    here where, in order to avoid a charge of privilege

6    waiver, I don't know that there's another solution

7    where we could hand these over to, you know, Johnson

8    and Johnson's -- one of Johnson and Johnson's

9    opponents, adversaries, counsel for numerous plaintiffs

10   in this litigation.

11          THE COURT:  Mr. Pollack?

12          MR. POLLACK:  Two thoughts.  One, Mr. Brody

13   keeps rewriting what my stipulation was.  I stipulated

14   that, as I said from the very first time I met you,

15   Your Honor, I had no doubt that Jim Conlan had access

16   to confidential and privileged --

17          THE COURT:  He just testified to that.  The

18   fact that you acknowledge it, we heard that in court

19   today.

20          MR. POLLACK:  Right.  So I'm -- that's my

21   story, I'm sticking with it.  Two, the fact is, I also

22   said that -- Mr. Conlan was quite clear each time Mr.

23   Brody questioned him; did you have access to the

24   formula for Coca-Cola, did you have access, you know,

25   to the formula to whatever?

1          His answer was, yeah but remember, my role is

2     here, it ain't this whole thing.  I'm listening, I got

3     my antenna up, I'm listening to the piece the relates

4     to me but I have no doubt that, that was discussed.

5     He's very clear and what Mr. Brody keeps trying to say

6     is that the time sheets we're going to focus on.  So I

7     would beg you, if you're going to do this which

8     obviously I have a problem with, that you remember that

9     Mr. Conlan has stuck with the same story three times

10    consistently.

11          Lastly, I would point out that <u>Yuna</u>

12    <u>O'Builders</u> 109 is right on point, at page 129.  I'm

13    sure you've both read it but in that, they faced

14    precisely this problem.  And the question was, "Yet

15    Defendant's submissions vaguely claimed only

16    information concerning pending and business-related

17    matters."

18          So let's assume we get more specific.  Is

19    super-secret discussions regarding how Mr. Haas has a

20    brilliant theory for how I'm going to, you know,

21    terminate all the plaintiffs' claims.  Whatever it is,

22    right?  One, the crucible of cross examination fails.

23    That's what he's -- that's what Justice Rivera-Soto

24    writing for the Court was addressing.

25          Was that, you have to put up, in my language,

1      put up or shut up.  You either put it out there or you

2      don't.  So providing it to you in court and you are

3      both intelligent readers, doesn't really solve my

4      problem.  I have to represent Beasley Allen and Andy

5      Birchfield who committed years and years to this case.

6              So I would respectfully submit, that's not

7      what the Supreme Court expects, it's not what they

8      accept and I've already given the essence of what Mr.

9      Brody really wants.  Yes, I did it on the first day.

10     Jim Conlan knew -- he listened to all kinds of

11     confidential stuff, I don't doubt it at all.

12             The question is, did he share it?  And when

13     it comes to that did he share it part, I'm going to be

14     very laser-focused because it has to be significantly

15     harmful.  Trupos, it has to be significantly harmful.

16     So it's not enough to jump around and wave and say

17     there were confidential discussions, we were talking

18     about the formula for Coca-Cola, we have all this other

19     stuff.

20             You have to show me the goods.  What exactly

21     is it that Jim Conlan learned in these discussions that

22     was disclosed?  And that issue, we're not addressing.

23     So I really think we're in a side-show over here

24     regarding, did he have confidential or -- he's conceded

25     it, I've conceded it.  The only one fighting,

1    apparently, is J and J.

2              THE COURT:  Thank you, Mr. Pollack.  Mr.

3    Brody, why don't we really -- I understand you have

4    your case.  Why don't we cut to the chase and focus

5    topically.  Reserve, you know, put aside the in-camera

6    issues but why don't you focus topically on what

7    exactly J and J believes that Mr. Conlan knew and that

8    ultimately, shared with Mr. Birchfield.

9              MR. BRODY:  Fair enough, Your Honor.  Let me

10   -- let me frame questions that way, see where we get,

11   reserving of course --

12             THE COURT:  Absolutely.

13             MR. BRODY:  -- the right to, you know, come

14   back to this issue of the billing records, as well as,

15   as may be relevant, I mean, there are certainly -- and

16   this is just a snapshot, an extraordinary number of

17   privileged and confidential communications that speak

18   to the scope of the work that Mr. Conlan did as outside

19   counsel for Johnson and Johnson but I will --

20             THE COURT:  Why don't you paint that picture

21   for us?

22             MR. BRODY:  Certainly.

23             THE COURT:  Okay.

24   BY MR. BRODY:

25        Q    You learned, Mr. Conlan, as outside counsel

1    for the company, how Johnson and Johnson evaluated the

2    viability of claims under different legal regimes;

3    didn't you?

4    A    Could you explain what you mean, "Under different

5    legal regimes?"

6        Q    Sure.  You learned how J and J analyzed

7    whether the validity of claims associated with a

8    blatant tort, in terms of things like: limitations,

9    ability to accurately plead that kind of claim, might

10   differ from jurisdiction-to-jurisdiction, thereby

11   impacting the evaluation of the number of viable future

12   claims that would be associated with the particular

13   mass tort?

14   A    I don't recall that.  What I recall, to help

15   anyone on that question is that, J and J thought that

16   all the claims were unfounded in science and fact and

17   the only distinctions I ever heard was, there's a

18   diagnosis or there's --

19           MR. BRODY:  No, I don't want you to say what

20   you heard.

21           THE WITNESS:  Okay.

22           MR. BRODY:  I'm -- and again, we're in a

23   situation where it's the company's privilege, the

24   company has not waived that privilege.

25           MR. POLLACK:  Your Honor, objection.  You

1    can't take the part of the answer you want and not the

2    part of the answer you don't want.

3              THE COURT:  I don't disagree.

4              MR. BRODY:  The -- the -- he was proceeding

5    to answer a different question.  The question simply

6    was --

7              THE COURT:  Well, I don't necessarily know

8    that because you asked from jurisdiction-to-

9    jurisdiction, different legal regimes and I think Mr.

10   Conlan -- I'm not making any argument but what I

11   understood the testimony was, was going in a direction

12   of how those jurisdictional issues impacted his work.

13             MR. BRODY:  He had gone already, Your Honor,

14   in a different direction, at that point.

15             THE COURT:  Okay, right.

16             MR. BRODY:  As to shifting from where my

17   limitations bar a claim, how might that differ from

18   jurisdiction-to-jurisdiction.  How that might impact

19   the incidents of future claims to, you know, what was J

20   and J's view of the science and what is J and J's view

21   of the science, underlying the Talc claims, which is a

22   completely different question.

23             THE COURT:  Okay.

24             MR. POLLACK:  Your Honor, I respectfully

25   don't know what the witness was going to say because I

1    didn't get to hear him and Mr. Haas gave incredibly

2    long illocutions of like a page and a half answers and

3    now we're going to cut Mr. Conlan down to the three

4    lines that Mr. Brody doesn't like and he's going to cut

5    him off?  I will have a standing objection on this

6    point.

7                THE COURT:  Well, I'm going to make sure --

8    I'm going to ask the witness, as I did before.  I

9    permitted the long answers to go because it was in

10   context.  So I want to make sure that Mr. Conlan has

11   the ability -- if the question addresses an issue that

12   perhaps goes into the attorney-client privilege, Mr.

13   Brody, counsel needs to be careful.  But I want to

14   permit the witness to be able to answer the questions,

15   so that we can resolve this issue.

16               MR. BRODY:  Certainly, Your Honor and this

17   was a case where I think the question was focused, the

18   answer was not, which is why I needed to stop Mr.

19   Conlan and do so based on a privilege objection, so.

20               THE COURT:  Okay.

21   BY MR. BRODY:

22        Q    You engaged at, during the time that you were

23   representing Johnson and Johnson, Mr. Conlan, in

24   discussions concerning legal arguments -- and this is a

25   yes or no, that might be advanced on claim validity;

1    right?

2              MR. POLLACK:  Objection.  Mr. Conlan, if you

3    can answer it yes or no, you can answer it that way.

4    It's the Court's purview, not Mr. Brody's, to direct

5    the (indiscernible) answer.

6              THE WITNESS:  No, not that I recall.  May I

7    expand?

8              THE COURT:  Let's hear that, Mr. Conlan.

9              THE WITNESS:  Okay.  I'm not a products

10   liability lawyer, I'm not a personal injury lawyer.

11   I've never brought a case, I've never defended a case.

12   It's not my area.  I was a restructuring lawyer.  So if

13   others were talking about that, it was lost on me.  It

14   was, solely my role is, how to use proceedings to

15   capture, not just currents but futures.

16             But I will say in these all-hands meetings, a

17   significant number of the items being discussed were

18   just not in my area.  And frankly, the items I would

19   discuss were not in the area of lots of other people on

20   those calls.

21   BY MR. BRODY:

22        Q    So your testimony is, you were exposed to all

23   of this privileged and confidential information, you

24   just didn't understand it?

25             MR. POLLACK:  Objection.

1          THE WITNESS:  Some of it, that would be true.

2          MR. BRODY:  And if somebody was talking about

3    --

4          THE COURT:  Overrule the objection.

5    BY MR. BRODY:

6      Q    If somebody was talking about how do we

7    determine whether a certain portion of the future

8    claims that are being predicted as part of this model,

9    this settlement model, you know, how is the law in

10   different jurisdictions going to impact the validity of

11   the future claims?  You just didn't understand that but

12   you were on the calls?

13   A    Yeah, I certainly don't recall that.

14         MR. BRODY:  All right.  This is another --

15   I'll move forward, Your Honor, but I'm going to mark

16   this point, as well, because this is another area

17   where, I believe, we should be able to, without waiving

18   privilege, showing the document merely to Mr. Conlan,

19   use a privilege document to refresh his recollection as

20   to the yes or no portion of this question.

21         But I'll move forward, given the Court's

22   preference that we see where we can get to and then

23   come back to this.

24         MR. POLLACK:  Your Honor --

25         THE COURT:  Also, keep in mind, if the Court

1    received material in-camera, it's generally reviewed

2    and a determination is made whether it remains in-

3    camera or it should be distributed.  So keep in mind,

4    Mr. Brody, that, that's also an option for it.  I'm not

5    saying that will happen but that's, you know, a

6    consideration when the Court received in-camera

7    material.

8              MR. POLLACK:  And if it does refresh the

9    witness' recollection, the standard practice at that

10   point, now that document is admitted into evidence.

11   You have now used a document to refresh their

12   recollection.  I've never heard of a Court saying, I'm

13   going to refresh your recollection but I'm still going

14   to keep it in the super-secret box because it's now a

15   part of the record.  So I think the whole argument is

16   self-defeating.

17             MR. BRODY:  I don't think that's -- I don't

18   think that's an objection, frankly.

19             THE COURT:  You may continue, Mr. Brody.

20             MR. BRODY:  All right, thank you.

21   BY MR. BRODY:

22        Q    Why don't we talk about it, since you brought

23   it up, Mr. Conlan, why don't we talk about the Imerys

24   bankruptcy, okay?

25        A    Okay.

1        Q    As a starting point, you would agree that the

2   ovarian cancer claims against Johnson and Johnson arise

3   out of the same nucleus of operative facts as the

4   ovarian claims against the Imerys debtors; correct?

5   A    Some of them.  There were claims against the

6   Imerys debtors that related to other products that were

7   not manufactured by Johnson and Johnson, like Colgate,

8   Palm Olive.

9        Q    So but the answer to my question was -- and

10  my question, Mr. Conlan, was focused on the ovarian

11  cancer claims against Johnson and Johnson.  And the

12  ovarian cancer claims against Johnson and Johnson arise

13  out of the same nucleus of operative facts as the

14  claims against the Imerys debtors, related to -- from

15  people who use Johnson and Johnson products; fair?

16  A    With that clarification, yes.

17       Q    All right and thank you, I understand the

18  distinction you were making and I'm glad we could get

19  on the same page with that one.  At the time -- let's

20  see.  Connection with that, sticking with Imerys, you

21  were privy to privileged and confidential analysis of

22  factors impacting the potential for a channeling

23  injunction through the Imerys bankruptcy; correct?

24            MR. POLLACK:  Can I have a standing

25  objection, Judge, just because I don't want to

 1    interrupt the flow.

 2              THE COURT:  That's fine, yep.

 3              MR. POLLACK:  Okay, thank you.

 4              THE WITNESS:  I don't know what you mean by

 5    factors affecting the channeling injunction.

 6    BY MR. BRODY:

 7         Q    You were on multiple teams, meetings, calls,

 8    with the Weil Gotshal team; correct?

 9    A    Correct.

10         Q    And the Weil Gotshal team analyzed the

11    potential for J and J to secure a channeling injunction

12    through the Imerys bankruptcy, for the Talc claims;

13    correct?

14    A    May I expand, just to make sure I'm answering

15    accurately?

16         Q    You may and anytime I ask you a question, if

17    you need a clarification or you have a question, just

18    let me know.

19    A    Sure.  During the course of the Imerys North

20    America bankruptcy, J and J, this is public, J and J

21    attempted what's called a bolt-on.  Meaning, to bolt-on

22    a J and J reorganization plan to the Imerys plan, in an

23    effort to utilize the Imerys bankruptcy to resolve the

24    claims against it, importantly, not just current but

25    futures.  And so in that context, Mr. Brody, yes, the

J. Conlan - Direct                    41

1    bolt-on effort.

2         Q    Right and you participated in numerous calls

3    with both the in-house and the outside counsel teams,

4    devoted to that subject; correct?

5    A    Yes and even lawyers for the Tort Claimant's

6    Committee who were part of the bolt-on effort.

7         Q    And you, in connection with that, received

8    detailed analysis that had been prepared by the Weil

9    Gotshal team; correct?

10   A    I probably did.

11        Q    And that detailed analysis was privileged and

12   confidential analysis that was prepared for discussion

13   with a Johnson and Johnson legal team; correct?

14   A    I would assume but I don't recall.

15        Q    Without revealing the substance, I'm going to

16   ask if you do recall this.  Some of the issues that

17   were discussed were the potential for a channeling

18   injunction to include not just ovarian claims but

19   Mesothelioma claims; correct?

20   A    Yes, that's what the bolt-on plan publically said.

21        Q    But internally, you were part of discussions

22   of what's our strategy for getting there, how do we

23   achieve that; right?

24             MR. POLLACK:  Objection.

25             THE COURT:  The nature of your objection, Mr.

1    Pollack?

2              MR. POLLACK:  Again, it's asking about what J

3    and J discussed with him.  I got no documents to back

4    it up other than the plan.  So I don't know how I would

5    test this proposition.  He has billing records, time

6    sheets, memos, documents, communications, Weil Gotshal

7    documents, all kinds of stuff.  I ain't seen none of

8    it.

9              It's not here and they've had the

10   opportunity.  You both have asked him, is the record

11   closed?  He says, yes.  So now, I'm suddenly being

12   asked, were these things generally discussed?  I don't

13   want to beat a dead horse but it concerns me deeply

14   because that's not what _Yuna_ is contemplating.

