```
                              SUPERIOR COURT OF NEW JERSEY
                              LAW DIVISION: CIVIL PART
                              ATLANTIC COUNTY
                              DOCKET NO.: ATL-L-2648-15
                              A.D. # _____

                         )
IN RE: JOHNSON AND JOHNSON)         TRANSCRIPT
TALCUM-BASED POWDER       )            OF
PRODUCTS LITIGATION       )          MOTION
                         )

                         Place: Atlantic County Civil Crt.
                                1201 Bacharach Blvd.
                                Atlantic City, NJ 08401

                         Date: April 10, 2024
                               AFTERNOON SESSION

BEFORE:

     HONORABLE JOHN C. PORTO, J.S.C. AND
     RUKHSANAH L. SINGH, U.S.M.J.

TRANSCRIPT ORDERED BY:

     SEAN GARRETT, ESQ., (Faegre Drinker)

APPEARANCES:

     JEFFREY M. POLLOCK, ESQ., AND
     MICHAEL SABO, ESQ., (Fox Rothschild, L.L.P.)
     Attorneys for the Plaintiff

     ANDY BIRCHFIELD, ESQ., (Beasley Allen)
     Attorney for the Plaintiff

  *(Appearances continued)


                         Transcriber:  Melissa Ulrich
                         PHOENIX TRANSCRIPTION
                         796 Macopin Road
                         West Milford, NJ 07480
                         (862) 248-0670

                         Audio Recorded
                         Recording Opr: Jennifer Walker
```

APPEARANCES CONTINUED:

    STEVE BRODY, ESQ., (O'Melveny & Myers, L.L.P.)
    Attorney for J&J and L.T.L. Mngt.

    ERIK HAAS, ESQ., (Johnson & Johnson W.W.V.P.L.)
    Attorney for Johnson & Johnson

3

## I N D E X

                                                          PAGE
Colloquy/Housekeeping...........................3,130

MOTION:

|  | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|

WITNESSES FOR
THE DEFENDANT:

| | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Mr. Conlan | 5 | 12 | 58 | 70 |
| Voir Dire | 52 | | | |
| | | | | |
| Mr. Birchfield | 72 | | | |

| EXHIBITS: | Ident. | Evid. |
|---|---|---|
| Plenary 67 Letter | 19 | |
| Exhibit 6 Letter | 38 | |
| Exhibit 4 | 42 | |
| Exhibit 7 Proposal | 47 | |
| Hearing Exhibit 4 | 67 | |
| Plenary 29 | 72 | |
| JJ-1 Privilege log | 93 | |

1        (Continuation of day's proceeding from morning)

2          (Afternoon session commenced at 1:36 p.m.)

3          THE COURT:  Thank you.  Please be seated.

4    We're back on the record.  All Counsel is here.  Mr.

5    Conlon is on the -- the witness stand.  Mr. Brody,

6    you're going to be closing up -- you know -- wrapping

7    up, so to speech -- so to speak.  What I want to do is

8    the Court is going to address the in camera at this

9    point issues.

10         The Court is not inclined to accept any

11   documents for an in camera review except there -- if

12   there are any allegations of perjury, not saying that

13   there are.  But, Mr. Brody, if J and J wants to review

14   and redact any particular documents it may do so in a

15   manner that could be shared with Mr. Pollock and that

16   would be limited to Mr. Pollock's eyes only.

17         So, look at it.  If you think there's

18   attorney client -- and we've all seen redacted attorney

19   -- you know -- time sheets with regard to that.  But,

20   that's how we're going to address the in camera review

21   Mr. Brody.

22         MR. BRODY:  Okay.  Thank you Your Honor.

23         THE COURT:  You're welcome.  Mr. Brody, you

24   may continue.

25         MR. BRODY:  Thank you.  And, I'll be able to

1    wrap this up very quickly I think.

2    DIRECT EXAMINATION BY MR. BRODY

3        Q    So, Mr. Conlan, when we left off I had asked

4    you questions about the November 2nd publication that

5    you authored that is at tab 15, right?

6    A    Yes.

7        Q    All right.  A week later, November 9th, you

8    sent a letter to Johnson and Johnson's board of

9    directors, right?

10   A    Yes.

11       Q    And, if you would turn to tab seven in the

12   notebook you have there?

13   A    Yeah, I'm there.

14       Q    All right.  That's the letter you wrote?

15   A    Yes.

16       Q    In that letter you attached what you said was

17   a minimum $19 billion price tag to your proposal,

18   correct?

19            MR. POLLOCK:  Objection --

20   A    Well, I said 19 billion or such greater amount as

21   determined by the auditors P.W.C.

22       Q    Right.  So, that's a minimum of 19 billion.

23   19 billion or greater, right?

24   A    Yes.

25       Q    All right.  And, you attached a settlement

1    matrix as an exhibit to the letter that you wrote,

2    correct?

3    A    Yes.

4         Q    And, that was the settlement matrix that you

5    had first referred to in hearing exhibit four, the

6    email that you wrote to Mr. Van Arsdale on October 18th

7    of 2023?

8    A    I believe so, yes.

9         Q    So, about three weeks earlier, correct?

10   A    Yes.

11        Q    In your letter you told the Johnson and

12   Johnson board that before you sent the matrix to J and

13   J, Legacy's proposal had been reviewed and was

14   supported by leadership counsel on both the federal

15   M.D.L. and in State Court cases across the country,

16   right?

17   A    Yeah.  I'm looking for the exact language but that

18   sounds right.

19        Q    Well, it's on the first page.  I'll let you

20   find it.  Second paragraph.

21   A    Right.

22        Q    It's on -- on page one.

23   A    I'm just -- I'm looking for it on page one.  I --

24   I thought it was on page two.

25                UNIDENTIFIED MALE:  (indiscernible)

J. Conlan - Direct                    7

1    BY MR. BRODY:

2         Q    It's the -- it's the paragraph -- paragraph

3    that starts, "Put simply."

4    A    Okay.

5              MR. POLLOCK:  It's plenary 62.

6              THE WITNESS:  Right.  Yes.

7    BY MR. BRODY:

8         Q    And, that was true, right?

9    A    Yes.

10        Q    That plaintiff's Counsel reviewed that

11   settlement matrix before you shared it with J and J,

12   correct?

13   A    Yes.  We got it from --

14        Q    And -- and you knew that --

15   A    -- we got it from Beasley Allen.

16        Q    Beasley Allen?

17   A    Yeah.

18        Q    Okay.  So, when you're referring to

19   plaintiff's Counsel you're referring to Beasley Allen?

20   A    I am.

21        Q    All right.  And, you knew that Beasley Allen

22   supported it because you had discussed it with them,

23   correct?

24   A    Yes.

25        Q    All right.  And, you had been communicating

1    with Mr. Birchfield for over six months by November

2    9th, 2000 -- 2023, correct?

3    A    Yeah, on and off.

4         Q    Yeah.  And, you didn't get a waiver from J

5    and J for any of that, did you?

6              MR. POLLOCK:  Objection.  It assumes facts in

7    evidence -- not in evidence that he had to get a

8    waiver.  I'm simply objecting to --

9              THE COURT:  Well, he just asked -- he asked

10   the question.  So --

11             MR. POLLOCK:  I know.

12             THE COURT:  -- I'll overrule the objection.

13   But --

14             THE WITNESS:  Right.  Same answer as before.

15   I didn't think I needed one including because I wasn't

16   practicing law and it was a proposal, it's consensual.

17   BY MR. BRODY:

18        Q    And, you didn't get a waiver?

19   A    Correct.

20        Q    You didn't ask for one?

21   A    Correct.

22        Q    And, you hadn't disclosed to J and J that you

23   were communicating with Mr. Birchfield until that

24   October 18th email that you sent to Mr. Van Arsdale,

25   right?

1    A    Other than the reference in the February 2nd

2    proposal.

3        Q    Right.  The -- the document we saw.  By the

4    way, this -- this proposal you -- you -- this February

5    2nd letter, you brought a copy of this with you to

6    court in -- in the hearing exhibit binder, right?

7    A    Yes.

8        Q    Right.  And -- and Mr. Pollock had copies of

9    it ready to hand to me already marked with an exhibit

10   sticker, right?

11   A    Yeah, I -- I don't know what Mr. --

12       Q    To the extent you know.

13   A    I don't know.  But -- but Mr. Pollock did have a

14   copy.

15       Q    Okay.  Did you meet with Mr. Pollock in

16   preparation for your testimony today?

17   A    With my Counsel, yes.

18       Q    And, Mr. Pollock?

19   A    Yes.

20       Q    All right.  And, by the way, not only did you

21   never tell J and J before -- let me -- let's put this

22   aside -- before the 18th of October that you were

23   meeting with Mr. Birchfield, you never told that

24   mediators in the LTL-2 bankruptcy that you had

25   previously represented J and J on the talc matters, did

J. Conlan - Direct                    10

1    you?

2                MR. POLLOCK:  Your Honor, asking directly

3    mediation privileged communications.  And, this is what

4    the mediators -- I don't know how you answer that

5    question without violating the privilege.

6    BY MR. BRODY:

7        Q    Let me ask you this, Mr. Conlan, the

8    mediators were not aware in LTL-2 that you had

9    previously represented Johnson and Johnson in talc

10   matters, were they?

11   A    Not that I'm aware of.

12               MR. BRODY:  All right.  Thank you.  That's

13   all I have.

14               THE COURT:  Okay.  Mr. Pollock?

15               MR. POLLOCK:  Your Honor -- Your Honor --

16               UNIDENTIFIED MALE:  (indiscernible)

17               MR. BRODY:  -- yeah -- one -- just one

18   housekeeping matter.  Mr. Pollock had asked that this

19   document be marked for identification purposes as

20   plaintiff's three.  We would just ask that the Court

21   receive it as part of the -- actually as -- as

22   evidenced in the record.

23               THE COURT:  Mr. Pollock?

24               MR. POLLOCK:  No objection.

25               THE COURT:  Okay.  So, that will be --

J. Conlan - Direct                               11

1    candidly we were going to ask that question with regard

2    to that particular document since it -- it was

3    prominently featured to this point in questioning Mr.

4    Conlan.

5            MR. POLLOCK:  (indiscernible) all day so I'm

6    going to go for it.

7            THE COURT:  So, that -- that -- that will be

8    part -- if we can have a copy when -- when you close

9    Mr. Pollock that is -- will be marked into evidence.

10           MR. POLLOCK:  If -- if Your Honors are dying

11   for a copy I'll give you one right now.

12           THE COURT:  No.

13           MR. POLLOCK:  Proceed?

14           THE COURT:  You may proceed.

15           MR. POLLOCK:  Thank you.  With the Court's

16   permission I may both sit and stand depending upon

17   where my eye sight's at, okay?

18           THE COURT:  Your pleasure.  Do you want to

19   use the podium or --

20           MR. POLLOCK:  Oh, I'm good.  I have a

21   condition called dry eye and I -- I -- I don't create

22   enough tears.  So, I got enough issues as my life

23   partner said, for my -- for myself.

24

25   CROSS EXAMINATION BY MR. POLLOCK

1        Q    All right.  Structural optimization and

2    disaffiliation.  You -- you heard me ask Mr. Haas

3    whether that would work and he did not like the idea.

4    He said -- I think -- I'm going to slaughter it.  But,

5    one it doesn't account for futures, it doesn't account

6    -- the auditors don't like it and there were some other

7    problems with it.  Do you agree with Mr. Haas that your

8    approach -- the Legacy approach would not work?

9    A    I do not agree with Mr. Haas.

10       Q    Can you please explain to the Court why you

11    think Mr. Haas got it wrong?

12    A    Structural optimization and disaffiliation of

13    solvent mass tort companies, entities that are

14    themselves liable, the entire point and purpose is that

15    it does capture future claims as well as current

16    claims.  The entities themselves that are liable,

17    contractually or in tort, are acquired by us so the

18    entities that remain don't have liability in the tort

19    system or contractually.

20       By definition, therefore, it captures all current

21    and all future claims.  That's quite frankly, the main

22    purpose of it.  Number twp. at the time that we acquire

23    those, in this case talc liable, group of entities the

24    auditors -- and this is a condition to us being willing

25    to do it -- have to agree that those entities we're

J. Conlan - Cross                                    13

1    acquiring are adequately or more than adequately

2    funded.  Why do they need to do that?

3         Because in order to remove the non cash charge

4    from the financials of those companies the auditors

5    must so conclude.  That way there is no fraudulent

6    transfer risk.  There is no unlawful dividend risk.

7    And, the auditors are tough.  But, when they say

8    "There's enough money there to remove the non cash

9    charge," there's enough money there to remove the non

10   cash charge.

11        And so, we can't and are not interested in

12   acquiring companies unless the company agrees.  That's

13   number one.  And, number two, the auditors are

14   comfortable removing the non cash charge.  And, I know

15   that's a lot of complicated talk but it's the core of

16   it.

17        Q    So, bear in mind, I'm a simple country

18   lawyer.  So, I -- I don't -- this -- this stuff is

19   beyond me.  When you talk about non cash charge, can

20   you spell that one out a little bit?  Because I -- I

21   apologize, I'm not getting it.  I don't know what it

22   means.

23   A    I can.  In the United States -- and I can refer to

24   outside the United States, GAP, generally accepted

25   accounting principles is what rules accounting

1      standards, it's largely what rules -- what the SEC says

2      you must put in your financials.  Under a particular

3      provision which is GAP ASC 450, a public company must

4      take a non-cash charge, meaning set up a -- a

5      provision, for the probable and estimable amount of a

6      contention liability.

7          So, when you look at really any public company

8      that has a mass tort liability that is current and

9      future they have a number.  And, that number is

10     provided by a combination of their actuaries and their

11     auditors to give the world notice that there's a

12     problem here.  So that investors can take it into

13     account, for example, in deciding how much they'll pay

14     for the stock.

15         In order to remove that non cash charge the

16     auditors have to conclude not only that the entities

17     that are liable are no longer owned by the group but

18     they were adequately funded at the time that they were

19     disaffiliated so that it won't come back on the

20     company.  In the United States it's called GAP ASC 450

21     and there's an equivalent in Europe.

22         Q    And -- in order to -- to fill this non cash

23     charge gap, whatever you just said, do you have to have

24     some clarity as to what the number is that you're

25     ultimately looking at -- the auditors are looking at?

1    A    Sum is an important modifier.  The auditors look

2    at all the data points.  So, for example, in the case

3    of J and J what the auditors would look at is, how many

4    people had already agreed to accept the $8.9 billion

5    plan, the fact that the attorney generals, from what I

6    read, are close to agreeing to a resolution.  The fact

7    that mesothelioma claimants are, in significant number,

8    agreeing to a resolution.

9         They would also be impacted by the fact that

10   there's a potential settlement for current ovarian

11   claimants.  Those are all data points that the auditors

12   would take into account in deciding what the amount is

13   that has to be essentially put into the entities that

14   are disaffiliated in order for them to remove the non

15   cash charge.  They don't have certainty by definition

16   because they're coming up with a number but the -- and

17   the number isn't certain because it's current and

18   futures.

19        Q    Is structural optimization and disaffiliation

20   a J and J confidence?

21   A    In no way, shape, or form.

22             MR. POLLOCK:  And, Your Honor, I've got a

23   times -- time frame I'm going to share with the Court.

24   I thought we could use it together.  And, I may

25   periodically ask -- Michael could you help me for a

1    second -- I may periodically ask Mr. Conlan and Mr.

2    Birchfield -- do it right here -- this is perfect --

3    this is perfect -- to share with me.  Because I -- I

4    think the timing -- you and I talked about this Judge

5    Porto (indiscernible) talked about it -- I think timing

6    of events is really important.

7            And, I'd like to just break briefly from my

8    line of questioning -- Michael you can step out of the

9    way.  That's great.  So, I've -- I've got a chart that

10   lays out -- I'm not asking about the Beasley Allen time

11   frame.  But, as far as the Jim -- Conlan time frame --

12   and you're welcome to stand up sir if you're -- if

13   you're -- with your permissions Your Honor, if he wants

14   to walk around I assume that's okay?

15           THE COURT:  Yeah, if he wants to approach the

16   easel -- that's fine.

17           MR. POLLOCK:  Yeah, you don't have to -- so

18   I'm nearsighted.  I can't see far.

19   BY MR. POLLOCK

20       Q    So, this one's June 19 -- June 19 -- 1988, is

21   that about when you started at Sidley (phonetic)?

22   A    Yes.

23       Q    And, did you spend your entire time at Sidley

24   until roughly May 2020?

25   A    Yes.

1        Q    And then did you make a mistake and decide to

2    go back to the practice of law at another law firm?

3    A    Well, I -- I didn't leave the practice of law.  I

4    went from Sidley to Faegre Drinker.

5        Q    Okay.  And, how long did you stay with Sidley

6    and Faegre -- to go to -- to go to Faegre?

7    A    I was there about 20 months.

8        Q    Okay.  So, that would be from roughly June

9    2020 to what?

10   A    To February, March 2022.

11       Q    Okay.  I don't have that one marked on there

12   but we can mark those on -- Mike you can play Vanna

13   White if you want to and -- and write some of these in

14   as he goes through.  With Your -- with Your Honors'

15   permission what I may do is have Mike just kind of

16   write in the time frame (indiscernible) want the

17   witness to do it (indiscernible) the witness to do it.

18             THE COURT:  Perfect.  What -- whatever --

19   whatever is easier.

20             MR. POLLOCK:  Okay.  I'm just trying to move

21   it along.  So, if you can write in the time period you

22   left, that would be great.

23   BY MR. POLLOCK

24       Q    What was the date again Jim?

25   A    I leave Sidley in June of 2020.

J. Conlan - Cross                          18

1          Q    Yes.

2     A    Having been there since the summer of 1988.  Hard

3     to believe that long.  And, I was at Faegre Drinker

4     about 20 months from June 2020 to February March 2022.

