```
                            SUPERIOR COURT OF NEW JERSEY
                            LAW DIVISION: CIVIL PART
                            ATLANTIC COUNTY
                            DOCKET NO.: ATL-L-2648-15
                            A.D. # _____

                         )
IN RE: JOHNSON AND JOHNSON)          TRANSCRIPT
TALCUM-BASED POWDER       )              OF
PRODUCTS LITIGATION       )            MOTION
                         )

                         Place: Atlantic County Civil Crt.
                                1201 Bacharach Blvd.
                                Atlantic City, NJ 08401

                         Date: May 3, 2024

BEFORE:

     HONORABLE JOHN C. PORTO, J.S.C. AND
     RUKHSANAH L. SINGH, U.S.M.J.

TRANSCRIPT ORDERED BY:

     JEFFREY M. POLLOCK, ESQ., (Fox Rothschild, L.L.P.)

APPEARANCES:

     JEFFREY M. POLLOCK, ESQ., AND
     AUSTIN W.B. HILTON, ESQ., (Fox Rothschild, L.L.P.)
     Attorneys for Plaintiff

     STEPHEN D. BRODY, ESQ., (O'Melveny & Myers,
     L.L.P.)
     Attorney for J&J and L.T.L. Mngt.

     ERIK HAAS, ESQ., (Johnson & Johnson W.W.V.P.L.)
     In-House Attorney for Johnson & Johnson


                         Transcriber:  Nitsa Carrozza
                         PHOENIX TRANSCRIPTION
                         796 Macopin Road
                         West Milford, NJ 07480
                         (862) 248-0670

                         Audio Recorded
                         Recording Opr: Kavonna Smith
```

I N D E X

                                                        PAGE
Colloquy/Housekeeping.....................3,75,119,132

MOTION TO DISQUALIFY:

WITNESSES FOR           DIRECT    CROSS    REDIRECT    RECROSS
THE DEFENDANT:
A. Birchfield                     20       77,129      121
by the Court            66,94


EXHIBIT:                          Ident.    Evid.
Hearing Ex 4 E-mail               41
Hearing Ex 7 Letter               44
Hearing Ex 15 Press release       48
Plenary Ex 56, Ex 5 Transcript    110
JJ-1 Privilege log                128
JJ-1-A Excerpt                    128
JJ-1-B Excerpt                    128
P-3 Unknown doc.                  132

 1              (Proceeding commenced at 9:38:36 a.m.)

 2              COURT OFFICER:  All rise for Judge Rukhsanah

 3    Singh and John Porto.

 4              THE COURT:  Thank you, good morning,

 5    everyone, please be seated.  Very nice to see everyone.

 6    This is In Re: Johnson and Johnson Talc-Based Product

 7    Litigation, docket number ATL-L-2648-15 and M.D.L. case

 8    2738, M.C.L. case 300.  May I have the appearance of

 9    counsel?  We'll start with Mr. Pollock.

10              MR. POLLACK:  Good morning, Your Honor, how

11    are you?

12              THE COURT:  Fine, thank you, good to see you.

13              MR. POLLACK:  Here on behalf of Mr.

14    Birchfield and the Beasley Allen Law Firm and I'm

15    joined with my Associate, Austin Hilton.

16              THE COURT:  Thank you, good morning, everyone

17    and Mr. Brody?

18              MR. BRODY:  Good morning, Your Honor, Steve

19    Brody from O'Melveny and Meyers, for Johnson and

20    Johnson and L.T.L. Management, L.L.C.

21              THE COURT:  Thank you, good morning to you.

22    Mr. Haas?

23              MR. HAAS:  Good morning, Your Honor, it's

24    Erik Haas on behalf of Johnson and Johnson.

25              THE COURT:  Thank you, good morning to you.

1    We've been together so many times.  We have a

2    continuation of your client's testimony, Mr. Pollock.

3    We've got the correspondence, we got the attorney's

4    eyes only material and anything to address before we go

5    forward with the testimony?

6              MR. POLLACK:   I think there's two preliminary

7    matters and if the Court, Courts, the Courts can run

8    this any way they want.  One is the admission of P-5.

9    P-5 was the document that was the response from Mr.

10   Conlon.

11             The issue that we tried to work it out as

12   counsel, we could not.  Opposing Counsel is objecting

13   to the statement by Mr. Conlon he did not recommend.

14   There was testimony on this point.  I submitted a

15   correspondence.  At some point, we need to address that

16   issue but it doesn't need to be addressed now.  If you

17   want to, we can but it's completely up to you and my

18   Opposing Counsel.

19             The second one is the belated submission of

20   time sheets in a redacted format.  And I don't know

21   whether you want to hear oral argument on this now or

22   if you want formal submissions but I object to it.  I

23   object to it because I asked for it prior to these

24   hearings.  I objected to it because UNA says that you

25   can produce it in-camera but it didn't say you can

1    produce it in-camera after three key witnesses have

2    taken the stand and left.

3             And in particular, Mr. Conlon, who they're

4    attacking.  They've had these documents, they've

5    prepared an Excel sheet.  So if you want me to, I can

6    prepare a formal response but I understand that the

7    Court did invite submission of these documents and I've

8    read the transcript and I'm sure you know what you said

9    but to me, this is completely violative of due process

10   as far as Mr. Conlon's rights.

11            And I don't represent him but the fact is, by

12   implication if you will, they're saying the two of us

13   are hooked together.  So I would like to know, does the

14   Court want oral argument right now, does it want to

15   have briefing later on?  How would Your Honors like to

16   proceed?  Because I do object to their admission.

17            THE COURT:  Let's hear from Mr. Brody first

18   and then what we can do is, I'm not so sure about oral

19   argument right now, maybe let's start with the

20   testimony.  Judge Singh and I will confer after we hear

21   from Counsel and then we will render our thoughts and

22   decision on that issue, okay?  Mr. Brody?

23            MR. BRODY:  Certainly, Your Honor and as Your

24   Honors are aware, after the lunch break on April 10th,

25   the Court indicated that Johnson and Johnson would be

1    entitled to make an in-camera, attorney's eyes only

2    submission, with redactions where we felt redactions

3    needed to be made in order to maintain privilege.

4            Really, as impeachment of instances where Mr.

5    Conlon testified to things that are flatly contradicted

6    by the record of what he did as J and J's Counsel, J

7    and J's Outside Counsel on Talc Litigation, on these

8    very matters, over the course of the 20 months where he

9    represented the company.  And so that's what we did.  I

10   think that -- I don't think there's an objection to the

11   submission of impeachment evidence, that would be

12   proper.

13           I do think that if Mr. Pollack wants to, in

14   the briefing that Your Honors have indicated you wish

15   to receive from the parties after the conclusion of

16   this hearing, if he wants to argue as to how that

17   should or should not be considered by the Court and the

18   weight that it should be given as impeachment, he's

19   certainly entitled to do that and the briefing will

20   give him the opportunity to do that.

21           And the Court then will have an opportunity

22   to decide how, based on the briefing, it wants to

23   consider those materials and the extent to which it

24   believes that those materials are material to its

25   evaluation on Mr. Conlon's credibility and his

1       testimony overall.

2               THE COURT:  Well, our record is not closed.

3       There has not been any decision on closing the record.

4       So you know, keeping in mind, you know, we also have a

5       confrontation issue, right, with regard to certain

6       material.  And I'm going to suggest to you that Judge

7       Singh and I, you know, perhaps anticipated this

8       argument that, you know, maybe there's another way to

9       address this, Mr. Brody and Mr. Pollock.  So let's

10      start with the testimony, Judge Singh and I will confer

11      and we'll address counsel, all right?

12              MR. BRODY:  Thank you.

13              MR. POLLACK:  Understood.

14              THE COURT:  So all right.  With the testimony

15      today of Mr. Birchfield, can you give us at least an

16      understanding or a head's up with regard to time frame?

17      This is continuation, candidly, of Mr. Birchfield's

18      testimony.  Do you think we're going to be all day?

19              MR. BRODY:  No, I don't think we're going to

20      be all day and I was looking back at the transcript

21      from April 10th and I saw that I told the Court at 4:30

22      p.m. that day that I thought I had 30 minutes left.  It

23      might be 40 but I'm going to try to hold close to what

24      I said on the 10th.

25              THE COURT:  That just gives us an idea about,

1    you know, where our day is, okay.

2                MR. BRODY:  And obviously, how long we're

3    here then will depend on what Mr. Pollack raises with

4    Mr. Birchfield and any redirect that I may have.

5                THE COURT:  Thank you, Mr. Brody.  Mr.

6    Pollack, any thoughts?  You know, we don't have a

7    stopwatch on everybody.

8                MR. POLLACK:  I know and I --

9                THE COURT:  But just to give us an idea.

10                MR. POLLACK:  I balance the fact that I

11    respect both judges have been patient and you've

12    committed the time to this hearing.  I do thank you for

13    that.  I understand you also want to get this job done

14    and I respect that too.  It did not miss me that

15    yesterday, Mr. Haas went out on national press on the

16    news and attacked Mr. Birchfield and his firm on the

17    same theme he's attacking him here today, that this is

18    self-interest, that this is just a big pay-day for

19    Beasley Allen, et cetera.

20                I'm also very mindful that with regard to the

21    -- one of the things they're directly attacking is

22    whether Beasley Allen should maintain its position on

23    the Talc Claimants Committee and should it be involved

24    in the future?  I have to take this job seriously

25    because I respect and I know the Beasley Allen Firm is

1    committed to what it's doing.

2           I have to allay any concerns you have that,

3    that firm is not out there for a pay-day, they are out

4    there to protect their clients.  Mr. Birchfield will

5    explain that on the stand and respectfully, it takes

6    whatever time it takes.  I'll do it as quickly as I can

7    but obviously, we were very patient with Mr. Haas, who

8    talked at nauseam in narrative.

9           And I therefore, I don't want to waste your

10   time but I also -- I can't commit to a specific time

11   frame.  I'll do it as quickly and as efficiently as I

12   can but as you both understand, this is a very serious

13   matter for a firm that is completely committed to its

14   clients.  I have to protect them.

15          THE COURT:  This Court, I didn't see any

16   comments and you know, I'll have Judge Singh address it

17   too.  This Court has no position with regard to Mr.

18   Birchfield or J and J.  It's the decision here with

19   regard to this decision is going to be based upon the

20   facts and the facts only.  Whatever is going on in the

21   litigation and whatever the comments are pro or against

22   any of the firms have no bearing, Mr. Pollock and Mr.

23   Brody, on this Court's decision, on this particular

24   issue or even going forward, should we have any

25   substantive issues.

1          We have trial coming up in September,

2     although it's not with Beasley Allen but under no

3     circumstances have I heard or thought anything that

4     would cause this Court to recuse itself or to issue an

5     adverse decision relating to either J and J or Beasley

6     Allen.

7          MR. POLLACK:  Right so just -- look, you both

8     have been living with me for a long time now, I'm

9     pretty straight to the point.  The real question is

10    1.6, you and I talked about that.  Was there a

11    disclosure?  There's been zero evidence of a

12    disclosure, none.  There's been not even one proffer

13    that there's a disclosure.

14         So my firm belief is, the real reason that J

15    and J is pursuing this nonsense is that they believe

16    that they can attack, in the news, in the press, every

17    place in the world, and especially before the Federal

18    Court and perhaps in the State Court, they can attack

19    the Beasley Allen Firm and say, this firm has got to

20    go, it's a problem child, it shouldn't be here.  And

21    that is absolutely crystal clear to me, that's what's

22    going on.

23         So I do understand that's not the decision

24    you're making here today, Judge Porto.  You're here to

25    decide whether a motion to disqualify should be granted

1    but you're also both smart enough to know this case has

2    a life and the fact is, Mr. Murdica is out there

3    beating the van, trying to collect plaintiffs' lawyers,

4    so that Mr. Haas can get to his 70 or 75 percent of

5    people, which he has announced in the national press

6    yesterday.

7              They're playing this whole process for time.

8    So I do agree that we're here on a very specific little

9    matter and frankly, shouldn't be here in my humble view

10   but I also am quite aware that there is a broader

11   spectrum and that is why I have to go into some detail

12   with regard to the commitment that the Beasley Allen

13   Firm has, the fact that it did not need any information

14   whatsoever from Jim Conlon because they knew far more

15   than Jim Conlon would ever have known regarding any of

16   these matters.  I have to be able to develop that

17   theme.

18              THE COURT:  Okay and Judge Singh?

19              JUDGE SINGH:  No, I would like to comment.  I

20   do appreciate the concerns.  It is panly evident that

21   there are things going on between the parties and the

22   media.  That is not what is before the Court, I echo

23   Judge Porto's comments in that regard.  What is before

24   the Court is, at least in the M.D.L. motion, the

25   request for the entry of an order to show cause as to

1    the disqualification.

2            We are here to hear the evidence.  Although

3    we are asking in terms of managing our expectations for

4    today's time frame --

5            MR. POLLACK:  Yep.

6            JUDGE SINGH:  I don't believe Judge Porto or

7    I have any intent on limiting the testimony without

8    actually hearing what will be presented on the front

9    end, as to what Mr. Birchfield intends to testify in

10   response to your examination.  But I would like to take

11   the opportunity to again remind the parties that we are

12   here to determine this particular issue based off of

13   the record presented.  Not only the declarations and

14   certifications previously submitted but also, the hours

15   of testimony that both Judge Porto and I have had the

16   opportunity to hear.  So thank you, Judge Porto.

17           MR. POLLACK:  Thank you.

18           THE COURT:  You're welcome, Judge Singh.

19           MR. POLLACK:  And if I may briefly just

20   respond on behalf of Johnson and Johnson and Mr. Haas.

21   Mr. Haas -- and first of all, I think that the events

22   of this week, frankly, are relevant to the

23   disqualification issue that is before the Court because

24   they speak to the ongoing prejudice to Johnson and

25   Johnson of having Beasley Allen and Mr. Birchfield and

 1       Ms. O'Dell both representing plaintiffs in the

 2       litigation, in the M.D.L., in the M.C.L., on a going

 3       forward basis, as evidenced by the events this week,

 4       where Johnson and Johnson announced a proposed plan

 5       that would resolve these cases.

 6              It was immediately criticized in the press by

 7       Mr. Birchfield, by Ms. O'Dell, by the Beasley Allen

 8       Firm, I mean within an hour or so of when it was

 9       announced.  And Mr. Haas responded to the statements

10       that were made first by Mr. Birchfield.  And so it's --

11       but as a whole, it is something that we will likely get

12       into to a degree today because it is directly relevant

13       to how the parties are positioned, where Beasley Allen

14       and Mr. Birchfield are positioned with the benefit of

15       their relationship that they have, as Judge Snyder

16       referred to it, the collaboration, with Mr. Conlon,

17       over a long period of time, unbeknownst to Johnson and

18       Johnson last year and it creates what is not just a 1.6

19       issue.

20              And I understand why Mr. Pollack repeatedly

21       refers to this as a narrow 1.6 issue but it's a 1.9

22       issue, it's a Rule 5.3 issue, it's a Rule 8.4 issue.

23       It is much broader than whatever Mr. Pollack wants to

24       put it but all of this, including the events of this

25       week, are relevant to that question and to the Court's

1    evaluation of what is the right answer going forward

2    and what has to happen here.

3              MR. POLLACK:  May I respond, Your Honor?

4              THE COURT:  Sure but let's keep in mind, this

5    Court, you know, we live in the world, these courts,

6    live in the real world.  We understand what is going on

7    and we can focus on what is at issue here and I can

8    assure you, whatever is out there, is not going to

9    infect this Court's decision with regard to the

10   underlying issue of disqualification.

11             MR. POLLACK:  I understand, Your Honor and

12   I'm not arguing with you, I'm not quiveling at all.

13   The only point I would make on that is that, what you

14   say and how you say it is going to have ramifications

15   and reverberations down the road, right?  Because the

16   fact is, this transcript, these hearings, these

17   discussions, I promise you, Mr. Birchfield and his firm

18   will be seeing it for years and Mr. Haas and Mr. Brody

19   or someone else will be using it as a lever for years

20   to come.  So how we articulate it is going to be

21   important.

22             I would like to step back for one second.

23   When we first talked years ago, it was literally last

24   year.  We were talking about Trupos, we were talking

25   about UNA Builders, et cetera and when I spent, I don't

1    know, 20 years, 15 years, on the Ethics Committee,

2    another ten on the Character and Fitness Committee.

3            When someone is being attacked or someone is

4    being accused of an ethical violation, it usually is

5    referred to the Ethics Committee.  That's what those

6    people do, that's what I did for years.  And typically,

7    the person who is being accused or being challenged or

8    being -- or is being attacked, is told exactly what it

9    is they allege to have done.

10           They're told with precision, this is the

11   client fund you should not have taken, this was the

12   alcoholism and drugs which unfortunately is about half

13   the matters we deal with.  It was a specific allegation

14   of negligence and miscarriage or something along those

15   lines.

16           In this case, it has been a constant

17   morphing.  Mr. Brody's first oral argument before you,

18   Judge Porto, was there is no ethical violation, no

19   R.P.C. on point we can find, none.  Judge Singh, you

20   asked the question pointedly; do I need to find an

21   R.P.C. violation to disqualify?  The answer from Mr.

22   Brody, no.

23           He and I disagree vehemently on this point

24   and by the way, I think the Supreme Court of New Jersey

25   is squarely in my corner on this one.  Once you got rid

1    of the appearance of impropriety, which they did in

2    1984 under the following condition --

3              THE COURT:   '93?

4              MR. POLLACK:   I'm sorry, '93, I apologize.

5    Once they came out with that one, at that point, the

6    reality is that, we shouldn't be here.   Because I

7    understand you want to do a credibility determination.

8    If that's what we're focused on, then the credibility

9    can be determined by, is Andy an honest guy, was Andy's

10   firm committed to his clients, you know, why are they

11   opposing the bankruptcy if you want to.

12             You can get into all those issues but what

13   Mr. Brody is now saying is; let's just try all the

14   issues right here.   I'm ready to do it.   If that's what

15   we want to do, I'm ready to do it and we will proceed

16   but I just think that, the reason the Supreme Court

17   said you should decide it on the papers, unless -- and

18   you grabbed onto this, Judge Porto.   I'm not

19   criticizing you but you appropriately said; hey, I have

20   some issues, I want to look at credibility.   It's not

21   supposed to be a free-for-all.

22             Now I'm looking at RPC 1.6, sharing of

23   confidential information.   Somehow, I'm now looking at

24   1.9, 1.10.   I have other rules that I haven't even

25   looked at yet that Mr. Brody is now articulating.   I've

1    never, in my 35 years of practice, seen an ethics

2    matter, which this is becoming, alleged where someone

3    is not told; this is what you're accused of doing and

4    that is a real problem here.

5           So I -- if we want to have the scope be

6    broad, Mr. Brody is arguing that this week's

7    discussions show that, you know, that Mr. Haas is a

8    great guy and Beasley Allen is a bad guy.  How is that

9    conceivably relevant in any way to the question of

10   whether Mr. Conlon shared confidential information with

11   my client?  Isn't that the issue we're here before?

12          THE COURT:  That's what Judge Singh and I

13   believe the issue is, that's.

14          MR. POLLACK:  To me but we've -- if we go

15   miles and miles beyond that, it had ramifications --

16          THE COURT:  I haven't seen it go that far and

17   I don't think Judge Singh has either.

18          MR. POLLACK:  Well, he just argued he wants

19   to do it and I'm concerned.

20          THE COURT:  Well, I didn't hear that yet but

21   you know, squarely is; did Mr. Conlon share

22   confidential information with Beasley Allen?  You know,

23   if I were to write a decision today, I would say, the

24   issue before this Court is; did Mr. Conlon share

25   confidential Johnson and Johnson information with

1    Beasley Allen.

2              MR. POLLACK:  I'm with you.

3              THE COURT:  And I will then start with the,

4    as we did in law school, rules, analysis, conclusion.

