# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

IN RE: JOHNSON & JOHNSON TALCUM POWDER PRODUCTS MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION

Case No. 3:16-md-2738 (MAS)/(RLS)

MLD Case No. 2738

[FILED ELECTRONICALLY]

---

## BEASLEY ALLEN'S POST-PLENARY HEARING BRIEF IN OPPOSITION TO DEFENDANTS JOHNSON & JOHNSON AND LTL MANAGEMENT LLC'S MOTION AND ORDER TO SHOW CAUSE SEEKING BEASLEY ALLEN'S DISQUALIFICATION FROM THIS LITIGATION AND REMOVAL FROM THE PLAINTIFFS' STEERING COMMITTEE

---

**FOX ROTHSCHILD LLP**
**Formed in the Commonwealth of Pennsylvania**
Jeffery M. Pollock, Esq.
Michael W. Sabo, Esq.
Princeton Pike Corporate Center
997 Lenox Drive
Lawrenceville, NJ 08648
Telephone: 609-896-7660
Facsimile: 609-896-1469
*Attorneys for Andy Birchfield and Beasley Allen*

## TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS.................................................................................................. i

TABLE OF AUTHORITIES ..........................................................................................ii

PRELIMINARY STATEMENT ...................................................................................... 1

BACKGROUND ............................................................................................................3

    A. Beasley Allen Possessed Comprehensive Knowledge of Assessing Talcum Powder Claims, Valuations, and Matrices from Decades of Experience Litigating Mass Tort Cases Including Against J&J, and James Conlan Never Shared J&J Confidences with the Firm.................. 3

    B. Beasley Allen Never Hired, Retained, Consulted With, or "Aligned" With James Conlan as an Attorney or Expert In Any Manner Adverse to J&J. ....................................................... 4

    C. The Undisputed Evidence Demonstrates That James Conlan Never Shared J&J's Privileged Information with Beasley Allen.............................................................................. 6

ARGUMENT ..................................................................................................................7

I.   J&J HAS FAILED TO CARRY ITS HEAVY BURDEN THAT BEASLEY ALLEN SHOULD BE DISQUALIFIED FROM THIS LITIGATION UNDER NEW JERSEY LAW ..................7

    A. Standard of Review....................................................................................................7

    B. J&J Failed to Prove An Actual Conflict, and Its Contradictory Ethics Theories and Changing Explanations Cannot Support Disqualification Under the RPCs .........................8

        1. The Supreme Court of New Jersey Rejected the Appearance of Impropriety Standard— J&J's Novel "Necessarily Imbued" or "Alliance" Standard...........................................8

        2. J&J's Evolving Theories of Misconduct Must Be Rejected As Too Vague and Ambiguous to Justify Disqualification ...........................................................................11

    C. The Motion Should Be Denied Because James Conlan is Concededly Not (and Never Was) an Attorney, Employee, Expert or Consultant at Beasley Allen...........................................13

    D. J&J Failed to Show James Conlan Shared any J&J Confidential Information with Beasley Allen...........................................................................................................................14

        1. The 19 Billion Dollar Legacy Proposal Was Not Derived From J&J Confidential Information ..................................................................................................................16

2.   The Matrix Attached to the Legacy Proposal Is Beasley Allen's Work Product and Not Derived From J&J Confidential Information................................................................17

3.   "Structural Optimization" and Related Concepts are not J&J Confidential Information 19

4.   J&J's Proofs and Generalized Claims Do Not Satisfy the Supreme Court of New Jersey's "Hobson's Choice" Requiring Specific Evidence to Disqualify Counsel .........20

E.   There is No Evidence That Beasley Allen Ever Obtained Any J&J Confidential Client Information Much Less Confidential Information Substantially Related to the Ongoing 2024 Talcum Powder MCL Litigation.........................................................................................22

1.   J&J Failed to Show That Any Information James Conlan May Possess from 2020 to 2022 is Substantially Related to the Current MCL Talc Litigation ..........................................23

2.   J&J Fails to Show that Any Information James Conlan Possessed Years Ago Would "Significantly Harm" J&J in the Current MCL Talc Litigation ......................................25

CONCLUSION..................................................................................................................28

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*LTL Mgmt., LLC v. Those Parties Listed on Appendix A To Complaint (In re LTL Mgmt., LLC)*,
64 F.4th 84 (3d Cir. 2023) ...................................................................................2

*Alexander v. Primerica Holdings, Inc.*,
822 F. Supp. 1099 (D.N.J. 1993) ........................................................................8

*Cavallaro v. Jamco Prop. Mgmt.*,
334 N.J. Super. 557 (App. Div. 2000) .................................................................8

*Cirino v. City of N.Y. (In re World Trade Ctr. Disaster Site Litig.)*,
754 F.3d 114 (2d Cir. 2014) ..............................................................................19

*City of Atlantic City v. Trupos*,
201 N.J. 447 (2010) .................................................................................. *passim*

*Cordy v. Sherwin-Williams Co.*,
156 F.R.D. 575 (D.N.J. 1994) ......................................................................13, 14

*Dewey v. R.J. Reynolds Tobacco Co.*,
109 N.J. 201 (1988) ...........................................................................................8

*In re Grand Jury Subpoena Issued to Galasso*,
389 N.J. Super. 281 (App. Div. 2006) ...............................................................21

*In re Hum. Tissue Prod. Liab. Litig.*,
255 F.R.D. 151 (D.N.J. 2008) ...........................................................................21

*J.G. Ries & Sons, Inc. v. Spectraserv, Inc.*,
384 N.J. Super. 216 (App. Div. 2006) .................................................................8

*Kane Props., LLC v. City of Hoboken*,
214 N.J. 199 (2013) ...................................................................................1, 9, 14

*Estate of Kennedy v. Rosenblatt*,
447 N.J. Super. 444 (App. Div. 2016) ...............................................................14

*Munich Reinsurance Am., Inc. v. Am. Nat. Ins. Co.*,
2011 WL 1466369 (D.N.J. Apr. 18, 2011) ........................................................21

*Nostrame v. Santiago*,
213 N.J. 109 (2013) ...........................................................................................27

*O Builders & Assocs. Inc. v. Yuna Corp.*,
206 N.J. 109 (2011) ................................................................................................. *passim*

*Richardson-Merrell, Inc. v. Koller*,
472 U.S. 424 (1985)............................................................................................................28

*State v. Hudson*,
443 N.J. Super. 276 (App. Div. 2015) ..............................................................................10

*In re Sup. Ct. Advisory Comm. on Pro. Ethics Opinion No. 697*,
188 N.J. 549 (2006) ................................................................................................1, 9, 14

*United States v. Lacerda*,
929 F. Supp. 2d 349 (D.N.J. 2013) ..................................................................................27

*United States v. Voigt*,
89 F.3d 1050 (3d Cir. 1996)..............................................................................................13

## Other Authorities

Professor Michael Ambrosio, *Reflections on the Appearance of Impropriety* N.J.
Lawyer 9 (December 2011)..........................................................................................1, 9

RPC 1.6 ..........................................................................................................................13, 14

RPC 1.7 ...................................................................................................................9, 11, 12, 14

RPC 1.9 ...........................................................................................................9, 11, 12, 13, 14

Rule 1.9(a)........................................................................................................................11, 13

RPC 1.10(c).............................................................................................................................14

## PRELIMINARY STATEMENT

Johnson & Johnson (J&J)'s motion to disqualify Beasley Allen must be denied because J&J provides no specific, competent evidence that its former counsel James Conlan disseminated J&J's confidential information to Beasley Allen. After multiple rounds of briefing and three plenary hearing sessions, J&J does not articulate a single fact, confidence, legal theory, strategy, or mental impression that Beasley Allen (or Andy Birchfield) learned from James Conlan. Each purported "confidence" J&J complains of is either public information (in many cases disclosed by J&J itself) or information Beasley Allen learned from decades of experience and expertise.

