# **ADDENDUM**

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION: CIVIL PART
ATLANTIC COUNTY
DOCKET NO.: ATL-L-2648-15
A.D. # _____

|  |  |
|---|---|
| ) | |
| IN RE: JOHNSON AND JOHNSON) | TRANSCRIPT |
| TALCUM-BASED POWDER          ) | OF |
| PRODUCTS LITIGATION          ) | MOTION |
| ) | |

Place: Atlantic County Civil Crt.
       1201 Bacharach Blvd.
       Atlantic City, NJ 08401

Date: January 17, 2024

BEFORE:

    HONORABLE JOHN C. PORTO, J.S.C.

TRANSCRIPT ORDERED BY:

    SEAN C. GARRETT, ESQ., (Faegre Drinker Biddle &
    Reath, L.L.P.)

APPEARANCES:

    JEFFREY M. POLLOCK, ESQ., (Fox Rothschild, L.L.P.)
    Attorney for Plaintiff

    TED MEADOWS, ESQ., AND
    ANDY BIRCHFIELD, ESQ., (Beasley Allen)
    Attorneys for Plaintiff

*(Appearances continued)

                    Transcriber:  Nitsa Carrozza
                    PHOENIX TRANSCRIPTION
                    796 Macopin Road
                    West Milford, NJ 07480
                    (862) 248-0670

                    Audio Recorded
                    Recording Opr: Bashu Dev

1          Against these facts, there is no question

2     that disqualification is required if there is going to

3     be any fairness to these proceedings for J and J going

4     forward and for that reason, we would ask the Court to

5     disqualify Beasley Allen.  We noted in our reply brief,

6     this will not leave those plaintiffs without

7     representation.

8          In all of the cases where Beasley Allen is

9     listed as counsel on the Court's docket for plaintiffs,

10    they are represented by three other law firms,

11    including the Segal Weiss Firm.  It is not a situation

12    where all of the sudden, you're going to have a large

13    number of plaintiffs who are not represented in this

14    M.C.L., that will not be the case.  What will be the

15    case is fairness and integrity with preservation, using

16    the words of the Baldonado (phonetic) Court,

17    preservation of a fair and just litigation process will

18    be maintained.  Thank you, Your Honor.

19         THE COURT:  Thank you, Mr. Brody.  Mr.

20    Pollock?

21         MR. POLLOCK:  Yes, Your Honor.  Thank you for

22    making time to hear us today.

23         THE COURT:  You're welcome and you'll have as

24    much (indiscernible) time as Mr. Brody did.  I will

25    have questions, though, afterwards.

1          MR. POLLOCK:  I'm ready for your questions

2     whenever you are, Judge, but I wish I had the courtesy

3     of their Powerpoint beforehand so I could have reviewed

4     it but I think I'm pretty good, so I'm going to go

5     forward.  What is stunning about the papers submitted

6     by J and J and by opposing counsel's argument today is,

7     he did not even mention the words, "Appearance of

8     impropriety," he didn't mention them.

9          And in 1984 when the Cordy decision was being

10    drafted by Magistrate Judge Kugler, which he

11    specifically says, there is no rule on-point.  The

12    reason is 1.9 and 1.10 didn't exist yet.  The Pala

13    (phonetic) condition had not, at that point, adopted

14    that rule.  So the only rule was 1.7 and counsel is

15    entitled to his own argument, he is not entitled to his

16    own facts.

17         And in the Cordy decision and I'm going to

18    refer you to page 581, there is no question that Greene

19    performed services for Brown.  He entered into a

20    contract, he paid, he learned their litigation

21    strategy, he reviewed their investigation, he rendered

22    some kind of oral opinion.  So it's a lot more than

23    this scant Powerpoint presentation that he just

24    provided saying he spent 28 hours.  He did a lot more.

25         Judge Kugler made those findings, he had an

1    investigation, he found those facts.  There are no such

2    facts here.  So what does counsel propose?  Counsel

3    says, well, you can't rely upon some certifications

4    from counsel.  The problem is, the Supreme Court of New

5    Jersey has said that's exactly what you're supposed to

6    do.

7            And they said unequivocally that, this is a

8    motion to disqualify and this is Trupos, as you

9    identified at 463 and O Builder's, Yuna, which is 206

10   N.J. at 117.  Both come to the same conclusion.  Yes,

11   because of the appearance of impropriety standard, we

12   don't want, unless absolutely necessary and you

13   articulated it up-front, Judge.  We don't want a

14   factual inquiry into the record because the fact is, we

15   have to balance these things.

16           If you do go there, what you uncover, the

17   whole series of issues.  But the Court had a choice in

18   1984 and they follow the American Law Institute's

19   guidance, they follow what Jeff Hazard had to say from

20   the University of Pennsylvania and they made the bold

21   choice to adopt the appearance of impropriety.  That's

22   the standard and that's why the Kugler decision -- and

23   by the way, I don't know what Connecticut law is and I

24   don't know what California law is.

25           I honestly don't know.  I do know New Jersey

1    law.  And I don't know whether Connecticut has adopted

2    or rejected the appearance of impropriety, I don't know

3    how they got there.  This is a New Jersey law issue.

4    This is a New Jersey law determination and the Supreme

5    Court of New Jersey is pretty clear; you are supposed

6    to do exactly what we've submitted.

7          J and J by the way, has an entire legion of

8    counsel, they have phalanxes of associates.  There is

9    no reason, if they had the proofs, counsel makes the

10   argument repeatedly that Mr. Conlon knew all -- he was

11   running the entire J and J defense.  He knew everything

12   about that case.  There's not one iota of proof in this

13   record and they could have deduced it, there's not one

14   iota of proof that any of that is true.

15         We have no idea what Mr. Conlon did.  We know

16   he spent 1,300, 1,600 hours, he know it cost something,

17   I have no idea but the fact is, this is their motion

18   and the Supreme Court of New Jersey has been very

19   clear.  We decide the motion based upon the papers

20   presented.  The arguments of counsel are just the

21   arguments of counsel.  If they wanted to educe those

22   proofs, obviously they felt strongly about it, they

23   have the opportunity to put that proof on the record

24   right now and to establish it.  They have failed.

25         On the counter balance, I've provided you two

1    certifications, one from Mr. Conlon, a lawyer who is no

2    longer practicing and from Mr. Birchfield, as well as

3    from Mr. Birchfield's partner.  All three of them say

4    and he calls it a self-serving set of papers.  I'm

5    sorry, I'm missing it because the Supreme Court of New

6    Jersey has said repeatedly that this is to be decided

7    on the papers.

8         So how else would I do it?  I think when you

9    talk about self-serving papers; they had the

10   opportunity to prove it, they have failed.  And they

11   warp Judge Kugler's decision in <u>Cordy</u> out of any

12   proportional reality in order to emphasize the point.

13   And by the way, if you look at Kevin Michael's book,

14   which I'm sure you may have and you look at the <u>Cordy</u>

15   decision, that case was decided before the appearance

16   of impropriety was adopted.

17        And if we adopt the rule that J and J wants

18   right now, we should just tell the Supreme Court of New

19   Jersey, you got it wrong.  That, the appearance of

20   impropriety is still the standard -- is no longer the

21   -- we're going to apply the same standard to judges, to

22   you, as you apply to me.  And frankly, that's just not

23   the rule, that's not the choice they made and it's not

24   up to J and J, with all due respect, to rewrite the

25   rules.

1         The Supreme Court has also said and this is

2    Yuna, 206 N.J. at 130, that disqualification is an

3    application to be granted sparingly and only in the

4    most extreme circumstances.  And in this case, I do

5    think it's worthwhile noting that they made the exact

6    same application in the Federal District Court.  And

7    the reason is, as the Supreme Court found and there are

8    several decisions directly on-point.

9         One is from Justice Patterson.  This is, I

10   can't pronounce it, Dimitrakopoulos, 237 N.J. 91 at

11   108.  The entire controversy doctrine embodies the

12   principle that the adjudication of legal controversies

13   should occur in one litigation and one court.  You

14   don't get two bites at the apple.

15        That's not just the only time they've said

16   it, Joel versus Morrocco, 147 N.J. at 546.  The entire

17   controversy doctrine seeks to further these objective

18   requiring that whenever possible, the adjudication of a

19   legal controversy should occur in one litigation and

20   only one court, citing Cogdale, which is part of the

21   three cases that lead up to the entire controversy

22   doctrine.

23        Why is that relevant here?  You don't have to

24   rule based upon the entire controversy but you know we

25   have a judicial shortage in New Jersey, we have a

1          judicial shortage in the Federal Court.  In that case

2          and the case with regard to Crispin versus Volkswagen,

3          the Supreme Court referred the lawyer to the Ethics

4          Committee for filing multiple actions based upon the

5          same thing.  Now here, they did one thing different.

6          They actually said, by the way, we're filing.  But

7          still, we've had to brief the matter twice but it also

8          does reflect on the credibility of J and J and having

9          pursued a hyper-aggressive tactic.

10              Counsel also made the point, well, Beasley

11         Allen Firm is going to make money out of this and

12         therefore, that obviously means they're biased.  That

13         may be true that they have an interest in the case.

14         Obviously, they would not be pursuing it if they did

15         not.  But the Third Circuit of the United States Court

16         of Appeals squarely and soundly and completely rejected

17         B.A.S.F.'s effort to try -- I'm sorry, wrong case, J

18         and J.'s effort, to try and wipe out his liabilities by

19         reforming the corporation and shoving things over into

20         one little entity and then bankrupting that entity, the

21         L.T.L.

22              J and J has shown in abundance that they will

23         strike out after anyone.  I represented Doctor Moline

24         who they tried to knock out.  They are not trying to

25         knock out the entire Beasley Allen Firm.  And

1    obviously, if they do that here, it would have an

2    impact under imputed disqualification in the Federal

3    District Court, as well.

4         So why are they so (indiscernible) the

5    Beasley Allen Firm?  I'm not inside of J and J, they

6    have no shared with me their information but since

7    counsel made his speculation, I'm going to make mine.

8    You know why, because Beasley Allen was successful.

9    They fought for their clients and the Third Circuit

10   agreed with them.

11        The Third Circuit Court of Appeals, which is

12   in the business, by and large, of approving bankruptcy

13   opinions.  The rate of bankruptcy approvals is

14   phenomenally high but in this case, they happened to

15   get a judge who actually knew the bankruptcy code and

16   actually had been a bankruptcy judge in Delaware.  And

17   the Third Circuit squarely and completely rejected

18   Judge Kaplan's effort and J and J's effort to use

19   L.T.L. to bankrupt the matter, to bankrupt the entity.

20        So when you look at it, my view is; does

21   Beasley Allen have an economic interest?  Sure, so does

22   J and J.  I can't decide that issue, I can't evaluate

23   who is more financially interested.  What I can do is

24   address the ethics rules and that's what I would like

25   to do.  The burden is a heavy burden, this is -- with

1    regard to doing it.  The motion is, as you and I just

2    discussed, should be decided on the papers.

3           With regard to the whole review, _Trupos_ I

4    think is pretty clear.  The papers, the ones provided

5    to you today, unless you find extraordinary

6    circumstances, are to be the ones you decide and right

7    now, we have complied squarely with the ethics rules.

8    I also look at R.P.C. 1.9 and 1.10.  These are the

9    rules that adopt the appearance of impropriety.

10          So I thought it might make sense -- I don't

11   have a fancy Powerpoint, I didn't realize that's what I

12   was supposed to do but I would like to go through 1.9

13   and 1.10 with you briefly.  1.6, confidential

14   information.  There is zero evidence in this record

15   that Mr. Conlon shared anything with the Beasley Allen

16   Firm.  There is no such beast.

17          And the fact is, to now find based upon

18   counsel's eloquent argument that it must have occurred

19   under the cover of darkness and when the two of them

20   are sweating it out, trying to figure out how to stick

21   it to J and J, that they must have shared that

22   information.  That is a fancy way of saying, the

23   appearance of impropriety.  That's not the rule, so

24   that argument fails.  And by the way, I don't know why

25   Connecticut found the way it found and I don't really

1    care, I don't practice in Connecticut.  So the fact is,

2    I do care deeply about New Jersey Law.

3           With regard to 1.9 and 1.10, these rules were

4    adopted by the Supreme Court of New Jersey after

5    careful deliberation.  They went through not only the

6    commission but then they actually went through

7    extensive argument and there was debate and

8    disagreement and as you know, there have been multiple

9    opinions afterwards.

10          Duties to clients, 1.9, "A lawyer who is

11   representing a client shall not thereafter."  Well, Mr.

12   Conlon is now a lawyer representing anyone in this

13   case.  He has his own firm, Legacy but the fact is,

14   even J and J apparently doesn't believe that Mr. Conlon

15   has acted inappropriately because they haven't pursued

16   him here.

17          They haven't brought a claim against Mr.

18   Conlon here, they have done nothing to prove that Mr.

19   Conlon violated R.P.C. 1.9, represents a party,

20   breached any confidentiality.  They have no problem

21   throwing rocks and stones at the Beasley Allen Firm but

22   I think that's really only because the Beasley Allen

23   Firm has done what it's supposed to do on behalf of its

24   client.

25          It's protected their interest, vigorously, at

1    the risk of tremendous debate before the Third Circuit.

2    Because obviously, there were people who wanted to take

3    the deal and run and there was the Beasley Allen Firm

4    and others who thought they should fight it through.

5    It's not up to me to decide whether that was the right

6    move or wrong move but I don't think there's an

7    evidence that the Beasley Allen Firm did anything other

8    than it pulled the highest standard of the law to do

9    what they thought was right on behalf of their clients.

10          It doesn't matter to me if J and J disagrees.

11   They are allowed to disagree but the Beasley Allen Firm

12   is allowed to go (indiscernible) and the Third Circuit,

13   obviously -- and by the way, J and J tried to go en

14   banc and it failed.  So clearly, the Third Circuit did

15   look at the issue thoroughly.

16          Unlike the Cordy decision which was decided

17   prior to this, in rule R.P.C. 1.10, it has a two-part

18   test and that two-part test is important here, under

19   1.10(b-1).  The matter has to be the same or

20   substantially related and any lawyer in the firm had

21   information protected.  There's no proof here that Mr.

22   Conlon shared information that was protected.

23          Did Mr. Conlon arguably have that

24   information?  Absolutely, there's no doubt.  He worked

25   for J and J, I assume he's a quality guy, I've never

1    met him.  He's at a decent firm, don't doubt that

2    either but it's not up to us, it's not our burden and

3    they bear, as the Supreme Court has said, a heavy

4    burden.

5           J and J has a heavy burden, in order to

6    fulfill what it wants to do, which is knock out the

7    Beasley Allen Firm.  And they can't carry that burden,

8    not on this record and not with these proofs because

9    they have failed.  Bear with me for one second, Your

10   Honor, I'm sorry.

11          THE COURT:  Sure.

12          MR. POLLOCK:  The -- counsel also mentioned

13   the idea of the side-switching lawyer.  And obviously,

14   that gets into two rules, 4.7, 1.9, 1.10 and a couple

15   others, I guess.  There's no indication here that Mr.

16   Conlon ever shared the information.  What he has argued

17   vehemently, upside-down and backwards is, well, it must

18   have occurred, it smells wrong, it doesn't sound right

19   because Conlon was working with Birchfield to try to

20   work up this deal.

21          So let's be clear, there's nothing in the

22   record as to what Mr. Conlon and Mr. Birchfield's roles

23   are other than that they communicated.  By the way, Mr.

24   Conlon also communicated with J and J.  There's nothing

25   in the record that -- to support Counsel's argument

1    that Andy Birchfield and the Beasley Allen Firm intend

2    to buy out some interest here.

3         There's rather the indication that Mr. Conlon

4    had an idea on behalf of his firm, Legacy Solutions,

5    which is a firm that apparently works on resolving

6    disputes which I thought the Court wanted to promote

7    but there's no proof here that there was any

8    information shared that was inside baseball.  Nothing

9    that J and J shared with Conlon that went to Mr.

10   Birchfield.

11        There hasn't been, in all the fancy

12   Powerpoint and the argument today, there's been no

13   showing that there was some super secret discussion.

14   Everything that my opposing counsel points out is, yes,

15   Mr. Birchfield did have discussions with different news

16   groups after they had a meeting, by the way, so did J

17   and J.

18        The reason being is, that the investors and

19   the stock guys are always looking at; where is the

20   world going?  They are allowed to have those

21   discussions, I'm sure they will happen all the time.

22   In this kind of litigation, it simply occurs.  There

23   was nothing there that shows that he had any inside

24   information that he was not allowed to reveal or that

25   he got from Mr. Conlon that was protected.  So I don't

1    understand how the side-switching lawyer works.

2         I do think that when you look at -- although

3    credibility should not, I believe, should be decided

4    respectfully, Your Honor, on the papers before you, I

5    don't believe that when you look at the credibility of

6    the entities because opposing counsel made multiple

7    attacks on Mr. Birchfield, on the Beasley Allen Firm, I

8    do think it's very significant that the entire

9    controversy doctrine literally is being litigated twice

10   here.

