**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| IN RE: JOHNSON & JOHNSON TALCUM POWDER PRODUCTS MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION | Case No. 3:16-md-2738-MAS-RLS<br><br>MDL Case No. 2738 |

**DEFENDANTS JOHNSON & JOHNSON'S AND
LLT MANAGEMENT LLC'S POST-HEARING BRIEF IN SUPPORT OF
MOTION TO DISQUALIFY
ANDY BIRCHFIELD AND BEASLEY ALLEN OR REMOVE THEM
FROM THE PLAINTIFFS' STEERING COMMITTEE**

**[Redacted for Public Filing]**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................1

STATEMENT OF FACTS ..................................................................................7

    A.    Conlan Received J&J's Sensitive Privileged And Confidential Information As Counsel For J&J In The Talc Litigation.....................7

        1.    Conlan was an integral member of J&J's talc litigation team. ....................................................................................7

        2.    Conlan's work for J&J involved the most sensitive privileged and confidential information related to the talc litigation. ...............................................................................13

        3.    Conlan's attempt to minimize the significance of his work on the talc litigation is flatly contradicted by the record........................................................................................15

    B.    Beasley Allen Obtained J&J's Confidential Information By Working With Conlan On The Same Matter, Claims, And Issues That Conlan Worked on For J&J. ...........................................18

        1.    Beasley Allen led opposition to the LTL-1 bankruptcy plan.................................................................................18

        2.    Beasley Allen collaborated with Conlan after LTL-1 was dismissed. .........................................................................19

        3.    Beasley Allen shared privileged and confidential work product about the talc claims with Conlan in furtherance of their strategic collaboration. .................................21

        4.    Beasley Allen received J&J's strategic confidences from Conlan. ......................................................................23

    C.    Beasley Allen Continued To Work With Conlan Against J&J After Collaborating During The LTL-2 Bankruptcy. ........................25

    D.    The Cover-Up Confirms The Crime ................................................28

    E.    The Talc Litigation Is Still The Same Matter, Involving The Same Claims And Same Issues That Conlan Worked On For Both Sides...........................................................................................30

ARGUMENT ....................................................................................................32

    A.    Conlan Violated Multiple Rules of Professional Conduct.................34

1.    Conlan violated Rule 1.6 by disclosing J&J's confidences to its litigation adversary.............................................34

2.    Conlan violated Rule 1.9(a) by switching sides in the same matter. ...............................................................42

3.    Conlan violated Rule 1.9(c) by sharing J&J's strategic confidences with its litigation adversary. .................................46

B.    Beasley Allen Is Responsible For Conlan's Ethical Violations..........46

1.    Beasley Allen violated Rule 5.3 by associating itself with Conlan. ...............................................................46

2.    Beasley Allen violated Rule 8.4(a) by facilitating and encouraging Conlan's Rule violations.....................................51

3.    Beasley Allen violated Rule 1.10 by associating with Conlan. ...............................................................52

C.    Beasley Allen Should Be Disqualified For Its Independent Rules Violations. ....................................................53

1.    Beasley Allen engaged in dishonesty and deceit in violation of Rules 3.3(a)(5) and 8.4(c). ...................................54

2.    Beasley Allen's conduct has been prejudicial to the administration of justice.............................................57

D.    Beasley Allen Should Be Removed From The PSC. .........................58

CONCLUSION .....................................................................60

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Brundage v. Est. of Carambio*,
195 N.J. 575 (2008) .................................................................................................54

*Capell v. Capell*,
358 N.J. Super. 107 (N.J. App. Div. 2003) ...........................................................17

*City of Atlantic City v. Trupos*,
201 N.J. 447 (2010) ................................................................................ 32, 43, 44

*Cordy v. Sherwin-Williams Co.*,
156 F.R.D. 575 (D.N.J. 1994) ..................................................................... passim

*Est. of Kennedy v. Rosenblatt*,
447 N.J. Super. 444 (App. Div. 2016) ........................................................ 33, 46

*Gohlke by Luciano v. Trinitas Reg'l Med. Ctr.*,
2023 WL 7383051 (N.J. Sup. Ct. App. Div. Nov. 8, 2023) .................................32

*Greig v. Macy's Ne., Inc.*,
1 F. Supp. 2d 397 (D.N.J. 1998) ..................................................... 34, 36, 51, 52

*Haggerty v. Red Bank Borough Zoning Bd. Of Adjustment*,
385 N.J. Super. 501 (App. Div. 2006) .................................................................47

*Heritage Pharms., Inc. v. Glazer*,
2019 WL 9309180 (D.N.J. Mar. 1, 2019) ............................................................35

*In re Commitment of W.W.*,
245 N.J. 438 (2021) ...............................................................................................58

*In re Forrest*,
158 N.J. 428 (1999) ................................................................................ 54, 55, 56

*In re Gen. Motors LLC Ignition Switch Litig.*,
2016 WL 1441804 (S.D.N.Y. Apr. 12, 2016) ......................................................59

*In re Kivler*,
193 N.J. 332 (2008) ...............................................................................................54

*In re LTL Mgmt., LLC*,
58 F.4th 738 (3d Cir. 2023) ..................................................................................19

*In re Merscorp Inc., Real Est. Settlement Procs. Act Litig.*,
2007 WL 4166128 (S.D. Tex. Nov. 20, 2007) .....................................................59

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*In re Pajerowski*,
156 N.J. 509 (1998) ........................................................................51

*In re Seelig*,
180 N.J. 234 (2004) ........................................................................54

*In re Terrorist Attacks on Sept. 11, 2001*,
2023 WL 4561766 (S.D.N.Y. July 17, 2023) ....................................59

*LoBiondo v. Schwartz*,
199 N.J. 62 (2009) ..........................................................................47

*Maldonado v. New Jersey ex rel. Admin. Off. Of Cts.-Prob. Div.*,
225 F.R.D. 120 (D.N.J. 2004) ................................................ 33, 36, 57

*Matter of Kernan*,
118 N.J. 361 (1990) ........................................................................55

*O Builders & Assocs., Inc. v. Yuna Corp. of New Jersey*,
206 N.J. 109 (2011) ............................................................. 39, 40, 41

*Owens v. First Fam. Fin. Servs., Inc.*,
379 F. Supp. 2d 840 (S.D. Miss. 2005) ............................................53

*Plaintiffs' Baycol Steering Comm. v. Bayer Corp.*,
419 F.3d 794 (8th Cir. 2005) ...........................................................59

*Reardon v. Marlayne, Inc.*,
83 N.J. 460 (1980) ..........................................................................36

*Shaikh v. Germadnig*,
2022 WL 16716116 (D.N.J. Nov. 4, 2022) ........................................58

*State v. Ingram*,
2021 WL 1235185 (N.J. Super. Ct. App. Div. Apr. 2, 2021) ................44

*Twenty-First Cent. Rail Corp. v. N.J. Transit Corp.*,
419 N.J. Super. 343 (App. Div. 2011) ............................... 36, 41, 43, 44

*United States v. Voigt*,
89 F.3d 1050 (3d Cir. 1996) ..................................................... 32, 58

## Rules

RPC 1.0(f) .......................................................................................36

RPC 1.10(c) .....................................................................................52

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

RPC 1.10(c)(2) .................................................................................38

RPC 1.18(b) ....................................................................................40

RPC 1.6 ..........................................................................................40

RPC 1.6(a) ......................................................................................33

RPC 1.9(a) ......................................................................................42

RPC 3.3(a) ......................................................................................54

RPC 5.3 ..........................................................................................50

RPC 5.3(a) ......................................................................................51

RPC 5.3(c) ................................................................................ 42, 45

RPC 5.3(c)(1) ..................................................................................46

RPC 8.4(a) ......................................................................................51

RPC 8.4(d) ......................................................................................58

## Other Authorities

2 Legal Malpractice § 18:53 (2024 ed.) ..............................................36

Associate, Miriam Webster,
   https://www.merriam-webster.com/dictionary/associate (last visited May
   15, 2024) .....................................................................................47

Associate, Oxford English Dictionary,
   https://www.oed.com/dictionary/associate_adj (last visited May 15, 2024) .......47

Manual for Complex Litigation § 10.224 (4th ed. 2023) ........................59

N.J. Ethics Op. No. 680,
   1995 WL 33971 (1995)........................................................ 45, 53, 57

Restatement (Third) of the Law Governing Lawyers § 123 cmt. c(iii) ............ 47, 48

RPC 5.3, Official Comment (Aug. 1, 2016) ..........................................47

**INTRODUCTION**

Side switching is impermissible.  It is impermissible when attorneys switch sides.  It is impermissible when paralegals switch sides.  It is impermissible when experts or consultants switch sides.  And it is impermissible when the person switching sides is a lawyer who no longer practices law.  That is what happened here.

James Conlan was Johnson & Johnson's ("J&J") lawyer.  He represented J&J in the talc litigation, which encompasses the claims brought in these multidistrict and multicounty litigations, billing for 1,600 hours of work over 22 months and devoting more time to J&J than any other client.  Conlan regularly communicated directly with J&J's in-house counsel and was an "integral part" of, and "central figure" on, the outside counsel team tasked with resolving the talc claims in these cases—whether through litigation, settlement, bankruptcy, or other options like structural optimization and disaffiliation.  Through his work, Conlan was exposed to J&J's most sacred confidences: how it valued plaintiffs' claims in the aggregate and individually, how it estimated and valued future claims, its preferred structures for resolving these cases, and strategies for doing so, including which opposing counsel to approach about resolution and when.

Then Conlan switched sides.  He started his own company, Legacy Liability Solutions, whose entire business was acquiring and administering mass tort liabilities—like the talc liabilities Conlan worked on for J&J—outside the

1

bankruptcy setting.   Indeed, Conlan repeatedly proposed Legacy to J&J as an alternative to the bankruptcy resolution J&J favored.   But J&J rejected his offers. So Conlan turned to J&J's litigation adversaries, Andy Birchfield, Leigh O'Dell, and other members of the Beasley Allen law firm (collectively "Beasley Allen").

By pairing with Beasley Allen, Conlan saw a path to profit from J&J's talc liabilities, contrary to what he knew was J&J's preferred resolution.   And Conlan had something to offer Beasley Allen in exchange: J&J's confidences.   New Jersey's ethics rules required Beasley Allen to turn Conlan away.   As both Beasley Allen and Conlan have admitted, Beasley Allen could not have retained Conlan to work on the talc litigation.   Yet Beasley Allen invited Conlan in, even though it knew he had represented J&J on the same matter.

Beasley Allen had a significant economic incentive to embrace Conlan's assistance.   It stands to receive up to 12% of any recovery by any firm representing clients in the MDL (where 93% of the ovarian talc claims are filed) or state cases— but only if J&J's contemplated bankruptcy resolution (which proscribed such recovery) is defeated.   Succumbing to that financial motivation, and in disregard of its ethical obligations, Beasley Allen allied itself with J&J's former lawyer.

While J&J's bankruptcy was pending, Beasley Allen and Conlan engaged in what Special Master Schneider called "[c]lose collaboration" on a "Legacy/Birchfield Proposal."   To that end, Beasley Allen admittedly shared with

2

Conlan its own confidential assessments of claim values and damages analysis. And Beasley Allen and Conlan passed drafts of a term sheet back and forth over the course of multiple weeks. Beasley Allen's inclusion of Conlan in that deliberative process necessarily implicated the confidences Conlan had acquired from his representation of J&J on the same claims, matters, and issues. It defies logic and human nature to assert that Conlan did not share J&J's confidences when collaborating on a proposed settlement of the talc claims. (And Birchfield admitted he would not know if he received J&J's confidences from Conlan.)

Beasley Allen ultimately defeated J&J's effort to resolve the talc claims through the pending bankruptcy, but not before interacting with J&J extensively in connection with discovery, briefing, and the hearing on the motion to dismiss. Not once during those interactions did Beasley Allen disclose to J&J that it was working with Conlan or ask J&J for its consent to their collaboration.

Following the dismissal of the bankruptcy petition, Conlan and Beasley Allen continued to collaborate in secret to advance their interests to the detriment of J&J. From July through September 2023, Conlan pressured J&J to adopt a resolution of the talc claims outside bankruptcy—each time J&J rejected the proposal. He continued to conceal his collaboration with Beasley Allen until October 2023, when he suggested that he had just engaged with Birchfield to supplement his proposal. When J&J promptly filed a show-cause motion, Birchfield omitted from his

3

certification opposing his own and Beasley Allen's disqualification any mention of contacts with Conlan, other than to certify that Conlan had not worked at or for Beasley Allen. And in his supplemental certification, Birchfield identified only his first contacts with Conlan. But that was not the whole truth: They had been collaborating in secret for months. The full extent of their collaboration would not have been revealed if the Courts had not held their plenary hearing.

