# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE: JOHNSON & JOHNSON TALCUM POWER PRODUCTS MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | No. 3:16-md-02738-MAS-RLS |

## DEFENDANTS JOHNSON & JOHNSON AND LLT MANAGEMENT LLC'S MOTION TO COMPEL INSPECTION OF DR. WILLIAM LONGO'S LABORATORY

## TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ................................................................................... ii
INTRODUCTION .................................................................................................. 1
BACKGROUND ................................................................................................... 3
LEGAL STANDARD ............................................................................................ 8
ARGUMENT ......................................................................................................... 9
CONCLUSION ....................................................................................................15

## TABLE OF AUTHORITIES

**Case**                                         **Page(s)**

*Cuno Inc. v. Pall Corp.*,
  116 F.R.D. 279 (E.D.N.Y. 1987) ........................................................................9

*E.E.O.C. v. Supervalu, Inc.*,
  2010 WL 5071196 (N.D. Ill. Dec. 7, 2010) .....................................................8, 9

*In re Garlock Sealing Techs., LLC*,
  504 B.R. 71 (Bankr. W.D.N.C. 2014) ................................................................3

*In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Prods. Litig.*,
  509 F. Supp. 3d 116 (D.N.J. 2020) .....................................................................1

*L.G. Philips v. Tatung Co. of America*,
  2005 WL 8157808 (C.D. Cal. Jan. 11, 2005) .............................................. 14, 15

*Nat'l Mfg. Co. v. Janed Enterprises, Inc.*,
  2013 WL 12470870 (D.N.J. July 3, 2013) ..........................................................9

### Other Authorities

Fed. R. Civ. P. 26 ................................................................................................8, 9

Fed. R. Civ. P. 34 ..........................................................................................1, 8, 9

Defendants Johnson & Johnson and LLT Management LLC (hereafter, "Defendants") submit this brief pursuant to Federal Rule of Civil Procedure 34(a)(2) to compel Plaintiffs' expert Dr. William Longo to make his laboratory available for inspection.

## INTRODUCTION

Dr. William Longo is one of Plaintiffs' testing experts, and a testifying expert in the bellwether cases. Dr. Longo tested bottles of Johnson's Baby Powder and claims he found asbestos in the bottles—a key issue in the cases pending in this MDL and one that will be a central focus of certain Rule 702 motions.

In connection with the first round of Rule 702 rulings in this MDL regarding Dr. Longo's talc testing, the Court concluded that "Dr. Longo's PLM [polarized light microscopy] methodology is unreliable because it was replete with subjectivity and reproducibility problems." *In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Prods. Litig.*, 509 F. Supp. 3d 116, 155 (D.N.J. 2020).

In order to sidestep this decision, Dr. Longo now uses a new PLM method, but his new method is even worse on the very same grounds than the prior one. Dr. Longo now claims to find "chrysotile" asbestos using PLM in nearly 100% of bottles of cosmetic talc he tests, regardless of mine source or manufacturer. But even another plaintiffs-side expert in cosmetic talc litigation agrees that what is really going on is that Dr. Longo is simply finding talc in the talc—and calling it chrysotile.

1

Defendants request an inspection of Dr. Longo's lab so that defense experts and Dr. Longo can look at the same particles at the same time and under the same microscope. The critical issue relevant to this request is Dr. Longo's insistence that only he and his analysts, using their equipment in their own lab (MAS), can undertake his new method and reach the conclusions he reaches. Dr. Longo has repeatedly and adamantly avoided questions regarding his testing methods and results based on the imaging that he has produced in reports and at deposition by claiming he would have to be *physically at an MAS microscope looking at a particle in real time in order to explain the basis for his opinions*. As one of many examples, when asked to identify a particle in his report, he testified: "**I'd have to be looking in the microscope at it to tell you what that is**." Ex. L, Longo *Valadez* Dep. 55:17-56:14. Defendants' request is therefore time sensitive because it concerns the reliability of Dr. Longo's testing method—which is at the heart of the upcoming Rule 702 briefing.

Since Dr. Longo claims that viewing the particles in his microscope live is necessary to ascertain whether a particle is talc or asbestos, Defendants request an order permitting an inspection of Dr. Longo's lab. Specifically, Defendants request an opportunity for defense experts to observe the lab's analysis in real time, so they can make contemporaneous observation of the same samples on the same PLM equipment used by MAS.

