# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE: JOHNSON & JOHNSON TALCUM POWER PRODUCTS MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | No. 3:16-md-02738-MAS-RLS |

## DEFENDANTS' OPPOSITION TO THE PLAINTIFF STEERING COMMITTEE'S MOTION TO QUASH OR FOR PROTECTIVE ORDER REGARDING SUBPOENA DIRECTED AT PAUL HESS

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ...................................................................... ii

INTRODUCTION ................................................................................ 1

BACKGROUND ................................................................................. 3

ARGUMENT ..................................................................................... 9

    I.    A Deposition Of Mr. Hess Is Relevant And Proportional To The Needs Of The Case. ....................................................... 9

    II.   Rule 26(b)(4)(D) Is No Bar To A Deposition Of Mr. Hess. ............... 12

        A.    The "Exceptional Circumstances" Standard Does Not Apply.     13

        B.    Even If The "Exceptional Circumstances" Standard Applied, It Would Be Met Here.     16

    III.   The PSC's Privilege Objections Are Moot. ........................................ 18

CONCLUSION ................................................................................. 19

i

# TABLE OF AUTHORITIES

**Case**                                                                                    **Page(s)**

*Bank Brussels Lambert v. Chase Manhattan Bank, N.A.*,
    175 F.R.D. 34 (S.D.N.Y. 1997) ........................................................................17

*Derrickson v. Cir. City Stores, Inc.*,
    No. DKC 95-3296, 1999 WL 1456538 (D. Md. Mar. 19, 1999). ....13, 14, 16, 17

*Dura Automotive Sys. Of Indiana, Inc. v. CTS Corp.*,
    285 F. 3d 609 (7th Cir. 2002) .........................................................................15

*Hartford Fire Ins. Co. v. Pure Air on the Lake Ltd. P'ship*,
    154 F.R.D. 202 (N.D. Ind. 1993)...............................................................16, 17

*Herman v. Marine Midland Bank*,
    207 F.R.D 26 (W.D.N.Y. 2002) ......................................................................14

*Kaisha v. Lotte Int'l Am. Corp.*,
    No. 15-cv-05477, 2019 WL 13258468 (D.N.J. Jan. 23, 2019) .........................15

*Lowery v. Cir. City Stores, Inc.*,
    158 F.3d 742, (4th Cir. 1998), cert. granted, judgment vacated, 527
    U.S. 1031 (1999)......................................................................................15, 16

*Oracle Am., Inc., v. Google, Inc.*,
    No. 10-cv-3561 .................................................................................................15

*TCL Commc'ns Tech. Holdings Ltd. v. Telefonaktenbologet LM
Ericsson*,
    No. SACV-14-00341, 2016 WL 6662727 (C.D. Cal. July 7, 2016). ................13

*Vopak N. Am. Inc.*,
    No. 16-cv-06526, 2018 WL 10561115 (C.D. Cal. Sept. 14, 2018)....................15

**Other Authorities**

Fed. R. Civ. P. 26(b) ...........................................................................*passim*

Defendants Johnson & Johnson and LLT Management LLC submit this opposition to the Plaintiffs' Steering Committee's ("PSC") Motion To Quash Or For Protective Order Regarding Subpoena Directed At Paul Hess (ECF No. 32195).

## INTRODUCTION

Dr. William Longo is Plaintiffs' primary testing expert. He has tested bottles of Johnson's Baby Powder and claims to find asbestos. In the first round of Rule 702 motions adjudicated in this MDL, the Court ruled that Dr. Longo's polarized light microscopy ("PLM") testing was not reliable. In response, Dr. Longo began using a new PLM method and now claims to find "chrysotile" asbestos in nearly 100% of bottles of cosmetic talc he tests—a type of asbestos he previously had never found in any of his prior testing.

Most often, however, it is not Dr. Longo who actually conducts this new, 2-to-6-hour PLM analysis. Rather, an analyst in his lab and the subject of this motion, Paul Hess, is the one who actually looks through the microscope. Under the PLM methodology at issue, correctly identifying the mineral type of a particle is dependent on accurately identifying the color that the particle appears under the microscope when coated in a particular oil. In the majority of instances, it is Mr. Hess who is making the critical color determinations that govern the result of the analysis.

