# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE: JOHNSON & JOHNSON TALCUM POWER PRODUCTS MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | No. 3:16-md-02738-MAS-RLS |

## REPLY IN SUPPORT OF DEFENDANTS' MOTION TO COMPEL INSPECTION OF DR. WILLIAM LONGO'S LABORATORY

## TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ................................................................................... ii

INTRODUCTION .....................................................................................................1

BACKGROUND ON RELEVANT TESTING.........................................................2

ARGUMENT .............................................................................................................4

    I.    Dr. Longo's Chosen Methodology Uniquely Requires The Requested Inspection..............................................................................4

    II.    This Court Can And Should Order Defendants' Requested Inspection. .................................................................................................10

        A.    This Court has authority to order Dr. Longo to conduct testing under the observation of Defendants............................10

        B.    This Court can order an inspection when testing is already occurring..................................................................................12

        C.    An inspection is proportional to the needs of the case and not unduly burdensome. ...........................................................13

        D.    This Court can order that Dr. Longo's testing should be excluded if he does not submit to an inspection. ......................14

CONCLUSION........................................................................................................15

## TABLE OF AUTHORITIES

**Case**                                                                                                          **Page(s)**

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993) ............................................................................................. 14

*Diepenhorst v. City of Battle Creek, et al.*,
   2006 WL 1851243 (W.D. Mich. June 30, 2006) .................................................. 10

*Holmes v. J.M. Prods., Inc., et al.*,
   2005 WL 927172 (W.D. Tenn. Jan. 7, 2005) ....................................................... 11

*Insituform Techs., Inc. v. AMerik Supplies, Inc.*,
   588 F. Supp. 2d 1349 (N.D. Ga. 2008) ................................................................ 10

*Insituform Techs., Inc. v. AMerik Supplies, Inc.*,
   2010 WL 11493292 (N.D. Ga. Feb. 19, 2010). .................................................... 10

*In re Diet Drugs Prods. Liab. Litig.*,
   2001 WL 454586 (E.D. Pa. Feb. 1, 2001) ............................................................ 14

*In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Prods. Litig.*,
   509 F. Supp. 3d 116 (D.N.J. 2020). ................................................................. 3, 15

*In re Paoli R.R. Yard PCB Litig.*,
   35 F.3d 717 (3d Cir. 1994) ................................................................................... 14

*Kemp v. Tyson Seafood Grp., Inc.*,
   2000 WL 1062105 (D. Minn. July 19, 2000) ....................................................... 14

*Ostrander v. Cone Mills, Inc.*,
   119 F.R.D. 417 (D. Minn. 1988) .......................................................................... 11

*Pizza Hut, Inc. v. Midwest Mech., Inc.*,
   1988 WL 8980 (N.D. Ill. Feb. 1, 1988) ................................................................ 11

*Rattay v. Medtronic, Inc.*,
   2007 WL 1417158 (N.D. W. Va. May 10, 2007) ................................................. 11

*Sero v. Tricam Indus., Inc.*,
   2023 WL 6318013 (D.N.J. Sept. 28, 2023) .......................................................... 11

*Spell v. Kendall-Futuro Co.*,
   155 F.R.D. 587 (E.D. Tex. 1994) ...........................................................................11

*Trice v. Toyota Motor Corp.*,
   2012 WL 12894708 (D. Minn. Sept. 12, 2012)....................................................11

*U.S v. Harpham*,
   2015 WL 4623717 (E.D. Wash. Aug. 3, 2015).....................................................11

*U.S. v. Hebshie*,
   754 F.Supp.2d 89 (D. Mass. 2010) ......................................................................14

*U.S. v. Johnson*,
   122 F. Supp. 3d 272 (M.D.N.C. 2015) ..........................................................14, 15

*Zenith Elecs. Corp. v. WH-TV Broad. Corp.*,
   395 F.3d 416 (7th Cir. 2005) ...............................................................................14

**Other Authorities**

Fed. R. Evid. 702 ........................................................................................*passim*

## INTRODUCTION

The issue on this motion is black and white: If Dr. Longo is not willing to submit to an inspection, this Court should exclude his PLM-chrysotile testing since it is not capable of being reproduced or independently verified absent the contemporaneous observation which the PSC is opposing. In an order issued after Defendants submitted their motion, the district court in another matter, *Gref,* succinctly summarized the core issue with MAS's PLM-chrysotile testing: The "firsthand observations of the colors seen through a polarized light microscope determine the purported identification of 'asbestos.'" Ex. AB at 4, *Hess et al. v. Am. Int'l Indus. et al.,* No. 1:24-cv-02195, ECF No. 7 (N.D. Ga.). Yet "these observations are subjective and unrepeatable" and "no one can retroactively observe what Mr. Hess saw—not even Dr. Longo" *Id.*

