# Exhibit AP

## Page 1

NO. 16-CI-03503    JEFFERSON CIRCUIT COURT
            DIVISION TEN (10)

DONNA ANN HAYES                PLAINTIFF

VS.    TRANSCRIPT OF PROCEEDINGS

    JULY 23, 2019

COLGATE-PALMOLIVE COMPANY,
ET AL.                    DEFENDANTS

* * *

Heard before the Hon. Angela McCormick Bisig,
Judge, Jefferson Circuit Court, Division 3,
Louisville Justice Center, Louisville, Kentucky.

* * *

NANCY L. NUNNELLEY, R.M.R.
Coulter Reporting, LLC
East Kentucky Street
Suite 200
Louisville, Kentucky  40203
(502) 582-1627
FAX: (502) 587-6299

## Page 2

I N D E X

WITNESS:  WILLIAM LONGO, Ph.D.

Direct Examination by Mr. Satterley........... 6
Cross Examination by Mr. Dubin................ 111
Cross Examination by Mr. Mularczyk............ 212
Redirect Examination by Mr. Satterley......... 253
Recross Examination by Mr. Dubin.............. 270
Recross Examination by Mr. Mularczyk.......... 279
Redirect Examination by Mr. Satterley......... 281

WITNESS:  LEE POYE

Direct Examination by Mr. Satterley........... 283

Reporter's Certificate Page................... 327

* * *

## Page 3

    A P P E A R A N C E S

FOR THE PLAINTIFF:

JOSEPH D. SATTERLEY
PAUL J. KELLEY
Satterley & Kelley
8700 Westport Road, Suite 202
Louisville, Kentucky  40242
Jsatterley@satterleylaw.com
Pkelley@satterleylaw.com

FOR THE DEFENDANT, COLGATE-PALMOLIVE COMPANY:
MEREDITH M. SHAW
Quinn Emanuel Urquhart & Sullivan, LLP
51 Madison Avenue, 22nd Floor
New York, New York  10010
Meredithshaw@quinnemanuel.com
EDWARD M. SLAUGHTER
Gordon Rees Scully Mansukhani
2200 Ross Avenue, Suite 4100 West
Dallas, Texas  75201
ESlaughter@grsm.com
PETER M. MULARCZYK
Foley & Mansfield
300 South Grand Avenue, Suite 2800
Los Angeles, California  90017
Pmularczyk@foleymansfield.com
MATTHEW W. BREETZ
FREDERICK R. BENTLEY
Stites & Harbison, PLLC
400 West Market Street, Suite 1800
Louisville, Kentucky  40202
Wbreetz@stites.com
Rbentley@stites.com

## Page 4

FOR THE DEFENDANT, JOHNSON & JOHNSON:
MORTON DUBIN
MATTHEW BUSH
PAIGE PAVONE
NINA TROVATO
Orrick, Herrinngton & Sutcliffe, LLP
51 West 52nd Street
New York, New York  10019-6119
Mdubin@orrick.com
Ppavone@orrick.com
Mbush@orrick.com
Ntrovato@orrick.com
R. SCOTT MASTERSON
Lewis Brisbois Bisgaard & Smith, LLP
1180 Peachtree Street, NE, Suite 2900
Atlanta, Georgia  30309
Scott.Masterson@lewisbrisboiscom

***

Page 177

1  at that time is that testing with those two
2  methods was the industry standard for asbestos
3  analysis at that time, and provided Scott's with a
4  reasonable basis to believe that consumer use of
5  their Libby vermiculite products did not cause any
6  significant exposure, correct?
7     A.  That's what I stated, yes.
8     Q.  And you also said that any
9  suggestion that some of these independent
10 laboratories, or Scott's, should have had the
11 knowledge or foresight to do further testing --
12 and I'm skipping a few words to -- with ATEM after
13 negative results with XRD and optical microscopy
14 in the 1970s is not reasonable or scientifically
15 valid, right?
16    A.  That is absolutely correct, for
17 Scott's --
18    Q.  Okay.
19    A.  -- Fertilizer Company.
20    Q.  And you also pointed out one of the
21 reasons why you thought -- now, they did not do --
22 or did not have done for them TEM work, right?
23    A.  That's correct.
24    Q.  Okay. And I think you believe that
25 TEM is the most sensitive method to look for

Page 178

1  asbestos in trace quantities, correct?
2     A.  It is. I asked them why they did
3  not -- they relied on their outside labs. And
4  McCrone was their primary lab. McCrone didn't
5  advise them to use TEM.
6     Q.  Okay. Actually what you said is,
7  "One of the problems in the 1970s was that there
8  were very few, if any, ATEMs in commercial
9  laboratories that had the appropriate technology
10 to perform accurate trace amphibole contaminant
11 analysis," right?
12    A.  And that's true.
13    Q.  And you said that in defending
14 Scott's -- when you said that defending Scott's,
15 did you know that McCrone had a TEM?
16    A.  Yes. McCrone had a TEM and that's
17 why I asked Ian Stewart, he was retired, why they
18 never told Scott's to do TEM when they had a TEM.
19 And Ian Stewart says, "Because there was nothing
20 there. We didn't think it was necessary."
21 So you're asking a fertilizer company,
22 depending on other -- other -- other consultants
23 to be able to determine that. That's why I stated
24 when they were using PLM and XRD, they were doing
25 the appropriate analysis.

