**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| IN RE: JOHNSON & JOHNSON TALCUM POWER PRODUCTS MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | No. 3:16-md-02738-MAS-RLS |

**DEFENDANTS JOHNSON & JOHNSON AND LLT MANAGEMENT, LLC'S RESPONSE IN OPPOSITION TO PLAINTIFF STEERING COMMITTEE'S, BEASLEY ALLEN'S, AND SMITH LAW FIRM'S MOTIONS TO QUASH AND/OR FOR PROTECTIVE ORDER**

## TABLE OF CONTENTS

TABLE OF CONTENTS ......................................................................................... ii

TABLE OF AUTHORITIES.................................................................................. iii

INTRODUCTION ................................................................................................1

BACKGROUND ................................................................................................3

LEGAL STANDARD ........................................................................................12

ARGUMENT ....................................................................................................13

    I.     Information about Litigation Funding is Considered Relevant and Discoverable in Courts Across the Country. ...............................13

    II.    There Is Good Cause For Discovery Of Information About Litigation Funding Here. ....................................................................18

    III.   Litigation Financing Materials are Necessary to Assess Champerty................................................................................................23

    IV.   Litigation Financing Materials are not Privileged or Protected Work Product..................................................................................24

        A.    Litigation financing materials are not privileged......................24

        B.    Litigation financing materials are not work product. ...............26

    V.    The Requests Are Not Unduly Burdensome, Overbroad, Or Harassing. ........................................................................................27

    VI.   The Subpoenas Are Procedurally Proper..............................................28

CONCLUSION ................................................................................................29

# TABLE OF AUTHORITIES

## CASES

*Acceleration Bay LLC v. Activision Blizzard, Inc.*, 2018 WL 798731 (D. Del. Feb. 9, 2018) ................................................................ 17, 26

*Charlotte-Mecklenburg Hosp. Auth v. First of Georgia Ins. Co.*, 455 S.E. 2d 655 (N.C. 1995).............................................................................23

*Clarity Sports Int'l LLC v. Redland Sports*, No. 1:19-cv-00305, 2020 WL 7342746 (M.D. Pa. Dec. 14, 2020) .........................................................12

*Cobra Int'l, Inc. v. BCNY Int'l, Inc.*, No. 05-61225-CIV, 2013 WL 11311345 (S.D. Fla. Nov. 4, 2013) .................................................. 18, 25

*Cohen v. Cohen*, No. 09 Civ. 10230, 2015 WL 745712 (S.D.N.Y. Jan. 30, 2015)...........................................................................................25

*Curtis v. Progressive N. Ins. Co.*, No. CIV-17-1076-C, 2018 WL 2976432 (W.D. Okla. June 13, 2018).............................................................29

*Dougherty v. Carlisle Transp. Prods., Inc.*, 610 Fed. App'x 91 (3d Cir. 2015) ......23

*Frick v. Henry Indus., Inc.*, No. 13-2490-JTM-GEB, 2016 WL 6966971 (D. Kan. Nov. 29, 2016) .................................................................29

*Gbarbe v. Chevron Corp.*, No. 14-cv-00173, 2016 WL 4154849 (N.D. Cal. Aug. 5, 2016).................................................................... 17, 22

*Green v. Crosby*, 314 F.R.D. 164 (E.D. Pa. 2016) ....................................................13

*Hedden v. Kean University*, 434 N.J. Super. 1 (N.J. Super. Ct. App. Div. 2013)...........................................................................................24

*Henry v. Morgan's Hotel Grp., Inc.*, No. 15-1789, 2016 WL 303114 (S.D.N.Y. Jan. 25, 2016) ...............................................................12

*Hobbs. v. Am. Commercial Barge Line LLC*, No. 4:22-cv-00063, 2023 WL 6276068 (S.D. Ind. Sept. 26, 2023) ........................................................17

*In re Am. Med. Sys., Inc.*, MDL No. 2325, 2016 WL 3077904 (S.D. W. Va. May 31, 2016) ............................................................................18

*In re BK Racing, LLC*, No. 18-30241, 2023 WL 3331563 (Bankr. W.D.N.C. May 9, 2023) .............................................................................29

*In re Broiler Chicken Antitrust Litig.*, No. 16 C 8367, 2024 WL 1214568 (N.D. Ill. Mar. 21, 2024) ...............................................................16

*In re Dealer Mgmt. Sys. Antitrust Litig.*, 335 F.R.D 510 (N.D. Ill 2020)...............25

*In re Domestic Drywall Antitrust Litig.*, 300 F.R.D. 234 (E.D. Pa. 2014) .............13

*In re Nat'l Prescription Opiate Litig.*, 2018 WL 2127807 (N.D. Ohio May 7, 2018)............................................................................................................18

*In re Nimitz Techs. LLC*, 2023-103, 2022 WL 17494845 (Fed. Cir. Dec. 8, 2022)............................................................................................................17

*In re Pork Antitrust Litig.*, 2024 WL 2819438 (D. Minn. June 3, 2024)................23

*In re Pork Antitrust Litig.*, 2024 WL 511890 (D. Minn. Feb. 9, 2024)..................14

*In re Selser*, 15 N.J. 393 (N.J. 1954)........................................................................24

*In re Turkey Antitrust Litig.*, No. 19 C 8318, 2024 WL 1328824 (N.D. Ill. Mar. 28, 2024)..................................................................................................14

*In re Valsartan*, 405 F. Supp. 3d 612 (D.N.J. 2019) .................................. 12, 19, 20

*In re Zantac (Ranitidine) Prods. Liab. Litig.*, 2020 WL 1669444 (S.D. Fla. Apr. 3, 2020) ......................................................................................... 17, 18

*Leader Techs., Inc. v. Facebook, Inc.*, 719 F. Supp. 2d 373 (D. Del. 2010)...........25

*Montgomery Cty. v. MicroVote Corp.*, 175 F.3d 296 (3d Cir. 1999).......................25

*Nelson v. Millennium Labs., Inc.*, No. 2:12-cv-01301, 2013 WL 11687684 (D. Ariz. May 17, 2013) ........................................................................................18

*Nimitz Techs. LLC v. CNET Media, Inc.*, 2022 WL 17338396 (D. Del. Nov. 30, 2022)................................................................................................... 15, 16

*Official Comm. of Equity Sec. Holders of Mirant Corp. v. The Wilson Law Firm, P.C. (In re Mirant Corp.)*, 334 B.R. 787 (Bankr. N.D. Tex. 2005)............20

