**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| IN RE: JOHNSON & JOHNSON TALCUM POWDER PRODUCTS MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION | Case No. 3:16-md-2738 (MAS)/(RLS) <br><br> MLD Case No. 2738 <br><br> [FILED ELECTRONICALLY] <br><br> Return Date: July 1, 2024 |

---

**NON-PARTY BEASLEY ALLEN'S REPLY BRIEF IN SUPPORT OF MOTION TO QUASH AND/OR FOR PROTECTIVE ORDER OVER SUBPOENA DIRECTED TO THE BEASLEY ALLEN LAW FIRM**

---

**FOX ROTHSCHILD LLP**
**Formed in the Commonwealth of Pennsylvania**
Jeffrey M. Pollock, Esq.
Michael W. Sabo, Esq.
Princeton Pike Corporate Center
997 Lenox Drive
Lawrenceville, NJ 08648
Telephone: 609-896-7660
Facsimile: 609-896-1469
*Attorneys for Andy Birchfield and Beasley Allen*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT .................................................................................................. 1

BACKGROUND ....................................................................................................................... 2

    A.    J&J's Bankruptcy Scheme Would Deny Women Individual Choice. ................... 2

    B.    J&J's Bankruptcy Scheme Employs Outrageous Ballot-Stuffing Methods. .......... 3

    C.    J&J's Bankruptcy Scheme Would Provide Far Too Little Compensation for Ovarian Cancer Victims. ...................................................................................... 5

    D.    J&J Knowingly and Falsely Portrays Beasley Allen's Trial Record and Excludes Verdicts Returned in Favor of Plaintiffs. ................................................ 7

ARGUMENT .............................................................................................................................. 7

    J&J'S SUBPOENA DIRECTED TO NON-PARTY BEASLEY ALLEN (ITS LITIGATION ADVERSARY IN THIS CASE) MUST BE QUASHED. ............. 7

    A.    The Subpoena Must Be Quashed Because it Seeks Irrelevant, Privileged Information, and the Subpoena Exceeds the Scope of Discovery. ......................... 7

        1.    The Subpoena seeks irrelevant information including Beasley Allen's non-existent documents and communications concerning Third-Party Litigation Funding. (Requests Nos. 1-5) ...................................................... 7

        2.    J&J's Subpoena to its Litigation Opponents' Counsel Seeks Privileged and Confidential Documents and Communications Concerning Client Settlement (Request No. 6) ........................................ 12

    B.    New Jersey Does Not Recognize Champerty, and the Issue Has No Bearing On Beasley Allen's Motion. ...................................................................................... 14

CONCLUSION ......................................................................................................................... 14

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Bates v. State Bar of Arizona*,
433 U.S. 350 (1977)................................................................................................14

*Benitez v. Lopez*,
2019 WL 1578167 (E.D.N.Y. March 14, 2019) .....................................................8

*In re Cendant Corp. Secs. Litig.*,
343 F.3d 658 (3d Cir. 2003).....................................................................................13

*DIRECTV, Inc. v. Richards*,
2005 WL 1514187 (D.N.J. June 27, 2005) .............................................................11

*Hinsinger v. Conifer Ins. Co.*,
2024 WL 866529 (D.N.J. Feb. 29, 2024) ...............................................................12

*Memory Bowl v. N. Pointe Ins. Co.*,
280 F.R.D. 181 (D.N.J. 2012)..................................................................................13

*O'Boyle v. Borough of Longport*,
218 N.J. 168 (2014) .................................................................................................13

*Riffin v. Consol. Rail Corp.*,
783 F. App'x 246 (3d Cir. 2019)..............................................................................14

*Sweeney v. Veneziano*,
70 N.J. Super. 185 (App. Div. 1961) .......................................................................14

*Times of Trenton Pub. Corp. v. Pub. Util. Serv. Corp.*,
2005 WL 1038956 (D.N.J. May 3, 2005) ..........................................................12, 13

*Topolewski v. Quorum Health Res., LLC*,
2013 WL 99843 (M.D. Tenn. Jan. 8, 2013)............................................................11

*United States v. Nobles*,
422 U.S. 225 (1975)..................................................................................................13

*In re Valsartan N-Nitrosodimethylamine (NDMA) Contamination Prods. Liab. Litig.*,
405 F. Supp. 3d 612 (D.N.J. 2019) .............................................................7, 8, 11, 12

