Jeffrey M. Pollock, Esq.
Michael W. Sabo, Esq**.**
**FOX ROTHSCHILD LLP**
**Formed in the Commonwealth of Pennsylvania**
Princeton Pike Corporate Center
997 Lenox Drive
Lawrenceville, NJ 08648
Telephone: 609-896-7660
Facsimile: 609-896-1469
*Attorneys for Andy Birchfield and Beasley Allen*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| IN RE: JOHNSON & JOHNSON TALCUM POWDER PRODUCTS MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION | Case No. 3:16-md-2738 (MAS)/(RLS)<br><br>MLD Case No. 2738<br><br>[FILED ELECTRONICALLY]<br><br>Return Date: July 1, 2024 |

**DECLARATION OF JEFFREY M. POLLOCK, ESQ.**

I, JEFFREY M. POLLOCK, ESQ., declare:

1.      I am a partner at the law firm Fox Rothschild LLP, counsel for Andy D. Birchfield, Jr., Esq. and Beasley Allen Crow Methvin Portis & Miles, P.C. (Beasley Allen). I make this declaration based on personal knowledge and in support of Beasley Allen's Motion to Quash and/or for Protective Order over the subpoena directed to Beasley Allen.

2.      Attached hereto as **Exhibit A** is a true and correct copy of a October 13, 2020 Notice of Appearance filed by Leigh, O'Dell, Esq. in *Detres v. Johnson & Johnson, et al.*, Case No. 3:18-cv-05401/MDL No. 2738.

3.      Attached hereto as **Exhibit B** is a true and correct copy of the "Prepackaged

1

Chapter 11 Plan of Reorganization of the Debtor" or J&J bankruptcy solicitation proposal.

4.      Attached hereto as **Exhibit C** is a true and correct copy of an excerpt of the April 17, 2023 deposition of Andy D. Birchfield, Jr., Esq.

5.      Attached hereto as **Exhibit D** is a true and correct copy of an excerpt of the May 1, 2024 J&J investors call.

6.      Attached hereto as **Exhibit E** is a true and correct copy of a May 2024 email exchange between and among various entities and persons, including Beasley Allen, its client, and J&J's counsel.

7.      Attached hereto as **Exhibit F** is a true and correct copy of $72 million (Fox) filed verdict sheet.

8.      Attached hereto as **Exhibit G** is a true and correct copy of a $55 million (Ristesund) filed verdict sheet.

9.      Attached hereto as **Exhibit H** is a true and correct copy of $70 million (Giannecchini) filed verdict sheet.

10.     Attached hereto as **Exhibit I** is a true and correct copy of a $110 million (Slemp) filed verdict sheet.

11.     Attached hereto as **Exhibit J** is a true and correct copy of a $417 million (Echeverria) filed verdict sheet.

Under 28 U.S.C. 1746, I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed on June 24, 2024

*/s/ Jeffrey M. Pollock*
JEFFREY M. POLLOCK, ESQ.

# **EXHIBIT A**

BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.
Post Office Box 4160
Montgomery, Alabama 36103
Telephone: (334) 269-2343

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ISADORA DETRES, | Case No. 3:18-cv-05401 |
| Plaintiff, | |
| v. | MDL No. 2738 |
| JOHNSON & JOHNSON, et al., | |
| Defendants. | **NOTICE OF APPEARANCE** |

## NOTICE OF APPEARANCE

**COMES NOW**, Leigh O'Dell, and hereby enters her Appearance as additional counsel on behalf of the Plaintiff, Isadora Detres, in the above-referenced matter.

**Respectfully submitted**, this the 13th Day of October 2020.

/s/ Leigh O'Dell
Leigh O'Dell
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.
Post Office Box 4160
218 Commerce Street
Montgomery, Alabama 36103
Telephone: (334) 269-2343
Facsimile: (334) 954-7555
Leigh.ODell@BeasleyAllen.com

*Attorney for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 13, 2020, a copy of the foregoing Notice of Appearance was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's system.

/s/ Leigh O'Dell
Leigh O'Dell
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.
Post Office Box 4160
218 Commerce Street
Montgomery, Alabama 36103
Telephone: (334) 269-2343
Facsimile: (334) 954-7555
Leigh.ODell@BeasleyAllen.com

*Attorney for Plaintiff*

2

# **EXHIBIT B**

## UNITED STATES BANKRUPTCY COURT
## [●] DISTRICT OF TEXAS
## [●] DIVISION

|  |  |
|---|---|
| In re: | Chapter 11 |
| Red River Talc LLC, | Case No: [●] |
| Debtor. |  |

Gregory M. Gordon (TX 08435300)
Dan B. Prieto (TX 24048744)
Amanda Rush (TX 24079422)
JONES DAY
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
gmgordon@jonesday.com
dbprieto@jonesday.com
asrush@jonesday.com

Brad B. Erens (IL 06206864)
Caitlin K. Cahow (IL 6317676)
JONES DAY
110 N. Wacker Drive, Suite 4800
Chicago, Illinois 60606
Telephone: (312) 782-3939
Facsimile: (312) 782-8585
bberens@jonesday.com
ccahow@jonesday.com

PROPOSED ATTORNEYS FOR DEBTOR

## **PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION OF THE DEBTOR**

VOTES TO ACCEPT OR REJECT THE PLAN ARE BEING SOLICITED BY LLT MANAGEMENT LLC, ON BEHALF OF THE DEBTOR, CONSISTENT WITH SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE. THE PLAN HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. FOLLOWING THE SOLICITATION OF VOTES, ASSUMING THE REQUISITE ACCEPTANCE OF THE PLAN WILL HAVE BEEN OBTAINED, THE DEBTOR MAY (1) BE FORMED AS PART OF A RESTRUCTURING INVOLVING LLT MANAGEMENT LLC AND JOHNSON & JOHNSON HOLDCO (NA) INC., (2) FILE A PETITION FOR RELIEF UNDER CHAPTER 11 OF THE BANKRUPTCY CODE, AND (3) SUBMIT THE DISCLOSURE STATEMENT AND THE PLAN TO THE BANKRUPTCY COURT FOR APPROVAL.

THE PLAN PROVIDES, AMONG OTHER THINGS, FOR THE ISSUANCE OF AN INJUNCTION PURSUANT TO SECTION 524(g), SECTION 1123(b)(6), AND/OR SECTION 105(a) OF THE BANKRUPTCY CODE THAT WILL CHANNEL ALL TALC PERSONAL INJURY CLAIMS AGAINST THE DEBTOR AND THE PROTECTED PARTIES (AS DEFINED HEREIN) IN CLASS 4 TO A TRUST, AS WELL AS OTHER INJUNCTIONS DESCRIBED IN <u>ARTICLE XI</u> OF THE PLAN.

## TABLE OF CONTENTS

**Page**

ARTICLE I     DEFINITIONS AND RULES OF INTERPRETATION ............................... 1

    1.1    Terms ........................................................................................ 1
    1.2    Interpretation; Application of Definitions; Rules of Construction; and
        Computation of Time ................................................................. 22
    1.3    Availability of Plan and Exhibits ............................................. 22
    1.4    Ancillary Documents ............................................................... 22

ARTICLE II     TREATMENT OF ADMINISTRATIVE CLAIMS AND PRIORITY
               TAX CLAIMS ......................................................................... 22

    2.1    Administrative Claims ............................................................. 22
    2.2    Fee Claims ............................................................................... 23
    2.3    Payment of Statutory Fees ....................................................... 24
    2.4    Allowed Priority Tax Claims .................................................... 24

ARTICLE III     TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS ................. 24

    3.1    Claims and Interests Classified ................................................ 24
    3.2    Treatment and Classification of Claims and Interests ............. 24
    3.3    Debtor's Rights with Respect to Unimpaired Claims ............. 27
    3.4    Elimination of Vacant Classes ................................................ 27

ARTICLE IV     THE TALC PERSONAL INJURY TRUST ................................... 27

    4.1    Establishment ........................................................................... 27
    4.2    Purpose .................................................................................... 27
    4.3    Initial Talc Trustees ................................................................. 28
    4.4    Initial Talc Trust Advisory Committee and FCR .................... 28
    4.5    Initial Talc Trust Administrators ............................................. 29
    4.6    Advancement of Expenses Prior to the Effective Date............ 29
    4.7    Trust Distribution Procedures ................................................. 29
    4.8    Assumption of Liability for Talc Personal Injury Claims ................. 30
    4.9    Contribution of Certain Assets ................................................ 31
    4.10   Payment of Talc Personal Injury Trust Expenses ................... 34
    4.11   Treatment of Remainder Assets ............................................. 35
    4.12   Dissolution .............................................................................. 35
    4.13   Funds and Investment Guidelines ........................................... 35
    4.14   Compliance with QSF Regulations ......................................... 35
    4.15   Cooperation Agreement .......................................................... 35
    4.16   Indemnification and Reimbursement of the Protected Parties............ 35
    4.17   Exculpation of the Protected Parties ....................................... 36

i

# TABLE OF CONTENTS

Page

ARTICLE V    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
LEASES ............................................................................................. 36

5.1    General Treatment ................................................................................ 36
5.2    Assumption and Assignment ............................................................... 37
5.3    Approval of Assumptions and Assignments and Related Procedures ................. 37
5.4    Payments Related to Assumption ........................................................ 38
5.5    Executory Contracts and Unexpired Leases to Be Rejected and Rejection
Procedures ............................................................................................. 39
5.6    Claims Based on Rejection .................................................................. 40
5.7    Contracts and Leases Entered Into After the Petition Date ................. 40
5.8    Reservation of Rights ........................................................................... 40
5.9    Imerys/Cyprus Matters ........................................................................ 41
5.10   Talc Insurance Assets .......................................................................... 42
5.11   Master Settlement Agreements ........................................................... 42

ARTICLE VI    DISTRIBUTIONS UNDER THE PLAN ON ACCOUNT OF NON-
TALC CLAIMS .................................................................................. 42

6.1    Distributions ......................................................................................... 42
6.2    Timing and Calculation of Amounts to be Distributed ....................... 42
6.3    Designation of Disbursing Agent ........................................................ 43
6.4    Rights and Powers of Disbursing Agent .............................................. 43
6.5    Distributions on Account of Claims Allowed After the Effective Date ............. 43
6.6    Delivery of Distributions and Undeliverable or Unclaimed Distributions .......... 43
6.7    Time Bar to Cash Payments ................................................................. 44
6.8    Record Date for Holders of Claims ..................................................... 44
6.9    Compliance with Tax Requirements and Allocations ......................... 45
6.10   Transfers of Claims .............................................................................. 46
6.11   Setoffs .................................................................................................. 46

ARTICLE VII    RESOLUTION OF DISPUTED NON-TALC CLAIMS ............................. 46

7.1    Disputed Non-Talc Claims .................................................................. 46
7.2    Rights of Debtor and Reorganized Debtor .......................................... 46
7.3    Proofs of Claim Not Required .............................................................. 47
7.4    No Distributions Pending Allowance ................................................... 47
7.5    Distributions on Account of Disputed Claims ..................................... 47

ARTICLE VIII    CONDITIONS PRECEDENT TO CONFIRMATION AND
CONSUMMATION OF THE PLAN ............................................. 47

8.1    Conditions Precedent to the Confirmation of the Plan ....................... 47
8.2    Conditions Precedent to the Effective Date of the Plan ...................... 53
8.3    Waiver of Conditions Precedent .......................................................... 54
8.4    Notice of Effective Date ....................................................................... 54

NAI-1539839717

# TABLE OF CONTENTS

Page

| | | |
|---|---|---|
| 8.5 | Effect of Nonoccurrence of Conditions Precedent to the Effective Date of the Plan | 54 |

**ARTICLE IX    MEANS FOR IMPLEMENTATION OF THE PLAN** ................. 54

| | | |
|---|---|---|
| 9.1 | General | 54 |
| 9.2 | Operations of the Debtor Prior to the Effective Date | 55 |
| 9.3 | Articles of Organization and Operating Agreement | 55 |
| 9.4 | Corporate Action | 55 |
| 9.5 | Authority of Officers | 55 |
| 9.6 | Post-Effective Date Governance; Continued Existence of the Reorganized Debtor | 55 |
| 9.7 | Arrangements of the Reorganized Debtor with Managers, Officers, and Employees | 56 |
| 9.8 | Good Faith Compromise and Settlement | 56 |
| 9.9 | Resolution of Channeled Talc Personal Injury Claims | 56 |
| 9.10 | Cash for Cash Contributions, Distributions, and Other Payments Pursuant to the Plan | 56 |
| 9.11 | Modification of the Plan | 57 |
| 9.12 | Revocation or Withdrawal of the Plan | 57 |
| 9.13 | Certain Technical Modifications | 57 |

**ARTICLE X    EFFECT OF CONFIRMATION** ................. 58

| | | |
|---|---|---|
| 10.1 | Preservation of Rights of Action by the Debtor and the Reorganized Debtor | 58 |
| 10.2 | Imerys/Cyprus Matters | 58 |
| 10.3 | Talc Insurance Assets | 61 |
| 10.4 | Preservation of Rights of Action by the Talc Personal Injury Trust | 63 |
| 10.5 | Terms of Injunctions and Automatic Stay | 63 |
| 10.6 | The FCR and the TCC | 64 |
| 10.7 | No Effect on United States Trustee | 64 |
| 10.8 | Binding Effect | 64 |

**ARTICLE XI    DISCHARGE, RELEASES, INJUNCTIONS, AND EXCULPATION** ....... 64

| | | |
|---|---|---|
| 11.1 | Discharge and Injunctions | 64 |
| 11.2 | Releases | 65 |
| 11.3 | Channeling Injunction and Insurance Entity Injunction | 68 |
| 11.4 | Exculpation | 73 |
| 11.5 | Disallowed Claims | 73 |
| 11.6 | No Successor Liability | 74 |
| 11.7 | Corporate Indemnities | 74 |
| 11.8 | Independent Legal Significance of Individual Provisions | 75 |

## TABLE OF CONTENTS

**Page**

ARTICLE XII    JURISDICTION OF BANKRUPTCY COURT ............................................ 75

    12.1    Jurisdiction ...................................................................................................... 75
    12.2    Specific Purposes ............................................................................................ 75
    12.3    District Court Jurisdiction ............................................................................... 77
    12.4    Reservation of Rights ...................................................................................... 77
    12.5    Compromises of Controversies ....................................................................... 77

ARTICLE XIII    MISCELLANEOUS PROVISIONS ............................................................ 77

    13.1    Closing of Chapter 11 Case ............................................................................ 77
    13.2    Timing of Distributions or Actions ................................................................. 77
    13.3    Governing Law ................................................................................................ 78
    13.4    Entire Agreement ............................................................................................ 78
    13.5    Notices to the Debtor and Reorganized Debtor .............................................. 78
    13.6    Post-Effective Date Notices by the Reorganized Debtor ................................ 79
    13.7    Inconsistencies ................................................................................................ 79
    13.8    Withholding of Taxes ...................................................................................... 79
    13.9    Transfer Taxes ................................................................................................. 79
    13.10    Successors and Assigns .................................................................................. 80
    13.11    Duty to Cooperate .......................................................................................... 80
    13.12    Effective Date Actions Simultaneous ............................................................ 80
    13.13    Plan Supplements ........................................................................................... 80

NAI-1539839717

## <u>EXHIBITS AND SCHEDULES TO PLAN</u>

| | |
|---|---|
| Exhibit A | Amended Articles of Organization of the Reorganized Debtor |
| Exhibit B | Amended Operating Agreement of the Reorganized Debtor |
| Exhibit C | Cash Contributions |
| Exhibit D | Cash Contributions Parent Guarantee |
| Exhibit E | Cooperation Agreement* |
| Exhibit F | Retained Rights of Action* |
| Exhibit G | Talc Insurance Policies |
| Exhibit H | Talc Personal Injury Trust Agreement |
| Exhibit I | Talc PI Note |
| Exhibit J | Talc PI Pledge Agreement |
| Exhibit K | Trust Distribution Procedures |
| Exhibit L | Executory Contracts and Unexpired Leases to Be Rejected |
| Schedule 1 | Debtor Corporate Parties |
| Schedule 2 | Imerys/Cyprus Parties |
| Schedule 3 | Retailers and Indemnified Parties |

\*    Provided by Plan Supplement

*Reference is made to the Disclosure Statement for a discussion of, among other things, the history, business, results of operations, and assets of the Debtor, and risks associated with the Plan. The Disclosure Statement also provides a summary of the Plan. YOU ARE URGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT WITH CARE IN EVALUATING HOW THE PLAN WILL AFFECT YOUR CLAIM(S) BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.*

*Nothing in the Plan or the other Plan Documents constitutes an admission by the Debtor as to the existence, merits, or amount of the Debtor's actual present or future liability on account of any Claim or demand (including any Talc Personal Injury Demand) except to the extent that such liability is specifically provided for in the Plan or the other Plan Documents in accordance with the Confirmation Order effective as of the Effective Date.*

## ARTICLE I
## DEFINITIONS AND RULES OF INTERPRETATION

1.1    Terms.  The capitalized terms used herein have the respective meanings set forth below.  Any term that is not otherwise defined in this Section 1.1, but that is defined elsewhere in the Plan or in the Bankruptcy Code or Bankruptcy Rules, shall have the meaning given to that term in the Plan, the Bankruptcy Code, or Bankruptcy Rules, as applicable.  For the avoidance of doubt, the uncapitalized terms "affiliate," "claim," "demand," "entity," "governmental unit," and "lien" have the meanings given to them in sections 101(2), 101(5), 524(g)(5), 101(15), 101(27), and 101(37) of the Bankruptcy Code, respectively.

1.1.1    "**2021 Chapter 11 Case**" means the chapter 11 case of LLT that was commenced on October 14, 2021, and subsequently dismissed on April 4, 2023.

1.1.2    "**2021 Corporate Restructuring**" means, collectively, the transactions comprising the corporate restructuring of Old JJCI that was completed on October 12, 2021, as part of which (a) Old JJCI ceased to exist and (b) LLT and Holdco were formed.

1.1.3    "**2023 Chapter 11 Case**" means the chapter 11 case of LLT that was commenced on April 4, 2023, and subsequently dismissed on August 11, 2023.

1.1.4    "**2023 Conversion**" means the conversion of LLT from a North Carolina limited liability company to a Texas limited liability company that occurred on December 29, 2023.

1.1.5    "**2023 Funding Agreement Modifications**" means the transactions contemplated by that certain Termination and Substitution Agreement, dated April 4, 2023, executed by J&J, Holdco, and LLT.

1.1.6    "**Administrative Claim**" means any Claim for any cost or expense of administration of the Chapter 11 Case under section 503(b) of the Bankruptcy Code, including:  (a) any actual and necessary post-petition cost or expense of preserving the Estate or operating the business of the Debtor; (b) Cure Amount Claims; (c) post-petition costs, indebtedness or contractual obligations duly and validly incurred or assumed by the Debtor in the ordinary course of business; (d) any Fee Claim, including any Claim for

1

compensation or reimbursement of expenses of Professionals to the extent allowed by the Bankruptcy Court under sections 327, 328, 330(a), 331, or 503(b) of the Bankruptcy Code or the provisions of the Plan; and (e) any fee or charge assessed against the Estate under 28 U.S.C. § 1930(6).

1.1.7    "**Administrative Claims Bar Date**" means the applicable deadline for filing requests for payment of Administrative Claims (other than Fee Claims and Cure Amount Claims) and shall be the Business Day that is sixty (60) days after the Effective Date.

1.1.8    "**Affiliate**" means, with respect to any specified entity:    (a) an "affiliate," as defined in section 101(2) of the Bankruptcy Code, of such specified entity; or (b) any other Person that, directly or indirectly through one or more intermediaries or otherwise, controls, is controlled by, or is under common control with the specified entity. As used in clause (b) of the prior sentence, "control" shall include the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the specified entity (whether through the ownership of equity, by contract or otherwise).

1.1.9    "**AHC of Supporting Counsel**" means the Ad Hoc Committee of Supporting Counsel formed to advance the common interests of the law firms representing certain holders of Channeled Talc Personal Injury Claims that have entered into plan support agreements with LLT and J&J on or after January 1, 2024.

1.1.10    "**Allowed**" means, as to any Non-Talc Claim or Interest, that such Non-Talc Claim or Interest is (a) expressly allowed under the Plan, (b) not Disputed, (c) either allowed or determined by a Final Order of a court of competent jurisdiction, or (d) agreed to by the Debtor or Reorganized Debtor and the holder of such Claim or Interest; *provided*, *however*, that, notwithstanding the foregoing, the Allowed amount of Non-Talc Claims shall be subject to and shall not exceed the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 and 503 of the Bankruptcy Code, to the extent applicable.

1.1.11    "**Allowed Amount**" means, with respect to any Non-Talc Claim, the amount for which that Claim is Allowed, denominated in U.S. dollars.

1.1.12    "**Amended Articles of Organization**" means the amended and restated articles of organization of the Reorganized Debtor, in substantially the form of Exhibit A.

1.1.13    "**Amended Charter Documents**" means, collectively, the Amended Articles of Organization and the Amended Operating Agreement.

1.1.14    "**Amended Operating Agreement**" means the amended and restated operating agreement of the Reorganized Debtor, in substantially the form of Exhibit B.

1.1.15    "**Bankruptcy Code**" means title 11 of the United States Code, as in effect on the Petition Date or thereafter amended with retroactive applicability to the Chapter 11 Case.

2

1.1.16    "**Bankruptcy Court**" means the United States Bankruptcy Court for the [•] District of Texas having jurisdiction over the Chapter 11 Case or, to the extent of the withdrawal of the reference under section 157 of title 28 of the United States Code, the District Court.

1.1.17    "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code and any local rules of the Bankruptcy Court, as in effect on the Petition Date, together with any and all amendments and modifications thereto that were subsequently made applicable to the Chapter 11 Case.

1.1.18    "**Business Day**" means any day other than a Saturday, a Sunday, or any other day on which banking institutions in Dallas, Texas, are authorized or required by law or executive order to close.

1.1.19    "**Cash**" means lawful currency of the United States of America and its equivalents.

1.1.20    "**Cash Contributions**" means Cash to be delivered to the Talc Personal Injury Trust in the amounts and on the dates set forth on Exhibit C.

1.1.21    "**Cash Contributions Guarantee**" means the guarantee, in substantially the form of Exhibit D, to be executed and delivered by J&J and New Holdco for the benefit of the Talc Personal Injury Trust, pursuant to which each of J&J and New Holdco will guarantee the timely delivery of the Cash Contributions.

1.1.22    "**Channeled Indirect Talc Personal Injury Claims**" means all Indirect Talc Personal Injury Claims that are not Defense Cost Claims.

1.1.23    "**Channeled Talc Personal Injury Claims**" means all Talc Personal Injury Claims that are not Defense Cost Claims, including (a) Ovarian/Gynecological Talc Personal Injury Claims and (b) Other Disease Talc Personal Injury Claims.

1.1.24    "**Channeling Injunction**" means the permanent injunction provided for in Section 11.3.1 with respect to Channeled Talc Personal Injury Claims to be issued pursuant to the Confirmation Order.

1.1.25    "**Chapter 11 Case**" means the chapter 11 case of the Debtor pending in the Bankruptcy Court.

1.1.26    "**Claim**" shall have the meaning ascribed to such term in section 101(5) of the Bankruptcy Code as it pertains to "claims" against the Debtor.

1.1.27    "**Claims Agent**" means Epiq Corporate Restructuring, LLC.

1.1.28    "**Class**" means a category of holders of Claims or Interests described in Article III.

NAI-1539839717

1.1.29    "**Clerk**" means the clerk of the Bankruptcy Court.

1.1.30    "**Compensation Procedures Order**" means any order of the Bankruptcy Court establishing procedures for interim compensation and reimbursement and expenses of Retained Professionals.

1.1.31    "**Confirmation**" means the entry of the Confirmation Order on the docket of the District Court.

1.1.32    "**Confirmation Date**" means the date on which the District Court enters the Confirmation Order on its docket.

1.1.33    "**Confirmation Hearing**" means, collectively, the hearing or hearings held by the Bankruptcy Court or the District Court on Confirmation of the Plan, as such hearing or hearings may be continued from time to time.

1.1.34    "**Confirmation Order**" means: (a) the order of the Bankruptcy Court and the District Court acting jointly or (b) the order of the District Court affirming an order entered separately by the Bankruptcy Court; in either case, which order confirms the Plan pursuant to section 1129 of the Bankruptcy Code.

1.1.35    "**Contribution Claim**" means any and all rights of a Talc Insurance Company that is not a Settling Talc Insurance Company, whether legal, equitable, contractual, or otherwise, of contribution, indemnity, reimbursement, subrogation, or other similar claims directly or indirectly arising out of or in any way relating to such insurer's payment of loss on behalf of the Debtor in connection with any Channeled Talc Personal Injury Claim.

1.1.36    "**Cooperation Agreement**" means a Cooperation Agreement among the Reorganized Debtor, J&J, the Talc Personal Injury Trust, and the Custodians in substantially the form of Exhibit E.

1.1.37    "**Cure Amount Claim**" means a Claim based on the Debtor's defaults pursuant to an Executory Contract or Unexpired Lease at the time such contract or lease is assumed by the Debtor under section 365 of the Bankruptcy Code (but, if the provisions of Section 4.9.3 and Section 5.9.1 are applicable, excluding any Claim arising out of an alleged breach, default, or violation under any Imerys/Cyprus Agreement whether or not such agreement is determined by court order to be an Executory Contract).

1.1.38    "**Custodians**" has the meaning set forth in the Cooperation Agreement.

1.1.39    "**Cyprus**" means Cyprus Mines Corporation.

1.1.40    "**Debtor**" means Red River Talc LLC, a Texas limited liability company and a successor to Old JJCI and LLT.

1.1.41    "**Debtor Corporate Parties**" means J&J and all of its current and former Affiliates, including all Persons listed on Schedule 1, other than (a) the Debtor and (b) as applicable, Imerys, Cyprus, and their respective Affiliates.

1.1.42    "**Defense Cost Claim**" means any Indirect Talc Personal Injury Claim to the extent in respect of legal fees or other out-of-pocket costs incurred in connection with the defense of claims.  For the avoidance of doubt, if the provisions of Section 4.9.3 and Section 5.9.1 are applicable, Defense Cost Claims include any such Indirect Talc Personal Injury Claims of the Imerys/Cyprus Parties under any Imerys/Cyprus Agreement or otherwise.

1.1.43    "**Direct Talc Personal Injury Claim**" means a Talc Personal Injury Claim that is asserted by or on behalf of:  (a) an injured individual; (b) the estate, legal counsel, relative, assignee, or other representative of an injured or deceased individual; or (c) an individual who claims injury or damages as a result of the death or injury of another individual caused by talc or a product or material containing talc.  For the avoidance of doubt, Direct Talc Personal Injury Claims include claims and demands for: (i) loss of consortium; (ii) loss of companionship, services, or society; or (iii) wrongful death.

1.1.44    "**Disallowed**" means, as to any Non-Talc Claim, that such Non-Talc Claim is denied, dismissed, expunged, overruled, or disallowed in whole or in part (but solely to the extent of the disallowance) by Final Order or under the Plan.

1.1.45    "**Disbursing Agent**" means the Reorganized Debtor, or such other Person or Persons chosen by the Debtor or the Reorganized Debtor to make or facilitate Distributions pursuant to the Plan.

1.1.46    "**Discharge Injunction**" means the injunction issued in accordance with sections 524 and 1141 of the Bankruptcy Code and contained in Section 11.1.2.

1.1.47    "**Disclosure Statement**" means the *Disclosure Statement for Prepackaged Chapter 11 Plan of Reorganization of the Debtor*, dated June 3, 2024, used by LLT to solicit votes to accept or reject the Plan for and on behalf of the Debtor, including all exhibits and schedules thereto, as such disclosure statement may be amended, modified, or supplemented from time to time.

1.1.48    "**Disputed**" means, as to any Non-Talc Claim (or any portion thereof), that such Non-Talc Claim (or portion thereof) is not Allowed or Disallowed pursuant to the Plan or a Final Order of the Bankruptcy Court, or is contingent or unliquidated.

1.1.49    "**Distributions**" means Cash, property, or interest in property to be paid or delivered hereunder to holders of Allowed Non-Talc Claims under the terms of the Plan.

1.1.50    "**Distribution Date**" means the date which is as soon as reasonably practicable after (a) the Effective Date or (b) in the case of any Non-Talc Claim (other than a Reinstated Non-Talc Claim) that is not yet Allowed as of the Effective Date, the date such Non-Talc Claim becomes Allowed.

1.1.51     "**Distribution Record Date**" means the record date for determining an entitlement to receive Distributions under the Plan on account of Allowed Non-Talc Claims (other than Reinstated Non-Talc Claims), which shall be the Confirmation Date.

1.1.52     "**District Court**" means the United States District Court for the [●] District of Texas.

1.1.53     "**Docket**" means the docket in the Chapter 11 Case maintained by the Clerk.

1.1.54     "**Effective Date**" means the Business Day upon which all of the conditions precedent to the occurrence of the Effective Date contained in Section 8.2 have been satisfied or waived pursuant to Section 8.3.

1.1.55     "**Encumbrance**" means, with respect to any property (whether real or personal, tangible or intangible), any mortgage, lien, pledge, charge, security interest, assignment or encumbrance of any kind or nature in respect of such property (including any conditional sale or other title retention agreement, any security agreement, and the filing of, or agreement to give, any financing statement under the Uniform Commercial Code or comparable law of any jurisdiction) to secure payment of a debt or performance of an obligation.

1.1.56     "**Equity Interests in the Debtor**" means the Interests issued by the Debtor.

1.1.57     "**Estate**" means the estate created in the Chapter 11 Case under section 541 of the Bankruptcy Code.

1.1.58     "**Exculpated Parties**" means, collectively, (a) the Debtor's officers and managers who served at any time, whether before, on, or after the Petition Date, prior to the Effective Date of the Plan (each solely in their capacity as such); (b) the Debtor; (c) the TCC and each of the members thereof, solely in his or her capacity as such; (d) the FCR, solely in her capacity as such; (e) the Retained Professionals; (f) solely as to conduct found by a court of competent jurisdiction to have been undertaken while acting as a fiduciary of the Debtor or the Estate, the employees of the Debtor or other individuals providing similar services to the Debtor (other than the Debtor's officers and managers), and the employees of the Retained Professionals, each solely in their capacities as such; and (g) counsel to the individual members of the TCC, each solely in their capacity as such; *provided*, *however* that the Bankruptcy Court is not determining the fiduciary status of any employees of the Debtor or other individuals providing similar services to the Debtor (other than the Debtor's officers and managers), or any employees of any of the Retained Professionals or counsel to the individual members of the TCC.  Nothing herein shall shift the burden of the employees of the Debtor or other individuals providing similar services to the Debtor (other than the Debtor's officers and managers), and the employees of the Retained Professionals or counsel to the individual members of the TCC, to establish that they were fiduciaries of the Debtor or the Estate prior to the Effective Date of the Plan.

1.1.59    "**Exculpation Injunction**" means the injunction described in Section 11.6.1.

1.1.60    "**Executory Contract**" means any executory contract as to which the Debtor is a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

1.1.61    "**Expense Funding Agreement**" means that certain Amended and Restated Funding Agreement, dated [●], by and between New Holdco, as payor, and the Debtor, as payee, pursuant to which New Holdco is obligated to provide funds for the payment by Debtor or the Reorganized Debtor of, among other things, costs and expenses incurred during the pendency of the Chapter 11 Case, including the costs of administering the Chapter 11 Case, all on and subject to the terms thereof.

1.1.62    "**FCR**" means Randi S. Ellis (or any Bankruptcy Court-appointed successor), in her capacity as the legal representative for any and all persons who may assert Talc Personal Injury Demands in the future, but who are currently unknown.  "FCR" stands for Future Claimants' Representative.

1.1.63    "**Fee Claim**" means any Claim of:  (a) a Professional for allowance of compensation and reimbursement of costs and expenses; or (b) a member of the TCC for reimbursement of costs and expenses, in each case incurred in the Chapter 11 Case on or before the Effective Date.

1.1.64    "**Final Order**" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, vacated, stayed, modified, or amended, and as to which the time to appeal, seek certiorari, or move for a new trial, reargument, or rehearing has expired and no appeal, petition for certiorari, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or, if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court or other court of competent jurisdiction shall have been affirmed by the highest court to which the order or judgment was appealed or certiorari shall have been denied or a new trial, reargument, or rehearing shall have been denied with prejudice or resulted in no modification of such order or judgment or has otherwise been dismissed with prejudice, and the time to take any further appeal, petition for certiorari, or move for a new trial, reargument, or rehearing shall have expired; *provided*, *however*, that the possibility that a motion pursuant to section 502(j) or 1144 of the Bankruptcy Code or under Rule 59 or 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order shall not cause such order to not be a Final Order.

1.1.65    "**Funding Agreements**" means, collectively, the Expense Funding Agreement and the Indemnity Funding Agreement.

1.1.66    "**Gynecological Cancer**" means any cancer of the female gynecologic tract that is not an Ovarian Cancer.

1.1.67     "**Holdco**" means the former Texas limited liability company named Johnson & Johnson Holdco (NA) LLC, which, as part of the Prepetition Corporate Restructuring, (a) was converted from a New Jersey corporation to a Texas limited liability company and, in connection therewith, changed its name from Johnson & Johnson Holdco (NA) Inc. to Johnson & Johnson Holdco (NA) LLC and (b) following such conversion, ceased to exist pursuant to a divisional merger thereof, including all names and historical forms thereof.

1.1.68     "**Imerys**" means Imerys Talc America, Inc.

1.1.69     "**Imerys/Cyprus Agreements**" means those contracts and/or agreements setting forth certain Imerys/Cyprus Related Rights, including as applicable: (a) that certain Agreement between Cyprus Mines Corporation and Johnson & Johnson, dated as of January 6, 1989; (b) that certain Talc Supply Agreement between Windsor Minerals Inc. and Johnson & Johnson Baby Products Company, a division of Johnson & Johnson Consumer Products, Inc., dated as of January 6, 1989; (c) that certain Supply Agreement between Johnson & Johnson Consumer Companies, Inc. and Luzenac America, Inc., dated as of April 15, 2001; (d) that certain Material Purchase Agreement between Johnson & Johnson Consumer Companies, Inc. and Luzenac America, Inc., dated as of January 1, 2010; and (e) that certain Material Purchase Agreement, between Johnson & Johnson Consumer Companies, Inc. and Luzenac America, Inc., dated as of January 1, 2011.

1.1.70     "**Imerys/Cyprus Defenses**" means any and all rights and defenses that any Imerys/Cyprus Party may have under any Imerys/Cyprus Agreement or applicable law with respect to a claim for contribution, reimbursement, subrogation, or indemnification in respect of Channeled Talc Personal Injury Claims, but Imerys/Cyprus Defenses do not include (a) any defense that the Plan or any other Plan Document does not comply with the Bankruptcy Code or (b) any defense that the transfer and assignment of the Imerys/Cyprus Related Rights by the Reorganized Debtor to the Talc Personal Injury Trust pursuant to Section 4.9.3, or any other action contemplated by Section 4.9.3, is prohibited by the Imerys/Cyprus Agreements or applicable non-bankruptcy law.

1.1.71     "**Imerys/Cyprus Parties**" means all Persons listed on Schedule 2.

1.1.72     "**Imerys/Cyprus Related Rights**" means any and all rights of contribution, reimbursement, subrogation, or indemnification that the Debtor, the Reorganized Debtor, or J&J has against any Imerys/Cyprus Party in respect of Channeled Talc Personal Injury Claims under any Imerys/Cyprus Agreement or any applicable law or order or otherwise.

1.1.73     "**Imerys/Cyprus Settlement**" means the settlement and release of disputes between LLT (or the Debtor as successor to LLT) and J&J, on the one hand, and Imerys, Cyprus, and their respective Affiliates, on the other hand, pursuant to the Imerys/Cyprus Settlement Agreement.

1.1.74     "**Imerys/Cyprus Settlement Agreement**" means a settlement agreement and release by and among LLT (or the Debtor as successor to LLT), J&J, and

8

Imerys, Cyprus, and their respective Affiliates that are parties thereto, which shall be in form and substance reasonably acceptable to LLT (or the Debtor as successor to LLT) and J&J.

1.1.75    "**Imerys/Cyprus Settlement Closing Date**" means the date, if any, on which the Imerys/Cyprus Settlement is consummated and becomes fully effective.

1.1.76    "**Imerys/Cyprus Settlement Termination Date**" means the date, if any, on which the Imerys/Cyprus Settlement Agreement is terminated in accordance with its terms.

1.1.77    "**Impaired**" means, as to any Claim, Class of Claims, or Interest, that such Claim, Class of Claims, or Interest is impaired within the meaning of section 1124 of the Bankruptcy Code.

1.1.78    "**Indemnity Cost Funding Agreement**" means that certain Amended and Restated Funding Agreement, dated [●], by and between New Holdco, as payor, and the Debtor, as payee, pursuant to which New Holdco is obligated to provide funds for the payment by the Debtor or Reorganized Debtor of, among other things, the Cash Contributions pursuant to the Plan, all on and subject to the terms thereof.

1.1.79    "**Indirect Talc Personal Injury Claim**" means a Talc Personal Injury Claim for contribution, reimbursement, subrogation, or indemnity (as those terms are defined by applicable non-bankruptcy law of the relevant jurisdiction), whether contractual or implied by law, and any other indirect Talc Personal Injury Claim, whether in the nature of or sounding in contract, tort, warranty, or other theory of law.  For the avoidance of doubt: (a) if the provisions of Section 4.9.3 and Section 5.9.1 are applicable, Indirect Talc Personal Injury Clams include any Talc Personal Injury Claim of any Imerys/Cyprus Party for contribution, reimbursement, subrogation, or indemnity under any Imerys/Cyprus Agreement or any applicable law or order or otherwise and any Talc Personal Injury Claim by any Imerys/Cyprus Party for any damages, including incidental, consequential, or indirect damages (including lost benefits, loss of enterprise value, diminution in value, or loss of goodwill), under or in connection with any Imerys/Cyprus Agreement or any applicable law or order, whether based on an alleged breach, default, or violation thereof or any other legal theory (which shall include any Claim for cure arising out of any alleged breach, default, or violation under any Imerys/Cyprus Agreement at the time such Imerys/Cyprus Agreement is assumed by the Debtor under section 365 of the Bankruptcy Code); and (b) Indirect Talc Personal Injury Claims do not include (i) any Direct Talc Personal Injury Claim, regardless of whether such claim is seeking compensatory, special, economic, non-economic, punitive, exemplary, administrative, or any other costs or damages, or any legal, equitable, or other relief whatsoever, including pursuant to a settlement, judgment, or verdict, or (ii) if the provisions of Section 4.9.3 and Section 5.9.1 are applicable, any claim against any Imerys/Cyprus Party based on, arising out of, or in any way relating to the Imerys/Cyprus Related Rights.

1.1.80    "**Injunctions**" means the Discharge Injunction, the Channeling Injunction, the Insurance Entity Injunction, the Release Injunction, the Exculpation

Injunction, and any other injunctions entered by the Bankruptcy Court or the District Court in connection with Confirmation of the Plan.

1.1.81    "**Insurance Entity Injunction**" means the injunction described in Section 11.3.2.

1.1.82    "**Intercompany Claim**" means any Claim (including Claims related to setoff rights) held against the Debtor by any Affiliate of the Debtor.

1.1.83    "**Interest**" means the rights of any holder of the equity of the Debtor and the rights of any Person to purchase or demand the issuance of any equity of the Debtor, including:  (a) redemption, conversion, exchange, voting, participation, and distribution rights; (b) liquidation preferences; and (c) any option and warrant rights.

1.1.84    "**Internal Revenue Code**" means title 26 of the United States Code, 26 U.S.C. §§ 1 *et seq.*, as in effect on the Petition Date, together with all amendments, modifications, and replacements of the foregoing as the same may exist on any relevant date to the extent applicable to the Chapter 11 Case.

1.1.85    "**IRS**" means the Internal Revenue Service of the United States of America.

1.1.86    "**J&J**" means Johnson & Johnson, a New Jersey corporation.

1.1.87    "**Judgment Claim**" means any Direct Talc Personal Injury Claim that has been adjudicated in state or federal court and resulted in the entry prior to the Effective Date of a judgment in favor of the holder of such Direct Talc Personal Injury Claim, whether such judgment was final and non-appealable or remained subject to appeal as of the Effective Date.

1.1.88    "**LLT**" means the former Texas limited liability company named LLT Management LLC, which, as part of the Prepetition Corporate Restructuring, ceased to exist pursuant to a merger thereof with and into Holdco, with Holdco as the surviving entity, including all names and historical forms thereof.

1.1.89    "**Love Proceeding**" means the legal proceedings commenced by the class action complaint filed on May 22, 2024, in the United States District Court for the District of New Jersey, Case Number 3:24-cv-06320, by Rebecca Love, D.D.S., Sharon Murphy,  William A. Henry, Alishia Gayle Davis, and Brandi Carl, both individually and on behalf of a proposed class, against, among others, LLT and J&J, and all claims, causes of action, and requests for relief asserted therein.

1.1.90    "**Lung Cancer**" means a primary lung cancer (i.e., a lung cancer that originates in the lungs and is unrelated to any previous cancer as opposed to a lung cancer that has spread to the lungs from another part of the body).

1.1.91    "**Master Settlement Agreement Claims**" means Direct Talc Personal Injury Claims that are entitled to be considered for settlement and, if such Direct Talc

10

Personal Injury Claims qualify for settlement, settled under the Master Settlement Agreements.

1.1.92    "**Master Settlement Agreements**" means those certain master settlement agreements, dated on or before the Petition Date, executed by LLT, J&J, and law firms representing certain holders of Talc Personal Injury Claims, pursuant to which Talc Personal Injury Claims may be considered for settlement and, if such Talc Personal Injury Claims qualify for settlement, settled, as such agreements may have been and may be amended, modified, or supplemented pursuant to the terms thereof.

1.1.93    "**Mesothelioma**" means the type of cancer that develops from the mesothelium, i.e., the thin layer of tissue that covers certain internal organs including the pleural, peritoneal, and pericardial cavities.

1.1.94    "**New Holdco**" means Johnson & Johnson Holdco (NA) Inc. (formerly named [●]), a New Jersey corporation that was formed as part of the Prepetition Corporate Restructuring and owns 100% of the membership interests in the Debtor as a result of the Prepetition Corporate Restructuring.

1.1.95    "**Non-Talc Claim**" means any Claim that is not a Talc Personal Injury Claim.

1.1.96    "**Old JJCI**" means the former Texas limited liability company named Chenango Zero LLC, which, as part of the 2021 Corporate Restructuring, (a) was the surviving entity in a merger with Johnson & Johnson Consumer Inc., a New Jersey corporation, and (b) following such merger, ceased to exist pursuant to a divisional merger thereof, including all names and historical forms thereof.

1.1.97    "**Ordinary Course Professionals Order**" means any order of the Bankruptcy Court authorizing the retention and compensation of Professionals utilized by the Debtor in the ordinary course of business.

1.1.98    "**Other Disease Talc Personal Injury Claim**" means any Direct Talc Personal Injury Claim that alleges that the relevant injured or deceased individual developed a disease other than Mesothelioma, Lung Cancer, Ovarian Cancer, or Gynecological Cancer (and not Mesothelioma, Lung Cancer, Ovarian Cancer, or Gynecological Cancer) in connection with such individual's use of talc or a product or material containing talc.

1.1.99    "**Ovarian Cancer**" means epithelial cancer that originates in the ovaries, fallopian tubes, and/or peritoneum, with: (a) serious, endometrioid, clear cell, or undifferentiated subtype; or (b) a mixture of subtypes that includes one or more of the subtypes specified in the immediately preceding clause (a).

1.1.100    "**Ovarian/Gynecological Cancer Talc Personal Injury Claim**" means any Direct Talc Personal Injury Claim that alleges that the relevant injured or deceased individual developed Ovarian Cancer or Gynecological Cancer (and not

Mesothelioma, Lung Cancer, or any other disease) in connection with such individual's use of talc or a product or material containing talc.

1.1.101    "**Person**" means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, governmental unit, or other entity.

1.1.102    "**Petition Date**" means the date on which the Debtor files its petition for relief under chapter 11 of the Bankruptcy Code commencing the Chapter 11 Case.

1.1.103    "**Plan**" means this *Prepackaged Chapter 11 Plan of Reorganization of the Debtor*, as the same may be amended or modified from time to time pursuant to section 1127 of the Bankruptcy Code.

1.1.104    "**Plan Documents**" means the Plan, the Disclosure Statement, and all of the exhibits and schedules attached to any of the foregoing (including, for the avoidance of doubt, the Talc Personal Injury Trust Documents and the Cooperation Agreement).

1.1.105    "**Plan Supplement**" means any documents or forms of documents related to the Plan that have been delivered to the parties to which the Disclosure Statement was delivered, each of which shall be in form and substance reasonably acceptable to LLT and J&J, as such documents or forms of documents may be amended, modified, or supplemented before the Effective Date.  Any Plan Supplement will be distributed to the same parties and in the same manner as the Disclosure Statement at least twenty-eight (28) days prior to the deadline for the submission of votes on the Plan.  A copy of any Plan Supplement will also be available for review on the Claims Agent's website free of charge at https://dm.epiq11.com/redrivertalc.

1.1.106    "**Postpetition Interest**" means, for the period following the Petition Date:  (a) interest at the rate set forth in the contract or other applicable document between the holder of a Claim and the Debtor giving rise to such holder's Claim, but excluding, for the avoidance of doubt, interest at any default rate; (b) if no such rate exists, interest at the federal judgment rate; or (c) such interest, if any, as otherwise agreed to by the holder of a Claim and the Debtor.

1.1.107    "**Prepetition Corporate Restructuring**" means, collectively, the transactions comprising the corporate restructuring of LLT and Holdco that was undertaken and completed after the solicitation of votes on the Plan, as part of which (a) LLT and Holdco ceased to exist and (b) the Debtor and New Holdco were formed.

1.1.108    "**Priority Non-Tax Claim**" means any Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code, other than an Administrative Claim or a Priority Tax Claim.

1.1.109    "**Priority Tax Claim**" means any Claim entitled to priority pursuant to section 507(a)(8) of the Bankruptcy Code.

NAI-1539839717

1.1.110    "**Professional**" means any Person retained or to be compensated pursuant to sections 327, 328, 330, 363(b), 503(b), 524(g)(4)(B)(i), or 1103 of the Bankruptcy Code, including any professional retained by the TCC or the FCR.

1.1.111    "**Proof of Claim**" means any proof of claim filed with the Bankruptcy Court or the Claims Agent pursuant to section 501 of the Bankruptcy Code and Bankruptcy Rules 3001 or 3002 that asserts a Claim against the Debtor.

1.1.112    "**Protected Party**" means any of the following:

(a)    the Debtor and its Representatives;

(b)    the Reorganized Debtor and its Representatives;

(c)    the Debtor Corporate Parties and their respective Representatives;

(d)    the Settling Talc Insurance Companies;

(e)    all Persons listed on Schedule 3, each of which is a third-party retailer that sold Old JJCI's talc-containing products or a third party to which the Debtor has contractual indemnification obligations relating to Old JJCI's talc-containing products;

(f)    if (i) the Imerys/Cyprus Settlement Agreement has not been fully executed prior to or on the Effective Date, (ii) the Imerys/Cyprus Settlement Agreement has been fully executed prior to or on the Effective Date and the Imerys/Cyprus Settlement Termination Date has occurred prior to or on the Effective Date, or (iii) the Imerys/Cyprus Settlement Agreement has been fully executed prior to or on the Effective Date and neither the Imerys/Cyprus Settlement Termination Date nor the Imerys/Cyprus Settlement Closing Date has occurred prior to or on the Effective Date, the Imerys/Cyprus Parties; *provided*, *however*, that, in the case of clause (iii), only so long as the Imerys/Cyprus Settlement Closing Date has not occurred;

(g)    Persons that, pursuant to the Plan or on or after the Effective Date, become a direct or indirect transferee of, or successor to, any assets of the Debtor or the Reorganized Debtor, or the Talc Personal Injury Trust, but only to the extent that liability is asserted to exist by reason of such Person becoming such a transferee or successor;

(h)    Persons that, pursuant to the Plan or on or after the Effective Date, make a loan to the Debtor or the Reorganized Debtor, or the Talc Personal Injury Trust, or to a successor to, or transferee of, any assets of the Debtor or the Reorganized Debtor, or the Talc Personal Injury Trust, but only to the extent that liability is asserted to exist by reason of it becoming such a lender; and

(i)    Persons that are alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the Debtor or the Reorganized Debtor, or the Talc Personal Injury Trust, to the extent that such alleged liability arises by reason of one or more of the following:

NAI-1539839717

(i)      such Person's ownership of a financial interest in the Debtor or the Reorganized Debtor, a past or present affiliate of a Debtor or Reorganized Debtor, or a predecessor in interest of a Debtor or Reorganized Debtor (including Old JJCI);

(ii)      such Person's involvement in the management of the Debtor or the Reorganized Debtor or a predecessor in interest of the Debtor or the Reorganized Debtor (including Old JJCI);

(iii)      such Person's service as an officer, manager, or employee of the Debtor or the Reorganized Debtor, a past or present affiliate of the Debtor or the Reorganized Debtor, a predecessor in interest of the Debtor or the Reorganized Debtor (including Old JJCI), or a Person that owns or at any time has owned a financial interest in the Debtor or the Reorganized Debtor, a past or present affiliate of the Debtor or the Reorganized Debtor, or a predecessor in interest of the Debtor or the Reorganized Debtor (including Old JJCI); and

(iv)      such Person's involvement in a transaction changing the corporate structure (including the 2021 Corporate Restructuring and the Prepetition Corporate Restructuring), or in a loan or other financial transaction affecting the financial condition, of the Debtor or the Reorganized Debtor, a past or present affiliate of the Debtor or the Reorganized Debtor, a predecessor in interest of the Debtor or the Reorganized Debtor (including Old JJCI), or a Person that owns or at any time has owned a financial interest in the Debtor or the Reorganized Debtor, a past or present affiliate of the Debtor or the Reorganized Debtor, or a predecessor in interest of the Debtor or the Reorganized Debtor (including Old JJCI), including (A) involvement in providing financing (debt or equity) or advice to a Person involved in such a transaction or (B) acquiring or selling a financial interest in any Person as a part of such transaction.

1.1.113      "**Recovery Actions**" means, collectively and individually, preference actions, fraudulent conveyance actions, and other claims or causes of action under sections 510, 544, 547, 548, 549, 550, and 553(b) of the Bankruptcy Code and other similar state law claims and causes of action.

1.1.114      "**Reinstated**" or "**Reinstatement**" means, with respect to Claims and Interests, the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

1.1.115      "**Reinstated Non-Talc Claims**" means, collectively, all Secured Claims, Unsecured Claims, and Intercompany Claims.

1.1.116      "**Release Injunction**" means the injunction described in <u>Section 11.2.3</u>.

1.1.117      "**Released Parties**" means each of:  (a) the Debtor; (b) the Reorganized Debtor;  (c) the Debtor Corporate Parties;  and (d) to the fullest extent permitted by

applicable law, with respect to each of the foregoing Persons in clauses (a)-(c), each such Person's Representatives.

1.1.118    "**Releasing Claim Holder**" means a holder of a Channeled Talc Personal Injury Claim.

1.1.119    "**Reorganized Debtor**" means the Debtor on and after the Effective Date.

1.1.120    "**Reorganized Debtor Payment Default**" means the failure by the Reorganized Debtor to pay when due any amount owed under the Talc PI Note.

1.1.121    "**Reorganized Debtor Payment Event of Default**" means a Reorganized Debtor Payment Default that is not remedied within thirty (30) days after the Reorganized Debtor has received written notice of such Reorganized Debtor Payment Default from the Talc Personal Injury Trust.

1.1.122    "**Representatives**" means, with respect to any Person, such Person's current and former:  (a) officers, directors, managers, employees, agents, and nominees; and (b) financial advisors, attorneys, accountants, investment bankers, consultants, experts, and other professionals; in each case solely in their capacity as such.

1.1.123    "**Retained Professionals**" means the professionals retained in the Chapter 11 Case by the Debtor, the TCC, or the FCR, including financial advisors, attorneys, accountants, investment bankers, and consultants.

1.1.124    "**Retained Rights of Action**" means any claims, demands, rights, and causes of action that the Debtor or its Estate may hold against any Person that are not transferred or assigned under the Plan to the Talc Personal Injury Trust, including:  (a) any Recovery Actions; (b) any right of contribution, reimbursement, subrogation, or indemnification, or similar rights, that the Debtor has against any Person in respect of Talc Personal Injury Claims under contract or applicable law (other than, if the provisions of Section 4.9.3 and Section 5.9.1 are applicable, the Imerys/Cyprus Related Rights); and (c) the causes of action listed or described on Exhibit F.

1.1.125    "**Schedules**" means any schedules of assets and liabilities and statements of financial affairs of the Debtor filed on the Docket in accordance with section 521 of the Bankruptcy Code, as any such schedules and statements may be amended or supplemented from time to time.

1.1.126    "**Secondment Agreement**" means that certain Amended and Restated Secondment Agreement, dated as of October 12, 2021, executed by LLT and Johnson & Johnson Services, Inc., a New Jersey corporation.

1.1.127    "**Secured Claim**" means a Claim, or any portion thereof:  (a) secured by a lien on property in which the Estate has an interest, which lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Final Order, to the extent of the value of the creditor's interest in the Estate's interest in such property as determined

15

pursuant to section 506(a) of the Bankruptcy Code; (b) subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the amount subject to setoff as determined pursuant to section 506(a) of the Bankruptcy Code; or (c) Allowed as secured pursuant to the Plan or any Final Order as a secured Claim.

1.1.128    "**Settled Talc Insurance Policy**" means any Talc Insurance Policy as to which the Talc Insurance Rights thereunder have been released pursuant to a Talc Insurance Settlement Agreement.

1.1.129    "**Settling Talc Insurance Company**" means, solely with respect to Settled Talc Insurance Policies:

(a)    any Talc Insurance Company that contributes funds, proceeds, or other consideration in respect of Channeled Talc Personal Injury Claims and is designated, with the consent of the Debtor, in the Confirmation Order as a Settling Talc Insurance Company, which shall include the Specified Settling Insurers; and

(b)    any Talc Insurance Company that contributes funds, proceeds, or other consideration in respect of Channeled Talc Personal Injury Claims and is designated as a Settling Talc Insurance Company by the Talc Personal Injury Trust (acting through the Reorganized Debtor, as its subrogee having the exclusive right to negotiate and enter into Talc Insurance Settlement Agreements) on or after the Effective Date; *provided*, *however*, that any addition to the list of Protected Parties on or after the Effective Date does not become effective until entry of a Final Order approving the addition.

1.1.130    "**Specified Insurance Settlement Agreements**" means those certain Confidential Settlement and Release Agreements dated May [●], 2024, by and among J&J and related parties, including LLT, on the one hand, and the Specified Settling Insurers, on the other hand.

1.1.131    "**Specified Settling Insurers**" means, collectively, AIG Europe S.A. (as successor in interest to L'Union Atlantique d'Assurances S.A.), AIG Property Casualty Company (f/k/a Birmingham Fire Insurance Company of Pennsylvania), AIU Insurance Company, American International Surplus Lines Insurance Company, Granite State Insurance Company, Lexington Insurance Company, The Insurance Company of the State of Pennsylvania, National Union Fire Insurance Company of Pittsburgh, Pa, New Hampshire Insurance Company, Wellfleet New York Insurance Company (f/k/a Atlanta International Insurance Company, as successor in interest to Drake Insurance Company), Starr Indemnity Liability Company (as successor in interest to Republic Insurance Company), Safety National Casualty Corporation f/k/a Safety Mutual Casualty Corporation, Berkshire Hathaway Specialty Insurance Co. (formerly known as Stonewall Insurance Co.), The Continental Insurance Company (for itself and as successor to certain policies issued by London Guarantee and Accident Company of New York and Harbor Insurance Company), ASR Schadeverzekering N.V. (as successor in interest to Assurantiekoor Van Wijk & Co.), Rheinland Versicherungen (as successor in interest only to the subscriptions of the former Dutch Company Rheinland Verzekeringen), and N.V. Schadeverzekeringsmaatschappij Maas Lloyd (individually and as successor in interest to

16

policies subscribed in favor of J&J by N.V. Rotterdamse Assurantiekas,  n/k/a De Ark), each solely in its capacity as a party to the Specified Insurance Settlement Agreements.

1.1.132    "**Talc In-Place Insurance Coverage**" means all of the Talc Insurance Rights under any Talc Insurance Policy that is not a Settled Talc Insurance Policy, including the right to payment or reimbursement of liability, indemnity, or defense costs incurred on or after the Effective Date arising out of or in any way relating to Channeled Talc Personal Injury Claims (other than Master Settlement Agreement Claims and Judgment Claims).

1.1.133    "**Talc Insurance Action**" means any claim, cause of action, or right of the Debtor under the laws of any jurisdiction against any Talc Insurance Company with respect to any Channeled Talc Personal Injury Claim (other than Master Settlement Agreement Claims and Judgment Claims) based on, arising out of, or in any way relating to:  (a) any such Talc Insurance Company's failure to provide coverage or otherwise pay in respect of Talc In-Place Insurance Coverage; (b) the refusal of any Talc Insurance Company to compromise and settle any such Channeled Talc Personal Injury Claim under or pursuant to any Talc Insurance Policy; (c) the interpretation or enforcement of the terms of any Talc Insurance Policy with respect to any such Channeled Talc Personal Injury Claim; (d) any conduct by a Talc Insurance Company constituting "bad faith," conduct that could give rise to extra-contractual damages, or other wrongful conduct under applicable law, in each case with respect to any such Channeled Talc Personal Injury Claim; or (e) any other dispute under, arising out of, or in any way relating to Talc In-Place Insurance Coverage or other Talc Insurance Rights.  Notwithstanding the foregoing, and for the avoidance of doubt, Talc Insurance Action shall not include any claim, cause of action, or right of the Debtor under the laws of any jurisdiction against any Talc Insurance Company with respect to amounts expended prior to the Effective Date.

1.1.134    "**Talc Insurance Assets**" means (a) all Talc In-Place Insurance Coverage, (b) all Talc Insurance Actions, (c) all Talc Insurance Recoveries, and (d) all Talc Insurance Settlement Agreements entered into after the Effective Date.  Notwithstanding the foregoing, and for the avoidance of doubt, Talc Insurance Assets do not include Talc Insurance Policies themselves, any rights to coverage held by any entity other than the Debtor, any rights to coverage under Talc Insurance Policies for amounts expended prior to the Effective Date, or any rights under Talc Insurance Policies that are not related to the Debtor's coverage or rights to coverage for Channeled Talc Personal Injury Claims (excluding Master Settlement Agreement Claims and Judgment Claims).

1.1.135    "**Talc Insurance Company**" means any insurance company, insurance syndicate, coverholder, insurance broker or syndicate insurance broker, guaranty association, or any other Person that may have liability under a Talc Insurance Policy.

1.1.136    "**Talc Insurance Policy**" means any insurance policy, currently or previously in effect at any time on or before the Effective Date, as to which the Debtor has rights as an insured, additional insured, successor, beneficiary, or otherwise, solely to the extent such policy provides the Debtor with coverage or a right to coverage for Channeled Talc Personal Injury Claims (other than Master Settlement Agreement Claims and

17

Judgment Claims), including the policies listed on <u>Exhibit G</u>. For the avoidance of doubt, Talc Insurance Policies shall not include any policy providing reinsurance to any Settling Talc Insurance Company.

1.1.137    "**Talc Insurance Recoveries**" means (a) the right to receive proceeds of Talc In-Place Insurance Coverage (including any receivables), (b) the right to receive the proceeds or benefits of any Talc Insurance Action, and (c) the right to receive amounts payable pursuant to any Talc Insurance Settlement Agreement, in each case, except in respect of amounts expended prior to the Effective Date.

1.1.138    "**Talc Insurance Rights**" means all rights of the Debtor to make claims under the Talc Insurance Policies with respect to Channeled Talc Personal Injury Claims (other than Master Settlement Agreement Claims and Judgment Claims). Notwithstanding the foregoing, and for the avoidance of doubt, Talc Insurance Rights do not include rights of the Debtor to make claims under the Talc Insurance Policies for amounts expended prior to the Effective Date.

1.1.139    "**Talc Insurance Settlement Agreement**" means any settlement agreement, or that portion of any settlement agreement, pursuant to which Talc Insurance Rights are released, including the Specified Insurance Settlement Agreements.

1.1.140    "**Talc Insurer Coverage Defense**" means all rights and defenses that any Talc Insurance Company may have under any Talc Insurance Policy and applicable law with respect to a claim seeking insurance coverage for a Channeled Talc Personal Injury Claim (other than a Master Settlement Agreement Claim or Judgment Claim) or to a Talc Insurance Action, but Talc Insurer Coverage Defenses do not include: (a) any defense that the Plan or any other Plan Document does not comply with the Bankruptcy Code; or (b) any defense that the transfer and assignment of the Talc Insurance Assets to the Talc Personal Injury Trust pursuant to <u>Section 4.9.4</u>, or any other action contemplated by <u>Section 4.9.4</u>, is prohibited by the Talc Insurance Policies or applicable non-bankruptcy law.

1.1.141    "**Talc Personal Injury Claim**" means any claim or Talc Personal Injury Demand against the Debtor, LLT, Old JJCI, or any other Protected Party, whether known or unknown, including with respect to any manner of alleged bodily injury, death, sickness, disease, emotional distress, fear of cancer, medical monitoring, or any other alleged personal injuries (whether physical, emotional, or otherwise), directly or indirectly arising out of or in any way relating to the presence of or exposure to talc or talc-containing products based on the alleged pre-Effective Date acts or omissions of the Debtor, LLT, Old JJCI, or any other Person, but, in the case of such acts or omissions of Old JJCI or any other Person (other than the Debtor) only to the extent the Debtor has, or is alleged to have, liability for LLT's, Old JJCI's, or such other Person's conduct, whether by operation of the law, by assumption of such liability from LLT, Old JJCI, or such other Person, by agreement to indemnify, defend, or hold harmless LLT, Old JJCI, or such other Person from and against such liability, or otherwise. For the avoidance of doubt, Talc Personal Injury Claims include: (a) all such claims and Talc Personal Injury Demands directly or indirectly arising out of or in any way relating to (i) any talc or talc-containing products

18

previously mined, processed, manufactured, designed, marketed, fabricated, constructed, sold, supplied, produced, installed, maintained, serviced, specified, selected, repaired, removed, replaced, released, distributed, and/or in any other way made available by the Debtor or any other Person, (ii) any talc or talc-containing materials present at any premises owned, leased, occupied, or operated by any Person, or (iii) any talc in any way connected to the Debtor alleged to contain asbestos or other contaminant; (b) all such claims and Talc Personal Injury Demands, whether (i) in tort, contract, warranty, restitution, conspiracy, guarantee, or any other theory of law, equity, or admiralty, whether brought, threatened, or pursued in any United States court or other court anywhere in the world, (ii) liquidated or unliquidated, fixed or contingent, direct or indirect, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, now existing or hereafter arising, in law, equity, or otherwise (including under piercing the corporate veil, agency, alter ego, successor liability, fraudulent conveyance, conspiracy, enterprise liability, market share, joint venture, or any other legal or equitable theory), (iii) seeking compensatory, special, economic, non-economic, punitive, exemplary, administrative, or any other costs, fees, injunctive, or similar relief, or any other measure of damages, (iv) seeking any legal, equitable, or other relief of any kind whatsoever, or (v) held by Persons residing within the United States or in a foreign jurisdiction; (c) all such claims and Talc Personal Injury Demands that have been resolved or are subject to resolution pursuant to any agreement or that are based on a judgment or verdict; (d) all such claims and Talc Personal Injury Demands for compensatory damages (such as, without limitation, loss of consortium, medical monitoring, personal or bodily injury, wrongful death, survivorship, proximate, consequential, general, and special damages) and punitive damages; and (e) Indirect Talc Personal Injury Claims.  Notwithstanding the foregoing, Talc Personal Injury Claims do not include:  (A) any claim or demand by any present or former employee of a predecessor or Affiliate of the Debtor for benefits under a policy of workers' compensation insurance or for benefits under any state or federal workers' compensation statute or other statute providing compensation to an employee from an employer; (B) any claim or demand that (I) alleges that the relevant injured or deceased individual was exposed to talc or the product or material containing talc, as applicable, in Canada or resided in Canada at the time such Direct Talc Personal Injury Claim is filed or (II) was brought, threatened, or pursued in any court in Canada; (C) any claim or demand asserted or assertable by or on behalf of any governmental unit under any federal, state, international, or foreign consumer or employee protection rule, statute, or regulation; or (D) any claim or demand that alleges that the relevant injured or deceased individual developed Mesothelioma or Lung Cancer (and not Ovarian Cancer, Gynecological Cancer, or any other disease) in connection with such individual's use of talc or a product or material containing talc; in each case, other than any such claim that is an Indirect Talc Personal Injury Claim of an Imerys/Cyprus Party.  In addition, notwithstanding the foregoing, Talc Personal Injury Claims do not include any claim or demand that a Settling Talc Insurance Company may have against its reinsurers and/or retrocessionaires in their capacities as such, and nothing in the Plan, the Plan Documents, or the Confirmation Order shall impair or otherwise affect the ability of a Settling Talc Insurance Company to assert any such claim or demand against its reinsurers and/or retrocessionaires in their capacities as such.

1.1.142    "**Talc Personal Injury Demand**" means a demand for payment, present or future, against the Debtor or any other Protected Party that:  (a) is in respect of an injury

that manifests after the Effective Date; and (b) would have otherwise been a Claim that is a Talc Personal Injury Claim if such injury had manifested on or before the Effective Date.

1.1.143    "**Talc Personal Injury Trust**" means the Red River Talc Personal Injury Trust established pursuant to the Talc Personal Injury Trust Agreement.

1.1.144    "**Talc Personal Injury Trust Agreement**" means that certain trust agreement, substantially in the form of Exhibit H.

1.1.145    "**Talc Personal Injury Trust Defenses**" means all defenses, cross-claims, offsets, and recoupments regarding Channeled Talc Personal Injury Claims that the Debtor, the Reorganized Debtor, or J&J has (or would have had absent the assumption by the Talc Personal Injury Trust of liabilities, obligations, and responsibilities for the Channeled Talc Personal Injury Claims as contemplated by Section 4.7.1) against any Person under applicable law; *provided*, *however*, that the Talc Personal Injury Trust Defenses shall not include: (a) any defenses, cross-claims, offsets, or recoupments against any Protected Party or any Talc Insurance Company; (b) any Retained Rights of Action, or (c) if the provisions of Section 4.9.3 and Section 5.9.1 are applicable, any Imerys/Cyprus Related Rights.

1.1.146    "**Talc Personal Injury Trust Documents**" means the Talc Personal Injury Trust Agreement, the Trust Distribution Procedures, and all other agreements, instruments, and documents governing the establishment, administration, and operation of the Talc Personal Injury Trust, which shall be substantially in the form set forth as exhibits hereto or in a Plan Supplement, as they may be amended or modified from time to time in accordance with their terms and the Plan.

1.1.147    "**Talc Personal Injury Trust Expenses**" means any liabilities, costs, or expenses incurred by, imposed upon, or in respect of the Channeled Talc Personal Injury Trust once established (except for payments to holders of Talc Personal Injury Claims on account of such Claims). Talc Personal Injury Trust Expenses shall also expressly include the reasonable documented costs and expenses incurred by the Debtor, the Reorganized Debtor, or any Debtor Corporate Party in taking any action on behalf of or at the direction of the Talc Personal Injury Trust, if any.

1.1.148    "**Talc PI Note**" means the note to be executed and delivered by the Reorganized Debtor in favor of the Talc Personal Injury Trust, in substantially the form of Exhibit I, in the principal amount of $400,000,000.00.

1.1.149    "**Talc PI Pledge**" means the pledge by New Holdco of all of the membership interests of the Reorganized Debtor pursuant to the Talc PI Pledge Agreement.

1.1.150    "**Talc PI Pledge Agreement**" means the Pledge Agreement, substantially in the form of Exhibit J, to be executed and delivered by New Holdco pursuant to which the Talc PI Pledge will be granted as security for payment of the Talc PI Note.

20

1.1.151    "**Talc Trust Advisory Committee**" means the committee appointed and serving in accordance with Section 4.4, and having the powers, duties, and obligations set forth in the Talc Personal Injury Trust Agreement.

1.1.152    "**Talc Trust Advisory Committee Member**" means any member of the Talc Trust Advisory Committee.

1.1.153    "**Talc Trust Claims Administrator**" means: (a) the Person who, pursuant to Section 4.5.1, is appointed by the Bankruptcy Court to serve as the initial claims administrator of the Talc Personal Injury Trust; or (b) any Person who is subsequently appointed to serve in such capacity pursuant to the terms of the Talc Personal Injury Trust Agreement.

1.1.154    "**Talc Trust Liens Resolution Administrator**" means: (a) the Person who, pursuant to Section 4.5.2, is appointed by the Bankruptcy Court to serve as the initial liens resolution administrator of the Talc Personal Injury Trust; or (b) any Person who is subsequently appointed to serve in such capacity pursuant to the terms of the Talc Personal Injury Trust Agreement.

1.1.155    "**Talc Trustee**" means: (a) any individual who, pursuant to Section 4.3, is appointed by the Bankruptcy Court to serve as an initial trustee of the Talc Personal Injury Trust; or (b) any individual who is subsequently appointed to serve in such capacity pursuant to the terms of the Talc Personal Injury Trust Agreement.

1.1.156    "**TCC**" means any official committee of talc claimants appointed in the Chapter 11 Case, as such committee is reconstituted from time to time.

1.1.157    "**Trust Distribution Procedures**" means the Talc Personal Injury Trust Distribution Procedures, substantially in the form of Exhibit K.

1.1.158    "**Trust Expense Advancement Order**" means the order of the Bankruptcy Court authorizing the Debtor, prior to the Effective Date, to advance Cash that would otherwise be delivered to the Talc Personal Injury Trust on the Effective Date pursuant to Section 4.9.1(a) in order to enable set-up and claims processing work to be undertaken in advance of the Effective Date, so as to allow the Talc Personal Injury Trust to make payments in respect of compensable Channeled Talc Personal Injury Claims as soon as possible after the Effective Date, which order shall be in form and substance reasonably acceptable to the Debtor, J&J, the AHC of Supporting Counsel, and the FCR.

1.1.159    "**Unexpired Lease**" means a lease to which the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

1.1.160    "**Unimpaired**" means, as to any Claim or Class of Claims, that such Claim or Class of Claims is not Impaired under the Plan.

1.1.161    "**United States Trustee**" means the United States Trustee appointed under section 581 of title 28 of the United States Code to serve in the [●] District of Texas.

NAI-1539839717

1.1.162    "**Unsecured Claim**" means a Claim against the Debtor that is not an Administrative Claim, a Channeled Talc Personal Injury Claim, a Cure Amount Claim, an Intercompany Claim, a Priority Non-Tax Claim, a Priority Tax Claim, or a Secured Claim. For the avoidance of doubt, Unsecured Claims include Defense Cost Claims.

1.2    Interpretation; Application of Definitions; Rules of Construction; and Computation of Time.  The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.  Wherever from the context it appears appropriate, each term stated in either the singular or the plural will include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender will include the masculine, feminine, and neuter.  Unless otherwise specified, all Article, Section, Exhibit, or Schedule references in the Plan are to the respective article or section of, or schedule or exhibit to, the Plan.  The words "herein," "hereof," "hereto," "hereunder," and other words of similar meaning refer to the Plan as a whole and not to any particular article, section, subsection, or clause contained in the Plan.  The rules of construction contained in section 102 of the Bankruptcy Code will apply to the construction of the Plan.  Unless otherwise stated herein, all references to dollars mean U.S. dollars.  In computing any period of time prescribed or allowed by the Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) will apply.  The words "including" or "includes" shall be without limitation.

1.3    Availability of Plan and Exhibits.  The plan and all exhibits and schedules to the Plan will be available following their filing with the Bankruptcy Court on (a) the Court's website: www.[●].uscourts.gov, and (b) the website maintained by the Claims Agent at https://dm.epiq11.com/case/redrivertalc.

1.4    Ancillary Documents.  Each of the exhibits and schedules to the Plan (including the Talc Personal Injury Trust Agreement, the Trust Distribution Procedures, and the Cooperation Agreement), the Disclosure Statement and supplements thereto, and the exhibits and schedules to the Disclosure Statement and the supplements thereto are an integral part of the Plan, and are hereby incorporated by reference and made a part of the Plan.

## ARTICLE II
## TREATMENT OF ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS

2.1    Administrative Claims.

2.1.1    Allowed Administrative Claims.  Holders of Allowed Administrative Claims (other than Fee Claims, which are governed by Section 2.2, and Cure Amount Claims, which are governed by Section 5.4), shall receive Cash equal to the unpaid portion of such Allowed Administrative Claims on the Distribution Date, in full satisfaction, settlement, release, and discharge of and in exchange for such Claims, or such other amounts and on such other terms as may be agreed to by the holders of such Claims and the Debtor or the Reorganized Debtor, as the case may be; *provided*, *however*, that: (a) Allowed Administrative Claims representing liabilities incurred on or after the Petition Date in the ordinary course of business by the Debtor shall be paid by the Debtor or the Reorganized Debtor, as the case may be, in accordance with the terms and conditions of the particular transactions and agreements relating to such liabilities without any further

action by the holders of such Claims or further approval of the Bankruptcy Court; and (b) holders of such Administrative Claims shall not be required to comply with the requirements set forth in Section 2.1.2.

2.1.2    Administrative Claims Bar Date.  Except as otherwise provided in this Article II, requests for payment of Administrative Claims (other than Fee Claims and Cure Amount Claims) must be filed and served on the Reorganized Debtor pursuant to the procedures specified in the Confirmation Order no later than sixty (60) days after the Effective Date.  Holders of Administrative Claims that are required to, but do not, file and serve a request for payment of such Administrative Claims by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against, as applicable, the Debtor or the Reorganized Debtor, or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date.  Objections to such requests, if any, must be filed and served on the Reorganized Debtor and the requesting party, as applicable, no later than ninety (90) days after the Effective Date, unless otherwise authorized by the Bankruptcy Rules or Bankruptcy Court.  Notwithstanding the foregoing, no request for payment of an Administrative Claim need be filed with respect to an Administrative Claim previously Allowed by Final Order, including all Administrative Claims expressly Allowed under the Plan.

2.1.3    Disputed Administrative Claims.  If and to the extent that there are Disputed Administrative Claims, any such Disputed Administrative Claims, other than Fee Claims and Cure Amount Claims which shall be resolved pursuant to the provisions of Section 2.2 and Article V, as appliable, shall be resolved pursuant to the provisions set forth in Article VII.  Distributions on account of any such Disputed Administrative Claims other than Fee Claims and Cure Amount Claims shall be made pursuant to the provisions set forth in Article VI.

2.2    Fee Claims.

2.2.1    All (a) final fee requests for compensation or reimbursement of Fee Claims pursuant to section 327, 328, 329, 330, 331, 363(b), 503(b), or 1103 of the Bankruptcy Code for services rendered to the Debtor, the TCC, or the FCR, (b) Fee Claims of members of the TCC for reimbursement of expenses, and (c) requests or Claims under section 503(b)(4) of the Bankruptcy Code, must be filed and served on the Reorganized Debtor and other parties required to be served by the Compensation Procedures Order no later than forty-five (45) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court.  Any objections to a final Fee Claim or any requests or claims under section 503(b)(4) of the Bankruptcy Code must be filed no later than twenty (20) days after the filing of such Claim.  The terms of the Compensation Procedures Order shall govern the allowance and payment of any final Fee Claims submitted in accordance with this Section 2.2.

2.2.2    The amount of the Fee Claims owing to the Professionals on and after the Effective Date shall be paid by the Reorganized Debtor in Cash to such Professionals as soon as reasonably practicable after such Claims are Allowed by a Bankruptcy Court

23

order.  Upon the Effective Date, any requirement that Professionals and Ordinary Course Professionals of the Reorganized Debtor comply with sections 327 through 331 and 1103 of the Bankruptcy Code, the Compensation Procedures Order, or the Ordinary Course Professionals Order in seeking retention or compensation for services rendered after such date will terminate, and the Reorganized Debtor may employ and pay any Professional or Ordinary Course Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

2.3     Payment of Statutory Fees.  All fees payable under section 1930 of title 28 of the United States Code, as determined at the Confirmation Hearing by the Bankruptcy Court or the District Court, as applicable, shall be paid on or before the Effective Date.  The Reorganized Debtor shall pay all such fees that arise after the Effective Date, but before the closing of the Chapter 11 Case, and shall comply with all applicable statutory reporting requirements.

2.4     Allowed Priority Tax Claims.  On the Distribution Date, holders of Allowed Priority Tax Claims shall receive Cash equal to the amount of such Allowed Priority Tax Claims, plus Postpetition Interest, if any, in full satisfaction, settlement, release, and discharge of and in exchange for such Claims unless the holder of such Claim agrees to an alternative treatment. Notwithstanding the provisions of this Section 2.4, any Claim on account of any penalty arising with respect to or in connection with an Allowed Priority Tax Claim that does not compensate the holder for actual pecuniary loss shall be treated as a Class 3 Claim, and the holder (other than as the holder of a Class 3 Claim) may not assess or attempt to collect such penalty from the Reorganized Debtor or its property.

### ARTICLE III
### TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

3.1     Claims and Interests Classified.  For purposes of organization, voting, and all Plan confirmation matters, all Claims (other than Administrative Claims and Priority Tax Claims) against and Equity Interests in the Debtor are classified as set forth in this Article III.   In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims, as described in Article II, have not been classified and are excluded from the following Classes.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest falls within the description of such Class, and is classified in another Class or Classes to the extent that any remainder of the Claim or Interest falls within the description of such other Class or Classes.  Notwithstanding anything to the contrary contained in the Plan, no Distribution shall be made on account of any Non-Talc Claim that is not an Allowed Claim for distribution purposes.

3.2     Treatment and Classification of Claims and Interests.  For purposes of all Plan confirmation matters, including voting on, Confirmation of, and Distributions under, the Plan, all Claims (other than Administrative Claims and Priority Tax Claims, which are not classified) against and Equity Interests in the Debtor shall be classified and treated in the manner set forth below.

NAI-1539839717

| Class | Designation | Treatment | Entitlement to Vote | Estimated Recovery |
|---|---|---|---|---|
| 1 | Priority Non-Tax Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) | 100% |
| 2 | Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) | Reinstated |
| 3 | Unsecured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) | Reinstated |
| 4 | Channeled Talc Personal Injury Claims | Impaired | Entitled to Vote to Accept or Reject | 100% |
| 5 | Intercompany Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) | Reinstated |
| 6 | Equity Interests in the Debtor | Impaired | Entitled to Vote to Accept or Reject | Reinstated Subject to Talc PI Pledge |

### 3.2.1    Class 1 – Priority Non-Tax Claims

(a)    Classification:  Class 1 consists of all Priority Non-Tax Claims against the Debtor.

(b)    Treatment:  On the Distribution Date, each holder of an Allowed Class 1 Priority Non-Tax Claim shall receive Cash equal to the Allowed Amount of such Priority Non-Tax Claim plus Postpetition Interest thereon, unless the holder of such Claim, agrees to less favorable treatment.

(c)    Voting:  Class 1 is Unimpaired, and each holder of a Claim in Class 1 is presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code. No holder of a Claim in Class 1 is entitled to vote to accept or reject the Plan.

### 3.2.2    Class 2 – Secured Claims

(a)    Classification:  Class 2 consists of all Secured Claims against the Debtor.

(b)    Treatment:  On the Effective Date, each Claim in Class 2 shall be Reinstated.

NAI-1539839717

(c)     Voting:  Class 2 is Unimpaired, and each holder of a Claim in Class 2 is presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code. No holder of a Claim in Class 2 is entitled to vote to accept or reject the Plan.

### 3.2.3     **Class 3 – Unsecured Claims**

(a)     Classification:  Class 3 consists of all Unsecured Claims, including Defense Cost Claims, against the Debtor.

(b)     Treatment:  On the Effective Date, each Claim in Class 3 shall be Reinstated.

(c)     Voting:  Class 3 is Unimpaired, and each holder of a Claim in Class 3 is presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code. No holder of a Claim in Class 3 is entitled to vote to accept or reject the Plan.

### 3.2.4     **Class 4 – Channeled Talc Personal Injury Claims**

(a)     Classification:  Class 4 consists of all Channeled Talc Personal Injury Claims, including Channeled Indirect Talc Personal Injury Claims.

(b)     Treatment:  On the Effective Date, liability for all Channeled Talc Personal Injury Claims, including Channeled Indirect Talc Personal Injury Claims, shall be channeled to and assumed by the Talc Personal Injury Trust without further act or deed and shall be resolved in accordance with the Talc Personal Injury Trust Documents.  Pursuant to the Plan and Trust Distribution Procedures, each holder of a Channeled Talc Personal Injury Claim shall have its Channeled Talc Personal Injury Claim permanently channeled to the Talc Personal Injury Trust, and such Channeled Talc Personal Injury Claim shall thereafter be resolved in accordance with the Talc Personal Injury Trust Documents.

(c)     Voting:  Class 4 is Impaired, and holders of Claims in Class 4 are entitled to vote to accept or reject the Plan in accordance with the voting procedures described in the Disclosure Statement.

### 3.2.5     **Class 5 – Intercompany Claims**

(a)     Classification:  Class 5 consists of all Intercompany Claims.

(b)     Treatment:  On the Effective Date, each Claim in Class 5 shall be Reinstated.

(c)     Voting:  Class 5 is Unimpaired, and each holder of a Claim in Class 5 is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No holder of a Claim in Class 5 is entitled to accept or reject the Plan.

26

3.2.6    **Class 6 – Equity Interests in the Debtor**

(a)    Classification:  Class 6 consists of all Equity Interests in the Debtor.

(b)    Treatment:  On the Effective Date, Equity Interests in the Debtor shall be Reinstated, and the holder of such Interests shall retain such Interests, subject to the Talc PI Pledge.

(c)    Voting:  Class 6 is Impaired, and each holder of an Equity Interest in the Debtor in Class 6 is entitled to vote to accept or reject the Plan.

3.3    Debtor's Rights with Respect to Unimpaired Claims.  Nothing under the Plan shall affect the rights of the Debtor or the Reorganized Debtor with respect to any Unimpaired Claims, including all rights with respect to legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

3.4    Elimination of Vacant Classes.  Any Class of Claims against or Interests in the Debtor that, as of the commencement of the Confirmation Hearing, do not have at least one holder of a Claim or Interest that is Allowed in an amount greater than $0.00 for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

## ARTICLE IV
## THE TALC PERSONAL INJURY TRUST

4.1    Establishment.  Prior to or on the Effective Date, the Talc Personal Injury Trust shall be created in accordance with the Plan Documents.  The Talc Personal Injury Trust shall be a "qualified settlement fund" within the meaning of the treasury regulations issued under Section 468B of the Internal Revenue Code.

4.2    Purpose.  The purposes of the Talc Personal Injury Trust shall be to assume all Channeled Talc Personal Injury Claims and, among other things, to:  (a) preserve, hold, manage, and maximize the assets of the Talc Personal Injury Trust; and (b) direct the processing, liquidation, and, if appropriate, payment of all compensable Channeled Talc Personal Injury Claims in accordance with the Plan, the Confirmation Order, and the Talc Personal Injury Trust Documents.  The Talc Personal Injury Trust will resolve Channeled Talc Personal Injury Claims in accordance with the Plan, the Confirmation Order, and the Talc Personal Injury Trust Documents in such a way that holders of Channeled Talc Personal Injury Claims are treated fairly and equitably, and otherwise comply in all respects with the requirements of a trust set forth in section 524(g)(2)(B)(i) of the Bankruptcy Code.  In the event of a conflict between the terms or provisions of the Plan and the Confirmation Order, on the one hand, and the Talc Personal Injury Trust Documents, on the other hand, the terms or provisions of the Plan and the Confirmation Order shall control.  In the event of a conflict between the terms and provisions of the Plan, on the one hand, and the Confirmation Order, on the other hand, the terms or provisions of the Confirmation Order shall control.

4.3    Initial Talc Trustees.  There shall be two initial Talc Trustees.  The initial Talc Trustees of the Talc Personal Injury Trust shall be the individuals identified as such in Exhibit H.  All successor Talc Trustees shall be appointed in accordance with the terms of the Talc Personal Injury Trust Agreement.  For purposes of performing his or her duties and fulfilling his or her obligations under the Plan, the Confirmation Order, and the Talc Personal Injury Trust Agreement, each Talc Trustee shall be deemed to be (and the Confirmation Order shall provide that he or she is) a "party in interest" within the meaning of section 1109(b) of the Bankruptcy Code.  A Talc Trustee shall be designated as the "administrator" of the Talc Personal Injury Trust as such term is used in Treasury Regulation Section 1.468B-2(k)(3).

4.4    Initial Talc Trust Advisory Committee and FCR.

4.4.1    Initial Talc Trust Advisory Committee.  The Talc Trust Advisory Committee shall be established pursuant to the Talc Personal Injury Trust Agreement.  The initial Talc Trust Advisory Committee Members shall be the individuals identified as such in Exhibit H.  Each of the Talc Trust Advisory Committee Members shall serve in accordance with the terms and provisions of the Talc Personal Injury Trust Agreement.  Successor Talc Trust Advisory Committee Members shall be appointed in accordance with the terms and provisions of the Talc Personal Injury Trust Agreement.  For purposes of performing his or her duties and fulfilling his or her obligations under the Plan, the Confirmation Order, and the Talc Personal Injury Trust Agreement, each Talc Trust Advisory Committee Member shall be deemed to be (and the Confirmation Order shall provide that he or she is) a "party in interest" within the meaning of section 1109(b) of the Bankruptcy Code.  The Debtor and J&J will not, and will cause the Debtor Corporate Parties not to, take any action in the Chapter 11 Case that seeks to cause the initial Talc Trust Advisory Committee to be comprised of individuals other than those appointed by the law firms identified and described in Exhibit H (Talc Personal Injury Trust Agreement) to the Plan attached to the Disclosure Statement in effect on June 3, 2024, as entitled to make such appointments.  If, notwithstanding the foregoing, the initial Talc Trust Advisory Committee would be comprised of individuals other than those appointed by the law firms identified and described in Exhibit H (Talc Personal Injury Trust Agreement) to the Plan attached to the Disclosure Statement in effect on June 3, 2024, as entitled to make such appointments, as a result of action taken in the Chapter 11 Case by the Debtor, J&J, or any other Debtor Corporate Party seeking to cause the initial Talc Trust Advisory Committee to be comprised of individuals other than those appointed by the law firms identified and described in Exhibit H (Talc Personal Injury Trust Agreement) to the Plan attached to the Disclosure Statement in effect on June 3, 2024, as entitled to make such appointments, the Debtor shall be required to resolicit votes with respect to the Plan with a disclosure statement reflecting that the initial Talc Trust Advisory Committee is to be comprised of such other individuals.

4.4.2    Initial FCR.  The Talc Personal Injury Trust Agreement shall provide for the continuation of an FCR to represent any and all persons who may assert Talc Personal Injury Demands in the future, but who are currently unknown.  The initial FCR under the Talc Personal Injury Trust Agreement shall be Randi S. Ellis.  The FCR under the Talc Personal Injury Trust shall serve in accordance with the terms and provisions of the Talc Personal Injury Trust Agreement.  Any successor FCR under the Talc Personal

Injury Trust shall be appointed in accordance with the terms and provisions of the Talc Personal Injury Trust Agreement. For purposes of performing his or her duties and fulfilling his or her obligations under the Plan, the Confirmation Order, and the Talc Personal Injury Trust Agreement, the FCR under the Talc Personal Injury Trust shall be deemed to be (and the Confirmation Order shall provide that he or she is) a "party in interest" within the meaning of section 1109(b) of the Bankruptcy Code.

4.5    Initial Talc Trust Administrators.

4.5.1    Initial Talc Trust Claims Administrator. The initial Talc Trust Claims Administrator of the Talc Personal Injury Trust shall be the Person identified as such in Exhibit H. All successor Talc Trust Claims Administrators shall be appointed in accordance with the terms and provisions of the Talc Personal Injury Trust Agreement. For purposes of performing its duties and fulfilling its obligations under the Plan, the Confirmation Order, and the Talc Personal Injury Trust Agreement, the Talc Trust Claims Administrator shall be deemed to be (and the Confirmation Order shall provide that it is) a "party in interest" within the meaning of section 1109(b) of the Bankruptcy Code.

4.5.2    Initial Talc Trust Liens Resolution Administrator. The initial Talc Trust Liens Resolution Administrator of the Talc Personal Injury Trust shall be the Person identified as such in Exhibit H. All successor Talc Trust Liens Resolution Administrators shall be appointed in accordance with the terms and provisions of the Talc Personal Injury Trust Agreement. For purposes of performing its duties and fulfilling its obligations under the Plan, the Confirmation Order, and the Talc Personal Injury Trust Agreement, the Talc Trust Lien Resolution Administrator shall be deemed to be (and the Confirmation Order shall provide that it is) a "party in interest" within the meaning of section 1109(b) of the Bankruptcy Code.

4.6    Advancement of Expenses Prior to the Effective Date. The Debtor will seek entry of the Trust Expense Advancement Order on or prior to the Confirmation Date. Subject to, and in accordance with, the Trust Expense Advancement Order, prior to the Effective Date, the Debtor will advance Cash otherwise to be delivered to the Talc Personal Injury Trust on the Effective Date pursuant to Section 4.9.1(a) in order to enable set-up and claims processing work to be undertaken in advance of the Effective Date, so as to allow the Talc Personal Injury Trust to make payments in respect of compensable Channeled Talc Personal Injury Claims as soon as possible after the Effective Date.

4.7    Trust Distribution Procedures.

4.7.1    General. Prior to or on the Effective Date, the Talc Personal Injury Trust shall implement the Trust Distribution Procedures in accordance with the terms of the Talc Personal Injury Trust Agreement. From and after the Effective Date, the Talc Trustees shall have the authority to modify or amend the Trust Distribution Procedures solely in accordance with the terms and provisions thereof and of the Talc Personal Injury Trust Agreement.

29

4.7.2    Channeled Talc Personal Injury Claims.   The Trust Distribution Procedures shall include procedures for processing, evaluating, valuing, resolving, and paying (as appropriate) Channeled Talc Personal Injury Claims, including Channeled Indirect Talc Personal Injury Claims.

4.8    Assumption of Liability for Talc Personal Injury Claims.

4.8.1    Assumption of Liability Generally.   In consideration for the assets delivered, transferred, and assigned to the Talc Personal Injury Trust pursuant to this Article IV, and in furtherance of the purposes of the Plan, the Confirmation Order, and the Talc Personal Injury Trust, on the Effective Date, subject to Section 4.8.4(a), the Talc Personal Injury Trust shall assume all liabilities, obligations, and responsibilities, financial or otherwise, of the Reorganized Debtor, J&J, and the other Protected Parties for all Channeled Talc Personal Injury Claims, including Channeled Indirect Talc Personal Injury Claims.   This assumption shall not affect:  (a) the application of the Discharge Injunction and the Channeling Injunction to the Reorganized Debtor, J&J, and the other Protected Parties; (b) any Talc Insurance Company's obligation under any Talc Insurance Policy; or (c) if the provisions of Section 4.9.3 and Section 5.9.1 are applicable, the Imerys/Cyprus Related Rights.   From and after the Effective Date, other than with respect to obligations to fund the Trust as set forth in the Plan, the Reorganized Debtor, J&J, and the other Protected Parties shall have no liability, obligation, or responsibility, financial or otherwise, for any Channeled Talc Personal Injury Claim, including any Channeled Indirect Talc Personal Injury Claim.

4.8.2    Defenses.   Upon the assumption by the Talc Personal Injury Trust of liabilities, obligations, and responsibilities for Channeled Talc Personal Injury Claims as contemplated by Section 4.8.1, subject to Section 4.8.4(b), the Reorganized Debtor and J&J shall transfer and assign the Talc Personal Injury Trust Defenses to the Talc Personal Injury Trust.   The transfer and assignment of the Talc Personal Injury Trust Defenses to the Talc Personal Injury Trust pursuant to this Section 4.8.2 shall not impair, affect, alter, or modify the right of any Person against whom the Talc Personal Injury Trust may exercise Talc Personal Injury Trust Defenses to assert each and every defense or basis for claim reduction such Person could have asserted against the Debtor or J&J prior to the Effective Date; provided, however, for the avoidance of doubt, that no such Person may assert, as a defense or basis for claim reduction, that the Plan or any of the other Plan Documents does not comply with the Bankruptcy Code or that the transfer and assignment of the Talc Personal Injury Trust Defenses to the Talc Personal Injury Trust pursuant to this Section 4.8.2, or any other action contemplated by this Section 4.8.2, is prohibited by applicable non-bankruptcy law.

4.8.3    Enforcement of Defenses and Other Related Rights.   From and after the Effective Date: (a) the Talc Personal Injury Trust shall have control over the Talc Personal Injury Trust Defenses and the Talc Personal Injury Trust shall thereby become the estate representative pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with the exclusive right to enforce each of the Talc Personal Injury Trust Defenses; (b) subject to Section 4.8.4(b), the proceeds of the recoveries on any of the Talc Personal Injury Trust Defenses shall be delivered to and become the property of the Talc Personal Injury Trust;

and (c) the Talc Personal Injury Trust shall have the right to enforce the Plan and any of the other Plan Documents (including the Cooperation Agreement) according to their respective terms. Notwithstanding the provisions of <u>Section 4.8.2</u> and this <u>Section 4.8.3</u>: (i) the Talc Personal Injury Trust shall have no rights against the Reorganized Debtor, J&J, or the other Protected Parties except to enforce the Plan and the other Plan Documents; (ii) the Talc Personal Injury Trust Defenses transferred and assigned to the Talc Personal Injury Trust shall not include any claims fully and finally released, enjoined, compromised, or settled pursuant to the Plan; and (iii) for the avoidance of doubt, the Talc Personal Injury Trust Defenses transferred and assigned to the Talc Personal Injury Trust shall not include any rights of the Reorganized Debtor, J&J, or the other Protected Parties arising under the Channeling Injunction or any of the other Injunctions.

4.8.4    <u>Common Benefit Fund</u>.

(a)    Notwithstanding anything to the contrary contained in the Plan, neither the Debtor nor the Reorganized Debtor shall have any right or obligation under Case Management Order No. 7(A) entered by the United States District Court for the District of New Jersey in the multidistrict litigation *In re: Johnson & Johnson Talcum Powder Products Marketing, Sales Practices and Products Liability Litigation*, Civil Action No. 3:16-md-02738, to withhold any amounts from payments made by it under the Plan or any other Plan Document to or for the benefit of the Talc Personal Injury Trust to account for any common benefit assessments thereunder or to make any payment to the common benefit fund account established pursuant thereto.

(b)    The Talc Personal Injury Trust Agreement and the Trust Distribution Procedures shall provide that the Talc Trustees are not authorized to pay, and shall not pay, any common benefit fees or expenses from the Talc Personal Injury Trust, and shall take no action with respect to the common benefit fund established pursuant to that certain Case Management Order No. 7(A) entered by the United States District Court for the District of New Jersey in the multidistrict litigation *In re: Johnson & Johnson Talcum Powder Products Marketing, Sales Practices and Products Liability Litigation*, Civil Action No. 3:16-md-02738, in each case without the written consent of the FCR and a supermajority of the Talc Trust Advisory Committee (consisting of not less than 66% of all Talc Trust Advisory Committee Members).

4.9    <u>Contribution of Certain Assets</u>.

4.9.1    <u>Cash Contributions</u>.

(a)    The Reorganized Debtor shall deliver, or cause to be delivered, to the Talc Personal Injury Trust Cash Contributions in accordance with <u>Exhibit C</u>.

(b)    All Cash Contributions to be made by the Reorganized Debtor pursuant to the Plan and the Talc Personal Injury Trust Documents shall be funded by the Reorganized Debtor. All Cash necessary for the Reorganized Debtor to fund such Cash Contributions pursuant to the Plan and the Talc Personal Injury Trust Documents shall be obtained through: (a) the Reorganized Debtor's Cash balances; (b) the Indemnity Funding

Agreement; or (c) such other means of financing or funding as determined by the board of managers of the Reorganized Debtor.

(c)    On the Effective Date, J&J and New Holdco shall execute and deliver to the Talc Personal Injury Trust the Cash Contributions Guarantee.  For the avoidance of doubt, nothing contained in this Section 4.9.1 shall in any way affect the obligations of J&J and New Holdco under the Cash Contributions Parent Guarantee.

4.9.2    Talc PI Note and Related Talc PI Pledge.

(a)    On the Effective Date: (i) the Reorganized Debtor shall execute and deliver to the Talc Personal Injury Trust the Talc PI Note; and (ii) New Holdco shall execute and deliver to the Talc Personal Injury Trust the Talc PI Pledge Agreement.

(b)    The Talc PI Note shall:  (i) bear no interest; (ii) mature on the later of (A) the seventh anniversary of the Petition Date and (B) the first anniversary of the Effective Date; (iii) be secured by the Talc PI Pledge; and (iv) provide for payment in full of the principal amount of the PI Talc Note on or before its maturity date.

(c)    A Reorganized Debtor Payment Event of Default shall not provide a basis for the Talc Personal Injury Trust or any other Person to contend that a material breach of the Plan has occurred or that any Protected Party is no longer entitled to the protections provided to such Protected Party pursuant to the Plan, including the protections of the Channeling Injunction and related indemnification by the Talc Personal Injury Trust. If a Reorganized Debtor Payment Event of Default occurs, the Talc Personal Injury Trust may, upon five (5) days' written notice to the Reorganized Debtor and New Holdco, foreclose upon the Talc PI Pledge.

4.9.3    Imerys/Cyprus Related Rights.  The following provisions shall apply if either (x) the Imerys/Cyprus Settlement Agreement has not been fully executed prior to or on the Effective Date or (y) if the Imerys/Cyprus Settlement Agreement has been fully executed prior to or on the Effective Date and the Imerys/Cyprus Settlement Termination Date occurs, whether prior to, on, or following the Effective Date:

(a)    On the Effective Date or, if later, the Imerys/Cyprus Settlement Termination Date, the Reorganized Debtor and J&J shall transfer and assign to the Talc Personal Injury Trust the Imerys/Cyprus Related Rights.  The transfer and assignment of the Imerys/Cyprus Related Rights to the Talc Personal Injury Trust pursuant to this Section 4.9.3 shall not impair, alter, or modify the right of any Imerys/Cyprus Party against whom the Talc Personal Injury Trust may exercise the Imerys/Cyprus Related Rights to assert each and every defense or basis for claim reduction such Person could have asserted against the Debtor and J&J prior to the Effective Date or, if later, the Imerys/Cyprus Settlement Termination Date; *provided*, *however*, for the avoidance of doubt, that no such Person may assert, as a defense or basis for claim reduction, that the Plan or any of the other Plan Documents does not comply with the Bankruptcy Code or that the transfer and assignment of the Imerys/Cyprus Related Rights to the Talc Personal Injury Trust  pursuant

to this Section 4.9.3, or any other action contemplated by this Section 4.9.3, is prohibited by applicable non-bankruptcy law.

(b)     From and after the Effective Date or, if later, the Imerys/Cyprus Settlement Termination Date:  (a) the Talc Personal Injury Trust shall have control over the Imerys/Cyprus Related Rights and the Talc Personal Injury Trust shall be the estate representative pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with the exclusive right to enforce the Imerys/Cyprus Related Rights; and (b) the proceeds of the recoveries on any Imerys/Cyprus Related Rights shall be delivered to and become the property of the Talc Personal Injury Trust.

(c)     From and after the Effective Date or, if later, the Imerys/Cyprus Settlement Termination Date:  (i) the Reorganized Debtor, J&J, and the Talc Trustees shall cooperate and use their respective commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things that are reasonably necessary or appropriate to effectuate the transfer and assignment of the Imerys/Cyprus Related Rights to the Talc Personal Injury Trust in accordance with this Section 4.9.3; and (ii) without limiting the generality of the foregoing clause (i), the Reorganized Debtor and J&J shall provide, or make available to, the Talc Personal Injury Trust copies of the Imerys/Cyprus Agreements and other information within the possession and control of the Reorganized Debtor and J&J in accordance with the terms and provisions of the Cooperation Agreement.  Pursuant to the Plan and the Confirmation Order, to the extent the Reorganized Debtor or J&J provides to the Talc Personal Injury Trust privileged information pursuant to the terms and provisions of this Section 4.9.3 or the Cooperation Agreement, such provision of information shall not result in the destruction or waiver of any applicable privileges pertaining to such information.

4.9.4     Talc Insurance Assets.

(a)     Subject to the provisions of this Section 4.9.4 and the Cooperation Agreement, on the Effective Date, the Reorganized Debtor shall transfer and assign to the Talc Personal Injury Trust the Talc Insurance Assets; *provided*, *however*, that, for the avoidance of doubt, the Reorganized Debtor shall not transfer and assign to the Talc Personal Injury Trust, and shall retain, (i) all proceeds of Talc In-Place Insurance Coverage received by the Debtor on or prior to the Effective Date and all rights to Talc-In-Place Insurance Coverage for amounts expended prior to the Effective Date, (ii) all proceeds or benefits of any Talc Insurance Action received by the Debtor on or prior to the Effective Date and all rights to proceeds or benefits of any Talc Insurance Action for amounts expended prior to the Effective Date, and (iii) all amounts payable pursuant to any Talc Insurance Settlement Agreement received by the Debtor on or prior to the Effective Date and all amounts payable pursuant to any Talc Insurance Settlement Agreement for amounts expended prior to the Effective Date.

(b)     From and after the Effective Date, in consideration of the Reorganized Debtor's obligations under Section 4.9.1, Section 4.9.2, and, if applicable, Section 4.9.3:  (i) the Reorganized Debtor, as the subrogee of the Talc Personal Injury Trust, shall have the exclusive right (A) to pursue and resolve any Talc In-Place Insurance

33

Coverage, (B) to pursue and resolve any Talc Insurance Action, (C) to pursue and obtain any Talc Insurance Recoveries, and (D) to negotiate and enter into any Talc Insurance Settlement Agreement; and (ii) any of the following received by the Talc Personal Injury Trust shall be delivered to, and retained by, the Reorganized Debtor, and may thereafter be used by the Reorganized Debtor as it may determine in its sole discretion: (A) all proceeds of Talc In-Place Insurance Coverage; (B) all proceeds or benefits of any Talc Insurance Action; and (C) all amounts payable pursuant to any Talc Insurance Settlement Agreement. Subject to the provisions of the Cooperation Agreement, the Reorganized Debtor shall pay, and bear sole responsibility with respect to the payment of, all costs and expenses, including attorneys' fees and expenses and other out-of-pocket fees and expenses, incurred by the Reorganized Debtor acting as subrogee of the Talc Personal Injury Trust pursuant to this Section 4.9.4(b). For the avoidance of doubt, nothing in the Plan, the Plan Documents, or the Confirmation Order shall impair or otherwise affect any rights that any Debtor Corporate Party may have under any Talc Insurance Policy or Talc Insurance Settlement Agreement.

(c)     From and after the Effective Date: (i) the Reorganized Debtor, J&J, and the Talc Trustee shall cooperate and use their respective commercially reasonably efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things that are reasonably necessary or appropriate to effectuate the transfer and assignment of the Talc Insurance Assets to the Talc Personal Injury Trust in accordance with, and subject to the terms and provisions of, this Section 4.9.4; and (ii) the Talc Personal Injury Trust shall provide, or make available to, the Reorganized Debtor and J&J information within the possession and control of the Talc Personal Injury Trust in accordance with the terms and provisions of the Cooperation Agreement and shall cooperate with the Reorganized Debtor and J&J and use commercially reasonable efforts to effectuate the terms and provisions of this Section 4.9.4. Pursuant to the Plan and the Confirmation Order, to the extent the Reorganized Debtor or J&J provides to the Talc Personal Injury Trust privileged information pursuant to the terms and provisions of this Section 4.9.4 or the Cooperation Agreement, such provision of information shall not result in the destruction or waiver of any applicable privileges pertaining to such information.

(d)     If, notwithstanding the provisions of the Plan and Confirmation Order, the transfer and assignment of any Talc Insurance Asset is determined by any court of competent jurisdiction to be invalid under, or to violate the provisions of, any Talc Insurance Policy, then, notwithstanding anything to the contrary in the Plan, solely with respect to such Talc Insurance Asset: (i) the Reorganized Debtor will be deemed to have retained such Talc Insurance Asset; and (ii) each provision of the Plan that provides or contemplates that the Talc Personal Injury Trust shall act through the Reorganized Debtor, or that the Reorganized Debtor shall act, as the subrogee of the Talc Personal Injury Trust with respect to such Talc Insurance Asset shall be deemed to instead provide or contemplate that the Reorganized Debtor will act for the benefit of the Talc Personal Injury Trust with respect to such Talc Insurance Asset. For the avoidance of doubt, nothing in this Section 4.9.4(d) shall affect clause (ii) of Section 4.9.4(b).

4.10    Payment of Talc Personal Injury Trust Expenses.    Subject to Section 4.6, Section 4.9.4(b), and the terms and provisions of the Cooperation Agreement, (a) the Talc Personal

Injury Trust shall pay all Talc Personal Injury Trust Expenses from the assets of the Talc Personal Injury Trust and (b) the Talc Personal Injury Trust shall bear sole responsibility with respect to the payment of the Talc Personal Injury Trust Expenses.  Subject to <u>Section 4.6</u>, <u>Section 4.9.4(b)</u>, and the terms and provisions of the Cooperation Agreement, the Talc Personal Injury Trust shall promptly pay all reasonable and documented Talc Personal Injury Trust Expenses incurred by the Reorganized Debtor or any Debtor Corporate Party for any and all liabilities, costs, or expenses as a result of taking action on behalf of or at the direction of the Talc Personal Injury Trust.

4.11   <u>Treatment of Remainder Assets</u>.  To the extent there are any assets remaining in the Talc Personal Injury Trust at such time as the Talc Personal Injury Trust is dissolved in accordance with the terms and provisions of the Talc Personal Injury Trust Agreement, such remaining assets shall be transferred to a charity or charities selected by Talc Trustees in accordance with the terms and provisions of the Talc Personal Injury Trust Agreement.

4.12   <u>Dissolution</u>.  The Talc Personal Injury Trust shall be dissolved upon satisfaction of the purposes of the Talc Personal Injury Trust in accordance with the terms and provisions of the Talc Personal Injury Trust Agreement.  Upon dissolution of the Talc Personal Injury Trust, the Talc Trustees, the Talc Trust Advisory Committee Members, the FCR under the Talc Personal Injury Trust Agreement, the Talc Trust Claims Administrator, and the Talc Trust Liens Resolution Administrator shall be released and discharged from all further authority, duties, responsibilities, and obligations relating to and arising from and in connection with the Chapter 11 Case.

4.13   <u>Funds and Investment Guidelines</u>.  All monies held in the Talc Personal Injury Trust shall be invested, subject to the investment limitations and provisions enumerated in the Talc Personal Injury Trust Agreement.

4.14   <u>Compliance with QSF Regulations</u>.  The Debtor and the Reorganized Debtor shall take all actions required of them as "transferor," and the designated Talc Trustee shall take all actions required of him or her as "administrator," with respect to the Talc Personal Injury Trust pursuant to treasury regulations promulgated under section 468B of the Internal Revenue Code. Pursuant to such treasury regulations, the Talc Trustee designated as "administrator" shall be responsible for all tax reporting and withholding requirements in respect of distributions made from the Talc Personal Injury Trust.  Any issue of interpretation of the Plan, the Confirmation Order, the Talc Personal Injury Trust Agreement, or any other Talc Personal Injury Trust Document shall be resolved in favor of an interpretation that conforms to the requirements of section 468B of the Internal Revenue Code and the treasury regulations promulgated thereunder.

4.15   <u>Cooperation Agreement</u>.  On the Effective Date, the Reorganized Debtor, J&J, the Custodians, and the Talc Personal Injury Trust shall enter into the Cooperation Agreement.  The provision of information by the Reorganized Debtor or J&J to the Talc Personal Injury Trust pursuant to the Cooperation Agreement shall not result in the destruction or waiver of any applicable privileges pertaining to such information.

4.16   <u>Indemnification and Reimbursement of the Protected Parties</u>.  From and after the Effective Date, the Talc Personal Injury Trust shall indemnify, defend, and hold harmless, to the fullest extent permitted by applicable law, each of the Reorganized Debtor and the other Protected Parties (other than, if the provisions of <u>Section 4.9.3</u> and <u>Section 5.9.1</u> are applicable, the

Imerys/Cyprus Parties for claims based on, arising out of, or in any way relating to the Imerys/Cyprus Related Rights) from and against any and all claims, demands, disputes, suits, damages, remedies, losses, awards, judgments, settlements, liabilities, expenses, costs, fees (including attorneys' fees), and other charges whatsoever suffered or incurred by it subsequent to the Effective Date arising out of or in any way relating to any Channeled Talc Personal Injury Claim.  Without limiting the generality of the foregoing, from and after the Effective Date, the Talc Personal Injury Trust shall promptly reimburse each Protected Party (other than, if the provisions of <u>Section 4.9.3</u> and <u>Section 5.9.1</u> are applicable, the Imerys/Cyprus Parties for claims based on, arising out of, or in any way relating to the Imerys/Cyprus Related Rights) for any and all out-of-pocket damages, remedies, losses, awards, judgments, liabilities, expenses, costs, fees (including attorneys' fees), and other charges whatsoever actually incurred by such Protected Party subsequent to the Effective Date attributable to the defense of any Channeled Talc Personal Injury Claim in the event that the holder of such Channeled Talc Personal Injury Claim seeks to hold such Protected Party liable for such Channeled Talc Personal Injury Claim in violation of the Plan and the Channeling Injunction.  For the avoidance of doubt, notwithstanding the foregoing, the Talc Personal Injury Trust shall have no obligation to indemnify, defend, or hold harmless, or reimburse any out-of-pocket liabilities, expenses, costs, fees (including attorneys' fees), or other charges incurred by, the Reorganized Debtor or J&J in connection with the performance of their obligations under the Master Settlement Agreements.

4.17    <u>Exculpation of the Protected Parties</u>.  None of the Protected Parties shall have or incur any liability to any Person for any act or omission taken or to be taken in connection with, arising out of, or in any way relating to the administration or operation of the Talc Personal Injury Trust, including:  (a) the management of the assets of the Talc Personal Injury Trust; and (b) the processing, liquidation, and payment of Channeled Talc Personal Injury Claims in accordance with the Talc Personal Injury Trust Documents.

**ARTICLE V**
**TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

5.1    <u>General Treatment</u>.  Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document entered into in connection with the Plan, on the Effective Date, pursuant to section 365 of the Bankruptcy Code, the Debtor or the Reorganized Debtor shall assume each of its Executory Contracts and Unexpired Leases other than those listed on <u>Exhibit L</u>; *provided*, *however*, that the Debtor reserves the right, at any time prior to the Effective Date, to amend <u>Exhibit L</u> to:  (a) delete any Executory Contract or Unexpired Lease listed therein, thus providing for its assumption pursuant hereto; or (b) add any Executory Contract or Unexpired Lease to <u>Exhibit L</u>, thus providing for its rejection pursuant to <u>Section 5.5</u>.  The Debtor shall provide notice of any amendments to <u>Exhibit L</u> to the parties to the Executory Contracts or Unexpired Leases affected thereby and to the parties on the then-applicable service list in the Chapter 11 Case.  Nothing herein shall constitute an admission by the Debtor or the

Reorganized Debtor that any contract or lease is an Executory Contract or Unexpired Lease or that the Debtor or the Reorganized Debtor has any liability thereunder.

    5.2    <u>Assumption and Assignment</u>.

        5.2.1    <u>Assumption</u>.  Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated, or is rejected or repudiated under the Plan.

        5.2.2    <u>Postpetition Amendments</u>.  Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

        5.2.3    <u>Assignment</u>.  Each assumed Executory Contract or Unexpired Lease shall be a contract or lease of the Reorganized Debtor unless an assignee is identified in accordance with the procedures in <u>Section 5.3</u>.

    5.3    <u>Approval of Assumptions and Assignments and Related Procedures</u>.

        5.3.1    <u>Effect of Assumption</u>.  Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the effective date of the assumption.

        5.3.2    <u>Approval and Related Procedures</u>.  The Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions described in <u>Section 5.1</u>, pursuant to section 365 of the Bankruptcy Code, as of the Effective Date.  The procedures for assumption or assumption and assignment of an Executory Contract or Unexpired Lease are as follows:

        (a)    After the entry of the Confirmation Order, the Debtor shall serve upon each party to an Executory Contract or Unexpired Lease being assumed pursuant to the Plan notice of:  (i) the contract or lease being assumed or assumed and assigned and, if applicable, any assignee; (ii) the Cure Amount Claim, if any, that the Debtor believes would be payable in connection with such assumption; and (iii) the procedures for such party to object to the assumption or assumption and assignment of the applicable contract or lease or the amount of the proposed Cure Amount Claim.

(b)     Any Person wishing to object to (i) the proposed assumption or assumption and assignment of an Executory Contract or Unexpired Lease under the Plan or (ii) the proposed amount of the related Cure Amount Claim must file and serve on counsel to the Debtor or the Reorganized Debtor a written objection setting forth the basis for the objection within twenty (20) days of service of the notice described in Section 5.3.2(a).

(c)     If no objection to the proposed assumption or assumption and assignment or the proposed amount of the Cure Amount Claim is properly filed and served prior to the objection deadline with respect to an Executory Contract or Unexpired Lease: (i) the proposed assumption or assumption and assignment of the Executory Contract or Unexpired Lease shall be approved in accordance with the Plan and the Confirmation Order, effective as of the Effective Date, without further action of the Bankruptcy Court; and (ii) the Cure Amount Claim identified by the Debtor in the notice shall be fixed and shall be paid in accordance with the Plan on or after the Effective Date, without further action of the Bankruptcy Court, to the appropriate contract or lease party identified on the notice.

(d)     If an objection to the proposed assumption or assumption and assignment or the proposed amount of the Cure Amount Claim is properly filed and served prior to the objection deadline with respect to an Executory Contract or Unexpired Lease, the Debtor or the Reorganized Debtor, as applicable, and the objecting party may resolve such objection by stipulation, without further action of the Bankruptcy Court.

(e)     If an objection to the proposed assumption or assumption and assignment or the proposed amount of the Cure Amount Claim is properly filed and served prior to the objection deadline with respect to an Executory Contract or Unexpired Lease and the parties are unable to resolve such objection:  (i) the Debtor or the Reorganized Debtor, as applicable, may file a reply to such objection no later than thirty (30) days after the filing and service of such objection and ask the Bankruptcy Court to schedule a hearing on the particular objection and the related reply at an appropriate time; or (ii) the Debtor or the Reorganized Debtor, as applicable, may designate the Executory Contract or Unexpired Lease underlying such objection for rejection pursuant to Section 5.5 and amend Exhibit L accordingly.

5.4     Payments Related to Assumption.

5.4.1     Payment Options.  To the extent that such Claims constitute monetary defaults, the Cure Amount Claims associated with each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, at the option of the Debtor or the Reorganized Debtor assuming such contract or lease, or the assignee of the Debtor or the Reorganized Debtor, if any: (a) by payment of the Cure Amount Claim in Cash on the Effective Date or as promptly as reasonably practicable after the Cure Amount Claim is allowed; or (b) on such other terms as are agreed to by the parties to such Executory Contract or Unexpired Lease.

5.4.2    <u>Disputes</u>.  Pursuant to section 365(b)(2)(D) of the Bankruptcy Code, no Cure Amount Claim shall be allowed for a penalty rate or other form of default rate of interest.  If there is a dispute regarding (a) the amount of any Cure Amount Claim, (b) the ability of the Reorganized Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (c) any other matter pertaining to assumption of such contract or lease, the payment of any Cure Amount Claim required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving the assumption.

5.5    <u>Executory Contracts and Unexpired Leases to Be Rejected and Rejection Procedures</u>.

5.5.1    <u>Rejection Generally</u>.  On the Effective Date, each Executory Contract and Unexpired Lease listed on <u>Exhibit L</u> shall be rejected pursuant to section 365 of the Bankruptcy Code.  Each contract and lease listed on <u>Exhibit L</u> shall be rejected only to the extent that any such contract or lease constitutes an Executory Contract or Unexpired Lease.  Listing a contract or lease on <u>Exhibit L</u> shall not constitute an admission by the Debtor or the Reorganized Debtor that such contract or lease is an Executory Contract or Unexpired Lease or that the Debtor or the Reorganized Debtor has any liability thereunder.  The Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejections, pursuant to section 365 of the Bankruptcy Code, as of the Effective Date.

5.5.2    <u>Rejection Procedures</u>.  The procedures for rejection of an Executory Contract or Unexpired Lease are as follows:

(a)    After the entry of the Confirmation Order, the Debtor shall serve upon each party to an Executory Contract or Unexpired Lease being rejected pursuant to the Plan notice of such proposed rejection.  For the avoidance of doubt, additional notices may be served upon any amendment to <u>Exhibit L</u> (including pursuant to <u>Section 5.3.2(e)</u>).

(b)    Any Person wishing to object to the proposed rejection of an Executory Contract or Unexpired Lease under the Plan must file and serve on counsel to the Debtor or the Reorganized Debtor a written objection setting forth the basis for the objection within twenty (20) days of service of the notice described in <u>Section 5.5.2(a)</u>.

(c)    If no objection to the proposed rejection is properly filed and served prior to the objection deadline with respect to an Executory Contract or Unexpired Lease, the proposed rejection of the applicable Executory Contract or Unexpired Lease shall be approved in accordance with the Plan and the Confirmation Order, effective as of the Effective Date, without further action of the Bankruptcy Court.

(d)    If an objection to the proposed rejection is properly filed and served prior to the objection deadline with respect to an Executory Contract or Unexpired Lease, the Debtor or the Reorganized Debtor, as applicable, and the objecting party may resolve such objection by stipulation, without further action of the Bankruptcy Court.

(e)      If an objection to the proposed rejection is properly filed and served prior to the objection deadline with respect to an Executory Contract or Unexpired Lease and the parties are unable to resolve such objection, the Debtor or the Reorganized Debtor, as applicable, may file a reply to such objection no later than thirty (30) days after the filing and service of such objection and ask the Bankruptcy Court to schedule a hearing on the particular objection and the related reply at an appropriate time.

5.6      Claims Based on Rejection.

5.6.1      Proof of Claim Required.  If the rejection or deemed rejection of an Executory Contract or Unexpired Lease by the Debtor results in damages to the other party or parties to such Executory Contract or Unexpired Lease, a Claim for such damages shall be automatically disallowed and forever barred from assertion, and unenforceable, against the Debtor, the Reorganized Debtor, any assignee, or their properties, whether by way of setoff, recoupment, or otherwise, without the need for any objection, any further notice, or any action, order, or approval of the Bankruptcy Court, unless a Proof of Claim is filed with the Claims Agent and served upon counsel for the Debtor or the Reorganized Debtor by the later of (a) thirty (30) days after service of the notice described in Section 5.5.2(a) and (b) thirty (30) days after service of notice of entry of a Final Order rejecting such Executory Contract or Unexpired Lease, which notice, in each case, will set forth such deadline.  If a Proof of Claim is filed in accordance with this Section 5.6.1, any objections to such Proof of Claim shall be filed with the Bankruptcy Court and served upon the holder of such Non-Talc Claim no later than thirty (30) days after the filing of such Proof of Claim, unless extended by order of the Bankruptcy Court prior to the expiration of such period.

5.6.2      Classification of Claims.  Claims arising from the rejection of an Executory Contract or Unexpired Lease shall be classified as Class 3 Unsecured Claims and shall be treated in accordance with Section 3.2.3; *provided*, *however*, that all Claims arising from rejection or deemed rejection of an Executory Contract or Unexpired Lease shall be deemed Disputed.

5.7      Contracts and Leases Entered Into After the Petition Date.  Notwithstanding any other provision of the Plan, contracts and leases entered into after the Petition Date by the Debtor, including any Executory Contracts and Unexpired Leases assumed by the Debtor, shall be performed by the Debtor or the Reorganized Debtor in accordance with the terms and conditions of such contracts and leases in the ordinary course of its business.  Accordingly, such contracts and leases and other obligations (including any assumed Executory Contracts and Unexpired Leases) shall survive and remain unaffected by entry of the Confirmation Order.

5.8      Reservation of Rights.  Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on Exhibit L, or anything contained in the Plan or any Plan Supplement, shall constitute an admission by the Debtor that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Reorganized Debtor, or any assignee has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtor, the Reorganized Debtor, or any assignee, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

40

5.9    Imerys/Cyprus Matters.

5.9.1    Imerys/Cyprus Agreements. If either (x) the Imerys/Cyprus Settlement Agreement has not been fully executed prior to or on the Effective Date or (y) if the Imerys/Cyprus Settlement Agreement has been fully executed prior to or on the Effective Date and the Imerys/Cyprus Settlement Termination Date occurs, whether prior to, on, or following the Effective Date, the foregoing provisions of this Article V shall not apply to the Imerys/Cyprus Agreements and instead the following provisions shall apply thereto:

(a)    To the extent that the Imerys/Cyprus Agreements are considered to be executory contracts, the Plan shall constitute a motion to assume and assign the Imerys/Cyprus Agreements to the Talc Personal Injury Trust (in order to effect the transfer and assignment of the Imerys/Cyprus Related Rights thereunder in accordance with Section 4.9.3) and, subject to the occurrence of the Effective Date and the Imerys/Cyprus Settlement Termination Date, the entry of the Confirmation Order shall constitute approval of such assumption and assignment pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that such assumption and assignment is in the best interest of the Debtor, the Debtor's Estate, and all parties in interest in the Chapter 11 Case.

(b)    Unless otherwise determined by a Final Order entered by the Bankruptcy Court prior to the Effective Date or, if later, the Imerys/Cyprus Settlement Termination Date, no payments are required to cure any defaults of the Debtor existing as of the Effective Date with respect to any Imerys/Cyprus Agreements and the Cash Contributions delivered to the Talc Personal Injury Trust by or on behalf of the Reorganized Debtor shall be deemed to satisfy in full any Claim arising out of any alleged breach, default, or violation under the Imerys/Cyprus Agreements.

(c)    The Imerys/Cyprus Agreements shall be transferred by the Reorganized Debtor and J&J to the Talc Personal Injury Trust as of the Effective Date or, if later, the Imerys/Cyprus Settlement Termination Date to effect the transfer and assignment of the Imerys/Cyprus Related Rights under such agreements in accordance with Section 4.9.3.

5.9.2    Imerys/Cyprus Settlement Agreement. If the Imerys/Cyprus Settlement Agreement has been executed prior to or on the Effective Date and the Imerys/Cyprus Settlement Closing Date occurs, whether prior to, on, or following the Effective Date, the following provisions shall apply:

(a)    Notwithstanding any other provision of this Plan, the Plan shall constitute a motion to assume the Imerys/Cyprus Settlement Agreement, and, subject to the occurrence of the Effective Date, the entry of the Confirmation Order shall constitute: (i) approval of such assumption pursuant to Section 365(a) of the Bankruptcy Code; and (ii) a finding by the Bankruptcy Court that such assumption is in the best interest of the Debtor, the Debtor's Estate, and all parties in interest in the Chapter 11 Case.

(b)    Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed by the parties thereto prior to the Effective Date, no payments are

41

required to cure any defaults of the Debtor with respect to the Imerys/Cyprus Settlement Agreement.

5.10    Talc Insurance Assets.    Notwithstanding any other provision of this Plan, this Article V shall not apply to the Talc Insurance Assets.  To the extent that the Talc Insurance Assets are considered to be executory contracts, the Plan shall constitute a motion to assume and assign the Talc Insurance Assets to the Talc Personal Injury Trust in accordance with Section 4.9.4, and, subject to the occurrence of the Effective Date, the entry of the Confirmation Order shall constitute approval of such assumption and assignment pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that such assumption and assignment is in the best interest of the Debtor, the Debtor's Estate, and all parties in interest in the Chapter 11 Case.  Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed by the parties thereto prior to the Effective Date, no payments are required to cure any defaults of the Debtor existing as of the Effective Date with respect to any Talc Insurance Asset.  The Talc Insurance Assets shall be assigned by the Reorganized Debtor to the Talc Personal Injury Trust in accordance with Section 4.9.4 as of the Effective Date.

5.11    Master Settlement Agreements.    Notwithstanding any other provision of this Plan, the Plan shall constitute a motion to assume the Master Settlement Agreements and any settlement or other agreements entered into in accordance with the terms thereof, and, subject to the occurrence of the Effective Date, the entry of the Confirmation Order shall constitute:  (a) approval of such assumption pursuant to Section 365(a) of the Bankruptcy Code; and (b) a finding by the Bankruptcy Court that such assumption is in the best interest of the Debtor, the Debtor's Estate, and all parties in interest in the Chapter 11 Case.  Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed by the parties thereto prior to the Effective Date, no payments are required to cure any defaults of the Debtor existing as of the Effective Date with respect to any Master Settlement Agreement or any settlement or other agreement entered into in accordance with the terms of any Master Settlement Agreement.

# ARTICLE VI
## DISTRIBUTIONS UNDER THE PLAN ON ACCOUNT OF NON-TALC CLAIMS

6.1    Distributions.    Distributions on account of Allowed Non-Talc Claims (other than Reinstated Non-Talc Claims) shall be made on or after the Distribution Date as provided in this Article VI.  This Article VI shall not apply to Talc Personal Injury Claims or Reinstated Non-Talc Claims.  All Channeled Talc Personal Injury Claims shall be liquidated and, as appropriate, paid, or otherwise resolved, by the Talc Personal Injury Trust pursuant to and in accordance with the Talc Personal Injury Trust Documents.  All Reinstated Non-Talc Claims shall be Reinstated.

6.2    Timing and Calculation of Amounts to be Distributed.

6.2.1    General.    On the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each holder of an Allowed Non-Talc Claim shall receive the full amount of the Distribution that the Plan provides for such Allowed Claim in the manner provided herein.  In the event that any payment or act under the Plan is required to be made or performed on a date that

is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  Any Distribution to be made pursuant to the Plan shall be deemed to have been timely made if made within sixty (60) days after the time therefor specified in the Plan.  No interest shall accrue or be paid with respect to any Distribution as a consequence of such Distribution not having been made on the Effective Date.

6.2.2    <u>Disputed Non-Talc Claims</u>.  If and to the extent that there are Disputed Non-Talc Claims, Distributions on account of any such Disputed Non-Talc Claims shall be made pursuant to the provisions set forth in this <u>Article VI</u>.

6.3    <u>Designation of Disbursing Agent</u>.  All Distributions under the Plan shall be made by the Disbursing Agent.

6.4    <u>Rights and Powers of Disbursing Agent</u>.

6.4.1    <u>General</u>.  The Disbursing Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all Distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

6.4.2    <u>Fees and Expenses</u>.  Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtor.

6.5    <u>Distributions on Account of Claims Allowed After the Effective Date</u>. Notwithstanding any other provision of the Plan, no Distributions shall be made under the Plan on account of any Disputed Non-Talc Claim, unless and until such Disputed Non-Talc Claim becomes an Allowed Non-Talc Claim.  Distributions made after the Effective Date to holders of Disputed Non-Talc Claims that are not Allowed Non-Talc Claims as of the Effective Date but which later become Allowed Non-Talc Claims shall be made as if such Claim had been an Allowed Claim on the Effective Date.  Except as otherwise may be agreed to by the Debtor or the Reorganized Debtor, on the one hand, and the holder of a Disputed Non-Talc Claim, on the other hand, and notwithstanding any provision otherwise in the Plan, no partial payments and no partial Distributions shall be made with respect to any Disputed Non-Talc Claim until all Disputed Non-Talc Claims held by the holder of such Disputed Non-Talc Claim have become Allowed Non-Talc Claims or have otherwise been resolved by settlement or Final Order.

6.6    <u>Delivery of Distributions and Undeliverable or Unclaimed Distributions</u>.

6.6.1    <u>Delivery of Distributions to Holders of Non-Talc Claims</u>.  Distributions to holders of Allowed Non-Talc Claims shall be made to holders of record as of the Distribution Record Date by the Disbursing Agent:  (a) to the signatory set forth on any of

the Proof of Claim filed by such holder or other representative identified therein (or at the last known addresses of such holder if no Proof of Claim is filed or if the Debtor has been notified in writing of a change of address); (b) at the addresses set forth in any written notices of address changes delivered to the Disbursing Agent after the date of any related Proof of Claim; or (c) at the addresses reflected in the Schedules if no Proof of Claim has been filed and the Disbursing Agent has not received a written notice of a change of address.

6.6.2    <u>Full Benefit of Distributions</u>.  Distributions under the Plan on account of Non-Talc Claims shall not be subject to levy, garnishment, attachment, or similar legal process, so that each holder of an Allowed Non-Talc Claim shall have and receive the benefit of the Distributions in the manner set forth in the Plan.  None of the Debtor, the Reorganized Debtor, or the applicable Disbursing Agent shall incur any liability whatsoever on account of any Distributions under the Plan except where such Distributions are found by Final Order to have been made with gross negligence, willful misconduct, or fraud.

6.6.3    <u>Undeliverable Distributions and Unclaimed Property</u>.  In the event that any Distribution to any holder of an Allowed Non-Talc Claim is returned as undeliverable, no further Distribution to such holder shall be made unless and until the Disbursing Agent has determined the then current address of such holder, at which time such Distribution shall be made as soon as practicable after such Distribution has become deliverable to such holder without interest; *provided*, *however*, that such Distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and forfeited at the expiration of three (3) months from the applicable Distribution Date.  After such date, all "unclaimed property" or interests in property in respect of the Reorganized Debtor shall revert to the Reorganized Debtor, notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary.  The claim of any holder to such property or interest in property shall be discharged and forever barred.  Nothing contained in the Plan shall require the Debtor, the Reorganized Debtor, or the Disbursing Agent to attempt to locate any holder of an Allowed Claim.

6.7    <u>Time Bar to Cash Payments</u>.  Checks issued by the Disbursing Agent in respect of Allowed Non-Talc Claims shall be null and void if not cashed within one hundred and eighty (180) days of the date of issuance thereof.  The holder of the Allowed Non-Talc Claim with respect to which such check originally was issued may make a request for re-issuance of any check directly to the Disbursing Agent; *provided*, *however*, that any such request for re-issuance of a check shall be made on or before the twelve (12)-month anniversary of the Distribution Date.  After such date, all Non-Talc Claims in respect of void checks shall be discharged and forever barred.

6.8    <u>Record Date for Holders of Claims</u>.  Except as otherwise provided in an order of the Bankruptcy Court that is not subject to any stay, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001, on or prior to the Distribution Record Date, shall be treated as the holders of such Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to such transfer has not expired by the Distribution Record Date.  If there is any dispute regarding the identity of the Person entitled to receive a Distribution

in respect of a Claim under the Plan, no Distribution need be made in respect of such Claim until such dispute has been resolved.

6.9    Compliance with Tax Requirements and Allocations.

6.9.1    General.  In connection with the Plan and all Distributions hereunder, the Disbursing Agent shall comply with all tax withholding and reporting requirements imposed on them by any federal, state, or local taxing authority, and all Distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the Distribution to be made under the Plan if necessary to generate sufficient funds to pay applicable withholding taxes, withholding Distributions pending receipt of information necessary to facilitate such Distributions including tax certification forms, or establishing any other reasonable mechanisms it believes are necessary or appropriate.  To the extent that any Claim holder fails to submit appropriate tax certification forms required by a Disbursing Agent or to comply with any other mechanism established by a Disbursing Agent to comply with such withholding and reporting requirements, such Claim holder's Distribution may, in such Disbursing Agent's reasonable discretion, be deemed "unclaimed property" subject to Section 6.6.3.

6.9.2    Tax Withholding.  Without limiting the generality of the foregoing, in accordance with the Internal Revenue Code's backup withholding rules, a holder of a Claim may be subject to backup withholding with respect to Distributions made pursuant to the Plan, unless the holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact; or (b) provides at the applicable Disbursing Agent's request a completed IRS Form W-9 (or substitute therefor) on which the holder includes a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the taxpayer is not subject to backup withholding because of a failure to report all dividend and interest income.  Among other things, to receive any Postpetition Interest, if requested by a Disbursing Agent, a holder of an Allowed Claim shall be required to establish an exemption from backup withholding or to make arrangements with respect to the payment of backup withholding.  Non-U.S. Allowed Claim holders may be required by the applicable Disbursing Agent to provide a completed IRS Form W-8BEN or W-8BEN-E, as applicable (or other applicable Form W-8 or successor form) to establish an exemption from or a treaty-reduced rate of withholding on interest distributed pursuant to the Plan.  Unless a Disbursing Agent, in its discretion, determines otherwise, no Distributions on account of Postpetition Interest shall be made to a holder of an Allowed Claim until such time as the holder of such Claim establishes exemption from withholding or provides the applicable IRS Form.

6.9.3    Obligations of Distribution Recipients.  Notwithstanding any other provision of the Plan, each Person receiving a Distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations

imposed on it by any governmental unit on account of such Distribution, including income, withholding, and other tax obligations.

6.9.4    Tax Allocations.  For tax purposes, Distributions in full or partial satisfaction of Allowed Claims shall be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims.

6.10    Transfers of Claims.  In the event that the holder of any Non-Talc Claim shall transfer such Claim after the Distribution Record Date, it shall immediately advise the Reorganized Debtor in writing of such transfer and file a notice of the transfer with the Bankruptcy Court.  The Reorganized Debtor shall be entitled to assume that no transfer of any Claim has been made by any holder unless and until written notice of a transfer has been actually received by the Reorganized Debtor.  Each transferee of any Non-Talc Claim shall take such Claim subject to the provisions of the Plan, and, except as provided in a notice of transfer, the Reorganized Debtor shall be entitled to assume conclusively that the transferee named in any notice of transfer shall thereafter be vested with all rights and powers of the transferor of such Claim.

6.11    Setoffs.  The Debtor and the Reorganized Debtor may, pursuant to the applicable provisions of the Bankruptcy Code, or applicable non-bankruptcy law, set off against any applicable Allowed Claim (before any Distribution is made on account of such Claim) any and all claims, rights, causes of action, debts, or liabilities of any nature that the Debtor or the Reorganized Debtor may hold against the holder of such Allowed Claim; *provided*, *however*, that the failure to effect such a setoff shall not constitute a waiver or release of any such claims, rights, causes of action, debts, or liabilities.

## ARTICLE VII
## RESOLUTION OF DISPUTED NON-TALC CLAIMS

7.1    Disputed Non-Talc Claims.  This Article VII shall apply to all Disputed Non-Talc Claims.  This Article VII shall not apply to Talc Personal Injury Claims.  All Channeled Talc Personal Injury Claims shall be resolved by the Talc Personal Injury Trust in accordance with the Talc Personal Injury Trust Documents.

7.2    Rights of Debtor and Reorganized Debtor .

7.2.1    Right to Litigate.  Prior to the Effective Date, the Debtor, and on and after the Effective Date, the Reorganized Debtor, shall have the right to:  (i) file objections to Non-Talc Claims that have not already been Allowed by Final Order, agreement, or the Plan; and (ii) litigate any Disputed Non-Talc Claim either in the Bankruptcy Court or in any court of competent jurisdiction.

7.2.2    No Approval or Notice Required Generally.  Notwithstanding any prior order of the Bankruptcy Court, other than with respect to Fee Claims, prior to the Effective Date, the Debtor, and on and after the Effective Date, the Reorganized Debtor,  shall have the authority to compromise, settle, otherwise resolve, or withdraw any objections to Disputed Claims and to compromise, settle, or otherwise resolve any Disputed Claims without approval of the Bankruptcy Court.

7.3    Proofs of Claim Not Required.

      7.3.1    Resolution of Claims.    Notwithstanding section 502(a) of the Bankruptcy Code, and except as otherwise set forth in the Plan, holders of Non-Talc Claims (other than Administrative Expense Claims and Claims arising from the rejection of Executory Contracts or Unexpired Leases) need not file Proofs of Claim with the Bankruptcy Court and shall not be subject to any claims-resolution process in the Bankruptcy Court in connection with their Claims.    The Reorganized Debtor and the holders of such Claims shall determine, adjudicate, and resolve any disputes over the validity and amounts of such Claims as if the Chapter 11 Case had not been commenced.

      7.3.2    Deemed Withdrawal of Claims.    Except for Proofs of Claim in respect of Administrative Claims and Claims arising from the rejection of Executory Contracts or Unexpired Leases, upon the Effective Date, any filed Non-Talc Claim, regardless of the time of filing, and including Claims filed after the Effective Date, shall be deemed withdrawn without prejudice to (i) the treatment of such Claim in the Plan; and (ii) each holder's rights under this Section 7.3.2 to assert their Claims in any proper forum as though the Chapter 11 Case had not been commenced.

7.4    No Distributions Pending Allowance.    No Distributions or other consideration shall be paid with respect to any Claim that is a Disputed Claim unless and until all objections to such Disputed Claim are resolved by agreement or Final Order and such Disputed Claim becomes an Allowed Claim.

7.5    Distributions on Account of Disputed Claims.    At such time as determined to be practicable by the Reorganized Debtor, the Disbursing Agent will make Distributions on account of any Disputed Claim that has become Allowed.    Such Distributions will be made pursuant to the applicable provisions of Article VI; *provided*, *however*, that Distributions on account of Allowed Fee Claims shall be made as provided in Article II.

## ARTICLE VIII
## CONDITIONS PRECEDENT TO CONFIRMATION
## AND CONSUMMATION OF THE PLAN

8.1    Conditions Precedent to the Confirmation of the Plan.    Confirmation of the Plan shall not occur unless each of the following conditions has been satisfied or waived pursuant to Section 8.3:

      (a)    The Bankruptcy Court shall have entered an order, in form and substance reasonably acceptable to the Debtor, J&J, the AHC of Supporting Counsel, and the FCR approving the Disclosure Statement as containing adequate information within the meaning of section 1125 of the Bankruptcy Code.

      (b)    Class 4 shall have voted in requisite numbers and amounts in favor of the Plan as required by sections 524(g), 1126, and 1129 of the Bankruptcy Code.

      (c)    The Plan and, if applicable, any Plan Supplements, including any schedules, documents, supplements, and exhibits thereto, shall be (i) in form and substance

47

reasonably acceptable to the Debtor, J&J, the AHC of Supporting Counsel, and the FCR and (ii) consistent with section 524(g) of the Bankruptcy Code, as applicable.

(d)    The Confirmation Order shall:

(i)    have been entered;

(ii)    be in form and substance reasonably acceptable to the Debtor, J&J, the AHC of Supporting Counsel, and the FCR; and

(iii)    provide for the Injunctions in form and substance reasonably acceptable to the Debtor, J&J, the AHC of Supporting Counsel, and the FCR.

(e)    The Bankruptcy Court and the District Court acting jointly or the Bankruptcy Court acting separately but affirmed by the District Court shall have made the following findings, each of which shall be contained in the Confirmation Order:

(i)    The Channeling Injunction and the Insurance Entity Injunction are to be implemented in connection with the Plan and the Talc Personal Injury Trust.

(ii)    (A) As of the Effective Date, the Talc Personal Injury Trust shall assume all liability and responsibility, financial and otherwise, for all Channeled Talc Personal Injury Claims and (B) subject to the delivery, transfer, or assignment, as applicable, to the Talc Personal Injury Trust of the Cash Contributions, Talc PI Note, Talc Pledge Agreement, Imerys/Cyprus Related Rights (if the provisions of Section 4.9.3 and Section 5.9.1 are applicable), and Talc Insurance Assets pursuant to Section 4.9, from and after the Effective Date, no Protected Party (other than, if the provisions of Section 4.9.3 and Section 5.9.1 are applicable, any Imerys/Cyprus Party for claims based on, arising out of, or in any way relating to the Imerys/Cyprus Related Rights, as applicable) shall have any liability or responsibility, financial or otherwise, for any Channeled Talc Personal Injury Claims.

(iii)    As of the Petition Date, the Debtor (as a successor to LLT and Old JJCI) had been named as a defendant in personal injury or wrongful death actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products.

(iv)    The Talc Personal Injury Trust shall be funded in whole or in part by securities of the Reorganized Debtor and by the obligation of the Reorganized Debtor to make future payments.

(v)    The Talc Personal Injury Trust, by the exercise of rights granted under the Plan, would be entitled to own, if specified contingencies occur, a majority of the voting shares of the Reorganized Debtor.

48

(vi)      The Talc Personal Injury Trust shall use its assets or income to pay Channeled Talc Personal Injury Claims, including Talc Personal Injury Demands.

(vii)      As to Talc Personal Injury Demands:

(A)      The Debtor is likely to be subject to substantial future Talc Personal Injury Demands for payment arising out of the same or similar conduct or events that gave rise to the Talc Personal Injury Claims that are addressed by the Channeling Injunction and the Insurance Entity Injunction.

(B)      The actual amounts, numbers, and timing of future Talc Personal Injury Demands cannot be determined.

(C)      Pursuit of Talc Personal Injury Demands outside the procedures prescribed by the Plan and the Plan Documents, including the Trust Distribution Procedures, is likely to threaten the Plan's purpose to deal equitably with Talc Personal Injury Claims and Talc Personal Injury Demands.

(viii)      The terms of the Channeling Injunction and the Insurance Entity Injunction, including any provisions barring actions against third parties pursuant to section 524(g)(4)(A) of the Bankruptcy Code, are set out in the Plan and in the Disclosure Statement.

(ix)      The Plan establishes a separate class of the claimants whose claims are to be addressed by the Talc Personal Injury Trust which class has voted, by at least 75% of those voting, to accept the Plan.

(x)      Pursuant to court orders or otherwise, the Talc Personal Injury Trust shall operate through mechanisms, such as structured, periodic, or supplemental payments, pro rata distributions, matrices, or periodic review of estimates of the numbers and values of Channeled Talc Personal Injury Claims, or other comparable mechanisms, that provide reasonable assurance that the Talc Personal Injury Trust shall value, and be in a financial position to pay, Channeled Talc Personal Injury Claims, including Talc Personal Injury Demands, that involve similar claims in substantially the same manner.

(xi)      Each Protected Party is:

(A)      identifiable from the terms of the Channeling Injunction and the Insurance Entity Injunction by name or as part of an identifiable group and is or may be alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the Debtor to the extent that such alleged liability arises by reason of one or more of the following:

49

(I)     such Person's ownership of a financial interest in the Debtor or the Reorganized Debtor, a past or present affiliate of the Debtor or the Reorganized Debtor, or a predecessor in interest of the Debtor or the Reorganized Debtor (including Old JJCI);

(II)     such Person's involvement in the management of the Debtor or the Reorganized Debtor or a predecessor in interest of the Debtor or the Reorganized Debtor (including Old JJCI);

(III)     such Person's service as an officer, director, manager, or employee of the Debtor or the Reorganized Debtor, a past or present affiliate of the Debtor or the Reorganized Debtor, a predecessor in interest of the Debtor or the Reorganized Debtor (including Old JJCI), or a Person that owns or at any time has owned a financial interest in the Debtor or the Reorganized Debtor, a past or present affiliate of the Debtor or the Reorganized Debtor or a predecessor in interest of the Debtor or the Reorganized Debtor (including Old JJCI);

(IV)     such Person's provision of insurance to the Debtor or the Reorganized Debtor, a past or present affiliate of the Debtor or the Reorganized Debtor, a predecessor in interest of the Debtor or the Reorganized Debtor (including Old JJCI), or a Person that owns or at any time has owned a financial interest in the Debtor or the Reorganized Debtor, a past or present affiliate of the Debtor or the Reorganized Debtor, or a predecessor in interest of the Debtor or the Reorganized Debtor (including Old JJCI); or

(V)     such Person's involvement in a transaction changing the corporate structure (including the 2021 Corporate Restructuring and the Prepetition Corporate Restructuring), or in a loan or other financial transaction affecting the financial condition, of the Debtor or the Reorganized Debtor, a past or present affiliate of the Debtor or the Reorganized Debtor, a predecessor in interest of the Debtor or the Reorganized Debtor (including Old JJCI), or any Person that owns or at any time has owned a financial interest in the Debtor or the Reorganized Debtor, a past or present affiliate of the Debtor or the Reorganized Debtor, or a predecessor in interest of the Debtor or the Reorganized Debtor (including Old JJCI), including (1) involvement in providing financing (debt or equity) or advice to a Person involved in such a transaction or (2) acquiring or selling a

NAI-1539839717

financial interest in any Person as part of such transaction; and/or

(B) otherwise entitled to the Channeling Injunction pursuant to section 1123(b)(6) and/or section 105(a) of the Bankruptcy Code.

(xii) The FCR was appointed as part of the proceedings leading to issuance of the Channeling Injunction and the Insurance Entity Injunction for the purpose of protecting the rights of all Persons, whether known or unknown, that might subsequently assert, directly or indirectly, against the Debtor a Talc Personal Injury Demand that is addressed in the Channeling Injunction and the Insurance Entity Injunction and channeled to the Talc Personal Injury Trust.

(xiii) Identifying each Protected Party (by name or as part of an identifiable group, as applicable) in the Channeling Injunction and the Insurance Entity Injunction is fair and equitable with respect to individuals that might assert Talc Personal Injury Demands against each such Protected Party, in light of the benefits provided, or to be provided, to the Talc Personal Injury Trust by or on behalf of any such Protected Party.

(xiv) The Plan and the Plan Documents comply with section 524(g) of the Bankruptcy Code in all respects, and the Talc Personal Injury Trust Documents are fully consistent with the Plan.

(xv) The Plan, including the Channeling Injunction and the Insurance Entity Injunction, and the other Plan Documents are a fair, equitable, and reasonable resolution of the liability of the Debtor for the Channeled Talc Personal Injury Claims, including Talc Personal Injury Demands that are Channeled Talc Personal Injury Claims.

(xvi) The FCR has adequately and completely fulfilled her duties, responsibilities, and obligations as the representative for any and all persons who may assert Talc Personal Injury Demands in the future, but who are currently unknown, in accordance with section 524(g) of the Bankruptcy Code.

(xvii) Adequate and sufficient notice of the Plan and the Confirmation Hearing, as well as all deadlines for objecting to the Plan, has been given to: (A) all known creditors and holders of Interests; (B) parties that requested notice in accordance with Bankruptcy Rule 2002 (including the TCC and the FCR); (C) all parties to Unexpired Leases and Executory Contracts with the Debtor; (D) all taxing authorities listed on the Debtor's Schedules or in the Debtor's Claims database; (E) the Department of the Treasury by service upon the District Director of the IRS; (F) state attorneys general and state departments of revenue for states in which the Debtor has

51

conducted business; and (G) the Securities and Exchange Commission; in each case, (I) in accordance with the solicitation procedures governing such service and (II) in substantial compliance with Bankruptcy Rules 2002(b), 3017, and 3020(b). Such transmittal and service were adequate and sufficient to bind, among other parties, each holder of a Channeled Talc Personal Injury Claim, and each party represented by the FCR, and no other or further notice is or shall be required.

(xviii)   Each holder of a Channeled Talc Personal Injury Claim and each party represented by the TCC or the FCR has been afforded due process based on the notice referenced in clause (xvii) above, the appointment of the TCC and the FCR, and the Plan's compliance with section 524(g) of the Bankruptcy Code.

(xix)   If the provisions of Section 4.9.3 and Section 5.9.1 are applicable, the Bankruptcy Code authorizes the transfer and assignment of the Imerys/Cyprus Related Rights by the Reorganized Debtor to the Talc Personal Injury Trust pursuant to Section 4.9.3, and from and after the transfer and assignment of the Imerys/Cyprus Related Rights by the Reorganized Debtor to the Talc Personal Injury Trust, no Imerys/Cyprus Party may assert under any Imerys/Cyprus Agreement or otherwise (i) any defense that the Plan or any other Plan Document does not comply with the Bankruptcy Code or (ii) any defense that the transfer and assignment of the Imerys/Cyprus Related Rights by the Reorganized Debtor to the Talc Personal Injury Trust pursuant to Section 4.9.3, or any other action contemplated by Section 4.9.3, is prohibited by any Imerys/Cyprus Agreement or by applicable non-bankruptcy law.

(xx)   The Bankruptcy Code authorizes the transfer and assignment of the Talc Insurance Assets by the Reorganized Debtor to the Talc Personal Injury Trust pursuant to Section 4.9.4, and from and after the transfer and assignment of the Talc Insurance Assets to the Talc Personal Injury Trust pursuant to Section 4.9.4, no Talc Insurance Company may assert under any Talc Insurance Policy or Talc Insurance Settlement Agreement (i) any defense that the Plan or any other Plan Document does not comply with the Bankruptcy Code or (ii) any defense that the transfer and assignment of the Talc Insurance Assets by the Reorganized Debtor to the Talc Personal Injury Trust pursuant to Section 4.9.4, or any other action contemplated by Section 4.9.4, is prohibited by any Talc Insurance Policy or Talc Insurance Settlement Agreement or by applicable non-bankruptcy law.

(xxi)   Neither the Plan nor any other Plan Document, including the Trust Distribution Procedures, creates any right or obligation under Case Management Order No. 7(A) entered by the United States District Court for the District of New Jersey in the multidistrict litigation *In re: Johnson & Johnson Talcum Powder Products Marketing, Sales Practices and Products*

*Liability Litigation*, Civil Action No. 3:16-md-02738, that would permit or require the Debtor or the Reorganized Debtor to withhold any amounts from payments made by it under the Plan or any other Plan Document to or for the benefit of the Talc Personal Injury Trust to account for any common benefit assessments thereunder or to make any payment to the common benefit fund account established pursuant thereto.

(f)     The Bankruptcy Court and the District Court, as required, shall have entered an order approving the Channeling Injunction and the Insurance Entity Injunction, which order may be included in the Confirmation Order and which order shall be in form and substance reasonably acceptable to the Debtor, J&J, the AHC of Supporting Counsel, and the FCR.

8.2     Conditions Precedent to the Effective Date of the Plan.  Notwithstanding any other provision of the Plan or the Confirmation Order, the Effective Date of the Plan shall not occur unless and until each of the following conditions has been satisfied or waived pursuant to Section 8.3:

(a)     The Confirmation Order in form and substance reasonably acceptable to the Debtor, J&J, the AHC of Supporting Counsel, and the FCR shall have been entered, and shall have become a Final Order.

(b)     An order shall have been entered by the Bankruptcy Court and the District Court acting jointly or by the District Court affirming an order entered separately by the Bankruptcy Court approving the Channeling Injunction and the Insurance Entity Injunction and authorizing the Debtor and the Reorganized Debtor to implement the Plan, which order may be included in the Confirmation Order and which order shall be in form and substance reasonably acceptable to the Debtor, J&J, the AHC of Supporting Counsel, and the FCR and shall have become a Final Order.

(c)     The Confirmation Order, the Channeling Injunction, and the Insurance Entity Injunction shall be in full force and effect, and no order shall be in effect staying or enjoining the implementation or enforcement of the Plan, the Confirmation Order, the Channeling Injunction, or the Insurance Entity Injunction.

(d)     The Talc Personal Injury Trust Defenses, Cash Contribution (to the extent payable on the Effective Date), Talc PI Note, Talc PI Pledge Agreement, Imerys/Cyprus Related Rights (if the provisions of Section 4.9.3 and Section 5.9.1 are applicable), and Trust Insurance Assets shall, simultaneously with the occurrence of the Effective Date or as otherwise provided herein, be delivered, transferred, and assigned, as applicable, to the Talc Personal Injury Trust in accordance with Article IV.

(e)     The Talc Personal Injury Trust Agreement (and related documents) and the other applicable Plan Documents (including those attached to any Plan Supplement) necessary or appropriate to implement the Plan shall have been executed, delivered, and, where applicable, filed with the appropriate governmental units in form and

53

substance reasonably acceptable to the Debtor, J&J, the AHC of Supporting Counsel, and the FCR, and shall be fully enforceable in accordance with their terms.

(f)    The fees of the United States Trustee then owed by the Debtor shall have been paid in full.

The Effective Date shall occur as of 12:01 a.m., prevailing Central Time, on the date that the Debtor or Reorganized Debtor files a notice with the Bankruptcy Court stating that the Effective Date has occurred because each of the conditions to the Effective Date has been satisfied or waived pursuant to Section 8.3.

8.3    Waiver of Conditions Precedent.  To the greatest extent permitted by law, each of the conditions precedent in this Article VIII may be waived or modified, in whole or in part, by the Debtor (with the consent of (a) in the event such waiver or modification affects the rights of J&J expressly contained herein, J&J, (b) in the event such waiver or modification affects the rights of the AHC of Supporting Counsel expressly contained herein, the AHC of Supporting Counsel, and (c) in the event such waiver or modification affects the rights of the FCR expressly contained herein, the FCR).  Any waiver or modification of a condition precedent under this Section 8.3 may be effected at any time, without notice, without leave or order of the Bankruptcy Court or District Court, and without any other formal action.  Confirmation and the Effective Date shall occur irrespective of whether any Claims allowance process or related litigation has been completed.

8.4    Notice of Effective Date.  The Debtor shall file with the Bankruptcy Court the notice contemplated by Section 8.2 within five (5) Business Days after each of the conditions precedent to the Effective Date of the Plan set forth therein has been satisfied or waived pursuant to Section 8.3.

8.5    Effect of Nonoccurrence of Conditions Precedent to the Effective Date of the Plan. If any of the conditions precedent to the Effective Date of the Plan set forth in Section 8.2 has not been satisfied or duly waived in accordance with Section 8.3, then, upon motion by the Debtor made before the time that each of such conditions precedent has been satisfied or duly waived and upon notice to such parties in interest as the Bankruptcy Court may direct, the Confirmation Order shall be vacated by the Bankruptcy Court; *provided*, *however*, that, notwithstanding the filing of such motion, the Confirmation Order may not be vacated if each of the conditions precedent set forth in Section 8.2 is either satisfied or duly waived before the Bankruptcy Court enters an order granting such motion.  If the Confirmation Order is vacated pursuant to this Section 8.5:  (a) the Plan shall be null and void in all respects, including with respect to the discharge of Claims; and (b) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims by or against, or any Interest in, the Debtor or (ii) prejudice in any manner the rights, including any claims or defenses, of the Debtor or any other Person.

## ARTICLE IX
## MEANS FOR IMPLEMENTATION OF THE PLAN

9.1    General.  On or after the Confirmation Date, the Debtor shall be empowered and authorized to take or cause to be taken, prior to the Effective Date, all actions necessary or appropriate to achieve the Effective Date and enable the Reorganized Debtor to implement

NAI-1539839717

effectively the provisions of the Plan, the Talc Personal Injury Trust Documents, and the Confirmation Order, including the creation of the Talc Personal Injury Trust and the preparations for the delivery, transfer, and assignment of assets to the Talc Personal Injury Trust pursuant to Article IV.

9.2     Operations of the Debtor Prior to the Effective Date.  The Debtor shall continue to operate as debtor and debtor-in-possession through and until the Effective Date.

9.3     Articles of Organization and Operating Agreement.  From and after the Effective Date, the Reorganized Debtor shall be governed pursuant to the Amended Charter Documents. The Amended Articles of Organization and the Amended Operating Agreement shall contain such provisions as are necessary to satisfy the provisions of the Plan and, to the extent necessary to prohibit the issuance of non-voting equity securities as required by section 1123(a)(6) of the Bankruptcy Code, subject to further amendment of the Amended Charter Documents after the Effective Date, as permitted by applicable law.

9.4     Corporate Action.  On the Effective Date, the matters under the Plan involving or requiring corporate action of the Debtor or Reorganized Debtor, including actions requiring a vote of the board of managers and execution of all documentation incident to the Plan, shall be deemed to have been authorized by the Confirmation Order and to have occurred and be in effect from and after the Effective Date without any further action by the Bankruptcy Court or the officers or managers of the Debtor or Reorganized Debtor.

9.5     Authority of Officers.  Each officer of the Debtor and the Reorganized Debtor shall be authorized and empowered to execute, deliver, file, or record such contracts, instruments, releases, and other agreements and documents and take such other actions as may be necessary or appropriate to effect and implement the provisions of the Plan.  The secretary or any assistant secretary of the Debtor or the Reorganized Debtor shall be authorized to certify or attest to any of the actions taken pursuant to this Section 9.5.

9.6     Post-Effective Date Governance; Continued Existence of the Reorganized Debtor.

9.6.1     General.  The Reorganized Debtor shall continue its existence as a separate entity after the Effective Date, with all the powers thereof, pursuant to the applicable law in the jurisdiction in which the Reorganized Debtor is formed and pursuant to the Amended Charter Documents and any other formation documents in effect following the Effective Date, and such documents are deemed to be adopted pursuant to the Plan and require no further action or approval.

9.6.2     Officers and Managers.  On the Effective Date, the officers and managers of the Reorganized Debtor then in office shall continue to serve in such capacities, subject to the terms of the Amended Charter Documents and any other formation document in effect following the Effective Date.

9.6.3     Property and Operations.  On the Effective Date, all property of the Debtor's Estate other than the assets delivered, transferred, or assigned to the Talc Personal Injury Trust pursuant to Article IV, including any property acquired by the Debtor or the Reorganized Debtor pursuant to the Plan, shall vest in the Reorganized Debtor, free and

55

clear of all Claims, interests, liens, other Encumbrances, and liabilities of any kind except as otherwise expressly provided herein.  On and after the Effective Date, the Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any claims, interests, or Retained Rights of Action, without supervision or approval by the Bankruptcy Court, or notice to any other Person, and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

9.7     <u>Arrangements of the Reorganized Debtor with Managers, Officers, and Employees</u>. As of the Effective Date, the Reorganized Debtor shall be authorized to:  (a) maintain, amend, or revise existing indemnification and other arrangements with its active and retired managers and officers, subject to the terms and conditions of any such agreement, or enter into new indemnification and other arrangements with its active and retired managers and officers; and (b) maintain, amend, cancel, or revise the Secondment Agreement or enter into new employee secondment arrangements with its Affiliates; all as determined by the board of managers of the Reorganized Debtor.

9.8     <u>Good Faith Compromise and Settlement</u>.  The Plan, the other Plan Documents, and the Confirmation Order constitute a good faith compromise and settlement of claims and controversies based on the unique circumstances of this Chapter 11 Case, and none of the foregoing documents, the Disclosure Statement, or any other papers filed in furtherance of Plan Confirmation, nor any drafts of such documents, may be offered into evidence or deemed as an admission in any context whatsoever beyond the purposes of the Plan, in any other litigation or proceeding, except as necessary, and as admissible in such context, to enforce their terms before the Bankruptcy Court or any other court of competent jurisdiction.

9.9     <u>Resolution of Channeled Talc Personal Injury Claims</u>.  Channeled Talc Personal Injury Claims shall be channeled to and resolved by the Talc Personal Injury Trust in accordance with the Talc Personal Injury Trust Documents, subject to:  (a) the right of any Talc Insurance Company to raise any valid Talc Insurer Coverage Defense in response to any claim, cause of action, or right asserted by the Talc Personal Injury Trust (acting through the Reorganized Debtor, as its subrogee having the exclusive right (i) to pursue and resolve any Talc In-Place Insurance Coverage, (ii) to pursue and resolve any Talc Insurance Action, (iii) to pursue and obtain any Talc Insurance Recoveries, and (iv) to negotiate and enter into any Talc Insurance Settlement Agreement) in respect of any Talc Insurance Assets; and (b) if the provisions of <u>Section 4.9.3</u> and <u>Section 5.9.1</u> are applicable, the right of any Imerys/Cyprus Party to raise any valid Imerys/Cyprus Defense in response to any claim, cause of action, or right asserted by the Talc Personal Injury Trust in respect of any Imerys/Cyprus Related Rights.

9.10     <u>Cash for Cash Contributions, Distributions, and Other Payments Pursuant to the Plan</u>.  All Cash for the payment of Cash Contributions, Distributions, and other Cash payments to be made by the Reorganized Debtor pursuant to the Plan and the Talc Personal Injury Trust Documents shall be funded by the Reorganized Debtor.  All Cash necessary for the Reorganized Debtor to fund the payment of such Cash Contributions, Distributions, and other Cash payments pursuant to the Plan and the Talc Personal Injury Trust Documents shall be obtained through: (a) the Reorganized Debtor's Cash balances; (b) the Funding Agreements; or (c) such other means of financing or funding as determined by the board of managers of the Reorganized Debtor.  On the Effective Date, J&J and Holdco shall execute and deliver to the Talc Personal Injury Trust the

Cash Contributions Guarantee as provided in Section 4.9.1(c). For the avoidance of doubt, nothing contained in this Section 9.10 shall in any way affect the obligations of J&J and Holdco under the Cash Contributions Guarantee.

9.11    Modification of the Plan.

(a)    To the extent permissible under section 1127 of the Bankruptcy Code, at any time prior to substantial consummation of the Plan, any proposed amendments to or modifications of the Plan under section 1127 of the Bankruptcy Code or as otherwise permitted by law may be submitted by the Debtor (with the consent of (a) J&J, (b) solely to the extent that any proposed amendments to or modifications of the Plan materially negatively affect the rights of the AHC of Supporting Counsel expressly contained herein, the AHC of Supporting Counsel, and (c) solely to the extent that any proposed amendments to or modifications of the Plan materially negatively affect the rights of the FCR expressly contained herein, the FCR), without additional disclosure pursuant to section 1125 of the Bankruptcy Code, unless section 1127 of the Bankruptcy Code requires additional disclosure. In addition, and without limiting the generality of the foregoing, prior to the Effective Date, the Debtor may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court, to the extent permissible under section 1127 of the Bankruptcy Code; *provided*, *however*, that such technical adjustments and modifications do not adversely affect in a material way the rights or protections of the Protected Parties or the treatment of holders of Claims or Interests under the Plan.

(b)    To the extent permissible under section 1127(b) of the Bankruptcy Code, following substantial consummation of the Plan, the Reorganized Debtor may remedy any defects or omissions or reconcile any inconsistencies in the Plan Documents for the purpose of implementing the Plan in such manner as may be necessary or appropriate to carry out the purposes and intent of the Plan.

(c)    From and after the Effective Date, any holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan as amended, modified, or supplemented pursuant to this Section 9.11, unless the Bankruptcy Court rules otherwise.

9.12    Revocation or Withdrawal of the Plan. The Debtor reserves the right to revoke and withdraw the Plan (with the consent of J&J) at any time before its substantial consummation. If the Debtor revokes or withdraws the Plan, the Plan shall be deemed null and void and nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the Debtor, or any other Person, or to prejudice in any manner the rights of the Debtor, or any other Person, in any further proceedings involving the Debtor until the occurrence of the Effective Date. For the avoidance of doubt, unless and until the Plan is confirmed and the Effective Date occurs, the Plan will have no force or effect.

9.13    Certain Technical Modifications. Prior to the Effective Date, the Debtor may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court, to the extent permissible under section 1127 of the Bankruptcy Code; *provided, however*, that such technical adjustments and modifications do not adversely affect in a material way the rights or protections of the Protected Parties or the treatment of holders of Claims or Interests under the Plan.

# ARTICLE X
# EFFECT OF CONFIRMATION

10.1    Preservation of Rights of Action by the Debtor and the Reorganized Debtor.

10.1.1    Retained Rights of Action.  The Reorganized Debtor shall retain and may enforce, prosecute or settle, and shall have the sole right to enforce, prosecute or settle, the Retained Rights of Action.  The Reorganized Debtor or its successors may pursue or resolve such Retained Rights of Action, as appropriate in accordance with the best interests of the Reorganized Debtor or its successors holding such Retained Rights of Action.  The Reorganized Debtor's rights under this Section 10.1.1 shall be preserved notwithstanding the occurrence of the Effective Date.

10.1.2    Reservation of Rights.  No Person may rely on the absence of a specific reference in the Plan, any Plan Supplement, or the Disclosure Statement to any Retained Rights of Action against them as any indication that the Reorganized Debtor will not pursue the Retained Rights of Action.  The Reorganized Debtor expressly reserves all rights to prosecute any and all Retained Rights of Action.  Unless any of the Retained Rights of Action against a Person are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtor expressly reserves all such Retained Rights of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Retained Rights of Action as a consequence of the Confirmation of the Plan.

10.1.3    Retained Defenses.  Without limiting the generality of the foregoing, upon the Effective Date, except as expressly provided in Article IV with respect to Talc Personal Injury Trust Defenses, Imerys/Cyprus Related Rights (if the provisions of Section 4.9.3 and Section 5.9.1 are applicable), and Talc Insurance Assets, the Reorganized Debtor shall retain and enforce all defenses and counterclaims to all Claims that were or could have been asserted against the Debtor or its Estate, including setoff, recoupment, and any rights under section 502(d) of the Bankruptcy Code.

10.1.4    No Approval Required.  On or after the Effective Date, subject to Article IV with respect to Talc Personal Injury Trust Defenses, Imerys/Cyprus Related Rights (if the provisions of Section 4.9.3 and Section 5.9.1 are applicable), and Talc Insurance Assets, the Reorganized Debtor may pursue, settle, or withdraw, without Bankruptcy Court approval, claims, rights, or causes of action as it determines in accordance with its best interests.

10.2    Imerys/Cyprus Matters.

10.2.1    Imerys/Cyprus Related Rights.  If the provisions of Section 4.9.3 and Section 5.9.1 are applicable, the provisions of this Section 10.2.1 shall apply to all Persons (including the Imerys/Cyprus Parties):

(a)    Preservation of Imerys/Cyprus Related Rights.  All Imerys/Cyprus Related Rights, and all claims, causes of action, and rights in respect thereof, shall be

NAI-1539839717

preserved notwithstanding anything to the contrary contained in the Plan or the Confirmation Order. For the avoidance of doubt, nothing in the Plan or the Confirmation Order shall discharge, settle, release, enjoin, or otherwise impair any claim against any Imerys/Cyprus Party based on, arising out of, or in any way relating to the Imerys/Cyprus Related Rights.

(b)     Actions in Respect of Imerys/Cyprus Related Rights From and After the Effective Date.

(i)     Upon the transfer and assignment of the Imerys/Cyprus Related Rights by the Reorganized Debtor to the Talc Personal Injury Trust pursuant to Section 4.9.3 on the Effective Date or, if later, the Imerys/Cyprus Settlement Termination Date, the Imerys/Cyprus Related Rights shall exclusively vest in the Talc Personal Injury Trust in accordance with section 1123(a)(5)(B) of the Bankruptcy Code.

(ii)     From and after the transfer and assignment of the Imerys/Cyprus Related Rights by the Reorganized Debtor to the Talc Personal Injury Trust pursuant to Section 4.9.3 on the Effective Date or, if later, the Imerys/Cyprus Settlement Termination Date, the Talc Personal Injury Trust shall retain the Imerys/Cyprus Related Rights, and all claims, causes of action, and rights in respect thereof, as the appointed estate representative in accordance with section 1123(b)(3)(B) of the Bankruptcy Court.

(iii)     From and after the transfer and assignment of the Imerys/Cyprus Related Rights by the Reorganized Debtor to the Talc Personal Injury Trust pursuant to Section 4.9.3 on the Effective Date or, if later, the Imerys/Cyprus Settlement Termination Date, the Talc Personal Injury Trust shall have the exclusive right to pursue and resolve the Imerys/Cyprus Related Rights.

(c)     No Impairment of Rights or Obligations of Imerys/Cyprus Parties.

(i)     Nothing contained in the Plan, the Plan Documents, or the Confirmation Order, including any provision that purports to be preemptory or supervening, shall in any way operate to, or have the effect of, impairing, altering, supplementing, changing, expanding, decreasing, or modifying the rights or obligations of any Imerys/Cyprus Party or the Debtor or any Debtor Corporate Party arising out of or under any Imerys/Cyprus Agreement. For all issues relating to indemnity rights of the Debtor, including the venue and choice-of-law rules for resolving disputes relating thereto, the provisions, terms, conditions, and limitations of the Imerys/Cyprus Agreements shall control. For the avoidance of doubt, nothing contained in the Plan, the Plan Documents, or the Confirmation Order shall operate to require any Imerys/Cyprus Party to indemnify or pay the liability of any other Protected Party that it would not have been required

59

to pay in the absence of the Plan, or to impose any requirement for an Imerys/Cyprus Party to mount the defense of any claim, indemnify any claim, or otherwise undertake any action that an Imerys/Cyprus Party would not have been required to take in the absence of the Plan.

(ii)    The Plan, the Plan Documents, the Confirmation Order, and all proceedings, determinations, and findings in, of, or by the Bankruptcy Court are neutral with respect to, and have no effect on, the rights, defenses, and obligations of the Debtor, the Debtor Corporate Parties, the Imerys/Cyprus Parties, and the Talc Personal Injury Trust under the Imerys/Cyprus Agreements. Nothing in the Chapter 11 Case shall be construed otherwise or be used as evidence to support or suggest a construction to the contrary.

(d)    <u>Plan Binding on Imerys/Cyprus Parties</u>. The Plan, the Plan Documents, and the Confirmation Order shall be binding on the Imerys/Cyprus Parties; *provided*, *however*, that, except as provided in <u>Section 10.2.1(e)</u>, none of (a) the Bankruptcy Court's approval of the Plan or the Plan Documents, (b) the Confirmation Order or any findings and conclusions entered with respect to Confirmation, nor (c) any estimation or valuation of Talc Personal Injury Claims, either individually or in the aggregate (including any agreement as to the valuation of Talc Personal Injury Claims) in the Chapter 11 Case shall, with respect to the Imerys/Cyprus Parties, constitute a trial or hearing on the merits or an adjudication, judgment, finding, conclusion, or other determination, or be used as evidence of or suggestion regarding the rights and obligations of any Imerys/Cyprus Party under any Imerys/Cyprus Agreement.

(e)    <u>Issues Actually Litigated by Imerys/Cyprus Parties</u>. Nothing in this <u>Section 10.2.1</u> is intended or shall be construed to preclude otherwise applicable principles of *res judicata* or collateral estoppel from being applied against the Imerys/Cyprus Parties with respect to any issue that is actually litigated by any of them as part of its objections, if any, to Confirmation of the Plan or as part of any contested matter or adversary proceeding filed by any Imerys/Cyprus Party in connection with or related to Confirmation of the Plan; *provided*, *however*, that any Plan objection that an Imerys/Cyprus Party withdraws prior to the conclusion of the Confirmation Hearing (or a finding that an Imerys/Cyprus Party lacks standing to litigate or is otherwise unable to or chooses not to litigate at or before the Confirmation Hearing) shall be deemed not to have been actually litigated. The resolution of any related objection raised by other parties and any related findings or determinations (other than those contemplated by <u>Section 8.1(e)(xix)</u>) shall not be offered for evidentiary purposes nor be binding on any Imerys/Cyprus Party in any way or otherwise prejudice, impair, or affect (under principles of preclusion, waiver, estoppel, or otherwise) an Imerys/Cyprus Party's legal, equitable, or contractual rights or obligations. No Imerys/Cyprus Party shall be bound, prejudiced, impaired, or affected (under principles of preclusion, waiver, estoppel, or otherwise) by the fact that an Imerys/Cyprus Party withdrew, chose to withdraw, or did not press any objection or argument before or after Confirmation.

60

10.2.2    <u>Imerys/Cyprus Settlement</u>.  If the Imerys/Cyprus Settlement Closing Date occurs, whether prior to, on, or following the Effective Date, nothing in the Plan or any other Plan Document will prevent a holder of a Channeled Talc Personal Injury Claim from recovering from both (a) the Talc Personal Injury Trust in respect of his, her, or its Channeled Talc Personal Injury Claim and (b) any trust established pursuant to any plan of reorganization that becomes effective in any chapter 11 case of Imerys, Cyprus, or any of their respective Affiliates (or the estates thereof) in respect of talc-related personal injury claims against Imerys, Cyprus, and/or any of their respective Affiliates, so long as the Imerys/Cyprus Settlement (including the releases contemplated thereby) is effective and, in the case of recovery from a trust established pursuant to any such plan of reorganization, such plan of reorganization is consistent with the Imerys/Cyprus Settlement (including the releases contemplated thereby).

10.3    <u>Talc Insurance Assets</u>.  The provisions of this <u>Section 10.3</u> shall apply to all Persons (including all Talc Insurance Companies).

10.3.1    <u>Preservation of Talc Insurance Assets</u>.  All Talc Insurance Assets, and all claims, causes of action, and rights in respect thereof, shall be preserved notwithstanding anything to the contrary contained in the Plan or the Confirmation Order. For the avoidance of doubt, nothing in the Plan or the Confirmation Order shall discharge, settle, release, enjoin, or otherwise impair any claim against any Talc Insurance Company based on, arising out of, or in any way relating to the Talc Insurance Assets.

10.3.2    <u>Actions in Respect of Talc Insurance Assets From and After the Effective Date</u>.

(a)    Upon the transfer and assignment of the Talc Insurance Assets by the Reorganized Debtor to the Talc Personal Injury Trust pursuant to <u>Section 4.9.4</u> on the Effective Date, subject to the provisions of <u>Section 4.9.4</u> and the Cooperation Agreement, the Talc Insurance Assets shall exclusively vest in the Talc Personal Injury Trust in accordance with section 1123(a)(5)(B) of the Bankruptcy Code;

(b)    From and after the transfer and assignment of the Talc Insurance Assets by the Reorganized Debtor to the Talc Personal Injury Trust pursuant to <u>Section 4.9.4</u> on the Effective Date, subject to the provisions of <u>Section 4.9.4</u> and the Cooperation Agreement, the Talc Personal Injury Trust shall retain the Talc Insurance Assets, and all claims, causes of action, and rights in respect thereof, as the appointed estate representative in accordance with section 1123(b)(3)(B) of the Bankruptcy Court; and

(c)    From and after the transfer and assignment of the Talc Insurance Assets by the Reorganized Debtor to the Talc Personal Injury Trust pursuant to <u>Section 4.9.4</u> on the Effective Date, pursuant to the provisions of <u>Section 4.9.4</u> and the Cooperation Agreement: (i) the Reorganized Debtor, as the subrogee of the Talc Personal Injury Trust, shall have the exclusive right (A) to pursue and resolve any Talc In-Place Insurance Coverage, (B) to pursue and resolve any Talc Insurance Action, (C) to pursue and obtain any Talc Insurance Recoveries, and (D) to negotiate and enter into any Talc Insurance Settlement Agreement; and (ii) any of the following received by the Talc

61

Personal Injury Trust shall be delivered to, and retained by, the Reorganized Debtor: (A) all proceeds of Talc In-Place Insurance Coverage; (B) all proceeds or benefits of any Talc Insurance Action; and (C) all amounts payable pursuant to any Talc Insurance Settlement Agreement. For the avoidance of doubt, nothing in the Plan, the Plan Documents, or the Confirmation Order shall impair or otherwise affect any rights that any Debtor Corporate Party may have under any Talc Insurance Policy or Talc Insurance Settlement Agreement.

 10.3.3 <u>No Impairment of Rights or Obligations of Talc Insurance Companies</u>.

 (a) Except as provided in any Talc Insurance Settlement Agreement or in <u>Section 11.2.1</u>, nothing contained in the Plan, the Plan Documents, or the Confirmation Order, including any provision that purports to be preemptory or supervening, shall in any way operate to, or have the effect of, impairing, altering, supplementing, changing, expanding, decreasing, or modifying the rights or obligations of any Talc Insurance Company or the Debtor arising out of or under any Talc Insurance Policy. For all issues relating to insurance coverage, the provisions, terms, conditions, and limitations of the Talc Insurance Policies or Talc Insurance Settlement Agreements shall control. For the avoidance of doubt, nothing contained in the Plan, the Plan Documents, or the Confirmation Order shall operate to require any Talc Insurance Company to indemnify or pay the liability of any Protected Party that it would not have been required to pay in the absence of the Plan.

 (b) The Plan, the Plan Documents, the Confirmation Order, and all proceedings, determinations, and findings in, of, or by the Bankruptcy Court are neutral with respect to, and have no effect on, the rights, defenses, and obligations of the Debtor, the Talc Insurance Companies, and the Talc Personal Injury Trust under the Talc Insurance Policies. Nothing in the Chapter 11 Case shall be construed otherwise or be used as evidence to support or suggest a construction to the contrary.

 10.3.4 <u>Plan Binding on Talc Insurance Companies</u>. The Plan, the Plan Documents, and the Confirmation Order shall be binding on the Talc Insurance Companies; *provided*, *however*, that, except as provided in <u>Section 10.3.6</u>, none of (a) the Bankruptcy Court's approval of the Plan or the Plan Documents, (b) the Confirmation Order or any findings and conclusions entered with respect to Confirmation, nor (c) any estimation or valuation of Talc Personal Injury Claims, either individually or in the aggregate (including any agreement as to the valuation of Talc Personal Injury Claims) in the Chapter 11 Case shall, with respect to any Talc Insurance Company, constitute a trial or hearing on the merits or an adjudication, judgment, finding, conclusion, or other determination, or be used as evidence of or suggestion regarding the rights and obligations of any Talc Insurance Company under any Talc Insurance Policy.

 10.3.5 <u>Plan Protections of Settling Talc Insurance Companies</u>. No provision of the Plan, other than those provisions contained in the applicable Injunctions set forth in <u>Article XI</u>, shall be interpreted to affect or limit the protections afforded to any Settling Talc Insurance Company by the Channeling Injunction or the Insurance Entity Injunction.

10.3.6    Issues Actually Litigated by the Talc Insurance Companies.  Nothing in this Section 10.3 is intended or shall be construed to preclude otherwise applicable principles of *res judicata* or collateral estoppel from being applied against any Talc Insurance Company with respect to any issue that is actually litigated by such Talc Insurance Company as part of its objections, if any, to Confirmation of the Plan or as part of any contested matter or adversary proceeding filed by such Talc Insurance Company in conjunction with or related to Confirmation of the Plan; *provided*, *however*, that any Plan objection that a Talc Insurance Company withdraws prior to the conclusion of the Confirmation Hearing (or a finding that a Talc Insurance Company lacks standing to litigate or is otherwise unable to or chooses not to litigate at or before the Confirmation Hearing) shall be deemed not to have been actually litigated.  The resolution of any related objection raised by other parties and any related findings or determinations (other than those contemplated by Section 8.1(e)(xx)) shall not be offered for evidentiary purposes nor be binding on any Talc Insurance Company in any way or otherwise prejudice, impair, or affect (under principles of preclusion, waiver, estoppel, or otherwise) a Talc Insurance Company's legal, equitable, or contractual rights or obligations.  No Talc Insurance Company shall be bound, prejudiced, impaired, or affected (under principles of preclusion, waiver, estoppel, or otherwise) by the fact that a Talc Insurance Company withdrew, chose to withdraw, or did not press any objection or argument before or after Confirmation.

10.4    Preservation of Rights of Action by the Talc Personal Injury Trust.  As of the Effective Date, the Talc Personal Injury Trust shall be empowered to initiate, prosecute, defend, settle, maintain, administer, preserve, pursue, and resolve all legal actions and other proceedings related to any asset, liability, or responsibility of the Talc Personal Injury Trust, including Channeled Talc Personal Injury Claims and Talc Personal Injury Trust Defenses.  Without limiting the foregoing, on and after the Effective Date, the Talc Personal Injury Trust shall be empowered to initiate, prosecute, defend, settle, maintain, administer, preserve, pursue, and resolve all such actions in the name of either the Debtor or the Reorganized Debtor, if deemed necessary or appropriate by the Talc Personal Injury Trust.  The Talc Personal Injury Trust shall be responsible for the payment of all damages, awards, judgments, settlements, expenses, costs, fees, and other charges incurred subsequent to the Effective Date arising out of or in any way relating to any such legal action or other proceeding.  This Section 10.4 shall not apply to legal actions and other proceedings related to (a) if the provisions of Section 4.9.3 and Section 5.9.1 are applicable, the Imerys/Cyprus Related Rights, which shall be pursued, resolved, and settled in accordance with the provisions of Section 4.9.3 and Section 10.2.1, or (b) the Talc Insurance Assets, which shall be pursued, resolved, and settled in accordance with the provisions of Section 4.9.3 and Section 10.3.

10.5    Terms of Injunctions and Automatic Stay.

10.5.1    General.  Any and all injunctions and/or automatic stays provided for in or in connection with the Chapter 11 Case, whether pursuant to sections 105, 362, or any other provision of the Bankruptcy Code, Bankruptcy Rules, or other applicable law in existence immediately prior to the Confirmation Date, shall remain in full force and effect until the Injunctions become effective pursuant to a Final Order, and shall continue to remain in full force and effect thereafter as and to the extent provided by the Plan, the Confirmation Order, or by their own terms.  In addition, on and after Confirmation, the

Debtor may seek such further orders as the Debtor deems necessary or appropriate to preserve the status quo during the time between the Confirmation Date and the Effective Date.

10.5.2    Effectiveness.  Each of the Injunctions contained in the Plan or the Confirmation Order shall become effective on the Effective Date and shall continue in effect at all times thereafter unless otherwise provided by the Plan or the Confirmation Order.

10.6    The FCR and the TCC.

10.6.1    General.  The FCR and the TCC shall continue in their official capacities until the Effective Date.  The Debtor shall pay the reasonable fees and expenses incurred by the FCR and the TCC through the Effective Date, in accordance with the Compensation Procedures Order and the terms of the Plan, including Section 2.2.

10.6.2    Dissolution.  On the Effective Date, the TCC shall dissolve, and the members of such committee shall be released and discharged from all duties and obligations arising from or related to the Chapter 11 Case.  Similarly, on the Effective Date, the FCR shall be deemed released and discharged from all duties and obligations from or related to the Chapter 11 Case.  The Professionals retained by the TCC and the members thereof or by the FCR shall not be entitled to assert any Fee Claim for any services rendered or expenses incurred after the Effective Date, except for services rendered and expenses incurred in connection with any applications for allowance of compensation and reimbursement of expenses pending on the Effective Date or filed and served after the Effective Date pursuant to Section 2.2.

10.7    No Effect on United States Trustee.  Nothing in this Section 10 shall limit or otherwise affect the rights of the United States Trustee under section 502 of the Bankruptcy Code or otherwise to object to Claims or requests for allowance of Fee Claims and other Administrative Claims.

10.8    Binding Effect.  Subject to Section 10.2 and Section 10.3, as of the Effective Date, the Plan, the Plan Documents, and the Confirmation Order shall be binding on the Debtor, the Reorganized Debtor, the Talc Personal Injury Trust, any and all holders of Claims against or Interests in the Debtor (regardless of whether such Claim or Interest is Impaired and regardless of whether such holder voted to accept the Plan), and any and all other Persons that are affected in any manner by the Plan.

## ARTICLE XI
## DISCHARGE, RELEASES, INJUNCTIONS, AND EXCULPATION

11.1    Discharge and Injunctions.

11.1.1    Discharge of Claims Against the Debtor.  As of the Effective Date, Confirmation of the Plan shall afford the Debtor a discharge to the fullest extent permitted by Bankruptcy Code sections 524 and 1141(d)(1).

NAI-1539839717

11.1.2    **Discharge Injunction.  From and after the Effective Date, to the maximum extent permitted under applicable law, all Persons that hold, have held, or may hold a Claim, demand, or other debt or liability that is discharged are permanently enjoined from taking any of the following actions on account of, or on the basis of, such discharged Claims, demands, debts, or liabilities:  (i) commencing or continuing any action or other proceeding of any kind against the Debtor, the Reorganized Debtor, or their respective property; (ii) enforcing, attaching, collecting, or recovering by any manner or means of any judgment, award, decree, or order against the Debtor, the Reorganized Debtor, or their respective property; (iii) creating, perfecting, or enforcing any lien or other Encumbrance of any kind against the Debtor, the Reorganized Debtor, or their respective property; and (iv) commencing or continuing any judicial or administrative proceeding, in any forum and in any place in the world, that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order.  The foregoing injunction shall extend to the successors of the Debtor (including the Reorganized Debtor) and their respective properties and interests in property.  The discharge provided in this <u>Section 11.1</u> shall void any judgment obtained against the Debtor or any successor of the Debtor (including the Reorganized Debtor) at any time, to the extent that such judgment relates to a discharged Claim or demand.  Notwithstanding the foregoing, nothing in this <u>Section 11.1</u> shall impair the rights of holders of Judgment Claims to seek to enforce and collect on the judgments on which such Judgment Claims are based, including through the defense or prosecution of appellate litigation related thereto.**

11.2    <u>**Releases**</u>**.**

11.2.1    <u>**Releases by the Debtor and Its Estate**</u>**.  As of the Effective Date, for good and valuable consideration (including services provided before and during the Chapter 11 Case to facilitate the implementation of the Talc Personal Injury Trust), the adequacy of which is hereby confirmed, the Reorganized Debtor, the Debtor Corporate Parties, and the respective Representatives of the Debtor, the Reorganized Debtor, and the Debtor Corporate Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released, to the maximum extent permitted by law, as such law may be extended subsequent to the Effective Date, by the Debtor and the Estate from any and all claims, counterclaims, disputes, obligations, suits, judgments, damages, demands, debts, rights, causes of action, liens, remedies, losses, contributions, indemnities, costs, liabilities, fees (including attorneys' fees) and expenses whatsoever, including any indirect claims asserted or assertable on behalf of the Debtor or the Estate (including any Recovery Actions), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that the Debtor or the Estate would have been legally entitled to assert in its own right, or on behalf of the holder of any Claim or Interest or other Person, based on, arising out of, or in any way relating to, in whole**

65

or in part, the Debtor (as it existed prior to or after the Petition Date), the 2021 Corporate Restructuring, the 2021 Chapter 11 Case, the 2023 Chapter 11 Case, the 2023 Conversion, the 2023 Funding Agreement Modifications, the Prepetition Corporate Restructuring, the Estate, the Chapter 11 Case, the purchase, sale, or rescission of the purchase or sale of any security of the Debtor, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements or interactions (including the exercise of any common law or contractual rights of setoff or recoupment at any time on or prior to the Effective Date) between the Debtor, on the one hand, and the Reorganized Debtor, any Debtor Corporate Party, or any Representative of the Debtor, the Reorganized Debtor, or any Debtor Corporate Party, on the other hand, the sale or distribution of assets by Holdco in connection with the separation of J&J's consumer health business into a new company named Kenvue, Inc., the Love Proceeding, the restructuring of any Claim or Interest before or during the Chapter 11 Case, the negotiation, formulation, preparation, or implementation of, or the solicitation of votes with respect to, the Plan, or any other act or omission related to the Disclosure Statement, the Plan, or any related agreement, instrument, or document or any of the foregoing.  Notwithstanding the foregoing, claims or causes of action against the Reorganized Debtor, any Debtor Corporate Party, or any Representative of the Debtor, the Reorganized Debtor, or any Debtor Corporate Party arising out of or relating to any act or omission of such Person prior to the Effective Date that is determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted a criminal act, actual fraud, gross negligence, or willful misconduct, including findings after the Effective Date, are not released pursuant to this Section 11.2.1; *provided*, *however*, that (i) no Person may commence or pursue any such claim or cause of action without the Bankruptcy Court (A) first determining, after notice and a hearing, that such claim or cause of action represents a colorable claim and (B) specifically authorizing such Person to bring such claim or cause of action and (ii) to the fullest extent permitted by law, the Bankruptcy Court shall have sole and exclusive jurisdiction to adjudicate the underlying colorable claim or cause of action.  For the avoidance of doubt, nothing contained in this Section 11.2.1 shall release or otherwise affect the obligations of any Person to be performed from and after the Effective Date under any Funding Agreement, the Cash Contributions Guarantee, or any other Plan Document to which it is a party.  The Reorganized Debtor, and any other entity that continues the Debtor's business after the Effective Date, shall be bound, to the same extent the Debtor and the Estate are bound, by the releases set forth in this Section 11.2.1.

11.2.2    **Releases by Holders of Claims.**  As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, including the service of the Released Parties before and during the Chapter 11 Case to facilitate the implementation of the Talc Personal Injury Trust, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released, to the maximum extent permitted by law, as such law may be extended subsequent to the Effective Date, by the Releasing Claim Holders from any and all claims, counterclaims, disputes, obligations, suits, judgments, damages, demands, debts, rights, causes of action, liens, remedies, losses, contributions, indemnities, costs,

NAI-1539839717

liabilities, fees (including attorneys' fees), and expenses whatsoever, including any indirect claims asserted or assertable on behalf of the Debtor or the Estate (including any Recovery Actions), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that such holders or their estates, Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons or parties claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively), or on behalf of the holder of any Claim or Interest or other Person, based on, arising out of, or in any way relating to, in whole or in part, the Debtor (as it existed prior to or after the Petition Date), the 2021 Corporate Restructuring, the 2021 Chapter 11 Case, the 2023 Chapter 11 Case, the 2023 Conversion, the 2023 Funding Agreement Modifications, the Prepetition Corporate Restructuring, the Estate, the Chapter 11 Case, the purchase, sale, or rescission of the purchase or sale of any security of the Debtor, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements or interactions (including the exercise of any common law or contractual rights of setoff or recoupment at any time on or prior to the Effective Date) between the Debtor, on the one hand, and any other Released Party, on the other hand, the restructuring of any Claim or Interest before or during the Chapter 11 Case, the sale or distribution of assets by Holdco in connection with the separation of J&J's consumer health business into a new company named Kenvue, Inc., the Love Proceeding, the negotiation, formulation, preparation, or implementation of, or the solicitation of votes with respect to, the Plan, or any other act or omission related to the Disclosure Statement, the Plan, or any related agreement, instrument, or document or any of the foregoing. Notwithstanding the foregoing:  (a) claims or causes of action against a Released Party arising out of or relating to any act or omission of such Released Party prior to the Effective Date that is determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted a criminal act, actual fraud, gross negligence, or willful misconduct, including findings after the Effective Date, are not released pursuant to this <u>Section 11.2.2</u>; *provided*, *however*, that (i) no Person, without regard to whether such Person is a Releasing Claim Holder, may commence or pursue any such claim or cause of action without the Bankruptcy Court (A) first determining, after notice and a hearing, that such claim or cause of action represents a colorable claim and (B) specifically authorizing such Person to bring such claim or cause of action and (ii) to the fullest extent permitted by law, the Bankruptcy Court shall have sole and exclusive jurisdiction to adjudicate the underlying colorable claim or cause of action; (b) holders of Master Settlement Agreement Claims shall not release their rights to have such Master Settlement Agreement Claims considered for settlement and, if such Master Settlement Agreement Claims qualify for settlement, settled under the Master Settlement Agreements; and (c) holders of Judgment Claims shall not release their rights to seek to enforce and collect on the judgments on which

such Judgment Claims are based, including through the defense or prosecution of appellate litigation related thereto. For the avoidance of doubt, nothing contained in this <u>Section 11.2.2</u> shall release or otherwise affect the obligations of any Person to be performed from and after the Effective Date under any Funding Agreement, the Cash Contributions Parent Guarantee, or any other Plan Document to which it is a party.

11.2.3  <u>Injunction Related to Releases</u>.  The Confirmation Order shall permanently enjoin the commencement or prosecution by any Person, whether directly, indirectly, or otherwise, of any claims, commitments, obligations, suits, judgments, damages, demands, debts, causes of action, and liabilities released pursuant to this <u>Section 11.2</u>.

11.3  <u>Channeling Injunction and Insurance Entity Injunction</u>.  In order to supplement the injunctive effect of the Discharge Injunction, and pursuant to section 524(g), section 1123(b)(6), and/or section 105(a) of the Bankruptcy Code, the Confirmation Order shall provide for the following permanent injunctions to take effect as of the Effective Date.

11.3.1  <u>Channeling Injunction</u>.

(a)  To preserve and promote the settlements contemplated by and provided for in the Plan and pursuant to the exercise of the equitable jurisdiction and power of the Bankruptcy Court and the District Court under section 524(g), section 1123(b)(6), and/or section 105(a) of the Bankruptcy Code, notwithstanding anything to the contrary contained in the Plan, (i) the sole recourse of any holder of a Channeled Talc Personal Injury Claim against a Protected Party (on account of such Channeled Talc Personal Injury Claim) shall be to and against the Talc Personal Injury Trust pursuant to the Talc Personal Injury Trust Documents and (ii) such holder shall have no right whatsoever at any time to assert its Channeled Talc Personal Injury Claim against any Protected Party or any property or interest in property of any Protected Party. On and after the Effective Date, all holders of Channeled Talc Personal Injury Claims shall be permanently and forever stayed, restrained, barred, and enjoined from taking any action for the purpose of, directly or indirectly, collecting, recovering, or receiving payment, satisfaction, or recovery of, on, or with respect to any Channeled Talc Personal Injury Claim against a Protected Party other than from the Talc Personal Injury Trust pursuant to the Talc Personal Injury Trust Documents, including:

(i)  commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including a judicial, arbitration, administrative, or other proceeding) in any forum in any jurisdiction around the world against or affecting any Protected Party or any property or interests in property of any Protected Party;

(ii)  enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering, by any manner or means, whether directly or indirectly, any judgment, award,

decree, or order against any Protected Party or any property or interests in property of any Protected Party;

(iii)    creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any lien of any kind against any Protected Party or any property or interests in property of any Protected Party;

(iv)    asserting, implementing, or effectuating any setoff, recoupment, right of contribution, reimbursement, subrogation, or indemnification, or similar right of any kind, in any manner, directly or indirectly, against any obligation due to any Protected Party or against any property or interests in property of any Protected Party; and

(v)    taking any act in any manner, and in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan, the Plan Documents, or the Talc Personal Injury Trust Documents or with regard to any matter that is within the scope of the matters designated by the Plan to be subject to resolution by the Talc Personal Injury Trust, except in conformity and compliance with the Talc Personal Injury Trust Documents.

(b)    Notwithstanding anything to the contrary in <u>Section 11.3.1(a)</u>, this Channeling Injunction shall not impair:

(i)    the rights of holders of Channeled Talc Personal Injury Claims to assert such Talc Personal Injury Claims solely against the Talc Personal Injury Trust in accordance with the Talc Personal Injury Trust Documents;

(ii)    the rights of holders of Channeled Talc Personal Injury Claims to assert such claims against anyone other than a Protected Party;

(iii)    the rights of holders of Master Settlement Agreement Claims to have such Master Settlement Agreement Claims considered for settlement and, if such Master Settlement Agreement Claims qualify for settlement, settled under the Master Settlement Agreements, so long as such holder has not (A) previously received payment in respect of such Master Settlement Agreement Claim from the Talc Personal Injury Trust or (B) submitted such Master Settlement Agreement Claim to the Talc Personal Injury Trust under the Trust Distribution Procedures (unless such Master Settlement Agreement Claim has been properly withdrawn in accordance with the Trust Distribution Procedures and has not thereafter been resubmitted

NAI-1539839717

to the Talc Personal Injury Trust under the Trust Distribution Procedures);

(iv)    the rights of holders of Judgment Claims to seek to enforce and collect on the judgments on which such Judgment Claims are based, including through the defense or prosecution of appellate litigation related thereto;

(v)    the rights of all Persons to assert any claim, debt, obligation, cause of action, or liability for payment of Talc Personal Injury Trust Expenses solely against the Talc Personal Injury Trust; or

(vi)    the Talc Personal Injury Trust from enforcing its rights explicitly provided to it under the Plan and the Talc Personal Injury Trust Documents, including, if the provisions of Section 4.9.3 and Section 5.9.1 are applicable, the Imerys/Cyprus Related Rights.

(c)    There shall be no modification, dissolution, or termination of the Channeling Injunction, which shall be a permanent injunction.

(d)    Nothing in the Plan or the Talc Personal Injury Trust Agreement shall be construed in any way to limit the scope, enforceability, or effectiveness of the Channeling Injunction issued in connection with the Plan or the Talc Personal Injury Trust's assumption of all liability with respect to Talc Personal Injury Claims.

(e)    The Debtor's compliance with the formal requirements of Bankruptcy Rule 3016(c) shall not constitute an admission that the Plan provides for an injunction against conduct not otherwise enjoined under the Bankruptcy Code.

(f)    Any Protected Party may enforce the Channeling Injunction as a defense to any Claim brought against such Protected Party that is enjoined under the Plan as to such Protected Party and may seek to enforce such injunction in a court of competent jurisdiction.

(g)    If a Talc Insurance Company that is not a Settling Talc Insurance Company asserts that it has Contribution Claims against a Settling Talc Insurance Company:  (i) such Contribution Claims may be asserted as a defense or counterclaim against the Talc Personal Injury Trust in any Talc Insurance Action involving such Talc Insurance Company, and the Talc Personal Injury Trust (acting through the Reorganized Debtor, as its subrogee having the exclusive right to pursue and resolve any Talc Insurance Action) may assert the legal or equitable rights (if any) of the Settling Talc Insurance Company; and (ii) to the extent such Contribution Claims are determined to be valid, the liability (if any) of such Talc Insurance Company to the Talc Personal Injury Trust shall be reduced by the amount of such Contribution Claims.

70

11.3.2    **Insurance Entity Injunction**.

(a)    **In order to protect and preserve the Talc Insurance Assets, pursuant to the equitable jurisdiction and power of the Bankruptcy Court, the Bankruptcy Court shall issue the Insurance Entity Injunction; *provided, however*, that the Insurance Entity Injunction is not issued for the benefit of any Talc Insurance Company, and no Talc Insurance Company is a third-party beneficiary of the Insurance Entity Injunction, except as otherwise specifically provided in any Talc Insurance Settlement Agreement.**

(b)    **Subject to the provisions of <u>Section 11.3.1</u> and this <u>Section 11.3.2</u>, all Persons that have held or asserted, that hold or assert, or that may in the future hold or assert any claim, demand, or cause of action against any Talc Insurance Company based on, arising out of, or in any way relating to any Channeled Talc Personal Injury Claim, whenever and wherever arising or asserted, whether in the United States of America or anywhere else in the world, whether sounding in tort, contract, warranty, or any other theory of law, equity, or admiralty, shall be stayed, restrained, and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering, or receiving payments, satisfaction, or recovery with respect to any such claim, demand, or cause of action including:**

(i)    **commencing, conducting, or continuing, in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including a judicial, arbitration, administrative, or other proceeding) in any forum with respect to any such claim, demand, or cause of action against any Talc Insurance Company, or against the property of any Talc Insurance Company, with respect to any such claim, demand, or cause of action;**

(ii)    **enforcing, levying, attaching, collecting, or otherwise recovering, by any means or in any manner, whether directly or indirectly, any judgment, award, decree, or other order against any Talc Insurance Company, or against the property of any Talc Insurance Company, with respect to any such claim, demand, or cause of action;**

(iii)    **creating, perfecting, or enforcing in any manner, directly or indirectly, any Encumbrance against any Talc Insurance Company, or the property of any Talc Insurance Company, with respect to any such claim, demand, or cause of action; and**

(iv)    **asserting or accomplishing any setoff, right of subrogation, indemnity, contribution, or recoupment of any kind, directly or indirectly, against any obligation of any Talc Insurance Company, or against the property of any Talc Insurance Company, with respect to any such claim, demand, or cause of action;**

71

*provided, however,* that: (A) the injunction set forth in this <u>Section 11.3.2(b)</u> shall not impair in any way (I) any actions pursued by the Talc Personal Injury Trust (acting through the Reorganized Debtor, as its subrogee) against any Talc Insurance Company, (II) the rights of the Debtor or the Reorganized Debtor against any Talc Insurance Company with respect to amounts expended prior to the Effective Date, or (III) the rights of any co-insured of the Debtor (1) with respect to any Talc Insurance Policy or Talc Insurance Settlement Agreement against any Talc Insurance Company or (2) as specified under any Final Order of the Bankruptcy Court approving a Talc Insurance Settlement Agreement; and (B) the Talc Personal Injury Trust (acting through the Reorganized Debtor, as its subrogee) shall have the sole and exclusive authority at any time to terminate, or reduce or limit the scope of, the injunction set forth in this <u>Section 11.3.2(b)</u> with respect to any Talc Insurance Company upon express written notice to such Talc Insurance Company, except that the Talc Personal Injury Trust (acting through the Reorganized Debtor, as its subrogee) shall not have any authority to terminate, reduce, or limit the scope of the injunction herein with respect to any Settling Talc Insurance Company so long as, but only to the extent that, such Settling Talc Insurance Company complies fully with its obligations under any applicable Talc Insurance Settlement Agreement.

(c)    Notwithstanding anything to the contrary above, this Insurance Entity Injunction shall not enjoin:

(i)    the rights of all Persons to the treatment accorded them under the Plan, as applicable, including the rights of holders of Channeled Talc Personal Injury Claims to assert such Claims, as applicable, in accordance with the Talc Personal Injury Trust Documents;

(ii)    the rights of all Persons to assert any claim, debt, obligation, cause of action, or liability for payment of Talc Personal Injury Trust Expenses solely against the Talc Personal Injury Trust;

(iii)    the rights of the Talc Personal Injury Trust (acting through the Reorganized Debtor, as its subrogee) (A) to pursue and resolve any Talc In-Place Insurance Coverage, (B) to pursue and resolve any Talc Insurance Action, (C) to pursue and obtain any Talc Insurance Recoveries, and (D) to negotiate and enter into any Talc Insurance Settlement Agreement; or

(iv)    the rights of any Talc Insurance Company to assert any claim, debt, obligation, cause of action, or liability for payment against any other Talc Insurance Company that is not a Settling Talc Insurance Company, or as otherwise specifically provided in any Talc Insurance Settlement Agreement.

(d)    For the avoidance of doubt, nothing in the Plan, the Plan Documents, or the Confirmation Order shall impair or otherwise affect any rights

NAI-1539839717

that any Debtor Corporate Party may have under any Talc Insurance Policy or Talc Insurance Settlement Agreement.

11.4    **Exculpation**.

11.4.1    **Exculpation of Certain Parties.  None of the Exculpated Parties shall have or incur any liability to any Person for any act or omission taken or to be taken, whether before, on, or after the Petition Date through and including the Effective Date in connection with, arising out of, or in any way relating to:  (a) the Prepetition Corporate Restructuring or the Chapter 11 Case; (b) the negotiation, formulation, and preparation of the Plan and the other Plan Documents (including the Disclosure Statement), and any of the terms and/or settlements and compromises reflected in the Plan and the other Plan Documents, and the releases and Injunctions contained in the Plan; (c) the pursuit of Confirmation of the Plan (including the solicitation of votes with respect to the Plan); (d) the administration, consummation, and implementation of the Plan or the property to be distributed under the Plan or the Trust Distribution Procedures; or (e) the management or operation of the Debtor (except for any liability that results primarily from such Exculpated Party's criminal acts, actual fraud, willful misconduct, or gross negligence as determined by a Final Order).  No Person may commence or pursue any claim or cause of action seeking to impose on any Exculpated Party liability for any such act or omission that results primarily from such Exculpated Party's criminal acts, actual fraud, willful misconduct, or gross negligence without the Bankruptcy Court (i) first determining, after notice and hearing, that such claim or cause of action represents a colorable claim and (ii) specifically authorizing such Person to bring such claim or cause of action, and to the fullest extent permitted by law, the Bankruptcy Court shall have sole and exclusive jurisdiction to adjudicate the underlying colorable claim or cause of action.  In all respects, each Exculpated Party shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under, or in connection with, the Chapter 11 Case, the Plan, the Plan Documents, and the administration of each of them.  Without limiting the generality of the foregoing, the Exculpated Parties shall be entitled to and granted the protections and benefits of section 1125(e) of the Bankruptcy Code.**

11.4.2    **Injunction Related to Exculpation.  The Confirmation Order shall permanently enjoin all Persons from taking any action against any Exculpated Party for the purpose of, directly or indirectly, receiving payment of, on, or with respect to any liability from which the Exculpated Parties are exculpated pursuant to this Section 11.4.**

11.5    Disallowed Claims.    On and after the Effective Date, the Debtor and the Reorganized Debtor shall have no liability or obligation on a Disallowed Claim, and any order disallowing a Claim which is not a Final Order as of the Effective Date solely because of a Person's right to move for reconsideration of such Final Order pursuant to section 502 of the Bankruptcy Code or Bankruptcy Rule 3008 shall, nevertheless, become and be deemed to be a Final Order on the Effective Date.  The Confirmation Order shall constitute a Final Order:  (a) disallowing all Claims (other than Talc Personal Injury Claims) to the extent such Claims are not allowable under

any provision of Section 502 of the Bankruptcy Code, including time-barred Claims and Claims for unmatured interest; and (b) disallowing or subordinating to all other Claims, as the case may be, any Claims for penalties, punitive damages, or any other damages not constituting compensatory damages.

11.6    No Successor Liability. The Reorganized Debtor does not, pursuant to the Plan or otherwise, assume, agree to perform, pay, or indemnify any Person, or otherwise have any responsibility for any liabilities or obligations of the Debtor arising out of or in any way relating to the operations of or assets of the Debtor, whether arising prior to, on, or after the Effective Date. None of the Reorganized Debtor, the other Protected Parties, and the Talc Personal Injury Trust is, or shall be deemed to be, a successor to the Debtor by reason of any theory of law or equity (except as otherwise provided in Article IV), and none shall have any successor or transferee liability of any kind or character; *provided*, *however*, the Reorganized Debtor and the Talc Personal Injury Trust shall assume and remain liable for their respective obligations specified in the Plan and the Confirmation Order.

11.7    Corporate Indemnities.

11.7.1    Prepetition Indemnification and Reimbursement Obligations. The obligations of the Debtor to indemnify and reimburse Persons who are or were managers, officers, or employees of the Debtor on the Petition Date or at any time thereafter through the Effective Date, against and for any obligations pursuant to the articles of organization or operating agreement of the Debtor, applicable state or non-bankruptcy law, or specific agreement, or any combination of the foregoing, (a) shall survive Confirmation of the Plan and remain unaffected thereby, (b) are assumed by the Debtor, and (c) shall not be discharged under Section 1141 of the Bankruptcy Code, irrespective of whether indemnification or reimbursement is owed in connection with any event occurring before, on, or after the Petition Date.

11.7.2    Plan Indemnity. In addition to the matters set forth above and not by way of limitation thereof, the Debtor shall indemnify, defend, and hold harmless all Persons who are or were managers or officers of the Debtor on the Petition Date or at any time thereafter through the Effective Date on account of and with respect to any claim, cause of action, liability, judgment, settlement, cost, or expense (including attorney's fees) on account of claims or causes of action threatened or asserted by any third party against such managers or officers that seek contribution, indemnity, equitable indemnity, or any similar claim, based upon or as the result of the assertion of primary claims against such third party by any representative of the Debtor's Estate.

11.7.3    Limitation on Indemnification. Notwithstanding anything to the contrary set forth in the Plan or elsewhere, the Debtor and the Reorganized Debtor, as applicable, shall not be obligated to indemnify, defend, or hold harmless any Person for any claim, cause of action, liability, judgment, settlement, cost, or expense that results primarily from: (a) such Person's bad faith, gross negligence, or willful misconduct; or (b) a Talc Personal Injury Claim.

74

11.8    Independent Legal Significance of Individual Provisions.   For the avoidance of doubt, each of Sections 11.1 through 11.8 is legally independent from the other such Sections and the validity and effect of any such Section is not dependent upon, will not be affected in any manner by, and will not be interpreted or construed by reference to any other such Section.  By way of illustration and not limitation, the releases set forth in Section 11.2 are independent from, will not be affected in any manner by, and will not be interpreted or construed by reference to the Channeling Injunction set forth in Section 11.4.

### ARTICLE XII
### JURISDICTION OF BANKRUPTCY COURT

12.1    Jurisdiction.   Subject to Section 12.3, the Bankruptcy Court shall retain the fullest and most extensive exclusive jurisdiction that is permissible (and to the extent not permitted, non-exclusive jurisdiction), including the jurisdiction necessary to ensure that the purposes and intent of the Plan are carried out.  The Bankruptcy Court shall retain exclusive jurisdiction (and to the extent not permitted, non-exclusive jurisdiction) to hear and determine all Claims against the Debtor and all other causes of action which may exist on behalf of the Debtor; *provided*, *however*, that this Section 12.1 shall not apply to adjudication or enforcement of any Talc Insurance Action.

12.2    Specific Purposes.   Subject to Section 12.3, in furtherance to the foregoing, the Bankruptcy Court shall retain exclusive jurisdiction (and to the extent not permitted, non-exclusive jurisdiction) for each of the following specific purposes after Confirmation of the Plan:

(a)    to modify the Plan after Confirmation, pursuant to the provisions of the Bankruptcy Code and the Bankruptcy Rules;

(b)    to correct any defect, cure any omission, reconcile any inconsistency, or make any other necessary changes or modifications in or to the Plan, the Talc Personal Injury Trust Agreement, or the Confirmation Order as may be necessary to carry out the purposes and intent of the Plan;

(c)    to assure the performance by the Talc Personal Injury Trust and the Disbursing Agent of their respective obligations under the Plan including hearing and determining any motions or contested matters that may arise between or among the Talc Trustees, the Talc Trust Advisory Committee, and/or the FCR in connection with the administration of the Talc Personal Injury Trust and/or the Trust Distribution Procedures;

(d)    to enforce and interpret the terms and conditions of the Plan, the other Plan Documents, and the Talc Personal Injury Trust Agreement; to enter such orders or judgments, including injunctions (i) as are necessary to enforce the title, rights, and powers of the Reorganized Debtor and the Talc Personal Injury Trust and (ii) as are necessary to enable holders of Claims to pursue their rights against any Person that may be liable therefor pursuant to applicable law or otherwise;

(e)    to hear and determine any motions or contested matters involving taxes, tax refunds, tax attributes, tax benefits, and similar or related matters, including contested matters arising on account of transactions contemplated by the Plan, or relating to the period of administration of the Chapter 11 Case;

(f)       to hear and determine all applications for compensation of Professionals and reimbursement of expenses under sections 327, 328, 329, 330, 331, 503(b), or 1103 of the Bankruptcy Code;

(g)       to hear and determine any causes of action arising during the period from the Petition Date through the Effective Date, or in any way related to the Plan or the transactions contemplated hereby;

(h)       to adjudicate any Retained Rights of Action that are retained by the Reorganized Debtor hereunder, including any Recovery Actions and the causes of action listed or described on Exhibit F;

(i)       to resolve any matters related to the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which the Debtor is a party or with respect to which the Debtor or the Reorganized Debtor may be liable and to hear, determine and, if necessary, liquidate any Claims arising therefrom, including any Cure Amount Claims;

(j)       to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(k)       to determine the allowance and/or disallowance of any Non-Talc Claims, including Administrative Claims, against the Debtor or the Estate, including any objections to any such Non-Talc Claims, and the compromise and settlement of any Non-Talc Claim, including Administrative Claims, against the Debtor or the Estate;

(l)       to determine all questions and disputes regarding title to the assets of the Debtor or the Estate, or the Talc Personal Injury Trust;

(m)       to issue such orders as may be necessary for the addition of any Settling Talc Insurance Company as a Protected Party;

(n)       to hear and determine any other matters related hereto, including the implementation and enforcement of all orders entered by the Bankruptcy Court in the Chapter 11 Case;

(o)       to resolve any disputes concerning whether a Person had sufficient notice of the Chapter 11 Case, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Case, any bar date established in the Chapter 11 Case, in each case, for the purpose of determining whether a Claim is discharged hereunder or for any other purpose;

(p)       to enter in aid of implementation of the Plan such orders as are necessary, including the implementation and enforcement of the releases and the Injunctions described herein; and

(q)       to enter and implement such orders as may be necessary or appropriate if any aspect of the Plan, the Talc Personal Injury Trust, or the Confirmation

Order is, for any reason or in any respect, determined by a court to be inconsistent with, violative of, or insufficient to satisfy any of the terms, conditions, or other duties associated with any Talc Insurance Policy; *provided, however*, that: (i) such orders shall not impair any Talc Insurer Coverage Defense or the rights, claims, or defenses, if any, of any Talc Insurance Company that are set forth or provided for in the Plan, the Plan Documents, the Confirmation Order, or any other Final Orders entered in the Chapter 11 Case; (ii) this provision does not, in and of itself, grant the Bankruptcy Court jurisdiction to hear and decide disputes arising out of or relating to any Talc Insurance Policy; and (iii) all interested parties, including any Talc Insurance Company, reserve the right to oppose or object to any such motion or order seeking such relief.

To the extent that the Bankruptcy Court is not permitted under applicable law to preside over any of the foregoing matters, the reference to the "Bankruptcy Court" in this Article shall be deemed to be replaced by the "District Court." Notwithstanding anything to the contrary in this Article 12, the resolution of Talc Personal Injury Claims, and the forum in which such resolution will occur, shall be governed by and in accordance with the provisions of Section 3.2.4 and Article IV and the Talc Personal Injury Trust Documents.

12.3    District Court Jurisdiction.  The District Court shall, without regard to the amount in controversy, retain exclusive jurisdiction after entry of the Confirmation Order to hear and determine any motion to enforce the Channeling Injunction, and shall be deemed to have withdrawn the reference to the Bankruptcy Court for such purpose.

12.4    Reservation of Rights.  Nothing contained in the Plan shall (i) constitute a waiver of any claim, right, or cause of action that the Debtor, the Reorganized Debtor, or the Talc Personal Injury Trust, as the case may be, may hold against the insurer under any policy of insurance or insurance agreement, except to the extent the insurer is a Settling Insurance Company; or (ii) limit the assertion, applicability, or effect of any Talc Insurer Coverage Defense.

12.5    Compromises of Controversies.  From and after the Effective Date, the Reorganized Debtor and/or the Talc Personal Injury Trust, as appropriate based on assets and liabilities retained or owed by each respectively, shall be authorized to compromise controversies in their discretion in a manner not inconsistent with the terms of the Plan, without notice to any other party or approval of or notice to the Bankruptcy Court.

## ARTICLE XIII
## MISCELLANEOUS PROVISIONS

13.1    Closing of Chapter 11 Case.  The Reorganized Debtor shall, promptly after the full administration of the Chapter 11 Case, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Case.

13.2    Timing of Distributions or Actions.  If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

13.3    <u>Governing Law</u>.  Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), or an instrument, agreement, or other document executed under the Plan provides otherwise, the rights, duties, and obligations arising under the Plan, and the instruments, agreements, and other documents executed in connection with the Plan, shall be governed by, and construed and enforced in accordance with, the internal laws of the State of Texas without giving effect to the principles of conflicts of law thereof.

13.4    <u>Entire Agreement</u>.  The Plan Documents set forth the entire agreement and undertakings relating to the subject matter thereof and supersede all prior discussions, negotiations, understandings, and documents.  No Person shall be bound by any terms, conditions, definitions, warranties, understandings, or representations with respect to the subject matter hereof, other than as expressly provided for in the Plan or the other Plan Documents or as may hereafter be agreed to by the affected parties in writing.

13.5    <u>Notices to the Debtor and Reorganized Debtor</u>.  All notices, requests, and demands required or permitted to be provided to the Debtor or the Reorganized Debtor under the Plan, in order to be effective, shall be in writing, and unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, to the addresses set forth below:

**PROPOSED COUNSEL FOR THE DEBTOR:**

JONES DAY
Gregory M. Gordon, Esq.
Dan B. Prieto, Esq.
Amanda Rush, Esq.
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
E-mail:    gmgordon@jonesday.com
            dbprieto@jonesday.com
            asrush@jonesday.com

-and-

JONES DAY
Brad B. Erens
Caitlin K. Cahow
110 N. Wacker Drive
Chicago, Illinois  60606
Telephone:  (312) 782-3939
Facsimile:  (312) 782-8585
E-mail:    bberens@jonesday.com
            ccahow@jonesday.com

NAI-1539839717

**COUNSEL FOR JOHNSON & JOHNSON**

WHITE & CASE LLP
Jessica C. Lauria
Gregory Starner
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
E-mail: jessica.lauria@whitecase.com
        gstarner@whitecase.com

-and-

WHITE & CASE LLP
Matthew E. Linder
Laura E. Baccash
111 S. Wacker Drive, Suite 5100
Chicago, IL 60606
Telephone: (312) 881-5400
Facsimile: (312) 881-5450
E-mail: mlinder@whitecase.com
        laura.baccash@whitecase.com

13.6    <u>Post-Effective Date Notices by the Reorganized Debtor</u>.  After the occurrence of the Effective Date, the Reorganized Debtor has authority to send a notice to any Person providing that to continue to receive documents pursuant to the Bankruptcy Rule 2002, such Person must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002; *provided*, *however*, that the United States Trustee need not file such a renewed request and shall continue to receive documents without any further actions being necessary.  After the occurrence of the Effective Date, the Reorganized Debtor is authorized to limit the list of Persons receiving documents pursuant to Bankruptcy Rule 2002 to the United States Trustee and those Persons that have filed such renewed requests.

13.7    <u>Inconsistencies</u>.  To the extent the Plan is inconsistent with the Disclosure Statement or other Plan Documents, the provisions of the Plan shall be controlling.  To the extent the Plan is inconsistent with the Confirmation Order, the provisions of the Confirmation Order shall be controlling.

13.8    <u>Withholding of Taxes</u>.  The Disbursing Agent, the Talc Personal Injury Trust, or any other applicable withholding agent, as applicable, shall withhold from any assets or property distributed under the Plan any assets or property which must be withheld for foreign, federal, state, and local taxes payable with respect thereto or payable by the Person entitled to such assets to the extent required by applicable law.

13.9    <u>Transfer Taxes</u>.  Pursuant to Section 1146 of the Bankruptcy Code, and to the fullest extent permitted by law, no stamp tax, transfer tax, filing fee, sales or use tax, or other similar tax

NAI-1539839717

shall be imposed or assessed by any taxing authority on account of (a) the transfer of any assets or property pursuant to the Plan; or (b) the making or delivery of an instrument of transfer under the Plan. The appropriate state or local government officials or agents shall be directed to forego the collection of any such tax and to accept for filing or recordation of any of the foregoing instruments or other documents without the payment of any such tax.

13.10    <u>Successors and Assigns</u>.    The rights, duties, and obligations of any Person under the Plan, the Plan Documents, and the Confirmation Order shall be binding upon, and shall inure to the benefit of, the successors, assigns, heirs, executors, legal representatives, and estates of such Person.

13.11    <u>Duty to Cooperate</u>.    Nothing in the Plan, the other Plan Documents, or the Confirmation Order shall relieve (by way of injunction or otherwise) any Person that is or claims to be entitled to indemnity under a Talc Insurance Policy from any duty to cooperate that may be required by any such insurance policy or under applicable law with respect to the defense and/or settlement of any Claim for which coverage is sought under such Talc Insurance Policy.

13.12    <u>Effective Date Actions Simultaneous</u>.    Unless the Plan or the Confirmation Order provides otherwise, actions required to be taken on the Effective Date shall take place and be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.

13.13    <u>Plan Supplements</u>.    Any and all exhibits, lists, or schedules referred to herein but not attached to the Plan shall be contained in a Plan Supplement, and each Plan Supplement is incorporated into and is part of the Plan as if set forth in full herein. Each Plan Supplement will be distributed to the same parties and in the same manner as the Disclosure Statement at least twenty-eight (28) days prior to the deadline for the submission of votes on the Plan and will also be available at the website maintained by the Claims Agent (https://dm.epiq11.com/redrivertalc).

NAI-1539839717

Dated: [●]

Respectfully submitted,

RED RIVER TALC LLC

_____
[●]
[●]

# EXHIBIT A

**Amended Articles of Organization of the Reorganized Debtor**

**Form 414**
**(Revised 09/13)**

Submit in duplicate to:
Secretary of State
P.O. Box 13697
Austin, TX 78711-3697
512 463-5555
FAX: 512/463-5709
**Filing Fee: See instructions**



This space reserved for office use.

**Restated Certificate of Formation With New Amendments**

## Entity Information

The name of the filing entity is:

Red River Talc LLC

State the name of the entity as currently shown in the records of the secretary of state. If the amendment changes the name of the entity, state the old name and not the new name.

The filing entity is a: (Select the appropriate entity type below.)

☐ For-profit Corporation                     ☐ Professional Corporation

☐ Nonprofit Corporation                      ☐ Professional Limited Liability Company

☐ Cooperative Association                    ☐ Professional Association

☑ Limited Liability Company                  ☐ Limited Partnership

The file number issued to the filing entity by the secretary of state is: _____[*]_____

The date of formation of the filing entity is: _____[*]_____

## Statement of Approval

Each new amendment has been made in accordance with the provisions of the Texas Business Organizations Code. The amendments to the certificate of formation and the restated certificate of formation have been approved in the manner required by the Code and by the governing documents of the entity.

## Required Statements

The restated certificate of formation, which is attached to this form, accurately states the text of the certificate of formation being restated and each amendment to the certificate of formation being restated that is in effect, and as further amended by the restated certificate of formation. The attached restated certificate of formation does not contain any other change in the certificate of formation being restated except for the information permitted to be omitted by the provisions of the Texas Business Organizations Code applicable to the filing entity.

Form 414

## Effectiveness of Filing (Select either A, B, or C.)

A. ☑ This document becomes effective when the document is filed by the secretary of state.

B. ☐ This document becomes effective at a later date, which is not more than ninety (90) days from the date of signing. The delayed effective date is: _____

C. ☐ This document takes effect upon the occurrence of the future event or fact, other than the passage of time. The 90th day after the date of signing is: _____

The following event or fact will cause the document to take effect in the manner described below:

## Execution

The undersigned affirms that the person designated as registered agent in the restated certificate of formation has consented to the appointment. The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

Date: _____ [*]

Red River Talc LLC
_____
Name of entity (see Execution instructions)


_____
Signature of authorized individual (see instructions)

[*]
_____
Printed or typed name of authorized individual

Attach the text of the amended and restated certificate of formation to the completed statement form. Identify the attachment as "Restated Certificate of Formation of [Name of Entity]."

Form 414

**AMENDED AND RESTATED**

**CERTIFICATE OF FORMATION**

**OF**

**RED RIVER TALC LLC**

**[●]**

This AMENDED AND RESTATED CERTIFICATE OF FORMATION is being duly filed by RED RIVER TALC LLC, a Texas limited liability company having file number [●] (the "Company"), in accordance with Sections 3.059 of the Texas Business Organizations Code (the "TBOC").

**ARTICLE I**
**ENTITY NAME AND TYPE**

The name of the filing entity is Red River Talc LLC. The filing entity is a limited liability company.

**ARTICLE II**
**REGISTERED AGENT AND REGISTERED OFFICE**

The Company's initial registered agent is CT Corporation System, who has consented to serve as the registered agent of the Company pursuant to Section 5.2011 of the TBOC, which consent is included in the Company's permanent records. The business address of both the registered agent and the Company's initial registered office is 1999 Bryan Street, Suite 900, Dallas, Texas 75201, Dallas County.

**ARTICLE III**
**GOVERNING AUTHORITY**

The Company will have managers. The name and address of the current managers of the Company are:

| Name | Address |
|------|---------|
| [●] | [●] |
| [●] | [●] |
| [●] | [●] |

**ARTICLE IV**
**PURPOSE**

The purpose for which the Company is formed is for the transaction of any and all lawful purposes for which limited liability companies may be organized under the TBOC.

## ARTICLE V
## EFFECTIVENESS OF FORMATION

The original formation of the Company was effective as of [●], Central Time, on [●].

## ARTICLE VI
## FORMATION UNDER PLAN OF DIVISIONAL MERGER

The Company was originally formed under a plan of divisional merger pursuant to Sections 3.006 and Chapter 10 of the TBOC.

## ARTICLE VII
## NO ISSUANCE OF NONVOTING OWNERSHIP INTERESTS

To the extent prohibited by section 1123(a)(6) of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), the Company will not issue nonvoting ownership interests; provided, however, that the foregoing restriction (a) will have no further force and effect beyond that required under section 1123 of the Bankruptcy Code, (b) will have force and effect only for so long as section 1123 of the Bankruptcy Code is in effect and applicable to the Company, and (c) in all events may be amended or eliminated in accordance with the TBOC and other applicable law as from time to time may be in effect.

# EXHIBIT B

## Amended Operating Agreement of the Reorganized Debtor

**AMENDED AND RESTATED**
**LIMITED LIABILITY COMPANY AGREEMENT**

**OF**

**RED RIVER TALC LLC**

**a Texas limited liability company**

This AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT of Red River Talc LLC is declared and entered into by the undersigned, and shall be effective as of [•] (the "Effective Date").

**ARTICLE I**
**DEFINITIONS**

1.01    **Specific Definitions**. As used in this Agreement, the following terms have the following meanings:

"Affiliate" means, with respect to any Person, any other Person directly or indirectly Controlling, Controlled By or Under Common Control with, such Person.

"Agreement" means this Amended and Restated Limited Liability Company Agreement (including any schedules, exhibits or attachments hereto) as amended, supplemented or modified from time to time.

"Assistant Secretary" shall have the meaning set forth in Section 3.04(c)(v).

"Assistant Treasurer" shall have the meaning set forth in Section 3.04(c)(iv).

"Associate" means, when used to indicate a relationship with a Person: (i) an entity or organization for which the Person (A) is a director, general partner, member, manager or officer or (B) beneficially owns, directly or indirectly, either individually or through an Affiliate, 10 percent or more of a class of voting ownership interests or similar securities of the entity or organization; (ii) a trust or estate in which the Person has a substantial beneficial interest or for which the Person serves as trustee or in a similar fiduciary capacity; (iii) the Person's spouse or a relative of the Person related by consanguinity or affinity who resides with the Person; or (iv) a director, general partner, member, manager, officer or Affiliate of the Person.

"Bankruptcy" means bankruptcy under any section or chapter of the Bankruptcy Code or under any similar law or statute of the United States or any state thereof.

"Bankruptcy Code" means title 11 of the United States Code, as amended.

"Board of Managers" shall have the meaning set forth in Section 3.01.

"Certificate" shall have the meaning set forth in Section 2.01.

"CFO" shall have the meaning set forth in Section 3.04(c)(ii).

"<u>Chief Legal Officer</u>" shall have the meaning set forth in Section 3.04(c)(vi).

"<u>Code</u>" means Internal Revenue Code of 1986, as amended.

"<u>Company</u>" means Red River Talc LLC, a Texas limited liability company.

"<u>Controlling</u>" means, with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of another Person, through the ownership of voting securities, by contract or otherwise. The terms "Controlled By" and "Under Common Control" have correlative meanings.

"<u>Covered Person</u>" shall have the meaning set forth in Section 3.08(a).

"<u>Effective Date</u>" shall have the meaning set forth in the Preamble.

"<u>Encumbrance</u>" means any mortgage, security interest, lien, pledge, equitable interest, easement, option, right of first refusal or a restriction or interest similar to any of the foregoing of any kind.

"<u>Legal Requirement</u>" means any order, constitution, law, ordinance, regulation, statute or treaty issued by any federal, state, local, municipal, foreign, international or multinational governmental, administrative or judicial body or any principle of common law, in each case binding on or affecting the referenced Person.

"<u>Majority in Interest of the Members</u>" means Members whose Percentage Interests aggregate to greater than 50% of the Percentage Interests of all Members, or in the event the Company has a single Member, such sole Member.

"<u>Manager</u>" means a member of the Board of Managers.

"<u>Members</u>" means the Persons identified as currently being a Member on <u>Schedule I (Member Register)</u> and all other Persons admitted as additional or substituted Members pursuant to this Agreement from time to time, in each case so long as they remain Members. Reference to a "Member" means any one of the Members if there is more than one or the sole Member if there is only one.

"<u>Membership Interest</u>" means the ownership interest of a Member in the Company (which shall be considered personal property for all purposes), consisting of (i) such Member's Percentage Interest in the Company's profits, losses, allocations and distributions pursuant to this Agreement and the TBOC, (ii) such Member's right to vote or grant or withhold consents with respect to Company matters as provided in this Agreement and the TBOC and (iii) such Member's other rights and privileges as provided in this Agreement and the TBOC.

"<u>Officers</u>" shall have the meaning set forth in Section 3.04(a).

"<u>Percentage Interest</u>" means a Member's share of the profits and losses of the Company and the Member's percentage right to receive distributions of the Company's assets. The Percentage Interest of each Member shall be the percentage set forth opposite such Member's

NAI-1540049625

name on <u>Schedule I</u>, as such Schedule shall be amended from time to time in accordance with the provisions of this Agreement. The combined Percentage Interest of all Members shall at all times equal 100%.

"<u>Person</u>" means any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, benefit plan, unincorporated organization, business, syndicate, sole proprietorship, association, organization, labor union or other entity, association or governmental body.

"<u>President</u>" shall have the meaning set forth in Section 3.04(c)(i).

"<u>Property</u>" means any property, real or personal, tangible or intangible, including cash, and any legal or equitable interest in such property.

"<u>Secretary</u>" shall have the meaning set forth in Section 3.04(c)(v).

"<u>Secretary of State</u>" shall mean the Secretary of State of the State of Texas.

"<u>TBOC</u>" means the Texas Business Organizations Code as it may be amended, revised or supplemented from time to time.

"<u>Transfer</u>" means any sale, assignment, transfer, exchange, grant, hypothecation or other transfer (including a transfer by operation of law), absolute or as an Encumbrance.

"<u>Treasurer</u>" shall have the meaning set forth in Section 3.04(c)(iv).

"<u>Vice President</u>" shall have the meaning set forth in Section 3.04(c)(iii).

1.02    **Interpretation**. Unless the context shall require otherwise:

(a)     Words importing the singular number or plural number shall include the plural number and singular number respectively;

(b)     Words importing the masculine gender shall include the feminine and neuter genders and vice versa;

(c)     References to "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation";

(d)     Reference in this Agreement to "herein," "hereby" or "hereunder," or any similar formulation, shall be deemed to refer to this Agreement as a whole, including the schedules and exhibits hereto;

(e)     References to documents and agreements shall include such documents and agreements as amended from time to time; and

(f)     The headings of this Agreement are for reference only and shall not be deemed to form a part of the text or be used in the construction or interpretation of this Agreement.

3

Unless otherwise indicated, all references to "Section" or "Sections" refer to the corresponding Section or Sections of this Agreement.

**ARTICLE II**
**FORMATION**

2.01     **Formation**. The Company was formed as a Texas limited liability company by filing a certificate of formation (the "Certificate") with the Secretary of State, along with the filing with the Secretary of State of a Certificate of Divisional Merger pursuant to which **[Holdco (Texas)]** LLC, a Texas limited liability company, effected a divisional merger pursuant to which the Company was created.

2.02     **Name**. The Company will conduct its business under the name set forth in the preamble of this Agreement or such other names as the Board of Managers may select from time to time that comply with applicable Legal Requirements.

2.03     **Purpose**. The purpose of the Company is to transact any and all lawful business for which a limited liability company may be formed under the TBOC and any other business or activity (including obtaining appropriate financing) that now or in the future may be necessary, incidental, proper, advisable or convenient to accomplish the foregoing purposes as determined by the Board of Managers and that is not forbidden by any Legal Requirement.

2.04     **Principal Office in the United States; Other Offices**. The principal office of the Company in the United States shall be at [●], or at such other place as the Board of Managers may designate from time to time, which need not be in the State of Texas. The Company may have such other offices as the Board of Managers or any appropriate Officer designates from time to time.

2.05     **Registered Agent and Office**. The Company's registered agent for the service of process and the registered office shall be as reflected in the Certificate. The Board of Managers, from time to time, may change the registered agent or office through appropriate filings with the Secretary of State. In the event the registered agent ceases to act as such for any reason or the address of the registered office shall change, the Board of Managers shall promptly designate a replacement registered agent or file a notice of change of address.

2.06     **Term**. The term of the Company shall be perpetual until dissolved and its affairs wound up in accordance with this Agreement.

2.07     **Effect of Inconsistencies with the TBOC**. The Members intend to be governed by this Agreement even when it is inconsistent with, or different than, the non-mandatory provisions of the TBOC, or any other non-mandatory Legal Requirement and the TBOC shall govern those circumstances not addressed by this Agreement. To the extent any provision of this Agreement is prohibited by or conflicts with the TBOC or other Legal Requirement, this Agreement shall be considered amended to the smallest degree possible in order to make this Agreement effective. In the event the TBOC or other Legal Requirement is subsequently amended or interpreted in such a way to make valid any provision of this Agreement that was formerly invalid, the provision shall be deemed valid from the effective date of such interpretation or amendment.

4

2.08    **Authorized Persons**. The Managers, the Officers and any person authorized in writing by any of them shall each be authorized to act on behalf of the Company in regard to a "filing instrument" within the meaning of the TBOC as permitted by the TBOC. Any Manager or Officer may execute, deliver and file any certificates (and any amendments or restatements thereof) necessary for the Company to qualify to do business in any jurisdiction in which the Company may wish to conduct business.

2.09    **Title to Company Property**. All of the Company's Property shall be owned by the Company as an entity and no Member shall have any ownership interest in such Property in such Member's individual name or right. The Company shall hold all of its Property in the name of the Company and not in the name of any Member.

2.10    **Certificates**. The Company shall not elect to treat any of its Membership Interests as a "security" under Section 8-103 of the Uniform Commercial Code as is in effect in the State of Texas or any other applicable jurisdiction, or elect to turn its uncertificated Membership Interests into certificated Membership Interests.

## ARTICLE III
## MANAGEMENT OF THE COMPANY

3.01    **Management by Board of Managers**. Except as otherwise set forth herein, the management and control of the business and affairs of the Company shall be vested in a governing board (the "Board of Managers"). The Board of Managers shall be comprised of between one and three individuals as determined by the Members, and the Members shall elect the members of the Board of Managers from time to time. The Members, in their sole discretion, may remove any Manager or the entire Board of Managers at any time with or without cause. If a vacancy occurs on the Board of Managers, the Members may elect a successor or leave vacant the position.

3.02    **Authority and Duties of the Board of Managers and Officers**. Subject to the terms of this Agreement and any applicable Legal Requirement, the Board of Managers shall have full power and authority to conduct, manage and control the business of the Company through the Officers. Except to the extent provided herein, each Manager and Officer shall have a fiduciary duty of loyalty and fiduciary duty of care similar to those of directors and officers of for-profit corporations under the TBOC.

3.03    **Actions of the Board of Managers**.

(a)    **Meetings**. Meetings of the Board of Managers may be held at any time upon the call of the President or any Manager by providing at least two days' notice to each Manager, unless such notice is waived by all of the Managers. A quorum shall exist for any meeting of the Board of Managers if half or more of the Managers are in attendance. Attendance at a meeting shall constitute a waiver of notice of the meeting by the Manager, unless the Manager attends the meeting for the sole purpose of objecting to the lack of proper notice of the meeting. The Managers may participate in and hold meetings by means of conference telephone, video conference or similar communications equipment whereby all persons participating in the meeting can hear each other.

NAI-1540049625

(b)    **Required Vote; Action by Written Consent**. Any and all actions of the Board of Managers shall be taken by the affirmative vote of a simple majority of the Managers in attendance. In lieu of acting at a meeting and without notice, the Board of Managers may act by the written consent of a simple majority of the Managers.

3.04    **Officers**.

(a)    **Generally**. The Board of Managers may appoint employees or agents as officers from time to time (the "Officers"). The Officers shall be responsible for implementing the decisions of the Board of Managers and for conducting the day-to-day activities of the Company as determined by the Board of Managers. The Board of Managers may from time to time set the limits of authority of the President and other Officers, including limits regarding operating expenditures, capital expenditures, incurrence of debt, commencement or settlement of litigation and compensation of Officers and employees. Any number of offices may be held by the same Person.

(b)    **Appointment; Vacancies; Removal**. All Officers of the Company shall hold office until their successors are appointed or until their earlier death, resignation or removal. Whenever any vacancies shall occur in any office by death, resignation, removal, increase in the number of Officers, or otherwise, the same may be filled by the Board of Managers. In the discretion of the Board of Managers, any Officer position may be left vacant. Any Officer appointed by the Board of Managers may be removed with or without cause at any time in the sole discretion of the Board of Managers. Such removal may be with or without prejudice to the contract rights, if any, of the Person so removed. Appointment of an Officer shall not, of itself, create contract rights.

(c)    **Officers; Delegation by the Board of Managers**. To the extent the Board of Managers appoints the following Officers, such Officers shall have the powers and duties set forth below unless otherwise provided by the Board of Managers from time to time. Such other Officers as the Board of Managers may appoint shall perform the duties and have the powers as from time to time may be assigned to them by the Board of Managers. The Board of Managers from time to time may delegate any of its powers and duties to any Officer, employee or agent of the Company, including the power of delegation, for whatever period of time necessary or desirable.

(i)    **President**. The president (the "President") shall have responsibility for the general and active day-to-day management of the business of the Company and shall carry out all orders and resolutions of the Board of Managers. The President may sign deeds, mortgages, bonds, contracts or other instruments, except in cases where the execution thereof shall be expressly delegated by the Board of Managers or by this Agreement to some other Officer or agent of the Company, or shall be required by Legal Requirement to be otherwise executed. The President shall also perform such other duties and may exercise such other powers as may be assigned by this Agreement or prescribed by the Board of Managers from time to time.

6

(ii)    **Chief Financial Officer**.  The chief financial officer (the "<u>CFO</u>") shall have custody of the funds of the Company as may be entrusted to his keeping and account for the same. The CFO shall be prepared at all times to give information as to the financial condition of the Company. The CFO shall also generally exercise such other powers and perform such other duties as the President delegates and the Board of Managers prescribes from time to time. The duties of the CFO may also be performed by the Treasurer or any Assistant Treasurer appointed by the Board of Managers from time to time.

(iii)    **Vice Presidents**. Any vice president (each a "<u>Vice President</u>"), in the order of seniority unless otherwise determined by the Board of Managers, shall in the absence or disability of the President perform the duties and exercise the powers of the President. Each Vice President shall perform the usual and customary duties that pertain to such office. Each Vice President shall generally assist the President by executing deeds, mortgages, bonds, contracts or other instruments, except in cases where the execution thereof shall be expressly and exclusively delegated by the Board of Managers or this Agreement to some other Officer or agent of the Company or shall be required by Legal Requirement to be otherwise executed. Each Vice President shall also generally exercise such other powers and perform such other duties as are delegated to him by the President, as the Board of Managers may further prescribe from time to time, or are indicated by the specific title given to such Vice President upon his or her appointment.

(iv)    **Treasurer**. The treasurer (the "<u>Treasurer</u>") shall have the custody of the corporate funds and securities and shall keep full and accurate accounts of receipts and disbursements in books belonging to the Company and shall deposit all moneys and other valuable effects in the name and to the credit of the Company in such depositories as may be designated by the Board of Managers. The Treasurer shall have the authority to sign and issue surety bonds on behalf of the Company, except in cases where the execution thereof shall be expressly and exclusively delegated by the Board of Managers or this Agreement to some other Officer or agent of the Company or shall be required by Legal Requirement to be otherwise executed. The duties of the Treasurer may be performed by any assistant treasurer (an "<u>Assistant Treasurer</u>") appointed by the Board of Managers from time to time.  The duties of such Assistant Treasurers may be specified or limited by the specific title given to such Assistant Treasurer upon his or her appointment.

(v)    **Secretary**. The secretary (the "<u>Secretary</u>") shall perform such duties as may be prescribed by the President, under whose supervision he or she shall be. The Secretary shall have custody of the seal of the Company, if any, and the Secretary shall have authority to affix the same to any instrument requiring it, and when so affixed, it may be attested by the signature of the Secretary. The Board of Managers or the President may give general authority to any other Officer to affix the seal of the Company and to attest the affixing by his or her signature. The Secretary shall ensure that all books, reports, statements, certificates and other documents and records required by Legal Requirement to be kept or filed are properly kept or filed, as the case may be. The duties of the Secretary may be

7

performed by any assistant secretary (an "<u>Assistant Secretary</u>") appointed by the Board of Managers from time to time. The duties of such Assistant Secretaries may be specified or limited by the specific title given to such Assistant Secretary upon his or her appointment. The Secretary shall also generally exercise such other powers and perform such other duties as are delegated to him or her by the President and as the Board of Managers may further prescribe from time to time.

(vi)    **Chief Legal Officer**. The chief legal officer (the "<u>Chief Legal Officer</u>") shall perform such duties as may be prescribed by the Board of Managers or the President, under whose supervision he shall be. The Chief Legal Officer shall perform the usual and customary duties that pertain to such office and generally exercise such other powers and perform such other duties as are delegated to him by the President and as the Board of Managers may further prescribe from time to time. The Chief Legal Officer shall generally assist the President by executing deeds, mortgages, bonds, contracts or other instruments, except in cases where the execution thereof shall be expressly and exclusively delegated by the Board of Managers or this Agreement to some other Officer or agent of the Company or shall be required by Legal Requirement to be otherwise executed.

3.05    <u>**Voting Securities Owned by the Company**</u>. Any Officer may execute on behalf of the Company any contracts, powers of attorney, proxies, waivers of notice of meeting, consents and other instruments any of which relate to securities or partnership or other interests owned or held by the Company. Any Officer may, on behalf of the Company, vote in person or by proxy any interest of any entity in which the Company owns securities or holds other interests and at any meeting shall possess and may exercise any and all rights and powers incident to the ownership of such securities or other interests, including delegating like powers upon any other Person.

3.06    <u>**Compensation and Expenses**</u>. Except as provided in this Agreement or as approved by the Board of Managers or, in the event the Board of Managers has a single Manager, the Members, no Manager shall receive any salary, fee or other remuneration for services rendered to or on behalf of the Company or otherwise in his or her capacity as a Manager. Any Manager who is not an Officer or employee of the Company or any of its Affiliates shall receive remuneration for services rendered to or on behalf of the Company or otherwise in his capacity as Manager as approved by the Board of Managers, or in the event the Board of Managers has a single Manager, the Members. Each Manager shall be reimbursed for all proper, direct expenses he or she reasonably incurs on behalf of the Company in performing his or her duties as a Manager either (a) in the Company's sole discretion (as determined by the Board of Managers or, in the event the Board of Managers has a single Manager, the Members) or (b) if such expenses are pre-approved in writing, in either event upon submission of appropriate and all other reasonably requested documentation.

3.07    <u>**Other Activities of the Members and Agreements with Related Parties**</u>. Subject to the provisions of any other agreement binding upon a Member, each Member, in its individual capacity or otherwise, will be free to engage in, to conduct or to participate in any business or activity whatsoever without any accountability, liability or obligation to the Company or, if then applicable, to any other Member, even if such business or activity competes with or is enhanced

8

by the business of the Company. The Board of Managers, in the exercise of its power and authority under this Agreement, may contract and otherwise deal with or otherwise obligate the Company to entities in which a Member may have an ownership or other financial interest.

3.08    **Indemnification; Exculpation**.

(a)    **General**. Every Person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative by reason of the fact that such Person is, or was at the time of the alleged event giving rise to a claim for indemnity, (i) a Member, Manager or Officer, (ii) an Affiliate of a Member, (iii) an employee, agent, fiduciary or trustee of the Company, (iv) an officer, director, manager, employee, agent, fiduciary or trustee of a Member or (v) serving at the request of the Company or a Person it Controls (directly or indirectly) as an officer, director, manager, employee, agent, fiduciary or trustee of another Person (each a "Covered Person") (except a Covered Person shall not include a Person providing on a fee-for-service basis trustee, fiduciary or custodial services), shall be indemnified by the Company against any and all reasonable costs and expenses, judgments, fines and amounts paid in settlement actually and reasonably incurred by the Covered Person in connection with such action, suit or proceeding if the Covered Person acted in good faith and in a manner the Covered Person reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action or proceeding, had no reasonable cause to believe the Covered Person's conduct was unlawful. The resolution of any action, suit or proceeding by judgment, order, settlement, conviction or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the Covered Person did not act in good faith and in a manner which the Covered Person reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action or proceeding, shall not, of itself, create a presumption that the Covered Person had reasonable cause to believe that the Covered Person's conduct was unlawful.

(b)    **Advances**. Expenses (including attorneys' fees) incurred by a Covered Person with respect to any action, suit or proceeding of the nature described in the preceding paragraph may be paid by the Company, in the sole discretion of the Board of Managers, and, if such Covered Person is a Member, Manager or Officer, then such expenses shall be paid by the Company, in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of the Covered Person to repay such amount if it shall ultimately be determined that the Covered Person is not entitled to be indemnified by the Company as authorized in this Section 3.08. In addition, the Company may elect at any time to discontinue advancing expenses to a Covered Person (other than a Member, Manager or Officer) if such advancement is determined by the Company, in its sole discretion, not to be in the best interest of the Company.

(c)    **Indemnity Limited to Assets**. Indemnification under this Section 3.08 shall be made only out of the assets of the Company. Neither any Member nor any Manager shall be personally liable for such indemnification, and they shall have no obligation to contribute or loan any monies or Property to the Company to enable it to provide such indemnification.

(d)    **Insurance**. The Company may purchase and maintain (or reimburse any Member or its Affiliates the cost of) insurance on behalf of any Covered Person, and any other Person that the Board of Managers determines, against any liability that may be asserted against

or expense that may be incurred by such Persons in connection with the Company's activities or such Persons' activities on behalf of the Company, regardless of whether the Company would have the power to indemnify such Persons against such liability or expense under this Agreement.

(e) **Other Contracts and Procedures**. The Company may enter into indemnity contracts with Covered Persons and such other Persons as the Board of Managers shall determine and adopt written procedures pursuant to which arrangements are made for the advancement of expenses and the funding of obligations under this Section 3.08 and containing such other procedures regarding indemnification as are appropriate.

(f) **Exculpation**. Notwithstanding anything in this Agreement to the contrary, to the full extent permitted by the TBOC or any other applicable Legal Requirement currently or hereafter in effect, no Member, Manager or Officer will be personally liable to the Company or any Member, Manager or Officer for or with respect to any act or omission by such Member, Manager or Officer in such capacity. Any elimination or modification of this Section 3.08(f) will not adversely affect any right or protection of a Member, Manager or Officer existing prior to such elimination or modification.

3.09 **Approval of Certain Contracts and Transactions**.

(a) This Section 3.09 applies to a contract or transaction between the Company and (i) one or more Managers or Officers, or one or more Affiliates or Associates of one or more Managers or Officers, or (ii) an entity or organization in which one or more Managers or Officers, or one or more Affiliates or Associates of one or more Managers or Officers, is (A) a director, general partner, member, manager or officer or (B) has a financial interest.

(b) The Company may enter into a contract or transaction described in Section 3.09(a) if one of the following conditions is satisfied:

(i) the material facts as to the relationship or interest described in Section 3.09(a) and as to the contract or transaction are disclosed to or known by the Board of Managers and the Board of Managers in good faith authorizes the contract or transaction by the approval of a majority of the disinterested Managers or, if there is only one disinterested Manager, the sole disinterested Manager, regardless of whether the disinterested Managers or Manager constitutes a quorum; or

(ii) the material facts as to the relationship or interest described in Section 3.09(a) and as to the contract or transaction are disclosed to or known by the Members and the Members in good faith approve the contract or transaction by vote of the Members; or

(iii) the contract or transaction is fair to the Company when the contract or transaction is authorized, approved or ratified by the Board of Managers or the Members.

(c) Interested Managers may be included in determining the presence of a quorum at a meeting of the Board of Managers that authorizes the contract or transaction.

10

(d)     A Person who has the relationship or interest described in Section 3.09(a) may (i) be present at or participate in and, if the Person is a Manager, may vote at a meeting of the Board of Managers that authorizes the contract or transaction or (ii) sign, in the Person's capacity as a Manager, a written consent of the Board of Managers to authorize the contract or transaction.

## ARTICLE IV
## RIGHTS AND OBLIGATIONS OF THE MEMBERS

4.01     **Limitation of Liability**. Except as provided by the provisions of the TBOC that may not be modified by this Agreement or waived under any Legal Requirement, no Member shall be liable for any obligation of the Company solely by reason of being or acting as a Member. The failure of the Company to observe any formalities or requirements relating to the exercise of its powers or management of its business or affairs under this Agreement or the TBOC shall not be grounds for imposing liability on a Member for liabilities of the Company.

4.02     **Compensation of the Members**. A Member shall be reimbursed for all proper, direct expenses it reasonably incurs on behalf of the Company in performing its duties as a Member upon delivery by such Member to the Company of a detailed invoice (including amounts paid to any Person to perform services for the Company).

4.03     **Profits and Losses; Distributions**. Subject to the Code, if the Company has more than one Member under the Code, each item of income, gain, loss, deduction or credit of the Company, for each fiscal year of the Company, shall be allocated among the Members in proportion to their respective Percentage Interests. Except as prohibited by provisions of the TBOC that may not be modified by this Agreement or waived under applicable Legal Requirements, the Company may make distributions as determined by and in the sole discretion of the Board of Managers; notwithstanding the foregoing, no distribution shall be made if such distribution would violate Section 101.206 of the TBOC or any other applicable Legal Requirement.

4.04     **No Nonvoting Ownership Interests**. To the extent prohibited by section 1123(a)(6) of chapter 11 of the Bankruptcy Code, the Company will not issue nonvoting ownership interests; provided, however, that the foregoing restriction (a) will have no further force or effect beyond that required by section 1123 of the Bankruptcy Code, (b) will have force and effect only for so long as section 1123 of the Bankruptcy Code is in effect and appliable to the Company, and (iii) in all events may be amended or eliminated in accordance with the TBOC and any other applicable Legal Requirements as from time to time may be in effect.

## ARTICLE V
## MEETINGS OF THE MEMBERS

5.01     **No Required Meetings**. The Members may, but shall not be required to, hold annual, periodic or other formal meetings.

5.02     **Action by the Members**. Action required or permitted to be taken at a meeting of the Members may be taken without a meeting and without notice if the action is evidenced by a written consent, approval or resolution describing the action taken.  All decisions of the Members, whether at a meeting or by written consent, approval or resolution, must be made or taken by a Majority in Interest of the Members.

11

## ARTICLE VI
## BOOKS AND RECORDS

6.01    **Maintenance of Books and Records**. The Company may maintain at its principal office, separate books of account for the Company that include a record of all costs and expenses incurred, all charges made, all credits made and received and all income derived in connection with the conduct of the Company and the operation of its business in accordance with this Agreement.

6.02    **Access to Books, Records, etc**. A Member or any of its agents or representatives, at such Member's own expense and upon reasonable notice during normal business hours, may visit and inspect any of the properties of the Company (subject to reasonable safety requirements) and examine and audit any information it may reasonably request and make copies of and abstracts from the financial and operating records and books of account of the Company and its subsidiaries and copies of any other documents relating to the businesses of the Company and its subsidiaries, and discuss the affairs, finances and accounts of the Company and its subsidiaries with any Manager, any other Member, any Officer and the independent accountants of the Company, if any, all at such reasonable times and as often as such Member or any of its agents or representatives may reasonably request.

6.03    **Reliance on Documents and Reports**.  The appropriate Officer shall cause to be prepared and to be delivered to the Members by the Company any other reports or information regarding the Company or its subsidiaries that a Majority in Interest of the Members requests. The Board of Managers shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any of its Members, Officers or employees, or by any other Person as to matters the Board of Managers reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company (including, without limitation, information, opinions, reports or statements as to the value and amount of the assets, liabilities, profits or losses of the Company or any other facts pertinent to the existence and amount of assets from which distributions to Members might properly be paid). In addition, the Board of Managers may consult with legal counsel, accountants, appraisers, management consultants, investment bankers and other consultants and advisors selected by them, and any opinion of any such Person as to matters which the Board of Managers reasonably believes to be within such Person's professional or expert competence shall be full and complete authorization and protection in respect of any action taken or suffered or omitted by the Board of Managers in good faith and in accordance with such opinion.

## ARTICLE VII
## TRANSFER OF MEMBERSHIP INTERESTS AND
## ADMISSION OF ASSIGNEES AND
## ADDITIONAL MEMBERS

7.01    **Transfer**. A Member may effect a Transfer of all or a portion of its Membership Interest either voluntarily or by operation of law. Notwithstanding any provision of the TBOC to the contrary, upon the Transfer of a Membership Interest, the transferee shall be admitted immediately as a Member without further action upon the completion of the Transfer. Upon the

12

Transfer of all of a Member's Membership Interest (other than the transfer of an Encumbrance), the transferring Member shall cease to be a Member and, to the fullest extent permitted by Legal Requirements, shall have no further rights or obligations under this Agreement, except that the transferring Member shall have the right to such information as may be necessary for the computation of the transferring Member's tax liability. In connection with a Transfer of all of the Membership Interests in the Company, the transferee shall be admitted as a Member immediately before the transferring Member ceases to be a Member and the Company shall continue without dissolution.

7.02    **Admission of Additional Members**. The Members may admit additional Members from time to time and determine the capital contributions to be made by such additional Members.

7.03    **Member Register**. Schedule I will be updated by the Secretary or any Assistant Secretary for the name, business address and Percentage Interest of each additional or substituted Member of the Company, and any such update will not be considered to be an "amendment" of this Agreement.

## ARTICLE VIII
## DISSOLUTION AND WINDING UP

8.01    **Dissolution**. The Company shall be dissolved and its affairs wound up, only upon the first to occur of the following: (a) the written consent of a Majority in Interest of the Members; (b) the termination of the legal existence of the last remaining Member or the occurrence of any other event that terminates the continued membership of the last remaining Member in the Company unless the business of the Company is continued in a manner permitted by this Agreement or the TBOC; or (c) the entry of a decree of judicial dissolution under Section 11.301 of the TBOC that has become final. Anything in this Agreement to the contrary notwithstanding, the Bankruptcy of a Member shall not cause such Member to cease to be a Member and upon the occurrence of a Bankruptcy of a Member, the business of the Company shall continue without dissolution. The existence of the Company as a separate legal entity shall continue until the cancellation of the Certificate as provided in the TBOC.

8.02    **Effect of Dissolution**. Upon dissolution, the Company shall continue solely for the purpose of winding up its affairs in an orderly manner, liquidating its assets (with sufficient time allowed to minimize the losses normally associated with liquidation) and satisfying the claims of its creditors and the Members, and neither the Board of Managers nor any Member shall take any action with respect to the Company that is inconsistent with the winding up of the Company's business and affairs, until such time as the Company's Property has been distributed pursuant to this Section 8.02 and the existence of the Company has been terminated pursuant to the TBOC. The Officers, or, if there are none, the Managers, or, if there are none, the Members, shall be responsible for overseeing the winding up of the Company. The Persons winding up the Company shall take full account of the Company's Property and liabilities and shall cause as soon as reasonably practicable the Company's Property or the proceeds from the sale or disposition thereof, to the extent sufficient therefor, to be applied and distributed, to the maximum extent permitted by any applicable Legal Requirement and notwithstanding anything in this Agreement to the contrary, in the following order (without duplication):

13

(a)      First, to creditors, including Members and their Affiliates who are creditors, in satisfaction of the liabilities of the Company (whether by payment or reasonable provision for payment); and

(b)      Second, to the Members in proportion to their Percentage Interests.

8.03    **No Restoration of Capital Account**. In no event shall a Member be required to contribute additional capital to the Company, upon the liquidation of the Company or at any other time.

8.04    **Winding Up and Certificate of Termination**. The winding up of the Company shall be completed when all debts, liabilities and obligations of the Company have been paid and discharged or reasonably adequate provision therefor has been made, and all of the remaining Property of the Company has been distributed to the Members. Upon the completion of winding up of the Company, a certificate of termination shall be delivered to the Secretary of State for filing. The certificate of termination shall set forth the information required by the TBOC.

## ARTICLE IX
## MISCELLANEOUS

9.01    **Amendment**. This Agreement may be amended from time to time only by a written agreement executed by a Majority in Interest of the Members.

9.02    **Governing Law; Signatures and Records**. This Agreement and the rights and duties of the Members arising under this Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas, without reference to the conflict of laws rules thereof that would call for the application of the laws of any other jurisdiction. Any signature on this Agreement, and any certificate or other document or agreement which the Company is authorized to issue or execute pursuant to this Agreement, may be a facsimile, a conformed signature or an electronically transmitted signature. Any consent, approval or resolution transmitted by electronic transmission by a Manager, Member or a Person or Persons authorized to act for a Member shall be deemed to be written and signed for purposes of this Agreement. Unless a Member expressly requests otherwise, all notices, disclosures, authorizations, acknowledgements and other documents required to be provided by any other Member or the Company or related to the Company, including its operation, governance and internal affairs, may be transmitted electronically to such Member. The Company may maintain a copy of this Agreement, all other information required to be maintained by the TBOC and all of its other records in electronic or any other non-written form that is capable of conversion into written form within a reasonable time.

9.03    **Rights of Creditors and Third Parties Under Agreement**. This Agreement is declared and entered into by the Members for the exclusive benefit of the Company, the Members, the Managers and their successors and assignees, and is not intended for the benefit of any creditor of the Company or any other Person. Except and only to the extent required by a Legal Requirement, no such creditor or other Person shall have any rights under this Agreement or any agreement between the Company and the Members with respect to any capital contribution.

9.04    **Successors and Assigns**. This Agreement shall be binding upon and benefit the Members and their successors and assigns.

9.05    **Severability**. The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of its other provisions. Following a determination by a court of competent jurisdiction that any provision of this Agreement is invalid or unenforceable, the Members shall negotiate in good faith new provisions that, as far as legally possible, most nearly reflect the intent of the Members originally expressed herein and that restore this Agreement as nearly as possible to its original intent and effect.

9.06    **Entire Agreement**. This Agreement represents the entire declaration and agreement by the Members.

9.07    **Construction**. Every covenant, term and provision of this Agreement shall be construed simply according to its fair meaning and not strictly for or against any party.

*[Signature Page Follows]*

15

**IN WITNESS WHEREOF**, the sole Member has executed this Agreement as of the Effective Date.

**[New Intermediate Holding Corp]**, a New Jersey corporation

By: _____
    Name:  [●]
    Title:  [●]

*[Signature Page to Limited Liability Company Agreement of LLT Management LLC]*

NAI-1540049625

# SCHEDULE I – MEMBER REGISTER

To the Amended and Restated Limited Liability Company Agreement

of

Red River Talc LLC (a Texas limited liability company)

| Member Name and Address | Percentage Interest | Dates of Admission/Departure |
|---|---|---|
| **[New Intermediate Holding Corp] (a New Jersey corporation)**<br>One Johnson & Johnson Plaza<br>New Brunswick, NJ 08933<br><br>Received interest upon formation in connection with the divisional merger of **[Holdco (Texas)]** LLC, a Texas limited liability company, into three newly created Texas limited liability companies, one of which was the Company | 100% | [●] |

**EXHIBIT C**

**Cash Contributions**

**Cash Contributions**

On each date specified in the table below (column (a)), the Reorganized Debtor shall deliver, or cause to be delivered, to the Talc Personal Injury Trust Cash Contributions in the amount set forth opposite such date (column (b)).

| Delivery Date for Cash Contribution* (a) | Total Amount of Cash Contribution to be Delivered to the Talc Personal Injury Trust (b) |
|---|---|
| Effective Date | $2,000,000,000, as adjusted** |
| 1st Anniversary of Petition Date | $2,000,000,000, as adjusted*** |
| 2nd Anniversary of Petition Date | $740,000,000, as adjusted*** |
| 3rd Anniversary of Petition Date | $740,000,000, as adjusted*** |
| 7th Anniversary of Petition Date | $87,500,000 |
| 12th Anniversary of Petition Date | $483,000,000 |
| 17th Anniversary of Petition Date | $483,000,000 |
| 22nd Anniversary of Petition Date | $483,000,000 |
| 25th Anniversary of Petition Date | $481,500,000 |
| **TOTAL** | $7,498,000,000 as adjusted |

\*       No Cash Contribution shall be delivered prior to the Effective Date.  If the delivery date for a Cash Contribution set forth below occurs prior to the Effective Date, such Cash Contribution shall instead be delivered on the Effective Date.

\*\*     The amount to be delivered to the Talc Personal Injury Trust on the Effective Date shall be adjusted as follows:

(a)     commencing on the first Business Day after the Confirmation Date, interest shall accrue on such amount at the rate of 4.41% per annum, with interest to be calculated (i) on the basis of a 365/366-day year and paid for the actual number of days elapsed and (ii) taking into account the amounts and dates of any Cash advances made by the Debtor in accordance with the Trust Expense Advancement Order prior to the Effective Date; and

(b)    such amount shall be reduced by the aggregate amount of any Cash advanced by the Debtor in accordance with the Trust Expense Advancement Order prior to the Effective Date.

***    If the delivery date set forth for such Cash Contribution occurs prior to the Effective Date and, accordingly, such Cash Contribution is to be delivered on the Effective Date, the amount to be delivered to the Talc Personal Injury Trust shall be adjusted as follows: commencing on the first Business Day after the delivery date set forth for such Cash Contribution, interest shall accrue on such amount at the rate of 4.41% per annum, with interest to be calculated on the basis of a 365/366-day year and paid for the actual number of days elapsed.

# EXHIBIT D

## Cash Contributions Parent Guarantee

THIS GUARANTEE HAS BEEN ISSUED PURSUANT TO SECTION 1145 OF THE U.S. BANKRUPTCY CODE, WHICH PROVIDES AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT OF 1933, AS AMENDED, AND APPLICABLE STATE STATUTES.

## GUARANTEE

[•]

This GUARANTEE (this "Guarantee") is issued pursuant to the Prepackaged Chapter 11 Plan of Reorganization (the "Plan") of Red River Talc LLC, debtor in the chapter 11 case captioned *In re: Red River Talc LLC*, Case No. [•] ([•]) pending in the United States Bankruptcy Court for the [•] District of Texas. All capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to them in the Plan.

Each of JOHNSON & JOHNSON, a New Jersey corporation ("J&J"), and  JOHNSON & JOHNSON HOLDCO (NA) INC., a New Jersey corporation ("New Holdco" and, together with J&J, the "Guarantors" and each, a "Guarantor"), for the benefit of the RED RIVER TALC PERSONAL INJURY TRUST (the "Talc Personal Injury Trust"), hereby unconditionally guarantees the full and timely delivery of each Cash Contribution to the Talc Personal Injury Trust, in each case, to the extent such Cash Contribution is required to be made pursuant to and in accordance with Section 4.9.1(a) of, and Exhibit C to, the Plan, on the terms set forth herein (the "Guarantee Obligation").

SECTION 1.   Independent Obligation.  The Guarantee Obligation is an independent obligation of each Guarantor and, upon any failure of the Reorganized Debtor to timely deliver a Cash Contribution in full in accordance with Section 4.9.1(a) of, and Exhibit C to, the Plan, the Talc Personal Injury Trust may proceed against either Guarantor, or both Guarantors, without proceeding against or joining the Reorganized Debtor.

SECTION 2.   Continuing Obligation.  The Guarantee Obligation of each Guarantor is a continuing obligation and will remain in full force and effect, notwithstanding any available defenses, so long as any obligations of the Reorganized Debtor remain outstanding under Section 4.9.1(a) of, and Exhibit C to, the Plan.

SECTION 3.   Payment Obligation.  The Guarantee Obligation of each Guarantor is a guarantee of payment and not of collection.

SECTION 4.   Certain Guarantor Representations.  Each Guarantor hereby represents and warrants to the Talc Personal Injury Trust as follows:  (a) such Guarantor is a corporation validly organized and existing under the laws of the State of New Jersey and a controlling Affiliate of the Reorganized Debtor; (b) such Guarantor has all requisite power, authority and legal capacity to execute and deliver this Guarantee and perform its obligations hereunder; (c) the execution and delivery of this Guarantee has been duly authorized by all required action by such Guarantor and is the legal, valid and binding obligation of such Guarantor, enforceable against such Guarantor in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally and to general principles of equity; (d) neither such Guarantor's execution and delivery

of this Guarantee nor the performance by such Guarantor of its obligations hereunder will violate or conflict with the certificate of incorporation or by-laws of such Guarantor or with any law or any material contract, permit or order to which such Guarantor is a party or by which such Guarantor is bound; and (e) no consent or authorization or notice to any person or entity is required in connection with such Guarantor's execution or delivery of this Guarantee or the performance by such Guarantor of its obligations hereunder.

SECTION 5.    Certain Guarantor Acknowledgements.  Each Guarantor acknowledges that holders of Channeled Talc Personal Injury Claims may have voted to accept the Plan in reliance on such Guarantor's execution and delivery of this Guarantee.

SECTION 6.    Notices.  Any notice or other communication hereunder shall be by hand delivery, overnight delivery via nationally recognized overnight delivery service or registered or certified United States mail with return receipt, postage prepaid, addressed to the receiving party at its address specified below (or at any other address that the receiving party may hereafter specify to the delivering party in writing), and unless otherwise provided herein shall be deemed to have been given or made when delivered or, if sent via United States mail, when the return receipt therefor is signed by the receiving party:

| | |
|---|---|
| Talc Personal Injury Trust: | Red River Talc Personal Injury Trust |
| | [●] |
| | [●] |
| | Attention:  [●] |
| | |
| J&J: | Johnson & Johnson |
| | One Johnson & Johnson Plaza |
| | New Brunswick, NJ 08933 |
| | Attention:  Treasurer |
| | |
| New Holdco: | Johnson & Johnson Holdco (NA) Inc. |
| | One Johnson & Johnson Plaza |
| | New Brunswick, NJ 08933 |
| | Attention:  President |

SECTION 7.    Governing Law.  This Guarantee shall be deemed a contract made under the laws of the State of Texas without regard to principles of conflicts of laws.

SECTION 8.    Severability.  If any one or more of the provisions contained in this Guarantee are invalid, illegal, or unenforceable in any respect, the validity, legality, or enforceability of all the remaining provisions will not in any way be affected or impaired.  If any one or more provisions contained in this Guarantee are deemed invalid, illegal, or unenforceable because of their scope or breadth, such provisions shall be reformed and replaced with provisions whose scope and breadth are valid under applicable law.

SECTION 9.    Assignment; Amendment and Waiver.  This Guarantee shall bind each Guarantor and its successors and assigns and shall inure to the benefit of the Talc Personal Injury Trust.  Neither this Guarantee nor any rights hereunder may be assigned, in whole or in part, by the Talc Personal Injury Trust, and any such purported assignment shall be void.  This Guarantee

NAI-1539839717

may be assigned, in whole or in part, by each Guarantor, but neither Guarantor shall be relieved of any of its obligations hereunder as a result of any such assignment unless the Talc Personal Injury Trust shall otherwise agree in writing. No amendment or waiver of any provision of this Guarantee shall in any event be effective unless the same shall be in writing, specifically refer to this Guarantee, and be signed by each of the Guarantors and the Talc Personal Injury Trust, and then such amendment or waiver shall be effective only in the specific instance and for the specific purpose for which given.  A waiver on any such occasion shall not be construed as a bar to, or waiver of, any such right or remedy on any future occasion.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

NAI-1539839717

IN WITNESS WHEREOF, each Guarantor has executed and delivered this Guarantee on the date first written above.

JOHNSON & JOHNSON

By:_____
Name: _____
Title: _____

JOHNSON & JOHNSON HOLDCO (NA) INC.

By:_____
Name: _____
Title: _____

The foregoing is agreed to and accepted as of the date first written above by the following:

RED RIVER TALC PERSONAL INJURY TRUST

By:_____
Name: _____
Title: _____

*[Signature Page to Guarantee]*

**EXHIBIT E**

**Cooperation Agreement**

(TO COME)

**EXHIBIT F**

**Retained Rights of Action**

(TO COME)

# EXHIBIT G

## Talc Insurance Policies

# EXHIBIT G

## Talc Insurance Policies

| General Description |
| --- |
| LTL Management LLC is an insured under insurance policies issued to Johnson & Johnson |
| A.G. Securitas - Insurance Policy No. 7339178 |
| A.G. Securitas - Insurance Policy No. 7339186 |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 01 XN 1209 WCA |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 01 XN 1211 WCA |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 01 XN 1213 WCA |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 01 XN 1577 WCA |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 01 XN 1598 WCA |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 01 XN 2001 WCA |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 01 XN 2002 WCA |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 01 XN 2003 WCA |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 01 XN 2336 WCA |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 01 XN 2476 WCA |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 01 XN 2478 WCA |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 01 XN 2480 WCA |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 01 XN 2482 WCA |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 01 XN 2838 WCA |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 01 XN 2840 WCA |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 01 XN 2842 WCA |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 01 XN 2844 WCA |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 01 XN 3219 WCA |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 01 XN 3220 WCA |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 01 XN 3221 WCA |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 01 XN 3222 WCA |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 01 XN 3538 WCA |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 01 XN 3539 WCA |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 01 XN 3540 WCA |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 01 XN 3541 WCA |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 01 XN 3985 WCA |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 01 XN 4052 WCA |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 01 XN 4536 WCA |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 01 XN 4537 WCA |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 01 XN 4538 WCA |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 01 XN 4539 WCA |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 01 XN 509 WCA |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 01 XN 509 WCA |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 01 XN 509 WCA |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 01 XN 945 WCA |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 38 AL 012470 SC(Y) |

| |
|---|
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 38 AL 012470 SC(Y) |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 38 AL 128800 SR(Y) |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 38 AL 128800 SR(Y) |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 38 AL 128800 SR(Y) |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 38 AL 144156 SR(Y) |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 38 AL 234570 SRA |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 38 AL 234935 SRA |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 38 AL 237601 SRA |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 38 AL 237618 |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 38 AL 237624 SCA |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 38 AL 252868 SRA(Y) |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 38 AL 5000SRY |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 38 AL 5000SRY |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 38 AL 5000SRY |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 38 AL 5000SRY |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 38 AL 5000SRY |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 38 AL 9608-SR(Y) |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 38 AL 9608-SR(Y) |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 38 AL 9608-SR(Y) |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 38 GL 18 SCA |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 38 LC 3025RRRY |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 38 LC 4798Y |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 38 LC 4800RRY |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 38 LC 4800RRY |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 38 LC 4800RRY |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 38 PK 01 SC(Y) |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 38 PK 02 SC(Y) |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 38 PK 03 SC(Y) |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 38 PK 04 SCA(Y) |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 38 PK 07 SCA |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 38 PK 09SCA |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 38 PK 10 SCA |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 38 PK 15 SCA |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 38 PK 18 SCA |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 38 PK11SCA |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 38 PK13SCA |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 38 PK17SCA |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 38 XN 07 SCA |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 38 XN 1 SC |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 38 XN 1 SC |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 38 XN 1 SC |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 38 XN 1 SC |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 38 XN 1 SC |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 38 XN 1 SC |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 38 XN 1 SC |

| |
|---|
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 38 XN 1 SC |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 38 XN 1 SC |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 38 XN 9 WCA |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 38 XN 9 WCA |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 38 XN 9 WCA |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 38 XS 3 SC |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 38 XS 3 SC |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 38 XS 3 SC |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 38 XS 36 SC |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 38 XS 36 SC |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 38 XS 36 SC |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 38AL138750 SR(Y) |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 38AL138750 SR(Y) |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 38AL138750 SR(Y) |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 38PK 05 SCA (Y) |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 38XS 550SCA |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 38XS 550SCA |
| Aetna Casualty and Surety (Travelers) - Insurance Policy No. 38XS 550SCA |
| Affiliated FM Ins. Company - Insurance Policy No. XL 96447 |
| Affiliated FM Ins. Company - Insurance Policy No. XL 97780 |
| Affiliated FM Ins. Company - Insurance Policy No. XL 98363 |
| AIU Ins. Company - Insurance Policy No. 75-100006 |
| AIU Ins. Company - Insurance Policy No. 75-101004 |
| AIU Ins. Company - Insurance Policy No. 75-101768 |
| AIU Ins. Company - Insurance Policy No. 75-102009 |
| AIU Ins. Company - Insurance Policy No. 75-102228 |
| AIU Ins. Company - Insurance Policy No. 75-102237 |
| AIU Ins. Company - Insurance Policy No. 75-104350 |
| Allianz Ins. Company - Insurance Policy No. XL 55 95 63 |
| American Centennial Ins. Company - Insurance Policy No. CC-00-03-79 |
| American Centennial Ins. Company - Insurance Policy No. CC-00-03-79 |
| American Centennial Ins. Company - Insurance Policy No. CC-00-11-98 |
| American Centennial Ins. Company - Insurance Policy No. CC-00-11-99 |
| American Centennial Ins. Company - Insurance Policy No. CC-00-12-00 |
| American Centennial Ins. Company - Insurance Policy No. CC-00-13-74 |
| American Centennial Ins. Company - Insurance Policy No. CC-00-13-75 |
| American Centennial Ins. Company - Insurance Policy No. CC-00-13-76 |
| American Centennial Ins. Company - Insurance Policy No. CC-00-26-18 |
| American Centennial Ins. Company - Insurance Policy No. CC-00-26-18 |
| American Centennial Ins. Company - Insurance Policy No. CC-00-26-54 |
| American Centennial Ins. Company - Insurance Policy No. CC-00-26-54 |
| American Centennial Ins. Company - Insurance Policy No. CC-01-58-73 |
| American Motorists Ins. Company - Insurance Policy No. 1YM 578 951-01 |
| American Motorists Ins. Company - Insurance Policy No. 1YM 578 951-01 |
| American Motorists Ins. Company - Insurance Policy No. 1YM 578 951A |

| |
|---|
| American Motorists Ins. Company - Insurance Policy No. 1YM 578 951A |
| American Re-Insurance Company - Insurance Policy No. M1049624 |
| Assurances Generales De France - Insurance Policy No. 59243/85 |
| Assurantiekantoor VanWijk & Co. - Insurance Policy No. 7335660 |
| Birmingham Fire Ins. Company - Insurance Policy No. SE 6073435 |
| Birmingham Fire Ins. Company - Insurance Policy No. SE 6073443 |
| Birmingham Fire Ins. Company - Insurance Policy No. SE 6073583 |
| Birmingham Fire Ins. Company - Insurance Policy No. SE 6073584 |
| Birmingham Fire Ins. Company - Insurance Policy No. SE 6073751 |
| Birmingham Fire Ins. Company - Insurance Policy No. SE 6073752 |
| Birmingham Fire Ins. Company - Insurance Policy No. SE 6073908 |
| Birmingham Fire Ins. Company - Insurance Policy No. SE 6074011 |
| Birmingham Fire Ins. Company - Insurance Policy No. SE 6074012 |
| Birmingham Fire Ins. Company - Insurance Policy No. SE 6074203 |
| Birmingham Fire Ins. Company - Insurance Policy No. SE 6074226 |
| Central National Ins. Company of Omaha - Insurance Policy No. CNZ 14-06-28 |
| Central National Ins. Company of Omaha - Insurance Policy No. CNZ 14-07-46 |
| Central National Ins. Company of Omaha - Insurance Policy No. CNZ 14-07-48 |
| City Ins. Company - Insurance Policy No. HEC 9 69 37 45 |
| City Ins. Company - Insurance Policy No. HEC 9 69 37 45 |
| City Ins. Company - Insurance Policy No. HEC 9 69 37 53 |
| City Ins. Company - Insurance Policy No. HEC 9 69 37 53 |
| City Ins. Company - Insurance Policy No. HEC 9 82 57 73 |
| City Ins. Company - Insurance Policy No. HEC 9 82 63 69 |
| City Ins. Company - Insurance Policy No. HEC 9 82 63 70 |
| City Ins. Company - Insurance Policy No. HEC 9 82 63 71 |
| Colonia Versicherungs AG, Koln - Insurance Policy No. Unknown |
| Colonia Versicherungs AG, Koln - Insurance Policy No. Unknown |
| Drake Ins. Company of New York - Insurance Policy No. XL 01437 |
| Employers Ins. of Wausau - Insurance Policy No. 5734-00-300600 |
| Employers Ins. of Wausau - Insurance Policy No. 5734-00-300601 |
| Employers Ins. of Wausau - Insurance Policy No. 5735-00-100273 |
| Employers Ins. of Wausau - Insurance Policy No. 5735-00-100273 |
| Employers Ins. of Wausau - Insurance Policy No. 5735-00-100273 |
| Employers Ins. of Wausau - Insurance Policy No. 5735-00-100561 |
| Employers Ins. of Wausau - Insurance Policy No. 5735-02-100561 |
| Employers Ins. of Wausau - Insurance Policy No. 5735-03-100561 |
| Employers Ins. of Wausau - Insurance Policy No. 5735-04-100561 |
| Employers Ins. of Wausau - Insurance Policy No. 5736 00 102585 |
| Employers Mutual Casualty Company - Insurance Policy No. MMO-70634 |
| Employers Mutual Casualty Company - Insurance Policy No. MMO-71147 |
| Eurinco Allgemeine Versicherungs AG, Dusseldorf - Insurance Policy No.  Unknown |
| Eurinco Allgemeine Versicherungs AG, Dusseldorf - Insurance Policy No. Unknown |
| Fireman's Fund Ins. Company - Insurance Policy No. XLX 120 28 48 |
| Fireman's Fund Ins. Company - Insurance Policy No. XLX 126 71 73 |

NAI-1540089146

| |
|---|
| First State Ins. Company - Insurance Policy No. 924197 |
| First State Ins. Company - Insurance Policy No. 924214 |
| First State Ins. Company - Insurance Policy No. 925944 |
| First State Ins. Company - Insurance Policy No. 925945 |
| First State Ins. Company - Insurance Policy No. 927459 |
| First State Ins. Company - Insurance Policy No. 927460 |
| First State Ins. Company - Insurance Policy No. 929233 |
| First State Ins. Company - Insurance Policy No. 929234 |
| First State Ins. Company - Insurance Policy No. 930826 |
| First State Ins. Company - Insurance Policy No. 930827 |
| First State Ins. Company - Insurance Policy No. 932300 |
| First State Ins. Company - Insurance Policy No. 934289 |
| First State Ins. Company - Insurance Policy No. 934290 |
| Gibraltar Casualty Company - Insurance Policy No. GMX 00825 |
| Gibraltar Casualty Company - Insurance Policy No. GMX 01456 |
| Gibraltar Casualty Company - Insurance Policy No. GMX 02007 |
| Gibraltar Casualty Company - Insurance Policy No. GMX 02521 |
| Granite State Ins. Company - Insurance Policy No. 6179-0868 |
| Granite State Ins. Company - Insurance Policy No. 6179-1003 |
| Granite State Ins. Company - Insurance Policy No. 6180-1791 |
| Granite State Ins. Company - Insurance Policy No. 6481-5094 |
| Granite State Ins. Company - Insurance Policy No. 6481-5095 |
| Granite State Ins. Company - Insurance Policy No. 6481-5096 |
| Granite State Ins. Company - Insurance Policy No. 6482-5317 |
| Granite State Ins. Company - Insurance Policy No. 6482-5318 |
| Granite State Ins. Company - Insurance Policy No. 6482-5562 |
| Granite State Ins. Company - Insurance Policy No. 6483-5520 |
| Granite State Ins. Company - Insurance Policy No. 6483-5521 |
| Granite State Ins. Company - Insurance Policy No. 6483-5522 |
| Granite State Ins. Company - Insurance Policy No. 6483-5523 |
| Granite State Ins. Company - Insurance Policy No. 6484-0068 |
| Granite State Ins. Company - Insurance Policy No. 6484-0068 |
| Granite State Ins. Company - Insurance Policy No. 6484-0068 |
| Granite State Ins. Company - Insurance Policy No. 6484-5726 |
| Granite State Ins. Company - Insurance Policy No. 6484-5726 |
| Granite State Ins. Company - Insurance Policy No. 6484-5726 |
| Granite State Ins. Company - Insurance Policy No. 6485-7000 |
| Granite State Ins. Company - Insurance Policy No. 6485-7001 |
| Granite State Ins. Company - Insurance Policy No. SCLD 80-94068 |
| Great Northern Ins. Company - Insurance Policy No. (82) 7129-89-81 |
| Great Northern Ins. Company - Insurance Policy No. (83) 7129-89-81 |
| Great Northern Ins. Company - Insurance Policy No. (84) 7129-89-81 |
| Great Northern Ins. Company - Insurance Policy No. (85) 7129-89-81 |
| Great Northern Ins. Company - Insurance Policy No. (86) 7129-89-81 |
| Great Southwest Fire Ins. Company - Insurance Policy No. XL 13811 |

NAI-1540089146

| |
|---|
| Groupe Drouot - Insurance Policy No. 59243/85 |
| Groupe Drouot - Insurance Policy No. XF 750027D (59244/85) |
| Harbor Ins. Company - Insurance Policy No. HI 178415 |
| Harbor Ins. Company - Insurance Policy No. HI 178575 |
| Hartford Accident and Indemnity Company - Insurance Policy No. 10 XS 103213 |
| Hartford Accident and Indemnity Company - Insurance Policy No. 10 XS CB 6983 |
| Hartford Accident and Indemnity Company - Insurance Policy No. 10 XS CB6983 |
| Hartford Accident and Indemnity Company - Insurance Policy No. 10 XS GN 4596 |
| Home Ins. Company - Insurance Policy No. HEC 1 20 34 76 |
| Home Ins. Company - Insurance Policy No. HEC 1 20 34 77 |
| Home Ins. Company - Insurance Policy No. HEC 1 20 34 78 |
| Home Ins. Company - Insurance Policy No. HEC 1 70 34 79 |
| Home Ins. Company - Insurance Policy No. HEC 4 35 67 55 |
| Home Ins. Company - Insurance Policy No. HEC 4 35 67 55 |
| Home Ins. Company - Insurance Policy No. HEC 4 35 67 55 |
| Home Ins. Company - Insurance Policy No. HEC 4 35 67 56 |
| Home Ins. Company - Insurance Policy No. HEC 4 35 67 56 |
| Home Ins. Company - Insurance Policy No. HEC 4 76 40 31 |
| Home Ins. Company - Insurance Policy No. HEC 4 97 35 01 |
| Home Ins. Company - Insurance Policy No. HEC 9 00 69 74 |
| Home Ins. Company - Insurance Policy No. HEC 9 00 69 75 |
| Home Ins. Company - Insurance Policy No. HEC 9 20 85 31 |
| Home Ins. Company - Insurance Policy No. HEC 9 32 88 13 |
| Home Ins. Company - Insurance Policy No. HEC 9 32 88 48 |
| Ideal Mutual Ins. Company - Insurance Policy No. 0130 |
| Industrial Indemnity Company - Insurance Policy No. JE 884-2682 |
| Ins. Company of North America - Insurance Policy No. 45 HF 20351 |
| Ins. Company of North America - Insurance Policy No. 45HF 20337 |
| Ins. Company of North America - Insurance Policy No. 47HF20003 |
| Ins. Company of North America - Insurance Policy No. XCP 144474 |
| Ins. Company of North America - Insurance Policy No. XCP 144999 |
| Ins. Company of North America - Insurance Policy No. XCP 144999 |
| Ins. Company of North America - Insurance Policy No. XCP 156496 |
| Ins. Company of North America - Insurance Policy No. XCP 156496 |
| Ins. Company of North America - Insurance Policy No. XCP 156496 |
| Ins. Company of North America - Insurance Policy No. XCP 156496 |
| Ins. Company of North America - Insurance Policy No. XCP155946 |
| Ins. Company of North America - Insurance Policy No. XCP155946 |
| Ins. Company of the State of Pennsylvania - Insurance Policy No. UXL 82-1002 |
| Ins. Corporation of Singapore Limited - Insurance Policy No. Unknown |
| Ins. Corporation of Singapore Limited - Insurance Policy No. Unknown |
| Integrity Ins. Company - Insurance Policy No. XL 200216 |
| Integrity Ins. Company - Insurance Policy No. XL 200603 |
| Integrity Ins. Company - Insurance Policy No. XL 200662 |
| Integrity Ins. Company - Insurance Policy No. XL 201442 |

NAI-1540089146

| |
|---|
| Integrity Ins. Company - Insurance Policy No. XL 202013 |
| Integrity Ins. Company - Insurance Policy No. XL 208000 |
| International Ins. Company - Insurance Policy No. 522 029479 5 |
| International Ins. Company - Insurance Policy No. 522 029480 4 |
| International Ins. Company - Insurance Policy No. 522 034427 7 |
| International Ins. Company - Insurance Policy No. 522 034428 6 |
| International Ins. Company - Insurance Policy No. 522 034431 3 |
| International Surplus Lines Ins. Company - Insurance Policy No. XSI 10049 |
| International Surplus Lines Ins. Company - Insurance Policy No. XSI 10050 |
| International Surplus Lines Ins. Company - Insurance Policy No. XSI 10051 |
| International Surplus Lines Ins. Company - Insurance Policy No. XSI 9092 |
| International Surplus Lines Ins. Company - Insurance Policy No. XSI 9093 |
| International Surplus Lines Ins. Company - Insurance Policy No. XSI 9094 |
| International Surplus Lines Ins. Company - Insurance Policy No. XSI 9095 |
| Lexington Ins. Company - Insurance Policy No. 522 2127 |
| Lexington Ins. Company - Insurance Policy No. 522 2127 |
| Lexington Ins. Company - Insurance Policy No. 552 2648 |
| Lexington Ins. Company - Insurance Policy No. 552 2648 |
| Lexington Ins. Company - Insurance Policy No. 552 3855 |
| Lexington Ins. Company - Insurance Policy No. 552 3855 |
| Lexington Ins. Company - Insurance Policy No. 552 3855 |
| Lexington Ins. Company - Insurance Policy No. 552 5292 |
| Lexington Ins. Company - Insurance Policy No. 552 5292 |
| Lexington Ins. Company - Insurance Policy No. 552 5292 |
| Lexington Ins. Company - Insurance Policy No. 552 6398 |
| Lexington Ins. Company - Insurance Policy No. 552 6398 |
| Lexington Ins. Company - Insurance Policy No. 5520275 |
| London Guarantee and Accident Company of N.Y. - Insurance Policy No. LX 1 89 82 01 |
| London Guarantee and Accident Company of N.Y. - Insurance Policy No. LX 2 11 07 24 |
| L'Union Atlantique S.A. d'Assurances - Insurance Policy No. 7345658 |
| Mead Reinsurance Corporation - Insurance Policy No. XL 1574 |
| Mead Reinsurance Corporation - Insurance Policy No. XL 1695 |
| Mead Reinsurance Corporation - Insurance Policy No. XL 1829 |
| Mead Reinsurance Corporation - Insurance Policy No. XL 1973 |
| Middlesex Assurance Company - Insurance Policy No. 1-34001-00 |
| Middlesex Assurance Company - Insurance Policy No. 1-34001-00 |
| Middlesex Assurance Company - Insurance Policy No. 1-34001-00 |
| Middlesex Assurance Company - Insurance Policy No. 1-34001-00 |
| Middlesex Assurance Company - Insurance Policy No. 1-34001-00 |
| Middlesex Assurance Company - Insurance Policy No. 1-34001-00 |
| Middlesex Assurance Company - Insurance Policy No. 1-34001-00 |
| Middlesex Assurance Company - Insurance Policy No. 1-34001-00 |
| Middlesex Assurance Company - Insurance Policy No. 1-34001-00 |
| Middlesex Assurance Company - Insurance Policy No. 1-34001-00 |
| Middlesex Assurance Company - Insurance Policy No. 1-34001-00 |

NAI-1540089146

| |
|---|
| Middlesex Assurance Company - Insurance Policy No. 1-34003-00 |
| Middlesex Assurance Company - Insurance Policy No. 1-34003-00 |
| Middlesex Assurance Company - Insurance Policy No. 1-34003-00 |
| Middlesex Assurance Company - Insurance Policy No. 1-34003-00 |
| Middlesex Assurance Company - Insurance Policy No. 1-34003-00 |
| Middlesex Assurance Company - Insurance Policy No. 1-34003-00 |
| Middlesex Assurance Company - Insurance Policy No. 1-34003-00 |
| Middlesex Assurance Company - Insurance Policy No. 1-34004-00 |
| Middlesex Assurance Company - Insurance Policy No. 1-34005-00 |
| Middlesex Assurance Company - Insurance Policy No. 1-34005-00 |
| Middlesex Assurance Company - Insurance Policy No. 1-34005-00 |
| Middlesex Assurance Company - Insurance Policy No. 1-34005-00 |
| Middlesex Assurance Company - Insurance Policy No. 1-34005-00 |
| Middlesex Assurance Company - Insurance Policy No. 1-34005-00 |
| Middlesex Assurance Company - Insurance Policy No. 1-34006-01 |
| Middlesex Assurance Company - Insurance Policy No. 1-34006-01 |
| Middlesex Assurance Company - Insurance Policy No. 1-34006-01 |
| Middlesex Assurance Company - Insurance Policy No. 1-34006-01 |
| Middlesex Assurance Company - Insurance Policy No. 1-34007-00 |
| Middlesex Assurance Company - Insurance Policy No. 1-34007-00 |
| Middlesex Assurance Company - Insurance Policy No. 1-34010-00 |
| Middlesex Assurance Company - Insurance Policy No. 1-34010-00 |
| Middlesex Assurance Company - Insurance Policy No. 1-34014-00 |
| Middlesex Assurance Company - Insurance Policy No. 1-34015-00 |
| Middlesex Assurance Company - Insurance Policy No. 1-34016-00 |
| Middlesex Assurance Company - Insurance Policy No. 1-34017-00 |
| Middlesex Assurance Company - Insurance Policy No. 1-34018-00 |
| Middlesex Assurance Company - Insurance Policy No. MX 119 |
| Midland Ins. Company - Insurance Policy No. XL 1386 |
| Midland Ins. Company - Insurance Policy No. XL 145822 |
| Midland Ins. Company - Insurance Policy No. XL 148397 |
| Midland Ins. Company - Insurance Policy No. XL 148398 |
| Midland Ins. Company - Insurance Policy No. XL 160202 |
| Midland Ins. Company - Insurance Policy No. XL 160203 |
| Midland Ins. Company - Insurance Policy No. XL 706594 |
| Midland Ins. Company - Insurance Policy No. XL 723765 |
| Midland Ins. Company - Insurance Policy No. XL 724752 |
| Midland Ins. Company - Insurance Policy No. XL 724753 |
| Midland Ins. Company - Insurance Policy No. XL 739784 |
| Midland Ins. Company - Insurance Policy No. XL 739785 |
| Midland Ins. Company - Insurance Policy No. XL 739970 |
| Midland Ins. Company - Insurance Policy No. XL 739971 |
| Midland Ins. Company - Insurance Policy No. XL 770800 |
| Midland Ins. Company - Insurance Policy No. XL 770801 |
| Midland Ins. Company - Insurance Policy No. XL 770802 |

NAI-1540089146

| |
|---|
| Midland Ins. Company - Insurance Policy No. XL 770803 |
| Midland Ins. Company - Insurance Policy No. XL 770818 |
| Mission Ins. Company - Insurance Policy No. M 831914 |
| Mission Ins. Company - Insurance Policy No. M 887719 |
| Mission National Ins. Company - Insurance Policy No. MN027390 |
| Mission National Ins. Company - Insurance Policy No. MN027480 |
| Mutual Fire, Marine, & Inland Ins. Company - Insurance Policy No. EL 100011 |
| Mutual Fire, Marine, & Inland Ins. Company - Insurance Policy No. EL 100193 |
| N.V. Rotterdamse Assurantiekas - Insurance Policy No. 7339178 |
| N.V. Rotterdamse Assurantiekas - Insurance Policy No. 7339186 |
| N.V. Rotterdamse Assurantiekas - Insurance Policy No. 7344546 |
| N.V. Rotterdamse Assurantiekas - Insurance Policy No. 7344554 |
| N.V. Rotterdamse Assurantiekas - Insurance Policy No. 7352670 |
| N.V. Rotterdamse Assurantiekas - Insurance Policy No. 7352689 |
| N.V. Schadeverzekeringsmaatschappij Maas Lloyd - Insurance Policy No. C. 5950619 |
| National Casualty Company - Insurance Policy No. XU 000074 |
| National Casualty Company - Insurance Policy No. XU 000184 |
| National Casualty Company - Insurance Policy No. XU 000185 |
| National Union Fire Ins. Company - Insurance Policy No. 122 47 99 |
| National Union Fire Ins. Company - Insurance Policy No. 122 95 32 |
| National Union Fire Ins. Company - Insurance Policy No. 123 29 73 |
| National Union Fire Ins. Company - Insurance Policy No. 960 30 54 |
| National Union Fire Ins. Company - Insurance Policy No. 960 30 54 |
| National Union Fire Ins. Company - Insurance Policy No. 960 33 73 |
| National Union Fire Ins. Company - Insurance Policy No. 960 84 73 |
| National Union Fire Ins. Company - Insurance Policy No. 960 85 19 |
| National Union Fire Ins. Company - Insurance Policy No. 960 90 12 |
| National Union Fire Ins. Company - Insurance Policy No. 960 90 12 |
| National Union Fire Ins. Company - Insurance Policy No. 991 05 19 |
| National Union Fire Ins. Company - Insurance Policy No. 991 05 39 |
| New Hampshire Ins. Company - Insurance Policy No. 5178-0671 |
| North River Ins. Company - Insurance Policy No. 520 021480 5 |
| North River Ins. Company - Insurance Policy No. 522 027180 9 |
| North River Ins. Company - Insurance Policy No. 522 031453 2 |
| North River Ins. Company - Insurance Policy No. JU 0030 |
| North River Ins. Company - Insurance Policy No. JU 0030 |
| North River Ins. Company - Insurance Policy No. JU 0030 |
| North River Ins. Company - Insurance Policy No. JU 0031 |
| North River Ins. Company - Insurance Policy No. JU 0031 |
| North River Ins. Company - Insurance Policy No. JU 0031 |
| North River Ins. Company - Insurance Policy No. JU 0162 |
| North River Ins. Company - Insurance Policy No. JU 0163 |
| North River Ins. Company - Insurance Policy No. JU 0176 |
| North River Ins. Company - Insurance Policy No. JU 0275 |
| North River Ins. Company - Insurance Policy No. JU 0276 |

9

| |
|---|
| North River Ins. Company - Insurance Policy No. JU 0276 |
| North River Ins. Company - Insurance Policy No. JU 0276 |
| North River Ins. Company - Insurance Policy No. JU 0277 |
| North River Ins. Company - Insurance Policy No. JU 0278 |
| North River Ins. Company - Insurance Policy No. JU 0453 |
| North River Ins. Company - Insurance Policy No. JU 0454 |
| North River Ins. Company - Insurance Policy No. JU 0455 |
| North River Ins. Company - Insurance Policy No. JU 0465 |
| North River Ins. Company - Insurance Policy No. JU 0625 |
| North River Ins. Company - Insurance Policy No. JU 0626 |
| North River Ins. Company - Insurance Policy No. JU 0627 |
| North River Ins. Company - Insurance Policy No. JU 0628 |
| North River Ins. Company - Insurance Policy No. JU 0629 |
| North River Ins. Company - Insurance Policy No. JU 0629 |
| North River Ins. Company - Insurance Policy No. JU 0630 |
| North River Ins. Company - Insurance Policy No. JU 0630 |
| North River Ins. Company - Insurance Policy No. JU 0630 |
| North River Ins. Company - Insurance Policy No. JU 0630 |
| North River Ins. Company - Insurance Policy No. JU 0631 |
| North River Ins. Company - Insurance Policy No. JU 0631 |
| North River Ins. Company - Insurance Policy No. JU 0631 |
| North River Ins. Company - Insurance Policy No. JU 0631 |
| North River Ins. Company - Insurance Policy No. JU 0802 |
| North River Ins. Company - Insurance Policy No. JU 0802 |
| North River Ins. Company - Insurance Policy No. JU 0803 |
| North River Ins. Company - Insurance Policy No. JU 0803 |
| North River Ins. Company - Insurance Policy No. JU 0804 |
| North River Ins. Company - Insurance Policy No. JU 0805 |
| North River Ins. Company - Insurance Policy No. JU 0806 |
| North River Ins. Company - Insurance Policy No. JU 0807 |
| North River Ins. Company - Insurance Policy No. JU 0967 |
| North River Ins. Company - Insurance Policy No. JU 0968 |
| North River Ins. Company - Insurance Policy No. JU 0969 |
| North River Ins. Company - Insurance Policy No. JU 0970 |
| North River Ins. Company - Insurance Policy No. JU 1081 |
| North River Ins. Company - Insurance Policy No. JU 1081 |
| North River Ins. Company - Insurance Policy No. JU 1082 |
| North River Ins. Company - Insurance Policy No. JU 1082 |
| North River Ins. Company - Insurance Policy No. JU 1083 |
| North River Ins. Company - Insurance Policy No. JU 1210 |
| Northbrook Excess and Surplus Ins. Company - Insurance Policy No. 63 001 407 |
| Northbrook Excess and Surplus Ins. Company - Insurance Policy No. 63 003 476 |
| Northbrook Excess and Surplus Ins. Company - Insurance Policy No. 63 004 938 |
| Northbrook Excess and Surplus Ins. Company - Insurance Policy No. 63 005 182 |
| Northbrook Excess and Surplus Ins. Company - Insurance Policy No. 63 006 348 |

10

| |
|---|
| Northbrook Excess and Surplus Ins. Company - Insurance Policy No. 63 006 349 |
| Northbrook Excess and Surplus Ins. Company - Insurance Policy No. 63 007 515 |
| Northbrook Excess and Surplus Ins. Company - Insurance Policy No. 63 007 516 |
| Northbrook Excess and Surplus Ins. Company - Insurance Policy No. 63 008 347 |
| Northbrook Excess and Surplus Ins. Company - Insurance Policy No. 63 008 348 |
| Northbrook Excess and Surplus Ins. Company - Insurance Policy No. 63 009 325 |
| Northbrook Excess and Surplus Ins. Company - Insurance Policy No. 63 009 326 |
| Northeastern Fire Ins. Company of Pennsylvania - Insurance Policy No. 0691 |
| Northeastern Fire Ins. Company of Pennsylvania - Insurance Policy No. 1535 |
| Pacific Employers Ins. Company - Insurance Policy No. XCC 01 22 95 |
| Pacific Employers Ins. Company - Insurance Policy No. XMO 01 72 06 |
| Prudential Reinsurance Company - Insurance Policy No. DXC 901038 |
| Prudential Reinsurance Company - Insurance Policy No. DXC DX 0708 |
| Prudential Reinsurance Company - Insurance Policy No. DXC DX 1226 |
| Prudential Reinsurance Company - Insurance Policy No. DXC DX 1227 |
| Prudential Reinsurance Company - Insurance Policy No. DXC DX0025 |
| Prudential Reinsurance Company - Insurance Policy No. DXC DX0026 |
| Republic Indemnity Company of America - Insurance Policy No. 4CX 10062 |
| Republic Ins. Company - Insurance Policy No. CDE 0674 |
| Republic Ins. Company - Insurance Policy No. CDE 0855 |
| Republic Ins. Company - Insurance Policy No. CDE 1103 |
| Republic Western Ins. Company - Insurance Policy No. R10-002 |
| Republic Western Ins. Company - Insurance Policy No. R10-005 |
| Royal Belge I.R., S.A. d'Assurances - Insurance Policy No. 7335660 |
| Royal Belge I.R., S.A. d'Assurances - Insurance Policy No. 7339178 |
| Royal Belge I.R., S.A. d'Assurances - Insurance Policy No. 7344546 |
| Royal Belge I.R., S.A. d'Assurances - Insurance Policy No. 7345658 |
| Royal Belge I.R., S.A. d'Assurances - Insurance Policy No. 7352670 |
| Royal Belge I.R., S.A. d'Assurances - Insurance Policy No. 7357656 |
| Royal Belge I.R., S.A. d'Assurances - Insurance Policy No. 7357656 |
| Royal Belge I.R., S.A. d'Assurances - Insurance Policy No. 7357664 |
| Royal Indemnity Company - Insurance Policy No. ED 101527 |
| Royal Ins. Company - Insurance Policy No. ED102360 |
| Royal Ins. Company - Insurance Policy No. ED102360 |
| Royal Ins. Company - Insurance Policy No. ED102360 |
| Royal Ins. Company - Insurance Policy No. ED102360 |
| Safety Mutual Casualty Corporation - Insurance Policy No. UF 1192 NJ |
| Seguros La Republica SA - Insurance Policy No. XL 01-0056 |
| Southern American Ins. Company - Insurance Policy No. 04-066 XX800020 |
| Southern American Ins. Company - Insurance Policy No. 800120 |
| Transamerica Premier - Insurance Policy No. 13397727 |
| Transit Casualty Company - Insurance Policy No. SCU 955-064 |
| Transit Casualty Company - Insurance Policy No. SCU 955-424 |
| Transit Casualty Company - Insurance Policy No. SCU 955-425 |
| Transit Casualty Company - Insurance Policy No. SCU 955-426 |

NAI-1540089146

| |
|---|
| Transit Casualty Company - Insurance Policy No. SCU 955-774 |
| Transit Casualty Company - Insurance Policy No. SCU 955-775 |
| Transit Casualty Company - Insurance Policy No. SCU 955-776 |
| Transit Casualty Company - Insurance Policy No. SCU 955-777 |
| Transit Casualty Company - Insurance Policy No. SCU 956-086 |
| Transit Casualty Company - Insurance Policy No. SCU 956-086 |
| Transit Casualty Company - Insurance Policy No. SCU 956-087 |
| Transit Casualty Company - Insurance Policy No. SCU 956-088 |
| Transit Casualty Company - Insurance Policy No. SCU 956-351 |
| Transit Casualty Company - Insurance Policy No. SCU 956-352 |
| UAP - Insurance Policy No. Unknown |
| Union Atlantique d'Assurances S.A. - Insurance Policy No. 7352689 |
| Union Indemnity Ins. Company of New York - Insurance Policy No. UF 11 00 049 |
| Union Indemnity Ins. Company of New York - Insurance Policy No. UF 11 00 088 |
| Union Indemnity Ins. Company of New York - Insurance Policy No. UF 11 00 178 |
| Union Indemnity Ins. Company of New York - Insurance Policy No. UF 11 00 310 |
| Westport/Puritan Ins. Company - Insurance Policy No. ML 65 04 17 |

12

**EXHIBIT H**

**Talc Personal Injury Trust Agreement**

**RED RIVER TALC PERSONAL INJURY TRUST AGREEMENT**

NAI-1538255475

# TABLE OF CONTENTS

**Page**

ARTICLE I        AGREEMENT OF TRUST ...................................................... 3

   1.1    Creation and Name ............................................................... 3

   1.2    Purpose............................................................................... 3

   1.3    Assumption of Talc Claims .................................................. 4

   1.4    Assignment of Defenses to Talc Claims ................................ 4

   1.5    Cash Contributions.............................................................. 5

   1.6    Delivery of Talc PI Note and Related Talc PI Pledge ............. 5

   1.7    Assignment of Imerys/Cyprus Related Rights........................ 6

   1.8    Assignment of Talc Insurance Assets .................................... 6

   1.9    Cooperation Agreement ....................................................... 7

   1.10   Indemnification and Reimbursement Obligations .................. 7

   1.11   Construction ....................................................................... 8

ARTICLE II       POWERS AND TRUST ADMINISTRATION ........................ 9

   2.1    Powers................................................................................ 9

   2.2    General Administration........................................................ 14

   2.3    Claims Administration ......................................................... 20

   2.4    Medicare Reporting Obligations........................................... 20

   2.5    No Common Benefit Fund Payments Shall Be Made ............. 21

ARTICLE III      ACCOUNTS, INVESTMENTS, AND PAYMENTS ................. 21

   3.1    Accounts ............................................................................ 21

   3.2    Investments ........................................................................ 22

   3.3    Source of Payments............................................................. 24

ARTICLE IV      TRUSTEES; DELAWARE TRUSTEE.................................... 25

   4.1    Number .............................................................................. 25

   4.2    Term of Service................................................................... 25

   4.3    Appointment of Successor Trustees....................................... 26

   4.4    No Liability of Trustees, the TAC Members and the FCR....... 27

   4.5    Compensation and Expenses of the Trustees.......................... 27

   4.6    Indemnification of Trustees, the TAC Members, FCR and Others .................... 28

   4.7    Lien ................................................................................... 29

   4.8    Trustees' Employment of Experts and Administrators........................ 30

NAI-1538255475

# TABLE OF CONTENTS
(continued)

**Page**

| | | |
|---|---|---|
| 4.9 | Trustee Independence | 31 |
| 4.10 | No Bond | 32 |
| 4.11 | Delaware Trustee | 32 |
| ARTICLE V | TRUST ADVISORY COMMITTEE | 34 |
| 5.1 | Members | 34 |
| 5.2 | Duties | 35 |
| 5.3 | Term of Office | 36 |
| 5.4 | Appointment of Successors | 37 |
| 5.5 | TAC's Employment of Professionals | 39 |
| 5.6 | Compensation and Expenses of the TAC | 40 |
| ARTICLE VI | THE FCR | 40 |
| 6.1 | Duties | 40 |
| 6.2 | Term of Office | 41 |
| 6.3 | Appointment of Successor | 42 |
| 6.4 | FCR's Employment of Professionals | 42 |
| 6.5 | Compensation and Expenses of the FCR | 43 |
| ARTICLE VII | GENERAL PROVISIONS | 44 |
| 7.1 | Procedures for Consulting with or Obtaining Consent of the TAC, the FCR, the Reorganized Debtor, or J&J | 44 |
| 7.2 | Irrevocability | 47 |
| 7.3 | Term; Termination | 47 |
| 7.4 | Amendments | 49 |
| 7.5 | Severability | 50 |
| 7.6 | Notices | 50 |
| 7.7 | Successors and Assigns | 53 |
| 7.8 | Limitation on Claim Interests for Securities Laws Purposes | 53 |
| 7.9 | Entire Agreement; No Waiver | 54 |
| 7.10 | Headings | 54 |
| 7.11 | Governing Law | 54 |
| 7.12 | Settlors' Representative and Cooperation | 55 |

NAI-1538255475

# TABLE OF CONTENTS
(continued)

**Page**

7.13    Enforcement and Administration ........................................................ 55

7.14    Effectiveness ...................................................................................... 56

7.15    Counterpart Signatures ....................................................................... 56

NAI-1538255475

## RED RIVER TALC PERSONAL INJURY TRUST AGREEMENT

This Red River Talc Personal Injury Trust Agreement (this **"Trust Agreement"**), dated [●], and effective as of the first Business Day following the Confirmation Date, is entered into pursuant to the Prepackaged Chapter 11 Plan of Reorganization of the Debtor [Docket No. [●]] (as may be further amended or modified, the **"Plan"**),[1] by:

(1)    Red River Talc LLC (the **"Debtor"** and, on and after the Effective Date, the **"Reorganized Debtor"**), a Texas limited liability company and the debtor and debtor-in-possession whose Chapter 11 Case, known as *In re: Red River Talc LLC*, is administered in the United States Bankruptcy Court for the [●] District of Texas (**"Bankruptcy Court"**), Case No. [●]-[●] ([●]) (the **"Bankruptcy Case"**);

(2)    Johnson & Johnson, a New Jersey corporation (**"J&J"**);

(3)    Johnson & Johnson Holdco (NA) Inc., a New Jersey corporation that was formerly named [●] Inc. (**"Holdco"**);

(4)    the members (**"TAC Members"**) of the Talc Trust Advisory Committee (the **"TAC"**) identified on the signature pages hereto;

(5)    the FCR (the **"FCR"**);

(6)    the Talc Trustees (the **"Trustees"**) identified on the signature pages hereto; and

(7)    [●] (the **"Delaware Trustee"** and, together with the Debtor, J&J, Holdco, the TAC Members, the FCR, and the Trustees, the **"Parties"**).

---

[1]    All capitalized terms used but not defined herein shall have the definitions set forth in the Plan or the TDP (as defined below), as applicable, and such definitions are incorporated herein by reference. All terms used but not defined herein or in the Plan or the TDP, but defined in the Bankruptcy Code or Bankruptcy Rules, shall have the definitions set forth in the Bankruptcy Code and Bankruptcy Rules, and such definitions are incorporated herein by reference.

1

## <u>RECITALS</u>

**WHEREAS,** the Debtor expects to reorganize pursuant to the Plan; and

**WHEREAS,** the Confirmation Order confirming the Plan pursuant to section 1129 of the Bankruptcy Code has been entered by the District Court; and

**WHEREAS,** the Plan provides for, among other things, the creation of the Talc Personal Injury Trust (the **"Talc Trust"**) pursuant to this Trust Agreement; and

**WHEREAS,** pursuant to the Plan, from and after the Effective Date, the Talc Trust is to use its assets and income to resolve all Channeled Talc Personal Injury Claims (**"Talc Claims"**); and

**WHEREAS,** it is the intent of the Debtor, J&J, Holdco, the TAC Members, the FCR, and the Trustees that the Talc Trust will be administered, maintained and operated at all times through mechanisms that provide reasonable assurance that the Trust will value, and be in a financial position to pay, Talc Claims that involve similar Channeled Talc Personal Injury Claims in substantially the same manner and in accordance with the terms of the Plan, the Confirmation Order, this Trust Agreement, and the Trust Distribution Procedures in the form attached as Exhibit K to the Plan (the **"TDP"**); and

**WHEREAS,** all rights of the holders of Talc Claims arising under this Trust Agreement and the TDP shall vest upon the Effective Date; and

**WHEREAS,** pursuant to the Plan, the Talc Trust is intended to qualify as a "qualified settlement fund" (a **"Qualified Settlement Fund"**) within the meaning of section 1.468B-1 *et seq.* of the Treasury Regulations promulgated under section 468B of the Internal Revenue Code (the **"QSF Regulations"**); and

2

**WHEREAS,** the Bankruptcy Court (and the District Court as applicable) have determined that the Talc Trust and the Plan satisfy all the prerequisites for issuance of an injunction pursuant to sections 524(g), 1123(b)(6), and/or 105(a) of the Bankruptcy Code with respect to any and all Talc Claims, and such injunction has been entered in connection with the Confirmation Order.

<u>**AGREEMENT**</u>

**NOW, THEREFORE,** the Parties hereby agree as follows:

**ARTICLE I**

<u>**AGREEMENT OF TRUST**</u>

1.1     <u>**Creation and Name**</u>.

(a)     The Debtor as settlor ("<u>**Settlor**</u>") hereby creates the Talc Trust, which is to be known as the "Red River Talc Personal Injury Trust."

(b)     It is the intention of the Parties that the Talc Trust constitute a statutory trust under chapter 38 of title 12 of the Delaware Code, 12 Del. C. § 3801 *et seq.* (the "<u>**Act**</u>") and that this Trust Agreement constitute the governing instrument of the Talc Trust.

(c)     The Trustees and the Delaware Trustee are hereby authorized and directed to execute and file a Certificate of Trust with the Delaware Secretary of State in the form attached hereto as <u>Exhibit 1</u>.

1.2     <u>**Purpose**</u>.

(a)     The purpose of the Talc Trust is to assume all liabilities, obligations, and responsibilities for all Talc Claims and, among other things, to:  (i) preserve, hold, manage, and maximize the assets of the Talc Trust; and (ii) direct the processing, liquidation, and, if

3

appropriate, payment of all compensable Talc Claims in accordance with the Plan, the

Confirmation Order, this Trust Agreement, and the TDP.

(b)    The Talc Trust will resolve all Talc Claims in accordance with the Plan,

the Confirmation Order, this Trust Agreement, and the TDP in such a way that holders of Talc

Claims are treated fairly and equitably, and otherwise comply in all respects with the

requirements of a trust set forth in section 524(g)(2)(B)(i) of the Bankruptcy Code.

**1.3    Assumption of Talc Claims.**

(a)    In consideration of the assets delivered, transferred, and assigned to the

Talc Trust pursuant to, and in accordance with, Article IV of the Plan, and in furtherance of the

purposes of the Plan, the Confirmation Order, and the Talc Trust, on the Effective Date, the Talc

Trust shall assume all liabilities, obligations, and responsibilities, financial and otherwise, of the

Reorganized Debtor, J&J, and the other Protected Parties for all Talc Claims (including Indirect

Talc Personal Injury Claims and Talc Personal Injury Demands).  To effectuate the foregoing, on

the Effective Date, the Talc Trust shall execute and deliver an instrument of assignment and

assumption in the form attached hereto as Exhibit 2 (the "**Effective Date Assignment and**

**Assumption Instrument**").

(b)    From and after the Effective Date, other than with respect to obligations to

fund the Trust as set forth in the Plan, the Reorganized Debtor, J&J, and the other Protected

Parties shall have no liability, obligation, or responsibility, financial or otherwise, for any Talc

Claim (including any Indirect Talc Personal Injury Claim and any Talc Personal Injury Demand).

**1.4    Assignment of Defenses to Talc Claims.**

(a)    Pursuant to, and in accordance with, Section 4.8.2 of the Plan, on the

Effective Date, upon assumption by the Talc Trust of liabilities, obligations, and responsibilities

4

for Talc Claims as provided in Section 1.3(a) above, the Reorganized Debtor and J&J shall transfer and assign to the Talc Trust, and the Talc Trust shall accept, Talc Personal Injury Trust Defenses. To effectuate the foregoing, on the Effective Date, each of the Reorganized Debtor, J&J, and the Talc Trust shall execute and deliver the Effective Date Assignment and Assumption Instrument.

      (b)    Pursuant to, and in accordance with Section 4.8.3 of the Plan, from and after the Effective Date, the Talc Trust shall have control over, and the exclusive right to enforce, the Talc Personal Injury Trust Defenses.

    **1.5**    **Cash Contributions**. Pursuant to, and in accordance with, Section 4.9.1 of the Plan:

      (a)    on and after the Effective Date, the Reorganized Debtor shall deliver, or cause to be delivered, to the Talc Trust Talc Trust Cash Contributions in accordance with Exhibit C to the Plan, and the Talc Trust shall accept such Cash Contributions; and

      (b)    on the Effective Date, J&J and Holdco shall execute and deliver to the Talc Trust, and the Talc Trust shall accept and agree to, the Cash Contributions Parent Guarantee in the form attached as Exhibit D to the Plan.

    **1.6**    **Delivery of Talc PI Note and Related Talc PI Pledge**. Pursuant to, and in accordance with, Section 4.9.2 of the Plan, on the Effective Date:

      (a)    the Reorganized Debtor shall execute and deliver to the Talc Trust, and the Talc Trust shall accept and agree to, the Talc PI Note in the form attached as Exhibit J to the Plan; and

(b)     Holdco shall execute and deliver to the Talc Trust, and the Talc Trust shall

accept and agree to, the Talc PI Pledge Agreement in the form of

Exhibit K to the Plan.

**1.7     Assignment of Imerys/Cyprus Related Rights**.  If either (x) the Imerys/Cyprus

Settlement Agreement has not been executed prior to or on the Effective Date or (y) if the

Imerys/Cyprus Settlement Agreement has been executed prior to or on the Effective Date and the

Imerys/Cyprus Settlement Termination Date occurs, whether prior to, on, or following the

Effective Date:

(a)     Pursuant to, and in accordance with, Section 4.9.3 of the Plan, on the

Effective Date or, if later, the Imerys/Cyprus Settlement Termination Date, the Reorganized

Debtor and J&J shall transfer and assign to the Talc Trust, and the Talc Trust shall accept, the

Imerys/Cyprus Related Rights.  To effectuate the foregoing, on the Effective Date, each of the

Reorganized Debtor, J&J, and the Talc Trust shall execute and deliver the Effective Date

Assignment and Assumption Instrument.

(b)     Pursuant to, and in accordance with, Section 4.9.3 of the Plan, from and

after the Effective Date or, if later, the Imerys/Cyprus Settlement Termination Date, the Talc

Trust shall have control over, and the exclusive right to enforce, the Imerys/Cyprus Related

Rights.

**1.8     Assignment of Talc Insurance Assets**.

(a)     Pursuant to, and in accordance with, Section 4.9.4 of the Plan, on the

Effective Date, the Reorganized Debtor shall transfer and assign to the Talc Trust, and the Talc

Trust shall accept, the Talc Insurance Assets.  To effectuate the foregoing, on the Effective Date,

6

each of the Reorganized Debtor and the Talc Trust shall execute and deliver the Effective Date Assignment and Assumption Instrument.

(b)    Pursuant to, and in accordance with, Section 4.9.4 of the Plan, from and after the Effective Date, in consideration of the Reorganized Debtor's obligations under Section 4.9.1, Section 4.9.2, and, if applicable, Section 4.9.3 of the Plan, (i) the Reorganized Debtor, as the agent for and subrogee of the Talc Trust, shall have the exclusive right (A) to pursue and resolve any Talc In-Place Insurance Coverage, (B) to pursue and resolve any Talc Insurance Action, (C) to pursue and obtain any Talc Insurance Recoveries, and (D) to negotiate and enter into any Talc Insurance Settlement Agreement and (ii) any of the following received by the Talc Trust shall be delivered to, and retained by, the Reorganized Debtor, which may thereafter use the same as it may determine in its sole discretion:  (A) all proceeds of Talc In-Place Insurance Coverage; (B) all proceeds or benefits of any Talc Insurance Action; and (C) all amounts payable pursuant to any Talc Insurance Settlement Agreement.

**1.9    Cooperation Agreement.**  Pursuant to, and in accordance with, Section 4.15 of the Plan, on the Effective Date, each of the Reorganized Debtor, J&J, the Custodians, and the Talc Trust shall enter into the Cooperation Agreement substantially in the form of Exhibit E of the Plan.

**1.10    Indemnification and Reimbursement Obligations.**  Pursuant to, and in accordance with, Section 4.16 of the Plan, from and after the Effective Date, the Talc Trust shall indemnify, defend, and hold harmless each of the Reorganized Debtor and the other Protected

NAI-1538255475

Parties (other than, if Section 1.7 above is applicable, the Imerys/Cyprus Parties for claims based on, arising out of, or in any way relating to the Imery/Cyprus Related Rights).

**1.11    Construction**.

(a)    The Trustees may transact the business and affairs of the Talc Trust in the name of the Talc Trust, and references herein to the Talc Trust shall include the Trustees acting on behalf of the Talc Trust.

(b)    In the event of a conflict between the terms or provisions of the Plan and the Confirmation Order, on the one hand, and this Trust Agreement and the TDP, on the other hand, the terms or provisions of the Plan and the Confirmation Order shall control.  In the event of a conflict between the terms or provisions of the Plan, on the one hand, and the Confirmation Order, on the other hand, the terms or provisions of the Confirmation Order shall control.  In the event of a conflict between the terms or provisions of this Trust Agreement, on the one hand, and the TDP, on the other hand, the terms or provisions of this Trust Agreement shall control.

(c)    Nothing in this Trust Agreement or in the TDP shall be construed or implemented in a manner that would cause the Talc Trust to fail to qualify as a Qualified Settlement Fund under the QSF Regulations.  Any issue of interpretation of this Trust Agreement and the TDP shall be resolved in favor of an interpretation that conforms to the QSF Regulations.

(d)    Nothing in this Trust Agreement or in the TDP shall be construed in any way to limit (i) the scope, enforceability, or effectiveness of the Injunctions or (ii) the Talc Trust's assumption of all liabilities, obligations, and responsibilities for all Talc Claims.

(e)    For purposes of this Trust Agreement and the TDP, (i) the words "must," "will," and "shall" are intended to have the same mandatory force and effect, while the word

NAI-1538255475

"may" is intended to be permissive rather than mandatory and (ii) the words "include" and "including" shall be deemed to be followed by the words "without limitation."

(f)    To the extent required by the Act, the beneficial owners (within the meaning of the Act) of the Talc Trust shall be deemed to be the holders of Talc Claims; *provided*, *however*, that (i) the holders of Talc Claims, as such beneficial owners, shall have only such rights with respect to the Talc Trust and its assets as are set forth in the TDP, (ii) such rights shall exist only from and after the Effective Date, and (iii) no greater or other rights, including upon dissolution, liquidation, or winding up of the Talc Trust, shall be deemed to apply to the holders of Talc Claims in their capacity as beneficial owners.

## ARTICLE II

## POWERS AND TRUST ADMINISTRATION

**2.1**   **Powers**.

(a)    The Trustees are and shall act as fiduciaries to the Talc Trust in accordance with the terms and provisions of the Plan, the Confirmation Order, this Trust Agreement, and the TDP. The Trustees shall, at all times, administer the Talc Trust and its assets in accordance with the purposes set forth in Section 1.2 above. Subject to the limitations set forth in this Trust Agreement, the Trustees shall have:

(i)    the power to take any and all actions that, in the reasonable judgment of the Trustees, are necessary or proper to fulfill the purpose of the Talc Trust, including each action required to be taken by the Trustees pursuant to the express terms and provisions of the Plan, the Confirmation Order, this Trust Agreement, and the TDP;

9

(ii)    any power reasonably incidental thereto and not inconsistent with the Plan, the Confirmation Order, this Trust Agreement (including Section 2.2 below), or the TDP; and

(iii)    any trust power now or hereafter permitted under the laws of the State of Delaware.

(b)    Except as required by applicable law or otherwise specified herein or in the TDP, the Trustees need not obtain the order or approval of the Bankruptcy Court or any other court in the exercise of any power or discretion conferred hereunder.

(c)    Without limiting the generality of Section 2.1(a) above, and except as limited by the Plan or the Confirmation Order or otherwise specified herein or in the TDP, the Trustees shall have the power to:

(i)    receive and hold the Cash Contributions, accept and agree to the Cash Contributions Parent Guarantee, the Talc PI Note, and the Talc PI Pledge Agreement, accept the Imerys/Cyprus Related Rights (if Section 1.7 above is applicable) and the Talc Insurance Assets, and enter into the Cooperation Agreement, and perform all obligations and exercise all rights of the Talc Trust with respect to each of them and with respect to the Plan and any other Plan Documents;

(ii)    invest the monies held from time to time by the Talc Trust;

(iii)    enter into leasing and financing agreements with third parties to the extent such agreements are reasonably necessary to permit the Talc Trust to operate;

(iv)    pay liabilities and expenses of the Talc Trust, including without limitation the indemnification and reimbursement obligations set forth in Section 4.16 of the Plan and Section 1.10 of this Trust Agreement;

10

(v)    establish within the Talc Trust estate such accounts and reserves as the Trustees, in their reasonable judgment, deem necessary or proper in carrying out the purpose of the Talc Trust;

(vi)    sue and be sued and participate, as a party or otherwise, in any judicial, administrative, arbitrative, or other proceeding solely in their capacities as the Trustees of the Talc Trust;

(vii)    establish, supervise, and administer the Talc Trust in accordance with the Plan, the Confirmation Order, this Trust Agreement, and the TDP, and the terms hereof and thereof;

(viii)    (A) appoint the Talc Trust Claims Administrator and the Talc Trust Liens Resolution Administrator, (B) engage the Claims Processor, (C) appoint such officers and agents, hire such employees, and engage such Trust Professionals (as defined below) as the Trustees, in their reasonable judgment, deem necessary or proper, in conducting the business (including alternate dispute resolution activities) of the Talc Trust, and (D) delegate to such Persons such powers and authorities as the fiduciary duties of the Trustees permit and as the Trustees, in their reasonable judgment, deem necessary or proper in carrying out the purpose of the Talc Trust;

(ix)    pay reasonable compensation to (A) the Talc Trust Claims Administrator, the Talc Trust Liens Resolution Administrator, and the Claims Processor and (B) the officers, agents, employees, and Trust Professionals appointed, hired, or engaged by the Trustees;

(x)    as provided below, (a) compensate the Trustees and the FCR, (b) reimburse the Trustees, the TAC Members, and the FCR for all reasonable out-of-pocket

11

costs and expenses incurred by them in connection with the performance of their duties

hereunder and (c) reimburse the TAC or the FCR (as applicable) for, or pay directly, the fees and

costs of the TAC Professionals (as defined below) and the FCR Professionals (as defined below);

(xi)     execute, deliver, and perform such other agreements and

instruments as the Trustees, in their reasonable judgment, deem necessary or proper in

administering the Talc Trust, so long as such agreements and instruments are not inconsistent

with the Plan, the Confirmation Order, this Trust Agreement, or the TDP;

(xii)     enter into such other arrangements with third parties as the

Trustees, in their reasonable judgment, deem necessary or proper in carrying out the purpose of

the Talc Trust, so long as such arrangements are not inconsistent with the Plan, the Confirmation

Order, or any other provision of this Trust Agreement;

(xiii)     in accordance with Sections 4.4 and 4.6 below, defend, indemnify,

and hold harmless, and purchase insurance indemnifying, (A) the Trustees, (B) the TAC

Members, (C) the FCR, (D) the Talc Trust Claims Administrator, the Talc Trust Liens

Resolution Administrator, and the Claims Processor, (E) the officers, agents, employees, and

Trust Professionals appointed, hired, or engaged by the Trustees, and (F) the TAC Professionals

and the FCR Professionals (the Persons described in the foregoing clauses (D), (E), and (F) being

referred to herein as the **"Additional Indemnitees"**), to the fullest extent that a statutory trust

organized under the laws of the State of Delaware is from time to time entitled to defend,

indemnify, hold harmless, and/or insure such Persons; *provided*, *however*, that no Person shall be

indemnified in any way for any liability, expense, claim, damage, or loss for which such Person

is liable under Section 4.4 below;

12

(xiv)    consult with the TAC and the FCR at such times and with respect to such issues relating to the purpose, conduct, and affairs of the Talc Trust as the Trustees, in their reasonable judgment, deem necessary or proper in administering the Talc Trust;

(xv)    after the Effective Date, make, pursue (by litigation or otherwise), collect, compromise, or settle, in the name of the Talc Trust, any claim, right, action, or cause of action included in the Talc Personal Injury Trust Defenses or the Imerys/Cyprus Related Rights (if Section 1.7 above is applicable) or which may otherwise accrue in favor of the Talc Trust, before any court of competent jurisdiction;

(xvi)    subject to the written consent of the FCR and a supermajority of the TAC (consisting of not less than 66% of all TAC Members), take action with respect to the common benefit fund established pursuant to that certain Case Management Order No. 7(A) entered by the United States District Court for the District of New Jersey in the multidistrict litigation *In re: Johnson& Johnson Powder Products Marketing, Sales Practices and Products Liability Litigation*, Civil Action No.  3:16-md-02738 (the "**Common Benefit Fund**"); and

(xvii)    exercise any and all other rights, and take any and all other actions as are required or permitted, of the Trustees in accordance with the terms and provisions of the Plan, the Confirmation Order, this Trust Agreement, and the TDP.

(d)    The Trustees shall not have the power to guarantee any debt of other Persons.

(e)    The Trustees shall take all actions required to be taken by the Talc Trustees, and shall cause the Talc Trust to take all actions required to be taken by it, pursuant to the terms and conditions of the Plan, the Confirmation Order, this Trust Agreement, and the TDP.

NAI-1538255475

(f)    The Trustees shall give the TAC and the FCR prompt notice of any act performed or taken pursuant to clause (i), (iii), (vi), or (xvi) of Section 2.1(c) above, and any act proposed to be performed or taken pursuant to Section 2.2(f) below.

2.2    **General Administration**.

(a)    The Trustees shall act in accordance with the Plan, the Confirmation Order,  this Trust Agreement and the TDP.

(b)    The Trustees shall (i) timely file such income tax and other returns and statements required to be filed and shall timely pay all taxes required to be paid by the Talc Trust, (ii) comply with all applicable reporting and withholding obligations, (iii) satisfy all requirements necessary to qualify and maintain qualification of the Talc Trust as a Qualified Settlement Fund within the meaning of the QSF Regulations, and (iv) take no action that could cause the Talc Trust to fail to qualify as a Qualified Settlement Fund within the meaning of the QSF Regulations.  Without limiting the generality of the foregoing, one of the Trustees shall be designated as the "administrator" of the Talc Trust as such term is used in the QSF Regulations, and such Trustee shall take all actions required of him or her as "administrator" with respect to the Talc Trust pursuant to the QSF Regulations.

(c)    Following the Effective Date, the Trustees shall timely account to the Bankruptcy Court as follows:

(i)    The Trustees shall cause to be prepared and filed with the Bankruptcy Court, as soon as available, and in any event within one hundred and twenty (120) days, following the end of each fiscal year, an annual report (the "**Annual Report**") containing financial statements of the Talc Trust (including a balance sheet of the Talc Trust as of the end of such fiscal year and a statement of operations for such fiscal year) audited by a firm of

14

independent certified public accountants selected by the Trustees and accompanied by an opinion

of such firm as to the fairness of the financial statements' presentation of the cash and

investments available for the payment of claims from the Talc Trust.  The Trustees shall provide

a copy of such Annual Report to the TAC, the FCR, the Reorganized Debtor, and J&J when such

report is filed with the Bankruptcy Court.

(ii)     The Trustees shall cause to be prepared and filed with the

Bankruptcy Court simultaneously with the filing of the Annual Report a report (the "**Annual**

**Claims Report**") containing a summary regarding the number and type of claims resolved

during the fiscal year covered by the financial statements contained in the Annual Report.

Without limiting the generality of the foregoing, the Annual Claims Report shall contain

reasonable detail regarding Direct Claims resolved during the applicable fiscal year, including

breakdowns with respect to (A) the types of Direct Claims resolved, (B) the application of (I) the

Expedited Review Process, (II) the Individual Review Process, (III) the Quickpay Review

Process, (IV) the ADR Procedures, and (V) litigation as described in the TDP, and (C) the

average Allowed Claim Amount by (I) type of Direct Claim resolved and (II) specific category

of injury within the applicable Review Criteria.  The Trustees shall provide a copy of such

Annual Claims Report to the TAC, the FCR, the Reorganized Debtor, and J&J when such report

is filed with the Bankruptcy Court.

(iii)     Except as expressly set forth herein, materials filed with the

Bankruptcy Court pursuant to this Section 2.2(c) need not be served on any parties in the

Bankruptcy Case but shall be available for inspection by the public in accordance with

procedures established by the Bankruptcy Court.

(d)      Following the Effective Date, in addition to providing the TAC, the FCR, the Reorganized Debtor, and J&J with the Annual Report and the Annual Claims Report in accordance with Section 2.2(c) above, the Trustees shall prepare and deliver information to the TAC, the FCR, the Reorganized Debtor, and J&J as follows:

(i)      The Trustees shall cause to be prepared and delivered to the TAC, the FCR, the Reorganized Debtor, and J&J together with each Annual Claims Report, a supplement to such Annual Claims Report containing additional detail regarding Direct Claims resolved during the applicable fiscal year, including breakdowns with respect to (A) Claimant's Jurisdiction and (B) counsel to Direct Claimants.

(ii)      The Trustees shall cause to be prepared and delivered to the TAC, the FCR, the Reorganized Debtor, and J&J as soon as practicable, and in any event within forty-five (45) days, following the end of each of the first three fiscal quarters of each fiscal year, (A) a quarterly report (the "**Quarterly Report**") containing unaudited financial statements of the Talc Trust (including a balance sheet of the Talc Trust as of the end of such fiscal quarter and a statement of operations for such fiscal quarter) and (B) a report (the "**Quarterly Claims Report**") containing a summary of the number and type of claims resolved during the fiscal quarter covered by the financial statements contained in the Quarterly Report.  Without limiting the generality of the foregoing, the Quarterly Claims Report shall contain reasonable detail regarding Direct Claims resolved during the applicable fiscal quarter, including breakdowns with respect to (A) the types of Direct Claims resolved, (B) the application of (I) the Expedited Review Process, (II) the Individual Review Process, (III) the Quickpay Review Process, (IV) the ADR Procedures, and (V) litigation as described in the TDP, (C) the average Allowed Claim

16

Amount by (I) type of Direct Claim resolved and (II) specific category of injury within the applicable Review Criteria, (D) Claimant's Jurisdiction, and (E) counsel to Direct Claimants.

(iii)    The Trustees shall cause to be prepared and delivered to the TAC, the FCR, the Reorganized Debtor, and J&J a monthly report (the "**Monthly Status Report**") containing a summary of the status of claims submitted to the Talc Trust on or prior to the last day of the most recently ended month. Without limiting the generality of the foregoing, the Monthly Status Report shall contain reasonable detail regarding Direct Claims, including breakdowns with respect to (A) the types of Direct Claims and (B) specific category of injury within the applicable Review Criteria.

(iv)    The Trustees shall cause to be prepared and delivered to the TAC, the FCR, the Reorganized Debtor, and J&J as soon as practicable, but in any event prior to the commencement of each fiscal year, a budget and cash flow projections covering such fiscal year.

(e)    The Trustees shall consult with the TAC and the FCR on:  (i) the general implementation and administration of the Talc Trust; (ii) the general implementation and administration of the TDP; and (iii) such matters as expressly require consultation with the TAC or the FCR under this Trust Agreement or the TDP.

(f)    In addition to any other consent of the TAC and the FCR expressly required under this Trust Agreement or the TDP, except as otherwise provided in this Trust Agreement or the TDP, the Trustees shall be required to obtain the consent of the TAC and the FCR in order:

(i)    to reduce the number of Trustees as provided in Section 4.1 below;

(ii)    to change any of the following under the TDP:

(A)    the treatment provided under Section 4.2 of the TDP for previously resolved Direct Claims;

17

(B)    the Claim Submission Procedures, including the Claim Submission Requirements;

(C)    the Preliminary Evaluation Criteria;

(D)    the Expedited Review Process, including the Expedited Review Criteria;

(E)    the Individual Review Process, including the Individual Review Criteria;

(F)    the Quickpay Review Process, including the Quickpay Review Criteria;

(G)    the Maximum Value;

(H)    the Cash Value of a Point; or

(I)    the forms of Acceptance and Release;

(J)    the first-in-first-out processing procedures; or

(K)    the first-in-first-out payment procedures;

(iii)    to terminate the Talc Trust pursuant to Section 7.3 below;

(iv)    if Section 1.7 above is applicable, to settle the liability of any Imerys/Cyprus Party in respect of the Imerys/Cyprus Related Rights or any legal action related thereto;

(v)    to change the compensation or expense reimbursement of the TAC, the TAC Members, the FCR, or the Trustees, other than to reflect cost-of-living increases or to reflect changes approved by the Bankruptcy Court as otherwise expressly provided herein;

(vi)    to take actions to minimize any tax on the assets of the Talc Trust; *provided*, *however*, that no such action may be taken if it prevents the Talc Trust from qualifying as a Qualified Settlement Fund within the meaning of the QSF Regulations or requires an election for the Talc Trust to be treated as a grantor trust for tax purposes;

18

(vii)    to amend any provision of this Trust Agreement or the TDP in accordance with the terms hereof or thereof; *provided*, *however*, that no such amendment shall conflict with the Plan or the Confirmation Order;

(viii)    to acquire an interest in, or to merge any claims resolution organization formed by the Talc Trust with, another claims resolution organization that is not specifically created by this Trust Agreement or the TDP, or to contract with another claims resolution organization or other entity that is not specifically created by this Trust Agreement or the TDP, or permit any other party to join in any claims resolution organization that is formed by the Talc Trust pursuant to this Trust Agreement or the TDP; *provided*, *however*, that no such acquisition, merger, contract, or joinder shall (A) subject the Reorganized Debtor or any Protected Party to any risk of having any Talc Claim asserted against it, (B) otherwise jeopardize the validity or enforceability of the Injunctions or any other injunction or release issued or granted in connection with the Plan or the Confirmation Order, (C) permit the surviving organization to make decisions about the allowability and value of claims other than in accordance with the TDP, or (D) cause the Talc Trust to fail to qualify as a Qualified Settlement Fund within the meaning of the QSF Regulations; or

(ix)    to delegate any or all of the authority herein conferred with respect to the investment of all or any portion of the Talc Trust's assets to any one or more investment advisors or investment managers, except as provided in Section 4.4 below.

(g)    The Trustees shall meet with the TAC and the FCR no less often than quarterly.  The Trustees shall meet with the TAC and the FCR between quarterly meetings when so requested by either.  Meetings may be held in person, by video conference, by telephone conference, or by any combination thereof.

19

(h)     The Trustees, upon notice from either the TAC or the FCR, shall at their next meeting with the TAC or the FCR consider issues submitted by the TAC or the FCR.  The Trustees shall keep the TAC and the FCR reasonably informed regarding all aspects of the administration of the Talc Trust.

**2.3**     **Claims Administration**.  Commencing on the Effective Date, the Trustees shall promptly proceed to implement the TDP in accordance with the terms thereof.  In connection with the implementation of the TDP:

(a)     the Trustees, with the consent of the TAC and the FCR, shall prepare and maintain a list of approved mediators that may be used in connection with the ADR Procedures; and

(b)     the Trustees, with the consent of the TAC and the FCR, shall establish the Individual Review Claims Panel.

**2.4**     **Medicare Reporting Obligations.**

(a)     The Talc Trust shall register as a Responsible Reporting Entity **("RRE")** under the reporting provisions of section 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007 (Pub. L. 110-173) (**"MMSEA"**).

(b)     The Talc Trust shall, at its sole expense, timely submit all reports that are required under MMSEA on account of any claims settled, resolved, paid, or otherwise liquidated by the Talc Trust or with respect to contributions to the Talc Trust.  The Talc Trust, in its role as RRE, shall follow all applicable guidance published by the Centers for Medicare & Medicaid Services of the United States Department of Health and Human Services and/or any other agent or successor entity charged with responsibility for monitoring, assessing, or receiving reports

NAI-1538255475

made under MMSEA (collectively, **"CMS"**) to determine whether or not, and, if so, how, to report to CMS pursuant to MMSEA.

(c)    Before remitting funds to claimants' counsel, or to the claimant if such claimant is acting *pro se*, in respect of any Talc Claim, the Trustees shall obtain a certification that such claimant (or such claimant's authorized representative) has or will provide for the payment and/or resolution of any obligations owing or potentially owing under 42 U.S.C. § 1395y(b), or any related rules, regulations, or guidance, in connection with, or relating to, such Talc Claim.

**2.5    No Common Benefit Fund Payments Shall Be Made.**  The Trustees are not authorized to pay, and shall not pay, any common benefit fees or expenses from the Trust, and shall take no action with respect to the Common Benefit Fund, in each case without the written consent of the FCR and a supermajority of the TAC (consisting of not less than 66% of all TAC Members).

## ARTICLE III

## ACCOUNTS, INVESTMENTS, AND PAYMENTS

**3.1    Accounts.**

(a)    The Trustees shall include in the reports to be filed with the Bankruptcy Court and provided to the TAC and the FCR, the Reorganized Debtor, and J&J pursuant to Section 2.2(c)(i) above a reasonably detailed description of the Talc Trust, including (i) the Cash Contributions and other deposits made thereto, (ii) the proceeds of and earnings on the assets held therein, and (iii) the payments made therefrom.

(b)    The Trustees may, from time to time, create such accounts and reserves within the Talc Trust as they, in their reasonable judgment, deem necessary or proper in order to

21

provide for the payment of expenses and Talc Claims and may, with respect to any such account or reserve, restrict the use of monies therein, and the earnings thereon. The Trustees shall include in the reports to be filed with the Bankruptcy Court and provided to the TAC, the FCR, the Reorganized Debtor, and J&J pursuant to Section 2.2(c)(i) above a reasonably detailed description of (i) the creation of any such account or reserve in accordance with this Section 3.1 and (ii) with respect to each such account, (A) the transfers made to such account, (B) the proceeds of or earnings on the assets held in each such account, and (C) the payments made from each such account.

  **3.2** **Investments**.  Investment of monies held in the Talc Trust shall be administered in a manner consistent with the standards set forth in the Uniform Prudent Investor Act, subject to the following limitations and provisions;

    (a) With respect to equity investments, the Talc Trust may invest only in diversified equity portfolios whose benchmark is a broad equity market index such as, but not limited to, the S&P 500 Index, the Russell 1000 Index, the S&P ADR Index, and the MSCI EAFE Index.  The Talc Trust shall not acquire, directly or indirectly, equity in any entity or business enterprise if, immediately following such acquisition, the Talc Trust would hold more than 5% of the equity in such entity or business enterprise.  The Talc Trust shall not hold, directly or indirectly, more than 5% of the equity in any entity or business enterprise.

    (b) The Talc Trust shall not acquire or hold any long-term debt securities unless (i) such securities are rated "Baa" or higher by Moody's, "BBB" or higher by Standard & Poor's (**"S&P"**), or have been given an equivalent investment grade rating by another nationally recognized statistical rating agency, or (ii) have been issued or fully guaranteed as to principal and interest by the United States of America or any agency or instrumentality thereof.  This

22

restriction does not apply to any pooled investment vehicles where pooled assets receive an investment grade rating (*i.e.*, "BBB" rating or above) by a nationally recognized rating agency.

(c)    The Talc Trust shall not acquire or hold for longer than ninety (90) days any commercial paper unless such commercial paper is rated "Prime-l" or higher by Moody's or "A-l" or higher by S&P or has been given an equivalent rating by another nationally recognized statistical rating agency.

(d)    The Talc Trust shall not acquire any debt securities or other debt instruments issued by any entity if, following such acquisition, the aggregate market value of all such debt securities and/or other debt instruments issued by such entity held by the Talc Trust would exceed 5% of the then current aggregate value of the Talc Trust's assets.  There is no limitation on holding debt securities or other debt instruments issued or fully guaranteed as to principal and interest by the United States of America or any agency or instrumentality thereof.

(e)    The Talc Trust shall not acquire or hold any certificates of deposit in an amount exceeding any federal insurance on such certificates of deposit unless all publicly held, long-term debt securities, if any, of the financial institution issuing the certificate of deposit and the holding company, if any, of which such financial institution is a subsidiary, meet the standards set forth in Section 3.2(b) above.

(f)    The Talc Trust may acquire and hold any securities or instruments (i) delivered to the Talc Trust pursuant to the Plan, (ii) obtained by the Talc Trust in accordance with the Talc PI Pledge Agreement, or (iii) obtained by the Talc Trust as proceeds of litigation or otherwise to resolve disputes, in each case without regard to the limitations set forth in Section 3.2 (a) through Section 3.2(e) above.

NAI-1538255475

(g)     The Talc Trust shall not acquire or hold any repurchase obligations unless, in the reasonable judgment of the Trustees, such obligations are adequately collateralized.

(h)     The Talc Trust may allow its investment managers to acquire or hold derivative instruments, including options, futures, and swaps, in the normal course of portfolio management to help hedge, manage, or mitigate portfolio risk, including interest rate risk and equity market risk.  However, using derivative instruments to speculate or to leverage a portfolio at a much greater risk to the portfolio is prohibited.

(i)     The Talc Trust may lend securities on a short-term basis, subject to adequate, normal, and customary collateral arrangements.

(j)     Notwithstanding Section 3.2(a) above, the Talc Trust may acquire and hold an equity interest in a claims resolution organization without limitation as to the size of the equity interest acquired and held if, prior to such acquisition, the Talc Trust obtains the consent of the TAC and the FCR and complies with the other provisions of clause (viii) of Section 2.2(f) above with respect to the acquisition.

**3.3     <u>Source of Payments</u>.**

(a)     Subject to Section 3.4 below and Section 4.9.4(b) of the Plan, all Talc Trust expenses and payments and all liabilities with respect to Talc Claims shall be payable solely by the Talc Trust out of the Talc Trust's assets.  No other Person (including the Debtor, the Reorganized Debtor, or any Protected Party) shall be liable for the payment of any Talc Trust expense or any other liability of the Talc Trust, except to the extent expressly provided for in the Plan (including Section 4.6 and Section 4.9.4(b) of the Plan) or other Plan Document.

(b)     The Trustees shall include in the reports to be filed with the Bankruptcy Court and provided to the TAC, the FCR, the Reorganized Debtor, and J&J pursuant to

24

Section 2.2(c)(i) above a reasonably detailed description of any payments made in accordance with this Section 3.3.

(c)    The Trustees, with the consent of the TAC and the FCR, shall establish and implement billing guidelines applicable to the Trustees, the TAC, and the FCR, as well as (i) the Talc Trust Claims Administrator, the Talc Trust Liens Resolution Administrator, and the Claims Processor and (ii) the respective professionals of the Trustees, the TAC, and the FCR who seek compensation or reimbursement or payment of expenses from the Talc Trust.

## ARTICLE IV

## TRUSTEES; DELAWARE TRUSTEE

**4.1**    **Number.**  In addition to the Delaware Trustee appointed pursuant to Section 4.11, there shall be two (2) Trustees, who initially shall be those individuals named as such on the signature pages hereto.  Upon the joint written direction of the TAC and the FCR, the number of Trustees may be reduced to one (1) at such time as the TAC and the FCR, in their reasonable judgment, may determine.  For the avoidance of doubt, the procedures provided in Section 7.1 shall not apply to the decision of the TAC and the FCR to reduce the number of Trustees; absent the joint written consent of the TAC and the FCR to reduce the number of Trustees, the number of Trustees shall remain as set forth herein.

**4.2**    **Term of Service.**

(a)    The initial Trustees named pursuant to Section 4.1 above shall serve an initial term of service of four or five years as indicated on the signature pages hereto.  Thereafter, each term of service shall be for five (5) years.  The initial Trustees shall serve from the date first written above until the earliest of (i) the end of his or her term, (ii) his or her death, (iii) his or her mandatory retirement at the end of the year in which he or she reaches the age of 70 (unless, and

NAI-1538255475

for so long as, this mandatory retirement requirement is waived with the consent of the TAC and the FCR), (iv) his or her resignation pursuant to Section 4.2(b) below, (v) his or her removal pursuant to Section 4.2(c) below, or (vi) the termination of the Talc Trust pursuant to Section 7.3 below.

(b)     A Trustee may resign at any time by written notice to the TAC and the FCR.  Such notice shall specify a date when such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)     A Trustee may be removed by the Bankruptcy Court, on the motion of the TAC or the FCR in the event that he or she becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence, or for other good cause. Good cause shall be deemed to include any substantial failure to comply with the general administration provisions of Section 2.2 above, a consistent pattern of neglect and failure to perform or participate in performing the duties of a Trustee hereunder, or repeated non-attendance at scheduled meetings.  Such removal shall take effect at such time as the Bankruptcy Court shall determine.

**4.3     <u>Appointment of Successor Trustees</u>.**

(a)     In the event of a vacancy in a Trustee position, whether by term expiration, death, retirement, resignation, or removal, the vacancy shall be filled by the TAC and the FCR.  In the event that the TAC and the FCR cannot agree on the appointment of a successor Trustee, the Bankruptcy Court shall select the successor Trustee.

(b)     Immediately upon the appointment of any successor Trustee, all rights, titles, duties, powers, and authority of the predecessor Trustee hereunder shall be vested in, and undertaken by, the successor Trustee without any further act.  No successor Trustee shall be

26

liable personally for any act or omission of his or her predecessor Trustee.  No successor Trustee shall have any duty to investigate the acts or omissions of his or her predecessor Trustee.

(c)      Each successor Trustee shall serve until the earliest of (i) the end of the term of five (5) years for which he or she was appointed if his or her immediate predecessor Trustee completed his or her term pursuant to Section 4.2(a) above, (ii) the end of the term of the Trustee whom he or she replaced if his or her predecessor Trustee did not complete such term, (iii) his or her death, (iv) his or her mandatory retirement at the end of the year in which the Trustee reaches the age of 70 (unless, and for so long as, this mandatory retirement requirement is waived with the consent of the TAC and the FCR), (v) his or her resignation pursuant to Section 4.2(b) above, (vi) his or her removal pursuant to Section 4.2(c) above, or (vii) the termination of the Talc Trust pursuant to Section 7.3 below.

(d)      Nothing in this Trust Agreement shall prevent the reappointment of an individual serving as a Trustee for one or more additional terms.

**4.4      No Liability of Trustees, the TAC Members and the FCR.**  None of the Trustees, the TAC Members, or the FCR shall be liable to the Talc Trust, to any holder of a Talc Claim, or to any other Person, except in respect of their own acts or omissions that constitute a bad faith violation of the implied contractual covenant of good faith and fair dealing within the meaning of 12 Del. C. § 3806(e).

**4.5      Compensation and Expenses of the Trustees.**

(a)      Each Trustee shall receive a retainer from the Talc Trust for his or her service as a Trustee in the amount of $[●] per annum, paid annually.  Hourly time, as described below, shall first be billed and applied to the annual retainer.  Hourly time in excess of the annual retainer shall be paid by the Talc Trust.  For all time expended as Trustees, including attending

27

meetings, preparing for such meetings, and working on authorized special projects, the Trustees

shall receive the sum of $[●] per hour.  For all non-working travel time in connection with Talc

Trust business, the Trustees shall receive the sum of $[●] per hour.  All time shall be computed

on a decimal (1/10th) hour basis.  The Trustees shall record all hourly time to be charged to the

Talc Trust on a daily basis.  The hourly compensation payable to the Trustees hereunder shall be

reviewed every year by the Trustees and, after consultation with the TAC and the FCR,

appropriately adjusted for changes in the cost of living.

(b)     The Talc Trust will promptly reimburse the Trustees for all reasonable

out-of-pocket costs and expenses incurred by the Trustees in connection with the performance of

their duties hereunder.

(c)     The Talc Trust shall include in the reports to be filed with the Bankruptcy

Court and provided to the TAC, the FCR, the Reorganized Debtor, and J&J pursuant to

Section 2.2(c)(i) above a reasonably detailed description of the amounts paid under this

Section 4.5.

**4.6     <u>Indemnification of Trustees, the TAC Members, FCR and Others</u>.**

(a)     The Talc Trust shall indemnify and defend the Trustees, the TAC

Members, and the FCR in connection with the performance of their duties, and/or actions

undertaken by them, hereunder to the fullest extent that a statutory trust organized under the laws

of the State of Delaware (after the application of Section 7.11) is from time to time entitled to

indemnify and defend such Persons against any and all liabilities, expenses, claims, damages, or

losses incurred by or on behalf of them in connection with the performance of their duties, and/or

actions undertaken by them, hereunder and/or in connection with activities undertaken by them

prior to the date first written above to form and establish the Talc Trust, except in respect of their

28

own acts or omissions that constitute a bad faith violation of the implied contractual covenant of good faith and fair dealing within the meaning of 12 Del. C. § 3806(e).

        (b)    The Talc Trust shall indemnify to the fullest extent permitted by applicable law any of the Additional Indemnitees against any and all liabilities, expenses, claims, damages, or losses incurred by them as a result of their activities in their capacities hereunder.

        (c)    Reasonable expenses, costs, and fees (including attorneys' fees and costs) incurred by or on behalf of the Trustees, a TAC Member, the FCR, or any Additional Indemnitee in connection with any action, suit, or proceeding, whether civil, administrative, or arbitrative, from which such Person is indemnified by the Talc Trust pursuant to Section 1.9 or this Section 4.6, shall be paid by the Talc Trust in advance of the final disposition thereof upon receipt of an undertaking, by or on behalf of such Person, to repay such amount in the event that it shall be determined ultimately by final order that such Person is not entitled to be indemnified by the Talc Trust.

        (d)    The Talc Trust must purchase and maintain reasonable amounts and types of insurance on behalf of each Person who is indemnified by the Talc Trust pursuant to Section 4.6(a) or Section 4.6(b) above, including against liability asserted against or incurred by such Person in connection with the performance of their duties, or actions undertaken by them, hereunder.

    **4.7**   **Lien.**  The Trustees, the TAC Members, the FCR, and the Additional Indemnitees shall have a first priority lien upon the Talc Trust's assets to secure the payment of any amounts payable to them pursuant to Section 4.6 above or any undisputed compensation.

NAI-1538255475

**4.8**    **Trustees' Employment of Experts and Administrators.**

(a)    The Trustees may, but are not required to, retain and consult counsel, accountants, auditors, experts, financial and investment advisors, and such other parties deemed by the Trustees, in their reasonable judgment, to be qualified as experts on the matters submitted to them (the **"Trust Professionals"**) regardless of whether any such party is affiliated with any of the Trustees in any manner.  In the absence of a bad faith violation of the implied contractual covenant of good faith and fair dealing within the meaning of 12 Del. C. § 3806(e), the written opinion of or information provided by any Trust Professional deemed by the Trustees, in their reasonable judgment, to be an expert on the particular matter submitted to such Trust Professional shall be full and complete authorization and protection in respect of any action taken or not taken by the Trustees hereunder in good faith and in accordance with the written opinion of or information provided by such Trust Professional.

(b)    The Trustees, with the consent of the TAC and the FCR, shall appoint a Talc Trust Claims Administrator in accordance with this Section 4.8(b).  Any qualified party may be appointed as such regardless of whether such party is affiliated with any of the Trustees in any manner.  The initial Talc Trust Claims Administrator shall be [ARCHER Systems, LLC],[2] which has been appointed with the consent of the TAC and the FCR.  Any successor Talc Trust Claims Administrator shall be appointed by the Trustees, with the consent of the TAC and the FCR.  In the event that the Trustees cannot agree on a successor Talc Trust Claims Administrator or the TAC and the FCR do not consent, the Bankruptcy Court shall select the successor Talc Trust Claims Administrator.

---

[2]    Subject to competitive pricing and due diligence.

(c)    The Trustees, with the consent of the TAC and the FCR, shall appoint a Talc Trust Liens Resolution Administrator in accordance with this Section 4.8(c).  Any qualified party may be appointed as such regardless of whether such party is affiliated with any of the Trustees in any manner.  The initial Talc Trust Liens Resolution Administrator shall be **[•]**, which has been appointed with the consent of the TAC and the FCR.  Any successor Talc Trust Liens Resolution Administrator shall be appointed by the Trustees, with the consent of the TAC and the FCR.  In the event that the Trustees cannot agree on a successor Talc Trust Liens Resolution Administrator or the TAC and the FCR do not consent, the Bankruptcy Court shall select the successor Talc Trust Liens Resolution Administrator.

(d)    The Trustees, with the consent of the TAC and the FCR, shall engage a Claims Processor in accordance with this Section 4.8(d) to assist in the development of procedures and protocols to implement the TDP effectively and efficiently.  Any qualified party may be engaged as such regardless of whether such party is affiliated with any of the Trustees in any manner.  The initial Claims Processor shall be **[•]**, which has been engaged with the consent of the TAC and the FCR.  Any successor Claims Processor shall be engaged by the Trustees, with the consent of the TAC and the FCR.  In the event that the Trustees cannot agree on a successor Claims Processor or the TAC and the FCR do not consent, the Bankruptcy Court shall select the successor Claims Processor.

**4.9**    **Trustee Independence.**  The Trustees shall not, during the term of their service, hold a financial interest in, act as attorney or agent for, or serve as an officer or as any other professional for the Reorganized Debtor, J&J, or any of their respective Affiliates.  Notwithstanding the foregoing, the Trustees may serve, without any additional compensation other than the compensation to be paid by the Talc Trust pursuant to Section 4.5(a) above, as a

NAI-1538255475

manager of the Reorganized Debtor.  The Trustees shall not act as an attorney, agent, or other professional for any Person who holds a Talc Claim.  For the avoidance of doubt, this Section 4.9 shall not be applicable to the Delaware Trustee.

4.10    **No Bond.**  Neither the Trustees nor the Delaware Trustee shall be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

4.11    **Delaware Trustee.**

(a)    There shall at all times be a Delaware Trustee to serve in accordance with the requirements of the Act.  The Delaware Trustee shall either be (i) a natural person who is at least 21 years of age and a resident of the State of Delaware or (ii) a legal entity that (A) has its principal place of business in the State of Delaware in accordance with section 3807 of the Act, (B) otherwise meets the requirements of applicable Delaware law, and (C) shall act through one or more individuals authorized to bind such entity.  If at any time the Delaware Trustee shall cease to be eligible in accordance with the provisions of this Section 4.11, it shall resign immediately in the manner and with the effect hereinafter specified in Section 4.11(c) below.  For the avoidance of doubt, the Delaware Trustee will only have such rights and obligations as expressly provided by reference to the Delaware Trustee hereunder.

(b)    The Delaware Trustee shall not be entitled to exercise any powers, nor shall the Delaware Trustee have any of the duties and responsibilities of the Trustees set forth herein.  The Delaware Trustee shall be one of the trustees of the Talc Trust for the sole and limited purpose of fulfilling the requirements of section 3807 of the Act and for taking such actions as are required to be taken by a Delaware Trustee under the Act.  The duties (including fiduciary duties), liabilities, and obligations of the Delaware Trustee shall be limited to (i) accepting legal process served on the Talc Trust in the State of Delaware and (ii) the

32

execution of any certificates required to be filed with the Delaware Secretary of State that the

Delaware Trustee is required to execute under section 3811 of the Act (acting solely at the

written direction of the Trustees) and the Delaware Trust shall have no other duties (including

fiduciary duties) or obligations, express or implied, at law or in equity.  To the extent that, at law

or in equity, the Delaware Trustee has duties (including fiduciary duties) and liabilities relating

thereto to the Talc Trust, the other Parties hereto, or any beneficiary of the Talc Trust, it is

hereby understood and agreed by the other Parties hereto that such duties and liabilities are

replaced by the duties and liabilities of the Delaware Trustee expressly set forth in this Trust

Agreement.

(c)    The Delaware Trustee shall serve until such time as the Trustees remove

the Delaware Trustee or the Delaware Trustee resigns, and a successor Delaware Trustee is

appointed by the Trustees in accordance with the terms of Section 4.11(d) below.  The Delaware

Trustee may resign at any time upon the giving of at least sixty (60) days' advance written notice

to the Trustees; *provided*, *however*, that such resignation shall not become effective unless and

until a successor Delaware Trustee shall have been appointed by the Trustees in accordance with

Section 4.11(d) below.  If the Trustees do not act within such 60-day period, the Delaware

Trustee may apply to the Court of Chancery of the State of Delaware for the appointment of a

successor Delaware Trustee.

(d)    Upon the resignation or removal of the Delaware Trustee, the Trustees

shall appoint a successor Delaware Trustee by delivering a written instrument to the outgoing

Delaware Trustee.  Any successor Delaware Trustee must satisfy the requirements of

section 3807 of the Act.  Any resignation or removal of the Delaware Trustee and appointment

of a successor Delaware Trustee shall not become effective until a written acceptance of

appointment is delivered by the successor Delaware Trustee to the outgoing Delaware Trustee and the Trustees and any undisputed fees and expenses due to the outgoing Delaware Trustee are paid.  Following compliance with the preceding sentence, the successor Delaware Trustee shall become fully vested with all of the rights, powers, duties, and obligations of the outgoing Delaware Trustee under this Trust Agreement, with like effect as if originally named as Delaware Trustee, and the outgoing Delaware Trustee shall be discharged of its duties and obligations under this Trust Agreement.

(e)     The Delaware Trustee shall neither be required nor permitted to attend meetings relating to the Talc Trust.

(f)     The Delaware Trustee shall be paid such compensation as agreed to pursuant to a separate fee agreement.

(g)     The Talc Trust will promptly reimburse the Delaware Trustee for all reasonable out-of-pocket costs and expenses incurred by the Delaware Trustee in connection with the performance of their duties hereunder.

(h)     The Delaware Trustee shall be permitted to retain counsel only in such circumstances as required in the exercise of its obligations hereunder, and compliance with the advice of such counsel shall be full and complete authorization and protection for actions taken or not taken by the Delaware Trustee in good faith in compliance with such advice.

## ARTICLE V

## TRUST ADVISORY COMMITTEE

5.1    **Members.**  The TAC shall consist of five (5) TAC Members if no official committee is appointed in the Bankruptcy Case and seven (7) TAC Members if an official committee is appointed in the Bankruptcy Case.  In either case, five (5) TAC Members shall be

34

appointed as follows:  (a) one (1) TAC Member (the "**Andrews & Thornton Appointee**") shall be appointed by Andrews & Thornton, Attorneys At Law, A Law Corporation ("**Andrews & Thornton**"); (b) one (1) TAC Member (the "**Pulaski Kherkher Appointee**") shall be appointed by Pulaski Kherkher, PLLC ("**Pulaski Kherkher**"); (c) one (1) TAC Member (the "**Watts Appointee**") shall be appointed by Watts Law Firm LLP ("**Watts**"); (d) one (1) TAC Member (the "**Onder Appointee**") shall be appointed by OnderLaw, LLC ("**Onder**"); and (e) one (1) TAC Member (the "**Nachawati Appointee**" and, together with the Andrews & Thornton Appointee, the Pulaski Kherkher Appointee, the Watts Appointee, and the Onder Appointee, the "**AHC Appointees**") shall be appointed by Nachawati Law Group, PLLC ("**Nachawati**" and, together with Andrews & Thornton, Pulaski Kherkher, Watts, and Onder, the "**AHC Appointing Firms**").  If an official committee is appointed in the Bankruptcy Case, two (2) TAC Members (each, a "**TCC Appointee**") shall be appointed by a majority vote of the members of such official committee.  The initial TAC shall consist of the TAC Members named as such on the signature pages hereto.

　　　　5.2　　**Duties.**  The TAC Members shall serve in a fiduciary capacity, representing the interests of all holders of Existing Direct Claims.  The TAC Members shall have no fiduciary obligations or duties to any Party or Person other than the holders of Existing Direct Claims.  The Trustees must consult with the TAC on matters expressly identified in Section 2.2(e) above and in other provisions of this Trust Agreement and the TDP and must obtain the consent of the TAC on matters expressly identified in Section 2.2(f) above and in other provisions of this Trust Agreement and the TDP.  Except for the duties and obligations expressed in this Trust Agreement and the documents referenced herein (including the TDP), the TAC and the TAC Members shall have no other duties (including fiduciary duties) or obligations, express or

implied, at law or in equity. To the extent that, at law or in equity, the TAC or the TAC Members have duties (including fiduciary duties) and liabilities relating thereto to the Talc Trust, the other Parties hereto, or any beneficiary of the Talc Trust, it is hereby understood and agreed by the other Parties hereto that such duties and liabilities are replaced by the duties and liabilities of the TAC and the TAC Members expressly set forth in this Trust Agreement and the documents referenced herein (including the Plan, the Confirmation Order, and the TDP).

**5.3    Term of Office.**

(a)    The initial TAC Members appointed in accordance with Section 5.1 above shall serve the staggered three-, four-, or five-year terms as indicated on the signature pages hereto. Thereafter, each term of office shall be five (5) years. Each TAC Member shall serve until the earlier of (i) his or her death, (ii) his or her resignation pursuant to Section 5.3(b) below, (iii) his or her removal pursuant to Section 5.3(c) below, (iv) the end of his or her term as provided above, or (v) the termination of the Talc Trust pursuant to Section 7.3 below.

(b)    A TAC Member may resign at any time by written notice to the Trustees, the other TAC Members, and the FCR. Such notice shall specify a date when such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)    A TAC Member may be removed in the event that he or she becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence, or a consistent pattern of neglect and failure to perform or to participate in performing the duties of a TAC Member hereunder, such as repeated non-attendance at scheduled meetings, or for other good cause. Such removal may be made by the Bankruptcy Court on the motion of a majority of the other TAC Members.

36

5.4    **Appointment of Successors.**

(a)    In the event of a TAC Member vacancy, (i) if the vacancy has occurred with respect to the Andrews & Thornton Appointee, Andrews & Thornton shall appoint a successor TAC Member, (ii) if the vacancy has occurred with respect to the Pulaski Kherkher Appointee, Pulaski Kherkher shall appoint a successor TAC Member, (iii) if the vacancy has occurred with respect to the Watts Appointee, Watts shall appoint a successor TAC Member, (iv) if the vacancy has occurred with respect to the Onder Appointee, Onder shall appoint a successor TAC Member, (v) if the vacancy has occurred with respect to the Nachawati Appointee, Nachawati shall appoint a successor TAC Member, and (vi) if the vacancy has occurred with respect to a TCC Appointee, the remaining TCC Appointee shall appoint a successor TAC Member; *provided*, *however*, that, if a successor TAC Member is not appointed in accordance with the preceding provisions of this Section 5.4(a) within thirty (30) days following the occurrence of such vacancy, (A) if such vacancy relates to the Andrews & Thornton Appointee, Pulaski Kherkher, Watts, Onder, and Nachawati shall appoint the successor TAC Member, (B) if such vacancy relates to the Pulaski Kherkher Appointee, Andrews & Thornton, Watts, Onder, and Nachawati shall appoint the successor TAC Member, (C) if such vacancy relates to the Watts Appointee, Andrews & Thornton, Pulaski Kherkher, Onder, and Nachawati shall appoint the successor TAC Member, (D) if such vacancy relates to the Onder Appointee, Andrews & Thornton, Pulaski Kherkher, Watts, and Nachawati shall appoint the successor TAC Member, (E) if such vacancy relates to the Nachawati Appointee, Andrews & Thornton, Pulaski Kherkher, Watts, and Onder shall appoint the successor TAC Member, and (F) if such vacancy relates to a TCC Appointee, the Trustees shall appoint the successor TAC Member; *provided further*, *however*, that, if a successor TAC Member is not appointed in accordance with the preceding

37

provisions of this Section 5.4(a) within sixty (60) days following the occurrence of such vacancy, the Bankruptcy Court may appoint the successor TAC Member on motion of the Trustees. Any appointment of a successor TAC Member in accordance with the foregoing sentence (other than appointment by the Bankruptcy Court) shall be subject to the consent of at least fifty percent (50%) of the TAC Members in place following the occurrence of such vacancy; *provided*, *however*, that if such consent is withheld, the party seeking to appoint such successor TAC Member may seek a ruling from the Bankruptcy Court that the consent was unreasonably withheld and that the successor TAC Member is appointed.

(b)    Nothing in this Trust Agreement shall prevent the reappointment of an individual serving as a TAC Member for an additional term, and there shall be no limit on the number of terms that a TAC Member may serve.

(c)    Each successor TAC Member shall serve until the earlier of (i) the end of the full term for which he or she was appointed, (ii) the end of the term of the TAC Member whom he or she replaced if his or her predecessor TAC Member did not complete such term, (iii) his or her death, (iv) his or her resignation pursuant to Section 5.3(b) above, (v) his or her removal pursuant to Section 5.3(c) above, or (vi) the termination of the Talc Trust pursuant to Section 7.3 below.

(d)    No successor TAC Member shall be liable personally for any act or omission of his or her predecessor TAC Member. No successor TAC Member shall have any duty to investigate the acts or omissions of his or her predecessor TAC Member. No TAC Member shall be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

NAI-1538255475

**5.5**      **TAC's Employment of Professionals.**

(a)     The TAC may, but is not required to, retain and consult counsel, accountants, auditors, experts, financial and investment advisors, and such other parties deemed by the TAC to be qualified to assist the TAC in connection with its rights or duties as may be requested on the matters submitted to them (the **"TAC Professionals"**).  The TAC and the TAC Professionals shall at all times have complete access to the Trustees' and the Talc Trust's officers, agents, and employees, as well as to any Trust Professionals, and shall also have complete access to all non-privileged information generated by them or otherwise available to the Talc Trust or the Trustees.  In the absence of a bad faith violation of the implied contractual covenant of good faith and fair dealing within the meaning of 12 Del. C. § 3806(e), the written opinion of or information provided by any TAC Professional or Trust Professional deemed by the TAC to be an expert on the particular matter submitted to such TAC Professional or Trust Professional shall be full and complete authorization and protection in respect of any action taken or not taken by the TAC and the TAC Members in good faith and in accordance with the written opinion or other advice or information provided by such TAC Professional or Trust Professional.

(b)     The Talc Trust shall promptly reimburse the TAC for, or if so instructed, pay directly for the benefit of the TAC, all reasonable fees and costs of the TAC Professionals retained and consulted by the TAC pursuant to this Section 5.5.

(c)     In the event that the TAC retains counsel in connection with any matter, whether or not related to any claim that has been or might be asserted against the TAC or the TAC Members and irrespective of whether the Talc Trust pays such counsel's fees and related expenses, any communications between the TAC and such counsel shall be deemed to be within

39

the attorney-client privilege and protected by section 3333 of title 12 of the Delaware Code, regardless of whether such communications are related to any claim that has been or might be asserted by or against the TAC or the TAC Members and regardless of whether the Talc Trust pays such counsel's fees and related expenses.

      **5.6**    **Compensation and Expenses of the TAC.**  The TAC Members shall not be entitled to compensation for their services, but the Talc Trust will promptly reimburse each TAC Member for, or, if so instructed, pay directly for the benefit of such TAC Member, all reasonable out-of-pocket costs or expenses incurred by such TAC Member in connection with the performance of his or her duties hereunder including without limitation the premiums of any liability insurance policy the TAC Members obtain to cover the TAC Members' duties and actions in connection with the Talc Trust.  Such reimbursement or direct payment shall be deemed a Talc Trust Expense.  The Talc Trust shall include a description of the amounts reimbursed or paid under this Section 5.6 in the Annual Report to be filed with the Bankruptcy Court and provided to the TAC, the FCR, the Reorganized Debtor, and J&J pursuant to Section 2.2(c)(i).

**ARTICLE VI**

**THE FCR**

      **6.1**    **Duties.**  The initial FCR shall be the individual identified as such on the signature pages hereto.  He or she shall serve in a fiduciary capacity, representing the interests of the holders of future Talc Claims for the purpose of protecting the rights of such Persons.  The FCR shall have no fiduciary obligations or duties to any Party or Person other than holders of future Talc Claims.  The Trustees must consult with the FCR on matters expressly identified in Section 2.2(e) above and in other provisions of this Trust Agreement or the TDP and must obtain

40

the consent of the FCR on matters expressly identified in Section 2.2(f) above and in other provisions of this Trust Agreement and the TDP.  Except for the duties and obligations expressed in this Trust Agreement and the documents referenced herein (including the TDP), the FCR shall have no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity.  To the extent that, at law or in equity, it is determined that the FCR has duties (including fiduciary duties) and liabilities relating thereto to the Talc Trust, the other Parties hereto, or any beneficiary of the Talc Trust, it is hereby understood and agreed by the other Parties hereto that such duties and liabilities are replaced by the duties and liabilities of the FCR expressly set forth in this Trust Agreement and the documents referenced herein (including the Plan, and Confirmation Order, and the TDP).

### 6.2 <u>Term of Office</u>.

(a)    The FCR shall serve until the earlier of (i) his or her death, (ii) his or her resignation pursuant to Section 6.2(b) below, (iii) his or her removal pursuant to Section 6.2(c) below, or (iv) the termination of the Talc Trust pursuant to Section 7.3 below.

(b)    The FCR may resign at any time by written notice to the Trustees and the TAC.  Such notice shall specify a date when such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)    The FCR may be removed in the event that he or she becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence, or a consistent pattern of neglect and failure to perform or to participate in performing the duties hereunder, such as repeated non-attendance at scheduled meetings, or for other good cause.  Such removal may be made by the Trustees with consent of the TAC, or by the Bankruptcy Court on the motion of the Trustees or the TAC.

NAI-1538255475

**6.3**    **Appointment of Successor.**

(a)    A vacancy caused by resignation or death of the FCR shall be filled with an individual nominated by the FCR prior to the effective date of such resignation or death. A vacancy caused by removal of the FCR based on inability of the FCR to discharge his or her duties due to accident, physical deterioration, or mental incompetence shall be filled with an individual nominated by the FCR prior to such inability. In the event (i) a vacancy was caused as provided above and the FCR did not nominate his or her successor as provided above or (ii) a vacancy was caused by removal of the FCR for other reasons, the successor FCR shall be selected by the Trustees in consultation with the TAC.

(b)    No successor FCR shall be liable personally for any act or omission of his or her predecessor. No successor FCR shall have any duty to investigate the acts or omissions of his or her predecessor. No FCR shall be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

**6.4**    **FCR's Employment of Professionals.**

(a)    The FCR may, but is not required to, retain and consult counsel, accountants, auditors, experts, financial and investment advisors, and such other parties deemed by the FCR to be qualified to assist the FCR in connection with his or her duties as may be requested on the matters submitted to them (the **"FCR Professionals"**). The FCR and the FCR Professionals shall at all times have complete access to the Trustees' and the Talc Trust's officers, agents, and employees, as well as to any Trust Professionals, and shall also have complete access to all non-privileged information generated by them or otherwise available to the Talc Trust or the Trustees. In the absence of a bad faith violation of the implied contractual covenant of good faith and fair dealing within the meaning of 12 Del. C. § 3806(e), the written

NAI-1538255475

opinion of or information provided by any FCR Professional or Trust Professional deemed by the

FCR to be an expert on the particular matter submitted to such FCR Professional or Trust

Professional shall be full and complete authorization and protection in respect of any action

taken or not taken by the FCR in good faith and in accordance with the written opinion or other

advice or information provided by such FCR Professional or Trust Professional.

(b)      The Talc Trust shall promptly reimburse the FCR for, or, if so instructed,

pay directly for the benefit of the FCR, all reasonable fees and costs of the FCR Professionals

retained and consulted by the FCR pursuant to this Section 6.4.

(c)      In the event that the FCR retains counsel in connection with any matter,

whether or not related to any claim that has been or might be asserted against the FCR and

irrespective of whether the Talc Trust pays such counsel's fees and related expenses, any

communications between the FCR and such counsel shall be deemed to be within the attorney-

client privilege and protected by section 3333 of title 12 of the Delaware Code, regardless of

whether such communications are related to any claim that has been or might be asserted by or

against the FCR and regardless of whether the Talc Trust pays such counsel's fees and related

expenses.

**6.5**      **Compensation and Expenses of the FCR.**  The FCR shall receive compensation

from the Talc Trust in the form of payment at the FCR's normal hourly rate for services

performed, as such may be adjusted from time to time.  The Talc Trust will promptly reimburse

the FCR for, or, if so instructed, pay directly for the benefit of the FCR, all reasonable out-of-

pocket costs and expenses incurred by the FCR in connection with the performance of his or her

duties hereunder including without limitation the premiums of any liability insurance policy the

FCR obtains to cover the FCR's duties and actions in connection with the Talc Trust.  Such

reimbursement or direct payment shall be deemed a Talc Trust expense.  The Talc Trust shall include a description of the amounts reimbursed or paid under this Section 6.5 in the Annual Report to be filed with the Bankruptcy Court and provided to the TAC, the FCR, the Reorganized Debtor, and J&J pursuant to Section 2.2(c)(i).

## ARTICLE VII

## GENERAL PROVISIONS

7.1 **Procedures for Consulting with or Obtaining Consent of the TAC, the FCR, the Reorganized Debtor, or J&J.**

(a)    In the event the Trustees are expressly required to consult with the TAC, the FCR, the Reorganized Debtor, or J&J pursuant to any provision of this Trust Agreement (including without limitation Section 2.2(e) above) or the TDP, the following procedures shall apply:

(i)    The Trustees shall provide the TAC, the FCR, the Reorganized Debtor, or J&J (as applicable) with written advance notice of the matter under consideration and the scope of the action the Trustees propose to take along with all relevant information concerning the matter as is reasonably practicable under the circumstances.  The Trustees shall also provide the TAC, the FCR, the Reorganized Debtor, or J&J (as applicable) with such reasonable access to the Talc Trust's officers, agents, and employees, as well as any Trust Professionals, as the TAC, the FCR, the Reorganized Debtor, or J&J (as applicable) may reasonably request during the time that the Trustees are considering such matter, and shall also provide the TAC, the FCR, the Reorganized Debtor, or J&J (as applicable) the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such matter with the Trustees.

44

(ii)    In determining when to take definitive action on any matter subject to the consultation process set forth in this Section 7.1(a), the Trustees shall take into consideration the time required for the TAC, the FCR, the Reorganized Debtor, or J&J (as applicable), if they so wish, to retain and consult with their own advisors as to such matter.  In any event, the Trustees shall not take definitive action on any such matter until at least ten (10) Business Days after providing the TAC, the FCR, the Reorganized Debtor, or J&J (as applicable) with the initial written notice that such matter is under consideration by the Trustees, unless such period is waived by the TAC, the FCR, the Reorganized Debtor, or J&J (as applicable).

(b)    In the event the Trustees are expressly required to obtain the consent of the TAC, the FCR, the Reorganized Debtor, or J&J (as applicable) pursuant to any other provision of this Trust Agreement (including without limitation Section 2.2(f) above) or the TDP, the following procedures shall apply:

(i)    The Trustees shall provide the TAC, the FCR, the Reorganized Debtor, or J&J (as applicable) with a written notice stating that their consent is being sought pursuant to that provision, describing in detail the nature and scope of the action the Trustees propose to take and explaining in detail the reasons why the Trustees desire to take such action. The Trustees shall provide the TAC, the FCR, the Reorganized Debtor, or J&J (as applicable) with as much relevant additional information concerning the proposed action as is reasonably practicable under the circumstances.  The Trustees shall also provide the TAC, the FCR, the Reorganized Debtor, or J&J (as applicable) with such reasonable access to the Talc Trust's officers, agents, and employees, as well as any Trust Professionals, as the TAC, the FCR, the Reorganized Debtor, or J&J (as applicable) may reasonably request during the time that the Trustees are considering such action, and shall also provide the TAC, the FCR, the Reorganized

45

Debtor, or J&J (as applicable) the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such action with the Trustees.

(ii)    The TAC, the FCR, the Reorganized Debtor, or J&J (as applicable) must advise the Trustees in writing of their consent or objection to the proposed action within ten (10) Business Days of receiving the original request for consent from the Trustees, or within such additional time as the Trustees, the TAC, the FCR, the Reorganized Debtor, or J&J (as applicable) may agree.  If the TAC, the FCR, the Reorganized Debtor, or J&J (as applicable) does not advise the Trustees in writing of its consent or objection to the proposed action within ten (10) Business Days of receiving notice regarding such request (or any additional time period agreed to as provided above), then consent of the TAC, the FCR, the Reorganized Debtor, or J&J (as applicable) to the proposed action shall be deemed to have been affirmatively granted.

(iii)    The TAC and the FCR may not unreasonably withhold, delay, or condition their consent hereunder.  If the TAC or the FCR decides to withhold consent, they must explain in reasonable detail their objection to the proposed action.  If, after following the procedures specified in this Section 7.1(b), the TAC or the FCR continues to object to the proposed action and to withhold its consent to the proposed action, the Trustees and the TAC or the FCR (as applicable) shall resolve their dispute pursuant to Section 7.13.  The TAC or the FCR (as applicable) shall have the burden of proving that it reasonably withheld its consent.  If the TAC or the FCR (as applicable) meets that burden, the Talc Trust shall then have the burden of showing why it should be permitted to take the proposed action notwithstanding the reasonable objection of the TAC or the FCR (as applicable).

(iv)    Each of the Reorganized Debtor and J&J may withhold its consent hereunder in its sole and absolute discretion.

NAI-1538255475

**7.2**   **Irrevocability.**  To the fullest extent permitted by applicable law, the Talc Trust is irrevocable.

**7.3**   **Term; Termination.**

(a)   The term for which the Talc Trust is to exist shall commence on the date of the filing of the Certificate of Trust and shall terminate pursuant to the provisions of Section 7.3(b) through Section 7.3(d) below.

(b)   The Talc Trust shall automatically dissolve on (i) the date on which the Confirmation Order is vacated by the Bankruptcy Court or (ii) if the Effective Date shall have occurred, the date ninety (90) days after the first occurrence of any of the following events (as applicable, the **"Dissolution Date"**):

(i)   the date on which the Trustees decide, with the consent of the TAC and the FCR, to dissolve the Talc Trust because (A) the Trustees, in their reasonable judgment, deem it unlikely that new Talc Claims will be filed against the Talc Trust, (B) all Talc Claims duly filed with the Talc Trust have been liquidated and paid or otherwise resolved, and (C) twelve (12) consecutive months have elapsed during which no new Talc Claim has been filed with the Talc Trust;

(ii)   if the Trustees, with the consent of the TAC and the FCR,  have procured and have in place irrevocable insurance policies and have established claims handling agreements and other necessary arrangements with suitable third parties adequate to discharge all expected remaining obligations and expenses of the Talc Trust in a manner consistent with this Trust Agreement and the TDP, the date on which the Bankruptcy Court enters an order approving such insurance and other arrangements and such order becomes a Final Order; or

NAI-1538255475

(iii)    to the extent that any rule against perpetuities shall be deemed applicable to the Talc Trust, the date on which twenty-one (21) years less ninety-one (91) days pass after the death of the last survivor of all the descendants of the late Joseph P. Kennedy, Sr., father of the late President John F. Kennedy, living on the date hereof.

(c)    If the Effective Date shall have occurred, on the Dissolution Date (or as soon thereafter as is reasonably practicable), after the wind-up of the Talc Trust's affairs by the Trustees and payment of all the Talc Trust's liabilities has been provided for as required by applicable law including Section 3808 of the Act, all monies remaining in the Talc Trust shall be given to charitable organization(s) exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code, which tax-exempt organization(s) shall be selected by the Trustees in their reasonable discretion; *provided*, *however*, that (i) if practicable, the activities of the selected tax-exempt organization(s) shall be related to the treatment of, research on the cure of, or other relief for individuals suffering from, ovarian cancer, or other gynecological disease and (ii) the tax-exempt organization(s) shall not bear any relationship to the Reorganized Debtor within the meaning of section 468B(d)(3) of the Internal Revenue Code.  Notwithstanding any contrary provision of any Plan Document, this Section 7.3(c) cannot be modified or amended.

(d)    Following the dissolution and, if the Effective Date shall have occurred, distribution of the assets of the Talc Trust, the Talc Trust shall terminate and the Trustees and the Delaware Trustee (acting solely at the written direction of the Trustees) shall execute and cause a Certificate of Cancellation of the Certificate of Trust of the Talc Trust to be filed in accordance with the Act.  Notwithstanding anything to the contrary contained in this Trust Agreement, the existence of the Talc Trust as a separate legal entity shall continue until the filing of such Certificate of Cancellation.

48

**7.4**    **Amendments.**

(a)    Prior to the Effective Date, this Trust Agreement may be modified or amended only by mutual agreement of the Parties.  From and after the Effective Date, the Trustees, subject to the consent of the TAC and the FCR, may modify or amend this Trust Agreement (except with respect to Section 7.3(c), which by its own terms is expressly not subject to modification or amendment); *provided*, *however*, that with respect to any requirement in this Trust Agreement that consent of the TAC be made pursuant to a supermajority of the TAC, any modification or amendment of such supermajority requirement shall be subject to the consent of a supermajority of the TAC (consisting of not less than 66% of all TAC Members). From and after the Effective Date, the Trustees, subject to the consent of the TAC and the FCR, may modify or amend the TDP; *provided*, *however*, that no modification or amendment to the TDP shall be inconsistent with the provisions of the TDP limiting amendments or modifications to the TDP.  Any modification or amendment made pursuant to this Section 7.4 must be in writing.

(b)    Notwithstanding anything contained in this Trust Agreement or the TDP to the contrary:

(i)    Neither this Trust Agreement, the TDP, nor any document annexed hereto or thereto shall be modified or amended in any way that could jeopardize, impair, or modify:  (A) the applicability of section 524(g), section 1123(b)(6) and/or section 105 of the Bankruptcy Code to the Plan, the Confirmation Order, or the Talc Trust; (B) the enforceability, the scope, or the terms of the discharge, releases, injunctions, and exculpation included in Article XI of the Plan; or  (C) the Talc Trust's status as a Qualified Settlement Fund within the meaning of the QSF Regulations.

(ii)     Any modification or amendment of this Trust Agreement affecting the rights, duties, immunities, or liabilities of the Delaware Trustee shall require the Delaware Trustee's written consent.

(iii)     Any modification or amendment of this Trust Agreement or the TDP affecting the rights of the Reorganized Debtor or J&J, including rights with respect to (A) the applicability of section 524(g), section 1123(b)(6) and/or section 105 of the Bankruptcy Code to the Plan, the Confirmation Order, or the Talc Trust; (B) the enforceability, the scope, or the terms of the discharge, releases, injunctions, and exculpation included in Article XI of the Plan; or (C) the Talc Trust's status as a Qualified Settlement Fund within the meaning of the QSF Regulations, shall require the written consent of the Reorganized Debtor or J&J (as applicable).  For the avoidance of doubt, any modification or amendment to clause (i) or clause (iii) of this Section 7.4(b) shall require the written consent of the Reorganized Debtor and J&J.

**7.5     Severability.**  Should any provision in this Trust Agreement be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any other provision of this Trust Agreement.

**7.6     Notices.**

(a)     Notices to Persons asserting claims shall be given by first class mail, postage prepaid, at the address of such Person, or, where applicable, such Person's representative, in each case as provided on such Person's claim form submitted to the Talc Trust in accordance with the TDP with respect to his or her Talc Claim, or by such other means, including electronic notice, as may be implemented by the Trustees, with the consent of the TAC and the FCR.

NAI-1538255475

(b)    Any notices or other communications required or permitted hereunder to the following Parties shall be in writing and delivered to the addresses or email addresses designated below, or to such other addresses or email addresses as may hereafter be furnished in writing to each of the other Parties listed below in compliance with the terms hereof.

To the Talc Trust or the Trustees:

> Red River Talc Personal Injury Trust
> c/o
> Scott Freeman
> 1775 Saint James Place #200
> Houston, TX 77056
>
> Fouad Kurdi
> 30 Monument Square, Suite 245
> Concord, MA 01742

With a copy to:

> [•]

To the TAC or the TAC Members:

> Andrews & Thornton
> 4701 Von Karman Ave. Suite 300
> Newport Beach, CA 92660
> Attn:   Anne Andrews
> Email:  aa@andrewsthornton.com
>
> Pulaski Kherkher, PLLC
> 2925 Richmond Avenue, Suite 1725
> Houston, TX 77098
> Attn:   Adam Pulaski
> Email:  adam@pulaskilawfirm.com
>
> Watts Law Firm LLP
> 811 Barton Springs Road #725
> Austin, TX 78704
> Attn:   Mikal Watts
> Email:  mikal@wattsllp.com
>
> OnderLaw, LLC
> 110 E. Lockwood Ave
> St. Louis, MO 63119

Attn:   James Onder
Email:  Onder@onderlaw.com

Nachawati Law Group
5489 Blair Road
Dallas, TX 75231
Attn:   Majed Nachawati
Email: mn@ntrial.com

[●]

With a copy to:

[●]

To the FCR:

[●]

With a copy to:

[●]

To the Debtor or the Reorganized Debtor:

[●]

With a copy to:

Jones Day
2727 N. Harwood Street
Dallas, Texas  75201
Attention:   Dan Prieto
Email:        dbprieto@jonesday.com

To J&J or Holdco:

c/o Johnson & Johnson
One Johnson & Johnson Plaza
New Brunswick, New Jersey  08933
Attention:   [●]
Email:        [●]

NAI-1538255475

With copies to:

> Barnes & Thornburg LLP
> 2029 Century Park East
> Suite 300
> Los Angeles, California  90067
> Attention:  Jim Murdica
> Email:        jmurdica@btlaw.com
>
> and
>
> White & Case LLP
> 1221 Avenue of Americas
> New York, New York  10020
> Attention:  Jessica C. Lauria (Boelter)
> Email:        jessica.boelter@whitecase.com

To the Delaware Trustee;

> [•]

(c)      All such notices and communications if mailed shall be effective when physically delivered at the designated addresses or, if electronically transmitted, when the communication is received at the designated addresses and confirmed by the recipient by return transmission.

**7.7**     **Successors and Assigns.**  The provisions of this Trust Agreement shall be binding upon and inure to the benefit of the Trustees, the TAC Members, the FCR, the Debtor, the Reorganized Debtor, J&J, and Holdco and their respective successors and assigns, except that none of them may assign or delegate any of their rights or obligations under this Trust Agreement except:  (a) in the case of the Trustees, in accordance with Section 4.3 above; (b) in the case of the TAC Members, in accordance with Section 5.4 above; and (c) in the case of the FCR, in accordance to Section 6.3 above.

**7.8**     **Limitation on Claim Interests for Securities Laws Purposes.**  Talc Claims and any interests therein:  (a) shall not be assigned, conveyed, hypothecated, pledged, or otherwise

NAI-1538255475

transferred, voluntarily or involuntarily, directly or indirectly, except by will or under the laws of descent and distribution; (b) shall not be evidenced by a certificate or other instrument; (c) shall not possess any voting rights; and (d) shall not be entitled to receive any dividends or interest; *provided*, *however*, that the foregoing clause (a) shall not apply to subrogation resulting from payments made by a third party in respect of such Talc Claim.

7.9    **Entire Agreement; No Waiver.**  The entire agreement of the Parties relating to the subject matter of this Trust Agreement is contained herein and in the documents referred to herein (including the Plan), and this Trust Agreement and such documents supersede any prior oral or written agreements concerning the subject matter hereof.  No failure to exercise or delay in exercising any right, power, or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power, or privilege hereunder preclude any further exercise thereof or of any other right, power, or privilege.  The rights and remedies herein provided are cumulative and are not exclusive of rights under law or in equity.

7.10    **Headings**.  The headings used in this Trust Agreement are inserted for convenience only and do not constitute a portion of this Trust Agreement, nor in any manner affect the construction of the provisions of this Trust Agreement.

7.11    **Governing Law.**  The validity and construction of this Trust Agreement and all amendments hereto and thereto shall be governed by the laws of the State of Delaware, and the rights of all Parties hereto and the effect of every provision hereof shall be subject to and construed according to the laws of the State of Delaware without regard to the conflicts of law provisions thereof that would purport to apply the law of any other jurisdiction; *provided*, *however*, that the Parties hereto intend that the provisions hereof shall control and there shall not be applicable to the Talc Trust, this Trust Agreement, or the Parties, any provision of the laws

54

(statutory or common) of the State of Delaware pertaining to trusts that relate to or regulate in a manner inconsistent with the terms hereof:  (a) the filing with any court or governmental body or agency of Trustees accounts or schedules of Trustees fees and charges; (b) affirmative requirements to post bonds for the Trustees, officers, agents, employees, or professionals of a trust; (c) the necessity for obtaining court or other governmental approval concerning the acquisition, holding, or disposition of real or personal property; (d) fees or other sums payable to the Trustees, officers, agents, employees, or professionals of a trust; (e) the allocation of receipts and expenditures to income or principal; (f) restrictions or limitations on the permissible nature, amount, or concentration of trust investments or requirements relating to the titling, storage, or other manner of holding of trust assets; (g) the existence of rights or interests (beneficial or otherwise) in trust assets; (h) the ability of beneficial owners or other Persons to terminate or dissolve a trust; or (i) the establishment of fiduciary or other standards or responsibilities or limitations on the acts or powers of the Trustees or beneficial owners that are inconsistent with the limitations on liability or authorities and powers of Trustees, the Delaware Trustee, the TAC, the TAC Members, or the FCR set forth or referenced in this Trust Agreement.  Section 3540 of the Act shall not apply to the Talc Trust.

       **7.12**   <u>**Settlors' Representative and Cooperation.**</u>  The Debtor is hereby irrevocably designated as the Settlor and is hereby authorized to take any action required of the Settlor by the Trustees in connection with the Trust Agreement.  The Reorganized Debtor agrees to cooperate in implementing the goals and objectives of this Trust Agreement at the sole expense of the Talc Trust.

       **7.13**   <u>**Enforcement and Administration.**</u>  The provisions of this Trust Agreement and the TDP shall be enforced by the Bankruptcy Court pursuant to the Plan and the Confirmation

Order.  The Parties hereby acknowledge and agree that the Bankruptcy Court shall have continuing exclusive jurisdiction over the settlement of the accounts of the Trustees and over any disputes that arise under this Trust Agreement or the TDP.

**7.14**     **Effectiveness.**  This Trust Agreement shall not become effective until the later of (a) the Confirmation Date and (b) the date on which this Trust Agreement has been executed and delivered by all the Parties hereto.

**7.15**     **Counterpart Signatures.**  This Trust Agreement may be executed in any number of counterparts and by different Parties on separate counterparts, and each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute one and the same instrument.  Electronic signatures and original signatures delivered electronically, in PDF or otherwise, shall be deemed to be original signatures.

[Remainder of page intentionally left blank]

NAI-1538255475

IN WITNESS WHEREOF, the Parties have executed this Trust Agreement as of the date
first written above.

**SETTLOR:**

**RED RIVER TALC LLC**

By: _____
Name: _____
Title: _____

**JOHNSON & JOHNSON**

By: _____
Name: _____
Title: _____

**JOHNSON & JOHNSON HOLDCO (NA) INC.**

By: _____
Name: _____
Title: _____

**TRUSTEES**                                    **DELAWARE TRUSTEE:**
[●]

_____        By: _____
Name:  Scott Freeman                           Name:_____
Expiration Date of Initial Term:               Title:_____
[●] anniversary of the date first written above


_____
Name:  Fouad Kurdi
Expiration Date of Initial Term:
[●] anniversary of the date first written above

**INITIAL TALC TRUST ADVISORY
COMMITTEE MEMBERS**

Andrews & Thornton Appointee:                    First TCC Appointee:


_____          _____
Name:  Anne Andrews                              **Name:  [●]**
Expiration Date of Initial Term:  [●]            **Expiration Date of Initial Term:  [●]**
anniversary of the date first written above      anniversary of the date first written above


Pulaski Kherkher Appointee:                       Second TCC Appointee:


_____          _____
Name:  Adam Pulaski                              **Name:  [●]**
Expiration Date of Initial Term:  [●]            **Expiration Date of Initial Term:  [●]**
anniversary of the date first written above      anniversary of the date first written above


Watts Appointee:


_____
Name:  Mikal C. Watts
Expiration Date of Initial Term:  [●]
anniversary of the date first written above


Onder Appointee:


_____
Name:  James G. Onder
Expiration Date of Initial Term:  [●]
anniversary of the date first written above


Nachawati Appointee:


_____
Name:  Majed Nachawati
Expiration Date of Initial Term:  [●]
anniversary of the date first written above

**FCR**

_____
Name:  Randi S. Ellis

**Exhibit 1**

Certificate of Trust

See attached.

# CERTIFICATE OF TRUST

## OF

## RED RIVER TALC PERSONAL INJURY TRUST

This Certificate of Trust of the Red River Talc Personal Injury Trust (this "**Trust**") is being executed and filed by the undersigned, as the trustees of the Trust, to form a statutory trust under the Delaware Statutory Trust Act (12 Del. Code, § 3801 et. seq.) (the "**Act**").

1.     **Name.**  The name of the statutory trust formed hereby is Red River Talc Personal Injury Trust.

2.     **Delaware Trustee.**  The name and business address of the trustee of the Trust in the State of Delaware are [●].

3.     **Effective Date.**  This Certificate of Trust shall be effective upon filing.

[Remainder of page intentionally left blank]

IN WITNESS WHEREOF, the undersigned have duly executed this Certificate of Trust in accordance with section 3811(a) of the Act.

**RED RIVER TALC PERSONAL INJURY TRUST**

By: _____
Name: Scott Freeman, solely as Trustee,
      and not in his/her individual capacity

By: _____
Name: Fouad Kurdi, solely as Trustee,
      and not in his/her individual capacity

**Exhibit 2**

Effective Date Assignment and Assumption Instrument

See attached.

## INSTRUMENT OF ASSIGNMENT AND ASSUMPTION

This Instrument of Assignment and Assumption (this "**Instrument**"), dated [●], is entered into by (1) Red River Talc LLC, a Texas limited liability company (the "**Reorganized Debtor**"), (2) Johnson & Johnson, a New Jersey corporation ("**J&J**"), and (3) the Red River Talc Personal Injury Trust (the "**Talc Trust**" and, together with the Reorganized Debtor, J&J, and Holdco, the "**Parties**") established pursuant to the Red River Talc Personal Injury Trust Agreement dated [●] (the "**Trust Agreement**"), as contemplated by Section 1.3(a), Section 1.4(a), Section 1.7(a) and Section 1.8(a) of the Trust Agreement.  All capitalized terms used but not defined herein shall have the definitions set forth (or incorporated by reference) in the Trust Agreement.

1.    **Effective Date.**  Each of the Parties hereby acknowledges that the Effective Date has occurred.

2.    **Talc Claims.**  As contemplated by Section 1.3(a) of the Trust Agreement, pursuant to, and in accordance with, Section 4.8.1 of the Plan, the Talc Trust hereby assumes all liabilities, obligations, and responsibilities, financial and otherwise, of the Reorganized Debtor and the other Protected Parties for all Talc Claims (including Indirect Talc Personal Injury Claims and Talc Personal Injury Demands).

3.    **Talc Personal Injury Trust Defenses.**  As contemplated by Section 1.4(a) of the Trust Agreement, pursuant to, and in accordance with, Section 4.8.2 of the Plan, the Reorganized Debtor and J&J hereby transfer and assign to the Talc Trust, and the Talc Trust hereby accepts, the Talc Personal Injury Trust Defenses.

4.    **Imerys/Cyprus Related Rights.**  If Section 1.7(a) of the Trust Agreement is applicable, as contemplated by such Section 1.7(a), pursuant to, and in accordance with, Section 4.9.3 of the Plan, the Reorganized Debtor and J&J hereby transfer and assign to the Talc Trust,

and the Talc Trust hereby accepts, the Imerys/Cyprus Related Rights, effective as of the Effective Date or, if later, the Imerys/Cyprus Settlement Termination Date (without the need for any further action by the Reorganized Debtor, J&J, the Talc Trust, or any other Person).

5.  **Talc Insurance Assets.**  As contemplated by Section 1.8(a) of the Trust Agreement, pursuant to, and in accordance with, Section 4.9.4 of the Plan, the Reorganized Debtor hereby transfer and assigns to the Talc Trust, and the Talc Trust hereby accepts, the Talc Insurance Assets.

6.  **Construction.**  This Instrument is being executed solely to give effect to the transactions contemplated by the Plan, the Confirmation Order, and the Trust Agreement.  Nothing in this Instrument, express or implied, is intended to, or will be construed to, modify, expand, or limit in any way the terms of the Plan, the Confirmation Order, and the Trust Agreement.

7.  **Governing Law.**  The validity and construction of this Instrument shall be governed by the laws of the State of Delaware, and the rights of all Parties and the effect of every provision hereof shall be subject to and construed according to the laws of the State of Delaware without regard to the conflicts of law provisions thereof that would purport to apply the law of any other jurisdiction.

8.  **Counterparts.**  This Instrument may be executed in any number of counterparts and by different Parties on separate counterparts, and each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute one and the same instrument. Electronic signatures or original signatures delivered electronically, in PDF or otherwise, shall be deemed to be original signatures.

[Remainder of page intentionally left blank]

2

       IN WITNESS WHEREOF, the Parties have executed this Instrument as of the date first written above.


**RED RIVER TALC LLC**


By: _____
Name: _____
Title: _____


**JOHNSON & JOHNSON**


By: _____
Name: _____
Title: _____


**RED RIVER TALC PERSONAL INJURY TRUST**


By: _____
Name: Scott Freeman, solely as Trustee, and
       not in his/her individual capacity


By: _____
Name: Fouad Kurdi, solely as Trustee, and
       not in his/her individual capacity

NAI-1538255475

**EXHIBIT I**

**Talc PI Note**

THIS NOTE HAS BEEN ISSUED PURSUANT TO SECTION 1145 OF THE U.S. BANKRUPTCY CODE, WHICH PROVIDES AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT OF 1933, AS AMENDED, AND APPLICABLE STATE STATUTES.

### SECURED NON-RECOURSE NOTE

[●]

This SECURED NON-RECOURSE NOTE (this "Note") is issued pursuant to the Prepackaged Chapter 11 Plan of Reorganization (the "Plan") of Red River Talc LLC, debtor in the chapter 11 case captioned *In re: Red River Talc LLC*, Case No. [●] ([●]) pending in the United States Bankruptcy Court for the [●] District of Texas. All capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to them in the Plan.

Red River Talc LLC, a Texas limited liability company ("Maker"), hereby promises to pay the RED RIVER TALC TALC PERSONAL INJURY TRUST (together with its successors and registered assigns, "Payee") the principal sum of $400,000,000.00 on the terms set forth herein.

SECTION 1.    Payments in Cash.  All payments to be made to Payee under this Note shall be made in the lawful money of the United States of America in immediately available funds to the following trust account established and maintained by Payee to hold Talc Personal Injury Trust:

[●]

SECTION 2.    Security.  This Note is secured by a pledge of 100% of the ownership interests in Maker, pursuant to that certain pledge agreement, executed by New Holdco in favor of Payee (the "Pledge Agreement"), as further described therein and subject to the terms thereof.

SECTION 3.    Optional Prepayments.  Maker may, at any time and from time to time, prepay all or any portion of this Note in accordance with Section 1 above.

SECTION 4.    Payment at Maturity.  Maker shall repay all outstanding amounts due under this Note on or before the later of (a) the seventh anniversary of the Petition Date and (b) the first anniversary of the Effective Date (the "Maturity Date").  In any event, the entire principal balance of this Note shall be due and payable on the Maturity Date.

SECTION 5.    Non-Recourse Obligations; Payment Default.  If Maker fails to pay the principal balance of this Note on the Maturity Date (a "Payment Default"), then Payee shall be permitted to exercise its rights under the Pledge Agreement.  Payee's sole remedy for nonpayment hereunder shall be to exercise its rights under the Pledge Agreement with respect to the Pledged Collateral (as defined therein).  Payee shall only have recourse to the Pledged Collateral for payment of this Note, and no other assets of Maker shall be subject to levy,

execution, or other enforcement procedure for satisfaction or payment of amounts owing under this Note.

SECTION 6.    Interest.  This Note will bear no interest.

SECTION 7.    Partial Payments.  Any payment of this Note that is made in an amount less than the aggregate amount of the entire principal balance shall reduce the principal amount.

SECTION 8.    Record of Payment; Business Day.  Payee shall record the amount of any payment received by it hereunder and the applicable dates with respect thereto, by such method as Payee may generally employ, and such records of Payee shall be rebuttably presumptive evidence of the amounts that remain owing and unpaid hereunder; *provided*, *however*, that failure to make any such entry shall in no way affect Maker's obligations hereunder.  Whenever any payment to be made hereunder is due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day.

SECTION 9.    Notices.  Any notice or other communication hereunder shall be by hand delivery, overnight delivery via nationally recognized overnight delivery service, or registered or certified United States mail with return receipt, postage prepaid, addressed to the receiving party at its address specified below (or at any other address that the receiving party may hereafter specify to the delivering party in writing), and unless otherwise provided herein shall be deemed to have been given or made when delivered or, if sent via United States mail, when the return receipt therefor is signed by the receiving party:

Payee:      Red River Talc Personal Injury Trust
            [•]
            [•]
            Attention:  [•]

Maker:      Red River Talc LLC
            [•]
            [•]
            Attention:  [•]

SECTION 10.    Governing Law.  This Note shall be deemed a contract made under the laws of the State of Texas without regard to principles of conflicts of laws.

SECTION 11.    Severability.  If any one or more of the provisions contained in this Note are invalid, illegal, or unenforceable in any respect, the validity, legality, or enforceability of all the remaining provisions will not in any way be affected or impaired.  If any one or more provisions contained in this Note are deemed invalid, illegal, or unenforceable because of their scope or breadth, such provisions shall be reformed and replaced with provisions whose scope and breadth are valid under applicable law.

SECTION 12.    Assignment; Note Register.  This Note shall bind Maker and Maker's successors and assigns and shall inure to the benefit of Payee and its successors and assigns. This Note may be assigned, in whole or in part, by Payee and Payee shall provide written notice of any such assignment to Maker.  Maker shall maintain a written register setting forth the name

2

and address of Payee and each of its assigns, and the amounts owing to each hereunder.  This Note may be assigned, in whole or in part, by Maker, but Maker shall not be relieved of any of its obligations hereunder.

SECTION 13.   <u>Tax Forms</u>.  By accepting this Note, Payee (including any assignee thereof) agrees to deliver to Maker upon or prior to its receipt of this Note, a duly completed Internal Revenue Service Form W-9 (or applicable Form W-8) establishing a complete exemption from withholding tax, including backup withholding tax, and to subsequently provide to Maker an updated form upon the obsolescence or invalidity of any previously delivered form.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

NAI-1539839717

IN WITNESS WHEREOF, Maker has executed and delivered this Note on the date first written above.

RED RIVER TALC LLC

By:_____
Name:_____
Title:_____

The foregoing is agreed to and accepted as of the date first written above by the following:

RED RIVER TALC PERSONAL INJURY TRUST

By:_____
Name:_____
Title:_____

*[Signature Page to Talc PI Note]*

NAI-1539839717

**EXHIBIT J**

**Talc PI Pledge Agreement**

This PLEDGE AGREEMENT, dated as of [●] (as amended, amended and restated, supplemented, or otherwise modified from time to time in accordance with the provisions hereof, this "<u>Agreement</u>"), made by JOHNSON & JOHNSON HOLDCO (NA) INC., a New Jersey corporation, as pledgor (in such capacity and together with any successors and assigns in such capacity, "<u>Pledgor</u>"), in favor of the RED RIVER TALC PERSONAL INJURY TRUST (together with its successors and assigns, "<u>Payee</u>").

## RECITALS

A.      Red River Talc LLC, a Texas limited liability company ("<u>Maker</u>"), has entered into that certain Secured Non-Recourse Note, dated as of date hereof (as amended, amended and restated, supplemented, or otherwise modified from time to time, the "<u>Note</u>"), in favor of Payee.

B.      This Agreement is given by Pledgor in favor of Payee to secure the payment of all of the Secured Obligations (as defined below).

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Pledgor and Payee hereby agree as follows:

ARTICLE I
DEFINED TERMS

SECTION 1.1      <u>Certain Terms Defined in UCC</u>.  Unless otherwise defined herein, capitalized terms used herein that are defined in the UCC have the meanings assigned to them in the UCC.

SECTION 1.2      <u>Certain Terms Defined in Note</u>.  Unless otherwise defined herein, capitalized terms used herein that are not defined in the UCC have the meanings ascribed to them in the Note.

SECTION 1.3      <u>Terms Defined Herein</u>.  The following terms used herein have the following meanings:

"<u>Additional Pledged Ownership Interests</u>" means any additional ownership interests in Maker, or options, warrants or similar rights to acquire additional ownership interests in Maker, in each case together with all rights, privileges and powers relating thereto under any Organizational Document of Maker, and the certificates, instruments and agreements representing the same, if any, acquired by Pledgor after the date hereof.

"<u>Business Day</u>" means any day other than a Saturday, a Sunday, or a day on which commercial banks in Dallas, Texas are authorized or obligated by law, executive order or regulation to be closed.

"<u>Distributions</u>" means any dividends, distributions, returns of capital, or other property, including cash and securities (debt or equity), from time to time received or receivable by Pledgor

in respect of, or in exchange for, any of the Securities Collateral, including as a result of a revision, reclassification or other like change of the Securities Collateral.

"Initial Pledged Ownership Interests" means the outstanding ownership interests in Maker, representing a 100% share of the profits and losses of Maker and of the right to receive Distributions of Maker's assets, together with all rights, privileges and powers relating thereto under any Organizational Document, held by Pledgor on the date hereof.

"Organizational Documents" means the certificate of formation and limited liability company agreement of Maker.

"Pledged Ownership Interests" means, collectively, the Initial Pledged Ownership Interests and the Additional Pledged Ownership Interests.

"Secured Obligations" means all payment obligations due and owing to Payee by Maker under the Note.

"Securities Collateral" means, collectively, the Pledged Ownership Interests and the Successor Interests.

"Successor Interests" means any ownership interests or options, warrants, or similar rights to acquire ownership interests in any successor limited liability company, corporation, partnership, or other entity formed by or resulting from any consolidation or merger in which Maker or other issuer of the Pledged Ownership Interests is involved but does not survive.

"UCC" means the Uniform Commercial Code as in effect from time to time in the State of Texas.

## ARTICLE II
## GRANT OF SECURITY AND SECURED OBLIGATIONS

SECTION 2.1  Grant of Security Interest.  As collateral security for the payment in full of all the Secured Obligations, Pledgor hereby pledges and grants to Payee, a lien on and security interest in and to all of the right, title and interest of Pledgor in, to and under the following property, wherever located, whether now existing or hereafter arising or acquired from time to time (collectively, the "Pledged Collateral"):

(a)    all Securities Collateral; and

(b)    all Proceeds of the Securities Collateral.

SECTION 2.2  UCC Filings.  Pledgor hereby irrevocably authorizes Payee at any time and from time to time to file in Pledgor's jurisdiction of formation an initial financing statement (and any continuation statement in respect thereof or amendment thereto) that contains the information required by Article 9 of the Uniform Commercial Code of such jurisdiction for the filing of any financing statement, continuation statement, or amendment covering only the Pledged Collateral.

NAI-1539839717

ARTICLE III
PERFECTION; SUPPLEMENTS; FURTHER ASSURANCES;
USE OF PLEDGED COLLATERAL

SECTION 3.1    Delivery of Certificated Securities Collateral.  Pledgor represents and warrants that there are no certificates, agreements, or instruments representing or evidencing the Securities Collateral in existence on the date hereof.  Pledgor shall, upon obtaining any certificates, agreements or instruments representing or evidencing Securities Collateral after the date hereof, accept the same for the benefit of Payee and promptly (and in any event within ten Business Days) deliver such certificates, agreement, or instruments to Payee.  Any certificated Securities Collateral, if any, shall be in suitable form for transfer by delivery or shall be accompanied by duly executed instruments of transfer or assignment in blank, all in form and substance reasonably satisfactory to Payee.

SECTION 3.2    Supplements; Further Assurances.  Pledgor shall take such further actions, and execute and deliver to Payee such additional assignments, agreements, supplements, powers, and instruments, as Payee may in its reasonable judgment deem necessary, wherever required by applicable law, in order to perfect the security interest in the Pledged Collateral as provided herein and/or permit Payee to exercise and enforce its rights, powers, and remedies hereunder with respect to any Pledged Collateral.

ARTICLE IV
CERTAIN PROVISIONS CONCERNING SECURITIES COLLATERAL

SECTION 4.1    Pledge of Additional Securities Collateral.  Pledgor shall, upon obtaining any Securities Collateral after the date hereof, accept the same for the benefit of Payee and promptly (and in any event within ten Business Days thereafter) deliver to Payee any certificates, agreements, or instruments representing or evidencing such Securities Collateral in accordance with Section 3.1 above.

SECTION 4.2    Voting Rights; Distributions.  Unless a Payment Default has occurred and is continuing and Payee has delivered notice to Pledgor providing that its rights under clauses (a) or (b) below shall cease:

(a)    Pledgor shall be entitled to exercise any and all voting and other consensual rights pertaining to the Securities Collateral or any part thereof for any purpose not inconsistent with the terms or purposes hereof; and

(b)    Pledgor shall be entitled to receive and retain, upon receipt, and to utilize free and clear of the lien hereof, any and all Distributions; *provided*, *however*, that any and all such Distributions in the form of Securities Collateral shall be accepted for the benefit of Payee and any certificates, agreements, or instruments representing or evidencing such Securities Collateral shall promptly (and in any event within ten Business Days thereafter) delivered to Payee in accordance with Section 3.1 above.

NAI-1539839717

ARTICLE V
REMEDIES

Upon the occurrence and during the continuance of any Payment Default, Payee may from time to time exercise in respect of the Pledged Collateral, in addition to the other rights and remedies provided for herein or otherwise available to it, the following remedies:

(a)     sell, assign, or otherwise liquidate, or direct Pledgor to sell, assign or otherwise liquidate, any and all Pledged Collateral or any part thereof, and take possession of the proceeds of any such sale, assignment, or liquidation;

(b)     receive, retain, and apply any Distributions to the Secured Obligations;

(c)     exercise any and all rights as beneficial and legal owner of the Pledged Collateral, including perfecting assignment of and exercising any and all voting, consensual, and other rights and powers with respect to any Pledged Collateral; and

(d)     exercise any other rights and remedies of a secured party on default under the UCC (whether or not the UCC applies to the affected Pledged Collateral).

ARTICLE VI
MISCELLANEOUS

SECTION 6.1   Continuing Security Interest; Assignment.  This Agreement shall create a continuing security interest in the Pledged Collateral and shall (a) be binding upon Pledgor and its successors and assigns and (b) inure, together with the rights and remedies of Payee hereunder, to the benefit of Payee and each of its successors and assigns under the Note.  No other person or entity (including any other creditor of Pledgor) shall have any interest herein or any right or benefit with respect hereto.

SECTION 6.2   Termination Release.  This Agreement shall terminate and the Pledged Collateral shall be released from the lien of this Agreement when the Secured Obligations shall have been paid in full.  Upon termination hereof, the security interests granted hereby shall terminate and all rights to the Pledged Collateral shall revert to Pledgor or to such other person  or entity as may be entitled thereto pursuant to any applicable law.  Upon termination hereof, Payee shall promptly, upon the written request and at the sole cost and expense of Pledgor, (a) file (or authorize Pledgor or its designee to file) amendments to all financing statements filed pursuant to Section 2.2 above, which amendments shall terminate such financing statements and (b) assign, transfer, and deliver to Pledgor, against receipt and without recourse to or warranty by Payee except to the extent that Payee has not assigned or otherwise transferred its security interest in the Pledged Collateral, all of the Pledged Collateral as may be in possession of Payee and shall not have been applied in satisfaction of the Secured Obligations.

SECTION 6.3   Modification in Writing.  No amendment, modification, supplement, termination, or waiver of or to any provision hereof, nor consent to any departure by Pledgor therefrom, shall be effective unless in writing and signed by Payee and Pledgor.  Any amendment, modification, or supplement of or to any provision hereof, any waiver of any provision hereof and any consent to any departure by Pledgor from the terms of any provision hereof shall be effective

4

only in the specific instance and for the specific purpose for which made or given. Except where notice is specifically required by this Agreement, no notice to or demand on Pledgor in any case shall entitle Pledgor to any other or further notice or demand in similar or other circumstances.

SECTION 6.4    Notices.    Unless otherwise provided herein, any notice or other communication herein required or permitted to be given shall be given in the manner and become effective as set forth in the Note, as to Pledgor, addressed to it at the address of Maker set forth in the Note and as to Payee, addressed to it at the address set forth in the Note, or in each case at such other address as shall be designated by such party in a written notice to the other party complying as to delivery with the terms of this Section 6.4.

SECTION 6.5    Governing Law.    This Agreement shall be deemed a contract made under the laws of the State of Texas without regard to principles of conflicts of laws.

SECTION 6.6    Severability of Provisions.    Any provision hereof which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

SECTION 6.7    Execution in Counterparts.    This Agreement and any amendments, waivers, consents, or supplements hereto may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed to be an original, but all such counterparts together shall constitute one and the same agreement. Delivery of an executed counterpart of a signature page of this Agreement by electronic transmission shall be effective as delivery of a manually executed counterpart of this Agreement.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, Pledgor and Payee have caused this Pledge Agreement to be duly executed and delivered by their duly authorized officers as of the date first above written.

JOHNSON & JOHNSON HOLDCO (NA) INC., as Pledgor

By: _____

Name: _____

Title: _____

RED RIVER TALC PERSONAL INJURY TRUST, as Payee

By: _____

Name: _____

Title: _____

**EXHIBIT K**

**Trust Distribution Procedures**

**TRUST DISTRIBUTION PROCEDURES**

**FOR**

**RED RIVER TALC PERSONAL INJURY TRUST**

NAI-1539103334

# TABLE OF CONTENTS

**Page**

Article 1    INTRODUCTION AND OVERVIEW ................................................. 1

1.1    Purpose............................................................................................. 1

1.2    Vesting of Rights ............................................................................. 1

1.3    Exclusivity ....................................................................................... 1

1.4    General Principles ............................................................................ 1

Article 2    INTERPRETATION AND DEFINITIONS ...................................... 2

2.1    Interpretation .................................................................................... 2

2.2    Definitions......................................................................................... 2

Article 3    TDP ADMINISTRATION ................................................................. 11

3.1    General Administration..................................................................... 11

    3.1.1    Coordination ......................................................................... 11

    3.1.2    Consultation and Consent ..................................................... 11

3.2    Review of Costs ................................................................................ 11

3.3    Publication of Claim Submission Procedures................................... 12

3.4    Adoption of Procedures for Notice of Trust Determinations............. 12

3.5    Adoption of Procedures for Execution and Delivery of Acceptance and
       Release .............................................................................................. 12

3.6    Potential Adoption of Procedures for Other Disease Talc Personal Injury
       Claims ............................................................................................... 12

Article 4    ALLOWANCE PROCESS FOR DIRECT CLAIMS ......................... 13

4.1    Single Direct Claim Limitation........................................................ 13

4.2    Treatment of Previously Resolved Direct Claims ............................. 13

    4.2.1    Direct Claims Previously Released and Paid.............................. 13

    4.2.2    Direct Claims Subject to the Terms of a Master Settlement
             Agreement............................................................................... 14

    4.2.3    Individual Direct Claims Previously Rejected or Dismissed........ 15

    4.2.4    Direct Claims Subject to Final Judgment ................................... 15

    4.2.5    Direct Claims Subject to Appealable Judgment ......................... 16

4.3    Claim Submission Materials............................................................. 16

4.4    Claim Submission Deadlines............................................................ 16

    4.4.1    Deadline to Submit Existing Direct Claims................................. 16

-i-

# TABLE OF CONTENTS
(continued)

**Page**

|  |  | 4.4.2 | Effect of Statutes of Limitations | 17 |
| 4.5 |  | Claim Submission Procedures | | 17 |
|  |  | 4.5.1 | FIFO Processing | 18 |
|  |  | 4.5.2 | Withdrawal of Submitted Claims | 18 |
|  |  | 4.5.3 | Deferral of Submitted Claims | 19 |
|  |  | 4.5.4 | Claim Submission Requirements | 19 |
|  |  | 4.5.5 | Deficient Submissions | 21 |
| 4.6 |  | Claim Evaluation Procedures | | 21 |
|  |  | 4.6.1 | Efficient and Expeditious Processing | 22 |
|  |  | 4.6.2 | Preliminary Evaluation of Claim Submission Materials | 22 |
|  |  | 4.6.3 | Evaluation of Confirmed Claims | 23 |
|  |  | 4.6.4 | Expedited Review Process | 24 |
|  |  | 4.6.5 | Individual Review Process | 25 |
|  |  | 4.6.6 | Quickpay Review Process | 26 |

Article 5    VALUATION OF DIRECT CLAIMS ................................................................. 27

| 5.1 | In General | 27 |
| 5.2 | Punitive and Other Non-Compensable Damages | 27 |
| 5.3 | Determination of Scheduled Point Values Under Expedited Review Process | 27 |
|  | 5.3.1 | Valuation Process | 27 |
|  | 5.3.2 | Initial Scheduled Point Value | 28 |
|  | 5.3.3 | Adjusted Scheduled Point Value | 29 |
|  | 5.3.4 | Further Adjustments to Adjusted Scheduled Point Value | 29 |
|  | 5.3.5 | Final Scheduled Point Value | 32 |
| 5.4 | Determination of Final Scheduled Point Values Under Individual Review Process | 33 |
|  | 5.4.1 | Underlying Scheduled Point Value | 33 |
|  | 5.4.2 | Final Scheduled Point Value | 33 |

**TABLE OF CONTENTS**

(continued)

**Page**

5.5    Determination of Allowed Claim Amounts Under Quickpay Review
Process ........................................................................................................ 33

    5.5.1    Direct Claims For Which Expedited Review Process
Available .................................................................................. 34

    5.5.2    Gynecological Claims ................................................................. 34

Article 6    RECONSIDERATION REQUESTS BY DIRECT CLAIMANTS ................. 34

6.1    Reconsideration of Determinations Other Than Individual Review Process
Determinations ........................................................................................... 34

    6.1.1    Reconsideration Requests ........................................................... 34

    6.1.2    ADR Procedures ......................................................................... 36

    6.1.3    Litigation .................................................................................... 36

6.2    Reconsideration of Individual Review Process Determinations......................... 38

Article 7    PAYMENT PROCESS FOR DIRECT CLAIMS ............................................. 39

7.1    Points-Based Monetary Values .................................................................. 39

    7.1.1    Uncertainty of Liabilities ........................................................... 39

    7.1.2    Points Valuation System ............................................................ 39

7.2    Guidelines for Paying Allowed Claims ...................................................... 41

    7.2.1    Documentation Requirements..................................................... 41

    7.2.2    Deadline For Acceptance of Offers From Trust ......................... 42

    7.2.3    Offsets ........................................................................................ 42

    7.2.4    Contribution, Indemnity, Reimbursement, and Subrogation ....... 42

7.3    Lien Resolution.......................................................................................... 42

7.4    No Common Benefit Fund Payments Shall Be Made ................................... 43

7.5    Payment of Claims ..................................................................................... 43

    7.5.1    Allowed Claim Amounts Held in Escrow .................................. 43

    7.5.2    Payment of Net Award Amount ................................................. 43

7.6    Payment Processing ................................................................................... 44

    7.6.1    FIFO Payment Processing........................................................... 44

    7.6.2    Discretion to Vary Order and Amounts of Payments ................. 44

NAI-1539103334

**TABLE OF CONTENTS**

(continued)

**Page**

Article 8        RESOLUTION OF INDIRECT CLAIMS............................................................ 45

   8.1     Claim Submission Procedures for Indirect Claims............................................. 45

      8.1.1        Indirect Claim Submission Deadline ........................................... 45

      8.1.2        Indirect Claim Review Criteria.................................................... 45

      8.1.3        Payments on Account of Allowed Claims.................................... 46

   8.2     Court Review ...................................................................................................... 46

Article 9        TRUST AUDITING AND REPORTING ........................................................... 47

   9.1     Trust Auditing..................................................................................................... 47

      9.1.1        Cross-Trust Audit Program.......................................................... 47

      9.1.2        Consequences of Audit Program ................................................. 48

      9.1.3        Detection and Prevention of Fraud .............................................. 48

   9.2     Trust Reporting ................................................................................................... 48

Article 10      MISCELLANEOUS ............................................................................................ 49

   10.1    Non-Binding Effect of Trust and/or Litigation Outcome ................................... 49

   10.2    Independence of Trust......................................................................................... 49

   10.3    Amendments ....................................................................................................... 49

   10.4    Severability ......................................................................................................... 50

   10.5    Governing Law ................................................................................................... 50

NAI-1539103334

## TRUST DISTRIBUTION PROCEDURES

These Trust Distribution Procedures (these "**TDP**") provide the means for resolving all Channeled Talc Personal Injury Claims as provided in and required by the Prepackaged Chapter 11 Plan of Reorganization of the Debtor dated [●] (the "**Plan**"), and the Talc Personal Injury Trust Agreement attached thereto as Exhibit K (the "**Trust Agreement**").

The Plan and the Trust Agreement establish the Red River Talc Personal Injury Trust (the "**Trust**"). The trustee(s) of the Trust (the "**Trustees**") shall implement and administer these TDP in accordance with the Trust Agreement.

### Article 1
### INTRODUCTION AND OVERVIEW

### 1.1    Purpose

These TDP have been adopted pursuant to the Plan and Trust Agreement and are intended to provide reasonable assurance that the Trust will evaluate, value, and pay similar Channeled Talc Personal Injury Claims in substantially the same manner, and otherwise comply with the requirements of a trust set forth in section 524(g) of the Bankruptcy Code. To achieve this goal, these TDP set forth procedures for (i) processing, evaluating, resolving, and paying Direct Claims through the Expedited Review Process, the Individual Review Process, or the Quickpay Review Process and (ii) liquidating and paying Indirect Claims. These TDP are designed to be consistent with characteristics known to be relevant to the valuation of Channeled Talc Personal Injury Claims in the tort system, including disease type and age at diagnosis, and/or the theories promulgated by plaintiffs' experts in the MDL, including time since last talc use.

### 1.2    Vesting of Rights

Except as expressly provided herein, nothing in these TDP shall be deemed to create a substantive right for the holder of any Channeled Talc Personal Injury Claim. To the extent these TDP provide rights and benefits to holders of Channeled Talc Personal Injury Claims, such rights and benefits shall vest in such holders as of the Effective Date.

### 1.3    Exclusivity

These TDP shall be the sole and exclusive method by which a party may seek allowance and payment of a Channeled Talc Personal Injury Claim (other than a Master Settlement Agreement Claim or a Judgment Claim).

### 1.4    General Principles

These TDP are founded on the following principles: (i) the efficient resolution of all Channeled Talc Personal Injury Claims (including both Direct Claims and Indirect Claims) and equitable valuation of all similarly situated Channeled Talc Personal Injury Claims; (ii) clear and objective qualification and valuation criteria; (iii) clear and reliable evidentiary requirements; (iv) a rigorous review and evaluation process requiring the Trustees to determine the appropriate values

for Direct Claims in accordance with these TDP and applicable law; (v) independence of the Trust and the Trustees; (vi) administrative transparency; and (vii) fraud detection and prevention.

**Article 2**
**INTERPRETATION AND DEFINITIONS**

### 2.1    Interpretation

The terms of the Plan and Confirmation Order shall prevail if there is any discrepancy between the terms of the Plan or Confirmation Order and the terms of these TDP.

### 2.2    Definitions

(1)    **"Acceptance and Release"** shall mean the document pursuant to which the holder of an Allowed Claim accepts an offer from the Trust for payment of such Allowed Claim and provides the requisite releases required as a condition of payment as described in Section 7.2.1(A) (in the case of Direct Claims) or Section 8.1.3 (in the case of Indirect Claims).

(2)    **"Adjusted Scheduled Point Value"** shall mean, with respect to any Direct Claim evaluated under the Expedited Review Process, the claim-specific Point Value of such Direct Claim resulting from adjustment of the Initial Scheduled Point Value of such Direct Claim, as determined in accordance with Section 5.3.3.

(3)    **"ADR Procedures"** shall mean the alternative dispute resolution procedures set forth in Section 6.1.2.

(4)    **"Allowed Claim"** shall mean (a) a Direct Claim that has been determined to satisfy the Expedited Review Criteria under Section 4.6.4, the Individual Review Criteria under Section 4.6.5, or the Quickpay Review Criteria under Section 4.6.6, as applicable, or (b) an Indirect Claim that has been determined to satisfy the Indirect Claim Review Criteria under Section 8.1.2.

(5)    **"Allowed Claim Amount"** shall mean:  (a) with respect to a Direct Claim evaluated under the Expedited Review Process, the dollar value determined by multiplying (i) the Cash Value of a Point by (ii) the Final Scheduled Point Value of such Direct Claim as determined pursuant to Section 5.3; (b) with respect to a Direct Claim evaluated under the Individual Review Process, the dollar value determined by multiplying (i) the Cash Value of a Point by (ii) the Final Scheduled Point Value of such Direct Claim as determined pursuant to Section 5.4; (c) with respect to a Direct Claim evaluated under the Quickpay Review Process, the dollar value determined pursuant to Section 5.5; and (d) with respect to an Indirect Claim, the dollar value determined pursuant to Section 8.1.2.

(6)    **"Allowed Claim Notice"** shall mean a written notice delivered by the Trustees to a Direct Claimant or an Indirect Claimant informing such Direct Claimant or Indirect Claimant that her Direct Claim or Indirect Claim, as applicable, has become an Allowed Claim and indicating the proposed Allowed Claim Amount.

2

(7)     "**Allowed Judgment Amount**" shall have the meaning set forth in Section 6.1.3.

(8)     "**Atypical Use Factor**" shall have the meaning set forth in Section 5.3.4.

(9)     "**Auditor**" shall mean [●] and/or any other Auditor subsequently appointed pursuant to the Trust Agreement and these TDP.

(10)    "**Bankruptcy Code**" shall have the meaning set forth in the Plan.

(11)    "**Bankruptcy Court**" shall have the meaning set forth in the Plan.

(12)    "**Cash Value of a Point**" shall mean the dollar value assigned to a point by the Trustees in accordance with Section 7.1.2.

(13)    "**Channeled Talc Personal Injury Claims**" shall have the meaning set forth in the Plan.

(14)    "**Claim Submission Deadline**" shall mean:  (a) with respect to a Direct Claim, the applicable deadline to submit such Direct Claim to the Trust under Section 4.4; and (b) with respect to an Indirect Claim, the deadline to submit an Indirect Claim to the Trust under Section 8.1.1.

(15)    "**Claim Submission Form**" shall mean the form that Direct Claimants must complete and submit to the Trust pursuant to the Claim Submission Procedures for Direct Claims adopted by the Trustees as set forth in Section 4.5.

(16)    "**Claim Submission Materials**" shall mean, with respect to a Direct Claim, all evidence and other materials submitted to the Trust in support of such Direct Claim, including the information and documentation required to be so submitted pursuant to Section 4.5.4.

(17)    "**Claim Submission Procedures**" shall mean:  (a) with respect to a Direct Claim, the procedures for the submission of Direct Claims to the Trust adopted by the Trustees as set forth in Section 4.5; and (b) with respect to an Indirect Claim, the procedures for the submission of Indirect Claims to the Trust adopted by the Trustees as set forth in Section 8.1.

(18)    "**Claim Submission Requirements**" shall have the meaning set forth in Section 4.5.4.

(19)    "**Claimant's Jurisdiction**" shall mean, with respect to a Direct Claim, either (a) the jurisdiction in which such Direct Claim was filed against the Debtor and/or any Debtor Corporate Party in the tort system prior to the Petition Date or (b) if such Direct Claim was not filed against the Debtor and/or any Debtor Corporate Party in the tort system prior to the Petition Date, then at the relevant Direct Claimant's election (i) the jurisdiction in which such Direct Claimant resided on the Date of Relevant Diagnosis; (ii) the jurisdiction in which such Direct Claimant resides at the time she submits her Direct Claim to the Trust; or (iii) the principal

NAI-1539103334

jurisdiction in which such Direct Claimant engaged in Regular Perineal Use of J&J Talc Products.

(20) **"Claims Administrator"** shall mean [ARCHER Systems, LLC][1] and/or any other qualified party subsequently appointed pursuant to the Plan, Trust Agreement, and these TDP to assist the Trustees in processing, reviewing, administering, and evaluating claims submitted pursuant to these TDP.

(21) **"Claims Processor"** shall mean **[•]** which shall be engaged by the Claims Administrator with the consent of the Trustees, the TAC, and the FCR to assist in the development of procedures and protocols to implement these TDP effectively and efficiently, and/or any other qualified party subsequently engaged by the Claims Administrator with the consent of the Trustees, the TAC, and the FCR for such purpose pursuant to the Plan, the Trust Agreement, and these TDP.

(22) **"Common Benefit Fund"** shall mean the common benefit fund established pursuant to Case Management Order No. 7(A) entered by the United States District Court for the District of New Jersey in the MDL.

(23) **"Confirmation Order"** shall have the meaning set forth in the Plan.

(24) **"Confirmed Claim"** shall mean any Submitted Claim which the Trustees determine with the assistance of the Claims Administrator has satisfied the Preliminary Evaluation Criteria under Section 4.6.2.

(25) **"Cross-Trust Audit Program"** shall mean the audit program developed and implemented by the Trust pursuant to Section 9.1.1.

(26) **"Date of First Diagnosis"** shall mean, with respect to a Direct Claim, the date on which the relevant Direct Claimant received the original pathologic diagnosis for Ovarian Cancer or Gynecological Cancer that she alleges was caused by her use of J&J Talc Products.

(27) "**Date of Relevant Diagnosis**" shall mean, with respect to a Direct Claim, the date on which the relevant Direct Claimant received either (i) the original pathologic diagnosis for Ovarian Cancer or Gynecological Cancer or (ii) a diagnosis of a recurrence of such Ovarian Cancer or Gynecological Cancer after remission, whichever is the basis of such Direct Claim.

(28) **"Debtor"** shall have the meaning set forth in the Plan.

(29) **"Debtor Corporate Party"** shall have the meaning set forth in the Plan.

(30) **"Deferral Request"** shall have the meaning set forth in Section 4.5.3.

---

[1] Subject to competitive pricing and due diligence.

(31)  **<u>Deficiency Notice</u>**" shall have the meaning set forth in Section 4.5.5.

(32)  "**<u>Diagnostic Adjustment</u>**" shall mean the percentage by which the Initial Scheduled Point Value determined pursuant to Section 5.3.2 is to be adjusted to account for the claim-specific disease subtype as set forth in Section 5.3.3.

(33)  "**<u>Direct Claim</u>**" shall mean any Channeled Talc Personal Injury Claim that is a Direct Talc Personal Injury Claim.

(34)  "**<u>Direct Claimant</u>**" shall mean any holder of a Direct Claim.  For the avoidance of doubt, to the extent that a Direct Claim is being asserted by the estate, legal counsel, relative, assignee, or other representative of an injured or deceased individual, the term Direct Claimant shall refer to (a) such estate, legal counsel, relative, assignee, or other representative, (b) such injured or deceased individual, or (c) both, as the context requires.

(35)  "**<u>Direct Talc Personal Injury Claim</u>**" shall have the meaning set forth in the Plan.

(36)  "**<u>Disallowed Claim</u>**" shall mean: (a) any Direct Claim that (i) pursuant to Section 4.5.5, is not entitled to progress to a Preliminary Evaluation, (ii) pursuant to Section 4.6.2, is not entitled to become a Confirmed Claim, or (iii) is a Confirmed Claim but is not entitled to become an Allowed Claim pursuant to Section 4.6.4, Section 4.6.5, Section 4.6.6, or Section 6.1.3; or (b) any Indirect Claim that is not entitled to become an Allowed Claim pursuant to Article 8.

(37)  "**<u>Disallowed Claim Notice</u>**" shall mean a written notice delivered by the Trustees to a Direct Claimant or an Indirect Claimant informing such Direct Claimant or Indirect Claimant that the applicable Direct Claim or Indirect Claim has become a Disallowed Claim.

(38)  "**<u>Effective Date</u>**" shall have the meaning set forth in the Plan.

(39)  "**<u>Exigent Financial Hardship</u>**" means the financial status of a Direct Claimant that leads the Trustees or the Individual Review Claims Panel to determine that (a) the Direct Claimant needs financial assistance on an immediate basis based on the Direct Claimant's expenses and all sources of available income, and (b) there is a causal connection between the Direct Claimant's dire financial condition and the Direct Claimant's talc-related disease.

(40)  "**<u>Existing Direct Claims</u>**" shall mean all Direct Claims with a Date of First Diagnosis prior to the Petition Date.

(41)  "**<u>Expedited Review Criteria</u>**" shall mean the criteria that must be satisfied in order for a Confirmed Claim evaluated under the Expedited Review Process to become an Allowed Claim, as  set forth in Section 4.6.4.

NAI-1539103334

(42)    **"<u>Expedited Review Process</u>"** shall mean the claims-evaluation process in which a Direct Claim is evaluated as described in Section 4.6.4.

(43)    **"<u>FCR</u>"** shall mean Randi S. Ellis or such successor future claims representative appointed in accordance with the Plan, the Trust Agreement, and these TDP.

(44)    **"<u>FIFO Payment Queue</u>"** shall mean, with respect to a particular Review Track, the first-in-first-out processing queue for the payment of Direct Claims that become Allowed Claims under such Review Track, as described in Section 7.6.1.

(45)    **"<u>FIFO Processing Queue</u>"** shall mean, with respect to a particular Review Track, the first-in-first-out processing queue for the evaluation of Submitted Claims under such Review Track, as described in Section 4.5.1.

(46)    **"<u>Final Scheduled Point Value</u>"** shall mean (a) with respect to any Direct Claim evaluated under the Expedited Review Process, the final claim-specific Point Value of such Direct Claim resulting from further adjustment of the Adjusted Scheduled Point Value of such Direct Claim, as determined in accordance with Section 5.3.4 and Section 5.3.5, and (b) with respect to any Direct Claim evaluated under the Individual Review Process, the final claim-specific Point Value of such Direct Claim, as determined in accordance with Section 5.4.2.

(47)    **"<u>Fraudulent Claim Submission</u>"** has the meaning set forth in Section 4.6.3.

(48)    **"<u>Fraudulent Claimant</u>"** has the meaning set forth in Section 4.6.3.

(49)    **"<u>Future Direct Claims</u>"** shall mean all Direct Claims that are not Existing Direct Claims.

(50)    **"<u>Gynecological Claim</u>"** shall mean any Direct Claim involving allegations that the relevant Direct Claimant developed a Gynecological Cancer.

(51)    **"<u>Gynecological Cancer</u>"** has the meaning set forth in the Plan.

(52)    **"<u>Identifying Information</u>"** shall mean with respect to any Direct Claim: (a) the relevant Direct Claimant's (i) full legal name, (ii) date of birth, (iii) physical and email address (if applicable), and (iv) social security number; and (b) the name, email address, and physical address of the law firm and attorney serving as the relevant Direct Claimant's representative (if any). For the avoidance of doubt, to the extent that a Direct Claim is being asserted by the estate, legal counsel, relative, assignee, or other representative of an injured or deceased individual, Identifying Information shall refer to the foregoing information for both (A) such estate, legal counsel, relative, assignee, or other representative and (B) such injured or deceased individual, in each case to the extent applicable.

(53)    **"<u>Indirect Claim</u>"** means any Channeled Talc Personal Injury Claim that is an Indirect Talc Personal Injury Claim.

6

(54) "**Indirect Claim Judicial Review Election Deadline**" shall have the meaning set forth in Section 8.2.

(55) "**Indirect Claim Judicial Review Election Notice**" shall have the meaning set forth in Section 8.2.

(56) "**Indirect Claim Review Criteria**" shall mean the criteria that an Indirect Claim must satisfy in order to become an Allowed Claim, as set forth in Section 8.1.2.

(57) "**Indirect Claimant**" means a holder of an Indirect Claim.

(58) "**Indirect Talc Personal Injury Claim**" shall have the meaning set forth in the Plan.

(59) "**Individual Review Claims Panel**" shall have the meaning set forth in Section 4.6.5(A).

(60) "**Individual Review Criteria**" shall mean the criteria that must be satisfied for a Confirmed Claim evaluated under the Individual Review Process to become an Allowed Claim, as set forth in Section 4.6.5.

(61) "**Individual Review Process**" shall mean the claims-evaluation process in which a Direct Claim is evaluated as described in Section 4.6.5.

(62) "**Initial Cash Value of a Point**" shall have the meaning set forth in Section 7.1.2(A).

(63) "**Initial Scheduled Point Value**" shall mean, with respect to a Direct Claim evaluated under the Expedited Review Process, the initial Point Value of such Direct Claim, as determined in accordance with Section 5.3.2.

(64) "**Initial Submission Acceptance Date**" shall mean the date on which the Trust first begins to accept the submission of Channeled Talc Personal Injury Claims.

(65) "**J&J**" means Johnson & Johnson, a New Jersey corporation.

(66) "**J&J Talc Products**" shall mean all products formulated, manufactured, distributed, and/or sold by the Debtor and/or any Debtor Corporate Party containing talcum powder, including Johnson's Baby Powder and Johnson & Johnson's Shower to Shower.

(67) "**Judgment Claim**" shall have the meaning set forth in the Plan.

(68) "**Length of Perineal Use Factor**" shall have the meaning set forth in Section 5.3.4.

NAI-1539103334

**(69)** **"Lien Resolution Administrator"** shall mean **[•]** and/or any other qualified party subsequently appointed pursuant to the Plan, Trust Agreement, and these TDP to assist in the resolution of Direct Claimants' relevant medical liens.

**(70)** **"LLT"** shall have the meaning set forth in the Plan.

**(71)** **"Master Settlement Agreement Claim"** shall have the meaning set forth in the Plan.

**(72)** **"Master Settlement Agreements"** shall have the meaning set forth in the Plan.

**(73)** "**Maximum Value**" shall mean: (a) with respect to any Direct Claim evaluated under the Expedited Review Process, three times (3x) the amount determined by multiplying (i) the Cash Value of a Point by (ii) the Final Scheduled Point Value of such Direct Claim; and (b) with respect to any Direct Claim evaluated under the Individual Review Process, three times (3x) the amount determined by multiplying the (i) Cash Value of a Point by (ii) the Underlying Scheduled Point Value of such Direct Claim.

**(74)** **"Maximum Years of Regular Perineal Use"** shall have the meaning set forth in Section 5.3.4.

**(75)** **"MDL"** shall mean *In re: Johnson & Johnson Talcum Powder Products Marking, Sales Practices and Products Liability Litigation* (D.N.J.) (MDL No. 2738).

**(76)** **"Mediator"** shall have the meaning set forth in Section 6.1.2.

**(77)** "**Medical Risk Factor**" shall have the meaning set forth in Section 5.3.4.

**(78)** **"Net Award Amount"** shall mean, with respect to a Direct Claim, the total Allowed Claim Amount of such Direct Claim, less amounts payable upon the resolution of the issues set forth in Section 7.3, Section 7.4 and Section 7.5.

**(79)** **"Non-J&J Talc Products"** shall mean products containing talcum powder that are not J&J Talc Products.

**(80)** "**Non-J&J Talc Use Factor**" shall have the meaning set forth in Section 5.3.4.

**(81)** **"Other Disease Talc Personal Injury Claims"** shall have the meaning set forth in the Plan.

**(82)** **"Ovarian Cancer"** shall have the meaning set forth in the Plan.

**(83)** **"Ovarian Cancer Claim"** shall mean any Direct Claim involving allegations that the relevant Direct Claimant developed Ovarian Cancer.

**(84)** **"Petition Date"** shall have the meaning set forth in the Plan.

**(85)** **"Plan"** shall have the meaning set forth in the preamble.

NAI-1539103334

(86)  **"Plan Support Agreements"** shall mean those certain Plan Support Agreements, dated on or after January 1, 2024, executed by LLT, J&J, and law firms representing certain holders of Channeled Talc Personal Injury Claims, as such agreements may have been and may be amended, modified, or supplemented pursuant to the terms thereof.

(87)  "**Point Value**" shall mean, with respect to a Direct Claim, the value of such Direct Claim expressed as a number of points, as determined in accordance with Article 5.

(88)  **"Preliminary Evaluation"** shall mean the preliminary evaluation of Submitted Claims described in Section 4.6.2, pursuant to which the Trustees with the assistance of the Claims Administrator shall determine whether a Submitted Claim constitutes a Confirmed Claim.

(89)  **"Preliminary Evaluation Criteria"** shall mean the criteria that Submitted Claims must satisfy in order to become a Confirmed Claim, as set forth in Section 4.6.2.

(90)  **"Protected Party"** shall have the meaning set forth in the Plan.

(91)  **"Quickpay Review Criteria"** shall mean the criteria that must be satisfied for a Confirmed Claim evaluated under the Quickpay Review Process to become an Allowed Claim, as set forth in Section 4.6.6.

(92)  **"Quickpay Review Process"** shall mean the claims-evaluation process in which a Direct Claim is evaluated as described in Section 4.6.6.

(93)  **"Reconsideration Decision Notice"** shall have the meaning set forth in Section 6.1.1(D).

(94)  "**Reconsideration Denial Notice**" shall have the meaning set forth in Section 6.1.1(D).

(95)  "**Reconsideration Grant Notice**" shall have the meaning set forth in Section 6.1.1(D).

(96)  **"Reconsideration Request"** shall mean a written request submitted to the Trust by a Direct Claimant that the Trustees or Individual Review Claim Panel, as applicable, reconsider a Disallowed Claim Notice, a Secondary Election Activation Notice, or, solely with respect to Direct Claims that become Allowed Claims under the Expedited Review Process or the Individual Review Process, an Allowed Claim Notice, as set forth in Section 6.1.1 and Section 6.2, as applicable.

(97)  **"Regular J&J Talc Perineal Use"** shall mean a Direct Claimant's Regular Perineal Use of J&J Talc Products.

(98)  **"Regular Non-J&J Talc Perineal Use"** shall mean a Direct Claimant's Regular Perineal Use of Non-J&J Talc Products.

9

(99) **"Regular Perineal Use"** shall mean, with respect to the use of J&J Talc Products or Non-J&J Talc Products, as applicable, a Direct Claimant's consistent use thereof on her own perineal area after puberty for a minimum of four (4) consecutive years, established by sworn testimony or affidavit.

(100) **"Reorganized Debtor"** shall have the meaning set forth in the Plan.

(101) **"Review Criteria"** shall mean: (a) with respect to a Direct Claim, the Expedited Review Criteria, the Individual Review Criteria, or the Quickpay Review Criteria, as applicable, and (b) with respect to an Indirect Claim, the Indirect Claim Review Criteria.

(102) **"Review Tracks"** shall mean, collectively, the Expedited Review Process, the Individual Review Process, and the Quickpay Review Process.

(103) **"Secondary Election"** shall have the meaning set forth in Section 4.5.4.

(104) "**Secondary Election Activation Notice**" shall have the meaning set forth in Section 4.6.5(B).

(105) **"Submitted Claim"** shall mean any Direct Claim that has been submitted to the Trust and determined by the Trustees with the assistance of the Claims Administrator to have been submitted with substantially complete information and documentation under Section 4.5.4.

(106) **"TAC"** shall mean the Talc Trust Advisory Committee appointed and serving in accordance with the Plan and the Trust Agreement.

(107) **"TDP"** shall have the meaning set forth in the preamble.

(108) **"Time Since Last Use Factor"** shall have the meaning set forth in Section 5.3.4.

(109) **"Trust"** shall have the meaning set forth in the preamble.

(110) **"Trust Agreement"** shall have the meaning set forth in the preamble.

(111) **"Trustees"** shall have the meaning set forth in the preamble.

(112) **"Underlying Scheduled Point Value"** shall mean, with respect to any Direct Claim evaluated under the Individual Review Process, the initial claim-specific Point Value of such Direct Claim, as determined in accordance with Section 5.4.1.

(113) **"Years of Regular J&J Talc Perineal Use"** shall have the meaning set forth in Section 5.3.

NAI-1539103334

**Article 3**
**TDP ADMINISTRATION**

## 3.1     General Administration

### 3.1.1     Coordination

The Trustees shall implement these TDP to resolve any and all Channeled Talc Personal Injury Claims pursuant to the Plan and Trust Agreement with the assistance of the Claims Administrator and the Claims Processor.

The Trustees, the Claims Administrator, and the Claims Processor shall consult and coordinate with each other to promptly develop and implement comprehensive systems and processes intended to (i) provide the Trustees with all information necessary to implement these TDP, (ii) streamline the Claim Submission Procedures, (iii) ensure maximally efficient evaluation of the Channeled Talc Personal Injury Claims and, where applicable, Reconsideration Requests, (iv) ensure proper application of the Review Criteria and the audit provisions contained herein, (v) limit the use of the Trust's assets to uses permitted by the Plan, and (vi) promote prompt payment of Allowed Claims.

### 3.1.2     Consultation and Consent

The Trustees shall implement these TDP to resolve any and all Channeled Talc Personal Injury Claims pursuant to the Plan and Trust Agreement in consultation with the TAC and the FCR.

The Trustees shall not proceed with any matter that expressly requires consultation with or consent of the TAC, the FCR, the Reorganized Debtor, or J&J under these TDP unless and until the applicable procedures for such consultation or consent set forth in Section 7.1 of the Trust Agreement have been complied with.

## 3.2     Review of Costs

The Trustees shall seek to ensure that the costs incurred by the Trust with respect to evaluating and investigating the validity of Claim Submission Materials submitted by a Direct Claimant are necessary and reasonable in light of the obligations of the Trust under the Plan, the Trust Agreement, and these TDP.  Nothing herein, however, shall prevent the Trustees from either (i) contesting the validity of any Direct Claim, whatever the costs, or (ii) declining to accept Claim Submission Materials from sources determined to be deceptive, fraudulent, or otherwise unreliable.

The Trustees shall periodically, and at least annually, review the cost of evaluating and investigating Claim Submission Materials submitted by Direct Claimants and take steps to reduce such costs where feasible and appropriate, while still ensuring that the Trust's obligations under the Plan, the Trust Agreement, and these TDP are appropriately satisfied.

NAI-1539103334

**3.3**     **Publication of Claim Submission Procedures**

Within sixty (60) days following entry of the Confirmation Order, the Trustees shall publish detailed Claim Submission Procedures required by these TDP to the Trust's website. Publication of the Claim Submission Procedures shall occur no later than sixty (60) days prior to the Initial Submission Acceptance Date.

**3.4**     **Adoption of Procedures for Notice of Trust Determinations**

Following entry of the Confirmation Order, the Trustees shall, with the assistance of the Claims Administrator and the Claims Processor, develop procedures for providing notices, including, without limitation, Allowed Claim Notices, Deficiency Notices, Disallowed Claim Notices, Reconsideration Decision Notices, Reconsideration Denial Notices, Reconsideration Grant Notices, and Secondary Election Activation Notices, with respect to determinations made pursuant to these TDP and, with the consent of the TAC and the FCR, adopt such procedures.

**3.5**     **Adoption of Procedures for Execution and Delivery of Acceptance and Release**

Following entry of the Confirmation Order, the Trustees shall, with the assistance of the Claims Administrator and the Claims Processor, develop procedures for the execution and delivery of an Acceptance and Release by a Direct Claimant or Indirect Claimant that decides to accept an offer of payment from the Trust as described in Section 7.2.1(A) (in the case of Direct Claims) or Section 8.1.3 (in the case of Indirect Claims) and, following consultation with the Reorganized Debtor and J&J and with the consent of the TAC and the FCR, adopt such procedures. Such procedures shall make the Acceptance and Release available for completion and execution electronically via Adobe Sign, DocuSign, or a similar electronic signature program or other simplified and expedient means. Any Acceptance and Release provided with an Allowed Claim Notice as described in Section 7.2.1(A) (in the case of Direct Claims) or Section 8.1.3 (in the case of Indirect Claims) shall be in a form adopted by the Trustees with the consent of the Reorganized Debtor, J&J, the TAC, and the FCR.

**3.6**     **Potential Adoption of Procedures for Other Disease Talc Personal Injury Claims**

These TDP provide detailed procedures for processing, evaluating, valuing, and paying Ovarian Cancer Claims and Gynecological Claims. The TDP are also intended to provide Direct Claimants with Other Disease Talc Personal Injury Claims an opportunity for consideration and evaluation of such Other Disease Talc Personal Injury Claims. For such consideration and evaluation of Other Disease Talc Personal Injury Claims, a Direct Claimant must first provide the Trust with the following:

(1)     a disease diagnosis acceptable to the Trustees, the TAC, and the FCR and accompanied by evidence establishing that such diagnosis occurred at least ten (10) years following such Direct Claimant's first use of J&J Talc Products;

(2)     medical records sufficient to demonstrate that such Direct Claimant was treated for the diagnosed disease;

NAI-1539103334

(3) detailed evidence of such Direct Claimant's use of J&J Talc Products, established by sworn testimony or affidavit;

(4) a medical report or affidavit by a board-certified medical doctor, doctor of osteopathy, oncologist, or pathologist with qualified expertise to diagnose the disease that is being asserted establishing such Direct Claimant's exposure to J&J Talc Products as a contributing factor in causing the disease identified in the diagnosis, which report or affidavit shall include citation to peer-reviewed medical or scientific literature recognizing a causal association between talc exposure and the diagnosed disease asserted;

(5) evidence acceptable to the Trustees, the TAC, and the FCR that the medical or scientific community recognizes a causal link between exposure to J&J Talc Products and the diagnosed disease asserted; and

(6) evidence acceptable to the Trustees, the TAC, and the FCR establishing that such Direct Claimant had no significant occupational or industrial exposure (whether direct or bystander) to asbestos.

If, based upon the foregoing, the Trustees, the TAC, and the FCR are satisfied that a Direct Claimant has presented an Other Disease Talc Personal Injury Claim that would be cognizable and valid in the tort system, the Trustees shall, in conjunction with the Claims Administrator and the Claims Processor, develop procedures for processing, evaluating, valuing, and paying Other Disease Talc Personal Injury Claims asserting the relevant disease and, with the consent of the TAC and the FCR, adopt such procedures; *provided*, *however*, that in no event may the Trust offer payment of more than one thousand dollars and zero cents ($1,000.00) to resolve any such Other Disease Talc Personal Injury Claim. In the event that the Trustees, the TAC, and the FCR cannot agree on (i) whether a Direct Claimant has presented an Other Disease Talc Personal Injury Claim that would be cognizable and valid in the tort system or (ii) procedures for processing, evaluating, valuing, and paying any Other Disease Talc Personal Injury Claim, the Bankruptcy Court shall resolve any such dispute.

**Article 4**
**ALLOWANCE PROCESS FOR DIRECT CLAIMS**

## 4.1 <u>Single Direct Claim Limitation</u>

A Direct Claimant may submit no more than one Direct Claim to the Trust, and may recover from the Trust only in respect of such Direct Claim.

## 4.2 <u>Treatment of Previously Resolved Direct Claims</u>

### 4.2.1 **Direct Claims Previously Released and Paid**

Any Direct Claimant who previously submitted a release and received payment in full with respect to her Direct Claim may not receive any payment from the Trust. Promptly following the Effective Date, the Reorganized Debtor will provide the Trust with a list of all Direct Claimants

who submitted a release and received payment in full with respect to Direct Claims prior to the Effective Date.

### 4.2.2  Direct Claims Subject to the Terms of a Master Settlement Agreement

For any Direct Claim that is subject to the terms of a Master Settlement Agreement as of the Petition Date, the following limitations apply:

(i)   If there has not yet been a final determination between the parties to such Master Settlement Agreement or by the special master appointed pursuant to such Master Settlement Agreement regarding whether such Direct Claim qualifies for settlement and compensation pursuant to the terms of such Master Settlement Agreement, then the relevant Direct Claimant may not submit such Direct Claim to the Trust for evaluation and resolution pursuant to these TDP;

(ii)  If there has been a final determination between the parties to such Master Settlement Agreement or by the special master appointed pursuant to such Master Settlement Agreement that such Direct Claim qualifies for settlement and compensation pursuant to the terms of such Master Settlement Agreement, then (a) the relevant Direct Claimant may not submit such Direct Claim to the Trust for evaluation and resolution pursuant to these TDP and may not receive any payment from the Trust and (b) such Direct Claim may be resolved and paid only pursuant to the terms of such Master Settlement Agreement; and

(iii) If there has been a final determination between the parties to such Master Settlement Agreement or by the special master appointed pursuant to such Master Settlement Agreement that the Direct Claim does not or cannot qualify for settlement and compensation pursuant to the terms of such Master Settlement Agreement, then the relevant Direct Claimant may submit such Direct Claim to the Trust for evaluation and resolution pursuant to these TDP.

For the avoidance of doubt, if any Direct Claim was subject to the terms of a Master Settlement Agreement but, prior to the Petition Date, such Direct Claim was withdrawn from consideration pursuant to the terms of such Master Settlement Agreement by the applicable Direct Claimant's law firm and a different Direct Claim was substituted in place thereof under the terms of such Master Settlement Agreement, then the Direct Claimant whose Direct Claim was withdrawn from consideration may submit her Direct Claim to the Trust for evaluation and resolution pursuant to these TDP.

The limitation set forth in clause (ii) above shall apply regardless of whether any individual Direct Claimant:  (i) has accepted her settlement allocation under the applicable Master Settlement Agreement; (ii) has finalized the resolution of her Direct Claim pursuant to the terms of the Master Settlement Agreement, including through the submission of her legally binding and enforceable individual release agreement and/or compliance with any other settlement administration

14

requirements set forth in the Master Settlement Agreement; (iii) has resolved any and all medical or other liens associated with her Direct Claim; and/or (iv) has actually received payment in respect of her Direct Claim.

Promptly following the Effective Date and monthly thereafter, the Reorganized Debtor will provide the Trust with a list of all Direct Claimants who have Direct Claims that, as of the Effective Date are, or following the Effective Date become, subject to the terms of a Master Settlement Agreement, indicating for each such Direct Claim that: (i) there has been no final determination regarding whether such Direct Claim qualifies for settlement and compensation under a Master Settlement Agreement; (ii) there has been a final determination that such Direct Claim qualifies for settlement and compensation under a Master Settlement Agreement; (iii) there has been a final determination that such Direct Claim does not or cannot qualify for settlement and compensation under a Master Settlement Agreement; or (iv) such Direct Claim has been withdrawn from consideration for settlement and compensation under a Master Settlement Agreement.

### 4.2.3    Individual Direct Claims Previously Rejected or Dismissed

Any individual who filed a Direct Claim in any state or federal court prior to the Petition Date and whose Direct Claim was thereafter dismissed with prejudice shall not be eligible to recover any payment whatsoever from the Trust.

Direct Claims which were filed in any state or federal court prior to the Petition Date and thereafter dismissed without prejudice may be submitted to the Trust for evaluation pursuant to these TDP, but, during such evaluation, such Direct Claims shall be subject to such heightened scrutiny as the Trustees with the assistance of the Claims Administrator deem appropriate.

Direct Claims which were individually submitted to J&J, the Debtor, and/or any other Debtor Corporate Party for settlement consideration prior to the Petition Date but were rejected by J&J, the Debtor, and/or such other Debtor Corporate Party may be submitted to the Trust for evaluation and resolution pursuant to these TDP. For the avoidance of doubt, nothing in this paragraph shall apply to Direct Claims that were subject to the terms of a Master Settlement Agreement as of or prior to the Petition Date, which Direct Claims are addressed in Section 4.2.2.

### 4.2.4    Direct Claims Subject to Final Judgment

### (A)    Favorable Final Judgment

Any individual who filed a Direct Claim in any state or federal court and whose Direct Claim was adjudicated and resulted in a final, non-appealable favorable judgment (*e.g.*, a jury verdict for money damages) prior to the Effective Date shall not be eligible to recover any payment whatsoever from the Trust and any such Judgment Claim shall be the responsibility of the relevant judgment debtor. In the event that the relevant judgment debtor is the Debtor, J&J, or any other Debtor Corporate Party, the Debtor, J&J, or such other Debtor Corporate Party, as applicable, shall indemnify and hold the Trust harmless from such Judgment Claim. For the avoidance of doubt, nothing contained in the Plan will impair the rights of such individual to seek to enforce and collect on such Judgment Claim against any judgment debtor. For the avoidance of doubt, this Section 4.2.4(A) shall not apply to any Direct Claim subject to litigation pursuant to Section 6.1.3.

**(B)      Unfavorable Final Judgment**

Any individual who filed a Direct Claim in any state or federal court and whose Direct Claim was adjudicated and resulted in a final, non-appealable unfavorable judgment (*e.g.*, a defense verdict) prior to the Effective Date shall not be eligible to recover any payment whatsoever from the Trust.

### 4.2.5   Direct Claims Subject to Appealable Judgment

Any individual who filed a Direct Claim in any state or federal court and whose Direct Claim was adjudicated and resulted in a favorable judgment subject to appeal as of the Effective Date shall not be eligible to recover any payment whatsoever from the Trust and any such Judgment Claim and the defense of any appeal thereof shall be the responsibility of the relevant judgment debtor.  In the event that the relevant judgment debtor is the Debtor, J&J, or any other Debtor Corporate Party, the Debtor, J&J, or such other Debtor Corporate Party, as applicable, shall indemnify and hold the Trust harmless from such Judgment Claim and the defense of any appeal thereof.  For the avoidance of doubt, nothing contained in the Plan will impair the rights of such individual to seek to enforce and collect on such Judgment Claim against any judgment debtor, including through the defense or prosecution of appellate litigation related to such Judgment Claim.  For the avoidance of doubt, this Section 4.2.5 shall not apply to any Direct Claim subject to litigation pursuant to Section 6.1.3 hereof.

### 4.3     Claim Submission Materials

All Claim Submission Materials must be signed under the pains and penalties of perjury. Direct Claimants may sign all Claim Submission Materials electronically via Adobe Sign, DocuSign, or a similar electronic signature program or other simplified and expedient means, and Direct Claimants shall not be required to have any Claim Submission Materials notarized.  The submission of deceptive or fraudulent Claim Submission Materials to the Trust may violate the criminal laws of the United States, including the criminal provisions applicable to Bankruptcy Crimes, 18 U.S.C. § 152, and may subject those responsible to criminal prosecution.

### 4.4     Claim Submission Deadlines

### 4.4.1   Deadline to Submit Existing Direct Claims

Existing Direct Claims must be submitted to the Trust prior to the date that is one hundred twenty (120) days after the Initial Submission Acceptance Date, which date shall be posted on the Trust's website no later than the date that is thirty (30) days prior thereto.  If a Direct Claimant fails to submit her Existing Direct Claim within this time period, such Direct Claimant shall be deemed to have waived the right to submit her Existing Direct Claim or otherwise seek compensation from the Trust.

16

### 4.4.2    Effect of Statutes of Limitations

#### (A)    Existing Direct Claims Previously Filed in Tort System

For each Existing Direct Claim submitted to the Trust that was filed in the tort system against the Debtor and/or any other Protected Party prior to the Petition Date, to be considered timely and therefore eligible to pursue compensation via the procedures set forth in these TDP, the Existing Direct Claim must have been timely filed in the tort system under the applicable federal or state statutes of limitations that were in effect at the time the Direct Claim was filed in the tort system.

#### (B)    Unfiled Existing Direct Claims

For each Existing Direct Claim submitted to the Trust that was not filed in the tort system against the Debtor and/or any other Protected Party prior to the Petition Date, to be considered timely and therefore eligible to pursue compensation via the procedures set forth in these TDP, the Direct Claim must not be time-barred under the applicable federal or state statutes of limitations. The applicable federal or state statutes of limitations shall be deemed to have begun running as of May 19, 2020, the date that J&J publicly announced the discontinuation of the sale of talc-containing products.

#### (C)    Tolling and Timeliness

##### (i)    Existing Direct Claims

The running of the applicable statute of limitations with respect to any Existing Direct Claim shall be considered tolled as of the earliest of: (a) the Petition Date; (b) the actual filing of such Existing Direct Claim against the Debtor and/or any other Protected Party in the tort system prior to the Petition Date; or (c) the date specified in any tolling agreement between the relevant Direct Claimant and the Debtor, J&J, or any other Debtor Corporate Party; *provided*, *however*, that such tolling was still in effect as of the Petition Date.  Any Existing Direct Claim that meets any of these three tolling provisions shall be treated as timely filed so long as (i) the Direct Claim was not barred by the applicable federal or state statute of limitations at the time of the relevant tolling event, and (ii) the Direct Claim is submitted to the Trust within one hundred twenty (120) days after the Initial Submission Acceptance Date.

##### (ii)    Future Direct Claims

Any Future Direct Claim shall be treated as timely if it is submitted to the Trust: (a) within three (3) years of the Initial Submission Acceptance Date, (b) within two (2) years of the Date of First Diagnosis, or (c) within applicable state statutes of limitations, whichever is later.

### 4.5    Claim Submission Procedures

The Claim Submission Procedures for Direct Claims shall be developed by the Trustees with the assistance of the Claims Administrator and Claims Processor and adopted by the Trustees with the consent of the TAC and the FCR.  The Claim Submission Procedures for Direct Claims shall include, but not be limited to, the following:

NAI-1539103334

### 4.5.1   FIFO Processing

For processing purposes, the Trust shall order all Direct Claims in a particular Review Track on a first-in-first-out basis in the order each Direct Claim is submitted to the Trust, except as otherwise provided herein.

For all Direct Claims submitted to the Trust on or before the date that is one hundred and twenty (120) days after the Initial Submission Acceptance Date, a Direct Claim's position in the applicable FIFO Processing Queue shall be determined based on the earliest of:  (i) the date on which the law firm representing the relevant Direct Claimant first identified such Direct Claimant in Exhibit A to a Plan Support Agreement (or any earlier plan support agreement executed by LLT, J&J, and such law firm) or in a supplement to such an Exhibit A delivered in accordance with the terms of a Plan Support Agreement (or any earlier plan support agreement executed by LLT, J&J, and such law firm); (ii) the date prior to the Petition Date that a Direct Claim was filed by the relevant Direct Claimant against the Debtor or any other Protected Party in any state or federal court; (iii) the date prior to the Petition Date that a Direct Claim was filed by the relevant Direct Claimant against another defendant in any state or federal court, if, at the time, such Direct Claim was subject to a tolling agreement with the Debtor or any Debtor Corporate Party; (iv) the date a ballot was properly submitted in respect of such Direct Claim in connection with the solicitation of votes on the Plan; and (v) the date such Direct Claim is submitted to the Trust.

For all Direct Claims where the position in the applicable FIFO Processing Queue is based on the date the Direct Claim is submitted to the Trust, such Direct Claim's position in the applicable FIFO Processing Queue shall be determined based on the date that such Direct Claim was properly and completely submitted to the Trust.  If any Direct Claims are submitted to the Trust on the same date, a Direct Claim's position in the applicable FIFO Processing Queue vis-à-vis such other Direct Claims shall be determined based on the Date of Relevant Diagnosis with respect to each Direct Claim, with the earlier Date of Relevant Diagnosis having priority over the later Date of Relevant Diagnosis.  In the event that two or more such Direct Claims are submitted to the Trust on the same date and also have the same Date of Relevant Diagnosis, the priority of such Direct Claims in the FIFO Processing Queue shall be determined based on the dates of birth of the relevant Direct Claimants, with the earlier dates of birth receiving priority over later dates of birth.

### 4.5.2   Withdrawal of Submitted Claims

A Direct Claimant may, at any time after submitting her Direct Claim to the Trust, but prior to receiving a Disallowed Claim Notice or an Allowed Claim Notice, withdraw her Submitted Claim by providing written notice to the Trust.  The related Direct Claimant shall retain the right to re-submit her Direct Claim after such withdrawal; *provided*, *however*, that any such re-submitted Direct Claim shall be evaluated the same as any new Submitted Claim and shall be unaffected by the prior submission of such Direct Claim to the Trust, except that (i) during its evaluation, such Direct Claim shall be subject to such heightened scrutiny as the Trustees with the assistance of the Claims Administrator deem appropriate and (ii) the Direct Claim's place in the FIFO Processing Queue shall be determined based on the most recent date that the Direct Claim was submitted to the Trust (*i.e.*, the Direct Claim is moved to the end of the applicable FIFO Processing Queue upon its re-submission).  The one hundred and twenty (120) day deadline to submit an Existing Direct

18

Claim pursuant to Section 4.4.1 shall apply to any Existing Direct Claim submitted by the Direct Claimant, including a Submitted Claim that was previously withdrawn.

### 4.5.3   Deferral of Submitted Claims

A Direct Claimant is entitled to defer processing of her Submitted Claim for up to three (3) years from the date the Direct Claim was submitted to the Trust (a "**Deferral Request**") so long as the Deferral Request is received by the Trust in writing pursuant to any procedures adopted by the Trust for such requests (i) within thirty (30) days after the date the Direct Claims was submitted to the Trust and (ii) in any event, before the Trustees provide a Disallowed Claim Notice, Deficiency Notice, or an Allowed Claim Notice to the Direct Claimant.  A Direct Claimant may rescind the Deferral Request at any time by informing the Trust in writing pursuant to any procedures adopted by the Trust for such notices, and the Direct Claim shall thereupon be returned to its original place in the applicable FIFO Processing Queue.  A Direct Claimant may make only one Deferral Request.

The Trust shall approve any properly submitted Deferral Request; *provided*, *however*, that the Trust may only defer a Submitted Claim for a maximum of three (3) years from the date the Direct Claim was submitted to the Trust.  Any Direct Claimant who makes a Deferral Request shall retain her original place in the applicable FIFO Processing Queue.

### 4.5.4   Claim Submission Requirements

Any Direct Claimant who wishes to submit her respective Direct Claim to the Trust must satisfy the following requirements with respect to information and documentation in order to show that the Direct Claim should be processed pursuant to these TDP.  Every Direct Claimant seeking compensation from the Trust must provide to the Trust the following information and documentation at the time her Direct Claim is submitted to the Trust (the "**Claim Submission Requirements**"):

(1)   Citizenship/Residency: Proof that the Direct Claimant (and, to any extent applicable, the minor, incapacitated or deceased individual represented by such Direct Claimant) is a United States citizen or a lawful permanent resident of the United States (or is otherwise lawfully residing in the United States), which proof may be in the form of sworn testimony or affidavit and may be included as part of the Claims Submission Form;

(2)   Claimant Information: All claimant information required under the Claim Submission Procedures for Direct Claims adopted by the Trustees as set forth herein, including the Direct Claimant's Identifying Information;

(3)   Claim Submission Form: A properly completed Claim Submission Form, which shall include complete information for where notices to the Direct Claimant should be sent and where payments to the Direct Claimant should be sent (including if such payments should be sent directly to counsel for the Direct Claimant); the Claim Submission Form shall also include a requirement that the Direct Claimant elect whether to proceed under the Expedited Review Process, Individual Review Process, or Quickpay

Review Process, a requirement that a Direct Claimant electing the Individual Review Process also indicate such Direct Claimant's preference as to whether, in the event that her Direct Claim fails to satisfy the conditions set forth in Section 4.6.5(B)(2) (as determined by the Trustees, with the assistance of the Claims Administrator and Claims Processor) under the Individual Review Process, the Submitted Claim should be processed under either the Expedited Review Process or Quickpay Review Process (the "**Secondary Election**"); and a requirement that the Direct Claimant identify and, if necessary, elect her Claimant's Jurisdiction; the Claim Submission Form template shall be adopted by the Trustees, with the consent of the TAC and the FCR, no later than the date that is sixty (60) days prior to the Initial Submission Acceptance Date and attached to the Claim Submission Procedures for Direct Claims;

(4)  Talc Use Evidence:  Evidence of the Direct Claimant's use, and extent and specific years of use, of any and all talc and talc-containing products (including both J&J Talc Products and Non-J&J Talc Products), including whether the Direct Claimant engaged in Regular Perineal Use of such products, established by sworn testimony or affidavit; and

(5)  Medical Evidence: (a) Medical records that the Direct Claimant reasonably believes are sufficient to (i) satisfy the applicable Review Criteria pursuant to these TDP and (ii) provide the Claims Administrator with all information necessary to accurately determine the appropriate Final Scheduled Point Value and resulting Allowed Claim Amount or (b) a statement of the Direct Claimant in the Claim Submission Form attesting, under the pains and penalties of perjury, to the fact that all available relevant documentation has been submitted, which statement must show proof of the Direct Claimant's MyChart or similar patient portal, identifying the Direct Claimant's treatment providers and her prior medical history.

While the precise extent of medical records required by the above Claim Submission Requirements may vary from claim to claim, depending on the particular types of Direct Claims involved, diseases alleged, and other factors relevant to the valuation of Direct Claims pursuant to these TDP, in general, production of (i) all pathology reports and contemporaneous treatment records or (ii) admission and discharge notes from any biopsy or other procedure indicating disease type, in either case, along with records sufficient to establish a Direct Claimant's relevant medical history, would be satisfactory for any Direct Claimant regardless of the type of Direct Claim asserted or Review Track elected.

Only Direct Claims that are submitted with substantially complete information and documentation at the time of submission (as determined by the Claims Administrator) shall be deemed Submitted Claims and be subjected to the Preliminary Evaluation Process set forth below.

### 4.5.5   Deficient Submissions

In the event that a Direct Claimant submits information and documentation that are insufficient (as determined by the Claims Administrator) to satisfy the Claim Submission Requirements, the Trustees shall provide a notice indicating each deficiency (a "**Deficiency Notice**") to such Direct Claimant and automatically defer further action on the relevant Direct Claim for one hundred twenty (120) days to ensure the Direct Claimant a fair opportunity to cure any such deficiencies.  If the Direct Claimant fails to either timely supplement her Direct Claim with information and documentation sufficient to resolve any deficiencies identified, or timely respond to the Deficiency Notice requesting further relief, upon expiration of the one hundred twenty (120)-day period, the Direct Claim at issue shall become a Disallowed Claim and the Trustees shall send a Disallowed Claim Notice to the relevant Direct Claimant.  If the Direct Claimant timely responds with a request for further relief, the applicable deadline to supplement her Direct Claim with information and documentation sufficient to resolve any deficiencies identified shall automatically be extended until (i) if such request for further relief is denied by the Claims Administrator, the date that is the later of (a) ten (10) days after such denial and (b) the last day of the applicable one hundred twenty (120) day deadline set forth in this paragraph, and (ii) if such request for further relief is granted by the Claims Administrator, such date as may be specified by the Claims Administrator.

In the event that the medical evidence submitted pursuant to Section 4.5.4 is deemed insufficient by the Claims Administrator to establish a Direct Claimant's relevant medical history, the Direct Claimant may submit an affidavit from her counsel (or the Direct Claimant herself if she is not represented by counsel) attesting, under the pains and penalties of perjury, to the fact that all available relevant documentation has been submitted, which affidavit must show proof of the Direct Claimant's MyChart or similar patient portal, identifying the Direct Claimant's treatment providers and her prior medical history.  The Claims Administrator shall have the sole discretion to determine whether such affidavit is sufficient to resolve the deficiency as to the medical evidence submitted.  However, medical evidence that does not include either a pathology report related to the Direct Claimant's alleged disease or, for Ovarian Cancer Claims only, the Direct Claimant's treating physician's detailed report as to the Direct Claimant's pathologic diagnosis, shall not be deemed satisfactory evidence to establish an Allowed Claim.  Direct Claimants who are unable to satisfy these requirements may, however, still be eligible to proceed under the Quickpay Review Process.

If the Direct Claim becomes a Disallowed Claim on that basis, the Trustees will not conduct a Preliminary Evaluation of such Direct Claim in accordance with Section 4.6.

If the Direct Claimant adequately cures all deficiencies identified by supplementing her Direct Claim within the one hundred twenty (120)-day deferral period (as determined by the Claims Administrator), the Direct Claim will become a Submitted Claim and shall be subjected to the Preliminary Evaluation Process in accordance with Section 4.6.

### 4.6   Claim Evaluation Procedures

To assist the Trustees to determine whether each Direct Claim submitted to the Trust is either (i) compensable and therefore should be processed pursuant to these TDP or (ii) is not

NAI-1539103334

compensable and therefore should be a Disallowed Claim, the Claims Administrator, in conjunction with the Claims Processor, shall act according to the following uniform procedures and guidelines to thoroughly and individually evaluate all Submitted Claims.

### 4.6.1    Efficient and Expeditious Processing

The Trustees shall take all reasonable steps to resolve Direct Claims as efficiently and expeditiously as possible at each stage of claims processing, including with respect to any Reconsideration Requests and/or pursuant to the ADR Procedures, which steps may include, in the Trustees' sole discretion, conducting settlement discussions with representatives with respect to more than one Direct Claim at a time, *provided, however*, that the relevant Direct Claimants' respective positions in the applicable FIFO Processing Queues are maintained and that each Direct Claim is individually evaluated pursuant to the valuation factors set forth in Article 5.

### 4.6.2    Preliminary Evaluation of Claim Submission Materials

Within sixty (60) days of each Direct Claim being deemed a Submitted Claim, the Claims Administrator shall conduct a Preliminary Evaluation of the related Claim Submission Materials to determine that:

(i)      the Submitted Claim was timely submitted to the Trust pursuant to Section 4.4;

(ii)     the Submitted Claim has not previously been submitted to the Trust pursuant to these TDP or otherwise (except for Direct Claims that were submitted and later formally withdrawn pursuant to Section 4.5.2);

(iii)    the Submitted Claim has not previously been resolved through litigation and/or settlement (including settlement under a Master Settlement Agreement), other than as described in Section 4.2;

(iv)     the Submitted Claim is not then subject to consideration for potential settlement under a Master Settlement Agreement; and

(v)      the Direct Claimant's Claim Submission Materials are substantially and substantively completed and signed under penalty of perjury.

Submitted Claims that satisfy the Preliminary Evaluation Criteria (as determined by the Claims Administrator) shall be deemed Confirmed Claims and thereafter routed to either the Expedited Review Process, the Individual Review Process, or the Quickpay Review Process, as elected by the Direct Claimant in her Claim Submission Form. A Submitted Claim that fails to satisfy one or more of the Preliminary Evaluation Criteria (as determined by the Claims Administrator) shall become a Disallowed Claim, and the Trustees shall provide a Disallowed Claim Notice to the relevant Direct Claimant.

In the event that a Submitted Claim becomes a Disallowed Claim because it was previously submitted to the Trust with different counsel, the Trust shall provide notice to the Direct Claimant regarding the duplicative submission and such Direct Claimant shall have thirty (30) days from

NAI-1539103334

the date of such notice to submit to the Trust a certification signed by such Direct Claimant, and all counsel who purported to represent the Direct Claimant in submissions to the Trust, confirming which counsel shall be representing the Direct Claimant with respect to the original Submitted Claim and withdrawing any later Submitted Claim. If the Direct Claimant satisfies this requirement, her Direct Claim will retain its place in the applicable FIFO Processing Queue based on the original Submitted Claim and the Direct Claim may proceed through the evaluation processes set forth in these TDP. Failure to timely submit such certification shall result in (i) the original Submitted Claim being indefinitely deferred pending clarification from the Direct Claimant and her counsel as to who represents the Direct Claimant and (ii) any later Submitted Claim being deemed withdrawn.

### 4.6.3    Evaluation of Confirmed Claims

For each Confirmed Claim, the Claims Administrator shall, in conjunction with the Claims Processor, individually evaluate the Claim Submission Materials with respect to such Confirmed Claim to assist the Trustees to determine whether such Confirmed Claim should be an Allowed Claim. Regardless of the Review Track selected, this process shall involve (i) a thorough review and consideration of all the Claim Submission Materials with respect to such Confirmed Claim, (ii) a full evaluation and determination as to the credibility of such Claim Submission Materials, and (iii) determination as to whether such Claim Submission Materials satisfy the applicable Review Criteria.

If the Trustees determine with the assistance of the Claims Administrator that (i) a Confirmed Claim satisfies the applicable Review Criteria and (ii) the Claim Submission Materials with respect to such Confirmed Claim are not deceptive or fraudulent, then the Confirmed Claim shall be deemed an Allowed Claim. If, on the other hand, the Trustees determine with the assistance of the Claims Administrator that (i) the Claim Submission Materials with respect to such Confirmed Claim are not deceptive or fraudulent, but (ii) the Confirmed Claim does not satisfy the applicable Review Criteria, then the Claims Administrator has the discretion to either (a) make the Confirmed Claim a Disallowed Claim, in which case the Trustees shall provide a Disallowed Claim Notice to the relevant Direct Claimant, or (b) provide a Deficiency Notice to the relevant Direct Claimant, which shall request that the Direct Claimant submit to the Trust supplemental Claim Submission Materials sufficient to resolve any deficiency within one hundred twenty (120) days of the date of the Deficiency Notice. Extensions of time to submit supplemental Claim Submission Materials may be requested by the Direct Claimant to the Claims Administrator so long as made within such one hundred twenty (120)-day period, and the Claims Administrator retains full discretion to either grant or deny any such request. If such supplemental Claim Submission Materials are not received by the Claims Administrator prior to the expiration of the one hundred twenty (120)-day period (as extended, if applicable), the Confirmed Claim shall become a Disallowed Claim, and the Trustees shall provide a Disallowed Claim Notice to the relevant Direct Claimant. If the Direct Claimant timely requests an extension of time to submit supplemental Claim Submission Materials, the applicable deadline to submit such supplemental Claim Submission Materials shall automatically be extended until (i) if such request for extension is denied by the Claims Administrator, the date that is the later of (a) ten (10) days after such denial and (b) the last day of the applicable one hundred twenty (120) day deadline set forth in this paragraph, and (ii) if such request for extension is granted by the Claims Administrator, such date as may be specified by the Claims Administrator.

NAI-1539103334

In the event, however, that the Trustees determine with the assistance of the Claims Administrator that any portion of the Claim Submission Materials with respect to a Direct Claim are deceptive or fraudulent (each, a "**Fraudulent Claim Submission**"), then such Direct Claim shall become a Disallowed Claim, and the Trustees shall provide a Disallowed Claim Notice to the relevant Direct Claimant (each, a "**Fraudulent Claimant**"). The Claim Submission Procedures shall set forth the criteria that the Claims Administrator will evaluate in making determinations with respect to a Fraudulent Claim Submission. Further, if the Trustees determine that any individual attorney or law firm is continually representing Fraudulent Claimants and submitting Fraudulent Claim Submissions to the Trust, the Direct Claims of other Direct Claimants who are represented by such attorney or law firm, in their evaluation under these TDP, shall be subject to such heightened scrutiny as the Trustees with the assistance of the Claims Administrator deem appropriate; *provided*, *however*, that such other Direct Claimants that may be subject to such heightened scrutiny shall not otherwise be prejudiced with respect to the processing of their Direct Claims.

### 4.6.4    Expedited Review Process

#### (A)    In General

For each Confirmed Claim electing to proceed under the Expedited Review Process, the Claims Administrator shall, in conjunction with the Claims Processor, thoroughly review and evaluate the Claim Submission Materials with respect to such Confirmed Claim to assist the Trustees to determine whether the Expedited Review Criteria are satisfied. If, in undertaking the Expedited Review Process, the Trustees determine with the assistance of the Claims Administrator that a Confirmed Claim satisfies such Expedited Review Criteria, then such Confirmed Claim shall become an Allowed Claim and shall proceed to the valuation processes set forth in Section 5.3. If the Trustees determine with the assistance of the Claims Administrator that a Confirmed Claim does not satisfy such Expedited Review Criteria, then such Confirmed Claim shall become a Disallowed Claim, and the Trustees shall provide a Disallowed Claim Notice to the relevant Direct Claimant.

#### (B)    Expedited Review Criteria

Confirmed Claims that are Ovarian Cancer Claims proceeding under the Expedited Review Process and that satisfy the following Expedited Review Criteria shall become Allowed Claims, and Confirmed Claims that are Ovarian Cancer Claims proceeding under the Expedited Review Process but that fail to satisfy the following Expedited Review Criteria shall become Disallowed Claims:

    (1)   <u>Proof of Regular J&J Talc Perineal Use</u>: the Direct Claimant establishes Regular J&J Talc Perineal Use; and

    (2)   <u>Date of First Diagnosis</u>: the Direct Claimant's Date of First Diagnosis for Ovarian Cancer was at least ten (10) years following the first day of her Regular J&J Talc Perineal Use.

### 4.6.5   Individual Review Process

#### (A)   In General

The Individual Review Process is available for any Direct Claimant who (i) elects to have her Direct Claim evaluated under the Individual Review Process on her Claim Submission Form and (ii) pays to the Trust a one-time, non-refundable administrative fee in the amount of one thousand dollars and zero cents ($1,000.00) with her Claim Submission Form.  If a Direct Claimant fails to include the administrative fee with her Claim Submission Form, her Direct Claim shall automatically be evaluated under the Expedited Review Process or the Quickpay Review Process, whichever is indicated by the Direct Claimant as her Secondary Election on her Claim Submission Form, rather than under the Individual Review Process.

For each Confirmed Claim electing to proceed under the Individual Review Process as to which the applicable fee has been paid, the Trustees shall, with the assistance of the Claims Administrator and Claims Processor, review and evaluate the Claim Submission Materials with respect to such Confirmed Claim to determine whether the Individual Review Criteria are satisfied.

A Direct Claimant who initially elected on her Claim Submission Form to have her Direct Claim evaluated under the Quickpay Review Process may not later request to have her Direct Claim evaluated under the Individual Review Process.

A Direct Claimant who initially elected on her Claim Submission Form to have her Direct Claim evaluated pursuant to the Individual Review Process may, at any time after the date her Direct Claim was submitted to the Trust, but before such Direct Claimant receives a Disallowed Claim Notice or an Allowed Claim Notice, as applicable, request to have her Direct Claim evaluated under either the Expedited Review Process or the Quickpay Review Process instead by providing written notice to the Trust.  A Direct Claimant who initially elected to proceed under the Individual Review Process and paid the required administrative fee, but later switches Review Tracks, shall not recover the administrative fee.

#### (B)   Individual Review Criteria

A Confirmed Claim evaluated under the Individual Review Process shall become an Allowed Claim if it satisfies the following Individual Review Criteria:

> (1)   the Confirmed Claim satisfies either the applicable Expedited Review Criteria (if the Direct Claimant indicated the Expedited Review Process as her Secondary Election) or the Quickpay Review Criteria (if the Direct Claimant indicated the Quickpay Review Process as her Secondary Election); and

> (2)   the Confirmed Claim satisfies at least one of the following: (a) the Direct Claimant has little likelihood of substantial recovery elsewhere; (b) the Direct Claimant is experiencing Exigent Financial Hardship; or (c) the Confirmed Claim exhibits other extraordinary characteristics that merit the Confirmed Claim becoming an Allowed Claim.

25

A Direct Claimant seeking evaluation under the Individual Review Process may submit any Claim Submission Materials she deems relevant to satisfy the conditions set forth in clause (2) of the preceding sentence.

If, in undertaking the Individual Review Process, the Trustees, with the assistance of the Claims Administrator and Claims Processor, determine that a Confirmed Claim satisfies the Individual Review Criteria in Section 4.6.5(B)(1) and Section 4.6.5(B)(2), then such Confirmed Claim shall be an Allowed Claim and shall proceed to the valuation processes set forth in Section 5.4.

If the Trustees, with the assistance of the Claims Administrator and Claims Processor, determine that a Confirmed Claim fails to satisfy the conditions set forth in Section 4.6.5(B)(2), but determine that such Confirmed Claim satisfies the conditions set forth in Section 4.6.5(B)(1) (*i.e.*, the Expedited Review Criteria (if the Direct Claimant indicated the Expedited Review Process as her Secondary Election) or the Quickpay Review Criteria (if the Direct Claimant indicated the Quickpay Review Process as her Secondary Election)), such Confirmed Claim shall be an Allowed Claim but shall not proceed to the valuation processes set forth in Section 5.4 and instead shall proceed to the valuation processes set forth in Section 5.3 (if the Direct Claimant indicated the Expedited Review Process as her Secondary Election) or Section 5.5 (if the Direct Claimant indicated the Quickpay Review Process as her Secondary Election), and the Trustees shall provide a written notice to that effect to the relevant Direct Claimant (a "**Secondary Election Activation Notice**").

If the Trustees, with the assistance of the Claims Administrator and Claims Processor, determine that a Confirmed Claim fails to satisfy the Individual Review Criteria in Section 4.6.5(B)(1) and Section 4.6.5(B)(2), such Confirmed Claim shall be deemed a Disallowed Claim, and the Trustees shall provide a Disallowed Claim Notice to the relevant Direct Claimant.

### 4.6.6    Quickpay Review Process

#### (A)    In General

For each Confirmed Claim electing to proceed under the Quickpay Review Process, the Claims Administrator, with a focus on efficiency, shall, in conjunction with the Claims Processor, review and evaluate the Claim Submission Materials with respect to such Confirmed Claim to assist the Trustees to determine whether the Quickpay Review Criteria are satisfied. If in doing so the Trustees determine with the assistance of the Claims Administrator that a Confirmed Claim satisfies the Quickpay Review Criteria, then such Confirmed Claim shall be deemed an Allowed Claim and shall proceed to the valuation processes set forth in Section 5.5. If the Trustees determine with the assistance of the Claims Administrator that a Confirmed Claim does not satisfy the Quickpay Review Criteria, then such Confirmed Claim shall become a Disallowed Claim, and the Trustees shall provide a Disallowed Claim Notice to the relevant Direct Claimant.

A Direct Claimant who initially elected on her Claim Submission Form to have her Direct Claim evaluated pursuant to the Expedited Review Process or the Individual Review Process may, at any time after the date her Direct Claim was submitted to the Trust, but before such Direct Claim

becomes a Disallowed Claim or is paid, as applicable, request to have her Direct Claim evaluated under the Quickpay Review Process in this Section 4.6.6 instead.

**(B)     Quickpay Review Criteria**

Confirmed Claims that are Ovarian Cancer Claims or Gynecological Claims and that satisfy the following Quickpay Review Criteria shall become Allowed Claims, and Confirmed Claims that are Ovarian Cancer Claims or Gynecological Claims but fail to satisfy the following Quickpay Review Criteria shall be Disallowed Claims:

(1)     <u>Proof of Regular J&J Talc Perineal Use</u>: the Direct Claimant establishes Regular J&J Talc Perineal Use; and

(2)     <u>Date of First Diagnosis</u>: the Direct Claimant's Date of First Diagnosis for Ovarian Cancer or Gynecological Cancer was at least ten (10) years following the first day of her Regular J&J Talc Perineal Use.

**Article 5**
**VALUATION OF DIRECT CLAIMS**

**5.1     In General**

The Claims Administrator, in conjunction with the Claims Processor, shall identify and utilize the appropriate valuation process, as described in this Article 5, to assist the Trustees to determine the value for every Direct Claim that becomes an Allowed Claim.  These valuation processes are intended to be a direct continuation of the resolution process for Direct Claimants, commencing immediately upon determination by the Trustees that her Direct Claim has become an Allowed Claim under the applicable Review Process.  Promptly after determination of the value for an Allowed Claim under this Article 5, the Trustees shall provide an Allowed Claim Notice to the relevant Direct Claimant, which Allowed Claim Notice shall indicate (i) the determination that her Direct Claim has become an Allowed Claim and (ii) the proposed Allowed Claim Amount of her Direct Claim.

**5.2     Punitive and Other Non-Compensable Damages**

No punitive or exemplary damages shall be payable with respect to any Direct Claim litigated against the Trust in the tort system pursuant to Article 6 herein.

**5.3     Determination of Scheduled Point Values Under Expedited Review Process**

**5.3.1     Valuation Process**

Upon determination by the Trustees that an Ovarian Cancer Claim submitted to the Trust by a Direct Claimant that elected to proceed under the Expedited Review Process is an Allowed Claim, the Claims Administrator, in conjunction with the Claims Processor, shall undertake the following seven (7)-stage valuation process with respect to such Ovarian Cancer Claim.  This process requires the Claims Administrator:

NAI-1539103334

(1)    To identify the Initial Scheduled Point Value based on the Direct Claimant's age on the Date of Relevant Diagnosis and specific category of injury; then

(2)    To establish the Adjusted Scheduled Point Value based on the Initial Scheduled Point Value and the Diagnostic Adjustment as determined by the disease subtypes; then

(3)    To further adjust the Adjusted Scheduled Point Value based on the length of Regular J&J Talc Perineal Use; then

(4)    To further adjust the Adjusted Scheduled Point Value based on the length of time between the end of the Direct Claimant's Regular J&J Talc Perineal Use and the Date of First Diagnosis; then

(5)    To further adjust the Adjusted Scheduled Point Value based on atypical perineal use of J&J Talc Products, if applicable; then

(6)    To further adjust the Adjusted Scheduled Point Value by a certain percentage discount based on the existence of certain medical risk factors as set forth in Section 5.3.4(D) below, if applicable; and finally

(7)    To further adjust the Adjusted Scheduled Point Value based on the extent of the Direct Claimant's Regular Non-J&J Talc Perineal Use, if applicable.

### 5.3.2   Initial Scheduled Point Value

The Initial Scheduled Point Values for Ovarian Cancer Claims that have become Allowed Claims, prior to the application of any of the listed adjustments and/or reductions, will be determined based on the Direct Claimant's age and stage of cancer as detailed in the chart below. The relevant age shall be determined based on a Direct Claimant's age on the Date of Relevant Diagnosis. The relevant stage of cancer shall be determined by the most advanced stage of Ovarian Cancer the Direct Claimant received a diagnosis for, as established by the medical evidence included in the Claim Submission Materials with respect to the relevant Ovarian Cancer Claim. Such medical evidence must be (i) provided by a board-certified medical doctor, doctor of osteopathy, oncologist, or pathologist with qualified expertise to diagnose Ovarian Cancer and (ii) documented in contemporaneous medical records.[2]

---

[2]    The Trustees shall determine the applicable stage of cancer in accordance with the meanings and definitions thereof that are generally accepted in the medical community.

NAI-1539103334

| Age on Date of Relevant Diagnosis (in years) | Stage IV **OR** Related Death | Stage III (with or without recurrence) | Stage I-II (with recurrence) | Stage II (without recurrence) | Stage I (without recurrence) |
|---|---|---|---|---|---|
| Under 45 | 1,200 | 840 | 420 | 240 | 120 |
| 45-49 | 1,020 | 715 | 355 | 205 | 100 |
| 50-54 | 780 | 545 | 275 | 155 | 80 |
| 55-59 | 660 | 460 | 230 | 130 | 65 |
| 60-64 | 480 | 335 | 170 | 95 | 50 |
| 65-69 | 360 | 250 | 125 | 70 | 35 |
| 70+ | 300 | 210 | 105 | 60 | 30 |

### 5.3.3   Adjusted Scheduled Point Value

Each Ovarian Cancer Claim's Initial Scheduled Point Value will then be adjusted by multiplying such Initial Scheduled Point Value by the applicable Diagnostic Adjustment set forth in the chart below.[3]  The resulting claim-specific Point Value shall be referred to as the Adjusted Scheduled Point Value.

| Ovarian Cancer Diagnostic Subtypes | Diagnostic Adjustment |
|---|---|
| Serous Carcinoma | 100% |
| Endometrioid Carcinoma | 90% |
| Clear Cell Carcinoma | 75% |
| Mixed Epithelial Carcinoma | See below |
| • Each subtype identified is a qualifying subtype (*e.g.*, serous with clear cell) | 100% |
| • Primary subtype is a qualifying subtype (*i.e.*, serous, endometrioid, clear cell) but other subtypes are non-qualifying (*e.g.*, serous with mucinous) | 65% |
| Undifferentiated Epithelial Carcinoma | 100% |
| Ovarian Carcinoma with Epithelial Component of Unknown or Unidentified Subtype (*e.g.*, "ovarian adenocarcinoma") | 50% |
| Borderline Ovarian Tumors with Serous, Endometrioid, or Clear Cell Subtypes | 30% |

### 5.3.4   Further Adjustments to Adjusted Scheduled Point Value

Each Ovarian Cancer Claim's Adjusted Scheduled Point Value will then be further adjusted based on a series of multiplicative talc usage and medical risk factors to determine the

---

[3]     The Trustees shall determine the applicable Ovarian Cancer diagnostic subtype in accordance with the meanings and definitions thereof that are generally accepted in the medical community.

NAI-1539103334

Final Scheduled Point Value for the Ovarian Cancer Claim, as set forth in this Section 5.3.4 and Section 5.3.5.

### (A)    Step I Adjustment:  Length of Perineal Use

Each Ovarian Cancer Claim's Adjusted Scheduled Point Value shall be adjusted based on the total length of the Direct Claimant's Regular J&J Talc Perineal Use (*i.e.*, the number of years of Regular Perineal Use of J&J Talc Products in her perineal area).  Specifically, the Adjusted Scheduled Point Value shall be reduced proportional to the Years of Regular J&J Talc Perineal Use relative to the Maximum Years of Regular Perineal Use where "**Years of Regular J&J Talc Perineal Use**" shall mean the lesser of (i) the number of full years of Regular J&J Talc Perineal Use after the Direct Claimant reached puberty and prior to the Date of First Diagnosis[4] or (ii) forty (40) years, and "**Maximum Years of Regular Perineal Use**" shall mean the lesser of (i) the number of years elapsed between puberty and the Direct Claimant's Date of First Diagnosis or (ii) forty (40) years.

$$Step\ I\ Adjustment\ of\ Adjusted\ Point\ Value\ =\ 1 - \frac{(Years\ of\ Regular\ J\&J\ Talc\ Perineal\ Use\ )}{(Maximum\ Years\ of\ Regular\ Perineal\ Use\ )}$$

This reduction factor shall be referred to as the "**Length of Perineal Use Factor**" and expressed as a percentage, and shall not be less than 0% or exceed 100%.

By way of example, if a Direct Claimant was forty-three (43) years old when first diagnosed with the Ovarian Cancer, which diagnosis is the subject of her Direct Claim, the Maximum Years of Regular Perineal Use is thirty (30) years.  If she regularly used J&J Talc Products in her perineal area for twenty (20) full years between ages thirteen (13) and forty-three (43), then the Adjusted Scheduled Point Value would be subject to a Length of Perineal Use Factor adjustment of 1-(20 years/30 years) = 33.33%.

### (B)    Step II Adjustment: Time Since Last Perineal Use

Next, the Adjusted Scheduled Point Value shall be further adjusted based on the length of time between the Direct Claimant's last Regular J&J Talc Perineal Use and her Date of First Diagnosis, as set forth in the following table:

| Time Since Last Regular J&J Talc Perineal Use | Reduction of Adjusted Scheduled Point Value |
|---|---|
| 0 to <6 years | 0% |
| 6 to <30 years | 2% per year[5] |
| 30+ years | 55% |

---

[4]    For purposes of evaluating claims pursuant to these TDP, a Direct Claimant shall be assumed to have reached puberty on her thirteenth birthday.

[5]    A Direct Claimant who was diagnosed with a qualifying disease ten (10) years after her last Regular J&J Talc Perineal Use would be subject to a Time Since Last Use Factor discount of (10– 6) x 2% = 8%.

NAI-1539103334

This reduction factor shall be referred to as the "**Time Since Last Use Factor**" and expressed as a percentage, and shall not be less than 0% or exceed 55%.

### (C)    Step III Adjustment:  Atypical Perineal Use

Next, if the Claims Administrator and/or Claims Processor determines that a Direct Claimant's perineal use of J&J Talc Products varies substantially from the use pattern of the typical qualifying claim, the Trustees may, with the consent of the TAC and the FCR, conduct an individual review of the Claim Submission Materials with respect to the Ovarian Cancer Claim and reasonably reduce the Adjusted Scheduled Point Value based on the frequency the Direct Claimant's perineal talc use of J&J Talc Products, as compared to what would constitute normal use based on other submissions.  This discretionary reduction factor shall be referred to as the "**Atypical Use Factor**" and expressed as a percentage, and, if applicable, shall not be less than 0% or exceed 100%.

By way of example, if 5% of Ovarian Cancer Claims allege monthly exposure to J&J Talc Products through lining tampons or other feminine hygiene products with J&J Talc Product prior to application on the Direct Claimant's body, the Trustees may determine that such use is not a typical use of J&J Talc Products.  The Adjusted Scheduled Point Value would be subject to an Atypical Use Factor adjustment in a percentage determined by the Trustees, with the consent of the TAC and the FCR.

### (D)    Step IV Adjustment:  Medical Risk Factors

Next, the Adjusted Scheduled Point Value shall be further reduced based on the Direct Claimant's family history and genetic predisposition to ovarian cancer, based on the table below. If more than one medical risk factor is present, only the greatest of the reductions for applicable medical risk factors shall apply.  Discounts applicable pursuant to this Section 5.3.4(D) are not applied cumulatively (*i.e.*, if a Direct Claimant has BRCA 1 as well as a family history of ovarian cancer, the total reduction is 45%, not 80%).

| Risk Factor | Reduction of Adjusted Scheduled Point Value |
|---|---|
| BRCA 1 or BRCA 2 | 45% |
| Family history of Ovarian Cancer (in 1st degree relative) | 35% |
| Personal or family history (in 1st degree relative) of colon or breast cancer | 20% |

This reduction factor shall be referred to as the "**Medical Risk Factor**" and expressed as a percentage, and, if applicable, shall be 20%, 35%, or 45%, and no other percentage.

### (E)    Step V Reductions:  Non-J&J Talc Perineal Use

Next, the Adjusted Scheduled Point Value shall be further adjusted based on a Direct Claimant's Regular Non-J&J Talc Perineal Use (if applicable and established by sworn testimony or affidavit).

NAI-1539103334

| Discounts | Reduction of Adjusted Scheduled Point Value |
|---|---|
| Other Talc Use<br>(applies only if Regular Non-J&J Talc Perineal Use) | 25%<br>(increasing to the total percentage of Regular Perineal Use that is Regular Non-J&J Talc Perineal Use) |

This reduction factor shall be referred to as the "**Non-J&J Talc Use Factor**" and expressed as a percentage, and, if applicable, shall not be less than 25% or exceed 100%.

By way of example, if a Direct Claimant used J&J Talc Products every morning in her perineal area and used Non-J&J Talc Products every evening in her perineal area for thirty (30) years (i.e., half of her perineal area applications were J&J Talc Products and half were Non-J&J Talc Products), then the Adjusted Scheduled Point Value of her Ovarian Cancer Claim will be reduced by 50% = 30 years of Regular Non-J&J Talc Perineal Use / (30 years of Regular J&J Talc Perineal Use + 30 years of Regular Non-J&J Talc Perineal Use). If, instead, she had used Non-J&J Talc Products in her perineal area once a day for four (4) years and used J&J Talc Products in her perineal area once a day for twenty (20) years (i.e., one-sixth of the Regular Perineal Use of talc-based products in her perineal area was use of Non-J&J Talc Products), then the Adjusted Scheduled Point Value of her claim will be reduced by the minimum 25%.

### 5.3.5    Final Scheduled Point Value

The Final Scheduled Point Value of each Ovarian Cancer Claim shall be determined based on the Initial Scheduled Point Value multiplied by the relevant Diagnostic Adjustment and any applicable reduction factors outlined in Steps I–V (rounded to the nearest whole number), as follows:

$$
\begin{aligned}
&\textit{Final Scheduled Point Value}\\
&= (\textit{Initial Scheduled Point Value}) \times (\textit{Diagnostic Adjustment})\\
&\quad \times (1 - \textit{Length of Use Factor Reduction})\\
&\quad \times (1 - \textit{Time Since Last Use Factor Reduction})\\
&\quad \times (1 - \textit{Inconsistent Use Factor Reduction})\\
&\quad \times (1 - \textit{Medical Risk Factor Reduction})\\
&\quad \times (1 - \textit{Non J\&J Talc Use Factor Reduction})
\end{aligned}
$$

By way of example, if a Direct Claimant with an Ovarian Cancer Claim was diagnosed with the Stage IV clear cell carcinoma, which diagnosis is the basis of her Direct Claim, at age fifty-three (53), had thirty (30) years of Regular J&J Talc Perineal Use, stopped using J&J Talc Products in her perineal area ten (10) years before the Date of First Diagnosis, has a family history of colon cancer in her mother, and never used Non-J&J Talc Products in her perineal area, then the Final Scheduled Point Value of her Ovarian Cancer Claim would be 323 points.

NAI-1539103334

| | | | |
|---|---|---|---|
| **Initial Scheduled Point Value** | | | **780** |
| Diagnostic Adjustment | Clear cell ovarian carcinoma = 75% | × | 75% |
| **Adjusted Scheduled Point Value** | | | **585** |
| Adjustment for Length of Regular Perineal Use Factor | 1–(30÷40) = 25% | × | 75% = 1 – 25% **438.75** |
| Adjustment for Time Since Last Use Factor | (10–6)×2% = 8% | × | 92% = 1 – 8% **403.65** |
| Adjustment for Atypical Use Factor | Discretionary (not applied) | × | n/a |
| Adjustment for Medical Risk Factor | Colon cancer in family history = 20% | × | 80% = 1 – 20% **322.92** |
| Adjustment for Non-J&J Talc Use Factor | 0 years of total use = 0% | × | 100% = 1 – 0% **322.92** |
| **Final Scheduled Point Value** | | = | **322.92 (rounded to 323)** |

## 5.4    Determination of Final Scheduled Point Values Under Individual Review Process

### 5.4.1    Underlying Scheduled Point Value

Upon determination by the Trustees that an Ovarian Cancer Claim submitted to the Trust by a Direct Claimant that elected to proceed under the Individual Review Process is an Allowed Claim, the Claims Administrator, in conjunction with the Claims Processor, shall undertake the seven (7)-stage valuation process set forth in Section 5.3 with respect to such Ovarian Cancer Claim to determine the Point Value of such Allowed Claim that would have resulted if such Direct Claimant had elected to proceed under the Expedited Review Process.  The resulting claim-specific Point Value shall be referred to as the Underlying Scheduled Point Value.

### 5.4.2    Final Scheduled Point Value

To determine the Final Scheduled Point Value of such Allowed Claim, the Trustees shall then apply to the Underlying Scheduled Point Value a multiplier on account of the extraordinary nature of such Allowed Claim not to exceed three times (3x), as the Trustees shall determine in their sole discretion.

The Trustees shall take into consideration factors that affect the amount of damages and values in the tort system, including credible evidence of:  (i) the degree to which the characteristics of a Direct Claim allowed under the Individual Review Process differ from a Direct Claim processed under the Expedited Review Process; and (ii) factors such as (a) the Direct Claimant's age, disabilities, dependents, and employment status, (b) disruption of the Direct Claimant's household, family, or recreational activities, and (c) the Direct Claimant's pain and suffering.

## 5.5    Determination of Allowed Claim Amounts Under Quickpay Review Process

Gynecological Claims shall only be eligible to receive amounts based on the Quickpay Review Process below in this Section 5.5.

NAI-1539103334

Upon determination by the Trustees that a Direct Claim submitted to the Trust is an Allowed Claim under the Quickpay Review Process, the Claims Administrator, in conjunction with the Claims Processor, shall determine the Allowed Claim Amount for such Allowed Claim pursuant to Section 5.5.1 or Section 5.5.2, as applicable. For the avoidance of doubt, the Allowed Claim Amounts under Section 5.5.1 and Section 5.5.2 are fixed and may not be challenged by a Reconsideration Request under Article 6, or otherwise.

### 5.5.1   Direct Claims For Which Expedited Review Process Available

If a Direct Claimant could have appropriately elected to submit her Direct Claim to the Trust pursuant to the Expedited Review Process, but for whatever reason chose instead to elect the Quickpay Review Process, the resulting Allowed Claim shall have an Allowed Claim Amount of one thousand five hundred dollars and zero cents ($1,500.00).

### 5.5.2   Gynecological Claims

Gynecological Claims that become Allowed Claims shall have an Allowed Claim Amount of one thousand five hundred dollars and zero cents ($1,500.00).

## Article 6
## RECONSIDERATION REQUESTS BY DIRECT CLAIMANTS

### 6.1   Reconsideration of Determinations Other Than Individual Review Process Determinations

#### 6.1.1   Reconsideration Requests

##### (A)   Requirements for Reconsideration Requests

Following receipt of (i) a Disallowed Claim Notice or (ii) solely with respect to Direct Claims that become Allowed Claims under the Expedited Review Process, an Allowed Claim Notice, a Direct Claimant may submit to the Trust a Reconsideration Request pursuant to this Section 6.1.1; *provided*, *however*, that, for the avoidance of doubt, the procedures set forth in this Section 6.1.1 shall be inapplicable to (a) any Disallowed Claim Notice or Secondary Election Activation Notice provided to a Direct Claimant under Section 4.6.5 and (b) any Allowed Claim Notice with respect to a Direct Claim that becomes an Allowed Claims under the Individual Review Process. For a Reconsideration Request to be considered, it must be properly submitted to the Trust in accordance with the process therefor set forth in the Claim Submission Procedures for Direct Claims. Each Reconsideration Request submitted to the Trust pursuant to this Section 6.1.1 must include:

(1)    a completed Reconsideration Request form, the template for which shall be attached to the Claim Submission Procedures for Direct Claims; and

(2)    payment of five hundred dollars and zero cents ($500.00) as an administrative reconsideration fee.

34

**(B)    Forfeiture of Right to Request Reconsideration**

Direct Claimants found to have submitted deceptive or fraudulent Claim Submission Materials to the Trust shall be deemed to have forfeited their right to request reconsideration pursuant to this Section 6.1.1.

**(C)    Failure to Request Reconsideration Deemed Acceptance**

The deadline to submit a Reconsideration Request pursuant to this Section 6.1.1 shall be sixty (60) days after the date of a Disallowed Claim Notice or Allowed Claim Notice.  Any Direct Claimant who fails to properly submit a Reconsideration Request to the Trust prior to the expiration of such sixty (60)-day period shall be deemed to accept the determination set forth in the applicable Disallowance Claim Notice or Allowed Claim Notice, which determination shall thereupon become final and non-appealable.

**(D)    Reconsideration Request Procedures**

Upon receipt of a properly submitted Reconsideration Request, the Trustees shall proceed with a re-evaluation of the Direct Claim.  The Trustees will have the sole discretion whether to grant or deny the Reconsideration Request and will provide written notice of their decision to grant or deny the Reconsideration Request within thirty (30) days of receiving the Reconsideration Request, as described below.

If a Reconsideration Request is denied, the administrative fee will not be returned, and the Trustees will provide timely written notice to the relevant Direct Claimant that it will not reconsider the Direct Claim (a "**Reconsideration Denial Notice**").  The Direct Claimant shall retain the ability to pursue her Direct Claim in mediation or litigation pursuant to the ADR Procedures and litigation procedures set forth below in Sections 6.1.2 and Section 6.1.3, respectively.

If a Reconsideration Request is granted, the Trustees will provide timely written notice to the relevant Direct Claimant that they are reconsidering her Direct Claim (a "**Reconsideration Grant Notice**").  The Trustees will then reconsider the Direct Claim, including all new Claim Submission Materials provided by the Direct Claimant to the Trust in the Reconsideration Request, and will have the discretion to maintain or revise the original determination, or alternatively to request supplemental Claim Submission Materials as necessary to reach a final conclusion.  The Trustees will use their best efforts to provide the Direct Claimant written notice of their decision to affirm or revise the original determination within sixty (60) days of having sent the applicable Reconsideration Grant Notice.

To the extent the Trustees determine that a Submitted Claim, upon reconsideration is an Allowed Claim (if it was previously a Disallowed Claim) or should receive a higher or lower proposed Final Scheduled Point Value, the Trustees shall provide an Allowed Claim Notice and, unless the Trustees determine that such Submitted Claim should receive a lower proposed Final Scheduled Point Value, return the administrative fee to the Direct Claimant.  If, however, the Trustees decide that no change to the original determination is warranted, that the Allowed Claim should receive a lower proposed Final Scheduled Point Value, or that the Claims Submission Materials provided by the Direct Claimant were insufficient to reach a final conclusion, then the

administrative fee shall not be returned and either (i) the earlier allowance determination and/or Final Scheduled Point Value shall stand or (ii) if the Trustees decided that the Allowed Claim should receive a lower proposed Final Scheduled Point Value, such lower proposed Final Scheduled Point Value shall apply. The Trustees will use their best efforts to provide written notice of their decision within sixty (60) days of the Trust having sent the applicable Reconsideration Grant Notice (a "**Reconsideration Decision Notice**").

### 6.1.2   ADR Procedures

If (i) a Reconsideration Request is denied or (ii) the Direct Claimant remains unsatisfied with the Trustees' determination upon reconsideration, then the Direct Claimant may elect to proceed to mediation by providing written notice to the Claims Administrator within sixty (60) days of the date of the applicable Reconsideration Denial Notice, Allowed Claim Notice, or Reconsideration Decision Notice. If the Direct Claimant does not timely provide such written notice requesting mediation, then the applicable Disallowed Claim Notice or Allowed Claim Notice shall be final and non-appealable.

The Trustees shall, with the consent of the TAC and the FCR, prepare and maintain a list of approved mediators, which shall be made available to all Direct Claimants who submit their Direct Claims to the Trust. The Claims Administrator and the Direct Claimant shall jointly choose a mediator (the "**Mediator**") from the list maintained by the Trustees. If the Claims Administrator and the Direct Claimant are unable to reach agreement regarding the Mediator, the TAC shall select one from the list maintained by the Trustees.

The Mediator will work with the Claims Administrator and the Direct Claimant to reach a settlement of the Direct Claim that is mutually acceptable to the Trustees and the Direct Claimant; *provided*, *however*, that the settlement amount may not exceed the Maximum Value of the Direct Claim. The Mediator shall not have the authority to unilaterally impose a settlement upon the parties. The Direct Claimant and Trust shall split the fees and expenses incurred by the Mediator equally; *provided*, *however*, that the Direct Claimant's share of the Mediator's fees and expenses shall be capped at two thousand five hundred dollars and zero cents ($2,500.00). The parties shall otherwise bear their own costs, including legal fees.

If the mediation results in a settlement agreement, the agreed-upon amount shall constitute the Direct Claimant's Allowed Claim Amount and payment of such Allowed Claim shall be processed in the same manner as payments made to Direct Claimants who did not submit a Reconsideration Request. If the mediation concludes with no settlement, the Mediator will formally conclude mediated discussions and the Direct Claimant may proceed to litigation pursuant to Section 6.1.3.

### 6.1.3   Litigation

A Direct Claimant who has exhausted his or her rights pursuant to Sections 6.1.1 and Section 6.1.2 shall retain the right to institute a lawsuit in the tort system against the Trust in the Claimant's Jurisdiction in order to determine the compensatory amount of her Direct Claim. Such lawsuit may not name the Debtor, J&J, or any other Debtor Corporate Party, or any other Protected Party and must only be filed against the Trust as defendant. Any such lawsuit must be filed by the

36

Direct Claimant in her own right and name and not as a member or representative of a class or acting in the public interest pursuant to a statute allowing for a private right of action or otherwise, and no such lawsuit may be consolidated with any other lawsuit. For the avoidance of doubt, an Indirect Claimant may not pursue litigation pursuant to the provisions contained in this Section 6.1.3.

A Direct Claimant seeking to commence litigation pursuant to this Section 6.1.3 must notify the Trust of her intention to seek judicial review within sixty (60) days following the conclusion of ADR Procedures pursuant to Section 6.1.2. Direct Claimants who seek judicial review of the Trust's determination of the Final Scheduled Point Value of a Direct Claim must pay a fee of two thousand five hundred dollars and zero cents ($2,500.00) to the Trust, and Direct Claimants who seek judicial review of the Trust's determination that the Direct Claim is a Disallowed Claim must pay a fee of ten thousand dollars and zero cents ($10,000.00) to the Trust.

Both the Direct Claimant and the Trust shall have all appropriate defenses available to them (including, with respect to the Trust, all defenses which could have been asserted by any Protected Party). Further, the Trust may use any and all Claim Submission Materials with respect to a Direct Claim in its defense of any lawsuit in the tort system, including evidence of deceptive or fraudulent behavior. The Trustees shall have authority to settle such lawsuits in the exercise of their business judgment. However, the settlement amount of such settlement agreement may not exceed the Maximum Value of the Direct Claim.

In the event a Direct Claimant elects to pursue a lawsuit pursuant to this Section 6.1.3 which results, after waiver and/or exhaustion of any party's rights of appeal, in a final judgment for monetary damages, then such Direct Claimant shall be eligible to receive payment from the Trust of the portion of such judgment that constitutes compensatory damages, up to the Maximum Value of such Direct Claim (the "**Allowed Judgment Amount**"). Payment of the Allowed Judgment Amount shall be processed in the same manner as payments made to Direct Claimants who did not submit a Reconsideration Request, except that upon reaching the front of the FIFO Payment Queue, the Trust shall distribute to the Direct Claimant only an initial payment equal to Trust's last offer, if any, to the Direct Claimant (*provided*, *however*, that in no event shall such payment amount exceed the amount of the judgment obtained in the tort system). The balance of the judgment, up to the Allowed Judgment Amount for the Direct Claim, if any, shall be paid to the Direct Claimant in five (5) equal installments in years six (6) through ten (10) following the year of the initial payment. Under no circumstances shall any non-compensatory monetary damages or any interest be paid under any statute on any judgments obtained in the tort system.

In the event that the Direct Claimant prevails at trial but is awarded a judgment less than the Trust's last offer, if any, the Allowed Judgment Amount shall be reduced on a dollar-for-dollar basis by all fees, costs, and expenses the Trust incurred in defending against the Direct Claimant's lawsuit; *provided*, *however*, that such dollar-for-dollar reduction shall not exceed the Allowed Judgment Amount. In the event that the Direct Claimant does not prevail at trial, the Direct Claim shall be a Disallowed Claim.

NAI-1539103334

**6.2      Reconsideration of Individual Review Process Determinations**

Following receipt of (i) a Disallowed Claim Notice or a Secondary Election Activation Notice provided under Section 4.6.5 or (ii) solely with respect to Confirmed Claims that become Allowed Claims under the Individual Review Process, an Allowed Claim Notice, a Direct Claimant may submit to the Trust a Reconsideration Request pursuant to this Section 6.2. For such a Reconsideration Request to be considered, it must be properly submitted to the Trust in accordance with the process set forth in the Claim Submission Procedures for Direct Claims. Each Reconsideration Request submitted to the Trust pursuant to this Section 6.2 must include a completed Reconsideration Request form, the template for which shall be attached to the Claim Submission Procedures for Direct Claims.

The deadline to submit a Reconsideration Request pursuant to Section 6.2 shall be sixty (60) days after the date of a Disallowed Claim Notice, a Secondary Election Activation Notice, or an Allowed Claim Notice. Any Direct Claimant who fails to properly submit a Reconsideration Request to the Trust prior to the expiration of such sixty (60)-day period shall be deemed to accept the determination set forth in the applicable Disallowed Claim Notice, Secondary Election Activation Notice, or Allowed Claim Notice, which determination shall thereupon become final and non-appealable.

In the event that a Direct Claimant submits a Reconsideration Request to the Trust consistent with this Section 6.2, such Reconsideration Request shall be submitted to a special panel of individuals established by the Trustees with the consent of the TAC and the FCR (the "**Individual Review Claims Panel**") for resolution. Upon receipt of a properly submitted Reconsideration Request, the Individual Review Claims Panel shall proceed with a re-evaluation of the Direct Claim. The Individual Review Claims Panel will have the sole discretion whether to grant or deny the Reconsideration Request and will provide written notice of their decision to grant or deny the Reconsideration Request within thirty (30) days of receiving the Reconsideration Request, as described below.

If a Reconsideration Request is denied by the Individual Review Claims Panel, the Individual Review Claims Panel will provide timely written notice to the relevant Direct Claimant that it will not reconsider the Direct Claim. The decision of the Individual Review Claims Panel to deny the Reconsideration Request shall be final and binding, and not subject to any further administrative or judicial review, including pursuant to Section 6.1.2 or Section 6.1.3.

If a Reconsideration Request is granted by the Individual Review Claims Panel, the Individual Review Claims Panel will provide timely written notice to the relevant Direct Claimant that it is reconsidering her Direct Claim. The Individual Review Claims Panel will then reconsider the Direct Claim, including all new Claim Submission Materials provided by the Direct Claimant to the Trust in the Reconsideration Request, and will have the discretion to maintain or revise the original determination, or alternatively to request supplemental Claim Submission Materials as necessary to reach a final conclusion. The Individual Review Claims Panel will use its best efforts to provide the Direct Claimant written notice of its decision to affirm or revise the original determination within sixty (60) days of having sent the Direct Claimant written notice that it is reconsidering her Direct Claim. All decisions of the Individual Review Claims Panel shall be final

38

and binding, and not subject to any further administrative or judicial review, including pursuant to Section 6.1.2 or Section 6.1.3.

## Article 7
## PAYMENT PROCESS FOR DIRECT CLAIMS

### 7.1    Points-Based Monetary Values

#### 7.1.1    Uncertainty of Liabilities

Litigation arising from the use of talc or talc-containing products is a relatively new mass tort and the total number of Direct Claims that may be paid over time by the Trust pursuant to these TDP is uncertain.  As a result of this uncertainty, in undertaking to ensure substantially equitable treatment of all similar Existing Claims and Future Claims, the Trustees must from time to time determine or redetermine the Cash Value of a Point.

#### 7.1.2    Points Valuation System

##### (A)    Initial Cash Value of a Point

To provide reasonable assurance that the Trust will value, and be in a financial position to pay, Existing Direct Claims and Future Direct Claims that involve similar Channeled Talc Personal Injury Claims in substantially the same manner, within thirty (30) days after the Claim Submission Deadline, and in any event prior to any distributions from the Trust, the Trustees, with the consent of the TAC and the FCR, shall establish an initial Cash Value of a Point (the "**Initial Cash Value of a Point**").  The Trustees shall base their determination of the Cash Value of a Point on (i) current estimates as to the number, types, and Final Scheduled Point Values for Existing Direct Claims, Future Direct Claims, and Indirect Claims (ii) the value of the assets available to the Trust for payment of Allowed Claims, including without limitation a determination by the Trustees that the Trust will have sufficient assets as of the date the Initial Cash Value of a Point is established to pay Existing Direct Claims and Future Direct Claims that involve similar Channeled Talc Personal Injury Claims in substantially the same manner, (iii) all anticipated administrative and legal expenses, and (iv) any other matters that are reasonably likely to affect the sufficiency of funds to pay all Existing Direct Claims and Future Direct Claims based on the same application of these TDP to all similar Direct Claims and the points awarded for each Direct Claim.  When making these determinations, the Trustees shall evaluate all relevant factors to determine a conservative Cash Value of a Point with the goal of assuring that the Trust will be able to treat all similar Existing Direct Claims and Future Direct Claims in substantially the same manner while taking in to account the value of Indirect Claims.[6]  Under no circumstances shall the Trustees seek to set the Initial Cash Value of a Point such that it would result in the Trust having a present or projected negative balance at any time.

The Initial Cash Value of a Point and any later determined Cash Value of a Point, as in effect at the beginning of each calendar year, will be adjusted for inflation annually, beginning as

---

[6]    In determining the Initial Cash Value of a Point, the Trustees are not bound by the range provided in the Disclosure Statement.

NAI-1539103334

of January 1, 20___ (the "**Inflation Adjustment**").  The amount of each such Inflation Adjustment shall equal the increase for the preceding year in the Consumer Price Index for All Urban Consumers ("**CPI-U**"), but such Inflation Adjustment for any year shall not exceed 5%.  The Trust shall rely upon CPI-U as published by the United States Department of Labor, Bureau of Labor Statistics ("**BLS**"); provided, however, that if BLS ceases to publish CPI-U, the Trustees, subject to the consent of the TAC and FCR, shall select the most comparable index of inflation published by BLS or another reputable and established source.

(B)    **Redetermination of Cash Value of a Point**

To provide continued reasonable assurance that the Trust will value, and be in a financial position to pay Existing Direct Claims and Future Direct Claims that involve similar Channeled Talc Personal Injury Claims in substantially the same manner, the Cash Value of a Point shall be subject to change pursuant to the terms of these TDP and the Trust Agreement.  No less than annually beginning on the first (1st) anniversary of the date when the Initial Cash Value of a Point is established, the Trustees shall review the then-applicable Cash Value of a Point as it deems necessary to assure that it is based on accurate, current information, and shall compare (i) the claims and liability estimation on which the then-applicable Cash Value of a Point was based with the actual Channeled Talc Personal Injury Claims submission and payment experience of the Trust, (ii) the projected assets of the Trust on which the then-applicable Cash Value of a Point was based with the current assets and any updated projections of asset values, and (iii) any other matters that are reasonably likely to affect the sufficiency of funds to pay all Existing Direct Claims and Future Direct Claims based on (a) the application of these TDP in substantially the same manner to all similar Direct Claims and (b) the points awarded for each Direct Claim that is an Allowed Claim. If the results of the comparisons indicate that the Trust will be unable to value, and be in a financial position to pay, Existing Direct Claims and Future Direct Claims that involve similar Channeled Talc Personal Injury Claims in substantially the same manner, the Trustees shall propose a change in the Cash Value of a Point; *provided*, *however*, that any adjustment to the Cash Value of a Point must be made with the consent of the TAC and the FCR.  In the event that the Trustees determine to adjust the Cash Value of a Point, the Trustees shall provide written notice to the TAC and FCR at least thirty (30) days prior to any requested change in the Cash Value of a Point.  If the adjusted Cash Value of a Point is adopted, the Trust shall publicly disclose the adjusted Cash Value of a Point on its website.

(C)    **Supplemental Payments**

If at any point the Trustees, with the consent of the TAC and the FCR, determine to increase the Cash Value of a Point, then the Trustees shall cause the Trust to make supplemental payments in respect of Ovarian Cancer Claims that have previously received a payment from the Trust based on the valuation thereof pursuant to Section 5.3 or Section 5.4.  The supplemental payment in respect of any such Ovarian Cancer Claim shall be (i) an amount equal to the Net Award Amount of such Direct Claim as recalculated (a) based on the Allowed Claim Amount of such Direct Claim as recalculated using the increased Cash Value of a Point and (b) taking into account any additional reductions to the Allowed Claim Amount, less (ii) all payments previously made by the Trust in respect of such Direct Claim.  Notwithstanding the foregoing, supplemental payments that are less than one hundred dollars and zero cents ($100.00) shall not be payable; *provided, however*, that supplemental payments shall accrue such that, if sequential supplemental payments owed to a

40

Direct Claimant in the aggregate equal or exceed one hundred dollars and zero cents ($100.00), the relevant Direct Claimant shall receive payment of such aggregate amount. For the avoidance of doubt, the amount of the Final Scheduled Point Value of the applicable Ovarian Cancer Claim shall not be re-determined or otherwise reconsidered in connection with any supplemental payment in respect thereof.

Checks issued by the Trust in respect of any supplemental payments shall be mailed to the last address the Direct Claimant provided to the Trust for the Trust to send payments, which address may be the Direct Claimant's attorney. Checks issued by the Trust in respect of any supplemental payments shall be null and void if not negotiated within 180 days after the date of issuance thereof. If the Direct Claimant does not request reissuance of such un-negotiated check within 180 days thereafter (*i.e.*, within 360 days from the date of issuance), the amount represented by such voided check shall irrevocably revert to the Trust. Any Allowed Claim in respect of such voided check shall be discharged and forever barred from assertion against the Trust, and the Direct Claimant shall not be entitled to any future payments from the Trust, including future supplemental payments.

Notwithstanding anything contained herein to the contrary, if a change to the Cash Value of a Point has been proposed in writing by the Trustees to the TAC and FCR but has not yet been adopted, the Direct Claimant shall receive the lower of the current Cash Value of a Point or the proposed Cash Value of a Point. If the proposed Cash Value of a Point is the lower amount but is not subsequently adopted, the Direct Claimant shall thereafter receive the difference between the lower proposed amount and the higher current amount. Conversely, if the proposed Cash Value of a Point is the higher amount and is subsequently adopted, the Direct Claimant shall thereafter receive the difference between the lower current amount and the higher adopted amount. In either event, however, no supplemental payments will be made to a Direct Claimant in the event the payment in question would be less than one hundred dollars and zero cents ($100.00).

## 7.2    Guidelines for Paying Allowed Claims

### 7.2.1    Documentation Requirements

#### (A)    Acceptance and Release

A Direct Claimant who decides to accept an offer of payment from the Trust based on the proposed Allowed Claim Amount of her Allowed Claim shall complete and execute an Acceptance and Release, a copy of which shall be provided with the Allowed Claim Notice. The Acceptance and Release provided with the Allowed Claim Notice shall include a release of all claims against the Debtor, the Reorganized Debtor, J&J, the other Debtor Corporate Parties, and the other Protected Parties, to the extent any such claims arise from or are related to the alleged use of or other exposure to talc or talc-containing products, including J&J Talc Products, and resulting injury.

#### (B)    Documents Establishing Legal Representation

Direct Claimants asserting a Direct Claim on behalf of a minor, incapacitated, or deceased person must, before any funds related to such Direct Claim may be distributed from the Trust, submit to the Trust appropriate documentation confirming the Direct Claimant's legal authority to

41

resolve the Direct Claim on behalf of the minor, incapacitated, or deceased person. Such documentation should generally be in the form of a court order, letters of administration, power of attorney, or the like.

### 7.2.2    Deadline For Acceptance of Offers From Trust

Direct Claimants (other than Direct Claimants who (i) have submitted a Reconsideration Request or (ii) (a) hold Submitted Claims as a representative of an injured or deceased individual and (b) are required to obtain court approval before accepting any Final Scheduled Point Value proposed by Trust) shall have one hundred eighty (180) days from the date of the applicable Allowed Claim Notice to accept such offer by causing the Trust to receive a fully completed and executed Acceptance and Release. The Trustees, in their sole discretion, may, but are not required to, extend this deadline upon a showing of good cause by the Direct Claimant that additional time is necessary to obtain the required authority or approval to accept an offer of payment from the Trust.

### 7.2.3    Offsets

Notwithstanding anything to the contrary contained in these TDP, the Trust shall have the right to offset or reduce payment of an Allowed Claim Amount on a dollar-for-dollar basis based on any amounts paid, or to be paid, to the relevant Direct Claimant on account of her Direct Claim from any source other than Trust.

### 7.2.4    Contribution, Indemnity, Reimbursement, and Subrogation

In the event that the Trust pays a Direct Claim for which another party, other than a Protected Party, may be partially or entirely liable, the Trust shall have a claim for contribution, indemnity, reimbursement, or subrogation, whether contractual or implied by law, against such other party that it may assert.

## 7.3    <u>Lien Resolution</u>

With respect to any Direct Claim that becomes an Allowed Claim pursuant to these TDP, all related medical liens shall be paid from amounts that otherwise would be paid by the Trust to the Direct Claimant in respect of such Allowed Claim, with a corresponding reduction to the Net Award Amount.

On or as soon as practicable following the submission of any Direct Claim to the Trust, the Lien Resolution Administrator shall begin working to quantify any and all known medical liens arising from or related to such Direct Claim, with the goal of negotiating the satisfaction of any such liens by the time the Allowed Claim Amount of such Direct Claim, if it becomes an Allowed Claim, has been determined.

The Lien Resolution Administrator shall be responsible for the satisfaction of any and all such known and valid medical liens. The Lien Resolution Administrator shall provide written verification of the same to the Trustees and the TAC before any portion of an Allowed Claim Amount is paid to the relevant Direct Claimant and/or her counsel. Neither the Debtor, the Reorganized Debtor, J&J, nor any other Debtor Corporate Party shall bear any responsibility for

payment of any Direct Claimant's liens. The Trust shall not bear any responsibility for payment of any Direct Claimant's liens to the extent such liens are for amounts in excess of amounts otherwise payable by the Trust to such Direct Claimant in respect of her Direct Claim.

For the avoidance of doubt, the medical liens arising from or relating to Direct Claims that are to be resolved by the Lien Resolution Administrator as described above are not Indirect Claims and are not subject to resolution under Article 8.

## 7.4    No Common Benefit Fund Payments Shall Be Made

The Trustees are not authorized to pay, and shall not pay, any common benefit fees or expenses from the Trust, and shall take no action with respect to the Common Benefit Fund, in each case without the written consent of the FCR and a supermajority of the members of the TAC (consisting of not less than 66% of all members of the TAC).

## 7.5    Payment of Claims

### 7.5.1    Allowed Claim Amounts Held in Escrow

Promptly upon receipt of a Direct Claimant's properly completed and executed Acceptance and Release, the Allowed Claim Amount for such Direct Claimant's Allowed Claim shall be set aside and remain segregated within the Trust pending the final resolution of various administrative issues involving the resolution of the relevant Direct Claim, including issues related to applicable medical liens, fees and expenses of counsel, fees, expenses and obligations related to administration of the Trust, probate, guardianship/conservatorship, and personal bankruptcy filings, and the final payment of the Net Award Amount to such Direct Claimant and/or her counsel.

### 7.5.2    Payment of Net Award Amount

Upon (i) the Trust's receipt of a Direct Claimant's properly completed and executed Acceptance and Release and (ii) resolution of any lien, attorney fees, expenses, and obligations related to administration of the Trust, and any other issues involving resolution of the relevant Direct Claim, payment to such Direct Claimant and/or her respective counsel shall be made in the Net Award Amount. If a Direct Claimant elected to receive her payment pursuant to these TDP through her retained counsel, the Trustees shall transfer the Net Award Amount to the payee identified on such Direct Claimant's Claim Submission Form.

Notwithstanding anything to the contrary contained herein, the Trustees, with the consent of the TAC and the FCR, may pay part of the Allowed Claim Amount that has been set aside and segregated for a Direct Claimant as provided in Section 7.5.1 to such Direct Claimant and/or her counsel prior to resolution of all issues applicable to such Direct Claim, including the resolution of medical liens and obligations related to administration of the Trust. In such event, the Trustees will cause the Trust to continue to hold, on a segregated basis, a portion of such Allowed Claim Amount that the Trustees, with the consent of the TAC and the FCR, determine to be appropriate to satisfy any unresolved issues applicable to resolution of such Direct Claimant's Direct Claim. Upon the resolution of such unresolved issues and the final determination of such Direct Claimant's Net Award Amount, the Trustees shall pay to the Direct Claimant and/or her counsel,

NAI-1539103334

from the portion of her Allowed Claim Amount that the Trust continues to hold on a segregated basis, the remaining balance of her Net Award Amount.

## 7.6    Payment Processing

### 7.6.1    FIFO Payment Processing

Direct Claims that have become Allowed Claims under a particular Review Track and liquidated in accordance with the terms herein shall be paid in first-in-first-out order based on the date the Trust received a Direct Claimant's properly completed and executed Acceptance and Release, subject to the sequencing adjustments provided for herein.

As to any particular FIFO Payment Queue, in the event that the Trust receives more than one relevant Acceptance and Release on a particular date, each Direct Claim's position in such FIFO Payment Queue shall be determined by the Date of Relevant Diagnosis, with an earlier Date of Relevant Diagnosis having priority over a later Date of Relevant Diagnosis.  In the unlikely event that  the Trust receives more than one relevant Acceptance and Release on a particular date and the relevant Direct Claims also have the same Date of Relevant Diagnosis, the positions of these Direct Claims in the particular FIFO Payment Queue shall be determined based on the relevant Direct Claimants' dates of births, with earlier dates of birth given priority over later dates of birth.

### 7.6.2    Discretion to Vary Order and Amounts of Payments

Consistent with the provisions hereof and subject to the applicable FIFO Processing Queue and FIFO Payment Queue, the Trustees shall proceed as quickly as possible to liquidate Allowed Claims and to make payments to relevant Direct Claimants in accordance with these TDP on an ongoing basis, as funds become available and while maintaining sufficient resources to pay Future Direct Claims that are determined to be Allowed Claims in the same amount as Existing Direct Claims.  If the properly executed and completed Acceptance and Release forms for a group of Direct Claimants represented by the same law firm have been received by the Trust, the Trustees, in their sole discretion, may simultaneously issue payments to all such Direct Claimants regardless of their individual placement in the FIFO Payment Queue.

Because the Trust's assets and liabilities over time remain uncertain, and decisions about payments must be based on estimates that cannot be made precisely, such decisions may have to be revised in light of experiences over time, and there can be no guarantee of any specific level of payment to Direct Claimants.  The Trustees shall, however, use their best efforts to treat similar Direct Claims in substantially the same manner, consistent with their duties as Trustees, the purposes of the Trust, and the practical limitations imposed by the inability to predict the future with precision.

In the event that the Trust faces issues with respect to liquidity that cannot be resolved based on adjustments to the Cash Value of a Point, the Trustees may, with the consent of the TAC and FCR, (i) suspend the normal order of payment or (ii) temporarily limit or suspend payments altogether.

44

**Article 8**
**RESOLUTION OF INDIRECT CLAIMS**

## 8.1  Claim Submission Procedures for Indirect Claims

The Claim Submission Procedures for Indirect Claims shall be developed by the Trustees with the assistance of the Claims Administrator and Claims Processor and adopted by the Trustees with the consent of the TAC and the FCR. These Claim Submission Procedures shall include, but shall not be limited to, the following:

### 8.1.1  Indirect Claim Submission Deadline

Indirect Claimants must submit their Indirect Claims to the Trust within one hundred twenty (120) days of the Initial Submission Acceptance Date. If an Indirect Claimant fails to submit his/her/its Indirect Claim within this time period, such Indirect Claimant shall be deemed to have waived the right to submit his/her/its Indirect Claim or otherwise seek compensation from the Trust.

### 8.1.2  Indirect Claim Review Criteria

An Indirect Claim shall become an Allowed Claim if it satisfies the following Indirect Claim Review Criteria:

(1)     the Indirect Claim is not subject to (a) disallowance under section 502 of the Bankruptcy Code, including subsection (e) thereof (subject to the right of the holder of the Indirect Claim to seek reconsideration by the Trustees under section 502(j) of the Bankruptcy Code), or is not otherwise legally invalid, or (b) subordination under sections 509(c) or 510 of the Bankruptcy Code, or otherwise under applicable law;

(2)     the Indirect Claim has not been previously submitted to, or paid by, the Trust, or previously resolved through litigation and/or settlement involving the Debtor, the Reorganized Debtor, J&J, or any other Debtor Corporate Party;

(3)     the Indirect Claim is entitled to contribution, reimbursement, subrogation, or indemnity (as those terms are defined by applicable non-bankruptcy law of the relevant jurisdiction) from the Trust on account of a payment made by the Indirect Claimant;

(4)     the Indirect Claim is not subject to a valid defense, including, without limitation, that such Indirect Claim is barred by a statute of limitations or by other applicable law; and

(5)     the Indirect Claimant does not have an obligation to indemnify the Trust from the liability that was the basis of the payment made by the Indirect Claimant.

45

For each Indirect Claim submitted to the Trust, the Claims Administrator shall, in conjunction with the Claims Processor, thoroughly review and evaluate such Indirect Claim to assist the Trustees to determine whether the Indirect Claim Review Criteria are satisfied. If, in undertaking such review and evaluation, the Trustees determine with the assistance of the Claims Administrator that an Indirect Claim satisfies the Indirect Claim Review Criteria, then such Indirect Claim shall be an Allowed Claim and the Trustees with the assistance of the Claims Administrator shall determine the Allowed Claim Amount of such Allowed Claim, which shall be the amount necessary to pay such Allowed Claim in full. If the Trustees determine with the assistance of the Claims Administrator that an Indirect Claim does not satisfy the Indirect Claim Review Criteria, then such Indirect Claim shall become a Disallowed Claim, and the Trustees shall provide a Disallowed Claim Notice to the relevant Indirect Claimant.

### 8.1.3 Payments on Account of Allowed Claims

As promptly as practicable following a determination by the Trustees with the assistance of the Claims Administrator that an Indirect Claim is an Allowed Claim, the Trustees shall provide the relevant Indirect Claimant an Allowed Claim Notice, which Allowed Claim Notice will indicate (i) the determination that such Indirect Claim is an Allowed Claim and (ii) the proposed Allowed Claim Amount of such Indirect Claim.

An Indirect Claimant that decides to accept an offer of payment from the trust based on the proposed Allowed Claim Amount of his/her/its Allowed Claim shall complete and execute an Acceptance and Release, a copy of which shall be provided with the Allowed Claim Notice. The Acceptance and Release provided with the Allowed Claim Notice shall include a release of all claims against the Debtor, the Reorganized Debtor, J&J, the other LTL Corporate Parties, and the other Protected Parties, to the extent any such claims arise from or are related to the Indirect Claimant's Allowed Claim.

Upon the Trust's receipt of an Indirect Claimant's properly completed and executed Acceptance and Release, payment to such Indirect Claimant shall be made by the Trust in the Allowed Claim Amount of the relevant Indirect Claim as promptly as practicable.

## 8.2    Court Review

Within thirty (30) days after the date of a Disallowed Claim Notice or Allowed Claim Notice (the "**Indirect Claim Judicial Review Election Deadline**"), an Indirect Claimant may notify the Trust of its intention to seek a *de novo* review of the Trust's determination as to its Indirect Claim in accordance with Section 8.1 by the Bankruptcy Court. Such notification shall be made by submitting a written notice to the Trustees (an "**Indirect Claim Judicial Review Election Notice**") by the Indirect Claim Judicial Review Election Deadline. Extensions of the Indirect Claim Judicial Review Election Deadline may be requested by the Indirect Claimant from the Trustees so long as requested prior to the Indirect Claim Judicial Review Election Deadline, and the Trustees retain full discretion to either grant or deny any such request. If an Indirect Claim Judicial Review Election Notice is not received by the Trustees prior to the Indirect Claim Judicial Review Election Deadline (as extended, if applicable), then the applicable Disallowed Claim Notice or Allowed Claim Notice shall be final and binding.

46

An Indirect Claimant that commences a legal proceeding following submission to the Trustees of an Indirect Claim Judicial Review Election Notice may not seek costs or expenses against the Trust in any such judicial proceeding, and the Trust may not seek costs or expenses against the Indirect Claimant in such proceeding.

In no event shall the submission of an Indirect Claim Judicial Review Election Notice entitle the holder of an Indirect Claim to request or receive treatment different than the treatment provided for under these TDP, including Section 8.1. The *de novo* review provided for herein shall be solely to determine whether an Indirect Claim is an Allowed Claim and, if so, to determine the Allowed Claim Amount of the Indirect Claim, all under and in accordance with these TDP. All defenses shall be available to both the Indirect Claimant and the Trust in any judicial proceeding commenced following submission to the Trustees of an Indirect Claim Judicial Review Election Notice. Upon entry of final non-appealable order of a court competent jurisdiction that establishes the Allowed Claim Amount of an Indirect Claim, such Indirect Claim shall be paid in accordance with this Article 8.

## Article 9
## TRUST AUDITING AND REPORTING

### 9.1    Trust Auditing

#### 9.1.1    Cross-Trust Audit Program

The Trustees, with the consent of the TAC and the FCR, shall develop and implement a Cross-Trust Audit Program that shall be overseen by the Auditor, which program shall include methods for auditing the reliability of medical evidence, as well as the reliability of evidence of usage of talc or talc-containing products for which the Trust has legal responsibility and the reliability of reporting on other asbestos exposure. This Cross-Trust Audit Program will be designed to compare Direct Claims submitted to the Trust against claims filed with any other bankruptcy or mass-tort trusts. Further, as part of its coordination with other bankruptcy or mass-tort trusts, the Trust shall fully comply with reasonable subpoenas served against it by other bankruptcy or mass-tort trusts seeking to conduct a similar audit.

By submitting a Direct Claim to the Trust, regardless of the treatment sought, a Direct Claimant shall be deemed to have affirmatively consented to (i) any release by the Trust of necessary and sufficient information sought either through the Cross-Trust Audit Program or in response to any subpoena served against the Trust; (ii) any release by any other bankruptcy or mass-tort trusts that participate in the Cross-Trust Audit Program or the Trust has served a subpoena on, to the Auditor of all information submitted to such other trusts by or on behalf of the relevant Direct Claimant pursuant to the provisions of the Cross-Trust Audit Program, or subpoena, if applicable, and (iii) disclosure by or to the Auditor of the status, amount, and date of payment made with respect to the claim asserted or filed by the relevant Direct Claimant to the Trust or any other bankruptcy or mass-tort trust.

To the extent that the Trustees believe it is relevant, nothing herein shall preclude the Trust or the Auditor, in the Trustees' sole discretion, from reviewing or taking into consideration filed state or federal court complaints, available discovery from any such case, or other claims filed

NAI-1539103334

against other bankruptcy or mass-tort trusts. Any Direct Claimant shall cooperate with and provide the Trust with (i) any non-privileged information reasonably requested by the Trust and (ii) upon request by the Trust, authorization to obtain from other bankruptcy or mass-tort trusts any information such Direct Claimant has provided to such other trusts.

### 9.1.2    Consequences of Audit Program

In the event that the Trustees determine that an audit under the Cross-Trust Audit Program reveals that deceptive or fraudulent Claim Submission Materials have been provided to the Trust with respect to a Direct Claim, the Trust may penalize the relevant Direct Claimant and her counsel by: (i) disallowing the Direct Claim, (ii) seeking to require the source of such deceptive or fraudulent Claim Submission Materials, including the Direct Claimant and her counsel, to reimburse the Trust for all costs incurred in connection with such audit and any future audit or audits of the Direct Claim, (iii) reordering the priority of payment of the Direct Claim, and (iv) taking any other appropriate action, including seeking  sanctions or informing law enforcement agencies.

The Trust may also place reasonable restrictions, limitations, or affirmative requirements on Direct Claims submitted to the Trust in the future by Direct Claimants represented by any attorney and/or law firm who previously represented a Direct Claimant that was determined to have submitted deceptive or fraudulent Claim Submission Materials to the Trust, including (i) requiring that the attorney and/or law firm representing such Direct Claimants pay a $1,000.00 penalty for each new Direct Claim submitted to the Trust and (ii) subjecting all such Direct Claims to audit under the Cross-Trust Audit Program, *provided*, *however*, that such audit shall not prejudice the relevant Direct Claimant with respect to the processing or evaluation of her Direct Claim or, to the extent such Direct Claim is deemed an Allowed Claim, as to the timing of payment to the relevant Direct Claimant.

Direct Claims that are subject to heightened scrutiny pursuant to Section 4.2.3, Section 4.2.5, Section 4.5.2, or Section 4.6.3 shall be automatically subject to audit under the Cross-Trust Audit Program.

### 9.1.3    Detection and Prevention of Fraud

The Trustees shall, with the assistance of the Claims Administrator, develop and institute auditing and other procedures to detect and prevent the allowance of Direct Claims involving Fraudulent Claim Submissions. Among other things, such procedures will permit the Trustees or Claims Administrator to conduct random audits to verify information and documentation included in randomly selected Claim Submission Materials, as well as targeted audits of Claim Submission Materials, any of which may include an examination requested by the Trustees (including by healthcare professionals selected by the Trustees).

## 9.2    **Trust Reporting**

Periodically, and at least annually, the Trust shall publish a report summarizing the Direct Claims resolved pursuant to these TDP, including breakdowns with respect:  to (i) the types of Direct Claim involved; (ii) application of the Expedited Review Process, Individual Review Process, Quickpay Review Process, and/or any ADR Procedures, litigations, or settlements, and

(iii) the average Allowed Claim Amount by type of Direct Claim and specific category of injury. The Trustees also shall simultaneously provide the TAC and the FCR with (i) a more detailed version of the above-mentioned report that also includes breakdowns as to Claimant's Jurisdiction and the counsel representing Direct Claims submitted to the Trust and (ii) detailed monthly status reports regarding the evaluation status of Submitted Claims, as well as the valuation and payment status of all Allowed Claims for which the Allowed Claim Amount has been determined.

## Article 10
## MISCELLANEOUS

### 10.1 Non-Binding Effect of Trust and/or Litigation Outcome

Notwithstanding any other provision of these TDP, the Trust's determination to pay or not to pay any claim shall not be binding on, or have any *res judicata*, collateral estoppel, or other preclusive effect in any lawsuit or other proceeding against, the Debtor, the Reorganized Debtor, J&J, the other Debtor Corporate Parties, the other Protected Parties, or any other person or entity other than the Trust.

### 10.2 Independence of Trust

Except as otherwise specifically provided in the Plan, the Trust Agreement or these TDP, (i) none of the Debtor, the Reorganized Debtor, J&J, or any other Debtor Corporate Party shall have any rights or involvement whatsoever in the implementation or operation of these TDP, (ii) none of the Debtor, Reorganized Debtor, J&J, or any Debtor Corporate Party is a third-party beneficiary of the Trust or these TDP, and (iii) nothing herein creates any rights or obligations that may give rise to a claim or cause of action by the Debtor, the Reorganized Debtor, J&J, or any other Debtor Corporate Party against the Trust, any Direct Claimant, or any Indirect Claimant.

### 10.3 Amendments

The Trustees, subject to the consent of the TAC and the FCR, may modify or amend these TDP; *provided*, *however*, that no modification or amendment to these TDP shall be inconsistent with the provisions of the Trust Agreement or these TDP limiting amendments or modifications to these TDP; *provided*, *further*, *however*, that with respect to any requirement in these TDP that consent of the TAC be made pursuant to a supermajority of the members of the TAC, any modification or amendment of such supermajority requirement shall be subject to the consent of a supermajority of the members of the TAC (consisting of not less than 66% of all members of the TAC). Any modification or amendment made pursuant to this Section 10.3 shall be in writing and shall be publicly disclosed on the Trust's website. Notwithstanding anything contained in the Trust Agreement or these TDP to the contrary: (i) neither these TDP, nor any document annexed hereto, shall be modified or amended in any way that could jeopardize, impair, or modify: (a) the applicability of section 524(g), section 1123(b)(6), and/or section 105 of the Bankruptcy Code to the Plan, the Confirmation Order, or the Trust; (b) the enforceability, the scope, or the terms of the discharge, releases, injunctions, and exculpation included in Article XI of the Plan; or (c) the Trust's status as a qualified settlement fund within the meaning of regulations governing qualified settlement funds; and (ii) any modification or amendment of these TDP affecting the rights of the Reorganized Debtor or J&J shall require the prior written consent of the Reorganized Debtor or

49

J&J (as applicable).  For the avoidance of doubt, any modification or amendment to clause (i) or clause (ii) of the immediately preceding sentence shall require the prior written consent of the Reorganized Debtor and J&J.

**10.4**     **Severability**

Should any provision contained in these TDP be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of these TDP.

**10.5**     **Governing Law**

These TDP shall be construed in accordance with the laws of the State of Texas, without giving effect to any choice or conflict of law provision or rule that would cause the application of laws of another jurisdiction.  Notwithstanding the foregoing, the review and evaluation of Direct Claims under these TDP and the law governing mediation or litigation in the tort system shall be the law of the Claimant's Jurisdiction.

NAI-1539103334

**EXHIBIT L**

**Executory Contracts and Unexpired Leases to Be Rejected**

None

NAI-1539839717

## SCHEDULE 1

## Debtor Corporate Parties

3Dintegrated ApS
ABD Holding Company, Inc.
ABIOMED R&D, Inc.
ABIOMED, Inc.
Acclarent, Inc.
Actelion Ltd
Actelion Pharmaceuticals Ltd
Actelion Pharmaceuticals Trading (Shanghai) Co., Ltd.
Actelion Pharmaceuticals US, Inc.
Actelion Treasury Unlimited Company
Albany Street LLC
ALZA Corporation
Alza Land Management, Inc.
AMO (Hangzhou) Co., Ltd.
AMO (Shanghai) Medical Devices Trading Co., Ltd.
AMO ASIA LIMITED
AMO Australia Pty Limited
AMO Canada Company
AMO Denmark ApS
AMO Development, LLC
AMO France
AMO Germany GmbH
AMO Groningen B.V.
AMO International Holdings Unlimited Company
AMO Ireland
AMO Italy SRL
AMO Japan K.K.
AMO Manufacturing USA, LLC
AMO Netherlands BV
AMO Nominee Holdings, LLC
AMO Norway AS
AMO Puerto Rico Manufacturing, Inc.
AMO Sales and Service, Inc.
AMO Singapore Pte. Ltd.
AMO Spain Holdings, LLC
AMO Switzerland GmbH
AMO United Kingdom, Ltd.
AMO Uppsala AB
Anakuria Therapeutics, Inc.
AorTx, Inc.
Apsis SAS
Aragon Pharmaceuticals, Inc.

1-1

Asia Pacific Holdings, LLC
Atrionix, Inc.
AUB Holdings LLC
Auris Health, Inc.
Backsvalan 6 Handelsbolag
Beijing Dabao Cosmetics Co., Ltd.
BeneVir BioPharm, Inc.
Berna Rhein B.V.
BioMedical Enterprises, Inc.
Biosense Webster (Israel) Ltd.
Biosense Webster, Inc.
Breethe, Inc.
C Consumer Products Denmark ApS, n/k/a Coloplast Konsumerntvarer A/S
Carlo Erba OTC S.r.l.
Centocor Biologics, LLC
Centocor Research & Development, Inc.
Cerenovus, Inc.
ChromaGenics B.V.
Ci:z. Labo Co., Ltd.
Cilag AG
Cilag GmbH International
Cilag Holding AG
Cilag Holding Treasury Unlimited Company
Cilag-Biotech, S.L.
Coherex Medical, Inc.
ColBar LifeScience Ltd.
Consumer Test Entity
Cordis de Mexico, S.A. de C.V.
Corimmun GmbH
CoTherix Inc.
CRES Holdings, Inc.
CrossRoads Extremity Systems, LLC
CSATS, Inc.
Debs-Vogue Corporation (Proprietary) Limited
DePuy Hellas SA
DePuy International Limited
DePuy Ireland Unlimited Company
DePuy Mexico, S.A. de C.V.
DePuy Mitek, LLC
DePuy Orthopaedics, Inc.
DePuy Products, Inc.
DePuy Spine, LLC
DePuy Synthes Institute, LLC
DePuy Synthes Products, Inc.
DePuy Synthes Sales, Inc.
DePuy Synthes, Inc.

NAI-1539839717

Dutch Holding LLC
ECL7, LLC
EES Holdings de Mexico, S. de R.L. de C.V.
EES, S.A. de C.V.
EIT Emerging Implant Technologies GmbH
Ethicon Endo-Surgery (Europe) GmbH
Ethicon Endo-Surgery, Inc.
Ethicon Endo-Surgery, LLC
Ethicon LLC
Ethicon Sarl
Ethicon US, LLC
Ethicon Women's Health & Urology Sarl
Ethicon, Inc.
Ethnor (Proprietary) Limited
Ethnor del Istmo S.A.
Ethnor Farmaceutica, S.A.
Finsbury (Development) Limited
Finsbury (Instruments) Limited
Finsbury Medical Limited
Finsbury Orthopaedics International Limited
Finsbury Orthopaedics Limited
FMS Future Medical System SA
GATT Technologies B.V.
GH Biotech Holdings Limited
Global Investment Participation B.V.
GMED Healthcare BV
Guangzhou Bioseal Biotech Co., Ltd.
Hansen Medical Deutschland GmbH
Hansen Medical International, Inc.
Hansen Medical UK Limited
Hansen Medical, Inc.
Healthcare Services (Shanghai) Ltd.
**[Holdco (Texas) LLC]**
I.D. Acquisition Corp.
Innomedic Gesellschaft für innovative Medizintechnik und Informatik mbH
J & J Company West Africa Limited
J&J Argentina S.A.
J&J Pension Trustees Limited
J&J Productos Medicos & Farmaceuticos del Peru S.A.
J.C. General Services BV
Janssen Biologics (Ireland) Limited
Janssen Biologics B.V.
Janssen BioPharma, LLC
Janssen Biotech, Inc.
Janssen Cilag Farmaceutica S.A.
Janssen Cilag S.p.A.

NAI-1539839717

Janssen Cilag SPA
Janssen Cilag, C.A.
Janssen Development Finance Unlimited Company
Janssen Egypt LLC
Janssen Farmaceutica Portugal Lda
Janssen France Treasury Unlimited Company
Janssen Global Services, LLC
Janssen Holding GmbH
Janssen Inc.
Janssen Irish Finance Unlimited Company
Janssen Japan Treasury Unlimited Company
Janssen Korea Ltd.
Janssen Mexico Treasury Unlimited Company
Janssen Oncology, Inc.
Janssen Ortho LLC
Janssen Pharmaceutica (Proprietary) Limited
Janssen Pharmaceutica NV
Janssen Pharmaceutica S.A.
Janssen Pharmaceutical K.K.
Janssen Pharmaceutical Sciences Unlimited Company
Janssen Pharmaceutical Unlimited Company
Janssen Pharmaceuticals, Inc.
Janssen Products, LP
Janssen R&D Ireland Unlimited Company
Janssen Research & Development, LLC
Janssen Sciences Ireland Unlimited Company
Janssen Scientific Affairs, LLC
Janssen Supply Group, LLC
Janssen Vaccines & Prevention B.V.
Janssen Vaccines Corp.
Janssen-Cilag
Janssen-Cilag (New Zealand) Limited
Janssen-Cilag A/S
Janssen-Cilag AG
Janssen-Cilag Aktiebolag
Janssen-Cilag AS
Janssen-Cilag B.V.
Janssen-Cilag d.o.o. Beograd
Janssen-Cilag de Mexico S. de R.L. de C.V.
Janssen-Cilag Farmaceutica Lda.
Janssen-Cilag Farmaceutica Ltda.
Janssen-Cilag GmbH
Janssen-Cilag International NV
Janssen-Cilag Kft.
Janssen-Cilag Limited
Janssen-Cilag Manufacturing, LLC

1-4

Janssen-Cilag NV
Janssen-Cilag OY
Janssen-Cilag Pharma GmbH
Janssen-Cilag Pharmaceutical S.A.C.I.
Janssen-Cilag Polska, Sp. z o.o.
Janssen-Cilag Pty Ltd
Janssen-Cilag S.A.
Janssen-Cilag s.r.o.
Janssen-Cilag, S.A.
Janssen-Cilag, S.A. de C.V.
Janssen-Pharma, S.L.
J-C Health Care Ltd.
Jevco Holding, Inc.
JJ Surgical Vision Spain, S.L.
JJC Acquisition Company B.V.
JJHC, LLC
JJSV Belgium BV
JJSV Manufacturing Malaysia SDN. BHD.
JJSV Norden AB
JJSV Produtos Oticos Ltda.
JNJ Global Business Services s.r.o.
JNJ Holding EMEA B.V.
JNJ International Investment LLC
JNTL (APAC) HoldCo 2 LLC
JNTL (APAC) HoldCo 3 Pte. Ltd.
JNTL (APAC) HoldCo LLC
JNTL (APAC) HoldCo Pte. Ltd.
JNTL (Japan) HoldCo Inc.
JNTL (Malaysia) Sdn. Bhd.
JNTL (Middle East) HoldCo LLC
JNTL (Puerto Rico) HoldCo GmbH
JNTL (Shanghai) Investment Co., Ltd.
JNTL (Switzerland) HoldCo GmbH
JNTL (Thailand) HoldCo LLC
JNTL (UK) HoldCo Limited
JNTL Consumer Health (Belgium) BV
JNTL Consumer Health (Brazil) Ltda.
JNTL Consumer Health (Czech Republic) s.r.o.
JNTL Consumer Health (Dominican Republic), S.A.S.
JNTL Consumer Health (Finland) Oy
JNTL Consumer Health (France) SAS
JNTL Consumer Health (Hungary) Kft
JNTL Consumer Health (India) Private Limited
JNTL Consumer Health (New Zealand) Limited
JNTL Consumer Health (Norway) AS
JNTL Consumer Health (Philippines) Inc.

1-5

JNTL Consumer Health (Poland) sp. z o.o.
JNTL Consumer Health (Portugal) Limitada
JNTL Consumer Health (Services) LLC
JNTL Consumer Health (Slovakia), s.r.o.
JNTL Consumer Health (Spain), S.L.
JNTL Consumer Health (Taiwan) Limited
JNTL Consumer Health (Vietnam) Co. Ltd.
JNTL Consumer Health General Services BV
JNTL Consumer Health I (Ireland) Limited
JNTL Consumer Health I (Switzerland) GmbH
JNTL Consumer Health II (Switzerland) GmbH
JNTL Consumer Health LLC
JNTL Consumer Health Mexico, S. de R.L. de C.V.
JNTL Consumer Health Middle East FZ-LLC
JNTL HoldCo 2 LLC
JNTL HoldCo 3 LLC
JNTL HoldCo 4 LLC
JNTL HoldCo 5 LLC
JNTL HoldCo 6 LLC
JNTL HoldCo 7 LLC
JNTL HoldCo 8 LLC
JNTL HoldCo LLC
JNTL Holdings 2, Inc.
JNTL Holdings 3, Inc.
JNTL Holdings B.V.
JNTL Holdings, Inc.
JNTL Ireland HoldCo 2 B.V.
JNTL Netherlands HoldCo B.V.
JNTL Turkey Tüketici Sağlığı Limited Şirketi
Johnson & Johnson
Johnson & Johnson - Societa' Per Azioni
Johnson & Johnson (Angola), Limitada
Johnson & Johnson (Australia) Pty Ltd
Johnson & Johnson (Canada) Inc.
Johnson & Johnson (China) Investment Ltd.
Johnson & Johnson (Ecuador) S.A.
Johnson & Johnson (Egypt) S.A.E.
Johnson & Johnson (Hong Kong) Limited
Johnson & Johnson (Ireland) Limited
Johnson & Johnson (Jamaica) Limited
Johnson & Johnson (Kenya) Limited
Johnson & Johnson (Middle East) Inc.
Johnson & Johnson (Mozambique), Limitada
Johnson & Johnson (Namibia) (Proprietary) Limited
Johnson & Johnson (New Zealand) Limited
Johnson & Johnson (Philippines), Inc.

1-6

Johnson & Johnson (Private) Limited
Johnson & Johnson (Singapore) Holdco LLC
Johnson & Johnson (Thailand) Ltd.
Johnson & Johnson (Trinidad) Limited
Johnson & Johnson (Vietnam) Co., Ltd
Johnson & Johnson AB
Johnson & Johnson AG
Johnson & Johnson Bulgaria EOOD
Johnson & Johnson China Ltd.
Johnson & Johnson Consumer (Hong Kong) Limited
Johnson & Johnson Consumer (Thailand) Limited
Johnson & Johnson Consumer B.V.
Johnson & Johnson Consumer Holdings France
Johnson & Johnson Consumer Inc.
Johnson & Johnson Consumer NV
Johnson & Johnson Consumer Saudi Arabia Limited
Johnson & Johnson Consumer Services EAME Ltd.
Johnson & Johnson d.o.o.
Johnson & Johnson de Argentina S.A.C. e. I.
Johnson & Johnson de Chile S.A.
Johnson & Johnson de Colombia S.A.
Johnson & Johnson de Mexico, S.A. de C.V.
Johnson & Johnson de Uruguay S.A.
Johnson & Johnson de Venezuela, S.A.
Johnson & Johnson del Ecuador, S.A.
Johnson & Johnson Del Paraguay, S.A.
Johnson & Johnson del Peru S.A.
Johnson & Johnson do Brasil Industria E Comercio de Produtos Para Saude Ltda.
Johnson & Johnson Dominicana, S.A.S.
Johnson & Johnson Enterprise Innovation Inc.
Johnson & Johnson European Treasury Unlimited Company
Johnson & Johnson Finance Corporation
Johnson & Johnson Finance Limited
Johnson & Johnson Financial Services GmbH
Johnson & Johnson for Export and Import LLC
Johnson & Johnson Gateway, LLC
Johnson & Johnson Gesellschaft m.b.H.
Johnson & Johnson GmbH
Johnson & Johnson GT, Sociedad Anónima
Johnson & Johnson Guatemala, S.A.
Johnson & Johnson Health and Wellness Solutions, Inc.
Johnson & Johnson Health Care Systems Inc.
Johnson & Johnson Hellas Commercial and Industrial S.A.
Johnson & Johnson Hellas Consumer Products Commercial Societe Anonyme
Johnson & Johnson Hemisferica S.A.
Johnson & Johnson Holdco (NA) Inc.

1-7

Johnson & Johnson Holdco (NA) Inc.

Johnson & Johnson Holding GmbH

Johnson & Johnson Holdings (Austria) GmbH

Johnson & Johnson Inc.

Johnson & Johnson Industrial Ltda.

Johnson & Johnson Innovation - JJDC, Inc.

Johnson & Johnson Innovation Limited

Johnson & Johnson Innovation LLC

Johnson & Johnson International

Johnson & Johnson International (Singapore) Pte. Ltd.

Johnson & Johnson International Financial Services Unlimited Company

Johnson & Johnson Irish Finance Company Limited

Johnson & Johnson K.K.

Johnson & Johnson Kft.

Johnson & Johnson Korea Selling & Distribution LLC

Johnson & Johnson Korea, Ltd.

Johnson & Johnson Limited

Johnson & Johnson LLC

Johnson & Johnson Luxembourg Finance Company Sarl

Johnson & Johnson Management Limited

Johnson & Johnson Medical (China) Ltd.

Johnson & Johnson Medical (Proprietary) Ltd

Johnson & Johnson Medical (Shanghai) Ltd.

Johnson & Johnson Medical (Suzhou) Ltd.

Johnson & Johnson Medical B.V.

Johnson & Johnson Medical Devices & Diagnostics Group - Latin America, L.L.C.

Johnson & Johnson Medical GmbH

Johnson & Johnson Medical Greece Single Member S.A.

Johnson & Johnson Medical Korea Ltd.

Johnson & Johnson Medical Limited

Johnson & Johnson Medical Mexico, S.A. de C.V.

Johnson & Johnson Medical NV

Johnson & Johnson Medical Products GmbH

Johnson & Johnson Medical Pty Ltd

Johnson & Johnson Medical S.A.

Johnson & Johnson Medical S.p.A.

Johnson & Johnson Medical SAS

Johnson & Johnson Medical Saudi Arabia Limited

Johnson & Johnson Medical Taiwan Ltd.

Johnson & Johnson Medical, S.C.S.

Johnson & Johnson Medikal Sanayi ve Ticaret Limited Sirketi

Johnson & Johnson MedTech (Thailand) Ltd.

Johnson & Johnson Medtech Colombia S.A.S.

Johnson & Johnson Middle East FZ-LLC

Johnson & Johnson Morocco Societe Anonyme

Johnson & Johnson Nordic AB

NAI-1539839717

Johnson & Johnson Pacific Pty Limited
Johnson & Johnson Pakistan (Private) Limited
Johnson & Johnson Panama, S.A.
Johnson & Johnson Personal Care (Chile) S.A.
Johnson & Johnson Pharmaceutical Ltd.
Johnson & Johnson Poland Sp. z o.o.
Johnson & Johnson Private Limited
Johnson & Johnson Pte. Ltd.
Johnson & Johnson Pty. Limited
Johnson & Johnson Romania S.R.L.
Johnson & Johnson S.E. d.o.o.
Johnson & Johnson S.E., Inc.
Johnson & Johnson Sante Beaute France
Johnson & Johnson SDN. BHD.
Johnson & Johnson Services, Inc.
Johnson & Johnson Surgical Vision India Private Limited
Johnson & Johnson Surgical Vision, Inc.
Johnson & Johnson Taiwan Ltd.
Johnson & Johnson UK Treasury Company Limited
Johnson & Johnson Ukraine LLC
Johnson & Johnson Urban Renewal Associates
Johnson & Johnson Vision Care (Australia) Pty Ltd
Johnson & Johnson Vision Care (Shanghai) Ltd.
Johnson & Johnson Vision Care Ireland Unlimited Company
Johnson & Johnson Vision Care, Inc.
Johnson & Johnson Vision Korea, Ltd.
Johnson & Johnson, Lda
Johnson & Johnson, S.A.
Johnson & Johnson, S.A. de C.V.
Johnson & Johnson, s.r.o.
Johnson & Johnson, s.r.o.
Johnson and Johnson (Proprietary) Limited
Johnson and Johnson Sihhi Malzeme Sanayi Ve Ticaret Limited Sirketi
Johnson Y Johnson de Costa Rica, S.A.
JOM Pharmaceutical Services, Inc.
Kenvue Inc.
La Concha Land Investment Corporation
LLT Management LLC
McNeil AB
McNeil Consumer Pharmaceuticals Co.
McNeil Denmark ApS
McNeil Healthcare (Ireland) Limited
McNeil Healthcare (UK) Limited
McNeil Healthcare LLC
McNeil Iberica S.L.U.
McNeil LA LLC

NAI-1539839717

McNEIL MMP, LLC
McNeil Nutritionals, LLC
McNeil Panama, LLC
McNeil Products Limited
McNeil Sweden AB
Medical Device Business Services, Inc.
Medical Devices & Diagnostics Global Services, LLC
Medical Devices International LLC
Medos International Sarl
Medos Sarl
MegaDyne Medical Products, Inc.
Menlo Care De Mexico, S.A. de C.V.
Mentor B.V.
Mentor Deutschland GmbH
Mentor Medical Systems B.V.
Mentor Partnership Holding Company I, LLC
Mentor Texas GP LLC
Mentor Texas L.P.
Mentor Worldwide LLC
Middlesex Assurance Company Limited
Momenta Ireland Limited
Momenta Pharmaceuticals, Inc.
NeoStrata Company, Inc.
NeoStrata UG (haftungsbeschränkt)
Netherlands Holding Company
Neuravi Limited
NeuWave Medical, Inc.
**[New Holdco (Texas) LLC]**
**[New Intermediate Holding Corp]**
Novira Therapeutics, LLC
NuVera Medical, Inc.
Obtech Medical Mexico, S.A. de C.V.
OBTECH Medical Sarl
OGX Beauty Limited
OMJ Holding GmbH
OMJ Pharmaceuticals, Inc.
Omrix Biopharmaceuticals Ltd.
Omrix Biopharmaceuticals NV
Omrix Biopharmaceuticals, Inc.
Ortho Biologics LLC
Ortho Biotech Holding LLC
Orthospin Ltd.
Orthotaxy SAS
Patriot Pharmaceuticals, LLC
Pecos River Talc LLC
Peninsula Pharmaceuticals, LLC

1-10

Percivia LLC
Pharmadirect Ltd.
Pharmedica Laboratories (Proprietary) Limited
preCARDIA, Inc.
Princeton Laboratories, Inc.
Productos de Cuidado Personal y de La Salud de Bolivia S.R.L.
Proleader S.A.
Prosidyan, Inc.
PT Integrated Healthcare Indonesia
PT Johnson & Johnson Indonesia
PT Johnson and Johnson Indonesia Two
Pulsar Vascular, Inc.
Regency Urban Renewal Associates
RespiVert Ltd.
Review Manager Test Entity 2
Royalty A&M LLC
Royalty A&M LLC
Rutan Realty LLC
Scios LLC
Serhum S.A. de C.V.
Shanghai Elsker Mother & Baby Co., Ltd
Shanghai Johnson & Johnson Ltd.
Shanghai Johnson & Johnson Pharmaceuticals Ltd.
Sodiac ESV
Spectrum Vision Limited Liability Company
Spectrum Vision Limited Liability Partnership
SterilMed, Inc.
Surgical Process Institute Deutschland GmbH
Synthes Costa Rica S.C.R., Limitada
SYNTHES GmbH
Synthes GmbH
Synthes Holding AG
Synthes Holding Limited
SYNTHES Medical Immobilien GmbH
Synthes Medical Surgical Equipment & Instruments Trading LLC
Synthes Produktions GmbH
Synthes Proprietary Limited
Synthes S.M.P., S. de R.L. de C.V.
Synthes Tuttlingen GmbH
Synthes USA Products, LLC
Synthes USA, LLC
Synthes, Inc.
TARIS Biomedical LLC
TearScience, Inc.
The Anspach Effort, LLC
The Vision Care Institute, LLC

NAI-1539839717

Tibotec, LLC
Torax Medical, Inc.
UAB "Johnson & Johnson"
Vania Expansion
Verb Surgical Inc.
Vision Care Finance Unlimited Company
Vogue International LLC
WH4110 Development Company, L.L.C.
Xian Janssen Pharmaceutical Ltd.
XO1 Limited
Zarbee's, Inc.

1-12

## SCHEDULE 2

**Imerys/Cyprus Parties**

**Imerys Corporate Parties**

### CURRENT AFFILIATES

- AKROTIRIO THAHILAS DYO S.A.
- ALMATECH MINERAL INTERNATIONAL LTD
- ALUMICA CANADA INC.
- AMERICARB, INC.
- ARDOISIERES D'ANGERS
- ARTEMYN
- ARTEMYN ARG S.A.
- ARTEMYN ASIA PACIFIC PTE. LTD.
- ARTEMYN GELGIUM
- ARTEMYN BRAZIL LTDA
- AUSTRALIAN VERMICULITE INDUSTRIES (PTY) LTD
- BERG MINERALS CANADA INC.
- BERG MINERALS TRADING (SHANGHAI) CO., LTD
- BERG MINERALS UK LIMITED
- CALDERYS ALGERIE SPA
- CALDERYS REFRACTARIOS VENEZOLANOS SA
- CALDERYS USA, INC.
- CEBO HOLLAND B.V.
- CEBO INTERNATIONAL B.V.
- CEBO MARINE B.V.
- CEBO UK LIMITED
- DONBASSKERAMIKA
- DONKAOLIN
- ECCA HOLDINGS (PTY) LTD
- ECCA MINERALS (PTY) LTD
- ECO-BOS DEVELOPMENT LIMITED
- FOKIS MINING PARK
- GEORGIA PROPPANTS LLC (f.k.a. US CERAMICS LLC)
- GIMPEX-IMERYS INDIA PRIVATE LTD
- GUIYANG JIANAI SPECIAL ALUMINATES
- HARBORLITE AEGEAN ENDUSTRI MINERALLERI SANAYI A.S.
- IMERTECH
- IMERYS
- IMERYS (SHANGHAI) INVESTMENT MANAGEMENT CO., LTD
- IMERYS ADMINISTRATIVE GERMANY GMBH
- IMERYS AL ZAYANI FUSED MINERALS CO. W.L.L.
- IMERYS ALMERIA, SA DE CV

2-1

- IMERYS ALMERIA DIATOMITA CONCESIONES ZACOALCO S.A. de C.V.
- IMERYS ALUMINATES CORPORATE (f.k.a. KERNEOS CORPORATE SAS)
- IMERYS ALUMINATES GROUPE (f.k.a. KERNEOS GROUP SAS)
- IMERYS ALUMINATES LIMITED
- IMERYS ALUMINATES SA
- IMERYS ASIA PACIFIC PTE LTD
- IMERYS BAUXITE SA (f.k.a. ELMIN BAUXITES SA)
- IMERYS BELGIUM SA
- IMERYS BENTONITE GEORGIA LTD
- IMERYS BENTONITE HUNGARY KFT
- IMERYS CANADA INC.
- IMERYS CARBONATES (THAILAND), LTD
- IMERYS CARBONATES AUSTRIA GMBH
- IMERYS CARBONATES INDIA LIMITED
- IMERYS CARBONATES USA, INC.
- IMERYS CERAMICS (INDIA) PRIVATE LIMITED
- IMERYS CERAMICS (THAILAND) LTD
- IMERYS CERAMICS BRASIL MINERAIS PARA CERAMICAS LTDA
- IMERYS CERAMICS EGYPT
- IMERYS CERAMICS FRANCE
- IMERYS CERAMICS ITALY S.R.L.
- IMERYS CERAMICS MEXICO SA DE CV
- IMERYS CERAMICS NEW ZEALAND
- IMERYS CERAMICS PORTUGAL, SA
- IMERYS CLAYS, INC.
- IMERYS CLERAC (f.k.a. IMERYS REFRACTORY MINERALS CLERAC)
- IMERYS CZECH REPUBLIC S.R.O.
- IMERYS DIATOMITA ALICANTE, S.A.
- IMERYS DO BRASIL COMERCIO DE EXTRAÇAO DE MINÉRIOS
- IMERYS DOMODOSSOLA S.P.A. (f.k.a. IMERYS FUSED MINERALS DOMODOSSOLA S.P.A.)
- IMERYS DORTMUND GMBH (f.k.a. S&B HOLDING GMBH)
- IMERYS FILTRATION FRANCE
- IMERYS FILTRATION MINERALS, INC.
- IMERYS FUSED MINERALS (YINGKOU) CO., LTD
- IMERYS FUSED MINERALS FRANCE SARL
- IMERYS FUSED MINERALS GUIZHOU CO. LTD
- IMERYS FUSED MINERALS SALTO LTDA
- IMERYS GLOMEL (f.k.a. IMERYS REFRACTORY MINERALS GLOMEL)
- IMERYS GRAPHITE & CARBON BELGIUM SA
- IMERYS GRAPHITE & CARBON CANADA INC.
- IMERYS GRAPHITE & CARBON JAPAN KK
- IMERYS GRAPHITE & CARBON KOREA
- IMERYS GRAPHITE & CARBON SWITZERLAND SA

2-2

- IMERYS GREENELLE ONE
- IMERYS GREENELLE TWO
- IMERYS GREENEVILLE, INC. (f.k.a. IMERYS FUSED MINERALS GREENEVILLE, INC.)
- IMERYS HIGH RESISTANCE MINERALS JAPAN KK
- IMERYS INDUSTRIAL MINERALS DENMARK A/S
- IMERYS INDUSTRIAL MINERALS GREECE S.A.
- IMERYS KAOLIN, INC.
- IMERYS KILN FURNITURE (THAILAND) CO. LTD
- IMERYS KILN FURNITURE HUNGRY KFT.
- IMERYS KILN FURNITURE ESPAÑA, SA
- IMERYS LAUFENBURG GMBH (f.k.a. IMERYS FUSED MINERALS LAUFENBURG GMBH)
- IMERYS LITHIUM FRANCE (f.k.a. PARNASSE TRENTE DEUX)
- IMERYS MICA KINGS MOUTAIN, INC.
- IMERYS MIDDLE EAST HOLDING COMPANY W.L.L.
- IMERYS MINERAL AB
- IMERYS MINERAL ARABIA LLC
- IMERYS MINERALES ARGENTINA S.A.
- IMERYS MINERALES CHILE SPA
- IMERYS MINERALES PERU SAC
- IMERYS MINERALI CORSICO SRL
- IMERYS MINERALI SPA
- IMERYS MINERALS (INDIA) PRIVATE LIMITED
- IMERYS MINERALS (TAIWAN) LTD
- IMERYS MINERALS (THAILAND) LTD
- IMERYS MINERALS BULGARIA AD
- IMERYS MINERALS CHINA, INC.
- IMERYS MINERALS GMBH
- IMERYS MINERALS HOLDING LIMITED
- IMERYS MINERALS INTERNATIONAL SALES.
- IMERYS MINERALS JAPAN KK
- IMERYS MINERALS KOREA LTD
- IMERYS MINERALS LTD
- IMERYS MINERALS MALAYSIA SDN. BHD.
- IMERYS MINERALS NETHERLANDS B.V.
- IMERYS MINERALS OY
- IMERYS MINERALS VIETNAM LIMITED
- IMERYS MINERAUX BELGIQUE SA
- IMERYS MINÉRAUX FRANCE
- IMERYS MURG GMBH (f.k.a. IMERYS FUSED MINERALS MURG GMBH)
- IMERYS NEWQUEST (INDIA) PRIVATE LIMITED
- IMERYS NIAGARA FALLS, INC. (f.k.a. IMERYS FUSED MINERALS NIAGARA FALLS, INC.)

2-3

- IMERYS NORFOLK, INC. (f.k.a. KERNEOS INC.)
- IMERYS OILFIELD MINERALS, INC.
- IMERYS PACIFIC LTD
- IMERYS PCC FRANCE
- IMERYS PCC UK
- IMERYS PERFORMANCE AND FILTRATION MINERALS PRIVATE LIMITED
- IMERYS PERFORMANCE MINERALS AMERICAS, INC. (f.k.a. IMERTECH USA, INC.)
- IMERYS PERLITA BARCELONA, S.A.
- IMERYS PERLITE SARDINIA S.R.L.
- IMERYS PERLITE USA, INC.
- IMERYS PIGMENTS (QINGYANG) CO., LTD
- IMERYS PIGMENTS (WUHU) CO., LTD
- IMERYS POLAND S.P. Z.O.O.
- IMERYS RE
- IMERYS REFRACTORY MINERALS SOUTH AFRICA (PTY) LTD
- IMERYS REFRACTORY MINERALS USA, INC.
- IMERYS RICHARDS BAY (PTY) LTD (f.k.a. KERNEOS SOUTHERN AFRICA PTY LTD)
- IMERYS RIO CAPIM CAULIM S.A.
- IMERYS ROCA RODANDO CONCESIONES HMO, S.A. de C.V.
- IMERYS SERAMIK HAMMADDELERI SANAYI VE TICARET LIMITED SIRKETI
- IMERYS SERVICES
- IMERYS SERVICES GERMANY GMBH & CO. KG
- IMERYS SERVICES GREECE
- IMERYS SOUTH AFRICA (PTY) LTD
- IMERYS SOUTH EUROPE, S.L.
- IMERYS SPECIALITIES JAPAN CO., LTD
- IMERYS TABLEWARE DEUTSCHLAND GMBH
- IMERYS TABLEWARE FRANCE
- IMERYS TALC AMERICA, INC.
- IMERYS TALC AUSTRALIA PTY LTD
- IMERYS TALC AUSTRIA GMBH
- IMERYS TALC BELGIUM
- IMERYS TALC CANADA INC.
- IMERYS TALC EUROPE
- IMERYS TALC FINLAND OY
- IMERYS TALC GERMANY GMBH
- IMERYS TALC ITALY S.P.A.[1]
- IMERYS TALC LUZENAC FRANCE
- IMERYS TALC MEXICO, SA DE CV
- IMERYS TALC UK HOLDING LTD

---

[1]    Imerys Talc Italy S.p.A. is only an Imerys/Cyprus Party to the extent it does not commence a bankruptcy case.

- IMERYS TALC VERMONT, INC.
- IMERYS TEUTSCHENTAL (f.k.a. IMERYS FUSED MINERALS TEUTSCHENTHAL GMBH)
- IMERYS TRADING MINERALS EGYPT
- IMERYS TRUSTEES LTD
- IMERYS UK FINANCE LIMITED
- IMERYS UK LTD
- IMERYS UK PENSION FUND TRUSTEES LTD
- IMERYS USA, INC.
- IMERYS VILLACH GMBH (f.k.a. IMERYS FUSED MINERALS VILLACH GMBH)
- IMERYS VIZAG PRIVATE LIMITED (f.k.a. KERNEOS INDIA ALUMINATE TECHNOLOGIES PRIVATE LIMITED)
- IMERYS WOLLASTONITE USA, LLC
- IMERYS ZHEJIANG ZIRCONIA CO., LTD
- IMERYS ZSCHORNEWITZ GMBH (f.k.a. IMERYS FUSED MINERALS ZSCHORNEWITZ GMBH)
- INDUSTRIA MACINAZIONE MINERALI PER L'INDUSTRIA CERAMICA S.P.A
- INDUSTRIAL MINERALS OF GREECE
- INSTALACIONES REFRACTARIAS C.A.
- ISOCON S.A.
- KENTUCKY-TENNESSEE CLAY COMPANY
- KERNEOS (CHINA) ALUMINATE TECHNOLOGIES CO., LTD
- KERNEOS AUSTRALIA PTY LTD
- KERNEOS INDIA ALUMINATE PRIVATE LIMITED
- KINTA POWDERTEC SDN. BHD
- LATOMIA N. KORAKAS SA
- LAVIOSA CHIMICA MINERARIA SPA
- LAVIOSA PROMASA S.A.
- LINJIANG IMERYS DIATOMITE CO., LTD
- LIQUID QUIMICA MEXICANA, SA DE CV
- LLC IMERYS ALUMINATES
- METALLEION METALLEYMATON
- MICRON-ITA MINERACAO LTDA
- MIKRO MINERAL ENDUSTRIYEL MINERALLER SANAYI VE TICARET A.S.
- MILOS INITIATIVE
- MILOS MINING MUSEUM
- MINERA ROCA RODANDO S.DE R.L. DE C.V.
- MINERAL RESOURCES DEVELOPMENT (M.R.D.) CO. LTD
- MINVEN - (C-E MINERALES DE VENEZUELA)
- MIRCAL
- MIRCAL BRESIL
- MIRCAL DE MEXICO SA DE CV
- MIRCAL ITALIA SPA
- MONREFCO GMBH

NAI-1539839717

- MRD-ECC CO. LTD
- MSL MINERAIS S.A.
- NIIGATA GCC LTD
- NIPPON POWER GRAPHITE CO., LTD
- NORTH AFRICAN INDUSTRIAL MINERAL EXPLORATION SARL - NAIMEX
- NYCO MINERALS, LLC
- PARIMETAL
- PERAMIN AB
- PLIBRICO INSTALLACIONES REFRACTARIAS
- PPSA
- PT ESENSINDO CIPTA CEMERLANG
- PT IMERYS CERAMICS INDONESIA
- PYRAMAX CERAMICS SOUTHEAST, LLC
- QUARTZ CORP (SHANGHAÏ) CO., LTD
- RECLAYM LIMITED
- REFRACTORY MINERALS (PTY) LTD
- RESEARCH BY BRITISH LITHIUM LIMITED
- S&B INDUSTRIAL MINERALS MOROCCO S.A.R.L.
- S&B INDUSTRIAL MINERALS SPAIN S.L.U.
- S&B MINERALS FINANCE SARL
- S&B MINERALS PARTICIPATIONS SARL
- SAMREC (PTY) LTD
- SHANDONG IMERYS MOUNT TAI CO., LTD
- SIBIMIN OVERSEAS LTD
- THE QUARTZ CORP AS
- THE QUARTZ CORP SAS
- THE QUARTZ CORP USA
- TYGERKLOOF MINING (PTY) LTD
- VATUTINSKY KOMBINAT VOGNETRYVIV
- VERMICULITA Y DERIVADOS, SL
- VOUGIOUKLI QUARRIES AVEE
- XINYANG ATHENIAN MINING CO., LTD
- YBB CALCIUM PRODUCTS CO. LTD
- YUEYANG IMERYS ANTAI MINERALS CO., LTD
- ZAPATOS DE MEXICALI, S.A. DE C.V.
- ZHENGZHOU JIANAI SPECIAL ALUMINATES CO., LTD

## FORMER AFFILIATES

- 000 CALDERYS
- 11656490 CANADA INC.
- ADVANCED MINERALS CORPORATION
- AFRICA REFRACTORY CONSULTANTS (PTY) LTD
- AKROTIRIO TRAHILAS TRIA S.A.

- AMERICAN TRIPOLI, INC.
- AMMIN HOLDINGS, INC.
- ANADOLU PERLIT MEDENCILIK SANAYI
- ARC FUSED ALUMINA
- ARDOISE ET JARDIN
- AREFCON B.V.
- AREFCON HISMA B.V.
- ASSOS MERMER SANAYI VE TICARET LTD SIRKETI
- B & B REFRACTORY SERVICES PTY LTD
- BAOTOU JINGYUAN GRAPHITE CO., LTD
- BLX TRADING SAS
- CALDERYS ALGERIE SERVICES SPA
- CALDERYS AUSTRALIA PTY LTDCALDERYS AUSTRIA GMBH
- CALDERYS BELGIUM
- CALDERYS CHINA
- CALDERYS CHINA CO., LTD
- CALDERYS CZECH S.R.O
- CALDERYS DANMARK A/S
- CALDERYS DE MEXICO SA DE CV
- CALDERYS DEUTSCHLAND GMBH
- CALDERYS FINLAND OY
- CALDERYS FRANCE
- CALDERYS IBERICA REFRACTARIOS, SA
- CALDERYS INDIA REFRACTORIES LIMITED
- CALDERYS ITALIA SRL
- CALDERYS JAPAN CO., LTD
- CALDERYS KOREA CO. LTD
- CALDERYS MAGYARORSZAG K.F.T. (HUNGARY)
- CALDERYS NGJ LIMITED
- CALDERYS NORDIC AB
- CALDERYS NORWAY AS
- CALDERYS POLSKA SP. Z.O.O.
- CALDERYS SOUTH AFRICA (PTY) LTD
- CALDERYS TAIWAN CO LTD
- CALDERYS THE NETHERLANDS B.V.
- CALDERYS UKRAINE LTD
- CALDERYS UK LTD
- CALDERYS USA LLC
- CAPTELIA
- CARBONATOS ANDINOS SA
- C-E NEWELL, INC.
- CELITE MEXICANA, SA DE CV
- CHANGBAI CELITE DIATOMITE CO., LTD
- CHARGES MINERALES DU PERIGORD - CMP

- CHOICEWISE LIMITED
- CONDIMENTUM OY
- COVEO
- DALIAN JINSHENG FINE CHEMICAL INDUSTRY CO., LTD
- DAMOLIN ETRECHY
- DAMOLIN GMBH
- DAMOLIN INVESTMENT A/S
- DOLPHIN FELDSPAR PRIVATE LIMITED
- DOYET TERRE CUITE
- ECC OVERSEAS INVESTMENTS LTD
- ECC PACIFIC (AUSTRALIA) PTY LTD
- ECCA CALCIUM PRODUCTS, INC.
- EDWIN H. BRADLEY HOLDINGS LTD
- ELMIN BAUXITES S.R.L.
- ENGLISH CHINA CLAYS LTD
- EUROARGILLE
- EUROPE COMMERCE REFRACTORY
- FAGERSTA ELDFASTA AB
- FEL-MAC COMPANY LLC
- FIBERLEAN TECNOLOGIA E SOLUCOES EIRELI
- FIBERLEAN TECHNOLOGIE LIMITED
- FIBERLEAN TECHNOLOGIE NA INC.
- GOONAMARRIS LIMITED
- GRAN BIANCO CARRARA SRL
- GUIZHOU S&B NEW-TYPE MATERIALS CO., LTD
- GUIZHOU STAR MINERALS CO., LTD
- GUNUNG IMBANGAN SDN. BHD
- HARBORLITE (UK) LTD
- HAZNEDAR DURER DI? T?CARET A.? (f.k.a. VENDER ENDÜSTRIYEL MALZEMELERI TICARET A.S.)
- HAZNEDAR DURER REFRAKTER MALZEMELERI SANAYI VE TICARET A.S.
- HAZNEDAR GMBH
- HJM INDUSTRIES SDN. BHD
- IGM FOR FIBRE GLASS
- IMERPLAST UK LIMITED
- IMERYS (SHANGHAÏ) FILTRATION MINERALS TRADING CO., LTD
- IMERYS ADVANCED MATERIALS (YINGKOU) CO., LTD
- IMERYS ALÜMINÄT DIS TICARET
- IMERYS ALUMINATES ASIA PACIFIC PTE LTD
- IMERYS ALUMINATES GMBH
- IMERYS ALUMINATES ITALIA S.R.L.
- IMERYS ALUMINATES NORDIC AB
- IMERYS ARGENTINA SRL
- IMERYS BENTONITE ITALY S.P.A.

2-8

- IMERYS BENTONITE USA, LLC
- IMERYS CALCIUM SOLUTIONS AUSTRIA GMBH
- IMERYS CANADA 2004, INC.
- IMERYS CANADA LP
- IMERYS CARBONATES LLC
- IMERYS CERAMICS ESPAÑA
- IMERYS CERAMICS ITALIA
- IMERYS CSI SWITZERLAND SAGL
- IMERYS DIATOMITA MEXICO, SA DE CV
- IMERYS FINE CHEMICAL (CHANGSHU) CO., LTD
- IMERYS FUSED MINERALS (TAICANG) CO., LTD
- IMERYS FUSED MINERALS (ZIBO) CO., LTD
- IMERYS FUSED MINERALS HULL LIMITED
- IMERYS GECKO GRAPHITE (NAMIBIA) (PTY) LTD
- IMERYS GECKO HOLDING (NAMIBIA) (PTY) LTD
- IMERYS GECKO OKANJANDE MINING (PTY) LTD
- IMERYS GRAPHITE & CARBON (CHANGZHOU) CO., LTD
- IMERYS GRAPHITE & CARBON GERMANY GMBH
- IMERYS GRAPHITE & CARBON USA, INC.
- IMERYS ITATEX SOLUCOES MINERAIS LTDA
- IMERYS KAOLIN BELGIUM
- IMERYS KILN FURNITURE FRANCE
- IMERYS METALCASTING FRANCE SARL
- IMERYS METALCASTING GERMANY GMBH
- IMERYS MICA SUZORITE INC.
- IMERYS MINERALES ESPANA, S.L.
- IMERYS MINERALES PERU S.A.C.
- IMERYS MINERALES SANTIAGO LIMITADA
- IMERYS MINERALI GAMALERO SRL
- IMERYS MINERALS (HEZHOU) CO., LTD
- IMERYS MINERALS AUSTRALIA PTY LTD
- IMERYS MINERALS CALIFORNIA, INC.
- IMERYS MINERALS HONG KONG LIMITED
- IMERYS MINERALS USA, INC.
- IMERYS MINERAUX DE TUNISIE "IMT"
- IMERYS MINING DEVELOPMENT (QINGYANG) CO., LTD
- IMERYS PAPER CARBONATES LLC
- IMERYS PARTICIPACOES LTDA
- IMERYS PERLITA PAULINIA MINERAIS LTDA
- IMERYS PIGMENTS TRADING (SHANGHAI) CO., LTD
- IMERYS PIGMENTS, INC.
- IMERYS REFRACTARIOS PARTICIPACOES MONTE DOURADO LTDA
- IMERYS REFRACTORY MINERALS INTERNATIONAL SALES
- IMERYS REFRACTORY MINERALS JAPAN KK

NAI-1539839717

- IMERYS STEELCASTING DO BRASIL LTDA
- IMERYS STEELCASTING INDIA PRIVATE LIMITED
- IMERYS STEELCASTING USA, INC.
- IMERYS TABLEWARE BALKANS SRL
- IMERYS TABLEWARE CR S.R.O.
- IMERYS TABLEWARE GUANGZHOU CO., LTD
- IMERYS TABLEWARE NEW ZEALAND LTD
- IMERYS TALC CALIFORNIA, INC.
- IMERYS TALC DELAWARE, INC.
- IMERYS TALC OHIO, INC.
- IMERYS TALC SPAIN, S.A.
- IMERYS TC
- IMERYS TCSI SWITZERLAND SAGK
- IMERYS TECHNOLOGY CENTER AUSTRIA GMBH
- IMERYS TOITURE BELGIE N.V.
- IMERYS VOSTOK
- IMERYS WINDFARM PROJECT LTD
- IMERYS YILONG ANDALUSITE (XINJIANG) CO, LTD
- IMPALA ADMINCO LTD
- INDUSTRIALMIN
- ITACA S.R.L.
- KAOLIN AUSTRALIA PTY LTD
- KAOLINS DE NOZAY (SOCIÉTÉ ANONYME DES)
- KAOPOLITE, INC.
- KERAPLAN GMBH
- KERN TECH 1
- KERN TECH 2
- KERN TECH 3
- KERNEOS DE MEXICO SA DE CV
- KERNEOS DO BRASIL COMERCIAL LTDA
- KERNEOS ESPANA SL
- KERNEOS HOLDING GROUP SAS
- KERNEOS HOLDING NORTH AMERICA, INC.
- KERNEOS HOLDING NORTHERN EUROPE LIMITED
- KERNEOS POLSKA SP. Z.O.O.
- KERNEOS SERVICIOS SA DE CV
- KILITEAM V
- KORUND D.O.O.
- KPCL  K.V.S.
- LA FRANCAISE DES TUILES ET BRIQUES
- L-IMERYS INDUSTRIA E COMERCIO DE CAL LTDA
- LUXOL PHOTOVOLTAICS SN
- LUZENAC MICRO MILLING LIMITED
- MAGEMO SCI

- MASSA MINERALI SRL
- MATISCO DEVELOPPEMENT
- METRAMCO (PTY) LTD
- MICRON-ITA INDUSTRIA E COMERCIO DE MINERAIS LTDA
- MINERAL HOLDINGS, INC.
- MINERALIEN SCHIFFAHRT SPEDITION UND TRANSPORT GMBH - MST
- MINERALS MILLING TUNISIA
- MINERALS TRADING, INC.
- MIRCAL ARGENTINA SRL
- MIRCAL ASIA
- MIRCAL AUSTRALIA PTY LTD
- MIRCAL CHILI
- MIRCAL EUROPE
- MIRCAL TALC HOLDING
- MSL OVERSEAS LTD
- MULLITE COMPANY OF AMERICA - MULCOA
- N.G. JOHNSON (NORTHERN) HOLDINGS LIMITED
- N.G. JOHNSON LIMITED
- NIZEROLLES
- NYCO MINERALS CANADA, INC.
- ORGANIK MADENCILIK AS
- PABALK MADEN SANAYI VE TICARET A.S.
- PANSHI HUANYU WOLLASTONITE CO., LTD
- PARNASSE TRENTE ET UN
- PARNASSE TRENTE TROIS
- PARNASSE VINGT DEUX
- PERGEM MINERAL MADENCILIK SANAYI VE TICARET AS
- PERU MINERALS CORPORATION
- PERUCO, INC.
- PGB SA
- PLIBRICO LTD
- PLR REFRACTAIRES SAS U
- PPSA OVERSEAS LTD
- PROFIMO
- PROPERTY COMPANY ONE
- PROPERTY COMPANY TWO
- PT BINAH SURINDAH CEMERLANG
- PT INDOPORLEN
- PT INDOPORLEN SAKTI
- PT STOLLBERG - SAMIL INDONESIA
- PYRAMAX CERAMICS ARKANSAS, LLC
- PYRAMAX CERAMICS, LLC
- QA REFRACTORIES (PTY) LTD
- QINGDAO STOLLBERG & SAMIL CO., LTD

NAI-1539839717

- QS ABRASIVI MARENGO SRL
- QUARTZ DE MAURITANIE SA
- RECURSOS MINERALES DEL NORTE, SA DE CV
- RT 043 MINERACAO LTDA
- RUMICO FEUERFESTE BAUSTOFFE GMBH
- S&B BENTONITE CHAOYANG CO., LTD
- S&B ENDUSTRIYEL MINERALLER A.S.
- S&B INDUSTRIAL MINERALS (HENAN) CO., LTD
- S&B INDUSTRIAL MINERALS (SHANGHAI) CO., LTD
- S&B INDUSTRIAL MINERALS (TIANJIN) CO., LTD
- S&B MINERALS LIMITED
- S&B MINERALS PARTICIPATIONS 2 SARL
- S&B MINERALS PARTICIPATIONS LLC
- S&B MINERALS US HOLDING GMBH
- S&B MINERALS VERWALTUNG GMBH
- S&B WINES S.A.
- SAMREC VERMICULITE (ZIMBABWE) ( PRIVATE) LTD
- SCEA STE COLOMBE
- SCOVER PLUS
- SEG
- SET LININGS GMBH
- SIDEX MONOLITHIQUES SRL
- SILLA DE PAITA S.A.C.
- SLS BAUSTOFFE GESELLSCHAFT MBH
- SOCIEDAD MINERA CELITE DEL PERU SA
- SOCIETE DE VALORISATION DES MINERAUX INDUSTRIELS SAS
- SOTRIVAL
- SPRINDEALS SIX PTY LTD
- STOLLBERG & SAMI CO., LTD
- SUNWARD REFRACTORIES CO., LTD.
- TALIMMO
- TENNESSEE ELECTRO MINERALS, INC. - TECO
- TERMORAK AB
- TERMORAK OY
- TERMORAK (THAILAND) CO LTD
- TOKAI CERAMICS CO., LTD
- TREIBACHER SCHLEIFMITTEL ABRASIVES KAILI CO., LTD
- TREIBACHER SCHLEIFMITTEL ASIA LTD
- TREIBACHER SCHLEIFMITTEL INTERNATIONALE VERTRIEBS MBH
- TREIBACHER SCHLEIFMITTEL ITALIA P. MAROZZI & CO SAS
- UCM GROUP LTD
- UCM MAGNESIA, INC.
- UNITEC CERAMICS LIMITED
- VERMICULITE INTERNATIONAL SALES

2-12

- WORLD MINERALS AMERICA LATINA, SA
- WORLD MINERALS USD LLC
- WORLD MINERALS USD SARL
- ZHENGZHOU TREIBACHER SCHLEIFMITTEL TENGDA ABRASIVES CO., LTD

NAI-1539839717

### Rio Tinto Corporate Parties

- 10029734 Canada Inc.
- 1043802 Ontario Ltd
- 10676276 Canada Inc.
- 10676284 Canada Inc.
- 11091905 Canada Inc.
- 1109723 B.C. Ltd.
- 201 Logistics Center, LLC
- 46106 YUKON INC.
- 46117 YUKON INC.
- 535630 YUKON INC.
- 7600 West Center, LLC
- 7999674 CANADA INC.
- AGM Holding Company Pte. Ltd.
- Alcan Alumina Ltda.
- Alcan Asia Limited
- Alcan Betriebs- und Verwaltungsgesellschaft GmbH
- Alcan Chemicals Limited
- Alcan Composites Brasil Ltda
- Alcan Corporation
- Alcan Farms Limited
- Alcan Finances USA LLC
- Alcan Gove Development Pty Limited
- Alcan Holdings Australia Pty Limited
- Alcan Holdings Europe B.V.
- Alcan Holdings Nederland B.V.
- Alcan Holdings Switzerland AG (SA/Ltd.)
- Alcan International Network U.S.A. Inc.
- Alcan Lebensmittelverpackungen GmbH
- Alcan Management Services (Shanghai) Co., Ltd.
- Alcan Management Services Canada Limited / Societe de Services de Gestion Alcan Canada
  Limitee
- Alcan Northern Territory Alumina Pty Limited
- Alcan Packaging Mühltal Gmbh & Co. KG
- Alcan Primary Metal Australia Pty Ltd
- Alcan Primary Products Company LLC
- Alcan Primary Products Corporation
- Alcan Realty Limited / Societe Immobiliere Alcan Limitee
- Alcan South Pacific Pty Ltd
- Alcan Trading AG (SA/Ltd.)
- Alufluor AB
- Aluminerie Alouette Inc.
- Aluminerie De Bécancour, Inc.

2-14

- Aluminium & Chemie Rotterdam B.V.
- Aluminium Pechiney
- Aluminum Company of Canada Limited / Aluminium du Canada Limitee
- AML Properties Pty Ltd
- Anglesey Aluminium Metal Limited
- AP Service
- Argyle Diamond Mines Pty Limited
- Argyle Diamonds Limited
- Ashton Mining Pty Ltd
- Ashton Nominees Pty Limited
- Asia Gold Mongolia LLC
- Asia Naran Bulag LLC
- Asia Now Resources Corp
- Australian Coal Holdings Pty. Limited
- Australian Mining & Smelting Pty Ltd
- Balkhash Saryshagan LLP
- Bao-HI Ranges Joint Venture
- Beasley River Joint Venture
- Beasley River Management Pty Limited
- Beasley River Marketing Pty Ltd
- Beasley River Mining Pty Limited
- Beijing Iron Ore Trading Centre Corporation
- Bektau B.V.
- Boké Investment Company
- Boke Personnel Limited
- Boké Services Company SA
- Boké Services Management, Inc.
- Boké Trading Inc.
- Borax España, S.A.
- Borax Europe Limited
- Borax Francais
- Borax Malaysia Sdn Bhd
- Borax Rotterdam N.V.
- Boyne Smelters Limited
- British Alcan Aluminium Limited
- C.V.G. Bauxilum C.A.
- Canning Resources Pty Limited
- CanPacific Potash Inc.
- Cape Bougainville Joint Venture
- Capricorn Diamonds Investments Pty Limited
- Carol Lake Company Ltd.
- Cathjoh Holdings Pty Limited
- Champlain Reinsurance Company Ltd.
- Channar Management Services Pty Limited

2-15

- Channar Mining Joint Venture
- Channar Mining Pty Ltd
- Chinalco Rio Tinto Exploration Co. Ltd
- Chlor Alkali Unit Pte Ltd
- CIA. Inmobiliaria e Inversiones Cosmos S.A.C.
- Compagnie des Bauxites de Guinée
- Compania de Transmision Sierraoriente S.A.C.
- Consórcio de Alumínio do Maranhão
- CRA Investments Pty. Limited
- CRA Pty Ltd
- Dampier Salt Limited
- Daybreak Development LLC
- Daybreak Property Holdings LLC
- Daybreak Secondary Water Distribution Company
- Daybreak Water Holding LLC
- DB Medical I LLC
- DBVC1 LLC
- Diamond Producers Association Limited
- Diavik Diamond Mines (2012) Inc.
- Diavik Joint Venture
- Donkerpoort Iron Ltd
- East Kalimantan Coal Pte. Ltd
- Eastland Management Inc.
- Electric Power Generation Limited
- Elysis Limited Partnership / Elysis Societe en Commandite
- Empresa de Mineracao Finesa Ltda.
- Enarotali Gold Project Limited
- Endurvinnslan Ltd.
- Energy Resources of Australia Ltd
- Entrée Resources Ltd.
- Exeltium
- EXELTIUM 2
- Fabrica De Plasticos Mycsa, S.A.
- Falcon Insurance Ltd.
- Flambeau Mining Company
- Fondation Rio Tinto
- Foundation for Australia-Japan Studies
- France Aluminium Recyclage Sa
- Fundsprops Pty. Limited
- Gladstone Infrastructure Pty Ltd
- Gladstone Power Station Joint Venture
- Global Coal Limited
- Global Hubco BV
- Globalore Pte. Ltd.

2-16

- Gove Aluminium Ltd
- GPS Energy Pty Limited
- GPS Nominee Pty Limited
- GPS Power Pty. Limited
- Green Mountain Mining Venture
- Groupement pour la Gestion de Pensions Complementaires
- Gulf Power Company / La Compagnie Gulf Power
- Halco (Mining) Inc.
- Hamersley Exploration Pty Limited
- Hamersley HMS Pty Ltd
- Hamersley Holdings Limited
- Hamersley Iron - Yandi Pty Limited
- Hamersley Iron Pty. Limited
- Hamersley Resources Limited
- Hamersley WA Pty Ltd
- Henlopen Manufacturing Co., Inc.
- Heruga Exploration LLC
- High Purity Iron Inc.
- HIsmelt Corporation Pty Limited
- Hope Downs Joint Venture
- Hope Downs Marketing Company Pty Ltd
- Hunter Valley Resources Pty Ltd
- IAL Holdings Singapore Pte. Ltd.
- IEA Coal Research Limited
- IEA Environmental Projects Limited
- Industrias Metalicas Castello S.A.
- Integrity Land and Cattle LLC
- InterEmballage
- IOC Sales Limited
- Iron Ore Company of Canada
- Itallumina Srl
- Johcath Holdings Pty Limited
- Juna Station Pty Ltd
- Kalimantan Gold Pty Limited
- Kelian Pty. Limited
- Kembla Coal & Coke Pty. Limited
- Kennecott Barneys Canyon Mining Company
- Kennecott Exploration Company
- Kennecott Exploration Mexico, S.A. de C.V.
- Kennecott Holdings Corporation
- Kennecott Land Company
- Kennecott Land Investment Company LLC
- Kennecott Molybdenum Company
- Kennecott Nevada Copper Company

2-17

- Kennecott Ridgeway Mining Company
- Kennecott Royalty Company
- Kennecott Services Company
- Kennecott Uranium Company
- Kennecott Utah Copper LLC
- Kennecott Water Distribution LLC
- Korgantas LLP
- Kutaibar Holdings Pty Ltd
- Lao Sanxai Minerals Company Limited
- Lawson Mardon Flexible Limited
- Lawson Mardon Smith Brothers Ltd.
- Magma Arizona Railroad Company
- Metallwerke Refonda AG
- Metals & Minerals Insurance Pte. Limited
- Minera Escondida Ltda
- Minera IRL Limited
- Minera Kennecott, S.A. de C.V.
- Mineração Rio do Norte S.A.
- Mineracao Tabuleiro Ltda
- Minmetals Rio Tinto Exploration Company Limited
- Mitchell Plateau Bauxite Co. Pty. Limited
- Mitchell Plateau Joint Venture
- Mount Bruce Mining Pty Limited
- Mount Pleasant Pty Ltd
- Movele
- Mutamba Mineral Sands S.A.
- NBH Pty Ltd
- New Zealand Aluminium Smelters Ltd
- Nhulunbuy Corporation Limited
- Norgold Pty Limited
- North Gold (W.A.) Pty Ltd
- North Insurances Pty. Ltd.
- North IOC (Bermuda) Holdings Limited
- North IOC (Bermuda) Limited
- North IOC Holdings Pty Ltd
- North Limited
- North Mining Limited
- Northern Land Company Ltd
- Nozalela Mineral Sands (Pty) Ltd
- NZAS Retirement Fund Trustee Limited
- Oyu Tolgoi LLC
- Oyu Tolgoi Netherlands BV
- Pacific Aluminium (New Zealand) Limited
- Pacific Aluminium Pty. Limited

2-18

- Pacific Coast Mines, Inc.
- Pechiney Aviatube Limited
- Pechiney Bâtiment
- Pechiney Bécancour, Inc.
- Pechiney Cast Plate, Inc.
- Pechiney Consolidated Australia Pty Limited
- Pechiney Holdings, Inc.
- Pechiney Metals LLC
- Pechiney Philippines Inc.
- Pechiney Plastic Packaging, Inc.
- Pechiney Reynolds Quebec, Inc.
- Pechiney Sales Corporation
- Peko Exploration Pty Ltd.
- Peko-Wallsend Pty Ltd
- Pilbara Iron Company (Services) Pty Ltd
- Pilbara Iron Pty Ltd
- Port d'Ehoala S.A.
- Procivis Savoie
- Project Generation Group Pty Ltd
- PT Hutan Lindung Kelian Lestari
- PT Kelian Equatorial Mining
- PT Rio Tinto Consultants
- QIT Madagascar Minerals Ltd
- QIT Madagascar Minerals SA
- Quebec North Shore and Labrador Railway Company / Compagnie de Chemin de Fer du Littoral Nord de Quebec et du Labrador Inc.
- Queensland Alumina Limited
- Queensland Coal Pty. Limited
- Química e Metalúrgica Mequital Ltda.
- Ranges Management Company Pty Ltd
- Ranges Mining Pty Ltd
- Resolution Copper Company
- Resolution Copper Mining LLC
- Rhodes Ridge Joint Venture
- Richards Bay Mining (Proprietary) Limited
- Richards Bay Mining Holdings (Proprietary) Limited
- Richards Bay Prefco (Pty) Ltd
- Richards Bay Titanium (Proprietary) Limited
- Richards Bay Titanium Holdings (Proprietary) Limited
- Rightship Pty Ltd
- Rio de Contas Desenvolvimentos Minerais Ltda
- Rio Santa Rita Empreenimentos e-Particiacoes Ltda
- Rio Sava Exploration DOO
- Rio Tinto (Commercial Paper) Limited

2-19

- Rio Tinto (Hong Kong) Ltd
- Rio Tinto Advisory Services Pty Limited
- Rio Tinto Alcan Fund Inc.
- Rio Tinto Alcan Inc.
- Rio Tinto Alcan International Ltd. / Rio Tinto Alcan International Ltee
- Rio Tinto Alcan Middle East DMCC
- Rio Tinto Alcan Technology Pty Ltd
- Rio Tinto Aluminium (Bell Bay) Limited
- Rio Tinto Aluminium (Holdings) Limited
- Rio Tinto Aluminium Bell Bay Sales Pty Limited
- Rio Tinto Aluminium Limited
- Rio Tinto Aluminium Pechiney
- Rio Tinto Aluminium Services Pty Limited
- Rio Tinto America Holdings Inc.
- Rio Tinto America Inc.
- Rio Tinto Asia Ltd
- Rio Tinto Asia Pty. Limited.
- Rio Tinto AuM Company
- Rio Tinto Australian Holdings Limited
- Rio Tinto Bahia Holdings Limited
- Rio Tinto Base Metals Pty. Limited
- Rio Tinto Brazilian Holdings Limited
- Rio Tinto Brazilian Investments Limited
- Rio Tinto Canada Diamond Operation Management Inc.
- Rio Tinto Canada Inc
- Rio Tinto Canada Management Inc./ Rio Tinto Gestion Canada Inc.
- Rio Tinto Canada Uranium Corporation
- Rio Tinto Chile S.A.S.
- Rio Tinto Coal (Clermont) Pty Ltd
- Rio Tinto Coal Australia Pty Limited
- Rio Tinto Coal Investments Pty Limited
- Rio Tinto Coal NSW Holdings Limited
- Rio Tinto Commercial Americas Inc.
- Rio Tinto Commercial GmbH
- Rio Tinto Commercial Pte. Ltd.
- Rio Tinto Desenvolvimentos Minerais LTDA.
- Rio Tinto Diamonds and Minerals Canada Holding Inc.
- Rio Tinto Diamonds Limited
- Rio Tinto Diamonds Netherlands B.V.
- Rio Tinto Diamonds NV
- Rio Tinto Eastern Investments B.V.
- Rio Tinto Energy America Inc.
- Rio Tinto Energy Limited
- Rio Tinto Escondida Limited

2-20

- Rio Tinto European Holdings Limited
- Rio Tinto Exploration (Asia) Holdings Pte. Ltd.
- Rio Tinto Exploration (PNG) Limited
- Rio Tinto Exploration and Mining (India) Private Limited
- Rio Tinto Exploration Canada Inc.
- Rio Tinto Exploration Dunav d.o.o. Beograd-Vracar
- Rio Tinto Exploration Finland OY
- Rio Tinto Exploration India Private Limited
- Rio Tinto Exploration Kazakhstan LLP
- Rio Tinto Exploration Pty Limited
- Rio Tinto Exploration Zambia Limited
- Rio Tinto FalCon Diamonds Inc.
- Rio Tinto Fer et Titane inc.
- Rio Tinto Finance (USA) Inc.
- Rio Tinto Finance (USA) Limited
- Rio Tinto Finance (USA) plc
- Rio Tinto Finance Limited
- Rio Tinto Finance plc
- Rio Tinto France S.A.S.
- Rio Tinto Global Employment Company Pte. Ltd.
- Rio Tinto Guinée S.A.
- Rio Tinto Holdings LLC
- Rio Tinto Hydrogen Energy LLC
- Rio Tinto Iceland Ltd.
- Rio Tinto India Private Limited
- Rio Tinto Indonesian Holdings Limited
- Rio Tinto International Holdings Limited
- Rio Tinto Investments One Pty Limited
- Rio Tinto Investments Two Pty Limited
- Rio Tinto Iron & Titanium (Suzhou) Co., Ltd
- Rio Tinto Iron & Titanium GmbH
- Rio Tinto Iron & Titanium Holdings GmbH
- Rio Tinto Iron & Titanium Limited
- Rio Tinto Iron and Titanium Canada Inc. / Rio Tinto Fer et Titane Canada Inc.
- Rio Tinto Iron Ore Atlantic Limited
- Rio Tinto Iron Ore Europe S.A.S.
- Rio Tinto Iron Ore Trading China Limited
- Rio Tinto Japan Ltd
- Rio Tinto Jersey Holdings 2010 Limited
- Rio Tinto Korea Ltd
- Rio Tinto Limited
- Rio Tinto London Limited
- Rio Tinto Management Services South Africa (Proprietary) Ltd
- Rio Tinto Marketing Pte. Ltd.

NAI-1539839717

- Rio Tinto Marketing Services Limited
- Rio Tinto Medical Plan Trustees Limited
- Rio Tinto Metals Limited
- Rio Tinto Minera Peru Limitada SAC
- Rio Tinto Mineracao do Brasil Ltda
- Rio Tinto Minerals Asia Pte Ltd
- Rio Tinto Minerals Development Limited
- Rio Tinto Minerals Exploration (Beijing) Co., Ltd
- Rio Tinto Minerals Inc.
- Rio Tinto Mining and Exploration Inc.
- Rio Tinto Mining and Exploration Limited
- Rio Tinto Mining and Exploration S.A.C.
- Rio Tinto Mining Commercial (Shanghai) Co., Ltd.
- Rio Tinto Mongolia LLC
- Rio Tinto Nominees Limited
- Rio Tinto Orissa Mining Private Ltd
- Rio Tinto OT Management Limited
- Rio Tinto Overseas Holdings Limited
- Rio Tinto PACE Australia Pty Limited
- Rio Tinto PACE Canada Inc. / Gestion Rio Tinto PACE Canada Inc.
- Rio Tinto Pension 2009 Trustees Limited
- Rio Tinto Pension Fund Trustees Limited
- Rio Tinto Pension Investments Limited
- Rio Tinto Peru Limited
- Rio Tinto plc
- Rio Tinto Potash Management Inc. / Rio Tinto Potasse Management Inc.
- Rio Tinto Procurement (Singapore) Pte Ltd
- Rio Tinto Pte Ltd
- Rio Tinto Saskatchewan Management Inc.
- Rio Tinto Saskatchewan Potash Holdings General Partner Inc.
- Rio Tinto Saskatchewan Potash Holdings Limited Partnership
- Rio Tinto Secretariat Limited
- Rio Tinto Services Inc.
- Rio Tinto Services Limited
- Rio Tinto Shared Services Pty Limited
- Rio Tinto Shipping (Asia) Pte. Ltd.
- Rio Tinto Shipping Pty. Limited.
- Rio Tinto Simfer UK Limited
- Rio Tinto Singapore Holdings Pte Ltd
- Rio Tinto Sohar Logistics LLC
- Rio Tinto South East Asia Limited
- Rio Tinto Staff Fund (Retired) Pty Limited
- Rio Tinto Sulawesi Holdings Limited
- Rio Tinto Technological Resources Inc.

NAI-1539839717

- Rio Tinto Technological Resources UK Limited
- Rio Tinto Trading (Shanghai) Co., Ltd.
- Rio Tinto Uranium Limited
- Rio Tinto Western Holdings Limited
- Rio Tinto Winu Pty Limited
- Riversdale Connections (Proprietary) Ltd
- Robe River Iron Associates Joint Venture
- Robe River Limited
- Robe River Mining Co. Pty. Ltd.
- Robe River Ore Sales Pty. Ltd.
- Rocklea Station Pty Ltd
- RTA AAL Australia Limited
- RTA Boyne Limited
- RTA Gove Pty Limited
- RTA Holdco 1 Limited
- RTA Holdco 4 Limited
- RTA Holdco 7 Limited
- RTA Holdco 8 Limited
- RTA Holdco Australia 1 Pty Ltd
- RTA Holdco Australia 3 Pty Ltd
- RTA Holdco Australia 5 Pty Ltd
- RTA Holdco Australia 6 Pty Ltd
- RTA HOLDCO FRANCE 1 S.A.S.
- RTA HOLDCO FRANCE 2 S.A.S.
- RTA Pacific Pty Limited
- RTA Sales Pty Ltd
- RTA Smelter Development Pty Limited
- RTA Weipa Pty Ltd
- RTA Yarwun Pty Ltd
- RTAlcan 1 LLC
- RTAlcan 2 LLC
- RTAlcan 3 LLC
- RTLDS Aus Pty. Ltd
- RTLDS UK Limited
- RTPDS Aus Pty Ltd
- Saryarka B.V.
- Scheuch Unterstuetzungskasse GmbH
- SGLS LLC
- Sharp Strategic Funding Pte. Ltd.
- Simfer Jersey Finance 1 Ltd
- Simfer Jersey Finance 2 Ltd
- Simfer Jersey Limited
- Simfer Jersey Nominee Limited
- SIMFER S.A.

2-23

- Singapore Metals Pte. Ltd.
- Skymont Corporation
- Société De Financement Des Risques Industriels
- Société Départementale De Développement 65
- Société Minière Et De Participations Guinée-Alusuisse
- Sohar Aluminium Co. L.L.C.
- Sohio Western Mining Company
- Solutions Strategiques Funding LLC
- Southern Copper Pty. Limited
- Swift Current Land & Cattle LLC
- Swiss Aluminium Australia Limited
- TBAC Limited
- Technological Resources Pty. Limited
- The Barrier Corporation (Vic.) Pty. Limited
- The Kelian Community and Forest Protection Trust
- The Pyrites Company, Inc.
- The Roberval and Saguenay Railway Company/ La Compagnie du Chemin de Fer Roberval Saguenay
- The Zinc Corporation Pty Ltd
- Thos. W. Ward Limited
- THR Aruba Holdings LLC A.V.V.
- THR Delaware Holdings, LLC
- THR Kharmagtai Pte. Ltd.
- THR MINES (BC) LTD.
- THR Mines Services Co. Ltd.
- THR OYU TOLGOI LTD.
- THR Ulaan Pte. Ltd.
- Three Crowns Insurance Company, formerly known as Three Crowns Insurance Company Limited
- Tinto Holdings Australia Pty. Limited
- Tisand (Proprietary) Limited
- Tomago Aluminium Company Pty Limited
- Tomago Aluminium Joint Venture
- Trans Territory Pipeline Pty Limited
- TRQ Australia Pty. Ltd.
- Turquoise Hill (Beijing) Services Company Ltd
- Turquoise Hill Netherlands Cooperatief U.A.
- Turquoise Hill Resources Ltd.
- Turquoise Hill Resources Philippines Inc.
- Turquoise Hill Resources Singapore Pte Ltd.
- Twin Falls Power Corporation Ltd
- U.S. Borax Inc.
- Victoria Technology Inc.
- Waste Solutions and Recycling LLC

NAI-1539839717

- West Kutai Foundation Limited
- Wimmera Industrial Minerals Pty. Limited
- Winchester South Development Company Proprietary Limited
- Winter Road Joint Venture
- Wright Mgmt Services Pte. Ltd.
- Wyoming Coal Resources Company
- Yalleen Pastoral Co. Pty. Ltd.
- Yarraloola Pastoral Co
- Zululand Titanium (Pty) Ltd

NAI-1539839717

**Cyprus Corporate Parties**

- Ajo Improvement Company [AZ]
- Amax Arizona, Inc. [NV]
- Amax Energy Inc. [DE]
- Amax Exploration, Inc. [DE]
- Amax Metals Recovery Inc. [DE]
- Amax Nickel Overseas Ventures, Inc. [DE]
- Amax Research & Development, Inc. [DE]
- Amax Specialty Coppers Corporation [DE]
- Amax Specialty Metals (Driver), Inc. [DE]
- Amax Zinc (Newfoundland) Limited [DE]
- American Metal Climax, Inc. [DE]
- Ametalco Limited [UK]
- Ametalco, Inc. [DE]
- Apache Nitrogen Products, Incorporated [AZ]
- Arguello Inc. [DE]
- Arroyo Grande Land Company LLC [DE]
- Asarel-Exploration AD [Bulgaria]
- Atlantic Copper, S.L.U. [Spain]
- AZ Big Sandy, LLC [NV]
- Bagdad Fire and Rescue, Inc. [DE]
- Balkan Metals and Minerals EOOD [Bulgaria]
- Bisbee Queen Mining Co. [DE]
- Blackwell Zinc Company, Inc. [DE]
- Byner Cattle Company [NV]
- Cane River Development LLC [DE]
- Capital Gestao de Negocios LTDA. [Brazil]
- Carollite Holdings B.V. [The Netherlands]
- Cattierite Holdings Coöperatief U.A. [The Netherlands]
- Chino Acquisition LLC [DE]
- Climax Canada LTD. [DE]
- Climax Engineered Materials, LLC [CO]
- Climax Molybdenum Asia Corporation [DE]
- Climax Molybdenum B.V. [The Netherlands]
- Climax Molybdenum China Corporation [DE]
- Climax Molybdenum Company [DE]
- Climax Molybdenum GMBH [Germany]
- Climax Molybdenum Marketing Corporation [DE]
- Climax Molybdenum U.K. Limited [UK]
- Cobaltite Holdings Limited [Bermuda]
- Compania Exploradora De La Isla, S.A. [Cuba]
- Copper Market Inc. [AZ]
- Copper Overseas Service Company [DE]

NAI-1539839717

- CuAu International Holdings (BVI) LTD. [BVI]
- Cukaru Peki B.V. [The Netherlands]
- Cyprus Amax Indonesia Corporation [DE]
- Cyprus Amax Minerals Company [DE]
- Cyprus Climax Metals Company [DE]
- Cyprus Copper Marketing Corporation [DE]
- Cyprus Copperstone Gold Corporation [DE]
- Cyprus El Abra Corporation [DE]
- Cyprus Exploration and Development Corporation [DE]
- Cyprus Gold Company [DE]
- Cyprus Gold Exploration Corporation [DE]
- Cyprus Metals Company [DE]
- Cyprus Mines Corporation [DE]
- Cyprus Pinos Altos Corporation [DE]
- Cyprus Specialty Metals Company [DE]
- Cyprus Tohono Corporation [DE]
- Discovery Metals Kazakhstan LLP [Kazakhstan]
- Drum Mountains Mineral Properties LLC [DE]
- Eastern Mining Company, Inc. [DE]
- Enarotali Gold Project Limited [Isle of Jersey]
- Exploraciones Antakana S.A.C. [Peru]
- FCX Investment LLC [DE]
- FCX Investment LTD [Cayman Islands]
- FCX Oil & Gas LLC [DE]
- Flobarco S.A. de C.V. [Mexico]
- FM Chile Holdings Inc. [DE]
- FM Myanmar Holding LTD. [Bermuda]
- FM O&G Mexico Holdings B.V. [The Netherlands]
- FM O&G Mexico Intermediate Holdings B.V. [The Netherlands]
- FM Services Company [DE]
- FNS Holdings, LLC [AZ]
- Freeport Asia Holdings PTE. LTD. [Singapore]
- Freeport Azufre Limitada [Chile]
- Freeport Canadian Exploration Company [DE]
- Freeport Cobalt Americas LLC [DE]
- Freeport Cobalt Asia LTD. [Taiwan]
- Freeport Cobalt Europe GMBH [Germany]
- Freeport Cobalt Japan Inc. [Japan]
- Freeport Cobalt OY [Finland]
- Freeport Cobalt Trading (Shanghai) Co., LTD. [China]
- Freeport Copper Company [DE]
- Freeport Finance Company B.V. [Netherlands]
- Freeport International, Inc. [DE]
- Freeport Minerals Corporation [DE]

2-27

- Freeport Overseas Service Company [DE]
- Freeport Research and Engineering Company [DE]
- Freeport Sulphur Company [DE]
- Freeport Warim Inc. [DE]
- Freeport-McMoRan Inc. [DE]
- Freeport-McMoRan Australasia Inc. [DE]
- Freeport-McMoRan Bagdad Inc. [DE]
- Freeport-McMoRan Bulgaria B.V. [The Netherlands]
- Freeport-McMoRan Chino Inc. [DE]
- Freeport-McMoRan Chino Mines Company [NM]
- Freeport-McMoRan Cobalt Holdings Limited [Bermuda]
- Freeport-McMoRan Copper & Gold China Corporation [Cayman Islands]
- Freeport-McMoRan Copper & Gold Energy Services LLC [DE]
- Freeport-McMoRan Copper & Gold Investment Co., S.A. [Cayman Islands]
- Freeport-McMoRan do Brasil Mineração LTDA. [Brazil]
- Freeport-McMoRan Energy LLC [DE]
- Freeport-McMoRan Exploration & Production LLC [DE]
- Freeport-McMoRan Exploration Australia PTY LTD [Australia]
- Freeport-McMoRan Exploration Corporation [DE]
- Freeport-McMoRan Mercantile Company Inc. [DE]
- Freeport-McMoRan Miami Inc. [DE]
- Freeport-McMoRan Mineral Properties Canada Inc. [Canada]
- Freeport-McMoRan Mineral Properties Inc. [DE]
- Freeport-McMoRan Morenci Inc. [DE]
- Freeport-McMoRan Nevada LLC [DE]
- Freeport-McMoRan of Canada Limited [DE]
- Freeport-McMoRan Oil & Gas Inc. [DE]
- Freeport-McMoRan Oil & Gas LLC [DE]
- Freeport-McMoRan Safford Inc. [DE]
- Freeport-McMoRan Sales Company Inc. [DE]
- Freeport-McMoRan Shelf Properties LLC [DE]
- Freeport-McMoRan Sierrita Inc. [DE]
- Freeport-McMoRan Spain Inc. [DE]
- Freeport-McMoRan Tyrone Inc. [DE]
- Freeport-McMoRan Tyrone Mining LLC [NM]
- Fundacion Freeport-McMoRan Chile [Chile]
- Gaviota Gas Plant Company [CA]
- Grand Ecaille Land Company, Inc. [LA]
- Gulf Coast Ultra Deep Royalty Trust [DE]
- Habirshaw Cable and Wire Corporation [DE]
- Hidalgo Mining, LLC [NM]
- International Administrative Services Company [DE]
- International Air Capital Inc. [DE]
- International Asaz LLC [DE]

NAI-1539839717

- International Mining Investments, LLC [DE]
- International Purveyors Inc. [DE]
- International Support LLC [DE]
- James Douglas Insurance Company, LTD. [Bermuda]
- Jenny East Holdings LTD. [Bermuda]
- JRTW Holdings Inc. [DE]
- Kameni Potok Coöperatief U.A. [The Netherlands]
- Kisanfu Holdings LTD. [Bermuda]
- K-Mc Venture I LLC [DE]
- Koboltti Chemicals Holdings Limited [Bermuda]
- Las Quintas Serenas Water Co. [AZ]
- LHD Ventures, LLC [DE]
- Lompoc Land Company LLC [DE]
- Main Pass Energy Hub LLC [DE]
- McMoRan Exploration LLC [DE]
- Mcmoran Oil & Gas LLC [DE]
- Midwest Land Acquisition Company LLC [DE]
- Minera Cuicuilco S.A. de C.V. [Mexico]
- Minera Freeport-McMoRan South America Limitada [Chile]
- Minera Freeport-McMoRan South America S.A.C. [Peru]
- Missouri Lead Smelting Company [DE]
- Molinos Corporation [AZ]
- Montebello Land Company LLC [DE]
- MSS Properties, LLC [DE]
- Mt. Emmons Mining Company [DE]
- Nabire Bakti LLC [DE]
- Nicaro Nickel Company [DE]
- Nuevo Energy Company [DE]
- Overseas Service Company [DE]
- Pacific Western Land Company [CA]
- PD Peru, Inc. [DE]
- PD Receivables, LLC [DE]
- PDM Energy, LLC [AZ]
- PDRC Laurel Hill 9, LLC [DE]
- PDRC Laurel Hill Development, LLC [DE]
- Phelps Dodge Ajo, Inc. [DE]
- Phelps Dodge Congo S.A.R.L. [DRC]
- Phelps Dodge Development Corporation [DE]
- Phelps Dodge Hidalgo, Inc. [DE]
- Phelps Dodge High Performance Conductors of NJ, Inc. [NJ]
- Phelps Dodge Holdings Mexico, S.A. de C.V. [Mexico]
- Phelps Dodge Industries, Inc. [DE]
- Phelps Dodge Katanga Corporation [DE]
- Phelps Dodge Mining (Zambia) Limited [Zambia]

2-29

- Phelps Dodge Molybdenum Corporation [DE]
- Phelps Dodge of Africa, LTD. [DE]
- Phelps Dodge Refining Corporation [DE]
- Plains Acquisition Corporation [DE]
- Plains Offshore LLC [DE]
- Plains Offshore Operations Inc. [DE]
- Plains Vietnam LTD. [Cayman Islands]
- Pogo Partners, Inc. [TX]
- Point Arguello Natural Gas Line Company [CA]
- Point Arguello Pipeline Company [CA]
- PT Airfast Aviation Facilities Company [Indonesia]
- PT Eksplorasi Nusa Jaya [Indonesia]
- PT Freeport Indonesia [Indonesia]
- PT Freeport Management Indonesia [Indonesia]
- PT IRJA Eastern Minerals [Indonesia]
- PT Kencana Infra Nusakarya [Indonesia]
- PT Kencana Wisata Nusakarya [Indonesia]
- PT Manyar Maju Refinery [Indonesia]
- PT Mineserve International [Indonesia]
- PT Mitradaya Vulkanisindo [Indonesia]
- PT Nabire Bakti Mining [Indonesia]
- PT Papua Utama Mitra [Indonesia]
- PT Puncakjaya Power [Indonesia]
- PT Rio Tinto Indonesia [Indonesia]
- PT Smelting [Indonesia]
- PXP Aircraft LLC [DE]
- PXP Gulf Coast LLC [DE]
- PXP Louisiana LLC [DE]
- PXP Louisiana Operations LLC [DE]
- PXP Luxembourg S.A.R.L. [Luxembourg]
- PXP Morocco B.V. [The Netherlands]
- PXP Oil & Gas Inc. [DE]
- PXP Producing Company LLC [DE]
- PXP Resources LLC [DE]
- Rakita Exploraton DOO BOR [Serbia]
- Red Metal Limited [Australia]
- Servicios Especiales Nacionales, SA de CV a.k.a. "PD SENSA" [El Salvador]
- Silver Springs Ranch, Inc. [CO]
- Sociedad Contractual Minera El Abra [Chile]
- Sociedad Minera Cerro Verde S.A.A. [Peru]
- Southern Bayou Holdings, LLC [DE]
- Southern Discovery Metals LTD. [BVI]
- Southern Pearl Holdings, LLC [DE]
- Suva Reka (BVI) LTD. [BVI]

2-30

- Tank Barge LLC [DE]
- The Morenci Water & Electric Company [AZ]
- Timok JVSA (BVI) LTD. [BVI]
- Timok Metals D.O.O. BOR [Serbia]
- Tucson, Cornelia and Gila Bend Railroad Company [AZ]
- United States Metals Refining Company [DE]
- Warren Company [AZ]
- Western Nuclear, Inc. [DE]

NAI-1539839717

## SCHEDULE 3

### Retailers and Indemnified Parties

7-Eleven
7-Eleven, Inc.
Acme Markets, Inc.
Ahold Delhaize USA, Inc.
Albertsons Companies, Inc.
Alpha Beta Company
Associated Wholesaler Grocers, Inc.
Bartell Drug Company
Bashas', Inc.
Bausch & Lomb Americas Inc.
Bausch & Lomb Incorporated
Bausch + Lomb Corporation
Bausch Health Americas, Inc.
Bausch Health Companies Inc.
Bausch Health US, LLC
BCW LLC
Best Market of Astoria, Inc.
BI-LO, LLC
Bi-Mart Corporation
BJ's Wholesale Club, Inc.
C&S Wholesale Grocers
C&S Wholesale Grocers, Inc.
Classic Pharmacy, Inc.
Cosentino Enterprises, Inc.
Cosentino Group, Inc.
Cosentino Price Chopper
Cosentino's Food Stores
Costco Wholesale Corporation
CVS Health Corporation
CVS Pharmacy, Inc.
Demoulas Super Markets, Inc.
Dierbergs Markets, Inc.
Discount Drug Mart, Inc.
Dollar Tree Stores, Inc.
DRI I, Inc.
Duane Reade, Inc.
Eckerd Corporation of Florida, Inc.
Family Dollar Stores
Fleming Companies, Inc.
Food 4 Less of California
Food 4 Less of Southern California, Inc.
Foodland
Foodland Super Market, LTD
Food Lion, LLC (subsidiary of Ahold Delhaize USA)
Foot Locker Specialties, Inc., individually and as successor-in-interest to F.W. Woolworth Co.
Foot Locker Specialty, Inc.
Foot Locker, Inc./Woolworth Corporation
Four B Corporation d/b/a Balls Food Stores

Fred Meyer Stores, Inc.
Fruth Pharmacy, Inc.
Gerlands Food Fair, LLC
Gerlands, LLC
Gerlands, LLC/Lewis Food Town, Inc.
Giant Eagle, Inc.
Giant Food of Maryland, LLC
Giant Food Stores, LLC
Grocery Outlet Holding Corporation
Grocery Outlet Inc.
Grocery Outlet, Inc.
HAC, Inc.
H-E-B, LP
HSBC Finance Corporation
Hughes Markets, Inc.
Hy-Vee, Inc.
Jewel Food Stores
Jewel Osco
Jewel Osco Southwest
K&B Corporation
K&B Louisiana Corporation
Kings Park Slope, Inc.
Kings Pharmacy
Kings Pharmacy Holdings, LLC
Kings Third Ave. Pharmacy, Inc.
Knorr Street ShopRite, Inc.
La Luz Market, LTD. Co.
Lewis Food Town, Inc.
Longs Drug Stores California, L.L.C
Longs Drug Stores of Southern California, L.L.C.
Longs Drug Stores, L.L.C.
Lucky Stores, Inc.
Marc Glassman Inc.
Marc Glassman, Inc. d/b/a Marc's Store & Pharmacy
MBF Healthcare Holdings, Inc.
MBF Healthcare Management, LLC
Meijer, Inc.
MMG Equity Partners
Navarro Discount Pharmacies No. 5, LLC
Navarro Discount Pharmacies, LLC
New Seasons Market
Owens & Minor Distribution, Inc.
Owens & Minor, Inc.
Piggly Wiggly Carolina Co.
Piggly Wiggly Carolina Co., Inc.
Piggly Wiggly Companies, Inc.
Piggly Wiggly, LLC
Piggly Wiggly, LLC (subsidiary of C&S Wholesale Grocers)
Port Jervis Laboratories, Inc., f/k/a Kolmar Laboratories, Inc.
PTI
PTI Royston LLC, a Georgia Limited Liability Co., d/b/a Pharma Tech Industries

3-2

PTI Union, LLC d/b/a Pharma Tech Industries
Publix Super Markets, Inc.
Raley's
Ralphs Grocery Company
Randall's Food & Drug LP
Randall's Food Markets, Inc.
Rite Aid
Rite Aid Corporation
Rite Aid Hdqtrs. Corp.
Rite Aid of New York City, Inc.
Rite Aid of New York, Inc.
Rite Aid of Pennsylvania, Inc.
Rite Aid of South Carolina, Inc.
Rouse's Enterprises, L.L.C.
Rouse's Enterprises, L.L.C. d/b/a Rouses Market
Safeway Inc.
Save Mart Supermarkets, Inc.
Save Mart Supermarkets, Inc./Lucky Stores
Schnuck Markets
Schnuck Markets, Inc.
Sedano's Market, Inc.
Shanti Pharmacy Corp.
Shaw's Supermarkets, Inc.
Shop-Rite Supermarkets, Inc. a/k/a Shop Rite of Knorr Street
Smith Food and Drug Center, Inc.
Southeastern Grocers, Inc.
Star Markets Company, Inc.
Stater Bros. Markets
Super Center Concepts, Inc. d/b/a Superior Grocers
Superior Grocers
SuperValu, Inc.
T. Levy Associates, d/b/a Beauty Land Enterprises
T. Levy Associates, Inc. d/b/a Beauty Land Enterprises/Beautyland
Target Corporation
The Bartell Drug Company
The Kroger Company
The Stop & Shop Supermarket Company LLC
The Vons Companies, Inc.
Thrifty Payless, Inc.
Thrifty White Drug
Tops Holding, LLC
Valeant Pharmaceuticals International
Valeant Pharmaceuticals International, Inc.
Valeant Pharmaceuticals North America LLC
Wakefern Food Corp.
Walgreen Co.
Walgreen Eastern Co., Inc.
Walgreen Pharmacy Strategies, LLC
Walgreens Boots Alliance, Inc.
Walmart Inc.
Wegmans Food Markets, Inc.

NAI-1539839717

Winn-Dixie Stores, Inc.
Woolworth Corporation

NAI-1539839717

# EXHIBIT C

Page 1

```
 1
 2        UNITED STATES BANKRUPTCY COURT OF NEW JERSEY
                     Case No. 23-12825
 3   - - - - - - - - - - - - - - - -   x
     In re:                            :
 4                                     :
     LTL MANAGEMENT LLC,               :
 5                                     :
                              Debtor,  :
 6   - - - - - - - - - - - - - - - - -x
     LTL MANAGEMENT LLC,               :
 7                                     :
                         Plaintiff,    :
 8                                     :
 9            v.                       :
                                       :
     THOSE PARTIES LISTED ON APPENDIX A :
10   TO COMPLAINT and JOHN AND JANE DOES:
     1-1000,                           :
11                                     :
                         Defendants.   :
12   - - - - - - - - - - - - - - - - -x
13                               April 17, 2023
                                 1:12 p.m.
14                               7 Times Square
                                 New York, NY
15
16
17
18
19
20           VIDEOTAPED AND REMOTE DEPOSITION UPON
21   ORAL EXAMINATION OF ANDY BIRCHFIELD, ESQ., held
22   at the above-mentioned time and place, before
23   Randi Friedman, a Registered Professional
24   Reporter, within and for the State of New York.
25
```

```
                                              Page 2
 1                     A. Birchfield, Esq.
 2      APPEARANCES:
 3                OTTERBOURG, P.C.
                  Attorneys for Proposed counsel for the
 4                official committee of talc claimants
 5                230 Park Avenue
                  New York, New York 10169
 6
                  BY:  RICHARD G. HADDAD, ESQ.
 7
 8
                  GOLOMB SPIRT GRUNFELD
 9                Attorneys for TCC
10                1835 Market Street, Suite 2900
                  Philadelphia, Pennsylvania 19103
11
                  BY:  RICHARD M. GOLOMB, ESQ.
12
13
                  LEVIN PAPANTONIO RAFFERTY
14                Attorneys for William Henry
15                316 South Baylen Street
                  Pensicola, Florida 32502
16
                  BY:  CHRISTOPHER V. TISI, ESQ.
17
18
                  BEASLEY ALLEN
19                Attorneys for Alishia Landrum
20                218 Commerce Street
                  Montgomery Alabama 36104
21
                  BY:  LEIGH O'DELL, ESQ.
22
23
24
25      (Appearances continued.)
```

Page 3

```
 1                    A. Birchfield, Esq.
 2       (Appearances continued.)
 3                    COHEN, PLACITELLA & ROTH
                      Attorneys for Estate of Kimberly
 4                    Naranjo
 5                    127 Maple Avenue
                      Red Bank, New Jersey 07701
 6
                      BY:  CHRISTOPHER PLACITELLA, ESQ.
 7
 8
                      JOHNSON & JOHNSON
 9                    Attorneys for Johnson & Johnson
10                    1 Johnson & Johnson Plaza
                      New Brunswick, New Jersey 08933
11
                      BY:  ERIC HAAS, ESQ.
12
13
                      SKADDEN ARPS SLATE MEAGHER & FLOM, LLP
14                    Attorneys for LTL Management
15                    One Manhattan West
                      New York, New York 10001
16
                      BY:  ALLISON BROWN, ESQ.
17
18
                      WHITE & CASE, LLP
19                    Attorneys for Johnson & Johnson
20                    555 South Flower Street, Sute 2700
                      Los Angeles, California 90071
21
                      BY:  GREGORY STARNER, ESQ.
22                         KATHRYN KUETHMAN, ESQ.
23
24
25       (Appearances continued.)
```

```
                                                    Page 4
 1                    A. Birchfield, Esq.
 2      (Appearances continued.)
 3
                    KLEHR HARRISON HARVEY BRANZBURG, LLP
 4                  Attorneys for Andy Birchfield, Esq.
 5                  10000 Lincoln Drive East, Suite 201
                    Marlton, New Jersey 08053
 6
                    BY:   CAROL ANN SLOCUM, ESQ.
 7
                                * * *
 8
 9
10
11
12
13
14
15
16
17
18
19
20      ALSO PRESENT:
21                  Paul Baker - Videographer
                    Jerry Curran - Concierge
22                  Ted Meadows, Esq.
                    Jim Murdica, Esq.
23
24
25
```

Page 5

1              A. Birchfield, Esq.

2                STIPULATIONS

3          IT IS HEREBY STIPULATED AND AGREED, by

4    and among counsel for the respective parties

5    hereto, that the filing, sealing and

6    certification of the within deposition shall be

7    and the same are hereby waived;

8          IT IS FURTHER STIPULATED AND AGREED

9    that all objections, except as to form of the

10   question, shall be reserved to the time of the

11   trial;

12         IT IS FURTHER STIPULATED AND AGREED

13   that the within deposition may be signed before

14   any Notary Public with the same force and effect

15   as if signed and sworn to before the Court.

16                  * * *

17

18

19

20

21

22

23

24

25

Page 6

| | | |
|---|---|---|
| 1 | A. Birchfield, Esq. | |
| 2 | MR. VIDEOGRAPHER:  Good afternoon. | 13:12:46 |
| 3 | We are going on the record at 1:12 p.m. | 13:12:47 |
| 4 | Eastern Daylight Time on Monday, April 17th, | 13:12:51 |
| 5 | 2023. | 13:12:54 |
| 6 | Please note that the microphones | 13:12:56 |
| 7 | are sensitive and may pick up whispering and | 13:12:58 |
| 8 | private conversation.  Please mute all | 13:13:02 |
| 9 | cellphones at this time. | 13:13:04 |
| 10 | This is Media Unit 1 of the | 13:13:05 |
| 11 | video-recorded deposition of Andy Birchfield | 13:13:06 |
| 12 | in the matter of LTL Management LLC, filed | 13:13:08 |
| 13 | in the United States Bankruptcy Court, | 13:13:13 |
| 14 | District of New Jersey, Case No. 23-12825. | 13:13:14 |
| 15 | This deposition is being held at Brown | 13:13:21 |
| 16 | Rudnick LLP, located at 7 Times Square, New | 13:13:23 |
| 17 | York, New York. | 13:13:26 |
| 18 | My name is Paul Baker and I am the | 13:13:28 |
| 19 | videographer.  The court reporter is Randi | 13:13:29 |
| 20 | Friedman, and we are both from Veritext. | 13:13:31 |
| 21 | Appearances have been noted on the | 13:13:34 |
| 22 | stenographic record. | 13:13:36 |
| 23 | Will the court reporter please | 13:13:38 |
| 24 | swear in the witness. | 13:13:47 |
| 25 | | 13:13:47 |

```
                                            Page 28
 1                 A. Birchfield, Esq.
 2    BY MR. HAAS:                              13:36:50
 3         Q    So to summarize, Beasley Allen would   13:36:51
 4    be entitled to a share of the common benefit fund  13:36:56
 5    and a portion of its attorney fees that it    13:36:59
 6    otherwise charged; right?                  13:37:04
 7         A    If the court made that determination,  13:37:07
 8    yes.                                       13:37:09
 9         Q    Okay.  And the fees you otherwise   13:37:10
10    charge is a 40 percent contingency fee; correct?  13:37:11
11         A    As a general rule, that's true.   13:37:15
12         Q    Yes.  So it's fair to say that in   13:37:17
13    terms of the relative economic incentives,   13:37:23
14    because Beasley Allen is entitled to those   13:37:29
15    amounts from the common benefit fund outside of   13:37:32
16    bankruptcy, but not entitled to those amounts   13:37:34
17    inside a bankruptcy, that Beasley Allen has an   13:37:38
18    economic incentive to resolve the cases outside   13:37:41
19    of bankruptcy; correct?                    13:37:46
20                 MS. SLOCUM:  Objection.       13:37:47
21                 THE WITNESS:  No.  Our interest --  13:37:48
22            our interest is getting fair values for our  13:37:54
23            clients, period.  And that is our goal.  And  13:37:56
24            I have been steadfast.  I have been   13:38:02
25            steadfast on the position that we are not --  13:38:06
```

Page 29

1              A. Birchfield, Esq.

2      that I have urged, you know, everyone on our    13:38:09

3      side and we have -- we have maintained the     13:38:12

4      position we are not going to have the common   13:38:15

5      benefit, you know, fee issue become a          13:38:18

6      barrier to getting reasonable resolution,      13:38:21

7      fair values for our clients.                   13:38:26

8  BY MR. HAAS:                                       13:38:27

9      Q    We'll come back to that in a moment,      13:38:27

10  but you understand that as a general matter in    13:38:29

11  bankruptcy you would not be entitled to any       13:38:34

12  portion of a common benefit fund that you would   13:38:36

13  be entitled outside of bankruptcy; correct?       13:38:39

14      A    No, I do not.                            13:38:42

15           MS. SLOCUM:   Object.   The witness      13:38:44

16      is not here to testify to bankruptcy law.     13:38:45

17           MR. HAAS:   He can answer the            13:38:47

18      question.   If you want to instruct him not   13:38:47

19      to answer --                                  13:38:49

20           MS. SLOCUM:   Don't answer the           13:38:50

21      question.                                     13:38:50

22  BY MR. HAAS:                                       13:38:51

23      Q    Is it your view, Mr. Birchfield, that    13:38:51

24  as a general proposition you are entitled to the  13:38:53

25  common benefit fee in bankruptcy?                 13:38:56

Page 47

```
 1                A. Birchfield, Esq.
 2                MR. HAAS:  I'm curious, because I      13:57:43
 3       want to make sure the record is absolutely     13:57:44
 4       clear.                                         13:57:46
 5                MS. SLOCUM:  I'm objecting on work     13:57:46
 6       product.  This line of questioning is          13:57:48
 7       totally improper.                              13:57:50
 8                MR. HAAS:  Absolutely not.  Let me     13:57:51
 9       ask it one more time so we can get a clean     13:57:53
10       objection.                                     13:57:56
11   BY MR. HAAS:                                       13:57:57
12       Q    Mr. Birchfield, with respect to the      13:57:57
13   claims for which Beasley Allen represents, other   13:57:59
14   than ones for which Beasley Allen has a            13:58:04
15   co-counsel relationship, are those talc claims     13:58:07
16   securitization or collateralization for any        13:58:12
17   financing provided to Beasley Allen?               13:58:16
18                MS. SLOCUM:  Objection.  I'm          13:58:18
19       going --                                       13:58:19
20                THE WITNESS:  I want to answer        13:58:20
21       this; okay?                                    13:58:21
22                Because there has -- Beasley          13:58:24
23       Allen -- there was the allegation made that    13:58:26
24       Beasley Allen is so heavily indebted that we   13:58:29
25       could not accept the proposal, and that        13:58:32
```

Page 48

```
 1              A. Birchfield, Esq.
 2      is -- that is categorically false.  We have    13:58:35
 3      not.  We have not obtained litigation          13:58:40
 4      financing or funding for our talc claims.      13:58:44
 5  BY MR. HAAS:                                        13:58:47
 6      Q     Thank you for that.  Let me just         13:58:48
 7  clarify, since you opened the door to the          13:58:49
 8  questioning, do the talc claims for which Beasley  13:58:52
 9  Allen is representing the individual claimants     13:58:56
10  act as securitization or collateralization for    13:59:02
11  any financing?                                     13:59:06
12              MS. SLOCUM:  Again, objection.         13:59:08
13      I'm going to instruct the witness not to       13:59:08
14      answer.                                        13:59:10
15              MR. HAAS:  Are you interrupting        13:59:10
16      me?  You just asked me not to interrupt you.   13:59:11
17      Let me get the question on the record.  If     13:59:13
18      you want to object -- he just opened the       13:59:13
19      door to this.                                  13:59:13
20  BY MR. HAAS:                                        13:59:17
21      Q     Let's try to get a clean record,         13:59:18
22  Mr. Birchfield.                                    13:59:20
23              Again, do the talc claims that Beasley 13:59:21
24  Allen represents the individual talc claimants     13:59:23
25  constitute securitization or collateralization     13:59:27
```

Page 213

1                    A. Birchfield, Esq.
2        or off the record?                          17:54:50
3               MR. PLACITELLA:  On the record.      17:54:50
4        Can we agree that the court reporter was    17:54:50
5        awesome dealing with all of us?             17:54:54
6               MS. BROWN:  Thank you for your       17:54:56
7        help.                                       17:54:56
8               MR. VIDEOGRAPHER:  Please standby.   17:54:58
9        The time is 5:54 p.m. and concludes the     17:54:59
10       testimony given by Andy Birchfield.         17:55:03
11                        * * *
12
13

       _____
14                ANDY BIRCHFIELD, ESQ.
15
16     Subscribed and sworn to before me
17
     this __ day of _____, 2023.
18
19     _____
           Notary public
20
21
22
23
24
25

# **<u>EXHIBIT D</u>**

REFINITIV STREETEVENTS

# EDITED TRANSCRIPT

JNJ.N - Johnson & Johnson Announces Plan by its Subsidiary, LLT
Management Conference Call

EVENT DATE/TIME: MAY 01, 2024 / 12:00PM GMT

**OVERVIEW:**

Company Summary

©2024 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written
consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.



## MAY 01, 2024 / 12:00PM, JNJ.N - Johnson & Johnson Announces Plan by its Subsidiary, LLT Management Conference Call

### CORPORATE PARTICIPANTS

**Erik Haas** *Johnson & Johnson - Worldwide Vice President of Litigation*

**Jessica Moore** *Johnson & Johnson - VP of IR*

**Joaquin Duato** *Johnson & Johnson - CEO & Chairman*

**Joseph J. Wolk** *Johnson & Johnson - Executive VP & CFO*

### CONFERENCE CALL PARTICIPANTS

**Christopher Thomas Schott** *JPMorgan Chase & Co, Research Division - Senior Analyst*

**Jayson Tyler Bedford** *Raymond James & Associates, Inc., Research Division - MD & Senior Medical Supplies and Devices Analyst*

**Lawrence H. Biegelsen** *Wells Fargo Securities, LLC, Research Division - Senior Medical Device Equity Research Analyst*

**Matthew Stephan Miksic** *Barclays Bank PLC, Research Division - Research Analyst*

**Vamil Kishore Divan** *Guggenheim Securities, LLC, Research Division - MD of Healthcare Research & Senior Equity Research Analyst*

### PRESENTATION

**Operator**

Good morning, and welcome to Johnson & Johnson's Investor Conference Call. (Operator Instructions). This call is being recorded. (Operator Instructions)

I would now like to turn the conference over to Johnson & Johnson. You may begin.

---

**Jessica Moore** *- Johnson & Johnson - VP of IR*

Hello. This is Jessica Moore, Vice President of Investor Relations for Johnson & Johnson. We appreciate everyone joining us on such short notice to review today's announcement regarding the proposed plan by the company's subsidiary, LLT Management, or LLT, to resolve all current and future ovarian talc claims.

Joining me on today's call are Joaquin Duato, Chairman and Chief Executive Officer; Joe Wolk, Executive Vice President and Chief Financial Officer; and Erik Haas, Worldwide Vice President of Litigation. Following the call, you can find the presentation and additional supplemental resources on the Investor Relations section of the Johnson & Johnson website at investor.jnj.com.

Please note that today's presentation contains forward-looking statements. You are cautioned not to rely on these forward-looking statements, which are based on current expectations of future events using the information available as of the date of this recording and are subject to certain risks and uncertainties that may cause the company's actual results to differ materially from those projected.

A description of these risks, uncertainties and other factors can be found in our SEC filings, including our 2023 Form 10-K, which is available at investor.jnj.com and on the SEC's website.

I'll now turn the call over to Joaquin.

---

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2024 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.



**MAY 01, 2024 / 12:00PM, JNJ.N - Johnson & Johnson Announces Plan by its Subsidiary, LLT Management Conference Call**

**Joaquin Duato** - *Johnson & Johnson - CEO & Chairman*

Thanks, Jess, and thank you, everyone, for joining us. Let me start by recognizing the importance of this topic for all our credo stakeholders. As you have heard me say before, our intention with respect to talc litigation is to bring a responsible final and comprehensive resolution to these claims, as we continue our work to deliver life-changing innovation, medicines and technologies to patients.

And with today's announcement, we are making meaningful progress in our efforts to do just that. Today's announcement reflects our unwavering commitment to our credo and the responsibilities we have to all those who count on us. Our sharpened focus, strong operational performance and progress in our portfolio and pipeline gives me great confidence in the trajectory of our business.

Johnson & Johnson's impact across the full spectrum of health care is unique in our industry. And I'm more convinced than ever that we are going to lead the next wave of innovation on behalf of patients.

And with that, I will now turn it over to Erik.

**Erik Haas** - *Johnson & Johnson - Worldwide Vice President of Litigation*

Thank you, Joaquin. The plan we announced today enables the company to resolve all current and future ovarian talc claims through a consensual prepackaged reorganization by the company's subsidiary, LLT. This will result in the resolution of 99.75% of all pending talc lawsuits against Johnson & Johnson and its affiliates in the United States.

The small number of remaining talc personal injury lawsuits relate to mesothelioma and are being addressed outside of the plan. In that regard, the company has already resolved 95% of the mesothelioma lawsuits filed to date. In addition, the talc-related consumer protection claims asserted by states against the company already have been resolved through consensual settlements outside of bankruptcy. And for completeness, the company recently reached an agreement in principle to resolve all talc-related claims asserted against it in the bankruptcy cases filed by the suppliers of its talc, Imerys and Cyprus.

Now as a reminder, in the July 2023 dismissal of LLT's prior bankruptcy case, the New Jersey Bankruptcy Court noted that the company had made remarkable progress towards achieving an efficient and expeditious settlement of all claimants and strongly encourage the company to continue to pursue a comprehensive resolution through another bankruptcy. We followed that directive, and today's announcement is a culmination of those efforts. We firmly believe this plan is in the best interest of claimants and should receive a favorable vote and immediate confirmation from the bankruptcy court.

Notably, the counsel representing the overwhelming majority of current ovarian claimants helped develop and support the proposed plan for good reason. First, this plan commits to pay ovarian claimants a present value of approximately $6.5 billion, which will be paid over 25 years and is a far better recovery than what claimants stand to recover at trial. Second, the company has prevailed in approximately 95% of ovarian cases tried, including every ovarian case tried over the last 6 years. As that track record shows, most ovarian claimants have not recovered, nor are they expected to ever recover anything at trial. Third, at the rate of which these cases have been tried, it would take decades to try the remaining cases, meaning most claimants will never see their day in court.

Finally, in March of this year, the judge presiding over the multi-district litigation, where 93% of the ovarian claims are filed, agreed to reconsider the scientific validity of the opinions offered by plaintiffs' experts in a renewed Daubert hearing. If plaintiff opinions fail that review, all the ovarian claims should then be dismissed. We fully expect that will be the result because the opinions of plaintiff experts are irreconcilable with the research conducted for decades by independent experts as well as governmental and regulatory bodies. Johnson & Johnson's talc products are safe, do not contain asbestos and do not cause cancer, and none of the talc-related claims against the company have any merit whatsoever.

In terms of next steps, the plan provides for a 3-month solicitation period, in which the ovarian claimants will be informed of its terms and will have the opportunity to vote for or against the plan, something they were denied and deprived of in the previous bankruptcy cases due to the efforts

3

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2024 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.



MAY 01, 2024 / 12:00PM, JNJ.N - Johnson & Johnson Announces Plan by its Subsidiary, LLT Management
Conference Call

by plaintiff lawyers representing a small minority of claimants. Should the supermajority of the claimants or 75% vote in favor of the plan, [a Company subsidiary] (corrected by company after the call) may then file a consensual prepackaged Chapter 11 bankruptcy to secure confirmation.

During the solicitation period, the company remains firmly committed to pursuing the other 3 pathways towards a comprehensive resolution that we laid out last year, including: first, appealing the dismissal of LLT's prior bankruptcy case up through the Supreme Court, if necessary; second, aggressively litigating in the tort system against the claimants who elect not to settle during the solicitation period, and proceeding with the Daubert hearings in the MDL; and third, challenging the abuses of the mass tort plaintiffs' bar and its experts with our own affirmative actions.

In closing, the plan announced today demonstrates our substantial commitment to resolving the outstanding talc claims is in the best interest of all ovarian claimants and the company and, therefore, should put an end to this litigation.

I will now turn the call over to Joe.

---

**Joseph J. Wolk** - *Johnson & Johnson - Executive VP & CFO*

Thanks, Erik. You may be wondering how this announcement, along with the financial commitment in prior bankruptcy cases impacts the company's total outstanding liability for talc litigation. Let me walk you through where we stand today. As of year-end 2023, the company had a total reserve of approximately $9 billion. When you take into account today's proposed plan for a comprehensive resolution of the ovarian claims and other already settled claims, the company recorded an incremental charge of approximately $2.7 billion in the first quarter 2024 results.

As mentioned on our first quarter earnings call, the company incurred payments in furtherance of achieving a resolution, netting to a present value reserve balance of approximately $11 billion or a nominal value of $13.7 billion payable over 25 years. Additional details can be found in our first quarter 2024 Form 10-Q filed this morning and in the plan documents. While Johnson & Johnson stands behind the safety of its talc, with the support of counsel representing the overwhelming majority of current ovarian claimants, we believe this proposed plan is in the best interest of both ovarian claimants and the company.

We appreciate that the talc litigation has been on the minds of our investors and, in particular, how this litigation impacts Johnson & Johnson's ability to execute upon our capital allocation priorities. The settlement agreements have payout schedules that span up to 25 years. So while we feel any settlement is unjust based on science, this has not and will not impact Johnson & Johnson's ability to execute on our capital allocation strategy, as you have observed in recent years with record levels of R&D investment, continued annual increases of our dividend, value-creating strategic acquisitions like Abiomed, Ambrx and the pending Shockwave transaction and share repurchase programs.

Our annual free cash flow generation and robust balance sheet will continue to solidify an already strong financial foundation and fuel further investment leading to growth for our business and returns to our shareholders.

We now welcome your questions regarding today's announcement, and kindly ask Kevin to provide instructions and begin the Q&A portion of the call.

---

## QUESTIONS AND ANSWERS

**Operator**

(Operator Instructions) Our first question is coming from Chris Schott from JPMorgan.

---

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2024 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.



MAY 01, 2024 / 12:00PM, JNJ.N - Johnson & Johnson Announces Plan by its Subsidiary, LLT Management
Conference Call

**Christopher Thomas Schott** - *JPMorgan Chase & Co, Research Division - Senior Analyst*

Great. Thanks so much for hosting the call today and for the question. I just want to make sure I'm clear, just kind of bigger-picture question. Can you just go over what you view as, I guess, the major differences with the announcement today versus, I guess, the attempt or the structure you put forward in April of 2023? Is it simply kind of a larger settlement figure? Is it just wanting plaintiffs to get the ability to express a vote? Is it the updated Daubert hearing? I'm just trying to get a sense of just like where are we today versus where we were in April of '23.

**Erik Haas** - *Johnson & Johnson - Worldwide Vice President of Litigation*

Yes, that's a great question. And you hit on some key considerations, but maybe I can put it into context. First and foremost, what we are doing today is materially different from the prior bankruptcies in two significant respects. First, what we are doing here is we are proposing a consensual prepackaged bankruptcy reorganization. And what that means is that we are going out with a solicitation to determine whether the supermajority or 75% of the claimants support the plan before we make a filing in bankruptcy.

So we're not filing a bankruptcy today or tomorrow. We have a 3-month solicitation period after which, subject to securing the requisite 75% vote that we are required to obtain in order to file, we will then elect whether to file at that point in time.

Now let me just pause there. We fully expect to get that 75% vote for a number of reasons. First, as you may have seen in the LTL 2 bankruptcy last fall during the hearing in June of 2023, the court asked us what the relative support was for and against the bankruptcy resolution at that time. And at that time, the votes in favor or the counsel representing what the votes were in favor of the claim was approximately 70%.

Now based upon our communications with the counsel who we've been negotiating for the last year since the dismissal of the LTL bankruptcy, we now feel we have a much more robust and higher percentage of supporting vote. So the first difference is that the claimants get to decide. What we fundamentally are seeking to do is let the claimants' vote and decide whether this is in their best interest. Because in the prior bankruptcies, we never got there because a very small vocal contingent of plaintiff lawyers prevented that vote from happening. So that's the first and most significant distinction.

The second is that this is an ovarian-only prepackaged bankruptcy resolution proposal. And that's important because going back to where we were in July of 2023 when the LTL 2 bankruptcy was dismissed, we had basically 4 categories of claimants. We had the ovarians, we had the mesothelioma claimants, we had the states and we had the bankruptcies claimants that were from our suppliers, which was pending in the Imerys and Cyprus bankruptcies before Judge Silverstein.

What we have done since July 2023 is we have worked with counsel for each of those constituents in order to get us to where we are today. And in significant respect, what we've done is we resolved all other categories of claimants other than the ovarian claimants. And what do I mean by that? Well, let me start with the proposition of what the court's order was in the July 28 dismissal decision. What the judge said, Judge Kaplan said, was up to this time, notwithstanding that I'm dismissing the parties, both the LTL and the plaintiff lawyers had made "remarkable progress to achieving a comprehensive and final resolution," and he strongly encouraged, and those were his words, that we continue that process to reach a final global resolution through another bankruptcy.

And we followed that directive and that's what we did going forward. And we were since then working with the mesothelioma plaintiffs first. We were able to resolve the 95% of the claims that have been filed to date and effectively put an end to that litigation with the exception of one law firm whose claims are pending, and we are working on the resolution of that claim.

The second category is the states, and we have now entered into settlements with the states. Two states had pending litigations, and there was a coalition of 43 states that had asserted claims, and we have reached final and comprehensive settlements with respect to those state consumer protection claims.

And third, the debtors, the Imerys and Cyprus debtors. Likewise, we entered into negotiations with them, and we were able to resolve and settle all claims in those bankruptcies against the company. So now what we are left with are the ovarian claims.

5

©2024 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.



**MAY 01, 2024 / 12:00PM, JNJ.N - Johnson & Johnson Announces Plan by its Subsidiary, LLT Management Conference Call**

And the reason why we are pursuing in the manner that we are is because we have the significant support of the overwhelming majority of the claimants based upon our communications with their counsels and representation. So those are the significant differences between what was previously the case and what is currently the case.

---

**Operator**

Our next question is coming from Larry Biegelsen from Wells Fargo.

---

**Lawrence H. Biegelsen** - *Wells Fargo Securities, LLC, Research Division - Senior Medical Device Equity Research Analyst*

Erik, my question is around third-party release. Is there one here? Will the bankruptcy cut off liability for future claims? And what will happen to new claims filed going forward? And just lastly, how confident are you the courts will support this given that this has been a hangup in other product liability litigation that's ongoing.

---

**Erik Haas** - *Johnson & Johnson - Worldwide Vice President of Litigation*

Excellent question and very important, and it's a key to what the proposal is that we are making. So let me walk through those third-party releases. So we all are quite aware that there's a case before the Supreme Court, the Purdue case, that is addressing the legitimacy of third-party releases. That is in the context of non-asbestos claims. And the releases in that case were pursuant to 105(a) of the bankruptcy code.

We are moving under a different section in addition to 105, but we are moving primarily under 524(g) of the bankruptcy code, which explicitly allows for third-party releases. And if you listened to the Purdue argument before the Supreme Court last fall, that was a distinction that was actually made. The argument was, well, should Purdue be entitled to the third-party releases under its plan when the code did not explicitly provide for it as it did in the context of 524(g), which we are moving under.

So from the perspective of third-party releases, yes, that's a component of the plan. It's a necessary component of the plan to resolve any doubt with respect to finality because in this case, the third-party would-be Johnson & Johnson. But Johnson & Johnson has an indemnification right against the underlying debtors, so there are no valid claims against Johnson & Johnson, which distinguishes it factually from the Purdue matter.

But more importantly, what we have here is a different statutory regime, which allows us to obtain the third-party releases and really sets us apart from that prior precedent. And then the second question was, yes, is whether to what extent we believe the court would support this proposal.

Fundamentally, the difference again is that we are going into the bankruptcy this time with the support of the supermajority of the claimants. This is a prepackaged Chapter 11 reorganization. Courts look at these fundamentally different than they look at the prior bankruptcies that we went into. And importantly here, one component of that is and why they look at it differently is we are not asking for a stay of any litigation outside the bankruptcy before we get that vote. In fact, we are embracing the idea that we are moving forward with the litigation in the tort system and particularly with respect to the ovarian claims in the MDL, where 94% of those claims are housed and specifically having a renewal of the Daubert hearing in those proceedings.

So we are moving on parallel paths, and we expect that, particularly given the leverage that we have in the tort system as a consequence that we will be securing the requisite vote, that's what we've heard from the counsel that we've been working with that will represent the claimants. And once we get the requisite vote and submit it to the court, we would expect a prompt resolution.

---

**Operator**

Your next question is coming from Jayson Bedford from Raymond James.

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2024 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.



**MAY 01, 2024 / 12:00PM, JNJ.N - Johnson & Johnson Announces Plan by its Subsidiary, LLT Management Conference Call**

---

**Jayson Tyler Bedford** - *Raymond James & Associates, Inc., Research Division - MD & Senior Medical Supplies and Devices Analyst*

Just maybe a quick one for me, and I apologize if it's in the public domain already. But what's the timing on the Daubert reconsideration? And how does that fit into the 3-month solicitation window?

---

**Erik Haas** - *Johnson & Johnson - Worldwide Vice President of Litigation*

Yes. Great question because it really goes to my last answer in how these two parallel pathways are aligned. The Daubert motion was ordered by the court on March 27. The moving papers will be submitted in July, and the opposition papers will be submitted on August 22. There is a 3-month solicitation period under the proposed plan, which commences on May 1 and runs through July 26. Once the results of that solicitation are processed, we will know right about the time when the opposition papers are filed in the Daubert motion where we stand with respect to the vote. And therefore, we will be able to make an educated determination as to what is the best pathway forward for both claimants and for us.

And in the event that we don't secure the vote, obviously, we'll just move forward with the Daubert proceeding, and we fully expect to prevail in that case. But in the event that we do secure the requisite vote, then we will have the opportunity to make a determination at that time given all the information before us, whether to file.

---

**Operator**

Our next question is coming from Matt Miksic from Barclays.

---

**Matthew Stephan Miksic** - *Barclays Bank PLC, Research Division - Research Analyst*

Congrats on the progress here so far. So one question, I think, that investors ask often is sort of what is the breakdown, the helpful statistics that you gave around the percentage of claims remaining under ovarian and the percentage of claims under mesothelioma that you resolved so far. But maybe just taking again kind of a top-down view, the numbers last year being thrown around were kind of approaching in the 100,000 range.

If you could possibly walk through what's the total universe of claims and maybe come through the numbers that way to explain which segments have been resolved and kind of what's the numbers behind the claimants, if that's possible? And then I have one quick follow-up.

---

**Erik Haas** - *Johnson & Johnson - Worldwide Vice President of Litigation*

Thank you for the question. So 4 categories of claims, I'll take the two easy ones. First, the claims asserted in the bankruptcy proceedings by Imerys and Cyprus, 100% resolved. Those claims are done. Claims asserted by the states, 100% resolved. That leaves the personal injury claims, both mesothelioma and the ovarian claims.

The ovarian claims constitute far more than the vast majority. We're talking about anywhere from 85,000 to 100,000 claims, depending upon the ultimate process that we go through in vetting those claims. In contrast, in the mesothelioma, we're talking hundreds of claims, right? So there's approximately, I would say, 153, if my numbers are correct with respect to the mesothelioma claims filed, 68 of which remain with one single law firm and the other ones are sort of one-offs. So we have resolved all of the significant portfolios of mesothelioma claims, 95% of the claims filed to date.

So that's the mesothelioma world, and that's why we view those as fundamentally resolved. That also explains why we resolved the mesothelioma claims outside of bankruptcy and the ovarian claims inside of bankruptcy. Hundreds of claims to resolve outside of bankruptcy is manageable, and it's also consistent with the established, long-established mesothelioma model that exists outside of bankruptcy, in which we leverage but more in the settlement context rather than through a court-ordered escrow approach.

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2024 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.



That's a stark contrast to, let's call it, 100,000 claims in the ovarian bankruptcy, which you fundamentally need and require a process such as we are going through with the bankruptcy court, in this case, a prepackaged consensual bankruptcy proceeding in order to seek a resolution. So really, the vast -- overwhelmingly vast and really the most significant volume of claims are the ovarian claims. But a couple of important notes there. The ovarian claims also are the ones that have been the least successful of any claims that have been asserted to date. We have prevailed in 95% of the ovarian claims tried. That's 16 out of 17 cases tried. We have prevailed in every single one of those cases tried in the last 6 years. We prevailed in every one of those cases tried this year.

The one major law firm that has been the opponent of a resolution, the Beasley Allen firm, has lost every single claim they have brought to trial. 13 out of 13, they've lost. They've never recovered a dime for their client. That is why this makes sense for those claimants. We are proposing a resolution that will allow claimants to recover in a reasonable time frame, a significant amount and more than amount than that would otherwise recover in settlements outside of this process. And that is from any measure, objective or subjective, an equitable and efficient resolution from their perspective.

---

**Operator**

Our final question today is coming from Vamil Divan from Guggenheim.

---

**Vamil Kishore Divan** - *Guggenheim Securities, LLC, Research Division - MD of Healthcare Research & Senior Equity Research Analyst*

Great. I guess just one to clarify for me. I think you may have touched on this a little bit, but you said 75% of claimants vote in favor in the sort of prepackaged bankruptcy. Is there any reason attorneys that are holding out and not agreeing or the claimants then holding out are not going to just sue them and say that this ultimately should not end up in the bankruptcy side? I guess that's one thing I've been confused about from before. So I'm wondering how this overcomes that potential challenge if people still are arguing that bankruptcy is not the right path for this.

---

**Erik Haas** - *Johnson & Johnson - Worldwide Vice President of Litigation*

Yes. Great question to end on. So the primary opponent to resolving anything in bankruptcy as the individual I just referenced, it's the Beasley Allen firm and, in particular, Andy Birchfield, who has opposed any resolution through bankruptcy. Because as he testified in the last bankruptcy proceeding in June of 2023, that he has an economic incentive not to resolve his claims in bankruptcy, and we believe that presents an inherent conflict with the interest of his claimants.

The reason why he has a conflict of interest is because he sits on the plaintiff Executive Committee as he testified. And as he testified, it is his firm that stands to recover the vast amount of the common benefit fund amount that is allowed in the multi-district litigation for any recovery obtained outside of bankruptcy. So he stands to recover 12% from everybody else, all the other law firms that have been litigating this matter on top of the 40% fee he charges and admitted he charges his claimants.

So he would lose a lot of money outside of bankruptcy. And within bankruptcy, that would not be available because the plan calls for each of the claimants' counsel to earn their respective amount. So he has been the most vocal opponent to the bankruptcy proceeding to date and continues to be so. I don't see that as an impediment to this resolution for a number of reasons.

First of all, it is this vote that will dictate the claimants get to speak, the claimants' voices get to be heard, and that's the major distinction here. And if the vote is greater than 75%, it doesn't matter that he perhaps persuades his own claimants not to vote in favor of it. And by the way, he doesn't get a vote, his claimants do. So I would say that I would expect his claimants to take this deal because it's a good deal in any event. But regardless, it is the vote that matters at the end of the day.

And so that's one significant reason why I don't think it's going to matter. The other significant reason is I think there's a really good chance that he won't be around for much longer representing his claimants. We have moved to disqualify the Beasley Allen firm from representing claimants in this action as a consequence of their ethical breaches that arose from the Beasley Allen firm and, in particular, Mr. Birchfield, entering into an

8

©2024 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.



MAY 01, 2024 / 12:00PM, JNJ.N - Johnson & Johnson Announces Plan by its Subsidiary, LLT Management Conference Call

alliance with a former counsel of J&J. And that is a gross and egregious breach of the ethical obligations of the former counsel as well as Mr. Birchfield and his firm, and that issue is currently being litigated before both the federal and the state cases. The final day of that hearing is on Friday. And we'll have post-trial briefing and then we will determine whether or not Mr. Birchfield has any grounds to raise any objections in any event.

Final point with respect to anyone else who might not be in favor of this proposal, they don't have the standing to do so. This is an ovarian-only case. The parties withstanding are the claimants that have the opportunity to vote in favor of this plan. The mesothelioma claims are being addressed outside of this bankruptcy, as I indicated. And to the extent there's one or perhaps two claimants that law firms have decided not to resolve, we will address those claims outside of bankruptcy.

So the parties withstanding to object to this are the claimants' counsel that are participating in the bankruptcy. And the only real significant objections that they could have is to process. And the process we are following is much more stringent and much more compliant with the code than your typical process. So I feel very strongly that there will be no legitimate basis for objecting to this process. Because in the end, it's the claimants. We let the claimants vote, let the claimants decide if they choose this is in their best interest, it should be confirmed.

**Jessica Moore** - *Johnson & Johnson - VP of IR*

Thank you, Vamil, and thanks to everyone for your questions and your continued interest in our company. We apologize to those that we couldn't get to because of time, but don't hesitate to reach out to the Investor Relations team with any remaining questions you may have.

I will now turn the call back over to Erik and Joaquin for some brief closing remarks.

**Erik Haas** - *Johnson & Johnson - Worldwide Vice President of Litigation*

Thanks, Jess. So let me just reiterate the key takeaways from today's announcement. The plan is focused on current and future ovarian talc claims and would resolve 99.75% of all pending talc claims. The company has already resolved 95% of the mesothelioma lawsuits filed to date as well as all state claims and all claims against the company arising in the Imerys and Cyprus bankruptcy.

The plan differs significantly from the prior reorganization as it allows claimants to have their voice heard with a vote, which was denied to them by lawyers representing a small minority of claimants in the prior bankruptcy. We are letting the claimants decide the outcome. We fully expect to secure a favorable vote as the plan is in the best interest of the ovarian talc claimants, as most ovarian talc claimants have not recovered and will not recover anything at trial. And at the current run rate, most claimants will never get their day in court.

In addition, the plan was developed with the assistance and the support of counsel representing the overwhelming majority of the current claimants. So we know the likely of success is high. Overall, the plan enables Johnson & Johnson to ultimately resolve its talc litigation and to move on with what Johnson & Johnson does every day, which is to develop life-saving therapies for patients.

**Joaquin Duato** - *Johnson & Johnson - CEO & Chairman*

Thanks, Erik. And as Erik has commented, the focus of Johnson & Johnson always has been and will continue to be delivering life-saving solutions and technologies for patients. Today's announcement enables the company to resolve its talc litigation and continue our efforts in leading the next wave of health innovation. Thank you. Have a nice day.

**Operator**

Thank you. This concludes today's Johnson & Johnson Investor Conference Call. You may now disconnect.

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2024 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.



MAY 01, 2024 / 12:00PM, JNJ.N - Johnson & Johnson Announces Plan by its Subsidiary, LLT Management
Conference Call

**DISCLAIMER**

Refinitiv reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES REFINITIV OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.

©2024, Refinitiv. All Rights Reserved.

REFINITIV STREETEVENTS | www.refinitiv.com | Contact Us

©2024 Refinitiv. All rights reserved. Republication or redistribution of Refinitiv content, including by framing or similar means, is prohibited without the prior written consent of Refinitiv. 'Refinitiv' and the Refinitiv logo are registered trademarks of Refinitiv and its affiliated companies.



# EXHIBIT E

## Liz Achtemeier

| | |
|---|---|
| **From:** | Dee Detres <deedetres@gmail.com> |
| **Sent:** | Tuesday, May 14, 2024 11:43 AM |
| **To:** | Brittany Scott; jkim8@its.jnj.com; gmgordon@jonesday.com; jmurdica@btlaw.com |
| **Cc:** | brendan.pierson@thomsonreuters.com |
| **Subject:** | [EXT] date for 3rd bankruptcy -JNJ / LTL |

**[EXTERNAL]**

Brit,

Got your email yesterday with the update.

Please do me a favor and let me know the exact date they plan to issue paperwork for the 3rd bankruptcy

or John, or Greg or James, you can tell me directly.  You can text as well 215-853-7846

Thanks,
D

1

Case 3:16-md-02738-MAS-RLS   Document 32255-1   Filed 05/08/24   Page 3 of 3 PageID: Page 04128042

## Liz Achtemeier

| From: | Liz Achtemeier |
| --- | --- |
| Sent: | Tuesday, May 14, 2024 12:54 PM |
| To: | jkim8@its.jnj.com; gmgordon@jonesday.com; jmurdica@btlaw.com |
| Cc: | Brittany Scott; Ted Meadows; Leigh O'Dell |
| Subject: | RE: [EXT] date for 3rd bankruptcy -JNJ / LTL |

Counsel,

Please disregard the below attorney-client communication.

Thank you,



**Elizabeth Achtemeier**
Principal
800.898.2034

Liz.Achtemeier@BeasleyAllen.com
BeasleyAllen.com | My bio

**Learn more about our ongoing litigation.**

   

CONFIDENTIALITY & PRIVILEGE NOTICE

**From:** Dee Detres <deedetres@gmail.com>
**Sent:** Tuesday, May 14, 2024 11:43 AM
**To:** Brittany Scott <Brittany.Scott@BeasleyAllen.com>; jkim8@its.jnj.com; gmgordon@jonesday.com;
jmurdica@btlaw.com
**Cc:** brendan.pierson@thomsonreuters.com
**Subject:** [EXT] date for 3rd bankruptcy -JNJ / LTL

## [EXTERNAL]

Brit,

Got your email yesterday with the update.

Please do me a favor and let me know the exact date they plan to issue paperwork for the 3rd bankruptcy

or John, or Greg or James, you can tell me directly. You can text as well 215-853-7846

Thanks,
D

**BA_0038**                    **MURDICA_0002**

## Liz Achtemeier

| | |
|---|---|
| **From:** | Murdica, James <JMurdica@btlaw.com> |
| **Sent:** | Tuesday, May 14, 2024 5:54 PM |
| **To:** | Liz Achtemeier; jkim8@its.jnj.com; gmgordon@jonesday.com; brendan.pierson@thomsonreuters.com; deedetres@gmail.com |
| **Cc:** | Brittany Scott; Ted Meadows; Leigh O'Dell |
| **Subject:** | RE: [EXT] date for 3rd bankruptcy -JNJ / LTL |

### [EXTERNAL]

It appears from the disclosure that Beasley Allen again is seeking to enter into a surreptitious relationship to thwart a bankruptcy resolution—and Reuters is again preparing to act as plaintiffs counsel's mouthpiece—by publishing misleading and deceptive advertising, which raises a panoply of issues that may fall within the crime/fraud exception to the attorney-client privileged. We ask that Beasley Allen explain the nature of the relationship and communication with Reuters (and a self-proclaimed media "influencer") that it asserts gives rise to its privilege assertion.
Also, we've added back the original recipients that you deleted, and ask Brendan Pierson and Dee Detres confirm that they are in a privileged attorney-client relationship with Beasley Allen.

Jim

**James Murdica** | Partner
Barnes & Thornburg LLP
One North Wacker Drive Suite 4400, Chicago, IL 60606
Direct: (312) 214-4869 | Mobile: (215) 341-6996

    

Atlanta | Boston | California | Chicago | Delaware | Indiana | Michigan | Minneapolis | Nashville | New Jersey
New York | Ohio | Philadelphia | Raleigh | Salt Lake City | South Florida | Texas | Washington, D.C.

Visit our Subscription Center to sign up for legal insights and events.

**From:** Liz Achtemeier <Liz.Achtemeier@BeasleyAllen.com>
**Sent:** Tuesday, May 14, 2024 1:54 PM
**To:** jkim8@its.jnj.com; gmgordon@jonesday.com; Murdica, James <JMurdica@btlaw.com>
**Cc:** Brittany Scott <Brittany.Scott@BeasleyAllen.com>; Ted Meadows <Ted.Meadows@BeasleyAllen.com>; Leigh O'Dell <Leigh.ODell@BeasleyAllen.com>
**Subject:** [EXTERNAL] RE: [EXT] date for 3rd bankruptcy -JNJ / LTL

### Caution: This email originated from outside the Firm.

Counsel,

Please disregard the below attorney-client communication.

Thank you,

1



**Elizabeth Achtemeier**
Principal
800.898.2034

Liz.Achtemeier@BeasleyAllen.com
BeasleyAllen.com | My bio
**Learn more about our ongoing litigation.**

 

CONFIDENTIALITY & PRIVILEGE NOTICE

**From:** Dee Detres <deedetres@gmail.com>
**Sent:** Tuesday, May 14, 2024 11:43 AM
**To:** Brittany Scott <Brittany.Scott@BeasleyAllen.com>; jkim8@its.jnj.com; gmgordon@jonesday.com; jmurdica@btlaw.com
**Cc:** brendan.pierson@thomsonreuters.com
**Subject:** [EXT] date for 3rd bankruptcy -JNJ / LTL

**[EXTERNAL]**

Brit,

Got your email yesterday with the update.

Please do me a favor and let me know the exact date they plan to issue paperwork for the 3rd bankruptcy

or John, or Greg or James, you can tell me directly.  You can text as well 215-853-7846

Thanks,
D

**CONFIDENTIALITY NOTICE:** This email and any attachments are for the exclusive and confidential use of the intended recipient. If you are not the intended recipient, please do not read, distribute or take action in reliance upon this message. If you have received this in error, please notify us immediately by return email and promptly delete this message and its attachments from your computer system. We do not waive attorney-client or work product privilege by the transmission of this message.

**BA_0040**          **MURDICA_0004**

## Liz Achtemeier

| From: | Liz Achtemeier |
|---|---|
| Sent: | Wednesday, May 15, 2024 8:57 AM |
| To: | Murdica, James; jkim8@its.jnj.com; gmgordon@jonesday.com |
| Cc: | Brittany Scott; Ted Meadows; Leigh O'Dell |
| Subject: | RE: [EXT] date for 3rd bankruptcy -JNJ / LTL |

Mr. Murdica,

Ms. Detres is represented in this matter by Beasley Allen. As you know, it is not permissible for you to communicate directly with a represented individual.

### Elizabeth Achtemeier
Principal
334.269.2343

**From:** Murdica, James <JMurdica@btlaw.com>
**Sent:** Tuesday, May 14, 2024 5:54 PM
**To:** Liz Achtemeier <Liz.Achtemeier@BeasleyAllen.com>; jkim8@its.jnj.com; gmgordon@jonesday.com;
brendan.pierson@thomsonreuters.com; deedetres@gmail.com
**Cc:** Brittany Scott <Brittany.Scott@BeasleyAllen.com>; Ted Meadows <Ted.Meadows@BeasleyAllen.com>; Leigh O'Dell <Leigh.ODell@BeasleyAllen.com>
**Subject:** RE: [EXT] date for 3rd bankruptcy -JNJ / LTL

## [EXTERNAL]

It appears from the disclosure that Beasley Allen again is seeking to enter into a surreptitious relationship to thwart a bankruptcy resolution—and Reuters is again preparing to act as plaintiffs counsel's mouthpiece—by publishing misleading and deceptive advertising, which raises a panoply of issues that may fall within the crime/fraud exception to the attorney-client privileged. We ask that Beasley Allen explain the nature of the relationship and communication with Reuters (and a self-proclaimed media "influencer") that it asserts gives rise to its privilege assertion.
Also, we've added back the original recipients that you deleted, and ask Brendan Pierson and Dee Detres confirm that they are in a privileged attorney-client relationship with Beasley Allen.

Jim

**James Murdica** | Partner
Barnes & Thornburg LLP
One North Wacker Drive Suite 4400, Chicago, IL 60606
Direct: (312) 214-4869 | Mobile: (215) 341-6996

    

Atlanta | Boston | California | Chicago | Delaware | Indiana | Michigan | Minneapolis | Nashville | New Jersey
New York | Ohio | Philadelphia | Raleigh | Salt Lake City | South Florida | Texas | Washington, D.C.

1

**BA_0041**          **MURDICA_0005**

Visit our Subscription Center to sign up for legal insights and events.

**From:** Liz Achtemeier <Liz.Achtemeier@BeasleyAllen.com>
**Sent:** Tuesday, May 14, 2024 1:54 PM
**To:** jkim8@its.jnj.com; gmgordon@jonesday.com; Murdica, James <JMurdica@btlaw.com>
**Cc:** Brittany Scott <Brittany.Scott@BeasleyAllen.com>; Ted Meadows <Ted.Meadows@BeasleyAllen.com>; Leigh O'Dell <Leigh.ODell@BeasleyAllen.com>
**Subject:** [EXTERNAL] RE: [EXT] date for 3rd bankruptcy -JNJ / LTL

**Caution: This email originated from outside the Firm.**

Counsel,

Please disregard the below attorney-client communication.

Thank you,



**Elizabeth Achtemeier**
Principal
800.898.2034

Liz.Achtemeier@BeasleyAllen.com
BeasleyAllen.com | My bio
**Learn more about our ongoing litigation.**

   

CONFIDENTIALITY & PRIVILEGE NOTICE

**From:** Dee Detres <deedetres@gmail.com>
**Sent:** Tuesday, May 14, 2024 11:43 AM
**To:** Brittany Scott <Brittany.Scott@BeasleyAllen.com>; jkim8@its.jnj.com; gmgordon@jonesday.com; jmurdica@btlaw.com
**Cc:** brendan.pierson@thomsonreuters.com
**Subject:** [EXT] date for 3rd bankruptcy -JNJ / LTL

**[EXTERNAL]**

Brit,

Got your email yesterday with the update.

Please do me a favor and let me know the exact date they plan to issue paperwork for the 3rd bankruptcy

or John, or Greg or James, you can tell me directly.  You can text as well 215-853-7846

Thanks,
D

2

**CONFIDENTIALITY NOTICE:** This email and any attachments are for the exclusive and confidential use of the intended recipient. If you are not the intended recipient, please do not read, distribute or take action in reliance upon this message. If you have received this in error, please notify us immediately by return email and promptly delete this message and its attachments from your computer system. We do not waive attorney-client or work product privilege by the transmission of this message.

3

## Liz Achtemeier

| | |
|---|---|
| **From:** | Dee Detres <deedetres@gmail.com> |
| **Sent:** | Wednesday, May 15, 2024 9:44 AM |
| **To:** | Murdica, James |
| **Cc:** | Liz Achtemeier; jkim8@its.jnj.com; gmgordon@jonesday.com; brendan.pierson@thomsonreuters.com; Brittany Scott; Ted Meadows; Leigh O'Dell |
| **Subject:** | Re: [EXT] date for 3rd bankruptcy -JNJ / LTL |

### [EXTERNAL]

One of two emails back

regarding news cycles - mass media and independent journalism

1)

Reuters - immaterial.

You will also have to attack anyone who sees the world clearly - and doesnt make a living trying to cover their tracks while gutting women like a fish.

https://www.bloomberg.com/features/2016-baby-powder-cancer-lawsuits/

https://www.usatoday.com/story/news/nation/2021/07/27/talc-based-baby-powder-marketed-black-women-j-j-lawsuit-claims/5391526001/

https://cnnpressroom.blogs.cnn.com/2023/05/01/the-whole-story-with-anderson-cooper-investigates-claims-brought-against-johnson-johnson-in-shaken-baby-powder-on-trial-with-cnns-pamela-brown/

https://www.youtube.com/watch?v=wUQDjFiHldg

https://www.reuters.com/investigates/special-report/bankruptcy-tactics-two-step/

I am following all the news including https://www.law.com/njlawjournal/2024/02/20/beasley-allens-andy-birchfield-faces-evidentiary-hearing-on-disqualification/

Additionally, I attended all the court dates last year - which address phishing schemes

I have asked Brittnay to keep me up to date on if BA is even able to represent me her response was

"

a. Hearings are still ongoing, but we are confident the court will find that this is just another baseless attack by J&J."

1

also I inquired about this - where is my settlement

the answer was "

a. Johnson & Johnson is not willing to settle your case at this time, despite the information and records we have. Settlement requires agreement of all of the parties. We continue to pursue settlement with Johnson & Johnson. However, to date, J&J has been unwilling to settle."

I find this to be mentally abusive and have shared this many times - including my mental health professional (s) who were only contacted during the  fake bankruptcy process - because this is disgusting that adults act like this

I have seen all the billing/ requests for payments go through genova - and it further mentally abuses me.

I dont care that this is in an email - we belong in a mediation room and I have said that since 2016. My expectations are high only because the evidence is irrefutable

United States is better than this - or at least I am




I have




On Tue, May 14, 2024 at 6:53 PM Murdica, James <JMurdica@btlaw.com> wrote:

It appears from the disclosure that Beasley Allen again is seeking to enter into a surreptitious relationship to thwart a bankruptcy resolution—and Reuters is again preparing to act as plaintiffs counsel's mouthpiece—by publishing misleading and deceptive advertising, which raises a panoply of issues that may fall within the crime/fraud exception to the attorney-client privileged. We ask that Beasley Allen explain the nature of the relationship and communication with Reuters (and a self-proclaimed media "influencer") that it asserts gives rise to its privilege assertion.

Also, we've added back the original recipients that you deleted, and ask Brendan Pierson and Dee Detres confirm that they are in a privileged attorney-client relationship with Beasley Allen.


Jim

**BA_0045**                                                    **MURDICA_0009**

**James Murdica** | Partner
Barnes & Thornburg LLP
One North Wacker Drive Suite 4400, Chicago, IL 60606
Direct: (312) 214-4869 | Mobile: (215) 341-6996

   

Atlanta | Boston | California | Chicago | Delaware | Indiana | Michigan | Minneapolis | Nashville | New Jersey
New York | Ohio | Philadelphia | Raleigh | Salt Lake City | South Florida | Texas | Washington, D.C.

Visit our Subscription Center to sign up for legal insights and events.

**From:** Liz Achtemeier <Liz.Achtemeier@BeasleyAllen.com>
**Sent:** Tuesday, May 14, 2024 1:54 PM
**To:** jkim8@its.jnj.com; gmgordon@jonesday.com; Murdica, James <JMurdica@btlaw.com>
**Cc:** Brittany Scott <Brittany.Scott@BeasleyAllen.com>; Ted Meadows
<Ted.Meadows@BeasleyAllen.com>; Leigh O'Dell <Leigh.ODell@BeasleyAllen.com>
**Subject:** [EXTERNAL] RE: [EXT] date for 3rd bankruptcy -JNJ / LTL

**Caution: This email originated from outside the Firm.**

Counsel,

Please disregard the below attorney-client communication.

Thank you,



**Elizabeth Achtemeier**
Principal
800.898.2034

Liz.Achtemeier@BeasleyAllen.com
BeasleyAllen.com | My bio

**Learn more about our ongoing litigation.**

  

3

CONFIDENTIALITY & PRIVILEGE NOTICE

**From:** Dee Detres <deedetres@gmail.com>
**Sent:** Tuesday, May 14, 2024 11:43 AM
**To:** Brittany Scott <Brittany.Scott@BeasleyAllen.com>; jkim8@its.jnj.com; gmgordon@jonesday.com; jmurdica@btlaw.com
**Cc:** brendan.pierson@thomsonreuters.com
**Subject:** [EXT] date for 3rd bankruptcy -JNJ / LTL

**[EXTERNAL]**

Brit,

Got your email yesterday with the update.

Please do me a favor and let me know the exact date they plan to issue paperwork for the 3rd bankruptcy

or John, or Greg or James, you can tell me directly.  You can text as well 215-853-7846

Thanks,

D

**CONFIDENTIALITY NOTICE:** This email and any attachments are for the exclusive and confidential use of the intended recipient. If you are not the intended recipient, please do not read, distribute or take action in reliance upon this message. If you have received this in error, please notify us immediately by return email and promptly delete this message and its attachments from your computer system. We do not waive attorney-client or work product privilege by the transmission of this message.

4

## Liz Achtemeier

| | |
|---|---|
| **From:** | Murdica, James <JMurdica@btlaw.com> |
| **Sent:** | Wednesday, May 15, 2024 9:54 AM |
| **To:** | Liz Achtemeier |
| **Cc:** | JKim8@its.jnj.com; gmgordon@jonesday.com; Brittany Scott; Ted Meadows; Leigh O'Dell; brendan.pierson@thomsonreuters.com |
| **Subject:** | Re: [EXTERNAL] RE: [EXT] date for 3rd bankruptcy -JNJ / LTL |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |

**[EXTERNAL]**

Ms. Achtemeier-
As you well know, including a third party on an allegedly privileged communication abrogates that privilege. Please confirm that Thomson-Reuters is a client of Beasley Allen.
Brendan Pierson: please confirm that you and the Beasley Allen law firm are in an attorney-client relationship.
Thanks,
Jim

> On May 15, 2024, at 9:57 AM, Liz Achtemeier <Liz.Achtemeier@beasleyallen.com> wrote:
>
> **Caution: This email originated from outside the Firm.**
>
> Mr. Murdica,
>
> Ms. Detres is represented in this matter by Beasley Allen. As you know, it is not permissible for you to communicate directly with a represented individual.
>
> **Elizabeth Achtemeier**
> Principal
> 334.269.2343
>
> **From:** Murdica, James <JMurdica@btlaw.com>
> **Sent:** Tuesday, May 14, 2024 5:54 PM
> **To:** Liz Achtemeier <Liz.Achtemeier@BeasleyAllen.com>; jkim8@its.jnj.com; gmgordon@jonesday.com; brendan.pierson@thomsonreuters.com; deedetres@gmail.com
> **Cc:** Brittany Scott <Brittany.Scott@BeasleyAllen.com>; Ted Meadows <Ted.Meadows@BeasleyAllen.com>; Leigh O'Dell <Leigh.ODell@BeasleyAllen.com>
> **Subject:** RE: [EXT] date for 3rd bankruptcy -JNJ / LTL
>
> **[EXTERNAL]**
>
> It appears from the disclosure that Beasley Allen again is seeking to enter into a surreptitious relationship to thwart a bankruptcy resolution—and Reuters is again preparing to act as plaintiffs

1

counsel's mouthpiece—by publishing misleading and deceptive advertising, which raises a panoply of issues that may fall within the crime/fraud exception to the attorney-client privileged. We ask that Beasley Allen explain the nature of the relationship and communication with Reuters (and a self-proclaimed media "influencer") that it asserts gives rise to its privilege assertion.

Also, we've added back the original recipients that you deleted, and ask Brendan Pierson and Dee Detres confirm that they are in a privileged attorney-client relationship with Beasley Allen.

Jim

**James Murdica** | Partner
Barnes & Thornburg LLP
One North Wacker Drive Suite 4400, Chicago, IL 60606
Direct: (312) 214-4869 | Mobile: (215) 341-6996



# BARNES & THORNBURG LLP

## Atlanta | Boston | California | Chicago | Delaware | Indiana | Mic
## New York | Ohio | Philadelphia | Raleigh | Salt Lake City | S

Visit our Subscription Center to sign up for legal insights and events.
**From:** Liz Achtemeier <Liz.Achtemeier@BeasleyAllen.com>
**Sent:** Tuesday, May 14, 2024 1:54 PM
**To:** jkim8@its.jnj.com; gmgordon@jonesday.com; Murdica, James <JMurdica@btlaw.com>
**Cc:** Brittany Scott <Brittany.Scott@BeasleyAllen.com>; Ted Meadows
<Ted.Meadows@BeasleyAllen.com>; Leigh O'Dell <Leigh.ODell@BeasleyAllen.com>
**Subject:** [EXTERNAL] RE: [EXT] date for 3rd bankruptcy -JNJ / LTL

**Caution: This email originated from outside the Firm.**

Counsel,

Please disregard the below attorney-client communication.

Thank you,

2



**Elizabeth Achtemeier**
Principal
800.898.2034

Liz.Achtemeier@BeasleyAllen.com
BeasleyAllen.com | My bio
**Learn more about our ongoing litigation.**



CONFIDENTIALITY & PRIVILEGE NOTICE

**From:** Dee Detres <deedetres@gmail.com>
**Sent:** Tuesday, May 14, 2024 11:43 AM
**To:** Brittany Scott <Brittany.Scott@BeasleyAllen.com>; jkim8@its.jnj.com; gmgordon@jonesday.com; jmurdica@btlaw.com
**Cc:** brendan.pierson@thomsonreuters.com
**Subject:** [EXT] date for 3rd bankruptcy -JNJ / LTL

**[EXTERNAL]**

Brit,

Got your email yesterday with the update.

Please do me a favor and let me know the exact date they plan to issue paperwork for the 3rd bankruptcy

or John, or Greg or James, you can tell me directly.  You can text as well 215-853-7846

Thanks,
D

**CONFIDENTIALITY NOTICE:** This email and any attachments are for the exclusive and confidential use of the intended recipient. If you are not the intended recipient, please do not read, distribute or take action in reliance upon this message. If you have received this in error, please notify us immediately by return email and promptly delete this message and its attachments from your computer system. We do not waive attorney-client or work product privilege by the transmission of this message.

**CONFIDENTIALITY NOTICE:** This email and any attachments are for the exclusive and confidential use of the intended recipient. If you are not the intended recipient, please do not read, distribute or take action in reliance upon this message. If you have received this in error, please notify us immediately by return email and promptly delete this message and its attachments from your computer system. We do not waive attorney-client or work product privilege by the transmission of this message.

**BA_0050**          **MURDICA_0014**

## Liz Achtemeier

| | |
|---|---|
| **From:** | Lee, Chris (TR General Counsel) <Christopher.lee@thomsonreuters.com> |
| **Sent:** | Wednesday, May 15, 2024 1:26 PM |
| **To:** | JMurdica@btlaw.com |
| **Cc:** | Liz Achtemeier; gmgordon@jonesday.com; Brittany Scott; Ted Meadows; Leigh O'Dell |
| **Subject:** | RE: [EXTERNAL] RE: [EXT] date for 3rd bankruptcy -JNJ / LTL |

### [EXTERNAL]

Jim: Your emails were forwarded to me in my capacity as in-house legal counsel for Reuters. Beasley Allen does not represent Brendan Pierson, and we have seen no evidence to suggest that Beasley Allen represents Reuters or Thomson Reuters. Further, we respectfully disagree that Reuters has acted, or is "again preparing to act," as "plaintiffs counsel's mouthpiece."

This message is not a full recitation of the facts related to this matter and is without prejudice to Reuters' rights, claims, and defenses, all of which are expressly reserved.

Best regards,

Chris

**Chris Lee**
Associate General Counsel, Reuters News

Thomson Reuters

christopher.lee@tr.com
thomsonreuters.com

_____

**From:** Murdica, James <JMurdica@btlaw.com>
**Sent:** Wednesday, May 15, 2024 10:54 AM
**To:** Liz Achtemeier <Liz.Achtemeier@beasleyallen.com>
**Cc:** JKim8@its.jnj.com; gmgordon@jonesday.com; Brittany Scott <Brittany.Scott@beasleyallen.com>; Ted Meadows <Ted.Meadows@beasleyallen.com>; Leigh O'Dell <Leigh.ODell@beasleyallen.com>; Pierson, Brendan (Reuters) <Brendan.Pierson@thomsonreuters.com>
**Subject:** Re: [EXTERNAL] RE: [EXT] date for 3rd bankruptcy -JNJ / LTL

Ms. Achtemeier-
As you well know, including a third party on an allegedly privileged communication abrogates that privilege. Please confirm that Thomson-Reuters is a client of Beasley Allen.
Brendan Pierson: please confirm that you and the Beasley Allen law firm are in an attorney-client relationship.
Thanks,

1

**BA_0051**     **MURDICA_0015**

Jim

> On May 15, 2024, at 9:57 AM, Liz Achtemeier <Liz.Achtemeier@beasleyallen.com> wrote:
>
> **Caution: This email originated from outside the Firm.**
>
> ---
>
> Mr. Murdica,
>
> Ms. Detres is represented in this matter by Beasley Allen.  As you know, it is not permissible for you to communicate directly with a represented individual.
>
>
> **Elizabeth Achtemeier**
> Principal
> 334.269.2343
>
> **From:** Murdica, James <JMurdica@btlaw.com>
> **Sent:** Tuesday, May 14, 2024 5:54 PM
> **To:** Liz Achtemeier <Liz.Achtemeier@BeasleyAllen.com>; jkim8@its.jnj.com; gmgordon@jonesday.com; brendan.pierson@thomsonreuters.com; deedetres@gmail.com
> **Cc:** Brittany Scott <Brittany.Scott@BeasleyAllen.com>; Ted Meadows <Ted.Meadows@BeasleyAllen.com>; Leigh O'Dell <Leigh.ODell@BeasleyAllen.com>
> **Subject:** RE: [EXT] date for 3rd bankruptcy -JNJ / LTL
>
>
> **[EXTERNAL]**
>
> It appears from the disclosure that Beasley Allen again is seeking to enter into a surreptitious relationship to thwart a bankruptcy resolution—and Reuters is again preparing to act as plaintiffs counsel's mouthpiece—by publishing misleading and deceptive advertising, which raises a panoply of issues that may fall within the crime/fraud exception to the attorney-client privileged. We ask that Beasley Allen explain the nature of the relationship and communication with Reuters (and a self-proclaimed media "influencer") that it asserts gives rise to its privilege assertion.
> Also, we've added back the original recipients that you deleted, and ask Brendan Pierson and Dee Detres confirm that they are in a privileged attorney-client relationship with Beasley Allen.
>
> Jim
>
> **James Murdica** | Partner
> Barnes & Thornburg LLP
> One North Wacker Drive Suite 4400, Chicago, IL 60606
> Direct: (312) 214-4869 | Mobile: (215) 341-6996

   

BA_0052                      MURDICA_0016

Atlanta | Boston | California | Chicago | Delaware | Indiana | Mic
New York | Ohio | Philadelphia | Raleigh | Salt Lake City | S

Visit our Subscription Center to sign up for legal insights and events.

**From:** Liz Achtemeier <Liz.Achtemeier@BeasleyAllen.com>
**Sent:** Tuesday, May 14, 2024 1:54 PM
**To:** jkim8@its.jnj.com; gmgordon@jonesday.com; Murdica, James <JMurdica@btlaw.com>
**Cc:** Brittany Scott <Brittany.Scott@BeasleyAllen.com>; Ted Meadows
<Ted.Meadows@BeasleyAllen.com>; Leigh O'Dell <Leigh.ODell@BeasleyAllen.com>
**Subject:** [EXTERNAL] RE: [EXT] date for 3rd bankruptcy -JNJ / LTL

**Caution: This email originated from outside the Firm.**

Counsel,

Please disregard the below attorney-client communication.

Thank you,

**Elizabeth Achtemeier**
Principal
800.898.2034

Liz.Achtemeier@BeasleyAllen.com
BeasleyAllen.com | My bio
**Learn more about our ongoing litigation.**

CONFIDENTIALITY & PRIVILEGE NOTICE

**From:** Dee Detres <deedetres@gmail.com>
**Sent:** Tuesday, May 14, 2024 11:43 AM
**To:** Brittany Scott <Brittany.Scott@BeasleyAllen.com>; jkim8@its.jnj.com; gmgordon@jonesday.com;
jmurdica@btlaw.com
**Cc:** brendan.pierson@thomsonreuters.com
**Subject:** [EXT] date for 3rd bankruptcy -JNJ / LTL

**[EXTERNAL]**

Brit,

Got your email yesterday with the update.

3

Please do me a favor and let me know the exact date they plan to issue paperwork for the 3rd bankruptcy

or John, or Greg or James, you can tell me directly.  You can text as well 215-853-7846

Thanks,
D

**CONFIDENTIALITY NOTICE:** This email and any attachments are for the exclusive and confidential use of the intended recipient. If you are not the intended recipient, please do not read, distribute or take action in reliance upon this message. If you have received this in error, please notify us immediately by return email and promptly delete this message and its attachments from your computer system. We do not waive attorney-client or work product privilege by the transmission of this message.

**CONFIDENTIALITY NOTICE:** This email and any attachments are for the exclusive and confidential use of the intended recipient. If you are not the intended recipient, please do not read, distribute or take action in reliance upon this message. If you have received this in error, please notify us immediately by return email and promptly delete this message and its attachments from your computer system. We do not waive attorney-client or work product privilege by the transmission of this message.

BA_0054                          MURDICA_0018

## Liz Achtemeier

| | |
|---|---|
| **From:** | Murdica, James <JMurdica@btlaw.com> |
| **Sent:** | Wednesday, May 15, 2024 8:29 PM |
| **To:** | Lee, Chris (TR General Counsel) |
| **Cc:** | Liz Achtemeier; gmgordon@jonesday.com; Brittany Scott; Ted Meadows; Leigh O'Dell |
| **Subject:** | RE: [EXTERNAL] RE: [EXT] date for 3rd bankruptcy -JNJ / LTL |

## [EXTERNAL]

Chris,

Thank you for your email. Please let me know whether you are authorized to accept a subpoena for communications between Reuters and Beasley Allen relating to the issues raised in the recent correspondence. If you are represented by outside counsel in connection with this matter, please provide me their contact information.

Thank you.

Jim

**James Murdica** | Partner
Barnes & Thornburg LLP
One North Wacker Drive Suite 4400, Chicago, IL 60606
Direct: (312) 214-4869 | Mobile: (215) 341-6996

    

Atlanta | Boston | California | Chicago | Delaware | Indiana | Michigan | Minneapolis | Nashville | New Jersey
New York | Ohio | Philadelphia | Raleigh | Salt Lake City | South Florida | Texas | Washington, D.C.

Visit our Subscription Center to sign up for legal insights and events.

**From:** Lee, Chris (TR General Counsel) <Christopher.lee@thomsonreuters.com>
**Sent:** Wednesday, May 15, 2024 2:26 PM
**To:** Murdica, James <JMurdica@btlaw.com>
**Cc:** Liz.Achtemeier@BeasleyAllen.com; gmgordon@jonesday.com; Brittany Scott <Brittany.Scott@BeasleyAllen.com>; Ted Meadows <Ted.Meadows@BeasleyAllen.com>; Leigh O'Dell <Leigh.ODell@BeasleyAllen.com>
**Subject:** RE: [EXTERNAL] RE: [EXT] date for 3rd bankruptcy -JNJ / LTL

## Caution: This email originated from outside the Firm.

Jim: Your emails were forwarded to me in my capacity as in-house legal counsel for Reuters. Beasley Allen does not represent Brendan Pierson, and we have seen no evidence to suggest that Beasley Allen represents Reuters or Thomson Reuters. Further, we respectfully disagree that Reuters has acted, or is "again preparing to act," as "plaintiffs counsel's mouthpiece."

This message is not a full recitation of the facts related to this matter and is without prejudice to Reuters' rights, claims, and defenses, all of which are expressly reserved.

Best regards,

Chris

1

**Chris Lee**
Associate General Counsel, Reuters News

Thomson Reuters

christopher.lee@tr.com
thomsonreuters.com

_____

**From:** Murdica, James <JMurdica@btlaw.com>
**Sent:** Wednesday, May 15, 2024 10:54 AM
**To:** Liz Achtemeier <Liz.Achtemeier@beasleyallen.com>
**Cc:** JKim8@its.jnj.com; gmgordon@jonesday.com; Brittany Scott <Brittany.Scott@beasleyallen.com>; Ted Meadows <Ted.Meadows@beasleyallen.com>; Leigh O'Dell <Leigh.ODell@beasleyallen.com>; Pierson, Brendan (Reuters) <Brendan.Pierson@thomsonreuters.com>
**Subject:** Re: [EXTERNAL] RE: [EXT] date for 3rd bankruptcy -JNJ / LTL

Ms. Achtemeier-
As you well know, including a third party on an allegedly privileged communication abrogates that privilege. Please confirm that Thomson-Reuters is a client of Beasley Allen.
Brendan Pierson: please confirm that you and the Beasley Allen law firm are in an attorney-client relationship.
Thanks,
Jim

> On May 15, 2024, at 9:57 AM, Liz Achtemeier <Liz.Achtemeier@beasleyallen.com> wrote:

**Caution: This email originated from outside the Firm.**

Mr. Murdica,

Ms. Detres is represented in this matter by Beasley Allen. As you know, it is not permissible for you to communicate directly with a represented individual.

**Elizabeth Achtemeier**
Principal
334.269.2343

**From:** Murdica, James <JMurdica@btlaw.com>
**Sent:** Tuesday, May 14, 2024 5:54 PM
**To:** Liz Achtemeier <Liz.Achtemeier@BeasleyAllen.com>; jkim8@its.jnj.com; gmgordon@jonesday.com; brendan.pierson@thomsonreuters.com; deedetres@gmail.com
**Cc:** Brittany Scott <Brittany.Scott@BeasleyAllen.com>; Ted Meadows <Ted.Meadows@BeasleyAllen.com>; Leigh O'Dell <Leigh.ODell@BeasleyAllen.com>
**Subject:** RE: [EXT] date for 3rd bankruptcy -JNJ / LTL

2

**[EXTERNAL]**

It appears from the disclosure that Beasley Allen again is seeking to enter into a surreptitious relationship to thwart a bankruptcy resolution—and Reuters is again preparing to act as plaintiffs counsel's mouthpiece—by publishing misleading and deceptive advertising, which raises a panoply of issues that may fall within the crime/fraud exception to the attorney-client privileged. We ask that Beasley Allen explain the nature of the relationship and communication with Reuters (and a self-proclaimed media "influencer") that it asserts gives rise to its privilege assertion.

Also, we've added back the original recipients that you deleted, and ask Brendan Pierson and Dee Detres confirm that they are in a privileged attorney-client relationship with Beasley Allen.

Jim

**James Murdica** | Partner
Barnes & Thornburg LLP
One North Wacker Drive Suite 4400, Chicago, IL 60606
Direct: (312) 214-4869 | Mobile: (215) 341-6996



# BARNES & THORNBURG LLP  in 🖼 📧 📧

Atlanta | Boston | California | Chicago | Delaware | Indiana | Mic

New York | Ohio | Philadelphia | Raleigh | Salt Lake City | S

Visit our Subscription Center to sign up for legal insights and events.

**From:** Liz Achtemeier <Liz.Achtemeier@BeasleyAllen.com>
**Sent:** Tuesday, May 14, 2024 1:54 PM
**To:** jkim8@its.jnj.com; gmgordon@jonesday.com; Murdica, James <JMurdica@btlaw.com>
**Cc:** Brittany Scott <Brittany.Scott@BeasleyAllen.com>; Ted Meadows <Ted.Meadows@BeasleyAllen.com>; Leigh O'Dell <Leigh.ODell@BeasleyAllen.com>
**Subject:** [EXTERNAL] RE: [EXT] date for 3rd bankruptcy -JNJ / LTL

**Caution: This email originated from outside the Firm.**

Counsel,

Please disregard the below attorney-client communication.

Thank you,

3

**Elizabeth Achtemeier**

Principal
800.898.2034

Liz.Achtemeier@BeasleyAllen.com
BeasleyAllen.com | My bio

**Learn more about our ongoing litigation.**

CONFIDENTIALITY & PRIVILEGE NOTICE

**From:** Dee Detres <deedetres@gmail.com>
**Sent:** Tuesday, May 14, 2024 11:43 AM
**To:** Brittany Scott <Brittany.Scott@BeasleyAllen.com>; jkim8@its.jnj.com; gmgordon@jonesday.com; jmurdica@btlaw.com
**Cc:** brendan.pierson@thomsonreuters.com
**Subject:** [EXT] date for 3rd bankruptcy -JNJ / LTL


[EXTERNAL]

Brit,

Got your email yesterday with the update.

Please do me a favor and let me know the exact date they plan to issue paperwork for the 3rd bankruptcy

or John, or Greg or James, you can tell me directly.  You can text as well 215-853-7846

Thanks,
D

**CONFIDENTIALITY NOTICE:** This email and any attachments are for the exclusive and confidential use of the intended recipient. If you are not the intended recipient, please do not read, distribute or take action in reliance upon this message. If you have received this in error, please notify us immediately by return email and promptly delete this message and its attachments from your computer system. We do not waive attorney-client or work product privilege by the transmission of this message.

**CONFIDENTIALITY NOTICE:** This email and any attachments are for the exclusive and confidential use of the intended recipient. If you are not the intended recipient, please do not read, distribute or take action in reliance upon this message. If you have received this in error, please notify us immediately by return email and promptly delete this message and its attachments from your computer system. We do not waive attorney-client or work product privilege by the transmission of this message.

**CONFIDENTIALITY NOTICE:** This email and any attachments are for the exclusive and confidential use of the intended recipient. If you are not the intended recipient, please do not read, distribute or take action in reliance upon this message. If you have received

this in error, please notify us immediately by return email and promptly delete this message and its attachments from your computer system. We do not waive attorney-client or work product privilege by the transmission of this message.

5

BA_0059                    MURDICA_0023

## Liz Achtemeier

| From: | Murdica, James <JMurdica@btlaw.com> |
|---|---|
| Sent: | Wednesday, May 15, 2024 8:30 PM |
| To: | Liz Achtemeier; Brittany Scott; Ted Meadows; Leigh O'Dell |
| Subject: | FW: [EXTERNAL] Re: [EXT] date for 3rd bankruptcy -JNJ / LTL |

### [EXTERNAL]

All:

We write, first, to advise Beasley Allen that Ms. Detres reached out to us without solicitation. (*See* the email chain below.)  Second, please be advised that, in her correspondence, Ms. Detres apprised us that Beasley Allen has represented to her (and presumably other claimants) that Johnson & Johnson is not willing to settle her talc claims, which is of course false and directly contrary to the terms of the solicitation Johnson & Johnson announced on May 1, 2024.  Beasley Allen's representation to Ms. Detres also is false with respect to the state of affairs during the pendency of both LTL bankruptcies. As Beasley Allen is well aware—having participated in the settlement discussions and received the offers—Johnson & Johnson made repeated offers to settle Ms. Detres's (and all other) talc claims during those cases.  It is now evident that Beasley Allen is making both false affirmative representations and material omissions with respect to the settlements that were offered and available to its clients.  Ironically, as a claimant alleging *clear cell cancer*, Ms. Detres also seems unaware that Beasley Allen has advocated that her claim should be deemed worthless as a "non-qualifying" cancer.  Beasley Allen therefore is either knowingly deceiving Ms. Detres (and like situated claimants)—or the courts, the press and public to which it is making contrary assertions.

As with its conduct that is currently being adjudicated before the New Jersey courts presiding over the talc MDL and MCL, Beasley Allen's instant misrepresentations raise serious ethical issues.  While we are evaluating the appropriate steps to address, please be advised that **we hereby formally demand** that Beasley Allen (i) cease and desist its false and misleading representations regarding the proposed plan of reorganization that Johnson & Johnson announced, and (ii) provide corrective disclosures to claimants like Ms. Detres to whom it has made such misrepresentations.  Please confirm your acceptance of and compliance with this demand.

Jim

**James Murdica** | Partner
Barnes & Thornburg LLP
One North Wacker Drive Suite 4400, Chicago, IL 60606
Direct: (312) 214-4869 | Mobile: (215) 341-6996

    

Atlanta | Boston | California | Chicago | Delaware | Indiana | Michigan | Minneapolis | Nashville | New Jersey
New York | Ohio | Philadelphia | Raleigh | Salt Lake City | South Florida | Texas | Washington, D.C.

Visit our Subscription Center to sign up for legal insights and events.

**From:** Dee Detres <deedetres@gmail.com>
**Sent:** Wednesday, May 15, 2024 10:44 AM
**To:** Murdica, James <JMurdica@btlaw.com>
**Cc:** Liz Achtemeier <Liz.Achtemeier@beasleyallen.com>; jkim8@its.jnj.com; gmgordon@jonesday.com; brendan.pierson@thomsonreuters.com; Brittany Scott <Brittany.Scott@beasleyallen.com>; Ted Meadows <Ted.Meadows@beasleyallen.com>; Leigh O'Dell <Leigh.ODell@beasleyallen.com>
**Subject:** [EXTERNAL] Re: [EXT] date for 3rd bankruptcy -JNJ / LTL

1

**BA_0060**                    **MURDICA_0024**

**Caution: This email originated from outside the Firm.**

One of two emails back

regarding news cycles - mass media and independent journalism

1)

Reuters - immaterial.

You will also have to attack anyone who sees the world clearly - and doesnt make a living trying to cover their tracks while gutting women like a fish.

https://www.bloomberg.com/features/2016-baby-powder-cancer-lawsuits/

https://www.usatoday.com/story/news/nation/2021/07/27/talc-based-baby-powder-marketed-black-women-j-j-lawsuit-claims/5391526001/

https://cnnpressroom.blogs.cnn.com/2023/05/01/the-whole-story-with-anderson-cooper-investigates-claims-brought-against-johnson-johnson-in-shaken-baby-powder-on-trial-with-cnns-pamela-brown/

https://www.youtube.com/watch?v=wUQDjFiHldg

https://www.reuters.com/investigates/special-report/bankruptcy-tactics-two-step/

I am following all the news including https://www.law.com/njlawjournal/2024/02/20/beasley-allens-andy-birchfield-faces-evidentiary-hearing-on-disqualification/

Additionally, I attended all the court dates last year - which address phishing schemes

I have asked Brittnay to keep me up to date on if BA is even able to represent me her response was

"

    a. Hearings are still ongoing, but we are confident the court will find that this is just another baseless attack by J&J."

also I inquired about this - where is my settlement

the answer was "
    a. Johnson & Johnson is not willing to settle your case at this time, despite the information and records we have.  Settlement requires agreement of all of the parties.  We continue to pursue settlement with Johnson & Johnson.  However, to date, J&J has been unwilling to settle."

I find this to be mentally abusive and have shared this many times - including my mental health professional (s) who were only contacted during the  fake bankruptcy process - because this is disgusting that adults act like this

I have seen all the billing/ requests for payments go through genova - and it further mentally abuses me.

I dont care that this is in an email - we belong in a mediation room and I have said that since 2016. My expectations are high only because the evidence is irrefutable

United States is better than this - or at least I am

I have

On Tue, May 14, 2024 at 6:53 PM Murdica, James <JMurdica@btlaw.com> wrote:

It appears from the disclosure that Beasley Allen again is seeking to enter into a surreptitious relationship to thwart a bankruptcy resolution—and Reuters is again preparing to act as plaintiffs counsel's mouthpiece—by publishing misleading and deceptive advertising, which raises a panoply of issues that may fall within the crime/fraud exception to the attorney-client privileged. We ask that Beasley Allen explain the nature of the relationship and communication with Reuters (and a self-proclaimed media "influencer") that it asserts gives rise to its privilege assertion.

Also, we've added back the original recipients that you deleted, and ask Brendan Pierson and Dee Detres confirm that they are in a privileged attorney-client relationship with Beasley Allen.

Jim

**James Murdica** | Partner
Barnes & Thornburg LLP
One North Wacker Drive Suite 4400, Chicago, IL 60606
Direct: (312) 214-4869 | Mobile: (215) 341-6996

   

Atlanta I Boston I California I Chicago I Delaware I Indiana I Michigan I Minneapolis I Nashville I New Jersey
New York I Ohio I Philadelphia I Raleigh I Salt Lake City I South Florida I Texas I Washington, D.C.

Visit our Subscription Center to sign up for legal insights and events.

**From:** Liz Achtemeier <Liz.Achtemeier@BeasleyAllen.com>
**Sent:** Tuesday, May 14, 2024 1:54 PM
**To:** jkim8@its.jnj.com; gmgordon@jonesday.com; Murdica, James <JMurdica@btlaw.com>

3

Cc: Brittany Scott <Brittany.Scott@BeasleyAllen.com>; Ted Meadows <Ted.Meadows@BeasleyAllen.com>; Leigh O'Dell <Leigh.ODell@BeasleyAllen.com>
Subject: [EXTERNAL] RE: [EXT] date for 3rd bankruptcy -JNJ / LTL

**Caution: This email originated from outside the Firm.**

Counsel,

Please disregard the below attorney-client communication.

Thank you,



**Elizabeth Achtemeier**
Principal
800.898.2034

Liz.Achtemeier@BeasleyAllen.com
BeasleyAllen.com | My bio
**Learn more about our ongoing litigation.**

   

CONFIDENTIALITY & PRIVILEGE NOTICE

**From:** Dee Detres <deedetres@gmail.com>
**Sent:** Tuesday, May 14, 2024 11:43 AM
**To:** Brittany Scott <Brittany.Scott@BeasleyAllen.com>; jkim8@its.jnj.com; gmgordon@jonesday.com; jmurdica@btlaw.com
**Cc:** brendan.pierson@thomsonreuters.com
**Subject:** [EXT] date for 3rd bankruptcy -JNJ / LTL

**[EXTERNAL]**

Brit,

4

Got your email yesterday with the update.

Please do me a favor and let me know the exact date they plan to issue paperwork for the 3rd bankruptcy

or John, or Greg or James, you can tell me directly.  You can text as well 215-853-7846

Thanks,

D

**CONFIDENTIALITY NOTICE:** This email and any attachments are for the exclusive and confidential use of the intended recipient. If you are not the intended recipient, please do not read, distribute or take action in reliance upon this message. If you have received this in error, please notify us immediately by return email and promptly delete this message and its attachments from your computer system. We do not waive attorney-client or work product privilege by the transmission of this message.

**CONFIDENTIALITY NOTICE:** This email and any attachments are for the exclusive and confidential use of the intended recipient. If you are not the intended recipient, please do not read, distribute or take action in reliance upon this message. If you have received this in error, please notify us immediately by return email and promptly delete this message and its attachments from your computer system. We do not waive attorney-client or work product privilege by the transmission of this message.

**BA_0064**                    **MURDICA_0028**

**Liz Achtemeier**

| | |
|---|---|
| **From:** | Murdica, James <JMurdica@btlaw.com> |
| **Sent:** | Wednesday, May 15, 2024 9:59 PM |
| **To:** | Liz Achtemeier; Brittany Scott; Ted Meadows; Leigh O'Dell |
| **Subject:** | RE: [EXTERNAL] Re: [EXT] date for 3rd bankruptcy -JNJ / LTL |
| **Attachments:** | [EXTERNAL] Detres |

## [EXTERNAL]

All, please note that I also received the attached unsolicited contact today from Ms. Detres today. I just discovered it as I was going back through today's email. Obviously she is unaware of the offer at hand.

**James Murdica** | Partner
Barnes & Thornburg LLP
One North Wacker Drive Suite 4400, Chicago, IL 60606
Direct: (312) 214-4869 | Mobile: (215) 341-6996

   

Atlanta | Boston | California | Chicago | Delaware | Indiana | Michigan | Minneapolis | Nashville | New Jersey
New York | Ohio | Philadelphia | Raleigh | Salt Lake City | South Florida | Texas | Washington, D.C.

Visit our Subscription Center to sign up for legal insights and events.

**From:** Murdica, James
**Sent:** Wednesday, May 15, 2024 9:30 PM
**To:** Liz.Achtemeier@BeasleyAllen.com; Brittany Scott <Brittany.Scott@BeasleyAllen.com>; Ted Meadows <Ted.Meadows@BeasleyAllen.com>; Leigh O'Dell <Leigh.ODell@BeasleyAllen.com>
**Subject:** FW: [EXTERNAL] Re: [EXT] date for 3rd bankruptcy -JNJ / LTL

All:
We write, first, to advise Beasley Allen that Ms. Detres reached out to us without solicitation. (*See* the email chain below.) Second, please be advised that, in her correspondence, Ms. Detres apprised us that Beasley Allen has represented to her (and presumably other claimants) that Johnson & Johnson is not willing to settle her talc claims, which is of course false and directly contrary to the terms of the solicitation Johnson & Johnson announced on May 1, 2024. Beasley Allen's representation to Ms. Detres also is false with respect to the state of affairs during the pendency of both LTL bankruptcies. As Beasley Allen is well aware—having participated in the settlement discussions and received the offers—Johnson & Johnson made repeated offers to settle Ms. Detres's (and all other) talc claims during those cases. It is now evident that Beasley Allen is making both false affirmative representations and material omissions with respect to the settlements that were offered and available to its clients. Ironically, as a claimant alleging *clear cell cancer*, Ms. Detres also seems unaware that Beasley Allen has advocated that her claim should be deemed worthless as a "non-qualifying" cancer. Beasley Allen therefore is either knowingly deceiving Ms. Detres (and like situated claimants)—or the courts, the press and public to which it is making contrary assertions.

As with its conduct that is currently being adjudicated before the New Jersey courts presiding over the talc MDL and MCL, Beasley Allen's instant misrepresentations raise serious ethical issues. While we are evaluating the appropriate steps to address, please be advised that **we hereby formally demand** that Beasley Allen (i) cease and desist its false and misleading representations regarding the proposed plan of reorganization that Johnson & Johnson announced, and (ii) provide corrective disclosures to claimants like Ms. Detres to whom it has made such misrepresentations. Please confirm your acceptance of and compliance with this demand.

1

Jim

**James Murdica** | Partner
Barnes & Thornburg LLP
One North Wacker Drive Suite 4400, Chicago, IL 60606
Direct: (312) 214-4869 | Mobile: (215) 341-6996

 **BARNES &**   
**THORNBURG** LLP

Atlanta | Boston | California | Chicago | Delaware | Indiana | Michigan | Minneapolis | Minnesota | Nashville | New Jersey
New York | Ohio | Philadelphia | Raleigh | Salt Lake City | South Florida | Texas | Washington, D.C.

Visit our Subscription Center to sign up for legal insights and events.
**From:** Dee Detres <deedetres@gmail.com>
**Sent:** Wednesday, May 15, 2024 10:44 AM
**To:** Murdica, James <JMurdica@btlaw.com>
**Cc:** Liz Achtemeier <Liz.Achtemeier@beasleyallen.com>; jkim8@its.jnj.com; gmgordon@jonesday.com;
brendan.pierson@thomsonreuters.com; Brittany Scott <Brittany.Scott@beasleyallen.com>; Ted Meadows
<Ted.Meadows@beasleyallen.com>; Leigh O'Dell <Leigh.ODell@beasleyallen.com>
**Subject:** [EXTERNAL] Re: [EXT] date for 3rd bankruptcy -JNJ / LTL

**Caution: This email originated from outside the Firm.**

One of two emails back

regarding news cycles - mass media and independent journalism

1)

Reuters - immaterial.

You will also have to attack anyone who sees the world clearly - and doesnt make a living trying to cover their tracks while gutting women like a fish.

https://www.bloomberg.com/features/2016-baby-powder-cancer-lawsuits/

https://www.usatoday.com/story/news/nation/2021/07/27/talc-based-baby-powder-marketed-black-women-j-j-lawsuit-claims/5391526001/

https://cnnpressroom.blogs.cnn.com/2023/05/01/the-whole-story-with-anderson-cooper-investigates-claims-brought-against-johnson-johnson-in-shaken-baby-powder-on-trial-with-cnns-pamela-brown/

https://www.youtube.com/watch?v=wUQDjFiHldg

https://www.reuters.com/investigates/special-report/bankruptcy-tactics-two-step/

I am following all the news including https://www.law.com/njlawjournal/2024/02/20/beasley-allens-andy-birchfield-faces-evidentiary-hearing-on-disqualification/

2

Additionally, I attended all the court dates last year - which address phishing schemes

I have asked Brittnay to keep me up to date on if BA is even able to represent me her response was

"

    a.  Hearings are still ongoing, but we are confident the court will find that this is just another baseless attack by J&J."

also I inquired about this - where is my settlement

the answer was "

    a.  Johnson & Johnson is not willing to settle your case at this time, despite the information and records we have. Settlement requires agreement of all of the parties. We continue to pursue settlement with Johnson & Johnson. However, to date, J&J has been unwilling to settle."

I find this to be mentally abusive and have shared this many times - including my mental health professional (s) who were only contacted during the fake bankruptcy process - because this is disgusting that adults act like this

I have seen all the billing/ requests for payments go through genova - and it further mentally abuses me.

I dont care that this is in an email - we belong in a mediation room and I have said that since 2016. My expectations are high only because the evidence is irrefutable

United States is better than this - or at least I am

I have

On Tue, May 14, 2024 at 6:53 PM Murdica, James <JMurdica@btlaw.com> wrote:

It appears from the disclosure that Beasley Allen again is seeking to enter into a surreptitious relationship to thwart a bankruptcy resolution—and Reuters is again preparing to act as plaintiffs counsel's mouthpiece—by publishing misleading and deceptive advertising, which raises a panoply of issues that may fall within the crime/fraud exception to the attorney-client privileged. We ask that Beasley Allen explain the nature of the relationship and communication with Reuters (and a self-proclaimed media "influencer") that it asserts gives rise to its privilege assertion.

Also, we've added back the original recipients that you deleted, and ask Brendan Pierson and Dee Detres confirm that they are in a privileged attorney-client relationship with Beasley Allen.

3

**BA_0067**                **MURDICA_0031**

Jim

**James Murdica** | Partner
Barnes & Thornburg LLP
One North Wacker Drive Suite 4400, Chicago, IL 60606
Direct: (312) 214-4869 | Mobile: (215) 341-6996

   

Atlanta | Boston | California | Chicago | Delaware | Indiana | Michigan | Minneapolis | Nashville | New Jersey
New York | Ohio | Philadelphia | Raleigh | Salt Lake City | South Florida | Texas | Washington, D.C.

Visit our Subscription Center to sign up for legal insights and events.

**From:** Liz Achtemeier <Liz.Achtemeier@BeasleyAllen.com>
**Sent:** Tuesday, May 14, 2024 1:54 PM
**To:** jkim8@its.jnj.com; gmgordon@jonesday.com; Murdica, James <JMurdica@btlaw.com>
**Cc:** Brittany Scott <Brittany.Scott@BeasleyAllen.com>; Ted Meadows <Ted.Meadows@BeasleyAllen.com>;
Leigh O'Dell <Leigh.ODell@BeasleyAllen.com>
**Subject:** [EXTERNAL] RE: [EXT] date for 3rd bankruptcy -JNJ / LTL

**Caution: This email originated from outside the Firm.**

Counsel,

Please disregard the below attorney-client communication.

Thank you,

4



**Elizabeth Achtemeier**
Principal
800.898.2034

Liz.Achtemeier@BeasleyAllen.com
BeasleyAllen.com | My bio

**Learn more about our ongoing litigation.**



CONFIDENTIALITY & PRIVILEGE NOTICE

**From:** Dee Detres <deedetres@gmail.com>
**Sent:** Tuesday, May 14, 2024 11:43 AM
**To:** Brittany Scott <Brittany.Scott@BeasleyAllen.com>; jkim8@its.jnj.com; gmgordon@jonesday.com; jmurdica@btlaw.com
**Cc:** brendan.pierson@thomsonreuters.com
**Subject:** [EXT] date for 3rd bankruptcy -JNJ / LTL

**[EXTERNAL]**

Brit,

Got your email yesterday with the update.

Please do me a favor and let me know the exact date they plan to issue paperwork for the 3rd bankruptcy

or John, or Greg or James, you can tell me directly. You can text as well 215-853-7846

Thanks,

D

**CONFIDENTIALITY NOTICE:** This email and any attachments are for the exclusive and confidential use of the intended recipient.
If you are not the intended recipient, please do not read, distribute or take action in reliance upon this message. If you have

5

received this in error, please notify us immediately by return email and promptly delete this message and its attachments from your computer system. We do not waive attorney-client or work product privilege by the transmission of this message.

**CONFIDENTIALITY NOTICE:** This email and any attachments are for the exclusive and confidential use of the intended recipient. If you are not the intended recipient, please do not read, distribute or take action in reliance upon this message. If you have received this in error, please notify us immediately by return email and promptly delete this message and its attachments from your computer system. We do not waive attorney-client or work product privilege by the transmission of this message.

6

BA_0070                    MURDICA_0034

**Liz Achtemeier**

| | |
|---|---|
| **From:** | Dee Detres <deedetres@gmail.com> |
| **Sent:** | Wednesday, May 15, 2024 8:48 AM |
| **To:** | Murdica, James |
| **Subject:** | [EXTERNAL] Detres |

**Caution: This email originated from outside the Firm.**

I will respond to your other email

Please make an offer so I can get on with my life.

1

# **EXHIBIT F**




# VERDICT

22ª JUDICIAL CIRCUIT
CIRCUIT CLERK'S OFFICE
BY _____ DEPUTY

Note: Complete this form by writing in the names required by your verdict.

On the claim of Plaintiff for product liability, failure to warn, against defendant Johnson & Johnson as submitted in Instruction Number 6, we, the undersigned jurors, find in favor of:

_____(Plaintiff)_____        or        ___Defendant Johnson & Johnson___

On the claim of Plaintiff for negligence against defendant Johnson & Johnson as submitted in Instruction Number 8, we, the undersigned jurors, find in favor of:

_____(Plaintiff)_____        or        ___Defendant Johnson & Johnson___

On the claim of Plaintiff for conspiracy against defendant Johnson & Johnson as submitted in Instruction Number 10, we, the undersigned jurors, find in favor of:

_____(Plaintiff)_____        or        ___Defendant Johnson & Johnson___

On the claim of Plaintiff for product liability, failure to warn, against defendant Johnson & Johnson Consumer Companies, Inc. as submitted in Instruction Number 12, we, the undersigned jurors, find in favor of:

_____(Plaintiff)_____        or        Defendant Johnson & Johnson
                                                Consumer Companies, Inc.

On the claim of Plaintiff for negligence against defendant Johnson & Johnson Consumer Companies, Inc. as submitted in Instruction Number 14, we, the undersigned jurors, find in favor of:

_____(Plaintiff)_____        or        Defendant Johnson & Johnson
                                                Consumer Companies, Inc.

On the claim of Plaintiff for conspiracy against defendant Johnson & Johnson Consumer Companies, Inc. as submitted in Instruction Number 16, we, the undersigned jurors, find in favor of:

_(Plaintiff)_          or          Defendant Johnson & Johnson
                                   Consumer Companies, Inc.

On the claim of Plaintiff for product liability, failure to warn, against defendant Imerys Talc America, Inc. as submitted in Instruction Number 19, we, the undersigned jurors, find in favor of:

Plaintiff          or          Defendant Imerys Talc America, Inc.

On the claim of Plaintiff for negligence against defendant Imerys Talc America, Inc. as submitted in Instruction Number 21, we, the undersigned jurors, find in favor of:

Plaintiff          or          Defendant Imerys Talc America, Inc.

On the claim of Plaintiff for conspiracy against defendant Imerys Talc America, Inc. as submitted in Instruction Number 23, we, the undersigned jurors, find in favor of:

Plaintiff          or          Defendant Imerys Talc America, Inc.

Note: Complete the following paragraph only if one or more of the above findings is in favor of Plaintiff.

We, the undersigned jurors, assess compensatory damages for the personal injuries of Jacqueline Fox as follows:

$ _10,000.000.00_ *(stating the amount).*

Note: You cannot find in favor of the Plaintiff for wrongful death against any Defendant below that you did not find liable to Plaintiff for personal injuries above.

On the claim of Plaintiff for wrongful death as submitted in Instruction Number 27 against defendant Johnson & Johnson, we, the undersigned jurors, find in favor of:



_____Plaintiff_____          or          Defendant Johnson & Johnson

On the claim of Plaintiff for wrongful death as submitted in Instruction Number 29 against defendant Johnson & Johnson Consumer Companies, Inc., we, the undersigned jurors, find in favor of:



_____Plaintiff_____          or          Defendant Johnson & Johnson
                                          Consumer Companies, Inc.

On the claim of Plaintiff for wrongful death as submitted in Instruction Number 31 against defendant Imerys Talc America, Inc., we, the undersigned jurors, find in favor of:



_____Plaintiff_____          or          Defendant Imerys Talc America, Inc.

Note: Complete the following paragraph only if one or more of the above findings for wrongful death is in favor of Plaintiff.

We, the undersigned jurors, assess punitive damages for wrongful death as follows:

Against defendant Johnson & Johnson:

$ __22,000,000.00__ (stating the amount or, if none, write the word, "none")

Against defendant Johnson & Johnson Consumer Companies, Inc.:

$ __40,000,000.00__ (stating the amount or, if none, write the word, "none")

Against defendant Imerys Talc America, Inc.:

$ __None__ (stating the amount or, if none, write the word, "none")

Note: All jurors who agree to the above must legibly sign or print their names below.



# <u>EXHIBIT G</u>



FILED

MAY - 2 2016

22ND JUDICIAL CIRCUIT
CIRCUIT CLERK'S OFFICE
BY _____ DEPUTY

## VERDICT A

Note: Complete this form by writing in the names required by your verdict.

On the claim of plaintiff Gloria Ristesund for negligence against defendant Johnson & Johnson as submitted in Instruction Number 7, we, the undersigned jurors, find in favor of:

_____

Plaintiff Gloria Ristesund    or    Defendant Johnson & Johnson

On the claim of plaintiff Gloria Ristesund for product liability, failure to warn, against defendant Johnson & Johnson as submitted in Instruction Number 10, we, the undersigned jurors, find in favor of:

_____

Plaintiff Gloria Ristesund    or    Defendant Johnson & Johnson

On the claim of plaintiff Gloria Ristesund for conspiracy against defendant Johnson & Johnson as submitted in Instruction Number 13, we, the undersigned jurors, find in favor of:

_____

Plaintiff Gloria Ristesund    or    Defendant Johnson & Johnson

On the claim of plaintiff Gloria Ristesund for negligence against defendant Johnson & Johnson Consumer Companies, Inc., as submitted in Instruction Number 15, we, the undersigned jurors, find in favor of:

_____

Plaintiff Gloria Ristesund    or    Defendant Johnson & Johnson
                                    Consumer Companies, Inc.

On the claim of plaintiff Gloria Ristesund for product liability, failure to warn, against defendant Johnson & Johnson Consumer Companies, Inc., as submitted in Instruction Number 18, we, the undersigned jurors, find in favor of:

_____

Plaintiff Gloria Ristesund    or    Defendant Johnson & Johnson
                                    Consumer Companies, Inc.

On the claim of plaintiff Gloria Ristesund for conspiracy against defendant Johnson & Johnson Consumer Companies, Inc., as submitted in Instruction Number 21, we, the undersigned jurors, find in favor of:

_____

Plaintiff Gloria Ristesund    or    Defendant Johnson & Johnson
                                    Consumer Companies, Inc.

On the claim of plaintiff Gloria Ristesund for negligence against defendant Imerys Talc America, Inc., as submitted in Instruction Number 24, we, the undersigned jurors, find in favor of:

_____    or    _Defendant Imerys Talc America, Inc._
Plaintiff Gloria Ristesund

On the claim of plaintiff Gloria Ristesund for product liability, failure to warn, against defendant Imerys Talc America, Inc., as submitted in Instruction Number 27, we, the undersigned jurors, find in favor of:

WITHDRAWN BY PLAINTIFF
_____    or    _____
Plaintiff Gloria Ristesund              Defendant Imerys Talc America, Inc.

On the claim of plaintiff Gloria Ristesund for conspiracy against defendant Imerys Talc America, Inc., as submitted in Instruction Number 30, we, the undersigned jurors, find in favor of:

_____    or    Defendant Imerys Talc America, Inc.
Plaintiff Gloria Ristesund

Note: Complete the following paragraph only if one or more of the above findings is in favor of Plaintiff Gloria Ristesund.

We, the undersigned jurors, assess compensatory damages for the personal injuries of Plaintiff Gloria Ristesund as follows:

$ __5,000,000.00__ (stating the amount).

Note: You cannot find in favor of Plaintiff against any defendant below you did not find liable to Plaintiff for personal injuries above.

On the claim of plaintiff Gloria Ristesund for punitive damages against defendant Johnson & Johnson as set forth in Instruction Number 33, we, the undersigned jurors, find in favor of:

Plaintiff Gloria Ristesund    or    Defendant Johnson & Johnson

On the claim of plaintiff Gloria Ristesund for punitive damages against defendant Johnson & Johnson Consumer Companies, Inc., as set forth in Instruction Number 35, we, the undersigned jurors, find in favor of:

Plaintiff Gloria Ristesund    or    Defendant Johnson & Johnson
                                     Consumer Companies, Inc.

On the claim of plaintiff Gloria Ristesund for punitive damages against defendant Imerys Talc America, Inc., as set forth in Instruction Number 37, we, the undersigned jurors, find in favor of:

Plaintiff Gloria Ristesund        or        ⟨Defendant Imerys Talc America, Inc.⟩

For punitive damages against Defendant Johnson & Johnson

$ _35,000,000.00_____(stating the amount or, if none, write the word "none").

For punitive damages against Defendant Johnson & Johnson Consumer Companies, Inc.

$ _15,000,000.00_____(stating the amount or, if none, write the word "none").

For punitive damages against Defendant Imerys Talc America, Inc.

$ _NONE_____(stating the amount or, if none, write the word "none").

Note: All jurors who agree to the above must legibly sign or print their names below.



FILED

MAY - 2 2016

22ND JUDICIAL CIRCUIT
CIRCUIT CLERK'S OFFICE
BY _____ DEPUTY

## VERDICT B

Note:    Complete this form if fault is to be apportioned.

On the claims among Defendants for assessment of the proportions of fault for Plaintiff's compensatory damage assessed in Verdict A, we, the undersigned jurors, find:

Note:    Complete by writing in the percentage of the relative fault for each party you believe to be at fault. *If you believe a party named below is not at fault, write in "zero" for that percentage. You may not write in "zero" for any party you have determined to be at fault under Verdict A.* The total of the percentages you assess must not exceed 100%.

Defendant Johnson & Johnson is                              _50_ % at fault.

Defendant Johnson & Johnson Consumer Companies, Inc. is _50_ % at fault.

Defendant Imerys Talc America, Inc. is                      _0_ % at fault.

Note:    All jurors who agree to the above must legibly sign or print their names below.



# EXHIBIT H

FILED

OCT 2 7 2016

22ND JUDICIAL CIRCUIT
CIRCUIT CLERK'S OFFICE
BY_____ DEPUTY

## VERDICT A

Note:   Complete this form by writing in the names required by your verdict.

On the claim of plaintiff Deborah Giannecchini for negligence against defendant Johnson & Johnson Consumer Companies, Inc., as submitted in Instruction Number 7, we, the undersigned jurors, find in favor of:

Plaintiff Deborah Giannecchini    or    Defendant Johnson & Johnson
Consumer Companies, Inc.

On the claim of plaintiff Deborah Giannecchini for product liability, failure to warn, against defendant Johnson & Johnson Consumer Companies, Inc., as submitted in Instruction Number 8, we, the undersigned jurors, find in favor of:

Plaintiff Deborah Giannecchini    or    Defendant Johnson & Johnson
Consumer Companies, Inc.

On the claim of plaintiff Deborah Giannecchini for concealment against defendant Johnson & Johnson Consumer Companies, Inc., as submitted in Instruction Number 10, we, the undersigned jurors, find in favor of:

Plaintiff Deborah Giannecchini    or    Defendant Johnson & Johnson
Consumer Companies, Inc.

On the claim of plaintiff Deborah Giannecchini for negligence against defendant Imerys Talc America, Inc., as submitted in Instruction Number 13, we, the undersigned jurors, find in favor of:

Plaintiff Deborah Giannecchini  or  Defendant Imerys Talc America, Inc.

On the claim of plaintiff Deborah Giannecchini for product liability, failure to warn, against defendant Imerys Talc America, Inc., as submitted in Instruction Number 14, we, the undersigned jurors, find in favor of:

Plaintiff Deborah Giannecchini  or  Defendant Imerys Talc America, Inc.

1

On the claim of plaintiff Deborah Giannecchini for conspiracy against defendant Imerys Talc America, Inc., as submitted in Instruction Number 15, we, the undersigned jurors, find in favor of:

Plaintiff Deborah Giannecchini  or  Defendant Imerys Talc America, Inc.

Note:   Complete the following paragraph only if one or more of the above findings is in favor of Plaintiff Deborah Giannecchini.

We, the undersigned jurors, assess compensatory damages for the personal injuries of Plaintiff Deborah Giannecchini as follows:

$    575,000.00    (economic damages).

$    2,000,000.00    (non-economic damages).

Note:   You cannot find in favor of Plaintiff for punitive damages against any defendant below that you did not find liable to Plaintiff for personal injuries above.

On the claim of plaintiff Deborah Giannecchini for punitive damages against defendant Johnson & Johnson Consumer Companies, Inc., as set forth in Instruction Number 17, we, the undersigned jurors, find in favor of:

Plaintiff Deborah Giannecchini )  or    Defendant Johnson & Johnson Consumer Companies, Inc.

On the claim of plaintiff Deborah Giannecchini for punitive damages against defendant Imerys Talc America, Inc., as set forth in Instruction Number 18, we, the undersigned jurors, find in favor of:

Plaintiff Deborah Giannecchini or Defendant Imerys Talc America, Inc.

For punitive damages against Defendant Johnson & Johnson Consumer Companies, Inc.

$    65,000,000.00    (stating the amount or, if none,
write the word "none").

For punitive damages against Defendant Imerys Talc America, Inc.

$    2,500,000.00    (stating the amount or, if none,
write the word "none").

2

Note: All jurors who agree to the above must legibly sign or print their names below.



3

**VERDICT B**

FILED
OCT 2 7 2016

22ND JUDICIAL CIRCUIT
CIRCUIT CLERK'S OFFICE
BY _____ DEPUTY

Note: Complete this form if fault is to be apportioned.

On the claims among defendants for assessment of the proportions of fault for Plaintiff's compensatory damages assessed in Verdict A, we, the undersigned jurors, find:

Note: Complete by writing in the percentage of the relative fault for each party you believe to be at fault. If you believe a party named below is not at fault, write in "zero" for that percentage. You may not write in "zero" for any party you have determined to be at fault under the other instructions in this case. The total of the percentages you assess must not exceed 100%.

Defendant Johnson & Johnson Consumer Companies, Inc. is _90_ % at fault.

Defendant Imerys Talc America, Inc. is _10_ % at fault.

Note: All jurors who agree to the above must legibly sign or print their names below.



# EXHIBIT I

## **VERDICT A**

FILED

MAY  4 20??

22ND JUDICIAL CIRCUIT
CIRCUIT CLERK'S OFFICE
CIRCUIT CLERK'S OFFICE
DEPUTY

Note:   Complete this form by writing in the names required by your verdict.

On the claim of plaintiff Lois Slemp for conspiracy against defendant Johnson & Johnson as submitted in Instruction Number 7, we, the undersigned jurors, find in favor of:

__Plaintiff Lois Slemp__        or    Defendant Johnson & Johnson

On the claim of plaintiff Lois Slemp for breach of implied warranty against defendant Johnson & Johnson Consumer Companies, Inc., as submitted in Instruction Number 8, we, the undersigned jurors, find in favor of:

__Plaintiff Lois Slemp__        or    Defendant Johnson & Johnson
                                        Consumer Companies, Inc.

On the claim of plaintiff Lois Slemp for negligence against defendant Johnson & Johnson Consumer Companies, Inc., as submitted in Instruction Number 9, we, the undersigned jurors, find in favor of:

__Plaintiff Lois Slemp__        or    Defendant Johnson & Johnson
                                        Consumer Companies, Inc.

On the claim of plaintiff Lois Slemp for conspiracy against defendant Johnson & Johnson Consumer Companies, Inc., as submitted in Instruction Number 10, we, the undersigned jurors, find in favor of:

__Plaintiff Lois Slemp__        or    Defendant Johnson & Johnson
                                        Consumer Companies, Inc.

On the claim of plaintiff Lois Slemp for negligence against defendant Imerys Talc America, Inc., as submitted in Instruction Number 11, we, the undersigned jurors, find in favor of:

__Plaintiff Lois Slemp__        or    Defendant Imerys Talc America, Inc.

On the claim of plaintiff Lois Slemp for conspiracy against defendant Imerys Talc America, Inc., as submitted in Instruction Number 12, we, the undersigned jurors, find in favor of:

__Plaintiff Lois Slemp__        or    Defendant Imerys Talc America, Inc.

Note:  Complete the following paragraph only if one or more of the above findings is in favor of Plaintiff Lois Slemp.

We, the undersigned jurors, assess compensatory damages for the personal injuries of Plaintiff Lois Slemp as follows:

$ _5,401,921.02_ (stating the amount).

Note:  You cannot find in favor of Plaintiff for punitive damages against any defendant below that you did not find liable to Plaintiff for personal injuries above.

On the claim of plaintiff Lois Slemp for punitive damages against defendant Johnson & Johnson as set forth in Instruction Number 14, we, the undersigned jurors, find in favor of:

( Plaintiff Lois Slemp )          or     Defendant Johnson & Johnson

On the claim of Plaintiff Lois Slemp for punitive damages against defendant Johnson & Johnson Consumer Companies, Inc., as set forth in Instruction Number 15, we, the undersigned jurors, find in favor of:

( Plaintiff Lois Slemp )          or     Defendant Johnson & Johnson
                                         Consumer Companies, Inc.

On the claim of Plaintiff Lois Slemp for punitive damages against defendant Imerys Talc America, Inc., as set forth in Instruction Number 16, we, the undersigned jurors, find in favor of:

( Plaintiff Lois Slemp )          or     Defendant Imerys Talc America, Inc.

For punitive damages against Defendant Johnson & Johnson

$ _66,000,000_ (stating the amount or, if none, write the word "none").

For punitive damages against Defendant Johnson & Johnson Consumer Companies, Inc.

$ _39,000,000_ (stating the amount or, if none, write the word "none").

For punitive damages against Defendant Imerys Talc America, Inc.

$ _50,000_ (stating the amount or, if none, write the word "none").

Note: All jurors who agree to the above must legibly sign or print their names below.





**VERDICT B**

22ND JUDICIAL CIRCUIT

Note:    Complete this form if fault is to be apportioned.  CIRCUIT CLERK'S OFFICE

BY _____ DEPUTY

On the claims among Defendants for assessment of the proportions of fault for Plaintiff's compensatory damage assessed in Verdict A, we, the undersigned jurors, find:

Note:    Complete by writing in the percentage of the relative fault for each party you believe to be at fault. *If you believe a party named below is not at fault, write in "zero" for that percentage. You may not write in "zero" for any party you have determined to be at fault under Verdict A.* The total of the percentages you assess must not exceed 100%.

Defendant Johnson & Johnson is                          60% at fault.

Defendant Johnson & Johnson Consumer Companies, Inc. is 39% at fault.

Defendant Imerys Talc America, Inc. is                   1 % at fault.

Note:        All jurors who agree to the above must legibly sign or print their names below.

# EXHIBIT J

| SUPERIOR COURT OF CALIFORNIA COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp |
|---|---|

**SUPERIOR COURT OF CALIFORNIA COUNTY OF LOS ANGELES**

Courthouse Address:
600 So. Commonwealth Avenue
Los Angeles, CA 90005

Plaintiff/Petitioner:
Charmaine Lloyd, et al. (Plaintiff Eva Echeverria ONLY)

Defendant/Respondent:

Johnson & Johnson, et al.

**JUDGMENT ON SPECIAL VERDICT**

**FILED**
Superior Court of California
County of Los Angeles

**AUG 21 2017**

Sherri R. Carter, Executive Officer/Clerk
By _Jeannine Lorenz_ Deputy
Jeannine Lorenz

BC628228/JCCP4872

This action came on regularly for trial on August 21, 2017, in Department 307 of the Superior Court, the Honorable Carolyn B. Kuhl, Judge Presiding; the plaintiff(s) appearing by attorney(s)

> MARK P. ROBINSON, JR
> HELEN ZUKIN
> KEVIN CALCAGNIE
> MICHELLE A. PARFIT

and the defendant(s) appearing by attorney(s)

> BART H. WILLIAMS
> MANUEL CACHAN
> KIMBERLY DUNN
> SUSAN GUTIERREZ
> LEE M. POPKIN

TITLE OF COURT AND CAUSE

A jury of twelve (12) persons was regularly impaneled and sworn/acknowledged and agreed to try the cause. Witnesses were sworn and testified.  After hearing the evidence and arguments of counsel, the jury was duly instructed by the Court and the cause was submitted to the jury with directions to return a special verdict/verdict on special issues.  The jury deliberated and thereafter returned to court with its special verdict/verdict on special issues  submitted to the jury and the answers given thereto by the jury, which verdict was in words and figures as follows, to wit:

We the jury in the above referenced case select the following:

1. Find in favor of Plaintiff Eva Echeverria and against Defendant Johnson & Johnson and award noneconomic damages in the amount of $68,000,000.

2. Find in favor of Plaintiff Eva Echeverria and against Defendant Johnson & Johnson Consumer, Inc. and award noneconomic damages in the amount of $2,000,000.

If you found in favor of Plaintiff Eva Echeverria against Defendant Johnson & Johnson above, do you:

3. Find in favor of Plaintiff Eva Echeverria and against Defendant Johnson & Johnson and award punitive damages in the amount of $340,000,000.

If you found in favor of Plaintiff Eva Echeverria against Johnson & Johnson Consumer, Inc. above, do you:

4. Find in favor of Plaintiff Eva Echeverria and against Defendant Johnson & Johnson Consumer, Inc. and award punitive damages in the amount of $7,000,000.

Signed:  August 21, 2017

Michael Maher, Jr., Presiding Juror.

TITLE OF COURT AND CAUSE

This page left blank intentionally.  Jury Verdict ends on page 2.

TITLE OF COURT AND CAUSE

This page left blank intentionally.  Jury Verdict ends on page 2.

**JUDGMENT ON SPECIAL VERDICT**

It appearing by reason of said special verdict that

Plaintiff Eva Echeverria is entitled to judgment against Defendants Johnson & Johnson and Johnson & Johnson Consumer, Inc.


NOW THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED that said Plaintiff Eva Echeverria have and recover from said Defendants Johnson & Johnson and Johnson & Johnson Consumer, Inc.

Noneconomic damages in the sum of $68,000,000. from Defendant Johnson & Johnson, $2,000,000. from Defendant Johnson & Johnson Consumer, Inc. and

Punitive damages in the sum of $340,000,000. from Defendant Johnson & Johnson and $7,000,000. from Defendant Johnson & Johnson Consumer, Inc., with interest thereon at the rate of ten percent per annum from the date of the verdict until paid together with costs and disbursements in the amount of $_____(to be determined via memorandum of costs) amounting to the sum of $_____.




Dated: _August 21, 2017_       _Carolyn B. Kuhl_

Carolyn B. Kuhl, Judicial Officer

| NAME, ADDRESS, AND TELEPHONE NUMBER OF ATTORNEY OR PARTY WITHOUT ATTORNEY : (LEAVE BLANK IF NOTICE IS BY CLERK OF THE COURT) | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|

**ATTORNEY FOR (Name):**

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**

COURTHOUSE ADDRESS:    **CENTRAL CIVIL WEST COURTHOUSE**

PLAINTIFF:    **CHARMAINE LLOYD, ET AL (EVA ECHEVERRIA)**

DEFENDANT:    **JOHNSON & JOHNSON, ET AL**

**FILED**
Superior Court of California
County of Los Angeles

**AUG 21 2017**

SHERRI R. CARTER, EXECUTIVE OFFICER/CLERK
BY _____ Deputy
BENIGNO DEL BARRIO

**NOTICE OF ENTRY OF:**   ☑ JUDGMENT   ☐ DISMISSAL   ☐ OTHER ORDER

CASE NUMBER:   **BC628228**

To the above named parties and to their attorneys of record, you are hereby given notice of entry of:

☑ Judgment in the above-entitled matter, entered on (date): **AUGUST 21, 2017**

☐ Order of Dismissal in the above-entitled matter, filed on (date): _____

☐ Order _____, filed on (date): _____

## DECLARATION OF MAILING

I, (typed or printed name) **BENIGNO DEL BARRIO**, do hereby (check one):

☐ declare under penalty of perjury under the laws of the State of California that I am an active member of the State Bar of California;

☑ declare under penalty of perjury under the laws of the State of California that I am
(check one) ☑ employed in / ☐ a resident of ___LOS ANGELES___ County,
*(where mailing occurred)*
over the age of 18 years, and not a party to the cause within; that my (check one) ☑ business/☐ residence address is as shown above;

and that on the date shown below I served the notice of entry of the above-named document filed and entered herein, by ~~depositing true copies thereof in sealed envelope(s) with postage fully prepaid, in the United States Mail Service located at~~ ELECTRONIC SERVICE ON WWW.CASEANYWHERE.COM ~~(city)~~ ~~(state)~~

addressed to the parties named below:

**ELECTRONIC SERVICE ON**

**CASE ANYWHERE AT WWW.CASEANYWHERE.COM**

☐ Additional names and addresses on attached sheet.

Dated: **AUGUST 21, 2017**    Signed: _____
*(Signature of declarant)*
**BENIGNO DEL BARRIO**

*Typed or printed name of declarant:* **BENIGNO DEL BARRIO**

LACIV 123 (Rev. 01/07)
LASC Approved 01-05

**NOTICE OF ENTRY OF JUDGMENT/**
~~**DISMISSAL/OTHER ORDER**~~

Code Civ. Proc., §§ 664.5, 1013a
Cal. Rules of Court, rules 8.104 & 8.751