**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| IN RE: JOHNSON & JOHNSON TALCUM POWER PRODUCTS MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | No. 3:16-md-02738-MAS-RLS<br><br>MDL No. 16–2738 (MAS) (RLS) |

**DEFENDANTS OBJECTIONS TO THE SPECIAL MASTER'S ORDER
DENYING DEFENDANTS' MOTION TO COMPEL
AN INSPECTION OF DR. WILLIAM LONGO'S LABORATORY**

## TABLE OF CONTENTS

**Page(s)**

INTRODUCTION ................................................................................. 1

BACKGROUND ................................................................................. 9

LEGAL STANDARD ...........................................................................20

ARGUMENT......................................................................................21

    I.    Looking At The Same Particles As Dr. Longo At The Same Time Is Not Just Relevant, It Is Critical. ............................................21

        A.    Dr. Longo's chosen methodology uniquely requires the requested inspection..............................................................21

        B.    The Special Master's rationales for why an inspection is not warranted were wrong............................................................23

    II.    This Court Has Authority To Order An Inspection...........................29

        A.    This Court can order an observation of Dr. Longo's testing. ...29

        B.    This Court can order that Dr. Longo's testing should be excluded if he does not submit to an inspection. .....................32

    III.    An Inspection Is Not Unduly Burdensome And Is Proportional To The Needs Of The Case. ...........................................................34

CONCLUSION ...................................................................................35

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Coleman v. Anco Insulations, Inc.*,
  2017 WL 1735038 (M.D. La. Apr. 26, 2017)...................................................30

*Cuno Inc. v. Pall Corp.*,
  116 F.R.D. 279 (E.D.N.Y. 1987) .....................................................................19

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993)..........................................................................................31

*Diepenhorst v. City of Battle Creek, et al.*,
  2006 WL 1851243 (W.D. Mich. June 30, 2006) .......................................28, 29

*In re Diet Drugs Prods. Liab. Litig.*,
  2001 WL 454586 (E.D. Pa. Feb. 1, 2001) .......................................................32

*E.E.O.C. v. Supervalu, Inc.*,
  2010 WL 5071196 (N.D. Ill. Dec. 7, 2010)......................................................19

*In re Garlock Sealing Techs., LLC*,
  504 B.R. 71 (Bankr. W.D.N.C. 2014) ................................................................9

*Graff v. Baja Marine Corp.*,
  310 F. App'x 298 (11th Cir. 2009)....................................................................30

*Holmes v. J.M. Prods., Inc., et al.*,
  2005 WL 927172 (W.D. Tenn. Jan. 7, 2005) ...................................................29

*Insituform Techs., Inc. v. Amerik Supplies, Inc.*,
  2010 WL 11493292 (N.D. Ga. Feb. 19, 2010) .................................................29

*In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Prods. Litig.*,
  509 F. Supp. 3d 116 (D.N.J. 2020)...............................................................1, 32

*Kemp v. Tyson Seafood Grp., Inc.*,
  2000 WL 1062105 (D. Minn. July 19, 2000) ...................................................31

*In re Lamar Cty. Order*
  (Tx. Dist. Ct. July 5, 2001)...................................................................9

*Nat'l Mfg. Co. v. Janed Enterprises, Inc.*,
  2013 WL 12470870 (D.N.J. July 3, 2013).......................................19

*Ostrander v. Cone Mills, Inc.*,
  119 F.R.D. 417 (D. Minn. 1988).............................................29, 30

*In re Paoli R.R. Yard PCB Litig.*,
  35 F.3d 717 (3d Cir. 1994)......................................................31

*Pizza Hut, Inc. v. Midwest Mech., Inc.*,
  1988 WL 8980 (N.D. Ill. Feb. 1, 1988)........................................29

*Rattay v. Medtronic, Inc.*,
  2007 WL 1417158 (N.D. W. Va. May 10, 2007) ..........................29

*Sero v. Tricam Indus., Inc.*,
  2023 WL 6318013 (D.N.J. Sept. 28, 2023)...................................29

*Spell v. Kendall-Futuro Co.*,
  155 F.R.D. 587 (E.D. Tex. 1994)................................................29

*Trice v. Toyota Motor Corp.*,
  2012 WL 12894708 (D. Minn. Sept. 12, 2012)............................29

*U.S. v. Hebshie*,
  754 F.Supp.2d 89 (D. Mass. 2010)..............................................31

*U.S. v. Johnson*,
  122 F. Supp. 3d 272 (M.D.N.C. 2015)........................................32

*U.S. v. Andrews*,
  12 F.4th 255 (3d Cir. 2021).......................................................20

*U.S. v. Harpham*
  2015 WL 4623717 (E.D. Wash. Aug. 3, 2015)............................29

*Zenith Elecs. Corp. v. WH-TV Broad. Corp.*,
  395 F.3d 416 (7th Cir. 2005)......................................................31

**Other Authorities**

Fed. R. Civ. P. 26...............................................................................................19

Fed. R. Civ. P. 34.........................................................................................18, 19

Fed. R. Civ. P. 53.........................................................................................19, 20

Fed. R. Evid. 702 .......................................................................................*passim*

Defendants Johnson & Johnson and LLT Management LLC (formerly LTL) submit these Objections To The Special Master's Order Denying Defendants' Motion To Compel An Inspection Of Dr. William Longo's Laboratory. *See* ECF 32826 ("Order"). The Order, which was wrongly decided and turned upon counterfactual conclusions, should be set aside and an inspection ordered post haste.

Dr. Longo has made clear time and again that the ***only*** way to effectively challenge his methodology or test the basis of his expert opinion is to stand side-by-side with him in his laboratory and look at the precise same talc particle at the precise same moment ***through his microscope***. Accordingly, Defendants either are entitled to do so in order to cross-exam Dr. Longo and challenge the admission of his opinions pursuant to Rule 702, or Dr. Longo's opinions regarding alleged chrysotile contamination in Johnson's Baby Powder should be excluded now.

## INTRODUCTION

Dr. William Longo is Plaintiffs' main testing expert, and a testifying expert in the bellwether cases. Dr. Longo tested bottles of Johnson's Baby Powder and claims he found asbestos in the bottles—an issue that even the Special Master acknowledged is a pivotal issue in the cases pending in this MDL and one that will be a central focus of certain Rule 702 motions.

