UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE: JOHNSON & JOHNSON TALCUM POWDER PRODUCTS MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION<br><br>*THIS DOCUMENT RELATES TO ALL CASES* | MDL No. 16-2738 (MAS) (RLS) |

**Plaintiffs' Steering Committee's Motion for the Entry of an Order to Establish a Census and Require the Provision of Data by Persons with Unfiled Claims/Cases to Confirm the Plaintiff Suffers from Epithelial Ovarian Cancer, Fallopian Tube Cancer or Primary Peritoneal Cancer**

I.  INTRODUCTION

The Plaintiffs' Steering Committee (the "PSC") moves the Court for an Order that requires persons with unfiled cases/claims, to produce to the PSC threshold census information that includes medical proof (pathology report or oncology record) of a diagnosis of epithelial ovarian cancer, fallopian tube cancer or primary peritoneal cancer (hereinafter, "ovarian cancer"), or a statement regarding the unavailability of medical records.

The purpose of this request is for the PSC to have sufficient information to determine the total number of actual ovarian cancer claims/cases that are at issue in this litigation and that are likely to be filed in this MDL in the future but are as of

1

yet unfiled. The state of the record is that it has been reported in the public domain that there are thousands of unfiled claims that may vote on a proposed third bankruptcy but where there is no medical report or data (i.e., a pathology report or oncology record) documenting the injuries sustained by these women. In fact, Defendants have asserted there are tens of thousands of unfiled claims and that they have the overwhelming support of those unfiled claims for a bankruptcy solution to the litigation. But, there is no way to ascertain if these women suffer from ovarian cancer, or from some other gynecological cancer that is beyond the scope of this MDL.

The pivotal question is how many of the alleged unfiled cases/claims truly involve confirmable ovarian cancer and how many of the alleged unfiled cases/claims involve illnesses or injuries that do not meet the definition of epithelial ovarian cancer.

This MDL has been styled to litigate the question of the causal connection between the perineal use of talcum powder and the development of ovarian cancer. That is the issue that the PSC's experts have addressed and continue to address. Claims/cases that do not involve ovarian cancer are beyond the scope of this MDL. The information that PSC seeks will confirm that there are far less cases/claims with a confirmed diagnosis of ovarian cancer than the tens of thousands of cases that have been alluded to by the Defendants.

It is understood that the Disclosure Statement and Plan that Defendants have proposed for a planned bankruptcy state that the proposed bankruptcy is supported by approximately 71,000 persons represented by an *ad hoc*[1] committee. Upon information and belief, the PSC understands that a substantial percentage of these persons do not suffer from ovarian cancer. This group of 71,000 women or their family members is being used to create a false need for a bankruptcy. This gambit is to the detriment of the truly injured women who suffer from ovarian cancer, is designed to deprive this Court of its jurisdiction, and afford Defendants unwarranted protection from the civil tort system.

To remedy this critical issue involving unfiled cases, it is proposed that the Court enter an order creating a census registry wherein empirical and demographic data must be provided by all those with unfiled cases, including from those *ad hoc* groups who are propagating information that they have a huge number of clients desirous of the bankruptcy protection, to determine the accuracy of these assertions. This group of unfiled claimants[2] should be required to provide a pathology report or

---

[1] The *ad hoc* committee as identified in public documents are as follows: Andres Pereira Law Firm, P.C.; Andrews & Thornton; De la Rosa Law Firm; Duncan Stubbs; Johnson Law Group; Linville Law Group; McDonald Worley PC; Nachawati Law Group; Napoli Shkolnik; OnderLaw, LLC; Paul LLP; Pulaski Kherkher, PLLC; Rueb Stoller Daniel, LLP; Slater Slater Schulman LLP; and Watts Law Firm LLP.

[2] It is understood by the PSC that members of the *ad hoc* attorney group have entered into tolling agreements with Defendant pursuant to which the running of the statute

3

oncology record showing that their client, who would be registered on the census registry, suffers from ovarian cancer or serves as a personal representative for a woman who died as result of ovarian cancer.

