# EXHIBIT 2

Case: 3:16-md-02738-MAS-RLS Document 32985-3 Filed 07/19/24 Page 2 of 44
Case: 1:16-cv-06847 Document #: 1 Filed: 06/29/16 Page 1 of 41 PageID #:1
PageID: 189368

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| **TOD ALAN MUSGROVE, Individually and as Personal Representative of the Estate of PAMELA N. MUSGROVE, Deceased.** | |
| **Plaintiff,** | **Case Number: 1:16-cv-6847** |
| **v.** | |
| **JOHNSON & JOHNSON, and JOHNSON & JOHNSON CONSUMER COMPANIES, INC.,** | |
| **Defendants.** | **JURY TRIAL DEMANDED** |

## COMPLAINT

COMES NOW Plaintiff, Tod Alan Musgrove, individually and as the personal representative of the estate of Pamela N. Musgrove, deceased, by and through undersigned counsel, who brings this action against Defendants Johnson & Johnson ("J&J") and Johnson & Johnson Consumer Companies, Inc. ("J&J Consumer") as follows:

## INTRODUCTION

1.      This action arises out of Pamela N. Musgrove's diagnosis of uterine cancer and her subsequent death. Mrs. Musgrove's cancer and death were directly and proximately caused by her regular and prolonged exposure to talcum powder,

Case 3:16-md-02738-MAS-RLS   Document 32985-3   Filed 07/19/24   Page 3 of 44
Case 1:18-cv-00044   Document #: 1   Filed: 06/29/16   Page 2 of 41   PageID #:2
PageID: 189369

contained in Johnson & Johnson Baby Powder (hereinafter "J&J Baby Powder) and Shower to Shower. Plaintiff Tod Alan Musgrove brings this cause of action against Defendants for claims arising from the direct and proximate result of Defendants' and/or their corporate predecessors' negligent, willful, and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, distribution, labeling, and/or sale of the products known as J&J Baby Powder and Shower to Shower (hereinafter collectively referred to as "Products").

**PARTIES**

2.       Mrs. Musgrove was born on June 14, 1965, and used J&J Baby Powder and Shower to Shower, the "Products," for nearly her entire life. As a direct and proximate result of using the Products, Mrs. Musgrove was diagnosed with uterine cancer in approximately 2012, and ultimately died of uterine cancer on June 29, 2014. Mrs. Musgrove resided in Lee County, Illinois at the time of her diagnosis and death, and she purchased and used the Products in Lee County, Illinois.

3.       Plaintiff Tod Alan Musgrove resides in Lee County, Illinois, and was married to Mrs. Musgrove at all times pertinent to the allegations herein, including at the time of Mrs. Musgrove's use of the Products, diagnosis with uterine cancer, and death. On June 22, 2016, Mr. Musgrove was duly appointed as the Representative of the estate of his late wife in Lee County, Illinois.

4.      Defendant, Johnson & Johnson ("J&J"), is a New Jersey corporation with its principal place of business in the State of New Jersey.

5.      At all pertinent times, Johnson & Johnson was engaged in the business of manufacturing, marketing, testing, promoting, selling, and/or distributing the Products. At all pertinent times, Johnson & Johnson regularly transacted, solicited, and conducted business in all States of the United States, including the State of Illinois.

6.      Defendant, Johnson & Johnson Consumer Companies, Inc. is a New Jersey corporation with its principal place of business in the State of New Jersey.

7.      At all pertinent times, Johnson & Johnson Consumer Companies, Inc. was engaged in the business of manufacturing, marketing, testing, promoting, selling, and/or distributing the Products. At all pertinent times, Johnson & Johnson regularly transacted, solicited, and conducted business in all States of the United States, including the State of Illinois.

8.      At all pertinent times, all Defendants were engaged in the research, development, manufacture, design, testing, sale and marketing of the Products, and introduced such products into interstate commerce with knowledge and intent that such products be sold in the State of Illinois.

## JURISDICTION AND VENUE

Case 3:16-md-02738-MAS-RLS   Document 32985-3   Filed 07/19/24   Page 5 of 44
Case 1:18-cv-06843   Document #: 1   Filed: 06/29/16 Page 4 of 41 PageID #: 4
PageID: 189371

9.     This Court has original jurisdiction pursuant to 28 U.S.C. § 1332(d) because complete diversity exists between Plaintiff and Defendants, and the matter in controversy, exclusive of interest and costs, exceeds the sum or value of $75,000.

10.    This Court has personal jurisdiction over Defendants because Defendants are authorized to conduct and do conduct business in the State of Illinois. Defendants have marketed, promoted, distributed, and sold the Products in the state of Illinois and Defendants have sufficient minimum contacts with this State and/or sufficiently avail themselves of the markets in this State through their promotion, sales, distribution and marketing within this State to render the exercise of jurisdiction by this Court permissible.

11.    Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(a) and (b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this judicial district. Venue is also proper under 18 U.S.C. § 1965(a) because Defendants transact substantial business in this District.

## FACTS COMMON TO ALL COUNTS

### A. Background: Talc as a Carcinogen and Defendants' Knowledge

12.    Talc is a magnesium trisilicate and is mined from the earth. Talc is an inorganic mineral.

13.     Talc is the main substance in talcum powders. The Johnson & Johnson Defendants manufactured the Products. The Products are composed almost entirely of talc.

14.     At all pertinent times, a feasible alternative to the Products has existed. For example, cornstarch is an organic carbohydrate that is quickly broken down by the body with no known health effects. Cornstarch powders have been sold and marketed for the same uses as the Products with nearly the same effectiveness.

15.     Historically, "Johnson's Baby Powder" has been a symbol of freshness, cleanliness, and purity. During the time in question, the Johnson & Johnson Defendants advertised and marketed this product as the beacon of "freshness" and "comfort", eliminating friction on the skin, absorbing "excess wetness" helping keep skin feeling dry and comfortable, and "clinically proven gentle and mild." The Johnson & Johnson Defendants instructed women through advertisements to dust themselves with this product to mask odors. The bottle of "Johnson's Baby Powder" specifically targets women by stating, "For you, use every day to help feel soft, fresh, and comfortable."

16.     During the time in question, the Johnson & Johnson Defendants advertised and marketed the product "Shower to Shower" as safe for use by women as evidenced in its slogan "A sprinkle a day keeps odor away", and through advertisements such as "Your body perspires in more places than just under your arms.

Use SHOWER to SHOWER to feel dry, fresh, and comfortable throughout the day."
And "SHOWER to SHOWER can be used all over your body."

17.     In 1971, the first study was conducted that suggested an association
between talc and ovarian cancer. This study was conducted by Dr. W.J. Henderson and
others in Cardiff, Wales.

