# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE: JOHNSON & JOHNSON TALCUM POWER PRODUCTS MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | No. 3:16-md-02738-MAS-RLS |

# DEFENDANTS JOHNSON & JOHNSON AND LLT MANAGEMENT, LLC'S OBJECTIONS TO SPECIAL MASTER ORDER NO. 25 (ADDRESSING THREE MOTIONS TO QUASH AND/OR FOR PROTECTIVE ORDER) (ECF NO. 32926)

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... iii

INTRODUCTION ................................................................................. 2

BACKGROUND ................................................................................... 6

LEGAL STANDARD ........................................................................... 13

ARGUMENT ....................................................................................... 14

    I.    The Order contains numerous errors of fact. ...................... 14

        A.    The Order erroneously ignores evidence regarding the prevalence of litigation funding. ................................. 14

        B.    The Order erroneously ignores evidence establishing the relationship between Beasley Allen and the Smith Law Firm. ....................................................................... 17

        C.    The Order erroneously disregards the email exchange from Beasley Allen's own client. ................................. 19

    II.    The Order includes numerous errors of law. ...................... 20

        A.    The Order misinterprets Local Rule 7.1.1. .............. 20

        B.    The Order erroneously holds that "good cause" for litigation financing discovery does not exist. ........... 22

        C.    The Order erroneously ignores the wealth of cases holding litigation financing is discoverable. ............. 27

    III.    The Order does not reach other pivotal issues raised. ......... 31

        A.    Litigation financing materials are not privileged. ...... 31

        B.    Litigation financing materials are not work product. .............. 33

        C.    The Requests are not unduly burdensome, overbroad, or harassing. ........................................................ 34

CONCLUSION .................................................................................... 35

# TABLE OF AUTHORITIES

## Cases

*Acceleration Bay LLC v. Activision Blizzard, Inc.*, 2018 WL 798731 (D. Del. Feb. 9, 2018) .......................................................................... 29, 33

*Cobra Int'l, Inc. v. BCNY Int'l, Inc.*, No. 05-61225-CIV, 2013 WL 11311345 (S.D. Fla. Nov. 4, 2013) ............................................... 30, 32

*Cohen v. Cohen*, No. 09 Civ. 10230, 2015 WL 745712 (S.D.N.Y. Jan. 30, 2015) ................................................................................................ 32

*Gbarbe v. Chevron Corp.*, No. 14-cv-00173, 2016 WL 4154849 (N.D. Cal. Aug. 5, 2016) .................................................................... 27, 30

*Hedden v. Kean University*, 434 N.J. Super. 1 (N.J. Super. Ct. App. Div. 2013) ................................................................................................ 31

*Hobbs. v. Am. Commercial Barge Line LLC*, No. 4:22-cv-00063, 2023 WL 6276068 (S.D. Ind. Sept. 26, 2023) .......................................... 29

*In re Am. Med. Sys., Inc.*, MDL No. 2325, 2016 WL 3077904 (S.D. W. Va. May 31, 2016) ........................................................................... 30

*In re Broiler Chicken Antitrust Litig.*, No. 16 C 8367, 2024 WL 1214568 (N.D. Ill. Mar. 21, 2024) ....................................................... 29

*In re Dealer Mgmt. Sys. Antitrust Litig.*, 335 F.R.D 510 (N.D. Ill 2020) ................ 32

*In re Intel Corp. Microprocessor Antitrust Litig.*, 526 F. Supp. 2d 461 (D. Del. 2007) ........................................................................... 14

*In re Nat'l Prescription Opiate Litig.*, 2018 WL 2127807 (N.D. Ohio May 7, 2018) ............................................................................... 31

*In re Pork Antitrust Litig.*, 2024 WL 511890 (D. Minn. Feb. 9, 2024) .................. 21

*In re Selser*, 15 N.J. 393 (N.J. 1954) ......................................................... 31

*In re Turkey Antitrust Litig.*, No. 19 C 8318, 2024 WL 1328824 (N.D. Ill. Mar. 28, 2024) ............................................................................ 21

*In re Valsartan*, 405 F. Supp. 3d 612 (D.N.J. 2019) ..................................... 23, 25

*In re Zantac (Ranitidine) Prods. Liab. Litig.*, 2020 WL 1669444 (S.D. Fla. Apr. 3, 2020) ............................................................................ 30, 31

*Leader Techs., Inc. v. Facebook, Inc.*, 719 F. Supp. 2d 373 (D. Del. 2010) ............ 32

*Montgomery Cty. v. MicroVote Corp.*, 175 F.3d 296 (3d Cir. 1999) ...................... 33

*Nelson v. Millennium Labs., Inc.*, No. 2:12-cv-01301, 2013 WL 11687684 (D. Ariz. May 17, 2013) ...................................................................30

*Nimitz Techs. LLC v. CNET Media, Inc.*, 2022 WL 17338396 (D. Del. Nov. 30, 2022) ................................................................ 28, 29

*Official Comm. of Equity Sec. Holders of Mirant Corp. v. The Wilson Law Firm, P.C. (In re Mirant Corp.)*, 334 B.R. 787 (Bankr. N.D. Tex. 2005) ...........24

*Pittston Co. v. Allianz Ins. Co.*, 143 F.R.D. 66 (D.N.J. 1992) ................................32

*R.J. Reynolds Tobacco v. Philip Morris, Inc.*, 29 Fed. App'x 880 (3d Cir. 2002)................................................................................................34

*Rardon v. Falcon Safety Prods., Inc.*, 2023 WL 5347298 (3d Cir. Aug. 21, 2023) ................................................................................................35

*Stengart v. Loving Care Agency, Inc.*, 201 N.J. 300 (N.J. 2010) .............................32

*Threadgill v. Armstrong World Indus., Inc.*, 928 F.2d 1366 (3d Cir. 1991)............27

*Trejo v. All Lynn, LLC*, 344 F.R.D. 8 (D.N.J. 2023)...............................................33

*Wang v. Univ. of Pittsburgh*, No. 2:20-cv-1952, 2023 WL 5214893 (W.D. Pa. Aug. 15, 2023) ...................................................................14

**Statutes**

11 U.S.C. § 1125 ....................................................................................................24

W. Va. Code § 46A-6N-6 .......................................................................................3

Wis. Stat. § 804.01(2)(bg)......................................................................................3

**Other Authorities**

Aaseesh Polavarapu, *Discovery Third-Party Funding in Class Actions: a Proposal for In Camera Review*, 165 U. Pa. L. Rev. Online 215 (2017)...............3

Bert I. Huang, *Litigation Finance: What Do Judges Need to Know?*, 45 Colum. J.L. & Soc. Probs. 525 (2012) .................................................................3

Hailey Konnath, *Burford, Sysco Agree to Drop Litigation Funding Suits*, Law360 (June 28, 2023)...................................................................29

Jeffrey J. Grosholz, *In the Shadows: Third-party Litigation Funding Agreements & the Effect their Nondisclosure has on Civil Trials*, 47 Fla. St. U. L. Rev. 481 (2020)..........................................................................3

JPML, *MDL Statistics Report – Distribution of Pending MDL Dockets by Actions Pending* (June 3, 2024)............................................................................15

JPML, *Statistical Analysis of Multidistrict Litigation: 1992* (Oct. 1992) ..............14

Patrick A. Tighe, *Survey of Federal and State Disclosures Regarding Litigation Funding*, Advisory Committee on Civil Rules (Feb. 7, 2018) ...........28

