# EXHIBIT 15



**United States Government Accountability Office**

Report to Congressional Requesters

**December 2022**

# THIRD-PARTY LITIGATION FINANCING

# Market Characteristics, Data, and Trends

December 2022

# GAO Highlights

Highlights of GAO-23-105210, a report to congressional requesters

## THIRD-PARTY LITIGATION FINANCING

### Market Characteristics, Data, and Trends

## Why GAO Did This Study

Litigation funders are typically private firms that obtain investment capital from a variety of investors, such as endowments and pensions. While third-party litigation financing has been well established for decades in some countries, such as Australia and England, it gained a foothold in the U.S. around 2010, according to literature GAO reviewed. However, publicly available data on the market are limited. Some policymakers have raised concerns about the transparency of funding arrangements and other issues.

GAO was asked to review issues related to third-party litigation financing. This report describes (1) characteristics of and trends in the commercial and consumer markets, (2) data gaps in the markets, and policy options to address them, (3) potential advantages and disadvantages of third-party litigation financing for users and investors, and (4) its regulation and disclosure.

GAO analyzed data provided by a nongeneralizable sample of litigation funders for 2017–2021 (selected based on the category of funding they provide and other factors); reviewed relevant laws, court rules, and reports by academic researchers, government agencies, and others; interviewed federal agencies, litigation funders, and U.S. and international trade associations; and convened a roundtable with 12 experts (selected to represent a mix of views and professional fields, among other factors).

View GAO-23-105210. For more information, contact Michael E. Clements at (202) 512-8678 or clementsm@gao.gov.

## What GAO Found

Third-party litigation financing is an arrangement where a funder that is not a party to a lawsuit agrees to provide funding to a litigant (typically a plaintiff) or law firm in exchange for an interest in the potential recovery in a lawsuit (see figure). Plaintiffs do not have to repay the funding if their lawsuit is not successful. This funding generally falls into two categories: commercial and consumer financing. Commercial arrangements are between funders and corporate litigants or law firms. For example, a funder agrees to provide funding for legal or business expenses in exchange for a portion of the court award if the plaintiff wins. The funding is typically in the millions of dollars. Consumer arrangements are between a funder and an individual, such as the plaintiff in a personal injury case. The funder provides a relatively small amount (typically under $10,000) to the plaintiff, who uses it for living expenses. Trends identified by funders GAO interviewed included increased acceptance or familiarity with commercial and consumer funding arrangements and growth in the commercial market.

**Example of Third-Party Litigation Financing for Plaintiffs**



Source: GAO. | GAO-23-105210

Experts GAO spoke with identified gaps in the availability of market data on third-party litigation financing, such as funders' rates of return and the total amount of funding provided. They identified policy options to address the gaps and challenges posed by them. For example, state or federal courts could collect data, but the data may be incomplete or could create more burden for the courts.

Funders and stakeholders GAO interviewed identified several advantages and disadvantages of third-party litigation financing for users and investors. For example, this funding can help underfunded plaintiffs litigate their cases. However, it is expensive and may deter plaintiffs from accepting a settlement offer because they may want to make up the amount they will repay the funder. Third-party litigation financing can offer investors potentially high returns. But, the investor risks losing the investment if the plaintiff loses the case.

The third-party litigation financing industry is not specifically regulated under U.S. federal law. However, some states regulate consumer funding by, for example, limiting the fees funders can charge. There also is no nationwide requirement to disclose litigation funding agreements to courts or opposing parties in federal litigation, although courts have required disclosures of funding arrangements in some instances.

# Contents

| Letter | | 1 |
|---|---|---|
| | Background | 4 |
| | Commercial and Consumer TPLF Differ in Clients and Uses of Funding, and the Commercial Market Has Grown in Recent Years | 8 |
| | Experts Identified Data Gaps in the U.S. TPLF Markets and Policy Options to Address Them | 15 |
| | Funders and Stakeholders Identified Advantages and Disadvantages of TPLF for Its Users and Investors | 18 |
| | In the U.S. and Selected Foreign Countries, Regulation of TPLF Is Limited | 23 |
| | Agency Comments | 35 |

| Appendix I: Objectives, Scope, and Methodology | 37 |
|---|---|

| Appendix II: Members of Commercial and Consumer Third-Party Litigation Financing Trade Associations | 43 |
|---|---|

| Appendix III: State Laws Addressing Third-Party Litigation Financing | 45 |
|---|---|

| Appendix IV: GAO Contact and Staff Acknowledgments | 47 |
|---|---|

**Tables**

| Table 1: International Legal Finance Association Members | 43 |
|---|---|
| Table 2: American Legal Finance Association Members | 43 |
| Table 3: Examples of State Laws Addressing Consumer Third-Party Litigation Financing | 45 |

**Figure**

| Figure 1: Example of Third-Party Litigation Financing for Plaintiffs | 5 |
|---|---|

**Abbreviations**

| | |
|---|---|
| CFPB | Consumer Financial Protection Bureau |
| Exchange Act | Securities Exchange Act of 1934 |
| SEC | Securities and Exchange Commission |
| TPLF | third-party litigation financing |

This is a work of the U.S. government and is not subject to copyright protection in the
United States. The published product may be reproduced and distributed in its entirety
without further permission from GAO. However, because this work may contain
copyrighted images or other material, permission from the copyright holder may be
necessary if you wish to reproduce this material separately.



U.S. GOVERNMENT ACCOUNTABILITY OFFICE

441 G St. N.W.
Washington, DC 20548

December 20, 2022

The Honorable Chuck Grassley
Ranking Member
Committee on the Judiciary
United States Senate

The Honorable Andy Barr
Ranking Member
Subcommittee on National Security, International Development and
Monetary Policy
Committee on Financial Services
House of Representatives

The Honorable Darrell Issa
Ranking Member
Subcommittee on Courts, Intellectual Property, and the Internet
Committee on the Judiciary
House of Representatives

Third-party litigation financing (TPLF), also referred to as litigation funding
or alternative litigation financing, is an arrangement in which a funder that
is not a party to a lawsuit agrees to provide nonrecourse funding to a
litigant or law firm in exchange for an interest in the potential recovery in a
lawsuit.[1] The nonrecourse nature of TPLF means that if the lawsuit is not
successful, the litigant or law firm does not have to repay the funding.[2]

In the U.S., TPLF arrangements are available for both commercial and
consumer claims. Plaintiffs and defendants may litigate these claims in
U.S. federal or state courts. Nonrecourse funding may also be used in

---

[1]We do not include other types of third-party funding for disputes, such as loans from
banks, within the scope of this report.

[2]According to a report we reviewed, the nonrecourse nature of TPLF distinguishes it from
traditional loans, which require repayment of the principal and interest, regardless of the
outcome in a case. New York City Bar, *Report to the President by the New York City Bar
Association Working Group on Litigation Funding* (New York, NY: Feb. 2020), 4. While
TPLF arrangements are typically nonrecourse, recourse arrangements also exist,
according to literature we reviewed. *See, e.g.*, Sean Thompson, Dai Wai Chin Feman, and
Aaron Katz, "United States," in *The Third Party Litigation Funding Law Review*, 3rd ed., ed.
Leslie Perrin (London, UK: Law Business Research, Dec. 2019), 225.

claims that are arbitrated (a method of resolving a legal dispute without a trial) in the U.S. or internationally.[3]

TPLF has been well established for decades in other countries. While TPLF gained a foothold in the U.S. around 2010, publicly available data on litigation funders and TPLF arrangements remain limited. Additionally, some policymakers have raised concerns about the transparency of these arrangements and the high fees litigation funders charge their clients.

You asked us to review several issues related to TPLF. This report describes (1) characteristics of and trends in the commercial and consumer TPLF markets, (2) data gaps in the markets, and policy options to address them, (3) potential advantages and disadvantages of TPLF for users and investors, and (4) regulation and disclosure of TPLF in the U.S. and selected foreign countries.

Publicly available data on the TPLF market are limited as there is no central repository of information on funders and no federal law expressly requires all litigation funders to report market data publicly. Accordingly, to address the first objective, we reviewed annual financial reports from the two publicly traded commercial litigation funders we identified and collected data on TPLF transactions for 2017–2021. We sent a data collection instrument to all 12 funders we interviewed (selected by the methods described below) and received data from four of them.[4] We assessed the reliability of the data we collected by reviewing the data for obvious errors and obtaining written responses from the funders on the systems and methods they used to produce the data. We determined that the data we included in the report were sufficiently reliable for purposes of describing TPLF transactions from selected funders for 2017–2021. Data we collected cannot be generalized to all litigation funders.

We also reviewed reports by academic researchers, government agencies, and others that we identified through a literature search.

---

[3]In arbitration, a neutral decision maker (an arbitrator) issues a judgment in a case after listening to presentations by each party.

[4]We also requested examples of litigation funding agreements from the 12 funders we interviewed. Some funders declined the request for legal reasons (for example, one said disclosing its agreements could put related privileges and protections at risk and potentially harm the underlying litigation). Six funders provided examples of their agreements but omitted or redacted relevant data, such as investment returns, fees, and funding amounts.

Additionally, we interviewed officials from four federal agencies: the Securities and Exchange Commission, Consumer Financial Protection Bureau, Department of Justice, and Federal Judicial Center. We also conducted semistructured interviews with a sample of 12 litigation funders operating in the U.S. (seven commercial and five consumer funders) and 10 industry stakeholders.[5] We judgmentally selected the funders to include a mix in the type of TPLF provided, and we selected the stakeholders for their knowledge of the U.S. TPLF market, among other factors.[6] Information gathered from these interviews cannot be generalized to all litigation funders or industry stakeholders.

For the second objective, we convened a virtual roundtable of 12 experts to discuss policy options for addressing data gaps in the U.S. TPLF markets. We selected the experts based on their published work on TPLF and their knowledge about the industry, among other factors. We also discussed the data gaps and options identified by the experts with three litigation funding associations.

For the third objective, we reviewed reports by academic researchers, government agencies, and others that we identified through a literature search. We also interviewed litigation funders and industry stakeholders, selected through the methods described earlier.

For the fourth objective, we interviewed the federal agencies and industry stakeholders described above and reviewed legal materials related to TPLF in the U.S., including federal and state laws, federal court rules, proposed legislation, proposals by industry stakeholders to amend federal court rules, and reports by legal practitioners, government agencies, and others identified through a literature search.[7] We also selected three other countries (Australia, England, and Canada) and reviewed regulation and disclosure of TPLF. We selected the countries because they include a mix of geographic locations and have legal systems similar in some

---

[5]Industry stakeholders included trade associations, academic researchers, and other groups or individuals who had experience in or knowledge about consumer or commercial TPLF.

[6]The total number of litigation funders operating in the U.S. is unknown because of limited data.

[7]We did not conduct a comprehensive survey of state law on TPLF. Also, the fourth objective focuses on regulation and disclosure of TPLF in the context of litigation rather than arbitration.

respects to that of the U.S., among other factors.[8] We reviewed literature related to TPLF in these countries and interviewed government representatives from the Australian Treasury. We also interviewed industry stakeholders from the U.S. and each other country. Information gathered from these interviews cannot be generalized to all industry stakeholders. See appendix I for more details on our scope and methodology.

We conducted this performance audit from April 2021 to December 2022 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

# Background

## Overview of Third-Party Litigation Financing

TPLF has become a more established market in the U.S. in the past decade. It had been limited to some degree by prohibitions against maintenance, champerty, and barratry, which are common law doctrines that were incorporated into the laws of many states at the time of the nation's founding.[9] Maintenance refers to helping another prosecute a suit; champerty is maintaining a suit in return for a financial interest in the outcome; and barratry is a continuing practice of maintenance or champerty.[10] However, many states have begun to relax these prohibitions, according to literature we reviewed, which may have contributed to TPLF's increased acceptance and recent growth.[11]

---

[8]According to literature we reviewed, the legal systems of the United States, Australia, England and Canada incorporate common law principles. *See, e.g.*, Nicholas G. Karambelas, "Limited Liability Companies: Law, Practice and Forms," (2021).

