# EXHIBIT 16

# THE WESTFLEET INSIDER

## 2022 Litigation Finance Market Report



# OVERVIEW

## Demand for litigation financing continues to increase with no signs of slowing down.



The 2022 edition of *The Westfleet Insider* represents the fourth year in which we have published statistics on the US commercial litigation finance industry, and certain industry conditions and trends are becoming clear. One of these trends is that demand for litigation financing continues to increase with no signs of slowing down anytime soon. In fact, new capital commitments to law firms and their clients grew by nearly 16% in 2022, the largest year-over-year growth rate ever reported in this publication.

Notably, the industry's growth has continued despite shockwaves from a global pandemic that not only severely impacted our economy but also resulted in major bottlenecks within the US civil justice system in recent years. Although litigation finance is known as a non-correlated asset class, the continuation of positive trends in the face of such direct headwinds surprised even industry veterans. Litigation finance has proven to be resilient as well as non-correlated, and all signs point to a healthy and stable industry for the foreseeable future.

When contemplating the size and trajectory of the US commercial litigation finance industry, we believe context is critical not only for industry participants but also for opponents of the industry and policymakers. As detailed in this report, only a few hundred commercial litigation and arbitration matters are funded annually in the US, to which approximately $3.2 billion in capital was committed last year. Compared to the millions of civil cases filed annually in the US and the hundreds of billions of dollars spent litigating these cases, the US commercial litigation finance industry is but a rounding error. While we expect the industry to continue to grow, we do not expect its size relative to the US civil litigation system to materially change.

In recent months, one of the most noticeable developments in the US commercial litigation finance industry is the increased utilization of insurance. Funders are obtaining insurance policies to limit risk in individual investments and, in some instances, to wrap their investment portfolios and insure against an aggregate loss of capital. Litigants and law firms are buying insurance to protect their interests in large judgments they have secured and to guarantee a minimum recovery in pre-judgment matters. Whether this newfound ability to de-risk through insurance will prove to be a catalyst for additional growth—both in terms of investable cases for funders and of additional capital inflows from investors—remains to be seen.

Westfleet's core business is advising law firms and their clients on all aspects of securing litigation financing. The nature of our deal advisory role places Westfleet astride the market-facing operations of every active US litigation funder. We, therefore, have a unique perspective of the competitive landscape. The number of active funders in the US commercial market has been essentially stable for the last five years, despite some new entries and some shakeout. We believe the current number of industry participants is appropriate from the perspective of users of litigation funding (i.e., our clients). The market continues to be opaque—even to funders themselves—in terms of pricing and other deal terms, and significant differentiation exists among funders and their investment criteria. We routinely see dramatic spreads between funders' proposals to our clients, and these spreads typically represent differentials in the cost of capital equal to millions or tens of millions of dollars. If the competitive landscape were to contract or consolidate substantially, users of litigation financing would suffer from relatively fewer options.

Westfleet's core mission is to increase transparency in the US commercial litigation finance industry, and one of the ways we fulfill our mission is through the publication of this annual report. We are pleased that prior years' reports were cited extensively in the US Government Accountability Office's recent report on litigation funding. We are grateful for our relationships within the litigation finance industry, without which the data collection upon which this report relies would not be possible. It is with great pride that we present *The Westfleet Insider: 2022 Litigation Finance Report.*

# INDUSTRY SIZE & RECENT GROWTH



**44 ACTIVE FUNDERS**

**$13.5B AUM**

**INDUSTRY SNAPSHOT**

**$3.2B NEW COMMITMENTS TO DEALS**

**368 NEW DEALS**

## Growth of Industry

### Assets Under Management



- 2020: $11.3B
- 2021: $12.4B
- 2022: $13.5B

### New Commitments to Deals



- 2020: $2.5B
- 2021: $2.8B
- 2022: $3.2B

# TYPES OF LITIGATION FUNDERS

Litigation funders in the U.S. can be divided into three types: *dedicated*, *multi-strategy*, and *ad hoc*.

## DEDICATED FUNDERS

**Dedicated funders,** as their name suggests, specialize in litigation finance. These funders account for most of the capital available, and most of the deals completed, in the litigation finance industry. Some dedicated funders enjoy full autonomy to invest in deals that fit their mandate. Others manage their investors' capital but with limited autonomy. For instance, investors may reserve veto authority over financing deals. Several entities that hold themselves out as dedicated litigation funders do not manage a dedicated pool of capital at all, but instead, approach investors on a deal-by-deal basis to raise capital on the fly.

Two of the funders in this category with significant US activities are publicly traded entities, while the other funders in this category are privately held.

## MULTI-STRATEGY FUNDERS

**Multi-strategy funders** are entities—usually hedge funds—that invest in various markets and asset classes and have established a dedicated litigation finance area (or "desk"). This specific litigation finance area typically operates much like a dedicated funder, but these multi-strategy funders often have greater sensitivity to business conflicts and capital markets compliance issues due to the broader activities.

