**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| IN RE: JOHNSON & JOHNSON TALCUM POWER PRODUCTS MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | No. 3:16-md-02738-MAS-RLS<br><br>MDL No. 16–2738 (MAS) (RLS) |

**DEFENDANTS JOHNSON & JOHNSON AND LLT MANAGEMENT
LLC'S MOTION TO COMPEL
DEPOSITION TESTIMONY OF PAUL HESS
AND FOR SANCTIONS**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ....................................................................... ii

INTRODUCTION ............................................................................ 1

BACKGROUND ............................................................................. 3

ARGUMENT ................................................................................. 5

I.    Mr. Hess Was Improperly Instructed Not To Answer Numerous Directly Relevant Questions At His Deposition. ............................................ 10

    A.   Questions regarding Mr. Hess's testing of Sample M70484-001 from Dr. Longo's 4th Supplemental MDL Report (*Zimmerman*) ....... 10

    B.   Questions regarding Mr. Hess's testing of Sample M71614-001 from Dr. Longo's 4th Supplemental MDL Report (*Valadez*) .............. 12

    C.   Questions regarding the "Calidira" reference sample that is a critical component of MAS's PLM methodology. ............................... 16

    D.   Questions regarding the chrysotile reference sample in the ISO 22262-1 methodology MAS purports to follow. ................................. 19

    E.   Questions regarding illumination and color filtering. ......................... 21

    F.   Questions regarding Dr. Su and Dr. Wyle's review of Mr. Hess's work. ..................................................................... 24

    G.   Other questions regarding Mr. Hess's testing. .................................. 25

II.   Counsel Should Be Permitted To Ask Questions Comparing Mr. Hess's Work To Other Testing, Particularly His Own. ................................. 28

III.  This Court Should Award Sanctions. .......................................... 31

    A.   The federal rules authorize monetary and preclusion sanctions. ........ 32

    A.   This Court should award monetary sanctions. .................................. 33

    B.   This Court should preclude Plaintiffs from relying on any tests where Mr. Hess was the analyst. ........................................... 34

CONCLUSION ............................................................................. 35

# TABLE OF AUTHORITIES

**Cases**                                                                          **Page(s)**

*Access 4 All, Inc. v. ANI Assocs., Inc.*,
   2007 WL 178239 (D.N.J. Jan. 12, 2007)....................................................34, 35

*Antolini v. McCloskey*,
   2022 WL 1689331 (S.D.N.Y. May 26, 2022) ...................................................34

*Bell v. Lee*,
   2017 WL 1316938 (N.D. Cal. Apr. 10, 2017)......................................................5

*Bordelon Marine, Inc. v. F/V KENNY BOY*,
   2011 WL 164636 (E.D. La. Jan. 19, 2011) .....................................................5, 34

*Boyd v. Univ. of Maryland Med. Sys.*,
   173 F.R.D. 143 (D. Md. 1997) .........................................................................31

*Carbone v. Carbone*,
   2023 WL 3452333 (D.N.J. May 15, 2023).........................................................5

*Hochstein v. Microsoft Corp.*,
   2009 WL 2616253 (E.D. Mich. Aug. 21, 2009)..................................................5

*Lucas v. Breg, Inc.*,
   2016 WL 2996843 (S.D. Cal. May 13, 2016) ...............................................5, 34

*Quick v. Township of Bernards*,
   2023 WL 4237059 (D.N.J. June 28, 2023).........................................................5

*Specht v. Google, Inc.*,
   268 F.R.D. 596 (N.D. Ill. 2010)..........................................................................5

*Wellsco Int'l Co. Ltd. v. HD Supply Distribution Servs., LLC*,
   2010 WL 11508337 (N.D. Ga. July 26, 2010) ..................................................34

*Williams v. Benshetrit*,
   2020 WL 3315982 (E.D. Pa. June 18, 2020)................................................5, 34

**Other Authorities**

Fed. R. Civ. P. 30(c)(2) ............................................................................5

Fed. R. Civ. P. 16(f)(1)(C) ......................................................................32

Fed. R. Civ. P. 37(b)(2)(A)(ii) ................................................................33

Fed. R. Civ. P. 30(d)(2) ...........................................................................33

Defendants Johnson & Johnson and LLT Management LLC submit this Motion to Compel Deposition Testimony of Paul Hess and for Sanctions.

## INTRODUCTION

Plaintiffs have done everything possible to obstruct and prevent the deposition of Paul Hess, Dr. Longo's chief PLM microscopist and the only person with actual eyes on the slides that serve as the foundation for Dr. Longo's report in this matter.

Their most recent gambit was to obstruct the court-ordered deposition with *40 instructions not to answer questions*. Concerningly, Plaintiffs' multi-month delay tactics are threatening to come to fruition as Rule 702 motions are due tomorrow, and Defendants *still* have not had an opportunity to meaningfully question the person who actually conducted the critical analysis relied on by Plaintiffs in this MDL for the case-defining issue of whether or not asbestos is present in Defendants' talc products.

As this Court is well aware from prior briefing on the issue, the polarized light microscopy ("PLM") analysis at issue turns on accurately identifying the color of the particle. Yet, when Mr. Hess was shown a particle from the very testing that he conducted and that is indisputably at issue in this MDL, he was instructed not to answer questions as simple as: "What color is the particle that you're calling chrysotile here?" Ex. A, Hess Dep. 78:18-23.

1

This tactic was employed across numerous types and categories of questions. For example, he was instructed not to answer: "[T]he same type of edge effects that you're relying on to call particles chrysotile in Johnson & Johnson are also present on talc plates in your analysis; is that true?" *Id.* at 143:11-25. When defense counsel attempted to direct Mr. Hess's attention to a particular particle, he was even instructed not to answer the simple, non-controversial question: "Do you see that?" *Id.* at 125:21-25. The instructions not to answer were in violation of the Special Master's ruling that Mr. Hess *could* be questioned about the testing he conducted and associated images that comprise part of Dr. Longo's report. *Id.* at 44:11-45:3.

