# Exhibit A

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF NEW JERSEY

3    IN RE:              :   MDL NO.:

     JOHNSON & JOHNSON TALCUM :  16-2738 (MAS)(RLS)

4    POWDER PRODUCTS       :

     MARKETING, SALES      :

5    PRACTICES, AND PRODUCTS :

     LIABILITY LITIGATION   :

6

7                    - - -

8             Wednesday, July 10, 2024

9                    - - -

10          Remote videotaped deposition of PAUL

11   HESS, via Zoom video conference, conducted at

12   the location of the witness in Atlanta,

13   Georgia, taken on the above date, beginning at

14   approximately 9:06 a.m., before Jessica M.

15   Gericke, RPR, CCR-NJ, and Notary Public in and

16   for Delaware, New Jersey, and Pennsylvania.

17

18

19

20

21

22

23

24

25

Page 2

1 APPEARANCES VIA ZOOM VIDEO CONFERENCE:
2 BOVIS, KYLE, BURCH & MEDLIN, LLC
   BY: ERIC LUDWIG, ESQUIRE
3 200 Ashford Center North
   Suite 500
4 Atlanta, GA 30338-2668
   678-338-3925
5 eludwig@boviskyle.com
   (Present with Witness)
6
   Counsel for Deponent and Materials
7 Analytical Services
8
   BEASLEY, ALLEN, CROW, METHVIN,
9 PORTIS & MILES, P.C.
   BY: P. LEIGH O'DELL, ESQUIRE
10 218 Commerce Street
   Montgomery, AL 36104
11 334-269-2343
   leigh.odell@beasleyallen.com
12 (Present with Witness)
13 Counsel for Plaintiff Steering Committee
14
   COHEN, PLACITELLA & ROTH
15 BY: CHRISTOPHER M. PLACITELLA, ESQUIRE
       DREW M. RENZI, ESQUIRE
16 127 Maple Avenue
   Red Bank, NJ 07701
17 732-747-9003
   cplacitella@cprlaw.com
18
   Counsel for Plaintiff Steering Committee
19
20
21
22
23
24
25

Page 3

1 APPEARANCES (continued):
2 ASHCRAFT & GEREL, LLP
   BY: MICHELLE A. PARFITT, ESQUIRE
3 1824 K Street NW
   Washington, DC 20006
4 202-669-0032
   mparfitt@ashcraftlaw.com
5
   Counsel for Plaintiff Steering Committee
6
7 REILLY, McDEVITT & HENRICH, P.C.
   BY: BRANDY L. HARRIS, ESQUIRE
8 3 Executive Campus
   Suite 310
9 Cherry Hill, NJ 08002
   856-317-7180
10 bharris@rmh-law.com
11 Counsel for Personal Care Products Council
12
   KING SPALDING, LLP
13 BY: MORTON D. DUBIN, II, ESQUIRE
       KEVIN HYNES, ESQUIRE
14 JAKE KEESTER, ESQUIRE
   1185 Avenue of the Americas
15 34th Floor
   New York, NY 10036
16 212-790-5343
   mdubin@kslaw.com
17
   Counsel for Defendant Johnson & Johnson
18
19 FAEGRE DRINKER BIDDLE & REATH LLP
   BY: SUSAN M. SHARKO, ESQUIRE
20 600 Campus Drive
   Florham Park, NJ 07932
21 973-549-7000
   susan.sharko@faegredrinker.com
22
   Counsel for Defendant Johnson & Johnson
23
24     - - -
25

Page 4

1 APPEARANCES (continued):
2 ALSO PRESENT:
3     SPECIAL MASTER JOEL SCHNEIDER
4     CAROLIN De La ROSA, VIDEOGRAPHER
5     SHU-CHUN SU, PH.D.
6     - - -
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1            I N D E X
2 WITNESS NAME              PAGE
3 Paul Hess
4     By Mr. Dubin              6
5
6     - - -
7
8         E X H I B I T S
9 NO.     DESCRIPTION            PAGE
10 1    Resume of Paul M. Hess      8
11 2    MAS Report, dated          20
       February 24, 2020
12
    3    MAS Report, dated February  22
13       1, 2019
14 4    Hess Slide 2              46
15 5    MAS Report, dated September  58
       16, 2020
16
    6    MAS report, dated February  64
17       24, 2020
18 7    Declaration of William      69
       Longo, Ph.D.
19
    8    Hess Slide 20             70
20
    9    Hess Slide 22             74
21
    10   Hess Slide 24             76
22
    11   Hess Slide 25             81
23
    12   J3 Resources Inc. Report,   83
24       dated July 13, 2018
25

2 (Pages 2 - 5)

Page 6

1  INDEX (continued):
2  13      MAS Report, dated April 13,   87
           2021
3
    14      MAS Report, dated February    91
4          28, 20
5  15      Hess Slide 34         105
6  16      Su Tables             108
7  17      Hess Slide 43         110
8  18      Hess Slide            127
9  19      Hess Slide            134
10 20      Image, CX-00056       137
11 21      CX-00012              143
12 22      Hess Slide 48         143
13 23      Image, CX-00062       147
14 24      Image, CX-00019       164
15 25      Image, CX-00029       169
16 26      William E. Longo, Ph.D.,      176
           Deposition Transcript,
17         dated March 22, 2024
18 27      Hess Slide 95         178
19              - - -
20
21
22
23
24
25

Page 7

1               - - -
2          VIDEOGRAPHER:  We are now on
3   the record.  My name is Carolin De La Rosa, a
4   videographer for Golkow Litigation Services.
5   Today's date is July 10, 2024, and the time is
6   9:06 a.m.  This deposition is being held in
7   the matter of Talcum Powder litigation MDL
8   2738 versus Johnson & Johnson.  The deponent
9   today is Paul Hess.
10         All parties to this deposition
11  are appearing remotely and have agreed for the
12  witness to be sworn in remotely.  All parties
13  are noted on the stenographic record this
14  morning.
15         Would the court reporter,
16  please, administer the oath to the witness.
17              - - -
18         PAUL HESS, after having been
19   first duly sworn, was examined and
20   testified as follows:
21  BY MR. DUBIN:
22  Q.   Hi, Mr. Hess.  Good morning.
23  A.   Good morning.
24  Q.   So we're going to make the first
25  exhibit to your deposition a resume that I

Page 8

1   have received from you or at least I assume it
2   originated with you and we'll just call that
3   up and walk a little bit through your
4   employment background.
5          MR. DUBIN:  Jake, can we call
6   that up, please?
7          (Exhibit 1 marked for
8     identification.)
9   BY MR. DUBIN:
10  Q.   So it looks like you joined MAS in
11  December of 1995; is that correct?
12  A.   Yes, sir.
13  Q.   Okay.  Can you tell me very briefly
14  what this position was that you held before
15  that at Law Associates?
16  A.   PLM microscopist.
17  Q.   And what was -- what is or was Law
18  Associates?
19  A.   They were an engineering firm in
20  Atlanta, Georgia.
21  Q.   Okay.  Do you know why it has "law"
22  in the name?
23  A.   I have no idea.
24  Q.   Okay.  Does that have anything to do
25  with something legal or is it just -- was it

Page 9

1   somebody's name?  You have no idea?
2   A.   No idea, sir.
3   Q.   Okay.  And then it looks like you
4   departed MAS in August of 2008 for a fairly
5   short period and went to Long Brothers Oil &
6   Gas; is that right?
7   A.   That is correct.
8   Q.   Okay.  And then you went back to MAS
9   and you were there until February of 2023, as
10  a full-time employee, before leaving for a
11  brief period of a year where you were just a
12  consultant; is that right?
13  A.   That is correct.
14  Q.   Okay.  And then your current
15  employment status at MAS is what?
16  A.   Part-time.
17  Q.   Okay.  And looking through your
18  resume, it looks like you have a bachelor's of
19  science degree; is that correct?
20  A.   That is correct.
21  Q.   You don't have any further advanced
22  degrees, right, no master's and no Ph.D.?
23  A.   No, sir.
24  Q.   Okay.  I am sorry.  Sometimes it can
25  be confusing.

3 (Pages 6 - 9)

Page 10

1         It's correct you do not have a
2   master's or a doctorate; is that right?
3     A.   That is correct.
4     Q.   Thank you.  All right.  So we may go
5   through some of that in more depth later, but
6   what is -- what positions have you held over
7   time at MAS?
8     A.   PLM microscopist.
9     Q.   I have heard you referred to
10  sometimes as an analyst.
11         Is that the name of your
12  position, is PLM microscopist the name of your
13  position or what's the formal name of your
14  position?
15    A.   To the best of my knowledge, it's
16  PLM microscopist.
17    Q.   Okay.  That's fine.  And are you
18  represented by counsel today?
19    A.   I am.
20    Q.   Okay.  And is that your personal
21  counsel?  Was it provided to you by MAS?
22    A.   Provided by MAS.
23    Q.   Okay.  And it says here that you
24  have 34 years experience as a PLM
25  microscopist, analyzing an average of 10,000

Page 11

1   samples per year.
2         When you say that, are most of
3   the samples asbestos samples or is that a
4   variety of different types of PLM work?
5     A.   Most of those were standard asbestos
6   samples.
7     Q.   Okay.  And so is it correct to say
8   that your general job duties at MAS is just
9   PLM microscopy?
10    A.   That is correct.
11    Q.   Do you do any other type of
12  microscopy work at MAS?
13    A.   I had done some phase contrast.
14    Q.   No transmission electron microscopy;
15  is that right?
16    A.   No, sir.
17    Q.   Okay.  And do you know approximately
18  what percentage of your time at MAS is spent
19  performing work related to litigation?
20         MR. LUDWIG:  Objection to form.
21  BY MR. DUBIN:
22    Q.   You can respond.
23    A.   Just the last few years.
24    Q.   Okay.  So let me make sure I
25  understand what you're saying.

Page 12

1         You have only become involved
2   in litigation work within the last few years;
3   is that right?
4     A.   That is correct.
5     Q.   Okay.  And since becoming involved
6   with litigation work, about what percentage of
7   your time or your work at MAS relates to
8   litigation -- is related to litigation?
9         MR. LUDWIG:  Objection to form.
10        You can answer.
11        THE WITNESS:  I would say the
12  majority of the time.
13  BY MR. DUBIN:
14    Q.   Can you explain to me when and how
15  you started to become involved with litigation
16  work?
17    A.   I do not recall the exact year, but
18  Dr. Longo asked me to start taking a look at
19  amphiboles in talc samples.
20    Q.   And so you started -- they asked you
21  to take a look by PLM for amphiboles in talc
22  samples; is that right?
23    A.   That is right.
24    Q.   Okay.  Did you have any discussion
25  at that time about whether you should also

Page 13

1   look for chrysotile?
2     A.   Not that I recall.
3     Q.   Okay.  Did you ask why you were only
4   being -- being asked to look for amphiboles at
5   that time?
6     A.   Not that I recall.
7     Q.   Okay.  When you typically perform a
8   PLM analysis, let's say, before you became
9   involved in this litigation work, when you
10  were examining a sample, would you typically
11  look for both chrysotile and for amphiboles?
12    A.   In the standard samples, that is
13  correct.
14    Q.   So you -- when you first became
15  involved with looking at, let's say, talcum
16  powder samples, why didn't you continue to
17  follow that protocol and look for both
18  amphibole and chrysotile?
19        MR. LUDWIG:  Objection to form.
20        THE WITNESS:  At that time it
21  was basically just for the amphiboles.  I was
22  not asked to look for the chrysotile.
23  BY MR. DUBIN:
24    Q.   Okay.  And at some point you were
25  asked to start looking for chrysotile in

4 (Pages 10 - 13)

Page 14

1 cosmetic talc samples; is that right?
2    A.   I was asked to see what I could find
3 other than the amphiboles.
4    Q.   Okay.  And do you recall when
5 approximately that was?
6    A.   I do not recall.
7    Q.   Prior to becoming involved with
8 litigation work in the last several years, had
9 you ever previously examined talc, whether
10 industrial or cosmetic, for the presence of
11 asbestos by PLM?
12    A.   Not that I recall.
13    Q.   Okay.  When was the first time you
14 recall being involved with the testing of talc
15 at MAS, irrespective of whether it was
16 cosmetic or industrial?
17       MS. O'DELL:  Would you repeat
18 the question, please?
19 BY MR. DUBIN:
20    Q.   Sure.  When was the first time you
21 recall becoming involved with the testing of
22 talc for asbestos at MAS, irrespective of
23 whether it was cosmetic talc or industrial
24 talc?
25    A.   As I recall, it was somewhere around

Page 15

1 2018.
2    Q.   Have you looked at both industrial
3 and cosmetic talc by PLM for the presence of
4 asbestos?
5    A.   I don't recall industrial.
6    Q.   Okay.  Do you recall when the first
7 time was that you used -- and we'll talk more
8 about what this means -- but a 1.550
9 refractive index oil to examine talc,
10 irrespective of whether it's cosmetic or
11 industrial talc?
12    A.   1.550 has always been the oil used
13 since doing standard things or standard
14 samples, I should say.
15    Q.   So over -- but do you recall when
16 the first time you used that oil to examine
17 talc was?
18    A.   I don't recall exactly.
19    Q.   Okay.  You indicated before -- we
20 talked about the fact that you had experience
21 as a PLM microscopist looking at many
22 different samples over your career.
23       Can you tell me what type or
24 types of asbestos-containing products you
25 recall examining by PLM over your history?

