# Exhibit 1

Mary Poulton, Ph.D.

```
1         IN THE UNITED STATES DISTRICT COURT
2       FOR THE EASTERN DISTRICT OF NEW JERSEY
3                      -  -  -
4

        IN RE:  JOHNSON &         :
5       JOHNSON TALCUM POWDER      :
        PRODUCTS MARKETING,        :
6       SALES PRACTICES, AND       :   NO. 16-2738
        PRODUCTS LIABILITY         :   (FLW) (LHG)
7       LITIGATION                 :
                                   :
8       THIS DOCUMENT RELATES      :
        TO ALL CASES               :
9

                      -  -  -
10

                   March 18, 2019
11

                      -  -  -
12

13              Videotaped deposition of
        MARY POULTON, Ph.D., taken pursuant to
14      notice, was held at Skadden Arps, Four
        Times square, New York, New York,
15      beginning at 9:06 a.m., on the above
        date, before Michelle L. Gray, a
16      Registered Professional Reporter,
        Certified Shorthand Reporter, Certified
17      Realtime Reporter, and Notary Public.
18
                      -  -  -
19
20          GOLKOW LITIGATION SERVICES
            877.370.3377 ph| 917.591.5672
21              deps@golkow.com
22
23
24
```

Page 2

```
1  APPEARANCES:
2
3  BEASLEY ALLEN, P.C.
   BY: P. LEIGH O'DELL, ESQ.
4  BY: JENNIFER K. EMMEL, ESQ.
   218 Commerce Street
5  Montgomery, Alabama 36103
   (334) 269-2343
6  leigh.odell@beasleyallen.com
   Jennifer.emmel@beasleyallen.com
7
      - and -
8
   MOTLEY RICE, LLC
9  BY: CARMEN S. SCOTT, ESQ.
   28 Bridgeside Boulevard
10 Mt. Pleasant, South Carolina 29464
   (843) 216-9160
11 cscott@motleyrice.com
   Representing the Plaintiffs
12
13 ORRICK, HERRINGTON & SUTCLIFFE, LLP
   BY: ALEX V. CHACHKES, ESQ.
14 51 West 52nd street
   New York, New York 10019
15 (212) 506-3767
   achachkes@orrick.com
16
      - and -
17
   DRINKER BIDDLE & REATH LLP
18 BY: JACK N. FROST, JR., ESQ.
   600 Campus Drive
19 Florham Park, New Jersey 07932
   (973)549.7106
20 Jack.frost@dbr.com
21    - and -
22
23
24
```

Page 3

```
1  APPEARANCES: (Cont'd.)
2
   DRINKER BIDDLE & REATH, LLP
3  BY: KATHERINE McBETH, ESQ.
   One Logan Square, Suite 2000
4  Philadelphia, Pennsylvania 19103
   (215) 988-2706
5  katherine.mcbeth@dbr.com
   Representing the Defendants, Johnson
6  & Johnson entities
7
   SEYFARTH SHAW, LLP
8  BY: THOMAS T. LOCKE, ESQ.
   975 F Street, NW
9  Washington, D.C. 20004
   (202) 463-2400
10 tlocke@seyfarth.com
   Representing the Defendant, PCPC
11
12
13 ALSO PRESENT:
14
   VIDEOTAPE TECHNICIAN:
15   Henry Marte
16
17
18
19
20
21
22
23
24
```

Page 4

```
1         - - -
2      I N D E X
3         - - -
4
   Testimony of:     MARY POULTON, Ph.D.
5
6  By Ms. O'Dell        13, 359
7  By Mr. Chachkes        353
8
9
10        - - -
11    E X H I B I T S
12        - - -
13 NO.      DESCRIPTION        PAGE
14 Poulton-1  Notice of Deposition  15
15 Poulton-2  Expert Report of    18
             Mary Poulton, Ph.D.
16           2/25/19
17 Poulton-3  West Windsor Mill    49
             Sampling Calculations
18           And Notes
             (No Bates)
19
   Poulton-4  Faculty Senate      44
20           Minutes 3/3/08
21 Poulton-5  Amended Rule 26     103
             Report of Robert
22           B. Cook, Ph.D.
             1/22/19
23
24
```

Page 5

```
1         - - -
2    E X H I B I T S (Cont'd.)
3         - - -
4
5  NO.      DESCRIPTION        PAGE
6  Poulton-6  Rule 26 Expert     103
             Report of Mark
7            Krekeler, Ph.D.
8  Poulton-7  Department of      103
             Mineral Exploitation
9            Report of Italian
             Mine Samples
10           J&J
             (Pooley)
11           FDP0000000495-618
12 Poulton-8  Department of      108
             Mineral Exploitation
13           Report of Italian
             Mine Samples
14           (Pooley)
             JNJ000322351-475
15
   Poulton-9  Progress Report    143
16           Battelle Memorial
             Institute
17           5/9/58
             JNJAZ550000000906
18
   Poulton-10  Progress Report   151
19            10/15/57
              Battelle
20            JNJ 000087868-01
21 Poulton-11  Stefano Memo      164
              4/30/73
22            JNJ 000270588
23
24
```

Page 6

E X H I B I T S (Cont'd.)

NO.        DESCRIPTION        PAGE
Poulton-12   An Update of a        167
             Mortality Study of
             Talc Miners and Millers
             In Italy
             (Coggiola)
Poulton-13   The Geology of        180
             Ore Deposits
             (Guilbert & Park)
Poulton-14   Letter from Ashton    184
             To Caneer
             8/6/71
             JNJAZ55_000006103-5

Poulton-15   Talc Geology, Mining  189
             And Processing for
             Cosmetic, Pharma and
             Food Applications
             (McCarthy February 2010
             IMERYS 081025-62
Poulton-16   6. Cosmetics         200
             Eastern Magnesia
             The Cosmetics
             Industry
             JNJH29W_00003708-712
Poulton-17   Binder. Poulton      211
             Reliance Materials
             Bibliography/Scientific
             Literature

Page 8

E X H I B I T S (Cont'd.)

NO.        DESCRIPTION        PAGE
Poulton-24   The Fundamental      258
             Relationship Between
             Sample Mass and Sampling
             Variance
             (Stanley)
Poulton-25   Geology and Ore      267
             Reserves of the
             Hammondsville Ore Body
             IMERYS 436972-97

Poulton-26   Colorado School of   268
             Mines
             Geology and Ore Reserves
             12/4/70
             JNJ 000245002-48

Poulton-27   Interoffice          279
             Correspondence
             5/21/92
             Subject, Hamm Mine
             Core Drilling
             IMERYS 238270-77
Poulton-28   2008 Annual Report   293
             For Mineral Resources
             And Ore Reserves Estimates
             Argonaut Mine
             Ludlow, Vermont
             IMERYS-441340-17

Poulton-29   Rio Tinto Memo       325
             7/31/06
             RE, Vermont Market
             Plant 2006-2010
             IMERYS 132823

Page 7

E X H I B I T S (Cont'd.)

NO.        DESCRIPTION        PAGE
Poulton-18   Interoffice          216
             Correspondence
             3/25/92
             Cyprus Ore Reserves
             Arsenic & Tremolite
             (Munro)
             IMERYS 219720-22
Poulton-19   Memo, Rio Tinto      220
             8/17/06
             RE, North American
             Talc Market
             IMERYS-A_0005618-22
Poulton-20   Letter, 2/23/78      232
             From Lee to Miller
             IMERYS 139093-94
Poulton-21   Excerpts from        233
             Julie Pier's
             Deposition
             9/12/18

Poulton-22   Letter, 5/21/87      240
             From Stewart
             To Benninger
             Re, Windsor Minerals, Inc.
             JNJMX68_000015726

Poulton-23   Summary & Conclusions 247
             CSMRI
             4/14/71
             (Beers)
             IMERYS 238596-00

Page 9

E X H I B I T S (Cont'd.)

NO.        DESCRIPTION        PAGE
Poulton-30   Color Photograph     327
             Of a Rock
             (No Bates)
Poulton-31   Figure 137 Large     329
             Mass
             (No Bates)
Poulton-32   Binders              348
             Poulton Reliance
             Materials - J&J
             Defendants' Production
             Volume I
             Volume II
             &
             Poulton Reliance Materials
             Imerys' Productions
             Volume I
             Volume II
             Volume III

Poulton-33   Supplement List of   350
             Materials Reviewed
             And Considered by
             Mary Poulton, Ph.D.
Poulton-34   OneMine.org          367
             Document Search

Mary Poulton, Ph.D.

        - - -
    P R E V I O U S L Y   M A R K E D
        E X H I B I T S
        - - -

NO.      DESCRIPTION      PAGE
Hopkins-28   Demonstrative
            From the Hopkins
            Examination
            Spreadsheet

        - - -
    DEPOSITION SUPPORT INDEX
        - - -

Direction to Witness Not to Answer
PAGE   LINE
None.

Request for Production of Documents
PAGE   LINE
    16    17

Stipulations
PAGE   LINE
None.

Questions Marked

PAGE   LINE
None.

        - - -
        THE VIDEOGRAPHER:  We are
now on the record.  My name is
Henry Marte.  I am a videographer
with Golkow Litigation Services.
        Today's date is March 18,
2019.  And the time is 9:06 a.m.
        This videotaped deposition
is being held at Four Times
Square, New York, New York, in the
matter of Talcum Powder
Litigation.
        The deponent today is Dr.
Mary Poulton.
        All appearances are noted on
the stenographic record.
        Will the court reporter
please administer the oath to the
witness.
        - - -
        ... MARY POULTON, Ph.D.,
having been first duly sworn, was
examined and testified as follows:
        - - -

        EXAMINATION
        - - -
BY MS. O'DELL:
    Q.   Good morning, Dr. Poulton.
    A.   Good morning.
    Q.   My name is Leigh O'Dell.  I
represent the plaintiffs in the
multi-district litigation.  Would you
please state your full name for the
record?
    A.   Mary M. Poulton.
    Q.   What's your current address?
    A.   15521 North Howe Road, Mead,
Washington.
    Q.   And what's your current
employment?
    A.   University of Arizona,
co-director for the Lowell Institute For
Mineral Resources.
    Q.   Okay.  University of Arizona
is not located in Mead, Oregon.
    A.   No, it -- Washington.
    Q.   Washington, excuse me.
    A.   No, it's -- I go down about

Page 14

1 a week a month and then work remotely the
2 rest of the time. It's a part-time
3 position. I retired from the university
4 in May 2017.
5     Q.   Okay. Are you -- other than
6 your part-time work with the University
7 of Arizona and your work in this case, do
8 you have any other employment?
9     A.   Yes. I am a contractor to
10 NIOSH through a company called AECOM.
11 And I am also a co-founder and help run
12 three start-up companies for my research
13 and do consulting.
14     Q.   Okay. You mentioned a
15 company called AECOM?
16     A.   Yes.
17     Q.   Is that -- is that an
18 acronym?
19     A.   Yes. A-E-C-O-M.
20     Q.   Let me ask you to take a
21 look at what I've marked as Exhibit
22 Number 1 which is the notice of
23 deposition for your deposition here
24 today. Have you seen this before?

Page 15

1     A.   Yes.
2     Q.   And what documents have you
3 brought with you in response to the
4 notice?
5         (Document marked for
6         identification as Exhibit
7         Poulton-1.)
8         THE WITNESS: I have my
9 report and my CV in this binder.
10 BY MS. O'DELL:
11     Q.   Okay. May I see your
12 binder?
13     A.   Yes.
14     Q.   Thank you. Have you brought
15 anything else with you?
16     A.   This is what -- this is what
17 I have. I don't know what else might be
18 in binders here.
19         MR. CHACHKES: We produced
20     something to you, I believe,
21     yesterday in response to this
22     subpoena. So there's nothing
23     unique being brought to the
24     deposition.

Page 16

1         MS. O'DELL: Okay. I'm
2     going to ask questions about what
3     was produced yesterday --
4         MR. CHACHKES: Okay.
5         MS. O'DELL: -- at 8:30 last
6     night.
7 BY MS. O'DELL:
8     Q.   And I also want to ask, have
9 you brought with you today any invoices?
10     A.   No invoices today.
11     Q.   Have you submitted any
12 invoices in relation to your work on this
13 case?
14     A.   I have.
15     Q.   And how many?
16     A.   Two, December and January.
17         MS. O'DELL: And I would
18     like to request those. And Alex,
19     if you could get those to us
20     today, because we'd like to --
21         MR. FROST: They were
22     produced per a notice -- were a
23     response to the notice on
24     Saturday.

Page 17

1         MS. O'DELL: I got an
2     objection to the notice. But I
3     didn't get any documents. That's
4     all I got.
5         MR. FROST: Okay. It should
6     have been attached. We'll -- we
7     can rectify it during a -- it
8     should have been attached to the
9     e-mail. It's two invoices and the
10     retention letter that were served
11     with a response.
12         MS. O'DELL: Okay.
13         MR. FROST: We can sort that
14     out during a break, if that's all
15     right. If you don't have it,
16     we'll get someone here to print it
17     and get it to you soon after.
18         MS. O'DELL: That would be
19     fine.
20 BY MS. O'DELL:
21     Q.   Dr. Poulton, is the CV in
22 your binder different from the CV that
23 you produced with your report?
24     A.   In this binder?

Page 18

1    Q.    Yes.
2    A.    Let me look and see.
3    Q.    Just for ease, I'm going to
4  hand you what I'm marking Exhibit 3,
5  which is --
6         MR. CHACHKES:  Exhibit 2.
7         Exhibit 2?
8         MS. O'DELL:  Yes.  Thank
9  you.
10         (Document marked for
11         identification as Exhibit
12         Poulton-2.)
13 BY MS. O'DELL:
14    Q.    Exhibit 2, which is a copy
15 of the report that we received -- your
16 report that we received from defendants.
17 It had a CV enclosed in the report.
18    A.    Okay.
19    Q.    And I'm just trying to ask,
20 simply, have there been any changes to
21 your CV since your report was served in
22 February?
23    A.    No.
24    Q.    Dr. Poulton, what were you

Page 19

1  asked to do in this case?
2    A.    I was asked to review the
3  expert reports by Drs. Cook and Krekeler
4  and render an expert opinion on mining
5  and beneficiation as it related to talc
6  mining for cosmetic products for Johnson
7  & Johnson.
8    Q.    When were you contacted by
9  Johnson & Johnson counsel?
10    A.    I believe in December 2018.
11    Q.    Who contacted you?
12    A.    I believe it was Alex
13 Chachkes and Jack Frost.
14    Q.    I'm glad to know somebody
15 else has difficulty pronouncing Alex's
16 name.
17         MR. CHACHKES:  You wouldn't
18         be alone.
19 BY MS. O'DELL:
20    Q.    What materials were you
21 provided by Johnson & Johnson counsel?
22    A.    The expert reports from
23 Drs. Cook and Krekeler, and the documents
24 they cited.

Page 20

1    Q.    Were you provided any other
2  documents produced in the litigation
3  other than those cited in Dr. Cook and
4  Dr. Krekeler's reports?
5    A.    I received their
6  depositions.  I can look at the list of
7  what I have here.
8         I requested documents as I
9  was reviewing Dr. Cook and Krekeler's
10 reports.
11    Q.    What materials did you
12 request?
13    A.    I requested information on
14 geologic models, mine plans, drilling
15 results.  Clarification on sample
16 numbers, I believe.
17    Q.    Were you provided any
18 documents other than the documents that
19 were actually cited in Dr. Cook and
20 Dr. Krekeler's reports?
21    A.    Documents that were in their
22 reports, documents I requested.
23    Q.    I'm trying to discern the
24 difference in the group of documents

Page 21

1  cited in Dr. Cook and Dr. Krekeler's
2  reports, and documents that you were
3  describing as ones you requested.  I'm
4  trying to determine if that's a different
5  group of documents.  And if so, I want to
6  know what you received that was not cited
7  in Dr. Cook or Dr. Krekeler's reports.
8    A.    Right.  So I had asked for
9  some documents.
10    Q.    Did you receive additional
11 documents?
12    A.    Yes, I did.
13    Q.    How -- how many?
14    A.    I don't remember offhand how
15 many it was.
16    Q.    Can you give me an
17 estimation?
18    A.    I would estimate somewhere
19 between six and a dozen perhaps.
20    Q.    Were you provided access to
21 a database of documents where you could
22 perform your own searches?
23    A.    No.
24    Q.    Can you identify the

Mary Poulton, Ph.D.

Page 22

1 specific six to 12 documents that were
2 provided to you at your request?
3        A.   I would have to go through
4 my report and try and tease those out.
5        Q.   If, as you go through -- as
6 you go through -- strike that and start
7 again.
8                In walking through your
9 report, is it your belief that you could
10 identify those documents based on the
11 references in your report?
12        A.   Not easily.
13        Q.   Could you do that?
14        A.   Could I do it?
15        Q.   Yes.
16        A.   Yes, I could.  It would --
17 it would take some time.
18        Q.   Hold that thought.  We may
19 do that.
20                So let me ask this question.
21 You were -- you were provided Dr. Cook
22 and Dr. Krekeler's reports.
23                What were you asked to do in
24 relation to those two documents?

Page 23

1        A.   To -- their expert
2 reports?  I was asked to review them, see
3 if I agreed with what they did, what they
4 found, and then if not, why.  And what
5 information were they missing, what
6 analyses did I disagree with.
7                So, basically, looking at
8 mining and beneficiation practices and --
9 and those specific parts of their
10 reports.
11        Q.   In essence, you were asked
12 to critique their expert reports, true?
13        A.   Yes.
14        Q.   And what methodology did you
15 use in order to perform that critique?
16        A.   I started with the
17 assumption that they were correct in
18 their findings, and then corroborated
19 their statements with what I saw in
20 documents.  And if they said information
21 was missing, then I asked for that
22 information or looked for it within the
23 documents they had.
24                And then basically

Page 24

1 constructed the areas where I felt that
2 they were incorrect.
3        Q.   Is the methodology that you
4 employed in critiquing Dr. Cook and
5 Dr. Krekeler's reports methodology that's
6 been published in the scientific
7 literature?
8        A.   In terms of forming a
9 hypothesis and testing it, yes.
10        Q.   And can you name a reference
11 that would support that type of analysis?
12        A.   I believe nearly any
13 textbook on research methods would cite
14 how to form a hypothesis and -- and test
15 it.
16        Q.   What -- what was your
17 hypothesis in this particular -- in the
18 task that you were asked to perform?
19        A.   So my hypothesis was that
20 the conclusions reached by Drs. Cook and
21 Krekeler were correct.
22        Q.   And in terms of the process
23 that you undertook, could that process be
24 replicated by someone else?

Page 25

1        A.   Yes.
2        Q.   How?
3        A.   They -- if they have a
4 background in mining processes and -- and
5 beneficiation and geology, they could
6 look at the body of knowledge about how
7 you conduct mining, how you make mine
8 plans, how you process ore, and they
9 could compare that to the conclusions
10 that Drs. Cook and Krekeler reached from
11 the same documents that I looked at.
12        Q.   In regard to your -- your
13 background, is it fair to say that your
14 focus has been on mine safety and -- and
15 sort of the mine safety focus of
16 geological engineering?
17        A.   In my current stage of my
18 career, that's true.  I've had other
19 focus areas throughout the past 30-plus
20 years.
21        Q.   You are not an exploration
22 geologist, true?
23        A.   I've done quite a bit of
24 work in exploration geology, but I am an

Mary B. Gibson, Ph.D.

Page 26

1  engineer, not a geologist by degree.
2      Q.   You are not a certified
3  professional engineer, true?
4      A.   I have my EIT.
5      Q.   And what is an EIT?
6      A.   An EIT is the initial step
7  for professional certification.
8      Q.   So my question is, you are
9  not a certified professional engineer,
10  true?
11      A.   That's correct.
12      Q.   You are not a certified
13  professional geologist, true?
14      A.   True.
15      Q.   Turning your attention
16  toward what I've marked as Exhibit 2,
17  your expert report.  And about, I would
18  say, half the way into that document is
19  exhibit A which is a copy of your CV.
20          As I understand our
21  discussion a few minutes ago, that's an
22  up-to-date CV?
23      A.   It has not changed since I
24  submitted it.

Page 27

1      Q.   Okay.  And you have not
2  authored a peer-reviewed publication on
3  phyllosilicates, true?
4      A.   True.
5      Q.   You have not authored a
6  peer-reviewed publication regarding talc,
7  true?
8      A.   Let me look at my list.
9  I -- I covered talc in a software program
10  called Minerals Where and Why.  And I
11  just need to see if it's on the
12  peer-reviewed list or somewhere else.
13          So Publication 28 referee
14  book chapters could have included talc.
15  I don't remember.
16      Q.   My question related to
17  peer-reviewed publications and I took
18  that in your CV, referee journals to mean
19  peer-reviewed publications.
20          Is that fair?
21      A.   That's fair.  Referee book
22  chapters would also be peer reviewed.
23      Q.   And you have not authored
24  a -- a peer-reviewed publication

Page 28

1  regarding talc with a specific focus of
2  talc?
3      A.   That's correct.
4      Q.   And you have not authored a
5  peer-reviewed publication regarding the
6  geology of Vermont, correct?
7      A.   Correct.
8      Q.   You have not authored a
9  peer-reviewed publication regarding the
10  geology of Italy, correct?
11      A.   Correct.
12      Q.   And similarly, you have not
13  authored a peer-reviewed publication
14  regarding the geology of talc deposits in
15  China, correct?
16      A.   Correct.
17      Q.   Have you ever visited a talc
18  mine?
19      A.   Yes.
20      Q.   Where?
21      A.   In California.
22      Q.   And what mine?
23      A.   I don't remember.  It was in
24  the 1980s.

Page 29

1      Q.   What area?
2      A.   It -- that one would have
3  been in Southern California, Death Valley
4  kind of area.
5      Q.   That mine is not used to
6  source cosmetic talc, true?
7      A.   I believe that's true.
8      Q.   It is -- it contains high
9  levels of asbestos, true?
10      A.   What?
11      Q.   The mine that you visited in
12  Death Valley?
13      A.   I don't know that.
14      Q.   Is -- is that mine -- just
15  to make sure I'm thinking about the same
16  one you're thinking of -- and you don't
17  recall the name of the mine?
18      A.   I -- I don't.
19      Q.   Who was the owner?
20      A.   I don't know.
21      Q.   What was the purpose of your
22  visit?
23      A.   It was a class field trip.
24      Q.   You have not visited any of

Mary Poulson, Ph.D.

Page 30

1  the talc mines in Vermont, correct?
2      A.   Correct.
3      Q.   And that would be true also
4  of any talc mines in Italy or China?
5      A.   Correct.
6      Q.   Have you done any research,
7  published or nonpublished, regarding
8  asbestos that's not related to the
9  litigation?
10     A.   Could you repeat that
11 question for me?
12     Q.   Sure.  Have you done any
13 research -- let me step back and say it
14 this way.  It will be easier, sorry.
15     Have you -- have you
16 authored any peer-reviewed publications
17 regarding asbestos?
18     A.   No, I have not published
19 peer-reviewed papers on asbestos.
20     Q.   Have you done any research
21 specifically regarding asbestos other
22 than what you've done in this litigation?
23     A.   We have had some projects in
24 our department regarding asbestos

Page 31

1  associated with metal ores.  I wasn't the
2  lead person on it.  I was peripheral to
3  those studies.
4      Q.   It was not a focus of your
5  particular research?
6      A.   It was not my focus.
7      Q.   Is it fair to say that most
8  of your work in recent years has focused
9  on water preservation and health issues
10 as it relates to geology?
11     A.   In recent years that has
12 been one of my emphasis areas.
13     Q.   I notice on your CV there's
14 a company that you're involved with
15 called NOAH?
16     A.   NOAH.
17     Q.   What is NOAH?
18     A.   NOAH stands for neural
19 optimization applied hydrology.  We use
20 artificial neural networks coupled with
21 non-linear optimization to manage water
22 resources.
23     Q.   What is neural optimization?
24     A.   Neural networks are a form

Page 32

1  of artificial intelligence.  They're the
2  basis of photo recognition on your smart
3  phones and Alexa and Siri and all of
4  those technologies that are AI now.
5      Q.   All the technologies that
6  are invading our life --
7      A.   Exactly.
8      Q.   -- and listening --
9      A.   Yes.
10     Q.   -- at various times.
11     Let me switch gears.  You
12 are not a physician?
13     A.   I am not a physician.
14     Q.   You're not an expert on the
15 health effects of talcum powder, true?
16     A.   Correct.
17     Q.   You're not an expert on
18 health effects of asbestos, correct?
19     A.   Correct.
20     Q.   You're not an expert on the
21 health effects of heavy metals?
22     A.   Correct.
23     Q.   You are not an
24 epidemiologist?

Page 33

1      A.   Correct.
2      Q.   You're not a toxicologist?
3      A.   Correct.
4      Q.   You're not an industrial
5  hygienist?
6      A.   Correct.
7      Q.   Would it be fair to say that
8  you will defer to medical experts,
9  whether the genital use of talc can cause
10 cancer, true?
11     A.   Correct.
12     Q.   In regard to asbestos you
13 are not an expert in the identification
14 of asbestos in talc ore true?
15     A.   Could you clarify what you
16 mean by identification?
17     Q.   Have you examined cosmetic
18 talc for the presence of asbestos using
19 XRD?
20     A.   No.
21     Q.   Have you examined cosmetic
22 talc for the presence of asbestos using
23 polarized light microscopy?
24     A.   No.

Mary Poulton, Ph.D.

Page 34

1  Q.  Have you examined cosmetic
2  talc for the presence of asbestos using
3  TEM?
4  A.  No.
5  Q.  Have you ever tested
6  cosmetic talc in any way?
7  A.  No.
8  Q.  Do you have any expertise in
9  transmission electron microscopy?
10  A.  No.
11  Q.  Do you have any expertise in
12  using polarized light microscopy for
13  purposes of identifying contaminants in
14  an ore?
15  A.  Repeat the question for me.
16  I kind of lost my train of thought.
17  Q.  Do you use -- let me just
18  ask a different question.
19  A.  Okay.
20  Q.  Maybe that will address the
21  issue.
22  Do you use polarized light
23  microscopy as a routine part of your work
24  as a geological engineer?

Page 35

1  A.  No.
2  Q.  Do you plan to offer any
3  opinions in this case regarding the
4  appropriate technique for the use of
5  examining cosmetic talc for the presence
6  of asbestos?
7  A.  Maybe repeat the question
8  for me again.
9  Q.  Do you have any opinions
10  that you plan to provide in this case
11  that relate in any way to the appropriate
12  technique for use in analyzing cosmetic
13  talc for the presence of asbestos?
14  A.  Beyond the techniques that
15  are identified in things like ISO
16  standards.  I mean, just basically being
17  able to say that those are the identified
18  techniques.
19  Q.  But you have no expertise in
20  the techniques used to examine talc?
21  A.  In using those techniques,
22  correct.
23  Q.  Okay.  I didn't ask you this
24  before, Dr. Poulton.  But have you had

Page 36

1  your deposition taken before?
2  A.  No.
3  Q.  One of the things that will
4  help the court reporter and just all of
5  us, if you'll wait for me to finish --
6  A.  I'm sorry.
7  Q.  -- before you answer.  And
8  I'll endeavor to do the same with you.
9  And I'm from the south, as you probably
10  recognize, and sometimes I talk slow.  So
11  if you'll give me a minute to get my
12  question out, that would be great.
13  So have you ever been hired
14  as a consultant or otherwise employed by
15  a mine company to develop a drill core
16  program for purposes of evaluating an ore
17  deposit?
18  A.  Could you repeat that.
19  Q.  Outside the context of your
20  work as an academic, have you been hired
21  as a consultant or an employee of a
22  mining company to design a drill core
23  program?
24  A.  Pittsburgh and Midway Coal

Page 37

1  Mining Company.
2  Q.  And when was that?
3  A.  1984.
4  Q.  And what was your role with
5  Pittsburgh Coal and -- I'm sorry.  What's
6  the name of the company again?
7  A.  Pittsburgh and Midway.
8  Q.  Okay.
9  A.  So I was working on
10  long-range mine planning, 25-year mine
11  plan.  And we had to lay out the drilling
12  program, drill the holes, log the core,
13  assay the core, create the geologic
14  models, create the reserves, do the maps.
15  Q.  That was in 1984?
16  A.  Correct.
17  Q.  What was your position with
18  the company?
19  A.  Mining engineer.
20  Q.  How long did you have that
21  position?
22  A.  That was roughly May to
23  August.
24  Q.  And that was a summer job --

Page 38

1    A.    Yes.
2    Q.    -- fair?
3          And that was a summer job
4    prior to your getting your master's
5    degree or your Ph.D.?
6    A.    My bachelor's degree.
7    Q.    Yeah.  So this was a summer
8    job while you were getting your
9    bachelor's degree?
10   A.    Yes.
11   Q.    And that would be the last
12   time that you had a job that involved
13   drill core, drilling program, logging
14   cores, et cetera?
15   A.    So we did those kind of
16   activities within the context of our
17   curriculum with graduate students.
18   Q.    I'm asking in regard to
19   consulting in a situation outside of
20   academic.
21   A.    No.
22   Q.    To make sure the question is
23   clear.  The last time that you were hired
24   in any capacity to develop a drill

Page 39

1    program, participate in a core drill
2    program or log cores was in 1984 when you
3    were a student?
4    A.    Outside of academia, yes.
5    Q.    Yes.
6    A.    Yes.
7    Q.    Have you been hired by a
8    mining company to perform minerologic
9    exploration for purposes of economic
10   exploitation?
11   A.    Outside of academia?
12   Q.    Yes.
13   A.    I don't believe so.
14   Q.    Have you ever designed a
15   mine plan for a talc mine?
16   A.    No.
17   Q.    Outside of academia, would
18   it be fair to say that you have not
19   designed a mine plan for any type of
20   mine?
21   A.    Outside of academia?
22   Q.    Yes.
23   A.    Correct.
24   Q.    Describe your work with the

Page 40

1    Lowell Institute For Mineral Resources at
2    the University of Arizona.
3          A.    So the Lowell Institute is a
4    large interdisciplinary research
5    institute within the University of
6    Arizona.  We bring together faculty from
7    many different disciplines to work on a
8    broad range of mineral resources, issues,
9    from grass roots, exploration and
10   fundamental geosciences through mining,
11   health and safety, reclamation,
12   geotechnical engineering, law.
13          And so we do research.  We
14   do outreach.  We do professional and
15   continuing education.  We do
16   interdisciplinary education.  We do
17   technology transfer.  Basically,
18   everything from the beginning of a
19   mineral resources project through
20   ultimate closure and community relations,
21   along with K-12 and public outreach.
22          Q.    Define geologic engineering.
23          A.    So geological engineering is
24   an accredited engineering degree.  It

Page 41

1    combines geologic knowledge with
2    engineering.  And depending on the
3    university, it's usually associated with
4    mining engineering or in some cases civil
5    engineering, or in some cases geology.
6          At the University of
7    Arizona, it was associated with mining
8    engineering.  So the geological
9    engineering was essentially mining
10   engineering with extra geology and some
11   extra civil engineering.
12          Q.    And you were department head
13   of mining and geological engineering at
14   the University of Arizona for some period
15   of time?
16          A.    Yes.
17          Q.    And that program was
18   accredited?
19          A.    Yes.
20          Q.    And is the accreditation
21   board for engineering and technology
22   the -- the organization that provides
23   accreditation for the University of
24   Arizona's department?

Mary B. Poulton, Ph.D.

Page 42

1    A.   ABET.  Yes.
2    Q.   ABET.
3         Did ABET audit your
4  department in 2004-2005?
5    A.   I would have to think about
6  what years, let's see.  2014 -- no, I'm
7  sorry.  2016.  2010.
8         Probably 2004 or
9  thereabouts.  I'd have to -- to search my
10 memory as to exact dates.
11   Q.   And ABET does a thorough
12 review of departments when investigating
13 them for purposes of accreditation, true?
14   A.   Thorough investigation, yes.
15   Q.   And -- and you were head of
16 the department in 2004-2005?
17   A.   Yes.
18   Q.   Did ABET find that you had
19 approved students for graduation that had
20 not completed the appropriate credits?
21   A.   There was some controversy
22 over how credits were counted for some
23 particular courses that was cleared up.
24   Q.   And, in fact, ABET

Page 43

1  threatened to not accredit the department
2  based on your approval of students for
3  graduation without them having completed
4  the appropriate courses, true?
5    A.   No, not -- not -- restate
6  the question.
7    Q.   And, in fact, ABET
8  threatened to not accredit the department
9  based on your approval of students for
10 graduation without them having completed
11 the appropriate credits, true?
12   A.   No.
13   Q.   That's not true?
14   A.   Mining engineering was --
15 was fine.  Geological engineering had
16 some questions that needed clarification.
17   Q.   Let me show you what -- let
18 me -- before I -- I show you this, let me
19 just ask.
20        Following that incident with
21 ABET in 2004 and 2005, was the condition
22 of your department maintaining its
23 accreditation that you no longer advise
24 geological engineering students, true?

Page 44

1    A.   I don't remember that
2  happening.
3    Q.   After 2004, you no longer
4  advised geological engineering students,
5  true?
6    A.   There were other situations
7  related to personnel in the department
8  for geological engineering.  So it's --
9  it's not a true statement that I was not
10 allowed to advise students.  There
11 were -- there were some personnel issues
12 surrounding geological engineering.
13   Q.   Following 2005, you no
14 longer advised geological students, true?
15   A.   I did not.
16   Q.   Let me show you what I'm
17 marking as Exhibit 4.
18        (Document marked for
19        identification as Exhibit
20        Poulton-4.)
21 BY MS. O'DELL:
22   Q.   I provided you as Exhibit 4
23 some minutes from a faculty senate
24 meeting in March 3, 2008.

Page 45

1         Do you see that?
2    A.   Where are we looking?  Okay.
3  So cover page, March 3, 2008.
4    Q.   Page -- do you see those?
5         Let me ask you to turn to
6  page -- I think it's five of the
7  document.
8    A.   Five is a Number 5 or?
9    Q.   No.  Actually just count the
10 pages because there are multiple
11 documents that were attached to the
12 minutes.
13        So if you look at Page 5 and
14 turn to the back of that page.  You'll
15 see a Paragraph Number 3.
16        Do you see that?
17   A.   No, I'm not sure where you
18 are.
19   Q.   Page 2 of the attachment, I
20 think to this document.  It's -- here you
21 go, ma'am, I'll turn you to the right
22 page if you'd like me to.
23        Right there.  This is Page 2
24 of a memorandum from Dr. Ben Sternberg to

Page 46

1  the members of the faculty senate dated
2  March 1st, 2008.  Have you seen this
3  before?
4      A.    I would have to search my
5  memory.  I can tell you there was a
6  serious personnel issue with
7  Dr. Sternberg that I am not sure how much
8  I am allowed to say here.
9      Q.    Okay.
10     A.    But it is very germane to
11 the substance of this.
12     Q.    And looking at Page 2 under
13 Heading 3, Dr. Sternberg writes, "In the
14 2004-2005 accreditation cycle, the ABET
15 visitor for geological engineering found
16 that Dr. Poulton, department head of
17 mining and geological engineering, had
18 approved students for graduation without
19 their meeting the required number of
20 engineering credits.  Since this was
21 viewed as a fatal flaw, we were told that
22 we would lose accreditation.  After
23 extensive negotiations, the ABET
24 committee decided that they would allow

Page 47

1  this history to pass, if and only if
2  Dr. Poulton was no longer allowed to
3  advise geological engineering students.
4  Once this problem was overcome, the final
5  ABET report provided a strong
6  recommendation for our program."
7          Did I read that correctly?
8      A.    The -- you read that
9  correctly.
10     Q.    And it's fair to say that
11 the -- ABET agreed to accredit Arizona's
12 geological engineering program based on
13 the decision that you would be prohibited
14 from advising students, true?
15     A.    I strongly disagree with
16 this paragraph as being true.
17     Q.    You no longer advised
18 geological engineering students following
19 this time period, true?
20     A.    This was part of a personnel
21 action regarding Dr. Sternberg.
22     Q.    True?
23     A.    So --
24     Q.    Let me -- the question is --

Page 48

1          MR. CHACHKES:  Actually,
2      just let the witness finish the
3      answer, please.
4  BY MS. O'DELL:
5      Q.    And if you would just focus
6  on my question --
7          MR. CHACHKES:  Yeah, but
8      still, even if -- let the witness
9      finish her answer, please.
10 BY MS. O'DELL:
11     Q.    I'll let you certainly
12 explain your answer.  But if you'll just
13 listen to my question, Dr. Poulton.
14         You no longer advised
15 geological engineering students following
16 this 2004-2005 time period, true?
17     A.    That's not a true/false
18 question that I can answer.
19     Q.    Is that correct?
20     A.    It is correct I was not
21 advising students for that program.
22     Q.    Okay.
23     A.    But again, as part of a
24 personnel issue.