15             THE COURT:  Well, we're testing Mr. Conlan's

16   memory with regard to what was discussed.  So I'm going

17   to overrule the objection.  Do you need the question

18   rephrased or repeated?

19             THE WITNESS:  I would appreciate that, yes.

20   BY MR. BRODY:

21        Q    Sure, let me just ask it again.  You were

22   involved in discussions of strategies to achieve the

23   objective of a bolt-on settlement in the Imerys

24   bankruptcy?

25        A    Yes.

1    Q    You were involved in discussion of the impact

2    of settlement matrices on the potential for plaintiff-

3    attorney support for a bolt-on settlement in the Imerys

4    bankruptcy; weren't you?

5    A    Can you expand on that or explain it?

6    Q    Sure, let me just ask you this.  You were

7    involved in the discussion of settlement matrices, as a

8    part of an Imerys bolt-on resolution?

9    A    Not the numbers, I didn't get into the numbers.

10   For example, I don't even know if this is the right

11   word but the sells that are on a matrix, what each of

12   them means.  Not my area but what a bankruptcy court

13   could do in a bolt-on was something where I did have

14   expertise.

15   Q    And you were involved in meetings,

16   discussions, back and forth, that included -- and maybe

17   -- you know, it wasn't your area, so you weren't the

18   one speaking up but discussions of, where do we value

19   it: how do we value these and how do we get this to a

20   point where it's going to drive this to a total number

21   that is going to be okay not just for us but

22   potentially, to gain the support of the plaintiffs'

23   attorneys who we need support from?

24   A    I don't recall that.  I do recall the ultimate

25   number that was ascribed in the public pleadings of the

1   bolt-on plan.

2                   MR. BRODY:  We're going to have to --

3   certainly, Your Honor, we're going to have to put a pin

4   in that one too.

5                   THE COURT:  Okay.

6                   MR. BRODY:  Again, for impeachment or

7   refreshing recollection purposes.

8                   THE COURT:  Okay.

9   BY MR. BRODY:

10      Q    You were involved in discussions of how a

11  matrix would have to value claims in order to achieve

12  participation sufficient for J and J to meet its

13  resolution objectives?

14  A    No, everybody in my industry at that time would

15  have known that you need 75 percent plus vote in favor

16  of the plan by current claimants.

17      Q    And my question, Mr. Conlan, was a little

18  different than that.

19  A    Okay.

20      Q    My question was, you were involved in

21  discussions of how a matrix would have to value claims,

22  what the claim values would have to be, in order to

23  achieve that 75 percent?

24  A    That was Mr. Murdica's area and I just deferred to

25  what he said would have to occur in order for the plan

1   to garner 75 percent plus yes vote from the current

2   claimants.

3        Q    And you and Mr. Murdica discussed that;

4   didn't you?  You may have deferred to him, you had

5   those conversations with him; didn't you?

6   A    I don't recall having discussions with Mr. Murdica

7   as to how much money has to go for particular type of

8   claims to garner a 75 percent plus vote for current

9   claimants in favor of a plan.  I knew, that's my area,

10  75 percent plus required approval but it's not 75

11  percent plus by sell, it's 75 percent plus of all

12  current claimants have to vote for the plan in order

13  for the Court to approve it.

14       Q    And so the answer to my question is, no,

15  sitting here today, you don't recall talking with Mr.

16  Murdica about strategies to achieve that?

17            MR. POLLACK:  Objection, asked and answered.

18  Also, he's --

19            THE COURT:  Well, he said he's deferred to it

20  so I'm going to overrule the objection.  He deferred to

21  Mr. Murdica.  So specifically, then, Mr. Conlan?

22            THE WITNESS:  Discussing Mr. Murdica's

23  strategy to get the claimants to vote yes?  I wouldn't

24  call it a discussion, Mr. Murdica thought he could

25  achieve it.

1    BY MR. BRODY:

2         Q    And so he just said, hey, Jim Conlan, here's

3    my strategy for achieving this and you said, okay Jim,

4    that sounds like an okay strategy to me?

5    A    Yeah, it will come down to the vote.

6         Q    All right.  So he said, here's my strategy

7    and you said, all right, that's -- thank you for

8    sharing your thinking with me on this.  I now know your

9    strategy, Mr. Murdica?

10   A    I don't think I used those words.

11        Q    In sum and substance?

12   A    In sum and substance, Mr. Murdica negotiated, as I

13   understood it, a matrix with the Tort Claimant's

14   Committee or some members of the Tort Claimant's

15   Committee, that they collectively thought would achieve

16   a 75 percent yes vote by current claimants and by

17   response to that was, okay.

18        Q    And you talked to him about the progress of

19   those negotiations; correct?

20   A    Only in the most generic terms.  Like, I'm working

21   on this plaintiff's lawyer, okay.  This plaintiff's

22   lawyer's votes are important, okay.  But no, not at the

23   type of claim or the value of claims or that level of

24   detail, it just wasn't my area.

25        Q    So you understood then which plaintiffs'

J. Conlan - Direct                              47

1    lawyers Mr. Murdica felt were important?

2    A    Yes.

3        Q    And he discussed with you his progress with

4    the plaintiffs' lawyers that he felt were important;

5    didn't he?

6    A    Sometimes.  I would describe it more as just name-

7    dropping, to describe how the discussions that he was

8    having were going.

9        Q    You also addressed the importance of coming

10   up with a settlement matrix that was going to be

11   sufficient to and the factors that would go into that,

12   without disclosing any of them, you discussed that with

13   the Weil Gotshal teams, as well, didn't you, on these

14   meetings that you had with the J and J team?

15   A    The importance of coming up with a settlement that

16   would achieve a 75 percent plus yes vote?  I don't even

17   know that we would need to discuss that.  In the world

18   of bankruptcy, that's just an obvious pillar.

19       Q    That wasn't my question.

20   A    Okay.

21       Q    My question was whether it was that you also

22   had discussions with the Weil Gotshal team about how a

23   deal would have to be structured in order to try to get

24   that 75 percent participation; right?

25   A    I'm sorry, I don't know what you mean by, "How it

J. Conlan - Direct                          48

1    would have to be structured."

2         Q    Could there be, for example, you engaged in

3    discussions including -- and without revealing whether

4    anybody thought this was a good idea or a bad idea, the

5    advantages or disadvantages to Johnson and Johnson of

6    an estimation process as a part of an Imerys

7    resolution; didn't you?

8    A    Not in context, if we're talking about the $4.2

9    billion bolt-on settlement.  If you're talking about

10   separate and apart from that --

11        Q    Let me just ask it open-ended.  Did you ever

12   have those discussions with the Weil Gotshal team?

13   A    Which discussions, about estimation?

14        Q    About the advantages or disadvantages to

15   Johnson and Johnson of an estimation process, as part

16   of a resolution of its talc liabilities?

17   A    We did discuss what if Imerys, not with our

18   participation but, sought an estimation of the claims

19   against itself --

20        Q    Okay and --

21   A    -- what implication that would have for Johnson

22   and Johnson.

23        Q    All right and so -- and those were privileged

24   and confidential discussions that you had with the Weil

25   Gotshal team and the in-house team at Johnson and

1    Johnson; correct?

2    A    Yes.

3         Q    You discussed with them the -- and again

4    without revealing which way you came down on it or the

5    substance of it, the advantages or disadvantages of an

6    opt-in settlement matrix; correct?

7    A    Yes.

8         Q    You analyzed the opt-out component; fair?

9    A    What do you mean -- I apologize.  What do you

10   mean, analyzed the opt-out component?

11        Q    You billed for analyzing the opt-out

12   component of a potential resolution?

13   A    May I expand to respond to that?

14        Q    I don't want you to reveal privileged

15   information.  I don't want to say -- you can say -- you

16   can tell me what you did but I don't want you to say,

17   here are the factors that were more important to J and

18   J, here's what I recommended.

19   A    Can I, in so doing, describe what is a basic

20   restructuring concept?

21             THE COURT:  Basic?

22             THE WITNESS:  Basic.

23             THE COURT:  Sure.

24             THE WITNESS:  Yeah.  You need 75 percent

25   approval of current claimants.  If all of the current

1    claimants have the ability to opt out, the argument

2    would be, you didn't meet the 75 percent.  You

3    basically gave them an opportunity to say, yes or I'm

4    going back to the tort system.

5          And as Mr. Murdica testified on the 25th, one

6    of the questions was; could we do that and just bind

7    the futures?  So from a restructuring lawyer's

8    standpoint, that comes from the restructuring world,

9    the law of the restructuring world.  It's not J and J

10   confidential information.

11          MR. POLLACK:  Your Honor, may I be heard for

12   a second?  If Mr. Brody is going to go through

13   timesheet-after-timesheet, without date, without time,

14   without reference, obviously, I have my standing

15   objection.  But I also would like to get us back to,

16   what are we talking about here?

17          What specifically is the issue that Jim

18   Conlan learned, that he then purportedly conveyed to

19   Andy Birchfield?  Because I've already stipulated that

20   Jim Conlan did a lot of stuff, he's a smart guy and he

21   billed for it.  Okay, agreed.  I'm stipulating to time

22   sheets I haven't even seen, I've done that, don't tell

23   my partners.

24          But on this one, what I am concerned about

25   is, what exactly is the nexus between what Jim Conlan

1    knew because that's what we're here for, right, and

2    what he conveyed to Andy Birchfield, Beasley Allen.

3    And I would like, respectfully, to be focused on that

4    issue.  Otherwise, we're going to be here all day

5    reading time sheets that I haven't seen.

6              THE COURT:  Mr. Brody, any thoughts?

7              MR. BRODY:  (indiscernible)

8              THE COURT:  I know what you're doing.  I

9    mean, Judge Singh and I both know what you're doing.

10   You're saying, you knew this, this, this and this.  I

11   got it.  And then, he did something else with it, with

12   someone else, perhaps, all right?  How much more time

13   do you need with regard to, because I think the

14   testimony is clear, again, not making any credibility

15   findings.

16             There's privileged information, had to do

17   with bankruptcy, had to do with restructuring, had to

18   do with J and J, had to do with Imerys.  When are we

19   going to get the segue, the bridge so-to-speak, with

20   regard to whatever else happened with that information?

21             MR. BRODY:  We're going to get the bridge in

22   about 20 minutes, I hope.

23             THE COURT:  Okay, all right.

24             MR. BRODY:  But Your Honor, I do think these

25   things are important and it's important to -- I mean,

 1    it's 1,600 of work for which Mr. Conlan billed $2.24

 2    million and -- but it's important to establish the

 3    scope of that work, the breadth of that work which was,

 4    you know, every single aspect of this.

 5            Of the Talc Litigation, of resolution

 6    strategies.  It's every single aspect of it that he was

 7    exposed to during that time frame.

 8            THE COURT:  Okay, I'm hearing it, we both

 9    hear it, Judge Singh and I and I know what you're

10    doing.  Just keep an eye on, you know, whatever you

11    want the Court to review, if you raise it again with

12    regard to in-camera and we'll address that at that

13    point.

14            MR. BRODY:  Yep, absolutely.

15    BY MR. BRODY:

16        Q    You analyzed, Mr. Conlan, the -- how to value

17    opt-outs for Johnson and Johnson?

18            MR. POLLACK:  This is in Imerys?

19            MR. BRODY:  Yes.

20            THE WITNESS:  How to value opt-outs, people

21    who opted out under the Imerys-J and J bolt-on plan?

22            MR. POLLACK:  Correct.

23            THE WITNESS:  I don't recall how we would

24    value the opt-outs.  As I recall, I thought the

25    approach was to just assign a dollar per claim, which

1    is a fairly simple, albeit crude, approach that has

2    been adopted in bankruptcy courts over the years,

3    rather than trying to assign a value to the claim that

4    votes yes or no.

5    BY MR. BRODY:

6         Q    You billed -- you billed J and J for

7    analyzing the value of opt-outs; didn't you?

8    A    Yeah well again, when you say the value of opt-

9    outs, do you mean the amount of opt-outs, the

10   percentage, the (indiscernible)

11        Q    You analyzed -- first of all, you've -- let's

12   start with the approach.  You analyzed the approach to

13   valuing opt-outs; correct?

14   A    I'm not trying to be difficult.  I don't

15   understand what analyzing the approach to the value of

16   opt-outs is asking.

17        Q    Well, you just spoke generically about one

18   approach to valuing opt-outs?

19   A    Right.

20        Q    Which is a dollar per claim; right?

21   A    Correct.

22        Q    So in that sense, without disclosing any

23   recommendation that you may have made to the company or

24   any analysis that you may have been privy to,

25   privileged and confidential analysis, you certain

1    engaged in analysis of valuing opt-outs; didn't you?

2    A    It wouldn't surprise me if you said that we

3    described the opt-outs again in context of what it

4    means to have a 75 percent yes vote.  For example,

5    whether if somebody votes yes but opts-out, whether

6    that counts towards the 75 percent, which is a

7    bankruptcy law question.

8         Q    And you were involved in discussion of issues

9    like that, related to a potential opt-out or opt-in

10   settlement matrix, both, while you were doing

11   privileged and confidential work for Johnson and

12   Johnson; correct?

13   A    That sounds believable to me, as I think back.

14        Q    You were engaged or you were exposed,

15   certainly, to different settlement matrices that

16   Johnson and Johnson developed internally during the

17   period where the Imerys bankruptcy was pending;

18   correct?

19             MR. POLLACK:  Objection, same objection.  I

20   can't evaluate a matrix I can't see.

21             THE COURT:  Do you understand the question,

22   Mr. Conlan?

23             THE WITNESS:  I think I do.

24             THE COURT:  All right, I'll overrule the

25   objection.  I understand the nature of your objection,

1    Mr. Pollack.

2              THE WITNESS:  Yeah.  What I knew was, there

3    were settlement discussions going back and forth

4    between Jim Murdica, this is in Imerys, and the Tort

5    Claimants Committee and the individual lawyers on the

6    Tort Claimants Committee.  As for studying or

7    understanding any of that, it wasn't my area.

8    BY MR. BRODY:

9         Q    You were -- you received, you reviewed?

10   A    You mean exposed to it?

11        Q    Yeah, you reviewed them; didn't you?

12   A    No, I would not say I reviewed them.  I would say

13   I was exposed to them but it was not my area to analyze

14   them and say; oh you have this right, or this wrong, or

15   this is curious.

16        Q    Did you bill for analyzing them?

17   A    I billed for the time when I was on calls with

18   people.  Usually, quite frankly, a lot of them were

19   all-hands calls where lots of people were on them in

20   case their expertise was implicated by that call.

21        Q    And so you would be exposed on those

22   privileged and confidential calls and meetings to J and

23   J and its outside counsels' thinking about these

24   settlement matrices that were being exchanged

25   internally during that time period; correct?

1    A    Yes, exposed.

2         Q    These were settlement matrices that -- I

3    mean, look.  Settlement matrices are standard in mass

4    tort resolution discussions; right?