5          Q    So, Mike, if you can just circle the period

6     for Faegre, whatever Jim said, and just call that

7     Faegre that would be great.  Okay.  The -- Jim if you

8     could tell us looking at this chart which is just a

9     demonstrative -- it's not going into evidence unless

10    the Court directs otherwise -- the -- what -- during

11    what time period did you talk about structural

12    optimization and disaffiliation?

13         During what time did you work on -- when you were

14    at Sidley and Faegre did you talk historically about

15    it?  When did you actually work on that concept?

16    A    I -- I began the process of structurally

17    optimizing companies that came before disaffiliation in

18    about 2009, 2010 and it was in context of big companies

19    who had asbestos liabilities initially and who wanted

20    to remove the existential threat that asbestos would

21    eat all of the entities in the -- in the family of

22    companies rather than just potentially the entities

23    that were themselves liable.

24         So, if you could imagine a company with 500

25    entities and there were four that were actually liable

1    for asbestos, in the tort system or contractually, the

2    goal was to structurally optimize those four, removing

3    all the operating assets, but making sure they were

4    adequately capitalized with liquid funds so that they

5    could operate in the tort system.  But, they -- you

6    would contain the liability at that level.

7        Q    So, I just want a beginning date.  Like, when

8    did you start working on this stuff?

9    A    2009.

10        Q    Okay.  Just say 2009 -- disaffiliation -- I

11    can't even spell it -- start date.  Mr. Brody had asked

12    you -- I'm going to skip for one second -- Mr. Brody

13    had asked you about a proposal which I think is at

14    exhibit seven.  Yes.  Exhibit seven.  And, it's got an

15    Excel chart at -- oh I'm sorry -- it's exhibit -- where

16    is the Excel chart?  I apologize.

17             UNIDENTIFIED MALE:  It is seven.  That's the

18    legacy letter November 9th.

19             MR. POLLOCK.  Yeah, but is that the Excel

20    chart one?

21             UNIDENTIFIED MALE:  Yes (indiscernible)

22    BY MR. POLLOCK

23        Q    Okay.  At the last page -- yeah -- the last

24    page of it.  So, it's -- it's plenary 67.  Can you look

25    at plenary 67?

1    A    Yes.

2         Q    Now, we had talked about -- God I forgot the

3    word already -- the -- when we were talking about

4    quantification (sic) -- specification -- whenever you

5    used that word -- you used a strange word for it.  It

6    wasn't just affiliation.  It wasn't association.  You

7    -- when you were talking about the gap issue you needed

8    to quantify the risk there was a -- anyway -- you had

9    said the arbitrators -- the auditors need a specific

10   number.  They need something to be happy with?

11   A    Yeah.  They -- they need to come up with their

12   view of how much money needs to be in the liable

13   entities at the time that they're acquired, for

14   example, by a legacy in order for the auditors to

15   remove the non cash charge from the financials of the

16   seller.

17        Q    That's the one I was looking for.

18   A    Yes.

19        Q    Non cash charge.  I apologize.  The -- with

20   regard to the -- the -- approach that you had -- that

21   you're talking about, structural optimization and

22   disaffiliation, is it fair for me to say it's somewhat

23   like spandex?  That you can -- whether the number is

24   $20 billion, $30 billion, $12 billion, assuming that's

25   a fair number, anything -- whatever the number is it is

J. Conlan - Cross                                21

1    and that your approach would work based upon that

2    number assuming it's not too small?

3    A    Correct.

4         Q    Okay.  And, the -- the matrix that's attached

5    which is on 67, have you seen that -- you've seen that

6    matrix before?

7    A    Yes.

8         Q    And, you attached it to your letter?

9    A    Yes.

10        Q    Have you seen other matrices?

11   A    In my life?

12        Q    In this matter?  In this -- in this matter.

13   The -- the -- in discussions with Beasley Allen,

14   discussions with J and J, have you seen other matrices?

15   A    Yes, I've been exposed to other matrices.

16        Q    And, it would be fair to say that you at

17   Legacy are agnostic as to what the number is because

18   your approach is roughly the same whether it's $15

19   billion or $30 billion, it doesn't really matter a

20   whole lot?

21   A    Or -- correct.  Or whether it's talc or asbestos

22   or herbicides or pesticides or P-fabs (phonetic) to

23   name a few.

24        Q    At what point in time did you first -- and

25   you can look at the -- chronology if you'd like and --

1    and Mike I'm going to ask you to mark this one on.

2    When did you first hear about a $19 billion number?

3    Where did that come from?  Do you know?

4    A    The 19 billion?

5         Q    Yes sir.

6    A    It came from us, from Legacy.  It was January 30,

7    2023.  I alluded to this earlier.  The six -- sorry --

8    the Third Circuit issued its opinion, 58 page opinion,

9    finding that the J and J filing the -- the L.T.L.

10   filing was not in good faith.  That afternoon or late

11   morning the market capitalization of J and J, the value

12   of all of its stock declined $18 billion.

13        And, what that said to us is that the market --

14   we're big believers in the market -- that the market

15   didn't think the liability was 18.  The market thought

16   it was 18 more than what it thought it was the day

17   before.  Because the liability was there, obviously,

18   before.  But, the market traded stock down $18 billion

19   -- it recovered some later in that day.  But, it was

20   clear the market really didn't like this liability.

21   Which is common, the market really doesn't like

22   contingent liabilities of -- for public companies.

23        Our own view is that the market was exaggerating

24   the liability.  But, the market clearly thought it was

25   a big number.  That's why on February 2nd, just a

J. Conlan - Cross                                      23

1    couple of days later, the number that's in that letter

2    adds up to 17.6.  It was 16 from J and J and 1.6 from

3    us, 17.6.  And, again, there's a variety of factors

4    that go into that.  One is what    the market thinks.

5    Another -- and I'm going to try to keep this

6    interesting -- is the discount rate used to determine

7    the P-V of the liabilities is extremely important.

8         What that means is that as interest rates go up,

9    for example on the tenure today it's between 4.3 and

10   4.4, the yield on the U.S. tenure obligation -- as that

11   number goes up the liability goes down because the P-V

12   of the liabilities goes down the higher the discount

13   rate goes up.  So, frankly, as interest rates rise the

14   P-V of the liability declines.

15        So, as we all know in America today, that tenure

16   yield has been moving all over the place.  Mostly up in

17   the last few years.  So, it's not as simple as just

18   looking at the market.  It's not as simple as just

19   looking where the yield on the tenure is.  It's looking

20   at a variety of factors.  Probably what's the least

21   interesting is what the experts think it is because

22   that's not the world we live in.

23        Q    Mr. Brody asked you some questions right

24   before we broke for lunch and I don't have a

25   transcript.   But, I'm going to do the best I can.  You

1    were trying to position yourself for the Legacy toggle.

2    Hold on.  You wanted to make money, and he specifically

3    was pointing to you meaning I think Legacy, not you

4    individually, although I'm sure you would.

5    A    It would be both.

6         Q    And, he also said -- I can't remember the

7    other one -- but in any event that -- am I correct in

8    understanding that the proposal you're making would

9    financially benefit Legacy?

10   A    Yes.

11        Q    And, that part of the Legacy proposal is

12   premised upon the fact that if you buy these

13   liabilities from J and J you'll be holding onto them

14   for a little bit and that you make some interest on

15   that money?

16   A    That's correct.  To -- to be specific --

17        Q    Yes.

18   A    -- I mentioned the ten year yield today at 4.3 to

19   4.4.  We would absolutely expect, could virtually

20   guarantee that we would make 1.6. to 1.7 percent more

21   than that by simply investing in AA corporate.  So,

22   almost no risk, just matching the durations.

23        Q    And, to be clear, that money is part of

24   Legacy's investment proposal and structure because

25   that's how you make -- hopefully you take on risk and

J. Conlan - Cross                                    25

1    you make money?

2    A    Correct.  We hope.

3         Q    But, if you make money that doesn't -- let's

4    assume you'll hold onto the money for five years as

5    opposed to one year.  That doesn't increase the payout

6    to the talc claimants, correct?

7    A    Our incentive is to hold onto the money as long as

8    possible to pay the claimants within the

9    (indiscernible) propriety -- you know -- not pay them

10   soon but pay them over time.  Why?  Because we're

11   making that 1.6 to 1.7 percent spread.  On the other

12   hand, we're a rational defendant.  We're not going to

13   hold on and get popped in judgement.  So, it's the same

14   kind of balance that a company has when it's defending

15   a mass tort.

16        Q    He -- Mr. Brody mentioned -- and I'm

17   switching gears here for a second.  I'm sorry, I'm

18   going to be jumping around a little bit.

19   A    Okay.

20        Q    He mentioned that you and Mr. Murdica were

21   leading at one point when he was talking about, I

22   believe, the Imerys matter.  To put that in context,

23   were you leading at any point in time the J -- J and

24   J's efforts in bankruptcy or were their other firms

25   like Weil, Gotshal and Jones Day that were really

1    leading the charge?  What is your view?

2              MR. BRODY:  I'm just going to object to it

3    because I think the question misstates what my question

4    was to Mr. Conlan.

5              THE COURT:  Why -- why don't you create the

6    question that you would like Mr. Conlan -- you know --

7    I -- I don't want to say the record's mis

8    characterizing the question once we get a read back at

9    some point, which who knows if we can.  But, I

10   understand the objection.  Why don't -- why don't you

11   make the question your own?

12             MR. POLLOCK:  Sure.

13   BY MR. POLLOCK

14        Q    If I were to say that you, Jim Conlan, had

15   led J and J's bankruptcy efforts during the time that

16   you were at Faegre would that be a true statement?

17   A    That would not be a true statement.

18        Q    Were there other people, other law firms that

19   were in your view far more significantly involved on

20   behalf of J and J?

21   A    Yes.  And, narrowing first to the subject matter

22   of bankruptcy, lead Counsel -- far and away lead

23   Counsel for J and J and the Imerys North America

24   bankruptcy was Weil Gotshal, a very capable and big

25   player in the world of bankruptcy.  In LTL-1 it was

J. Conlan - Cross                                27

1    Jones Day as Counsel for L.T.L. and it was White and

2    Case as Counsel for J and J in the L.T.L. bankruptcy.

3    Again, that's just bankruptcy.

4         Jim Murdica is resolution Counsel.  Jim Stengel

5    and other were litigation Counsel.  There were a

6    variety of different roles.  But, in the world of -- of

7    bankruptcy our role -- it was Weil Gotshal for Imerys,

8    it was Jones Day for L.T.L. and it was White and Case

9    for Johnson and Johnson in the L.T.L. bankruptcy.

10        Q    Did Jones Day show you the L.T.L. filing

11   before J and J filed it?

12   A    May I answer that?

13            THE COURT:  Yeah, sure.

14   A    No.

15        Q    You mentioned that you had had a long career

16   at Sidley.  Can you walk the Court briefly through your

17   evolution was?  And, I don't want to know what your

18   first memo was and that kind of thing.  I'm talking

19   about -- I -- I want to go to the point where you're --

20   did you ever get a role of leadership?  Did you ever

21   get a role that was significant at Sidley while you

22   were there?

23   A    Yes.  Over time.

24        Q    What roles did you -- can you tell me

25   approximately what -- I want to hit the highlights of

1    your career.  If your mother was here, what -- what

2    were the best things that Jim Conlan did at Sidley?

3    What would you tell her?

4    A    Well, I'll just describe in terms of milestones.

5    I graduate from law school from the University of Iowa

6    in 1988.  I had been a summer associate at Sidley the

7    year before so then I join in 1988 as a first year

8    associate.  And, I immediately join the bankruptcy

9    group.

10        You had to pick a group right away at Sidley.

11   Eight years later I became a partner at Sidley along

12   with a lot of other people.  I don't remember what

13   precisely the year was I became vice chairman of the

14   restructuring practice.

15        Q    About when was that Jim?

16   A    I would say that was like -- I became partner in

17   1996, I think vice chair of the restructuring practice

18   was probably in 2002, 2003 -- I'm kind of going by what

19   my age was.  Shortly thereafter I became co chair of

20   the firm wide bankruptcy practice.  Thereafter I became

21   chairman of the firm wide bankruptcy practice.  And, I

22   suppose other things is I went on the executive

23   committee.

24        Q    About when was that?

25   A    I think it was about 2005.

J. Conlan - Cross                                    29

1        Q    Okay.  And, did you remain on the executive

2    -- committee until you departed?

3    A    Until shortly before.

4        Q    Okay.  And, during that time period did you

5    have discussions with other lawyers and other law firms

6    about potentially merging with Sidley?

7    A    Yes.

8        Q    And, did you commit to those people that you

9    would keep those discussions confidential?

10   A    Yes.

11       Q    And, did they have to reveal to you how their

12   practice was going, how their group was behaving, what

13   kind of monetary income they were making, what their

14   billing rates were?  All kinds of sensitive information

15   that were confidential to those law firms?

16   A    Yes.

17       Q    And, did you keep -- did you commit to

18   keeping that information confidential?

19   A    Always.

20       Q    And, did you do so?

21   A    Pardon me?

22       Q    Did you do so?

23   A    I did.

24       Q    Did you also get the joy of dealing with

25   problem partners and people who had issues?  Affairs

1    and got accused of alcoholism, that kind of thing?

2    A    Yes.

3         Q    And, did you have -- did you commit to

4    keeping those things confidential as well?

5    A    I did.

6         Q    And, did you do so?

7    A    I did.

8         Q    Has anybody ever accused you at any point in

9    time from your work at Sidley that you broached those

10   confidences?  You -- you -- you -- you told something

11   that you shouldn't have told out of school?

12   A    Not that I recall.

13        Q    There was a discussion regarding mediation.

14   And, I'd like to get this a little clear in my head if

15   I can.  And, I don't know if you can do this without

16   documents.  Do you know approximately when the

17   mediation efforts were that involved the -- the

18   documents that Mr. Brody was asking about?  He was

19   asking about -- did you send drafts back and forth --

20   do you know when the mediation was?

21   A    I don't know how long the mediation went.  The --

22   when Legacy was involved I recall as follows.  In May

23   of 2023 Scott Gilbert who is a part of Legacy and a

24   long time colleague you might say or someone who is

25   very familiar with Eric Green (phonetic), was talking

1    to Eric Green.  Eric Green was exploring Scott's new

2    role at Legacy.  He's a senior officer.  And, Scott was

3    explaining how Legacy works and undoubtedly promoting

4    it in some respects as well to Eric Green.  As a result

5    of that conversation some time in May of 2023, Scott

6    and Scott alone, had a meeting with the mediators.

7         Q    Who are the mediators?

8    A    Mr. Green, Mr. Russo (phonetic) and then Fuad

9    (phonetic) who is really Eric Green's right hand

10   person.

11        Q    Okay.

12   A    And, they had that meeting.  I wasn't in that

13   meeting.  But, it -- I had the impression it went a few

14   hours and it was a video.  And, in the wake of that

15   there was a desire to have a more full meeting --

16             MR. BRODY:  I'm sorry -- if we -- if we are

17   going to get into what the mediators wanted -- I mean,

18   I'm in a situation here where the plaintiff

19   (indiscernible) committee has claimed mediation

20   privilege over all of its communications and now we're

21   getting into -- if we're talking about May we're

22   talking about during the mediation.  And, I don't know

23   if we should be going down the road of -- of what the

24   mediators want.  Especially in a situation where the

25   mediators have indicated that they believe questions

1     about what they wanted are things that they can't

2     disclose.

3          THE COURT:  Thank you Mr. Brody.  Mr.

4     Pollock?

5          MR. POLLOCK:  I actually have no problem with

6     that objection.  I -- I -- I can move on.

7          THE COURT:  Okay.

8          MR. BRODY:  Yes, the -- just to update the

9     Court as to -- as the Court is aware the mediators

10    responded to depositions on written questions.  They

11    answered one of the questions -- well two really.  They

12    answered one of the four substantive questions without

13    objection and all three of them indicated that at no

14    point were they aware during the course of the LTL-2

15    mediation that Mr. Conlan had been Counsel for J and J

16    on the talc litigation.

17         MR. POLLOCK:  So, on that one Judge I -- the

18    mediators said what the mediators said.  I'd like the

19    record to simply be they were asked that -- upon the

20    direction of Judge Singh to answer questions in

21    writing.  They did so.  Whatever it says it says.  I --

22    I would rather not have it characterized by me or Mr.

23    Brody.

24         THE COURT:  Sure.

25         MR. POLLOCK:  It says what it says.  And, we

J. Conlan - Cross                                    33

 1   should -- we should -- should we post -- I assume we

 2   should mark those -- I thought we already agreed to

 3   mark those into identification.  Right?  And, they're

 4   moving into evidence?  Or no?

 5            MR. BRODY:  They -- no objection to then

 6   being part of the record.

 7            MR. POLLOCK:  Let's move them into evidence.

 8            THE COURT:  That's fine.  Okay.

 9            MR. POLLOCK:  I may move on?

10            THE COURT:  Yes.

11   BY MR. POLLOCK

12       Q    Mediation continue for approximately how

13   long?

14   A    I -- I don't know.

15       Q    Okay.

16   A    We met on June one --

17       Q    All right.

18   A    -- 2023.

19       Q    And, during the course of this with the

20   mediators Mr. Green, Mr. Fuad -- right -- and then

21   there was -- I'm missing -- Mr. Russo --

22   A    Yes.

23       Q    -- with those three guys.  Would it be fair

24   to say that you had discussions -- that you learned

25   information without describing what the information was

1    -- from Beasley Allen and other members of the Talc

2    Claimants' Committee that was confidential?

3    A    I suppose so, yeah.

4         Q    And, did they learn some stuff from you that

5    was confidential?

6    A    No --

7         Q    Okay.

8    A    -- it was just the tedium of structural

9    optimization and disaffiliation that the mediators

10   wanted to understand in detail.

11        Q    Did the mediators advise you that -- or did

12   you already know that what you discussed, as Mr. Brody

13   has pointed out, in mediation is confidential?