5              MR. POLLACK:  Yep.

6              THE COURT:  Credibility, based on the seven

7    factors that are found candidly in our evidence rules,

8    consistency, et cetera, does it make sense?  And

9    understandably, I was also thinking about this on my

10   way in is, you have the charge where it's false in one,

11   false in all.  You know, does that come into play with

12   regard to credibility?  So I think, and I'll turn the

13   dias, the bench over to Judge Singh, but that's the

14   issue that we're here for.

15             MR. POLLACK:  I'm with you.

16             THE COURT:  That's it, Judge Singh?

17             JUDGE SINGH:  I don't disagree and you are

18   all familiar with Federal Court standards for motions

19   for disqualification written, as well.  So we are

20   looking at the same issue and the ramifications

21   thereof.

22             MR. BRODY:  Absolutely and the questioning

23   that I -- the 30, 40 minutes that I have, is focused on

24   wrapping up the rest of that and hopefully, giving the

25   Court what it needs in order to evaluate the questions

Colloquy                                    19

1    that it's going to have to evaluate here.

2              It's -- you know, certainly, this is not an

3    appearance of impropriety case, this is a case of

4    actual impropriety and we are looking forward, based on

5    the record that's been developed, to setting that out

6    in the briefing that the Court has asked for and

7    explaining precisely why it is that you have actual

8    impropriety, you have actual violations of the ethical

9    rules and why it is that disqualification is required

10   here.

11             MR. POLLACK:  Thank you, Your Honor.

12             THE COURT:  All right, thank you.  Mr.

13   Birchfield, we're going to administer the oath one more

14   time today, May 3rd, 2024.  Mr. Birchfield, please

15   raise your right hand, tell us your name and spell your

16   last name, sir?

17             A. BIRCHFIELD:  Andy Birchfield, B-I-R-C-H-F-

18   I-E-L-D.

19   A N D Y   B I R C H F I E L D, DEFENDANT WITNESS, SWORN

20             THE COURT:  Thank you, you may be seated, Mr.

21   Birchfield.  Mr. Brody?

22             MR. BRODY:  Yes, good morning, Mr.

23   Birchfield.

24             THE WITNESS:  Good morning.

25

A. Birchfield - Cross                    20

1   CROSS EXAMINATION BY MR. BRODY:

2        Q    Do you recall providing testimony on April

3   10th about a draft term sheet that was exchanged

4   between your firm and Legacy?

5   A    Yes.

6        Q    All right and we had looked at, we had given

7   you a copy of the full privilege log that was prepared

8   by the Plaintiff Steering Committee, asserting

9   mediation privilege over documents that we had

10  subpoenaed from K.C.I.C., do you recall that?

11  A    Yes.

12           MR. BRODY:  All right.  I've prepared and if

13  I may approach, an excerpt of that to make it a littler

14  easier to talk about the term sheet.  I'm happy to give

15  you the full privilege log, as well.  I see you didn't

16  bring another copy of it up with you but I prepared an

17  excerpt with the references to the term sheet, taken

18  directly from that, which I thought would make it

19  easier.  If I may approach?

20           THE COURT:  You may approach.  Did you share

21  that with Mr. Pollack?

22           MR. BRODY:  Yes, I did.

23           MR. POLLACK:  Yes, I have a copy, Your Honor.

24           MR. BRODY:  I can give you the bigger one

25  which has larger font, if --

1          THE WITNESS:  I'll try this, let me try.

2          MR. BRODY:  If that would be helpful, all

3    right.

4    BY MR. BRODY:

5      Q    Now, we're going to take this in

6    chronological order.  We've sorted the spreadsheet that

7    the P.S.E. provided to us, we've put it in

8    chronological order here.  So going in chronological

9    order, starting at the top.  The first time we see your

10   name is on May 12th of last year; right?  It's the

11   second entry.

12   A    The second entry on here is May 12th, yes.

13     Q    And you're listed as the author; correct?

14   A    Correct.

15     Q    And you're listed as the author of a draft

16   term sheet for Legacy Ovarian Cancer Claim Proposal;

17   right?

18   A    Correct.

19     Q    All right and then if you continue, just

20   below the two entries with your name, you see that on

21   the 16th of May, Mr. Conlon --

22          MR. POLLACK:  Mine is May 24th.  Oh, up top.

23   Okay, got it.

24          MR. BRODY:  Yep, we're on the 16th.

25          MR. POLLACK:  All right.

1    BY MR. BRODY:

2         Q    The document number for the record is 111; do

3    you see it?

4    A    Yes.

5         Q    And so on the 16th, Mr. Conlon forwarded the

6    proposal to K.C.I.C., right?

7    A    I see that entry.

8         Q    And the Plaintiff Steering Committee has

9    asserted mediation privilege over that communication,

10   as well; right?

11   A    Yes.

12        Q    Because your position is that the mediation

13   privilege covers Mr. Conlon's communications with

14   K.C.I.C. in this instance; right?

15   A    I presume so.

16        Q    Yeah, as well as what you wrote in your

17   communications with Mr. Conlon; correct?

18   A    Yes.

19        Q    And there are a number of e-mails back and

20   forth addressing the term sheet.  And then if we go

21   down in the green, which gets us to May 24th, which is

22   about 12 days after your name first appears and we see

23   your name again; right?  It's number 20 in the document

24   number column?

25   A    Yes.

A. Birchfield - Cross                    23

1      Q   And that's May 24th, 2023; correct?

2   A    Yes.

3      Q   And that's again the Draft Term Sheet for

4   Legacy Ovarian Cancer Claim Proposal; right?

5   A    Yes.

6      Q   But this time, what was on the 12th of May a

7   seven page document has grown to eight pages; hasn't

8   it?  If you look at the page count column.

9   A    I see that entry on here.

10      Q   Right and it looks like there are a number of

11   copies of it.  You know, you see Document 42, Document

12   135, they are all eight pages; right?

13   A    That's the entries here, yes.

14      Q   All right.  Now if you flip over to the next

15   page.  And we move forward to June 7th, it's

16   highlighted in green at the bottom; do you see that?

17   A    Yes.

18      Q   And do you see the Document Number 45?

19   A    Yes.

20      Q   That document, Document Number 45, you're the

21   author of that; right?

22   A    I'm listed as the author, yes.

23      Q   And that's a Draft Term Sheet for Legacy

24   Ovarian Cancer Claim Proposal; correct?

25   A    Yes.

Q And by that point which is another two weeks exactly after the May 24th version, it had grown to ten pages; hadn't it?

A The -- the entry here is ten pages, that is correct.

Q Right.

A I don't --

Q And the exact same description, Draft Term Sheet for Legacy Ovarian Cancer Claim Proposal; correct?

A Yes, I can't say that, that is -- the term sheet grew to -- to ten pages, that's a general description, that's the number of pages that's in the entry. I haven't reviewed, you know, to see what that transmission was but the essence of that term sheet, as I've described previously, that was our term sheet.

It was a term sheet that had been prepared before, before the dismissal of LTL-1, as we were -- and before the filing of J and J's second bankruptcy, we had prepared a term sheet. We had prepared a term sheet and offered to meet and present that term sheet --

MR. BRODY: And Mr. Birchfield, I think you're getting far afield from my question, which --

THE COURT: Well, let him complete his thought, Mr. Brody.

                        A. Birchfield - Cross                    25

1           MR. BRODY:  Sure.

2           THE WITNESS:  And as I had testified

3   previously, you know, that term sheet was prepared and

4   there were no substantive changes in any discussions

5   with Legacy regarding that term sheet.  Scott Gilbert

6   --

7   BY MR. BRODY:

8       Q    And that's -- I think that's and just on that

9   point, on conversations.  We actually see a reference

10  to a conversation that you had with Legacy and K.C.I.C.

11  It's Document 118, it's the same date, June 7th, 2023.

12  It's just three, four lines below the entry we were

13  looking at and there's a reference to a K.C.I.C. and

14  Legacy discussion of conversation with ovarian cancer

15  counsel regarding comments on draft ovarian cancer term

16  sheet; right?

17  A    Right.

18      Q    As well as, discussing additional ovarian

19  cancer resolution proposal details; right?

20  A    That is -- that's what the entry says and --

21      Q    Yeah and ovarian cancer counsel did, as you

22  just mentioned in your prior answer, have discussions

23  with Legacy about the term sheet; correct?

24  A    We discussed the term sheet and we provided the

25  draft term sheet to K.C.I.C. and there were discussions

A. Birchfield - Cross                    26

1    about how the term sheet would be applied.  The terms

2    of that agreement would be applied in a claims

3    administration process.  That was the role of K.C.I.C.

4    --

5        Q    You didn't just provide it to K.C.I.C., you

6    also provided it to Mr. Conlon because as we saw, he

7    forwarded on May 16th the Draft Term Sheet.  He was the

8    one who forwarded it to K.C.I.C., right?

9    A    Correct because K.C.I.C. was the claims

10   administrator that was working with Legacy, that Legacy

11   had brought in --

12       Q    And then you all got together and you

13   discussed it and over the course of the next three,

14   four weeks, as we see from the privilege log, the page

15   count grew from seven to eight and then to ten pages;

16   right?

17            MR. POLLACK:  Objection, argumentative.

18   Assumes facts not in evidence that the document

19   actually could be red lined.  We have no idea why it

20   went from four, to eight, to ten, we have no clue where

21   it came from.

22            THE COURT:  Well, I'm going to overrule the

23   objection but why don't you clarify with your

24   questions, Mr. Brody, how it grew, why it grew and

25   maybe the testimony from Mr. Birchfield will provide

A. Birchfield - Cross                          27

1   some background with regard to the length of this

2   particular document.

3              MR. POLLACK:  Well, sure.  I mean --

4              THE COURT:  I don't think it's argumentative,

5   you know, but address the question, Mr. Brody.

6   BY MR. BRODY:

7       Q    Sure.  Based on the privilege log, the page

8   count for what is described as that proposal started at

9   seven pages, became eight pages and then became ten

10  pages; right?

11  A    The entries on this privilege log do change just

12  as you said.  That does not tell me that the term sheet

13  itself, you know, changed in any respect.  So I mean, I

14  can acknowledge that, that's what the entries say but I

15  can't go beyond that.

16      Q    Now, if I understood your testimony on April

17  10th, the last time we were here, your position is that

18  it was just -- and I'm going to use your words from the

19  transcript, grammatical-type stuff that was addressed

20  in the back and forth; right?

21  A    That's correct.  I mean, there were no substantive

22  changes.

23      Q    Right and you're willing to say that but

24  you're asserting that the substance of the term sheet

25  itself is privileged so we can't see it; right?

A. Birchfield - Cross                28

1    A    If you want to see the term sheet, I'll be glad to

2    show you the term sheet.  What I'm not willing to do

3    here -- I was prepared -- I was prepared on behalf of

4    the Ovarian Cancer Committee to present that term sheet

5    to J and J, to the General Counsel, Liz Forminard and

6    Mr. Haas, about two weeks before the second bankruptcy

7    petition was filed.

8        We made that offer.  We were prepared to -- to

9    share that term sheet.  That is -- that is no an issue

10   but what we were not prepared to do was to eviscerate

11   the mediation privilege and just say -- because this is

12   covered in the mediation process.  That's why we

13   asserted the privilege.  It's not that the term sheet

14   is secretive.  This is a term sheet that would have

15   gone to J and J.  We were prepared to present it to J

16   and J.

17       Q    So you asserted the mediation privilege over

18   the version that is described as the seven page version

19   of the term sheet, over the eight page version of the

20   term sheet, over what is described as the ten page,

21   page count version of the term sheet, over the

22   discussions that the ovarian cancer counsel had with

23   Legacy about the term sheet?  You've asserted mediation

24   privilege over all of that; right?

25              MR. POLLACK:  Objection, argumentative.  This

1    is a closing argument made in the middle of

2    questioning.  Is he really -- he knows the mediation

3    privilege has been asserted, he's already stipulated

4    that the page count is the page count.  So it's

5    inappropriate for Counsel to be making an argument to

6    the Court like this is a jury.

7                THE COURT:  Mr. Brody?

8                MR. BRODY:  I just asked him if he's

9    asserting mediation privileges to all of the different

10   versions of the term sheet, as well as the discussions

11   that were had with Mr. Conlon --

12               MR. POLLACK:  We're asserting mediation

13   privilege, that's not --

14               MR. BRODY:  -- and Legacy about the term

15   sheet.  It's a question for the witness.

16               THE COURT:  Across all three documents?

17               MR. POLLACK:  Your Honor, Judge Snyder has

18   ruled on these issues, we're asserting mediation

19   privilege.  I'll answer for the witness, we're standing

20   by it.

21               THE COURT:  Okay, notwithstanding what Mr.

22   Birchfield said, that he was prepared to share that

23   document with J and J.

24               MR. POLLACK:  He was prepared to provide a

25   document to J and J, he didn't say which one.  He said

A. Birchfield - Cross                    30

1    that he was going to provide a term sheet to J and J.

2    You have multiple variations, you have panels of

3    counsels.  I doubt that J and J would provide us a

4    draft that has all their mark-ups.

5            We are certainly willing and able right now

6    to provide a term sheet to them if that's what they

7    want but I'm not going to give them a mediation

8    privilege protected document.

9            THE COURT:  Okay, so the privilege was

10   asserted then, Mr. Brody?

11   BY MR. BRODY:

12       Q    Yes and I think Mr. Pollack has just,

13   frankly, made my point.  So why don't we talk about

14   something that was happening at the same time, these

15   terms sheets going back and forth.  The whole time that

16   you were sending terms sheets back and forth to Legacy

17   and K.C.I.C., you and the Tort Claimants Committee were

18   trying to get the LTL-2 bankruptcy dismissed; right?

19   A    Yes.  So I'm just trying to -- I'm trying to get

20   the timing right.  I mean, we -- I mean, we had the --

21   we did not engage, we didn't have any discussions with

22   -- with Legacy until after -- until after the second

23   bankruptcy petition, you know, was filed.  So while --

24   so yes, Judge Kaplan ordered mediation after LTL-2 was

25   filed and that's the period where we were having

1    discussions with Legacy.

2         Q    Right and if I -- let me make this simpler,

3    if you'll allow me to do it this way.  If I told you

4    that the -- the Claimants Committee filed its motion to

5    dismiss the bankruptcy on April 24th of last year,

6    would you disagree with me?

7    A    No.

8         Q    All right and then as we saw, at least from

9    the documents on the privilege log, the first version

10   of the term sheet that you sent over to Legacy was on

11   May 12th while that was pending?

12   A    Correct.

13        Q    Now you knew, of course, that Johnson and

14   Johnson wanted planned confirmation in the bankruptcy

15   proceeding; right?  That Johnson and Johnson's

16   objective; correct?

17   A    Right.

18        Q    And then you filed a motion to dismiss;

19   correct?

20   A    Yes.  I mean, I didn't, the T.C.C. did but I'm

21   part of that.

22        Q    You're a part of that; right?

23   A    I'm part of that, yes.

24        Q    Right, I'm putting you in with the T.C.C.

25   because you were a part of the T.C.C.

A. Birchfield - Cross                         32

1    A    Yes.

2         Q    You didn't want the plan to come up for a

3    vote; right?

4    A    We -- I mean, no, we did not want J and J's plan

5    to come up for a vote.  We were prepared --

6         Q    Neither did Mr. Conlon --

7              MR. POLLACK:  Your Honor, they keep on doing

8    this.  I want him to answer the question, please.

9              THE COURT:  Well, so does this Court.  So go

10   ahead, Mr. Birchfield.

11             THE WITNESS:  Okay.  So we were preparing, at

12   the same time we were moving forward with our motion to

13   dismiss, we were also preparing an alternative plan to

14   be presented and we had asked the Court if the Court

15   denied our motion to dismiss, we wanted to present an

16   alternative plan and that would have been voted on, had

17   Judge Kaplan not dismissed the bankruptcy and allowed

18   us to move forward with a competitive plan.

19   BY MR. BRODY:

20        Q    I guess Mr. Conlon didn't want the bankruptcy

21   plan to come up for a vote either; did he?

22             MR. POLLACK:  Objection as to speculation as

23   to what Mr. Conlon wanted, he's not here to testify.

24             THE COURT:  Unless Mr. Birchfield knows.

25             THE WITNESS:  I don't know.

 1          THE COURT:  Okay.

 2     BY MR. BRODY:

 3          Q    But you heard Mr. Conlon testify on April

 4     10th that if the Legacy proposal was accepted, he and

 5     Legacy would stand to make money; correct?

 6     A    Yes.

 7          Q    Right and that's not something that he would

 8     be able to take advantage of if J and J's preferred

 9     resolution, through plan confirmation in the bankruptcy

10     court had been accomplished; correct?

11     A    That's true, only if you accept the version of the

12     plan that J and J put forward.  A bankruptcy plan that

13     did include an option for the Legacy toggle and I

14     believe as he testified to, you know, previously.  That

15     would have been -- that would have been part of a

16     bankruptcy plan.

17          It would have included an option, it would have

18     been included in the alternative plan that we were

19     putting forward.  That was part of the discussions that

20     were going on at that time.

21          Q    And your alternative was not what J and J put

22     forth; was it?

23     A    No, it is very clear that what I want on behalf of

24     my clients, which is a fair and reasonable compensation

25     plan, is not what J and J wants and we are opposed to

1      that.  It is not that we are opposed to bankruptcy

2      period because in the very beginning, before J and J

3      filed its first bankruptcy, we were working toward a

4      resolution.

5          We were working toward a resolution that would

6      have included a bankruptcy component.  When J and J

7      filed its first bankruptcy, I was pushing, as Mr. Haas

8      knows, I was pushing for mediation --

9                  MR. BRODY:  We are so far afield from my

10     question.

11                 MR. POLLACK:  Let him answer the question.

12                 THE COURT:  I'm going to let him complete the

13     testimony.  I'm not going to have a filibuster, so to

14     speak but go ahead, Mr. Birchfield.

15                 THE WITNESS:  It's not that we're opposed to

16     bankruptcy period, not in the beginning because we were

17     trying -- we were trying to negotiate, before L.T.L.

18     motion to dismiss, we were negotiating a plan in

19     bankruptcy.  It's only after it became very clear that

20     we would not be able to get reasonable compensation for

21     our clients as long as J and J had the weapon of a

22     bankruptcy plan.  That's when we became adamant --

23                 THE COURT:  I think that's a good place to

24     stop, Mr. Birchfield.  Go ahead, Mr. Brody.

25     BY MR. BRODY:

1          Q    So Mr. Birchfield, I think, even after all

2     that, that we are on the same page here is that, this

3     Legacy toggle that you talked about was not what J and

4     J was proposing and not what J and J wanted to

5     accomplish through LTL-2 bankruptcy; correct?

6     A     They did not want to do the -- they didn't want to

7     pay the added amount that would be necessary.  What J

8     and J was saying at that point was that they wanted

9     finality, they were looking for finality.  They were

10    taking the position that it could only be achieved

11    through bankruptcy, which is false and the Legacy

12    option was a way for J and J to get finality without

13    coercing claimants into a bankruptcy plan --

14         Q    That was -- that was -- I mean, let's -- you

15    understand that J and J would object to the use of the

16    word coerce being attached to that; right?

17    A     No.

18         Q    And you understand -- I mean, come on, Mr.

19    Birchfield.  J and J -- you know J and J proposed an

20    $8.9 billion resolution of the claims through the LTL-2

21    bankruptcy that it wanted claimants to be able to vote

22    on; right?

23    A     That is true.

24         Q    And you did not want claimants to be able to

25    vote on that; did you?