Instead of satisfying its heavy burden to disqualify long-time opposing counsel, J&J's scripted witnesses attempt to re-write New Jersey attorney ethics law and replace it with a novel "alliance" or "necessarily imbued" standard (appearance of impropriety re-branded). That standard—even if it were relevant here—was abandoned by the American Bar Association in 1983. In 2004, New Jersey, one of the last states to retain the appearance of impropriety standard for lawyers, rejected that rule as too ambiguous and spawning inconsistent results.[1]

J&J's theory of attorney disqualification would overrule the Supreme Court of New Jersey's repeated holdings that the appearance of impropriety standard as applied to attorneys is obsolete. *See Kane Props., LLC v. City of Hoboken*, 214 N.J. 199, 220 (2013) (reaffirming that "appearance of impropriety" standard does not govern alleged attorney conflicts); *City of Atlantic City v. Trupos*, 201 N.J. 447, 464 (2010) (same); *In re Sup. Ct. Advisory Comm. on Pro. Ethics Opinion No. 697*, 188 N.J. 549, 562 n.5 (2006) (same).

---

[1] *See* Professor Michael Ambrosio, *Reflections on the Appearance of Impropriety Standard*, 273 N.J. Law Journal 9 (December 2011).

1

As Beasley Allen stated from the beginning (and J&J now confirmed), the Motion is a thinly veiled cynical attempt to remove opposing (successful) counsel for tactical reasons. J&J filed this motion to remove Beasley Allen as its chief antagonist in what J&J foreshadowed will be an expected third bad-faith bankruptcy filing. The Third Circuit (and later Judge Kaplan) saw through J&J's sham conduct and dismissed its bad faith bankruptcy petitions because they had "no valid bankruptcy purpose." *LTL Mgmt., LLC v. Those Parties Listed on Appendix A To Complaint (In re LTL Mgmt., LLC)*, 64 F.4th 84, 110 (3d Cir. 2023).

J&J initially admitted: (1) there is "no Rule of Professional Conduct [that] explicitly speaks to the precise situation here." (Trans ID: LCV20233584887 at 15); (2) its former attorney James Conlan "is not formally aligned against [J&J] on the docket." (*Id.* at 17); and (3) Beasley Allen, Andy Birchfield, Ms. O'Dell, and Mr. Meadows (the attorneys J&J seeks to disqualify) "never had a relationship with" J&J or James Conlan. (*Id.* at 18). Now, J&J alleges—without support—that James Conlan violated a myriad of RPCs and that somehow Beasley Allen (Andy Birchfield) must be disqualified by imputation.

None of the facts or testimony warrant disqualification. Plaintiffs—not J&J—created the matrix at issue, and J&J's own experts valued talc-related claims at over $20 billion. The $19 billion-dollar-number is not a J&J confidence. The matrix attached to the Legacy Proposal is also not a J&J confidence. Weighing the balance in favor of disqualification—rather than preserving Beasley Allen as its client's chosen champion—flies directly in the face of established New Jersey law. J&J fails to carry its heavy burden to justify the extraordinary remedy of disqualification. After days of testimony and multiple rounds of briefing, J&J still does not say what confidential information (and when) James Conlan purportedly disclosed to Beasley Allen. For these reasons, the Motion should be denied.

## BACKGROUND

**A.    Beasley Allen Possessed Comprehensive Knowledge of Assessing Talcum Powder Claims, Valuations, and Matrices from Decades of Experience Litigating Mass Tort Cases Including Against J&J, and James Conlan Never Shared J&J Confidences with the Firm.**

Before Andy Birchfield or anyone at Beasley Allen met James Conlan, Andy Birchfield, and the lawyers at Beasley Allen, "had extensive knowledge and understanding about the nature of [talc] claims" as well as "how J&J would evaluate" claims. (May 3 Tr. at 84 to 86). Through 10 years of litigation, motion practice, and over three years of intense settlement efforts both inside and outside bankruptcy proceedings, Beasley Allen had in-depth and thorough knowledge of the changing landscape of talc exposure claims as well as J&J's constantly morphing settlement strategies. (*Id.*); PlenaryHearing00103-05 (Supplemental Certification of Andy D. Birchfield, Jr., Esq. discussing extensive prior experience). J&J could not identify one single confidence, let alone a significant one, that James Conlan was privy to that Andy Birchfield and Beasley Allen did not already know. (*Id.*). This experience included twelve jury trials, multiple *Daubert* (and state court equivalent) hearings, the MDL proceedings before Judge Wolfson, the bankruptcy cases before Judge Kaplan, and New Jersey state court cases including an appeal before the New Jersey Appellate Division. (*Id.*) Andy Birchfield and the Beasley Allen team also had extensive negotiations on behalf of ovarian cancer claimants with Mr. Murdica beginning as early as April 2020 and by May 2020 had even provided Mr. Murdica with a matrix similar to the one at issue in the proposal at Exhibit 7 (Legacy Proposal). *Compare* (May 3 Tr. at 85 to 86), *with* (Plenary Hearing000067).

Beasley Allen (and Andy Birchfield) negotiated (and exchanged) various settlement proposals with J&J, which required "an in-depth understanding of the nature of the claims," *i.e.*, what claims are truly compensable, that is, supported by the science and medicine. (May 3 Tr. at

85 to 87). James Conlan also disavows all knowledge about mass tort trial strategy, matrices, claim valuations etc. (April 10 AM Tr. at 7, 17 to 19). James Conlan only served as J&J's "bankruptcy-related" counsel, and that representation ended more than two years ago and more than a year before ever meeting with Mr. Birchfield. (*Id.*). During his time as J&J's outside counsel, Mr. Conlan never engaged in privileged analysis of talc claims, values, models, and allocations. (April 10 AM Tr. at 19). For Andy Birchfield and Beasley Allen to engage in negotiations with J&J, they needed and had acquired an understanding of "how many claims" and the "total" "universe of the claims" (May 3 Tr. at 85 to 87). Through the course of negotiations with J&J, Beasley Allen obtained a "picture" of what J&J "would be willing to pay" at various points to settle J&J talc liabilities. (May 3 Tr. at 89 to 91). *See also* PlenaryHearing00103-05 (Supplemental Certification of Andy D. Birchfield, Jr., Esq. discussing comprehensive experience litigating talc cases over a decade). Likewise, J&J learned what settlement values Beasley Allen would be willing and unwilling to recommend to clients at various points in the litigation. (*Id.*).

**B.    Beasley Allen Never Hired, Retained, Consulted With, or "Aligned" With James Conlan as an Attorney or Expert In Any Manner Adverse to J&J.**

Beasley Allen neither hired James Conlan nor made any effort to do so because he was a third-party "vendor" that came to Beasley Allen on behalf of Legacy. (May 3 Tr. at 63 to 64); *see* May 3 Tr. at 101 to 102 (Beasley Allen never hired Conlan as an attorney or in any capacity).[2] Once James Conlan left Faegre, Mr. Conlan was working for Legacy. (April 10 AM Tr. at 100). (Notably, J&J knew that James Conlan was now working for Legacy, J&J negotiated extensively with James Conlan once he formed Legacy, and yet J&J (including Erik Haas) never objected at

---

[2] James Conlan served as J&J's "bankruptcy-related" counsel more than two years ago. (April 10 AM Tr. at 7). Mr. Conlan was a restructuring lawyer, not a trial lawyer, a plaintiff's lawyer, or a mass torts lawyer. (April 10 AM Tr. at 36).

any time to James Conlan's role while at Legacy). (P-3). Beasley Allen never retained James Conlan as an expert. (May 3 Tr. at 102 to 103); *see* (April 10 PM Tr. at 34 to 35) (confirming that Conlan never served as an attorney, expert, or expert witness for Beasley Allen); (March 25 AM Tr. at 131 to 132) (Mr. Haas confirming Conlan never served as Beasley Allen attorney). Beasley Allen never sought advice from Mr. Conlan "regarding how to prosecute or pursue [plaintiffs'] claims against J&J." (May 3 Tr. at 102 to 103). Beasley Allen never retained James Conlan as counsel. (May 3 Tr. at 102). Beasley Allen and Legacy never formed "an alliance" against J&J. (May 3 Tr. at 103). Beasley Allen never reviewed Legacy's Proposal prior to this motion. (May 3 Tr. at 103 to 104) (citing Plenary Hearing Exhibit 4)).