11        They are going to get two bites at the apple.

12   That's -- so you're not going to have one court, you

13   have two.  I do think that affects their credibility.

14   I do think that affects their credibility and all of

15   their efforts, they have failed to put up any proofs

16   whatsoever that the information Mr. Conlon was working

17   on -- and I have no idea what specifically he did.  I

18   don't know what he did with those 1,300 or 1,600 hours.

19        There's been no showing on this record that,

20   that information was directly relevant to what Mr.

21   Birchfield is discussing today.  And what the Supreme

22   Court has been very clear on is that Your Honor, you

23   have the opportunity and unfortunately the

24   responsibility, to engage in a detailed fact-finding

25   evaluation.

1          So let's go back to Judge Kugler and the

2    decision in Cordy.  He actually made a specific fact-

3    finding on that record because at that point in time,

4    under R.P.C. 1.7, he was doing the best he could, it

5    was the only option he had.  When the Supreme Court of

6    New Jersey made the choice which opposing counsel

7    refuses to recognize, that the appearance of

8    impropriety governs the standard today.

9          At that point, they came also out with a rule

10   that barring exceptional circumstances, the

11   determination whether counsel should be disqualified

12   which is an extraordinary remedy looking at Yuna, the

13   fact is, it needed to be decided on the papers before

14   you.  Do you have the right to do more?  Sure, you do.

15   But the fact is, right now, this is a high stakes

16   litigation.  The reality is, counsel from both sides

17   are capable and confident.  If they had the proofs,

18   they would have put them on the table already.

19         Looked at a different way, what would we do?

20   Will we start grilling Mr. Conlon and the inside

21   lawyers at J and J, what they discussed and what

22   strategies they had and what their strategies are today

23   and the same thing?  To me, it would turn the entire

24   process into a farce and it would completely derail

25   either going forward or settling.  I just don't see how

1    that inquiry, even if you were (indiscernible) I would

2    respectfully argue that it makes no sense, it doesn't

3    get you anywhere and by the way, it's also not the law.

4           If you'll bear with me one second, Your

5    Honor, I think I may be done.  Unless -- of course, if

6    you have any questions for me.  Your Honor, I think

7    I've addressed the core issues I have.  If you have any

8    questions for me, Your Honor.

9           THE COURT:  I do, Mr. Pollock and I'm going

10    to follow up and you may be seated.

11           MR. POLLOCK:  Yes, sir.

12           THE COURT:  You've been standing a long time.

13    The Trupos case we've been talking about is the City of

14    Atlantic City, back here, versus Trupos, 201 New Jersey

15    447, 2010 decision.  Notably, in the True Post

16    decision, it was a law firm's representation of

17    plaintiffs in the defense of tax appeal.  So factually

18    distinguishable but bearing alm with regard to

19    disqualification of counsel.

20           And the Court in that case was looking at

21    R.P.C. 1.9(a).  And what I wanted to start with is,

22    they give you the law and they say in practice, such a

23    motion should ordinarily be decided on the affidavits

24    and documentary evidence submitted and an evidentiary

25    hearing should be held only when the Court cannot with

1    through it paragraph-by-paragraph, there is a level of

2    detail there that establishes without a doubt that it

3    -- his work was germane to what is going on in this

4    M.C.L. right now and I don't think there is any dispute

5    as to that.

6            THE COURT:  Thank you, Mr. Brody.  Mr.

7    Pollock?

8            MR. POLLOCK:  Thank you, Your Honor and I

9    appreciate your patience.

10            THE COURT:  You're welcome.

11            MR. POLLOCK:  Two points I would make.  One

12    with regard to Trupos and I'm looking specifically at

13    201 N.J. at 463.  A determination of whether counsel

14    should be disqualified is an issue of law, subject to

15    DeNovo plenary appeal.  He also then -- I also will

16    cite to Yuna, which is 206 N.J. at 118.

17            After defendant sought and was granted leave

18    to appeal from that interlocutory (indiscernible)

19    order, the Appellate Division in an unpublished

20    decision procuring affirm the denial of defendant's

21    motion to disqualify, noting that motions for

22    disqualification should ordinarily be decided on

23    certifications and documentary evidence.

24            So and Judge, I'm not challenging you at all

25    in your authority.  You have the right to do what you

1    see is fit and I'm sure you will but I do believe that

2    if we, on the facts you have today, what J and J says

3    is Mr. Birchfield spent -- Mr. Conlon, I'm sorry, spent

4    a lot of time on this matter, 1,300 hours, $2 million

5    worth or whatever it was.

6            What specifically did he do on January 13th,

7    2021?  I have no clue.  What did he do on the following

8    day, I have no idea.  What there is, this basically is

9    a; hey, he worked on the matter for J and J.  Did it

10   involve the L.T.L. bankruptcy filings, what did it

11   involve?  I have no clue and neither does anybody else

12   because in these documents which is what the Supreme

13   Court has said in both <u>Yuna</u> and <u>Trupos</u>, there is no

14   record here to support their decision.

15           Again, Judge Porto, this is your courtroom

16   and I respect that and if you want to have a plenary

17   hearing, you have the right to order it but I do

18   question; how would we proceed?  At this point, am I

19   going to be grilling the J and J Head of Litigation or

20   somebody, walking through timesheet-after-timesheet?  I

21   mean, I can't imagine the number of litigation

22   objections, there will be an attorney-client work

23   product and everything else.

24           And also, why is it relevant?  Because at

25   this point, we keep on going back to <u>Cordy</u>, we keep on

1      going to these other cases, which is fine. Cordy was

2      decided without the appearance of impropriety. That

3      rule was a game changer. It was a significant decision

4      for the Supreme Court of New Jersey to make.

5              Prior to Cordy, I'll admit, we probably would

6      lose because the fact is, on that fact pattern, you

7      would look at it and you would say, you know what, it

8      smells right and that's really their argument. It must

9      be the case, it must be the case that something

10     transpired here. The problem is, in weighing the

11     balance and you know this, Judge, because you've

12     practiced for a long time.

13             You have a balance, the needs of the client

14     to be represented by the lawyer of its choosing. The

15     needs to protect client confidence of J and J, which I

16     respect, by the way. So you have this balancing going

17     on and it's very clear; unless there is a clear,

18     articulated violation of the rules of professional

19     conduct, then the answer is, the only finding on these

20     papers must be that the Beasley Allen Firm remains and

21     they can go forward and litigate as God intended.

22             The last thing I'll point out is that 1.9 and

23     1.10 were not lightly written, they were heavily

24     negotiated. And 1.9 says, "A lawyer who has

25     represented a client." That's not Beasley Allen, they

1    never represented J and J.  Ask Mr. Conlon.  So if they

2    have an issue, go after Mr. Conlon, which notably, they

3    have not done, which is kind of odd.

4            So then you go to 1.10 and as you pointed,

5    imputed disqualification.  A lawyer is associated with

6    a firm if they have confidential information -- I agree

7    with your interpretation.  We should not hire and will

8    not hire Mr. Conlon.  He is not going to be an employee

9    of Beasley Allen.

10           The fact is but the rules were written for

11   specifically that purpose and they were knowingly.  It

12   doesn't say that you can't -- you know, when you talk

13   about the whole idea of who you can interview in the

14   control group test, let's get outside of where we are

15   right now.  Who can I talk to?  Well, I can talk to

16   anyone who is not within the control group under R.P.C.

17   1.4 and 1.6.

18           Mr. Conlon, is he in that control group?  I

19   haven't seen anything saying he is.  I haven't seen any

20   effort by J and J to define him as a person that I

21   cannot talk to.  Classic example is, I'm suing Goodyear

22   Tire and I want to go talk to a mechanic.  How good are

23   those Goodyear tires?  Unless Goodyear puts that guy

24   within the control group, which they had the ability to

25   do but to this day, they have not done it.

1          So on those facts, all of that just speaks

2     volumes that this is a make-work argument.  And

3     therefore, with all due respect Judge, I would urge the

4     Court to rule on the papers that are before it, not the

5     papers that could have been before it and since they

6     failed to carry their heavy burden and it's being

7     written for strategic purposes, they don't like the

8     Beasley Allen Firm.

9          They are allowed to dislike the Beasley Allen

10    Firm but the fact is, that's not a basis for

11    disqualifying it.  Unless you have any further

12    questions, Your Honor, I'll rest.

13          THE COURT:  I don't know, so Mr. Pollock, I

14    shouldn't keep the record open?

15          MR. POLLOCK:  Your Honor, it's your courtroom

16    and I respect any decision you make.  If you want the

17    record open, you can but the fact is, I do believe what

18    the Supreme Court urges is that, unless there is a

19    nagging question and I'm sure there's a million

20    different issues.  What did Conlon do in 2019, how did

21    he do in law school, what role did he play in -- I have

22    no idea and I don't really care.

23          What I do care about is one narrow window.

24    The window where Conlon had an idea of trying to

25    resolve this dispute.  Mr. Birchfield, according to the

1    e-mail, had to communicate with him and so did J and J.

2    That's the one narrow window I'm looking at because I

3    don't care what he did before.

4            Unless there is some real evidence that he

5    shared that information inappropriately that he had

6    with Andy Birchfield and the Beasley Allen Firm and

7    there's no proof that he did.

8            THE COURT:  Thank you, Mr. Pollock.

9            MR. POLLOCK:  Thank you, Your Honor.

10           THE COURT:  Mr. Brody?

11           MR. BRODY:  If I may and I'll be brief, Your

12   Honor --

13           THE COURT:  We don't have a stopwatch,

14   Counsel.

15           MR. BRODY:  So first of all, I'm surprised to

16   hear reference to questions about a control group.

17   Clearly, the Hass declaration makes clear that Mr.

18   Conlon was meeting with people at the highest levels of

19   the Law Department.  And if there is to be -- if this

20   case were decided based on a control group test, that

21   is clearly met.

22           Again, what we're hearing, as the core

23   argument and this is actually what we started with

24   earlier this afternoon, is Beasley Allen's insistence,

25   Mr. Pollock's insistence that; well, because Beasley

67

1    of the day.

2              (Proceeding concluded at 3:28:04 p.m.)

3                         * * * * *

4

5

6

7

8

9                       CERTIFICATION

10        I, Nitsa Carrozza, the assigned transcriber, do

11   hereby certify the foregoing transcript of proceedings

12   on CourtSmart, timestamp from 01:59:33 p.m. to 03:28:04

13   p.m., is prepared to the best of my ability and in full

14   compliance with the current Transcript Format for

15   Judicial Proceedings and is a true and accurate non-

16   compressed transcript of the proceedings, as recorded.

17
18        /s/ Nitsa Carrozza                AD/T 639
19          Nitsa Carrozza                  AOC Number
20
21
22      Phoenix Transcription LLC            01/19/2024
23          Agency Name                        Date

```
                              SUPERIOR COURT OF NEW JERSEY
                              LAW DIVISION:  CIVIL PART
                              ATLANTIC COUNTY
                              DOCKET NO.:  ATL-L-2648-15
                              A.D. #_____

                         )
IN RE: JOHNSON AND JOHNSON)      TRANSCRIPT
TALCUM-BASED POWDER      )          OF
PRODUCTS LITIGATION      )       CONFERENCE
                         )
```

                    Place: Atlantic County Courthouse
                           (Heard Via Zoom)


                    Date: January 23, 2024


BEFORE:

     HONORABLE JOHN PORTO, J.S.C.

TRANSCRIPT ORDERED BY:

     JEFFREY M. POLLOCK, ESQ.,
     (Fox Rothschild)

APPEARANCES:

     JEFFREY M. POLLOCK, ESQ.,
     (Fox Rothschild)
     Attorney for Birchfield

     STEVEN BRODY, ESQ.,
     Attorney for Johnson & Johnson, LTL



                    Transcriber:  Sharon Conover
                    PHOENIX TRANSCRIPTION
                    796 Macopin Road
                    West Milford, NJ 07480
                    (862) 248-0670

                    Audio Recorded
                    Recording Opr:  Catherine Mauro

1          We had oral argument.  I got a copy of the

2    transcript.  I've reviewed all of the case law.  I'm

3    focusing, candidly on New Jersey State case law as well

4    as district court.  I'm not looking at any out-of-state

5    cases.  So, just want to let you know where I'm

6    focusing in on.

7          During oral argument and this is relating to

8    the disqualification, and I'm trying to do this as the

9    Trupos case said on the papers.  And Yuna also said and

10   adopted that same process.  The O Builders & Associates

11   versus Yuna Corporation of New Jersey 206 N.J. 109.

12   And I'm going to be focusing on page 129 of that

13   decision.  When I reviewed this transcript, counsel for

14   Beasley Allen, Mr. Pollock raised the point and I made

15   note of it, and also commented again in the review of

16   the transcript.

17         Notably, did Mr. Conlin (phonetic) have

18   discussions that are really germane to the work he did

19   with Birchfield, Mr. Birchfield.  And he intimated that

20   perhaps Conlin's role with J&J was limited to simply

21   the filing of the bankruptcy involving the LTL.

22         So what specifically, what I'm looking for

23   then Mr. Brody and again I'm trying to keep it as best

24   I can contained on the papers is, so what I'm looking

25   for is what specifically was Conlin working on, again a

1    shorthand reference I mean no disrespect or

2    familiarity, what was Conlin working on during those

3    1,600 hours with Faeger Drinker and is it substantially

4    similarly germane to any work with Birchfield?

5         Can you provide a certification in that

6    regard, Mr. Brody?

7         MR. BRODY:  Absolutely, Your Honor.  We --

8    Mr. Haas certainly provide that certification based on

9    his personal involvement with the work that Mr. Conlin

10   did.  And in particular can certify that Mr. Conlin

11   were involved in the evaluation of all of potential

12   resolution strategies for the Talc Litigation at the

13   highest level for the company.

14        So, the exact matter that is before Your

15   Honor  was subject of the work that Mr. Conlin was

16   doing as part of the senior J&J team.  Now obviously,

17   when you're talking about potential resolutions, you're

18   looking at all options including bankruptcy, including

19   as Your Honor knows a potential resolution through the

20   Imerys bankruptcy, as well as resolution through the

21   Tort System.

22        So, it is an all encompassing evaluation of

23   potential resolutions that included evaluation and

24   discussion of the -- and I do have to say high level,

25   strengths and weaknesses of the underlying cases, and

1     how that would intercept and impact the company's

2     strategies for the ultimately resolution, what it had

3     hoped would be the ultimate resolution of the

4     litigation.

5              THE COURT:  Now, it's no secret that J&J

6     desires to pursue the resolution through bankruptcy.

7     So one of the points that Mr. Conlin raised in his

8     certification, and I'm going by memory right now, is

9     that there's nothing that he derived from J&J that has

10    any basis on what Legacy is doing.

11             So we don't have any documentation, it's not

12    like _Trupos_ or _Yuna_ to the extent that there is no

13    documentation that I can look at.  We're looking at

14    inferential.  So what I'm trying to do Mr. Brody and

15    Mr. Pollock is this is a distinguishable case from all

16    the other cases I feel from what counsel cited and that

17    came up in the Court's research that involve a former

18    attorney, involving a former client, involving a former

19    attorney that is no longer practicing law who is

20    deriving -- who co-founds a company, the Legacy

21    Company, and is now trying to formulate a settlement

22    that doesn't involve the bankruptcy.  It involves the

23    capital markets, I think Mr. Conlin says.

24             So that's what I'm trying to do.  Mr.

25    Pollock, anything to add?

1            MR. POLLOCK:  No, Your Honor.  The only

2     points that I would raise, and I think I follow

3     analytically where you're going, that there's one issue

4     I also did raise during oral argument, is that timing

5     may matter, because Mr. Conlin was working at a

6     specific window in time, and the fact is we're now at a

7     different window in time.  I think that's another way

8     of, if you will, of addressing the issue you're hitting

9     which is how overlapping are these?

10            There's one other issue which I wish I

11     responded to, and I'm not trying to reargue the motion,

12     but I did miss this one last time and it may be

13     relevant.  Mr. Brody argued at length that Mr. Conlin

14     -- Mr. Birchfield reached out to Mr. Conlin, that they

15     were arm-in-arm and they were working together.  There

16     is zero proof that that is true.  I think Your Honor

17     stated it better, Legacy had an idea or thing to sell,

18     which is a resolution.  I believe that the truth is

19     that Legacy reached out to both, Conlin and to

20     Birchfield, and to J&J.

21            My point being that the inference was led and

22     I missed this one in oral argument and I should've

23     addressed it, and I think I want to address if there's

24     a responsive paper from J&J, that there is nothing in

25     the record that Birchfield reached out to Conlin and

1          MR. BRODY:  Of course.  Thank you.

2          THE COURT:  Again, Mr. Brody, Mr. Pollock,

3    thank you for being available.  I appreciate it.

4    Thanks so much.  Have a good rest of the day, everyone.

5    Thank you.

6          (Conference concluded at 3:57 p.m.)