The Beasley Allen-Conlan collaboration violates multiple ethical rules and requires disqualification. Most notably, Beasley Allen assisted and induced Conlan to violate Rule 1.6—one of the paramount rules in the canon. Rule 1.6 prohibits a lawyer from divulging client confidences. The weight of the evidence here confirms that Conlan violated this rule, as does New Jersey's presumption of shared confidences.

Although this Court should find that Conlan shared J&J's confidences, it need not do so to order disqualification. Conlan and Beasley Allen have effectively admitted that the firm violated Rule 5.3. Under that Rule, a lawyer is responsible for a nonlawyer's conduct where the nonlawyer's conduct would be a rules violation if engaged in by a lawyer. Both sides agree that Conlan's participation on plaintiffs' mediation team would have been a rules violation if engaged in by a lawyer: Rule 1.9(a) prohibited Conlan from working on both sides of the same matter.

4

Beasley Allen should also be disqualified for its own misconduct. It concealed material facts about its collaboration with Conlan from the mediators and this Court on multiple occasions, in violation of Rules 3.3(a)(5) and Rule 8.4(c). And Beasley Allen engaged in conduct prejudicial to the administration of justice in violation of Rule 8.4(d). It paired with J&J's former lawyer on this litigation and then attempted to keep that partnership a secret—from J&J, from the mediators, and from the courts.

Beasley Allen's defense has always been to escape on a technicality. But New Jersey's ethical rules do not contain the loopholes that Beasley Allen's arguments would require. For instance, Beasley Allen has argued that the law requires direct evidence that Conlan shared J&J's confidences. That is incorrect. Circumstantial evidence is an equally acceptable—and in this case powerful—method of proof. Further, this case illustrates precisely why New Jersey employs a presumption of shared confidences—it will often be impossible to prove what third parties said to each other, particularly where they have an incentive to deny confidences were disclosed. A "direct evidence" requirement would be inequitable and unworkable—especially in a side-switching scenario where the third parties are a former lawyer and adversary who secretly collaborated and then invoked the mediation privilege to keep those conversations secret.

Beasley Allen has also argued that it cannot be disqualified because it did not formally retain Conlan or because he was not a practicing lawyer when he

5

collaborated with the firm.  Again, by its terms, Rule 5.3 applies to "nonlawyers" who, like Conlan, "associated" with a firm.  If the rules were otherwise, a party could circumvent Rule 1.9 by doing exactly what Beasley Allen did: forming a strategic partnership with its adversary's former lawyer, while stopping short of formal engagement.  The law does not sanction that result.  Indeed, New Jersey expressly prohibits doing indirectly that which is explicitly disallowed.

Along similar lines, Beasley Allen has argued repeatedly that J&J seeks to disqualify it based on the "appearance of impropriety."  There is no question that Beasley Allen's conduct appears improper.  But that is not, and has never been, J&J's argument.  Beasley Allen's conduct was *actually improper*.  Indeed, it should go without saying that it is improper for a law firm to collaborate in secret with its adversary's former lawyer on a settlement proposal in the same matter and then try to minimize that collaboration in signed certifications to a court.

In truth, the excuses Beasley Allen and Conlan have advanced serve only to highlight their ethical breaches.  First, their counsel sought to shift blame to the court-appointed mediators, suggesting that Beasley Allen engaged Conlan at the direction of the mediators, who purportedly knew he was J&J's former counsel.  The mediators' certified responses refuted that suggestion.  Next, Conlan asserted that J&J consented to his work with Beasley Allen by not responding to a February 2023 *proposal* he emailed to J&J.  That assertion would be laughable if it were not such a

disturbing demonstration of his lack of credibility and disregard for the duties he owed his former client. Even if his conflict was waivable (it's not), a naked proposal does not constitute informed consent, in writing, after full disclosure and consultation. Last, Birchfield contended that it was appropriate for Beasley Allen to work with Conlan because the firm would be adverse to Legacy if their joint proposal were adopted. That is an incredible assertion. While Beasley Allen's sharing of confidences with Conlan does not excuse its ethical violations vis-à-vis J&J, it does show that Beasley Allen played fast and loose with its *own clients'* (and other counsels' clients') confidences.

For all these reasons, this Court should disqualify Beasley Allen and remove Beasley Allen from the Plaintiffs' Steering Committee ("PSC").[1]

## STATEMENT OF FACTS

### A.   Conlan Received J&J's Sensitive Privileged And Confidential Information As Counsel For J&J In The Talc Litigation.

1.   *Conlan was an integral member of J&J's talc litigation team.*

From July 2020 through March 2022, Conlan, then a partner at Faegre Drinker Biddle & Reath LLP ("FDBR"), represented J&J in connection with litigation and attempted resolution of claims alleging injuries from exposure to cosmetic talc

---

[1] J&J's briefs filed concurrently with Judges Porto and Singh are materially identical, except J&J's state court brief omits the argument that Beasley Allen should be removed from the PSC in federal court. For Judge Singh's convenience, the transcripts of the plenary hearing are lodged on the MDL docket at ECF No. 32153.

products.  Hr'g Ex. 13, ¶¶ 4-5.  Those claims were consolidated in an MDL in the District of New Jersey in Trenton and an MCL in Atlantic County.  3/25 (AM) Tr. 10:6-9.  Beasley Allen, whose mass torts group is led by Andy Birchfield and includes Leigh O'Dell, has served as co-lead counsel in the MCL, Hr'g Ex. 16 ¶ 7, and on the PSC in the MDL.  Dkt. 73.

For years, the talc claims in the MDL and MCL have been J&J's largest liability, and the Company assembled a team of top legal experts to determine how best to resolve them.  *See* 3/25 (AM) Tr. 34:7-19.  J&J retained Conlan to join that team based on his representations that he was the "premier expert" on restructuring mass tort liabilities.  *Id.* at 33:4-35:3, 122:8-20.  Conlan touted himself as having "more knowledge in this area … than anyone else on the planet."  *Id*. at 33:4-9.  He quickly became a central figure in, and integral part of, that core outside counsel team advising J&J on its talc liabilities.  *Id.* at 33:23-34:1.  In that role, Conlan routinely participated in weekly calls with the team regarding all aspects of the litigation and resolution of the talc claims.  *Id.* at 12:2-14, 16:7-21.

Conlan also participated in "many, many, many individual direct calls with" Erik Haas, Worldwide Vice President of Litigation, and attended weekly calls with other members at the highest echelons of J&J's Law Department: Joe Braunreuther, Associate General Counsel; Andrew White, Global Lead, Product Liability; and John Kim, White's predecessor.  *Id.* at 12:15-21; 34:20-35:25; 4/10 (AM) Tr. 8:18-

9:11.  Conlan exchanged direct emails with J&J in-house counsel, *see, e.g.*, J&J's May 1, 2024 letter submission (the "*In camera* letter"), Exs. D3, D4, D11, and was "continuously communicating with respect to all aspects of the cases" with Haas throughout his tenure,  3/25 (AM) Tr. 12:20-21.  He also participated in weekly calls with in-house counsel and the outside counsel who represented J&J in connection with all aspects of the talc claims.  *Id.* at 11:25-12:21.

In addition, Conlan interacted almost daily with Jim Murdica, J&J's lead resolution counsel.  *See* 3/25 (PM) Tr. 47:6-13, 63:21-24, 67:20-25.  Upon joining J&J's outside counsel team, Conlan and Murdica became "the main [two] people running the strategy [and] evaluating the settlement options."  *Id*. at 53:10-12; *see id*. at 47:6-13.  Together, they evaluated settlement proposals from Beasley Allen, *id*. at 53:4-54:5, 54:15-55:25, with Conlan acting as Murdica's "closest confidant" as J&J "went back and forth with Mr. Birchfield and his firm," *id*. at 54:22-55:1.

These confidential, privileged, and protected communications took place while J&J was litigating in the tort system, in the MDL and MCL, and during the pendency of two bankruptcy cases.  Almost immediately after he began representing J&J in the talc litigation, Conlan began working on an "outside bankruptcy settlement" to resolve the MDL and MCL claims.  4/10 (PM) Tr. 57:14-20, *see id*. 63:24-64:8.  His work on that resolution included advising on J&J's negotiations with "Mr. Birchfield for an initial resolution."  *Id.* at 49:16-23.  He also began

9

preparing "soup-to-nuts" analyses and recommendations about the strengths and weaknesses of different "[m]echanisms and options" for resolving the claims, including outside of bankruptcy.  4/10 (AM) Tr. 87:23-88:5, *see id*. 88:14-89:5.

In September 2020, J&J pivoted its efforts toward a potential resolution in bankruptcy.  The talc claims brought against J&J were also brought against a talc raw materials supplier, Imerys Talc America, Inc. ("Imerys"), alleging the same harms from the same operative facts—that talc in J&J's products, supplied by Imerys, caused ovarian cancer and mesothelioma.  3/25 (AM) Tr. 23:20-24:10, 4/10 (AM) Tr. 39:9-16; *In camera* letter, Exs. D9, D21.  Imerys filed for Chapter 11 bankruptcy in February 2019.  *See In re: Imerys Talc America, Inc.*, No. 19-10289 (LSS) (Bankr. D. Del.); 3/25 (AM) Tr. 24:11-18.  As a result, J&J had an interest in "ensuring that there [was] a fair determination and adjudication of th[e] claims" against Imerys, and J&J participated in that bankruptcy both as an objector and third-party debtor.  *Id.*

The Imerys bankruptcy presented an opportunity for J&J to resolve all of the MDL and MCL talc claims through what is called a "bolt-on" settlement— "bolt[ing] on a [J&J] reorganization plan to the Imerys plan, in an effort to utilize the Imerys bankruptcy to resolve" all present and future talc claims against J&J. 4/10 (AM) Tr. 40:10-41:1; *In camera* letter, Ex. D1.  Between fall 2020 and summer 2021, Conlan was "intimately involved" in J&J's extensive confidential and

10

privileged discussions on how best to effectuate this plan.  3/25 (AM) Tr. 24:24-25:7; 4/10 (AM) Tr. 42:21-25.  He and Murdica "worked hand-in-hand throughout." 3/25 (PM) Tr. 49:4-15.  This included standing weekly calls with the outside counsel group and J&J's top in-house legal executives, 3/25 (AM) Tr. 34:15-35:25, as well as "regular separate calls" where Conlan, Murdica, Braunreuther, and Kim would "coordinate the high-level strategy and resolution" efforts.  3/25 (PM) Tr. 49:16-24. Conlan participated in, and was privy to, discussions about options for structuring the bolt-on plan, current and future claim values, proposed settlement matrices, outside counsel's negotiations with plaintiffs, and other factors driving J&J's decision-making.  *See* 4/10 (AM) Tr. 15:16-16:4, 18:11-25, 20:3-17, 41:2-14, 44:20-47:2, 48:2-22, 53:22-54:13, 54:14-55:18, 60:19-21, 65:5-66:2, 67:8-19, 68:19-69:6, 77:15-23, 80:6-13; *In camera* letter, Exs. D1, D12, D13.  Conlan was so intimately involved, in fact, that he was part of a group of only five outside counsel that Murdica emailed to discuss ████████████████████████████████ ████████████████████████████████  *See In camera* letter, Ex. D15.

Conlan also played an important outward facing role during the Imerys bankruptcy—a task that required him to know J&J's "negotiating strategy."  3/25 (PM) Tr. 28:14-16.  Conlan "engaged on J&J's behalf" in discussions and in-person meetings with Natalie Ramsey of the Imerys Bankruptcy's Tort Claimants

Committee, 4/10 (AM) Tr. 75:9-14, on which Beasley Allen also sat, *id.* 77:24-78:6; *see also* 3/25 (PM) Tr. 51:5-19, and counsel for the future claimants, attempting to persuade them to vote for a bolt-on settlement on J&J's terms.  4/10 (AM) Tr. 72:10-16, 73:20-23, 76:23-77:14.    Conlan even skied with the future claimants representative.  4/10 (AM) Tr. 78:20-25.  And Conlan "communicat[ed] … on the back end" with Haas, White, and Kim about his negotiations "in order to develop the strategy of 'how are we going to get the[] [plaintiffs] to 'yes' within a structure that works for J&J.'"  4/10 (AM) Tr. 75:15-76:9.