## BACKGROUND

Plaintiffs' expert Dr. Longo is the President and a 75% owner of his lab Material Analytical Services, LLC ("MAS"). 95% of the time that he is in court, Dr. Longo is testifying for plaintiffs' attorneys in asbestos litigation. Ex. A, Longo 2/7/19 *Leavitt* Tr. 178:20-23.

Courts have excluded Dr. Longo's opinions on numerous occasions. In some instances, they have called his work "junk science" and "pseudo-science at best." Ex. B, *In re Lamar Cty. Order* (Tx. Dist. Ct. July 5, 2001) at 1; *In re Garlock Sealing Techs., LLC*, 504 B.R. 71, 80 (Bankr. W.D.N.C. 2014). One court elaborated: "Re-reading Dr. Longo's testimony reveals it to be practiced and to employ misdirection and evasiveness. It is at best disingenuous, not credible and unsupported by any respectable community of scientists." Ex. B, *In re Lamar Cty. Order* (Tx. Dist. Ct. July 5, 2001) at 12.

Dr. Longo began testing talc for asbestos for purposes of cosmetic talc litigation in late 2016. Ex. C, Longo 9/4/2019 *Cabibi* Tr. 2759:14-19. For years, he never found a type of asbestos known as chrysotile in cosmetic talc. *See* Ex. D, Longo *Rimondi* Tr. 140:14-141:8. Then in 2020, Dr. Longo began using a new method using polarized light microscopy (known as "PLM")—despite previously testifying that "the PLM method is not appropriate to do an evaluation for these types of products" (i.e. talcum powder products). Ex. W, Longo *Weirick* 8/24/18 Tr.

3

2921:25-28. In fact, Dr. Longo testified at least as of January 2019 that he had never "personally analyzed a [talc] sample for the presence of asbestos using PLM." Ex. E, Longo *Young* Dep. 85:18-20. As he put it then, "I don't do PLM analysis." *Id.* at 86:5-6. (MAS analysts did the actual testing.)

Dr. Longo now claims to find chrysotile using PLM in nearly 100% of cosmetic talc bottles he tests. Ex. F, Longo *Forrest* Dep. 138:9-18. He says that "[a]ny bottle that was sold in North America that used a mine source for cosmetic talc in North America will have some level of asbestos in it." Ex. G, Longo *Eagles* Dep. (Vol. III) 449:12-21.

As even an expert often on the *plaintiffs'* side of cosmetic talc litigation explains, the reason Dr. Longo is finding "chrysotile" in every talc bottle is because he is misidentifying talc as asbestos. In other words, Dr. Longo is simply finding talc in the talc—but calling it asbestos. Frequent plaintiffs' expert Mr. Lee Poye testified: "Q. In your opinion, what do those photos that Dr. Longo claims is chrysotile from that -- from his PLM analysis, what are those structures? A. The edge of talc plates." Ex. H, Poye *McNeal* Dep. 128:20-129:6. No one who has reviewed MAS's imaging has been willing to go on record to agree that MAS is finding chrysotile by PLM. Ex. V, Longo *MDL* (Vol. 1) Dep. 122:16-123:12.

Under the PLM method that Dr. Longo uses, the mineral type of a particle is determined by identifying the color that the particle appears under the microscope

4

after coating it in a particular oil. *See* Ex. F, Longo *Forrest* Dep. 72:15-17, 75:23-76:9. More specifically, PLM analysis performed at MAS relies on analysts correctly identifying the specific shade of color seen under the microscope, matching those colors up to a chart, and then reporting values that are used to identify whether the microscopic particles viewed are asbestos, talc, or some other mineral.

So for example, the ISO (International Standards Organization) protocols that Dr. Longo claims at least in part to follow state that talc in parallel orientation[1] should be a pale yellow. Ex. I, ISO 22262-1 at 28; Ex. J, Longo *Eagles* Dep. (Vol. II) 245:5-17. Chrysotile asbestos, by contrast, should appear purple in parallel, though colors can range from deep orange to blue. Below is an image of a sample particle and the color range for chrysotile in parallel from the ISO protocols:



---

[1] Particles are evaluated by PLM in both a "parallel" and "perpendicular" orientation, with each producing a different color.

5

Case 3:16-md-02738-MAS-RLS   Document 32227-1   Filed 05/21/24   Page 9 of 19 PageID: 183486



Ex. I, ISO 22262-1 at 41-43.