Importantly, Dr. Longo himself has testified that he cannot independently verify Mr. Hess's conclusions based on the images provided in his own report (images taken by Mr. Hess). Dr. Longo has repeatedly dodged questions regarding the conclusions and methods from his report by claiming he would have to be looking at the particle through the microscope in order to answer the question. Just last week, Dr. Longo offered similar testimony at a New Jersey state court hearing on the admissibility of his opinions: "[Q.] [I]f you're claiming to see some sort of edge effect here that you're basing your purple color on but it's an artifact, then your entire analysis is wrong? A. No, this analysis is not wrong. This is chrysotile ***and I would need to be looking at the microscope here.*** I stand by this. It's not wrong." Ex. A, Longo *Clark* Hr'g (Vol. I) 118:20-119:3 (emphasis added).

In other words, Dr. Longo is saying he cannot tell if his "entire analysis is wrong" without looking through the microscope himself. As the cross-examination on the reliability of his testing continued, Dr. Longo returned time and again to this tactic. *See infra* n. 4.[1]

But if it was not Dr. Longo but Mr. Hess who looked at a particular particle through the microscope and made a determination concerning its identification, then it is Mr. Hess who should answer questions concerning the findings. Again, such a

---

[1] Thus, the J&J Defendants also have moved to inspect the lab and microscope at MAS, and Dr. Longo as he works, so these pending questions concerning his methodology can finally be asked and answered.

conclusion is entirely consistent with Dr. Longo's own view of the world. Dr. Longo has testified that correctly identifying asbestos through PLM is a judgment call based on years of experience, and that it is Mr. Hess, not Dr. Longo, who has the true expertise. Dr. Longo has never taken a course in using PLM to detect asbestos and has testified: "I don't do PLM analysis." Ex. B, Longo *Young* Dep. 86:5-6. Mr. Hess, by contrast, has been doing PLM analysis for approximately 40 years.

In short: (1) Mr. Hess is the one with the relevant PLM expertise that goes to the very heart of the methodology; (2) it is Mr. Hess who most often conducts the analysis that leads to Dr. Longo's opinion; and (3) Dr. Longo has stated time and again that he cannot independently verify Mr. Hess's conclusions. Under these circumstances, Defendants' request to depose Mr. Hess is not only entirely appropriate, but critical to examining Dr. Longo's methodology on a *Daubert* challenge.[2]

## BACKGROUND

### Dr. Longo and MAS

Plaintiffs' expert Dr. Longo is the President and a 75% owner of his lab, MAS. For years, MAS never found a type of asbestos known as chrysotile in cosmetic talc.

---

[2] In fact, a state court previously ordered a deposition of Mr. Hess for these very reasons, though the case resolved before that deposition could take place. Ex. G, *Material Analytical Services, LLC v. Johnson & Johnson, et al.,* Civ. No. 23106785 (Sup. Ct. Ga. Oct. 20, 2023) Order at 2.

*See* Ex. C, Longo *Rimondi* Tr. 140:14-141:8. MAS then began using a new PLM method—despite Dr. Longo previously testifying that "the PLM method is not appropriate to do an evaluation for these types of products," i.e. talcum powder products. Ex. D, Longo *Weirick* Tr. 2921:25-28. Now MAS claims to find chrysotile using PLM in nearly 100% of cosmetic talc bottles it tests. Ex. E, Longo *Forrest* Dep. 138:9-18. Indeed, Dr. Longo says that "[a]ny bottle that was sold in North America that used a mine source for cosmetic talc in North America will have some level of asbestos in it." Ex. F, Longo (Vol. III) *Eagles* Dep. 449:12-21.

### *PLM Analysis*

The type of PLM analysis MAS is performing turns on accurately identifying the color the particle appears under the microscope after coating it in a particular oil. Ex. A, Longo *Clark* Hr'g 48:4-8; Ex. E, Longo *Forrest* Dep. 72:15-17, 75:23-76:9. The analyst matches the color they identify to a color chart, which is used to identify that color's corresponding wavelength of light. Ex. A, Longo *Clark* Hr'g 48:9-18. Then the analyst matches the wavelength to a "refractive index" (or "RI") value using a particular set of tables. *Id.* at 48:19-49:1. And then the RI value used to identify what mineral the particle is. The graphic below reflects the steps for this process for a reference standard for chrysotile asbestos from the International Standards Organization.