A deposition of Mr. Hess alone, however, is not sufficient to allow Defendants the opportunity to test what no party disputes is Dr. Longo's case-defining opinion in this matter, *i.e.,* his alleged observation of asbestos in Johnson's Baby Powder ("JBP"). Normally, a party is entitled to *both* the data that underlies an opposing expert's opinion in order to independently verify that expert's conclusions *and* a deposition of the expert who performed the relevant analysis stemming from that data. Here, Defendants have been afforded neither.

1

Per Dr. Longo's testimony, the *only* way to verify his testing is to look down the microscope live. It is Dr. Longo, not Defendants, who has repeatedly defined his method in that manner. The need for an inspection here is not an effort by Defendants to waste time or harass; it stems directly from Dr. Longo's own testimony. While ordering observation of an opposing party's expert's testing may be rare, it is not unprecedented. And it is dictated by the unique method Dr. Longo chose. Put succinctly, this is a position that Dr. Longo has put himself in.

Not only is the inspection critical to evaluating Dr. Longo's opinion under Rule 702, given Dr. Longo's day-to-day work in talc litigation, the PSC's burden arguments fall flat. Dr. Longo and the analysts that work for him at MAS conduct PLM analyses of cosmetic talc constantly. If the Court is not inclined to order a specific, MDL-centric inspection event, it can simply order an inspection when MAS is otherwise conducting such analysis.

**BACKGROUND ON RELEVANT TESTING**

To avoid any confusion regarding what testing is relevant to this motion, Defendants provide additional background on Dr. Longo's testing and reports. In the first round of expert reports in this MDL, Dr. Longo submitted, after some amendments, a February 1, 2019 report designated his "2nd Supplemental Report." Ex. AC, Longo 2/1/2019 *MDL* Rpt. As part of that report, Dr. Longo tested over 50 containers of JBP and Shower to Shower from the Johnson & Johnson archive. *Id.*

2

at 7, 27.[1] Dr. Longo conducted testing of the container samples by both TEM and PLM, but never found chrysotile in any sample using any testing method. *Id.* at 33-48. Following *Daubert* briefing and hearings, the Court excluded the PLM component of Dr. Longo's analysis. *In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Prods. Litig.*, 509 F. Supp. 3d 116, 155 (D.N.J. 2020).

In early 2020, Dr. Longo testified before the FDA that he had "cracked the code" for testing talc for chrysotile asbestos using PLM. Mot. Ex. T, Longo 2/4/20 FDA Tr. 176:19-177:5. He then proceeded to issue numerous reports in the state court litigation which set out the results of MAS's testing of JBP using his new PLM method. Now, as a matter of course, each time Dr. Longo issues a report in any individual case, it becomes part of the body of work that Dr. Longo relies on going forward in each subsequent case.

One report Dr. Longo issued since his reliance on a "new" PLM method was the *Valadez* report. *See* Mot. Ex. K. This report is particularly important because it was the first time MAS stopped using a microscope with a tungsten lightbulb that emitted a yellow/orange-hued light that distorted the color of the images—a key component of the analysis. MAS also used a new type of oil in this report, which also affects the color of the results. *See* Mot. Ex. X at 37 (comparing *Valadez* and pre-*Valadez* images).

---

[1] He also tested several "railcar samples" of talc. *Id.*

3

When the second round of expert reports were exchanged in this MDL, Dr. Longo submitted an updated 4th Supplemental Report. *See* Opp. Ex. D. As that report makes clear, Dr. Longo did not test (and has never tested) with his new PLM methodology the samples from the J&J archive that were the subject of his original MDL report. Instead, Dr. Longo's current MDL report incorporates his state court litigation reports issued between the time of the prior *Daubert* decision and his most recent deposition in this matter. *Id.* at 2.

The *Valadez* report, noted above, is among the testing incorporated into Dr. Longo's current MDL report. *Compare id.* at 24 (sample M71614-001) *with* Mot. Ex. K, Longo *Valadez* Rpt. (sample M71614-001). In short, the *Valadez* report is part of Dr. Longo's analysis in this MDL and serves as an exemplar of Dr. Longo's chrysotile testing.