Page 179

1  And the second part of this is, the
2  vermiculite from Libby, Montana, nobody is
3  disputing that it has asbestos in it. We're not
4  looking at, like, cosmetic talc. We know we were
5  starting with an asbestos-containing material with
6  accessory minerals, well understood, and we were
7  looking at did their process reduce the amount of
8  asbestos.
9  So I stick to everything I say in there.
10 But you can't compare a fertilizer company to a
11 giant pharmaceutical company and what they should
12 have known or not known about using transmission
13 electron microscopy. That is just not fair.
14    Q.  Okay. But you do know, if we go to
15 slide 54, you do know that Johnson & Johnson went
16 beyond the J-41 standard and beyond what Scott's
17 did and did have McCrone do TEM work for them?
18    A.  Yes, sir. I know that -- well, I
19 know that after I got involved in this when all
20 the secret documents came out.
21    Q.  Okay.
22    MR. DUBIN: Your Honor, move to strike
23 the nonresponsive portion of that answer.
24    MR. SATTERLEY: I'll object to that.
25    THE COURT: I'll allow him to say it.

Page 180

1  You can further question him about it if you'd
2  like.
3     Q.  Sir, my question is a simple one,
4  and I appreciate you responding to my questions
5  that I'm asking you. Is that okay? Will you do
6  that?
7     A.  Yes, sir. I tried, when I get a
8  question, I tried to explain it in full.
9     Q.  Okay. Did Johnson & Johnson go
10 beyond J4-1 and do -- have McCrone do TEM work for
11 them?
12    A.  I thought I said yes.
13    Q.  Okay. Thank you.
14 And I think you've already mentioned that
15 Scott's, the company that you were working for,
16 the attorneys for Scott's, the lab that they used
17 was McCrone, right?
18    A.  Correct.
19    Q.  The same McCrone?
20    A.  Yes, sir.
21    Q.  And in that context, you said when
22 you were representing the defendant, that McCrone
23 would have been a good choice in the 1970s for a
24 company to go to to test a product like talc?
25 Actually you said that in this -- in this context.

Page 325

1  the time that you have had with the witnesses that
2  we've had thus far. I just want to say that
3  hasn't occurred.
4      MR. SATTERLEY: And I --
5      THE COURT: So you're saying if you
6  take 10 minutes and then I'm going to let them
7  take three or four hours, that's not going to
8  happen.
9      MR. SATTERLEY: I wasn't suggesting
10 that, Your Honor. What I'm suggesting is if we
11 start at 9:30 and I turn the witness over at 9:40
12 and they cross-examine till 11 and I still have a
13 treating doctor, my -- the decedent, 49 minutes,
14 and within that there's cross-examination within
15 that.
16     THE COURT: I understand.
17     MR. SATTERLEY: And the treating
18 doctor.
19     THE COURT: So if I give you till
20 2 o'clock, I've basically given you the time you
21 asked me for when we started this conversation.
22     MR. SATTERLEY: Assuming the
23 cross-examination is short. That's the assumption
24 that --
25     THE COURT: Right. But, again, you

Page 326

1  made decisions when Dr. Egilman was on the stand
2  to talk about a lot of things. And, again, that's
3  your decision.
4      MR. SATTERLEY: Okay.
5      THE COURT: I'm giving you basically
6  what you asked me for in terms of time. I will
7  not -- I can tell you I won't allow them to
8  cross-examine any witness double the time that
9  they're on or that will be accounted for. I will
10 allow them to build in there some
11 cross-examination. And I have differed from the
12 schedule somewhat.
13     MR. SATTERLEY: I understand.
14     THE COURT: Mostly in your -- in your
15 favor in terms of giving you more time and taking
16 time away from them.
17     MR. SATTERLEY: I understand, Your
18 Honor.
19     THE COURT: All right. I'll see
20 you-all in the morning.
21
22 ***          ***          ***
23
24
25

Page 327

1  STATE OF KENTUCKY
2  COUNTY OF JEFFERSON
3      I, NANCY L. NUNNELLEY, RMR, Notary Public,
4  State of Kentucky at Large, do hereby certify that
5  the foregoing deposition was taken at the time and
6  place stated in the caption; that the appearances
7  were as set forth in the caption; that prior to
8  giving their testimony the witness was first duly
9  sworn by me, that said testimony was taken down by me
10 in stenographic notes and thereafter reduced under my
11 supervision to the foregoing typewritten pages and
12 that said typewritten transcript is a true, accurate
13 and complete record of my stenographic notes so
14 taken.
15     I further certify that I am not related by
16 blood or marriage to any of the parties hereto and
17 that I have no interest in the outcome of captioned
18 case.
19     My commission as Notary Public expires July 10,
20 2023.
21     Given under my hand this the 24th day of
22 July, 2019, at Louisville, Kentucky.
23
24
25             NOTARY PUBLIC