*OMS Invs., Inc. v. Lebanon Seabord Corp.*, No. 08-2681, 2008 WL 4952445 (D.N.J. Nov. 18, 2008) ...............................................................................12

*Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340 (1978).......................................12

*Pittston Co. v. Allianz Ins. Co.*, 143 F.R.D. 66 (D.N.J. 1992) .................................25

*R.J. Reynolds Tobacco v. Philip Morris, Inc.*, 29 Fed. App'x 880 (3d Cir. 2002)......................................................................................................27

*Rardon v. Falcon Safety Prods., Inc.*, No. 23-1594, No. 23-1596, 2023 WL 5347298 (3d Cir. Aug. 21, 2023) ................................................................. 12, 27

*Stengart v. Loving Care Agency, Inc.*, 201 N.J. 300 (N.J. 2010) ............................24

*Trejo v. All Lynn, LLC*, 344 F.R.D. 8 (D.N.J. 2023)................................................26

*WFIC, LLC v. LaBarre*, 148 A.3d 812 (Pa. 2016) ...................................................23

**STATUTES**

11 U.S.C. § 1125 ...................................................................................................20

**OTHER AUTHORITIES**

Black's Law Dictionary (11th ed. 2019).................................................................23

Hailey Konnath, *Burford, Sysco Agree to Drop Litigation Funding Suits*,
    Law360 (June 28, 2023)........................................................................................16

JPML, *MDL Statistics Report – Distribution of Pending MDL Dockets by
    Actions Pending* (June 3, 2024) .............................................................................7

JPML, *Statistical Analysis of Multidistrict Litigation: 1992* (Oct. 1992) ...............7

Patrick A. Tighe, *Survey of Federal and State Disclosures Regarding
    Litigation Funding*, Advisory Committee on Civil Rules (Feb. 7, 2018)............15

Tom Baker, *Where's the Insurance in Mass Tort Litigation?*, 101 Tex. L.
    Rev. 1569, 1587 (2023)..........................................................................................8

U.S. Government Accountability Office, *Third-Party Litigation Financing:
    Market Characteristics, Data, and Trends* (Dec. 2022) ........................................9

Westfleet Advisors, *The Westfleet Insider: 2022 Litigation Finance Market
    Report* (2022) .........................................................................................................9

**RULES**

Fed. R. Civ. P. 26................................................................................................ 13, 26

Fed. R. Civ. P. 45........................................................................................ 13, 28, 29

L.R. 7.1.1............................................................................................................ 13, 14

N.J. R. Evid. 504.......................................................................................................24

Defendants Johnson & Johnson and LLT Management LLC submit this opposition to the Plaintiffs' Steering Committee's ("PSC"), the Beasley Allen Law Firm's ("Beasley Allen"), and the Smith Law Firm's (collectively "Movants") motions to quash and/or for protective order (ECF Nos. 32445, 32483, 32603).

## INTRODUCTION

For several years, Defendants have been attempting to resolve the ongoing talc litigation, including with Beasley Allen. Today, there is an unprecedented offer on the table: resolution of all current and future talc-ovarian cancer claims for approximately $6.475 billion dollars through a "prepackaged" bankruptcy. Because this form of bankruptcy requires a 75% endorsement by the claimants themselves, it would represent the will of the true parties in interest. If approved, the proposed bankruptcy would represent one of the largest settlements in the history of mass tort litigation.

Given that the defense has ultimately prevailed in 95% of talc-ovarian cancer cases tried to date—including all eleven cases tried to date by Beasley Allen—resolution is in the best interest of the claimants in this litigation. Yet Beasley Allen is vehemently opposed to any resolution that does not maximize its own fee recovery (through, for instance, common benefit fund payments) as opposed to maximizing recoveries by its clients. Not only does Beasley Allen apparently intend to vote against the bankruptcy settlement on behalf of its over 11,000 clients, it has now

1

gone so far as to file a request for injunction to prevent the settlement from going forward **even if it is supported by over 75% of claimants**. Worse than that, Beasley Allen expressly told at least one of its clients (and likely more) that Defendants are "not willing to settle," a contention this Court knows is demonstrably false.

Even setting aside its opposition to the $6.475 billion settlement offer, Beasley Allen's misrepresentations to its own client regarding settlement raise, *at a bare minimum*, questions regarding whether the firm's interests are truly aligned with its clients' interests and whether the firm's own financial incentives are interfering with resolution of this litigation.

The District of New Jersey has recognized through Rule 7.1.1 that litigation funding could create just this sort of perverse-incentive, conflict-of-interest scenario. The Rule makes clear that information regarding litigation funding is relevant and discoverable precisely because it can result in a situation where the mere presence of a litigation financier creates conflicts of interest that impair the parties' ability to settle. And it's more than just whether the express terms of any agreement give a funder *formal* control over a settlement; the *size* of the loan can be so large that no settlement could ever be achieved that would be economically rational for both sides.

Given the extreme lengths to which Beasley Allen (and its co-counsel) have gone to derail voting on the proposed prepackaged bankruptcy, Defendants are left with no choice but to seek discovery that would shed light on what is really driving

2

the firm's persistent and vocal anti-vote campaign. In short, information regarding the litigation funding sought in Defendants' subpoenas is relevant, discoverable, and important to reaching a resolution of this MDL.

## BACKGROUND

### *History Of Settlement Negotiations With Beasley Allen*

The Beasley Allen Law Firm, according to testimony from firm principal Andy Birchfield, represents over 11,000 talc claimants. **Exhibit 1**, April 17, 2023 Deposition of A. Birchfield at 8:17–19. Mr. Birchfield has personally engaged in settlement negotiations with Defendants regarding talc claims for years. *Id.* at 56:6–57:9. Those settlement negotiations began as far back as 2020 with Defendants' outside settlement counsel, Jim Murdica. *Id.* at 60:8–18.

For example, a 58-page term sheet was created for resolving all current and future ovarian cancer claims for $3.25 billion. *Id.* at 65:9–66:23. The term sheet included input from both sides and was a "culmination of discussions" Mr. Birchfield had with Mr. Murdica at that time. *Id.* at 83:19-84:5, 86:3–7. Later, a matrix was prepared that specified how ovarian claims would be paid. *Id.* at 81:23–82:8.