**Statutes**

11 U.S.C. §1125(b) ............................................................................................................9

11 U.S.C. § 1125(e) ..........................................................................................9

11 U.S.C. § 1125(g) ..........................................................................................9

56 N.J. Prac., Personal Injury Law § 1:50 (2023-2024 ed.) .........................................14

**Other Authorities**

Local Civ. R. 7.1.1 ..........................................................................................8

Federal Rule of Civil Procedure 201 ..........................................................................4

RPC 4.2 ..........................................................................................1, 9, 10

RPC 4.2, cmt. 3 ..........................................................................................10

MOORE'S FEDERAL PRACTICE 3D § 45.05(1)(c)(2) .........................................11

U.S. Const. amend. I ..........................................................................................14

## PRELIMINARY STATEMENT

Under the guise of a discovery dispute, J&J is using this Court as a soap box to peddle a false narrative—that LTL's third bankruptcy effort will provide reasonable fair compensation to asbestos-laden talc exposure victims. It will not. J&J's own documents confirm that Beasley Allen has not obtained litigation funding in this matter—Mr. Meisels of Fortress has sworn that Fortress never provided Beasley Allen litigation funding, as well as Mr. Birchfield's sworn deposition testimony confirmed Beasley Allen has no litigation funding – the portion J&J omitted in its original submission. Beyond the purported interest in non-existent litigation funding, J&J wishes to bake a pie from the fruit of the poisonous tree. Any effort to invade Beasley Allen's attorney-client relationship is based on fruit of the poisonous tree because Beasley Allen directly advised Jim Murdica not to communicate with a Beasley Allen client—and yet, Mr. Murdica knowingly violated RPC 4.2 (communication with clients) regarding the substance of this matter. Rather than apologize and be grateful that this Court does not revoke Mr. Murdica's *pro hac vice* admission (or refer him to the Ethics Committee), J&J doubles down that it is entitled to further defile the attorney client relationship and insert itself directly between Beasley Allen and its clients.

In the hopes that repeated bankruptcy filings will permit it to resolve the talc claims against it for a fraction of fair and reasonable value, J&J continues to perpetuate false narratives in this matter to remove Beasley Allen as an impediment to its goal of steamrolling cancer victims. Erik Haas is explicit about this objective in J&J's Investors Call on May 1, 20204, announcing the plan.[1] Beasley Allen will not compromise its goal of obtaining fair and reasonable compensation

---

[1] *See* Pollock Decl., Exh. D, Transcript of May 1, 2024 Investors Call, pp. 7-9. In answering a question about how this third bankruptcy is expected to succeed where the first two failed, Mr. Haas spoke of Beasley Allen as "the opponent of a resolution" and added "The other significant reason is I think there's a really good chance that [Andy Birchfield] won't be around for much longer representing his claimants." *Id.* at 8.

for its clients. Beasley Allen opposes J&J's third attempted bankruptcy plan for one overarching reason: asbestos-laden talc victims are entitled to fair and reasonable compensation, not a pennies-on-the-dollar coerced result through a bankruptcy tool wielded by a nearly $400 billion company with a AAA credit rating.

J&J's most recent *ad hominem* attacks against plaintiffs' counsel are that: (1) Beasley Allen opposes a bankruptcy resolution because the Firm would not receive litigation common benefit fees; (2) Beasley Allen is using litigation funding (which Andy Birchfield has already denied under oath); and (3) J&J is entitled to discovery of Beasley Allen's privileged communications with its clients. As J&J knows, Beasley Allen has not sought or received litigation funding. As J&J knows, Beasley Allen has refused J&J efforts to negotiate common benefit fees in exchange for support of its bankruptcy plan, and Andy Birchfield has testified before this Court that the Beasley Allen and leadership position remains steadfast, that is, to focus on claimant recovery and the common benefit fee issue will "take care of itself." None of the discovery requests relate to the common benefit. Lastly, Beasley Allen's communications with its clients are privileged and J&J has no right to invade the privilege. Beasley Allen's motion to quash (Motion) J&J's ill-conceived discovery demands should be granted because the Subpoena seeks privileged (and nonexistent) information from its litigation adversary that J&J is not entitled to.