In connection with the first round of Rule 702 rulings in this MDL, the Court concluded that "Dr. Longo's PLM [polarized light microscopy] methodology is

1

unreliable because it was replete with subjectivity and reproducibility problems." *In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Prods. Litig.*, 509 F. Supp. 3d 116, 155 (D.N.J. 2020). In order to sidestep this decision, Dr. Longo now uses a new PLM method to test talc, but his new method is even worse and more vulnerable to attack under Rule 702 than the prior one.

Shockingly, Dr. Longo now claims to find "chrysotile" asbestos using PLM in nearly 100% of bottles of cosmetic talc he tests, regardless of mine source or manufacturer. But even another plaintiffs-side expert in cosmetic talc litigation agrees that what is really going on is that Dr. Longo is simply finding talc in the talc—and calling it chrysotile.

The methodology Dr. Longo employs to allegedly find chrysotile in talc turns on ascertaining the color that various particles appear under a microscope when coated in a particular oil. Talc should appear a pale yellow, and chrysotile asbestos should appear purple. But Dr. Longo is not accurately reporting the color of the particles he examines. For example, Dr. Longo calls the particle below purple, and therefore concludes it is asbestos, even though it is plainly yellow.



What's more, Dr. Longo does not dispute that the other particles surrounding this one he has highlighted in his report are yellow, and as such, indisputably talc. Instead, he just claims this particular particle is a different color—specifically, purple—and he is the only one that can see that distinction.

How did we get to this point? During the course of continued state court litigation following the first Rule 702 hearings in this matter, Defendants have raised numerous criticisms of Dr. Longo's analysis, forcing him to change his methodology in response to those criticisms. For example, although his entire analysis turns on accurately identifying color, Dr. Longo previously used a yellow-hued light bulb that distorted the color of the particles in the images he produces in his reports to reflect what he is seeing when examining material under the microscope. Defendants

pressed him on this clear flaw and the possibility that pictures were either being intentionally manipulated or were at the very least inaccurate given the use of a colored bulb. In response, Dr. Longo changed the bulb in his microscope and now uses a different light bulb. Similarly, after a defense expert contended that Dr. Longo should be using a different type of oil (which also changes the color of particles in images), Dr. Longo responded by using a different oil.

But now, with many of these potential photo-manipulating issues resolved, Dr. Longo is backed into a corner. His pictures of alleged chrysotile asbestos particles still appear yellow, which—just as with the above exemplar photograph— everyone can clearly see with their own two eyes. Yet, Dr. Longo has labelled these very same yellow particles "purple" in his expert report, and so stands by the report and insists that the clearly yellow particles are purple on cross examination. Now, his explanation does not turn on insisting that the photograph is somehow inaccurate and thus responsible for the disconnect. Instead, he has devised a new response: Claiming that one must be ***physically at his lab's microscope looking at a particle in real time to see its true color***, rather than looking at the images that Dr. Longo himself has produced. Only then, according to Dr. Longo, will the particle's true color be seen and thus the correctness of his analysis be recognized.

To be clear, this excuse was not a one-time event nor a passing excuse. Dr. Longo now returns to this same mantra time and time again to deflect defense

questioning. He testified he could not identify whether a particle was talc or asbestos because he would "***have to be looking in the microscope at it to tell you what that is***." Ex. L, Longo *Valadez* Dep. 55:17-56:14 (emphasis added). When asked if his imaging and testimony demonstrated that his "entire analysis is wrong," he testified: "I stand by this. It's not wrong." Ex. AD, Longo *Clark* Hr'g (Vol. I) 118:20-119:3 (emphasis added). His explanation: "This is chrysotile ***and I would need to be looking at the microscope here.***" *Id.* (emphasis added). When he was confronted with the opinions of a defense expert criticizing his method, Dr. Longo gave the same response: "I don't understand how he can make that decision in China when we're over in the United States ***never looking at the operative microscope***." *Id.* at 87:23-88:3 (emphasis added).

This testimony leaves the defense at an impasse. It is impossible for Defendants to disprove Dr. Longo's new "look-down-my-microscope" excuse because (1) the slides that hold the specific particles that his lab analyzed in connection with various reports degrade in short order and have been discarded; and (2) even if the slides were still available, Defendants have no access to Dr. Longo's microscope in any event. There is no way for defense experts to view the very same particles Dr. Longo looked at, let alone with the same instrument that Dr. Longo insists they must be viewed under in order to see their true color and verify his results. Put simply, unless this Court orders an inspection, Defendants have no

ability to review specific talc particles alongside Dr. Longo live under the microscope in his lab.

Dr. Longo has even taunted Defendants to have a defense expert visit his lab and look at his microscope with him: "I'd be perfectly happy to have, you know, Dr. Sanchez—well his PLM person come here—watch us make the sample. We can go and look for it and say here's the structure, go ahead and look at it. What's the difference? Probably better that way." Ex. AG, Longo *Streck* Dep. 135:17-25. But when Defendants sought to do just that and take Dr. Longo up on his offer, he balked.

An inspection is critical because it goes to an issue at the very heart of this MDL, namely, whether Johnson's Baby Powder is contaminated with asbestos. Per the PSC's own testing expert, the only way to answer this question and verify this expert opinion on the matter is to look down the microscope live. It is Dr. Longo, not Defendants, who has repeatedly defined his method in that manner. The need for an inspection here is not an effort by Defendants to waste time or harass; it stems directly from Dr. Longo's own testimony. While ordering observation of an opposing party's expert's testing may be rare, it is not unprecedented. And it is dictated by the unique method Dr. Longo chose. Put succinctly, this is a position that Dr. Longo has put himself in.

Yet, incredibly, the Special Master denied Defendants' motion to compel an inspection of Dr. Longo's lab for live observation of his testing. The Special Master

concluded that Defendants sought "irrelevant information." Order at 4. That conclusion is simply unsupportable by the record. It is a legal error warranting reversal. Dr. Longo's testing is critical to Plaintiffs' allegation that Defendants' talc is contaminated with asbestos. In fact, the Special Master recognized in a different order that Dr. Longo's testing is "case-defining." ECF No. 32826.

The Special Master reached his erroneous decision by relying on the fact that "Longo's testing method changed over time." Order at 5. That Dr. Longo used a different methodology in the past is of no moment to this motion. Dr. Longo is currently using a methodology that he claims finds chrysotile asbestos in talc 100% or nearly 100% of the time, and that he has testified over and over turns on the color he is seeing at the moment he looks down his microscope. That current methodology is the methodology Defendants want to observe, as was stated repeatedly at oral argument to the Special Master. Put another way, Defendants cannot replicate the conditions ***Dr. Longo*** says are necessary to verify his results: looking live down his microscope.