A mechanism for discovering information about the true total number of unfiled ovarian cancer claims/cases of women suffering from epithelial ovarian cancer will provide a greater understanding of the size of the MDL and could be helpful for negotiating a global resolution of the litigation.

It has been no secret that since the outset of this litigation the PSC has sought to represent ovarian cancer cases only.  The expert testimony and evidence developed and offered by the PSC has focused on the causal relationship between that injury and the perineal use of talcum powder. At no time has the PSC represented that this MDL litigation was commenced to include representing woman who suffered from other gynecological cancers.

**II.    THE PSC THAT HAS BEEN APPOINTED HAS, SINCE THE OUTSET OF THIS MDL, FOCUSED THIS MDL ON OVARIAN CANCER CASES ONLY**

---

of limitations for their clients has been tolled and there is no current need for those plaintiffs to file a lawsuit. This has enabled the cases to remain on the sidelines without having to file lawsuits that would subject these plaintiffs to the rigors of litigation, including having to produce a Plaintiff Profile Form ("PPF") and potentially, case-specific expert reports.

This MDL was established on October 4, 2016, when the Judicial Panel for Multidistrict Litigation (the "Panel") assigned the case to this Court, specifically to the former Chief Judge of this district, the now retired Honorable Freda L. Wolfson. *See In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Practices & Prods. Liab. Litig.*, 220 F. Supp. 3d 1356 (J.P.M.L. 2016). On October 20, 2016, Judge Wolfson issued a letter to "All Counsel" scheduling an "in-person Organizational Conference" on November 17, 2016, requiring that a Status Report be submitted by counsel no later than November 10, 2016. Among the items that the Court required the Status Report to address were "Suggestions regarding lead/liaison counsel." *See* Court Letter to All Counsel, Dkt. 4 (10/20/2016).

On November 10, 2016, a Plaintiffs' Status Report was submitted that addressed the following issues:

> a. Factual Background of the Cases;
> b. Discovery in Federal Court;
> c. Settlement;
> d. Pending Motions;
> e. Related State Court Litigation;
> f. Proposed Lead and Liaison Counsel; and
> g. Proposed Agenda Items (that included appointment of the Plaintiffs Steering Committee, among other items).

*See* Dkt. No. 43 (11/10/2016).

The Status Report noted that there was unanimous Agreement that Michelle A. Parfitt and P. Leigh O'Dell would serve as Co-Lead Counsel of the MDL and that Christopher M. Placitella would be appointed as Liaison Counsel. *Id.* at 7.

Subsequently, on November 21, 2016, a Joint Application for Appointment of the Plaintiffs' Steering Committee was filed wherein Ms. O'Dell, Ms. Parfitt and Mr. Placitella submitted the names of attorneys to comprise a steering committee, ***and described the duties that the PSC would be undertaking***. *See* Joint Application, Dkt. No. 54 (11/21/2016).

The Joint Application described the obligations that the PSC would be undertaking in this litigation, namely:

    a. To commit the time and resources to develop and attain a successful prosecution of this litigation ***on behalf of women who suffered personal injury and death from ovarian cancer following their use of talcum-powder based products***; (emphasis added)

    b. To form discovery teams to engage in discovery as required by the litigation towards proving the liability of the defendants in the case;

    c. To fund the case, in particular, to provide funding to pay for retained experts, for discovery, and to bring cases to trial;

    d. To develop science and expert evidence;

    e. To brief legal issues, including, among others, briefing of *Daubert*, dispositive motions; discovery disputes, etc.;

    f. To manage a document depository and to create a trial package of documents and deposition transcripts to use in the case;

    g. To take depositions of witnesses, both fact and expert witnesses;

    h. To develop procedures for the reporting of common benefit time and expenses related to the litigation of the case;

    i. To administer the case as necessary;

   j. Among other functions.