18.     In 1982, the first epidemiologic study was performed on talc powder use
in the female genital area. This study was conducted by Dr. Daniel Cramer and others.
This study found a 92% increased risk in ovarian cancer with women who reported
genital talc use. Shortly after this study was published, Dr. Bruce Semple of Johnson &
Johnson came and visited Dr. Cramer about his study. Dr. Cramer advised Dr. Semple
that Johnson & Johnson should place a warning on its talcum powders about the
ovarian cancer risks so that women can make an informed decision about their health.

19.     Since 1982, there have been approximately twenty-two (22) additional
epidemiologic studies providing data regarding the association of talc and ovarian
cancer. Nearly all of these studies have reported an elevated risk for ovarian cancer
associated with genital talc use in women.

   a.   In 1983, a case-control study found a 150% increased risk of ovarian
        cancer for women who use talcum powder in the genital area. Hartge, P.,
        *et al*. Talc and Ovarian Cancer. *JAMA*. 1983; 250(14):1844.

   b.   In 1988, a case control study of 188 women diagnosed with epithelial

ovarian cancer and 539 control women found that 52% of the cancer patients habitually used talcum powder on the genital area before their cancer diagnosis. The study showed a 50% increase in risk of ovarian cancer in women that used talcum powder on their genital area and a positive dose-response relationship. Whittemore AS, *et al*. Personal and environmental characteristics related to epithelial ovarian cancer. II. Exposures to talcum powder, tobacco, alcohol, and coffee. *Am. J. Epidemiol*. 1988 Dec; 128(6):1228-40.

c. A 1989 study looked at 235 women diagnosed with epithelial ovarian cancer and 451 controls, and found a 29% increased risk in ovarian cancer with women who reported genital talcum powder use more than once each week. Booth, M., *et al*. Risk factors for ovarian cancer: a case-control study. *Br J Cancer*. 1989 Oct; 60(4):592-8.

d. In 1992, a case-control study found a statistically significant 80% increased risk of ovarian cancer in women with more than 10,000 lifetime perineal applications of talc, demonstrating a positive dose-response relationship. Harlow BL, *et al*. Perineal exposure to talc and ovarian cancer risk. *Obstet Gynecol*. 1992 Jul; 80(1):19-26.

e. Another 1992 case-control study reported a 70% increased risk from genital talc use and a 379% increased risk of ovarian cancer of women

who used talc on sanitary napkins in their genital area. Rosenblatt, K.A. *et al.* Mineral fiber exposure and the development of ovarian cancer. *Gynecol Oncol.* 1992 Apr; 45(1):20-5.

f.   In 1995, the largest study of its kind to date found a statistically significant 27% increased risk in ovarian cancer for women who regularly use talc in the abdominal or perineal area. Purdie, D., *et al.* Reproductive and other factors and risk of epithelial ovarian cancer: An Australian case-control study. Survey of Women's Health Study Group. *Int J Cancer.* 1995 Sep 15; 62(6):678-84.

g.   In 1996, a case-control study found a statistically significant 97% increased risk of ovarian cancer in women who used what they described as a "moderate" or higher use of talc-based powders in their genital area. *See* Shushan, A., *et al.* Human menopausal gonadotropin and the risk of epithelial ovarian cancer. *Fertil. Steril.* 1996 Jan; 65(1):13-8.

h.   In 1997, a case control study of 313 women with ovarian cancer and 422 without this disease found that the women with cancer were more likely to have applied talcum powder to their external genitalia area. Women using these products had a statistically significant 50% to 90% higher risk of developing ovarian cancer. Cook, LS, *et al.* Perineal powder exposure and the risk of ovarian cancer. *Am. J Epidemiol.* 1997 Mar 1; 145(5):459-65.

Case 3:16-md-02738-MAS-RLS    Document 32985-3  Filed 07/10/24    Page 10 of 44
Case 1:18-cv-00847-Document #: 1 Filed: 06/29/16 Page 9 of 44 PageID #:9
PageID: 189376

i. In 1997, a case-control study involving over 1,000 women found a statistically significant increased risk of 42% for ovarian cancer for women who applied talc via sanitary napkins to their perineal area. Chang, S, *et al*. Perineal talc exposure and risk of ovarian carcinoma. *Cancer*. 1997 Jun 15; 79(12):2396-401.

j. In 1998, a case-control study found a 149% increased risk of ovarian cancer in women who used talc-based powders on their perineal area. Godard, B., *et al.* Risk factors for familial and sporadic ovarian cancer among French Canadians: a case-control study. *Am J Obstet Gynecol*. 1998 Aug; 179(2):403-10.

k. Dr. Daniel Cramer conducted another case-control study in 1999, observing 563 women newly diagnosed with epithelial ovarian cancer and 523 women in a control. The study found a statistically significant 60% increased risk of ovarian cancer in women that used talc-based body powders on their perineal area and an 80% increase in risk for women with over 10,000 lifetime applications. Cramer, DW, *et al.* Genital talc exposure and risk of ovarian cancer. *Int J Cancer*. 1999 May 5; 81(3):351-56.

l. In 2000, a case-control study of over 2,000 women found a statistically significant 50% increased risk of ovarian cancer from genital talc use in

Case 3:16-md-02738-MAS-RLS   Document 32925-16   Filed 07/19/24   Page 11 of 44
Case 1:16-cv-06847-DBR   Document 1-1   Filed 08/29/16   Page 10 of 44 PageID #:110
PageID: 189377

women. Ness, RB, *et al.* Factors related to inflammation of the ovarian epithelium and risk of ovarian cancer. *Epidemiology*. 2000 Mar; 11(2):111-7.

m. In 2004, a case-control study of nearly 1,400 women from 22 counties in Central California found a statistically significant 37% increased risk of epithelial ovarian cancer from women's genital talc use, and a 77% increased risk of serous invasive ovarian cancer from women's genital talc use. Importantly, this study also examined at women's use of cornstarch powders as an alternative to talc, and found no increased risk in ovarian cancer in women in the cornstarch group, further supporting the causal connection between genital talc use and ovarian cancer. Mills, PK, *et al*. Perineal talc exposure and epithelial ovarian cancer risk in the Central Valley of California. *Int J Cancer*. 2004 Nov 10; 112(3):458-64.

n. In 2008, a combined study of over 3,000 women from a New England-based case-control study found a general 36% statistically significant increased risk of epithelial ovarian cancer from genital talc use and a 60% increased risk of the serous invasive ovarian cancer subtype. The study also found a strong dose-response relationship between the cumulative talc exposure and incidence of ovarian cancer, adding further support to the causal relationship. Gates, MA, *et al.* Talc Use, Variants of the GSTM1,

Case 3:16-md-02738-MAS-RLS    Document 32985-2    Filed 07/10/24    Page 12 of 44
Case 1:16-cv-06847    Document 9-1    Filed 08/29/16    Page 21 of 44 PageID #: 21
PageID: 189378

GSTT1, and NAT2 Genes, and Risk of Epithelial Ovarian Cancer. *Cancer Epidemiol Biomarkers Prev.* 2008 Sep; 17(9):2436-44.