Tom Baker, *Where's the Insurance in Mass Tort Litigation?*, 101 Tex. L. Rev. 1569, 1587 (2023) ................................................................... 15, 16

U.S. Government Accountability Office, *Third-Party Litigation Financing: Market Characteristics, Data, and Trends* (Dec. 2022)....................16

Westfleet Advisors, *The Westfleet Insider: 2022 Litigation Finance Market Report* (2022) ..........................................................................16

## Rules

Fed. R. Civ. P. 26.................................................................................... 33, 34

Fed. R. Civ. P. 45.........................................................................................35

Fed. R. Civ. P. 53.................................................................................... 13, 14

L.R. 7.1.1 ............................................................................................ passim

N.J. R. Evid. 504 .........................................................................................31

Defendants Johnson & Johnson and LLT Management LLC object to Special Master Order No. 25 (ECF No. 32926) (the "Order"), which effectively tossed aside Local Rule 7.1.1 in favor of pre-Rule jurisprudence and erroneously granted motions to quash and/or for protective order filed by the Plaintiffs' Steering Committee ("PSC"), the Beasley Allen Law Firm ("Beasley Allen"), and the Smith Law Firm. The Court should reverse the Order's errant conclusions of fact and law; deny the motions to quash and/or for protective order; and compel Beasley Allen, the Smith Law Firm, and Ellington Management Group to comply with the subpoenas and, consistent with Local Rule 7.1.1, produce information concerning the third party litigation funding fueling this MDL (and, in all likelihood, preventing its resolution), regardless of whether that funding flows to counsel of record or a co-counsel.  In the alternative, even if the Court is not inclined to reverse the Order, Defendants respectfully request that the Court clarify that Rule 7.1.1 applies to any *party* whose attorneys' fees or expenses are being paid via litigation financing, regardless of whether that financing is funneled through a party's counsel of record or some other source. Such funding should be disclosed promptly.[1]

---

[1] If there is any doubt at all that such a directive is necessary, the Court need only look to the comments of counsel at the underlying hearing in this matter, where the PSC strenuously argued against the precise disclosures required by Rule 7.1.1:

> "And just think about the precedent that they're trying to set here.  What they are trying to sell you, Judge, is that 7.1.1 requires me or Beasley Allen or any of the other leaders in this case or any lawyer who accepts referrals from other lawyers, whether it's in a mass tort or not, that they

The gravamen of the Order turns on an erroneous premise: Namely, that Defendants were required to prove that discovery into litigation financing is relevant to the fair adjudication and resolution of matters before the Court. But this question already has been decided by the Chief Judge and the Lawyers Advisory Committee to the Court in the affirmative, whose collective view is firmly reflected in Local Rule 7.1.1.  Thus, the salient and dispositive issue before the Special Master was simply whether counsel—particularly counsel acting in a leadership role—had fully disclosed the known litigation financing that has funded the claims in this MDL. The Special Master erred when, instead of focusing on that question, he crafted an Order that effectively turns Rule 7.1.1 on its head by concluding that the relevance of discovery into litigation financing had not been shown.

## INTRODUCTION

Courts across the country—including this one—have taken notice of the explosion in litigation financing and its potentially deleterious effects, including the potential effects on settlement. *See, e.g.*, L.R. 7.1.1. So, too, has Congress. For instance, just two days after the issuance of the Order, Representative Darrell Issa introduced the Litigation Transparency Act of 2024, which would mandate

---

are now trying to impose on us a duty to say to the lawyer who is referring the case to us, do you have litigation funding.  That is not the point of 7.1.1."

Tr. of July 1, 2024 Hrg. (ECF No. 32883) at 58:9–18.

disclosure and discovery of third-party litigation financing. **Exhibit 1**, Litigation Transparency Act of 2024, 118th Congress (2024). The Chairman of the House Committee on Oversight and Accountability sent a letter to Chief Justice Roberts, and Senators John Cornyn and Thom Tillis sent a letter to the Secretary of the Committee on Rules of Practice and Procedure, each urging adoption of disclosure and discovery requirements for litigation financing. **Exhibit 2**, Letter from Rep. J. Comer to Hon. J. Roberts (July 12, 2024); **Exhibit 3**, Letter from Sens. J. Cornyn and T. Tillis to H. Byron III (July 11, 2024) (citing with approval L.R. 7.1.1). State legislatures similarly have begun requiring disclosure of litigation financing. W. Va. Code § 46A-6N-6; Wis. Stat. § 804.01(2)(bg). And academics, scholars, and legal commentators have all joined the chorus of voices calling for more transparency surrounding litigation financing. *See, e.g.*, Jeffrey J. Grosholz, *In the Shadows: Third-party Litigation Funding Agreements & the Effect their Nondisclosure has on Civil Trials*, 47 Fla. St. U. L. Rev. 481 (2020); Aaseesh Polavarapu, *Discovery Third-Party Funding in Class Actions: a Proposal for In Camera Review*, 165 U. Pa. L. Rev. Online 215 (2017); Bert I. Huang, *Litigation Finance: What Do Judges Need to Know?*, 45 Colum. J.L. & Soc. Probs. 525 (2012).

The recent congressional statements, as well as commentators and academics, reference New Jersey's Rule 7.1.1 as an example of the proper approach to these issues, requiring ***affirmative***, ***voluntary*** disclosure of third-party litigation financing

when a party receives non-recourse funding for fees and expenses. L.R. 7.1.1. That Rule reflects the judgment of this Court that litigation funding is relevant to the fair adjudication and resolution of matters pending in the District. Thus, in deciding the motions to quash and/or for protection, the Special Master needed only apply the Rule by (1) confirming that parties in the MDL were complying with Local Rule 7.1.1; and (2) determining whether the additional discovery Defendants sought pursuant to the Rule was warranted.

Unfortunately, the Order does neither, largely due to its reliance on pre-Rule jurisprudence for its analytical framework. More specifically, it begins by glossing over the (undisputed) facts regarding the prevalence of litigation financing—particularly in mass tort litigation—as unimportant to the dispute at hand. *E.g.*, Order at 8. But the dispute at hand involves litigation financing in the country's second-largest mass-tort MDL, where less than ***one tenth of one percent*** of the parties in the MDL have disclosed litigation funding. The Order likewise disregards the long-established relationships between Beasley Allen (a firm that admits the majority of its filed claims are the result of referrals from others), the Smith Law Firm (a known recipient of litigation funding), and several litigation funders (including funders controlled by foreign entities), which Beasley Allen touted in this litigation until attempting to distance itself for purposes of the instant dispute. *Id.* at 10–11. And the Order brushes aside desperate emails from Beasley Allen's own client—who, under

the false impression that Defendants are unwilling to settle this litigation, emailed Defendants directly attempting to settle her claims—demonstrating that "something untoward" may very well be occurring. *Id.* at 12–13.

These factual errors are compounded by errors in the application of controlling law. Most significantly, Local Rule 7.1.1 is dispositive of the relevance of litigation financing materials, and it expressly requires disclosure of ***all*** litigation financing received by a party, regardless of whether the law-firm intermediary between the client and the financier has appeared in the litigation. L.R. 7.1.1. But the Order, citing careful testimony from Beasley Allen, determined that the firm's purported lack of *direct* litigation funding was dispositive of whether that law firm's clients were the beneficiaries of litigation funding (and thus subject to the Rule). Order at 10–11.