[9]Thompson, Feman, and Katz, "United States," in *The Third Party Litigation Funding Law Review*, ed. Perrin, 219. The TPLF market has been well established for decades in countries such as Australia and England, where changes to champerty and maintenance laws, along with other factors, may have contributed to its growth.

[10]*In re Primus*, 436 U.S. 412, 424 (1978).

[11]New York City Bar, *Report to the President*, 7. According to the report, 28 jurisdictions permit maintenance (with limitations) and 16 explicitly allow champerty.

TPLF generally falls into two categories: commercial and consumer funding. Commercial TPLF arrangements are typically between a litigation funder and a corporate plaintiff or law firm and involve commercial claims, such as breach of contract. Consumer TPLF arrangements are between a funder and an individual person, such as the plaintiff in a personal injury case. Experts we spoke with noted that there could be other categories of TPLF. For example, TPLF for consumer class actions and mass tort litigation could be considered a separate category of TPLF altogether.[12] Plaintiffs that win their cases will generally repay the funder the amount funded plus a return on their investment as outlined in the TPLF agreement.[13] Plaintiffs do not have to repay the funding if they lose the case (see fig. 1).

**Figure 1: Example of Third-Party Litigation Financing for Plaintiffs**



1 Investor provides capital to litigation funder
2 Litigation funder provides funding to plaintiff
3 Plaintiff uses funding for expenses while pursuing claim in court

invests capital
provides funding
uses funding

Investor
Litigation funder
Plaintiff
Court

realizes returns
remits payment plus return
wins money from case

no payment required
loses case

6 Investor realizes financial returns based on successful lawsuits
5 Litigation funder recovers investment plus a return from the successful plaintiff
4 If the plaintiff wins the lawsuit, the plaintiff recovers money from the defendant

Source: GAO. | GAO-23-105210

Note: Litigation funders are typically private firms that obtain investment capital from a variety of investors, such as endowments and pensions.

[12]Black's Law Dictionary defines a class action as "a lawsuit in which the court authorizes a single person or a small group of people to represent the interests of a larger group." *Black's Law Dictionary*, 11th ed. (2019). The dictionary defines a mass tort as "a civil wrong that injures many people [such as] toxic emissions from a factory [or] the crash of a commercial airliner."

[13]Return structures can vary. Examples include returns based on a multiple of what a funder invested, a pre-negotiated percentage of the recovery, or a percentage rate of return.

Litigation funders vary in type, size, and investor base. For example, many funders are private entities that specialize in TPLF.[14] They may obtain investment capital from institutional investors, such as endowments and pensions, according to funders we interviewed. Other firms may be multistrategy funders, which are firms that invest in various markets and asset classes. A small number of funders are large, publicly traded companies. Other funders are smaller firms that may be backed by single investors, such as high-net-worth individuals, or may be family offices or hedge funds that only occasionally participate in litigation funding, according to literature we reviewed and a funder we interviewed.[15]

Litigation funders and other TPLF market participants have formed trade associations that support various policy positions on TPLF. For example, the International Legal Finance Association consists of 15 commercial litigation funders and was founded to represent the global commercial legal finance community. The association's mission is to engage with legislative, regulatory, and judicial authorities about commercial TPLF. The American Legal Finance Association consists of over 30 consumer litigation funders operating in the U.S.[16] The association supports legislation that regulates the consumer TPLF market. The Institute for Legal Reform, which is part of the U.S. Chamber of Commerce (a business trade association), has published reports on TPLF and developed proposals to mandate the disclosure of TPLF arrangements in any civil action filed in federal court.

## Civil Litigation Process

A civil lawsuit may be filed in federal court or state court, depending on the type of claim. The specific procedures used in state courts vary,

---

[14]Westfleet Advisors, *The Westfleet Insider: 2021 Litigation Finance Market Report* (2022).

[15]Westfleet Advisors, *The Westfleet Insider*.

[16]App. II lists the members of the International Legal Finance Association and American Legal Finance Association.

although many states have modeled their procedural rules on those used in federal courts.[17]

A civil lawsuit in federal court begins when a plaintiff files a complaint with the court and provides a copy of the complaint to the defendant.[18] The complaint describes the plaintiff's damages or injury, explains how the defendant caused them harm, shows that the court has jurisdiction, and asks the court for relief, such as money to compensate for the plaintiff's injury.

To prepare for trial, the parties must conduct discovery, a process in which they provide information to each other about the case, such as copies of any case-related documents. They also may file motions (requests with the court) asking the court to make decisions about the discovery process or about the procedures that will be followed at trial.

To limit the costs and delays that typically come with a trial, judges encourage litigants to try to reach an agreement resolving their dispute (known as a settlement) before going to trial. If a case is not settled, the court will schedule a trial, where a judge or jury will decide the case.

---

[17]There are federal rules of evidence and procedural rules that must be followed in cases brought in federal courts. The Chief Justice of the U.S. Supreme Court appoints committees of judges, lawyers, and professors to draft the rules. The rules are published for public comment and are later approved by the Judicial Conference of the United States, which is the national policy-making body for federal courts. The rules are promulgated by the U.S. Supreme Court and become law unless Congress votes to reject or modify them. Administrative Office of the U.S. Courts, *Understanding the Federal Courts*, 10. For a discussion of procedural rules in state courts, see John B. Oakley, "A Fresh Look at the Federal Rules in State Courts," 3 Nev. L.J. 354 (Winter 2002/2003).

[18]The following discussion of the civil litigation process in federal courts is based on the Administrative Office of the U.S. Courts' *Understanding the Federal Courts,* 11.

# Commercial and Consumer TPLF Differ in Clients and Uses of Funding, and the Commercial Market Has Grown in Recent Years

## Commercial TPLF Is Used by Law Firms and Companies to Fund Legal and Other Expenses

Corporate plaintiffs and law firms typically use commercial TPLF to fund legal expenses or to supplement their general operating budgets, according to seven funders and one trade association we interviewed.[19] The funders said their clients can include both small and large companies and law firms of varying sizes.

Commercial litigation funders we interviewed typically provided users with millions of dollars through single-case or portfolio financing agreements. The types of claims funded by commercial TPLF varied, as did the types of investors in the market.

- **Types of funding arrangements.** Single-case and portfolio arrangements are the most common financing arrangements identified by the seven commercial funders we interviewed. Single-case agreements are typically made between a funder and a corporate plaintiff who exchanges a portion of the value of an individual case for funding. In contrast to single-case arrangements with a plaintiff, two commercial funders we spoke to said it was difficult to provide funding arrangements for defendants because of the way agreements are structured. For example, two funders said defense-side matters do not typically yield a financial recovery for the defendant, making it difficult for funders to recoup their investment in those cases. However, two funders said they could provide single-case financing to defendants with strong counterclaims against a plaintiff, which could provide the defendant with a recovery and a financial return to the funder.

---

[19]The funding is provided in exchange for a portion of the value of a pending legal claim.

Portfolio arrangements involve a law firm or corporation using a portion of the value of a group of cases in exchange for funding.[20] Clients generally have more flexibility in their use of portfolio funding compared with single-case funding. For example, in addition to using funding for legal costs, a company can use portfolio funding to expand its business while its operating budgets are tied up in litigation, according to one trade association. Three funders and one trade association also told us that law firms may include both plaintiff and defense-side matters in a portfolio arrangement, allowing them to finance defense-side matters that would typically be difficult to fund through single-case arrangements.[21]

- **Types of claims.** The seven commercial litigation funders we interviewed told us they offered funding for various types of claims, including intellectual property, antitrust, asset recovery, fraud, and class actions. Five of the seven funders said they offered financing arrangements both in the U.S. and abroad, including in Australia and Europe. Some funders said they selected where to do business based on factors such as whether the region had an existing TPLF market and a legal system favorable to TPLF.[22]

- **Funding amounts.** Commercial TPLF funders typically provide millions of dollars in funding for high-value litigation and arbitration. For example, one trade association estimated its members (commercial funders) invested in litigation with damages worth $10 million or more, and typically invested a minimum of $2 million per

---

[20]Data we collected from three commercial funders show that of their 92 total new portfolio agreements made between 2017 and 2021, 80 were made with law firms, and 8 were made with other companies. The remaining 4 agreements were for mixed portfolios that may have included law firms or other companies.

[21]Two commercial litigation funders and one trade association we spoke with said funders may offer other types of financing arrangements based on client needs. For example, they may offer post-settlement financing, in which funders advance money to a law firm based on the firm's outstanding client receivables (unpaid fees that a client owes the law firm). Other examples include corporate claim monetization, which allows companies to get funding based on the value of pending commercial claims, and judgment enforcement, which allows a company to sell the rights to an awarded judgment to a funder, offsetting the need for the company to spend its own time and resources to enforce the judgment.

[22]In 2020, two publicly traded commercial litigation funders operating in the U.S. reported that the largest portion of their capital was concentrated in North America. Burford Capital reported that 43 percent of its capital was concentrated in North America and Omni Bridgeway reported that 49 percent of its estimated portfolio value was concentrated in North America.

transaction. Additionally, three commercial litigation funders we collected data from deployed, on average, about $2.3 million per single-case agreement and $4.5 million per portfolio agreement over the last 5 years. Similarly, a TPLF market report found that, in 2021, the average value of new single-case arrangements for the commercial funders that provided data was $3.5 million and the average value of portfolio arrangements was $8.5 million.[23]

- **Investors.** In the commercial TPLF market, one funder is publicly traded in the U.S. and the United Kingdom, and one funder is publicly traded in Australia. Funders told us their investors were typically large, sophisticated private entities, such as endowments and pensions. Investors for two funders also included sovereign wealth funds, which are government-controlled funds that seek to invest in other countries, and for another funder, family offices, which are offices that manage the investments of wealthy families.[24]

All the commercial funders we spoke with said that before deciding whether to fund a client, they undertook a due diligence process that evaluated several factors. Funders most commonly said they considered the merits of a potential case (six of seven funders), the potential client's legal team (five of seven funders), and the ability of the defending party to pay (five of seven funders). Most funders said they only fund a small percentage of the total requests for funding they receive after conducting due diligence. For example, data from two funders show that about 5 percent of formal requests for funding ultimately resulted in a funding agreement. Similarly, Burford Capital reported that in 2020 only 4 percent of requests for funding resulted in financing agreements.[25] Funders select the most meritorious cases to fund because they only receive returns when claims are successful.

All of the commercial litigation funders we interviewed said they did not make any decisions about litigation strategy for the cases they fund through TPLF arrangements. For example, three funders said they did not

---

[23]Westfleet Advisors, *The Westfleet Insider*. Westfleet Advisors collected anonymized data from commercial funders with a U.S. nexus for the period of July 1, 2020, to June 30, 2021. Westfleet reported that most of the 47 funders they identified with substantial market participation chose to provide data.

[24]One funder did not provide details about its sovereign wealth fund investor. The other, Burford Capital, publicly reported that at December 31, 2021, two funds with a sovereign wealth fund investor represented approximately 28 percent of its $2.8 billion in assets under management. Burford Capital, *Burford Capital Annual Report 2021* (2022).

[25]Burford Capital, *Burford Capital Annual Report 2020* (2021).

have the authority to decide whether to settle or move forward with a case. Some funders indicated they provided their views on elements of a case if requested by a client.

| The Commercial TPLF Market Has Grown in Recent Years as Businesses Have Become More Familiar with It | Data collected from three commercial funders show they experienced growth between 2017 and 2021. Additionally, funders and stakeholders we spoke with said industry growth is a trend they observed in the U.S. commercial TPLF market at large over the last 5 years. They also told us there have been some changes in the commercial TPLF client base and the type of agreements funders offered. |
|---|---|

- **Industry growth.** Data we collected from three commercial funders show that they experienced growth between 2017 and 2021. For example, the amount of TPLF the funders provided to clients through single-case and portfolio arrangements more than doubled. Additionally, formal requests for funding agreements increased by 27 percent, while total new agreements increased by 19 percent. All seven of the commercial litigation funders and one trade association we interviewed also told us the industry has grown in recent years. Some funders attributed this growth to larger corporations or law firms becoming more familiar with TPLF and more comfortable using it. They said they have observed growth in the number of funders entering the market, the amount of funding provided, the number of cases funded, investor interest, and demand for TPLF.