## *AD HOC* FUNDERS

**Ad hoc funders** are entities like hedge funds or family offices that only occasionally participate in the litigation finance space and do not have dedicated litigation finance desks. Ad hoc funders have an appetite for litigation finance deals, but most do not publicize their participation in the market. No reliable way exists to measure the investment activity within this category of funders.

# BREAKDOWN OF CAPITAL DEPLOYED

The following sections provide an overview of some of the key metrics we collect from funders that reflect in greater detail how the capital committed to new deals in 2022 was allocated. Generally, we observed a reversion to historical norms in terms of Big Law utilization (2021 was likely an aberration) and average deal size. Allocations to monetization deals and portfolio structures increased substantially, but these deviations may not reflect a trend.

## Average Deal Size

In 2022, the average size of the transactions of all types that we analyzed was $8.6 million ($6.5 million in 2021). Single-matter deals averaged $4.3 million ($3.5 million in 2021), while portfolio deals averaged $10.5 million ($8.5 million). Thus, across all deal types, the average size of the capital commitments increased in 2022 versus 2021. However, we believe 2021 may have been an aberrational year since the 2022 figures are more reflective of averages in prior years.



## Type Of Users

The allocation of capital between client-directed and lawyer-directed deals was more consistent with prior years, whereas in 2021, the allocation was more evenly distributed. In 2022, lawyer-directed deals comprised approximately 61% of capital commitments versus 52% in 2021.



**2022 Deployments By Type Of User**

## Type Of Deal Structure

The allocation of capital between single-matter and portfolio deals remained relatively constant in 2022 compared with prior years, with portfolios comprising 68% of new capital commitments. The ratio of portfolio deals to single-matter deals has remained approximately 2:1 consistently from 2019 through 2022, due largely to the relative efficiency of portfolio structures.



**2022 Deployments by Type of Deal**

## Use Of Proceeds

The allocation of capital toward claim monetization increased to 14% in 2022 (8% in 2021), with 86% of all capital commitments being used toward legal budgets. The increase in claim monetization appears to be driven largely by activity directed at corporate plaintiffs in antitrust litigation.



**2022 Deployments By Use of Proceeds**

## Patent Litigation

Patent litigation attracted a percentage of new commitments in 2022 more in line with historical norms, comprising 21% of all capital commitments, following an outlier year in 2021 in which 29% was allocated to patent litigation. As we noted at the time, the increase in 2021 may have been driven by a small number of outsized portfolio transactions in patent litigation.



**2022 Deployments For Patent Litigation**

# Big Law

Big Law utilization in 2022 returns to historical norms despite an uptick among the largest 200 US law firms in 2021.

**28%**
Percentage of Total Commitments Allocated to Big Law

**9%**
Percentage of Total Law Firm Portfolio Commitments Allocated to Big Law

**19%**
Percentage of Big Law Commitments in Law Firm Portfolio Deals

**47%**
Percentage of Big Law Commitments Allocated to Client-Directed, Single-Matter Deals



# WESTFLEET'S METHODOLOGY

This report would not have been possible without the participation of most of the major litigation funders, which provided thoughtful responses to our requests for information, and, through a third party, submitted confidential information from which we aggregated a complete picture of the industry's size and scope. By design, that third party shared no attributable data with anyone, even with Westfleet, which only received the aggregated information found in this report.

Further, much of the data relating to transactional volume and AUM is available online for the publicly traded entities, as these firms are required to adhere to a certain level of transparency in their operations. The more granular data included in our report was only gathered from those funders that directly participated in our survey. Nonetheless, based on the scope and composition of these participants, we believe these more granular data points accurately reflect the broader industry's activities.

## The methodology used in this guide was as follows:

- Funder data was included in this report if the organization had substantial participation in the U.S. commercial litigation finance market as of the report's publication.

- The transaction data we collected relates to the 12 months from July 1, 2021, to June 30, 2022.

- As used in this report, "litigation finance" refers only to commercial litigation finance, which we define as transactions between commercial entities in which the financier's repayment is contingent upon the outcome of one or more legal matters. Other forms of finance—including consumer litigation finance, full-recourse law firm finance, receivables factoring, and other legal finance in which repayment is not contingent on the outcome of legal matters—are excluded from consideration in this report.

- Only commercial litigation finance activities with a nexus to the U.S. (i.e., transactions that involve a U.S. law firm as lead counsel, a U.S. counterparty, and/or U.S. litigation or arbitration or related proceedings) are included in this report.

- Law firm portfolio transactions are included even where the underlying cases may contain cases that are not commercial (e.g., cases involving bodily injuries) if the nature of the law firm's repayment obligations are contingent upon recoveries in the underlying cases.

- Some funders manage capital that is not exclusively dedicated to U.S. commercial litigation finance. For these funders, we have adjusted to exclude any capital not dedicated or allocated to U.S. commercial litigation finance from our estimate of industry-wide AUM.



westfleetadvisors.com