The only principle that seemed to govern what Mr. Hess was or was not permitted to answer was whether the answer would hurt Plaintiffs' case. The most common ground for the instruction not to answer was that the response "calls for expert testimony." This is doubly nonsensical. "Calls for expert testimony" is not a basis to instruct a witness not to answer. Also, Mr. Hess is unquestionably an expert. The Special Master himself expressly stated that Mr. Hess is "a non-testifying *expert*," that "Hess, not Longo, has decades of experience doing PLM testing," and that Mr. Hess is "the *expert* Longo will rely upon" ECF 32817 at 2-3 ("Order") (emphasis added).

This should come as no surprise, since *Plaintiffs themselves* said *three separate times* in their motion to quash the Hess subpoena that the issue before the

Special Master was the propriety of discovery "from a non-testifying expert." ECF 32195 at 1; ECF 32195-1 at 8, 11. Yet at the deposition, Plaintiffs stated that Mr. Hess "is not an expert." Ex. A, Hess Dep. at 29:3. That is farcical. If Mr. Hess, and not Dr. Longo, is the one with decades of experience doing PLM testing, yet Mr. Hess (who is conducting the testing) is not the expert, then that not only leaves no expert for Defendants to question but also begs the question: How do Plaintiffs intend to advance their theory that Defendants' talc products are contaminated?

Mr. Hess was instructed not to answer questions about his own testing that is part of Dr. Longo's report at issue in this MDL. The instructions not to answer those questions are plainly improper. This Court should order another deposition of Mr. Hess within one week without the unfounded restrictions that were placed by counsel, and further issue sanctions to ensure such behavior does not continue.

## BACKGROUND

This Court is already familiar with the issues presented in this motion from the briefing on the motion to quash the deposition of Mr. Hess (ECF Nos. 32195, 32583, 32717, 32812) and the motion for an inspection of Dr. Longo's lab (ECF Nos. 32227, 32684, 32807, 32808, 32872), which Defendants incorporate herein by reference, including the exhibits submitted in conjunction with that briefing.

As the Special Master explained in his order: Dr. William Longo is Plaintiffs' "expert in materials science who will testify as to the presence of asbestos in

defendants' talc products." Order at 1. Dr. Longo "is the President and 75% owner of his lab – Material Analytical Services ('MAS')." *Id.*

Defendants sought "to depose Paul Hess, a non-testifying expert and a longtime employee of MAS." *Id.* at 2. "Hess is important because Hess, not Longo, is the analyst that conducted the PLM tests that support Longo's opinions. Hess, not Longo, did the microscopic analysis required under the PLM methodology." *Id.* And "Hess, not Longo, has decades of experience doing PLM testing." *Id.* at 1.

The PLM methodology that MAS employs turns on accurately identifying the color the particles appear under the microscope when coated in a particular oil.[1] Mr. Hess is the one making those critical color determinations and identifying the particles he claims are "asbestos." "As a result," the Special Master explained, "the how and why of the testing" was to be "covered at Hess's deposition" since it is "important testimony." *Id.* at 3.

Unfortunately, the Defendants still have not gotten to the "how and why of the testing" because at the Court-ordered deposition, the testimony was obstructed by ***40 instructions not to answer***, as discussed in more detail below. A full chart of each instruction not to answer is attached as Exhibit B. Such gamesmanship—on an issue all parties and the Special Master agree is case-defining—should not be

---

[1] This use of oil is called "central stop dispersion staining" ("CSDS") or sometimes just "dispersion staining."

countenanced. Defendants therefore request both an unrestricted deposition of Mr. Hess and sanctions.

## ARGUMENT

The law is clear that a witness may be instructed not to answer a question only when necessary "to preserve a privilege, to enforce a limitation ordered by the court, or to present a motion under Rule 30(d)(3)" for bad faith questioning that annoys, embarrasses, or oppresses the witness. Fed. R. Civ. P. 30(c)(2). Those are the *only* "three narrow exceptions to the general rule that a witness must answer the questions asked at a deposition." *Williams v. Benshetrit*, 2020 WL 3315982, at *3–4 (E.D. Pa. June 18, 2020).

So for example, courts routinely hold it is improper to instruct a witness not to answer based on all manner of grounds outside those three limited categories, such as: relevance, *Carbone v. Carbone*, 2023 WL 3452333, at *2 (D.N.J. May 15, 2023), calls for speculation, *Specht v. Google, Inc.*, 268 F.R.D. 596, 599 (N.D. Ill. 2010), calls for a legal conclusion, *Quick v. Township of Bernards*, 2023 WL 4237059, at *5 (D.N.J. June 28, 2023), and calls for expert testimony, *see, e.g. Bell v. Lee*, 2017 WL 1316938, at *3 (N.D. Cal. Apr. 10, 2017); *Lucas v. Breg, Inc.*, 2016 WL 2996843, at *3 & n.3 (S.D. Cal. May 13, 2016); *Bordelon Marine, Inc. v. F/V KENNY BOY*, 2011 WL 164636, at *4 (E.D. La. Jan. 19, 2011); *Hochstein v. Microsoft Corp.*, 2009 WL 2616253, at *4 (E.D. Mich. Aug. 21, 2009).

*None* of the three limited exceptions apply to the questions presented at Mr. Hess's deposition. Privilege was not at issue. No efforts were made to annoy or embarrass Mr. Hess. And the instructions not to answer were not to enforce an order. The Special Master was called at the beginning of the deposition and ruled that questions should address the "new method" and the tests set forth in the tables to Dr. Longo's report. Ex. A, Hess Dep. 35:13-36:2. The Court also said that because Defendants argued that "it was Mr. Hess that was making these ultimate decisions and not Dr. Longo," questions should not be related to "what somebody else did or what somebody else opines." *Id.* at 36:3-37:11.

When defense counsel sought clarification and explained that he wished to question Mr. Hess about particular images because those images were one of the "big topics" and Plaintiffs may "try to shut it down later," the Special Master ruled that questioning on such images would be permissible "[a]s long as it's limited to the specific tests at issue that are on that exhibit list." *Id.* at 44:11-45:3. Notwithstanding this ruling and in clear violation of it, Mr. Hess was instructed over and over not to answer questions about images from *those very tests on the exhibit list*.