Page 16

1    A.   Ceiling tiles, joint compounds,
2 roofing, putties, floor tiles.  A whole
3 spectrum of different types of building
4 materials.
5    Q.   And so do you recall being able to
6 identify chrysotile by PLM in products such as
7 joint compounds and floor tiles?
8    A.   Yes, sir.
9    Q.   And do you know what type or types
10 of chrysotile asbestos -- well, let me ask you
11 a different question.
12       Do you recall any of the brand
13 names of the joint compounds that you looked
14 at?
15    A.   I don't recall any brand names being
16 given by the clients that sent the samples in.
17    Q.   Do you know whether any of those
18 joint compounds or floor tiles would have
19 contained Calidria asbestos?
20    A.   Not that I recall; however, I did at
21 one point come to the understanding that
22 Calidria had been used in some of the floor
23 tiles.
24    Q.   Okay.  And you were able to identify
25 chrysotile in those floor tiles using PLM?

Page 17

1    A.   Yes, sir.
2    Q.   All right.  We'll talk a little bit
3 more about that later.
4       Are you the -- how many PLM
5 analysts have -- during the time you have been
6 there, have typically been employed by MAS?
7    A.   I do not know exactly how many.
8    Q.   Were there others besides you?
9    A.   There were.
10    Q.   Okay.  Let's say within the last
11 three years, how many other PLM analysts do
12 you recall working at MAS?
13    A.   One other besides myself.
14    Q.   And who was that?
15    A.   That was Christopher Dubois.
16       MR. LUDWIG:  Mr. Dubin, can I
17 ask you a question?  Are you finished with the
18 resume?  Because it's still up on the screen.
19 I didn't know if you were --
20       MR. DUBIN:  We can pull it down
21 for now; that's fine.
22 BY MR. DUBIN:
23    Q.   And was that individual trained in
24 PLM dispersion staining analysis?
25    A.   Yes, sir.

5 (Pages 14 - 17)

Page 18

1   Q.   Was there anything about his
2   training that would lead you to believe he
3   wasn't trained to look for chrysotile by PLM?
4           MR. LUDWIG:  Objection to form;
5   calls for speculation.
6   BY MR. DUBIN:
7   Q.   To your knowledge.
8   A.   I do not recall.
9   Q.   Okay.  We'll come back to some
10  background later, but what did you do to
11  prepare for your deposition today?
12  A.   I had a few sessions with
13  Mr. Ludwig.
14  Q.   Anything else?  Did you speak to
15  anybody else in preparation for your
16  deposition?
17  A.   Ms. O'Dell.
18  Q.   Okay.  How about Dr. Longo?
19  A.   Dr. Longo has been very busy the
20  last couple of weeks or so and I have not had
21  an opportunity to sit down and talk with him.
22  Q.   Okay.  Did you review any materials
23  to prepare for your deposition?
24  A.   I did review the reports by Dr. Su
25  and Dr. Wylie.

Page 19

1   Q.   Okay.  Did you review any of your
2   own PLM analysis?
3   A.   I did not go back over and review
4   any of the PLM analysis.
5   Q.   How are you compensated at MAS?  Are
6   you a salaried employee?
7   A.   Currently, I am hourly.
8   Q.   Okay.  How about before you --
9   before you took the recent break and became a
10  consultant?  Were you salaried at that time?
11  A.   I was.
12  Q.   Do you -- in your current structure,
13  do you receive bonuses?
14  A.   No, sir.
15  Q.   How about before, when you were a
16  salaried employee?  Did you receive bonuses?
17  A.   A long time ago the company used to
18  have an annual bonus that they would give out,
19  but that has not been in place for many years.
20          MR. DUBIN:  Okay.  I'm going to
21  mark as the next exhibit -- and start to get
22  into a little bit of substance -- what I
23  understand to be the first report that MAS
24  issued claiming to find chrysotile by PLM, and
25  that will be exhibit 2, internal reference

Page 20

1   number is CX-6 for pulling it up.  It's a
2   report, dated February 24, 2020, related to
3   Zimmerman, the Zimmerman report.
4           (Exhibit 2 marked for
5        identification.)
6   BY MR. DUBIN:
7   Q.   I don't know that you -- whether you
8   personally recall.
9           Do you recall this being the
10  first time you looked at cosmetic talc from
11  Johnson & Johnson by PLM for the presence of
12  chrysotile?
13  A.   I don't recall.
14  Q.   Okay.  We'll look at that report
15  some, but before I do that, I want to look at
16  something else.
17          Did you become aware at some
18  point that the FDA had reported a positive
19  finding for chrysotile by TEM in a bottle of
20  Johnson & Johnson?
21          MR. LUDWIG:  Objection to form.
22          Just for the record, Mr. Hess
23  is a fact witness that we produced because of
24  Court Order.  He is not here to opine on
25  expert issues or hearsay issues.

Page 21

1           MR. DUBIN:  I don't know what
2   you're saying, but I am sure I disagree with
3   it.  So let's just see how it goes with
4   individual questions.  Because I am definitely
5   going to be asking him about his work.
6           MR. LUDWIG:  You're asking
7   about FDA analysis and so I am going to object
8   to the form.
9           MR. DUBIN:  Okay.  Well, you
10  can object if you like, but you can respond.
11  Thank you.
12  BY MR. DUBIN:
13  Q.   Did you become aware of that at some
14  point?
15  A.   I am aware of that.
16  Q.   Okay.  Do you recall how you became
17  aware of that?
18  A.   I don't recall exactly.
19  Q.   Do you recall ever reporting
20  chrysotile in any Johnson & Johnson talc
21  samples prior to that FDA finding?
22  A.   I do not.
23  Q.   Now, what -- what type of refracted
24  index oil would you use traditionally to look
25  for fibrous talc by PLM?

6 (Pages 18 - 21)

Page 22

1    A.   1.550.
2    Q.   Would there be any difference in
3 your prep method in the way that you would
4 have traditionally looked for fibrous talc
5 versus chrysotile asbestos in 1.550?
6    A.   It would be no different in method
7 of preparation.
8    Q.   It makes no difference to the method
9 of preparation?  Is that what you said?
10   A.   No.  I said there is no difference
11 in preparation between the two types of
12 analyses.
13   Q.   All right.  And so I want to ask you
14 about another report before we go forward, one
15 that was issued before Zimmerman; that will be
16 exhibit 3.  It's a February 1, 2019 report
17 entitled:  MAS Second Supplemental Report.
18 Let's pull that up for a second.
19        (Exhibit 3 marked for
20     identification.)
21 BY MR. DUBIN:
22   Q.   This is a report that was issued by
23 MAS prior to the FDA finding.
24        It's entitled:  An Analysis of
25 Johnson & Johnson Historical Product

Page 23

1 Containers and Imerys' Historical Railroad Car
2 Samples from the 1960s to the early 2000s, for
3 Amphibole Asbestos, and if we --
4        MS. O'DELL:  Morty, could you
5 put the whole document on the screen so it can
6 be seen?  I am only seeing the first part.
7        MR. DUBIN:  I mean, I am going
8 to move around the document.  We can try to
9 adjust so you can see the full size.
10       Can you see it now?
11       MS. O'DELL:  Yes.  If you can
12 maybe make it a bit bigger?  Because I am
13 looking for the date on that because I can't
14 see it.
15       MR. DUBIN:  It's dated February
16 1, 2019.
17       MS. O'DELL:  Thank you.
18 BY MR. DUBIN:
19   Q.   And if we go to page 2, you can see
20 here that it relates to 72 J&J and
21 Imerys-supplied historical cosmetic talcum
22 powder containers, samples, and samples from
23 the 1960s, 1970s, 1980s, 1990s, and early
24 2000s.
25       Do you see that?  I can

Page 24

1 highlight it.
2        MS. O'DELL:  If you can't see
3 it, Dr. -- excuse me.  If you can't see it,
4 Mr. Hess, please let us know.
5        MR. DUBIN:  Jake, can you put
6 these things in chat, too?
7        MR. PLACITELLA:  Well, I want
8 the opportunity to look at the document before
9 you start asking questions about it.
10       MR. LUDWIG:  I mean, the report
11 speaks for --
12       MR. DUBIN:  (Inaudible.)
13       MR. LUDWIG:  -- themselves --
14 indicating one question or -- so the whole
15 thing speaks for itself, Paul.  I guess his
16 only --
17       MR. DUBIN:  Okay.  This is a
18 long speaking objection, it's improper, and I
19 am going to -- I am trying to show him things
20 to be able to ask him a question about it.
21       We can put these things in
22 chat, but I am not pausing at every question
23 to wait for you to read a 100-page report.  So
24 that's just not happening.  We're going to --
25       MS. O'DELL:  Well, it will

Page 25

1 happen if the witness needs it, Morty, and
2 we'll go off the record if he needs --
3        MR. DUBIN:  I haven't -- I
4 haven't asked a single question yet, other
5 than whether he sees it.  So we're not at --
6        MS. O'DELL:  Morty, I am not
7 finished and you can let me finish.
8        It's not fair to put a document
9 on the screen without giving him the
10 opportunity to see it.  Thank you for putting
11 it in the chat.  He can pull it down in the
12 chat and they will be printed if needed --
13       MR. DUBIN:  (Inaudible.)
14       MS. O'DELL:  -- examination.
15       You could have sent the
16 documents in hard copy had you chosen.  You
17 didn't do that; that's fine.  We'll work
18 around that, but he needs the opportunity to
19 review the document.
20       MR. DUBIN:  If you guys want to
21 go off record, he can read each time.  I am
22 not using my time to have him read a whole
23 report when I haven't been able to ask a
24 single question about it.
25       So if you want to go off, off

7 (Pages 22 - 25)

Page 26

1 record, and have him read the whole report, I
2 am happy to let him do that, or I can direct
3 him to the portions that I am going to ask
4 about. You choose. Because we can be here
5 all night. I don't care. So you tell me.
6          MR. LUDWIG: We're not going to
7 off the record, no. It sounds like --
8          MR. DUBIN: It is not going on
9 my time if he wants to read a 50-page document
10 that I haven't been able to ask a single
11 question yet. This is not happening.
12          So you want to go off the
13 record and have him read this report or you
14 want me to ask him questions and then the
15 witness can tell me if there is something he
16 needs to read.
17          Those are your two options.
18          MS. O'DELL: You don't --
19          MR. PLACITELLA: The third
20 option is -- the third option is we're going
21 to call the Special Master. Because we have a
22 right to know what's in the document --
23          MR. DUBIN: It's in the
24 document --
25          MR. PLACITELLA: -- before you

Page 27

1 ask the question. So if that's how we're
2 going to proceed, by picking pieces of a
3 document that he hasn't seen for years and I
4 have never seen before, then we've got to get
5 the Judge on the phone now.
6          MR. DUBIN: Okay. We can do
7 whatever you want. You guys have been
8 complaining about this without me asking a
9 single question about the document. The
10 witness hasn't said he needs to look at
11 anything else. You're just being
12 obstructionists. I am going to --
13          MR. PLACITELLA: Well, let's
14 get the Judge on the phone.
15          MR. LUDWIG: He has not
16 reviewed the MAS reports. So --
17          MR. DUBIN: This is his work.
18 I am asking him about his work.
19          MS. O'DELL: This is the report
20 of Dr. Bill Longo and Mark Rigler. This is --
21 so --
22          MR. DUBIN: With his PLM work.
23 I am not arguing about it anymore. I am
24 asking the questions. If you want to --
25          MR. PLACITELLA: Well, let's

Page 28

1 get the Judge on the phone --
2          MR. DUBIN: -- get the Judge on
3 the line, we can get the Judge on the line.
4 Go ahead. Go ahead.
5          MR. PLACITELLA: Let's get the
6 judge on the phone.
7          MR. DUBIN: Fine.
8          THE COURT REPORTER: Would you
9 like to go off the record for a moment?
10          MR. DUBIN: Sure. We'll go off
11 the record.
12          VIDEOGRAPHER: The time is
13 9:32 a.m. We are off the record.
14          (Brief recess.)
15          (Conference with Special Master
16      Joel Schneider taken off the video
17      record.)
18          THE COURT: Am I looking at the
19 infamous Paul Hess?
20          THE WITNESS: You are, sir.
21          THE COURT: Mr. Hess, I have
22 read so much about you. I am delighted to
23 meet you in person.
24          MS. O'DELL: Judge Schneider,
25 here is the issue that we're facing and I