Page 49

1      Q.    As a part of the faculty
2  senate meeting in -- in March of -- of
3  2008, did you submit a memorandum or
4  letter disputing Dr. Sternberg's
5  statements in this memorandum?
6      A.    I don't remember.
7      Q.    You do not recall doing
8  that, correct?
9      A.    I -- I just don't remember.
10         (Document marked for
11     identification as Exhibit
12     Poulton-3.)
13 BY MS. O'DELL:
14     Q.    Let me ask you to take a
15 look at what I'm marking as -- previously
16 marking as Exhibit 3.
17         And ask you to --
18         MS. O'DELL:  Before I ask
19     you to identify it, I would just
20     note an objection on the record.
21     This was received last night, I
22     think, at 8:30 p.m.
23         We object to the late
24     production, to the lack of

Mary Poulton, Ph.D.

Page 50

1  opportunity to review this
2  analysis prior to the deposition.
3       And so, on the basis of --
4  of that late disclosure of the
5  supplemental report we'll move to
6  hold the deposition open until
7  we've had adequate opportunity to
8  analyze it.
9       MR. CHACHKES:  Okay.
10  Obviously we disagree and -- and I
11  think you have produced many
12  things with even less notice.
13       So it's an odd objection,
14  but noted.
15       MS. O'DELL:  I don't agree
16  with -- with that, but --
17       MR. CHACHKES:  Yeah, and by
18  the way, there's no supplemental
19  report.  You said supplemental
20  report.  This is not a
21  supplemental report.
22       MS. O'DELL:  This is a
23  supplemental analysis.  Well --
24       MR. CHACHKES:  It is not.

Page 51

1  Why don't you ask the question.
2       MS. O'DELL:  I'm about to
3  ask the question.
4       MR. CHACHKES:  Okay.
5  BY MS. O'DELL:
6       Q.   Dr. Poulton, would you
7  please describe what I've marked as
8  Exhibit 3?
9       A.   It's a simple spreadsheet
10  that I put together, back-of-the-envelope
11  kinds of calculations, looking at mining
12  throughputs and potential material that's
13  being sampled from the mine through the
14  mill.
15       A lot of assumptions.  I
16  pulled data from multiple mine plans to
17  get the variables.
18       But I was just basically
19  looking at rate of production and
20  throughput through the mill.
21       Q.   And an analysis of this type
22  was not included in your initial report?
23       A.   Correct.
24       Q.   Fair?

Page 52

1       A.   Correct.
2       Q.   And when you're talking
3  about the mill, what mill are you
4  referring to?
5       A.   West Windsor.
6       Q.   And what's the methodology
7  that you used to perform this analysis?
8       A.   I looked at the data that
9  was in their annual mine reports, their
10  mine plans.
11       Q.   For what year?
12       A.   It was a combination of data
13  from 1998 and 2002 reports.
14       Q.   What was the purpose of
15  doing this analysis?
16       A.   I wanted to just clarify in
17  my mind what the rates of production
18  were, and if I converted a continuous
19  process to a batch process, how many
20  blocks of ore were being processed in a
21  given amount of time and how did that
22  relate to how long it might take to fill
23  a silo with finished talc.
24       Q.   It's fair to say that this

Page 53

1  calculation was based on certain
2  assumptions that you made rather than a
3  specific analysis of what occurred during
4  the operation at West Windsor?
5       A.   So I took actual data, but I
6  had to make some assumptions.  For
7  instance, I didn't account for stripping
8  ratio of 2 to 1, which is used.  I didn't
9  account for bulking factor as the silo
10  was filled.
11       I had to convert a
12  continuous process to a batch process for
13  resonance time.
14       Q.   You were not able to account
15  for certain ways the mine manager may
16  have directed personnel to fill silos
17  that are not reflected in the documents,
18  true?
19       A.   These are based on reported
20  numbers.
21       Q.   And based on assumptions
22  that you've made and not necessarily what
23  may have happened that was not recorded
24  in a written document, true?

Mary Poulson, Ph.D.

Page 54

1    A.   Correct.  Correct.

2    Q.   Were you asked to perform
3  this analysis by counsel?

4    A.   No.

5    Q.   When did you perform this
6  analysis?

7    A.   Two Sundays ago.

8    Q.   When was it provided to
9  counsel?

10    A.   I believe Saturday or Sunday
11  morning.

12    Q.   How many times did you meet
13  with counsel in preparation for your
14  deposition?

15    A.   In preparation just for the
16  deposition?  Probably three times in
17  person and once by videoconference.

18    Q.   When did the in-person
19  meetings occur?

20    A.   One in Spokane.

21    Q.   When?

22    A.   I'm trying to remember.

23  Two -- two Thursday ago, March 7th or

24  thereabouts, whatever that Thursday date

Page 55

1  might be.  And then Friday and Sunday of
2  this most recent week.

3    Q.   When was the
4  videoconference?

5    A.   I don't remember without
6  looking at a calendar.

7    Q.   Was it prior to the
8  March 7th meeting in Spokane?

9    A.   Yes.

10    Q.   Other than the three
11  in-person meetings that you've mentioned
12  in preparation for your deposition and
13  the videoconference, did you meet with
14  counsel in person on any other occasion?

15    A.   No.

16    Q.   Prior to the March 7th
17  meeting in Spokane, had you ever met
18  counsel in person?

19    A.   I don't believe so.

20    Q.   And prior to that time, all
21  of your communication had been by
22  telephone?

23    A.   Yes.  Principally telephone,
24  some e-mail.

Page 56

1    Q.   Who contacted you about
2  serving as an expert?

3    A.   I was contacted by a
4  colleague at the University of Arizona.

5    Q.   Who?

6    A.   Robert Downs.

7    Q.   Who is Robert Downs?

8    A.   He is a geosciences
9  professor.

10    Q.   Who contacted Dr. Downs
11  about seeking an expert for this
12  litigation?

13    A.   I don't know who contacted
14  him.  He referred me to Alex and Jack.

15    Q.   When did you agree to serve
16  as an expert?

17    A.   In December before
18  Christmas.  I don't remember the date.

19    Q.   And was that -- did you
20  agree to become an expert at the time
21  that you were contacted by counsel for
22  J&J?

23    A.   There were multiple
24  conversations before I committed.

Page 57

1    Q.   Let me ask a couple of
2  general questions.

3       Would you agree that ore --
4  and you've referred to ore often in your
5  report, it is a term of art in geology of
6  course.  But for members of the jury and
7  maybe even others reading this
8  transcript, the definition of ore may not
9  be clear.

10       But can we agree that ore is
11  a type of rock that contains minerals
12  that can be extracted for sale?

13    A.   With the addition of
14  extracted at a profit, extracted and
15  processed at a profit.

16    Q.   So the ore in your mind, it
17  needs to be profitable?

18    A.   Profitable, yes.

19    Q.   And so if you happened to be
20  an unfortunate mining company, which can
21  happen, where you're mining rock and
22  you're selling it, but you're not making
23  money, is that not ore to you?

24    A.   We would still call that

Mary Poulson, Ph.D.

Page 58

1 ore. But for purposes of starting the
2 mine, we use an economic definition.
3    Q.   Okay. Because the hope is
4 you're going to make money?
5    A.   The hope is you're going to
6 make money.
7    Q.   Not always true?
8    A.   Not always true.
9    Q.   So -- but setting aside the
10 expectation of profit, et cetera, bottom
11 line is ore is what you extract from the
12 ground for purposes of sale?
13    A.   Yes.
14    Q.   Would you agree that
15 ofttimes, ore can have a primary mineral
16 and then also have accessory minerals?
17    A.   Yes.
18    Q.   Would you agree that
19 occurrences of certain minerals based on
20 their geology can have a high degree of
21 variability in terms of the prevalence of
22 accessory minerals?
23    A.   You might have to rephrase
24 that question for me.

Page 59

1    Q.   Okay. Would you agree that
2 certain minerals can, just because of
3 their very nature, how they are formed in
4 the earth, they can have a high
5 variability of accessory minerals, true?
6    A.   On what scale?
7    Q.   I'm not -- I'm not limiting
8 it to a particular scale. I'm just
9 saying they can have a high variability
10 of accessory minerals.
11    A.   I think I would want to
12 think of the more specific situation
13 before I answered.
14    Q.   Not willing to agree to that
15 pretty simple concept?
16    A.   No, it's actually not a
17 simple concept. I think I would want to
18 have a more specific example to answer.
19    Q.   How about with talc? Talc
20 is a mineral that can be used in
21 industrial and cosmetic settings, true?
22    A.   True.
23    Q.   And talc can be formed in a
24 number of different ways. For example,

Page 60

1 they can have an ultramafic deposit
2 that's formed through the -- which would
3 be true of Vermont, fair?
4    A.   True.
5    Q.   And that talc deposits can
6 have variability in terms of the
7 accessory minerals that are present,
8 true?
9    A.   What would you mean by
10 accessory minerals with regard to talc?
11    Q.   It could be chlorite. It
12 could be serpentine. Could be asbestos
13 minerals. Could be cobalt, chromium, et
14 cetera. Would you agree that certain
15 deposits have a greater amount of those
16 accessory minerals than others?
17    A.   So I think in this context
18 we would want to separate the actual talc
19 body from surrounding rock when we're
20 talking about accessory minerals.
21    Q.   And is it your opinion that
22 talc body, as you just used, an ore body,
23 would be a homogenous sort of formation
24 of solely talc?

Page 61

1    A.   No. It would not be solely
2 the chemical formula for talc. But what
3 accessory minerals might exist with it
4 would be very specific to how that
5 particular talc deposit formed and it
6 could be peripheral to the talc body.
7    Q.   And they also could vary in
8 amount across different talc deposits,
9 true?
10    A.   Again, could you clarify
11 what you mean by they could vary?
12    Q.   What's unclear about that?
13    A.   Well, I'm just -- I'm just
14 trying to get in my mind, are we talking
15 only about ultramafic bodies, what
16 accessory minerals are we talking about?
17 I just -- I just want to be clear in my
18 mind.
19    Q.   Well, take Vermont for
20 example, and ultra -- ultramafic talc
21 deposits, they can vary in terms of the
22 prevalence of certain accessory minerals,
23 true?
24    A.   The -- the talc body can

Mary Poulson, Ph.D.

Page 62

1 certainly vary in terms of grade of talc,
2 brightness, other variables, but when we
3 are talking about accessory minerals, we
4 would want to clarify what's part of the
5 talc body versus what are the
6 peripheral -- peripheral rocks.
7    Q.   How do you define accessory
8 minerals?
9    A.   Accessory minerals, it would
10 depend on the type of ore body we are
11 talking about and whether we are talking
12 about the general geology of the ore
13 deposit.
14        Are we talking about what
15 might occur microscopically with a
16 particular mineral of interest?
17        So it just depends as -- as
18 to what specifically we are talking
19 about.
20    Q.   Is there a general
21 definition of accessory mineral that you
22 think is appropriate to use?
23    A.   I tend to think more of ore
24 versus gang as opposed to specific

Page 63

1 accessory minerals, coming from a mining
2 background.  So geologists might talk
3 about specific accessory minerals in a
4 different context than -- than I might.
5    Q.   Well, since we're talking
6 about -- let me strike that and say this.
7        How do you understand
8 geologists to define accessory minerals?
9    A.   I'm not sure I could answer
10 generically how a geologist might define
11 that.
12    Q.   What is your definition
13 of -- general definition of accessory
14 minerals, as it's used in the geologic
15 literature?
16    A.   So if I'm talking
17 specifically about the commodity that's
18 being extracted, the accessory minerals
19 could be economic and separable, or they
20 can be gang material that is not
21 economic.  It really depends on the
22 situation.
23    Q.   Do you use the term "gang"
24 as -- interchangeably with waste

Page 64

1 material?
2    A.   I do.
3    Q.   And in terms of the amount
4 of a material, in order for it to rise to
5 the level of an accessory mineral,
6 what -- what would that be in your mind?
7    A.   I don't know if I could
8 define a level that would make something
9 accessory.  If it could be separated and
10 is useful and could be sold, it would be
11 a byproduct or a co-product.  To a mining
12 person or a metal person, or a geologist,
13 that might still be considered an
14 accessory mineral.  If it is not of
15 sufficient quality or use to be sold,
16 then it would be gang or waste material.
17    Q.   You are not a geologist,
18 true?
19    A.   I am not a geologist.
20    Q.   Do you agree that selective
21 mining involves carefully outlining the
22 boundaries of a particular ore body
23 first?
24    A.   Outlining the?

Page 65

1    Q.   The particular boundaries of
2 an ore body.
3    A.   Yes.
4    Q.   That's the first step --
5    A.   First step.
6    Q.   -- in selective mining.
7        The second step is to ensure
8 that the ore is segregated from the waste
9 material that also might be located
10 within that particular deposit, true?
11    A.   To the extent you can, yes.
12    Q.   It's not always possible.
13 True?
14    A.   It depends on the particular
15 situation.  So are we talking
16 specifically about --
17    Q.   I asked you just a general
18 question --
19        MR. CHACHKES:  If you would
20 let the witness finish, please.
21        MS. O'DELL:  I thought she
22 was finished.
23        MR. CHACHKES:  She was not.
24        Go ahead.

Mary B. Ounson, Ph.D.

Page 66

BY MS. O'DELL:

Q.   I apologize.  I thought you were finished.

A.   Again, I've -- I've lost my train of thought.

So we were talking about selective mining and whether you can -- how -- how narrowly you can define the boundaries.

Q.   No.  We actually had moved on.

A.   Okay.

Q.   We had talked about the second step in selective mining is essentially extracting material and then delineating between ore versus waste material.  True?

A.   I apologize.

Q.   I'll restate it.  If it's -- I'm going to do my best to ask you clear questions.  And so you can respond to them and we can have an understanding that you understood my question.  But if you don't, just ask me to restate it.

Page 67

I'm happy to do that.

A.   Okay.

Q.   The second step of selective mining involves segregating ore and waste during the extraction process, true?

A.   Yes.  You are basically mining the ore and you don't want to spend money moving any more waste than you have to.

Q.   Right.  And sometimes, despite best efforts, it's not always possible to precisely segregate the ore from other waste material that might be included in that particular deposit, fair?

A.   So you can basically move your -- your boundaries in from your waste margins to prevent that from happening.

Q.   But in the delineation of the particular ore body, if those assumptions about the contours of the ore body are not accurate, it's very possible to extract waste believing that you're

Page 68

extracting ore, true?

A.   Well, you can tell the difference between ore and waste.  So I'm not quite sure, when you say contours, what you mean.

Q.   Is it always true that you can tell the difference between ore and waste within a mine setting?

A.   And are we talking generic mines or specific mines?

Q.   Generic.

A.   I think we would want to talk specific mines to answer that question.

Q.   I'm asking you a general question.

A.   I don't think there's a specific answer to that general question.

Q.   You said in response to my question that -- excuse me, let me go back up to your answer.

You said you can tell the difference between ore and waste.  That was your statement.  Is that always true?

Page 69

A.   Always true for every kind of mineral deposit?

Q.   Yes.

A.   Again, I don't think we can have a specific answer to a generic question like that.

Q.   It's not always true that you can tell the difference between waste and ore in certain mining contexts, true?

A.   I think we would want to talk about specifics.

Q.   I'm asking you a general question.  If you can't answer that question, then just say I can't answer it.

A.   Well, I -- I think it can be answered with specifics, but I don't think that it's --

Q.   That's -- that's not a general principle that you can agree to?

A.   Well, you certainly delineate ore and waste.

I just, I guess I'm still confused on what -- what you're thinking

Mary Poulton, Ph.D.

Page 70

1  of in terms of can you discriminate
2  between them.
3      Q.   In an open pit setting where
4  you have -- when you're using a drill and
5  blasting situation, you'd agree with me
6  that it is not always possible to discern
7  between the boundary of ore and waste,
8  true?
9      A.   Again, I think we have to be
10  talking about specific situations.
11      Q.   And you can't answer that
12  question in a general way?
13      A.   I -- I think we have to talk
14  about specifics.
15      Q.   Is the answer -- you cannot
16  answer that question?
17      A.   As phrased about a generic
18  situation, I can't.
19          MR. CHACHKES:  Leigh, we've
20      been going about an hour and ten
21      minutes.  So wherever you think is
22      a good point for a break.
23          MS. O'DELL:  I'm fine.  If
24      you'd like a break, that's fine

Page 71

1      with me.
2          THE VIDEOGRAPHER:  Please
3      remove your microphones.  The time
4      is 10:14 a.m.  We are going off
5      the record.
6          (Short break.)
7          THE VIDEOGRAPHER:  Okay.  We
8      are back on the record.  The time
9      is 10:36 a.m.
10  BY MS. O'DELL:
11      Q.   Dr. Poulton, it's fair to
12  say that you have never designed an open
13  pit mine, true?
14      A.   No.
15      Q.   And it's fair to say that
16  you have never directed the operation of
17  an open pit mine, true?
18      A.   True.
19      Q.   Okay.  And you have never
20  designed an underground mine, true?
21      A.   From scratch?
22      Q.   Yes.
23      A.   Certainly within the context
24  of the coursework that we teach, we work

Page 72

1  with real data for companies.  That
2  includes surface and underground mine
3  data, mine planning, mine design.  So
4  working with the students, student
5  projects in the curriculum, we're working
6  with mining companies with real data.
7          So certainly I've been
8  involved in mine design and mine planning
9  with real data.
10      Q.   In the context of a
11  classroom?
12      A.   In the context of the
13  university.
14      Q.   And in a classroom, true?
15      A.   It doesn't necessarily have
16  to happen in a classroom.
17      Q.   But in a context of work as
18  a professor, true?
19      A.   Yes.
20      Q.   And in terms of consulting
21  with a mining company for purposes of
22  designing an underground mine, you've
23  never done that, true?
24      A.   I have not.

Page 73

1      Q.   And you have never consulted
2  with, or been employed by a mining
3  company in any way for purposes of
4  directing the operation of an underground
5  mine in the real world, so to speak,
6  true?
7      A.   You might have to repeat the
8  question for me.
9      Q.   I'm happy to.  You have
10  never been employed by a mining company
11  to direct the operation of an underground
12  mine, true?
13      A.   True.
14      Q.   You have never designed a
15  beneficiation process outside the context
16  of your work as a professor in an
17  academic setting, true?
18      A.   True.
19      Q.   Let's take that question
20  again to make sure we have it clear.
21          Outside the context of your
22  work as a professor, you have never
23  designed a beneficiation or processing
24  plant, true?

Page 74

1 A. For a mining company?
2 Q. Yes.
3 A. True.
4 Q. And in relation to talc
5 specifically, you have never designed a
6 beneficiation process for talc, true?
7 A. True.
8 Q. And when we say
9 beneficiation in this context, would you
10 agree with me we're referring to the
11 processing plant that receives ore from
12 the mine, and it is taken through a
13 process to either purify it, remove
14 certain aspects of the ore, et cetera, in
15 order to get a final product?
16 A. So beneficiation includes
17 comminution, which is reduction in
18 particle size and then concentration.
19 Q. Turning to your report in
20 this case which we've marked previously
21 as Exhibit 2. And I'll ask you to turn
22 to Page 4 of your report. You cite an
23 article that was written by Miller and
24 published in 1984. It's an article by

Page 75

1 Roger Miller. Who is Roger Miller?
2 A. Roger Miller worked at the
3 Hammondsville mine. I think he might
4 have been mine manager at one point.
5 Q. And he was employee of
6 Windsor Minerals, true?
7 A. As far as I know, yes.
8 Q. And Windsor Minerals was a
9 wholly owned subsidiary of Johnson &
10 Johnson, true?
11 A. At one point, yes.
12 Q. Mr. Miller wrote a
13 presentation that was given at a meeting
14 of the society of mining engineers.
15 And it was -- the
16 publication relates to continuous mining
17 machines. Do you recall that?
18 A. Yes.
19 Q. And continuing mining
20 machines were utilized in underground
21 operations by Windsor Minerals, but they
22 were not used in open pit mining, true?
23 A. No.
24 Q. That's not true?

Page 76

1 A. I believe they were used in
2 open pit mining at one point.
3 Q. Which mines?
4 A. I would have to go back and
5 look at documents to be sure.
6 Q. What period of time?
7 A. Again, I'd have to look at
8 the documents to -- to be sure.
9 Q. Do you know how long?
10 A. How --
11 Q. How long they were used, if
12 they were used?
13 A. They were used? I don't
14 know without looking at the documents
15 again.
16 Q. Do you have a memory whether
17 it was a short period of time or a long
18 period of time?
19 A. What would you define as
20 short versus long?
21 Q. Less than a year, more than
22 a year?
23 A. That, I don't know.
24 Q. What mines were in Vermont

Page 77

1 were used to source Johnson & Johnson
2 talcum powder products?
3 A. I would want to refresh my
4 memory to make sure I have it exactly
5 right. Hammondsville was used. Argonaut
6 was used. My memory is that at certain
7 points perhaps Hamm was used or qualified
8 for use and perhaps Rainbow was either
9 qualified or perhaps had been used, but I
10 would want to check the record to be
11 certain that that is the right list.
12 Q. Any others?
13 A. Not that come to mind again
14 without checking through some of the
15 documents.
16 Q. What county is the
17 Hammondsville mine located in?
18 A. What county?
19 Q. Yes.
20 A. I don't know.
21 Q. What county is Argonaut
22 located in?
23 A. I don't know.
24 Q. Do you know what county the

Page 78

1 Hamm mine is located in?
2      A.   I don't know.
3      Q.   Do you know what county
4 Ludlow is located in?
5      A.   I don't without looking at a
6 map.
7      Q.   You don't know that in the
8 context of your work in this case?  You
9 don't know what county those mines are
10 located in, true?
11      A.   Off the top of my head in
12 this deposition, I don't.
13           I would have to consult a
14 map that was in some of the documents.
15      Q.   What mills were used by
16 Johnson & Johnson to process cosmetic
17 talc?
18      A.   West Windsor.
19      Q.   Any others?
20      A.   Not that I recall.
21      Q.   Ludlow, the Ludlow plant was
22 used to process industrial talc, true?
23      A.   That is my understanding.
24      Q.   And ore from -- ore --

Page 79

1 excuse me.
2           Ore for cosmetic talc was
3 crushed at Ludlow prior to being
4 transported to West Windsor for
5 processing, true?
6      A.   I would want to confirm that
7 in the documents.  That is my
8 recollection but I would want to confirm
9 that.
10      Q.   As I appreciate your answer,
11 is that's your recollection, that that
12 was the case, fair?
13      A.   Could you repeat the
14 question for my recollection?
15      Q.   Well, you just said it's my
16 recollection that it was true that ore
17 was crushed at Ludlow and then sent to
18 West Windsor for processing.  I
19 understood you to say that that is your
20 recollection.
21      A.   That is my recollection.
22      Q.   And then you keep saying
23 that you need to check documents.
24      A.   Yes.

Page 80

1      Q.   If you check documents and
2 you learn that that's not the case, would
3 you come back to me because I'm going to
4 rely on your answer that you've just
5 given.
6           MR. CHACHKES:  Counsel, I'm
7      just going to object there.  We
8      are not keeping the deposition
9      open.  If you want to investigate
10      documents, we can do it right
11      here.
12           MS. O'DELL:  Well, she's
13      saying I need to look at
14      documents.
15 BY MS. O'DELL:
16      Q.   If there's something that
17 you need to look at, I'm sure your lawyer
18 is going to provide it to you.  I don't
19 know exactly what document you are
20 referring to.  So you keep qualifying
21 your answer in that way.  And I'm just
22 trying to get a final answer so I'll know
23 what your opinion is.  Is that fair?
24      A.   Well, I don't want this to

Page 81

1 be a memory test.  I want it to be
2 accurate.  So I want to make sure that
3 what I'm answering is accurate.
4      Q.   I want -- I want to
5 understand your opinions.  That's why I'm
6 here today.  I want -- if there's
7 something that you have described in your
8 report, I'm here to ask you a question
9 about it.  If you've got another opinion
10 that's not in your report, I want to know
11 about it, because this is my opportunity.
12 Okay.
13           So it's your understanding
14 that cosmetic talc was crushed at Ludlow
15 and then sent to West Windsor for
16 processing, fair?
17      A.   That's my recollection.
18      Q.   Ore from Argonaut was mined
19 for both industrial purposes as well as
20 cosmetic purposes, true?
21      A.   True.
22      Q.   And that's also true for the
23 Hamm mine?
24      A.   I believe so.

Mary Poulson, Ph.D.

Page 82

1    Q.   That was also true for the
2  Hammondsville mine?
3    A.   That I would have to
4  confirm.
5    Q.   Hammondsville was used to
6  source cosmetic talc, true?
7    A.   True.
8    Q.   And Hammondsville was also
9  used to source industrial talc, true?
10    A.   I -- I would want to confirm
11  my memory on that.
12    Q.   But you believe that to be
13  the case?
14    A.   I believe sitting here right
15  now.  But again I don't necessarily want
16  to rely on memory right now.
17    Q.   Please describe the geology
18  of the talc deposits that were used to
19  source J&J talc, and I'm meaning the
20  Vermont deposit.
21    A.   Describe the geology?  Could
22  we look at the documents that -- that
23  describe the geology?
24    Q.   What's your understanding?

Page 83

1    A.   That they are talc bodies,
2  there is a sometimes serpentine or
3  serpentinite core that grades from that
4  core to a potentially talc carbonate
5  body, then a talc body, and then
6  ultimately to the boundary which is
7  called a black wall and then into country
8  rock.
9    Q.   What was the origin of
10  the -- the talc deposits in Vermont that
11  were used to source J&J talc?
12    A.   The geologic origin?
13    Q.   Yes.
14    A.   Again, I would want to go
15  back to geologic reports on that, because
16  my focus was primarily on the mining and
17  not the -- the genesis of ultramafic
18  bodies in Vermont.
19    Q.   You are not a mineralogist,
20  true?
21    A.   I am not a mineralogist, but
22  I do teach mineralogy and petrology for
23  engineers.
24    Q.   If the mineralogy of an ore

Page 84

1  body has been, you know, characterized,
2  data has been collected, whether through
3  core drilling or other mechanisms, and
4  that data has been collected and the
5  mineralogy of a particular deposit has
6  been described in the literature for
7  example, that data would be relevant for
8  all projects in the future that relate to
9  that particular ore body, true?
10    A.   So are we talking about a
11  general description of mineralogy
12  regionally?
13    Q.   It could be regionally.  It
14  could be a district that's being
15  described.
16         But for example, in this
17  particular case there are publications of
18  the mineralogy of Vermont and the talc
19  deposits found that were written in
20  1950s, 1960s, some earlier, that describe
21  the general mineralogy of those deposits.
22         Do you recall those?
23    A.   I think I've seen reference
24  to publications say by Chidester.  I

Page 85

1  think there was another one that is
2  commonly cited.  I don't remember the
3  author off the top of my head.
4    Q.   And in those publications,
5  though written in the 1950s, describe
6  the -- now, their -- let me strike that
7  and start again.
8         Those publications, though
9  they're written in 1950s for example,
10  characterize the mineralogy and continue
11  to have application for future projects
12  in that area, fair?
13    A.   And what do you mean by
14  projects?
15    Q.   Mining projects.
16    A.   Mining projects.  So it
17  really depends on the scale that you're
18  talking about.  And it also depends on
19  re-interpretation of geology since then
20  because we're much better at age dating
21  rocks.  We're much better at
22  understanding tectonic movements and --
23  and what was occurring when over millions
24  of years.  So maybe they are relevant on

Mary Poulson, Ph.D.

Page 86

1  a general level.  Maybe they are not.
2  And they may not be applicable when you
3  actually get down to the mining zone.
4      Q.  All right.  But the
5  fundamental geology doesn't change --
6  hasn't changed in the last hundred years,
7  fair?
8      A.  The rocks haven't changed --
9      Q.  Correct.
10      A.  -- perhaps in a million
11  years, but the -- the geologic science
12  has evolved.  And again it would come
13  down to revisions that can be made based
14  on new analytical techniques particularly
15  for aged dating.
16      Q.  But the fundamental
17  mineralogy would not vary over that
18  particular time period?
19      A.  The -- the minerals that are
20  in the rocks are -- are still there.  The
21  interpretation of the mineralogy could
22  potentially change.
23      Q.  May change, may not change?
24      A.  It depends on the level of

Page 87

1  detail of the analysis of the minerals.
2      Q.  If the geochemistry of a
3  particular ore body has been evaluated,
4  the data regarding that geochemistry
5  would be relevant for the entire period
6  of time that ore body is mined, true?
7      A.  So when you say
8  geochemistry, could you clarify for me --
9      Q.  The presence of heavy
10  metals, for example.
11      A.  The presence of heavy
12  metals.  And you're, again, asking
13  specifically what about the heavy metals?
14      Q.  I'm asking if the
15  fundamental geochemistry of a particular
16  ore body has been evaluated and described
17  in the literature, that would be relevant
18  for, you know, many years after that
19  publication was published, fair?
20      A.  Maybe not.  Again, it
21  depends on analytical techniques and
22  their resolution.  How samples were
23  taken.  So it -- it would really depend a
24  lot on when initial data were taken, what

Page 88

1  techniques, and what's available now.
2      Q.  If you assume the data is
3  correct, and if you assume -- assume the
4  methodology that was used is correct, and
5  there's been a description of the
6  geochemistry of a particular ore body,
7  that data would continue to be relevant
8  for decades after the publication of that
9  material, true?
10      A.  Again, it -- it really
11  depends on how those data were collected
12  and analyzed to start with.  And so I
13  can't say that something collected and
14  analyzed in the 1950s could be duplicated
15  with better techniques today.  I -- I
16  don't know the answer to that.
17      Q.  In terms of publications
18  like that, so we are talking about in
19  particular talc, in some of the -- the
20  publications that were written in the
21  '50s for example, the early '60s,
22  Chidester, do you have any basis to say
23  that those publications are no longer
24  relevant to the talc ore bodies in

Page 89

1  Vermont?
2      A.  So I have not read Chidester
3  and I couldn't answer specifically to
4  Chidester.
5      Q.  Have you had -- have you
6  read Seymour?
7      A.  I have not read Seymour.
8      Q.  Have you read Van Gosen on
9  talc deposits?
10      A.  I don't recall if I've read
11  all of Van Gosen.  I may have seen some
12  of Van Gosen.
13      Q.  Have you read the Ratté
14  publication on the mineralogy of Vermont?
15      A.  Which publication.
16      Q.  Ratté?
17      A.  Ratté.  And where is that in
18  my list?
19      Q.  I'm asking you, I'm not
20  looking at your list.
21      A.  Oh, okay.  I don't recognize
22  that name.  I guess I'd have to see the
23  citation.
24      Q.  Charles Ratté, Mineral

Page 90

1 Resource Provinces of Vermont, Geological
2 Survey, 1982.
3     A.   I don't recall referencing
4 that in my report.
5     Q.   Have you read Robert Virta,
6 "The phase relationship of talc and
7 amphiboles in a fibrous talc sample,"
8 Bureau of Mines, 1985?
9     A.   I -- I may have seen that
10 paper.  I don't recall.  But it's --
11     Q.   If it's not on your list you
12 have not seen it, correct?
13     A.   Well, I may have seen it in
14 passing and decided that it wasn't
15 relevant to looking at the -- the mine
16 planning.
17     Q.   Do you have any opinions
18 regarding the mine planting -- not
19 planting -- planning and implementation
20 that was conducted in the Italian talc
21 mines?
22     A.   So do I have a opinion on
23 the mine planning that was done or the
24 mine operations?

Page 91

1     Q.   Yes.
2     A.   So there's very little
3 information other than what has been
4 described in trip reports for the mining
5 operation.  And I don't believe I saw a
6 published report on mine plans for the
7 Fontaine mine.
8     Q.   Do you have any opinions
9 regarding the mine planning for the
10 Italian mines that were used to source
11 Johnson & Johnson's Baby Powder or Shower
12 to Shower?
13     A.   So what I have seen from
14 described reports, describe the mining
15 methods, and describe the mining process.
16 And how the talc was sorted.  I don't
17 know that I have seen a published mine
18 plan.
19     Q.   So you don't have any
20 opinions regarding the mine planning or
21 mine plan of the mines in Italy that were
22 used to source J&J talcum powder
23 products, true?
24     A.   If you mean mine plan maps

Page 92

1 of the mine, I have not seen maps of the
2 Fontaine mine.
3     Q.   You've not seen planning
4 documents for the Italian talc mines that
5 were used to source Baby Powder and
6 Shower to Shower, true?
7     A.   So planning maps, did you
8 say?
9     Q.   I think I said mine plans,
10 or planning documents?
11     A.   Planning documents would
12 include mine maps.  Again, I have not
13 seen mine maps for Fontaine.
14     Q.   Or plans of any other type?
15     A.   Or plans.  I've seen
16 descriptions of the mining methods.
17     Q.   What's your understanding of
18 the geological formation of the talc
19 deposit in China that is used to source
20 J&J talcum powder products?
21     A.   So again, I'm not focused on
22 the geologic formation of these deposits.
23 I'm focused on the mining methods and the
24 beneficiation.  The descriptions that

Page 93

1 I've seen of the geology indicate that
2 it's carbonate based and is a pure talc
3 or a high grade talc I should say.
4     Q.   It's a deposit that is
5 characterized by high levels of dolomite,
6 true?
7     A.   I would have to look at some
8 documents to confirm dolomite.
9     Q.   How about chlorite?
10     A.   That I don't know without
11 looking at documents.
12     Q.   Have you seen any data --
13 strike that.  Let me ask one question
14 before I get there.
15     What's the name of the mine
16 or mines in China that are used to source
17 Johnson & Johnson's Baby Powder?
18     A.   The Chinese names I would
19 have to look in my report if that's okay.
20     Q.   Sure.
21     A.   Okay.  So I list a surface
22 mine in Guangxi Province, Longshen County
23 in China.  I would have to look at one of
24 the documents to get the exact name of

Mary Poulson, Ph.D.

Page 94

1  the mine, because I'll mispronounce it.
2  It's something on the order of Guping or
3  something, I think. I want to go back
4  and look at that document.
5      Q.   Is the Zhizhuo -- and
6  forgive my pronunciation, but I think
7  that's close. Alex can probably tell me.
8  Is the Zhizhuo mine one of the mines that
9  was used to source Johnson & Johnson
10  talcum powder products?
11     A.   I'd want to go back and look
12  at that document to make certain which
13  mines were which.
14     Q.   Have you seen any mine
15  planning documents related to the Chinese
16  mine, or mines used to source Johnson &
17  Johnson products?
18     A.   I have not seen mine plans
19  for the mine in China.
20     Q.   Have you seen drill core
21  logs or any similar data from the mines
22  in China used to source -- source J&J
23  talcum powder products?
24     A.   No.