5    A    From the mass tort bankruptcies I've been involved

6    in, yes, but I've not, frankly, ever been involved in

7    them outside of a bankruptcy.

8         Q    And I mean you've said that you're not a

9    product liability lawyer but --

10   A    Correct.

11        Q    -- you've done a lot of work over the years

12   related to mass torts; right?

13   A    In context of restructuring.

14        Q    Right, where things like, as you've just

15   said, settlement matrices come into play; correct?

16   A    Correct.

17        Q    And settlement matrices, ultimately, based on

18   number of claimants and where everybody thinks the

19   claimants fall onto the matrix are going to drive, in

20   combination with other factors, the total number;

21   right?

22             MR. POLLACK:  Objection, argumentative,

23   leading.  He's testifying.

24             THE COURT:  I'm going to overrule the

25   objection.  I don't think it's argumentative.  Do you

1    understand the question?

2                    THE WITNESS:  I do and I think I can answer

3    it this way.  In context --

4                    THE COURT:  I don't think it's leading

5    either.

6                    THE WITNESS:  Okay.  In context of a mass

7    tort bankruptcy.  The, if you will, resolution lawyers

8    likened to Mr. Murdica, engage with their opposite

9    number if you will among the tort claimants and

10   sometimes the futures reps' experts.  They come up with

11   the guts of a resolution, if one is achieved.

12            Those then are processed into what are called

13   trust distribution procedures, which is how the

14   company, in its bankruptcy plan, will bring life to

15   that agreement.  What the procedures will be and how.

16   The bankruptcy lawyers drive the confirmation process

17   but the resolution lawyers drive the trust distribution

18   procedures and the matrix from which they spring.

19            So yes, I was exposed, frankly over decades,

20   to that but I never made it my business to understand,

21   nor frankly do I think I could have, the subject matter

22   of those matrices any more than the resolution lawyers

23   could understand in detail what the bankruptcy lawyers

24   were doing.

25   BY MR. BRODY:

1      Q    So you were both exposed to them and you

2   engaged in discussions with Mr. Murdica about his

3   progress on getting key important -- what he viewed as

4   key important plaintiff lawyers, to be on board with

5   them; right?

6           MR. POLLACK:  Objection, leading,

7   argumentative.

8           THE COURT:  Well, I think it is leading.  Did

9   you, I think would be appropriate in the framing of the

10   question, so.

11           THE WITNESS:  I heard Mr. Murdica say things

12   to me like, I think I have so-and-so or I talked to so-

13   and-so.  He didn't say how or why or what the number

14   was.  Frankly, Mr. Murdica used me as a sounding board

15   on the bankruptcy law, which he didn't understand and

16   how it worked.  The opposite was true, I didn't

17   understand what he was doing.

18   BY MR. BRODY:

19      Q    So you had -- you were -- I'm just trying to

20   understand.  So are you saying that you had discussions

21   with Mr. Murdica about claim values and settlement

22   matrices and estimation of future claims and you just

23   didn't understand what he was telling you?

24   A    I don't think I had substantive discussions on

25   those numerical concepts and those numerical

1    negotiations with Mr. Murdica.  It was just beyond my

2    capabilities.

3         Q    One of the things you did do is you analyzed

4    the potential for claim values to contain risk to J and

5    J; right?

6    A    Could you explain that question a little more?

7         Q    Sure.  You know what a settlement matrix, a

8    settlement grid looks like; right?

9    A    I do.

10        Q    You know what a settlement matrix and grid

11   looks like when you're talking about the Talc

12   Litigation; right?

13   A    They look the same to me, in Asbestos or

14   Herbicides or whatever it is, yeah.

15        Q    Right, you have different ages of claimants;

16   right?

17   A    There's an X and a Y axis, with cells, is how I

18   would describe it.

19        Q    Disease state, age?

20   A    Yes.

21        Q    All right and you -- you frankly, analyzed

22   the feasibility of values in settlement matrices, to

23   contain risk to Johnson and Johnson?

24             MR. POLLACK:  Objection, compound.

25             THE WITNESS:  I don't understand the

 1   question.

 2                 THE COURT:  Overruled.

 3                 THE WITNESS:  I understand --

 4                 THE COURT:  If you could repeat the question?

 5                 THE WITNESS:  Yeah.

 6   BY MR. BRODY:

 7        Q    Sure.  While you were representing Johnson

 8   and Johnson as outside counsel, you analyzed settlement

 9   grids and claim values for their potential to contain

10   risk to Johnson and Johnson?

11   A    That's not the language construct of

12   restructuring.  The language construct of restructuring

13   is that if a bolt-on plan like the one that J and J

14   filed in Imerys North America.  If it had garnered 75

15   percent approval from current claimants and the future

16   rep didn't object, that would have given the Court

17   power to channel the claims against J and J to a trust.

18   If that's what you mean by contain the risk, yes.

19        Q    Now, you billed for that; didn't you?

20   A    Yes.  Explaining how a channeling injunction

21   works, yes.

22        Q    You billed for analyzing grid tightness?

23   A    I don't recall using those words, but you're

24   obviously looking at something where those words are.

25        Q    You, without revealing the substance of any

 1    of your analysis, you analyzed approaches to diagnosis

 2    requirements for settlement participation; didn't you?

 3              MR. POLLACK:  Your Honor, can we get a

 4    clarification?  Is this a part of a narrative time

 5    entry or is this the entire time entry?  Because I

 6    would like to know, since he is -- Mr. Conlan has

 7    testified, I sat in during this.  I want to know if Mr.

 8    Brody is taking out line-by-line, where a series of

 9    issues.  I think I'm entitled to at least that

10    representation.  There is not one line --

11              THE COURT:  Put a time frame -- how about a

12    time frame with regard to this?

13              MR. BRODY:  Sure.

14              THE COURT:  Because we're talking about 21

15    months that Mr. Conlan worked for Faegre Drinker.

16              MR. BRODY:  Happy to, Your Honor.

17              THE COURT:  Yeah, can we get a time frame?

18    BY MR. BRODY:

19         Q    Yeah.  Focusing, Mr. Conlan, on the time

20    period of Fall of 2021, okay, before the L.T.L.

21    bankruptcy filing.  You analyzed approaches to

22    diagnosis requirements for settlement participation;

23    didn't you?

24              MR. POLLACK:  Your Honor, again, my problem

25    is this; I don't have the document.  I do believe the

1    Best Evidence Rule does apply.  I want to know from Mr.

2    Brody, if he's going to continue to do this.  Is that

3    the entire time entry, which may have been two

4    paragraphs long?

5              THE COURT:  Fair.

6              MR. POLLACK:  Or is it this little snippet

7    over here?  I've got to -- he's entitled to know and

8    I'm entitled to know, hat's exactly here?

9              THE COURT:  Let me ask you this, let me just

10   jump in here.  Did you bill weekly, monthly, how did

11   you bill J and J when you worked at Faegre Drinker.  Do

12   you recall?

13             THE WITNESS:  Yeah, my practice over decades

14   as a restructuring lawyer was to, every few days, go

15   back and try to summarize what it was I did.  And

16   sometimes, it was event-driven like, I attended this

17   call.  Sometimes, it was a combination of event-driven

18   and just what I was thinking about at that time and why

19   I was thinking about it.

20             THE COURT:  Thank you.  So are these excerpts

21   from time sheets, from that time frame or is it the

22   full entry?

23             MR. BRODY:  Well, the question -- I have the

24   full -- I have the full entries.

25             THE COURT:  Right but are you questioning him

1    on the full entry or is it an excerpt from an entry?

2              MR. BRODY:  It depends on the entry.

3              THE COURT:  Okay.

4              MR. BRODY:  The question wasn't necessarily

5    tied to a billing entry, though.  The question was, did

6    he analyze approaches in the fall --

7              THE COURT:  No, I understand that.

8              MR. BRODY:  Yeah.

9              THE COURT:  I want to get an understanding,

10   though, from the request we're talking, referencing

11   billing.  How did Mr. Conlan bill, if he remembers, got

12   that time frame.  So with regard to entries, could you

13   let us know if it's a singular entry that you're

14   looking at, addressing?  I think that's within the

15   confines of where we are right now.

16             MR. BRODY:  Sure, if I --

17             THE COURT:  Or is it an excerpt from a

18   billing entry from that time frame?

19   BY MR. BRODY:

20        Q    Sure.  Mr. Conlan, just for the benefit of

21   the Court.  When you billed J and J for work on the

22   Talc Litigation, you created -- and tell me if this is

23   right.  You created a single billing entry for each

24   day; right?

25        A    Yes.

1        Q    Okay.  So we call that, basically, block

2    billing; right, yes?

3    A    I've heard it referred to as that, yes, daily

4    billing, block billing.

5        Q    Right.  So if you do two things one day, you

6    might describe two things and then put down seven

7    hours?

8    A    Yeah or add analyze because it was a long day.

9        Q    I don't understand that.

10   A    Okay.  If you spent seven or eight hours on a

11   particular client's objectives in connection with the

12   Imerys North American bankruptcy, the time report that

13   you typed up yourself or transcribed or your assistant,

14   might list a couple of items that day or a generic

15   catch-all, because you knew how much time you had spent

16   that day thinking about those problems.

17       Q    I'm struggling with this idea of a generic

18   catch-all to capture time spent thinking, as opposed to

19   a time entry that -- I mean, is there a difference

20   between that and a time entry that accurately reflects

21   what you did?

22   A    I don't think so.  By definition, if you're

23   spending seven or eight hours, I at least typically

24   didn't list the 15 things I did that day.  I might list

25   a few of them and then have a more generic catch-all

J. Conlan - Direct                          65

1      that describes the remaining 13.

2            Q    All right.

3      A    That's just a hypothetical.

4            Q    All right.  So going back to the question I

5      asked which was not about billing records.  I simply

6      asked you whether you analyzed approaches to diagnosis

7      requirements for settlement participation in the Fall

8      of 2021?

9      A    I don't recall that.  I will tell you what I do

10     recall.

11           Q    Fair enough.

12     A    One of the questions, but I don't want to get into

13     anything that is confidential so you can stop me.  I'm

14     trying to self-regulate here.  Is the question of

15     whether or not -- whether it was Imerys or whether it

16     was J and J on a bolt-on, which was the Spring of '21,

17     not the Autumn of '21, whether or not it could or

18     should pay, offer to say claimants, where there was no

19     diagnosis or whether a diagnosis should be a

20     requirement in order to pay.

21           Q    Okay and you were then exposed -- I mean, you

22     participated in discussions of that issue with the J

23     and J team; right?

24     A    I was exposed to discussions of that issue.

25           Q    Right, privileged and confidential

1    discussions of that issue; correct?

2    A    I would assume so.

3         Q    All right.  You mentioned Imerys T.D.P.

4    values; do you recall that?

5    A    Yes.  The T.D.P.s.

6         Q    Yes, the T.D.P.s, exactly.  And you were

7    certainly a part of the J and J team that analyzed

8    those Imerys T.D.P.s; correct?

9    A    I was exposed to the T.D.P.s.  I wasn't the

10   drafter of the T.D.P.s, again, not my expertise.

11             THE COURT:  And for our record, what is

12   T.D.P.?

13             THE WITNESS:  Trust Distribution Procedure.

14             THE COURT:  All right, thank you.

15   BY MR. BRODY:

16        Q    All right and you were -- and the trust

17   distribution procedures come with -- they come with

18   claim values; right?

19   A    Yes.

20        Q    And one of the things that happened in those

21   discussions, again without revealing any of the

22   substance, is the J and J team evaluated arguments for

23   and against the validity of the T.D.P.s in the Imerys

24   plan; correct?

25   A    I don't recall it that way.  The way I recall it,

1    which was typical of most bankruptcy cases is; you have

2    an agreement with a group of claimants, the Tort

3    Claimants Committee and the T.D.P.s get drafted

4    together because there is agreement between the Tort

5    Claimants Committee and J and J.  And how you're going

6    to implement that, the trust distribution procedures,

7    is a common effort.

8         Q    But if one party proposes T.D.P.s than

9    another party, somebody likened to J and J, things are

10   inflated or maybe things are too low.  That party then

11   is going to engage in and you were privy to analysis of

12   T.D.P.s proposed as part of the Imerys plan, including

13   J and J's arguments as to the accuracy, validity,

14   feasibility of those T.D.P.s, right?

15   A    I'm sure there was back and forth on the drafting

16   of the T.D.P.s.  I'm sure I was exposed to it but I

17   don't recall it.

18        Q    It was extensive; wasn't it?

19   A    It always is, so I assume it was.

20        Q    All right and you were on -- you got every

21   meeting invite, didn't you, for the --

22   A    I don't know if I got every meeting invite but I

23   got a lot of meeting invites.

24             MR. POLLACK:  Objection as to speculation.

25   Hold on, objection.  How does he conceivably know how

1    many meeting invites there were and whether he was on

2    them.  I don't have any records to show how many

3    meeting invites there were.

4              THE COURT:  Well, Mr. Conlan did I think

5    answer the question with regard to whether he knew or

6    he didn't know they were all invited.  If he was

7    invited, he went to those -- if he could attend, then

8    he was there.

9              MR. POLLACK:  I agree but Mr. Brody then

10   says, but you were invited on all of them.  Well, if I

11   don't know what all is, I don't know what he's on.

12             THE COURT:  Objection to that, so yeah.

13             MR. BRODY:  Yeah.

14             THE COURT:  So do you know if you were

15   invited to all of those meetings?

16             THE WITNESS:  I don't know.

17             THE COURT:  Okay, all right --

18   BY MR. BRODY:

19        Q    But you were invited to a lot of them?

20        A    I was invited to a lot of them.

21        Q    And you joined a lot of them; didn't you?

22        A    I did, they were all-hands.  The approach was an

23   all-hands approach.

24        Q    Right and so you were -- you were exposed, I

25   think as you said, there were different people with

1    different expertise on those calls, meetings?

2    A    That's right.

3         Q    So you were exposed to the thinking of the

4    people with every single different discipline of

5    expertise?

6    A    Correct.

7         Q    Sticking with the Imerys bankruptcy.  You

8    analyzed the strength of estimates of numbers of future

9    claimants; didn't you?

10             MR. POLLACK:  Your Honor, I want to have a

11   standing request.  If he's going to read excerpts from

12   a time sheet, I want the entire excerpt read into the

13   record.  I want to know exactly what the billing

14   statement is because if we're going to cherry-pick this

15   little clause here and that little clause there, I

16   don't have a witness answer that, that's what he

17   focused on because to me, the narrative always is, you

18   had these discussions, is that what you did?  But it

19   may well be it was part of a whole series of things.  I

20   don't know and we don't know and you don't know.

21             THE COURT:  Any thoughts, Mr. Brody?

22             MR. BRODY:  Again, I'm asking for testimony

23   and the question was, did he do that analysis as

24   outside counsel for J and J.

25             MR. POLLACK:  Yeah but that's just --

1           THE COURT:  In what time frame?

2           MR. BRODY:  During the Imerys bankruptcy in

3    the Spring of 2021.