14   A    I'm sure they did.

15        Q    And, did you ever violate that confidence?

16   A    No.

17        Q    Have you ever been accused of violating that

18   confidence?

19   A    No, not that I'm aware of.

20        Q    Mr. Brody asked a number of questions about

21   -- bear with me one second -- I apologize -- Jim, can

22   we agree that you have never -- have you ever served as

23   an expert witness for the plaintiffs?

24   A    No, I have never.

25        Q    Have you ever served as an expert for Beasley

1    Allen?

2    A    No.

3         Q    After leaving Sidley and then Faegre have you

4    ever been employed by Beasley Allen?

5    A    No.

6         Q    As far as your position once you formed

7    Legacy you have been accused of being a side switching

8    lawyer.  Do you believe that you are a side switching

9    lawyer?

10   A    No --

11        Q    Why --

12   A    -- I'm not practicing law for one thing.

13        Q    -- and let me ask you the core question.  At

14   Legacy are you working against J and J?

15   A    No.  Quite frankly I would say we're working

16   trying to help them to obtain finality -- to give them

17   an option to obtain finality.

18        Q    Now, Mr. Brody's response to that as you

19   heard today during direct slash cross was that, "Well,

20   you are working against them because we would like the

21   $9 billion not the $19 billion number.  So, here's my

22   question for you.  Mr. Hass has said -- I believe you

23   said it on -- earlier on the first day that he wants a

24   fair and reasonable settlement for the plaintiffs so

25   they are not over compensated, not under compensated, a

1    fair and reasonable number.  Did you hear that

2    testimony during the first day?

3    A    I believe so.

4        Q    So, is it fair to say that Mr. Haas wants

5    that result but he only wants it if the number is $9

6    billion?

7    A    I -- I don't know.

8            MR. BRODY:  Sorry -- that's -- that's

9    argumentative and --

10           THE COURT:  Well, I don't necessarily know if

11   he can -- if Mr. Conlan can put himself in -- in the

12   mind of Mr. Haas.  So, to the extent there's an

13   objection I don't want Mr. Conlan to speculate.  So,

14   why don't you rephrase the question?

15           MR. POLLOCK:  Yeah, I'll be glad to.

16           MR. BRODY:  So, for the record Your Honor

17   I'll add a foundation objection to that.

18           THE COURT:  Okay.

19           MR. BRODY:  Thank you.

20           MR. POLLOCK:  Bear with me one second here,

21   I'm moving quickly.

22   BY MR. POLLOCK

23       Q    Once -- if -- if Legacy were to -- if J and J

24   were to say, "You know what?  I'm going to go ahead and

25   sell these liabilities or transfer these liabilities to

1    Legacy," -- so I want you to assume that has happened.

2    Understand my question?  Let's assume that's happened.

3    Do you believe that your interest and the Talc

4    Claimants' Committee's interest are aligned at that

5    point?  Do you have the same interest?

6    A    No, we would be opposed.

7         Q    And, why would you be opposed?

8    A    Because our economics at Legacy having acquired

9    the talc liable entities -- and it's not -- it's not

10   acquiring the liabilities.  It's acquiring talc liable

11   entities.  I don't mean to be particular about that but

12   it's important.  We're acquiring the boxes themselves

13   that are liable in the tort system or contractually.

14        Once we own those entities our objective is to

15   hold onto the cash as long as possible, to make that

16   spread 1.6 percent in a perfectly matched structure.

17   And, we certainly don't want to pay people who can't

18   take it from us.  Judgement, settlement.  Just like any

19   other mass tort defendant would look at it.

20        Q    The -- the words that J and J have used at

21   times during Mr. Haas's and Mr. Murdica's questioning

22   was that the conversations that you had with Mr.

23   Birchfield and with Beasley Allen were inherently

24   imbued with confidential information.  That it's, "In

25   your neurons," I think is Mr. -- Mr. Murdica's words.

1    That you -- you -- you could not have ever kept that

2    information separate and apart.

3        What you learned from your time period at J and J

4    and what you discussed with Beasley Allen.  Do you

5    agree that it -- your conversations were ever

6    inherently imbued with or that you -- that it was in

7    your neurons and you had to have divulged that

8    information.

9    A    No, I do not agree that I was imbued or that my

10   neurons were imbued.

11       Q    So, there's a point in time where Mr. Murdica

12   writes you a nastygram (phonetic).  Let me find it here

13   real quickly.  It's on Barnes and Thornburg letterhead

14   and I think it's exhibit six.  Yeah, it's exhibit six.

15   So, he writes a letter and he says -- and can you pull

16   that up so you can have it in front of you sir?

17   A    Okay.  I have it.

18       Q    And, he says in the last paragraph on the

19   first page, "You learned highly privileged information

20   about J and J and L.T.L. Strategies from the attorney

21   client relationship."  Do you see that?

22   A    I do.

23       Q    Now, LTL-1 and then LTL-2 as you've testified

24   on direct from Mr. Brody worked -- did not work

25   effectively for J and J, correct?

J. Conlan - Cross                                    39

1    A    Correct.

2         Q    And, the Bankruptcy Court disagreed with J

3    and J that that was a valid approach, right?

4    A    Well, yes.  I mean -- what's called LTL-1 it was

5    the Third Circuit that said cannot stay in bankruptcy,

6    not a good faith filing.  And then ultimately Judge

7    Kaplan (phonetic) executes by dismissing.  L.T.L. files

8    again.  It's called LTL-2 somewhere around April 2023.

9    And, on July 28th, 2023 Judge Kaplan dismisses again on

10   the grounds that they're not distressed.

11        Q    And, you responded -- other than learning

12   about L.T.L. which is what he seems to be complaining

13   about here -- I'm going to read it -- the whole

14   paragraph.  "You learned highly privileged -- highly

15   privileged information about J and J and L.T.L.'s

16   strategies from the attorney client relationship.  And,

17   while publically disparaging your own strategies," let

18   me stop there.  Was that your own strategy to file

19   L.T.L.?

20             MR. BRODY:  I -- I'm going to object on

21   privilege grounds based on what his -- his strategies

22   were or were not while he was outside Counsel to the

23   company.

24             MR. POLLOCK:  Well, Your Honor, let me

25   rephrase it if you don't mind.

J. Conlan - Cross                          40

1          THE COURT:  Well -- sure.

2     BY MR. POLLOCK.

3          Q    Did you ever propose to J and J that they

4     file something like L.T.L.?

5               MR. BRODY:  Same objection Your Honor.

6               MR. POLLOCK:  They've accused him of it.

7     They've testified to it.  But -- if -- if he wants to

8     -- if he wants to object I will stand on the objection

9     and note that the record is now devoid of that fact.

10              THE COURT:  Okay.

11    BY MR. POLLOCK

12         Q    Did you respond to --- Mr. Murdica's letter?

13    A    I did.

14         Q    And, did you respond on or about November 5,

15    2023 and tell him -- and what did you say in that

16    letter?

17              MR. BRODY:  The response contains privileged

18    information of Johnson and Johnson Your Honor.  We

19    object to reading the response.  I mean, it's -- I -- I

20    assume it could probably be redacted in some form or

21    another.  But, it -- it hasn't been and not knowing

22    what he's going to say, I have to object.

23              THE COURT:  Hold -- hold that thought.  Let's

24    go back and revisit Mr. Murdica's letter to Mr. Conlan.

25    And, his -- the letter to Mr. Conlan from Mr. Murdica

                          J. Conlan - Cross                            41

1    was that you're criticizing your own strategy.  I

2    sustained that objection.  I'm reconsidering.  I'm not

3    sustaining that -- I'm not sustaining that objection.

4    I'm overruling that objection because it's in the

5    letter from Mr. Murdica.

6              MR. POLLOCK:  Yes sir.

7              THE COURT:  So, you can ask that question

8    again.  And, hold that question -- that objection sir

9    -- Mr. Brody, okay?  It's revealed in the letter.  So,

10   to the extent there was an attorney client privilege

11   that's deemed waived by Mr. Murdica.

12   BY MR. POLLOCK

13       Q    So, Mr. Conlan, I'm going to try again.  With

14   regard to exhibit six -- I'm going to ask the simple

15   question, did you propose the -- what became L.T.L. to

16   Johnson and Johnson?

17   A    Did I propose the (indiscernible)

18       Q    Yes.

19   A    Am I able to answer that?

20              THE COURT:  Yes, you are.

21   A    No.

22       Q    Okay.  Mr. Murdica --

23   A    To be -- to be clear, we talked about all of the

24   options.

25       Q    (indiscernible)

1    A    I think your question is did I recommend that

2    option above others.

3         Q    Did you recommend it at all?

4    A    I -- there were options, they had pros and cons.

5         Q    Okay.  So, you discussed it --

6    A    There were certainly ones that I thought were

7    better than others.

8         Q    Fair enough sir.  Mr. Murdica claims that you

9    breached a confidence.  Did you write back to him on

10   November 5, 2023 and advise that you had not breached a

11   confidence?

12             MR. BRODY:  I'll let him -- I mean, yes or no

13   to that will not implicate privilege.  So -- but I just

14   object to going beyond that.

15             THE COURT:  But he's -- Mr. Conlan's being

16   accused of breaching that confidence.  So, I'm going to

17   permit Mr. Conlan to answer yes or no.

18             MR. BRODY:  Yeah.  And that's -- that's why I

19   said -- no objection to a yes or not answer there Your

20   Honor.

21             THE COURT:  Okay.

22   BY MR. POLLOCK

23   A    I -- I did object to that.

24        Q    And, did you disagree with him?

25   A    Yes.

1        Q    And, did he ever write back to you and say,

2    "No.  Here's all the reasons why you broached a

3    confidence," or in fact, "Here's the proof you broached

4    a confidence," or, "The fact is that since you broached

5    this confidence you should be ashamed of yourself?"

6    Anything of that nature?

7    A     No.  We did have brief communication about trying

8    to get together but it was non substantive.

9        Q    If you could go to exhibit four please?  And,

10   what I want to do is start at the end.  So, that would

11   be plenary hearing 26.  Let me know when you're ready.

12   A     Okay.  I'm there.

13       Q    You good to go?

14   A     Yes.

15       Q    Excellent.  So, the first one is Doug

16   Dachille (phonetic) to Robert Huffins (phonetic) and

17   Duane Van Arsdale and Jim Conlan.  Do you see that?

18   A     I do.

19       Q    And, it says, "Thank you for the

20   introduction," right?

21   A     Yes.

22       Q    And, the introduction -- what did you

23   understand the introduction to be?

24   A     Mr. Huffins wrote to Mr. Van Arsdale saying, "You

25   ought to meet with these guys."

1        Q    And, if you look at the next document above

2    -- because -- you know -- emails go reverse so you have

3    to start from the end, that's why I'm starting from the

4    end.

5    A    Understood.

6        Q    So, at -- the next one is August 21, Duane

7    Van Arsdale to Doug Dachille, Erik Haas, Jim Conlan,

8    Andrew White, do you see that?

9    A    I do.

10       Q    And, it says, "Thanks for the note and nice

11   to meet you as well.  I have copied Erik Haas and

12   Andrew White who will -- will also join the

13   discussion."  And then it goes on from there.  Was the

14   discussion a discussion between Legacy and J and J?

15   A    Yes.

16       Q    And, was it -- the discussion as you

17   understood it going to be about the Legacy Liability

18   Solutions proposal?

19   A    Yes.

20       Q    And, did alarm bells go off at that point in

21   time?  Were there threats and sanctions and criticism

22   and claims and anything like we're seeing today that

23   you as Legacy Liability Solutions were reaching out to

24   J and J?

25   A     Not at all.  And, Mr. Dachille is not a lawyer and

Case 3:16-md-02738-MAS-RLS   Document 32153-4   Filed 05/08/24   Page 45 of 133
PageID: 182298
J. Conlan - Cross                                    45

1    he's the chief investment officer of Legacy and he was

2    essentially one of the primary movers here.  There was

3    no request for a confidentiality agreement and there

4    was no objection.

5         Q    And, at this point was it -- did you believe

6    it was clear to everyone you and your colleague was

7    there and solely and exclusively for Legacy Liability

8    Solutions, you were not there for -- as a J and J

9    representative?

10   A    I was not there for --

11        Q    That you had your own -- that Legacy

12   Liability Solutions has its goal and J and J has its

13   goal?

14   A    Yes.

15        Q    And, your hope was that if you could sell,

16   promote the Legacy Liability Solutions you would make

17   money, J and J would get it off its balance sheets,

18   everybody would walk away happy, is that the idea?

19   A    Yes.

20        Q    But, you were completely -- no one complained

21   at that point in time, to be clear, that you were now

22   having been a former Faegre lawyer, you were now

23   working on behalf of Legacy Liability Solutions selling

24   a proposal to J and J?

25   A    No one complained.

1      Q    All right.  And, Mr. Haas knew about that?

2   A    Yes.

3      Q    At the top -- I'm going to skip forward to

4   plenary 23.  Everyone's been asked about this one so I

5   don't want you to feel excluded.  So, it's Wednesday

6   October 18, 2023, Jim Conlan to Van Arsdale, Doug

7   Dachille, Erik Haas and Andrew White and Doug something

8   -- I can't read it --

9   A    Dachille?

10     Q    Yeah, it is -- it's -- my copy is crossed

11  out, apologize.  So, Doug Dachille.  It says that,

12  "Andrew Birchfield, Doug Dachille and I are prepared to

13  meet with you."  It's the last -- the penultimate

14  paragraph there.  Do you see that?

15  A    I do.

16     Q    Did you ever tell -- did you believe at that

17  point in time when you wrote this letter -- this email

18  that you and Andy were conspiring under the cover of

19  darkness about how to come up with a proposal that

20  would take -- would destroy J and J's approach?

21  A    No.  The -- the opposite.  If you go back to the

22  -- the message that is directly below it --

23     Q    Yes sir.

24  A    -- or before it would be the other way to describe

25  it, it's the message from Mr. Van Arsdale to which this

1    is a response.  In the message from Mr. Van Arsdale

2    dated October 6, 2023, 12:43 p.m. he says, "Hi Doug and

3    Jim, thank you for the follow up note to our discussion

4    a few weeks ago.  To close the loop we have discussed

5    both internally," and this is the big language, "And

6    with our auditors and at this time we do not have an

7    interest in pursuing this strategy.

8         While unlikely, we will let you know if this

9    perspective changes in the future.  Thanks again for

10   your time and thoughts."  We looked at that language,

11   particularly the auditors, and thought to ourselves and

12   discussed it that J and J because they said it and Mr.

13   Haas testified to it, actually had discussed this with

14   Price, Waterhouse Coopers.

15        And, we thought either Price Waterhouse Coopers

16   didn't understand correctly or it wasn't conveyed

17   correctly because it didn't make any sense to suggest

18   that the auditors were saying it couldn't be done.

19   What did make sense to us is that the auditors were

20   saying, "It's going to be tricky, it could be a high

21   number, it could be a big range."  And so, the follow

22   on email is to say, "We think we can help you with the

23   range, we think we can help you with your auditors."

24        Q    So, if I -- if I -- if I look at that one and

25   I look at exhibit seven -- and I don't even

1    (indiscernible) put your fingers in both places.  But,

2    exhibit seven is going back to the Legacy proposal of

3    November nine.

4    A    Yes.

5         Q    So, you've got a proposal from Legacy and

6    you've got this matrix at the end on the last page?

7    A    Yes.

8         Q    Would you agree with my characterization that

9    this is like peanut butter and chocolate?  They're good

10   together but they're two different things, meaning that

11   it was the Legacy proposal for the first several pages.

12   It is the matrix which is the Beasley Allen proposal --

13   let me stop there.  Would you agree with that

14   characterization?

15   A    I would agree with it.  And, just to be -- put a

16   fine point on it, the Legacy proposal isn't dependent

17   on agreeing with Beasley Allen or dependent on having

18   that kind of a settlement.  It's just a data point for

19   the auditors to look at.  We would have gone forward

20   provided all of the other numbers worked without any

21   agreement from -- the lawyers at Beasley Allen or the

22   plaintiffs' lawyers generally.

23        The whole point -- if there's a single point I'd

24   like to convey is; companies beat their heads against

25   the wall trying to get the claimants to agree by 75

J. Conlan - Cross                                    49

1    percent plus and they often fail.  The beauty of this

2    structure is it doesn't require the plaintiffs' lawyers

3    to vote or agree at all.

4         It does require the auditors to come up with a

5    number.  It does require the company to agree.  So, it

6    -- it flips -- it flips it quite frankly and gives all

7    the power to the company.

8         Q    As to the actual value on page one which is

9    plenary exhibit 62 it says, "19 billion or such greater

10   amount is determined."  Do you see that?

11   A    I do.

12        Q    So, that is not a determination that Beasley

13   Allen makes, correct?

14   A    No.

15        Q    So, they have a -- they have a proposed

16   structure at the end of whatever this thing is on page

17   67.  But, that is not a Legacy Liabilities document,

18   correct?

19   A    Correct.  And, at least what we understand this to

20   be, the matrix, is it's only current ovarian cancer

21   claimants.  It's not mesothelioma claimants.  It's not

22   attorney general claimants.  It -- it -- it's not

23   future mesothelioma claimants or future ovarian cancer

24   claimants.

25        All components of those are captured by Legacy's

J. Conlan - Cross                                          50

1    acquisition of the talc liable entities.  And, when we

2    come up with a number at Legacy of 19 we're looking at

3    that number and how much it will grow and how that

4    growth will match against the claims.  It's sort of

5    like an insurance company.

6        Q    You hear some testimony during Mr. Haas's

7    testimony on day one and Mr. Murdica's testimony on the

8    same -- in the afternoon that, at page 56 from Mr.

9    Haas, it was egregious that Jim was communicating with

10   Talc Claimants' Committee and Andy.  Mr. Haas says, "It

11   was -- the first time was October 18, 2023."  The -- he

12   also then says he was shocked.