1    A    It's not that I was opposed to new claimants

2    voting.  It is -- and it's not that --

3         Q    That's why you dismissed --

4              MR. POLLACK:  Your Honor, please.

5              MR. BRODY:  I'm sorry, he's answered the

6    question.

7              THE COURT:  Hold on, Mr. Pollack, Mr. Brody.

8    Let me hear the full testimony based on that question

9    first.  Go ahead, do you remember the question, Mr.

10   Birchfield?

11             THE WITNESS:  That I'm opposed to claimants

12   voting?

13             THE COURT:  Right.

14             THE WITNESS:  Yeah, we are not opposed to a

15   vote that would be a fair vote.  We are opposed to a

16   plan that would essentially stuff the ballot box, in

17   order to coerce the more serious and legitimate

18   claimants to accept unreasonable values.

19   BY MR. BRODY:

20        Q    You didn't want the claimants who would have

21   a right to vote on the plan to be able to vote on the

22   plan and that's why you moved to dismiss the

23   bankruptcy; right?

24             MR. POLLACK:  Objection, Your Honor, asked

25   and answered twice now.

 1          THE COURT:  Well, I don't know if I heard the

 2    answer to that question.  Mr. Birchfield?

 3          THE WITNESS:  There were multiple reasons

 4    that we were opposing a bankruptcy.

 5    BY MR. BRODY:

 6       Q    And that was one of them; right?

 7    A    That -- we were opposing a vote as J and J had

 8    constructed in that plan, yes.

 9          MR. BRODY:  Right.

10          THE COURT:  Well, let us get back to our

11    central issue, Mr. Brody.  I know it appears you're

12    trying to lay some ground work here but let's not lose

13    focus of what our issue is --

14          MR. BRODY:  Of course, of course.

15          THE COURT:  -- with regard to, as the

16    allegations, as against Mr. Conlon.

17    BY MR. BRODY:

18       Q    Of course.  Mr. Mr. Birchfield, before we

19    recessed on April 10th, you started testifying about

20    your willingness in the fall of last year to join Mr.

21    Conlon to present a proposed settlement matrix to J and

22    J; do you recall that testimony?

23    A    Yes, Mr. Conlon had asked me if I would --

24       Q    It's just a yes -- I just asked you if you

25    recalled that testimony, that's all I asked?

1    A    Would I be willing to join with him --

2         Q    No, it's a -- it's a yes or no --

3              MR. POLLACK:  Mr. Brody, Your Honor, it's not

4    a yes or no --

5              MR. BRODY:  I'm just orienting him --

6              MR. POLLACK:  If he needs to give a narrative

7    response, he needs to give a -- I think it's going to

8    be a brief answer but Mr. Brody keeps clipping off his

9    answers because he doesn't like the answer.

10             THE COURT:  Well, I don't necessarily know if

11   Mr. Brody likes or dislikes the answer but you know,

12   focusing-wise, what is your response to that question

13   for your testimony, Mr. Birchfield?

14             THE WITNESS:  Would you repeat the question?

15   BY MR. BRODY:

16        Q    Sure.  My question was simply, do you recall

17   before we recessed on April 10th, beginning to talk

18   about your willingness to join Mr. Conlon to present a

19   proposed settlement matrix to Johnson and Johnson in

20   the fall of last year; do you recall that testimony?

21   A    I do not recall that testimony specifically.  I

22   did agree to, you know, meet with J and J to explain

23   the matrix.

24        Q    And we received a lot of testimony on it so I

25   don't want to spend too much time on it but we see your

A. Birchfield - Cross                          39

1    willingness reflected and disclosed to J and J for the

2    first time on October 18th of last year in an e-mail

3    from Mr. Conlon that's in your binder as Hearing

4    Exhibit 4.  Can you take a look at it?

5    A    So --

6              THE COURT:  Do you have that binder, Mr.

7    Birchfield?

8              THE WITNESS:  I do, I do, Your Honor.  So Mr.

9    Brody, may I ask, what is the question?  Are you asking

10   -- because you're saying that that's the first time

11   that it was disclosed and I can't answer that.

12   BY MR. BRODY:

13        Q    I'm asking you if you're familiar with that

14   exhibit?  You've seen it before?

15   A    I mean, yes, I'm familiar with the exhibit since

16   this has been filed, exhibit --

17        Q    Right.  Now, October 18th of last year, that

18   was shortly after the Mass Torts Made Perfect

19   Conference that took place in Las Vegas last fall;

20   right?

21   A    That sounds right.

22        Q    And you heard Mr. Murdica mention that he had

23   actually attended that conference last fall, he

24   testified to that on March 25th; right?

25   A    I know that he was in Las Vegas, I'm not sure if

A. Birchfield - Cross                    40

1    he attended the conference but he was there.

2         Q    All right and the conference was October 10th

3    to the 12th of last year, the last fall's version?

4    A    That sounds about right, I don't recall --

5         Q    And this is something that happens regularly;

6    right, this conference?

7    A    Yes, that would be an annual meeting.

8         Q    And it's a conference where plaintiffs'

9    lawyers come together to, from around the country, to

10   talk about things like the Talc Litigation; right?

11   A    Yes.

12        Q    You pitched the Legacy proposal to other talk

13   plaintiffs' lawyers at the Mass Torts Made Perfect

14   Meeting last year; didn't you?

15   A    No.

16        Q    You discussed it with them?

17   A    I may have had discussions about an option that

18   would give J and J finality, yes.

19        Q    Right, an option involving structural

20   optimization and disaffiliation; correct?

21   A    Yes.

22        Q    Because you were trying to garner support for

23   the proposal that you had been discussing with Mr.

24   Conlon?

25   A    No --

A. Birchfield - Cross                    41

1      Q    Was Mr. Conlon there, by the way, at Mass

2   Torts Made Perfect last year?

3   A    Not that I know of.

4      Q    All right.  Going back to the Hearing Exhibit

5   4, you see that Mr. Conlon there offered that you, Doug

6   Dachille and he were prepared to meet with J and J's

7   Treasurer in person to share and discuss the terms of a

8   matrix; right?

9   A    Yes.

10     Q    And that's a matrix that, I take it from your

11   testimony, that you developed; right?

12   A    Yes.  I mean, I developed it along with the

13   ovarian cancer negotiating group, yes.

14     Q    And shared it with Mr. Conlon and Legacy;

15   right?

16   A    Yes.

17     Q    And you know, at the end of the day, based

18   upon an anticipated number of claimants and the values

19   assigned to claims in a matrix, the math has to work if

20   that matrix is going to be associated with a total

21   dollar figure; right?

22            MR. POLLACK:  Objection, vague.

23            THE COURT:  Vague?

24            MR. POLLACK:  Vague.  I'm not sure what that

25   means, the math has to work as to a total dollar

A. Birchfield - Cross                          42

1     figure.

2                THE WITNESS:  Well, obviously, if the total

3     number of claimants that are submitted and are expected

4     to receive compensation under that grid, if it exceeds

5     the total amount of the acquisition by a significant

6     number, then it wouldn't work, that is true.

7     BY MR. BRODY:

8          Q    Right, right, so you can't put together a

9     claims matrix where, you know, every claim is worth a

10    million dollars, you have a hundred claims and you're

11    funding it at $10 million.  You just can't do that;

12    right?

13    A    That's right, that's right.

14         Q    All right.  Mr. Conlon was, of course, being

15    honest, I think as he testified, with his offer to have

16    you come in.  You were ready, willing and able to come

17    in and talk about the claims matrix; right?

18    A    I was.

19         Q    In connection with the proposal Mr. Conlon

20    was making to Johnson and Johnson for structural

21    optimization and disaffiliation; right?

22    A    Yes.

23         Q    You had been actually in discussions with Mr.

24    Conlon for months at that point; right?

25    A    If you look at the time of our first discussion,

A. Birchfield - Cross                              43

1      our first discussion as in the first time I ever met

2      him, it was in May, May 2nd.  So it had been months,

3      true, it had been months between May and October.

4           Q    Yeah, five and a half months?

5      A    Yeah.

6           Q    The day that e-mail was sent was the day

7      after Johnson and Johnson's third quarter earnings

8      call.  You're aware of that; right?

9      A    I'm aware that Mr. Haas made statements on October

10     the 17th and I can see the date of this letter on

11     October the 18th, yes.

12          Q    Right and you knew -- I mean, you certainly

13     knew that what was being proposed through Legacy was

14     not what Mr. Haas had announced on the earnings call as

15     any part of the company's preferred course, through the

16     bankruptcy process; right?

17     A    Is the Legacy proposal a bankruptcy proposal?  No,

18     it's not and what we had understood was that J and J

19     was looking for finality.  But we're -- and that was

20     what we were making this proposal for.  I mean, that's

21     why I agreed to submit a matrix and that's why I, you

22     know, offered to have Legacy considered as part of a

23     mediation, as part of a bankruptcy toggle plan.

24          Because this was a -- this would be a way that J

25     and J could have gotten finality without -- without

A. Birchfield - Cross                          44

1    having a coercive bankruptcy plan in place.  This would

2    be -- this matrix, this proposal would be an opt-in

3    proposal.  So the claimants and their counsel would

4    look at the settlement grid, they would look at the

5    terms of that grid and they would choose, do we want to

6    voluntarily participate or not?

7         Q    The proposal that was being made by Mr.

8    Conlon and that this settlement matrix was attached to

9    was not a bankruptcy proposal, it was a tort system

10   proposal; wasn't it?

11   A    Yes.

12        Q    And the -- did -- I assume Mr. Conlon had --

13   had told you that J and J had told him that it did not

14   believe the deal that he was proposing would actually

15   provide finality?

16   A    No.

17        Q    You -- did you miss that part of his

18   testimony from April 10th?

19   A    You're asking me if he told me that, that --

20   you're asking me if Mr. Conlon --

21        Q    I'm asking you if you -- let me ask you this.

22   Did you know that before April 10th of this year?

23   A    That J and J had told Mr. Conlon that the Legacy

24   option would not give them finality?

25        Q    That's right.

A. Birchfield - Cross                          45

1    A    Okay, no.

2         Q    Let's take a look at Hearing Exhibit 7.

3    A    I'm there.

4         Q    So this is the more detailed letter from Mr.

5    Conlon that actually attaches the settlement matrix;

6    right?

7    A    Yes.

8         Q    And that's the settlement matrix that you

9    were prepared to come in and talk about with J and J,

10   jointly with Mr. Conlon and Mr. Dachille; right?

11   A    I would have been talking about the matrix.    I

12   would have gone in with Mr. Conlon and Mr. Dachille if

13   J and J had made that invitation, yes.

14        Q    And this letter includes a $19 billion total

15   price tag that is associated with a tort system

16   resolution that tacks on your matrix; right?

17   A    Yes, I see -- I see that it is a -- it has a $19

18   billion number or such greater number as the

19   accountants, Price Waterhouse, would determine if it's

20   necessary to clear the non-cash charge --

21        Q    And he indicated that, "The proposal had been

22   reviewed and was supported by leadership counsel on

23   both the Federal M.D.L. and in State Court cases across

24   the country."  Do you see that, it's on page 1?  The

25   paragraph starts, "Put simply?"

1    A    Yes.

2         Q    And that was true; right?

3    A    I had not seen -- I had not seen this proposal but

4    I had what we -- what I had discussed with him was that

5    we would support a Legacy option being presented to J

6    and J.  It is -- this is -- this would be an offer that

7    J and J would have to accept.

8         If J and J were to accept, you know, this option,

9    then I would support -- I would support a settlement

10   agreement that incorporates this matrix that is

11   attached as Exhibit A.

12        Q    And you knew that -- I mean, I certainly

13   expect you knew that it was supported not just by you

14   but that you had talked about it with other plaintiffs'

15   counsel; fair?

16   A    I have -- I knew that this would be supported

17   because for four years, every day, every day, I have

18   been working toward a resolution.  So I talked to

19   plaintiffs' lawyers about various options and I have a

20   high level of confidence that based upon not only my

21   work but the -- all of the members of the Executive

22   Committee, all of the members of the T.C.C. on the

23   ovarian cancer side, we have been working on this

24   intensely for a long time.  So I knew that it would be

25   supported.

1      Q    And so Mr. Conlon was telling the truth when

2   he wrote to J and J's Board that Legacy's proposal has

3   been reviewed and is supported by leadership counsel on

4   both the Federal M.D.L. and in State Court cases across

5   the country; right?

6   A    I had not reviewed this proposal, I had not seen

7   this letter or this proposal as it is written.  I had

8   not seen that until you filed it but -- but I did -- I

9   did provide, I did provide the matrix and I did -- I

10  did say that I would support that.  And we have

11  leadership roles in both the M.D.L. and in State Court,

12  in State Court litigations across the country.

13     Q    And you -- you were on board with the

14  statement that we saw from Mr. Conlon on October 18th

15  that lead counsel for the ovarian cancer claimants,

16  including Andy Birchfield, for an M.D.L. opt-in

17  settlement matrix with Legacy would be expected to

18  garner a 95 percent opt-in of current ovarian cancer

19  claimants; right?

20  A    Yes, I told him that.

21     Q    Yeah, that was going to be my next question.

22  That's what you told him; correct?

23  A    Yeah.

24     Q    All right.  You are familiar -- by the way,

25  at the same time all this was going on, you publically

1    advocated for Mr. Conlon's proposal; right?

2    A    So that may be -- that may be a bit of a stretch.

3    I mean, he did -- he did publish the structural

4    optimization and in an op-ed piece.  And I did, I did

5    issue a press release that said, I think that this is

6    -- this would be a win-win because it would give -- at

7    that point, at that point I thought that J and J truly

8    was looking for a way to get finality and that would be

9    a win for J and J but the plaintiffs were also looking

10   for fair and reasonable compensation, you know, and --

11   and the right to choose and not a coercive plan.

12       Q    So you know, you referred to a press release

13   that you issued and to a piece that Mr. Conlon had

14   written.  And we have -- and we looked at it with Mr.

15   Conlon, the piece that he wrote is in your binder as

16   Hearing Exhibit 15.  If you could just verify that's

17   what you were referring to?

18   A    Yes.

19       Q    And that was the one that was titled, "Time

20   to Ditch the Texas Two-Step for a New Mass Tort

21   Strategy," right?

22   A    Yes.

23       Q    And if you turn to Hearing Exhibit 18, you

24   express support for Mr. Conlon's article the very same

25   day; right?

A. Birchfield - Cross                    49

1    A    That's true.

2         Q    And your press release was titled, "Key

3    Lawyer in Johnson and Johnson Talc Litigation Supports

4    Call to Rethink Legal Strategies in Light of Failure of

5    Texas Two-Step," right?

6    A    Yes.

7         Q    And it indicates, "Leading Mass Tort Lawyer

8    Andy Birchfield," that's you?

9    A    Yes.

10        Q    "Of the Beasley Allen Law Firm is expressing

11   strong support for a thought provoking article in

12   Bloomberg Law authored by James Conlon, a seasoned

13   expert in Corporate Restructuring and the former Global

14   Practice Leader of Sidley Austin's World-Wide

15   Restructuring Practice," right?

16   A    Yes.

17        Q    You didn't disclose that Mr. Conlon had

18   represented J and J in the Talc Litigation; did you?

19             MR. POLLACK:  Objection, argumentative.

20             THE COURT:  I don't find that argumentative,

21   I'm going to allow it.  Please answer the question, Mr.

22   Birchfield.

23             THE WITNESS:  I did not say -- I didn't say

24   anything about him working at Faegre.  This was the

25   main point was the structural optimization and

A. Birchfield - Cross                                    50

1    disaffiliation, which he had developed while he was at

2    Sidley Austin.  At this point, you know, the only thing

3    I knew about --

4    BY MR. BRODY:

5        Q    That's fine, you've -- no, you've, that's --

6    and I think you indicated, you didn't refer to the fact

7    that he had been in Faegre Drinker; did you?

8    A    I did not.

9        Q    All right.  You didn't disclose the fact that

10   you had been -- you know, you had met him and been

11   working with him for six months to the day, at this

12   point; right?

13   A    At this point, I had met him six months prior.

14       Q    Right and just two weeks before this, he had

15   offered that he and you and Mr. Dachille would go into

16   J and J to pitch this idea?

17   A    Yes, on October the 18th, the letter you just

18   showed.

19       Q    And somebody reading your press release would

20   know none of that; correct?

21   A    I mean, somebody reading this -- I mean, there's

22   nothing said about -- about an offer to meet with J and

23   J, that's true.

24       Q    You knew, however at the time that you wrote

25   this, that this was the Texas -- the structural

1    optimization and a resolution through the tort system

2    that was being pitched was adverse to J and J's

3    preferred resolution for the bankruptcy process which

4    had been announced by Mr. Haas on October 17th, just a

5    couple weeks before; right?

6    A    I have -- I mean, Mr. Haas has made clear that his

7    preference is bankruptcy, period.

8         Q    All right, so what both you and Mr. Conlon

9    advocated in your dual November 2nd public statements

10   was adverse to what J and J wanted; right?

11   A    I didn't know that.  I thought J and J wanted

12   finality.  I knew that Mr. Haas, you know, preferred

13   bankruptcy.  You know, what I had learned through all

14   of this process, through two mediations, an estimation

15   process, I had learned that J and J, I had heard over

16   and over again; J and J is looking for finality.  They

17   believed that finality could only be achieved through

18   bankruptcy.  That was --

19        Q    And you were advocating something else?

20   A    I was looking for, I was looking for a way to give

21   J and J what it said it wanted and getting our clients

22   what we believe they deserve and that's why, when Mr.

23   Conlon presented a path that would offer finality to a

24   company that had been done and I had come to see that,

25   that had viability.  So -- so I've submitted a matrix

A. Birchfield - Cross                         52

1    that would be part of that proposal, to see if that

2    proposal would be acceptable to J and J.

3         Q    And what you said is the plaintiffs' lawyers

4    shared Mr. Conlon's vision of what you called a win-win

5    solution, where claimants can pursue their claims in

6    the tort system; right?

7    A    Yes.

8         Q    It would certainly be a win for you; right?

9    A    A win for me is a win for our clients, period.

10        Q    With a tort system resolution and your firm's

11   position on the M.D.L. P.S.C., you stand to get money

12   from the common benefit fund in the M.D.L., if there's

13   a tort system resolution; correct?

14   A    That would be up to -- that would be up to the

15   Court, that would be up to the M.D.L. Court but it is

16   also true that common benefit, you know, funds are

17   available in bankruptcy proceedings too.

18        Q    Not in the J and J bankruptcy proposal;

19   correct?

20   A    I haven't seen the T.D.P., you know, for the

21   (indiscernible) but I'm sure that's the case, based on

22   everything that I have heard so far.

23        Q    So you're opposed to it and you're not

24   familiar with the terms of it?

25   A    Oh, I'm familiar with the terms enough to know

A. Birchfield - Cross                         53

1    what the claimants would get or possibly could get.  I

2    know the upper limits of what the claimants could get

3    under the J and J proposal.  Because I know, it states

4    in there, in their proposal and in what they have

5    rolled out, what the total amount would be and I know

6    what the -- I have a very good idea of what the total

7    number of claimants are.  So I know it falls far short

8    of what claimants would be -- would be a reasonable and

9    fair settlement for claimants.

10        Q    With all due respect, Mr. Birchfield, I don't

11   think you answered my question and my question was

12   simply -- let me -- I'll rephrase it so I can be sure

13   we're on the same page.  Are you so unfamiliar with the

14   terms of the bankruptcy proposal that you were

15   proposing and seeking to dismiss that you're not aware

16   of whether money from that proposal would go into the

17   M.D.L. common benefit fund or not?

18   A    I know the terms that J and J put forward in their

19   proposal and that proposal did not provide for common

20   benefit fees.