Conversely, Legacy's Proposal—which would remove all of J&J's talc liability—"would actually be in the best interest of J&J." (May 3 Tr. at 103). Beasley Allen understood that James Conlan/Legacy would be its adversary because if J&J accepted the Legacy Proposal, Legacy "would be standing in the shoes of J&J" as an adversary. (May 3 Tr. at 65, 101 to 103). If J&J accepted the Legacy Proposal, Beasley Allen "would be litigating against" Legacy. (May 3 Tr. at 102 to 104). Mr. Haas conceded that James Conlan is not: (1) a "side-switching" attorney, (2) adverse to J&J, (3) or "aligned" with Beasley Allen. (Mar. 25 PM Tr. at 4:17-25). Instead, Mr. Conlan "went to Legacy" and was in "a different role. He opened up a business where he's purporting to go out and pitch the Legacy structured optimization model." (*Id.*). Mr. Haas agreed that James Conlan "went from being a lawyer at Faegre to being a businessman at a company that he formed called Legacy." (*Id.*).

The record evidence shows that Beasley Allen and Legacy are actually adverse and were never "aligned" because once (and if) J&J consensually accepted Legacy's proposal, "Legacy is standing in the shoes of J&J" and becomes Beasley Allen's "adversary every bit as much as J&J

5

is now. They have all the talc liability." (May 3 Tr. at 65); *see* (April 10 AM Tr. at 112, 121 to 122) (confirming that Legacy never tried to position itself with Beasley Allen against J&J). Legacy and Beasley Allen have opposite interests because Legacy earns more money (via interest) the longer it puts off talc claimant payment, whereas Beasley Allen's objective is to obtain payment for its clients as soon as possible. (April 10 PM Tr. at 37, 53 to 54) (James Conlan explaining that Legacy's "objective is to hold onto the cash as long as possible" rather than pay claimants).

### C.   The Undisputed Evidence Demonstrates That James Conlan Never Shared J&J's Privileged Information with Beasley Allen.

Beasley Allen did not receive "any confidential information from Mr. Conlan." (May 3 Tr. at 65). Similarly, James Conlan denies that he ever shared with Beasley Allen any confidential information. (April 10 PM Tr. at 67 to 68); (*id.* AM Tr. at 113). James Conlan never revealed any J&J confidential information to Beasley Allen or Andy Birchfield. (April 10 PM Tr. at 97 to 98); (May 3 Tr. at 65). James Conlan has never revealed client confidences during his decades-long career. (April 10 PM Tr. at 29 to 34) (Conlan testifying that he never violated J&J's confidences, and no client has ever accused him of doing so in thirty-five years).

After the Third Circuit dismissed J&J's bad faith bankruptcy petition in January 2023, Legacy (via James Conlan) put J&J on notice that Legacy would negotiate settlements with plaintiff law firms like Beasley Allen. (April 10 AM Tr. at 101 to 102) (citing P-3 filed at ECF Doc. 31786; Trans ID: LCV2024938569). Legacy sent a February 2, 2023 email to Mr. Haas and Mr. Duato of J&J advising that it would "negotiate settlements with interested Asbestos plaintiff law firms of some or all of the pending claims filed by such firms . . .." (April 10 AM Tr. at 102 to 106). Therefore, J&J's feigned claims of surprise that Legacy spoke with Beasley Allen are not credible. (*Id.*)

Beasley Allen had conversations (including in mediation) with Legacy that involved its

"proposal of structural optimization and disaffiliation," not any confidences Conlan may have learned as J&J's counsel. (May 3 Tr. at 67 to 68). Indeed, Andy Birchfield had never seen the Legacy Proposal (Plenary Hearing Exhibit 7) prior to J&J's filing of this motion. (May 3 Tr. at 91 to 92). Beasley Allen provided the matrix to Legacy but did not negotiate any settlement matrix with Legacy or James Conlan. (May 3 Tr. at 95 to 98).

On November 5, 2023, J&J (through Mr. Murdica) sent James Conlan a letter claiming that he "learned highly privileged information about J&J and LTL strategies from the attorney-client relationship." (Plenary Hearing Joint Exhibit 6). Mr. Conlan responded to J&J via email later on November 5, 2023 and refuted J&J's public claims. *See* P-5 (Transaction LCV20241033560/ ECF Doc. 32046). J&J omitted Mr. Conlan's response and sought to conceal its contents from the evidentiary record, but the Court overruled J&J's objections. *See generally* Joint Plenary Hearing Exhibits; (April 10 PM Tr. at 40 to 41). In the November 5, 2023 email response, James Conlan told J&J that "I am always mindful of confidentiality and privilege (as I know you are), while at Faegre I did not obtain any privileged or confidential insights or knowledge that are relevant to Legacy or our desire and effort to consensually transact with J&J to solve its talc problem." *See* P-5 (Transaction LCV20241033560/ECF Doc. 32046). Contrary to J&J's initial claims, James Conlan confirmed that he never proposed or recommended that J&J/LTL try the Texas-Two Step as a way to resolve J&J's talc liabilities. (April 10 PM Tr. at 40 to 41).

<u>**ARGUMENT**</u>

<u>**J&J HAS FAILED TO CARRY ITS HEAVY BURDEN THAT BEASLEY ALLEN SHOULD BE DISQUALIFIED FROM THIS LITIGATION UNDER NEW JERSEY LAW.**</u>[3]

**A.     Standard of Review.**

---

[3] Beasley Allen incorporates by reference and adopts all facts and arguments in opposition to J&J's motion to disqualify and/or remove Beasley Allen from the Plaintiffs' Steering Committee.

In a motion to disqualify counsel, the moving party bears a heavy burden of proving that disqualification is appropriate. *Dewey v. R.J. Reynolds Tobacco Co.*, 109 N.J. 201, 221-22 (1988). Disqualification motions are viewed with "disfavor" and considered a "drastic measure which courts should hesitate to impose except when absolutely necessary.'" *Alexander v. Primerica Holdings, Inc.*, 822 F. Supp. 1099, 1114 (D.N.J. 1993) (citation omitted); *J.G. Ries & Sons, Inc. v. Spectraserv, Inc.*, 384 N.J. Super. 216, 231 (App. Div. 2006) (referring to disqualification as "drastic relief"); *see also Cavallaro v. Jamco Prop. Mgmt.*, 334 N.J. Super. 557, 572 (App. Div. 2000) (stating that the disqualification of an attorney selected by a client "is a harsh discretionary remedy which must be used sparingly."). Whether an attorney or law firm should be disqualified is a question of law. *J.G. Ries & Sons, Inc.*, 384 N.J. Super. at 222. A motion for disqualification calls for courts "to balance competing interests, weighing the need to maintain the highest standards of the profession against a client's right freely to choose his counsel." *Dewey*, 109 N.J. at 218 (internal quotation marks and citations omitted). New Jersey policy and law require denying J&J's motion to disqualify Beasley Allen.

**B.     J&J Failed to Prove An Actual Conflict, and Its Contradictory Ethics Theories and Changing Explanations Cannot Support Disqualification Under the RPCs.**

> **1.     The Supreme Court of New Jersey Rejected the Appearance of Impropriety Standard—J&J's Novel "Necessarily Imbued" or "Alliance" Standard.**

Despite being asked to do so on multiple occasions, J&J failed to produce evidence of a disclosure of either a privileged fact or legal theory that belonged to J&J. *See* Transcript Addendum. J&J has access to each and every email, time sheet, and memorandum that James Conlan received or sent while at Faegre and working on J&J matters—but J&J has not produced a scrap of paper that James Conlan shared with Beasley Allen.

J&J's invented "necessarily imbued" or "alliance" theory for disqualification—the defunct appearance of impropriety standard by another name—is unmoored from the RPCs and New

Jersey case law and cannot support disqualification. *See In re Sup. Ct. Advisory Comm. on Pro. Ethics Opinion No. 697*, 188 N.J. at 562 n.5 (rejecting "the appearance of impropriety as a factor to be considered in determining whether a prohibited conflict of interest exists under *R.P.C.* 1.7, 1.8 or 1.9" because "it injects an unneeded element of confusion."); *accord Kane Props., LLC*, 214 N.J. at 220 (same). The Supreme Court of New Jersey eliminated the appearance of impropriety standard because the appearance standard's "vagueness and ambiguity" "as an ethics concept" was "too vague to support discipline." *In re Sup. Ct. Advisory Comm. on Pro. Ethics Opinion No. 697*, 188 N.J. at 562-63.