7                       *  *  *  *

8

9

10

11

12    CERTIFICATION

13         I, Sharon Conover, the assigned transcriber, do

14    hereby certify the foregoing transcript of proceedings

15    on CourtSmart, Index No. from 3:35:52 to 3:57:04, is

16    prepared to the best of my ability and in full

17    compliance with the current Transcript Format for

18    Judicial Proceedings and is a true and accurate non-

19    compressed transcript of the proceedings, as recorded.

20

21

22
23    _____*/s/* Sharon Conover_____          ___AD/T 625___
24         Sharon Conover                     AOC Number
25
26
27    ___Phoenix Transcription LLC___         ___01/24/24___
28         Agency Name                        Date
29

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

2

3    _____
                              CIVIL DOCKET NUMBER:
4    IN RE:  JOHNSON & JOHNSON
     TALCUM POWDER PRODUCTS      3:16-md-02738-MAS-RLS
5    MARKETING, SALES PRACTICES
     AND PRODUCTS LIABILITY      CASE MANAGEMENT CONFERENCE
6    LITIGATION                  AND MOTION HEARING

7    _____

8         Clarkson S. Fisher Building & U.S. Courthouse
          402 East State Street
9         Trenton, New Jersey  08608
          February 07, 2024
10        Commencing at 1:00 p.m.

11   B E F O R E:    THE HONORABLE RUKHSANAH L. SINGH,
                     UNITED STATES MAGISTRATE JUDGE

12   A P P E A R A N C E S:

13   FOR THE PLAINTIFFS:

14      ASHCRAFT & GEREL, LLP
        BY:  MICHELLE A. PARFITT, ESQUIRE
15           JAMES S. GREEN, ESQUIRE
        1825 K STREET, N.W.
16      SUITE 700
        WASHINGTON, DC  20006

17

18      BEASLEY ALLEN LAW FIRM
        BY:  P. LEIGH O'DELL, ESQUIRE
19           ANDY BIRCHFIELD, ESQUIRE
        218 COMMERCE STREET
20      P.O. BOX 4160
        MONTGOMERY, AL  36104

21

22

23           Carol Farrell, Official Court Reporter
                  cfarrell.crr@gmail.com
24                   856-318-6100
        Proceedings recorded by mechanical stenography; transcript
25          produced by computer-aided transcription.

*United States District Court*
*District of New Jersey*

---

3

... THE DEFENDANTS:

2

3       FAEGRE DRINKER BIDDLE & REATH LLP
        BY:  SUSAN M. SHARKO, ESQUIRE
4            SEAN C. GARRETT, ESQUIRE
        600 CAMPUS
5       FLORHAM PARK, NJ  07932

6       O'MELVENY & MYERS LLP
        BY:  STEVE BRODY, ESQUIRE
7            JASON ZARROW, ESQUIRE
        1625 EYE STREET, NW
8       WASHINGTON, DC  20006

9       SHOOK, HARDY & BACON L.L.P.
        BY:  KATHLEEN FRAZIER, ESQUIRE
10      600 TRAVIS, SUITE 3400
        HOUSTON, TX  77002

11      HARDIN, KUNDLA, MCKEON & POLETTO
        BY:  JANET L. POLETTO, ESQUIRE
12      673 MORRIS AVENUE #100
        SPRINGFIELD, NJ  07081

13

14      REILLY, MCDEVITT & HENRICH, P.C.
        BY:  SUZANNE I. TURPIN, ESQUIRE
15      3 EXECUTIVE CAMPUS, SUITE 310
        CHERRY HILL, NJ  08002

16      ANDREW C. WHITE, ESQUIRE
        ASSISTANT GENERAL COUNSEL
17      ONE JOHNSON & JOHNSON PLAZA
        NEW BRUNSWICK, NJ  08933

18

19

20

21

22

23

24

25

*United States District Court*
*District of New Jersey*

---

2

A P P E A R A N C E S (Continued):

2

FOR THE PLAINTIFFS (Continued):

3

4    FOX ROTHSCHILD LLP
     BY:  JEFFREY M. POLLOCK, ESQUIRE
5    997 LENOX DRIVE, BUILDING 3
     LAWRENCEVILLE, NJ  08648-2311

6    BEASLEY ALLEN LAW FIRM
     BY:  P. LEIGH O'DELL, ESQUIRE
7         ANDY BIRCHFIELD, ESQUIRE
     218 COMMERCE STREET
8    P.O. BOX 4160
     MONTGOMERY, AL  36104

9

10   MOTLEY RICE LLC
     BY:  DANIEL R. LAPINSKI, ESQUIRE
     210 LAKE DRIVE EAST, SUITE 101
11   CHERRY HILL, NJ  08002

12   LEVIN, SEDRAN & BERMAN LLP
     BY:  LAURENCE S. BERMAN, ESQUIRE
13   510 WALNUT STREET, SUITE 500
     PHILADELPHIA, PA  19106-3697

14

15   COHEN, PLACITELLA & ROTH, PC
     BY:  CHRISTOPHER M. PLACITELLA, ESQUIRE
16   127 MAPLE AVENUE
     RED BANK, NJ  07701

17   GOLOMB LEGAL, P.C.
     BY:  RICHARD GOLOMB, ESQUIRE
18   1835 MARKET STREET, SUITE 2900
     PHILADELPHIA, PA  19103

19

20   MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC
     BY:  VICKI J. MANIATIS, ESQUIRE
21   1 BRIDGE PLAZA NORTH, SUITE 275
     FORT LEE, NJ  07024

22   LEVIN PAPANTONIO RAFFERTY
     BY:  CHRISTOPHER V. TISI, ESQUIRE
23   316 SOUTH BAYLEN STREET
     PENSACOLA, FL  32502

24

25

*United States District Court*
*District of New Jersey*

---

4

I N D E X

2

3    CASE MANAGEMENT CONFERENCE                    PAGE

4    BY:  MS. SHARKO                               7
5                                                  9
                                                   12

6    BY:  MS. O'DELL                               9
                                                   12
7                                                  13

8    BY:  MS. PARFITT                              11

9

     MOTION HEARING                                16
10

     BY:  Mr. BRODY                                17
11                                                 61

12   BY:  MR. POLLOCK                              38
                                                   65

13

14

15

16

17

18

19

20

21

22

23

24

25

*United States District Court*
*District of New Jersey*

49

1  provide in camera?  Go for it.  They have provided nada,
2  nothing.  And that being the case, they have failed on their
3  burden.
4        So I agree that right now, today, it is their burden
5  to prove that something was actually transpired.
6        The "it stinks" argument is absolutely the revocation
7  of the appearance of impropriety, and while you have lots of
8  powers as a Magistrate Judge, the Supreme Court of New Jersey
9  is the one that gets to decide that rule.  So I think -- and
10 they already said, no, we're not -- someone could convince
11 them, I suppose, that they could re-invoke it, but I don't
12 think they're going to.  And that being the case, until that
13 happens, I think the law is pretty simple and clear.
14       So I will go quickly at this point, Your Honor.
15 Again, if you want to stop me at any point in time, you have
16 questions --
17       THE COURT:  Go right ahead.  Thank you.
18       MR. POLLOCK:  -- I'm here to answer your questions.
19       One, they have not alleged a single RPC violation.
20 That speaks volumes.  You need an RPC violation because,
21 otherwise, you're back to the appearance of impropriety.
22       There is no evidence that there was significant harm.
23 And, again, I'm going to *O Builders*, where it has to be
24 something not just nominal, not just, hey, I think there was --
25 you know, I might know -- I don't -- I don't doubt Mr. Conlan

50

1  knew stuff.  He worked hard, Faegre Benson, top-quality firm --
2  I'm sure he knew lots of things.
3        Is it still relevant today?  Is it still relevant
4  after LTL?  And obviously, we haven't gotten to the fact that
5  he says, I haven't shared it with Beasley Allen, Birchfield.
6  And Birchfield, Beasley Allen, was saying, through both Ted
7  Wells, through Mr. Birchfield, they all say, I didn't get it.
8        So there is no evidence whatsoever.  If they had
9  proof, the mere fact that, hey, I think if I put together this
10 line of cookies, somehow it might turn into something, you've
11 got to show me the goods, and I don't see how that happens.
12       I do believe, with all due respect to Judge Porto, by
13 the way -- and, look, I think he's trying to do the right
14 thing.  I do believe, at the initial hearing, I think Judge
15 Porto was misled, just as I believe Mr. Brody has misled you,
16 because what he said was the two of them are aligned; that
17 Conlan and Birchfield had this nefarious plot to undercut J&J's
18 privacy and work against J&J.
19       Well, obviously, Birchfield, Beasley Allen, are
20 opposed to J&J; otherwise, we wouldn't be here.
21       Conlan is absolutely on his own little island, trying
22 to sell for Conlan.
23       There is no proof that the two -- other than one
24 meeting, and this is when Conlan has been working for several
25 months, trying to get J&J to buy into this approach -- hey, I

51

1  think I have an idea; are you guys interested?  Finally,
2  Mr. Haas says, nope, I'm not interested, no more.
3        So what does Conlan do?  He turns around and talks to
4  the Talc Creditors Committee.  He did not reach out to Mr. --
5  Mr. Birchfield.  There is no proof that he did.
6        Eventually, the two of them had discussions,
7  absolutely, because Beasley Allen, just as Mr. Haas had
8  recommended, was saying, hey, if there is a way to work this
9  out, we should talk.  This is somebody who might have a
10 solution.  But there is zero facts, zero evidence, that they
11 ever worked with any confidential J&J information.
12       Mr. Conlan was never retained, never a lawyer at,
13 never worked for, never hired as an expert.  I'm not doubting
14 he's qualified, but he was not any -- at any point in time
15 retained as someone to advise Beasley Allen.
16       They have a heavy burden, as you know, and they have
17 to show an actual conflict.  I think -- I don't think they can
18 show any of those things.
19       The Supreme Court has rejected this -- in the In Re:
20 Advisory Opinion 188 N.J. at 552, the history, to me -- this is
21 reviving history all over again.  What we are doing is we are
22 going back to the days that Gibbons Deldeo and other firms --
23 it wasn't just Gibbons -- that were challenging the question
24 of, hey, I'm getting knocked out of this case.  And it happened
25 to Wilentz too, and a few others.  And I have no idea what the

52

1  merits of those cases were about.  I didn't dig that far into
2  the history.  What I do know is that that was a significant
3  debate and discussion.
4        I do actually believe, candidly and fully, that the
5  entire purpose of this somewhat lengthy LTL bankruptcy exercise
6  was really one of delay, and it causes significant prejudice to
7  the 12,000 people that have entrusted their welfare to the
8  Beasley Allen Law Firm.
9        Beasley Allen has been working on these matters since
10 2013.  They have served in every possible role, as you know, on
11 the Claimants Committee and other things here, and there has
12 never been a smudge of a problem with them.  They are trying to
13 work out -- J&J's representing its view; Beasley Allen and the
14 plaintiffs are working out their view.
15       So to me, when you look at that, I think the burden of
16 all persuasion on the elements -- and this is Yuna, 206 at
17 127 -- is on the -- on J&J to prove there is a problem.  They
18 have failed.
19       Arguments of counsel are not evidence.  The documents
20 are evidence.
21       1.9 requires Mr. Conlan be representing them, and the
22 words are pretty simple because when the Pollock Commission --
23 these are the rules -- 1.9 and 1.10 are two of the rules that
24 is part of Ethics 2000, which was the ABA rule, that's what
25 they adopted.

53

1    And, Your Honor, you know this already, I'm sorry,
2  just moving along.  I don't want to waste your time.
3    THE COURT:  No.  Go ahead.
4    MR. POLLOCK:  But 1.9 is critical.  And I looked at it
5  again today, 1.9(a):  A lawyer who's representing a client in a
6  matter shall not thereafter represent.
7    Mr. Conlan is not representing anyone.  He is
8  representing his own company.  He's not representing the
9  plaintiffs.
10    RPC 1.10, Imputation of Conflicts.  And that's what I
11  thought they were going to go for, apparently not.
12    1.10(b):  When a lawyer is terminated in association
13  with a law firm -- so he leaves Faegre Benson -- the lawyer is
14  not prohibited from thereafter representing.  You gotta show
15  he's representing someone.  And the problem is, he has no
16  client.  He gave no advice, and there is no proof that he did.
17    Lastly, I'll just briefly go through a few pieces of
18  evidence and then I'll -- then I'll rest, Your Honor, unless
19  you, of course, have any questions.
20    I looked at the correspondence that J&J relied upon,
21  too.
22    So in -- October 18, 2023, and this is document 43 of
23  221, Legacy has the support of lead counsel for the OC
24  claimants, including Andy Birchfield, for an MDL opt-in
25  settlement matrix, with Legacy that required and is

United States District Court
District of New Jersey

54

1  approximately -- expected to garner 95 percent opt-in of
2  current OC claimants.  Andy Birchfield, Doug Dachille, and I
3  are prepared to meet with you.  There is nothing in here that
4  says, hey, by the way -- and Mr. Brody goes far on this one --
5  we were working together, they were in league, they prepared
6  this together.
7    I submit to Your Honor, it's one communication where
8  Conlan is trying to make the sale on behalf of his company, and
9  there is zero proof that the two guys were -- that Birchfield,
10  Beasley Allen, were working together in any way, other than the
11  same way that J&J had been working with Conlan for six months.
12  So to me, if that's true, then why are they not pointing that
13  out?  I think that's significant.
14    To make it clear, let's look at 44 of 221.  This is,
15  again, document 28976.  And this is a document dated September
16  28, 2023.  This is Doug Dachille and Mr. Conlan writing to the
17  folks at J&J:  As Jim explained:  Our solution -- that's not --
18  that's not Beasley Allen.  "Our solution," that's Legacy.  Our
19  solution will relieve J&J of both its current and future talc
20  liabilities.
21    To achieve that outcome -- it makes it crystal
22  clear -- Legacy will require -- acquire the LTL plus all other
23  entities.  Not Beasley Allen, not Birchfield, not the
24  plaintiffs.  Legacy.  He's arguing on behalf of Legacy
25  Solutions.  That's the only one, and logically, too.  It's his

United States District Court
District of New Jersey

55

1  company, by the way.
2    I want to go briefly to the Conlan document because
3  Mr. Conlan's certification is certainly not a model of clarity,
4  and I think it's important to clear that one up.
5    By the way, the -- let me get to that first.
6    So this is document -- Page 82 of 221 of -- of 221
7  pages, document 28976.  Mr. Murdica writes on that day,
8  November 5, 2023.  Now, it's interesting, in his certification,
9  it's a little unclear because his certification talks about
10  when Conlan was at -- was at Faegre Benson in 2021, '22, and
11  then he jumps to 2023.  So why?  Because what's happened is
12  that, apparently, at some point, now Conlan is absolutely at
13  Legacy Solutions.  He's on his own.  He no longer believes in
14  the LTL matter, but he had already told the general counsel, or
15  Mr. Haas, whatever he is, at J&J:  I'm not buying this whole
16  thing I cooked up, which is the LTL, you know, two-step
17  approach.
18    And he -- and what Mr. Conlan, who is so focused on
19  the disclosures that Mr. Conlan is making, Mr. Murdica -- I'm
20  sorry -- Mr. Murdica says to Mr. Conlan is the following:  You
21  learned highly privileged information about J&J and LTL
22  strategies from the attorney-client relationship.
23    So what was the attorney-client relationship?  It
24  wasn't 2023.  It was, as you know, while a partner at Faegre
25  Drinker Biddle Reath, FB -- FDBR in 2020 and '21.  It was two

United States District Court
District of New Jersey

56

1  years before.
2    So obviously, a lot happened after that, because he
3  had the idea for the whole bankruptcy thing with the LTL.  He
4  apparently didn't like his own idea later on.  There is zero
5  proof that he had any -- and Mr. Murdica, who is the, you know,
6  Doberman Pinscher for J&J, attacking Mr. Conlan, he doesn't
7  come out and say in 2023, and you had other information too.
8  He's focused on one narrow little strip of information which is
9  stale.
10    So that Supreme Court case that now says you have to
11  have significantly harmful, how does J&J conceivably meet that
12  burden?  Because their own evidence doesn't support it.  Their
13  own evidence says, hey, a couple years ago, there was
14  something.
15    THE COURT:  But is it your view then, counsel, that
16  there is essentially an expiration date on how long an attorney
17  should maintain the confidences of its client?
18    MR. POLLOCK:  Absolutely not.  4.7 is clear on that.
19  Once I give you my word to keep something confidential, unless
20  you authorize me to release it, it's protected and privileged.
21  Agree completely, that would be a misstatement.  There is no
22  proof that that happened.
23    And even what Mr. Murdica is complaining about is not
24  what happened in 2022 or '23.  He's talking about what
25  Mr. Conlan was working on in 2020 and '21.  What he was working

United States District Court
District of New Jersey

73

1     we are adjourned.  Have a great afternoon.

2         THE COURTROOM DEPUTY:  All rise.

3     (The proceedings concluded at 2:43 p.m.)

4       - - - - - - - - - - - - - - -

5

6        I certify that the foregoing is a correct transcript

7    from the record of proceedings in the above-entitled matter.