In the summer of 2021, efforts to resolve J&J's talc liabilities through the Imerys bankruptcy stalled.  *Id.* at 80:6-8.  So J&J decided to explore a different approach: filing "[its] own bankruptcy."  3/25 (AM) Tr. 40:8-14.  Conlan was "intimately involved" in "all the discussions regarding the potential for bringing a bankruptcy in which [J&J] was the debtor," 3/25 (AM) Tr. 40:3-20, including discussions with Haas, other senior members of J&J's Law Department, and J&J's core outside counsel team.  *Id.* at 40:2-41:3.  On October 13, 2021, LTL filed for bankruptcy.  *In re: LTL Mgmt. LLC*, No. 21-30589 (Bankr. W.D.N.C.).

All told, Conlan billed 1,600 hours to the talc matter, charging J&J $2.24 million.  Hr'g Ex. 1, ¶ 5.  This included 1,154 hours in 2021 alone—an average of 4.5 hours every single workday.  *Id.*  Indeed, he billed more to the talc matter than to any other client matter in his time at FDBR.  4/10 (AM) Tr. 10:13-17.

2.   *Conlan's work for J&J involved the most sensitive privileged and confidential information related to the talc litigation.*

There is no dispute that during his tenure as J&J's counsel, Conlan received confidential information from J&J.  Conlan himself agreed that the record is "crystal clear" he had confidential discussions.  4/10 (AM) Tr. 8:10-17.  And Beasley Allen's counsel repeatedly offered to stipulate to Conlan's "access to confidential and privileged" information.  *Id.* 29:13-16; *see* 3/25 (AM) Tr. 7:15-18.

There can also be no dispute that the information Conlan was exposed to as outside counsel remains some of the most sensitive information J&J possesses.  Conlan was privy to J&J's strategic thinking about how to resolve its biggest liability—be it "in the tort system … through litigation," or "other potential ways to resolve matters outside of the bankruptcy system and court system," including settlements, a divisional merger followed by a spin-off or bankruptcy, and structural optimization.  3/25 (AM) Tr. 15:21-16:21; *see id*. at 18:17-19:3.  Each of these topics was "discussed, debated, critiqued, [and] the strengths and benefits of them, the risks of those, the pros and cons of those were debated at great length during the calls that [J&J] had on a weekly basis, and individually with Mr. Conlan."  *Id*. at 16:23-17:1.

For example, the weekly calls Conlan attended were a place where J&J "would collectively discuss the strategy for litigating and adjudicating the [t]alc litigation."  *Id.* at 12:11-13.  As a participant in these recurring calls and discussions,

Conlan was exposed to "every single different discipline" of expertise relevant to resolving the MDL and MCL talc claims.  4/10 (AM) Tr. 68:19-69:6.

Conlan also participated in "discussions of the advantages and disadvantages of potential resolution through the tort system compared to other options."  3/25 (AM) Tr. 17:5-13.  He learned "the strategic issue" of "who do you approach and when" to effectuate a global settlement.  *Id*. at 20:1-21:14.  And he learned the amount J&J "would be willing to pay to resolve [the talc] claims, both on an aggregate basis and a per claim basis," which would be funneled "into what is called [a] settlement matrix."  *Id*. at 27:23-28:12.  In this respect, Conlan learned not only how J&J valued current claims—i.e., claims already asserted in the tort system—but also "the potential value of … future claims," "[b]oth at the aggregate level and per claim level and the criteria that go into how [J&J] set [its] per claim amounts."  *Id*. at 38:4-10, *see id*. at 30:18-24.  In short, Conlan learned J&J's strategic and confidential thinking about the right "forum, when, who, aggregate claim amount, per claim amount, factors to consider, how [t]o value future claims … the timing of future claims, [and] what factors go into whether … future claims are going to escalate or deescalate."  *Id.* at 81:21-82:1.

Like Haas, Murdica explained that Conlan learned not only "how J&J assessed the strength and weaknesses of the Beasley Allen proposals," 3/25 (PM) Tr. 55:2-5, but also more broadly "the way J&J thinks about talc claims, how they value

14

them," and "perhaps more importantly, the way [Murdica] work[s], because" Murdica is still "in charge of resolution for talc." *Id*. at 55:5-8; *see id*. at 56:23-57:3.

>    3.    *Conlan's attempt to minimize the significance of his work on the talc litigation is flatly contradicted by the record.*

At the plenary hearing, Conlan tried to downplay the significance of his 1,600 hours of work for J&J. Although he readily admitted that he was "exposed to" J&J's privileged and confidential information, he insisted that he did not understand the Company's resolution efforts outside the bankruptcy system. *See, e.g.*, 4/10 (AM) Tr. 55:2-15, 55:21-56:1, 58:1-17, 65:21-66:2. His excuses are paper thin—and appear designed to mislead the court. After all, Conlan held himself out as an expert in resolving mass torts inside and outside of bankruptcy. *See, e.g.*, 3/25 (AM) Tr. 122:16-20; 3/25 (PM) Tr. 49:4-6. As Haas testified, moreover, Conlan was an "active participant" on the weekly outside-counsel group calls, 3/25 (AM) Tr. 16:7-13—for "every issue that would come up, like which is the right forum, when should [J&J] bring a claim, who should [J&J] approach, how should [J&J] structure it … Mr. Conlan would bring his expertise to that matter and give his very strident opinions on what should be done, and critique … the views of other … counsel." *Id.* 33:13-22. Conlan could not have had "strident" opinions about these issues without understanding them.

Conlan's testimony about settlement matrices is illustrative. Conlan testified that he did not understand the "numbers" aspect of settlement negotiations, captured

in various matrices, and that he "never made it [his] business to understand, nor frankly d[id] [he] think [he] could have, the subject matter of those matrices." 4/10 (AM) 57:20-24, *see id* 43:6-14.  It is plainly not credible that Conlan, the self-described premier expert on restructuring, 3/25 (AM) Tr. 122:16-20, did not understand settlement matrices and related "numbers."  To the contrary, Haas and Murdica explained that Conlan was "extensively involved" in "evaluat[ing]" settlement matrices," 3/25 (AM) Tr. 29:5-11; *see* 3/25 (PM) Tr. 60:3-8, which was a necessary component of Conlan's work "develop[ing] … proposals that J&J has come up with to potentially resolve … the talc litigation." *Id.* at 55:19-60:2.[2]

Conlan's testimony also contradicts his own records.  For example, Conlan billed J&J on numerous occasions, often for a full day's work, ███████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

---

[2] Conlan's suggestion that he was incapable of understanding "numbers" borders on absurd.  At the plenary hearing, he gave a detailed explanation of Legacy's business model, which involves holding liabilities for extended periods of time to make money on the spread between the interest rate and yield on corporate bonds. *See, e.g.*, 4/10 (PM) Tr. 24:11-25:15.  The "numbers" in that business model are no less complicated than the numbers in a mass tort settlement matrix, with which Conlan would have been intimately familiar as a bankruptcy lawyer.

█████████ *In camera* letter, Ex. D1.  Conlan unquestionably sought to mislead the Court with his testimony.

Conlan's other tack was to deny or state that he could not recall the work he performed for J&J.  *See In camera* letter (collecting cites).  But his billing records for J&J tell the real story.  Conlan testified, for example, that he did not "engage in privileged and confidential analysis of future claimants allocations and models that would be needed to derive a settlement outcome" for J&J.  4/10 (AM) Tr. 19:14-22.

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

In addition, Conlan downplayed his role in evaluating the "Texas Two-Step" strategy as an option for J&J.  4/10 (AM) Tr. 83:14-84:1, 85:1-8, 86:1-87:13; 4/10 (PM) Tr. 58:24-59:5. ██████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

In short, Conlan was not a credible witness.  *See, e.g.*, *Capell v. Capell*, 358 N.J. Super. 107, 111 n.1 (App. Div. 2003) ("false in one, false in all").

**B.     Beasley Allen Obtained J&J's Confidential Information By Working With Conlan On The Same Matter, Claims, And Issues That Conlan Worked on For J&J.**

Conlan left FDBR in March 2022 to start Legacy, 3/25 (AM) Tr. 42:2-12, a company whose business model was to acquire or administer liabilities like the talc liabilities Conlan had worked on at J&J—almost as if he had them in mind when he formed his company.  Indeed, in short order, Conlan reached out directly to J&J to propose that Legacy acquire those very liabilities.  Hr'g Ex. 1 ¶ 9, Hr'g Ex. 2; *see also* Hr'g Ex. 1 ¶ 14; Hr'g Ex. 7.  J&J rejected Conlan's outreach, but as set out below, he was undeterred.

1.     *Beasley Allen led opposition to the LTL-1 bankruptcy plan.*

In the meantime, one of Beasley Allen's clients was appointed to the Tort Claimants' Committee, a small committee of claimants appointed by the U.S. Trustee to represent their claimant class.  Although J&J had support from "the vast majority" of claimants for resolving its talc liabilities through the LTL-1 bankruptcy, Beasley Allen led a small minority of law firms to oppose.  3/25 (AM) Tr. 42:13-43:16.  It is not hard to understand why: Beasley Allen would earn more money, through a common benefit fund, if the talc claims were resolved in litigation, as opposed to J&J's bankruptcy plan.  Dkt. 28760-1 at 9-10.  At the plenary hearing,

Birchfield disputed whether, as an abstract matter, plaintiffs' counsel can recover common benefit fees in bankruptcy. 5/3 Tr. 52:10-17. But he admitted, as a concrete fact, that J&J's bankruptcy proposal "did not provide for common benefit fees." *Id.* at 53:18-20.

After the bankruptcy court refused to dismiss LTL's petition, Beasley Allen pursued an appeal to the Third Circuit, which reversed. *In re LTL Mgmt., LLC*, 58 F.4th 738 (3d Cir. 2023). The bankruptcy court dismissed the LTL-1 bankruptcy case on April 4, 2023. Hr'g Ex. 16, ¶ 13. The same day, LTL filed a second bankruptcy petition ("LTL-2"). *See In re: LTL Mgmt., LLC*, No. 23-12825-MBK, ECF No. 1 (Bankr. D.N.J. Apr. 4, 2023). This time, J&J filed the petition with the support of more than 60,000 claimants. Debtor's Statement Regarding Refiling of Chapter 11 Case at 2, *In re LTL Mgmt., LLC*, No. 23-12825-MBK, ECF No. 3 (Bankr. D.N.J. Apr. 4, 2023); 3/25 PM Tr. 86:15-19; 119:11-16.

2. *Beasley Allen collaborated with Conlan after LTL-1 was dismissed.*

Conlan sought to take advantage of the developments in the LTL bankruptcies. He again wrote to Haas on February 2, 2023, just three days after the Third Circuit's decision, even before the mandate had issued. 4/10 AM Tr. 101:24-102:1; *In re LTL Mgmt., LLC*, No. 22-2003, ECF No. 181 (3d Cir. Mar. 31, 2023). Unsurprisingly, given the fallout from the dismissal, J&J did not respond to Conlan's February 2 letter. 4/10 AM Tr. 108:20-25.

19

Having been rebuffed by J&J, Conlan turned to its litigation adversary, Beasley Allen. They made "first contact" on April 27, 2023, through a call "facilitated" by counsel for the tort claimants' committee. Hr'g Ex. 16 ¶ 17. Around that time, Legacy approached Beasley Allen with a proposal. 4/10 (PM) Tr. 102:23-103:1, 106:23. Of course, "Legacy is not the only company that acquires and manages mass tort liabilities." *Id.* at 104:19-21. But Birchfield did not reach out to any of those companies after Conlan's approach. *Id.* at 104:22-106:3. Instead, as he "explored" teaming with Conlan "on behalf of the Plaintiff Leadership," Birchfield saw "an opportunity" and "took advantage." *Id.* at 107:12-108:1.

As Birchfield admitted, he "felt that Mr. Conlan and Legacy had a role to play in the mediation"—and authorized them to play it. *Id.* at 110:6-113:25; *see* 111:13-112:1 ("I didn't ask that [Legacy] be excluded. … I did want the … mediators to … hear from Legacy. ... I did that—for me, personally, and that was providing leadership."); *see also* Dkt. 29999 at 5. Soon, as Beasley Allen's counsel conceded, Conlan and Birchfield "were working together." 3/25 (AM) Tr. 76:3.