In order to call particles "chrysotile," Dr. Longo's lab incorrectly reports the colors of the particles. Take for example this particle below:[2]



Ex. K, Longo *Valadez* Report at 33. Dr. Longo admitted that particle is "brownish gold." Ex. J, Longo *Eagles* (Vol. II) Dep 263:5-18. (Talc should appear yellow.) However, Dr. Longo treats that particle as *purple* for purposes of his analysis, which

---

[2] Dr. Longo's analyst reports a numerical "refractive index" or "R.I." for the color of the particle he claims to see. Those indices correspond to particular colors. Dr. Longo's report lists this particle as R.I. 1.564, which corresponds to purple. Ex. K, Longo *Valadez* Report at 33.
6

is the color *chrysotile* should look like, such as in the ISO exemplar image above. Ex. G, Longo *Eagles* Dep. (Vol. III) at 308:4-309:7.

Additionally, for much of Dr. Longo's PLM testing for chrysotile, he claimed he was using a microscope that had a tungsten lightbulb which emitted a yellow-hued light. Ex. L, Longo *Valadez* Dep. 30:9-31:3. The colors of the particles in that testing—the key component of identifying the mineral—were therefore distorted. *See id; see also* Ex. X, *Valadez* Dep. Demonstrative at 14-15.

Even now when Dr. Longo says he is no longer using that light bulb, his images still suffer from coloration problems. Dr. Longo purports to rely in part on PLM methods authored by Dr. Shu-Chun Su. Dr. Longo has testified that Dr. Su is a "well respected scientist," "an authority in terms of mineral identification through staining techniques," and that essentially "every lab in the country" uses Dr. Su's methods for their PLM analysis. Ex. Y, Longo 7/7/21 *Prudencio* Tr. 5133:11-5134:11. But Dr. Su himself authored a report in this MDL explaining, among other things, that MAS's images are too dark. Specifically, Dr. Su says that "MAS routinely uses insufficient light intensity, as if the light intensity was suppressed." Ex. Z, Su Rpt. at 3, Exhibit C to the Su Report at 2-5. This in turn serves to distort the color the particles appear—the critical step in ascertaining the mineral type of the particles. *Id.*

7

Most critically, as discussed in more detail below, Dr. Longo has repeatedly dodged questions regarding his findings on the basis that he would need to be sitting live at the microscope to accurately confirm the aspects of the particles that would determine whether those particles are talc or asbestos.

To avoid this never-ending dodge by Dr. Longo and bring these issues of what color he is seeing to a head, Defendants served an Updated Notice of Oral and Videotaped Deposition of Dr. Longo, which included a Notice of Inspection pursuant to Fed. R. Civ. P. 34(a)(2) on April 18, 2024. *See* Ex. M. This would allow defense experts to view the same particles that Dr. Longo is viewing in real time. Plaintiffs objected. Ex. N. The parties met and conferred but were unable to reach agreement. Defendants now request on order requiring Dr. Longo to make his laboratory available for inspection.

## LEGAL STANDARD

Federal Rule of Civil Procedure 34(a)(2) permits a party to serve a request "within the scope of Rule 26(b)" to "permit entry onto designated land or other property" to order to "inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it."

A Rule 34(a) request to inspect "poses a very low hurdle." *E.E.O.C. v. Supervalu, Inc.*, 2010 WL 5071196, at *10 (N.D. Ill. Dec. 7, 2010) (internal citations and quotation marks omitted). The rule itself "requires only that such a request seek

8

information 'within the scope of Rule 26(b).'" *Id.* Rule 26(b), of course, permits "discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." A "showing of need" is accordingly not necessary. *Cuno Inc. v. Pall Corp.*, 116 F.R.D. 279, 281 (E.D.N.Y. 1987).

Some courts have said that they use "'reasonableness' as a guidepost" for Rule 34 requests to inspect. *See Nat'l Mfg. Co. v. Janed Enterprises, Inc.*, 2013 WL 12470870, at *2 (D.N.J. July 3, 2013) (granting in part request for inspection) (internal citations omitted).

## ARGUMENT

Defendants' request to inspect Dr. Longo's lab is relevant and proportional to the needs of the case. Dr. Longo now claims to find chrysotile asbestos in nearly every single bottle of cosmetic talc he tests using a method that depends on the color a particle appears.

But he has repeatedly avoided answering questions about the bases for his testing results by stating that he would have to be physically sitting at the microscope looking at a particle live to understand how he was purporting to identify chrysotile. For example:

- When asked to identify a particle in his report, Dr. Longo testified, "***I'd have to be looking in the microscope at it to tell you what that is***" and then said again: "***I'd have to be looking in the PLM scope to make a guess.***" Ex. L, Longo *Valadez* Dep. 55:17-56:14.