*Id.* at 48:14-18, 113:12-18.

Because Mr. Hess records the RI values for the particles that he claims are chrysotile, this process can be reversed to determine the color he claimed to see under the microscope. For example, Mr. Hess reported the yellow particle below as having an RI value of 1.564, which corresponds to purple. *Id.* at 110:22-111:23.



*See* Ex. H, MAS *Valadez* Rpt. at 32.

### PLM Requires Specialized Expertise And The Judgment Of The Analyst

Dr. Longo has testified that in order to identify asbestos in talc by PLM, there "has to be an analyst doing the PLM that has experience in looking at these types of materials, so a lot of years" because doing the analysis properly "just depends on the experience and time and individual doing it." Ex. I, Longo *Rimondi* Dep. 125:11-13, 124:20-21. In fact, he's said an analyst "would have to have decades of experience." Ex. J, Longo *Reyes* (Vol. II) Dep. 129:12-13. In Dr. Longo's view, using a "a regular PLM setup with a PLM analyst that's not experienced in looking at this, he may never find it." Ex. K, Longo *Zimmerman* (Vol. II) Dep. 374:16-18.

That's because the ability to accurately identify the color of a particle—a key PLM step—is a "judgment that comes from years and years of experience." Ex. E, Longo *Forrest* Dep. 73:11-13. Dr. Longo even believes that whether PLM analysis is "subjective depends on the analyst who's performing the analysis." Ex. L, Longo *Streck* Dep. 123:2-6; *see also id* at 123:14-15 (testifying that the level of subjectivity "just depends on your training and how much experience you've got.").

### Dr. Longo Is Not A PLM Analyst.

In 2018, Dr. Longo testified: "I haven't done PLM in such a long time." Ex. M, Longo *Allen* (Vol. I) Dep. 61:2-3. At least as of 2019, he had never "personally analyzed a [talc] sample for the presence of asbestos using PLM." Ex. B, Longo *Young* Dep. 85:18-20. As he put it then, "I don't do PLM analysis." *Id.* at 86:5-6.

6

When asked if he was "an expert in PLM," Dr. Longo responded only: "I think I know more than the average layperson." Ex. N, Longo 2/5/2019 *MDL* Dep. 262:13-15.

Dr. Longo has not taken any courses on using PLM to detect asbestos. *Id.* at 261:9-13. He has not taken any classes in PLM dispersion staining, the specific color-based PLM methodology that MAS claims to follow. Ex. O, Longo *Lanzo* (Vol. II) Dep. 278:8-10. He describes himself as "self-taught" in PLM. *Id.* at 278:11-13.

Rather, Dr. Longo views himself as an "electron microscopy person"—also referred to as "TEM" (transmission electron microscopy). Ex. P, Longo *Zundel* Dep. 182:20-24. He has historically "really considered [him]self a TEM analyst" because he's "done more TEM than anything." Ex. A, Longo *Clark* Hr'g 18:8-11. That kind of microscopic analysis "is not as complicated as PLM." Ex. P, Longo *Zundel* Dep. at 182:20-24. But Dr. Longo has refused to test Defendants' talc for chrysotile by TEM, even though using that type of microscope would make it "fairly simple to tell whether or not you are, in fact, looking at chrysotile as opposed to talc"—rather than relying on subtle color gradations. Ex. A, Longo *Clark* Hr'g 42:10-14; *see also* Ex. Q, Longo *Clark* (Vol. II) Dep. 206:7-11.

***Dr. Longo Relies On Paul Hess For PLM Analysis.***

Paul Hess has a degree in geology. Ex. R, Longo *Fong* (Vol. II) Dep. 214:1. He has been conducting PLM analysis for almost 40 years, and has worked at MAS for 33 of them. Ex. S, Longo *Krich* Dep. 53:3-8. Mr. Hess was trained and took a course in PLM at McCone Laboratories, which Dr. Longo has said was "literally the best lab in the country back in the 1970's and '80s." Ex. T, Longo *Hayes* Tr. 181:6-11. In fact, Mr. Hess was taught by the lab's namesake, Walter McCrone, who "was the best optical microscopist in the world" for his timeframe according to Dr. Longo. Ex. U, Longo *Von Salzen* Dep. 148:13-18; *see also* Ex. S, Longo *Krich* Dep. 53:17-22 (Walter McCrone taught course).