## ARGUMENT

### I. Dr. Longo's Chosen Methodology Uniquely Requires The Requested Inspection.

Dr. Longo and his team picked the methodology they use to allegedly and repeatedly identify chrysotile asbestos in JBP. And they chose a methodology that, by Dr. Longo's own testimony, **requires** looking live down his microscope in order to understand and confirm the conclusions. The need to look live down his microscope demonstrates why an inspection is appropriate, why this situation is

unlike the *Teer* and *Mancuso* cases the PSC relies on in opposition that involved no need for an observation, and why this Court has authority to order the inspection.

Defendants did not "distort" Dr. Longo's testimony regarding his methodology. The PSC's various responses to this fundamental issue do not hold water.

***First,*** the PSC criticizes Defendants for providing examples "exclusively from deposition testimony in the *Valadez* case." Opp. 12. There was no need for Defendants to ask Dr. Longo the same questions over and over again in different cases just to receive the same answers in multiple transcripts. But, lest there be any doubt as to Dr. Longo's position, less than *two weeks ago* during a New Jersey state court hearing on the reliability of his new PLM method, he repeatedly gave the same testimony. As in *Valadez*, Dr. Longo routinely defaulted to his mantra that to understand his conclusions, one must look live down his microscope:

- "[Y]ou have to be looking under the microscope." Ex. AD, Longo *Clark* Hr'g (Vol. I) 113:25-114:3.

- "I'm not sitting at the microscope and this has been copied a few times, so it's kind of hard to debate you on it." *Id.* at 117:2-4.

- "I would need to be looking at the microscope here." *Id.* at 119:1-2.

- "I'd have to be on the microscope." Ex. AE, Longo *Clark* Hr'g (Vol. II) 290:2-8.

5

***Second,*** Defendants did not "cherry pick" quotations or take material "out of context" as the PSC claims. *See* Opp. 11-12.[2] Dr. Longo's *repeated* testimony demonstrates that based on the methodology he chose to employ, it is impossible to independently verify his results without looking down his microscope. Using *Valadez* as an example, Dr. Longo testified that he *could not determine if a particle was talc or asbestos* without looking down the microscope. Mot. Ex. L, Longo *Valadez* Dep. 55:17-56:18. Similarly at the *Clark* hearing less than two weeks ago, Dr. Longo testified that the only way to determine whether his *entire analysis is wrong* is to be looking down the microscope:

> [Q.]   [I]f you're claiming to see some sort of edge effect here that you're basing your purple color on but it's an artifact, then **your entire analysis is wrong?**
>
> A.   No, this analysis is not wrong. This is chrysotile **and I would need to be looking at the microscope here.** I stand by this. It's not wrong.

Ex. AD, Longo Clark Hr'g (Vol. I) 118:20-119:3 (emphasis added).

And his testimony in this regard does not go to an ancillary issue. It is Dr. Longo's main justification to defend the core of his results claiming to find chrysotile—a justification he returns to time and time again. He has even said that he's "not aware of any other labs that have a PLM setup like" his and one might not find chrysotile on a "regular PLM setup." Ex. AR at 367:6-7, 374:16-18.

---

[2] To dispel any suggestion that the "full context of the discussion is not included in the excerpt," (Opp. 12), Defendants submit the entirety of the transcripts for the *Valadez* deposition (Ex. AF), and the two-day hearing in *Clark* (Exs. AD, AE).

6

Nor is the need to look down Dr. Longo's microscope a concern manufactured by Defendants. Testimony from other *plaintiff-side experts* further demonstrates that Defendants were not "cherry picking" testimony nor creating an issue out of nothing. Dr. Steven Compton is a plaintiff-side expert in the cosmetic talc litigation (though not in this MDL) who generally tests talc ore for the presence of asbestos. He is a "trained PLM microscopist." Ex. AH, Compton *Herford* (Vol. II) Dep. 100:1-2. He too has reviewed certain of Dr. Longo's chrysotile testing and testified: "Without looking at the sample myself, I can't independently verify the results." Ex. AI, Compton *Zimmerman* Dep. 22:10-12; *see also id.* at 21:3-20 (reviewed testing).