Through prior efforts to resolve the litigation via bankruptcy, Defendants proposed settlements that would have resolved all current and future talc claims (including mesothelioma and state attorneys general claims, as well as ovarian

3

cancer claims) for up to $8.9 billion. *See* **Exhibit 2**, Informational Brief of LTL Management LLC (ECF No. 3), *In re LTL Management LLC*, No. 21-30589 (Bankr. W.D.N.C. Oct. 14, 2021); **Exhibit 3**, Debtor's Statement Regarding Refiling of Chapter 11 Case, *In re LTL Management LLC*, No. 23-12825 (Bankr. D.N.J. Apr. 4, 2023).

Most recently, in May 2024, Defendants proposed a settlement through a "prepackaged" bankruptcy plan that would resolve just the current and future ovarian claims for approximately $6.475 billion dollars. **Exhibit 4**, May 1, 2024 Press Release. For the plan to be approved, 75% of claimants must vote in favor of it. The vote will close on July 26, 2024.

### *May 14, 2024 Email Exchange*

On May 14, 2024, an unknown individual—on her own initiative—reached out via email to counsel from Beasley Allen, J&J's outside settlement counsel, LLT's in-house counsel, and a reporter from Reuters. **Exhibit 5**, May 14–15, 2024 Email Chain at 4–5. The email requested an update on "the exact date [Defendants] plan to issue paperwork for the 3rd bankruptcy" and solicited Defendants' counsel to "tell her directly," including via text message. *Id.*

Beasley Allen responded, removing the individual and the journalist from the email chain, and (despite having no attorney-client relationship with Thompson

Reuters or its employee) wrote only: "Please disregard the below attorney-client communication." *Id.* at 4.

Defendants' settlement counsel, Mr. Murdica, re-added the individual (who appeared to be a "self proclaimed influencer") and the Reuters journalist and responded in three sentences: First, he noted that Beasley Allen seemed to be entering into a relationship with Reuters. *Id.* at 3. Second, he asked that Beasley Allen explain the nature of the relationship with Reuters that gave rise to its privilege assertion. *Id.* Third, he asked that the individual who sent the email and Reuters confirm that they are clients of Beasley Allen.[1] *Id.*

The individual, who is now known to be a talc-ovarian cancer claimant, then sent another unsolicited email communication stating that her attorneys told her that Defendants are unwilling to settle her case. Specifically, she was advised by her lawyers at Beasley Allen: "***Johnson & Johnson is not willing to settle your case at this time***" and "***to date, J&J has been unwilling to settle***":

---

[1] Movants' arguments that Defendants' counsel in some way violated any ethics rule is a thinly veiled attempt to point the "ethical violation" finger anywhere else after their own ethical lapses were exposed by those same emails.

As addressed in more detail in Defendants' May 31, 2024 letter (ECF No. 32484) Mr. Murdica's response was entirely reasonable and proper given both the confusing circumstances and Beasley Allen's opaque email seemingly calling Reuters a firm client. Had Beasley Allen wanted to ensure no communications with its client whatsoever, it could have explained the situation with more than a 7-word email.

also I inquired about this - where is my settlement

the answer was "

   a.  Johnson & Johnson is not willing to settle your case at this time, despite the information and records we have.  Settlement requires agreement of all of the parties.  We continue to pursue settlement with Johnson & Johnson.  However, to date, J&J has been unwilling to settle."

*Id.* at 2–3. Indeed, this particular claimant was so frustrated by her misimpression of Defendants' total unwillingness to settle that she again wrote separately (sidestepping her counsel once again): "Please make an offer so I can get on with my life." **Exhibit 6**, May 15, 2024 Email.

But as discussed above, not only have there been a slew of settlement negotiations over the years with her very counsel, Defendants *currently have a pending settlement offer* out to this claimant (and all other claimants in the MDL) through the LLT proposed plan of reorganization. The approximately $6.475 billion settlement offer would represent one of the largest resolutions in the history of mass tort litigation (and is more than double the amount included in the term sheet previously negotiated with Beasley Allen). The statement Beasley Allen made to its client (and, presumably, to other claimants) that J&J is unwilling to settle is objectively and demonstrably false. Beasley Allen's behavior, exposed by its client's unsolicited emails, amplifies a longstanding question: Why is the firm actively opposed to settling claims at terms that are favorable to its own clients?

6

### *The Rise Of Product Liability MDLs And Litigation Funding*

The circumstances giving rise to these email exchanges and other similar incidents, and the very real questions they raise, do not exist in a vacuum. This MDL exists within a broader context of the rise of product liability MDLs and the machine of litigation funding that has fueled it. In 1992, approximately 37,000 actions were pending in MDLs. **Exhibit 7**, JPML, *Statistical Analysis of Multidistrict Litigation: 1992*, at 4 (Oct. 1992). Today, over ***430,000 actions*** are pending in MDLs. **Exhibit 8,** JPML, *MDL Statistics Report – Distribution of Pending MDL Dockets by Actions Pending*, at 4 (June 3, 2024).

The vast majority of those MDL actions (97.3%) are pending in just 21 MDLs with 1,000 or more actions each:

| Docket Count | Range of the Number of Actions *PENDING* in a Docket | Percent of Dockets | Action Count | Percent of Actions |
|---|---|---|---|---|
| 46 | MDLs with between 0 and 10 Pending Actions | 27.06% | 219 | 0.05% |
| 73 | MDLs with between 11 and 100 Pending Actions | 42.94% | 2,271 | 0.52% |
| 30 | MDLs with 101 and 999 Pending Actions | 17.65% | 9,326 | 2.13% |
| 21 | MDLs with 1,000 or more Pending Actions | 12.35% | 425,286 | 97.3% |

*Id.* All 21 of those over-1,000-action MDLs—making up over 97% of MDL practice in the federal judiciary—are product liability litigations. *Id.* at 1. These MDL-based products cases on their own represent nearly two-thirds of the civil actions on the federal docket. **Exhibit 9**, U.S. District Courts—Civil Statistical Tables for the Federal Judiciary (December 31, 2023), at Table C-1: U.S. District Courts—Civil

Cases Filed, Terminated, and Pending, by Jurisdiction—During the 12-Month Period Ending December 31, 2023 (Dec. 31, 2023).

The fuel for this explosion in litigation is unquestionably third-party litigation funding. As one plaintiff's attorney observed: "When litigation funding came on the scene, mass tort practice changed." Tom Baker, *Where's the Insurance in Mass Tort Litigation?*, 101 Tex. L. Rev. 1569, 1587 (2023). "[M]ass tort funding provided to individual law firms now regularly exceeds $50 million. One broker described a law firm with $250 million in funding." *Id.* at 1586. A litigation funder explained it in this way:

> To understand what the financing is for, who provides it, and why the numbers get so big, go to Mass Torts Made Perfect and walk through the exhibition hall at Bellagio. There are tons of booths. For everything that has to be done in the lifecycle of a mass tort case--advertising, calling clients, intaking clients, following up to get medical records, everything through the process all the way through litigating the case-- there are multiple vendors that law firms can and do outsource to. If you are an aggregator, meaning you find and sign-up clients, you make deals with firms litigating and settling the cases. They include your inventory of clients in return for a share of the legal fees. Funding pays for all of the above.