## BACKGROUND

### A.    J&J's Bankruptcy Scheme Would Deny Women Individual Choice.

Beasley Allen opposes LTL's third bankruptcy filing because talc victims are entitled to fair and reasonable compensation for their injuries. J&J should not be rewarded with providing inadequate remuneration in a proposed bankruptcy when two courts have ruled that J&J is not entitled to bankruptcy because it lacks requisite financial distress. Permitting J&J to access bankruptcy though the backdoor by stuffing the ballot box, will deny worthy claimants of any hope

of being made whole.

In our civil justice system, anyone wronged by the conduct of another has a choice of enforcing their rights by bringing a lawsuit. Once a lawsuit is filed, that individual has a choice to accept or reject any settlement offer made by the opposing party. For example: if a woman was a longtime user of J&J's talc-based baby powder and was diagnosed with Stage IV ovarian cancer, she could choose to bring a lawsuit against J&J for the damages she has suffered and will suffer in the future. In such scenario, if J&J were to offer $150,000 to settle the case, the client – of her own free will – could decide whether to accept or reject the offer. One choice is to reject that offer as far too little and to proceed with the case litigating to trial or negotiating for a higher settlement. Or she could choose to accept the offer, thinking "it has been so long, I prefer to take the offer and be done with the case." Either way, it is an individual choice for the client to make. The client's lawyer can offer advice and a recommendation, but ultimately, the client makes the final choice. That is the way it works in the civil justice system.

That is not the situation with J&J's bankruptcy plan. In J&J's bankruptcy scheme, a collective "vote" supplants the individual's right to choose. So, if a client chooses to reject a proposal but 76% of voters chose to accept the plan, then J&J could seek to have a bankruptcy court impose its plan on all "creditors," even those victims who prefer to decide for themselves. Individual choice is lost.  J&J's objective is to use bankruptcy to cap its talc liability for ovarian cancer claims for all time. J&J's efforts to deny women and their families of the individual and highly personal right to choose is egregious enough, but J&J's machinations to stuff the ballot box in order to rig the vote in its favor inflames and perverts the situation further.

**B.     J&J's Bankruptcy Scheme Employs Outrageous Ballot-Stuffing Methods.**

Ovarian cancer and mesothelioma are both linked to the use of J&J's talc-based baby powder by decades of scientific studies. Other gynecological cancers – such as cervical cancer,

3

uterine cancer, vulvar cancer, and vaginal cancer –have no scientific support. Without scientific support, these claims cannot proceed to trial in a court of law.  In its second bankruptcy attempt, J&J tried to use the promised vote of thousands of claims not supported by science to persuade the bankruptcy court that J&J could succeed with its bankruptcy plan. Like the first petition, the Court dismissed J&J's second bad faith bankruptcy effort. With its third attempt, J&J is going even further to stuff the ballot box. This time, J&J is not only inviting the vote of cancer claims not supported by science, but also the votes of <u>any possible</u> injury related to baby powder other than mesothelioma or lung cancer. Pollock Decl., Exh. B (Plan Sections 3.2.4, 1.1.23, and 1.1.98).

In its Opposition to the Motion, J&J asserts that its bankruptcy vote "would represent the will of the true parties in interest." J&J Opp. Br. at 1. This is false. Again, ovarian cancer is clearly linked to the genital use of talcum powder. Other gynecological cancers are not. Yet, to rig a bankruptcy vote in its favor, J&J is soliciting votes of all gynecological cancer victims with a lure of a guaranteed $1500 payment. Even more, this solicitation is not limited to cancer victims represented by counsel but is part of an aggressive public media campaign on television and the internet. The vote (and the data) confirms that J&J's effort to rig, *i.e.*, to overwhelm the vote of the "true parties in interest." For example,

1. <u>Cervical</u> (In 2021, there were an estimated 295,748 women in United States estimated to be living with cervical cancer);

2. <u>Endometrial/Uterine</u> (In 2021, there were an estimated 862,875 women living with uterine cancer in the United States);

3. <u>Vaginal</u> (In 2022, there were an estimated 8,870 new cases in the United States); and

4. <u>Ovarian</u> (In 2021, there were an estimated 238,484 women living with ovarian cancer in the United States).[2]

---

[2] Per Federal Rule of Civil Procedure 201, the Court may take judicial notice of NIH cancer statistics. *See, e.g.*, https://seer.cancer.gov/statfacts/html/cervix.html (cervical).