The Special Master also faulted Defendants for not providing sufficiently analogous caselaw to support their request. Defendants want to be very clear on this point: This Court is faced with a singular scenario unlike any other expert opinion that has come before in product liability litigation. There is simply no case where a alleged expert presented a photograph that was plainly yellow, looked the judge and

7

jury in the eyes and called it purple, and then defended himself through an impossible-to-disprove excuse that if everyone could just look down his microscope with him in real time they too would understand that yellow was actually purple. Even attempting to explain Dr. Longo's unprecedented excuse feels like stepping through Alice's looking glass.

But that does not mean that the caselaw Defendants did provide is totally inapplicable either. Courts frequently require observation of an expert's testing when destructive testing is involved (though that is not the only situation). *See infra* at § II.A. The Special Master rejected all those cases by stating that "Longo did not do destructive testing." Order at 4. That is simply not true, meaning the Special Master's Order rests on an objectively incorrect factual finding. The particles Dr. Longo looked at were destroyed when the microscope slides degraded and were discarded. It is not relevant that other talc particles from the same container may exist. Nor is it relevant that the destroyed particles may be small. Destroyed is destroyed. In any event, whether or not Dr. Longo's method is technically destructive testing is just semantics. Dr. Longo testified repeatedly that the time in which his results can be justified is transitory: only when he is looking live down the microscope. If that is not destructive testing, it is the equivalent.

Additionally, the Special Master refused to even *consider* ordering exclusion of Dr. Longo's chrysotile testing if Dr. Longo does not submit to an inspection on

the ground that Defendants' alternative proposed enforcement method should be directed to the trial judge. Order at 8. ***Now is the time to decide that issue***. Either Dr. Longo submits to appropriate examination of his methodology so that Defendants can challenge it pursuant to Rule 702, or his opinion should be excluded. Briefing on Rule 702 occurs this month. The PSC and their expert should not be permitted to continue running down the clock on this foundational and pivotal issue.

Finally, Dr. Longo faces no undue burden from an inspection. The PSC submitted absolutely no evidence in that regard. Dr. Longo's testimony is critical to the case, and any burden from an inspection is far outweighed by the importance of observing the same particles as Dr. Longo in real time.

This Court should overrule the Special Master's decision and compel Dr Longo to submit to Defendants' requested inspection.

## BACKGROUND

### *Dr. Longo and MAS*

Plaintiffs' expert Dr. Longo is the President and a 75% owner of his lab Material Analytical Services, LLC ("MAS"). 95% of the time that he is in court, Dr. Longo is testifying for plaintiffs' attorneys in asbestos litigation. Ex. A, Longo 2/7/19 *Leavitt* Tr. 178:20-23.

Courts have excluded Dr. Longo's opinions on numerous occasions. In some instances, they have called his work "junk science" and "pseudo-science at best."

Ex. B, *In re Lamar Cty. Order* (Tx. Dist. Ct. July 5, 2001) at 1; *In re Garlock Sealing Techs., LLC*, 504 B.R. 71, 80 (Bankr. W.D.N.C. 2014). One court elaborated: "Re-reading Dr. Longo's testimony reveals it to be practiced and to employ misdirection and evasiveness. It is at best disingenuous, not credible and unsupported by any respectable community of scientists." Ex. B, *In re Lamar Cty. Order* (Tx. Dist. Ct. July 5, 2001) at 12.

Dr. Longo began testing talc for asbestos for purposes of cosmetic talc litigation in late 2016. Ex. C, Longo 9/4/2019 *Cabibi* Tr. 2759:14-19. For years, he never found a type of asbestos known as chrysotile in cosmetic talc. *See* Ex. D, Longo *Rimondi* Tr. 140:14-141:8. Then in 2020, Dr. Longo began using a new method using polarized light microscopy (known as "PLM")—despite previously testifying that "the PLM method is not appropriate to do an evaluation for these types of products" (i.e. talcum powder products). Ex. W, Longo *Weirick* 8/24/18 Tr. 2921:25-28. In fact, Dr. Longo testified at least as of January 2019 that he had never "personally analyzed a [talc] sample for the presence of asbestos using PLM." Ex. E, Longo *Young* Dep. 85:18-20. As he put it then, "I don't do PLM analysis." *Id.* at 86:5-6. (MAS analysts did the actual testing.)

Dr. Longo now claims to find chrysotile using PLM in nearly 100% of cosmetic talc bottles he tests. Ex. F, Longo *Forrest* Dep. 138:9-18. He says that "[a]ny bottle that was sold in North America that used a mine source for cosmetic

talc in North America will have some level of asbestos in it." Ex. G, Longo *Eagles* Dep. (Vol. III) 449:12-21.

### Dr. Longo's PLM Analysis

Under the PLM method that Dr. Longo uses, the mineral type of a particle is determined by identifying the color that the particle appears under the microscope after coating it in a particular oil. See Ex. F, Longo *Forrest* Dep. 72:15-17, 75:23-76:9. More specifically, PLM analysis performed at MAS relies on analysts correctly identifying the specific shade of color seen under the microscope, matching those colors up to a chart, and then reporting values that are used to identify whether the microscopic particles viewed are asbestos, talc, or some other mineral. Ex. AD, Longo *Clark* Hr'g (Vol. I) 48:9-49:1, 113:12-18; *see also* Ex. U, Demonstrative.

So for example, the ISO (International Standards Organization) protocols that Dr. Longo claims at least in part to follow state that talc in parallel orientation[1] should be a pale yellow. Ex. I, ISO 22262-1 at 28; Ex. J, Longo *Eagles* Dep. (Vol. II) 245:5-17. Chrysotile asbestos, by contrast, should generally appear purple in parallel. Below is an image of a sample for chrysotile in parallel from the ISO protocols:

---

[1] Particles are evaluated by PLM in both a "parallel" and "perpendicular" orientation, with each producing a different color.