*Id.*

On December 6, 2016, the Court entered its Order Appointing Lead and Laison Counsel and the Plaintiffs' Steering Committee, essentially adopting the Joint Application that had been made. *See* Order Appointing Lead Counsel and Plaintiffs' Steering Committee, Dkt. No. 73 (12/06/2016). Thus, the Court approved what was stated in the Joint Application that the focus of this litigation would be on ovarian cancer cases only. Since that date, there has never been any suggestion by the PSC that this case is being litigated on behalf of persons who do/did not suffer from ovarian cancer.

In the discharge of their duties and obligations, the PSC has litigated this case for approximately 8 years to date:

   a. reviewing documents;

   b. taking depositions;

   c. developing expert witnesses;

   d. preparing and filing legal briefs;

   e. negotiating various structural orders for the management of the case, i.e., orders governing the filing of Short Form Complaints, Direct Filing, ESI Protocol, Protective Orders, Preservation Orders, submitting Plaintiff Profile Forms;

   f. attending Court conferences;

    g. arguing motions;

    h. appearing before the Court appointed special master (Hon. Joel Schneider, retired);

    i. among other matters.

As the case developed and was litigated, the PSC stayed true to the original purpose of developing and submitting expert evidence that focused on ovarian cancer only, and general causation issues associated with this injury.

When the initial expert discovery concluded, and initial expert reports were submitted on **November 16, 2018,** the PSC expert reports supported general causation of epithelial ovarian cancer injuries only.[3]

After the submission of expert reports and depositions of experts, the Court conducted extensive proceedings relating to *Daubert* challenges that both the Plaintiffs and Defendants made against each other's expert witnesses. These proceedings included thousands of pages of briefs and exhibits, and an 8-day Court hearing during which additional testimony was heard.

**On April 27, 2020, the Court entered its 141-page opinion on the *Daubert* issue.** *See In re: Johnson & Johnson Talcum Powder Prods. Marketing, Sales Practices & Prods. Liab. Litig.,* 509 F.Supp.3d 116 (D.N.J. 2020) (Dkt. 13186).

---

[3] As the Court is aware, this litigation was delayed by the filing of bankruptcies by Defendants. Once the second of the two bankruptcies was dismissed, the parties submitted supplemental and new expert reports. These newer reports still address ovarian cancer issues only, and no other injury.

This was the second time a federal court conducted a *Daubert* analysis and determined that sound science supports the general causation link between J&J's talc-based powder and ovarian cancer. The first was in the case of *Deane Berg v. Johnson & Johnson, et al.,* CIV 09-4179-KES (D.S.D.), eight years prior. *See* Mem. Op. and Order of April 12, 2013 (denying Defendants' motions to exclude plaintiffs' experts and motion for summary judgment). Importantly, Judge Wolfson's opinion focused only on ovarian cancer causation, as no expert evidence was submitted by either the PSC or **Defendants** to address or to attempt to show a causal relationship between the use of talcum powder and uterine or other gynecological cancers.

Thus, it was clear from the earliest proceedings in this MDL through the development of expert evidence that was tested in the initial *Daubert* proceedings, that the evidence in this case did not and does not address non-ovarian cancers.

However, even though Defendants never presented to **this** Court the idea that this case involves gynecological cancers that were not ovarian cancer, Defendants have now developed a strategy that if they can expand the scope of this case to now include non-ovarian cancer cases, they will be able to use the non-qualifying person's claims to leverage a bankruptcy to the harm of the women who have been the focus of this MDL since its outset, i.e., the women who suffer from ovarian cancer.

9

Unfortunately, the case went astray after the *Daubert* opinion was issued. The issuance of the opinion apparently prompted the following:

a. the filing of an unsuccessful "two-step" bankruptcies by a newly formed entity of J&J, LTL;

b. the inclusion of thousands of claims by woman who allegedly suffered from gynecological and uterine cancers as "creditors" in the LTL bankruptcy, in addition to those who suffer from ovarian cancer;

c. fierce litigation over the propriety of the bankruptcy that resulted in its dismissal by the Third Circuit Court of Appeals;

d. the filing of a second LTL bankruptcy;

e. fierce litigation over the second LTL bankruptcy resulting in its dismissal by the bankrupcty court (now pending appeal in the Third Circuit Court of Appeals); and

f. tolling agreements between J&J and multiple plaintiff attorneys who have signed agreements to support J&J's bankruptcy effort.