o.  A 2009 case-control study of over 1,200 women found the risk of ovarian cancer increased significantly with increasing frequency and duration of talc use, with an overall statistically significant 53% increased risk of ovarian cancer from genital talc use. That increased risk rose dramatically, to 108%, in women with the longest duration and most frequent talc use. Wu, AH, *et al.* Markers of inflammation and risk of ovarian cancer in Los Angeles County. *Int. J Cancer.* 2009 Mar 15; 124(6):1409-15.

p.  In 2011, another case-control study of over 2,000 women found a 27% increased risk of ovarian cancer from genital talc use. Rosenblatt, KA, *et al.* Genital powder exposure and the risk of epithelial ovarian cancer. *Cancer Causes Control.* 2011 May; 22(5):737-42.

q.  In June of 2013, a pooled analysis of over 18,000 women in eight case-control studies found a 20% to 30% increased risk of women developing epithelial ovarian cancer from genital powder use. The study concluded by stating, "Because there are few modifiable risk factors for ovarian cancer, avoidance of genital powders may be a possible strategy to reduce ovarian cancer incidence." Terry, KL, *et al.* Genital powder use

and risk of ovarian cancer: a pooled analysis of 8,525 cases and 9,859 controls. *Cancer Prev Res (Phila)*. 2013 Aug; 6(8):811-21.

20.    Researchers have also examined the link between endometrial cancer, a form of uterine cancer, and the application of talcum powder to the perineal area.

21.    In 2010, one such study analyzed data from a 1976 cohort study of over 66,000 women, and found a statistically significant 21% increased risk of endometrial (uterine) cancer in postmenopausal women who had ever applied talcum powder in the perineal area. This risk rose to 24% for postmenopausal women who applied talc in the perineal area "regularly," defined as at least once a week. Karageorgi S., *et al.* (2010) Perineal use of talcum powder and endometrial cancer risk. *Cancer Epidemiol Biomarkers Prev*. 2010 May; 19:1269–1275.

22.    In 1993, the United States National Toxicology Program published a study on the toxicity of non-asbestiform talc and found clear evidence of carcinogenic activity. Talc was found to be a carcinogen, with or without the presence of asbestos-like fibers.

23.    In response to the United States National Toxicology Program's study, the Cosmetic Toiletry and Fragrance Association (CTFA) formed the Talc Interested Party Task Force (TIPTF). Johnson & Johnson, Inc., and Johnson & Johnson Consumer Companies, Inc. were members of the CTFA. The stated purpose of the TIPTF was to pool financial resources of these companies in an effort to collectively defend talc use at all costs and to prevent regulation of any type over this industry. The TIPTF hired

Case 3:16-md-02738-MAS-RLS   Document 32825-16   Filed 07/19/24   Page 14 of 44
Case 1:16-cv-06847   Document 11   Filed 08/29/16   Page 13 of 41 PageID #:13
PageID: 189380

scientists to perform biased research regarding the safety of talc, members of the TIPTF edited scientific reports of the scientists hired by this group prior to the submission of these scientific reports to governmental agencies, members of the TIPTF knowingly released false information about the safety of talc to the consuming public, and used political and economic influence on regulatory bodies regarding talc. All of these activities have been well coordinated and planned by these companies and organizations over the past four (4) decades in an effort to prevent regulation of talc and to create confusion to the consuming public about the true hazards of talc relative to cancer.

24.     On November 10, 1994, the Cancer Prevention Coalition mailed a letter to then Johnson & Johnson C.E.O, Ralph Larson, informing his company that studies as far back as 1960's ". . . show[ ] conclusively that the frequent use of talcum powder in the genital area pose[ ] a serious health risk of ovarian cancer." The letter cited a recent study by Dr. Bernard Harlow from Harvard Medical School confirming this fact and quoted a portion of the study where Dr. Harlow and his colleagues discouraged the use of talc in the female genital area. The letter further stated that 14,000 women per year die from ovarian cancer and that this type of cancer is very difficult to detect and has a low survival rate. The letter concluded by requesting that Johnson & Johnson withdraw talc products from the market because of the alternative of cornstarch powders, or at a

minimum, place warning information on its talc-based body powders about ovarian cancer risk they pose.

25.     In 1996, the condom industry stopped dusting condoms with talc due to the growing health concerns.

26.     In February of 2006, the International Association for the Research of Cancer (IARC) part of the World Health Organization published a paper whereby they classified perineal use of talc based body powder as a "Group 2B" human carcinogen. IARC which is universally accepted as the international authority on cancer issues, concluded that studies from around the world consistently found an increased risk of ovarian cancer in women from perineal use of talc. IARC found that between 16-52% of women in the world were using talc to dust their perineum and found an increased risk of ovarian cancer in women talc users ranging from 30-60%. IARC concluded with this "Evaluation": "There is limited evidence in humans for the carcinogenicity of perineal use of talc-based body powder." By definition "Limited evidence of carcinogenicity" means "a positive association has been observed between exposure to the agent and cancer for which a causal interpretation is considered by the Working Group to be credible, but chance, bias or confounding could not be ruled out with reasonable confidence."

27.     In approximately 2006, the Canadian government under The Hazardous Products Act and associated Controlled Products Regulations classified talc as a "D2A,"

Case: 3:16-md-02738-MAS-RLS Document 32925-2 Filed 07/19/24 Page 16 of 44
Case: 1:16-cv-06847 Document #: 1 Filed 06/29/16 Page 15 of 44 PageID #:15
PageID: 189382

"very toxic," 51 "cancer causing" substance under its Workplace Hazardous Materials Information System (WHMIS). Asbestos is also classified as "D2A".

28.     In 2006, Imerys Talc began placing a warning on the Material Safety Data Sheets (MSDS) it provided to the Johnson & Johnson Defendants regarding the talc it sold to them to be used in the Products. These MSDSs not only provided the warning information about the IARC classification but also included warning information regarding "States Rights to Know" and warning information about the Canadian Government's "D2A" classification of talc as well.

29.     Defendants had a duty to know and warn about the hazards associated with the use of the Products.

30.     Defendants failed to inform customers and end users of the Products of a known catastrophic health hazard associated with the use of the Products.

31.     In addition, Defendants procured and disseminated false, misleading, and biased information regarding the safety of the Products to the public and used influence over governmental and regulatory bodies regarding talc.

**B.  Mrs. Musgrove's Use of the Products**

32.     Mrs. Musgrove was born in 1965, and was a resident of Lee County, Illinois for the last twenty (20) years of her life.

33.     Mrs. Musgrove was first exposed to talcum based products as an infant, and she continued the practice of applying talcum powder based products to her

perineal area, including the Products, on a daily basis for the rest of her life, exactly as instructed and advertised by the Johnson & Johnson Defendants.

34.     There was never any indication, on the Products packaging or otherwise, that this normal use could and would cause her to develop uterine cancer.