The Rule—and even the pre-Rule jurisprudence cited in the Order—further mandate that, upon a showing of good cause, additional information regarding the details of litigation financing (i.e., information beyond the mandatory disclosures) is discoverable by a defendant. But the Order largely ignores that, too, relying on an erroneous assessment of the facts to hold that no good cause exists here to permit the requested discovery. *Id.* at 8–14. Finally, relying on what is mistakenly described as "controlling" case law from the District, which notably pre-dates the issuance of Rule 7.1.1, the Order ignores a wealth of jurisprudence from across the country

5

holding that litigation financing is discoverable—including from other district courts in the Third Circuit. *Id.* at 9.

The sum result of these compounding errors is that the Order misses the forest for the trees. The country's second-largest MDL—comprising more than 60,000 claimants—is admittedly being fueled, at least in part, by litigation funding. That funding has not been disclosed.  Based on the facts discovered to date, that litigation funding appears to be routed around Beasley Allen for the purposes of thwarting disclosure requirements while still benefiting the firm's clients and also impacting the parties' present ability to resolve this litigation. And while Beasley Allen remains vociferously opposed to resolution, Beasley Allen's clients are so desperate to settle that they are reaching out directly to Defendants' counsel ***despite the fact that a settlement offer is currently on the table***, clearly indicating some disconnect between lawyer and client. This is precisely the type of situation where this Court has already determined, via Rule 7.1.1, that discovery into the details of litigation financing is necessary and appropriate. The Order denying that discovery is wrong on the facts and wrong on the law. It should be reversed.

## BACKGROUND

### *History Of Settlement Negotiations With Beasley Allen*

The Beasley Allen Law Firm, according to testimony from firm principal Andy Birchfield, represents over 11,000 talc claimants. **Exhibit 4**, April 17, 2023

Deposition of A. Birchfield at 8:17–19. Mr. Birchfield has personally engaged in settlement negotiations with Defendants regarding talc claims for years. *Id.* at 56:6–57:9. Those settlement negotiations began as far back as 2020 with Defendants' outside settlement counsel, Jim Murdica. *Id.* at 60:8–18.

For example, a 58-page term sheet was created for resolving all current and future ovarian cancer claims for $3.25 billion. *Id.* at 65:9–66:23. The term sheet included input from both sides and was a "culmination of discussions" Mr. Birchfield had with Mr. Murdica at that time. *Id.* at 83:19–84:5, 86:3–7. Later, a matrix was prepared that specified how various claims would be paid under the matrix. *Id.* at 81:23–82:8.

Separately, through prior efforts to resolve the litigation via bankruptcy, Defendants proposed settlements that would have resolved all current and future talc claims (including mesothelioma and state attorneys general claims, as well as ovarian cancer claims) for up to $8.9 billion. *See* **Exhibit 5**, Informational Brief of LTL Management LLC (ECF No. 3), *In re LTL Management LLC*, No. 21-30589 (Bankr. W.D.N.C. Oct. 14, 2021); **Exhibit 6**, Debtor's Statement Regarding Refiling of Chapter 11 Case, *In re LTL Management LLC*, No. 23-12825 (Bankr. D.N.J. Apr. 4, 2023).

Most recently, in May 2024, Defendants proposed a settlement through a "prepackaged" bankruptcy plan that would resolve just the current and future

ovarian and gynecological cancer claims for approximately $6.475 billion dollars. **Exhibit 7**, May 1, 2024 Press Release. For the plan to be approved, 75% of claimants must vote in favor of it. The vote will close this Friday, July 26, 2024.

### *May 14, 2024 Email Exchange*

On May 14, 2024, an unknown individual—on her own initiative—reached out via email to counsel from Beasley Allen, J&J's outside settlement counsel, LLT's in-house counsel, and a reporter from Reuters. **Exhibit 8**, May 14–15, 2024 Email Chain at 4–5. The email requested an update on "the exact date [Defendants] plan to issue paperwork for the 3rd bankruptcy" and solicited Defendants' counsel to "tell her directly," including via text message. *Id.*

Beasley Allen responded, removing the individual and the journalist from the email chain, and (despite having no attorney-client relationship with Thompson Reuters or its employee) wrote only: "Please disregard the below attorney-client communication." *Id.* at 4.

Defendants' settlement counsel, Mr. Murdica, re-added the individual (who appeared to be a "self-proclaimed influencer") and the Reuters journalist and responded in three sentences: First, he noted that Beasley Allen seemed to be entering into a relationship with Reuters. *Id.* at 3. Second, he asked that Beasley Allen explain the nature of the relationship with Reuters that gave rise to its privilege

assertion. *Id.* Third, he asked that the individual who sent the email and Reuters confirm that they are clients of Beasley Allen. *Id.*

The individual, who is now known to be a claimant, then sent another unsolicited email communication stating that her attorneys at Beasley Allen had told her that Defendants are unwilling to settle her case. Specifically, she was advised by her lawyers at Beasley Allen: "***Johnson & Johnson is not willing to settle your case at this time***" and "***to date, J&J has been unwilling to settle***":

> also I inquired about this - where is my settlement
>
> the answer was "
>
> a. Johnson & Johnson is not willing to settle your case at this time, despite the information and records we have.  Settlement requires agreement of all of the parties.  We continue to pursue settlement with Johnson & Johnson.  However, to date, J&J has been unwilling to settle."

*Id.* at 2–3. Indeed, this particular claimant was so frustrated by her misimpression of Defendants' total unwillingness to settle that she again wrote separately (sidestepping her counsel once again): "Please make an offer so I can get on with my life." **Exhibit 9**, May 15, 2024 Email.

But as discussed above, not only have there been a slew of settlement negotiations over the years with her very own counsel, Defendants *currently* have a pending settlement offer out to this claimant (and all other claimants in the MDL) through the LLT proposed plan of reorganization. The approximately $6.475 billion settlement offer would represent one of the largest resolutions in the history of mass

tort litigation and is more than double the amount included in the term sheet previously negotiated with Beasley Allen. The statement Beasley Allen made to its client (and, presumably, to other claimants) that J&J is unwilling to settle is objectively and demonstrably false. Beasley Allen's behavior, exposed by its client's unsolicited emails, amplifies a longstanding question: Why is the firm actively opposed to settling claims at terms that are favorable to its own clients?

### *Talc Litigation Funding*

The Smith Law Firm and Beasley Allen have partnered on talc litigation for years. They were co-counsel together in seven talc-ovarian cancer trials, over *one third* of the trials that have occurred to date.[2] From the earliest days of the MDL, Beasley Allen has touted its close relationship with the Smith Law Firm, including the number of cases in which the firms act as co-counsel. *See generally* Interested Party Response to Petitioner's Motion for Transfer and Coordination or Consolidation (ECF No. 41). Critically, Beasley Allen principal, Mr. Birchfield, himself testified that his co-counsel at the Smith Law Firm acquired litigation funding in connection with talc litigation. **Ex. 1** at 35:23–36:25; *see also id.* at 154:13–155:14. Given their co-counsel relationship (and, thus, their representation

---

[2] It is unknown just how many of Beasley Allen's filed cases represent a co-counsel relationship with the Smith Law Firm.

of the same clients), litigation funding received by the Smith Law Firm has direct implications for Beasley Allen's ability to settle cases (and vice versa).