A 2021 market report also found that, among the funders that provided data, commercial TPLF had experienced growth in the last year in terms of capital from investors and new commitments toward litigation finance deals.[26] For example, capital commitments toward new deals increased 11 percent compared to the prior year, according to the report.[27] Further, the report provided the best available estimates we identified of the size of the U.S. commercial TPLF market. Specifically, it identified 47 active commercial litigation funders, and reported that they had a total of $12.4 billion in assets

---

[26]Westfleet Advisors, *The Westfleet Insider*. Westfleet reported that most of the 47 funders they identified with substantial market participation chose to provide data.

[27]In the report, Westfleet Advisors stated that it remains cautious about drawing sweeping conclusions on the trajectory of the market given the irregularities present in the U.S. litigation system and the broader economy, but noted that its 2021 report represents the third year for which it has collected and analyzed industry data, and its views are informed by those statistics. Westfleet Advisors, *The Westfleet Insider*.

under management and had committed $2.8 billion to new litigation financing agreements in 2021.[28]

However, no comprehensive estimate of total market size exists because publicly available data on the market are limited: there is no central repository of information on litigation funders, and no federal law expressly requires all litigation funders to report market data publicly.[29] In addition, industry observers and participants do not always agree on what should be measured.

- **Increased acceptance and use of TPLF.** All the commercial funders we interviewed said there had been an increased acceptance of litigation financing in recent years. Funders said increased acceptance had resulted in the use of TPLF by new parties, such as law firms and corporations and, according to one funder, an appetite for new and innovative funding agreement structures. For example, data we collected from three funders showed a shift from single-case agreements towards portfolio financing over the last 5 years. Specifically, portfolio agreements comprised about 39 percent of all new agreements in 2021, compared to about 19 percent in 2017. In addition, the proportion of total capital provided through portfolio agreements grew from 28 percent ($28 million of $101 million) in 2017 to 51 percent ($124 million of $240 million) in 2021. Similarly, Westfleet Advisors reported that in 2021, 59 percent of new capital commitments for the funders that provided data went to portfolio agreements.[30]

## Consumer TPLF Is Commonly Used by Plaintiffs with Personal Injury Cases for Living Expenses

Four of the five consumer funders and two trade associations we spoke with said consumer TPLF clients used funding to pay for living expenses (e.g., rent and medical bills) while their litigation was ongoing. They did not use the funding to finance the litigation itself. One trade association

---

[28]Westfleet Advisors, *The Westfleet Insider*.

[29]As discussed later, some litigation funders may be subject to public reporting requirements under federal securities laws and related rules and regulations.

[30]Westfleet Advisors, *The Westfleet Insider*. Westfleet reported that most of the 47 funders they identified with substantial market participation chose to provide data.

noted that using TPLF to pay legal costs could conflict with some states' champerty and maintenance laws.[31]

- **Types of funding arrangements.** All of the funders identified single-case funding arrangements for individual plaintiffs as their primary funding option.[32] Two funders said it was common to fund a client multiple times over the course of one case. The consumer litigation funders also told us they typically do not fund defendants. Defendants typically already have financial backing for litigation from their insurance policies, according to some funders.

- **Types of claims.** The five consumer funders, two trade associations, and one stakeholder we spoke with said consumer TPLF is provided to plaintiffs with personal injury cases. These cases included car accidents, slip-and-fall accidents, and medical malpractice.[33] Four of the funders said they offered funding in multiple states, depending on regulatory environment, but did not provide any international funding.

- **Funding amounts.** Two consumer litigation funders and two trade associations told us that consumer funders provide relatively small amounts of financing. They cited average funding amounts that ranged between $1,000 and $10,000. One study we reviewed found funders provided roughly 7 percent of the estimated value of a case in funding.[34] Two funders said they typically provided clients with no more than 10 percent of the estimated value of a case.[35] Four funders said they were conservative in the amount of funding they provide to clients to ensure they can recover their investment from future settlement awards. Three funders told us that if they provide too much

---

[31]As discussed earlier in the report, maintenance refers to helping another prosecute a suit and champerty refers to maintaining a suit in return for a financial interest in the outcome.

[32]Three funders told us they occasionally provided financing to law firms, but this was rare and not their primary focus.

[33]One study of roughly 200,000 cases over a 10-year period found that about 59 percent of observed cases involved car accidents. Ronan Avraham and Anthony Sebok, "An Empirical Investigation of Third Party Consumer-Litigant Funding," *Cornell Law Review*, vol. 104, no. 5 (July 2019): 1133-1181. This study reviewed data from a single large consumer funder and its findings cannot be generalized to all consumer funders.

[34]Avraham and Sebok, "An Empirical Investigation of Third Party Consumer-Litigant Funding."

[35]For example, if a funder estimated a client's claim to be worth $100,000, it would provide that client no more than $10,000.

funding up front, it could deter clients from accepting settlement offers because of the amount they owe to the funder.

- **Investors.** The consumer funders we interviewed are private companies that receive their funding through a variety of investors. These include securitized offerings, private institutional investors, and private credit investors.

Consumer funders told us they evaluate certain factors before deciding whether to provide funding—for example, whether the defendant's liability for a plaintiff's injuries has been established and whether the defendant has insurance. Data we collected from one consumer funder showed that about 21 percent of requests resulted in first-time funding. Two other funders told us they funded roughly half the requests they received.

All five of the consumer litigation funders we spoke with said their agreements did not give them any control over a client's litigation. They also said they did not provide advice on litigation decisions, such as whether to move forward with a case or to settle.

## Funders and Stakeholders Said Familiarity with the Consumer TPLF Market Has Increased and the Market Is Maturing

Trends in consumer TPLF include increased familiarity with TPLF, a maturing of the market, and increased efforts to regulate the industry at the state level.

- **Increased familiarity with TPLF.** Consumers have become increasingly familiar with consumer TPLF in recent years, according to four consumer litigation funders we interviewed. One funder said this has led to increased competition among funders and lowered the cost of TPLF for consumers. Another funder said lawyers may become more accepting of TPLF as their clients are interested in using it more frequently.

- **Maturing of the market.** The consumer TPLF market is becoming more mature. One trade association said this maturation could be seen through the emergence of securitization in consumer TPLF. Some consumer litigation funders have shifted toward providing TPLF that is funded through securities, which may indicate that the market is attracting more investors.[36] Additionally, one academic researcher told us the consumer TPLF market had matured to the point where

---

[36]For example, two consumer funders told us they initially provided funding to consumers using personal money and lines of credit, but in the past 5 years have started using funds raised through the sale of securities. The four largest consumer funders have also successfully securitized their funding transactions over the past 5 years, according to a trade association.

funders are using established business practices, strategies, and technology.

- **Efforts to regulate the industry.** Both opponents and proponents of consumer TPLF have increased efforts to regulate the industry at the state level, according to three consumer litigation funders and three stakeholders. For example, one funder said there has been a movement by TPLF opponents to limit fees that litigation funders can charge consumers. Additionally, one trade association said there have been recent efforts to ban TPLF in some states. Two trade associations said some states have adopted regulations that require clearly stipulated contract terms.[37]

As with the commercial TPLF market, there are no publicly available data on the overall size of the consumer TPLF market. In addition, there have not been any public industry surveys. At least one state (Maine) requires registered funders to report some data about consumer TPLF to a state agency, but the results of that data collection are not publicly available. Consumer litigation funders we interviewed did not have any estimates of the size of the market. Five stakeholders told us they were not clear on whether the industry had grown over the last 5 years.

## Experts Identified Data Gaps in the U.S. TPLF Markets and Policy Options to Address Them

Experts that participated in our roundtable and litigation funding associations we interviewed identified several possible gaps in the availability of data on U.S. TPLF markets. Examples of gaps include data on funders' rates of return, the number of funders operating in the U.S., and the total amount of funding provided.

Experts said that addressing these data gaps could help researchers answer important questions about the TPLF industry, such as what effect TPLF has on litigation and the extent to which conflicts of interest arise for judges who hear cases funded by TPLF and have ownership interests in litigation funders. Experts added that obtaining more data also may help address concerns about consumer and investor protections. For example, additional data about consumer funders could provide more transparency and increase market competition. Similarly, additional information on portfolios of publicly traded litigation funders in the commercial TPLF market could improve investor protections. Further, according to one expert, a lack of information about the industry may be the motivating force behind some stakeholders wanting to regulate it, and more data

---

[37]We discuss state regulation of consumer TPLF in more detail later in the report.

could provide a greater understanding of TPLF, thereby serving as an alternative to regulation.

Experts identified six policy options to address the data gaps they identified. These options are summarized below and represent potential actions by U.S. lawmakers, regulators, courts, and industry stakeholders. The options are organized by the TPLF market they apply to (commercial, consumer, or both) and describe the parties that could potentially collect or supply the data. The experts and litigation funding associations we interviewed also described potential implementation steps and challenges posed by these options, which also are summarized below.[38]

- **Arbitration institutions could collect data.** Some arbitration institutions have disclosure rules and practices that could provide an avenue for obtaining data on commercial TPLF. However, a litigation funding association we spoke to noted that obtaining data solely from these institutions would give an incomplete picture of the commercial TPLF market.

- **State regulators could collect data.** States could require funders to obtain licenses and report consumer TPLF data as part of licensure requirements. However, an expert noted that it could be difficult to get various states to enact legislation imposing those requirements. A litigation funding association we spoke with also expressed concerns that, depending on what data are collected, this option could result in defendants receiving information about plaintiffs that they would not ordinarily receive. Experts suggested that the funders could report the data on an aggregated, anonymized, or confidential basis.

- **Federal regulators could collect data.** Funders could report TPLF data to federal regulators.[39] For example, experts suggested that the Consumer Financial Protection Bureau (CFPB) may be able to gather data about consumer TPLF. However, litigation funding associations we interviewed questioned CFPB's authority to obtain data from funders and one association said Congress may need to pass legislation to authorize CFPB to do so. An expert also suggested the

---

[38]We asked roundtable participants and the litigation funding associations we interviewed to describe the potential advantages and disadvantages of the options, but the discussions primarily focused on potential challenges posed by the options.

[39]We discuss the role of federal regulators later in the report.

Securities and Exchange Commission (SEC) could obtain data from commercial TPLF funders that are subject to SEC regulation.

- **The court system could collect data.** Federal or state courts could collect data about commercial and consumer TPLF. For example, the courts could change their rules to require disclosure of TPLF arrangements or they could collect data through a survey of litigants. One expert suggested that the National Center for the State Courts could help to coordinate among state courts.[40] However, an expert noted that differences in the jurisdiction of state courts could make it difficult to collect standardized data through the state court system. At the same time, collecting data through federal courts alone would not capture cases funded by TPLF that are brought in state courts, according to a litigation funding association. An expert also noted that collecting data through the courts would exclude disputes funded by TPLF that are arbitrated outside of the court system. Another expert also cautioned that this option could create more burden for the courts.[41]

- **Funders could voluntarily provide data.** The judiciary or Congress could send funders a request or survey for data, or funders could be incentivized to voluntarily provide data.[42] However, funders may be unwilling to provide data because of confidentiality concerns or if they were not legally required to divulge such information. Experts also noted that it would be difficult to obtain data from funders without first knowing who the funders are, and that any data collected could suffer from selection bias and would not be representative of all funders.

- **Lawyers or law firms could provide data.** Lawyers or law firms could report TPLF data through state bar registration systems, for example. However, attorneys are subject to confidentiality and ethics requirements that could limit the data they report, according to an expert and a litigation funding association.

---

[40]According to its website, the National Center for State Courts is an independent, non-profit organization that works with judicial leaders to promote the rule of law and improve the administration of justice in state courts. National Center for State Courts, About Us, accessed Oct. 10, 2022, https://www.ncsc.org/about-us.