Egregiously, the vast majority of the instructions not to answer were based on "calls for expert testimony."[2] First, such an objection is not recognized as a basis to instruct a witness not to answer. Second, Mr. Hess is indeed an expert who has done work of and for an expert and who was ordered to give a deposition about expert issues. Plaintiffs cannot legitimately even argue that this ground not to answer was an attempt to enforce this the Special Master's ruling. The Special Master's order expressly stated multiple times that Mr. Hess is, indeed, *an expert*. Order at 2 ("[D]efendants' subpoena seeks to depose Paul Hess, a non-testifying expert. . . .");

---

[2] *See e.g.*, *id.* at 20: 24-25 ("He is not here to opine on expert issues"); *id* at 54:10-11 ("asking for expert opinion is beyond the scope"); *id.* at 57:11-12 ("that calls for an expert opinion."); *id.* at 57:22 ("seeks an expert opinion"); *id.* at 65:24: ("calls for expert testimony"); *id.* at 69:10-11 ("This, once again, calls for expert opinion"); *id.* at 77:3-4 ("Once again, you're getting into expert opinion"); *id.* at 72:24 ("calls for expert opinion"); *id.* at 75:7-8 ("calls for expert opinion"); *id.* at 78:23-24 ("It's calling for an expert opinion."); *id.* at 82:2 ("that goes into expert testimony"); *id.* at 82:8 ("This calls for expert opinion"); *id.*at 84:19-20 ("Calls for expert opinion."); *id.* at 91:10-11 ("calls for an expert opinion"); *id.* at 95:6-7 ("This calls for an expert opinion."); *id.* at 97:11-12 ("He is not here to offer expert opinion"); *id.* at 98:20 ("Seeks expert opinion."); *id.* at 103:10-11 ("seeks expert opinion"); *id.* at 109:25-110:1 ("calls for an expert opinion"); *id.* at 20-21 ("We have instructed him not to give expert opinion"); *id.* at 112:11-12 ("that is expert opinion and that's why we're instructing him not to answer"); *id.* at 119:7-8 ("This is an expert opinion"); *id.* at 124:8 ("seeks expert opinion"); *id.* at 126:4-5 ("that calls for expert testimony."); *id.* at 129:24-25 ("That's calling for an expert analysis"); *id.* at 137:16-17 ("He is not here as an expert witness"); *id.* at 140:24-25 ("seeks expert opinion."); *id.* at 148:19-20 ("calls for expert testimony"); *id.* at 149:21-22 ("calls for expert testimony"); *id.* at 154:18-19 ("Calls for an expert opinion"); *id.* at 158:22-23 ("calls for expert testimony"); *id.* at 159:24 ("Calls for expert testimony."); *id.* at 162:9-10 ("calls for expert testimony"); *id.* at 167:10-11 ("calls for expert opinion").

*id.* at 3 ("Hess, not Longo, has decades of experience doing PLM testing. . . ."); *id.* (calling Mr. Hess "the expert Longo will rely upon").

Plaintiffs themselves admitted *three times* that the deposition of Mr. Hess constituted discovery "from a non-testifying **expert**." ECF 32195 at 1; ECF 32195-1 at 8, 11.[3]

Further, the Special Master also explained in the order that the "***the how and why of the testing***" was to be "covered at Hess's deposition" since it is "important testimony." Order at 3 (emphasis added). The order further stated that one of the purposes the deposition of Mr. Hess was so that he could "explain the basis for MAS's findings." Order at 4. Explaining not just the "how" but also the "why" of the testing, along with explaining the basis for MAS's findings, necessarily calls for Mr. Hess's expert testimony.

If all that were not enough, the Special Master stated when called to the deposition that the deposition "was granted to the defendants to take Mr. Hess' deposition was based on the arguments that they made in their briefs." Ex. A, Hess

---

[3] The Special Master even quoted this argument, advanced by Plaintiffs, in the order granting the deposition. Order at 2-3. ("Plaintiffs also claim that defendants' subpoena 'seeks discovery from a non-testifying expert. . . .'") (quoting ECF 32195 at 1) (emphasis added). For good measure, Defendants also stated that Mr. Hess "has the true expertise" and "is the one with the relevant PLM expertise," and that "Mr. Hess' work as an expert involved independent specialization and scientific judgment that is inseparably entwined with Longo's analyses." ECF 32683 at 3, 14.

Dep. 35:9-12. Defendants explained that "Mr. Hess' work as an *expert* involved independent specialization and scientific *judgment* that is inseparably entwined with Longo's analyses." ECF 32583 at 14 (emphasis added). Indeed, Defendants quoted Dr. Longo's own testimony that identifying the color of the particle is "a judgment that comes from years and years of experience." *Id.* at 6 (quoting Longo *Forrest* Dep. 73:11-13). The Special Master agreed that "Defendants persuasively argue" that "Mr. Hess is the one making all the key decisions." Order at 5. Mr. Hess's *judgment*, which again necessarily includes his expert opinion, is plainly at issue. Indeed, Dr. Longo himself promotes Mr. Hess's experience. *See, e.g.*, Ex. C, Longo Krich Dep. 53:3-8.

The Special Master made clear that should Mr. Hess ever be instructed not to answer, that would not be the end of the matter: "We'll look at the transcript and we'll make a ruling on a more fulsome record." Ex. A, Hess Dep. 43:19-3. But that was plainly not an invitation to launch into a lawless riot of instructions not to answer to build a complete roadblock around relevant questions. And to state the even more obvious, it was not an invitation to instruct Mr. Hess not to answer the very questions the Special Master expressly ruled were permissible.

In short: The Special Master stated that Mr. Hess is an expert. Plaintiffs stated that Mr. Hess is an expert. Defendants stated that Mr. Hess is an expert. Dr. Longo

9

said that Mr. Hess is an expert. And there is no real question that Mr. Hess *is* in fact an expert with approximately 40 years of PLM experience.

Yet despite Plaintiffs' stating that the deposition of Mr. Hess "seeks discovery from a non-testifying expert," ECF 32195 at 1, Plaintiffs implausibly contended at the deposition that Mr. Hess "is not an expert" and so he was instructed not to answer on questioning that "seeks expert opinion." *See*, *e.g.* at, Hess Dep. at 29:3, 103:10-11. That is not tenable. The instructions to Mr. Hess not to answer defense questioning were abusive and improper, meriting both a second deposition and sanctions.