Page 29

1 invite Mr. Placitella to add if I don't cover
2 something, but as you know, Mr. Hess is a fact
3 witness, he is not an expert, and he has done
4 work at MAS Lab for purposes of Dr. Longo
5 rendering his expert opinion.
6          He is being shown reports by
7 Dr. Longo and Rigler. He has not -- this
8 is -- he has no involvement in the preparation
9 of the reports. His work is an underlying
10 analyst and we object to Mr. Hess being
11 examined on the full scope of Dr. Longo's
12 reports, which are not his work.
13          And so we believe -- we just
14 got started a bit ago. We think this is going
15 to be sort of the mode of the deposition and
16 we need direction from the Court as to how
17 this should be approached.
18          MR. DUBIN: Just so I can --
19          MR. PLACITELLA: Could I
20 supplement that?
21          MS. O'DELL: Please.
22          MR. PLACITELLA: So my concern,
23 your Honor, is as follows. These are reports
24 from other cases. The witness either has
25 never seen them before or hasn't seen them for

8 (Pages 26 - 29)

Page 30

1 many years.
2         Questions are being asked about
3 these reports that we have not been supplied
4 in advance of the deposition. Sticking them
5 in the chat now on a 30-page report from
6 another case doesn't give counsel even an
7 opportunity to determine whether the questions
8 are taken out of context, are fair or even
9 relevant. So we're not even in a position to
10 phrase our objections appropriately.
11        If they wanted to ask questions
12 about these reports, they should have been
13 sent long in advance of the deposition and we
14 could have had a debate about it then, not
15 now, when now they are going to claim every
16 time Mr. Hess has to stop and look at the
17 report, that somehow that counts -- it doesn't
18 count on their time for completing this
19 deposition.
20        It's an unfair way to proceed.
21 It was never contemplated by the Court and I
22 am at a loss as to how to even address these
23 circumstances. I mean, this is a tenuous
24 deposition at best and now we're taking it
25 into a whole different realm, which is

Page 31

1 completely unfair to counsel and the witness.
2         MR. DUBIN: If I could briefly
3 respond. Your Honor, I haven't asked --
4         THE COURT: One second.
5         MR. DUBIN: Sure.
6         THE COURT: You represent the
7 defendants, I assume?
8         MR. DUBIN: Yeah.
9         THE COURT: Who are who?
10        MR. DUBIN: I am Morton Dubin.
11        THE COURT: With what firm?
12        MR. DUBIN: I am with King &
13 Spalding.
14        THE COURT: And Mr. Hess is
15 physically where?
16        MR. DUBIN: He is in Atlanta.
17        THE COURT: And is
18 Mr. Placitella and Ms. O'Dell, are they both
19 in their office or are they with Mr. Hess?
20        MS. O'DELL: I am with the
21 witness, Judge, in Atlanta.
22        THE COURT: Okay.
23        MS. O'DELL: Mr. Placitella is
24 in New Jersey.
25        THE COURT: Okay. All right.

Page 32

1 Counsel, go ahead. Now I know.
2         MR. DUBIN: So I haven't even
3 asked him a single question basically
4 substantively yet before they decided that
5 they needed to approach the Court. All I had
6 done was put up one report and then I was
7 trying to orient him on what samples we were
8 talking about and then I was going to ask
9 him -- because he did the PLM work for that
10 report -- and I was going to ask him about the
11 conclusions and the work that he did.
12        And I made the entire report
13 available for counsel and I even offered if
14 they wanted to go off record and have the
15 witness read the entire report if he felt it
16 was necessary, but I didn't even get to ask a
17 single question.
18        Of course, they don't -- they
19 didn't even wait to see what the examination
20 was about other than, "Do you see here? This
21 was about 72 samples of talc," and then they
22 objected and we got the deposition shut down.
23        So I don't really know what
24 their complaint is. I am making materials
25 available to him. I am asking him about the

Page 33

1 work that he personally did, not about
2 anything else in the report, and so I don't
3 see what the objection is. It's a legitimate
4 scope of inquiry.
5         THE COURT: Can I ask a
6 question? In the case, is there a deposition
7 protocol that requires the production
8 beforehand of exhibits that are going to be
9 shown to a witness?
10        MS. O'DELL: There is a
11 deposition protocol and, your Honor, I do
12 believe that we mainly follow that, just to be
13 clear, more for an expert witness. There has
14 been a three-day disclosure rule; that's not
15 been followed in the instance of Mr. Hess
16 since his deposition is a little bit more
17 unique.
18        And so, Judge, let me just also
19 make clear, you know, as you know, in the
20 first round in the multi-district litigation,
21 the expert report that was at issue was the
22 February 1, 2019 expert report involving
23 historical samples that tested for amphibole
24 asbestos; that's the report that was at issue
25 in the Daubert hearing.

9 (Pages 30 - 33)

Page 34

1 Dr. Longo has had a two-day
2 deposition on that report. Dr. Rigler was
3 examined. Dr. Longo was examined before Judge
4 Wolfson at the Daubert hearing and the Court
5 issued a ruling allowing the analysis from
6 that report.
7 What Mr. Dubin --
8 MR. DUBIN: If I can --
9 MS. O'DELL: -- Mr. Dubin put
10 up is the February 1, 2019 material, and as
11 you are so well aware, what's been at issue in
12 the proceedings since they have been restarted
13 in the MDL are new things and there are
14 reports that have been disclosed by Dr. Longo
15 that relate to the analysis of talc for
16 chrysotile involving PLM.
17 And that is -- for those
18 reports that have been disclosed, to the
19 degree Mr. Hess was involved and worked on the
20 underlying analysis, we understand the Court
21 has allowed this deposition and that we'll go
22 forward, but for the defendants to try to go
23 back, replow 2019 round in a report that's not
24 involved is not fair.
25 For them to inquire of things

Page 35

1 that he wasn't involved in, including the
2 actual text of the report, is not fair. His
3 work was the bench work and the
4 photomicrographs and to go beyond that, we
5 believe, is objectionable and we ask the Court
6 to not allow it.
7 THE COURT: Can I jump in here?
8 Because I am very familiar with the issues.
9 And the reason why leave was granted to the
10 defendants to take Mr. Hess' deposition was
11 based on the arguments that they made in their
12 briefs.
13 Ms. O'Dell is correct that the
14 subject matter of the deposition should only
15 be limited to what I call -- and I'm not quite
16 sure if the defendants used this word -- this
17 new method. And if I remember right, even in
18 my decision I set forth -- there was, like, a
19 date range, if I remember right. I don't have
20 it in front of me. It started in 2020 and
21 maybe went to 2024.
22 And I specifically remember
23 there was an exhibit that may have been
24 duplicated in different versions that set
25 forth precisely the tests that were at issue

Page 36

1 regarding this new method; that's the first
2 thing.
3 The second thing is, the
4 deposition was only limited to Mr. Hess'
5 personal involvement. Because the defendants
6 were making the argument -- not in these
7 words, but, in essence, that it was Mr. Hess
8 that was making these ultimate decisions and
9 not Dr. Longo.
10 So the questions have to be
11 limited to only what Mr. Hess did, his tests,
12 his personal observations. The deposition is
13 not to get Mr. Hess' opinion on what somebody
14 else did or what somebody else opines.
15 Mr. Hess is there to testify
16 about his firsthand personal knowledge about
17 these -- this new testing method; that -- that
18 is precisely why Mr. Hess' deposition was
19 permitted. It was not permitted to go over
20 ground that was covered previously in the
21 case, the TEM tests, if I am --
22 MR. DUBIN: Right.
23 THE COURT: -- right or any of
24 the tests before this new method.
25 And if I remember right, I am

Page 37

1 obviously aware that Judge Wolfson had
2 stricken some of the tests in the original
3 Daubert opinion, and I think that the argument
4 is going to be that with this new method, it
5 was not subject to the old order and,
6 presumably, it will be the subject of a new
7 Daubert order.
8 But those parameters of why
9 Mr. Hess' deposition was permitted, those
10 should be the parameters of this deposition.
11 I hope that helps.
12 MR. DUBIN: We don't disagree
13 with that at all. The report I am asking him
14 about is the first time that he is using this
15 specific method to examine Johnson & Johnson,
16 as I will show when I go to the report.
17 In that report he begins to use
18 1.550 oil for the first time, which is the way
19 he is looking for chrysotile. In that report
20 is the first time that he starts to do that
21 and look at Johnson & Johnson.
22 And so that was what I was
23 going to ask him about, is about his personal
24 work using that method at that time, which
25 leads then into the first reports for

10 (Pages 34 - 37)

Page 38

1 chrysotile.
2          And so this is all about that
3 topic. I am not going into the TEM work. I
4 am not going into the PLM work that he did for
5 amphibole.
6          I am just asking him about this
7 kind of analysis that is the subject of the
8 entire deposition and this report, but I
9 didn't even get to get a single question in
10 before we ended up having to call your Honor,
11 I suppose.
12          THE COURT: Counsel, what you
13 were going to ask Mr. Hess about, is that one
14 of the tests that was on that list that
15 hopefully you know what I was referring?
16          MR. DUBIN: Your Honor, I will
17 go ahead and just explain to everybody,
18 although I really feel like I should be able
19 to ask the witness these questions, but what
20 we're going to see is that at this point,
21 before -- so at some point the FDA finds by
22 TEM chrysotile in one bottle of Johnson &
23 Johnson and after that time MAS starts to
24 report chrysotile by PLM basically every time
25 they look at it.

Page 39

1          What we're going to see is in
2 this report they're -- it's before the FDA
3 finding, they are using the exact same
4 methodology to look at the talc, and they do
5 not report chrysotile.
6          THE COURT: Counsel, what I'm
7 just concerned about is, you can ask him about
8 the tests using the new method. You can't --
9 the purpose of the deposition is not to say,
10 Why did this person not find chrysotile and
11 you found chrysotile?
12          Ask him about his tests and
13 what he did and how he did it.
14          MR. DUBIN: He did the work on
15 both. I am asking about his work.
16          MS. O'DELL: Your Honor, we
17 would object. This is the 2019 report. It
18 was for amphiboles. Much of that work was not
19 done at MAS, it was done by another lab, and
20 so we object as that was fully covered by the
21 last proceedings.
22          For the new material, as the
23 Court has said, for his work, if they want to
24 ask him about it and ask him what oil he used,
25 that's fair game, but to go back and somehow

Page 40

1 lay this as a foundation from the prior report
2 when some of that work was not his first is
3 improper and we object to that. I mean, the
4 2019 report is off the table.
5          MR. DUBIN: I am only asking --
6          MR. PLACITELLA: I would just
7 add to that, to be fair to everyone, you know,
8 popping a report up that's X period of -- no
9 one has looked at for four or five years, you
10 know, in this context and start asking
11 questions, it's just not proper.
12          We have -- we can't -- we don't
13 know the context. He has taken little lines.
14 He has highlighted one line or two lines in a
15 report and then says, Well, we put the report
16 in chat. Go, have it.
17          Well, that's not fair. The
18 deposition today is supposed to be about the
19 report here at issue, nothing beyond that
20 report, and that's the -- I don't know what
21 else is coming; that's why we stopped it.
22          Are they going to pull out some
23 other report from some other case? I don't
24 know, but we've got to have some parameters of
25 what we're doing here.

Page 41

1          THE COURT: Counsel, I am
2 persuaded by plaintiffs' argument. Really,
3 this shouldn't be that difficult an issue.
4 The boundaries of this deposition were set
5 forth in the requests and my Order.
6          It's just about the tests that
7 he did, how he did it, his observations. He
8 is not there to answer questions about why did
9 they get the result in a 2019 test and a
10 different result in a later test; that's not
11 why he is there.
12          He is there to talk from his
13 personal observation about the new test;
14 that's it.
15          MR. DUBIN: But I just -- all I
16 am asking him about is his own work, doing it
17 the exact same way, why he came to a
18 conclusion -- different conclusion one time
19 versus the other, his own personal PLM work.
20          I am not asking him about
21 anybody else's work, asking him to offer
22 opinions about anybody else's work. I am just
23 asking him about what he did.
24          THE COURT: Counsel, if it's
25 not one of the tests on this exhibit list that

11 (Pages 38 - 41)

Page 42

1  I referred to -- I know I referred to it
2  during oral argument.  I don't recollect if I
3  referred to it in my decision.
4          If it's not one of those tests,
5  it's off limits.  That's not the purpose of
6  the deposition.
7          MR. DUBIN:  I am only asking
8  him about his PLM work in 1.550 and 1.560,
9  which is his chrysotile -- method for looking
10 for chrysotile, which is the subject of the
11 deposition.  I'm not asking anything about any
12 PLM work.
13         THE COURT:  Counsel, I don't
14 have that exhibit, that list in front of me,
15 but I have a feeling you know what I am
16 referring to, it would -- I believe it was an
17 exhibit to the two reports that the defendants
18 submitted.
19         And, you know, one of the
20 arguments for why the exception was denied was
21 because those experts prepared detailed
22 reports rebutting the plaintiffs' experts and
23 in those reports they attached as exhibits the
24 list of the samples that are at issue
25 regarding this new method.  That's it.  That's

Page 43

1  it.  Those are the tests at issue.
2          MR. DUBIN:  I understand that,
3  your Honor, and that's why as part of asking
4  about those conclusions, I need to understand
5  what changed between the two times he looked
6  at this with 1.550 oil to understand his
7  conclusions.
8          THE COURT:  Well, if you're
9  asking about that, my ruling would be that's
10 off limits; that's not the purpose of this
11 deposition, not to compare old tests to new
12 tests.
13         The purpose of this deposition
14 is to ask him about his personal observations
15 regarding the new test; that's what was in the
16 defendant's papers.  They didn't say anything
17 about asking him to compare old to new.
18         That's my ruling.  If the
19 defendants think the questioning is going out
20 of those boundaries, instruct the witness not
21 to answer.  We'll look at the transcript and
22 we'll make a ruling on a more fulsome record,
23 but I don't know what else I can say, Counsel.
24         It really should be a pretty
25 easy deposition.  You have the tests at issue.