Page 95

1      Q.   In your report on Page 5,
2  you mention that the Guangxi University
3  tests talc ore for quality.
4          Do you see that?
5      A.   Yes.
6      Q.   And in relation to that
7  testing, have you seen any test results
8  from the Guangxi University testing?
9      A.   I would have to go back and
10  look at some of the documents to see if
11  there were specific test results from
12  that university.
13     Q.   Do you recall any as you sit
14  here today?
15     A.   Possibly. But I'm not sure.
16     Q.   Have you seen any
17  photomicrographs from that testing?
18     A.   I don't think I looked for
19  them.
20     Q.   So that's a no to my
21  question?
22     A.   If I have seen them, I would
23  agree I have not.
24     Q.   Have you seen any other data

Page 96

1  from testing from the tests that
2  ostensibly have been run by the Guangxi
3  University lab, whether that be, you
4  know, TEM data, SEM data, XRD data, et
5  cetera?
6      A.   I would have to look at some
7  of the documents for the Houston mill to
8  see if they had the university test
9  results in the documents when they
10  received shipment in Houston.
11     Q.   Do you -- I'm not asking for
12  any summary documents. I'm asking for
13  underlying data from that testing. Have
14  you seen any XRD, TEM, or SEM output or
15  data from that testing?
16     A.   And I would have to see if
17  those fundamental data were attached to
18  anything that was received in Houston.
19     Q.   Do you recall such data
20  being attached as you sit here today?
21     A.   I don't without going back
22  and looking at some of the documents.
23     Q.   So I'll represent to you
24  that I have -- I or my colleagues -- have

Page 97

1  looked through every document that's been
2  disclosed in this litigation regarding
3  geology testing, et cetera. If I've
4  never seen any XRD output, SEM output,
5  you know, TEM underlying data, would you
6  agree with me that it's not been
7  provided?
8          MR. CHACHKES: Objection.
9          THE WITNESS: I might ask a
10         second opinion, but...
11 BY MS. O'DELL:
12     Q.   You have no reason to
13  disagree with me?
14     A.   I don't have a reason to
15  disagree.
16     Q.   What is JORC J-O-R-K?
17     A.   C.
18     Q.   C, excuse me.
19     A.   JORC is joint ore reserve
20  committee.
21     Q.   And that joint ore resource
22  committee is a -- or document, is
23  published by the Australasian -- I can't
24  say this. Forgive me. Australasian --

Page 98

1  Pacific Rim is easier.  Australasian code
2  for reporting of mineral resources and
3  ore reserves?
4      A.    Correct.
5      Q.    And the Pacific of JORC is
6  to institute some type of standard or
7  agreed upon reporting in order to
8  evaluate ore reserves, correct?
9      A.    And resources.
10     Q.    And essentially the purpose
11 of that document, JORC, if you will, is
12 to ensure that ore reserves are
13 calculated with some accuracy for
14 purposes of evaluating the economic value
15 of a particular ore body, true?
16     A.    So it is for public
17 reporting of resources in reserves to
18 protect investors from erroneous reports
19 of resources and reserves.  So it sets a
20 professional standard for how those
21 resources and reserves should be
22 calculated and reported.
23     Q.    It is not a required
24 reporting mechanism for mines in the

Page 99

1  United States, true?
2      A.    So there is a harmonization
3  group for securities exchanges called
4  CRIRSCO.  So all of the various security
5  exchanges that deal with mine resource
6  and reserve reporting participate through
7  professional organizations within
8  CRIRSCO, a worldwide organization.  And
9  JORC has been a permanent standard in
10 that harmonization worldwide for
11 securities exchanges.
12         So the Securities & Exchange
13 Commission in the U.S., the SEC, used a
14 different standard called Guide 7 until
15 quite recently.  And now they have agreed
16 to change Guide 7 and update it to be
17 more in alignment with JORC.
18     Q.    But the SEC does not, has
19 not in the past and currently does not
20 require adherence to JORC, true?
21     A.    It's a similar standard.  It
22 leaves out certain categories of
23 resources.
24     Q.    The SEC does not require

Page 100

1  adherence to JORC, true?
2      A.    Adherence to JORC as
3  published on the JORC.org website, true.
4      Q.    As to the mines in China, do
5  you have any information to suggest that
6  the Chinese mining company is in
7  compliance with the JORC standards?
8      A.    I don't have information.
9      Q.    In terms of Vermont, would
10 it be fair to say that in relation to the
11 Vermont talc mines, that they were never
12 in compliance with JORC standards?
13     A.    I don't know that I can say
14 they were never in compliance.  Rio
15 Tinto, I believe, followed JORC as
16 largely an Australian company.  I don't
17 have complete records to know what was
18 reported for talc resources and reserves
19 through Rio Tinto.
20     Q.    During the -- during the
21 time period that Vermont was used to
22 source Johnson & Johnson's talcum powder
23 products, approximately 1960 to 2000 --
24 early 2003, do you have any information

Page 101

1  to suggest that either Windsor Minerals
2  or Cyprus Minerals or any of the
3  companies that owns -- Imerys, were in
4  compliance with JORC during the time they
5  operated the mines?
6      A.    Well, JORC didn't come into
7  existence until 1970s, I believe.  I'd
8  have to look at the exact date for when
9  JORC came into compliance.  I believe
10 Guide 7 for the SEC, late '70s, early
11 '80s, perhaps as well.  So you can only
12 go back as far as those standards of
13 practice existed.
14     Q.    That's fair -- that's fair
15 enough.
16         Following the creation of
17 JORC, 1970s, whatever it might have been.
18 And obviously the talc mines were in
19 operation in Vermont, the ones that were
20 used to source Baby Powder.  Do you have
21 any data to suggest that the operations
22 were in compliance with the mandates of
23 JORC?
24     A.    I have seen reference to

Page 102

1  JORC in some of the mine plans during the
2  Rio Tinto ownership.
3      Q.   And, in fact, Rio Tinto
4  in -- in 2008 in a document states that
5  they were not in JORC compliance.
6      A.   Not at that stage of the
7  planning.
8      Q.   And do you have any data to
9  suggest that they were in compliance with
10 JORC prior to 2008?
11     A.   I would have to go back and
12 look at earlier mine documents.
13     Q.   If JORC was never mentioned
14 in a Rio Tinto or Imerys or Cyprus or
15 West Windsor Minerals document prior to
16 2008, would you agree with me it's more
17 likely than not they were not in
18 compliance with JORC?
19     A.   Not necessarily.  It doesn't
20 have to say this is in compliance with
21 JORC to be in compliance with JORC.
22     Q.   Do you have any data to
23 suggest they were in compliance prior to
24 2008?

Page 103

1      A.   Were or were not in
2  compliance?
3      Q.   Were in compliance.
4      A.   I -- I don't have
5  information that they were or were not.
6      Q.   You can't say one way or the
7  other?
8      A.   I don't have that
9  information.
10     (Document marked for
11     identification as Exhibit
12     Poulton-5.)
13 BY MS. O'DELL:
14     Q.   Let me show you what I'm
15 going to mark as Exhibit 5.  It is a copy
16 of Dr. Cook's report that was served in
17 the litigation.  We'll be referring to
18 that some.
19     And then also hand you what
20 I'm marking as Exhibit 6 which is a copy
21 of Dr. Krekeler's report.
22     (Document marked for
23     identification as Exhibit
24     Poulton-6.)

Page 104

1  BY MS. O'DELL:
2      Q.   And you reviewed both of
3  these reports in writing your report in
4  this case, fair?
5      A.   Correct.
6          MR. CHACHKES:  Just for the
7      record, Exhibit 5 is the amended
8      report, right?
9          MS. O'DELL:  Yes.  That's
10     correct.  Exhibit 5 is Dr. Cook's
11     amended report.  Thanks for the
12     clarification.
13 BY MS. O'DELL:
14     Q.   If you'll turn to Page 6 of
15 your report, and we'll be toggling back
16 and forth a little bit between reports.
17     But, to start our
18 discussion, you criticize Dr. Cook and
19 Dr. Krekeler for, as you put it,
20 improperly conflating non-ore samples and
21 ore samples.
22     Fair?
23     A.   Correct.
24     Q.   And you base that in large

Page 105

1  measure on statements in which Dr. Cook
2  and Dr. Krekeler refer to a report of
3  Dr. Fred Pooley from -- regarding Italian
4  mines?
5      A.   Yes.
6      Q.   And fundamentally,
7  Dr. Poulton, is it your position that all
8  of the samples that Dr. Pooley analyzed
9  in that report regarding the Italian
10 mine, that those samples were not
11 material that would be considered ore?
12     A.   My recollection is that he
13 was, in this case, specifically
14 collecting samples of non-ore and took a
15 few examples of ore but was predominately
16 looking at non-ore.
17     Q.   But he considered both ore
18 and non-ore in the report, fair?
19     A.   He had a couple of ore
20 samples.
21     Q.   So he had ore samples and
22 what -- and what you would term as
23 "non-ore" --
24     A.   Non-ore.

Mary Poulton, Ph.D.

Page 106

1    Q.    -- true?
2    A.    I believe so.
3        (Document marked for
4    identification as Exhibit
5    Poulton-7.)
6  BY MS. O'DELL:
7    Q.    And I'm going to hand you
8  what I'm going to mark as Exhibit
9  Number 7 for your deposition.  And ask
10 you if that's the -- the Pooley report
11 that you're referring to in your report
12 at Page 6?
13   A.    I'd have to look at the one
14 I had, because I didn't have color
15 pictures in it.  So I'd have to find out
16 if this is the same one.
17       MR. CHACHKES:  Let's not
18   forget to write in Poulton on the
19   exhibit tags.  I see they are
20   blank right now with just numbers.
21       (Whereupon, a discussion was
22   held off the record.)
23 BY MS. O'DELL:
24   Q.    So taking a look at this,

Page 107

1  what I've marked as Exhibit 7, does this
2  appear to be the Pooley report that you
3  reviewed in reaching your opinions
4  expressed on Page 6 and thereafter?
5    A.    It seems to have different
6  numbers on it.  So I think I would have
7  to put mine side by side with this to
8  confirm.
9    Q.    Okay.  Did you bring yours
10 with you?
11   A.    I don't have it with.
12       MR. CHACHKES:  We -- we do
13   have every exhibit somewhere here
14   in the room.
15 BY MS. O'DELL:
16   Q.    Okay.  Well, I -- I believe
17 this to be the same report that you've
18 looked at, the -- the one I have marked
19 as -- as Exhibit 7.
20       But if you need to see your
21 own copy or your lawyer's copy to confirm
22 that, we can go off the record for a
23 moment and y'all can find the exhibit.
24   A.    Yeah, I'd like to because

Page 108

1  I -- I haven't seen color pictures in my
2  report.  So I would like to know that
3  it's exactly the same.
4        MS. O'DELL:  Let's go off.
5        THE VIDEOGRAPHER:  All
6    right.  The time is 11:23 a.m.
7    Off the record.
8        (Brief pause.)
9        THE VIDEOGRAPHER:  Okay.  We
10   are back on the record.  The time
11   is 11:44 a.m.
12 BY MS. O'DELL:
13   Q.    Dr. Poulton, I've put before
14 you your copy of Dr. Pooley's report
15 regarding Italian mine samples.  I've
16 marked it as Exhibit 8.  Do you have that
17 in front of you?
18   A.    I do.
19       (Document marked for
20   identification as Exhibit
21   Poulton-8.)
22 BY MS. O'DELL:
23   Q.    If you'll turn to Page 8 --
24 excuse me, not 8.  2 of his actual

Page 109

1  report, which has at the bottom, a number
2  JNJ 000322355.
3        Do you see that?
4    A.    Yes.
5    Q.    It's page --
6    A.    It also says JNJ 0050290.
7  Is that the same page?
8    Q.    It is.
9    A.    Okay.
10   Q.    So for our purposes today,
11 we'll go -- we'll go with the bottom
12 Bates number.
13   A.    Okay.
14   Q.    What you see right there on
15 the screen.
16   A.    Okay.
17   Q.    And if you'll look at the
18 top of the page, the second paragraph
19 beginning with the objective.
20       Do you see that?
21   A.    Yes.
22   Q.    It says, "The objective of
23 the examination has been mainly to
24 establish the major minerals which occur

Mary Boulson, Ph.D.

Page 110

1  in association with talc at the Italian
2  mine.  In particular, to look at the
3  association of these minerals with talc,
4  and especially those minerals which are
5  of the same family as the commercial
6  asbestos minerals, i.e., the amphiboles
7  and serpentine."
8       Did I read that correctly?
9       A.  I see that, yes.
10      Q.  And -- and so this is
11 Dr. Pooley's description of his objective
12 for this analysis, true?
13      A.  Yes, that he is looking at
14 the minerals that are associated with the
15 talc.  Not necessarily the talc ore.
16      Q.  Well, it can be associated
17 with talc in the same ore body.  Fair?
18      A.  Ore body being what's
19 extracted versus the surrounding rock
20 would be different.
21      Q.  Well, asbestos minerals can
22 occur within talc formations, fair?
23      A.  I would disagree to some
24 extent with that statement.  Because it

Page 111

1  very much depends on the origin of the
2  talc and whether you're talking about the
3  actual mining zone of commercial high
4  grade talc.
5       Q.  In regard to Dr. Pooley's
6  study in -- of Italian talc, he was
7  studying not only talc, but those
8  minerals associated with talc in the
9  Italian mine, true?
10      A.  That -- that would be the
11 minerals that are surrounding the talc
12 ore body.  Not necessarily the minerals
13 that are in the commercial talc.
14      Q.  Well you're speculating in
15 that sense.  I'm asking you what he set
16 out to do in this report.
17      MR. CHACHKES:  Objection.
18 BY MS. O'DELL:
19      Q.  His --
20      MS. O'DELL:  Let me finish.
21      MR. CHACHKES:  I thought you
22 were done.  Sorry.
23 BY MS. O'DELL:
24      Q.  His objective was to

Page 112

1  evaluate -- let me just read it.
2       His objective as stated was,
3  "The examination has been mainly to
4  establish the major minerals which occur
5  in association with talc at the Italian
6  mine," true?
7       A.  So that statement doesn't
8  mean that those minerals are associated
9  with the commercial minable talc.  It
10 means that they're associated surrounding
11 the talc body when you look at where he
12 took samples.
13      Q.  If you'll listen to my
14 question.  His -- I'm not asking you
15 about commercial Italian talc in a
16 general sense.  I'm asking you about the
17 objective of his study.  And he stated
18 his objective in his report, true?
19      A.  Well, I believe I answered
20 that question, that he is looking at
21 primarily samples surrounding the talc
22 ore body in the Italian mine.  So mine
23 would mean that they're mining commercial
24 talc.  And he's looking at the minerals

Page 113

1  that are surrounding that ore body to
2  understand whether they might contain
3  things that could be problematic for that
4  commercial talc.
5       Q.  He is examining samples to
6  identify minerals which occur in
7  association with talc at the Italian
8  mine, true?
9       A.  So.
10      Q.  That's what he states?
11      A.  Association with talc at the
12 Italian mine means that they are
13 surrounding the talc.
14      Q.  If you'll turn to the next
15 page, it lists the samples that
16 Dr. Pooley examined.  Sample I.5 was
17 general ore, meaning general talc ore,
18 fair?
19      A.  Yes.
20      Q.  He looked at I.7 which was
21 mica schist specimen?
22      A.  Which is not the talc ore.
23      Q.  I'm just asking if you
24 looked at that sample.

Page 114

1    A.   So I see that he lists I.7,
2  mica schist specimen --
3    Q.   So the answer to my question
4  was yes?
5    A.   Could you repeat your
6  question for me.
7    Q.   My question was, he looked
8  at a Sample I.7, and it was -- he
9  identified it as mica schist specimen?
10    A.   That's what it says.
11    Q.   He looked -- examined sample
12  I.19 which was tremolite, quartz and talc
13  in one sample?
14    A.   That's what it says.
15    Q.   I.24 was also a talc sample.
16  It says it's next to carbonate face 2?
17    A.   That's what it says.
18    Q.   So examined talc in that
19  sample, true?
20    A.   That's what it says.
21    Q.   And if you'll turn to the
22  next page, he looked at a sample that he
23  identified as I.41 which was described as
24  "face 2, good specimen."

Page 115

1    Do you see that?
2    A.   I see what it says there.
3    Q.   If you'll turn over to Page
4  $6 of Exhibit 8.  He gives a summary in
5  part of the method he used.
6    And then he goes onto
7  different a description of some of the
8  constituents.  Begin in the first
9  paragraph he says, "Thin and polished
10  sections were prepared of the specimens
11  of wallrock and, where possible, the talc
12  ore."
13    Do you see that?
14    A.   I see where it says that.
15    Q.   And it goes on to say, "The
16  minerals which formed a major constituent
17  in at least one of the sections were
18  quartz, muscovite, talc, chlorite (var
19  sheridanite), calcite, garnet and
20  tremolite."
21    Do you see that?
22    A.   Yes.
23    Q.   It goes on to say, "Phases
24  which were always minor or accessory were

Page 116

1  microcline, plagioclase, biotite, pennine
2  epidote, clinozoisite" -- do you know how
3  to say that?  Clinozoisite?
4    A.   You know, my copy is so
5  smudged, I can't read it.
6    Q.   Okay.
7    -- "hornblende, and then
8  actinolite."
9    Do you see that?
10    A.   I see those.
11    Q.   Were what he referred to as
12  minor or accessory minerals within the
13  deposit, true?
14    A.   Within the talc deposits, he
15  is listing a range of specimens here
16  which may or may not again be in the talc
17  ore.  It could be in the surrounding
18  rock.
19    Q.   And it could also be in the
20  talc ore, fair?
21    A.   We would have to look at the
22  specimens that came specifically from the
23  talc ore.
24    Q.   Is it agreed that within in

Page 117

1  the specimens that he examined and
2  reported on in Exhibit 8, Dr. Pooley
3  found tremolite?  True?
4    A.   Could you repeat that
5  question for me?
6    Q.   Dr. Pooley found tremolite
7  in the specimens that he examined and
8  reported on in Exhibit 8?
9    A.   So we would want to look at
10  the specific specimens and see which ones
11  listed tremolite.
12    Q.   Are you disputing that he
13  reported that he found tremolite within
14  these samples?
15    A.   I would want to look at each
16  specific specimen to see what each one
17  said.
18    Q.   So you can't agree with
19  that, just based on your knowledge of the
20  document?
21    A.   I would want -- because he
22  has a number of specimens here, I would
23  want to know what each one said.
24    Q.   Just sitting here today, you

Page 118

1 can't tell us whether Dr. Pooley reported
2 that he found tremolite or actinolite
3 within the specimens that he examined and
4 reported on in Exhibit 8?
5     A.    Well, we can go through the
6 specimens one by one.
7     Q.    All right.  We can do that.
8     A.    We can do that.
9     Q.    And we're going to go
10 through a number of them.  But I'm just
11 asking as a general matter, do you know
12 that one way or the other?
13     A.    Well, I would again be very
14 clear about looking at each analysis.
15     Q.    Turn to Page 6 of his
16 report.  It's at the top.  It's Page 6.
17 The Bates number at the bottom ends 361.
18     A.    Are you sure it's 6 or 8?
19     Q.    That's a good question.  It
20 could be 8.  It's eight.  Sorry.  Looked
21 like -- as you mentioned, this is not the
22 best copy.
23         Are you there?
24     A.    And can you repeat the Bates

Page 119

1 number for me?
2     Q.    361.
3     A.    361 yes.
4     Q.    He is describing what he
5 found with specimen I.5, general ore.
6         Do you see that?
7     A.    I see that.
8     Q.    And he reports that, "A
9 coarse aggregate of curving foliaceous
10 and feathery crystals of talc displaying
11 evidence of shearing and translation
12 twinning.  As in Specimen I.3, dusty
13 inclusions of transparent mineral with a
14 general prismatic habit occurs dispersed
15 in the talc.  As before, but to a lesser
16 extent, the talc is cleansed of these
17 inclusions along zones associated with
18 deformation and translation twinning, and
19 it appears that the inclusions" -- he's
20 talking about these prismatic
21 inclusions -- have either been converted
22 to talc (as in conversion of tremolite to
23 talc by low temperature)."
24         Do you see that?

Page 120

1     A.    Yes, yes.
2     Q.    And you would agree that
3 there were inclusions in the specimen I.5
4 of general talc ore, which had what
5 appears to be some metamorphous of
6 tremolite, true?
7     A.    So he's saying that the
8 inclusion has been converted to talc.
9     Q.    "As in conversion of
10 tremolite to talc by low temperature $CO_2$
11 metamorphism (sic)."
12         Do you see that?
13     A.    That's where -- I see that
14 sentence.
15     Q.    And those inclusions --
16         MR. CHACHKES:  I'm just
17     going to object.  I think you
18     misread.  I see "$CO_2$,
19     metasomatism."
20         MS. O'DELL:  That's fair.
21     That's fair.  Not intentional.
22 BY MS. O'DELL:
23     Q.    So tremolite, according to
24 Dr. Pooley, had been present and it had

Page 121

1 converted at least to some degree, maybe
2 not completely, but to some degree, to
3 talc, fair?
4     A.    That seems to be his
5 conclusion here.
6     Q.    If you'll turn over to Page
7 11 of his report, Bates ending 364, he
8 reports on his finding in relation to
9 Specimen I.7.
10         Do you see that?
11     A.    I see I.7.
12     Q.    And it says, "This specimen
13 of wallrock is quartz-muscovite-garnet
14 schist" -- he identifies certain
15 figures -- "containing some accessory
16 actinolite, Brown hornblende, talc, and
17 rare biotite."
18         Did I read that correctly?
19     A.    I believe so.
20     Q.    And in I.7 Dr. Pooley
21 identified actinolite.  Fair?
22     A.    He says some accessory
23 actinolite.
24     Q.    And then if you'll turn over

Page 122

1  to Page 32 of his report.  Bates number
2  ending 385.  He's reporting on Specimen
3  I.24.  And he refers to it as talc next
4  to carbonate.
5      A.   Mm-hmm.
6      Q.   Do you see that?
7      A.   I do.
8      Q.   And he says, "This specimen
9  of talc ore consists dominantly of course
10  fiber" -- "fibrous talc with minor
11  chlorite."
12          Do you see that?
13      A.   I see that.
14      Q.   And so in that sample of
15  talc ore, he identifies fibrous material,
16  true?
17      A.   He identifies fibrous talc.
18      Q.   Okay.  He identifies fibrous
19  material, true?
20      A.   He identifies fibrous talc.
21      Q.   If you'll turn to -- we've
22  got to go back two pages.  Sorry, I
23  skipped one I intended to mention, and
24  that's on Page 28.  Specimen I.19.

Page 123

1          Do you see that?
2      A.   Could you just confirm --
3  let's see.  Specimen, Page 28, the
4  specimen consists.  Okay.
5      Q.   He reports on Specimen I.19
6  and he states, "This specimen consists of
7  an aggregate of course grain anhedral
8  magnesite intergrown with solitary bladed
9  crystals and crystal aggregates of
10  tremolite associated with minor amounts
11  of fine fibrous talc and rare anhedral
12  grains of quartz."
13          Do you see that?
14      A.   I see that.
15      Q.   And then he goes -- he has a
16  photo microphotograph which shows
17  dissections under PPL showing course
18  bladed tremolite intergrown with very
19  course magnesite.
20          And so he confirms in
21  Specimen I.19 the presence of tremolite
22  and fibrous talc, fair?
23      A.   So he does identify crystal
24  aggregates of tremolite and minor amounts

Page 124

1  of fibrous talc.
2      Q.   And if you'll go to Page 83
3  of the document.  Bates number ending
4  396.
5      A.   Oh, that might take me a
6  while to find.  396.
7      Q.   Page 83 of the document.
8  Bates number ending 396.
9      A.   I think that's actually
10  Page 43 maybe.
11      Q.   It could be.  396.  But
12  it's -- it's Specimen I.41.
13      A.   Okay.  I see that page.
14      Q.   Okay.  Are you there?
15      A.   I am there.
16      Q.   And this is a specimen of
17  talc ore, correct?
18      A.   That's what it says.
19      Q.   And it says, "This specimen
20  of talc ore consists of course aggregate
21  of feathery talc intimately intergrown
22  with minor chlorite" -- it says V-A-R
23  period -- "sheridanite, and enclosing
24  rare large porphyroblasts of subhedral

Page 125

1  garnet which occasionally contain long
2  prismatic inclusions of tremolite."
3          Did I read that correctly?
4      A.   Yes.
5      Q.   And this would be an
6  instance where talc ore was found to
7  include tremolite, true?
8      A.   The tremolite was within the
9  garnet as I read this.
10      Q.   But it's within a talc ore
11  sample, true?
12      A.   So -- so the garnet is
13  within a talc ore.
14      Q.   And the garnet contains
15  tremolite, true?
16      A.   That's what it says.
17      Q.   In your report, you
18  criticize Dr. Cook and Dr. Krekeler in
19  their treatment of Dr. Pooley's report,
20  Exhibit 8.  And you say in part that
21  "Dr. Pooley makes clear there is no
22  asbestiform minerals."
23          In fact, Dr. Pooley's report
24  does find the presence of fibrous

Mary Poulson, Ph.D.

Page 126

1 material within the samples that -- that
2 he reported on Exhibit 8?
3      A.    So fibrous is not the same
4 as asbestiform.
5      Q.    How do you distinguish the
6 two?
7      A.    So asbestiform means that
8 the crystals are fibrils that have high
9 tensile strength and flexibility and no
10 lateral connection between fibrils.  So
11 that the fibrils can be separated from
12 each other.  That's not the same as
13 fibrous.
14      Q.    Fibrous -- let me strike
15 that and start again.
16          Dr. Pooley did report on
17 finding fibrous material within the
18 samples that he reported on in Exhibit 8,
19 true?
20      A.    He listed fibrous talc.
21      Q.    So the answer to my question
22 is yes, he did report fibrous material in
23 Exhibit 8?
24      A.    So he -- he did list fibrous

Page 127

1 talc.
2      Q.    And he also, you would
3 agree, reported the finding of -- finding
4 tremolite as well as actinolite within
5 these samples?
6      A.    He reported finding
7 tremolite and actinolite.
8      Q.    And are you aware that
9 tremolite has been found in other tests
10 of Italian talc?
11          MR. CHACHKES:  Objection.
12          THE WITNESS:  What other
13      Italian talc would we be talking
14      about?
15 BY MS. O'DELL:
16      Q.    Let me just ask a more
17 specific question.
18          Are you aware of historical
19 tests that report finding tremolite in
20 talc from mines in Italy that were used
21 to source Johnson & Johnson's Baby Powder
22 and Shower to Shower?
23      A.    So we could look at other
24 test reports for Italian samples if -- if

Page 128

1 you want to.
2      Q.    Are you aware that there
3 have been other tests in addition to
4 Dr. Pooley that have reported finding
5 tremolite in samples taken from the
6 Italian mine used to source J&J Baby
7 Powder?
8      A.    My recollection is Battelle
9 found tremolite, and we can look at those
10 specific test results.
11      Q.    And are you aware of test
12 results from the examination of Italian
13 talc that also reported the presence of
14 actinolite?
15      A.    So I -- I want to be careful
16 that I make a distinction between what is
17 called Italian talc for testing and what
18 is considered the ore zone that was used
19 for production and the fact that
20 actinolite and tremolite are not
21 asbestos.
22      Q.    They can be asbestos.
23      A.    There are asbestiform
24 varieties, but they are called tremolite

Page 129

1 asbestos and actinolite asbestos.
2      Q.    And historically, in reports
3 of asbestos testing, actinolite with the
4 word asbestos has not always been
5 included for purposes of reporting
6 asbestiform --
7          MR. CHACHKES:  Objection.
8 BY MS. O'DELL:
9      Q.    -- true?
10      A.    That I don't know.
11      Q.    In Dr. Pooley's report --
12 well, let me back up and say, you state
13 in your report that claims -- strike
14 that.  Start again.
15          You state in your report,
16 "Specimens collected in the hanging wall,
17 in the football of" -- "of the ore body,
18 are not concerning because essentially
19 the selected mining methods used would
20 ensure that actinolite or tremolite would
21 not contaminate the ore used in the
22 product," is that a -- long way of saying
23 it, but is that a fair summary of what
24 you -- what you said in your report?

Mary Poulson, Ph.D.

Page 130

1    A.   You may have lost me.  I was
2  looking at my report while you were
3  talking.  I apologize.
4    Q.   All right.
5    A.   So maybe we could just read
6  what my report says.
7    Q.   So where -- so what were you
8  looking at in your report?
9    A.   I was looking at the
10  paragraph on Page 6 that says, "and in
11  fact."
12        Is -- is that the section
13  you were referring to?
14    Q.   No, actually.  But you state
15  just below that, you state in the next
16  paragraph, you say, "The report," and
17  you're referring to Pooley's report,
18  Exhibit 8, "makes clear that no
19  asbestiform minerals were found."
20        And we've all -- you said
21  there's no asbestiform minerals that may
22  or may not be described, but certainly
23  there were fibrous material within the --
24  the samples, we've agreed on that, right?

Page 131

1    A.   There was fibrous talc
2  described.
3    Q.   And -- and "any
4  non-asbestiform amphiboles identified
5  were not located in ore typical of
6  production."  That's what you write.
7        Yet we've identified today
8  some talc ore that did, in fact, have
9  tremolite, true?
10    A.   So we would want to look at
11  the location of those specimens to make
12  sure even though they said ore, that was
13  considered in a production area.
14    Q.   He called them talc ore?
15    A.   Well, that doesn't
16  necessarily mean that they would be in a
17  production area.
18    Q.   Dr. Pooley referred to them
19  as talc ore, true?
20    A.   He said ore, but that does
21  not necessarily equate to production
22  areas.
23    Q.   Maybe, maybe not.  To
24  suggest otherwise sitting here today

Page 132

1  without any further information on your
2  part would be speculation, fair?
3        MR. LOCKE:  Objection.
4        THE WITNESS:  So we could go
5  back and look at more
6  descriptions.
7  BY MS. O'DELL:
8    Q.   He described that as talc
9  ore, true?
10    A.   That's the phrase he used.
11  But again, ore doesn't necessarily mean
12  that it is actually in a production area.
13  You do --
14    Q.   Maybe, maybe not.
15    A.   You do waste some ore.
16    Q.   I understand.  Maybe, or
17  maybe not.  That's the most you can say?
18    A.   Well, I would, again, want
19  to go through the report and look
20  specifically at where he later summarized
21  those samples.
22    Q.   Okay.  If -- and an ore by
23  your definition is material for sale,
24  true?

Page 133

1    A.   Yes, generally.
2    Q.   You go on to say, "Some
3  specimens were collected in the hanging
4  wall, but the method of mining, which
5  consisted of hand-filling methods,
6  precluded any gross contamination of the
7  ore."
8        Is what you -- that's what
9  you state?
10    A.   That's a quote from the
11  report.
12    Q.   Right.  And it goes on to
13  say that, "By virtue of the fact that
14  they were in the hanging wall, they would
15  not be included in the material that
16  ultimately was bottled as Johnson &
17  Johnson's Baby Powder and Shower to
18  Shower.
19        That's your -- that's your
20  opinion?
21    A.   So the hanging wall is
22  outside the ore zone by definition.
23    Q.   Does it mean that material
24  from a hanging wall cannot be included in

Mary E. Ouison, Ph.D.

Page 134

1  what's extracted from the mine, true?
2      A.   So you would mine within a
3  margin away from that.
4      Q.   But my question is, it
5  doesn't mean that the material from the
6  hanging wall was not included in what was
7  ultimately bottled for Johnson &
8  Johnson's Baby Powder, true?
9      A.   So the mining practices
10  would make every attempt to stay away
11  from that material, because it is too
12  hard to process.
13          So is it completely
14  theoretically hypothetically possible
15  some of that material could be commingled
16  with talc ore taken to a mill, maybe.
17      Q.   And you cannot say to a
18  reasonable degree of scientific certainty
19  that that did not occur, can you?
20      A.   I wasn't there.
21          MR. CHACHKES:  Tell me when
22  you reach a wrapping-up point,
23  because we're probably going to
24  have lunch at 12:15.

Page 135

1          MS. O'DELL:  Give me just a
2  few minutes.
3  BY MS. O'DELL:
4      Q.   Are you okay for another few
5  minutes, Doctor?
6      A.   A few.  Not 30.
7      Q.   Okay.  I'll be brief.  Let
8  me ask you to look at what's previously
9  been marked as Hopkins Exhibit 28.
10          Have you seen that before?
11      A.   I believe so.
12      Q.   And are you aware that --
13  that this exhibit, Hopkins-28 was a
14  product of the examination of Dr. John
15  Hopkins, who is a corporate
16  representative for Johnson & Johnson?
17          MR. CHACHKES:  Objection.
18          THE WITNESS:  I actually
19  don't know how it was produced.  I
20  just know that it was an exhibit I
21  received.
22  BY MS. O'DELL:
23      Q.   And it was an exhibit to
24  John Hopkins' deposition, true?

Page 136

1      A.   I assume that's true, since
2  it was marked as an exhibit.
3      Q.   Do you know who he is?
4      A.   I don't know who he is.
5      Q.   Do you have you read his
6  deposition?
7      A.   I only had one page of it.
8      Q.   What page of the deposition
9  did you have?
10      A.   I'd have to actually look at
11  my files to see which page I had.
12      Q.   So you did not see the whole
13  deposition?
14      A.   I did not see the whole
15  deposition.
16      Q.   And so if it lists the whole
17  deposition on your reliance materials,
18  that would be inaccurate; you only
19  received one page?
20      A.   I only saw one page that
21  came with the Cook and Krekeler
22  documents.  It's possible that it was
23  uploaded to my box, and I missed it.  But
24  I only saw, in my documents, the one

Page 137

1  page.
2      Q.   Did you examine all of the
3  exhibits that were identified as Hopkins
4  deposition exhibits?
5      A.   I looked at the ones that
6  were germane to my assignment, which was
7  mining and beneficiation.
8      Q.   Which was reviewing Dr. Cook
9  and Krekeler's reports.  And so if they
10  weren't referred to in Dr. Cook and
11  Dr. Krekeler's reports specifically, it
12  would be fair to say that you did not
13  review those?
14      A.   Correct, unless I requested
15  them for some reason.
16      Q.   Okay.  And if you'll look at
17  Hopkins Exhibit 28, he lists here a
18  10/15 -- or October 15, 1957, test by
19  Battelle.  And if you'll look to the
20  right, it says that that is of Italian
21  talc.  And the test revealed that,
22  "Italian talc averages about 10 percent
23  fibrous or acicular particles."
24          Did I read that correctly?

Mary Boulson, Ph.D.

Page 138

1    A.   That's what it says.
2    Q.   And is that consistent with
3  your understanding of the Battelle
4  testing document -- documents?
5    A.   I would want to go back and
6  look at that Battelle document, because
7  they tested a number of things.  And I
8  don't actually remember which Battelle
9  document was which.
10    Q.   If you'll look forward one
11  line to May 9th, 1958, Exhibit J&J-1,
12  also Battelle testing document, of talc
13  from the Val Chisone mine, and it was
14  processed Italian talc.
15        Do you see that?
16    A.   I see that.
17    Q.   Processed Italian talc would
18  be talc ore that has gone through
19  beneficiation and is essentially is ready
20  for bottling, true?
21    A.   I don't know how they define
22  processed talc.
23    Q.   It would be fair to say that
24  processed talc would be part of the talc

Page 139

1  ore, true?
2        MR. CHACHKES:  Objection.
3        THE WITNESS:  I believe --
4        MR. CHACHKES:  Sorry.  Go
5  ahead.  Objection.
6        THE WITNESS:  I believe so.
7  BY MS. O'DELL:
8    Q.   And it says the test
9  revealed tremolite.
10        Do you see that?
11    A.   I see that.
12    Q.   And that was consistent with
13  Dr. Pooley's results as reported in
14  Exhibit 8, true?  Where Dr. Pooley also
15  found tremolite in specimens taken from
16  the Italian mine, true?
17    A.   So we would basically want
18  to look at some more information as to
19  where samples were collected before
20  making a generalization that they were
21  from exactly the same area.
22    Q.   I didn't say that.  I said
23  it was from the Italian mine.  Dr. Pooley
24  took specimens from the Italian mine, and

Page 140

1  within those specimens as reported in
2  Exhibit 8, he found tremolite, true?
3  We've been through this.
4        MR. CHACHKES:  Objection.
5  BY MS. O'DELL:
6    Q.   Today.  So he reported
7  tremolite, fair?
8    A.   He -- he reported tremolite
9  in some of his studies, yes.
10    Q.   And in the test results from
11  Battelle dated May the 9th of processed
12  Italian talc, tremolite was also found,
13  true?
14    A.   That's what it says.
15    Q.   And if you'll look further
16  at May 23rd, 1958, was the date of the
17  test, also Battelle testing of processed
18  Italian talc from the Val Chisone mine,
19  tremolite was found, true?
20    A.   True.
21    Q.   And 6 to 10 percent fibrous
22  talc.
23        Did I read that correctly?
24    A.   That's what it says.

Page 141

1    Q.   And then in terms of
2  Dr. Pooley's testing and the results
3  where he found tremolite in the specimens
4  that he looked at, those results are
5  consistent with what Battelle found in
6  its examination of Italian talc, true?
7    A.   I may be comparing apples
8  and oranges, and to answer that again, I
9  would just want to be very careful as to
10  where Battelle samples came from relative
11  to where Pooley samples came from.  And
12  we would also want to know whether
13  processed talc meant that Battelle ground
14  it to some specification, or if somehow
15  it was processed by Johnson & Johnson.
16    Q.   And in your mind, that would
17  make a difference?
18    A.   It could.  There could be
19  beneficiation steps that were missing
20  between actual production versus a
21  laboratory test.
22    Q.   Is it your opinion to a
23  reasonable degree of scientific certainty
24  that asbestos found in talc can be

Mary Poulson, Ph.D.

Page 142

1 removed through a beneficiation process?
2        MR. CHACHKES:  Objection.
3        THE WITNESS:  So the
4        question is could asbestos be
5        removed through beneficiation?
6 BY MS. O'DELL:
7     Q.   Yes.
8     A.   Okay.  There are several
9 steps where it can be removed.
10    Q.   Can it be completely
11 removed?
12    A.   I don't know, depending on
13 the concentration and the processing
14 steps used.  I would want to see data.
15    Q.   Have you examined -- well,
16 before I go there, we'll get there in a
17 bit.  I want to come back to that.
18        When you talk about
19 processed Italian talc and you say
20 there's some confusion about whether that
21 was the process from -- that might have
22 been undertaken by Battelle versus
23 Johnson & Johnson.  Let's focus on that.
24        The material that was tested

Page 143

1 was processed Italian talc.  And is it
2 your belief that that does not mean talc
3 that has been through the beneficiation
4 process?
5     A.   I'd want to look at those
6 Battelle reports and see exactly what
7 they did.
8        MR. CHACHKES:  Leigh, how
9        much longer are you planning?
10        MS. O'DELL:  Give me just a
11        few minutes.  I was trying to
12        finish this section.
13        You know, I think this
14        exhibit -- I think the fact that
15        this is processed talc is pretty
16        clear.  But if -- if Dr. Poulton
17        doesn't remember then I'd like to
18        show her.
19 BY MS. O'DELL:
20    Q.   Let me show you what I'm
21 marking as Exhibit 9 to your deposition.
22        (Document marked for
23        identification as Exhibit
24        Poulton-9.)