4           THE COURT:  Okay.

5           MR. POLLACK:  But he's not just asking for

6    testimony.  He's arguing by saying, did you have

7    discussion regarding these concepts but the fact is, it

8    goes on for pages.

9           THE COURT:  Well, let me explain what I

10   believe Mr. Brody is doing.

11          MR. POLLACK:  Yes, sir.

12          THE COURT:  Mr. Brody is looking to elicit

13   testimony from Mr. Conlan.  He obviously has records

14   that he wants to receive, have the Court receive, in-

15   camera.  What he then wants to do it, depending on the

16   Court's decision with regard to those in-cameras, then

17   confront whether they are consistent, inconsistent,

18   with regard to the testimony.  So I'm going to permit

19   Mr. Brody to do that.

20          MR. POLLACK:  Understood.

21          THE COURT:  So I'm not delving into strategy

22   but it's clear as day to both Judge Singh and I, that's

23   what's going on here.

24          MR. POLLACK:  Got it.

25          THE COURT:  Am I correct or incorrect, Mr.

1    Brody?

2                    MR. BRODY:  You are correct.

3                    THE COURT:  And so, okay.

4                    MR. BRODY:  Yes.

5                    THE COURT:  So even someone on my level, I'm

6    not the sharpest knife in the drawer, Mr. Brody.  I can

7    understand that.

8                    MR. BRODY:  I'm not going to comment, Your

9    Honor.

10                    THE COURT:  That's my self-effacing comment.

11                    MR. BRODY:  I think you're doing fine.

12                    THE COURT:  Okay.

13    BY MR. BRODY:

14        Q    So the question, Mr. Conlan, did you in the

15    Spring of 2021, during the pendency of the Imerys

16    bankruptcy, engage in analysis of the strength of

17    claims from future claimants; right?

18    A    I don't know how to answer that without explaining

19    what was going on and that may result in me saying

20    things you don't want me to say.

21                    MR. BRODY:  Well --

22                    THE COURT:  Can you break the question down?

23    BY MR. BRODY:

24        Q    Sure, let me ask you this.  At that time, J

25    and J was internally, in March of 2021, working on a

1    proposed term sheet; right?

2    A    And what particular month was this?

3         Q    March of 2021.

4    A    I remember the 4.2 bolt-on was in the spring, so

5    that would be consistent with that time frame.

6         Q    And J and J was working on a term sheet;

7    right?

8    A    I don't remember precisely but that would be

9    consistent with that.

10        Q    And you were, around that time, actively

11   engaged on J and J's behalf, in negotiations with the

12   -- with counsel for the future claimants, in the Imerys

13   bankruptcy; right?

14   A    Yes, I do recall that.

15        Q    Yes, during that time period; correct?

16   A    Yes.

17        Q    And whether in connection with that or

18   otherwise, you engage in analysis of the strength of

19   claims from future claimants in the Imerys bankruptcy;

20   didn't you?

21   A    I think analysis is overstated, if I may.  In

22   virtually every situation I've ever been involved in,

23   the futures reps experts come up with numbers like

24   this.  The current claimants representatives come up

25   with numbers like this because there is a bit of a --

1    conflict is the wrong word but the currents don't want

2    to preserve a lot for futures.

3         The futures want to make sure that their claimants

4    in the future get the same as currents got in the past

5    and so it is a battle of experts and frankly,

6    exaggeration, often has been my experience.  So the

7    idea that I can analyze whether the futures reps

8    experts are going too high, I don't have the underlying

9    ability to do that but my experience is, they typically

10   do go too high and the currents go too low.

11        Q    And you were a part of privileged and

12   confidential discussions of arguments that J and J

13   developed, related to whether the estimates were too

14   high or too low; right?

15   A    I don't recall that.  I will note that you can't

16   confirm a plan and get a channeling injunction unless

17   the futures rep says yes, for whatever his or her

18   reasons are.  So it's not like -- it's not a litigation

19   in a battle, you either persuade them or you don't.

20        Q    And one of the things you were trying to do

21   was persuade the futures rep that it would be a good

22   idea to participate in the deal?

23   A    Yes.

24        Q    And in connection with that, you had

25   privileged and confidential discussions with Mr. Haas

1    and others at Johnson and Johnson; correct?

2    A    About what the futures rep said to me and what I

3    would say to them, yes.

4        Q    And about how the company wanted to respond

5    to positions that the futures rep was taking; right?

6    A    I would assume so.  I don't recall that exactly.

7        Q    You communicated with Mr. Haas in multiple

8    ways.  You communicated with Mr. Haas by e-mail; right?

9    A    I'm sure I did.

10       Q    You communicated with Mr. Haas on the phone?

11   A    I'm sure I did.

12       Q    You met with him in person?

13   A    Occasionally, it was COVID.

14       Q    Yeah and we were, you know, Mr. Braunreuther

15   -- by the way, Mr. Braunreuther basically had Mr. Haas'

16   job before he had his current job, even though the

17   titles may have been a little different; right?

18   A    Yes.

19       Q    Right and Mr. Braunreuther retired, I

20   believe, end of February, March 1st, 2021; is that

21   consistent with your recollection?

22   A    That sounds about right.

23       Q    Right and so, from that point forward, when

24   you needed to have a strategy discussion with somebody

25   at J and J, you typically reached out to Mr. Haas;

1    didn't you?

2    A    Again, it was a grouping of people.  I would reach

3    out to Mr. Haas but occasionally I would reach out to

4    somebody at Weil, occasionally I would reach out to Mr.

5    Stengel, occasionally I would reach out to Mr. Murdica.

6    Occasionally I would reach out, when it was

7    appropriate, to counsel to the Tort Claimants

8    Committee.  All of those things.

9        Q    Right and you bring up the Tort Claimants

10   Committee.  You engaged on J and J's behalf in

11   discussions with, at least Natalie Ramsey, counsel to

12   the Tort Claimants Committee in the Imerys bankruptcy;

13   correct?

14   A    Yes.

15       Q    All right and when you were doing that, you

16   were -- I mean, you were communicating then on the

17   back-end with Mr. Haas about those discussions that you

18   were having; correct?

19   A    Yes, Mr. Haas or one of the people in his law

20   firm.

21       Q    Okay, like Mr. White?

22   A    For example, yes.

23       Q    Mr. Kim?

24   A    Yes.

25       Q    All right and you were doing that in order to

1    you know, develop; okay, what's the strategy, what's

2    next, in terms of our contact with, whether it's the

3    futures rep, counsel to the T.C.C., as to how we're

4    going to get our deal done here?

5    A    How are we going to get them to yes.

6         Q    Yes, how are we going to get them to yes but

7    not just get them to yes, get them to yes at a number

8    and within a structure that works for J and J; right?

9    A    At least the latter, the numbers were not my area.

10        Q    Right but you -- you couldn't just, you know,

11   get them to yes at any old number.  You had to -- the

12   idea was, how do we get them to yes at a number that is

13   going to be acceptable to J and J; right?

14   A    That was Mr. Murdica's area.  What J and J would

15   find acceptable was Mr. Murdica's area.

16        Q    And you and Mr. Murdica, I believe, were sort

17   of the -- sort of the one-two negotiating team for J

18   and J.  You two were the two who were out there having

19   the discussions; right?

20   A    No, I don't think I was the negotiating team or a

21   part of a two person negotiating team on the amount of

22   money.

23        Q    I was talking as to the entire package, are

24   we going to get this deal done; it was you and Mr.

25   Murdica; right?

J. Conlan - Direct                          77

1    A    Again, on the bankruptcy structuring side, like

2    getting the futures rep over the issues that the

3    futures rep was having on the difference between how

4    futures would be treated and currents.  That's a

5    bankruptcy issue.

6         Q    And as to that futures question, you

7    mentioned that often times, discussions of things like

8    value of futures claims, it comes down to a battle of

9    experts; right?

10   A    Yes --

11        Q    That was your phrase?

12   A    Yes but in the end, the futures rep says yes or

13   they say no.  it isn't like you beat them in their

14   expert, they either say yes or no, yeah.

15        Q    And even beyond, even beyond you know just a

16   battle of experts, it's you while you were outside

17   counsel for Johnson and Johnson, while you were the

18   company's lawyer, you were exposed to privileged and

19   confidential analysis of exactly that, those futures

20   values, undertaken on a privileged and confidential

21   basis, by experts that J and J had retained as

22   consultants, to advise it internally; correct?

23   A    I'm sure I was exposed to it.

24        Q    Okay.  You mentioned the T.C.C. in the Imerys

25   bankruptcy.  That T.C.C. had a negotiating sub-

J. Conlan - Direct                         78

1    committee; didn't it?

2    A    That's my recollection.

3         Q    And Leigh O'Dell (indiscernible) from Beasley

4    Allen were on the T.C.C.'s negotiating Subcommittee;

5    weren't they?

6    A    That doesn't surprise me.  I don't remember

7    dealing with them.  I remember dealing with counsel for

8    the Tort Claimants Committee.  So the lawyers who

9    happen to be personal injury lawyers weren't the

10   bankruptcy lawyers, obviously.  Those were lawyers from

11   Willkie Farr and also Natalie Ramsey.

12        Q    Right and as we've said, Ms. Ramsey was

13   counsel to the T.C.C., correct?

14   A    Yes.

15        Q    Did you ever meet with Ms. Ramsey personally

16   during those negotiations?

17   A    I'm sure I did.

18        Q    Same with counsel for the futures rep?

19   A    Yes.

20        Q    All right.  I think you even played golf with

21   the futures rep as part of your negotiating on J and

22   J's behalf?

23   A    I'm not a golfer.  I may have ridden in a golf

24   cart while they were -- I skied with them, for example,

25   I did every year.

1    Q    Okay, fair enough, fair enough.  In the

2    process, you analyzed settlement dynamics and leverage

3    points around voting on the Imerys plan; right?

4              MR. POLLACK:  Your Honor, I have the same

5    objections to the Doctrine of Completeness.  If we're

6    going to quote from a time sheet, I would like to see

7    the time sheet or know what is the entire narrative.

8              THE COURT:  Mr. Brody?

9              MR. BRODY:  Your Honor, I asked him if he

10   analyzed settlement dynamics and leverage around voting

11   on the plan and he said yes.

12             THE COURT:  How about the time frame, though?

13   I mean, obviously, we're getting recollection from Mr.

14   Conlan.  So I'm going to overrule the objection but at

15   least for context for our record.

16             MR. BRODY:  Sure.

17             THE COURT:  How about providing us with a

18   time frame?

19   BY MR. BRODY:

20   Q    Sure, let me just ask you, what time period

21   were you engaged in analysis of settlement, dynamics,

22   surrounding voting on the Imerys plan?

23   A    My guess is that it would have been Winter 2021

24   and over into the Spring of '21 because as I recall,

25   the Imerys bolt-on plan which didn't end up going

J. Conlan - Direct                    80

1      through, was in the Spring of '21.  So that's how I

2      think of that time period.

3            Q    Fair enough and as you said, it didn't go

4      through; correct?

5      A    Correct.

6            Q    And it became clear, I think, that

7      negotiations had stalled by Summer of '21?

8      A    Yes.

9            Q    And at that time, you engaged in privileged

10     and confidential communications with Mr. Haas,

11     evaluating alternatives to the Imerys bolt-on

12     settlement; correct?

13     A    Yes.

14           Q    Now ultimately, J and J took the path of

15     filing the L.T.L. bankruptcy petition on October 2021;

16     correct?

17     A    That's my recollection.

18           Q    You were still a partner at Faegre Drinker at

19     that time; correct?

20     A    I was.

21           Q    You looked at the, without again disclosing

22     the substance of anything but you analyzed that as a

23     potential resolution; correct?  Just a yes or no.

24     A    Well --

25                MR. POLLACK:  Can we get a time frame, Your

1    Honor?

2              THE WITNESS:  Yeah, not before it was filed.

3              MR. POLLACK:  I would like a date.  I would

4    like a date, if there's a time entry, I would like to

5    know the date or time that it was done.

6              THE COURT:  Post-October 2021?

7              MR. POLLACK:  The reason is, well I don't

8    want to get into --

9              THE COURT:  I got it.

10             MR. POLLACK:  I would like to know whether --

11   because what's -- I would like to know when this is

12   being discussed.

13             THE COURT:  Why don't you rephrase the

14   question, Mr. Brody.

15             MR. BRODY:  Well, I think if we have the

16   record, the answer was not before October of '21.  So I

17   think we do have the time frame.

18             THE WITNESS:  Right but may I explain?  I

19   want to be careful, but.

20             THE COURT:  You need some elaboration?

21             THE WITNESS:  Yes.

22             THE COURT:  Okay, the Court will permit Mr.

23   Conlan for -- ask for elaboration.

24             THE WITNESS:  And I'll try to stick with

25   what's public.

1          THE COURT:  And I think after this question,

2     we'll take a break.

3          MR. BRODY:  Fair enough.

4          THE WITNESS:  Yeah.  Jones Day created the

5     Texas Two-Step and it filed <u>Bestwall</u>, a Texas Two-Step

6     in North Carolina in 2017.  Jones Day filed D.V.M.P., a

7     Texas Two-Step in 2020, in North Carolina.  Jones Day

8     filed <u>Aldrich Pump and Murray Boiler</u>, a Texas Two-Step,

9     also in 2020 in North Carolina.

10          I did discuss with J and J what I thought of

11     what Jones Day had been doing in these Texas Two-Step

12     cases in North Carolina and the viability of them and

13     the obstacles and the opportunities.

14          THE COURT:  Let's take our break.  Do you

15     want to come back here, in let's say, ten minutes?

16          MR. POLLACK:  Thank you, Your Honor.

17          MR. BRODY:  Thank you.

18          THE COURT:  Yeah, at 11:30, thanks.

19          COURT OFFICER:  All rise.

20          THE COURT:  We'll go off the record.

21     (Off the record at 11:17:05 a.m., back on the record at

22                    11:33:20 a.m.)

23          THE COURT:  You may continue, Mr. Brody.

24          MR. BRODY:  Thank you, Your Honor.

25     BY MR. BRODY:

1        Q    Mr. Conlan, before we broke, you indicated

2    that you were having discussions about what you

3    referred to as the Texas Two-Step strategy in the

4    Summer of 2021; do you recall that?

5    A    I don't think it's the summer.  I'm sorry, 2021?

6        Q    Yes.

7    A    Yes.

8        Q    You were actually having privileged and

9    confidential discussions with Mr. Haas, Mr. White and

10   Mr. Kim long before that; weren't you?

11   A    With respect to what Jones Day was doing, had

12   done, was in the process of doing in North Carolina,

13   yes.

14       Q    With respect to the potential for a Texas

15   Two-Step bankruptcy to serve as a potential resolution

16   of J and J's Talc Liabilities, irrespective of whether

17   Jones Day was involved.  You were engaged in privileged

18   and confidential discussions of that issue with J and

19   J's senior in-house counsel team, as early as the Fall

20   of 2020; weren't you?