13       This was page 53 to 54 of the transcript.  If you

14   want to see it I can show it to you.  Mr. Murdica then

15   parrots the language, "Shocked and appalled," page 238.

16   The -- at any point in time did you ever disclose a

17   single J and J confidence to Andy Birchfield?

18   A    Absolutely not.

19       Q    What -- the -- as far as what you knew from

20   your work at Faegre on behalf of J and J, is that at

21   all relevant other than that they're related because

22   they all involve talc somehow, was it related at all to

23   your proposal for Legacy today?

24   A    No.  There is nothing in our proposal -- which by

25   the way would be different today because factors have

1    moved around including interest rates, some claims have

2    been settled.  What is required for the Legacy proposal

3    has nothing to do with any confidential information

4    I've obtained.

5        In fact, this structure -- this type of proposal

6    has been made to lots of companies about whom I don't

7    have any confidential information.  It's the same

8    structure.

9        Q    And, if we go to the document of February 2,

10   2023 which is the document that closes with the

11   language Mr. Brody's asked you about multiple times.

12   And I'll -- to give him credit he points out, "This is

13   a proposal for agreement between Legacy Liability

14   Solutions and Johnson and Johnson.  Legacy and J and J

15   will agree as follows."

16       As Mr. Brody has noted it has six points.  The

17   sixth point is, "Legacy reserves the right in its

18   discretion to negotiate settlements with interest

19   (indiscernible) plaintiff law firms of some or all

20   pending claims filed by such firms.  All such

21   settlements to become effective at closing."  You've

22   seen that sentence before, correct?

23   A    Yes.

24       Q    Did Mr. Haas or Mr. Duato ever write back to

25   you and say, "You can't do that, you're a former J and

J. Conlan - Cross                              52

1    J lawyer.  We own you, you were at Faegre?"  Did they

2    ever complain to you?

3    A     No.

4         Q     With regard to the -- bear with me one second

5    -- there was no objection I think to exhibit four -- to

6    -- do I -- is that -- can we admit that in evidence?  I

7    can deal with it later on as a housekeeping matter if

8    you want me to.

9              MR. BRODY:  Which was exhibit four?

10             MR. POLLOCK:  Okay.  We'll deal with it

11   later.  I can't remember sir.  I'll go back to it.

12   Judge, if you could, I -- I think I may actually be

13   done.  Can you give me three minutes just to talk to my

14   client and confirm my notes?

15             THE COURT:  Sure.

16             MR. POLLOCK:  I promised to keep it brief and

17   I'm trying to do so.  Okay.

18             THE COURT:  We'll stay on the record.

19             MR. POLLOCK:  I apologize --

20             THE COURT:  It's okay.

21                         * * * *

22             MR. POLLOCK:  Your Honors, I have no further

23   questions of Mr. Conlan.

24             THE COURT:  Thank you.  Judge Singh, do you

25   have any questions?

1          JUDGE SINGH:  (indiscernible)

2          THE COURT:  I -- I have a couple questions.

3   VOIR DIRE BY THE COURT:

4      Q    After the quarterly call Mr. Conlan, the J

5   and J stock went down, what -- what dollar value?

6   A    Yeah.  It wasn't the quarterly call Your Honor.

7   It was on January 30, 2020 --

8      Q    Oh, after Ambrose -- Judge Ambrose's

9   decision.

10  A    Correct.

11     Q    Right.

12  A    So, that day Judge Ambrose, the Third Circuit

13  issued its opinion and when it issued its opinion the

14  value of all of J and J stock, which I refer to as its

15  market cap, declined $18 billion that day.  It bounced

16  around some but it declined substantially.

17     Q    And, Legacy got its total value for a

18  possible settlement from that market move?

19  A    That was one of the important market elements,

20  other interest rates.

21     Q    And, other interest rates.  Now, if -- when

22  -- when you testified -- when Mr. Brody was questioning

23  you, you testified you were involved in several team

24  meetings and all hands meetings.  And, your focus was

25  on the bankruptcy.

1    A    Yes.

2         Q    And, other aspects about the valuation -- the

3    tort valuation may have been discussed, probably was

4    discussed but you didn't really focus on it because

5    that wasn't your area?

6    A    Not my area.  However, I would add when J and J

7    filed and it became public the Bolton settlement offer,

8    that was 4.2.  So, I and everyone was aware of that.

9         Q    Now, you had said though -- but going back

10   your focus was on the bankruptcy --

11   A    Right.

12        Q    -- and restructuring, etcetera.  When you go

13   to Legacy you then become involved in the tort

14   analysis, right?  So, what happened from when you were

15   with Faegre looking at the bankruptcy and the

16   structuring, the -- Imerys bankruptcy, you didn't focus

17   in on the tort liability valuation but at Legacy you

18   did.  How -- where did that change come from?

19   A    Yeah.  So, Legacy is comprised of a lot of people.

20   One of the people is sitting in the courtroom back

21   there John Gaspervich (phonetic) -- Mr. Gaspervich

22   could you raise your arm?  Mr. Gaspervich for example

23   was the general Counsel of five companies, two public

24   companies.  One of those was Borg Warner -- just going

25   to (indiscernible) out there.  Borg Warner was

1      afflicted by an asbestos problem as you may recall.

2          I think everybody knows that.  While Mr.

3      Gaspervich was the general Counsel he wanted to cabin,

4      contain that asbestos liability so that it wouldn't eat

5      the entire company.  And so, I structurally optimized

6      Borg Warner while I was -- while Mr. Gaspervich was the

7      general Counsel.

8          Some years later those entities called -- we -- we

9      named them Morris Tech were disaffiliated in a sale to

10     Instar (phonetic).  Mr. Gaspervich brings that

11     expertise to Legacy.  Scott Gilbert (phonetic) a very

12     prominent insurance and insurance restructuring lawyer

13     joins Legacy.

14         He brings that dimension to it.  Doug Dachille is

15     the CIO of Legacy.  He's formerly the CIO of AIG and in

16     his prior life the hedge fund he created which was

17     merged into AIG he managed $8 billion worth of the

18     asbestos liabilities of the so called 524G trust of

19     prior bankruptcy proceedings.

20         And so, all of those elements were brought

21     together to create Legacy.  What do I bring?  I bring

22     the -- the expertise of a bankruptcy lawyer who was

23     watched companies struggle, often ineffectively, to try

24     to get the plaintiffs' lawyers to agree by 75 percent

25     plus in number to a solution that will resolve their

1    current and future liabilities.

2         And, my view after it all, there had to be a

3    better way, another way that wouldn't hand so much

4    power to the plaintiffs' lawyers and give the company

5    what it frankly needs and deserves which is an option

6    that allows it to say, "I can get rid of current and

7    future liabilities without having to go to the

8    bankruptcy Court, without having to beg the plaintiffs'

9    lawyers, and I just -- I have to agree to the amount

10   and I have to get my auditors to agree."  So, it

11   becomes a transaction, not a litigation.

12        Q    So, the settlement authority is then

13   hypothetically not with the company, in this case J and

14   J, all settlement authority rests with Legacy?  Is that

15   how this structure is?

16   A    Precisely.  Precisely.

17        Q    Did you notice, I was going to ask without 75

18   percent and without the involvement of J and J how do

19   you get the consent to settle?  The structure is J and

20   J provides you with the authority to settle?

21   A    Yes.  They essentially are selling us the liable

22   entities --

23        Q    And the authority?

24   A    -- and the authority.

25        Q    What happens if interest rates go down?  You

J. Conlan - Redirect                              57

1    have -- you know -- you have a one and a half percent

2    on top of the existing interest rate that you're making

3    money on.  And, you said the tort liability goes down

4    proportionate to when the interest rates go up?

5    A    Right.

6        Q    What happens if the interest rates go down?

7    A    Right.  And, this is Mr. Dachille's department.

8    We make sure they're closely matched including duration

9    so that if interest rates go down which would result in

10   the liability going up the value of our portfolio will

11   also go up because we have matched double A corporates.

12       So, it's a no -- very, very low risk structure

13   like an insurance company so that the assets, the

14   double A corporates are tightly matched against the

15   liabilities.  And, if they both move up, fine.  If they

16   both move down, fine.  But, you don't want one to move

17   up and the other to move down.

18            THE COURT:  All right.  Judge Singh?

19            JUDGE SINGH:  (indiscernible)

20            THE COURT:  Mr. Pollock, any questions before

21   I return to Mr. Brody based on the Court's questions?

22            MR. POLLOCK:  No sir.  No Your Honors, thank

23   you.

24            THE COURT:  You're welcome.  Mr. Brody?

25            MR. BRODY:  All right.  Thank you Your Honor.

1   And, I'll try to be brief so that we can keep moving

2   forward.

3   REDIRECT EXAMINATION BY MR. BRODY

4       Q    So, Mr. Conlan, you were asked about Weil

5   Gotshal's role in the Imerys bankruptcy, you recall

6   those questions from Mr. Pollock?

7   A    I do.

8       Q    And, you frequently in the course of your

9   discussions with the in house team at J and J discussed

10  and addressed your views on Weil Gotshal's analysis,

11  didn't you?

12  A    Yes.

13      Q    And, you discussed with them your views on

14  Jones Day's analysis, right?

15  A    I don't recall that.  The -- for example -- or to

16  illustrate, in the Imerys North America bankruptcy

17  case, during the pendency of that I was part of the

18  team, if you will, the all hands team that would work

19  on what was happening there.  I don't recall any such

20  effort during the L.T.L. case of which I was a part.

21      Q    Okay.  I'm -- I'm -- and -- and maybe my

22  question was -- was a little imprecise.

23  A    Okay.

24      Q    But, you said, "Well, the L.T.L. bankruptcy,

25  that was Jones Day."  You discussed your views on the

1    Texas two step with in house Counsel at J and J,

2    correct?

3    A    I discussed my views of what Jones Day was doing

4    in North Carolina and the pros and cons of it and what

5    they had to achieve, what the risks were before L.T.L..

6         Q    Right.  The -- you discussed the -- the risks

7    and -- and benefits to J and J in a privileged and

8    confidential setting, correct?

9    A    Yes.

10        Q    All right.  You indicated that whether the

11   structural optimization and disaffiliation approach

12   works depends on the amount, right?

13   A    Yeah, particularly the auditor.

14        Q    Right.  Exactly because you said you -- you

15   have to get the auditors on board with the amount or

16   it's not going to work, you're going to be --

17   A    Correct.

18        Q    -- you know -- potentially at risk for

19   something like a fraudulent transfer allocation?

20   A    We -- two things.  One, we just wouldn't do.  And,

21   number two, the company wouldn't either because it

22   wouldn't remove the non cash charge.

23        Q    And, the -- so whether the number works

24   depends on whether you -- you -- you know -- drilled

25   down and -- and gotten to a number that is big enough,

                    J. Conlan - Redirect                    60

1    right?

2    A    Are you talking about the auditors?

3        Q    I'm talking about whether -- whether a

4    structural optimization and disaffiliation is going to

5    successfully resolve liabilities is ultimately going to

6    depend on whether that number that is used to

7    capitalize the disaffiliated entity is high enough?

8    A    Well, it's resolved for the -- for the company no

9    matter what because once the auditors remove the non

10   cash charge --

11       Q    But, it's not -- it's -- but it's not

12   resolved if the auditor won't do that, that's your

13   testimony, right?

14   A    Correct.  That's correct.

15       Q    And so, you have to have a number that is

16   going to reflect things like -- and you listed some of

17   them in response to Mr. Pollock's question -- futures,

18   values of current claims in the talc context, whether

19   it's ovarian or ovarian plus the -- the mesothelioma

20   claims.  All of that is going to have to get wrapped up

21   in it, right?

22   A    All of those things would be taken into account by

23   the auditors.

24       Q    Right.  Exactly.  And, by the way, Beasley

25   Allen was okay with the $19 billion number?  You shared

1    that with them before you sent the letter to the board

2    of directors, right?

3    A    I didn't ask them if they were okay with it.  We

4    didn't need their vote.

5         Q    They were okay -- well you told J and J that

6    they were okay with the proposal, right?

7              MR. POLLOCK:  Objection.

8              MR. BRODY:  In your letter, you told -- you

9    told --

10             THE COURT:  Based on the letter the --

11   BY MR. BRODY:

12        Q    -- you told the board of directors on

13   November 9th, 2023 that your proposal had the support

14   of outside Counsel?

15             MR. POLLOCK:  Your Honor, the document says

16   what it says.  That's the best evidence.  It says, "$19

17   billion (indiscernible) as justified by J and J's

18   auditors."  So, to me the -- if we're going to get into

19   this language again it has to be precise.

20             THE COURT:  Right.  What's the exhibit Mr.

21   Brody, you're referring to?

22             MR. BRODY:  It's hearing exhibit seven.

23   BY MR. BRODY

24        Q    Let me ask you --

25             THE COURT:  So, second paragraph?

1          MR. BRODY:  Yeah.  Let me -- yeah.  First and

2     second.

3          THE WITNESS:  I think I can answer it.

4     BY MR. BRODY:

5     Q    Well, let me ask you a different question

6     since we're now a little bit back and forth beyond it.

7     The -- the factors that you were talking about that

8     have to go into a number -- right -- analysis of the

9     value of claims is -- is certainly going to be

10    something that you would expect an auditor might be

11    interested in, fair?

12    A    I think that's one of the factors, given my

13    experience, auditors look at.

14    Q    Right.  Or if -- if the -- if it were the

15    case, damages analysis, something like that?

16    A    It is one of the factors the auditors would look

17    at.

18    Q    Yeah --

19    A    Settlements.

20    Q    -- anticipated incidents of future claims?

21    A    That's one of the factors the auditors would look

22    at.

23    Q    Right.  And, Beasley Allen shared its

24    confidential work product on those very topics with you

25    last year, didn't they?

1    A    Beasley Allen did share some privileged

2    information with some of the people in Legacy.

3         Q    Yeah.  Including you?

4    A    I -- I don't recall receiving it.  But, I -- but I

5    can tell you this.  You asked the question whether they

6    were okay -- they were okay with structural

7    optimization and disaffiliation, not that we needed

8    them to be okay.  Because we don't need the yes vote.

9    That's the whole point.

10        On the second question, the 19 billion or such

11   greater amount as the auditors require has to cover

12   everything.  It has to cover current and future meso.

13   It has to cover current and future ovarian.  It has to

14   cover attorney general costs.  It has to cover defense

15   costs.  All of those things have to be included.

16        Q    And so -- so -- so Beasley Allen shared all

17   of that -- all of that information -- I mean, you don't

18   recall specifically what you looked at and when but you

19   do recall that Beasley Allen shared its privileged and

20   confidential work product on things like claim values,

21   damages, futures with Legacy, right?

22             MR. POLLOCK:  Objection Your Honor.  We're

23   talking about mediation confidential information, how

24   can he answer that question?

25             THE COURT:  I don't know that was covered in

J. Conlan - Redirect                          64

1     the -- in the mediation.  Is that a topic that's

2     covered in mediation?

3               MR. BRODY:  It's -- it's -- I'm -- it's

4     straight from the privilege log.  It's been supplied to

5     us.

6               MR. POLLOCK:  The mediation privilege log.

7     He's asking about the merits and the substance of the

8     mediation privilege log.

9               MR. BRODY:  I'm -- I'm simply asking whether

10    that was provided to -- by Beasley Allen to Legacy.

11              MR. POLLOCK:  He is not.  He's asking about

12    the details that was discussed that Judge Snyder

13    sitting behind me --

14              THE COURT:  I'll sustain the objection.

15    Yeah.

16              MR. BRODY:  All right.  I'll -- I'll make it

17    clearer.

18    BY MR. BRODY

19       Q    That -- that was provided to -- that

20    information was provided to you, without getting into

21    the substance of it?

22              THE COURT:  Judge Singh has a question.

23              JUDGE SINGH:  (indiscernible)

24              THE COURT:  Well --

25              JUDGE SINGH:  Okay.  Yeah, if you don't mind

1    I just want to go back to the line of questioning about

2    your -- your testimony that you didn't need the consent

3    of Beasley Allen or other plaintiffs.  If we turn to

4    exhibit seven on page two it's labeled plenary hearing

5    63, the second paragraph under details of proposal --

6              THE WITNESS:  I'm -- I'm sorry -- I'm sorry

7    Your Honor.  Exhibit seven?

8              JUDGE SINGH:  Yes.  I'm sorry.  I'm going

9    fast.

10             THE WITNESS:  Okay.  I'm on exhibit seven

11   now, sorry.

12             JUDGE SINGH:  Okay.  And, the second

13   paragraph under details of proposal it says, "To

14   provide enhanced certainty to P.W.C. in its

15   determination.  It is important to note that leading

16   Counsel in the M.D.L. have agreed to support an opt in

17   settlement with Legacy," et cetera.  Do you see that

18   language?

19             THE WITNESS:  I do, yeah.

20             JUDGE SINGH:  So -- so what was the important

21   piece of this?  Why is that important to P.W.C.?

22             THE WITNESS:  Yeah.  So, when the auditor

23   P.W.C. is looking at how much money has to be in the

24   talc liable entities for them to remove the non cash

25   charge -- because they don't like removing it.  They're

1    a conservative group of people.  But, to remove it they

2    want to have all of the data that will help them assess

3    the range of potential liabilities.

4              And, frankly, they want to make sure there's

5    enough liability to meet the high end of the range

6    because they don't want to be criticized later if it

7    were to turn out that there's not enough money.  And

8    so, the potential of settlements, even if they're just

9    potential, is an important data point.  The $8.9

10   billion settlement which didn't garner enough support

11   -- support would be relevant also.  The fact that that

12   many people were willing to support that is an

13   important data point.

14             JUDGE SINGH:  But here this references an

15   agreement that there's -- leading Counsel in the M.D.L.

16   have agreed.  So, there's something more than just a

17   data point in terms of what had been negotiated

18   previously, is that correct?