21        Q    Right and you are also generally familiar

22   with the terms of the M.D.L. order establishing the

23   common benefit fund; aren't you?

24   A    I am.

25        Q    And pursuant to the common benefit order that

1    Judge Wolfson entered in the Federal M.D.L., up to 12

2    percent, 10 percent fee and 2 percent cost, of any

3    amount recovered on talc claims in the M.D.L. is

4    assigned to a common benefit fund; correct?

5    A    No, up to 10 percent fees and up to 2 percent cost

6    could be.  That's --

7         Q    And that's exactly what I said; right?

8    A    I'm not so sure.  There are other provisions, so

9    it's not a -- it's not determined.  This is an order

10   that is entered to provide hold-backs on an interim

11   basis.  At the end of the day, the Court, the Article 3

12   Judge, would make that determination about what the

13   appropriate amount is.

14        Q    Your general understanding, though, just so

15   we're clear, I don't think this is that complicated.

16   Is that, the range of these that could be contributed

17   to the common benefit fund is anywhere from 8 percent

18   to 12 percent of the gross recovery amount, depending

19   upon whether or not the individual firms were early

20   participants or not; right?

21   A    It would be 6 percent fees to 10 percent fees and

22   2 percent costs.

23        Q    For a total of 8 to 12 percent; correct?

24   A    Yes.

25        Q    All right.

A. Birchfield - Cross                    55

1    A    Not fees but fees and costs.

2         Q    And that -- separate and apart from that 8 to

3    12 percent, the fees that you, Beasley Allen, otherwise

4    charge your talc clients is a 40 percent contingency

5    fee; correct?

6    A    It's not truly separate and apart because the

7    common benefit fees -- the common benefit fees are

8    deducted from the contingency fees.

9         Q    All right, so let's just talk about the

10   common benefit fees, okay?

11   A    Okay.

12        Q    When we're talking about 8 to 12 percent --

13             MR. POLLACK:  Your Honor, I'm going to

14   object.

15             THE COURT:  Sure.

16             MR. POLLACK:  We're here on R.P.C. 1.6, 1.10.

17   We had --

18             THE COURT:  You have a relevancy question,

19   right?

20             MR. POLLACK:  We had this whole discussion up

21   front --

22             THE COURT:  I don't mean to cut you off, Mr.

23   Pollack.

24             MR. POLLACK:  Yep.

25             THE COURT:  But how is this relevant with

1    regard to the conflict, alleged conflict with Mr.

2    Conlon?

3              MR. BRODY:  It's relevant to the motivations

4    for Mr. Birchfield to -- you know, in violation with

5    the ethical rules, align himself with Mr. Conlon,

6    without paying mind of the ethical rules, without

7    disclosing to J and J that he was working with its

8    former outside counsel from Faegre Drinker.

9              All of it goes to why it is and frankly, it

10   goes to credibility, as well.  Why it is that Mr.

11   Birchfield would so recklessly align himself with one

12   of J and J's former outside lawyers on the very same

13   matter.

14             MR. POLLACK:  There's no proffer that Mr.

15   Conlon and Mr. Birchfield are sharing fees.  There's no

16   proffer that there's an agreement between Mr.

17   Birchfield and Mr. Conlon to share fees.  What this is

18   has nothing to do, zero to do, with what's before you.

19   This is Mr. Haas' effort to try to get a sound byte in

20   the national press so he can attack Beasley Allen on a

21   different matter, outside this courtroom, which is that

22   they're greedy buggers who are simply trying to make

23   money.

24             That's his argument and it's a wonderful

25   argument and he has a great argument in response.  I'm

1    not, I'm trying to get a fair and reasonable

2    compensation for my clients and he'll have the

3    opportunity to answer that.

4              But respectfully, Your Honor, this is -- if

5    we're going to try the Beasley Allen Law Firm, then we

6    ought to get all the facts up here, let's just go do

7    it.  But if we're here to try an ethics issue, as a

8    basis for disqualification, this is so far remote, so

9    prejudicial, we should cut it off right now.

10             THE COURT:  I don't know if it's prejudicial,

11   I don't know if it's remote.  I think there's some

12   relevancy, Mr. Brody.  Candidly, we understand the

13   Court can take judicial notice of the common benefit

14   fund, you know, we all know that.  We know that

15   plaintiffs' attorneys have a percentage that is built

16   into any recovery but let's get it back focused to

17   whether Mr. Conlon or not --

18             MR. BRODY:  Sure.

19             THE COURT:  -- has shared confidential J and

20   J.  So you know, to the extent J and J is trying to

21   suggest there's motivation here or not, I think it gets

22   a little bit remote with regard to relevancy of why

23   we're here.  So I don't know if you want to adjust your

24   questions, fine tune your questions but I don't think

25   --

A. Birchfield - Cross                    58

1           MR. BRODY:  Let me --

2           THE COURT:  I don't think that's really on

3    point with why we're here.

4           MR. BRODY:  I think I can wrap this line of

5    questions up --

6           THE COURT:  Okay.

7           MR. BRODY:  -- with two, just two simple

8    questions.

9           THE COURT:  It's clear, I don't think there's

10   any secret here.  J and J wanted something, X.

11   Plaintiff, including Mr. Birchfield, wanted Y.  To the

12   extent there's a difference of opinion, the Courts

13   accept that.  You know but really, we want to get back

14   to where's Mr. Conlon and then the issue before this

15   Court.

16   BY MR. BRODY:

17        Q    And happy to -- actually, I can wrap it up

18   with a single question.  Just in terms of the common

19   benefit fund, Mr. Birchfield, the difference in terms

20   of amounts that would come into the common benefit

21   fund, an $8.9 billion resolution.  I mean, if an $8.9

22   billion resolution in the tort system and the money is

23   going into the common benefit fund, 12 percent of that

24   is more than a billion dollars; right?

25        A    Are you asking me to do the math?  I mean, are you

1    asking me if your math is correct?

2         Q    Yes.

3              THE COURT:  Do you need a calculator?

4              THE WITNESS:  I think -- maybe so.  The --

5              MR. POLLACK:  Can we take judicial notice?

6    Whatever the math is --

7              THE COURT:  It's a lot of money, it's a lot

8    of money.

9    BY MR. BRODY:

10        Q    All right and if you go to 19 billion, it's

11   double, plus; right?

12   A    Yeah, that's typically not the way that common

13   benefit funds work.  You know, typically, what courts

14   have done over decades with common benefit is that the

15   larger -- you know, the larger the recovery, depending

16   on the load star and the amount of hours that are put

17   in, you know, the percentage would be reduced.  But if

18   you're asking me if the math, if 12 percent of 8.9 is

19   less than 12 percent of 19 billion, the answer is yes.

20             THE COURT:  And let me just address.  You

21   know, obviously, that focuses on the M.D.L. and any

22   award by the District Court Judge.  So that's

23   prognostic here.  There's been no determination and I

24   will have Judge Singh, if Judge Singh would like to

25   address that.  Go ahead on that, please.

1          JUDGE SINGH:  Just to be abundantly clear.

2     To the extent there's any proffer of what would be

3     recoverable under the common benefit order entered in

4     the M.D.L., the Court is not making any preliminary

5     findings as to what may or may not be awarded on the

6     back end.

7          I do understand and appreciate some of these

8     points were raised in the parties' briefing on the

9     application, at least in Federal Court, as to the

10    potential import of the common benefit order.  The

11    Court will consider those arguments or not consider it,

12    as appropriate, based off of the applicable standard.

13         Notwithstanding, I also recognize that there

14    is the request in the Federal Court application for the

15    alternative relief, as applicable to the Plaintiff

16    Steering Committee.  To the extent this may or may not

17    be relevant to that alternative relief, it will be

18    addressed by the Court.

19         MR. BRODY:  Thank you, Your Honor.

20    BY MR. BRODY:

21    Q    Mr. Birchfield, you know who the attorney

22    Allen Smith is; right?

23    A    I do.

24    Q    And you have a co-counsel relationship with

25    the Allen Smith Law Firm; right?

A. Birchfield - Cross                        61

1    A    Yes.

2        Q    As a general matter, speaking -- not limited

3    to Allen Smith at this point, the majority of your talc

4    claims are obtained or referred to you through co-

5    counsel relationships; right?

6    A    Yes.  I mean, the vast majority of the claims

7    where we represent claimants, we have co-counsel

8    agreements.

9        Q    Among them, Allen Smith has a litigation

10   financing arrangement; correct?

11   A    I understand that Allen Smith and probably a

12   number of the co-counsel would have litigation funding

13   agreements.

14       Q    And at some point, I believe Fortress was

15   financing some of the Allen Smith claims?

16           MR. POLLACK:  Objection, Your Honor,

17   relevance as to what Allen Smith is doing regarding a

18   litigation funding matter where the question is, did

19   Jim Conlon share confidential information with Beasley

20   Allen?  So we're asking for hearsay as to the

21   relationship regarding whatever this funding group is,

22   what discussions they had, we don't have the terms

23   sheets and conditions here and we are far afield on

24   relevancy because there's been no proof that litigation

25   funding is relevant to Mr. Birchfield's decisions.  So

```
 1    I object to this unrelevance.

 2                 THE COURT:  Thank you, Mr. Brody?

 3                 MR. BRODY:  It goes to the same point, Your

 4    Honor, and these are just three preliminary questions

 5    and I have about four more questions after that on this

 6    issue but it goes to -- it goes to the -- you know,

 7    what is driving Mr. Birchfield and what drove Mr.

 8    Birchfield --

 9                 THE COURT:  Allegedly.

10                 MR. BRODY:  -- to take advantage of the --

11                 THE COURT:  We've made no findings.

12                 MR. BRODY:  Right but to join forces with Mr.

13    Conlon over a period of over six months last year, to

14    engage in strategies that he knew and Mr. Conlon knew

15    were adverse to what J and J preferred.

16                 THE COURT:  I sustain the objection with

17    regard to the litigation funding agreements.

18                 MR. BRODY:  Fair enough.

19                 THE COURT:  On relevance.

20    BY MR. BRODY:

21        Q    Fair enough.  So Mr. Birchfield, the -- your

22    position is that -- first of all, you couldn't have

23    hired Jim Conlon to be a lawyer at Beasley Allen to

24    work on the talc cases; right?

25        A    Never made -- never made any effort to hire him.
```

1    I mean, that's the whole point, he came to us as a

2    vendor.

3         Q    But you -- but you couldn't have done that;

4    right?

5    A    Would not have done that because if we were going

6    to hire him, we would have found out more about his

7    involvement, the length of his work and at that point,

8    we would not have hired him.

9         Q    I'm kind of struggling with your answer.  Are

10   you telling me, you think there might be a circumstance

11   where it would be okay to hire somebody who had been

12   outside counsel for your opponent to work on the same

13   matter as a lawyer?

14   A    Not without a waiver.

15        Q    Excuse me?

16   A    Not with a -- no, I would not.

17        Q    All right.

18   A    What I was saying is, you know, that what has come

19   out in this courtroom was much different than anything

20   I ever knew because Jim Conlon was working behind the

21   scenes.  The only thing that I knew was what Jim

22   Murdica had told me and that was that he had worked

23   with an F.C.R. on a proposal that Jim Murdica and I

24   were working together to try to get the Imerys T.C.C.

25   to sign off on.

A. Birchfield - Cross                            64

1          Q    And we've covered that, I don't want to go

2     back to that but you acknowledge, no matter what his

3     role was, if he's outside counsel for J and J on the

4     Talc Litigation, you can't hire him as a lawyer at

5     Beasley Allen to work on the Talc Litigation; right?

6     A     Agreed.

7               MR. POLLACK:  Objection, asked and answered.

8               THE WITNESS:  Agree.

9               MR. BRODY:  All right and you --

10              THE COURT:  I'll permit the question but go

11    ahead.

12    BY MR. BRODY:

13         Q    And you can't hire him as an expert witness;

14    right?

15    A     I would not hire him as an expert witness, no.

16         Q    Right but you couldn't, the ethical rules

17    would prohibit you from doing that; right?

18    A     Right.

19         Q    Right but just your position is, entering

20    into a relationship with him as C.E.O. of Legacy to

21    design a resolution of the Talc Litigation was just

22    fine; right?

23              MR. POLLACK:  Objection.

24              THE WITNESS:  This proposal, it would --

25              THE COURT:  Hold on.

 1              MR. POLLACK:  Design a resolution because

 2     that -- we're going to see this in briefs, I promise

 3     you, for months to come --

 4              THE COURT:  Suggests facts that are not in --

 5              MR. POLLACK:  Exactly.

 6              THE COURT:  Okay.

 7              MR. BRODY:  I mean, he can answer the

 8     question.  It's simply a --

 9              THE COURT:  I think it's more of a

10     hypothetical than a factual question.  Why don't you

11     rephrase your question, Mr. Brody.

12              MR. BRODY:  Sure.

13     BY MR. BRODY:

14         Q    Your position is that the work you did with

15     Mr. Conlon as C.E.O. of Legacy is just fine; right?

16         A    I didn't get any confidential information from Mr.

17     Conlon.  What would happen, understanding the nature of

18     this proposal, makes that crystal clear.  Because for

19     this proposal to go anywhere, it has to be acceptable

20     to J and J.  They can do it without my participation

21     and that was a big concern but if the proposal were

22     accepted, then Legacy is standing in the shoes of J and

23     J.

24          They are our adversary, every -- every bit as much

25     as J and J is now.  They have all the talc liability,

1    that's the nature of it.  So I went into these

2    discussions knowing that.

3              MR. BRODY:  And --

4              THE COURT:  Let me ask a question, Mr. Brody,

5    Pollock.

6              MR. BRODY:  Yes, of course.

7    BY THE COURT:

8        Q    Mr. Birchfield, you said you didn't get any

9    confidential information from Conlon regarding J and J,

10   that was your last testimony; right?

11   A    Yeah.

12       Q    So to the extent, you know you didn't get any

13   confidential information.  So Mr. Conlon didn't say,

14   hey by the way Mr. Birchfield, I have this information

15   regarding J and J.  He never came to you in that

16   regard; right?

17   A    Right.

18       Q    But he -- he could have told you information

19   that he got from J and J.  I mean, you're not

20   discounting that; am I right?  You wouldn't know that.

21   A    I wouldn't.

22       Q    You wouldn't know.  If he came to you and

23   said, Mr. Birchfield and I'm referring to you as Mr.

24   Birchfield.

25   A    Yes.

1      Q    If you do X, Y and Z, why don't you consider

2    that and convey that to the Plaintiffs Committee.  To

3    the extent that he got that information from J and J

4    but didn't tell you that, you wouldn't know that;

5    right?  I'm not trying to set you up, I --

6    A    Right.

7      Q    Unless he said, hey Mr. Birchfield, listen to

8    what J and J is doing and here's what they're thinking.

9    I worked there for 22 months, here's the information I

10   got, X, Y and Z.  He could have just came to you and

11   said, Mr. Birchfield, why don't you propose X, Y and Z

12   to your clients and the Plaintiffs Committee?

13   A    He did not, he did not do that.  The discussion,

14   all the discussions you know with Mr. Conlon were --

15   and the other Legacy people were focused on this

16   proposal of structural optimization and disaffiliation.

17      And so we didn't -- that proposal, we didn't need

18   any information from them except as to how structural

19   optimization and disaffiliation would work.  And

20   frankly, you know, our big concern was, what are the

21   traps?  Are there minefields here that we must -- that

22   we must avoid?  Legacy --

23      Q    And money drives -- and money drives any

24   settlement, right?  So you have 8.9 million, you have

25   19 million.  So to the extent any plan would work, it's

1    fund driven?

2    A    It is fund driven, absolutely.  The focus from our

3    perspective was, what would give our clients reasonable

4    compensation, period?  If we put together a structure,

5    if we put together a structure and a settlement fund

6    that would provide our clients with reasonable

7    compensation.

8         Common benefit will take care of itself, other

9    issues will take care of itself.  That was the goal,

10   that was the driver, to get a resolution plan that

11   would be acceptable to J and J and that's where the

12   finality came in.

13              THE COURT:  Thank you, Mr. Birchfield.  Judge

14   Singh?

15              JUDGE SINGH:  No follow-up.

16              THE COURT:  Thank you.  I didn't mean to side

17   track but I wanted to follow up with regard to that

18   question.

19              MR. BRODY:  That's quite all right, quite all

20   right and Mr. Birchfield, you would agree with me --

21              THE COURT:  Hold on, Mr. Placitella has

22   something from --

23              MR. PLACITELLA:  No, someone just sent me a

24   note that they can hear Mr. Haas' questions or

25   information being provided to Mr. Brody over the -- I

A. Birchfield - Cross                    69

1   just wanted to let everybody know.

2            MR. HAAS:  Your Honor -- thank you, thank

3   you, thank you, Chris.  Your Honor --

4            THE COURT:  Thank you, Mr. Placitella and

5   that is probably the case with regard to that

6   transponder that's in front of you, Mr. Haas.

7            MR. HAAS:  Thank you very much, Your Honor,

8   but I am completely confident that anything I said to

9   my Counsel, I have no problem sharing the word.

10           THE COURT:  Okay.

11           MR. HAAS:  As of this point, in the

12  courtroom, so it's okay.

13           THE COURT:  So keep that in mind.  You also

14  have, with your microphones, there's a mute button so

15  that we can't hear.  And you can also, I'm going to

16  tell you, Mr. Pollack and Mr. Brody, the green light,

17  if you touch it, it becomes a red light.  So, thank

18  you, sir.

19           MR. PLACITELLA:  Sorry, I didn't mean to

20  (indiscernible)

21           THE COURT:  That's quite all right.  I think

22  that's important to know, everybody needs to know.  Go

23  ahead, Mr. Brody.

24  BY MR. BRODY:

25       Q    Yeah, definitely good to know, thank you.  It

1    would certainly help if you were trying to come up with

2    a number that J and J would agree to, to have somebody

3    who had been on the inside, wouldn't it?

4            MR. POLLACK:  Objection, speculative,

5    hypothetical.

6            THE WITNESS:  Not at --

7            THE COURT:  No, I disagree, objection

8    overruled.  To the extent that Mr. Birchfield

9    understands the question and can not speculate.

10           THE WITNESS:  Okay, not at that point in

11   time.  I mean, at that point in time or the time I

12   first ever met Jim Conlon, we had been negotiating,

13   started negotiations, started negotiations with Mr.

14   Murdica in April of 2020 and I had been focused on --

15   BY MR. BRODY:

16      Q    I'm sorry, my question -- my question was

17   just, if you wanted to come up with a number that J and

18   J would agree to, it help to have someone who had been

19   on the inside; wouldn't it?

20   A    No.

21           MR. POLLACK:  Your Honors, I understand Mr.

22   Brody wants a yes or no.  Mr. Birchfield is explaining

23   that he already knows all this stuff anyway.  If he's

24   going to ask that question, I respectfully beg you, let

25   my client answer the question because Mr. Brody can't

1    just do it the way he wants to do it because he wants

2    to shorten it, that's not the answer.  We're here to

3    get the truth.  I respectfully beg that Mr. Birchfield

4    be able to give his response.

5            THE COURT:  Thank you.  You were responding

6    to that question but with regard to -- more directly,

7    though, Mr. Birchfield?

8            THE WITNESS:  At that point in time, we had a

9    very good idea of what J and J would willingly pay

10   under those circumstances.  They put it on the table.

11   They had done that through the $8.9 billion proposal

12   that they had rolled out.  That was after a year long,

13   a year long mediation.

14           So no, what we were looking for was a way --

15   because the whole idea was that J and J needed

16   finality, they needed finality.  We saw the bankruptcy

17   plan.  The bankruptcy plan would not pay, would not pay

18   reasonable compensation to our clients and so we were

19   looking for a way to give J and J the finality so we

20   could get.