Here, adopting J&J's novel "necessarily imbued" or "alliance" theory for attorney disqualification would establish a state-wide sea-change in attorney ethics directly at odds with the Supreme Court's repeated edict that the "appearance of impropriety" standard is dead. *See Trupos*, 201 N.J. at 469 (reaffirming that the "appearance of impropriety" standard "no longer has any vibrancy when gauging the propriety of attorney conduct"). The Supreme Court of New Jersey eliminated the appearance of impropriety standard to eliminate abuse and ambiguity—the precise problems J&J's motion created. To this day, J&J has never provided any evidence of an actual conflict of interest by Beasley Allen, or any specific confidential information James Conlan shared with Beasley Allen.

The Appearance of Impropriety was adopted for lawyers by the ABA in 1969. That standard proved highly subjective because what looks inappropriate depends upon where you sit and how the "facts" are presented. Because of the inconsistent results, the ABA removed the appearance of impropriety standard for lawyers in 1983. *See* Michael Ambrosio, *Reflections on the Appearance of Impropriety*, 273 N.J. LAWYER 9 (December 2011). By 2004, New Jersey, one of the last states to retain the standard, adopted the Pollock Commission's finding that an actual

conflict or RPC violation, rather than the mere appearance of impropriety, must be the basis for a violation of the Rules of Professional Conduct.

Ignoring New Jersey law and ignoring the history of the Rules of Professional Conduct, J&J re-brands the appearance of impropriety standard under the guise of "necessarily imbued" or "alliance" standard. Having no evidence of a disclosure (and no PRC violation), J&J alleges without support that Mr. Conlan must have told Beasley Allen confidential information and is presumed to have done so without any record evidence to support the claim. *See* March 25 AM Tr. at 82:12-13 (Mr. Haas claiming, without evidence, that any conversation Andy Birchfield had with James Conlan was "necessarily imbued" with J&J's "views"); *id.* at 82:8-15; 98:24-25 (Mr. Haas claiming that "[e]very time Mr. Conlan and Andy Birchfield sit down and talk about anything to do with this proposal, those conversations necessarily implicate the attorney-client" privileged and is "necessarily imbued in those conversations, no matter how he communicates, are our views."); *id.* at 131:14-19 (Mr. Haas claiming that James Conlan's "communications must contain our privileged work product and attorney-client communications because he can't separate that out in his neurons. Any single view that he espouses, necessarily, yes, is imbued with the conversations we've had.").

Mr. Murdica parroted Mr. Hass' unsupported theory of "imbued" conflicts, but insisted he was uniquely capable of doing what neither James Conlan nor Andy Birchfield could do: "separate out in his neurons" client confidences from non-confidences in carrying out his duties as counsel. (March 25 AM Tr. at 131). *Compare* (March 25 PM Tr. at 116:9-13) (Mr. Murdica claiming that "I always kept every settlement conversation confidential," but asserting that neither James Conlan nor Andy Birchfield could not do the same). There is no "necessarily imbued" or "necessarily implicate" standard of New Jersey ethics law. *See State v. Hudson*, 443 N.J. Super. 276, 280, 288

10

(App. Div. 2015) (reversing trial court's order disqualifying counsel because the "appearance of impropriety may not be used as a basis to find a conflict of interest under RPC 1.7 or RPC 1.9" or any other RPC violation).[4]

Both James Conlan and Andy Birchfield testified under oath that no J&J confidences were shared. (May 3 Tr. at 65, 96:20-25 to 97:1-3); *see* (April 10 PM Tr. at 29 to 34)) (James Conlan testifying that he never violated J&J's confidences, and no client has ever accused him of doing so in thirty-five years). J&J responded with speculation, baseless assumptions, and novel ethics theories. J&J failed to provide any evidence to support its heavy burden. *O Builders & Assocs. Inc. v. Yuna Corp.*, 206 N.J. 109, 114 (2011) (the "burden of persuasion and proof remains on the party seeking disqualification"). The Motion must be denied.

### 2. J&J's Evolving Theories of Misconduct Must Be Rejected As Too Vague and Ambiguous to Justify Disqualification.

The Motion should be denied because James Conlan indisputably was never an attorney, employee, expert, or consultant at Beasley Allen, and he does not "represent" Plaintiff talc victims under the RPCs. After he left Faegre in early 2022, Mr. Conlan acted on Legacy's behalf.

When it first filed the motions in December 2023, J&J conceded that:

1. There is "no Rule of Professional Conduct [that] explicitly speaks to the precise situation here." Trans ID: LCV20233584887 at 15;

2. James Conlan "is not formally aligned against his former client on the docket . . .." *Id.* at 17; and

---

[4] In the span five (5) months, J&J has shifted its disqualification theory dramatically. Now, it claims that it "does not need to prove that James Conlan divulged its confidences to Beasley Allen to prevail under any of those rules. In fact, J&J does not even need to prove that it disclosed confidential information to James Conlan for Beasley Allen to be disqualified for his violation of Rule 1.9(a)." (ECF Doc. 31070). There is simply no limit to what J&J will argue, how it will warp the law, or what outlandish claims it will make to secure Beasley Allen's disqualification in this case, to gain a tactical litigation advantage.

3.   Beasley Allen, Andy Birchfield, Ms. O'Dell, and Mr. Meadows "never had a relationship with" J&J. *Id.* at 18.

J&J therefore admitted that: (1) the RPCs do not cover its motion to disqualify Beasley Allen; (2) neither James Conlan nor any Beasley Allen attorney is "formally aligned" against J&J; and (3) Beasley Allen "never had a relationship" with J&J. *Id.* James Conlan has never "represented" Plaintiff talc victims. For these reasons, RPC 1.7 and 1.9 do not apply because J&J was indisputably never Beasley Allen's client—either directly or imputed by one of its attorneys.

James Conlan is also not a "side-switching" lawyer or any lawyer. (April 10 PM Tr. at 35). While the term is loaded with negative connotations and J&J invokes it with great flair and frequency, it is simply inapposite here. (Plenary Hearing Joint Exhibit 17). Mr. Conlan is not adverse to J&J, but would stand in their shoes if J&J agreed to the Legacy Proposal. (May 3 Tr. at 65) ("Legacy is standing in the shoes of J&J" and becomes Beasley Allen's "adversary every bit as much as J&J is now. They have all the talc liability."); *see* (April 10 PM Tr. at 129 to 132) (confirming that Legacy never tried to position itself with Beasley Allen against J&J); (April 10 AM Tr. at 112) (Conlan testifying Legacy is "not adverse" to J&J); (May 3 Tr. at 126 to 127) (Mr. Birchfield discussing Legacy adversity to J&J).   J&J admits Mr. Conlan is "a businessman at a company that he formed called Legacy." (Mar. 25 PM Tr. at 4:17-25).[5] Beasley Allen therefore cannot be disqualified under any theory posited by J&J, and the Motion should be denied.

Before Judge Singh, J&J claimed that it did not even need to allege a specific RPC violation to disqualify Mr. Birchfield and Beasley Allen. *See* (Feb. 7, 2024 Tr. at 29) (J&J claiming that no

---

[5] According to J&J, James Conlan and Andy Birchfield are the only attorneys in the United States who are not capable of acting ethically in screening out and/or not revealing "confidential" information to other attorneys in the course of day-to-day business or mediation proceedings. *See* (March 25 PM Tr. at 116 to 117) (Mr. Murdica claiming that "I always kept every settlement conversation confidential," but asserting that James Conlan and Andy Birchfield could not do the same).

"formal relationship" is needed to disqualify counsel); (*id.* at 32) (J&J claiming that the Court "definitely do[es] not need to find a violation of a specific rule of professional conduct to disqualify Beasley Allen."). That proposition has no basis in New Jersey law.[6] Faced with this reality, J&J now alleges that Mr. Conlan violated RPC 1.6 and 1.9, and claims that Andy Birchfield and Beasley Allen "are responsible for those violations under Rules 5.3, 1.10, 8.3, and 8.4." *See* ECF Doc. 31070 (J&J letter again revising theory of disqualification). As discussed herein, none of the RPCs cited by J&J apply here and its novel "imbued" theory of ethical conflicts would re-write New Jersey law.