8

9    */S/ Carol Farrell, NJ-CRCR, FCRR, RDR, CRR, RMR, CRC, CRI*
    *Court Reporter/Transcriber*

10

11    *February 09, 2024*
     *Date*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

         *United States District Court*
           *District of New Jersey*

```
                                    SUPERIOR COURT OF NEW JERSEY
                                    LAW DIVISION
                                    ATLANTIC COUNTY
                                    DOCKET NO.: ATL-L-2648-15


    IN RE: TALC-BASED POWDER   )
    PRODUCTS,                  )
            Plaintiff,         )         TRANSCRIPT
        vs.                    )            OF
                              )      STATUS CONFERENCE
    JOHNSON & JOHNSON, JOHNSON )
    & JOHNSON CONSUMER         )         MCL NO. 300
    COMPANIES, INC. f/ka       )
    JOHNSON & JOHNSON CONSUMER )
    COMPANIES, INC., IMERYS    )
    TALC AMERICA, INC., f/k/a  )         (Via Zoom)
    LUZENAC AMERICA, INC.,     )
    PERSONAL CARE PRODUCTS      )
    COUNCIL f/k/a COSMETIC     )
    TOILETRY AND FRAGRANCE     )
    ASSOCIATION (CFTA), JOHN   )
    DOES/JANE DOES 1-30,       )
    UNKNOWN BUSINESSES AND/OR  )
    CORPORATIONS 1-50,         )
                              )
            Defendants.        )



                        Place:  Atlantic County Courthouse
                                1201 Bacharach Blvd.
                                Atlantic City, NJ  08401


                        Date:   February 14, 2024

    BEFORE:

        THE HONORABLE JOHN C. PORTO, J.S.C.


    TRANSCRIPT ORDERED BY:

        JEFFREY M. POLLOCK, ESQUIRE
        (Fox, Rothschild, LLP)


    APPEARANCES:

        RICHARD GOLOMB, ESQUIRE
        (Golomb, Honik, PC)
        Attorney for the Plaintiffs

        CHRISTOPHER PLACITELLA, ESQUIRE
        (Cohen, Placitella & Roth, P.C.)
        Attorney for the Plaintiffs

        STEVE BRODY, ESQUIRE
        (O'Melveny & Myers, LLP)
        Attorney for the Defendants
```

2

APPEARANCES (Cont'd.):

    SUSAN SHARKO, ESQUIRE
    (Faegre, Drinker, Biddle & Reath, LLP)
    Attorneys for the Defendants

    JEFFREY M. POLLOCK, ESQUIRE
    (Fox, Rothschild, LLP)
    Attorneys for the Defendants


             Transcriber:   Lois A. Vitarelli
                        DIANA DOMAN TRANSCRIBING, LLC
                        P.O. Box 129
                        Gibbsboro, NJ  08026
                        PHONE:  (856)435-7172
                        FAX:    (856)435-7124
                        EMAIL:  dianadoman@comcast.net

                        Audio Recorded
                        Operator: Catherine Mauro

---

3

1        (The following was held via Zoom at 1:36 p.m.)
2        THE COURT:  Okay, Chris, you can have
3  everyone come in from the meeting room.  Good
4  afternoon, Counsel.  It's Judge John Porto, February
5  14, 2024.  We have -- we're on the record.  I'm in the
6  Atlantic County Civil Courthouse.  Today -- yesterday
7  was a weather-related day.  I was in Cape May.  This is
8  a continuation of the order to show cause that was
9  filed on behalf of J&J and LTL in In Re: Talc Powder --
10  Talc-Based Powder Product, Master Docket Number ATL-L-
11  2648-15, Case Number 300.  And I have identified -- my
12  staff has identified on the Zoom -- we're conducting
13  this by Zoom -- is I have Mr. Birchfield, Mr. Pollock,
14  Mr. Szabo, Mr. Golomb, Mr. Chris Placitella, Stephanie
15  Sherman, Leonard Winters, Steven Brody, Susan Sharko,
16  Jasmine Castro, Suzanne Turpin, Jenn Berryman, Esquire,
17  and I think I'm missing someone -- did I get everyone?
18        UNIDENTIFIED SPEAKER:  Is Ms. Sharko on?
19        THE COURT:  Yes.
20        MS. SHARKO:  I am.
21        UNIDENTIFIED SPEAKER:  Okay.
22        THE COURT:  That's all I have.  So, why don't
23  we start?  Ms. Sharko, with J&J/LTL attorneys, why
24  don't we have the appearance of counsel?
25        MS. SHARKO:  Yeah, Susan Sharko, from Faegre,

Colloquy                                    4

1      Drinker, for the (inaudible).
2                MR. BRODY:  Good afternoon, Judge Porto.
3      This is Steve Brody for Johnson & Johnson and LTL.
4                MR. POLLOCK:  Good afternoon, Judge, and
5      thank you for lettering us appear by Zoom.  This is
6      Jeff Pollock from Fox, Rothschild on behalf of Beasley
7      Allen and Mr. Birchfield.
8                MR. GOLOMB:  Good afternoon, Your Honor,
9      Richard Golomb for the plaintiffs in this litigation.
10               MR. PLACITELLA:  Good afternoon, again, Your
11     Honor.  Chris Placitella, here, also on behalf of the
12     plaintiffs.
13               MS. SHERMAN:  Your Honor, good afternoon,
14     Stephanie Sherman, also, not speaking, just monitoring,
15     and I'm here on behalf of plaintiffs.
16               MS. TURPIN:  Good afternoon, Your Honor.
17     This is Suzanne Conlan from Reilly, McDevitt and
18     Henrich.  I'm appearing on behalf of PCPC, just to
19     monitor, as well.
20               THE COURT:  Everyone else is just observing,
21     which is certainly appropriate.  Okay.  So, you're
22     welcome, certainly, conducting this by Zoom much more
23     easier logistically.  This is -- I look at this as a
24     logistic meeting -- logistical meeting.  We scheduled
25     the plenary hearing on March 25.  I think we scheduled


Colloquy                                    5

1      it in the morning.  It looks like it's going to take
2      all day.  The Court identified witnesses, Mr. Conlan
3      and Mr. Birchfield.  So, I was really looking at,
4      Counsel, who are the other witnesses, and if there are
5      other witnesses, what I'm looking at candidly, is in
6      terms of the framework.  We're -- you know, we're going
7      to be looking at, there will be relevancy objections,
8      I'm sure.  I'm going to be looking at, candidly, within
9      the confines of the declaration that was submitted on
10     behalf of Mr. Haas, and then certifications from
11     everyone else, I'm going to be looking at, really, in
12     the context, generally, as those documents framing
13     where we are, I'll probably permit a little bit of
14     latitude.  But I'm really looking at not going too far
15     afield, you know, I think it comes down to credibility
16     determinations.  And that's why I found it was
17     necessary for a plenary hearing.
18               Mr. Pollock, any thoughts?
19               MR. POLLOCK:  I have a number of thoughts,
20     Judge, and, you know, one of the things you're taught
21     in law school is, don't argue with the Judge, so I'm
22     not going to argue with you.  But I would like to make
23     a few observations, and because I did think about this
24     a lot after I looked at the hearing -- after I looked
25     at your order.

Colloquy                                                          6

1          The first one is that, as the Supreme Court
2    said in <u>Truepose</u>, that the regulation of lawyers is of
3    constitutional dimension under the New Jersey
4    Constitution.  And that triggered in my mind the due
5    process clause, which raises the question, what exactly
6    is Beasley Allen, Mr. Birchfield accused of?  And I'm
7    not being glib.  I understand we've had extensive
8    discussions.  We've had briefing.  I get all that.  And
9    you and I have both read them.  But, so far, J&J have
10   said, they cannot identify an RPC violation.  It's
11   something else.  And in my view, it has to be an RPC
12   violation or we shouldn't be here.
13         So, I'm raising the question up front for
14   Your Honor and for Mr. Brody, what exactly is the
15   accusation?  The best I can do is kind of what you did,
16   RPC 1.6, confidentiality of information; RPC 1.9, 1.10,
17   you know, the duty you owe the prior client, et cetera.
18   But I do think that we have to grapple with that
19   seriously because I have to advise Mr. Birchfield and
20   the Beasley Allen firm of exactly and precisely what it
21   is they're being accused of.
22         The second thing I looked at was called <u>Yuna</u>,
23   and this is <u>Yuna</u>, and this is a (inaudible) -- I'm sure
24   you've studied it -- you quoted the opinion in your
25   brief, in your -- and you quoted those opinions in your

Colloquy                                                          7

1    opinion.  At 128, 129, the Supreme Court gets into what
2    I call the muddy or tacky issue.  How do you go about
3    proving the proposition, and let's assume it is 1.6,
4    1.9, 1.10.  That's the best I can see.  So, let's
5    assume it is that.
6          To me, then, the question is, you know, what
7    proofs are we looking at.  And, realistically, I'm
8    assuming Mr. Brody, Ms. Sharko and J&J are all
9    competent people and competent counsel.  You have asked
10   them to produce, if they have evidence, either in
11   camera and Judge Singh (inaudible).  So, what we've got
12   is a certification from Mr. Haas and a certification
13   from Mr. Murdica.  But they have not provided what I
14   would call the smoking gun, which is the document where
15   Haas, Mr. Birchfield and Mr. Conlan were sharing super
16   secret confidential J&J information.  So, to me, the
17   question, then, is well, what are we going to add to
18   the exercise?  That's why I -- I understand the choices
19   you've made, which are Conlan and Birchfield.  I'm not
20   sure what the Haas and Murdica would add, other than
21   hearsay, frankly, because I can describe the
22   activities.  They can describe the activities.  But
23   none of that, really, I think, is going to shed light
24   on the fundamental question which is -- I -- I think
25   these are the ones you're going for -- did Mr. Conlan

Colloquy                                              8

```
 1        share J&J's confidential information that Mr. Conlan
 2        learned while at the Faegre firm with Beasley Allen.  I
 3        think that's the big question.
 4                On the flip side of that is, did Andy
 5        Birchfield or Beasley Allen receive information that
 6        belonged to J&J that Mr. Birchfield learned while at
 7        Faegre?  And my thought is, and, obviously it's your
 8        courtroom, and as I've said before, I respect the fact
 9        that you're trying to do everything you can to follow
10        the Rules.  I expect completely that you're doing that
11        seriously, and you're studying both the record and the
12        Supreme Court opinion.  So, I throw that out there.
13                My thought is that that should be the end of
14        the inquiry.  But if you find that there is something
15        that it -- that something did happen, then there is one
16        more question we have to ask, which is, again, under
17        Yuna at 127, 128, was that disclosure significant, and
18        did it really have an impact.  But I started with the
19        fundamental question up front, to put it glibly, what
20        are we doing here, because you've got the
21        certification.  Let's assume that Mr. Conlan and Mr.
22        Birchfield both say, yep, I didn't -- I didn't send/I
23        didn't receive, I'm not sure where else we go.  And
24        that -- that -- I think it's worth grappling that issue
25        a little bit, because I'd like to know where we're
```

Colloquy                                              9

```
 1        going.
 2                I hope I haven't overstated my welcome, but
 3        I'm just kind of framing the issue so I know how to
 4        prepare with my client.
 5                THE COURT:  You haven't, Mr. Pollock, and I
 6        appreciate that.  I have sets of certifications, one
 7        declaration.  The rest are certifications.  And they
 8        are all diametrically opposed.  So, for me, who do I
 9        believe?  Who has -- who -- who is credible?  The only
10        way I can determine credibility is by looking at that
11        witness, getting a sense and using those factors that
12        we instruct juries to do.  Is it reasonable?  Is there
13        any contradictory information?  Are they testifying
14        with an intent to deceive the Court?  Those factors.
15        So, I can't determine credibility from the papers, Mr.
16        Pollock, Mr. Brody, everyone, and that's why I need to
17        look at, you know, we're going to do this by -- no,
18        we're all coming in person.  That witness is going to
19        be sitting here about six feet away from me.  And I'm
20        going to make that determination of credibility as to
21        whether there is an actual violation of the RPCs.
22                The appearance is gone.  Has to be actual.
23        Has to be significant.  So, I got -- so, that's what
24        I'm doing here, Mr. Pollock.  I identified Mr.
25        Birchfield and Mr. Conlan, and I left open the
```

Colloquy                                      10

1    possibility for anyone else I'd like to hear from.  Do
2    you think it's -- do you need any other witnesses, Mr.
3    Pollock?
4                  MR. POLLOCK:  I don't think so, because
5    anything else would be hearsay, and the question, for
6    example, if Mr. Haas or Mr. Murdica were to take the
7    stand, how do I ever test the proposition of their
8    testimony, and how do you ever evaluate the actors,
9    here?  But I agree with -- Your Honor, as I promised
10   you up front, I'll stand by my word, you have the
11   absolute right, and you've done so, to request a
12   hearing, we will be there on the 25th.  But I do think
13   the universe should be, did Mr. Conlan share anything?
14   Do you believe Mr. Conlan is a truthful, honorable man?
15   And did Mr. Birchfield receive anything?  I'd argue
16   that that should be the beginning and the end of the
17   inquiry.
18                  THE COURT:  I don't disagree.
19                  Mr. Brody, what are your thoughts?
20                  MR. BRODY:  Your Honor, I think -- first of
21   all, I think we've strayed a bit from logistics, but
22   I've been taking notes on what Mr. Pollock has said
23   about how he sees the framework for this hearing.  I
24   think it is going to be important, given the fact that
25   Your Honor indicated you want to make credibility

Colloquy                                      11

1    determinations that you also hear from Mr. Haas and Mr.
2    Murdica, and they are prepared and available to testify
3    on the 25th.  We have a situation here where the case
4    law makes it clear that, as the movant, moving for
5    disqualification, the burden is on the J&J and LTL to
6    make the case, establish facts so that -- that --
7    showing that disqualification is required.  We think we
8    could do that.  But given Your Honor's interest in, and
9    understandable interest in, making credibility
10   determinations in this instance, I think it's important
11   that you hear from them.
12                  I also think it's important that you hear
13   from them because we've heard extensive argument from
14   counsel for Beasley Allen, from Mr. Pollock, both here
15   and in the Federal MDL hearing that took place last
16   week, that somehow the work that Mr. Conlan was doing,
17   when he was outside counsel for Johnson & Johnson, in
18   the same matter that we're addressing here, the Talc
19   litigation, that somehow that is not germane to what he
20   presented, jointly, with Mr. Birchfield to Johnson &
21   Johnson, to what he was advocating, you know, last
22   October when he wrote to J&J's treasurer and said, Mr.
23   Birchfield and I, along with our chief investment
24   officer, want to come in and present our settlement
25   matrix to you.