Having been welcomed onto the plaintiffs' mediation team, Conlan engaged in "[c]lose collaboration and strategy communications regarding how to consider, conduct, participate in, initiate and/or continue to mediate with J&J regarding plaintiffs' proposal." Dkt. 29999 at 6. That work included "collaborat[ion] on a settlement proposal to J&J," *id.* at 1 n.2, which Special Master Schneider, after

20

reviewing plaintiffs' privileged documents, described as "the Legacy/Birchfield proposal," *id.* at 4; *see also id.* at 2 (Conlan "collaborated with Birchfield to present a settlement proposal to J&J.").

> 3. *Beasley Allen shared privileged and confidential work product about the talc claims with Conlan in furtherance of their strategic collaboration.*

To facilitate that proposal, Beasley Allen shared its own privileged and confidential work product with Legacy. Dkt. 29999 at 5, 9; 4/10 (PM) Tr. 93:19-22, 105:17-19, 123:7-13; *see also* Priv. Log Docs. 55, 109, 119, 165, 166, 191, 213, 23, 258, 315, 321, 355, 377, 410. According to the privilege log, Beasley Allen shared:

- An "ovarian cancer claim estimation report methodology presentation; marked 'confidential, no further distribution without consent of TCC,'" authored by Birchfield (Priv. Log Doc. Nos. 109, 410)

- An "ovarian cancer leadership memo to Legacy discussing ovarian cancer case values, injuries, and damages analysis," authored by O'Dell (Priv. Log Doc. Nos. 165, 166, 191, 321)

- "[D]raft [qualified settlement fund] qualifications for Legacy ovarian cancer proposal," authored by Niall Davies, a Beasley Allen project manager (Priv. Log Doc. Nos. 119, 213, 315, 355)

- A draft document "regarding ovarian cancer claim values," authored by Birchfield (Priv. Log Doc. Nos. 234, 258, 377)

- A "document prepared as part of Legacy proposal for ovarian cancer claim resolution," authored by Birchfield (Priv. Log Doc. No. 55)

Faced with these disclosures, Birchfield was forced to admit that he shared work product with Conlan, 4/10 (PM) Tr. 93:19-22, and that, in sharing these documents, he, O'Dell, and their Beasley Allen colleagues "gave somebody [they'd]

identified as a potential future adversary [their] analysis of case values, injuries, and … damages analysis," 5/3 Tr. 127:24-128:5 (emphasis added); *see also* Dkt. 29999 at 9.  These admissions conflict with Birchfield's sworn certification that he has never "shared confidential information, including trial strategy, litigation, strategies, settlement practices," etc., that he learned from his clients, Hr'g Ex. 9, ¶ 11; *see also* 4/10 PM Tr. 89:14-22, 93:13-22.

And they cast serious doubt on Beasley Allen's leadership in this litigation.  If J&J had accepted the "Legacy/Birchfield Proposal," Legacy "would then hold the entity that had talc liabilities … and in essence, they would be on the other side of the [v] from" Beasley Allen.  5/3 Tr. 126:12-23.  If Beasley Allen truly believed Conlan to be a "potential future adversary," then its admitted disclosure of this highly sensitive information to Conlan would conflict with its "fiduciary duty" toward "other claimants and their counsel," not to mention its duties to its own clients, *id.* at 126:4-7.  That is because, if Birchfield's plan had succeeded, talc plaintiffs would have been left in a situation where their adversary (Legacy) possessed their confidences.  This willingness to compromise client confidences, not to mention the way it exposes the falsity in Birchfield's certification, makes it impossible to credit any of the denials in Birchfield's multiple sworn statements, whether declarations, certifications, or testimony.

4.     _Beasley Allen received J&J's strategic confidences from Conlan._

Beasley Allen's and Conlan's collaboration was not a one-way street. Although Beasley Allen has claimed that its communications with Conlan are secret, the factual record shows that Conlan likewise provided input on the "Legacy/Birchfield proposal," which he could not have done without sharing (either intentionally or inadvertently) the confidential information he acquired from J&J. As Haas and Murdica testified—and common sense confirms—any conversations Conlan had with Beasley Allen about that settlement proposal "necessarily [we]re imbued with Mr. Conlan's confidential, privileged, and work product information that he obtained from Johnson & Johnson."  3/25 (AM) Tr. 127:25-128:4.   "[I]t would be impossible to jump and talk to the other side and separate in [his] brain everything that [he's] learned by representing J&J[,] to suddenly be pure of mind and not disclose confidential information."  3/25 (PM) Tr. 81:8-11.   Put simply, Murdica "c[ouldn't] think of any possible way that's the case."  _Id._ at 81:12-13.

Indeed, Conlan and Beasley Allen went back and forth for 22 days, from May 16 through June 7, 2023, over edits to a draft term sheet for a settlement with the ovarian cancer claimants.[3]  The privilege log entries for these emails include:

- "draft term sheet for Legacy ovarian cancer claim proposal; marked FRE 408 and mediation privilege," Priv. Log Doc. Nos. 20, 35, 42, 131, 135, 174, 206;

---

[3] Priv. Log Doc. Nos . 11, 20, 96, 103, 111, 155, 163, 179, 188, 195, 229, 242, 243, 244, 253, 256, 281, 284, 291, 294, 311, 330, 332, 348, 417.

- "email from ovarian cancer counsel forwarding draft ovarian cancer term sheet and protocol for claims handling," Priv. Log Doc. No. 111; *see also* Doc. No. 103 (similar);

- "email from ovarian cancer counsel to Legacy regarding confidential ovarian cancer materials, edits to ovarian cancer proposal draft term sheet," Priv. Log Doc. Nos. 188; *see also* Doc. Nos. 229, 243, 311 (similar);

- "draft Legacy proposal ovarian cancer term sheet issues, ovarian cancer claims matrix," Priv. Log Doc. No. 231;

- email "referencing discussion with ovarian cancer counsel regarding ovarian cancer claim values, matrix," Priv. Log Doc. No. 244;

- email "discussing ovarian cancer counsel interest in discussing Legacy proposal," Priv. Log Doc. No. 294;

- "discussion of ovarian cancer proposal draft term sheet issues, Legacy concept regarding ovarian cancer claims matrix," Priv. Log Doc. No. 365; and

- "KCIC and Legacy discussion of conversation with ovarian cancer counsel regarding comments on draft ovarian cancer term sheet; discussing additional ovarian cancer resolution proposal details," Priv. Log Doc. No. 118.

The term sheet grew longer as edits came in: on May 12, it was seven pages long; on May 24, eight pages; and on June 7, ten pages. *Compare* Priv. Log Doc. No. 381 (May 12, 2023), *with* Doc. No. 135 (May 24, 2023), *and* Doc. No. 45 (June 7, 2023).

Birchfield's attempt to explain away these revisions was thoroughly unconvincing. According to Birchfield, Legacy provided only "grammatical" edits. 4/10 (PM) Tr. 118:22-25, 121:8-15. But it does not take more than three weeks and multiple turns to provide grammatical edits. And the document swelled in length, refuting the notion that the edits were only grammatical—just a semi-colon here, a fixed typo there. Clearly, the edits were something more. Further, it is implausible

24

that senior officers at Legacy and Birchfield would review and convene discussions of a term sheet for grammar and punctuation, when that work could have been performed by a first year associate at Beasley Allen and without requiring meetings. Tellingly, Birchfield's "grammar only" excuse was *not* corroborated by Conlan.

## C.   Beasley Allen Continued To Work With Conlan Against J&J After Collaborating During The LTL-2 Bankruptcy.

Just as it had during LTL-1, Beasley Allen, representing a small minority of talc claimants, objected to the LTL-2 bankruptcy.  Its opposition, orchestrated from Beasley Allen's perch on the PSC, again led to dismissal on July 28, 2023, denying recovery to the more than 60,000 current claimants whose counsel supported the plan, which would have made $8.9 billion available to resolve talc liabilities.  That dismissal is still on appeal.  *See In re LTL Mgmt., LLC*, No. 23-2972 (3d Cir.).

Ever the opportunist, Conlan attempted to pitch Legacy to Haas that same day. 4/10 (AM) Tr. 126:13-18.  Still, he did not disclose his collaboration with Beasley Allen.  On September 11, 2023, Conlan and Doug Dachille met with Haas, White, and J&J Treasurer Duane Van Arsdale.  *Id.* at 127:19-128:5.  Again, Conlan did not inform the J&J team that he had been meeting with Beasley Allen lawyers since late April.  *Id*. at 129:14-19.  On October 6, 2023, J&J again rejected Conlan's proposal. Hr'g Ex. 4 at 1-2.

On October 17, 2023, J&J held its third-quarter earnings call, Hr'g Ex. 3, during which Haas reiterated J&J's intention to pursue resolution through the

bankruptcy process, *id.* at 9.  The next day, Conlan doubled down.  In an email to Van Arsdale, Conlan again pitched his proposal and, for the first time, revealed to J&J that he was working with Birchfield.  Hr'g Ex. 4 at 1.  In an apparent effort to change J&J's mind, Conlan explained that "Legacy has the support of lead counsel for the [ovarian cancer] Claimants (*including Andy Birchfield*) for an MDL opt-in settlement matrix with Legacy," Hr'g Ex. 4 at 1 (emphasis added)—clearly indicating Conlan's ability to understand settlement matrices, contrary to his testimony at the plenary hearing, *supra* at 15-16.  Conlan closed by stating that "*Andy Birchfield*, Doug Dachille, and I are prepared to meet with you, and your team, in person to share and discuss the terms of such matrix."  *Id.* (emphasis added).  Conlan testified that he "wouldn't offer that [Birchfield] would come without confirming."  4/10 (AM) Tr. 132:7-17.

Beasley Allen's and Conlan's collaboration continued even after J&J rejected the proposal—now out in the open.  On November 2, 2023, Conlan published an opinion piece in Bloomberg, arguing that J&J's effort to use the bankruptcy process was a "spectacular" "failure" that had "polluted the dialogue about the legitimate interest of a public company in obtaining 'finality' with respect to both current and future claims, and plaintiffs' legitimate interest to have their claims determined or settled in the tort system and paid in full."  Hr'g Ex. 15.  Conlan insisted that "[s]tructural optimization and disaffiliation of the liable entities"—exactly what he

26

was pitching to J&J—was "the right answer."  *Id.*  The article identified Conlan only as Legacy's CEO and a "former Sidley Austin restructuring chair," omitting any mention of his time at FDBR, where he spent 1,600 hours representing J&J in the talc litigation.  He did, however, use Bloomberg to explain what "the companies believed" they would gain by pursuing a resolution through bankruptcy, showing no reticence about offering insights into the thinking of his former client.  *Id.*

That same day, Birchfield endorsed Conlan's commentary in a news release also published by Bloomberg, opining that "[p]laintiffs' lawyers in talc-related ovarian cancer cases share Mr. Conlan's concerns that the Texas Two-Step has 'polluted' the narrative."  Hr'g Ex. 18.  He continued that Conlan's scheme "should be appealing," because plaintiffs' lawyers "share [Mr. Conlan's] vision of a win-win solution where claimants can pursue their claims in the tort system."  *Id.*

Their joint effort did not go unnoticed.  On November 5, 2023, Murdica wrote to Conlan to "express concern regarding the confidentiality of J&J's legal strategy known to you and learned by you in a privileged attorney-client relationship."  Hr'g Ex. 6 at 1.  Murdica reminded Conlan that he had represented both J&J and LTL "regarding strategies for resolution of [their] talc liabilities, including various bankruptcy options and proposed structural optimization."  *Id.*

Shortly after receiving Murdica's letter, on November 9, 2023, Conlan wrote to J&J to attach a $19 billion price tag to his proposal.  Hr'g Ex. 7 ¶ 14; 3/25 (AM)

27

Tr. 66:18-67:11, 97:3-9.   In the letter, Conlan again represented that "*Leading Counsel in the MDL* have agreed to support an opt-in settlement with Legacy, post-acquisition, on the terms described in the accompanying matrix."  Hr'g Ex. 7 at 2 (emphasis added).   Conlan continued, "*Leading Counsel in the MDL* believe the matrix settlement will enjoy 95% plus opt-in," *id.* (emphasis added), a fact that could only be known from Conlan's communications with his former litigation adversary.

On the day J&J received Conlan's email, Haas responded to Legacy's Executive Chairman John Gasparovic, copying Conlan, advising that J&J's outside counsel had provided notice to Conlan "regarding his conflicting positions," and emphasized that the Company expected Conlan to respect his duties to J&J, his former client, going forward.  Hr'g Ex. 8, Hr'g Ex. 1 ¶ 15.