9

- When pressed on whether that particle was talc, he stuck to his same response: "Again, *I'd have to be looking in the microscope to make any decision on what that might be.*" *Id.* at 56:15-18.

    o A video excerpt of these first two examples is available at Ex. L.1.

- When asked why he was identifying a so-called chrysotile particle as "magenta" when it was clearly not magenta, Dr. Longo stated as part of his answer that he would "*have to be under the microscope to look at it*." Ex. L, Longo *Valadez* Dep. 61:5-62:3.

- When asked whether he was treating a different yellow "chrysotile" particle as purple for purposes of his analysis he said: "*I'd have to be sitting at the PLM scope*." *Id.* at 64:13-20.

- When asked if his lab was reporting yet another "chrysotile" particle as closer to the purple end of the light spectrum than a prior particle, Dr. Longo testified: "*I'm not looking in a microscope. I can't answer it anymore and help you out here*." *Id.* at 67:2-17.

- When asked whether he could identify numerically (by the wavelength of light per the methodology Dr. Longo claims to follow) the color on specific area of the particle Dr. Longo claimed was relevant, he testified: "*No. In order for me to do that, I would have to be sitting at the microscope*, in focus, out of focus, and look at that." *Id.* at 78:13-79:9.

- When asked what the refractive index of talc particles are, he again testified: "*I'd need to be looking in the microscope*." *Id.* at 39:17-40:14.

It is therefore critical to Defendants' defense of these cases and Rule 702 analysis for a defense expert to view the same particles as Dr. Longo at the same time in the same lab and on the same equipment so that there can be no dispute about what the particles truly look like.

Additionally, to try to explain why he was reporting yellow particles as purple, Dr. Longo claims that he is relying on the color that appears just on the *edges* of the

10

particles. However, Dr. Longo admitted that those edge colors could simply be an artifact of his images, for example if the "focus is off": "[E]very particle has some of the red around it. And *I don't know if that's just an artifact or not*." Ex. J, Longo *Eagles* Dep. (Vol. II) 256:21-257:11. Accordingly, the only way to determine the true color of the area of the particle Dr. Longo is relying on is to look live through a microscope, not at the produced images.

Indeed, the same red/purple edges Dr. Longo relies on to identify particles as "chrysotile" can routinely be seen around particles that even Dr. Longo acknowledges are talc:



See Ex. X, *Valadez* Dep. Demonstrative at 25; Ex. K, Longo *Valadez* Rpt. at 33, 34, 38, 39.

Dr. Longo has previously testified that a different method—transmission electron microscopy or "TEM"—is the best way to accurately identify chrysotile in

11

talc. *See* Ex. O, Longo *Kerkhof* Dep. 187:19-188:17. Yet Dr. Longo has refused to test the validity of his PLM work by using TEM, which if faithfully applied could conclusively determine whether the particles at issue are talc or asbestos. Ex. P, Longo *Clark* Dep. (Vol. II) 206:7-11.

Defendants' request is also necessary and reasonable because they cannot replicate Dr. Longo's PLM method. In fact, the *only* way to view the particles at-issue without distorted lighting is to view them through the microscope in Dr. Longo's lab. First, as discussed above, the lighting MAS uses to take images of the particles distorts the particles' color—and the particles' color is the critical step to identifying the minerals in this PLM method.

Second, the slides with the samples that MAS looks at under the microscope degrade in relatively short order. Ex. Q, 3/15/23 *Valadez* CMC Tr. at 54:5-6. For example, Defendants requested Dr. Longo's slides in the *Valadez* case in California state court days after Dr. Longo issued his report in that case. Ex. R, 3/9/23 Letter. But Defendants were later informed those slides were no longer usable at that time. Ex. S, 3/23/23 CMC Tr. at 55:15-21. In other words, the only way for defense experts to look at the same particles MAS is looking at in the same way is to view them live under the microscope at the same time as Dr. Longo.

Third, Dr. Longo's methodology cannot be replicated because it is constantly in flux. *See* Ex. P, Longo *Clark* Dep. 197:24-227:15. He has invented his own PLM

12

method that has never been subject to peer review. Ex. F, Longo *Forrest* Dep. 126:10-13; *see also id.* at 59:6-17. In February 2020, Dr. Longo testified before the FDA that he had "cracked the code" for testing talc for chrysotile. Ex. T, Longo 2/4/20 FDA Tr. 176:19-177:5. Part of that method at the time involved using an iodine solution to stain the samples, claiming to follow a 1974 preparation protocol from the Colorado School of Mines. Ex. U, Longo *Zimmerman* Dep. 191:22-192:8, 192:20-23. But he later admitted "We're not using iodine anymore" because "[t]hat did not work." Ex. F, Longo *Forrest* Dep. 59:9-12.