Testing talc for chrysotile by PLM has been "really up to one person" at MAS: Paul Hess. Ex. P, Longo *Zundel* Dep. 182:3-11. Every time MAS has reported finding "chrysotile" by PLM in Defendants' talc products, Mr. Hess has been the analyst whose name appears on the analyst worksheets. *See, e.g.*, Ex. H, MAS *Valadez* Rpt. at 24 ("Analysis By: PH").

It can take Mr. Hess "anywhere from two to six hours" to analyze one sample by PLM. Ex. V, Longo *Weirick* Dep. 21:18-21. Mr. Hess is the one "the one who's looking through the PLM microscope to make the determination of the particle's color." Ex. L, Longo *Streck* Dep. 49:14-19. Mr. Hess is the one who makes "a determination to match it to a refractive index." *Id.* Sometimes those values are

reported in a range rather than a specific number because "Mr. Hess thinks it's more accurate to do it that way." *Id.* at 108:23-109:3. Mr. Hess is also the one who selects which images make it into the report. Ex. W, Longo *Alexander-Jones* Dep. 134:24-135:1.

Dr. Longo has said that he will on infrequent occasions be called over to look at a particle, but that Mr. Hess is the one "the person that [performs the analysis] from start to finish." Ex. A, Clark Hr'g (Vol. I) 44:10-20; *see also* Ex. B, Longo Young Dep. 86:21-86:6 (Dr. Longo admits he "periodically will be asked by one of the analysts to take a look at this, what do you think").

In short, Mr. Hess is the one "identifying the particles" by PLM. Ex. W, Longo *Alexander-Jones* Dep. 135:3-8. And the slides with the talc samples that Mr. Hess analyzed are discarded shortly afterward because "they don't last within a couple of weeks." Ex. L, Longo *Streck* Dep. 53:4-13.

## ARGUMENT

**I.    A Deposition Of Mr. Hess Is Relevant And Proportional To The Needs Of The Case.**

There cannot be any genuine dispute that a deposition of Mr. Hess is *relevant*. Mr. Hess's analysis is not some ancillary issue—whether Defendants' talc contains asbestos is at the heart of the case. And Mr. Hess is the one looking down the

microscope and claiming to find chrysotile asbestos in nearly 100% of Defendants' talc products.[3]

A deposition of Mr. Hess is also proportional to the needs of the case. First, Dr. Longo has repeatedly avoided questions regarding MAS's PLM testing methodology on the ground that he would need to be looking at the particle in the microscope. For example, when asked to identify whether a particle in his report is talc or chrysotile asbestos, Dr. Longo testified, "I'd have to be looking in the microscope at it to tell you what that is" and then said again: "I'd have to be looking in the PLM scope to make a guess." Ex. X, Longo *Valadez* Dep. 55:17-56:14.[4] But

---

[3] Whatever "higher standard of relevance" (Mot. 5) that may need to normally be shown for discovery directed at third parties does not apply here where Mr. Hess is not a stranger to the litigation. His work forms the basis for Dr. Longo's chrysotile testing. In any event, Mr. Hess's work meets any standard of relevance because his work claiming to find chrysotile in Defendants' products goes to the heart of the case.

[4] *See also, e.g. id.* at 56:15-18 ("I'd have to be looking in the microscope to make any decision on what that might be."); *id.* at 61:5-62:3 ("I'd have to be under the microscope to look at it"); *id.* at 64:13-20 ("I'd have to be sitting at the PLM scope."); *id.* at 67:2-17 ("I'm not looking in a microscope. I can't answer it anymore and help you out here."); *id.* at 78:13-79:9 ("In order for me to do that, I would have to be sitting at the microscope, in focus, out of focus, and look at that."); *id.* at 39:17-40:14 ("I'd need to be looking in the microscope."); Ex. AA, Longo *Eagles* (Vol. II) Dep. 257:8-9 ("I'd have to focus in on it to see if we -- you know, the focus is off"); Ex. A, Longo *Clark* Hr'g 113:25-114:3 ("And you have to be looking under the microscope"); *id.* at 117:2-4 ("I'm not sitting at the microscope and this has been copied a few times, so it's kind of hard to debate you on it."); *id.* at 119:1-2 ("I would need to be looking at the microscope here."); Ex. AB, Longo *Clark* Hr'g (Vol. II) 290:2-8 ("I'd have to be on the microscope.").