Under the circumstances, Dr. Compton explained that Dr. Longo's test methodology leaves Defendants with two options—trust the lab who did the testing or look down the microscope yourself: "So, you either have to rely on the fact that the work is being completed by an accredited laboratory, by someone who has been trained and understands the methodology and the principles behind how that analysis is performed, or you would need to analyze it yourself." Ex. AJ, Compton *Lopez* Dep. 108:15-21.

What's more, Dr. Compton tested 18 Chinese talc ore samples (the talc used for years in JBP) by TEM, which is a more sensitive microscope than PLM. Ex AO, 9/24/2020 Compton Report at 3; Ex. AP, Longo *Hayes* Tr. 177:24-178:5 (more sensitive). Dr. Compton found **no chrysotile** in any of the 18 samples. Ex. AO,

7

9/24/2020 Compton Report at 3. Dr. Longo then tested the same 18 samples by PLM, the less sensitive microscope, yet somehow reported finding chrysotile in all 18 of the 18 samples. Ex. AQ, Longo 10/8/2020 Rpt. at 12, 22-23 Yet, according to the PSC, both Defendants *and this Court* are supposed to simply accept these results and live with Dr. Longo's representation that if we could only look down his microscope, we would see why he is right (though he has no plan to let us look).

**Third**, the PSC complains that the "exhibits being referenced [in the deposition] are not identified nor attached to the filing." Opp 12. In fact, Defendants attached the full set of images that were being shown to Dr. Longo (Mot. Ex. X) and attached Dr. Longo's full *Valadez* report that was the main subject of the questioning (Mot. Ex. K). For good measure, Defendants even attached an exemplar *video clip* so the Court could watch the questioning of Dr. Longo with the relevant image on the screen so that there could be no confusion on this issue. Mot. Ex. L.1.[3]

**Fourth,** the fact that the *Valadez* "deposition was conducted remotely" is not relevant. *See* Opp. 12. As the video clip Defendants submitted makes clear, Dr. Longo had *his own hard copy version* of the report in front of him during that deposition. *See* Mot. Ex. L.1. And Dr. Longo appeared in person at the recent *Clark*

---

[3] To the extent there is truly any concern on this issue, Defendants have submitted an exhibit matching the *Valadez* testimony to the image being displayed. *See* Ex. AK.

8

hearing where he gave the same exact testimony regarding his need to look live in his microscope in order to answer simple questions about the imaging in his report.

*Fifth,* the PSC's arguments regarding the reports of Dr. Wylie and Dr. Su raised in their supplemental letter (ECF No. 32807) are meritless. Those reports do not move the needle on the critical issue before the Court on *this* motion. Yes, those reports amply demonstrate that Defendants and their experts have criticisms of Dr. Longo's analysis. But Dr. Longo's *response* to those criticisms is to say he needs to look down his microscope in order to explain why he is right—precisely what Defendants have moved the Court on this motion to do as well.[4]

*Finally,* as the *Valadez*, *Clark*, and other examples cited in these papers make clear, Defendants cannot simply cross examine Dr. Longo as the PSC suggests. (Opp. 9-10). When Defendants ask him about fundamental flaws in his testing, Dr. Longo's response is to essentially say: *well trust me, when you look down the microscope at my lab you can tell this is asbestos.* That leaves no follow up question to ask. His testimony places a roadblock on further questioning if he is not willing to have a defense expert look at the same particles at the same time under the same microscope.

---

[4] Similarly, the PSC's suggestion that "Defendants' experts have never tested any samples from these bottles" is flat out false. Opp. 8. Defendants' expert Dr. Matt Sanchez has conducted tests of samples from many of the same bottles when permitted to do so in the relevant state court case where the MAS test was originally conducted. *See, e.g.*, Ex. AM.

9

## II. This Court Can And Should Order Defendants' Requested Inspection.

### A. This Court has authority to order Dr. Longo to conduct testing under the observation of Defendants.

This Court has the authority to order the inspection of Dr. Longo's testing as Defendants' have requested. While it is generally true that an expert is allowed "to perform his or her work without being scrutinized by the opposing expert," "the particular circumstances of a case may dictate a different result." *Diepenhorst v. City of Battle Creek, et al.,* 2006 WL 1851243, at *1 (W.D. Mich. June 30, 2006). For example, "when a party proposes destructive testing, or there is controversy concerning the nature of the test, it sometimes becomes necessary to force the experts to collaborate." *Id.*