*Id.* at 1586–87.

A 2022 report from the Government Accountability Office estimates that 47 active commercial litigation funders reported a total of $12.4 billion in assets under management and that they had committed $2.8 billion to new litigation in 2021. **Exhibit 10**, U.S. Government Accountability Office, *Third-Party Litigation*

*Financing: Market Characteristics, Data, and Trends*, at 11–12 (Dec. 2022). These numbers likely understate the true figures since publicly available data is limited. *Id.* Approximately 70% of litigation funding is devoted to mass actions rather than just an individual case. **Exhibit 11**, Westfleet Advisors, *The Westfleet Insider: 2022 Litigation Finance Market Report*, at 5–6 (2022). And for good reason: funders are reporting a return on investment ***greater than 90%*** for their litigation funding portfolios. **Ex. 10** at 22.

### *Talc Litigation Funding.*

The Smith Law Firm and Beasley Allen have partnered on talc litigation for years. They were co-counsel together in seven talc-ovarian cancer trials, over *one third* of the trials that have occurred to date.[2] Critically, Mr. Birchfield testified that his co-counsel at the Smith Law Firm acquired litigation funding in connection with talc litigation. **Ex. 1** 35:23–36:25; *see also id.* at 154:13–155:14. Given their co-counsel relationship (and, thus, their representation of the same clients), litigation funding received by the Smith Law Firm has direct implications for Beasley Allen's ability to settle cases (and vice versa).

We now know through a subpoena issued in connection with this very dispute that Fortress Investment Group LLC managed funds that invested in a loan to the

---

[2] It is unknown just how many of Beasley Allen's filed cases represent a co-counsel relationship with the Smith Law Firm.

Smith Law Firm in the amount of $24 million. **Exhibit 12**, May 20, 2024 Declaration of David Meisels, ¶ 5. That loan appears to have been refinanced, and now, based on information and belief, the Smith Law Firm is in possession of litigation funding through Ellington Management. *Id.* ¶ 4. Defendants believe this follow-on funding was likely orders of magnitude larger than the Fortress funding, perhaps as much as ten times the original loan. From his extensive negotiations with Beasley Allen, Defendants' settlement counsel, Mr. Murdica, came to the belief that "the Beasley firm is not able to say yes to any deal, because they're way too deep in debt from funding." **Exhibit 13**, April 16, 2023 Deposition of J. Murdica at 234:23–25.

### *The Subpoenas*

After the May 14 email exchange—and given Beasley Allen's persistent opposition to settling this litigation, their obvious misrepresentations to their clients, and their refusal to correct or withdraw their misleading statements—Defendants issued subpoenas to discover the extent of any obstacles to resolution. The subpoenas issued to Beasley Allen (ECF No. 32201); the Smith Law Firm (ECF No. 32226); Ellington Management Group (ECF No. 322215); Fortress Investment Group LLC (ECF No. 32203); and Thompson Reuters (ECF No. 32204).

The subpoenas seek what can be summarized as three, discrete categories of information: (1) documents regarding the subpoenaed parties' litigation financing, including communications with third parties; (2) the subpoenaed parties'

communications with third parties regarding settlements; and (3) the subpoenaed parties' communications with third parties regarding Defendants' proposed reorganization.

Despite the discrete nature of the documents sought, Defendants have remained willing to work with the subpoenaed parties to further narrow the scope of the documents sought. For instance, based on the affidavit of David Meisels, Defendants have withdrawn the subpoena to Fortress Investment Group. Defendants also have chosen not to further pursue the subpoena issued to Thompson Reuters and are willing to exclude communications with Thompson Reuters and other media organizations from the scope of the other subpoenas. Further, Defendants have never sought—and do not seek in Request 6 to Beasley Allen and Smith Law Firm—to obtain communications between Beasley Allen or the Smith Law Firm and their clients.

Defendants do, however, seek information from Beasley Allen, the Smith Law Firm, and Ellington Management Group regarding litigation funding and their communications with third parties (including communications between the firms and their litigation financiers) regarding settlement authority generally and the

proposed reorganization plan specifically. This information is relevant and discoverable, and the Court should order it produced.[3]

## LEGAL STANDARD

Subpoenas issued under Federal Rule of Civil Procedure must seek information that is relevant as defined by Rule 26. *See Rardon v. Falcon Safety Prods., Inc.*, No. 23-1594, No. 23-1596, 2023 WL 5347298, at *2 (3d Cir. Aug. 21, 2023); *OMS Invs., Inc. v. Lebanon Seabord Corp.*, No. 08-2681, 2008 WL 4952445, at *2 (D.N.J. Nov. 18, 2008). Relevance is "construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978); *see also Henry v. Morgan's Hotel Grp., Inc.*, No. 15-1789, 2016 WL 303114, at *3 (S.D.N.Y. Jan. 25, 2016) (recognizing that the *Oppenheimer* Court's definition of relevance continues to apply after the 2015 amendments to the Federal Rules of Civil Procedure). A district court may deny a motion to quash "if there is any ground on which [the information sought] might be relevant." *Clarity Sports Int'l LLC v. Redland Sports*, No. 1:19-cv-00305, 2020 WL 7342746, at *1 (M.D. Pa. Dec. 14, 2020).

---

[3] In the alternative, the Court should order the subpoenaed parties to produce all documents responsive to Defendants' subpoenas to the Court for *in camera* inspection. *See In re Valsartan*, 405 F. Supp. 3d 612, 618–19 (D.N.J. 2019) (noting *in camera* review may be appropriate in certain circumstances); Argument §§ 1–2, *infra*.

If the information sought via subpoena is relevant, the burden shifts to the subpoenaed party—here Beasley Allen, Smith Law Firm, and Ellington Management Group—to establish some basis to quash the subpoena, *see In re Domestic Drywall Antitrust Litig.*, 300 F.R.D. 234, 239 (E.D. Pa. 2014), or to seek a protective order, s*ee* Fed. R. Civ. P. 26(c) (setting forth standards for motion for protection); *see also id.* R. 45(d)(3)(A)–(B) (setting forth standards for motion to quash). "The burden of the party opposing the subpoena 'is particularly heavy to support a motion to quash as contrasted to some more limited protection such as a protective order.'" *Green v. Crosby*, 314 F.R.D. 164, 170 (E.D. Pa. 2016) (quoting *In re Domestic Drywall*, 300 F.R.D. at 239).