In a normal bankruptcy proceeding (*i.e.*, one in which the Debtor was in financial distress and entitled to specialized treatment of the bankruptcy court, unlike J&J) such voting parameters would be supervised by the bankruptcy court. Not here. J&J is conducting its solicitation before any bankruptcy case is filed, thus seeking to evade court supervision.

### C.    J&J's Bankruptcy Scheme Would Provide Far Too Little Compensation for Ovarian Cancer Victims.

The J&J proposal offers woefully inadequate compensation for our clients.  J&J has stated publicly and under oath that it estimates that there are approximately 100,000 current gynecologic cancer claims. However, the $6.475 billion proposed would be divided not only among the 100,000 current claims but also among the thousands and thousands of women who will develop cancer in the years ahead due to past long-term use of talc-based baby powder for feminine hygiene.

After its May 1ˢᵗ announcement, J&J changed its bankruptcy proposal. Although the total amount did not change, now a total of $5.5 billion would be paid in the first three years. The balance would be paid over a 25-year period. If the total $5.5 billion were to be set aside solely for current claims, that would result in an average payment of $55,000 per cancer claim. However, that is $55,000 before reductions for medical liens, attorneys' fees, and costs. There is no assurance that even this insufficient amount would be devoted solely to current claims. If J&J committed the entire $5.5 billion to current claimants, that would be a ratio of approximately 5.5 to 1, meaning 5.5 current claims to each one expected future claim (15.4% for futures). For the decades of future claims, that ratio appears unworkable, and there are likely to be even more future claims. Therefore, if the Futures Claims Representative (FCR) appointed by the bankruptcy court were to demand more funds, then current ovarian cancer victims would receive even less.

It is both ironic and outrageous that J&J is responsible for inflating the number of potential claims thereby lowering payments owed to existing ovarian cancer victims. J&J's 100,000

estimated claims include all gynecologic cancers, not only ovarian cancer which have been linked to talc-based baby power by decades of research and science. By contrast, Beasley Allen's analysis indicates that there are approximately 50,000 to 52,000 current claims that would meet appropriate legal and medical criteria, excluding the other gynecologic cancers that lack scientific and legal support. When has this Court ever seen defendants insist that there are <u>more</u> claims than the plaintiff asserts? The fact that this has not occurred speaks volumes about J&J's effort here to stuff the bankruptcy ballot box.

If the $5.5 billion included only payments for claims supported by science (and *Daubert* tested by two separate federal courts), the average compensation per claim would still be significantly less than $120,000 per cancer claim. This is substantially less than even the medical costs to treat most ovarian cancer patients. Is this reasonable compensation for an ovarian cancer claim? What are elements to be considered in determining what would be fair and reasonable compensation for ovarian cancer victims and their families? Some elements are objective and calculable, such as medical costs and lost wages.

1. Medical costs alone for treating ovarian cancer can range from over $1.5 million dollars to less than $50,000 depending on the age of the victim and the stage of the cancer.

2. The weighted average of medical costs for treating ovarian cancer is **more than $220,000** per victim. Likewise, lost wages are objective and calculable. Lost wages for ovarian cancer claimants average **in excess of $230,000** per victim**.**

3. In addition to the **objective factors that total over $450,000 per ovarian cancer claim**, there are subjective factors such as pain and suffering and punitive damages. The pain and agony that ovarian cancer victims experience is staggering – certainly to be valued at a multiple of the medical costs.

These are the reasons Beasley Allen (MDL leadership and many other counsel) fiercely opposes J&J's third bankruptcy plan. Beasley Allen's commitment to stand in the way of J&J's effort to steamroll cancer victims has provoked J&J. When challenged in this litigation, J&J has attacked every institution designed to hold it accountable: independent scientists, courts, attorneys, victims,

6

juries, and the free press. Such attacks continue here with this unfounded discovery request
targeted at opposing counsel.