 In order to call particles "chrysotile," Dr. Longo's lab incorrectly reports the colors of the particles. Take for example this particle below:

**Dr. Longo's
Claimed "Chrysotile" Asbestos (Ex. K. at 33)**    **Dr. Longo's
Claimed Color**

 Dr. Longo admitted that particle is "brownish gold." Ex. J, Longo Eagles (Vol. II) Dep 263:5-18. (Talc should appear yellow.) However, Dr. Longo treats that

particle as the purple color depicted on the right for purposes of his analysis—i.e. the color chrysotile should look like. Ex. G, Longo *Eagles* Dep. (Vol. III) at 308:4-309:7.[2]

Indeed, Dr. Longo is claiming that the particle above is somehow a different than all the other yellow particles of talc that surround it:



Ex. K, Longo *Valadez* Report at 33

---

[2] Dr. Longo's analyst reports a numerical "refractive index" or "R.I." value for the color of the particle he claims to see. Those indices correspond to particular colors. Dr. Longo's report lists this particle as R.I. 1.564, which corresponds to a purple of 560 nanometers depicted above. Ex. K, Longo Valadez Report at 33; Ex. AD, Longo *Clark* Hr'g (Vol. I) 48:9-49:1, 113:12-18; see also Ex. AK, *Valadez* Demonstrative.

### *Criticisms Of Dr. Longo's Analysis*

Dr. Longo's analysis suffers from numerous flaws, and has been criticized by defense experts and plaintiff-side experts alike. For example, Defense experts criticized Dr. Longo's work for not being appropriately "white balanced" and therefore not faithfully depicting the colors of the particles. Ex. X, Longo *Bonnem* Dep. 32:22-36:15. That led Dr. Longo to acknowledge that he was using a microscope with a tungsten lightbulb which emitted a yellow-hued light that distorted the color of his imaging—the key component of identifying the mineral. Ex. L, Longo *Valadez* Dep. 30:9-31:3. And Dr. Longo no longer uses that lightbulb. Dr. Longo was also previously using a different type of oil, which also affects the color of the particles. Dr. Longo no longer uses that type of oil anymore in response to criticisms from defense experts.

Even now Dr. Longo's images still suffer from coloration problems. Dr. Longo purports to rely in part on PLM methods authored by Dr. Shu-Chun Su. Dr. Longo has testified that Dr. Su is a "well respected scientist," "an authority in terms of mineral identification through staining techniques," and that essentially "every lab in the country" uses Dr. Su's methods for their PLM analysis. Ex. Y, Longo 7/7/21 *Prudencio* Tr. 5133:11-5134:11.

But Dr. Su himself authored a report in this MDL explaining, among other things, that MAS's images are too dark. Specifically, Dr. Su says that "MAS

routinely uses insufficient light intensity, as if the light intensity was suppressed." Ex. Z, Su Rpt. at 3, Exhibit C to the Su Report at 2-5. This in turn serves to distort the color the particles appear—the critical step in ascertaining the mineral type of the particles. *Id.*

Defense expert Dr. Matt Sanchez has tested talc from many of the same containers that Dr. Longo has tested, and he reports seeing only talc. But Dr. Sanchez has not been able to look at the same particles that Dr. Longo is looking at because the slides with the samples that MAS looks at under the microscope degrade in relatively short order, and are then discarded by MAS. Ex. Q, 3/15/23 *Valadez* CMC Tr. at 54:5-6. For example, Defendants requested Dr. Longo's slides in the *Valadez* case in California state court days after Dr. Longo issued his report in that case. Ex. R, 3/9/23 Letter. But Defendants were later informed those slides were no longer usable at that time. Ex. S, 3/23/23 CMC Tr. at 55:15-21. In other words, the only way for defense experts to look at the same particles MAS is looking at in the same way is to view them live under the microscope at the same time as Dr. Longo.

Even an expert often on the *plaintiffs'* side of cosmetic talc litigation explains that the reason Dr. Longo is finding "chrysotile" in every talc bottle is because he is misidentifying talc as asbestos. Frequent plaintiffs' expert Mr. Lee Poye testified: "Q. In your opinion, what do those photos that Dr. Longo claims is chrysotile from that -- from his PLM analysis, what are those structures? A. The edge of talc plates."

Ex. H, Poye *McNeal* Dep. 128:20-129:6. No one who has reviewed MAS's imaging has been willing to go on record to agree that MAS is finding chrysotile by PLM. Ex. V, Longo *MDL* (Vol. 1) Dep. 122:16-123:12.

Dr. Longo has previously testified that a different method—transmission electron microscopy or "TEM"—is the best way to accurately identify chrysotile in talc. *See* Ex. O, Longo *Kerkhof* Dep. 187:19-188:17. In fact, he testified that it using TEM would make it "fairly simple to tell whether or not you are, in fact, looking at chrysotile as opposed to talc"—rather than relying on color gradations. Ex. AD, Longo *Clark* Hr'g (Vol. I) 42:10-14. Yet Dr. Longo has refused to test the validity of his PLM work by using TEM, which if faithfully applied could conclusively determine whether the particles at issue are talc or asbestos. Ex. P, Longo *Clark* Dep. (Vol. II) 206:7-11.

The findings of another frequent plaintiffs-side expert (though not in this MDL) may explain why. Dr. Compton tested 18 Chinese talc ore samples (the talc used for years in JBP) by TEM, which is a more sensitive microscope than PLM. Ex AA, 9/24/2020 Compton Report at 3; Ex. T, Longo *Hayes* Tr. 177:24-178:5 (more sensitive). Dr. Compton found no chrysotile in any of the 18 samples. Ex. AA, 9/24/2020 Compton Report at 3. Dr. Longo then tested the same 18 samples by PLM, the less sensitive microscope, yet somehow reported finding chrysotile in all 18 of the 18 samples. Ex. AB, Longo 10/8/2020 Rpt. at 12, 22-23

16

### *Dr. Longo's Response To Criticisms*

Dr. Longo now has a new response to criticisms of his methodology: That everyone would see what he sees if only they could look live down the microscope at the particles rather than looking at the images Dr. Longo produced. Across multiple depositions and a *Daubert*-equivalent New Jersey state court hearing, Dr. Longo has repeatedly stated one would need to be physically sitting at a microscope looking at the live at the particle to understand how he was purporting to identify chrysotile:

- When asked to identify a particle in his report, Dr. Longo testified, "***I'd have to be looking in the microscope at it to tell you what that is***" and then said again: "***I'd have to be looking in the PLM scope to make a guess.***" Ex. L, Longo *Valadez* Dep. 55:17-56:14.

- When pressed on whether that particle was talc, he stuck to his same response: "Again, ***I'd have to be looking in the microscope to make any decision on what that might be.***" *Id.* at 56:15-18.