It is understood that in the bankruptcies, Defendants had little if no empirical data about the nature of the claims of thousands of women who have been accorded some form of creditor status. It has appeared to the PSC that all that Defendants were interested in was amassing a list of a large number of persons who allegedly supported a bankruptcy plan, in an effort to cram down that plan regardless if the plan included persons who did not suffer from ovarian cancer, and instead suffered from other gynecological cancers that are beyond the scope of this MDL. However, by affording such women creditor status, that empowers them and their attorneys with voting rights even if there is no evidence establishing a causal connection

10

between the type of injury claimed and the genital use of talcum powder. By using the votes of claimants outside the scope of this MDL, or any legal proceeding, to support its bankruptcy plan, J&J seeks to deprive this Court of its jurisdiction and deny the women with claims pending before the Court their fundamental Constitutional rights, including of course their right to a jury trial.

With J&J's two bankruptcies having been dismissed, and the existence of the thousands of women who do not suffer from ovarian cancer but have secured a tolling agreement, J&J is weaponizing votes of claims outside the scope of this MDL against the legitimate, *Daubert*-tested claims for which this Court has been assigned responsibility by the JPML. By utilizing the case management powers invested in MDL Courts, this Court should enter the requested census order that requires the production of supporting medical evidence to determine the extent of current unfiled claims that fall within the scope of this MDL.

**III. An Order that Requires the Thousands of Unfiled Claims/Cases to be Identified on a Census/Registry and to Produce Basic Information About Their Case (Pathology Report or Oncology Record) Will Assist the PSC in Evaluating the Size of this MDL, and Will Enable the Court and the PSC to Have a More Fulsome Understanding of the Composition of the Unfiled Cases**

For unfiled cases/claims, there is no requirement that they file a PPF as they are not in litigation. This means that the PSC does not have access to information about the unfiled cases/claims that arguably are within the scope of this MDL. The

11

PSC does not know the number of cases/claims that have not been filed nor what the actual injury may be for each of these unfiled cases/claims. When such a situation exists, the presiding Court can manage the litigation by entering a case management order that requires some basic information be produced about even unfiled cases to enable the Court and the parties to have a perspective on the number of unfiled cases and the injuries involved in the unfiled cases. *See* Order of April 28, 2015, *In re: Actos (Pioglitazone) Prod. Liab. Litig.*, No. 6:11-MDL-2299 (W.D. La.) (Doherty, J.); *see also* Order of November 9, 2007, *In re: Vioxx Prod. Liab. Litig.,* No. 2:05-md-01657 (E.D. La) (Fallon, J.). Obviously, the attorneys representing the unfiled claims/cases should know what kinds of injuries their clients suffer from. Arguably, Defendants may be privy to the injury status of any unfiled cases subject to a tolling agreement as a result of disclosures made to Defendants by the *ad hoc* attorneys. The imbalance of information is underscored by the fact that neither the PSC nor the Court have such information. Said information is necessary to effectively manage the litigation and to conduct productive settlement negotiations.

      What the PSC requests is that unfiled claimants now be listed on a census registry and that each claimant be ordered to produce a pathology report or other oncology record documenting the injury suffered. The power of this Court to require even unfiled claimants to be listed on a census registry and to provide at least minimal medical evidence to identify the injury each alleges is grounded in the fact

12

that this Court has jurisdiction over the counsel involved, because they have appeared in this Court with their filed cases. The appearance of these counsel in this Court gives this Court *in personam* jurisdiction over the counsel and hence, the claimants they represent.