35.     Mrs. Musgrove was diagnosed with uterine cancer in or around 2012, and underwent a total hysterectomy and subsequent treatment.

36.     Mrs. Musgrove died as a result of uterine cancer on June 29, 2014. She was only 49 years old.

37.     As noted above, Plaintiff Tod Alan Musgrove is Mrs. Musgrove's surviving spouse and the personal representative of her estate.

## COUNT ONE - STRICT LIABILITY
## (FAILURE TO WARN)

38.     Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

39.     At all pertinent times, the Johnson & Johnson Defendants were manufacturing, marketing, testing, promoting, selling and/or distributing the Products in the regular course of business.

40.     At all pertinent times, Mrs. Musgrove used the Products to powder her perineal area, which is a reasonably foreseeable use.

41.     At all pertinent times, Defendants in this action knew or should have known that the use of talcum powder based products in the perineal area significantly

Case 3:16-md-02738-MAS-RLS Document 32885-16 Filed 07/10/24 Page 18 of 44
Case: 1:16-cv-36647 Document #: 1 Filed 08/29/16 Page 17 of 44 PageID #:17
PageID: 189384

increases the risk of cancer, including, but not limited to, ovarian and uterine cancer, based upon scientific knowledge dating back for decades.

42.     At all pertinent times, including the time of sale and consumption, the Products, when put to the aforementioned reasonably foreseeable use, were in an unreasonably dangerous and defective condition because they failed to contain adequate and proper warnings and/or instructions regarding the increased risk of cancer, including, but not limited to, ovarian and uterine cancer, associated with the use of the Products by women to powder their perineal area. Defendants themselves failed to properly and adequately warn and instruct Mrs. Musgrove as to the risks and benefits of the Products given her need for this information.

43.     Had Mrs. Musgrove received a warning that the use of the Products would significantly increase her risk of developing cancer, she would not have used them. As a proximate result of Defendants' design, manufacture, marketing, sale, and distribution of the Products, Mrs. Musgrove was injured catastrophically, and was caused severe pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort, economic damages, and death.

44.     The development of uterine cancer by Mrs. Musgrove was the direct and proximate result of the unreasonably dangerous and defective condition of the Products at the time of sale and consumption, including their lack of warnings; Mrs. Musgrove

suffered injuries and damages including, but not limited to, physical and mental pain and suffering, medical expenses, and death.

45.    Defendants' products were defective because they failed to contain warnings and/or instructions, and breached express warranties and/or failed to conform to express factual representations upon which Mrs. Musgrove justifiably relied in electing to use the Products. The defect or defects made the Products unreasonably dangerous to persons, such as Mrs. Musgrove, who could reasonably be expected to use and rely upon such products. As a result, the defect or defects were a producing cause of Mrs. Musgrove's injuries and damages.

46.    Defendants' products failed to contain, and continue to this day not to contain, adequate warnings and/or instructions regarding the increased risk of cancer, including, but not limited to, ovarian and uterine cancer, with the use of their products by women. Defendants continue to market, advertise, and expressly represent to the general public that it is safe for women to use their product regardless of application. These Defendants continue with these marketing and advertising campaigns despite having scientific knowledge that dates back to the 1960's that their products increase the risk of ovarian cancer in women when used in the perineal area.

47.    Mrs. Musgrove sustained the following damages as a foreseeable, direct, and proximate result of Defendants' acts and/or omissions:

          a.   Economic losses including medical care and lost earnings; and

Case 3:16-md-02738-MAS-RLS   Document 32885-16   Filed 07/10/24   Page 20 of 44
Case: 1:16-cv-06047 Document #: 1 Filed: 06/29/16 Page 19 of 44 PageID #:19
PageID: 189386

b. Noneconomic losses including physical and mental pain and

suffering, emotional distress, inconvenience, loss of enjoyment

and impairment of quality of life, past and future, and death.

## COUNT TWO – STRICT LIABILITY
## (DESIGN AND/OR MANUFACTURING DEFECT)

48.     Plaintiff incorporates by reference each of the preceding paragraphs as if

fully set forth herein.

49.     Defendants engaged in the design, development, manufacture,

marketing, sale, and distribution of the Products in a defective and unreasonably

dangerous condition to consumers, including Mrs. Musgrove.

50.     Defendants caused the Products to enter the stream of commerce and to

be sold through various retailers, where Mrs. Musgrove purchased the Products.

51.     The Products were expected to, and did, reach consumers, including

Mrs. Musgrove, without change in the condition in which it was manufactured and

sold by Defendants and/or otherwise released into the stream of commerce.

52.     Mrs. Musgrove used the Products in a manner normally intended,

recommended, promoted, and marketed by Defendants.

53.     Products failed to perform safely when used by Mrs. Musgrove in a

reasonably foreseeable manner, specifically increasing her of developing uterine

cancer.

Case 3:16-md-02738-MAS-RLS   Document 32885-16   Filed 07/19/24   Page 21 of 44
Case: 1:16-cv-06847 Document #: 11 Filed: 08/29/16 Page 20 of 44 PageID #:20
PageID: 189387

54.     The propensity of talc fibers to translocate into the female reproductive system, including, but not limited to, the ovaries and endometrial lining of the uterus, thereby substantially increasing the risk of cancer, including, but not limited to, ovarian and uterine cancer, renders the Products unreasonably dangerous when used in the manner it was intended and to an extent beyond that would be contemplated by the ordinary consumer.

55.     Importantly, the Products are an inessential cosmetic product that do not treat or cure any serious disease. Further, safer alternatives, including corn-starch based powders, have been readily available for decades.

56.     Defendants have known, or should have known, that the Products are unreasonably dangerous when used by a woman in her perineal area but have continued to design, manufacture, sell, distribute, market, promote, and supply the Products so as to maximize sales and profits at the expense of public health and safety in conscious disregard of the foreseeable harm to the consuming public, including Mrs. Musgrove.

57.     As a direct and proximate result of Defendants' conduct, including actions, omissions, and misrepresentations, Mrs. Musgrove sustained the following damages:

      a.   Economic losses including medical care and lost earnings; and

      b.   Noneconomic losses including physical and mental pain and

Case 3:16-md-02738-MAS-RLS   Document 32985-2   Filed 07/10/24   Page 22 of 44
Case 1:16-cv-06047   Document 1-1   Filed 08/29/16   Page 21 of 44   PageID #: 21
PageID: 189388

suffering, emotional distress, inconvenience, loss of enjoyment
and impairment of quality of life, past and future, and death.