Defendants now know through a subpoena issued in connection with this very dispute that Fortress Investment Group LLC—wholly owned by a sovereign wealth fund of the government of Abu Dhabi—managed funds that invested in a loan to the Smith Law Firm in the amount of $24 million. **Exhibit 10**, May 20, 2024 Declaration of David Meisels, ¶ 5. That loan appears to have been refinanced, and now, based on information and belief, the Smith Law Firm is in possession of litigation funding through Ellington Management. *Id.* ¶ 4. Defendants believe this follow-on funding was likely orders of magnitude larger than the Fortress funding, perhaps as much as ten times the original loan. From his extensive negotiations with Beasley Allen, Defendants' settlement counsel, Mr. Murdica, came to the belief that "the Beasley firm is not able to say yes to any deal, because they're way too deep in debt from funding." **Exhibit 11**, April 16, 2023 Deposition of J. Murdica at 234:23–25.

### The Subpoenas

After the May 14 email exchange—and given Beasley Allen's persistent opposition to settling this litigation, its obvious misrepresentations to at least one (and possible more) of its clients, and its abject refusal to correct or withdraw its misleading statements—Defendants issued subpoenas to discover the full extent of any obstacles to resolution that litigation may pose. The subpoenas issued to Beasley

Allen (ECF No. 32201); the Smith Law Firm (ECF No. 32226); Ellington Management Group (ECF No. 322215); Fortress Investment Group LLC (ECF No. 32203); and Thompson Reuters (ECF No. 32204).

The subpoenas seek what can be summarized as three, discrete categories of information: (1) documents regarding the subpoenaed parties' litigation financing, including communications with third parties; (2) the subpoenaed parties' communications with third parties regarding settlements; and (3) the subpoenaed parties' communications with third parties regarding Defendants' proposed reorganization. Defendants have since narrowed the scope of the subpoenas, withdrawing the subpoena to Fortress Investment Group (based on affidavit of David Meisels), foregoing the subpoena to Thomson Reuters (and excluding communications with journalists from the remaining subpoenas), foregoing requests to Beasley Allen and the Smith Law Firm seeking communications with third parties regarding the proposed bankruptcy and any settlement offers, and clarifying that Defendants do not seek production of communications solely between the law firms and their clients. Letter from K. Fournier to Hon. J. Schneider (June 21, 2024) (ECF No. 32845).

Defendants do, however, seek information from Beasley Allen, the Smith Law Firm, and Ellington Management Group regarding litigation funding and their communications with third parties (including communications between the firms

and their litigation financiers) regarding settlement authority generally and the proposed reorganization plan specifically.

### *Special Master Order No. 25*

Following services of the subpoenas, Beasley Allen, the Smith Law Firm, and the Plaintiffs' Steering Committee each filed motions to quash and/or for protection. ECF Nos. 32445, 32483, 32603. Defendants opposed the motions, ECF No. 32827, and the Court referred the motions to the Special Master, who held a hearing on July 1. *See* Tr. of July 1, 2024 Hrg. (ECF No. 32883). On July 9, the Special Master issued Special Master Order No. 25 (ECF No. 32926) granting the motions and quashing the subpoenas. Defendants object to that Order.

## LEGAL STANDARD

A court may appoint a special master to, among other things, "address pretrial . . . matters that cannot be effectively and timely addressed by an available district judge or magistrate judge." Fed. R. Civ. P. 53(a)(1)(C). Pursuant to Rule 53, the Court appointed retired Magistrate Judge Joel Schneider as a Special Master and referred the motions to quash and/or for protective order to him for decision. ECF Nos. 704, 18360, 32853.

The Special Master's authority is limited, however, and his rulings are not entitled to deference. Rather, the Court "must decide de novo all objections to findings of fact" and "all objections to conclusions of law." Fed. R. Civ. P. 53(f)(3)–

(4); *see also, e.g.*, *Wang v. Univ. of Pittsburgh*, No. 2:20-cv-1952, 2023 WL 5214893, at *1 (W.D. Pa. Aug. 15, 2023) (stating rule and partially sustaining objections to special master report); *In re Intel Corp. Microprocessor Antitrust Litig.*, 526 F. Supp. 2d 461, 463–66 (D. Del. 2007) (stating rule and declining to adopt special master report and recommendation). Based on its review, the Court may, *inter alia*, reverse the Special Master's findings and issue its own order on the underlying motions. Fed. R. Civ. P. 53(f)(1).

## ARGUMENT

### I.    The Order contains numerous errors of fact.

#### A.    *The Order erroneously ignores evidence regarding the prevalence of litigation funding.*

The circumstances giving rise to the May 14 email exchanges and other similar incidents, and the very real questions they raise, do not exist in a vacuum. This MDL exists within a broader context of the rise of product liability MDLs and the machine of litigation funding that has fueled it. The Order ignores this evidence in its entirety. Order at 8. But this context is crucial to understanding why litigation financing is no doubt providing a substantial portion of the funding for the mind-boggling 60,000 claims in this MDL, and why the dearth of Rule 7.1.1 disclosures is itself evidence of "something untoward" occurring.

In 1992, approximately 37,000 actions were pending in MDLs. **Exhibit 12**, JPML, *Statistical Analysis of Multidistrict Litigation: 1992*, at 4 (Oct. 1992). Today,

over ***430,000 actions*** are pending in MDLs. **Exhibit 13**, JPML, *MDL Statistics Report – Distribution of Pending MDL Dockets by Actions Pending*, at 4 (June 3, 2024).

The vast majority of those MDL actions (97.3%) are pending in just 21 MDLs with 1,000 or more actions each:

| Docket Count | Range of the Number of Actions *PENDING* in a Docket | Percent of Dockets | Action Count | Percent of Actions |
|---|---|---|---|---|
| 46 | MDLs with between 0 and 10 Pending Actions | 27.06% | 219 | 0.05% |
| 73 | MDLs with between 11 and 100 Pending Actions | 42.94% | 2,271 | 0.52% |
| 30 | MDLs with 101 and 999 Pending Actions | 17.65% | 9,326 | 2.13% |
| 21 | MDLs with 1,000 or more Pending Actions | 12.35% | 425,286 | 97.3% |

*Id.* All 21 of those over-1,000-action MDLs—making up over 97% of MDL practice in the federal judiciary—are product liability litigations. *Id.* at 1. These MDL-based product liability cases on their own represent nearly two-thirds of the civil actions on the federal docket. **Exhibit 14**, U.S. District Courts—Civil Statistical Tables for the Federal Judiciary (December 31, 2023), at Table C-1: U.S. District Courts—Civil Cases Filed, Terminated, and Pending, by Jurisdiction—During the 12-Month Period Ending December 31, 2023 (Dec. 31, 2023).

The fuel for this explosion in litigation is unquestionably third-party litigation funding. As one *plaintiff's* attorney observed: "When litigation funding came on the scene, mass tort practice changed." Tom Baker, *Where's the Insurance in Mass Tort Litigation?*, 101 Tex. L. Rev. 1569, 1587 (2023). "[M]ass tort funding provided to individual law firms now regularly exceeds $50 million. One broker described a law

firm with $250 million in funding." *Id.* at 1586. A litigation funder explained it in this way:

> To understand what the financing is for, who provides it, and why the numbers get so big, go to Mass Torts Made Perfect and walk through the exhibition hall at Bellagio. There are tons of booths. For everything that has to be done in the lifecycle of a mass tort case--advertising, calling clients, intaking clients, following up to get medical records, everything through the process all the way through litigating the case--there are multiple vendors that law firms can and do outsource to. If you are an aggregator, meaning you find and sign-up clients, you make deals with firms litigating and settling the cases. They include your inventory of clients in return for a share of the legal fees. Funding pays for all of the above.