[41]Litigation funding associations we interviewed also expressed concerns that disclosures could give defendants a tactical advantage over plaintiffs, for example, if the funding budget were revealed. We discuss these types of concerns later in the report.

[42]The experts did not provide examples of potential incentives or who would provide them.

The policy options above may not reflect all possible options, but rather those identified by the expert roundtable we convened. Additionally, as with all policy options, they involve trade-offs. As noted above, the options may also require legal action or other steps to implement. For example, federal or state lawmakers may need to pass legislation authorizing relevant agencies to act or compelling disclosure by private parties. Federal or state agencies may need to issue or modify regulations, or in the case of courts, promulgate or modify procedural rules. Some options may require cooperation by nongovernment stakeholders. We did not evaluate how to implement the options or how effective the options would be. Lastly, we discuss existing regulatory and disclosure requirements later in this report.

# Funders and Stakeholders Identified Advantages and Disadvantages of TPLF for Its Users and Investors

## TPLF Can Help Its Users Access the Legal System and Manage Risks, but It Is Expensive

Commercial and consumer TPLF can offer users several advantages, such as giving underfunded plaintiffs resources to litigate cases against well-funded defendants and allowing plaintiffs to transfer litigation risk, according to literature we reviewed and funders and stakeholders we interviewed. However, consumer and commercial TPLF also can be costly to plaintiffs and defendants, and may create incentives for parties not to reach settlement, according to funders and stakeholders.

### Advantages

- **Helps even the playing field for underfunded plaintiffs.** TPLF can help ensure that plaintiffs with limited resources have the funding they need to litigate their cases, according to eight litigation funders, three trade associations, and one academic researcher we interviewed. For example, commercial TPLF can allow a small business with a breach of contract claim against a large corporation, but without funding for a

lawsuit, to bring its claim in court.[43] Underfunded corporate plaintiffs can also use it to more effectively litigate complex cases—for example, by using the funding to hire more experienced lawyers or expert witnesses. Similarly, consumer TPLF can help pay living expenses for an injured plaintiff who cannot work during a lawsuit. This can give the plaintiff an opportunity to sustain litigation longer and avoid accepting a low settlement offer.

- **Ability to monetize claims.** A benefit of TPLF for plaintiffs is that it allows them to monetize their claims (that is, convert the value of their claims to cash), according to four litigation funders and two stakeholders we interviewed. This allows plaintiffs to realize the value of their claim upfront instead of having to wait until after they win their case. For example, companies and individuals can use the expected proceeds from a claim for business purposes or living expenses, respectively.

- **Ability to transfer risk to a third party.** TPLF allows plaintiffs to offload some of the risk of negative litigation outcomes to funders.[44] Plaintiffs do not have to pay back the TPLF if they lose their case, which reduces their risk exposure similar to the way defendants transfer risk to their liability insurers.[45]

Funders and stakeholders identified additional advantages for commercial TPLF users. For example, plaintiffs can benefit from the due diligence TPLF funders conduct in assessing the merits of a plaintiff's case, which gives the plaintiff feedback on the case's strengths and weaknesses.[46]

---

[43]Some opponents of TPLF have argued that TPLF is not necessary in these instances because in the U.S., plaintiffs can finance their litigation through contingency fee arrangements—where a lawyer agrees to represent a client in exchange for a fixed percentage of their recovery if they win the case. We did not examine whether a law firm's fee is the same or differs when TPLF is involved.

[44]Jayme Herschkopf, "Third-Party Litigation Finance," Federal Judicial Center: Pocket Guide Series (Washington, D.C.: Federal Judicial Center, 2017), https://www.fjc.gov/sites/default/files/materials/34/Third-Party_Litigation_Finance.pdf.

[45]Individuals or companies can transfer the risk of potential claims by purchasing insurance policies. Specifically, an insurance company charges a fee, or an insurance premium, to the policyholder and in return, the insurer assumes certain risks that are defined in the insurance policy. For example, an individual who is injured in a car accident may decide to sue the other driver for damages. If the injured party (the plaintiff) wins the case and the other driver (the defendant) has a car insurance policy, the insurance company would generally help pay for the claim.

[46]Two commercial litigation funders and one trade association told us this screening function can also help decrease the number of frivolous claims filed in court.

Further, TPLF can allow corporate plaintiffs to take litigation costs off their balance sheets, according to two commercial litigation funders.

Disadvantages

- **TPLF is expensive.** TPLF can be costly to obtain.[47] For example, one consumer litigation funder we interviewed has rates starting at 15 percent of the amount funded, according to its website.[48] Another consumer litigation funder we interviewed listed its rates as 18 percent of the amount funded (applied every 6 months). Funders say they charge a high rate for TPLF because they assume a lot of risk. Two funders and one stakeholder noted that if plaintiffs are not careful with how much financing they obtain, the fees associated with the financing could significantly cut into their recovery amount.

- **TPLF may deter settlement.** Plaintiffs who use TPLF may be inclined to reject a fair settlement offer, according to literature we reviewed, one trade association, and one consumer litigation funder.[49] According to the funder, plaintiffs may seek extra money to make up the amount that has to be repaid.

- **Litigation costs for defendants could increase.** Three stakeholders told us TPLF could increase litigation costs for defendants. For example, one trade association told us TPLF could encourage the filing of meritless lawsuits, which would create legal costs for defendants. Another association told us defendants may file additional discovery motions to get access to the TPLF agreement, which could

---

[47]As discussed earlier, plaintiffs that win their cases will generally repay the funder the amount of funding they received plus an additional amount based on a return structure outlined in the TPLF agreement.

[48]The funder told us that the total amount a plaintiff will repay is based on the length of time the funding is outstanding and the amount is expressly listed in the TPLF agreement. Several states require this type of information to be set forth in the agreement. For example, under a state statute in Maine, funding agreements must include the total amount that consumers must repay, in 6-month intervals for 42 months, as well as the annual percentage fee on advance. See Appendix III for more information.

[49]Herschkopf, "Third-Party Litigation Finance."

increase costs.[50] Defendants also may face increased expenses because cases may run longer, since plaintiffs may be less inclined to settle.

Other potential disadvantages for commercial TPLF users, according to two trade associations and a report, include risks that a funder paying for the litigation may exert control over the case (such as influencing decisions about litigation strategy or whether to settle) and that TPLF may lead to conflicts of interest between attorneys and their clients (for example, if the lawyer were to put the funder's interest ahead of the plaintiff's).[51] One of the associations also noted that having sovereign wealth funds invest in the U.S. commercial TPLF market may be a disadvantage because they may seek to influence litigation.[52] Two stakeholders told us that another potential disadvantage of consumer TPLF is consumers not being fully aware of its cost. There is also a risk of funders taking advantage of vulnerable consumers in dire need of financial assistance, according to three stakeholders and one funder.[53]

---

[50]Some TPLF opponents have argued that TPLF agreements should be disclosed because the agreements may violate state champerty laws or create conflicts of interest between the plaintiff and their attorneys, among other concerns. Conversely, TPLF proponents have argued that defendants want access to TPLF agreements to gain a tactical advantage over plaintiffs (for example, by learning about the plaintiff's litigation budget). In its consideration of a proposal to require disclosure of TPLF agreements, the Advisory Committee on Civil Rules observed that there is a concern that mandatory disclosure could generate litigation about the adequacy of the disclosure and lead to further attempts to discover more information about the funding arrangement, its origins, and perhaps ongoing implementation of the agreement. *See* Advisory Committee on Civil Rules, Agenda, 354 (Nov. 7, 2017). We discuss TPLF disclosure requirements later in the report.

[51]Congressional Research Service, *Following the Money: Should Federal Law Require Litigants to Disclose Litigation Funding Agreements?* Legal Sidebar, LSB10145 (May 31, 2018).

[52]An article we reviewed also noted that sovereign wealth funds may be involved in TPLF to further foreign policy or military goals. Maya Steinitz, "Follow the Money? A Proposed Approach for Disclosure of Litigation Finance Agreements," *UC Davis Law Review*, vol. 53, no.2 (2019): 1103-1104.

[53]Some states have enacted laws that can help guard against these potential abuses (for example, by capping the amount of interest funders can charge and requiring that contracts clearly disclose the cost of financing). See Appendix III for more information.

## TPLF Offers Investors Returns Uncorrelated to Financial Markets, but Investment Risk Can Be High

Commercial and consumer TPLF offers investors potentially high returns and an opportunity to diversify their investment portfolios because the returns are not correlated with financial markets. Funders we interviewed said the primary disadvantage to investors is the high risk of losing the investment.

### Advantages

- **High returns.** TPLF can offer high returns, according to most funders and four stakeholders we interviewed. For example, in 2021, one commercial funder reported a 93 percent return on invested capital on concluded assets since inception in one of its portfolios.[54] Another commercial funder reported a 91 percent return on invested capital on completed investments in two of its funds since 2017.[55] Investing in TPLF can offer high returns because these investments are high risk—investors lose all of their investments if the lawsuit is unsuccessful.

- **Returns are uncorrelated to financial markets.** According to eight funders and two stakeholders we interviewed, TPLF has become an attractive market for investors because returns are uncorrelated to the price movements of other investments, such as stocks, bonds, and commodities. Litigation occurs in markets that trend upward or downward and does not depend on macroeconomic factors. As a result, TPLF offers investors an opportunity to diversify their investment portfolio.

### Disadvantages

The primary disadvantage of investing in commercial and consumer TPLF is the potentially high risk of losing the investment, according to five funders. Since funders provide TPLF to clients on a nonrecourse basis, if a plaintiff loses the case, the funder loses the money invested in that case.[56]

Another potential disadvantage for investors in commercial TPLF is that it may take a long time to receive a return on investment since cases can

---

[54]Buford reported this return for concluded assets in its Burford-only balance sheet capital provision-direct portfolio. Burford defines concluded assets as those in which there is no longer any litigation risk remaining. Burford Capital, *Burford Capital Annual Report 2021* (2022).

[55]The majority of Omni Bridgeway's investments sit within seven funds. Omni Bridgeway, *Annual Report 2021* (2021). This return is generally comparable to the performance of the S&P 500 over a similar time period.

[56]Commercial TPLF investors may face less risk when investing in portfolio arrangements because the return on the investment depends on multiple cases instead of just one.

take several years to resolve. In addition, there is a risk that funders may not have complete information about the cases in which they invest—for example, because they may not be privy to confidential or privileged information from the lawsuit. Another stakeholder told us investors could be misled about a case's prospects and invest in cases less likely to be successful than they believe.

# In the U.S. and Selected Foreign Countries, Regulation of TPLF Is Limited

## In the U.S., TPLF Is Not Federally Regulated, but Some State Regulation and Industry Best Practices Exist

The TPLF industry is not specifically regulated under federal law. However, the activities of litigation funders may be subject to regulation under laws of more general applicability, such as federal securities laws. According to staff at the SEC, the TPLF industry most commonly intersects with SEC regulation if a litigation funder has public reporting obligations under federal securities laws.[57] For example, the Securities Exchange Act of 1934 (Exchange Act) and related rules and regulations of the SEC govern the registration of securities on national securities exchanges and require issuers to regularly report information about their business, results of operations, and financial condition.[58] Litigation funders that are issuers subject to these requirements may thus be required to disclose information regarding their TPLF activities. SEC identified one such funder, Burford Capital Limited, which is a large commercial litigation funder incorporated in Guernsey that has registered its securities on the New York Stock Exchange pursuant to Section 12(b)

---

[57]According to an SEC website, companies are subject to public reporting requirements if they sell securities in a public offering, allow their investor base to reach a certain size, or voluntarily register with the SEC, among other things. Securities and Exchange Commission, *Public Companies* (accessed July 14, 2022, https://www.investor.gov/introduction-investing/investing-basics/how-stock-markets-work/public-companies).

[58]Securities Exchange Act of 1934 (codified as amended at 15 U.S.C. §§ 78a-78qq). Related rules and regulations are codified in scattered sections of chapter II of title 17 of the *Code of Federal Regulations. See, e.g.*, 15 U.S.C. §§ 78l, 78m, 78o(d), and 17 C.F.R. pt. 249, subpt. D.

of the Exchange Act.[59] The funder files periodic reports with SEC, including an annual report on Form 20-F, which is a report filed by foreign private issuers that discloses financial and other information about the company.