## I.     Mr. Hess Was Improperly Instructed Not To Answer Numerous Directly Relevant Questions At His Deposition.

Mr. Hess was instructed not to answer questions without any legitimate basis on a number of topics regarding his testing that is part of Dr. Longo's controlling, 4th Supplemental Report in this MDL.

### A.     Questions regarding Mr. Hess's testing of Sample M70484-001 from Dr. Longo's 4th Supplemental MDL Report (*Zimmerman*)

One of the first tests listed in Dr. Longo's operative 4th Supplemental Report in this MDL is MAS's test of sample M70484-001, originally from the *Zimmerman* case in California. *See* Ex. D, Longo 4th Supp. Rpt. at 16 (Table 1, Row 2). That report—where Mr. Hess was listed as the analyst—was marked as Ex. 6 at the deposition. Ex. E, M70484/*Zimmerman* (Dep. Ex. 6) at 32.

Mr. Hess's attention was drawn to the image below on page 39 of the report that Mr. Hess claims (and Dr. Longo's report parrots) is chrysotile asbestos. Ex. A, Hess Dep. 76:19:23.



Ex. E, M70484/*Zimmerman* Rpt. (Dep. Ex. 6) at 38.

Mr. Hess was asked the question: "What color is that?" Ex. A, Hess Dep. 77:2. He was instructed not to answer that question on the ground that it was "calling for an expert opinion." *Id.* at 77:22-24, 78:8-9; *see also id.* at 78:18-22 (instructing not to answer: "What color is the particle that you're calling chrysotile here?").

There is no legitimate basis for an instruction not to answer such a simple question which falls squarely within any conceivable scope of the deposition. The Special Master expressly stated that questioning regarding images was permitted if they are images of "the specific tests at issue that are on" the list of testing in the

tables to Dr. Longo's report. *Id.* at 44:11-45. That is precisely what occurred here and what counsel obstructed.

For the testing at issue, MAS used a microscope with a tungsten lightbulb which affected the coloring of the image. Mr. Hess was asked if that lightbulb was adding "sort of darker golden colors or orange colors to the image." Ex. A, Hess Dep. 95:3-5. But again, Mr. Hess was instructed not to answer the question on the grounds that it "calls for an expert opinion." *Id.* at 95:6-9; *see also id.* at 97:19-98:1 (instructing Mr. Hess not to answer a second time). Again, that is not a legitimate basis to instruct not to answer. Mr. Hess is unquestionably an expert. And the question involved Mr. Hess's own testing that makes up Dr. Longo's report in this MDL.

**B.      Questions regarding Mr. Hess's testing of Sample M71614-001 from Dr. Longo's 4th Supplemental MDL Report (*Valadez*)**

Another test listed in Dr. Longo's operative 4th Supplemental Report in this MDL is MAS's test of sample M71614-001, originally from the *Valadez* case in California. *See* Ex. D, Longo 4th Supp. Rpt. at 23 (Table 6, Row 41). Mr. Hess was listed as the analyst in that report. Ex. F, M71614-001/*Valadez* Rpt. (Dep. Ex. 14) at 33. So, Mr. Hess was shown an image from that report:



Ex. G (Dep. Ex. 17).

He was asked: "[What] color are you assigning to the talc plates that we're looking at here?" Ex. A, 124:5-6. Mr. Hess was instructed not to answer that question, *id.* at 124:16-24, along with an objection that it "seeks expert opinion," *id.* at 124:7-8. Again this question, like the questions below, concern Mr. Hess's *own* testing that is part of *this MDL* and a component of Dr. Longo's *operative report* here. There is no legitimate basis to instruct Mr. Hess not to answer.

Mr. Hess was shown another image of his testing from that same report:



*See* Ex. H (Dep. Ex. 18); Ex. A, Hess Dep. 127:13-128; *see also id.* at 128:10-11 (identifying particle CSM-002). Mr. Hess was asked whether the purple and magenta color he was seeing on the particle he testified was chrysotile asbestos was the "same type of purple or red colors that are on the talc plates." Ex. A, Hess Dep. 128:17-22. Mr. Hess was instructed not to answer without any stated basis. *Id.* at 128:25-129:2.

For that same image, he was even instructed not to answer whether he was following counsel's questions and understood what particle counsel wanted to draw Mr. Hess's attention to. He was asked: "If you move your eye from the top of the two arrows over towards the left, there is a rounded talc plate. Do you see that?" *Id.* at 125:21-25. Shockingly, he was instructed ***not to answer*** on the grounds that it somehow "calls for expert testimony." *Id.* at 126:2-6.

He was next asked: "Is the particle you're calling chrysotile here, is that essentially the same color as the talc plates in the image?" *Id.* at 126:23-25. Again, he was instructed not to answer based on the "same objection." *Id.* at 127:1-3.

In its reports, MAS claims it is using the colors just on the *edges* of particles to make a call on the critical asbestos versus non-asbestos question. So, Mr. Hess was asked: "[W]ithout these sort of red colors at the edges, then the CSDS color that you would have had to assign to the particle would be -- would correspond to yellow, right?" *Id.* at 131:18-22. Mr. Hess was instructed not to answer on the grounds that it is "calling for an expert analysis." *Id.* at 131:18-22.

Mr. Hess also was asked regarding the testing in this same report whether "the same types of edges on these – [are] on many of the rounded structures that are talc plates?" *Id.* at 136:7-9. Mr. Hess was instructed not to answer. *Id.* at 136:12-18

Mr. Hess was similarly asked whether "the same type of edge effects that you're relying on to call particles chrysotile in Johnson & Johnson are also present on talc plates in your analysis." *Id.* at 143:11-16. Mr. Hess was instructed not to answer. *Id.* at 143:24-25; *see also id.* at 118:25-119:9 (instructed not to answer "what refractive index number would you assign to any of the talc plates that also have an edge effect" due to an "expert opinion").

Finally, Mr. Hess used a different type of oil for Sample M70484-001 (*Zimmerman*) than he did for Sample M71614-001 (*Valadez*)—both part of Dr. Longo's 4th Supplemental Report. Mr. Hess was asked: "What is the expected effect of switching to . . . 1.560 oil?" Mr. Hess was instructed not to answer on the ground that it "calls for an expert opinion." *Id.* at 91:9-12. To drill down on this issue, Mr.