Page 44

1  Mr. Hess is only going to testify about his
2  personal observations.  To me that's pretty --
3  the boundaries are pretty clear.  So I don't
4  know what else I can say.
5          MR. DUBIN:  I understand, your
6  Honor.  Again, I believe I am trying to stay
7  within that by asking him about his personal
8  observations of this material in 1.550 and
9  1.560 oil, but I understand.  I will skip this
10 report.
11         I would like to be able to ask
12 him about differences in his images.  Because
13 one of the big topics here is images.  If they
14 decide to try to shut it down later when I do
15 it, I guess we'll take it up then, but we'll
16 see.  I need to understand how -- what his
17 microscope setups are and whether he is
18 changing them and the like.
19         THE COURT:  As long as it's
20 limited to the specific tests at issue that
21 are on that exhibit list.  The exhibits are
22 attached to your expert reports, Counsel.  So
23 you should have those at your fingertips.
24         Those were the tests that were
25 in the motion that the argument was that new

Page 45

1  method was used and they found chrysotile
2  where they didn't previously find it; that's
3  the boundary of this deposition.  Okay.
4          So I am in a mediation today,
5  but if you need me, send me an e-mail or a
6  text, and when I am available, I will get back
7  on the Zoom.  Thank you, Counsel.
8          MS. O'DELL:  Thank you, your
9  Honor.
10         MR. LUDWIG:  Thank you, Judge.
11         MR. DUBIN:  So we'll keep that
12 as an exhibit, as a proffer for the record.
13         (Break held off the record.)
14         VIDEOGRAPHER:  The time is
15 10:17 a.m.  We are back on the record.
16 BY MR. DUBIN:
17   Q.   In terms of your background, when
18 did you start performing PLM dispersion
19 staining analysis?
20   A.   1989.
21   Q.   That was when you took the course at
22 McCrone?
23   A.   That is correct.
24   Q.   Can you tell me a little bit about
25 that course?  How long did it last?  What were

12 (Pages 42 - 45)

Page 46

1 you trained in?
2    A.   It lasted a week.
3    Q.   Okay.
4    A.   And we were trained to utilize the
5 dispersion staining method to identify the
6 various asbestos forms or minerals.
7         MR. DUBIN:  And if we can call
8 up Hess slide 2.  I will make a copy of it
9 exhibit 4.
10         (Exhibit 4 marked for
11 identification.)
12 BY MR. DUBIN:
13    Q.   And do you know what this is that
14 we're looking at here in the image?
15    A.   Well, it's stated on the matrix,
16 reference chrysotile.
17    Q.   And when you taught -- took the
18 course at McCrone, were you taught that
19 chrysotile should look magenta in parallel?
20    A.   We were.
21    Q.   And are you aware that McCrone has
22 studied different types of chrysotile,
23 including Calidria?
24         MR. LUDWIG:  Objection to form.
25         THE WITNESS:  I am not aware of

Page 47

1 what Dr. McCrone or what McCrone had studied.
2         MS. O'DELL:  (Inaudible.)
3         MR. DUBIN:  That would be
4 exhibit 4.
5         MS. O'DELL:  Would you, please,
6 download it in the chat?
7         MR. DUBIN:  Sure.  Just, Jake,
8 whenever we do exhibits, let's just put them
9 in chat.
10 BY MR. DUBIN:
11    Q.   And so we'll walk through just so we
12 can understand the basic process of dispersion
13 staining.
14         The first step after you have
15 put the slide -- prepared the slide and put it
16 on the microscope, the first step is for the
17 analyst to make a judgment about what color
18 they are seeing, right?
19    A.   Yes, sir.
20    Q.   Okay.  And then after you make a
21 judgment about what color you're seeing --
22         MR. DUBIN:  Jake, there is some
23 weird stuff on the screen.  Can you take that
24 off screen, please, or just put the slide
25 back?

Page 48

1         MR. KEESTER:  Sorry, Morty.
2 It's hard to print a single slide while
3 we're -- I'm showing it.
4         MR. DUBIN:  Okay.  Again, we'll
5 put them in chat so that you have them later,
6 but I don't want to take them off screen while
7 we're doing this.  It's a single slide.  You
8 can see it on the screen.
9 BY MR. DUBIN:
10    Q.   All right.  So --
11         MS. O'DELL:  We can't see it.
12 Mr. Hess would, please, request a copy.
13 BY MR. DUBIN:
14    Q.   The next step after you have made a
15 judgment about what color you're looking at is
16 to figure out what wavelength of light that
17 is, right?
18    A.   That is correct.
19    Q.   And then you use some tables to
20 convert that into a refractive index?
21    A.   That is correct.  We used Dr. Su's
22 tables.
23    Q.   And then, ultimately, those numbers
24 can be used to derive a birefringence number,
25 correct?

Page 49

1    A.   Yes, sir.
2    Q.   Okay.  And can you define for me
3 what an alpha refractive index is?
4    A.   That would be your length slow --
5 length fast direction.
6    Q.   Okay.  How about a gamma refractive
7 index?  Do you know what a gamma refractive
8 index is?
9    A.   That would be your length slow
10 direction.  It's -- normally for chrysotile,
11 that would be parallel.
12    Q.   Okay.  Can your alpha refractive
13 index ever be higher than your gamma
14 refractive index?
15    A.   Only if a mineral is negative in
16 elongation.
17         THE COURT REPORTER:  Can you,
18 please, repeat the answer.
19         THE WITNESS:  Only if the
20 mineral is negative in elongation.
21 BY MR. DUBIN:
22    Q.   All right.  What does the refractive
23 index of a mineral measure?
24    A.   It measures, basically, the
25 difference in the light path as it passes

13 (Pages 46 - 49)

1 through the oil and particle edge. They
2 interface.
3    Q.    What properties of a mineral
4 determine its refractive index?
5    A.    Generally, the chemical, density.
6    Q.    Anything else?
7         MR. LUDWIG:  Objection to form.
8         THE WITNESS:  I don't recall
9 off the top of my head.
10 BY MR. DUBIN:
11    Q.    What is birefringence?
12    A.    Birefringence is the difference
13 between the mineral's highest refractive
14 indices and its lowest refractive indices.
15    Q.    Okay.  What do you mean by -- what
16 do you mean by highest refractive indices,
17 first?
18    A.    The highest refractive index for the
19 mineral.
20    Q.    And so if a mineral is displaying
21 more than one color, how do you determine what
22 the highest refractive index is?
23         MR. LUDWIG:  Objection to form.
24         THE WITNESS:  One would
25 normally look for the wavelength that would be

1 the highest of the mineral in the gamma
2 direction and --
3 BY MR. DUBIN:
4    Q.    And -- sorry.  Go ahead.
5    A.    And then apply that to the charts.
6    Q.    Okay.  How do you -- and then how do
7 you determine that the lowest refractive index
8 is if a mineral is displaying more than one
9 color?
10    A.    You put it into the alpha direction.
11 For chrysotile, that would be perpendicular.
12    Q.    Is it correct that the birefringence
13 is the quantitative expression of the maximum
14 difference in refractive index due to double
15 refraction?
16         MR. LUDWIG:  Objection to form.
17         THE WITNESS:  That is my
18 understanding.
19 BY MR. DUBIN:
20    Q.    And what do you understand maximum
21 difference in that context to mean?
22    A.    For any particular particle, it
23 would be what my examination leads me to
24 determine to be the refractive indices in most
25 gamma and alpha direction.

1    Q.    But is it the difference between the
2 highest and the lowest refractive indices?  Is
3 that what maximum difference means?
4    A.    Can you rephrase that just a little
5 bit?
6    Q.    Sure.  I mean, if you get -- if
7 you're saying that alpha and gamma are defined
8 by highest and lowest refractive indices, the
9 maximum difference means the difference
10 between that highest and that lowest
11 refractive index, right?
12    A.    That would be the way I would see
13 it, yes.
14    Q.    Okay.  And do you know -- if we go
15 back to that slide that was marked as
16 exhibit 4.
17         MR. DUBIN:  It could also be
18 slide 10.  Whatever makes it easier for you,
19 Jake, to call it up.
20 BY MR. DUBIN:
21    Q.    Do you know what causes chrysotile
22 to appear magenta in parallel?
23    A.    It's the angle of the fraction as
24 the light passes up at the oil-particle
25 interface.

1    Q.    And what creates the color magenta?
2 What creates -- what causes you to see the
3 color magenta specifically?
4         MS. O'DELL:  I object to the
5 question to the degree it calls for an expert
6 opinion and it relates not to the testing
7 analysis that Mr. Hess has done on a specific
8 sample, which is the purpose of this
9 deposition.  Asking expert opinion is not the
10 purpose of this deposition.
11         MR. LUDWIG:  The Court has
12 already ordered on that.  So this doesn't have
13 anything to do with the specific exam or the
14 scope on which the Court just advised the
15 parties to stay within.  I am objecting to the
16 form of the question.
17         MR. DUBIN:  I will lay a
18 further foundation for it.
19 BY MR. DUBIN:
20    Q.    We are going to be talking about
21 your work identifying chrysotile in Johnson &
22 Johnson but, typically, when MAS was
23 identifying chrysotile in Johnson & Johnson,
24 it was -- what was being called chrysotile was
25 yellow in parallel, right?

14 (Pages 50 - 53)

1          MR. LUDWIG: Same objection.
2          That is exactly what the Court
3  ruled upon. So objection.
4          MR. DUBIN: No. Those are the
5  reports at issue, which the Court said we
6  could ask about.
7          MS. O'DELL: And if you would
8  like to ask Mr. Hess about specific reports,
9  he is here and prepared to respond to your
10  questions, but asking for expert opinion is
11  beyond the scope of what Judge Schneider
12  established for this deposition and we'll
13  instruct the witness not to answer.
14          MR. LUDWIG: I instruct the
15  witness not to answer that question.
16  BY MR. DUBIN:
17    Q.   In your reports identifying
18  chrysotile in Johnson & Johnson, what color
19  are the particles that you're calling
20  chrysotile typically in parallel?
21          MR. LUDWIG: Objection to form.
22          THE WITNESS: The colors that I
23  utilize to determine the wavelength are at the
24  edge of the particle and not in the center.
25  BY MR. DUBIN:

1    Q.   Okay. What color are the particles?
2          MS. O'DELL: Objection to the
3  form.
4          What particle? What --
5  BY MR. DUBIN:
6    Q.   The particle that you're calling
7  chrysotile in the reports that you're talking
8  about today?
9          MR. LUDWIG: Is there a
10  specific report you want to show him? This
11  right here, it looks like an exhibit created
12  by defense counsel. So that's not -- he is
13  not here to opine about this exhibit that
14  looks like a PowerPoint by someone else.
15          This is not a --
16          MR. DUBIN: This is enough
17  speaking objections. You can make your
18  objections if you want to make your
19  objections. If you want to instruct your
20  witness not to answer the question, then you
21  can do that, but no more speaking objections.
22  It's gone way too far.
23          MR. LUDWIG: Based on the scope
24  that the Judge had lined out, I am instructing
25  him not to answer that question.