Page 144

1 BY MS. O'DELL:
2     Q.   This correlates with J&J-1,
3 which is the May 9, 1958, test that we
4 just discussed.
5     A.   Okay.
6     Q.   Do you see that?
7     A.   I do.
8     Q.   If you'll turn to Bates
9 number ending 911.
10    A.   Okay.
11    Q.   At the bottom, last
12 paragraph, "The measurements presented in
13 this report were made on the same samples
14 of EGT Extra 0000 talc obtained from
15 Cranford, New Jersey, plant which was
16 used in the work previously reported."
17        So this is beneficiated talc
18 that has been through the Johnson &
19 Johnson plant, correct?
20        MR. CHACHKES:  Just for the
21        record -- the record, you left out
22        "except where otherwise noted."
23        MS. O'DELL:  Okay.  Fair
24        enough.

Page 145

1 BY MS. O'DELL:
2     Q.   So this is beneficiated or
3 processed talc that has been processed by
4 Johnson & Johnson that's being reported
5 in Exhibit 9, true?
6     A.   So this says EGT Extra
7 00000, and the table says, "Processed
8 talc Italian 1."
9        Are -- are those the same?
10    Q.   They are.  I think you will
11 find that Italian 1 is referred to on
12 Page 5 of this report, and it's the
13 identification of the specific sample.
14    A.   I see.
15    Q.   Do you see that?
16    A.   I see.
17    Q.   So are we in agreement now
18 that the samples reported as on May 9,
19 1958, and on May 23, 1958, are samples of
20 processed Johnson & Johnson talc?
21    A.   Could I read a little more
22 of this report?
23    Q.   I'm just asking a simple
24 question.

Mary B. Poulton, Ph.D.

Page 146

1    A.   Well, I just, I just want to
2  make sure.  I have seen that paragraph on
3  Page 2.  I want to read the lead-up to
4  the table we just referred to on Page 5.
5    Q.   Have you seen this report
6  before?
7    A.   I have, yeah.  I have seen a
8  lot of reports.
9    Q.   Sure, I'm just asking.
10    A.   Yeah, I have seen this.
11    Q.   I'm not suggesting anything
12  other than I'm just asking if you have
13  seen this.
14    A.   Yeah, I have seen this.
15    Q.   Okay.  All right.  Anything
16  about what you've read so far that --
17  that makes you doubt that this was
18  processed talc that was actually tested?
19    A.   Well, again I want to see
20  what they were doing inhouse versus what
21  they acquired, just, just to be sure in
22  my mind.
23    Q.   Do you think that they were
24  adding tremolite inhouse?

Page 147

1    A.   I don't know.  I -- I
2  just -- I want to read the report.
3    Q.   It could, could be.  It
4  could, could be, okay.
5    A.   I just want to --
6    Q.   Well, we'll take a break,
7  and if you -- you can read it over lunch,
8  and then we'll come back and I'll ask you
9  a few more questions about it.
10    A.   Okay.
11    THE VIDEOGRAPHER:  Off the
12  record, right?
13    MS. O'DELL:  Yeah.
14    THE VIDEOGRAPHER:  The --
15  time is 12:28 p.m.  Off the
16  record.
17    - - -
18    (Lunch break.)
19    - - -
20    THE VIDEOGRAPHER:  Okay.  We
21  are back on the record.  The time
22  is 1:29 p.m.
23    - - -
24    A F T E R N O O N   S E S S I O N

Page 148

1    - - -
2    EXAMINATION (Cont'd.)
3    - - -
4  BY MS. O'DELL:
5    Q.   Dr. Poulton, before lunch,
6  we were talking about testing that
7  Battelle had done of certain Italian talc
8  samples.  And we were discussing whether
9  they were processed Italian talc, in
10  other words, there -- the samples had
11  been processed -- was -- were -- whether
12  the samples were processed powder by J&J.
13    And we looked at page, I
14  think it's 2 of the report ending Bates
15  911.  It refers to the samples as being
16  EGT Extra 00000 talc from the mill at
17  Cranford, New Jersey.  And you wanted to
18  take a little closer look at that report.
19    A.   Yeah.
20    Q.   Have you had an opportunity
21  to do that?
22    A.   I did look at it.
23    Q.   And are we in agreement that
24  the samples that were tested were

Page 149

1  processed Johnson & Johnson talcum
2  powder?
3    A.   I could not confirm that
4  from the Cranford, New Jersey, plant.
5  And I -- and I couldn't accurately map
6  Talc 1 and Talc 2 to EGT Extra.  So I --
7  I am still confused as to whether that is
8  truly a Johnson & Johnson processed talc.
9    Q.   And in your mind, you don't
10  know -- strike that.
11    You don't know whether EGT
12  talc was actually the product name for
13  Italian talc?
14    A.   From -- from Cranford.
15    Q.   You do not know that?
16    A.   I do not know that EGT Extra
17  00000 talc from Cranford is Johnson &
18  Johnson talc.  I -- I don't have
19  confirmation of that.
20    Q.   Are -- are you -- have you
21  seen that referred to in documents as
22  Johnson & Johnson Italian talc?
23    A.   EGT Extra?
24    Q.   Yeah.

Page 150

1    A.   I'd have to go back and look
2 for -- for that reference.
3    Q.   And you are aware that
4 the -- Battelle did a series of tests on
5 Johnson & Johnson talcum powder from
6 Italy.  Are you not?
7         MR. CHACHKES:  Objection.
8         THE WITNESS:  I -- I know
9    that Battelle did a number of
10   tests for Johnson & Johnson
11   involving samples from Italy.
12 BY MS. O'DELL:
13   Q.   And, in fact, we looked at
14 not only the May the 9th sample results
15 that we just have reviewed the actual
16 report which is Exhibit 9.  But in the
17 Hopkins Exhibit 28 chart, we also looked
18 at the test results for a May 23, 1958,
19 sample.
20      Do you recall that?
21   A.   We have that in the table.
22 I don't think that we've looked at J&J-2,
23 the Battelle report for that.
24   Q.   Well -- fair -- fair enough.

Page 151

1      But the Hopkins charts
2 refers to it as processed talc as well,
3 correct?
4    A.   It -- it does.  I would have
5 the same questions as to what the actual
6 origination of the sample is.
7    Q.   And you doubt that
8 originated from Johnson & Johnson, is
9 that your testimony?
10   A.   I have a question about
11 that.
12      (Document marked for
13   identification as Exhibit
14   Poulton-10.)
15 BY MS. O'DELL:
16   Q.   Let me show you what I'm
17 marking as Exhibit 10, which is a
18 Battelle report dated October 15th, 1957.
19   Do you see that?
20   A.   Let's see.  Yes.  Okay.
21   Q.   And if you look at Page 1 of
22 the actual report which ends in Bates
23 number ending 874.
24      Do you see that?

Page 152

1    A.   I do.
2    Q.   And if you'll look, the
3 samples measured in this or analyzed in
4 this report at the bottom are also
5 referred to as EGT Extra 0000.
6      Do you see that?
7    A.   I see that.
8    Q.   And they're taken weekly --
9 at weekly intervals from the conveyor at
10 the Cranford, New Jersey plant.  Which is
11 a J&J processing plant, correct?
12   A.   So I don't know that.  I
13 would want to see some documentation that
14 that was exclusively Johnson & Johnson
15 sourcing.
16   Q.   What do you know about the
17 beneficiation process of Italian talc
18 that J&J employed?
19   A.   So I believe that there was
20 hand sorting in Italy to select the
21 purest grades of talc.  And it was
22 shipped to the United States.  At that
23 point I actually don't know where the
24 Italian talc was processed.

Page 153

1    Q.   Okay.  Let's assume for
2 purposes of my question that the
3 Cranford, New Jersey facility is a
4 Johnson & Johnson facility, which I will
5 represent to you it is, that based on
6 this document, taken in the context of
7 not only Exhibit 10, but also Exhibit 9,
8 which analyzed EGT Extra 000 talc.  Does
9 it appear that that is talc that was
10 taken from the conveyor of the processing
11 plant there in New Jersey?
12   A.   It does say it's taken from
13 the conveyor at that processing plant.
14   Q.   So in other words, it was
15 processed talc?
16   A.   It looks like it.
17   Q.   In both of those samples,
18 excuse me.  In both of those samples
19 tremolite was identified?
20   A.   So per this table, tremolite
21 is identified from this report.  I think
22 I would look through here and see exactly
23 what that was.
24   Q.   Let me ask you -- let me ask

Mary Poulson, Ph.D.

Page 154

1  you this question.  You gave us earlier,
2  and I marked it as Exhibit 3, this table.
3      A.   Yes.
4      Q.   And this was the, what you
5  called the "back of the envelope many
6  assumptions" analysis that you conducted
7  over the last couple of weeks?
8      A.   Yes.
9      Q.   And what was the purpose of
10 you performing this analysis?
11     A.   I just had questions in my
12 mind as to what the actual mining rates
13 might have been and I wanted to do some
14 calculations to see what they looked like
15 and how that material flowed through the
16 mill, how long it might take.  It was
17 actually not something that I relied on.
18 It was just a question I had as I was
19 reviewing documents.
20     Q.   So this is not a calculation
21 or analysis that you relied on in
22 reaching your opinions?
23     A.   That's correct.
24     Q.   And what was -- what were

Page 155

1  your conclusions or what were, you know,
2  your takeaways from your analysis?
3      A.   That it was very slow
4  production.  It was not -- it confirmed
5  that this is truly a small mine with slow
6  production.
7      Q.   When you say small mine,
8  what are you referring to?
9      A.   Well, I often deal with very
10 large metal mines that produce in one
11 truckload what Argonaut produces in a
12 day.
13     Q.   And the data that you
14 considered in doing this calculation was
15 data from Argonaut?
16     A.   Yes.
17     Q.   So you criticize Dr. Cook
18 and Dr. Krekeler for conflating
19 non-asbestiform minerals with asbestiform
20 minerals?
21     A.   Correct.
22     Q.   If you'll turn to Dr. Cook's
23 report, which we previously marked, I
24 believe -- do you have it in front of you

Page 156

1  there?
2      A.   Hang on a minute.
3  Exhibit 5.
4      Q.   Yes.
5      A.   Okay.
6      Q.   And if you will turn to Page
7  13 of Dr. Cook's report, the second full
8  paragraph right before the table.
9          Do you see that?
10     A.   The paragraph that starts,
11 "The testing results --
12     Q.   That's right?
13     A.   -- "appearing in Table 17"?
14     Q.   Yes.  And in that sentence
15 it says, "The testing results appearing
16 in table" -- "in the table below are some
17 of the reported instances within
18 defendant's internal documents where
19 serpentine asbestos, chrysotile,
20 amphibole asbestos or potentially
21 asbestiform amphiboles have been found in
22 samples of talc used to source J&J talcum
23 powder products."
24         Did I read that correctly?

Page 157

1      A.   That's what it says.
2      Q.   The sentence makes clear
3  that Dr. Cook and, I believe there's a
4  similar sentence in Dr. Krekeler's
5  reports, are not conflating asbestiform
6  asbestos with non-asbestiform asbestos,
7  true?
8      A.   No.  That was not my reading
9  of their expert reports in conjunction
10 with the full documents that I looked at
11 for these samples.
12         Where they're saying things
13 are amphibole asbestos, I was not seeing
14 reference to asbestos in test samples
15 that were specifically labeled as ore.
16     Q.   The table is presented in
17 terms of serpentine asbestos, amphibole
18 asbestos, or potentially asbestiform
19 amphiboles.
20         Do you see that?
21     A.   Could you show me where
22 you're looking?
23     Q.   Where I just read.
24     A.   Okay.  And this table is

Page 158

1  essentially Hopkins' table?
2      Q.   It has similarities.  But it
3  is not the same.
4      A.   It is not the same.  And the
5  difference is?
6      Q.   My question to you is not a
7  comparison of the table to the
8  Hopkins-28.  My question is in presenting
9  this table of results, Dr. Cook
10 acknowledges that there are internal
11 documents that state there's serpentine
12 asbestos or chrysotile, amphibole
13 asbestos, or potentially asbestiform
14 amphiboles.  He is clearly not conflating
15 the two, correctly -- correct?
16          MR. CHACHKES:  Objection.
17          THE WITNESS:  I disagree
18      with that interpretation when I
19      looked at these documents and how
20      Drs. Cook and Krekeler were
21      associating test results with
22      their conclusion, that these were
23      asbestiform minerals in the ore
24      samples.

Page 159

1  BY MS. O'DELL:
2      Q.   Did -- are there -- are your
3  criticisms of the table reporting the
4  results of asbestos testing fully set out
5  in your report?
6      A.   I identified a few examples.
7      Q.   Are they fully set out in
8  your report?
9      A.   When you say fully set out,
10 what do you mean?
11     Q.   I'm saying if you have a
12 criticism of the report of Dr. Cook's --
13 strike that.  Start again.
14          Are all your criticisms of
15 the table reporting the test results for
16 asbestos testing contained in your
17 report?
18     A.   I think I'm still
19 unfortunately having trouble following
20 your question.
21     Q.   Are all your criticisms of
22 the table containing asbestos test
23 results in Dr. Cook and Dr. Krekeler's
24 reports outlined in your report?

Page 160

1      A.   So I looked at some of the
2  examples that they listed as being
3  asbestos-containing samples.  I looked at
4  the cited documents and concluded that
5  they had not correctly identified samples
6  as containing asbestos when the
7  reports said those were not ore samples
8  or they did not identify things as
9  asbestos.
10     Q.   And your criticisms are
11 outlined in your expert report, true?
12     A.   Yes.
13     Q.   If you'll turn to Page 7 of
14 your report.  And specifically you cite
15 J&J 000087868, which we just marked a few
16 moments ago as Exhibit 10.
17          And you criticize Dr. Cook
18 by saying that, "When tremolite was
19 identified, the tremolite was not
20 identified as asbestiform."
21          Do you see that sentence in
22 your report?
23     A.   Yes, I do.
24     Q.   And if you'll turn to Page

Page 161

1  21 of the report that we've marked as
2  Exhibit 10 -- do you see that, Page 21?
3      A.   Labeled "conclusions"?
4      Q.   Yes.
5      A.   Okay.
6      Q.   Under Number 2.  Battelle et
7  al. concludes that 10 percent of the
8  material that was examined was fibrous,
9  correct?
10     A.   That's what it says.
11 Fibrous is not the same as asbestos.
12     Q.   Can be asbestiform, true?
13     A.   Fibrous?
14     Q.   Yes.
15     A.   Is a broader term.
16 Asbestiform is quite specific.
17     Q.   And asbestiform -- fibrous
18 material includes asbestiform material,
19 correct?
20     A.   I would not put the two in
21 the same category.
22     Q.   But if -- if your -- in your
23 view as fibrous is a broader category
24 than asbestiform, asbestiform certainly

Page 162

1 would be encompassed by the term
2 "fibrous"?
3     A.   I wouldn't make that
4 equation because I think it confuses the
5 definition of asbestiform.  I -- I would
6 say that if it's truly asbestiform, it is
7 asbestiform.  And fibrous is distinct
8 from that.
9     Q.   But asbestiform is fibrous
10 material.  We can -- we can debate the
11 definition, we can debate some of the
12 characteristics, but asbestiform asbestos
13 is fibrous in nature, true?
14         MR. LOCKE:  Objection.
15         THE WITNESS:  Again, I -- I
16     would stay with a very specific
17     definition.  I would not agree to
18     equate fibrous with asbestiform.
19 BY MS. O'DELL:
20     Q.   I didn't -- I didn't say
21 equate.  I said asbestiform is -- would
22 be encompassed in the term "fibrous."
23     A.   I would not put it in that
24 set.

Page 163

1     Q.   Okay.  So it's --
2     A.   I would keep asbestiform
3 separate.
4     Q.   It's not fibrous material?
5     A.   I would keep it as a
6 separate distinction from fibrous.
7     Q.   My question is, is
8 asbestiform asbestos fibrous in nature?
9     A.   Again, I would stay with the
10 definition of asbestiform having very
11 specific characteristics which may not be
12 characteristic of something in a fibrous
13 set.  So I would keep them separate.
14     Q.   I get -- I understand what
15 you're saying, but the truth is that in
16 the context of a 1958 or '7 report,
17 fibrous -- 10 percent fibrous material
18 would include potentially asbestiform
19 material, true?
20         MR. LOCKE:  Objection.
21         THE WITNESS:  I don't agree
22     with that.
23 BY MS. O'DELL:
24     Q.   You also go on to cite a

Page 164

1 document, it's a memo from Dr. Umberto
2 Stefano.  It's a 1973 memo.  Do you
3 recall that?
4     A.   Yes.
5     Q.   And you cite it for purposes
6 of -- of stating that there are no
7 asbestiform fibers in talc from the Val
8 Chisone region, true?
9     A.   Can we look at his memo?
10     Q.   I'm asking you a question
11 about what you cite it for.
12     A.   Well, I'm -- I'd like to see
13 what his memo says to refresh my memory.
14     Q.   Who -- who is he?
15     A.   I don't know if he was a
16 medical doctor for a company or a medical
17 doctor in the region.
18         (Document marked for
19     identification as Exhibit
20     Poulton-11.)
21 BY MS. O'DELL:
22     Q.   Here is Exhibit 11, which
23 is -- is that the memo you're referring
24 to in your report?

Page 165

1     A.   I believe so.
2     Q.   And according to your
3 report, Dr. Stefano references a study
4 and -- of whether talc mining in the Val
5 Chisone region caused lung -- lung
6 diseases in mine and mill workers due to
7 the presence of asbestiform minerals and
8 silica.  That's what you state in your
9 report, correct?
10     A.   Let me just read.
11     Q.   Is that the document you
12 cited, Dr. Poulton?
13     A.   It is.
14     Q.   And Dr. Stefano reports
15 information from conversations that he's
16 had with physicians in the Val Chisone
17 area, true?
18     A.   He contacted physicians and
19 health officers in the area.
20     Q.   And he -- this is not a
21 scientific study published in the
22 peer-reviewed literature, true?
23     A.   As far as -- I -- I don't
24 know whether this was published or not.

Mary Poulson, Ph.D.

Page 166

1 I just have this memo.
2    Q.   And this, this memo was not
3 published in a peer-reviewed literature,
4 true?
5    A.   This exact memo, I don't
6 know.
7    Q.   What you're holding in your
8 hand is not a peer-reviewed publication,
9 true?
10    A.   That's correct.
11    Q.   And there's no protocol
12 outlined in this memo, true?
13    A.   True.
14    Q.   There's no identification of
15 patients that were followed as a part of
16 this examination, true?
17    A.   True.
18    Q.   That -- you know,
19 interviewing medical doctors is not an
20 appropriate study method for determining
21 if individuals have developed lung --
22 lung disease or silicosis as opposed to
23 exposure to an environmental material,
24 true?

Page 167

1       MR. CHACHKES:  Objection.
2       THE WITNESS:  So I am not
3    commenting on whether this is a
4    scientific study.  I'm simply
5    citing that this memo exists and
6    what his conclusions were.
7 BY MS. O'DELL:
8    Q.   And this memo states that
9 tremolite is the only asbestos mineral
10 found in a very small amount in this
11 talc?
12    A.   That's his sentence.
13    Q.   You go on to talk about
14 Coggiola.  Coggiola.  I'm not sure how
15 you say that.  And you cite Coggiola for
16 the purpose of stating that there are no
17 asbestiform fibers in the -- in the Val
18 Chisone reason -- region.
19       Do you see that in your
20 report?
21    A.   I see that statement.
22       (Document marked for
23    identification as Exhibit
24    Poulton-12.)

Page 168

1 BY MS. O'DELL:
2    Q.   Let me show you what I've
3 marked as Exhibit 12.  Is that the
4 article that you're referencing?
5    A.   I believe so.
6    Q.   And this is a -- study
7 of -- of talc miners and millers in Italy
8 to determine if they have significant
9 excess mortality from exposure to
10 asbestiform fibers, fair?
11    A.   In Val Chisone, yes.
12    Q.   And -- and it -- it states
13 in the background that, top of the page,
14 talc found here is free from asbestiform
15 fibers.
16       Do you see that?
17    A.   Yes.
18    Q.   Is there any citation to
19 support that statement?
20    A.   I would need to read through
21 the paper to see.
22    Q.   Is there any citation at
23 that location to support the statement
24 that talc from Italy is free from

Page 169

1 asbestiform fibers?
2    A.   I'd -- I'd want to go
3 through the paper and -- and look for his
4 references.
5    Q.   Okay.
6       MS. O'DELL:  Let's go off
7    the record.
8       THE VIDEOGRAPHER:  Okay.
9    The time is 1:56 p.m.  Off the
10    record.
11       (Short break.)
12       THE VIDEOGRAPHER:  We are
13    back on the record.  The time is
14    1:59 p.m.
15 BY MS. O'DELL:
16    Q.   So, Doctor, before we went
17 off the record, I pointed you to the
18 statement in Coggiola that states, "Talc
19 found here is free from asbestiform
20 fibers."  And I asked you the question,
21 is there a reference to support that
22 statement.  There's certainly no footnote
23 there.
24    A.   So the references are on

Page 170

Page 64.

Q.   Okay.

A.   Left-hand column, first full paragraph that starts, "To provide further evaluation on the issue, we updated the analysis of the Italian cohort of talc miners and millers in Val Chisone/Turin, reference Rubino et al. 1976, 1979, in which the talc was free from asbestiform fibers, reference Verdel et al. 1983; Parks 1994.

Q.   And that's what you're relying on to say that talc from Italy has no asbestiform fibers?

MR. CHACHKES:  Objection.

THE WITNESS:  That's what I'm relying on in this paper that the miners and millers in their study from the Val Chisone region were not exposed to talc that had asbestiform.

BY MS. O'DELL:

Q.   Okay.  And you've seen tests from the Val Chisone reason -- region

Page 171

that has -- of talc with asbestiform fibers, true?

A.   I don't recall seeing asbestos in the talc ore that was being milled.

Q.   Okay.  And so it's your view that Battelle and -- and Pooley's analysis that show asbestiform fibers are -- are not applicable to Johnson & Johnson commercial talc?

MR. CHACHKES:  Objection.

THE WITNESS:  I did not see reference to asbestos minerals, asbestiform minerals in the samples that were marked as ore for Johnson & Johnson.

BY MS. O'DELL:

Q.   We went through a sample, if you'll recall, in Dr. Pooley's report, of talc ore that contained tremolite?

A.   And I think that, again, just because it says it's ore doesn't mean that it's coming from an area that's actually mined.  So you can mark things

Page 172

as ore and waste them so you don't produce them.  And you may call it part of the ore body, but it's not the ore that you're mining.  You're wasting it.

Q.   And what's your methodology for concluding that the reference to talc ore in the Pooley report is -- is incorrect?

MR. CHACHKES:  Objection.

THE WITNESS:  I believe he had a statement in his report that I referenced.

He mentions that, "Materials being tested do not represent an average collection of specimens of material being produced at the mine.  The specimens were collected with the intention of sampling those areas with obvious non-talc mineral inclusions.

BY MS. O'DELL:

Q.   And that's your -- that's your methodology?

A.   That's his quote from his

Page 173

report stating what he was sampling and why.

Q.   And yet, he goes on to say -- and we went through this earlier -- that he also sampled talc ore and we went through those results, I think the record will reflect that?

A.   And I outline in my paragraph which samples were from pure talc faces, a sample I.39 was from the crusher, had no asbestiform minerals. The sample I.41 that we talked about labeled "good specimen from face 2" had tremolite only as an inclusion in a garnet grain.

Q.   Let me just stop you there. It had tremolite in this one.

MR. CHACHKES:  We should let the witness finish.  Please don't interrupt her.

MS. O'DELL:  Excuse me.

MR. CHACHKES:  Move to strike the question.

MS. O'DELL:  So be it.

Mary Poulson, Ph.D.

Page 174

1    That's fine.
2  BY MS. O'DELL:
3    Q.   So let me ask you this.
4  Rubino is -- was the initial mortality
5  study of talc miners and millers in
6  Italy, true?
7    A.   I do not look up that
8  reference.
9    Q.   I'll represent to you that
10 that's the case.  And Coggiola is a
11 follow-up study to that particular study.
12    That is -- neither Rubino or
13 Coggiola involved the testing of talc
14 samples, true?
15    MR. CHACHKES:  Objection.
16    THE WITNESS:  I don't know.
17 BY MS. O'DELL:
18    Q.   Coggiola does not involve
19 the testing of talc samples, true, for
20 the presence of asbestos?
21    A.   I believe he is relying on
22 others for that information.
23    Q.   Does not involve the testing
24 of talc samples for asbestos, true?

Page 175

1    MR. CHACHKES:  Objection.
2    THE WITNESS:  I believe he
3    is not testing --
4  BY MS. O'DELL:
5    Q.   So the answer to my question
6  is, that is correct?
7    MR. CHACHKES:  Objection.
8    Asked and answered.
9  BY MS. O'DELL:
10    Q.   You may answer.
11    A.   I may answer that, okay?
12 Can you just rephrase your question one
13 more time for me.
14    Q.   What I'm asking you, a
15 simple question, yes or no, is, Coggiola
16 does not involve the testing of talc
17 samples for the presence of asbestos,
18 true?
19    A.   That's my understanding.
20    Q.   And do you have a copy of
21 Verdel with you?
22    A.   I do not.
23    Q.   Let me ask you if you agree
24 with this statement.  The term "zoning"

Page 176

1  in terms -- zoning, Z-O-N-I-N-G -- is --
2  let me just ask you before I ask and see
3  if you agree with this statement.
4    Do you -- do you understand
5  the term "zoning" in the context of
6  geologic exploration?
7    A.   I understand zoning in the
8  context of alteration zones.
9    Q.   Do you agree that when you
10 conduct zoning in ore deposits, what
11 you're really doing is identifying a
12 regular pattern or distribution of
13 minerals or elements over a particular
14 geographic area?  Do you agree with that?
15    A.   I don't think that's
16 phrasing I understand for zoning.
17    Q.   Have you heard the term
18 "regional zoning"?
19    A.   Regional zoning?  In the
20 context of what exactly?
21    Q.   Of geologic exploration or
22 evaluation.
23    A.   Can you give me an example?
24    Q.   Well, for example, the --

Page 177

1  when you look at the Southern Piedmont
2  marked region, for example, there are
3  areas of sedimentary deposits that
4  encompass a large part of that region.
5  Are you familiar with that?
6    A.   So you're talking about east
7  coast geology, and that regional scale
8  geology is really not the core focus of
9  my report.
10    Q.   So that -- you wouldn't be
11 qualified to comment on the geology of
12 basically the eastern seaboard, fair?
13    A.   I would not be able to
14 comment on the genesis of rocks on the
15 eastern seaboard.
16    Q.   Are you familiar with the
17 term metallogeny?
18    A.   Metallogeny.
19    Q.   Thank you.  Metallogeny.
20    A.   Yes, I've heard it.
21    Q.   How would you define it?
22    A.   I would define it as
23 distribution of formation of metals.
24    Q.   And regional -- metallogeny,

Page 178

1 say it again one more time for me, if you
2 don't mind?
3     A.   Metallogeny.
4     Q.   Metallogeny.  I'm going to
5 get it.  Metallogeny is a form of
6 regional zoning, true?
7     A.   I don't know that I would
8 necessarily say that.  But again, you're
9 straying outside my zone of expertise
10 here, so I couldn't comment.
11     Q.   Would you agree that there
12 can be broad consistency in ore deposits
13 over a geographic region?
14     A.   No.  And I think we would
15 again have to take this on a case-by-case
16 basis, not a general hypothetical.
17     Q.   I'm entitled to ask you
18 hypotheticals.  And so my question is,
19 would you agree that similarities in
20 particular types of ore deposits can
21 occur over regions?
22     A.   So we would want to be
23 careful with the word "similarity" to
24 answer that question honestly.

Page 179

1     Q.   How about consistency?
2     A.   Even consistency we would
3 want to define.
4     Q.   Okay.  Would you agree with
5 me that economic geologists often look to
6 a particular region and the consistencies
7 in the deposits of certain types of
8 minerals in order to evaluate that area
9 for, you know, economic exploitation?
10     A.   So we have models of mineral
11 deposits that may be based on, say,
12 tectonic locations.  They may be based on
13 formation in a particular kind of basin
14 or in a particular time frame in the
15 Earth's evolution.
16         So that may put you in a
17 particular part of the world that is
18 relevant for that type of deposit.  But
19 if it were so easy to say I have to be in
20 South America to find copper, we wouldn't
21 be exploring for copper.  We would know
22 where it all is.  So it only gets you so
23 close, and then the details become very
24 important.

Page 180

1     Q.   In terms of zoning however,
2 that's an important first step to
3 understand the details of a specific
4 deposit, true?
5     A.   I think we're using zoning
6 differently from my body of knowledge of
7 how the word "zoning" would be used.  So
8 I think I'm not on the same page where
9 you are with this question.
10     Q.   Okay.  Let me ask you to
11 look at what I'm marking as Exhibit 13.
12         (Document marked for
13         identification as Exhibit
14         Poulton-13.)
15 BY MS. O'DELL:
16     Q.   It's an expert from Guilbert
17 and Park which you cite.  I don't have
18 another copy.  I'm sorry.  You are
19 familiar with Guilbert and Park?
20     A.   I am.
21     Q.   You cite that in your
22 report?
23     A.   I do.
24     Q.   It's authoritative?

Page 181

1     A.   Yes.
2     Q.   And Guilbert and Park have a
3 section on regional zoning.
4         Do you see this?
5     A.   Yes.
6     Q.   And they write, "Economic
7 geologists have been aware that many
8 types of ore deposits seem to have broad
9 scale pattern consistencies," and they
10 talked about the defied explanation until
11 the 1970s.  And then they give examples
12 of different types of deposits and the
13 bands of deposits that can occur over
14 broad geographical areas.
15         Do you see that?
16     A.   Yes.
17     Q.   And would you agree with me
18 that the ultramafic deposits, talc
19 deposits that are located in Vermont are
20 part of a consistent pattern of
21 ultramafic deposits that start in Canada
22 and move down the eastern seaboard
23 through western North Carolina, north
24 Georgia, Alabama, et cetera?

Page 182

```
 1        A.   I wouldn't be an
 2  authoritative expert on Eastern Seaboard
 3  ultramafic rocks.
 4        Q.   Would you agree with me that
 5  regional zoning, such as described in
 6  Guilbert and Park is a generally accepted
 7  principle in geologic exploration?
 8        A.   So I think that as Guilbert
 9  and Park are using zoning, and -- and
10  you're referring to them, it's very
11  similar to what I said where you look at
12  tectonic locations, history.  That puts
13  you in the ballpark.
14        So to the extent that that's
15  a zone, that it puts you in the ballpark,
16  then yes, it helps you narrow into an
17  area.  But as you get closer and closer,
18  smaller scales, then those differences
19  become very important.
20        So zoning gets you in the
21  ballpark.  Then it's important to figure
22  out which seat you are in if we use a
23  ballpark analogy.
24        Q.   And you've not done that
```

Page 183

```
 1  examination for the eastern part of the
 2  United States that contains ultramafic
 3  derived talc deposits, true?
 4        A.   I'm not the geologic expert
 5  for Eastern Seaboard ultramafic rocks.
 6        Q.   Including the talc deposits
 7  in -- in Vermont, true?
 8        A.   The region of the talc
 9  deposits in Vermont.
10        Q.   You cite Guilbert and Park
11  as an authoritative source.  But Guilbert
12  and Park does not describe ultramafic
13  talc occurrences, true?
14        A.   I was not citing them in the
15  context of ultramafic talc.
16        Q.   And Guilbert and Park does
17  not address talc occurrences specifically
18  in Vermont, true?
19        A.   I believe that's correct.
20        Q.   On Page 8 of your report you
21  criticize Dr. Cook in relation to a
22  letter that he relied on.  Do you see
23  that, on the top of Page 8?
24        A.   The paragraph that starts,
```

Page 184

```
 1  "Cook states chrysotile is also
 2  reported"?
 3        Q.   Correct.
 4        A.   Correct.  Yes.
 5        Q.   And what he says is, in this
 6  report is, "Chrysotile is also reported
 7  in the Val Chisone mineral suite in 1971
 8  by Ashton."
 9        That's the quote you
10  criticize, correct?
11        A.   That's the quote I
12  criticize.
13        Q.   Let me ask you to look at
14  what I'm marking as Exhibit 14.
15        (Document marked for
16        identification as Exhibit
17        Poulton-14.)
18  BY MS. O'DELL:
19        Q.   Exhibit 14 is a letter from
20  Bill Ashton, an employee of Johnson &
21  Johnson, to a Mr. Caneer at the Colorado
22  School of Mines.
23        It's dated 1971, correct?
24        A.   Correct.
```

Page 185

```
 1        Q.   And do you know who Bill
 2  Ashton is?
 3        A.   I do not.
 4        Q.   Do you know what his role
 5  was at Johnson & Johnson?
 6        A.   I do not.
 7        Q.   In the third paragraph from
 8  the bottom, and -- well, maybe I should
 9  start at the top.  He says, "Dear
10  Mr. Caneer," he said, "I've shipped to
11  Bob Beers' attention one drum of Italian
12  rock from the Crosetto mine in the
13  Chisone valley of the Italian Alps."
14        Do you see that?
15        A.   Yes.
16        Q.   He says this is -- "That is
17  the" -- "the working from which the high
18  grade Italian talc originates," referring
19  to talc for Baby Powder.
20        Do you see that?
21        A.   I don't know that it says
22  Baby Powder.  It just says high grade
23  Italian talc.
24        Q.   And he calls it the high
```

Mary Poulson, Ph.D.