21   A    I don't recall it in the Fall of 2020 but because

22   the Texas Two-Steps were quite famous and three of them

23   were pending in North Carolina, all Jones Day cases,

24   the inventor of the Texas Two-Step.  I do recall J and

25   J -- again, I'm trying to answer the question but I'll

1    contain it to the minimal amount.

2         Q    Maybe do it this way, then.  I'll just ask

3    you, do you recall, without revealing any of the

4    substance, having discussions about it with the in-

5    house counsel team at Johnson and Johnson well before

6    Summer of 2021?

7              MR. POLLACK:  Your Honor, just one point of

8    clarification which I have to ask.  When he said, about

9    it --

10             THE COURT:  About the Texas Two-Step.

11             MR. POLLACK:  Is it about whether J and J is

12   going to file an L.T.L. or about whether the Texas Two-

13   Step in general and that point is critical.  And

14   without seeing the document that was discussed, I

15   really need to know, was it about whether J and J was

16   going to file L.T.L. or just about the Texas Two-Step,

17   in general?

18             THE COURT:  Fair.  Mr. Brody, who or what is

19   it?

20   BY MR. BRODY:

21        Q    The Texas Two-Step, as a resolution for J and

22   J?

23   A    Yes, I would say in general.  Particularly, what

24   do you think of what Greg Gordon is doing in North

25   Carolina?

J. Conlan - Direct                                85

1          Q    And that was well before -- I mean you

2    testified before the break, this was Summer of 2021.

3    You were involved in privileged and confidential

4    discussions of that issue with Johnson and Johnson well

5    before the Summer of 2021; right?

6    A    My recollection and I'm filling in details here,

7    is at that point, the impression I had was that Jones

8    Day was pitching that.

9          Q    That wasn't my question.

10   A    Okay, I'm sorry.

11         Q    My question was whether you had discussions

12   with senior leadership in the J and J Law Department

13   about that issue prior to the Summer of 2021?

14              MR. POLLACK:  Again, that issue, Your Honor.

15   I really need to know --

16              MR. BRODY:  The Texas Two-Step.

17              MR. POLLACK:  -- whether J and J is going to

18   file L.T.L. or whether it's the Texas Two-Step, in

19   general.  The distinction for me is critical.

20              THE WITNESS:  About the Texas Two-Step, in

21   general, and what Greg Gordon was doing in North

22   Carolina.

23   BY MR. BRODY:

24         Q    Prior to the Summer of 2021; correct?

25   A    That wouldn't surprise me because --

1    Q    In fact, you -- you analyzed whether a, we'll

2    call it a Texas Two-Step bankruptcy filing, was

3    appropriate to resolve J and J's Talc claims?

4                MR. POLLACK:  Your Honor, objection.  If

5    we're going to ask that question, I want to know what

6    his analysis was and that's going to get into attorney-

7    client privileged communication.  I know where they're

8    driving, you can't have half the story.  I need to hear

9    the echo.

10               THE COURT:  Well, Mr. Brody?

11               MR. BRODY:  Well, Your Honor, he can clearly

12   answer the question.  Did he engage in that analysis

13   and did he discuss the analysis of the potential for a

14   Texas Two-Step bankruptcy with in-house counsel at J

15   and J.  We'll start with --

16               THE COURT:  I'm going to overrule the

17   objection.  You can answer the question, Mr. Conlan and

18   just for our record, I want to permit Mr. Conlan.  Mr.

19   Conlan is being alleged to have done certain things

20   here and I'm going to permit the record to reflect, to

21   the extent possible, the ability of Mr. Conlan to

22   address specifically what he is being alleged to have

23   done.  I'm not taking --

24               MR. POLLACK:  Understood.

25               THE COURT:  I'm not making anybody's

1    argument, Mr. Pollack or Mr. Brody, but I want to have

2    the individual who is at the subject of this, along

3    with Mr. Birchfield, the opportunity to address

4    specifically, now that we're honing in on it, Mr.

5    Brody.

6              MR. BRODY:  Of course.

7              THE COURT:  All right, Mr. Conlan?

8              THE WITNESS:  Yes.  What I discussed was the

9    weaknesses and the strengths of what Jones Day was

10   doing in North Carolina and in particular, reminding

11   everyone that it doesn't work unless 75 percent plus of

12   claimants vote yes and that is a difficult thing to

13   achieve in context of a solvent company bankruptcy.

14   BY MR. BRODY:

15        Q    And you participated in meetings, privileged

16   and confidential discussions in meetings with Mr. Haas,

17   Mr. White and Mr. Kim, on exactly that subject;

18   correct?

19   A    Yes.

20        Q    And in the context, you also talked to them

21   about structural optimization; didn't you?

22   A    And disaffiliation.

23        Q    Right.  You were doing a soup-to-nuts

24   privileged and confidential analysis of options that J

25   and J might have to resolve its Talc liabilities?

1    A    Right, mechanisms and options.

2         Q    Right.  Throw everything on the table and

3    let's talk about strengths and weaknesses of each one;

4    right?

5    A    Correct.

6         Q    And it, in connection with structural

7    optimization.  That included comparisons between

8    structural optimization and alternative options;

9    correct?

10   A    Not to be difficult here.  Structural optimization

11   and disaffiliation.  Structural optimization alone

12   doesn't get you to where you need to be.  Structural

13   optimization and disaffiliation.

14        Q    Okay.  So I understand what you're trying to

15   say.  My question -- and I'll add the words for you,

16   that's fine.  You were engaging in analysis of the

17   advantages and disadvantages of structural optimization

18   and disaffiliation, compared to other options that the

19   company might have for resolution of its Talc

20   liabilities; correct?

21   A    Correct, currently.

22             MR. POLLACK:  Can I get a point in time --

23   can I get a point in time when this occurred?

24             THE COURT:  Mr. Brody, what time?

25   BY MR. BRODY:

1        Q    And I'll just -- that's fine.  You were

2    having these discussions with the in-house team at

3    Johnson and Johnson throughout the time that you were

4    outside counsel for the company; correct?

5    A    Certainly, for a portion of the time, I was.

6        Q    You raised the issue with Mr. Braunreuther,

7    as well; correct?

8    A    I assume I did.

9        Q    You raised the issue as early as August 2020,

10   a month after you got to Faegre Drinker; correct?

11   A    That wouldn't surprise me to know that, yes.

12       Q    You raised it multiple additional times

13   through the Fall of 2020, specifically with Mr. White;

14   didn't you?

15   A    Yes.

16       Q    You raised it with Mr. White, Mr. Haas, Mr.

17   Braunreuther, Mr. Kim, in the Winter 2020-21; right?

18   A    I don't remember each specific instance but I

19   wouldn't be surprised by that, so.

20       Q    And then take Mr. Braunreuther out of that

21   group at the beginning of March of 2021 but through the

22   Spring and as you've said, the Summer of 2021, as well,

23   right?

24   A    Yes.

25       Q    And those discussions that you were having,

1    those privileged and confidential discussions,

2    continued into the Fall of 2021; didn't they?

3    A    Well, just to quivel on one point.  What I was

4    doing was referring to all the companies that didn't

5    file bankruptcy and it had achieved finality using

6    structural optimization and disaffiliation.

7         Q    And you were comparing structural

8    optimization and disaffiliation as an option for

9    Johnson and Johnson, to other options that were on the

10   table and part of those privileged and confidential

11   discussions; correct?

12   A    Yes, including the fact that it doesn't require a

13   vote of the claimants.  So you don't need a yes vote,

14   let alone 75 percent.

15        Q    So one of the things that those discussions

16   included was conditions that would need to be addressed

17   and satisfied for J and J to pursue structural

18   optimization and disaffiliation as a resolution

19   strategy; correct?

20   A    I would assume so, yes.

21        Q    How J and J's corporate structure might or

22   might not lend itself to a resolution through

23   structural optimization and disaffiliation; correct?

24   A    Not correct.  Every single entity in the family of

25   any group of companies can be structurally optimized.

1          Q     So are you denying that you discussed with

2     the in-house counsel team at J and J issues related to

3     J and J's corporate structure and how J and J's

4     corporate structure might or might not lend itself to

5     structural optimization and disaffiliation, as a

6     resolution for Talc liabilities?

7     A     Incorrect.  I described how you could structurally

8     optimize all of the liable entities.  The second part

9     where you said, or not.  I don't recall and, "Or not."

10    I don't recall saying, you couldn't structurally

11    optimize this entity but you could this.  The approach

12    was, you can structurally optimize any of the entities

13    in the family.

14         Q     And so what you were doing is you were having

15    discussions with the in-house counsel team at Johnson

16    and Johnson about, let's just -- and I don't want to

17    get into privileged information here.

18    A     I understand.

19         Q     But as to -- I'll leave off the, "Or not."

20    A     Okay.

21         Q     As to how J and J's corporate structure might

22    lend itself to a structural optimization and

23    disaffiliation resolution of its Talc liabilities?

24    A     Yes.

25         Q     All right.  In connection with those

1    discussions of structural optimization and

2    disaffiliation and other options, the full panoply of

3    resolution options that had to be considered in that

4    privileged and confidential context, you gained

5    confidential information about how J and J felt the

6    passage of time might impact the company's negotiating

7    position; didn't you?

8    A    I don't recall that.  How the passage of time

9    would change the options?

10        Q    Correct.

11   A    I don't recall that.

12            MR. BRODY:  We'll put a pin in that one, Your

13   Honor.

14            MR. POLLACK:  Again, same objection, Judge.

15   If I can't see the document, I can't question it.

16            MR. BRODY:  You -- I mean, Your Honor, again,

17   I think Your Honor understands why I asked to put a pin

18   in that.  I mean, this is a situation where this is

19   cross examination.  I'm asking Mr. Conlan questions

20   about what he did, what confidential information he was

21   exposed to.

22            He's just indicated, in this instance, he

23   doesn't recall.  The document would be to refresh his

24   recollection or to impeach.  It's not a situation where

25   it is offering it.  Obviously, we would have to do that

1    in an in-camera context because we don't want to waive

2    privilege as to the question but just in response to

3    Mr. Pollack.  I take it, the Court does understand why

4    I've asked that the court put a pin in that.

5                  THE COURT:  We do.

6                  MR. BRODY:  Thank you.

7                  THE COURT:  And Judge Singh and I, we're

8    going to come back.  We're going to address that after

9    our lunch break.

10                  MR. BRODY:  Okay, thank you.

11                  MR. POLLACK:  Several responses.  One, we're

12    not at cross.  There's been no demonstration that he,

13    the witness, Mr. Conlan, is adverse to J and J.  So

14    there's been no hostility, he hasn't been lying under

15    oath and there is nothing here that indicates he is

16    adverse.  He is a non-party, so I disagree with the

17    starting point.

18                  The second thing is, I think an hour and 20

19    minutes ago, even accounting for the ten minute break,

20    we were to get to the point, I thought, which was what

21    information specifically did Mr. Conlan share with Mr.

22    Birchfield.  What J and J is doing is building an

23    appellate record.  The appellate record is, he knew a

24    lot of stuff, Jim is an important guy.  Stipulated.

25                  And hour and 35 minutes ago, he knew

1    confidential information.  Judge Porto, I was talking

2    to you on the phone by video and I told him right up

3    front, he knew confidential information.  If we're

4    going to get this done, at some point, I think I'm

5    entitled to know, what specifically did Mr. Conlan know

6    that he shared with Mr. Birchfield?  We've now been at

7    it for 20 minutes and that turned into an hour and 20

8    minutes.

9           THE COURT:  Well, that was our Zoom

10   conference.

11          MR. POLLACK:  Yes, sir.

12          THE COURT:  Yes, so.

13          MR. BRODY:  Yeah.

14          THE COURT:  Mr. Brody?

15          MR. BRODY:  Just in response, that's -- the

16   standard here is not, is Mr. Conlan going to come in

17   and confess on the witness stand?  I shared Erik Haas'

18   --

19          THE COURT:  Well, you didn't ask him that

20   question, though yet, Mr. Brody.

21          MR. BRODY:  Right but that's not the standard

22   and I just think it's important.  In every fifth

23   objection, we here from Mr. Pollack what we have to get

24   to and what the standard for disqualification is.  You

25   know, basically, does Mr. Conlan confess that, you

1    know, yes, I told Andy Birchfield what Andy Haas said

2    about the three conditions that would have to occur if

3    the company were to consider structural optimization as

4    an option.

5            That is, frankly, not the standard and the

6    reason it's not is because in situations where you have

7    a lawyer like Mr. Conlan who was outside lawyer for

8    Johnson and Johnson, who then gets into an arrangement

9    where he's working with Mr. Birchfield and Beasley

10   Allen.  If both sides could simply, Beasley Allen and

11   Mr. Conlan, could say well I deny that I ever shared

12   any confidential information.  You would never have a

13   situation where there would be disqualification.

14   Fortunately --

15           THE COURT:  We got it.

16           MR. BRODY:  Yeah, fortunately, the rules

17   don't require it.

18           MR. POLLACK:  Your Honor, I couldn't disagree

19   more strongly.  That is exactly what the Supreme Court

20   said in 188, 149, exactly what they say in <u>Trupos</u>.  You

21   can't -- what they're doing and this is why this whole

22   thing should stop right now is they're saying, it must

23   be imbued with -- that inherently, there's some

24   discussion of, they have to show an actual disclosure.

25           THE COURT:  What I meant was -- I understand

1   J and J's position, I understand Beasley Allen's

2   position.

3          MR. POLLACK:  Yes, Your Honor.

4          MR. BRODY:   Thank you.

5          THE COURT:  Ultimately but you know, the

6   Court has to make its determination but I would like to

7   get us, you know, I understand the foundation, you have

8   to build a house with a foundation but you know, Mr.

9   Brody, not that I'm asking you to abbreviate your

10  presentation here but I think, getting to the central

11  issue here, you know, might be appropriate.

12          And it was an hour and 20 minutes ago because

13  Mr. Brody says, you know, give me 20 minutes.  I'm not

14  rushing people but I want to get, you know, right to

15  the heart of the matter.

16          MR. BRODY:  Yeah and I apologize for the

17  passage of time, Your Honor.  It's -- but it is

18  important and it's as you have seen --

19          THE COURT:  Well, that ties into your

20  question to Mr. Conlan, so I get that.

21          MR. BRODY:  Yes, yes.

22          THE COURT:  So, okay.

23  BY MR. BRODY:

24     Q    You were exposed to confidential information

25  about how J and J felt that the passage of time might

1    impact trial risk associated with both ovarian cancer

2    and Mesothelioma claims; correct?

3    A    I'm struggling with exposed.  It's certainly the

4    case that whenever you're estimating liabilities, for

5    example, for a structural optimization.  If the

6    settlement trajectory shows up or the judgements show

7    up, they would say; gee, we should have done it

8    earlier, before the trajectory moved up.  But that's

9    not because someone told me that, that's just the

10   reality of structural optimization and disaffiliation.