19             THE WITNESS:  Yeah -- yes.  So, the -- the

20   concept from Beasley Allen was its belief or you could

21   say its agreement that it would support -- not that it

22   could deliver -- but that it would support something

23   like this.  It wasn't -- they didn't have the

24   authority, we didn't have the authority to enter into

25   the agreement.

J. Conlan - Redirect                              67

1           But, an auditor in saying, "Is it this big or

2    is it this big," in coming up and -- frankly taking off

3    the high end of the range which hopefully they would do

4    and lower it down to this, all of the potentials for

5    resolution help them take the high end of the range

6    off.  Again, it's not a settlement.  We're just taking

7    the liable entities and they're agreeing that the

8    liable entities have enough funds in them that J and J

9    can be removed from the picture.

10           JUDGE SINGH:  Okay.  Thank you.

11   BY MR. BRODY

12      Q    And so, post bankruptcy, post mediation, you

13   were having discussion I think as you testified with

14   Mr. Birchfield about the settlement matrix that I think

15   you said is -- is his settlement matrix that was

16   attached to your letter to the J and J board, right?

17   A    Yes.

18      Q    Right.  And, this was after -- I think you --

19   you said that they had previously -- Beasley Allen had

20   previously sent you related privileged and confidential

21   work product, right?

22   A    Sent people at Legacy privileged information.

23      Q    Right.  And, even after the mediation ended

24   as you were having these discussions with Mr.

25   Birchfield -- I mean you were asked about J and J not

J. Conlan - Redirect                              68

1    raising an objection when you reached out to Mr. Van

2    Arsdale or when he wrote back and included you on an

3    email that was dated August 21st of last year, you

4    remember that right?

5    A    Could you draw me to this?

6         Q    It's part of hearing exhibit four.

7    A    Okay.

8         Q    Mr. Pollock asked you, "Well did J and J --

9    you know -- raise any alarm bells," --

10   A    Yes.  I'm sorry.  Yes.

11        Q    -- "Or say you -- you -- you -- you know --

12   no, we don't want you talking about structural

13   optimization?"

14   A    Correct.

15        Q    Right.  But, you didn't tell them you were

16   working with Mr. Birchfield, did you?

17   A    I didn't call it to their attention, no.

18        Q    Right.  And, when you went in and you met

19   with them on September 11th you didn't tell them you

20   were working with Mr. Birchfield at that time either,

21   did you?

22   A    I did not call it to their attention, no.

23        Q    And, it was only -- it was only on October

24   18th that you did that, right?

25   A    Correct.

1          Q      Right.  And, during that time period that's

2     when you were having the discussions with Mr.

3     Birchfield and Beasley Allen about the settlement

4     matrix and what kind of support are we going to get for

5     a settlement matrix so that I can represent to Johnson

6     and Johnson that I have this support and that I'm

7     confident that I'm going to get the support, right?

8     A      There's two components.  One is it's helping us

9     assess whether we want to take this and at what price.

10    And, number two, it's helping the auditors take the

11    high end of the range off in coming up with the number

12    at which they'll remove the non cash charge.  Neither

13    happens unless J and J says -- sorry -- structural

14    optimization, disaffiliation don't happen unless J and

15    J says, "Yes," and the auditors agree and provide a

16    number, otherwise nothing goes anywhere.

17         Q      And -- and my question was a little

18    different.  My question was actually, you were during

19    this time period having discussions about the matrix

20    and whether you were going to get that 95 percent

21    support with Mr. Birchfield and Beasley Allen, correct?

22    A      I -- I wouldn't call it discussions.  Mr.

23    Birchfield said, "I think I could get 95 percent for

24    this."  We -- we didn't negotiate it.  We didn't -- it

25    was nothing like that.

1      Q    And, this is -- is the matrix that has the

2      claim values, right?

3      A    Yeah.  For --

4      Q    Right.

5      A    -- what -- for what we understand to be current

6      ovarian cancer claimants.  Not meso, not futures, not

7      the attorney general claims.

8      Q    And -- and your testimony, if I understand

9      it, is that they shared their privilege and

10     confidential attorney work product with you, right?

11     A    That's my understanding.

12     Q    But you, when you were having your

13     discussions with them, walled off everything you

14     learned in 20 months representing Johnson and Johnson

15     in one part of your brain so that you wouldn't disclose

16     client confidences from the other part of your brain

17     when you were having discussions with Mr. Birchfield.

18     Is that -- is that your testimony?

19     A    Correct.

20             MR. BRODY:  Thank you.  That's all I have.

21             THE COURT:  Mr. Pollock?

22     RECROSS EXAMINATION BY MR. POLLOCK

23     Q    One question.  Everything you learned --

24     let's just pick on that last phrase.  Tell me one

25     thing, whatever it is, that you learned while working

1      for J and J that was directly relevant -- that was

2      necessary for you to propose the Legacy Liability

3      solution?  I'd like to know one thing --

4                  MR. BRODY:  That's -- I'm sure it might --

5                  THE COURT:  With the exception of attorney

6      client privilege.

7                  MR. POLLOCK:  Actually, Your Honor, I would

8      even include that.  The fact is --

9                  MR. BRODY:  (indiscernible)

10                 MR. POLLOCK:  -- this is -- this -- this goes

11     to the significantly harmful element Your Honor.  I

12     need to know.  Tell me the one thing because right now

13     I'm seeing a lot of nothing.  I'm seeing that --

14                 THE COURT:  Well, I'm permitting the -- the

15     -- what -- what's your -- any objection Mr. Brody?

16                 MR. BRODY:  Yeah.  The objection is -- is

17     privilege -- you know -- tell me one thing you learned

18     that would be relevant to this and obviously what he

19     learned is privileged.

20                 MR. POLLOCK:  Let me take it by -- step by

21     step.  How about this?

22     BY MR. POLLOCK

23          Q    Is there anything -- just yes or no.  Is

24     there anything that you learned while you were at J and

25     J that was absolutely necessary for you to perform your

1    function as the CEO of Legacy making a proposal on

2    behalf of Legacy Liability Solutions?  Just yes or no.

3    A    No.

4          MR. POLLOCK:  Excellent.  I'm done.

5          THE COURT:  Okay.  We're going to continue.

6    I -- look to see if we're going to take a break.  Mr.

7    Conlan, you can step down.  We'll go a little bit

8    further.  Mr. Brody (indiscernible) Mr. Birchfield come

9    up?

10         MR. BRODY:  Yeah.  I call Mr. Birchfield

11   unless the Court thinks it would be easier to take a

12   recess -- a short recess now and not interrupt the

13   flow?

14         THE COURT:  No, I think -- play it by ear.

15   Thank you Mr. Conlan.  Mr. Birchfield, please come

16   forward.  Before you're seated Mr. Birchfield, please

17   raise your right hand, tell me your name and spell your

18   last name.

19         MR. BIRCHFIELD:  Andy Birchfield, B-I-R-C-H

20   -F-I-E-L-D.

21   A N D Y   B I R C H F I E L D, DEFENSE WITNESS, SWORN,

22         THE COURT:  Thank you, you may be seated.

23   DIRECT EXAMINATION BY MR. BRODY

24     Q    Mr. Birchfield, do you have a copy of the

25   hearing exhibits there with you?

1    A    I do.

2         Q    All right.  Do you have anything else besides

3    the hearing exhibits there?

4    A    I have my pen.

5         Q    I just meant in the notebook.  I -- that's

6    okay.  I --

7    A    I have --

8         Q    -- whatever -- whatever you have in your coat

9    is -- it's all right.

10   A    Notes on some times.

11        Q    Okay.  Notes for today?

12   A    Yes.

13        Q    All right (indiscernible)

14   A    I mean, just if -- if I get into dates I have some

15   notes.

16        Q    If you refer to your notes we'll -- we'll --

17   we'll talk about them, all right?

18   A    Okay.

19        Q    All right.  You new in 2020 that James Conlan

20   was representing Johnson and Johnson in the talc

21   matters, correct?

22   A    I knew -- I knew that Mr. Murdica had told me that

23   Jim Conlan was working -- he was working with -- he was

24   having dinner with at a ski resort with the F.C.R.s

25   pertaining to the Imerys -- the Imerys proposal that we

1    were working together on -- that Mr. Murdica and I were

2    working together on.  I knew -- I knew from Mr. Murdica

3    that extent but that was it.

4         Q    Right.  And so, you understood that Mr.

5    Conlan was acting on behalf of J and J, correct?

6              MR. POLLOCK:  Just to be clear, this is --

7    can I get a time -- a point in time?  Because I -- I

8    need to know when he's working on what.

9              THE COURT:  Sure.  Mr. Brody?

10             MR. BRODY:  The question -- the question was

11   in 2020.

12             MR. POLLOCK:  2020.

13             THE WITNESS:  In 2020 Mr. Murdica and I had

14   made a proposal to the -- to the Imerys T.C.C.  And,

15   part of that proposal was dependent on the F.C.R.

16   support.  And so Mr. Murdica told me -- that was the

17   extent -- Mr. Murdica told me that -- that Mr. Conlan

18   was at a conference -- a bankruptcy conference.  They

19   were -- he would be skiing and having dinner with the

20   F.C.R., F.C.R.'s Counsel to -- to try to gain support

21   for that proposal.

22   BY MR. BRODY:

23        Q    Okay.  And I guess Counsel for Beasley Allen

24   is going to update their chart in real time during my

25   examination?

1          MR. POLLOCK:  I -- I can do it later on.

2     I'll do it later.  That's fine.  I apologize.  I'll do

3     it later.

4          MR. BRODY:  I -- I don't know how they want

5     to do this.  But --

6          THE COURT:  Well, it's not -- it's not in

7     evidence.  So -- but you can continue Mr. Brody.

8          MR. BRODY:  Thank you.

9     BY MR. BRODY:

10     Q    And -- and again, just so the record is clear

11     Mr. Birchfield, you knew that Mr. Conlan was acting on

12     behalf of J and J at the time, correct?

13     A    I knew what Mr. Murdica had told me.

14     Q    All right.  And, that's what Mr. Murdica told

15     you, right?

16     A    Yeah.

17     Q    All right.  Mr. Conlan was at the Faegre

18     Drinker Law Firm at the time, right?

19     A    That's what I've heard today.  And --

20     Q    Yeah.  And -- and you knew that Faegre

21     Drinker was lead Counsel for J and J in the M.D.L. in

22     Trenton, correct?

23     A    I -- I knew Ms. Sharko was lead Counsel in the

24     M.D.L. and that she was with Faegre.

25     Q    And that she was also lead Counsel here in

1    Atlantic City, correct?

2    A    Yes.

3         Q    All right.  And, in 2020 the cases that were

4    pending against Johnson and Johnson both here in

5    Atlantic City and in Trenton were active, correct?

6    A    Were active?  I'm sorry?

7         Q    Yes.  Active.

8    A     Yes.

9         Q    Because that was before the bankruptcy stay

10   that followed the L.T.L. petition filing in October of

11   2021, right?

12   A    Yes.

13        Q    And, 2021 was when you proposed to J and J

14   through Mr. Murdica to settle all ovarian cancer talc

15   claims current and future through the Imerys bankruptcy

16   for $3.25 billion, correct?

17   A    No.

18        Q    All right.  Do you recall giving a deposition

19   in April of last year Mr. Birchfield?

20   A    I do.

21             MR. BRODY:  If I may approach to hand him a

22   copy of it?

23             THE COURT:  Could you share it with Mr.

24   Pollock first?

25             MR. BRODY:  Of course.

1          MR. POLLOCK:  I thought it was plenary

2     exhibit 29.  Isn't -- are we talking about a different

3     -- I --

4          MR. BRODY:  This is -- that's got the whole

5     thing here.

6          MR. POLLOCK:  Okay.  I -- I object to using

7     -- I've got -- they had the document, they produced the

8     records, they picked what they wanted.  They have

9     exhibit five.  I don't know why we're going beyond the

10    exhibits in (indiscernible) the record.  I don't know

11    how I'm supposed to prepare this, read it on the fly --

12         THE COURT:  Well --

13         MR. BRODY:  It's impeachment Your Honor.

14    It's --

15         THE COURT:  -- well, go ahead.

16         MR. BRODY:  Thank you.  May I approach?

17         THE COURT:  You may.

18         MR. BRODY:  And would the Court like a copy?

19    BY MR. BRODY

20         Q   Mr. Birchfield, I've handed you a copy of the

21    transcript of your deposition from April 17th, 2023.

22    Do you have that?

23    A    I do.

24         Q   If you would turn to page 65, line 24?  Are

25    you there?

1   A    Yes.

2        Q    And, it carries over to the next page.  If

3   you could turn to the top of page 66 you were asked,

4   "Based on your review of the document Mr. Birchfield,

5   does this refresh your recollection that in September

6   of 2020 you proposed to Johnson and Johnson through its

7   representative Mr. James Murdica to settle all ovarian

8   cancer claims both current and future through the

9   Imerys bankruptcy for a total of $3.25 billion?"  And,

10  your answer was, "So, I submitted this -- I submitted

11  -- I submitted this proposal, that is true."  That was

12  your response, correct?

13  A    That is my response, that I --

14       Q    Right.  And --

15  A    -- submitted this proposal but -- but the proposal

16  --

17            MR. BRODY:  -- and -- and --

18            MR. POLLOCK:  Your Honor, if -- I'm getting

19  sandbagged with a document at the last second.  A page

20  I have never read and a witness I cannot prepare

21  because I didn't know he was going to go when they've

22  actually produced the document as exhibit five.  I

23  would beg you, give him some latitude to answer the

24  question because Mr. Brody wants to steam roll this

25  thing.  But, it's not the Brody hearing.  I mean --

A. Birchfield - Direct                    79

1   we've got to hear from the witness.

2              THE COURT:  True.  But that was the question

3   that was posed on March 25th.

4              MR. POLLOCK:  No sir.  The fact is it was --

5              THE COURT:  The settlement -- the settlement

6   number of --

7              MR. POLLOCK:  -- this is -- yes.

8              THE COURT:  -- I remember specifically.

9              MR. BRODY:  Correct.

10             THE COURT:  And, it came from Mr. Haas's

11  testimony was -- with regard to the settlement, drew

12  some reaction.  So, that -- that's not a number that

13  was really hidden.  At least wasn't hidden from me Mr.

14  Pollock.

15             MR. POLLOCK:  Your Honor, Mr. Haas testified

16  that he thought Andy had reneged on a deal.  And he

17  (indiscernible)

18             THE COURT:  That number --

19             MR. POLLOCK:  -- he quoted directly from the

20  transcript at that point in time.  Now we're going to a

21  completely different section of the transcript which I

22  have not had the opportunity to prepare this witness

23  on.  I'm just simply asking for a little bit of

24  latitude.  Mr. Birchfield is trying to explain the

25  answer.  But, if -- if you don't want to give it to me

1    that's -- that's your courtroom and Judge I respect it.

2              THE COURT:  Well, you asked the question, is

3    that the number?

4              MR. BRODY:  I -- I asked -- yeah, I asked --

5              THE COURT:  Was that your response --

6              MR. BRODY:  I asked -- yeah -- the question

7    was that --

8              THE COURT:  That's -- that's the response.

9              MR. BRODY:  -- correct.  And, it's --

10             THE COURT:  So, that's the response from Mr.

11   Birchfield at this point.

12             MR. BRODY:  Correct.  And, if -- if there is

13   --

14             THE COURT:  It can be addressed.

15             MR. BRODY:  -- yes Your Honor.  And, if

16   there's some -- you know -- additional explanation that

17   Mr. Pollock thinks needs to be made about that --

18             THE COURT:  Counsel is entitled to the answer

19   to the question.  It may go -- it works on both sides.

20   So, if he needs further explanation I'm sure he'll have

21   the opportunity.

22             MR. BRODY:  Yeah.  And, it's -- it's -- you

23   know -- frankly it's -- it's impeachment.  It's not --

24   you know -- it's -- it's his own testimony.

25             THE COURT:  Continue.  Yes.

1          MR. BRODY:  Thank you.

2          THE WITNESS:  (indiscernible)

3          THE COURT:  I don't want you directing --

4          MR. BRODY:  Now, focusing --

5          THE COURT:  -- Mr. Birchfield, you're a

6    witness.

7          THE WITNESS:  I understand.

8          THE COURT:  You don't direct any questions to

9    the Court.

10         THE WITNESS:  I understand.

11         THE COURT:  You direct to Counsel if there's

12   anything -- so you -- your focus is with regard to

13   Counsel.

14         THE WITNESS:  Yes.

15         MR. BRODY:  Thank you.

16         THE WITNESS:  Yes Your Honor.

17   BY MR. BRODY

18      Q    So, Mr. Birchfield, September of 2020 at --

19   at that time I take it in your view there may be

20   others, but the two big differences in the talc matters

21   writ large between September of 2020 and the time of

22   the LTL-2 bankruptcy proceeding last year were the

23   number of filed claims and the fact that J and J had

24   proceeded with the bankruptcy, is that fair?

25      A    And, there were multiple -- there were multiple

1    differences between September '20 and -- and today.

2            Q    All right.  Do you --

3    A    And --

4            Q    -- I'm sorry, go ahead.

5    A    -- so -- but this is not -- this is not a proposal

6    to settle all claims for 3.25 billion.  I answered the

7    question that that was the proposal that I submitted.

8    But, I did not agree that that was a proposal to settle

9    all current and future talc claims, ovarian cancer

10   claims in the Imerys bankruptcy for 3.25.

11           Q    All right.  Well -- well, we'll let the --

12   the record of the -- your testimony today and your --

13   your prior testimony -- you know -- stand for the words

14   that are going to be written on the transcript.  My

15   question was -- was actually about the big differences

16   or any differences -- big differences between the

17   litigation at that time, September of 2020 and as of

18   the time of the LTL-2 bankruptcy proceeding last year

19   and in your view the -- the two big differences are

20   simply the total number of filed claims and the fact

21   that as of last year J and J -- L.T.L. was in

22   bankruptcy, right?