21   BY MR. BRODY:

22       Q    So I take it that, that's a no, you disagree,

23   it wouldn't be helpful to have somebody who had been on

24   the inside if you wanted to come up with a number that

25   J and J would agree to.  And so you just tossed 19

1    billion out there, when you know that J and J proposed

2    8.9?

3    A    I did not toss out the 19 billion.  The 19 billion

4    number is Jim Conlon and Legacy's number and that is a

5    -- that's what he testified to.  He testified as to how

6    he got to that number and that would be for all talc

7    liability, for all time.

8        Taking on all of J and J's talc liability.  That

9    was not the number -- that's not a number for the

10   ovarian cancer claims.  The ovarian cancer claims were

11   a piece of that overall proposal but only a piece.

12       Q    And you don't know whether that number is

13   based on confidential discussions he had with J and J;

14   do you?

15   A    He testified that it is not and --

16       Q    Well, he testified to a lot of things.  You

17   don't know; do you?

18   A    If you're suggesting that J and J had told them

19   internally that that's the number, then I would find

20   that surprising but I don't have any way of knowing.

21       Q    All right, fair enough, let's wrap this up.

22   You know that on Wednesday morning, J and J announced a

23   proposed plan of reorganization by L.T.L. Management,

24   L.L.C., for the comprehensive and final resolution of

25   all claims and future claims related to ovarian cancer,

1    arising from cosmetic talc litigation, against it and

2    its affiliates in the United States; right?

3    A    Yes.

4         Q    And you know that the announced plan provides

5    for a three month solicitation period during which

6    ovarian claimants are informed of its terms and will

7    have the opportunity to vote for or against the plan;

8    right?

9    A    I understand that that's a provision of the

10   proposal.

11        Q    And that was announced Wednesday morning;

12   right?

13   A    Yes.

14        Q    And by 8:26 a.m. on Wednesday morning, the

15   same day, you had issued a press release stating your

16   opposition to it; right?

17   A    Yes.

18        Q    And you probably remember this but I'm

19   quoting what was attributed to you in that press

20   release.  "We believe any bankruptcy based on this

21   solicitation and vote will be found fraudulent and

22   filed in bad faith under the bankruptcy code.  On

23   behalf of our clients who deserve better, we are

24   blowing the whistle on this cynical legal tactic and

25   we'll resist it at every turn."  That was your

1     statement; right?

2     A    Yes.

3          Q    And Ms. O'Dell also made a statement in

4     opposition; correct?

5     A    Yes.

6          Q    And she was quoted as saying, "The company is

7     afraid of a legitimate vote among those who are truly

8     sick and the families of the deceased who have been

9     battling J and J's obstruction and bad faith for years

10    and who are supported by numerous scientific studies

11    showing that talc contains asbestos and other known

12    cancer causing ingredients."  That's what Ms. O'Dell

13    stated; right?

14    A    Yes.

15         Q    So you're both out in the media resisting J

16    and J's latest plan to resolve its talc liabilities;

17    right?

18    A    Yes.

19         Q    You even sent an open letter to the legal

20    community on the same day; right?

21    A    That's right.

22         Q    And you did that under the Mass Torts Made

23    Perfect Organization logo; didn't you?

24    A    It was a joint letter with Mike Pappentonio

25    (phonetic).

Colloquy                                    75

1        Q    And you don't just want, as you stated there,

2    you don't merely want to challenge J and J's proposed

3    resolution as filed in bad faith, although frankly

4    nothing has been filed, as you indicated but you also

5    want to try to galvanize claimant opposition to J and

6    J's plan; right?

7    A    Yes.

8        Q    And you're urging people to be united in

9    opposition to the J and J plan; right?

10   A    Yes.

11       Q    So I mean really, nothing has changed since

12   last summer when you were opposing the J and J LTL-2

13   plan.  You're still opposing the way in which J and J

14   wants to resolve these claims; right?

15   A    Yeah --

16            MR. POLLACK:  Objection, Your Honor, again

17   relevance.  What does the challenge to a plan today

18   have to do with a question of disclosure a year ago?  I

19   don't see any connection.

20            MR. BRODY:  He already answered my question

21   yes and that was my last question.

22            THE WITNESS:  No.

23            MR. POLLACK:  Your Honor, I still object to

24   it.  I frankly, I don't know what -- Mr. Brody was

25   going to be done in half an hour, now it's two hours.

Colloquy                                        76

1   At this rate, we'll be here all day.

2            THE COURT:  I'm sustaining the objection.

3            MR. BRODY:  That's fine, I have nothing

4   further.

5            THE COURT:  Thank you.  Judge Singh, do you

6   want to take a break or do you want to continue?

7            JUDGE SINGH:  No, no -- yeah, I'm fine with

8   the break (indiscernible)

9            THE COURT:  Okay.  May we take ten minutes,

10  everyone?

11           MR. POLLACK:  Fine, Your Honor, what time

12  would you like to reconvene?

13           THE COURT:  25 after 11:00.  I'm using that

14  clock, I know we all haven't synchronized our watches

15  but I'll start in ten minutes.

16           COURT OFFICER:  All rise.

17  (Off the record at 11:13:00 p.m., back on the record at

18                   11:25:00 p.m.)

19           THE COURT:  Thank you, please be seated.  Mr.

20  Birchfield, come on back.  You're still under oath,

21  sir.

22           THE WITNESS:  Yes.

23           THE COURT:  Mr. Pollack, we have some

24  questions?

25           MR. POLLACK:  I do, Your Honor, Honors, I

1   apologize.

2           THE COURT:  Yep, we're going to wait for Mr.

3   Brody, okay.

4           MR. POLLACK:  Oh, it will be so much faster

5   without him.

6           MR. BRODY:  Apologies.

7           THE COURT:  Quite all right.  Just for the

8   record, you were pretty close to our time in coming

9   back but go ahead, Mr. Pollack.

10          MR. POLLACK:  Yes, Your Honor.

11  REDIRECT EXAMINATION BY MR. POLLACK:

12      Q    Mr. Birchfield, what I would like to do is

13  start with the -- and Your Honor, this goes to the

14  question of whether Mr. Conlon had significantly

15  harmful information, you know, so that's what I'm

16  focused on here.  Mr. Birchfield, could you please walk

17  me through what Beasley Allen first -- when did it

18  first become involved in talc litigation against J and

19  J?

20      A    It began in 2013.  In 2013, it was when we opened

21  our first case and again, you know, investigating the

22  talc issue with J and J.

23      Q    And do you know what that first case was, by

24  chance?

25      A    I don't.

1    Q    And do you know when they had their first

2    verdict?

3    A    Okay, so the first trial was in 2016, in February

4    of 2016 and we had the Fox Trial, that was a $72

5    million verdict.

6    Q    And is there another one called Ristesund, R-

7    I-S-T-E-S-U-N-D, have you heard of that one?

8    A    Ristesund, yes.

9    Q    And when was that one, sir?

10   A    So it was in 2016, as well.  So in 2016, we had

11   three verdicts, the $72 million verdict, I believe a

12   $55 million verdict and a $70 million verdict in 2016.

13   Q    And was Leigh O'Dell ever appointed as co-

14   lead of the M.D.L.?

15   A    Yes, so --

16   Q    When did that occur?

17   A    That would have been in 2016, as well, I believe

18   in December of 2016.

19   Q    And I'm just going to skip a few, just for

20   brevity, Your Honors.  Slemp, there's a matter called

21   Slemp; have you ever heard of that one?

22   A    Yes.

23   Q    What was Slemp?

24   A    Slemp was an ovarian cancer trial and I believe

25   that was $110 million verdict.

1      Q    And do you know approximately what year that

2      was?

3      A    I believe that was 2017.  So in 2016, we had three

4      verdicts, three favorable plaintiffs verdicts and then

5      in the beginning of 2017, we had a Daniels case that

6      was a defense verdict and then we had the Slemp trial,

7      ovarian cancer trial, I believe that was $110 million

8      verdict.

9          And then those cases were -- those cases, the

10     verdicts were vacated based on the Bristol-Myers Squibb

11     case out of the Supreme Court.  The verdicts were

12     vacated on personal jurisdiction but those cases are --

13     those cases are still ready to be retried.  I'm sorry.

14         Q    Were there any Daubert challenges or Ingum

15     (indiscernible) challenges as to expert qualification

16     during the course of these trials?

17     A    Yes, I mean, every -- I mean every trial, you

18     know, you would have -- maybe not Daubert.  I mean, in

19     preceding these trials, the Courts would weigh under

20     the local state standard.  So in New Jersey, it would

21     be Kemp and in California, which is --

22              THE COURT:  Accutane now.

23              THE WITNESS:  Accutane, okay, all right.

24              THE COURT:  Just for our record, Kemp,

25     Accutane, Daubert.

1          THE WITNESS:  Okay and then Sargon

2     (phonetic), you know, there was in 2017.  After the

3     Slemp case, we helped try the El Shevoria (phonetic)

4     case in California, there was a Sargon hearing there.

5     BY MR. POLLACK:

6          Q     What's a Sargon hearing?  I missed that one.

7     A     It's the equivalent of the Accutane here but in

8     California.

9          Q     Oops, okay.

10     A     The state court equivalent of the Daubert, you

11     know, proceeding.

12          Q     And could you describe for the Court the

13     team, the Beasley Allen team that works on -- what's

14     your role within the talc stuff that you do; what's

15     your title?

16     A     I'm the Section Head for the Mass Tort Section.

17     Our firm is divided into sections and I head up our

18     Mass Tort Section.  And so we have a pretty large team,

19     30-something lawyers, in the Mass Tort Section and in

20     the staff, a large staff.  So I manage, I supervise and

21     you know, and since 2020, I have been hands on in the

22     talc.

23          Before that, I was not the one that tried those

24     cases.  You know, so Ted Meadows tried and Gerry

25     Beasley, our Senior Partner, tried the first Fox case

A. Birchfield - Redirect                    81

1      in 2016.  But I mean, I was involved in learning the

2      case, learning the details and supervising but I had

3      other things, prior to April of 2020 and at that point,

4      at that point, had my first meeting with Mr. Murdica,

5      who testified here and at that point, we began pursuing

6      resolution.

7          So we had a number of trials we had gone through.

8      I'm sorry, I'll stop but we had gone through a number

9      of trials up to that point.  My role prior to April of

10     2020 was more of a supervisory role within our section.

11         Q    Did there come a point in time when you

12     weren't just representing clients for Beasley Allen but

13     you also had a leadership role among the Torts Bar at

14     large?

15     A    Yes, that would have been -- well, I mean,

16     officially, we would have been in the M.D.L.  So before

17     2016, there was no M.D.L. formed.  Once the M.D.L. was

18     formed, you know, Judge Wolfson appointed Leigh O'Dell,

19     my Law Partner, as Co-Lead, along with Michelle Parfitt

20     from Ashcraft Gerel, she appointed the committee.

21         And so Leigh and Michelle's -- Ms. O'Dell and Ms.

22     Parfitt, served as Co-Lead Counsel and so, we had a

23     leadership role nationally, in that regard.  There's

24     coordinated litigation here in New Jersey and Ted

25     Meadows and Mr. Placitella and Mr. Golomb were

1      instrumental there.  I don't think there is an official

2      order but just, just that role.

3          Q    And do you view as -- as Chair of the

4      Department, do you view your role because at the time,

5      I think you mentioned 2016, that your role vis-a-vis

6      the other plaintiffs' law firm, that you owe their

7      clients a duty of loyalty too, that you're there to

8      protect their joint interest?

9      A    Yes, I mean, our view, our view and when I say our

10     view, shared by Ms. O'Dell that it's our firm approach

11     and there are differences in how firms would approach

12     leadership roles and M.D.L.s.  But my first M.D.L.

13     leadership role was in <u>Vioxx</u> for you know, Judge Eldon

14     Fallon and you know, in that -- it was instilled then,

15     you have a duty to all of the claimants.

16         There are a number of times when leadership have

17     resolved their own cases and that can be but you know,

18     we would never abandon our role as leadership.  We have

19     a fiduciary duty, in my view, to all of the claimants

20     that are pending in the M.D.L., the lawyers and the

21     claimants.

22         Q    I would like you to address to the Court what

23     you learned, and I'm going to skip all the way up to

24     2021.  I'm going to go right up to this point right

25     here when Mr. Conlon joins Faegre.  So let's call it

1    sometime in 2020.  I would like you to briefly describe

2    what you learned and the premise, Your Honors, for my

3    question is; what did Mr. Conlon know that he didn't

4    already know?

5         That's really what I'm getting to, all right?  So

6    Andy, if you could walk through, what did you learn

7    from 2013 to 2020 regarding the natures of the claims,

8    the types of claims, value of claims, matrices, just go

9    for it.

10                  MR. BRODY:  I'm going to --

11                  THE COURT:  I think Mr. Brody wants to

12   address the Court, Mr. Pollack.

13                  MR. BRODY:  Well, first I'm going to object

14   to the question that is calling for a narrative.  It's,

15   you know, what did you learn about -- I heard a list of

16   six, seven, eight, nine things.  I think the question

17   should be more focused.

18                  You know, generally, I'm all in favor of

19   Counsel framing things for the Court when they are

20   going to go into a certain area and ask questions but I

21   think what we're hearing from Mr. Pollack is argument

22   and I think that it's improper to offer argument during

23   the examination of Mr. Birchfield.  So I would object

24   to the continued framing arguments.

25                  MR. POLLACK:  I can reframe it.

1        THE COURT:  Could you rephrase the question?

2        MR. POLLACK:  Of course.

3        THE COURT:  Mr. Pollack, with regard to what

4   you're exactly -- the testimony that you want to elicit

5   from Mr. Birchfield?

6   BY MR. POLLACK:

7        Q    Absolutely.  Mr. Birchfield, the challenge

8   here today is that you obtained information that was

9   confidential to J and J and that you got it from Mr.

10  Conlon.  That is the allegation that has been brought

11  against you.  I would like to know, what did you know

12  before regarding these claims, what did you know before

13  you met Jim Conlon?

14  A    Before I ever met Jim Conlon, we had extensive,

15  extensive, you know, knowledge and understanding about

16  the nature of these claims, as well as -- as well as

17  what -- how J and J would evaluate these claims.  We

18  gained that because in my view, there -- you learn the

19  strengths and the weaknesses of the cases through the

20  trials.  And so we had tried multiple, multiple trials

21  before I ever met Jim Conlon.

22       Before I ever met Legacy, Jim Conlon or anyone at

23  Legacy, we had gone through multiple Daubert-like

24  hearings.  We had gone through the M.D.L. in front of

25  Judge Wolfson, I mean, that was extensive briefing and

1    expert reports and live testimony.  And we had the --

2    you know, we had the <u>Daubert</u> decision from Judge

3    Wolfson.  We're going through a similar type proceeding

4    with Judge Nelson Johnson here, ending up on appeal to

5    the Appellate Court.

6         And then beyond that, I mean, I've had extensive

7    negotiations, you know, on behalf of ovarian cancer

8    claimants, with Jim Murdica.  So I had -- I believe, I

9    believe the first matrix, you know, that I provided to

10   J and J for Jim Murdica, I believe that was as early as

11   May of 2020.  And so you know, we had been evaluating,

12   you know, how can -- how can we put together a

13   structure for global resolution?

14        We had been working on that for a long time and a

15   long time before ever met, you know, anyone, Jim Conlon

16   or anyone from Legacy.  You know, we negotiated, we

17   negotiated toward a private -- when I say private, it

18   would be through a global deal for all claimants but

19   not part of any bankruptcy.  We did that and then there

20   was a proposal that was a bolt-on to the Imerys

21   bankruptcy and so we had negotiated all of that.

22        All of that requires, you know, an in-depth

23   understanding of the nature of the claims.  What are

24   truly compensable claims, what are the claims that are

25   supported by the science and the medicine and what's

1     not.  It also requires an understanding of how many

2     claims.  What is the total, you know, universe of

3     claims?  You need to know that, unless it's just purely

4     a pay as you go type proposal, you need to know what

5     are the number of claims.

6          So we had worked very closely with firms across

7     the country to assess that, to get a handle on what the

8     total number of claims were.  All of that was done, all

9     of that was done before -- before J and J filed its

10    first bankruptcy.  Then, when J and J filed its first

11    bankruptcy in October of 2021, at first, at first, I on

12    behalf of our ovarian cancer team, I was pushing for

13    resolution in that bankruptcy, in that bankruptcy

14    context.  And now I look back and I see that, that was

15    -- you know, that was a mistake.

16         We had -- at that point, you know, there were

17    Mesothelioma lawyers that were representing clients on

18    the T.C.C. and they were saying, no, you can't, you

19    can't.  We've had experience with bankruptcy, we've had

20    experience with the Texas Two-Step.  It will not work,

21    you cannot get reasonable resolution in the bankruptcy

22    context.  I resisted that and I was pushing for

23    resolution in the bankruptcy context at the beginning

24    of LTL-1.

25         But then after we got -- so through that process,

1    you know, the LTL-1, you know, was filed in North

2    Carolina, it was transferred to Judge Kaplan here in

3    New Jersey.  Judge Kaplan, you know, urged mediation.

4    That didn't happen, I mean, not officially before the

5    motion to dismiss hearing but we did engage.

6         We were trying to reach a resolution once Judge

7    Kaplan denied the motion to dismiss.  When he denied

8    that motion to dismiss, he ordered mediation and he

9    ordered Judge Joel Snyder and Gary Russo to serve as

10   mediators and --

11        THE COURT:  I think that's giving -- I'm

12   sorry, Mr. Birchfield.  I think that gets us to where

13   -- what --

14        MR. POLLACK:  Sure.

15        THE COURT:  To the crux of your question.

16   What did he know at that time frame?

17   BY MR. POLLACK:

18    Q    Correct, I think you're right, Your Honor.

19   Imerys, I know that everyone else probably knows more

20   than I do.  What was the Imerys bankruptcy?

21   A    Imerys is a mining company, they were a supplier

22   to J and J.  So Imerys and Cyprus were suppliers.  They

23   both filed bankruptcies.  The Imerys bankruptcy was

24   filed I think in February of 2019 and Beasley Allen,

25   Leigh O'Dell, Ted Meadows, we served -- we represented

1    a member of that Imerys Tort Claimants Committee, as

2    well.  There is a Cyprus, Cyprus filed bankruptcy, as

3    well but that was primarily for Mesothelioma and we do

4    not have a client on that committee.

5          Q    During the course of the Imerys bankruptcy,

6    did you have discussions with J and J regarding

7    potential resolution of the talc claims?

8    A    We did.

9          Q    And over what time period did you have those

10   discussions?

11   A    So I believe that would have been in -- it would

12   have been the fall of 2020 and up through the spring of

13   2021.

14         Q    Okay.

15   A    Roughly.

16         Q    And the -- were there -- was there a

17   settlement matrix that you ever shared with anyone at

18   that point in time?

19   A    Yes.  I mean, there was a settlement matrix that

20   was developed and it's part of that process, as well.

21         Q    And when you say the settlement matrix was

22   developed, is this something that you worked on with

23   the Talc Claimants Committee?

24   A    Yeah, I mean, it is something that was, you know,

25   presented to the -- you know, to the Tort Claimants

A. Birchfield - Redirect                    89

1    Committee.  I'm just hesitant here because there are

2    very, very strict rules about what goes on within the

3    Tort Claimants Committees on this bankruptcies.

4         Q    Fair enough.  On the -- I lost my train of

5    thought, I'm sorry.  During the course of time in

6    working on Imerys, did you gain insight as to what you

7    believed were the settlement values that J and J was

8    looking for; did you learn about their settlement

9    position?