C.    **The Motion Should Be Denied Because James Conlan is Concededly Not (and Never Was) an Attorney, Employee, Expert or Consultant At Beasley Allen.**

Because Mr. Conlan is not and has never been associated professionally as a lawyer with the Beasley Allen firm, imputed disqualification also fails. Under RPC 1.9(a), "[a] lawyer who has represented a client in a matter shall not thereafter represent another client in the same or a substantially related matter in which that client's interests are materially adverse to the interests of the former client unless the former client gives informed consent confirmed in writing." The "prohibition [of RPC 1.9(a) is triggered when two factors coalesce: the matters between the present and former clients must be 'the same or ... substantially related,' and the interests of the present and former clients must be 'materially adverse.'" *Trupos*, 201 N.J. at 462-68 (explaining that the RPCs, including Rule 1.9, apply to "prior representation" and "current representation" by same attorneys or firm and adverse clients).

---

[6] J&J previously cited *United States v. Voigt*, 89 F.3d 1050, 1076 n.12 (3d Cir. 1996) for the proposition that an attorney may be disqualified where no clear RPC violation is proved. *Voigt*—like *Cordy*—is inapposite, pre-dates New Jersey's elimination of the appearance of impropriety standard by a decade and is no longer good law.

No conflict may be imputed from James Conlan to Beasley Allen because Mr. Conlan has never been—and is not now—an attorney or employee at Beasley Allen. Under RPC 1.10(c), "[w]hen a lawyer becomes associated with a firm, no lawyer associated in the firm shall knowingly represent a person in a matter in which that lawyer is disqualified under RPC 1.9 unless: (1) the matter does not involve a proceeding in which the personally disqualified lawyer had primary responsibility." *Estate of Kennedy v. Rosenblatt*, 447 N.J. Super. 444, 453 (App. Div. 2016). *See O Builders & Assocs. Inc.*, 206 N.J. at 120-30 (denying motion to disqualify because parties conceded that the other side "consulted" but never retained attorney to be disqualified). Also, because Beasley Allen never represented J&J (and Mr. Conlan does not represent Plaintiffs in the talc litigation), RPCs 1.6 and 1.9 (and the "substantially related" inquiry) do not apply.[7]

### D.     J&J Failed to Show James Conlan Shared Any J&J Confidential Information With Beasley Allen.

The Motion should be denied because J&J (despite numerous opportunities) failed to show Mr. Conlan shared any confidential information with Beasley Allen. With no legal support from New Jersey law, J&J argues that a disclosure must be presumed. That argument turns the Supreme Court of New Jersey's rejection of the appearance of impropriety on its head. The law does not presume an RPC violation nor that lawyers have disclosed confidential information. *See Trupos*,

---

[7]     *Cordy v. Sherwin-Williams Co.*, 156 F.R.D. 575 (D.N.J. 1994) is inapposite and no longer good law in light of the Supreme Court of New Jersey's decisions invalidating the appearance of impropriety standard. *See Kane Props., LLC v. City of Hoboken*, 214 N.J. 199, 220 (2013) (reaffirming under *Trupos* that appearance of impropriety standard no longer governs attorney conflict issues). *Cordy*, which predated *Trupos* and controlling case law from the Supreme Court of New Jersey, relied heavily upon the appearance of impropriety aspect of RPC 1.7—which is now defunct and has no place in the disqualification analysis. *See Trupos*, 201 N.J. at 464 (noting that the Supreme Court "eliminated the 'appearance of impropriety' language from the *Rules of Professional Conduct*" after "the 2004 overhaul"); *In re Sup. Ct. Advisory Comm. on Pro. Ethics Opinion No. 697*, 188 N.J. 549, 562 n.5 (2006) (rejecting "the appearance of impropriety as a factor to be considered in determining whether a prohibited conflict of interest exists under *R.P.C.* 1.7, 1.8 or 1.9" because "it injects an unneeded element of confusion.").

201 N.J. at 464 (noting that the appearance of impropriety standard is rejected and an RPC conflict must be "based in fact"). Rather, as the Supreme Court noted in *Yuna*, the burden of proof and production is on the complaining party (J&J). *See O Builders & Assocs. Inc.*, 206 N.J. at 129 (movant bore "the burden of production and persuasion in the request to disqualify"). J&J has proffered only innuendo, speculation, and loaded but inapplicable labels, but no evidence.

The undisputed record shows that Beasley Allen did not receive "any confidential information from Mr. Conlan." (May 3 Tr. at 65 to 67). James Conlan never came to Beasley Allen with "any confidential information." (May 3 Tr. at 65 to 68). Mr. Conlan never revealed any J&J confidential information to Beasley Allen or Andy Birchfield. (May 3 Tr. at 65 to 67, 96 to 98). James Conlan has never revealed client confidences during his decades-long career. *see* (April 10 PM Tr. at 29 to 34) (Mr. Conlan testifying that he never violated J&J's confidences, and no client has ever accused him of doing so in thirty-five years). "Bald and unsubstantiated assertions"—like J&J's claims here—are insufficient to disqualify counsel. *O Builders & Assocs. Inc.*, 206 N.J. at 129; *Trupos*, 201 N.J. at 456-57, 469 ("unfounded" "surmise alone cannot support an order of disqualification").[8]

Mr. Conlan exchanged emails with Mr. Haas, Mr. White, and J&J leadership from August 2023 to October 2023. (Plenary Hearing Exhibit 4). At no point does J&J object to Mr. Conlan's overtures or warn him about violating alleged confidences. (*Id.*). In his November 5, 2023 email

---

[8] After four months of proceedings, hearings, and briefing in state and federal court, J&J belatedly produced heavily redacted "in camera" timesheets on May 1, 2024. Beasley Allen requested the timesheets numerous times beginning in January 2024, but J&J refused to produce them. J&J also refused to show Mr. Conlan any of the timesheets that allegedly supported their claims. J&J's conduct violated James Conlan's confrontation and due process rights. Beasley Allen also requested J&J's evidence and objected to attempts to proffer partial documents or document "summaries." *See*, *e.g.*, (April 10 AM Tr. at pgs. 10 to 14, 62 and 79) (objecting to J&J's failure to include Mr. Conlan's November 5, 2023 response to J&J and Mr. Murdica's letter of November 5, 2023 based on Best Evidence Rule and Doctrine of Completeness).

responding to J&J's baseless claims that he violated their confidences, Mr. Conlan told J&J that "I am always mindful of confidentiality and privilege (as I know you are), while at Faegre I did not obtain any privileged or confidential insights or knowledge that are relevant to Legacy or our desire and effort to consensually transact with J&J to solve its talc problem." *See* P-5 (Transaction LCV20241033560/ECF Doc. 32046). Contrary to J&J's initial claims, Mr. Conlan confirmed that he never proposed or recommended that J&J/LTL try the Texas-Two Step as a way to resolve J&J's talc liabilities. (April 10 PM Tr. at 40 to 42). James Conlan proposed to J&J and Beasley Allen James Conlan's (Legacy's) preferred (non-confidential) method of resolving mass tort liabilities: structural optimization and disaffiliation. (P-5). J&J apparently rejected that advice. J&J's attempt to shield Mr. Conlan's same-day rebuke of J&J's belated confidentiality concerns and its failure to meaningfully respond to Conlan's email is telling. (April 10 PM Tr. at 40 to 43) (Mr. Conlan testifying that J&J never provided proof to substantiate its unfounded ethics claims).

Moreover, as detailed below, none of the other alleged "confidences" J&J pointed to in these proceedings are in fact J&J "confidential" information.