Colloquy                                    12

1          Given those extensive arguments that we
2     actually just heard again the idea from Mr. Pollock
3     that somehow this isn't significant or we can't show
4     that it's significant, I don't think the Court can
5     evaluate that without hearing from Mr. Haas as to --
6     and it's not hearsay.  Mr. Haas was involved in working
7     with Mr. Conlan.  Mr. Murdica worked with Mr. Conlan as
8     outside counsel for Johnson & Johnson.  So, having them
9     come in and talk about what it is they worked on and
10    why it is that what they worked on is germane to what
11    is being advocated by Mr. Birchfield and Mr. Conlan now
12    is a significant part of the inquiry of the Court.  And
13    it also goes to, specifically, the question of
14    confidential information being shared and violations of
15    the Rules of Professional Conduct.
16          So, I think it is very important that the
17    Court hear from them.  I don't know that their
18    testimony has to be lengthy, but it is -- it is
19    critical to that presentation and critical to the fact
20    that the burden here rests on Johnson & Johnson.  And,
21    given that, what I would suggest is -- and, obviously,
22    I defer to Your Honor as to how you want to conduct the
23    hearing -- but would suggest that Johnson & Johnson
24    call Mr. Haas and Mr. Murdica first, and the Court hear
25    from them, direct examination, any cross-examination


Colloquy                                    13

1     that Mr. Pollock wants to do while they are on the
2     witness stand, before hearing from Mr. Birchfield and
3     Mr. Conlan, presumably through direct examination by
4     Mr. Pollock, after which they would be cross-examined,
5     and some of the assertions that they make on direct
6     examination could be tested.
7          You know, I'm suggesting that simply because,
8     as the party with the burden, as the movant, I would
9     think we would put our witnesses on first, and that
10    would be followed by witnesses.  And I don't know if
11    there are going to be other witnesses that Mr. Pollock
12    thinks are important that he may call as counsel for
13    Beasley Allen.  But that's the way I see it going.
14          THE COURT:  What I'm looking at, Mr. Brody,
15    is, you know, obviously the burden rests with your
16    client for this disqualification.  What I was, you
17    know, looking at, when I consider the Haas declaration
18    and certification, and then the Murdica certification
19    is, you know, what they did and what their
20    responsibilities for J&J, you know, maybe could be
21    stipulated.  What I'm looking at is the connection
22    between what they worked on with regard to this
23    settlement matrix, and, you know, are they going to
24    come in and say, Judge, we have this diagram, and we
25    have this note structure that we conducted in a

Colloquy                                        14

```
 1        meeting, and Mr. Conlan was there, and we formulated
 2        this.  Here's our meeting minutes, and this is what our
 3        settlement structure was, and then, Judge, lo and
 4        behold, after Mr. Conlan leaves the law firm, he comes
 5        up, and all of a sudden, he's presenting the exact
 6        same settlement structure that we developed.
 7                Now, Mr. Conlan says, in his later
 8        certification, I developed these concepts and these
 9        ideas way before I joined Faegre, Drinker, and this was
10        from my 30 years in that prior position that I
11        developed those ideas and this settlement structure.
12        So, you know, when I'm looking at them, Mr. Brody, is
13        that what we're going to see?  Because I think that
14        would be, then, something that could be -- that moves
15        the needle.  I'm using that just as a hypothetical, as
16        an example.  So, in terms of, you know, Mr. Haas and
17        Mr. Murdica, you know, I thought a lot of that could be
18        stipulated to, what they're going to be testifying to.
19        I'm looking at, really, you know, narrowing down, you
20        know, zoning in with a microscope, saying, I'm looking
21        at what happened; what went on; why does Johnson &
22        Johnson have these thoughts; what actually happened;
23        what do we have in terms of documentation or is it just
24        testimony; and then I need credibility.
25                So, what do you think, Mr. Brody?
```

Colloquy                                        15

```
 1                MR. BRODY:  I think that you've hit the nail
 2        on the head, Your Honor, and I think that is exactly
 3        what their testimony will go to is -- is the connection
 4        that the Court is looking to assess, to evaluate for
 5        this hearing.  And I think it's -- it's something that
 6        is going to be very important to address the arguments
 7        that we've seen from Beasley Allen.  It's -- you know,
 8        it was a very large part of the argument that we heard
 9        last week from Mr. Pollock down in Trenton, and I -- it
10        has been a significant part of the briefing that we've
11        seen from Beasley Allen on this issue.
12                But Your Honor is getting directly to what I
13        think the heart of the question is and what we will be
14        able to present to the Court through the testimony from
15        Mr. Haas and Mr. Murdica.  Now, that said, you know,
16        I'm certainly as interested as anyone here is in seeing
17        if there are stipulations that can be reached that will
18        shorten the proceedings, simply things and allow us to
19        really hone in on what is going to be most central for
20        the Court.
21                THE COURT:  Thank you, Mr. Brody.
22                Mr. Pollock, any thoughts?
23                MR. POLLOCK:  A number, Your Honor.  One,
24        it's not my case.  It's their case to bring.  I'm
25        responding.  So, what we had talked about before, when
```

Colloquy                                16

1     Mr. Brody and I met and conferred was they were calling
2     these witnesses.  I don't intend to call any witnesses,
3     other than Mr. Brody has indicated he might want to
4     call an expert, but I don't -- that has not been
5     discussed today.  So, my view is, this is their case.
6     They are their witnesses.  They can call whom they see
7     fit.
8            With regard to the witnesses, it would seem
9     to me, again, Judge, this is -- you know, you were a
10    prosecutor, so you know trial practice better than
11    most.  My view would be that, under the Rules, the
12    first question is, did Conlan and Birchfield share
13    privileged information.  Haas and Murdica aren't going
14    to know anything about that.  They have no personal
15    knowledge what communications that Conlan shared with
16    Mr. Birchfield and the Beasley Allen firm and vice
17    versa.  So, that would all be hearsay.
18           If you reach the conclusion, in the course of
19    the hearing, that there was a -- there's a significant
20    question whether there was an exchange or if there was
21    an exchange, and at that point, you get to the second
22    prong, which is, under <u>Yuna</u>, was that information
23    significant.  Right.  But you first have to reach the
24    conclusion there was anything, and if there is no 1.6,
25    and I would argue there is no 1.9, 1.10.  Did you ever

Colloquy                                17

1     represent the plaintiffs?  Did you ever retained as an
2     expert by the plaintiffs?  Did you serve as counsel for
3     the plaintiff?  Any of those questions would get 1.9
4     and 1.10.  Yes, Mr. Conlan and Mr. Birchfield can
5     answer those questions.  With regard to 1.6, was there
6     any information?  Mr. Conlan and Mr. Birchfield can
7     answer those questions.  But once you open Pandora's
8     Box, and you start allowing testimony regarding what
9     Mr. Haas and Mr. Murdica were doing for J&J, that
10    invites the exact minefield that <u>Yuna</u> was trying to
11    avoid, which is, yes, it's your burden, but you have
12    invited them, in camera, to produce those documents.
13    Judge Singh did the same thing.  To the best of my
14    knowledge, there has been no production of documents in
15    camera, and I certainly don't want to get sandbagged at
16    trial with a -- and I'm not suggesting Mr. Brody would
17    do it, and I'm not suggesting you would permit it, but
18    you can understand why I would be concerned about it.
19           That raises a real question with regard to
20    Haas and Murdica, because I don't -- other than saying,
21    this is what I've seen, and this is what I reviewed,
22    and this is what my recollection is, I don't understand
23    how we test that proposition.  But if we don't get --
24    if we get to the point where you are satisfied that
25    Conlan can describe what he did, and that he did not

Colloquy                          18

1    disclose confidential information, Birchfield can
2    disclose what he did over time, and he didn't
3    get/didn't receive the confidential information, that
4    may end the inquiry.  So, I would suggest we invert the
5    order of witnesses.  Start with Conlan and Haas --
6    Conlan and Birchfield, and then, at that point, it's up
7    to you completely, because you're the finder of fact,
8    where you want to do.
9            I think the starting with Haas and Murdica is
10   starting on your left foot, because you're assuming the
11   answer.  You're assuming there is a problem.
12           THE COURT:  And let me just add, Mr. Pollock,
13   I wasn't a prosecutor.  I was a county counsel for Cape
14   May County, so I just want to --
15           MR. POLLOCK:  I'm sorry.
16           THE COURT:  -- just so the record is clear
17   that my prior position 15 years ago was what it was, so
18   I only do that --
19           MR. POLLOCK:  Well, you can attack either
20   way, so it's fair enough.
21           THE COURT:  Well, thank you.  Now, you know,
22   Mr. Brody, you have the burden, and, as you
23   acknowledge, Mr. Pollock is not going to call any
24   witnesses.  You know, I would defer -- Mr. Pollock has
25   made a suggestion with the order of witnesses.  You


Colloquy                          19

1    know, for me, a party with the burden, I don't want to
2    go in and say, Mr. Brody, you know, here is your order,
3    but that's why I used the example of the document.
4    Now, Mr. Pollock, I haven't seen any -- I don't believe
5    I've seen anything other than what counsel has seen.  I
6    didn't get anything in camera.  I got everything that
7    was submitted, and I think it was on eCourts.
8            Now, and what I'm looking at, in terms of
9    Conlan and Mr. Birchfield, is -- and I use this -- the
10   settlement, because everybody knows what the settlement
11   structure proposed by Legacy is, so I wasn't inviting
12   any attorney/client -- anything -- any further
13   attorney/client privilege, because the world knows it's
14   this settlement structure that Legacy has gone -- you
15   know, gone out and, you know, tried to garner support
16   for that purportedly was developed when he was at
17   Faegre, Drinker with Mr. Haas and Mr. Murdica, so
18   that's why I use that example.  So, I wasn't going to
19   go any further, opening any further -- any other door
20   that goes into J&J's attorney/client privilege.  So,
21   that's why, you know, I carefully chose, you know, what
22   I was looking at.
23           Mr. Brody, any thoughts?
24           MR. BRODY:  I -- I -- well, I think you --
25   and Your Honor, you know, is correct that, as the party

Colloquy                                    20

1      with the burden, we ought to present first.  I think
2      the question that Mr. Pollock asked, you know, was
3      there kind of an exchange of privileged or confidential
4      information is not a question that you can answer
5      without the underlying framework, which is, you know,
6      what exactly was -- and let's flush it out and assess
7      the credibility of Mr. Haas and Mr. Murdica on that --
8      what was the scope of Mr. Conlan's representation of
9      J&J when he was outside counsel for J&J and what types
10     of confidential and privileged communications was he
11     exposed to.  That, then, forms the background for
12     making the assessment, based on testimony from Mr.
13     Birchfield and Mr. Conlan, as to whether the Court, you
14     know, finds them credible, finds denials of sharing
15     confidential information to be credible or not
16     credible.
17             So, I think calling Mr. Haas and Mr. Murdica
18     first really frames the issues for the Court in the way
19     that -- based on Your Honor's comments I think is going
20     to be helpful to the Court.
21             THE COURT:  Can there be some stipulation --
22     I don't want to run too far afield.  I know you've got
23     to set the table, provide context, Mr. Brody.  You
24     know, if counsel thinks, you know, maybe gets the idea,
25     you know, we're going to be -- I don't envision this,

Colloquy                                    21

1      candidly, being more than the morning, you know, when I
2      look at what I'm anticipating.  I don't know what I'm
3      going to hear.  But what I anticipate hearing is maybe
4      three hours and a decision shortly thereafter.  I've
5      set the law out.  I've provided context.  I said to
6      counsel today -- I thought I was clear, but I want to
7      be abundantly clear -- you know, I'm looking at
8      credibility.  I mean, you know, who do I believe, and I
9      can't do it just looking at these papers.  So, you
10     know, can there be some context stipulations with
11     regard to Mr. Haas' and Mr. Murdica's testimony?  I
12     only know that if you, Mr. Brody and you, Mr. Pollock,
13     have an idea to sit down with each other and discuss
14     that.
15             MR. POLLOCK:  Oh, yeah, Your Honor, a couple
16     of quick thoughts.  So, I'm assuming, right now, that
17     what I'm looking at is RPC 1.6.
18             THE COURT:  That's what I am.
19             MR. POLLOCK:  That sounds to me like that's
20     the allegation, you know, J&J didn't make, but that's
21     where we're going.  So, if that's the case, I'm going
22     to prepare the matter for -- (inaudible) committee,
23     but, you know, the fact is I need to know and prepare
24     Mr. Birchfield.  I don't represent Mr. Conlan as to
25     what has happened -- what the allegation is, what the

Colloquy                          26

1      out.
2              So, to the extent this is an objection to the
3      use of exhibits during the hearing, I -- you know, it's
4      new.  I'm not thinking anything extensive at all, but
5      there may be things that provide context when you're
6      actually presenting testimony.  There may be documents
7      that I think or exhibits that I think are potentially
8      important to question Mr. Birchfield or Mr. Conlan
9      about.  And so what I am proposing is, so that there
10     are no surprises, you know, obviously, it's impossible
11     to predict exactly what might ultimately be relevant to
12     a cross-examination, but what I'm hoping to do is
13     streamline things.  And that's where the suggestion for
14     an advance exchange of potential hearing exhibits comes
15     into play.
16             THE COURT:  Do you have those available, now,
17     to share, Mr. Brody?
18             MR. BRODY:  Excuse me?
19             THE COURT:  Do you have those documents now
20     or do you need to go speak with your client?
21             MR. BRODY:  I don't need to speak with the
22     client before identifying anything for that exchange.
23             MR. POLLOCK:  Your Honor, I object.  I object
24     strenuously on this.  I am -- I -- the documents that
25     (inaudible).  This has now been argued twice to you.

Colloquy                          27

1      It's been briefed fully.  It's been submitted to the
2      Federal District Court.  They have presented, these are
3      the facts.  These are the -- whatever documents we've
4      got in the record, Federal and State Court, in my view,
5      are fair game.  You are talking about the
6      constitutional-level right to practice law.  You're
7      talking about the right to 12,000 people who have
8      chosen the Beasley Allen firm.  And, now, suddenly,
9      it's can you bar the door, because I have no idea if a
10     few -- I don't know what these few documents mean.  I
11     have no idea what do we do with -- I mean, I thought
12     the record was closed.  And, on that basis, any of
13     those documents are fair game.  I agree.  But I can't
14     -- I can't -- I vehemently object to anything else
15     being logged in at this point.
16             THE COURT:  Well, in terms of continuity --
17             MR. GOLOMB:  Your Honor, could I add
18     something?
19             THE COURT:  Hold on, Mr. Golomb.
20             Mr. Pollock, this started with regard to
21     context, how do we get context in stipulations, so I
22     was looking, really, for material that will provide
23     you, Mr. Pollock, with context as to what Mr. Conlan
24     did.  That's the direction that we were taking -- that
25     I was taking.  So, I'm looking at documents for context

Colloquy                                    28

1    as to what Mr. Conlan do at Faegre, Drinker, on behalf
2    of J&J.
3            MR. POLLOCK:  Let's go down that minefield,
4    because I think we're going to quickly find that this
5    is a slippery slope that Yuna is telling us not to go
6    down.  We get his time sheets from whatever he worked
7    on.  Then I'm going to want to know, okay, what was the
8    agenda for that meeting?  How many people were there?
9    Was there a transcript of those meetings, and what role
10   did Mr. Conlan actually play, as opposed to the field
11   of 5,000 other people who were there?  Were there
12   emails back and forth exchanged regarding each of those
13   communications?  What role did Mr. Conlan play?  What
14   role did Mr. Haas play?  And, to me, what concerns me
15   here is, J&J is going to be jumping up and down, in my
16   view, appropriately so, hey, they're using confidential
17   stuff.  You're getting into all of our internal
18   thoughts, et cetera.  But if I don't -- you know, I'm
19   either doing my job or I'm not.  And, respectfully, I
20   don't know how you -- how could I allow, when there is
21   so much animosity and tension between the two sides,
22   how could I, with all due respect to Mr. Brody who is a
23   capable, decent guy, how could I allow him to
24   cherrypick the documents he wants, when I don't have
25   the full, unfettered ability to say that these are 52

Colloquy                                    29

1    documents to show that's nonsense.  I think that's
2    exactly why Yuna says, look, you want to go there,
3    you've got to do so with trepidation, because, right
4    now, if we don't stick with the record we've got, which
5    is what I would respectfully and strongly suggest we
6    do, I don't know how I put a fence around what is the
7    edge of discoverability, because I've got to discredit
8    that -- those statements.  The only way to do it is to
9    get full-blown discovery and get into it.
10           THE COURT:  So, it sounds like the only way
11   we're going to get a context of, then, what Mr. Conlan
12   did for J&J is through the testimony of Mr. Murdica and
13   Mr. Haas?
14           MR. POLLOCK:  My view, Your Honor, is it's
15   their case.  They can present it as they see fit.
16   They've got the proofs they want to produce.  They have
17   cited, I assume, since they've got great counsel, and
18   they have a number of them, they've cited the evidence
19   they think they've got.  It would be completely unfair
20   to me, Beasley Allen and Andy to suddenly say, by the
21   way, we've got a few more things we'll allow in, and
22   now, I have no idea how far that fence is.
23           My view is, they have chosen the proofs they
24   wanted.  That was their choice.  And it wasn't my
25   choice.  It was their choice.  And they've been given

1    the opportunity by you, personally, Judge, and by Judge
2    Singh, if you've got anything else, show it to me.
3    And, to me, that raises -- you know, obviously, that
4    raises a whole different level of issues, but you can
5    understand that I'm -- please understand, I'm not
6    trying to be difficult.  I know you're doing your job.
7    I hope you understand I am trying to earnestly and
8    sincerely do my job.  I've got to have a fair playing
9    field, and allowing them to suddenly say, well, I've
10   got six more documents that I think is helpful, that
11   raises a real hornet's nest of, well, what else is
12   relevant, because, if you want me to go into discovery,
13   I can go into discovery-mode, we'll be here next
14   Summer.
15              THE COURT:  So, Mr. Brody, the context of Mr.
16   Conlan's employment will be by way of testimony, no
17   further documents.
18              MR. BRODY:  Okay.
19              THE COURT:  All right.  Mr. Golomb, you
20   wanted to add something?
21              MR. GOLOMB:  I did, Your Honor.  I think you
22   asked a very relevant question, and that is when you
23   said, I thought that the record was closed.  And, you
24   know, something that hasn't been talked about here
25   today, and I don't know if you've had an opportunity to

1    look at the transcript from the hearing in front of
2    Judge Singh?
3              THE COURT:  I did.
4              MR. GOLOMB:  But Judge Singh -- so, you know
5    that Judge Singh, at the very beginning of that
6    hearing, asked a very important question of both Mr.
7    Pollock and Mr. Brody, and she asked them both, can I
8    rule on this today, based on the record that I have or
9    should I wait until after March 25th?  And both Mr.
10   Brody and Mr. Pollock agreed that this record is
11   closed, and that you can rule today.  And so, it is
12   really surprising to hear, suddenly, that, no, this
13   record is not closed, and we want to not only present
14   these witnesses that the Court did not ask for, but
15   somehow, there is going to be some new documents that
16   are going to be produced.  They were not produced in
17   the bite of the apple number one on January 17th or
18   bite of the apple number two that occurred shortly
19   thereafter that when you -- when Your Honor allowed the
20   supplemental certifications.
21              THE COURT:  Well, I might have opened that
22   door, Mr. Golomb, by for context as to what Mr. Conlan
23   did, so I don't disagree with everyone.  The record is
24   closed with regard to documents.  Whatever comes out is
25   going to be by way of testimony from the witnesses that