### D.   The Cover-Up Confirms The Crime.

If Conlan's collaboration with Beasley Allen were above board, they would have been forthright with the mediators and the Court.   But all three mediators affirmed under oath that they were never informed that Conlan had previously represented J&J in the same matters.  Apr. 8, 2024 Russo Dep. Tr. 4:20-21; Apr. 8, 2024 Kurdi Dep. Tr. 5:3; Apr. 8, 2024 Green Dep. Tr. 5:7.

Birchfield's certifications to this Court were also deceptive.  His certification says only that "[t]he first meeting with Legacy personnel was on May 2, 2023," Hr'g Ex. 16 ¶ 18, when Legacy, Beasley Allen, and KCIC gathered for "additional

meetings" after May 2, including one on May 16, to discuss the term sheet.  4/10 (AM) Tr. 114:23-116:14; 4/10 (PM) Tr. 122:11-123:13; Priv Log Doc Nos. 9, 292; 3/25 (AM) Tr. 54:5-17.  And in fact, Conlan and Legacy were in "[r]egular communications with Birchfield and other counsel for plaintiffs" between mid-April and August 2023.  Dkt. 29999 at 6; *see also, e.g.*, Priv. Log Doc. Nos. 9, 111, 188, 229, 243, 292 311, 44, 181, 215.  As Birchfield later admitted under cross-examination, "there were a lot of things that I did not mention in the certification." 4/10 (PM) Tr. 102:21-22.  Like Conlan, Birchfield was thoroughly uncredible.

Nor did Conlan and Birchfield disclose their engagement to J&J, notwithstanding the fact that they both agree that "ethical rules would have prohibited [Conlan] from taking a job with Beasley Allen … to work on the [t]alc [l]itigation" or from being "retained by Beasley Allen as an expert witness or as a consultant on the [t]alc [l]itigation."  4/10 (AM) Tr. 100:19-101:5; 5/3 Tr. 64:1-18.[4] At the plenary hearing, Conlan offered a purported defense to his non-disclosure: he claimed to have "put [J&J] on notice" via a clause in his February 2, 2023 proposal. 4/10 (AM) Tr. 128:11-13.  That clause, one of six proposed but never accepted conditions, read:  "Legacy reserves the right, in its discretion, to negotiate settlements with interested asbestos-plaintiff law firms of some or all pending claims

---

[4] Neither Birchfield, O'Dell, nor Conlan requested J&J's written informed consent before collaborating.  *See* 4/10 (PM) Tr. 101:23-102:2, 103:13-17, 103:21-25; 4/10 (AM) Tr. 113:11-19.

filed by such firms, all such settlements to become effective at Closing." Dkt. 31786, ¶ 6. That reservation of rights was plainly contingent upon J&J accepting Legacy's "*proposal*." *Id.* at 3 (emphasis added).

J&J did not accept Legacy's proposal. In fact, it never responded. Conlan repeatedly suggested that this silence amounted to J&J's tacit acceptance because J&J did not "disagree, or object." 4/10 (AM) Tr. 102:7-103:11, 105:7-109:10. But no reasonable person with Conlan's legal and business acumen would understand a non-response to a business proposal as a "yes," let alone a conflict waiver—and under the ethical rules, it is not. RPC 1.7, 1.10. Conlan himself admitted that he would not ordinarily view such silence "as agreement." 4/10 (AM) Tr. 109:3-7. Yet again, Conlan revealed his lack of credibility.

### E. The Talc Litigation Is Still The Same Matter, Involving The Same Claims And Same Issues That Conlan Worked On For Both Sides.

Not much has changed about the talc litigation since Conlan stopped representing J&J in February 2022. This matter has seen different stages, but they are all connected by a common thread: all have been efforts to resolve the same claims in the MDL and MCL. Conlan himself recognized that bankruptcy proceedings "were efforts to resolve the talc litigation," including "all of the pending claims [in the MCL] here in Atlantic City and all of the pending claims in the MDL in Trenton." 4/10 (AM) Tr. 135:9-24. Those bankruptcies simply operated as a "subcomponent part" of J&J's greater talc litigation and resolution efforts. *Id.* at

30

135:13-17.  The privileged and confidential information that Conlan learned while representing J&J remains "highly pertinent" to J&J's strategy for resolving the talc claims.  3/25 (AM) Tr. 81:18-21.

Indeed, the litigation in this MDL and MCL was "inactive for nearly two years," Dkt. 28912-1 at 1, due to the bankruptcy stays during LTL-1 and -2.  More important, the strategic considerations are the same.  As Haas agreed, "whether it be talking about potential resolution [through] the tort system, resolution through the [Imerys] bankruptcy, [or] resolution through MDL, … those confidential and privileged discussions that [Conlan] was involved in [are] relevant to" the LTL-2 mediation and J&J's continued efforts to achieve a global resolution.  3/25 (AM) Tr. 78:7-14, 81:1-9.  Every claim value discussion, settlement matrix, future claims assessment, negotiation strategy, and case analysis that Conlan was exposed to "remain[s] relevant," and "all of the insight that [Murdica and Conlan] had back then is as important now as it was then."  3/25 (PM) Tr.  58:23-59:4.

In other words, this is still the same matter.  The claims are still the claims and the underlying strategy is still the underlying strategy—how J&J values plaintiffs' claims, for example, does not shift based on the forum.  And it is J&J's full intention to resolve these claims in bankruptcy.  J&J is appealing the dismissal of the LTL-2 bankruptcy petition.  And even if the Third Circuit affirms the dismissal, J&J has announced a plan for a third LTL bankruptcy, as the Company (and the majority of

31

claimants) still maintains that the bankruptcy process offers the fairest, most efficient resolution of the MDL and MCL talc claims. The plan provides for a three-month solicitation period during which ovarian cancer claimants are informed of its terms and will have the opportunity to vote for or against the plan. 5/3 Tr. 73:4-10.

Immediately upon J&J's May 1, 2024 announcement of its intent to file a third bankruptcy, Beasley Allen launched an opposition campaign. By 8:26 a.m. that day, Beasley Allen issued a press release calling the bankruptcy "fraudulent and filed in bad faith under the Bankruptcy Code," and expressing its intent to "resist it at every turn." *Id*. at 73:19-74:2. The press release also quotes O'Dell, claiming that "[t]he company is afraid of a legitimate vote among those who are truly sick and the families of the deceased who have been battling J&J's obstruction and bad faith for years." *Id*. at. 74:6-14. Later that day, Birchfield also sent an open letter to the legal community opposing J&J's proposed plan. *Id.* at 74:19-25. In his testimony, Birchfield admitted that the point of this campaign was to galvanize opposition to J&J's plan, and to urge people to unite against it. *Id*. at 75:1-10.

## ARGUMENT

New Jersey state and federal courts have strong interests in maintaining public confidence in the integrity of their proceedings and protecting confidential communications between attorneys and their clients. *See United States v. Voigt*, 89 F.3d 1050, 1076 n.12 (3d Cir. 1996) (noting court's "independent interest[] in …

preserving the integrity of its proceedings"); *Gohlke by Luciano v. Trinitas Reg'l Med. Ctr.*, 2023 WL 7383051, at *4 (N.J. Sup. Ct. App. Div. Nov. 8, 2023) (similar). To safeguard these interests, courts can disqualify counsel for ethical misconduct. "[A] motion for disqualification calls for" the court "to balance competing [considerations], weighing the need to maintain the highest standards of the [legal] profession against a client's right freely to choose his counsel." *City of Atlantic City v. Trupos*, 201 N.J. 447, 462 (2010) (quotations omitted).

In striking "that balance, courts must consider that a person's right to retain counsel of his or her choice is limited," *id.* (quotations omitted), and must give way when ethical considerations so demand, or when "the fairness and integrity of the judicial process" would be compromised by permitting the representation to continue, *Cordy v. Sherwin-Williams Co.*, 156 F.R.D. 575, 584 (D.N.J. 1994). "[A]ny doubt as to the propriety of an attorney's" continued participation in a matter "must be resolved in favor of disqualification." *Est. of Kennedy v. Rosenblatt*, 447 N.J. Super. 444, 451 (App. Div. 2016) (quotations omitted); *see Maldonado v. New Jersey ex rel. Admin. Off. Of Cts.-Prob. Div.*, 225 F.R.D. 120, 136-37 (D.N.J. 2004).

Here, Beasley Allen attorneys "collaborated" in secret with J&J's former lawyer to advance their interests in the talc litigation against J&J—and then tried to cover it up. There is no doubt about the impropriety of Beasley Allen's conduct.

**A.     Conlan Violated Multiple Rules of Professional Conduct.**

1.     *Conlan violated Rule 1.6 by disclosing J&J's confidences to its litigation adversary.*

Rule 1.6 enshrines one of the most sacrosanct obligations of the legal profession: lawyers may not "reveal information relating to representation of a client" without that client's consent.  RPC 1.6(a).  There is no dispute that Conlan possessed J&J's confidences.  Beasley Allen repeatedly offered to stipulate to that fact, *supra* at 13, and Conlan himself admitted that he was "exposed to" highly confidential discussions, *id*. at 14-15.[5]  The only question is whether Conlan shared that information with Beasley Allen.  The answer is yes, based on both the record evidence and New Jersey's presumption of shared confidences.

a.  The Court should find that Conlan shared J&J's confidences.  The weight of the evidence shows that Conlan shared J&J's confidences when working with Beasley Allen to formulate what Special Master Schneider described as "the Legacy/Birchfield proposal."  Dkt. 29999 at 4.  "After all, Conl[a]n and Birchfield collaborated on [the] settlement proposal" during the LTL-2 mediation, *id.* at 1 n.2. That collaboration would not have been possible without Conlan revealing, either

---

[5] To be sure, Conlan professed he did not understand much of the information he heard.  *See, e.g.*, 4/10 (AM) Tr. 58:19-59:2.  But that is neither credible, *supra* at 15-16, nor legally relevant.  An attorney can still share confidential information without understanding what it means.  For example, an attorney for Coke could share the secret formula without understanding what exactly all the ingredients are.

intentionally or inadvertently, J&J's confidential information.  *See, e.g.*, 3/25 (AM) Tr. 98:23-99:1 ("Every time Mr. Conlan and Mr. Birchfield sit down and talk about anything to do with this proposal, those conversations necessarily implicate the attorney-client privilege[.]"); *id*. at 135 ("Any single view that [Conlan] espouses necessarily … is imbued with the conversations" he had with J&J.); 3/25 (PM) Tr. 81:8-13 ("I can tell you … it would be impossible to jump and talk to the other side and separate in my brain everything I have learned by representing J&J."); *see also, e.g.*, *Greig v. Macy's Ne., Inc.*, 1 F. Supp. 2d 397, 402 n.4 (D.N.J. 1998).

The nature and extent of the communications further confirm that confidences were shared.  As the privilege log shows, plaintiffs' counsel communicated with Conlan for *more than three weeks* about a draft term sheet.  *Supra* at 24.  And over the course of those communications, that document grew from seven, to eight, and then to ten pages.  *See* Priv. Log Docs. 236, 381, 42, 135, 45.  The only reasonable inference is that Conlan and Legacy provided substantive feedback on this "Legacy/Birchfield proposal."  And any such feedback necessarily would have revealed J&J's most important confidences.  For example, any express or implied statement that the joint proposal would be acceptable to or was within range for J&J would have revealed Conlan's knowledge of the types of offers J&J would be willing to consider and accept.  "To believe" that Conlan did "not remember and ultimately use that information, even 'subliminally, … defies common sense and human

nature." *Cordy*, 156 F.R.D. at 584 (quotations omitted).

Beasley Allen has suggested that the Court cannot infer from these compelling facts that confidences were shared because J&J is obligated to produce direct evidence—a witness stand confession. Beasley Allen is wrong. Circumstantial evidence is an accepted method of proof, including in ethics cases. Although disqualification orders must be fact-based, "nothing in *Trupos* abandon[s] the principle that facts in an ethics-related case may be determined through reasonable inferences, as well as by means of circumstantial evidence." *Heritage Pharms., Inc. v. Glazer*, 2019 WL 9309180, at *2 (D.N.J. Mar. 1, 2019) (quoting *Twenty-First Cent. Rail Corp. v. N.J. Transit Corp.*, 419 N.J. Super. 343, 357 (App. Div. 2011) (collecting cases), *rev'd on other grounds*, 210 N.J. 264 (2012)). In fact, the rules themselves acknowledge that facts "may be inferred from circumstances." RPC 1.0(f). And the circumstantial evidence here is powerful: It shows that Conlan collaborated with Beasley Allen to formulate the "Legacy/Birchfield proposal," exchanging emails about and edits to the proposal across multiple weeks.