Other parts of the method have changed over time as well. For example, the type of oil used to coat the sample has changed, which affects the color the particle appears. *See, e.g.*, Ex. P, Longo *Clark* (Vol. II) Dep. 209:21-23, 221:15-17 (1.550 oil vs. 1.560 oil). Which part of the sample is used for the testing has changed. *See, e.g. id.* at 208:5-8, 209:12-14 (heavy fraction vs. light fraction). The approach to using a centrifuge has also changed. *See, e.g. id.* at 199:24-200:3, 217:19-25 (500 RPM and 1800 RPM for 10 minutes each at room temperature vs. vigorous shaking for 10-20 seconds followed by 2,000 RPM for 72 hours at 15°C).

Dr. Longo even testified in his May 2, 2024 deposition in this MDL that for his PLM testing, he hasn't "finished the standard operating procedures because we keep doing research and changing slight – slight conditions." Ex. V, Longo *MDL* (Vol. I) Dep. 47:6-13. He additionally testified that his PLM methodology is not

13

ready to be published in a peer-reviewed journal. *Id.* at 118:5-119:7; *see also* Ex. AA, Longo Chapman Dep. 607:5-15 (agreeing in 2022 his method was still in the "beta phase"). And he disagreed that "submitting [his] methods to the scrutiny of the larger scientific community is a component of good science." Ex. V, Longo *MDL* (Vol. I) Dep. 124:16-24.

Defense experts need to visit Dr. Longo's lab to see the particles Dr. Longo claims are asbestos at the same time he is looking at them. This way, the defense can respond to Dr. Longo's deflections that one would need to be live at the microscope to answer critical questions about those particles. An inspection would allow the defense to evaluate the particles without potential distortions or "artifacts" resulting from the still images taken of the particles. And it would permit defense experts to view the particles under the exact same lighting conditions MAS is using in its lab and with Dr. Longo's own sample preparation method. Nor would an inspection pose any undue burden on Plaintiffs or MAS.

In short, since Dr. Longo testifies differentiating between talc and chrysotile asbestos requires him to be sitting at his microscope live, then the defense deserves an opportunity to examine those supposed chrysotile particles live in that same manner. By Dr. Longo's own admission, the still images he produces are not sufficient to understand the bases for his opinion. *See L.G. Philips v. Tatung Co. of America*, 2005 WL 8157808, at *2 (C.D. Cal. Jan. 11, 2005) ("Irrespective of

whether documents produced already contain a written description detailing the manufacturing process, viewing defendant's manufacturing process is clearly relevant or, at a minimum, reasonably calculated to lead to the discovery of admissible evidence") (internal citation omitted); *see also id.* ("[T]he mere fact that defendant CPT has already produced thousands of pages of documents in discovery does not establish that plaintiffs are already in possession of the same information that they would obtain from the plant inspections.").

## CONCLUSION

Defendants request that the following be made available for inspection:

1. All PLM microscopes used by MAS at 3945 Lakefield Ct, Suwanee, GA 30024 for its analysis of the materials referenced in Defendants' requests for production 20-24 (attached hereto as Exhibit M at 10-12);

2. MAS's methodology for preparing the materials referenced in Defendants' requests for production 20-24 (Ex. M at 10-12) for subsequent analysis by PLM for the identification of "chrysotile," including but not limited to observing in real time the preparation of one or more samples of Johnsons Baby Powder performed by MAS; and

3. MAS's methodology for analyzing the materials referenced in Defendants' requests for production 20-24 (Ex. M at 10-12) for analysis by PLM for the identification of "chrysotile," including but not limited to observing in real time the analyses performed by MAS on the samples of Johnsons Baby Powder, as well as Defendants' experts undertaking real time, contemporaneous observation of the samples on the same PLM equipment used by MAS in which MAS has previously reported, and may during the inspection report, observing "chrysotile."

Dated: May 21, 2024            Respectfully submitted,

/s/ *Susan M. Sharko*
Susan M. Sharko

**FAEGRE DRINKER BIDDLE & REATH LLP**

Attorneys for Defendants Johnson & Johnson and LLT Management, LLC