Dr. Longo is generally *not the one* looking through the microscope at these particles—Mr. Hess is. If looking down the microscope is necessary to explain the basis for MAS's findings, then Defendants are entitled to depose the person who actually did that.

Second, Mr. Hess is the one with the real PLM expertise, not Dr. Longo. Mr. Hess has approximately 40 years of PLM experience and was trained by the world's foremost expert in optical microscopy. Dr. Longo by contrast is "self-taught," had not done PLM work in a "long time" and had never "personally analyzed a [talc] sample for the presence of asbestos using PLM" as of 2019. Ex. O, Longo *Lanzo* (Vol. II) Dep. 278:11-13; Ex. M, Longo *Allen* (Vol. I) Dep. 61:2-3; Ex. B, Longo *Young* Dep. 85:18-20.  Mr. Hess is even the one who came up with the idea of using a reference sample for a unique form of chrysotile which Dr. Longo has claimed unlocked MAS's ability to identify chrysotile in talc. Ex. Y, Longo *Powers* Dep. 75:24-76:3; Ex. Z, Longo *Weiss* Dep. at 22:7-15; Ex. A, Longo Clark Hr'g 36:10-15, 159:8-16, 160:1-8.

Finally, Mr. Hess is the one making all the key decisions. He's the one determining the particle's color and matching it to its corresponding RI value—the critical steps in the analysis. Ex. L, Longo *Streck* Dep. 49:14-19. As part of that, he is the one choosing what *area* of the particle to use for the color match. And Dr. Longo cannot independently verify Mr. Hess's conclusions because Dr. Longo says

he needs to be at the microscope to preform that verification, which he did not do. And there is no longer any opportunity for Dr. Longo to make his own observations because the slides have long since degraded and been discarded.

Mr. Hess is also making some of the smaller but still important decisions. For example, he is responsible for selecting the images that make it into the report. Ex. W, Longo *Alexander-Jones* Dep. 134:24-135:1. And Mr. Hess is the one controlling the illumination through a small wheel on the microscope. *See* Ex. A, Longo *Clark* Hr'g 90:14-15. It appears as if Mr. Hess is not using enough light intensity, which would distort the color the particles appear and therefore distort the entire analysis. Ex. AC, Su Rpt. at 3, Exhibit C to the Su Report at 2-5.

The PSC's argument that the subpoena is "unduly burdensome, oppressive, and harassing" (Mot. 9) is simply a rehash of its argument that the subpoena is "neither relevant to this MDL nor proportional to the needs of the case" (*Id.*). The PSC did not offer any explanation or evidence that a single deposition would be burdensome, and that argument should be rejected for all the same reasons discussed above.

## II.   Rule 26(b)(4)(D) Is No Bar To A Deposition Of Mr. Hess.

Rule 26(b)(4)(D)'s "exceptional circumstances" standard does not apply to a deposition of Mr. Hess. *Infra* § A. And even if that standard did apply, it would be satisfied here. *Infra* § B.

### A.    The "Exceptional Circumstances" Standard Does Not Apply.

"Exceptional circumstances" under Rule 26(b)(4)(D)(ii) are not required for a deposition of Mr. Hess. That rule does not apply to "testimony regarding work that went directly into the testifying expert's report." *TCL Commc'ns Tech. Holdings Ltd. v. Telefonaktenbologet LM Ericsson*, 2016 WL 6662727, at *5 (C.D. Cal. July 7, 2016). "When a non-testifying expert's work forms the substance of a report of the testifying expert, that non-testifying expert may be subjected to deposition as an appropriate means of testing the reliability of the report." *Id.* at *4.