Ordering an expert to conduct a test may be rare, but it is not "wholly unprecedented." *See* Opp. 4. *Insituform Techs., Inc. v. AMerik Supplies, Inc.* was a patent infringement case involving a pipeline system known as "Top Hat." 588 F. Supp. 2d 1349, 1351 (N.D. Ga. 2008). The plaintiff's expert, Dr. Parnas, performed destructive testing of Top Hat samples where he heated them to 450°C. *Insituform Techs., Inc. v. Amerik Supplies, Inc.*, 2010 WL 11493292, at *12 (N.D. Ga. Feb. 19, 2010). The court "ORDER[ED] Insituform to instruct Parnas to repeat his testing on another Top Hat sample, should Cosmic so request. Cosmic's counsel and an expert witness shall be allowed to attend Parnas's second test." *Id.* at *24.

10

Similarly, *United States v. Harpham* concerned a criminal defendant who was charged with attempting to use an improvised explosive device (known as an "IED"). 2015 WL 4623717, at *1 (E.D. Wash. Aug. 3, 2015). The prosecution's expert conducted tests of IEDs, and the court "required, at the defense expert's request, the FBI to 'forthwith re-construct three identical test IEDs and re-perform the tests conducted earlier with [the defense expert] present.'" *Id.* at *3.

Indeed, courts routinely require that the other side's expert be permitted to attend destructive testing.[5] In fact, one of the factors courts consider in whether to permit destructive testing is whether there is a "reasonable opportunity for the [non-movants] and their experts to observe and record the procedures involved." *Sero v. Tricam Indus., Inc.*, 2023 WL 6318013, at *7 (D.N.J. Sept. 28, 2023)

The circumstances here are analogous. It's true that, at least in some instances, other talc from the same containers that MAS tested was available for Defendants' expert to test. But critically, the slides with the *specific particles identified as chrysotile* have degraded and been discarded—even when Defendants worked quickly to try to obtain them. *See,* Mot. Exs. R-S. Had Defendants known in advance

---

[5] *See e.g., Trice v. Toyota Motor Corp.*, 2012 WL 12894708, at *2 (D. Minn. Sept. 12, 2012); *Rattay v. Medtronic, Inc.*, 2007 WL 1417158 at *2-3 (N.D. W. Va. May 10, 2007); *Holmes v. J.M. Prods., Inc., et al.*, 2005 WL 927172 at *4 (W.D. Tenn. Jan. 7, 2005); *Spell v. Kendall-Futuro Co.*, 155 F.R.D. 587, 588 (E.D. Tex. 1994); *Ostrander v. Cone Mills, Inc.*, 119 F.R.D. 417, 420 (D. Minn. 1988); *Pizza Hut, Inc. v. Midwest Mech., Inc.*, 1988 WL 8980, at *1 (N.D. Ill. Feb. 1, 1988).

11

that Dr. Longo would discard the PLM slides and *then* claim that the only way to properly identify the particles would be to look live down the microscope, Defendants would have requested to be present for that testing—none of which even occurred directly in connection with this MDL. The PSC should not be permitted to shield Dr. Longo by virtue of the fact he only claimed that live examination of the particles was essential to his conclusions after the testing was completed and the slides discarded.

**B.    This Court can order an inspection when testing is already occurring.**

The PSC's suggestion that Defendants' request will require special testing, and that such testing would be burdensome, has no foundation in reality. MAS is constantly performing PLM testing of cosmetic talc. In his MDL report alone, Dr. Longo lists 49 chrysotile tests over the past 3 years. Opp. Ex. D at 17-26 (Tables 1-7). And he is testing cosmetic talc generally even more often than that. A plaintiffs' firm-created chart shows that MAS has performed 125 different tests using Dr. Longo's new PLM method as of February 2023 (100% of which reported as finding chrysotile). *See* Ex. AL. Indeed, Dr. Longo has testified that his PLM-talc work is ongoing. Mot. Ex. V, Longo *MDL* (Vol. I) Dep. 47:6-13, 118:5-119:7. In short, the Court can simply order that the inspection occur at a time when MAS testing would otherwise be occurring as part of their regular lab activities.

12

### C. An inspection is proportional to the needs of the case and not unduly burdensome.

Relatedly, the requested inspection is far from "disproportionate to the needs of the case." Opp. at 6. Whether JBP contains asbestos is at the very heart of this MDL. And Dr. Longo is claiming to find chrysotile in nearly 100% of all samples he tests now using a method that he claims can only be evaluated by looking live down the microscope in his lab. While Defendants recognize that an inspection inherently carries burdens not associated with other types of discovery such as document requests, the need for this inspection far outweighs any burden on MAS.