## ARGUMENT

### I.     Information About Litigation Funding Is Considered Relevant And Discoverable In Courts Across The Country.

Local Rule 7.1.1 expressly recognizes that information concerning third-party litigation funding is relevant, requiring the disclosure of the identity of third-party funders, whether the funder's approval is necessary for settlement decisions, and the nature of the funder's financial interest. *See* L.R. 7.1.1(a). The Rule then expressly provides that the parties may seek additional discovery upon a showing of good cause that: (1) the funder "has authority to make material litigation decisions or settlement decisions;" (2) the "interests of the parties or the class (if applicable) are

not being promoted or protected;" (3) "conflicts of interest exist;" or (4) the "disclosure is necessary to any issue in the case." L.R. 7.1.1(b).

The very terms of the Rule make clear that litigation funding can create diverging interests between the parties and the attorneys representing them. The Rule also makes clear that understanding the underlying interests at play is critical to achieving resolutions through settlement, which serves as a basis for discovery. If this litigation is to resolve, Defendants need to know who the players are so they can understand the financial incentives driving their motivations, and even more fundamentally, if the financial incentives have become so out of balance that settlement is effectively impossible.

In other words, it's not just the *terms* of the litigation funding that matters. The *size* of the loan could be so large that no settlement could ever be achieved that would be economically rational for both parties. *See, e.g.*, *In re Turkey Antitrust Litig.*, No. 19 C 8318, 2024 WL 1328824, at *8 (N.D. Ill. Mar. 28, 2024) ("The fear, understandably, is that these third parties will flex their financial power to bully plaintiffs, who own the legal right to the claim, into pursuing a course of action adverse to plaintiffs' interests."); *In re Pork Antitrust Litig.*, 2024 WL 511890, at *7 (D. Minn. Feb. 9, 2024) ("The largest harm that condoning Burford's efforts to maximize its return on investment would cause is the harm of forcing litigation to continue that should have settled.").

The need to understand the settlement playing field is all the more important in a mass tort such as this, with nearly 60,000 pending cases in this MDL alone. Unlike traditional litigation, settlement in this case would impact literally tens of thousands of individuals' claims. Absent exclusion of Plaintiffs' experts under Rule 702, settlement is likely the only realistic way to resolve this mass-tort MDL as it is a practical impossibility for 60,000 cases to go to trial.

Understanding the relevance of litigation funding to settlement (and a host of other issues), other courts have also enacted similar rules requiring disclosure of third-party litigation financing. *E.g.*, **Exhibit 14**, Patrick A. Tighe, *Survey of Federal and State Disclosures Regarding Litigation Funding*, Advisory Committee on Civil Rules, at 2 (Feb. 7, 2018) (noting that, as of November 2017, roughly 25% of federal district courts "require disclosure of the identify of litigation funders in a civil case"). Indeed, Chief Judge Connolly of the District of Delaware has issued a standing order, modeled on this Court's Rule 7.1.1, requiring disclosure of litigation financing. *Nimitz Techs. LLC v. CNET Media, Inc.*, 2022 WL 17338396, at *3 (D. Del. Nov. 30, 2022) (discussing standing order). Judge Connolly's order—and the discovery that followed in several cases—are a case study on why disclosure of litigation financing is warranted and why additional discovery may be necessitated based on those disclosures.

By requiring parties to comply with his order, including by issuing show cause and contempt orders for noncompliance, Judge Connolly uncovered massive, previously undisclosed litigation financing underlying a docket of cases in his court. *See generally id.* The litigation financers were in charge of retaining counsel, were making strategic litigation and settlement decisions, and were reaping the vast majority of the benefits from the litigation. *E.g.*, *id.* at *20–22, *25. In other words, the litigation funders—not the named parties—were driving the litigation. *Id.*[4]

Following suspicions raised by odd behavior and inconsistent disclosures under his standing rule, Judge Connolly was able to suss out the litigation financing arrangement only by engaging in further discovery, questioning clients (and their counsel) under oath, and requiring production of communications with the financier, including about the initiation and settlement of cases and other documents necessary to assess the level of control exercised by the funders. *Id.* at *26. The Federal Circuit

---

[4] Another well-publicized example of the perils of unchecked litigation financing is playing out in district courts in Illinois and Minnesota, where Burford Capital—a litigation financier—derailed settlements reached by the litigation parties in antitrust litigation because it refused to assent to the settlements. *See, e.g.*, **Exhibit 15**, Hailey Konnath, *Burford, Sysco Agree to Drop Litigation Funding Suits*, Law360 (June 28, 2023). Had the litigation funding not been disclosed, defendants would have been left defending cases that plaintiffs no longer wanted to prosecute with no understanding of why the parties were unable to settle. Because the litigation funding was disclosed, however, defendants (and the courts) are now aware of the real parties in interest to the litigation, allowing the litigation to move forward. *See, e.g.*, *In re Broiler Chicken Antitrust Litig.*, No. 16 C 8367, 2024 WL 1214568 (N.D. Ill. Mar. 21, 2024) (allowing substitution of Burford Capital entity for Sysco as plaintiff).

denied a mandamus petition challenging Judge Connolly's discovery, finding the information he sought was proper because it related either "to potential legal issues in the case" or "to aspects of proper practice before the court." *In re Nimitz Techs. LLC*, 2023-103, 2022 WL 17494845, at *2 (Fed. Cir. Dec. 8, 2022).

In addition to Local Rule 7.1.1 and its counterparts nationwide, courts across the country (including other district courts in the Third Circuit) have found litigation funding documents to be relevant and discoverable under Federal Rule of Civil Procedure 26. *E.g.*, *Hobbs v. Am. Commercial Barge Line LLC*, No. 4:22-cv-00063, 2023 WL 6276068, at *4 (S.D. Ind. Sept. 26, 2023) (finding litigation-related medical funding relevant to settlement evaluation); *Acceleration Bay LLC v. Activision Blizzard, Inc.*, 2018 WL 798731, at *3 (D. Del. Feb. 9, 2018); *Gbarbe v. Chevron Corp.*, No. 14-cv-00173, 2016 WL 4154849, at *2 (N.D. Cal. Aug. 5, 2016) (finding litigation financing relevant to class counsel's adequacy);[5] *In re Am. Med.*

---

[5] It bears repeating that Beasley Allen has now filed a class action—pending in this MDL—seeking to enjoin LLT's proposed bankruptcy plan on behalf of all individuals with pending talc claims (ovarian cancer or mesothelioma). Complaint (ECF No. 1) ¶ 279, *Love v. Johnson & Johnson*, No. 24-cv-6320 (D.N.J. May 22, 2024); *see also* **Ex. 18**. Beasley Allen's litigation funding is directly relevant to its adequacy as putative class counsel.