**D.    J&J Knowingly and Falsely Portrays Beasley Allen's Trial Record and Excludes Verdicts Returned in Favor of Plaintiffs.**

In the trials that Beasley Allen has been involved, juries have returned verdicts in favor of
plaintiffs, including in the following amounts: (1) $72 million (Fox) (Pollock Decl., Exh. F); (2)
$55 million (Ristesund) (Pollock Decl., Exh. G); (3) $70 million (Giannecchini) (Pollock Decl.,
Exh. H); (4) $110 million (Slemp) (Pollock Decl., Exh. I); and (5) $417 million (Echeverria)
(Pollock Decl., Exh. J).  Although each verdict was vacated on appeal on procedural grounds, the
merits of plaintiffs' claims were untouched by the appellate courts and each case awaits retrial.
J&J's appeals did not result in losses, but delayed justice for plaintiff victims.

## ARGUMENT

### J&J'S SUBPOENA DIRECTED TO NON-PARTY BEASLEY ALLEN (ITS LITIGATION ADVERSARY IN THIS CASE) MUST BE QUASHED.

**A.    The Subpoena Must Be Quashed Because it Seeks Irrelevant, Privileged Information, and the Subpoena Exceeds the Scope of Discovery.**

The Subpoena must be quashed because it seeks irrelevant, privileged information that
exceeds the permissible scope of discovery.

**1.    The Subpoena seeks irrelevant information including Beasley Allen's non-existent documents and communications concerning Third-Party Litigation Funding. (Requests Nos. 1-5).[3]**

The Subpoena must be quashed because it seeks irrelevant information, including non-
existent documents and communications concerning litigation funding. Discovery "directed to a
plaintiff's litigation funding is irrelevant." *In re Valsartan N-Nitrosodimethylamine (NDMA)*

---

[3] In a letter to the Special Master dated June 21, 2024, J&J agreed to "forego Requests 7-8." ECF
No. 32845.

*Contamination Prods. Liab. Litig.*, 405 F. Supp. 3d 612, 615 (D.N.J. 2019) (collecting cases finding litigation funding irrelevant). *See also Benitez v. Lopez*, 2019 WL 1578167, at *1 (E.D.N.Y. March 14, 2019) ("As to the litigation funding documents, Defendants fail to establish that such discovery is 'relevant to any party's <u>claims or defense.</u>'") (emphasis added).

The Subpoena should be quashed because Beasley Allen has complied with Local Rule 7.1.1., and J&J fails to articulate any "good cause" or "something untoward" to justify enforcing the Subpoena and seeking third-party litigation funding documents. Local Civil Rule 7.1.1. requires a party to disclose thirty-party litigation funders. The Rule also permits parties to "seek additional discovery of the terms of any such agreement upon a showing of <u>good cause</u> that the non-party has authority to make <u>material litigation decisions</u> or settlement decisions." (emphasis added). J&J does not make any cogent argument about how any litigation funding—even if it existed—has any relevance to the claims and defenses in the MDL. *In re Valsartan*, 405 F. Supp. 3d at 615. J&J's brief discusses general issues with litigation funding in other jurisdictions (and generally), but never once articulates any supported basis to pursue that discovery against Beasley Allen—its years-long litigation adversary. J&J cannot re-write Local Rule 7.1.1., which was written to balance the Court's right to know whether a plaintiff is being unreasonable because a non-party with financial strength exerts harmful influence on clients, against a plaintiff's right to protect work product and strategic alliances. *Id.* There is no factual basis—let alone "good cause"—that any third-party "has the authority to make material litigation decisions or settlement decisions" or that "the interests of parties or the class" are "not being promoted or protected" to necessitate disclosure. Rule 7.1.1. The Subpoena should be quashed because J&J continues to flout ethical rules and norms for its own craven benefit, while using this Motion as a baseless way to

undermine Beasley Allen's credibility.[4]

J&J and its counsel violated RPC 4.2 in its zeal to "get" Beasley Allen at all costs. RPC 4.2 states that "A lawyer shall not communicate about the subject matter of the representation with a person the lawyer knows, or by the exercise of reasonable diligence should know, to be represented by counsel . . ."

It is J&J—not Beasley Allen—that acted unethically concerning Beasley Allen's clients. The following timeline shows what actually transpired:

1. May 14, 2024 at 11:43 a.m.- Beasley Allen client DD sent an email to Beasley Allen and Mr. Murdica, counsel for J&J. (Pollock Decl. Exh. E, at (BA_0037)).