   - A video excerpt of these first two examples is available at Ex. L.1 and was previously lodged with the Court.

- When asked why he was identifying a so-called chrysotile particle as "magenta" when it was clearly not magenta, Dr. Longo stated as part of his answer that he would "***have to be under the microscope to look at it.***" Ex. L, Longo *Valadez* Dep. 61:5-62:3.

- When asked whether he was treating a different yellow "chrysotile" particle as purple for purposes of his analysis he said: "***I'd have to be sitting at the PLM scope.***" *Id.* at 64:13-20.

- When asked if his lab was reporting yet another "chrysotile" particle as closer to the purple end of the light spectrum than a prior particle, Dr. Longo testified: "***I'm not looking in a microscope. I can't answer it anymore and help you out here.***" *Id.* at 67:2-17.

17

- When asked whether he could identify numerically (by the wavelength of light per the methodology Dr. Longo claims to follow) the color on specific area of the particle Dr. Longo claimed was relevant, he testified: "***No. In order for me to do that, I would have to be sitting at the microscope***, in focus, out of focus, and look at that." *Id.* at 78:13-79:9.

- When asked what the refractive index of talc particles are, he again testified: "***I'd need to be looking in the microscope***." *Id.* at 39:17-40:14.

- "***I'd have to focus in on it*** to see if we -- you know, the focus is off." Ex. J, Longo *Eagles* (Vol. II) Dep. 257:8-9

- "[Y]ou have to be ***looking under the microscope***." Ex. AD, Longo *Clark* Hr'g (Vol. I) 113:25-114:3.

- "I'm ***not sitting at the microscope*** and this has been copied a few times, so it's kind of hard to debate you on it." *Id.* at 117:2-4.

- "***I would need to be looking at the microscope here***." *Id.* at 119:1-2.

- "I don't understand how he can make that decision in China when we're over in the United States ***never looking at the operative microscope***." *Id.* at 87:23-88:3.

- "***I'd have to be on the microscope***." Ex. AE, Longo *Clark* Hr'g (Vol. II) 290:2-8.

The Special Master specifically found that "Defendants' numerous citations to Dr. Longo's testimony from other cases, including testimony held weeks ago in a New Jersey State court case, is illustrative of the fact that defendants are not 'nitpicking' as plaintiffs argue." ECF 32817 at 3.

### *Procedural History*

In order to respond to Dr. Longo's assertion that the basis for his opinions could only be ascertained by looking live down his microscope, Defendants served

an Updated Notice of Oral and Videotaped Deposition of Dr. Longo, which included a Notice of Inspection pursuant to Fed. R. Civ. P. 34(a)(2) on April 18, 2024. *See* Ex. M. This would allow defense experts to view the same particles that Dr. Longo is viewing in real time. Plaintiffs objected, Ex. N, and Defendants filed a motion to compel.

The Special Master issued an order denying Defendants' motion. Although the Special Master recognized in a different order that Dr. Longo's testimony claiming to find asbestos is "case-defining," ECF No. 32826, the Special Master ruled that Defendants requested "irrelevant information." Order at 4. The Special Master also concluded that the caselaw Defendants did not provide sufficiently analogous caselaw to this unique situation of an expert claiming only live observation can justify his opinions. As part of that analysis, the Special Master ruled that "Dr. Longo did not do destructive testing" as was the situation in many of Defendants' cases. Order at 4. But there is no dispute the particles Dr. Longo looked have been destroyed. And while the PSC submitted no evidence of any burden on Dr. Longo, the Special Master concluded an inspection would be unduly burdensome.

Defendants now filed this objection to the Special Master's ruling. *See* ECF 704 at 3 (setting forth the procedures).

19

## LEGAL STANDARD

Federal Rule of Civil Procedure 34(a)(2) permits a party to serve a request "within the scope of Rule 26(b)" to "permit entry onto designated land or other property" to order to "inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it."

A Rule 34(a) request to inspect "poses a very low hurdle." *E.E.O.C. v. Supervalu, Inc.*, 2010 WL 5071196, at *10 (N.D. Ill. Dec. 7, 2010) (internal citations and quotation marks omitted). The rule itself "requires only that such a request seek information 'within the scope of Rule 26(b).'" *Id.* Rule 26(b), of course, permits "discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." A "a showing of need" is accordingly not necessary. *Cuno Inc. v. Pall Corp.*, 116 F.R.D. 279, 281 (E.D.N.Y. 1987).

Some courts have said that they use "'reasonableness' as a guidepost" for Rule 34 requests to inspect. *See Nat'l Mfg. Co. v. Janed Enterprises, Inc.*, 2013 WL 12470870, at *2 (D.N.J. July 3, 2013) (granting in part request for inspection) (internal citations omitted).

This Court "shall review the findings of the Special Master according to the standards of review set forth in Fed. R. Civ. P. 53(f)(3)-(5)." ECF 704 at 3. "The court must decide de novo all objections to findings of fact made or recommended

20

by a master." Fed. R. Civ. P. 53(f)(3). "The court must decide de novo all objections to conclusions of law made or recommended by a master." Fed. R. Civ. P. 53(f)(4). "[T]he court may set aside a master's ruling on a procedural matter only for an abuse of discretion," Fed. R. Civ. P. 53(f)(5), meaning that the Court has "a definite and firm conviction that [the special master] committed a clear error of judgment in the conclusion it reached." *U.S. v. Andrews*, 12 F.4th 255, 259 (3d Cir. 2021).

## ARGUMENT

### I. Looking At The Same Particles As Dr. Longo At The Same Time Is Not Just Relevant, It Is Critical.

#### A. Dr. Longo's chosen methodology uniquely requires the requested inspection.

Dr. Longo and his team picked the methodology they use to allegedly and repeatedly identify chrysotile asbestos in JBP. And they chose a methodology that, by Dr. Longo's own testimony, ***requires*** looking live down his microscope in order to understand and confirm the conclusions. This unique situation requires a unique solution: having an expert from both sides look through the microscope at the same particles at the same time.

A few examples of Dr. Longo's "look-down-the microscope" testimony discussed above warrant closer examination. Identifying "asbestos" particles and differentiating them talc particles is the entire point of Dr. Longo's analysis. Yet when asked to identify a particle in his report as either talc or asbestos, Dr. Longo

testified ***three times*** that he would need to be "looking in the microscope" to identify the particle. Ex. L, Longo *Valadez* Dep. 55:17-56:14. Defendants lodged with the Court a video clip of this testimony showing Dr. Longo unable to identify the particle after looking at the images for a considerable amount of time.