Requiring counsel representing clients who have not yet filed a case in court to provide information about their client is not unusual. Courts use a "census of claims" registry to obtain information in such situations. Typically, this census is the backbone of a tolling agreement. But even where providing a census is not a condition to tolling, a census can still be used to ascertain basic information about unfiled cases. *See In re: Philips CPAP, Bi-Level Pap, Mech. Ventilator Prods. Liab.*, C.A. No. 2:21-mc-01230-JFC, Dkt. No. 870 (11/16/2022) (W.D. Pa.) (Pretrial Order No. 25(a) Modifying census Registry Program); *In re: Zantac (Ranitidine) Prod. Liab. Litig.*, C.A. No. 9:20-md-02924-RLR (S.D. Fla.); Dkt. No. 547 (04/02/2020) (Pretrial Order #15) (Order on Procedures for Implementing Census).

In the **Benicar** litigation, the Court utilized a census system for the registration of both filed cases and unfiled claims. *See* CMO No. 30, *In re: Benicar,* 15-md-2606 (D.N.J.) (8/1/2017). The Court later supplemented that Order with the entry of CMO 37 that applied to *all* counsel who registered one or more claimants with unfiled claim in the Census, further showing the power of a Court to exercise jurisdiction

13

over unfiled claimants where the counsel is before the Court for filed cases. *See* CMO 37, *In re: Benicar,* 15-md-2606 (D.N.J.) (9/20/2017).

Here, the PSC is not presently seeking a PPF from the unfiled cases/claims, nor even the extent of information that might typically be required to be provided in a census as in *Philips* or *Zantac*. What the PSC requests is an identification of each unfiled claimant and for each such person to produce a pathology report or another oncology record(s), so as to be able to assess which, if any, suffer from ovarian cancer, the injury that the PSC is litigating, as compared to some other injury, or other gynecological cancer.

What the PSC asks for is not onerous. For each such unfiled claimant represented by counsel, that counsel should have, at the minimum, determined from what illness the client suffers and whether the claimant suffers from ovarian cancer. An unfiled claimant can comply by simply providing a pathology report or another oncology record showing the injury that they suffered. If the unfiled claimants can do that, then the person's obligation under the proposed Order the PSC seeks here will have been satisfied.

The Third Circuit has recognized that a District Court should be accorded great latitude in managing an MDL case. *See Hamer v. Livanova Deutschland GmbH*, 994 F.3d 173, 178-179 (3rd Cir. 2021). As noted by the Third Circuit, a District Court does not abuse its discretion by entering a case management order or

by including among its provisions a requirement that plaintiffs produce medical evidence to support a claim. A district court, administrating a multidistrict case, faces unique challenges not present when administrating cases on a routine docket. As such, in the MDL context, the Third Circuit concluded that district courts must be granted significant latitude to manage their dockets and to mitigate "potential burdens on the defendants and court." In an MDL case, management orders are essential tools in helping the court weed out non-meritorious or factually distinct claims. That said, "efficiency must not be achieved at the expense of preventing meritorious claims from going forward." The Order the PSC seeks strikes the appropriate balance.

Dated: July 10, 2024          Respectfully submitted,

*/s/ P. Leigh O'Dell*
P. Leigh O'Dell
BEASLEY, ALLEN, CROW, METHVIN PORTIS & MILES, P.C.
218 Commerce St.
Montgomery, AL 36104
Tel: 334-269-2343
leigh.odell@beasleyallen.com
**Plaintiffs' Co-Lead Counsel**

*/s/ Michelle A. Parfitt*
Michelle A. Parfitt
ASHCRAFT & GEREL, LLP
1825 K Street, NW, Suite 700
Washington, DC 20006
Tel: 202-335-2600

15

>mparfitt@ashcraftlaw.com
>***Plaintiffs' Co-Lead Counsel***
>
>*/s/ Christopher M. Placitella*
>Christopher M. Placitella
>COHEN, PLACITELLA & ROTH, P.C.
>127 Maple Ave.
>Red Bank, NJ 07701
>Tel: 732-747-9003
>clpacitella@cprlaw.com
>***Plaintiffs' Liaison Counsel***

## CERTIFICATE OF SERVICE

I hereby certify that on July 10, 2024, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the CM/ECF participants registered to receive services in this MDL.

>Respectfully submitted,
>
>*/s/ P. Leigh O'Dell*
>P. Leigh O'Dell

16