## COUNT THREE-NEGLIGENCE

58.     Plaintiff incorporates by reference each of the preceding paragraphs as if
fully set forth herein.

59.     The Johnson & Johnson Defendants were negligent in marketing,
designing, manufacturing, producing, supplying, inspecting, testing, selling and/or
distributing the Products in one or more of the following respects:

- In failing to warn Mrs. Musgrove of the hazards associated with the use of
  the Products;

- In failing to properly test their products to determine adequacy and
  effectiveness or safety measures, if any, prior to releasing the Products for
  consumer use;

- In failing to properly test their products to determine the increased risk of
  ovarian cancer during the normal and/or intended use of the Products;

- In failing to inform ultimate users, such as Mrs. Musgrove as to the safe
  and proper methods of handling and using the Products;

- In failing to remove the Products from the market when Defendants knew
  or should have known the Products were defective;

Case 3:16-md-02738-MAS-RLS Document 32995-2 Filed 07/10/24 Page 22 of 44
Case 1:16-cv-06847 Document 1 Filed 08/29/16 Page 22 of 44 PageID #:22
PageID: 189389

- In failing to instruct the ultimate users, such as Mrs. Musgrove, as to the methods for reducing the type of exposure to the Products which caused increased risk of cancer, including, but not limited to, ovarian and uterine cancer;

- In failing to inform the public in general and Mrs. Musgrove in particular of the known dangers of using the Products for dusting the perineum;

- In failing to advise users how to prevent or reduce exposure that caused increased risk for cancer, including, but not limited to, ovarian and uterine cancer;

- In marketing and labeling the Products as safe for all uses despite knowledge to the contrary.

- In failing to act like a reasonably prudent company under similar circumstances.

Each and all of these acts and omissions, taken singularly or in combination, were a proximate cause of the injuries and damages sustained by Mrs. Musgrove.

60.    At all pertinent times, the Johnson & Johnson Defendants knew or should have known that the Products were unreasonably dangerous and defective when put to their reasonably anticipated use.

61.    Mrs. Musgrove sustained the following damages as a foreseeable, direct, and proximate result of Defendants' acts and/or omissions:

Case 3:16-md-02738-MAS-RLS Document 32905-2 Filed 07/10/24 Page 24 of 44
Case: 1:16-cv-06844 Document #: 1 Filed: 06/29/16 Page 23 of 44 PageID #:23
PageID: 189390

     a.  Economic losses including medical care and lost earnings; and

     b.  Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, and loss of enjoyment and impairment of quality of life, past and future, and death.

### COUNT FOUR- BREACH OF EXPRESS WARRANTY

62.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

63.    The Johnson & Johnson Defendants expressly warranted, through direct-to-consumer marketing, advertisements, and labels, that the Products were safe and effective for reasonably anticipated uses, including use by women in the perineal area.

64.    The Products did not conform to these express representations because they cause serious injury when used by women in the perineal area in the form of cancer, including, but not limited to, ovarian and uterine cancer.

65.    Mrs. Musgrove sustained the following damages as a foreseeable, direct, and proximate result of Defendants' acts and/or omissions:

     a.  Economic losses including medical care and lost earnings; and

     b.  Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future, and death.

Case 3:16-md-02738-MAS-RLS  Document 32885-2  Filed 07/10/24  Page 25 of 44
Case: 1:16-cv-06847  Document #: 1  Filed: 08/29/16  Page 24 of 44  PageID #:24
PageID: 189391

## COUNT FIVE – BREACH OF IMPLIED WARRANTIES

66.     Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

67.     At the time the Defendants manufactured, marketed, labeled, promoted, distributed and/or sold the Products, the Johnson & Johnson Defendants knew of the uses for which the Products were intended, including use by women in the perineal area, and impliedly warranted the Products to be of merchantable quality and safe for such use.

68.     Defendants breached their implied warranties of the Products sold to Mrs. Musgrove because they were not fit for their common, ordinary and intended uses, including use by women in the perineal area.

69.     Mrs. Musgrove sustained the following damages as a foreseeable, direct, and proximate result of Defendants' acts and/or omissions:

    a.  Economic losses including medical care and lost earnings; and

    b.  Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future, and death.

## COUNT SIX – PUNITIVE DAMAGES

70.     Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

Case 3:16-md-02738-MAS-RLS   Document 32885-16   Filed 07/10/24   Page 26 of 44
Case: 1:16-cv-06847 Document #: 1 Filed: 06/29/16 Page 25 of 44 PageID #:25
PageID: 189392

71. Defendants have acted willfully, wantonly, with an evil motive, and recklessly in one or more of the following ways:

    a. Defendants knew of the unreasonably high risk of cancer, including, but not limited to, ovarian and uterine cancer, posed by the Products before manufacturing, marketing, distributing and/or selling the Products, yet purposefully proceeded with such action;

    b. Despite their knowledge of the high risk of cancer, including, but not limited to, ovarian and uterine cancer, associated with the Products, Defendants affirmatively minimized this risk through marketing and promotional efforts and product labeling;

    c. Through the actions outlined above, Defendants expressed a reckless indifference to the safety of users of the Products, including Mrs. Musgrove. Defendants' conduct, as described herein, knowing the dangers and risks of the Products, yet concealing and/or omitting this information, in furtherance of their conspiracy and concerted action was outrageous because of Defendants' evil motive or a reckless indifference to the safety of users of the Products.

72. Mrs. Musgrove sustained the following damages as a foreseeable, direct, and proximate result of Defendants' acts and/or omissions:

    a. Economic losses including medical care and lost earnings; and

    b. Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future, and death.

## COUNT SEVEN – NEGLIGENT MISREPRESENTATION

73. Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

Case 3:16-md-02738-MAS-RLS   Document 32925-16   Filed 07/19/24   Page 27 of 44
Case: 1:16-cv-06047 Document #: 1 Filed 08/29/16 Page 26 of 44 PageID #:26
PageID: 189393

74.     Defendants had a duty to accurately and truthfully represent to the medical and healthcare community, Mrs. Musgrove, and the public, that the Products had been tested and found to be safe and effective for use in the perineal area. The representations made by Defendants, in fact, were false.

75.     Defendants failed to exercise ordinary care in the representations concerning the Products while they were involved in their manufacture, sale, testing, quality assurance, quality control, and distribution in interstate commerce, because Defendants negligently misrepresented the Products' high risk of unreasonable, dangerous, adverse side effects.

76.     Defendants breached their duty in representing that the Products have no serious side effects.

77.     As a foreseeable, direct and proximate result of the negligent misrepresentation of Defendants as set forth herein, Defendants knew, and had reason to know, that the Products had been insufficiently tested, or had not been tested at all, and that they lacked adequate and accurate warnings, and that it created a high risk, and/or higher than acceptable risk, and/or higher than reported and represented risk, of adverse side effects, including, but not limited to, ovarian and uterine cancer.

78.     Mrs. Musgrove sustained the following damages as a foreseeable, direct, and proximate result of Defendants' acts and/or omissions:

             a.  Economic losses including medical care and lost earnings; and

Case 3:16-md-02738-MAS-RLS Document 32895-2 Filed 07/19/24 Page 27 of 44
Case 1:16-cv-06847 Document #: 1 Filed 08/29/16 Page 27 of 44 PageID #:27
PageID: 189394

    b. Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future, and death.