*Id.* at 1586–87.

A 2022 report from the Government Accountability Office estimates that 47 active commercial litigation funders reported a total of $12.4 billion in assets under management and that they had committed $2.8 billion to new litigation in 2021. **Exhibit 15**, U.S. Government Accountability Office, *Third-Party Litigation Financing: Market Characteristics, Data, and Trends*, at 11–12 (Dec. 2022). These numbers likely understate the true figures since publicly available data is limited. *Id.* Approximately 70% of litigation funding is devoted to mass actions rather than just an individual case. **Exhibit 16**, Westfleet Advisors, *The Westfleet Insider: 2022 Litigation Finance Market Report*, at 5–6 (2022). And for good reason: funders are reporting a return on investment ***greater than 90%*** for their litigation funding portfolios. **Ex. 15** at 22.

16

The Order ignores these salient facts entirely, dismissing such empirical data as "Defendants' distaste" for litigation funding and finding it "irrelevant to the issues at hand." Order at 8. This conclusion misses the point. Defendants agree that whether (or not) they have a policy view related to propriety of litigation financing is irrelevant. But their position is not the thrust of the argument, nor the point of the empirical data cited.

Rather, understanding the realities of current mass tort litigation is crucial both to understanding the bases for Defendants' attempt to obtain discovery into litigation financing and to contextualizing the truly suspicious lack of disclosures to date in this litigation. Any analysis of the discovery Defendants seek must consider the empirical evidence that litigation financing is almost certainly bankrolling this MDL, at least in part. To ignore the wealth of data presented by Defendants on this issue renders any analysis acontextual and divorced from the reality of the situation at hand. That the Order refused to consider this evidence or make factual findings on this issue is error.

### B.     The Order erroneously ignores evidence establishing the relationship between Beasley Allen and the Smith Law Firm.

The Order holds that there was no evidence of a relationship between Beasley Allen and the Smith Law Firm sufficient to consider the Smith Law Firm's documented receipt of litigation funding in assessing the discovery directed to the firm and to Beasley Allen. *Id.* at 10–11. This, too, is clearly erroneous. Beasley Allen

and the Smith Law Firm have repeatedly appeared as co-counsel in numerous talc cases, meaning they jointly represent clients asserting the very types of claims at issue in this litigation. Indeed, as Beasley Allen has previously represented to the Court, Beasley Allen and the Smith Law Firm have worked hand-in-hand on talc litigation for nearly a decade: Beasley Allen admits that, even in the infancy of talc litigation, Beasley Allen and the Smith Law Firm were co-counsel in some 800 cases—nearly 40% of all then-filed ovarian talc cases *in the entire country*. ECF No. 41 at 6.

In light of the evidence of widespread coordination and a longstanding co-counsel relationships between Beasley Allen and the Smith Law Firm, a narrow focus on whether or not Defendants could present a specific list of cases in which Beasley Allen was counsel of record for a plaintiff, show that each of those plaintiffs were referred by The Smith Law Firm, and then pair that list with specific evidence that The Smith Law Firm had received litigation funding for each particular claim, is entirely circular in nature. It amounts to asking Defendants to produce the very sort of evidence for which it seeks the Court's assistance because they are presently being stonewalled in their efforts to discover the same.

If Beasley Allen and the Smith Law Firm are co-counsel on nearly a thousand cases (and likely more), it takes no stretch of the imagination to determine that the Smith Law Firm's receipt of litigation funding in those cases impacts Beasley Allen's

18

conduct, including its ability to settle. And in any event, as discussed below, the relevant inquiry is not precisely which firm received the litigation financing, but rather which clients' claims are impacted by the litigation financing. The refusal to consider evidence of Beasley Allen's and the Smith Law Firm's longstanding relationship was error.

## C.   The Order erroneously disregards the email exchange from Beasley Allen's own client.

The Order's most significant factual error is its disregard of the May 14, 2024 email exchange between a talc claimant and Defendants' outside counsel.[3] Order at 12–13. The Order is premised in part on a finding that the May 14 email exchange does not provide sufficient evidence of good cause to justify discovery of litigation financing because "[w]e know almost nothing about the sender of the email and what else she may or may not have been told about settlement. There is no context to the produced emails, and it is not known if Jane Doe is accurately or completely stating what Beasley Allen relayed." *Id.* at 13. Of course that is the case: there is no way to know this information without seeking discovery, which is why the May 14 email exchange spurred Defendants' subpoenas.

Indeed, the need for further information to explain the May 14 email exchange, the representations by Beasley Allen to its clients that Defendants are

---

[3] The Order erroneously describes the communication as occurring on May 14, 2020, Order at 12, but they occurred on May 14, 2024. **Ex. 8.**

unwilling to settle, and Beasley Allen's general refusal to productively engage in ongoing settlement negotiations is the driving force behind the discovery Defendants seek. Defendants need not have the answers to these questions prior to seeking discovery; rather, the standard is simply whether there has been a showing of good cause, such as a showing that "something untoward" (like a client so desperate to settle that she twice bypasses her own lawyers to speak directly to opposing counsel) has occurred. The decision to disregard the May 14 letter based on another instance of circular logic—that discovery seeking to understand the genesis of the May 14 email exchange is inappropriate because Defendants do not fully understand the genesis of the May 14 email exchange—is clearly erroneous.

## II.  The Order includes numerous errors of law.

### A.  *The Order misinterprets Local Rule 7.1.1.*

Local Rule 7.1.1 expressly recognizes that information concerning third-party litigation funding is relevant, requiring the disclosure of the identity of third-party funders, whether the funder's approval is necessary for settlement decisions, and the nature of the funder's financial interest. *See* L.R. 7.1.1(a). Of note, the Rule is not specific to a party's counsel of record; instead, it requires that "***all parties*** . . . file a statement" regarding litigation funding if some other entity is providing funding for some or all of the ***parties'*** attorneys' fees or the ***parties'*** expenses in exchange for an interest in the results of the litigation. *Id.* (emphasis added). In other words, the Rule

is particular to each party, not each party's law firm, and the Rule cannot be circumvented by strategically structuring litigation funding to go only to law firms not appearing as counsel of record.[4]

The very terms of the Rule make clear that litigation funding can create diverging interests between the parties and the attorneys representing them. The Rule also makes clear that understanding the underlying interests at play is critical to achieving resolutions through settlement, which serves as a basis for discovery. If this litigation is to resolve, Defendants need to know who the relevant players are so that they can understand the financial incentives driving their motivations, and even more fundamentally, if the financial incentives have become so out of balance that settlement is effectively impossible.

In other words, it's not just the *terms* of the litigation funding that matters. The *size* of the loan could be so large that no settlement could ever be achieved that would be economically rational for both parties. *See, e.g.*, *In re Turkey Antitrust Litig.*, No. 19 C 8318, 2024 WL 1328824, at *8 (N.D. Ill. Mar. 28, 2024) ("The fear, understandably, is that these third parties will flex their financial power to bully plaintiffs, who own the legal right to the claim, into pursuing a course of action adverse to plaintiffs' interests."); *In re Pork Antitrust Litig.*, 2024 WL 511890, at *7 (D. Minn. Feb. 9, 2024) ("The largest harm that condoning Burford's efforts to

21

maximize its return on investment would cause is the harm of forcing litigation to continue that should have settled.").