In addition, SEC staff said it is possible that TPLF arrangements could implicate other provisions of federal securities laws and related rules and regulations, depending on the structure of the arrangements and other factors. SEC staff noted, for example, that TPLF arrangements could be "investment contracts" or otherwise constitute securities under federal securities laws. In addition, the SEC issued proposed rules earlier this year, which, if adopted, would require certain registered investment advisors to confidentially report information about investments in litigation finance made by private funds they manage.[60] The preamble to the rules notes the evolution of the private fund industry in the last decade and the increasing prevalence of certain investment strategies, including litigation finance. The preamble states that the new information would be used to support SEC oversight efforts and improve the Financial Stability Oversight Council's ability to address systemic risks to the country's financial stability.[61]

The CFPB regulates the offering and provision of consumer financial products and services, including extensions of credit. CFPB officials told us that whether any given TPLF arrangement is a credit product within CFPB's regulatory authority, as outlined in the Consumer Financial Protection Act of 2010, would depend on the specific facts and

---

[59]SEC's Division of Corporation Finance selectively reviews filings under the Securities Act of 1933 and the Exchange Act to monitor and enhance compliance with disclosure and accounting requirements. The Division reviewed Burford Capital Limited's registration statement on Form 20-F, which was declared effective on September 30, 2020. The funder's registration statement and other related documentation are publicly available on SEC's Electronic Data Gathering, Analysis, and Retrieval System.

[60]*See* Amendments to Form PF to Amend Reporting Requirements for All Filers and Large Hedge Fund Advisers, 87 Fed. Reg. 53,832 (Sept. 1, 2022) and Amendments to Form PF to Require Current Reporting and Amend Reporting Requirements for Large Private Equity Advisers and Large Liquidity Fund Advisors, 87 Fed. Reg. 9,106 (Feb. 17, 2022). The rules propose to collect the information by amending Form PF, a confidential reporting form used by SEC-registered investment advisors that manage private funds and have at least $150 million in private fund assets under management.

[61]Form PF may also be filed with the Commodity Futures Trading Commission (CFTC), for example, if an SEC-registered investment advisor required to file Form PF is also registered with the CFTC as a commodity pool operator or commodity trading adviser.

circumstances.[62] For example, in a 2017 enforcement action against a litigation funder, CFPB stated that certain funding—which had been provided to consumers awaiting payment of an award—was an extension of credit or an offer to extend credit for purposes of the act.[63]

At the state level, there is some regulation of consumer TPLF.[64] For example, some states limit the interest rates and fees that funders can charge consumers who enter into TPLF agreements.[65] Arkansas, for example, caps interest rates at 17 percent, while Tennessee caps annual fees at no more than 10 percent of the original amount of money provided to the consumer.[66] Some states, such as Maine and Nebraska, require consumer litigation funders to register with the state and disclose certain

---

[62]*See, e.g.*, 12 U.S.C. § 5481(5), (7), (15)(A)(i). We also interviewed Department of Justice officials, who told us they do not interact with litigation funders or engage with the TPLF industry.

[63]*See* Consumer Fin. Prot. Bureau v. RD Legal Funding, LLC, No. 1:17-cv-00890 (S.D.N.Y. filed Feb. 7, 2017). According to the complaint, the defendants offered or provided funds to consumers who were entitled to receive compensation under a settlement fund or judgment and were awaiting payment, and upon receipt of their awards, consumers were required to repay the funding at a considerable premium. The complaint alleged that the defendants engaged in deceptive and abusive acts and practices related to such funding in violation of the Consumer Financial Protection Act of 2010. *See* 12 U.S.C. §§ 5531, 5536(a).

[64]According to literature we reviewed, one state—Wisconsin—has enacted legislation that extends to commercial litigation funding. *See, e.g.*, Elizabeth Korchin, Patrick Dempsey, and Eric Blinderman, "The Third Party Litigation Funding Law Review: USA," (November 22, 2021), accessed July 13, 2022, https://thelawreviews.co.uk/title/the-third-party-litigation-funding-law-review/usa. We discuss this law later in the report and in Appendix III. Also, as discussed earlier, state common law doctrines prohibiting maintenance, champerty or barratry are also relevant.

[65]States may also have separate usury laws, which restrict the amount of interest a lender can charge for a loan. According to a report by the New York Bar Association, litigation funders often avoid running afoul of state usury laws because the funding does not ordinarily involve an absolute obligation to repay. The report identified some instances where courts classified funding agreements as loans subject to state usury laws, but said the majority view was that such laws did not restrict litigation funding. New York City Bar, *Report to the President*, 9.

[66]*See* Ark. Code Ann. §§ 4-57-109, 4-57-104, Ark. Const. amend. 89 § 3 and Tenn. Code Ann. § 47-16-110(a). Tennessee also limits the term of funding transactions to 3 years and the maximum yearly fees funders can charge consumers (which are separate from the annual fee and can include underwriting fees and other charges) to a maximum of $360 per year for each $1,000 of the unpaid principal amount of funds advanced to the consumer. *See* Tenn. Code Ann. § 47-16-110(c).

information in their funding contracts, such as the total amount consumers must repay.[67]

Two consumer litigation funders told us uniform state regulation would make it easier to work across state lines. Other stakeholders noted the challenge of ensuring consumer protections for TPLF while avoiding overregulation that would limit its availability to consumers. See appendix III for more information on state regulation of consumer TPLF.

Trade and professional associations have developed voluntary best practices related to litigation funding. For example, the International Legal Finance Association has developed best practices for commercial litigation funders, which include providing services in a clear manner and not interfering with lawyers' duties to their clients. Similarly, the American Legal Finance Association and the Alliance for Responsible Consumer Legal Funding have developed best practices for consumer litigation funders. Examples of these practices include not providing consumers funding in excess of their needs and not offering or paying commissions or referral fees to any attorney referring clients to a funder. The American Bar Association has also developed best practices for attorneys that use litigation funding. For example, the practices state that attorneys should ensure a litigation funding arrangement is in writing and that the client remains in control of the case.[68]

## There Is No Nationwide Requirement to Disclose TPLF Agreements in the U.S, but Some Federal Courts Require Some Disclosure

There is no nationwide requirement to disclose litigation funding agreements to courts or opposing parties in U.S. federal litigation.[69] However, there have been efforts to implement such a requirement. For example, in 2014 and 2017, the U.S. Chamber Institute for Legal Reform and other industry stakeholders proposed that the Advisory Committee on Civil Rules (which drafts rules that govern civil ligation in federal courts) consider an amendment to require disclosure of TPLF arrangements in

---

[67]See Me Rev. Stat. Ann. tit. 9-A, §§ 12-104, 12-106, and Neb. Rev. Stat. §§ 25-3303, 25-3307.

[68]Though not specific to TPLF, state professional codes of conduct for attorneys may also be relevant. *See* New York City Bar, *Report to the President*, 20-33.

[69]*See, e.g.,* Robin Davis et al., "United States – other key jurisdictions," in *Litigation Funding 2022,* eds. Steven Friel and Jonathan Barnes (London, UK: Law Business Research, Nov. 2021), 131; New York City Bar, *Report to the President*, 45; Congressional Research Service, *Following the Money*, 3.

any civil action filed in federal court.[70] The committee did not act on the proposals, but stated that it would continue to monitor TPLF.[71] Federal legislation to require disclosure of TPLF agreements also has been proposed.[72] Some industry stakeholders have called for the mandatory disclosure of TPLF agreements because of concerns that the agreements could create conflicts of interest between plaintiffs and their attorneys and because disclosure could provide additional transparency.[73] However, other stakeholders are concerned that defendants want access to TPLF agreements to gain a tactical advantage in court since they would know how much plaintiffs could spend on litigation.

Despite the absence of a nationwide disclosure requirement, federal courts can still obtain information about TPLF arrangements. For example, the Advisory Committee on Civil Rules has observed that judges can obtain information about third-party funding when it is relevant in a particular case.[74] Additionally, some federal courts have developed local rules or taken other steps to require litigants to disclose information about their TPLF arrangements. Examples include the following:

- **Northern District of California.** In November 2018, the Northern District of California began requiring parties in any class, collective, or

---

[70]*See* Advisory Committee on Civil Rules, Agenda 371 (Oct. 5, 2021). Industry stakeholders have since submitted additional proposals, including a 2021 proposal that the committee test TPLF disclosure in federal civil cases through a pilot project. The Advisory Committee on Civil Rules is a component of the federal judiciary that evaluates proposed changes to the Federal Rules of Civil Procedure and prepares draft amendments. It recommends amendments for further consideration within the federal judiciary, which, if approved, are ultimately promulgated by the U.S. Supreme Court.

[71]*See* Advisory Committee on Civil Rules, Agenda, 371-372 (Oct. 5, 2021) and Meeting Minutes 34, 36 (Oct. 5, 2021).

[72]*See, e.g.,* Litigation Funding Transparency Act of 2021, S. 840, 117th Cong. (2021).

[73]According to a report we reviewed, courts generally do not require disclosure of the litigation funding agreement itself and have justified withholding this information as irrelevant or protected by the work product doctrine. New York City Bar, *Report to the President*, 45.

[74]Advisory Committee on Civil Rules, Memorandum 4 (Dec. 2, 2014).

representative action to disclose to the court the identity of any person or entity that is funding the prosecution of any claim or counterclaim.[75]

- **District of New Jersey.** In June 2021, the District of New Jersey adopted a rule requiring litigants who have certain TPLF arrangements to file a statement that (1) identifies the funder, (2) describes whether the funder's approval is needed for litigation or settlement decisions, and if so, the nature of the terms and conditions of that approval, and (3) provides a brief description of the nature of the funder's financial interest.[76]

In addition, several federal courts have developed rules requiring litigants to disclose the identity of outside parties with a financial interest in the outcome of a litigation, according to a report by the New York City Bar Association.[77] The report noted that the purpose of these rules is to allow judges to assess whether there are any conflicts that bear on the judges' recusal and disqualification. The rules do not specifically target TPLF, but may require disclosure of litigation funders' identities, according to the report.

At the state level, at least two states have enacted laws requiring disclosure of TPLF agreements in civil litigation, according to literature we reviewed.[78] In 2018, Wisconsin passed a law requiring a party in a civil action to disclose to the other parties any agreement that provides a contingent right to compensation from the proceeds of the action.[79]

---

[75]*See* U.S. District Court for the Northern District of California, Standing Order for all Judges of the Northern District of California on the Contents of Joint Case Management System, § 19 (eff. Nov. 1, 2018).

[76]U.S. District Court for the District of New Jersey,  Local Civ. Rule 7.1.1, Disclosure of Third-Party Litigation Funding. A statement is required if any person or entity that is not a party provides funding for some or all of the attorneys' fees and expenses for the litigation on a non-recourse basis in exchange for (1) a contingent financial interest based upon the results of the litigation or (2) a non-monetary result that is not in the nature of a personal or bank loan, or insurance. *See* Local Civ. Rule 7.1.1(a).

[77]New York City Bar, *Report to the President*, 45, 47-49. *See also* Korchin, Dempsey, and Blinderman, "The Third Party Litigation Funding Law Review: USA."

[78]*E.g.*, Ryan M. Billings, Robert L. Gegios, and Melinda A. Bialzik, "Sweeping Changes to Rules of Civil Procedure," *Wisconsin Lawyer*, June 1, 2018, accessed July 14, 2022, https://www.wisbar.org/NewsPublications/WisconsinLawyer/Pages/Article.aspx?Volume=91&Issue=6&ArticleID=26396.

[79]*See* 2017 Wisconsin Act 235, § 12 (codified at Wis. Stat. § 804.01(2)(bg)). The statute excludes certain contingent fee arrangements with attorneys representing a party.