Hess was also asked: "[I]f I have a particle that is orange in parallel in 1.550 and I change my oil to 1.560, it should appear more magenta, right?" *Id.* at 98:12-15. He was again instructed not to answer on the grounds that it "[s]eeks expert opinion." *Id.* at 98:19-23.

All these instructions not to answer were beyond improper; they were intentionally obstructionist.

### C. Questions regarding the "Calidira" reference sample that is a critical component of MAS's PLM methodology.

Defendants explained in their original brief that "Mr. Hess is even the one who came up with the idea of using a reference sample for a unique form of chrysotile [known as Calidira] which Dr. Longo has claimed unlocked MAS's ability to identify chrysotile in talc." ECF 32683 at 11 (citing Longo *Powers* Dep. 75:24-76:3; Longo *Weiss* Dep. at 22:7-15; Longo *Clark* Hr'g 36:10-15, 159:8-16, 160:1-8).

Essentially, MAS took a sample of this unique and rare form of chrysotile, put it under the PLM microscope, and took images of it. MAS then claims to identify "chrysotile" supposedly by comparing the particles they find in Defendants' talc to this very specific reference sample created per Mr. Hess's idea. Those images of the reference sample are part of MAS's work in this MDL and were marked as Exhibit 25 to the Hess deposition. Ex. I, Calidria Reference Sample (Dep. Ex. 25).

Mr. Hess was then shown an image of MAS's Calidria reference sample (that is a component of the very methodology at issue in this MDL that Mr. Hess

16

supposedly follows) and an image from M71614-001 (the *Valadez* report that is also part of Dr. Longo's 4th Supplemental Report in this MDL, as discussed above).



**Dr. Longo Calidria Reference**        Dr. Longo Chrysotile in J&J

Ex. J, M71614-001/Reference Sample Comparison (Dep. Ex. 27); Ex. A, Hess Dep. 178:2-9.

Mr. Hess was asked: "Are you claiming those two – those two images have the same dispersion staining colors?" Ex. A, Hess Dep.178:20-22. Again, he was instructed not to answer. *Id.* at 179:4-7. The position is absurd. Comparing the particles MAS identified in Defendants' talc to MAS's Caldaria reference sample is precisely what Dr. Longo testified was the *critical* step in the analysis that allowed MAS to identify chrysotile despite never finding it previously. And, as Dr. Longo has told us time and again, Mr. Hess is the man who undertakes this critical step. Thus, questions regarding how Mr. Hess is making this comparison when he conducts the analysis are unquestionably appropriate.

Additionally, one of Defendants' concerns about the MAS Calidria reference sample is that while the image contains huge swathes of chrysotile particles that appear blue, MAS chose as its point of comparison an outlier particle that is a different color that is likely an impurity in the sample (i.e. not chrysotile). This issue is amply illustrated below when one examines the totality of the reference:



*See* Ex. I, Calidria Reference Sample (Dep. Ex. 25); *see also* Ex. A, Hess Dep. 177:9-11 (acknowledging that all the blue is chrysotile).

Whether the particle being used as the reference is *actually* chrysotile is incredibly significant and clearly fair game for questioning considering that Mr. Hess is the one who came up with the idea of using this special reference sample and took the images of the sample, and Dr. Longo claims that using this specific sample as a

point of comparison is critical to MAS's methodology which has led to the expert opinion that Defendants' talc products contain asbestos. Yet when Mr. Hess was asked whether he was "aware that Calidria can have impurities in it," he was instructed not to answer. *Id.* at 177:12-16.

That question goes directly to the "***how and why of the testing***" that the Special Master expressly ordered was to be part of the deposition—i.e. *why* is MAS using a particle that is not representative of the larger reference sample as its critical point of comparison. *See* Order at 3 (emphasis added). Similarly, Mr. Hess was instructed not to answer questions as to why the color of Calidria supposedly "changes" so "that sometimes when you're finding it, it's to you golden yellow" on the ground that it "[c]alls for expert testimony." Ex. A, Hess Dep. 159:18-23.

### D. Questions regarding the chrysotile reference sample in the ISO 22262-1 methodology MAS purports to follow.

MAS also purports to rely, at least in part, on a protocol from the International Organization for Standardization ("ISO") known as ISO 22262-1 for the testing in this MDL. Ex. F, M71614-001/*Valadez* Rpt. (Dep. Ex. 14) at 3 ("The PLM analysis used method ISO 22262-1. . . ."); Ex. K, Longo *Prudencio* Dep. 26:9-11 (similar). Part of that protocol contains reference images for what chrysotile is supposed to look like using PLM, which look very different than the particles MAS claims are chrysotile.



Ex. G, *Valadez/*ISO Comparison (Dep. Ex. 17).

As the graphic above shows, Mr. Hess treated the particle on the left that is part of the testing in this MDL as *purple* corresponding to a wavelength of light that is 560nm. Mr. Hess was asked whether the "the wavelength of light that you assigned to this particle on the left that you're calling chrysotile in Johnson & Johnson, you are saying that it is even more purple than standard reference chrysotile depicted on the right?" Ex. A, Hess Dep. 110:16-21. He was instructed not to answer that question. *Id.* at 112:13-14.

He was similarly instructed not to answer the question: "As a fact, factually, you assigned a darker purple color to that particle on the left than standard reference chrysotile." *Id.* at 112:20-113:18; *see also id.* at 109:19-110:6 (Hess being instructed not to answer whether "the refractive index number given for that particle by ISO is 1.556; that corresponds to magenta"). This reference image is part of the ISO protocols claimed to be followed in the reports. And, as the Special Master pointed

out, "defendants are not required to accept at face value that Longo's written methodology was followed." Order at 4. Thus, these questions were decidedly fair game and should have been answered.

Additionally, the Special Master stated at the deposition that "the reason why leave was granted to the defendants to take Mr. Hess' deposition was based on the arguments that they made in their briefs." Ex. A, Hess Dep. 35:9-12. Defendants used this *exact example* of the color of the ISO reference sample and the color of particle in the original briefing regarding this very deposition:



*See* ECF 32683 at 5. Questions regarding this reference sample therefore fall squarely within the reasons Defendants' sought a deposition.