1          MR. DUBIN: All right. Let's
2  take this down. We'll come back to it when we
3  show your reports.
4  BY MR. DUBIN:
5    Q.   What color -- what is the refractive
6  index of talc?
7    A.   It has wide -- a large
8  birefringence, but normally it will be
9  somewhere in the range of around 1.540 to
10  1.605, based on the experience of what I have
11  seen.
12    Q.   How about a talc plate, a flat talc
13  plate? What is -- what is the refractive
14  index of a talc plate?
15          MS. O'DELL: Object to the
16  form.
17          THE WITNESS: I don't believe
18  the talc plate has any birefringence, but the
19  edges that I have seen have been blue in 1.55,
20  and have been yellowish in 1.605.
21  BY MR. DUBIN:
22    Q.   Did the CSDS colors associated with
23  talc itself in 1.550 oil include the color
24  red?
25          MS. O'DELL: Would you repeat

1  the question? I missed the first part.
2  BY MR. DUBIN:
3    Q.   Do the central stop dispersion
4  staining colors of talc plates themselves in
5  1.550 oil include the color red?
6          MS. O'DELL: Object to the
7  form.
8          MR. LUDWIG: Same objection as
9  before.
10          I instruct you not to answer.
11          That's -- that calls for an
12  expert opinion.
13          MR. DUBIN: I am asking his
14  understanding and it relates to this work that
15  he is doing.
16  BY MR. DUBIN:
17    Q.   Did it -- does it include red?
18          MS. O'DELL: If you have a
19  specific particle you would like to ask him
20  about, that's within the scope of the order,
21  but to ask it in isolation is beyond the scope
22  and seeks an expert opinion.
23          MR. DUBIN: Fine --
24          MR. LUDWIG: Join.
25          MR. DUBIN: -- when you get to

15 (Pages 54 - 57)

Page 58

1 the specific color, the specific reports.
2 BY MR. DUBIN:
3     Q.   So let's look at one of your reports
4 just so we can understand, again, what color
5 talc should be.  So we're now going to be
6 looking at an image from your -- from the
7 September 16, 2020 report on Chinese talc
8 research samples where you were the PLM
9 analyst.
10         MR. DUBIN:  So can we make that
11 image exhibit 5.
12         (Exhibit 5 marked for
13     identification.)
14         MS. O'DELL:  So, first, object
15 to a reference that those reports are his
16 report.  Those reports are reports from
17 Dr. Longo, first.
18         Second, if you're going to ask
19 him a question about a report, it needs to be
20 put in the chat and the specific page that
21 you're referring to needs to be identified so
22 he can see it in context.
23         MR. DUBIN:  And I am going to
24 identify the specific page that we're talking
25 about.  So let's put it in chat and then we

Page 59

1 can call it up, okay, and then we're going to
2 go to page 3 of this.
3         MS. O'DELL:  And if you would
4 identify -- please, just if you'll go back to
5 page 1.  Because I am not seeing it in the
6 chat yet.
7         MR. LUDWIG:  It's in the chat
8 here now.
9         MR. DUBIN:  It is in the chat.
10         MS. O'DELL:  Okay.
11         MR. DUBIN:  296, actually, is
12 the image and we can rotate that so we can see
13 it better.
14         MS. O'DELL:  And what's -- I'm
15 sorry, Morty.  I couldn't see it.  I was too
16 slow trying to see.  I see here.  Just a
17 moment.  Let me make sure that this is
18 actually a report at issue in the MDL.
19         This is not one of the reports
20 that's been disclosed in the MDL and so we
21 would object to questioning based on that.
22         MR. LUDWIG:  If it's not a
23 report disclosed in the MDL and it's not
24 subject to the Judge's scope, then I am
25 instructing the witness not to answer.  I

Page 60

1 don't know if it's his report or not.  I trust
2 Ms. O'Dell.
3         So you're instructed not to
4 answer.
5         MR. DUBIN:  Okay.  We'll
6 double-check what you're -- the list that went
7 in, but I believe that the results in this are
8 included in the reports, but we'll -- I'll
9 hold off on this image until after a break so
10 that we don't have to spend time arguing it.
11 BY MR. DUBIN:
12     Q.   Let's look at another image first,
13 but before I get to more images, I want to
14 stop and ask you a little bit about your
15 microscopes, okay, and what microscopes you
16 were using and how you set them up.
17         At some point initially were
18 you using an Olympus microscope for -- to look
19 at Johnson & Johnson for chrysotile?
20     A.   Olympus BH2.
21     Q.   And that -- so can you repeat the
22 model number for me?  BX?
23     A.   BH, bravo --
24     Q.   Okay.  BH2.  Okay.  And those
25 microscopes had tungsten lightbulbs?

Page 61

1     A.   Yes, sir.
2     Q.   And then at some point you switched
3 over to Leica microscopes; is that right?
4     A.   That is correct.
5     Q.   And what was the Leica model number?
6     A.   As I recall, it's the 2700P.
7     Q.   Do you recall approximately when you
8 changed over microscopes?
9     A.   It was during the early part of
10 2021, I believe.
11     Q.   And just so we understand basically
12 how it operated, how was illumination
13 controlled on the Olympus PLM?
14     A.   By individual controls on the side
15 and to bring up as much light as possible.
16     Q.   Okay.  So was it a dial?  Was it a
17 switch?  How did you adjust illumination?
18     A.   On the lamp itself, there was a
19 little dial on the side.
20     Q.   Okay.  And what -- did MAS have any
21 protocols for how illumination should be set
22 on the Olympus microscope when doing the
23 analysis?
24     A.   I would always set it myself to the
25 highest illumination.

16 (Pages 58 - 61)

Page 62

1    Q.   Okay.  As a PLM analyst, how do you
2  tell if an image is appropriately illuminated?
3    A.   Well, if the scope had capability,
4  we use Kohler illumination, but the best way
5  to get the most illumination out of any type
6  of scope is to have all the different parts
7  align and centered.
8    Q.   Okay.  And is it important for a PLM
9  analyst to be able to see all the particles in
10  the field of view clearly?
11    A.   Through the ocular, yes.
12    Q.   When you were doing your analysis on
13  the Olympus microscope and you were looking
14  for the colors of the particle, were you
15  typically doing that by assessing it through
16  the eyepiece of the microscope or by looking
17  at the -- or looking at a screen?
18    A.   Through the microscope.
19    Q.   And did the -- what is white
20  balancing?
21    A.   Basically, it takes the program that
22  you're using for the graphics and allows it to
23  adjust to the pure white light.
24    Q.   And did the Olympus come with any
25  filters, like a daylight filter or blue

Page 63

1  filter, to perform white balancing with?
2    A.   It had a -- we had a blue diffusion,
3  but there was nothing in -- to do white
4  balance, you have to have a white background.
5    Q.   So it came with a blue light or
6  daylight filter?
7    A.   I would just remove the diffuser.
8    Q.   I am sorry.  I don't understand.
9         Would -- did the microscope
10  come with or did you have a blue light or
11  daylight filter on the Olympus?
12    A.   I don't recall.
13    Q.   Do you know whether you used a blue
14  light or a daylight filter when performing
15  analysis for chrysotile in Johnson & Johnson
16  with the Olympus microscope?
17         MR. LUDWIG:  Objection to form.
18         Is there are a specific test
19  you're asking about?  It's my understanding
20  there was lots of tests.
21         So I am going to object to the
22  form.  Same scope issue.
23         MR. DUBIN:  It's the reports at
24  issue.  I'm asking about his microscope setup
25  for the reports at issue.

Page 64

1         MR. LUDWIG:  Is there a
2  specific report you're asking about?
3         MR. DUBIN:  There are a set of
4  reports that are done on an Olympus
5  microscope.  There are then a set of reports
6  that are done on the Leica microscope.
7         I am asking about the ones he
8  did on Olympus.  If we want -- if we need to
9  call up an example, I am happy to do that.  So
10  we'll call up an example of that.
11         We can go to the Zimmerman
12  report and that will be exhibit 6 and so let's
13  make that exhibit 6.  For internal reference
14  it's CX-6.  It's -- this is an image from the
15  February 24, 2020 analysis of Johnson &
16  Johnson.  We can put it in chat and call it
17  up.
18         (Exhibit 6 marked for
19    identification.)
20  BY MR. DUBIN:
21    Q.   Okay.  And I want to look at an
22  image there.  We can go to, I guess, 39 of the
23  report.  I am just going to -- okay.  For
24  example, this was in 2020.
25         So this would be on the Olympus

Page 65

1  microscope, correct?
2    A.   That is correct.
3    Q.   Okay.  So now we have an image.
4  We're talking about a specific report.
5         When you were doing these
6  analyses for Johnson & Johnson, were you using
7  a blue light or daylight filter?
8    A.   I don't recall if we ever had any
9  specific daylight or blue filters for the
10  Olympus.  The only thing blue was the
11  diffuser.
12         MS. O'DELL:  What is your other
13  report?
14         MR. DUBIN:  So this is -- this
15  was page 36, I think.
16  BY MR. DUBIN:
17    Q.   All right.  We'll come back to that
18  in a bit.
19         Do you know what the purpose is
20  of a blue light or a daylight filter?
21         MS. O'DELL:  Object to the
22  form.
23         MR. LUDWIG:  Object to the
24  form, yeah.  It calls for expert testimony.
25         I instruct you not to answer

17 (Pages 62 - 65)

Page 66

1 that question.
2         MR. DUBIN:  You're instructing
3 him not to answer?  I am asking him about the
4 work he did, how he set up his microscope, and
5 what filters he was using and you're
6 instructing him not to answer that?
7         MS. O'DELL:  That was not your
8 question.
9         MR. DUBIN:  Well, I just asked
10 him about whether it had a blue light filter
11 and whether he was using it and I am asking
12 him now what his understanding of the purpose
13 of that type of filter is.  Are you
14 instructing him not to answer that question?
15        MS. O'DELL:  He is here to --
16 he is here to testify to what he did, which
17 he -- the equipment he used, which he has been
18 responding to those questions.
19        Understanding about certain
20 methodologies, giving his opinion about
21 certain methodologies is beyond the scope of
22 what Judge Schneider has ordered.
23        MR. DUBIN:  Are you instructing
24 him not to answer --
25        MR. LUDWIG:  The objection --

Page 67

1         MR. DUBIN:  -- a simple
2 question about the purpose of a blue light
3 filter?  Are you instructing him not to
4 answer?
5         MR. LUDWIG:  Yes.
6         MR. DUBIN:  Okay.
7         MR. LUDWIG:  I believe that is
8 outside the scope of what the Judge just
9 said --
10        MR. DUBIN:  I really don't --
11 if you instruct him not to answer, I don't
12 need to hear a long speaking objection in
13 addition.
14        MR. LUDWIG:  Sure.  Fair
15 enough.
16        MS. O'DELL:  And just for the
17 record, Morty -- and I think it's just a page
18 number issue -- you identified what's on the
19 screen as page 36 of the report.  I am
20 assuming you mean 36 -- page 36 in the PDF?
21        MR. KEESTER:  It's 39 in the
22 PDF.
23        MR. DUBIN:  Thirty-nine.
24 Sorry.
25        MS. O'DELL:  Okay.  Let me just

Page 68

1 get there.  Okay.  Thank you.
2 BY MR. DUBIN:
3     Q.   Do you know how looking at an image
4 to tell whether a blue light filter or
5 daylight filter is being used?
6     A.   I don't recall ever dealing with
7 them.
8     Q.   Okay.  How was focus adjusted on the
9 Olympus microscope?
10    A.   Focus would be adjusted using the
11 fine focus knob.
12    Q.   Okay.  I want to show you another
13 image and ask you if you can tell me whether a
14 blue light filter is being used or not.
15        MR. DUBIN:  It will be
16 exhibit -- what number are we on?  We are now
17 on six?
18        THE COURT REPORTER:  Seven.
19        MR. DUBIN:  And that is --
20        THE COURT REPORTER:  You're on
21 exhibit 7, I believe.
22        MR. DUBIN:  Exhibit 7.  Okay.
23 That is CX-11A to call it up and if you could
24 just go to page 22 of it and put it in chat.
25        MS. O'DELL:  Mr. Hess, just

Page 69

1 give us a moment to see what's going to be put
2 on the screen and what the report is.
3         (Exhibit 7 marked for
4     identification.)
5 BY MR. DUBIN:
6     Q.   Page 22, can you tell me if a blue
7 light or daylight filter is being used on this
8 image?
9         MR. LUDWIG:  Objection --
10 objection.  This, once again, calls for expert
11 opinion, which is outside the scope of the
12 purpose of this deposition as instructed by
13 the Judge.
14        MR. DUBIN:  Are you instructing
15 him not to answer the question?
16        MR. LUDWIG:  I am instructing
17 him not to answer the question.
18        MS. O'DELL:  Yes.  This is not
19 a document that's been disclosed in the MDL.
20 It's a report for Dr. Longo.  It's analysis of
21 ceramic slip clay for something else that's
22 not related and we object to the use of this
23 exhibit.
24        MR. DUBIN:  Okay.  Can we call
25 up -- we'll make the next exhibit in order

18 (Pages 66 - 69)

Page 70

1 Hess slide 20.
2          THE COURT REPORTER:  This is
3 exhibit 8.
4          MR. DUBIN:  That's exhibit 8.
5 Can we call that up, Jake?
6          (Exhibit 8 marked for
7    identification.)
8 BY MR. DUBIN:
9    Q.  I am putting up the image that I
10 showed you before, as well as the image from
11 Zimmerman that I showed you before.  These are
12 both analyses that you performed.
13          Can you tell me why the color
14 of the talc is different in the two images?
15          MS. O'DELL:  We object to the
16 use of this document.  First, Vanderbilt is
17 not at issue in this case, it's not a report
18 that's at issue in this case.  We object to
19 the use of that image.
20          To the degree you want to have
21 him -- ask him about the Zimmerman report.
22 You had it up.  He is welcome to answer
23 questions, but we object to the use of this
24 defense created exhibit.
25          MR. LUDWIG:  And I am going to

Page 71

1 join and I am going to instruct him not to
2 answer.
3          Once again, you're getting into
4 expert opinion, which is outside the scope of
5 what the Judge instructed this witness.
6          MR. DUBIN:  Was your -- okay.
7 So you're instructing him not to answer.  I am
8 going to ask another question.  If you
9 instruct him not to answer, then so be it.
10 BY MR. DUBIN:
11    Q.  But was the microscope set up
12 differently in these two analyses?  Can you
13 tell by looking at the images whether the
14 microscope was set up differently in the two
15 analyses?
16          MR. LUDWIG:  Same objection.
17          MS. O'DELL:  Please put the
18 exhibit in the chat.
19          MR. DUBIN:  Are you instructing
20 him not to answer?
21          MR. LUDWIG:  Yes.
22          MR. DUBIN:  And if -- can you
23 leave it back up, Jake?  What's going on?  I
24 am not done yet.  Can you put that back up,
25 Jake?  Thank you.