Page 186

1  grade Italian talc originates, that's
2  what he says, right?
3      A.   The high -- the high grade
4  Italian talc originates.
5      Q.   And he says at the bottom,
6  "I have also checked into the
7  mineralization of that part of the
8  territory, and the minerals which show in
9  the valley are talc, pyrite, magnetite,
10  dolomite, apatite, clinochlore,
11  chrysotile, tourmaline, tremolite,
12  actinolite," and then he goes on.
13          So, in fact, Dr. Cook's
14  citation of this letter is accurate.
15      A.   I don't read that the same
16  way.  This paragraph says he's -- he's
17  checked into mineralization of that part
18  of the territory in the valley and it
19  doesn't -- it doesn't relate that suite
20  of minerals specifically back to the
21  mine.  It's simply talking about some
22  unknown size region.
23      Q.   And -- and that's your
24  criticism of -- of Dr. Cook's, that

Page 187

1  citation in Dr. Cook's report?
2      A.   Yes.  It does not state
3  that -- that chrysotile is in the
4  Crosetto mine.
5      Q.   What he actually stated was,
6  is that chrysotile is reported in the Val
7  Chisone mineral suite, and that's -- he's
8  referring to the valley, Val Chisone
9  valley, correct?
10          MR. CHACHKES:  Objection.
11          THE WITNESS:  Dr. Cook is
12      reporting to Val Chisone.
13          This paragraph says
14      "territory in the valley."  And it
15      doesn't -- I -- I can't infer from
16      that that valley and territory are
17      as specific as Val Chisone.
18  BY MS. O'DELL:
19      Q.   He says the valley in the
20  paragraph that Dr. Cook references.  He
21  says, "I've also checked in the
22  minimization of that part of the
23  territory."  He doesn't stop there.  And
24  he says, "The minerals which show in the

Page 188

1  valley."
2          And he's referring to the
3  Val Chisone valley in this letter,
4  correct?
5      A.   I don't know that.  He's
6  referring to Val Chisone in the first
7  paragraph where the talc samples that
8  he -- he has shipped have come from.
9          This is too nonspecific for
10  me to say that -- that he's referencing
11  territory and valley as specifically Val
12  Chisone.
13      Q.   And it's your -- you're
14  testifying here under oath that valley in
15  this letter does not refer to the Chisone
16  Valley?
17      A.   I can't say that it does.
18  It's -- it's too general in that
19  paragraph.
20      Q.   And in certainly the whole
21  context of the letter is the Val Chisone
22  Valley, correct?
23      A.   The first paragraph that the
24  sourcing of the material has come from

Page 189

1  the Chisone Valley.  Again, I can't say
2  in a broad paragraph that says territory
3  and valley, what he is specifically
4  referring to.
5      Q.   And you're -- you're opining
6  that valley in the latter paragraph is
7  not the Chisone Valley, correct?
8      A.   I cannot conclusively say
9  it's Val Chisone Valley.
10      Q.   And that's your criticism of
11  Dr. Cook's report --
12      A.   Yes, yes.
13      Q.   I think reasonable sort of
14  minds could differ on that point.
15          Let me ask you to look at
16  Imerys 081025.
17          And you state in your
18  report, "Cook misrepresents general
19  information on minerals associated with
20  talc in Italy."  And you cite that
21  document.
22          Do you see that?
23      A.   Yes.
24      Q.   Let me ask you to look at

Page 190

```
 1  Exhibit 15.
 2         (Document marked for
 3      identification as Exhibit
 4      Poulton-15.)
 5  BY MS. O'DELL:
 6      Q.   And it's Bates Number
 7  081025.  That's the document you referred
 8  to, correct?
 9      A.   Yes.
10      Q.   And your criticism of
11  Dr. Cook is that he misrepresents general
12  information regarding Italy in citation
13  of this document?
14      A.   That is my criticism.
15      Q.   Isn't it true that you're in
16  error, Dr. Poulton, by referring to this
17  document in relation to Italy?
18      A.   Could you explain me -- what
19  you think my error is?
20      Q.   First, Dr. Cook does not
21  cite this document in his description of
22  Italian talc mines.
23      A.   Oh, he does not?
24      Q.   He does not.  In fact, I'll
```

Page 191

```
 1  direct your attention to Page 10 of
 2  Dr. Cook's report where he describes the
 3  geology of Italian talc mines.  And this
 4  document is not included, correct?
 5      A.   We would want to check that
 6  there isn't another number for my
 7  citation.
 8      Q.   I mean you're the -- you --
 9  you're the one who included that number.
10      A.   I did include that number.
11  And it's quite possible that if I opened
12  one of his documents that was the same
13  file, I numbered it as Imerys in my
14  document, so I would want to actually
15  confirm that there isn't some other
16  number for the Imerys document that I
17  have cited here.  I don't believe I
18  pulled it out of thin air.
19      Q.   I'll represent to you that
20  Imerys documents typically don't have
21  more than one number.  So unlike J&J
22  documents which have been involved in
23  litigation for quite a period of time.
24         So I put before you Imerys
```

Page 192

```
 1  081025.  And that's Exhibit 15.  You have
 2  that in front of you?
 3      A.   I do.
 4      Q.   That's what you cite?
 5      A.   That's what I cite.
 6      Q.   There's no reference in --
 7  excuse me.
 8         There's no reference in that
 9  document to Italy, correct?
10      A.   In this document?
11      Q.   Correct.  Exhibit 15.
12      A.   I stand corrected.  There is
13  not Italy in this particular document.
14  So I've either mis-cited the document or
15  I've put it in the wrong place.
16      Q.   Or you were incorrect in
17  making the statement?
18         MR. LOCKE:  Objection.
19         THE WITNESS:  I may be
20      incorrect in referencing this
21      document.
22  BY MS. O'DELL:
23      Q.   So as stated in your report
24  on Page 8, the second paragraph from the
```

Page 193

```
 1  top of the page is incorrect?
 2      A.   This document does not cite
 3  Italy, so I am incorrect in that citation
 4  of the document.
 5      Q.   Earlier today you said that
 6  asbestos could be removed from talc in
 7  the beneficiation process.
 8         Do you recall that?
 9      A.   I would have to see exactly
10  what I said, but there is the ability to
11  separate asbestos.  I would have to see
12  exactly what I said this morning.
13      Q.   That's all you said.
14      A.   Okay.
15      Q.   I'm just asking you the
16  question, is what is -- what are you
17  relying on to make the statement that as
18  asbestos can be fully removed from talc?
19      A.   I don't think I said the
20  word "fully," did I?
21      Q.   If you -- what process --
22  let me just back up.
23         Can asbestos in the --
24  present in talcum powder be completely
```

Page 194

1  removed in the beneficiation process?
2      A.   So when you say talcum
3  powder, do you mean talc ore?
4      Q.   You can assume it means talc
5  ore that's being processed for purposes
6  of bottling.
7      A.   Okay.  Okay.  So as long as
8  there are physical properties differences
9  between minerals, you have the ability to
10 separate them based on particle size in
11 an air classification separator.
12         You have the possibility of
13 different surface chemistry processes or
14 surface chemistry properties that would
15 allow separation and flotation with the
16 correct reagents.
17         You may have the
18 possibility, even in the crushing and
19 grinding, because amphiboles are harder
20 than talc ore is.  And the grinding mills
21 are set up for particular hardness of
22 minerals.
23         So there are several stages
24 that you can separate minerals based on

Page 195

1  their physical properties.  And
2  asbestiform minerals would have different
3  physical properties than talc.
4      Q.   Okay.  Have you ever
5  designed a process for purposes of
6  removing asbestiform minerals from talc?
7      A.   No.
8      Q.   Have you ever supervised a
9  process that the purpose of which was to
10 remove asbestos from talc?
11     A.   No.
12     Q.   What reported process are
13 you -- let me strike that and start
14 again.
15         What peer-reviewed
16 publication are you relying on to
17 conclude that asbestos in talcum powder
18 can be removed during the beneficiation
19 process?
20     A.   So I'm relying on background
21 knowledge of separating asbestos from
22 other minerals.  And I have looked at
23 West Windsor document where they looked
24 at changes of flotation reagents and its

Page 196

1  impact on asbestos.
2         But I'm largely looking at
3  when we have asbestos mixed in with other
4  kinds of minerals.
5      Q.   Can you remove or separate
6  asbestos from talc based on the specific
7  physical properties of asbestos?
8      A.   There are differences in the
9  physical properties with talc.  So based
10 on the separation and the beneficiation
11 processes that you're using, I would say
12 it is possible.
13     Q.   Possible, but you've not
14 ever studied that process or been
15 involved in that process, fair?
16     A.   I have not had personal
17 experience.
18     Q.   You've not written on that,
19 separation of asbestos from talc or other
20 minerals, true?
21     A.   I have not published on
22 that.
23     Q.   Let me ask you in Exhibit 15
24 to turn to -- first let me, before you

Page 197

1  turn to the page, this PowerPoint is
2  entitled "Talc Geology Mining and
3  Processing For Cosmetic, Pharma, and Food
4  Applications" by E.F. McCarthy dated
5  February 2010.
6         You've seen this document
7  before?
8      A.   I have.
9      Q.   And you're aware that
10 Mr. McCarthy was a toxicologist and
11 safety director that worked for Imerys
12 Talc America?
13     A.   I knew he was an Imerys
14 employee.  I didn't know what his actual
15 role was.
16     Q.   If you'll turn to page Bates
17 number ending in 043.  Mr. McCarthy has
18 created a slide called "Talc
19 Beneficiation," correct?
20     A.   Yes.
21     Q.   And he's -- in the second
22 bullet, he's talking about rejection of
23 fibrous minerals.
24         Do you see that?

Page 198

1    A.    Yes.
2    Q.    And he says, and he's
3  referring to fibrous minerals, "Can be
4  selectively rejected and levels reduced
5  by flotation and manual sorting, but they
6  cannot be eliminated to meet cosmetic
7  standards."
8        Did I read that correctly?
9    A.    That's what his bullet says.
10   Q.    If you'll look at Dr. Cook's
11 report, Page 11.  He's talking about --
12 I'll give you a moment to get there, Page
13 11 of Dr. Cook's report.  In the second
14 paragraph, he does a literature review
15 for Vermont talc occurrences.
16       Do you see that?
17   A.    Yes.
18   Q.    And he is describing the
19 geology of the counties that surround the
20 mines that were used to source Johnson &
21 Johnson's Baby Powder, true?
22   A.    I don't actually know where
23 these mines are located geographically
24 relative to the Johnson & Johnson mines.

Page 199

1    Q.    Okay.  And you don't know
2  the counties where the Johnson & Johnson
3  source mines were located, true?
4    A.    That's correct.
5    Q.    And you state in your report
6  that the Johnson mine was never used to
7  source Baby Powder in your report?
8    A.    That's my understanding.
9    Q.    How did you get that
10 understanding?
11   A.    I believe I looked at the
12 reports where the mines were cited that
13 were producing Johnson & Johnson Baby
14 Powder.  I don't recall seeing Johnson
15 mine on that list.
16   Q.    What reports were you
17 referring to?
18   A.    Many reports.
19   Q.    Are you referring to an
20 expert report, or some other type of
21 report?
22   A.    No, I'm referring to
23 documents that were produced.
24   Q.    You are aware that the

Page 200

1  Johnson mine was owned by Johnson &
2  Johnson -- a Johnson & Johnson
3  subsidiaries, are you not?
4        MR. CHACHKES:  Objection.
5        THE WITNESS:  I would have
6        to look back at the documents of
7        who owned what and when.
8  BY MS. O'DELL:
9    Q.    Do you know that as you're
10 sitting here?
11   A.    I don't know that off the
12 top of my head.
13       (Document marked for
14       identification as Exhibit
15       Poulton-16.)
16 BY MS. O'DELL:
17   Q.    Let me show you what I'm
18 going to mark as Exhibit 16.  Have you
19 seen this document before?
20   A.    This does not look familiar.
21 I would have to check my list to see if
22 it's one that I had.
23   Q.    If you'll turn to the second
24 page of the document.  I think you're

Page 201

1  already there.
2        Do you see at the top, this
3  is Eastern Magnesia Talc Inc., a Johnson
4  & Johnson company?
5        Do you see that?
6    A.    I see that.
7    Q.    And it's a memo entitled
8  "The Cosmetics Industry."
9        Do you see that?
10   A.    Yes.
11   Q.    And it goes through today's
12 market.  And then talks about, in
13 Subsection B, perfumed Baby Powder.
14       Do you see that?
15   A.    I'm struggling to find where
16 you see perfumed Baby Powder here.  Oh,
17 B?
18   Q.    Yes.
19   A.    Okay.
20   Q.    And if you look down to D it
21 talks about EMTals for cosmetic.
22       Do you see that?
23   A.    I do.
24   Q.    He's talking about cosmetic

Mary E. Poulton, Ph.D.

1  talc powder.
2       Do you see that?  EMTals for
3  cosmetics?
4       A.    And what is an EMTal?
5       Q.    It is a reference to
6  cosmetic powder produced by Eastern
7  Magnesia Talc Company.
8       Do you see that?
9       A.    I see.  So we're looking at
10 the column under D, EMTals?
11      Q.    Actually, I'm looking at the
12 title.  Says "EMTals For Cosmetics."
13      A.    Cosmetics.
14      Q.    Do you see that?
15      A.    I see that.
16      Q.    I'll represent to you that
17 is a reference to cosmetic talc?
18           MR. LOCKE:  Objection.
19           MR. CHACHKES:  Objection.
20           THE WITNESS:  So I -- I see
21      Grade 66 which is what I recognize
22      as Johnson & Johnson's talc grade
23      from Vermont.  And that's
24      referenced for West Windsor.

1  BY MS. O'DELL:
2       Q.    Right.
3       A.    I do not see that same grade
4  referenced for Johnson.
5       Q.    And at different mines, in
6  other words, Italy had a different
7  product reference for the talc that was
8  used for Johnson's Baby Powder than --
9  with reference for mine talc, correct?
10           MR. CHACHKES:  Objection.
11           THE WITNESS:  So Italy had
12      its own number?
13 BY MS. O'DELL:
14      Q.    Product code.
15      A.    Product code.
16      Q.    And it was a different
17 product code in the West Windsor group of
18 mines, correct?
19      A.    So I've only seen 66
20 referenced for approved Johnson & Johnson
21 talc.
22      Q.    Right.
23      A.    I've never seen another
24 number in any document associated with

1  Johnson & Johnson cosmetic talc products.
2       Q.    Well, you are aware that
3  Italy had a different product number for
4  talc used in Johnson's Baby Powder and
5  Shower to Shower, true?
6       A.    Yes.
7       Q.    And you're -- are you aware
8  that China had a different product code
9  for the talcum powder that was used in --
10 is still being used for Johnson's Baby
11 Powder?
12      A.    Yes.
13      Q.    Okay.  And so turn to Page 3
14 of this document.  Do you see at the
15 bottom, Dr. Poulton, EMTCO which is
16 Eastern Magnesia Talc Company.
17      Do you see that?  "Working
18 to replace Johnson EMTals," which we've
19 established was cosmetic talc?
20      A.    Okay.
21           MR. LOCKE:  Objection.
22           MR. CHACHKES:  Objection.
23 BY MS. O'DELL:
24      Q.    "With West Windsor EMTals

1  when and if Johnson cosmetic grades are
2  eliminated due to arsenic content."
3       Do you see that?
4       A.    I'm sorry, I'm just catching
5  up with where you are now.
6       You are on page?
7       Q.    I'm on Page 3, at the
8  bottom.
9       A.    Okay.
10      Q.    Number 5, under 3, do you
11 see that?
12      Are you with me?
13      A.    Yes, I see that statement.
14      Q.    "EMTCO," which is Eastern
15 Magnesia Talc Company, "working to
16 replace Johnson EMTals," which we've just
17 reviewed, "or cosmetic talc" --
18           MR. LOCKE:  Objection.
19 BY MS. O'DELL:
20      Q.    -- "with West Windsor EMTals
21 when and if Johnson cosmetic grades are
22 eliminated due to arsenic content."
23      Do you see that?
24           MR. CHACHKES:  Objection.

Mary Poulson, Ph.D.

Page 206

1    THE WITNESS:  I see that
2  statement.  I still stand by my
3  statement that I've never seen
4  anything but Grade 66 referenced
5  for Johnson & Johnson cosmetic
6  talc.
7  BY MS. O'DELL:
8    Q.   And you've only seen in
9  review of -- for your report, the
10  references cited by Dr. Cook and
11  Dr. Krekeler, plus six to 12 other
12  documents, true?
13    A.   That I asked for, yes.
14    Q.   And are you aware that there
15  are thousands and thousands of other
16  documents that have been produced in this
17  litigation, including the one that's been
18  marked as Exhibit 16?
19    A.   I have heard from other
20  depositions that there are many
21  documents.
22    Q.   What depositions are you
23  referring to?
24    A.   Dr. Cook's and

Page 207

1  Dr. Krekeler's.
2    Q.   And in regard to Exhibit 16,
3  the clear import is that Johnson EMTals
4  are being used, or Johnson's cosmetic
5  talc is being used for cosmetic purposes
6  according to this memo?
7    MR. CHACHKES:  Objection.
8    THE WITNESS:  So I would
9  imagine there are other documents
10  that could corroborate that.  But
11  again, I stand by the only thing I
12  have seen is Grade 66 associated
13  with Johnson & Johnson cosmetic
14  grade talc.
15    So seeing this document out
16  of context, I can't agree that the
17  Johnson mine was used as a
18  commercial source for Johnson &
19  Johnson cosmetic products.
20  BY MS. O'DELL:
21    Q.   But it's clearly what this
22  memo states.
23    MR. CHACHKES:  Objection.
24    THE WITNESS:  I don't know

Page 208

1  that that's what this memo states
2  without looking at larger context.
3  BY MS. O'DELL:
4    Q.   The words of this memo says,
5  "We're working to replace Johnson EMTals
6  with West Windsor EMTals when and if
7  Johnson cosmetic grades are eliminated
8  due to arsenic content."
9    That's what the document
10  says.
11    A.   That's what this says.  But
12  again, I believe there's probably a
13  larger context.
14    MS. O'DELL:  Move to strike.
15  You're speculating.
16  BY MS. O'DELL:
17    Q.   You don't know that, do you?
18    MR. CHACHKES:  Objection.
19    THE WITNESS:  Based on the
20  documents I've seen, I would stand
21  by that statement.
22  BY MS. O'DELL:
23    Q.   And it's your statement that
24  only Grade 66 was -- has ever been used

Page 209

1  to make Johnson's Baby Powder?
2    MR. CHACHKES:  Objection.
3    THE WITNESS:  That's the
4  only reference I have seen.
5  BY MS. O'DELL:
6    Q.   Okay.
7    You cited on Page 8 of your
8  report Guilbert and Park, Page 66 and 67.
9  And you say, "Guilbert and Park note the
10  role of stress in changing the
11  distribution of mineralization in mineral
12  deposits and how the permeability and
13  porosity created by fractures and joints
14  at the large scale and crystal boundaries
15  and cleavage planes at the small scale
16  contribute to both the final
17  configuration of ore deposit components."
18  Citing Page 66 and 67.
19    A.   Correct.
20    Q.   Page 66 and 67 of Guilbert
21  and Park deal with migration of
22  hydrothermal fluids at shallow depth,
23  true?
24    A.   I would need to see the

Page 210

1  reference again to ensure that.
2          MR. CHACHKES:  Do you have
3  another copy?
4          MS. O'DELL:  Sure.
5  It's your copy.
6          MR. FROST:  It's -- it's one
7  of the books.  We can get another
8  one if you want it.
9          MR. CHACHKES:  That's fine.
10         THE WITNESS:  Yes.
11  BY MS. O'DELL:
12      Q.   And that does not relate to
13  talc deposits in Vermont, correct?
14      A.   It could.
15      Q.   Does it reference -- excuse
16  me.  It doesn't reference talc
17  occurrences in Vermont, true?
18      A.   That's a more general
19  quotation from a more general section of
20  that book, not specifically referenced in
21  my report or the book for Vermont talc.
22      Q.   Or talc in general?
23      A.   Or talc in general.
24          MS. O'DELL:  I'm just going

Page 211

1      to go ahead and mark the binder
2      that's been provided as
3      Exhibit 17.
4          MR. CHACHKES:  Okay.  We've
5      been going an hour and 20 minutes.
6      Maybe take a break at some point?
7          MS. O'DELL:  Yeah, that's
8      fine.
9  BY MS. O'DELL:
10      Q.   Let me just identify this
11  for the record and we can take a break.
12          (Document marked for
13      identification as Exhibit
14      Poulton-17.)
15  BY MS. O'DELL:
16      Q.   So Exhibit 17 are the
17  excerpts of the -- let me just strike
18  that.
19          What is Exhibit 17?
20      A.   Exhibit 17 is additional
21  references that I cited.
22      Q.   And those are excerpts from
23  certain books that you have listed on
24  your reference list, correct?

Page 212

1      A.   Some are books.  Some are
2  papers.
3      Q.   And -- fair enough.
4          MS. O'DELL:  We can take a
5  break.
6          THE VIDEOGRAPHER:  Remove
7  your microphones.  The time is
8  2:51 p.m.  Off the record.
9          (Short break.)
10         THE VIDEOGRAPHER:  Okay.  We
11  are back on the record.  The time
12  is 4:16 p.m. -- I mean 3:16 p.m.
13  Sorry.
14  BY MS. O'DELL:
15      Q.   Dr. Poulton, let me ask you
16  to look at Page 11 of your report.
17      A.   Page 11 of my report.  Okay.
18      Q.   And you state that Dr. Cook
19  misrepresents the arsenic content of talc
20  ore for cosmetic applications.
21          And your criticism, at least
22  in part, is that he cites a 2006 test
23  report.
24          Do you see that?

Page 213

1      A.   Yes.
2      Q.   Is it -- is it your opinion
3  that the talc mines in Vermont did not
4  have high levels of arsenic?
5      A.   The test results I've seen
6  indicated that there is arsenic.  It was
7  something that they were managing.  Some
8  zones of the mine had fractures that were
9  coated with arsenic-bearing minerals that
10  they identified.  Other areas of the mine
11  did not have those zones of arsenic.
12  That's my understanding.
13      Q.   And the documents also say
14  that material that was in silos and
15  weathered could also have higher levels
16  of arsenic.  I'm sure you saw those
17  documents?
18      A.   I didn't see any reference
19  to material that was processed into
20  silos.  I saw that if it was blasted on
21  benches, that they suspected arsenic had
22  weathered and they were watching their
23  stock piles.  That's the information I
24  remember.

Mary Poulson, Ph.D.

Page 214

1    Q.   So would the limit of your
2 criticism be that Dr. Cook cited in part
3 for his opinion that some of the talc ore
4 had high levels of arsenic, that he cited
5 a 2006 report?
6        MR. CHACHKES:  Objection.
7        THE WITNESS:  That is one of
8    the criticisms that I make here.
9 BY MS. O'DELL:
10    Q.   But you're not stating that
11 the ore in the
12 Argonaut/Hamm/Hammondsville mine did not
13 have a high level of arsenic in parts?
14 That's not your criticism?
15    A.   So I agree that there are
16 zones where they've identified higher
17 arsenic that they were managing.
18    Q.   The arsenic problem in the
19 Vermont mines was an ongoing problem
20 throughout the time that talc was being
21 mined for purposes of cosmetic powders,
22 true?
23    A.   So you say it was an ongoing
24 problem?

Page 215

1    Q.   Correct.
2    A.   Throughout the history of
3 using Vermont talc?
4    Q.   Correct.
5    A.   I think I would want to look
6 very specifically at arsenic test results
7 at different time periods.
8    Q.   Certainly in '92 it was
9 reported as a problem in talc deposits in
10 Vermont, true?
11    A.   Oh, I would need to see a
12 reference.
13    Q.   Do you recall that?
14    A.   I don't recall the specific
15 documents or date.
16    Q.   And -- and I guess the
17 question I have is in relation to
18 Dr. Cook's report, and what he
19 specifically opines on, he states that in
20 certain areas of the Vermont talc mines,
21 there was a high level of arsenic.
22 That's sort of the summary of his
23 opinion.
24        Do you disagree with that?

Page 216

1    A.   Could we look at his report
2 specifically in that section?
3    Q.   Do you disagree with that
4 statement?
5    A.   I would want to see the
6 statement.
7    Q.   Let me ask you, do you
8 disagree with the statement that in
9 certain areas of the Vermont talc mines
10 there were high levels of arsenic?
11    A.   So I think we would want to
12 talk about specific mines sourced for
13 Johnson & Johnson talc and what the
14 specific levels of arsenic are instead of
15 saying simply high levels in all Vermont
16 mines.
17    Q.   Okay.  Let me show you what
18 I'm going to mark as Exhibit Number 18
19 for this deposition.
20        (Document marked for
21    identification as Exhibit
22    Poulton-18.)
23 BY MS. O'DELL:
24    Q.   Have you seen this document

Page 217

1 before?
2    A.   I believe I have.
3        MR. CHACHKES:  Just for the
4    record, it's also Downey-12,
5    right?
6        MS. O'DELL:  I covered that
7    up on her copy.
8        MR. CHACHKES:  Right.  I'm
9    just making a record.
10        MS. O'DELL:  It won't matter
11    because it's covered up.  But it
12    was Downey-12.
13        MR. CHACHKES:  Just to
14    cross-reference once we get the
15    transcript in.
16        MS. O'DELL:  I see.  Fair
17    enough.
18 BY MS. O'DELL:
19    Q.   And Exhibit 18, have you
20 seen this before?
21    A.   I believe I have.
22    Q.   In this 1992 memo from R.C.
23 Munro discusses arsenic that is present
24 in Cyprus talc deposits that are used to

Mary Poulson, Ph.D.

Page 218

1  source J&J talc, true?
2      A.   I see reference to Rainbow.
3  So I would first want to know if Rainbow
4  was a source for Johnson & Johnson talc
5  at this particular date.
6      Q.   West Windsor was the
7  processing plant for cosmetic talcs,
8  true?
9      A.   True.
10     Q.   And if you look down in the
11  page -- first page, third paragraph, it
12  says, "High, e.g., six parts per million
13  arsenic" -- "soluble arsenic contents of
14  mill feed through the West Windsor mill
15  contribute to reduced recoveries and
16  milling rates."
17         Do you see that?
18     A.   I see that sentence.
19     Q.   At West Windsor part of the
20  mill recovery problem, at least as been
21  ascribed to a high fines content in the
22  feed and to low pH both of which
23  contribute to increased soluble arsenic?
24     A.   Yes.

Page 219

1      Q.   And so Munro is reporting
2  high levels of arsenic at the West
3  Windsor feed, correct?
4      A.   At West Windsor.  West
5  Windsor also produced industrial talc, is
6  my understanding.
7      Q.   What's the basis for that
8  understanding?
9      A.   I have seen some reports
10  that indicated material that wasn't
11  within spec for Johnson & Johnson Grade
12  66 was sold to industrial buyers for
13  other applications.  And if memory serves
14  me, the number of silos at West Windsor,
15  the ones for Grade 66 are specifically
16  marked for Grade 66.  And there are
17  others that are not marked for Grade 66,
18  presumably because they don't hold Grade
19  66 talc.
20     Q.   Are you testifying that ore
21  used in Baby Powder did not test high for
22  arsenic?
23     A.   I think we again would have
24  to look at individual test samples and

Page 220

1  then see if the certificates of
2  acceptance were created for those samples
3  or if they were rejected.
4      Q.   Have you seen arsenic test
5  results of product or processed talc?
6      A.   I would have to go back and
7  look at data to refresh my memory
8  specifically on arsenic.
9      Q.   But you -- as you're sitting
10  here today, you cannot identify --
11     A.   I cannot name specific
12  samples.
13     Q.   And you don't recall at this
14  point seeing test results for specific
15  samples, fair?
16     A.   I would have to refresh my
17  memory if I saw them in a table or
18  document.
19     Q.   But you don't recall as you
20  sit here today?
21     A.   As I sit here right now
22  without the documents in front of me, I
23  don't recall.
24     Q.   Let me show you what I've

Page 221

1  marked as Exhibit 19.
2         (Document marked for
3          identification as Exhibit
4          Poulton-19.)
5  BY MS. O'DELL:
6      Q.   Have you seen this before?
7      A.   I believe so.
8      Q.   And this is a memo from
9  Mr. McCarthy, Ed McCarthy dated 2006.
10  If you'll turn to Page 4 of
11  the document there's a section entitled
12  "Vermont."
13         Do you see that?
14     A.   Yes.
15     Q.   It says, "The Vermont
16  operation consists of the Argonaut mine."
17         Do you see that?
18     A.   Yes.
19     Q.   And if you'll look down two
20  more paragraphs, the paragraph beginning
21  "The mine."
22         Do you see that?
23     A.   Yes.
24     Q.   Argonaut was one of the

Mary Poulson, Ph.D.

Page 222

1  mines that sourced Johnson's Baby Powder,
2  true?
3      A.   True.
4      Q.   It says, "The mine has a
5  poor" -- "a history of poor operation,
6  primarily due to management shortcomings,
7  inadequate stripping, poor productivity,
8  ore variability, arsenic and serpentine
9  contamination, and water management have
10  all been issues in recent years."
11          Do you see that?
12      A.   I see that.
13      Q.   "And because of this, it has
14  been difficult to upgrade the product
15  line."
16          Do you see that?
17      A.   Yes.
18      Q.   According to Mr. McCarthy,
19  arsenic contamination had been an issue
20  for some period of years, correct?
21      A.   I don't know what his time
22  frame is for history.
23      Q.   But he says in recent years.
24      A.   Let's see.  Where -- could

Page 223

1  you refresh my memory on where it says
2  recent years?
3      Q.   The paragraph we were just
4  reading from:  "The mine has a history."
5          Do you see that?
6      A.   Has a history...
7          Oh I see.  Okay.
8      Q.   So arsenic contamination had
9  been a problem for some years, true?
10      A.   So --
11      Q.   That's what the document
12  says, correct?
13      A.   In recent years --
14      Q.   That's what the document
15  says, correct?
16      A.   It says recent years.
17      Q.   All right.  Let me ask you
18  to turn in your report to Page 12.  And
19  you're referring to a trip that
20  exploration -- exploratory trip that was
21  undertaken by David Crouse and others to
22  explore potential new mines to source
23  Baby Powder.
24          Do you see that?

Page 224

1      A.   I see that paragraph.
2      Q.   And you assert that the --
3  Dr. Krekeler's criticism of the sampling
4  that was done on that trip, if you
5  recall, their -- they visited four mines
6  and they took eight samples.
7          Do you recall that?
8      A.   Yes.
9      Q.   And -- and Dr. Krekeler
10  criticized that sampling process as being
11  inadequate to evaluate the mines for
12  purposes of determining if they were
13  appropriate sources of -- for Baby Powder
14  or cosmetic powder?
15      A.   I believe that was his
16  conclusion.
17      Q.   And it's your opinion that
18  eight samples is a sufficient number in
19  order to adequately evaluate four
20  cosmetic mines, is that your opinion?
21      A.   So we need to be very
22  careful about the word evaluate.
23      Q.   How do you use evaluate?
24      A.   So you can use evaluate to

Page 225

1  look at business opportunities, and that
2  is, I believe, what Mr. Crouse stated was
3  the purpose.
4          He was looking specifically
5  for potential prospect areas.  The report
6  is a summary of that trip with
7  recommendations and opportunities
8  identified.  And in that report he talked
9  about potential joint ventures with
10  Chinese state-owned companies.  So he was
11  there looking at business opportunities
12  and not conducting an exploration
13  program.
14      Q.   And Dr. Crouse is -- is a
15  geologist, true, or Mr. Crouse is a
16  geologist, true?
17      A.   I don't know what his -- his
18  background is.
19      Q.   Do you know his role at
20  Imerys?
21      A.   I do not.
22      Q.   Do you know whether any
23  further sampling was done to evaluate the
24  geology of those mines?

Mary B. Coulson, Ph.D.

Page 226

1      A.   I do not know what was
2  conducted after his field trip.
3      Q.   It'd be fair to say that
4  eight samples of four mines is not a
5  representative number of samples to
6  evaluate the geology of those mines,
7  true?
8      A.   He was not there to sample
9  the geology.  He was there to look at
10  potential business opportunities, is my
11  understanding of his field trip report.
12      Q.   Certainly evaluating a
13  potential mine to source a product would
14  involve evaluating the geology of the
15  particular deposit, true?
16      A.   Not necessarily at this
17  stage.
18      Q.   Okay.  So you think he was
19  sightseeing in China at various mines and
20  didn't care what was -- what the geology
21  was?
22          MR. CHACHKES:  Objection.
23          MR. LOCKE:  Objection.
24          THE WITNESS:  I -- I --

Page 227

1  BY MS. O'DELL:
2      Q.   Is that your opinion?
3      A.   I can't say that he was
4  there to sightsee.  I can say that when
5  you go evaluate potential business
6  opportunities, you may collect a sample
7  just to show, say, what a typical piece
8  of high grade ore would look like or some
9  other interesting sample.  But you're not
10  there to conduct an exploration program.
11          You're there to -- to get a
12  sense of what the business environment
13  looks like and what the -- what the state
14  of the businesses are and what the
15  potential resources might be that you
16  would investigate later.
17      Q.   Imerys was already
18  purchasing talc from China at this time
19  that this trip was undertaken, true?
20      A.   I would need to again look
21  at what date he did this trip to refresh
22  my memory.
23      Q.   When did Imerys start
24  selling talc from China to source Baby

Page 228

1  Powder?
2      A.   So I believe Rio Tinto was
3  doing that before Imerys bought those
4  operations.  So we'd need to look at when
5  Rio Tinto was doing work and -- and when
6  it was Imerys.
7      Q.   For purposes of our
8  discussion, there were predecessor
9  companies to Imerys.  I'm going to refer
10  to them globally as Imerys.
11      A.   Okay.
12      Q.   Do you know when Imerys
13  began to source cosmetic talc for Baby
14  Powder?
15      A.   I believe it was around
16  2003.
17      Q.   And the trip that you refer
18  to that Mr. Crouse took was in 2004,
19  correct?
20      A.   I would want to look at that
21  document just to confirm the date.
22      Q.   Let me ask you, have you
23  been hired or consulted with any mining
24  companies for purposes of leading a trip

Page 229

1  to explore potential mines --
2          MS. O'DELL:  Just leave it
3  right there.
4  BY MS. O'DELL:
5      Q.   -- of any type in any
6  region?
7          Have you ever been hired by
8  a company to lead an exploratory trip to
9  evaluate potential mines?
10      A.   Hired by a company to lead a
11  trip to evaluate exploration prospects?
12  Not hired by a company.
13      Q.   And -- and you have not
14  consulted or been hired by a company to
15  participate in an evaluation trip like
16  the one we are talking about involving
17  Dr. Crouse, true?
18      A.   Could you restate your
19  question for me again?
20      Q.   Have you ever been hired to
21  consult for -- by a mining company for
22  purposes of exploring potential
23  sources of -- potential sources for a
24  mineral?

Mary Poulson, Ph.D.

Page 230

1    A.    So those projects were
2  funded through the university to do the
3  projects for the companies?
4    Q.    I'm asking if you've been
5  hired by a company, not what you've done
6  in relation to the university.
7    A.    Outside of the university,
8  no.
9    Q.    Let me ask you to turn --
10 look at the bottom of Page 12 of your
11 report.  And then onto Page 13, you state
12 that "Imerys 139093 states that the
13 applicable testing protocols surpasses
14 industry standards."
15        Do you see that?
16    A.    Help me find that.
17    Q.    Page 13 of your report.
18    A.    Okay.  I see the statement.
19    Q.    And you say that Imerys
20 conducted biweekly testing of the talc
21 using Test Method 7024.
22        Do you see that?
23    A.    Yes.
24    Q.    And that they test weekly

Page 231

1  composites of CT -- using the CTFA J4-1
2  method.
3        Do you see that?
4    A.    Yes.
5    Q.    So biweekly -- is it your
6  position that Imerys and J&J conducted
7  testing -- testing for purposes of
8  identifying asbestos either weekly or
9  biweekly?
10    A.    I would have to look at
11 which samples were specifically for
12 asbestos because not all of the tests
13 were specifically for asbestos as I
14 understand it.
15    Q.    What -- what is Test
16 Method 7024?
17    A.    I believe the TM is -- is
18 transition microscopy.  But again I'd
19 want to confirm that.
20    Q.    Do -- do you -- do you know
21 what TM 7024 was designed to identify?
22    A.    No.  The -- the microscopy
23 testing is -- is not my area of
24 expertise.

Page 232

1    Q.    And is it -- is your opinion
2  or criticism of Dr. Cook and Krekeler
3  based on your understanding that testing
4  was -- for asbestos was conducted
5  biweekly or weekly?
6        MR. CHACHKES:  Objection.
7        THE WITNESS:  Again, I would
8    want to go back and just confirm
9    with my memory when the asbestos
10    testing was done on what
11    composites that were collected at
12    which times.
13 BY MS. O'DELL:
14    Q.    Is -- was it done biweekly?
15    A.    Again, I'd want to go back
16 and look at that document with their
17 sampling protocols.
18    Q.    But, you don't know as
19 you're sitting here today?
20    A.    I would need to refresh my
21 memory.
22        (Document marked for
23    identification as Exhibit
24    Poulton-20.)

Page 233

1  BY MS. O'DELL:
2    Q.    Let me show you what I'm
3  marking as Exhibit 20.  Have you seen
4  that document before?
5    A.    It looks familiar.
6    Q.    But you don't recall having
7  seen that as you sit here today?
8    A.    It's not foremost in my
9  brain.
10    Q.    Okay.  And it's your
11 understanding that testing for asbestos
12 was done on a weekly or biweekly basis?
13    A.    I don't know that the
14 testing with the TEM was done on that
15 basis, but samples were collected on some
16 fixed schedule that were composited and
17 used for the asbestos testing.
18    Q.    And in fact, talc for use in
19 Baby Powder was not tested on a weekly or
20 biweekly basis for asbestos, true?
21        MR. CHACHKES:  Objection.
22        THE WITNESS:  Again, I would
23    want to go back and look at that
24    testing schedule.

Page 234

1    (Document marked for
2    identification as Exhibit
3    Poulton-21.)
4  BY MS. O'DELL:
5    Q.   Let me show you what I'm
6  marking as Exhibit 21.  You'll see this
7  is the deposition of -- the front page of
8  the deposition of Julie Pier.
9    Do you see that?
10   A.   Yes.
11   Q.   And I'll represent to you
12 that Ms. Pier was the head of testing for
13 Imerys, and she testified as a corporate
14 representative for testing from 1989 to
15 the present.  I'll represent that to you.
16 If I'm incorrect about that, I'm sure
17 your counsel will weigh in.
18       But she was a corporate
19 representative, and she testified to bind
20 the company on the testing that was
21 performed on Johnson & Johnson talc.
22   A.   I'm sorry.  Your voice
23 dropped off for a minute.  You said she
24 was -- and part of your sentence dropped

Page 235

1  off.
2    Q.   Her testimony binds the
3  company as to how they were testing
4  Johnson & Johnson talc for asbestos.
5    A.   Okay.  Thank you.
6    Q.   Now, she was asked a series
7  of questions regarding the testing for
8  asbestos.
9        If you turn to Page 219.
10 Let me just go back.  She's
11 asked about testing for various things.
12 And she gets to TEM, which you understand
13 to be transmission electron microscopy.
14   A.   Correct.
15   Q.   And she said, "The TEM
16 quarterly sample is constructed from two
17 silos' composites in Vermont.  So as a
18 silo is being filled a periodic sampling
19 is done of the entire product to
20 represent what's in the silos.  And then
21 that is composited, sent to Denver for
22 x-ray defraction, basically the J-4-1
23 method.  For those samples, a quarterly
24 deposit is being made and sent to" -- I

Page 236

1  think she means composite, not deposit --
2  "is made and sent to an external lab for
3  TEM."
4        Do you see that?
5    A.   Yes.
6    Q.   So only quarterly testing
7  was done for purposes of asbestos?
8        MR. CHACHKES:  I'm just
9    going to object to providing an
10   incomplete part of her depo.
11 BY MS. O'DELL:
12   Q.   Okay.  That was what was --
13 her testimony was.
14   A.   So I haven't seen the whole
15 deposition.  I know that the silos were
16 sampled at regular intervals as they were
17 being filled.  So there was sampling
18 being done.  How often the TEM actual
19 measurements were done, this indicates
20 quarterly, but on a composited sample
21 that was taking frequently during
22 filling.
23   Q.   Quarterly, a quarterly
24 testing was performed.