11        Conversely, it could go the other way.  The

12   judgements could start to come in for the mass tort

13   defendant, in which case the settlement models that the

14   auditors, for example, use to come up with the number

15   at which they could disaffiliate, would go down.  So

16   the passage of time changes the data points.

17        Q    And it might -- it sounds then to me like it

18   might then be important to have a sense of whether you

19   expected that would go up or go down in the future?

20   A    If you could see the future, I suppose.

21        Q    Yeah and nobody can see the future but we can

22   certainly try to predict the future based on the

23   knowledge, experience and expertise we have with a

24   certain mass tort, certain type of case, certain area

25   of law; right?

1          MR. POLLACK:  Objection, vague, ambiguous,

2     argumentative.  I'm not sure what it goes to.

3          THE WITNESS:  I don't know how to --

4          THE COURT:  Did you understand the question,

5     Mr. Conlan?

6          THE WITNESS:  I didn't.

7          THE COURT:  Okay.

8     BY MR. BRODY:

9     Q    You said, we can't be certain what the future

10    is going to hold but we can try to predict it; right?

11    A    You can try but when you're doing a structural

12    optimization and disaffiliation and you're saying, this

13    amount of money will cover current and future claims,

14    you live with the record as it exists at that point.

15    Q    And if you are thinking about the potential

16    timing at which it might be advisable to pursue

17    structural optimization and disaffiliation as a

18    strategy, you would want to factor in; what's my

19    prediction about how the passage of time is going to

20    impact the amount of money that would be necessary to

21    fund the disaffiliated entity with, right?

22    A    Yes, in theory, the trajectory.

23    Q    Correct, correct and you were exposed to J

24    and J's thinking on what that trajectory was going to

25    look like in the future; weren't you?

1    A    I was exposed to J and J's thinking that they

2    didn't think these claims were legitimate.  I didn't --

3    wasn't exposed to whether J and J thought it was going

4    to win a trial, lose a trial.  I just, that wasn't my

5    area.

6         Q    I'm not talking about, okay, this case is

7    going to trial on this date and here's how we think

8    it's going to come out.  You were exposed to J and J's

9    in-house counsels' thinking about how the passage of

10   time would impact that trajectory, during the course of

11   the work you did as outside counsel for the company;

12   correct?

13   A    I don't recall J and J or being exposed to J and J

14   saying that the trajectory is this way or that way, we

15   want to do a structural optimization sooner or later, I

16   don't recall that.

17        Q    Okay.

18   A    I have heard companies say that, in my -- over my

19   years, in deciding whether and when they want to do a

20   structural optimization.

21        Q    So this is another instance where you would,

22   on that point, not recalling it, you would want to see

23   a document to refresh your recollection on that?

24   A    Sure.

25            MR. BRODY:  All right, another one, Your

J. Conlan - Direct                         100

1    Honor.

2              MR. POLLACK:  I have the same objection.

3    BY MR. BRODY:

4         Q    So you left the Faegre Drinker Law Firm in

5    March of 2022 while the first L.T.L. bankruptcy was

6    pending; correct?

7    A    Yeah, I think it was March 1.

8              AUTOMATED VOICE:  Recording in progress.

9              THE COURT:  That's okay, that's just the

10   livestream.

11             THE WITNESS:  Yeah, end of February,

12   beginning of March.

13   BY MR. BRODY:

14        Q    All right and you started Legacy Liability

15   Solutions; correct?

16   A    Correct.

17        Q    You're the C.E.O.?

18   A    I am.

19        Q    I take it you'll admit that ethical rules

20   would have prohibited you from taking a job with

21   Beasley Allen at that time to work on the Talc

22   Litigation?

23   A    Yes.

24        Q    Whether you joined the firm as an attorney or

25   in any other role; correct?

1    A    Correct.

2         Q    And you understand that you could not have

3    been retained by Beasley Allen as an expert witness or

4    as a consultant on the Talc Litigation; right?

5    A    That would be my understanding, yes.

6         Q    All right, no matter how deep your knowledge

7    of structural optimization and disaffiliation; correct?

8    A    Correct.

9         Q    In any event, you started Legacy and in that

10   role, you met with Andy Birchfield of Beasley Allen on

11   May 2nd of last year; didn't you?

12   A    That sounds right.

13        Q    You didn't tell J and J you were going to

14   meet with Mr. Birchfield; did you?

15   A    Not specifically but the background here is really

16   important.  On January 30, 2023, the Third Circuit

17   Court of Appeals, in a 58 page decision by Justice

18   Thomas Ambro ruled, quite publically, that the L.T.L.

19   bankruptcy filing was not in good faith and ordered

20   Judge Kaplan to dismiss it when they returned it to

21   him.  On February 2nd, 2023 --

22        Q    Can I ask you to pause there.  You're looking

23   at a document, can you tell me what you're looking at?

24   A    Yeah, I'm looking at the e-mail proposal that we

25   sent to Erik Haas and to the C.E.O. of J and J, Mr.

1    Duato, on February 2nd, 2023, before we ever met or

2    engaged with Mr. Birchfield or anyone else.

3         Q    Okay, so my question, Mr. Conlan,

4    respectfully.  Was, you didn't tell J and J that you

5    were going to meet with Mr. Birchfield before you met

6    with him on May 2nd; did you?

7    A    That's what I'm responding to.  Paragraph 6 of

8    this e-mail to Mr. Haas and Mr. Duato says; Legacy

9    reserves the right, in its discretion, to negotiate

10   settlements with interested Asbestos plaintiff law

11   firms of some or all of the pending claims filed by

12   such firms, all such settlements to become effective at

13   closing of the Legacy proposal, that was an e-mail sent

14   at almost 9 o'clock in the evening on February 1.

15        It's a February 2 proposal, it's to Mr. Haas and

16   it's to the C.E.O. of J and J, Mr. Joaquin Duato and

17   that last part is Paragraph 6.  So no, I don't think

18   your question is accurate -- your question is not

19   accurate.

20        Q    So your testimony is, because you had a

21   Paragraph 6 in a February e-mail that said, Legacy

22   reserves the right.  That if its proposal were accepted

23   that, that somehow was a disclosure that you were going

24   to meet with Mr. Birchfield on May 2nd?  I'm having

25   trouble following the logic here.

1    A    Yeah, what I'm saying is, on February 2nd, 2023,

2    we send the first proposal to Mr. Haas and Mr. Duato,

3    in which we lay out what a Legacy proposal would look

4    like.  And in the final paragraph of that letter, we

5    say, we reserve the right to meet with.  In other

6    words, we're telling you we may meet with --

7         Q    If the proposal is accepted; right?

8    A    No, not necessarily.

9         Q    Right, that's --

10   A    No, it doesn't work like that.  Structural

11   optimization and disaffiliation is a process --

12        Q    If the proposal is accepted by J and J?

13            MR. POLLACK:  Objection, Your Honor,

14   argumentative, asked and answered and frankly,

15   incorrect.

16            THE COURT:  Well, I want some clarity with

17   regard to, you've asked Mr. Conlan questions and Mr.

18   Conlan responded.  So what are you now addressing to

19   Mr. Conlan, I guess in reply, Mr. Brody?

20            MR. BRODY:  I'm asking him if it's his

21   position that Paragraph 6 that's he's reading from and

22   I would love to get a copy of what he's reading from

23   because I don't have it with me.

24            THE COURT:  Yeah.

25            THE WITNESS:  Well, your client has a copy of

1      it and the C.E.O. of your client.

2                  MR. POLLACK:  Here you go.

3                  THE COURT:  What's the exhibit number for

4      that?

5                  MR. BRODY:  It's not in the record.  Mr.

6      Conlan says the record is closed.  Mr. Pollack says the

7      record is closed but now he's having witnesses bring

8      documents in.

9                  THE COURT:  I thought that was part of what

10     was in our book.

11                 MR. POLLACK:  No, Your Honor.

12                 MR. BRODY:  No, it's not.

13                 MR. POLLACK:  I was going to mark this as P-3

14     for identification.  I did not intend to introduce it

15     into the record.  I was advised of the document two

16     days ago and Mr. Conlan has raised the issue.  But for

17     Mr. Brody to now argue that the record is closed is

18     laughable, given the fact that he is reading for hours

19     from transcripts regarding time sheets.  So I think

20     that ship has sailed, apparently.

21                 If the Court would like a copy, I have a copy

22     but again, I was only planning to mark it for

23     identification during --

24                 THE COURT:  Don't need to see it because Mr.

25     Brody asked Mr. Conlan.  At least at this point, I

J. Conlan - Direct                    105

1    don't think we need to see it.  Mr. Brody asked Mr.

2    Conlan what was he referring to.

3            MR. POLLACK:  So the Court does not want a

4    copy?

5            THE COURT:  Not at this point, no.

6            MR. POLLACK:  Okay, yes, Your Honor.

7            MR. BRODY:  So Mr. Conlan, I'm really -- now

8    having looked at the document, I'm struggling even more

9    with this idea that somehow, that Paragraph 6 was you

10   telling J and J that you were going to meet with Mr.

11   Birchfield on May 2nd of 2023.  And I'll tell you why

12   I'm confused and you can tell me if I shouldn't.

13           THE WITNESS:  Okay.

14   BY MR. BRODY:

15       Q    All right because what you have brought with

16   you today is a letter on Legacy Liability Solutions

17   letterhead, dated February 2nd, 2023, which says, "This

18   is a proposal for agreement between Legacy Liability

19   Solutions and Johnson and Johnson.  Legacy and J and J

20   will agree, as follows."  Are you with me so far?

21   A    I am.

22       Q    And then there are six parts to it; right?

23   A    Yes.

24       Q    So if J and J agrees, you'll enter into a

25   transactions, a structural optimization and

J. Conlan - Direct                                106

1    disaffiliation transaction with J and J, are you still

2    with me?

3    A    I am.

4         Q    And as part of that, after J and J funds and

5    disaffiliates the entity that is acquired by Legacy,

6    you're proposing that Legacy then will reserve the

7    right, in its discretion, to negotiate settlements with

8    interest plaintiff law firms of some or all pending

9    claims filed by those firms?

10   A    No.  During and after closing is what it says in

11   Paragraph 6 and what I was responding to is the idea

12   that J and J had no idea, was not on notice, was

13   surprised, isn't consistent with the written record.

14        Q    And J and J explicitly rejected your

15   proposal; correct?

16   A    No.  We got no response, no yes, no no, no maybe,

17   no confidentiality objection, nothing.

18        Q    So your position is, that Paragraph 6 was

19   notice that you were going to go out, you, J and J's

20   former lawyer, were going to go out and meet with Mr.

21   Birchfield?  Even if J and J did not accept your

22   proposal; correct?

23   A    There's no mention of Mr. Birchfield in that

24   letter.

25        Q    I agree.

1    A    The concept is, we're once again -- we're telling

2    you how this works.  The Third Circuit has just told

3    you no more on the bankruptcy.  And so we're offering a

4    solution that doesn't require a vote, doesn't require a

5    bankruptcy.

6         We're telling you how the solution works and

7    Paragraph 6, we're referencing the fact that in doing

8    this with you -- and it won't happen overnight, it's

9    not a quick transaction.  That, we reserve the right to

10   engage with Plaintiff's counsel to understand, for

11   example, the size of the risk that we would be taking.

12        Q    So what it says is, J and J, Legacy and J and

13   J will agree, so that's your proposal; right?

14   A    (indiscernible)

15        Q    And the proposal is, Legacy and J and J will

16   agree as follows; right?

17   A    In the ultimate transaction, the way --

18        Q    Just, my question was different.  My question

19   was, you made a proposal and in your proposal, you

20   proposed that Legacy and J and J will agree as follows;

21   correct?

22   A    Correct, over --

23        Q    And -- and you proposed that J and J and

24   Legacy would agree to six things; didn't you?  I'm just

25   reading the letter.

J. Conlan - Direct                                    108

1    A    I understand but --

2         Q    There's a colon.

3    A    That's not the way a structural optimization and

4    disaffiliation works.

5         Q    That wasn't my question, Mr. Conlan.

6    A    Well, that's what we're --

7         Q    My question was, you sent a letter to Joaquin

8    Duato and Erik Haas and the letter proposes that Legacy

9    and J and J agree to six things; correct?

10   A    We we're outlining how a structural optimization

11   and disaffiliation would work.

12        Q    It says, "This is a proposal for agreement

13   between Legacy Liability Solutions and Johnson and

14   Johnson.  Legacy and J and J will agree as follows,"

15   colon; correct?

16   A    Yes, that's what this says.

17        Q    Right and then there were six things listed

18   there; right?

19   A    Yes.

20        Q    J and J didn't agree to it; did they?

21   A    They didn't say anything in response to it.

22        Q    Right, they didn't agree; did they?

23             MR. POLLACK:  Objection, argumentative.

24             THE WITNESS:  They didn't say anything in

25   response to it.

1          THE COURT:  Overruled.

2     BY MR. BRODY:

3          Q    Do you often, in entering into a business

4     transaction with somebody, send them a proposal that

5     they agree to something and if you don't hear back from

6     them, treat that as agreement?

7     A    No.

8          Q    J and J didn't agree to any of that; did

9     they?

10    A    Or disagree, or object, it was silence.

11         Q    There was no -- come on, Mr. Conlan, there

12    was no agreement.

13         MR. POLLACK:  Objection, argumentative, Your

14    Honor, asked and answered.

15         THE COURT:  Well, it's repetitive.  I think

16    we had an answer from Mr. Conlan?

17         MR. BRODY:  Fair enough, Your Honor, fair

18    enough.

19    BY MR. BRODY:

20         Q    So I will say, you know, we haven't heard --

21    we've had a lot of briefing on this.  You, I think,

22    submitted three different -- two certifications and one

23    declaration.  Maybe the first declaration and the first

24    certification were the same.

25         But two different submissions in the State Court,

1    a submission in the Federal Court.  You didn't mention

2    this as a purported justification for going to Mr.

3    Birchfield; did you?

4    A    Until I sat here and listened to the testimony on

5    March 25 about the shock and horror of learning that

6    late, much later, that we would talk with Plaintiff's

7    Counsel in order to size it.  I didn't think it was

8    relevant.

9        Q    And all of a sudden, a proposal that said J

10   and J and Legacy will agree to these six things that J

11   and J never agreed to was an indication that their

12   former lawyer was going to go talk to Plaintiff's

13   counsel in the Talc Litigation?

14            MR. POLLACK:  Objection, argumentative, asked

15   and answered, for the fourth time.

16            THE COURT:  Well, it was asked.  I don't know

17   necessarily if it was argumentative.  I'll permit the

18   question in terms of finality.  Are you able to answer

19   that question, Mr. Conlan?