23   A    Those are two big factors.  Those are not the only

24   big factors.

25           Q    Those -- those -- but you would agree those

1    -- those are the big differences, right?

2    A    Those are two of --

3              MR. POLLOCK:  Objection, argumentative.

4    Asked and answered.

5              THE WITNESS:  -- those are two of the

6    differences --

7              THE COURT:  I'm going to overrule the

8    objection.

9    BY MR. BRODY:

10       Q    All right.  Do you recall giving a second

11   deposition in the L.T.L. bankruptcy proceeding in May

12   of last year?

13   A    I do.

14             MR. BRODY:  Can I get a copy of that?  And,

15   if I may approach?

16             THE COURT:  Yes.

17             MR. BRODY:  Thank you.

18             MR. POLLOCK:  Your Honor, again, I object.

19   This was not part of the record.  It was not even a

20   partial part of the record.  This is a brand new

21   document being given to me on the fly which they

22   obviously had in advance.  I object to its use.

23             THE COURT:  To the extent this is going to be

24   for impeachment Mr. --

25             MR. BRODY:  This is for impeachment Your

1    Honor, yes.

2    BY MR. BRODY

3        Q    So, Mr. Birchfield, this is a copy of -- a

4    transcript of a deposition you gave on May 30th of last

5    year, correct?

6    A    Yes.

7        Q    And, if you would turn to page 101 of that

8    transcript?  Are you there?

9    A    Yes.

10       Q    And, there's a question, "Just following up

11   on your testimony that the situation is much different

12   today, the world has changed, other than the number of

13   change -- number of filed and unfiled claims, had there

14   been any other developments pertinent to the talc

15   litigation that you think would raise the settlement

16   amount?"

17       Your answer was, "There may be others but the two

18   big differences were the total number of filed claims

19   in September 2020 and J and J's filing of bankruptcy,

20   the debtor's filing of bankruptcy."  And, that was your

21   testimony on May 30th of last year, correct?

22            MR. POLLOCK:  Your Honor, I object under the

23   Doctrine of Completeness.  The question in line -- and

24   this actually starts at page 100 --

25            THE COURT:  I'm going to give you an

A. Birchfield - Direct                    85

1   opportunity Mr. Pollock to address that on cross

2   examination.

3           MR. POLLOCK:  Fair enough.

4           THE COURT:  For completeness.  Yes.

5           MR. BRODY:  (indiscernible) yeah -- thank you

6   Your Honor.

7   BY MR. BRODY:

8       Q    Putting the September 2020 proposal aside

9   you've made additional settlement proposals to Johnson

10  and Johnson as part of the Tort Claimant Committee in

11  the L.T.L. bankruptcy, correct?

12  A    I have.

13      Q    In fact, you led the team effort on behalf of

14  ovarian cancer plaintiffs to reach a mediated

15  resolution of talc claims against J and J in the first

16  L.T.L. bankruptcy, correct?

17  A    I did.

18      Q    And, you had stated that there was in depth

19  discussion of the value of talc claims from both sides

20  within the context of that mediation, correct?

21  A    That would be true.

22      Q    All right.

23  A    I -- you're -- you're asking me if I said that --

24  I'm -- I'm sure that I have.  I don't recall saying

25  that.  But, that's certainly true.

A. Birchfield - Direct                    86

1          Q    Do you have -- do you have -- do you have

2     your hearing exhibit binder there?

3     A    I do.

4          Q    And, if you would turn to tab 16?  You there?

5     A    I am.

6          Q    You recognize that document as a

7     certification that you prepared, correct?

8     A    I do.

9          Q    And, if you would turn to paragraph 11 of

10    your certification, you wrote or you signed the

11    statement, "With mediators involved there was in depth

12    discussion of the value of the talc -- of talc claims

13    from both sides," correct?

14    A    That's correct.

15         Q    All right.  But, notwithstanding discussion

16    of your position in the mediation context, the amount

17    that you think would be reasonable compensation for

18    ovarian cancer claimants is something that you consider

19    to be confidential attorney work product, correct?

20              MR. POLLOCK:  Your Honor, I object.  I need a

21    time frame because this has been going on for four

22    years, the facts have changed.  So, if we're going to

23    have a discussion regarding what they are worth I'd

24    like to know what time that discussion occurred.

25              THE COURT:  That's -- that's a fair question

A. Birchfield - Direct                    87

1    -- fair objection.

2                MR. BRODY:  The question was -- I -- I don't

3    think specific at all to time frame Your Honor, it was

4    simply --

5                THE COURT:  Do you have a time frame then?

6                MR. BRODY:  -- it was simply if he -- if he

7    considers that to be attorney work product.  I don't

8    think --

9                THE COURT:  At any time?

10               MR. BRODY:  -- I -- yeah.  I don't think

11   there's a temporal component to that.

12               THE COURT:  Okay.  I -- I ruled --

13   BY MR. BRODY

14   A    Okay.  I just want to make sure I understand.

15   You're asking me if the -- if the value -- how I would

16   value a -- a claim -- a plaintiff's claim, if that is

17   attorney client work product?

18       Q    I'm asking you if the amount you think would

19   be reasonable compensation for ovarian cancer claimants

20   is something you consider to be confidential attorney

21   work product?

22   A    It can be.

23       Q    It's not something you would disclose, is it?

24   A    No.  We have talked -- I mean, we have talked --

25   we've talked in open court about factors that would

A. Birchfield - Direct                    88

1    come into play in evaluating what a reasonable -- you

2    know -- what reasonable settlement values would be for

3    -- you know -- for claimants.

4         Q    Do you still have a copy of your May 30th

5    deposition there?  It's the smaller one.

6    A    Yes.

7         Q    And, if you would, turn to page 94, line 14.

8    Are you there?

9    A    Yes.

10        Q    You were asked, "And you won't tell us what

11   amount you think would be reasonable compensation for

12   ovarian cancer claimants, correct?"  And, Ms. O'Dell

13   objects on the basis that it's been asked and answered

14   and says, "It's protected by Rule 408.  It's protected

15   by the attorney client work product privilege and I

16   would instruct the witness not to answer."

17        And, if you go to the next page you're asked

18   whether you would accept that instruction and you say,

19   "My lawyer's instruction, yes."  That was your

20   testimony, correct?

21   A    That is my testimony.

22        Q    All right.  Similarly, Beasley Allen's view

23   of what amount, on average, any resolution of its filed

24   claims must be is confidential and protected attorney

25   work product, correct?

A. Birchfield - Direct                          89

1    A    It can be.

2         Q    All right.  And, so you -- didn't take issue

3    when Ms. O'Dell objected on that basis to that same

4    question when you were asked that question in the

5    course of the second L.T.L. bankruptcy proceeding when

6    you were deposed on May 30th of last year, right?

7    A    I did not.  I followed the advice of Counsel.

8         Q    All right.  In other words, Beasley Allen's

9    assessment of case values and injuries is its work

10   product, right?

11             MR. POLLOCK:  Objection --

12             THE WITNESS:  It can be.

13   BY MR. BRODY:

14        Q    And, when you do that kind of assessment,

15   that kind of assessment is based on confidential client

16   information?

17   A    It can be, yeah.

18        Q    Damages analysis as well?  You consider that

19   to be work product?

20   A    It can be.

21        Q    Based on confidential client information?

22   A    It can be.

23        Q    All right.  And, because you're trying to

24   draw this distinction saying, "It can be," and I'm

25   taking from that and I'm going to -- I'm going to go

A. Birchfield - Direct                    90

1    with you here.  Sometimes it's not.  Why don't you tell

2    me why it is that you are couching your answers?

3    A    Well, if I'm -- if I'm arguing before a jury I'm

4    going to put forward in closing argument -- I'm going

5    to put forward the information in the analysis and make

6    a recommendation about -- you know -- what that value

7    is.  But -- but there is a process in -- in getting

8    there.  So, it depends on the context.

9        It depends on -- you know -- what the setting is.

10   You -- you would -- you would discuss those -- those

11   factors in mediation.  You would discuss those -- you

12   know -- in court -- in court proceedings.  So, to say

13   that it is -- you know -- that it's protected attorney

14   client -- you know -- privilege just as a -- a blanket

15   statement is more than I could -- more than I could

16   just embrace.

17       Q    Well, clearly if you were standing in this

18   courtroom and you were talking to the jury over there

19   and you presented the jury with a number you're --

20   you're -- you're telling the jury; here's what we want

21   you to give to --

22           THE COURT:  You can't suggest that in New

23   Jersey.

24           MR. BRODY:  All right.  If you were not --

25           THE COURT:  You can't suggest a number.

1        MR. BRODY:  -- if you were not in this

2    courtroom --

3        THE COURT:  Hypothetically.  I'm just telling

4    you so if anybody is looking at the record, you can't

5    suggest a number.

6    BY MR. BRODY:

7        Q    All right -- all right.  So, we're -- we're

8    taking you out of this courtroom.  Okay?  We're --

9    we're taking you -- we're taking you to a jurisdiction

10   where you're presenting that information to the jury as

11   -- to -- to go with your -- your hypothetical.  And --

12   you know -- when you do that, you're -- you're telling

13   the jury; here's -- here's what we think you should

14   award to my client, right?

15   A    Yes.

16       Q    Right.  And, that's very different than the

17   internal analysis that goes on that -- that makes you

18   arrive at a place where you have an opinion -- you know

19   -- here's what I think this case -- you know -- might

20   really be worth in a settlement context or -- or

21   potentially in any other context, right?

22   A    I think so.  I'm not sure I follow.

23       Q    Well, I mean it -- it -- it -- it's clearly

24   attorney work product to you to the extent that you

25   followed Ms. O'Dell's instruction and objection in your

1    deposition in the L.T.L. bankruptcy proceeding and

2    refused to answer that question, right?

3    A    Right.  But there -- right.  That is true.  But,

4    there are -- there are different -- there are different

5    contexts.  What are -- what are we talking about?  Are

6    you talking about the -- you know -- the value of an

7    individual claimant?  Are you talking about the value

8    of all ovarian cancer claimants?

9         Are you talking about the -- the value of -- you

10   know -- of all the -- the claimants that were part of

11   the L.T.L. bankruptcy plan?  Are you talking about the

12   value in -- in the context of litigation?  Are you --

13   are you talking about in the context of a bankruptcy

14   proceeding?  There are a lot of -- multiple variables

15   that would come in to play.

16        And so, I -- I don't -- I don't know.  I don't --

17   I honestly don't remember the full lead-up to, you

18   know, to Ms. O'Dell's objection and me following her

19   instruction.  So, I can't answer more than that.

20        Q    All right.  So your testimony is, yes, you

21   know, our analysis of claim values is our work product

22   but we might present our work product in a certain

23   forum if we decided that it would be helpful to us or

24   necessary, you know, for example, for the purposes of

25   making an argument to a jury?

1          MR. POLLACK:  Objection, he never said -- he

2    never said he was providing work product, he said he

3    would provide a number and there may be a big

4    difference because one is attorney-client privilege,

5    how do you get to the number versus the number?  So the

6    word work product to me is very latent here because

7    obviously, it has relevance in the attorney-client work

8    product scenario.

9          THE COURT:  Can you rephrase the question,

10   Mr. Brody?

11         MR. BRODY:  Sure, I'll rephrase the question.

12   BY MR. BRODY:

13   Q    Fair to say that you would assess, in the

14   circumstances, whether the information was

15   confidential, attorney work product, based on client

16   confidences that you felt needed to be protected or

17   not; you would make that assessment as a lawyer?

18   A    I would.

19   Q    All right, fair enough.  You would agree,

20   though, with Mr. Conlan that Beasley Allen send its

21   work product to Legacy; correct?

22   A    We did provide some work product to Legacy.

23   Q    All right and some of that work product is

24   described on a privilege log that was provided to

25   Johnson and Johnson, in connection with a third-party

A. Birchfield - Direct                    94

1   subpoena that was served in the M.D.L., correct?

2   A    Yes.

3            MR. BRODY:  All right, if I may approach with

4   a copy of the log?

5            THE COURT:  Are you familiar with that, Mr.

6   Pollack?

7            MR. POLLACK:  I am.

8            THE COURT:  All right, you may approach.

9            MR. BRODY:  Okay.

10           MR. POLLACK:  I got it.  Are we marking this

11   for identification?

12           MR. BRODY:  Yeah, we can do that.

13           THE COURT:  What number are we on with regard

14   to -- is it D-1, JJ-1, how are we marking?

15           UNIDENTIFIED MALE:  We could make this JJ-1.

16           THE COURT:  Okay.

17   BY MR. BRODY:

18       Q    Now we tried to make it as big as possible

19   for orienting you.  The entries run across the page and

20   then they are continued on the back side because there

21   are so many columns on the chart.  So if you, just to

22   orient you, if you look at number one, document one,

23   runs all the way across and then it continues.  You see

24   the doc number on the next page, continues across,

25   through the description; are you with me?

1   A    I do, I do.

2        Q    Okay.  So if you would, why don't we start

3   and they go in order, as they were numbered on the

4   privilege log.  If you turn to document number 165.

5   Are you there?

6   A    Yes, document 165?

7        Q    Correct, you got it?

8   A    Yes.

9        Q    And that's -- the date there is May 7th,

10  2023; correct?

11  A    Yes.

12       Q    The author is Leigh O'Dell; correct?

13  A    Yes.

14       Q    And if you look at the description for

15  document 165 on the next page, it's described as an

16  ovarian cancer leadership memo to Legacy, discussing

17  ovarian cancer case values, injuries and damages

18  analysis; correct?

19  A    Yes.

20       Q    And that's one of the items of work product

21  that Beasley Allen sent to Legacy; correct?

22  A    That would be my understanding.

23       Q    Okay and the next document 166 is the same

24  thing; correct?

25  A    Yes.

1      Q    All right and if you would turn to document

2   234, as another example.  Tell me when you're there.

3   A    Document 234, I'm there.

4      Q    All right.  That's a document that you're the

5   author of; correct?

6   A    Yes.

7      Q    And the date on that is May 15th, 2023;

8   correct?

9   A    Yes.

10     Q    And if you carry it over to the next page,

11  it's a draft attachment regard ovarian cancer claim

12  values; correct?

13  A    Correct.

14     Q    And that's another one of the work product

15  documents you sent over to Legacy; right?

16  A    I presume so.

17     Q    Yeah.  The fact that you shared your work

18  product with Mr. Conlan last year is not a fact that is

19  disclosed in any of the certifications that you've

20  filed in this case, is it?

21  A    No.

22     Q    By the way, it's not just amount, it's number

23  of claims.  You consider, for example, your sources of

24  information used to identify what you believed to be

25  the potential number of future talc claims against

A. Birchfield - Direct                              97

1    Johnson and Johnson to be confidential and protected

2    work product; right?

3    A    I mean, it could be, yes.

4         Q    All right.  If you would, you still have the

5    May 30th deposition?

6    A    Yes.

7         Q    If you would, turn to page 78?

8    A    Page 73, I'm sorry?

9         Q    I'm sorry, 78.

10   A    78.

11        Q    And you were quoted, the question was, you

12   note later in that paragraph, you were being asked

13   about a document.  "In addition, any resolution must

14   factor in at least 20,000 future claims.  Do you see

15   that?"  You said, "I do."  Question, "Do you know where

16   you got that figure?"

17        There's an objection and Ms. O'Dell says, "You may

18   not answer where you got the information provided.  You

19   can answer yes or no but beyond that is protected by

20   the attorney-client work product privilege and I would

21   instruct you not to answer."

22        And your response was, "I do know where I got that

23   information, it would be work product."  That was your

24   answer; correct?

25   A    About the total number of future claimants and

A. Birchfield - Direct                    98

1    where I got that number?

2         Q    That's right.

3    A    Yes.

4              MR. BRODY:  All right.  After the second --

5    so we're at a bit of a transition point here, Your

6    Honor and I don't know if you were going to take a

7    break this afternoon?

8              THE COURT:  Yeah, I intended to.  I wanted to

9    see if this is a good, natural spot to take a break?

10             MR. BRODY:  This is perfect.

11             THE COURT:  Let's do it, yeah.

12             MR. POLLACK:  Can I find out one thing?  Are

13   we finishing today or how long are we going to be?

14             THE COURT:  That was going to be my next

15   question too.

16             MR. BRODY:  Again, I certainly hope --

17             THE COURT:  All right.

18             MR. BRODY:  I would be done examining Mr.

19   Birchfield before 4:30.  It's just a question of how

20   long Mr. Pollack may have and then what could come

21   after that.

22             THE COURT:  Okay, well, if we don't finish

23   today, we have to continue.  I mean, that's the bottom

24   line.

25             MR. BRODY:  Right.

A. Birchfield - Direct                    99

1           THE COURT:  Okay.  Let's take a break, we'll

2     go for ten.  Off the record.

3      (Off the record at 3:29:00 p.m., back on the record at

4                       3:45:50 p.m.)

5           THE COURT:  Mr. Brody?  Thank you.

6           MR. BRODY:  Thank you, Your Honor.  Mr.

7     Birchfield, are you ready?

8           THE WITNESS:  Yes.

9     BY MR. BRODY:

10          Q    After the second L.T.L. bankruptcy filing,

11    you, Ms. O'Dell and Mr. Meadows from Beasley Allen,

12    served as representatives of a Beasley Allen client,

13    appointed to serve on the Tort Claimants Committee on

14    that bankruptcy; correct?

15    A    Yes.

16          Q    And that also involved a mediation; correct?

17    A    It did.

18          Q    And you mentioned that fact in the January

19    29th certification, not the mediation but the fact that

20    you and Ms. O'Dell and Mr. Meadows served as

21    representatives on the T.C.C. in the certification you

22    submitted on January 29th; correct?

23    A    Correct.

24          Q    When you described your role in the second

25    L.T.L. bankruptcy, you did not disclose in that

1    certification that you were engaged in communications

2    and discussions with Mr. Conlan, throughout the course

3    of that mediation; correct?