10   A    Well, yes.  Through the course of the

11   negotiations, you know, we were given a pretty clear

12   picture of at least what they were, you know, they were

13   saying that they would be willing to pay at that point.

14        Q    And if I were to pick the time -- I have on

15   the calendar up here or the clock up here, 2019,

16   roughly is when Imerys starts and 2024 is Imerys

17   ongoing.  I don't know if that's accurate.  Were the

18   number of claims, as you understood them, changing, the

19   number of claimants and the number of types of claims,

20   changing between 2019 and 2023 in Imerys?

21   A    I'm having a little difficulty, you know, teasing

22   out Imerys because I can't really speak to Imerys --

23             MR. POLLACK:  So let me try to

24   (indiscernible) let me ask you a different question

25   because I probably screwed it up.  I apologize, Judge,

1    as I am not a talc guy.  I live a decent life, I have

2    not done this talc stuff.

3          THE COURT:  It's quite all right.

4    BY MR. POLLACK:

5    Q    So I apologize if I botched it.  Let me make

6    the question broader.  If I look at the number of talc

7    claims regarding J and J, just generally between 2019

8    and 2022-23, do you believe there was a change in the

9    number and value of those claims?

10   A    There was a significant change in the, you know,

11   in the total number of claims.  I mean, that is true

12   and I mean, there are -- there were factors that, you

13   know, any lawyer would weigh, you know, impacting the

14   value or a reasonable settlement value.  You know,

15   those factors would change over time, as well.

16         But I mean, over the course of this litigation,

17   over the last, you know, over the last ten years, there

18   have been, you know, milestones that have impacted the

19   total number of -- the total number of claims.

20   Q    So if we could go to something that I'm dying

21   to get into, I love numbers.  We're going to go to

22   Exhibit 7, sir, and this was one that Mr. Brody was

23   asking you about.  Let me know when you're there.

24   A    I'm there.

25   Q    And Exhibit 7 has a proposal from Jim Conlon,

A. Birchfield - Redirect                91

1    Doug Dachille and Jon Disparavich (phonetic).  I'm

2    looking at Plaintiff's Plenary Hearing 66.

3    A    Okay.

4         Q    And it has a matrix then at the end of 67.

5    A    Yeah.

6         Q    So I want to focus first of all on the

7    letter.

8    A    Okay.

9         Q    Am I correct in understanding that you had

10   not seen this document nor a draft of it until you --

11   this litigation began?

12   A    That's right.  I mean, the first time I saw this

13   letter was when this motion was filed.

14        Q    And if we go back to the e-mail that Mr.

15   Brody was asking you about, which is Exhibit 4.  Am I

16   correct in understanding that you did not get a C.C. on

17   this document either?

18   A    Right, I did not.

19        Q    Now, if we go to -- and I'm worried about

20   timing here but we'll get into it, Exhibit 6, which is

21   Plenary -- it's Exhibit 7, it's the last page of the

22   document.  It's the matrix there.

23   A    Yeah.

24        Q    Could you walk us through -- first of all,

25   who created this matrix?

1    A    I did, in conjunction with the leadership

2    committee on the talc claims.

3        Q    So there's been a lot of questions and

4    comments about the matrix, there had been oral argument

5    about the matrix.  Since you are the author of it, you

6    might be the one to say.  What -- can you explain to

7    the Court this matrix?  What is this telling -- what is

8    this telling the receiver, what are you trying to

9    describe?

10   A    So this -- this -- the way that this would work is

11   that, if a -- and this is -- this is not, you know,

12   uncommon.  We develop similar type matrixes in other

13   litigations.  You know, we developed a similar one in

14   _Vioxx_ in the early mid-2000's.  but the way that this

15   would work is a claimant, a client, would be able to

16   identify, okay, when was I diagnosed?  How old was I

17   when I was diagnosed?

18       And then, what was the injury, what stage?  What I

19   diagnosed with Stage 4?  You know, if I was diagnosed

20   with Stage 4 when I'm 55 years old, then you would see

21   that, that is -- that would -- the allocation there

22   would be 500,000, 531,995, that's how it would work.

23   And then there would be a term sheet would provide

24   qualification criteria and that's a key component.

25       And that is a -- that's a primary, a significant

1    reason, for our opposition and especially our

2    opposition to this last proposal.  What we would base

3    our, you know, any settlement on would be the claims

4    that are supported by the medicine and the science for

5    the ovarian cancer, you know, claimants.

6        The type of cancer, the sub-types that were

7    supported by the science.  You know, you're talking

8    about the epithelial ovarian cancer, it can be the

9    fallopian tube or peritoneal cancers, all the same,

10   that's the same.  But if you meet that criteria, you

11   have the appropriate sub-type, then you would be

12   qualified here.  And so that's how the matrix would

13   work.

14       Q    So when I was talking to Mr. Conlon, I think

15   I talked about peanut butter and chocolate in Reeces

16   cups because it was almost lunch.  The part of the deal

17   in Exhibit 7 is a Jim Conlon thing and the attachment

18   is an Andy Birchfield thing.  Is that -- do you believe

19   that's a fair statement?

20   A    Yes, I mean, the matrix, the matrix, that is

21   definitely us.  I mean, me on behalf of the team, the

22   ovarian cancer team, yeah.

23           MR. POLLACK:  Did you ever --

24           THE COURT:  May I ask a question, Mr.

25   Pollock?

1           MR. POLLACK:  Yes, yes, Your Honor.

2      BY THE COURT:

3           Q    I apologize.  So the total funding of this

4      matrix is $19 million?

5      A    No, sir.

6           Q    What's the total funding of the matrix?  If

7      you know.

8      A    Well, in order to determine that -- I mean, I can

9      tell you what --

10          Q    But it's more than $19 million, $19 billion?

11     A    No, sir, it would be -- it would be less than the

12     19 billion.  So the 19 billion that -- that the Legacy

13     proposal includes, that is a proposal for Legacy to

14     acquire an entity with all of J and J's talc liability

15     for all time.

16          So that would include -- it would include the

17     current ovarian cancer claims, it would include the

18     future ovarian cancer claims, it would include, at the

19     time that this proposal was made, it would have

20     included the Mesothelioma present and future.  It would

21     have included the Attorney General's actions.  So you

22     had the two states that were litigating but you also

23     had an ad hoc group of 42 states.

24          So essentially, all the states had claims.  It

25     would have included all -- any talc related liability

 1    from J and J.  And so you know, most of those buckets

 2    are fairly easy to model.  The talc -- I mean,

 3    Asbestos, Mesothelioma, that litigation has been going

 4    on for decades.

 5        There are easy ways to model how many claims you

 6    will have each year.  It's much more difficult with

 7    ovarian cancer.  That's why, you know, for a Legacy

 8    proposal, they needed, they needed information from us.

 9    We didn't need information from them, they needed

10    information from us.

11            THE COURT:  Thank you.  I apologize, I didn't

12    want to get too far afield because I wanted to stay, I

13    wanted to make sure my question was addressed to the

14    current questions that you were posing, so.

15            MR. POLLACK:  Your Honor, this is your

16    courtroom and I respect that and we are here to answer

17    your questions.  You're the audience, so jump in

18    anytime you want.

19    BY MR. POLLACK:

20        Q    Is it fair to say that you never haggled with

21    Jim Conlon over the values in your matrix?  Your values

22    are your values?

23    A    That is true.  I mean, this is the product of a

24    matrix that, this wasn't our first.  You know, this

25    wasn't our first matrix, this wasn't our opening demand

1      in this litigation.  Before we got to this matrix, it

2      had been compromised -- we had compromised through two

3      rounds of mediations, I mean, to some extent.

4          J and J really didn't engage in the mediation in

5      LTL-2 but we had engaged in negotiations through LTL-1

6      and then even following the dismissal.  So and as I had

7      mentioned earlier, you know, we had put together a

8      matrix.

9          We, the ovarian cancer team, had put together a

10     matrix very similar to this and a term sheet in March

11     of 2023, that we offered to present to J and J, in a

12     meeting with Mr. Haas and Ms. Forminard, their General

13     Counsel, but they declined that meeting but that was

14     put together.  This matrix is a compromised matrix

15     through years of negotiation but this was our matrix.

16         Q    But to put a point on it, you weren't

17     compromising with Jim Conlon?

18     A    No, no, we were not haggling, we were not

19     discussing, we were not negotiating matrix.

20         Q    So I'm going to quote from the language of

21     R.P.C. 1.6, first line, "A lawyer shall not reveal

22     information relating to representation of a client

23     unless the client consents," and it does go on from

24     there.  Under oath, to the best of your knowledge and

25     belief, at any point in time, did Mr. Conlon ever

1    reveal to you any information that he had learned while

2    at J and J?

3    A    No.

4         Q    The -- sitting here today, I recognize it's

5    impossible to look behind a black screen of what Mr.

6    Conlon learned during the course of his representation

7    of J and J at Faegre.  Is there anything that you can

8    think of that he would have learned, having heard his

9    testimony, that was conceivably relevant to your

10   position representing clients in Beasley Allen?

11   A    Not at that point in time.  By the time I met him,

12   there would have been nothing that I can think of.

13        Q    And have you seen a single document, record,

14   anything here that Mr. Conlon shared any J and J

15   confidences with you?

16   A    No.

17             MR. BRODY:  I'm going to object to that, Your

18   Honor.  He's (indiscernible) really, he's asking for an

19   opinion on the evidence.

20             THE COURT:  Are you asking for an opinion or

21   a fact, Mr. Pollack?

22             MR. POLLACK:  I'm asking a factual question.

23   He is being accused of having received information --

24             THE COURT:  To the extend he knows.

25             MR. POLLACK:  And he said he did not.

1           THE COURT:  Right, Mr. Brody.  But I think

2    the Court's questions earlier all based on your

3    questions, Mr. Brody, is you know, candidly, he may not

4    know, he wouldn't know.

5           MR. BRODY:  Exactly, exactly, Your Honor.

6           THE COURT:  So his testimony is, no.

7           MR. POLLACK:  We can address this later.  I

8    think his testimony is more than that.  I think it's,

9    no, I didn't receive anything and it's also, no, I

10   can't think of anything that he could have shared that

11   was relevant.  So let me drill down on this a little

12   bit, if you would?

13          THE COURT:  Go ahead.

14          MR. POLLACK:  He's at Faegre until -- I can't

15   --

16          THE COURT:  March 2023.

17   BY MR. POLLACK:

18       Q    March '23.  So during -- can you describe

19   briefly for the Court the changes in the number of tort

20   claims, Asbestos claims, that are out there between

21   June 2020 and -- I'm sorry, March 2023.  Can you

22   describe what the evolutionary change is, if there's

23   any?

24   A    Okay, well, yes.  There was a significant -- I

25   mean, there was a significant increase in the total

1    number of claims.  And I'm -- I mean, I apologize.

2    This is just -- there is so much mixed in here and I

3    want to be clear because from our perspective, you talk

4    about two different things.

5         You talk about the total number of compensable

6    claims versus the total number of claims.  And so to

7    answer your question, I really need to know, what are

8    you asking?

9         Q    Let me break it out.

10   A    Okay.

11        Q    That's a fair comment.  So at what -- Andy,

12   you know the dates better than I do.  L.T.L. was filed,

13   according to (indiscernible) October 2021, L.T.L. is

14   dismissed on January of 2023.  Does that sound about

15   right?

16   A    Yeah, the Third Circuit issued its opinion on

17   January the 30th, 2023.

18        Q    Okay.

19   A    It was the mandate issued, it was technically

20   dismissed by Judge Kaplan on April the 4th of 2023.

21        Q    And so -- and you live in this world, right.

22   Does the number of claims out there, did that change

23   significantly as a result of the Third Circuit's

24   rejection of the L.T.L. plan?

25   A    I wouldn't say that there was a significant number

1    of changes as a result of the Third Circuit.  I mean,

2    there were -- along the scope of this litigation, you

3    know, there had been some key events that have, you

4    know, caused spiked in the number of claims and the

5    number of claims filed.

6         And you know, some were verdicts, some were the --

7    you know, the Supreme Court's decision in Ingum, you

8    know, the Daubert rulings and but the biggest, the

9    biggest spike in the total number of claims came as a

10   result of the L.T.L. filing.  And that is because --

11   that's a major concern from my perspective because

12   we've always looked at, you know, what are the

13   compensable claims?

14        So Ms. O'Dell, Mr. Parfitt, as part of the M.D.L.,

15   they communicate with lawyers.  They communicate and

16   they have over the course of these years, indicate,

17   telling them; you know, this is what the science shows,

18   these are the types of cases that are supported by the

19   science, just this finite group.  But then when J and J

20   filed its second bankruptcy, they brought in all these

21   other claims.

22        These other gynecological cancers that are not

23   supported to-date by the scientific literature.  So

24   cervical cancer cases, uterine cancer cases, vaginal

25   cancer cases, you know, other types of cases.  You

A. Birchfield - Redirect                101

1    know, they are serious injuries, they're just not

2    (indiscernible) but the -- in the second bankruptcy, in

3    the third that is proposed, that's what -- they are

4    bringing those claims in.

5        They're bringing those claims in and would have

6    them vote.  They would vote and vote on a plan that, if

7    passed, would then force these unreasonably low values

8    on the meritorious claims, the claims that are

9    supported by the science.

10       Q    Let me switch gears with you for a second

11   here.  With regard to expert, Mr. Brody intimated in

12   the first day before Judge Porto that Mr. Conlon, who

13   was citing a case from the District Court of New

14   Jersey, that he was an expert.  Did you ever retain Jim

15   Conlon as an expert?

16            MR. BRODY:  I'm just going to object to the

17   characterization of my argument from January 17th

18   because it is inaccurate.

19            THE COURT:  Well, you'll have an opportunity

20   to address that but I certainly, our record reflects

21   what it is but go ahead, Mr. Pollack.

22   BY MR. POLLACK:

23       Q    I'm not going to quivel.  Did you retain him

24   as an expert?

25       A    No.

A. Birchfield - Redirect                    102

1        Q    Did you ever seek advice from him regarding

2    how to prosecute or pursue your claims against J and J?

3    A    No.

4        Q    Side-switching lawyer was another argument

5    that was raised.  Did you ever retain Mr. Conlon?

6    A    No.  I mean, from the very beginning of any

7    interaction with Jim Conlon or Legacy, I recognized, I

8    recognized the role that they would play and they would

9    be standing in the shoes of J and J.  They would be our

10   adversary and any claim, any -- the proposal that we

11   put forward, the proposal that is in here, it is an

12   opt-in proposal.

13       Clients would voluntarily choose to accept the

14   settlement or not and if -- if the settlement -- if

15   they chose not to, then -- or if the settlement

16   proposal didn't meet the threshold of 95 percent,

17   Legacy would be litigating.  They would have full

18   responsibility, full liability, we would be litigating

19   against them.

20       So I approached this.  Our team, you know,

21   approached this with that understanding and that

22   appreciation.  They would be our -- they would be the

23   adversary, they would be on the opposite side of the

24   (indiscernible) if J and J chose to sell off its -- all

25   this talc liability to Legacy or to whoever.

A. Birchfield - Redirect                      103

1        Q    Mr. Brody has argued repeatedly that there

2   was an alliance between you and Jim Conlon to work

3   against J and J.  Do you agree that you were ever in an

4   alliance with Mr. Conlon to work against the interest

5   of J and J?

6   A    No.

7        Q    Why not?

8   A    As I just said, I mean, this was -- this was not

9   -- it was not against J and J.  It's against, it's

10  against the proposal that Mr. Haas has said is his

11  preferred method, his preferred bankruptcy but it's not

12  opposed to J and J.  I think this is -- I think that

13  getting rid of the talc liability would actually be in

14  the best interest of J and J.

15       Q    Did you ever sit down with Jim Conlon and

16  say, Jim, I got an idea, we can get more money out of J

17  and J this way.  Was that ever one of the discussions

18  you had?

19  A    No.

20       Q    So when I look at Exhibit 4, it says from Jim

21  Conlon to Duane Van Arnsdale, Doug Dachille, Erik Haas

22  and Andrew White.  It says, "Duane, thank you for your

23  efforts to evaluate our proposal."  Whose proposal is

24  it?

25  A    It's Legacy's proposal.

A. Birchfield - Redirect                        104

1          Q    And that's a proposal that you had not seen

2     before it was sent to J and J; correct?

3     A    Correct.

4          Q    And at the end it says, "Andy Birchfield,

5     Doug Dachille and I are prepared to meet with you."

6     Did you ever take from that sentence that the idea --

7     or was it your belief that you two were going to link

8     up, that is you and Legacy were going to link up and go

9     attack J and J and take them for everything they're

10    worth?

11    A    No, not at all.

12         Q    What was your understanding of what the

13    meeting was about?

14    A    The meeting was -- as I understood it, at least as

15    the invitation to me, would I join, would be for me to

16    talk about the matrix and how it would provide a

17    measure of certainty.  You know, that the auditors, the

18    external auditors, Pricewater House, would be able to

19    factor in because they would have to give sign off on

20    the -- they would have to sign off on the gap

21    procedure, ASE-450.

22         They would have to sign off on that to remove the

23    non-cash charge from J and J, to get the talc liability

24    off of J and J's books.  And the uncertainty around the

25    ovarian cancer case liability would be a factor that

1    could provide a wide range and as external auditors, to

2    cover themselves, they would have to go on the highest

3    end.   This would provide some measure of certainty

4    about what the ovarian cancer liability could be

5    resolved for.

6         And so you know, to explain that and for Legacy

7    people to explain the structural optimization and

8    disaffiliation and how that would benefit J and J, that

9    was my understanding.   My role would have been to talk

10   about the matrix, to talk about the values in the

11   matrix and what that would add up to.   And Judge Porto,

12   you asked me about the value and before I got to that,

13   you asked about, is it more than the 19 billion.

14        This matrix, the matrix value here before there

15   are any reductions for risk factors, based on what we

16   know about the universe of the claims, the value of

17   this would be approximately a 300,000 case average for

18   the legitimate claims.   When I say legitimate, I don't

19   mean to disparage any cancer victims but there are,

20   there are cases, there are the ovarian cancer, the

21   epithelial ovarian cancer, there are certain sub-types

22   that are supported by the science.

23        If it's limited to that, this grid would be a

24   300,000 case average.   We know that.   We can't look at

25   this grid and determine that but we know because we

1    have worked on this for a long time, we know what a

2    reasonable projection of how many claimants would fall

3    into each of those boxes.

4         So we can make that calculation of what this grid

5    would average and that's what we have done but it is,

6    based on the much smaller universe, the total number of

7    claims because J and J is now saying that the total

8    number of current claimants is 100,000.  You know, we

9    would say that the total number of claimants that meet

10   true qualifying criteria are significantly less than

11   that.

12        Q    I'm going to move on topics.  You got

13   questioned today regarding common benefit.  On page 49,

14   lines 10 through 12, Mr. Haas, throughout the common

15   benefit fee, he was not available and the plan at

16   L.T.L. was advancing --

17             MR. BRODY:  Sorry, page 49 of what?

18             MR. POLLACK:  Page 49 of, I apologize Steve,

19   it's Erik Haas' direct on March 25.

20             MR. BRODY:  Okay.

21             MR. POLLACK:  You can take my copy.

22             MR. BRODY:  That's all right, no, I have one.

23   BY MR. POLLACK:

24        Q    If the common benefit fee was not available

25   and the plan of L.T.L. was advancing in the L.T.L.

A. Birchfield - Redirect                    107

1    bankruptcy.  Here it is, Steve.  And you were

2    questioned about it today.  Do you agree with Mr. Haas

3    that you are not entitled to -- I'm sorry, let me try

4    it this way.  Was the driving factor for you, at any

5    point in time regarding the L.T.L. bankruptcy, that you

6    would not get common benefit?