### 1. The 19 Billion Dollar Legacy Proposal Was Not Derived From J&J Confidential Information.

The 19-billion-dollar number is not J&J's confidential information, and it cannot be the basis for disqualification for three reasons. First, J&J's own experts have opined that an appropriate number to settle all talc-related claims is between $12 and  $21 billion dollars. *See* P-1/P-2 (admitted for identification – J&J expert reports); Trans ID: LCV2024793954 at 4 ("**range from $11 billion to $21 billion (inclusive of government claims)**" is appropriate settlement number.); (*id.* at 17) (same); (*id.* at 25) (same); (*id.* at 27) (same)). J&J produced the expert reports during bankruptcy proceedings before Judge Kaplan. The reports are not J&J confidences, and J&J's own experts support the 19-billion-dollar valuation. *See* P-1 (Trans ID: LCV2024793954)

at 16 to 17 (J&J June 7, 2023 report concluding that the "**total present value of the costs to defend and resolve talc-related claims in the tort system would range from $11 billion to $21 billion (inclusive of government claims**"); P-2 at 44 ("total costs for defending and resolving talc personal injury claims less than $20 billion.").

Second, neither Beasley Allen nor Andy Birchfield developed the 19-billion-dollar number. Andy Birchfield "did not toss out the 19 billion. The $19 billion number is James Conlan and Legacy's number." (May 3 Tr. at 71 to 73). The 19-billion-dollar number is "not a number for the ovarian cancer claims." (*Id.*). Instead, the 19-billion-dollar number reflects an amount at which Legacy would agree to "acquire an entity with all of JJ's talc liability for all time." (May 3 Tr. at 93 to 94). The 19-billion-dollar number is not a Beasley Allen number. (April 10 PM Tr. at 48 to 49). Instead, Legacy calculated the number after the Third Circuit ordered the dismissal of LTL's first bankruptcy in January 2023. (April 10 PM Tr. at 21 to 24).  Legacy arrived at the 19 billion number based on several factors, including: (1) the drop in J&J's market capitalization after the Third Circuit's decision; (2) the discount rate used to determine the present value of the liabilities; and (3) interest rate variability. (*Id.*).

Third, and perhaps most telling, the 19-billion-dollar number is a public figure, and it was made public by J&J. J&J filed the entire Legacy Proposal as an exhibit to the instant motion – not under seal and with no redactions. The 19-billion-dollar number is not a J&J confidence, and it cannot be a basis to disqualify Beasley Allen or remove it from Plaintiffs' Steering Committee.

### 2.     The Matrix Attached to the Legacy Proposal Is Beasley Allen's Work Product and Not Derived From J&J Confidential Information.

All parties admit that the matrix attached to the Legacy Proposal is not J&J confidential information, and it cannot be the basis for disqualification for three reasons. First, J&J conceded in response to the Court's questioning that the data and numbers in the matrix did not come from

J&J. (March 25 AM Tr. at 84 to 85) (Mr. Haas admitting that "This particular matrix, the numbers here are different than the numbers. The matrix concept is not new to this particular tort."); (*id.* at PM 108 to 110) (Mr. Murdica admitting same). Mr. Murdica repeatedly "guessed" about the matrix, and he went further—he testified that he had no idea where the matrix came from. (Mar. 25 PM Tr. at 108 to 109). *See, e.g.*, (Mar. 25 PM Tr. at 104 to 105) (Mr. Murdica testifying that "I can't tell you for certain that this is our document" in response to whether the matrix is a J&J document or Conlan document.).

Second, Andy Birchfield confirmed that the matrix attached to the Legacy Proposal was supplied by Beasley Allen; it is based on Beasley Allen numbers and analysis developed before ever meeting with or talking to James Conlan or anyone at Legacy. (May 3 Tr. at 77 to 87). The matrix is not a J&J confidence James Conlan learned and shared with Beasley Allen. (May 3 Tr. at 94 to 96). Beasley Allen created the matrix based on extensive negotiations on behalf of ovarian cancer claimants that began with Mr. Murdica as early as April 2020, with Andy Birchfield providing to J&J a proposed matrix as early as May 2020. (May 3 Tr. at 84 to 86). Beasley Allen exchanged "settlement" proposals with J&J between 2020 and Spring 2021 during the Imerys bankruptcy. (May 3 Tr. at 86 to 90). Parties in mass tort litigation frequently exchange and negotiate settlement proposals in mass tort litigations. (May 3 Tr. at 95 to 98).

Third, and perhaps most telling, the matrix attached to the Legacy Proposal is public, and it was made public by J&J. (Plenary Hearing Joint Exhibit 7). J&J filed the entire Legacy Proposal, including the matrix, as an exhibit to the instant motion. (*Id.*). It was not filed under seal, and it was not filed with redactions. The matrix attached to the Legacy Proposal originated from Beasley Allen and Plaintiffs not J&J. In sum, the matrix attached to the Legacy Proposal is not the product of J&J confidential information and cannot be a basis to disqualify Beasley Allen.

### 3. "Structural Optimization" and Related Concepts Are Not J&J Confidential Information.

Structural optimization and disaffiliation structures, precepts and transactions are not "confidential" J&J information and cannot be the basis for disqualification. Structural optimization generally—and its application to mass tort defendants like J&J—predate Mr. Conlan's representation of J&J. (PlenaryHearing00110); (April 10 PM Tr. at 15:19-20) (structural optimization and disaffiliation is "in no way, shape, or form" a "J&J confidence."). Conlan's knowledge and expertise in structural optimization did not emanate from J&J in any respect. (*Id.*) While at Sidley Austin, James Conlan structurally optimized numerous entities including Borg Warner (Morse TEC), and numerous other public companies. (PlenaryHearing00110-11). Jones Day and other firms have structurally optimized other entities. (April 10 PM Tr. at 18 to 20, 54 to 55) (James Conlan discussing other public structural optimizations pre-dating his time at J&J).

Structural optimization and disaffiliation is effective because it would not require a talc claimant vote nor require approval by any plaintiff represented by Beasley Allen or any other firm. (April 10 PM Tr. at 59 to 61). James Conlan did not share any purported structural optimization-related confidences with Beasley Allen. (April 10 PM Tr. at 15). It would make no sense for Mr. Conlan to do so since Legacy (J&J) would not "need their vote." (April 10 PM Tr. at 59 to 61). For these reasons, the Legacy Proposal (structural optimization) is not a J&J confidence and cannot be a basis to disqualify Beasley Allen.[9]

---

[9] Neither the 75% support requirement nor the 95% opt in threshold J&J previously mentioned is (or is derived from) J&J confidential information. *Compare* (April 10 AM Tr. at 44) (noting that the 75% buy in from claimants is public and "everybody in [James Conlan's] industry at that time would have known that you need 75 percent plus vote in favor of the plan by current claimants."); *id.* at 52 to 53 (the issue of binding future claimants and 75% settlement buy in issues was not confidential information), *with Cirino v. City of N.Y. (In re World Trade Ctr. Disaster Site Litig.)*, 754 F.3d 114, 117-19 (2d Cir. 2014) (stating that the 9/11 first responder settlement "would become effective only if at least 95% of the plaintiffs 'eligible' to participate agreed to do so.").

**4.    J&J's Proofs and Generalized Claims Do Not Satisfy the Supreme Court of New Jersey's "Hobson's Choice" Requiring Specific Evidence to Disqualify Counsel.**

The Motion should also be denied because J&J failed to provide any specific confidential information James Conlan shared with Beasley Allen. A "movant seeking disqualification of opposing counsel always is presented with a Hobson's choice in respect of the disclosure of confidential information." *O Builders & Assocs. Inc.*, 206 N.J. at 129. The party seeking disqualification must disclose "confidential information" so "that the court can grapple fairly with the issues." (*Id.*). Here, J&J refused to provide specific confidential information Mr. Conlan allegedly told Beasley Allen despite the Court's repeated invitation to do so. A reasonable inference is that there is no evidence. *See* Transcript Addendum.

J&J tried to prove its claims by directing its witnesses Mr. Haas and Mr. Murdica to respond without "revealing" "any of the substance" behind J&J's alleged confidences James Conlan purportedly shared with Beasley Allen. *See* (March 25 PM Tr. at 53:15-16) ("without revealing any of the substance" about J&J's negotiating); (*id.* at 92:18-25) ("I don't want you to go into the substance"); (*id.* at 92:24-25) ("I don't want you to go into a substance of a communication that Conlan made"); (AM *id.* at 17:7-8) ("I want you to limit this, not disclose the substance of it"); (*id.* at 41:1-16) ("I want a yes or no without any substance."); (AM *id.* at 14:18-22) (seeking testimony "at a high level"); (PM *id.* at 46:6-7) (asking for explanation "at a general level"); (PM *id.* at 27:1-6) (asking for J&J to identify confidential information "without getting into the substance"). J&J failed to comply with the Supreme Court of New Jersey's Hobson's Choice—J&J was obligated to submit clear evidence of a conflict and waive privilege, or not, and abandon (lose) their disqualification application. The Motion should be denied because J&J has not provided any evidence that James Conlan shared J&J confidences with Beasley Allen.