Colloquy                                                    42

```
 1                    (No audible response)
 2              THE COURT:  All right, everyone, very nice
 3      seeing everyone.  We're back.  The courthouses are open
 4      today.  It's good to see everyone.  Let me know -- if
 5      you need me, let me know, Mr. Brody, Mr. Pollock, on
 6      that --
 7              MR. BRODY:  Absolutely.
 8              THE COURT:  -- disqualification issue.
 9              Thanks, everyone.
10              ALL COUNSEL:  Thank you, Your Honor.
11              THE COURT:  You're welcome.
12              We can go off the record.
13                    (Proceedings concluded, 2:30 p.m.)
14                              * * *
15
16
17
18
19
20
21
22
23
24
25
```

43

```
 1                C E R T I F I C A T I O N
 2
 3
 4
 5
 6              I, Lois A. Vitarelli, the assigned
 7      transcribers, do hereby certify the foregoing
 8      transcript of proceedings recorded on Court Smart
 9      recording, on February 14, 2024 from 1:36 p.m. to 2:30
10      p.m., is prepared in full compliance with the current
11      Transcript Format for Judicial Proceedings and is a
12      true and accurate compressed transcript of the
13      proceedings as recorded.
14
15
16
17
18      /s/Lois A. Vitarelli                    366
19      LOIS A. VITARELLI                  AOC NUMBER
20      DIANA DOMAN TRANSCRIBING, LLC
21
22
23        02/16/24
24      DATE
```

```
                          SUPERIOR COURT OF NEW JERSEY
                          LAW DIVISION:  CIVIL PART
                          ATLANTIC COUNTY
                          DOCKET NO.:  ATL-L-2648-15
                          A.D. #_____

                     )
IN RE: JOHNSON AND JOHNSON)        TRANSCRIPT
TALCUM-BASED POWDER      )            OF
PRODUCTS LITIGATION      )          HEARING
                     )

                      Place: Atlantic County Civil Crt.
                             1201 Bacharach Blvd.
                             Atlantic City, NJ 08401

                      Date: March 25, 2024
                            AFTERNOON SESSION

BEFORE:

     HONORABLE JOHN C. PORTO, J.S.C. AND
     RUKHSANAH L. SINGH, U.S.M.J.

TRANSCRIPT ORDERED BY:

     JEFFREY M. POLLOCK, ESQ.,
     (Fox Rothschild)

APPEARANCES:

     JEFFREY M. POLLOCK, ESQ.,
     MICHAEL SABO, ESQ.
     (Fox Rothschild)
     Attorney for Birchfield

     STEVEN BRODY, ESQ.,
     Attorney for Johnson & Johnson, LTL




                      Transcriber:  Sharon Conover
                      PHOENIX TRANSCRIPTION
                      796 Macopin Road
                      West Milford, NJ 07480
                      (862) 248-0670

                      Audio Recorded
                      Recording Opr:  Heather Canale
```

1    Q    The first thing I want to ask you, Mr. Haas,

2    your testimony about the kinds of issues and privilege

3    and confidential communications that Mr. Conlan was

4    privied to, exposed to, a part of while he was outside

5    counsel for Johnson & Johnson is that based on your

6    personal knowledge?

7    A    Yes, sir.

8    Q    And how did you acquire that personal

9    knowledge?

10   A    Through group calls, through individual calls from

11   Mr. Conlan, through individual emails with Mr. Conlan,

12   going out to dinner, going out to lunch with Mr.

13   Conlan.  Group calls where we had deliberations among

14   the entire outside counsel group.

15       So, it was one interaction after the other

16   throughout for the entire time that he was retained by

17   Johnson & Johnson.  He was an integral part of our

18   outside counsel group that worked with our internal

19   counsel group to develop and implement the strategies

20   for both the litigation, adjudication, and a resolution

21   of the talc claims.

22   Q    And you've talked about the outside counsel

23   team.  But did you have one-on-one direct

24   communications with Mr. Conlan about privileged and

25   confidential strategic considerations related to the

1    CERTIFICATION

2        I, Sharon Conover, the assigned transcriber, do

3    hereby certify the foregoing transcript of proceedings

4    on CourtSmart, Index No. from 1:50:53 to 4:37:26, is

5    prepared to the best of my ability and in full

6    compliance with the current Transcript Format for

7    Judicial Proceedings and is a true and accurate non-

8    compressed transcript of the proceedings, as recorded.

9

10

11

12    /s/ Sharon Conover                    AD/T 625

13    Sharon Conover                        AOC Number

14

15

16    Phoenix Transcription LLC             03/28/24

17    Agency Name                           Date

18

19

20

```
                              SUPERIOR COURT OF NEW JERSEY
                              LAW DIVISION: CIVIL PART
                              ATLANTIC COUNTY
                              DOCKET NO.: ATL-L-2648-15
                              A.D. # _____

                         )
IN RE: JOHNSON AND JOHNSON)        TRANSCRIPT
TALCUM-BASED POWDER       )            OF
PRODUCTS LITIGATION       )          HEARING
                         )

                          Place: Atlantic County Civil Crt.
                                 1201 Bacharach Blvd.
                                 Atlantic City, NJ 08401

                          Date: March 25, 2024
                                MORNING SESSION

BEFORE:

     HONORABLE JOHN C. PORTO, J.S.C. AND
     RUKHSANAH L. SINGH, U.S.M.J.

TRANSCRIPT ORDERED BY:

     JEFFREY M. POLLOCK, ESQ., (Fox Rothschild)

APPEARANCES:

     JEFFREY M. POLLOCK, ESQ., AND
     MICHAEL SABO, ESQ., (Fox Rothschild, L.L.P.)
     Attorneys for Plaintiff

     STEVE BRODY, ESQ., (O'Melveny & Myers, L.L.P.)
     Attorney for J&J and L.T.L. Mngt.

  *(Appearances continued)


                          Transcriber:  Nitsa Carrozza
                          PHOENIX TRANSCRIPTION
                          796 Macopin Road
                          West Milford, NJ 07480
                          (862) 248-0670

                          Audio Recorded
                          Recording Opr: Heather Canale
```

1        that point because we now know it wasn't true but I'm

2        telling you, contemporaneously at the time and given

3        the way this was written, that is exactly what it was

4        conveying to us.

5            That suddenly, Mr. Conlon had said, well, let me

6        go out and now contact the other side and start working

7        against you.  That's egregious.  We now know it's even

8        more egregious because it wasn't the first time.

9        Q    Well, that was going to be my next question

10       for you.  Have you since come to learn that Mr. Conlon

11       and Mr. Birchfield were working together throughout the

12       pendency of the mediation that was taking place in the

13       L.T.L. bankruptcy in the Summer of 2023?

14                 MR. POLLOCK:  Objection, Your Honor.  This

15       goes with the Best Evidence Rule.  There is no evidence

16       that this ever occurred.  All I have is rank

17       speculation from Mr. Haas as to discussions he was not

18       even a part of.  How do I possibly cross examine when

19       they have not produced a single scrap of paper in the

20       record to support any of Mr. Haas' hypothesis?

21                 All I have is rage from him, I get it, he's

22       angry but I'm entitled to documents and I can't oppose

23       a witness when he has not produced the documents that

24       UNA squarely says, you have a Hobson's choice, produce

25       it or don't.  I am deeply concerned about where this

```
 1      testimony is going because there's no evidence

 2      whatsoever to support it.

 3                  THE COURT:  Mr. Brody.

 4                  MR. BRODY:  Your Honor, well first of all,

 5      Mr. Haas --

 6                  THE COURT:  I believe this is a credibility

 7      determination, to the extent that there's no document

 8      and the Court permits the questions to go forward.

 9                  MR. BRODY:  Well, let me ask Mr. Haas, I

10      mean.

11                  THE COURT:  I'll overrule the objection, I'll

12      give you that opportunity but there is no

13      documentation.  I think we cleared that earlier in one

14      of our conversations.

15                  MR. BRODY:  Certainly, Your Honor.

16      BY MR. BRODY:

17          Q    Let me ask you, Mr. Haas, when did you first

18      learn that Mr. Conlon and Beasley Allen were working --

19      first of all, I don't know if I got an answer to the

20      prior question before the objection, so let me ask that

21      one again, just for the record.

22          Have you since come to learn that Mr. Conlon and

23      Mr. Birchfield were working together throughout the

24      pendency of the mediation that was taking place in the

25      L.T.L. bankruptcy in the Spring and Summer of 2023?
```

1    wrote, "Indeed, if such a plan were confirmed, it

2    simply cannot free J and J of its direct liability."

3    Do you see that?

4    A    I do.

5        Q    And was that something that caused you

6    concern?

7    A    He's speaking to the plan that we're proposing.

8    There is our former counsel who provided advice on that

9    very issue, inconsistent with what he's saying here but

10   he's basically taking a position with respect to a plan

11   we are currently proposing that has been deliberated

12   extensively over the course of the time frame in which

13   he was our counsel and now he's going out and opining

14   that it will never work.  This is our advocate,

15   advocating against us.

16       Q    Have you learned, Mr. Haas, that not only is

17   this something that was being advanced through the

18   Bloomberg article and the press release that we saw

19   from November 2nd in the media but also that, it was

20   being advanced with the investment community?

21   A    So immediately after receiving this, I sent an e-

22   mail to Mr. Conlon's firm saying; stop it, you're

23   breaching your ethical obligations.  Ignored.

24       On the 15th of November, I believe that was the

25   right date, we received notice that Mr. Birchfield and

1   Mr. Conlon were then pending an investor conference,

2   the Gordon Haskett Conference, in which they were going

3   to present this very proposal.

4            MR. POLLOCK:  Objection, speculation as to

5   what they were going to present.

6            THE COURT:  Sustained.

7   BY MR. BRODY:

8       Q    I'm sorry, did you at that time come to have

9   an understanding of what they were going to present?

10      A    We were advised that Mr. Birchfield and Mr. Conlon

11  were making a proposal at an investor conference, the

12  Gordon Haskett Conference, regarding the resolution of

13  the talc claims.

14           MR. POLLOCK:  Same objection, Your Honor.  We

15  were advised.  Rank hearsay, I move to strike.

16           THE COURT:  I agree, I sustain the objection.

17           MR. BRODY:  That's fine, Your Honor.

18  BY MR. BRODY:

19      Q    Mr. Haas, before we conclude, I want to bring

20  you back to last summer.  What was going on in the

21  L.T.L. bankruptcy last summer when Mr. Conlon was

22  engaged in these, what they say are, privileged

23  communications with Mr. Birchfield and Ms. O'Dell and

24  others at Beasley Allen?

25      A    There was extensive motion practice.  The motion

1    to dismiss that Mr. Beasley -- Mr. Birchfield was

2    leading.  There was extensive discovery with respect to

3    that, motion practice.  It ultimately culminated in a

4    week-long hearing on a motion to dismiss, followed by

5    extensive post-trial findings of fact and conclusions

6    of law.

7        I suffice it to say there were myriad

8    opportunities for either Mr. Conlon or Mr. Birchfield

9    to disclose the alliance that they had formed at that

10   time and not once, not once in any of those motions,

11   submissions, discoveries, including the deposition of

12   Mr. Birchfield or in the week-long intensive hearing

13   followed by a full briefing on the motion to dismiss,

14   did they ever disclose that Mr. Conlon was working with

15   Mr. Birchfield.

16       And Mr. Conlon never approached me for a waiver or

17   anyone at my firm and never once asked for consent to

18   engage in that relationship, not once.  There were

19   untold opportunities to do so and he never did.

20       Q    And is it concerning to you now to know that

21   while Johnson and Johnson was engaged in mediation with

22   the T.C.C. in the L.T.L. bankruptcy, that your former

23   lawyer Mr. Conlon was communicating directly,

24   collaborating directly, with Mr. Birchfield and his

25   firm, on the other side of that mediation?

1          MR. POLLOCK:  Objection to the word

2     collaborating.  Again, it is conspiracy either in the

3     cover of darkness.  They were working together, yes but

4     there's no proof of anything else beyond the fact that

5     they were communicating.

6          THE WITNESS:  I can answer without

7     (indiscernible)

8          THE COURT:  May be a choice of word?

9     BY MR. BRODY:

10         Q    It may be a choice of word and Your Honor, we

11    will definitely get to collaborating today but for now,

12    I'll just ask you.  Knowing now what you know from the

13    privilege claims that have been asserted by the

14    Plaintiff Steering Committee and what you know about

15    the work, communications, that were going on, in

16    secret, on the other side of that mediation; is that a

17    concern to you?

18    A    I go back to what I said earlier.  This

19    fundamentally undermines the entire judicial process.

20    It provides an unfair advantage to an adversary in an

21    adversarial system.  The conversations that were being

22    had by the disclosures in the privilege log and based

23    upon the declaration submitted by Mr. Birchfield,

24    indicated they involve the same matters and the same

25    issues for which Mr. Conlon was representing us.

1          Having those communications, by their very nature,

2     is a violation of his duties to us because those

3     conversations necessarily are imbued with the

4     confidential work product, privileged information we

5     conveyed to Mr. Conlon and at extensive discussion and

6     deliberation.

7          So I go back to the core principal, it contravenes

8     the judicial process, it's contrary to the interest of

9     justice and it fundamentally undermines the adversarial

10    system.

11    Q    Was Mr. Conlon privy to privileged and

12    confidential information about J and J's negotiating

13    strategy, in its attempt to resolve the litigations

14    pending in New Jersey and in the M.D.L., that you

15    believe would be directly relevant to the L.T.L.

16    bankruptcy mediation that went on last summer?

17              MR. POLLOCK:  Your Honor, I object.  There

18    has been multiple efforts at a settlement.  There was

19    an effort within Amyris, there was an effort within

20    L.T.L., then there was L.T.L.2, there's been mediation

21    before people.  I have no clue what time period we're

22    asking about --

23              THE COURT:  Well, it was last summer.  Any

24    particular time --

25              MR. POLLOCK:  Is that the only time period?

1              THE COURT:  Yeah, that was the time period.

2              MR. BRODY:  My question --

3              THE COURT:  Right, was that it?

4              MR. BRODY:  I can rephrase it, Your Honor.

5              THE COURT:  Okay.

6       BY MR. BRODY:

7          Q    My question is, based on your knowledge of

8       the privileged and confidential communications that Mr.

9       Conlon was exposed to, whether it be talking about

10      potential resolution for the tort system, resolution

11      through the Amyris bankruptcy, resolution through

12      M.D.L., are those confidential and privileged

13      discussions that he was involved in relevant to the

14      mediation that took place last summer?

15             MR. POLLOCK:  Your Honor, again, same

16      objection.  Multiple discussions regarding M.D.L.  I

17      can't even remember what the litany was, it was that

18      long.  I am entitled, when my client is accused of

19      having violated the Rules of Professional Conduct, to

20      some facts.

21             That's what True-Post says, I'm entitled to

22      some facts.  I would like to know what discussions,

23      what date, what year, where were they, what happened?

24      Because right now, I have no clue, I'm attacking a

25      boogeyman.  I can't do it if I don't know what it looks

1     like.

2                 THE WITNESS:  I can answer without

3     (indiscernible)

4                 THE COURT:  Well, I understood the question.

5     Mr. Haas, you understand the question.

6                 THE WITNESS:  Yes, sir.

7                 THE COURT:  So I'm overruling the objection

8     but you know, the time frame is last summer.  So is it

9     June, July, August?  July, June, August, what's, in

10    terms of summer?

11    BY MR. BRODY:

12    Q    My question is, is the privileged and

13    confidential information that Mr. Conlon learned during

14    the 20 months that he represented J and J relevant to

15    the mediation discussions that were going on in May,

16    June and July of last year, in the L.T.L. bankruptcy?

17                MR. POLLOCK:  This is precisely my objection,

18    Your Honor.  He is morphing time frames.  He is not

19    talking about after Mr. Conlon formed Legacy.  He is --

20    Mr. Brody is asking about all this stuff you learned

21    beforehand, whatever that time period was, is it

22    relevant to what's occurring now.

23                And if that's true, if that's really his

24    question which I think it is, I would like to know

25    which one, Amyris, L.T.L.?  Which discussions, where

1    did they occur, what was discussed?  Because I have no

2    idea how to value relevance.  UNA says clearly, you

3    have a Hobson's choice.  Put the documents in or tell

4    us what the discussions are or you don't have the

5    argument.

6              What they want to do is have the best of both

7    worlds.  They want to say, I'm not going to give you

8    the facts but it's generally true, we talked about some

9    stuff and it's relevant to now.  I want to know, if

10   we're going to go here and this is our big wind-up, I

11   would like to know exactly what was discussed and when.

12             THE COURT:  Well, one of the points raised in

13   one of the certifications, I think it was probably Mr.

14   Birchfield saying, whatever Mr. Conlon learned, it's

15   now dated.

16             MR. POLLOCK:  Correct.

17             THE COURT:  Right?

18             MR. POLLOCK:  Yes, sir, that's exactly my

19   point.