In addition to this circumstantial evidence, there is a legal "presumption that confidential information has been shared." 2 Legal Malpractice § 18:53 (2024 ed.); *see Greig*, 1 F. Supp. 2d at 402-03; *Cordy v. Sherwin-Williams Co.*, 156 F.R.D. 575, 583-84 (D.N.J. 1994); *see also Maldonado*, 225 F.R.D. at 137. That presumption applies "between attorney and former client," *Reardon v. Marlayne, Inc.*, 83 N.J.

460, 473 (1980)—i.e., J&J and Conlan.  And it applies between the side-switcher and the adversary lawyer—i.e., Conlan and Beasley Allen.  In *Cordy*, for instance, the court applied the presumption to disqualify opposing counsel where an expert switched sides.  156 F.R.D. at 583-84.  And in *Greig*, the court applied the presumption where the same firm represented a client's former lawyer in a malpractice action and his adversary in the underlying case.  1 F. Supp. 2d at 402-03.

"It is clear why this presumption arises that confidences passed to the attorney."  *Cordy*, 156 F.R.D. at 584.  "There is an inherent difficulty in determining, at some later time, whether it happened."  *Id*.  And persons accused of sharing or receiving confidences have an obvious interest in denying any confidences were shared, which is why "[s]elf-serving affidavits of counsel and others are not helpful."  *Id*.  Those considerations apply fully here.  While it is always difficult to prove exactly what third-parties said, Beasley Allen has made that difficult task impossible by invoking the mediation privilege—J&J cannot probe Conlan or Birchfield on what they discussed while they were collaborating.  And Conlan and Beasley Allen both have powerful incentives to deny that confidences were shared.  But given their close collaboration on a "Legacy/Birchfield proposal," this Court should presume that they were.  Indeed, any doubt as to whether confidences were shared must be resolved in favor of disqualification.  *Supra* at 33.

37

b. <u>Beasley Allen's contrary arguments lack merit</u>.  Birchfield claimed that in the 22 days the term sheet was revised, the *only* edits Legacy offered were for "typos and grammatical issues."  4/10 (PM) Tr. 118:17-23.  That is not credible.  For one thing, it does not take sophisticated actors more than three weeks of near daily exchanges to make grammatical edits to a document.  Then there is the document's length—the document grew by three pages as the team edited it, which does not happen from finessing grammar and fixing typos.  And the idea that Birchfield would have Conlan, the former head of Sidley Austin's bankruptcy practice and the CEO of a sophisticated company, or other senior executives at Legacy, review a draft for grammar and punctuation borders on absurd, when paralegals or junior associates can perform that work.

Tellingly, Conlan did not corroborate Birchfield's "grammar only" excuse.  Instead, he insisted that when he was engaged in privileged and confidential discussions with Beasley Allen, he "walled off everything [he] learned in 20 months representing Johnson & Johnson in one part of [his] brain so that [he] wouldn't disclose client confidences from the other part of [his] brain."  4/10 (PM) Tr. 70:12-19.  That is not how the human mind works.  People do not have airtight lockboxes in their brains that they can use to stow away and compartmentalize information.  *Supra* at 23 (summarizing Haas's and Murdica's testimony).

New Jersey's ethical rules reflect this principle.  There would be no need for

screening measures, *see* RPC 1.10(c)(2), if attorneys could simply promise not to cross-contaminate information in their brains.  In fact, there would be no reason for Rule 1.9(a) *at all* on Conlan's theory—an attorney could litigate against a former client simply by promising to "wall off everything" in another part of his or her mind. *Contra Dewey*, 109 N.J. at 217.  The argument that Conlan avoided disclosing J&J's confidences outside the presence of opposing counsel and the Court when commenting on a settlement proposal simply is not credible.[6]

In light of their obvious incentives to lie, the implausibility of their excuses, and the powerful circumstantial evidence discussed above, Conlan's and Birchfield's "[s]elf-serving" denials cannot overcome the presumption of shared confidences. *Cordy*, 156 F.R.D. at 584.  Indeed, the Court could reject their denials based on the "false in one, false in all" maxim alone.[7]

Beasley Allen has never squarely addressed the presumption of shared confidences and has no good answer to the actual evidence here.  Instead, its principal argument has been for an invented standard.  Citing *O Builders &*

---

[6] Conlan's testimony at the plenary hearing was a case study in the difficulty of "self-regulat[ion]."  4/10 (AM) Tr. 65:12-14.  He repeatedly struggled to avoid disclosing J&J's confidences when questioned about his work for J&J, even with attorney instructions not to.  *See id.*; *id.* at 83:25-84:1 ("I'm trying to answer the question but I'll contain it to the minimal amount.").

[7] Birchfield also admitted on questioning from the Court that he would not know whether he received J&J's confidences from Conlan unless Conlan expressly said so.  5/3 Tr. at 66:18-25.

*Associates, Inc. v. Yuna Corp. of New Jersey*, 206 N.J. 109 (2011), it has argued that J&J must prove through direct evidence not only *that* confidences were shared but also what *specific* confidences those were.  *See, e.g.*, 4/10 (AM) Tr. 11:21-12:7

 *Yuna* does not require J&J to prove what confidences Conlan shared with Beasley Allen.  Borrowing from Rule 1.9 case law, *Yuna* held that a client sometimes must prove what confidences *it shared* with *its lawyer* (the equivalent here of Conlan) to prove a violation of Rule 1.18.  That rule makes legal and practical sense.  A party can prove what information *it* shared.  And to determine whether information received by the former prospective client is "significantly harmful," RPC 1.18(b), a court must generally know what that information is.

 But it makes no sense to transplant this requirement to Rule 1.6.  Legally, there is no need to know precisely what confidences were shared to find a violation of Rule 1.6—what matters is *that* confidences were shared, a fact the law presumes in circumstances such as these, *supra* at 36-37; *see* RPC 1.6.  And Beasley Allen's rule does not work practically either.  In all but the most unusual circumstances, a party will not know what third parties (the former lawyer and adversary) said to each other.  *See, e.g.*, *Cordy*, 156 F.R.D. at 584.  Especially so here.  Beasley Allen has asserted the mediation privilege over its communications with Conlan—those communications are secret.  Yet Beasley Allen argues at the same time that J&J must prove the very substance of those secret communications.  *Yuna*'s interpretation of a

different ethical rule does not support that perverse result.  Nor does *Yuna* hold that J&J is required to prove the specific confidences it shared with Conlan, although that argument is moot in light of the testimony from Haas and Murdica and the submission of Conlan's billing records to the Court.  *In camera* letter, Ex. D1.

Beasley Allen focused myopically on *Yuna*'s statement that a party seeking disqualification faces a "Hobson's choice in respect of the disclosure of confidential information," *Yuna*, 206 N.J. at 129, but ignored important caveats in the Court's decision.  *Yuna* explained that a party seeking disqualification must disclose its confidences "[*i*]*n those instances* where the disclosure of confidential information must be made so that the court can grapple fairly with the issues."  *Id*. (emphasis added).  *Yuna* presented one of those instances because the party seeking disqualification "vaguely claimed only that information 'concerning pending litigation and business matters' had been disclosed" to the attorney.  *Id*.

The year after *Yuna*, the New Jersey Supreme Court made clear that a party seeking disqualification need not prove what confidences were shared with the former lawyer in every case.  In *Twenty-First Century*, the Court held that the *Trupos/Yuna* standard requiring "the former client to point to a confidence that was revealed to the lawyer" was satisfied by a "letter's reference to the consideration of … potential blameworthy behavior" of the other side.  210 N.J. at 278-79 (letter referenced "design and constructability issues").  That letter is far *less* detailed than

41

the evidence offered by J&J here.  Indeed, unlike in *Yuna*, where the party seeking disqualification provided only a vague claim of information sharing, Haas and Murdica—corroborated by Conlan's own billing records and communications— testified in detail about the type of confidential information Conlan received, including claim valuations, analysis of future claims, detailed resolution strategies, and so on.  *Supra* at 13-14.  The Court does not need anything more to find that Conlan possessed J&J's confidences and shared them in violation of Rule 1.6.

2.   *Conlan violated Rule 1.9(a) by switching sides in the same matter.*

If Conlan had been a practicing lawyer, Rule 1.9(a) would have prohibited him from collaborating with Beasley Allen during the LTL-2 mediation.  Counsel for Beasley Allen has conceded that it "could not hire Mr. Conl[a]n as an attorney to work on Talc cases unless there was some type of screening."  1/17 MCL Hr'g Tr. 47:14-22.[8]  Conlan admitted that New Jersey's "ethical rules would have prohibited [him] from taking a job with Beasley Allen … to work on the talc litigation."  4/10 (AM) Tr. 100:19-101:1.  And Birchfield likewise acknowledged exactly the same thing.  5/3 Tr. 64:1-18.  Thus, Beasley Allen and Conlan both agree that his conduct "would be a violation of [Rule 1.9] if engaged in by a lawyer."  RPC 5.3(c).

---

[8] Rule 1.9(a)'s written consent exception does not apply.  Neither Conlan nor Beasley Allen secured written consent from J&J.  *See* 3/25 (AM) Tr. 55:2-17, 75:16-19; 3/25 (PM) Tr. 4:10-14, 32:19-33:12; 4/10 (AM) Tr. 111:11-17.  And obviously, Conlan was not screened from the talc litigation.

These admissions follow straightforwardly from Rule 1.9(a) itself.  That Rule provides that a lawyer shall not "represent another client in the same or a substantially related matter in which that client's interests are materially adverse to the interests of the former client" absent consent.  RPC 1.9(a).  Conlan represented J&J.  And the talc plaintiffs' interests are materially adverse to J&J's.  So under *Trupos*, the burden shifts to Beasley Allen to prove that the matter in which Conlan represented J&J (i.e., talc litigation) is "not the same or substantially related to the controversy in which the disqualification motion is brought" (i.e., talc litigation).  201 N.J. at 462-63.  Beasley Allen cannot carry that burden.

a. <u>Conlan worked on both sides of the "same matter."</u>  Having admitted that it could not hire Conlan to work on the talc litigation, Beasley Allen cannot prove that Conlan worked on a different matter when he represented J&J.  The matters, claims, and issues are the same.  Conlan represented J&J in the talc litigation.  *Supra* at 7-12.  And Conlan's work with plaintiffs' mediation team was also in the talc litigation.  The liabilities Conlan was trying to resolve as a lawyer for J&J are the same ones plaintiffs were trying to resolve through the "Legacy/Birchfield proposal" in mediation.  Because Conlan worked on both sides of the same matter, the Court need not inquire whether "any particular confidence" was revealed to Conlan, let alone from Conlan to Beasley Allen.  *Twenty-First Century Rail*, 210 N.J. at 278.