In *TCL Communications*, the defendant sought to depose analysts concerning their methodology and the accuracy of their analyses relating to cell-phone standards, which supported portions of the testifying experts' reports. *Id.* at *4-5. The court held that imposing the exceptional circumstances requirement would not be appropriate: "[T]here is a distinction between requesting deposition testimony from non-testifying experts for work they did that implicates Federal Rule of Civil Procedure 26(b)(4)(D) and testimony that would not implicate Rule 26(b)(4)(D)." Id. at *5 (internal citation omitted). "The testimony that would not implicate 26(b)(4)(D) is the testimony regarding work that went directly into the testifying expert's report"—just like Mr. Hess' work here. *Id.*

Numerous other courts have permitted depositions of a testifying's expert's assistant. *Derrickson v. Circuit City Stores* is an employment discrimination case.

The employee's testifying expert based his opinions on the employer's data contained in tables prepared by the testifying expert's assistant. *Derrickson v. Cir. City Stores, Inc.*, 1999 WL 1456538, at *7 (D. Md. Mar. 19, 1999). The tables did not contain raw data, but rather interpretive data that—similar to Mr. Hess's work— had been "subjected to various selection, aggregation and weighting processes" done by the testifying expert's assistant. *Id. Derrickson* found that the testifying expert and the non-testifying assistant had "worked hand-in-glove, and the fruits of their labor [we]re indivisible"—as with Dr. Longo and Mr. Hess. *Id.* Concluding that the employer couldn't adequately cross-examine the testifying expert without knowing "how [the] assistant manipulated the data," the court held that the assistant under these circumstances did not fall under Rule 26(b)(4)(D)[5] for "work of a so-called 'non-testifying' expert."[6] *Id*. The employer was "entitled to know what [the] assistant did" and was permitted to depose the assistant. *Id.* at *7-8.

Other federal cases similarly support a deposition here without the need to find "exceptional circumstances" where Mr. Hess' work as an expert involved independent specialization and scientific judgment that is inseparably entwined with Longo's analyses without the need to analyze. *See, e.g., Herman v. Marine Midland*

---

[5] At the time, the provision was in Rule 26(b)(4)(B).

[6] As discussed below, the Court also held, in the alternative, that the result would be the same even if Rule 26(b)(4)(D) applied.

*Bank*, 207 F.R.D 26, 30-32 (W.D.N.Y. 2002) (rejecting application of Rule 26(b)(4) and ordering deposition of non-testifying assisting expert due to his "substantial collaborative work" and "substantial assistance to [the testifying expert] in preparing the expert report," which the employing party relied on in litigation); *Dura Automotive Sys. Of Indiana, Inc. v. CTS Corp.*, 285 F. 3d 609, 612-13 (7th Cir. 2002) ("The opposing party can depose [expert's assistants] in order to make sure they performed their tasks competently."); Ex. AD, *Oracle Am., Inc., v. Google, Inc.*, No. 10-cv-3561, ECF No. 1717 (N.D. Cal. Apr. 22, 2016) (ordering deposition of testifying expert's assistant in response to motion to exclude testifying expert).[7]

The three cases the PSC includes in a single string cite do not apply here. *See* Mot. 8. In *Kaisha,* the court precluded depositions of an expert's assistants because they performed merely "ministerial tasks" *Kaisha v. Lotte Int'l Am. Corp.*, 2019 WL 13258468, at *3 (D.N.J. Jan. 23, 2019). In *Vopak*, the party seeking the deposition could not, among other things, identify the "specific deficiencies in [the testifying expert's] report or knowledge." *Vopak N. Am. Inc.*, 2018 WL 10561115, at *1 (C.D. Cal. Sept. 14, 2018). *Lowery* did not even involve a deposition request. *Lowery v.*

---

[7] *See also* Ex. AE, *Oracle Am., Inc., v. Google, Inc.*, Motion to Exclude Testimony From Dr. Kemerer, ECF 1557 (March 23, 2016) (arguing that the testifying expert was "spoon-fed the facts, data, and substantive analyses that serve as the basis for his" opinions).

*Cir. City Stores, Inc.*, 158 F.3d 742, 765 (4th Cir. 1998), cert. granted, judgment vacated, 527 U.S. 1031 (1999).

Those cases are nothing like the situation here. As discussed above, Mr. Hess's work went directly into Dr. Longo's reports and forms the substance of the work in the reports. In fact, Mr. Hess's PLM worksheets are literally a part of Dr. Longo's reports. And critically, Dr. Longo could not himself independently verify the work of Mr. Hess based on the information and images provided in the report.