The PSC submitted no evidence whatsoever to support a burden, much less its contention that an inspection "would have the effect of shutting down MAS's operations for the duration of the inspection." Opp. at 10. In fact, Dr. Longo testified: "I'd be perfectly happy to have, you know, Dr. Sanchez—well his PLM person come here—watch us make the sample. We can go and look for it and say here's the structure, go ahead and look at it. What's the difference? Probably better that way." Ex. AG, Longo *Streck* Dep. 135:17-25.

MAS conducts testing of talc constantly. The "72 hours" of sample preparation time that the PSC refers to (Opp. 10) represents the amount of time MAS has at times spun the talc sample in a centrifuge. *See* Opp. Ex. G at 148:16-17; *but see* Mot. Ex. P at 203:6-10 (10 minutes). Defendants are obviously not suggesting

13

that experts stare at a centrifuge for 72 hours straight. No observation is necessary during that passive component.

>   **D.     This Court can order that Dr. Longo's testing should be excluded if he does not submit to an inspection.**

Finally, and importantly, the Court has at its disposal another mechanism of resolving this issue if Dr. Longo is so fundamentally opposed to allowing Defendants to look live down the microscope he keeps holding out as the key to his groundbreaking opinions: exclude Dr. Longo's PLM testing.

Under *Daubert* and Rule 702, a "key question" is whether the technique at issue "can be (and has been) tested." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593 (1993); *see In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 (3d Cir. 1994) (discussing the "testability of the expert's hypothesis"). "Someone else using the same data and methods must be able to replicate the result" of the expert. *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005); *U.S. v. Hebshie,* 754 F.Supp.2d 89, 125 (D. Mass. 2010) ("Documentation is necessary to test a hypothesis; in fact, reproducibility is the sine qua non of 'science'"). An expert's opinion must "allow[ ] a factfinder to independently verify the accuracy of the expert's results" to be admissible. *Kemp v. Tyson Seafood Grp., Inc.*, 2000 WL 1062105, at *7 (D. Minn. July 19, 2000).

For example, an expert's opinion was excluded where he "could not reproduce his own results when asked to re-score the slides using his own method." *In re Diet*

14

*Drugs Prods. Liab. Litig.*, 2001 WL 454586, at *13 (E.D. Pa. Feb. 1, 2001); *see also U.S. v. Johnson*, 122 F. Supp. 3d 272, 330 (M.D.N.C. 2015) (excluding expert testimony because expert's subjective "methodology is seriously flawed and cannot be replicated"). Here, Dr. Longo similarly could not identify whether a particle was talc or asbestos when asked to look at the very images **MAS itself produced.**

The prior opinion in this MDL demonstrates why, short of allowing inspection, Dr. Longo's PLM analysis should be excluded. In the first round of expert reports, Dr. Longo did not produce the standards which he used to determine what percentage of asbestos he was claiming to find by PLM. *In re J&J Talc Litig.*, 509 F. Supp. 3d at 155. In striking his testimony, the Court explained: "Without that information, which is internally created by MAS, reproducing Dr. Longo's test under the PLM would not be possible, and hence, the testing is unreliable." *Id.*

Similarly in this second round of PLM testing, Defendants do not have the materials sufficient to independently verify Dr. Longo's PLM testing, rendering it unreliable. Because of the way Dr. Longo himself has defined his methodology as requiring live examination under his microscope, the Court, Defendants and any future jury is left with the ipse dixit of Dr. Longo: *It is asbestos because I say so after I looked down the microscope* (which Dr. Longo in fact rarely did himself).

## CONCLUSION

The Court should grant Defendants' motion to compel.

| | |
|---|---|
| Dated: June 11, 2024 | Respectfully submitted, |

*/s/ Kristen R. Fournier*
Kristen R. Fournier

**KING & SPALDING LLP**
1185 Avenue of the Americas
34th Floor
New York, NY 10036
(212) 556-2100
kfournier@kslaw.com

Susan M. Sharko
**FAEGRE DRINKER BIDDLE & REATH LLP**
600 Campus Drive
Florham Park, NJ 07932
susan.sharko@faegredrinker.com

*Attorneys for Defendants Johnson & Johnson and LLT Management, LLC*