Additionally, the rest of the MDL is functioning as a quasi-representative proceeding. Particularly given Beasley Allen's position on the Plaintiff Steering Committee, evaluating the firm's adequacy to represent the interest of all MDL plaintiffs—and not the interests of remote litigation financiers or its own financial health due to overwhelming debt—is of the utmost importance. *See In re Zantac (Ranitidine) Prods. Liab. Litig.*, 2020 WL 1669444, at *6 (S.D. Fla. Apr. 3, 2020)

*Sys., Inc.*, MDL No. 2325, 2016 WL 3077904, at *5 (S.D. W. Va. May 31, 2016) (finding litigation financing relevant to plaintiffs' motivation to undergo medical treatment); *Cobra Int'l, Inc. v. BCNY Int'l, Inc.*, No. 05-61225-CIV, 2013 WL 11311345, at *3 (S.D. Fla. Nov. 4, 2013); *Nelson v. Millennium Labs., Inc.*, No. 2:12-cv-01301, 2013 WL 11687684, at *6 (D. Ariz. May 17, 2013) (finding litigation financing relevant to assess bias).

Not surprisingly, MDL courts around the country have recently required disclosure of litigation financing information given the prevalence of litigation financing in mass tort litigation. *See* **Exhibit 16**, Case Management Order No. 61 (Third-Party Litigation Funding) (ECF No. 3815), *In re 3M Combat Arms Earplug Prods. Liab. Litig.*, No. 3:19-md-02885 (N.D. Fla. Aug. 29, 2023); *In re Zantac (Ranitidine) Prods. Liab. Litig.*, 2020 WL 1669444, at *6 (S.D. Fla. Apr. 3, 2020); *In re Nat'l Prescription Opiate Litig.*, 2018 WL 2127807, at *1 (N.D. Ohio May 7, 2018).

## II.     There Is Good Cause For Discovery Of Information About Litigation Funding Here.

Rule 7.1.1 is dispositive of the relevance of the litigation funding materials sought by Defendants' subpoenas. Even if it weren't, the District of New Jersey's decision to issue Rule 7.1.1 and allow additional discovery of third-party litigation

---

(requiring disclosure of litigation financing when assessing potential leadership counsel for plaintiffs).

financing by rule in many ways tracks the reasoning of Your Honor's decision in *In re Valsartan*. 405 F. Supp. 3d 612 (D.N.J. 2019). Contrary to Movants' contentions, *In re Valsartan* does not stand for the proposition that discovery of third-party litigation financing is inappropriate in all circumstances. Rather, the Court expressly noted that it was "*not* ruling that litigation funding discovery is off-limits in all instances" and that such discovery would be allowed "if good cause exists to show the discovery is relevant," such as "a showing that something untoward occurred." *Id.* at 615.

The Court in *Valsartan* further noted that, in considering whether *in camera* review (and, presumably, discovery) of litigation funding materials was warranted, the Court would consider factors such as "whether the litigation is unduly prolonged and if settlement or ADR is discouraged, whether counsel's control over the litigation is undercut, if settlement money is unduly direct away from a plaintiff, if the attorney-client relationship is compromised, or if the professional independence of an attorney is diminished." *Id.* at 619 n.9. The decision also recognized that a funder can still have "de facto control" over litigation decisions even without "formal" control. *Id.* at 619 n.8.

Here, there is good cause to suspect that funders have express or de facto control over settlement, that the interests of the plaintiffs are not being promoted or protected, and that conflicts of interests exist. The Court need look no farther than

the May 14 email exchange to see that: Beasley Allen has an ethical obligation to communicate settlement offers to its client, yet, in addition to failing to inform its client of a settlement offer, it ***actively misrepresented*** to its client that Defendants were "unwilling to settle" (**Ex. 5**) even though Defendants currently have a settlement offer on the table.[6]

This individual's interests—and likely others of Beasley Allen's 11,000+ clients—are not being protected or promoted. Claimant begged Defendants to make her a settlement offer. The problem is that she does not know—because her own counsel will not tell her—that Defendants have already made an offer. This is unlikely to be an isolated incident. Beasley Allen's conduct suggests that other undisclosed financial interests are actually driving its decisions relating to the resolution of the talc litigation. It is clear that "the litigation is unduly prolonged," "settlement . . . is being discouraged," and "counsel's control over the litigation" is potentially undercut. *In re Valsartan*, 405 F. Supp. 3d at 619 n.9.[7]

---

[6] These misrepresentations regarding the Plan violate the solicitation provisions of the Bankruptcy Code. See 11 U.S.C. § 1125(e); *see also Official Comm. of Equity Sec. Holders of Mirant Corp. v. The Wilson Law Firm, P.C. (In re Mirant Corp.)*, 334 B.R. 787, 789–790, 793 (Bankr. N.D. Tex. 2005) (finding that solicitation of rejections of a plan of reorganization through the use of misleading or counterfactual materials does not constitute good faith solicitation within the meaning of section 1125(e) of the Bankruptcy Code).

[7] Movants' unverified contentions that they are not receiving litigation financing do not change the analysis, particularly where, as here, the existence of such funding at some time has been confirmed by a financier. *See* **Ex. 12**.