2. May 14, 2024 at 12:54 p.m.- Beasley Allen's Elizabeth Achtemeier, Esq. advised Mr. Murdica to "please disregard the below [DD's email] attorney-client communication." (*Id.* at BA_0038).

3. May 14, 2024 at 5:54 p.m.- J&J's outside counsel, Mr. Murdica, directly contacted a known Beasley Allen client (DD) in violation of RPC 4.2 and then solicited a response from DD. Mr. Murdica also "added back the original recipients," including DD. (*Id.* at BA_0039). In that email, Mr. Murdica, writing to DD, accused Beasley Allen of "seeking to enter into a surreptitious relationship to thwart a bankruptcy resolution . . . by publishing misleading and deceptive advertising," and suggesting that Beasley Allen was engaged in fraud. *Id.* Mr. Murdica concluded his email by calling for a response from the Beasley Allen client, asking DD to "confirm that they are in a privileged attorney-client relationship with Beasley Allen." *Id.*

---

[4] J&J continues to falsely accuse Beasley Allen of violating the solicitation provisions of the Bankruptcy Code. Beasley Allen is unaware of any new bankruptcy filing by J&J or any LTL entity. Therefore, 11 U.S.C. § 1125(e)'s solicitation provisions do not apply. 11 U.S.C. §1125(b) states that "an acceptance or rejection of a plan may not be solicited after the commencement of the case under this title from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information." (emphasis added). In contrast, 11 U.S.C. § 1125(g) states "Notwithstanding subsection (b), an acceptance or rejection of the plan may be solicited from a holder of a claim or interest if such solicitation complies with applicable nonbankruptcy law and if such holder was solicited before the commencement of the case in a manner complying with applicable nonbankruptcy law." (emphasis added). Here, there is no applicable nonbankruptcy law that prohibits counseling a no vote on a plan that has not yet been filed.

4.  May 15, 2024 at 8:57 a.m.- Beasley Allen's Elizabeth Achtemeier, Esq. again directly advised Mr. Murdica (J&J) that DD "is represented in this matter by Beasley Allen. As you know, it is not permissible for you to communicate directly with a represented individual." (*Id.* at BA_0041).

The facts regarding Mr. Murdica are clear—he knowingly violated RPC 4.2 because he was told at 12:54 PM that this was a Beasley Allen Client, and yet at 5:54 PM he communicated directly with her regarding the substance of Beasley Allen's representation of that client. J&J and its counsel violated RPC 4.2 by continuing to communicate directly with a Beasley Allen client after Beasley Allen put J&J on notice. *See* ABA RPC 4.2, cmt. 3 (noting that rule "applies even though the represented person initiates or consents to the communication. A lawyer must immediately terminate communication with a person if, after commencing communication, the lawyer learns that the person is one with whom communication is not permitted by this rule.").[5]

Moreover, the Subpoena should be quashed because it is unclear what J&J seeks from Beasley Allen that is relevant or non-privileged. J&J's subpoena includes eight requests (now six), none of which survive legal scrutiny, factual reality, or J&J's unilateral reversals. **First**, Requests 1 through 5—which seek documents and communications concerning Fortress or any person/litigation funder—are now moot. J&J withdrew its subpoena to Fortress because Fortress confirmed weeks ago it has not provided Beasley Allen with litigation funding. *See* ECF No. 32213, at 4 (Mr. Meisels states that he has no knowledge of any litigation funding by Beasley Allen). Request Nos. 1-3—which are relevant to Fortress—are moot.

**Second**, Mr. Birchfield's unrefuted testimony confirmed that Beasley Allen does not have any litigation funding for this case, and J&J does not provide any basis to challenge that testimony.

---

[5] Mr. Murdica obviously looked up information about DD because he was aware that she suffers from clear cell ovarian cancer, something DD did not reveal in her emails. Mr. Murdica had actual notice that Beasley Allen represented DD but continued to communicate with her anyway. *See* Pollock Decl., Exh. A (Beasley Allen's 2020 notice of appearance as DD's counsel of record).