Similarly at the New Jersey *Daubert*-like hearing at the end of May, Dr. Longo testified that the only way to determine whether his *entire analysis* is wrong is to be looking down the microscope:

> [Q.]   [I]f you're claiming to see some sort of edge effect here that you're basing your purple color on but it's an artifact, then ***your entire analysis is wrong?***
>
> A.   No, this analysis is not wrong. This is chrysotile ***and I would need to be looking at the microscope here.*** I stand by this. It's not wrong.

Ex. AD, Longo Clark Hr'g (Vol. I) 118:20-119:3 (emphasis added).

The slides MAS looked at have long since degraded and discarded. Exs. Q-S. That leaves Defendants with no way to disprove Dr. Longo's assertion that his entire analysis would be shown to be correct if one were only to look down the microscope at the particles. In this scenario, Defendants should have the opportunity to look down the microscope at the same particles that Dr. Longo is looking at—the only way Dr. Longo claims his results can be verified.

22

**B.      The Special Master's rationales for why an inspection is not warranted were wrong.**

**1.         An inspection is necessary disprove Dr. Longo's excuses.**

The Special Master concluded an inspection was not warranted because defense experts issued reports "with discussions critiquing Longo's conclusions, analysis, and methodology" that "do not mention anything about needing an inspection to evaluate Longo's work." Order at 7. That entirely misses the point. Yes, defense experts reviewing Dr. Longo's work conclude that Dr. Longo is in fact finding particles of talc and calling them "asbestos." But *Dr. Longo's explanation* for why the defense experts are wrong is that the defense experts are not looking down the microscope in his lab. So the experts need to look through the microscope in real time to disprove Dr. Longo's newest excuse.

For example, when confronted with defense expert Dr. Su's conclusions, Dr. Longo simply says that Dr. Su is not looking down the microscope and in fact criticizes him for being *far away* from the microscope in China: "I don't understand how he can make that decision in China when we're over in the United States **never looking at the operative microscope**." Ex. AD, Longo *Clark* Hr'g (Vol 1) 87:23-88:3.

All the various types of questions where Dr. Longo has employed his "look-down-the-microscope" response show why Defendants cannot simply cross examine Dr. Longo or present their own experts' conclusions. When Defendants ask him

about fundamental flaws in his testing, Dr. Longo's response is to essentially say: *well trust me, when you look down the microscope at my lab you can tell this is asbestos.* That leaves no follow up question to ask. Contrary to the Special Master's conclusions, Dr. Longo's testimony places a roadblock on further questioning if he is not willing to have a defense expert look at the same particles at the same time under the same microscope. *See* Order at 7. There is no way for the defense to disprove Dr. Longo's look-down-the-microscope excuse without looking down the microscope.

### 2.     Dr. Longo's testimony is plainly relevant.

The Special Master was also wrong to conclude that Defendants have requested "irrelevant information." Order at 4. As the Special Master recognized, Dr. Longo's testimony claiming to find asbestos is "case-defining." ECF No. 32826.

For his conclusion that the inspection is not relevant, the Special Master relied entirely on the fact that Dr. Longo's methodology has "changed over time." Order at 5. But that is a reason to *grant* the inspection, not deny it. Plaintiffs never even argued that changes to Dr. Longo's methodology were a reason to deny the inspection, instead calling the entire issue a "red herring," arguing that Dr. Longo's methodology *could* be replicated. ECF 32684 at 8

Dr. Longo's methodology has changed over time in response to defense criticisms of his work. For example, defense expert Dr. Su issued a report that Dr.

Longo should be using a different type of oil (which affects the color of the particles). Ex. AF, Su 1/30/2022 "Talc Misidentified as Chrysotile" Rpt. As a result, Dr. Longo changed the oil he used. Ex. L, Longo *Valadez* Dep. at 15:3-18. Though he still defended his earlier testing by claiming without evidence that Dr. Su's report was fraudulently drafted by someone else. Ex. AH, Longo *Zundel* Dep. at 77:24-78:14.

But he was forced to drop that argument after being confronted with a video of Dr. Su acknowledging that he, in fact, wrote the report with his name on it, Ex. AI, 9/1/2023 Longo *Cardillo* Dep. at 133:2-20. And as discussed above, criticisms from the defense led Dr. Longo to use a different type of light bulb in his PLM work. As a result of these various responses to the defense arguments, the color of Dr. Longo's images has changed drastically:



**Pre-Valadez**                    **Valadez**

The exchange between the defense and Dr. Longo has now backed Dr. Longo into a corner. The only excuse he has remaining is to say one would need to look live down the microscope.

That is not the only example of how Dr. Longo is now forced to retreat to his look-down-the-microscope response. When the defense has confronted Dr. Longo with the fact the particles he is calling purple are clearly yellow, Dr. Longo claimed that he is relying on the color that appears just on the *edges* of the particles. Ex. J, Longo *Eagles* Dep. (Vol. II) at 256:21-257:4. Then the defense confronted Dr. Longo with the fact that edge effect Dr. Longo relies on to identify particles as "chrysotile" can routinely be seen around particles that even Dr. Longo acknowledges are talc:



Ex. AK, *Valadez* Demonstrative.

Dr. Longo was forced to admit that those edge colors could simply be an artifact of his images, for example if the "focus is off": "[E]very particle has some of the red around it. And I don't know if that's just an artifact or not." Ex. J, Longo *Eagles* Dep. (Vol. II) 256:21-257:11.

Then when asked whether basing analysis on "some sort of edge effect" that could simply be "an artifact" means his "entire analysis is wrong" Dr. Longo retreated to his new look-down-the-microscope safe harbor: "No, this analysis is not wrong. This is chrysotile ***and I would need to be looking at the microscope here.*** I stand by this. It's not wrong." Ex. AD, Longo Clark Hr'g (Vol. I) 118:20-119:3 (emphasis added).

Indeed, the Special Master himself concluded that "Longo testified in other cases that he is unable to answer certain of defendants' questions about his conclusions without looking through a microscope." ECF 32817 at 3.

It is simply not true that "no assurances can be given that the current testing defendants request will recreate or replicate the conditions that existed when the relevant tests were done." Order at 5. Again, Plaintiffs never even made this argument. Dr. Longo is currently employing a methodology that he claims finds chrysotile asbestos in talc 100% of the time, or nearly so. In fact, Dr. Longo at his deposition in this MDL disclosed two new chrysotile tests he had just recently

27

completed. Ex. V, Longo *MDL* Dep. at 130:11-131:6. Defendants seek to observe that current methodology.