### COUNT EIGHT – FRAUDULENT CONCEALMENT

79. Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

80. Defendants owed consumers, including Mrs. Musgrove, a duty to fully and accurately disclose all material facts regarding the Products, not to conceal material defects related thereto, not to place these defective products into the stream of commerce, and to fully and accurately label product packaging. To the contrary, Defendants explicitly and/or implicitly represented that the Products were safe and effective.

81. Defendants actively and intentionally concealed and/or suppressed material facts, in whole or in part, to induce consumers, including Mrs. Musgrove, to purchase and use the Products and did so at her expense. Specifically:

    a. Defendants have been aware of the positive association between feminine talc use and cancer demonstrated by epidemiology studies since at least 1982 and more than a dozen such published studies, including meta- analyses, have been published demonstrating similar results;

Case 3:16-md-02738-MAS-RLS Document 32885-6 Filed 07/10/24 Page 29 of 44
Case 1:16-cv-06847 Document 9-1 Filed 08/29/16 Page 28 of 41 PageID #:28
PageID: 189395

b. Defendants have been aware, for decades, of the propensity for talc particles to translocate from the perineum through the vaginal tract into the ovaries;

c. IARC, the recognized world authority of agent carcinogenicity, has determined that there is a credible causal connection between feminine talc use and ovarian cancer; and

d. Johnson & Johnson's own paid consultant, Dr. Alfred Wehner, advised the company on multiple occasions, by at least 1997, that Johnson & Johnson's denial of a positive association between feminine talc use and ovarian cancer was "technically and factually incorrect."

e. Recent studies have established a statistically significant correlation between talcum powder use in the perineal area and uterine cancer.

82. Defendants made the misrepresentations and/or omissions for the purpose of deceiving and defrauding Mrs. Musgrove and with the intention of having her act and rely on such misrepresentations and/or omissions.

83. Defendants knew that their concealments, misrepresentations and/or omissions were material, and that they were false, incomplete, misleading, deceptive, and deceitful when they were made. Alternatively, Defendants concealed information,

Case 3:16-md-02738-MAS-RLS Document 32885-16 Filed 07/10/24 Page 30 of 44
Case: 1:16-cv-06847 Document #: 1 Filed: 08/29/16 Page 29 of 44 PageID #:29
PageID: 189396

and/or made the representations with such reckless disregard for the truth that knowledge of the falsity can be imputed to them.

84.     Defendants profited, significantly, from their unethical and illegal conduct that caused Mrs. Musgrove to purchase and habitually use a dangerous and defective product.

85.     Defendants' actions, and Mrs. Musgrove's justifiable reliance thereon, were substantial contributing factors in causing injury and incurrence of substantial damages.

86.     Mrs. Musgrove sustained the following damages as a foreseeable, direct, and proximate result of Defendants' acts and/or omissions:

    a.  Economic losses including medical care and lost earnings; and

    b.  Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future, death.

### COUNT NINE – FRAUD
### (INTENTIONAL MISREPRESENTATION)

87.     Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

Case 3:16-md-02738-MAS-RLS   Document 32925-16   Filed 07/10/24   Page 31 of 44
Case 1:16-cv-06847   Document 1   Filed 08/29/16   Page 90 of 44   PageID #:30
PageID: 189397

88.     Defendants, who engaged in the development, manufacture, marketing, sale and distribution of personal hygiene products, including the Products, owed a duty to provide accurate and complete information regarding said products.

89.     Defendants fraudulently misrepresented the use of the Products as safe and effective, specifically:

    a.  Johnson & Johnson's website calls it a "misconception" that talc in baby powder can be "absorbed into the body";

    b.  Johnson & Johnson print advertisements directed at adult women asserted that, because Johnson & Johnson Baby Powder is used on babies, women can "trust" that Johnson & Johnson will take "just as much care" of their skin;

    c.  Misleading consumers in advertisements that the talc in Johnson & Johnson Baby Powder is safe because it comes from "nature" and is "pure";

    d.  Johnson & Johnson, on its website, claims that "30 years of research by independent scientists, review boards and global authorities [] have concluded that talc can be used safely in personal care products," failing to mention the dozens of studies demonstrating a relationship between feminine talc use and ovarian cancer, as well as the decision by IARC to label feminine

Case 3:16-md-02738-MAS-RLS Document 32985-16 Filed 07/10/24 Page 32 of 44
Case: 1:16-cv-06847 Document #: 1 Filed: 06/29/16 Page 31 of 44 PageID #:31
PageID: 189398

talc powder use as "possibly carcinogenic"; and

  e. On the Johnson & Johnson Baby Powder bottle, Defendants include a conspicuous warning to mothers to prevent babies from inhaling the powder and the inclusion of this lone warning implies to the consumer that Johnson & Johnson Baby Powder is safe in all other manners of use.

90. Defendants knew that these misrepresentations and/or omissions were material, and that they were false, incomplete, misleading, deceptive and deceitful when they were made.

91. Defendants made the misrepresentations and/or omissions for the purpose of deceiving and defrauding consumers, including Mrs. Musgrove, with the intention of having them act and rely on such misrepresentations and/or omissions.

92. Mrs. Musgrove relied, with reasonable justification, on the misrepresentations by Defendants, which induced her to purchase and use the Products on a regular basis for decades.

93. Defendants profited, significantly, from their unethical and illegal conduct that fraudulently induced Mrs. Musgrove, and millions of other consumers, to purchase a dangerous and defective product.

94. Defendants' actions, and Mrs. Musgrove's justifiable reliance thereon, were substantial contributing factors in causing injury and incurrence of substantial

Case 3:16-md-02738-MAS-RLS   Document 32885-2   Filed 07/19/24   Page 33 of 44
Case: 1:16-cv-36847   Document #: 11   Filed: 08/29/16   Page 92 of 44   PageID #:32
PageID: 189399

damages.

95.     As a foreseeable, direct, and proximate result of the aforementioned
fraudulent misrepresentations by Defendants, Mrs. Musgrove sustained the following
damages:

    a.  Economic losses including medical care and lost earnings; and

    b.  Noneconomic losses including physical and mental pain and
       suffering, emotional distress, inconvenience, loss of enjoyment
       and impairment of quality of life, past and future, and death.

## COUNT TEN – VIOLATION OF ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT (815 ILCS 505/1, *et seq.*)

96.     Plaintiff incorporates by reference each of the preceding paragraphs as if
fully set forth herein.

97.     Mrs. Musgrove purchased and used Defendants' Products primarily for
personal use and thereby suffered ascertainable losses as a result of Defendants'
actions in violation of the consumer protection laws.

98.     Had Defendants not engaged in the deceptive conduct described herein,
Mrs. Musgrove would not have purchased and/or paid for Defendants' product, and
would not have incurred related injuries and damages.