The need to understand the settlement playing field is all the more important in a mass tort such as this, with nearly 60,000 pending cases in this MDL alone. Unlike traditional litigation, settlement in this case would impact literally tens of thousands of individuals' claims. Absent exclusion of Plaintiffs' experts under Rule 702, settlement is likely the only realistic way to resolve this mass-tort MDL as it is a practical impossibility for 60,000 cases to go to trial.

Despite the existence of Rule 7.1.1—and its dispositive impact on the relevance of litigation funding—the Order largely ignores the Rule and the policy rationales considered by the District of New Jersey in implementing it. Instead, the Order relies largely on *pre*-Rule 7.1.1 jurisprudence and a misapplication of Rule 26 to analyze the relevance of litigation funding information. This application of the incorrect legal standard is error.

### B. The Order erroneously holds that "good cause" for litigation financing discovery does not exist.

Rule 7.1.1 expressly provides that the parties may seek additional discovery into litigation financing—beyond the required disclosures—upon a showing of good cause that: (1) the funder "has authority to make material litigation decisions or settlement decisions;" (2) the "interests of the parties or the class (if applicable) are

not being promoted or protected;" (3) "conflicts of interest exist;" *or* (4) the "disclosure is necessary to any issue in the case." L.R. 7.1.1(b) (emphasis added).

Rather than apply this controlling standard, the Order instead relies almost exclusively on a pre-Rule 7.1.1 decision in *In re Valsartan* and misguided citations to Rule 26 to analyze the requested discovery. Order at 7, 9, 13; *In re Valsartan*, 405 F. Supp. 3d 612 (D.N.J. 2019). Nevertheless, even under *Valsartan*, the Court expressly noted that it was "*not* ruling that litigation funding discovery is off-limits in all instances" and that such discovery would be allowed "if good cause exists to show the discovery is relevant," such as "a showing that something untoward occurred." *Id.* at 615. In other words, both Rule 7.1.1 and *Valsartan* allow discovery of litigation financing information for good cause shown.

The Court in *Valsartan* further noted that, in considering whether *in camera* review (and, presumably, discovery) of litigation funding materials was warranted, the Court would consider factors such as "whether the litigation is unduly prolonged and if settlement or ADR is discouraged, whether counsel's control over the litigation is undercut, if settlement money is unduly direct away from a plaintiff, if the attorney-client relationship is compromised, or if the professional independence of an attorney is diminished." *Id.* at 619 n.9. The decision also recognized that a funder can still have "de facto control" over litigation decisions even without "formal" control. *Id.* at 619 n.8.

23

Here, the Order holds that there was not good cause—under either Rule 7.1.1 or *Valsartan*—to justify discovery. Order at 8–14. That finding is error. There is good cause to suspect that funders have express or de facto control over settlement, that the interests of the plaintiffs are not being promoted or protected, and that conflicts of interests exist. The Court need look no farther than the May 14, 2024 email exchange to find such good cause. Beasley Allen has an ethical obligation to communicate settlement offers to its client, yet, per the express language of the email, in addition to failing to inform its client of a settlement offer, it actively misrepresented to its client that Defendants were "unwilling to settle" (**Ex. 8**) even though Defendants currently have a settlement offer on the table.[5] The email is black and white on these facts. A series of hypotheticals about the emails' author that could (or could not) explain away the plain language of the email do not change what it very clearly states.

Faced with these facts, it is entirely fair to reach the conclusion that this individual's interests—and likely others of Beasley Allen's 11,000+ clients—are not being protected or promoted.  Claimant begged Defendants to make her a settlement

---

[5] These misrepresentations regarding the Plan violate the solicitation provisions of the Bankruptcy Code. See 11 U.S.C. § 1125(e); *see also Official Comm. of Equity Sec. Holders of Mirant Corp. v. The Wilson Law Firm, P.C. (In re Mirant Corp.)*, 334 B.R. 787, 789–790, 793 (Bankr. N.D. Tex. 2005) (finding that solicitation of rejections of a plan of reorganization through the use of misleading or counterfactual materials does not constitute good faith solicitation within the meaning of section 1125(e) of the Bankruptcy Code).

24

offer because her own counsel apparently did not tell her that Defendants have already made several. These facts undoubtedly suggest that other undisclosed financial interests may be driving Beasley Allen's decisions relating to the resolution of the talc litigation.  Put another way, the email makes clear that "the litigation is unduly prolonged," "settlement . . . is being discouraged," and "counsel's control over the litigation" is potentially undercut. *In re Valsartan*, 405 F. Supp. 3d at 619 n.9.

Even if this glaring example were not sufficient, additional conflicts of interest abound. Based on the Court's common benefit fund orders, Beasley Allen stands to collect up to 12% of the recovery any firm earns (on top of their cut of any amount recovered for their own clients) if the talc litigation resolves *in the MDL or in state court*—but not in the bankruptcy. *See* Case Management Order No. 7 (ECF No. 426); Case Management Order No. 7A (ECF No. 14741); Special Master Opinion and Order No. 15 (ECF No. 26572) at 2–5 (summarizing the orders).[6]

Beasley Allen's own public statements make this conflict abundantly clear. In a variety of press releases, Beasley Allen has urged other firms to oppose the

---

[6] Beasley Allen's only response to this fact is to speculate that a bankruptcy court might award something akin to a common benefit fund in some amount. May 22, 2024 Letter (ECF 32251) at 8. That speculation is belied by the terms of the solicitation offer announced on May 1, 2024. And Beasley Allen's musings that it may be able to persuade Defendants to adopt another plan, in addition to being utterly baseless, do not negate the financial incentives they are guaranteed by a resolution through the MDL (but not through bankruptcy).

bankruptcy in extreme and aggressive language, but in the same breath made clear it stands "ready to discuss a *non-bankruptcy solution*." **Exhibit 17**, Press Release (emphasis added). In other words, Beasley Allen knows full well that settlement is the right outcome for this litigation, and it is not even suggesting the unprecedented amount offered (more than double the amount in the prior term sheet) is too little. Instead, it opposes losing the right to tax 12% of the settlement amount (i.e., some ***$777 million dollars***) for its own personal gain through this MDL. Particularly in combination with what we now know the firm is telling at least certain of its clients, these public statements are further evidence that Beasley Allen's *own* financial needs are being put ahead of its clients', warranting the very discovery that Rule 7.1.1 and even pre-Rule case law like *Valsartan* anticipated would be necessary under the right circumstances.

Indeed, understanding who truly controls settlement decisions has become even more relevant now that a purported class action has been filed in this Court, on behalf of all ovarian and mesothelioma talc plaintiffs, including those who *favor the Plan*, seeking to scuttle the Plan. **Exhibit 18**, Pls.' Mot. for Temporary Restraining Order (ECF No. 6), *Love v. LLT Management LLC*, No. 3:24-cv-06320 (D.N.J. June 11, 2024). Through this filing, Beasley Allen and others are boldly and publicly declaring that ***even if 75% of claimants—i.e., the women who claim to be impacted by Defendants' products—support LLT's settlement*** through bankruptcy, the firm

intends to try and prevent that settlement from being achieved. This latest publicity stunt has squarely put at issue the "balance of the equities" and the "public interest" (not to mention the firm's adequacy as putative class counsel) that litigation funding is directly relevant too. *Id.* at 11–12; *Gbarbe v. Chevron Corp.*, No. 14-cv-00173, 2016 WL 4154849, at *2 (N.D. Cal. Aug. 5, 2016) (finding litigation financing relevant to class counsel's adequacy). The defendants are entitled to know who is funding these efforts, directly or indirectly.