Disclosure is required unless otherwise stipulated or ordered by the court. In 2019, West Virginia amended a state consumer protection law to include a similar requirement for agreements with litigation funders.[80] Other states, such as Texas and Florida, have considered proposed legislation to require disclosure of TPLF agreements.[81]

## Regulation of TPLF in Selected Countries Is Limited

We reviewed regulation and disclosure of TPLF in three selected countries—Australia, England, and Canada.[82] The manner and extent of regulation varied. However, the regulation we identified in these countries was limited to certain funders or types of funding, or was not specific to TPLF. The disclosure requirements we identified also varied and applied only in certain circumstances.

### Australia

Litigation funders typically fund three categories of claims in Australia, according to representatives of the Association of Litigation Funders of Australia: class actions (involving individuals and companies), insolvency claims for companies under external control and trustees in bankruptcy, and commercial claims. The representatives we interviewed added that single-case and portfolio arrangements for law firms and other businesses are available to clients, but single-case arrangements are the most common.

Data on the total amount of funding committed to litigation finance in Australia are not publicly accessible, according to trade association representatives, but they estimated that between $150 million to $200 million (in U.S. dollars) are invested in Australia's TPLF market annually. They also said that between 10 and 20 litigation funders have been actively funding claims in Australia during the last 5 years.

---

[80]See Act of March 7, 2019, art. 6N, § 46A-6N-6 (codified at W. Va. Code § 46A-6N-6).

[81]See, e.g., Tex. S.B. 1567, 86th Leg. R.S. (2019) and Fla. S.B. 1750 (2021).

[82]We selected these countries because they include a mix of geographic locations and they have a legal system similar to that of the U.S. in some respects, among other factors.

The regulatory environment for litigation funders in Australia is complex and continues to develop, according to literature we reviewed.[83] Funders are subject to certain laws of general applicability but have been specifically exempted from some requirements.[84] For example, the government issued regulations in 2012 that exempted funders from certain requirements focused on conduct and disclosure in relation to financial services and products.[85] This included the requirement to hold a financial services license, among other things. In an effort to increase regulatory oversight, the government issued new regulations in 2020 that removed the exemptions for litigation funding when used in the context of class actions.[86] However, in September of this year, the government released draft regulations that would reinstate the exemptions for class

[83]*See* Jason Geisker and Dirk Luff, "The Third Party Litigation Funding Law Review: Australia," (November 22, 2021), accessed September 1, 2022, https://thelawreviews.co.uk/title/the-third-party-litigation-law-review/australia, Simon Morris et al., "Australia," in *Litigation Funding 2022,* eds. Friel and Barnes, 10-21, and Susanna Taylor, "Litigation funding," Practical Law ANZ Practice Note w-004-7182, accessed Sept. 1 2022, https://anzlaw.thomsonreuters.com.

[84]The literature noted, for example, that funders are subject to certain provisions of law that protect consumers against unfair contract terms and conduct that is misleading or deceptive. Also relevant are general laws, rules, and regulations pertaining to corporate governance, shareholding, and securities exchanges, among others, according to the literature. *See, e.g.,* Geisker and Luff, "The Third Party Litigation Funding Law Review: Australia," and Australian Law Reform Commission, *Integrity, Fairness and Efficiency—An Inquiry into Class Action Proceedings and Third-Party Litigation Funding* (December 2018), 62-63. For a discussion of exemptions related to financial services and credit regimes, see Australian Securities and Investments Commission, *Consultation Paper 345: Litigation funding schemes: Guidance and relief* (July 2021), 6-8, and related resources provided by the Australian Securities and Investments Commission (ASIC), accessed September 20, 2022, https://asic.gov.au/regulatory-resources/managed-funds/litigation-funding-schemes.

[85]*See, e.g.,* Australian Securities and Investments Commission, *PJC inquiry into litigation funding and the regulation of the class action industry* (June 2020), 5-6. The report cites the Corporations Amendment Regulation 2012 (No. 6) (as amended). The report clarifies that services in relation to litigation funding were generally exempt, although litigation funders may have been required to obtain a financial services license for other activities. *See also* Australian Securities and Investments Commission, *Consultation Paper 345: Litigation funding schemes: Guidance and relief*, 6-7.

[86]*See, e.g.,* Australian Securities and Investments Commission, *Consultation Paper 345: Litigation funding schemes: Guidance and relief*, 7-8, citing the Corporations Amendment (Litigation Funding) Regulations 2020 (Cth) (Austl.). *See also* Explanatory Statement, Corporations Amendment (Litigation Funding) Regulations 2020 (Cth) 1-2 (Austl.). The new regulations retained exemptions for funding of insolvency and single-plaintiff matters, according to the explanatory statement.

action funding.[87] According to a media release issued by the government, the changes followed a seminal judicial ruling earlier this year and are intended to facilitate access to justice.[88]

Claimants are required to disclose litigation funding agreements in class actions brought in federal courts, according to literature we reviewed.[89] The trade association we interviewed described the courts' general practice as requiring disclosure in unredacted form to the judge and in redacted form to the defendant. Claimants can redact commercially sensitive information—such as the funding budget—when disclosing the agreement to the defendant, which ensures the latter does not gain a tactical advantage, according to the association and literature we reviewed.[90] The literature noted that courts scrutinize funding arrangements, for example, when litigants seek court approval for a settlement of the class action that involves payment to funders.[91] The association said that, outside of class actions, there are fewer requirements to disclose a TPLF agreement to the court, unless the court deems it necessary for the efficient progress of the claim.[92]

---

[87]*See*, *e.g.*, Joint Media Release by the Attorney-General and Assistant Treasurer and Minister for Financial Services, "Unfair hurdles to class action funding unwound," (September 2, 2022), accessed September 23, 2022, https://ministers.ag.gov.au/media-centre/unfair-hurdles-class-action-funding-unwound-02-09-2022. The draft regulations and draft explanatory statement are available on the Australian Treasury's website, accessed September 21, 2022, https://treasury.gov.au/consultation/c2022-308630.

[88]Joint Media Release by the Attorney-General and Assistant Treasurer and Minister for Financial Services, "Unfair hurdles to class action funding unwound." *See also* Taylor, "Litigation funding," Practical Law ANZ Practice Note w-004-7182 (2022), citing *LCM Funding Pty Ltd v Stanwell Corporation Ltd [2022]* FCAFC 103.

[89]*E.g.*, Morris et al., "Australia," in *Litigation Funding 2022*, eds. Friel and Barnes, 11-13, 17. The authors note that disclosure is also required in certain state courts.

[90]*E.g.*, Geisker and Luff, "The Third Party Litigation Funding Law Review: Australia." According to the association, Parts 5 and 6 of the Federal Court Class Actions Practice Note GPN-CA set out the court's expectation in relation to disclosure. Other examples of commercially sensitive information may include the litigation budget, the commission and cost structure, and settlement amounts, according to literature we reviewed and a stakeholder we interviewed.

[91]*See, e.g.*, Taylor, "Litigation funding," Practical Law ANZ Practice Note w-004-7182.

[92]According to literature we reviewed, courts may also be involved in reviewing litigation funding agreements in connection with applications by liquidators or for security for costs. *E.g.*, Taylor, "Litigation funding," Practical Law ANZ Practice Note w-004-7182 and Morris et al., "Australia," in *Litigation Funding 2022*, eds. Friel and Barnes, 13.

| England | In England, litigation funders mainly fund plaintiffs in business-to-business disputes or large scale commercial disputes, and plaintiffs typically use the funding to pay lawyers and legal costs, according to representatives of the Association of Litigation Funders of England and Wales, a trade association we interviewed.[93] They told us that plaintiffs are provided single-case and portfolio financing arrangements, with the latter also being used (to a lesser degree) by law firms and other businesses to manage costs and operations.

Association representatives told us the size of England's litigation funding industry is unknown because of a lack of data, but there are likely no more than 20 major litigation funders operating in the market. One industry report noted that the pipeline of court cases and money held by litigation funders increased from 2019 to 2021.[94]

The government has not specifically regulated the TPLF industry in England, according to association representatives. However, the association provides a form of self-regulation.[95] Specifically, the association administers a voluntary code of conduct to be observed by funders that are members of the association.[96] The code sets out standards of practice and behavior, such as capital adequacy requirements and limitations on the funder's ability to terminate a funding |

---

[93]On its website, the association describes itself as an independent body charged by the Ministry of Justice with delivering self-regulation of litigation funding in England and Wales. *See* Association of Litigation Funders of England and Wales, "About Us," accessed August 23, 2022, https://associationoflitigationfunders.com/about-us/.

[94]Simon Latham and Glyn Rees, "The Third Party Litigation Funding Law Review: United Kingdom: England and Wales (November 22, 2021), accessed June 28, 2022, https://thelawreviews.co.uk/title/the-third-party-litigation-funding-law-review/united-kingdom-england--wales.

[95]*See* News Release, Civil Justice Council, Civil Justice Council Working Group Agrees Code of Conduct on Litigation Funding (Nov. 23, 2011), accessed August 26, 2022, https://www.judiciary.uk/wp-content/uploads/JCO/Documents/CJC/Publications/CJC+papers/CJC+News+Release+-+Code+of+Conduct+for+Litigant+Funders.pdf.

[96]Association representatives told us that membership in the association is voluntary and subject to certain requirements (for example, members must have £5 million in assets under management).

agreement or control litigation.[97] The code was facilitated by the Civil Justice Council, an advisory body sponsored by the Ministry of Justice of England and Wales.[98] Association representatives told us they communicate with the Civil Justice Council about the TPLF market, but there are no formal reporting requirements.

There is no universal requirement that compels a litigant to disclose a litigation funding agreement to an opposing party or the court, according to literature we reviewed.[99] However, the literature noted that disclosures regarding TPLF arrangements may be required in certain circumstances. For example, one report stated that courts are likely to review and scrutinize funding arrangements in collective proceedings, and another described the court's role in determining appropriate funding terms and structures in that context.[100] The literature also noted that a court may require disclosure of a funder's identity, for example, to facilitate payment of an opponent's legal costs.[101] Association representatives told us that, unlike the United States, England has a "loser pays" rule (where the losing party in a lawsuit has to pay the opposing party's legal expenses), and if defendants have concerns about how their costs will be paid if they

[97]*See* Association of Litigation Funders of England and Wales, *Code of Conduct for Litigation Funders* (Jan. 2018), accessed August 25, 2022, https://associationoflitigationfunders.com/code-of-conduct/documents/.

[98]According to Amey, the code was first published in 2011 and subsequently revised and updated by the association. Matthew Amey, "Third party litigation funding in England and Wales: an overview," Practical Law UK Practice Note 8-521-3304, accessed August 23, 2022, https://uk.practicallaw.thomsonreuters.com.

[99]*See* Friel et al., "England and Wales," in *Litigation Funding 2022*, eds. Friel and Barnes, 42 and Amey, "Third party litigation funding in England and Wales: an overview," Practical Law UK Practice Note 8-521-3304.

[100]Friel et al, "England and Wales," in *Litigation Funding 2022*, eds. Friel and Barnes, 36, 42; Latham and Rees, "The Third Party Litigation Funding Review: United Kingdom-England and Wales."

[101]*See, e.g.,* Friel et al., "England and Wales," in *Litigation Funding 2022*, eds. Friel and Barnes, 42 and Amey, "Third party litigation funding in England and Wales: an overview," Practical Law UK Practice Note 8-521-3304.

win the case, they can apply to the court to learn about the plaintiff's finances.[102]

Canada

According to literature we reviewed, TPLF has been used in Canada for more than ten years including for class actions, insolvency, and commercial litigation (such as breach of contract and intellectual property disputes).[103] The literature did not identify any government agency that specifically regulates the TPLF industry in Canada.[104] However, one report noted that insurance regulators may have oversight of an arrangement if the funder is also providing insurance to the client.[105]

TPLF agreements must be disclosed to the court in class actions and insolvency matters, where TPLF arrangements are subject to court approval, according to literature we reviewed.[106] One report stated that, where funding is disclosed and approved, courts have protected commercial details and allowed defendants to view only a redacted version of the agreement.[107] The literature highlighted the approval requirements for Ontario class actions in particular, which are prescribed

---

[102]According to Friel et al., England's rules of civil procedure give courts broad discretion to award payment of an opponent's costs. "If the court decides to make an order in relation to costs, the general rule is that the unsuccessful party will be ordered to pay the costs of the successful party, subject to some exceptions." Friel et al., "England and Wales," in *Litigation Funding 2022*, eds. Friel and Barnes, 39. According to a report by the Congressional Research Service, the general rule in the United States is that each party pays for its own attorney, subject to certain exceptions. Congressional Research Service, *Awards of Attorneys' Fees by Federal Courts and Federal Agencies*, 94-970 (October 22, 2009).