### E.   Questions regarding illumination and color filtering.

Defendants also raised in their original briefing that Mr. Hess is making "smaller but still important decisions" such as "controlling the illumination." ECF 32683 at 12. Defendants then cited defense expert Dr. Su's report to argue that it "appears as if Mr. Hess is not using enough light intensity, which would distort the color the particles appear and therefore distort the entire analysis." *Id.*

Dr. Longo has testified that *Mr. Hess* is using the maximum illumination possible. Ex. L, Longo *Clark* Hr'g 73:18-24. To test and challenge that assertion with the person actually controlling the illumination, Mr. Hess was shown as a demonstrative a sample PLM image that is plainly brighter than Mr. Hess's own PLM imaging above.



Ex. M, PLM Image (Dep. Ex. 23). Mr. Hess was simply asked the question: "Is your Leica microscope able to take images that are as bright as what we're seeing here?" *Id.* at 147:24-148:1. The Lecia microscope is the one Mr. Hess is currently using for the testing at issue in the MDL. *See, e.g.*, Ex. F, M71614-001/*Valadez* Rpt. (Dep. Ex. 14) at 18. Once again, he was instructed not to answer the question on the grounds that it "calls for expert testimony." *Id.* at 148:19-22.

As defense counsel explained in the deposition, this question fell squarely within the scope of appropriate questioning since Mr. Hess was being asked "about

his microscope, his illumination settings, what he sees under the microscope," and "whether his microscope that he knows and he works with is capable of producing an image at this illumination level." *Id.* at 148:23-149. The question goes directly to "how and why" the illumination levels of Mr. Hess's images appear as they do *See* Order at 3. *Why* are the brightness levels too low and *how* did they get that way through the microscope's settings?

Similarly, polarized light microscopes can use filters in order to normalize coloring and ensure that the colors the analyst is seeing is an accurate representation of what the particles actually look like and not, for example, distorted by external light sources. Indeed, the ISO 22262-1 method that MAS claims is being followed in the testing at issue in this MDL states that a blue "daylight" filter must be used. Ex. N, ISO 22262-1 at 15, 25. So Mr. Hess—the person with nearly 40 years of PLM experience who Dr. Longo relies on for the testing at issue in the MDL—was asked: "Do you know what the purpose is of a blue light or a daylight filter?" *Id.* at 65:19-20. He was instructed not to answer on the grounds that it "calls for expert testimony." *Id.* at 65:23-66:1.

As the Special Master pointed out and already discussed above, "defendants are not required to accept at face value that Longo's written methodology was followed." Order at 4. The method at issue calls for a use of this filter. In seeking to know "the how and why" of the testing, *see* Order at 3, Defendants wanted know

not just *how* the testing was conducted (whether such a filter was being used), but also if the reason *why* the filter was not being used is due to Mr. Hess's awareness of its purpose. Does he not know the purpose of using the filter or does he know its purpose and chooses to intentionally not use it? Defendants were not permitted to get answers to these basic questions that go directly to the purpose of the deposition.

### F.    Questions regarding Dr. Su and Dr. Wyle's review of Mr. Hess's work.

In preparation for his deposition, Mr. Hess reviewed the reports of defense experts Dr. Shu-Chun Su and Dr. Ann Wylie from this MDL. Ex. A, Hess Dep. at 18:22-25. These are reports explaining defense experts' views of why Mr. Hess's analysis in this MDL is flawed and otherwise incorrect. But when Mr. Hess was asked if he had any comments on their reviews of his work, he was instructed not to answer. *Id.* at 84:12-85:16. The reasons Mr. Hess—who has the relevant expertise and who conducted the analysis at issue—thinks that defense criticisms of his own testing are wrong is at the heart of the deposition.

If, after reviewing their reports, Mr. Hess thinks Dr. Su and Dr. Wylie's criticisms are correct and that MAS is not using the PLM microscope correctly and/or not actually identifying chrysotile, then Dr. Longo's report should be struck from the case. Presumably Mr. Hess has *some* response to justify "the basis for MAS's findings" that the Special Master ruled was part of what was to be covered

at the deposition. *See* Order at 4. Given the obstruction of counsel, Defendants are presently left without any way to know what those responses may be.

### G.    Other questions regarding Mr. Hess's testing.

The instructions not to answer were so numerous, that they applied to a wide variety of other questions that do not neatly fall into the categories above. *See, e.g.*, Ex. A, Hess Dep. at 57:2-12 (being instructed not to answer: "Do the central stop dispersion staining colors of talc plates themselves in 1.550 oil include the color red?"); *id.* at 103:5-15 (being instructed not to answer: "Are you familiar with the fact that you can -- that even with Cargille glass that has a single refractive index, you can sometimes see edge colors that don't correspond to that refractive index?"); *id.* at 141:7-10 (being instructed not to answer: "[D]o you know how to perform a Becke line analysis?"); *id.* at 158:19-23 (being instructed not to answer, "So the whole reason why dispersion staining can be used is because minerals have defined refractive indices, right?"); *id.* at 162:5-8 (being instructed not to answer: "Are you familiar with any published reference values for the refractive indices of talc in parallel, in talc -- elongated fiber of talc in parallel?"). Each of these instructions not to answer, as well as all of the others outlined in Ex. B, were improper. The wide-ranging nature of the instructions demonstrates the need for an unrestricted deposition of Mr. Hess.

\* \* \*

Mr. Hess's expertise was inherently at issue in the deposition, because it is at issue in this MDL. As the Special Master concluded: "Hess, not Longo, has decades of experience doing PLM testing and is the expert Longo will rely upon to support his opinion that defendants' talc products contained asbestos." Order at 3. The "why" of the testing is "important testimony." *Id.* And Mr. Hess's "work and testing is critical to Longo's conclusion."

The Special Master also explained that a reason for the deposition of Mr. Hess was that "Longo testified in other cases that he is unable to answer certain of defendants' questions about his conclusions without looking through a microscope" and that "Hess, therefore, is likely to provide missing answers." Order at 3.[4] The Special Master explained that "Defendants correctly note that, '[i]f looking down the microscope is necessary to explain the basis for MAS's findings, then Defendants are entitled to depose the person [i.e., Hess] who actually did that.'" *Id.* at 4 (citing Defendants' Opposition at 11 (ECF No. 32683).) Explaining the basis of MAS's findings *is* expert opinion.