Page 72

1          And if I asked you about the
2 differences in illumination in these two
3 images, are you going to instruct your witness
4 not to answer that also?
5          MR. LUDWIG:  Yes.
6          MS. O'DELL:  And, again -- and,
7 Jake, I know you have a lot going on, but if
8 you would put that in the chat, please.
9 BY MR. DUBIN:
10    Q.  How are your images being taken on
11 the Olympus?  How are the images being taken?
12    A.  It was done using an AmScope camera
13 and an AmScope program.
14    Q.  Okay.  Were there any specific
15 settings that you had on the camera for
16 purposes of taking the images?
17    A.  I don't recall everything.
18    Q.  Are you familiar -- you're familiar
19 with ISO 22262-1?
20    A.  Familiar.
21    Q.  Do you know whether it says anything
22 about using blue or daylight filters?
23          MS. O'DELL:  Object to the
24 form; calls for expert opinion; beyond the
25 scope of the work that Mr. Hess did in the

Page 73

1 MDL; and that's my objection.
2          Counsel can decide whether to
3 instruct him not to answer.
4          MR. LUDWIG:  I am instructing
5 you not to answer that.
6 BY MR. DUBIN:
7    Q.  Okay.  Let's talk about your Leica
8 microscope setup.
9          First, how was illumination
10 adjusted on the Leica microscope?
11    A.  It had a lamp knob on the side,
12 which we could bring up full illumination.
13    Q.  Was it a dial or was it -- was it a
14 switch?  How did the illumination work?
15    A.  It was a dial.
16    Q.  And what -- if you turn that dial,
17 if you kept turning it, would it stop at some
18 point or could you continue to turn it and
19 turn it?
20    A.  I could continue to turn it.
21    Q.  Okay.  So how did you set the
22 brightness on the Leica?
23    A.  By observation through the
24 microscope itself to the brightest point
25 available.

19 (Pages 70 - 73)

Page 74

1    Q.    So you -- did you always keep it at
2    the brightest point available?
3    A.    Yes, sir.
4    Q.    Okay.  And did the Leica microscope
5    come with any filters?
6    A.    The only filter I'm aware of is the
7    530 nanometer plate.
8    Q.    Did it have a daylight filter
9    switch?
10   A.    Not that I am aware of.
11         MR. DUBIN:  Let's make exhibit
12   9 Hess slide 22 and we can call that up.
13         (Exhibit 9 marked for
14    identification.)
15   BY MR. DUBIN:
16   Q.    Is this -- does this look familiar
17   to you as the Leica microscope that you were
18   using?
19   A.    It looks familiar.
20   Q.    Do you recall the switches that we
21   see here:  Daylight filter switch, neutral
22   density filter switch?
23   A.    Yes.
24   Q.    Okay.  Do you know whether your --
25   when you started using the Leica microscope,

Page 75

1    whether your daylight filter switch was in an
2    "on" or "off" position?
3    A.    I don't recall today.
4    Q.    All right.  Are you familiar with
5    what reference talc looks like from the USP
6    documents?
7         MR. LUDWIG:  Objection; calls
8    for expert opinion.  I am instructing him not
9    to answer.
10        MS. O'DELL:  Join.
11        MR. DUBIN:  Okay.  Well,
12   just -- we'll see.  You may instruct him not
13   to answer again, but I am going to ask it.
14        If we can put Hess slide 24 as
15   the next exhibit.
16        MS. O'DELL:  We have not gotten
17   the last exhibit in the chat yet.  So, please,
18   if we can just pause and take the time and put
19   that in the chat?  Thank you.
20        MR. KEESTER:  I'm sorry, Morty.
21   What slide are we doing?
22        MR. DUBIN:  Twenty-four.
23        MR. LUDWIG:  Is slide 24
24   exhibit 9 or is slide 24 exhibit 10?  I'm
25   sorry.

Page 76

1         MR. DUBIN:  Exhibit 10.
2         (Exhibit 10 marked for
3    identification.)
4    BY MR. DUBIN:
5    Q.    Do you know why your images taken on
6    the Olympus microscope of talc are more orange
7    than reference talc images?
8         MS. O'DELL:  I object to the
9    use of this exhibit.  It's unclear if it came
10   from a report that's at issue in this
11   deposition, it's unclear if it's -- if it's
12   Mr. Hess' work, and we object to its use.
13        MR. LUDWIG:  And I will join.
14   It outside the scope of the parameter of the
15   deposition.  I am instructing Mr. Hess not to
16   answer that question.
17        MR. DUBIN:  Okay.
18   BY MR. DUBIN:
19   Q.    Let's, again, go to your Zimmerman
20   report.  We have already marked that as an
21   exhibit.  We can call it back up, CX-6.  So we
22   have looked at this already.  Let's go back to
23   that image, starting at page 39.
24        So this is something that
25   you're calling chrysotile in parallel in

Page 77

1    1.550.
2         What color is that?
3         MS. O'DELL:  If you need to see
4    it and see it more closely, Mr. Hess, please
5    let us know that.
6         And if there is -- if there is
7    a specific structure you're referring to that
8    you can direct Mr. Hess?
9         MR. DUBIN:  Right.
10   BY MR. DUBIN:
11   Q.    The one with the micron bar under it
12   is the one that they are calling chrysotile.
13        What color is it?
14        MR. LUDWIG:  Can I have that
15   question reread, please?
16        THE COURT REPORTER:  One
17   moment.
18        "QUESTION:  So this is
19    something that you're calling chrysotile
20    in parallel in 1.550.
21        "What color is that?"
22        MR. LUDWIG:  I am going to
23   object once again.  It's calling for an expert
24   opinion.
25        MR. DUBIN:  This is -- I am

20 (Pages 74 - 77)

Page 78

1 asking him about his reports that are at issue
2 in this case and asking him what color that he
3 is calling particles and that is exactly in
4 the scope of the deposition.
5          So unless you're instructing
6 him not to answer that as well, my question
7 stands.
8          MR. LUDWIG: I instruct him not
9 to answer that question.
10          MR. DUBIN: Okay. So now
11 you're instructing the witness not to answer
12 questions even about the specific reports that
13 he was -- that we were permitted to depose him
14 on.
15          Is that my understanding?
16          MS. O'DELL: So would you
17 repeat your question, please?
18          MR. DUBIN: Oh, my goodness.
19 What color is the particle that you're calling
20 chrysotile here?
21          MR. LUDWIG: I am standing by
22 my objection. I am instructing him not to
23 answer.
24          It goes to -- you're asking him
25 to opine as to the color. The color is on the

Page 79

1 screen and it is part of an expert report
2 prepared by MAS and you're taking it out of
3 context.
4          So I am going to instruct you
5 not to answer.
6          If you want to ask him how he
7 developed the color, that's what the Judge
8 said, but --
9          MR. DUBIN: (Inaudible.)
10          MR. LUDWIG: -- his personal
11 involvement.
12 BY MR. DUBIN:
13     Q.   You are the analyst who did this
14 work for the Zimmerman report and we can go
15 through your PLM -- the PLM sheets.
16          You did this analysis, right?
17          MR. LUDWIG: Okay. That's
18 fine. Let's do that.
19 BY MR. DUBIN:
20     Q.   You did this analysis? These are
21 your PLM images, correct, Mr. Hess?
22     A.   It is.
23     Q.   So I'm asking you what color did you
24 assess this particle as?
25     A.   Could you zoom in on the particle?

Page 80

1     Q.   We can zoom more in.
2     A.   The center part of it is a golden
3 yellow, but I cannot determine the edges,
4 which is where I need to look.
5     Q.   Okay. Well, we'll go over this edge
6 effect, but you can agree that this is not --
7 this does not look like reference chrysotile,
8 correct?
9          MS. O'DELL: Object to the
10 form.
11          MR. LUDWIG: Same objection.
12          THE WITNESS: The center of the
13 particle is not what you would usually call.
14 BY MR. DUBIN:
15     Q.   And -- sorry. And you see that
16 there are rounded structures in this image,
17 right?
18     A.   There are.
19     Q.   Those are talc?
20     A.   Some may be.
21     Q.   Are they the same color as the
22 particle that you're calling chrysotile?
23          MS. O'DELL: Object to the
24 form.
25          THE WITNESS: It is, but I --

Page 81

1 the other particle colors, without being able
2 to see the true edges of the particle in
3 question --
4 BY MR. DUBIN:
5     Q.   Okay. We'll talk about edges --
6          MS. O'DELL: Excuse me, Morty.
7 I don't believe you could hear. He is not
8 finished with his answer.
9 BY MR. DUBIN:
10     Q.   Go ahead.
11     A.   -- I cannot comment.
12     Q.   We'll talk about edges later.
13          Have you seen any PLM work of
14 Johnson & Johnson done by any other experts?
15     A.   I don't recall.
16          MR. DUBIN: Okay. Let's put up
17 Hess slide 25 as exhibit 11.
18          (Exhibit 11 marked for
19     identification.)
20 BY MR. DUBIN:
21     Q.   We're looking at images of PLM --
22 and I will mark the entire report also from
23 Mr. Poye and from you -- both from on talcs.
24          Do you have any understanding
25 why the images look so different?

21 (Pages 78 - 81)

Page 82

1    MR. LUDWIG: Objection to form;
2 that goes into expert testimony and you made
3 your question -- this appears to be a defense
4 exhibit, I guess, comparing two different
5 samples. It is not a specific report from
6 MAS.
7    So I am instructing the witness
8 not to answer. This calls for expert opinion,
9 outside the scope of his testimony.
10    MS. O'DELL: Join.
11    MR. DUBIN: So the whole -- so
12 that we have the whole report in the record,
13 let's mark CX-53 as exhibit 11.
14    MS. O'DELL: Please put the
15 slide in the chat screen, Jake. Thank you.
16    THE COURT REPORTER: I just
17 want to confirm. Exhibit 11 was slide 25.
18 Are we now marking the whole report?
19    MR. DUBIN: Yeah, we're going
20 to now mark the whole report as exhibit 11.
21    MS. O'DELL: And we have --
22 since the --
23    MR. DUBIN: I am just marking
24 it for the record. I understand you have
25 objected to my asking him about it.

Page 83

1    MS. O'DELL: Understood, but is
2 the report going to be exhibit 12 and the
3 slide is going to be exhibit 11?
4    MR. DUBIN: I thought the
5 report was 11, but maybe I miscounted.
6    MR. LUDWIG: Exhibit 11 was the
7 slide and then exhibit 12 was going to be the
8 full report, if that's what you want to do.
9    I'm sorry. I am not trying to
10 step on your toes. I am trying to be helpful
11 in this.
12    MR. DUBIN: If the slide was
13 not marked -- I thought that was exhibit 10,
14 but if it's not marked, that's fine. I can
15 make it exhibit 12.
16    THE COURT REPORTER: This is
17 the court reporter. We have slide 25 as
18 exhibit 11. We have the report as exhibit 12.
19    MR. DUBIN: Okay.
20    MS. O'DELL: Thank you.
21    (Exhibit 12 marked for
22    identification.)
23 BY MR. DUBIN:
24    Q. All right. You indicated that one
25 of the things that you reviewed in preparation

Page 84

1 for your deposition today was some material
2 from Dr. Su.
3    What did you review?
4    A. I reviewed primarily the -- all the
5 images that he had put in the comments. For
6 lack of a better way to put it, the slide
7 show.
8    Q. Okay. Have you reviewed his
9 affidavit entitled: Review of Dr. Longo's PLM
10 Methods for the Identification of Chrysotile?
11    A. I don't recall that one.
12    Q. Okay. What, if any, comments do you
13 have on the slides that you reviewed from
14 Dr. Su?
15    A. Well --
16    MS. O'DELL: Object to form.
17    MR. LUDWIG: Object to the
18 form.
19    MS. O'DELL: Calls for expert
20 opinion. It's beyond the scope of this
21 deposition.
22    MR. DUBIN: Are you instructing
23 him not to answer?
24    MR. LUDWIG: I am instructing
25 him not to answer.