Page 237

1    A.   Quarterly testing on a
2  sample that was taken at regular
3  intervals during filling.
4    Q.   So according to Ms. Pier
5  neither weekly or biweekly testing for
6  asbestos was conducted, at least for the
7  period of 1989 forward?
8        MR. CHACHKES:  Objection.
9  BY MS. O'DELL:
10   Q.   True?  Her testimony, it was
11 quarterly.
12   A.   So she says TEM quarterly.
13   Q.   Correct.
14   A.   Does that imply as well that
15 the XRD was only done quarterly or PLM
16 was only done quarterly?
17   Q.   Testing for asbestos was
18 only done quarterly, is what her
19 testimony is.
20       MR. CHACHKES:  Objection.
21       MR. LOCKE:  Objection.
22       THE WITNESS:  Well, it says
23 TEM was done quarterly.  There are
24 other tests for asbestos.  So I

Page 238

1  would want to see, again, what was
2  the schedule for PLM and XRD.
3  BY MS. O'DELL:
4     Q.   Were you provided Ms. Pier's
5  deposition?
6     A.   I only had one page.
7     Q.   Of her deposition?
8     A.   Yes.
9     Q.   So you had one page of
10 Ms. Pier's deposition and one page of
11 John Hopkins' deposition?
12    A.   Yes.
13    Q.   What pages were you
14 provided?
15    A.   I would have to look in my
16 notes and see which page I got.  But it
17 was one that was cited by Cook and
18 Krekeler.
19    Q.   And that was the only --
20    A.   That was the only page I
21 got.
22    Q.   In your report on Page 13,
23 you cite a letter from McCrone.  And the
24 Bates number is JNX -- JNJMX-68.

Page 239

1     Do you see that?
2     A.   Yes.
3     Q.   How did you obtain this
4  document?
5     A.   That was, if not part of the
6  materials that I received Cook and
7  Krekeler, it was related to requests I
8  made about more information on sampling
9  graphs.
10    Q.   It was not cited by Cook or
11 Krekeler.  So this was a document that
12 was selected by counsel and provided to
13 you.
14       MR. FROST:  Objection.
15       THE WITNESS:  I don't know
16    that it was provided at their
17    insistence or whether I had
18    requested information.
19 BY MS. O'DELL:
20    Q.   And if you requested
21 information, then they would have
22 selected the document that was provided
23 to you, correct?
24       MR. FROST:  Objection.

Page 240

1       THE WITNESS:  I would assume
2    so.
3  BY MS. O'DELL:
4     Q.   If Ms. Pier testified in her
5  deposition that all testing for asbestos
6  took place on a quarterly basis, would
7  that be important for your opinion in
8  this case?
9       MR. CHACHKES:  Objection.
10      THE WITNESS:  I think I
11   would want to see the full context
12   of what she was talking about.
13 BY MS. O'DELL:
14    Q.   You would have wanted to see
15 that?
16    A.   Yes.
17    Q.   And that was not provided to
18 you, was it?
19    A.   As far as I know it was not.
20 Perhaps I missed it in the box folder.
21    Q.   You were provided, according
22 your testimony a few minutes ago, one
23 page of the Pier deposition, true?
24    A.   That's what I saw in my

Page 241

1  collection.
2       (Document marked for
3    identification as Exhibit
4    Poulton-22.)
5  BY MS. O'DELL:
6     Q.   Let me show you what I'm
7  marking Exhibit 22, which is the letter
8  to Armstrong World Industries from
9  McCrone.  Do you recall this?
10    A.   I think I recall seeing
11 this.
12    Q.   And you cite it in your
13 report, correct?
14    A.   If you say so.
15    Q.   It's your report.  Did you
16 cite it in your report?
17      MR. CHACHKES:  Objection.
18      THE WITNESS:  There are so
19   many documents cited I would have
20   to look at this number --
21 BY MS. O'DELL:
22    Q.   Well, to be --
23    A.   -- and look at my list

Mary E. Poulton, Ph.D.

Page 242

1  honestly.
2        Q.   Yeah.  Well, to be fair,
3  Dr. Poulton, I had already directed your
4  attention to it on Page 13, fair?
5        A.   Fair.
6        Q.   I'd already done that.  So
7  I'm not trying to be tricky.  I'm just
8  asking you if this is what you cited.
9  And I understand -- is that a yes?  Is
10 this the document that you were referring
11 to?
12       A.   Is this the JNJMX68
13 document?
14       Q.   Yes.
15       A.   Okay.
16       Q.   You rely on it for purposes
17 of this statement.  It's in the last full
18 paragraph at the bottom.  Windsor -- and
19 it says, "Suffice it to say that amidst
20 mutterings of 'that inspector is no
21 longer with us,' the Illinois EPA
22 wrote" -- "wrote to Windsor Minerals to
23 the effect that they were satisfied that
24 Windsor product is free of asbestos."

Page 243

1        That's what the document
2  says, right?
3        A.   That's what that quote says.
4        Q.   And you cited for purposes
5  of saying that McCrone has been of the
6  opinion that Windsor product is free of
7  asbestos for over 15 years, correct?
8        A.   That's what this document
9  says.
10       Q.   And Mr. Stewart from McCrone
11 goes on to say, "That has always been our
12 opinion and continues to be our opinion
13 based on 15 years of closely examining
14 this product."
15       And that's what you refer
16 to, correct?
17       A.   This product, and I think
18 there are, in reference to the Illinois
19 EPA, there was a document that indicated
20 what the Illinois EPA was looking at was
21 potentially industrial talc and not
22 cosmetic grade talc, if my memory is
23 correct.
24       Q.   You have seen test results

Page 244

1  from testing that are dated after 1987
2  where cosmetic talc has tested positive
3  for asbestos, true?
4        A.   I don't recall.  We'd have
5  to look at specific examples.
6        Q.   Let me ask you to turn to --
7  I'll find it, to Page 19 of Dr. Cook's
8  report.
9        A.   On what page?
10       Q.   Page 19.  If you'll look
11 about three-fourths of the way down,
12 there's a sample dated February the 25th,
13 1992.
14       Do you see that?
15       A.   J&J-202.
16       Q.   That's correct.
17       A.   Yes.
18       Q.   The testing entity was
19 Cyprus.  The mine was Argonaut, you know,
20 Hammondsville.
21       They tested ore, and then
22 the results revealed fibrous tremolite
23 was identified in exposures in cores at
24 East Argonaut 7 and Black Bear mines.

Page 245

1        Do you see that?
2        A.   I see that column.
3        Q.   And did you review the test
4  results that are compiled in the asbestos
5  chart that Dr. Cook and Dr. Krekeler have
6  in their reports?
7        A.   I looked at some.
8        Q.   But you did not look at all?
9        A.   I did not look at all of
10 them.  I tried to focus on those related
11 to the mine.
12       Q.   And you are aware of tests
13 that postdate -- that predate 1987 where
14 talc used in Johnson's talcum powder
15 products tested positive for asbestos?
16       MR. CHACHKES:  Objection.
17 BY MS. O'DELL:
18       Q.   True?
19       A.   I -- I don't recall that, so
20 we'd have to look at some specific
21 examples, those specific tests.
22       Q.   And I'm -- I'm -- as you're
23 sitting here today, now we've been
24 through some of them that were from

Mary Poulson, Ph.D.

Page 246

1  Italian talc.
2      But as you're sitting here
3  today, your testimony is that you're
4  not -- you have not reviewed test results
5  from tests prior to May 21, 1987, that --
6      MR. CHACHKES:  Objection.
7      THE WITNESS:  No, that's not
8  what I said.
9  BY MS. O'DELL:
10     Q.    I wasn't finished.
11     A.    Oh, sorry.
12     Q.    But -- so you -- so my
13  question is, are you aware of test
14  results prior to 1987 reporting the
15  presence of asbestos in talc used in
16  Johnson's Baby Powder?
17     A.    I don't recall those tests.
18  But if we look at specific examples
19  you're thinking of, we can see where
20  they're from.
21     Q.    And certainly you would
22  agree with me that there were numerous
23  tests listed in the table compiling
24  asbestos test results that were dated

Page 247

1  prior to 1987?
2      A.    Yes.  There are tests before
3  1987.
4      Q.    And in some you -- you
5  looked at, and some you did not look at,
6  fair?
7      A.    Fair.
8      Q.    And I'll direct your -- your
9  attention to Exhibit 23.
10     (Document marked for
11     identification as Exhibit
12     Poulton-23.)
13  BY MS. O'DELL:
14     Q.    And this is a test result
15  from April 14, 1971.
16     Do you see that?
17     A.    I see the date.
18     Q.    From the Colorado School of
19  Mines, correct?
20     A.    Yes.
21     Q.    The results are being
22  reported to Robert Russell at Johnson &
23  Johnson, correct?
24     A.    Yes.

Page 248

1      Q.    And there are two samples
2  being tested, Sample A and Sample B.
3      Do you see that?
4      A.    Yes.
5      Q.    And going down the page, the
6  summary and conclusions, it says, "X-ray
7  defraction studies indicated a trace of
8  tremolite and actinolite in CSM RI Sample
9  Number 16."
10     Do you see that?
11     A.    I see that.
12     Q.    And Colorado School of Mines
13  is a respected institution in the world
14  of geology, fair?
15     A.    I have to say under oath
16  that a rival school is respected, yes.
17     Q.    And if you turn over to
18  Page 2 of the results.  We're talking
19  about microscopic analyses of the -- of
20  the as-received samples.
21     Do you see that?
22     A.    I see that sentence.
23     Q.    And they note tremolite and
24  actinolite in Sample Number 16.

Page 249

1      Do you see that?
2      A.    Yes.
3      Q.    And so this would be an
4  example of a positive test result for
5  talc used in Johnson's Baby Powder prior
6  to 1987, true?
7      A.    I don't see any reference to
8  what the samples are.  It says, "Two
9  Vermont final product samples."  It
10  doesn't say that this is cosmetic grade.
11  So I don't know if this is industrial
12  talc or if this is cosmetic talc.
13     Q.    In terms of -- of Johnson &
14  Johnson, they sell cosmetic talc, true?
15     A.    They sell cosmetic talc.
16     Q.    And in this report, you
17  can't say to -- to -- with certainty that
18  that was not cosmetic talc, can you?
19     A.    Conversely you would want to
20  say with certainty, and this memo does
21  not say in certainty what the -- what the
22  samples are.
23     So there -- there needs to
24  be something that identifies these

Mary Poulton, Ph.D.

Page 250

```
 1  samples.
 2        Q.   And if -- just -- you know,
 3  the document states that these are two
 4  Vermont final product samples, talking
 5  about final talcum powder product
 6  samples.
 7             Do you see that on Page 1?
 8             MR. FROST:  Objection.
 9             THE WITNESS:  It doesn't
10  follow necessarily, because it
11  says product that it's going to be
12  cosmetic grade.
13  BY MS. O'DELL:
14        Q.   And -- and it's your belief
15  that -- is it your belief that industrial
16  grade talc is -- well, strike that.
17             Let me ask you to turn,
18  Dr. Poulton, to Exhibit 28, Hopkins 28.
19             And if you'll look on Page 1
20  you'll see a July 7th -- can you not find
21  it, ma'am?
22        A.   It's a deep excavation.
23        Q.   Page 1.
24        A.   Okay.
```

Page 251

```
 1        Q.   You'll see July 7, 1971.
 2  It's at J&J-15.  Do you see that about
 3  midway down the page?
 4        A.   Yes.
 5        Q.   That's Vermont talc.
 6             Do you see that?
 7        A.   Yes.
 8        Q.   It's processed talc.
 9             Do you see that?
10        A.   Sample 344-L?
11        Q.   Yes.  And it tested positive
12  for tremolite and actinolite.
13             Do you see that?
14        A.   I see that.
15        Q.   If you go down further,
16  October 12, 1971, do you see that,
17  J&J-23?
18        A.   Yes.
19        Q.   McCrone tested Shower to
20  Shower.
21             Do you see that?
22        A.   Yes.
23        Q.   It had traces of tremolite.
24             Do you see that?
```

Page 252

```
 1        A.   Wait, which date are we
 2  looking at?
 3        Q.   October 12, 1971.
 4        A.   And that's J&J-23?
 5        Q.   Yes.
 6        A.   And it's Shower to Shower?
 7        Q.   Yes.  Do you see that it has
 8  traces of -- of chrysotile?
 9             Do you see that?
10        A.   Yeah.  I'm reading the
11  description below it.  Is that unrelated?
12        Q.   That is unrelated to that.
13  It had chrysotile, correct?
14             MR. CHACHKES:  Objection.
15             THE WITNESS:  In the JNJ23?
16  BY MS. O'DELL:
17        Q.   Yes.
18        A.   That's what it says.  We
19  would want to look at that full report.
20        Q.   But if -- if you'll go
21  further, Page 2, you'll see on Line 3,
22  August 24, 1972, there is a sample of
23  Shower to Shower.
24             Do you see that?
```

Page 253

```
 1        A.   August 24, 1972, JNJ29.
 2  Sperry Rand?
 3        Q.   Yes.  "Shower to Shower was
 4  tested, and the test found asbestos
 5  fibers could be detected in the sample."
 6             Do you see that?
 7        A.   I see that there was
 8  discussion of whether that was a true
 9  finding.
10        Q.   Where do you see that?
11        A.   I remember that report.
12        Q.   From what?
13        A.   I remember a discussion
14  about Sperry Rand doing testing and
15  whether or not their methodology was able
16  to detect asbestos.
17        Q.   What methodology are you
18  referring to?
19        A.   I seem to recall and we can
20  pull up that document.  That perhaps they
21  used SEM.
22        Q.   Okay.  Let me just take you
23  to the bottom of the page, 1221 1973.
24             Do you see that?
```

Mary Poulton, Ph.D.

Page 254

1    A.    JNJ263?

2    Q.    Correct.  Colorado School of

3  Mines.

4    A.    Yes.

5    Q.    Okay.  They understand how

6  to test talcum powder for asbestos, don't

7  they, Dr. Poulton?

8        MR. FROST:  Objection.

9        THE WITNESS:  I don't know

10  what they understand.

11  BY MS. O'DELL:

12    Q.    Do you have any reason to

13  believe that they are not experts in

14  testing talc for asbestos?

15    A.    In 1973, I think a lot of

16  people were wondering how to do it.

17    Q.    Okay.  You are not an expert

18  in it?

19    A.    I am not an expert in it.

20    Q.    And the finding from the

21  Colorado School of Mines, using TEM on a

22  Vermont talc sample was they identified

23  chrysotile, correct?

24        MR. CHACHKES:  Objection.

Page 255

1        THE WITNESS:  And again, we

2        would want to look at that

3        document and the testing that they

4        did.

5  BY MS. O'DELL:

6    Q.    Do you have any reason to

7  believe that that is not an accurate

8  summary of that test result?

9    A.    The details are important in

10  looking at the results and so we want to

11  look at what the samples are and how the

12  testing was done, make sure there was no

13  contamination.  Make sure proper

14  methodologies were done.

15    Q.    You're not an expert on the

16  proper methodologies, correct?

17    A.    I am not.

18    Q.    And let me ask you to look

19  further on the next page in 19 -- midway

20  down the page, May 8, 1974.  You'll see

21  JNJ66.

22    A.    Next to McCrone?

23    Q.    Yes.

24    A.    Yes.

Page 256

1    Q.    And Windsor 66 ore and

2  product was tested and tremolite and

3  chrysotile was found using TEM, correct?

4    A.    And the next column says

5  possible contamination.  So we'd want to

6  look at the details on that.

7    Q.    Multiple test results

8  showing asbestos from tests dated prior

9  to 1987 were provided to you,

10  Dr. Poulton, true?

11        MR. FROST:  Objection.

12        THE WITNESS:  Yes.  We've

13        looked at a number of samples in

14        this chart.

15  BY MS. O'DELL:

16    Q.    And the statement in the

17  McCrone letter that Windsor's product is

18  free of asbestos for over 15 years is

19  incorrect based on the testing data that

20  we reviewed, correct?

21        MR. CHACHKES:  Objection.

22        THE WITNESS:  I disagree

23        with that statement.

24  BY MS. O'DELL:

Page 257

1    Q.    On Page 14 of your report,

2  you assert that Dr. Krekeler's theory

3  that composite sampling should not be

4  used for cosmetic products -- in other

5  words, Dr. Krekeler asserts that

6  composite samples is an inappropriate

7  method for cosmetics where there may be

8  trace amounts of carcinogens.

9        Do you recall that from his

10  report?

11    A.    I recall him saying that.

12    Q.    And it's your opinion that

13  that is incorrect?

14    A.    I disagree with him that you

15  can't use composite sampling.

16    Q.    And you cite Stanley as a

17  basis for your disagreement with

18  Dr. Krekeler, correct?

19    A.    Stanley is an example of

20  sampling theory.

21    Q.    And you rely on Stanley in

22  your critique of Dr. Krekeler, true?

23    A.    I cite Stanley as an -- as

24  an example of sampling theory.

Mary Poulson, Ph.D.

Page 258

1    Q.    And in fact, Stanley is an
2  article that deals with sampling
3  involving gold, correct?
4    A.    No.
5    Q.    That's not correct?
6    A.    So Stanley's model was
7  generalizable as he states in his paper
8  and we can -- and we can look at the
9  quote, I believe to all geologic
10 materials was his statement.
11   Q.    Okay.  Let's look at
12 Stanley.
13         Exhibit 24.
14         (Document marked for
15         identification as Exhibit
16         Poulton-24.)
17 BY MS. O'DELL:
18   Q.    Exhibit 24.  This is the
19 paper that you're relying on?
20   A.    Yes.
21   Q.    One of the assumptions that
22 Stanley makes is that the geological
23 material exhibits homogenous distribution
24 of the element of interest, true?

Page 259

1    A.    We would have to go through
2  this paper, because I believe that he was
3  disputing that you would use the equant
4  grain model.
5    Q.    In fact, if you look at Page
6  110 on the right-hand side of the page
7  down at the bottom, do you see that
8  under, sample size and -- size and sample
9  variance.
10         Do you see that?
11   A.    Yes.
12   Q.    He states, "Assume that this
13 geological material exhibits a homogenous
14 distribution of the element of interest
15 at least at and above the scale of the
16 sample."
17         Did I read that correctly?
18   A.    You did.  However he's
19 starting his derivation.
20   Q.    You would agree in terms of
21 asbestos in talc, that would not be a
22 substance that is homogenous in its
23 distribution across talc ore, true?
24         MR. CHACHKES:  Objection.

Page 260

1         THE WITNESS:  Correct.
2  BY MS. O'DELL:
3    Q.    And in terms of -- of
4  sampling talc, it would be fair to say
5  that the minerals of interest, asbestos,
6  fibrous talc, chromium, cobalt and
7  nickel, they would not be homogenous
8  across the ore body, true?
9         MR. CHACHKES:  Objection.
10        THE WITNESS:  Asbestos
11        should not be homogenous across
12        the ore body.  I believe I would
13        need to look specifically at metal
14        distribution.  Because we've
15        talked about arsenic being a
16        function of particular fractures.
17 BY MS. O'DELL:
18   Q.    When you use composite
19 sampling like what was used in Vermont,
20 isn't it fair to say that the sampling in
21 terms of isolating a particular element
22 that you are diluting your ability to
23 find a particular element because many,
24 many samples are composited and then only

Page 261

1  a small amount of that composited sample
2  is tested?
3    A.    So there are two ways that
4  we use composite that are different.  So
5  could you clarify for me which way you
6  use composite?
7    Q.    Well, I'm talking about the
8  way they use composite sampling in
9  Vermont.  For example, they took daily
10 sample from certain silos, put it in a
11 bucket.  That became their composite
12 sample location.
13        Are you in agreement with me
14 there?
15   A.    Yes.
16   Q.    And then they took that
17 composite, in some instances on a monthly
18 basis, and they took a small portion and
19 that's what they tested, fair?
20   A.    So the -- when you do that
21 kind of sampling and they talk about
22 this, they blend the material, and then
23 there are specific ways that you split
24 that sample to get something that is

Mary E. Poulton, Ph.D.

Page 262

1  statistically representative of that
2  population of your sample.
3       So I think in many ways you
4  could argue that this method is more
5  representative of the bulk, but certainly
6  what's important is that you're relating
7  all of your sampling to the material
8  that's coming through.
9       Q.   What -- what are you relying
10 on for your understanding that there was
11 a particular blending process that took
12 place in creating composite samples?
13      A.   I believe I saw a document
14 that talked about once they took the
15 samples that they collected as they were
16 filling the silo, I -- I believe I saw
17 somewhere that they talked about how they
18 broke that down to -- to collect a sample
19 to do the microscopy.
20      Q.   Did you cite that document
21 in your report?
22      A.   I don't remember if I did.
23      MS. O'DELL:  Why don't we go
24 off the record.

Page 263

1       MR. CHACHKES:  Take a break,
2  it's been about an hour?
3       MR. FROST:  Yeah, I'd say
4  it's been about an hour and 5
5  minutes.
6       THE VIDEOGRAPHER:  The time
7  is 4:19 p.m.  Off the record.
8       (Short break.)
9       THE VIDEOGRAPHER:  We are
10 back on the record.  The time is
11 4:49 p.m.
12 BY MS. O'DELL:
13      Q.   Dr. Poulton, prior to the
14 break, you testified that you have seen a
15 document that describes the manner in
16 which composite samples are, you know,
17 mixed and prepared for testing.  Do you
18 recall that?
19      A.   Correct.
20      Q.   And you were going to look
21 for that document during the break.  Did
22 you do that?
23      A.   Yes.
24      Q.   And what document are you

Page 264

1  relying on for your opinion in that
2  regard?
3       A.   So the two are J&J 0043746.
4       Q.   Why don't you give that to
5  me one more time, please.
6       A.   Okay.  J&J 0043746 and
7  Downey Exhibit 51.
8       Q.   And do you cite those in
9  your report?
10      A.   I don't remember if I do or
11 not.
12      Q.   And you said J&J 007437 --
13      A.   No.  004374746.
14      Q.   Okay.  And that's not
15 included on your reliance list,
16 Dr. Poulton.
17      A.   Is it not?
18      Q.   No.
19      A.   Okay.
20      Q.   Dr. Poulton, you realize
21 today that this is my opportunity to
22 understand what you've seen and you
23 relied on and what your opinions are in
24 this case?

Page 265

1       A.   Yes.
2       Q.   And -- and so these
3  documents -- and you said Downey 51?
4       A.   Yes.
5       Q.   And Downey 51 is not on your
6  reliance list.
7       MR. CHACHKES:  I'm just
8  going to object.  They have
9  alternate stampings and numbers.
10 So that's not quite clear yet.
11      MS. O'DELL:  We'll -- we'll
12 check that.
13      MR. CHACHKES:  Yeah.
14      MS. O'DELL:  But neither the
15 Bates number that you provided to
16 me today for the J&J document or
17 Downey 51 are on your reliance
18 list.
19 BY MS. O'DELL:
20      Q.   So, were those provided to
21 you by counsel during the break?
22      A.   I asked them to search for
23 certain keywords.
24      Q.   Have you expressed all of

Mary Poulton, Ph.D.

Page 266

1  your criticisms of -- if you have any, of
2  Dr. Cook and Dr. Krekeler regarding
3  fibrous talc in your report?
4      A.   Could you --
5      Q.   Are all your opinions or
6  criticisms of Dr. Cook and Krekeler in
7  relation to fibrous talc contained in
8  your report?
9      A.   I am not sure that I talk
10 specifically about fibrous talc.  I
11 believe I focused on asbestos minerals.
12     Q.   So if you have any
13 criticisms of Dr. Cook and Dr. Krekeler
14 regarding fibrous talc, they would be in
15 your report, fair?
16     A.   I would have to take a quick
17 look and see if I ever mentioned fibrous
18 talc.
19     Q.   I will -- I will say that
20 I've looked and you don't mention fibrous
21 talc.
22     A.   Okay.
23     Q.   And I'm trying to make sure
24 I understand, because this is my chance

Page 267

1  with you today, that if you don't have
2  any opinions in your report regarding
3  fibrous talc, that means you're not going
4  to have any if we get to the point of
5  trial, fair?
6      A.   I'm -- I'm not quite sure
7  I'm understanding.  So if I don't mention
8  fibrous talc in the context of Drs. Cook
9  and Krekeler --
10     Q.   You don't mention fibrous
11 talc in your report at all, correct.
12     A.   Okay.
13     Q.   And so I'm assuming based on
14 that, you don't have any opinions on
15 fibrous talc, fair?
16     A.   I believe that's fair.
17     Q.   Based on that answer, I'm
18 not going to have to take you through
19 that big slog of a document.
20          Okay.  Let me show you what
21 I'm going to -- in terms of -- of your
22 opinions regarding selective mining, let
23 me just turn you to the right page in
24 your report.  Page 16.

Page 268

1          Do you see that?
2      A.   I do.
3      Q.   Let me ask you to look at
4  what was previously marked as Downey
5  Exhibit 15.  And I'll mark it for
6  purposes of your deposition as
7  Exhibit 25.
8          (Document marked for
9          identification as Exhibit
10         Poulton-25.)
11 BY MS. O'DELL:
12     Q.   Did you review this document
13 in -- in reaching your opinions in this
14 case?
15     A.   I did.
16     Q.   And let me ask you -- well,
17 I tried hard not to mark this, but I've
18 just got to.  So there you go.
19          Let me also mark what was
20 previously identified as Downey 14.  And
21 I'm going to mark it Exhibit 26 to your
22 deposition.
23          (Document marked for
24          identification as Exhibit

Page 269

1      Poulton-26.)
2  BY MS. O'DELL:
3      Q.   And these documents relate
4  to the -- a drill -- a core drill program
5  that was undertaken at the Hammondsville
6  mine, you know, in -- first reported in
7  1970, and then there were other drill
8  cores taken and they were reported, I
9  believe, in 1978.
10         Do you recall that?
11     A.   Yes.
12     Q.   In relation to the drilling
13 that was conducted at Hammondsville,
14 and -- and I'm going to be toggling back
15 and forth because both of these documents
16 deal with the drilling program at -- in
17 Hammondsville.
18         But Downey Exhibit 15, and
19 Bates Number 4369 -- let me get to the
20 right page, 979.
21     A.   Is that marked Page 4,
22 careful attention?
23     Q.   Yes.
24         And if you'll look, one of

Page 270

1 the criticisms of the drilling program at
2 Hammondsville was the distance between
3 the particular drill holes, true?
4     A.    Yes.  Mining engineers and
5 geologists always want more data.
6     Q.    Right.  And, in fact, for
7 the Hammondsville exploration, these
8 drill holes, some of them were nearly
9 500 feet apart, correct?
10     A.    So they say some holes are
11 nearly 500 feet from near shaft drill
12 holes.  But again, it's the context of
13 what part of the ore body they are
14 sampling.
15     Q.    And in terms of the
16 precision of the data that can be gleaned
17 from core drilling, the closer the holes
18 are together, the more data that can be
19 learned about the underlying ore body,
20 fair?
21     A.    Not necessarily.  So you
22 could have --
23     Q.    Is that a general principle?
24     A.    No, I wouldn't -- I wouldn't

Page 271

1 necessarily generalize, because it very
2 much depends on what you're trying to
3 sample.
4     Q.    Okay.  For purposes of
5 evaluating the structure of an ore body
6 like talc, particularly because they are
7 smaller in scope, you mentioned that
8 earlier today, the mines at Vermont were
9 quite small, fair?
10     A.    Yes.
11     Q.    And -- and the ore bodies
12 within the mines, the talc ore bodies,
13 were variable, in other words, they
14 were -- there were dikes that were
15 present within the ore body, true?
16     A.    I would have to look at
17 whether we would say present in the ore
18 body or present on the fringes.
19     Q.    Or within the actual ore
20 body, correct?
21     A.    We'd have to look at that
22 specific language.
23     Q.    In -- in fact, there are
24 drill cores that discuss the presence

Page 272

1 of -- of dikes within the actual talc
2 ore, true?
3     A.    We'd have to look at that
4 specific situation.
5     Q.    Do you recall that, having
6 reviewed the documents?
7     A.    I've reviewed documents and
8 I've seen reference to small stringers
9 that ultimately were not in the ore body.
10     Q.    And -- but they occurred
11 within the talc deposit, correct?
12     A.    Well, if you think of talc
13 deposit including the surrounding
14 non-talc rock.
15     Q.    I'm thinking of within the
16 actual deposit where the talc is located,
17 true?
18     A.    So we would want to look at
19 those specific examples.
20     Q.    Do you recall having
21 reviewed documents, both from
22 Hammondsville and Argonaut that describe
23 in detail the presence of dikes within
24 the talc ore body?

Page 273

1     A.    I remember seeing the
2 presence of dikes.  I would have to
3 confirm whether or not they were
4 considered to be in the ore body, as in
5 the minable ore.
6     Q.    If you'll turn to Exhibit 15
7 (sic), Downey-15, to Bates 437034?
8        MR. CHACHKES:  Exhibit 25.
9        THE WITNESS:  What was the
10 page number?
11 BY MS. O'DELL:
12     Q.    437034.  Do you see that?
13     A.    Your voice dropped off
14 again.
15     Q.    437034.
16     A.    034.
17     Q.    Do you see that?
18     A.    I see image 14.
19     Q.    Figure 14 has a subtitle
20 surface geologic map of the Argonaut ore
21 body showing a general relationship of
22 various rocks.
23        And the -- this is Figure
24 14.  And this is a description of the ore

Page 274

1  body at Argonaut, true?
2      A.   That's what the caption
3  says.
4      Q.   Yes.  And within the center
5  of this is actually serpentine, correct?
6      A.   That's how it's mapped.
7  Serpentinite.
8      Q.   And within the -- outside
9  the serpentinite there is a -- there are
10 small veins of talc carbonate schist?
11     A.   You're looking specifically
12 at the vertical dashes?  Yes.
13     Q.   Right here in the -- what in
14 the nomenclature is the -- is the little
15 circles.
16        Do you see that?
17     A.   So the circles are carbonate
18 talc rock.  You had mentioned talc
19 carbonate schist.
20     Q.   All right.  Let's be fair
21 then.  This with the circles is carbonate
22 talc rock, meaning there's more carbonate
23 than talc, correct?
24     A.   I believe so.  I'd have to

Page 275

1  look at their definition.
2      Q.   And then there's talc
3  carbonate schist here, which is a greater
4  amount of talc, correct?
5      A.   I believe that's their
6  definition.
7      Q.   And so looking at this,
8  there is variability within the ore body
9  in terms of width and length of talc,
10 correct?
11     A.   Yes.
12     Q.   If you'll turn over to the
13 next page, also seeing -- there's biotite
14 chlorite schist within the actual ore
15 body, correct?  I'm pointing to that
16 right there.
17     A.   Yes.
18     Q.   So dikes that occur actually
19 within the talc ore body, correct?
20     A.   Yes.  It's just a question
21 of whether you mine that section of the
22 ore body is the point that I've been
23 making.
24     Q.   But it is present within the

Page 276

1  talc ore?
2      A.   It's present within the
3  talc.
4      Q.   And in terms of delineating
5  distinctions in the talc deposit, the
6  greater number of drill cores that you
7  have to gather data, the greater
8  precision by which you're going to
9  understand the contours of the particular
10 talc deposit, true?
11     A.   So I would say that first
12 and foremost, you place your drill holes
13 according to the geology that you're
14 seeking to confirm.  They could be angled
15 and actually cover more of the deposit
16 than vertical closely spaced holes would.
17 So context is important for the
18 information that you're trying to derive.
19     Q.   Isn't it -- wouldn't you
20 agree with me that when there is
21 variations in the drill hole spacing, the
22 thickness of the ore body, or grade, that
23 will distort the results obtained through
24 the triangulation method of drilling?

Page 277

1      A.   Could you repeat that for
2  me?
3      Q.   Happy to.  If you'll look
4  at --
5      MS. O'DELL:  I'm done with
6      that, Henry.  Thank you.
7  BY MS. O'DELL:
8      Q.   Are you familiar with a
9  triangular method that's used in planning
10 core drilling?
11     A.   It's what we did before we
12 had computers.
13     Q.   And that's what was used in
14 Hammondsville and Hamm and Argonaut in
15 the '70s and early '80s, fair?
16     A.   That would be my
17 understanding.
18     Q.   Okay.  And that's what is
19 depicted on -- in your report at Page 18,
20 is a diagram using a triangulation
21 method -- triangulation method.  That's
22 what you include in the body of your
23 report?
24     A.   Yes.

Mary Poulton, Ph.D.

Page 278

1    Q.    Correct?  And you include it
2  in your report as Figure 1-B, correct?
3    A.    Yes.
4    Q.    And this is a model that is
5  used to evaluate ore reserves, correct?
6    A.    Yes.  It can be.
7    Q.    And that's typically the use
8  of a model like this, to evaluate the
9  grade and the volume of a particular type
10  of ore, true?
11    A.    So that's part of what you
12  use it for.
13    Q.    It's often and most often
14  used as an economic model in order to
15  understand how much product there is to
16  sell, true?
17    A.    It's one of the uses.
18    Q.    And in terms of the data
19  within this model for Hammondsville,
20  there was, in some areas insufficient
21  drill core in order to fully complete
22  this model, correct?
23    A.    Probably for the areas that
24  they were contemplating extending the

Page 279

1  mine into, was the way the reports were
2  written.
3    Q.    In addition to these drill
4  core programs 1970 and 1978 at Hamm -- at
5  Hammondsville, there was also drilling
6  that was done at Hamm mine.  Do you
7  recall that?
8    A.    I recall drilling at Hamm.
9  I need to look at the dates.
10    Q.    And I'm not asking for
11  specific dates.  I'll represent it's
12  after the Hammondsville exploration.
13    Do you recall that?
14    A.    I recall drilling at Hamm.
15    Q.    Okay.  And did you look at
16  those drill cores?
17    A.    I believe I did.
18    Q.    Let me show you what I'm
19  marking as Exhibit Number 27.
20    (Document marked for
21    identification as Exhibit
22    Poulton-27.)
23  BY MS. O'DELL:
24    Q.    I've handed you a memorandum

Page 280

1  dated May 21, 1992 that discusses the
2  Hamm mine core drilling, correct?
3    A.    Yes.
4    Q.    It was prepared as an
5  overview of drilling that had occurred in
6  1992, correct?
7    A.    I believe so.
8    Q.    And there were four drill
9  holes that were drilled.
10    Do you see that, on page --
11  I believe it's 5 of the memo.
12    A.    Yes.
13    Q.    And this is a summary on
14  Page 5 of what was logged from the cores.
15    Do you see that?
16    A.    Yes.
17    Q.    And so Hole 91 -- 92-1 has
18  intervals of talc carbonate and then
19  serpentinite and then it goes again to
20  talc carbonate and serpentinite.  And you
21  see a chloritic dike that's at 235 feet.
22    Do you see that?
23    A.    I see that.
24    Q.    So there are in this

Page 281

1  instance two.  There was not only
2  Argonaut, but in the Hamm mine there was
3  chloritic dikes that occurred within the
4  talc deposit, correct?
5    A.    Within the deposit.  You
6  have to put these into the context of the
7  edges of the deposit and what was going
8  to be minable ore versus waste.
9    Q.    They can also occur within
10  the talc deposit, true, within the talc
11  as we saw for Argonaut?
12    A.    Well, it can be within the
13  talc and still not be in a minable zone
14  within the talc.
15    Q.    Then you look at 92-2 and
16  then Hole 92-3 and you also see chloritic
17  dikes that occur within those drill
18  cores, correct?
19    A.    Yes.  And they are actually
20  coded separately from the ore.
21    Q.    They are identified as
22  chloritic dikes, true?
23    A.    They are identified as
24  chloritic dikes, and the ore code for

Mary B. Poulton, Ph.D.