20            THE WITNESS:  Could you repeat it?

21   BY MR. BRODY:

22       Q    Sure I'm just asking, so all of the sudden --

23   I guess I'm just going to leave it at this.  Your

24   purported justification for not -- first of all, you

25   didn't tell J and J that you were going to meet with

J. Conlan - Direct                          111

1    Mr. Birchfield on May 2nd, we know that; right?

2    A    Correct.

3        Q    Correct but your purported excuse,

4    justification I guess for that, is that you sent a six

5    item proposal to J and J in February of last year, that

6    they did not agree to, that should have told them that

7    their former lawyer on the Talc Litigation was going to

8    go out and meet with Plaintiff's counsel on the Talc

9    Litigation?

10            MR. POLLACK:  Objection.

11   BY MR. BRODY:

12       Q    That's the excuse?

13            MR. POLLACK:  Objection.

14            THE COURT:  What's the basis of your

15   objection?

16            MR. POLLACK:  He's no excuse.  The fact is,

17   he's a businessman at this point.  So what is the --

18   there's an allegation he had some reason --

19            THE COURT:  I'll strike the excuse.  We don't

20   have a jury here, it's the justification.  That letter

21   was your and Mr. Brody's question was, that was your

22   justification?

23            THE WITNESS:  I wouldn't say it was a

24   justification.  It was letting them know that this was

25   a possibility.

1    BY MR. BRODY:

2         Q    You didn't ask J and J for a waiver?

3    A    Is that a question?

4         Q    Yeah.

5    A    Yeah, I don't think a waiver would have even made

6    sense.  One, we're not adverse, it's an offer, they get

7    to say no, number one.

8         Q    They never said yes to your (indiscernible)

9    did they?

10             MR. POLLACK:  Your Honor, he's still

11   answering the question.  Mr. Brody has cut him off.  I

12   want an answer, sir.

13             MR. BRODY:  Fair enough, I apologize, Your

14   Honor.  I apologize.

15             THE COURT:  I agree, so let Mr. Conlan finish

16   his response.

17             THE WITNESS:  It's not adverse, they get to

18   say no.  It's a consensual transaction, number one.

19   Number two, I'm not a practicing lawyer.  I am here on

20   behalf of Legacy, offering them a consensual

21   transaction to which they get to say no.  And if they

22   say no, nothing happens.

23   BY MR. BRODY:

24        Q    I take it you would agree with me that your

25   obligations to your clients from the time you were

1    practicing law do not end simply because you stopped

2    practicing law?

3    A     I agree that my obligations as a former practicing

4    lawyer include not to share confidential information or

5    to use confidential information.

6         Q     And they go further than that.  You have a

7    fiduciary duty to your former clients, as well.  You

8    understand that; right?

9    A     I believe I complied with each of my ongoing

10   responsibilities, as a former lawyer.

11        Q     All right, well let's talk about that a

12   little more.  You have never, at any point in time,

13   gotten a waiver from Johnson and Johnson to communicate

14   with Mr. Birchfield or anyone else from Beasley Allen

15   about the Talc Litigation; right?

16   A     It wouldn't have even made any sense to me to ask

17   for a waiver.

18        Q     So you didn't ask?

19   A     I did not.

20        Q     And you never got one?

21   A     Because I never asked for one.  It wouldn't have

22   made any sense to me to ask for one.

23        Q     And after this May 2nd meeting, you exchanged

24   communications, written communications, with Mr.

25   Birchfield and other members of Beasley Allen Law Firm;

J. Conlan - Direct                                    114

 1    correct?

 2    A     Written communications, we communicated, yes and

 3    I'm sure some of it was in writing but --

 4          Q     So you talked on the phone?

 5    A     Yes but --

 6                MR. BRODY:  Yeah, you had --

 7                MR. POLLACK:  Can you please, Your Honor --

 8                THE COURT:  Yep.

 9                MR. BRODY:  -- additional in-person meetings?

10                MR. POLLACK:  -- Mr. Brody, let him answer

11    the question.  He's answering the question.

12                THE COURT:  Well, we're all not helping

13    ourselves.  So but he asked a question, please let Mr.

14    Conlan -- as I indicated on the 25th, let the witness

15    provide a response.

16    BY MR. BRODY:

17          Q     Sure.  You talked on the phone?

18    A     It's important for context --

19                MR. BRODY:  Your Honor --

20                THE COURT:  Well, could you answer that

21    question first.

22                THE WITNESS:  Yes.

23    BY MR. BRODY:

24          Q     All right and you had additional in-person

25    meetings; correct?

1    A    I'm sure we did but --

2         Q    All right, you had a meeting again two weeks

3    later on May 16th of last year; right?

4    A    May I add this?

5              MR. BRODY:  I would like to get an answer to

6    my question.

7              THE COURT:  Yeah, you'll have an opportunity.

8              THE WITNESS:  Okay.

9              THE COURT:  I'm sure Mr. Pollack is going to

10   give you an opportunity.

11             THE WITNESS:  I understand.

12             MR. POLLACK:  Just to be clear, Your Honor,

13   the reason he's struggling is this occurs during the

14   mediation privilege.  Therefore, he is struggling to

15   answer the question.  That point has not been brought

16   out.

17             THE COURT:  Okay, you're going to have an

18   opportunity, Mr. Pollock, to bring that out.

19             MR. POLLACK:  Yes, Your Honor.

20             MR. BRODY:  I --

21             THE COURT:  Thank you.

22   BY MR. BRODY:

23        Q    Yeah and I'm not asking you to reveal the

24   substance of those communications because I understand

25   that the Plaintiff Steering Committee has taken the

1    position and it's been recognized by Judge Snyder that,

2    it's communications with you during that time period

3    are covered by the Mediation Privilege.

4        So I don't want you to talk about substance of any

5    of those communications because of their assertion of

6    the Mediation Privilege.  I'm just asking you, you had

7    more meetings; right?  Yes or no?

8    A    Yes but it wasn't with Mr. Birchfield alone.  It

9    was arranged by Mr. Molten.

10       Q    It included Leo Dell; correct?

11   A    I believe Leo Dell was there.

12       Q    Meeting included Ted Meadows from Beasley

13   Allen; correct?

14   A    I think so.

15       Q    And just a yes or no because Beasley Allen

16   and the other lawyers on the Plaintiff Steering

17   Committee in the M.D.L. have asserted the Mediation

18   Privilege Claim, you received copies of Plaintiff's

19   Counsel's analysis of claim values for the Talc

20   Litigation; didn't you?

21   A    It wasn't just me at the meeting.  Scott Gilbert

22   was there.  It is possible that there was

23   communications coming from Plaintiff's Counsel to us.

24   Certainly, there was ultimately the matrix which came

25   from the Beasley Allen Firm.

1      Q    What you were trying to do and in looking at,

2   you know, all of these communications, in engaging in

3   this collaboration with Beasley Allen was to position

4   Legacy with Beasley Allen to get J and J to go not with

5   its preferred resolution of Talc liabilities through

6   the L.T.L. bankruptcy but with what you refer to as the

7   Legacy Toggle; right?

8              MR. POLLACK:  Your Honor, objection to the

9   work collaboration and second of all, that they were

10  working with.  There's been no proof of either.

11             THE COURT:  Thank you.  Mr. Brody, do you

12  want to address that?

13             MR. BRODY:  Sure.  I mean, I don't need to go

14  much further into quote from Mr. Pollack on March 25th,

15  page 83 of the transcript.  "They were working

16  together?"  "Yes," he said.

17             THE COURT:  So they were working together,

18  how about that term?

19             MR. BRODY:  They were working together.

20             THE COURT:  Yeah.

21  BY MR. BRODY:

22     Q    You were working -- what you were doing was

23  working with Beasley Allen to try to position Legacy

24  with Beasley Allen, to get J and J to go not with its

25  preferred resolution of the Talc liabilities through

                    J. Conlan - Direct                        118

1    the L.T.L. bankruptcy but with what you referred to as

2    the Legacy Toggle; right?

3              MR. POLLACK:  Objection, Your Honor.

4              THE COURT:  And the basis of your objection,

5    Mr. Pollack?

6              MR. POLLACK:  Because again, the question is

7    loaded.  The fact is, yes, they're in a mediation.  Is

8    that working with?  They're having discussions, is that

9    working with, is that conspiracy, is that

10   collaborating?

11             THE COURT:  Well, I don't think it was

12   established through Mr. Conlan's testimony that, that

13   was mediation.

14             MR. POLLACK:  I know and that's what concerns

15   me because the lack of context is killing me here.

16             THE COURT:  Well, why don't you preface --

17   that's your question, why don't you preface it?  Was

18   that during mediation, Mr. Conlan?

19             THE WITNESS:  I don't know when the entire

20   mediation is going on, I don't know the time span.  The

21   only -- we had a fairly limited participation, from a

22   timing perspective, in the mediation.

23             THE COURT:  So then your question -- I'll

24   overrule the objection but so I don't find that that's

25   during mediation --

1          MR. BRODY:  Yes, so --

2          THE COURT:  -- and that privilege doesn't

3     cover it.

4     BY MR. BRODY:

5     Q    So what you were trying to do, Mr. Conlan, is

6     position Legacy with Beasley Allen, during the time you

7     were working with them, to get J and J to go not with

8     its preferred resolution of Talc liabilities through

9     the L.T.L. bankruptcy but with what you refer to as the

10    Legacy Toggle?

11    A    No.  What we were trying to do was size the

12    liability as part of deciding whether we wanted to take

13    the Talc-liable entities of J and J.  We don't need the

14    approval of the plaintiffs' lawyers, we don't need a

15    yes vote, we don't need a no objection.  We don't need

16    any of that.  The one yes we do need is from J and J.

17    Q    And you were trying to get a yes from J and

18    J; correct?

19    A    Of course.

20    Q    And you were trying to get a yes from J and

21    J, even though you knew that the resolution J and J

22    wanted was a planned confirmation in the L.T.L.

23    bankruptcy; correct?

24    A    Not correct.  J and J on January 30, 2023, was

25    told by the Third Circuit Court of Appeals that the

1    case had to be dismissed as lacking good faith.

2    Another one was filed immediately in the wake of it and

3    dismissed on July 28th.

4         What we were attempting to do is offer a path to J

5    and J, if it chose it, to obtain the finality that it

6    was seeking but never did obtain.

7         Q    And you were trying to do that before the

8    bankruptcy was dismissed; weren't you?

9    A    Before the second bankruptcy was dismissed.

10        Q    Correct, before the second bankruptcy was

11   dismissed?

12   A    That's correct.

13        Q    At a time when you knew that J and J was

14   trying to achieve plan confirmation in that bankruptcy

15   proceeding; correct?

16   A    From public records, yes.

17        Q    Yes and so you knew that what you were trying

18   to get to was not what the company wanted at that point

19   in time; right?

20   A    No.  What I knew the company wanted was finality.

21   It was trying to get to a 75 percent plus vote and it

22   wasn't getting there, by public information.

23        Q    And so what you were doing was trying to

24   position yourself to take advantage of that; is that

25   fair?

J. Conlan - Direct                    121

1    A    Take advantage of it?  We were --

2         Q    Yeah, so if -- look.  I mean, while the

3    bankruptcy was pending, you understand that Mr.

4    Birchfield, along with others, was trying to get the

5    bankruptcy dismissed; right?

6    A    I was generally aware of what was being filed

7    publically.  Some of the plaintiffs' lawyers were

8    opposing it, some of them were supporting it.

9         Q    Mr. Birchfield was opposing it; correct?

10   A    That's my understanding.

11        Q    You knew that, you were talking to him at the

12   time; right?

13   A    Yes.

14        Q    Right and you knew that Mr. Birchfield was

15   opposed to J and J's preferred resolution which was

16   confirmation of the $8.9 billion bankruptcy plan in

17   LTL-2; right?

18   A    Yes.

19        Q    All right and at that time, you were trying

20   to position yourself to engage in -- in what you called

21   a Legacy Toggle; right?

22   A    I don't remember, the concept of a toggle, it is

23   -- J and J can say yes to this whenever it wants and if

24   it says yes, there's no bankruptcy, there just isn't

25   one.

1      Q    Are you denying that you refer to this as the

2   Legacy Toggle?

3   A    No, I'm not denying that.  Others use that word,

4   toggle, which I think is kind of an unusual phrase

5   because it's not a plan of reorganization, it's not

6   something the Bankruptcy Court approves.  It's an

7   offer, a consensual transaction to J and J that says,

8   would you like to do this.

9      Q    And you were trying to do that through the

10   Tort Claimants Committee that was appointed in the

11   L.T.L. bankruptcy; weren't you?

12   A    Trying to have that offer be made to J and J?

13      Q    Trying to work with the Tort Claimants

14   Committee to advance your Legacy toggle, while J and J

15   was seeking claim confirmation of its $8.9 billion

16   bankruptcy plan?

17   A    I just don't agree with the characterization.  We

18   were trying to size the liability, as part of deciding

19   whether we wanted to take the Talc liable entities, if

20   J and J agreed to it.  We were not seeking a yes vote

21   from the claimants, we were not seeking to have them

22   say no to J and J.  We were offering a consensual

23   alternative.

24      Q    You were pursuing an alternative that would

25   have brought administrative and management fees to

J. Conlan - Direct                        123

1   Legacy if Legacy had handled it; correct?

2   A    Yes.

3        Q    The ability for Legacy to maintain any

4   spread, if there happened to be a spread, between the

5   amount that the disaffiliated entity was funded with

6   and the amount that the Talc liabilities were

7   ultimately resolved for; correct?

8   A    Not correct.  One of the features, in fact, we

9   offer this to J and J when we meet with them on

10  September 11, 2023, after the second L.T.L. bankruptcy

11  is dismissed.  Our mechanisms to allow J and J, in the

12  wake of accepting our deal, to recapture through what

13  we call adverse event cover.  So if the claims end up

14  being less than what the auditors required, J and J can

15  participate in that, so.

16       Q    And you'll still make money; right?

17  A    Yes.

18       Q    And that's what you wanted, you wanted to

19  make money?

20  A    Correct.

21       Q    Okay.  If the plan had been confirmed in the

22  bankruptcy, you wouldn't have made money; would you?

23  A    Correct.

24       Q    And if J and J doesn't go with the Legacy

25  Toggle, it doesn't make money; does it?  Or you don't

J. Conlan - Direct                          124

1   make money, Legacy doesn't make money?

2   A    Correct.  By the way, you said, if it doesn't go

3   with.  There is no toggle, L.T.L. is not in bankruptcy.

4   So if L.T.L. wanted to do a transaction.  Sorry, should

5   I answer?

6          THE COURT:  I don't hear any objection, so

7   yeah.

8          THE WITNESS:  Okay.  If L.T.L. and J and J

9   entered into the transaction today, there's no toggle.

10  They would just enter into the transaction.

11  BY MR. BRODY:

12      Q    You -- but you did refer to it as the Legacy

13  Toggle; right, during the bankruptcy?

14  A    I may have.  I don't think I came up with that

15  phrase, but.

16      Q    Who came up with that, did Mr. Birchfield

17  come up with that?

18  A    I think it may have been David Molten.

19      Q    All right and toggle means we're switching.

20  We're not going to go with what J and J wants, we're

21  going to go with what Legacy wants?