4    A    In the certification, I said, I said, when we had

5    our first encounter, you know, with Legacy and when we

6    had our first meeting, I said that.  I didn't talk

7    about the mediation or anything further.

8         Q    Right and you didn't disclose the subsequent

9    communications where you provided your work product and

10   that the discussion went on beyond May 2nd of 2023.

11   That's just not in your certification; right?

12             MR. POLLACK:  Objection to the phrase work

13   product.  There's no proof of it, I would like to see

14   what it is, I don't know what we're talking about.

15             THE COURT:  Well --

16             MR. BRODY:  I was just referring to his prior

17   testimony, Your Honor.

18             THE COURT:  Okay, Mr. Birchfield's testimony?

19             MR. BRODY:  Yes, right.

20             THE COURT:  Okay.

21   BY MR. BRODY:

22        Q    That's not in your certification; right?

23   A    It's not in my certification.

24        Q    All right.  What is in your certification is

25   a statement that your first contact with Legacy, in

1    connection with the J and J Talc Litigation, was in

2    April of last year; right?

3    A    Correct.

4        Q    And that your first meeting with anyone from

5    Legacy was on May 2nd of last year; correct?

6    A    Correct.

7        Q    And you met Mr. Conlan that day too; didn't

8    you?

9    A    On May 2nd, yes.

10       Q    That's right.  All you said about your

11   interactions with Mr. Conlan in your certification is

12   that you met him for the first time on May 2nd, 2023;

13   right?

14   A    Correct.

15       Q    And again, as I think you've said it, it

16   doesn't say anything about your written communications

17   with him; right?

18   A    Correct.

19       Q    Or any subsequent meetings with him after May

20   2nd, 2023; correct?

21   A    No, it just discusses our initial contact, that's

22   correct.

23       Q    Right and now going back to that first

24   meeting on May 2nd, 2023, you didn't contact anyone at

25   Johnson and Johnson to tell them that you were going to

1    be speaking with Mr. Conlan; did you?

2    A    I did not.

3         Q    You didn't tell any of Johnson and Johnson's

4    outside counsel either; did you?

5    A    No.

6         Q    So there was no sort of, you know, hey guys,

7    I've got this meeting set up with James Conlan, I know

8    he represented you in the Talc matter, are you okay

9    with that?  You never went to J and J with any sort of

10   request like that; right?

11             MR. POLLACK:  Objection, argumentative

12   because he's trying to make a closing during the middle

13   of questioning.

14             MR. BRODY:  Your Honor, it's a --

15             THE COURT:  I'm going to overrule the

16   objection.

17             MR. BRODY:  Thank you.

18             THE COURT:  Do you understand the question,

19   Mr. Birchfield?

20             THE WITNESS:  I think so, Your Honor.  I did

21   not mention -- there were a lot of things that I did

22   not mention in the certification.  I was just merely

23   stating, you know, when the contact began and this was

24   a meeting with Legacy who had an alternative, you know,

25   path that we were exploring through the mediation

1   process.  That, it was a meeting with Legacy, a vendor

2   but I did not -- I didn't -- I didn't disclose that to

3   J and J, it never crossed my mind.

4   BY MR. BRODY:

5       Q    Right, it never crossed your mind to go to J

6   and J and say, hey, I'm going to have a meeting with

7   your former outside counsel on the talc matters and are

8   you guys okay with that?

9   A    No, the only thing that I knew about Jim Conlan at

10  that point was the -- you know, the one thing that Jim

11  Murdica had told me in all late 2020, that he was

12  working with the F.C.R., that was it.

13      Q    And then -- so you certainly didn't ask Mr.

14  Conlan, hey, do you have a waiver that allows you,

15  former J and J lawyer, on the talc matters, to talk to

16  me, Andy Birchfield, representative on the T.C.C.?

17  A    I certainly did not.  I mean, in this context, I'm

18  meeting with a vendor, Legacy, who has an alternative

19  path.  That, there was nothing that suggested that a

20  waiver would be in order.

21      Q    And to the extent you know, nobody else from

22  Beasley Allen asked Mr. Conlan that either; right?

23  A    No, not to my knowledge.

24      Q    Including Ms. O'Dell; right?

25  A    Including Ms. O'Dell.

A. Birchfield - Direct                    104

1      Q    Who is co-lead Counsel for the plaintiffs in

2    the M.D.L., right?

3    A    Correct.

4      Q    All right.  You just said that, you referred

5    to Legacy, did I get that right, as a vendor?

6    A    Yes.

7      Q    And that's something that appears in the

8    certification that you submitted on January 29th;

9    doesn't it?

10    A    Probably so.

11      Q    If you want to take a look, your

12    certification is Tab 16 and it's Paragraph 19?

13    A    It's consistent with my testimony.

14      Q    You said you just -- you always viewed Legacy

15    as a vendor, who I guess had a creative solution to a

16    difficult problem based on their collective experience

17    in similar transactions?

18    A    Correct.

19      Q    Legacy is not the only company that acquires

20    and manages mass tort liabilities, is it?

21    A    It's not.  To my understanding, it is not.

22      Q    There are others like End Star Group?

23    A    Correct.

24      Q    I don't know how to pronounce it, Delkitus

25    (phonetic), Delkitus Group?

1    A    I haven't had any dealings with them but I

2    understand, they would be -- it would be another

3    competitor in this area.

4         Q    Global Risk?

5    A    Sounds right.

6         Q    R and O Legacy?

7    A    I don't know that name, but.

8         Q    You didn't partner with any of those

9    companies, though; did you?

10   A    Okay, I didn't partner with any of those

11   companies.  I wouldn't consider our engagement with

12   Legacy as partnering either.

13        Q    Okay, well, I'll use your word, engagement.

14   You didn't enter into an engagement with any of those

15   other companies; right?

16   A    I didn't talk with any of those other companies.

17   I don't have an engagement, you know, with Legacy.  You

18   know, I mean, we did -- obviously, we did talk and we

19   worked through mediation, a mediation process together.

20   I have not talked with any of the -- any of the other

21   companies that you named.

22        Q    All right.  You didn't go to a single, not

23   just the ones I named, you didn't go to a single other

24   company that acquires and manages tort liabilities?

25   Any of the companies in Legacy's field and ask them;

A. Birchfield - Direct                106

1    hey, can you help us out here?  We're looking for

2    somebody to work with in this Talc realm?

3    A    I did not do that, I did not reach out to Legacy.

4        Q    You spoke to Legacy?

5    A    I did.

6        Q    You continued to speak with them after the

7    first meeting?

8    A    I did.

9        Q    You continued to speak with Mr. Conlan after

10   the first meeting?

11   A    Yes.

12       Q    You sent him the documents that we see on the

13   privilege log after the first meeting; right?

14   A    Yes.

15       Q    You never went to any other company and said;

16   hey, can you guys do this, right?

17   A    No.

18       Q    All right, you chose to partner with

19   (indiscernible) since you objected to that.  You chose

20   to work with the one that had Johnson and Johnson's

21   former lawyer from the talc matters as its C.E.O.,

22   didn't you?

23   A    No, Legacy came to us.  They came to us and they

24   laid out this proposal that would be a path to the

25   finality that we understood that J and J had been

1    seeking.  Finality outside of bankruptcy.  So Legacy

2    came to us, so we explored that option and we explored

3    that option through the mediation process and beyond.

4          Q    You said Legacy came to you.  You wanted

5    Legacy; didn't you?

6    A    No, not at the beginning.  So Legacy came to us.

7    Legacy came to us with this proposal and a proposal, a

8    path, that would give J and J, you know, finality.  I

9    became -- I became concerned about -- about Legacy and

10   about this path, whether it is with Legacy or with

11   another entity.

12         So when Legacy first talked with us, when they

13   first talked with us, you know, alarm bells were going

14   off in my mind.  Not for, you know, any client

15   confidences from J and J but as -- I quickly came to

16   understand that this is an offer.  This would be an

17   offer and Legacy or one of its competitors could engage

18   in this transaction without us.  So it was a serious

19   concern.

20         Then I saw it as a potential opportunity.  As I

21   explored more on behalf of the Plaintiff Leadership, as

22   we explored this more and vetted this, you know, we saw

23   this as an opportunity and an opportunity that was

24   before us in the second bankruptcy and the mediation

25   that Judge Kaplan had ordered and so we began to

1    explore that option.  But it was not something where we

2    were seeking -- we were seeking out, you know, Legacy

3    or any of its competitors.

4         Q    So you took advantage of what you saw as an

5    opportunity; correct?

6    A    Yes.

7         Q    And you took advantage of that opportunity

8    with Legacy, a company whose C.E.O. had represented

9    Johnson and Johnson as its outside counsel in the talc

10   matters; correct?

11             MR. POLLACK:  Objection to the phrase

12   advantage.

13             THE COURT:  We can rephrase the question,

14   yeah.

15             MR. BRODY:  Sure.

16   BY MR. BRODY:

17        Q    You recognized it as an opportunity and you

18   proceeded to work with Legacy, a company whose C.E.O.

19   was previously outside counsel for Johnson and Johnson

20   on the Talc Matter?

21   A    It is true that we explored this with Legacy, it

22   is true that Jim Conlan is the C.E.O. of Legacy and it

23   is true that Jim Conlan worked with Faegre while Faegre

24   was representing J and J.  None of that, none of that

25   was really on the table, none of that was part of the

1    -- you know, part of the evaluation of this process.

2        We did not need any of the information that Jim

3    Conlan would have had as a lawyer.  That's -- that's

4    the reason that a --

5        Q    (indiscernible) sorry, I didn't mean to cut

6    you off.

7    A    That's the reason we put, I put in my

8    certification, when the first contact with Legacy was

9    because by that point, by May 2nd of 2023, late-April

10   when we had the first contact from anyone from Legacy.

11   By that point, we had been in the Talc Litigation for

12   ten years.

13       So we had gone through mediation, we had gone

14   through an estimation process, we had tried 12 cases.

15   We had extensive, extensive understanding of the -- you

16   know, the claims and the claims value.  We had

17   extensive understanding of J and J's approaches to the

18   litigation and their approaches to settlement.  We've

19   gone through one bankruptcy and we're in the middle of

20   a second.

21       Q    And so what you did is, you made clear that

22   you wanted to include Legacy in the upcoming mediation

23   that you anticipated to be part of the LTL-2

24   proceeding; correct?

25   A    We did want Legacy to be part of that mediation

1    because Legacy offered -- offered a path to give J and

2    J the finality that it had been telling us that it must

3    have and had been telling the Court that it could only

4    get through bankruptcy, which we knew not to be true.

5    Legacy provided a win-win.

6         Q    You didn't come out of that May 2nd, meeting

7    and tell Mr. Conlan to take a hike; right?

8    A    I did not.

9         Q    You told him you wanted him in the mediation;

10   right?

11   A    I don't know that coming out of that meeting -- I

12   mean, at some point, you know, there was a discussion

13   about Legacy being involved in the mediation process.

14   I can't say that it was the day after or right out of

15   that meeting or even at that meeting, I can't say.  But

16   we did -- we did want Legacy to be involved in the

17   mediation process.

18        Q    And in fact, I mean the Plaintiff Steering

19   Committee has filed a brief in the M.D.L., arguing, in

20   order to keep its communications with Mr. Conlan

21   confidential that, it made clear, counsel made clear,

22   that it wanted to include Mr. Conlan's company, Legacy;

23   right?

24   A    We did.

25        Q    Right and -- and as I said, you didn't tell

1    him after that meeting, you know, no, we're not

2    interested, we don't want to work with you guys; right?

3    A    We did not.

4         Q    You told him that you wanted him, that you

5    felt he had a role; right?

6    A    We considered -- we considered, you know, after

7    that meeting, that the Legacy option was still a viable

8    option.  It would give J and J what we understood J and

9    J to want and that was the finality.  They wanted the

10   Talc Liability off its books.  This was a way, a way,

11   that we could get there.  We were exploring multiple

12   paths to get reasonable values for our clients.

13        Q    And if you -- my question was I think a lot

14   simpler than that and a little different.  You felt

15   that Mr. Conlan and Legacy had a role to play in the

16   mediation; correct?

17   A    Yes, I thought that they had a role to play, as

18   presenting an option.

19        Q    Right and they were, as far as you were

20   concerned, authorized to play that role.  I mean, you

21   wanted them; right?

22   A    I did not -- I didn't ask that they be excluded

23   from the mediation, I did not.  I did want the -- the

24   mediators to -- you know, to hear from Legacy, I did.

25   I did that -- for me personally, and I was providing

A. Birchfield - Direct                      112

1    leadership.

2           Q    And they did what you wanted, Legacy did what

3    you wanted; right?

4           MR. POLLACK:  Objection.  When you say, "Did

5    what you wanted," can I have some clarification, Your

6    Honor?

7           THE COURT:  Well, did you understand the

8    question?

9           THE WITNESS:  No, I mean --

10          THE COURT:  Okay, the witnesses did not

11   understand the question.

12          MR. BRODY:  I would be happy to clarify, Your

13   Honor.

14   BY MR. BRODY:

15          Q    Legacy, you said that you wanted Legacy to

16   communicate with the mediators; right?

17   A    I did want Legacy to communicate with the

18   mediators.

19          Q    And they did what you wanted them to do;

20   right?

21   A    They did communicate with the mediators.

22          Q    Right, yes, they did what you wanted them to

23   do; right?

24          MR. POLLACK:  Objection -- is the doing what

25   you want them to do, the problem is, the mediators are

1   having a discussion.  So you're talking about a

2   discussion with a third-party.

3            THE COURT:  Mr. Birchfield answered the

4   question.  He said, they did what he wanted them to do.

5            MR. BRODY:  Fair enough, Your Honor.

6   BY MR. BRODY:

7       Q    Again, without telling Johnson and Johnson;

8   correct?

9       A    I did not -- I did not tell Johnson and Johnson.

10  I anticipated that Johnson and Johnson would engage in

11  the mediation, as Judge Kaplan ordered the parties to

12  do.  And that if the mediators -- if you viewed Legacy

13  as a viable option that, that would be part of the

14  mediation process in the next few days.

15       But J and J did not engage in the mediation

16  process but it wasn't that we were trying to keep that

17  from J and J.  I thought Legacy -- I thought Legacy's

18  involvement in the mediation would be front and center

19  with all of the parties.

20       Q    So the answer to my question is no, you

21  didn't disclose that to J and J.  You didn't disclose

22  the fact that you felt that Legacy had a role to play

23  in the mediation and you had authorized them to play

24  that role?

25       A    I did not.

A. Birchfield - Direct                          114

1       Q    Okay.  We talked about some of the documents

2   authored by Ms. O'Dell and by you, that you sent over

3   to Legacy, that appear on the privilege log.  Do you

4   know who -- you do know, I expect, who Nile Davies is?

5   A    I do.

6       Q    He is or was a Project Manager at Beasley

7   Allen last year during the course of the mediation;

8   correct?

9   A    Correct.

10      Q    And he also sent over various documents to

11  the mediators; right?

12  A    He sent some documents that were part of the

13  mediation process.  I don't know if he sent anything

14  directly to the mediators, I don't recall.

15      Q    All right, if you could take a look at the

16  privilege log, if you still have it up there with you.

17  I would like you to take a look at Document 315?

18  A    315, I'm sorry?

19      Q    Yes, 315, we'll just take a look at one of

20  them.

21  A    Okay.

22      Q    Are you there?

23  A    Yes.

24      Q    And you see that on May 12th, Mr. Davies sent

25  over and it carries over to the next page, "Draft

A. Birchfield - Direct                    115

1      Q.S.F. qualifications for the Legacy ovarian cancer

2      proposal," right?

3      A     Right.

4           Q    And you were providing information to Legacy

5      to work to develop that proposal with Legacy; correct?

6      A     No, that's not correct.

7           Q    All right.  You just randomly asked Mr.

8      Davies to send over information?  I mean, there must

9      have been a reason for it?

10     A     He sent the information but that was -- that was

11     based on qualifications, client qualifications that had

12     been -- you know, that had been developed before any

13     contact with Legacy.  So it was providing information,

14     it wasn't developing with Legacy, you know, the

15     criteria.

16          Q    Well, one of the things you did develop with

17     Legacy was a term sheet for the Legacy ovarian cancer

18     claim proposal; right?

19     A     No.

20          Q    All right, why don't you take a look at 381.

21     Tell me when you're there.

22     A     381, I'm there.

23          Q    That's a seven page document, you're the

24     author; correct?

25     A     Correct.

A. Birchfield - Direct                    116

1        Q    The date on that is May 12th, 2023; right?

2    A    Yes.

3        Q    And if you flip to the next page, that is a

4    draft term sheet for the Legacy ovarian cancer

5    proposal; correct?

6    A    Yes.

7        Q    By the way, that draft term sheet went back

8    and forth and back and forth numerous times; didn't it?

9    A    It went back and forth several times.  That was

10   not a --

11            MR. BRODY:  All right, if you take a look --

12   if you take a look --

13            MR. POLLACK:  Your Honor, could he please

14   finish answering the question?

15   BY MR. BRODY:

16       Q    Why don't we take a look at 103 and tell me

17   when you're there?

18   A    103, I'm there.

19       Q    And if you take a look at 103, this is

20   something that Mr. Conlan sent to Jonathan Terol

21   (phonetic) at K.C.I.C. and it's an e-mail from ovarian

22   cancer counsel, forwarding the draft term sheet and

23   protocol for ovarian cancer claims administration;

24   right?

25   A    Yes.

1      Q    And if we go forward in time, and there are a

2    lot of them so I don't want to stop on all of them but

3    why don't we take a look at 330.  Tell me when you're

4    there?

5    A    I'm there.

6      Q    And this is a document from you; right?

7    A    Yes.

8      Q    It's dated June 7th, 2023?

9    A    Yes.

10     Q    And if you would flip over to the next page.

11   This is an e-mail from ovarian cancer counsel, that's

12   you, ovarian cancer counsel; right?