7    A     Absolutely not.  I mean --

8         Q    Why not?  What did Mr. Haas get wrong?

9    A     Well I mean, first of all, I mean, there is no

10   principle that you cannot -- you cannot -- that a

11   bankruptcy court cannot award common benefit fees.  But

12   the thing that is so frustrating here is that, you

13   know, that we have resisted overtures, we have resisted

14   overtures, to negotiate a common benefit fee.  We are

15   not going to do that.

16       We are firmly committed that we will look out for

17   the best interest of our clients.  If we take care of

18   getting reasonable compensation for our clients, the

19   common benefit fee will take care of itself.  We are

20   not going to put that ahead of the clients and the

21   client interests.  The reason -- the reason that we are

22   opposing bankruptcy is because of the values that are

23   being offered in bankruptcy.

24       If you look at the proposal, you look at the

25   proposal that they had in LTL-2, you look at the

A. Birchfield - Redirect                    108

1    proposal that they rolled out on Wednesday.  They have

2    a payment schedule, a payment schedule.  It would be

3    $4.34 billion that would be available during the first

4    seven years.  So that would be for your current

5    claimants.  Current claimants would be paid within

6    that.

7         They're saying there's 100,000, 100,000 claimants,

8    that would be a 43.4 thousand average, case average.

9    Now, there would be a range there but you cannot, at

10   that total number, even if you were to limit it to the

11   truly compensable cases, you cannot get to fair values

12   for the claimants here.  We know, we know because we

13   have been looking at this for a long time.  What are

14   the elements that would be going into a reasonable

15   compensation for the claimants?

16        One, you have the medical cost.  The medical cost

17   for especially someone in their 50's or younger that is

18   diagnosed with a Stage 4, those easily exceed a million

19   dollars, just in the medical cost.  And if you have, if

20   you look at the matrix, I mean, there are Stage 1 cases

21   that go up to 80 years old or so.  The cost for

22   treating someone who is 80 and diagnosed with Stage 1,

23   that's in the tens of thousands, it's much lower.

24        But we know that the weighted average across this

25   entire spectrum would be about 224,000 average case

1    value.  The numbers that they are putting forward in

2    this bankruptcy and their bankruptcy proposal would be

3    truly pennies on the dollar.

4              THE COURT:  And that's getting -- you know,

5    there's no objection by Mr. Brody but in terms of where

6    we are.  I think you're getting a little bit far afield

7    from your question but certainly, that's the testimony,

8    but.

9              MR. POLLACK:  I'll move it along, Your Honor.

10             THE COURT:  You want to get us back to what

11   he knew with regard to Mr. Conlon, what Mr. Conlon may

12   or may not have conveyed to him.

13             MR. POLLACK:  We can, Your Honor, I'm going

14   to move it along.  There was one direct -- part of

15   their theory of the case was to argue that Andy is a

16   bad guy and he's not credible.  And one of the points

17   Mr. Haas made at direct solicitation of Mr. Brody's

18   testimony was that the bias here is because Andy is

19   looking for a payday and the way that the payday works

20   is that you get -- you don't get common benefit in

21   bankruptcy.

22             So I will move it along.  I do need to

23   address it one more time because he squarely addressed

24   it during the course of direct and I need to respond.

25             THE COURT:  Yes, you do.

A. Birchfield - Redirect                    110

1          MR. POLLACK:  But I also understand loudly

2     and clearly, we want to get this done today.  I think

3     we're going to, I just need -- if you give me a little

4     bit more leeway, I would appreciate it.

5          THE COURT:  Go right ahead.

6     BY MR. POLLACK:

7          Q    So if you go back to your binder exhibits,

8     page 5 -- I'm sorry, Exhibit 5, I'm looking at page 29.

9     It's Plenary Exhibit 56.

10    A    Yeah.

11         Q    Let me know when you're ready.

12    A    What page, I'm sorry?

13         Q    It's Plenary Exhibit 56, Exhibit 5.

14    A    Yes, I'm there.

15         Q    Okay.  So before you go and read that, let me

16    just ask you.  Mr. Haas has argued that you admitted

17    that you are not entitled to common benefit before.  Do

18    you agree that you ever admitted that you are not

19    entitled to common benefit?

20    A    No.

21         MR. BRODY:  I'm just going to object and ask

22    for a reference.

23         THE COURT:  On the page number, I think it's

24    line 9.

25         MR. POLLACK:  Yeah, I have lines 9 through

1    14.

2              THE COURT:  Thought so, okay.

3    BY MR. POLLACK:

4         Q    So lines 9 through 14.  We'll come back.

5    This is a questioning of you and you were deposed

6    before; correct?

7    A    Yes.

8         Q    And you were deposed on or about April 17th,

9    2023?

10   A    Yes.

11        Q    And you were asked the following question by

12   Mr. Haas, "We'll come back to that in a moment but you

13   understand that as a general matter in bankruptcy, you

14   would not be entitled to any portion of a common

15   benefit fund that you would be entitled to outside of

16   the bankruptcy; correct?"  Answer, line -- answer, "No,

17   I do not."  Is that the answer you gave?

18   A    It is.

19        Q    And do you stand by that answer today?

20   A    Yes.

21        Q    There was also a question regarding a -- bear

22   with me for one second, I'm sorry, Judge.  I'm going to

23   go to -- you were handed a transcript of April 17, 2023

24   the last time we were here and the -- and in

25   particular, Mr. Haas had argued during the first day

1    that you had backed out of a deal.  Do you recall

2    having that testimony from Mr. Haas?

3    A    I recall that testimony --

4                MR. BRODY:  I'm going to object, it

5    mischaracterizes the testimony.

6                THE COURT:  It's not that we're going to base

7    our evidence, any evidence decision or make a fact

8    finding on the question.  So I remember the question,

9    Judge Singh, I'm sure, remembers that question because

10   that drew a reaction, candidly, of what I recall, you

11   know, from many, many individuals.  So why don't you

12   synthesize the question down.

13               MR. POLLACK:  Sure.

14               THE COURT:  I got your point, Mr. Brody, but

15   yeah.

16               MR. BRODY:  Thank you.

17               MR. POLLACK:  If you want me to spend the

18   time for ten minutes, I can find the exact quote.  I

19   think the sum and substance of what I just said is

20   absolutely right.  Mr. Haas accused Andy of having

21   backed out of the deal in the Imerys bankruptcy and

22   said, we had a deal at $3.5 billion and you backed out.

23               And simply, since this is redirect, I'm

24   allowed some latitude, I believe.  If you want me to

25   find the exact quote, I can find the exact quote.  It

A. Birchfield - Redirect                    113

1    will take me ten minutes to do it.

2              THE COURT:  Can you help, Mr. Brody?

3              MR. BRODY:  Well, I think the problem is

4    trying to build a characterization of Mr. Haas'

5    testimony into the question.  I mean, he could just ask

6    him a question about the deal, I think we can get to

7    where he's going.

8              THE COURT:  And that's a fair

9    characterization.  Do you remember that question with

10   regard to purportedly the deal and something happened

11   to that deal?

12             THE WITNESS:  Yes but there are two separate

13   deals --

14             THE COURT:  But -- all right.

15             MR. POLLACK:  Let me run with it, Andy.

16             THE COURT:  Go right ahead.

17             MR. POLLACK:  And Judge Porto will tell me if

18   I screw it up, okay, is that fair?

19             THE COURT:  That's fair but --

20             MR. POLLACK:  Judges have been doing that --

21             THE COURT:  I just want to hear the question.

22             MR. POLLACK:  Judges have been doing that to

23   me for years, I've gotten used to it.

24   BY MR. POLLACK:

25        Q    I'm looking at the April 17th, 2023 exhibit

1    that transcript that Mr. Brody was kind enough to

2    provide us last time.  So I'm going to go to page 61 of

3    that transcript.

4         Line 9, "Do you recall that August and September

5    of 2020, you had further discussions with Johnson and

6    Johnson's counsel regarding proposal to settle all

7    ovarian cancer claims through the Imerys bankruptcy,"

8    and there's a whole host of objections.  Apparently,

9    they were pretty excited that day.

10        And then it goes on again, page 63, line 24, "On

11   September 5, 2020, you made a proposal, Mr. Murdica, on

12   behalf of J and J, in this role on behalf of J and J to

13   settle all the ovarian cancer claims, both current and

14   future, for $3.25 billion, right?"  And that's page 64.

15   Then again, a mountain of objections.

16        And at page 74, I'll have a question soon, "And

17   you did not represent to J and J," this is line 3, "In

18   connection with this settlement offer of 3.25 billion,

19   that you had spoken to each and every one of the

20   clients regarding a proposed offer, correct?"  Your

21   answer, line 8, "I did not.  I did not make that

22   representation."

23        "And you did not require, as an element of your

24   offer, that each of the other participating law firms

25   were required to get an affidavit to represent to

1    Johnson and Johnson that they had spoken to every one

2    of their clients regarding the proposal, correct?"

3    There's objections, answer, "We never got -- we never

4    got to that point."

5        What did you mean when you said, "We never got to

6    that point," what's going on?

7    A    Well, I mean, this was a proposal that was made.

8    It was not for --

9        Q    Whose proposal, Andy, help me out?

10   A    I made the proposal.

11       Q    Okay.

12   A    It was a term sheet and -- that was made, you

13   know, to J and J.  I was questioned about that term

14   sheet in my deposition and it was characterized and

15   being a $3.25 billion proposal for all ovarian cancer

16   claims, present and future.

17       And so, and through that colloquy and what Mr.

18   Brody asked me about on April the 10th, I think when we

19   were here was, did you submit it?  I did submit that

20   proposal.  What I was objecting to is, it is not a

21   $3.25 billion proposal.  That was only a portion of the

22   settlement proposal then.  That was it, that was --

23       Q    So what's the total value?  What's the real

24   number and how do I break it out?  Can you explain it

25   to the Court, please?

1    A    Okay, that was a proposal that would have been

2    testing my memory but I believe that the total would

3    have 5.5 to in the 6 range, depending on how you count

4    the present value because it would have provided a ten

5    year payout for futures in that regard.  But that was a

6    proposal in September of 2020, when the total universe

7    of claims, current claims, was much, much smaller.

8         But that's not -- that's not the proposal that Mr.

9    Haas has accused me of reneging on.  That was a -- and

10   in the hearing, in the hearing last time on April the

11   10th, there was probably what you saw, the reaction,

12   was that there was a shift.  Mr. Haas didn't say on

13   April the 10th that I reneged.

14        He said that he received communication from the

15   mediations that the committee would accept it and

16   that's a different position than had been taken

17   previously but that -- but those are two separate

18   proposals.  I was asked in my deposition about the, you

19   know, that proposal in September of 2020.  It was

20   presented as a 3.25 -- in my deposition, it was

21   presented as a $3.25 billion deal, which it was not.

22        That's one and then later, there was an Imerys

23   proposal and then there was a mediator's proposal.  So

24   we're talking about different steps along the way,

25   different agreements but it was the mediator's proposal

1    that I was initially accused of reneging on and then it

2    was purported that the mediators said that the

3    committee would agree, which we did.

4         Q    If we go on to one last question on page 94,

5    same transcript of April 17, 2023, lines 12 to 17,

6    let's call it.  Mr. Haas, "So does that clarify, Mr.

7    Birchfield, that?"  Answer, "This is the proposal.  It

8    was made in September of 2020.  The world has changed

9    since September of 2020 in multiple ways that would

10   impact a proposal."  It goes on from there.

11        Can you describe for the Court, just to put this

12   in context, this transcript is created April 17th, 2023

13   and it's the bankruptcy, apparently.  How had the world

14   changed between September of 2020 and April 17th of

15   2023?

16   A    Well, in the -- in the scope of the talc

17   litigation.  So in September of 2020, there had not

18   been a -- you know, a bankruptcy filing.  You know,

19   there had been an effort to do a bolt-on but you know,

20   the number of claims, the number of claims had

21   increased, you know, dramatically between September of

22   2020 and then the time that deposition was given in

23   April of 2023.

24        So the number of claims had shifted dramatically.

25   Plus, there was the introduction by J and J in their

A. Birchfield - Redirect                    118

1   bankruptcy proposal, their L.T.L. proposal on April the

2   4th of 2023, that all these other cancers should be

3   included, as well.  So that impacted, you know,

4   matters.

5        But perhaps one of the bigger, you know, another

6   big shift is we had gone through, we had gone through

7   the threat of a J and J bankruptcy.  You know, you're

8   going to be in bankruptcy, your claims are going to be

9   on hold for years and clients are going to die, the

10   delay is going to cause significant problems.  We had

11   been through that.

12        We had gone through LTL-1, we had gone through the

13   motion to dismiss trial, we had gone through the appeal

14   to the Third Circuit and the Third Circuit had

15   dismissed the bankruptcy for lack of financial

16   distress.  So that was a significant change.

17        At that point, even though they had filed their

18   second bankruptcy on the strength of the Third Circuit,

19   there was a significant change in the risk that we

20   thought we were facing.

21        Q    So subject to any questions the Court may

22   have, I really only have one last question for you, Mr.

23   Birchfield.  You opposed the bankruptcy matter, the

24   bankruptcy filing that J and J had proposed.  Why did

25   you propose -- why did you oppose that on behalf of the

Colloquy                                    119

1    Talc Claimants Committee and Beasley Allen?

2    A    Okay, you say the bankruptcy filing, you're

3    talking about LTL-2.

4         Q    Yes, yes.

5    A    You know, their second bankruptcy filing.  The

6    reason that we opposed that bankruptcy is because it

7    would not provide, it would not provide reasonable

8    compensation, you know, to the claimants.  And the

9    matrix, you know, the matrix values that we've put

10   forward that is now public, that J and J has made

11   public with this filing, those reflect reasonable

12   values for legitimate claims.

13        And we are adamantly opposed to a bankruptcy or

14   any settlement from a solvent defendant that would

15   force a claimant to accept value.  Even what we would

16   conclude to be reasonable values, they shouldn't be

17   forced to take that.  But certainly, you know,

18   certainly, they should not be forced to take

19   unreasonably low values.

20        That's the only reason.  The interest of the

21   client is the only reason that we have opposed these

22   bankruptcies and continue to oppose these bankruptcies.

23             MR. POLLACK:  Your Honors, do you have any

24   questions?

25             THE COURT:  Judge Singh?

Colloquy                                     120

1              JUDGE SINGH:  I do not.

2              THE COURT:  I don't have any questions

3     either.

4              MR. POLLACK:  Thank you, Judges.

5              THE COURT:  Why don't we take our lunch

6     break, 45 minutes?

7              MR. BRODY:  Sure.

8              MR. POLLACK:  Yes.

9              THE COURT:  Okay?  Mr. Brody, how long do you

10    think you'll need?

11             MR. BRODY:  20 minutes, maybe.

12             THE COURT:  Okay, all right and we're

13    adhering to Judge Singh's calendar with regard to

14    supplemental briefing and when we return, we'll address

15    the objections on like Exhibit 5 and with regard to the

16    confidential client information, okay?

17             MR. POLLACK:  Yes, Your Honor.

18             MR. BRODY:  Thank you.

19             THE COURT:  Thanks.

20             MR. POLLACK:  Thank you both.

21             COURT OFFICER:  All rise.

22              (Off the record at 12:29:00 p.m.)

23                      (Lunch recess)

24                         * * * *

25             (Back on the record at 1:16:35 p.m.)

A. Birchfield - Recross                    121

1           THE COURT:  Counsel, thank you, please be

2      seated.  We're going back on the record.  Reconvening,

3      Mr. Brody.  What did you say, you have five questions

4      left?

5           MR. BRODY:  Not many more than that,

6      actually.

7               THE COURT:  Okay, all right.

8               MR. BRODY:  So --

9           THE COURT:  It probably was a little bit more

10     but I was downplaying the questions, Mr. Brody.

11              MR. BRODY:  No, it's not many, it's not many

12     more than that.

13          THE COURT:  And Mr. Birchfield, you're still

14     under oath, sir.

15              THE WITNESS:  Yes.

16     RECROSS EXAMINATION BY MR. BRODY:

17        Q    Mr. Birchfield, you talked about some of the

18     trials, the talc trials that the Beasley Allen Firm has

19     had; do you recall that testimony?

20     A    Yes.

21        Q    And you talked about some verdicts that came

22     out in 2016, I think you mentioned three in particular?

23     A    Yes.

24        Q    Right.  None of those are still standing

25     after the appeal; right?

1    A    No, they -- none of the verdicts are standing,

2    that's true.

3         Q    Right.

4    A    The verdicts were vacated and the trials are

5    pending, awaiting retrial.

6         Q    And it's basically fair to say that since

7    2013, when Beasley Allen started representing talc

8    plaintiffs, Beasley Allen has tried only 13 cases, not

9    recovered a dime for claimants and has not settled any

10   of the cases; right?

11   A    I mean, the point that you're wanting to make is

12   accepted, it's not true that we haven't collected a

13   dime.  We did have a co-counsel agreement in the -- for

14   a plaintiff in the Ingum case but it is true that we've

15   been in this litigation.  We have a longstanding and

16   continued commitment to this litigation, even though we

17   haven't been paid a dime, that's true.

18        Q    Right.  So it is fair to say that since 2013,

19   Beasley Allen has tried only 13 cases, not recovered a

20   dime for claimants and not settled any of the cases?

21             MR. POLLACK:  Objection, compound, asked and

22   answered.

23             THE COURT:  Why don't you break that question

24   up?  And you did ask the question, what's different

25   about that question, Mr. Brody?

1          MR. BRODY:  Well, there were a bunch of

2     qualifications that preceded it.  I was just trying to

3     make sure the record is clean.

4          THE COURT:  Certainly, that's fine.  Why

5     don't you just address each of those points, all right,

6     Mr. Brody?

7          MR. BRODY:  That's fine.

8     BY MR. BRODY:

9     Q    So since 2013, Beasley Allen has tried only

10    13 cases; right?

11    A    We have had -- we have had 13 cases go to trial.

12    I mean, some of those cases are cases that were our

13    cases, some we were helping other law firms, but yes.

14    Q    Beasley Allen has not recovered a dime for

15    the claimants?

16    A    Not true.  I mean --

17    Q    Fair enough and has not settled any of the

18    cases; right?

19    A    We have not settled any of the cases.

20    Q    All right.  Do you have a copy of your April

21    2023 deposition in front of you up there?

22    A    I do not.

23         MR. BRODY:  All right, I'll give you -- I'll

24    give you a copy.  If I may approach, Your Honor?

25         THE COURT:  You may.  Do you have a copy of

1    that, Mr. Pollack?

2              MR. POLLACK:  I do not.

3              MR. BRODY:  I'll give you a copy, it's the

4    one you were reading from earlier.

5              MR. POLLACK:  Okay, is it the same big fat

6    thing?

7              MR. BRODY:  Yeah.

8              MR. POLLACK:  Okay, then I probably have it.

9              THE COURT:  Oh, well it's not one of the

10   exhibit either?

11             MR. POLLACK:  I'm sure -- thank you.

12             MR. BRODY:  Yeah, I think it's in the

13   exhibits, as well.

14             MR. POLLACK:  We're good, thank you, Judge.

15   BY MR. BRODY:

16        Q    It's within the excerpt that is in the

17   exhibits, as well.  So if you turn to page 58, line 20;

18   are you there?

19   A    Yeah.

20        Q    And you were asked the question, so since

21   2013 with respect to the 11,300 claims that Beasley

22   Allen represents, Beasley Allen has tried only 11

23   cases.  There have been two in Florida this year in

24   addition to that; right?

25   A    That's correct.

A. Birchfield - Recross                         125

1    Q    "Not recovered a dime for claimants and not

2    settled any of the cases; is that fair?"  And your

3    answer was, "That's basically fair," correct?