J&J repeatedly used "privilege" as a sword and a shield—revealing "confidences"

20

selectively to its benefit but withholding context and critical evidence to prevent Beasley Allen from testing J&J's claims. "It goes without saying that privilege may not be used both as a sword and a shield." *In re Hum. Tissue Prod. Liab. Litig.*, 255 F.R.D. 151, 158 (D.N.J. 2008). At the eleventh hour and after Mr. Hass, Mr. Murdica, and James Conlan completed their testimony, J&J produced a heavily redacted batch of "timesheets" after Beasley Allen requested relevant documents months prior. Beasley Allen (and Judges Porto and Singh) requested specific proofs (including i*n camera*) from J&J multiple times, including the "timesheets."[10]

Beasley Allen repeatedly objected to J&J's refusal to produce relevant evidence and complete documents. *See* (March 25 AM Tr. at 13) (Beasley Allen objecting to Mr. Haas' attempt to testifying to "billing entries" not in the record or produced). *See Munich Reinsurance Am., Inc. v. Am. Nat. Ins. Co.*, 2011 WL 1466369, at *22 (D.N.J. Apr. 18, 2011) ("a litigant cannot at one and the same time make use of those privileged communications which support his position while hoping to maintain the privilege as those communications which undercut his legal position"); *In re Grand Jury Subpoena Issued to Galasso*, 389 N.J. Super. 281, 298 (App. Div. 2006) (a party cannot "use the privilege as a sword rather than a shield," and thereby "divulge whatever information is favorable to [the client's] position and assert the privilege to preclude disclosure of the detrimental facts."). Likewise, J&J repeatedly used the privilege log pertaining to mediation as a sword seeking to eviscerate New Jersey's robust mediation privilege to purport improper inferences. That is exactly what J&J repeatedly attempted to do (and did) throughout these

---

[10] J&J also improperly continues to use Beasley Allen's privilege log as a sword against it in these proceedings. Judge Schneider—the Court appointed Special Master (a well-respected former federal magistrate judge)—conducted a detailed privilege review of mediation documents involving Beasley Allen and James Conlan and upheld Beasley Allen's privilege claims. *See* Trans ID: LCV2024883012 ECF Doc. 29077; ECF Doc. 29999. Mr. Birchfield testified that he believed Judge Schneider to be capable and he "understands the players in the game." (May 3 Tr. at 129).

proceedings. The Motion should be denied.

Moreover, J&J failed to provide any specific evidence to support their claims (even *in camera* or under seal). *See* (March 25 AM Tr. at 52 to 53) (objecting to Mr. Haas speculative testimony without documentary support under Best Evidence Rule and *Yuna*'s Hobson's Choice); April 10 AM Tr. at 11 to 20 (colloquy and Beasley Allen objecting under *Yuna*'s Hobson's Choice where J&J refused to produce billing sheets but sought to testify to their purported contents). *See also* Feb. 14, 2024 Hearing Tr. at 18:21-25 to 19:1-7 (Judge Porto noting that to date, "I don't believe I've seen anything other than what counsel has seen. I didn't get anything in camera. I got everything that was submitted, and I think it was on eCourts."). None of the heavily redacted documents J&J belatedly provided support its disqualification application.

J&J cannot have it both ways. J&J's claims lack credibility because if evidence to support their claims existed, it would be in the record. J&J engaged in the exact conduct and situation the Supreme Court of New Jersey sought to prevent—attorneys accused of ethical misconduct without any meaningful chance to cross-examine their accusers or address unfounded allegations. New Jersey law obligated J&J to provide specific evidence or forego the chance. J&J failed to do so. The Motion should be denied.

> **E.    There is No Evidence That Beasley Allen Ever Obtained Any J&J Confidential Client Information Much Less Confidential Information Substantially Related to the Ongoing 2024 Talcum Powder MCL Litigation.**

J&J fails to carry its heavy burden to disqualify Beasley Allen because there is no evidence that James Conlan shared any relevant or significantly harmful privileged information with Beasley Allen. To justify disqualification, two factors must coalesce: 1) the information disclosed must be the same or substantially related to the present lawsuit and 2) the disclosed information must be significantly harmful to the former client in the present lawsuit. *O Builders & Assocs., Inc.*, 206 N.J. 109, 113-14. J&J cannot satisfy its heavy burden on either factor. It fails to show

that Conlan shared relevant confidential information with Beasley Allen in a manner that would "significantly harm" J&J's case at this juncture.

1.      **J&J Failed to Show That Any Information James Conlan May Possess from 2020 to 2022 is Substantially Related to the Current MCL Talc Litigation.**

J&J fails to show that any confidential information James Conlon may possess is substantially related to the current MCL talcum powder litigation. Matters are "substantially related" if "the lawyer for whom disqualification is sought received confidential information from the former client that can be used against that client in the subsequent representation of parties adverse to the former client" or the "facts relevant to the prior representation are both relevant and material to the subsequent representation." *O Builders & Assocs., Inc.*, 206 N.J. at 125 (quoting *Trupos*, 201 N.J. at 451-52). J&J has a heavy burden to demonstrate matters are substantially related. *See Trupos*, 201 N.J. at 467 ("plaintiff, as the moving party, retains the burden of persuasion and, thus, of proving that, in fact, the current and former representations are 'substantially related.'").

In *Trupos*, the Supreme Court of New Jersey held that disqualification is not warranted unless the moving party can articulate that the firm to be disqualified acquired facts directly relevant to the current litigation involving the parties. 201 N.J. at 469. *Trupos* involved a motion by Atlantic City to disqualify its former attorney (and his law firm) because the attorney allegedly learned confidential information in the course of his representation for the City in a 2006-2007 tax appeal. *Id.* at 467-70. Atlantic City sought disqualification of its former counsel because "both its prior representation of plaintiff and its current representation of taxpayers' tax appeals touches the same subject matter: the propriety of a municipal real estate tax assessment." *Id.*

The Court found that the "superficial" overlap in the "tax appeal" subject matter for the representation was insufficient to disqualify the law firm. *Id.* at 468-70. The law firm's prior

representation of the City involved the defense of tax appeals lodged by the primary industry of Atlantic City: a handful of large casino and hospitality entities, while the law firm now sought to represent some two hundred-plus Atlantic City taxpayers in their tax appeals. *Id.* The City sought disqualification because its prior law firm "may have acquired otherwise privileged information when it participated, on a non-voting basis, in the selection of the revaluation company that produced the assessments subject to the 2009 tax appeals." *Id.* at 468.

The Supreme Court of New Jersey rejected the City's claims and found that it failed to satisfy the heightened burden to disqualify its former law firm. *Id.* at 468-71. The Court concluded that the tax appeals were not "substantially related" because: (1) during its representation of the City in 2006-2007, the law firm did not receive confidential information from plaintiff which can be used against the City in the prosecution of the 2009 tax appeals adverse to the City, and (2) the facts relevant to the law firm's 2006 representation of the City also are not relevant and material to the law firm's representation of the taxpayers in the 2009 tax appeals. *Id.* at 470. The 2008 tax revaluation represented a "clean break between the 2007 assessments and the 2008 assessments" so the matters were not related and disqualification improper. *Id.* at 469.

In *O Builders & Associates, Inc.*, the Supreme Court of New Jersey confirmed that matters are not substantially related for disqualification purposes where the movant generally claims an attorney "disclosed business, financial and legal information" "related to the current lawsuit." 206 N.J. at 129. The Court concluded that "vague" and "bald and unsubstantiated assertions" that an attorney or firm learned a client's "business and legal affairs" fails to satisfy the heavy burden needed to disqualify counsel. *Id.* In sum, the Court held that movant failed to demonstrate "that the matters disclosed during the February 2008 consultation were either the same or substantially related to the subject matter of the lawsuit" and the filed 2009 complaint. *Id.* at 114, 130.