20             THE COURT:  Well and now -- and I'm not

21   making anybody's argument here but Mr. Brody is now

22   saying, is it now irrelevant in contrary to the dated

23   statement?  So I'm going to overrule the objection.

24   You can ask that question.  Do you understand that

25   question (indiscernible)

1                        <u>CERTIFICATION</u>

2

3           I, Nitsa Carrozza, the assigned transcriber, do

4      hereby certify the foregoing transcript of proceedings

5      on CourtSmart, timestamp from <u>09:38:03</u> a.m. to <u>12:49:08</u>

6      p.m., is prepared to the best of my ability and in full

7      compliance with the current Transcript Format for

8      Judicial Proceedings and is a true and accurate non-

9      compressed transcript of the proceedings, as recorded.

10
11        <u>/s/ Nitsa Carrozza</u>              <u>AD/T 639</u>
12         Nitsa Carrozza                   AOC Number
13
14
15     <u>Phoenix Transcription LLC</u>        <u>03/28/2024</u>
16          Agency Name                       Date
17
18
19
20
21

```
                                    SUPERIOR COURT OF NEW JERSEY
                                    LAW DIVISION: CIVIL PART
                                    ATLANTIC COUNTY
                                    DOCKET NO.: ATL-L-2648-15
                                    A.D. # _____

                        )
IN RE: JOHNSON AND JOHNSON)          TRANSCRIPT
TALCUM-BASED POWDER       )              OF
PRODUCTS LITIGATION       )            MOTION
                        )

                        Place: Atlantic County Civil Crt.
                               1201 Bacharach Blvd.
                               Atlantic City, NJ 08401

                        Date: April 10, 2024
                              MORNING SESSION

BEFORE:

     HONORABLE JOHN C. PORTO, J.S.C. AND
     RUKHSANAH L. SINGH, U.S.M.J.

TRANSCRIPT ORDERED BY:

     SEAN GARRETT, ESQ., (Faegre Drinker)

APPEARANCES:

     JEFFREY M. POLLOCK, ESQ., AND
     MICHAEL SABO, ESQ., (Fox Rothschild, L.L.P.)
     Attorneys for Plaintiff

     ANDY BIRCHFIELD, ESQ., (Beasley Allen)
     Attorney for Plaintiff

  *(Appearances continued)


                        Transcriber:  Nitsa Carrozza
                        PHOENIX TRANSCRIPTION
                        796 Macopin Road
                        West Milford, NJ 07480
                        (862) 248-0670

                        Audio Recorded
                        Recording Opr: Jennifer Walker
```

1   and Johnson.  But I do want to caution you, I'm going

2   to be asking you questions about whether you looked at,

3   whether you evaluated certain issues.  I'm not going to

4   ask you to reveal the substance of any recommendations

5   you made, of any analysis you received because those

6   are privileged.  You understand that; right?

7   A    I do.

8        Q    And you understand that, that's the company's

9   privilege; correct?

10  A    I understand.

11       Q    All right and so if I ask you -- and just so

12  that we're on the same page, I want to make sure we're

13  on the same page.  So I could ask you a question like,

14  did you analyze different resolution options available

15  to Johnson and Johnson in the summer of 2021.

16       I'm not looking for you to tell me what you

17  concluded or what somebody else said about a particular

18  option.  I'm just looking for yes or no, did you do

19  that, for that type of question.  Is that clear?

20  A    I understand.

21            MR. POLLACK:  Your Honor, I object to the

22  entire line of questioning proposed.  Yuna gives him a

23  Hobson's choice; put up or shut up.  Show me the

24  documents, we can inquire.  You got billing sheets,

25  show them to me, you got time entries, show them to me,

1    you've got actual memos, show them to me.

2              I know that we've had this discussion before

3    but I have to raise it again because now he

4    intentionally wants to go through a series of

5    discussions but I can't test the proposition and

6    respectfully, neither can you.

7              THE COURT:  Unless we ask for in-camera

8    review.  So should the need arise, Mr. Pollock.  I'm

9    going to overrule the objection but I understand the

10   nature of the objection.  To the extent there are some

11   substantive aspects that Mr. Conlan needs to review,

12   Mr. Brody will hear, right?

13             MR. BRODY:  Yeah, we will and --

14             THE COURT:  So to answer, you know, yes or no

15   in that context, I understand the nature of the

16   question but you know, to have an adequate ability to

17   test the substance, we may need to see some in-camera

18   review.  So I'm going to leave that avenue open for the

19   Court.

20             MR. BRODY:  Absolutely, Your Honor.  We're

21   prepared to proceed that way, if it becomes necessary.

22   And I will just say, I mean, we didn't hear it but that

23   sounded like another Best Evidence Rule 10-02 objection

24   and I think the law is fairly clear that, that's not a

25   valid Best Evidence Rule objection testimony about

1    Do you recall receiving communications containing

2    analysis of that?

3    A    I don't recall that.

4            MR. BRODY:  All right, let's see if we can

5    refresh your recollection and we're going to have to do

6    this in-camera, Your Honor, we're already at that

7    point.  I have copies for you.  Mr. Conlan can look at

8    it and I can ask him if it refreshes his recollection.

9            THE COURT:  And how about a copy for Mr.

10   Pollack?

11           MR. BRODY:  I can't give it to Mr. Pollack if

12   it's in-camera because we have a privilege waiver issue

13   here.

14           MR. POLLACK:  This is precisely the problem

15   that Yuna predicted, Your Honor.  She had a choice.

16   Second paragraph (indiscernible) Hobson's choice.

17   Either put up or shut up, put the documents in or

18   don't.  Because you -- that client refused to put the

19   communications into the record and obviously, as you

20   both know, the crucible of cross examination is

21   critical here.

22           So I not only not have the document, not

23   understand it, not only forget the fact that the record

24   is closed, now I'm not going to be able to see it.

25           THE COURT:  Why don't we -- with the

1          (Off the record, back on the record)

2          MR. POLLACK:  So I have a proposal that might

3    solve the dilemma we've got.  Which is, that we will

4    stipulate, consistent with Mr. Conlan's last three

5    answers basically, that yes, I billed for the phone

6    calls, I did hear these issues, I was there monitoring

7    the discussions, I billed my time.

8          So that solves, to some degree, the need to

9    get into infinite detail and repeat each time, were you

10   there, did you hear this?  Where I maintain my

11   objection is that, if there is going to be more

12   specificity as to what exactly did he do with it, I

13   want to see the time sheets, I want to see exactly what

14   he did.

15         But I have no doubt, I will stipulate -- and

16   I haven't seen these time sheets so I'm stipulating to

17   something I haven't seen before.  Hope Fox's

18   malpractice policy covers that one but the reality is,

19   I will stipulate that he billed accurately, honestly,

20   truthfully and that he heard whatever he heard and that

21   he did whatever he did.  I don't think I can go any

22   farther than that.

23         THE COURT:  Mr. Brody?

24         MR. BRODY:  So a couple of things, Your

25   Honor.  First of all, the use of the documents, for

1  example, showing billing entries to Mr. Conlan, would

2  be on impeachment -- for impeachment purposes or to

3  refresh his recollection.  It's not as if they're being

4  offered into evidence.

5          But given the stipulation, you know, I wonder

6  if what we ought to do, if the stipulation is that Mr.

7  Conlan billed accurately, that his billing records are

8  correct, that they accurately describe what he did, we

9  should make those part of the record, in conjunction

10  with that stipulation.

11          It will have to be submitted in-camera and it

12  will only be the Court that is reviewing those billing

13  records but that seems to be, one, a solution that the

14  Court received as evidence and as part of the record,

15  in-camera for purposes of the disqualification motion.

16  It would also have the benefit of shortening this cross

17  examination considerably.

18          THE COURT:  Without hearing him and just for

19  our record, you know, my statements with regard to

20  retainer agreements.  I'm not making anybody's

21  argument.  I'm just letting counsel know that there are

22  other parameters at play here possibly with regard to

23  billing.

24          With regard to having the Court just look at

25  the documents, Mr. Brody, in-camera, without Mr.

1   Pollack.  I -- the Court has trouble with that because

2   there is no basis for any appropriate objection.

3   Candidly, I would like to have heard about this prior

4   to coming here today.  We could have addressed it in

5   maybe a manner where a confidentiality agreement could

6   have been entered, considered, for counsel's, for

7   attorneys' eyes only.

8           So I want to make sure, in protecting our

9   record, subject to any appeal which is likely but you

10  know, we don't decide cases based on appeals.  If they

11  happen, they happen, we make the best record that we

12  can.  So that's my thoughts, Mr. Brody and Mr. Pollack,

13  with regard to that.

14          MR. BRODY:  So I wonder, Your Honor, just, if

15  the stipulation that was proposed that, the billing

16  records are accurate, that they accurately describe

17  what Mr. Conlan did and for how long he did it, as he's

18  testified.  That he felt his billing records were

19  accurate and the time is accurate.

20          If that, you know, solves the question, it's

21  -- it would be submitted by stipulation.  It's

22  obviously -- I mean, frankly, we're getting into now

23  one of the reasons why New Jersey Law recognizes a

24  presumption of shared confidences in this situation.

25          THE COURT:  Got it, yep.

Case 3:16-md-02738-MAS-RLS Document 32155-206 Filed 05/08/24 Page 28 of 38 PageID: 182148309

1          MR. BRODY:  Because you get into this exact

2    scenario where, you know, I have material that is

3    privileged but is, as you see right now, important to

4    the examination of a witness that the Court has said it

5    wants to hear from before deciding our motion.

6          THE COURT:  Well, we're here to determine

7    whether J and J confidences were shared by Mr. Conlan

8    to Mr. Birchfield.  That's what our focus here is.  The

9    fact that Mr. Conlan has testified, he had privileged

10   and confidential information.  He billed, he billed for

11   his time,  Those bills, to the best of his

12   recollection, were accurate for his time.

13          The Court accepts that stipulation and that's

14   consistent with the testimony here.  I'm not making any

15   credibility findings at this point but it's consistent

16   with what I'm hearing today.

17          MR. BRODY:  Right and I just -- the next

18   question, though, is yes, he was exposed to privileged

19   and confidential information.  It's what kinds of

20   privileged and confidential information that ultimately

21   becomes important, given the arguments that we've heard

22   from Beasley Allen throughout, you know, the course of

23   the Court's consideration of these motions.

24          So and I know Mr. Conlan has -- Mr. Pollack,

25   excuse me, hasn't responded to my proposal but given

1    the stipulation that he has proposed that this material

2    is accurate, I would ask that the Court receive these,

3    frankly, as evidence, in-camera.

4              And it's -- you know, we're in a situation

5    here where, in order to avoid a charge of privilege

6    waiver, I don't know that there's another solution

7    where we could hand these over to, you know, Johnson

8    and Johnson's -- one of Johnson and Johnson's

9    opponents, adversaries, counsel for numerous plaintiffs

10   in this litigation.

11             THE COURT:  Mr. Pollack?

12             MR. POLLACK:  Two thoughts.  One, Mr. Brody

13   keeps rewriting what my stipulation was.  I stipulated

14   that, as I said from the very first time I met you,

15   Your Honor, I had no doubt that Jim Conlan had access

16   to confidential and privileged --

17             THE COURT:  He just testified to that.  The

18   fact that you acknowledge it, we heard that in court

19   today.

20             MR. POLLACK:  Right.  So I'm -- that's my

21   story, I'm sticking with it.  Two, the fact is, I also

22   said that -- Mr. Conlan was quite clear each time Mr.

23   Brody questioned him; did you have access to the

24   formula for Coca-Cola, did you have access, you know,

25   to the formula to whatever?

1        His answer was, yeah but remember, my role is

2    here, it ain't this whole thing.  I'm listening, I got

3    my antenna up, I'm listening to the piece the relates

4    to me but I have no doubt that, that was discussed.

5    He's very clear and what Mr. Brody keeps trying to say

6    is that the time sheets we're going to focus on.  So I

7    would beg you, if you're going to do this which

8    obviously I have a problem with, that you remember that

9    Mr. Conlan has stuck with the same story three times

10   consistently.

11       Lastly, I would point out that <u>Yuna</u>

12   <u>O'Builders</u> 109 is right on point, at page 129.  I'm

13   sure you've both read it but in that, they faced

14   precisely this problem.  And the question was, "Yet

15   Defendant's submissions vaguely claimed only

16   information concerning pending and business-related

17   matters."

18       So let's assume we get more specific.  Is

19   super-secret discussions regarding how Mr. Haas has a

20   brilliant theory for how I'm going to, you know,

21   terminate all the plaintiffs' claims.  Whatever it is,

22   right?  One, the crucible of cross examination fails.

23   That's what he's -- that's what Justice Rivera-Soto

24   writing for the Court was addressing.

25       Was that, you have to put up, in my language,

1  put up or shut up.  You either put it out there or you

2  don't.  So providing it to you in court and you are

3  both intelligent readers, doesn't really solve my

4  problem.  I have to represent Beasley Allen and Andy

5  Birchfield who committed years and years to this case.

6          So I would respectfully submit, that's not

7  what the Supreme Court expects, it's not what they

8  accept and I've already given the essence of what Mr.

9  Brody really wants.  Yes, I did it on the first day.

10  Jim Conlan knew -- he listened to all kinds of

11  confidential stuff, I don't doubt it at all.

12          The question is, did he share it?  And when

13  it comes to that did he share it part, I'm going to be

14  very laser-focused because it has to be significantly

15  harmful.  Trupos, it has to be significantly harmful.

16  So it's not enough to jump around and wave and say

17  there were confidential discussions, we were talking

18  about the formula for Coca-Cola, we have all this other

19  stuff.

20          You have to show me the goods.  What exactly

21  is it that Jim Conlan learned in these discussions that

22  was disclosed?  And that issue, we're not addressing.

23  So I really think we're in a side-show over here

24  regarding, did he have confidential or -- he's conceded

25  it, I've conceded it.  The only one fighting,

Case 18-2817, Document 82-1, 12/20/2018, 2457123, Page 32 of 94
Case 1:16-cr-00776-VEC-RLS Document 321-3 Filed 05/08/2017 Page 32 of 33 PageID: 13313

1    apparently, is J and J.

2              THE COURT:  Thank you, Mr. Pollack.  Mr.

3    Brody, why don't we really -- I understand you have

4    your case.  Why don't we cut to the chase and focus

5    topically.  Reserve, you know, put aside the in-camera

6    issues but why don't you focus topically on what

7    exactly J and J believes that Mr. Conlan knew and that

8    ultimately, shared with Mr. Birchfield.

9              MR. BRODY:  Fair enough, Your Honor.  Let me

10   -- let me frame questions that way, see where we get,

11   reserving of course --

12             THE COURT:  Absolutely.

13             MR. BRODY:  -- the right to, you know, come

14   back to this issue of the billing records, as well as,

15   as may be relevant, I mean, there are certainly -- and

16   this is just a snapshot, an extraordinary number of

17   privileged and confidential communications that speak

18   to the scope of the work that Mr. Conlan did as outside

19   counsel for Johnson and Johnson but I will --

20             THE COURT:  Why don't you paint that picture

21   for us?

22             MR. BRODY:  Certainly.

23             THE COURT:  Okay.

24   BY MR. BRODY:

25        Q    You learned, Mr. Conlan, as outside counsel

1    for the company, how Johnson and Johnson evaluated the

2    viability of claims under different legal regimes;

3    didn't you?

4    A     Could you explain what you mean, "Under different

5    legal regimes?"

6         Q     Sure.  You learned how J and J analyzed

7    whether the validity of claims associated with a

8    blatant tort, in terms of things like: limitations,

9    ability to accurately plead that kind of claim, might

10   differ from jurisdiction-to-jurisdiction, thereby

11   impacting the evaluation of the number of viable future

12   claims that would be associated with the particular

13   mass tort?

14   A     I don't recall that.  What I recall, to help

15   anyone on that question is that, J and J thought that

16   all the claims were unfounded in science and fact and

17   the only distinctions I ever heard was, there's a

18   diagnosis or there's --

19              MR. BRODY:  No, I don't want you to say what

20   you heard.

21              THE WITNESS:  Okay.

22              MR. BRODY:  I'm -- and again, we're in a

23   situation where it's the company's privilege, the

24   company has not waived that privilege.

25              MR. POLLACK:  Your Honor, objection.  You

1    can't take the part of the answer you want and not the

2    part of the answer you don't want.

3              THE COURT:  I don't disagree.

4              MR. BRODY:  The -- the -- he was proceeding

5    to answer a different question.  The question simply

6    was --

7              THE COURT:  Well, I don't necessarily know

8    that because you asked from jurisdiction-to-

9    jurisdiction, different legal regimes and I think Mr.

10   Conlan -- I'm not making any argument but what I

11   understood the testimony was, was going in a direction

12   of how those jurisdictional issues impacted his work.

13             MR. BRODY:  He had gone already, Your Honor,

14   in a different direction, at that point.