Beasley Allen's argument seems to be that the matters are different because

Conlan worked on the bankruptcy component of the talc litigation, whereas there is currently no active bankruptcy case pending.  That argument is wrong factually, procedurally, and legally.  Factually, Conlan represented J&J *before* any bankruptcy proceedings were initiated, evaluating all potential resolutions for these talc cases, whether inside or outside bankruptcy.  *Supra* at 7-8.  Procedurally, Conlan worked with Beasley Allen on a mediation *in bankruptcy*.  So Beasley Allen's argument that Conlan's work extended only to the bankruptcy aspect of the talc litigation is a moot point—his work for J&J included bankruptcy and he worked with Beasley Allen on a mediation in bankruptcy.  And legally, matters can be the same even if they are not the same exact case with the same exact docket number.  *State v. Ingram*, 2021 WL 1235185, at *6-*7 (N.J. Super. Ct. App. Div. Apr. 2, 2021); *see also Twenty-First Century Rail*, 210 N.J. at 276-77.  That conclusion applies forcefully in the context of these bankruptcies, which were simply a procedural mechanism for resolving the underlying MDL and MCL cases.  As Conlan himself admitted, the bankruptcies were "subcomponent[] part[s]" of the talc litigation, 4/10 (AM) Tr. 135:12-24—they were "efforts to resolve the talc litigation," "[i]ncluding all of the pending claims here in Atlantic City, and all of the pending claims in the MDL in Trenton."  *Id*.

   b. The talc litigation is substantially related to the talc litigation.  Beasley Allen certainly cannot prove that the matters are not substantially related.  Under *Trupos*, matters are substantially related if: (1) the lawyer "received confidential

information from the former client that can be used against that client in the subsequent representation of parties adverse to the former client, or (2) facts relevant to the prior representation are both relevant and material to the subsequent representation." 201 N.J. at 467.  Both aspects are satisfied here: (1) Conlan received confidential information from J&J, and there is no real dispute that this information could be used against J&J; and (2) Beasley Allen cannot dispute that facts relevant to Conlan's representation of J&J were material to his work with plaintiffs on the LTL-2 mediation or this litigation more generally.

c. **An attorney-client relationship with talc plaintiffs is not required**.  One of Beasley Allen's defenses has been that Conlan technically could not have violated Rule 1.9(a) because he was not acting as a lawyer for the talc plaintiffs when he was collaborating with their counsel.  That is an erroneous reading of the rules.  As explained below, *infra* at 46-48,  the whole point of Rule 5.3 is that it holds lawyers responsible for the conduct of nonlawyers—it applies where a nonlawyer's conduct "would be a violation of the [RPCs] if engaged in by a lawyer."  RPC 5.3(c).  What matters under Rule 5.3 is that Conlan's conduct would have violated Rule 1.9 *if* he had been a lawyer—and both Beasley Allen and Conlan himself admit that it would have.  *Supra* at 42.[9]

---

[9] Even setting aside Rule 5.3, the Court should reject Beasley Allen's cramped interpretation because it would defeat the purpose of the Rule 1.9(a).  Conlan *de facto* represented talc plaintiffs' interests by virtue of the fact that he was part of their

3.   *Conlan violated Rule 1.9(c) by sharing J&J's strategic confidences with its litigation adversary.*

Conlan's participation on the plaintiffs' mediation team also violated Rule 1.9(c). Rule 1.9(c) prohibits a lawyer from using confidential information from a prior representation to the former client's disadvantage. It thus "underscore[s] the principle that an attorney may not use information obtained from a client to the detriment of that client." *Kennedy*, 447 N.J. Super. at 453. That is what Conlan did. He revealed J&J's confidential information to Beasley Allen to advance his preferred resolution of the talc litigation through Legacy to J&J's detriment: J&J's litigation adversary now possesses its confidences. *Supra* at 34-37 (discussing Rule 1.6).

**B.   Beasley Allen Is Responsible For Conlan's Ethical Violations.**

1.   *Beasley Allen violated Rule 5.3 by associating itself with Conlan.*

Rule 5.3 embodies a common-sense principle: an attorney may not do through a nonlawyer what he could not do himself. The Rule provides in relevant part: "[w]ith respect to a nonlawyer employed or retained by or associated with a lawyer

---

counsel's mediation team and served in that role at their counsel's pleasure. He was permitted by plaintiffs' counsel to "play" a "role" in, and was not excluded from, the mediation only because plaintiffs' counsel believed he would advance their clients' interests. 4/10 (PM) Tr. 111:13-112:1; 113:20-25. Conlan could not have taken actions antagonistic to the talc plaintiffs or he would not have been permitted to participate in the mediation. The fact that Conlan did not have a formal attorney-client relationship with talc plaintiffs is thus no impediment to this Court finding that he represented them within the meaning of Rule 1.9(a), especially where the ethical rules make clear that "an attorney may not do indirectly that which is prohibited directly." N.J. Ethics Op. No. 680, 1995 WL 33971, at *3.

… a lawyer shall be responsible for conduct of such a person that would be a violation of the Rules of Professional Conduct if engaged in by a lawyer if … the lawyer orders or ratifies the conduct." RPC 5.3(c)(1). In other words, a lawyer will be held responsible for a nonlawyer's conduct where: (1) the nonlawyer is "associated with" the lawyer; (2) the lawyer ordered or ratified the nonlawyer's conduct; and (3) the nonlawyer's conduct would be a Rules violation if engaged in by a lawyer. Each element is satisfied here.

a. <u>Beasley Allen "associated with" Conlan</u>. Rule 5.3 applies to nonlawyers "employed," "retained," "or associated with a lawyer." As this text makes clear, the Rule applies to "nonlawyers in the firm and nonlawyers *outside the firm* who work on firm matters." RPC 5.3, Official Comment (Aug. 1, 2016) (emphasis added).

Here, Beasley Allen "associated" itself with Conlan to advance their shared goal of a negotiated resolution to the talc cases through Conlan's company. To "associate" means "[t]o join in common purpose [or] action."[10] For example, the Restatement explains that lawyers and law firms "associate" with one another when they act as co-counsel on the same case. Restatement (Third) of the Law Governing Lawyers § 123, cmt. c(iii). Similarly, "when a lawyer consults with other lawyers

---

[10]    *Associate*, Oxford English Dictionary, https://www.oed.com/dictionary/associate_adj (last visited May 15, 2024); *see also Associate*, Miriam Webster, https://www.merriam-webster.com/dictionary/associate (last visited May 15, 2024) ("to join or connect together").

in specialized areas of the law," the lawyers have formed "an association for purposes of the matter in question." *Id*.  New Jersey courts frequently look to the Restatement for guidance.  *See, e.g.*, *LoBiondo v. Schwartz*, 199 N.J. 62, 110-11 (2009) (collecting cases); *Haggerty v. Red Bank Borough Zoning Bd. Of Adjustment*, 385 N.J. Super. 501, 516 (App. Div. 2006) (consulting comment c to Section 123). And the Rule makes perfect sense.  It would thwart the purpose of the ethical rules to allow a lawyer to circumvent his obligations merely by allying with a nonlawyer to accomplish a prohibited purpose, but then claim (as Beasley Allen does here) that he cannot be disqualified because no formal retention or employment relationship exists.  That is why the Rule's framers used a broad word like "associate."

There can be no dispute that Beasley Allen "associated" itself with Conlan "for purposes of the matter in question," i.e., the talc litigation.  Restatement (Third) of the Law Governing Lawyers § 123 cmt. c(iii).  Conlan was an integral part of Beasley Allen's mediation team—so integral, in fact, that the firm shared its own confidential information with him and claimed the mediation privilege over his communications.  *Supra* at 23-24.  And, as Special Master Schneider found, "Conl[a]n and Birchfield collaborated on a settlement proposal to J&J" as part of the plaintiffs' mediation efforts.  Dkt. 29999 at 1 n.2.  Again, this is not disputed. Everyone agrees that Conlan and Birchfield worked together on a settlement proposal, *supra* at 19-21—what Birchfield initially called an "engagement" until he

48

recognized the implications of his admission.  4/10 (PM) Tr. 105:10-21.

The collaboration was extensive.  "Legacy/Conl[a]n … worked to provide plaintiffs with the information plaintiffs requested and needed for the J&J mediation," Dkt. 29999  at 8, and engaged in "[c]lose collaboration and strategy communications," *id*. at 6.  Although there are numerous companies that offer the same services as Legacy, 4/10 (PM) Tr. 104:14-105:7, Beasley Allen did not approach them, *id.* at 105:8-106:6.  Instead, Beasley Allen took "advantage of what [Birchfield] saw as an opportunity."  4/10 (PM) Tr. 108:4-6.

Beasley Allen wanted to thwart bankruptcy plan confirmation.  And Conlan wanted a settlement through his business.  Both had a financial motive to collaborate. Beasley Allen would obtain common benefit fees if J&J accepted Legacy's proposal that were not available through J&J's bankruptcy plan. *See* 5/3 Tr. 53:10-55:10.  And Conlan would not make anything unless Legacy could close a deal with J&J.  4/10 (AM) Tr. 123:21-124:2.  Thus, to accomplish their shared goal of orchestrating a settlement through Legacy, Beasley Allen and Conlan collaborated extensively.  That is the definition of association—working together towards a common purpose.  No different than if Beasley Allen had hired Conlan as an expert or consultant, or if Conlan had been Beasley Allen's co-counsel or a non-retained consultant, Beasley

49

Allen is responsible for Conlan's misconduct.[11]

Rule 5.3's plain text thus forecloses one of Beasley Allen's key defenses. Beasley Allen has argued that it cannot be disqualified "because Conlan was never a partner, associate, or otherwise an employee of Beasley Allen." Dkt. 28826 at 10; Trans. ID LCV202475816 at 14.   Although Conlan admitted that New Jersey's ethical rules would have prohibited him from work at Beasley Allen on the talc litigation and that he "could not have been retained by Beasley Allen as an expert witness or a consultant," 4/10 (AM) Tr. 101:2-8, Beasley Allen's defense is that a formal employment relationship or retention is required.   Rule 5.3 says otherwise. It applies to a nonlawyer who is "employed or retained by *or associated with* a lawyer."   RPC 5.3 (emphasis added).   If employment and retention were required, the words "associated with" would be superfluous and Rule 5.3 would contain a gaping loophole.   The Court need only apply the Rule as written to reject that result.

b. <u>Beasley Allen "ratified" Conlan's conduct</u>.   For substantially similar reasons, this Court should find that Beasley Allen "ratified" Conlan's conduct— namely, his participation on Beasley Allen's mediation team, *supra* at 20.   Birchfield admitted that "[w]e did want Legacy to be part of [the] mediation," 4/10 (PM) Tr.

---

[11] Birchfield testified that Conlan's role was to advise plaintiffs on a procedural vehicle to effectuate settlement—i.e., structural optimization and disaffiliation.   That is consulting.   And Conlan would make money only if his consulting resulted in a settlement using Legacy.   4/10 (AM) Tr. 123:21-124:2.

109:21-110:5, and that he "felt Mr. Conlan and Legacy had a role to play," *id*. at 111:4-21; *see id*. at 112:2-113:4  (The Court observing Birchfield "said they [i.e., Legacy] did what [Birchfield] wanted them to do"); *see also* Dkt. 29999 at 5.  And Beasley Allen's "collaborat[ion] on a settlement proposal to J&J," Dkt. 29999 at 1 n.2, unquestionably constitutes ratification of Conlan's participation in mediation. If Beasley Allen did not approve of Conlan's participation, it would not have collaborated with him.  Conlan was not a stranger to plaintiffs' mediation team; he was an invited guest.

c. Conlan would have violated Rule 1.9(a) as a practicing lawyer.  The final element is that the nonlawyers' conduct would have been "a violation of the Rules of Professional Conduct if engaged in by a lawyer."  RPC 5.3(a).  As explained above, this element is not disputed.  Everyone agrees that Conlan would have violated Rule 1.9(a) if he had been a practicing lawyer when he joined plaintiffs' mediation team. *Supra* at 42.  Under the plain text of Rule 5.3, that is a violation of New Jersey's ethical rules and Beasley Allen is responsible for the violation.

2. *Beasley Allen violated Rule 8.4(a) by facilitating and encouraging Conlan's Rule violations.*

Rule 8.4(a) prohibits attorneys from "knowingly assist[ing] or induc[ing] another" attorney to violate his or her ethical duties.  RPC 8.4(a).  That is exactly what Beasley Allen did.

51

As described at length above, Beasley Allen assisted, induced, and "encouraged," *In re Pajerowski*, 156 N.J. 509, 513 (1998), Conlan to share J&J's confidences by creating conditions in which that sharing was inevitable. *See Greig*, 1 F. Supp. 2d at 401-03. Beasley Allen wanted Conlan to play role in mediation. To facilitate Conlan's participation, Beasley Allen sent Conlan plaintiffs' own highly-privileged work product. And it "collaborated" with Conlan on a settlement proposal, exchanging edits to a draft term sheet multiple times over the course of several weeks. This close collaboration is not disputed. Counsel for Beasley Allen readily conceded that "they [Conlan and Birchfield] did work together to come up with a strategy to try and resolve or settle disputes." 1/17 MCL Hr'g Tr. 46:5-7. And Birchfield admitted that he and Conlan "worked through … [the] mediation process together." 4/10 (PM) Tr. 105:17-19. "It should have been clear to [Beasley Allen] … that [Conlan] would be in danger of violating his duty of confidentiality to [J&J] by divulging [confidential] information to [its] adversary." *Greig*, 1 F. Supp. 2d at 401. "Pursuant to RPC 8.4(a), [Beasley Allen] should have abstained from assisting him in violating this duty." *Id.*

   3. *Beasley Allen violated Rule 1.10 by associating with Conlan.*

Beasley Allen is also responsible under Rule 1.10 for Conlan's violations of Rule 1.9. That Rule provides that "[w]hen a lawyer becomes associated with a firm, no lawyer associated in the firm shall knowingly represent a person in a matter in

which that lawyer is disqualified under RPC 1.9 unless" several inapplicable conditions are satisfied.  RPC 1.10(c).  As with Rule 5.3, the analysis proceeds in two steps: (1) Beasley Allen "associated" itself "with" Conlan, *supra* at 47-50[12]; and (2) Conlan was disqualified under Rule 1.9, *supra* at 42.