Defendants need not show "exceptional circumstances," and a deposition of Mr. Hess is warranted.

## B.   Even If The "Exceptional Circumstances" Standard Applied, It Would Be Met Here.

Even if this Court were to conclude that Rule 26(b)(4)(D)'s exceptional circumstances were applicable, a deposition of Mr. Hess meets that standard. Rule 24(b)(4)(D) expressly permits discovery where "it is impracticable for the party to obtain facts or opinions on the same subject by other means." "[T]he Rule is not an impenetrable fortress against discovery." *Hartford Fire Ins. Co. v. Pure Air on the Lake Ltd. P'ship*, 154 F.R.D. 202, 207 (N.D. Ind. 1993).

In *Derrickson*, the court concluded that "[e]ven if the court considered Dr. Medoff's assistant to be a non-testifying expert, the result would be the same." *Derrickson*, 1999 WL 1456538, at *8. The Court explained that since the information at issue was "exclusively within the assistant's cognizance, Defendant

16

[wa]s entitled to it under Rule 26(b)(4)." *Id.* Mr. Hess here similarly is the only one who looked at the particles under the necessary conditions live under the microscope.

Additionally, a "common" situation where the rule is satisfied occurs "where the object or condition observed by the non-testifying expert is no longer observable by an expert of the party seeking discovery." *Bank Brussels Lambert v. Chase Manhattan Bank, N.A.*, 175 F.R.D. 34, 44 (S.D.N.Y. 1997) (internal quotation marks omitted); *see also Hartford Fire Ins. Co*, 154 F.R.D at 208 (collecting cases). "This situation has been demonstrated where some physical condition has deteriorated enough so that one party's expert may be the only expert who actually could have fairly observed it before its deterioration." *Bank Brussels Lambert*, 175 F.R.D. 34 at 44.

Here, the slides Mr. Hess analyzed degraded quickly and have been discarded. Ex. L, Longo *Streck* Dep. 53:4-13. The images of the particles provided in MAS's report do not provide the necessary information regarding what Mr. Hess observed. According to Dr. Longo's own testimony, one would need to be looking down the microscope at the particles in order to fully understand the basis for the opinions in this case. Accordingly, even if Rule 26(b)(4)(D) were to apply, this situation presents exceptional circumstances permitting discovery.

### III.    The PSC's Privilege Objections Are Moot.

The PSC's privilege objections are directed solely at Defendants' document requests, not the deposition request. Defendants stand by their view that the documents would provide illuminating and relevant information. But in order to narrow the dispute and limit the issues this Court needs to decide, Defendants will limit their requests to those of greatest significance to the key methodological issues: the request for an inspection of MAS and the request for a deposition of Mr. Hess. Defendants therefore withdraw their document requests in the subpoena.[8]

Since Defendants are no longer pursuing the document requests through the subpoena, the PSC's privilege objections are moot. If this Court orders a deposition, any privilege objections can be raised on a question-by-question basis. Defendants note however that the PSC cites authorities stating that "[p]rotected 'communications' include those between the party's *attorney* and assistants of the expert witness," which is not at issue. *See* Mot. 10 (emphasis added). No privilege log was ever provided. Additionally, Dr. Longo has already testified regarding some communications between himself and Mr. Hess, potentially waiving any privilege that might have ever applied. *See* Ex. Y, Longo *Powers* Dep. 75:24-76:3.

---

[8] Defendants reserve the right to request these documents at a later date.

## CONCLUSION

This Court should deny the PSC's motion to quash and order a deposition of Paul Hess.

Dated: June 3, 2024

Respectfully submitted,

*/s/ Kristen R. Fournier*
Kristen R. Fournier

**KING & SPALDING LLP**
1185 Avenue of the Americas
34th Floor
New York, NY 10036
(212) 556-2100
kfournier@kslaw.com

Susan M. Sharko
**FAEGRE DRINKER BIDDLE & REATH LLP**
600 Campus Drive
Florham Park, NJ 07932
susan.sharko@faegredrinker.com

*Attorneys for Defendants Johnson & Johnson and LLT Management, LLC*

19