Even if this glaring example were not sufficient, additional conflicts of interest abound. Based on the Court's common benefit fund orders, Beasley Allen stands to collect up to 12% of the recovery any firm earns (on top of their cut of any amount recovered for their own clients) if the talc litigation resolves *in the MDL or in state court*—but not in the bankruptcy. *See* Case Management Order No. 7 (ECF No. 426); Case Management Order No. 7A (ECF No. 14741); Special Master Opinion and Order No. 15 (ECF No. 26572) at 2–5 (summarizing the orders).[8]

Beasley Allen's own public statements have made this conflict abundantly clear. In a recent press release, Beasley Allen urged other firms to oppose the bankruptcy in extremely aggressive language, but in the same breath made clear it stands "ready to discuss a *non-bankruptcy solution*." **Exhibit 17**, Press Release (emphasis added). In other words, Beasley Allen knows full well that settlement is the right outcome for this litigation, and it is not even suggesting the unprecedented amount offered (more than double the amount in the prior term sheet) is too little. Instead, it opposes losing the right to tax 12% of the settlement amount (i.e., some ***$777 million dollars***) for its own personal gain through this MDL. Particularly in

---

[8] Beasley Allen's only response to this fact is to speculate that a bankruptcy court might award something akin to a common benefit fund in some amount. May 22, 2024 Letter (ECF 32251) at 8. That speculation is belied by the terms of the solicitation offer announced on May 1, 2024. And Beasley Allen's musings that it may be able to persuade the J&J Defendants to adopt another plan, in addition to being utterly baseless, do not negate the financial incentives they are guaranteed by a resolution through the MDL (but not through bankruptcy).

combination with what we now know the firm is telling its clients, these public statements are further evidence that Beasley Allen's *own* financial needs are being put ahead of its clients', warranting the very discovery Rule 7.1.1 and your Honor have anticipated would be necessary under the right circumstances.

Understanding who truly has control over settlement decisions has become even more relevant now that the plaintiffs have filed a purported class action on behalf of *all ovarian and mesothelioma talc plaintiffs*, including those who favor the plan, seeking to scuttle the plan. In particular, Beasley Allen has filed a motion for a temporary restraining order and preliminary injunction in this MDL to try to prevent LLT's proposed prepackaged bankruptcy. *See* **Exhibit 18**, TRO (ECF No. 6), *Love v. LLT Management LLC*, No. 3:24-cv-06320 (D.N.J. June 11, 2024).

In other words, firms like Beasley Allen are boldly and publicly declaring that ***even if 75% of claimants—i.e., the women who claim to be impacted by Defendants' products—support LLT's settlement*** through bankruptcy, the firm still will go to any length to prevent that settlement from being achieved. This latest publicity stunt has squarely put at issue the "balance of the equities" and the "public interest" (not to mention the firm's adequacy as putative class counsel) that litigation funding is directly relevant too. *Id.* at 11–12; *Gbarbe*, 2016 WL 4154849, at *2.

### III.   Litigation Financing Materials Are Necessary To Assess Champerty.

In addition to the above, information about litigation financing is also necessary to address potential champerty issues for Plaintiffs who filed suit in states that outlaw the practice. Champerty is defined as "an agreement to divide litigation proceeds between the owner of the litigated claims and a party unrelated to the lawsuit who supports or helps enforce the claim." *Champerty*, Black's Law Dictionary (11th ed. 2019).

A number of states still outlaw the practice. *E.g.*, *Dougherty v. Carlisle Transp. Prods., Inc.*, 610 Fed. App'x 91, 93 (3d Cir. 2015) (recognizing champerty is outlawed in Pennsylvania); *WFIC, LLC v. LaBarre*, 148 A.3d 812, 818–19 (Pa. 2016) (applying champerty laws to litigation funding agreement); *Charlotte-Mecklenburg Hosp. Auth v. First of Georgia Ins. Co.*, 455 S.E. 2d 655, 657 (N.C. 1995) (holding champerty laws apply to assignments governed by North Carolina law by which the assignee undertakes control of the claim).

And even states that have abolished the champerty doctrine still apply its precepts to determine if litigation funding arrangements violate public policy. *In re Pork Antitrust Litig.*, 2024 WL 2819438, at *4 (D. Minn. June 3, 2024) ("Though the State of Minnesota has abolished its common-law prohibition against champerty, courts must still be careful to ensure that litigation financiers do not attempt to control the course of the underlying litigation" (internal quotation marks omitted)).

23

Given that claims are pending in states that outlaw champerty and where litigation funding may violate public policy, discovery of litigation financing is separately relevant to assess this issue.

## IV. Litigation Financing Materials Are Not Privileged Or Protected Work Product.

### A. Litigation financing materials are not privileged.

In New Jersey, the attorney-client privilege protects confidential communications between an attorney and a client. N.J. R. Evid. 504; *see also Hedden v. Kean University*, 434 N.J. Super. 1, 10 (N.J. Super. Ct. App. Div. 2013) ("Specifically, the attorney-client privilege generally applies to communications (1) in which legal advice is sought, (2) from an attorney acting in his capacity as a legal advisor, (3) and the communication is made in confidence, (4) by the client."). But because it "rests in the suppression of the truth[,] the privilege should be strictly construed." *In re Selser*, 15 N.J. 393, 402 (N.J. 1954).

As an initial matter, documents regarding funding do not represent communications in which *legal* advice is sought or communications between attorneys and their *clients*, making the privilege inapplicable. Moreover, even if the privilege applied, it is waived—as here—when a person discloses "any part of the privileged matter or consented to such a disclosure made by anyone." *Stengart v. Loving Care Agency, Inc.*, 201 N.J. 300, 323 (N.J. 2010). And the "common interest" exception does not preserve the privilege because the interest shared is *financial*, not

*legal*. *Pittston Co. v. Allianz Ins. Co.*, 143 F.R.D. 66, 69 (D.N.J. 1992) ("A [common interest] exists where different persons or entities have an identical *legal* interest with respect to the subject matter of a communication between an attorney and client concerning *legal* advice. The key consideration is that the nature of the interest must be identical, not similar, *and be legal, not solely commercial*." (cleaned up) (emphasis added)).

As a result, courts routinely hold that litigation funding documents are not protected by the attorney-client privilege. *See In re Dealer Mgmt. Sys. Antitrust Litig.*, 335 F.R.D 510, 519 (N.D. Ill 2020) (holding litigation funding materials not privileged); *Cobra International*, 2013 WL 11311345, at *3 (holding litigation funding agreement not privileged); *Cohen v. Cohen*, No. 09 Civ. 10230, 2015 WL 745712, at *4 (S.D.N.Y. Jan. 30, 2015) (finding privilege waived in communications with third-party litigation funder and refusing to apply common interest exception); *Leader Techs., Inc. v. Facebook, Inc.*, 719 F. Supp. 2d 373, 377 (D. Del. 2010) (finding litigation funding documents not privileged due to waiver and refusing to apply the "common interest" exception because the exception requires a common legal, not financial, interest); *see also, e.g.*, *Montgomery Cty. v. MicroVote Corp.*, 175 F.3d 296, 304 (3d Cir. 1999) ("The attorney-client privilege does not shield fee arrangements").

Because any litigation funding materials requested by the subpoenas (funding agreements, communications, etc.) were necessarily shared with third parties, they are not protected by the attorney-client privilege.