10

*See* Motion to Disqualify (ECF No. 32153) at 60 to 62; Pollock Decl., Exh. C at 47:23 to 48:4 ("there was the allegation made that Beasley Allen is so heavily indebted that we could not accept the proposal, and that is–that is categorically false. We have not. **We have not obtained litigation financing or funding for our talc claims.**"). The documents sought in RFPs Nos. 1-5 (even if they existed) are irrelevant. "The fact that defendants have raised no nonspeculative basis for their discovery request" should result in quashing the Subpoena. *See In re Valsartan*, 405 F. Supp. 3d at 619 (citing cases and noting that "[s]peculation does not justify discovery.").[6]

**Third**, J&J's about face regarding the Subpoena's scope—including also withdrawing its request for documents and communications with third parties like Thomson Reuters—confirms that the Subpoena was always a vehicle to harass Beasley Allen (opposing counsel) rather than a serious discovery demand. *DIRECTV, Inc. v. Richards*, 2005 WL 1514187, at *2 (D.N.J. June 27, 2005) (A subpoena is considered unduly burdensome when it "is unreasonable or oppressive."); *Topolewski v. Quorum Health Res., LLC*, 2013 WL 99843, at *4 (M.D. Tenn. Jan. 8, 2013) (quoting MOORE'S FEDERAL PRACTICE 3D § 45.05[1][c][2], p. 45–36) ("obtaining discovery or testimony from opposing counsel undermines the adversarial system and increases the time and cost of litigation, because questions of attorney-client privilege and work product protections are practically unavoidable when counsel becomes a witness.").[7] Even if Beasley Allen had documents responsive to Requests 1-6, J&J's retraction and precedent end the matter.[8]

---

[6] There is similarly no basis to order an in-camera review because J&J cannot satisfy any the factors warranting same. *See In re Valsartan*, 405 F. Supp. 3d at 619, n.8 (discussing considerations not applicable here).

[7] J&J withdrew its subpoena to Thomson Reuters and is now "willing to exclude communications with Thomson Reuters and other media organizations from the scope" of the subpoenas. *See* J&J Opp. Br. at 11; *see also* ECF No. 32845 (J&J agreeing "to limit the scope of Requests 1-6 to exclude communications to journalists").

[8] The Subpoena should also be quashed because it seeks documents and communications not

2.     **J&J's Subpoena to its Litigation Opponents' Counsel Seeks Privileged and Confidential Documents and Communications Concerning Client Settlement (Request No. 6).**

The Subpoena must be quashed because Request No. 6 seeks Beasley Allen's attorney-client privileged communications, including "All Documents, Communications, or Agreements" that concern the "authority to settle or otherwise resolve" the talc litigation. ECF No. 32201 at 14. The "Court 'must quash or modify a subpoena' that, *inter alia,* requires disclosure of privileged or other protected matter, if no exception or waiver applies; or . . . subjects a person to undue burden." *Hinsinger v. Conifer Ins. Co.*, 2024 WL 866529, at *5 (D.N.J. Feb. 29, 2024).

"The attorney-client privilege applies to communications by a client, made in confidence, for the purpose of seeking legal advice from an attorney who is acting in his or her capacity as an attorney." *Hinsinger*, 2024 WL 866529, at *7 (citation omitted). *See Times of Trenton Pub. Corp. v. Pub. Util. Serv. Corp.*, 2005 WL 1038956, at *6 (D.N.J. May 3, 2005) (finding documents relating "to legal strategy regarding a settlement offer" "protected by the attorney-client privilege and the work-product doctrine").

Request No. 6 must be quashed because it broadly seeks "All Documents, Communications, or Agreements" that concern "the authority to settle or otherwise resolve" the MDL litigation. J&J belatedly claims that "Defendants have never sought—and do not seek in Request 6 to Beasley Allen and Smith Law Firm—to obtain communications between Beasley Allen or the Smith Law Firm and their clients." J&J Opp. Br. at 11; ECF No. 32845 (claiming same). But Request No. 6, by its plain terms, would sweep in exactly those privileged documents, *i.e.*, "All Documents, Communications or Agreements concerning the authority to settle or

---

proportional to the needs of the MDL. *See In re Valsartan*, 405 F. Supp. 3d at 615-19 (denying request for litigation funding discovery because unsupported request in MDL was disproportionate).

otherwise resolve the Litigation and/or claims that have or may be asserted therein." ECF No. 32201 at 10. Neither Beasley Allen's clients nor Beasley Allen waived privilege—Beasley Allen warned J&J that it must cease further communications with its known client—which J&J failed to heed. Pollock Decl., Exh. E.