That Dr. Longo may have used a different methodology in the past is of no moment. And there is no way to predict the future of what new dodge Dr. Longo may devise after a defense expert looks down his microscope to disprove Dr. Longo's current justification for his testing.

### 3.      The deposition of Dr. Longo's analyst is not sufficient.

The Special Master also pointed to his granting a deposition of Dr. Longo's analyst, Paul Hess, as further justification to deny the inspection. As the Special Master explained in that ruling, "Hess, not Longo, did the microscopic analysis required under the PLM methodology." ECF 32817.

A deposition of Mr. Hess alone, however, is not sufficient to allow Defendants the opportunity to test Dr. Longo's critical opinion in this matter, i.e., his alleged observation of asbestos in Johnson's Baby Powder ("JBP"). Normally, a party is entitled to both the data that underlies an opposing expert's opinion in order to independently verify that expert's conclusions and a deposition of the expert who performed the relevant analysis stemming from that data. A deposition of Mr. Hess is helpful and important since he is the one *actually* reaching the conclusions at issue.

But Defendants are still entitled to the data to allow them to independently verify the explanations Dr. Longo is offering for his opinion. And Dr. Longo repeatedly testifies that the only way to do that is to look live down his microscope.

## II.   This Court Has Authority To Order An Inspection.

### A.   This Court can order an observation of Dr. Longo's testing.

This Court has authority to order an inspection. The Special Master relied on the fact that Defendants provided "no controlling case law authorizing their request" and concluded that the cases Defendants' cited were insufficiently similar to the facts here. Order at 4.

The lack of closely analogous caselaw is driven entirely by the singular nature of Dr. Longo's opinion and testimony. His opinion depends entirely on an "Emperor's New Clothes" methodology: looking at particles that everyone with their own two eyes can see are yellow yet claiming they are, in fact, purple. But rather than the sham-magic being that only smart people can see the clothing, Dr. Longo is claiming that everyone need only look down his microscope. It should not be surprising that there are no nearly identical cases to the facts before this Court.

But that does not mean no similar cases exist at all. While it is generally true that an expert is allowed "to perform his or her work without being scrutinized by the opposing expert," "the particular circumstances of a case may dictate a different result." *Diepenhorst v. City of Battle Creek, et al.*, 2006 WL 1851243, at *1 (W.D.

29

Mich. June 30, 2006). For example, "when a party proposes destructive testing, or there is controversy concerning the nature of the test, it sometimes becomes necessary to force the experts to collaborate." *Id.*

Indeed, courts routinely require that the other side's expert be permitted to attend destructive testing.[3] And Courts have ordered that experts re-conduct tests with opposing parties present. *See, e.g. Insituform Techs., Inc. v. Amerik Supplies, Inc.*, 2010 WL 11493292, at *12 (N.D. Ga. Feb. 19, 2010); *U.S. v. Harpham* 2015 WL 4623717, at *3 (E.D. Wash. Aug. 3, 2015).

In fact, one of the factors courts consider in whether to permit destructive testing is whether there is a "reasonable opportunity for the [non-movants] and their experts to observe and record the procedures involved." *Sero v. Tricam Indus., Inc.*, 2023 WL 6318013, at *7 (D.N.J. Sept. 28, 2023). That said, destructive testing is not the *only* situation observation where courts order observation of an expert's testing. For example, one court permitted the opposing expert to observe non-destructive testing because the "circumstance necessitates additional care and safeguards." *See Rattay v. Medtronic, Inc.*, 2007 WL 1417158 at *2-3 (N.D. W. Va. May 10, 2007).

---

[3] *See e.g., Trice v. Toyota Motor Corp.*, 2012 WL 12894708, at *2 (D. Minn. Sept. 12, 2012); *Holmes v. J.M. Prods., Inc., et al.*, 2005 WL 927172 at *4 (W.D. Tenn. Jan. 7, 2005); *Spell v. Kendall-Futuro Co.*, 155 F.R.D. 587, 588 (E.D. Tex. 1994); *Ostrander v. Cone Mills, Inc.*, 119 F.R.D. 417, 420 (D. Minn. 1988); *Pizza Hut, Inc. v. Midwest Mech., Inc.*, 1988 WL 8980, at *1 (N.D. Ill. Feb. 1, 1988).

The Special Master rejected all of Defendants' cases on the ground that "Longo did not do destructive testing." Order at 4. That conclusion is wrong for two reasons. First, it is simply not true. The talc particles that Dr. Longo analyzed were placed on slides which degrade and were then discarded. Exs. Q-S. That *other* talc from the same container may exist does not mean that Dr. Longo did not destroy the talc particles he did analyze. Even when samples are split between the parties, or when other portions of an object remain, courts rightly describe testing that destroys part of a sample as "destructive testing."[4] That the particles are small—in fact, microscopic—also does not render them any less destroyed.

Second, even if Dr. Longo's testing were to be considered not "destructive," all the same rationales for allowing defense experts to observe destructive testing are still present. According to Dr. Longo's testimony, the only time when chrysotile can be differentiated from talc are the fleeting moments when someone is looking live at the particles through the microscope. Those moments cannot now be replicated.

Whether falling under the semantic definition of "destructive testing" or not, the conditions that Dr. Longo says are necessary to identify asbestos in talc are

---

[4] *See, e.g.*, *Ostrander*, 119 F.R.D. at 418. ("They seek production of a portion of the remaining pieces to conduct destructive testing."); *Graff v. Baja Marine Corp.*, 310 F. App'x 298, 301 (11th Cir. 2009) (expert "conducted destructive tensile tests on a portion of the gimbal housing"); *Coleman v. Anco Insulations, Inc.*, 2017 WL 1735038, at *1 (M.D. La. Apr. 26, 2017) (granting request for "destructive testing" on "a small portion of Decedent's tissue").

31

transitory. Defendants should therefore be entitled to be present in that transitory time.

**B.      This Court can order that Dr. Longo's testing should be excluded if he does not submit to an inspection.**

The Court also has at its disposal another mechanism of resolving this issue if Dr. Longo is so fundamentally opposed to allowing Defendants to look live down the microscope he keeps holding out as the key to his groundbreaking opinions: exclude Dr. Longo's PLM testing. The Special Master expressly stated it was not considering exclusion and stated that the argument "instead should be directed to the trial judge." Order at 8.