99.     Defendants engaged in wrongful conduct while at the same time
obtaining, under false pretenses, monetary gain from Mrs. Musgrove for the Products

Case 3:16-md-02738-MAS-RLS   Document 32925-16   Filed 07/19/24   Page 34 of 44
Case: 1:16-cv-36894-TS Document #: 1-1 Filed: 06/29/16 Page 93 of 44 PageID #:33
PageID: 189400

that would not have been paid had Defendants not engaged in unfair and deceptive conduct.

100.    Defendants engaged in unfair methods of competition and deceptive acts or practices that were proscribed by law, including the following:

        a.    Representing that goods or services have characteristics, ingredients, uses, benefits, or quantities that they do not have;

        b.    Advertising goods or services with the intent not to sell them as advertised; and

        c.    Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion or misunderstanding.

101.    Defendants intended for Mrs. Musgrove to rely on their representations and advertisements regarding the Products in order to achieve monetary gain from Mrs. Musgrove through her purchase of the Products.

102.    Mrs. Musgrove was injured by the cumulative and indivisible nature of Defendants' conduct. The cumulative effect of Defendants' conduct directed at Mrs. Musgrove and other consumers was to create demand for and sell the Products. Each aspect of Defendants' conduct combined to artificially create sales of the product.

103.    Defendants have a statutory duty to refrain from unfair or deceptive acts or trade practices in the design, labeling, development, manufacture, promotion, and sale of the Products.

Case 3:16-md-02738-MAS-RLS Document 32885-2 Filed 07/10/24 Page 35 of 44
Case 1:16-cv-06047 Document #: 1 Filed 08/29/16 Page 94 of 44 PageID #:34
PageID: 189401

104.    Had Defendants not engaged in the deceptive conduct described above, Mrs. Musgrove would not have purchased and/or paid for the product, and would not have incurred related injuries and damages.

105.    Defendants' intentional, deceptive, unconscionable, and fraudulent representations and material omissions to Mrs. Musgrove, physicians, and consumers, constituted unfair and deceptive acts and trade practices in violation of the Illinois Consumer Fraud Act.

106.    Defendants' actions, as complained of herein, constitute unfair competition or unfair, unconscionable, deceptive or fraudulent acts, or trade practices in violation of the Illinois consumer protection statute.

107.    Defendants have engaged in unfair competition or unfair or deceptive acts or trade practices, or have made false representations in violation of the Illinois Consumer Fraud Act.

108.    Under these statutes, Defendants are the suppliers, manufacturers, advertisers, and sellers, who are subject to liability under such legislation for unfair, deceptive, fraudulent and unconscionable consumer sales practices.

109.    Defendants violated the statutes that were enacted in these states to protect consumers against unfair, deceptive, fraudulent and unconscionable trade and business practices and false advertising, by knowingly and falsely representing that Defendants' the Products were fit to be used for the purpose for which it was

Case 3:16-md-02738-MAS-RLS   Document 32885-2   Filed 07/10/24   Page 36 of 44
Case: 1:16-cv-06047 Document #: 1 Filed: 08/29/16 Page 95 of 44 PageID #:35
PageID: 189402

intended, when in fact it was defective and dangerous, and by other acts alleged herein. These representations were made in marketing and promotional materials.

110.    The actions and omissions of Defendants alleged herein are uncured or incurable deceptive acts under the statues enacted in the states to protect consumers against unfair, deceptive, fraudulent and unconscionable trade and business practices and false advertising.

111.    Defendants had actual knowledge of the defective and dangerous condition of Defendants' product and failed to take any action to cure such defective and dangerous conditions.

112.    Mrs. Musgrove relied upon Defendants' misrepresentations and omissions in determining which product to use.

113.    Defendants' deceptive, unconscionable or fraudulent representations and material omissions to Mrs. Musgrove and other consumers constituted deceptive acts and practices.

114.    By reason of the unlawful acts engaged in by Defendants, and as a direct and proximate result thereof, Mrs. Musgrove, suffered ascertainable losses and damages.

115.    As a direct and proximate result of Defendants' violations of the states' consumer protection laws, Mrs. Musgrove sustained the following damages:

        a.   Economic losses including medical care and lost earnings; and

b.  Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future, and death.

### COUNT ELEVEN –WRONGFUL DEATH ACT (740 ILCS 180/0.01 *et seq.*)

116.  Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

117.  As a direct and proximate result of the conduct of Defendants and the defective nature of the Products as described above, Mrs. Musgrove suffered bodily injuries resulting in pain and suffering, disability, disfigurement, mental anguish, loss of capacity of the enjoyment of life, shortened life expectancy, expenses for hospitalization, medical and nursing treatment, loss of earnings, loss of ability to earn, funeral expenses and death.

118.  Plaintiff brings this claim on his own behalf as the personal representative of the estate of Mrs. Musgrove under the Illinois Wrongful Death Statute, 740 ILCS 180/0.01 *et seq.*

119.  As a direct and proximate cause of the conduct of Defendants, Plaintiff has incurred grief, sorrow, mental suffering, as well as hospital, nursing and medical expenses, funeral expenses, and estate administration expenses as a result of Mrs. Musgrove's death. Plaintiff brings this claim for these damages and for all pecuniary losses sustained.

Case 3:16-md-02738-MAS-RLS   Document 32985-2   Filed 07/10/24   Page 38 of 44
Case: 1:16-cv-06847 Document #: 1 Filed: 06/29/16 Page 97 of 44 PageID #:37
PageID: 189404

## COUNT TWELVE – SURVIVAL ACTION (755 ILCS 5/27-6)

120.     Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

121.     As a direct and proximate result of the aforementioned acts and omissions of Defendants and the defective nature of the Products, Mrs. Musgrove suffered serious injuries of a personal nature, including, but not limited to, great pain and suffering before her death, thereby subjecting Defendants to liability pursuant to 755 ILCS 5/27-6, commonly referred to as the Survival Statute.

122.     This claim is brought by Plaintiff as the personal representative of the estate of Mrs. Musgrove.

## TOLLING STATUE OF LIMITATIONS

123.     Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

124.     Mrs. Musgrove suffered an illness that had a latency period and did not arise until many years after exposure. Mrs. Musgrove was not aware at the time of her diagnosis or death that her uterine cancer and death were caused by her use of the Defendants' Products.  Similarly, Plaintiff was not aware at the time of Mrs. Musgrove's diagnosis or death that her uterine cancer was caused by her use of the Defendants' Products.  Consequently, the discovery rule applies to this case and the statute of

Case 3:16-md-02738-MAS-RLS Document 32885-2 Filed 07/19/24 Page 39 of 44
Case: 1:16-cv-36847 Document #: 11 Filed 08/29/16 Page 98 of 44 PageID #:98
PageID: 189405

limitations has been tolled until the day that Plaintiff knew or had reason to know that Mrs. Musgrove's uterine cancer was linked to her use of Defendants' Products.

125. Furthermore, the running of any statute of limitations has been equitably tolled by reason of Defendants' fraudulent concealment and conduct. Through their affirmative misrepresentations and omissions, Defendants actively concealed from Plaintiff and Mrs. Musgrove the true risks associated with the Products.