In light of the overwhelming evidence, the determination that good cause for discovery of litigation financing information did not exist was erroneous.

### C. *The Order erroneously ignores the wealth of cases holding litigation financing is discoverable.*

In addition to emphasizing pre-Rule jurisprudence over the directives of Rule 7.1.1 itself, the Order ignores cases and disclosure rules from around the country— including from other district courts in the Third Circuit—on the rationale that "controlling case law and the Local Rules from this District address the relevant issue." Order at 9. Such a conclusion represents and additional error because cases from the district court are never "controlling." *Threadgill v. Armstrong World Indus., Inc.*, 928 F.2d 1366, 1371 (3d Cir. 1991) ("[T]here is no such thing as 'the law of the district'"). Thus, the decision to ignore cases from across the country, most importantly including cases from the Third Circuit, in favor of a single, unappealed

case from a  magistrate judge in this District on the grounds that the case from this District was "controlling" was error.

What's more, and contrary to the cursory treatment afforded them in the Order, the rules and cases cited by Defendants underscore the importance of litigation funding discovery. Understanding the relevance of litigation funding to settlement (and a host of other issues), other courts—like this District—have also enacted a variety of rules requiring disclosure of third-party litigation financing. *E.g.*, **Exhibit 19**, Patrick A. Tighe, *Survey of Federal and State Disclosures Regarding Litigation Funding*, Advisory Committee on Civil Rules, at 2 (Feb. 7, 2018) (noting that, as of November 2017, roughly 25% of federal district courts "require disclosure of the identify of litigation funders in a civil case"). Indeed, Chief Judge Connolly of the District of Delaware has issued a standing order, modeled on this Court's Rule 7.1.1, requiring disclosure of litigation financing. *Nimitz Techs. LLC v. CNET Media, Inc.*, 2022 WL 17338396, at *3 (D. Del. Nov. 30, 2022) (discussing standing order). Judge Connolly's order—and the discovery that followed in several cases—are a case study on why disclosure of litigation financing is warranted and why additional discovery may be necessitated based on those disclosures.

By requiring parties to comply with his order, including by issuing show cause and contempt orders for noncompliance, Judge Connolly uncovered massive, previously undisclosed litigation financing underlying a docket of cases in his court.

*See generally id.* Only through such discovery did it become clear that litigation financers were in charge of retaining counsel, were making strategic litigation and settlement decisions, and were reaping the vast majority of the benefits from the litigation. *E.g.*, *id.* at *20–22, *25. In other words, the litigation funders—not the named parties—were driving the litigation. *Id.*[7]

In addition to Local Rule 7.1.1 and its counterparts nationwide, courts across the country (including other district courts in the Third Circuit) have found litigation funding documents to be relevant and discoverable under Federal Rule of Civil Procedure 26. *E.g.*, *Hobbs. v. Am. Commercial Barge Line LLC*, No. 4:22-cv-00063, 2023 WL 6276068, at *4 (S.D. Ind. Sept. 26, 2023) (finding litigation-related medical funding relevant to settlement evaluation); *Acceleration Bay LLC v. Activision Blizzard, Inc.*, 2018 WL 798731, at *3 (D. Del. Feb. 9, 2018); *Gbarbe*,

---

[7] Another well-publicized example of the perils of unchecked litigation financing is playing out in district courts in Illinois and Minnesota, where Burford Capital—a litigation financier—derailed settlements reached by the litigation parties in antitrust litigation because it refused to assent to the settlements. *See, e.g.*, **Exhibit 20**, Hailey Konnath, *Burford, Sysco Agree to Drop Litigation Funding Suits*, Law360 (June 28, 2023). Had the litigation funding not been disclosed, defendants would have been left defending cases that plaintiffs no longer wanted to prosecute with no understanding of why the parties were unable to settle. Because the litigation funding was disclosed, however, defendants (and the courts) are now aware of the real parties in interest to the litigation, allowing the litigation to move forward. *See, e.g.*, *In re Broiler Chicken Antitrust Litig.*, No. 16 C 8367, 2024 WL 1214568 (N.D. Ill. Mar. 21, 2024) (allowing substitution of Burford Capital entity for Sysco as plaintiff).

29

2016 WL 4154849, at \*2;[8] *In re Am. Med. Sys., Inc.*, MDL No. 2325, 2016 WL 3077904, at \*5 (S.D. W. Va. May 31, 2016) (finding litigation financing relevant to plaintiffs' motivation to undergo medical treatment); *Cobra Int'l, Inc. v. BCNY Int'l, Inc.*, No. 05-61225-CIV, 2013 WL 11311345, at \*3 (S.D. Fla. Nov. 4, 2013); *Nelson v. Millennium Labs., Inc.*, No. 2:12-cv-01301, 2013 WL 11687684, at \*6 (D. Ariz. May 17, 2013) (finding litigation financing relevant to assess bias).

Not surprisingly, MDL courts in particular tend to require disclosure of litigation financing information given the prevalence of litigation financing in mass tort litigation. *See* **Exhibit 21**, Case Management Order No. 61 (Third-Party Litigation Funding) (ECF No. 3815), *In re 3M Combat Arms Earplug Prods. Liab. Litig.*, No. 3:19-md-02885 (N.D. Fla. Aug. 29, 2023); *In re Zantac (Ranitidine)*

---

[8] It bears repeating that Beasley Allen has now filed a class action seeking to enjoin LLT's proposed bankruptcy plan on behalf of all individuals with pending talc claims (ovarian cancer or mesothelioma). Complaint (ECF No. 1) ¶ 279, *Love v. Johnson & Johnson*, No. 24-cv-6320 (D.N.J. May 22, 2024). As such, Beasley Allen's litigation funding is directly relevant to its adequacy as putative class counsel.

Additionally, the rest of the MDL is functioning as a quasi-representative proceeding. Particularly given Beasley Allen's position on the Plaintiff Steering Committee, evaluating the firm's adequacy to represent the interest of all MDL plaintiffs—and not the interests of remote litigation financiers or its own financial health due to overwhelming debt—is of the utmost importance. *See In re Zantac (Ranitidine) Prods. Liab. Litig.*, 2020 WL 1669444, at \*6 (S.D. Fla. Apr. 3, 2020) (requiring disclosure of litigation financing when assessing potential leadership counsel for plaintiffs).

*Prods. Liab. Litig.*, 2020 WL 1669444, at *6 (S.D. Fla. Apr. 3, 2020); *In re Nat'l Prescription Opiate Litig.*, 2018 WL 2127807, at *1 (N.D. Ohio May 7, 2018)

**III.   The Order does not reach other pivotal issues raised.**

Because the subpoenas were quashed on relevance grounds, the Order does not address the objections of privilege, work product, and proportionality that were also raised by Beasley Allen and others. Order at 11 n.7. In addition to reversing the Order on relevance grounds, the Court should decide the remaining issues as a matter of first impression.  None favor the outcome the Special Master reached.

### A.   *Litigation financing materials are not privileged.*

In   New   Jersey,   the   attorney-client   privilege   protects   confidential communications between an attorney and a client. N.J. R. Evid. 504; *see also Hedden v. Kean University*, 434 N.J. Super. 1, 10 (N.J. Super. Ct. App. Div. 2013) ("Specifically, the attorney-client privilege generally applies to communications (1) in which legal advice is sought, (2) from an attorney acting in his capacity as a legal advisor, (3) and the communication is made in confidence, (4) by the client."). But because it "rests in the suppression of the truth[,] the privilege should be strictly construed." *In re Selser*, 15 N.J. 393, 402 (N.J. 1954).