[103]Paul Rand, Pierre-Jérôme Bouchard, and Naomi Loewith, "Canada," in *Litigation Funding 2022*, eds. Friel and Barnes, 31.

[104]*See* Rand, Bouchard, and Loewith, "Canada," *in Litigation Funding 2022,* eds. Friel and Barnes, 31. Hugh Meighen, "The Third Party Litigation Funding Law Review: Canada," (Nov. 22, 2021), accessed February 1, 2022 https://thelawreviews.co.uk/title/the-third-party-litigation-funding-law-review/canada, and Geoff Moysa, "Litigation Funding: Overview," Practical Law Canada Practice Note Overview w-021-3651, accessed July 15, 2022, https://ca.practicallaw.thomsonreuters.com.

[105]Rand, Bouchard, and Loewith, "Canada," in *Litigation Funding 2022*, eds. Friel and Barnes, 31.

[106]*E.g.,* Rand, Bouchard, and Loewith, "Canada," in *Litigation Funding 2022*, eds. Friel and Barnes, 31, 33.

[107]Rand, Bouchard, and Loewith, "Canada," in *Litigation Funding 2022*, eds. Friel and Barnes, 33.

by legislation.[108] Under that framework, the court will not approve an agreement unless the court is satisfied that the agreement is fair and reasonable and does not impair the lawyer-client relationship, among other things.[109] According to one report, the Ontario legislation reflects general principles from case law that are relevant in other parts of Canada.[110]

## Agency Comments

We provided a draft of this report to CFPB, the Department of Justice, the Federal Judicial Center, and SEC for review and comment. CFPB, the Federal Judicial Center, and SEC provided technical comments, which we incorporated as appropriate. The Department of Justice did not provide comments.

As agreed with your offices, unless you publicly announce the contents of this report earlier, we plan no further distribution until 30 days from the report date. At that time, we will send copies to the appropriate congressional members and committees, the Director of the Consumer Financial Protection Bureau, the Attorney General, the Director of the Federal Judicial Center, the Chairman of the Securities and Exchange Commission, and other interested parties. In addition, the report will be available at no charge on the GAO website at https://www.gao.gov.

---

[108]According to Moysa, the *Class Proceedings Act, 1992*, S.O. 1992, c. 6 was amended effective October 2020 to codify certain approval requirements that existed under common law. Moysa, "Litigation Funding: Overview," Practical Law Canada Practice Note Overview w-021-3651.

[109]Meighen, "The Third Party Litigation Funding Law Review: Canada."

[110]Rand, Bouchard, and Loewith, "Canada," in *Litigation Funding 2022*, eds. Friel and Barnes, 31.

If you or your staff have any questions about this report, please contact me at (202) 512-8678 or clementsm@gao.gov. Contact points for our Offices of Congressional Relations and Public Affairs may be found on the last page of this report. GAO staff who made key contributions to this report are listed in appendix IV.

Michael E. Clements
Director, Financial Markets and Community Investment

# Appendix I: Objectives, Scope, and Methodology

This report describes (1) characteristics of and trends in the commercial and consumer third-party litigation financing (TPLF) markets, (2) data gaps in the markets, and policy options to address them; (3) potential advantages and disadvantages of TPLF for users and investors; and (4) regulation and disclosure of TPLF in the U.S. and selected foreign countries. For purposes of this report, we define TPLF as an arrangement in which a funder that is not a party to a lawsuit agrees to provide nonrecourse funding to a litigant or law firm in exchange for an interest in the potential recovery in the lawsuit. The scope of this report does not include other types of third-party funding for disputes, such traditional loans from banks.

Publicly available data on the TPLF market are limited as there is no central repository of information on funders and no federal law expressly requires all litigation funders to report market data publicly. The total number of litigation funders operating in the U.S. also is unknown because of limited data. Accordingly, to address the first objective, we collected data on TPLF transactions for 2017–2021 from a sample of litigation funders we interviewed (selected based on methods described below). To collect the data, we developed a data collection instrument that we pretested with two commercial and two consumer litigation funders to ensure clarity and understandability. We sent the instrument to all 12 funders we interviewed and received data from four of them.[1] We assessed the reliability of these data by reviewing them for obvious errors and obtaining written responses from the funders on the systems and methods they used to produce the data. We determined that the data we included in the report were sufficiently reliable for purposes of describing TPLF transactions from selected funders for 2017–2021. Data we collected from the litigation funders cannot be generalized to all funders. We also reviewed annual financial reports from the two publicly traded commercial litigation funders we identified (Burford Capital and Omni Bridgeway) for 2016–2020.

Additionally, we reviewed reports by academic researchers, government agencies, and others that we identified through a literature search. We conducted literature searches in January and August 2022 on the TPLF

---

[1]We also requested examples of litigation funding agreements from the 12 funders we interviewed. Some funders declined the request for legal reasons (for example, one said disclosing its agreements could put related privileges and protections at risk and potentially harm the underlying litigation). Six funders provided examples of their agreements but omitted or redacted relevant data, such as investment returns, fees, and funding amounts.

**Appendix I: Objectives, Scope, and
Methodology**

markets in the U.S., Australia, England, and Canada. Databases searched included ProQuest, EBSCO, Scopus, Social Science Research Network, and Westlaw Edge. We identified additional reports by conducting internet searches and searching agency websites, and by soliciting recommendations from federal agency officials, trade associations, and other industry stakeholders during the course of interviews.

We also interviewed officials from four federal agencies: the Securities and Exchange Commission, Consumer Financial Protection Bureau, Department of Justice, and Federal Judicial Center, and conducted semistructured interviews with a sample of 12 litigation funders operating in the U.S. (seven commercial and five consumer funders) and 10 industry stakeholders.[2] We compiled a list of funders by reviewing membership directories from litigation funding trade associations, industry rankings, and information published by a third-party funding research initiative. We then selected a judgmental sample of funders based on the following factors: the type of TPLF they provided (to obtain a mix of consumer and commercial litigation funders), ownership information (to obtain a mix of public and private funders), geographic location, rankings by industry experts, and recommendations by trade associations.

We compiled a list of industry stakeholders by reviewing literature and comment letters on TPLF submitted to the Advisory Committee on Civil Rules (a committee that drafts the rules that govern civil litigation in federal courts), and obtaining recommendations from representatives of federal agencies and other stakeholders we met with during our background-gathering process. We then selected a judgmental sample of stakeholders based on their knowledge of the U.S. TPLF market, their perspectives on TPLF (to obtain a mix of TPLF proponents, opponents, and neutral parties), the type of entity (to obtain a mix of trade associations, researchers, and others), and recommendations we received from federal agencies and other stakeholders.

The stakeholders we interviewed were the American Association for Justice, members of the American Bar Association, American Legal Finance Association, American Property Casualty Insurance Association, International Legal Finance Association, members of the New York City

---

[2]Industry stakeholders included trade associations, academic researchers, and other groups or individuals who have experience in or knowledge about consumer or commercial TPLF.

Appendix I: Objectives, Scope, and
Methodology

Bar Association, U.S. Chamber Institute for Legal Reform, Westfleet
Advisors, and Professors Anthony Sebok and Brian Fitzpatrick.[3]
Information gathered from the interviews cannot be generalized to all
litigation funders or industry stakeholders.

To address the second objective, we convened a virtual roundtable of 12
experts. These experts discussed possible data gaps in the U.S. TPLF
markets; whether the gaps need to be addressed and, if so, policy options
for addressing them; challenges posed by the options; and potential
implementation steps for the options.[4]

To identify a list of experts to select from, we reviewed a list of TPLF
industry stakeholders (compiled by the methods described earlier) and
reviewed literature. We then conducted internet searches to identify
additional information on the experts' experience, education, and
published work. We selected the 12 experts for our roundtable based on
(1) their published work on TPLF, (2) their knowledge of TPLF (as
measured by how long they have worked in their fields and their number
of publications on TPLF), (3) their type of work experience (to obtain a
mix of varied experiences, such as professors, attorneys, and others),
and (4) their perspectives on TPLF (to obtain a mix of roundtable
participants with various positions on TPLF).

The 12 experts we selected were Charles Agee, Managing Partner of
Westfleet Advisors; Ronen Avraham, law professor at the University of
Texas at Austin School of Law and Tel Aviv University; John Beisner,
attorney at Skadden, Arps, Slate, Meagher & Flom LLP and author of
publications for the U.S. Chamber Institute for Legal Reform; Page Faulk,
Senior Vice President of legal reform initiatives at the U.S. Chamber
Institute for Legal Reform; Radek Goral, attorney at Dentons; Tripp
Haston, attorney at Bradley, Arant, Boult, Cummings LLP; John
McCarthy, attorney at Smith, Gambrel & Russell, LLP and member of the
New York City Bar Association Litigation Funding Working Group; Lucian

---

[3]We also gathered background information from representatives of the firm Chambers and
Partners and the Alliance for Responsible Consumer Legal Funding.

[4]We also met with litigation funding associations (the International Legal Finance
Association, American Legal Finance Association, and the Alliance for Responsible
Consumer Legal Funding) to gather their perspectives about the data gaps and potential
advantages and disadvantages of the options the experts identified. We asked roundtable
participants and the litigation funding associations we interviewed to describe the potential
advantages and disadvantages of the options, but the discussions primarily focused on
potential challenges posed by the options.

**Appendix I: Objectives, Scope, and Methodology**

Pera, attorney at Adams and Reese LLP and ethics advisor for Westfleet Advisors; Victoria Sahani, law professor at Sandra Day O'Connor College of Law, Arizona State University; Anthony Sebok, law professor at Cardozo School of Law and ethics consultant for Burford; Maya Steinitz, law professor at University of Iowa College of Law; and Robert Weber, law professor at Georgia State University College of Law. To help identify any potential biases or conflicts of interest, we asked each expert who participated in the roundtable to disclose whether they had investments, sources of earned income, organizational positions, relationships, or other circumstances that could affect, or could be viewed to affect, their view on the options. For our purposes, there was sufficient variation among the experts' backgrounds and positions on TPLF for the roundtable. The comments of these experts generally represented the views of the experts themselves and not the university, law firm, or other organization with which they were affiliated, and are not generalizable to the views of others in the field.

The roundtable discussions were recorded and transcribed to ensure that we accurately captured experts' statements. We analyzed the transcript to identify common themes related to data gaps identified by the experts and potential options to address them. We then summarized that information in our report. We did not poll expert participants or take votes on approaches discussed during the roundtable. Consequently, we do not provide counts or otherwise quantify the number of experts agreeing to an approach. Further, because experts were generating and discussing ideas as part of a free-flowing group discussion, the number of times a concept was or was not repeated does not necessarily indicate the level of consensus on that concept. In the report, we use the term "experts" to refer to more than one expert.

We did not evaluate the options identified by the experts, such as how effective the options may be or what steps would be required to implement them. Their inclusion in this report should not be interpreted as a recommendation to federal agencies or a matter for congressional consideration. The options are not listed in any specific rank or order. Although the experts identified a range of options for collecting information, other options may exist that were not raised.

To address the third objective, we reviewed reports by academic researchers, government agencies, and others that we identified through a literature search. We also interviewed litigation funders and industry stakeholders. We conducted the literature search and selected the interviewees based on the methods described earlier.