Take this example: One of the critical questions Defendants highlighted in their brief was that when Dr. Longo was asked if the edge effect that MAS is relying on to identify chrysotile is also present on the talc particles, then isn't it the

---

[4] (citing Defendants' Opposition at 10 n.4 (ECF No. 32683) and Defendants' Inspection Request Reply at 5-8 (ECF 32808)).

case that "***your entire analysis is wrong***"? ECF 32683 (citing Longo *Clark* Hr'g (Vol. I) 118:20-119:3 (emphasis added). Dr. Longo's only response was to dodge the question, responding: "I would need to be looking at the microscope." *Id.* That is *precisely* the issue the Special Master concluded justified a deposition of Mr. Hess who actually looked down the microscope.

But when Defendants asked Mr. Hess whether "[t]he same type of edge effects that you're relying on to call particles chrysotile in Johnson & Johnson are also present on talc plates in your analysis," he was instructed not to answer. *Id.* at 143:11-25. This gamesmanship prevents *anyone* from answering a question that goes to whether MAS's *entire analysis is wrong* on a *case-defining issue*.

The Special Master denied Defendants' request to inspect Dr. Longo's microscope and methodology in part because he "granted defendants' request to depose Paul Hess, the MAS analyst who conducted the tests upon which Longo relies" and that "Mr. Hess's testimony should fill in the gaps from Longo's deposition." ECF 32826 at 8. But that reasoning can no longer hold up if Defendants are not able to actually question Mr. Hess about these critical issues.

Understanding and evaluating Mr. Hess's work is critical not only for future juries, but also for this Court via its important Rule 702 gatekeeping function. The tactics that have been employed are just serving to prevent scrutiny into MAS's work. That is not proper, particularly for an issue that is so important to this MDL.

27

Mr. Hess—someone with decades of PLM experience who actually conducted the relevant tests—should be able to answer basic questions about that testing. The machinations to avoid inquiry into this topic all beg the questions: What are Plaintiffs afraid of? What are they hiding? What mischief is afoot in MAS's testing?

Defendants should be allowed to conduct a simple deposition where they are actually permitted to answer basic questions regarding the central testing in this matter.

## II.     Counsel Should Be Permitted To Ask Questions Comparing Mr. Hess's Work To Other Testing, Particularly His Own.

At the beginning of the deposition, defense counsel sought to ask questions touching upon Mr. Hess's own prior PLM testing in this MDL. The Special Master ruled: "that's not the purpose of this deposition, not to compare old tests to new tests" Ex. A, Hess Dep. at 43:10-12. The Special Master stated that defense counsel "didn't say anything about asking him to compare old to new" in their arguments for why a deposition was warranted. *Id.* at 43:16-17.

Defendants request that this line of questioning be permitted in a continued deposition. Defendants' original brief seeking Mr. Hess's deposition specifically argued *on page 1* that Dr. Longo was now finding "a type of asbestos he previously had never found in any of his prior testing." ECF 32683 at 1. The fact that Mr. Hess did not find chrysotile in his prior PLM work but now finds it with his new method

goes directly to "the how and why" of the new methodology. Order at 3. *Why* is Mr. Hess only finding chrysotile for the first time beginning in 2020 and *how* has the methodology changed to result in these alleged findings? Those questions are at the heart of the parties' dispute about the new PLM methodology at issue. The questions' relevance and importance to the new methodology do not change just because, by their nature, they touch on prior work. That the prior work was done *by Mr. Hess* and *in this very MDL* makes them all the more relevant to the issues at hand.

Similarly, Defendants want to ask Mr. Hess about the illumination and coloring in the new PLM methodology at issue in this MDL that touches on prior testing Mr. Hess himself conducted of another company's product. As discussed above, illumination and coloring issues were directly raised by Defendants in their initial briefing. Below are images of Mr. Hess's testing of another company's talc as well as his testing of Johnson & Johnson sample M70484 (*Zimmerman*) that is part of Dr. Longo's report in this MDL.

| **Vanderbilt** | **Sample M70484 (*Zimmerman*)** |



| **Date: 1/9/2020**<br>**Analyst: Paul Hess**<br>**Sample: Talc**<br>**Oil: 1.550** | **Date: 2/21/2020**<br>**Analyst: Paul Hess**<br>**Sample: Talc**<br>**Oil: 1.550** |

Ex. O, Vanderbilt vs. M70484 (Dep. Ex. 8).

Both of the above are images of talc that Mr. Hess took using the same type of oil only a little over a month apart. Yet the illumination levels and coloring look completely different. Again, this goes directly to "the how and why" of the testing. *See* Order at 3. Defendants want to know *how* the microscope for this MDL was set up, presumably differently, than testing of other talc in the very same time period and *why* the microscope settings were changed for the MDL testing. *See* Ex. A, Hess Dep. 71:11-21 (being instructed not to answer "was the microscope set up differently in these two analyses?"). Mr. Hess is ***the only person*** who actually knows the answer to these critical questions because he is the one who is actually sitting at the microscope and controlling its settings. If the microscope setting are being changed

from product to product in order to change the ultimate results, that is incredibly important and relevant information that is and directly within Mr. Hess's knowledge (and maybe only Mr. Hess's knowledge).

Defendants raised in their original briefing that they sought to question Mr. Hess regarding the colors of his testing and specifically pointed out the sub-topic of issues of illumination levels. Defendants did not need to name every possible sub-sub-topic or question they wished to ask concerning this general subject in order for it to be fair game at the deposition.

Moreover, just because a question touches on Mr. Hess's prior work should not mean it is out of bounds. For some issues, questions that focus on comparison are the best and clearest way to understand *how* Mr. Hess is using his microscope in the PLM testing at issue in this MDL and *why* he is using the microscope in that way. This questioning should be permitted as well.

### III. This Court Should Award Sanctions.

When a witness is improperly instructed not to answer a question, the "instances are few and far between" where sanctions are not warranted. *Boyd v. Univ. of Maryland Med. Sys.*, 173 F.R.D. 143, 147 (D. Md. 1997).

The egregious and repeated frustration of the court-ordered deposition of Mr. Hess merits sanctions here. The Special Master already ordered that this deposition go forward over Plaintiffs' objection. Then, despite the Special Master's ruling at the

31

deposition that Mr. Hess could be questioned about his testing at issue in this MDL including the relevant images from that testing, counsel violated that ruling by instructing Mr. Hess not to answer those very questions.