Page 85

1 BY MR. DUBIN:
2    Q. You also indicated you reviewed some
3 materials from Dr. Wylie?
4    MS. O'DELL: Same.
5 BY MR. DUBIN:
6    Q. What did you review?
7    A. The report that -- I don't recall
8 the name of the report, but I believe it was
9 her most recent report.
10    Q. Okay. Do you have any comments on
11 the -- on her review of your work?
12    MR. LUDWIG: Same objection.
13    I instruct him not to answer.
14 He is not here to provide criticisms of
15 Dr. Wylie. The Court made it very clear, the
16 scope of the testimony.
17    MS. O'DELL: Join.
18    MR. DUBIN: These are all
19 related to his work that is the subject of
20 this deposition, but if you're instructing him
21 not to answer, then that will be an
22 instruction. We'll take it up at some point.
23    Because we're clearly going to
24 have to go back to the drawing board about the
25 way that these objections are being made, but

22 (Pages 82 - 85)

Page 86

1  if you're instructing him not to answer, but
2  my proffer is that they are all about the
3  reports at issue in this case.
4         MS. O'DELL:  Mr. Hess is here
5  today to answer questions regarding his
6  reports and he has answered your questions
7  about those.  He is not here to offer expert
8  opinion, criticism, thoughts, et cetera, about
9  defense or expert witnesses.
10        MR. DUBIN:  Okay.
11 BY MR. DUBIN:
12   Q.   In terms of illumination, I want to
13 look at another report just quickly, your
14 report and your analysis.  It will be exhibit
15 13.  It's CX-28 is the internal reference and
16 it's dated 4/13/2021.
17        MR. DUBIN:  If we could put it
18 in chat and then call it up.
19        MS. O'DELL:  Chris, you put a
20 comment in chat.  Did you have an objection?
21 We're not hearing you if you're making an
22 objection.
23        MR. PLACITELLA:  Well, my
24 objection is that it seems like it's
25 repeatedly -- documents are repeatedly being

Page 87

1  put up in contravention of the Court's Order
2  and we're here to try to get through this
3  deposition and the purposes of trying to make
4  a record.
5         I mean, this is exactly what
6  the Judge said not to do --
7         MR. DUBIN:  Okay.
8         MR. PLACITELLA:  -- and you
9  keep doing it.
10        MR. DUBIN:  I completely
11 disagree with you and I am making my record.
12 He is being instructed not to answer, I need a
13 record of that, and thank you for your
14 comments, but we're moving on.
15        MR. PLACITELLA:  Okay.  No
16 problem.
17        MR. DUBIN:  Thanks.
18        (Exhibit 13 marked for
19   identification.)
20 BY MR. DUBIN:
21   Q.   So I just want to understand your
22 testimony.  If we go to PDF 2 here, this is
23 one of your -- sorry.  It will be the image.
24 So it's at 84.  And, again, I want to talk to
25 you a little bit about illumination.

Page 88

1         Is it your testimony that this
2  image was taken at maximum illumination?
3   A.   Yes, sir.
4   Q.   So the brightness level on the
5  Olympus does not go any higher than this?
6         MR. LUDWIG:  Objection; asked
7  and answered.
8         THE WITNESS:  Pardon?
9         MR. LUDWIG:  I said, objection;
10 asked and answered.
11 BY MR. DUBIN:
12   Q.   Is that correct?  Your testimony is
13 that the Olympus microscope you were using at
14 this time, it cannot take any brighter images
15 than this.
16         Is that your testimony?
17        MS. O'DELL:  Object to the
18 form.
19        THE WITNESS:  May I see the
20 lower part of the image?
21 BY MR. DUBIN:
22   Q.   I'm sorry?  You want to see the
23 lower part of the image?  Sure.
24   A.   Thank you.
25         That was not taken on the

Page 89

1  Olympus.
2   Q.   Okay.  So this is Leica?
3   A.   This is a Leica.
4   Q.   Okay.  So is it your testimony that
5  the Leica microscope cannot take any brighter
6  images than this?
7         MS. O'DELL:  Object to the
8  form.
9         MR. LUDWIG:  Object to the
10 form.
11        THE WITNESS:  That is the
12 brightest I could get for that particular
13 mount.
14 BY MR. DUBIN:
15   Q.   Okay.  And, for example, if we just
16 look at page 85 of this, we can see the
17 perpendicular.
18         Is it your testimony that this
19 type of image is taken at maximum brightness
20 on the Leica?
21        MS. O'DELL:  Object to the
22 form.
23        THE WITNESS:  It is.
24 BY MR. DUBIN:
25   Q.   Okay.  We'll come back to

23 (Pages 86 - 89)

Page 90

1 illumination in a bit, but let's first just
2 talk a little bit about the switch that was
3 made at some point to 1.560 oil.
4           Do you know why that switch was
5 made in your analysis?
6           MR. DUBIN:  You can take this
7 down, Jake.
8           THE WITNESS:  The switch was
9 made at the suggestion -- I don't recall his
10 name, but he was in, talking with Dr. Longo;
11 and he was back, watching me do some work; and
12 he made the suggestion because of the intense
13 stretch of yellow on the color chart for 1.55,
14 that we do it with 1.560 to better define the
15 upper level of what we were finding in the
16 chrysotile.
17           MR. LUDWIG:  I think the
18 question went to switching microscopes.
19           MR. DUBIN:  No.  He understood
20 the question.  It was why the oil was
21 switched.
22           MR. LUDWIG:  I'm sorry.
23 BY MR. DUBIN:
24      Q.   Okay.  And what is the expected
25 effect if you are switching from 1.550 to 1.60

Page 91

1 oil?
2      A.   We didn't switch to 1.60.
3      Q.   Sorry.  What did you say?
4      A.   That we didn't switch to 1.60.
5      Q.   You didn't switch to 1.560?  Maybe I
6 misspoke.
7           What is the expected effect of
8 switching to one, five -- 1.560 oil?
9           MR. LUDWIG:  I'm going to
10 object; that calls for an expert opinion.  I
11 am instructing the witness not to answer that
12 question.
13           MR. DUBIN:  Okay.  Well, I want
14 to call up -- let's just mark the Valadez
15 report as the next exhibit in order.  I guess
16 that's 14.
17           (Exhibit 14 marked for
18     identification.)
19           MR. LUDWIG:  Mr. Dubin, we have
20 been going for close to an hour and fifteen.
21 Do you want to just do this last one and then
22 take a break?
23           MR. DUBIN:  I'll call up --
24 I'll put up the report and I'll put it in chat
25 because we're going to talk about it for a

Page 92

1 bit.  Let's put that in chat and we can go to
2 page 32 of it.  Sorry.  Is it page 32?  It
3 should be the image.  Okay.
4           Well, let's -- I will -- we can
5 just take the break now.  I will leave that in
6 chat so that if anybody needs it over the
7 break.
8           What are we going to take?  Ten
9 minutes?
10           MR. LUDWIG:  Ten minutes is
11 great.
12           MR. DUBIN:  All right.  We can
13 do ten minutes.
14           VIDEOGRAPHER:  The time is
15 11:19 a.m.  We are off the record.
16           (Break held off the record.)
17           VIDEOGRAPHER:  The time is
18 11:37 a.m.  We are back on the record.
19           MR. DUBIN:  We are going to
20 start talking about the Valadez report and the
21 Valadez report -- if we can put it back up?
22 We can just go to the front cover first and
23 then we'll come back here to the image.  Okay.
24 BY MR. DUBIN:
25      Q.   So the -- this is what we referred

Page 93

1 to as the Valadez report from 2023.
2           So we would be taking about a
3 Leica microscope, correct?
4      A.   That is correct.
5      Q.   And we're talking now about using
6 1.560 oil, right?
7      A.   Yes, sir.
8      Q.   Okay.  And so let's go to that image
9 first.
10           MS. O'DELL:  For the record,
11 what page in the PDF?
12           MR. DUBIN:  What page is that,
13 Jake?
14           MR. KEESTER:  This is PDF page
15 33.
16           MR. DUBIN:  It's particle CSM
17 001.
18 BY MR. DUBIN:
19      Q.   Now, I want to just quickly flip
20 back to the Zimmerman report we have already
21 looked at, the image, and if we can just look
22 at the image we had up before.
23           Can you see that the image in
24 the Zimmerman report is more golden or orange
25 than the image in the Valadez report?  We can

Page 94

1  go back and forth between them if you need to.
2          MR. DUBIN:  Can we flip back to
3  Valadez?
4  BY MR. DUBIN:
5      Q.  Do you see that the Zimmerman report
6  image is more golden or orange?
7      A.  I do.
8      Q.  Do you know why that is?
9      A.  From the BH2, which is the Zimmerman
10  report, we were on a tungsten lamp, and it was
11  to the respect that we were dealing with extra
12  yellows from the tungsten lamp.
13      Q.  So the tungsten lamp was changing
14  the color of the particle then?
15          MS. O'DELL:  Object to the
16  form.
17          MR. LUDWIG:  Object to form.
18  BY MR. DUBIN:
19      Q.  Is that correct?
20          MS. O'DELL:  Object to the
21  form.
22          THE WITNESS:  We felt it was
23  adding more yellow to the image of what we
24  were seeing and what we were documenting.
25  BY MR. DUBIN:

Page 95

1      Q.  Okay.  And it wasn't just adding
2  yellow.  If we go back to the Zimmerman report
3  image, it was adding sort of darker golden
4  colors or orange colors to the image, right?
5          MS. O'DELL:  Object to form.
6          MR. LUDWIG:  Objection.  This
7  calls for an expert opinion.
8          I will instruct you not to
9  answer that one.
10          MR. DUBIN:  You're instructing
11  him not to answer that question about the
12  comparison between these two images?
13          MR. LUDWIG:  Correct.  You're
14  testifying and I am going to object to that
15  one.
16          MR. DUBIN:  You're objecting
17  and you're instructing your witness not to
18  answer a question about the impact of lighting
19  on his images in the reports at issue in this
20  deposition and you're instructing him not to
21  answer.
22          Is that my understanding?
23          MR. LUDWIG:  Could you -- let
24  me hear the question again because I think
25  you -- what you said was different than what

Page 96

1  your question was.
2          MR. DUBIN:  We can read the
3  question back.
4          THE COURT REPORTER:  One
5  moment.
6          "QUESTION:  And it wasn't just
7      adding yellow.  If we go back to the
8      Zimmerman image, it was adding sort of
9      darker golden colors or orange colors to
10      the image, right?"
11          MS. O'DELL:  Object to the
12  form.
13          MR. LUDWIG:  I am going to
14  stand by my objection.
15          MR. DUBIN:  So you're not just
16  objecting.  You're instructing him not to
17  answer that question.  I need to understand
18  that.
19          MR. LUDWIG:  Correct.
20          MR. DUBIN:  So if I ask him any
21  questions trying to compare various images in
22  his reports, are you going to instruct him not
23  to answer that?
24          MS. O'DELL:  You can proceed
25  with your deposition, Morty.  It's no way

Page 97

1  to -- to respond to that.  I mean --
2          MR. DUBIN:  Okay.  I just --
3  we're obviously going to have to deal with
4  this after the end of the questioning today,
5  but we'll proceed.
6          MS. O'DELL:  I am not finished.
7          MR. DUBIN:  Okay.
8          MS. O'DELL:  Stop interrupting,
9  please.  If you ask him questions about the
10  image and the work that he did, he is
11  available to answer your question.  He is not
12  here to offer expert opinion.  It has been
13  stated numerous times.
14          MR. DUBIN:  I am asking him
15  directly about his images right now.  So --
16  and he is still being instructed not to
17  answer.
18  BY MR. DUBIN:
19      Q.  So, again, I am asking you a
20  question about this image.
21          The tungsten lighting is not
22  just adding more yellow; it's adding golden
23  colors and more orange color to the images,
24  right?  Is that correct?
25          MR. LUDWIG:  Object.

25 (Pages 94 - 97)

Page 98

1    I instruct you not to answer.
2    MR. DUBIN: You're instructing
3 him not to answer that question. Okay.
4 BY MR. DUBIN:
5    Q. And if we -- if we look at the
6 Valadez image, the effect of changing the
7 refractive index oil should have been to make
8 the particles less yellow, right? To move the
9 yellows towards the range of magenta, correct?
10    A. It was done to make it easier to
11 determine the upper refractive indices.
12    Q. But by -- if I have a particle that
13 is orange in parallel in 1.550 and I change my
14 oil to 1.560, it should appear more magenta,
15 right --
16    MS. O'DELL: Objection.
17 BY MR. DUBIN:
18    Q. -- in the magenta range?
19    MS. O'DELL: Excuse me.
20 Objection. Seeks expert opinion.
21    MR. LUDWIG: Join.
22    I instruct the witness not to
23 answer.
24 BY MR. DUBIN:
25    Q. What color is this particle that you

Page 99

1 identified as chrysotile? What color is it?
2    A. Please, focus in.
3    Q. (Counsel complies.)
4    MS. O'DELL: Again, this is
5 page 33 of the Valadez report and that's being
6 shown on the screen?
7    MR. DUBIN: It may be page 32,
8 I think, but I don't know. Is it 33 or 32,
9 Jake?
10    MR. KEESTER: I have it as PDF
11 33.
12    MR. DUBIN: Okay. PDF 33.
13    THE WITNESS: It has a mottled
14 appearance, some yellow, but I cannot
15 ascertain the edge off of the photograph.
16    MR. DUBIN: Okay.
17    MS. O'DELL: And, Morty, just
18 to correct the record, I believe that this is
19 page 32 of the Valadez --
20    MR. DUBIN: I said 32. It may
21 just be PDF 33.
22    MS. O'DELL: I am looking at
23 the actual report. The PDF report is 32 just
24 so it's clear when we go back what we're
25 looking at.