Page 282

1  them is different than the -- the -- the
2  rock code is different than the minable
3  ore.
4      Q.   Okay.  And then if you'll
5  turn over to Page 6 of the memo, you'll
6  see that core samples were taken to the
7  Columbia mill and -- and tested.
8          Do you see that?
9      A.   First paragraph?
10     Q.   Yes.
11     A.   Yes.
12     Q.   And the sample that you'll
13  see at the end of that paragraph was then
14  pulverized to pass 325 mesh and tested
15  for talc content, brightness, and the
16  presence of arsenic and amphibole.
17          Do you see that?
18     A.   Yes.
19     Q.   If you'll look down further
20  to the fourth paragraph, it says, middle
21  of the paragraph, "In the pit, arsenic
22  was observed as oxidized coatings on
23  fractured surfaces."
24          Do you see that?

Page 283

1      A.   Not yet.
2      Q.   Fourth paragraph.  Midway
3  down.
4      A.   Okay.
5      Q.   "In the pit, arsenic was
6  observed"?
7      A.   Yes, I see it.
8      Q.   And then -- then you go on
9  down to the next paragraph and it talks
10  about "XRD scanning did not reveal the
11  presence of amphibole in the drill core."
12          Do you see that?
13     A.   I see that sentence.
14     Q.   And, in fact, the portions
15  of the core that contained amphibole were
16  not sampled, true?
17     A.   There is a companion
18  document for this that says that anything
19  that contains amphibole is going to be
20  wasted.
21     Q.   They were not -- the
22  material containing amphiboles was not
23  sampled for purposes of testing, true?
24     A.   It was not sampled as part

Page 284

1  of this campaign.
2      Q.   If you'll turn back to the
3  first page, Dr. Poulton, second
4  paragraph, this document states that
5  "fibrous amphiboles, actinolite, were
6  observed only within the chloritized
7  mafic dikes extending into places a
8  couple of inches into the contacting talc
9  ore."
10          Do you see that?
11     A.   I see that sentence.
12     Q.   So the chloritic dikes
13  were -- did occur in the talc ore and,
14  according to this document, they
15  contained fibrous actinolite, true?
16     A.   So it says they extended a
17  couple of inches into the contacting talc
18  ore which doesn't mean that they're
19  necessarily going to be in a minable
20  block.
21     Q.   But they are in the talc ore
22  nonetheless, correct?
23     A.   They -- they are at the edge
24  of the talc ore.

Page 285

1      Q.   In fact, it says they extend
2  into that talc ore in places?
3      A.   A couple of inches.
4      Q.   Your analysis of the
5  selective mining that took place within
6  Vermont is based on your review of the
7  core drilling that was done, correct?
8      A.   Core drilling was part of
9  that.
10     Q.   And what years of core
11  drilling support -- or are you relying on
12  to support your opinions?
13     A.   I have a -- we're talking
14  about Argonaut now?
15     Q.   Any of the mines.
16     A.   So we can -- we can talk
17  about Argonaut.  I referenced a document
18  that had actually several thousand
19  samples from drilling in it.  And I also
20  looked at the mine -- block models that
21  were described in reports.
22     Q.   Of those periods of -- of
23  drilling, what would you say were the
24  most comprehensive, you know, drilling

Mary Poulson, Ph.D.

Page 286

1  efforts in terms of the different years?
2      A.   I would have to look at the
3  documents.  Off the top of my head I
4  don't remember all the years and how many
5  holes.
6      Q.    Would you agree with me that
7  the 1998 drilling campaign was the -- was
8  the most comprehensive that was
9  undertaken in?
10     A.   I'd -- I'd want to confirm
11 that.
12     Q.    You don't remember as you're
13 sitting here today?
14     A.    As I'm sitting here without
15 looking at the document, I don't.
16     Q.    In terms of the most
17 reliable and comprehensive drilling that
18 was done at any of the talc mines, not
19 limiting it to Argonaut.  It could be
20 Hamm, Hammondsville, or Argonaut, what
21 was the most comprehensive and reliable
22 core drilling campaign that was done?
23 Can you say that?
24     A.    What -- what do you mean by

Page 287

1  comprehensive and reliable?
2      Q.    Well, planned sufficiently
3  so that the drill core holes were not too
4  far apart, that it was adequate -- the
5  cores were adequately sampled.
6          Do you find that there was
7  any drilling that was more comprehensive
8  than another?
9      A.    So these are not -- the --
10 the mine is like a living engineering
11 project.  So there's not a static, we
12 will define all of this and it's -- it's
13 done.  You constantly add information to
14 the mine model.  I can't say that there
15 is one year where the drilling was
16 somehow perfect, in other years it was
17 imperfect, without looking at each of the
18 drilling campaigns and what specifically
19 they were trying to accomplish and what
20 information they were adding to their
21 knowledge base.
22     Q.    How many campaigns were
23 undertaken at Vermont?
24     A.    At all of Vermont or --

Page 288

1      Q.    Let's stick with Argonaut.
2      A.    At Argonaut?  Again, I would
3  have to go back and look at how many
4  different drilling campaigns and how many
5  holes.
6      Q.    In terms of your report, is
7  there one drilling campaign that you
8  relied on more than others?
9      A.    I don't know that I can say
10 there was one campaign more than another,
11 again without having the data all in
12 front of me.
13     Q.    You say on Page 20 that
14 there were -- of your report, that
15 approximately 2500 feet of core was
16 drilled in 1998.
17          Do you see that?
18     A.   I see that.
19     Q.    And -- and you talk in terms
20 of which holes were drilled and the --
21 how far apart and -- and so forth.
22          Do you see that?
23     A.   I -- I -- yes, I see that
24 I'm referencing the Figure 3 I believe.

Page 289

1      Q.    Okay.  And Figure 3 is on
2  Page 22 of your report, correct?
3      A.   Yes.
4      Q.    And if you look at Figure 22
5  in your report, this is a depiction, a
6  drawing of the drill holes that were
7  drilled in Argonaut, correct?
8          MR. CHACHKES:  Figure 22?
9          THE WITNESS:  You said
10 Figure 22?
11         MS. O'DELL:  I said -- I was
12 trying to say Figure 3.
13         THE WITNESS:  Okay.
14         MS. O'DELL:  That's what I
15 meant.
16 BY MS. O'DELL:
17     Q.    That's what you referred to,
18 correct?
19     A.   Yes.
20     Q.    And so -- I'm on Page 22.
21 That's what I was -- Page 22, Figure 3.
22     A.   That's...
23     Q.    That's what I was trying to
24 say, but if I didn't say that correctly.

Mary Poulton, Ph.D.

Page 290

1      Do you see that?
2      A.   I see the figure.
3      Q.   And that's the -- the
4  drilling program that you relied on in
5  large measure to discuss selective
6  mining, correct?
7      A.   I can't say that I relied on
8  this in large measure.  It was one of the
9  pieces of information I used.
10     Q.   You relied on it in reaching
11  your opinions regarding selective mining,
12  true?
13     A.   It -- it was part of my
14  information.
15     Q.   The -- looking at Figure 3,
16  the parallel lines across the figure, let
17  me just -- if you'll --
18         MS. O'DELL:  If I can have
19     the Elmo.
20  BY MS. O'DELL:
21     Q.   These parallel lines, these
22  blocks if you will, they are in blocks of
23  100 feet, correct?
24     A.   This may be a local mine

Page 291

1  coordinate system.  And I don't know what
2  the scale is, once this has been
3  reproduced.
4      Q.   Okay.  So you don't know the
5  scale for this particular figure?
6      A.   I'm -- I'm estimating it.
7      Q.   What is your estimate?
8      A.   I can't -- I can't read the
9  numbers on this particular one.  I think
10  I estimated that these holes were roughly
11  100 feet apart perhaps.
12     Q.   And when you mean -- you're
13  referring to the holes, you are talking
14  about these lines actually depict drill
15  cores, correct?
16     A.   They represent the drill
17  holes --
18     Q.   Correct.
19     A.   -- projected to a horizontal
20  plane.
21     Q.   Yes.  And in many instances,
22  those holes are anywhere from 100 to as
23  many as 150 feet apart, correct?
24     A.   Could be.

Page 292

1      Q.   And so it would be fair to
2  say that the data from each hole is used
3  to extrapolate the material between the
4  holes, true?
5      A.   Not solely, because you also
6  have blast hole drills and you have
7  in-fill drilling.
8      Q.   That would be one of the
9  primary mechanisms by which you estimate
10  or extrapolate what is actually present
11  between the drill core holes?
12     A.   So you create a drill
13  statistical model based on all your
14  drilling and geological data.  And from
15  that, you can map the support of one set
16  of data to another set of data.  That's
17  the basics -- basics of geostatistics.
18     Q.   And it's a model.  It's not
19  necessarily actual data on what's there.
20  It's a model of what's estimated to be
21  there, correct?
22     A.   It is a model.
23     Q.   In a geostatistical analysis
24  like this, is 500 feet a appropriate

Page 293

1  distance in order to accurately estimate
2  what material is there?
3      A.   It depends on what you're
4  actually trying to estimate.  You may
5  just be looking for an edge of something.
6  You may be looking for a particular
7  structure.
8      Q.   Let me ask you.  I think we
9  previously marked this, 2008 annual
10  report for mineral resource and ore
11  reserve estimates of the Argonaut mine.
12         Do you see that?
13         MR. CHACHKES:  You said 25
14     or 26?
15         MS. O'DELL:  No. It looks
16     like this.
17         MR. CHACHKES:  I don't think
18     we have it.
19         MS. O'DELL:  I'll mark it
20     Exhibit 28.
21         (Document marked for
22     identification as Exhibit
23     Poulton-28.)
24  BY MS. O'DELL:

Mary Poulson, Ph.D.

Page 294

1    Q.   Have you seen that document
2 before?
3    A.   Yes.
4    Q.   And on Page 26 of your
5 report, you reference this document,
6 true?
7    A.   Could you give me paragraph?
8    Q.   The second paragraph from
9 the bottom.
10    A.   Krekeler improperly assumes?
11    Q.   Yes.  And you say he
12 properly assumes that only drilling at a
13 core density of 50 to 100 feet on a
14 square grid pattern covering the entire
15 ore body would allow for a selective --
16 effective selective mining.
17         MR. CHACHKES:  You said
18      properly, when you meant to say
19      improperly.
20         MS. O'DELL:  I think I said
21      improperly.  But I may not have
22      been clear.
23 BY MS. O'DELL:
24    Q.   You write he improperly

Page 295

1 assumes that drilling at core density of
2 50 to 100 feet on a square grid pattern
3 covering the entire ore body would allow
4 effective selective mining.
5    A.   Yes.  That's what I wrote.
6    Q.   And that's your opinion,
7 right?
8    A.   That's my opinion.
9    Q.   And you rely on Exhibit --
10 what we have marked as Exhibit 28, and
11 it's Bates number 441340, correct?
12    A.   That is one of the pieces of
13 information that I used as an example.
14    Q.   And this was written in
15 2008, correct?
16    A.   Yes.
17    Q.   And that's an appropriate --
18 that would be an appropriate reference to
19 evaluate the talc deposits at Argonaut,
20 true?
21    A.   So -- so 2008 they were no
22 longer producing talc for Johnson &
23 Johnson.  I referenced this report as an
24 example of a mine model.

Page 296

1    Q.   And this is an evaluation of
2 the ore deposit at Argonaut?
3    A.   At Argonaut.
4    Q.   And it contains not only
5 data collected in 2008, but it analyzes
6 data that had been collected in prior
7 drill core programs, correct?
8    A.   Yes.
9    Q.   And so there is data from
10 the time period during which talc was
11 being sourced to Johnson & Johnson within
12 this document, correct?
13    A.   I would have to confirm
14 that.  But I believe that to be true.
15    Q.   And that data is relevant to
16 the talc that was being mined and
17 supplied to J&J, true?
18    A.   I would have to confirm
19 that.
20    Q.   And provided the data was
21 before 2003, in your mind, that would be
22 relevant data, correct?
23    A.   If it was before 2003.
24    Q.   And in fact, to a degree,

Page 297

1 the data was collected after 2003 but
2 dealt with the same ore bodies, it would
3 also have relevance, true?
4    A.   You might have to explain
5 your question to me.
6    Q.   I think it's clear.  That if
7 data that was collected after 2003, but
8 relates to the same ore body that was
9 used to source Johnson & Johnson talc,
10 it's also relevant data?
11    A.   And so what data would that
12 be that you would be referring to?
13    Q.   It could be certain core
14 drill information.  It could be other
15 sampling information, correct?
16    A.   So you could certainly
17 refine your model.  I guess I am confused
18 about the timing of certificates of
19 analysis that are sent to J&J.
20    Q.   I didn't mention
21 certificates of analysis to J&J.  I said
22 there's data in this document regarding
23 2002 drilling, for example, that would be
24 very relevant to the talc that was sold

Mary E. Poulson, Ph.D.

Page 298

1  to J&J during that time period, correct?
2      A.   I guess my answer would be
3  it just depends on what we're talking
4  about.
5      Q.   The drilling that was done
6  in 2002 at Argonaut provides data
7  regarding the deposit that is relevant
8  for the material and constituents
9  contained in Argonaut's deposit true?
10     A.   So you're asking if holes
11 drilled in 2002 relate to --
12     Q.   They're relevant?
13     A.   Are relevant to --
14     Q.   The issues that we're
15 dealing with in this case.
16     A.   So because you drill and
17 produce your model in advance of mining,
18 holes that you drill in 2002 might not
19 actually be relevant until much, much
20 later.
21     Q.   Let me ask you this
22 question.  Did this report evaluate
23 previous core drilling that had been done
24 at the Argonaut mine?

Page 299

1      A.   I'd have to go back and look
2  at it.
3      Q.   Do you remember as you're
4  sitting here?
5      A.   As I'm sitting here I could
6  not confirm what years this includes.
7      Q.   If you'll turn to Page 14 of
8  the document.  Do you see at the bottom
9  of the Page 3.3 data validation in QA and
10 QC?
11     A.   Yes.
12     Q.   It's talking about drilling
13 performed at the Argonaut mine in
14 previous years.
15     Do you see that?
16     A.   I see where it says over 300
17 drill hole datasets were found.
18     Q.   It goes on to say, "Found
19 without complete geology logs, no collar
20 data, survey data or inconsistent and
21 unrealistic data.  All of these 300 drill
22 holes were drilled during the 1990s with
23 very poor data collection and retention.
24 None of these drill holes were used in

Page 300

1  the construction and estimate of either
2  the 2002 or the 2007 model.
3      Did I read that correctly?
4      A.   You read that correctly.
5      Q.   So the 1998 data that you
6  rely on in your report was deemed
7  essentially unreliable and unusable by
8  Rio Tinto in 2008, correct?
9      MR. CHACHKES:  Objection.
10     THE WITNESS:  No.  That's I
11 believe misstating what these
12 drill holes may actually
13 represent.
14 BY MS. O'DELL:
15     Q.   It goes on to say, the
16 historic drill data was checked for
17 accuracy, frequently the assay and logs
18 at geologic intervals did not coincide.
19     Do you see that?
20     A.   Yes.
21     Q.   In some cases, the logged
22 rock height was not consistent with assay
23 data.
24     Do you see that?  First

Page 301

1  sentence of the next paragraph.
2      A.   Yes.
3      Q.   And so the evaluation of the
4  drilling that was done at Argonaut in the
5  1990s, was essentially determined to be
6  of poor quality and not relied on in this
7  model, correct?
8      A.   So it's relevant to what --
9  the context is, can you take those drill
10 hole data that were based on the numbers
11 of them, most likely blast hole data that
12 were used for ore control at the time,
13 and are they relevant to put into a new
14 computer model.  That's my interpretation
15 of this document.
16     Q.   But yet -- and for this
17 model, they rejected that data and did
18 not rely on it, the 1990s drill core
19 data, correct?
20     A.   At least at the time this
21 document is drafted.
22     Q.   That's what it states?
23     A.   That's what it's stating at
24 the time of this draft.

Mary Poulton, Ph.D.

Page 302

1    Q.    You mentioned blast hole
2  samples?
3    A.    Yes, I did.
4    Q.    Have you seen any documents
5  or data that document testing of blast
6  hole samples?
7    A.    I would have to look and see
8  if there were any mentions.
9    Q.    I'm talking about specific
10 test results from blast holes.
11    A.    Yeah, and I -- and I would
12 have to look and see if I saw any data.
13    Q.    Do you recall as you're
14 sitting here today, that data?
15    A.    I don't recall with the
16 amount of data I've looked at.
17    Q.    You talk a lot in your
18 report about the -- the block models and
19 creating block models for deposits that
20 identify particular segments of talc
21 versus other material.
22    A.    Yes.
23    Q.    And let me ask you if you
24 wouldn't mind.  We marked the literature

Page 303

1  and excerpts of books that you relied on.
2  If you wouldn't mind, Dr. Poulton, if I
3  could have that, because I don't have a
4  copy of one of the articles.
5  Specifically the Noble article.
6        Do you recall that?
7    A.    I believe so.
8    Q.    And in Noble you describe
9  certain theories or methodology regarding
10 block models, true?
11    A.    We can look at Noble.
12    Q.    And the Noble reference that
13 we're referring to is a chapter in a
14 mining engineering book entitled "Mineral
15 Resource Estimation."
16        Fair?
17    A.    I believe so.
18    Q.    And because we only have one
19 copy, I'll put it up on the Elmo so we
20 can look together.
21        So this is the reference
22 that you relied on, correct?
23    A.    Yes.
24    Q.    And Noble goes through

Page 304

1  different methodologies for estimating
2  the amount of ore in a particular
3  deposit, true?
4    A.    Yes.
5    Q.    And it describes data
6  collection, geologic interpretation, it
7  goes through some statistics, et cetera,
8  correct?
9    A.    Yes.
10    Q.    And on Page 212 of Noble,
11 it -- right here, I don't know if you can
12 see -- describes certain common problems
13 that are associated with block models
14 such as this, correct?
15    A.    Some.
16    Q.    It says, "The most common
17 problem with geometric methods is that
18 they may imply more selective mining that
19 may be achieved by the mining method."
20        In other words, the model
21 may not match what's going on in the
22 actual real world mine, true?
23    A.    So I would actually need to
24 see the article and the context of what

Page 305

1  came before this.
2    Q.    It goes on to say, "The
3  results from estimating the resource from
4  samples, the size of the drill hole,
5  but" -- sorry, let me read that again.
6        "This results from
7  estimating the resource from samples the
8  size of a drill hole but mining larger,
9  less selective volumes."
10        Did I read that correctly?
11    A.    You read it correctly.
12    Q.    "High grade blocks usually
13 include lower grade material when they
14 are mined and low grade blocks usually
15 include some higher grade material."
16        Did I read that correctly?
17    A.    Yes.
18    Q.    "The resulting mined grades
19 are different from the predicted
20 distribution for cutoff grades below the
21 average grade of the deposit, the mined
22 grade will be lower and the tonnage will
23 be higher."
24        Did I read that correctly?

Mary Poulton, Ph.D.

Page 306

1    A.   Yes.
2    Q.   "If the cutoff grade is
3  significantly higher than the average
4  grade of the deposit however, both the
5  mined grade and the tonnage can be lower,
6  resulting in severe overestimation of
7  contained metal."
8        Do you see that?
9    A.   Yes, I saw that.
10   Q.   And -- so in other words,
11 the model and what's predicted to be in
12 the mine and what's predicted to be
13 actually extracted may -- may not act --
14     MS. O'DELL:  Excuse me.
15 Thank you.  You see all my notes.
16     THE WITNESS:  Oh great.
17     MR. CHACHKES:  It's over for
18 you.
19     MS. O'DELL:  Well, there you
20 go.  I made it a long time, so
21 hopefully I skip.
22 BY MS. O'DELL:
23   Q.   But the model and what's
24 predicted to be mined from the deposit

Page 307

1  may not match what actually is removed by
2  the people on the ground in the equipment
3  removing the material, true?
4    A.   So we have to be careful,
5  because the section that you just quoted
6  in that article was potentially leading
7  up to more sophisticated methods that
8  lead to a more accurate mine model.
9        So I think that we can't
10 just take one paragraph out of context
11 and then draw the conclusion that the
12 model is inaccurate.
13   Q.   Well, let me -- let me just
14 ask in a general way.  You can have a
15 model of what's in the deposit, the ore
16 that -- that is designated to be removed.
17 And the truth of the matter is, that
18 model may or may not match what's
19 actually going on in the mine itself,
20 true?
21   A.   That's why you constantly
22 reconcile the two, so it's a -- it's a
23 learning process.
24       You start.  You see what's

Page 308

1  there.  You correct.  You mine more.  You
2  correct so your model becomes more and
3  more sophisticated over time.
4    Q.   So the answer to my
5  question, what's -- what's in the model
6  and what's happening in the mine may not
7  match.  The answer to my question is yes,
8  that is true?
9    A.   I think we're talking about
10 different time scales and different uses
11 of the model.
12       So keep in mind the model is
13 not -- I've -- I've built this rigid
14 thing that can never change.  It
15 constantly improves as we gather more
16 information and --
17   Q.   What's the first mine model
18 that you saw related to any of the
19 Vermont talc mines, what's the date on
20 that?
21   A.   2002 would come to mind.
22 There might have been something sooner
23 than that.  But I believe I saw 2002.
24   Q.   No mine models for those

Page 309

1  mines in the 1970s, 1980s, or up until,
2  let's say, 1999.  True?
3    A.   No, I wouldn't say that
4  there's no models.  It depends on whether
5  we are talking about paper based, even
6  physical 3D models versus computer
7  models.
8    Q.   No, there were no computer
9  models in the '90s for Argonaut, true?
10   A.   I don't know that that's
11 true.
12   Q.   The -- in terms of -- of the
13 mining process itself, and I'm not
14 talking about a computer model, I'm
15 talking about what happens within the --
16 the open pit itself.  The selective
17 mining process is dependent on, in large
18 measure, on the visual inspection of an
19 equipment operator, true?
20   A.   I would say that there are
21 many inputs to selecting what you're
22 mining for delivery to a particular
23 stockpile for a particular use or -- or
24 wasting it.

Mary Poulson, Ph.D.

Page 310

1    Q.   And that decision on an
2  hourly by hourly basis is made by the
3  person who is running the excavator
4  that's removing the material, true?
5    A.   Not necessarily.  You have
6  other input to what that operator is
7  doing.
8    Q.   But it can be, correct?
9    A.   That would be a
10 hypothetical.
11   Q.   No, that's real world, in
12 fact.
13       For an excavator operator
14 who is loading trucks and making a
15 decision of whether material is going to
16 go to West Windsor for cosmetic talc
17 versus Ludlow for industrial talc, that's
18 going to be made when that operator is
19 extracting the material with an excavator
20 and placing it in a truck, true?
21   A.   So the equipment operator is
22 excavating the material and placing it in
23 a truck.
24       That material may have been

Page 311

1  already marked by the geologist, the
2  mining engineer, as to what material that
3  is and where that truck is routed to.
4    Q.   May or may not have been
5  premarked, correct?
6    A.   So premarked as opposed to
7  other ways of delineating it.
8    Q.   And in terms of -- of that
9  process, the determination of what's
10 going to be in a talc mine, cosmetic talc
11 versus industrial talc, is going to be
12 decided at the site of extraction?
13   A.   I would say not solely.
14   Q.   But in large measure?
15   A.   I can't define what in large
16 measure would be.
17   Q.   It -- that's part of the
18 decisionmaking process, true?
19   A.   It's one of the inputs.
20   Q.   The excavator operator is
21 going to be determining what material is
22 going to be beneficiated versus what's
23 going to be wasted.  You might have
24 gotten input from -- of a geology

Page 312

1  engineer or a mine manager, but for that
2  bucket-by-bucket decision, that's going
3  to be the excavator operator, true?
4    A.   So your question is, is the
5  excavator operator the sole person making
6  that decisions?
7    Q.   That's not what I said.
8    A.   Okay.  Because you --
9    Q.   He's going to be one of the
10 people who is making the decision about
11 whether material is going to be
12 beneficiated or wasted?
13   A.   So there's a distinction
14 between making the decision as opposed to
15 executing the decision.
16   Q.   In terms of -- of actually
17 loading a particular truck that's going
18 to go to a particular mill --
19   A.   Yes.
20   Q.   -- that's going to be the
21 excavator operator, correct?
22   A.   No, not necessarily.  So,
23 so, basically, based on what you know
24 you're mining and where it's going to go,

Page 313

1  the -- the truck driver who is ultimately
2  taking that material to its destination
3  is told where that truck should go.  That
4  could be based on a dispatching system.
5  It could be based on today everything is
6  going to Stockpile 54.  But there's a
7  difference between making a decision
8  versus executing the decision.
9    Q.   Well, that may be true.  I
10 wouldn't -- won't dispute that.  But
11 executing the -- the decision is sort of
12 where the proof is in the pudding,
13 correct?
14       I mean, in terms of that
15 excavator operator delineating the ore
16 that should go for cosmetic talc, that
17 person is going to be looking at
18 potentially boundaries that are drawn by
19 a geologist, correct?
20   A.   Yes.
21   Q.   Or a mine manager, not
22 necessarily a geologist?
23   A.   Yes.  Yes.
24   Q.   Those boundaries, as

Mary Poulson, Ph.D.

Page 314

¹ material is removed, can be disrupted, so
² it's more difficult to tell where those
³ boundaries occur, true?
⁴      A.   Mm-hmm, could be.
⁵      Q.   And you got, in a pit
⁶ situation you're going to have dust,
⁷ true, that may impinge on the
⁸ identification of a particular material?
⁹      A.   I would not think that dust
¹⁰ in this situation is going to obstruct
¹¹ your visibility.
¹²      Q.   You've got snow in certain
¹³ parts of -- certain time periods of the
¹⁴ year, correct?
¹⁵      A.   You do have snow.
¹⁶      Q.   You could have rain and
¹⁷ other weather elements that impact the
¹⁸ person who is trying to remove certain
¹⁹ ore?
²⁰      A.   Usually wet makes things
²¹ easier to identify.
²²      Q.   Maybe, maybe not.  Depends
²³ on the mud, true?
²⁴      A.   I wouldn't say the mud,

Page 315

¹ but -- but certainly if you take a rock
² sample and you make it wet, a lot of
³ times the identification is much easier.
⁴      Q.   But we're not talking about
⁵ rock samples.  We're talking about
⁶ somebody in a piece of equipment.
⁷      A.   No, I'm -- I'm still saying
⁸ the rock face when wet can be far more
⁹ distinctive than when dry.
¹⁰      Q.   But not the floor of the pit
¹¹ in -- not the floor of the pit in many
¹² instances --
¹³      A.   Well, the floor of the pit
¹⁴ we're generally driving on.
¹⁵      Q.   Not necessarily.  It depends
¹⁶ on if you've got -- you've blasted and
¹⁷ you've got material that's been blasted
¹⁸ and it's being prepared to be excavated
¹⁹ and -- and trucked to the mill.
²⁰      A.   So you're talking about a
²¹ muck pile on a bench?
²²      Q.   Maybe, maybe not.  Could be.
²³      But let me just ask this
²⁴ question.  An excavator operator is

Page 316

¹ approximately how far from the end of the
² bucket on the excavator?
³      A.   It very much depends on the
⁴ excavator.
⁵      Q.   And -- and you have
⁶ described an excavator that is
⁷ appropriate for selective mining in the
⁸ context of -- of Vermont talc as having a
⁹ 4.7-yard bucket, correct?
¹⁰      A.   That's the bucket that they
¹¹ have described having.
¹²      Q.   And that's the bucket they
¹³ were using?
¹⁴      A.   Yes.
¹⁵      Q.   And the location of the
¹⁶ operator in front of the controls in the
¹⁷ seat of the machine to the end of the
¹⁸ bucket would be anywhere from 25 to
¹⁹ 35 feet, correct?
²⁰      A.   It very much depends on
²¹ where the machine is relative to the
²² excavator arm.  It could be closer.
²³      Q.   And it -- it could be
²⁴ farther?

Page 317

¹      A.   Depends on the reach of the
² boom.
³      Q.   Yes.
⁴      A.   You generally don't want to
⁵ lift a lot of things from a great
⁶ distance because of the stress on the
⁷ boom.
⁸      Q.   Correct.  But the -- a good
⁹ estimate of the distance would be
¹⁰ somewhere between 25 and 35 feet,
¹¹ correct?
¹²      A.   I don't know that I could
¹³ say that that's an estimate of the
¹⁴ distance between the operator and what
¹⁵ that person is digging.
¹⁶      Q.   How many pounds of material
¹⁷ would a 4.7-cubic-yard bucket hold?
¹⁸      A.   So we would have to do some
¹⁹ math late in the day here.  I believe a
²⁰ ten-foot by ten-foot by ten-foot block of
²¹ rock was roughly 75 tons.  I'd have to go
²² through and calculate bank cubic yards
²³ and figure out what would actually fit in
²⁴ an excavator of that size and then figure

Mary E. Poulson, Ph.D.

Page 318

1  out what that weight would be. I don't
2  think I'm prepared to do that math right
3  now.
4       Q.  And you don't know that from
5  your information in -- in the mining
6  field?
7            MR. CHACHKES: Objection.
8            THE WITNESS: I don't know
9       that from my information in the
10      mining field? No, I just can't
11      calculate it right now.
12 BY MS. O'DELL:
13      Q.  Would it be fair to say that
14 3,000 pounds per yard is a reasonable
15 estimate of the amount of material
16 that -- that would be in one yard of a
17 bucket?
18      A.  3,000 pounds per yard of
19 talc?
20      Q.  Yes.
21      A.  I'd have to do some
22 calculations.
23      Q.  So assume for me, for
24 purposes of this discussion, that a yard

Page 319

1  would hold approximately 3,000 pounds and
2  a 4.7 -- 4.7-cubic-yard bucket would hold
3  approximately 15,000 pounds of ore,
4  assume that with me.
5            If there are trace minerals
6  or accessory -- accessory minerals within
7  that talc, it would be impossible to
8  selectively mine that material with any
9  precision, true?
10           MR. CHACHKES: Objection.
11           MR. LOCKE: Objection to
12      form.
13           THE WITNESS: So these
14      impurities don't jump out of the
15      rock face into the muck pile.
16           Again, we've built these
17      models so that we're, for cosmetic
18      grade talc, mining the very best
19      blocks. And I -- I object to the
20      conclusion that there would
21      suddenly be unknown contaminants
22      appearing in the muck pile.
23           MS. O'DELL: Move to strike
24      as nonresponsive.

Page 320

1  BY MS. O'DELL:
2       Q.  Let me ask you this. That
3  15,000 pounds of -- a bucket that can
4  hold 15,000 pounds is hardly a precise
5  instrument from which to identify certain
6  ore and remove only that ore for purposes
7  of cosmetic talc, true?
8            MR. CHACHKES: Objection.
9            THE WITNESS: That would
10      assume that you're always
11      completely filling the entire
12      bucket, which you may not do.
13 BY MS. O'DELL:
14      Q.  Let's say it's half,
15 7500 pounds, that's not a terribly
16 precise process by which to selectively
17 mine material, true?
18           MR. CHACHKES: Objection.
19           MR. LOCKE: Objection.
20           THE WITNESS: You could fill
21      it with even less than that.
22 BY MS. O'DELL:
23      Q.  For purposes of selective
24 mining, impurities within talc ore may

Page 321

1  not be apparent to the operator who is
2  removing the material, true?
3            MR. FROST: Objection.
4            THE WITNESS: When you say
5       may not be apparent to the
6       operator?
7  BY MS. O'DELL:
8       Q.  Through visual inspection --
9       A.  And this --
10      Q.  -- of the material from the
11 seat of their particular machine.
12           MR. FROST: Objection.
13           THE WITNESS: And this would
14      assume that the operator is
15      incapable of asking for help in
16      identifying what's in the
17      material?
18 BY MS. O'DELL:
19      Q.  That's assuming that he or
20 she is not able to identify microscopic
21 amounts of impurities within talc rocks.
22           MR. FROST: Objection.
23           THE WITNESS: So by the
24      definition of microscopic

Mary Poulton, Ph.D.

Page 322

1   impurities, you're basically
2   saying nobody can identify this.
3   BY MS. O'DELL:
4      Q.   If there is tremolite within
5   a talc rock and -- and it's within that
6   rock, and it's 25 to 35 feet away from a
7   machine operator, more likely than not,
8   that is not going to be visible with the
9   naked eye, true?
10      MR. CHACHKES:  Objection.
11      THE WITNESS:  So I -- I am
12      struggling with sort of the -- the
13      logic of a single tremolite
14      crystal in a pile of rock.
15  BY MS. O'DELL:
16      Q.   I didn't say either of those
17  things.  I said within a rock that
18  microscopic amounts of tremolite are not
19  going to be visual -- visible to the
20  naked eye.
21      True?
22      A.   They may not be visible to
23  the naked eye, but surely they would have
24  been detected in the analysis of the rock

Page 323

1   in that vicinity.
2      Q.   Right.  Within -- within the
3   context of core holes driven -- drilled
4   anywhere from 100 to 500 feet apart,
5   fair?
6      A.   Well, the geologists are
7   also capable of taking samples from the
8   bench face.  So it's not solely drill
9   core.
10      Q.   Did you see data for samples
11  taken from the bench face?
12      A.   I saw reference to taking
13  grab samples from the bench face.
14      Q.   Did you see data?
15      A.   I don't know that I saw
16  assay data.
17      MS. O'DELL:  Let's take a
18      short break.
19      THE VIDEOGRAPHER:  All
20      right.  Stand by, please.  Remove
21      your microphones.  The time is
22      6:04 p.m.  Off the record.
23      (Short break.)
24      THE VIDEOGRAPHER:  We are

Page 324

1   back on the record.  The time is
2   6:37 p.m.
3   BY MS. O'DELL:
4      Q.   Dr. Poulton, following up on
5   the, sort of our discussion that we were
6   having before the break about selective
7   mining.
8      Would you agree with me that
9   excavator operators have an influence
10  over the material that is extracted and
11  mined as ore versus waste?
12      A.   When you say influence, what
13  do you mean?
14      Q.   They have an impact on the
15  decision of what is determined to be ore
16  versus waste.
17      A.   I would say that based on
18  the mine model, the geologic input, the
19  ore versus waste has multiple inputs.  I
20  would not say that the excavator operator
21  has necessarily a major influence.
22      But again the excavator
23  operator is probably the person that
24  looks most at the rocks.  So again, they

Page 325

1   execute decisions.  How much latitude
2   they have to make decisions, I think we
3   would have to know from mine managers
4   there.
5      Q.   And they would have an
6   influence on those decisions, true?
7      A.   Influence versus input
8   versus executing a decision, I don't
9   think that's something that I can say
10  from not knowing how they did their
11  day-to-day operations.
12      Q.   And so you cannot agree to
13  the word influence?
14      A.   I would not agree to the
15  word influence.
16      Q.   You cannot agree to the
17  statement that excavator operators have
18  influence on the degree of ore loss or
19  dilution?
20      A.   Influence over ore loss or
21  dilution.  To the extent that the
22  excavator operator is putting material in
23  trucks to go certain places.  Again, I
24  think I need to see some context for all

Page 326

1  of this just to know what I'm answering.
2      Q.   Let me ask you to look at
3  what I'm going to mark as Exhibit 29.
4  This is a July 31, 2006 memo from Ed
5  McCarthy regarding Vermont market.
6      Do you see that?
7      A.   Yes.
8      (Document marked for
9      identification as Exhibit
10     Poulton-29.)
11 BY MS. O'DELL:
12     Q.   If you'll turn, please, to
13 Page 3 of this document.  You see a
14 caption reading "Present Situation."
15     Do you see that?
16     A.   I do.
17     Q.    And if you'll look at the
18 second sentence, it reads, "It's very
19 critical that care be exercised near the
20 limits of the talc zones as serpentine
21 and arsenic are commonly found there.  In
22 theory that ore is segregated by talc
23 content, color, and arsenic content at
24 the mine face, but in actuality, mine ore

Page 327

1  control is rudimentary and is generally
2  based on post-mill rather than drill hole
3  analysis."
4      Did I read that correctly?
5      A.   Yes.
6      MR. LOCKE:  Can I ask, is
7  this different from the exhibit
8  you previously --
9      MS. O'DELL:  Yes.
10     MR. LOCKE:  One is a
11 handwritten Bates?
12     MS. O'DELL:  It's a
13 different document, Tom.
14     MR. LOCKE:  I've got two
15 here that are on 730106.
16     MS. O'DELL:  I think -- I
17 think that they are different.
18 There is another memo that looks
19 very similar to this.  But it's --
20 it's different.
21 BY MS. O'DELL:
22     Q.   Let me ask you to look at
23 what I'm marking as Exhibit 30.
24     (Document marked for

Page 328

1  identification as Exhibit
2  Poulton-30.)
3      MS. O'DELL:  I'm one short
4  on this.  I'm sorry.
5      MR. CHACHKES:  That's fine.
6  Two is fine.
7  BY MS. O'DELL:
8      Q.   Do you see this,
9  Dr. Poulton?
10     A.   I see this image.
11     Q.   Can you identify the -- the
12 minerals in this image?
13     MR. FROST:  Objection.
14     THE WITNESS:  With no
15 context, no.
16 BY MS. O'DELL:
17     Q.   You cannot?
18     A.    I -- I don't have any
19 information on size.  I don't have any
20 information on hardness, specific
21 gravity.  I can't rotate it.  I can't use
22 a hand lens to look at it in detail.
23 I'm -- I'm basically just looking at a
24 color image.