22  A    No, I think what David Molten meant when he used

23  the phrase toggle, which is something Jessica Boelter

24  from White and Kay, J and J's Counsel in the L.T.L.

25  case often used, in other cases that we worked together

1    on is that, J and J could take the Legacy option and if

2    it did, the bankruptcy would just go away.

3         But if J and J didn't take the Legacy option, then

4    the Tort Claimants would proceed with whatever they

5    were going to do.  Vote in favor, vote against, do

6    whatever they were going to do, confirm their own plan.

7         Q    During May of last year, while you were,

8    unbeknownst to J and J, communicating with Mr.

9    Birchfield, you reached out to Mr. Haas to propose this

10   -- or to try to get him to agree to discuss this Legacy

11   Toggle proposal with you; right?

12   A    Yeah, reaching out to Mr. Haas was a fairly

13   continuous process.  When you say May, I'm trying to --

14   are you saying May of 2023?

15        Q    Correct.

16   A    Yeah, that wouldn't surprise me.

17        Q    All right.  During the time that you were

18   engaged in what the Plaintiff Steering Committee says

19   are confidential privileged discussions with Mr.

20   Birchfield; right?

21   A    Yes.

22        Q    Yeah.  You didn't tell Mr. Haas that you were

23   talking to Mr. Birchfield; right?

24   A    I don't recall telling Mr. Haas that, I didn't

25   think I needed to.

J. Conlan - Direct                        126

1          Q    And you didn't?

2     A    And I didn't.

3          Q    He rejected your outreach; correct?

4     A    I don't recall rejected.  He certainly didn't say

5     yes.

6          Q    J and J was going through -- or L.T.L. was

7     going through bankruptcy at that point in time; right?

8     A    Right.

9          Q    All right.  Now ultimately, Judge Kaplan

10    announced that he was dismissing the second L.T.L.

11    bankruptcy on July 28th of last year; right?

12    A    That sounds correct.

13         Q    And you sent an e-mail to Mr. Haas the same

14    day; didn't you?

15    A    I think I did.

16         Q    And you were pitching structural optimization

17    and disaffiliation with Legacy; right?

18    A    Again, yes.

19         Q    All right.  You didn't tell him at that time,

20    when you reached out to him, that you had been meeting

21    with Mr. Birchfield and other lawyers from Beasley

22    Allen since the beginning of May; did you?

23    A    I don't think I did, no.

24         Q    That you had been communicating with them

25    throughout last year's L.T.L. bankruptcy proceeding?

1    A    Again, when you say L.T.L.  L.T.L. later was

2    called LTL-1.  The Third Circuit ordered its dismissal

3    on January 30, 2023 --

4        Q    I'm talking about last summer's mediation.

5    A    Yeah.  Then, Judge Kaplan finally dismissed it and

6    a few hours later, L.T.L. files again, called LTL-2.

7    That case is brief, it goes from, I don't know, April-

8    May 2023 until July 28th when Judge Kaplan dismisses

9    it.

10       Q    And so if I could get an answer to my

11   question?

12   A    Yes.

13       Q    You didn't tell Mr. Haas that you had been

14   communicating with Mr. Birchfield and others from

15   Beasley Allen, throughout the pendency of the mediation

16   that took place during the course of what you referred

17   to as LTL-2; correct?

18   A    I don't think I did.

19       Q    All right.  Now, you ultimately met with Mr.

20   Haas on September 11th of last year; right?

21   A    Yes.

22       Q    And it was you and Mr. Dachille?

23   A    Dachille, yes.

24       Q    Dachille, apologies to Mr. Dachille.  He is

25   Legacy's Chief Investment Officer?

J. Conlan - Direct                                    128

1    A    He is.

2        Q    And you met with Duane Van Arsdale, J and J's

3    Treasurer, right, along with Mr. Haas and Mr. White;

4    correct?

5    A    Correct.

6        Q    In the meeting, you did not reveal to them

7    that you had been communicating with Mr. Birchfield and

8    Beasley Allen; did you?

9    A    Again, don't -- I didn't reveal it during that

10   meeting, going all the way back to February 2nd, 2023.

11   We, frankly, though we put them on notice that as part

12   of our model, we need to size the liabilities but

13   ultimately, it's up to the auditors.

14       Q    All right and that's the February 2nd letter

15   where you -- you proposed that J and J and Legacy agree

16   to something and J and J never responded and never said

17   we agreed?

18   A    Or objected.

19       Q    All right and it says, the -- and that was

20   just where you said Legacy reserves the right to

21   negotiate settlements with interested Asbestos

22   plaintiff law firms; right?

23   A    Yeah.

24       Q    To become effective at closing; right?

25   A    Right.

1      Q    All right and is that -- and the closing

2    that, that's referring to is the signing of a

3    definitive agreement, embodying the terms of the

4    letter; correct?

5    A    No, it's the ultimate acquisition of the Talc-

6    liable entities, after the auditors have concluded that

7    they will disaffiliate the entities.  That's when

8    closing occurs.  Closing is at the very end, it's not

9    at the beginning.

10     Q    All right, so that we don't get too far off

11   track here, I don't want us to go too far down the

12   road, but.

13   A    I understand.

14     Q    You didn't, at that September 11th meeting,

15   tell Mr. Van Arsdale and Mr. Haas or Mr. White that you

16   had been meeting with Mr. Birchfield and Beasley Allen

17   lawyers for what was four months at that point in time;

18   right?

19   A    On again, off again, that's right.

20     Q    Okay, all right.

21   A    Just to make sure we're clear, they're not in

22   bankruptcy anymore at that point.

23     Q    I didn't ask you whether they were in

24   bankruptcy or not.

25   A    Okay, okay, I'm just --

1          Q    So that's a yes, you didn't tell them?

2     A    Correct.

3          Q    All right.  Following the meeting, Mr. Van

4     Arsdale told you -- told you and Mr. Dachille that J

5     and J wasn't interested in your proposal; correct?

6     A    Well, he said more than that but yes.  I think

7     it's all attached as Exhibit 3 to Mr. Haas' affidavit.

8          Q    Right.  J and J's third-quarter earnings call

9     was October 17th of last year; correct?

10    A    I don't remember that precisely but that wouldn't

11    surprise me in terms of the quarter.

12         Q    I mean, you were aware of it when it was

13    going on; right?

14    A    I'm generally aware of quarterly earnings calls,

15    yes.

16         Q    Yeah and you were aware of what Mr. Haas

17    about the company's intentions with respect to its Talc

18    liabilities on that earnings call?

19    A    I was told by others what Mr. Haas said during

20    that call.

21         Q    And then you reached out to Mr. Van Arsdale

22    the very next day; didn't you?

23    A    I don't remember the exact date.  It certainly

24    wasn't because of the earnings call.

25         Q    All right, well open up the notebook you have

1    in front of you.

2    A    Okay.

3         Q    And turn to Tab 4.

4    A    Okay.

5         Q    Do you recognize that as an e-mail you sent

6    to Mr. Van Arsdale; correct?

7    A    This is the one dated October 18th?

8         Q    Correct.

9    A    Yep.

10        Q    All right and you wrote that; right?

11   A    Yes.

12        Q    All right and what you said there was, that

13   you were -- to further enhance our solution, Legacy has

14   the support of lead counsel for the O.C., that's

15   ovarian cancer; right?

16   A    Yes.

17        Q    Claimants, including Andy Birchfield, for an

18   M.D.L. opt-in settlement matrix with Legacy that will

19   require and is expected to garner a 95 percept opt-in

20   of current O.C. claimants; right?

21   A    Yes.

22        Q    And you indicated that Mr. Dachille and you

23   and Mr. Birchfield, were prepared to meet with Mr. Van

24   Arsdale and his team in-person to discuss the terms of

25   the matrix; right?

J. Conlan - Direct                    132

1    A    Yes.

2         Q    As part of the Legacy proposal; correct?

3    A    Correct.

4         Q    And you were truthful with Mr. Van Arsdale in

5    that e-mail; right?

6    A    Yes.

7         Q    You knew that Mr. Birchfield was ready,

8    willing and able to come in with you to talk about the

9    settlement matrix; right?

10   A    Yes.

11        Q    And to talk about the resolution that you

12   were proposing; correct?

13   A    Right.

14        Q    Because you had already discussed that with

15   Mr. Birchfield; right?

16   A    I wouldn't offer that he would come without

17   confirming that he would come.

18        Q    Right and he was okay with it; right?

19             MR. POLLACK:  Objection, "Okay with it."

20             THE COURT:  The matrix, can you just be

21   clear?

22   BY MR. BRODY:

23        Q    He was okay with coming in with you to meet

24   with J and J; right?

25   A    Yes.

J. Conlan - Direct                         133

1      Q    Right and I take it, he probably authorized

2    you to say, yes, you know, say -- I mean, I'm sure he

3    authorized you to represent to J and J that he was

4    willing to come in; right?

5    A    Yes.

6      Q    All right.  Mr. Van Arsdale did not accept

7    your offer; did he?

8    A    Mr. Van Arsdale I don't think responded but one of

9    the things that's important to understand is, the e-

10   mail immediately preceding this --

11     Q    I'm sorry, the question was just whether Mr.

12   Van Arsdale never -- didn't accept your offer; did he?

13          MR. POLLACK:  Your Honor, again, we've

14   allowed long, narrative responses from Mr. Haas.  Good-

15   gander should apply.  But if you want to do it step-by-

16   step, we'll do it step-by-step.

17          THE COURT:  Well, I'm waiting, really for a

18   response to Mr. Van Arsdale -- did Mr. Van Arsdale ever

19   respond?

20          THE WITNESS:  Not to this e-mail.

21          THE COURT:  Okay.

22   BY MR. BRODY:

23     Q    All right.  So he didn't accept your offer to

24   come in with Mr. Birchfield; fair?

25   A    He didn't respond.

J. Conlan - Direct                                   134

1       Q    He didn't accept the offer; fair?

2   A    Or reject, he just didn't respond.

3       Q    All right.  Two weeks later, you pitched this

4   structural optimization and disaffiliation idea in the

5   media by writing a piece published by Bloomberg; didn't

6   you?

7   A    Yes.

8       Q    And if you turn to Tab 15 of your binder, can

9   you just confirm that's a copy of it?

10          THE COURT:  And topically then, Mr. Brody,

11  why don't we finish with this line of questioning on

12  this Bloomberg article and then we'll take our lunch

13  break.

14          MR. BRODY:  Fair enough.

15          THE COURT:  All right.

16          THE WITNESS:  Yes.

17  BY MR. BRODY:

18      Q    Are you there?

19  A    I am.

20      Q    And that's -- you wrote that; right?

21  A    I did.

22      Q    On the first page, it says, "Legacy Liability

23  Solutions C.E.O. James Conlan, former Sidley Austin

24  Restructuring Chair, proposes an alternative to the

25  Texas Two-Step that provides finality to companies and

J. Conlan - Direct                          135

1    relief to injured plaintiffs," right?

2    A     Yes.

3         Q     No mention of the fact that you were a

4    partner at Faegre Drinker; correct?

5    A     Not in this article, no.

6         Q     No mention of the fact that you represented J

7    and J in the Talc Litigation, including in its analysis

8    of bankruptcy as a settlement option; correct?

9    A     Just one clarification.  You keep saying in the

10   Talc Litigation.  It was only with respect to

11   bankruptcy issues.

12        Q     Those --

13   A     In the Imerys North America bankruptcy and then

14   briefly in the LTL-1 bankruptcy, not the Talc

15   Litigation.

16        Q     Those -- those bankruptcy --

17   A     You view it as a sub-component part.

18        Q     Those bankruptcy proceedings were efforts to

19   resolve the Talc Litigation; correct?

20   A     Yes.

21        Q     Including all of the pending claims here in

22   Atlantic City and all of the pending claims in the

23   M.D.L. in Trenton; correct?

24   A     Yes.

25        Q     All right and you didn't disclose the fact

1    that you had represented Johnson and Johnson in the

2    Talc matters, I'll say matters if it makes it easier

3    for you.  You didn't disclose in this article that you

4    had represented Johnson and Johnson in the Talc matters

5    as outside counsel; did you?

6    A    No.

7         Q    Were you trying to hide the fact that you had

8    been a partner at Faegre Drinker?

9    A    No.

10        Q    That you had represented J and J in the Talc

11   Litigation?

12   A    Was I trying to hide that fact, is that your?

13        Q    Right.

14   A    No.

15        Q    That you had done 1,600 hours of work for the

16   company on the Talc matters?

17   A    Correct.

18        Q    You were not trying to hide that?

19   A    Correct, that I had done 1,600 hours, no, I was

20   not trying to hide the fact that I had done 1,600.

21            MR. BRODY:  All right.  Your Honor, you

22   indicated you wanted to break there?

23            THE COURT:  Yes, let's do that.

24            MR. BRODY:  Thank you, Your Honor.

25            MR. POLLACK:  Wait, before we break, can we

Colloquy                                    137

 1    just get an idea of how much longer we have to go

 2    because I had hoped we would finish today.  It sounds

 3    like we may not.

 4                MR. BRODY:  I have very few additional

 5    questions for Mr. Conlan.

 6                THE COURT:  Okay.

 7                MR. POLLACK:  Thank you.

 8                THE COURT:  Thank you.  Are we going to be

 9    able to get to Mr. Birchfield today?

10                MR. BRODY:  Oh, absolutely, absolutely.  I'll

11    cut down and really see if we can -- I mean, it depends

12    on what Mr. Pollack has for Mr. Conlan but --

13                THE COURT:  Sure.

14                MR. BRODY:  I would expect we will be able to

15    get to and through Mr. Birchfield.

16                MR. POLLACK:  That will be 20 minutes.

17                THE COURT:  Yeah, I want to stick to our time

18    frame of leaving here at 4:30.

19                MR. POLLACK:  Excellent.

20                MR. BRODY:  Absolutely, yep.

21                THE COURT:  Okay, all right.

22                MR. POLLACK:  Thank you.

23                THE COURT:  Thanks, everyone.  Mr. Conlan,

24    you're still under oath, okay?

25                THE WITNESS:  Yes.

1        COURT OFFICER:  All rise.

2        (Morning session concluded at 12:38:53 p.m.)

3        (Continuation of day's proceeding on afternoon session)

4                            * * * *

5

6

7

8

9

10

11                        <u>CERTIFICATION</u>

12        I, Nitsa Carrozza, the assigned transcriber, do

13   hereby certify the foregoing transcript of proceedings

14   on CourtSmart, timestamp from <u>09:37:00</u> a.m. to <u>12:38:53</u>

15   p.m., is prepared to the best of my ability and in full

16   compliance with the current Transcript Format for

17   Judicial Proceedings and is a true and accurate non-

18   compressed transcript of the proceedings, as recorded.

19
20   ___*/s/* Nitsa Carrozza___          ___AD/T 639___
21        Nitsa Carrozza                    AOC Number
22
23
24   ___Phoenix Transcription LLC___     ___04/22/2024___
25        Agency Name                         Date