13   A    Yes.

14     Q    To Legacy, attaching edits to proposed

15   ovarian cancer claims term sheet; correct?

16   A    Correct.

17     Q    And I don't want to go through every entry

18   but you'll agree that, that wasn't the only time that

19   drafts were going back and forth; was it?

20   A    There were -- you know, as I recall, there were a

21   couple of back and forth on the term sheets.  I mean,

22   one of the things that you see in the privilege log is

23   that, if there were e-mails that were the same e-mail,

24   different people, it's in here multiple times, it's the

25   same document.  But yes, there were e-mails back and

1    forth on the term sheet but that is not a term sheet

2    that was developed with Legacy.

3         So the Plaintiff's Leadership had developed a term

4    sheet.  We had a term sheet that we had all agreed on

5    in March, late March of 2023.  And that is -- that's

6    before the LTL-1 bankruptcy is officially dismissed and

7    the second bankruptcy is filed.  So we, as the Ovarian

8    Cancer Leadership Committee, had developed a -- we had

9    developed a term sheet with the terms and had offered

10   to provide that to J and J in an in-person meeting with

11   Mr. Haas and Liz Formernard (phonetic).

12        So we had offered to do that.  That's in late

13   March of 2023.  So that -- the term sheet, the term

14   sheet that is here, is not a term sheet that was

15   developed with Legacy.  It was already developed.  So

16   --

17        Q    Fair enough and so what was happening here

18   was, there are communications going back and forth

19   between you and Legacy, including Mr. Conlan,

20   exchanging edits to that term sheet; right?

21   A    The -- the back and forth with that term sheet was

22   with Scott Gilbert.  There weren't any changes to the

23   term sheet other than typos and grammatical issues.

24   Scott Gilbert is a stickler for that but the term sheet

25   was not developed.

1          It was a term sheet that we had already developed

2     as the Ovarian Cancer Committee.  We were providing it

3     to -- to Legacy and to K.C.I.C., so that they could --

4     so that they could test that with claimant data.

5          Q    So let me make sure I understand.  So you

6     wanted to get them the term sheet and in the process,

7     there was some back and forth.  You were fixing things,

8     you were making edits.  I imagine you're getting down

9     to a pretty granular level at that point; fair?

10    A    Granular level in grammatics and typos but the

11    term sheet was our term sheet and it's what we had --

12    what we had developed through -- you know, we had

13    developed through mediation in LTL-1.  We had

14    developed, you know, that in the wake of the Third

15    Circuit's -- the Third Circuit's dismissal order on

16    January the 30th.

17         We had been putting together proposals inside --

18    inside bankruptcy proposal, as well as outside options

19    at that point.  We had that term sheet together.

20         Q    And then all of that was shared with Legacy

21    for what you -- and I take it that the Plaintiff

22    Steering Committee was accurate in its description of

23    documents in the privilege log that it provided, in

24    order to assert privilege claims over documents that

25    had been identified by K.C.I.C., fair?

1    A    I would assume so.

2        Q    And so if the privilege log reflects that

3    those communications regarding the term sheet went back

4    and forth numerous times over a period of 21 days,

5    between May 18th and June 8th that, that would be

6    accurate; right?

7    A    I don't have any reason to doubt the accuracy of

8    the privilege log.

9        Q    Okay and then the reason that you were

10   engaged in this back and forth was so that Legacy could

11   see, okay, here's what we have developed, we the

12   plaintiffs in the Talc Litigation, counsel representing

13   plaintiffs in the Talc Litigations, here's what we have

14   developed.  And you said you -- Legacy could then sort

15   of test that against their claim values, was what you

16   said; right?

17   A    No.  I said that K.C.I.C., K.C.I.C., the claims

18   administrator, you know, entity that Legacy had brought

19   in to -- I don't know the official business

20   relationship but that K.C.I.C. could take -- could see

21   the claims criteria and they could process some claims

22   data to see, you know, if it works and how efficient it

23   would be.

24        That is -- that's part of the process with any

25   claims administration group that you're going to be

A. Birchfield - Direct                     121

1    utilizing in a mass tort settlement.  So you know, that

2    was the -- that was the purpose of providing them with

3    the term sheet, which included the claims criteria --

4         Q    And it wasn't just K.C.I.C., it was also

5    Legacy that was sending drafts back and forth; wasn't

6    it?

7    A    That Legacy was sending drafts back and forth --

8         Q    Legacy was commenting on the draft term

9    sheet?

10   A    Yes, grammatical-type stuff, that's what I'm --

11        Q    Well, it was -- it was deeper than

12   grammatical.  It wasn't just, oh here's -- three weeks

13   later we found another typo, without revealing any of

14   the substance, it went deeper than just, there should

15   be a semi-colon here; right?

16   A    I do not recall a single substantive change that

17   was made by Legacy to, you know, to the term sheet that

18   we had, that we had proposed.

19        Q    So you went back and forth over the course of

20   three weeks on typos, that's your grammatical issues?

21   A    I think that's an unfair characterization because

22   you know, in the -- we could go back and forth in two

23   hours and have really serious substantive discussions.

24   But you can go over a period of three weeks and not

25   have any substantive changes.  It's just a matter of

A. Birchfield - Direct                    122

1    timing.

2         The details, the substantive details of this term

3    sheet, had been developed by us.  You know, similar

4    term sheets had been shared, you know, through the

5    mediation process with J and J.  There were not

6    substantive issues to be dealt with, with Legacy.

7         Q    So Legacy was reviewing -- I'm just trying to

8    bring this to a close.  You guys developed a term

9    sheet, you share it with Legacy; right?

10   A    We did.

11        Q    And you say to Legacy, do you think this is

12   going to -- well actually, I'm not even going to ask

13   because there's a mediation privilege claim.  So I was

14   going to ask you about what you said to Legacy about

15   the term sheet but I'm not going to ask at this point

16   because I don't want to invade the mediation privilege

17   that's been asserted.

18        Let me ask you this.  In addition to exchanging

19   drafts of the term sheet, in addition to providing the

20   work product that you identified earlier, you also had

21   Zoom meetings to go over proposed claims administration

22   processes, right, without disclosing the substances of

23   the processes?

24   A    We did, that's part of what I just described.

25   With K.C.I.C., processing claims data.

1      Q    You had additional meetings, in-person

2   meetings, after May 2nd of last year; right?

3   A    We did.

4      Q    And you discussed term sheet issues; right?

5   A    No, no, I don't recall ever discussing any term

6   sheet issues with anyone other than Scott Gilbert, back

7   on the grammar and style issues.  I mean, we discussed

8   it, we discussed it in the essence of, you know, being

9   able to describe for them and for K.C.I.C. how it would

10  work, what would be -- you know, what would be valid

11  claims, what would be excluded claims, what would be

12  the medical records that would be necessary to identify

13  those claims.

14     Q    And so what you were doing was, you were

15  engaging in close collaboration and strategy

16  communications regarding how to consider, conduct,

17  participate in, initiate and or continue to mediate

18  with J and J regarding this proposal; right?

19           MR. POLLACK:  Objection to collaboration, I'm

20  not sure what that means but --

21           THE COURT:  Do you understand the question,

22  Mr. Birchfield?

23           THE WITNESS:  I mean, I don't know what he

24  means by collaboration --

25           THE COURT:  Can you rephrase the question?

A. Birchfield - Direct                    124

1    BY MR. BRODY:

2         Q    Well let me ask you this.  You're aware that

3    while plaintiffs in this litigation may have decided --

4    you know, may have asserted mediation privilege and so

5    these documents are not available, they've been kept

6    confidential from Johnson and Johnson.  You understand

7    that Judge Snyder reviewed the documents in-camera;

8    correct?

9    A    I do.

10        Q    And you understand that after his in-camera

11   review, Judge Snyder found that the documents include

12   close collaboration and strategy communications

13   regarding how to consider, conduct, participate in,

14   initiate and or continue to mediate with J and J

15   regarding Plaintiff's proposal to resolve the talc

16   cases; right?

17   A    Am I aware that he made that finding; is that what

18   you're asking me?

19        Q    Yes.

20   A    Yes.

21        Q    He didn't get it wrong; did he?

22   A    Well, I think that you could describe that as

23   collaboration.

24        Q    All right, thank you, that's fine.  He also

25   found --

1    A    In the sense that we may collaborate on --

2              MR. BRODY:  I'm sorry, you've answered, Mr.

3    Birchfield and I'm -- this is --

4              MR. POLLACK:  Actually, the question was

5    whether he thought Judge Snyder had it right and Mr.

6    Brody is again cutting him off.  So to me, the question

7    is, on that phrase, there was a whole bunch of phrases

8    in there; does Judge Snyder have it right?

9              MR. BRODY:  Well, let me ask this question --

10             THE COURT:  You're asking for his opinion,

11   you're asking for Mr. Birchfield's opinion?

12             MR. BRODY:  Let me ask this question.

13             THE COURT:  Okay.

14             MR. BRODY:  Because I, Judge Porto, I believe

15   I got an answer.

16   BY MR. BRODY:

17       Q    So he found that there were regular

18   communications with Birchfield.  That's you, right?

19   A    Yes.

20       Q    And other counsel for plaintiffs regarding

21   the foregoing matters, including when and how to

22   present the settlement proposal to J and J in the

23   context of mediation; correct?

24   A    He did.

25       Q    He also found that the communications

A. Birchfield - Direct                    126

1    included consideration of what mediator to use and he

2    found that it included the role to be played by the

3    mediator in the discussions; right?

4    A    Yes, he made that finding.

5         Q    In other words, the dynamics of the

6    mediation; fair?

7    A    He did make that finding.

8         Q    Your communication and -- and you agree with

9    me, that's sort of a mediation dynamics issue; isn't

10   it?

11   A    About which mediator --

12        Q    Which mediator to use and when?

13   A    I don't recall -- I don't recall any of that, you

14   know, taking place here.  Judge Kaplan -- Judge Kaplan

15   appointed -- he entered an order appointing the

16   mediators.  That's -- that's who was used, I don't

17   recall anything -- I don't recall any discussions

18   beyond that.

19        Q    You understand that none of the mediators

20   were aware that Mr. Conlan previously worked for

21   Johnson and Johnson as outside counsel on the talc

22   matters; right?

23   A    I saw their answers to the interrogatories or --

24        Q    So that's a yes, you're aware of that;

25   correct?

A. Birchfield - Direct                  127

1    A    I am aware of that, yeah.

2         Q    All right.  Your communications with Mr.

3    Conlan did not end when the second L.T.L. bankruptcy

4    was dismissed; did they?

5    A    They did not.

6         Q    And you continued to discuss the Legacy

7    proposal with Mr. Conlan and others at Legacy; correct?

8    A    We discussed a proposal, I mean, in a sense that

9    we had -- we had -- we had worked through the Legacy

10   approach, the structural optimization and

11   disaffiliation.  We had provided, you know, Legacy with

12   a term sheet, including a matrix that we would support.

13   So that was in place.

14        So yes, I did have a follow-up conversation with

15   Mr. Conlan, as he testified today.  I mean, would I be

16   willing to -- would I be willing to meet with J and J

17   executives, Mr. Haas, to walk through the grid and how,

18   you know, I believe that would be received by

19   plaintiffs across the county and how I believe that it

20   would garner the 95 percent voluntary opt-in, out.

21        We did have discussions.  Mr. Conlan and I did

22   have discussions about, would you still support, you

23   know, this term sheet with this matrix?  Would you be

24   willing to meet with J and J executives.  So yes, we

25   did have conversations.

1      Q    So you sat down and you talked about the

2   matrix, you talked about some of the things that you

3   had laid out with ovarian cancer counsel in the work

4   product documents we saw.  I mean, that's sort of the

5   nuts and bolts of the matrixes.  Assessment of claim

6   values, injuries, damages analysis.  That all gets

7   wrapped up in there; doesn't it?

8            MR. POLLACK:  Objection, compound.  If we

9   could break that down, that would be helpful.

10           THE COURT:  We're coming close to 4:30, so.

11  BY MR. BRODY:

12     Q    My question, Mr. Birchfield, is simply, all

13  those factors get wrapped up into a claims matrix;

14  right?

15           MR. POLLACK:  Objection to the word work

16  product in the last question, since he's not going to

17  rephrase.

18           MR. BRODY:  I think I just did rephrase.

19           MR. POLLACK:  No, you said all those factors,

20  which would include work product, which is the one I'm

21  objecting to.  That's why I was asking for

22  clarification.

23           MR. BRODY:  Assessment of claim -- let me ask

24  it this way, I'm happy to rephrase, Your Honor.

25  BY MR. BRODY:

A. Birchfield - Direct                    129

1        Q    Assessments of claim values, damages

2    analysis, injuries.  All of that gets wrapped up into a

3    claims matrix; doesn't it?

4    A    I mean, a claims matric would include, it would

5    include settlement values, so the value of the claims

6    in the settlement context.  It would include the -- an

7    analysis of the injuries.  What injuries are going to

8    be included or not.  It would include the assessment of

9    risk factors and should there be reductions or

10   deductions for risk factors and if so, to what degree.

11   All of those factors and others are included in -- you

12   include in a matrix.

13       Q    Right and the discussions that you were

14   having with Mr. Conlan included discussions of, you

15   know, why do you think that we could get a 95 percent

16   opt-in to this kind of settlement matrix; right?

17   A    No.

18       Q    All right, you just -- so let me ask it this

19   way.  I mean, you just said and correct me if I'm

20   wrong, you just said that after the bankruptcy ended,

21   you and Mr. Conlan talked about, well, what kind of

22   support are we going to get for this proposal; right?

23   A    No, I mean, not after the -- you know, we had this

24   discussion early on in the interaction, in the

25   mediation process.  When we laid out our term sheet in

1    our matrix, we told -- we told Legacy, I'm sure we told

2    the mediators, that we would -- we're confident that we

3    would garner 95 percent participation, voluntary

4    participation in an opt-out, opt-in settlement program.

5    So we had those -- we had those discussions.  That's

6    not something that I discussed, you know, with Mr.

7    Conlan.

8             MR. BRODY:  Your Honor, we are at 4:30.

9             THE COURT:  Do you need more time?  How much

10   more time do you need, Mr. Brody?

11            MR. BRODY:  I probably have 30 minutes.

12            THE COURT:  Okay and we're not going to

13   continue today, we're going to have to look at another

14   day.  And obviously, I don't want to look to you, Mr.

15   Pollack, and say you have to get things done in seven

16   minutes.  So I think that's fair for you, after 30 more

17   minutes of Mr. Brody, for whatever examination time

18   that you need.

19            MR. POLLACK:  I promise you, I need one-tenth

20   of what he's using.

21            THE COURT:  Well, I'm not going to hold you

22   to it.

23            MR. POLLACK:  Okay.

24            THE COURT:  So we're going to adjourn today,

25   we're going to look at our calendars one more time.

Colloquy                                               131

1    Perhaps 30 minutes, more or less, perhaps ten minutes,

2    I don't know, Mr. Pollack but when we come back, we'll

3    do that.  So let's all look at our calendars one more

4    time, we'll do what we did before, we'll send an e-mail

5    out, all right?

6                    MR. POLLACK:  And tomorrow does not work, I

7    assume?  The Court --

8                    THE COURT:  Tomorrow doesn't work, no.

9                    MR. POLLACK:  Okay, thank you, sir.

10                   THE COURT:  What we're also looking at

11   anticipating is written closings.  Is that what counsel

12   was looking at, revision, getting the transcripts and

13   then providing written closings to the Court?

14                   MR. BRODY:  We can do that.  Judge Singh had

15   entered an order requesting simultaneous submission of

16   briefs from each side, two weeks after the conclusion

17   of the hearing and then replies a week after that.

18                   THE COURT:  Fair, yeah.  I think that's a

19   good time period, assuming we get the transcript in

20   that time period.

21                   JUDGE SINGH:  Yep.

22                   MR. BRODY:  Okay, we were also prepared, Your

23   Honor -- I know that, Judge Porto, you had asked for us

24   to just close and present --

25                   THE COURT:  Well, I thought so too but maybe,

1    you know, in terms of getting a full aspect, whatever

2    closings are necessary.  Judge Singh and I were

3    conferring today about that.

4                MR. POLLACK:  Can we do something unique

5    since I've been doing this for 35 years now?  Can we

6    file with both courts the same brief, at the same time?

7                THE COURT:  Yes, that's exactly --

8                MR. POLLACK:  That would be kind of fun,

9    right?

10                THE COURT:  Yes, that's exactly what we

11    anticipated.

12                MR. POLLACK:  Excellent.

13                JUDGE SINGH:  And one cleanup for our docket

14    (indiscernible) I can't quite recall.  If the

15    transcripts from these proceedings are not being filed

16    on the docket, please ensure that they are filed on my

17    docket so that the record is complete.

18                MR. POLLACK:  Absolutely.

19                JUDGE SINGH:  Thank you.

20                THE COURT:  All right, everyone?

21                MR. POLLACK:  Thank you, Your Honor.

22                THE COURT:  Thanks so much, take care.

23                UNIDENTIFIED MALE:  Thank you, Your Honor.

24                THE COURT:  Court adjourned, we can go off

25    the record.

Certification                                              133

1                  (Proceeding concluded at 4:31 p.m.)

2                              * * * * *

3

4

5

6                            <u>CERTIFICATION</u>

7          I, Melissa Ulrich, the assigned transcriber, do

8     hereby certify the foregoing transcript of proceedings

9     on CourtSmart, timestamp from <u>01:36:22</u> to <u>04:31:32</u>

10    p.m., is prepared to the best of my ability and in full

11    compliance with the current Transcript Format for

12    Judicial Proceedings and is a true and accurate non-

13    compressed transcript of the proceedings, as recorded.

14

15    ___*/s/* Melissa Ulrich___          ___AD/T 658___

16          Melissa Ulrich                 AOC Number

17

18    ___Phoenix Transcription LLC___      ___04/23/2024___

19          Agency Name                    Date