4    A    Correct, that's basically fair.

5    Q    That was -- that's -- all right.  You can set

6    that aside.  The -- you were asked questions by Mr.

7    Pollack about whether a contribution to the M.D.L.

8    common benefit fund could be part of a bankruptcy

9    resolution; do you recall those questions?

10   A    Yes.

11   Q    And you understand, however, that a

12   contribution to the M.D.L. common benefit fund was not

13   part of J and J's proposed bankruptcy resolution;

14   right?

15   A    I understand that, yes.

16   Q    All right.  You talked about a settlement

17   matrix that you shared with J and J during the course

18   of the Imerys bankruptcy; do you recall that testimony?

19   A    Yes.

20   Q    You were not privy to Johnson and Johnson's

21   internal privileged and confidential discussions of

22   that settlement matrix; were you?

23   A    No.

24   Q    Last thing I want to ask you about.  Last

25   thing I want to ask you about.  You indicated that as a

A. Birchfield - Recross                    126

1    result of your leadership position, that you at times

2    are representing not only your own clients' interests

3    but the interests of clients of other lawyers; right?

4    A    What I said is that, we view -- we view our role

5    as a leadership role in the M.D.L. as having a

6    fiduciary duty to the other claimants and their

7    counsel.

8         Q    Fair and that was going to be my next

9    question.  You indicated that you have duties to them;

10   right?

11   A    Right.

12        Q    And one of the things you talks about, with

13   respect to the Legacy proposal that you testified about

14   was this idea that Legacy, if the proposal were

15   accepted, would be adverse to you and your clients;

16   right?

17   A    Yes.

18        Q    That they would then hold the entity that had

19   talc liabilities --

20   A    Right.

21        Q    -- and in essence, they would be on the other

22   side of the bead from where you are; right?

23   A    Yeah, that's right.

24             MR. BRODY:  Now, if I may, I just -- to

25   reorient ourselves from April 10th.  If I may approach

A. Birchfield - Recross                    127

1    with another excerpt from the privilege log?

2              THE COURT:  You may.

3    BY MR. BRODY:

4         Q    And this just makes it easier than sorting

5    through the (indiscernible) okay, we pulled out from

6    that entries that -- and we talked about some of these

7    on April 10th, where Ms. O'Dell shared an ovarian

8    cancer leadership memo with Legacy, discussing ovarian

9    cancer case values, injuries and damages analysis; do

10   you see that?

11   A    Yes.

12        Q    Your ovarian cancer claim values, as well as

13   claim estimation report methodology; do you see that?

14   A    Yes.

15        Q    And then we talked about Nile Davies who is

16   listed on here sharing draft Q.S.F. qualifications for

17   the Legacy ovarian cancer proposal; do you see that?

18   A    I do.

19        Q    And Mr. Davies, is he still with the Beasley

20   Allen Firm?

21   A    He is.

22        Q    All right and he was at the time; right?

23   A    Yes.

24        Q    Right and so you gave somebody you've

25   identified as a potential future adversary your

A. Birchfield - Recross                  128

1    analysis of case values, injuries and your damages

2    analysis, if I'm reading this correctly; right?

3    A    (indiscernible)

4        Q    Yes?

5    A    Yes --

6            MR. BRODY:  Thank you, that's all I have.

7            THE WITNESS:  Okay.

8            THE COURT:  Thank you.  Mr. Pollack, anything

9    to follow up?

10           MR. POLLACK:  Sure.  Using the last document

11   which I don't think it was marked for identification.

12   Do you want to give it a number or what do we want to

13   do?

14           MR. BRODY:  Sure.  I believe the privilege

15   log was marked as JJ-1.

16           THE COURT:  Right.

17           MR. BRODY:  So maybe the excerpt that I used

18   earlier today could be JJ-1-A and this excerpt can be

19   JJ-1-B, if that's okay?

20           THE COURT:  Fair.  Mr. Pollack, any thoughts?

21           MR. POLLACK:  Works for me.

22           THE COURT:  A and B, yep.

23           MR. POLLACK:  Simple.  On whatever you said,

24   just 1-B, the one you have in front of you.

25           THE WITNESS:  Right.

1    REDIRECT EXAMINATION BY MR. POLLACK:

2         Q    That one.  Can we agree that these documents

3    were subjected to a mediator -- I'm sorry, a mediation

4    privileges claim; correct?

5    A    Pardon me?  Yes.

6         Q    Mediation -- they were submitted for review

7    by Judge Snyder; correct?

8    A    Yes.

9         Q    And Judge Snyder reviewed them and decided

10   they were privileged too; correct?

11   A    Yeah, I mean, he entered his order, yes.

12        Q    Right and his order says they're privileged;

13   right?

14   A    Right, that's right.

15        Q    Okay.  Do you believe Judge Snyder is

16   capable?

17   A    I do.

18        Q    Do you think he understands the players in

19   the game?

20   A    I do.

21        Q    Fair enough.  So Mr. Brody got into the

22   question of how you have tried 13 cases and some of

23   them are somebody else's cases, some of them are your

24   cases.  Let's just call it 13, we'll make it simple,

25   I'm a simple guy.  So let's call it 13 cases and you

A. Birchfield - Redirect                    130

1   have not collected a significant amount.

2       I'm having a hard time reconciling this because

3   I'm looking at the numbers that are being offered in

4   settlement and they are different with zero value.  So

5   how do you value the claims, what do you think the

6   value of these claims is, in broad brush?  Why are you

7   pursuing -- let me ask it differently, why are you

8   pursuing it?

9           THE COURT:  And you're talking about current

10  claims, future claims or claims with merit, as --

11  BY MR. POLLACK:

12      Q    Good point.  So let me go back, since I

13  slaughtered this question and I'm going to try to clean

14  it up, I'll do it the right way.  Beasley Allen, you've

15  said, is trying to get reasonable and fair value for

16  its clients.  You testified to that before; right?

17  A    Yes.

18      Q    What are the claims that you think are the

19  ones you are pursuing today?  Can you describe that

20  category of claims?

21  A    You know, the claims that we are pursuing are the

22  ovarian cancer claims.  I mean, that's the leadership

23  role that Beasley Allen has, pertains to the ovarian

24  cancer claims.  I do think that Beasley Allen has one

25  maybe two Meso claims but our focus is and has been

A. Birchfield - Redirect                    131

1    since 2014 for the ovarian cancer claimants.

2         Q    And we've heard about the -- if I get it off

3    by a little bit or I'm wrong, 3.2 billion -- 3.52

4    billion in Imerys.  We've heard about the 7.9 billion

5    that is J and J's preferred plan.  Is that the -- to

6    address the ovarian cancer claims, is that what those

7    numbers are targeted at?

8    A    Yes, so there have been multiple proposals, term

9    sheets, that have been -- that have been proffered

10   through the course of these last four years and

11   including the proposal that we talked about in

12   September of 2020 that was presented as a 3.25 but that

13   was just one slice, it wasn't a 3.25.  That was one

14   proposal in 2020.

15        The number of claims was much different, the

16   number of claims was much different then.  We have the

17   -- not the 7.9 but the $8.9 billion proposal that was

18   part of the LTL-2 bankruptcy.  That was for both the

19   ovarian cancer currents and the futures, Mesothelioma

20   currents and futures and all of the Attorney General's

21   actions.

22        But the only -- I mean, our position, whether we

23   have been -- you know, whether it was in the earliest

24   proposal in 2020 or part of the Imerys deal or

25   negotiations mediation in the bankruptcy, it has always

Colloquy                                    132

1    been to get reasonable settlement values for our

2    claimants, for our clients and that's it.

3         Q    And do you believe in good faith, that the

4    claims you have are pursuing, on behalf of Beasley

5    Allen and the M.D.L., the Talc Claimants Committee, the

6    groups you work with, do you believe that those claims

7    have merit?

8    A    Yes, absolutely.

9         Q    And do you intend to pursue them?

10   A    Yes.

11             MR. POLLACK:  I have no further questions.

12             THE COURT:  Thank you.  You may step down,

13   Mr. Birchfield.

14                  (Witness excused)

15             THE COURT:  Let's quickly address.  Yes?

16             MR. BRODY:  With the Court's permission, I

17   would like to ask Mr. Haas to -- the Court to allow Mr.

18   Haas to take the stand to answer five or so questions

19   about the document that was brought and offered as P-3

20   by Mr. Conlon.

21             MR. POLLACK:  Your Honor, absolutely not.  We

22   have been patient to (indiscernible) on your end and

23   our end.  To suddenly allow Mr. Haas to megaphone, once

24   again.  There is nothing in that document that could

25   not have been addressed before and there is no reason

Colloquy                                            133

1    we should be addressing it now.

2              Mr. Haas knew about this document, he

3    received this document.  So there's no reason he

4    couldn't have addressed it before.  The fact that they

5    withheld it and now they're saying we now want to

6    address it, that's ludicrous.  At some point, there has

7    to be an end, Your Honors.  I respectfully submit that

8    should be it.

9              THE COURT:  Well, Judge Singh and I will

10   discuss that separately.  Counsel can be seated.  The

11   initial question we want to address is what was

12   contained in the correspondence that we received this

13   week.  Regarding Exhibit 5 and objections, J and J has

14   objections.  To the extent J and J has any objections,

15   we would receive that document with J and J's

16   objections.  Mr. Pollock, Mr. Brody, any thoughts?

17             MR. POLLACK:  So there's only -- there's one

18   word that is objected to.  The one word is,

19   "Recommended," I think it is.  And you had already

20   ruled, Judge Porto, that did Jim Conlon recommend the

21   Texas Two-Step?  He says, I did not.  And so to me, it

22   is -- that's the only objection they've got, that word

23   recommend because that would be attorney advice.  But

24   that bit of attorney advice, I'll even agree --

25             THE COURT:  But that's out, that was out as

Colloquy                              134

1    part of our record.

2              MR. POLLACK:  I agree.  That's why I'll even,

3    since I'm a generous guy, I'll agree to a partial

4    waiver if you want.  As to that document, the

5    privilege, whatever there is, is waived but that's

6    gone.

7              THE COURT:  All right, Mr. Brody?

8              MR. BRODY:  Well, I don't think --

9              THE COURT:  Because that was part of the

10   testimony.

11             MR. BRODY:  It was part of the testimony but

12   I don't think there was -- I don't think the Court's

13   waiver holding as to the question that was posed to Mr.

14   Conlon about Texas Two-Step and his recommendation was

15   so broad as to encompass the entirety of the November

16   5th e-mail.  There can't be a -- there certainly can't

17   be a waiver of anything in there by Mr. Pollack because

18   it's J and J's privilege.

19             And we had proposed two very minor

20   redactions, as the Court saw.  I think the Court saw

21   both a redacted and an unredacted version.  We tried to

22   be as narrow as possible based on objections that we

23   think it should still be able to maintain.  Obviously,

24   the Court has seen that, the Court understands what its

25   ruling was, understands the scope of its waiver ruling

1  and so obviously, the Court can make a decision on

2  which version will come into the record.

3          THE COURT:  I think we're going to stand by

4  -- we'll accept it with the J and J recommendations

5  (sic).

6          JUDGE SINGH:  No, the redactions --

7          THE COURT:  Redactions, I'm sorry.

8          JUDGE SINGH:  -- approved from our

9  perspective.

10         MR. BRODY:  Yes, thank you.

11         THE COURT:  And then, there was another

12  objection.

13         JUDGE SINGH:  The objections to the attorneys

14  eyes only materials.

15         THE COURT:  Correct, yeah.  What are your

16  thoughts with regard to those records, then, Mr.

17  Pollack?  Because they don't really address -- they're

18  not any issue with regard to credibility or impeachment

19  as it relates to Mr. Birchfield.  Really, it goes to --

20  it's impeaching Mr. Conlon and Mr. Conlon has counsel

21  and I didn't see any objection from, I don't think

22  Judge Singh did, with regard to any objection from Mr.

23  Conlon's attorney.

24         MR. POLLACK:  Mr. Conlon's Counsel doesn't

25  have it, it wasn't served on him.  So he -- with all

Colloquy                                    136

1    due respect, Judge, that's unfair.  They were not given

2    the opportunity to be heard.  But remember, Andy is

3    being tied part and parcel under the broad application

4    of R.P.C. 1.6, which addresses an attorney, meaning Mr.

5    Conlon, disclosing information.

6              But to me, the -- the -- it is blatantly

7    unfair and certainly, it goes to credibility, at a

8    minimum.  It has to go to the credibility of those

9    documents, at a minimum, that J and J had these

10   records.  Mr. Haas' certification is, we've got an

11   incredible computer system, everything gets shoved in

12   there, we had this stuff months ago.

13             So why did they wait until Jim Conlon is off

14   the stand and they have a legion of lawyers, a billion

15   dollars to blow on defense and yet they sandbagged Jim

16   Conlon with this document after he's off the stand and

17   back home.  That's outrageous.  Confrontation clause.

18   He has an ethics hearing in Ohio or Illinois, wherever

19   he lives.

20             THE COURT:  Iowa.

21             MR. POLLACK:  Whatever, it's all the same,

22   it's west of the Mississippi.  But the bottom line is,

23   the fact is that he has no chance to rebut it himself.

24   Second of all, I strongly and incredibly disagree, when

25   you look at 99 percent of the documents; I don't

1    recall, I can't remember, I can't really -- that's not

2    the way I remember it.

3              There's only a few where they say there's

4    something and then look at the redactions.  The

5    redactions are, I had incredibly detailed discussions

6    regarding, blank.  In fact, here's a memo from me

7    regarding, blank.  So how does this Court ever make any

8    sense out of what was allegedly discussed?  Because

9    while it's true, under UNA, they had the choice of

10   putting it in, I think that they have to actually make

11   their case.

12             And right now, all it says is yes, what I

13   conceded with you, Judge Porto, on the very first day.

14   Jim Conlon was a lawyer at Faegre.  He worked on super

15   secret J and J stuff, I've never denied it.  He was a

16   lawyer and he gave advice but how do I, representing

17   Andy Birchfield, ever confront the question; did Jim

18   Conlon learn anything during the course of that

19   representation that is disclosed?  That's not been

20   proven at all but even if it was, was it significantly

21   harmful?  And I have to rely on both prongs, right?

22             I'm not giving up the second part of UNA.  So

23   it worries me deeply about admitting these documents

24   after the fact, at the end of the hearing, once Mr.

25   Haas and Murdica and Conlon are gone and suddenly, I

Colloquy                                          138

1      get these documents.  I object to their introduction.

2                  THE COURT:  Mr. Brody?  I mean, they go

3      directly to Mr. Conlon's testimony.

4                  MR. BRODY:  They do, they go directly to Mr.

5      Conlon's testimony and --

6                  THE COURT:  And they weren't provided to Mr.

7      Conlon's attorney?

8                  MR. BRODY:  Well, it's attorney's eyes only.

9                  MR. POLLACK:  No.

10                 THE COURT:  Right.

11                 MR. POLLACK:  They were not.

12                 MR. BRODY:  We followed the Court's

13     instruction.  Now, as Your Honors know, I sought to

14     offer them while Mr. Conlon was on the stand and the

15     Court's decision was, no, let's wait and you know, when

16     you go through the transcript, you'll see the number of

17     places where in response to his testimony, I said, you

18     know, here's another place where I would bring a

19     document out now, if permitted.

20                 The Court's preference was announced after

21     the lunch break on April 10th was, if there are areas

22     where you believe that he perjured himself and you have

23     that impeachment, you know, provide that impeachment.

24     We have submitted that impeachment in-camera and

25     attorney's eyes only at the Court's direction.

Colloquy                                139

1            You know, as to the question that Mr. Pollack

2      asked.  Well, how does the Court make sense of what was

3      submitted, of what the documents show or don't show?

4      That's really an argument about the weight that Mr.

5      Pollack believes the Court should give those documents

6      and certainly, I expect the parties will be making

7      arguments about the weight the Court should give all of

8      the documents that have been provided and are part of

9      the record, including, you know, including documents

10     like Plaintiff's P-3 that Mr. Conlon brought with him

11     to his testimony on April 10th.

12            And so the answer to that one is easy.  You

13     know, the answer to the objection is, we sought to

14     offer these while Mr. Conlon was on the stand as

15     impeachment.  We followed the Court's direction.  We're

16     submitting them --

17            THE COURT:  Well, there's also a concern

18     about the waiver of the privilege also.  That was, you

19     know, critical to the Court's thoughts in that regard.

20     So it wasn't that we just blanketly said, don't

21     disclose them.  It's just, we were concerned about the

22     privilege.

23            MR. BRODY:  Right and the Court addressed

24     that in its invitation that we make redactions and

25     obviously, Your Honor said, well even with redactions,

Colloquy                                    140

1    you submit them and I may find that there has been a

2    waiver or not a waiver.  You made that point during the

3    hearing on April 10th and so that's where we stand.

4            We followed the Court's direction, you know

5    and we submitted the materials, they are impeachment

6    materials and I am sure that we will have arguments

7    from Mr. Pollack and Beasley Allen as to the weight

8    that the Court should give them.

9            THE COURT:  All right.  I think Judge Singh

10   and I would just like to discuss briefly with regard to

11   that, with regard to P-3.

12           MR. BRODY:  Yes.

13           THE COURT:  And then the for your eyes only

14   privilege material.

15           MR. BRODY:  Certainly.

16           THE COURT:  We'll take five, okay?  We'll go

17   off the record.

18           (Off the record, back on the record)

19           THE COURT:  Thank you, you may be seated.

20   Counsel, the Courts are going to maintain its position

21   with regard to the attorney eyes only privileged

22   material.  Argue the weight, you know, how much, you

23   know but maintain the privilege that's been asserted,

24   okay?  So you can reference but maintain the privilege.

25   That goes to the weight with regard to the issue here.

Colloquy                                        141

1              As it relates to, what, P-5?  The Court does

2     not require or need any additional testimony, all

3     right?

4              MR. BRODY:  Thank you, Your Honor.

5              THE COURT:  All right?

6              MR. BRODY:  Thank you, Your Honor.

7              THE COURT:  You're welcome.  Judge Singh?

8              JUDGE SINGH:  Just one Federal Court footnote

9     as to the attorneys eyes only submission.  To the

10    extent the parties address something substantive that

11    has been submitted with that designation, we anticipate

12    it will be appropriately filed under seal, on the

13    Federal Court's docket, pursuant to our local civil

14    rule.

15             THE COURT:  And the same thing with regard to

16    E-Courts.

17             MR. BRODY:  Thank you, Your Honors and as to

18    the briefing, just to confirm.  Two weeks, simultaneous

19    submission and then replies seven days after that?

20             JUDGE SINGH:  Correct.

21             THE COURT:  That's correct.

22             MR. BRODY:  Great, thank you.

23             THE COURT:  Counsel, thank you.

24             MR. POLLACK:  Thank you, Your Honors.

25             MR. HAAS:  Thank you, Your Honors.

Certification                                                    142

1              THE COURT:  You're welcome.

2              (Proceeding concluded at 1:42:57 p.m.)

3                          *  *  *  *

4

5

6

7

8

9

10                        <u>CERTIFICATION</u>

11         I, Nitsa Carrozza, the assigned transcriber, do

12    hereby certify the foregoing transcript of proceedings

13    on CourtSmart, timestamp from <u>09:38:36</u> a.m. to <u>01:42:57</u>

14    p.m., is prepared to the best of my ability and in full

15    compliance with the current Transcript Format for

16    Judicial Proceedings and is a true and accurate non-

17    compressed transcript of the proceedings, as recorded.

18
19        <u>/s/ Nitsa Carrozza  </u>              <u>AD/T 639  </u>
20           Nitsa Carrozza                     AOC Number
21
22
23    <u>Phoenix Transcription LLC  </u>        <u>05/07/2024  </u>
24           Agency Name                         Date