24

Here, J&J makes the same speculative, vague accusations against Beasley Allen that the Supreme Court found insufficient in both *Trupos* and *O Builders*. J&J claims that the Court must disqualify Beasley Allen because James Conlan learned information related to the "same matter" and "same issue(s)" now before the Court. James Conlan indisputably does not represent Plaintiffs or work at Beasley Allen. He works for himself and Legacy. Moreover, any "superficial" overlap in subject matter for J&J's case in 2024 (its talc liability post-bankruptcy) is not sufficient to disqualify Beasley Allen). *Compare Trupos*, 201 N.J. at 467-70 ("superficial" similarity that both matters involved "tax appeals" without specific factual similarities insufficient to disqualify). J&J falls far short of its heavy burden to disqualify Beasley Allen, and the Motion must be denied. *Id.*

### 2. J&J Fails to Show that Any Information James Conlan Possessed Years Ago Would "Significantly Harm" J&J in the Current MCL Talc Litigation.

In the alternative, J&J fails to show that any information James Conlan may have learned from 2020 to 2022 could <u>significantly</u> harm J&J in the current 2024 MCL talcum powder litigation. Information is "significantly harmful" if "prejudicial in fact to the former prospective client within the confines of the <u>specific matter</u> in which disqualification is sought." *O Builders & Assocs., Inc.*, 206 N.J. at 126 (emphasis added). The "significantly harmful" inquiry requires a finding of "significant harm" not mere prejudice or harm. *Id.* The "significantly harmful" analysis is "a determination that is exquisitely fact-sensitive and -specific." *Id.*

Beasley Allen's lawyers have been committed to representing their clients in talc exposure cases for over a decade. (PlenaryHearing00103-05); (May 3 Tr. at 77 to 87). They have leaned every aspect of these cases by being in the trenches in courtrooms across the country and for over ten years. (*Id.*). They have (and are currently) participated in trials, depositions, appeals, settlement efforts, expert challenges, led national conferences—in short they have been chosen by other law firms to lead these talc claims because Beasley Allen has earned that position by commitment and

experience. (*Id.*). There is nothing about the valuation or strengths and weaknesses of these cases that James Conlan could have conceivable known that Beasley Allen was not already aware of. (*Id.*). J&J provides no fact or confidence that James Conlan may have learned years ago that could "significantly harm" J&J in the pending 2024 talcum powder litigation.[11] J&J's failed bankruptcies and years of changed circumstances represent a "clean break" from Mr. Conlan's prior representation such that any information he may have learned does not "substantially prejudice" J&J. Disqualifying Beasley Allen based upon purely speculative claims and novel legal theories would substantially prejudice its clients, including plaintiffs where Beasley Allen is counsel of record and preparing for trials in New Jersey and Philadelphia.

The myriad of considerations, factors, and variables at play in this mass tort litigation have changed in the two years since James Conlan left Faegre. *See, e.g.*, (May 3 Tr. at 90 to 92) (the total number of claims and various factors affecting reasonable settlement values changed between 2019 and 2023); (*id.* at 98 to 100) (any information James Conlan could have learned from 2020 to 2022 and later shared with Beasley Allen would have no relevance to Beasley Allen's position representing claimants in 2023); (*id.* at 90, 117 to 120) (After the Third Circuit dismissed LTL 1 for lack of financial distress, "there was a significant change in the risk that [plaintiffs] thought [they] were facing," and "significant change" "in the total number of claims"); (*id.*) (between

---

[11] J&J's application states that Mr. Conlan attending meetings, phone calls, dinners and golf outings with J&J and its other counsel years ago. Dinners, golf outings, and earnings calls are public venues. Mr. Conlan also purportedly learned confidential information that J&J later put in the public domain, including that it continues to believe bankruptcy is the appropriate vehicle to resolve its talc liability. *See* (Plenary Hearing Joint Exhibit 2) (Haas, Exh. 2 at 9) (stating on October 17, 2023 that J&J is considering filing yet "another bankruptcy"); Trans ID: LCV20233584887 at 7 (discussing "another bankruptcy"). Mr. Conlan confirmed that his Legacy model—which J&J belatedly complains about and now claims is confidential—applies to all solvent mass tort defendants like J&J. (Plenary Hearing Joint Exhibit 17) (Conlan Suppl. Cert., at ¶¶5-12). Mr. Conlan's understanding of what J&J and LTL "believed" was disclosed by J&J on investor calls, in news articles, and in courtrooms nationwide. (*Id.*).

September 2020 and April 2023, the number of talc claims "shifted dramatically" and J&J filed multiple bankruptcies). *See Trupos*, 201 N.J. at 469-70 (holding that matters are not substantially related and cannot inflict harm on former client where there is a "clean break" between prior information revealed and information related to current matter); *accord O Builders & Assocs., Inc.*, 206 N.J. at 129–30 (information disclosed to former attorney was not harmful—much less significantly harmful—where attorney services were limited to discrete issues and attorney services terminated prior to emergence of issues now before the court). James Conlan's years-old representation of J&J is not a basis to disqualify Beasley Allen and remove a firm that has represents thousands of cancer victims (many for more than ten years) and has been a leader in holding J&J accountable for over ten (10) years.

Moreover, J&J met with Mr. Conlan in September 2023 to discuss the exact issues it now baselessly claims he improperly shared with Beasley Allen. *See* Murdica Cert., Exh. 1 (confirming that in September 2023, "J&J met with [Conlan] regarding those ventures two months ago"). J&J was interested in Mr. Conlan's services until it no longer financially and reputationally suited them. If J&J did not treat James Conlan's purported knowledge with care—there is no basis for the Court to do so and order disqualification based on public information.

J&J has not come close to providing evidence to justify disqualifying Beasley Allen— Plaintiffs' years-long counsel of choice. *United States v. Lacerda*, 929 F. Supp. 2d 349, 360 (D.N.J. 2013) (a party's choice of attorney "should not be interfered with in cases where potential conflicts of interest are highly speculative."); *see also Nostrame v. Santiago*, 213 N.J. 109, 113 (2013) ("because the right of the client to be represented by counsel of his or her choosing is of paramount importance, there should be no interference with a client's free choice to retain and to discharge any attorney"). Motions to disqualify made for tactical reasons or to obtain a litigation advantage

should not be countenanced. *See, e.g.*, *Richardson-Merrell, Inc. v. Koller*, 472 U.S. 424, 436 (1985) (expressing concern about the "tactical use of disqualification motions to harass opposing counsel"). J&J filed the Motion to attack Beasley Allen for opposing J&J's bad faith bankruptcies, which "would not provide reasonable compensation to the claimants and the matrix values" not are not "in the interest of the client." (May 3 Tr. at 119 to 120). The Motion should be denied.

## CONCLUSION

The Rules of Professional Conduct (RPCs) are proscriptive, meaning that when applied to legal counsel they are read narrowly and strictly. Put differently, the rules are the rules, but they are not to be expanded—as J&J seeks to do here—beyond their literal wording. J&J concedes that the RPCs do not apply to the situation they complain of here. J&J concedes Beasley Allen never represented it. J&J concedes that Beasley Allen never hired or retained Mr. Conlan in any form. The Supreme Court of New Jersey has repeatedly rejected the "appearance of impropriety" standard for attorney ethics and disqualification matters. After multiple opportunities, J&J fails to provide any evidence that Mr. Conlan revealed prejudicial confidential information to Beasley Allen. Left with these undisputed facts, J&J seeks to resurrect the defunct "appearance of impropriety" standard under a new banner: an "alliance" theory of imputed disqualification. J&J's "necessarily implicate" theory of attorney conflicts is unmoored from the Supreme Court's repeated holdings that an "appearance" standard is dead. As there is no basis for J&J's motion, it should be denied, and the matter should proceed to trial with Beasley Allen acting as the champion of the clients who chose it.

Respectfully submitted,

**FOX ROTHSCHILD LLP**

*Attorneys for Andy Birchfield and Beasley*

Allen

_/s/ Jeffrey M. Pollock_
Jeffrey M. Pollock

Dated: May 17, 2024