15             THE COURT:  Okay, right.

16             MR. BRODY:  As to shifting from where my

17   limitations bar a claim, how might that differ from

18   jurisdiction-to-jurisdiction.  How that might impact

19   the incidents of future claims to, you know, what was J

20   and J's view of the science and what is J and J's view

21   of the science, underlying the Talc claims, which is a

22   completely different question.

23             THE COURT:  Okay.

24             MR. POLLACK:  Your Honor, I respectfully

25   don't know what the witness was going to say because I

1    didn't get to hear him and Mr. Haas gave incredibly

2    long illocutions of like a page and a half answers and

3    now we're going to cut Mr. Conlan down to the three

4    lines that Mr. Brody doesn't like and he's going to cut

5    him off?  I will have a standing objection on this

6    point.

7              THE COURT:  Well, I'm going to make sure --

8    I'm going to ask the witness, as I did before.  I

9    permitted the long answers to go because it was in

10   context.  So I want to make sure that Mr. Conlan has

11   the ability -- if the question addresses an issue that

12   perhaps goes into the attorney-client privilege, Mr.

13   Brody, counsel needs to be careful.  But I want to

14   permit the witness to be able to answer the questions,

15   so that we can resolve this issue.

16             MR. BRODY:  Certainly, Your Honor and this

17   was a case where I think the question was focused, the

18   answer was not, which is why I needed to stop Mr.

19   Conlan and do so based on a privilege objection, so.

20             THE COURT:  Okay.

21   BY MR. BRODY:

22        Q    You engaged at, during the time that you were

23   representing Johnson and Johnson, Mr. Conlan, in

24   discussions concerning legal arguments -- and this is a

25   yes or no, that might be advanced on claim validity;

1    right?

2                   MR. POLLACK:  Objection.  Mr. Conlan, if you

3    can answer it yes or no, you can answer it that way.

4    It's the Court's purview, not Mr. Brody's, to direct

5    the (indiscernible) answer.

6                   THE WITNESS:  No, not that I recall.  May I

7    expand?

8                   THE COURT:  Let's hear that, Mr. Conlan.

9                   THE WITNESS:  Okay.  I'm not a products

10   liability lawyer, I'm not a personal injury lawyer.

11   I've never brought a case, I've never defended a case.

12   It's not my area.  I was a restructuring lawyer.  So if

13   others were talking about that, it was lost on me.  It

14   was, solely my role is, how to use proceedings to

15   capture, not just currents but futures.

16                   But I will say in these all-hands meetings, a

17   significant number of the items being discussed were

18   just not in my area.  And frankly, the items I would

19   discuss were not in the area of lots of other people on

20   those calls.

21   BY MR. BRODY:

22        Q    So your testimony is, you were exposed to all

23   of this privileged and confidential information, you

24   just didn't understand it?

25                   MR. POLLACK:  Objection.

1          THE WITNESS:  Some of it, that would be true.

2          MR. BRODY:  And if somebody was talking about

3     --

4          THE COURT:  Overrule the objection.

5     BY MR. BRODY:

6     Q     If somebody was talking about how do we

7     determine whether a certain portion of the future

8     claims that are being predicted as part of this model,

9     this settlement model, you know, how is the law in

10    different jurisdictions going to impact the validity of

11    the future claims?  You just didn't understand that but

12    you were on the calls?

13    A     Yeah, I certainly don't recall that.

14          MR. BRODY:  All right.  This is another --

15    I'll move forward, Your Honor, but I'm going to mark

16    this point, as well, because this is another area

17    where, I believe, we should be able to, without waiving

18    privilege, showing the document merely to Mr. Conlan,

19    use a privilege document to refresh his recollection as

20    to the yes or no portion of this question.

21          But I'll move forward, given the Court's

22    preference that we see where we can get to and then

23    come back to this.

24          MR. POLLACK:  Your Honor --

25          THE COURT:  Also, keep in mind, if the Court

1    received material in-camera, it's generally reviewed

2    and a determination is made whether it remains in-

3    camera or it should be distributed.  So keep in mind,

4    Mr. Brody, that, that's also an option for it.  I'm not

5    saying that will happen but that's, you know, a

6    consideration when the Court received in-camera

7    material.

8           MR. POLLACK:  And if it does refresh the

9    witness' recollection, the standard practice at that

10   point, now that document is admitted into evidence.

11   You have now used a document to refresh their

12   recollection.  I've never heard of a Court saying, I'm

13   going to refresh your recollection but I'm still going

14   to keep it in the super-secret box because it's now a

15   part of the record.  So I think the whole argument is

16   self-defeating.

17          MR. BRODY:  I don't think that's -- I don't

18   think that's an objection, frankly.

19          THE COURT:  You may continue, Mr. Brody.

20          MR. BRODY:  All right, thank you.

21   BY MR. BRODY:

22       Q    Why don't we talk about it, since you brought

23   it up, Mr. Conlan, why don't we talk about the Imerys

24   bankruptcy, okay?

25       A    Okay.

1      Q    As a starting point, you would agree that the

2    ovarian cancer claims against Johnson and Johnson arise

3    out of the same nucleus of operative facts as the

4    ovarian claims against the Imerys debtors; correct?

5    A    Some of them.  There were claims against the

6    Imerys debtors that related to other products that were

7    not manufactured by Johnson and Johnson, like Colgate,

8    Palm Olive.

9      Q    So but the answer to my question was -- and

10   my question, Mr. Conlan, was focused on the ovarian

11   cancer claims against Johnson and Johnson.  And the

12   ovarian cancer claims against Johnson and Johnson arise

13   out of the same nucleus of operative facts as the

14   claims against the Imerys debtors, related to -- from

15   people who use Johnson and Johnson products; fair?

16   A    With that clarification, yes.

17     Q    All right and thank you, I understand the

18   distinction you were making and I'm glad we could get

19   on the same page with that one.  At the time -- let's

20   see.  Connection with that, sticking with Imerys, you

21   were privy to privileged and confidential analysis of

22   factors impacting the potential for a channeling

23   injunction through the Imerys bankruptcy; correct?

24          MR. POLLACK:  Can I have a standing

25   objection, Judge, just because I don't want to

1    interrupt the flow.

2               THE COURT:  That's fine, yep.

3               MR. POLLACK:  Okay, thank you.

4               THE WITNESS:  I don't know what you mean by

5    factors affecting the channeling injunction.

6    BY MR. BRODY:

7        Q    You were on multiple teams, meetings, calls,

8    with the Weil Gotshal team; correct?

9    A    Correct.

10       Q    And the Weil Gotshal team analyzed the

11   potential for J and J to secure a channeling injunction

12   through the Imerys bankruptcy, for the Talc claims;

13   correct?

14   A    May I expand, just to make sure I'm answering

15   accurately?

16       Q    You may and anytime I ask you a question, if

17   you need a clarification or you have a question, just

18   let me know.

19   A    Sure.  During the course of the Imerys North

20   America bankruptcy, J and J, this is public, J and J

21   attempted what's called a bolt-on.  Meaning, to bolt-on

22   a J and J reorganization plan to the Imerys plan, in an

23   effort to utilize the Imerys bankruptcy to resolve the

24   claims against it, importantly, not just current but

25   futures.  And so in that context, Mr. Brody, yes, the

1    BY MR. BRODY:

2         Q    And so he just said, hey, Jim Conlan, here's

3    my strategy for achieving this and you said, okay Jim,

4    that sounds like an okay strategy to me?

5    A    Yeah, it will come down to the vote.

6         Q    All right.  So he said, here's my strategy

7    and you said, all right, that's -- thank you for

8    sharing your thinking with me on this.  I now know your

9    strategy, Mr. Murdica?

10   A    I don't think I used those words.

11        Q    In sum and substance?

12   A    In sum and substance, Mr. Murdica negotiated, as I

13   understood it, a matrix with the Tort Claimant's

14   Committee or some members of the Tort Claimant's

15   Committee, that they collectively thought would achieve

16   a 75 percent yes vote by current claimants and by

17   response to that was, okay.

18        Q    And you talked to him about the progress of

19   those negotiations; correct?

20   A    Only in the most generic terms.  Like, I'm working

21   on this plaintiff's lawyer, okay.  This plaintiff's

22   lawyer's votes are important, okay.  But no, not at the

23   type of claim or the value of claims or that level of

24   detail, it just wasn't my area.

25        Q    So you understood then which plaintiffs'

1    lawyers Mr. Murdica felt were important?

2    A    Yes.

3         Q    And he discussed with you his progress with

4    the plaintiffs' lawyers that he felt were important;

5    didn't he?

6    A    Sometimes.  I would describe it more as just name-

7    dropping, to describe how the discussions that he was

8    having were going.

9         Q    You also addressed the importance of coming

10   up with a settlement matrix that was going to be

11   sufficient to and the factors that would go into that,

12   without disclosing any of them, you discussed that with

13   the Weil Gotshal teams, as well, didn't you, on these

14   meetings that you had with the J and J team?

15   A    The importance of coming up with a settlement that

16   would achieve a 75 percent plus yes vote?  I don't even

17   know that we would need to discuss that.  In the world

18   of bankruptcy, that's just an obvious pillar.

19        Q    That wasn't my question.

20   A    Okay.

21        Q    My question was whether it was that you also

22   had discussions with the Weil Gotshal team about how a

23   deal would have to be structured in order to try to get

24   that 75 percent participation; right?

25   A    I'm sorry, I don't know what you mean by, "How it

1    would have to be structured."

2        Q    Could there be, for example, you engaged in

3    discussions including -- and without revealing whether

4    anybody thought this was a good idea or a bad idea, the

5    advantages or disadvantages to Johnson and Johnson of

6    an estimation process as a part of an Imerys

7    resolution; didn't you?

8    A    Not in context, if we're talking about the $4.2

9    billion bolt-on settlement.  If you're talking about

10   separate and apart from that --

11       Q    Let me just ask it open-ended.  Did you ever

12   have those discussions with the Weil Gotshal team?

13   A    Which discussions, about estimation?

14       Q    About the advantages or disadvantages to

15   Johnson and Johnson of an estimation process, as part

16   of a resolution of its talc liabilities?

17   A    We did discuss what if Imerys, not with our

18   participation but, sought an estimation of the claims

19   against itself --

20       Q    Okay and --

21   A    -- what implication that would have for Johnson

22   and Johnson.

23       Q    All right and so -- and those were privileged

24   and confidential discussions that you had with the Weil

25   Gotshal team and the in-house team at Johnson and

1      COURT OFFICER:  All rise.

2          (Morning session concluded at 12:38:53 p.m.)

3      (Continuation of day's proceeding on afternoon session)

4                          * * * *

5

6

7

8

9

10

11                       <u>CERTIFICATION</u>

12          I, Nitsa Carrozza, the assigned transcriber, do

13      hereby certify the foregoing transcript of proceedings

14      on CourtSmart, timestamp from <u>09:37:00</u> a.m. to <u>12:38:53</u>

15      p.m., is prepared to the best of my ability and in full

16      compliance with the current Transcript Format for

17      Judicial Proceedings and is a true and accurate non-

18      compressed transcript of the proceedings, as recorded.

19
20      <u>    /s/ Nitsa Carrozza    </u>        <u>    AD/T 639    </u>
21           Nitsa Carrozza                      AOC Number
22
23
24      <u>  Phoenix Transcription LLC  </u>     <u>   04/22/2024   </u>
25            Agency Name                          Date

```
                              SUPERIOR COURT OF NEW JERSEY
                              LAW DIVISION: CIVIL PART
                              ATLANTIC COUNTY
                              DOCKET NO.: ATL-L-2648-15
                              A.D. # _____

                         )
IN RE: JOHNSON AND JOHNSON)         TRANSCRIPT
TALCUM-BASED POWDER       )            OF
PRODUCTS LITIGATION       )          MOTION
                         )

                         Place: Atlantic County Civil Crt.
                                1201 Bacharach Blvd.
                                Atlantic City, NJ 08401

                         Date: May 3, 2024

BEFORE:

     HONORABLE JOHN C. PORTO, J.S.C. AND
     RUKHSANAH L. SINGH, U.S.M.J.

TRANSCRIPT ORDERED BY:

     JEFFREY M. POLLOCK, ESQ., (Fox Rothschild, L.L.P.)

APPEARANCES:

     JEFFREY M. POLLOCK, ESQ., AND
     AUSTIN W.B. HILTON, ESQ., (Fox Rothschild, L.L.P.)
     Attorneys for Plaintiff

     STEPHEN D. BRODY, ESQ., (O'Melveny & Myers,
     L.L.P.)
     Attorney for J&J and L.T.L. Mngt.

     ERIK HAAS, ESQ., (Johnson & Johnson W.W.V.P.L.)
     In-House Attorney for Johnson & Johnson


                         Transcriber:  Nitsa Carrozza
                         PHOENIX TRANSCRIPTION
                         796 Macopin Road
                         West Milford, NJ 07480
                         (862) 248-0670

                         Audio Recorded
                         Recording Opr: Kavonna Smith
```

1     evaluation of what is the right answer going forward

2     and what has to happen here.

3              MR. POLLACK:  May I respond, Your Honor?

4              THE COURT:  Sure but let's keep in mind, this

5     Court, you know, we live in the world, these courts,

6     live in the real world.  We understand what is going on

7     and we can focus on what is at issue here and I can

8     assure you, whatever is out there, is not going to

9     infect this Court's decision with regard to the

10     underlying issue of disqualification.

11              MR. POLLACK:  I understand, Your Honor and

12     I'm not arguing with you, I'm not quiveling at all.

13     The only point I would make on that is that, what you

14     say and how you say it is going to have ramifications

15     and reverberations down the road, right?  Because the

16     fact is, this transcript, these hearings, these

17     discussions, I promise you, Mr. Birchfield and his firm

18     will be seeing it for years and Mr. Haas and Mr. Brody

19     or someone else will be using it as a lever for years

20     to come.  So how we articulate it is going to be

21     important.

22              I would like to step back for one second.

23     When we first talked years ago, it was literally last

24     year.  We were talking about Trupos, we were talking

25     about UNA Builders, et cetera and when I spent, I don't

1    know, 20 years, 15 years, on the Ethics Committee,

2    another ten on the Character and Fitness Committee.

3              When someone is being attacked or someone is

4    being accused of an ethical violation, it usually is

5    referred to the Ethics Committee.  That's what those

6    people do, that's what I did for years.  And typically,

7    the person who is being accused or being challenged or

8    being -- or is being attacked, is told exactly what it

9    is they allege to have done.

10             They're told with precision, this is the

11   client fund you should not have taken, this was the

12   alcoholism and drugs which unfortunately is about half

13   the matters we deal with.  It was a specific allegation

14   of negligence and miscarriage or something along those

15   lines.

16             In this case, it has been a constant

17   morphing.  Mr. Brody's first oral argument before you,

18   Judge Porto, was there is no ethical violation, no

19   R.P.C. on point we can find, none.  Judge Singh, you

20   asked the question pointedly; do I need to find an

21   R.P.C. violation to disqualify?  The answer from Mr.

22   Brody, no.

23             He and I disagree vehemently on this point

24   and by the way, I think the Supreme Court of New Jersey

25   is squarely in my corner on this one.  Once you got rid

1    of the appearance of impropriety, which they did in

2    1984 under the following condition --

3           THE COURT:  '93?

4           MR. POLLACK:  I'm sorry, '93, I apologize.

5    Once they came out with that one, at that point, the

6    reality is that, we shouldn't be here.  Because I

7    understand you want to do a credibility determination.

8    If that's what we're focused on, then the credibility

9    can be determined by, is Andy an honest guy, was Andy's

10   firm committed to his clients, you know, why are they

11   opposing the bankruptcy if you want to.

12          You can get into all those issues but what

13   Mr. Brody is now saying is; let's just try all the

14   issues right here.  I'm ready to do it.  If that's what

15   we want to do, I'm ready to do it and we will proceed

16   but I just think that, the reason the Supreme Court

17   said you should decide it on the papers, unless -- and

18   you grabbed onto this, Judge Porto.  I'm not

19   criticizing you but you appropriately said; hey, I have

20   some issues, I want to look at credibility.  It's not

21   supposed to be a free-for-all.

22          Now I'm looking at RPC 1.6, sharing of

23   confidential information.  Somehow, I'm now looking at

24   1.9, 1.10.  I have other rules that I haven't even

25   looked at yet that Mr. Brody is now articulating.  I've

1           THE COURT:  You're welcome.

2              (Proceeding concluded at 1:42:57 p.m.)

3                          * * * *

4

5

6

7

8

9

10                        CERTIFICATION

11      I, Nitsa Carrozza, the assigned transcriber, do

12   hereby certify the foregoing transcript of proceedings

13   on CourtSmart, timestamp from 09:38:36 a.m. to 01:42:57

14   p.m., is prepared to the best of my ability and in full

15   compliance with the current Transcript Format for

16   Judicial Proceedings and is a true and accurate non-

17   compressed transcript of the proceedings, as recorded.

18
19      /s/ Nitsa Carrozza                    AD/T 639
20         Nitsa Carrozza                     AOC Number
21
22
23      Phoenix Transcription LLC             05/07/2024
24         Agency Name                          Date