Beasley Allen's defense has been that Conlan was not acting as a lawyer.  That is not a defense to Rule 5.3, which expressly applies to nonlawyers.  *Supra* at 47.  And it is not a defense to Rule 1.10.  Although the typical application of Rule 1.10 involves a side-switching attorney who continues to practice law, courts applying similar or identical rules have also held that it applies "to non-lawyer employees."  *Owens v. First Fam. Fin. Servs., Inc*., 379 F. Supp. 2d 840, 850 (S.D. Miss. 2005).  That interpretation is consistent with a foundational principle of New Jersey ethics law: "an attorney may not do indirectly that which is prohibited directly."  N.J. Ethics Op. No. 680, 1995 WL 33971, at *3 (1995).  And it requires Beasley Allen's disqualification for Conlan's violations of Rule 1.9.

### C.  Beasley Allen Should Be Disqualified For Its Independent Rules Violations.

The Court need not base disqualification of Beasley Allen solely on its

---

[12] The text of Rule 1.10(c) reinforces that conclusion.  It uses both the phrases "associated with" and "associated in."  A lawyer is "associated in" a firm when he or she is part of the firm.  "Associated with" must mean something different.  It encompasses lawyers outside the firm who share a common action or purpose.  *Supra* at 47.

responsibility for Conlan's conduct.  Beasley Allen committed its own serious rules violations.  It attempted to obstruct this Court's truth-seeking function by covering up its engagement with Conlan in violation of Rules 3.3(a)(5) and 8.4(c).  And its conduct, including its deceptive half-truths, have been prejudicial to the administration of justice, in violation of Rule 8.4(d).

>    1.    *Beasley Allen engaged in dishonesty and deceit in violation of Rules 3.3(a)(5) and 8.4(c).*

Rule 8.4(c) prohibits attorneys from "engag[ing] in conduct involving dishonesty, fraud, deceit or misrepresentation."  The Rule covers a broad range of conduct, from affirmative misrepresentations to failures to disclose material facts. *See, e.g.*, *In re Kivler*, 193 N.J. 332, 341 (2008) (attorney "affirmatively misrepresented" the nature of his work to his client); *In re Forrest*, 158 N.J. 428, 436-38 (1999) (attorney "concealed a material fact from the court and arbitrator").

Rule 3.3(a)(5) imposes a heightened duty of candor to a tribunal.  It prohibits a lawyer from knowingly "fail[ing] to disclose to the tribunal a material fact knowing that the omission is reasonably certain to mislead."  Thus, lawyers may not tell half-truths to a tribunal. *Brundage v. Est. of Carambio*, 195 N.J. 575, 598 (2008) ("Partial disclosures may at times result in misrepresentations due to the nondisclosure of material facts." (quotations and alteration omitted)).  This duty applies both to "facts that are at issue in the case [and] facts relating to the management of the case." *In re Seelig*, 180 N.J. 234, 248 (2004) (quotations omitted).

New Jersey courts have read RPC 3.3(a)(5) broadly.  They have found violations where "the attorneys neither affirmatively misrepresented material information to the tribunal, nor evaded a direct question from the tribunal; rather, the attorneys held back the information in order to advance their clients' interests."  *In re Seelig*, 180 N.J. at 252; *see, e.g.*, *In re Forrest*, 158 N.J. at 430-31 (attorney's statement to arbitrator that husband was "unavailable" when he was actually dead violated Rules 3.3(a)(5) and 8.4(c)); *Matter of Kernan*, 118 N.J. 361, 364 (1990) (attorney in divorce action engaged in material nondisclosure when he failed to inform the court that he had transferred certain property to his mother).

That is the case here.  Birchfield told deceptive half-truths to this Court in his certifications to advance his own and Beasley Allen's interest in avoiding disqualification.  In his first certification, Birchfield completely omitted to mention his extensive relationship with Conlan, stating only that Conlan was never "a member, partner, employee, or counsel at Beasley Allen."  Hr'g Ex. 9 ¶ 7.  And in his supplemental certification, Birchfield stated only that his "first contact with anyone at Legacy was on April 27, 2023," and that "[t]he first meeting with Legacy personnel was on May 2, 2023."  Hr'g Ex. 16 ¶ 17-18.  But that was far from the whole truth.  In reality, Birchfield and Beasley Allen had an ongoing relationship for months, during which they communicated extensively and secretly collaborated on a settlement proposal.  Birchfield disclosed none of that to this Court.  Indeed,

Birchfield admitted on cross-examination that "there were a lot of things that I did not mention in [my] certification[s]."  4/10 (PM) Tr. 102:21-22.

Birchfield's certifications about his "first" conversations with "Legacy personnel" were "nothing less than a concealment of the material fact" that he had an extensive relationship with Conlan.  *In re Forrest*, 158 N.J. at 435.  The nature and number of his communications with Conlan are clearly material to disqualification.   And the omission of that information from Birchfield's certifications was reasonably certain to mislead this Court about facts that are "crucial to the fair and proper resolution" of this motion.  *Id.* at 438.  It appears Birchfield intentionally minimized his contacts with Conlan in an effort to avoid disqualification.  And if this Court had not ordered a plenary hearing, those extensive contacts might never have been discovered—he almost succeeded in impairing this Court's truth-seeking function.  That is precisely the type of dishonesty that warrants disqualification under Rules 3.3(a)(5) and 8.4(c).

Beasley Allen also omitted material facts from the mediators in the LTL-2 mediation.  *See In re Forrest*, 158 N.J. at 435 (holding that 3.3(a) applies to arbitration).  Not only did Beasley Allen fail to disclose to J&J during the mediation in LTL-2 that it was collaborating with its former counsel, but the firm never disclosed that critical information to the mediators.  *Supra* at 28-29.  It was incumbent on Beasley Allen to speak up, for Beasley Allen and Conlan were the only

ones who knew both that Conlan was participating in the mediation and was J&J's former lawyer. But Beasley Allen did not speak up because it had an obvious interest in keeping this fact secret not just from J&J, but also from the mediators.

2. _Beasley Allen's conduct has been prejudicial to the administration of justice._

Finally, Beasley Allen violated Rule 8.4(d)'s prohibition on conduct "that is prejudicial to the administration of justice." This provision reflects the well-settled principle that "an attorney may not do indirectly that which is prohibited directly." *See* N.J. Ethics Op. 680, at *3; *accord Maldonado*, 225 F.R.D. at 138. Or, Beasley Allen's counsel conceded, lawyers cannot "bypass[] the rules" and "do through the back door what [they] can't do through the front." 2/7 MDL Hr'g Tr. 41:8-18.

Throughout these proceedings, that has been Beasley Allen's defense. It has trotted out highly technical arguments for why its conduct and Conlan's did not run afoul of New Jersey's ethical rules. Its argument is that although its conduct may have been unscrupulous and *morally* unethical, it did not violate the letter of any ethical rule, and thus this Court is powerless to order disqualification.

That is as wrong as it sounds. The plain letter of the rules discussed above account for the circumstances here. But on top of those rules violations, there is no question that Beasley Allen's conduct has been prejudicial to the administration of justice. Beasley Allen partnered with J&J's former lawyer in secret to collaborate on a settlement proposal. It did not tell J&J about this collaboration. It did not tell

the mediators about this collaboration.  And it did not tell this Court.  In fact, when faced with disqualification, Beasley Allen tried to cover up its misdeeds, selectively disclosing when Birchfield, O'Dell, and Conlan first met while withholding the truth of their months-long relationship.

One final point is in order.  Beasley Allen repeatedly has accused J&J of advocating for application of an "appearance of impropriety" standard.  To be very clear, J&J is advocating nothing of the sort.  Indeed, it should go without saying that it is *actually improper* for a lawyer to collaborate with his adversary's former lawyer in the same case and then attempt to hide that fact from his adversary, mediators, and the courts.  Beasley Allen's conduct "*is* prejudicial to the administration of justice." RPC 8.4(d) (emphasis added).  It should be disqualified.[13]

### D.    Beasley Allen Should Be Removed From The PSC.

Disqualification will mean that Beasley Allen is no longer a part of the PSC, and the Court need not separately address whether to remove members of the firm from being a part of it.  But considering removal from the PSC separately from the

---

[13] Although Beasley Allen has violated multiple ethical rules, it is also wrong that an express rule violation is required for the Court to order disqualification.  *See Voigt*, 89 F.3d at 1076 n.12 (disqualification "need not be ... predicated on a finding of a specific RPC violation"); *Shaikh v. Germadnig*, 2022 WL 16716116, at *3 (D.N.J. Nov. 4, 2022) ("specific violation is not a prerequisite for disqualification" (quotations omitted)); *In re Commitment of W.W.*, 245 N.J. 438, 449 (2021) (where literal interpretation of statute would lead results inconsistent with its overall purpose, that interpretation should be rejected).

grounds for disqualification, there is no question the Court should exercise its "inherent power" to do so.  *Plaintiffs' Baycol Steering Comm. v. Bayer Corp.*, 419 F.3d 794, 797 (8th Cir. 2005); *see also In re Terrorist Attacks on Sept. 11, 2001*, 2023 WL 4561766, at *13-14 (S.D.N.Y. July 17, 2023).

There is no singular standard under which a court must evaluate removing an attorney from a PSC.  *See In re Gen. Motors LLC Ignition Switch Litig.*, 2016 WL 1441804, at *6 (S.D.N.Y. Apr. 12, 2016).  But it stands to reason that because removal from a steering committee is a lesser sanction than disqualification, the standard for removal is lower.  And that is borne out in the case law, as courts have removed attorneys from steering committees for reasons not approaching ethical misconduct, such as poor performance.  *See In re Merscorp Inc., Real Est. Settlement Procs. Act Litig.*, 2007 WL 4166128, at *1 (S.D. Tex. Nov. 20, 2007).

Beasley Allen's multiple ethical lapses have compromised its ability to lead this MDL.  Its lawyers' half-truths and omissions to this Court and J&J about their collaboration with J&J's former counsel have severely compromised their ability to "work cooperatively with opposing counsel and the court."  Manual for Complex Litigation § 10.224 (4th ed. 2023).  And Beasley Allen has compromised its ability "to command the respect of [its] colleagues," not only because of this ethical fiasco, but because it admitted to prejudicing the rights of all plaintiffs in this litigation by sharing privileged and confidential information with a potential adversary.

Birchfield testified repeatedly that, in its "leadership role in the MDL," Beasley Allen's attorneys viewed themselves as having a "fiduciary duty to the other [talc] claimants and their counsel."  5/3 Tr. 82:18-21, 126:5-7.  Yet in the LTL-2 mediation, Birchfield, O'Dell, and Niall Davies, all of Beasley Allen, shared privileged and confidential information from ovarian cancer plaintiffs and their counsel with Conlan, who Birchfield claims was at the time "a potential future adversary."  *Id.* at 127:24-128:5.  That is a significant lapse in judgment that irreparably compromises Beasley Allen's continued leadership in this MDL.

Its greatest lapse in judgment, however, was in not turning Conlan away.  New Jersey's ethical rules prohibit side switching, full stop.  Beasley Allen has acknowledged it could not have retained Conlan.  And it has acknowledged that in New Jersey, a lawyer cannot do indirectly what is prohibited directly.  Beasley Allen has all but admitted it should not have allied itself with J&J's former lawyer to work adversely to J&J.  That should end this matter.

## CONCLUSION

For the foregoing reasons, J&J respectfully requests that this Court grant J&J's motion to disqualify Birchfield and Beasley Allen from this litigation or remove Beasley Allen from the PSC.

Dated: May 17, 2024

Respectfully submitted,

*/s/ Stephen D. Brody*
Stephen D. Brody
O'MELVENY & MYERS LLP
1625 Eye Street N.W.
Washington, DC 20006
Tel.: 202-383-5300
sbrody@omm.com

Susan M. Sharko
FAEGRE DRINKER BIDDLE & REATH
LLP
600 Campus Drive
Florham Park, NJ 07932
Tel.: 973-549-7000
susan.sharko@faegredrinker.com

*Attorneys for Johnson & Johnson and LTL*
*Management, LLC n/k/a LLT Management*
*LLC*