### B.     Litigation financing materials are not work product.

Nor are the materials sought covered by the work product protection. Work product is governed by Federal Rule of Civil Procedure 26, which protects documents created by or for a party or party's representative in anticipation of litigation. Fed. R. Civ. P. 26(b)(3). In the Third Circuit, "a court must consider both whether the moving party demonstrates that the documents were created in anticipation of litigation and whether the material was produced because of the prospect of litigation *and for no other purpose*." *Trejo v. All Lynn, LLC*, 344 F.R.D. 8, 11 (D.N.J. 2023) (cleaned up) (emphasis added). Litigation funding documents are not work product because they are "prepared with the primary purpose of obtaining a loan, as opposed to aiding in possible future litigation." *Acceleration Bay*, 2018 WL 798731, at *2.

Moreover, when documents are prepared for a litigation funder, which is not a party to the litigation, "the work product protection does not apply." *Id.* And even if the work product protection did apply, the protection may be overcome by a showing of substantial need and undue hardship. Fed. R. Civ. P. 26(b)(3)(A)(ii). Defendants' substantial need for the materials—to determine the genesis of

Movants' misrepresentations regarding settlement and to understand whether this MDL may be resolved—is set out fully above, and there is no way by which Defendants can obtain the information sought other than from Movants. The work product privilege is not a bar to disclosure.[9]

## V.   The Requests Are Not Unduly Burdensome, Overbroad, Or Harassing.

Left with no real substantive arguments, Movants fall back on boilerplate objections of undue burden, overbreadth, and harassment. Undue burden is assessed by considering "relevance, the need for the information requested, whether the information can be obtained by other means, burdens the subpoena may impose, the status of the recipient as a non-party, and the costs of compliance." *Rardon*, 2023 WL 5347298 at *2. As set forth above, the discovery sought is relevant, and the information sought cannot be obtained from sources other than Movants. Moreover, Movants have provided nothing but rank speculation to carry their burden to show that the subpoenas—seeking three, narrowly tailored categories of documents— would impose outsized burdens or exorbitant costs. And while the recipients are

---

[9] Of course, even if the Court were to determine that certain documents within the scope of Defendants' subpoenas could be deemed privileged or protected work product, the appropriate course is not to quash the subpoenas as a whole. Rather, because Movants have "the burden of establishing that [their] documents are privileged," if responsive documents exist that they believe merit withholding, they should expeditiously prepare a privilege log describing the withheld documents in sufficient detail for Defendants and the Court to assess the claim of privilege. *E.g., R.J. Reynolds Tobacco v. Philip Morris, Inc.*, 29 Fed. App'x 880, 882 (3d Cir. 2002).

technically non-parties in that they are neither plaintiffs nor defendants, they are parties intimately involved in (and, indeed, driving) this litigation. There is no undue burden, and the subpoenas should not be quashed on that ground.

Given that the subpoenas are narrowly tailored (seeking three discrete categories of documents) and entirely justified by Movants' own conduct, Movants' objections on grounds of overbreadth and harassment are likewise meritless. What's more, Movants' specious overbreadth and harassment objections cannot serve as a basis to quash the subpoenas. Fed. R. Civ. P. 45(d)(3).

## VI. The Subpoenas Are Procedurally Proper.

Lastly, Movants' procedural arguments fare no better than their arguments regarding the substance of the subpoenas. First, Movants' argument that the subpoenas are invalid because they were issued in the District of New Jersey are outdated (by more than a decade). Since 2013, the Federal Rules of Civil Procedure have *required* that subpoenas "must issue from the court where the action is pending." Fed. R. Civ. P. 45(a)(2). Movants' arguments to the contrary are simply wrong.

Second, Movants' contention that the subpoenas violate the 100-mile rule is also incorrect. Rule 45 requires that "production of documents, electronically stored information, or tangible things" take place "at a place within 100 miles of where the person resides, is employed, *or regularly transacts business in person*." Fed. R. Civ.

P. 45(c)(2)(A) (emphasis added). Movants are all involved in the talc ovarian cancer litigation pending in this Court; as such, employees of each entity regularly transact business in the very Court from which the subpoena issued. Indeed, attorneys from Beasley Allen and the Smith Law Firm will presumably be in New Jersey on July 1 to argue this very motion. The Clarkson S. Fisher Building & United States Courthouse in Trenton is less than 60 miles from the offices of King & Spalding in New York City, where compliance is required. Moreover, the 100-mile limitation imposed by Rule 45 is of no consequence where, as here, the documents may be produced electronically. *See, e.g.*, *In re BK Racing, LLC*, No. 18-30241, 2023 WL 3331563, at *3 (Bankr. W.D.N.C. May 9, 2023) (holding the 100-mile rule is inapplicable where documents can be produced via email or mail); *Curtis v. Progressive N. Ins. Co.*, No. CIV-17-1076-C, 2018 WL 2976432, at *2 (W.D. Okla. June 13, 2018) (same); *Frick v. Henry Indus., Inc.*, No. 13-2490-JTM-GEB, 2016 WL 6966971, at *3 (D. Kan. Nov. 29, 2016) (same). There is no violation of the 100-mile rule here.

## CONCLUSION

Claimant's unsolicited communications create a real and concerning specter that something untoward is occurring: Beasley Allen is misleading its client and likely other plaintiffs about an unprecedented potential settlement with Defendants, the proposed $6.675 billion restructuring plan. Defendants—and the Court—are

entitled to know why. Movants' motions should be denied, and Movants should be required to answer basic questions about their litigation financing, their non-client communications regarding settlement, and their non-client communications regarding the proposed restructuring.

Dated: June 17, 2024                    Respectfully submitted,

                                        */s/ Kristen R. Fournier*
                                        Kristen R. Fournier
                                        **KING & SPALDING LLP**
                                        1185 Avenue of the Americas
                                        34th Floor
                                        New York, NY 10036
                                        (212) 556-2100
                                        kfournier@kslaw.com

                                        Susan M. Sharko
                                        **FAEGRE DRINKER BIDDLE &
                                        REATH LLP**
                                        600 Campus Drive
                                        Florham Park, NJ 07932
                                        susan.sharko@faegredrinker.com

                                        *Attorneys for Defendants Johnson &
                                        Johnson and LLT Management, LLC*

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on June 17, 2024, I electronically filed the foregoing document with the clerk of the Court using the CM/ECF system, which will send notification of such filing to the CM/ECF participants registered to receive service in this MDL.

*/s/ Kristen R. Fournier*
Kristen R. Fournier