Similarly, the Subpoena should be quashed because Request No. 6 seeks documents protected by the work product doctrine, including documents and agreements exchanged with clients concerning settlement. The work product doctrine "is 'distinct from and broader than the attorney-client privilege.'" *Memory Bowl v. N. Pointe Ins. Co.*, 280 F.R.D. 181, 186 (D.N.J. 2012) (quoting *United States v. Nobles*, 422 U.S. 225, 238 (1975)). *See Times of Trenton Pub. Corp.*, 2005 WL 1038956, at *6 (finding that work product doctrine applied to communications concerning settlement offers between client and attorney). Request No. 6 seeks all documents, communications, and agreements exchanged between Beasley Allen and its clients concerning settlement, *i.e.*, Beasley Allen's core protected settlement-related mental processes. *See O'Boyle v. Borough of Longport*, 218 N.J. 168, 189 (2014) (recognizing that the burden is on party seeking to invade "privacy of an attorney's course of preparation"); *In re Cendant Corp. Secs. Litig.*, 343 F.3d 658, 663 (3d Cir. 2003) ("Thus, core or opinion work product receives greater protection than ordinary work product and is discoverable only upon a showing of rare and exceptional circumstances."). J&J belatedly claims that it does not seek "privileged communications" "solely between Beasley Allen or the Smith Law Firm and their clients regarding legal advice." ECF No. 32845. But those are the only documents (if they existed) that could be produced in response to Request No. 6. Request No. 6—to the extent anything is left of it—must be quashed.

13

**B.      New Jersey Does Not Recognize Champerty, and the Issue Has No Bearing On Beasley Allen's Motion.**

New Jersey law does not recognize Champerty, and the issue has no bearing on Beasley Allen's Motion, or the issues raised therein. *See* 56 N.J. Prac., Personal Injury Law § 1:50 (2023-2024 ed.).  Even assuming *arguendo* Champerty were still recognized (and it has been abandoned in the majority of states), there are no facts supporting the argument that the claims here are being pursued for vexatious reasons—these are injured claimants with real injuries. More to the point, Champerty and its companion (Barratry) are dead or dying doctrines. The United States Supreme Court's decision in *Bates v. Arizona* changed the landscape and found that lawyers and law firms have a First Amendment right to free speech.  *Bates v. State Bar of Arizona*, 433 U.S. 350 (1977). J&J has no valid basis to seek the documents sought. Instead, it resurrects Champerty from the grave. J&J does not cite a single New Jersey state or District of New Jersey case to support its novel Champerty theory because New Jersey has not applied Champerty for decades. *See Riffin v. Consol. Rail Corp.*, 783 F. App'x 246, 250 (3d Cir. 2019) (noting that New Jersey courts have held that the defense of Champerty "does not apply in this State.") (quoting *Sweeney v. Veneziano*, 70 N.J. Super. 185, 193 (App. Div. 1961)). J&J points to several other states and laws with no relevance to this application. For these reasons, the Subpoena—to the extent anything is left of it—must be quashed.

## CONCLUSION

The Subpoena served upon Beasley Allen is J&J's latest attempt to use the civil courts and the bankruptcy code to harass Beasley Allen and its talc-asbestos victim clients. The Subpoena must be quashed because it seeks: (1) irrelevant, non-existent litigation funding; and (2) attorney-client privileged communications and documents concerning settlement. J&J must be put on notice that its repeated abuses of the federal courts—including issuing a subpoena to its litigation

14

adversary (opposing counsel) cannot continue.

Respectfully submitted,

**FOX ROTHSCHILD LLP**

*Attorneys for Andy Birchfield and Beasley Allen*

/s/ Jeffrey M. Pollock
    Jeffrey M. Pollock
    Michael W. Sabo

Dated: June 24, 2024

15

## CERTIFICATE OF SERVICE

I, Jeffrey M. Pollock, Esq., hereby certify that I caused a true and correct copy of the foregoing Reply Brief in Support of Beasley Allen's Motion to Quash and/or for Protective Order to be served upon all Counsel of Record via the Court's CM/ECF system.

*/s/ Jeffrey M. Pollock*

Jeffrey M. Pollock, Esq.
Michael W. Sabo, Esq.
*Attorneys for Andy Birchfield and Beasley Allen*

Dated: June 24, 2024

16