Under *Daubert* and Rule 702, a "key question" is whether the technique at issue "can be (and has been) tested." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593 (1993); *see In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 (3d Cir. 1994) (discussing the "testability of the expert's hypothesis"). "Someone else using the same data and methods must be able to replicate the result" of the expert. *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005); *U.S. v. Hebshie,* 754 F.Supp.2d 89, 125 (D. Mass. 2010) ("Documentation is necessary to test a hypothesis; in fact, reproducibility is the sine qua non of 'science'"). An expert's opinion must "allow[ ] a factfinder to independently verify the accuracy of the expert's results" to be admissible. *Kemp v. Tyson Seafood Grp., Inc.*, 2000 WL 1062105, at *7 (D. Minn. July 19, 2000).

For example, an expert's opinion was excluded where he "could not reproduce his own results when asked to re-score the slides using his own method." *In re Diet Drugs Prods. Liab. Litig.*, 2001 WL 454586, at *13 (E.D. Pa. Feb. 1, 2001); *see also U.S. v. Johnson*, 122 F. Supp. 3d 272, 330 (M.D.N.C. 2015) (excluding expert testimony because expert's subjective "methodology is seriously flawed and cannot be replicated"). Here, Dr. Longo similarly could not identify whether a particle was talc or asbestos when asked to look at the very images ***MAS itself produced.***

The prior opinion in this MDL demonstrates why, short of allowing inspection, Dr. Longo's PLM analysis should be excluded. In the first round of expert reports, Dr. Longo did not produce the standards which he used to determine what percentage of asbestos he was claiming to find by PLM. *In re J&J Talc Litig.*, 509 F. Supp. 3d at 155. In striking his testimony, the Court explained: "Without that information, which is internally created by MAS, reproducing Dr. Longo's test under the PLM would not be possible, and hence, the testing is unreliable." *Id.*

Similarly in this second round of PLM testing, Defendants do not have the materials sufficient to independently verify Dr. Longo's explanation for his PLM results, rendering it unreliable. Because of the way Dr. Longo himself has defined his methodology as requiring live examination under his microscope, the Court, Defendants and any future jury is left with the ipse dixit of Dr. Longo: *It is asbestos*

33

*because I say so after I looked down the microscope* (which Dr. Longo in fact rarely did himself).

## III. An Inspection Is Not Unduly Burdensome And Is Proportional To The Needs Of The Case.

The PSC submitted no evidence whatsoever that the inspection of Dr. Longo's lab would be unduly burdensome. It would not be. In fact, Dr. Longo even taunted Defendants to have a defense expert visit his lab: "I'd be perfectly happy to have, you know, Dr. Sanchez—well his PLM person come here—watch us make the sample. We can go and look for it and say here's the structure, go ahead and look at it. What's the difference? Probably better that way." Ex. AG, Longo *Streck* Dep. 135:17-25.

The change of tune in now arguing that an inspection would burdensome is not based in reality. MAS is constantly performing PLM testing of cosmetic talc. In his MDL report alone, Dr. Longo lists 49 chrysotile tests over the past 3 years. Ex. AC at 17-26 (Tables 1-7). And he is testing cosmetic talc generally even more often than that. A plaintiffs' firm-created chart shows that MAS has performed 125 different tests using Dr. Longo's new PLM method as of February 2023 (100% of which reported as finding chrysotile). See Ex. AJ. Indeed, Dr. Longo has testified that his PLM-talc work is ongoing. Mot. Ex. V, Longo MDL (Vol. I) Dep. 47:6-13, 118:5-119:7. In short, the Court can simply order that the inspection occur at a time

34

when MAS testing would otherwise be occurring as part of their regular lab activities.

Moreover, any burdens on MAS are outweighed by the critical nature of Dr. Longo's testimony. Whether JBP contains asbestos is at the very heart of this MDL. And Dr. Longo is claiming to find chrysotile in nearly 100% of all samples he tests now using a method that he claims can only be evaluated by looking live down the microscope in his lab.

If Dr. Longo is going to claim he needs to look down the microscope to verify his results, criticize defense experts for not looking down his microscope, and even offer for defense experts to visit his lab to look down his microscope, Defendants should be able to take Dr. Longo up on that offer.

## CONCLUSION

Defendants request that the following be made available for inspection:

1.     All PLM microscopes used by MAS at 3945 Lakefield Ct, Suwanee, GA 30024 for its analysis of the materials referenced in Defendants' requests for production 20-24 (attached hereto as Exhibit M at 10-12);

2.     MAS's methodology for preparing the materials referenced in Defendants' requests for production 20-24 (Ex. M at 10-12) for subsequent analysis by PLM for the identification of "chrysotile," including but not limited to observing in real time the preparation of one or more samples of Johnsons Baby Powder performed by MAS; and

3.     MAS's methodology for analyzing the materials referenced in Defendants' requests for production 20-24 (Ex. M at 10-12) for analysis by PLM for the identification of "chrysotile," including but not limited

to observing in real time the analyses performed by MAS on the samples of Johnsons Baby Powder, as well as Defendants' experts undertaking real time, contemporaneous observation of the samples on the same PLM equipment used by MAS in which MAS has previously reported, and may during the inspection report, observing "chrysotile."

Dated: July 1, 2024                              Respectfully submitted,

                                                 */s/ Kristen R. Fournier*
                                                 Kristen R. Fournier

                                                 **KING & SPALDING LLP**
                                                 1185 Avenue of the Americas
                                                 34th Floor
                                                 New York, NY 10036
                                                 (212) 556-2100
                                                 kfournier@kslaw.com

                                                 Susan M. Sharko
                                                 **FAEGRE DRINKER BIDDLE &
                                                 REATH LLP**
                                                 600 Campus Drive
                                                 Florham Park, NJ 07932
                                                 susan.sharko@faegredrinker.com

                                                 *Attorneys for Defendants Johnson &
                                                 Johnson and LLT Management, LLC*

## CERTIFICATION OF SERVICE

I hereby certify that on July 1, 2024, a true and correct copy of the foregoing motion was filed electronically.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.  Parties may access this filing through the Court's system.

/s/ *Kristen R. Fournier*
Kristen R. Fournier

**KING & SPALDING LLP**
1185 Avenue of the Americas
34th Floor
New York, NY 10036
(212) 556-2100
kfournier@kslaw.com