126. As a result of Defendants' actions, Mrs. Musgrove and her prescribing physicians were unaware, and could not reasonably know or have learned through reasonable diligence that she had been exposed to the risks alleged herein and that those risks were the direct and proximate result of Defendants' acts and omissions.

127. Furthermore, Defendants are estopped from relying on any statute of limitations because of their concealment of the truth, quality and nature of the Products. Defendants were under a duty to disclose the true character, quality and nature of the Products because this was non-public information over which the Defendants had and continue to have exclusive control, and because the Defendants knew that this information was not available to Mrs. Musgrove, her medical providers and/or her health facilities.

128. Defendants had the ability to and did spend enormous amounts of money in furtherance of their purpose of marketing and promoting a profitable product, notwithstanding the known or reasonably known risks. Mrs. Musgrove and medical

Case: 3:16-md-02738-MAS-RLS Document: 32805-2 Filed: 07/10/24 Page: 40 of 44
Case: 1:16-cv-06847 Document #: 1 Filed: 06/29/16 Page 39 of 44 PageID #:39
PageID: 189406

professionals could not have afforded and could not have possibly conducted studies to determine the nature, extent and identity of related health risks, and were forced to rely on Defendants' representations.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendants on each of the above-referenced claims and causes of action, and as follows:

a. Awarding compensatory damages in excess of $75,000, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, death and other non-economic damages in an amount to be determined at trial of this action;

b. Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings, funeral expenses, and other economic damages in an amount to be determined at trial of this action;

c. Punitive and/or exemplary damages for the wanton, willful, fraudulent, reckless acts of the Defendants who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and Mrs. Musgrove in an amount sufficient to punish Defendants and deter future similar conduct;

d. Prejudgment interest;

e. Postjudgment interest;

   f.   Awarding Plaintiff's reasonable attorneys' fees;

   g.   Awarding Plaintiff the costs of these proceedings; and

   h.   Such other and further relief as this Court deems just and proper.


Dated: June 29, 2016

                                Respectfully submitted,

                                **TOD ALAN MUSGROVE, Individually and as Personal Representative of the Estate of PAMELA N. MUSGROVE, Deceased.**

                                By:    */s/ David A. Golanty*
                                       One of his attorneys

                                Stewart M. Weltman (ARDC No. 3122196)
                                David A. Golanty (ARDC No. 6298397)
                                **Boodell & Domanskis, LLC**
                                One N. Franklin, Ste. 1200
                                Chicago, Illinois  60606
                                T: 312.938.4070
                                F: 312.540.1162
                                E: sweltman@boodlaw.com
                                     dgolanty@boodlaw.com

                                Korey A. Nelson (LA #30002)
                                *pro hac vice application to be filed*
                                Amanda K. Klevorn (LA #35193)
                                *pro hac vice application to be filed*
                                **BURNS CHAREST LLP**
                                365 Canal Street, Suite 1170
                                New Orleans, Louisiana 70130
                                T: 504.799.2845
                                F: 504.881.1765
                                E: aklevorn@burnscharest.com
                                   knelson@burnscharest.com

Case 3:16-md-02738-MAS-RLS   Document 32885-2   Filed 07/10/24   Page 42 of 44
Case: 1:16-cv-08047  Document #: 1   Filed: 08/29/16   Page 41 of 44 PageID #:41
PageID: 189408

Warren T. Burns (TX #24053119)
*pro hac vice application to be filed*
Daniel H. Charest (TX #24057803)
*pro hac vice application to be filed*
**BURNS CHAREST LLP**
500 North Akard Street, Suite 2810
Dallas, Texas 75201
T: 469.904.4551
F: 469.444.5002
E: wburns@burnscharest.com
   dcharest@burnscharest.com

ILND 44 (Rev. 04/13/16)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Tod Alan Musgrove, Individually and as a Personal Representative of the Estate of Pamela N. Musgrove, deceased.

## DEFENDANTS

Johnson & Johnson, and Johnson & Johnson Consumer Companies, Inc.

**(b)** County of Residence of First Listed Plaintiff    Lee County, IL
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Middlesex County, NJ
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Boodell & Domanskis, LLC, One North Franklin, Suite 1200, Chicago, IL 60606; (312) 938-4070

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government
        Plaintiff

☐ 2  U.S. Government
        Defendant

☐ 3  Federal Question
        *(U.S. Government Not a Party)*

☑ 4  Diversity
        *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                    *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☑ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☑ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729 (a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 460 Deportation |
| ☐ 153 Recovery of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 480 Consumer Credit |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | ☐ 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - Alien Detainee (Prisoner Petition) | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☑ 1  Original Proceeding
☐ 2  Removed from State Court
☐ 3  Remanded from Appellate Court
☐ 4  Reinstated or Reopened
☐ 5  Transferred from Another District *(specify)*
☐ 6  Multidistrict Litigation

## VI. CAUSE OF ACTION *(Enter U.S. Civil Statute under which you are filing and write a brief statement of cause.)*

28 U.S.C. sec. 1332

## VII. Previous Bankruptcy Matters *(For nature of suit 422 and 423, enter the case number and judge for any associated bankruptcy matter previously adjudicated by a judge of this Court. Use a separate attachment if necessary.)*

## VIII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $
$75001

CHECK YES only if demanded in complaint:

**JURY DEMAND:**    ☑ Yes    ☐ No

## IX. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____    DOCKET NUMBER _____

## X. This case (check one box)    ☐ Is not a refiling of a previously dismissed action    ☐ is a refiling of case number _____ previously dismissed by Judge _____

DATE    6/29/2016    SIGNATURE OF ATTORNEY OF RECORD  /s/ David. A. Golanty

Case 3:16-md-02738-MAS-RLS Document 22985-29 Filed 07/10/24 Page 44 of 44
Case: 1:16-cv-06044-J Document #: 1-1 Filed 09/29/16 Page 26 of 24 PageID #: 43
PageID: 189410

**INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44**

Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I.          **(a)  Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

            (b)  County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of  filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

            (c)  Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an  attachment, noting in this section "(see attachment)".

II.          **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are  included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; NOTE: federal question actions take  precedence over diversity cases.)

III.          **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV.          **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerk(s) in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

V.          **Origin.** Place an "X" in one of the six boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

VI.          **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. Do not cite jurisdictional statutes unless diversity. Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service

VII.          **Previous Bankruptcy Matters**  For nature of suit 422 and 423 enter the case number and judge for any associated bankruptcy matter previously adjudicated by a judge of this court. Use a separate attachment if necessary.

VIII.          **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P. Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

 IX.          **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

X.          **Refiling Information.** Place an "X" in one of the two boxes indicating if the case is or is not a refiling of a previously dismissed action. If it is a refiling of a previously dismissed action, insert the case number and judge.

            **Date and Attorney Signature.** Date and sign the civil cover sheet.