As an initial matter, documents regarding funding do not represent communications in which *legal* advice is sought or communications between attorneys and their *clients*, making the privilege inapplicable. Moreover, even if the

privilege applied, it is waived—as here—when a person discloses "any part of the privileged matter or consented to such a disclosure made by anyone." *Stengart v. Loving Care Agency, Inc.*, 201 N.J. 300, 323 (N.J. 2010). And the "common interest" exception does not preserve the privilege because the interest shared is *financial*, not *legal*. *Pittston Co. v. Allianz Ins. Co.*, 143 F.R.D. 66, 69 (D.N.J. 1992) ("A [common interest] exists where different persons or entities have an identical *legal* interest with respect to the subject matter of a communication between an attorney and client concerning *legal* advice. The key consideration is that the nature of the interest must be identical, not similar, *and be legal, not solely commercial*." (cleaned up) (emphasis added)).

As a result, courts routinely hold that litigation funding documents are not protected by the attorney-client privilege. *See In re Dealer Mgmt. Sys. Antitrust Litig.*, 335 F.R.D 510, 519 (N.D. Ill 2020) (holding litigation funding materials not privileged); *Cobra International*, 2013 WL 11311345, at *3 (holding litigation funding agreement not privileged); *Cohen v. Cohen*, No. 09 Civ. 10230, 2015 WL 745712, at *4 (S.D.N.Y. Jan. 30, 2015) (finding privilege waived in communications with third-party litigation funder and refusing to apply common interest exception); *Leader Techs., Inc. v. Facebook, Inc.*, 719 F. Supp. 2d 373, 377 (D. Del. 2010) (finding litigation funding documents not privileged due to waiver and refusing to apply the "common interest" exception because the exception requires a common

legal, not financial, interest); *see also, e.g.*, *Montgomery Cty. v. MicroVote Corp.*, 175 F.3d 296, 304 (3d Cir. 1999) ("The attorney-client privilege does not shield fee arrangements").

Because any litigation funding materials requested by the subpoenas (funding agreements, communications, etc.) were necessarily shared with third parties, they are not protected by the attorney-client privilege.

### B.   *Litigation financing materials are not work product.*

Nor are the materials sought covered by the work product protection. Work product is governed by Federal Rule of Civil Procedure 26, which protects documents created by or for a party or party's representative in anticipation of litigation. Fed. R. Civ. P. 26 (b)(3). In the Third Circuit, "a court must consider both whether the moving party demonstrates that the documents were created in anticipation of litigation and whether the material was produced because of the prospect of litigation *and for no other purpose*." *Trejo v. All Lynn, LLC*, 344 F.R.D. 8, 11 (D.N.J. 2023) (cleaned up) (emphasis added). Litigation funding documents are not work product because they are "prepared with the primary purpose of obtaining a loan, as opposed to aiding in possible future litigation." *Acceleration Bay*, 2018 WL 798731, at *2.

Moreover, when documents are prepared for a litigation funder, which is not a party to the litigation, "the work product protection does not apply." *Id.* And even

if the work product protection did apply, the protection may be overcome by a showing of substantial need and undue hardship. Fed. R. Civ. P. 26(b)(3)(A)(ii). Defendants' substantial need for the materials—to determine the genesis of Beasley Allen's misrepresentations regarding settlement and to understand whether this MDL may be resolved—is set out fully above. There is no other way that Defendants can obtain the information sought other than through the subpoenas at issue. Thus, the work product privilege is not a bar to disclosure.[9]

### C.   The Requests are not unduly burdensome, overbroad, or harassing.

In their moving papers, Beasley Allen (and the others) also asserted boilerplate objections of undue burden, overbreadth, and harassment. None of these objections apply, nor should they be relied upon to quash the subpoenas.

Undue burden is assessed by considering "relevance, the need for the information requested, whether the information can be obtained by other means, burdens the subpoena may impose, the status of the recipient as a non-party, and the costs of compliance." *Rardon v. Falcon Safety Prods., Inc.*, 2023 WL 5347298, at *2

---

[9] Of course, even if the Court were to determine that certain documents within the scope of Defendants' subpoenas could be deemed privileged or protected work product, the appropriate course is not to quash the subpoenas as a whole. Rather, if responsive documents exist that Beasley Allen or others believe merit withholding, they should expeditiously prepare a privilege log describing the withheld documents in sufficient detail for Defendants and the Court to assess the claim. *E.g., R.J. Reynolds Tobacco v. Philip Morris, Inc.*, 29 Fed. App'x 880, 882 (3d Cir. 2002).

(3d Cir. Aug. 21, 2023). As set forth above, the discovery sought is relevant, and the information sought cannot be obtained from other sources. Beasley Allen has provided nothing but rank speculation to suggest that these subpoenas—seeking three, narrowly tailored categories of documents—would impose outsized burdens or exorbitant costs. And while the recipients are technically non-parties in that they are neither plaintiffs nor defendants, they are parties intimately involved in (and, indeed, driving) this litigation. There is no undue burden, and the subpoenas should not be quashed on that ground.

Given that the subpoenas are narrowly tailored (seeking three discrete categories of documents) and entirely justified by Beasley Allen's own conduct, objections on grounds of overbreadth and harassment are likewise meritless. In any event, overbreadth and harassment objections cannot serve as a basis to quash the subpoenas wholesale. Fed. R. Civ. P. 45(d)(3).

## CONCLUSION

Instead of starting from the clear language and conclusions of Rule 7.1.1, which leave no question that discovery into litigation financing is relevant as a matter of law and certainly relevant under these circumstances, the Order relies on a narrow set of pre-Rule case law to conclude that such discovery is not, in fact, relevant. Adding insult, the Order faults Defendants for not convincing the Special Master

otherwise.  But this framing of the pertinent issues was legal error, and the Order should be reversed on that basis alone.

Moreover, a series of unsolicited communications from a Beasley Allen client have created a real and concerning specter that something untoward is occurring: Is Beasley Allen misleading its clients about an unprecedented potential settlement with Defendants, and if so, why?  Defendants—and the Court—are entitled to know the answer to these questions as ongoing efforts to resolve this MDL continue. In reaching its decision to quash the subpoenas, the Order brushed off and effectively ignored the critical facts presented in the May 14, 2024 email, which also was error.

In short, the Order was both factually and legally erroneous, and it should be reversed.

Dated: July 21, 2024

Respectfully submitted,

/s/ Kristen R. Fournier

Kristen R. Fournier
**KING & SPALDING LLP**
1185 Avenue of the Americas
34th Floor
New York, NY 10036
(212) 556-2100
kfournier@kslaw.com

Susan M. Sharko
**FAEGRE DRINKER BIDDLE &
REATH LLP**
600 Campus Drive
Florham Park, NJ 07932
susan.sharko@faegredrinker.com

*Attorneys for Defendants Johnson &
Johnson and LLT Management, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on July 21, 2024, I electronically filed the foregoing

document with the clerk of the Court using the CM/ECF system, which will send

notification of such filing to the CM/ECF participants registered to receive service

in this MDL.

/s/ Kristen R. Fournier

Kristen R. Fournier

37