Appendix I: Objectives, Scope, and
Methodology

To address the fourth objective, we interviewed the federal agencies and industry stakeholders described above and reviewed legal materials related to TPLF in the U.S., including federal and state laws, federal court rules, proposed legislation, and proposals to amend federal court rules made by industry stakeholders to the Advisory Committee on Civil Rules.[5]

Additionally, we selected a sample of three other countries—Australia, England, and Canada—to review regulation and disclosure of TPLF. We compiled a list of countries to select from by reviewing a list of independent states (countries) maintained by the U.S. Department of State's Bureau of Intelligence and Research, reports on international TPLF markets, and information about the legal systems in different countries. We then selected a judgmental sample of countries to include a mix of geographic locations and types of TPLF regulation (such as government regulation or self-regulation). The selected countries also have a legal system similar to the U.S. in some respects and an established TPLF market (determined through literature we reviewed and interviews with stakeholders).[6] We interviewed officials from the Australian Treasury and representatives from the Association of Litigation Funders of Australia, the Association of Litigation Funders of England and Wales, and the British Columbia Law Institute. We identified these stakeholders through a literature review. Information gathered from these interviews cannot be generalized to all stakeholders in the selected countries we reviewed.

We also reviewed literature about regulation and disclosure of TPLF in the U.S. and the three other countries, including reports by legal practitioners, government agencies, and others.

We conducted this performance audit from April 2021 to December 2022 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that

---

[5]We did not conduct a comprehensive survey of state law on TPLF. Also, the fourth objective focuses on requirements pertaining to TPLF funding in the context of litigation rather than arbitration.

[6]According to literature we reviewed, the legal systems of the United States, Australia, England and Canada incorporate common law principles. *See, e.g.*, Nicholas G. Karambelas, "Limited Liability Companies: Law, Practice and Forms," (2021).

**Appendix I: Objectives, Scope, and
Methodology**

the evidence obtained provides a reasonable basis for our findings and
conclusions based on our audit objectives.

# Appendix II: Members of Commercial and Consumer Third-Party Litigation Financing Trade Associations

**Table 1: International Legal Finance Association Members**

| Funder name | Founding member | Publicly traded company |
|---|---|---|
| Burford Capital | ✓ | ● |
| D.E. Shaw & Co. | – | – |
| Delta Capital Partners | – | – |
| Fortress | – | – |
| Harbour Litigation Funding | ✓ | – |
| Innsworth | – | – |
| Law Finance Group | – | – |
| Longford Capital Litigation Finance | ✓ | – |
| Nivalion | – | – |
| Omni Bridgeway | ✓ | ● |
| Parabellum Capital | – | – |
| Therium | ✓ | – |
| TRGP Capital | – | – |
| Validity | – | – |
| Woodsford | ✓ | – |

Legend: ✓ = founding member of association, ● = publicly traded company, – = not applicable
Source: International Legal Finance Association. | GAO-23-105210

**Table 2: American Legal Finance Association Members**

| Funder name |
|---|
| Barrister Capital |
| Bridgeway Legal Funding |
| Broadway Funding Group |
| Cherokee Funding |
| Covered Bridge Capital |
| Cronus Capital |
| Global Financial |
| Golden Pear Funding |
| Grape Leaf Capital |
| GreenLink Solutions |
| LawCash |
| Law Street Capital |
| LH Funding |

**Appendix II: Members of Commercial and Consumer Third-Party Litigation Financing Trade Associations**

| Funder name |
| --- |
| Magnolia Legal Funding |
| Mighty |
| Multi Funding |
| Multi Funding USA |
| Mustang Litigation Funding |
| Necessity Funding |
| Pegasus Legal Capital |
| Plaintiff Investment Funding, LLC |
| Plaintiff Legal Funding |
| Plaintiff Support |
| PS Finance |
| PreSettlement Solutions |
| Pravati Capital |
| Prime Case Funding |
| Resolution Funding |
| Signal Funding |
| Thrivest Link |
| Towncenter Partners LLC |
| Universal Funds |
| US Claims Litigation Funding |

Source: American Legal Finance Association. | GAO-23-105210

# Appendix III: State Laws Addressing Third-Party Litigation Financing

Several states have enacted laws addressing consumer third-party litigation financing. As shown in table 3, these laws may require litigation funders to disclose certain information in their funding contracts, including financial terms such as the amount that must be repaid and the annual percentage rate. States may also require registration or impose reporting requirements. In addition, some states limit the interest rates and fees that litigation funders can charge consumers.

**Table 3: Examples of State Laws Addressing Consumer Third-Party Litigation Financing**

| State | Law | Example of requirements or provisions |
|---|---|---|
| Arkansas | Consumer Lawsuit Lending<br>Ark. Code Ann. § 4-57-109 | Litigation funders cannot charge consumers annual interest rates greater than 17 percent. Funding contracts must disclose the annual percentage rate applicable to the transaction. Any amount paid to a litigation funder that exceeds the amount provided to the consumer in connection with the dispute must be included as interest. |
| Maine | Maine Consumer Credit Code Legal Funding Practices<br>Me. Rev. Stat. Ann. tit. 9-A, art. 12 | Litigation funders must register with the state. Funding contracts must include the total amount that consumers must repay, in 6-month intervals for 42 months, and the annual percentage fee on advance, compounded semiannually. Litigation funders are prohibited from assessing fees for any period exceeding 42 months from the date of the funding contract. Fees cannot be compounded more frequently than semiannually. |
| Nebraska | Nonrecourse Civil Litigation Act<br>Neb. Rev. Stat. §§ 25-3301 - 25-3309 | Litigation funders must register with the state. Funding contracts must include the total dollar amount to be repaid by the consumer, in 6-month intervals for 36 months, including all fees, and the annual percentage rate of return, calculated as of the last day of each 6-month interval, including frequency of compounding. |
| Nevada | Consumer Litigation Funding<br>Nev. Rev. Stat. ch. 604C (2021) | Litigation funders must be licensed. The provisions apply to consumer litigation funding transactions that do not exceed $500,000. The litigation funder must require the amount to be paid to be set as a predetermined amount based on intervals of time. The amount may not exceed the funded amount plus charges not to exceed a rate of 40 percent annually. The funding contract must disclose the maximum amount to be assigned by the consumer to the litigation funder and a payment schedule listing all dates and the amount due at the end of each 180-day period from the funding date. |
| Ohio | Nonrecourse Civil Litigation Advance Contracts<br>Ohio Rev. Code § 1349.55 | Funding contracts must include the total dollar amount to be repaid by the consumer, in 6-month intervals for 36 months, including all fees, and the annual percentage rate of return, calculated as of the last day of each 6-month interval, including frequency of compounding. |
| Oklahoma | Consumer Litigation Funding Agreements<br>Okla. Stat. tit. 14A, art. 3, pt. 8 | Litigation funders must obtain a license from the state's Department of Consumer Credit. Funding contracts must include a payment schedule that includes the funded amount and charges, and lists all dates and the amount due at the end of each 180-day period from the funding date until the due date of the maximum amount due to the funder by the consumer to satisfy the amount owed under the agreement. |

| State | Law | Example of requirements or provisions |
|-------|-----|---------------------------------------|
| Tennessee | Tennessee Litigation Financing Consumer Protection Act<br><br>Tenn. Code. Ann. tit. 47, ch. 16 | Litigation funders must be registered in the state. Funders cannot charge consumers an annual fee that is more than 10 percent of the original amount of money provided to the consumer. The term of funding transactions is limited to 3 years, and the maximum yearly fees funders can charge consumers (which are separate from the annual fee and include underwriting fees and other charges) are limited to a maximum of $360 per year for each $1,000 of the unpaid principal amount of funds advanced to the consumer. |
| Vermont | Consumer Litigation Funding Companies<br><br>Vt. Stat. Ann. tit. 8, ch. 74 | Litigation funders must register with the state. Funders must file annual reports, which include the number of contracts entered into, the dollar value of funded amounts to consumers and charges under each contract, the dollar amount and number of litigation funding transactions in which the realization to the funder was as contracted, and the dollar amount and number of transactions in which the realization to the funder was less than contracted. Funding contracts must include the total funded amount provided to the consumer under the contract, an itemization of charges, and the annual percentage rate of return. |
| West Virginia | Consumer Litigation Financing<br><br>W. Va. Code. ch. 46A, art. 6N | Litigation funders must register with the state. Funding contracts must disclose the total funded amount provided to the consumer under the contract and the total amount due from the consumer, in 6-month intervals for 42 months, including all fees and charges. Litigation funders may not charge the consumer an annual fee of more than 18 percent of the original amount of money provided to the consumer for the litigation financing transaction and a litigation funder may not assess fees for any period exceeding 42 months from the date of the contract with the consumer. Parties to a civil action must disclose to other parties agreements which provide litigation funders a contingent right to compensation from the proceeds of the action. |
| Wisconsin | 2017 Wisconsin Act 235, § 12<br><br>Wis. Stat. § 804.01(2)(bg) | Parties to a civil action must disclose to other parties in the action agreements which provide to any person—other than an attorney permitted to charge a contingent fee representing a party—a contingent right to compensation from the proceeds of the action.[a] |

Source: GAO analysis of state laws. | GAO-23-105210

Note: This table reflects the referenced laws as of November 4, 2022 and is not exhaustive. Other states may have enacted laws that address consumer third-party litigation financing.

[a]The related statutory provision does not expressly distinguish between agreements that are consumer or commercial in nature. According to literature we reviewed, Wisconsin is the only state to require litigation funding disclosure in commercial litigation. See, e.g., Elizabeth Korchin, Patrick Dempsey, and Eric Blinderman, "The Third Party Litigation Funding Law Review: USA," (November 22, 2021), accessed July 13, 2022, https://thelawreviews.co.uk/title/the-third-party-litigation-funding-law-review/usa.

# Appendix IV: GAO Contact and Staff Acknowledgments

| GAO Contact | Michael E. Clements, (202) 512-8678 or clementsm@gao.gov |
|---|---|
| Staff Acknowledgments | In addition to the contact named above, John Forrester (Assistant Director), Erika Navarro (Analyst in Charge), John Karikari, Jill Lacey, Evan Nemoff, Kirsten Noethen, Jennifer Schwartz, and Jena Sinkfield made key contributions to this report. |

| GAO's Mission | The Government Accountability Office, the audit, evaluation, and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
|---|---|
| Obtaining Copies of GAO Reports and Testimony | The fastest and easiest way to obtain copies of GAO documents at no cost is through our website. Each weekday afternoon, GAO posts on its website newly released reports, testimony, and correspondence. You can also subscribe to GAO's email updates to receive notification of newly posted products. |
| Order by Phone | The price of each GAO publication reflects GAO's actual cost of production and distribution and depends on the number of pages in the publication and whether the publication is printed in color or black and white. Pricing and ordering information is posted on GAO's website, https://www.gao.gov/ordering.htm. |
| | Place orders by calling (202) 512-6000, toll free (866) 801-7077, or TDD (202) 512-2537. |
| | Orders may be paid for using American Express, Discover Card, MasterCard, Visa, check, or money order. Call for additional information. |
| Connect with GAO | Connect with GAO on Facebook, Flickr, Twitter, and YouTube. Subscribe to our RSS Feeds or Email Updates. Listen to our Podcasts. Visit GAO on the web at https://www.gao.gov. |
| To Report Fraud, Waste, and Abuse in Federal Programs | Contact FraudNet: |
| | Website: https://www.gao.gov/about/what-gao-does/fraudnet |
| | Automated answering system: (800) 424-5454 or (202) 512-7700 |
| Congressional Relations | A. Nicole Clowers, Managing Director, ClowersA@gao.gov, (202) 512-4400, U.S. Government Accountability Office, 441 G Street NW, Room 7125, Washington, DC 20548 |
| Public Affairs | Chuck Young, Managing Director, youngc1@gao.gov, (202) 512-4800 U.S. Government Accountability Office, 441 G Street NW, Room 7149 Washington, DC 20548 |
| Strategic Planning and External Liaison | Stephen J. Sanford, Managing Director, spel@gao.gov, (202) 512-4707 U.S. Government Accountability Office, 441 G Street NW, Room 7814, Washington, DC 20548 |



Please Print on Recycled Paper.