As discussed at length above, "calls for expert testimony" is not a ground to instruct a witness not to answer. Nor could such an instruction legitimately be an attempt to enforce the Special Master's ruling considering both the Special Master and Plaintiffs themselves expressly acknowledged what cannot be denied: that Mr. Hess is an expert.

Accordingly, Defendants request monetary sanctions and that Plaintiffs be precluded from relying on any PLM tests where Mr. Hess is an analyst under Rules 16(f), 30(d)(2), 37(b)(1), and 37(b)(2). This motion is being served on Mr. Hess' counsel.

### A.    The federal rules authorize monetary and preclusion sanctions.

Rule 16(f)(1)(C) provides that "[o]n motion or on its own, the court may issue any just orders, including those authorized by Rule 37(b)(2)(A)(ii)-(vii), if a party or its attorney fails to obey a scheduling or other pretrial order." Fed. R. Civ. P. 16(f)(1)(C). Rule 37(b)(2)(A)(ii) states that "[i]f a party … fails to obey an order to provide or permit discovery, … the court where the action is pending may issue further just orders" including "prohibiting the disobedient party from supporting or

opposing designated claims or defenses, or from introducing designated matters in evidence." Fed. R. Civ. P. 37(b)(2)(A)(ii).

Rule 37(b)(1) states: "If the court where the discovery is taken orders a deponent to be sworn or to answer a question and the deponent fails to obey, the failure may be treated as contempt of court." And Rule 30(d)(2) provides: "The court may impose an appropriate sanction—including the reasonable expenses and attorney's fees incurred by any party—on a person who impedes, delays, or frustrates the fair examination of the deponent." Fed. R. Civ. P. 30(d)(2).

### A. This Court should award monetary sanctions.

Rule 30(d)(2) specifically provides that reasonable expenses and attorneys fees may be awarded for a person who impedes, delays, or frustrates the fair examination at a deposition.

The Advisory Committee notes further explain that this provision "authorizes appropriate sanctions not only when a deposition is unreasonably prolonged, but also when an attorney engages in other practices that improperly frustrate the fair examination of the deponent, *such as making improper objections or giving directions not to answer* . . ." (emphasis added). Advisory Committee Note to Rule 30, subdivision (d), paragraph (3) (1993 Amendment).

District Courts routinely hold that such monetary sanctions are warranted when counsel improperly instructs a witness not to answer questions. *See, e.g.*,

*Williams v. Benshetrit*, 2020 WL 3315982 (E.D. Pa. June 18, 2020); *Lucas v. Breg, Inc.*, 2016 WL 2996843, at *5 (S.D. Cal. May 13, 2016); *Bordelon Marine, Inc. v. F/V KENNY BOY*, 2011 WL 164636, at *4, *6 (E.D. La. Jan. 19, 2011); *Wellsco Int'l Co. Ltd. v. HD Supply Distribution Servs., LLC*, 2010 WL 11508337, at *5 (N.D. Ga. July 26, 2010); *Antolini v. McCloskey*, 2022 WL 1689331, at *4, *6 (S.D.N.Y. May 26, 2022).

Defendants therefore request as a monetary sanction the reasonable fees and expenses incurred in preparing for and taking the deposition of Mr. Hess.

**B.      This Court should preclude Plaintiffs from relying on any tests where Mr. Hess was the analyst.**

This Court may also preclude Plaintiffs from relying on MAS testing conducted by Mr. Hess as a sanction. A four-factor test is used to determine whether or not excluding evidence as a sanction for failing to comply with an Order compelling discovery is appropriate:

> (1) the prejudice or surprise to the party against whom the withheld evidence will be offered; (2) the ability to cure the prejudice; (3) the extent to which the evidence would disrupt the orderly and efficient trial of the case; and (4) bad faith or willfulness of the delinquent party in failing to comply with the court's orders.

*Access 4 All, Inc. v. ANI Assocs., Inc.*, 2007 WL 178239, at *2 (D.N.J. Jan. 12, 2007) (Schneider, J.). "Prejudice need not be irremediable and may include the 'burden imposed by impeding a party's ability to prepare effectively a full and complete trial

strategy' and the burden a party must bear when forced to file motions in response to the strategic discovery tactics of an adversary." *Id.*

All these factors are met for all the reasons discussed throughout this brief. And Defendants are prejudiced because despite requesting the deposition in April in the middle of expert discovery, Defendants were not able to fully depose Mr. Hess by the time of the Rule 702 motion deadline (which is tomorrow). In any continued deposition, Mr. Hess now has an improper preview of many of the questions Defendant intend to ask him. Additionally, Defendants will have to expend twice the effort to depose Mr. Hess than they should have because of Plaintiffs' conduct in the deposition.

This Court should therefore award preclusion as a sanction

## CONCLUSION

This Court should order an unrestricted deposition of Mr. Hess within a week along with sanctions. Defendants also request that Plaintiffs and Mr. Hess's counsel be instructed not to share the brief with Mr. Hess or use it to prepare for further deposition questioning as that would allow them to further profit from their misconduct.

Dated: July 22, 2024

Respectfully submitted,

*/s/ Kristen R. Fournier*

Kristen R. Fournier

**KING & SPALDING LLP**
1185 Avenue of the Americas
34th Floor
New York, NY 10036
(212) 556-2100
kfournier@kslaw.com

Susan M. Sharko
**FAEGRE DRINKER BIDDLE &
REATH LLP**
600 Campus Drive
Florham Park, NJ 07932
susan.sharko@faegredrinker.com

*Attorneys for Defendants Johnson &
Johnson and LLT Management, LLC*

## CERTIFICATION OF SERVICE

I hereby certify that on July 22, 2024, a true and correct copy of the foregoing motion was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's system.

I hereby certify that on July 22, 2024, a true and correct copy of the foregoing motion was sent via email to counsel for Mr. Hess, Eric Ludwig, Esq.

/s/ *Kristen R. Fournier*
Kristen R. Fournier
**KING & SPALDING LLP**
1185 Avenue of the Americas
34th Floor
New York, NY 10036
(212) 556-2100
kfournier@kslaw.com