Page 100

1    MR. DUBIN: Right. And so it's
2 also clear, it's CSM 001.
3 BY MR. DUBIN:
4    Q. Do you see rounded structures here
5 that you believe to be talc plates?
6    A. There are.
7    Q. And do you see that some of those
8 rounded structures have some red coloration
9 around the edges?
10    Do you see that?
11    A. I cannot --
12    Q. (Inaudible.)
13    A. -- the edge color --
14    MS. O'DELL: He was not
15 finished; so.
16 BY MR. DUBIN:
17    Q. What was the answer?
18    A. I cannot determine the edge colors
19 from the photograph as presented.
20    Q. You don't see red edges on the talc
21 plates?
22    MR. LUDWIG: Asked and
23 answered.
24    THE WITNESS: I don't on the
25 photograph as presented.

Page 101

1 BY MR. DUBIN:
2    Q. Is red a central stop dispersion
3 color that is associated with talc itself in
4 1.550 or 1.560?
5    A. I am not aware that it is.
6    Q. Do you ever go through any process
7 to calibrate your dispersion staining colors?
8    A. We do that.
9    Q. And how do you do that? How did you
10 do that?
11    A. I didn't do them. There was
12 somebody else in the lab that did them.
13    Q. Do you know what the process was?
14    A. Initially, it was through the
15 Cargille glass solids.
16    Q. Cargille glass?
17    A. Yes, and --
18    Q. And --
19    MS. O'DELL: Sorry. He is not
20 finished.
21 BY MR. DUBIN:
22    Q. Go ahead.
23    A. And then recently was acquired a
24 refractive scope where you can check your
25 index difference.

26 (Pages 98 - 101)

Page 102

1  Q.   And Cargille -- those Cargille glass
2  standards have a single refractive index; is
3  that right?
4  A.   That is correct.
5  Q.   Meaning that they only have one true
6  central stop dispersion staining color; is
7  that correct?
8  A.   That is correct.
9  Q.   Okay.  Can you still see sometimes
10 edges on the Cargille glass that show a
11 different color, not their true central stop
12 dispersion staining color?  Can you sometimes
13 see edges on them of different colors?
14       MS. O'DELL:  Objection to the
15 form to the degree it's talking about a
16 process that he did not do himself.
17 BY MR. DUBIN:
18 Q.   Just only if you know personally?
19       MS. O'DELL:  And do not
20 speculate, please, Mr. Hess.  If you -- if
21 that's a process you were involved in for
22 purposes of your work in this case, you can
23 respond, but if it was not, well, that's
24 beyond the scope, and that's expert opinion.
25       THE WITNESS:  I did not do the

Page 103

1  calibrations --
2  BY MR. DUBIN:
3  Q.   Are you --
4  A.   -- just said.
5  Q.   Are you familiar with the fact that
6  you can -- that even with Cargille glass that
7  has a single refractive index, you can
8  sometimes see edge colors that don't
9  correspond to that refractive index?
10       MS. O'DELL:  Objection; seeks
11 expert opinion beyond the scope of the
12 deposition.  I will let Mr. Hess' counsel
13 instruct him.
14       MR. LUDWIG:  I am going to
15 instruct him not to answer that question.
16 BY MR. DUBIN:
17 Q.   Do you know what total reflection
18 means in the context of PLM dispersion
19 staining?
20       MS. O'DELL:  Same objection.
21       MR. LUDWIG:  Is the question
22 does he know what total dispersion -- repeat,
23 please?
24 BY MR. DUBIN:
25 Q.   Total reflection.

Page 104

1  A.   I am unfamiliar with the term.
2  Q.   If we scroll down so we can see the
3  bottom of this, you see that there is a
4  refractive index number, 1.564; that is the
5  refractive index number that you assigned to
6  this particle; is that correct?
7  A.   That is correct.
8  Q.   Do you know what color that
9  refractive index number corresponds to in
10 1.560 oil?
11 A.   Without the temperature information
12 handy and without the actual charts utilized,
13 it was more of a.
14 Q.   So are you done with your answer?
15 A.   I don't recall exactly off the top
16 of my head.
17 Q.   Well, let's go through the process
18 so we understand how you can take that
19 refractive index number and determine what
20 color you were calling this particle.
21       And so I am going to show you a
22 couple different slides.  We can just mark
23 them as separate exhibits.  We can just start
24 with slide 34.
25       THE COURT REPORTER:  For the

Page 105

1  record, I believe this is Exhibit 15.
2        MR. DUBIN:  Thank you.
3        (Exhibit 15 marked for
4    identification.)
5  BY MR. DUBIN:
6  Q.   Do you know the temperature in the
7  lab at MAS?
8  A.   We did have an immersion thermometer
9  at station.
10 Q.   And what is the temperature?
11 A.   It was 21 degrees.
12 Q.   And so if we wanted to figure out
13 what color you're calling the particle, we
14 could look at the Su tables or 1.560, and we
15 take your RI given, right, and then we can
16 match that up with a wavelength of light,
17 correct?
18 A.   Correct.
19       MS. O'DELL:  I object to the
20 question.
21       Where did this table -- what
22 reference did this table come from?
23       MR. DUBIN:  You're familiar
24 with the Su tables.  We can mark them as an
25 exhibit if it's necessary.  I will mark the Su

27 (Pages 102 - 105)

Page 106

1  tables so we have them.  I will mark the Su
2  tables as Exhibit 35.  I guess it must be
3  CX-26.
4          MR. LUDWIG:  My understanding,
5  this is a document prepared by defense
6  counsel.  This is not the Su tables.  This is
7  an excerpt, table, picture of Dr. Su, and some
8  other things; is that correct?
9          MR. DUBIN:  An excerpt and
10 that's why in case you need it, I am marking
11 the entire document as the next exhibit.
12         MR. LUDWIG:  Okay.  Well, now I
13 am objecting to testimony about this document
14 then.
15         MR. DUBIN:  What is your
16 possible objection about my asking him about
17 the color of the particle in the report that
18 he is here to be deposed about?
19         MR. LUDWIG:  I am objecting to
20 this exhibit 15, which is a defense exhibit --
21         MR. DUBIN:  It's --
22         MR. LUDWIG:  -- that's what I
23 am objecting to.
24         MR. DUBIN:  Okay.  So,
25 Mr. Placitella, do you agree and say that you

Page 107

1  can never use a demonstrative created by
2  counsel as part of examining a witness?
3  Because I am curious about your view on that,
4  Mr. Placitella.  So no more creating exhibits
5  to ask -- or demonstratives to ask our
6  witnesses about, right, Mr. Placitella, or do
7  you disagree with --
8          MR. LUDWIG:  (Inaudible) --
9          MR. PLACITELLA:  You're now
10 asking me questions?
11         MR. DUBIN:  I am asking you
12 that question.
13         MR. PLACITELLA:  How about I
14 ask you a few?
15 BY MR. DUBIN:
16    Q.   All right.  I am going to continue
17 to ask you questions about this document.
18         So going back to this, you can
19 find on the table --
20         MS. O'DELL:  Morty, excuse me.
21 The reason I asked is so if this is a
22 defense-created exhibit, so we understand
23 what's being discussed and for the record,
24 first; and then, second, so Mr. Hess has an
25 understanding of what's being asked of him.

Page 108

1          I understand you're going to
2  put the Su tables that you're referring to in
3  the chat and so if you go ahead and do that
4  and I assume they are going to be marked as
5  exhibit 16; is that correct?
6          MR. DUBIN:  I think that's the
7  correct number.  Exhibit 16 will be the Su
8  tables.
9          MS. O'DELL:  And if you need to
10 see the Su tables, Mr. Hess, or anything else,
11 just request that, and we'll get it in front
12 of you.
13         MR. DUBIN:  That's fine.
14         (Exhibit 16 marked for
15    identification.)
16 BY MR. DUBIN:
17    Q.   Anyway, so you can look at the RI
18 that you gave, 1.564, and that will correspond
19 with a wavelength of light, correct?
20    A.   That is correct.
21    Q.   And we can see that the wavelength
22 of -- the color associated with that
23 wavelength of light is purple, right, 560
24 nanometers?
25    A.   In the color chart, that's what it

Page 109

1  shows.
2     Q.   So for purposes of your analysis
3  calling this chrysotile, you were treating
4  this particle as if it was purple, correct?
5          MS. O'DELL:  Object to the
6  form.
7          THE WITNESS:  I was treating
8  what I could see around the edges through my
9  scope.
10 BY MR. DUBIN:
11    Q.   And, in fact, if we -- if we look
12 back at what we looked at before, which was
13 reference chrysotile -- we can put that slide
14 back up.
15         MR. DUBIN:  I don't remember
16 what number it was, but for calling it up,
17 Jake, we can use slide 40.
18 BY MR. DUBIN:
19    Q.   Reference chrysotile, the refractive
20 index number given for that particle by ISO is
21 1.556; that corresponds to magenta, correct?
22         MS. O'DELL:  Object to the
23 form.
24         We had an objection previously
25 to this exhibit because it calls for an expert

28 (Pages 106 - 109)

Page 110

1 opinion and so --
2        MR. DUBIN: Are you instructing
3 him not to answer?
4        MR. LUDWIG: I am instructing
5 him not to answer for the reasons stated
6 before.
7        MR. DUBIN: Okay. Let's go
8 to -- make the next exhibit slide 43.
9        MR. KEESTER: I'm sorry, Morty.
10 That was 43?
11        MR. DUBIN: Yeah, and that will
12 be exhibit 17.
13        (Exhibit 17 marked for
14    identification.)
15 BY MR. DUBIN:
16    Q.   The number -- the wavelength of
17 light that you assigned to this particle on
18 the left that you're calling chrysotile in
19 Johnson & Johnson, you are saying that it is
20 even more purple than standard reference
21 chrysotile depicted on the right, correct?
22        MS. O'DELL: Objection.
23        This is an incomplete depiction
24 of what's being examined. It is including
25 images that are not Dr. -- Mr. Hess', excuse

Page 111

1 me, and it is an inappropriate examination of
2 this witness, who is a fact witness, and seeks
3 expert opinion, and we to object to it.
4        MR. DUBIN: First off, I don't
5 understand how you can say every time that he
6 is a fact witness and not an expert. He is
7 here to be deposed about his polarized light
8 microscopy work. There is no way to depose
9 someone about their polarized light microscopy
10 work without asking them questions that are
11 technical in nature.
12        And so if your objection is
13 that every time I ask him for something about
14 his conclusions, it's an expert opinion, then
15 you are essentially shutting down this
16 deposition. It's --
17        MS. O'DELL: That's not
18 correct. We're asking -- we have not
19 instructed Mr. Hess to not respond to
20 questions that are technical. We have
21 instructed him not to give expert opinion
22 because he is here as a fact witness as you
23 know and as the Special Master has ruled.
24        And this seeks a comparison
25 between the photomicrograph that Mr. Hess took

Page 112

1 to an ISO record for chrysotile and that is
2 beyond the scope of this deposition.
3        That's -- that is --
4        MR. DUBIN: Are you instructing
5 him not to answer?
6        MS. O'DELL: Let me finish.
7 I'm sorry. Let me finish. I stuttered there.
8        Judge Schneider was very clear
9 that he is going to be asked about his work
10 and not a comparison of his work to others and
11 that is expert opinion and that's why we're
12 instructing him not to answer.
13        MR. DUBIN: Okay. So you're
14 instructing him not to answer?
15        MR. LUDWIG: Correct.
16        MR. DUBIN: Okay.
17 BY MR. DUBIN:
18    Q.   I want to make sure and let me raise
19 the question.
20        As a fact, factually, you
21 assigned a darker purple color to that
22 particle on the left than standard reference
23 chrysotile, correct?
24        MS. O'DELL: Objection; that is
25 the same objection, and I just also object to

Page 113

1 use of this color chart without reference to
2 the other charts from Dr. Su's tables that
3 take into consideration the temperature and
4 other aspects of the table. It's an
5 incomplete hypothetical. He --
6        MR. DUBIN: I am sorry. I
7 don't think you understand the -- I don't
8 think you understand how the analysis works.
9 Because we already did the temperature of the
10 lab when we figured out what nanometer of
11 light he was calling the particle. So that is
12 not a valid objection scientifically. Are you
13 instructing him not to answer?
14        MS. O'DELL: I am going to let
15 Mr. Hess' counsel instruct him, but I have
16 made my objection.
17        MR. LUDWIG: I am instructing
18 him not to answer.
19        MR. PLACITELLA: I would just
20 like to -- can you hear me? I would just like
21 to add the following objection and I am trying
22 to stay out of this.
23        If you're taking a tiny, little
24 piece of a big slide and then blowing -- and
25 then sticking it next to a different slide,

29 (Pages 110 - 113)