Page 329

1      Q.   If I represent to you that
2  this is a photo of actinolite within
3  talc, would you disagree with that?
4      A.   I don't have any information
5  to agree or disagree with that.  I don't
6  know what this image is.
7      Q.   Cannot identify it?
8      MR. FROST:  Objection.
9      THE WITNESS:  I can't
10 identify from a picture when I
11 have no information.
12     (Document marked for
13     identification as Exhibit
14     Poulton-31.)
15 BY MS. O'DELL:
16     Q.   Let me show you what I'm
17 marking as Exhibit 31.  See the caption
18 on this figure, "Large mass,
19 approximately 15 centimeters across of
20 actinolite in talc from the Argonaut
21 quarry.  Ludlow, Vermont."
22     Do you see that?
23     A.   I see the caption.
24     Q.   Do you -- do you have any

Mary Poulson, Ph.D.

Page 330

1 basis for disagreeing with that
2 identification?
3         MR. FROST:  Objection.
4         THE WITNESS:  I don't know
5     what this figure is from.  I don't
6     know who has identified it.  So
7     again, I -- it's not something I
8     can touch and see.
9 BY MS. O'DELL:
10     Q.   Have you any basis to
11 disagree with that caption?
12     A.   Again, I don't know where
13 it's from.  I don't have any information.
14     Q.   The -- well, you do have
15 information on page -- or on Exhibit 31,
16 don't you?
17         MR. FROST:  Objection.
18         THE WITNESS:  Well, I -- I
19     see a figure caption here.  Again,
20     I don't know who has identified
21     it.  I don't know where this has
22     come from.  So I --
23 BY MS. O'DELL:
24     Q.   You just --

Page 331

1     A.   I don't know how I can
2 identify something with no information.
3     Q.   But you have information
4 that's provided in caption -- on -- the
5 caption on Exhibit 31, true?
6         MR. FROST:  Objection.
7         THE WITNESS:  Again, I don't
8     know where this caption has come
9     from.  I don't know where the
10     picture has come from.  I don't
11     know what the document is.
12 BY MS. O'DELL:
13     Q.   And with the information
14 provided on Exhibit 35 -- 31, you are
15 unable to identify that -- what that rock
16 is or state the reasons why it's not
17 actinolite in talc?
18         MR. CHACHKES:  Objection.
19         MR. FROST:  Objection.
20 BY MS. O'DELL:
21     Q.   True?
22     A.   I've already stated that I
23 can't touch it.  I can't take
24 measurements on it.  I can't confirm the

Page 332

1 identification.
2     Q.   And you would need to touch
3 it in order to identify the mineral?
4         MR. LOCKE:  Objection.
5         THE WITNESS:  I -- I would
6     need to be to make measurements on
7     it.
8 BY MS. O'DELL:
9     Q.   Let me ask you to turn to
10 Page 25 your report.  And you have it in
11 front of you?
12     A.   Yes.
13     Q.   And are you looking at
14 the -- you're -- you're looking at your
15 copy, not the marked copy of the report,
16 correct?
17     A.   It's the copy in this
18 binder.
19     Q.   Okay.  I'm going to ask you
20 to pull out from your stack the copy of
21 the report that I marked because I want
22 you to draw on it.  It should be --
23         MR. CHACHKES:  I think
24     Number 1 or 2.

Page 333

1 BY MS. O'DELL:
2     Q.   I think it's Number 2.  It
3 should be on the bottom.
4     A.   My report?
5     Q.   Correct.
6     A.   This one?
7     Q.   Yes.  All right.  If you'll
8 turn to Page 25.  Are you -- are you
9 there?
10     A.   I am.
11     Q.   You write, "Notice the color
12 change to distinguish the ore from waste
13 is easily discernable."
14         Do you see that?
15     A.   And we are on Page 25?
16     Q.   Correct.
17     A.   I say, "Close-up of the
18 lamprophyre dikes.  Notice the boundaries
19 are sharp and it is easy to segregate
20 this material during selective mining."
21     Q.   I think if you'll look on
22 Figure 6 that you write, "Notice the
23 color change to distinguish the ore from
24 waste is easily discernable."

Page 334

1    Do you see that?
2    A.   Yes.
3    Q.   Where is -- I'd like for you
4  to identify the area of ore in this
5  photo.
6    A.   So I'm denoting that there
7  is a color change, and based on the
8  document that I -- I took this from, have
9  denoted that -- that the light material
10 is different than the dark material.
11   Q.   I would like for you to
12 draw.  If you don't -- you're welcome to
13 use my pen or somebody else's pen, what
14 you identify as ore versus waste.
15   A.   Well, I can -- I can mark
16 where we have the fault in that material
17 as waste.
18      To -- to go beyond that with
19 a photograph, I think is -- is difficult
20 to do without more context.
21   Q.   Can you identify the ore in
22 that photograph, yes or no?
23   A.   I would say that it would be
24 difficult again without having more

Page 335

1  information.
2    Q.   So you cannot, as you're
3  sitting here today, identify the ore
4  that's present in that photograph, true?
5    MR. CHACHKES:  Objection.
6    THE WITNESS:  I would say
7    again, I would want to have more
8    information before I marked on it.
9  BY MS. O'DELL:
10   Q.   So based on the information
11 you have today, and based on the
12 materials you reviewed, you're unable to
13 identify the ore that's depicted in that
14 photograph, true?
15   MR. CHACHKES:  Objection.
16   THE WITNESS:  I wouldn't say
17   that I'm unable.  I would say that
18   I would want to make sure that I
19   did it carefully with more
20   information.
21 BY MS. O'DELL:
22   Q.   And you're not able to do
23 that as we sit here in the deposition
24 today, correct?

Page 336

1    MR. CHACHKES:  Objection.
2    THE WITNESS:  At this moment
3    in time.
4  BY MS. O'DELL:
5    Q.   If you'll look in your
6  stack, please, Dr. Poulton, for
7  Exhibit 28, which is the 2008 annual
8  report for mineral resources and ore
9  reserves.  Do you have that in front of
10 you?
11   A.   28?
12   Q.   Yes.
13   A.   Yes.
14   Q.   Great.  If you'll turn to
15 Page 16 of the document.  Are you there?
16   A.   I am on Page 16.
17   Q.   Okay.  Top of the page,
18 Doctor, it reads, "Only limited blast
19 hole data was utilized in the
20 construction of the geologic polygons
21 primarily due to the lack of quality
22 control on the blast hole database."
23      Do you see that?
24   A.   I see that paragraph.

Page 337

1    Q.   It says, "The blast hole
2  data could not be confirmed reliable,
3  therefore, was used sparing" --
4  "sparingly."
5    Do you see that?
6    A.   I see that sentence.
7    Q.   And to the degree that blast
8  hole data is something that is typically
9  relied on, Imerys determined that the
10 data they had was not reliable for
11 purposes of the computer model that was
12 being created for Argonaut, fair?
13   A.   Possibly.
14   Q.   It's what the document says?
15   A.   Well, again the -- the blast
16 hole data can be used to inform the
17 mining that you're doing and that
18 information can also go into the geologic
19 and computer model.  So it's not just
20 drill hole data that informs these
21 computer models.  There's other geologic
22 information that informs these models.
23   Q.   So blast hole data, however,
24 was determined to be unreliable by the

Mary Poulson, Ph.D.

Page 338

1 individuals who wrote this annual report,
2 correct?
3          MR. CHACHKES:  Objection.
4          THE WITNESS:  So again we
5     have to look at the context of
6     where this paragraph comes from
7     and what they are attempting to do
8     with that particular blast hole
9     data.
10 BY MS. O'DELL:
11     Q.   Certainly what they --
12 certainly what they stated, correct?
13     A.   Not necessarily.  Again, we
14 have to look at the full context of
15 what's being stated, not just a paragraph
16 without any context.
17     Q.   That's what that paragraph
18 stated, correct?
19     A.   Again, I would say context
20 is very important to understand what's
21 being said.
22     Q.   Yes or no?
23     A.   I don't think I can say yes
24 or no to a question that requires

Page 339

1 context.
2     Q.   And I don't think this
3 requires context.  That's what that
4 paragraph stated, correct?
5          MR. FROST:  Objection.
6          THE WITNESS:  No.  I would
7     say based on my background, you do
8     need context.
9 BY MS. O'DELL:
10     Q.   I'm not asking you about
11 your background to be, you know,
12 respectful, Doctor.
13          I'm just asking if the
14 statement in the report was that they
15 could not confirm the reliability of the
16 blast hole data, that's what it says.
17     A.   That's what it says, but
18 it's what it says in the context of other
19 things that matters.
20     Q.   You were asked -- strike
21 that.  Let me start this way.
22          You cite in your report, I
23 believe it's the -- the Noakes 2005.  Let
24 me turn to it on Page 5 of your report.

Page 340

1 It's one of your references.
2          So Page 5 of your report.
3 Let's see.  Noakes 2005.
4          Do you see that?
5     A.   Yes.
6     Q.   And you give an example
7 regarding the Three Springs talc mine in
8 Australia?
9     A.   Yes.
10     Q.   Three Springs is not a
11 cosmetic talc mine, true?
12     A.   That's my understanding.
13     Q.   It's a mine for industrial
14 talc, correct?
15     A.   That's my understanding.
16     Q.   You cite Birkhimer on
17 Page 30 of your report, and you cite
18 Birkhimer in the last paragraph, and you
19 are talking about hydraulic excavators.
20          And you say, "Birkhimer
21 notes that hydraulic excavators can
22 selectively mine layers or pockets of
23 material."
24          Do you see that?

Page 341

1     A.   Yes.
2     Q.   Birkhimer, first, is there,
3 you know, any designation to the size of
4 the equipment in relation to what was
5 used at the Argonaut mine?
6          Let me strike that.  Start
7 again.
8          Is there any designation of
9 the size of equipment that is being
10 referred to in Birkhimer as compared to
11 the equipment that was used at Argonaut?
12     A.   Could I look at Birkhimer
13 again?
14     Q.   Sure.  In fact, let me just
15 ask you to look on the screen here so we
16 can both look.
17          This is Birkhimer.  Do you
18 see that?  Do you recognize that?
19     A.   I believe so.
20          MR. CHACHKES:  Objection.
21     This is a page from Birkhimer.
22 BY MS. O'DELL:
23     Q.   Did you rely on anything
24 else in reaching your opinions in the

Mary Poulson, Ph.D.

Page 342

1 Birkhimer article?
2      A.   I was focused on hydraulic
3 excavators as opposed to other kinds of
4 equipment.
5      Q.   And -- and this is the page
6 that you relied on, fair?
7      A.   Yes.
8      Q.   Is -- does this refer in any
9 way to talc mining?
10      A.   It does not refer to any
11 particular kind of mining if memory
12 serves me.
13      Q.   Is there any designation of
14 the size of the equipment that's being
15 used and the precision of its ability to
16 selectively mine?
17      A.   In this table it's just
18 comparing three different kinds of
19 loading tools.
20      Q.   Do you have any information
21 that would allow you to apply the data
22 contained in this table to the equipment
23 that was used at Argonaut?
24      A.   The fact that it's a

Page 343

1 hydraulic excavator and not an electric
2 cable shovel would be an example.
3      Q.   And that's the only thing,
4 in terms of size of bucket, size of
5 machinery, you don't have any of that
6 data?
7      A.   It is the type of equipment
8 that Birkhimer is referring to.
9      Q.   And when you say, talking
10 about hydraulic excavators, you are
11 talking about excavators that are
12 typically used in an open pit situation
13 as opposed to a underground mine
14 situation?
15      A.   I'm sorry?
16      Q.   As opposed to an underground
17 mine situation?
18      A.   So you're asking --
19      Q.   You're talk -- when you say
20 a hydraulic excavator, you are talking
21 about something that's typically used in
22 an open pit?
23      A.   Correct.
24      Q.   And, in fact, those types of

Page 344

1 excavators are depicted in some of the
2 photos in your report, hydraulic
3 excavators?
4      A.   Yes.
5      Q.   You were -- I asked you
6 earlier about -- we had a discussion
7 earlier about some depositions that are
8 on your reliance list.
9      You also list in addition to
10 Dr. Hopkins' deposition, Alice Blount's
11 deposition.
12      A.   Yes.
13      Q.   Did -- were you provided the
14 entire deposition of Dr. Blount?
15      A.   I believe I have the entire
16 deposition.
17      Q.   Did you read that
18 deposition?
19      A.   I skimmed it.
20      Q.   Did you rely on it in
21 reaching your opinions in this case?
22      A.   No.
23      Q.   Were you provided the
24 deposition of Pat Downey?

Page 345

1      A.   Yes.
2      Q.   How much of that deposition
3 were you provided?
4      A.   I believe I have the entire
5 deposition.
6      Q.   Were you provided the
7 deposition of -- of Donald Hicks?
8      A.   I believe I have one page.
9      Q.   And were you provided the
10 depositions of Dr. Krekeler and Dr. Cook?
11      A.   Yes.
12      Q.   Were you provided those
13 depositions in their entirety?
14      A.   I believe so.
15      Q.   You cited the -- the Miller
16 article.  We talked about that earlier.
17 The -- the reference that was authored by
18 Roger Miller.  Do you recall that?
19      A.   Is that -- can you give me
20 the reference again?
21      Q.   It's Miller.
22      A.   Okay.  In?
23      Q.   Do you recall us looking at
24 that earlier?

Mary Poulton, Ph.D.

Page 346

1    A.   Perhaps.
2    Q.   If you'll recall, and I'll
3  just put it under -- we marked as an
4  exhibit, this was entitled "Talc mining
5  in Vermont:  The application of
6  continuous machines."  Roger Miller?
7    A.   Yes.
8    Q.   It is a presentation at a
9  fall meeting in October of 1984, correct?
10    A.   So it was presented at the
11  fall meeting.  I believe there's -- he
12  submitted a preprint for this meeting.
13    Q.   And this is not a
14  peer-reviewed publication, correct?
15    A.   I believe SME preprints
16  quite often are peer reviewed.  I would
17  have to confirm that for that particular
18  time period.
19    Q.   Do -- you don't have -- as
20  you're sitting here today, you don't know
21  if a presentation in 1984 was peer
22  reviewed, correct?
23    A.   Well, it's written as a
24  paper.  The presentation would be slides.

Page 347

1  So he's -- he's written the paper, he
2  gives a presentation based on the paper.
3  So I wouldn't characterize his paper as a
4  presentation.  It was a paper that was
5  presented.
6    Q.   That's what the document
7  says, it was a presentation, correct?
8    A.   Well, that means he
9  presented the content of the paper at the
10  meeting.
11    Q.   And -- and it's your
12  testimony under oath that he would have
13  had slides in 1984 for a presentation to
14  the Society of Mining Engineers in
15  Colorado?
16    A.   Well, in 1984 I was using
17  slides to give presentations,
18  35-millimeter slides.
19    Q.   Yeah.  Not -- well,
20  35-millimeter maybe, but not PowerPoint
21  slides?
22    A.   Oh heavens no.  No, but
23  we -- we took --
24    Q.   Correct.  So let's be clear.

Page 348

1    A.   We -- we took 35-millimeter
2  photographs and used slide carousels.
3    Q.   Do you have any -- any
4  information as you are sitting here today
5  that that was a peer-reviewed
6  publication?
7    A.   I don't for that particular
8  time with SME.
9        MS. O'DELL:  Let's go off
10  the record.
11        THE VIDEOGRAPHER:  Sure.
12  The time is 7:03 p.m.  Off the
13  record.
14        (Short break.)
15        THE VIDEOGRAPHER:  We are
16  back on the record.  The time is
17  7:23 p.m.
18  BY MS. O'DELL:
19    Q.   For the record, I've marked
20  as Exhibit 32 a group of binders, I think
21  it's six -- five binders brought to the
22  deposition which I understand are
23  Dr. Poulton's reliance materials in terms
24  of the Bates documents that she was

Page 349

1  provided.  That's Exhibit 32.
2        (Document marked for
3  identification as Exhibit
4  Poulton-32.)
5        MS. O'DELL:  Exhibit 33 --
6        MR. CHACHKES:  Exhibit 32,
7  I'll have to double-check exactly
8  what they are.  So if they were
9  sent to me I haven't reviewed
10  them.  I think that's what they
11  are, so --
12        MS. O'DELL:  Well, I'll
13  identify, just they are Imerys
14  Volumes 1 through 3 and J&J
15  Reliance Materials 1 and 2.
16        MR. CHACHKES:  Right.
17  That's what the legal assistant
18  put on the spine.
19        MR. FROST:  I was going to
20  say.  Leigh, the other thing I
21  want to put on the record, it
22  might not be a complete collection
23  of all the reliance materials.
24  But it is certainly what we

Page 350

1  brought with us today to the
2  deposition.
3      MS. O'DELL:  To -- in terms
4  of the reliance list that was
5  provided to us listing Bates
6  numbers, is it -- is it -- are
7  y'all representing that that's a
8  different group of documents than
9  what's being disclosed?
10     MR. CHACHKES:  No, what I'm
11 saying is I don't know.  And we
12 can -- we can talk later about
13 exactly what it is.  It's just
14 what my paralegal gave me and
15 that's all I can tell you right
16 now.
17     MR. FROST:  I will say it
18 shouldn't be.
19     MS. O'DELL:  I understand
20 that's what you're saying, and
21 that doesn't comfort me a whole
22 lot.  But I understand.
23     (Document marked for
24 identification as Exhibit

Page 351

1  Poulton-33.)
2  BY MS. O'DELL:
3      Q.   Okay.  Let me show you what
4  I'm marking as Exhibit Number 33 which is
5  a supplemental reliance list.  And it
6  lists the reports of Wiley, Webb and
7  Dyar.
8      Have you reviewed those?
9      A.   Yes.
10     Q.   In addition, there are some
11 invoices that follow the supplemental
12 reliance list.  And are those all the
13 invoices that you have produced in this
14 case?
15     A.   So far.  I still have other
16 invoices to produce.
17     Q.   In addition to the hours
18 depicted in these two invoices, how many
19 hours have you spent working on this
20 case?
21     A.   I have not added up February
22 and March to date.
23     Q.   Can you give me an
24 approximation?

Page 352

1      A.   I don't know that I can
2  ballpark it very accurately.
3      Q.   Is it more than 50 hours or
4  less than 50 hours?
5      A.   I would estimate more than
6  50.
7      Q.   More than 100 hours or less
8  than 100 hours?
9      A.   That I don't know.
10     Q.   Is it between 50 and
11 100 hours to the best of your knowledge?
12     MR. CHACHKES:  Objection.
13     THE WITNESS:  Possibly.  I
14 don't know.
15 BY MS. O'DELL:
16     Q.   And your retention with
17 counsel for J&J was December the 19th,
18 2018, correct?
19     A.   That is the date, yes.
20     Q.   And that's the date you
21 agreed to serve as an expert?
22     A.   Yes.
23     MS. O'DELL:  I have nothing
24 further.

Page 353

1      MR. CHACHKES:  Let's go off
2  the record.  And then we might
3  have a little bit of redirect.
4  Maybe not.  Okay.  Give us a few
5  minutes.
6      THE VIDEOGRAPHER:  The time
7  is 7:26 p.m.  Off the record.
8      (Short break.)
9      THE VIDEOGRAPHER:  We are
10 back on the record.  The time is
11 7:40 p.m.
12         - - -
13     EXAMINATION
14         - - -
15 BY MR. CHACHKES:
16     Q.   Professor Poulton, you were
17 asked --
18     THE VIDEOGRAPHER:
19 Counselor, your microphone is not
20 on.
21 BY MR. CHACHKES:
22     Q.   Professor Poulton, you were
23 asked questions about working with
24 industry for mineral exploration mine

Mary Poulson, Ph.D.

Page 354

1  design, through that process. Do you
2  remember that?
3      A.   I do.
4      Q.   What about otherwise, you
5  were asked very specifically about
6  directly with industry, I think
7  consulting directly for them.
8          What about otherwise?
9      A.   So rather than going outside
10 the university and doing consulting, we
11 actually brought the consulting projects
12 into our classes, and into our student
13 projects. So that way the students would
14 learn and the students would benefit and
15 it gave the faculty the opportunity to
16 work together on a wide range of
17 different kinds of projects.
18         So as one example, we have a
19 field methods in geophysical exploration
20 and we would have a company basically be
21 the client for that class and we would
22 design geophysical surveys with the
23 class. We would go out and collect the
24 data. Process the data, produce the

Page 355

1  reports, work with the company,
2  geologists, and geophysicists on overall
3  interpretation, and choose bore hole
4  selections where appropriate. That is
5  one example.
6          Another example is we would
7  do rock mechanics testing for mines. And
8  we would have those samples in our
9  geomechanics laboratory. So the students
10 had the opportunity to work with real
11 samples and collect the data, write the
12 reports, and work alongside the company
13 on what those test results meant and were
14 being used for. Those are two examples.
15     Q.   You talked a little bit
16 about the possibility that material from
17 outside the talc body might be mined. Do
18 you recall that?
19         MS. O'DELL: Object to the
20 form.
21         THE WITNESS: I do.
22 BY MR. CHACHKES:
23     Q.   Okay. Based on your review
24 of the documents in this case and your

Page 356

1  experience, what's your opinion on what
2  happened in practice for the mines that
3  J&J sourced its cosmetic talc from?
4          MS. O'DELL: Object to the
5  form.
6          THE WITNESS: So there --
7  there are two things you do. One
8  is you leave a buffer zone when
9  you have to be careful about
10 inclusion of undesirable rocks in
11 your process stream.
12         The other thing with
13 underground mining is you need to
14 leave some supporting rocks
15 because you're -- you're mining
16 out holes and you don't have
17 support for the rock over your
18 head.
19         So quite frequently you will
20 leave the undesirable rock behind
21 as your support.
22 BY MR. CHACHKES:
23     Q.   Okay. You recall the charts
24 in the Cook and Krekeler reports that

Page 357

1  they list documents to support their
2  opinions about testing results?
3      A.   Yes.
4          MS. O'DELL: Object to the
5  form.
6  BY MR. CHACHKES:
7      Q.   If you in your rebuttal did
8  not mention a document in one of those
9  charts, to what degree does that mean you
10 agreed with their take on the document?
11         MS. O'DELL: Object to the
12 form.
13         THE WITNESS: It does not
14 mean that I agreed with their
15 conclusions. It -- it simply
16 means that that wasn't one of the
17 documents I selected to examine.
18 BY MR. CHACHKES:
19     Q.   And you were asked a lot of
20 questions about general principles in
21 mining. To what degree are there any --
22 are any of those general principles
23 applicable to a specific mine?
24         MS. O'DELL: Object to the

Mary Poulson, Ph.D.

Page 358

```
 1   form.
 2        THE WITNESS:  So you -- you
 3   take those general principles and
 4   then you look at the context of
 5   your specific mining situation and
 6   determine how you modify those
 7   general principles.  So every mine
 8   has potentially unique situations
 9   that you have to take into
10   account.
11   BY MR. CHACHKES:
12        Q.   What is your understanding
13   of the conclusion of Pooley's testing in
14   Italy?
15        A.   So my understanding of
16   Pooley's testimony, and it's a direct
17   quote from his report, "No amphibole or
18   chrysotile material was detected in any
19   of the numerous powders examined."
20        MS. O'DELL:  Where -- excuse
21   me.  Doctor, if you don't mind, if
22   you're quoting that, would you
23   just tell me what page you are on?
24        THE WITNESS:  7 of my
```

Page 359

```
 1   report.
 2        MS. O'DELL:  What's the page
 3   on the Pooley document?
 4        THE WITNESS:  I have the
 5   quote in the J&J number, I don't
 6   have the specific page number.
 7        MR. CHACHKES:  Okay.  So no
 8   further questions.
 9        MS. O'DELL:  Okay.  I have a
10   few questions.
11             - - -
12        EXAMINATION
13             - - -
14   BY MS. O'DELL:
15        Q.   You mentioned the Pooley
16   report.  What page were you referring to?
17        A.   We could open up the Pooley
18   report and find the exact page number.
19        Q.   No.  You're -- you
20   mentioned -- you quoted from your report,
21   correct?
22        A.   Yes.
23        Q.   And what -- what was the
24   specific quote you were reading?
```

Page 360

```
 1        A.   So I was reading a quote
 2   from Pooley's report.
 3        Q.   What page of your report?
 4        A.   Of my report is Page 7.
 5        Q.   Page 7.  And just so I
 6   can -- can follow.  Did you read a
 7   portion of the quote that appears at the
 8   top of Page 7?
 9        A.   Yes.
10        Q.   If you'll go to Exhibit 8,
11   which is the Pooley report.  Exhibit 8.
12        Are you there?
13        A.   I have Exhibit 8.
14        Q.   And if you'll turn to the
15   last page of the exhibit.  When you --
16   the quote in your report actually leaves
17   out some sentences on this page.
18        You -- you state in your
19   report, "Particles formed from the
20   amphibole mineral found at the mine were
21   hardly fibers of character, and the
22   majority of the tremolite breaking to
23   give compact particles."
24        And then you don't quote the
```

Page 361

```
 1   next sentence:  "Those" -- "those fibers
 2   formed were short and had a very large
 3   diameter with" -- "when compared to
 4   commercial varieties of asbestos."
 5        Did I read that directly?
 6        MR. FROST:  Objection.
 7        THE WITNESS:  I haven't
 8   found where you are exactly.
 9   BY MS. O'DELL:
10        Q.   The last page of the report.
11   Are you there?
12        A.   I see the last page.
13        Q.   And it's Bates Number 475?
14        A.   475.
15        Q.   And you quoted in your
16   report from the second paragraph at the
17   end, correct?
18        A.   Yes.
19        Q.   And Dr. Pooley noted that
20   there were fibers within the talc,
21   correct?
22        MR. LOCKE:  Objection to
23   form.
24        THE WITNESS:  So those
```

Mary Poulson, Ph.D.

Page 362

1    fibers are not asbestos.  They are
2    not identified as asbestos.
3    BY MS. O'DELL:
4        Q.    Then he goes on to say, "The
5    Italian talc" -- this is the next
6    paragraph.
7            "The Italian talc contains
8    observable quantities of chlorite and
9    carbonate minerals and could contain any
10   one of the following minerals in minor
11   amounts," and he includes in that
12   tremolite, correct?
13       A.    And tremolite is not
14   asbestos.
15       Q.    It can be asbestos, correct?
16       MR. FROST:  Objection to
17   form.
18       MR. CHACHKES:  Objection.
19       THE WITNESS:  That's not
20   what's stated here.
21   BY MS. O'DELL:
22       Q.    Tremolite can be asbestiform
23   or non-asbestiform, correct?
24           Is that a true statement?

Page 363

1        A.    Tremolite asbestos is the
2    asbestos mineral.
3        Q.    That's not what I asked you.
4    I asked you if tremolite can occur in
5    non-asbestiform and an asbestiform habit,
6    true?
7        A.    So -- so --
8        Q.    Is that true?
9        A.    -- tremolite --
10       Q.    Is that true, ma'am?
11       A.    -- can be --
12       MR. CHACHKES:  Please don't
13   badger the witness.  Let her
14   answer.
15       MS. O'DELL:  She needs to
16   answer my question.  I just asked
17   her a simple question that's
18   noncontroversial --
19       MR. CHACHKES:  So let her --
20   let her answer, please.
21       MR. LOCKE:  Just for the
22   record, we're over the time --
23       MR. CHACHKES:  Yeah.
24       MR. LOCKE:  -- that was

Page 364

1    spent for --
2        MS. O'DELL:  I had
3    14 minutes left, Tom.
4        MR. LOCKE:  Yeah, I think
5    based on the way you did timing
6    for the prior depositions, I think
7    we're already over.
8        MS. O'DELL:  No, I don't --
9    I -- I disagree with that.
10   BY MS. O'DELL:
11       Q.    Ma'am, do you remember my
12   question?
13       A.    So tremolite asbestos is not
14   the same as tremolite.
15       Q.    Tremolite can occur as a
16   non-asbestiform mineral and also an
17   asbestiform mineral, true?
18       A.    So tremolite asbestos is not
19   tremolite.
20       MR. CHACHKES:  Okay.  So by
21   the way, this -- let's go off the
22   record just for a moment.  Because
23   it's my understanding that you --
24   y'all in your depositions limited

Page 365

1    our redirect -- our recross to the
2    time of redirect without regard to
3    the amount of time that was
4    leftover from the --
5        MS. O'DELL:  That -- that's
6    not --
7        MR. LOCKE:  True.
8        MR. CHACHKES:  That is true.
9        MS. O'DELL:  Jack, you know
10   that's not true.  That is
11   absolutely not true.  That we
12   allowed the time that remained was
13   added to your redirect, any
14   additional --
15       MR. CHACHKES:  That's why I
16   wanted to go off the record.  Let
17   me just clarify --
18       THE VIDEOGRAPHER:  Yeah,
19   we're still on the record, so --
20       MR. CHACHKES:  Yeah.
21       THE VIDEOGRAPHER:  You want
22   to go off?
23       MR. CHACHKES:  Yeah, let's
24   go off.  Just to make sure because

Mary Poulson, Ph.D.

1    this is an important point, right?
2        MS. O'DELL:  We're off the
3    record?
4        THE VIDEOGRAPHER:  The time
5    is 7:50 p.m.  We're off the
6    record.
7        (Brief pause.)
8        THE VIDEOGRAPHER:  We are
9    back on the record.  The time is
10   7:53 p.m.
11   BY MS. O'DELL:
12       Q.   You talked about with
13   counsel for J&J classes.  I think you
14   mentioned field methods was one class
15   where there was some engagement with
16   industry and students worked on projects
17   that involved geophysical exploration,
18   surveys, et cetera.
19       Do you call -- recall that?
20       A.   That was one example.
21       Q.   And did any of those
22   projects involve talc mines?
23       A.   No.
24       Q.   You also mentioned a class

1    involving rock mechanic testing in a lab.
2        A.   Yes.
3        Q.   Did that type of testing
4    that was done in that lab involve TEM?
5        A.   TEM is not a rock mechanics
6    instrument.
7        Q.   I would -- what is rock
8    mechanics, just to make sure I
9    understand?
10       A.   Rock mechanics is the
11   engineering strength of rocks.
12       Q.   So tensile strength?
13       A.   Compressive strength,
14   tensile strength.
15       Q.   Any evaluation by
16   microscopy?
17       A.   I don't believe so for
18   undergraduate testing.
19       (Document marked for
20       identification as Exhibit
21       Poulton-34.)
22   BY MS. O'DELL:
23       Q.   Let me show you what I've
24   marked as Exhibit 34.  It's something

1    that was in the binders that were
2    prepared for you.  It's a printout from a
3    website that you referenced in your
4    reliance materials.  I think it's called
5    OneMine.org?
6        A.   Yes.
7        Q.   And is that the web page
8    which you relied on in reaching your
9    opinions in this case?
10       MR. CHACHKES:  Objection.
11       THE WITNESS:  I used this
12       website to search for documents.
13   BY MS. O'DELL:
14       Q.   Is that the page that --
15   that -- does that page reflect data that
16   you reviewed and relied on in reaching
17   your opinions?
18       MR. CHACHKES:  Objection.
19       THE WITNESS:  This page is a
20       search box.
21   BY MS. O'DELL:
22       Q.   What searches did you
23   perform using OneMine.org?
24       A.   So I searched for talc.  I

1    searched for sampling.  I believe I
2    searched for asbestos.
3        Q.   Any other searches?
4        A.   Possibly.  I don't remember.
5        Q.   You also testified
6    regarding -- I think you used the -- the
7    term "buffer."
8        You were asked the question:
9    "Based on your review of the documents in
10   this case and your experience, what's
11   your opinion on what happened in practice
12   for the mines that sourced -- that J&J
13   sourced its cosmetic talc from?"
14       Do you remember that
15   question?
16       A.   Is that a question that Alex
17   asked?
18       Q.   Correct.
19       A.   Okay.
20       Q.   And -- and you testified
21   that -- about a buffer zone that was left
22   in the mining process used to source J&J
23   talc.
24       What data are you relying on

Mary Poulton, Ph.D.

Page 370

1  regarding the use of a buffer zone?
2      A.   So can you read the exact
3  question?
4      Q.   "Based on your review of the
5  documents in this case and your
6  experience, what's your opinion on what
7  happened in practice for the mines that
8  J&J sourced its cosmetic talc from?"
9          And I want to know -- you
10  testified to a buffer zone, and I want to
11  know what you're relying on to state that
12  there was a buffer zone used.
13     A.   So I believe in reading
14  through the documents, they talked about
15  staying away from the black wall and
16  using that as the boundary.  And they
17  also talked about leaving rock behind for
18  support.
19     Q.   And that was in underground
20  mines?
21     A.   Underground.
22         MS. O'DELL:  Okay.  I have
23  nothing further.  Thank you.
24         THE VIDEOGRAPHER:  This

Page 371

1  marks the end of today's
2  deposition.  The time is 7:58 p.m.
3      (Excused.)
4      (Deposition concluded at
5  approximately 7:58 p.m.)

Page 372

1
2          CERTIFICATE
3
4
5      I HEREBY CERTIFY that the
witness was duly sworn by me and that the
6  deposition is a true record of the
testimony given by the witness.
7
       It was requested before
8  completion of the deposition that the
witness, MARY POULTON, Ph.D., have the
9  opportunity to read and sign the
deposition transcript.
10
11
12
       MICHELLE L. GRAY,
13  A Registered Professional
Reporter, Certified Shorthand
14  Reporter, Certified Realtime
Reporter and Notary Public
15  Dated:  March 19, 2019
16
17
18     (The foregoing certification
19  of this transcript does not apply to any
20  reproduction of the same by any means,
21  unless under the direct control and/or
22  supervision of the certifying reporter.)
23
24

Page 373

1  INSTRUCTIONS TO WITNESS
2
3      Please read your deposition
4  over carefully and make any necessary
5  corrections.  You should state the reason
6  in the appropriate space on the errata
7  sheet for any corrections that are made.
8      After doing so, please sign
9  the errata sheet and date it.
10     You are signing same subject
11  to the changes you have noted on the
12  errata sheet, which will be attached to
13  your deposition.
14     It is imperative that you
15  return the original errata sheet to the
16  deposing attorney within thirty (30) days
17  of receipt of the deposition transcript
18  by you.  If you fail to do so, the
19  deposition transcript may be deemed to be
20  accurate and may be used in court.

Mary Poulton, Ph.D.

Page 374

```
 1         - - - - - -
             E R R A T A
 2         - - - - - -

 3

 4  PAGE  LINE  CHANGE

 5  _____  _____

 6     REASON: _____

 7  _____  _____

 8     REASON: _____

 9  _____  _____

10     REASON: _____

11  _____  _____

12     REASON: _____

13  _____  _____

14     REASON: _____

15  _____  _____

16     REASON: _____

17  _____  _____

18     REASON: _____

19  _____  _____

20     REASON: _____

21  _____  _____

22     REASON: _____

23  _____  _____

24     REASON: _____
```

Page 376

```
 1         LAWYER'S NOTES
 2  PAGE  LINE

 3  _____ _____  _____

 4  _____ _____  _____

 5  _____ _____  _____

 6  _____ _____  _____

 7  _____ _____  _____

 8  _____ _____  _____

 9  _____ _____  _____

10  _____ _____  _____

11  _____ _____  _____

12  _____ _____  _____

13  _____ _____  _____

14  _____ _____  _____

15  _____ _____  _____

16  _____ _____  _____

17  _____ _____  _____

18  _____ _____  _____

19  _____ _____  _____

20  _____ _____  _____

21  _____ _____  _____

22  _____ _____  _____

23  _____ _____  _____

24  _____ _____  _____
```

Page 375

```
 1

 2      ACKNOWLEDGMENT OF DEPONENT

 3

 4      I,_____, do

 5  hereby certify that I have read the

 6  foregoing pages, 1 - 376, and that the

 7  same is a correct transcription of the

 8  answers given by me to the questions

 9  therein propounded, except for the

10  corrections or changes in form or

11  substance, if any, noted in the attached

12  Errata Sheet.

13

14

15  _____

16  MARY POULTON, Ph.D.        DATE

17

18

19  Subscribed and sworn
      to before me this

20  _____ day of _____, 20____.

21  My commission expires:_____

22

23  Notary Public

24
```