# Exhibit 2

                                        Page 1

 1              UNITED STATES DISTRICT COURT
 2                  DISTRICT OF NEW JERSEY
 3      ---------------------------
 4      IN RE:  JOHNSON & JOHNSON    MDL NO.:
        TALCUM POWDER PRODUCTS       16-2738 (MAS)(RLS)
 5      MARKETING, SALES PRACTICES,
        AND PRODUCTS LIABILITY
 6      LITIGATION
 7      ---------------------------
 8              SUPERIOR COURT OF NEW JERSEY
 9            LAW DIVISION, ATLANTIC COUNTY
10      ---------------------------------
11      BRANDI CARL,                    DOCKET NO.
              Plaintiff,           ATL-L-06546-14
12
        V.                          TALC-BASED POWDER
13
        JOHNSON & JOHNSON, ET AL.,   PRODUCTS LITIGATION
14            Defendants.            CASE NO. 300
        ---------------------------------
15
        DIANA BALDERRAMA,               DOCKET NO.
16            Plaintiff,           ATL-L-6540-14
17      V.                          TALC-BASED POWDER
18      JOHNSON & JOHNSON, ET AL.,   PRODUCTS LITIGATION
              Defendants.            CASE NO. 300
19      ---------------------------------
20                  EXPERT DEPOSITION OF
21              KATHLEEN M. SUTCLIFFE, PHD
22          Tuesday, May 28, 2024, 9:11 a.m.
23
        Reported by:  Denise Dobner Vickery, CRR, RMR
24      JOB NO.: 6717900

Page 2

```
 1
 2
 3
 4
 5
 6
 7
 8                    Tuesday, May 28, 2024
 9                    9:11 a.m.
10
11          Expert Deposition of KATHLEEN M.
12   SUTCLIFFE, PHD, held at the offices of:
13
14          SKADDEN ARPS SLATE MEAGHER & FLOM LLP
15          The Washington Building
16          1440 New York Avenue NW
17          Washington, DC 20005
18
19
20          Pursuant to notice, before Denise
21   Dobner Vickery, Certified Realtime Reporter,
22   Registered Merit Reporter, and Notary Public in
23   and for the District of Columbia.
24
```

Page 4

```
 1   APPEARANCES:
 2
 3   For NEW JERSEY PLAINTIFFS:
 4        ANAPOL WEISS
 5          BY:  RICHARD GOLOMB, ESQ.
 6        One Logan Square
 7        130 N 18th Street, Suite 1600
 8        Philadelphia, PA 19103
 9        215.929.8822
10        rgolomb@anapolweiss.com
11
12
13
14   For DEFENDANTS JOHNSON & JOHNSON AND JOHNSON &
15   JOHNSON CONSUMER INC.:
16        KING & SPALDING LLP
17          BY:  JOHN EWALD, ESQ.
18          BY:  JAKE KEESTER, ESQ.
19        1185 Avenue of the Americas
20        New York, NY 10036
21        212.790.5341
22        jewald@kslaw.com
23        jkeester@kslaw.com
24
```

Page 3

```
 1   APPEARANCES:
 2
 3   For PLAINTIFFS:
 4        LEVIN PAPATONIO RAFFERTY PROCTOR
 5        BUCHANAN O'BRIEN BARR & MOUGEY, PA
 6          BY:  CHRISTOPHER V. TISI, ESQ.
 7        316 South Baylen Street, Suite 600
 8        Pensacola, FL 32502-5996
 9        850.435.7999
10        ctisi@levinlaw.com
11
12
13   For MDL PLAINTIFFS (Via Zoom):
14        BEASLEY ALLEN
15          BY:  RYAN BEATTIE, ESQ.
16          BY:  DR. MARGARET M. THOMPSON, ESQ.
17          BY:  LEIGH O'DELL, ESQ.
18        218 Commerce Street
19        Montgomery, AL 36103-4160
20        308.874.3186
21        ryan.beattie@beasleyallen.com
22        margaret.thompson@beasleyallen.com
23        leigh.odell@beasleyallen.com
24
```

Page 5

```
 1   APPEARANCES
 2
 3   For PERSONAL CARE PRODUCTS COUNCIL (PCPC)
 4   (Via Zoom):
 5        REILLY MCDEVITT & HENRICH PC
 6          BY:  SUZANNE I. TURPIN, ESQ.
 7        3 Executive Campus, Suite 310
 8        Cherry Hill, NJ 08002
 9        856.317.7180
10        sturpin@rmh-law.com
11
12
13
14   ALSO PRESENT:
15        JEFFERY WRIGHT, Paralegal
16        LEVIN PAPATONIO
17
18
19
20
21
22
23
24
```

2 (Pages 2 - 5)

Page 6

1                    INDEX
2 EXAMINATION OF KATHLEEN M. SUTCLIFFE, PHD    PAGE
3 BY MR. TISI                14
4 AFTERNOON SESSION                265
5 BY MR. GOLOMB                431
6 BY MR. TISI                480
7 FURTHER BY MR. EWALD                485
8 FURTHER BY MR. GOLOMB                488
9 FURTHER BY MR. TISI                489
10 FURTHER BY MR. EWALD                496
11
12
13
14
15
16
17       LITIGATION SUPPORT INDEX
18 QUESTION/ANSWER MARKED    PAGE 118
19
20
21
22
23
24

Page 8

1 EXHIBIT 10  Memo to File; Talc/Asbestos    195
2        Meeting with Commissioner
3        Schmidt, FDA, January 16 1974
4        JNJ 000259267 - JNJ 000259270
5 EXHIBIT 11  Excel Spreadsheet; Product    201
6        Stewardship/Baby Discussion
7        October 2010
8        JNJ 000444327 - JNJ 000444346
9 EXHIBIT 12  Ovarian Cancer and Talc, A    207
10        Case-Control Study, Cramer et al.
11        JNJ 000384063 - JNJ 000384073;
12        Cancer Prevention Coalition
13        Citizen Petition Seeking Carcinogenic
14        Labeling on All Cosmetic Talc
15        Products, September 17, 1994, Kessler
16 EXHIBIT 13  Perineal Exposure to Talc and    214
17        Ovarian Cancer Risk, Harlow et al
18        July 1992
19 EXHIBIT 14  Perineal Powder Exposure and the  221
20        Risk of Ovarian Cancer, Cook et al
21        1996
22 EXHIBIT 15  Mineral Fiber Exposure and the    224
23        Development of Ovarian Cancer
24        Rosenblatt et all, 1992

Page 7

1        SUTCLIFFE DEPOSITION EXHIBITS
2 NUMBER        DESCRIPTION            PAGE
3 EXHIBIT 1    Appendix A Curriculum Vitae    15
4 EXHIBIT 2    April 12, 2024 Expert Report of   15
5        Kathleen M. Sutcliffe, Ph.D. with
6        Appendices and Exhibits
7 EXHIBIT 3   Notice of Deposition        74
8 EXHIBIT 4   **SKIPPED**
9 EXHIBIT 5   FDA Authority Over Cosmetics:   150
10        How Cosmetics Are Not FDA-Approved,
11        But Are FDA-Regulated
12 EXHIBIT 6  October 17, 2011 Expert Report of 169
13        Kathleen M. Sutcliffe, Ph.D. in the
14        Oil Rig "Deepwater Horizon" Case
15 EXHIBIT 7   April 12, 2024 Expert Report of  181
16        Kathleen M. Sutcliffe, Ph.D.
17 EXHIBIT 8   Johnson & Johnson SOP 2010    183
18        Preparation of Safety Surveillance
19        Reports for U.S. Marketed Products
20        JNJ 000771212 - JNJ 000771236
21 EXHIBIT 9   **SKIPPED**            --
22
23
24

Page 9

1 EXHIBIT 16  A Meta-Analytical Approach    225
2        Examining the Potential Relationship
3        Between Talc Exposure and Ovarian
4        Cancer, Gross and Berg, 1995
5 EXHIBIT 17  Genital Talc Exposure and Risk   230
6        of Ovarian Cancer, Cramer et al 1998
7 EXHIBIT 18  Perineal Talc Exposure and    235
8        Epithelial Ovarian Cancer Risk in
9        The Central Valley of California
10        Mills et al, 2004
11 EXHIBIT 19  Genital Powder Use and Risk of   243
12        Ovarian Cancer: A Pooled Analysis
13        Of 8,525 Cases and 9,859 Controls
14        Terry et al, 2013
15 EXHIBIT 20  Top E-mail 7/9/1999 RE: Talc fyi  249
16        JNJ 000564377 - JNJ 000564378
17 EXHIBIT 21  Risk Factors Genetics and    258
18        Screening, Ovarian, Fallopian or
19        Primary Peritoneal Cancer Risk
20        Factors
21 EXHIBIT 22  Johns Hopkins Ovarian Cancer    261
22        Center, About Ovarian Cancer, 2010
23
24

Golkow Technologies,
877-370-3377        A Veritext Division        www.veritext.com

Page 10

1  EXHIBIT 23  Jones Memo February 4, 1994,    277
2        Subject: Talc Symposium Follow-up
3        JNJ 000022605
4  EXHIBIT 24  Jones Memo April 17, 1995,    279
5        Subject: Talc Comments by
6        Dr. John Bailey of FDA
7        JNJ 000023191
8  EXHIBIT 25  February 10, 1998,    291
9        FDA's Cosmetics Program
10       PCPC0058604 - PCPC0058654
11 EXHIBIT 26  Musser Letter April 1, 2014 to    297
12       Epstein, Cancer Prevention Coalition
13 EXHIBIT 27  Wehner Letter 9/17/97 to    315
14       Chudkowski, Preclinical Toxicology
15       JNJ 000040596 - JNJ 000040597
16 EXHIBIT 28  Epstein Letter November 10, 1994  323
17       to Larson, Johnson & Johnson
18       JNJ 000016645 - JNJ 000016646
19 EXHIBIT 29  Jones Memo January 24, 1995    328
20       Subject: Proposal for New Talc Study
21       JNJ 000000081 - JNJ000000083
22
23
24

Page 11

1  EXHIBIT 30  CTFA Memorandum October 27, 2000  345
2        Subject: Proposal from Nichols-
3        Dezenhall on Talc
4        PCPC_MDL00144426 - PCPC_MDL00144435
5  EXHIBIT 31  **SKIPPED**    --
6  EXHIBIT 32  E-mail November 17, 2000    351
7        Subject: Monday 11/20 Talc Meeting
8        Attachment
9        JNJ 000368160 - JNJ 000368163
10 EXHIBIT 33  Health Canada; A Draft Screening  364
11       Assessment of Talc Proposes That
12       It May Be Harmful to Human Health
13 EXHIBIT 34  **SKIPPED**    --
14 EXHIBIT 35  Federal Register March 28, 2024  374
15       EPA Asbestos Par 1: Chrysotile
16       Asbestos; Regulation of Certain
17       Conditions of Use Under the Toxic
18       Substances Control Act (TSCA)
19 EXHIBIT 36  Designation Run Report    378
20       Hopkins 4-11 on 10-20
21 EXHIBIT 37  Toxic Substances Control Act of  386
22       1973, Environment Subcommittee
23       February 23, 26, and March 21, 1973
24

Page 12

1  EXHIBIT 38  Ingham v. J&J Trial Transcript  393
2        Volume 25, July 6, 2018 Excerpts
3  EXHIBIT 39  **SKIPPED**    --
4  EXHIBIT 40  July 14, 1975 Antiperspirant OTC  401
5        Drug Review Panel File, J. Merritt
6        Meeting XII, July 9 and 10, 1975
7        JNJ 000030027 - JNJ 000030035
8  EXHIBIT 41  White Paper: IWGACP Scientific  404
9        Opinions on Testing Methods for
10       Asbestos in Cosmetic Products
11       Containing Talc, December 2021
12       P-2318 - P-2318_030
13 EXHIBIT 42  **SKIPPED**    --
14 EXHIBIT 43  **SKIPPED**    --
15 EXHIBIT 44  Rio Tinto Issue briefing - talc  414
16       quality assurance letters
17       IMERYS 243558 - IMERYS 243569
18 EXHIBIT 45  Amphibole Content of Cosmetic    420
19       And Pharmaceutical Talcs, Blount
20       JNJNL61_000014431 - JNJNL61_000014437
21 EXHIBIT 46  Hatcher Letter March 16, 1998 to  424
22       O'Shaughnessy
23       JNJ 000064591 - JNJ 000064592
24

Page 13

1  EXHIBIT 47  Blount Letter April 23, 1998 to  428
2        Hatcher, Received April 27, 1998
3        JNJNL61_000052427 - JNJNL61_000052449
4  EXHIBIT 48  Analysis Group Invoices;    78
5        April 19, 2024, May 16, 2024
6  EXHIBIT 49  Handwritten Notes    86
7        Dr. Nicholson 2/5/21, and
8        Dr. Hopkins 2020
9  EXHIBIT 50  **SKIPPED**    --
10 EXHIBIT 51  Talc: Consumer Uses and Health  275
11       Perspectives, Bethesda, Maryland
12       January 31-February 1, 1994, Carr
13       IMERYS 210870 - IMERYS 210874
14 EXHIBIT 52  Top E-mail November 14, 2000    352
15       Subject: FW: Talc - Nov 9th
16       JNJ 000404424 - JNJ 000404429
17
18
19
20
21
22       (Exhibits attached to transcript.)
23
24

4 (Pages 10 - 13)

1     P R O C E E D I N G S
2              - - -
3          KATHLEEN M. SUTCLIFFE, PHD
4  called for examination, and, after having been
5  duly sworn, was examined and testified as
6  follows:
7              - - -
8          EXAMINATION
9              - - -
10  BY MR. TISI:
11     Q.     Good morning.
12     A.     Good morning.
13     Q.     Please state your name.
14     A.     Kathleen M. Sutcliffe.
15     Q.     And are you what's called a -- you
16  have a PhD in Organization Theory and Behavior?
17     A.     Correct.
18     Q.     And would it be fair that you
19  describe yourself as an expert in what is called
20  organization behavior and theory?
21     A.     Organization science, organization
22  behavior, organization theory.  Correct.
23     Q.     Okay.  And you are designated in
24  this case as an expert in that field, correct?

1     A.     Correct.
2          MR. TISI:  All right.  I'd
3     like to hand you what is marked as
4     Exhibit Number 1, which is a copy of your
5     report but I -- excuse me.  A copy of
6     your curriculum vitae.
7          (Document marked for
8     identification as Sutcliffe Exhibit 1.)
9  BY MR. TISI:
10     Q.     And this is -- this is curriculum
11  vitae.
12          Is this your professional resumé?
13     A.     Correct.
14     Q.     Is it complete as of today?
15     A.     Let me just check one thing.
16          If it was -- came from the report,
17  it is complete as of today.
18          MR. TISI:  Okay.  And Exhibit
19     Number 2 I'm going to have marked,
20     although I see you have in front of you,
21     your expert report with appendices and
22     exhibits.
23          (Document marked for
24     identification as Sutcliffe Exhibit 2.)

1  BY MR. TISI:
2     Q.     And you can use your own if you
3  would prefer.
4     A.     I would prefer.
5     Q.     Does this contain the opinions
6  you're prepared to give in this case?
7     A.     Yes.
8     Q.     Okay.  You know I represent women
9  who claim that the use of Johnson & Johnson's baby
10  powder caused them to develop ovarian cancer,
11  correct?
12     A.     Yes.
13     Q.     And you understand that the
14  plaintiffs I represent allege that J&J has known
15  for decades that talc and baby powder may pose --
16  may pose a health risk to consumers and that they
17  covered up these health risks, correct?
18     A.     Would you restate your question,
19  please?
20     Q.     Yes.
21          You understand that the plaintiffs
22  that I represent allege that J&J has known for
23  decades that talc in its baby powder may pose
24  health risks to consumers?

1     A.     I saw that in the complaint.
2     Q.     Okay.  And you understand that the
3  plaintiffs that I represent contend that J&J and
4  its related consumer company ignored over half a
5  century of data and failed to adequately ensure
6  the safety to its customers, correct?
7     A.     I understand the claim.
8     Q.     And you understand that we claim
9  that they should have mitigated those risks by
10  doing several things:  Number one, replacing talc
11  with cornstarch in its powder products, correct?
12     A.     I understand the complaint.
13     Q.     And you understand that we claim
14  that they should have instructed women not to use
15  talc for feminine hygiene, correct?
16     A.     I understand the claim.
17     Q.     Okay.  And you understand that we
18  claim that they failed to warn consumers and women
19  of the potential risk of ovarian cancer, correct?
20     A.     I don't have the complaint in front
21  of me, but I understand the claim.
22     Q.     Okay.  And you understand we claim
23  that they failed to study adequately their
24  products, correct?

5 (Pages 14 - 17)

Page 18

1    A.    I -- I don't recall that specific
2 sentence, but I understand the claim.
3    Q.    Okay.  Now, in your report --
4         MS. TURPIN:  I hate to
5    interrupt, but we can't really hear
6    Dr. Sutcliffe's testimony.  We can hear
7    the questioning very clearly, but her --
8    I think her volume needs to be turned up.
9         MR. EWALD:  Kathleen, speak up
10   a little bit more.
11        THE WITNESS:   Okay.
12        MR. EWALD:  I know she has
13   allergies.
14        THE WITNESS:  I'm a little --
15   I have a little -- yeah.  Okay.
16        MR. EWALD:  Let me see the
17   mic.
18        THE WITNESS:  I will try.
19        MR. TISI:  Let's go off the
20   record, if you don't mind.
21        MR. EWALD:  Yeah.
22        (Recess:  9:15 a.m. -
23        9:15 a.m.)
24 BY MR. TISI:

Page 19

1    Q.    Now, in your report, Exhibit
2 Number 2, you have a section entitled "Plaintiffs'
3 Causal Narrative" where you characterize what you
4 believe to be the plaintiffs' claims, correct?
5    A.    Correct.
6    Q.    All right.  And you call us and our
7 expert's interpretation of the data and the
8 evidence cherry-picking, don't you?
9    A.    Yes.
10   Q.    And you mention that several times
11 in your report, correct?
12   A.    Yes.
13   Q.    You would never want to be accused
14 of that, correct?
15   A.    It is a bad practice.
16   Q.    And you believe that your
17 methodology does not -- accounts for
18 cherry-picking, correct?
19   A.    My methodology is a well-known,
20 established qualitative methodology that is very
21 -- that is excellent for the kind of work that I
22 have done.
23   Q.    Okay.  And you call that sensemaking
24 methodology, correct?

Page 20

1    A.    No, that's not correct.
2    Q.    What is the methodology called?
3    A.    The methodology is a qualitative
4 methodology.
5    Q.    What is it called?
6    A.    It is called a qualitative
7 methodology.
8    Q.    That doesn't have a name in your --
9 in your field of practice?
10        Qualitative methodology is something
11 that can be used across -- across disciplines.
12        Do you have anything in your field
13 where you identify it as a methodology?
14   A.    A qualitative methodology can be
15 used across disciplines, and it is used in the
16 area of organization science.
17   Q.    Okay.  Now, particularly you
18 reviewed the reports of David Kessler, former FDA
19 Commissioner, correct?
20   A.    I have looked at many -- at many
21 reports.  I'm not sure what you're asking.
22   Q.    I'm asking you:  You've reviewed the
23 expert report of David Kessler, an FDA
24 Commissioner, correct?

Page 21

1    A.    Yes, I did.
2    Q.    Okay.
3    A.    Which did not include any kind of
4 methodology.
5    Q.    Okay.  That wasn't my question.
6 Please answer my questions, ma'am.
7    A.    I reviewed the report, and as I
8 said, it didn't contain a methodology.
9    Q.    That wasn't my question.
10        Did you review the report?
11   A.    I reviewed the report.
12        MR. EWALD:  She answered your
13    question.
14 BY MR. TISI:
15   Q.    Okay.  Did you -- did you review the
16 report of George Newman, an expert in marketing
17 and a psychologist, correct?
18   A.    I did.
19   Q.    Okay.  Did you review any other
20 reports that you can remember of any other
21 plaintiffs' experts?
22   A.    I do not.  I may have reviewed
23 reports over the five years I've been studying
24 this.  I don't remember.

6 (Pages 18 - 21)

Page 22

1    Oh, yeah.  I reviewed David or --
2 oh, my gosh.  Now I'm blocking on his name but,
3 anyway, I reviewed reports last fall.
4    Q.    Do you remember who it was?
5    A.    David Michaels.
6    Q.    Okay.  And have you reviewed any
7 depositions --
8    A.    I --
9    Q.    -- of any experts?
10    A.    I reviewed Dr. Kessler's deposition.
11    Q.    Okay.  Did you review Dr. Newman's
12 deposition?
13    A.    No.
14    Q.    And you believe their analysis is
15 flawed because they engage in what you call
16 hindsight bias, correct?
17    A.    Correct.
18    Q.    Okay.  And to combat hindsight bias,
19 you say your methodology considers what was being
20 said and done in the medical and scientific
21 community and by other stakeholders and what they
22 did at the time, correct?
23    A.    Correct.
24    Q.    Okay.  And not with the benefit of

Page 23

1 what we know now, correct?
2    A.    Not -- not with the benefit of what
3 we know now.
4    Q.    All right.  So --
5    A.    I wanted to understand the context
6 of action from the perspective of the
7 participants.
8    Q.    At the time?
9    A.    What was happening at the time.
10    Q.    And so it's important for you as an
11 expert to actually look at the data as it
12 developed over time, correct?
13    A.    I looked at a large amount of data
14 over time.  In fact, a large amount of data over
15 decades.
16    Q.    Perfect, and we're going to ask --
17 I'm going to ask some of those questions.
18    Okay?
19    A.    (Nods head).
20    Q.    Okay.  So what is sensemaking?
21 We've talked about that as part of your process.
22    What is sensemaking?
23    A.    Sensemaking is a well-established
24 conceptual framework in organization theory.

Page 24

1    Q.    Okay.  And what is sensemaking?
2 Explain it to me as if I was your Uncle Charlie.
3 Tell me in a very basic way.
4    A.    In a basic way, sensemaking is the
5 process of how information enters an organization,
6 how it's interpreted, how it's acted upon, how it
7 is reaffirmed.  Essentially, it answers two
8 questions: What's the story?  And now what?
9    Q.    Okay.  What's the story?  And now
10 what?
11    And that's dependent upon the things
12 that were available, for example, in this case,
13 the medical and scientific literature, correct?
14    A.    It's dependent on many kinds of
15 things.
16    Q.    Okay.  I'm asking you the kinds of
17 examples.
18    What was being said in the medical
19 and scientific committee -- scientific community
20 one of the things that would come into an
21 organization like this?
22    A.    It's -- I guess I would back up --
23    Q.    Uh-huh.
24    A.    -- and I would say that it's

Page 25

1 dependent on thinking about how is organization --
2 how is information coming into an organization.
3    Q.    Okay.
4    A.    Is it -- is it broad?  Is it deep?
5 Is it narrow?  Etc.
6    Q.    Would you expect a company that
7 is -- that is marketing consumer product where
8 science is an issue to keep up with the science
9 and medical information in the community at the
10 time?
11    A.    I -- the best practices in
12 sensemaking reveal that you would like to have a
13 broad and rich understanding of what's happening
14 in the environment.
15    Q.    Okay.  And the environment would
16 include the medical -- in this case -- would
17 include what's happening in the medical and
18 scientific community, correct?
19    A.    In this case, the environment would
20 include a lot of things, including what's going on
21 in the scientific community.
22    Q.    As well as what's going on in the
23 regulatory community, correct?
24    A.    As well as what's going on in the

7 (Pages 22 - 25)

Page 26

1 regulatory community, correct.
2    Q.    And academic community, correct?
3    A.    Correct.
4    Q.    All right.  Now, applying this
5 methodology, you have concluded in your report
6 that -- and I'm quoting on page 81.  You can check
7 it if you want.
8         "Over the course of decades, Johnson
9 & Johnson paid attention to knowledge in the
10 external environment; it devoted attention and
11 resources to the interpretation of that knowledge;
12 and it took actions as a result of that
13 knowledge."
14         Correct?
15    A.    Can you tell me where you're
16 reading? Because I don't see it.
17    Q.    Yeah.  Page 81.
18    A.    Right.
19    Q.    Paragraph 189.
20    A.    Okay.  Yep.
21    Q.    Okay.  And you say that you would
22 have expected a company like J&J to have looked
23 at -- out for the well-being of its consumers,
24 correct?

Page 27

1    A.    I'm sorry.  Your question didn't
2 make sense to me.
3    Q.    Okay.  You would expect a company
4 like J&J to look out for the well-being of its
5 consumers, correct?
6    A.    That's what my analysis is all
7 about.
8    Q.    Okay.  And before we go any further,
9 let me ask you a couple preliminary questions
10 before we go much deeper.
11         First, you understand that Johnson's
12 talcum powder products are in a class of consumer
13 products called cosmetics, correct?
14    A.    I understand it's a cosmetic
15 product.
16    Q.    All right.  And these are marketed
17 and manufactured -- these cosmetics are subject to
18 the Food, Drug, and Cosmetic Act, correct?
19    A.    I don't know the ins and outs of the
20 regulations, but I understand that -- that it's a
21 cosmetic product.
22    Q.    Well, you understand that it is --
23 it is subject to the Federal Food, Drug, and
24 Cosmetic Act.  Either you know that or you don't.

Page 28

1    A.    I have to say, I understand that
2 it's -- it's a cosmetic product and I have not --
3 I don't know the ins and outs of all the
4 regulatory language.
5    Q.    I didn't ask you whether you knew
6 the ins and outs of it.
7         Do you know that it is covered by
8 the Federal Food, Drug, and Cosmetic Act?
9    A.    I know that the FDA -- that J&J
10 works closely with the FDA.
11    Q.    And so they are subject to the
12 Federal Food, Drug, and Cosmetic Act?
13    A.    Okay.  I don't know the Cosmetic
14 Act.
15    Q.    Okay.
16    A.    So I can't say one way or another.
17    Q.    Now, it says in your report,
18 Exhibit 2, page 7, paragraph 20, as part of your
19 narrative of the plaintiffs' claims --
20         MR. GOLOMB:  Sorry.  What
21    page?
22         MR. TISI:  7.
23         THE WITNESS:  Page 7 in my
24    report.

Page 29

1 BY MR. TISI:
2    Q.    Paragraph 20.
3    A.    Yep.
4    Q.    Very last sentence says:
5         "The fact that J&J's baby powder was
6 an effective and successful product over many
7 decades is not in dispute."
8         Do you see that?
9    A.    Yes.
10    Q.    Okay.  Do you understand that J&J
11 cannot represent or advertise that these powders
12 have any medical benefit or effect on human
13 beings?  Do you have any understanding about that
14 whatsoever?
15    A.    I have an understanding that it --
16 that the product is not a medical product, but
17 clinically it has many, many uses.
18    Q.    Okay.
19    A.    And, you know, it's -- I mean, for
20 people who have urticaria.  It's really important
21 for people who have fungus infections, and it can
22 soothe them.  So it has clinical properties.
23    Q.    Do you understand that -- that it is
24 not -- it is not approved as a medication and no

8 (Pages 26 - 29)

Page 30

1 representations can be made about its
2 effectiveness as a -- as a medical product?
3    A.    I --
4    Q.    You don't know?
5    A.    I said, it is not a medical product.
6    Q.    Okay.
7    A.    It is not -- it is not a medical
8 product. I said that in my last answer.
9    Q.    And you know that no claims could be
10 made as in terms of effectiveness as a medical
11 product, correct?
12    A.    I -- I --
13    Q.    You don't know?
14    A.    It's not a medical product, and as
15 far as I know, there are no claims made about a
16 medical product.
17    Q.    Okay. Second, you know over the
18 years J&J advertised Johnson's Baby Powder as
19 pure, correct?
20    A.    I have seen marketing.
21    Q.    Okay. That's not my -- you need to
22 answer my question.
23        Do you understand that over the
24 years J&J has advertised the product as pure talc?

Page 31

1    A.    I have seen its advertisements as
2 pure talc.
3    Q.    Okay. And pure enough to be put on
4 babies, correct?
5    A.    I have seen that language.
6    Q.    And pure enough to use on the most
7 intimate parts of a woman's body, correct?
8    A.    I have seen marketing materials.
9    Q.    That say that?
10    A.    Yes.
11    Q.    Okay. You need to actually answer
12 my question, if you don't mind. Saying "marketing
13 materials" doesn't answer my question.
14    A.    Okay.
15    Q.    Thank you.
16        You understand that the only
17 ingredients that ever been listed on talc -- on
18 Johnson's Baby Powder are talc and fragrance,
19 correct?
20    A.    I have not looked at the ingredients
21 on the product. So I can't really answer your
22 product -- your question. Sorry.
23    Q.    You understand that Johnson &
24 Johnson has always represented talc was and always

Page 32

1 has been asbestos-free, correct?
2    A.    If you want to show me something
3 where it says that.
4    Q.    You've reviewed the -- you've
5 reviewed thousands of pages?
6    A.    I have.
7    Q.    Okay. You know that they have
8 represented that talc is asbestos-free, correct?
9    A.    The institutionalized knowledge is
10 that talc is asbestos-free. Correct.
11    Q.    Okay. Third, you don't dispute, do
12 you, that well over half a century there have been
13 questions raised in the medical and scientific
14 community relating to the safety of talc,
15 including whether it could cause ovarian cancer?
16    A.    I'm a little concerned about the
17 general nature of your question, and so is there's
18 something that you'd like me to take a look at?
19    Q.    I want you -- I want to ask you the
20 question that I'm asking you, ma'am.
21        Over the past five decades, have you
22 seen reference to various articles, papers, etc.,
23 that there have been concerns about talc and
24 whether or not talc causes ovarian cancer?

Page 33

1    A.    There has been -- over the past
2 decades have been allegations raised at various
3 times, at which I think about as disruptive
4 ambiguity.
5    Q.    Okay. In terms of whether or not
6 talc can cause ovarian cancer?
7    A.    I have seen -- I have seen lots of
8 things related to asbestos and related to the
9 safety of the product, right.
10    Q.    Okay. Including whether or not talc
11 can cause ovarian cancer?
12    A.    It has been -- it has -- that has
13 been raised.
14    Q.    Okay. And it has been something
15 that has been fairly consistent, even as of today,
16 as to whether talc can cause ovarian cancer.
17 True?
18        MR. EWALD: Objection to form.
19        THE WITNESS: I don't -- I
20    don't know what "consistent" means.
21        All I can say is that, yes,
22    that the issue has been raised and I've
23    heard about the issue. Correct.
24 BY MR. TISI:

9 (Pages 30 - 33)

Page 34

1    Q.    Okay.  It was raised in the 1970s in
2  the Henderson paper where they found talc in the
3  ovaries of women with ovarian cancer, correct?
4    A.    I would have to take another look at
5  the Henderson paper because I don't remember it.
6    Q.    Do you remember that there was a
7  study in the 1970s that talked about talc in
8  ovaries of women with ovarian cancer?
9    A.    Again, I do not recall specifically.
10  I probably reviewed that paper.  I don't remember
11  it.
12    Q.    Do you remember in the 1980s there
13  were epidemiology studies by, for example,
14  Dr. Cramer?
15    A.    I am aware of Dr. Cramer's study,
16  which of course was, you know, called into
17  question.
18    Q.    Okay.  Are you aware that there are
19  plenty of other studies in the 1990s, 2000s, 2010s
20  relating to the question of whether or not talc is
21  associated with the risk of ovarian cancer,
22  correct?
23        MR. EWALD:  Objection to form.
24        THE WITNESS:  I -- I know

Page 35

1        there have been studies.  I have not
2        reviewed all of the scientific literature
3        because I'm not an epidemiologist, but I
4        am aware that there have been studies
5        conducted.
6  BY MR. TISI:
7    Q.    Well, you are aware -- and we'll
8  talk about this -- but you are aware that during
9  the course of those studies that recommendations
10  were made to the company to do the things that we
11  talked about before: warnings, changing to
12  cornstarch, instructions to women not using -- not
13  using talc in their -- in their private areas, to
14  do additional studies.
15        You remember all of those, correct?
16        MR. EWALD:  Objection to form.
17        Go ahead.
18        THE WITNESS:  Again, I did
19        not do a review of all of the scientific
20        literature because I'm not an
21        epidemiologist and I'm not --
22  BY MR. TISI:
23    Q.    I'm not asking --
24    A.    -- opining on that today.

Page 36

1    Q.    I'm not asking --
2        MR. EWALD:  Hold on.  You're
3        talking over her a couple times, Chris.
4        I know it's inadvertent, but you just let
5        her finish her answer to your questions.
6  BY MR. TISI:
7    Q.    Okay.  You need to answer my
8  question.
9        My question is:  Do you know whether
10  or not in the context of the public literature
11  there were questions raised about whether or not
12  additional steps ought to be taken to -- you need
13  to -- you're about ready to answer my question.
14    A.    I -- again --
15    Q.    Okay.
16    A.    -- you know, if you -- if you want
17  me to look at a specific --
18    Q.    Oh, I'm going to.
19    A.    -- document, that would be fine.
20    Q.    I'm going to.
21    A.    I'm not opining on the epidemiology
22  and -- and so I can't say.
23    Q.    You didn't -- you didn't actually --
24  before you start answering my question, you didn't

Page 37

1  let me finish my question.  So let me ask you the
2  question.
3        In the context of the literature,
4  there were discussions about whether or not
5  additional steps needed to be taken to protect
6  women from the potential for ovarian cancer.
7        Do you know that to be true or not
8  true?
9    A.    It would be good if you were giving
10  me a document --
11    Q.    I will.
12    A.    -- that I can specifically look at.
13        MR. EWALD:  Well, Chris, it
14        keeps happening where she is clearly in
15        the middle of her answer and you are
16        interrupting her.
17        MR. TISI:  I will answer.  I
18        will show you.
19        MR. EWALD:  So let her finish
20        her answer first and then you can --
21        THE WITNESS:  Okay.
22        MR. EWALD:  -- follow up.
23        Finish your answer.
24  BY MR. TISI:

10 (Pages 34 - 37)

Page 38

1    Q.    You need to answer my question,
2  though.
3           I will show -- I promise you, I will
4  show you studies where recommendations were made
5  about -- of what the company ought to do, as part
6  of sensemaking process, to understand what was
7  going on at the time in realtime.  I will show you
8  those documents.
9           But as a general matter, do you
10 understand that there were recommendations made to
11 warn to change to cornstarch study?
12   A.    I answer again that I have not done
13 a systematic analysis of all the literature --
14   Q.    Okay.
15   A.    -- with respect to cancer, ovarian
16 cancer.
17   Q.    Okay.  Well, you know that
18 cornstarch powder has been available for over half
19 a century, correct?
20   A.    I know that cornstarch powder has
21 been available since the 1970s.
22   Q.    Okay.  And you know that it was
23 actually developed -- and you mentioned this in
24 your report -- as an alternative -- initially as

Page 39

1  an alternative or replacement for talc products
2  because of safety issues that were being raised in
3  the 1970s, correct?
4    A.    That --
5           MR. EWALD:  Object to the
6     form.
7           THE WITNESS:  I have a
8     different understanding.
9  BY MR. TISI:
10   Q.    Okay.  Could you look at paragraph
11 116 of your report, please.
12   A.    Sure.
13   Q.    Do you see where it says:
14         "J&J began a second phase of active
15 development of a cornstarch-based baby powder" at
16 the time that there were attacks on the product.
17   A.    Yes, I understand that that's, you
18 know, that was something that came from the
19 sensemaking.  There was a lot of disruptive
20 ambiguity.
21         But it was not a replacement.  It
22 was not -- which should be expected.  Because as I
23 said here, with the process of sensemaking, if we
24 go to my Footnote 200, that when things don't make

Page 40

1  sense then and we can't continue in an action,
2  then we might want to do something else.
3           But by the end of the 1970s, the
4  ambiguity was gone.  Testing had been established.
5  Multilevels of testing had been established.
6           And I do also want to say that, you
7  know, there were other -- other starches that J&J
8  was looking at, rice, etc., and it was not a
9  replacement product because it had different
10 characteristics.
11   Q.    Okay.  That wasn't my question.
12 Okay?  So you need to focus on my question now.
13         MR. EWALD:  She answered your
14     question, but go ahead.
15 BY MR. TISI:
16   Q.    So my question was:  In the 1970s,
17 cornstarch was being developed, at least initially
18 until you say in the late 1970s when destructive
19 disruptive ambiguity was resolved, as a potential
20 replacement for talcum powder.
21         True or not true?
22   A.    Not true.
23   Q.    Okay.  All right.  Next question.
24         Did you see any evidence in your

Page 41

1  review of the record that Johnson & Johnson could
2  not have manufactured cornstarch for its baby
3  powder products at any time over the past 60
4  years?
5    A.    I beg your pardon.  I don't
6  understand the question.
7    Q.    Do you contend that J&J could not
8  have manufactured Johnson's Baby Powder with
9  cornstarch at any point during the past 60 years?
10   A.    My analysis wasn't aimed at looking
11 at manufacturing or looking at individual
12 incidents.
13         I've done an analysis of what J&J
14 knew and when and how they secured scientific
15 knowledge about its product, and whether or not
16 the actions it's taken --
17   Q.    Okay.
18   A.    -- has contributed -- shows that
19 they have the well-being of consumers in mind.
20   Q.    Okay.  Move to strike the
21 nonresponsive portion of your answer.
22         Using the phraseology that you had
23 before, do you see any evidence that cornstarch is
24 not a commercially effective or viable product?

11 (Pages 38 - 41)

Page 42

1    A.    I did not study the cornstarch
2 product. So I can't answer anything on that.
3    Q.    Okay. Have you ever seen any
4 suggestion that cornstarch products are associated
5 with any potentially dangerous disease?
6    A.    I have not studied cornstarch, and I
7 know that it was considered and I know it wasn't a
8 perfect replacement product and I know it had
9 different properties. That's what I know.
10    Q.    That wasn't -- that wasn't my
11 question, though.
12         Have you seen any evidence that
13 cornstarch powders were associated with a
14 potentially dangerous disease?
15    A.    I go back to my answer.
16         I have not studied the cornstarch
17 and cornstarch manufacturing and I don't know
18 anything really about cornstarch. And I can't
19 answer your question.
20    Q.    So you don't know whether or not
21 it's -- you have no -- you don't know whether
22 you've ever seen any evidence in your review of
23 thousands of documents as to whether or not
24 cornstarch was associated with a fatal disease?

Page 43

1    A.    I have not studied cornstarch.
2    Q.    Okay.
3    A.    I can't answer.
4    Q.    Okay. Now, what we're talking --
5 and you know that Johnson's Baby Powder -- you
6 referred to this in your report -- was actually
7 withdrawn in North America in 2000 as a product,
8 correct?
9    A.    Correct.
10    Q.    And if I read your report correctly,
11 that would have been withdrawn at the time frame
12 you were actually consulting with Mr. Ewald and
13 others in connection with this litigation. True?
14    A.    I started work on this project in
15 2019. 2020 is after 2019.
16    Q.    So at any time during the course of
17 time that you were actually working on the
18 litigation side, did Johnson & Johnson contact you
19 to see if they could get your advice or your
20 expertise in connection with their product
21 withdrawal?
22    A.    I -- I was working for Johnson &
23 Johnson related to putting this project together.
24    Q.    Would "this project" be in

Page 44

1 litigation, not -- not the withdrawal of the
2 product, correct?
3    A.    No. This project being this -- this
4 report.
5    Q.    Right.
6    A.    Doing -- doing this -- this
7 analysis.
8    Q.    You were working -- you know that
9 Johnson & Johnson withdrew talc worldwide in 2022,
10 correct?
11    A.    I would have to go back. I don't
12 remember the exact date.
13    Q.    Okay. Well, you were working on
14 this project, the litigation project, at that
15 time, correct?
16    A.    First of all, I don't think about
17 this as a litigation project, but I think about it
18 as -- as an analysis. And, again, I've been
19 working on it since 2019.
20    Q.    Did Johnson & Johnson, the company
21 or any division of Johnson & Johnson, ever reach
22 out to you in the normal course of business and
23 say, "Hey, you know, you've got some expertise
24 here that's really important to our business.

Page 45

1 Could you help us do some sensemaking"?
2    A.    I have a full-time job, as you know,
3 and I took on this project as well. This was
4 enough for me.
5    Q.    Well, I didn't ask you whether you
6 did it or not.
7         I asked you whether anybody ever
8 asked you to do it.
9    A.    Nobody has asked me to do that.
10    Q.    Okay. The fact that you feel
11 whether or not J&J ever in the course -- have you
12 ever heard in your review of thousands of pages of
13 documents that anybody at J&J at any time had ever
14 said, "You know something? We need to consult
15 with a behavioral and organizational expert to
16 help us make sense of the environment in which we
17 are operating our consumer business"?
18    A.    I have to say, J&J has -- I'm sure
19 has plenty of people in their organization to help
20 them figure out what to do.
21    Q.    I am not -- I did not ask that
22 question. They have employees. Everybody from
23 janitors to scientists. Okay? They have
24 everybody and everybody in between.

12 (Pages 42 - 45)

Page 46

1    I'm asking you whether in your
2  review of the -- of the documents and literature,
3  had you ever seen them consult with and say, "We
4  need to have an organizational, behavioral expert
5  come and help us make sense of the external
6  environment in which we are operating our consumer
7  business"?
8    A.    I know what J&J asked me to do, and
9  I've done it in this case.
10   Q.    That's not what I asked you.
11        Have you ever seen in your -- in
12 your review of the record whether or not -- you've
13 seen them that they've consulted with
14 epidemiologists, correct?
15   A.    Uh-huh.
16   Q.    Toxicologists, correct?
17   A.    Correct.
18   Q.    Regulatory people, correct?
19   A.    Correct.
20   Q.    You've seen all kinds of specialties
21 which were contacted.
22        Did they ever contact your
23 specialty, to the best of your knowledge?
24   A.    To my knowledge, I have no knowledge

Page 47

1  of that.
2    Q.    Okay.  Now, let's talk about -- you
3  alluded to this, but I want to make sure we get
4  this on the record.
5        I want to talk about some of the
6  things that you are not going to testify to.
7        Okay?
8    A.    Uh-huh.
9    Q.    Now, I marked as Exhibit Number 1
10 your CV, correct?
11   A.    Correct.
12   Q.    Number 2 is your expert report,
13 which is, the narrative is 82 pages long, correct?
14   A.    I will just look.
15        Correct.
16   Q.    Okay.  I did a word search of your
17 document, of your narrative, and of the 82 pages,
18 the word "asbestos" appears 300 times on 60 of the
19 82 pages.
20        Does that -- do you have any reason
21 to think that I'm incorrect?
22        MR. EWALD:  Objection to form.
23        THE WITNESS:  I can't say
24    that you're correct or incorrect because

Page 48

1    I've never done a word search on it.
2  BY MR. TISI:
3    Q.    Okay.  Well, it appears a lot in
4  your report.  True?
5    A.    It is --
6        MR. EWALD:  Objection to form.
7        Go ahead.
8        THE WITNESS:  I write about
9    asbestos in there.  So I'm assuming.
10 BY MR. TISI:
11   Q.    You write about asbestos a lot in
12 that report?
13   A.    All I can say is, I don't -- I can't
14 say 80 or what have you.  I don't know.
15   Q.    I'm not asking you for.
16        Over 50 percent of your report deals
17 with asbestos.
18        Would you agree?
19        MR. EWALD:  Objection.
20 BY MR. TISI:
21   Q.    And asbestos-related issues?
22        MR. EWALD:  Objection.
23 BY MR. TISI:
24   Q.    Testing, mining, the characteristics

Page 49

1  of the asbestos.  True?
2    A.    Asbestos is part of my report,
3  correct.
4    Q.    Okay.  And in addition to your
5  report, there are numerous tables to your report.
6  For example, there are tables that deal with
7  mining, the characteristics of asbestos, testing
8  methods, test results.
9        You have all kinds of tables and
10 appendices related to those issues, correct?
11   A.    Correct.
12   Q.    All right.  You're not a
13 mineralogist, are you?
14   A.    I'm not a mineralogist.
15   Q.    You're not a geologist?
16   A.    I'm not a geologist.
17   Q.    You're not an expert in mining?
18   A.    Correct.
19   Q.    You're not an expert in mining for
20 talc?
21   A.    Correct.
22   Q.    You're not an expert in testing talc
23 for the presence of asbestos or any unwanted
24 constituents, correct?

13 (Pages 46 - 49)

Page 50

1    A.    I am not a toxicologist or a
2  microscopist.
3    Q.    That wasn't my question.
4        You're not an expert in testing for
5  talc?
6    A.    I am not a testing, correct.
7    Q.    Actually, you know nothing, you have
8  known nothing.  You're not an expert in PLM, XRD,
9  or any other testing that you referred to in your
10  report, correct?
11    A.    No.  What I know of these fine
12  details are what I've learned over five years.
13    Q.    Right.
14        In the context of the litigation?
15    A.    In studying this project.
16    Q.    Right.
17    A.    In studying -- in studying thousands
18  of pages of data.
19    Q.    Would you -- would you characterize
20  yourself now as an expert in testing?
21    A.    I'm not an expert on testing, and
22  I'm not opining in this -- in this matter.
23    Q.    Okay.  Now, I've reviewed all the
24  references in your CV.

Page 51

1    A.    Uh-huh.
2    Q.    Done a word search of that.
3        Would it surprise you that the word
4  "asbestos" doesn't appear in any of your published
5  literature?
6    A.    Okay.
7    Q.    Does it?
8    A.    Not that I recall.
9    Q.    Now, in your report, Exhibit
10  Number 2, there's a Figure 1.
11        Do you see that?
12    A.    Oh, maybe I should look at your
13  exhibit.
14    Q.    It's on F-1.i.
15        Here I can show you?
16    A.    Yeah.
17    Q.    Okay.  It talks about serpentine and
18  amphiboles and asbestiform and non-asbestiform and
19  tremolite and chrysotile.
20        You see all those characterizations?
21    A.    Yes.
22    Q.    You've never used those words in
23  your professional practice outside of this
24  litigation, have you?

Page 52

1    A.    I have not written about these
2  things, correct.
3    Q.    You've never even probably said
4  those words.  True?  Have you --
5    A.    I have said them a lot, actually.
6    Q.    Have you ever used the word
7  "chrysotile" outside of litigation?
8    A.    I've -- first of all, I don't use it
9  inside litigation but, no, I don't think I've
10  talked about it.
11    Q.    Well, it's in your report?
12    A.    Yes.
13    Q.    Okay.  Do you know whether or not
14  any of the testing that J&J did was specifically
15  designed to test for chrysotile?
16    A.    I believe that TEM is -- is -- is a
17  sensitive method.
18    Q.    Okay.  Before this case, before
19  being involved in this project, did you know what
20  an amphibole is?
21    A.    I do not remember whether I knew or
22  I didn't know.
23    Q.    Do you know -- did you know whether
24  or not you knew what chrysotile was?

Page 53

1    A.    I honestly do not remember whether I
2  did or not.
3    Q.    You're not a toxicologist, ma'am.
4  True?
5    A.    I am not a toxicologist, correct.
6    Q.    Have you ever taken a course in
7  toxicology?
8    A.    I am not a toxicologist, correct.
9    Q.    Okay.  That wasn't my question.
10        Did you ever take a course in
11  toxicology?
12    A.    Again, I haven't studied toxicology.
13    Q.    Have you ever -- can you answer my
14  question?
15        Have you ever taken -- I'm not a
16  statistician, but I took statistics in college.
17    A.    Uh-huh.
18    Q.    My question is:  Did you take --
19  have you ever taken a course in toxicology?
20    A.    I have not taken a course in
21  toxicology.
22    Q.    Thank you.
23        Have you ever -- you are not an
24  epidemiologist?

14 (Pages 50 - 53)

Page 54

1    A.    I'm not an epidemiologist.  Of
2  course, I have read the literature.  In my last
3  book, I drew a lot on epidemiology of medical
4  mistakes.
5    Q.    Ma'am, that wasn't my question.
6        MR. TISI:  Could you please
7    read back my question.
8        (The reporter read the record
9        on page 53 lines 23-24.)
10        THE WITNESS:  Again, I'm not
11    an epidemiologist --
12  BY MR. TISI:
13    Q.    Thank you.
14    A.    -- but I certainly have read many
15  epidemiological studies.
16    Q.    Except not the epidemiology studies
17  in this case?
18    A.    In this case, that was not my
19  assignment.
20    Q.    All right.  And have you ever taken
21  a course in epidemiology?
22    A.    It's hard to remember whether or not
23  in my nursing studies.  I -- I don't recall
24  whether I did or not.

Page 55

1    Q.    Let's talk a bit about cosmetics.
2        We talked about the Food, Drug, and
3  Cosmetic Act.
4        You are not an expert in FDA
5  regulations, are you?
6    A.    I'm not a regulatory expert,
7  correct.
8    Q.    Okay.  You're not an expert in FDA
9  regulations as they pertain to Johnson's Baby
10  Powder or Shower to Shower, are you?
11    A.    I am not -- again, I'm not a
12  regulatory expert and I'm not opining on that in
13  this case.
14    Q.    Do you know the standard for adding
15  a warning to a cosmetic?
16    A.    I do not.
17    Q.    Do you know the standard for
18  adulteration or misbranding?
19    A.    I am not opining in this case on --
20  on any regulatory standards.
21    Q.    Okay.  Have you ever drafted or
22  participated in the drafting of a label for a
23  cosmetic product?
24    A.    Again, I'm not a regulatory expert.

Page 56

1  I have not done --
2    Q.    That wasn't my question.
3    A.    I have not done anything related
4  to -- to warnings.
5    Q.    Okay.  So my question is:  Have you
6  ever drafted a label of any kind for a cosmetic
7  product?
8    A.    I have not.
9    Q.    Okay.  Have you ever drafted
10  instructions for a cosmetic product?
11    A.    I have not.
12    Q.    Have you ever participated in
13  drafting warnings or instructions for any product
14  covered by the Food, Drug, and Cosmetic Act?
15    A.    I am not a regulatory expert and I
16  have not done -- I have not created a warning.
17    Q.    Okay.  Have you ever participated in
18  any way, outside of this litigation, in
19  sensemaking with respect to drafting a warning or
20  an instruction for a product covered by the Food,
21  Drug, and Cosmetic Act?
22    A.    I don't -- in your -- could you --
23  could you --
24        MR. EWALD:  Yeah.

Page 57

1        THE WITNESS:  -- say your
2    question again?  Because there was a lot
3    packed into it.
4  BY MR. TISI:
5    Q.    Okay.  Let me be clear.
6        You have not participated in any way
7  as a consultant, as a behavioral, organizational
8  expert, in the drafting of a warning or an
9  instruction for a cosmetic product.  True?
10    A.    I think I answered that earlier that
11  I have not created warnings for cosmetic products.
12    Q.    Have you consulted with the FDA?
13        You've listed a bunch of things in
14  your CV that where you've consulted.
15        Have you consulted with the FDA?
16    A.    I do not recall consulting for the
17  FDA.
18    Q.    Okay.  So the answer would be no.
19  True?
20    A.    True.
21    Q.    Okay.  Have you consulted with any
22  FDA regulating company, including Johnson &
23  Johnson, as to how to organize themselves to
24  comply with the duties and responsibilities under

Page 58

1 the Federal Food, Drug, and Cosmetic Act?
2    A.    I have not consulted on --
3    Q.    Have -- I'm sorry.  I didn't mean to
4 interrupt you?
5    A.    -- on anything related to the FDA,
6 as far as I recall.
7    Q.    Have you ever drafted a standard
8 operating procedure, a policy and procedure for a
9 company that was covered by the Food, Drug, and
10 Cosmetic Act?
11    A.    I -- I really can't answer that
12 because I don't recall.  I mean, I have -- I have
13 worked with companies to think about processes and
14 standard operating procedures over the 40 years
15 I've been an organization scientist.  I don't
16 recall whether any of them were covered by the
17 FDA.
18    Q.    Okay.
19    A.    It's possible they might have been.
20    Q.    Okay.  As you sit here today, do you
21 ever remember participating in drafting or helping
22 a company draft SOPs or policies that are related
23 to the food -- compliance with the Food, Drug, and
24 Cosmetic Act?

Page 59

1    A.    Again, I honestly can't say one way
2 or another --
3    Q.    You don't remember?
4    A.    -- because I've worked on hundreds
5 of projects with students where we were doing
6 consultations with -- with companies.  So I just
7 don't remember, no.
8    Q.    But nothing jumps out at you today?
9    A.    Nothing jumps out at me.
10    Q.    Have you ever consulted with a
11 company covered by the Food, Drug, and Cosmetic
12 Act for developing a policy and procedure as to
13 when to employ risk mitigation for a consumer
14 product?
15    A.    I do not recall doing that at this
16 moment.
17    Q.    Do you ever -- I assume you've never
18 been involved in drafting a policy and procedure
19 for assessing potential risk for a consumer
20 product?
21    A.    I do not recall.
22    Q.    And you never worked on design of a
23 consumer product or any product covered by the
24 Food, Drug, and Cosmetic Act.  True?

Page 60

1    A.    I have not created a product design.
2    Q.    You've never written on these
3 topics, have you?
4    A.    I am not a marketing specialist or,
5 you know, a person who studies products.
6    Q.    And you never taught about any of
7 these issues in any of the courses you've ever
8 given over the course of your career, as best as
9 you can recall, correct?
10        MR. EWALD:  Objection to the
11    form as to "these issues."
12        THE WITNESS:  Yeah, I agree.
13    I don't know what issues you're talking
14    about.  If you're talking about, you
15    know, have I taught products marketing?
16 BY MR. TISI:
17    Q.    Okay.
18    A.    No, I have not.
19    Q.    Let me withdraw the question and let
20 me rephrase the question.
21        Have you ever given as part of any
22 of your discussion -- your teaching
23 responsibilities over the course of your career at
24 Hopkins, at Michigan, or at Minnesota, taught

Page 61

1 about compliance with the Food and Drug
2 Administration policies related to cosmetic drugs?
3    A.    I have taught just generally
4 speaking about the importance of thinking about
5 regulations, but I have not taught specifically.
6    Q.    Now, you've read the report and
7 reviewed the deposition of Dr. David Kessler.
8 True?
9    A.    True.
10    Q.    You know he's a former FDA
11 Commissioner, correct?
12    A.    Yes.
13    Q.    Okay.  And in fact, in your report,
14 you cite to various FDA Commissioners as part of
15 your sensemaking process, correct?
16    A.    I report -- I talk about the FDA in
17 my report at various moments.
18    Q.    Well, you actually talked about
19 things that various FDA Commissioners said in the
20 1980s and '70s, correct?
21    A.    Correct.
22    Q.    All right.  It's fair to say you're
23 critical of Dr. David Kessler, correct?  You
24 accuse him of cherry-picking and hindsight bias,

16 (Pages 58 - 61)

Page 62

1  correct?
2      A.    Generally speaking, I was talking
3  about the plaintiffs. So I don't think that I
4  mentioned him specifically.
5      Q.    Okay. If you do in your report, do
6  you have any criticisms of him specifically?
7      A.    I'm not -- I'm talking generally.
8      Q.    Okay. Do you think you have more --
9  I mean, on balance you've looked at his report and
10 his qualifications and you have yours.
11         Do you think that you or he have
12 more experience as to what the FDA requires of a
13 cosmetic manufacturer like J&J?
14         MR. EWALD: Objection to form.
15     Speculation.
16         Go ahead.
17         THE WITNESS: I mean, I can't
18     make a judgment about -- obviously he,
19     you know, has worked in government. I
20     understand that I can't say one way or
21     the other.
22 BY MR. TISI:
23     Q.    He not only worked in government,
24 ma'am. He was -- he was the Commissioner of the

Page 63

1  Food and Drug Administration.
2         Do you think you have more
3  experience than he does about the rules and
4  regulations that govern the development of
5  cosmetic products --
6         MR. EWALD: Chris.
7  BY MR. TISI:
8      Q.    -- than you?
9         MR. EWALD: You've cut her off
10     again.
11         Can you continue to answer,
12     Dr. Sutcliffe?
13         THE WITNESS: Yeah. What I
14     was going to say, you know, obviously he
15     has more experience. I have not worked
16     for the FDA.
17 BY MR. TISI:
18     Q.    Okay.
19     A.    But I can't make a judgment about
20 his --
21     Q.    Okay.
22     A.    -- performance or experience or
23 anything because I have not examined that.
24     Q.    Okay. You've read the deposition --

Page 64

1  the testimony -- the report of George Newman,
2  correct?
3      A.    Yes.
4      Q.    He's a psychologist and an expert in
5  marketing, correct?
6      A.    I've seen his -- his CV.
7      Q.    You're not an expert in marketing,
8  are you?
9      A.    Report.
10         I am not an expert in marketing, and
11 I think -- I don't think he has a degree in
12 marketing. I know he took some classes. I don't
13 know what his -- his --
14     Q.    You haven't even taken any classes,
15 have you?
16     A.    -- background is.
17         Oh, I have done other things in
18 marketing. I've gained a perspective of that.
19     Q.    Okay. You're not a medical doctor?
20     A.    I'm not a medical doctor.
21     Q.    You're not an oncologist?
22     A.    I'm not an oncologist.
23     Q.    You're not a gynecologist?
24     A.    I'm not a gynecologist.

Page 65

1      Q.    Now, since being named or since
2  starting your work in 2019, I think you said on
3  this project, this litigation project?
4      A.    That's correct.
5      Q.    Have you said -- have you -- you
6  have contacts with various industries and
7  consulted with various industries. True?
8      A.    Yes, I have.
9      Q.    Have you said to -- have you
10 contacted any pharmaceutical consumer product
11 company and say, "Hey, look, you know, I've done
12 some work now on looking at a company dealing with
13 regulated by the Food, Drug, and Cosmetic Act. I
14 can help you in your -- in your normal course of
15 business."
16         Have you done that at all?
17     A.    No.
18     Q.    All right. Let's look at your CV,
19 Exhibit 1.
20         And you mention that you are -- you
21 have your PhD in Organization Theory and Behavior,
22 correct?
23     A.    That's correct.
24     Q.    Okay. And you've been a professor

17 (Pages 62 - 65)

Page 66

1 at various schools at Johns Hopkins since 2014?
2    A.    Correct.
3    Q.    And you've worked as a professor or
4 assistant professor at University of Michigan,
5 correct?
6    A.    I was a professor.  I was a chair
7 professor at Michigan, correct.
8    Q.    Have you ever looked at what the
9 Johns Hopkins and University of Michigan said
10 about talc and ovarian cancer at the times in the
11 1990s and early 2000s?
12    A.    I have not investigated Michigan or
13 Johns Hopkins.
14    Q.    Now, on page 28 of your -- A-28 of
15 your expert -- of your CV, Exhibit Number 1?
16    A.    Uh-huh.
17    Q.    I notice that you've taught
18 undergraduate and graduate students?
19    A.    That's correct.
20    Q.    Okay.  And I think I asked you this
21 before, but I want to be really specific.
22        In any of the courses listed here,
23 did you ever teach a course or as part of a course
24 how to manage a company that is covered by the

Page 67

1 Food, Drug, and Cosmetic Act?
2    A.    I believe that in many of the
3 courses, the multidisciplinary action projects in
4 particular at Michigan, we oftentimes worked
5 with -- with companies that were covered.  I mean,
6 I can't recall anything off the top of my head --
7    Q.    Okay.
8    A.    -- but, yes.
9    Q.    That wasn't my question.
10        My question is:  As part of your
11 actual coursework when you're actually teaching,
12 did you have any class or module in class that
13 talks about the unique responsibilities of a
14 company that is covered by the Food, Drug, and
15 Cosmetic Act?
16    A.    I have not taught the Food and Drug
17 Act, correct.
18    Q.    Okay.  Now I've looked at your
19 literature.
20        I asked you whether or not you ever
21 remember in any of the literature discussing
22 asbestos, and you said the answer was no, correct?
23    A.    I in my -- you're talking about my
24 published work?

Page 68

1    Q.    Yes.
2    A.    I do not recall talking about
3 asbestos.
4    Q.    Do you ever recall even mentioning
5 the Food, Drug, and Cosmetic Act?
6    A.    I do not recall.  I don't know one
7 way or another.
8    Q.    Okay.  Do you ever recall it?
9    A.    I beg your pardon?
10    Q.    Do you ever recall that being the
11 subject of your professional research?
12    A.    It's -- I -- no.
13    Q.    Do you ever recall ever talking
14 about talc in any of your research?
15    A.    I do not recall.
16    Q.    Now, in Exhibit Number 1 on page
17 A-33 of your CV, you talk about various
18 consulting, correct?
19    A.    Correct.
20    Q.    Okay.  Is this litigation consulting
21 that you've talked that's listed here --
22    A.    No.
23    Q.    I'm sorry.  You need to let me
24 finish.

Page 69

1    A.    Okay.  Sorry.
2    Q.    Is this litigation consulting or in
3 the normal course of your academic work
4 consulting?
5    A.    No, this is -- there's just one
6 thing that relates to litigation and that's the
7 consulting with Analysis Group.
8    Q.    Okay.  The Analysis Group is --
9 okay.  We'll talk about the Analysis Group in a
10 moment.
11        But all the companies -- Marathon
12 Oil, Goldman Sachs, Georgia-Pacific, General
13 Electric, Hewlett-Packard, etc., Xerox -- these
14 are all companies that you -- that you have
15 consulted with, correct?
16    A.    Correct.
17    Q.    Okay.
18    A.    And, of course, this doesn't
19 represent the projects that I have done with
20 students, which I just mentioned earlier.
21    Q.    Okay.  My question to you is this:
22 In any of these examples, did any of these
23 companies produce consumer products or cosmetics
24 or anything covered by the Food, Drug, and

18 (Pages 66 - 69)

Page 70

1 Cosmetic Act?
2    A.    I mean, here I would say where
3 I've -- where I've seen companies that are -- are
4 -- that have products would be in my teaching
5 related to the Multidisciplinary Action Project.
6    Q.    Okay.  That wasn't my question.
7    A.    So.  Okay.
8    Q.    Okay.
9    A.    I have -- myself have not consulted.
10 I mean, I don't know.  Maybe some of these
11 companies do have products.  For example, General
12 Electric have -- they have GE Healthcare.  I do
13 not recall.
14    Q.    But you didn't -- you have -- in
15 your consulting work for these companies, they
16 were not in the context of a consumer product
17 covered by the Food, Drug, and Cosmetic Act.
18 True?
19    A.    As far as I recall, no.  Correct.
20    Q.    Okay.  Now, you have been an expert
21 in litigation.  True?
22    A.    I have been an expert in litigation
23 in the past.
24    Q.    For example, you have been an expert

Page 71

1 for British Petroleum, or BP, in the Deepwater
2 Horizon case.  True?
3    A.    Correct.
4    Q.    In that case, BP released millions
5 of gallons of oil into the Gulf of Mexico.  True?
6    A.    Gallons of oil were -- were -- yes.
7    Q.    I'm sorry?
8    A.    Yes, that's correct.
9    Q.    Okay.  And you provided an expert
10 report that in effect said BP had a great safety
11 culture and you testified, as you do here, that BP
12 was committed to safety, correct?
13         MR. EWALD:  Objection to form.
14         THE WITNESS:  Again, I
15      applied my organizational expertise to
16      analyze BP's safety culture in the time
17      leading up to the Deepwater Horizon.
18 BY MR. TISI:
19    Q.    And you felt that BP had a great or
20 very good safety culture when it -- leading up to
21 the release of millions of gallons of -- of oil
22 into the Gulf of Mexico.  True?
23    A.    Again, my -- my role was to apply my
24 expertise in doing an analysis of BP's safety

Page 72

1 culture in the time leading up to the Deepwater
2 Horizon.
3    Q.    And your conclusion was they did
4 everything right?
5    A.    I had, you know, broad conclusions,
6 and I don't believe -- I think you're
7 mischaracterizing what I -- what I said.
8    Q.    You said they had good safety
9 culture.  True?
10    A.    I am saying that BP was enacting,
11 enabling, and elaborating a safety culture and it
12 was -- and they -- and they were taking actions to
13 do that.
14    Q.    And you were designated by BP,
15 correct?
16    A.    I -- I beg your pardon?
17         MR. EWALD:  Objection to form.
18 BY MR. TISI:
19    Q.    You were designated as an expert?
20 You worked for BP in that litigation?
21    A.    Yes, I worked for BP.
22    Q.    And your testimony was struck in
23 that case, wasn't it?
24    A.    No, that -- my testimony in the --

Page 73

1 in the -- there were two phases.  I think it was
2 the -- I can't remember what the names of them
3 are.
4         My testimony was struck because
5 another expert, his testimony was struck and so
6 mine was not needed.
7    Q.    Okay.  Why was his testimony struck?
8    A.    I have no idea.
9    Q.    Okay.  So your testimony was not
10 needed?
11    A.    My testimony was not needed.
12    Q.    Have you ever been struck in any
13 other case involving -- in litigation as either
14 being not qualified, not applying appropriate
15 methodology, or your testimony doesn't fit the
16 case?
17    A.    Are you asking about a Daubert
18 motion?
19    Q.    Not necessarily.  I'm asking struck
20 for any reason.
21    A.    As far as I know, my testimony has
22 never been struck.
23    Q.    Other than BP?
24    A.    Aside from when the expert was

19 (Pages 70 - 73)

Page 74

1 eliminated and my testimony wasn't needed.
2    Q.    Okay.  All right.  Do you have a
3 copy of that order?
4    A.    Do I?  No.
5        MR. TISI:  All right.  Let me
6    go to Exhibit Number 3, which is the
7    notice of deposition.
8        (Document marked for
9    identification as Sutcliffe Exhibit 3.)
10 BY MR. TISI:
11    Q.    Now, there's a lot to cover here,
12 but I'm going to kind of cut it down to the -- to
13 the minimum here.
14        Have you seen this document before?
15    A.    Yes.
16    Q.    Okay.  Have you reviewed documents?
17 Have you reviewed your files for complying with
18 this subpoena, this notice of deposition?
19    A.    I believe that I have.
20    Q.    Okay.  First of all, you charge
21 $1100 an hour to do your work.  True?
22    A.    Correct.
23    Q.    All right.  And how many hours have
24 you devoted to this project over the years?

Page 75

1    A.    I --
2    Q.    And when I -- I want to be clear.
3 Let me be -- let me be a hundred percent clear.
4 Okay?
5        I'm not talking about your work for
6 Carl and Balderrama or the MDL.  I'm talking you
7 about you worked for Johnson & Johnson completely
8 from the first day that you started working for
9 them, whether it's a mesothelioma case or an
10 ovarian cancer case or any other case.
11        I want to know how much time you
12 have spent on the talc project.
13    A.    I can't give you a precise number,
14 but I can say that from the start of the project
15 in 2019 to the end of this week on Friday, I think
16 I will have billed between 400 and 500 hours.
17    Q.    Okay.  At $1100 an hour, how much
18 does that --
19        MR. EWALD:  Hold on.
20        THE WITNESS:  Yeah.  My -- I
21    started off at $900 an hour.
22 BY MR. TISI:
23    Q.    Okay.
24    A.    So it was not $1100 for the whole

Page 76

1 time.
2    Q.    How much would you say that you've
3 -- how much would you say that you have personally
4 made in dealing with this project?
5    A.    I -- I would -- I can't really
6 answer that because I don't know precisely.  I
7 didn't -- I didn't count it up.
8    Q.    Between 4 and $500,000 perhaps?
9    A.    I would say between 400 and 500,000.
10    Q.    Okay.  Now, in addition, you have
11 worked for the Analysis Group.  True?
12    A.    I am working for -- no, I don't
13 think that's correct.
14    Q.    Okay.  What is the Analysis Group?
15    A.    The Analysis Group is -- I think
16 about it as an economic and research consulting
17 group.
18    Q.    Do you have any stake or ownership
19 of the business?
20    A.    I don't.
21    Q.    Okay.  Who owns the business?
22    A.    I -- I don't know all the ins and
23 outs of the business.
24    Q.    I didn't ask that.

Page 77

1        Do you know who owns it?
2    A.    I honestly don't know.
3    Q.    Okay.  In addition to yourself, did
4 the Analysis Group bill for their time and efforts
5 in this?
6    A.    Yes.  I described in my document
7 that I have a research team from Analysis Group.
8        MR. TISI:  Okay.  Can I have
9    Exhibit 48?
10        These are a little bit out of
11    order because I got these yesterday and
12    so these may be out of order.  So I
13    apologize for that.
14        Here's Exhibit --
15        MR. EWALD:  So the record is
16    clear, we transmitted them on Friday.  I
17    know that it was a holiday weekend, but I
18    just want the record to be clear --
19        MR. TISI:  That's fine.
20        MR. EWALD:  -- when they got
21    to plaintiffs.
22        MR. TISI:  They got to me on
23    Saturday actually, but that's okay.  I'm
24    not --

20 (Pages 74 - 77)

Page 78

1          MR. EWALD:  I'm not saying --
2     (laugh).
3          (Document marked for
4     identification as Sutcliffe Exhibit 48.)
5  BY MR. TISI:
6     Q.     Attached are three bills from the
7  Analysis Group.
8     A.     Okay.  Uh-huh.
9     Q.     Okay.  Now, these -- first of all,
10 the Analysis Group is based out of Boston,
11 correct?
12    A.     Yes.
13    Q.     And how did you first -- is this the
14 first time you've worked with the Analysis Group,
15 or have you done that over the years?
16    A.     No, I have done that over the years.
17    Q.     Now, you said you've worked for
18 various companies doing litigation support.  True?
19    A.     I don't think that I said that.
20    Q.     Okay.  You have worked -- well,
21 you've been designated an expert.
22         We know the Deepwater Horizon case,
23 and I think you've designated two other cases in
24 your report where you've given testimony in the

Page 79

1  past four years, correct?
2     A.     Correct.
3     Q.     Okay.  Was that with the Analysis
4  Group as well?
5     A.     Yes.
6     Q.     Okay.  Let me ask you this:  How
7  long have you been providing expert testimony on
8  behalf of companies?
9     A.     Since 2011.
10    Q.     And over -- since 2011, can you give
11 me a sense of how much, generally speaking, you
12 have made consulting for expert -- consulting for
13 companies in litigation?
14    A.     No, I can't.
15         MR. EWALD:  Object to form.
16         THE WITNESS:  I can't answer
17    that question because I have not looked
18    that up.
19 BY MR. TISI:
20    Q.     Well, in this case, it's about a
21 half million dollars, correct?
22    A.     In this case, as I said, it's
23 between 400 and 500.
24    Q.     Right.

Page 80

1          And what about, you know, over the
2  years, can you give me a sense of how much of your
3  income, even as a percentage-wise, has been
4  working with companies in litigation?
5     A.     I honestly can't recall, you know,
6  there were years when I wasn't working.  So I
7  think it would have to be specific.
8     Q.     What about BP?  How much -- how much
9  money did you make from BP to defend them against
10 the oil spill in the Gulf of Mexico?
11    A.     I do not recall.
12    Q.     Over half a million dollars?
13    A.     No.
14    Q.     Okay.
15    A.     I -- no.
16    Q.     Over a hundred thousand dollars?
17    A.     I can't recall.  I'm sorry, I have
18 not looked at that.
19    Q.     Would it be fair to say since 2011
20 you have made millions of dollars testifying for
21 companies?
22    A.     No, absolutely not.
23    Q.     Over a million dollars?
24    A.     No.

Page 81

1     Q.     Really?  Okay.
2          All right.  With Analysis Group, did
3  you get billed through the Analysis Group over --
4  since 2011?
5     A.     I beg your pardon?
6     Q.     Did your -- did your billing go
7  through the Analysis Group?
8     A.     I send my bills to the Analysis
9  Group and they send them to the company, yes.
10    Q.     Okay.  So the Analysis Group would
11 have records of the amount of money that you have
12 billed for the various projects which you worked
13 since 2011.  True?
14    A.     I don't know what they keep.  I -- I
15 can't answer that question.
16    Q.     Okay.  All right.  Now, do you know
17 the qualifications of the people?  Here you
18 list -- on Exhibit Number 48, you list various
19 management principals, management --
20         MR. EWALD:  I'm sorry, Chris.
21    What page are you on that?
22         MR. TISI:  Second page.
23         MR. EWALD:  Second page.
24         Right there.

21 (Pages 78 - 81)

Page 82

1          THE WITNESS:  Right there.
2     Yeah.
3 BY MR. TISI:
4     Q.    Now, is this -- first of all, are
5 these $276,000 in addition to the 4 to $500,000
6 that you have billed?
7     A.    I would have to count up everything,
8 but this is what analysis -- this is the -- this
9 is my team.
10    Q.    Right.
11    A.    And this is a bill for their work.
12    Q.    Right.
13          So, but what I'm saying is you
14 billed and they billed?
15    A.    Correct.
16    Q.    Right.
17          So you have 4 to $500,000 and now
18 you have $276,000 for the -- for the Analysis
19 Group, correct?
20    A.    That's sounds correct.
21    Q.    All right.
22    A.    I mean, just putting those numbers
23 together.
24    Q.    Right.

Page 83

1          So we're now at about $750,000,
2 correct?
3     A.    Correct.
4     Q.    All right.
5     A.    It's a very time-intensive,
6 resource-intensive process.
7     Q.    All right.  And this is listed as
8 for the Balderrama and -- Balderrama and Brandi
9 Carl case, correct?
10    A.    Correct.
11    Q.    All right.  Were there bills in
12 addition to that?
13          MR. EWALD:  Objection to the
14     form.
15          THE WITNESS:  I don't know
16     what Analysis Group bills.  I just know
17     what I bill to --
18 BY MR. TISI:
19    Q.    Well, do you know --
20    A.    -- Analysis Group.
21    Q.    Do you know what they billed for the
22 project in which you were working on to develop
23 Exhibit Number 2, your expert report?  Were they
24 actually billing in addition to the $276,000?

Page 84

1     A.    No.
2     Q.    Do you know that?
3     A.    I don't.
4     Q.    Because on page 1, it says:
5          "The professional services rendered
6 in connection with the above referenced case."
7          Okay?
8     A.    Yeah.
9     Q.    You know this case involves more
10 than just Brandi Carl and Ms. Balderrama, correct?
11    A.    I -- I am -- I wrote this report for
12 this particular case.
13    Q.    Well, we're being served today, as
14 counsel has represented, the identical report in
15 what's called the multidistrict litigation.
16          Are you aware of that?
17    A.    I -- I honestly don't recall.
18    Q.    Have you signed another report in
19 connection with this case?
20    A.    I do not recall what reports are
21 that I'm -- that I'm writing reports for.  So.
22          MR. TISI:  Counsel, do you
23     want to make a representation as to
24     whether she's going to be designated?

Page 85

1          MR. EWALD:  She is designated
2     in the MDL.  Her report will be served
3     later today for her, and the report is in
4     all material respects identical to the
5     Carl and Balderrama report.
6          MR. TISI:  Okay.
7          MR. EWALD:  I can also
8     represent to you that there are not
9     separate bills for the MDL.
10          MR. TISI:  That's what I
11     wanted to know.
12          MR. EWALD:  Yes.  Yes.
13          MR. TISI:  Okay.
14          THE WITNESS:  Okay.  Sorry.
15     I --
16          MR. EWALD:  You're not a
17     lawyer.  (Laugh.)
18 BY MR. TISI:
19    Q.    Now, in addition --
20          MR. EWALD:  And just we're
21     going on an hour.  I'm not saying stop
22     right now, but at a good stopping point,
23     can we take a break.
24          MR. TISI:  I will definitely

22 (Pages 82 - 85)

Page 86

1    do that.  Just let me finish up the
2    notice of deposition --
3            MR. EWALD:  Go ahead.  Of
4    course.
5            MR. TISI:  -- and we'll move
6    on.
7            You provided -- I'm going to
8    show you what's Exhibit Number 49,
9    please.
10           (Document marked for
11       identification as Sutcliffe Exhibit 49.)
12  BY MR. TISI:
13       Q.    And these are notes from your review
14  of Dr. Nicholson and Dr. Hopkins.
15       A.    These are notes from Dr. Nicholson,
16  not Dr. Hopkins.
17       Q.    If you look at the back?
18       A.    Oh, sorry.  I didn't see it.
19       Q.    Wait a second.
20       A.    Oh, okay.  I see it.
21       Q.    Correct?
22       A.    Yes.
23       Q.    And those were done at your
24  direction?

Page 87

1    A.    The interviews?
2    Q.    Yes.
3    A.    Were conducted with my direction,
4  yes.
5    Q.    How did you choose those people to
6  interview?
7    A.    I chose those two -- well, first of
8  all, you know, I asked about people who might have
9  been in the company at the time of particularly
10  the disruptive ambiguity happening in the 1970s,
11  and there were no people really around other than
12  Dr. Hopkins.
13          And I thought it would be important
14  to -- to interview Dr. Nicholson because she was
15  thinking about women's health and she was
16  available.
17       Q.    How did you give -- how did you get
18  both of those names?  Did you get it from counsel?
19       A.    How did I get their names?
20       Q.    Uh-huh.
21       A.    Well, I mean, I've been reviewing
22  the literature and the evidence and -- yeah, I
23  think --
24       Q.    Well, there are plenty of other

Page 88

1    people, a cast of characters in this case.
2    There's Lorena Telofski.  There's -- there's
3    Catherine Wille.  There's all kinds of people, and
4    we'll ask you about those.
5            Can you tell me how you chose these
6    two as opposed to anybody else who you've seen in
7    the records?
8       A.    I don't recall why -- why these two.
9    These two were the people that I interviewed.
10      Q.    Well, how did -- in terms of having
11  a methodology -- first of all, you spoke to these
12  people after litigation had started, correct?
13      A.    I spoke to these people, I think, in
14  2020.  I don't remember -- oh, this was 2021.  I
15  think I talked to Dr. Hopkins in 2020.
16      Q.    All right.  And, you know, one of
17  the things you talked about -- and we'll talk
18  about this in a moment -- talking about things
19  like retrospective bias or I forget what you
20  called it.
21      A.    Hindsight bias?
22      Q.    Hindsight bias.
23          Do you think any of these witnesses
24  who were involved as litigation witnesses might

Page 89

1    have some hindsight bias when they were
2    interviewed by a litigation expert in connection
3    with a litigation report?
4       A.    I was looking at multiple avenues of
5    evidence.  You know, triangulating is what we call
6    it.  I interviewed these two people to see what
7    they had to say.
8       Q.    Was there anybody there who would
9    challenge them on some of the assertions that they
10  made, for example, about the Credo?
11      A.    I do not recall.  I do not recall
12  who was there, actually.
13      Q.    You just took their word for it?
14  When they said, "We complied with the Credo," you
15  took their word for it, right?
16          MR. EWALD:  Objection to form.
17          Go ahead.
18          THE WITNESS:  This was one
19      source of evidence.  The evidence that I
20      relied on primarily was the primary
21      evidence that I --
22  BY MR. TISI:
23      Q.    Okay.
24      A.    -- I document throughout my report.

23 (Pages 86 - 89)

Page 90

1 This was one other source of evidence that I used
2 and put it into context.
3    Q.    Okay.  Let me just look through some
4 of the things here.
5       Did you have communications and
6 e-mails with the Analysis Group over time?
7    A.    We -- we have occasional e-mails
8 but, generally speaking, we don't do a lot of
9 stuff by e-mail.
10    Q.    Okay.  Do you have e-mails relating
11 to -- to your communications with the Analysis
12 Group?
13    A.    Again, you know, occasionally we do
14 logistics over -- over e-mail, but we don't
15 communicate through e-mail.
16    Q.    I asked whether you have e-mails.
17    A.    I don't.  Probably not, no.
18    Q.    Okay.  If you do, we'd like them and
19 we make a request.
20    A.    I don't -- I don't have it.
21       MR. EWALD:  Take that under --
22    I'll just note, we did make objections in
23    our response, and subject to those
24    objections, we will need to confer.

Page 91

1 BY MR. TISI:
2    Q.    Okay.  Did you do any -- have you
3 done any PowerPoint presentations or anything
4 related to cosmetics outside of this litigation,
5 to the best of your knowledge?
6    A.    No.
7    Q.    When did you -- when did you
8 complete your report?
9       I know your report in this case was
10 signed on April 12th of 2024.
11       When was this report actually
12 completed?
13    A.    April 12, 2024.
14    Q.    So you continued to review things in
15 this case up until April 12th?
16    A.    I was reviewing things up until
17 April 12th.
18    Q.    When would you say the bulk of your
19 review was?  You were contacted in 2019.
20       When was your -- was the work steady
21 over time?  Was there a particular --
22    A.    For this report?
23    Q.    For this report.  For the opinions
24 in this report.  I mean, I'm not asking you the

Page 92

1 written work.  I'm asking -- I'm not asking you
2 the actual words on the page.
3       I'm asking you:  When did you
4 actually develop the opinions that were
5 encapsulated in this report?
6    A.    Between 2019 and 2021 and then got
7 reengaged in last year and in the fall, and then
8 did this report this year.
9    Q.    When -- when was the bulk -- you
10 talk about in your Methodology section you got, I
11 think, 600 documents initially and --
12    A.    Uh-huh.
13    Q.    -- then you got 500,000 documents
14 later?
15    A.    Right.
16    Q.    When in the continuum of this
17 five-year period did you get the bulk of the
18 documents to do your complete methodologic review?
19    A.    2019, 2020.  Then in 2021, I got the
20 additional production documents from the LAOSD
21 and, you know, continued to -- to do work then.
22 And as I said, I did work last fall and did work
23 this spring.
24    Q.    Well, the LAOSD is a -- was a

Page 93

1 mesothelioma docket, wasn't it?
2    A.    It was -- I believe it was a meso --
3 meso case, correct.
4    Q.    Right.
5       So most of the work and most of the
6 documents, this is an ovarian cancer case.
7       You know that, right?
8    A.    I know that, and the original
9 documents that I reviewed covered both things.
10       MR. TISI:  Okay.  All right.
11    This is probably a pretty good time to
12    kind of stop.
13       MR. EWALD:  Great.
14       MR. TISI:  We can take a quick
15    break.
16       THE COURT REPORTER:  Off the
17    record.
18       (Recess:  10:18 a.m. -
19       10:27 a.m.)
20       MR. TISI:  Back on the record.
21 BY MR. TISI:
22    Q.    So just a couple other questions
23 about the billing.
24       There is no separate billing -- and

24 (Pages 90 - 93)

Page 94

1 maybe I can ask this to counsel.
2          MR. TISI:  There's no separate
3     billing for the MDL report, correct?
4          MR. EWALD:  Right.
5 BY MR. TISI:
6     Q.     Okay.  And do you have any ownership
7 interest in the Analysis Group?
8     A.     No.
9     Q.     Do you know whether the Analysis
10 Group has done work for J&J --
11    A.     I --
12    Q.     -- outside of litigation.
13    A.     I'm not aware of anything.
14    Q.     Now, when you submit bills to the
15 Analysis Group, do you typically outline what it
16 is you're doing, or do you just say I've done 50
17 hours and I've charged a thousand dollars an hour
18 and here's my bill?  Do you have to account for
19 what you're doing and when you're doing it?
20    A.     Yeah, I generally account for that I
21 met with my team or that I reviewed materials or
22 that I met with counsel, etc.
23    Q.     Doesn't say what you've done, right?
24    A.     No.

Page 95

1     Q.     None of those are reflected in
2 Exhibit Number 48, other than a bill for -- on
3 April 19th for $1100 -- $11,000, correct?
4     A.     I've never seen that.  Okay.
5     Q.     The second one is April 19th bill
6 for $11,000?
7     A.     I'm sorry.  I'm not sure where
8 you're referring.
9     Q.     The second one.  It's dated April
10 19th.
11    A.     Oh, okay.
12    Q.     It's $11,000, and these are the
13 kinds of things you would send to --
14    A.     Correct.
15    Q.     -- Analysis Group --
16    A.     This is.
17    Q.     -- periodically, but it would not
18 say?
19    A.     Correct.
20    Q.     It would say "expert services" and
21 the number of hours?
22    A.     Yes.
23    Q.     It wouldn't indicate what you're
24 doing?

Page 96

1     A.     This is what they send.
2     Q.     And they pay bills like that?
3     A.     I have no idea about how Analysis
4 does their bills.
5     Q.     I assume over the course of time
6 because this is only $11,000, you have maybe
7 between 4 and $500,000 that numerous letters like
8 this have gone back and forth over to Analysis
9 Group over the past five years, correct?
10    A.     I have not seen -- I have not seen
11 what Analysis -- this is, like, the first time I'm
12 seeing this.
13    Q.     Well, how do you -- how do you
14 report your hours to Analysis Group?
15    A.     I send them an invoice.
16    Q.     Okay.  Do you have a copy of your
17 invoices?
18    A.     Not -- no, I don't.
19    Q.     You know that we asked for that,
20 right?
21    A.     Well, I -- I --
22    Q.     We asked for your invoices, not
23 Analysis Group's.  Your invoices.
24    A.     I send Analysis Group my invoices.

Page 97

1     Q.     Have you produced those?
2     A.     I haven't produced anything other
3 than I've produced --
4     Q.     Yes.
5     A.     -- I sent that to him.  Or not to
6 him but...
7     Q.     Do you have any objection -- do you
8 have any objection producing -- the invoices will
9 tell us when you did work, correct?
10    A.     Yes.
11    Q.     And it will tell you how much time
12 you spent on the work that you did in preparation
13 for your MDL report and your Carl and Balderrama
14 reports, correct?
15    A.     Correct.
16    Q.     All right.  And we are going to ask
17 that that be produced.
18          Okay?
19    A.     Okay.
20          MR. EWALD:  And we'll take
21     that under advisement subject to our
22     objections and we need to confer.
23 BY MR. TISI:
24    Q.     So let's talk about your methodology

25 (Pages 94 - 97)

Page 98

1 for a moment. We've talked about your
2 qualifications. Let's talk about your
3 methodology.
4         You used the word "sensemaking."
5         Would you explain that in layman's
6 term for Uncle Charlie?
7     A.    I believe I answered that question
8 earlier today.
9     Q.    Enlighten me again, please.
10    A.    Again, it is a well-established
11 framework in organization studies, organization
12 behavior, organization theory.
13    Q.    And what does it attempt to do?
14    A.    It attempts to provide insight into
15 how people -- how organizations size up the
16 situation. How they understand what they're
17 facing. Before people and organizations take
18 action, they have to understand what they're
19 facing. This is a way of understanding the
20 institutionalized knowledge that is developed in
21 an organization.
22    Q.    Okay. So I'm just a layperson here.
23 I have to confess. This is the first time I've
24 ever deposed a behavioral, organizational expert

Page 99

1         Sensemaking is an attempt to -- and
2 what's the phrase you just used? I wish I had it
3 in front of me. It's an attempt to look at what
4 they're facing at the time?
5     A.    Sensemaking is a way to understand
6 the process of how entities come to understand and
7 how they develop their institutionalized knowledge
8 about particular situations.
9     Q.    Okay. So if we are to use the word,
10 what are they facing? Okay? We talked about
11 before.
12         One of the things we're trying to
13 figure out, for example, what J&J was facing in
14 terms of -- I'm not talking about disruptive
15 ambiguity, but in terms of what they're facing on
16 the issues relating to the safety of talc, that
17 could come from various sources both external and
18 internal, correct?
19    A.    It's a process --
20    Q.    Right.
21         And what they're facing --
22    A.    -- of how --
23    Q.    I'm sorry.
24    A.    Can I just continue?

Page 100

1     Q.    Sure.
2     A.    It's a process of how information
3 enters an organization, how it's interpreted, how
4 it's acted upon, how it's affirmed. And as I said
5 earlier today, it really entails in some way for
6 lay people, who don't really understand it, what's
7 the story? Now what?
8     Q.    Okay.
9     A.    It is the knowledge that we have
10 that affects our actions.
11    Q.    Okay. Okay. So I'm taking away
12 from this explanation three questions as I'm
13 trying to process it. You tell me whether or not
14 I'm making sense.
15         But the three questions are: What
16 are they facing? Correct?
17    A.    Yes, it's -- that -- that's a --
18    Q.    That's part of it?
19    A.    That's an outcome. The process is,
20 you know, what are we doing to be able to get
21 information --
22    Q.    Okay.
23    A.    -- that gives us a sense of -- of,
24 you know, of the landscape.

Page 101

1     Q.    Okay. So four questions.
2         You got to get information about the
3 landscape, right?
4     A.    It's a process.
5     Q.    Right.
6         And part of that process is looking
7 external to the company, for example. You got to
8 look at the environment in which you're working.
9 True?
10    A.    There are many things that you might
11 want to look at and, you know, I can tell --
12    Q.    I'm asking -- I'm asking just one at
13 a time because I'm trying to wrap my head around
14 it. Okay? So just bear with me.
15         One of the things that you do is
16 you -- as part of this sensemaking process -- is
17 you have to get information external to the
18 organization? Again, can come from various
19 sources but you got to get information externally,
20 if it's available?
21    A.    I guess I'm having trouble
22 understanding what you're asking.
23         Because, generally speaking, you can
24 think about it as sensemaking is a process that

26 (Pages 98 - 101)

Page 102

1  entails, you know, how -- how does -- how does
2  information enter an organization?  There are best
3  practices.  One best practice would be, yes, to --
4  to go broad and deep in sources of information
5  because that doesn't always happen.
6      Q.    Okay.
7      A.    So, for example, I studied
8  organizations that actually don't -- who don't
9  collect information at all.  They decide that
10 internally, you know, "We know best."  That
11 happened in Toyota when I studied Toyota.
12         And so, you know, I mean, there are
13 many things that go into it.
14     Q.    So let's -- let's break it up, and I
15 don't want to interrupt you but, honestly, I'm
16 trying to get an understanding of this method.
17         Okay?  So just -- just let me --
18     A.    It's number -- can I just say that
19 you used the term "method."  It's not a method.
20 It's a conceptual framework.
21     Q.    Okay.  Conceptual framework.
22     A.    Uh-huh.
23     Q.    Bear with me because I'm just a
24 stupid lawyer.  Okay?

Page 103

1          One of the things you look at is
2  what's -- if it's available, a good sensemaking
3  process framework is to look at what's happening
4  outside your organization.  True?
5      A.    Best practices -- I mean, I'm
6  thinking -- (laugh).  I don't know whether we're
7  on the same page.
8      Q.    I don't really know what's
9  controversial about that.
10         Do you look at the environment in
11 which the company is operating?
12     A.    Where, I mean, a best practice would
13 be searching broad and deep --
14     Q.    Okay.
15     A.    -- for information.
16     Q.    Okay.
17     A.    Working with experts to get
18 information.
19     Q.    Okay.
20     A.    Drawing on others' expertise.
21     Q.    Okay.  And you would also look
22 within the organization?
23     A.    You can look within the organization
24 as well.

Page 104

1      Q.    And then once you collect all the
2  information as best as you can from external
3  sources and internal sources, you pull all
4  together and you try to make decisions, correct?
5      A.    It is an ongoing process.
6      Q.    True.  Okay.
7          And for Johnson & Johnson, okay, you
8  have to be doing this continuing throughout the
9  lifecycle of the product.  True?
10     A.    Right.  Sensemaking is occurring
11 throughout -- throughout time.
12     Q.    Right.
13     A.    And it is especially important when
14 there is disruptive ambiguity.
15     Q.    Okay.  We'll talk about disruptive
16 ambiguity in a minute.  Give me one concept at a
17 time.  Okay?
18         So you now have sensemaking.  You
19 have to understand the process during the
20 lifecycle of the issue you're discussing.
21         And in this case, we have -- we have
22 a product, let's say, from the 1970s through the
23 2000s.  Throughout the product, you cover about
24 40, 50 years, generally speaking, in your report,

Page 105

1  correct?
2      A.    Generally speaking, I have looked at
3  what the patterns of action are --
4      Q.    Right.
5      A.    -- over decades, correct.
6      Q.    Okay.  Both inside the organization
7  and outside the organization.  True?
8      A.    I'm really uncomfortable with the
9  way you're characterizing it.
10     Q.    Help me.
11     A.    It's the breadth of information --
12     Q.    Okay.
13     A.    -- that an organization is seeking.
14     Q.    Okay.
15     A.    In this case, I was trying to
16 ascertain how active J&J was in pursuing
17 scientific knowledge about the safety of its
18 product.
19     Q.    Okay.
20     A.    What kinds of actions was it taking
21 and what, you know, what resulted from -- from
22 that --
23     Q.    Okay.
24     A.    -- and whether or not they -- their

27 (Pages 102 - 105)

Page 106

1  actions demonstrated that they cared about --
2  about the well-being of consumers.
3      Q.    Okay.  So knowledge of the safety of
4  their product is important, correct?
5          I'm writing down the things --
6      A.    That's --
7      Q.    -- that you say.
8          One of the things they need to know
9  over the lifecycle of the product is the knowledge
10  as it is being developed over time.  True?
11     A.    I am saying -- (laugh).
12     Q.    I'm using your words.  I'm trying to
13  do my best here.  Help me.
14     A.    Because I think that you're
15  misrepresenting or mischaracterizing --
16     Q.    I am not.
17     A.    -- what I had to say.
18     Q.    Okay.  So let's --
19     A.    It is the process.  In this case,
20  what I have studied is how actively J&J was in
21  pursuing scientific knowledge about the safety of
22  its product and whether the actions that it was
23  taking were consistent with what we would expect
24  to see in a company that cared about the

Page 107

1  well-being of its consumers.
2      Q.    Over time?
3      A.    Its patterns.  I said earlier that I
4  was looking at patterns of action over decades.
5      Q.    That's what I want to know.  Okay?
6          It's not limited to a particular
7  month or a day.  It's looking at the lifecycle of
8  the product, and in this case, we're talking
9  about, let's say, from the late '60s, early '70s
10  through the present.  True?
11     A.    I am not -- I am not thinking about
12  it as a lifecycle of the product.  I am thinking
13  about it as a process --
14     Q.    Okay.
15     A.    -- of understanding and creating
16  institutionalized knowledge over time.
17     Q.    Now, you talked about disruptive
18  ambiguity several times.  Let me get a definition
19  of what that means.
20     A.    It means that there's something
21  that, you know, surprised us that we weren't
22  expecting.
23     Q.    Okay.
24     A.    It just means uncertainty.

Page 108

1  Ambiguity means that there are multiple and
2  conflicting interpretations of what's going on.
3      Q.    Okay.  So uncertainty would, for
4  example, the Cramer study, the publication of the
5  Cramer study and the subsequent epidemiologies
6  that came out, be part of raising questions that
7  would be disruptive ambiguity?
8      A.    I think any -- any -- any study or
9  any piece of information that conflicts with what
10  our -- what we think would be considered --
11  considered that.  I mean, it's not black and
12  white.  I mean, it's --
13     Q.    Okay.
14     A.    There are interpretations.
15     Q.    It happens over time.  Things
16  happen, and I get it.  Look, this part of it I'm
17  really just trying to understand.  Okay?
18     A.    Yeah.
19     Q.    So -- so over time things happen
20  that cause people to react and evaluate.  True?
21     A.    Over time things happen that aren't
22  consistent with our -- with the way we think the
23  world is working and so they -- you know, it's a
24  surprise.

Page 109

1      Q.    All right.  So now you talked about
2  the disruptive ambiguity in the 1970s relating to
3  asbestos that was, in your opinion, resolved by
4  the late 1970s, correct?
5      A.    Yes.
6      Q.    All right.  And then there's this
7  Cramer report that comes out and disruptive
8  ambiguity kind of picks up again, right?
9      A.    I, you know, I wouldn't -- not
10  necessarily, no.
11     Q.    Not necessarily, but it's something
12  -- I think the phrase you used something out of
13  the ordinary that challenges the way we thought
14  things worked, correct?
15     A.    I, you know, I mean, I'd have to --
16  I'd have to think about that.
17     Q.    Okay.
18     A.    I don't know that I can say that for
19  sure.
20     Q.    Well, you know over time there have
21  been 30, 40 epidemiology studies of different, of
22  different structures, different organizations that
23  talk about the potential for -- for one way or the
24  other for talc to cause ovarian cancer, right?

28 (Pages 106 - 109)

Page 110

1          MR. EWALD:  Objection to the
2     form.
3          THE WITNESS:  I know there
4     have been studies of ovarian cancer.
5 BY MR. TISI:
6     Q.    Right.
7     A.    I also know that there have been
8 other things happening in the regulatory
9 environment that have provided other signals about
10 with what's -- what's --
11    Q.    Right.
12    A.    -- what's up.
13    Q.    And that's -- this is not -- I'm not
14 -- honestly, I'm just really trying to get it.
15         Study published.  Other studies
16 happen.  Regulatory people weigh in.  Academic
17 organizations weigh in.
18         That can be disruptive ambiguity,
19 right?
20    A.    I mean, it can be or it might not
21 be.
22    Q.    Okay.
23    A.    Depending on, you know, depending on
24 what's happening in the context.

Page 111

1     Q.    *All right.  So how did -- do you
2 know how J&J got your name?
3     A.    I have no idea.
4     Q.    Who first contacted you?
5     A.    Kim -- Kris Comeaux from Analysis
6 Group first contacted me.
7     Q.    So is it your understanding that the
8 Analysis Group was contacted by J&J to look for an
9 expert and you came in mind?  I mean, did you ask
10 any questions about that?
11    A.    No.
12    Q.    You just said, "Yeah, sure, I'll do
13 it"?
14    A.    I asked to know what -- what the
15 project entailed and I thought it would be
16 interesting, and I have worked with the Analysis
17 Group before and so I said, you know.  I didn't
18 know what I'd find.
19    Q.    Uh-huh.  And when is the first time
20 you met a lawyer for J&J?
21    A.    It was sometime, I think, in the --
22 I do not remember.  It was sometime in 2019, but
23 it was after I started working on the project with
24 the team.

Page 112

1     Q.    Now, on page -- paragraph 52 of your
2 report, if you go to that.
3     A.    Uh-huh.
4     Q.    Again, you know this is ovarian
5 cancer case, right?
6     A.    Yep.
7     Q.    Paragraph 52 in the middle of the
8 paragraph says:
9          "This case was inherently defined by
10 the allegations that J&J baby powder/talc products
11 were contaminated with asbestos and that these
12 allegedly contaminated J&J baby powder/talc
13 products caused plaintiffs to develop cancer."
14         Do you see that?
15    A.    I see that.
16    Q.    Is that your understanding of how
17 this case was defined?
18    A.    That's how I defined it.
19    Q.    So the case wasn't defined to you
20 along the lines of:  There have been 40 years of
21 epidemiology studies which demonstrated an
22 increased risk of ovarian cancer and we're trying
23 to understand them and that those studies
24 establish the risk?

Page 113

1          MR. EWALD:  Objection to form.
2 BY MR. TISI:
3     Q.    It was solely tethered to asbestos.
4 True?
5     A.    It was -- it was tethered to the
6 safety of the product.
7     Q.    Okay.  So, but the safety of the
8 product can come -- the questions about the safety
9 of the product can come from different sources,
10 correct?
11    A.    Questions about the safety of -- of
12 the product can come from many sources --
13    Q.    Right.
14    A.    -- and -- and that's --
15    Q.    Asbestos could be one --
16    A.    -- what I took on.
17    Q.    I'm sorry.  I didn't mean to
18 interrupt you.
19         Asbestos could be one of them,
20 correct?
21    A.    Asbestos can be one of them.
22    Q.    Okay.  Epidemiology studies could be
23 another source of -- of -- of disruptive
24 ambiguity.  True?

29 (Pages 110 - 113)

Page 114

1    A.    I -- I don't know where you're --
2  you're going with that.  That didn't -- I'm sorry,
3  that didn't --
4    Q.    You don't need to know where I'm
5  going.  You need to answer my question.
6    A.    That -- what your question didn't
7  follow the original question that you were asking.
8    Q.    Well, it doesn't have to follow.
9         My question is -- my question is --
10         MR. EWALD:  Chris, I'm sorry.
11    You said asbestos is a source against?
12         MR. TISI:  Let me rephrase the
13    question.
14         MR. EWALD:  Yeah.  Right.
15         MR. TISI:  Let me rephrase the
16    question.
17  BY MR. TISI:
18    Q.    Was the case initially defined to
19  you as:  Plaintiffs in this case have said
20  asbestos causes ovarian cancer and there's
21  asbestos in the talc?  Is that how it was
22  initially explained to you?
23    A.    I do not recall how the case was
24  initially explained to me.

Page 115

1         I was initially contacted to do a
2  study, an analysis of many decades of -- of
3  evidence and research to come to an understanding
4  of what J&J knew and when about the potential for
5  its product to be unsafe, and whether or not the
6  actions that J&J had taken demonstrate -- because
7  I'm an organization scientist -- whether it showed
8  a company that cared about the well-being of its
9  consumers.
10    Q.    When you say -- where I'm getting
11  hung up, you say the product is unsafe.
12         Unsafe for women who use it for --
13  for genital hygiene to cause ovarian cancer.
14         Is that included in the unsafe
15  portion of what you've just described?
16    A.    It was included --
17    Q.    Okay.
18    A.    -- which I have written.
19    Q.    Right.
20    A.    If I may?
21    Q.    Of course.  I'm letting you.
22    A.    You know, I mean, my assignment was
23  to understand the potential for asbestos in the
24  product, as well as the potential for the

Page 116

1  association between talc and ovarian cancer.
2    Q.    Okay.  Now, you spent a lot of time
3  talking about asbestos, but not a lot of time
4  talking about the association that was discussed
5  over 40 years in the medical literature.  True?
6         MR. EWALD:  Objection to form.
7    Vague.
8         THE WITNESS:  I did not do a
9    systematic study of --
10  BY MR. TISI:
11    Q.    Okay.
12    A.    -- of ovarian cancer.
13         I talked to experts in the company.
14  I looked at what was happening in the scientific
15  literature and what J&J was aware of with respect
16  to the regulators and regulations and things that
17  were coming out of the regulatory community.
18    Q.    But if your question -- if the
19  question when you say inherently defined by the
20  allegations Johnson's Baby Powder talc products
21  were contaminated with asbestos and those
22  allegedly contaminated J&J baby products caused
23  the plaintiffs to develop cancer, if your inherent
24  definition of the nature of our claims is wrong,

Page 117

1  then everything that happens afterward would be
2  called into question.  True?
3    A.    No.
4         MR. EWALD:  Objection to form.
5    Legal conclusions.
6         Go ahead.
7  BY MR. TISI:
8    Q.    Okay.
9    A.    I generally -- as I said, my role in
10  the case was to examine what --
11    Q.    All of it?
12    A.    -- J&J knew --
13         MR. EWALD:  She's doesn't need
14    help with her answer.
15         Go ahead.
16         THE WITNESS:  What J&J knew
17    and when about the safety of its products
18    and whether or not their actions were
19    consistent with a company that cared
20    about the well-being of its consumers.
21  BY MR. TISI:
22    Q.    So it's not just limited to
23  asbestos.  It's just the safety of the product
24  generally?

30 (Pages 114 - 117)

Page 118

1    A.    Generally speaking --
2    Q.    Okay.
3    A.    -- as I said, and I've written it
4  earlier throughout this report, you know, what J&J
5  knew and when about the allegation of asbestos in
6  the product and what they knew about the potential
7  association between talc and ovarian cancer.
8    Q.    Perfect. Thank you. Because it
9  wasn't clear to me, and I appreciate that
10  clarification. Thank you.
11    A.    And it's -- it's in here several
12  times.
13    Q.    Well, several times you talk about
14  asbestos, and I want to make sure that your
15  analysis is not solely dependent upon your
16  opinions about asbestos.
17          It's about the safety of talc and
18  ovarian cancer whatever the source of the
19  information?
20    A.    Yes.
21          MR. TISI: Okay. Could you,
22    Madam Court Reporter, just mark that
23    question and answer because I'm going to
24    come back to it, if you don't mind.

Page 119

1  BY MR. TISI:
2    Q.    Now, you reviewed the testimony -- I
3  think in your process you interviewed
4  Drs. Nicholson and Hopkins.
5          Did you review any of the
6  depositions taken in the MDL?
7    A.    I would -- do not -- I --
8    Q.    Let me give you some names and ask
9  whether you remember them.
10    A.    I --
11    Q.    Did you --
12    A.    Did you ask if I interviewed?
13    Q.    No, did you review the testimony.
14    A.    Okay.
15    Q.    Have you reviewed the testimony of
16  Catherine Wille?
17    A.    I do not recall.
18    Q.    Have you reviewed the testimony of
19  Dr. Musket, an outside epidemiologist who
20  conducted --
21    A.    No. I mean, I've heard the name. I
22  do not recall.
23    Q.    John McKeegan?
24    A.    If it -- if those are in my

Page 120

1  documents considered --
2    Q.    They are not.
3    A.    -- then I reviewed it.
4          Then I did not.
5    Q.    Do you know --
6    A.    I mean, although I can't really say
7  that because I have reviewed many things that I
8  don't have on the considered list, but I do not
9  remember.
10    Q.    Do you know a Mr. Caverna, who's an
11  advertising person? Have you looked at him?
12    A.    I don't recall.
13    Q.    John O'Shaughnessy?
14    A.    I believe that I reviewed that a
15  couple years ago.
16    Q.    Okay. That's one you did review.
17    A.    I do not remember.
18    Q.    Donald Hicks, who is a testing
19  expert?
20    A.    I -- I may have. I -- I do not
21  remember.
22    Q.    Julie Pier for Imerys, a testing
23  expert?
24    A.    I recall having reviewed Dr. -- I

Page 121

1  mean Julie.
2    Q.    Because they're not on your list.
3  Any other places?
4    A.    I did. I believe that I reviewed
5  her.
6    Q.    Okay. What about any other Imerys
7  witnesses? Do you remember that?
8    A.    I don't remember.
9    Q.    Lorena Telofski?
10    A.    It sounds familiar. I may have. I
11  don't remember.
12    Q.    You said you considered the -- the
13  testimony and the opening statements of the
14  plaintiffs and defendant in the Ingham case.
15          Did you remember saying you
16  considered those things?
17    A.    Uh-huh.
18    Q.    I'm sorry. Is that a yes?
19    A.    Yes, that's a yes.
20    Q.    Okay. Did you review the judicial
21  findings of the Missouri Court of Appeals which
22  found Johnson & Johnson to have been subject to
23  punitive damages for misleading the public about
24  the safety of talc?

31 (Pages 118 - 121)

Page 122

1      A.    I --
2            MR. EWALD:  Objection to form.
3            THE WITNESS:   I do not
4      remember.
5  BY MR. TISI:
6      Q.    You did not review that?
7      A.    I don't recall.
8            MR. EWALD:  And, Chris, I just
9      want to make sure that amongst the
10     materials you got on Saturday, there was
11     an updated reliance list that had
12     highlighted a couple of additions to the
13     list.  Did you get that?
14           MR. TISI:  I did, but I didn't
15     see it, but perhaps maybe it's in there
16     and we can -- I can double-check.
17           MR. EWALD:  Okay.  It does
18     list including the O'Shaughnessy
19     deposition.
20           MR. TISI:  Okay.  That's fine.
21  BY MR. TISI:
22     Q.    Okay.  So when you -- let's talk
23  about your interviews of Dr. Hopkins and Dr. --
24  let's go back to that, if you don't mind, Exhibit

Page 123

1  Number 49.
2            First of all, did you -- did you
3  record in any way, other than Exhibit 49, your
4  interview with any of these people?
5      A.    No.
6      Q.    Okay.  Did you have a list of
7  questions when you went in?
8      A.    I think I had questions.  I don't
9  recall that.
10     Q.    You don't remember what questions
11  you had?
12     A.    No.
13     Q.    So you don't have -- when you
14  conduct interviews in trying to do sensemaking, as
15  part of your analytic methodology, did you -- do
16  you have a standard set of questions you ask
17  people when you interview them?
18     A.    It's context-dependent.
19     Q.    Okay.  Did you have -- did you
20  develop the context before interviewing these
21  people and having a list of questions?
22     A.    I thought about it before I
23  interviewed them.  I probably had questions.  I
24  don't -- I don't have them.

Page 124

1      Q.    Okay.  I mean, before I interviewed
2  you today, I have -- I wrote down questions here
3  that I knew I was going to ask you.
4            Did you do that for the -- for
5  these -- these witnesses?  You just meet them for
6  coffee and ask them questions that popped into
7  your head?
8      A.    I --
9            MR. EWALD:  Objection to form.
10           THE WITNESS:  I think I just
11     answered that.
12           I probably had a list of
13     questions.  I don't remember it and I
14     don't have them.
15  BY MR. TISI:
16     Q.    Okay.  So not the questions you
17  asked, but the notes of your questions.  For
18  example, let's take Dr. Nicholson.
19           You see that?
20     A.    Yes.
21     Q.    Did you ask her at all about the
22  epidemiology evidence that developed in the 1990s
23  and 2000s?  Did you ask her about that?
24     A.    I asked her about -- I mean, we

Page 125

1  discussed what she was paying attention to or
2  whatever, and -- and she told me the kinds of
3  things that she was doing.
4      Q.    Did she talk about the epidemiology
5  studies that had -- that had started in 1980s,
6  1990s, 2000s, 2010s?  Did she talk about those?
7      A.    I know that she was paying attention
8  to the literature and that's what I know.  I
9  didn't go into any specific studies.
10     Q.    You didn't ask her.  I didn't ask
11  you about any specific studies.
12           Did you ask them, for example, "Did
13  anybody ever recommend that you look at corn --
14  change and look at cornstarch in the '80s, '90s,
15  2000s, 2021 as a potential safer alternative to
16  your talcum powder product?"  Did you ask her that
17  question?
18     A.    I already had examined the
19  literature before then.  So I knew what was
20  happening.  I asked her the questions that I asked
21  here.
22     Q.    Well, you said -- let's break that
23  down.  I mean, you know, let's be specific.
24           You said you did not look at the

32 (Pages 122 - 125)

Page 126

1 epidemiology studies?
2    A.    What I said was, I didn't do a
3 systematic analysis --
4    Q.    Okay.
5    A.    -- of the -- of the scientific
6 literature.
7    Q.    So you did or did not read the
8 epidemiology studies?
9    A.    I have read some studies over time.
10 I don't remember which ones that I read, but I did
11 not do a systematic analysis, as I said earlier.
12    Q.    Okay. So my question is: Did you
13 ask her the specific question, "At any time in the
14 '90s, 2000s, 2010s, did the company consider
15 changing to cornstarch"?
16    A.    I do not recall asking that
17 question.
18    Q.    Did you ask her the question about
19 whether or not they talked about adding an
20 instruction to women saying, you know, for safety
21 sake, you better not -- we don't recommend you use
22 it in the genital area?
23    A.    Generally speaking, I was asking
24 Dr. Nicholson about her basic actions and the

Page 127

1 kinds of things she was doing, how the
2 organization was structured, as you can see from
3 this interview.
4    Q.    Did you ask her whether they had
5 policies and procedures to do that?
6    A.    She -- she talked a little bit about
7 the way the organization was structured --
8    Q.    Did she tell you --
9    A.    -- related to quality and safety.
10    Q.    Did she tell you that there was
11 specific policies and procedures that would --
12 that would -- that were in place at the time that
13 would allow them to actually do an analysis
14 according to a pre-described plan?
15    A.    I -- I do not recall specifically
16 all the things that -- that I asked her.
17    Q.    Well, I mean, other than asking her
18 whether she likes apple pie, did you ask her the
19 recipe of apple pie?
20        MR. EWALD:    Objection.
21 BY MR. TISI:
22    Q.    I mean, I'm not being facetious
23 here. This is a lot of -- a lot of stuff about
24 "We paid attention."

Page 128

1        Did you ask her how she paid
2 attention?
3    A.    I -- I mean, yes. Like she's
4 paying, you know, that she -- I mean, if you want
5 to go through these notes, I'm happy to do that.
6    Q.    I'm asking. Look at the notes. You
7 tell me what she paid attention to. Tell me --
8 tell me what studies she looked at. Tell me what
9 committee meetings she went to.
10        Tell me what -- what -- what -- at
11 what periods of time they did an analysis as to
12 whether or not they changed to cornstarch. Tell
13 me what specifically you asked her about any of
14 the issues relating to this case.
15    A.    I was --
16        MR. EWALD:    Objection to form.
17    Compound.
18        Go ahead.
19        THE WITNESS:    I wanted to
20    know, you know, what she was thinking
21    about, what she was doing, what J&J was
22    doing. I wanted to know about the
23    structure of the organization, you know,
24    how it thinks about safety, how it was

Page 129

1    thinking about other -- other things, and
2    that's what I asked her about.
3 BY MR. TISI:
4    Q.    Do you know when she first started
5 becoming involved in the talc issue at J&J?
6    A.    I might have written about that in
7 here somewhere. I do not recall specifically.
8    Q.    Do you know that she didn't become
9 involved until the mid- to late 2010s?
10    A.    I don't recall when.
11    Q.    Did you interview anybody -- John
12 Hopkins left the company in the early '80s,
13 correct?
14    A.    Well, he was still testifying for
15 the company.
16    Q.    All right. I'm not asking what he
17 testified to because, you know, that might be
18 subject to hindsight bias.
19        I'm asking you: Did you speak to
20 anybody who was actually at the company between
21 the mid-1980s to the mid-2010s?
22    A.    I think for the issue of the NTP
23 meetings, I think that I did interview two. I
24 mean, I did -- I didn't interview them, but I

33 (Pages 126 - 129)

Page 130

1  looked at their -- their depositions.
2      Q.    I'm asking whether you interviewed
3  anybody that was actually there at the company
4  that would be able to give you some insight as to
5  -- let's look at what you said -- knowledge of
6  what was coming into the company to evaluate the
7  actions that were being taken as part of your
8  sensemaking framework?
9      A.    Earlier today I highlighted that
10 what's most important in my analysis is really
11 understanding what was actually happening and
12 using the primary data to do that --
13     Q.    Okay.
14     A.    -- and that's what I've done.
15     Q.    Okay.  So just to be clear,
16 Dr. Nicholson never told you about any policies
17 and procedures that -- that were in place at the
18 time to evaluate the safety of talc.  True?
19     A.    I was not asking about policies and
20 procedures.  I was generally asking about:  What
21 is the structure?  What are you doing?  What are
22 you thinking about?  Etc.
23     Q.    Well, haven't you as part of your BP
24 testimony testified that, according to your

Page 131

1  framework to evaluate a safety culture, you have
2  to look at policies and procedures?
3      A.    Here I was not -- I was not studying
4  the safety culture in this, and I did -- I used a
5  completely different framework than my BP work.
6      Q.    Ah.  So your framework is dependent
7  upon the case in which you're -- you're testifying
8  in, right?
9              MR. EWALD:  Objection to form.
10             THE WITNESS:  The framework
11      depends on what is my -- what's the
12      question that I'm trying to answer.
13 BY MR. TISI:
14     Q.    Okay.  All right.  So there's a
15 couple things I see in these notes that are --
16 that I'm curious about.
17     A.    Uh-huh.
18     Q.    You say on the Nicholson -- first of
19 all, do you know Dr. Nicholson was actually held
20 in contempt by a court for not testifying in a
21 case?
22             MR. EWALD:  Objection to form.
23 BY MR. TISI:
24     Q.    Have you been told that?

Page 132

1      A.    I don't know anything more about
2  Dr. Nicholson, other than what I --
3      Q.    Do you know she pled guilty to -- to
4  being -- being held in contempt, right?
5              MR. EWALD:  Objection to form.
6      Mischaracterizes.
7              THE WITNESS:  I don't know
8      anything.  I don't know anything one way
9      or another.
10 BY MR. TISI:
11     Q.    Okay.  Do you know -- it says here,
12 it says:
13             "People want to do the right thing
14 if people feel pressured."
15             Do you see that statement?
16     A.    Let's see.  Where is that?
17             MR. EWALD:  It's in the
18      fourth.
19             THE WITNESS:  Yeah, I see it.
20 BY MR. TISI:
21     Q.    Do you know what that means?
22     A.    Yeah, that people want to do -- in
23 the organization that there is -- that there is
24 the Credo and that people want to do the right

Page 133

1  thing, even if they feel pressured.
2      Q.    Okay.  So now let me ask you this as
3  part of the Credo.
4             It's important that you not just
5  have a Credo, you know.  It's important to have
6  enabling -- something that enables the Credo to
7  actually be carried out, right?  Policies,
8  procedures, SOPs, etc.  Companies need to have
9  that, right?
10     A.    Standard operating procedures are --
11     Q.    Correct.
12     A.    -- pretty normal in organizations.
13     Q.    And it's important because people
14 want to know what to do when safety issues arise,
15 correct?
16     A.    That's one way to do it.  There are
17 many other ways to do it.
18     Q.    And they need to know who's
19 accountable for executing on those issues,
20 correct?
21     A.    You know, you're asking a pretty
22 (laugh) -- I mean, it's a pretty broad question.
23 I --
24     Q.    Well, you have a whole section here

34 (Pages 130 - 133)

Page 134

1 in your appendix on -- on policies and procedures
2 and the Credo, right?
3    A.    I have included a section on the
4 Credo.
5    Q.    Right.
6         And -- but in order to execute on
7 the Credo, they have to have clear lines of
8 communication, clear lines of accountability, and
9 clear lines of what to do when situations arise,
10 correct?
11    A.    That's -- I would -- I would say I
12 don't really agree with that.
13    Q.    You don't agree.  Okay.
14    A.    I would say -- can I finish?
15    Q.    Sure.  Go ahead.
16    A.    Okay.
17    Q.    Please.
18    A.    The Credo is a -- is a value
19 statement.
20    Q.    A value statement, but you have to
21 have --
22    A.    And --
23         MR. EWALD:  Hold on.  She's
24    not done.

Page 135

1 BY MR. TISI:
2    Q.    I thought you were finished.  Go
3 ahead.
4    A.    Yeah, and there are many ways for
5 people to act.  It's essentially what do we do
6 when -- I mean, what values do we hold dear?
7    Q.    You actually started to answer the
8 question.  The "what do we do" part.  Okay?
9    A.    What do we -- right, and, you know,
10 there are many ways that people can take action.
11    Q.    And they need to know.  In an
12 organization, they need to have policies and
13 procedures that help them know what to do, who to
14 speak to, how to analyze issues.
15         Those are really important, correct?
16 SOPs.
17    A.    They can be important.  They may not
18 be important because there are many, you know,
19 because people act in various ways --
20    Q.    Okay.
21    A.    -- under different conditions.
22    Q.    Okay.  Let's go back because we're
23 going to talk about that in a moment.
24         Methodology.  In your report, you

Page 136

1 said you put things in bins.
2         What are bins?
3    A.    Categories.
4    Q.    How did you define the categories?
5    A.    As I said, we initially used
6 temporal categories.  Things happening at this
7 time in the 1950s, the 1940s, 1960s, 1970s.  And
8 then, you know, as it gets -- as over time it gets
9 a little bit more refined.  And you could think of
10 the bins here and see 1, 2, 3, 4 that then over
11 time they get refined, and the data that were put
12 initially in those temporal categories are then
13 put into these categories.
14         So, for example, you know, the data
15 from the -- from 19, or not 19 -- 1898 or whatever
16 how much data we've got to the 1950s, '60s goes
17 into the early efforts and actions taken by J&J.
18    Q.    All right.
19    A.    And so it's just simply a category
20 system.
21    Q.    Do you have a list of the bins you
22 used?
23    A.    No.
24    Q.    Okay.  Now, one of the bins that's

Page 137

1 not in your report is what did the epidemiology
2 studies say, correct?
3    A.    Again, you know, I was not -- I was
4 not charged with looking at the epidemiology
5 studies.  I'm not opining on epidemiology.
6    Q.    But you're not -- but you're not an
7 expert in asbestos either, and you do a lot of
8 opining on that.  True?
9    A.    I am --
10         MR. EWALD:  Objection to form.
11         THE WITNESS:  I am not
12    opining on asbestos either.
13 BY MR. TISI:
14    Q.    Go to paragraph 12, if you could, of
15 your report.
16         Okay.  Your Summary of Opinions
17 section.  I just want to make sure I understand
18 the scope of your report.
19         It says you were retained by J&J and
20 you list what you were retained to do here,
21 correct?
22    A.    Correct.
23    Q.    Okay.  And after you talk about
24 Ms. Carl and Ms. Balderrama, you say that

35 (Pages 134 - 137)

Page 138

1 plaintiffs further allege that J&J and J&J -- I'm
2 sorry -- has and that J&J -- I'm sorry.
3         "Plaintiffs further allege that J&J
4 has known for decades that the talc in its baby
5 powder may pose health risks to consumers, and
6 that J&J ignored and covered up these health
7 risks."
8         Correct?
9    A.    That's -- yeah, that's what I put.
10    Q.    Okay.  And that would include the
11 risk of ovarian cancer.  True?
12    A.    Yes.
13    Q.    It's not just the risk of asbestos
14 and mesothelioma, right?
15    A.    I believe we discussed this earlier.
16 Correct.
17    Q.    I just want to be absolutely 100
18 percent clear --
19    A.    It's clear.
20    Q.    -- you discuss talc and ovarian
21 cancer.  Okay?
22    A.    Again, the health risks --
23    Q.    Because if you're not going to
24 testify to that, I don't want to ask you

Page 139

1 questions.
2    A.    The health risks of its -- of its
3 talc.
4    Q.    And it says:
5         "These claims revolve around
6 questions of whether J&J's baby powder was
7 contaminated with asbestos or was otherwise unsafe
8 to use, and whether J&J did enough to warn users
9 of the alleged health risks."
10         Do you see that?
11    A.    Uh-huh.
12    Q.    Okay.  I'm sorry.  Is that a yes?
13    A.    Yes.
14    Q.    And you are addressing those
15 questions as well?
16    A.    Correct.
17    Q.    Okay.  So it's not just whether or
18 not talc was contaminated with asbestos but
19 whether it was "otherwise unsafe to use"?
20    A.    As I stated earlier, that it was
21 also the potential association between talc and
22 cancer.
23    Q.    Okay.  Okay.  And just so we're a
24 hundred percent clear, it includes not just talc

Page 140

1 and asbestos.  It also includes the association
2 between talc and ovarian cancer.  True?
3         MR. EWALD:  Objection.  Asked
4    and answered a lot of times.
5         Go ahead.
6         THE WITNESS:  I have said, I
7    have stated that several times this
8    morning.
9 BY MR. TISI:
10    Q.    Okay.  Okay.  So let's talk about
11 ovarian cancer.  Okay?
12         Paragraph number 36 of your report
13 you say when J&J -- in the third sentence, it
14 says:
15         "When J&J approved Johnson's Baby
16 Powder with Cornstarch for national sale in 1978,
17 it was not introduced as a replacement for
18 talc-based products -- powders, because by that
19 time much of the ambiguity and concern regarding
20 the safety of cosmetic talc had been resolved."
21         Do you see that?
22    A.    Yes.
23    Q.    Okay.  That's not true, is it?
24    A.    It is true.

Page 141

1    Q.    It's not.  You don't think that
2 issues relating to the question about whether talc
3 can cause ovarian cancer were published in the
4 literature from the '80s, '90s, 2000s, 2010s, that
5 was also disruptive ambiguity?
6    A.    Again, I mean, it's
7 context-dependent.
8    Q.    Okay.
9    A.    And so at this point in time, it was
10 pretty clear that the talc was safe.
11    Q.    And all the studies that came
12 afterward did not raise any questions about
13 whether talc was safe after 1970.
14         Is that your testimony?
15    A.    My testimony is that if we go to
16 later on in here is that J&J was paying attention
17 to the regulatory environment that suggested that
18 there was no association between talc and ovarian
19 cancer.
20    Q.    That's kind of not my question.
21         MR. EWALD:  Hold on.  Let her
22    finish her answer.
23         MR. TISI:  You really need to
24    answer my question.

36 (Pages 138 - 141)

Page 142

1          MR. EWALD:  No.  Let her
2    finish her answer.
3          MR. TISI:  I thought it was
4    done.
5          MR. EWALD:  Are you done?
6          THE WITNESS:   That because
7    J&J is paying attention to a tremendous
8    amount of --
9 BY MR. TISI:
10    Q.    Right.
11    A.    -- of information, making sense of
12 it, affirming it with other people, and the
13 regulatory environment was quite -- was quite
14 clear --
15    Q.    Right.  So the fact that --
16    A.    -- the whole time.
17    Q.    So the fact that IARC said that talc
18 was a potential -- a potential cause of ovarian
19 cancer without asbestos and with asbestos was a
20 potential cause of ovarian cancer, those are not
21 -- that's not disruptive ambiguity?
22    A.    Again, at that time, I mean, the FDA
23 was saying something different.
24    Q.    Oh, we're going to -- we're going to

Page 143

1 look at the FDA, what the FDA said.
2          My question is:  The FDA isn't the
3 only source of information, is it?
4    A.    Again, no, the FDA -- I'm just
5 saying, J&J was paying attention to a lot of
6 different information and that was suggested.
7    Q.    Right.
8    A.    They're paying attention to the
9 scientific literature.  Actively seeking out
10 information, and taking actions that suggested
11 that they had solid institutional knowledge of the
12 environment and took actions that demonstrated
13 that they were taking the well-being of consumers
14 into account.
15    Q.    Respectfully, you're not answering
16 my question.  My question was about disruptive
17 ambiguity.  Okay?
18          You agree with me that there were
19 questions raised in the medical and scientific
20 community, including IARC, FDA, your own
21 institutions, talking about the potential of talc
22 causing ovarian cancer.
23          You agree to that?
24    A.    I agree that J&J was paying

Page 144

1 attention to --
2    Q.    That wasn't my question.
3    A.    I --
4    Q.    Paying attention to is something
5 different.  Okay?
6    A.    (Laugh.)
7    Q.    I'm paying attention to that glass
8 of water right there.  I'm looking at it.
9          A separate question is:  Is there a
10 glass of water there, right?  Two separate
11 questions, right?
12          My question is:  Whether J&J was
13 paying attention or not, you would agree with me
14 that in the medical and scientific community,
15 there was questions about whether or not talc was
16 safe for women using it with respect to ovarian
17 cancer.  True?
18    A.    There have been questions about the
19 talc for many years --
20    Q.    Okay.
21    A.    -- and many of those questions have
22 been answered.
23    Q.    Fine.  We'll talk about whether they
24 were answered or not.

Page 145

1          My question was:  Was there
2 questions being raised?  And the answer is yes.
3 True?
4    A.    Again, I, you know, I did not look
5 at the whole literature on --
6    Q.    Okay.
7    A.    -- talc and ovarian cancer and so
8 I'm, you know, I mean, there are -- I haven't done
9 that here.
10    Q.    Okay.  When you ask about whether or
11 not Johnson & Johnson was paying attention, one of
12 the things they would be paying attention to are
13 what scientists, academics, regulators, other
14 institutions were saying about the safety of talc.
15 True?
16    A.    And as I've demonstrated in here in
17 this document, J&J was paying attention to that.
18    Q.    Okay.  Switch a little bit, talk
19 about a slightly different question.
20          We talked about cosmetics being
21 covered by the Food, Drug, and Cosmetic Act,
22 right?
23          Right?
24    A.    You've mentioned that.

37 (Pages 142 - 145)

Page 146

1    Q.    Well, do you disbelieve me?
2    A.    I'm not --
3    Q.    It's called the Food, Drug, and
4 Cosmetic Act.
5    A.    Okay.
6    Q.    It says the word "cosmetics" in it,
7 right?
8    A.    I have not read the Act.  I -- I --
9    Q.    That's not my question.
10    A.    Okay.
11    Q.    One of the things that you have to
12 consider is what role does the company have to
13 ensure the safety of its products.  True?
14    A.    I have taken a decades-long look at
15 the actions that J&J was taking, the routines that
16 they had --
17    Q.    Right.
18    A.    -- patterns of activity over
19 decades --
20    Q.    Right.
21    A.    -- to assure the safety of its
22 product.
23    Q.    Okay.  And in the Toyota case, you
24 talked about, okay, one of the things you had to

Page 147

1 consider was the regulatory environment, for
2 example, of -- of the National Traffic Safety --
3 NHTSA?
4    A.    In the Toyota case, I applied my
5 expertise as an organization scientist --
6    Q.    Right.
7        But you had to --
8    A.    -- to the matter at hand.
9    Q.    Right.
10        And you had to consider the
11 environment in which the company was operating.
12 True?
13    A.    I -- I -- my analysis was a little
14 different in that case.
15    Q.    Okay.  So it's irrelevant to you?
16    A.    No, it is not irrelevant.
17    Q.    Okay.
18    A.    Because I know exactly what Toyota
19 did.
20    Q.    Okay.  So is -- maybe I'll phrase it
21 a different way.
22        Is it relative to you in terms of
23 looking at organizational behavior the regulatory
24 environment in which you're operating?

Page 148

1        MR. EWALD:  Objection to form.
2        THE WITNESS:  I need a
3    specific question.
4        I am not opining in this
5    case --
6 BY MR. TISI:
7    Q.    Okay.  Let's be specific.
8        MR. EWALD:  Hold on.  Hold on.
9 BY MR. TISI:
10    Q.    You want a specific question, I'll
11 give you a specific question.
12    A.    But you cut me off.
13    Q.    Okay.  Let's do it.  Go ahead.
14 Finish your question.
15    A.    Now I've forgotten.
16    Q.    Okay.  So let me --
17    A.    But essentially what I was saying is
18 my role here is not to opine from a regulatory
19 standpoint.
20    Q.    Not asking that.
21    A.    I am not a regulator, and what I
22 have done is -- is take a look at J&J.  I mean, I
23 don't need to know everything that everybody is
24 doing at every moment in time in order to make an

Page 149

1 organizational assessment of organization
2 behavior, which is what I've done.
3    Q.    I didn't ask that question.  So I'll
4 respectfully -- I will try to let you finish your
5 answers if you actually try to answer my question.
6        Do we have a deal?
7    A.    I have been answering your questions
8 all morning.
9        MR. EWALD:  She's answering.
10 BY MR. TISI:
11    Q.    Okay.  My question is this:  Is it
12 relevant or is it not relevant the regulatory
13 environment in which a company is operating when
14 you do your work?
15        MR. EWALD:  Objection to form.
16        THE WITNESS:  I mean, do
17    companies follow regulations whatever?  I
18    mean, it would depend.  I mean --
19 BY MR. TISI:
20    Q.    Okay.
21    A.    -- honestly, I'm trying to
22 understand in this case whether J&J was taking its
23 actions and the kinds of actions we would expect
24 to see in a company that cared about the

38 (Pages 146 - 149)

Page 150

1 well-being of its consumers.
2          MR. TISI: Okay. Let's look
3     at Exhibit 5. Maybe we can get a
4     specific answer if we do it this way.
5          (Document marked for
6     identification as Sutcliffe Exhibit 5.)
7 BY MR. TISI:
8     Q.    I'm going to show you Exhibit
9 Number 5. The printout from the FDA website which
10 talks about the relative responsibilities of a
11 cosmetic company versus the FDA.
12    A.    Uh-huh.
13    Q.    I'm going to ask whether or not it's
14 either relevant or not relevant and whether you
15 know it or you don't know it.
16          Okay?
17    A.    Relevant to what?
18    Q.    Your opinions. Okay? So let me --
19 let's talk about it.
20          It says -- on the very first page,
21 it says -- first paragraph, it says:
22          The FDA does not -- does not require
23 cosmetic products and ingredients to have FDA
24 approval.

Page 151

1          Is that important or not important
2 to you?
3     A.    It just -- it's not -- I mean, I
4 can't say that it's important or not important. I
5 mean, it is what it is here.
6     Q.    Okay.
7     A.    It says:
8          "The law does not require cosmetic
9 products and ingredients, other than color
10 additives, to have FDA approval before they go on
11 the market."
12    Q.    So it means that the company has
13 sole responsibility for the safety of its product,
14 correct?
15          MR. EWALD: Objection to form.
16          THE WITNESS: The company
17     is -- is tasked as -- the company is
18     making a product.
19 BY MR. TISI:
20    Q.    Okay.
21    A.    They have to think about, you know,
22 they have to think about those matters.
23    Q.    Okay. Next page it says:
24          "What does the law say about the

Page 152

1 safety and labeling of cosmetics?"
2          Bullet point number 1 talks about
3 adulteration.
4     Q.    Do you see "adulteration"? The word
5 "adulterated"?
6     A.    I see that, yes.
7     Q.    It says:
8          "A cosmetic is adulterated if 'it
9 bears or contains any poisonous or deleterious
10 substance which may render it injurious to users
11 under the conditions of use prescribed in the
12 labeling thereof, or under conditions of use as
13 are customary and usual.'"
14          Do you see that?
15    A.    I see that.
16    Q.    First of all, you would agree with
17 me, even though you're not an expert in asbestos,
18 asbestos is a dangerous subject -- substance,
19 correct?
20    A.    Asbestos is harmful.
21    Q.    Right.
22          It may be harmful and you -- no
23 question about that, right?
24    A.    I think that's been borne out.

Page 153

1     Q.    And if there's asbestos in the
2 product, you would even agree that it would be
3 adulterated, correct?
4          MR. EWALD: Objection to form
5     and calls for legal conclusion.
6          THE WITNESS: And I -- I
7     can't say. I mean, adulterated is a
8     pretty big word. I can't say yes or no.
9     I don't know specifically what
10    constitutes adulterated.
11 BY MR. TISI:
12    Q.    Okay.
13    A.    But I understand what you're saying.
14    Q.    Okay. Next thing, next page, it
15 says:
16          "Under the Food, Drug, and Cosmetic
17 Act, a product also may be misbranded."
18    A.    Where is this?
19    Q.    Next page. Under the last bullet
20 point, it says:
21          "Under the Food, Drug, and Cosmetic
22 Act."
23    A.    I'm -- I'm not on the same page.
24          Okay.

39 (Pages 150 - 153)

Page 154

1    Q.    It says:
2         "A product also may be misbranded
3    due to failure to provide material facts. This
4    means, for example, any directions for safe use
5    and warning statements needed to ensure a
6    product's safe use."
7         Do you see that?
8    A.    I see what's written there.
9    Q.    Do you know whether or not the
10   company has the ability to voluntarily add warning
11   instructions to a cosmetic?
12   A.    I have -- I am not a regulatory
13   expert and I am not -- I have not studied
14   warnings.
15   Q.    It says -- you know, this is the
16   part I really want to talk about it. It says:
17        "Who is responsible for
18   substantiating the safety of cosmetics?"
19        Do you see that?
20   A.    Yes.
21   Q.    It says:
22        "Companies and individuals who
23   manufacture or market cosmetics have a legal
24   responsibility to ensure the safety of their

Page 155

1    products."
2         Do you see that?
3    A.    I see that.
4    Q.    Okay. Do you understand that to be
5    the case? Did you assume that when you were doing
6    your analysis of safety?
7    A.    I understand that. I tried to
8    understand, and what I've done is whether or not
9    J -- you know, whether or not the kinds of actions
10   J&J was taking to assure the safety of its
11   product.
12   Q.    Well, it uses the word "ensure."
13        Do you see that? "Ensure the
14   safety."
15   A.    Where are you talking about?
16   Q.    It says:
17        "Companies and individuals who
18   manufacture or market cosmetics have a legal
19   responsibility to ensure the safety of their
20   products."
21   A.    I see what it says.
22   Q.    Okay. Is that your understanding?
23   A.    I see what it says.
24        I think what you're saying is that,

Page 156

1    you know, the FD -- the FDA doesn't have premarket
2    approval. I get that but --
3    Q.    That's not what --
4    A.    -- that doesn't mean that the FDA
5    doesn't have -- that it's toothless.
6    Q.    But that's not what -- that's not --
7    that's actually not what I'm asking. This
8    question has nothing to do with the FDA.
9         The question is:
10        "Companies and individuals who
11   manufacture or market cosmetics have a legal
12   responsibility to ensure the safety of its
13   products."
14        That's what it says. True?
15   A.    I see what it says.
16   Q.    Okay. And the company has a
17   responsibility to ensure the safety of the
18   product. True?
19   A.    It says:
20        "Companies and individuals who
21   manufacture or market cosmetics have a legal
22   responsibility to ensure the safety of their
23   products."
24   Q.    Was that your understanding when you

Page 157

1    actually did your review?
2    A.    I have to say, I have not looked at
3    this before I did my review. I understand that
4    the company is responsible for assuring the safety
5    of its product, and that's the kind of thing that
6    I was looking at.
7    Q.    Okay. And that's really important.
8    Okay? Because the company has responsibility to
9    ensure the safety of the product. True?
10   A.    What I have done in my analysis is
11   to understand J&J, what they knew and when about
12   the safety of its product, and whether or not the
13   actions that they have taken to actively seek out
14   scientific knowledge about the safety of its
15   product, whether the actions it's taken are
16   consistent with a company that cares about the
17   well-being of its consumers. And I have done
18   that.
19   Q.    Next sentence.
20        I move to strike because it's not
21   nonresponsive.
22        Next sentence.
23        "Neither the law nor FDA regulations
24   require specific tests to demonstrate the safety

40 (Pages 154 - 157)

Page 158

1 of individual products or ingredients."
2        Do you see that?
3    A.    I see that.
4    Q.    Did you understand that to be the
5 case that the company could adopt whatever test it
6 wanted to ensure the safety of its product?
7    A.    I --
8        MR. EWALD: Objection to form.
9        THE WITNESS: I can't sit
10    here and say that one way or another.
11 BY MR. TISI:
12    Q.    Okay.
13    A.    I mean, I have not studied this.
14    Q.    Is there any test -- and we'll talk
15 about this.
16        Is there any test that can ensure
17 there's absolutely 100 percent no asbestos in
18 talc?
19    A.    I am not opining on the testing.
20    What I do know is that J&J, along
21 with others in the industry, along with the FDA,
22 proactively sought to develop testing in the
23 1970s. And I know that J&J additionally went
24 beyond the industry standard.

Page 159

1    Q.    And J&J also knew that its test
2 could not guarantee that talc was 100 percent
3 asbestos-free. True?
4    A.    Again, I am not opining. I'm not a
5 -- I'm not a --
6    Q.    Yeah.
7    A.    -- microscopist or a toxicologist.
8    What I do know is that J&J adopted a
9 technique that went beyond the industry standard
10 to test its products over decades.
11    Q.    You test -- in one of the very last
12 footnotes in one of your appendices -- and I'll
13 get it in a moment because it's a little bit out
14 of order of where I was going to go.
15    You acknowledge that there were
16 detection limits of the tests that they -- that
17 they -- that they employed. True?
18    A.    Again, I -- I am not opining on
19 testing. I'm not a testing expert.
20    Q.    Okay.
21    A.    That is better left -- that question
22 is better left for somebody else.
23    Q.    Next thing it says here -- we'll
24 talk about that. FDA. Next sentence.

Page 160

1        "FDA has consistently advised
2 manufacturers to use whatever testing is necessary
3 to ensure the safety of their products and
4 ingredients."
5        Correct?
6    A.    I see that, you know.
7    Q.    Okay. And you agree with that?
8        As a consumer, wouldn't you agree
9 with that?
10        That the company if a -- can I have
11 a bottle?
12        If I have a bottle of Coke Zero in
13 front of me, don't you as a consumer have the --
14        MR. EWALD: Let the record
15    reflect there's a Coke Zero.
16        MR. TISI: A Coke Zero on the
17    table.
18 BY MR. TISI:
19    Q.    That there's no sugar in this Coke?
20 No, absolutely zero sugar in this Coke Zero?
21        MR. EWALD: Objection to form.
22        THE WITNESS: I mean, I don't
23    really know. (Laugh.) I mean, I would
24    hope so.

Page 161

1 BY MR. TISI:
2    Q.    Okay. And if somebody is told that
3 it's a hundred percent free of asbestos, you would
4 agree with me that when somebody says it is --
5 that when the company says talc is pure and has
6 zero asbestos, that they have the right to expect
7 that it has no or zero asbestos?
8        MR. EWALD: Objection to form.
9    Outside the scope.
10        Go ahead.
11        THE WITNESS: I, you know, I
12    mean, yeah, I hope that but --
13 BY MR. TISI:
14    Q.    Okay.
15    A.    -- you know, I don't -- you're not
16 -- you're asking a question that is very ambiguous
17 and hypothetical.
18    Q.    Okay. Well, you testified you have
19 about 60 -- 60 of your pages of your report talk
20 about asbestos, asbestos testing, and the results
21 of asbestos testing and the knowledge of the
22 asbestos testing. True?
23    A.    In my report, I talk about
24 testing --

41 (Pages 158 - 161)

Page 162

1    Q.    Yeah.
2    A.    -- and how testing has -- has -- has
3    actually contributed to the safety of the
4    industry.
5    Q.    In all of the -- in all of your
6    review, you've never seen that there is questions
7    about whether or not talc can cause -- talc can
8    contain asbestos?
9            MR. EWALD:  Objection to form.
10   BY MR. TISI:
11   Q.    Even minute amounts.
12   A.    Again, you know, what I -- what I
13   know is what J&J has been doing, and that is to
14   test its product over decades, after having worked
15   collaboratively with experts, with scientists,
16   with the FDA --
17   Q.    Well --
18   A.    -- to develop methods to do that.
19   Q.    Good question.  I'm glad you raised
20   that.
21          When did the company provide all the
22   test results that it had done over time to the
23   FDA?  Did it provide it in realtime or did it
24   provide it at the very end of the process?

Page 163

1    A.    I have seen reports to the FDA.  I
2    don't -- I don't recall.  No, I can't answer that.
3            MR. EWALD:  We've been going
4        about an hour.  Whenever it is a good
5        stopping point, just let me know.
6            MR. TISI:  I know.  Let me
7        just --
8            THE WITNESS:  Are we done
9        with this document?
10   BY MR. TISI:
11   Q.    Yes, please.
12          Let me -- let me go to the next
13   section, if you don't mind, because then after
14   that it will be a whole different thing.
15          As an expert in organizational
16   science, a different -- let's just talk about
17   policies and procedures and all of that.
18          As an expert in organizational
19   science, do you agree that there must be a culture
20   of safety, particularly in an industry like J&J
21   where public safety is involved?
22   A.    I think that a strong safety culture
23   is -- is a good thing to have --
24   Q.    You agree about that?

Page 164

1    A.    -- and, frankly, I mean, in this
2    case, I think the Credo provided a real basis for
3    that.
4    Q.    And you've written about that.
5    True?
6    A.    I've written about safety culture in
7    the past.
8    Q.    And although you're not an expert in
9    FDA regulations, you understand that it's not
10   enough to just say you have a safety culture.  You
11   actually have to enact clear policies that carry
12   out that safety culture.  True?
13   A.    Actually, I don't agree with that.
14   Q.    Okay.
15   A.    I think that there are many ways to
16   achieve a safety culture, and enacting policies is
17   one, but that's not the only thing that
18   organizations can do.
19   Q.    Well, let's talk about that because
20   I have some questions based upon your literature.
21          An organization must provide an
22   infrastructure to implement?
23   A.    An infrastructure entails many
24   things.

Page 165

1    Q.    Okay.  But -- but they need to have
2    something more than just say, "We're a safe
3    company."
4            They have to do something to carry
5    that out, correct?
6    A.    There, generally speaking, yes.
7    Q.    Okay.  Oftentimes and with a highly
8    regulated industry -- well, with a regulated
9    industry, you would expect to see policies,
10   procedures, SOPs.  You talked about that before.
11          That's typical, correct?
12   A.    I think having policies and
13   procedures is pretty typical in most
14   organizations.
15   Q.    And you should have a chain of
16   command as to who's actually making these
17   decisions and what powers they have, correct?
18   A.    You know, I mean, I don't see that
19   as a -- as a prerequisite but, generally speaking,
20   people have ideas of who they talk to.
21   Q.    All right.  And companies need to be
22   flexible in how they deal with safety and
23   disruptive ambiguity, correct?
24          MR. EWALD:  Objection to form.

42 (Pages 162 - 165)

Page 166

1    Vague.
2        THE WITNESS:  First of all, I
3    mean, disruptive -- I'm sorry, I missed
4    part of your question because it was
5    combining several things.
6 BY MR. TISI:
7    Q.    Companies have to be flexible in
8 addressing issues raised by disruptive ambiguity.
9 True?
10       MR. EWALD: Objection to form.
11   Vague.
12       Go ahead.
13       THE WITNESS: Well, I think
14   that's an empirical question but
15   flexibility I'm not -- adaptability,
16   flexibility could be a good thing or, I
17   mean, I think it depends.
18 BY MR. TISI:
19   Q.    Well, you've written you can't be
20 rigid.  You have to be proactive in dealing with
21 disruptive ambiguity.  True?
22   A.    You're -- you're linking rigidity
23 and proactivity, which doesn't truly make sense to
24 me.  I mean, the issue is, are we engaging with

Page 167

1 the -- with -- with certain things or not.
2    Q.    Okay.  Well, let's do a little
3 sensemaking here.  I'll make some sense.  Okay?
4    Issue arises.  Okay?  You would
5 expect a company who is responsible for safety of
6 a product to be -- to react and not be rigid in
7 its looking at the issue.  True?
8        MR. EWALD: Objection.  Form.
9    Vague.
10       THE WITNESS:  I think it's
11   more complicated than what you're saying,
12   and that I think really you've got to
13   think about the whole context.  Because
14   information is, you know, can be coming
15   from multiple different directions and
16   paying attention can vary across
17   organizations.  So I think it's more
18   complicated than you make it.
19 BY MR. TISI:
20   Q.    Well, you have had -- I pulled your
21 expert report in the Deepwater Horizon case where
22 you do actually talk about this question.
23   A.    Uh-huh.
24   Q.    And you put together a chart, which

Page 168

1 I found actually to be pretty helpful.  So I'm
2 going to show it to you.  Maybe we can talk
3 through it.
4        Okay?
5    A.    Maybe.  I have not looked at that
6 report for probably 10 years.
7    Q.    Well, I assume your -- I assume that
8 your opinions don't just change depending upon the
9 case in which you're involved.  You have a
10 standard methodology that you employ.  True?
11   A.    That -- actually, I don't really
12 understand what you said or whether I agree with
13 it.  You recall that --
14   Q.    Well, do you --
15   A.    -- I'm using different frameworks.
16 Every -- every project is different --
17   Q.    Okay.
18   A.    -- and the same framework is not
19 used in every project.
20   Q.    Well, let's see if this framework
21 helps you.  Your own framework from the Deepwater
22 Horizon case.
23   A.    Sure.  Yeah.
24       MR. EWALD: Do you have one

Page 169

1    more copy?
2        MR. TISI:  Oh, I'm sorry.
3        MR. EWALD:  Okay.  Thank you.
4        (Document marked for
5        identification as Sutcliffe Exhibit 6.)
6 BY MR. TISI:
7    Q.    On page 5 of your report, you talk
8 about a safety culture and it says:
9        "Within this framework" -- talking
10 about the framework of your analysis in that case.
11   A.    Uh-huh.
12   Q.    You said:
13       "A strong safety culture shares
14 three elements: (1) it is enabled, meaning that
15 the organization and its leaders emphasize safety
16 and create a positive safety climate."
17       Is that true then and is it true
18 now?
19   A.    True.
20   Q.    Okay.  Number 2.  "It is enacted,
21 meaning the members of the organization put the
22 organization's safety policies and procedures into
23 practice."
24   A.    Correct on that.

43 (Pages 166 - 169)

Page 170

1    Q.    Was that true then?
2    A.    It's true.  It's -- it is what it
3  says.
4    Q.    And it's true now?
5    A.    I believe that cultures are enabled,
6  enacted, and elaborated.
7    Q.    And they must put the organization
8  policies and procedures into practice, right?
9    A.    That's what I've written about, yes.
10    Q.    And that's true?  It's your words,
11  right?
12    A.    It's -- it's -- yes, and there are
13  many different ways to do that.
14    Q.    Okay.  Number 3.  "It is elaborated,
15  meaning that the organization rigorously reflects
16  on its safety performance and seeks to improve its
17  policies and procedures as a result."
18         Do you see that?
19    A.    Yes.
20    Q.    So that's an iterative process.  You
21  learn and you adapt, correct?
22    A.    It is an iterative process and
23  that's the kind -- yes.  Yes.
24    Q.    Okay.  And on the next page, you

Page 171

1  actually have a figure where you try to illustrate
2  this issue.
3    A.    Uh-huh.
4    Q.    Correct?
5    A.    Yes.
6    Q.    Enable, enact, and elaborate.
7    A.    Right.
8    Q.    True?
9    A.    Yes.
10    Q.    All right.
11    A.    And this is not exhaustive, just to
12  remind you.
13    Q.    Oh, I'm -- there may be other
14  things, but I'm -- I'm just going by your own
15  words.
16    A.    Yes.
17    Q.    Okay.  "Leaders and the organization
18  prioritize safety.  They invest in policies and
19  procedures to create a safety infrastructure and
20  take actions that reflect their commitment to
21  safety."
22         Do you see that?
23    A.    Yeah.
24    Q.    Okay.  So they must "invest in

Page 172

1  policies and procedures to create a safety
2  infrastructure."
3         Do you see that?
4    A.    Yes.  As I wrote, "They invest in
5  policies and procedures to create."  I didn't say
6  "must."  You used "must."  I think that added on.
7    Q.    Okay.  Fine.
8    A.    Yes.
9    Q.    Okay.
10    A.    So just to make that clear.
11    Q.    So it's not just to prioritize
12  safety, have a Credo.
13         You actually have to invest in
14  policies and procedures to create a safety
15  infrastructure, correct?
16    A.    Yes, and that can be accomplished in
17  multiple ways.
18    Q.    Okay.  We'll talk about it.
19         Okay.  Number 4 it says:
20         "Individuals perceive that leaders
21  and the organization are committed to safety."
22         Correct?
23    A.    I see that.
24    Q.    They need to know who the leaders

Page 173

1  are.  True?
2    A.    You know, there -- first of all,
3  there I think about leaders as many leaders.  It's
4  at multiple levels in the organization.  It
5  doesn't have to be one single leader.
6    Q.    Right.
7         But it can't be chaos either, right?
8  You need to have people you who you know and say,
9  "Look, I have a toxicology question.  I'm going to
10  go to Mr. Golomb here, who's a toxicologist.  I
11  have somebody a regulatory question.  I need to go
12  to Mr. Wright here, who's a regulatory person."
13         You need to know who to go to,
14  right?
15    A.    I mean, people develop their --
16  their social networks in multiple ways.  So I have
17  to -- I mean, it would be nice if there were
18  organizational charts but, you know, organizations
19  don't always have those things.
20    Q.    Okay.
21    A.    And so people develop their social
22  networks in multiple ways.
23    Q.    Okay.  Number 2 is they must enact
24  the policies and the procedures.

44 (Pages 170 - 173)

Page 174

1        You see that?
2    A.    Yes.
3    Q.    Okay.  They need to "take
4 preventative action to avoid problems and adaptive
5 action to respond to problems as they unfold."
6        Do you see that?
7    A.    Yes.
8    Q.    Okay.  They need to -- for example,
9 they need to minimize risk.  If disruptive
10 ambiguity happens, they need to take action to
11 minimize risk.  True?
12    A.    That can be one thing --
13    Q.    Okay.
14    A.    -- but it's not -- it's not
15 everything.
16    Q.    Okay.  And the third thing it says
17 you need to elaborate.  You need to learn as you
18 go along.
19        "The organization seeks to improve
20 its safety-related policies and procedures."
21        Correct?
22    A.    That's what I've written in the
23 past.
24    Q.    So it needs to -- you need to enable

Page 175

1 a safety culture, have a defined set of procedures
2 to follow --
3    A.    Uh-huh.
4    Q.    -- enact them, and then continue to
5 elaborate on them over time.  True?
6    A.    That's what the -- the process that
7 I've outlined for safety culture, which of course,
8 you know, in this case, I didn't -- I wasn't
9 analyzing the safety culture.
10    Q.    Okay.  So as part of your analysis,
11 did you notice that there were clear guidelines in
12 the '70s, '80s, '90s, and 2000s as to whether or
13 not there were policies and procedures, for
14 example, to analyze potential risks?
15    A.    My role in this -- in this case was
16 different than my role in the BP case.
17        I was not analyzing the safety
18 culture of J&J over time.
19        What I was doing is what I've said
20 earlier is trying to understand what J&J knew and
21 when about the potential safety -- safety of its
22 product and whether or not their actions were
23 consistent with what I would expect to see in a
24 company that cared about the well-being of its

Page 176

1 consumers.
2    Q.    Well, I think you said "and how they
3 respond to that information."  I'm looking for the
4 words you used, but I wrote them down.  I think
5 you said how they actually.
6    A.    The actions that they take --
7    Q.    Okay.
8    A.    -- in response to developing their
9 institutionalized knowledge.
10    Q.    But the action --
11    A.    For example -- I can give you an
12 example.
13    Q.    I don't really want an example.  I
14 want you to answer my questions.
15    A.    Okay.
16    Q.    So if a company takes actions,
17 oftentimes actions are in a company like this you
18 would expect there to be a policies and procedure
19 that would describe what actions should be taken
20 and when.  True?
21        MR. EWALD:  I'm sorry.  When
22    you're talking about "this," you're
23    talking about BP?  J&J?
24        MR. TISI:  J&J.

Page 177

1 BY MR. TISI:
2    Q.    In a company like J&J, would you
3 expect to see policies and procedures that would
4 describe when, how, and who is to take action in
5 response to a safety issue?
6    A.    I would have to say that just
7 knowing how organizations develop policies and
8 procedures over time is that, you know, it's a
9 process.
10    Q.    Right.
11    A.    And that sometimes they're more
12 detailed, sometimes they're not.  And in this
13 case, I was not studying the individual policies
14 and procedures that J&J has.  I've described
15 several times what I -- what my role was here.
16    Q.    Well, but -- but one of the things
17 you're -- you're going to opine by, if a judge
18 lets you give any opinion whatsoever, is whether
19 or not how a person -- how the company responded
20 to issues of safety as they arise.  True?
21    A.    Generally speaking, I'm not -- no,
22 that's not an accurate characterization.
23    Q.    Okay.
24    A.    What I'm trying to understand is

45 (Pages 174 - 177)

Page 178

1  what J&J knew and when, how is information coming
2  into the organization, how was it being
3  interpreted, and what actions were resulting from
4  that.
5      Q.    And the actions --
6      A.    With an example of --
7      Q.    I'm not asking you an example.
8      A.    But I want to give you an example.
9            MR. EWALD:  She --
10  BY MR. TISI:
11     Q.    Counsel will have an opportunity to
12  give you an example.  Okay?
13     A.    (Laugh).
14     Q.    But -- but the actions that are
15  taken in a company are typically governed by
16  policies and procedures; is that not true?
17           MR. EWALD:  Objection to form.
18           THE WITNESS:  I mean, I'd
19     have to look at a specific case because
20     actions, you know, occur for a variety of
21     reasons which can be, you know, the
22     informal ideas about what -- what needs
23     to happen.
24  BY MR. TISI:

Page 179

1      Q.    All right.  So let me -- let me see
2  if I can cut this.
3      A.    You're trying to say that
4  organization, you know, that you have to have the
5  specific thing that says this thing.  People
6  develop knowledge about how to act in
7  organizations through multiple ways.
8      Q.    Companies need to be predictable in
9  the way in which they approach problems.  True?
10     A.    I -- I would have to think about
11  that.
12     Q.    Okay.
13     A.    I mean, I -- I don't know what --
14  what that means, frankly.
15     Q.    So, but let me just see if I can
16  wrap my head around this, and maybe I can
17  short-cut it by asking this question.
18           Other than the Credo, which is
19  aspirational, you would agree, right?
20     A.    The Credo is a vision.  It's a
21  vision, value --
22     Q.    A vision statement?
23     A.    It's a vision statement.  It's a
24  value statement.  It's a normative statement.

Page 180

1      Q.    Right.
2      A.    About how we expect people to act in
3  this organization.
4      Q.    Right.
5            It's aspirational.  I want to have a
6  good day, right?
7      A.    I think it's more than aspirational.
8      Q.    Okay.
9      A.    It's a value statement.
10     Q.    Okay.  Value statement.
11     A.    How are people -- I mean, very --
12  it's -- in organizations, these kinds of
13  statements provide insight to people about how do
14  we act when nobody is looking.
15     Q.    Okay.  And so now my question is
16  this:  Have you seen a single policy and procedure
17  in place at either Johnson & Johnson or Johnson &
18  Johnson Consumer companies -- it changed over
19  time -- which governed how to analyze a safety
20  question when the issue arises?
21           It's a yes or no question.
22     A.    I was not studying that.  I looked
23  at policies and procedures, but my role was
24  different.

Page 181

1      Q.    Okay.  My question was:  Did you see
2  it?
3      A.    I have to say, I don't recall what I
4  saw or didn't see.
5      Q.    Okay.
6      A.    I just --
7      Q.    So the answer would be --
8      A.    It was -- the answer is that's not
9  what I was doing here.
10     Q.    Okay.  But my answer is you
11  didn't -- my question is:  Did you see it?
12     A.    I don't -- I cannot recall.
13     Q.    Well, in the back in Exhibit 16 --
14  excuse me -- Exhibit 7, which I'm going to show
15  you.
16     A.    Okay.
17           (Document marked for
18     identification as Sutcliffe Exhibit 7.)
19  BY MR. TISI:
20     Q.    You have an appendix where you talk
21  about "Johnson & Johnson's Credo and
22  Organizational Policies and Procedures."
23     A.    Right.  Yeah.
24     Q.    Exhibit Number 7.

46 (Pages 178 - 181)

Page 182

1    A.    Yeah.
2    Q.    All right.  And it's entitled
3 "Johnson & Johnson Credo and Organization Policies
4 and Procedures," correct?
5    A.    Which is what I just said that I did
6 review certain policies and procedures.
7    Q.    Actually, you said that wasn't your
8 job.
9        I'm trying to understand.  I'm
10 really trying to understand your --
11    A.    It's --
12    Q.    -- your opinions here.  You have a
13 whole section in the back of your thing.  It says:
14        "Organizational Policies and
15 Procedures."
16    A.    Uh-huh.
17    Q.    Am I correct?  So you did look at
18 policies and procedures?
19    A.    I did.
20    Q.    Okay.
21    A.    I did look at the structure of the
22 organization --
23    Q.    All right.
24    A.    -- but it was not the real focus of

Page 183

1 my -- of my work.
2    Q.    All right.  So, now my question is:
3 Having looked at it, have you ever seen a policy
4 and procedure that would govern risk mitigation in
5 the event a safety signal arises?
6        MR. EWALD:  Objection to form.
7        Go ahead.
8        THE WITNESS:  Again, I don't
9    recall specifically.
10 BY MR. TISI:
11    Q.    That's fair.
12    A.    I do not recall.
13        MR. TISI:  That's fair.
14        Did you ever see a -- let me
15    give you an example of a safety -- of a
16    policy and procedure that we do have for
17    a Johnson & Johnson Consumer, Exhibit
18    Number 8.
19        (Document marked for
20    identification as Sutcliffe Exhibit 8.)
21 BY MR. TISI:
22    Q.    And this one deals --
23        MR. EWALD:  Before you go,
24    we've been going an hour and 20 minutes.

Page 184

1        MR. TISI:  Then we'll stop.
2    We'll stop.
3        MR. EWALD:  Off the record.
4        (Recess:  11:45 a.m. -
5        11:55 a.m.)
6 BY MR. TISI:
7    Q.    I've handed you what I have had
8 marked as Exhibit Number 8, and this is a consumer
9 group policy and procedure, and it's entitled
10 "Preparation of Safety Surveillance Reports For
11 U.S. Marketed Products Monitored in the Remetrex
12 Safety Program."
13        Do you see that?
14    A.    I see it.
15    Q.    I assume you haven't seen this
16 before.  It wasn't on your reliance list, and I
17 really am not going to ask you about the Remetrex
18 Safety System or anything related to that.
19        But let me ask you this:  First of
20 all, this does indicate that there are standard
21 operating -- this is from 2010.
22        Do you see down there it says
23 approvals 2010?  On the right-hand side, it says
24 "Date/Time 2010"?

Page 185

1    A.    Ah.
2    Q.    Bottom.  The chart on the bottom on
3 the right-hand side.
4    A.    Oh, right there.  Okay.
5    Q.    You see it?
6    A.    I see somebody approved it.
7    Q.    In 2010?
8    A.    Uh-huh.
9    Q.    So, first of all, this does indicate
10 that there were policies and procedures at J&J?
11    A.    I think that I said there are
12 policies and procedures at J&J.
13    Q.    I understand.  I understand that.
14    A.    Yeah.
15    Q.    My question is:  I have never seen
16 one dealing with risk mitigation or risk
17 assessment.
18        Have you?
19    A.    I -- I can't say that I have or that
20 I haven't.  I don't remember.
21    Q.    Okay.  Next page is a -- actually,
22 on page 4 of the document.
23    A.    4 of which document?
24    Q.    It's the one that says "Roles and

47 (Pages 182 - 185)

Page 186

1 Responsibilities." This one here. (Indicates).
2    A.    You want me to --
3    Q.    It's page 2.
4    A.    -- to take a look at this? I'm
5 going to need to read this.
6    Q.    You can. I'm not going to ask you
7 about the policy. I'm just going to ask you about
8 -- if you need to, I will give it to you.
9        But let me ask you this: It says
10 there is a Global Safety Review group
11 "cross-functional team that provides an
12 organizational focus and information exchange for
13 departments involved in signal detection, risk
14 management, mitigation, and monitoring."
15        Do you see that?
16    A.    I see it.
17    Q.    Okay. Have you ever seen a Global
18 Safety Review group dealing with talc?
19    A.    I did not examine the specific --
20    Q.    So you don't know who --
21    A.    -- the specifics. So I cannot say
22 one way or another.
23    Q.    Next one says:
24        "Medical Safety Officer: Physician

Page 187

1 responsible for leading and overseeing signal
2 evaluation and risk management."
3        Do you see that?
4    A.    I see that.
5    Q.    Do you know who was responsible for
6 risk management at any time during the point
7 during the time that you were reviewing the
8 company's responsibilities in dealing with safety
9 and risk?
10    A.    I was not studying the risk
11 management structure of the organization.
12    Q.    So the --
13    A.    So I can't say one way or another
14 who it was.
15    Q.    But the answer is, as you sit here
16 today, you do not know any point in time who
17 was responsible at J&J for risk management?
18    A.    I did not study who was responsible.
19 I don't know the structure, and I can't say who
20 was or wasn't responsible.
21    Q.    So the answer is you don't know?
22    A.    I do not know.
23    Q.    Okay. Third one is Office of
24 Toxicology.

Page 188

1        You do not know who was in the
2 Office of Toxicology at any time in the past five
3 decades with respect to your review of policies
4 and procedures with respect to safety of talc?
5    A.    I don't know, but I would -- I would
6 say that, you know, it's important to -- to keep
7 in mind that, you know, structures, organization
8 designs change over time. That oftentimes the
9 policies are not necessarily written down and then
10 the organization learns, and all of a sudden they
11 realize, you know, "We need to codify our
12 policies," but they have been acting in particular
13 ways.
14        So I think it's important to know
15 that -- that designs change over time.
16    Q.    I don't honestly -- first of all,
17 I'm going to move to strike because that was not
18 in any way responsive to my question.
19        But since you raise this issue,
20 Johnson & Johnson is a huge pharmaceutical company
21 with different divisions, correct?
22    A.    It is a multidivisional company,
23 correct.
24    Q.    It's -- it's a half a trillion

Page 189

1 dollar company. True?
2    A.    I don't know what their worth is --
3 worth is.
4    Q.    Would you expect, as somebody who
5 studies organizations, policies and procedures
6 that would discuss things like risk management or
7 risk assessment for a company like this?
8        Would you expect it?
9    A.    I would expect that the organization
10 has policies and procedures that cover lots of
11 things.
12    Q.    Would you expect them to -- to -- of
13 all things, you know they provide pharmaceuticals,
14 medical devices, and consumer products that we in
15 our everyday lives rely on. True?
16    A.    They -- they -- yes, they produce a
17 lot of products.
18    Q.    As somebody who is an organizational
19 expert, you would expect a company of this
20 sophistication and this size to have clear
21 policies and procedures as to who was responsible
22 for risk assessment and risk mitigation.
23        True or not true?
24    A.    I, you know, I can't say true or not

48 (Pages 186 - 189)

Page 190

1 true because there are many ways to organize.
2 There is equifinality, many ways to the same end,
3 and I have not studied this. And so I can't say
4 unequivocally that there should be one thing or
5 another thing. There are many ways to go.
6       Q.    I didn't say unequivocally.
7             I said you would expect that to be
8 true?
9       A.    I would expect that, you know, the
10 organization would have policies and procedures
11 covering certain things and, you know, I have not
12 -- that's all I can say.
13      Q.    And you have not seen a single
14 policy and procedure that covers risk assessment
15 or risk management.
16            Is that true or not true?
17      A.    I can't say that I have or I haven't
18 because I do --
19      Q.    Okay.
20      A.    -- I do not recall.
21      Q.    As you sit here today, can you
22 recall a single policy and procedure that involves
23 risk assessment or risk -- risk management? Can
24 you sit here? Do you know of any of them?

Page 191

1       A.    I think I just answered that
2 question.
3       Q.    No, I'm saying you couldn't answer
4 whether you've seen one.
5             As you sit here today, can you tell
6 me of a single one?
7       A.    I can't say that I have or I haven't
8 because I don't recall.
9       Q.    Okay. You don't recall.
10            And as you sit here -- because this
11 is my only chance to actually ask you questions.
12 Okay?
13            As you sit here today, you can't
14 recall any, can you?
15      A.    I -- I have to say, I can't recall
16 seeing. I can't recall not seeing. So I can't
17 say.
18      Q.    All right. Let's go to Exhibit
19 Number 7, if you don't mind.
20      A.    Number 7?
21      Q.    Let's talk about J&J.
22      A.    Okay. Number 7?
23      Q.    I'm sorry.
24      A.    Because I note on the first page

Page 192

1 that, you know, I said I wasn't asked to opine
2 about culture. So.
3       Q.    There's no question pending, ma'am.
4       A.    Okay.
5       Q.    Thank you.
6             MR. EWALD: Did you mean 7 or
7       did you mean another one?
8 BY MR. TISI:
9       Q.    Well, actually, in paragraph number
10 11 on Number 7, you mention that in 2013, J&J
11 corporate established the Office of Chief Medical
12 Officer.
13            Do you see that?
14      A.    Yes, I see that.
15      Q.    Okay. And I'm going to mark as
16 Exhibit Number 9, which is the SOP that deals with
17 --
18      A.    So this?
19      Q.    First of all, let me, before you go
20 any further.
21            You also know the Credo requires a
22 company to take responsibility when it makes
23 mistakes, right? You say -- you saw that?
24      A.    I have to say, I don't recall

Page 193

1 specifically.
2       Q.    Let's move on.
3       A.    Okay.
4       Q.    So let's kind of switch gears a
5 little bit.
6             Have you been able to determine
7 whether there's an SOP or not the criteria applied
8 by J&J at any time to determine when to replace or
9 take risk mitigation with respect to any of its
10 consumer products?
11            MR. EWALD: Objection to form.
12            THE WITNESS: I thought I --
13      I thought I responded that I wasn't
14      analyzing all of the policies and
15      procedures at J&J.
16 BY MR. TISI:
17      Q.    I didn't ask you about policies and
18 procedures.
19            I asked you -- you said it could
20 come from several sources and that it's not
21 necessary to have policies and procedures.
22            Now, I'm broadening it to say: Have
23 you seen any evidence from anything that says what
24 standard J&J applied to analyzing risk mitigation

49 (Pages 190 - 193)

1 in the context of a consumer product --
2     A.    I was not --
3     Q.    -- and its safety?
4     A.    I was not studying that.
5     Q.    Okay.
6     A.    I was studying other things.
7     Q.    Okay.  Are you familiar -- you've
8 actually written about -- what's called
9 precautionary principle?
10    A.    I -- I have never labeled everything
11 a precautionary principle.  So, no, I am not
12 familiar with what you're talking about.
13    Q.    You don't know what precautionary
14 principle is?
15    A.    No.
16        MR. TISI:  Okay.  Can I have
17    Exhibit Number 18.
18        I'm sorry.  Exhibit Number 10.
19    This is Exhibit Number 10.  I'm sorry.  I
20    meant to say Number 10.
21        (Document marked for
22    identification as Sutcliffe Exhibit 10.)
23 BY MR. TISI:
24    Q.    I'm going to show you Exhibit

1 Number 10.
2        MR. EWALD:  So he knows what
3    you wanted when you get the wrong number?
4        MR. TISI:  I did.  He does.
5        MR. EWALD:  (Laugh).
6        MR. TISI:  Because we had
7    initial -- we actually had an initial
8    number and then we had a change number.
9        MR. EWALD:  (Laugh).
10        MR. TISI:  I'm not easy.
11 BY MR. TISI:
12    Q.    This is Exhibit Number 10.
13        Do you see that?
14    A.    I see it, yes.
15    Q.    Okay.
16    A.    I need to take a look at it.
17    Q.    This is a -- I'm just going to ask
18 you about one statement in here.
19        This is a meeting with Commissioner
20 Schmidt at FDA on January 16, 1974 called
21 "Talc/Asbestos" and it's a memo to the file.
22        Do you see that?
23    A.    Yes, I see that.
24    Q.    Okay.  And speaking for J&J is,

1 among other people, a Dr. R. Fuller.
2        Do you see that?
3    A.    Yes, as well as the other two.
4    Q.    Okay.  On page, the last, page 3 of
5 the memo to file.
6    A.    Uh-huh.
7    Q.    Third paragraph down it says:
8        "Dr. Fuller stressed Johnson &
9 Johnson's policy of full cooperation with FDA and
10 that if the results of any scientific studies show
11 any question of safety of talc, Johnson & Johnson
12 will not hesitate to take it off the market."
13        Do you see that?
14    A.    I see that.
15    Q.    Is that your understanding of what
16 J&J's, when you were doing your review, the metric
17 that they applied to looking at the questions of
18 safety and talc?
19    A.    Number one, I wasn't -- I see what's
20 written here.  I wasn't studying.  I mean, I was
21 taking a broader view --
22    Q.    All right.
23    A.    -- with respect to --
24    Q.    Well, how --

1        MR. EWALD:  Hold on.
2        Go ahead.
3        THE WITNESS:  -- with respect
4    to what J&J knew and when about the
5    safety of its product and what it was and
6    whether or not its actions are consistent
7    with a company that cared about the
8    well-being of its consumers.
9 BY MR. TISI:
10    Q.    Well, its actions are consistent.
11 What metric did you apply to whether its actions
12 were consistent?  Okay?
13        I mean, this is a metric here.  This
14 is, "If there's a question about safety, we will
15 not hesitate to take it off the market."
16        That's a -- that's a metric of some
17 fashion, correct?
18    A.    I am studying J&J's pursuit of
19 scientific knowledge about the safety of its
20 product and whether or not its actions are
21 consistent with a company that cares about the
22 well-being of its customers.  And I used a
23 scientific methodology, qualitative analysis, with
24 a particular framework, sensemaking framework, to

Page 198

1 understand whether or not J&J was taking actions
2 that are consistent with what we would expect to
3 see.
4     Q.    Did J&J take actions in this case
5 consistent with what is said by Dr. Fuller here,
6 that is, "If there is any question of the safety
7 of talc, Johnson & Johnson will not hesitate to
8 take it off the market"?  Is that -- did J&J act
9 with that -- consistent with that statement?
10    A.    What I saw in my analysis is that no
11 one at J&J -- in my review of thousands of pages
12 of documents, I never saw anything that suggested
13 that anyone at J&J thought it would be okay to
14 expose consumers to asbestos.
15    Q.    Okay.  How about expose consumers to
16 a product which was associated with the risk of
17 ovarian cancer?
18    A.    Or I would say the same thing.
19    Q.    Okay.
20    A.    That J&J was paying attention.
21    Q.    But paying attention is one thing.
22 Okay?  Doing something about it is something else.
23        This is a metric.  Dr. Fuller says
24 "If there is any scientific study that shows any

Page 199

1 question of the safety of talc, Johnson & Johnson
2 will not hesitate to take it off the market."
3        Using that metric.
4    A.    I see what's being said there.
5    Q.    Okay.
6    A.    And in my estimation, J&J was acting
7 consistent with -- with -- with what --
8    Q.    That metric.
9    A.    -- we're seeing.
10    Q.    That metric.
11    A.    Number one, I have not studied the
12 metric, and I am not thinking in metric ways.
13        I have just answered the question
14 that I think J&J was acting consistently with what
15 we'd expect to see from a company that cared.
16        MR. TISI:  Can I have Exhibit
17    Number 19.
18 BY MR. TISI:
19    Q.    Is it important to you how J&J
20 actually makes decisions in your framework?
21    A.    I have not studied specific
22 decision-making.  I studied a broad range of
23 evidence, and I'm not looking at any one incident.
24    Q.    I know.  I'm not asking any one

Page 200

1 incident.
2        What I'm asking you is --
3        MR. TISI:  Can you please read
4    back the question, please.
5        (The reporter read the record
6    on page 199 lines 23-24.)
7        THE WITNESS:   And that's what
8 I'm saying.  I'm not looking at any
9    single decision.
10 BY MR. TISI:
11    Q.    I'm not asking you about -- I
12 said -- you're really not answering my questions,
13 ma'am, with all due respect.
14        MR. EWALD:  I disagree.  Go
15    ahead.
16 BY MR. TISI:
17    Q.    Okay.  I asked you the question:  Is
18 it important to your opinions as to how J&J makes
19 decisions?
20        I'm not asking about a specific
21 decision.  I'm asking you:  Is it important to
22 understand how they make decisions?
23    A.    I am not studying J&J's necessarily
24 decision processes.

Page 201

1    Q.    Okay.  So it's not important?
2    A.    I --
3        MR. EWALD:  Objection to form.
4        THE WITNESS:  I'm not saying
5    that it's important or not important.
6    I'm saying I did not study that.
7 BY MR. TISI:
8    Q.    Is it important to understand how
9 J&J responded to -- to issues of safety to
10 understand how they make their decisions?
11    A.    I am not studying how J&J made
12 particular decisions.  I am studying over time
13 their pattern of actions related to seeking
14 knowledge, scientific knowledge, to understand the
15 safety of its products and what they did with
16 that.
17        MR. TISI:  Here is Exhibit
18    Number 11.
19        (Document marked for
20    identification as Sutcliffe Exhibit 11.)
21 BY MR. TISI:
22    Q.    Now, we looked at 1994 what
23 Dr. Fuller said.  Let's look at what they're
24 saying in 2010.  This is a Product Stewardship.

51 (Pages 198 - 201)

Page 202

1      First of all, do you know whether
2 J&J had a Product Stewardship section?
3    A.    I do not, no.
4    Q.    You don't know.  You don't know what
5 they did, do you?
6    A.    I don't know, no.
7    Q.    On page 6, it says -- there's a
8 slide that says "How We Make Decisions."
9      Do you see that?
10    A.    I see on page 2 in the agenda "How
11 We Make Decisions."
12      Okay.
13    Q.    Okay.  You see where it says --
14    A.    Uh-huh.
15    Q.    You see that -- do you see on page 6
16 it says:
17      "First, we examine the opinions of
18 regulatory and scientific bodies.  By following
19 the EU Directive WW, we are embracing the
20 precautionary approach as laid out by the EU
21 regulatory framework."
22      Do you know what that precautionary
23 approach is?
24    A.    I am not studying this.  I have not

Page 203

1 studied this, no.
2    Q.    Okay.  Next sentence.
3      "How We Make Decisions."
4      Do you see that?
5    A.    I see it.
6    Q.    Okay.  And there is something in
7 red.
8      Do you see that, or is it not -- did
9 that not come through on the copy?
10    A.    I -- I see the -- I see what it
11 says.
12    Q.    Okay.  Of all things, it says -- it
13 says we look at emerging -- at the bottom it says:
14      "We look at emerging data and
15 trends" and "If there is a safety concern, we exit
16 the material."
17      Do you see that?
18    A.    I see what's written there.  I can't
19 comment on what that means.  I haven't studied it,
20 and I don't know what it means.
21    Q.    But we agreed, did we not, that over
22 the course of 50 years there has always been a
23 safety concern about talc, right?
24      MR. EWALD:  Objection to form.

Page 204

1 Mischaracterizes testimony.
2      THE WITNESS:  I don't -- I
3 don't know that I agreed with that.
4      I know that there has been
5 disruptive ambiguity.  I don't know
6 whether it's been a safety concern.  I
7 know that there have been --
8 BY MR. TISI:
9    Q.    Okay.
10    A.    There have been issues.
11    Q.    All right.  Well, let's see if we
12 can talk about that.
13      There is disruptive ambiguity and I
14 think we agreed that that disruptive ambiguity has
15 existed over time in the decades leading up to
16 today.  True?
17    A.    I would say that there have been
18 periods where there have been -- where there have
19 been long periods where there has not been
20 disruptive ambiguity, where there has been
21 stability, where -- where things have -- have been
22 relatively stable.
23    Q.    What period is that where there's
24 been no concern about talc?

Page 205

1    A.    I would say between -- I mean, I
2 don't know that I could say for sure, but after
3 the, you know, after the disruptive ambiguities of
4 the 1970s, early on I think that there was -- it
5 was pretty stable once the multilevels of testing
6 had been established at J&J that things went --
7 went along.
8    Q.    Okay.  And then there ever come a
9 time where disruptive ambiguity picked up again?
10    A.    You know, I haven't been thinking --
11 I can't sit here and answer because I haven't
12 thought about it that way.
13    Q.    All right.  Could you turn to page
14 150 -- excuse me -- to paragraph 157 of your
15 report.
16    A.    Uh-huh.  Yep.
17    Q.    And it says:
18      "J&J continued to follow this
19 research over decades."
20      Do you see that?
21    A.    Yes.
22      MR. GOLOMB:  "Closely follow."
23      MR. TISI:  Oh, appreciate
24    that.

52 (Pages 202 - 205)

Page 206

1  BY MR. TISI:
2     Q.    "Closely follow this research over
3  decades."
4           And you mentioned IARC, NTP and the
5  1995 FDA workshop, and Health Canada in 2019.
6           Do you see that?
7           MR. EWALD:  1994 it says.
8  BY MR. TISI:
9     Q.    1994.  Excuse me.
10    A.    Yeah, I think I talk about those
11 later on in the report.
12    Q.    And you also -- there was also a lot
13 of literature that was coming out at the time.
14 True?
15    A.    Again, as I said, I didn't look
16 at -- do a scientific review of all the
17 literature.
18    Q.    Well, let's -- you talk about --
19 let's talk first about Cramer because in paragraph
20 -- page -- on several pages you talk about
21 Dr. Cramer's 1982 study over 40 years ago.
22        Right?
23    A.    I talk about it on the previous
24 page.

Page 207

1          MR. TISI:  Okay.  Exhibit
2      Number 12, please.  Just look at that for
3      a moment.
4          (Document marked for
5      identification as Sutcliffe Exhibit 12.)
6  BY MR. TISI:
7     Q.    Dr. Cramer just -- just for the
8  record is a -- is a researcher and epidemiologist
9  and gynecologist out of Harvard, right?
10    A.    I don't know where Dr. Cramer, if
11 Dr. Cramer --
12    Q.    Well, it says Department of
13 Obstetrics, Gynecology, and Pathology, Boston
14 Hospital for Women, Harvard School of Public
15 Health.
16        All of those things, those are good
17 institutions?
18    A.    Yes.
19    Q.    Okay.  It says sponsored by an NIH
20 grant.
21        Do you see that?
22    A.    I see that, yes.
23    Q.    Okay.  And this is peer-reviewed,
24 right?

Page 208

1     A.    I'm assuming that.
2     Q.    Okay.  First sentence says:
3          "The possibility that ovarian cancer
4  may be caused by exposure to various hydrous
5  magnesium silicates such as talc and asbestos has
6  been raised by several researchers."
7          Do you see that?
8     A.    I see that.
9     Q.    Okay.  And so the question is right
10 here in the paper about the safety of talc.  Going
11 back and if you look at the footnotes, those
12 footnotes go back to the Henderson article that we
13 talked about before.  Footnote number 2.
14    A.    I see what you're saying.
15    Q.    Okay.  And so he conducts -- just to
16 make sense, okay, of what is going on here.
17        He conducts a study based upon
18 studies that happened previously about the
19 potential of talc as a cause of ovarian cancer?
20    A.    I can't agree or disagree with that
21 because I don't know.  I mean, I see there's a --
22 number one, I haven't studied this aside from
23 talking about it a little bit but --
24    Q.    Okay.

Page 209

1     A.    -- you know.
2     Q.    But in realtime, if we're looking at
3  what happens in realtime, okay, he says that there
4  has been interest in the question of whether or
5  not talc is a cause of ovarian cancer, correct?
6     A.    He says what he says here, yes.
7     Q.    Right.  All right.
8          And so J&J would be on notice that
9  there were questions being raised about the safety
10 of both talc and asbestos, correct?
11    A.    I think that I stated in my -- in my
12 report that J&J was following the research
13 alleging that association.
14    Q.    Okay.  And so this would be an
15 example of potential disruptive ambiguity
16 happening in the 1980s, correct?
17    A.    I think we have to put it into
18 context because there were also questions raised
19 about this particular study.
20    Q.    Understood.
21    A.    Okay.  Just saying.
22    Q.    I'm not asking -- we're going to
23 talk about bunch of studies now.  Okay?  We're
24 going to go through them.

53 (Pages 206 - 209)

Page 210

1    A.    Yeah.  Knowing that.
2    Q.    We're going to go through them.
3 Okay?
4         But -- but without reading too much
5 in my question, you get a study that comes across
6 your desk for a study from the -- supported by the
7 National Institutes of Health from a bunch of
8 researchers at Harvard saying the possibility of
9 ovarian cancer may be caused by, among other
10 things, talc has been raised by several
11 researchers, and he cites things going back to the
12 1970s, right?
13    A.    It appears that he cited something
14 from 1971, correct.
15    Q.    Right.  Right.
16         And so -- and so as somebody looking
17 at things not with the benefit of hindsight,
18 right, not with hindsight bias, we're looking at
19 what happens at the time.
20         They're saying there is a question
21 about the safety of talc, a study is being
22 conducted, and the questions go back to the 1970s,
23 right?
24    A.    Number one, I don't agree with your

Page 211

1 original statement that, you know, there are
2 questions about the safety of talc.  I don't think
3 that's -- I wouldn't put it in that
4 framework.
5    Q.    Okay.
6    A.    I think --
7    Q.    Well, let's use his phrase.
8    A.    I think -- I mean, this was raised,
9 I mean.
10    Q.    Let's use his phrase because I
11 really need you to not extrapolate from my
12 question.  Okay?
13    A.    Okay.
14    Q.    Researcher at Harvard says the
15 possibility of ovarian cancer may be caused by
16 exposure to, among other things, talc has been
17 raised by several researchers since the 1970s.
18         True or not true?
19    A.    That's what's written here.
20    Q.    Okay.  So it's being raised and J&J
21 knows question is being raised; correct?
22    A.    Right.
23    Q.    All right.
24    A.    And what I have stated in my report

Page 212

1 is that, you know, J&J took this seriously --
2    Q.    Okay.
3    A.    -- and they met with Dr. Cramer.
4    Q.    All right.
5    A.    And that's what we would expect to
6 see in a company that cared about the consumer's
7 well-being.
8    Q.    And Dr. Cramer said, if you look at
9 the back of his study, said additional studies
10 need to be done to explore this question, right?
11    A.    Where are you?  Where are you
12 talking about?
13    Q.    I'm on the page -- on the last page.
14    A.    Uh-huh.
15    Q.    "He hopes this report will stimulate
16 further study on the relationship of talc exposure
17 in relation to ovarian cancer."
18         Correct?
19    A.    Okay.  I see that.
20    Q.    He's not saying this is the final
21 word, right?  He says this raises the question do
22 more studies?
23    A.    Do more studies.
24    Q.    And you agree with that, that would

Page 213

1 be a reasonable thing to do, and that was being
2 said not with hindsight but it's being said at the
3 time.  True?
4    A.    I would say there are many
5 reasonable things that organizations could do --
6    Q.    Okay.
7    A.    -- related to this.
8    Q.    Okay.
9    A.    And one of them, as I said, is that
10 J&J met with them --
11    Q.    Okay.
12    A.    -- to better understand what they
13 were facing.
14    Q.    Okay.
15    A.    The other thing is, you can stay on
16 top of the literature.  There are many things to
17 do.
18    Q.    Okay.  Study it or you could even
19 just say, "Hey, look, you know, no problem.  Let's
20 see if we can study it or we can just change to
21 cornstarch and not have a problem at all."  Right?
22 Could do that?
23    A.    You know, frankly, I mean, we know
24 that J&J was doing other kinds of things being

54 (Pages 210 - 213)

Page 214

1 part of -- of conferences and things like that.
2    Q.    Okay.  The 1994 conference you're
3 talking about because we are going to talk about
4 that in a minute.  All right?  Right?  That's what
5 you're talking about?
6    A.    I'm just talking about being part of
7 the scientific community.
8        MR. TISI:  All right.  So next
9    thing that happens -- let's go to the
10    next study.  Let's go ahead 10 years.
11    Let's go to 1992.
12        I'm going to show you an
13    article by Harlow, Exhibit Number 13.
14        (Document marked for
15    identification as Sutcliffe Exhibit 13.)
16 BY MR. TISI:
17    Q.    And this is a 1992 publication by
18 Dr. Harlow, correct?
19    A.    By -- yes.
20    Q.    And it says under the Conclusions
21 "These data" -- this is a new study.
22        "These data support the concept that
23 a lifetime pattern of perineal talc use may
24 increase the risk for epithelial ovarian cancer

Page 215

1 but is unlikely to be the etiology for the
2 majority of epithelial ovarian cancers."
3        Correct?
4    A.    Ah.
5    Q.    The very first page under
6 Conclusions.
7    A.    Oh, right there.  Okay.
8    Q.    Let's read it together.
9        "These data support the concept that
10 a lifetime pattern of perineal talc use may
11 increase the risk for epithelial ovarian cancer
12 but is unlikely to be the etiology for the
13 majority of epithelial ovarian cancers."
14        Right?
15    A.    I see what you're reading.
16    Q.    Okay.  I'm not going to ask you
17 about the scientific question there.  That's for
18 other people.
19        But let me ask you about another
20 statement that Dr. Harlow and his colleagues make
21 here.  It's the last sentence.  Take a look at
22 this.
23        "Nevertheless" --
24        MR. EWALD:  Hold on.  Let her

Page 216

1    get there.  It's the last page.
2 BY MR. TISI:
3    Q.    Page 26.
4    A.    Okay.  Thank you.
5    Q.    It says:
6        "Nevertheless, given the poor
7 prognosis for ovarian cancer, any potentially
8 harmful exposures should be avoided, particularly
9 those with limited benefits.  For this reason, we
10 discourage the use of talc in genital hygiene,
11 particularly as a daily habit."
12        Do you see that?
13    A.    I see that.
14    Q.    All right.  So they're recommending
15 at this time in realtime, not using the benefit of
16 hindsight bias, they're recommending in realtime
17 in 1992 that maybe women in light of the
18 then-existing information, okay, that women not be
19 exposed to talc which has limited benefit.  True?
20    A.    I see what's written here.
21    Q.    And you agree with me that I'm not
22 lying about what it says?
23    A.    No, I see what's written.
24    Q.    Okay.  And what is written is

Page 217

1 actually what it says, correct?
2    A.    It says:
3        "Nevertheless, given the poor
4 prognosis for ovarian cancer, any potentially
5 harmful exposures should be avoided, particularly
6 those with limited benefits.  For this reason, we
7 discourage the use of talc in genital hygiene,
8 particularly as a daily habit."
9    Q.    So --
10        MR. EWALD:  One second.  I
11    know you already read it once.  For the
12    court reporter's benefit, when you're
13    reading something, she has to take it
14    down.
15        THE WITNESS:  Okay.  Oh, I'm
16    going too fast?
17        MR. EWALD:  A little too fast
18    but okay.
19        THE WITNESS:  Sorry.
20        MR. TISI:  She got it.
21        MR. EWALD:  She got it.
22    (Laugh.)
23        MR. TISI:  She's good.
24 BY MR. TISI:

55 (Pages 214 - 217)

Page 218

1     Q.     And so in realtime, not in the
2  benefit of hind -- of bias, now we have a
3  recommendation being made that maybe women
4  shouldn't be exposed to this talc issue in light
5  of what is known and what is not known.  True?
6     A.     That's what it says here.
7     Q.     All right.  Do you have any evidence
8  that they reached out to speak to Dr. Harlow?
9     A.     I have -- I don't know that they did
10  or that they didn't.
11     Q.     Do you know whether or not they
12  said, "You know something?  Maybe that's a good
13  idea.  Let's get our various committees and people
14  together and see whether or not we need to either
15  advise women not to use talc as in genital hygiene
16  or maybe switch to cornstarch."
17          Have you seen anything like that in
18  response to this in the medical literature at the
19  time?  Did you see it?
20     A.     I -- I can't say that I did or that
21  I didn't.  What I know is we put this into
22  context.
23          As I wrote in -- in my report, you
24  know, at this time, we know that the World Health

Page 219

1  Organization IARC was saying that after extensive
2  review of the vast scientific literature on talc
3  that there is no scientific evidence for cosmetic
4  talc causes cancer.
5     Q.     Actually, what they said was that
6  there is possible human carcinogen in 2006;
7  correct?
8     A.     At this point in time, they did not
9  say that.
10     Q.     All right.  At that point in time,
11  the IARC review was years before, right?  This is
12  emerging literature.
13     A.     This is -- the IARC review was just
14  a couple years before.
15     Q.     Okay.
16     A.     As was --
17     Q.     I'm going to ask you --
18          MR. EWALD:  Hold on a second.
19  She's being responsive to your question.
20  Let her finish.
21          MR. TISI:  No, she's not being
22  responsive to my question at all.
23          MR. EWALD:  Then let her
24  finish.

Page 220

1          Okay.  If I interrupted David
2  Kessler on his long pages long answers
3  every single time I didn't feel he was
4  being responsive, I still let him finish.
5          She's giving relatively short
6  answers.  Let her finish.
7          THE WITNESS:  This was just a
8  couple years before --
9  BY MR. TISI:
10     Q.     Okay.
11     A.     -- that there were studies
12  suggesting -- I mean, that IARC said there was no
13  association.
14     Q.     Okay.
15     A.     And there were several studies that
16  came out that said there was no association.
17     Q.     Okay.  Now --
18     A.     J&J was keeping on top of the
19  literature at this time.
20     Q.     Okay.  Now, in 1992, there was a
21  recommendation that women not be exposed to talc
22  when used in the genital area, correct?
23  Dr. Harlow.
24     A.     I see what's written here.

Page 221

1          MR. TISI:  Okay.  Let's move
2  ahead two years to 1996.  We'll go
3  through these very quickly.
4          Here's an article by Cook.
5          MR. EWALD:  You mean four
6  years?
7          MR. TISI:  Four years.
8          (Document marked for
9  identification as Sutcliffe Exhibit 14.)
10  BY MR. TISI:
11     Q.     This is actually a Johns Hopkins
12  study, correct?  In the American Journal of
13  Epidemiology.
14     A.     (Reviews document.)
15     Q.     Actually, it's published in the --
16     A.     It looks --
17     Q.     -- Johns Hopkins University School
18  of Hygiene?
19     A.     I don't -- yeah, I don't think it's
20  a --
21     Q.     You're correct.  It's published in
22  the Johns Hopkins University --
23     A.     Yeah.
24     Q.     -- School of Hygiene.

56 (Pages 218 - 221)

Page 222

1    A.    The researchers were from
2 Washington.
3    Q.    Right.
4        And what they say is studies
5 demonstrating -- documenting --
6        MR. EWALD:  Sorry.  Where are
7    you?
8        MR. TISI:  First page.
9 BY MR. TISI:
10    Q.    It says:
11        "Studies documenting the migration
12 of carbon particles and radioactive particulate
13 agents from the vagina to the ovaries, as well as
14 those that have identified talc-like particles
15 more frequently in ovarian tumors than in normal
16 human ovarian tissue, have raised concern that
17 genital powder exposure may increase a woman's
18 risk of developing ovarian cancer."
19        Do you see that?
20    A.    I see that.
21    Q.    Okay.  So they're raising the
22 question in this Johns Hopkins journal, okay, that
23 whether -- that, number one, talc may migrate;
24 number two, that it's found in ovarian tissue; and

Page 223

1 number three, there are concerns about a risk of
2 women getting ovarian cancer as a result.  True?
3    A.    I see what is written here.
4    Q.    And what I'm saying is true,
5 correct?
6    A.    It's what is written.
7    Q.    Right.  Okay.
8        And they go on to say, and if you
9 look at the abstract portion, it says these
10 results support that hypothesis.
11        Do you see that?
12    A.    I see that.
13    Q.    Okay.  At the very back if you go to
14 the last page -- actually, just leave it there.
15        So they agree that question is being
16 raised again in 1996, correct?
17    A.    This is written in 1997.
18        MR. TISI:  Okay.  Let's go to
19    1992.  Let's go backwards, actually.
20        MR. EWALD:  Back in time?
21        MR. TISI:  Back in time.
22        MR. EWALD:  Yeah.
23        MR. TISI:  This is Rosenblatt.
24    This is a Hopkins study.  Exhibit

Page 224

1    Number 15.
2        (Document marked for
3    identification as Sutcliffe Exhibit 15.)
4 BY MR. TISI:
5    Q.    Do you know any of the authors here?
6    A.    I do not.
7    Q.    Do you see where they talk about an
8 increased risk of ovarian cancer seen in this
9 Johns Hopkins study?
10    A.    (Reviews document.)
11    Q.    Let's see if I can help you here.
12 If you go to page 22 of the document.
13    A.    22?  Okay.
14    Q.    It says on the right-hand column,
15 second to last full paragraph it says:
16        "The results of our study and others
17 suggest that genital fiber exposure may be
18 associated with an adverse -- with an adverse
19 effect but further study is needed to determine if
20 this relationship is causal in nature."
21        Do you see that?
22    A.    I see that.
23    Q.    That's a Johns Hopkins study,
24 correct?

Page 225

1    A.    The faculty from Johns Hopkins, yes.
2        MR. TISI:  Let's look at
3    Exhibit Number 16.
4        (Document marked for
5    identification as Sutcliffe Exhibit 16.)
6 BY MR. TISI:
7    Q.    This is a study by among -- by Gross
8 and Berg.  Now, if you look at the back of this
9 particular study, it's acknowledging -- page 194
10 it has an Acknowledgements section, correct?
11    A.    Yes.
12    Q.    And it was supported in part by
13 Johnson & Johnson.  The authors thank Dr. Wang and
14 Dr. Wehner in further assistance with the paper.
15        You see that?
16    A.    Yes, I see that.
17    Q.    And you actually refer to Dr. Wehner
18 in your report, correct?
19    A.    I at one -- I think in one paragraph
20 I talk about that.
21    Q.    And this is a Johnson &
22 Johnson-sponsored paper, correct?
23    A.    The research was supported in part
24 by Johnson & Johnson.

57 (Pages 222 - 225)

Page 226

1    Q.    So it's by Johnson & Johnson to know
2  about this paper, correct?
3    A.    Again, I didn't -- have not
4  systematically read the literature.  So I don't
5  know.
6    Q.    Let's put -- let's look at what they
7  say about the concern about a potential risk.
8        In the Introduction, would you read
9  the first sentence, please?  First two sentences,
10  actually.
11    A.    "The concern that use of talc or
12  talc-containing substances in the perineal region
13  of women may subject them to an increased risk for
14  ovarian cancer has become an important issue in
15  the study of ovarian cancer."
16    Q.    Okay.  Let's go to the Introduction
17  section.
18        What does that say?  First two
19  sentences.
20    A.    "There has been recent concern that
21  women's use of talc or talc-containing substances
22  in their perineal region puts them at an increased
23  risk for ovarian cancer."
24    Q.    Next sentence.

Page 227

1    A.    "This concern has been brought to
2  the forefront by several case-control studies
3  assessing the risk of ovarian cancer associated
4  with perineal talc use."
5    Q.    Okay.  And actually if you go to the
6  very last page, when they report the results of
7  the study on page 193, would you read the last
8  paragraph?
9    A.    "Thus, the body of knowledge found
10  in the medical literature does not unequivocally
11  support the hypothesis that talc use by women puts
12  them at an increased risk of ovarian cancer.
13  However, the results of the meta-analyses do
14  suggest the possibility of an increased risk of
15  ovarian cancer due to perineal talc use.  Further
16  research in this area is warranted by these
17  results."
18    Q.    Okay.  So the questions in this
19  J&J-sponsored study, they acknowledge longstanding
20  questions about the safety of talc and they say
21  additional studies need to be conducted, but the
22  evidence so far supports the association.  True?
23        MR. EWALD:  Objection to form.
24        THE WITNESS:  I see what's

Page 228

1  written here.  I have not studied this.
2        I just see what's written.
3  BY MR. TISI:
4    Q.    Okay.  But as somebody who is
5  involved in sensemaking and as trying to make
6  sense of what was happening at the time and not of
7  the benefit of what we know now, okay, the issue
8  is being raised, additional studies are being
9  recommended, and there's an association that's
10  being reported in this J&J-sponsored study.  True?
11    A.    I understand where you're going, and
12  what I also have to say is we need to look at the
13  other things that were happening in the context --
14    Q.    We're going to --
15    A.    -- at the time.
16    Q.    We're going to --
17    A.    It's important to do that.
18    Q.    I'm going to do it all.  I promise
19  you, I will.  Be patient with me.
20    A.    Okay, but I'm just saying.
21    Q.    I'm just saying, how about answering
22  my question, and I promise you we'll go back ad
23  we'll talk about IARC and the FDA and we're going
24  to talk about all kinds of things.  Okay?

Page 229

1        So let's just deal with the
2  questions here because you don't need to predict
3  where I'm going.
4    A.    I'm not predicting where you're
5  going.
6    Q.    Okay.  So let's just do it a little
7  bit at a time and let's just discuss at a time.
8        In 1994, okay, they do -- J&J
9  sponsors with Dr. Wehner's help a meta-analysis
10  which says questions are being raised about the
11  safety of talc with respect to ovarian cancer.
12        True or not true?
13    A.    I see what's written here and that's
14  true.
15    Q.    Okay.  Secondly, they say additional
16  studies need to be conducted, but there is
17  evidence of an association.
18        True or not true?
19    A.    I see that "further research in this
20  area is warranted."
21    Q.    Okay.  And it says there is a
22  possibility of an increased risk of talc and
23  ovarian cancer.  True?
24    A.    I see what's written there.

58 (Pages 226 - 229)

Page 230

1    Q.    All right. Let's go forward in
2 time. Let's go to the next. 1999.
3         Now, after Dr. Cramer says there was
4 problems with the study, he continued to publish,
5 did he not?
6    A.    I believe one of those studies had
7 his name on it.
8         MR. TISI: Okay. Let's look
9      at what he says in 1999.
10        (Document marked for
11      identification as Sutcliffe Exhibit 17.)
12 BY MR. TISI:
13    Q.    And this is a study, Exhibit
14 Number 17. It says at the top of the abstract on
15 the right-hand side of the page.
16        I'm sorry. Are you following my
17 question or are you reading your report?
18    A.    No, I'm just looking.
19    Q.    Okay. Let's look at my question
20 here.
21        On the right-hand side of the
22 page -- left-hand side of the page -- excuse me --
23 it says:
24        "We conclude that there is a

Page 231

1 significant association between the use of talc in
2 genital hygiene and risk of epithelial ovarian
3 cancer that, when reviewed in perspective of
4 published data on this association, warrants more
5 formal public health warnings."
6         Do you see that?
7    A.    I see that.
8    Q.    And if you look at the back, the
9 last sentence of it -- and I'm not going to ask
10 you to comment on the design of the study or the
11 science of the study or anything like that -- they
12 make a safety recommendation.
13        Do you see that?
14        Last sentence.
15        "We estimate that avoidance of talc
16 in genital hygiene might reduce the occurrence of
17 a highly lethal form of cancer by at least 10%.
18 Balanced against what are primarily aesthetic
19 reasons for using talc in genital hygiene, the
20 risk benefit decision not complex. Appropriate
21 warnings should be provided to women about the
22 potential risks of regular use of talc in the
23 genital area."
24        Do you see that?

Page 232

1    A.    I see that.
2    Q.    All right. Now, we've done the
3 1990s. Do you see any -- and we've talked about
4 several studies where the issue was being raised.
5 We're going to talk about all the other things in
6 context. I'm going to talk about the FDA and the
7 meeting at the FDA and all that stuff in a minute.
8         But have you seen in your review of
9 the medical -- review of the internal documents
10 any internal discussion at J&J as to whether or
11 not either switch to cornstarch or warnings and
12 instructions should be added to talc? Did you see
13 any internal discussions about that?
14    A.    I was --
15        MR. EWALD: Time frame?
16        MR. TISI: In the 1990s I said
17      up until now.
18        MR. EWALD: Okay.
19 BY MR. TISI:
20    Q.    From '84 to '99. Now we're talking
21 about a 15-year period of time.
22        In that time frame, did you ever see
23 any internal discussion about "Maybe these
24 researchers are right, maybe we ought to just in

Page 233

1 light of the ambiguity of the -- of the studies,
2 disruptive ambiguity of the studies, maybe we
3 ought to take risk mitigation"? Did you see any
4 discussion about that?
5    A.    What I saw is that J&J was closely
6 following the research, that it was paying
7 attention to regulatory bodies, that it was
8 engaging with people in workshops, and that it was
9 being aware of what was -- what regulatory bodies
10 were saying.
11    Q.    So other than being aware, you're
12 not -- move to strike the answer because it's not
13 responsive.
14        My question was: other than being
15 aware of the literature, which I agree that they
16 were aware of everything, my question is: Other
17 than being aware, would you tell me whether or not
18 there was any discussion about whether on balance
19 warnings, instructions or perhaps a change in
20 design ought to -- ought to occur?
21    A.    I was not looking at -- at a single
22 event or whatever. I'm looking at J&J's pattern
23 of actions over time.
24    Q.    And I'm asking -- I'm asking you

59 (Pages 230 - 233)

Page 234

1 about actions.
2         Do you see any actions within J&J
3 where they actively considered whether or not to
4 change to cornstarch?
5         Let's take it one at a time.
6    A.    First of all, J&J had cornstarch
7 on -- on --
8    Q.    Withdraw.  Excuse me.  Withdraw.
9 Withdraw because I'm going to talk about this as
10 well.
11         Withdraw Johnson's Baby Powder with
12 talc in favor of its cornstarch.
13         Do you see any discussion about
14 that?
15   A.    I did not examine that issue.
16   Q.    Okay.  So the answer would be no,
17 you saw no discussion?
18   A.    I can't say that I did or that I
19 didn't.
20   Q.    Well, this is your time to actually
21 answer that question.  Okay?
22   A.    Yeah.
23   Q.    Honestly.
24         So my question is:  As you sit here

Page 235

1 today, do you remember seeing any discussion in
2 that 15-year period about whether or not you ought
3 to switch -- J&J ought to switch or withdraw its
4 product or at least put a warning label on it?
5    A.    What I saw is that J&J was following
6 the research, was paying attention --
7    Q.    Okay.
8    A.    -- to regulators, and I did not -- I
9 can't say whether they did or they didn't because
10 I wasn't looking at that.
11        MR. TISI:  Okay.  Let's go to
12 2004, Exhibit Number 25.
13        Excuse me.
14        (Document marked for
15 identification as Sutcliffe Exhibit 18.)
16 BY MR. TISI:
17   Q.    This is a different group of
18 researchers from Dr. Mills.
19        MR. EWALD:  Is that 18?
20        MR. TISI:  This is Exhibit
21 Number 18, yes, please.
22 BY MR. TISI:
23   Q.    If you look at the left-hand side,
24 it says:

Page 236

1         "This study provides some support
2 for the hypothesis that perineal talc use is
3 associated with an increased risk of EOC."
4    Q.    Do you see that?  Left-hand side.
5 Excuse me.  In the abstract.
6    A.    Where is it?  Left-hand side?
7    Q.    Left-hand side.  The bolded part,
8 last sentence.
9    A.    Oh, okay.  I see it.
10   Q.    See that?
11   A.    "Some support for the hypothesis."
12 I see it.
13   Q.    Now, it also talks about -- if you
14 go halfway down the first full paragraph of the
15 article, it says:
16        "Collectively, these studies point
17 to a possible etiologic role of talc in ovarian
18 cancer via an inflammatory process at the site of
19 the ovarian epithelium."
20        Do you see that?
21   A.    I see that.
22   Q.    It goes on in the next paragraph.
23 It says:
24        "The role of cornstarch powder on

Page 237

1 ovarian cancer has also been evaluated in
2 epidemiologic research and a recent review
3 concluded that there is no association between
4 this type of powder and increased risk of ovarian
5 cancer."
6         Do you see that?
7    A.    I see that.
8    Q.    But then it goes on to say:
9         "Cornstarch is also not thought to
10 exert the same toxicologic reaction in human
11 tissues as does talc."
12        Do you see that?
13   A.    I see that.
14   Q.    So they're making a comparison
15 between the risk-benefit of cornstarch and talc in
16 this article, correct?
17   A.    They're raising the issue of
18 cornstarch in the article.  I see where it's
19 written.
20   Q.    And at the very last page of the
21 article, they say the question, however -- the
22 second sentence starts:
23        "However, given the suggestive
24 though uncertain role of talcum powder and EOC

Page 238

1 found in epidemiologic studies, including the
2 present study, users should exercise prudence in
3 reducing or eliminating use. In this instance,
4 the precautionary principle should be invoked,
5 especially given that this is a serious form of
6 cancer, usually associated with a poor prognosis,
7 with no current effective screening tool, steady
8 incidence rates during the last quarter century
9 and no prospect for successful therapy. Unlike
10 other forms of environmental exposures, talcum
11 powder use is easily avoidable."
12      Do you see that?
13      A.    I see what you're reading, correct.
14      Q.    Is any part of that untrue at the
15 time? Not with hindsight, but looking at it like
16 right at that snapshot in time in 2004, is any
17 part of that not true from your perspective?
18      A.    I'm just -- I see what's written
19 here. I can't say whether it's true or not true.
20 It is what the researchers wrote.
21      Q.    Okay. This isn't referred to in
22 your -- in your sensemaking report, is it?
23      A.    I wasn't looking at -- number one,
24 I've already said that I wasn't looking at a

Page 239

1 systematic analysis of all the studies I looked
2 through.
3      Q.    I'm not asking you to analyze the
4 study. I'm asking you -- look, and I really want
5 to be fair to you here.
6      We have now gone through several
7 articles and we're going to go through several
8 more where issues are saying not only is there a
9 potential association, which I'm not asking you to
10 do. You're not an epidemiologist.
11      But as somebody concerned with
12 safety, they're raising questions about whether or
13 not women should be warned, cornstarch ought to be
14 used, women should be instructed not to use it,
15 and studies be done.
16      All those things are being raised in
17 realtime. True?
18      A.    The research was happening when it
19 was happening. And at the same time, you know,
20 what I have shown in my analysis is that J&J was
21 paying attention to the scientific research, that
22 it was paying attention to what regulators were
23 saying, that it was paying attention to -- to what
24 was happening.

Page 240

1      Q.    Okay. There's a tree over in that
2 corner, right?
3      A.    Yes. A plant.
4      Q.    I'm paying attention to it now. I'm
5 paying attention to it now. I'm looking at it.
6      Am I doing anything with that tree?
7      A.    Again, J&J was --
8      Q.    I'm just asking: Am I doing
9 anything with that tree? I'm paying attention to
10 it right now. I'm looking at it.
11      Am I -- am I paying attention to it?
12      A.    I don't know whether you're paying
13 attention to it.
14      Q.    Okay. You agree that paying
15 attention to and doing something are different
16 things. True?
17      A.    I agree that's true.
18      Q.    Okay. So now other than paying
19 attention to the question, did you ever see any
20 internal analysis at J&J -- now we're at 2004. 20
21 years have happened between the time of the Cramer
22 study -- and we haven't gone through all the
23 studies, and I'm not pretending that I have.
24      Between 1984 -- 82 and 2004, several

Page 241

1 researchers were raising whether or not risk
2 safety ought to be considered to prevent people
3 from this potential of ovarian cancer. True?
4      A.    There were studies that came out.
5 True.
6      Q.    Okay. And now I'm asking you this:
7 Did J&J internally -- I'm not asking you what they
8 talked about at the FDA or at conferences or
9 whatever.
10      Did you ever see an internal
11 evaluation in that 20-year period where J&J said,
12 "Let's put everything on the table and let's
13 decide whether or not perhaps maybe we should
14 warn, substitute cornstarch, or instruct women not
15 to use it in the genital area"?
16      A.    What I saw and what I established in
17 my report is that J&J created -- developed over
18 time through the best practices of sensemaking
19 their institutional knowledge of their product and
20 the safety of its product, and that there were no
21 -- nothing at that moment in time was coming to
22 the forefront to change what they were thinking.
23      Q.    Okay. Now, can you answer my
24 question?

Page 242

1    A.    That's an answer to your question.
2    Q.    All right.  My question is:  Have
3 you seen any internal document, any document where
4 the company said, "We are doing a systematic" --
5 I'm not asking to you do the systematic review.
6         Did you see any internal document
7 within the company where they did a systematic
8 review of what was available at the time in that
9 22-year period that would -- take risk
10 reduction measures?
11    A.    Again, you know, I'm not looking at
12 a single instance.  I'm looking over time --
13    Q.    I'm not asking.  I'm asking --
14    A.    -- of what J&J was doing.
15    Q.    I'm looking at a 20-year period of
16 time.  Yes, I agree.  20-year period.  Pick a
17 date.  Pick a time.  Pick a time frame.
18         Have you seen any document internal
19 to the company where they actually analyze whether
20 or not risk reduction measures should be taken in
21 light of the then-existing knowledge?
22    A.    I was not -- I was not examining
23 risk reduction measures.
24    Q.    Okay.

Page 243

1    A.    I was examining J&J's
2 institutionalized knowledge and whether the ways
3 that in which they were acting were showing
4 that -- that they cared about consumers.
5         MR. TISI:  Let me look at
6    Exhibit Number 19.  This is now we're
7    going forward to 2013.  This is Exhibit
8    Number 19.
9         (Document marked for
10    identification as Sutcliffe Exhibit 19.)
11 BY MR. TISI:
12    Q.    This is an article by Terry.  The
13 Ovarian Cancer Association Consortium.
14         You see that one?  You see the very
15 top?
16         You see at the very bottom there it
17 says a bunch of authors and Ovarian Cancer
18 Association Consortium?
19    A.    I see it.
20    Q.    Okay.  If you look at the bottom, it
21 says authors affiliated.  Just take a scan in
22 there.  We see some of the most major institutions
23 in the country, cancer institutions.
24         Harvard School of Public Health,

Page 244

1 Cedars-Sinai, University of Southern California,
2 Stanford, Memorial Sloan-Kettering, Dartmouth,
3 Yale.
4         You see all those?
5    A.    I see those.
6    Q.    You see all those people?
7    A.    Uh-huh.
8    Q.    Okay.  Now, they say -- these are --
9 you don't disagree that these are major academic
10 and scientific institutions in this country?
11    A.    No.
12    Q.    At the very top, there's an abstract
13 and at the very bottom of that abstract, it says:
14         "In summary, genital powder use is a
15 modifiable exposure associated with
16 small-to-moderate increases in risk of most
17 histologic subtypes of epithelial ovarian cancer."
18         Do you see that?
19    A.    I see what's written.
20    Q.    All right.  At the very back of the
21 study, it says -- and I'm not asking you about the
22 science of this.  I'm asking you about the
23 recommendations, taken together with safety issue,
24 right?

Page 245

1         It says:
2         "In conclusion, our large pooled
3 analysis of case-control studies shows a
4 small-to-moderate (20%-30%) increased risk of
5 ovarian cancer" --
6         MR. EWALD:  Hold on.  I'm
7    sorry.  She wasn't there at the last
8    page.
9         THE WITNESS:  Yeah.
10         MR. EWALD:  There you go.
11 BY MR. TISI:
12    Q.    Actually, why don't you read it so
13 I'm not -- I'm not rushing quickly.  You read from
14 "In conclusion."
15    A.    So "In conclusion, our large pooled
16 analysis of case-control studies shows a
17 small-to-moderate increased risk of ovarian cancer
18 with genital powder use, most clearly pertaining
19 to nonmucinous -- I guess -- epithelial ovarian
20 tumors.  More work is needed to understand how
21 genital powders may exert a carcinogenic effect,
22 and which constituents (e.g., talc) may be
23 involved.  Because there are few modifiable risk
24 factors for ovarian cancer, avoidance of genital

62 (Pages 242 - 245)

Page 246

1 powders may be a possible strategy to reduce
2 ovarian cancer incidence."
3    Q.    Now, this group, this consortium
4 here is saying, maybe in light of the
5 then-existing knowledge, avoidance of genital
6 powders is prudent.  True?
7    A.    I -- I read what -- what is here.
8    Q.    Okay.  But what is here is now a
9 continuum.  We've looked at several researchers:
10 Harvard, Yale, Dartmouth, Stanford.  People going
11 back.  We talked about the Harlow study from 1992.
12 Now this is 2013.  Excuse me.  2013 I believe.
13    A.    2013.
14    Q.    And they're also talking about
15 avoiding the potential risk factor of ovarian --
16 of using talc.  True?
17    A.    They're saying what they're saying.
18 True.
19    Q.    Right.
20         And so now my question is now I'm
21 going to 2013.  Okay?
22         We saw it from Mills.  We saw it
23 from Terry.  We saw it from Harlow.  We saw it
24 from Cramer.  We saw it from all these people

Page 247

1 talking about:  Maybe it's a good idea to take
2 risk reduction measures and perhaps avoid the use
3 of talc.
4         Do you see that?
5         MR. EWALD:  Objection to form.
6         THE WITNESS:  They said what
7    they said.
8 BY MR. TISI:
9    Q.    Right.
10         Do you see any evidence that Johnson
11 & Johnson at any time in that 20-year had
12 according to applying any standard metric, a
13 policy and procedure, formal or informal, that
14 evaluated whether or not they ought to take safety
15 measures that are being recommended by these
16 authors?
17    A.    What I saw is -- and what I analyzed
18 I've already said earlier is -- J&J's
19 institutionalized knowledge that was created over
20 decades, very -- I mean, very rigorously engaging
21 with the scientific literature and experts and
22 paying attention to regulators, and I think you
23 have to put that into context.
24    Q.    Okay.  So they -- so the answer to

Page 248

1 my question is no, you haven't seen --
2    A.    I have seen --
3    Q.    Let me finish.
4    A.    -- or haven't seen?
5    Q.    You have not seen any internal
6 analysis from J&J applying any standard metric to
7 determine whether or not they should change to
8 cornstarch or perhaps issue a warning?
9    A.    I did not study J&J's individual
10 decisions related to that issue.
11    Q.    Okay.  Let's look at some
12 organizations -- what some organizations were
13 saying at the time.
14         MR. EWALD:  And just -- I'm
15    trying to get at a good spot.  We've been
16    going more than hour.  It's 1:00 almost.
17         MR. TISI:  We'll take a
18    break --
19         MR. EWALD:  I know you're on a
20    run, but just whenever you want to at a
21    good spot.
22         MR. TISI:  I will.  Thank you
23    very much.
24         Let's look at Exhibit

Page 249

1    Number 20.
2         (Document marked for
3    identification as Sutcliffe Exhibit 20.)
4 BY MR. TISI:
5    Q.    I'm showing you Exhibit Number 20,
6 which is an internal e-mail dated July 9, 1999.
7         Now, this is in the time frame that
8 we've been talking about, the 20, 25 years where
9 issues of whether or not to use talc as for
10 feminine hygiene.
11         This occurs in that time frame,
12 right?
13    A.    Yes.
14    Q.    Okay.  And so this is an internal
15 e-mail and you see, actually, it's interesting,
16 some interest here.
17         It says on Thursday, July 8th,
18 internally within J&J they say:
19         "John, You may" -- oh, I'm sorry.
20         It says:
21         "Michael, Michele, depending on how
22 widely this gets publicized, you may want to build
23 this into your forecast thinking (e.g., stay
24 conservative on the total powder business,

63 (Pages 246 - 249)

Page 250

1 accelerated shift from talc to cornstarch.)"
2        You see that?
3    A.    I see that.
4    Q.    Okay.  Did you see from your review
5 at any time that actually in this time frame J&J
6 was considering changing from talc to
7 cornstarch --
8    A.    That's --
9    Q.    -- in light of what was going on?
10    A.    As I've said before, I have not
11 analyzed any single event or any single issue.
12    Q.    Now, what they're forwarding here is
13 a company -- a press release from the American
14 Cancer Society and other organizations, correct?
15    A.    I don't -- I see what's on here, but
16 I don't know what they're doing with this.  I
17 can't say.
18    Q.    It says:
19        "Medical Experts Recommend Women Use
20 Cornstarch Powder."
21    A.    I see that.
22    Q.    Realtime, not hindsight bias, right?
23    A.    I see that.
24    Q.    Okay.  1999 internal to J&J.  True?

Page 251

1    A.    This looks like an internal to J&J.
2    Q.    Okay.  It says:
3        "American Cancer Society and Other
4 Cancer Groups Say Non-Talc Powders Are Safe to
5 Use."
6        Do you see that?
7    A.    I see that.
8    Q.    Okay.  And it says, the first
9 sentence:
10        "The American Cancer Society and
11 national Ovarian Cancer Coalition, among others,
12 are recommending that women use cornstarch
13 powders, rather than talcum powders, in the
14 genital area."
15        You see that?
16    A.    I see that.
17    Q.    You said that J&J was paying
18 attention to what was going on in the environment,
19 right?
20    A.    I didn't.  I said that --
21    Q.    Right.
22    A.    -- but I also said that J&J was very
23 active in seeking out scientific knowledge about
24 that.

Page 252

1    Q.    American Cancer Society is a pretty
2 important organization.
3        Don't you agree?
4    A.    Yes, I agree.  So is, you know,
5 other organizations.
6    Q.    Right.
7        They're choosing which ones to
8 believe and which ones don't believe, right?
9    A.    I disagree with your statement.
10    Q.    All right.  Next, third paragraph
11 down:
12        "Consumers need to know that there
13 are mainly two kinds of powders -- cornstarch and
14 talc, he adds.  Medical groups, such as the ACS,
15 make a clear distinction between the two types of
16 powders and offer recommendations to women on
17 which ones are considered safe to use.  For
18 example, 'Talcum Powder and Cancer' from the
19 American Cancer Society states:  'Until additional
20 information is available, women may wish to
21 consider avoiding these products or substituting
22 cornstarch-based powders that contain no talc."
23        Do you see that?
24    A.    I see that.

Page 253

1    Q.    Okay.  And so they're clearly
2 squarely raising the question of women really, in
3 light of what was known at the time, shouldn't be
4 using cornstarch and should be using -- shouldn't
5 be using talc, should be using cornstarch, right?
6    A.    I see what they're saying here.
7    Q.    Okay.  And in fact, J&J is
8 commenting on this and saying, "We may want to
9 accelerate or switch from -- a shift from talc to
10 cornstarch," correct?
11    A.    I don't know what J&J is saying
12 because I have not studied this.
13    Q.    Well, it actually says it.  It says:
14        In light of this "depending on how
15 widely this gets publicized, you may want to build
16 this into your forecast thinking (stay
17 conservative on the talc business, accelerated
18 shift from talc to cornstarch)."
19        Correct?
20    A.    I see what's written.  I can't
21 divine exactly what they were meaning.
22    Q.    Because you didn't look, did you?
23    A.    I -- I don't recall whether I saw
24 this or didn't see this.

64 (Pages 250 - 253)

Page 254

1    Q.    Okay.  In fact, you know -- do you
2  know that in 1999 to 2000 the company considered
3  and rejected switching to talc and cornstarch for
4  reasons that we have not been able to figure out?
5    A.    I was -- I did not study a single
6  decision.
7    Q.    All right.
8    A.    I was studying J&J's pattern of
9  actions over decades.
10    Q.    Well, we've talked about pattern
11  of -- pattern of publications over decades.  1994,
12  1992, 1999, this in 1999, 2004 were the Mills, and
13  2013 Terry.
14          This wasn't one isolated moment,
15  this was a continuum, correct?
16    A.    It was years.  I don't know that
17  it's a continuum.
18    Q.    All right.  Keep going to the next
19  page of this.  It says:
20          A doctor from the Illinois Division
21  of the American Cancer Society confirms this
22  position, states:  "The American Cancer Society
23  currently recommends that women who wish to use
24  powder use a cornstarch-based powder and avoid

Page 255

1  talc powders at this time."
2          You see that?
3    A.    I see that.
4    Q.    Okay.  Goes on.  Next paragraph it
5  says:
6          "Until more research is conducted,
7  it is prudent to avoid using talc powder in the
8  genital area.  There are a number of
9  cornstarch-based powders on the market, however,
10  which offer women a safe alternative."
11          Correct?
12    A.    Yeah.  Somehow I've lost that.
13          MR. EWALD:  Go to the very
14    next one further down.
15          THE WITNESS:  Right there?
16          MR. EWALD:  Right there.
17          THE WITNESS:  Oh, okay.  Got
18    it.
19          Yeah, I see that.
20  BY MR. TISI:
21    Q.    Okay.  And if you skip down below,
22  there's a sentence that says -- it says:
23          "Based on Dr. Whysner's expertise --
24    A.    Yeah.

Page 256

1    Q.    -- and the findings of this paper,
2  he offers the following advice to women who wish
3  to use feminine powder:  'If a person is concerned
4  about the risk of ovarian cancer from the use of
5  talc-containing powders, I think
6  cornstarch-containing powder is a safe
7  alternative."
8          Correct?
9    A.    I see that.
10    Q.    Okay.  And so now we've seen in this
11  time frame between multiple people, organizations,
12  raising the question as to whether or not
13  cornstarch is a safe alternative in light of what
14  was being talked about with ovarian cancer, not
15  asbestos, ovarian cancer.  True?
16    A.    You have represented that there are
17  many studies.
18    Q.    Well, I haven't represented.  I've
19  shown them to you.  True?
20    A.    You have.  Well, that's what I
21  meant.
22    Q.    Okay.  And you hadn't even -- you
23  hadn't considered those in drafting your report,
24  have you?

Page 257

1    A.    I am not looking at the systematic
2  literature.
3    Q.    Okay.  Let's look at the next one
4  here.
5          In fact, your own institutions were
6  talking about cornstarch as an alternative to
7  talc, were they not?
8    A.    I have no idea what people were
9  talking about.
10    Q.    You haven't looked at what the
11  University of Michigan and University of Johns
12  Hopkins was saying at the time?
13    A.    I -- I mentioned that I didn't do a
14  systematic analysis of the research.
15    Q.    Well, let's look at what was being
16  said at the time.  Because your report is
17  hindsight, is it not?  It's 2020 to 2024, your
18  report was, your analysis in this case, right?
19          You were looking at what happened
20  over time.  True?
21    A.    It was retrospective.  I wouldn't
22  call it hindsight.
23    Q.    Okay.  Okay.  Other people
24  hindsight, but just not you?

65 (Pages 254 - 257)

Page 258

1    A.    Hindsight is a completely different
2 thing. I did a retrospective analysis.
3    Q.    Now, we're talking about things you
4 didn't consider. True?
5    A.    Again, as I mentioned, you know, my
6 role was to do a particular thing.
7        MR. TISI: I'm going to show
8    you what University of Michigan where you
9    were. This is Exhibit Number 21. This
10    is University of Michigan.
11        (Document marked for
12    identification as Sutcliffe Exhibit 21.)
13 BY MR. TISI:
14    Q.    And this is, I'll represent to you,
15 was from 2019.
16    A.    Okay.
17    Q.    It says "Risk Factors Genetics and
18 Screening."
19        Do you see that?
20    A.    Yes.
21    Q.    And it says "Talcum powder" at the
22 bottom. Would you read for the record what it
23 said in 2019?
24    A.    "Talcum powder" at the bottom of

Page 259

1 what? Sorry. I mean, I -- this doesn't say
2 "talcum powder."
3        MR. EWALD: She was cut off
4    over here.
5        MR. TISI: No. It's right
6    here on the top page.
7        MR. EWALD: No. The top for
8    some reason the printing is different.
9        MR. TISI: Okay.
10        MR. EWALD: Top of the next
11    page.
12        MR. TISI: Thank you.
13        THE WITNESS: "There has been
14    some research proving a slight increased
15    risk for ovarian cancer for women who use
16    talcum powder. There is no evidence
17    linking cornstarch powders with any
18    female cancers."
19 BY MR. TISI:
20    Q.    So University of Michigan where you
21 were was saying there's -- there is a slight
22 increase in ovarian cancer in women that's proven
23 by the research, right? Used the word "proof,"
24 right?

Page 260

1    A.    It says "There has been some
2 research proving a slight increased risk for
3 ovarian cancer for women who use talcum powder."
4    Q.    And then they compare it to
5 cornstarch, don't they? And what do they say
6 about cornstarch?
7    A.    "There is no evidence linking
8 cornstarch powders with any female cancers."
9    Q.    Was University of Michigan wrong?
10    A.    I don't know whether University of
11 Michigan is wrong or right.
12        What I was studying was J&J and the
13 institutionalized knowledge it had and that it was
14 not -- and what it was doing.
15    Q.    Well, one of the things that --
16 well, what it was doing is the key, right?
17        The institutional knowledge it had.
18 We're talking about the knowledge. True. Okay?
19        I'm asking you what they were doing.
20 What were they doing internally in the company?
21        Now, you saw before in response to
22 the American Cancer Society that there was a
23 discussion about an accelerated switch to
24 cornstarch.

Page 261

1        Did you not see that?
2    A.    I -- I saw what was written there.
3 I can't divine what was happening there.
4    Q.    Because you haven't seen any
5 documents.
6        Have you seen any documents that
7 talked about the switch to cornstarch in that time
8 frame?
9    A.    I was not studying the switch to
10 cornstarch.
11        MR. TISI: Okay. Let's look
12    at what Johns Hopkins was saying in 2010
13    in this time frame.
14        (Document marked for
15    identification as Sutcliffe Exhibit 22.)
16 BY MR. TISI:
17    Q.    Now, let me just stop here for a
18 minute and talk about Johns Hopkins.
19        Are you familiar with -- do you know
20 Dr. Merlo and Dr. Diette, our experts in this case
21 from your -- do you know who they are?
22    A.    No.
23    Q.    Okay. They're with the Johns
24 Hopkins School of Public Health as well. They're

Page 262

1 epidemiologists who have also earned millions of
2 dollars --
3     A.    Uh-huh.
4     Q.    -- in connection with this case.
5     A.    I admit, I wish I had earned
6 millions of dollars, but that's not true.
7     Q.    Okay.  Well, you earned almost a
8 million dollars so far?
9     A.    Maybe but.
10          MR. EWALD:  Objection to form.
11 BY MR. TISI:
12     Q.    "Maybe but."
13          $750,000, right?
14     A.    I have no idea.
15     Q.    Okay.  Well, at this time before --
16 before Johns Hopkins started being Johns Hopkins
17 Research has been paid millions of dollars overall
18 for -- for talc litigation, let's look at what
19 they were actually saying.  Okay?
20          This is from 2010.  Look at the --
21 there's a section on "Talcum powder and asbestos."
22          Can you see what they say?  Can you
23 read what they say?
24     A.    Where are you talking?  I'm sorry.

Page 263

1     Q.    Second page.
2     A.    Okay.
3     Q.    Says at the very bottom.
4     A.    Okay.  It says:
5          "Habitual use of talcum powder on
6 the genital area may increase the risk for ovarian
7 cancer, but the evidence is not strong."
8     Q.    Keep going.
9     A.    "A study at Harvard Medical School
10 found that using talc this way doubled the risk,
11 but other studies found no increased risk.  Some
12 researchers believe that talc may be carcinogenic
13 because it contains particles of asbestos, a known
14 carcinogen.  It's been shown that rates of ovarian
15 cancer are higher than normal in women whose jobs
16 expose them to asbestos."
17     Q.    Now, would you agree, Doctor, that
18 during this time frame, we've looked at a bunch of
19 documents there was some disruptive ambiguity
20 about talc and ovarian cancer.  We looked at a
21 bunch of articles.  Now websites, press releases
22 from the American Cancer Society.
23          You agree with me that there was
24 serious questions being raised by all kinds --

Page 264

1 coming from all kinds of corridors about talc and
2 ovarian cancer, correct?
3          MR. EWALD:  Objection to form.
4          Go ahead.
5          THE WITNESS:  I would agree
6     that studies had been conducted.
7          MR. TISI:  Okay.  All right.
8     This is probably a good time to take that
9     break.
10          (Whereupon, at 1:08 p.m., a
11     luncheon recess was taken.)
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 265

1          AFTERNOON SESSION
2            (1:39 p.m.)
3          KATHLEEN M. SUTCLIFFE, PHD
4 called for continued examination and, having been
5 previously duly sworn, was examined and testified
6 further as follows:
7          EXAMINATION (CONTINUED)
8 BY MR. TISI:
9     Q.    All right.  So let's talk about the
10 World Health Organization and IARC.  I don't think
11 there's very many questions I need to ask about
12 this.
13          But you would agree with me that in
14 2006 talc without asbestiform fibers was -- was
15 rated as a possible human carcinogen 2B, correct?
16     A.    I need to check on that.
17          So I thought -- let me just check.
18          You're talking about 2010?
19     Q.    Well, it's 2010, but the review was
20 in 2006, but fine, use 2010.
21     A.    Okay.
22          They published a monograph that
23 evaluated the carcinogenic hazards of talc not
24 containing asbestos fibers and listed perineal use

67 (Pages 262 - 265)

Page 266

1 of talc-based baby powder include to be possibly
2 carcinogenic.
3     Q.    Okay.  And then you know that in
4 2012 talc with asbestiform fibers was categorized
5 as a Category 1, correct?  Or do you not know?  I
6 didn't see that referred to in your report.
7     A.    I don't know that I had that in
8 here.
9     Q.    But the World Health Organization
10 never categorized talc as being safe, did they?
11     A.    Again, all I know is that the World
12 Health Organization in 19 -- early 1989, early 19
13 -- in 1989 suggested that cosmetic talc doesn't
14 cause cancer of any kind.
15     Q.    Okay.  Can you keep your voice up,
16 please?  I think there are people trying to hear
17 us.
18         MS. TURPIN:  I'm having a hard
19     time hearing the witness again.
20         THE WITNESS:  I'll speak up.
21         MR. TISI:  I asked her to
22     speak up.
23         MS. TURPIN:  Thank you.
24 BY MR. TISI:

Page 267

1     Q.    So 2000 -- in the mid-2000s, it
2 categorized talc as being a possible human
3 carcinogen, correct?
4     A.    In 20 -- in whatever you say, 2009
5 or 2010 they --
6     Q.    Right.
7     A.    -- published a monograph, as I
8 mentioned.
9     Q.    Right.
10         But the announcement was made in
11 2006.
12     A.    Okay.
13     Q.    So I'll just -- I think the record
14 will be what the record is.
15         But IARC never said talc was safe,
16 did it?
17     A.    They listed it as a group to be
18 possibly carcinogenic.
19     Q.    And so my question is:  There is a
20 category for being safe, right?  A Category 3.
21         It's not Category 3, is it?
22     A.    I think Category 3 is not
23 classifiable as to its carcinogenesis.
24     Q.    My question is:  They were not --

Page 268

1 IARC did not say that talc was safe, did it?
2         MR. EWALD:  Objection to form.
3         THE WITNESS:  IARC -- I can't
4     say what IARC said or didn't say.
5         What I know is that they
6     listed perineal use of talc-based baby
7     powder include 2B.
8 BY MR. TISI:
9     Q.    Possibly carcinogenic?
10     A.    Correct.
11     Q.    And with asbestiform fibers, which
12 you don't know, you weren't provided, you didn't
13 review, is a -- I will represent to you is a
14 Category 1, which is carcinogenic.  Okay?
15         So talc is either possibly or in
16 fact carcinogenic according to current -- the
17 then-current classification of talc, according to
18 the IARC, correct?
19         MR. EWALD:  Objection to form.
20         THE WITNESS:  All I -- all I
21     can say for sure -- I mean, I understand
22     what you're -- what you're saying -- is
23     that in 2006 or 2010, as I reported here,
24     they published a new monograph that

Page 269

1     evaluated the hazards and they listed
2     this as group 2B.
3 BY MR. TISI:
4     Q.    Okay.  And now so, again, we're
5 talking about the 2000 -- 1984 with Cramer.  We
6 were just kind of talking about 2000 -- '80s,
7 '90s, 2000s, that 30-year period.
8         Did anybody, to your knowledge, ever
9 come out and directly say talc is safe?
10         MR. EWALD:  Objection to form.
11         THE WITNESS:  I do not recall
12     that language.
13 BY MR. TISI:
14     Q.    Okay.
15     A.    I know that nobody came out saying
16 that, as we know, as I've said earlier, you know,
17 that talc was -- that there were no conclusive
18 findings.
19     Q.    Okay.  There's a difference between
20 no conclusive findings and no evidence, right?
21     A.    Again, I'm not a toxicologist --
22     Q.    Okay.  So let's --
23     A.    -- or I am not an epidemiologist and
24 that was not my --

Page 270

1    Q.    Okay.
2    A.    My role in this case was different.
3    Q.    So let's stick with what we know.
4  Okay?
5         What we know is, nobody ever came
6  out and said talc was safe in that time frame,
7  other than J&J, correct?
8         MR. EWALD:  Objection to form.
9         THE WITNESS:  I --
10        MR. EWALD:  Go ahead.
11        THE WITNESS:  Sitting here,
12    all I can say is what I know.
13 BY MR. TISI:
14    Q.    Okay.
15    A.    And what I know is I established
16 J&J's institutionalized knowledge and how they
17 developed it --
18    Q.    Okay.  Now, answer my --
19    A.    -- about the safety of its product.
20    Q.    Okay.  So now let's -- let me ask
21 you my question now, not your question.
22        My question is:  Have you ever seen
23 anybody come out and say in this time frame from
24 1984 -- right now we're talking about the late

Page 271

1  2000s, actually 2000 -- let's put it to today.
2         Did anybody ever come out, to your
3  knowledge, and say talc is safe?  That there are
4  no questions about talc, talc is safe?
5    A.    I was not studying whether or not --
6    Q.    I didn't ask you a study.
7    A.    I have to say, I can't answer your
8  question because --
9    Q.    Okay.  Fine.
10    A.    -- that is not something that I was
11 studying.
12    Q.    So you can't say that you have ever
13 seen it or not.
14        You've told me about all the times
15 that talc said there were not conclusive evidence
16 that it would cause ovarian cancer, but you're not
17 willing to tell me that nobody ever said it was
18 safe?
19    A.    I --
20        MR. EWALD:  Objection to form.
21    Mischaracterizes testimony.
22        Go ahead.
23        THE WITNESS:  I know that FDA
24    reviewed the research available in the

Page 272

1    19 -- late 1990s and there was no causal
2    link between talc and ovarian cancer.
3 BY MR. TISI:
4    Q.    Okay.  We're going to talk about
5  that, but I'm going to ask you the question that
6  I'm going to ask you, which is:  Can you think of
7  a single researcher, organization, regulatory
8  authority that said talc was proven to be safe?
9    A.    I did not study that.
10    Q.    Okay.
11    A.    I studied -- I didn't do a
12 systematic review of the literature.
13    Q.    Okay.  So now we've talked about
14 medical literature.  We talked about IARC.  Let's
15 talk about the FDA since you've wanted to talk
16 about it all morning.
17    A.    Okay.
18    Q.    Let's talk about the FDA.
19        MR. EWALD:  Slight
20    mischaracterization there. (Laugh.)
21        MR. TISI:  It's all right.
22 BY MR. TISI:
23    Q.    In 1994, you point out on page 62,
24 paragraph number 157 that there was a 1994

Page 273

1  workshop that was cosponsored by the FDA, correct?
2    A.    Correct.
3    Q.    As part of your sensemaking
4  framework, that was an important event, correct?
5    A.    As part of my sensemaking framework,
6  it was one data point suggesting -- showing
7  exactly how -- how J&J was interacting with the --
8  interacting, you know, regularly and with the
9  scientific community.
10    Q.    Well we looked at a lot of other
11 data points that you said you hadn't considered,
12 but you looked at this one, right?
13        We looked at -- we looked at
14 Cramer -- Cramer '82, which you did consider.  We
15 looked at Harlow '92, which is a data point you
16 didn't consider.  We looked at Mills, which you
17 didn't consider.  We looked at Cramer '99, which
18 you didn't consider.
19        We looked at a lot of other things
20 you didn't consider, but you did consider the 1994
21 conference, right?
22    A.    The conference is one.  It shows
23 that J&J --
24    Q.    Okay.

69 (Pages 270 - 273)

Page 274

1    A.    -- was taking actions to interact
2  with the scientific community --
3    Q.    Okay.
4    A.    -- like it did.  And as I said, I
5  did not look at all of the research on ovarian
6  cancer.
7    Q.    By the way, we would only know that
8  if we saw your billing records about what you
9  reviewed and when you reviewed it, right?
10         MR. EWALD:  Objection to form.
11         THE WITNESS:  I do not say
12    exactly what I reviewed.
13  BY MR. TISI:
14    Q.    All right.  So let me show you a
15  document that was not in your list.
16         Now, according -- actually, could
17  you show me the Carr?
18         I'll represent to you that Carr
19  article just so we can move through this.  There
20  was a two-day conference January 31-February 1,
21  1994.
22         Does that sound about right to you?
23    A.    I'm not sure what you're talking
24  about.

Page 275

1    Q.    Okay.  The ISTRP conference.
2    A.    Okay.  The ISRTP?
3    Q.    Yes.
4    A.    Yeah, I don't -- I don't recall.
5    Q.    Okay.
6    A.    I'd have to look back.
7         MR. TISI:  Let me show you.
8    Let me see if I can have this marked.
9    Well, I just have a copy of it.  Maybe
10    you can just take a look at it.
11         Look at Footnote Number 1 the
12    record reflect and I'll just -- I don't
13    have it.
14         Do you have a copy?
15         I'm going to show you what
16    I've had marked as Exhibit Number 51,
17    which is the conference.
18         (Document marked for
19    identification as Sutcliffe Exhibit 51.)
20         THE WITNESS:  Uh-huh.
21  BY MR. TISI:
22    Q.    All I'm going to ask you is the date
23  of the conference.
24         This is the document you reviewed,

Page 276

1  right?  The Carr?
2    A.    I have to look.  Can we look to see?
3         Can I look at something?
4         MR. EWALD:  Oh, sure.
5         THE WITNESS:  320.  Just to
6    make sure.
7         MR. EWALD:  There you are.
8         THE WITNESS:  Okay.  Thanks.
9         Yep.  Yeah.
10  BY MR. TISI:
11    Q.    Can you just confirm for me the date
12  of the conference?
13         It's in the Footnote 1.
14         It's Footnote 1, front page.
15    A.    Oh, right here.
16         1994.
17    Q.    January 31-February 1, 1994,
18  correct?
19    A.    Correct.
20         MR. TISI:  Now I show you an
21    internal FDA document four days later,
22    which I don't see any reference in your
23    list, Exhibit Number 23 dated February 4,
24    1994.

Page 277

1         (Document marked for
2    identification as Sutcliffe Exhibit 23.)
3  BY MR. TISI:
4    Q.    Do you see that?
5    A.    I do see that, yes.
6    Q.    Okay.  Does it -- does it not say --
7  it says "I called the FDA."
8         This is from Stephen Gettings,
9  Director of Toxicology, entitled "Talc Symposium
10  Follow-up."  It's a memorandum dated February 4,
11  1994.
12         Do you see that?
13    A.    Uh-huh.
14    Q.    Would you read to me what it says?
15    A.    "They are still in the process of
16  evaluating the information from the meeting but
17  their initial impression is that the possibility
18  of risk (of ovarian cancer) cannot be totally
19  dismissed and may need additional work to answer
20  the question."
21    Q.    Okay.  So the FDA still had
22  questions about the safety of talc.  True?
23    A.    I don't know what -- whether they
24  had questions about it.  I see what I'm -- what

Page 278

1 they said, what was said here.
2    Q.    And the next sentence --
3    A.    So that's all I can say.
4    Q.    I'm sorry.  I didn't mean to
5 interrupt.
6        The next sentence it says:
7        "In addition, we have received
8 information that at least one of our companies has
9 received a call from a gynecologist interested in
10 conducting further research to the ovarian cancer
11 issue."
12    A.    I see that.
13    Q.    So two things were happening.
14 Number one is, there's contact with the FDA
15 saying, "We still have concerns, the issue is not
16 off the table," right?
17    A.    I see what's written here.  I can't
18 say whether --
19    Q.    Well, how do you interpret it?
20    A.    I don't.  I see what's written here.
21    Q.    You don't interpret it at all?
22    A.    I see what's written here and I
23 can't divine what --
24    Q.    Okay.

Page 279

1    A.    -- was actually said.
2    Q.    So you are willing to interpret the
3 conference that you referenced, but you're not
4 willing to -- to interpret a two-sentence
5 follow-up memo about that conference?
6    A.    I am willing to interpret that J&J
7 participated in the conference, that they were
8 actively interacting with the scientific community
9 on these matters.
10    Q.    And they actively spoke to Dr. -- to
11 the FDA and actively found out the FDA still had
12 concerns and actively heard that there was
13 additional research needed to be done, right?
14 They actively heard those things?
15    A.    I --
16        MR. EWALD:  Objection to form.
17        THE WITNESS:  I don't know
18    whether they -- I know that what I see
19    here on my paper.
20        MR. TISI:  Let's go to the
21    next one.  Exhibit Number 42.  I'm sorry.
22    Exhibit Number 24.
23        (Document marked for
24    identification as Sutcliffe Exhibit 24.)

Page 280

1 BY MR. TISI:
2    Q.    Following that meeting -- you wanted
3 to mention FDA a couple times this morning, and I
4 told you we'll get to it and I'm keeping my
5 promises.
6    A.    Well, that's good because, you know,
7 I can also talk about, you know, the Citizens'
8 Petitions or that.
9    Q.    Oh, I'm going to talk about that
10 too.
11    A.    Oh, that's great.
12    Q.    I'm going to talk about that too.  I
13 promise, I'm going to get there.
14    A.    Okay.
15    Q.    You can't anticipate my questions.
16 You got to answer the questions in the order in
17 which I -- which I do it.  That's part of the
18 process.  Okay?
19        Now, the FDA, April 17, 1995.
20 Here's Exhibit Number 24.
21        This is an e-mail -- excuse me -- a
22 memo about a communication with John Bailey at the
23 FDA, correct?
24    A.    I need to take a minute to read

Page 281

1 this.
2    Q.    Sure.
3    A.    (Reviews document.)
4        Okay.
5    Q.    Okay.  Now, so a couple things from
6 this memo.  This is -- first of all, you hadn't
7 seen the exhibit I showed you before, the
8 facsimile, correct?  That had not been part of
9 your review?
10    A.    I don't recall whether I saw it or
11 didn't see it.
12    Q.    You didn't see this one either?
13    A.    I have to say, I don't remember.
14    Q.    Okay.
15    A.    As I said, I considered a lot of
16 things that are not necessarily in this report.
17    Q.    Okay.  So this is -- well, but you
18 did refer to the FDA and that's part of your --
19 your issue about, you know, that they were paying
20 attention to -- to the FDA, right?
21    A.    It's not just paying attention, that
22 they were interacting and collaborating with the
23 FDA --
24    Q.    Perfect.  Let's use your word.

71 (Pages 278 - 281)

Page 282

1      A.      -- over time.
2      Q.      Let's use your word.  Interactive.
3            They spoke to John Bailey at the FDA
4  on or about April 15, 1995, correct?
5      A.      It looks like that it says April 17,
6  1995.
7      Q.      Now, John O'Shaughnessy is listed
8  here.  You know he's the product liability lawyer
9  for J&J.
10           You know that, right?
11     A.      I know he was a lawyer.  I don't --
12  I don't know much about that.
13     Q.      He's the head of -- he was the head
14  of litigation for Johnson & Johnson.  He's at that
15  meeting as well.
16           In fact, he was on the prior
17  e-mail -- the prior facsimile, correct?
18     A.      I do not -- I don't know.
19     Q.      In fact, he was at the -- if you
20  look at the Carr paper, he was actually there as
21  well?
22     A.      I haven't.  I mean --
23     Q.      Well, take a look.
24           I'll just represent to you that he's

Page 283

1  there.
2      A.      I have to look.
3      Q.      It's in the middle of the page.
4  Second page.
5      A.      Okay.  Yep.  He's there.
6      Q.      Okay.  So their product liability
7  lawyers are all over this, aren't they?  They're
8  at every single meeting.  True?
9      A.      I --
10           MR. EWALD:  Objection to form.
11       Characterization.
12           THE WITNESS:  I have not
13       looked at every single meeting.  So I
14       can't say anything about it.
15  BY MR. TISI:
16     Q.      Do you know whether or not when the
17  first talc ovarian cancer case was filed?
18     A.      I do not know.
19     Q.      Would it surprise you that the first
20  trial was in 2014, some 20 years after this, that
21  their product liability lawyers were involved in
22  discussions, correct?
23     A.      I --
24           MR. EWALD:  Objection to form.

Page 284

1            THE WITNESS:  I have no idea
2       what -- what --
3  BY MR. TISI:
4      Q.      Okay.
5      A.      -- people were doing at these
6  meetings.
7      Q.      So J&J was paying attention to the
8  FDA, but so were their product liability lawyers.
9  True?
10     A.      I -- I can't say one way or another.
11     Q.      Okay.  So let's talk about this
12  1995.  This is, of course, comments by FDA's John
13  Bailey during a luncheon.  It says:
14           "He described talc safety as an
15  issue that 'is still on the table' and that he
16  would move to some action."
17           You see that?
18     A.      I see that.
19     Q.      The FDA still had concerns even
20  after this conference.
21           This is now a year later, right?
22     A.      I see what is said there.
23     Q.      Well, am I wrong?  What's your
24  interpretation of that?

Page 285

1      A.      You know, he says that it's still on
2  the table.
3      Q.      Okay.  Now, it says he refers to the
4  Citizens' Petition.
5           He says:
6           "Finally, he referred to the
7  Citizens' Petition letter requesting warnings on
8  talc products saying it shows concerns continue
9  and the FDA will have to develop a response in the
10  future."
11           Right?
12     A.      Where?  Can you tell me where that
13  is?
14     Q.      It says "Finally."  The third --
15  fourth paragraph down:
16           "Finally, he --
17     A.      Okay.
18     Q.      -- referred to the Cancer Prevention
19  Coalition Citizens' Petition requesting warnings
20  on all talc products."
21           I'm going to talk about that in a
22  minute.
23           But it says those -- and I'm
24  paraphrasing here.

72 (Pages 282 - 285)

Page 286

1      It says the concerns -- their
2  concerns continue and FDA will have to develop a
3  response in the future, correct?
4      A.    I see what's written.
5      Q.    Okay.  And do you interpret that is
6  that there is still concerns in the medical and
7  scientific community about the safety of talc?
8      A.    I see what's written here.  I mean,
9  looking at the -- at the paragraph above that, you
10  know, he said that it's a weak association.  It's
11  a relatively weak scientific plausibility --
12  Q.    Right.
13  A.    -- of association.
14  Q.    But there's still a concern, right?
15  A.    I see what's written here.
16  Q.    Okay.  But how do you interpret it?
17      You interpret it as being that
18  there's -- I mean, they use "concerns continue."
19  I mean, am I reading the English incorrect?  Do
20  you interpret that as being there are continued
21  concerns about the safety of talc?
22  A.    I interpret that J&J is attending to
23  the literature and paying attention to what's
24  going on in the environment.

Page 287

1      Q.    Oh, paying attention again.  Okay.
2  So let's talk about paying attention.
3      They also say:
4      "Steve outlined a protocol presented
5  by J&J by Ernst Wynder of AHF and ask him to
6  invite the Talc Interested Party Task Force to
7  join us in sponsoring the study."
8      Do you see that?
9      A.    Yes.
10  Q.    Have you ever seen a study that J&J
11  did, other than the Gross and Berg one that we
12  talked about before that says do more studies?
13  A.    I have not looked at particular
14  studies J&J has done.
15  Q.    Well, we're talking about other than
16  paying attention, we want to talk about actions,
17  right?  So let's talk about actions.
18      Did you ever see any studies that
19  J&J ever did on the issue of whether or not talc
20  can migrate?
21  A.    You know, there are many ways that
22  organizations can be -- can attend to or be
23  involved in what they're concerned of.  So.
24  Q.    How about answering my question now?

Page 288

1      Have you ever seen --
2      A.    I --
3      Q.    I'm not asking you whether there are
4  many ways to do it.
5      I'm asking you:  In your review,
6  have you ever seen -- I mean, if a judge -- forget
7  about I'm a lawyer.
8      If a judge asked you and you were
9  sitting in the courtroom right now and said,
10  "Doctor, have you ever seen a study where there's
11  -- where J&J investigated whether talc can
12  migrate?"  What would your answer be?
13  A.    My answer --
14      MR. EWALD:  Objection.
15      Speculation.  Argumentative.
16      Go ahead.
17      THE WITNESS:  My answer would
18      be that is not what I -- that was not my
19      role here.  I have not --
20  BY MR. TISI:
21      Q.    I didn't ask you whether it's your
22  role.
23      A.    I have not studied that.
24      Q.    I'm not asking you whether or not

Page 289

1  you studied it.
2      You're testifying that J&J paid
3  attention and acted appropriately.  True?
4      A.    I -- I am not -- I -- it wasn't just
5  paying attention.
6      Q.    Okay.
7      A.    I established J&J's, you know,
8  institutional knowledge --
9      Q.    Okay.
10  A.    -- that was gained over time through
11  multiple means, actions and, you know,
12  interactions with experts.  Interactions with the
13  scientific community, like going to this
14  conference.  Interactions with the FDA,
15  collaborating, etc., and it gained its knowledge
16  that way.
17  Q.    Okay.  How about gaining --
18  corporation's gaining -- can gain knowledge by
19  conducting their own studies.  True?
20  A.    They can -- there are many -- as I
21  said earlier, there are many ways that
22  organizations --
23  Q.    Okay.
24  A.    -- can attend to the scientific

73 (Pages 286 - 289)

Page 290

1 literature.
2    Q.    And that would be one of them doing
3 their own studies, correct?
4    A.    That's one of them, but there are
5 other means to do it as well.
6    Q.    Understood.  We will talk about the
7 others.
8         Let's talk about this one.  This
9 one, doing studies.
10         Have you ever seen a study looking
11 at the question of whether or not talc can migrate
12 by J&J?
13    A.    Again, I can't say that I have or
14 that I haven't.
15    Q.    Have you ever seen a study, an
16 epidemiology study, other than the Gross and Berg
17 one?
18    A.    I replied earlier that I did not do
19 a scientific analysis of the ovarian literature.
20    Q.    That's not the ovarian literature.
21         I'm asking whether they ever did a
22 study.
23    A.    Again, I didn't do a scientific --
24    Q.    I mean, if they didn't do a study,

Page 291

1 there's no literature to review, right?
2    A.    I have not done a systematic
3 analysis of the literature.
4    Q.    That's not literature.
5         If the study wasn't done, there's no
6 literature.
7    A.    Again, I don't know what's been done
8 or what hasn't been done.
9    Q.    Perfect.  That's the answer.
10         You don't know, right?
11    A.    I have not looked at this.  It was
12 not something --
13    Q.    Okay.
14    A.    -- I investigated.
15         MR. TISI:  Let's keep going
16    with the FDA.  Exhibit Number 25, please.
17         (Document marked for
18         identification as Sutcliffe Exhibit 25.)
19 BY MR. TISI:
20    Q.    Here's a document from the FDA
21 itself about its view about talc.
22    A.    Thank you.
23    Q.    This is the FDA's Cosmetic Program
24 dated February 10, 1988, and this is three years

Page 292

1 after the -- I'm sorry -- three years after the
2 conference that you relied on.
3         Have you seen this document before?
4    A.    You know, I have to say, I don't
5 recall.
6    Q.    Okay.
7    A.    So I don't remember.
8    Q.    Okay.  This is dated February 10,
9 1988 and it's titled "FDA's Cosmetic Program:
10 Current Projects and Resources and A Discussion of
11 the 'Model' Program."
12         Do you see that?
13    A.    Yes.
14    Q.    Okay.  Now, if you look at page --
15 page ending with the Bates number 509.
16         Do you see that?
17         MR. EWALD:  509 or 609?
18         THE WITNESS:  509?  I don't
19    see any 509.
20         MR. TISI:  Right here on the
21    bottom in the Bates number.
22         MR. EWALD:  Oh.  Sorry.  It's
23    the number, the one in the middle.
24         THE WITNESS:  Oh, okay.

Page 293

1    What?  This is all 669.
2         MR. EWALD:  Yeah.  Which page?
3    Can I see what?
4         THE WITNESS:  There's no 509.
5         MR. TISI:  (Indicates).
6         MR. EWALD:  Yeah.  It's
7    different than what we have.
8         MR. TISI:  Okay.  Let me see
9    if I can get that.
10         I have absolutely no idea what
11    happened.
12 BY MR. TISI:
13    Q.    Okay.  Well, I'm going to give you
14 my copy, and I'll have this marked.  This is
15 Exhibit Number 25.
16         And if you go to page 509, mine is
17 highlighted so you can actually read what it says.
18         Would you read into the record what
19 the FDA says?
20    A.    "Talc is a commonly used ingredient
21 used in a variety of cosmetic, drug, and medical
22 device preparations.  Perineal talc has been
23 linked to increased risk of ovarian cancer.  FDA
24 sponsored a workshop on talc safety in 1994.

74 (Pages 290 - 293)

Page 294

1  Additional data obtained since then further
2  suggests a health hazard. CF San is collaborating
3  with CDRH in further assessing possible action on
4  talc."
5      Q.    So it looks like the FDA is
6  continuing to look at the issue after 1994 and
7  says that there is further evidence of health
8  hazard. True?
9      A.    I can't say one way or another. I
10 see what's here.
11     Q.    Okay.
12     A.    I mean, that's all -- that's all I
13 can say is I see what's written here.
14           Did you want this back or is this --
15     Q.    But you didn't review that in
16 connection with your report then?
17     A.    What I know about the FDA is that,
18 you know, they denied Citizens' Petition in 1994.
19 So, and in 2014.
20     Q.    Okay. We're going to get to that, I
21 promise. You wanted to go there, but you're not
22 going to my -- you're not following my questions.
23 You want to go where you want to go.
24     A.    I am sorry.

Page 295

1      Q.    Okay? My question is -- so we just
2  summarize where we were. Conference in 1994,
3  correct? At the end of January, beginning of
4  February, correct?
5      A.    The conference?
6      Q.    Yes.
7      A.    You mean, are you talking about this
8  one? (Indicates).
9      Q.    Yes.
10     A.    I see, yeah.
11     Q.    Three or four days later, FDA
12 interacts with J&J and they say there's still a
13 concern and additional studies ought to be done,
14 correct?
15     A.    I see what is written in this memo.
16 That's what I see.
17     Q.    Okay. A year later they go to a
18 conference with Dr. Gettings, and Dr. Gettings
19 said the issue is still on the table and
20 additional studies need to be done, right?
21     A.    Again, you know, you're linking all
22 these things. I'm just saying, I saw what was
23 in -- in the document.
24     Q.    Okay. And now we looked at the FDA

Page 296

1  document saying there is additional information
2  since the conference you relied on says additional
3  -- that additional evidence gotten since that
4  conference shows it's a health hazard, right?
5      A.    I see what's written in the document
6  you showed me.
7      Q.    All right. And by the way, do you
8  happen to know whether or not John Bailey actually
9  left the FDA and became a consultant for the talc
10 industry?
11     A.    I did not study John Bailey or the
12 FDA.
13     Q.    You didn't know that. You didn't
14 know that he left the company and then started
15 making money with the talc industry?
16     A.    I have no --
17     Q.    Okay.
18     A.    -- insight on that.
19     Q.    All right. So now let me go to...
20           So referring to the FDA document.
21 You keep wanting to come to the FDA document,
22 Citizens' Petition. So let's look at it. I told
23 we'd get there. We're going to get there now.
24 Okay?

Page 297

1           MR. TISI: Let's look at
2      Exhibit Number 26, please.
3           (Document marked for
4           identification as Sutcliffe Exhibit 26.)
5  BY MR. TISI:
6      Q.    Now, this is a letter to which you
7  were referring where they denied the Citizens'
8  Petition, correct?
9      A.    I would have to check the document
10 because you have a different number, I think.
11     Q.    Well, I will represent to you this
12 is it.
13     A.    Okay.
14     Q.    I mean, I will represent to you that
15 this is the Citizens' Petition denial letter.
16     A.    Okay. I'm just trying to make sure.
17 That's all.
18     Q.    I'm not going to lie to you here.
19     A.    Okay.
20           MR. EWALD: It's part of the
21     same document. (Laugh).
22           THE WITNESS: Okay.
23           MR. EWALD: On this he's
24     right. (Laugh).

75 (Pages 294 - 297)

Page 298

1    THE WITNESS:  I'm really bad
2  at looking at these numbers, though.
3    MR. TISI:  I didn't retype
4  anything, believe it or not.
5    THE WITNESS:  Okay.
6  BY MR. TISI:
7    Q.    All right.  So this is the -- so
8  this is the -- first of all, this is the Petition
9  that's filed in the '90s, right?
10    A.    I believe that there were two,
11  right?
12    Q.    Right.
13    Do you know why it took the FDA
14  almost 20 years to respond to this first Citizens'
15  Petition and the second one was filed in 2008, six
16  years later?
17    A.    I don't know.  I have no idea.
18    Q.    Do you know whether or not the FDA
19  ever met with the American Cancer Coalition
20  independently?
21    A.    I do not recall or have knowledge.
22    Q.    Do you know that the company took --
23  J&J and the PCPC took a whole host of industry
24  people to the FDA and met with them separately

Page 299

1  without -- without anybody representing the
2  American Cancer Coalition about this -- about
3  this --
4    A.    I do not.
5    Q.    -- Citizens' Petition?
6    A.    I do not recall this.
7    Q.    You don't know any of the
8  circumstances at all about how the Citizens --
9  this letter came about, do you?
10    MR. EWALD:  Objection to form.
11  Mischaracterizes testimony.
12    THE WITNESS:  I don't know
13  that.  I know what I know here.  That
14  there were the Citizen's Petitions and
15  that they were acted on.
16  BY MR. TISI:
17    Q.    I mean, weren't you curious as to
18  why it took almost 20 years to respond to a
19  Citizens' Petition on a warning letter?
20    A.    Again, I represented what I -- what
21  I found here.
22    Q.    I mean, aren't you intellectually
23  curious as to what took the company almost the
24  time it takes to raise a child to adulthood to

Page 300

1  actually answer a letter?
2    MR. EWALD:  The company?
3    THE WITNESS:  The company?
4  BY MR. TISI:
5    Q.    The FDA?
6    A.    Again, you know, I --
7    Q.    You're not interested?
8    A.    It's -- it's not that.  My job was a
9  bigger job.
10    Q.    Okay.
11    A.    To look across decades of what was
12  happening --
13    Q.    Well, I'm looking --
14    A.    -- and patterns of behavior.
15    Q.    Okay.  I'm looking across decades as
16  well.  It took two decades to answer this letter.
17    Well, let's -- but you have -- you
18  know no background about that, do you?
19    A.    I -- I am not interested in the FDA.
20    Q.    Okay.  Now, one of these -- it says
21  in this letter, now it denied the Citizens'
22  Petition to require a specific warning.  True?
23    A.    The FDA responded to the Petitions
24  noting it "did not find that the data submitted

Page 301

1  presented conclusive evidence of a causal
2  association between talc use in the perineal area
3  and ovarian cancer" and "did not find enough
4  additional support at this time for your suggested
5  warning label."
6    Q.    Right.
7    So they were responding to a request
8  to require a specific warning label, correct?
9    A.    I'm reading what this was, yes.  It
10  was -- yes.
11    Q.    So I mean, have you -- all right.
12  So let me actually go to the document.
13    Can you go to page 5 of the
14  document, please.
15    And you actually read this letter
16  from cover to cover, not just the portions that
17  the lawyers told you to -- the lawyers told you to
18  look at.
19    You actually, as part of your
20  review, actually looked at the letter, right?
21    A.    First of all, the lawyers never told
22  me to review this or that.
23    Q.    Okay.  Perfect.  Let's look at it.
24    A.    So.

76 (Pages 298 - 301)

Page 302

1    Q.    Let's look at the whole letter.
2    A.    Then look at the whole letter.
3    Q.    All right.  On page 5, could you
4  read the last sentence before it says "Request for
5  hearing"?
6    A.    The last sentence before that?
7    Q.    The last paragraph.
8    A.    "While the growing body of evidence
9  to support a possible association between genital
10  talc exposure and serous ovarian cancer is
11  difficult to dismiss, the evidence is insufficient
12  for FDA to require as definitive a warning as you
13  are seeking."
14    Q.    So they were responding to a request
15  for a very definitive warning.  True?
16    A.    I see what's written here.  Again, I
17  didn't study this particular.
18    Q.    So if you go back to the sentence
19  before that, it says:
20          "The best evidence for an
21  association or causal relationship between genital
22  talc exposure and ovarian cancer comes from
23  epidemiologic data which show a statistically
24  significant but modest increased risk of

Page 303

1  epithelial ovarian cancer, especially with serous
2  histology, among women with a history of genital
3  dusting with talcum powder."
4          Correct?
5    A.    I see that.
6    Q.    "While the growing body of evidence
7  to support a possible association between genital
8  talc exposure and serous ovarian cancer is
9  difficult to dismiss."
10          Do you see that?
11    A.    I see that.
12    Q.    They're not giving -- they're not
13  saying that talc is safe, are they?  They're
14  saying a growing body of literature can't be
15  dismissed showing an association.
16          Am I wrong about that?
17    A.    I see what's written here --
18    Q.    Okay.
19    A.    -- and I see what they said.
20    Q.    And didn't they say what I said they
21  said?  Am I misrepresenting that at all?
22    A.    I'm just -- it says what it says.
23    Q.    All right.  And what did J&J do when
24  it got this letter?  Did it reformulate the

Page 304

1  cornstarch?
2    A.    Again, you know, what -- my role
3  here was not to opine on -- on this issue of
4  what's happening at the FDA.
5    Q.    So, so let me get this right.
6          J&J -- we've marched through
7  literature all day today starting from the early
8  1990s talking about talc and association,
9  switching to cornstarch, adding warnings.
10          You remember all those documents,
11  correct?
12    A.    Yeah, you keep talking about
13  switching to cornstarch.  I mean, J&J already had
14  a cornstarch product.
15    Q.    Okay.  Okay.  Discontinuing.
16    A.    So there was no switching.
17    Q.    Okay.
18    A.    I mean, there were two products on
19  the market.  So just to make that clear.
20    Q.    Okay.  So let me -- you're right.
21  So let me just -- let me just amend my question.
22          You saw for 20 -- 25 or 30 years
23  literature where doctors were publishing in the
24  peer-reviewed medical literature that women should

Page 305

1  either be warned or they should not use talc in
2  their genital area, correct?
3          MR. EWALD:  Objection.
4  Mischaracterizes the documents.
5          THE WITNESS:  First of all, I
6    did not do a systematic review of all the
7    studies.  There were many studies we
8    know.  There are many studies, and that
9    wasn't my role here.
10          My role was to establish that
11    J&J's institutional knowledge about the
12    safety of its product and to determine
13    the extent to which they were taking
14    actions that would show that they're a
15    company that cares about consumers.
16  BY MR. TISI:
17    Q.    And the institutional knowledge of
18  the safety of the products would include documents
19  that include the kinds of things I talked -- I
20  showed you today that, number one, that people
21  were recommending risk mitigation in the '90s and
22  2000s.  True?
23    A.    Again, there were multiple studies
24  that were going on --

77 (Pages 302 - 305)

Page 306

1    Q.    I understand.
2    A.    -- and there was -- there was -- --
3    Q.    I showed you that but --
4    A.    -- no change in the regulatory -- in
5  regulations that suggested that they should amend
6  their -- their knowledge.
7    Q.    Does the FDA even have the authority
8  and do you even know whether the FDA has authority
9  to compel them to change to cornstarch?
10    A.    Number one, they already had a
11  cornstarch product on the market.
12    Q.    To withdraw the product.
13         Do you even know what the FDA's
14  authority is in that regard?
15    A.    Again, I'm not a regulatory person
16  and that's not what I was studying.
17    Q.    Well, you just answered my question
18  saying there was no change in the regulatory
19  environment that would require them to do
20  anything.
21    A.    No, I didn't say --
22    Q.    I'm responding to you.
23    A.    -- require them to do anything.
24         What I said was to amend -- to make

Page 307

1  them to change their institutional knowledge.
2    Q.    You saw -- you saw -- I showed you
3  early on that it's the company, not the FDA, that
4  has responsibility, sole responsibility, for the
5  safety of cosmetics.
6         Did we not see that?
7    A.    Again, what I studied -- I'm not a
8  regulatory requirement -- regulatory person.  I'm
9  not opining on that.
10         I'm opining on the institutional
11  knowledge J&J had over time and how it developed
12  it using a scientific methodology and a conceptual
13  framework, sensemaking, and I have demonstrated
14  that J&J actively pursued knowledge about its --
15  the safety of its product over time.
16    Q.    Okay.  Obviously, if we were in
17  court and the judge asks you, Judge, what is your
18  -- "Doctor, what is your opinion and why are you
19  even relevant to this case?"  What would you say?
20    A.    I am relevant --
21         MR. EWALD:  Objection.
22         THE WITNESS:  Sorry.
23  BY MR. TISI:
24    Q.    What would you say if the judge

Page 308

1  asked you that question?
2    A.    Because I am an organization
3  scientist, and I have studied whether the company
4  is responsible.
5         And in my view, based on a
6  scientific methodology that can be applied across
7  disciplines, using thousands of pages of
8  documents, I have demonstrated that this company
9  has taken actions proactively to understand what's
10  in its product and to understand the safety of its
11  product.
12         And in my view, this company has
13  engaged in actions showing that it is a
14  responsible company --
15    Q.    And what actions if I'm a woman --
16    A.    -- working with the scientific --
17         MR. EWALD:  No, you asked her
18    the question.
19         THE WITNESS:  No.
20         MR. EWALD:  When you say the
21    judge, the judge wouldn't cut her off in
22    the middle of a sentence.
23         MR. TISI:  Actually, the judge
24    would cut this answer off.

Page 309

1         MR. GOLOMB:  He probably
2    would.
3         MR. TISI:  He probably would,
4    but go ahead.
5         THE WITNESS:  Go ahead.  It's
6    obviously not what the judge is going to
7    say.
8         MR. TISI:  I thought she was
9    -- I actually thought she was done.
10  BY MR. TISI:
11    Q.    But go ahead.  I want you to
12  continue to tell me why you think you are
13  relevant.
14    A.    I am relevant because I have studied
15  organizations.  I understand organizational
16  behavior.  I have done it for 40 years.
17         And, again, I have done a systematic
18  analysis reviewing thousands of pages, hundreds,
19  you know, I don't know how many pages of
20  documents.
21         I have used multiple sources of
22  evidence to demonstrate that the company has
23  engaged in actions to actively pursue knowledge,
24  scientific knowledge, regarding the safety of its

78 (Pages 306 - 309)

Page 310

1 product.
2    Q.    Okay.  Now, when I was asking you if
3 I am my client, one of my clients, I asked you
4 what actions did you do to actually help me
5 understand the potential risk of ovarian cancer
6 before I took -- I used my talc Johnson's Baby
7 Powder in my underwear for 20 years, what would
8 you tell me that J&J did for me?
9    A.    Again, I am studying J&J's
10 institutional knowledge, how they developed it
11 over time, and I am not an epidemiologist.  I have
12 not -- I have not looked at this case with that.
13    Q.    Okay.  But you would agree with me
14 that the FDA said that the evidence demonstrating
15 talc and ovarian cancer there's association was
16 difficult to -- what's the phrase? -- is difficult
17 to dismiss?
18          MR. EWALD:  Possible
19     association, something like that.
20 BY MR. TISI:
21    Q.    Is difficult to dismiss?
22          MR. EWALD:  Objection to form.
23          THE WITNESS:  I --
24          MR. EWALD:  Mischaracterizes

Page 311

1     the document.  Go ahead.
2          MR. TISI:  No, I'll read it.
3          MR. EWALD:  Go ahead and read
4     it.
5 BY MR. TISI:
6    Q.    "While the growing body of
7 evidence -- growing body of evidence to support a
8 possible association between genital talc exposure
9 and ovarian cancer is difficult to dismiss."
10        Do you see that?
11          MR. EWALD:  "Serous ovarian
12     cancer."  You left out that word.
13 BY MR. TISI:
14    Q.    Do you see that?
15    A.    I see the sentence that starts:
16        "While the growing body of evidence
17 to support a possible association between genital
18 talc exposure and serous ovarian cancer is
19 difficult to dismiss, the evidence is insufficient
20 for FDA to require as definitive a warning as you
21 are seeking."
22    Q.    What did J&J do when it got this
23 letter that said that there was a growing body of
24 evidence that was difficult to dismiss?  What did

Page 312

1 J&J do?
2    A.    Again, I am not studying one single
3 decision or action.  I have looked at J&J's
4 pattern of actions over time.
5    Q.    Okay.  Then let's be -- let's be
6 clear.
7        From 2014 on, for the next 15 years
8 it was on the market or 10 years it was on the
9 market, could you do me a favor and tell me at any
10 point during that time what FD -- what J&J did for
11 the benefit of my clients?
12          MR. EWALD:  Objection to form.
13     Speculation.  Ambiguous.
14 BY MR. TISI:
15    Q.    What did J&J do?  You said you're
16 not looking at any specific period of time.  I'm
17 giving you a full decade.  Tell me what J&J did.
18    A.    J&J --
19          MR. EWALD:  Are you talking --
20     I'm sorry.  Vague and ambiguous.  Are you
21     saying for your clients was the last
22     question?  Generally for talc?  For
23     America?  For United States?  What?
24 BY MR. TISI:

Page 313

1    Q.    Generally.
2    A.    All right.
3    Q.    I'm asking:  What did they do for
4 the benefit of women who were using this product
5 in the face of the growing evidence that was
6 difficult to dismiss?  What did J&J do?
7    A.    Again, that, my role in this case
8 was not to look at individual actions J&J is
9 doing.
10    Q.    You can't --
11    A.    J&J has been interacting with the
12 scientific community.
13    Q.    Okay.
14    A.    It's been interacting with -- with
15 various entities.  It's been providing input and
16 insight to other organizations.
17    Q.    Was J&J interacting with the
18 scientific community to ensure the safety of a
19 product or to influence the scientific community
20 to go its way?
21          MR. EWALD:  Objection to form.
22     Compound question.
23          THE WITNESS:  It was -- do
24     you have a specific example you might

79 (Pages 310 - 313)

Page 314

1    give me?
2 BY MR. TISI:
3    Q.    Yes.
4        What was the purpose of interacting
5 -- what was the purpose of the company interacting
6 with scientists?  Was it to really understand the
7 question, or was it to have them say that talc was
8 safe?
9        MR. EWALD:  Objection to form.
10 BY MR. TISI:
11    Q.    Defending talc.  What was their --
12 what was their goal?
13    A.    I can't answer that question.
14    Q.    Okay.
15    A.    It's way too general.
16    Q.    Okay.  So you don't know whether
17 they -- wouldn't it be important for sensemaking
18 to understand what J&J's goals were?
19        MR. EWALD:  Objection to form.
20        THE WITNESS:  Again, if you
21    have a specific question or instance you
22    want me to answer, I'm happy to do that.
23 BY MR. TISI:
24    Q.    Well, every time I ask you for a

Page 315

1 specific instance, your answer is, I'm not looking
2 at something at a particular point in time.
3        When I ask you something generally,
4 you say you want a specific instance.  I don't
5 really know how to approach asking you questions.
6        MR. EWALD:  Is that a
7    question?
8        MR. TISI:  Yeah.
9 BY MR. TISI:
10    Q.    I mean, you tell me.  Can you think
11 of what was the goal of J&J in interacting with
12 the authorities?
13    A.    What I have seen over time is that
14 J&J was trying to provide factually accurate
15 information to the community.
16        MR. TISI:  Okay.  Well, let's
17    take a look at what it was representing.
18    Let's look at the Wehner letter that you
19    referred to.  Let's look at Exhibit
20    Number 27.
21        (Document marked for
22    identification as Sutcliffe Exhibit 27.)
23 BY MR. TISI:
24    Q.    You refer to this document in your

Page 316

1 report as well?
2    A.    I do, yeah.
3    Q.    Okay.  This is a document dated
4 September 17, 1997, correct?
5    A.    Right.  I need to review this
6 because I know that there's -- that there's some
7 stuff that relates to this but --
8        MR. GOLOMB:  I'm sorry.  I
9    didn't hear your answer.
10        THE WITNESS:  No, I said I
11    need to review this.
12        MR. GOLOMB:  But you said
13    something else.  The stuff that because.
14        THE WITNESS:  Because I need
15    to review the whole thing.  The whole
16    letter.
17 BY MR. TISI:
18    Q.    Well, I'm not going to ask about the
19 whole letter.  I'm going to ask you about one
20 paragraph.  So I'm going to ask you --
21    A.    Yeah, but I think it's important to
22 review the whole letter.
23    Q.    Well, you didn't review it before
24 today?  It's actually cited in your report.

Page 317

1    A.    I did review it.
2    Q.    So let's --
3        MR. EWALD:  She can take the
4    time to review this page letter.
5        MR. TISI:  Then let's go off
6    the record.
7        MR. EWALD:  No, let's not do
8    that.  When Kessler got up to look at his
9    binders and review something, did we go
10    off the record?  No.
11 BY MR. TISI:
12    Q.    Okay.  Go ahead.  Go ahead.  Let's
13 not waste time.
14        MR. EWALD:  Take your time.
15 BY MR. TISI:
16    Q.    No, don't take your time.  Read the
17 letter.
18        MR. EWALD:  Don't let him rush
19    you.
20        Are you going to rush her?
21        MR. TISI:  Yes, I'm going to
22    rush her.
23        MR. EWALD:  Okay.  Don't let
24    him rush you.

80 (Pages 314 - 317)

Page 318

1        THE WITNESS:  Okay.  (Laugh.)
2        (Reviews document.)
3        Okay.
4  BY MR. TISI:
5    Q.    Okay.  Have you had a chance to
6  fully read the letter?
7    A.    Yes, I think so.
8    Q.    And this is a letter you've seen
9  before, correct?
10    A.    Yes.
11    Q.    Okay.  First of all, it says you
12  can't -- he says -- Wehner, who is a consultant
13  for J&J, says you can't say that there's no
14  evidence of migration.  True?
15        MR. EWALD:  Where does he say?
16        MR. TISI:  I didn't say.
17        THE WITNESS:  Where are you
18    pointing to?
19  BY MR. TISI:
20    Q.    In the second -- the first full
21  paragraph.
22        He says you cannot say there are
23  studies that support the translocation of talc
24  into the ovaries.  True?

Page 319

1    A.    (Reviews document.)
2        I'm, you know, I'm really bad.
3    Q.    Actually, let me withdraw -- let me
4  withdraw that question.  Let me go to the main
5  reason why I want to use this.
6        It says:
7        "The response statement dated
8  November 17, 1994 --
9        MR. EWALD:  Second page?
10        MR. TISI:  Second page.
11        THE WITNESS:  Yes, I got it.
12  BY MR. TISI:
13    Q.    -- is just as bad."
14        "The second sentence in the third
15  paragraph reads:
16        "The workshop" -- meaning 1994
17  ISTRP workshop -- "concluded that, although some
18  of these studies suggested a weak association
19  might exist, when taken together, the results of
20  the studies are insufficient to demonstrate any
21  real association.'"
22        Do you see?  So far so good, right?
23    A.    Yeah.
24    Q.    Goes on to say:

Page 320

1        "This statement is also inaccurate,
2  to phrase it euphemistically.  At that time there
3  had been about 9 studies (more by now) published
4  in the open literature that did show a
5  statistically significant association between
6  hygienic talc use and ovarian cancer."
7        Correct?
8    A.    I see that, yes.
9    Q.    Okay.  "Anybody who denies this
10  risks that the talc industry will be perceived by
11  the public like it perceives the cigarette
12  industry: denying the obvious in the face of all
13  evidence to the contrary."
14        Do you see that?
15    A.    I see that.
16    Q.    Am I lying exactly what it says?
17    A.    I see what it says.
18    Q.    "This would be particularly tragic."
19        You see that?
20    A.    Yes.
21    Q.    Okay.  And so the question that I
22  have for you is J&J --
23        MR. EWALD:  Do you want to
24    finish the rest of the sentence?

Page 321

1        MR. TISI:  No, I'm not going
2    to.
3        MR. EWALD:  All right.
4        MR. TISI:  You can complete it
5    if you would like.
6        MR. EWALD:  Okay.
7  BY MR. TISI:
8    Q.    So he's saying substantively you
9  cannot say that there's no association.  True?
10    A.    What he was saying is that, you
11  know, we needed -- that we need to rewrite -- what
12  he's saying is what he said here, which includes
13  the fact that he said "this would be a
14  particularly tragic misperception in view of the
15  fact that the industry does have powerful valid
16  arguments to support its position."
17    Q.    Right.
18        But didn't say that the evidence was
19  conclusive, did he?
20    A.    Again, he said what he said.
21    Q.    All right.  So we've gone through a
22  lot of documents now.  Okay?  We're not taking one
23  point in time.  We're not taking one data point.
24    A.    Uh-huh.

81 (Pages 318 - 321)

Page 322

1    Q.    We're looking -- we looked at
2 documents today from the medical and scientific
3 community, from IARC, from FDA, internal
4 consultant, okay, to J&J.
5         Is there any evidence that you have
6 seen over this 20 or 30 period time at any time --
7 ah, you're about ready to answer me and I
8 haven't -- I haven't finished the question.
9    A.    No.  I'm waiting to hear evidence
10 about what.
11    Q.    Okay.  Evidence that the company sat
12 down internally and said, "You know what?  We have
13 valid arguments that are outlined here by
14 Dr. Wehner but, you know, on balance, we ought to
15 discontinue talc."
16        Did you ever see that discussion?
17    A.    Again, my role was to do something
18 different.  I am not studying whether J&J wanted
19 to discontinue talc.
20    Q.    I didn't ask you whether they
21 wanted.
22    A.    Again, I did what I did.
23    Q.    I'm not asking you what -- I'm
24 asking did you see in your review of the thousands

Page 323

1 of documents you reviewed any time where the
2 company sat down and said, "We want to take an
3 objective look at this.  We're concerned about
4 safety and we're concerned about our product."
5         Did you ever see that?
6    A.    Again, my -- my role in this case
7 was to do what I've said several times.
8    Q.    And from an operational standpoint,
9 you never saw anybody sit down and say, "We ought
10 to discontinue talc," did you?
11    A.    Again, my role was to do something
12 completely different.
13        MR. TISI:  Let me show you
14    another -- actually, let me just skip
15    that.  Actually, let me show you Number
16    28.
17        (Document marked for
18    identification as Sutcliffe Exhibit 28.)
19 BY MR. TISI:
20    Q.    This is Exhibit Number 28.  A letter
21 from 1994 from the Cancer Prevention Coalition not
22 to the FDA but to J&J.
23        Have you seen this letter before?
24    A.    Let me see.

Page 324

1        (Reviews document.)
2        I may have.  I don't remember
3 whether I did or not.
4    Q.    You don't know?
5    A.    You know, it kind of looks familiar,
6 but I don't remember.
7    Q.    Okay.  It's a letter from the
8 American Cancer Coalition to Ralph Larson, the CEO
9 of Johnson & Johnson, correct?
10    A.    That's what it says.
11    Q.    Okay.  First of all, in your review
12 of the literature, of the documents, have you ever
13 seen any response to this letter by J&J to the
14 American Cancer Prevention Coalition?
15    A.    I don't recall one way or another.
16    Q.    It says -- it says that the -- let's
17 just go to the second page.  It says:
18        "Women have the inarguable right to
19 know of this information."  And I'll just -- about
20 talc and ovarian cancer.
21        "The Cancer Prevention Coalition
22 urges you to immediately withdraw your talc
23 products from the market and substitute them with
24 a safer alternative, such as cornstarch.  At the

Page 325

1 very minimum, we urge Johnson & Johnson to label
2 its talcum powder products with information about
3 the ovarian cancer risk they pose."
4        You see that?
5    A.    I see that.
6    Q.    Now, in the context of all that
7 we've been discussing today and your opinions that
8 J&J had acquired information, that they as an
9 organization cared about safety, had you ever seen
10 any internal analysis about what -- whether there
11 should be a discontinuation of talc or warning in
12 response to this letter?
13    A.    I do not.  I don't have the ins and
14 outs of this letter.
15    Q.    I'm not asking you the ins and outs.
16    A.    Uh-huh.
17    Q.    I'm asking you:  Had you ever seen
18 anything doing -- evaluating what Dr. Epstein is
19 asking the company -- the CEO of the company to
20 do?
21    A.    Again, I go back to what I did, and
22 what my role in this case was.
23    Q.    Okay.  So the answer is you don't --
24 you don't remember?

82 (Pages 322 - 325)

Page 326

1    A.    The answer is, is that I examined
2 J&J's pattern of activities over decades and the
3 extent to which they were very active in seeking
4 scientific knowledge about the safety of its
5 product. And in my view, J&J undertook actions
6 that demonstrated that they cared about the
7 well-being of their consumers.
8    Q.    Very active in seeking scientific
9 knowledge --
10    A.    Correct.
11    Q.    -- about its product.
12    Okay. I wrote that down.
13    So that's your opinion. They were
14 very active in seeking scientific knowledge about
15 its product.
16    That's what you said, right?
17    A.    My opinions are all stated in my
18 report.
19    Q.    That's what you just said.
20    Am I not wrong?
21    A.    I -- I said that, but my opinions --
22    Q.    Okay.
23    A.    -- are specifically noted in my
24 report.

Page 327

1    Q.    Let's talk about something that
2 whether the company was very active in seeking
3 scientific knowledge about its product.
4    I showed you the 1994 study that was
5 sponsored by J&J by Gross and Berg.
6    Do you remember that study? Exhibit
7 Number -- Exhibit Number 16.
8    A.    You've shown me lots of studies.
9    MR. TISI: Okay. Pull that
10    one out if you don't mind.
11    Thank you, counsel.
12    MR. EWALD: There you go.
13    THE WITNESS: Thank you.
14 BY MR. TISI:
15    Q.    You remember that study, right?
16    A.    There are a lot of studies in there,
17 as I --
18    Q.    At the very end, this is a study
19 that was sponsored by J&J. They said -- we talked
20 about this. It says:
21    "The results of the meta-analyses do
22 suggest the possibility of an increased risk of
23 ovarian cancer due to perineal talc. Further
24 research in this area is warranted by these

Page 328

1 results."
2    Okay?
3    A.    I see that.
4    Q.    J&J study, right? J&J-sponsored
5 study?
6    A.    Supported it. I don't know what --
7 if there's a difference between support and
8 sponsor.
9    Q.    Fine. It says what it says.
10    A.    Yeah, it says what it says.
11    Q.    Do you know -- did you look and see
12 whether or not J&J actually was -- there was
13 actually a proposal to do a definitive study that
14 would show the safety of talc?
15    MR. EWALD: Objection to form.
16    THE WITNESS: I -- that wasn't
17    the focus of my analysis.
18    MR. TISI: Okay. I'd like to
19    show you Exhibit Number 29.
20    (Document marked for
21    identification as Sutcliffe Exhibit 29.)
22 BY MR. TISI:
23    Q.    By the way, just remind me again.
24    You said you were paid yourself

Page 329

1 between 4 and $500,000 to look at this case?
2    A.    No. What I said was that I will
3 have spent by the end of next week between 400 and
4 500 hours.
5    Q.    500,000. How much -- how much money
6 have you made in this case?
7    MR. EWALD: You say "this
8    case." What are you referring to?
9    THE WITNESS: I --
10    MR. TISI: The J&J Talc
11    Litigation.
12    THE WITNESS: As I said, I
13    don't know.
14 BY MR. TISI:
15    Q.    I thought you said 4 or 500 -- 4 or
16 500 hours times about a thousand -- on average a
17 thousand dollars an hour?
18    A.    Okay.
19    Q.    That's about $500,000?
20    A.    Maybe and it's probably less than
21 that.
22    Q.    Okay. About $500,000?
23    A.    I don't recall specifically.
24    Q.    About $500,000?

83 (Pages 326 - 329)

Page 330

1    A.    Uh-huh.
2    Q.    Let's be conservative and say
3 $400,000.
4    A.    Okay.
5    Q.    Okay?
6          MR. EWALD:  Just so the record
7    is clear, you're talking about all of J&J
8    talc litigation that she's worked on, not
9    just this MDL action over the last two
10   months?
11         THE WITNESS:  Right.
12         MR. TISI:  Yes.
13         MR. EWALD:  Okay.
14 BY MR. TISI:
15   Q.    Okay now, here's a document dated
16 November -- excuse me -- January 24, 1995 entitled
17 "Proposal for New Talc Study."
18         Do you see that?
19   A.    Uh-huh.
20   Q.    Have you seen this document before?
21   A.    I don't recall.
22   Q.    Okay.  And it says:
23         "This recommends that J&J sponsor a
24 new, highly structured epidemiology study focused

Page 331

1 to examine the possibility that cosmetic talc use
2 can lead to increased risk of ovarian cancer."
3          Do you see that?
4    A.    I see that.
5    Q.    Okay.  And this is a recommendation,
6 internal recommendation by J&J to do that study,
7 correct?
8    A.    It -- it looks like this is --
9 that's what it says this recommends.
10   Q.    Okay.  And actually the next two
11 sentence -- two paragraphs down, it reports on the
12 Harlow study that we talked about before.  It
13 says:
14         "Harlow reported an odds ratio of
15 1.5, but also identified a high application rate
16 subset of subjects which had a 2.8 odds ratio.
17 Harlow described this group as having a threefold
18 risk of getting ovarian cancer."
19         You see that?
20   A.    I see the paragraph that you're
21 citing to.
22   Q.    Okay.  And it says "What we will
23 learn."
24         At the bottom it says:

Page 332

1          "What we learn" from the study
2 that's being proposed.  It says the study that's
3 being proposed for J&J will be comprehensive.
4          You see the word "comprehensive"?
5    A.    I see "will be more comprehensively
6 study the possibility by."
7    Q.    Actually, let's go up to the
8 sentence.
9          It says we -- we -- okay.
10         "Hopkins and I met with the group
11 and upon detailed review of the protocol are
12 impressed by the proposed study."
13         Do you see that?
14   A.    I -- I see the sentence.
15   Q.    Okay.  "Since then, I've had
16 feedback from Marjorie, Bill Ashton, and Steve
17 Phillips.  We believed it is a well-controlled,
18 potentially significant study which should replace
19 all others as the definitive treatise on this
20 issue."
21         Do you see that?
22   A.    I see what it says.
23   Q.    Okay.  The study will more
24 comprehensively -- the proposed study to J&J --

Page 333

1 study the epidemiology of talc and ovarian cancer.
2          You see that?
3    A.    I see the sentence you're pointing
4 to.
5    Q.    So what is being described, the
6 adjectives used by J&J for this proposed study, is
7 a new, highly structured, well-controlled,
8 significant, comprehensive study that should
9 replace all others as the definitive treatise on
10 this issue?
11   A.    I see what's been written here.
12   Q.    Okay.  And if you look at the second
13 page, it says the costs of that study is $398,000.
14         Do you see that?
15   A.    I see that.
16   Q.    That's less money than you've been
17 paid to sit here -- to sit here and give opinions
18 about behavioral -- organizational behavior,
19 correct?
20   A.    I see what the number is here.
21   Q.    Okay.  And do you know whether or
22 not J -- and, oh, if you look at the cost and
23 timing, it says the study would require two years
24 to complete.

84 (Pages 330 - 333)

Page 334

1        Do you see that?
2    A.    I see what it says.
3    Q.    So this study if initiated -- let's
4 give them a year. Let say January 1995. Let's
5 give them a full year to get up.
6        It would be two years to do. This
7 study would have been done by 1998. Give you two
8 years, plus -- plus a year just to be generous,
9 right?
10    A.    I see what is said here, I mean.
11    Q.    All right. So they had a proposal
12 for a highly structured, well-controlled,
13 significant, definitive study that would replace
14 all other studies that had happened at the time.
15        You see that?
16    A.    I see the language that's here.
17    Q.    And it would be two years to do?
18    A.    I see the language that's here.
19    Q.    And costs less money than it's taken
20 to have you sit here today in litigation, right?
21        MR. EWALD: Objection to form.
22    Mischaracterizes the cost, sitting here
23    today in litigation. You know that.
24        MR. GOLOMB: I'm sorry?

Page 335

1        THE WITNESS: I see what's
2    here. I see what's written here.
3        MR. EWALD: It didn't cost
4    $4,000 for her to sit here today in
5    litigation. It's not -- not the case.
6 BY MR. TISI:
7    Q.    Okay. And it'd take less time than
8 you've been paid to be an expert for Johnson &
9 Johnson talc, correct?
10    A.    First of all, I don't -- I don't
11 think we can say that definitively. I mean, this
12 is -- this is totally an estimate. One never
13 knows what's going to happen.
14    Q.    Okay. Let's -- okay. So let's
15 expand it. Let's add a hundred thousand dollars
16 just for giggles. Okay? Let's make it a $500,000
17 study. It would have been done by 1998.
18        Have you seen the results of that
19 study?
20    A.    Again, I did not look at a specific
21 -- I didn't look at specific studies.
22    Q.    Have you seen mention of Dr. Musket?
23 He was the guy who drafted the protocol in this
24 case. Have you reviewed his deposition?

Page 336

1    A.    I did -- I do not recall.
2    Q.    Do you say he never understood why?
3 It was clear that they didn't want to do the
4 study, correct? Did you know that?
5    A.    I have not investigated the
6 particular studies that J&J has done.
7    Q.    By the way, can you look at the cc's
8 there on this report?
9    A.    Yeah.
10    Q.    See John O'Shaughnessy there? The
11 product liability lawyer for J&J. You see that?
12    A.    I see the name.
13    Q.    Does that seem odd to you that a
14 product liability lawyer, as somebody who's
15 involved in safety analysis for organizations, a
16 product liability lawyer would be involved in
17 drafting a definitive epidemiology to study a
18 safety issue?
19        MR. EWALD: Objection to form.
20    Mischaracterizes the letter. It's
21    nothing but a draft.
22        THE WITNESS: I have no idea.
23    I mean, yeah.
24        MR. EWALD: We've been going

Page 337

1 more than an hour. Can we get perchance
2 a break?
3        MR. TISI: Okay. We can do
4    that right now.
5        THE COURT REPORTER: Off the
6    record.
7        (Recess: 2:44 p.m. -
8        2:54 p.m.)
9 BY MR. TISI:
10    Q.    Just a couple more questions about
11 the study.
12        First of all, if the definitive
13 study that J&J done -- did are referenced in the
14 document we just looked at had been available, do
15 you think it would be among the 500 documents that
16 you initially reviewed in this case? Would you
17 expected it to be?
18        MR. EWALD: How many what?
19 BY MR. TISI:
20    Q.    In the initial 500 documents.
21        MR. EWALD: Oh, sorry.
22 BY MR. TISI:
23    Q.    5 or 600 documents that were
24 provided to you in this case.

85 (Pages 334 - 337)

Page 338

1    A.    What do you mean?
2    Q.    If there was a definitive study that
3  they did that proactively showed that they were
4  concerned enough about safety to do a study, would
5  they have been in the documents that you were
6  provided do you think?
7    A.    I -- I imagine.
8    Q.    The fact that you didn't see it,
9  does that give you any indication as to whether
10  the study was done?
11    A.    I don't know whether the study was
12  done.
13    Q.    And you talked about the Credo.  The
14  importance to be responsible to parents and
15  children and the people who use J&J's products.
16       You remember that cultural,
17  aspirational Credo that you talked about?
18    A.    I have included the Credo in my
19  report.
20    Q.    Do you think it's part of the Credo
21  to actually have a definitive study designed that
22  would cost half a million dollars and save perhaps
23  thousands of lives and not do it?
24       MR. EWALD:  Objection to form.

Page 339

1    Speculative.  Argumentative.
2       Go ahead.
3       THE WITNESS:  You know, I
4    mean, I can't say anything about one
5    single study how -- I mean, you know.
6  BY MR. TISI:
7    Q.    Especially if it weren't done,
8  right?
9    A.    There are many, obviously many
10  studies have been done, as you pointed out today.
11    Q.    None by J&J.  True?
12    A.    I don't know what J&J has done or
13  hasn't done.
14    Q.    Well, isn't that part of the
15  carrying out the Credo is knowing what they did to
16  actually care about safety and parents and
17  children?
18    A.    There are many ways to demonstrate
19  that you care without having to do a single study.
20    Q.    So we talked about cornstarch.  I'd
21  like to talk about that a bit.
22       You saw reference in an earlier
23  document with the American Cancer Society in 1999
24  that there was a discussion about using cornstarch

Page 340

1  as a switching to cornstarch, and I'm
2  paraphrasing, but that there would be abandonment
3  of talc in favor of cornstarch.
4       Do you remember that document?
5    A.    Is it something in here?
6    Q.    Yes, it is.  It's 1999.
7       MR. EWALD:  Do you know which
8    exhibit number it is?
9       MR. TISI:  I do not know it
10    off the top of my head, but if she does
11    not remember it.
12       THE WITNESS:  No, I think I
13    remember it, but -- oh, it was -- it was
14    a press release?
15       MR. EWALD:  Exhibit 20.  Oh,
16    there it is.
17       THE WITNESS:  Was it the
18    press release here?
19  BY MR. TISI:
20    Q.    You see that one?
21    A.    Yes.
22    Q.    Now, you talked about -- and would
23  you read me the statement that it says again?
24       It says from 1999, it says, given

Page 341

1  the recommendation of the American Cancer Society
2  to use cornstarch, they might consider an
3  "accelerated shift from talc to cornstarch."
4       Do you see that?
5    A.    I see what's written here.
6    Q.    Well, do you see what I just said?
7    A.    It says -- I see what's written.  It
8  says:
9       "Depending on how widely this gets
10  publicized, you may want to build this into your
11  forecast thinking (stay conservative on the total
12  powder business, accelerated shift from talc to
13  cornstarch)."
14       I see what's written here.
15    Q.    Is that the first time you've
16  actually seen any discussion that there was a
17  discussion in the 1999-2000 time frame about
18  reimagining a shift from talcum powder to
19  cornstarch in favor of -- because of the ovarian
20  cancer issue?
21       Let me -- let me just reorient
22  myself.
23       In your report, you talked about the
24  fact that there was no shift to cornstarch in the

86 (Pages 338 - 341)

Page 342

1 1990s because the disruptive ambiguity related to
2 asbestos had been done by then.
3          Remember that?
4     A.     Number one, I think I was talking
5 about the fact that cornstarch came on the market
6 in 1978.
7     Q.     Oh.
8     A.     At that time, and it wasn't a
9 replacement product because it didn't have the
10 same characteristics.
11     Q.     Okay. But you see now some
12 evidence -- and we'll talk about it a little
13 bit -- that there was a discussion within Johnson
14 & Johnson about shifting its business away from
15 talc towards cornstarch in the 1999 time frame.
16          Do you see that reference in the
17 document that I just put in front of you again?
18     A.     I see the language here. I can't
19 divine what they were thinking.
20     Q.     Okay. Well, we'll talk about that.
21          Do you know any -- can you think of
22 any reason why, in light of all the things we were
23 discussing, why the company would not encourage a
24 shift away from talc to cornstarch in light of the

Page 343

1 things that we've been discussing today?
2     A.     Again, I can't make that decision.
3 I mean, I'm not -- I wasn't a member of the
4 company. I don't have all the information in my
5 -- all the information at hand. It would have to
6 -- I'd have to know the context.
7     Q.     Well --
8     A.     I can't make that decision.
9     Q.     Well, I'm not asking you to make the
10 decision.
11          I'm trying to, as part of
12 sensemaking, you want to make sense of what they
13 did and did not do, right? You want to understand
14 what they wanted to do in realtime. True?
15     A.     No, that's not really the case.
16     Q.     Okay. Well, in any event, you had
17 seen -- you saw the reference in the 1999 document
18 that there was a discussion about a shift to
19 cornstarch away from talc?
20     A.     Number one, I see what's written in
21 this e-mail. I don't know whether there was a
22 discussion going on. All I know is what I see
23 here.
24     Q.     And can I have Exhibit 31, please.

Page 344

1          First of all, I think I asked you
2 before whether you looked at the deposition of
3 John McKeegan.
4          Do you remember his name?
5     A.     No.
6     Q.     So you don't know anything about
7 him. The lawyers have not provided you with his
8 deposition at all, have they?
9     A.     I do not recall.
10     Q.     Here is Exhibit Number 30. Is it 30
11 or 31? I'm sorry. 31.
12          Now, this document is about a year
13 later after the e-mail I just told you with -- I
14 showed you with the American Cancer Society and
15 the suggestion about accelerating the shift to
16 cornstarch, correct? This is about a year later?
17     A.     This document is November 28th.
18 That was 7/9/1999. So.
19     Q.     Right. So about a little over a
20 year?
21     A.     A little over a year.
22          MR. TISI: Okay. And it's
23     from -- it's to -- it's from John
24     McKeegan to -- I'm sorry. I looked at

Page 345

1 the wrong one. I'm sorry. I'm sorry.
2 I'm looking at Number 14. Put that one
3 aside for a moment.
4          Can we off the record for a
5 second?
6          THE COURT REPORTER: Off the
7 record.
8          (Recess: 3:02 p.m. -
9          3:04 p.m.)
10          MR. TISI: I'm going to show
11 you Exhibit Number 30.
12          (Document marked for
13     identification as Sutcliffe Exhibit 30.)
14 BY MR. TISI:
15     Q.     This is an October 27, 2000
16 memorandum and this is to John McKeegan from CFTA.
17          You know who CFTA is, right?
18     A.     Yeah, the Cosmetic, Talc &
19 Fragrance --
20     Q.     Sorry. You need to speak louder.
21     A.     The Cosmetic, Talc & Fragrance
22 Association.
23     Q.     And that was the initial trade
24 group?

87 (Pages 342 - 345)

Page 346

1    A.    It was and then it changed its name.
2    Q.    And this is a confidential
3 memorandum from Nicholas -- Nichols-Dezenhall?
4    A.    I see the name.
5    Q.    And I assume you have not seen this
6 document before?
7    A.    I do not recall seeing this
8 document.
9    Q.    And this is October 22nd and he has
10 attached a confidential memorandum.
11        Do you see that?
12   A.    October 27, 2000?
13   Q.    Right.
14        It says:
15        "As you know, over the years, we've
16 stood shoulder-to-shoulder with CFTA and its
17 members in the unbending defense of the safety of
18 several cosmetics ingredients.  More often than
19 not, together, we've prevailed.  Like you, we have
20 never shied away from a tough battle, and we're
21 not going to start now."
22        Do you see that?
23   A.    I see that.
24   Q.    Now, in the documents, do you

Page 347

1 understand that J&J was actually, quote, defending
2 talc?
3    A.    I understand that J&J was providing
4 information.
5    Q.    Okay.  And it says at the bottom --
6 they lay out a couple issues and feel free to take
7 a look at it, but it says:
8        "We could go on and on in laying out
9 the negatives, but bottom-line -- except for a
10 very few number of recruited scientific experts --
11 the cosmetics industry will be a lone voice in
12 handling a very tough issue."
13        Do you see that?
14   A.    Where are you?  I'm sorry.  Just in
15 the first paragraph?
16   Q.    No.  Oh, sorry.  Let's go through it
17 together.
18        It says -- it talks about the fact
19 that they're with the industry a hundred percent,
20 correct?
21   A.    That --
22   Q.    In defending talc?
23   A.    -- I see what's written there.
24   Q.    Okay.  It says:

Page 348

1        "There comes a time, however, when
2 it is essential that -- together -- we fully
3 assess and appreciate what we are up against."
4        Do you see that?
5    A.    I see that.
6    Q.    And it lays out a bunch of different
7 bullet points about the outside environment about
8 talc and ovarian cancer, correct?
9    A.    I see the bullet points.
10   Q.    Okay.  Now, at the very bottom it
11 says:
12        "We could go on and go on in laying
13 out the negatives, but bottom-line -- except for a
14 very few number of recruited scientific experts --
15 the cosmetics industry will be a lone voice in
16 handling a very tough issue."
17        You see that?
18   A.    Yes.
19   Q.    It says:
20        "This doesn't diminish one bit our
21 will to fight, but it should shape our
22 expectations on what to expect, and it should
23 influence potential contingencies as events
24 unfold.  It also serves to remind us that the

Page 349

1 relative regulatory freedom of the cosmetics
2 industry depends, in large part, on the hard won
3 perception that it takes self-policing action when
4 confronted with credible information about an
5 ingredient safety issue."
6        You see that?
7    A.    I see that.
8    Q.    Okay.  And what they're saying is,
9 look, other than a couple of your experts here
10 that are funded by you, there seems to be a lot of
11 people that's saying there's a problem with talc.
12 True?
13        MR. EWALD:  Objection to form.
14   Mischaracterizes the document.
15        Go ahead.
16        THE WITNESS:  I see what's
17   written here.  I have not studied this
18   document.  I can't divine what they were
19   talking about.
20 BY MR. TISI:
21   Q.    It goes on in the next page.  It
22 said:
23        "It would not be unwise for
24 companies marketing talc-based products for use

Page 350

1  with babies and infants to consider ways to
2  reformulate if necessary."
3        Do you see that?
4    A.    I see that sentence.
5    Q.    Okay.  "Attached is a recommended
6  plan to do everything we can (within your budget
7  parameters) to work with CFTA and its members to
8  maintain consumer confidence in the cosmetics
9  products that include talc."
10        You see that?
11    A.    I see the sentence.
12    Q.    It says:
13        "But let us all be clear on what
14  we're up against."
15        Last sentence, correct?
16    A.    I see what's written.
17    Q.    So they're raising the question
18  that -- that everything is reaching a crescendo
19  here with in the 2000 time frame about talc and
20  ovarian cancer, correct?
21    A.    I can't comment one way or another.
22  I have not studied this document.  I don't know
23  what's going on here.
24        MR. TISI:  I have to go off

Page 351

1    the record.  I'm sorry.
2        THE COURT REPORTER:  Off the
3    record.
4        (Recess:  3:10 p.m. -
5        3:10 p.m.)
6        MR. TISI:  All right.  I'm
7    going to show you a document the next
8    month on November 17, 2000, Exhibit
9    Number 32.
10        (Document marked for
11    identification as Sutcliffe Exhibit 32.)
12  BY MR. TISI:
13    Q.    And it's an e-mail and it says:
14        "Attached is the agenda and a
15  background document for the Monday discussion on
16  talc."
17        Do you see that?
18    A.    Yes.
19    Q.    And it's to, among other people,
20  Mr. McKeegan is on there, but John O'Shaughnessy
21  is on there as well as, the lawyer for J&J.
22        You see that?
23    A.    I see that.
24    Q.    And you know who Colleen Goggins is?

Page 352

1    A.    No.
2    Q.    Okay.  Colleen Goggins, I'll
3  represent to you, is a high executive within the
4  company.  In fact, I believe she's the president
5  of Johnson & Johnson Consumer at the time.
6    A.    I don't know.
7    Q.    Okay.  And it says that there was
8  going to be a hearing of the NTP.
9        Do you see that?
10    A.    Yep.
11        MR. TISI:  I have to take a
12    break.  I apologize.
13        THE COURT REPORTER:  Off the
14    record.
15        (Recess:  3:12 p.m. -
16        3:13 p.m.)
17        MR. TISI:  I'm going to show
18    you what I've had marked as Exhibit
19    Number 52.
20        (Document marked for
21    identification as Exhibit 52.)
22        (Pause.)
23  BY MR. TISI:
24    Q.    I apologize for the delay.

Page 353

1        All right.  So this is an e-mail
2  from Ms. Colamarino to Nancy Musco entitled "Here
3  is the current thinking" and it's dated talc March
4  9th.
5        Do you see that?
6    A.    I see it.  November?  November?
7    Q.    Right.  November 14th and it's a
8  forward on talc.
9        Do you see that?
10    A.    "Talc - November 9th."
11    Q.    Right.
12        And if you go to the second page,
13  there is a draft position statement about talc and
14  NTP.
15        Do you see that?
16    A.    There is a -- the second page is
17  just a memorandum.
18    Q.    It says "Johnson & Johnson Consumer"
19  on the next page after that?
20    A.    I see that.
21    Q.    "Johnson & Johnson Consumer" and it
22  has "Summary Background Notes."
23        Do you see that?
24    A.    I see that.

89 (Pages 350 - 353)

Page 354

1    Q.    And it says a draft report is to be
2  presented to NTP on December 13th and 14th.
3         Do you see that?
4    A.    Where is that?
5    Q.    It's right here. (Indicates).
6    A.    Oh.
7         (Reviews document.)
8    Okay. I see that.
9    Q.    Okay. And it says if you look at
10 the next page, they prepared a holding statement
11 before that conference.
12        You see that? Last page.
13        Next page.
14   A.    Uh-huh.
15   Q.    And the holding statement says --
16 and this is before --
17        MR. EWALD: On the next page.
18        THE WITNESS:  Okay.
19 BY MR. TISI:
20   Q.    -- before NTP.
21        It says:
22        "Johnson & Johnson intends to
23 discontinue its use of talc -- of talc in all of
24 its consumer products in the U.S.  Beginning

Page 355

1  December 1, 2000, the company's U.S. manufacturing
2  operations will switch to cornstarch."
3         You see that?
4    A.    I see that.
5    Q.    And so this would have been before
6  NTP had actually made a decision because the
7  papers weren't being submitted until mid-December.
8  True?
9    A.    I honestly don't remember the date
10 of the papers.
11   Q.    Well, go back to -- go back to the
12 second page. The third page of the document.  See
13 if we can go through this together.
14        The draft report will be presented
15 to NTP on December 13-14.
16   A.    Okay.
17   Q.    You see that?
18   A.    I see that.
19   Q.    Okay. And so what they're doing is
20 they're preparing a holding statement announcing
21 the switch to cornstarch on December 1st before
22 they -- before they ever knew the result of the
23 NTP.
24        Do you see that?

Page 356

1    A.    I see what they're -- I see what's
2  written here.
3    Q.    Okay. And this is an e-mail to
4  Nancy Musco.
5         You know who Nancy Musco is.  You've
6  cited her in your report, right?
7    A.    I know the name. I don't know
8  specifically who she is.
9    Q.    Okay. On November 14th and it talks
10 about the current thinking is in talc.
11   A.    I see this memo.
12   Q.    Okay. So let's see if we can kind
13 of put it together, and I apologize for the little
14 bit of confusion with the documents.
15        In 1999, they were talking about
16 discontinuing -- discontinuing talc in favor of
17 cornstarch.
18        We looked at that, right?
19   A.    I see this memo.
20   Q.    Okay. Now, we see this memo where
21 they announce that they're going to do it on
22 December 1st?
23   A.    I see what is written here.
24   Q.    Okay. And they were also talking

Page 357

1  about a meeting with upper management.  True?
2    A.    Again, if that's in here, then it's
3  in this document.
4         MR. TISI: Now, there was a
5    meeting on -- there was an agenda for a
6    meeting on December 1st.  Here is Exhibit
7    Number 32.
8         Did I give that to you, John?
9         MR. EWALD: Yes.
10 BY MR. TISI:
11   Q.    And there's a meeting that's been
12 set. It says:
13        "Attached is the agenda and a
14 background document for the Monday discussion on
15 talc.  Please review the backgrounder before the
16 meeting."
17        And the importance is high.
18        Do you see that?
19   A.    I see that.
20   Q.    And the date of the meeting was
21 January 20th -- excuse me -- November 20, 2000,
22 correct?
23   A.    I see the Monday 11/20.
24   Q.    Have you ever seen the minutes from

90 (Pages 354 - 357)

Page 358

1 that meeting of this upper level management of
2 J&J?
3      A.    Again, I haven't studied individual
4 events.  So I don't recall seeing meeting minutes.
5      Q.    Would it be important to you if
6 there was a meeting that would discuss the switch
7 to cornstarch that was being discussed that would
8 happen on December 1, 2000?
9             Would that be important information
10 for you to know and consider when considering
11 J&J's response to talc ovarian cancer issue?
12     A.    What would be important -- I mean,
13 what's important is, is what -- what -- just in
14 total everything is important.  And in my
15 analysis, I'm not taking into account one single
16 piece of information, and recall that what I've
17 done is to establish J&J's institutionalized
18 knowledge over time and the extent to which J&J
19 has taken actions to assure this would be.
20     Q.    So the fact that there was a meeting
21 that we do not have the minutes of from
22 November 20, 2000, right before a proposed
23 withdrawal of talc from the market on
24 December 1st, that would not be important for you

Page 359

1 to know or see?
2      A.    Again, I, you know, I have not -- I
3 have not studied this, and I can't say that it
4 would be important or it wouldn't be important.
5      Q.    Oh, and by the way, company's lawyer
6 was on that document, too.
7             John O'Shaughnessy was at the
8 meeting, right?
9      A.    I mean, there are people.  There's
10 many people on here.  So.
11     Q.    The product liability lawyer is on
12 the market -- is on -- John O'Shaughnessy, right?
13     A.    I see -- I see his name.
14     Q.    John O'Shaughnessy has been on all
15 these documents we've looked at in this time
16 frame, right?
17            MR. EWALD:  Objection to form.
18            THE WITNESS:  Again, I've
19     seen the name on some documents.  I don't
20     know.
21 BY MR. TISI:
22     Q.    All right.  Let's talk about --
23 let's switch topics a bit.  Let's talk about
24 Health Canada just a bit.

Page 360

1      A.    Uh-huh.
2      Q.    You mentioned that in your report.
3      A.    Yes.
4      Q.    On page 72 of your report, you have
5 several paragraphs about Health Canada?
6      A.    Correct.
7      Q.    And you understand as general
8 background in 2019 the Canadian version of the FDA
9 issued a draft report doing a comprehensive review
10 of the evidence and concluding that talc was a
11 cause of ovarian cancer.
12            True?
13     A.    I do -- I know about Health Canada.
14     Q.    Well, and the exact generally what
15 it said?
16     A.    Generally, yes.
17     Q.    And had you seen any prior
18 evaluation, like what Health Canada did, done by
19 J&J in the 20-30 years that the issue was -- was
20 before J&J?
21            Have you seen any internal
22 evaluation of the evidence as of that time that
23 J&J did, much like Health Canada did?
24     A.    I think that J&J has been paying

Page 361

1 attention to the -- not paying attention -- has
2 been looking at studies over time and had been
3 interacting with FDA and other entities.  So yes,
4 they were -- they were interacting with the
5 scientific community.
6      Q.    I move to strike.  That wasn't my
7 question.
8             My question was:  Had you seen prior
9 2000 -- 1999 -- excuse me -- 2019 J&J performed
10 any kind of comprehensive review of the
11 epidemiology studies all in one place like Health
12 Canada did?
13            Not paying attention.  Not
14 interacting.  I'm talking about something where
15 the scientists sat down together and did a
16 comprehensive review like Health Canada did.
17     A.    I --
18     Q.    Or even like FDA did in that 2014
19 letter.
20     A.    I know that J&J was following the
21 scientific literature.
22     Q.    Not my question, respectfully.
23            Had you ever seen a document where
24 J&J actually did a comprehensive review?

91 (Pages 358 - 361)

Page 362

1    A.    I have -- I can't say that I did or
2 I didn't.  So.
3    Q.    Okay.  Now, that report was
4 available online, correct?  The draft report,
5 right?
6    A.    I don't recall.
7    Q.    Do you know where you got the
8 document from?  Did you get it from one of -- from
9 J&J's lawyers?
10    A.    I mean, all of the materials came to
11 Analysis Group.  So I don't know one way or
12 another.
13    Q.    So you never did your own -- I'm
14 sorry.
15        You never did your own review of the
16 medical literature, scientific literature?  You
17 never got online and did your own evaluation?  You
18 got your information from Analysis Group?
19    A.    I --
20        MR. EWALD:  Objection to form.
21    Mischaracterizes testimony.
22        Go ahead.
23        THE WITNESS:  No, the
24    documents that I reviewed are on a

Page 363

1    portal, and Analysis Group keeps track of
2    those documents.
3 BY MR. TISI:
4    Q.    Did you collect them or did Analysis
5 Group collect them?
6    A.    I mean, they're -- they're coming in
7 from the production materials, from trial
8 testimony, etc., as I've described in my report.
9    Q.    Did you do any of your own
10 individual research?  Apart from -- apart from
11 Analysis Group, did you get on the computer, go to
12 the library, do anything yourself, other than get
13 stuff through --
14    A.    I looked at several websites and
15 other -- I mean, I've looked at documents.
16    Q.    Well, I understand you looked at
17 documents.  You looked at documents provided by
18 Analysis Group.
19    A.    I looked at documents provided by
20 many places --
21    Q.    Okay.
22    A.    -- as well as, as I've described,
23 publicly available documents.
24    Q.    Okay.

Page 364

1    A.    Yes.
2    Q.    Well, Health Canada was publicly
3 available, correct?
4    A.    I -- I don't know.  I'm -- I don't
5 know.  I don't remember.
6    Q.    Did you get it from Analysis Group
7 or did you get it from your own research?
8    A.    I did not look up Health Canada
9 myself.
10    Q.    Okay.  That was my question.
11    A.    Yeah.
12    Q.    Did you see that Health Canada
13 provided an infographic with the proposed -- with
14 the draft report?
15    A.    I looked at the draft screening
16 assessment.  I don't remember.
17        MR. TISI:  Well, I should have
18    marked 33.
19        (Document marked for
20    identification as Sutcliffe Exhibit 33.)
21 BY MR. TISI:
22    Q.    This is the infographic that was
23 provided by Health Canada with its Draft Screening
24 Assessment.

Page 365

1    A.    Okay.
2    Q.    Have you seen this before?
3    A.    I've seen this before.
4    Q.    Okay.  And it says here.  It says,
5 first of all, "These products may cause ovarian
6 cancer."
7        Do you see that?
8    A.    "May be harmful to human health."
9    Q.    Well, on the right side in the box
10 it says, "These products may cause ovarian
11 cancer," right?
12    A.    I see that.
13    Q.    Okay.  And it says to minimize
14 exposure, risk minimization, which we've talked
15 about all day, it says you can do several things.
16        Number 1.  You can "Avoid inhaling
17 loose talc powder."
18        You see that?
19    A.    I see that.
20    Q.    Number 2.  "Avoid female genital
21 exposure to talc."
22    A.    I see that.
23    Q.    Number 3.  "Choose a talc-free
24 alternative" like cornstarch, correct?

92 (Pages 362 - 365)

Page 366

1    A.    I see "Choose a talc-free
2  alternative."
3    Q.    All of these options for risk
4  mitigation were on the table for 20, 30 years,
5  correct?
6    A.    Again, I see what you're saying
7  here.
8    Q.    I know you see what I'm saying.
9    A.    Yeah.
10   Q.    I mean, we can all. I can hand this
11 to anybody and they can see what I'm saying.
12        I'm asking you: All of these risk
13 reduction strategies were -- were being discussed
14 in realtime, not in hindsight, all these things
15 were being discussed in the medical and scientific
16 literature for 30-40 years before -- before this
17 infographic came out. True?
18   A.    Again, I have not done a systematic
19 review of all of the literature.
20   Q.    I didn't ask you whether you did a
21 systematic review of all the literature,
22 respectfully.
23   A.    Yeah.
24   Q.    We've gone through documents today

Page 367

1  where the issue of changing to cornstarch. The
2  Cancer Society, Harlow, Dr. Cramer, all these were
3  being discussed in realtime. True?
4    A.    You keep talking about changing to
5  cornstarch. Cornstarch was available to people
6  already.
7    Q.    Fine.
8        I asked discontinuing talc in favor
9  of cornstarch?
10   A.    Again, I've demonstrated J&J's
11 institutional knowledge --
12   Q.    Not asking --
13   A.    -- and that --
14        MR. EWALD: Let her finish
15    answering.
16        THE WITNESS: -- it has not
17    been disavowed by the regulatory agencies
18    or information like that.
19 BY MR. TISI:
20   Q.    All right. Now, please answer my
21 question.
22        All the risk strategies to
23 reducing -- risk strategies listed in this
24 infographic were discussed in the documents that I

Page 368

1  showed you today going back 20-30 years?
2    A.    Again, I have not analyzed all the
3  literature.
4    Q.    I didn't ask you whether you
5  analyzed all the literature.
6        I asked you whether they were in the
7  documents I showed you today.
8    A.    I've seen various things in the
9  documents today.
10   Q.    Okay. And that included choosing a
11 talc-free alternative like cornstarch?
12   A.    And I've said that J&J had a
13 cornstarch in the 1970s.
14   Q.    And did they ever tell women, you
15 may want -- did J&J -- okay. Let's see. Let's do
16 this as well.
17        You saw the University of Michigan
18 website that said there was an association between
19 talc and ovarian cancer and that cornstarch does
20 not have that risk.
21        You remember that?
22   A.    I remember seeing a document from
23 Michigan.
24   Q.    You saw the American Cancer Society

Page 369

1  which said, in light of the uncertainty, women may
2  want to switch to cornstarch.
3        Remember that from 1999?
4    A.    I honestly reviewed a lot of
5  documents today. I'm not sure.
6    Q.    Okay. You remember that one? We
7  just talked about it in five minutes ago. The
8  1999 switch to cornstarch, correct?
9    A.    Oh, the -- yes, I saw that.
10   Q.    Okay. Take those two.
11        Did J&J ever tell consumers what
12 University of Michigan was telling its -- telling
13 people on its website?
14   A.    Again, J&J came to an understanding
15 of what the safety of its talc over time, actively
16 seeking knowledge, scientific knowledge through
17 many activities. And I think that J&J, you know,
18 that their stance is, after all this time in
19 trying to affirm, disaffirm what they know, they
20 came to a conclusion, and I think the way that
21 they've been acting is consistent with what they
22 think.
23   Q.    So my question is going back to the
24 University of Michigan: J&J never told consumers

93 (Pages 366 - 369)

Page 370

1  what University of Michigan told its patients, did
2  it?
3      A.    Again, I'm just, you know, I can't
4  comment on that because I wasn't studying it.
5      Q.    University of Michigan told -- told
6  consumers a lot more than J&J ever told them,
7  correct?
8          MR. EWALD: Objection to form.
9      Argumentative.
10          THE WITNESS:  I think I
11      answered the question like one -- one
12      time ago about J&J's institutionalized
13      knowledge about the safety of its
14      product.  I think they've been consistent
15      with what they -- what they know and
16      believe.
17  BY MR. TISI:
18      Q.    Okay.  Let's talk about asbestos.
19  Let's get to asbestos now.
20          You're really not an expert in
21  asbestos and testing, correct?
22      A.    I am not an expert in testing.
23      Q.    Okay.  Well, you're not an expert in
24  asbestos either, are you?

Page 371

1      A.    No.  I've learned a lot about
2  asbestos over the last five years.
3      Q.    Right, in this case.
4          But outside, outside the courtroom,
5  you have never studied asbestos?
6      A.    I have not studied asbestos, but
7  that's like, you know, the other act -- the other
8  projects that I've worked on.  I mean, I don't
9  have to be an expert in everything in order to
10  understand what an organization does.
11      Q.    But you do know asbestos in any form
12  is a serious safety issue for any product,
13  correct?
14      A.    I know that asbestos can be harmful.
15      Q.    And you agree with what you've read.
16  There's no safe level of asbestos, correct?
17      A.    At the present time, it's -- there
18  is no safe level or it's unknown whether there's a
19  safe level --
20      Q.    Well --
21      A.    -- I guess would be a better way to
22  put it.
23      Q.    -- the FDA has indicated and the EPA
24  has indicated there is no safe level of asbestos.

Page 372

1  True?  You've seen that reference.  You've seen
2  that phrase.  There is no safe level of asbestos,
3  correct?
4      A.    Again, it's unknown about whether
5  there's a safe level.
6      Q.    Okay.  And so in light of that, you
7  don't want to expose anybody to any asbestos.
8  True?
9      A.    If they're -- I just -- I just
10  talked about that.
11      Q.    Well, do you want to be exposed to
12  asbestos?
13      A.    Asbestos is in the air.  I mean, you
14  know, the FDA has said that.
15      Q.    Okay.  Do you want to be exposed to
16  one more -- one more fiber of asbestos than what's
17  in the air?
18      A.    Again --
19      Q.    Would you walk into a room where
20  there's asbestos -- an increased level of
21  asbestos, even if it's tiny bit?
22      A.    Of course, nobody would want to do
23  that, but we know that it exists in the
24  environment.

Page 373

1      Q.    Okay.  So, so nobody would want to
2  walk -- voluntarily walk into a room where there's
3  even a tiny bit of asbestos more than is in the
4  background, right?
5      A.    Again, it exists.
6      Q.    No, I didn't ask you whether it
7  exists.
8          You would not want to walk into this
9  room -- if I told you there was an increased
10  number of fibers in this room, even if it's a tiny
11  bit, you would not walk into this room, would you?
12      A.    I would not want to walk into a room
13  with asbestos.
14      Q.    Okay.  Now, can I have Exhibit
15  Number 34, please.
16          You know that talc and asbestos from
17  what you've studied can occur together
18  geologically, correct?
19      A.    I understand that.
20      Q.    Okay.  And you also know that talc
21  has been implicated as a potential source of
22  asbestos exposure, correct?
23      A.    Yes.
24      Q.    Okay.  Can I have Exhibit Number 35,

94 (Pages 370 - 373)

Page 374

1 please.
2          Would you knowingly recommend that
3 women apply asbestos to their genital area?
4     A.    Of course not.
5     Q.    Would you tell women they should
6 apply talc to their genital area even if it
7 contains a little bit of asbestos?
8     A.    I -- I -- no, of course not.
9          MR. TISI:  Exhibit Number 35,
10    if I could, is a recent FDA final rule
11    dated March 28, 2004.
12         (Document marked for
13    identification as Sutcliffe Exhibit 35.)
14 BY MR. TISI:
15    Q.    Have you seen that?
16         MR. EWALD:  Is it '4?
17         MR. TISI:  35.
18         MR. EWALD:  No.  Is it 2004 or
19    2024?
20         THE WITNESS:  2024.
21 BY MR. TISI:
22    Q.    I'm sorry.  2024.
23    A.    Yeah, 2024.
24         I have -- I don't -- I haven't seen

Page 375

1 this document since it just came out.
2     Q.    Let's just look at it really
3 quickly, and I'll just ask you one question about
4 it.
5          It says -- if you go to page -- page
6 on the -- the one that ends in 21973.  The middle
7 column, almost at the bottom, it says:
8          "Some talc deposits and articles
9 containing talc have been shown to contain
10 asbestos.  Thus" --
11         MR. EWALD:  Sorry.  Hold on
12    one second.  I think we're close, but we
13    need to find it.
14         There you go.  Go ahead.
15 BY MR. TISI:
16    Q.    It says:
17         "Some talc deposits and articles
18 containing talc have been shown to contain
19 asbestos."
20         You see that?
21    A.    I see that.
22    Q.    And you know that the FDA actually
23 tested J&J talc and found asbestos, right?
24    A.    Actually, I know that the FDA

Page 376

1 tested, did not find asbestos.
2     Q.    No.  You know that they tested two
3 bottles of J&J talc and found asbestos?
4     A.    If you're talking about 2019?  Is
5 that what you're talking about?
6     Q.    Yes.
7     A.    Yes, then I know that J&J -- that,
8 you know, other labs did not find it.
9     Q.    And you know that the FDA has
10 maintained and continues to maintain they found
11 what it found?
12    A.    And you know the other 155 tests
13 suggested that it wasn't in the lot.
14    Q.    Except the ones that RJ Lee did
15 where it says it was the cause of contamination
16 based upon an air conditioner, right?
17    A.    We know that there's contamination
18 that happens.
19    Q.    Okay.  So everything -- everything
20 is positive until it becomes negative, right?
21    A.    That's incorrect.
22         MR. EWALD:  Objection.
23    Argumentative.
24 BY MR. TISI:

Page 377

1     Q.    All right.  So the FDA has found the
2 test of two -- of two bottles of -- of J&J talc
3 and found asbestos in one of them, and they have
4 never disavowed that.  True?
5     A.    So as far as I know, that nothing
6 has been said yet.
7     Q.    Okay.  Since 2019, nothing has been
8 said yet.  It's been five years.
9     A.    Again, at the same time, we know
10 that there are plenty of other testings that's
11 going on.
12    Q.    Okay.  So, and you know that talc
13 with asbestos -- do you know whether or you've
14 been told as you revealed that talc with asbestos
15 has been found by IARC to be a Class 1 carcinogen?
16    A.    I am -- I'm not sure what you're
17 saying.
18    Q.    Now, you read -- I'm sorry.
19         You read Dr. Hopkins' testimony on
20 -- you read several of his transcripts including
21 in Ingham, correct?
22    A.    I -- yes.
23    Q.    Have you read that Dr. Hopkins said
24 there was a zero tolerance policy for talc and

95 (Pages 374 - 377)

Page 378

1 asbestos?
2    A.    I don't remember.
3            MR. TISI:  All right.  Let's
4    show Exhibit Number 36, please.
5            (Document marked for
6        identification as Sutcliffe Exhibit 36.)
7 BY MR. TISI:
8    Q.    This is a transcript of Dr. Hopkins
9 dated April 11, 2018, Exhibit Number 36.
10           MR. EWALD:  Can you read that?
11           THE WITNESS:  Okay.  It's
12   pretty -- okay.  Yeah.
13 BY MR. TISI:
14   Q.    If you go to page 108, which is on
15 the second page of the document.
16   A.    Uh-huh.
17   Q.    Question: "Johnson & Johnson has
18 told the world that it has a zero tolerance policy
19 for asbestos in its talc, correct?"
20       You see that question?
21   A.    Where is it?
22   Q.    It's on line 108.
23           MR. EWALD:  What page?
24           MR. TISI:  Page 107.  Here,

Page 379

1    John.
2            MR. EWALD:  Oh.
3            THE WITNESS:  Okay.  I see
4    it.
5            MR. EWALD:  Yep.
6            THE WITNESS:  Right.
7 BY MR. TISI:
8    Q.    Okay.  So let's read it together.
9 Okay?
10   A.    Uh-huh.
11   Q.    It says:
12       "Johnson & Johnson has told the
13 world that it has a zero tolerance policy for
14 asbestos in talc, correct?"
15       Answer:  "I'm not sure the whole
16 world.  Johnson & Johnson's policy is to have talc
17 which is zero asbestos."
18       He said that, right?
19   A.    Yeah.  He's not saying that there's
20 zero tolerance policy, whatever that is.  He's
21 saying Johnson & Johnson's policy is to have talc
22 with just zero asbestos.
23   Q.    Okay.  Question: "So Johnson &
24 Johnson has a zero tolerance policy for any

Page 380

1 asbestos in its talc, correct?"
2    A.    I see that.
3    Q.    What was his answer?
4    A.    Okay.  He says "Yes."
5    Q.    Okay.  "The reason is that no mother
6 or father would ever buy talc for use on
7 themselves or their children if they knew it had a
8 single fiber of asbestos in it, correct?"
9       What was Mr. -- Dr. Hopkins' name --
10 answer?
11   A.    "Yes."
12   Q.    Question: "Johnson & Johnson knows
13 that asbestos in its talc could make people sick
14 because Johnson & Johnson knows asbestos is a
15 carcinogen and can cause mesothelioma, correct,
16 sir?"
17       You see that?
18   A.    I see that.
19   Q.    And his answer is: "That's correct,"
20 he says.
21       And question: "Johnson & Johnson
22 knows there's no safe level of asbestos exposure,
23 especially for children, correct, sir?"
24       Answer:  "Again, there is no safe

Page 381

1 level."
2            MR. EWALD:  Hold on.
3            THE WITNESS:  "No known safe
4    level."
5 BY MR. TISI:
6    Q.    "No known safe level," correct?
7    A.    "No known safe level."
8    Q.    "That's right.  Especially for
9 children, correct?"
10       "Yes."
11       Do you agree with Dr. Hopkins this
12 whole testimony that we just read together?
13   A.    What I agree -- what I agree to is
14 that I have in the thousands of pages of documents
15 that I've reviewed have never seen anything
16 suggesting that anyone at Johnson & Johnson
17 thought it was acceptable to expose consumers to
18 asbestos.
19   Q.    That's -- okay.  Let's continue to
20 talk about it.
21       Now, next page, the next page of the
22 document on page 145, 115.  Page 145.  I'm sorry.
23 On line 6 it says:
24       "Does CT" --

96 (Pages 378 - 381)

Page 382

1    MR. EWALD:  Sorry.  Hold on.
2    Hold on.
3    THE WITNESS:  Page 145.
4    MR. EWALD:  145 bottom right.
5    THE WITNESS:  15.
6    MR. EWALD:  There's a word.
7    MR. TISI:  (Indicates).
8    MR. EWALD:  Right.  Right.
9  BY MR. TISI:
10    Q.    It says:
11    "Does CTFA J4 look for chrysotile at
12  all?  I'm giving you an opportunity to say no,
13  because that's the truth."
14    Question:  "Does it look for
15  chrysotile?"
16    "It doesn't -- it doesn't look for
17  chrysotile specifically."
18    Do you see that?
19    A.    I see that.
20    Q.    Okay.  So the J4-1 method does mot
21  look for chrysotile.  True?  You agree with
22  Dr. Hopkins?
23    A.    The J4-1 -- as far as I know, J4-1
24  looks for amphiboles, and we know that J&J

Page 383

1  implemented TEM early in the 1970s in order to
2  have the most sensitive tests, which are still the
3  ones that are recommended today.
4    Q.    Most sensitive doesn't mean
5  completely sensitive, does it?
6    A.    Again, I am not a testing expert --
7    Q.    Okay.
8    A.    -- and I am not opining --
9    Q.    But you know --
10    A.    -- on tests.
11    What I do know is that J&J was
12  active in making sure that tests were developed,
13  working with the FDA as well as the scientific
14  community, and they implemented not only what was
15  implemented by the industry, but they went beyond
16  the industry standard.
17    Q.    Does the FDA consider -- FDA has
18  said that it's been long understanding that there
19  is shortcomings with the testing for talc in
20  asbestos.
21    They use that word "shortcoming," do
22  they not?
23    A.    Yeah.  I know that also in 2019 --
24    Q.    No.  My question is actually can you

Page 384

1  -- I'm really going to interrupt you and move to
2  strike your testimony.
3    Do you understand that -- and I'm
4  not looking to argue.
5    Do you understand that the FDA has
6  recognized shortcomings with the testing of talc
7  for asbestos?
8    A.    I am understanding that there are
9  debates going on right now about testing and
10  thinking about the IWGACP, and I understand that
11  there are debates going on, but I also understand
12  that these are the tests that are recommended at
13  this time.
14    Q.    Okay.  I'm not asking you that
15  question.  I'm not asking about debates.
16    I'm asking you whether or not the
17  FDA has said there has been long understood
18  shortcomings with the testing for talc, long
19  understood in the past.
20    A.    Again, I'm not a text -- a testing
21  expert.
22    Q.    Okay.
23    A.    And if you want to show me where the
24  FDA.

Page 385

1    Q.    I'm going to.
2    A.    I just don't remember the FDA --
3    Q.    You don't remember.  Okay.
4    A.    -- precisely what the FDA said.
5    Q.    All right.  Have you seen as far
6  back as the 1970s they were talking about just not
7  dealing with the whole issue at all of asbestos in
8  talc and just saying, you know, let's be safe and
9  just use cornstarch instead of talc?
10    Have you seen any references to
11  that?
12    MR. EWALD:  They is who?
13  BY MR. TISI:
14    Q.    People in the medical and scientific
15  community.
16    A.    Yeah, again, I, you know, I did not
17  study the issue of cornstarch.
18    Q.    You have a lot of discussion in your
19  report about talc and asbestos.
20    Would you agree that one way to
21  absolutely 100 percent sure that people were not
22  exposed to asbestos in Johnson's Baby Powder would
23  be to use cornstarch?
24    A.    Again, I haven't studied cornstarch

97 (Pages 382 - 385)

Page 386

1 and --
2    Q.    I'm not asking for that.
3         I'm asking you:  The only way, the
4 only way, to assure 100 percent certainty that a
5 woman is not exposed to asbestos with the use of
6 Johnson's Baby Powder, the only way is to not use
7 it?
8    A.    Again, I have not studied that
9 issue.  I have studied what J&J knew and when.  I
10 have studied the issue of the tests that have been
11 -- that have been taken over time that have
12 contributed to J&J's understanding of the safety
13 of its talc product.
14         (Document marked for
15         identification as Sutcliffe Exhibit 37.)
16 BY MR. TISI:
17    Q.    I show you testimony from a
18 Congressional hearing in 1974.
19         Have you seen this document before?
20    A.    I can't say that I did or didn't.  I
21 don't recall.
22    Q.    I'm going to show you the content --
23 the comments at the hearing.
24         Would you go to the page 173,

Page 387

1 please.
2         Actually, can I see that document,
3 please?  It may have my notes on it.  I'm sorry.
4         No, it does not.  There you go.
5 Thank you.
6         MR. EWALD:  It's in the very
7    back.
8         THE WITNESS:  173.  Okay.
9    The whole document.  I guess it goes from
10    173 to 180.
11 BY MR. TISI:
12    Q.    I'm just looking at 173.
13    A.    Okay.
14    Q.    In the middle of the page it says:
15         "Before 1895, when Johnson and
16 Johnson began selling talc -- began talc
17 manufacture, babies were commonly dusted with corn
18 starch; this safe substitute is still available,
19 and at one-fourth the cost of talc.  We recommend
20 it.  Don't use feminine hygiene sprays which
21 contain talc.  Avoid talc-dusted balloons, rice,
22 prophylactics and chewing gum.  If you suspect a
23 product, write to the manufacturer -- and let use
24 know if you discover another use of asbestos."

Page 388

1         Do you see that?
2    A.    I see that.
3    Q.    It says don't -- this is from 1974.
4 President Nixon was in office in that -- in that
5 time.
6         MR. EWALD:  Are you making a
7    representation as to who is making this
8    statement?
9         MR. TISI:  No, I am not making
10    a statement that President Nixon is
11    making the statement.
12         MR. EWALD:  No, I'm saying,
13    are you making a representation who is
14    making the statement?
15         MR. TISI:  Oh, I'll say it's
16    Barry Castleman.
17         MR. EWALD:  All right.
18         MR. TISI:  Okay.
19         THE WITNESS:  Who is it?
20 BY MR. TISI:
21    Q.    Barry Castleman.
22    A.    I don't know who that is.
23    Q.    At that time he was -- he was a
24 young research student at the with the Maryland

Page 389

1 Department of Public Health.
2    A.    Yeah.
3    Q.    He goes on to say:
4         "While many of the applications of
5 asbestos products cannot be judged at this moment
6 due to lack of sufficient evidence of hazardous
7 use, still we should err on the side of prudence;
8 we should remove a suspected product until the
9 manufacturer proves that the item is not harmful.
10 It is not the duty of the public interest
11 scientist to prove whether each and every item is
12 harmful or safe.  The public has the right to
13 demand the scientific evidence from the
14 manufacturers of the consumer products which will
15 otherwise simply be means to further profits at
16 the expense of the health and safety of the
17 American people."
18         Do you see that?
19    A.    I see that.
20    Q.    Okay.  Do you think based upon what
21 you know it's the manufacturer J&J's
22 responsibility to prove the product is, in fact,
23 safe as opposed to having me sit here and prove
24 that it's unsafe?

98 (Pages 386 - 389)

Page 390

1             MR. EWALD: Objection to form.
2      Legal conclusion.
3             Go ahead.
4             THE WITNESS:  Again, you're
5      -- you're veering off into areas that I
6      did not --
7  BY MR. TISI:
8      Q.     And you have no view on that?
9      A.     -- examine.
10     Q.     You have no view on that?
11     A.     No, I have no view on that.
12     Q.     Okay.  Now, you've written countless
13  tables and appendices and pages and pages and
14  pages of discussions of asbestos in your report.
15  True?
16            MR. EWALD: Objection to form.
17     Vague.
18            Go ahead.
19            THE WITNESS:  I discussed
20     asbestos.  We talked about that this
21     morning.
22  BY MR. TISI:
23     Q.     It's a lot.
24     A.     That's part of what -- I don't know

Page 391

1  whether it's a lot or a little.
2      Q.     It's a majority of what you've
3  discussed?
4      A.     I've discussed lots of things in
5  here.
6      Q.     Okay.  All right.  We'll let the
7  judge understand and take a look at your report
8  and see how much asbestos you have discussed.
9             But based upon everything that you
10  know, distilling it in its most clear form, is the
11  testing methodology used by J&J -- this really is
12  a yes or no question -- a hundred percent
13  sensitive for the detection of asbestos?  100
14  percent.
15            MR. EWALD: Objection to form.
16            THE WITNESS:  I am not
17     opining on testing or sensitivity,
18     reliability or validity of the testing.
19  BY MR. TISI:
20     Q.     Okay.  Well, that cuts about -- out
21  about 90 percent of your report.  So thank you.
22            MR. EWALD: Objection to form.
23     Mischaracterizes testimony.
24  BY MR. TISI:

Page 392

1      Q.     Now, you know that J&J represented
2  that Johnson's Baby Powder and Shower to Shower
3  was, in fact, absolutely 100 percent free of
4  asbestos, right?
5      A.     Did you want to ask me about a
6  specific test?
7      Q.     I'm going to -- no, I'm asking you
8  about a particular representation.
9             Are you aware that J&J represented
10  that Johnson's Baby Powder and Shower to Shower
11  were a hundred percent pure and free of asbestos?
12     A.     To the knowledge that J&J accrued
13  over time through the multiple testings suggested
14  that it was -- there was no asbestos.
15     Q.     I didn't ask you that question,
16  honestly.  Honestly.
17            I asked you whether they represented
18  that the talc was a hundred percent free of
19  asbestos, 100 percent free pure talc.
20     A.     If you want to show me a document, I
21  can look at it.
22            MR. TISI:  Sure.  Let's do
23     that.  Let's look at Exhibit Number 38,
24     please.

Page 393

1             (Document marked for
2      identification as Sutcliffe Exhibit 38.)
3  BY MR. TISI:
4      Q.     It's a document that we looked at
5  before.  You can pull it out, please.  It's the
6  testimony of Mr. Hopkins.
7      A.     It's in here?  Okay.
8      Q.     Oh, I'm sorry.  It's not.
9             There you go.
10     A.     Oh, is this different?
11     Q.     Yeah, it is different.
12     A.     Okay.
13            MR. EWALD:  What page?
14            MR. TISI:  5376.
15            THE WITNESS:  Yeah, thank you.
16  BY MR. TISI:
17     Q.     Line 21.  And this is from the
18  Ingham trial.
19            You read the Ingham transcript,
20  right?
21     A.     Yes.
22     Q.     Okay.  It says:
23            "Johnson & Johnson assured the world
24  that the FDA -- and the FDA that its

99 (Pages 390 - 393)

Page 394

1  asbestos-free.  Its talc's asbestos-free, didn't
2  it?"
3          Answer: "Yes."
4      True?
5      A.    I see that, yeah.
6      Q.    Okay.  And it talks about -- and it
7  says the next on 5378 line 18 it says:
8          "The truth of the matter is, even in
9  your websites y'all tell the world that your
10 product is asbestos-free, right?"
11         Answer: "Yes."
12     Right?
13     A.    Where is that?  On page 78?
14     Q.    On page -- on page 5378.
15         MR. EWALD:  Right below.
16         THE WITNESS:  Right.  Got it.
17 BY MR. TISI:
18     Q.    You see that?
19         Do you see that?
20     A.    I see that.
21     Q.    It says:
22         "The truth of the matter is, even in
23 your websites y'all tell the world your product is
24 asbestos-free, right?"

Page 395

1          And the answer was "Yes" by Dr.
2  Hopkins.
3      A.    I see that, yeah.
4      Q.    If you go to the next page 5379, the
5  question is asked then:
6          "There is a difference between
7  saying it's asbestos-free, as if you've proven
8  there's no asbestos and telling the truth, which
9  is with these tests we were not able to detect it
10 to this degree of sensitivity, isn't there?"
11         "There is a difference between those
12 two, two statements, yes."
13     Do you see that?
14     A.    Will you just tell me what line
15 you're on?  I'm sorry.
16     Q.    Yeah.  It's line -- line 19, 42.
17 I'm sorry.  It's line 2 to line 8.
18     A.    So go from here to here.  Line what?
19     Q.    "There is a difference between
20 saying it's asbestos-free, as if you've proven
21 there's no asbestos and telling the truth, which
22 is with these tests we were not able to detect it
23 to this large degree of sensitivity, isn't there?"
24         And the answer:

Page 396

1          "There is a difference between those
2  two, two statements, yes."
3      A.    I see what's written.
4      Q.    Okay.  So you would agree with
5  Dr. Hopkins that there's a difference between
6  saying something is asbestos-free and something
7  saying that there's no detectable asbestos,
8  correct?
9      A.    Again, I am not a toxicologist, and
10 I am not opining on that.
11         What I do know is that premier
12 scientists in the world -- Dr. Pooley, for
13 example -- examined Italian talc, examined Vermont
14 talc and found no asbestos, as well as other --
15 other experts as well.
16     Q.    Honestly, again, not answering my
17 question.
18         My question is:  Is there a
19 difference between saying talc is asbestos-free
20 and talc -- there's no detectable level of --
21 there's no detectable talc?
22     A.    Again --
23     Q.    Asbestos.
24         I'm asking:  Is there a difference,

Page 397

1  in your mind, between those two things?
2          I'm not asking you to tell me the
3  sensitivity of the test.
4          I'm saying:  In your mind, is there
5  a difference?
6      A.    Again, I didn't opine.
7      Q.    You can't?
8      A.    I'm not opining on that.
9      Q.    Okay.  But you are testifying -- you
10 can opine about Dr. Pooley and all kinds of stuff,
11 but you're not able to tell me whether there's a
12 difference between saying something is
13 asbestos-free and something cannot detect
14 asbestos?
15         MR. EWALD:  Objection.  Form.
16 Argumentative.
17         Go ahead.
18 BY MR. TISI:
19     Q.    You're not able to do that?
20     A.    I am not opining on that.
21     Q.    Okay.  Okay.  Exhibit 33.
22         Do you know how much asbestos --
23 now, it's fair to say we don't know the exact
24 number, but it's fair to say between the 1970s and

100 (Pages 394 - 397)

Page 398

1  2000 -- the 2000s that J&J sold a lot of talc?
2      A.    I have no idea.
3      Q.    You don't have any idea how much
4  tons and tons of talc, tons and tons of Johnson's
5  Baby Powder.
6          You have absolutely no idea how
7  much?
8      A.    I have no idea.
9      Q.    Okay.  Do you have any idea how much
10 talc was actually tested using the testing
11 methodology that they used?
12     A.    Again, I'm not -- I know the tests
13 but, no, I'm not -- I haven't examined that.
14     Q.    Would it surprise you that less than
15 2 teaspoons of talc has been tested over that
16 50-year period?
17     A.    Again, I'm not --
18     Q.    You don't know that?
19     A.    I -- I don't know that.  I'm not
20 opining on those issues.
21     Q.    So you don't know how much talc was
22 actually tested, do you?
23     A.    I know that there are multiple
24 levels of testing that were conducted over decades

Page 399

1  and that --
2      Q.    But you don't know how much talc was
3  tested?
4      A.    -- they're using -- I'm not opining
5  on the way testing were done.
6          MR. EWALD:  Are you talking
7      about all testing methods or just one?
8  BY MR. TISI:
9      Q.    I'm testing you -- I'm asking you:
10 How much talc was tested using Johnson & Johnson?
11     A.    I -- I don't know.
12     Q.    You don't know?
13     A.    No.
14     Q.    Have you seen documents that says
15 there's a detectable limit that allows .5 percent
16 asbestos?
17     A.    Again, I'm not opining on issues
18 related to testing.
19     Q.    Okay.  Except for the 60 out of --
20 out of 80 pages where you talk about asbestos
21 testing?
22         MR. EWALD:  Objection to form.
23     Argumentative.
24         THE WITNESS:  Okay.

Page 400

1  BY MR. TISI:
2      Q.    Except for those?
3      A.    I'm -- I'm opining in the larger
4  sense --
5      Q.    Okay.
6      A.    -- of the fact that the test -- that
7  testing was created, that multiple levels of
8  testing were created, that the -- that the -- that
9  in addition to J4-1, J&J went beyond the industry
10 standard since the 1970s.
11     Q.    And you can't tell me how much talc
12 was actually tested in five decades, can you?
13     A.    I'm not a toxicologist --
14         MR. EWALD:  Objection to form.
15         THE WITNESS:  -- or a
16     microscopist.
17 BY MR. TISI:
18     Q.    It doesn't take a --
19     A.    I'm not looking at that.
20     Q.    I'm not asking you how much is in a
21 sample.
22         I'm asking you:  How much talc was
23 tested over -- over five decades?  Was it a
24 thimble full?  Was it a box full?  Was it a

Page 401

1  dumpster full?  How much talc was tested?
2          MR. EWALD:  And are you saying
3      by J4-1 or other methods?
4          MR. TISI:  I'm saying by J4-1.
5          THE WITNESS:  I don't know how
6      much was tested.
7  BY MR. TISI:
8      Q.    By any method how much.  How many
9  tons of talc were tested?
10     A.    All I can say is that I reviewed
11 thousands of tests and took a look at them, and I
12 reported them in here.
13     Q.    And you don't know whether or not it
14 was testing the size of a -- of a quarter of a
15 stamp (indicates) or whether it was testing the
16 size of this table?  You don't know?
17     A.    Again, those questions are left for
18 people who are testing experts.
19         MR. TISI:  All right.  Okay.
20     Let me see Exhibit Number 40, please.
21         (Document marked for
22     identification as Sutcliffe Exhibit 40.)
23 BY MR. TISI:
24     Q.    I think this was one of the

101 (Pages 398 - 401)

Page 402

1 documents you reviewed, but if you don't remember
2 it. Here's Exhibit Number 40. It is an FDA
3 meeting in July of 2000 -- of 1975.
4        Have you seen this document before?
5    A.    It looks familiar but, honestly, it
6 could be.
7    Q.    Do you remember they discussed the
8 detection limits of talc by the method -- the CFTA
9 method being .5 percent?
10   A.    Again, I know that -- I know about
11 the round-robin testing. I'm not opining on the
12 tests in particular.
13   Q.    I'm not asking you the tests in
14 particular.
15        I'm asking you the detection limits.
16 What were the detection limits of
17 the -- of the CFTA testing, the J4-1?
18       MR. EWALD:  CTFA?
19 BY MR. TISI:
20   Q.    CTFA.
21   A.    CTFA.
22        I'm not opining on what the limits
23 are.
24   Q.    Okay. Except in your report at the

Page 403

1 very -- on D-1, the footnote on D-1, it says:
2        "Testing methods have limits of
3 detection."
4        Except for that?
5    A.    I was highlighting that they have
6 the limits, but I'm not making judgments about
7 that.
8    Q.    Okay. But you will agree, apart
9 from the judgment of how much limits, you know
10 that there are detection limits with the tests
11 that were being done because you noted it in your
12 report?
13   A.    I understand that there are
14 specifications for the test.
15   Q.    And so you know that the tests were
16 not 100 percent effective? You do know that,
17 right?
18   A.    Again --
19       MR. EWALD:  Objection to form.
20       THE WITNESS:  -- those --
21    those questions are better left to the
22    toxicologists --
23 BY MR. TISI:
24   Q.    Okay.

Page 404

1    A.    -- and microscopists.
2        MR. TISI:  And if you go to
3    the Exhibit Number 41, please.
4        (Document marked for
5    identification as Sutcliffe Exhibit 41.)
6 BY MR. TISI:
7    Q.    This is the document that I think
8 you were alluding to.
9        Is this the IWGACP document?
10   A.    Yes. Yeah.
11   Q.    This is -- tell me what this is.
12   A.    Yeah. This is their -- their --
13   Q.    Who's they?
14   A.    The IWGACP.
15   Q.    And who are they?
16   A.    It's a group of people put together
17 by the FDA to talk about these issues.
18   Q.    And can you read what's on page 4,
19 the third paragraph, please, and read it into the
20 record, please.
21   A.    Page 4, the third paragraph?
22   Q.    Uh-huh.
23   A.    "In 1976, the cosmetics industry
24 voluntarily implemented a protocol to test

Page 405

1 cosmetic talc for amphibole asbestos minerals
2 using the CTFA J4-1 method in response to test
3 results indicating the presence of asbestos. Talc
4 suppliers to the pharmaceutical industry use a
5 similar method to certify that talc meets the
6 United States Pharmacopeia's (USP's) requirement
7 for 'Absence of Asbestos.'"
8        Is it too fast? Okay.
9        "To date, both methods rely on
10 screening techniques [X-ray diffraction (XRD) or
11 infrared (IR) spectroscopy] and require optical
12 microscopy [polarized light microscopy (PLM)]
13 only if the screening test is positive. These two
14 published protocols have long-recognized
15 shortcomings in specificity and sensitivity to
16 detect the presence of asbestos and similar
17 mineral particles that may pose a health concern
18 (see Appendix F). For example, recent testing" --
19   Q.    No, that's all right. You can stop
20 right there.
21   A.    Okay.
22   Q.    You don't need to keep going. You
23 can read the rest if you want to, but, I mean,
24 that's the part I wanted to ask you about.

Page 406

1    A.    Okay.
2    Q.    Now, first of all, it talks about
3 the protocol to testing for talc.
4        It talks about it as being for
5 amphibole asbestos, correct?
6    A.    Yes, I think that's what I mentioned
7 earlier.
8    Q.    Okay. And it also says -- and you
9 said that it is debated at the FDA about the
10 testing methodology, but this says
11 "long-recognized shortcomings in specificity and
12 sensitivity," correct?
13    A.    I see what's written here.
14    Q.    Okay. Well, what's written here is
15 what I said was written there, which is there are
16 long-recognized shortcomings in specificity and
17 sensitivity to the testing methodology used by
18 talc manufacturers, correct?
19    A.    Right. I see what's written.
20    Q.    Well, I know you see what's written.
21 I could ask -- seriously, I could ask the
22 receptionist if she can see what's written.
23        I'm asking you: Does that help you
24 with what we testified to before that it's not

Page 407

1 just debate, but there's long-recognized
2 shortcomings in the specificity and sensitivity to
3 detect asbestos?
4        MR. EWALD: Objection to form.
5    Incomplete.
6        THE WITNESS: I see what's
7    written there, and I also know what J&J
8    has been doing over decades.
9 BY MR. TISI:
10    Q.    I'm asking: Did J&J recognize that
11 there was long-recognized shortcomings in
12 specificity and sensitivity of the tests that it
13 was being used?
14    A.    I think that J&J was -- was applying
15 the most sensitive methods that exist today.
16    Q.    But it was not a hundred percent
17 sensitive, was it?
18    A.    Again, I am not a toxicologist or
19 microscopist. So I am not opining on the
20 particular details of testing.
21    Q.    I'm not asking you to the details of
22 testing.
23    A.    Yes, you are.
24    Q.    No, I'm not. I'm asking you, you

Page 408

1 are -- I'm not going to fight with you.
2        You have relied on the IWGACP
3 report, okay, in your opinions in this case, and
4 the report says there were long-recognized
5 shortcomings of specificity and sensitivity.
6        And I'm asking you whether based
7 upon your review of the evidence, J&J recognized
8 there were long-recognized shortcomings in
9 specificity and sensitivity.
10        I'm not asking whether you used the
11 best test, the most reasonable test, what the
12 detection limits were. I'm not asking you any of
13 that stuff.
14        Based upon your review, did you --
15 do you see whether or not J&J recognized that
16 there were shortcomings with respect to the
17 testing that it was being -- that it was using?
18    A.    Again -- again, I know what J&J was
19 doing.
20    Q.    Okay.
21    A.    That it was -- it worked
22 collaboratively with the FDA, with others in the
23 industry, with experts to develop the testing
24 methods and it has been applying those methods,

Page 409

1 which the FDA and the IWGACP say are the most
2 appropriate methods to be using right at the
3 moment.
4    Q.    Really? You think that the IWGACP
5 says that?
6    A.    I believe in this document somewhere
7 it says that, you know, XRD, PLM, and TEM should
8 be the methods used at the moment.
9    Q.    Who is Imerys?
10    A.    Imerys is a -- was a company that
11 took over -- took over the -- I have to go back
12 here.
13    Q.    Actually, they had different names,
14 but they were -- they were Rio Tinto or Luzenac,
15 but they were also -- the same company, correct?
16    A.    Right. Well, it was Luzenac, then
17 Imerys, and then it went to another one.
18    Q.    And if you look at F-3.i of your
19 report, which is the --
20    A.    Yeah. Got it.
21    Q.    Okay.
22    A.    Yeah.
23    Q.    It has the dates. They were the
24 primary mining company supplying Johnson & Johnson

Page 410

1 talc; is that true?

2    A.    They were doing routine testing.

3    Q.    They were doing the vast majority of

4 the testing, correct?

5          MR. EWALD:  Objection to form.

6          THE WITNESS:   Not for the

7       whole time, the whole decades.

8 BY MR. TISI:

9    Q.    Well, they first -- on the ground

10 ore, they did testing 2003 to 2020, correct?

11    A.    2003 to -- well, 2000 --

12    Q.    2003 to 2020?

13    A.    Well, I have in my -- on my document

14 2021, I think.  But, anyway, yeah, they were --

15    Q.    Okay.  But the ground ore --

16    A.    They were testing the China talc.

17    Q.    Well, I have here.  I'm looking

18 maybe on number 1, ground talc ore material.  It

19 was being monthly tested from 2003 to 2020 using

20 XRD, PLM, and TEM.

21          Do you see that?

22    A.    I do see that.

23    Q.    Okay.

24    A.    I -- yeah.

Page 411

1    Q.    Okay.  They did -- they looked at

2 finished talc between 1993 and 2003 using XRD and

3 PLM, correct?

4    A.    That's correct.

5    Q.    Okay.  And they did additional

6 testing monthly between 2009 and 2020 doing XRD,

7 PLM, and TEM, according to you, correct?

8    A.    Yes.

9    Q.    They did a lot of testing for the

10 vast majority of the time that's relevant in this

11 case, 2003 to 2020.

12          They did a lot of testing using all

13 the test methodology you say were standard of art,

14 right?

15          MR. EWALD:  I'm sorry.  What

16       time frame are you representing relevant

17       to this case?

18          MR. TISI:  No, I'm saying --

19          MR. EWALD:  What is the time

20       frame relevant to this case?

21          MR. TISI:  Actually, I think

22       the full time is relevant to this case.

23          MR. EWALD:  You said vast

24       majority.

Page 412

1          MR. TISI:  I said --

2          MR. EWALD:  So I want to know

3       what the time frame is.

4          MR. TISI:  I'm going to

5       continue to ask my questions.

6 BY MR. TISI:

7    Q.    From 2003 to 2020, which is a period

8 of almost 20 years?

9    A.    17 years.

10    Q.    Right.

11          They've done the state of the art

12 testing, correct?

13    A.    They have done the testing for 17

14 years.

15    Q.    And they've done the state of the

16 art.  There's nothing better than what they did,

17 correct?

18    A.    Again, what I know is that they were

19 using the three levels of testing over 17 years.

20    Q.    The most advanced testing that was

21 state of the art, right?

22    A.    The testing that was collaboratively

23 developed over time, they have been using.

24    Q.    The ones that J&J fully understood

Page 413

1 what they were doing because they were working

2 together, right?

3    A.    Again, they were -- I studied J&J.

4 I wasn't studying Imerys.

5    Q.    Okay.

6    A.    I know that Imerys was doing

7 testing.

8    Q.    Well, you showed a lot of test

9 results that Imerys did, correct?

10    A.    I included test results that were

11 being done.

12    Q.    Okay.  Would you agree with me that

13 Imerys is a -- is a -- I mean, J&J wouldn't rely

14 on a company to do testing that was not an expert

15 in testing, would it?

16    A.    Again, I didn't study Imerys.  I

17 know that they're a supplier and there are

18 supplier standards, and I know that they were

19 doing the three levels of testing.

20    Q.    And they were doing the testing for

21 a large part of the time, correct, using --

22          MR. EWALD:  Objection to form.

23       Vague and ambiguous.

24 BY MR. TISI:

104 (Pages 410 - 413)

Page 414

1    Q.    From 2003 to 2020, they were doing
2 levels of testing on ground talc, finished talc --
3 ground talc and finished talc, right?
4    A.    As we read here, they were doing
5 testing on the -- on the grinding of the ground
6 talc, as we know, on the finished talc, and the
7 additional testing.
8        MR. TISI:  Okay.  Show you
9    Exhibit Number 44, which is from 2009.
10       (Document marked for
11    identification as Sutcliffe Exhibit 44.)
12       THE WITNESS:  Are we done with
13    this one?
14 BY MR. TISI:
15   Q.    This is from Rio Tinto, which is the
16 same company as Imerys, correct?
17   A.    I think it switched -- I think it --
18   Q.    Switched names, but it's the same
19 company?
20   A.    It switched names.
21   Q.    You see the section that says "Key
22 Messages"?
23       Feel free to read the document if
24 you wish.

Page 415

1    A.    (Reviews document.)
2        MR. EWALD:  While she's
3    reviewing, we've been going over an hour
4    and 15 minutes.  Do you want to take a
5    break or something?
6        MR. TISI:  We're kind of
7    almost done, actually.
8        MR. EWALD:  That's what I
9    thought.  I didn't want to, you know,
10   presume anything.
11       MR. TISI:  No, I'm almost
12   done.
13       MR. EWALD:  So why don't you
14   continue that and then we can take a
15   break.
16       THE WITNESS:  Okay.
17 BY MR. TISI:
18   Q.    See, it says the fourth bullet point
19 down:
20       "We also updated the letters so that
21 they are more accurate."
22       Do you see that they're updating a
23 letter about the quality assurance of talc?
24   A.    In the fourth?

Page 416

1        MR. EWALD:  Fifth one.
2 BY MR. TISI:
3    Q.    Fifth one.
4        It says:
5        "We also updated the letters so that
6 they are more accurate:
7        "We can assure customers that our
8 products meet the most stringent standards for
9 asbestos, and that we cannot detect asbestos above
10 applicable testing limits."
11       And that's what we've been
12 discussing, right?
13   A.    Again, you were discussing that.  I
14 was --
15   Q.    Oh.  Yeah, you were avoiding the
16 answers.
17   A.    No, I'm not avoiding the answers.
18       MR. EWALD:  Objection to form.
19    Argumentative.
20       MR. TISI:  Okay.  Okay.
21       THE WITNESS:  I'm not opining
22    on that.
23 BY MR. TISI:
24   Q.    Okay.  Next one it says:

Page 417

1        "We cannot say our products are
2 'asbestos-free' -- the scientific instruments that
3 would allow us to make that statement accurately
4 have not yet been invented."
5        Do you see that?
6    A.    I see that.
7    Q.    Okay.  And that would have been
8 something that was well-known and understood at
9 the time, correct?
10   A.    Again, that's a question that other
11 experts could really take on.
12   Q.    Okay.  So let me -- let me ask you
13 this question.
14       If that were true, if the mining
15 company that actually did the testing from 2003 to
16 2021 were accurate, and they said the testing
17 instruments haven't even been invented that could
18 say they were asbestos-free, was it reasonable for
19 J&J to tell customers and the FDA that their talc
20 was asbestos-free?
21   A.    Again, I -- I mean, all I know that
22 the -- that many experts have testified to the
23 fact that there was no asbestos in J&J's talc
24 mines.

105 (Pages 414 - 417)

Page 418

1  Q.  Which experts have said that?
2  A.  Dr. Pooley.
3  Q.  Okay.
4  A.  And Dr. McCrone and --
5  Q.  From the '70s?
6  A.  From the '70s.
7  Q.  Okay.  Now we're talking about --
8  A.  And later from the '80s.
9  Q.  Okay.  Okay.  Was Dr. Pooley saying
10 that in the '80s?
11 A.  Dr. Pooley did.  He discussed the
12 Italian mines and the -- and the Vermont mines.
13 Q.  Okay.  Now, we have Rio Tinto in
14 2009 with the most advanced technology doing the
15 best that they could with all three levels of
16 testing, right?
17 A.  Again, I'm not, you know, I'm not a
18 person to ask on these questions.
19 Q.  Okay.  You discuss Alice Blount.
20     I'm really almost done, and then we
21 can take a break.
22     You discuss Alice Blount, correct,
23 in your report?
24 A.  Yes.

Page 419

1  Q.  Okay.  You understand she was a
2  consultant for J&J, correct?
3  A.  Yes.
4  Q.  And you're aware that she published
5  a paper in 1991 in which she did high density
6  separation and found that there was asbestos in
7  Johnson & Johnson talc, correct?
8  A.  Actually, I can't agree with that
9  because it's hard to know what she found.
10 Q.  Oh, it's hard to know what she
11 found.
12 A.  Exactly.
13 Q.  She told them, she told them that
14 there was -- she told J&J that there was levels of
15 asbestos in Johnson & Johnson talc.
16     You know that.  True?
17 A.  Again, I need -- if you want me to
18 take a look at a document --
19 Q.  Sure.  Let's do that.
20 A.  -- that would be great.
21     MR. TISI:  Can I show you
22 Exhibit 45, 46, and 47.
23     First of all, this is the --
24 this is from Johnson & Johnson files.

Page 420

1        MR. EWALD:  I will say, if
2  we're going to go through three more
3  documents --
4        MR. TISI:  No, we'll take --
5  we'll take a break.
6        MR. EWALD:  -- take a quick
7  break.
8        MR. TISI:  So long as we have
9  an agreement not to talk about this
10 topic.
11        MR. EWALD:  I will not talk
12 about the topic.
13        MR. TISI:  No problem.
14        MR. EWALD:  That works.
15        MR. TISI:  I believe you.
16 You're a man of your honor.
17        (Recess:  4:14 p.m. -
18        4:20 p.m.).
19        (Document marked for
20 identification as Sutcliffe Exhibit 45.)
21 BY MR. TISI:
22 Q.  So, Dr. Sutcliffe, I'm handing what
23 I have marked actually from J&J's files a copy of
24 the 1991 Blount paper, which I assume you've seen

Page 421

1 before?
2  A.  Yes.
3  Q.  And this was an article.
4        Was it peer-reviewed?  Do you know?
5  A.  You know, it's in the Environmental
6 Health Perspectives.  I'm assuming it is.  I don't
7 know.  I don't think it's been cited much.
8  Q.  Okay.  Do you read articles that
9 haven't been cited much?
10 A.  Do I?
11 Q.  Yeah.
12 A.  I have a few, but I have, you know,
13 I have a lot of citations.
14 Q.  Okay.  So this is entitled
15 "Amphibole Content" -- by the way, did I ask you
16 whether it was cited much?
17 A.  I beg your pardon?
18 Q.  Did I ask you whether it was cited
19 much?
20 A.  Whether this was cited much?
21 Q.  Yeah.
22 A.  I just happened to mention it.
23 Q.  Oh, I know.
24     How did you find out it wasn't cited

106 (Pages 418 - 421)

Page 422

1 much?
2    A.    I looked.
3    Q.    Okay.  It's entitled "Amphibole
4 Content of Cosmetic and Pharmaceutical Talcs."
5        Correct?
6    A.    Yes.
7    Q.    They talk about a new high
8 density-optical method for testing talc, correct?
9    A.    I think this has -- this has to do
10 with test preparation.
11    Q.    Right.  That wasn't my question.
12        It's a high density-optical method
13 of testing, correct?
14        The first sentence.
15    A.    It doesn't say "high."  It says "a
16 new density."
17    Q.    "Optical method"?
18    A.    "Optical method."
19    Q.    Okay.  And it says the results are
20 one:
21        "Only one was found to contain an
22 amphibole particle size distribution typical of
23 asbestos."
24        Do you see that?

Page 423

1    A.    Yes.
2    Q.    Okay.  And you know that to be the
3 one sample "I" on Table 1 that was Johnson &
4 Johnson's talc.  True?
5    A.    No.
6    Q.    You don't know that?
7    A.    No.
8    Q.    Okay.  On the very last page of the
9 document, which was in J&J's files, it has a key.
10        Have you seen that document?
11    A.    I have.
12    Q.    Okay.  And it indicates "I" being
13 Windsor, Johnson & Johnson baby powder.
14        You see that?
15    A.    I see what it says.
16    Q.    Okay.
17    A.    But I don't know what that means.
18    Q.    Okay.  You don't know that J&J --
19 that the key at the back says -- it says "I -
20 "Windsor - J&J JBP."  That stands for Johnson's
21 Baby Powder.
22        You don't know that to be true?
23    A.    What I know is that it's
24 inconsistent with the way that the sample is

Page 424

1 described in this particular paper.
2    Q.    And where did you get that
3 information?
4    A.    It's that I read this paper.
5    Q.    Oh, you did it.
6        So the lawyers didn't tell you that?
7    A.    No, of course not.
8    Q.    Oh, of course not.  Okay.  All
9 right.
10        Now, you know that -- that she has
11 insisted over time that Johnson's Baby Powder
12 actually has trace amounts of asbestos, correct?
13    A.    I -- I know what she wrote in a
14 letter.  I've seen that, but it's ambiguous.
15    Q.    Oh, it's ambiguous.
16    A.    Yes, it is.
17        MR. TISI:  Well, we'll talk
18    about it.  I'm going ask you about it's
19    ambiguous.
20        Here is Exhibit Number 46,
21    which is March 16, 1998.
22        (Document marked for
23    identification as Sutcliffe Exhibit 46.)
24 BY MR. TISI:

Page 425

1    Q.    And this was before there was any
2 Johnson's Baby Powder ovarian cancer linkage, and
3 I will represent to you that that's the case.
4        And this is a letter to John
5 O'Shaughnessy, who, of course, we've seen during
6 the course of this deposition, is the products
7 liability lawyer for J&J, correct?
8        MR. EWALD:  Objection.  Form.
9    Foundation.  Mischaracterizes.
10        THE WITNESS:  I see who the
11    letter is from and who it's going to.
12 BY MR. TISI:
13    Q.    And in the second paragraph, it says
14 that, in her opinion, commercial talcum powder
15 preparations, including Johnson's Baby Powder,
16 contain trace amount of asbestos.
17        Do you see that?
18    A.    I see that line.
19    Q.    And you discount that?
20    A.    Well, number one, we don't know what
21 she's talking about, really.  But she also said
22 that of "all the powders she tested, including
23 Johnson & Johnson's Baby Powder were well below
24 acceptable limits and that she considered Vermont

107 (Pages 422 - 425)

Page 426

1    talc as some of the purest talc available."
2          So that's what she said.
3    Q.    She also said it contains trace
4    amounts of asbestos?
5    A.    You know what?  I don't know what
6    that means.
7    Q.    You don't know what that means,
8    except what it says?
9    A.    I -- I --
10   Q.    Which is it contains trace amount of
11   asbestos?
12   A.    I, you know, she stated she didn't
13   think that whatever amount of asbestos that might
14   be present in baby powder was harmful.
15   Q.    Okay.  She doesn't know that.
16   A.    That the one talc was blown out of
17   proportion and that she has a very high opinion of
18   Johnson & Johnson Baby Powder.
19   Q.    Understood.  I hear what -- I hear
20   what you're saying and that's the company talking
21   points, and I get it.  I totally get it.  Okay?
22         But now my question is --
23            MR. EWALD:  Completely leading
24         and argumentative.

Page 427

1    BY MR. TISI:
2    Q.    My question had nothing to do with
3    health effects, did it?
4    A.    I think I answered your question
5    that I did not --
6    Q.    No.  My question was --
7    A.    That I did not --
8    Q.    My question was:  Did she say -- did
9    she say that, in her opinion, Johnson & Johnson
10   had trace amounts of asbestos?
11   A.    Actually, this is reporting what
12   she's -- this is like secondary reporting.  So I
13   don't know what she said specifically.
14   Q.    Okay.  Do you know whether or not
15   Mr. O'Shaughnessy actually followed up with her to
16   see whether or not to clear up the ambiguity that
17   you say is contained in this letter?
18   A.    I know it's a thin record.  I don't
19   know what happened or what didn't happen.
20   Q.    Wouldn't that be important to
21   know --
22   A.    So I can't say.
23   Q.    -- if you're doing sensemaking to
24   find out whether they cared about patient safety,

Page 428

1    wouldn't it be important to know what she did and
2    what investigation was done or not done?
3    A.    Number one, I don't think I'm
4    studying patient safety, but number two, I think
5    that, you know, I took this into account.  I put
6    it into context.
7            MR. TISI:  Next letter is
8    Exhibit Number 47, which is a letter from
9    Alice Blount dated April 27, 1998.
10           (Document marked for
11        identification as Sutcliffe Exhibit 47.)
12   BY MR. TISI:
13   Q.    Again, I assume you've seen this
14   letter.
15   A.    (Reviews document.)
16   Q.    You see where she writes:
17        "As I told you, I believe that
18   Johnson & Johnson's Vermont talc contains trace
19   amounts of asbestos which are well below those
20   specified by OSHA."
21        Do you see that?
22   A.    Again, I see what you're saying.
23   Q.    Okay.  But she also says that the
24   specified limit was .1 percent, correct?

Page 429

1    A.    I see the sentence there.
2    Q.    It says:
3        "Although my papers report an
4    improved method for analysis, the determination
5    for the sample labeled 'I' (Johnson & Johnson's
6    Vermont talc) have been done by the traditional
7    methods as well."
8        Do you see that?
9    A.    That's in the 1990 paper.
10   Q.    Right.
11        But she -- the label sample was "I,"
12   correct?
13   A.    In the 1990 paper.
14   Q.    Right.
15        And the same -- the same samples
16   were used in -- in the 1990 paper?
17   A.    Actually, that's really not correct.
18   Q.    Oh.
19   A.    We don't really know.  She doesn't
20   remember.  In her deposition, she told us she did
21   not remember.
22   Q.    Okay.  All right.  It's your story
23   and you're sticking with it, right?
24   A.    I --

108 (Pages 426 - 429)

Page 430

1        MR. EWALD: Objection.
2    Argumentative.
3 BY MR. TISI:
4    Q.    All right.
5        MR. GOLOMB: You don't have to
6    smile.
7        MR. EWALD: Smart forum. So.
8 BY MR. TISI:
9    Q.    All right. Have you seen, as an
10 organizational expert, this density method that
11 she describes as being the better (indicates)
12 testing methodology in her 1991 paper -- 1991
13 paper? Have you seen J&J do any analysis of that
14 methodology as being more sensitive than the one
15 that they were using?
16    A.    I have not investigated that. I
17 know over decades that at times J&J has been
18 concerned with concentration methods, but it was
19 not -- but what they were doing was -- was better
20 than -- than that.
21    Q.    Well, I'm not -- actually, I'm just
22 not -- again, I'm not asking that question.
23        I'm asking the question: Have you
24 seen any documents in the record where J&J does a

Page 431

1 comprehensive analysis of the methodology that was
2 described by Dr. Blount in her 1991 article?
3    A.    I don't recall one way or another.
4    Q.    As a company that you would expect
5 to be concerned with safety, would you expect to
6 see that if it had occurred?
7    A.    No. I mean, as far as I know, none
8 of the experts, J&J's testing experts made any
9 mention of it.
10        MR. TISI: Okay. Let's take a
11    break.
12        THE COURT REPORTER: Off the
13    record.
14        (Recess: 4:30 p.m. -
15        4:38 p.m.)
16        MR. TISI: I cede my time to
17    Mr. Golomb.
18        MR. GOLOMB: I just have a few
19    questions.
20        EXAMINATION
21 BY MR. GOLOMB:
22    Q.    I want to -- it may seem like I'm
23 jumping around a little bit, but I want to be
24 methodical and not duplicate questions so I won't

Page 432

1 be very long.
2        But I want to start with something
3 you said at the very end. You said "I don't study
4 patient safety."
5        Did I get that right?
6    A.    Well, I do study patient safety, but
7 you mentioned patient safety. I should say, I
8 don't think about it as related to this case.
9    Q.    Right.
10        So in this case, you're not --
11 patient safety is not a factor?
12    A.    But -- well, I mean, I'm not looking
13 at patients.
14    Q.    Right.
15    A.    Right.
16    Q.    In this case, you're looking at the
17 conduct of the company?
18    A.    I'm sorry, I --
19    Q.    In this case, you were asked to look
20 at the conduct of the company?
21    A.    Correct.
22    Q.    Okay. Let me just clarify some --
23 some definitions here.
24        First of all, in your -- in your

Page 433

1 report, you use the word "cherry-picking."
2    A.    Uh-huh.
3    Q.    What did you mean by that?
4    A.    Just picking a particular document
5 and just drawing on that one document, not putting
6 it into context.
7    Q.    Okay. And did anybody do that in
8 this case?
9    A.    I have seen that throughout reports.
10    Q.    Give me an example.
11    A.    In the Kessler report, I think there
12 were some evidence of cherry-picking.
13    Q.    What evidence of cherry-picking was
14 there in the report?
15    A.    No, I can't remember specifically
16 right at the moment.
17    Q.    Okay. So you remember there was
18 cherry-picking, but you can't give me a single
19 example of it, as you sit here today?
20        MR. EWALD: You want to show
21    her a copy of the report?
22        THE WITNESS: Yeah.
23        MR. EWALD: She can point it
24    out.

109 (Pages 430 - 433)

Page 434

1    MR. GOLOMB: She -- she used
2 the word --
3    THE WITNESS: You know, I --
4    MR. GOLOMB: She used the word
5 "cherry-picking" without looking --
6    THE WITNESS: And I meant that
7 it's not --
8 BY MR. GOLOMB:
9    Q.    Let me finish my question.
10    A.    Okay.
11    Q.    You used the word "cherry-picking"
12 in your testimony earlier today in reference to
13 Dr. Kessler.
14        At that time, you didn't have the
15 report in front of you and you didn't give any
16 examples.
17        And now I'm asking you if you can
18 give us some examples of Dr. Kessler's
19 cherry-picking.
20    MR. EWALD: Without putting it
21 in front of her first.
22 BY MR. GOLOMB:
23    Q.    If the answer is -- if the answer is
24 "I don't remember," just say so.

Page 435

1    A.    I have to say, I don't remember
2 specifics.
3    Q.    Okay. Sensemaking. Would you --
4 would you agree that sensemaking is the "ongoing
5 retrospective development of plausible images that
6 rationalize what people are doing"?
7    A.    There are many definitions of
8 sensemaking that comes from my belief from my
9 collaborators' work.
10    Q.    I'm sorry?
11    A.    I said that there are other ways to
12 think about sensemaking.
13    Q.    Okay. But do you agree or disagree
14 with the statement I just read to you?
15    A.    I believe that came from my
16 collaborators' work.
17    Q.    Right.
18        That was your work with Dr. Weick
19 and Dr. Oberfield in 2012?
20    A.    Obstfeld.
21    Q.    Okay. So obviously you agree with
22 your own statement, right?
23    A.    Yeah, but, I mean, sensemaking is
24 more than that. There are many ways to think

Page 436

1 about it.
2    Q.    And if you were in front of a jury
3 and asked to explain what that sentence means, how
4 would you put it?
5    A.    The idea that we're looking at our
6 experience and figuring out, you know, what we're
7 thinking as a consequence of having experienced
8 it.
9    Q.    Okay. And by "retrospective" you
10 mean looking at past events, correct?
11    A.    Not necessarily. Just looking at
12 the past moment, you know, and what I'm
13 experiencing. I mean, you experience something
14 and then you reflect on it.
15    Q.    What's the difference?
16    A.    But there are other ways to think
17 about sensemaking. As I have defined in my
18 document, drawing on other people's work and that
19 relates more specifically to the idea of how
20 information enters an organization, how it's
21 interpreted, how it's acted upon, how it is
22 affirmed or disaffirmed.
23    Q.    What is the difference between past
24 events and past moments?

Page 437

1    A.    Just -- just I'm thinking about it
2 in time. Sensemaking is kind of happening.
3    Q.    That wasn't my question.
4        My question is: I asked you about
5 past events and you said past moments.
6        And I'm asking you: What's the
7 difference between past events and past moments?
8    A.    Because sensemaking is ongoing and
9 so it's occurring at, you know, as people are
10 experiencing things or in the moment.
11    Q.    And hindsight bias allows people to
12 convince themselves after an event that they
13 accurately predicted it before it happened?
14    A.    Hindsight bias is the idea of
15 knowing certain particular outcomes and looking
16 back and making the assumption that things are
17 more predictable than they would have been.
18    Q.    Okay. Do you agree or disagree with
19 the statement I just made? And I'll repeat it.
20        Hindsight bias allows people to
21 convince themselves after an event that they
22 accurately predicted it before it happened.
23        Do you agree or disagree with that
24 statement?

110 (Pages 434 - 437)

Page 438

1    A.    That can be the case, but there are
2 many ways to think about hindsight bias.
3    Q.    And disruptive ambiguity is when
4 situations that happen which are not expected to
5 disrupt our plans or way of life.
6    A.    Disruptive --
7    Q.    Do you agree or disagree with that
8 statement?
9    A.    It can be defined in other ways as
10 well. It can be a surprise. It's an
11 inconsistency between what we expected and what
12 we're experiencing.
13    Q.    Is the statement that I just said
14 the definition of disruptive ambiguity something
15 you agree with or disagree with?
16        They are situations that happen
17 which are not expected to disrupt our plans or way
18 of life.
19    A.    I -- I would have to say I think
20 about it a little bit differently.
21    Q.    Okay. And Credo is a statement of
22 the beliefs or aims which guide someone's actions.
23    A.    It can be guide -- a guiding
24 statement.

Page 439

1    Q.    Did you know what IARC was before
2 this case?
3    A.    I might have heard about IARC
4 before.
5    Q.    How might you have heard about it
6 before?
7    A.    I read the epidemiology literature
8 at times. I have used it in my own work and I
9 have, you know, I mean, I'm aware of particular
10 institutions around the world.
11    Q.    And you know that in -- and I'm not
12 going to go into the details of what Mr. Tisi
13 already did with you, but you know that in 2012
14 talc without asbestos was determined to be a 2B
15 possible carcinogen by IARC, correct?
16    A.    Again, I would have to look at the
17 -- at what I know is that in 2010 IARC published a
18 monograph that evaluated the carcinogenic hazards
19 of talc not containing asbestos fibers and listed
20 perineal use of talc-based baby powder in group 2B
21 possibly a carcinogenic.
22    Q.    Okay. And you know that following
23 that that talc with asbestos was ruled a
24 carcinogen, correct?

Page 440

1    A.    No, I -- I am not aware of that. I
2 think you brought it up this morning.
3    Q.    You weren't aware of that before
4 today?
5    A.    I don't recall whether I was or I
6 wasn't.
7    Q.    Okay. In your report, you say that
8 you were initially provided 600 documents,
9 correct?
10    A.    In my report, I asked for initial
11 documents and I received 600, and I described
12 in -- early in my report what I asked for.
13    Q.    Your name is Kathleen M. Sutcliffe,
14 PhD, correct?
15    A.    Correct.
16    Q.    Okay. See, you can answer a
17 question yes or no.
18        MR. EWALD: Oh, come on.
19 BY MR. GOLOMB:
20    Q.    My question to you was --
21        MR. EWALD: Is that a question
22    before? Did she answer it?
23        MR. GOLOMB: She did. She
24    said "correct."

Page 441

1        THE WITNESS: And I said
2    "correct" many times this morning.
3 BY MR. GOLOMB:
4    Q.    Okay. Are you aware one way or the
5 other as to whether or not IARC is looking at the
6 association between talc and ovarian cancer any
7 further?
8    A.    I -- I am not aware. I mean, I
9 don't know what IARC is looking at, at the moment.
10    Q.    Okay.
11    A.    I'm not studying that.
12    Q.    And if IARC was looking at this
13 further and concluded that, in fact, talc without
14 asbestos like talc with asbestos was a carcinogen,
15 would that in any way change your organizational
16 behavioralist assessment?
17    A.    You know, I can't answer that just
18 in the abstract. I would have to investigate
19 things and think about it, and I can't answer it
20 right at the moment.
21    Q.    And so does that mean that maybe it
22 would?
23    A.    It means that I can't really say
24 whether I would or whether I wouldn't.

Page 442

1    Q.    Okay.  Now, let me go back to the
2  600 documents and see if I can get an answer to
3  the question.
4        I believe the question was:  When
5  you were initially retained, you were provided
6  with 600 documents; is that correct?
7    A.    When I was initially retained, I
8  asked for documents and I can tell you what those
9  were.
10        As I stated in my report here is
11  that I wanted an exhaustive search of the
12  production records for documents that would be
13  relevant, such as materials related to the
14  industry, regulatory, scientific, and media
15  perspectives on whether cosmetic talc contained
16  asbestos, and how these perspective change --
17  perspectives changed over time.  Materials that
18  informed general understanding of J&J's
19  orientation toward health and safety, in the
20  ordinary course of business, documents regarding
21  health and safety of J&J baby powder materials
22  that informed an understanding of how J&J was
23  organized to respond to potential health safety
24  issues related to its baby powder talc products,

Page 443

1  its capabilities to do so, associated
2  expenditures.
3    Q.    Are you through?
4    A.    Yeah.
5    Q.    Okay.  Move to strike the answer.
6        I'm going to try the question again.
7        When you were initially retained,
8  you received a set of 600 documents for your
9  initial review, correct?
10    A.    When I was initially retained, I
11  asked for an exhaustive set of documents that
12  could get me up to speed on what the issues were.
13    Q.    Okay.  What you were provided
14  initially was a set of documents, which was --
15  which included 600 documents?
16    A.    The 600 documents were the first
17  things that I reviewed and then --
18    Q.    That's my question.
19    A.    Okay.  And then I, you know, asked
20  for everything that was produced.
21    Q.    I didn't ask you that.
22    A.    Okay.  But I'm letting you know.
23    Q.    Move to strike everything after
24  "Yes."

Page 444

1    A.    It is an iterative process.  My
2  process is iterative.
3    Q.    Just try to answer my question.
4        The initial set of documents that
5  you got was a set of 600 documents; is that
6  correct?
7    A.    I said it was a set of 600
8  documents --
9    Q.    Okay.
10    A.    -- that I asked for related to the
11  issues that I've already read.
12    Q.    Okay.  And that set of 600 documents
13  were documents that were sent to you by the
14  lawyers for J&J?
15    A.    The documents were sent to Analysis
16  Group by the lawyers.
17    Q.    Okay.  By the way, you were asked
18  earlier as to whether or not you had an ownership
19  interest in the Analysis Group, and your answer
20  was no, correct?
21    A.    No, as far as I know, I don't have
22  an ownership interest.
23    Q.    If you have an ownership interest in
24  Analysis Group, don't you think you would know

Page 445

1  that?
2    A.    I think I would know that.
3    Q.    Okay.  Did you -- we know that you
4  received somewhere in the area of 4 to $500,000 as
5  Kathleen Sutcliffe.
6        Did -- were -- did you have the
7  invoices -- because we haven't received your
8  invoices.
9        Did the invoices that you provided
10  to counsel for J&J in order for you to get paid
11  that 4 to $500,000, did that come on Kathleen
12  Sutcliffe letterhead?
13    A.    Yes.
14        MR. EWALD:  Objection to form.
15  BY MR. GOLOMB:
16    Q.    All right.  And were those invoices
17  similar to -- similar to what we have here
18  (indicates) from Analysis Group?
19        And by that I mean, what we have
20  from Analysis Group is a three-page document.  The
21  first is a bullet point description of what you
22  did or what the Analysis Group did.
23    A.    My team.
24    Q.    Yeah.

112 (Pages 442 - 445)

Page 446

1    A.    Yes.
2    Q.    There is a second page is a summary
3 by name of how many hours somebody worked on it
4 and what their hourly rate was.
5    A.    Uh-huh.
6    Q.    And then the third page is wiring
7 instructions.
8         The bills that you provided, were
9 they similar?
10    A.    Probably not as specific but
11 similar.
12    Q.    Less specific than that?
13    A.    I just write whether I reviewed
14 documents, what I was working on, whether I was
15 having meetings, what I was doing.
16    Q.    So you don't have any timesheets for
17 the work that you did?
18    A.    Those are the timesheets for the
19 work that I did.
20    Q.    Well, that's -- it's a summary that
21 says I worked --
22    A.    I put -- I put the dates on it.
23    Q.    Excuse me.  Let me finish my
24 question.

Page 447

1         That's a summary that said, I worked
2 X number of hours at Y number -- Y hourly rate --
3    A.    Uh-huh.
4    Q.    -- equalling the total.
5         Is that something that you did?
6    A.    That I -- I submitted my invoices
7 the way I submitted them, which was the date that
8 I did work, what I was doing, and how many hours I
9 spent.
10    Q.    Okay.  But anybody looking at this
11 document would have no -- no way of knowing of
12 what it is you did specifically day in and day out
13 in relationship to your work as an expert in this
14 case; is that right?
15    A.    Because this isn't -- this isn't my
16 document.
17    Q.    Well, do you have that summary?
18    A.    This is -- this is for my team.
19    Q.    But do you have a similar document?
20    A.    I submit the document similar to
21 this.
22    Q.    Okay.  My question is:  In the -- in
23 the 4 to $500,000 that you invoiced J&J, is your
24 invoice similar to this one?

Page 448

1    A.    It is not as specific, but it put --
2 it has -- as I said a couple minutes ago, I have
3 the number of hours I spent, the date that I was
4 working on it, and what I was doing.
5    Q.    And so that -- so that the work that
6 -- the work that you did, if we wanted to know
7 specifically what you were doing or, in fact, if
8 J&J wanted to know specifically what you were
9 doing day in and day out --
10    A.    Uh-huh.
11    Q.    -- you don't have, for example,
12 timesheets that would indicate how many hours you
13 spent reviewing certain documents?
14    A.    I don't have the specific documents
15 I reviewed by time, correct.
16    Q.    And so are you -- would you be able
17 to determine what the 600 documents that J&J
18 initially provided to you what they were?
19    A.    I reviewed all the 600 documents
20 that I -- that were received.
21    Q.    My question is a little bit
22 different, and that is:  If we wanted to know
23 specifically what you reviewed in those 600
24 documents, how would we know that if they

Page 449

1 weren't -- if they're not on your timesheets?
2    A.    I -- because I have reviewed all the
3 documents.
4    Q.    Well, you're asking us to take you
5 at your word.
6    A.    Uh-huh.
7    Q.    You're not -- you don't have any
8 evidence to prove to us what it is of the 600
9 documents that you actually reviewed or for us to
10 determine what those 600 documents are?
11    A.    All I can say is I have reviewed all
12 the documents.
13    Q.    Okay.
14         MR. EWALD:  And on that one,
15    I'd be happy to work with you guys.  I
16    can't say with certainty that we're able
17    to do that, but I can certainly look to
18    see if we can.  I'm pretty sure we can,
19    if we can, be happy to provide that.
20         MR. GOLOMB:  Okay.  I
21    appreciate that.
22 BY MR. GOLOMB:
23    Q.    And just to -- just to finalize this
24 issue, in other words, the 600 -- the initial 600

113 (Pages 446 - 449)

Page 450

1  documents that you reviewed, they're not all on
2  your reliance or things considered list?
3      A.    No, they aren't.
4      Q.    Okay.
5      A.    Because I -- well, they were on -- a
6  lot of them are on there but not all -- not all of
7  the original 600, correct.
8      Q.    Okay.  And then --
9      A.    Because I didn't use them all.
10     Q.    And then in some form or fashion,
11 you asked for -- you asked for additional
12 documents and you were provided access to a
13 database, which you've described as about 500,000
14 documents?
15     A.    About.  Yeah, I think it was 480 or
16 whatever, and then I received additional documents
17 or we received the database of an additional
18 80,000 -- 80,000 or so from the LAOSD.
19     Q.    All right.  And we would have no way
20 of knowing either from your report or from your
21 billing records what -- what any portion of those
22 50,000 documents -- 500,000 documents are that you
23 reviewed?
24     A.    Not that I would know of.  I mean,

Page 451

1  they're posted.  I've talked -- I talk about them
2  with the team.  I reviewed them.  The original
3  documents were in binders, I think.
4      Q.    And in fact -- and in fact, the
5  500,000 -- if J&J looked at your bills and said
6  $500,000 -- $500,000, what did you do for
7  $500,000, how much time did you spend reviewing
8  these 600 documents, how much time did you spend
9  reviewing any of the 500,000 documents, they would
10 have no way of knowing, would they?
11     A.    I, you know, all I can say is that I
12 noted on my timesheets what I was doing.
13          The other thing is to remember that
14 my method is, as I said earlier, resource- and
15 time-intensive.  I work with a team.  I direct a
16 team.  I supervise the team.  The team, I have two
17 people looking at each document before it gets
18 binned, and then we're having frequent
19 discussions.
20     Q.    But we would have no way -- there is
21 no evidence in your report or in your -- in your
22 billing invoices to in any way, shape, or form
23 tell us when those meetings took place, who was in
24 those meetings, anything like that, correct?

Page 452

1      A.    I think that I document the meetings
2  that I've had.
3      Q.    How did you document the meetings
4  you've had?
5      A.    On my -- on my timesheets that I --
6  my invoices.
7      Q.    Your -- your invoices?
8      A.    That is not my --
9      Q.    I know --
10     A.    Yeah.
11     Q.    -- but you told us earlier that the
12 information that's on these two pages --
13     A.    Uh-huh.
14     Q.    Because the third page is nothing
15 more than your wiring instructions, right?
16     A.    Right.
17     Q.    Okay.  But you've told us --
18     A.    I mean -- well, I didn't -- I didn't
19 do those.
20     Q.    Yeah, but you've told us that the
21 information on these pages that we received from
22 the Analysis Group --
23     A.    Uh-huh.
24     Q.    -- are actually more detailed than

Page 453

1  your records?
2      A.    They're a little bit more detailed,
3  correct.
4      Q.    Okay.  And there's no way for us to
5  tell from this, from the Analysis Group records --
6      A.    Uh-huh.
7      Q.    -- when you met with somebody from
8  the Analysis Group, how much time you spent, what
9  records you reviewed, any of that from these two
10 pages.
11          Wouldn't you agree with that?
12     A.    It says what it says.
13     Q.    Okay.  Well, you tell me.
14          (Hands document.)
15          Where is the detail of any meeting
16 that you had with Susan Nicholson, for example?
17     A.    You have my notes from my meeting.
18     Q.    We have your notes, but we don't
19 know what you did to prepare for that, what you
20 did after that.
21     A.    Uh-huh.
22     Q.    We don't know how much time you
23 spent with her.  We don't know any of that.
24     A.    Yeah.

114 (Pages 450 - 453)

Page 454

1    Q.    Okay.  And you met with John
2 Hopkins?
3    A.    Correct.
4    Q.    Okay.  We don't know what you did to
5 prepare for that meeting.  We don't know who you
6 spoke with before that meeting.  We don't know how
7 long that meeting took place.  We don't know what
8 you did after that meeting.  We don't have any of
9 that information.
10    A.    That could be on one of my invoices.
11 I don't remember.  That was a while ago.
12    Q.    Okay.  Why -- why weren't your
13 invoices turned over?
14    A.    I -- I don't know.  I mean, this is
15 what was turned over.
16    Q.    Did you turn over your invoices to
17 the lawyers?
18    A.    I submitted my invoices to AG.
19    Q.    To who?
20    A.    Analysis Group.
21    Q.    Okay.  So your invoices went to
22 Analysis Group.
23        So if we subpoenaed Analysis Group,
24 do you think your invoices would be in those

Page 455

1 records?
2    A.    I can't say that they would or
3 wouldn't.
4        (Recess taken due to technical
5    difficulties - 5:01 p.m. - 5:03 p.m.)
6 BY MR. GOLOMB:
7    Q.    All right.  We had a little
8 technical issues.  So I just want to clarify a
9 couple things.
10        So you provided your bills on
11 Kathleen M. Sutcliffe letterhead, and those bills
12 were somewhere between 400 and $500,000, correct?
13    A.    Yes, over a five-year period.
14    Q.    And those bills were then submitted
15 to Analysis Group?
16    A.    Correct.
17    Q.    So you didn't submit anything
18 directly to J&J?
19    A.    No.
20    Q.    It went to Analysis Group?
21    A.    Yes.
22    Q.    All right.  And when you got paid,
23 whatever the number is, 4 or $500,000 based on
24 what you billed on your letterhead, did that all

Page 456

1 go to you or did you have to share that with
2 anybody whether it was Analysis Group or anybody
3 else?
4    A.    No, that comes to me.  I'm directing
5 a team at Analysis Group.
6    Q.    Okay.  But -- and any of the 285,000
7 or so which was billed for Analysis Group and the
8 nine people that are itemized on that summary on
9 that two-page invoice, did you receive any share
10 of that?
11    A.    No, that's what they billed.
12    Q.    Okay.  So you didn't receive a
13 percentage of the Analysis Group?
14    A.    No, I'm not saying that.  I mean.
15    Q.    Well, that's what I'm asking.
16    A.    Okay.  That's -- that's the bill
17 that they billed for the time that they -- that
18 the team has been spending doing the work that
19 I've asked them to do.
20    Q.    My question is:  Aside from the 4 to
21 $500,000 or more that you received as a result of
22 you invoicing on Kathleen Sutcliffe letterhead,
23 did you receive any -- any share of the $285,000
24 that was billed under the Analysis Group

Page 457

1 letterhead?
2    A.    I -- I mean, I don't know that I can
3 answer that question.  I'm not receiving.  The
4 Analysis Group, that's for the work that they
5 completed.
6    Q.    Okay.  Well, when you -- when you
7 received the check for the 4 or $500,000 for the
8 work that you did, who did the check come from?
9    A.    Analysis Group put -- I mean, J&J.
10 J&J is paying -- paying me through Analysis Group.
11 Analysis Group puts the money into my account.
12    Q.    Okay.  So just so I'm clear, so
13 there is -- there was somewhere in the area of 7
14 to $800,000 that was billed as between you and
15 Analysis Group.
16        And then those bills were then
17 submitted to J&J, J&J then wrote a single check
18 back to Analysis Group, and Analysis Group wrote
19 you a check for your portion of it?
20        MR. EWALD:  Objection to form.
21    Vague and ambiguous.  Compound.
22        Go ahead.
23        THE WITNESS:  You know, I
24    mean, I don't know what happens with

115 (Pages 454 - 457)

Page 458

1    between J&J and Analysis Group.
2         MR. GOLOMB:  That's like the
3    most specific question I've asked.
4         MR. EWALD:  Pretty long but.
5         THE WITNESS:  All I know is I
6    submit my bills to Analysis Group.
7    Analysis Group submits it to either the
8    lawyers or the -- or J&J.  They get paid.
9    They pay me.
10   BY MR. GOLOMB:
11   Q.    Okay.  Well, when you say "they pay
12   me," Analysis Group pays you?
13   A.    Analysis Group pays me.
14   Q.    Okay.  So why aren't you just on the
15   one of the nine or ten people on the Analysis
16   Group?
17   A.    Because this is my team at Analysis
18   Group.  I submit -- I'm the -- I'm an independent
19   person.
20   Q.    Okay.
21   A.    I don't work for Analysis Group.
22   Q.    Have you ever testified in a
23   courtroom before?
24   A.    No.

Page 459

1    Q.    So you've never testified in a
2    trial?
3    A.    No.
4    Q.    You've never testified at a Daubert
5    hearing?
6    A.    No.
7    Q.    Do you know what a Daubert hearing
8    is?
9    A.    Yes.
10   Q.    Again, I don't want to -- I don't
11   want to repeat areas.  So just bear with me.
12        You testified earlier that Credo is
13   a "value statement"; is that right?
14   A.    I did say that.
15   Q.    Okay.  Is there any value in a Credo
16   if the company fails to implement what their Credo
17   says?
18   A.    I think that, you know, it's
19   important to -- to have congruence between what we
20   say and what we do, but I think -- I think credos
21   have value have -- value regardless.
22   Q.    Okay.  And so what is -- tell me
23   what the value of a Credo is if the company
24   doesn't follow the Credo?  What is the value of a

Page 460

1    Credo if they don't follow it?
2    A.    I think it's a -- it's a statement,
3    you know, suggesting what we -- what we should
4    live up to.
5    Q.    And so if you -- if you --
6    hypothetically, if your Credo -- well, let me
7    strike that.
8         What is the Credo of J&J, as you
9    understand, based on your review of the documents
10   as a behavioral -- organizational behavioralist?
11   A.    I'm not sure I get your question.
12   Q.    You got -- you were hired by J&J,
13   correct?
14   A.    Correct.
15   Q.    All right.  And you reviewed many,
16   many documents.  The 600 documents plus some
17   portion of 500,000 documents?
18   A.    I -- yes, I reviewed thousands of
19   pages of documents.
20   Q.    Okay.  And based on your -- based on
21   your review of those documents, based on your
22   conversation with John Hopkins, based on your
23   conversation with Susan Nicholson, you learned
24   through that -- through that review and through

Page 461

1    those discussions what J&J's Credo is, correct?
2    A.    J&J's Credo is written down.
3    Q.    Okay.  What's J&J's Credo?
4    A.    Right.  First of all, it's been
5    revised over time as -- as credos or belief
6    statements or value statements happen.
7    Q.    What was J&J's Credo when you were
8    first retained in 2019?
9    A.    I -- I do not remember.
10   Q.    Okay.
11   A.    But anyway, as I said here, you
12   know, the 1943 version, I have it written in my
13   report, and I know that it has been updated over
14   time and that's pretty normal for organizations.
15   Q.    And what was the Credo in 1943?
16   A.    1943.  It just started out that "We
17   believe that our first responsibility is to our
18   customers."
19   Q.    All right.  And how has it changed
20   over time since 1943?
21   A.    You know, I did not study
22   specifically how it's changed.  I know that it has
23   been reexamined over time several times.  As it
24   should be.

116 (Pages 458 - 461)

Page 462

1    Q.    But regardless of what the words in
2    the Credo are from as they changed over the years,
3    would you agree with me that the emphasis was on
4    customer safety?
5    A.    The emphasis is -- is on, you know,
6    that there was -- we have a responsibility to the
7    people that we're serving.
8    Q.    Okay.  And that's their customers
9    correct?
10    A.    It's changed over time.
11    Q.    And so are you saying that the J&J
12    Credo that was -- they went it was customers --
13    customers come first in 1943 that that somehow has
14    changed since 1943?
15    A.    My understanding is if you look -- I
16    mean, number one, I have not -- I have not done a
17    redline on the Credo.
18    Q.    Okay.
19    A.    I included the Credo just as -- as
20    an example to help think about or include it just
21    because I wanted to understand the organizational
22    ethos in some way.
23    Q.    Okay.
24    A.    But I have not gone through a

Page 463

1    redline and looked at how specifically it has
2    changed over time.  I know that it's been changed.
3    Q.    Okay.  And how has it been changed?
4    A.    I mean, I'm just looking on my page
5    E-1 and E-2, and as I said in my document, J&J's
6    Credo today, the first line is a little different
7    than it was in 1943.
8    Q.    Okay.  By "today" you mean as we sit
9    here today in 2024?
10    A.    No, I -- this when I wrote, whenever
11    I put this together, that was probably in 2021.
12    Q.    Okay.
13    A.    So as of 2021.  I don't know whether
14    it's -- I don't recall whether it's changed
15    between 2021 and now.
16    Q.    What was the Credo that you
17    documented as of 2021?
18    A.    "We believe our first responsibility
19    is to the patients, doctors and nurses, to mothers
20    and fathers and all others who use our products
21    and services."
22    Q.    Okay.  And as an organizational
23    behavioralist, would it ever be acceptable for a
24    company like J&J to have a Credo in which their

Page 464

1    final responsibility was to the stockholders?
2    A.    No, I don't -- I mean, I can't
3    really answer that off the top of my head.  It
4    seems like it's weird.  I don't know whether that
5    would happen but, you know, I think about a Credo
6    as a value statement.
7    Q.    Okay.  Would it ever be -- would it
8    ever be acceptable for you, as an organizational
9    behavioralist, for a company like J&J, $380
10    billion public company, $90 billion a year in
11    revenue, would it ever be acceptable to them --
12    acceptable to you, as an organizational
13    behavioralist, for the company to have a Credo in
14    which their final responsibility was to the
15    stockholders where they were putting profits over
16    people?  Would that ever be acceptable?
17        MR. EWALD:  Objection to form.
18    Mischaracterizes.
19        THE WITNESS:  You know, I
20    mean -- I mean, if you're trying to -- I
21    don't really know what you're trying to
22    say.
23        You're trying to say that J&J
24    was putting profits over people?  I will

Page 465

1    just say that the hundreds of thousands
2    of document pages that I have reviewed
3    does not -- is not -- it's not consistent
4    with what you're saying.
5    BY MR. GOLOMB:
6    Q.    I'm just asking a question.
7        Would it ever be acceptable for a
8    company -- for a company's Credo to be that their
9    final responsibility is to the stockholders, in
10    other words, putting profits over people?
11    A.    No, I mean --
12        MR. EWALD:  Objection.
13        Go ahead.
14        THE WITNESS:  -- I think
15    that's a -- that's a hypothetical
16    question and I don't think that I can
17    really answer that just -- just on the
18    face of it.  Because for some companies
19    maybe stakeholders or shareholders are
20    the key persons to benefit from an
21    organization.
22    BY MR. GOLOMB:
23    Q.    Well, you and your colleagues were
24    paid $700,000 as an expert in this case and

117 (Pages 462 - 465)

Page 466

1  experts answer hypothetical questions all the
2  time.
3      A.    Again --
4      Q.    That's part of what they do, that's
5  part of what they get paid for, and that's part of
6  why you're allowed to go into a courtroom and
7  testify in front of a jury.
8          MR. EWALD:  Is there a
9      question?
10 BY MR. GOLOMB:
11     Q.    So are you saying --
12         MR. GOLOMB:  Yes.
13         MR. EWALD:  Okay.
14 BY MR. GOLOMB:
15     Q.    Are you saying that you're unable to
16 answer the question, as an organizational
17 behavioralist, as to whether or not it would be
18 acceptable to put profits over people?
19     A.    Again, as I said, it may be.  In
20 some context, maybe but, you know, in this case,
21 it's -- that's not what I saw.
22     Q.    Okay.  Tell me the context in which
23 it would be -- it would be acceptable to you, as
24 an organizational behavioralist, for a company to

Page 467

1  put profits over people.
2      A.    You know, I can't sit here and say
3  this.  I would have to really think about these --
4  these questions and this issue.
5      Q.    Okay.  You talked about BP.
6          You were an expert in BP, right?
7      A.    I was retained by BP, correct.
8      Q.    Okay.  What was your ultimate
9  opinion in BP?
10     A.    Again, I -- I -- it's been, you
11 know, years since I looked at my report for BP.
12 We discussed it this morning, and I think I said
13 that one of the things I did was to study BP's
14 safety culture in the time leading up to Deepwater
15 Horizon.
16     Q.    And you also mentioned Toyota.
17         Were you an expert in Toyota?
18     A.    I was an expert for plaintiffs in
19 Toyota.
20     Q.    Okay.  And what was your -- what was
21 your ultimate opinion in Toyota?
22     A.    I -- that Toyota, unlike J&J, had
23 numerous sensemaking failures.  That they did not
24 seek -- when they started having unintended

Page 468

1  acceleration, that they did not reach out to
2  experts to understand what they were facing.  That
3  they totally had a belief system that the
4  engineers knew -- knew what was right, and
5  that's -- that's about it.
6      Q.    They had -- you just said they had
7  -- they didn't have an understanding of the
8  failures?
9      A.    No.  What I said was they had
10 sensemaking failures.  That they weren't reaching
11 out to experts, that they were very insulated,
12 that engineers believed that they knew best.
13     Q.    Okay.
14     A.    That they weren't digging into their
15 failures.
16     Q.    But in this case, there were no
17 sensemaking failures?
18     A.    In this case, I'm saying that I saw
19 different processes going on.
20     Q.    Okay.  But -- so, but my question
21 was:  Your opinion is in this case is that there
22 were no sensemaking failures?
23     A.    I was not looking at sensemaking
24 failures in this case.  I was looking at the

Page 469

1  sensemaking process.
2      Q.    Okay.  Well, were there sensemaking
3  failures in this case?
4      A.    In this case, I was looking at the
5  institutionalized knowledge that J&J created over
6  time and the processes that they engaged in.
7      Q.    Okay.  But sitting here today,
8  having reviewed the initial 600 documents, having
9  reviewed some portion of 50,000 documents, having
10 looked at -- although you're not -- not an
11 epidemiologist.
12         I would assume -- correct me if I'm
13 wrong -- some of those 500,000 pages of documents
14 included epidemiology studies; is that correct?
15     A.    I read some studies that I've --
16 that I've discussed today.
17     Q.    Okay.  And so you weren't asked to
18 address by J&J whether or not there were
19 sensemaking failures in this case, correct?
20     A.    In this case, what I was asked to do
21 is to understand what J&J knew and when, and how
22 they were, and whether or not the actions that
23 they were pursuing to make sense of what the
24 safety -- the safety of their -- the safety of

118 (Pages 466 - 469)

Page 470

1 talc, whether the practices they were engaging in
2 were consistent with the best practices in
3 sensemaking. And I found that they were.
4    Q.    Okay. Move to strike that. That
5 wasn't my question.
6        My question was: Isn't it correct
7 that in this case, part of what you were asked to
8 do did not include whether or not there were
9 sensemaking failures on the part of J&J?
10   A.    The way that I see it is it's all --
11 it's all connected.
12       I mean, when I say the term
13 "sensemaking failure," what I'm meaning is that
14 the organization was not engaging in the kinds of
15 practices that I would have expected to see in a
16 company that was doing a good job in making sense.
17   Q.    Okay. But five minutes ago you
18 talked about the sensemaking failures in Toyota,
19 and you were very clear to say that that's not
20 something you assessed in this case; is that
21 correct?
22   A.    If I said that, I made -- I might
23 have misspoken. But I was looking at the
24 practices, the sensemaking practices that J&J was

Page 471

1 engaging in, in order to come up with a fair
2 institutionalized knowledge of the safety of their
3 talc products.
4    Q.    Okay. And so in this case, your
5 opinion is, is that despite over three dozen
6 studies dating back to 1971 that showed a
7 statistically significant association between
8 genital talc use and ovarian cancer, that in this
9 case there were no sensemaking failures on the
10 part of J&J.
11       Is that your testimony?
12   A.    Again, I did not do a systematic
13 analysis of the research on ovarian cancer.
14   Q.    Okay.
15   A.    What I was looking at was the extent
16 to which J&J actively pursued scientific knowledge
17 related to its talc products and the safety of its
18 talc products, and whether or not the kinds of
19 activities, actions they took were consistent with
20 what I would expect to see in a company that cared
21 about consumers and the well-being of consumers.
22   Q.    And you've seen not one but two
23 documents, one from a toxicologist, Dr. Wehner,
24 W-e-h-n-e-r, dating back to 1976, and you saw a

Page 472

1 Johnson & Johnson document dating back to 1996.
2 Both of which where they make -- where
3 recommendations were made for J&J to do their own
4 study for about half as much money as they paid
5 you to defend them in this case.
6        And you don't think that's a
7 sensemaking failure either; is that correct?
8        MR. EWALD: Objection to form.
9    Mischaracterizes testimony.
10   Argumentative.
11       Go ahead.
12       THE WITNESS: I -- I'm not
13   connecting that with sensemaking. Thank
14   you.
15 BY MR. GOLOMB:
16   Q.    Okay. You're not.
17       The fact that there were two
18 recommendations made to J&J to do these studies
19 and their failure to do -- to do those studies or
20 their refusal to do those studies, that there's no
21 connection on the sensemaking failure on that?
22   A.    Again, I have not studied what
23 J&J -- what kinds of studies they pursued or they
24 didn't pursue.

Page 473

1        I investigated thousands of pages of
2 documents over decades, understanding J&J's
3 pattern of actions over time related to its
4 pursuit of scientific knowledge related to the
5 safety of its talc products, and whether or not
6 the actions in which they engaged in were
7 consistent with a company that cares about the
8 well-being of its -- of its consumers.
9    Q.    Okay. And so is it your view
10 that -- that J&J, who didn't take the -- they
11 didn't take the advice of at least two experts
12 that we know of to do their -- to do a study to
13 make a determination on their own as to whether or
14 not there's an association between talc and
15 ovarian cancer, that that is a company that cares
16 about the safety of their products and their
17 customers?
18       MR. EWALD: Objection.
19   Argumentative. Mischaracterizes
20   testimony.
21       Go ahead.
22       THE WITNESS: What I looked
23   at is like 60 -- 60 years of evidence
24   over time about the company's actions and

119 (Pages 470 - 473)

Page 474

1    their pattern of actions.
2         And what I discerned is that
3    the types of activities that J&J was
4    engaging in -- interacting with experts,
5    interacting with the scientific
6    community, interacting openly and
7    collaboratively with -- with other
8    scientists, with the FDA, with
9    regulators, establishing -- taking
10   actions related to setting up multiple
11   levels of testing, interacting with
12   scientists at various, you know,
13   conferences, paying and assuring that
14   they're interacting with people and
15   discussing research -- those are the
16   kinds of activities that were -- were
17   important to me.
18   BY MR. GOLOMB:
19       Q.    Okay.  And the -- well, the fact
20   that they were active on the research and active
21   in following up on the research, you don't know
22   whether or not their activity was because they
23   were trying to understand the science and deal
24   with the science, or they were trying to influence

Page 475

1    the science.
2         You don't know that based on -- on
3    what records you reviewed, right?
4         MR. EWALD:  Objection to form.
5         THE WITNESS:  You know, I am
6    not sure what you're asking but, I mean,
7    I know that J&J was attending to the
8    science, attending conferences and paying
9    and interacting with scientists over 60
10   years.
11   BY MR. GOLOMB:
12       Q.    Okay.  But you don't know whether or
13   not -- you don't know the reason why they were
14   attending conferences is my point.
15       A.    Again, I know that what they were
16   doing.
17       Q.    Okay.  Would it change your opinion
18   if you -- if you knew that they were attending
19   conferences because they were trying to influence
20   the outcome in those conferences on the conclusion
21   of the talc ovarian cancer issue?
22       A.    Again, I mean, you know, I can't
23   discern all the things from every single document.
24         I know what I saw, and I saw that

Page 476

1    J&J was attending conferences where they were
2    discussing things with scientists.  They were
3    engaging experts from around the world to pay --
4    to assess the talc and to help them understand
5    testing and other things like that.  I saw that
6    they were very active.
7        Q.    Can you identify a single one of the
8    experts that you just talked about, a single one
9    of the experts that went to a conference for J&J
10   to talk about the association between talc and
11   ovarian cancer that wrote on the subject before
12   they were hired by J&J?
13       A.    That wasn't something that I studied
14   and -- and I'm not looking at one single event, as
15   I described earlier.
16       Q.    Okay.  Would it make a difference to
17   you whether or not an expert that -- that wrote on
18   behalf of J&J had never written on the subject
19   before getting hired?
20       A.    You know, I can't sit here and say
21   that.  It's just not something that I looked at.
22       Q.    Okay.  And would it make a
23   difference to you as to whether or not there were
24   multiple plaintiffs' experts who had been writing

Page 477

1    on the subject for decades before they're ever
2    retained by the plaintiffs in this case?
3         Are those facts that matter to you?
4        A.    Those -- what I -- what mattered to
5    me was the primary evidence looking at what J&J
6    was doing over time.
7        Q.    Okay.  Let's talk about one of the
8    things that you said this morning.
9         Now, you said over and over and over
10   again -- correct me if I'm wrong -- but you said
11   over and over and over again when Mr. Tisi was
12   asking you questions about testing that you're not
13   a testing expert, correct?
14       A.    I am not opining on the testing.
15       Q.    Yet you said at 11:25 this
16   morning -- I wrote it down -- that in regards to
17   testing that J&J went beyond industry standards.
18         So if you're not a testing expert,
19   how are you able to come up with that opinion?
20       A.    I am not opining on the details of
21   the tests.
22       Q.    Okay.  Then why would you say --
23       A.    I am --
24         MR. EWALD:  Let her finish her

120 (Pages 474 - 477)

Page 478

1    answer.
2            MR. GOLOMB:  I'm sorry.  I
3    thought she was finished.
4            THE WITNESS:  No, I wasn't.
5    BY MR. GOLOMB:
6        Q.    Go ahead.
7        A.    I'm not opining on the details of
8    particular tests.  What I know is that I know
9    about the -- I mean, I know from my research.  I
10   looked at the round-robin.  I know why -- what was
11   happening in the 1970s.
12           I know that once J4-1 was
13   established that -- that there were -- that it
14   wasn't going to cover everything and that, you
15   know, TEM was not appropriate for all of the
16   companies because they either couldn't afford it
17   or didn't have the capabilities to do it.
18           I know that J&J decided, "Yeah,
19   we're going to -- we're going to spring for the
20   resources and we will be doing it," and I know
21   that they engaged in -- in TEM as well.
22       Q.    And so -- but my question is
23   different.
24           You said you're not a testing

Page 479

1    expert.  You just, again, said that you're not
2    opining on testing.
3            But in a -- in a long answer at
4    11:25 this morning, one of the things you said was
5    J&J went beyond industry standards.
6            On what basis do you say that?
7        A.    Because after in the 1970s and later
8    the FDA recognized this, I think in -- I can't
9    remember if it was 1984 or what year it was.
10   1986.  That the FDA reaffirmed J4-1 as the valid
11   standing testing procedure, and I know that from
12   the mid-1970s that J&J was -- was using TEM.
13       Q.    As a -- as an organizational
14   behavioralist, do you believe that a company has a
15   duty to provide a warning to its customers -- to
16   its customers if they know its product may cause
17   disease?
18       A.    Again, I am not the person to ask on
19   warnings.  I mean, if -- I am just not -- I'm not
20   opining on the warnings.
21           MR. EWALD:  By the way, you
22   got three minutes.
23           MR. GOLOMB:  Do you want the
24   time?

Page 480

1            MR. TISI:  Let me ask you.
2    How much time do you have?
3            THE COURT REPORTER:  I have to
4    figure that out.
5            MR. TISI:  Let's go off the
6    record.
7            (Recess:  5:29 p.m. -
8            5:31 p.m.)
9            FURTHER EXAMINATION
10   BY MR. TISI:
11       Q.    You had talked about the additional
12   of time you spent with the Texas AG in another
13   case I must have missed in your report.
14       A.    I'm sorry.  What?
15       Q.    The Texas AG case.
16       A.    The Texas AG case?
17       Q.    I'm sorry.  The Mississippi AG case.
18   I'm sorry.
19           You did work on the Mississippi AG
20   case?
21       A.    Oh, last fall.
22       Q.    Did you -- did you bill separately
23   for that?
24       A.    It was like I usually bill.

Page 481

1        Q.    All-inclusive?  But was it in that
2    in addition to the 4 or $500,000 or is that
3    included?
4        A.    No, that's included.
5        Q.    Okay.  Do you know whether or not --
6    these bills that we got were dated April and May
7    of 2024.
8            Were those -- do you know whether or
9    not the Analysis Group had received payments
10   periodically and previously four years in addition
11   to the amounts that were listed in that report --
12   in this -- in these monthly billing statements, or
13   do you know anything about that?
14       A.    If you're asking whether I was
15   working with a team, as I've described in here --
16       Q.    No, that's not my question.
17       A.    -- I was working with a team.
18       Q.    I may be unclear.
19           The documents that we have on
20   Exhibit Number 48 show billing in April and May of
21   2024.
22       A.    Uh-huh.
23       Q.    Work had been ongoing from 2019?
24       A.    Correct.

121 (Pages 478 - 481)

Page 482

1    Q.    Okay.  I assume they didn't wait
2  five years to actually get paid?
3    A.    I imagine they haven't.  I don't
4  know how they billed, but I;m imagining that they
5  billed.
6    Q.    All right.
7    A.    Because I had a very big team when I
8  originally started the work.
9    Q.    All right.  So, so in addition to
10  the $276,000, there were additional bills for the
11  team that you worked with that went beyond that
12  $276,000, correct?
13    A.    I -- I -- yes.
14    Q.    Okay.
15    A.    I believe that.  I don't know what
16  they are.
17    Q.    And we would only know that if we
18  got the bills from -- from the Texas -- from AG,
19  correct?
20    A.    Yes.
21    Q.    And would those monthly bills show
22  generally when you did the bulk of your work?
23    A.    I -- that's how I -- I don't know
24  anything about AG's bills.  I only know about my

Page 483

1  own.
2    Q.    And the people who are listed
3  here -- Ms. Comeaux, Wewel, Kellachan -- do they
4  have a technical or scientific background?  Are
5  they paralegals?  What are they?
6    A.    They're PhDs.  They're -- they have
7  MBAs.  They have graduate degrees.  They're
8  research analysts.  I don't know about all of them
9  but --
10    Q.    Okay.  We'll find that out.
11    A.    -- I know about the ones I worked
12  with, and as I said, I described it in my
13  methodology.
14    Q.    And were there different people who
15  you worked with over time?  I mean, have you
16  ever --
17    A.    The four people that I worked with
18  on this report right here are Kris Comeaux,
19  Solvejg Wewel, Dylan Kellachan, and Conlan Orino.
20    Q.    Okay.
21    A.    And the others were -- were
22  additional researchers.
23    Q.    Have you worked with them since the
24  very beginning?

Page 484

1    A.    I have worked with a variety of
2  people.
3    Q.    Were there people you worked with at
4  the beginning who left the company?
5    A.    I don't know if they left the
6  company, but these people I worked with recently
7  on this project, and I think I worked with -- with
8  subsets of them over time.
9    Q.    Are any of them epidemiologists, to
10  your knowledge?
11    A.    Not that I know of.
12    Q.    Were any of them asbestos experts?
13  Do you know?
14    A.    I --
15        MR. EWALD:  Objection to form.
16  BY MR. TISI:
17    Q.    Were any of them toxicologists?  Do
18  you know?
19    A.    As I said, I think they have
20  graduate degrees, and I don't know what everybody
21  studied.
22    Q.    Were most of them MBAs?
23    A.    Not -- that one person has -- has a
24  PhD.  I think the others.

Page 485

1    Q.    Do they have any scientific or
2  technical knowledge, to your knowledge?
3    A.    They absolutely might have in their
4  undergraduate degrees, and I don't know about
5  that.
6    Q.    But not in their graduate degrees,
7  to your knowledge?
8    A.    I don't -- yeah, as far as I know.
9        MR. EWALD:  That's it.  Take a
10    break.
11        MR. TISI:  Thank you.  Have a
12    good day.
13        MR. EWALD:  I'm going to ask
14    some questions.
15        MR. TISI:  Oh, you're going to
16    ask questions?
17        MR. EWALD:  Yeah.  Yeah.  Give
18    me two minutes.
19        (Recess:  5:35 p.m. -
20    5:40 p.m.)
21        EXAMINATION
22  BY MR. EWALD:
23    Q.    Okay.  Dr. Sutcliffe, I'm going to
24  ask you some -- some questions in response to

Page 486

1 others that were asked by counsel, but we've
2 discussed over the break that one issue that you
3 wanted to clarify.
4    A.    (Nods head).
5    Q.    And so related to the attribution
6 question, and so I'll just ask you what you want
7 to clarify and I'll ask you follow-up questions.
8         MR. GOLOMB:  This is to the
9    attribution question?
10        THE WITNESS:  Yes.
11        MR. EWALD:  Yeah.
12        MR. GOLOMB:  What is the
13    attribution question?
14        MR. TISI:  Let's hear the
15    answer.  This is about sensemaking.
16        (Laugh.)
17 BY MR. EWALD:
18    Q.    All right.  Please, go ahead.
19    A.    So you asked me a question about,
20 like, a stake in the company or something like
21 that related to the bill from AG, and I
22 misunderstood it or just was interpreting.
23        I -- I -- I don't know specifically
24 about that bill, but there is what -- what AG

Page 487

1 discusses as an attribution, which is a small
2 payment that I get.  And I don't know specifically
3 what it is, but it relates to the work that's been
4 done in the company on this case.
5        MR. GOLOMB:  So just --
6        MR. EWALD:  I'll go ahead and
7    I'll pass the witness for this purpose.
8    I have other questions.
9        MR. GOLOMB:  Yeah, I got it.
10        FURTHER EXAMINATION
11 BY MR. GOLOMB:
12    Q.    So I'm not clear.  So I'm going to
13 ask you some questions about what you just said.
14        So you billed on your own
15 letterhead, and we've been using the number -- it
16 is what it is -- but the 4 to $500,000 on your own
17 letterhead.  You send that to AG?
18    A.    Correct.
19    Q.    And then AG submits it to -- to J&J?
20    A.    Correct.
21    Q.    And then J&J sends a check to AG,
22 and then you get that full 4 to $500,000?
23    A.    Whatever I've billed, correct.
24    Q.    Right, whatever you billed.

Page 488

1         And so are you now saying that in
2 addition to that 4 or $500,000, that you're also
3 getting a percentage of the 285,000 that was
4 billed --
5    A.    I --
6    Q.    Let me just finish the question.
7    A.    Okay.
8    Q.    That you're getting a percentage of
9 the 285,000 that was billed by the other nine
10 people?
11        MR. TISI:  Or more because it
12    goes back.  That was only last month.
13        MR. GOLOMB:  No, no.  Right,
14    but for these bills.
15        THE WITNESS:  I don't -- I get
16    an additional payment.  I don't know how
17    much it is and I don't know how it's --
18    how it's established.  But I just -- I'm
19    sorry I can't be more specific.  I just
20    -- I believe it's based on the amount of
21    work that -- that AG has done.
22 BY MR. GOLOMB:
23    Q.    Okay.  So just to be clear, so
24 you're getting -- although you don't know what it

Page 489

1 is, you're getting a percentage of their work, but
2 they're not getting a percentage of your work?
3    A.    Correct.
4        MR. GOLOMB:  Okay.
5        MR. TISI:  I just have a
6    follow-up on that.
7        THE WITNESS:  I mean, I don't
8    even know whether I would call it a
9    percentage of their work, but I don't
10    know how it works.
11        FURTHER EXAMINATION
12 BY MR. TISI:
13    Q.    I'm just a little bit confused
14 because I'm trying to get this.
15        The $278,000 which were billed in
16 April and May of this year?
17    A.    True.
18    Q.    Okay.  Were there other additional
19 bills by AG for the work that they collaborated on
20 with you that go back in time in addition to the
21 $278,000?
22    A.    They've been -- I've had a team of
23 people --
24    Q.    For four years?

123 (Pages 486 - 489)

Page 490

1    A.    -- at AG for four years.
2    Q.    So they --
3    A.    They bill for their work.
4    Q.    And so they could have billed
5 another $700,000 for all we know?
6    A.    They could have billed. I'm sure
7 they billed a lot more because this was an
8 incredibly intensive process.
9    Q.    Okay. And you get a percentage
10 of -- let's say they billed a million dollars over
11 the past -- over the past four, five years,
12 including that.
13        Just hypothetically, you would get a
14 percentage of that in addition to the 4 or
15 $500,000 you directly billed?
16    A.    Correct.
17        MR. TISI: Okay. That I
18 appreciate it.
19        THE WITNESS: I hope you
20 understand.
21        MR. GOLOMB: Why wasn't that
22 turned over?
23        MR. EWALD: Why wasn't what
24 turned over?

Page 491

1        MR. GOLOMB: These bills.
2        MR. EWALD: The --
3        MR. GOLOMB: We don't have a
4 single bill from her, not at all.
5        THE WITNESS: No, I thought
6 there --
7        MR. TISI: $11,000.
8        MR. EWALD: You were
9 provided -- you were provided two
10 invoices --
11        MR. GOLOMB: But they were
12 all --
13        MR. EWALD: -- for the period
14 of time for her work during this case.
15        MR. TISI: For $11,000.
16        MR. EWALD: No. Look at
17 the -- look at the bill.
18        MR. TISI: Look at the bill.
19        MR. EWALD: There's two bills.
20 There's 10 for 11 and the other one is.
21 That's the hours spent in April and May
22 for her.
23        MR. TISI: And she's done
24 nothing else on this case. Everything

Page 492

1 else -- I mean, this report -- I mean,
2 look, you keep referring to --
3        THE COURT REPORTER: Still on
4 the record?
5        MR. EWALD: We're on the
6 record.
7        MR. GOLOMB: We're on the
8 record.
9        MR. TISI: You keep referring
10 to Dr. Kessler, right?
11        MR. EWALD: Right.
12        MR. TISI: Dr. Kessler you got
13 all the bills relating to his report that
14 he's billing the MDL, right?
15        MR. EWALD: Right.
16        MR. TISI: This report is a
17 60-page report that was apparently done
18 over time.
19        MR. EWALD: It's actually an
20 82-page report.
21        MR. TISI: Single space with
22 400 footnotes --
23        MR. EWALD: Right.
24        MR. TISI: -- with appendices

Page 493

1 in the middle over time, that it
2 developed over time. We have not
3 gotten -- I've gotten bills for this
4 witness for like 11 or $12,000.
5        MR. EWALD: Right.
6        MR. TISI: I mean --
7        MR. EWALD: We can talk more
8 about it.
9        MR. TISI: This I'm talking
10 about it. I've got no bills for this
11 report.
12        MR. EWALD: You have the bills
13 for this report.
14        MR. TISI: No, I have the
15 bills -- I have the bills --
16        MR. EWALD: No. Let me
17 finish. Let me finish.
18        There is, which you didn't
19 choose to ask about. There is a prior
20 report that was created for the Sandoval
21 case that's disclosed in her report.
22 There was -- this bill is on the report
23 in that.
24        MR. TISI: That isn't true.

124 (Pages 490 - 493)

Page 494

1  We're going to go through.
2        MR. EWALD:  No, we're not
3  going to go through.
4        MR. TISI:  No, I'm now going
5  on the record.  I actually -- I actually
6  drafted, and I said for any of the work
7  done.  And I asked you in this notice of
8  deposition.
9        MR. EWALD:  I know, and we
10  agreed to give you for the bills for this
11  case.  This case meaning --
12        MR. TISI:  This case.
13        MR. EWALD:  -- in this case.
14        And so if you want to go back
15  and we want to get all of the bills for
16  your experts when they billed upon prior
17  reports.
18        MR. TISI:  But they would --
19  this is the exact same report.
20        THE WITNESS:  It is not.
21        MR. EWALD:  It's not the exact
22  same report.
23        THE WITNESS:  No, it is not
24  the same.

Page 495

1        MR. EWALD:  You didn't even
2  know -- you didn't even know the Sandoval
3  report existed two minutes ago.  How do
4  you know it's the exact same report?
5        MR. TISI:  Let me put it this
6  way.  I mean, let me -- all right.  We're
7  going to deal with this.
8        MR. EWALD:  Right.
9        MR. TISI:  We are definitely
10  going to deal with this.
11        MR. EWALD:  Great, and I also
12  want to deal with them as I asked at the
13  time for Longo's bill.  I see take
14  them --
15        MR. TISI:  All right.  Longo's
16  bill, he had separate reports in
17  different cases.  Completely separate
18  reports.
19        MR. EWALD:  This is a separate
20  report in another case.  Exact same
21  thing.
22        MR. TISI:  It is not.  Come
23  on, John.
24        MR. EWALD:  Okay.

Page 496

1        MR. TISI:  I'm more than happy
2  to take a look at this issue.
3        MR. EWALD:  I -- okay.  So
4  I'll go back to my questioning.
5        FURTHER EXAMINATION
6  BY MR. EWALD:
7    Q.    Okay.  Dr. Sutcliffe.
8        MR. EWALD:  I have nothing new
9  for you.  So if you have to leave, you
10  know, that's fine.
11        MR. GOLOMB:  I'm sorry?
12        MR. EWALD:  I have nothing new
13  for you, but if you want to stay, you're
14  welcome to.
15        MR. GOLOMB:  All right.
16  BY MR. EWALD:
17    Q.    I wanted to ask you a little bit
18  about what was marked as Exhibit 1, your
19  curriculum vitae, and in particular there's a
20  discussion under the "Honors, Awards and
21  Recognition."
22        So in 2021, "Appointed by the
23  National Academies of Science, Engineering and
24  Medicine Transportation Research Board to a

Page 497

1  Committee on Emerging Trends in Aviation Safety."
2        Do you see that?
3    A.    Yes.
4    Q.    Can you tell me what that is?
5    A.    It is a committee that I was
6  appointed to in 2021 that deals with the emerging
7  risks in aviation safety, and it was mandated by
8  Congress.  And I was asked to be part of it, even
9  though, of course, I don't have -- I'm not a pilot
10  and not everybody on the committee is a pilot, but
11  I didn't have any special -- special insight into
12  aviation.  But I know organization behavior and I
13  know organizational culture issues and other
14  issues related to organizational processes.
15    Q.    And there was -- you said
16  "appointed."  I just want to be clear.
17        Who -- who appointed you?
18    A.    The National Academies of Science,
19  Engineering and Medicine Transportation Research
20  Board.
21    Q.    Okay.  And if you had to describe
22  generally what methodology you were using in your
23  work on that, how would you describe it?
24    A.    I think it's -- it's similar to the

Page 498

1 methodology that we're using here and particularly
2 the related to, you know, getting information and
3 creating some research questions, and now we're --
4 we're being more descriptive in terms of talking
5 about recommendations.
6     Q.    And so -- sorry.
7     A.    And we published one paper -- or not
8 a paper.  We published one book (indicates) --
9 book-length report in, I think it was, 2022.  And
10 we are in the process now of just finalizing our
11 second report that will be published this summer.
12     Q.    Okay.  And in your what was marked
13 as Exhibit 2 in front of you, I just want to just
14 ask you:  There was a fair number of questions
15 from plaintiffs' counsel about aspects that are
16 not included in your report.
17         But if the court and if anyone else
18 is looking for the opinions that you are offering
19 in this case and the methodologies that you
20 employed, are those included within what was
21 marked as Exhibit 2?
22     A.    Correct.
23     Q.    And when you look at the assignment
24 that you had in this case, is what is stated in

Page 499

1 paragraphs 9 and 10 an accurate statement of the
2 assignment that you understand to have had in this
3 case?
4     A.    Yes.
5     Q.    And does anything that you've heard
6 in questions about today change the opinions that
7 you are -- conclusions that you reached in the
8 report that was marked as Exhibit 2?
9     A.    No.
10         MR. EWALD:  Okay.  I have no
11     further questions.
12         MR. TISI:  No further
13     questions.  Have a good day.
14
15         (Signature not waived, the
16     deposition concluded at 5:50 p.m.)
17
18             *   *   *
19
20
21
22
23
24

Page 500

1             ERRATA SHEET
2
3 Page No._____Line No._____Change to:_____
4 _____
5 Page No._____Line No._____Change to:_____
6 _____
7 Page No._____Line No._____Change to:_____
8 _____
9 Page No._____Line No._____Change to:_____
10 _____
11 Page No._____Line No._____Change to:_____
12 _____
13 Page No._____Line No._____Change to:_____
14 _____
15 Page No._____Line No._____Change to:_____
16 _____
17 Page No._____Line No._____Change to:_____
18 _____
19 Page No._____Line No._____Change to:_____
20 _____
21 Page No._____Line No._____Change to:_____
22 _____
23 Page No._____Line No._____Change to:_____
24 _____

Page 501

1     DECLARATION UNDER PENALTY OF PERJURY
2
3
4         I declare under penalty of
5 perjury that I have read the entire transcript of
6 my Deposition taken in the captioned matter
7 or the same has been read to me, and
8 the same is true and accurate, save and
9 except for changes and/or corrections, if
10 any, as indicated by me on the DEPOSITION
11 ERRATA SHEET hereof, with the understanding
12 that I offer these changes as if still under
13 oath.
14
15     Signed on the _____ day of
16 _____, 2024.
17
18 _____
19     KATHLEEN M. SUTCLIFFE, PHD
20
21
22
23
24

Page 502

1           CERTIFICATE OF REPORTER
2    DISTRICT OF COLUMBIA     )
3           I, Denise Dobner Vickery, a
4    Registered Court Reporter and Notary Public of
5    the District of Columbia, do hereby certify that
6    the witness was first duly sworn by me.
7           I do further certify that the
8    foregoing is a verbatim transcript of the
9    testimony as taken stenographically by me at the
10   time, place and on the date herein set forth, to
11   the best of my ability.
12          I do further certify that I am
13   neither a relative nor employee nor counsel of
14   any of the parties to this action, and that I am
15   neither a relative nor employee of such counsel,
16   and that I am not financially interested in the
17   outcome of this action.
18
19
20          *Denise D. Vickery*
21          DENISE DOBNER VICKERY, CRR,RMR
            Notary Public in and for the
22          District of Columbia
23
24   My Commission expires:  March 14, 2028

**[& - 12th]**                                                                Page 1

| & | 0 |
|---|---|

**&**   1:4,13,18
2:14 3:5 4:14
4:14,16 5:5
7:17 10:17 16:9
26:9 31:23 41:1
43:18,22 44:9
44:20,21 57:22
75:7 104:7
121:22 145:11
180:17,17
181:21 182:3
183:17 188:20
196:8,11 198:7
199:1 225:13
225:21,24
226:1 247:11
282:14 324:9
325:1 335:8
342:14 345:18
345:21 352:5
353:18,21
354:22 378:17
379:12,16,21
379:23 380:12
380:14,21
381:16 393:23
399:10 409:24
419:7,15,24
423:3,13
425:23 426:18
427:9 428:18
429:5 472:1

**0**

**000000081**
  10:21
**000014431**
  12:20
**000014437**
  12:20
**000016645**
  10:18
**000016646**
  10:18
**000022605**   10:3
**000023191**   10:7
**000030027**   12:7
**000030035**   12:7
**000040596**
  10:15
**000040597**
  10:15
**000052427**   13:3
**000052449**   13:3
**000064591**
  12:23
**000064592**
  12:23
**000259267**   8:4
**000259270**   8:4
**000368160**   11:9
**000368163**   11:9
**000384063**   8:11
**000384073**   8:11
**000404424**
  13:16
**000404429**
  13:16

**000444327**   8:8
**000444346**   8:8
**000564377**   9:16
**000564378**   9:16
**000771212**   7:20
**000771236**   7:20
**030**   12:12
**06546-14**   1:11
**08002**   5:8

| 1 |
|---|

**1**   7:3 10:11
11:15 13:12
15:4,8 47:9
51:10 65:19
66:15 68:16
84:4 136:10
152:2 169:14
266:5 268:14
274:20 275:11
276:13,14,17
355:1 358:8
365:16 377:15
403:1,1 410:18
423:3 428:24
463:5 496:18
**1.5**   331:15
**1.i.**   51:14
**10**   8:1 10:8,16
12:6 168:6
194:18,19,20
194:22 195:1
195:12 214:10
231:17 291:24
292:8 312:8
491:20 499:1

**10-20**   11:20
**100**   138:17
158:17 159:2
385:21 386:4
391:13 392:3
392:19 403:16
**10036**   4:20
**107**   378:24
**108**   378:14,22
**10:18**   93:18
**10:27**   93:19
**11**   8:5 192:10
201:18,20
378:9 491:20
493:4
**11,000**   95:3,6
95:12 96:6
491:7,15
**11/20**   11:7
357:23
**1100**   74:21
75:17,24 95:3
**115**   381:22
**116**   39:11
**118**   6:18
**1185**   4:19
**11:25**   477:15
479:4
**11:45**   184:4
**11:55**   184:5
**12**   7:4,15 8:9
91:13 137:14
207:2,5
**12,000**   493:4
**12th**   91:10,15
91:17

**[13 - 1999]**                                                                                    Page 2

| | | | |
|---|---|---|---|
| **13**  8:16 214:13 | 412:19 | 205:4 210:12 | **1991**  419:5 |
| 214:15 | **173**  386:24 | 210:22 211:17 | 420:24 430:12 |
| **13-14**  355:15 | 387:8,10,12 | 368:13 383:1 | 430:12 431:2 |
| **130**  4:7 | **18**  9:7 194:17 | 385:6 397:24 | **1992**  8:18,24 |
| **13th**  354:2 | 235:15,19,21 | 400:10 478:11 | 214:11,17 |
| **14**  6:3 8:19 12:4 | 394:7 | 479:7,12 | 216:17 220:20 |
| 13:14 221:9 | **180**  387:10 | **1971**  210:14 | 223:19 246:11 |
| 345:2 502:24 | **181**  7:15 | 471:6 | 254:12 |
| **1440**  2:16 | **183**  7:17 | **1973**  11:22,23 | **1993**  411:2 |
| **145**  381:22,22 | **189**  26:19 | **1974**  8:3 195:20 | **1994**  8:15 10:1 |
| 382:3,4 | **1895**  387:15 | 386:18 388:3 | 10:16 13:12 |
| **14th**  353:7 | **1898**  136:15 | **1975**  12:4,6 | 201:22 206:7,9 |
| 354:2 356:9 | **18th**  4:7 | 402:3 | 214:2 229:8 |
| **15**  7:3,4 8:22 | **19**  9:11 13:5 | **1976**  404:23 | 254:11 272:23 |
| 224:1,3 232:21 | 136:15,15 | 471:24 | 272:24 273:20 |
| 235:2 282:4 | 199:17 243:6,8 | **1978**  140:16 | 274:21 276:16 |
| 312:7 382:5 | 243:10 266:12 | 342:6 | 276:17,24 |
| 415:4 | 266:12 272:1 | **1980s**  34:12 | 277:11 293:24 |
| **150**  7:9 205:14 | 395:16 | 61:20 125:5 | 294:6,18 295:2 |
| **15207**  502:20 | **19103**  4:8 | 129:21 209:16 | 319:8,16 |
| **155**  376:12 | **193**  227:7 | **1982**  206:21 | 323:21 327:4 |
| **157**  205:14 | **194**  225:9 | **1984**  240:24 | **1995**  9:4 10:4 |
| 272:24 | **1940s**  136:7 | 269:5 270:24 | 10:19 206:5 |
| **16**  8:3 9:1 12:21 | **1943**  461:12,15 | 479:9 | 280:19 282:4,6 |
| 13:5 181:13 | 461:16,20 | **1986**  479:10 | 284:12 330:16 |
| 195:20 225:3,5 | 462:13,14 | **1988**  291:24 | 334:4 |
| 327:7 424:21 | 463:7 | 292:9 | **1996**  8:21 221:2 |
| **16-2738**  1:4 | **195**  8:1 | **1989**  266:12,13 | 223:16 472:1 |
| **1600**  4:7 | **1950s**  136:7,16 | **199**  200:6 | **1997**  223:17 |
| **169**  7:12 | **1960s**  136:7 | **1990**  429:9,13 | 316:4 |
| **17**  7:12 8:15 9:5 | **1970**  141:13 | 429:16 | **1998**  9:6 10:8 |
| 10:4 11:6 | **1970s**  34:1,7 | **1990s**  34:19 | 12:21 13:1,2 |
| 230:11,14 | 38:21 39:3 40:3 | 66:11 124:22 | 334:7 335:17 |
| 280:19 282:5 | 40:16,18 87:10 | 125:6 232:3,16 | 424:21 428:9 |
| 316:4 319:8 | 104:22 109:2,4 | 272:1 304:8 | **1999**  230:2,9 |
| 351:8 412:9,13 | 136:7 158:23 | 342:1 | 249:6 250:24 |

[1999 - 212.790.5341]                                    Page 3

254:2,12,12
339:23 340:6
340:24 342:15
343:17 356:15
361:9 369:3,8
**1999-2000**
341:17
**19th**  95:3,5,10
**1:00**  248:16
**1:08**  264:10
**1:39**  265:2
**1st**  355:21
356:22 357:6
358:24

**2**

**2**  7:4 15:19,24
19:2 28:18
47:12 51:10
83:23 136:10
169:20 173:23
186:3 202:10
208:13 365:20
395:17 398:15
463:5 498:13
498:21 499:8
**2.8**  331:16
**2/5/21**  13:7
**20**  9:15 28:18
29:2 183:24
240:20 241:11
242:15,16
245:4 247:11
249:1,3,5,8
267:4 283:20
298:14 299:18

304:22 310:7
322:6 340:15
357:21 358:22
366:4 412:8
**20-30**  360:19
368:1
**200**  39:24
**2000**  11:1,6
13:14 43:7
254:2 267:1
269:5,6 271:1
345:15 346:12
350:19 351:8
355:1 357:21
358:8,22 361:9
398:1 402:3
410:11
**20005**  2:17
**2000s**  34:19
66:11 104:23
124:23 125:6
125:15 126:14
141:4 175:12
267:1 269:7
271:1 305:22
398:1
**2003**  410:10,11
410:12,19
411:2,11 412:7
414:1 417:15
**2004**  9:10
235:12 238:16
240:20,24
254:12 374:11
374:18

**2006**  219:6
265:14,20
267:11 268:23
**2008**  298:15
**2009**  267:4
411:6 414:9
418:14
**201**  8:5
**2010**  7:17 8:7
9:22 184:21,23
184:24 185:7
201:24 261:12
262:20 265:18
265:19,20
267:5 268:23
439:17
**2010s**  34:19
125:6 126:14
129:9,21 141:4
**2011**  7:12 79:9
79:10 80:19
81:4,13
**2012**  266:4
435:19 439:13
**2013**  9:14
192:10 243:7
246:12,12,13
246:21 254:13
**2014**  10:11 66:1
283:20 294:19
312:7 361:18
**2018**  12:2 378:9
**2019**  43:15,15
44:19 65:2
75:15 91:19
92:6,19 111:22

206:5 258:15
258:23 360:8
361:9 376:4
377:7 383:23
461:8 481:23
**2020**  13:8 43:15
88:14,15 92:19
257:17 410:10
410:12,19
411:6,11 412:7
414:1
**2021**  12:11
88:14 92:6,19
125:15 410:14
417:16 463:11
463:13,15,17
496:22 497:6
**2022**  44:9 498:9
**2024**  1:22 2:8
7:4,15 11:14
13:5,5 91:10,13
257:17 374:19
374:20,22,23
463:9 481:7,21
501:16
**2028**  502:24
**207**  8:9
**20th**  357:21
**21**  9:17 11:23
258:9,12
393:17
**210870**  13:13
**210874**  13:13
**212.790.5341**
4:21

[214 - 4]

**214**  8:16
**215.929.8822**
  4:9
**218**  3:18
**21973**  375:6
**22**  9:21 224:12
  224:13 242:9
  261:15
**221**  8:19
**224**  8:22
**225**  9:1
**22nd**  346:9
**23**  10:1 11:23
  13:1 276:23
  277:2
**23-24**  54:9
  200:6
**230**  9:5
**2318**  12:12,12
**235**  9:7
**24**  10:4,19
  279:22,24
  280:20 330:16
**243**  9:11
**243558**  12:17
**243569**  12:17
**249**  9:15
**25**  10:8 12:2
  235:12 249:8
  291:16,18
  293:15 304:22
**258**  9:17
**26**  10:11 11:23
  216:3 297:2,4
**261**  9:21

**265**  6:4
**27**  10:13 11:1
  13:2 315:20,22
  345:15 346:12
  428:9
**275**  13:10
**276,000**  82:5,18
  83:24 482:10
  482:12
**277**  10:1
**278,000**  489:15
  489:21
**279**  10:4
**28**  1:22 2:8
  10:16 11:14
  66:14,14
  323:16,18,20
  374:11
**285,000**  456:6
  456:23 488:3,9
**28th**  344:17
**29**  10:19 328:19
  328:21
**291**  10:8
**297**  10:11
**2:44**  337:7
**2:54**  337:8
**2b**  265:15 268:7
  269:2 439:14
  439:20

**3**

**3**  5:7 7:7 74:6,9
  136:10 170:14
  196:4 267:20
  267:21,22

365:23
**3.i**  409:18
**30**  11:1 109:21
  245:4 269:7
  304:22 322:6
  344:10,10
  345:11,13
  366:4
**30-40**  366:16
**300**  1:14,18
  47:18
**308.874.3186**
  3:20
**31**  11:5 13:12
  274:20 276:17
  343:24 344:11
  344:11
**310**  5:7
**315**  10:13
**316**  3:7
**32**  11:6 351:9
  351:11 357:7
**320**  276:5
**323**  10:16
**32502-5996**  3:8
**328**  10:19
**33**  11:10 68:17
  364:18,20
  397:21
**34**  11:13 373:15
**345**  11:1
**35**  11:14 373:24
  374:9,13,17
**351**  11:6
**352**  13:14

**36**  11:19 140:12
  378:4,6,9
**36103-4160**
  3:19
**364**  11:10
**37**  11:21 386:15
**374**  11:14
**378**  11:19
**38**  12:1 392:23
  393:2
**380**  464:9
**386**  11:21
**39**  12:3
**393**  12:1
**398,000**  333:13
**3:02**  345:8
**3:04**  345:9
**3:10**  351:4,5
**3:12**  352:15
**3:13**  352:16

**4**

**4**  7:8 10:1 76:8
  82:5,17 96:7
  136:10 172:19
  185:22,23
  276:23 277:10
  329:1,15,15
  374:16 404:18
  404:21 445:4
  445:11 447:23
  455:23 456:20
  457:7 481:2
  487:16,22
  488:2 490:14

**[4,000 - 8,525]**

**4,000**  335:4
**4-11**  11:20
**40**  12:4 58:14
104:24 109:21
112:20 116:5
206:21 309:16
401:20,22
402:2
**400**  75:16 76:9
79:23 329:3
455:12 492:22
**400,000**  330:3
**401**  12:4
**404**  12:8
**41**  12:8 404:3,5
**414**  12:15
**42**  12:13 279:21
395:16
**420**  12:18
**424**  12:21
**428**  13:1
**43**  12:14
**431**  6:5
**44**  12:15 414:9
414:11
**45**  12:18 419:22
420:20
**46**  12:21 419:22
424:20,23
**47**  13:1 419:22
428:8,11
**48**  13:4 77:9
78:4 81:18 95:2
481:20
**480**  6:6 450:15

**485**  6:7
**488**  6:8
**489**  6:9
**49**  13:6 86:8,11
123:1,3
**496**  6:10
**4:14**  420:17
**4:20**  420:18
**4:30**  431:14
**4:38**  431:15

**5**

**5**  7:9 150:3,6,9
169:7 301:13
302:3 337:23
399:15 402:9
**50**  13:9 48:16
94:16 104:24
203:22 398:16
**50,000**  450:22
469:9
**500**  75:16 79:23
329:4,15,16
337:15,20
**500,000**  76:8,9
82:5,17 92:13
96:7 329:1,5,19
329:22,24
335:16 445:4
445:11 447:23
450:13,22
451:5,6,6,7,9
455:12,23
456:21 457:7
460:17 469:13
481:2 487:16

**487:22 488:2
490:15
509**  292:15,17
292:18,19
293:4,16
**51**  13:10 275:16
275:19
**52**  13:14 112:1
112:7 352:19
352:21
**53**  54:9
**5376**  393:14
**5378**  394:7,14
**5379**  395:4
**5:01**  455:5
**5:03**  455:5
**5:29**  480:7
**5:31**  480:8
**5:35**  485:19
**5:40**  485:20
**5:50**  499:16

**6**

**6**  7:12 12:2
169:5 202:7,15
381:23
**60**  41:3,9 47:18
161:19,19
399:19 473:23
473:23 475:9
492:17
**600**  3:7 92:11
337:23 440:8
440:11 442:2,6
443:8,15,16
444:5,7,12

**448**:17,19,23
449:8,10,24,24
450:7 451:8
460:16 469:8
**609**  292:17
**60s**  107:9
136:16
**62**  272:23
**6540-14**  1:16
**669**  293:1
**6717900**  1:24

**7**

**7**  7:15 28:18,22
28:23 181:14
181:18,24
191:19,20,22
192:6,10
457:13
**7/9/1999**  9:15
344:18
**700,000**  465:24
490:5
**70s**  61:20 107:9
175:12 418:5,6
**72**  360:4
**74**  7:7
**750,000**  83:1
262:13
**78**  13:4 394:13

**8**

**8**  7:17 183:18
183:20 184:8
395:17
**8,525**  9:13

**80** 48:14 399:20
**80,000** 450:18
  450:18
**800,000** 457:14
**80s** 125:14
  129:12 141:4
  175:12 269:6
  418:8,10
**81** 26:6,17
**82** 47:13,17,19
  240:24 273:14
  492:20
**84** 232:20
**850.435.7999**
  3:9
**856.317.7180**
  5:9
**86** 13:6
**8th** 249:17

**9**

**9** 7:21 12:6
  192:16 249:6
  320:3 499:1
**9,859** 9:13
**9/17/97** 10:13
**90** 391:21
  464:10
**900** 75:21
**90s** 125:14
  126:14 141:4
  175:12 269:7
  298:9 305:21
**92** 273:15
**99** 232:20
  273:17

**9:11** 1:22 2:9
**9:15** 18:22,23
**9th** 13:15 353:4
  353:10

**a**

**a.m.** 1:22 2:9
  18:22,23 93:18
  93:19 184:4,5
**abandonment**
  340:2
**ability** 154:10
  502:11
**able** 100:20
  130:4 193:6
  254:4 395:9,22
  397:11,19
  448:16 449:16
  477:19
**above** 84:6
  286:9 416:9
**absence** 405:7
**absolutely**
  80:22 138:17
  158:17 160:20
  293:10 385:21
  392:3 398:6
  485:3
**abstract** 223:9
  230:14 236:5
  244:12,13
  441:18
**academic** 26:2
  69:3 110:16
  244:9

**academics**
  145:13
**academies**
  496:23 497:18
**accelerate**
  253:9
**accelerated**
  250:1 253:17
  260:23 341:3
  341:12
**accelerating**
  344:15
**acceleration**
  468:1
**acceptable**
  381:17 425:24
  463:23 464:8
  464:11,12,16
  465:7 466:18
  466:23
**access** 450:12
**accomplished**
  172:16
**account** 94:18
  94:20 143:14
  358:15 428:5
  457:11
**accountability**
  134:8
**accountable**
  133:19
**accounts** 19:17
**accrued** 392:12
**accurate**
  177:22 315:14
  415:21 416:6

  417:16 499:1
  501:8
**accurately**
  417:3 437:13
  437:22
**accuse** 61:24
**accused** 19:13
**achieve** 164:16
**acknowledge**
  159:15 227:19
**acknowledge...**
  225:10
**acknowledging**
  225:9
**acquired** 325:8
**acs** 252:14
**act** 11:18,21
  27:18,24 28:8
  28:12,14 55:3
  56:14,21 58:1
  58:10,24 59:12
  59:24 65:13
  67:1,15,17 68:5
  70:1,17 135:5
  135:19 145:21
  146:4,8 153:17
  153:22 179:6
  180:2,14 198:8
  371:7
**acted** 24:6
  100:4 289:3
  299:15 436:21
**acting** 188:12
  199:6,14 243:3
  369:21

**[action - additional]**

| | | | |
|---|---|---|---|
| **action** 23:6 | 474:10 | 168:11 171:1 | 449:9 452:24 |
| 40:1 67:3 70:5 | **active** 39:14 | 172:13 176:5 | 482:2 492:19 |
| 98:18 105:3 | 105:16 251:23 | 182:7 185:21 | 494:5,5 |
| 107:4 135:10 | 326:3,8,14 | 191:11 192:9 | **ad** 228:22 |
| 174:4,5,10 | 327:2 383:12 | 194:8 195:7 | **adapt** 170:21 |
| 176:10 177:4 | 474:20,20 | 199:20 217:1 | **adaptability** |
| 284:16 294:3 | 476:6 | 219:5 221:11 | 166:15 |
| 312:3 330:9 | **actively** 106:20 | 221:15 223:14 | **adaptive** 174:4 |
| 349:3 502:14 | 143:9 157:13 | 223:19 225:17 | **add** 154:10 |
| 502:17 | 234:3 279:8,10 | 226:10 227:5 | 335:15 |
| **actions** 26:12 | 279:11,12,14 | 234:20 242:19 | **added** 172:6 |
| 41:16 72:12 | 307:14 309:23 | 245:12 249:15 | 232:12 |
| 100:10 105:20 | 369:15 471:16 | 250:5 253:13 | **adding** 55:14 |
| 106:1,22 115:6 | **activities** 326:2 | 262:19 271:1 | 126:19 304:9 |
| 117:18 126:24 | 369:17 471:19 | 274:16 279:1 | **addition** 49:4 |
| 130:7 136:17 | 474:3,16 | 282:20 293:17 | 76:10 77:3 82:5 |
| 143:10,12 | **activity** 146:18 | 296:8 300:1 | 83:12,24 85:19 |
| 146:15 149:23 | 474:22 | 301:12,15,19 | 278:7 400:9 |
| 149:23 155:9 | **actual** 67:11 | 301:20 308:23 | 481:2,10 482:9 |
| 157:13,15 | 92:2 | 309:9 310:4 | 488:2 489:20 |
| 171:20 175:22 | **actually** 23:11 | 316:24 319:3 | 490:14 |
| 176:6,16,17,19 | 31:11 36:23 | 323:14,15 | **additional** |
| 178:3,5,14,20 | 38:23 43:6,12 | 328:12,13 | 35:14 36:12 |
| 197:6,10,11,20 | 43:17 50:7 52:5 | 331:10 332:7 | 37:5 92:20 |
| 198:1,4 201:13 | 61:18 67:11 | 338:21 339:16 | 212:9 227:21 |
| 233:23 234:1,2 | 77:23 83:24 | 341:16 347:1 | 228:8 229:15 |
| 254:9 274:1 | 89:12 91:11 | 355:6 361:24 | 252:19 277:19 |
| 287:16,17 | 92:4 102:8 | 375:22,24 | 279:13 294:1 |
| 289:11 305:14 | 127:13 129:20 | 383:24 387:2 | 295:13,20 |
| 308:9,13,15 | 130:3,11 | 398:10,22 | 296:1,2,3 301:4 |
| 309:23 310:4 | 131:19 133:7 | 400:12 409:13 | 411:5 414:7 |
| 312:4 313:8 | 135:7 149:5 | 411:21 415:7 | 450:11,16,17 |
| 326:5 358:19 | 156:7 157:1 | 417:15 419:8 | 480:11 482:10 |
| 438:22 469:22 | 162:3 164:11 | 420:23 424:12 | 483:22 488:16 |
| 471:19 473:3,6 | 164:13 165:16 | 427:11,15 | 489:18 |
| 473:24 474:1 | 167:22 168:1 | 429:17 430:21 | |

[additionally - allegation]                                         Page 8

| | | | |
|---|---|---|---|
| **additionally** 158:23 | **advertising** 120:11 | **agents** 222:13 | **ah** 131:6 185:1 215:4 322:7 |
| **additions** 122:12 | **advice** 43:19 256:2 473:11 | **ago** 120:15 206:21 369:7 370:12 448:2 | **ahead** 35:17 40:14 48:7 |
| **additives** 151:17 | **advise** 218:15 | 454:11 470:17 495:3 | 62:16 86:3 89:17 117:6,15 |
| **address** 469:18 | **advised** 160:1 | **agree** 48:18 | 128:18 134:15 |
| **addressing** 139:14 166:8 | **advisement** 97:21 | 60:12 134:12 134:13 143:18 | 135:3 140:5 148:13 161:10 |
| **adds** 252:14 | **aesthetic** 231:18 | 143:23,24 | 166:12 183:7 |
| **adequately** 17:5,23 | **affects** 100:10 | 144:13 152:16 153:2 160:7,8 | 197:2 200:15 214:10 221:2 |
| **adjectives** 333:6 | **affiliated** 243:21 | 161:4 163:19 163:24 164:13 | 264:4 270:10 271:22 288:16 |
| **administration** 61:2 63:1 | **affirm** 369:19 | 168:12 179:19 208:20 210:24 | 309:4,5,11 311:1,3 317:12 |
| **admit** 262:5 | **affirmed** 100:4 436:22 | 212:24 216:21 223:15 233:15 | 317:12 339:2 349:15 362:22 |
| **adopt** 158:5 | **affirming** 142:12 | 240:14,17 242:16 252:3,4 | 375:14 390:3 390:18 397:17 |
| **adopted** 159:8 | **afford** 478:16 | 263:17,23 264:5 265:13 | 457:22 465:13 472:11 473:21 |
| **adulterated** 152:5,8 153:3,7 153:10 | **afternoon** 6:4 265:1 | 310:13 371:15 381:11,13,13 | 478:6 486:18 487:6 |
| **adulteration** 55:18 152:3,4 | **afterward** 117:1 141:12 | 382:21 385:20 396:4 403:8 | **ahf** 287:5 |
| **adulthood** 299:24 | **ag** 454:18 480:12,15,16 | 413:12 419:8 435:4,13,21 | **aimed** 41:10 |
| **advanced** 412:20 418:14 | 480:17,19 482:18 486:21 | 437:18,23 438:7,15 | **aims** 438:22 |
| **adverse** 224:18 224:18 | 486:24 487:17 487:19,21 | 453:11 462:3 | **air** 372:13,17 376:16 |
| **advertise** 29:11 | 488:21 489:19 490:1 | **agreed** 203:21 204:3,14 | **al** 1:13,18 3:19 8:10,17,20 9:6 |
| **advertised** 30:18,24 | **ag's** 482:24 | 494:10 | 9:10,14 |
| **advertisements** 31:1 | **agencies** 367:17 | **agreement** 420:9 | **alice** 418:19,22 428:9 |
| | **agenda** 202:10 351:14 357:5 357:13 | | **allegation** 118:5 |

**[allegations - announcement]**                                    Page 9

| | | | |
|---|---|---|---|
| **allegations** 33:2 | 204:13,14,20 | 405:1 406:5 | 336:15 358:15 |
| 112:10 116:20 | 205:9 209:15 | 421:15 422:3 | 362:11,18 |
| **allege** 16:14,22 | 233:1,2 263:19 | 422:22 | 363:1,4,11,18 |
| 138:1,3 | 342:1 427:16 | **amphiboles** | 364:6 429:4 |
| **alleged** 139:9 | 438:3,14 | 51:18 382:24 | 430:13 431:1 |
| **allegedly** | **ambiguous** | **analyses** 227:13 | 444:15,19,24 |
| 112:12 116:22 | 161:16 312:13 | 327:21 | 445:18,20,22 |
| **alleging** 209:13 | 312:20 413:23 | **analysis** 9:12 | 452:22 453:5,8 |
| **allen** 3:14 | 424:14,15,19 | 13:4 22:14 27:6 | 454:20,22,23 |
| **allergies** 18:13 | 457:21 | 38:13 41:10,13 | 455:15,20 |
| **allow** 127:13 | **amend** 304:21 | 44:7,18 69:7,8 | 456:2,5,7,13,24 |
| 417:3 | 306:5,24 | 69:9 71:24 | 457:4,9,10,11 |
| **allowed** 466:6 | **america** 43:7 | 76:11,14,15 | 457:15,18,18 |
| **allows** 399:15 | 312:23 | 77:4,7 78:7,10 | 458:1,6,7,12,13 |
| 437:11,20 | **american** | 78:14 79:3 81:2 | 458:15,17,21 |
| **alluded** 47:3 | 221:12 250:13 | 81:3,7,8,10 | 471:13 481:9 |
| **alluding** 404:8 | 251:3,10 252:1 | 82:8,18 83:16 | **analysts** 483:8 |
| **alternative** | 252:19 254:21 | 83:20 90:6,11 | **analytic** 123:15 |
| 38:24 39:1 | 254:22 260:22 | 94:7,9,15 95:15 | **analytical** 9:1 |
| 125:15 255:10 | 263:22 298:19 | 96:3,8,11,14,23 | **analyze** 71:16 |
| 256:7,13 257:6 | 299:2 324:8,14 | 96:24 111:5,8 | 135:14 175:14 |
| 324:24 365:24 | 339:23 341:1 | 111:16 115:2 | 180:19 239:3 |
| 366:2 368:11 | 344:14 368:24 | 118:15 126:3 | 242:19 |
| **ambiguities** | 389:17 | 126:11 127:13 | **analyzed** |
| 205:3 | **americas** 4:19 | 128:11 130:10 | 247:17 250:11 |
| **ambiguity** 33:4 | **amount** 23:13 | 147:13 155:6 | 368:2,5 |
| 39:20 40:4,19 | 23:14 81:11 | 157:10 169:10 | **analyzing** |
| 87:10 99:15 | 142:8 425:16 | 175:10 197:23 | 175:9,17 |
| 104:14,16 | 426:10,13 | 198:10 229:9 | 193:14,24 |
| 107:18 108:1,7 | 488:20 | 239:1,20 | **anapol** 4:4 |
| 109:2,8 110:18 | **amounts** | 240:20 245:3 | **anapolweiss....** |
| 113:24 140:19 | 162:11 424:12 | 245:16 248:6 | 4:10 |
| 141:5 142:21 | 426:4 427:10 | 257:14,18 | **announce** |
| 143:17 165:23 | 428:19 481:11 | 258:2 290:19 | 356:21 |
| 166:8,21 | **amphibole** | 291:3 309:18 | **announcement** |
| 174:10 204:5 | 12:18 52:20 | 325:10 328:17 | 267:10 |

**[announcing - april]**                                          Page 10

| | | | |
|---|---|---|---|
| **announcing** | 394:3,11 395:1 | 366:11 372:7 | **apply** 71:23 |
| 355:20 | 395:24 434:23 | 433:7 447:10 | 197:11 374:3,6 |
| **answer** 6:18 | 434:23 440:16 | 456:2,2 | **applying** 26:4 |
| 21:6 30:8,22 | 440:22 441:17 | **anyway** 22:3 | 73:14 247:12 |
| 31:11,13,21 | 441:19 442:2 | 410:14 461:11 | 248:6 407:14 |
| 36:5,7,13 37:15 | 443:5 444:3,19 | **apart** 363:10,10 | 408:24 |
| 37:17,20,23 | 457:3 464:3 | 403:8 | **appointed** |
| 38:1,12 41:21 | 465:17 466:1 | **apologize** 77:13 | 496:22 497:6 |
| 42:2,15,19 43:3 | 466:16 478:1 | 352:12,24 | 497:16,17 |
| 53:13 57:18 | 479:3 486:15 | 356:13 | **appreciate** |
| 58:11 63:11 | **answered** 21:12 | **apparently** | 118:9 205:23 |
| 67:22 76:6 | 40:13 57:10 | 492:17 | 348:3 449:21 |
| 79:16 81:15 | 98:7 124:11 | **appeals** 121:21 | 490:18 |
| 114:5 117:14 | 140:4 144:22 | **appear** 51:4 | **approach** 9:1 |
| 118:23 131:12 | 144:24 191:1 | **appearances** | 179:9 202:20 |
| 135:7 141:22 | 199:13 306:17 | 3:1 4:1 5:1 | 202:23 315:5 |
| 141:24 142:2 | 370:11 427:4 | **appears** 47:18 | **appropriate** |
| 145:2 149:5 | **answering** | 48:3 210:13 | 73:14 231:20 |
| 150:4 163:2 | 36:24 143:15 | **appendices** 7:6 | 409:2 478:15 |
| 176:14 181:7,8 | 149:7,9 200:12 | 15:21 49:10 | **appropriately** |
| 181:10 187:15 | 228:21 287:24 | 159:12 390:13 | 289:3 |
| 187:21 191:3 | 367:15 396:16 | 492:24 | **approval** |
| 205:11 233:12 | **answers** 24:7 | **appendix** 7:3 | 150:24 151:10 |
| 234:16,21 | 149:5 220:2,6 | 134:1 181:20 | 156:2 |
| 241:23 242:1 | 416:16,17 | 405:18 | **approvals** |
| 247:24 270:18 | **anticipate** | **apple** 127:18,19 | 184:23 |
| 271:7 277:19 | 280:15 | **applicable** | **approved** 7:10 |
| 280:16 288:12 | **antiperspirant** | 416:10 | 29:24 140:15 |
| 288:13,17 | 12:4 | **application** | 185:6 |
| 291:9 300:1,16 | **anybody** 45:7 | 331:15 | **april** 7:4,15 |
| 308:24 314:13 | 45:13 88:6 89:8 | **applications** | 10:4,11 13:1,2 |
| 314:22 315:1 | 125:13 129:11 | 389:4 | 13:5 91:10,13 |
| 316:9 322:7 | 129:20 130:3 | **applied** 71:15 | 91:15,17 95:3,5 |
| 325:23 326:1 | 269:8 270:23 | 147:4 193:7,24 | 95:9 280:19 |
| 367:20 379:15 | 271:2 299:1 | 196:17 308:6 | 282:4,5 378:9 |
| 380:3,10,19,24 | 320:9 323:9 | | 428:9 481:6,20 |

**[april - asking]**                                                      Page 11

| | | | |
|---|---|---|---|
| 489:16 491:21 | **asbestiform** | 372:20,21 | **ascertain** |
| **area** 20:16 | 51:18,18 | 373:3,13,16,22 | 105:16 |
| 126:22 220:22 | 265:14 266:4 | 374:3,7 375:10 | **ashton** 332:16 |
| 227:16 229:20 | 268:11 | 375:19,23 | **aside** 73:24 |
| 231:23 241:15 | **asbestos** 8:1 | 376:1,3 377:3 | 208:22 345:3 |
| 251:14 255:8 | 11:15,16 12:10 | 377:13,14 | 456:20 |
| 263:6 301:2 | 32:1,8,10 33:8 | 378:1,19 | **asked** 45:7,8,9 |
| 305:2 327:24 | 47:18 48:9,11 | 379:14,17,22 | 46:8,10 66:20 |
| 374:3,6 445:4 | 48:17,21 49:1,2 | 380:1,8,13,14 | 67:20 87:8 |
| 457:13 | 49:7,23 51:4 | 380:22 381:18 | 90:16 96:19,22 |
| **areas** 35:13 | 67:22 68:3 | 383:20 384:7 | 111:14 124:17 |
| 390:5 459:11 | 109:3 112:11 | 385:7,19,22 | 124:24 125:20 |
| **argue** 384:4 | 113:3,15,19,21 | 386:5 387:24 | 125:20 127:16 |
| **argumentative** | 114:11,20,21 | 389:5 390:14 | 128:13 129:2 |
| 288:15 339:1 | 115:23 116:3 | 390:20 391:8 | 140:3 192:1 |
| 370:9 376:23 | 116:21 117:23 | 391:13 392:4 | 193:19 200:17 |
| 397:16 399:23 | 118:5,14,16 | 392:11,14,19 | 266:21 288:8 |
| 416:19 426:24 | 137:7,12 | 394:1,1,10,24 | 308:1,17 310:3 |
| 430:2 472:10 | 138:13 139:7 | 395:7,8,20,21 | 344:1 367:8 |
| 473:19 | 139:18 140:1 | 396:6,7,14,19 | 368:6 392:17 |
| **arguments** | 142:19,19 | 396:23 397:13 | 395:5 432:19 |
| 321:16 322:13 | 152:17,18,20 | 397:14,22 | 436:3 437:4 |
| **arises** 167:4 | 153:1 158:17 | 399:16,20 | 440:10,12 |
| 180:20 183:5 | 159:3 161:3,6,7 | 405:1,3,7,16 | 442:8 443:11 |
| **arps** 2:14 | 161:20,20,21 | 406:5 407:3 | 443:19 444:10 |
| **art** 411:13 | 161:22 162:8 | 416:9,9 417:2 | 444:17 450:11 |
| 412:11,16,21 | 195:21 198:14 | 417:18,20,23 | 450:11 456:19 |
| **article** 208:12 | 208:5 209:10 | 419:6,15 | 458:3 469:17 |
| 214:13 221:4 | 256:15 262:21 | 422:23 424:12 | 469:20 470:7 |
| 236:15 237:16 | 263:13,16 | 425:16 426:4 | 486:1,19 494:7 |
| 237:18,21 | 265:24 342:2 | 426:11,13 | 495:12 497:8 |
| 243:12 274:19 | 370:18,19,21 | 427:10 428:19 | **asking** 20:21,22 |
| 421:3 431:2 | 370:24 371:2,5 | 439:14,19,23 | 24:16 32:20 |
| **articles** 32:22 | 371:6,11,14,16 | 441:14,14 | 35:23 36:1 46:1 |
| 239:7 263:21 | 371:24 372:2,7 | 442:16 484:12 | 48:15 73:17,19 |
| 375:8,17 421:8 | 372:12,13,16 | | 91:24 92:1,1,3 |

**[asking - attribution]**                                                        Page 12

| | | | |
|---|---|---|---|
| 101:12,12,22 | 465:6 475:6 | 227:22 228:9 | 350:5 351:14 |
| 114:7 126:16 | 477:12 481:14 | 229:17 231:1,4 | 357:13 |
| 126:23 127:17 | **asks** 307:17 | 237:3 239:9 | **attachment** |
| 128:6 129:16 | **aspects** 498:15 | 243:13,18 | 11:8 |
| 129:19 130:2 | **aspirational** | 286:10,13 | **attacks** 39:16 |
| 130:19,20 | 179:19 180:5,7 | 301:2 302:9,21 | **attempt** 98:13 |
| 133:21 148:20 | 338:17 | 303:7,15 304:8 | 99:1,3 |
| 156:7 161:16 | **assertions** 89:9 | 310:15,19 | **attempts** 98:14 |
| 178:7 179:17 | **assess** 348:3 | 311:8,17 | **attend** 287:22 |
| 199:24 200:2 | 476:4 | 319:18,21 | 289:24 |
| 200:11,20,21 | **assessed** 470:20 | 320:5 321:9 | **attending** |
| 209:22 233:24 | **assessing** 59:19 | 345:22 368:18 | 286:22 475:7,8 |
| 233:24 239:3,4 | 227:3 294:3 | 441:6 471:7 | 475:14,18 |
| 239:9 240:8 | **assessment** | 473:14 476:10 | 476:1 |
| 241:6,7 242:5 | 11:11 149:1 | **assume** 59:17 | **attention** 26:9 |
| 242:13,13 | 185:17 189:7 | 96:5 155:5 | 26:10 125:1,7 |
| 244:21,22 | 189:22 190:14 | 168:7,7 184:15 | 127:24 128:2,7 |
| 260:19 288:3,5 | 190:23 364:16 | 346:5 420:24 | 141:16 142:7 |
| 288:24 290:21 | 364:24 441:16 | 428:13 469:12 | 143:5,8 144:1,4 |
| 310:2 313:3 | **assignment** | 482:1 | 144:7,13 |
| 315:5 322:23 | 54:19 115:22 | **assuming** 48:9 | 145:11,12,17 |
| 322:24 325:15 | 498:23 499:2 | 208:1 421:6 | 167:16 198:20 |
| 325:17,19 | **assistance** | **assumption** | 198:21 233:7 |
| 343:9 366:12 | 225:14 | 437:16 | 235:6 239:21 |
| 367:12 384:14 | **assistant** 66:4 | **assurance** | 239:22,23 |
| 384:15,16 | **associated** | 12:16 415:23 | 240:4,5,9,11,13 |
| 386:2,3 392:7 | 34:21 42:4,13 | **assure** 146:21 | 240:15,19 |
| 396:24 397:2 | 42:24 198:16 | 155:10 358:19 | 247:22 251:18 |
| 399:9 400:20 | 224:18 227:3 | 386:4 416:7 | 281:20,21 |
| 400:22 402:13 | 236:3 238:6 | **assured** 393:23 | 284:7 286:23 |
| 402:15 406:23 | 244:15 443:1 | **assuring** 157:4 | 287:1,2,16 |
| 407:10,21,24 | **association** | 474:13 | 289:3,5 361:1,1 |
| 408:6,10,12 | 116:1,4 118:7 | **atl** 1:11,16 | 361:13 |
| 430:22,23 | 139:21 140:1 | **atlantic** 1:9 | **attribution** |
| 434:17 437:6 | 141:18 209:13 | **attached** 13:22 | 486:5,9,13 |
| 449:4 456:15 | 220:13,16 | 78:6 346:10 | 487:1 |

**[authorities - beasley]**                                                Page 13

**authorities**
  315:12
**authority**   7:9
  272:8 306:7,8
  306:14
**authors**   224:5
  225:13 243:17
  243:21 247:16
**available**   24:12
  38:18,21 87:16
  101:20 103:2
  242:8 252:20
  271:24 337:14
  362:4 363:23
  364:3 367:5
  387:18 426:1
**avenue**   2:16
  4:19
**avenues**   89:4
**average**   329:16
**aviation**   497:1
  497:7,12
**avoid**   174:4
  247:2 254:24
  255:7 365:16
  365:20 387:21
**avoidable**
  238:11
**avoidance**
  231:15 245:24
  246:5
**avoided**   216:8
  217:5
**avoiding**
  246:15 252:21
  416:15,17

**awards**   496:20
**aware**   34:15,18
  35:4,7,8 84:16
  94:13 116:15
  233:9,11,15,16
  233:17 392:9
  419:4 439:9
  440:1,3 441:4,8

**b**

**babies**   31:4
  350:1 387:17
**baby**   8:6 16:9
  16:15,23 29:5
  30:18 31:18
  39:15 41:2,8
  43:5 55:9
  112:10,12
  116:20,22
  138:4 139:6
  140:15 234:11
  266:1 268:6
  310:6 385:22
  386:6 392:2,10
  398:5 423:13
  423:21 424:11
  425:2,15,23
  426:14,18
  439:20 442:21
  442:24
**back**   24:22
  42:15 44:11
  54:7 86:17
  93:20 96:8
  118:24 122:24
  135:22 181:13

182:13 200:4
208:11,12
210:11,22
212:9 223:13
223:20,21
225:8 228:22
231:8 244:20
246:11 275:6
294:14 302:18
325:21 355:11
355:11 368:1
369:23 385:6
387:7 409:11
423:19 437:16
442:1 457:18
471:6,24 472:1
488:12 489:20
494:14 496:4
**background**
  64:16 300:18
  351:15 353:22
  357:14 360:8
  373:4 483:4
**backgrounder**
  357:15
**backwards**
  223:19
**bad**   19:15
  298:1 319:2,13
**bailey**   10:6
  280:22 282:3
  284:13 296:8
  296:11
**balance**   62:9
  233:18 322:14

**balanced**
  231:18
**balderrama**
  1:15 75:6 83:8
  83:8 84:10 85:5
  97:13 137:24
**balloons**   387:21
**barr**   3:5
**barry**   388:16
  388:21
**based**   1:12,17
  39:15 78:10
  140:18 164:20
  208:17 252:22
  254:24 255:9
  255:23 266:1
  268:6 308:5
  349:24 376:16
  389:20 391:9
  408:6,14
  439:20 455:23
  460:9,20,20,21
  460:22 475:2
  488:20
**basic**   24:3,4
  126:24
**basis**   164:2
  479:6
**bates**   292:15,21
**battle**   346:20
**baylen**   3:7
**bear**   101:14
  102:23 459:11
**bears**   152:9
**beasley**   3:14

**[beasleyallen.com - bit]**

**beasleyallen....**
3:21,22,23
**beattie**  3:15
**becoming**
129:5
**beg**  41:5 68:9
72:16 81:5
421:17
**began**  39:14
387:16,16
**beginning**
295:3 354:24
483:24 484:4
**behalf**  79:8
476:18
**behavior**  14:16
14:20,22 65:21
98:12 147:23
149:2 300:14
309:16 333:18
497:12
**behavioral**
45:15 46:4 57:7
98:24 333:18
460:10
**behavioralist**
441:16 460:10
463:23 464:9
464:13 466:17
466:24 479:14
**beings**  29:13
**belief**  435:8
461:5 468:3
**beliefs**  438:22
**believe**  19:4,16
22:14 52:16

67:2 72:6 74:19
93:2 98:7
120:14 121:4
138:15 170:5
230:6 246:12
252:8,8 263:12
298:4,10 352:4
370:16 409:6
420:15 428:17
435:15 442:4
461:17 463:18
479:14 482:15
488:20
**believed**  332:17
468:12
**benefit**  22:24
23:2 29:12
210:17 216:15
216:19 217:12
218:2 228:7
231:20 237:15
312:11 313:4
465:20
**benefits**  216:9
217:6
**berg**  9:4 225:8
287:11 290:16
327:5
**best**  25:11
46:23 60:8 91:5
102:2,3,10
103:5,12 104:2
106:13 241:18
302:20 408:11
418:15 468:12
470:2 502:11

**bethesda**  13:11
**better**  126:21
159:21,22
213:12 371:21
403:21 412:16
430:11,19
**beyond**  158:24
159:9 383:15
400:9 477:17
479:5 482:11
**bias**  22:16,18
61:24 88:19,21
88:22 89:1
129:18 210:18
216:16 218:2
250:22 437:11
437:14,20
438:2
**big**  153:8 482:7
**bigger**  300:9
**bill**  77:4 82:11
83:17 94:18
95:2,5 332:16
456:16 480:22
480:24 486:21
486:24 490:3
491:4,17,18
493:22 495:13
495:16
**billed**  75:16
81:3,12 82:6,14
82:14 83:21
455:24 456:7
456:11,17,24
457:14 482:4,5
487:14,23,24

488:4,9 489:15
490:4,6,7,10,15
494:16
**billing**  81:6
83:24 93:23,24
94:3 274:8
450:21 451:22
481:12,20
492:14
**billion**  464:10
464:10
**bills**  78:6 81:8
83:11,16 85:9
94:14 96:2,4
446:8 451:5
455:10,11,14
457:16 458:6
481:6 482:10
482:18,21,24
488:14 489:19
491:1,19
492:13 493:3
493:10,12,15
493:15 494:10
494:15
**binders**  317:9
451:3
**binned**  451:18
**bins**  136:1,2,10
136:21,24
**bit**  18:10 55:1
77:10 127:6
136:9 145:18
159:13 193:5
208:23 229:7
339:21 342:13

[bit - cancer]                                                    Page 15

348:20 356:14
359:23,24
372:21 373:3
373:11 374:7
431:23 438:20
448:21 453:2
489:13 496:17
**black** 108:11
**blocking** 22:2
**blount** 12:19
13:1 418:19,22
420:24 428:9
431:2
**blown** 426:16
**board** 496:24
497:20
**bodies** 202:18
233:7,9
**body** 31:7
227:9 302:8
303:6,14 311:6
311:7,16,23
**bolded** 236:7
**book** 54:3 498:8
498:9
**borne** 152:24
**boston** 78:10
207:13
**bottle** 160:11
160:12
**bottles** 376:3
377:2
**bottom** 185:2,2
203:13 243:16
243:20 244:13
258:22,24

263:3 292:21
331:24 347:5,9
348:10,13
375:7 382:4
**box** 365:9
400:24
**bp** 71:1,4,10,11
71:19 72:10,14
72:20,21 73:23
80:8,9 130:23
131:5 175:16
176:23 467:5,6
467:7,9,11
**bp's** 71:16,24
467:13
**brandi** 1:11
83:8 84:10
**breadth** 105:11
**break** 85:23
93:15 102:14
125:22 248:18
264:9 337:2
352:12 415:5
415:15 418:21
420:5,7 431:11
485:10 486:2
**briefing** 12:15
**british** 71:1
**broad** 25:4,13
72:5 102:4
103:13 133:22
199:22
**broadening**
193:22
**broader** 196:21

**brought** 227:1
440:2
**buchanan** 3:5
**budget** 350:6
**build** 249:22
253:15 341:10
**building** 2:15
**bulk** 91:18 92:9
92:17 482:22
**bullet** 152:2
153:19 348:7,9
415:18 445:21
**bunch** 57:13
209:23 210:7
243:17 263:18
263:21 348:6
**business** 44:22
44:24 45:17
46:7 65:15
76:19,21,23
249:24 253:17
341:12 342:14
442:20
**buy** 380:6

**c**

**c** 14:1
**california** 9:9
244:1
**call** 19:6,23
22:15 89:5
257:22 278:9
489:8
**called** 14:4,15
14:19 20:2,5,6
27:13 34:16

84:15 88:20
117:2 146:3
194:8 195:20
265:4 277:7
**calls** 153:5
**campus** 5:7
**canada** 11:10
206:5 359:24
360:5,13,18,23
361:12,16
364:2,8,12,23
**canadian** 360:8
**cancer** 8:9,12
8:17,20,23 9:4
9:6,8,12,19,21
9:22 10:12
16:10 17:19
32:15,24 33:6
33:11,16 34:3,8
34:21 37:6
38:15,16 66:10
75:10 93:6
109:24 110:4
112:5,13,22
114:20 115:13
116:1,12,23
118:7,18
138:11,21
139:22 140:2
140:11 141:3
141:19 142:19
142:20 143:22
144:17 145:7
198:17 208:3
208:19 209:5
210:9 211:15

**[cancer - case]**                                                    Page 16

| | | | |
|---|---|---|---|
| 212:17 214:24 | 339:23 341:1 | 149:24 175:24 | 117:10 121:14 |
| 215:11 216:7 | 341:20 344:14 | 197:7 199:15 | 128:14 131:7 |
| 217:4 219:4 | 348:8 350:20 | 212:6 243:4 | 131:21 146:23 |
| 222:18 223:2 | 358:11 360:11 | 325:9 326:6 | 147:4,14 148:5 |
| 224:8 226:14 | 365:6,11 367:2 | 427:24 471:20 | 149:22 155:5 |
| 226:15,23 | 368:19,24 | **career** 60:8,23 | 158:5 164:2 |
| 227:3,12,15 | 425:2 441:6 | **cares** 157:16 | 167:21 168:9 |
| 229:11,23 | 471:8,13 | 197:21 305:15 | 168:22 169:10 |
| 231:3,17 | 473:15 475:21 | 473:7,15 | 175:8,15,16 |
| 236:18 237:1,5 | 476:11 | **carl** 1:11 75:6 | 177:13 178:19 |
| 238:6 241:3 | **cancers** 215:2 | 83:9 84:10 85:5 | 198:4 227:2 |
| 243:13,17,23 | 215:13 259:18 | 97:13 137:24 | 245:3,16 |
| 244:17 245:5 | 260:8 | **carr** 13:12 | 257:18 261:20 |
| 245:17,24 | **capabilities** | 274:17,18 | 262:4 270:2 |
| 246:2 250:14 | 443:1 478:17 | 276:1 282:20 | 283:17 307:19 |
| 251:3,4,10,11 | **captioned** | **carried** 133:7 | 310:12 313:7 |
| 252:1,18,19 | 501:6 | **carry** 164:11 | 323:6 325:22 |
| 254:21,22 | **carbon** 222:12 | 165:4 | 329:1,6,8 335:5 |
| 256:4,14,15 | **carcinogen** | **carrying** | 335:24 337:16 |
| 259:15,22 | 219:6 263:14 | 339:15 | 337:24 343:15 |
| 260:3,22 263:7 | 265:15 267:3 | **case** 1:14,18 | 371:3 408:3 |
| 263:15,20,22 | 377:15 380:15 | 7:14 8:10 14:24 | 411:11,17,20 |
| 264:2 266:14 | 439:15,24 | 16:6 24:12 | 411:22 425:3 |
| 271:16 272:2 | 441:14 | 25:16,19 46:9 | 432:8,10,16,19 |
| 274:6 277:18 | **carcinogenesis** | 52:18 54:17,18 | 433:8 438:1 |
| 278:10 283:17 | 267:23 | 55:13,19 71:2,4 | 439:2 447:14 |
| 285:18 293:23 | **carcinogenic** | 72:23 73:13,16 | 465:24 466:20 |
| 298:19 299:2 | 8:13 245:21 | 75:9,10,10 | 468:16,18,21 |
| 301:3 302:10 | 263:12 265:23 | 78:22 79:20,22 | 468:24 469:3,4 |
| 302:22 303:1,8 | 266:2 267:18 | 83:9 84:6,9,12 | 469:19,20 |
| 310:5,15 311:9 | 268:9,14,16 | 84:19 88:1 91:9 | 470:7,20 471:4 |
| 311:12,18 | 439:18,21 | 91:15 93:3,6 | 471:9 472:5 |
| 320:6 323:21 | **care** 5:3 339:16 | 104:21 105:15 | 477:2 480:13 |
| 324:8,14,20,21 | 339:19 | 106:19 107:8 | 480:15,16,17 |
| 325:3 327:23 | **cared** 106:1,24 | 112:5,9,17,19 | 480:20 487:4 |
| 331:2,18 333:1 | 115:8 117:19 | 114:18,19,23 | 491:14,24 |

**[case - choosing]**                                                        Page 17

493:21 494:11
494:11,12,13
495:20 498:19
498:24 499:3
**cases** 9:13
78:23 495:17
**cast** 88:1
**castleman**
388:16,21
**categories**
136:3,4,6,12,13
**categorized**
266:4,10 267:2
**category**
136:19 266:5
267:20,20,21
267:22 268:14
**catherine** 88:3
119:16
**causal** 19:3
224:20 272:1
301:1 302:21
**cause** 32:15
33:6,11,16
108:20 109:24
115:13 141:3
142:18,20
162:7 208:19
209:5 266:14
271:16 360:11
365:5,10
376:15 380:15
479:16
**caused** 16:10
112:13 116:22
208:4 210:9

211:15
**causes** 32:24
114:20 219:4
**causing** 143:22
**caverna** 120:10
**cc's** 336:7
**cdrh** 294:3
**cedars** 244:1
**cede** 431:16
**center** 9:22
**central** 9:9
**century** 17:5
32:12 38:19
238:8
**ceo** 324:8
325:19
**certain** 11:16
167:1 182:6
190:11 437:15
448:13
**certainly** 54:14
449:17
**certainty** 386:4
449:16
**certificate**
502:1
**certified** 2:21
**certify** 405:5
502:5,7,12
**cf** 294:2
**cfta** 345:16,17
346:16 350:7
402:8,17
**chain** 165:15
**chair** 66:6

**challenge** 89:9
**challenges**
109:13
**chance** 191:11
318:5
**change** 38:11
125:14 168:8
188:8,15 195:8
213:20 233:19
234:4 241:22
248:7 306:4,9
306:18 307:1
441:15 442:16
475:17 499:6
500:3,5,7,9,11
500:13,15,17
500:19,21,23
**changed** 128:12
180:18 346:1
442:17 461:19
461:22 462:2
462:10,14
463:2,2,3,14
**changes** 501:9
501:12
**changing** 35:11
126:15 250:6
367:1,4
**chaos** 173:7
**characteristics**
40:10 48:24
49:7 342:10
**characterizati...**
177:22 283:11
**characterizati...**
51:20

**characterize**
19:3 50:19
**characterizing**
105:9
**characters** 88:1
**charge** 74:20
**charged** 94:17
137:4
**charlie** 24:2
98:6
**chart** 167:24
185:2
**charts** 173:18
**check** 15:15
26:6 122:16
265:16,17
297:9 457:7,8
457:17,19
487:21
**cherry** 5:8 19:8
19:18 61:24
433:1,12,13,18
434:5,11,19
**chewing** 387:22
**chief** 192:11
**child** 299:24
**children** 338:15
339:17 380:7
380:23 381:9
**china** 410:16
**choose** 87:5
365:23 366:1
493:19
**choosing** 252:7
368:10

[chose - command]                                                    Page 18

**chose** 87:7 88:5
**chris** 36:3
   37:13 63:6
   81:20 114:10
   122:8
**christopher** 3:6
**chrysotile**
   11:15 51:19
   52:7,15,24
   382:11,15,17
   382:21
**chudkowski**
   10:14
**cigarette**
   320:11
**circumstances**
   299:8
**citations**
   421:13
**cite** 61:14
**cited** 210:13
   316:24 356:6
   421:7,9,16,18
   421:20,24
**cites** 210:11
**citing** 331:21
**citizen** 8:13
**citizen's** 299:14
**citizens** 280:7
   285:4,7,19
   294:18 296:22
   297:7,15
   298:14 299:5,8
   299:19 300:21
**claim** 16:9 17:7
   17:8,13,16,18

   17:21,22 18:2
**claims** 19:4
   28:19 30:9,15
   116:24 139:5
**clarification**
   118:10
**clarify** 432:22
   455:8 486:3,7
**class** 27:12
   67:12,12
   377:15
**classes** 64:12,14
**classifiable**
   267:23
**classification**
   268:17
**clear** 57:5 75:2
   75:3 77:16,18
   118:9 130:15
   134:7,8,9
   138:18,19
   139:24 141:10
   142:14 164:11
   172:10 175:11
   189:20 252:15
   304:19 312:6
   330:7 336:3
   350:13 391:10
   427:16 457:12
   470:19 487:12
   488:23 497:16
**clearly** 18:7
   37:14 245:18
   253:1
**client** 310:3

**clients** 310:3
   312:11,21
**climate** 169:16
**clinical** 29:22
**clinically** 29:17
**close** 375:12
**closely** 28:10
   205:22 206:2
   233:5
**coalition** 8:12
   10:12 251:11
   285:19 298:19
   299:2 323:21
   324:8,14,21
**codify** 188:11
**coffee** 124:6
**coke** 160:12,15
   160:16,19,20
**colamarino**
   353:2
**collaborated**
   489:19
**collaborating**
   281:22 289:15
   294:2
**collaboratively**
   162:15 408:22
   412:22 474:7
**collaborators**
   435:9,16
**colleagues**
   215:20 465:23
**collect** 102:9
   104:1 363:4,5
**collectively**
   236:16

**colleen** 351:24
   352:2
**college** 53:16
**color** 151:9
**columbia** 2:23
   502:2,5,22
**column** 224:14
   375:7
**combat** 22:18
**combining**
   166:5
**come** 24:20
   46:5 99:6,17
   101:18 113:8,9
   113:12 115:3
   118:24 193:20
   203:9 205:8
   269:9 270:23
   271:2 296:21
   440:18 445:11
   457:8 462:13
   471:1 477:19
   495:22
**comeaux** 111:5
   483:3,18
**comes** 109:7
   210:5 302:22
   348:1 435:8
   456:4
**coming** 25:2
   116:17 130:6
   167:14 178:1
   206:13 241:21
   264:1 363:6
**command**
   165:16

**[comment - complicated]**

**comment**
203:19 231:10
350:21 370:4
**commenting**
253:8
**comments** 10:5
284:12 386:23
**commerce** 3:18
**commercial**
425:14
**commercially**
41:24
**commission**
502:24
**commissioner**
8:2 20:19,24
61:11 62:24
195:19
**commissioners**
61:14,19
**commitment**
171:20
**committed**
71:12 172:21
**committee**
24:19 128:9
497:1,5,10
**committees**
218:13
**commonly**
293:20 387:17
**communicate**
90:15
**communication**
134:8 280:22

**communicati...**
90:5,11
**community**
22:21 24:19
25:9,18,21,23
26:1,2 32:14
116:17 143:20
144:14 214:7
273:9 274:2
279:8 286:7
289:13 313:12
313:18,19
315:15 322:3
361:5 383:14
385:15 474:6
**companies**
58:13 59:6 67:5
69:11,14,23
70:3,11,15
78:18 79:8,13
80:4,21 133:8
149:17 154:22
155:17 156:10
156:20 165:21
166:7 179:8
180:18 278:8
349:24 465:18
478:16
**company** 17:4
25:6 26:22 27:3
35:10 38:5
44:20 57:22
58:9,22 59:11
65:11,12 66:24
67:14 81:9 87:9
101:7 103:11

106:24 115:8
116:13 117:19
126:14 129:12
129:15,20
130:3,6 146:12
147:11 149:13
149:24 150:11
151:12,16,17
154:10 156:16
157:4,8,16
158:5 160:10
161:5 162:21
165:3 167:5
175:24 176:16
176:17 177:2
177:19 178:15
188:20,22
189:1,7,19
192:22 197:7
197:21 199:15
212:6 242:4,7
242:19 250:13
254:2 260:20
296:14 298:22
299:23 300:2,3
305:15 307:3
308:3,8,12,14
309:22 314:5
322:11 323:2
325:19,19
327:2 342:23
343:4 352:4
409:10,15,24
413:14 414:16
414:19 417:15
426:20 431:4

432:17,20
459:16,23
463:24 464:9
464:10,13
465:8 466:24
470:16 471:20
473:7,15
479:14 484:4,6
486:20 487:4
**company's**
187:8 355:1
359:5 465:8
473:24
**compare** 260:4
**comparison**
237:14
**compel** 306:9
**complaint** 17:1
17:12,20
**complete** 15:14
15:17 91:8
92:18 321:4
333:24
**completed**
91:12 457:5
**completely**
75:7 131:5
258:1 323:12
383:5 426:23
495:17
**complex** 231:20
**compliance**
58:23 61:1
**complicated**
167:11,18

**[complied - considered]**                                     Page 20

complied  89:14
comply  57:24
complying
    74:17
compound
    128:17 313:22
    457:21
comprehensive
    332:3,4 333:8
    360:9 361:10
    361:16,24
    431:1
comprehensi...
    332:5,24
computer
    363:11
concentration
    430:18
concept  104:16
    214:22 215:9
conceptual
    23:24 102:20
    102:21 307:12
concern  140:19
    203:15,23
    204:6,24
    222:16 226:7
    226:11,20
    227:1 286:14
    295:13 405:17
concerned
    32:16 239:11
    256:3 287:23
    323:3,4 338:4
    430:18 431:5

concerns  32:23
    223:1 278:15
    279:12 284:19
    285:8 286:1,2,6
    286:18,21
conclude
    230:24
concluded  26:5
    237:3 319:17
    441:13 499:16
concluding
    360:10
conclusion  72:3
    153:5 245:2,14
    245:15 369:20
    390:2 475:20
conclusions
    72:5 117:5
    214:20 215:6
    499:7
conclusive
    269:17,20
    271:15 301:1
    321:19
conditioner
    376:16
conditions
    11:17 135:21
    152:11,12
conduct  123:14
    432:17,20
conducted  35:5
    87:3 119:20
    210:22 227:21
    229:16 255:6
    264:6 398:24

conducting
    278:10 289:19
conducts
    208:15,17
confer  90:24
    97:22
conference
    214:2 273:21
    273:22 274:20
    275:1,17,23
    276:12 279:3,5
    279:7 284:20
    289:14 292:2
    295:2,5,18
    296:2,4 354:11
    476:9
conferences
    214:1 241:8
    474:13 475:8
    475:14,19,20
    476:1
confess  98:23
confidence
    350:8
confidential
    346:2,10
confirm  276:11
confirms
    254:21
conflicting
    108:2
conflicts  108:9
confronted
    349:4
confused
    489:13

confusion
    356:14
congress  497:8
congressional
    386:18
congruence
    459:19
conlan  483:19
connected
    470:11
connecting
    472:13
connection
    43:13,20 84:6
    84:19 89:2
    262:4 294:16
    472:21
consequence
    436:7
conservative
    249:24 253:17
    330:2 341:11
consider
    126:14 146:12
    147:1,10
    252:21 258:4
    273:14,16,17
    273:18,20,20
    341:2 350:1
    358:10 383:17
considered
    42:7 108:10,11
    120:1,8 121:12
    121:16 234:3
    241:2 252:17
    254:2 256:23

**[considered - contributed]**                                                                 Page 21

273:11 281:15
425:24 450:2
**considering**
250:6 358:10
**considers**   22:19
**consistent**
33:15,20
106:23 108:22
117:19 157:16
175:23 197:6
197:10,12,21
198:2,5,9 199:7
369:21 370:14
465:3 470:2
471:19 473:7
**consistently**
160:1 199:14
**consortium**
243:13,18
246:3
**constituents**
49:24 245:22
**constitutes**
153:10
**consult**   45:14
46:3
**consultant**   57:7
296:9 318:12
322:4 419:2
**consultations**
59:6
**consulted**   46:13
57:12,14,15,21
58:2 59:10 65:7
69:15 70:9

**consulting**
43:12 57:16
68:18,20 69:2,4
69:7 70:15
76:16 79:12,12
**consumer**   4:15
13:10 17:4 25:7
27:12 45:17
46:6 59:13,19
59:23 65:10
69:23 70:16
160:8,13
180:18 183:17
184:8 189:14
193:10 194:1
350:8 352:5
353:18,21
354:24 389:14
**consumer's**
212:6
**consumers**
16:16,24 17:18
26:23 27:5
41:19 106:2
107:1 115:9
117:20 138:5
143:13 150:1
157:17 176:1
197:8 198:14
198:15 243:4
252:12 305:15
326:7 369:11
369:24 370:6
381:17 471:21
471:21 473:8

**contact**   43:18
46:22 278:14
**contacted**
46:21 65:10
91:19 111:4,6,8
115:1
**contacts**   65:6
**contain**   16:5
21:8 162:8
252:22 375:9
375:18 387:21
422:21 425:16
**contained**
427:17 442:15
**containing**
12:11 226:12
226:21 256:5,6
265:24 375:9
375:18 439:19
**contains**   152:9
263:13 374:7
426:3,10
428:18
**contaminated**
112:11,12
116:21,22
139:7,18
**contamination**
376:15,17
**contempt**
131:20 132:4
**contend**   17:3
41:7
**content**   12:18
386:22 421:15
422:4

**context**   23:5
36:10 37:3
50:14 70:16
90:2 110:24
123:18,20
141:7 167:13
194:1 209:18
218:22 228:13
232:6 247:23
325:6 343:6
428:6 433:6
466:20,22
**contingencies**
348:23
**continue**   40:1
63:11 99:24
175:4 285:8
286:2,18
309:12 381:19
412:5 415:14
**continued**
91:14 92:21
205:18 230:4
265:4,7 286:20
**continues**
376:10
**continuing**
104:8 294:6
**continuum**
92:16 246:9
254:15,17
**contrary**
320:13
**contributed**
41:18 162:3
386:12

[control - correct]                                              Page 22

| | | | |
|---|---|---|---|
| **control** 8:10 | 234:12 236:24 | 19:14,18,24 | 99:18 100:16 |
| 11:18,21 227:2 | 237:9,15,18 | 20:1,19,24 | 104:4 105:1,5 |
| 245:3,16 | 239:13 241:14 | 21:17 22:16,17 | 106:4 109:4,14 |
| **controlled** | 248:8 250:1,7 | 22:22,23 23:1 | 113:10,20 |
| 332:17 333:7 | 250:20 251:12 | 23:12 24:13 | 129:13 133:11 |
| 334:12 | 252:13,22 | 25:18,23 26:1,2 | 133:15,20 |
| **controls** 9:13 | 253:4,5,10,18 | 26:3,14,24 27:5 | 134:10 135:15 |
| **controversial** | 254:3,24 255:9 | 27:13,18 30:11 | 137:2,21,22 |
| 103:9 | 256:6,13 257:6 | 30:19 31:4,7,19 | 138:8,16 |
| **conversation** | 259:17 260:5,6 | 32:1,8,10 33:23 | 139:16 151:14 |
| 460:22,23 | 260:8,24 261:7 | 34:3,22 35:15 | 152:19 153:3 |
| **convince** | 261:10 304:1,9 | 38:19 39:3 43:8 | 160:5 165:5,11 |
| 437:12,21 | 304:13,14 | 43:9 44:2,10,15 | 165:17,23 |
| **cook** 8:20 221:4 | 306:9,11 | 46:14,16,17,18 | 169:24 170:21 |
| **cooperation** | 324:24 339:20 | 46:19 47:10,11 | 171:4 172:15 |
| 196:9 | 339:24 340:1,3 | 47:13,15,24 | 172:22 174:21 |
| **copy** 15:4,5 | 341:2,3,13,19 | 49:3,10,11,18 | 182:4,17 |
| 74:3 96:16 | 341:24 342:5 | 49:21,24 50:6 | 188:21,23 |
| 169:1 203:9 | 342:15,24 | 50:10 52:2 53:5 | 197:17 209:5 |
| 275:9,14 | 343:19 344:16 | 53:8 55:7 60:9 | 209:10,16 |
| 293:14 420:23 | 355:2,21 | 61:11,15,20,21 | 210:14 211:21 |
| 433:21 | 356:17 358:7 | 61:23 62:1 64:2 | 212:18 214:18 |
| **corn** 125:13 | 365:24 367:1,5 | 64:5 65:4,22,23 | 215:3 217:1 |
| 387:17 | 367:5,9 368:11 | 66:2,5,7,19 | 219:7 220:22 |
| **corner** 240:2 | 368:13,19 | 67:17,22 68:18 | 221:12,21 |
| **cornstarch** | 369:2,8 385:9 | 68:19 69:15,16 | 223:5,16 |
| 17:11 35:12 | 385:17,23,24 | 70:19 71:3,8,12 | 224:24 225:10 |
| 38:11,18,20 | **corporate** | 72:15 74:22 | 225:18,22 |
| 39:15 40:17 | 192:11 | 76:13 78:11 | 226:2 237:16 |
| 41:2,9,23 42:1 | **corporation's** | 79:1,2,21 82:15 | 238:13 250:14 |
| 42:4,6,13,16,17 | 289:18 | 82:19,20 83:2,3 | 253:10,19 |
| 42:18,24 43:1 | **correct** 14:17 | 83:9,10 84:10 | 254:15 255:11 |
| 125:14 126:15 | 14:22,24 15:1 | 86:21 88:12 | 256:8 264:2 |
| 128:12 140:16 | 15:13 16:11,17 | 93:3 94:3 95:3 | 265:15 266:5 |
| 213:21 218:16 | 17:6,11,15,19 | 95:14,19 96:9 | 267:3 268:10 |
| 232:11 234:4,6 | 17:24 19:4,5,11 | 97:9,14,15 | 268:18 270:7 |

**[correct - court]**

| | | | |
|---|---|---|---|
| 273:1,2,4 | 429:12,17 | 146:4 150:11 | **count**  76:7 82:7 |
| 276:18,19 | 432:21 436:10 | 150:23 151:8 | **countless** |
| 280:23 281:8 | 439:15,24 | 152:8 153:16 | 390:12 |
| 282:4,17 | 440:9,14,15,24 | 153:21 154:11 | **country**  243:23 |
| 283:22 286:3 | 441:2 442:6 | 219:3 266:13 | 244:10 |
| 290:3 295:3,4 | 443:9 444:6,20 | 291:23 292:9 | **county**  1:9 |
| 295:14 297:8 | 448:15 450:7 | 293:21 331:1 | **couple**  27:9 |
| 301:8 303:4 | 451:24 453:3 | 345:18,21 | 36:3 93:22 |
| 304:11 305:2 | 454:3 455:12 | 405:1 422:4 | 120:15 122:12 |
| 316:4 318:9 | 455:16 460:13 | 442:15 | 131:15 219:14 |
| 320:7 324:9 | 460:14 461:1 | **cosmetics**  7:9 | 220:8 280:3 |
| 326:10 331:7 | 462:9 467:7 | 7:10 10:9 27:13 | 281:5 337:10 |
| 333:19 335:9 | 469:12,14,19 | 27:17 55:1 | 347:6 349:9 |
| 336:4 344:16 | 470:6,21 472:7 | 69:23 91:4 | 448:2 455:9 |
| 347:20 348:8 | 477:10,13 | 145:20 146:6 | **course**  26:8 |
| 350:15,20 | 481:24 482:12 | 152:1 154:18 | 34:16 35:9 |
| 357:22 360:6 | 482:19 487:18 | 154:23 155:18 | 43:16 44:22 |
| 362:4 364:3 | 487:20,23 | 156:11,21 | 45:11 53:6,10 |
| 365:24 366:5 | 489:3 490:16 | 307:5 346:18 | 53:19,20 54:2 |
| 369:8 370:7,21 | 498:22 | 347:11 348:15 | 54:21 60:8,23 |
| 371:13,16 | **corrections** | 349:1 350:8 | 65:14 66:23,23 |
| 372:3 373:18 | 501:9 | 404:23 | 69:3,18 86:4 |
| 373:22 377:21 | **correctly**  43:10 | **cosponsored** | 96:5 115:21 |
| 378:19 379:14 | **corridors**  264:1 | 273:1 | 175:7 203:22 |
| 380:1,8,15,19 | **cosmetic**  8:14 | **cost**  333:22 | 284:12 372:22 |
| 380:23 381:6,9 | 12:10,18 27:14 | 334:22 335:3 | 374:4,8 424:7,8 |
| 396:8 406:5,12 | 27:18,21,24 | 338:22 387:19 | 425:5,6 442:20 |
| 406:18 409:15 | 28:2,8,12,13 | **costs**  333:13 | 497:9 |
| 410:4,10 411:3 | 55:3,15,23 56:6 | 334:19 | **courses**  60:7 |
| 411:4,7 412:12 | 56:10,14,21 | **council**  5:3 | 66:22 67:3 |
| 412:17 413:9 | 57:9,11 58:1,10 | **counsel**  84:14 | **coursework** |
| 413:21 414:16 | 58:24 59:11,24 | 84:22 87:18 | 67:11 |
| 417:9 418:22 | 61:2 62:13 63:5 | 94:1,22 178:11 | **court**  1:1,8 |
| 419:2,7 422:5,8 | 65:13 67:1,15 | 327:11 445:10 | 93:16 118:22 |
| 422:13 424:12 | 68:5 70:1,17 | 486:1 498:15 | 121:21 131:20 |
| 425:7 428:24 | 140:20 145:21 | 502:13,15 | 217:12 307:17 |

[court - date]                                                      Page 24

337:5 345:6
351:2 352:13
431:12 480:3
492:3 498:17
502:4
**courtroom**
288:9 371:4
458:23 466:6
**cover** 74:11
104:23 189:10
301:16,16
478:14
**covered** 16:17
28:7 56:14,20
58:9,16 59:11
59:23 66:24
67:5,14 69:24
70:17 93:9
138:6 145:21
**covering**
190:11
**covers** 190:14
**cramer** 8:10
9:6 34:14 108:4
108:5 109:7
206:19 207:7
207:10,11
212:3,8 230:3
240:21 246:24
269:5 273:14
273:14,17
367:2
**cramer's** 34:15
206:21
**create** 169:16
171:19 172:1,5

172:14
**created** 56:16
57:11 60:1
241:17 247:19
400:7,8 469:5
493:20
**creating** 107:15
498:3
**credible** 349:4
**credo** 89:10,14
132:24 133:3,5
133:6 134:2,4,7
134:18 164:2
172:12 179:18
179:20 181:21
182:3 192:21
338:13,17,18
338:20 339:15
438:21 459:12
459:15,16,23
459:24 460:1,6
460:8 461:1,2,3
461:7,15 462:2
462:12,17,19
463:6,16,24
464:5,13 465:8
**credos** 459:20
461:5
**crescendo**
350:18
**criteria** 193:7
**critical** 61:23
**criticisms** 62:6
**cross** 186:11
**crr** 1:23 502:21

**ct** 381:24
**ctfa** 11:1
382:11 402:18
402:20,21
405:2
**ctisi** 3:10
**cultural** 338:16
**culture** 71:11
71:16,20 72:1,9
72:11 131:1,4
163:19,22
164:6,10,12,16
169:8,13 175:1
175:7,9,18
192:2 467:14
497:13
**cultures** 170:5
**curious** 131:16
299:17,23
**current** 238:7
268:16,17
292:10 353:3
356:10
**currently**
254:23
**curriculum** 7:3
15:6,10 496:19
**customary**
152:13
**customer** 462:4
**customers** 17:6
197:22 416:7
417:19 461:18
462:8,12,13
473:17 479:15
479:16

**cut** 63:9 74:12
148:12 179:2
179:17 259:3
308:21,24
**cuts** 391:20
**cv** 47:10 50:24
57:14 64:6
65:18 66:15
68:17

**d**

**d** 14:1 403:1,1
**daily** 216:11
217:8
**damages**
121:23
**dangerous** 42:5
42:14 152:18
**dartmouth**
244:2 246:10
**data** 17:5 19:7
23:11,13,14
50:18 130:12
136:11,14,16
203:14 214:21
214:22 215:9
231:4 273:6,11
273:15 294:1
300:24 302:23
321:23
**database**
450:13,17
**date** 44:12
184:24 242:17
275:22 276:11
355:9 357:20

**[date - demonstrating]**                                                                 Page 25

| | | | |
|---|---|---|---|
| 405:9 447:7 448:3 502:10 | **deals** 48:16 183:22 192:16 497:6 | 231:20 254:6 312:3 343:2,8 343:10 355:6 | **definitely** 85:24 495:9 |
| **dated** 95:9 249:6 276:23 277:10 291:24 292:8 316:3 319:7 330:15 353:3 374:11 378:9 428:9 481:6 | **dear** 135:6 **debate** 407:1 **debated** 406:9 **debates** 384:9 384:11,15 **decade** 312:17 **decades** 16:15 16:23 23:15 | **decisions** 104:4 165:17 199:20 200:19,22 201:10,12 202:8,11 203:3 248:10 **declaration** 501:1 **declare** 501:4 | **definition** 107:18 116:24 438:14 **definitions** 432:23 435:7 **definitive** 302:12,15 311:20 328:13 332:19 333:9 |
| **dates** 409:23 446:22 **dating** 471:6,24 472:1 **daubert** 73:17 459:4,7 | 26:8 29:7 32:21 33:2 105:5 107:4 115:2 138:4 146:14 146:19 159:10 | **deep** 25:4 102:4 103:13 **deeper** 27:10 **deepwater** 7:14 71:1,17 72:1 | 334:13 336:17 337:12 338:2 338:21 **definitively** 335:11 |
| **david** 20:18,23 22:1,5 61:7,23 220:1 | 162:14 188:3 204:15 205:19 206:3 247:20 254:9,11 | 78:22 167:21 168:21 467:14 **defend** 80:9 472:5 | **degree** 64:11 395:10,23 **degrees** 483:7 484:20 485:4,6 |
| **day** 75:8 107:7 180:6 274:20 304:7 365:15 447:12,12 448:9,9 485:12 499:13 501:15 | 300:11,15,16 326:2 398:24 400:12,23 407:8 410:7 430:17 473:2 477:1 | **defendant** 121:14 **defendants** 1:14,18 4:14 **defending** 314:11 347:1 347:22 | **delay** 352:24 **deleterious** 152:9 **demand** 389:13 **demonstrate** 115:6 157:24 309:22 319:20 |
| **days** 276:21 295:11 **dc** 2:17 **deal** 49:6 149:6 165:22 229:1 474:23 495:7 495:10,12 | **december** 12:11 354:2 355:1,7,15,21 356:22 357:6 358:8,24 **decide** 102:9 241:13 | **defense** 346:17 **define** 136:4 **defined** 112:9 112:17,18,19 114:18 116:19 175:1 436:17 | 339:18 **demonstrated** 106:1 112:21 143:12 145:16 307:13 308:8 326:6 367:10 |
| **dealing** 65:12 76:4 166:20 185:16 186:18 187:8 385:7 | **decided** 478:18 **decision** 199:22 200:9,21,24 | 438:9 | **demonstrating** 222:5 310:14 |

**denial**  297:15
**denied**  294:18
  297:7 300:21
**denies**  320:9
**denise**  1:23
  2:20 502:3,21
**density**  419:5
  422:8,12,16
  430:10
**denying**  320:12
**department**
  207:12 389:1
**departments**
  186:13
**depend**  149:18
**dependent**
  24:11,14 25:1
  118:15 123:18
  131:6 141:7
**depending**
  110:23,23
  168:8 249:21
  253:14 341:9
**depends**  131:11
  166:17 349:2
**deposed**  98:24
**deposition**  1:20
  2:11 7:1,7
  22:10,12 61:7
  63:24 74:7,18
  86:2 122:19
  335:24 344:2,8
  425:6 429:20
  494:8 499:16
  501:6,10

**depositions**
  22:7 119:6
  130:1
**deposits**  375:8
  375:17
**describe**  14:19
  176:19 177:4
  497:21,23
**described**  77:6
  115:15 127:14
  177:14 284:14
  331:17 333:5
  363:8,22 424:1
  431:2 440:11
  450:13 476:15
  481:15 483:12
**describes**
  430:11
**description**  7:2
  445:21
**descriptive**
  498:4
**design**  59:22
  60:1 231:10
  233:20
**designated**
  14:23 72:14,19
  78:21,23 84:24
  85:1
**designation**
  11:19
**designed**  52:15
  338:21
**designs**  188:8
  188:15

**desk**  210:6
**despite**  471:5
**destructive**
  40:18
**detail**  453:15
**detailed**  177:12
  332:11 452:24
  453:2
**details**  50:12
  407:20,21
  439:12 477:20
  478:7
**detect**  395:9,22
  397:13 405:16
  407:3 416:9
**detectable**
  396:7,20,21
  399:15
**detection**
  159:16 186:13
  391:13 402:8
  402:15,16
  403:3,10
  408:12
**determination**
  429:4 473:13
**determine**
  193:6,8 224:19
  248:7 305:12
  448:17 449:10
**determined**
  439:14
**develop**  16:10
  83:22 92:4 99:7
  112:13 116:23
  123:20 158:22

  162:18 173:15
  173:21 177:7
  179:6 285:9
  286:2 408:23
**developed**
  23:12 38:23
  40:17 98:20
  106:10 124:22
  241:17 270:17
  307:11 310:10
  383:12 412:23
  493:2
**developing**
  59:12 176:8
  222:18
**development**
  8:23 39:15 63:4
  435:5
**device**  293:22
**devices**  189:14
**devoted**  26:10
  74:24
**dezenhall**  11:3
  346:3
**diana**  1:15
**diette**  261:20
**difference**
  269:19 328:7
  395:6,11,19
  396:1,5,19,24
  397:5,12
  436:15,23
  437:7 476:16
  476:23
**different**  39:8
  40:9 42:9

[different - disruptive]                                                    Page 27

109:21,22,22
113:9 131:5
135:21 142:23
143:6 144:5
145:19 147:14
147:21 163:14
163:16 167:15
168:15,16
170:13 175:16
180:24 188:21
235:17 240:15
258:1 259:8
270:2 293:7
297:10 322:18
323:12 348:6
393:10,11
409:13 448:22
463:6 468:19
478:23 483:14
495:17
**differently**
438:20
**difficult** 302:11
303:9 310:16
310:16,21
311:9,19,24
313:6
**difficulties**
455:5
**diffraction**
405:10
**digging** 468:14
**diminish**
348:20
**direct** 451:15

**directing** 456:4
**direction** 86:24
87:3
**directions**
154:4 167:15
**directive**
202:19
**directly** 269:9
455:18 490:15
**director** 277:9
**disaffirm**
369:19
**disaffirmed**
436:22
**disagree** 200:14
208:20 244:9
252:9 435:13
437:18,23
438:7,15
**disavowed**
367:17 377:4
**disbelieve**
146:1
**discern** 475:23
**discerned**
474:2
**disciplines**
20:11,15 308:7
**disclosed**
493:21
**discontinuation**
325:11
**discontinue**
322:15,19
323:10 354:23

**discontinuing**
304:15 356:16
356:16 367:8
**discount**
425:19
**discourage**
216:10 217:7
**discover** 387:24
**discuss** 138:20
189:6 229:7
358:6 418:19
418:22
**discussed** 116:4
125:1 138:15
358:7 366:13
366:15 367:3
367:24 390:19
391:3,4,8 402:7
418:11 467:12
469:16 486:2
**discusses** 487:1
**discussing**
67:21 104:20
325:7 342:23
343:1 416:12
416:13 474:15
476:2
**discussion** 8:6
60:22 232:10
232:23 233:4
233:18 234:13
234:17 235:1
260:23 292:10
322:16 339:24
341:16,17
342:13 343:18

343:22 351:15
357:14 385:18
496:20
**discussions**
37:4 232:13
283:22 390:14
451:19 461:1
**disease** 42:5,14
42:24 479:17
**dismiss** 302:11
303:9 310:17
310:21 311:9
311:19,24
313:6
**dismissed**
277:19 303:15
**dispute** 29:7
32:11
**disrupt** 438:5
438:17
**disruptive** 33:3
39:19 40:19
87:10 99:14
104:14,15
107:17 108:7
109:2,7 110:18
113:23 141:5
142:21 143:16
165:23 166:3,8
166:21 174:9
204:5,13,14,20
205:3,9 209:15
233:2 263:19
342:1 438:3,6
438:14

**[distilling - doing]**                                                   Page 28

| | | | |
|---|---|---|---|
| **distilling** | 221:14 224:2 | 386:19 387:2,9 | 363:2,15,17,17 |
| 391:10 | 224:10,12 | 392:20 393:1,4 | 363:19,23 |
| **distinction** | 225:4 230:10 | 401:21 402:4 | 366:24 367:24 |
| 252:15 | 235:14 242:3,3 | 404:4,7,9 409:6 | 368:7,9 369:5 |
| **distribution** | 242:6,18 243:9 | 410:13 414:10 | 381:14 399:14 |
| 422:22 | 249:2 258:11 | 414:23 415:1 | 402:1 420:3 |
| **district**  1:1,2 | 261:14 274:15 | 419:18 420:19 | 430:24 440:8 |
| 2:23 502:2,5,22 | 275:18,24 | 423:9,10 | 440:11 442:2,6 |
| **divine**  253:21 | 276:21 277:1 | 424:22 428:10 | 442:8,12,20 |
| 261:3 278:23 | 279:23 281:3 | 428:15 433:4,5 | 443:8,11,14,15 |
| 342:19 349:18 | 291:17,20 | 436:18 445:20 | 443:16 444:4,5 |
| **division**  1:9 | 292:3 295:23 | 447:11,16,19 | 444:8,12,13,15 |
| 44:21 254:20 | 296:1,5,20,21 | 447:20 451:17 | 446:14 448:13 |
| **divisions** | 297:3,9,21 | 452:1,3 453:14 | 448:14,17,19 |
| 188:21 | 301:12,14 | 463:5 465:2 | 448:24 449:3,9 |
| **dobner**  1:23 | 311:1 315:21 | 472:1 475:23 | 449:10,12 |
| 2:21 502:3,21 | 315:24 316:3 | **documented** | 450:1,12,14,16 |
| **docket**  1:11,15 | 318:2 319:1 | 463:17 | 450:22,22 |
| 93:1 | 323:17 324:1 | **documenting** | 451:3,8,9 460:9 |
| **doctor**  64:19,20 | 328:20 330:15 | 222:5,11 | 460:16,16,17 |
| 254:20 263:17 | 330:20 337:14 | **documents** | 460:19,21 |
| 288:10 307:18 | 339:23 340:4 | 38:8 42:23 | 469:8,9,13 |
| **doctors**  304:23 | 342:17 343:17 | 45:13 46:2 | 471:23 473:2 |
| 463:19 | 344:12,17 | 74:16 92:11,13 | 481:19 |
| **document**  15:7 | 345:12 346:6,8 | 92:18,20 93:6,9 | **doing**  17:10 |
| 15:23 36:19 | 349:14,18 | 120:1 198:12 | 44:6,6 59:5,15 |
| 37:10 47:17 | 350:22 351:7 | 232:9 261:5,6 | 71:24 78:18 |
| 74:8,14 77:6 | 351:10,15 | 263:19 304:10 | 94:16,19,19 |
| 78:3 86:10 | 352:20 354:7 | 305:4,18 308:8 | 95:24 100:20 |
| 89:24 145:17 | 355:12 357:3 | 309:20 321:22 | 104:8 125:3 |
| 150:5 163:9 | 357:14 359:6 | 322:2 323:1 | 127:1 128:21 |
| 169:4 181:17 | 361:23 362:8 | 324:12 337:15 | 128:22 130:21 |
| 183:19 185:22 | 364:19 368:22 | 337:20,23 | 148:24 155:5 |
| 185:23 194:21 | 374:12 375:1 | 338:5 346:24 | 162:13 175:19 |
| 201:19 207:4 | 378:5,15 | 356:14 359:15 | 181:9 196:16 |
| 214:14 221:8 | 381:22 386:14 | 359:19 362:24 | 198:22 213:24 |

**[doing - early]**                                                                 Page 29

240:6,8,15
242:4,14
250:16 260:14
260:16,19,20
284:5 290:2,9
313:9 325:18
355:19 360:9
407:8 408:19
410:2,3 411:6
413:1,6,19,20
414:1,4 418:14
427:23 430:19
435:6 446:15
447:8 448:4,7,9
451:12 456:18
470:16 475:16
477:6 478:20
**dollar**  189:1
**dollars**  79:21
80:12,16,20,23
94:17 262:2,6,8
262:17 329:17
335:15 338:22
490:10
**donald**  120:18
**double**  122:16
**doubled**  263:10
**dozen**  471:5
**dr**  3:16 10:6
13:7,8 18:6
22:10,11 34:14
34:15 61:7,23
63:12 86:14,14
86:15,16 87:12
87:14 88:15
119:19 120:24

122:23,23
124:18 126:24
130:16 131:19
132:2 196:1,8
198:5,23
201:23 206:21
207:7,10,11
212:3,8 214:18
215:20 218:8
220:23 225:13
225:14,17
229:9 230:3
235:18 255:23
261:20,20
279:10 295:18
295:18 322:14
325:18 335:22
367:2 377:19
377:23 378:8
380:9 381:11
382:22 395:1
396:5,12
397:10 418:2,4
418:9,11
420:22 431:2
434:13,18
435:18,19
471:23 485:23
492:10,12
496:7
**draft**  11:10
58:22 336:21
353:13 354:1
355:14 360:9
362:4 364:14
364:15,23

**drafted**  55:21
56:6,9 58:7
335:23 494:6
**drafting**  55:22
56:13,19 57:8
58:21 59:18
256:23 336:17
**drawing**  103:20
433:5 436:18
**drew**  54:3
**drs**  119:4
**drug**  12:5 27:18
27:23 28:8,12
55:2 56:14,21
58:1,9,23 59:11
59:24 61:1 63:1
65:13 67:1,14
67:16 68:5
69:24 70:17
145:21 146:3
153:16,21
293:21
**drugs**  61:2
**due**  154:3
200:13 227:15
327:23 389:6
455:4
**duly**  14:5 265:5
502:6
**dumpster**
401:1
**duplicate**
431:24
**dusted**  387:17
387:21

**dusting**  303:3
**duties**  57:24
**duty**  389:10
479:15
**dylan**  483:19

**e**

**e**  9:15 11:6
13:14 14:1,1
90:6,7,9,10,14
90:15,16 249:6
249:15 280:21
282:17 343:21
344:13 351:13
353:1 356:3
463:5,5 471:24
471:24
**e.g.**  245:22
249:23
**earlier**  57:10
69:20 98:8
100:5 107:3
118:4 126:11
130:9 138:15
139:20 175:20
247:18 269:16
289:21 290:18
339:22 406:7
434:12 444:18
451:14 452:11
459:12 476:15
**early**  66:11
107:9 129:12
136:17 205:4
266:12,12
304:7 307:3

383:1 440:12
**earned**  262:1,5
    262:7
**easily**  238:11
**easy**  195:10
**economic**  76:16
**effect**  29:12
    71:10 224:19
    245:21
**effective**  29:6
    41:24 238:7
    403:16
**effectiveness**
    30:2,10
**effects**  427:3
**efforts**  77:4
    136:17
**either**  27:24
    73:13 137:7,12
    150:14 173:7
    180:17 218:14
    232:11 268:15
    281:12 305:1
    370:24 450:20
    458:7 472:7
    478:16
**elaborate**  171:6
    174:17 175:5
**elaborated**
    170:6,14
**elaborating**
    72:11
**electric**  69:13
    70:12
**elements**
    169:14

**eliminated**  74:1
**eliminating**
    238:3
**embracing**
    202:19
**emerging**
    203:13,14
    219:12 497:1,6
**emphasis**  462:3
    462:5
**emphasize**
    169:15
**empirical**
    166:14
**employ**  59:13
    168:10
**employed**
    159:17 498:20
**employee**
    502:13,15
**employees**
    45:22
**enable**  171:6
    174:24
**enabled**  169:14
    170:5
**enables**  133:6
**enabling**  72:11
    133:6
**enact**  164:11
    171:6 173:23
    175:4
**enacted**  169:20
    170:6
**enacting**  72:10
    164:16

**encapsulated**
    92:5
**encourage**
    342:23
**ends**  375:6
**engage**  22:15
**engaged**  308:13
    309:23 469:6
    473:6 478:21
**engaging**
    166:24 233:8
    247:20 470:1
    470:14 471:1
    474:4 476:3
**engineering**
    496:23 497:19
**engineers**  468:4
    468:12
**english**  286:19
**enlighten**  98:9
**ensure**  17:5
    146:13 154:5
    154:24 155:12
    155:13,19
    156:12,17,22
    157:9 158:6,16
    160:3 313:18
**entailed**  111:15
**entails**  100:5
    102:1 164:23
**enter**  102:2
**enters**  24:5
    100:3 436:20
**entire**  501:5
**entities**  99:6
    313:15 361:3

**entitled**  19:2
    182:2 184:9
    277:9 330:16
    353:2 421:14
    422:3
**environment**
    11:22 25:14,15
    25:19 26:10
    45:16 46:6
    101:8 103:10
    110:9 141:17
    142:13 143:12
    147:1,11,24
    149:13 251:18
    286:24 306:19
    348:7 372:24
**environmental**
    238:10 421:5
**eoc**  236:3
    237:24
**epa**  11:15
    371:23
**epidemiologic**
    237:2 238:1
    302:23
**epidemiologi...**
    54:15
**epidemiologies**
    108:5
**epidemiologist**
    35:3,21 53:24
    54:1,11 119:19
    207:8 239:10
    269:23 310:11
    469:11

[epidemiologists - ewald]                                      Page 31

| | | | |
|---|---|---|---|
| **epidemiologi...** | 5:6 | **evaluating** | 311:16,19,24 |
| 46:14 262:1 | **essential** 348:2 | 277:16 325:18 | 313:5 318:14 |
| 484:9 | **essentially** 24:7 | **evaluation** | 320:13 321:18 |
| **epidemiology** | 135:5 148:17 | 187:2 241:11 | 322:5,9,11 |
| 34:13 36:21 | **establish** | 360:18,22 | 342:12 360:10 |
| 54:3,16,21 | 112:24 305:10 | 362:17 | 360:22 389:6 |
| 109:21 112:21 | 358:17 | **event** 183:5 | 389:13 408:7 |
| 113:22 124:22 | **established** | 233:22 250:11 | 433:12,13 |
| 125:4 126:1,8 | 19:20 23:23 | 273:4 343:16 | 449:8 451:21 |
| 137:1,4,5 | 40:4,5 98:10 | 437:12,21 | 473:23 477:5 |
| 221:13 290:16 | 192:11 205:6 | 476:14 | **ewald** 4:17 6:7 |
| 330:24 333:1 | 241:16 270:15 | **events** 348:23 | 6:10 18:9,12,16 |
| 336:17 361:11 | 289:7 478:13 | 358:4 436:10 | 18:21 21:12 |
| 439:7 469:14 | 488:18 | 436:24 437:5,7 | 33:18 34:23 |
| **epithelial** 9:8 | **establishing** | **everybody** | 35:16 36:2 |
| 214:24 215:2 | 474:9 | 45:22,24,24 | 37:13,19,22 |
| 215:11,13 | **estimate** 231:15 | 148:23 484:20 | 39:5 40:13 |
| 231:2 244:17 | 335:12 | 497:10 | 43:12 47:22 |
| 245:19 303:1 | **estimation** | **everyday** | 48:6,19,22 |
| **epithelium** | 199:6 | 189:15 | 56:24 60:10 |
| 236:19 | **et** 1:13,18 8:10 | **evidence** 19:8 | 62:14 63:6,9 |
| **epstein** 10:12 | 8:17,20,24 9:6 | 40:24 41:23 | 71:13 72:17 |
| 10:16 325:18 | 9:10,14 | 42:12,22 87:22 | 75:19 77:15,20 |
| **equalling** 447:4 | **ethos** 462:22 | 89:5,19,19,21 | 78:1 79:15 |
| **equifinality** | **etiologic** 236:17 | 90:1 115:3 | 81:20,23 83:13 |
| 190:2 | **etiology** 215:1 | 124:22 193:23 | 85:1,7,12,16,20 |
| **ernst** 287:5 | 215:12 | 199:23 218:7 | 86:3 89:16 |
| **err** 389:7 | **eu** 202:19,20 | 219:3 227:22 | 90:21 93:13 |
| **errata** 500:1 | **euphemistically** | 229:17 247:10 | 94:4 97:20 |
| 501:11 | 320:2 | 259:16 260:7 | 110:1 113:1 |
| **especially** | **evaluate** 108:20 | 263:7 269:20 | 114:10,14 |
| 104:13 238:5 | 130:6,18 131:1 | 271:15 294:7 | 116:6 117:4,13 |
| 303:1 339:7 | **evaluated** | 296:3 301:1 | 122:2,8,17 |
| 380:23 381:8 | 237:1 247:14 | 302:8,11,20 | 124:9 127:20 |
| **esq** 3:6,15,16 | 265:23 269:1 | 303:6 309:22 | 128:16 131:9 |
| 3:17 4:5,17,18 | 439:18 | 310:14 311:7,7 | 131:22 132:5 |

**[ewald - example]**                                                   Page 32

| | | | |
|---|---|---|---|
| 132:17 134:23 | 288:14 292:17 | 399:22 400:14 | 495:4,20 |
| 137:10 140:3 | 292:22 293:2,6 | 401:2 402:18 | **exactly**   147:18 |
| 141:21 142:1,5 | 297:20,23 | 403:19 407:4 | 253:21 273:7 |
| 148:1,8 149:9 | 299:10 300:2 | 410:5 411:15 | 274:12 320:16 |
| 149:15 151:15 | 305:3 307:21 | 411:19,23 | 419:12 |
| 153:4 158:8 | 308:17,20 | 412:2 413:22 | **examination** |
| 160:14,21 | 310:18,22,24 | 415:2,8,13 | 6:2 14:4,8 |
| 161:8 162:9 | 311:3,11 | 416:1,18 420:1 | 265:4,7 431:20 |
| 163:3 165:24 | 312:12,19 | 420:6,11,14 | 480:9 485:21 |
| 166:10 167:8 | 313:21 314:9 | 425:8 426:23 | 487:10 489:11 |
| 168:24 169:3 | 314:19 315:6 | 430:1,7 433:20 | 496:5 |
| 176:21 178:9 | 317:3,7,14,18 | 433:23 434:20 | **examine**   117:10 |
| 178:17 183:6 | 317:23 318:15 | 440:18,21 | 186:19 202:17 |
| 183:23 184:3 | 319:9 320:23 | 445:14 449:14 | 234:15 331:1 |
| 192:6 193:11 | 321:3,6 327:12 | 457:20 458:4 | 390:9 |
| 195:2,5,9 197:1 | 328:15 329:7 | 464:17 465:12 | **examined**   14:5 |
| 200:14 201:3 | 330:6,13 | 466:8,13 472:8 | 63:23 125:18 |
| 203:24 206:7 | 334:21 335:3 | 473:18 475:4 | 265:5 326:1 |
| 215:24 217:10 | 336:19,24 | 477:24 479:21 | 396:13,13 |
| 217:17,21 | 337:18,21 | 484:15 485:9 | 398:13 |
| 219:18,23 | 338:24 340:7 | 485:13,17,22 | **examining**   9:2 |
| 221:5 222:6 | 340:15 349:13 | 486:11,17 | 242:22 243:1 |
| 223:20,22 | 354:17 357:9 | 487:6 490:23 | **example**   24:12 |
| 227:23 232:15 | 359:17 362:20 | 491:2,8,13,16 | 34:13 49:6 |
| 232:18 235:19 | 367:14 370:8 | 491:19 492:5 | 70:11,24 89:10 |
| 245:6,10 247:5 | 374:16,18 | 492:11,15,19 | 99:13 101:7 |
| 248:14,19 | 375:11 376:22 | 492:23 493:5,7 | 102:7 108:4 |
| 255:13,16 | 378:10,23 | 493:12,16 | 124:18 125:12 |
| 259:3,7,10 | 379:2,5 381:2 | 494:2,9,13,21 | 136:14 147:2 |
| 262:10 264:3 | 382:1,4,6,8 | 495:1,8,11,19 | 154:4 174:8 |
| 268:2,19 | 385:12 387:6 | 495:24 496:3,6 | 175:14 176:11 |
| 269:10 270:8 | 388:6,12,17 | 496:8,12,16 | 176:12,13 |
| 270:10 271:20 | 390:1,16 | 499:10 | 178:6,7,8,12 |
| 272:19 274:10 | 391:15,22 | **exact**   44:12 | 183:15 209:15 |
| 276:4,7 279:16 | 393:13 394:15 | 360:14 397:23 | 252:18 313:24 |
| 283:10,24 | 397:15 399:6 | 494:19,21 | 396:13 405:18 |

[example - experienced]                                    Page 33

433:10,19
448:11 453:16
462:20
**examples** 24:17
69:22 434:16
434:18
**excel** 8:5
**excellent** 19:21
**except** 54:16
347:9 348:13
376:14 399:19
400:2 402:24
403:4 426:8
501:9
**excerpts** 12:2
**exchange**
186:12
**excuse** 15:5
181:14 205:14
206:9 230:22
234:8 235:13
236:5 246:12
280:21 330:16
357:21 361:9
446:23
**execute** 134:6
**executing**
133:19
**executive** 5:7
352:3
**exercise** 238:2
**exert** 237:10
245:21
**exhaustive**
171:11 442:11
443:11

**exhibit** 7:3,4,7
7:8,9,12,15,17
7:21 8:1,5,9,16
8:19,22 9:1,5,7
9:11,15,17,21
10:1,4,8,11,13
10:16,19 11:1,5
11:6,10,13,14
11:19,21 12:1,3
12:4,8,13,14,15
12:18,21 13:1,4
13:6,9,10,14
15:4,8,18,24
19:1 28:18 47:9
51:9,13 65:19
66:15 68:16
74:6,9 77:9,14
78:4 81:18
83:23 86:8,11
95:2 122:24
123:3 150:3,6,8
169:5 181:13
181:14,18,24
183:17,20
184:8 191:18
192:16 194:17
194:18,19,22
194:24 195:12
199:16 201:17
201:20 207:1,5
214:13,15
221:9 223:24
224:3 225:3,5
230:11,13
235:12,15,20
243:6,7,10

248:24 249:3,5
258:9,12
261:15 275:16
275:19 276:23
277:2 279:21
279:22,24
280:20 281:7
291:16,18
293:15 297:2,4
315:19,22
323:18,20
327:6,7 328:19
328:21 340:8
340:15 343:24
344:10 345:11
345:13 351:8
351:11 352:18
352:21 357:6
364:20 373:14
373:24 374:9
374:13 378:4,6
378:9 386:15
392:23 393:2
397:21 401:20
401:22 402:2
404:3,5 414:9
414:11 419:22
420:20 424:20
424:23 428:8
428:11 481:20
496:18 498:13
498:21 499:8
**exhibits** 7:1,6
13:22 15:22
**exist** 319:19
407:15

**existed** 204:15
495:3
**existing** 216:18
242:21 246:5
**exists** 372:23
373:5,7
**exit** 203:15
**expand** 335:15
**expect** 25:6
27:3 106:23
149:23 161:6
165:9 167:5
175:23 176:18
177:3 180:2
189:4,8,9,12,19
190:7,9 198:2
199:15 212:5
348:22 431:4,5
471:20
**expectations**
348:22
**expected** 26:22
39:22 337:17
438:4,11,17
470:15
**expecting**
107:22
**expenditures**
443:2
**expense** 389:16
**experience**
62:12 63:3,15
63:22 436:6,13
**experienced**
436:7

**[experiencing - fair]**                                                          Page 34

**experiencing**
  436:13 437:10
  438:12
**expert**  1:20
  2:11 7:4,12,15
  14:19,24 15:21
  20:23 21:16
  23:11 45:15
  46:4 47:12
  49:17,19,22
  50:4,8,20,21
  55:4,6,8,12,24
  56:15 57:8 64:4
  64:7,10 66:15
  70:20,22,24
  71:9 72:19 73:5
  73:24 78:21
  79:7,12 83:23
  89:2 95:20
  98:24 111:9
  120:19,23
  137:7 152:17
  154:13 159:19
  163:15,18
  164:8 167:21
  189:19 335:8
  370:20,22,23
  371:9 383:6
  384:21 413:14
  430:10 447:13
  465:24 467:6
  467:17,18
  476:17 477:13
  477:18 479:1
**expert's**  19:7

**expertise**  43:20
  44:23 71:15,24
  103:20 147:5
  255:23
**experts**  21:21
  22:9 103:17
  116:13 162:15
  247:21 250:19
  261:20 289:12
  347:10 348:14
  349:9 396:15
  401:18 408:23
  417:11,22
  418:1 431:8,8
  466:1 468:2,11
  473:11 474:4
  476:3,8,9,24
  484:12 494:16
**expires**  502:24
**explain**  24:2
  98:5 436:3
**explained**
  114:22,24
**explanation**
  100:12
**explore**  212:10
**expose**  198:14
  198:15 263:16
  372:7 381:17
**exposed**  216:19
  218:4 220:21
  372:11,15
  385:22 386:5
**exposure**  8:16
  8:19,22 9:3,5,7
  208:4 211:16

  212:16 222:17
  224:17 244:15
  302:10,22
  303:8 311:8,18
  365:14,21
  373:22 380:22
**exposures**
  216:8 217:5
  238:10
**extensive**  219:1
**extent**  305:13
  326:3 358:18
  471:15
**external**  26:10
  46:5 99:17
  101:7,17 104:2
**externally**
  101:19
**extrapolate**
  211:11

**f**

**f**  51:14 405:18
  409:18
**face**  313:5
  320:12 465:18
**facetious**
  127:22
**facing**  98:17,19
  99:4,10,13,15
  99:21 100:16
  213:13 468:2
**facsimile**  281:8
  282:17
**fact**  23:14 29:5
  45:10 61:13

  142:15,17
  253:7 254:1
  257:5 268:16
  282:16,19
  321:13,15
  338:8 341:24
  342:5 347:18
  352:4 358:20
  389:22 392:3
  400:6 417:23
  441:13 448:7
  451:4,4 472:17
  474:19
**factor**  246:15
  432:11
**factors**  9:17,20
  245:24 258:17
**facts**  154:3
  477:3
**factually**
  315:14
**faculty**  225:1
**failed**  17:5,18
  17:23
**fails**  459:16
**failure**  154:3
  470:13 472:7
  472:19,21
**failures**  467:23
  468:8,10,15,17
  468:22,24
  469:3,19 470:9
  470:18 471:9
**fair**  14:18 61:22
  80:19 183:11
  183:13 239:5

**[fair - find]**                                                                     Page 35

397:23,24
471:1 498:14
**fairly**   33:15
**fall**   22:3 92:7
92:22 480:21
**fallopian**   9:18
**familiar**   121:10
194:7,12
261:19 324:5
402:5
**far**   30:15 58:6
70:19 73:21
227:22 262:8
319:22 377:5
382:23 385:5
431:7 444:21
485:8
**fashion**   197:17
450:10
**fast**   217:16,17
405:8
**fatal**   42:24
**father**   380:6
**fathers**   463:20
**favor**   234:12
312:9 340:3
341:19 356:16
367:8
**fd**   156:1 312:10
**fda**   7:9,10,11
8:3 10:6 20:18
20:23 28:9,10
55:4,8 57:12,15
57:17,22 58:5
58:17 61:10,14
61:16,19 62:12

63:16 142:22
143:1,1,2,4,20
150:9,11,22,23
151:10 156:1,4
156:8 157:23
158:21 159:24
160:1 162:16
162:23 163:1
164:9 195:20
196:9 206:5
228:23 232:6,7
241:8 271:23
272:15,18
273:1 276:21
277:7,21
278:14 279:11
279:11 280:3
280:19,23
281:18,20,23
282:3 284:8,19
285:9 286:2
289:14 291:16
291:20 293:19
293:23 294:5
294:17 295:11
295:24 296:9
296:12,20,21
298:13,18,24
300:5,19,23
302:12 304:4
306:7,8 307:3
310:14 311:20
322:3 323:22
360:8 361:3,18
371:23 372:14
374:10 375:22

375:24 376:9
377:1 383:13
383:17,17
384:5,17,24
385:2,4 393:24
393:24 402:2
404:17 406:9
408:22 409:1
417:19 474:8
479:8,10
**fda's**   10:9
284:12 291:23
292:9 306:13
**february**   10:1,8
11:23 13:12
274:20 276:17
276:23 277:10
291:24 292:8
295:4
**federal**   11:14
27:23 28:8,12
58:1
**feedback**
332:16
**feel**   45:10
132:14 133:1
220:3 347:6
414:23
**felt**   71:19
**female**   259:18
260:8 365:20
**feminine**   17:15
249:10 256:3
387:20
**fiber**   8:22
224:17 372:16

380:8
**fibers**   265:14
265:24 266:4
268:11 373:10
439:19
**field**   14:24 20:9
20:12
**fifth**   416:1,3
**fight**   348:21
408:1
**figure**   45:20
51:10 99:13
171:1 254:4
480:4
**figuring**   436:6
**file**   8:1 12:5
195:21 196:5
**filed**   283:17
298:9,15
**files**   74:17
419:24 420:23
423:9
**final**   212:20
374:10 464:1
464:14 465:9
**finalize**   449:23
**finalizing**
498:10
**finally**   285:6,14
285:16
**financially**
502:16
**find**   111:18
300:24 301:3
375:13 376:1,8
421:24 427:24

**[find - form]**                                                                    Page 36

483:10

**findings** 121:21
256:1 269:18
269:20

**fine** 36:19
50:11 77:19
122:20 144:23
172:7 265:20
271:9 328:9
367:7 496:10

**finish** 36:5 37:1
37:19,23 68:24
86:1 134:14
141:22 142:2
148:14 149:4
219:20,24
220:4,6 248:3
320:24 367:14
434:9 446:23
477:24 488:6
493:17,17

**finished** 135:2
322:8 411:2
414:2,3,6 478:3

**first** 27:11
37:20 44:16
52:8 74:20 75:8
78:9,13,14 82:4
87:7 88:11
96:11 98:23
111:4,6,19
123:2 129:4
131:18 150:20
150:21 152:16
166:2 173:2
184:19 185:9

188:16 191:24
192:19 202:1
202:17 206:19
208:2 215:5
222:8 226:9,9
226:18 234:6
236:14 251:8
281:6 283:17
283:19 298:8
298:14 301:21
305:5 318:11
318:20 324:11
335:10 337:12
341:15 344:1
347:15 365:5
406:2 410:9
419:23 422:14
432:24 434:21
443:16 445:21
461:4,8,17
462:13 463:6
463:18 502:6

**fit** 73:15

**five** 21:23 32:21
50:12 92:17
96:9 188:2
369:7 371:2
377:8 400:12
400:23 455:13
470:17 482:2
490:11

**fl** 3:8

**flawed** 22:15

**flexibility**
166:15,16

**flexible** 165:22
166:7

**flom** 2:14

**focus** 40:12
182:24 186:12
328:17

**focused** 330:24

**follow** 10:2
37:22 114:7,8
149:17 175:2
205:18,22
206:2 277:10
279:5 459:24
460:1 486:7
489:6

**followed**
427:15

**following**
202:18 209:12
230:16 233:6
235:5 256:2
280:2 294:22
361:20 439:22
474:21

**follows** 14:6
265:6

**food** 27:18,23
28:8,12 55:2
56:14,20 58:1,9
58:23,23 59:11
59:24 61:1 63:1
65:13 67:1,14
67:16 68:5
69:24 70:17
145:21 146:3
153:16,21

**footnote** 39:24
208:13 275:11
276:13,14
403:1

**footnotes**
159:12 208:11
208:12 492:22

**force** 287:6

**forecast** 249:23
253:16 341:11

**forefront** 227:2
241:22

**foregoing** 502:8

**forget** 88:19
288:6

**forgotten**
148:15

**form** 33:18
34:23 35:16
39:6 47:22 48:6
60:11 62:14
71:13 72:17
79:15 83:14
89:16 110:2
113:1 116:6
117:4 122:2
124:9 128:16
131:9,22 132:5
137:10 148:1
149:15 151:15
153:4 158:8
160:21 161:8
162:9 165:24
166:10 167:8
178:17 183:6
193:11 201:3

**[form - fw]**                                                                Page 37

203:24 227:23
231:17 238:5
247:5 262:10
264:3 268:2,19
269:10 270:8
271:20 274:10
279:16 283:10
283:24 299:10
310:22 312:12
313:21 314:9
314:19 328:15
334:21 336:19
338:24 349:13
359:17 362:20
370:8 371:11
390:1,16
391:10,15,22
397:15 399:22
400:14 403:19
407:4 410:5
413:22 416:18
425:8 445:14
450:10 451:22
457:20 464:17
472:8 475:4
484:15
**formal** 231:5
247:13
**former** 20:18
61:10
**forms** 238:10
**forth** 96:8
502:10
**forum** 430:7
**forward** 230:1
243:7 353:8

**forwarding**
250:12
**found** 34:2
121:22 168:1
222:24 227:9
238:1 263:10
263:11 279:11
299:21 375:23
376:3,10,11
377:1,3,15
396:14 419:6,9
419:11 422:21
470:3
**foundation**
425:9
**four** 79:1 101:1
221:5,7 276:21
295:11 481:10
483:17 489:24
490:1,11
**fourth** 132:18
285:15 387:19
415:18,24
**fragrance**
31:18 345:19
345:21
**frame** 43:11
232:15,22
242:17 249:7
249:11 250:5
256:11 261:8
261:13 263:18
270:6,23
341:17 342:15
350:19 359:16
411:16,20

412:3
**framework**
23:24 98:11
102:20,21
103:3 130:8
131:1,5,6,10
168:18,20,21
169:9,10
197:24,24
199:20 202:21
211:4 273:4,5
307:13
**frameworks**
168:15
**frankly** 164:1
179:14 213:23
**free** 32:1,8,10
159:3 161:3
347:6 365:23
366:1 368:11
392:3,11,18,19
394:1,1,10,24
395:7,20 396:6
396:19 397:13
414:23 417:2
417:18,20
**freedom** 349:1
**frequent**
451:18
**frequently**
222:15
**friday** 75:15
77:16
**front** 15:20
17:20 99:3
160:13 276:14

342:17 434:15
434:21 436:2
466:7 498:13
**full** 45:2 196:9
224:15 236:14
312:17 318:20
334:5 400:24
400:24 401:1
411:22 487:22
**fuller** 196:1,8
198:5,23
201:23
**fully** 318:6
348:2 412:24
**functional**
186:11
**funded** 349:10
**fungus** 29:21
**further** 6:7,8,9
6:10 27:8 138:1
138:3 192:20
212:16 224:19
225:14 227:15
229:19 255:14
265:6 278:10
294:1,3,7
327:23 389:15
441:7,13 480:9
487:10 489:11
496:5 499:11
499:12 502:7
502:12
**future** 285:10
286:3
**fw** 13:15

[fyi - go]                                                                Page 38

| | | | |
|---|---|---|---|
| **fyi** 9:15 | 222:17 224:17 | 357:8 433:10 | 197:2 200:14 |
| **g** | 231:2,16,19,23 | 433:18 434:15 | 208:12 209:24 |
| **g** 14:1 | 241:15 244:14 | 434:18 485:17 | 210:2,22 214:9 |
| **gain** 289:18 | 245:18,21,24 | 494:10 | 214:10,11 |
| **gained** 64:18 | 246:5 251:14 | **given** 60:8,21 | 221:2 223:8,13 |
| 289:10,15 | 255:8 263:6 | 78:24 216:6 | 223:18,19 |
| **gaining** 289:17 | 302:9,21 303:2 | 217:3 237:23 | 224:12 226:16 |
| 289:18 | 303:7 305:2 | 238:5 340:24 | 227:5 228:22 |
| **gallons** 71:5,6 | 311:8,17 | **gives** 100:23 | 230:1,2 235:11 |
| 71:21 | 365:20 374:3,6 | **giving** 37:9 | 236:14 239:7 |
| **ge** 70:12 | 471:8 | 220:5 303:12 | 245:10 255:13 |
| **gears** 193:4 | **geologically** | 312:17 382:12 | 264:4 270:10 |
| **general** 32:17 | 373:18 | **glad** 162:19 | 271:22 279:20 |
| 38:9 69:12 | **geologist** 49:15 | **glass** 144:7,10 | 288:16 293:16 |
| 70:11 314:15 | 49:16 | **global** 186:10 | 294:21,23,23 |
| 360:7 442:18 | **george** 21:16 | 186:17 | 295:17 296:19 |
| **generally** 61:3 | 64:1 | **go** 18:19 27:8 | 301:12,13 |
| 62:2,7 79:11 | **georgia** 69:12 | 27:10 35:17 | 302:18 309:4,5 |
| 90:8 94:20 | **getting** 115:10 | 39:24 40:14 | 309:11 311:1,3 |
| 101:23 104:24 | 223:2 331:18 | 42:15 44:11 | 313:20 317:5,9 |
| 105:2 117:9,24 | 476:19 488:3,8 | 48:7 62:16 74:6 | 317:12,12 |
| 118:1 126:23 | 488:24 489:1,2 | 81:6 86:3 89:17 | 319:4 324:17 |
| 130:20 165:6 | 498:2 | 102:4,13 112:2 | 325:21 327:12 |
| 165:19 177:21 | **gettings** 277:8 | 117:6,15 | 332:7 339:2 |
| 312:22 313:1 | 295:18,18 | 122:24 125:9 | 347:8,16 |
| 315:3 360:14 | **giggles** 335:16 | 128:5,18 | 348:12,12 |
| 360:16 482:22 | **give** 16:6 75:13 | 134:15 135:2 | 349:15 350:24 |
| 497:22 | 79:10 80:2 | 135:22 137:14 | 353:12 355:11 |
| **generous** 334:8 | 87:17 104:16 | 140:5 141:15 | 355:11,13 |
| **genetics** 9:17 | 119:8 130:4 | 148:13 151:10 | 362:22 363:11 |
| 258:17 | 148:11 176:11 | 159:14 161:10 | 375:5,14,14 |
| **genital** 9:5,11 | 177:18 178:8 | 163:12 166:12 | 378:14 386:24 |
| 115:13 126:22 | 178:12 183:15 | 173:10,11,13 | 387:4 390:3,18 |
| 216:10 217:7 | 186:8 293:13 | 174:18 183:7 | 393:9 395:4,18 |
| 218:15 220:22 | 314:1 333:17 | 183:23 190:5 | 397:17 404:2 |
| | 334:4,5,7 338:9 | 191:18 192:19 | 409:11 420:2 |

[go - group]                                                          Page 39

439:12 442:1
456:1 457:22
465:13 466:6
472:11 473:21
478:6 480:5
486:18 487:6
489:20 494:1,3
494:14 496:4
**goal** 314:12
315:11
**goals** 314:18
**goes** 136:16
236:22 237:8
255:4 319:24
349:21 387:9
389:3 488:12
**goggins** 351:24
352:2
**going** 15:19
23:16,17 25:20
25:22,24 36:18
36:20 38:7 47:6
63:14 74:12
84:24 85:21
86:7 97:16
108:2 114:2,5
118:23 124:3
135:23 138:23
142:24,24
150:8,13
159:14 163:3
168:2 171:14
173:9 177:17
181:14 183:24
184:17 186:5,6
186:7 188:17

192:15 194:24
195:17 208:10
208:16 209:22
209:24 210:2
210:11 214:3
214:12 215:16
217:16 219:17
228:11,14,16
228:18,23
229:3,5 231:9
232:5,6 234:9
239:7 243:7
246:10,21
248:16 250:9
251:18 254:18
258:7 263:8
272:4,5,6
275:15,22
280:9,12,13
285:21 286:24
289:13 291:15
293:13 294:20
294:22 296:23
297:18 305:24
309:6 316:18
316:19,20
317:20,21
321:1 335:13
336:24 343:22
345:10 346:21
350:23 351:7
352:8,17
356:21 368:1
369:23 377:11
384:1,9,11
385:1 386:22

392:7 405:22
408:1 412:4
415:3 420:2
424:18 425:11
439:12 443:6
468:19 478:14
478:19,19
485:13,15,23
487:12 494:1,3
494:4 495:7,10
**goldman** 69:12
**golomb** 4:5 6:5
6:8 28:20
173:10 205:22
309:1 316:8,12
334:24 430:5
431:17,18,21
434:1,4,8,22
440:19,23
441:3 445:15
449:20,22
455:6 458:2,10
465:5,22
466:10,12,14
472:15 474:18
475:11 478:2,5
479:23 486:8
486:12 487:5,9
487:11 488:13
488:22 489:4
490:21 491:1,3
491:11 492:7
496:11,15
**good** 14:11,12
37:9 71:20 72:8
85:22 93:11

103:2 162:19
163:4,23
166:16 180:6
207:16 217:23
218:12 247:1
248:15,21
264:8 280:6
319:22 470:16
485:12 499:13
**gosh** 22:2
**gotten** 296:3
493:3,3
**govern** 63:4
183:4
**governed**
178:15 180:19
**government**
62:19,23
**graduate** 66:18
483:7 484:20
485:6
**grant** 207:20
**great** 71:10,19
93:13 280:11
419:20 495:11
**grinding** 414:5
**gross** 9:4 225:7
287:11 290:16
327:5
**ground** 410:9
410:15,18
414:2,3,5
**group** 13:4 69:7
69:8,9 76:11,14
76:15,17 77:4,7
78:7,10,14 79:4

**[group - head]**                                                                                     Page 40

81:2,3,7,9,10
82:19 83:16,20
90:6,12 94:7,10
94:15 95:15
96:9,14,24
111:6,8,17
184:9 186:10
186:18 235:17
246:3 267:17
269:2 331:17
332:10 345:24
362:11,18
363:1,5,11,18
364:6 404:16
439:20 444:16
444:19,24
445:18,20,22
452:22 453:5,8
454:20,22,23
455:15,20
456:2,5,7,13,24
457:4,9,10,11
457:15,18,18
458:1,6,7,12,13
458:16,18,21
481:9
**group's** 96:23
**groups** 251:4
252:14
**growing** 302:8
303:6,14 311:6
311:7,16,23
313:5
**guarantee**
159:2

**guess** 24:22
101:21 245:19
371:21 387:9
**guide** 438:22,23
**guidelines**
175:11
**guiding** 438:23
**guilty** 132:3
**gulf** 71:5,22
80:10
**gum** 387:22
**guy** 335:23
**guys** 449:15
**gynecologist**
64:23,24 207:9
278:9
**gynecology**
207:13

**h**

**h** 471:24
**habit** 216:11
217:8
**habitual** 263:5
**half** 17:4 32:12
38:18 79:21
80:12 188:24
338:22 472:4
**halfway** 236:14
**hand** 15:3
147:8 184:23
185:3 224:14
230:15,21,22
235:23 236:4,6
236:7 343:5
366:10

**handed** 184:7
**handing** 420:22
**handling**
347:12 348:16
**hands** 453:14
**handwritten**
13:6
**happen** 102:5
108:16,19,21
110:16 178:23
296:8 335:13
358:8 427:19
438:4,16 461:6
464:5
**happened**
102:11 208:18
240:21 257:19
293:11 334:14
421:22 427:19
437:13,22
**happening** 23:9
25:13,17 37:14
87:10 103:3
110:8,24
116:14 125:20
130:11 136:6
209:16 228:6
228:13 239:18
239:19,24
261:3 278:13
300:12 304:4
437:2 478:11
**happens** 108:15
117:1 174:10
209:3 210:19
214:9 376:18

457:24
**happy** 128:5
314:22 449:15
449:19 496:1
**hard** 54:22
266:18 349:2
419:9,10
**harlow** 8:17
214:13,18
215:20 218:8
220:23 246:11
246:23 273:15
331:12,14,17
367:2
**harmful** 11:12
152:20,22
216:8 217:5
365:8 371:14
389:9,12
426:14
**harvard** 207:9
207:14 210:8
211:14 243:24
246:10 263:9
**hatcher** 12:21
13:2
**hate** 18:4
**hazard** 294:2,8
296:4
**hazardous**
389:6
**hazards** 265:23
269:1 439:18
**head** 23:19 67:6
101:13 124:7
179:16 282:13

282:13 340:10
464:3 486:4
**health** 11:10,12
13:10 16:16,17
16:24 87:15
138:5,6,22
139:2,9 206:5
207:15 210:7
218:24 231:5
243:24 261:24
265:10 266:9
266:12 294:2,7
296:4 359:24
360:5,13,18,23
361:11,16
364:2,8,12,23
365:8 389:1,16
405:17 421:6
427:3 442:19
442:21,23
**healthcare**
70:12
**hear** 18:5,6
266:16 316:9
322:9 426:19
426:19 486:14
**heard** 33:23
45:12 119:21
279:12,14
439:3,5 499:5
**hearing** 266:19
302:5 352:8
386:18,23
459:5,7
**held** 2:12
131:19 132:4

**help** 45:1,16,19
46:5 65:14
105:10 106:13
117:14 135:13
224:11 229:9
310:4 406:23
462:20 476:4
**helpful** 168:1
**helping** 58:21
**helps** 168:21
**henderson** 34:2
34:5 208:12
**henrich** 5:5
**hereof** 501:11
**hesitate** 196:12
197:15 198:7
199:2
**hewlett** 69:13
**hey** 44:23 65:11
213:19
**hicks** 120:18
**high** 331:15
352:3 357:17
419:5 422:7,12
422:15 426:17
**higher** 263:15
**highlighted**
122:12 130:9
293:17
**highlighting**
403:5
**highly** 165:7
231:17 330:24
333:7 334:12
**hill** 5:8

**hind** 218:2
**hindsight** 22:16
22:18 61:24
88:21,22 89:1
129:18 210:17
210:18 213:2
216:16 238:15
250:22 257:17
257:22,24
258:1 366:14
437:11,14,20
438:2
**hired** 460:12
476:12,19
**histologic**
244:17
**histology** 303:2
**history** 303:2
**hold** 36:2 75:19
134:23 135:6
141:21 148:8,8
197:1 215:24
219:18 245:6
375:11 381:2
382:1,2
**holding** 354:10
354:15 355:20
**holiday** 77:17
**honestly** 53:1
59:1 77:2 80:5
84:17 102:15
110:14 149:21
188:16 234:23
355:9 369:4
392:16,16
396:16 402:5

**honor** 420:16
**honors** 496:20
**hope** 160:24
161:12 490:19
**hopes** 212:15
**hopkins** 9:21
11:20 13:8
60:24 66:1,9,13
86:14,16 87:12
88:15 119:4
122:23 129:12
221:11,17,22
222:22 223:24
224:9,23 225:1
257:12 261:12
261:18,24
262:16,16
332:10 377:19
377:23 378:8
380:9 381:11
382:22 393:6
395:2 396:5
454:2 460:22
**horizon** 7:14
71:2,17 72:2
78:22 167:21
168:22 467:15
**hospital** 207:14
**host** 298:23
**hour** 74:21
75:17,21 85:21
94:17 163:4
183:24 248:16
329:17 337:1
415:3

**hourly** 446:4
  447:2
**hours** 74:23
  75:16 94:17
  95:21 96:14
  329:4,16 446:3
  447:2,8 448:3
  448:12 491:21
**huge** 188:20
**huh** 24:23
  46:15 47:8 51:1
  53:17 66:16
  78:8 87:20
  92:12 102:22
  111:19 112:3
  121:17 131:17
  139:11 150:12
  167:23 169:11
  171:3 175:3
  182:16 185:8
  196:6 202:14
  205:16 212:14
  244:7 262:3
  275:20 277:13
  321:24 325:16
  330:1,19
  354:14 360:1
  378:16 379:10
  404:22 433:2
  446:5 447:3
  448:10 449:6
  452:13,23
  453:6,21
  481:22
**human** 11:12
  29:12 219:6

222:16 237:10
  265:15 267:2
  365:8
**hundred** 75:3
  80:16 139:24
  161:3 335:15
  347:19 391:12
  392:11,18
  407:16
**hundreds** 59:4
  309:18 465:1
**hung** 115:11
**hydrous** 208:4
**hygiene** 17:15
  115:13 216:10
  217:7 218:15
  221:18,24
  231:2,16,19
  249:10 387:20
**hygienic** 320:6
**hypothesis**
  223:10 227:11
  236:2,11
**hypothetical**
  161:17 465:15
  466:1
**hypothetically**
  460:6 490:13

**i**

**iarc** 142:17
  143:20 206:4
  219:1,11,13
  220:12 228:23
  265:10 267:15
  268:1,3,4,18

272:14 322:3
  377:15 439:1,3
  439:15,17
  441:5,9,12
**idea** 73:8 96:3
  111:3 218:13
  247:1 257:8
  262:14 284:1
  293:10 298:17
  336:22 398:2,3
  398:6,8,9 436:5
  436:19 437:14
**ideas** 165:20
  178:22
**identical** 84:14
  85:4
**identification**
  15:8,24 74:9
  78:4 86:11
  150:6 169:5
  181:18 183:20
  194:22 201:20
  207:5 214:15
  221:9 224:3
  225:5 230:11
  235:15 243:10
  249:3 258:12
  261:15 275:19
  277:2 279:24
  291:18 297:4
  315:22 323:18
  328:21 345:13
  351:11 352:21
  364:20 374:13
  378:6 386:15
  393:2 401:22

404:5 414:11
  420:20 424:23
  428:11
**identified**
  222:14 331:15
**identify** 20:13
  476:7
**ignored** 17:4
  138:6
**illinois** 254:20
**illustrate** 171:1
**images** 435:5
**imagine** 338:7
  482:3
**imagining**
  482:4
**imerys** 12:17
  12:17 13:13,13
  120:22 121:6
  409:9,10,17
  413:4,6,9,13,16
  414:16
**immediately**
  324:22
**implement**
  164:22 459:16
**implemented**
  383:1,14,15
  404:24
**implicated**
  373:21
**importance**
  61:4 338:14
  357:17
**important**
  23:10 29:20

[important - infographic]                                    Page 43

44:24 87:13
104:13 106:4
130:10 133:4,5
133:13 135:15
135:17,18
151:1,1,4,4
157:7 188:6,14
199:19 200:18
200:21 201:1,5
201:5,8 226:14
228:17 252:2
273:4 314:17
316:21 358:5,9
358:12,13,14
358:24 359:4,4
427:20 428:1
459:19 474:17
**impressed**
332:12
**impression**
277:17
**improve**   170:16
174:19
**improved**
429:4
**inaccurate**
320:1
**inadvertent**
36:4
**inarguable**
324:18
**incidence**   238:8
246:2
**incident**   199:23
200:1

**incidents**   41:12
**include**   21:3
25:16,17,20
138:10 266:1
268:7 305:18
305:19 350:9
462:20 470:8
**included**
115:14,16
134:3 338:18
368:10 413:10
443:15 462:19
469:14 481:3,4
498:16,20
**includes**   139:24
140:1 321:12
**including**   25:20
32:15 33:10
57:22 122:18
143:20 238:1
377:20 425:15
425:22 490:12
**inclusive**   481:1
**income**   80:3
**incomplete**
407:5
**inconsistency**
438:11
**inconsistent**
423:24
**incorrect**   47:21
47:24 286:19
376:21
**increase**   214:24
215:11 222:17
259:22 263:6

**increased**
112:22 224:8
226:13,22
227:12,14
229:22 236:3
237:4 245:4,17
259:14 260:2
263:11 293:23
302:24 327:22
331:2 372:20
373:9
**increases**
244:16
**incredibly**
490:8
**independent**
458:18
**independently**
298:20
**index**   6:1,17
**indicate**   95:23
184:20 185:9
448:12
**indicated**
371:23,24
501:10
**indicates**   186:1
293:5 295:8
354:5 382:7
401:15 423:12
430:11 445:18
498:8
**indicating**
405:3
**indication**
338:9

**individual**
41:11 158:1
177:13 248:9
313:8 358:3
363:10
**individuals**
154:22 155:17
156:10,20
172:20
**industries**   65:6
65:7
**industry**
158:21,24
159:9 162:4
163:20 165:8,9
296:10,15
298:23 320:10
320:12 321:15
347:11,19
348:15 349:2
383:15,16
400:9 404:23
405:4 408:23
442:14 477:17
479:5
**infants**   350:1
**infections**
29:21
**inflammatory**
236:18
**influence**
313:19 348:23
474:24 475:19
**infographic**
364:13,22
366:17 367:24

[informal - interesting]                                            Page 44

**informal**
  178:22 247:13
**information**
  24:5 25:2,9
  100:2,21 101:2
  101:17,19
  102:2,4,9
  103:15,18
  104:2 105:11
  108:9 118:19
  142:11 143:3,6
  143:10 167:14
  176:3 178:1
  186:12 216:18
  252:20 277:16
  278:8 296:1
  315:15 324:19
  325:2,8 343:4,5
  347:4 349:4
  358:9,16
  362:18 367:18
  424:3 436:20
  452:12,21
  454:9 498:2
**informed**
  442:18,22
**infrared**  405:11
**infrastructure**
  164:22,23
  171:19 172:2
  172:15
**ingham**  12:1
  121:14 377:21
  393:18,19
**ingredient**
  293:20 349:5

**ingredients**
  31:17,20
  150:23 151:9
  158:1 160:4
  346:18
**inhaling**  365:16
**inherent**
  116:23
**inherently**
  112:9 116:19
**initial**  195:7,7
  277:17 337:20
  345:23 440:10
  443:9 444:4
  449:24 469:8
**initially**  38:24
  40:17 92:11
  114:18,22,24
  115:1 136:5,12
  337:16 440:8
  442:5,7 443:7
  443:10,14
  448:18
**initiated**  334:3
**injurious**
  152:10
**input**  313:15
**ins**  27:19 28:3,6
  76:22 325:13
  325:15
**inside**  52:9
  105:6
**insight**  98:14
  130:4 180:13
  296:18 313:16
  497:11

**insisted**  424:11
**instance**  238:3
  242:12 314:21
  315:1,4
**institutes**  210:7
**institutional**
  143:11 241:19
  260:17 289:8
  305:11,17
  307:1,10
  310:10 367:11
**institutionaliz...**
  32:9 98:20 99:7
  107:16 176:9
  243:2 247:19
  260:13 270:16
  358:17 370:12
  469:5 471:2
**institutions**
  143:21 145:14
  207:17 243:22
  243:23 244:10
  257:5 439:10
**instruct**  241:14
**instructed**
  17:14 239:14
**instruction**
  56:20 57:9
  126:20
**instructions**
  35:12 56:10,13
  154:11 232:12
  233:19 446:7
  452:15
**instruments**
  417:2,17

**insufficient**
  302:11 311:19
  319:20
**insulated**
  468:11
**intellectually**
  299:22
**intends**  354:22
**intensive**  83:5,6
  451:15 490:8
**interact**  274:1
**interacting**
  273:7,8 279:8
  281:22 313:11
  313:14,17
  314:4,5 315:11
  361:3,4,14
  474:4,5,6,11,14
  475:9
**interactions**
  289:12,12,14
**interactive**
  282:2
**interacts**
  295:12
**interest**  94:7
  209:4 249:16
  389:10 444:19
  444:22,23
**interested**
  278:9 287:6
  300:7,19
  502:16
**interesting**
  111:16 249:15

**[internal - italian]**                                                                Page 45

**internal** 99:18
104:3 232:9,10
232:13,23
240:20 241:10
242:3,6,18
248:5 249:6,14
250:24 251:1
276:21 322:3
325:10 331:6
360:21
**internally**
102:10 241:7
249:18 260:20
322:12
**interpret**
278:19,21
279:2,4,6 286:5
286:16,17,20
286:22
**interpretation**
19:7 26:11
284:24
**interpretations**
108:2,14
**interpreted**
24:6 100:3
178:3 436:21
**interpreting**
486:22
**interrupt** 18:5
58:4 102:15
113:18 278:5
384:1
**interrupted**
220:1

**interrupting**
37:16
**interview** 87:6
87:14 123:4,17
127:3 129:11
129:23,24
**interviewed**
88:9 89:2,6
119:3,12
123:23 124:1
130:2
**interviewing**
123:20
**interviews** 87:1
122:23 123:14
**intimate** 31:7
**introduced**
140:17
**introduction**
226:8,16
**invented** 417:4
417:17
**invest** 171:18
171:24 172:4
172:13
**investigate**
441:18
**investigated**
66:12 288:11
291:14 336:5
430:16 473:1
**investigation**
428:2
**invite** 287:6
**invoice** 96:15
447:24 456:9

**invoiced** 447:23
**invoices** 13:4
96:17,22,23,24
97:8 445:7,8,9
445:16 447:6
451:22 452:6,7
454:10,13,16
454:18,21,24
491:10
**invoicing**
456:22
**invoked** 238:4
**involved** 52:19
59:18 88:24
129:5,9 163:21
168:9 186:13
228:5 245:23
283:21 287:23
336:15,16
**involves** 84:9
190:22
**involving** 73:13
**ir** 405:11
**irrelevant**
147:15,16
**isolated** 254:14
**isrtp** 275:2
**issue** 12:15 25:8
33:22,23
104:20 129:5
129:22 166:24
167:4,7 171:2
177:5 180:20
188:19 218:4
226:14 228:7
232:4 234:15

237:17 244:23
248:8,10
250:11 278:11
278:15 281:19
284:15 287:19
294:6 295:19
304:3 332:20
333:10 336:18
341:20 347:12
348:16 349:5
358:11 360:19
367:1 371:12
385:7,17 386:9
386:10 449:24
467:4 475:21
486:2 496:2
**issued** 360:9
**issues** 39:2
48:21 49:10
60:7,11,13
99:16 128:14
133:14,19
135:14 141:2
166:8 177:20
201:9 204:10
239:8 249:9
347:6 398:20
399:17 404:17
442:24 443:12
444:11 455:8
497:13,14
**istrp** 275:1
319:17
**it'd** 335:7
**italian** 396:13
418:12

**[item - j&j's]**                                    Page 46

| | | | |
|---|---|---|---|
| **item** 389:9,11 | 157:11 158:20 | 288:11 289:2 | 408:15,18 |
| **itemized** 456:8 | 158:23 159:1,8 | 290:12 295:12 | 412:24 413:3 |
| **iterative** 170:20 | 162:13 163:20 | 298:23 303:23 | 413:13 417:19 |
| 170:22 444:1,2 | 175:18,20 | 304:6,13 | 419:2,14 |
| **iwgacp** 12:8 | 176:23,24 | 307:11,14 | 423:18,20 |
| 384:10 404:9 | 177:2,14 178:1 | 310:8 311:22 | 425:7 430:13 |
| 404:14 408:2 | 185:10,12 | 312:1,10,15,17 | 430:17,24 |
| 409:1,4 | 187:17 191:21 | 312:18 313:6,8 | 442:21,22 |
| | 192:10 193:8 | 313:11,17 | 444:14 445:10 |
| **j** | 193:15,24 | 315:11,14 | 447:23 448:8 |
| | 195:24 197:4 | 318:13 320:22 | 448:17 451:5 |
| **j** 12:5 155:9 | 198:1,4,8,11,13 | 322:4,18 | 455:18 457:9 |
| 333:22 | 198:20 199:6 | 323:22 324:13 | 457:10,17,17 |
| **j&j** 12:1 16:14 | 199:14,19 | 325:8 326:5 | 458:1,8 460:8 |
| 16:22 17:3 | 200:18 201:9 | 327:5,19 328:4 | 460:12 462:11 |
| 26:22 27:4 28:9 | 201:11 202:2 | 328:4,12 | 463:24 464:9 |
| 29:10 30:18,24 | 205:6,18 209:8 | 329:10 330:7 | 464:23 467:22 |
| 39:14 40:7 41:7 | 209:12 211:20 | 330:23 331:6 | 469:5,18,21 |
| 41:13 45:11,13 | 212:1 213:10 | 332:3,24 333:6 | 470:9,24 |
| 45:18 46:8 | 213:24 220:18 | 336:6,11 | 471:10,16 |
| 52:14 62:13 | 227:19 228:10 | 337:13 339:11 | 472:3,18,23 |
| 94:10 99:13 | 229:8 232:10 | 339:12 347:1,3 | 473:10 474:3 |
| 105:16 106:20 | 233:5 234:2,6 | 351:21 358:2 | 475:7 476:1,9 |
| 111:2,8,20 | 235:3,5 239:20 | 358:18 360:19 | 476:12,18 |
| 112:10,12 | 240:7,20 241:7 | 360:20,23,24 | 477:5,17 |
| 115:4,6 116:15 | 241:11,17 | 361:9,20,24 | 478:18 479:5 |
| 116:22 117:12 | 242:14 248:6 | 368:12,15 | 479:12 487:19 |
| 117:16 118:4 | 249:18 250:5 | 369:11,14,17 | 487:21 |
| 128:21 129:5 | 250:24 251:1 | 369:24 370:6 | **j&j's** 29:5 |
| 136:17 137:19 | 251:17,22 | 375:23 376:3,7 | 139:6 196:16 |
| 138:1,1,2,3,6 | 253:7,11 | 377:2 382:24 | 197:18 200:23 |
| 139:8 140:13 | 260:12 270:7 | 383:11 386:9 | 233:22 243:1 |
| 140:15 141:16 | 273:7,23 279:6 | 391:11 392:1,9 | 247:18 248:9 |
| 142:7 143:5,24 | 282:9 284:7 | 392:12 398:1 | 254:8 270:16 |
| 144:12 145:17 | 286:22 287:5 | 400:9 407:7,10 | 289:7 305:11 |
| 146:15 148:22 | 287:10,14,19 | 407:14 408:7 | 310:9 312:3 |
| 149:22 155:10 | | | |

314:18 326:2
338:15 358:11
358:17 362:9
367:10 370:12
386:12 389:21
417:23 420:23
423:9 431:8
442:18 461:1,2
461:3,7 463:5
473:2
**j4** 382:11
**j4-1** 382:20,23
382:23 400:9
401:3,4 402:17
405:2 478:12
479:10
**jake** 4:18
**janitors** 45:23
**january** 8:3
10:19 13:12
195:20 274:20
276:17 295:3
330:16 334:4
357:21
**jbp** 423:20
**jeffery** 5:15
**jersey** 1:2,8 4:3
**jewald** 4:22
**jkeester** 4:23
**jnj** 7:20,20 8:4
8:4,8,8,11,11
9:16,16 10:3,7
10:15,15,18,18
10:21 11:9,9
12:7,7,23,23
13:16,16

**jnj000000083**
10:21
**jnjnl61** 12:20
12:20 13:3,3
**job** 1:24 45:2
182:8 300:8,9
470:16
**jobs** 263:15
**john** 4:17 10:6
119:23 120:13
129:11 249:19
280:22 282:3,7
284:12 296:8
296:11 336:10
344:3,23
345:16 351:20
357:8 359:7,12
359:14 379:1
425:4 454:1
460:22 495:23
**johns** 9:21 66:1
66:9,13 221:11
221:17,22
222:22 224:9
224:23 225:1
257:11 261:12
261:18,23
262:16,16
**johnson** 1:4,4
1:13,13,18,18
4:14,14,14,15
7:17,17 10:17
10:17 16:9 26:8
26:9 31:23,24
41:1,1 43:18,18
43:22,23 44:9,9

44:20,20,21,21
57:22,23 75:7,7
104:7,7 121:22
121:22 145:11
145:11 180:17
180:17,17,18
181:21 182:3,3
183:17,17
188:20,20
196:8,11,11
198:7,7 199:1,1
225:13,13,21
225:22,24,24
226:1,1 247:10
247:11 282:14
282:14 324:9,9
325:1,1 335:8,9
342:13,14
352:5,5 353:18
353:18,21,21
354:22,22
378:17,17
379:12,12,16
379:21,23,24
380:12,12,14
380:14,21,21
381:16,16
387:15,16
393:23,23
399:10,10
409:24,24
419:7,7,15,15
419:24,24
423:3,13,13
425:23 426:18
426:18 427:9,9

428:18 429:5
472:1,1
**johnson's** 16:9
27:11 30:18
31:18 41:8 43:5
55:9 116:20
140:15 181:21
196:9 234:11
310:6 379:16
379:21 385:22
386:6 392:2,10
398:4 423:4,20
424:11 425:2
425:15,23
428:18 429:5
**join** 287:7
**jones** 10:1,4,19
**journal** 221:12
222:22
**judge** 177:17
288:6,8 307:17
307:17,24
308:21,21,23
309:6 391:7
**judged** 389:5
**judgment**
62:18 63:19
403:9
**judgments**
403:6
**judicial** 121:20
**julie** 120:22
121:1
**july** 8:18 12:2,4
12:6 249:6,17
402:3

**[jumping - know]**                                                                Page 48

**jumping**
  431:23
**jumps**  59:8,9
**jury**  436:2
  466:7

**k**

**kathleen**  1:21
  2:11 6:2 7:5,13
  7:16 14:3,14
  18:9 265:3
  440:13 445:5
  445:11 455:11
  456:22 501:19
**keep**  25:8 81:14
  188:6 254:18
  263:8 266:15
  291:15 296:21
  304:12 367:4
  405:22 492:2,9
**keeping**  220:18
  280:4
**keeps**  37:14
  363:1
**keester**  4:18
**kellachan**  483:3
  483:19
**kessler**  8:15
  20:18,23 61:7
  61:23 220:2
  317:8 433:11
  434:13 492:10
  492:12
**kessler's**  22:10
  434:18

**kettering**  244:2
**key**  260:16
  414:21 423:9
  423:19 465:20
**kim**  111:5
**kind**  19:21 21:3
  56:6 74:12
  93:12 109:8
  141:20 157:5
  170:23 193:4
  266:14 269:6
  324:5 356:12
  361:10 415:6
  437:2
**kinds**  24:14,16
  46:20 49:9 88:3
  95:13 105:20
  125:2 127:1
  149:23 155:9
  180:12 213:24
  228:24 252:13
  263:24 264:1
  305:19 397:10
  470:14 471:18
  472:23 474:16
**king**  4:16
**knew**  28:5
  41:14 52:21,24
  115:4 117:12
  117:16 118:5,6
  124:3 125:19
  157:11 159:1
  175:20 178:1
  197:4 355:22
  380:7 386:9
  468:4,4,12

469:21 475:18
**know**  16:8
  18:12 23:1,3
  27:19,24 28:3,7
  28:9,13 29:19
  30:4,9,13,15,17
  32:7 33:20
  34:16,24 36:4,9
  36:16 37:7
  38:17,20,22
  39:18 40:7 42:7
  42:7,8,9,17,20
  42:21 43:5 44:8
  44:23 45:2,14
  46:8 48:14 50:7
  50:11 52:13,19
  52:22,23,23
  55:14,17 60:5
  60:13,15 61:10
  62:19 63:14
  64:12,13 65:11
  68:6 70:10 72:5
  73:21 75:11
  76:6,22 77:1,2
  77:17 78:22
  80:1,5 81:14,16
  83:15,16,19,21
  84:2,9 85:11
  87:8 88:16 89:5
  90:13 91:9
  92:21 93:7,8
  94:9 96:19
  100:20,24
  101:11 102:1
  102:10,10,12
  103:6,8 105:21

106:8 107:5,21
  108:23 109:9
  109:15,18,20
  110:3,7,23
  111:2,14,17,18
  112:4 114:1,4
  115:22 118:4
  120:5,10 125:7
  125:8,23
  126:20 128:4
  128:20,20,22
  128:23 129:4,8
  129:17 131:19
  132:1,3,7,8,11
  132:21 133:5
  133:14,18,21
  135:9,11,13,18
  136:8,14 137:3
  145:4,8 147:18
  148:23 150:15
  150:15 151:21
  153:9 154:9,15
  155:9 156:1
  158:20,23
  159:8 160:6,23
  161:11,15
  162:12,13
  163:5,6 165:18
  167:14 172:24
  173:2,8,13,18
  175:8 177:8
  178:20,21
  179:4,13
  186:20 187:5
  187:16,19,21
  187:22 188:1,5

**[know - know]**                                                    Page 49

| | | | |
|---|---|---|---|
| 188:6,7,11,14 | 289:7,11 291:7 | 375:22,24 | 437:9 439:1,9 |
| 189:2,13,24 | 291:10 292:4 | 376:2,7,8,9,12 | 439:11,13,17 |
| 190:9,11,24 | 294:17,18 | 376:17 377:5,9 | 439:22 441:9 |
| 192:1,21 | 295:21 296:8 | 377:12,13 | 441:17 443:19 |
| 194:13 199:24 | 296:13,14 | 382:23,24 | 443:22 444:21 |
| 202:1,4,4,6,22 | 298:13,17,18 | 383:9,11,23 | 444:24 445:2,3 |
| 203:20 204:3,4 | 298:22 299:7 | 385:8,16 | 448:6,8,22,24 |
| 204:5,7 205:2,3 | 299:12,13,13 | 387:24 388:22 | 450:24 451:11 |
| 205:10 207:10 | 300:6,18 304:2 | 389:21 390:24 | 452:9 453:19 |
| 208:21 209:1 | 305:8 306:8,13 | 391:10 392:1 | 453:22,23 |
| 211:1 212:1 | 309:19,19 | 396:11 397:22 | 454:4,5,6,7,14 |
| 213:19,23,23 | 314:16 315:5 | 397:23 398:12 | 457:2,23,24 |
| 217:11 218:9 | 316:6 319:2 | 398:18,19,21 | 458:5 459:7,18 |
| 218:11,12,21 | 321:11 322:12 | 398:23 399:2 | 460:3 461:12 |
| 218:24,24 | 322:14 324:4,5 | 399:11,12 | 461:13,21,22 |
| 224:5 226:1,5 | 324:19 328:6 | 401:5,13,16 | 462:5 463:2,13 |
| 228:7 239:19 | 328:11 329:13 | 402:10,10 | 464:4,5,19,21 |
| 240:12 242:11 | 333:21 334:23 | 403:9,15,16 | 466:20 467:2 |
| 248:19 250:16 | 336:4 338:11 | 406:20 407:7 | 467:11 473:12 |
| 252:4,12 | 339:3,5,12 | 408:18 409:7 | 474:12,21 |
| 253:11 254:1,2 | 340:7,9 342:21 | 412:2,18 413:6 | 475:2,5,7,12,13 |
| 254:16 258:5 | 343:6,21,22 | 413:17,18 | 475:15,22,24 |
| 260:10 261:19 | 344:6 345:17 | 414:6 415:9 | 476:20 478:8,8 |
| 261:21 266:3,5 | 346:15 350:22 | 417:21 418:17 | 478:9,10,12,15 |
| 266:7,11 268:5 | 351:24 352:6 | 419:9,10,16 | 478:18,20 |
| 268:12 269:15 | 356:5,7,7 | 421:4,5,7,12,23 | 479:11,16 |
| 269:16,16 | 358:10 359:1,2 | 423:2,6,17,18 | 481:5,8,13 |
| 270:3,5,12,15 | 359:20 360:13 | 423:22,23 | 482:4,15,17,23 |
| 271:23 273:8 | 361:20 362:7 | 424:10,13 | 482:24 483:8 |
| 274:7 277:23 | 362:11 364:4,5 | 425:20 426:5,5 | 483:11 484:5 |
| 279:17,18 | 366:8 369:17 | 426:7,12,15 | 484:11,13,18 |
| 280:6,7 281:19 | 369:19 370:3 | 427:13,14,18 | 484:20 485:4,8 |
| 282:8,10,11,12 | 370:15 371:7 | 427:19,21 | 486:23 487:2 |
| 282:18 283:16 | 371:11,14 | 428:1,5 429:19 | 488:16,17,24 |
| 283:18 285:1 | 372:14,23 | 430:17 431:7 | 489:8,10 490:5 |
| 286:10 287:21 | 373:16,20 | 434:3 436:6,12 | 494:9 495:2,2,4 |

**[know - legal]**                                                Page 50

496:10 497:12
497:13 498:2
**knowing**  177:7
210:1 339:15
437:15 447:11
450:20 451:10
**knowingly**
374:2
**knowledge**  26:9
26:11,13 32:9
41:15 46:23,24
46:24 91:5
98:20 99:7
100:9 105:17
106:3,9,21
107:17 130:5
143:11 157:14
161:21 176:9
179:6 197:19
201:14,14
227:9 241:19
242:21 243:2
246:5 247:19
251:23 260:13
260:17,18
269:8 270:16
271:3 289:8,15
289:18 298:21
305:11,17
306:6 307:1,11
307:14 309:23
309:24 310:10
326:4,9,14
327:3 358:18
367:11 369:16
369:16 370:13

392:12 469:5
471:2,16 473:4
484:10 485:2,2
485:7
**known**  16:14
16:22 19:19
50:8 138:4
218:5,5 253:3
263:13 381:3,6
381:7 417:8
**knows**  195:2
211:21 335:13
380:12,14,22
**kris**  111:5
483:18
**kslaw.com**  4:22
4:23

**l**

**l**  1:11,16
**label**  55:22 56:6
235:4 301:5,8
325:1 429:11
**labeled**  194:10
429:5
**labeling**  8:14
152:1,12
**labs**  376:8
**lack**  389:6
**laid**  202:20
**landscape**
100:24 101:3
**language**  28:4
31:5 269:12
334:16,18
342:18

**laosd**  92:20,24
450:18
**large**  23:13,14
245:2,15 349:2
395:23 413:21
**larger**  400:3
**larson**  10:17
324:8
**late**  40:18 107:9
109:4 129:9
270:24 272:1
**laugh**  78:2
85:17 103:6
106:11 133:22
144:6 160:23
178:13 195:5,9
217:22 272:20
297:21,24
318:1 486:16
**law**  1:9 151:8
151:24 157:23
**law.com**  5:10
**lawyer**  85:17
102:24 111:20
282:8,11 288:7
336:11,14,16
351:21 359:5
359:11 425:7
**lawyers**  283:7
283:21 284:8
301:17,17,21
344:7 362:9
424:6 444:14
444:16 454:17
458:8

**lay**  100:6 347:6
**laying**  347:8
348:12
**layman's**  98:5
**layperson**
98:22
**lays**  348:6
**lead**  331:2
**leader**  173:5
**leaders**  169:15
171:17 172:20
172:24 173:3,3
**leading**  71:17
71:20 72:1
187:1 204:15
426:23 467:14
**learn**  170:21
174:17 331:23
332:1
**learned**  50:12
371:1 460:23
**learns**  188:10
**leave**  223:14
496:9
**lee**  376:14
**left**  129:12
159:21,22
230:22 235:23
236:4,6,7 296:9
296:14 311:12
401:17 403:21
484:4,5
**legal**  117:5
153:5 154:23
155:18 156:11
156:21 390:2

**leigh** 3:17
**leigh.odell** 3:23
**length** 498:9
**lethal** 231:17
**letter** 10:11,13
   10:16 12:21
   13:1 285:7
   297:6,15 299:9
   299:19 300:1
   300:16,21
   301:15,20
   302:1,2 303:24
   311:23 315:18
   316:16,19,22
   317:4,17 318:6
   318:8 323:20
   323:23 324:7
   324:13 325:12
   325:14 336:20
   361:19 415:23
   424:14 425:4
   425:11 427:17
   428:7,8,14
**letterhead**
   445:12 455:11
   455:24 456:22
   457:1 487:15
   487:17
**letters** 12:16
   96:7 415:20
   416:5
**letting** 115:21
   443:22
**level** 358:1
   371:16,18,19
   371:24 372:2,5

372:20 380:22
381:1,4,6,7
396:20
**levels** 173:4
398:24 400:7
412:19 413:19
414:2 418:15
419:14 474:11
**levin** 3:4 5:16
**levinlaw.com**
3:10
**liability** 1:5
282:8 283:6,21
284:8 336:11
336:14,16
359:11 425:7
**library** 363:12
**lie** 297:18
**life** 438:5,18
**lifecycle** 104:9
104:20 106:9
107:7,12
**lifetime** 214:23
215:10
**light** 216:17
218:4 233:1
242:21 246:4
250:9 253:3,14
256:13 342:22
342:24 369:1
372:6 405:12
**likes** 127:18
**limit** 399:15
428:24
**limited** 107:6
117:22 216:9

216:19 217:6
**limits** 159:16
402:8,15,16,22
403:2,6,9,10
408:12 416:10
425:24
**line** 347:9
348:13 378:22
381:23 393:17
394:7 395:14
395:16,16,17
395:17,18
425:18 463:6
500:3,5,7,9,11
500:13,15,17
500:19,21,23
**lines** 54:9
112:20 134:7,8
134:9 200:6
**link** 272:2
**linkage** 425:2
**linked** 293:23
**linking** 166:22
259:17 260:7
295:21
**list** 81:18,18
120:8 121:2
122:11,13,18
123:6,21
124:12 136:21
137:20 184:16
274:15 276:23
450:2
**listed** 31:17
57:13 66:22
68:21 83:7

265:24 267:17
268:6 269:1
282:7 367:23
439:19 481:11
483:2
**literature** 24:13
35:2,20 36:10
37:3 38:13 46:2
51:5 54:2 67:19
67:21 87:22
116:5,15 125:8
125:19 126:6
141:4 143:9
145:5 164:20
206:13,17
213:16 218:18
219:2,12
220:19 226:4
227:10 233:15
247:21 257:2
272:12,14
286:23 290:1
290:19,20
291:1,3,4,6
303:14 304:7
304:23,24
320:4 324:12
361:21 362:16
362:16 366:16
366:19,21
368:3,5 439:7
**litigation** 1:6,13
1:18 6:17 43:13
43:18 44:1,14
44:17 50:14
51:24 52:7,9

[litigation - looking]                                                    Page 52

| | | | |
|---|---|---|---|
| 56:18 65:3 | 220:2,2 383:18 | 230:19 231:8 | 31:20 62:9 66:8 |
| 68:20 69:2,6 | 384:17,18 | 235:23 239:4 | 67:18 79:17 |
| 70:21,22 72:20 | 405:14 406:11 | 243:5,20 | 80:18 105:2 |
| 73:13 78:18 | 406:16 407:1 | 248:11,24 | 116:14 120:11 |
| 79:13 80:4 | 407:11 408:4,8 | 253:22 257:3 | 128:8 130:1 |
| 84:15 88:12,24 | 420:8 432:1 | 257:15 261:11 | 157:2 168:5 |
| 89:2,3 91:4 | 454:7 458:4 | 262:18,20 | 180:22 183:3 |
| 94:12 262:18 | 479:3 | 274:5 275:6,10 | 201:22 239:1 |
| 282:14 329:11 | **longo's**  495:13 | 275:11 276:2,2 | 246:9 257:10 |
| 330:8 334:20 | 495:15 | 276:3 282:20 | 263:18,20 |
| 334:23 335:5 | **longstanding** | 282:23 283:2 | 273:10,12,13 |
| **little**  18:10,14 | 227:19 | 292:14 294:6 | 273:13,15,16 |
| 18:15 32:16 | **look**  23:11 27:4 | 296:22 297:1 | 273:17,19 |
| 77:10 127:6 | 32:18 34:4 | 300:11 301:18 | 283:13 287:13 |
| 136:9 145:18 | 36:17 37:12 | 301:23 302:1,2 | 291:11 295:24 |
| 147:13 159:13 | 39:10 47:14 | 313:8 315:17 | 301:20 310:12 |
| 167:2 193:5 | 51:12 65:11,18 | 315:18,19 | 312:3 322:1 |
| 208:23 217:17 | 86:17 90:3 99:3 | 317:8 323:3 | 337:14 344:2 |
| 229:6 342:12 | 101:8,11 103:1 | 328:11 329:1 | 344:24 356:18 |
| 344:19,21 | 103:3,10,21,23 | 333:12,22 | 359:15 363:14 |
| 356:13 374:7 | 108:16 111:8 | 335:20,21 | 363:15,16,17 |
| 391:1 431:23 | 125:13,14,24 | 336:7 347:7 | 363:19 364:15 |
| 438:20 448:21 | 128:6 130:5 | 349:9 354:9 | 393:4 411:1 |
| 453:2 455:7 | 131:2 143:1 | 364:8 375:2 | 422:2 451:5 |
| 463:6 489:13 | 145:4 146:14 | 382:11,14,16 | 463:1 467:11 |
| 496:17 | 148:22 150:2 | 382:21 391:7 | 469:10 473:22 |
| **live**  460:4 | 173:9 178:19 | 392:21,23 | 476:21 478:10 |
| **lives**  189:15 | 182:17,21 | 401:11 409:18 | **looking**  40:8 |
| 338:23 | 186:4 195:16 | 419:18 432:19 | 41:10,11 65:12 |
| **llp**  2:14 4:16 | 201:23 203:13 | 439:16 449:17 | 89:4 101:6 |
| **logan**  4:6 | 203:14 206:15 | 462:15 491:16 | 107:4,7 137:4 |
| **logistics**  90:14 | 207:2 208:11 | 491:17,18 | 144:8 147:23 |
| **lone**  347:11 | 212:8 213:19 | 492:2 496:2 | 157:6 167:7 |
| 348:15 | 215:21 223:9 | 498:23 | 176:3 180:14 |
| **long**  47:13 79:7 | 225:2,8 226:6 | **looked**  20:20 | 196:17 199:23 |
| 146:14 204:19 | 228:12 230:8 | 23:13 26:22 | 200:8 209:2 |

**[looking - management]** Page 53

210:16,18
230:18 233:21
233:22 235:10
238:15,23,24
240:5,10
242:11,12,15
257:1,19 286:9
290:10 298:2
300:13,15
312:16 315:1
322:1 345:2
361:2 384:4
387:12 400:19
410:17 432:12
432:16 434:5
436:5,10,11
437:15 441:5,9
441:12 447:10
451:17 463:4
468:23,24
469:4 470:23
471:15 476:14
477:5 498:18
**looks** 221:16
251:1 282:5
294:5 324:5
331:8 382:24
402:5
**loose** 365:17
**lorena** 88:2
121:9
**lost** 255:12
**lot** 25:20 39:19
48:3,11 52:5
54:3 57:2 74:11
90:8 116:2,3

127:23,23
137:7 140:4
143:5 189:17
206:12 273:10
273:19 281:15
321:22 327:16
349:10 369:4
370:6 371:1
376:13 385:18
390:23 391:1
398:1 411:9,12
413:8 421:13
450:6 490:7
**lots** 33:7 189:10
327:8 391:4
**louder** 345:20
**luncheon**
264:11 284:13
**luzenac** 409:14
409:16
**lying** 216:22
320:16

**m**

**m** 1:21 2:11
3:16 6:2 7:5,13
7:16 14:3,14
265:3 440:13
455:11 482:4
501:19
**ma'am** 21:6
32:20 53:3 54:5
62:24 192:3
200:13
**madam** 118:22

**made** 30:1,10
30:15 35:10
38:4,10 76:4
79:12 80:20
89:10 201:11
218:3 267:10
329:6 355:6
431:8 437:19
470:22 472:3
472:18
**magnesium**
208:5
**mail** 9:15 11:6
13:14 90:9,14
90:15 249:6,15
280:21 282:17
343:21 344:13
351:13 353:1
356:3
**mails** 90:6,7,10
90:16
**main** 319:4
**maintain** 350:8
376:10
**maintained**
376:10
**major** 243:22
244:9
**majority** 215:2
215:13 391:2
410:3 411:10
411:24
**make** 27:2
39:24 45:16
46:5 47:3 62:18
63:19 80:9

84:23 90:19,22
104:4 118:14
122:9 137:17
148:24 166:23
167:3,18
172:10 200:22
201:10 202:8
202:11 203:3
208:16 215:20
228:5 231:12
252:15 276:6
297:16 304:19
306:24 335:16
343:2,8,9,12
380:13 417:3
469:23 472:2
473:13 476:16
476:22
**makes** 192:22
199:20 200:18
**making** 100:14
142:11 151:18
165:16 199:22
237:14 296:15
383:12 388:6,7
388:9,11,13,14
403:6 437:16
470:16
**man** 420:16
**manage** 66:24
**management**
81:19,19
186:14 187:2,6
187:11,17
189:6 190:15
190:23 357:1

**[management - mean]**                                                    Page 54

358:1
**mandated**
497:7
**manufacture**
154:23 155:18
156:11,21
387:17
**manufactured**
27:17 41:2,8
**manufacturer**
62:13 387:23
389:9,21
**manufacturers**
160:2 389:14
406:18
**manufacturing**
41:11 42:17
355:1
**marathon**
69:11
**march**   11:14,23
12:21 353:3
374:11 424:21
502:24
**marched**   304:6
**margaret**   3:16
**margaret.tho...**
3:22
**marjorie**
332:16
**mark**   118:22
192:15
**marked**   6:18
15:3,7,19,23
47:9 74:8 78:3
86:10 150:5

169:4 181:17
183:19 184:8
194:21 201:19
207:4 214:14
221:8 224:2
225:4 230:10
235:14 243:9
249:2 258:11
261:14 275:8
275:16,18
277:1 279:23
291:17 293:14
297:3 315:21
323:17 328:20
345:12 351:10
352:18,20
364:18,19
374:12 378:5
386:14 393:1
401:21 404:4
414:10 420:19
420:23 424:22
428:10 496:18
498:12,21
499:8
**market**   151:11
154:23 155:18
156:11,21
196:12 197:15
198:8 199:2
255:9 304:19
306:11 312:8,9
324:23 342:5
358:23 359:12
**marketed**   7:19
27:16 184:11

**marketing**   1:5
21:16 25:7
30:20 31:8,12
60:4,15 64:5,7
64:10,12,18
349:24
**maryland**
13:11 388:24
**mas**   1:4
**material**   85:4
154:3 203:16
410:18
**materials**   31:8
31:13 94:21
122:10 362:10
363:7 442:13
442:17,21
**matter**   38:9
50:22 147:8
394:8,22 477:3
501:6
**mattered**   477:4
**matters**   151:22
279:9
**mbas**   483:7
484:22
**mccrone**   418:4
**mcdevitt**   5:5
**mckeegan**
119:23 344:3
344:24 345:16
351:20
**mdl**   1:4 3:13
75:6 85:2,9
94:3 97:13
119:6 330:9

492:14
**mdl00144426**
11:4
**mdl00144435**
11:4
**meagher**   2:14
**mean**   29:19
58:3,12 62:9,17
67:5 70:2,10
82:22 87:21
91:24 102:12
103:5,12
108:11,12
109:15 110:20
111:9 113:17
115:22 119:21
120:6 121:1
124:1,24
125:23 127:17
127:22 128:3,4
129:24 133:22
135:6 141:6
142:22 145:8
148:22 149:16
149:18,18
151:3,5 153:7
156:4 158:13
160:22,23
161:12 164:1
165:18 166:3
166:17,24
173:15,17
178:18 179:13
180:11 192:6,7
196:20 197:13
205:1 208:21

**[mean - method]**                                                           Page 55

| | | | |
|---|---|---|---|
| 211:8,9 213:23 | **meaning** | 385:14 | 346:10 353:17 |
| 220:12 221:5 | 169:14,21 | **medication** | **memorial** |
| 247:20 259:1 | 170:15 253:21 | 29:24 | 244:2 |
| 268:21 278:4 | 319:16 470:13 | **medicine** | **mention**   19:10 |
| 282:22 286:8 | 494:11 | 496:24 497:19 | 65:20 192:10 |
| 286:18,19 | **means**   33:20 | **meet**   124:5 | 280:3 335:22 |
| 288:6 290:24 | 107:19,20,24 | 416:8 | 421:22 431:9 |
| 294:12 295:7 | 108:1 132:21 | **meeting**   8:2 | **mentioned** |
| 297:14 299:17 | 151:12 154:4 | 11:7 12:6 | 38:23 62:4 |
| 299:22 301:11 | 179:14 203:19 | 195:19 232:7 | 69:20 145:24 |
| 304:13,18 | 203:20 289:11 | 277:16 280:2 | 206:4 257:13 |
| 315:10 334:10 | 290:5 389:15 | 282:15 283:8 | 258:5 267:8 |
| 335:11 336:23 | 423:17 426:6,7 | 283:13 357:1,5 | 360:2 406:6 |
| 338:1 339:4,5 | 436:3 441:23 | 357:6,11,16,20 | 432:7 467:16 |
| 343:3 358:12 | **meant**   194:20 | 358:1,4,6,20 | **mentioning** |
| 359:9 362:10 | 256:21 434:6 | 359:8 402:3 | 68:4 |
| 363:6,15 | **measures** | 453:15,17 | **merit**   2:22 |
| 366:10 371:8 | 242:10,20,23 | 454:5,6,7,8 | **merlo**   261:20 |
| 372:13 383:4 | 247:2,15 | **meetings**   128:9 | **merritt**   12:5 |
| 405:23 413:13 | **media**   442:14 | 129:23 284:6 | **meso**   93:2,3 |
| 417:21 431:7 | **medical**   22:20 | 446:15 451:23 | **mesothelioma** |
| 432:12 433:3 | 24:13,18 25:9 | 451:24 452:1,3 | 75:9 93:1 |
| 435:23 436:10 | 25:16,17 29:12 | **meets**   405:5 | 138:14 380:15 |
| 436:13 439:9 | 29:16 30:2,5,7 | **member**   343:3 | **messages** |
| 441:8,21 | 30:10,14,16 | **members** | 414:22 |
| 445:19 450:24 | 32:13 54:3 | 169:21 346:17 | **met**   94:21,22 |
| 452:18 454:14 | 64:19,20 116:5 | 350:7 | 111:20 212:3 |
| 456:14 457:2,9 | 143:19 144:14 | **memo**   8:1 10:1 | 213:10 298:19 |
| 457:24 462:16 | 186:24 189:14 | 10:4,19 195:21 | 298:24 332:10 |
| 463:4,8 464:2 | 192:11 218:18 | 196:5 279:5 | 453:7 454:1 |
| 464:20,20 | 227:10 232:9 | 280:22 281:6 | **meta**   9:1 |
| 465:11 470:12 | 250:19 252:14 | 295:15 356:11 | 227:13 229:9 |
| 475:6,22 478:9 | 263:9 272:14 | 356:19,20 | 327:21 |
| 479:19 483:15 | 286:6 293:21 | **memorandum** | **method**   52:17 |
| 489:7 492:1,1 | 304:24 322:2 | 11:1 277:10 | 102:16,19,19 |
| 493:6 495:6 | 362:16 366:15 | 345:16 346:3 | 382:20 401:8 |

**[method - missed]**                                    Page 56

402:8,9 405:2,5
422:8,12,17,18
429:4 430:10
451:14
**methodical**
431:24
**methodologic**
92:18
**methodologies**
498:19
**methodology**
19:17,19,20,24
20:2,3,4,7,10
20:13,14 21:4,8
22:19 26:5
73:15 88:11
92:10 97:24
98:3 123:15
135:24 168:10
197:23 307:12
308:6 391:11
398:11 406:10
406:17 411:13
430:12,14
431:1 483:13
497:22 498:1
**methods** 12:9
49:8 162:18
399:7 401:3
403:2 405:9
407:15 408:24
408:24 409:2,8
429:7 430:18
**metric** 196:16
197:11,13,16
198:23 199:3,8

199:10,12,12
247:12 248:6
**mexico** 71:5,22
80:10
**mic** 18:17
**michael** 249:21
**michaels** 22:5
**michele** 249:21
**michigan** 60:24
66:4,7,9,12
67:4 257:11
258:8,10
259:20 260:9
260:11 368:17
368:23 369:12
369:24 370:1,5
**microscopist**
50:2 159:7
400:16 407:19
**microscopists**
404:1
**microscopy**
405:12,12
**mid** 129:9,21
129:21 267:1
355:7 479:12
**middle** 37:15
112:7 283:3
292:23 308:22
375:6 387:14
493:1
**migrate** 222:23
287:20 288:12
290:11
**migration**
222:11 318:14

**million** 79:21
80:12,23 262:8
338:22 490:10
**millions** 71:4
71:21 80:20
262:1,6,17
**mills** 9:10
235:18 246:22
254:12 273:16
**mind** 18:20
31:12 41:19
111:9 118:24
122:24 163:13
188:7 191:19
327:10 397:1,4
**mine** 73:6
293:16
**mineral** 8:22
405:17
**mineralogist**
49:13,14
**minerals** 405:1
**mines** 417:24
418:12,12
**minimization**
365:14
**minimize** 174:9
174:11 365:13
**minimum**
74:13 325:1
**mining** 48:24
49:7,17,19
409:24 417:14
**minnesota**
60:24

**minute** 104:16
162:11 214:4
232:7 261:18
280:24 285:22
**minutes** 183:24
357:24 358:4
358:21 369:7
415:4 448:2
470:17 479:22
485:18 495:3
**misbranded**
153:17 154:2
**misbranding**
55:18
**mischaracteri...**
272:20
**mischaracteri...**
132:6 204:1
271:21 299:11
305:4 310:24
334:22 336:20
349:14 362:21
391:23 425:9
464:18 472:9
473:19
**mischaracteri...**
72:7 106:15
**misleading**
121:23
**misperception**
321:14
**misrepresenti...**
106:15 303:21
**missed** 166:3
480:13

**[mississippi - need]**                                    Page 57

mississippi
  480:17,19
missouri
  121:21
misspoken
  470:23
mistakes  54:4
  192:23
misunderstood
  486:22
mitigated  17:9
mitigation
  59:13 183:4
  185:16 186:14
  189:22 193:9
  193:24 233:3
  305:21 366:4
model  292:11
moderate
  244:16 245:4
  245:17
modest  302:24
modifiable
  244:15 245:23
module  67:12
moment  59:16
  69:10 88:18
  98:1 135:23
  148:24 159:13
  207:3 241:21
  254:14 345:3
  389:5 409:3,8
  433:16 436:12
  437:10 441:9
  441:20

moments  61:17
  436:24 437:5,7
monday  11:7
  351:15 357:14
  357:23
money  80:9
  81:11 296:15
  329:5 333:16
  334:19 457:11
  472:4
monitored
  184:11
monitoring
  186:14
monograph
  265:22 267:7
  268:24 439:18
montgomery
  3:19
month  107:7
  351:8 488:12
monthly  410:19
  411:6 481:12
  482:21
months  330:10
morning  14:11
  14:12 140:8
  149:8 272:16
  280:3 390:21
  440:2 441:2
  467:12 477:8
  477:16 479:4
mot  382:20
mother  380:5
mothers  463:19

motion  73:18
mougey  3:5
move  41:20
  86:5 157:20
  188:17 193:2
  221:1 233:12
  274:19 284:16
  361:6 384:1
  443:5,23 470:4
multidiscipli...
  67:3 70:5
multidistrict
  84:15
multidivisional
  188:22
multilevels
  40:5 205:5
multiple  89:4
  108:1 167:15
  172:17 173:4
  173:16,22
  179:7 256:11
  289:11 305:23
  309:21 392:13
  398:23 400:7
  474:10 476:24
musco  353:2
  356:4,5
musket  119:19
  335:22
musser  10:11

**n**

n  4:7 14:1
  471:24

name  14:13
  20:8 22:2 111:2
  119:21 230:7
  336:12 344:4
  346:1,4 356:7
  359:13,19
  380:9 440:13
  446:3
named  65:1
names  73:2
  87:18,19 119:8
  409:13 414:18
  414:20
nancy  353:2
  356:4,5
narrative  19:3
  28:19 47:13,17
narrow  25:5
national  140:16
  147:2 210:7
  251:11 496:23
  497:18
nature  32:17
  116:24 224:20
necessarily
  73:19 109:10
  109:11 188:9
  200:23 281:16
  436:11
necessary
  160:2 193:21
  350:2
need  30:21
  31:11 36:7,12
  38:1 40:12
  45:14 46:4

**[need - number]** Page 58

68:23 90:24
97:22 106:8
114:4,5 117:13
133:8,18
135:11,12
141:23 148:2
148:23 165:1
165:21 172:24
173:8,11,13
174:3,8,9,10,17
174:17,24
179:8 186:5,8
188:11 195:16
211:11 212:10
218:14 227:21
228:12 229:2
229:16 252:12
265:11,16
277:19 280:24
295:20 316:5
316:11,14
321:11 345:20
375:13 405:22
419:17
**needed** 37:5
73:6,10,11 74:1
154:5 224:19
245:20 279:13
321:11
**needs** 18:8
174:24 178:22
**negative** 376:20
**negatives** 347:9
348:13
**neither** 157:23
502:13,15

**networks**
173:16,22
**never** 19:13
48:1 51:22 52:3
59:17,22 60:2,6
73:22 95:4
130:16 162:6
185:15 194:10
198:12 266:10
267:15 301:21
323:9 335:12
336:2 346:20
362:13,15,17
369:24 371:5
377:4 381:15
459:1,4 476:18
**nevertheless**
215:23 216:6
217:3
**new** 1:2,8 2:16
4:3,20 10:20
214:21 268:24
330:17,24
333:7 422:7,16
496:8,12
**newman** 21:16
64:1
**newman's**
22:11
**nhtsa** 147:3
**nice** 173:17
**nicholas** 346:3
**nichols** 11:2
346:3
**nicholson** 13:7
86:14,15 87:14

119:4 124:18
126:24 130:16
131:18,19
132:2 453:16
460:23
**nih** 207:19
**nine** 456:8
458:15 488:9
**nixon** 388:4,10
**nj** 5:8
**nods** 23:19
486:4
**non** 51:18
251:4
**nonmucinous**
245:19
**nonresponsive**
41:21 157:21
**normal** 44:22
65:14 69:3
133:12 222:15
263:15 461:14
**normative**
179:24
**north** 43:7
**notary** 2:22
502:4,21
**note** 90:22
191:24
**noted** 326:23
403:11 451:12
**notes** 13:6
86:13,15
124:17 128:5,6
131:15 353:22
387:3 453:17

453:18
**notice** 2:20 7:7
66:17 74:7,18
86:2 175:11
209:8 494:7
**noting** 300:24
**nov** 13:15
**november**
10:16 11:6
13:14 319:8
330:16 344:17
351:8 353:6,6,7
353:10 356:9
357:21 358:22
**ntp** 129:22
206:4 352:8
353:14 354:2
354:20 355:6
355:15,23
**number** 7:2
15:4,19 17:10
19:2 47:9,12
51:10 66:15
68:16 74:6
75:13 81:18
83:23 86:8 95:2
95:21 102:18
123:1 140:12
150:9 152:2
169:20 170:14
172:19 173:23
181:24 183:18
184:8 191:19
191:20,22
192:9,10,16
194:17,18,19

**[number - offer]** Page 59

194:20 195:1,3
195:8,8,12
196:19 199:11
199:17 201:18
207:2 208:13
208:22 210:24
214:13 222:23
222:24 223:1
224:1 225:3
230:14 235:12
235:21 238:23
243:6,8 249:1,5
255:8 258:9
272:24 275:11
275:16 276:23
278:14 279:21
279:22 280:20
291:16 292:15
292:21,23
293:15 297:2
297:10 305:20
306:10 315:20
323:15,20
327:7,7 328:19
333:20 340:8
342:4 343:20
344:10 345:2
345:11 347:10
348:14 351:9
352:19 357:7
365:16,20,23
373:10,15,24
374:9 378:4,9
392:23 397:24
401:20 402:2
404:3 410:18

414:9 424:20
425:20 428:3,4
428:8 447:2,2
448:3 455:23
462:16 481:20
487:15 498:14
**numbers** 82:22
298:2
**numerous** 49:5
96:7 467:23
**nurses** 463:19
**nursing** 54:23
**nw** 2:16
**ny** 4:20

**o**

**o** 14:1
**o'brien** 3:5
**o'dell** 3:17
**o'shaughnessy**
12:22 120:13
122:18 282:7
336:10 351:20
359:7,12,14
425:5 427:15
**oath** 501:13
**oberfield**
435:19
**object** 39:5
79:15
**objection** 33:18
34:23 35:16
47:22 48:6,19
48:22 60:10
62:14 71:13
72:17 83:13

89:16 97:7,8
110:1 113:1
116:6 117:4
122:2 124:9
127:20 128:16
131:9,22 132:5
137:10 140:3
148:1 149:15
151:15 153:4
158:8 160:21
161:8 162:9
165:24 166:10
167:8 178:17
183:6 193:11
201:3 203:24
227:23 247:5
262:10 264:3
268:2,19
269:10 270:8
271:20 274:10
279:16 283:10
283:24 288:14
299:10 305:3
307:21 310:22
312:12 313:21
314:9,19
328:15 334:21
336:19 338:24
349:13 359:17
362:20 370:8
376:22 390:1
390:16 391:15
391:22 397:15
399:22 400:14
403:19 407:4
410:5 413:22

416:18 425:8
430:1 445:14
457:20 464:17
465:12 472:8
473:18 475:4
484:15
**objections**
90:22,24 97:22
**objective** 323:3
**obstetrics**
207:13
**obstfeld** 435:20
**obtained** 294:1
**obvious** 320:12
**obviously** 62:18
63:14 307:16
309:6 339:9
435:21
**occasional** 90:7
**occasionally**
90:13
**occur** 178:20
233:20 373:17
**occurred** 431:6
**occurrence**
231:16
**occurring**
104:10 437:9
**occurs** 249:11
**october** 7:12
8:7 11:1 345:15
346:9,12
**odd** 336:13
**odds** 331:14,16
**offer** 252:16
255:10 501:12

**[offering - okay]**

Page 60

| | | | |
|---|---|---|---|
| **offering** 498:18 | **okay** 14:23 | 73:7,9 74:2,16 | 130:15 131:14 |
| **offers** 256:2 | 15:18 16:8 17:2 | 74:20 75:4,17 | 132:11 133:2 |
| **office** 187:23 | 17:17,22 18:3 | 75:23 76:10,14 | 134:13,16 |
| 188:2 192:11 | 18:11,15 19:23 | 76:21 77:3,8,23 | 135:8,20,22 |
| 388:4 | 20:17 21:2,5,15 | 78:8,9,20 79:3 | 136:24 137:16 |
| **officer** 186:24 | 21:19 22:6,11 | 79:6 80:14 81:1 | 137:23 138:10 |
| 192:12 | 22:18,24 23:18 | 81:10,16 84:7 | 138:21 139:12 |
| **offices** 2:12 | 23:20 24:1,9,16 | 85:6,13,14 | 139:17,23,23 |
| **oftentimes** 67:4 | 25:3,15 26:20 | 86:20 89:23 | 140:10,10,11 |
| 165:7 176:17 | 26:21 27:3,8 | 90:3,10,18 91:2 | 140:23 141:8 |
| 188:8 | 28:13,15 29:10 | 93:10 94:6 95:4 | 143:17 144:5 |
| **oh** 22:1,2 36:18 | 29:18 30:6,17 | 95:11 96:16 | 144:20 145:6 |
| 51:12 64:17 | 30:21 31:3,11 | 97:18,19 98:22 | 145:10,18 |
| 86:18,20 88:14 | 31:14,15 32:7 | 99:9,10 100:8 | 146:5,10,23,24 |
| 95:11 142:24 | 32:11 33:5,10 | 100:11,11,22 | 147:15,17,20 |
| 169:2 171:13 | 33:14 34:1,18 | 101:1,14 102:6 | 148:7,13,16 |
| 185:4 205:23 | 36:7,15 37:21 | 102:17,21,24 | 149:11,20 |
| 215:7 217:15 | 38:14,17,22 | 103:14,16,19 | 150:2,16,18 |
| 236:9 249:19 | 39:10 40:11,12 | 103:21 104:6,7 | 151:6,20,23 |
| 255:17 276:4 | 40:23 41:17,20 | 104:15,17 | 153:12,14,24 |
| 276:15 280:9 | 42:3 43:2,4 | 105:6,12,14,19 | 155:4,22 |
| 280:11 287:1 | 44:13 45:10,23 | 105:23 106:3 | 156:16 157:7,8 |
| 292:22,24 | 47:2,7,16 48:3 | 106:18 107:5 | 158:12 159:20 |
| 333:22 337:21 | 49:4 50:23 51:6 | 107:14,23 | 160:7 161:2,14 |
| 340:13,15 | 51:17 52:13,18 | 108:3,13,17 | 161:18 164:14 |
| 342:7 347:16 | 53:9 55:8,21 | 109:17 110:22 | 165:1,7 167:2,3 |
| 354:6 359:5 | 56:5,9,17 57:5 | 113:7,22 | 167:4 168:4,17 |
| 369:9 379:2 | 57:18,21 58:18 | 115:17 116:2 | 169:3,20 |
| 388:15 393:8 | 58:20 60:17 | 116:11 117:8 | 170:14,24 |
| 393:10 416:15 | 61:13 62:5,8 | 118:2,21 | 171:17,24 |
| 419:10 421:23 | 63:18,21,24 | 119:14 120:16 | 172:7,9,18,19 |
| 424:5,8,15 | 64:19 65:24 | 121:6,20 | 173:20,23 |
| 429:18 440:18 | 66:20 67:7,18 | 122:17,20,22 | 174:3,8,13,16 |
| 480:21 485:15 | 68:8,20 69:1,8 | 123:6,19 124:1 | 175:10 176:7 |
| **oil** 7:14 69:12 | 69:9,17,21 70:6 | 124:16 126:4 | 176:15 177:23 |
| 71:5,6,21 80:10 | 70:7,8,20 71:9 | 126:12 130:13 | 178:12 179:12 |

**[okay - okay]**                                                    Page 61

| | | | |
|---|---|---|---|
| 180:8,10,15 | 230:8,19 | 285:17 286:5 | 344:22 347:5 |
| 181:1,5,10,16 | 232:18 234:16 | 286:16 287:1 | 347:24 348:10 |
| 182:20 185:4 | 234:21 235:7 | 289:6,9,17,23 | 349:8 350:5 |
| 185:21 186:17 | 235:11 236:9 | 291:13 292:6,8 | 352:2,7 354:8,9 |
| 187:23 190:19 | 238:21 240:1 | 292:14,24 | 354:18 355:16 |
| 191:9,12,22 | 240:14,18 | 293:8,13 | 355:19 356:3,9 |
| 192:4,15 193:3 | 241:6,23 | 294:11,20 | 356:12,20,24 |
| 194:5,7,16 | 242:24 243:20 | 295:1,17,24 | 362:3 363:21 |
| 195:15,24 | 244:8 246:8,21 | 296:17,24 | 363:24 364:10 |
| 196:4 197:12 | 247:24 248:11 | 297:13,16,19 | 365:1,4,13 |
| 198:13,15,19 | 249:14 250:4 | 297:22 298:5 | 368:10,15 |
| 198:22 199:5 | 250:24 251:2,8 | 300:10,15,20 | 369:6,10 |
| 200:17 201:1 | 253:1,7 254:1 | 301:23 303:18 | 370:18,23 |
| 202:12,13 | 255:4,17,21 | 304:15,15,17 | 372:6,15 373:1 |
| 203:2,6,12 | 256:10,22 | 304:20 307:16 | 373:14,20,24 |
| 204:9 205:8 | 257:3,23,23 | 310:2,13 312:5 | 376:19 377:7 |
| 207:1,19,23 | 258:16 259:9 | 313:13 314:14 | 377:12 378:11 |
| 208:2,9,15,16 | 260:18 261:11 | 314:16 315:16 | 378:12 379:3,8 |
| 208:24 209:3 | 261:23 262:7 | 316:3 317:12 | 379:9,23 380:4 |
| 209:14,21,23 | 262:15,19 | 317:23 318:1,3 | 380:5 381:19 |
| 210:3 211:5,12 | 263:2,4 264:7 | 318:5,11 320:9 | 382:20 383:7 |
| 211:13,20 | 265:21 266:3 | 320:21 321:6 | 384:14,22 |
| 212:2,19 213:6 | 266:15 267:12 | 321:22 322:4 | 385:3 387:8,13 |
| 213:8,11,14,18 | 268:14 269:4 | 322:11 324:7 | 388:18 389:20 |
| 214:2 215:7,16 | 269:14,19,22 | 324:11 325:23 | 390:12 391:6 |
| 216:4,18,24 | 270:1,4,14,18 | 326:12,22 | 391:20 393:7 |
| 217:15,18 | 270:20 271:9 | 327:9 328:2,18 | 393:12,22 |
| 219:15 220:1 | 272:4,10,13,17 | 329:18,22 | 394:6 396:4 |
| 220:10,14,17 | 273:24 274:3 | 330:4,5,13,15 | 397:9,21,21 |
| 220:20 221:1 | 275:1,2,5 276:8 | 330:22 331:5 | 398:9 399:19 |
| 222:21,22 | 277:6,21 | 331:10,22 | 399:24 400:5 |
| 223:7,13,18 | 278:24 280:14 | 332:9,15,23 | 401:19 402:24 |
| 224:13 226:16 | 280:18 281:4,5 | 333:12,21 | 403:8,24 405:8 |
| 227:5,18 228:4 | 281:14,17 | 335:7,14,14,16 | 405:21 406:1,8 |
| 228:7,20,24 | 283:5,6 284:4 | 337:3 342:11 | 406:14 408:3 |
| 229:6,8,15,21 | 284:11 285:3 | 342:20 343:16 | 408:20 409:21 |

**[okay - organization]**                                              Page 62

410:15,23
411:1,5 413:5
413:12 414:8
415:16 416:20
416:20,24
417:7,12 418:3
418:7,9,9,13,19
419:1 421:8,14
422:3,19 423:2
423:8,12,16,18
424:8 426:15
426:21 427:14
428:23 429:22
431:10 432:22
433:7,17
434:10 435:3
435:13,21
436:9 437:18
438:21 439:22
440:7,16 441:4
441:10 442:1
443:5,13,19,22
444:9,12,17
445:3 447:10
447:22 449:13
449:20 450:4,8
452:17 453:4
453:13 454:1,4
454:12,21
456:6,12,16
457:6,12
458:11,14,20
459:15,22
460:20 461:3
461:10 462:8
462:18,23

463:3,8,12,22
464:7 466:13
466:22 467:5,8
467:20 468:13
468:20 469:2,7
469:17 470:4
470:17 471:4
471:14 472:16
473:9 474:19
475:12,17
476:16,22
477:7,22 481:5
482:1,14
483:10,20
485:23 488:7
488:23 489:4
489:18 490:9
490:17 495:24
496:3,7 497:21
498:12 499:10
**once** 104:1
205:5 217:11
478:12
**oncologist**
64:21,22
**ones** 126:10
252:7,8,17
376:14 383:3
412:24 483:11
**ongoing** 104:5
435:4 437:8
481:23
**online** 362:4,17
**open** 320:4
**opening** 121:13

**openly** 474:6
**operating**
45:17 46:6 58:8
58:14 103:11
133:10 147:11
147:24 149:13
184:21
**operational**
323:8
**operations**
355:2
**opine** 148:18
177:17 192:1
304:3 397:6,10
**opining** 35:24
36:21 50:22
55:12,19 137:5
137:8,12 148:4
158:19 159:4
159:18 307:9
307:10 383:8
391:17 396:10
397:8,20
398:20 399:4
399:17 400:3
402:11,22
407:19 416:21
477:14,20
478:7 479:2,20
**opinion** 109:3
177:18 307:18
326:13 425:14
426:17 427:9
467:9,21
468:21 471:5
475:17 477:19

**opinions** 12:9
16:5 91:23 92:4
118:16 137:16
150:18 168:8
182:12 200:18
202:17 325:7
326:17,21
333:17 408:3
498:18 499:6
**opportunity**
178:11 382:12
**opposed** 88:6
389:23
**optical** 405:11
422:8,12,17,18
**options** 366:3
**order** 74:3
77:11,12 134:6
148:24 159:14
280:16 371:9
383:1 445:10
471:1
**ordinary**
109:13 442:20
**ore** 410:10,15
410:18
**organization**
14:16,20,21,21
14:22 20:16
23:24 24:5,21
25:1,2 45:19
58:15 65:21
98:11,11,12,21
100:3 101:18
102:2 103:4,22
103:23 105:6,7

**[organization - ovarian]** Page 63

| | | | |
|---|---|---|---|
| 105:13 115:7 | 497:14 | **outcome** | 198:17 208:3 |
| 127:2,7 128:23 | **organizations** | 100:19 475:20 | 208:19 209:5 |
| 132:23 135:12 | 98:15,17 102:8 | 502:17 | 210:9 211:15 |
| 147:5 149:1 | 109:22 110:17 | **outcomes** | 212:17 214:24 |
| 164:21 169:15 | 133:12 164:18 | 437:15 | 215:2,11,13 |
| 169:21 170:7 | 165:14 167:17 | **outline** 94:15 | 216:7 217:4 |
| 170:15 171:17 | 173:18 177:7 | **outlined** 175:7 | 222:15,16,18 |
| 172:21 173:4 | 179:7 180:12 | 287:4 322:13 | 222:24 223:2 |
| 174:19 178:2 | 189:5 213:5 | **outs** 27:19 28:3 | 224:8 226:14 |
| 179:4 180:3 | 248:12,12 | 28:6 76:23 | 226:15,23 |
| 182:3,22 | 250:14 252:5 | 325:14,15 | 227:3,12,15 |
| 187:11 188:7 | 256:11 287:22 | **outside** 51:23 | 229:11,23 |
| 188:10 189:9 | 289:22 309:15 | 52:7 56:18 91:4 | 231:2 236:17 |
| 190:10 219:1 | 313:16 336:15 | 94:12 103:4 | 236:19 237:1,4 |
| 252:2 265:10 | 461:14 | 105:7 119:19 | 241:3 243:13 |
| 266:9,12 272:7 | **organize** 57:23 | 161:9 348:7 | 243:17 244:17 |
| 308:2 325:9 | 190:1 | 371:4,4 | 245:5,17,19,24 |
| 371:10 436:20 | **organized** | **ovarian** 8:9,17 | 246:2,15 |
| 465:21 470:14 | 442:23 | 8:20,23 9:3,6,8 | 251:11 256:4 |
| 497:12 | **orientation** | 9:12,18,21,22 | 256:14,15 |
| **organization's** | 442:19 | 16:10 17:19 | 259:15,22 |
| 169:22 | **original** 93:8 | 32:15,24 33:6 | 260:3 263:6,14 |
| **organizational** | 114:7 211:1 | 33:11,16 34:3,8 | 263:20 264:2 |
| 45:15 46:4 57:7 | 450:7 451:2 | 34:21 37:6 | 271:16 272:2 |
| 71:15 98:24 | **originally** | 38:15 66:10 | 274:5 277:18 |
| 147:23 149:1 | 482:8 | 75:10 93:6 | 278:10 283:17 |
| 163:15,18 | **orino** 483:19 | 109:24 110:4 | 290:19,20 |
| 173:18 181:22 | **osha** 428:20 | 112:4,22 | 293:23 301:3 |
| 182:14 186:12 | **otc** 12:4 | 114:20 115:13 | 302:10,22 |
| 189:18 309:15 | **ought** 36:12 | 116:1,12 118:7 | 303:1,8 310:5 |
| 333:18 430:10 | 38:5 232:24 | 118:18 138:11 | 310:15 311:9 |
| 441:15 460:10 | 233:3,20,20 | 138:20 140:2 | 311:11,18 |
| 462:21 463:22 | 235:2,3 239:13 | 140:11 141:3 | 320:6 324:20 |
| 464:8,12 | 241:2 247:14 | 141:18 142:18 | 325:3 327:23 |
| 466:16,24 | 295:13 322:14 | 142:20 143:22 | 331:2,18 333:1 |
| 479:13 497:13 | 323:9 | 144:16 145:7 | 341:19 348:8 |

**[ovarian - paragraph]**                                           Page 64

350:20 358:11
360:11 365:5
365:10 368:19
425:2 441:6
471:8,13
473:15 475:21
476:11
**ovaries** 34:3,8
222:13 318:24
**overall** 262:17
**overseeing**
187:1
**own** 16:2
143:20 168:21
171:14 257:5
289:19 290:3
362:13,15,17
363:9 364:7
435:22 439:8
472:3 473:13
483:1 487:14
487:16
**ownership**
76:18 94:6
444:18,22,23
**owns** 76:21
77:1

**p**

**p** 12:12,12 14:1
**p.m.** 264:10
265:2 337:7,8
345:8,9 351:4,5
352:15,16
420:17,18
431:14,15

455:5,5 480:7,8
485:19,20
499:16
**pa** 3:5 4:8
**pacific** 69:12
**packard** 69:13
**packed** 57:3
**page** 6:2,18 7:2
26:6,17 28:18
28:21,23 54:9
66:14 68:16
81:21,22,23
84:4 92:2 103:7
112:1 150:20
151:23 153:14
153:19,23
169:7 170:24
185:21,22
186:3 191:24
196:4,4 200:6
202:7,10,15
205:13 206:20
206:24 212:13
212:13 215:5
216:1,3 222:8
223:14 224:12
225:9 227:6,7
230:15,22,22
237:20 245:8
254:19 259:6
259:11 263:1
272:23 276:14
283:3,4 292:14
292:15 293:2
293:16 301:13
302:3 317:4

319:9,10
324:17 333:13
349:21 353:12
353:16,19
354:10,12,13
354:17 355:12
355:12 360:4
375:5,5 378:14
378:15,23,24
381:21,21,22
381:22 382:3
386:24 387:14
393:13 394:13
394:14,14
395:4 404:18
404:21 423:8
445:20 446:2,6
452:14 456:9
463:4 492:17
492:20 500:3,5
500:7,9,11,13
500:15,17,19
500:21,23
**pages** 32:5
45:12 47:13,17
47:19 50:18
161:19 198:11
206:20 220:2
308:7 309:18
309:19 381:14
390:13,13,14
399:20 452:12
452:21 453:10
460:19 465:2
469:13 473:1

**paid** 26:9
127:24 128:1,7
262:17 289:2
328:24 333:17
335:8 445:10
455:22 458:8
465:24 466:5
472:4 482:2
**panel** 12:5
**papatonio** 3:4
5:16
**paper** 12:8 34:2
34:5,10 208:10
225:14,22
226:2 256:1
279:19 282:20
419:5 420:24
424:1,4 429:9
429:13,16
430:12,13
498:7,8
**papers** 32:22
355:7,10 429:3
**par** 11:15
**paragraph**
26:19 28:18
29:2 39:10
112:1,7,8
137:14 140:12
150:21 192:9
196:7 205:14
206:19 224:15
225:19 227:8
236:14,22
252:10 255:4
272:24 285:15

[paragraph - people]                                                           Page 65

286:9 302:7
316:20 318:21
319:15 331:20
347:15 404:19
404:21 425:13
**paragraphs**
331:11 360:5
499:1
**paralegal**  5:15
**paralegals**
483:5
**parameters**
350:7
**paraphrasing**
285:24 340:2
**pardon**  41:5
68:9 72:16 81:5
421:17
**parents**  338:14
339:16
**part**  23:21
28:18 38:5 49:2
60:21 61:14
66:23 67:10
100:18 101:6
101:16 108:6
108:16 123:15
130:7,23 133:3
135:8 154:16
166:4 175:10
214:1,6 225:12
225:23 236:7
238:14,17
273:3,5 280:17
281:8,18
297:20 301:19

338:20 339:14
343:11 349:2
390:24 405:24
413:21 466:4,5
466:5 470:7,9
471:10 497:8
**participants**
23:7
**participated**
55:22 56:12,17
57:6 279:7
**participating**
58:21
**particle**  422:22
**particles**
222:12,14
263:13 405:17
**particular**  67:4
84:12 91:21
99:8 107:6
188:12 197:24
201:12 209:19
225:9 258:6
287:13 302:17
315:2 336:6
392:8 402:12
402:14 407:20
424:1 433:4
437:15 439:9
478:8 496:19
**particularly**
20:17 87:9
163:20 216:8
216:11 217:5,8
320:18 321:14
498:1

**particulate**
222:12
**parties**  502:14
**parts**  31:7
**party**  287:6
**pass**  487:7
**past**  32:21 33:1
41:3,9 70:23
79:1 96:9 164:7
174:23 188:2
384:19 436:10
436:12,23,24
437:5,5,7,7
490:11,11
**pathology**
207:13
**patient**  228:19
427:24 428:4
432:4,6,7,11
**patients**  370:1
432:13 463:19
**pattern**  201:13
214:23 215:10
233:22 254:8
254:10,11
312:4 326:2
473:3 474:1
**patterns**  105:3
107:3,4 146:18
300:14
**pause**  352:22
**pay**  96:2 458:9
458:11 476:3
**paying**  125:1,7
128:4 141:16
142:7 143:5,8

143:24 144:4,7
144:13 145:11
145:12,17
167:16 198:20
198:21 233:6
235:6 239:21
239:22,23
240:4,5,9,11,12
240:14,18
247:22 251:17
281:19,21
284:7 286:23
287:1,2,16
289:5 360:24
361:1,13
457:10,10
474:13 475:8
**payment**  487:2
488:16
**payments**
481:9
**pays**  458:12,13
**pc**  5:5
**pcpc**  5:3 11:4,4
298:23
**pcpc0058604**
10:10
**pcpc0058654**
10:10
**peer**  207:23
304:24 421:4
**penalty**  501:1,4
**pending**  192:3
**pensacola**  3:8
**people**  29:20,21
45:19 46:18

**[people - phrase]**                                                      Page 66

81:17 87:5,8,11
88:1,3,9,12,13
89:6 98:15,17
100:6 108:20
110:16 123:4
123:17,21
132:13,14,22
132:24 133:13
135:5,10,19
142:12 165:20
173:8,15,21
179:5 180:2,11
180:13 196:1
215:18 218:13
233:8 241:2
244:6 246:10
246:24 256:11
257:8,23
266:16 284:5
298:24 305:20
338:15 349:11
351:19 359:9
359:10 367:5
369:13 380:13
385:14,21
389:17 401:18
404:16 435:6
437:9,11,20
451:17 456:8
458:15 462:7
464:16,24
465:10 466:18
467:1 474:14
483:2,14,17
484:2,3,6
488:10 489:23

**people's** 436:18
**perceive** 172:20
**perceived**
    320:10
**perceives**
    320:11
**percent** 48:16
    75:3 138:18
    139:24 158:17
    159:2 161:3
    347:19 385:21
    386:4 391:12
    391:14,21
    392:3,11,18,19
    399:15 402:9
    403:16 407:16
    428:24
**percentage**
    80:3 456:13
    488:3,8 489:1,2
    489:9 490:9,14
**perception**
    349:3
**perchance**
    337:1
**perfect** 23:16
    42:8 118:8
    281:24 291:9
    301:23
**performance**
    63:22 170:16
**performed**
    361:9
**perineal** 8:16
    8:19 9:7 214:23
    215:10 226:12

226:22 227:4
227:15 236:2
265:24 268:6
293:22 301:2
327:23 439:20
**period** 92:17
    204:23 232:21
    235:2 241:11
    242:9,15,16
    269:7 312:16
    322:6 398:16
    412:7 455:13
    491:13
**periodically**
    95:17 481:10
**periods** 128:11
    204:18,19
**peritoneal** 9:19
**perjury** 501:1,5
**person** 60:5
    120:11 173:12
    177:19 256:3
    306:15 307:8
    418:18 458:19
    479:18 484:23
**personal** 5:3
**personally** 76:3
**persons** 465:20
**perspective**
    23:6 64:18
    231:3 238:17
    442:16
**perspectives**
    13:11 421:6
    442:15,17

**pertain** 55:9
**pertaining**
    245:18
**petition** 8:13
    285:4,7,19
    294:18 296:22
    297:8,15 298:8
    298:15 299:5
    299:19 300:22
**petitions** 280:8
    299:14 300:23
**petroleum** 71:1
**ph.d.** 7:5,13,16
**pharmaceutical**
    12:19 65:10
    188:20 405:4
    422:4
**pharmaceutic...**
    189:13
**pharmacopeia's**
    405:6
**phase** 39:14
**phases** 73:1
**phd** 1:21 2:12
    6:2 14:3,16
    65:21 265:3
    440:14 484:24
    501:19
**phds** 483:6
**philadelphia**
    4:8
**phillips** 332:17
**phrase** 99:2
    109:12 147:20
    211:7,10
    310:16 320:2

**[phrase - possibility]**                                    Page 67

372:2
**phraseology**
41:22
**physician**
186:24
**pick** 242:16,17
242:17
**picked** 205:9
**picking** 19:8,18
61:24 433:1,4
433:12,13,18
434:5,11,19
**picks** 109:8
**pie** 127:18,19
**piece** 108:9
358:16
**pier** 120:22
**pilot** 497:9,10
**place** 127:12
130:17 180:17
361:11 451:23
454:7 502:10
**places** 121:3
363:20
**plaintiff** 1:11
1:16
**plaintiffs** 3:3
3:13 4:3 16:14
16:21 17:3 19:2
19:4 21:21
28:19 62:3
77:21 112:13
114:19 116:23
121:14 138:1,3
467:18 476:24
477:2 498:15

**plan** 127:14
350:6
**plans** 438:5,17
**plant** 240:3
**plausibility**
286:11
**plausible** 435:5
**please** 14:13
16:19 21:6
39:11 54:6 86:9
98:9 134:17
163:11 200:3,4
207:2 226:9
235:21 266:16
291:16 297:2
301:14 343:24
357:15 367:20
373:15 374:1
378:4 387:1,3
392:24 393:5
401:20 404:3
404:19,20
486:18
**pled** 132:3
**plenty** 34:19
45:19 87:24
377:10
**plm** 50:8
405:12 409:7
410:20 411:3,7
**plus** 334:8,8
460:16
**point** 41:9
85:22 141:9
152:2 153:20
163:5 187:6,16

219:8,10
236:16 272:23
273:6,15
312:10 315:2
321:23,23
415:18 433:23
445:21 475:14
**pointed** 339:10
**pointing** 318:18
333:3
**points** 273:11
348:7,9 426:21
**poisonous**
152:9
**polarized**
405:12
**policies** 58:22
61:2 127:5,11
130:16,19
131:2 133:7
134:1 135:12
163:17 164:11
164:16 165:9
165:12 169:22
170:8,17
171:18 172:1,5
172:14 173:24
174:20 175:13
176:18 177:3,7
177:13 178:16
180:23 181:22
182:3,6,14,18
185:10,12
188:3,9,12
189:5,10,21
190:10 193:14

193:17,21
**policing** 349:3
**policy** 58:8
59:12,18
180:16 183:3
183:16 184:9
186:7 190:14
190:22 196:9
247:13 377:24
378:18 379:13
379:16,20,21
379:24
**pooled** 9:12
245:2,15
**pooley** 396:12
397:10 418:2,9
418:11
**poor** 216:6
217:3 238:6
**popped** 124:6
**portal** 363:1
**portion** 41:21
115:15 223:9
450:21 457:19
460:17 469:9
**portions** 301:16
**pose** 16:15,16
16:23 138:5
325:3 405:17
**position** 254:22
321:16 353:13
**positive** 169:16
376:20 405:13
**possibility**
208:3 210:8
211:15 227:14

[possibility - press]                                                 Page 68

229:22 277:17
327:22 331:1
332:6
**possible**  58:19
219:6 236:17
246:1 265:15
267:2 294:3
302:9 303:7
310:18 311:8
311:17 439:15
**possibly**  266:1
267:18 268:9
268:15 439:21
**posted**  451:1
**potential**  9:2
17:19 37:6
40:19 59:19
109:23 115:4
115:23,24
118:6 125:15
139:21 142:18
142:18,20
143:21 175:14
175:21 208:19
209:15 226:7
231:22 239:9
241:3 246:15
310:5 348:23
373:21 442:23
**potentially**  42:5
42:14 216:7
217:4 332:18
**powder**  1:4,12
1:17 8:19 9:11
16:10,15,23
17:11 27:12

29:5 30:18
31:18 38:18,20
39:15 40:20
41:3,8 43:5
55:10 112:10
112:12 116:20
125:16 138:5
139:6 140:16
222:17 234:11
236:24 237:4
237:24 238:11
244:14 245:18
249:24 250:20
252:18 254:24
254:24 255:7
256:3,6 258:21
258:24 259:2
259:16 260:3
262:21 263:5
266:1 268:7
303:3 310:7
325:2 341:12
341:18 365:17
385:22 386:6
392:2,10 398:5
423:13,21
424:11 425:2
425:14,15,23
426:14,18
439:20 442:21
442:24
**powders**  29:11
42:13 140:18
245:21 246:1,6
251:4,13,13
252:13,16,22

255:1,9 256:5
259:17 260:8
425:22
**powerful**
321:15
**powerpoint**
91:3
**powers**  165:17
**practice**  19:15
20:9 51:23
102:3 103:12
169:23 170:8
**practices**  1:5
25:11 102:3
103:5 241:18
470:1,2,15,24
470:24
**pre**  127:14
**precautionary**
194:9,11,13
202:20,22
238:4
**precise**  75:13
**precisely**  76:6
385:4
**preclinical**
10:14
**predict**  229:2
**predictable**
179:8 437:17
**predicted**
437:13,22
**predicting**
229:4
**prefer**  16:3,4

**preliminary**
27:9
**premarket**
156:1
**premier**  396:11
**preparation**
7:18 97:12
184:10 422:10
**preparations**
293:22 425:15
**prepare**  453:19
454:5
**prepared**  16:6
354:10
**preparing**
355:20
**prerequisite**
165:19
**prescribed**
152:11
**presence**  49:23
405:3,16
**present**  5:14
107:10 238:2
371:17 426:14
**presentations**
91:3
**presented**
287:4 301:1
354:2 355:14
**president**  352:4
388:4,10
**press**  250:13
263:21 340:14
340:18

**[pressured - product]**                                           Page 69

| | | | |
|---|---|---|---|
| **pressured** | 238:4 | **procedures** | 469:6 497:14 |
| 132:14 133:1 | **printing** 259:8 | 58:14 127:5,11 | **proctor** 3:4 |
| **presume** | **printout** 150:9 | 130:17,20 | **produce** 69:23 |
| 415:10 | **prior** 282:16,17 | 131:2 133:8,10 | 189:16 |
| **pretending** | 360:17 361:8 | 134:1 135:13 | **produced** 97:1 |
| 240:23 | 493:19 494:16 | 163:17 165:10 | 97:2,3,17 |
| **pretty** 93:11 | **prioritize** | 165:13 169:22 | 443:20 |
| 133:12,21,22 | 171:18 172:11 | 170:8,17 | **producing** 97:8 |
| 141:10 153:8 | **private** 35:13 | 171:19 172:1,5 | **product** 8:5 |
| 165:13 168:1 | **proactive** | 172:14 173:24 | 25:7 27:15,21 |
| 205:5 252:1 | 166:20 | 174:20 175:1 | 28:2 29:6,16,16 |
| 378:12 449:18 | **proactively** | 175:13 177:3,8 | 30:2,5,8,11,14 |
| 458:4 461:14 | 158:22 308:9 | 177:14 178:16 | 30:16,24 31:21 |
| **prevailed** | 338:3 | 180:23 181:22 | 31:22 33:9 |
| 346:19 | **proactivity** | 182:4,6,15,18 | 39:16 40:9 |
| **prevent** 241:2 | 166:23 | 185:10,12 | 41:15,24 42:2,8 |
| **preventative** | **probably** 34:10 | 188:4 189:5,10 | 43:7,20 44:2 |
| 174:4 | 52:3 90:17 | 189:21 190:10 | 55:23 56:7,10 |
| **prevention** | 93:11 123:23 | 193:15,18,21 | 56:13,20 57:9 |
| 8:12 10:12 | 124:12 168:6 | **process** 23:21 | 59:14,20,23,23 |
| 285:18 323:21 | 264:8 309:1,3 | 24:5 38:6 39:23 | 60:1 65:10 |
| 324:14,21 | 329:20 446:10 | 61:15 83:6 99:6 | 70:16 104:9,22 |
| **previous** | 463:11 | 99:19 100:2,13 | 104:23 105:18 |
| 206:23 | **problem** | 100:19 101:4,6 | 106:4,9,22 |
| **previously** | 213:19,21 | 101:16,24 | 107:8,12 113:6 |
| 208:18 265:5 | 349:11 420:13 | 103:3 104:5,19 | 113:8,9,12 |
| 481:10 | **problems** 174:4 | 106:19 107:13 | 115:5,11,24 |
| **primarily** | 174:5 179:9 | 119:3 162:24 | 117:23 118:6 |
| 89:20 231:18 | 230:4 | 170:20,22 | 125:16 146:22 |
| **primary** 9:19 | **procedure** 58:8 | 175:6 177:9 | 151:13,18 |
| 89:20 130:12 | 58:8 59:12,18 | 236:18 277:15 | 153:2,17 154:2 |
| 409:24 477:5 | 176:18 180:16 | 280:18 444:1,2 | 155:11 156:18 |
| **principals** | 183:4,16 184:9 | 469:1 490:8 | 157:5,9,12,15 |
| 81:19 | 190:14,22 | 498:10 | 158:6 162:14 |
| **principle** 194:9 | 247:13 479:11 | **processes** 58:13 | 167:6 175:22 |
| 194:11,14 | | 200:24 468:19 | 194:1 197:5,20 |

**[product - psychologist]**

198:16 201:24
202:2 235:4
241:19,20
270:19 282:8
283:6,21 284:8
304:14 305:12
306:11,12
307:15 308:10
308:11 310:1
313:4,19 323:4
326:5,11,15
327:3 336:11
336:14,16
342:9 359:11
370:14 371:12
386:13 387:23
389:8,22
394:10,23
479:16
**product's** 154:6
**production**
92:20 363:7
442:12
**products** 1:4,5
1:13,18 5:3
7:19 8:15 12:10
17:11,24 27:12
27:13 39:1 41:3
42:4 57:11 60:5
60:15 63:5
69:23 70:4,11
112:10,13
116:20,22
117:17 140:18
146:13 150:23
151:9 155:1,20

156:13,23
158:1 159:10
160:3 184:11
189:14,17
193:10 201:15
252:21 285:8
285:20 304:18
305:18 324:23
325:2 338:15
349:24 350:9
354:24 365:5
365:10 389:5
389:14 416:8
417:1 425:6
442:24 463:20
471:3,17,18
473:5,16
**professional**
15:12 51:23
68:11 84:5
**professor** 65:24
66:3,4,6,7
**profits** 389:15
464:15,24
465:10 466:18
467:1
**prognosis** 216:7
217:4 238:6
**program** 10:9
184:12 291:23
292:9,11
**project** 43:14
43:23,24 44:3
44:14,14,17
45:3 50:15
52:19 65:3,3

70:5 74:24
75:12,14 76:4
83:22 111:15
111:23 168:16
168:19 484:7
**projects** 59:5
67:3 69:19
81:12 292:10
371:8
**promise** 38:3
228:18,22
280:13 294:21
**promises** 280:5
**proof** 259:23
**properties**
29:22 42:9
**prophylactics**
387:22
**proportion**
426:17
**proposal** 10:20
11:2 328:13
330:17 334:11
**proposed** 332:2
332:3,12,24
333:6 358:22
364:13
**proposes** 11:11
**prospect** 238:9
**protect** 37:5
**protocol** 287:4
332:11 335:23
404:24 406:3
**protocols**
405:14

**prove** 389:11
389:22,23
449:8
**proven** 259:22
272:8 395:7,20
**proves** 389:9
**provide** 98:14
154:3 162:21
162:23,24
164:21 180:13
189:13 315:14
449:19 479:15
**provided** 71:9
86:7 110:9
164:2 231:21
268:12 337:24
338:6 344:7
363:17,19
364:13,23
440:8 442:5
443:13 445:9
446:8 448:18
450:12 455:10
491:9,9
**provides**
186:11 236:1
**providing** 79:7
313:15 347:3
**proving** 259:14
260:2
**prudence** 238:2
389:7
**prudent** 246:6
255:7
**psychologist**
21:17 64:4

[public - question]                                                    Page 71

| public 2:22 | purest 426:1 | q | 131:12 133:22 |
|---|---|---|---|

**public** 2:22
36:10 121:23
163:21 207:14
231:5 243:24
261:24 320:11
389:1,10,12
464:10 502:4
502:21
**publication**
108:4 214:17
**publications**
254:11
**publicized**
249:22 253:15
341:10
**publicly** 363:23
364:2
**publish** 230:4
**published** 51:4
67:24 110:15
141:3 221:15
221:21 231:4
265:22 267:7
268:24 320:3
405:14 419:4
439:17 498:7,8
498:11
**publishing**
304:23
**pull** 104:3
327:9 393:5
**pulled** 167:20
**punitive** 121:23
**pure** 30:19,24
31:2,3,6 161:5
392:11,19

**purest** 426:1
**purpose** 314:4
314:5 487:7
**pursuant** 2:20
**pursue** 309:23
472:24
**pursued** 307:14
471:16 472:23
**pursuing**
105:16 106:21
469:23
**pursuit** 197:18
473:4
**put** 31:3 90:2
136:1,11,13
138:9 167:24
169:21 170:7
209:17 211:3
218:21 226:6
235:4 241:12
247:23 271:1
342:17 345:2
356:13 371:22
404:16 428:5
436:4 446:22
446:22 448:1
457:9 463:11
466:18 467:1
495:5
**puts** 226:22
227:11 457:11
**putting** 43:23
82:22 433:5
434:20 464:15
464:24 465:10

**q**

**qualifications**
62:10 81:17
98:2
**qualified** 73:14
**qualitative**
19:20 20:3,6,10
20:14 197:23
**quality** 12:16
127:9 415:23
**quarter** 238:8
401:14
**question** 6:18
16:18 21:5,9,13
27:1 30:22
31:12,13,22
32:17,20 34:17
34:20 36:8,9,13
36:24 37:1,2
38:1 40:11,12
40:14,16,23
41:6 42:11,19
45:22 50:3 53:9
53:14,18 54:5,7
56:2,5 57:2
60:19,20 67:9
67:10 69:21
70:6 79:17
81:15 98:7
114:5,6,7,9,9
114:13,16
116:18,19
117:2 118:23
125:17 126:12
126:13,17,18

131:12 133:22
135:8 141:2,20
141:24 143:2
143:16,16
144:2,9,12
145:1,19 146:9
148:3,10,11,14
149:3,5,11
152:23 156:8,9
159:21 161:16
162:19 166:4
166:14 167:22
173:9,11
179:17 180:15
180:20,21
181:1,11 183:2
185:15 188:18
191:2 192:3
196:11 197:14
198:6 199:1,13
200:4,17 208:9
209:4 210:5,20
211:12,21
212:10,21
215:17 219:19
219:22 222:22
223:15 228:22
230:17,19
233:14,16
234:21,24
237:21 240:19
241:24 242:1,2
246:20 248:1
253:2 256:12
267:19,24
270:21,21,22

**[question - read]**                                               Page 72

| | | | |
|---|---|---|---|
| 271:8 272:5 | 486:13,19 | 485:14,16,24 | 253:2 256:12 |
| 277:20 287:24 | 488:6 | 486:7 487:8,13 | 350:17 |
| 290:11 295:1 | **questioning** | 498:3,14 499:6 | **ralph** 324:8 |
| 304:21 306:17 | 18:7 496:4 | 499:11,13 | **range** 199:22 |
| 308:1,18 | **questions** 21:6 | **quick** 93:14 | **rate** 331:15 |
| 312:22 313:22 | 23:17 24:8 27:9 | 420:6 | 446:4 447:2 |
| 314:7,13,21 | 32:13 36:5,11 | **quickly** 221:3 | **rated** 265:15 |
| 315:7 319:4 | 93:22 100:12 | 245:13 375:3 | **rates** 238:8 |
| 320:21 322:8 | 100:15 101:1 | **quite** 142:13,13 | 263:14 |
| 350:17 361:7,8 | 108:6 111:10 | **quote** 347:1 | **rather** 251:13 |
| 361:22 364:10 | 113:8,11 123:7 | **quoting** 26:6 | **ratio** 331:14,16 |
| 367:21 369:23 | 123:8,10,16,21 | **r** | **rationalize** |
| 370:11 375:3 | 123:23 124:2,6 | | 435:6 |
| 378:17,20 | 124:13,16,17 | **r** 14:1 196:1 | **ray** 405:10 |
| 379:23 380:12 | 125:20 139:1,6 | 471:24 | **reach** 44:21 |
| 380:21 382:14 | 139:15 141:12 | **radioactive** | 468:1 |
| 383:24 384:15 | 143:19 144:11 | 222:12 | **reached** 218:8 |
| 391:12 392:15 | 144:15,18,21 | **rafferty** 3:4 | 499:7 |
| 395:5 396:17 | 145:2 149:7 | **raise** 141:12 | **reaching** |
| 396:18 417:10 | 162:6 164:20 | 188:19 299:24 | 350:18 468:10 |
| 417:13 422:11 | 176:14 191:11 | **raised** 32:13 | **react** 108:20 |
| 426:22 427:2,4 | 196:17 200:12 | 33:2,13,22 34:1 | 167:6 |
| 427:6,8 430:22 | 209:9,18 | 36:11 39:2 | **reaction** 237:10 |
| 430:23 434:9 | 210:22 211:2 | 143:19 145:2 | **read** 43:10 54:2 |
| 437:3,4 440:17 | 227:18,20 | 162:19 166:8 | 54:7,8,14 61:6 |
| 440:20,21 | 229:2,10 | 208:6 209:9,18 | 63:24 126:7,9 |
| 442:3,4 443:6 | 239:12 263:24 | 210:10 211:8 | 126:10 146:8 |
| 443:18 444:3 | 265:11 271:4 | 211:17,20,21 | 186:5 200:3,5 |
| 446:24 447:22 | 277:22,24 | 222:16 223:16 | 215:8 217:11 |
| 448:21 456:20 | 280:15,16 | 228:8 229:10 | 226:4,8 227:7 |
| 457:3 458:3 | 294:22 315:5 | 232:4 239:16 | 245:12,13 |
| 460:11 465:6 | 337:10 401:17 | 263:24 | 246:7 258:22 |
| 465:16 466:9 | 403:21 412:5 | **raises** 212:21 | 262:23 277:14 |
| 466:16 468:20 | 418:18 431:19 | **raising** 108:6 | 280:24 293:17 |
| 470:5,6 478:22 | 431:24 466:1 | 222:21 237:17 | 293:18 301:15 |
| 481:16 486:6,9 | 467:4 477:12 | 239:12 241:1 | 302:4 311:2,3 |

**[read - recommendations]** Page 73

| | | | |
|---|---|---|---|
| 317:16 318:6 | 168:11 176:13 | 68:4,6,8,10,13 | **receiving** 457:3 |
| 340:23 371:15 | 182:10 184:17 | 68:15 70:13,19 | **recent** 226:20 |
| 377:18,19,20 | 200:12 211:11 | 80:11,17 84:17 | 237:2 374:10 |
| 377:23 378:10 | 239:4 253:2 | 84:20 88:8 | 405:18 |
| 379:8 381:12 | 298:1 314:6 | 89:11,11 | **recently** 484:6 |
| 393:19 404:18 | 315:5 319:2 | 114:23 119:17 | **receptionist** |
| 404:19 405:23 | 343:15 370:20 | 119:22 120:12 | 406:22 |
| 414:4,23 421:8 | 375:2 384:1 | 120:24 122:7 | **recess** 18:22 |
| 424:4 435:14 | 391:11 409:4 | 123:9 126:16 | 93:18 184:4 |
| 439:7 444:11 | 417:11 418:20 | 127:15 129:7 | 264:11 337:7 |
| 469:15 501:5,7 | 425:21 429:17 | 129:10 163:2 | 345:8 351:4 |
| **reading** 26:16 | 429:19 441:23 | 168:13 181:3 | 352:15 420:17 |
| 210:4 215:15 | 464:3,21 | 181:12 183:9 | 431:14 455:4 |
| 217:13 230:17 | 465:17 467:3 | 183:12 190:20 | 480:7 485:19 |
| 238:13 286:19 | **realtime** 2:21 | 190:22 191:8,9 | **recipe** 127:19 |
| 301:9 | 38:7 162:23 | 191:14,15,16 | **recognition** |
| **reads** 319:15 | 209:2,3 216:15 | 192:24 253:23 | 496:21 |
| **ready** 36:13 | 216:16 218:1 | 269:11 275:4 | **recognize** |
| 322:7 | 239:17 250:22 | 281:10 292:5 | 407:10 |
| **reaffirmed** | 343:14 366:14 | 298:21 299:6 | **recognized** |
| 24:7 479:10 | 367:3 | 324:15 329:23 | 384:6 405:14 |
| **real** 164:2 | **reason** 47:20 | 330:21 336:1 | 406:11,16 |
| 182:24 319:21 | 73:20 216:9 | 344:9 346:7 | 407:1,11 408:4 |
| **realize** 188:11 | 217:6 259:8 | 358:4,16 362:6 | 408:7,8,15 |
| **really** 18:5 | 319:5 342:22 | 386:21 431:3 | 479:8 |
| 29:20 31:21 | 380:5 475:13 | 440:5 463:14 | **recommend** |
| 42:18 44:24 | **reasonable** | **receive** 456:9 | 125:13 126:21 |
| 58:11 66:21 | 213:1,5 408:11 | 456:12,23 | 250:19 374:2 |
| 76:5 81:1 87:11 | 417:18 | **received** 13:2 | 387:19 |
| 100:5,6 103:8 | **reasons** 178:21 | 278:7,9 440:11 | **recommendat...** |
| 105:8 108:17 | 231:19 254:4 | 443:8 445:4,7 | 218:3 220:21 |
| 110:14 120:6 | **recall** 18:1 34:9 | 448:20 450:16 | 231:12 331:5,6 |
| 130:10 134:12 | 51:8 54:23 | 450:17 452:21 | 341:1 |
| 135:15 141:23 | 57:16 58:6,12 | 456:21 457:7 | **recommendat...** |
| 154:16 157:7 | 58:16 59:15,21 | 481:9 | 35:9 38:4,10 |
| 160:23 167:12 | 60:9 67:6 68:2 | | 244:23 252:16 |

[recommendations - related]                                    Page 74

472:3,18 498:5
**recommended**
228:9 247:15
350:5 383:3
384:12
**recommending**
216:14,16
251:12 305:21
**recommends**
254:23 330:23
331:9
**record** 18:20
41:1 46:12 47:4
54:8 77:15,18
93:17,20 123:3
160:14 184:3
200:5 207:8
258:22 267:13
267:14 275:12
293:18 317:6
317:10 330:6
337:6 345:4,7
351:1,3 352:14
404:20 427:18
430:24 431:13
480:6 492:4,6,8
494:5
**records** 81:11
88:7 274:8
442:12 450:21
453:1,5,9 455:1
475:3
**recruited**
347:10 348:14
**red** 203:7

**redline** 462:17
463:1
**reduce** 231:16
246:1
**reducing** 238:3
367:23
**reduction**
242:10,20,23
247:2 366:13
**reengaged** 92:7
**reexamined**
461:23
**refer** 225:17
281:18 315:24
**reference** 32:22
276:22 339:22
342:16 343:17
372:1 434:12
**referenced**
84:6 279:3
337:13
**references**
50:24 385:10
**referred** 43:6
50:9 238:21
266:6 285:6,18
315:19
**referring** 95:8
296:20 297:7
329:8 492:2,9
**refers** 285:3
**refined** 136:9
136:11
**reflect** 160:15
171:20 275:12
436:14

**reflected** 95:1
**reflects** 170:15
**reformulate**
303:24 350:2
**refusal** 472:20
**regard** 306:14
**regarding**
140:19 309:24
442:20
**regardless**
459:21 462:1
**regards** 477:16
**region** 226:12
226:22
**register** 11:14
**registered** 2:22
502:4
**regular** 231:22
**regularly** 273:8
**regulated** 7:11
65:13 165:8,8
**regulating**
57:22
**regulation**
11:16
**regulations**
27:20 55:5,9
61:5 63:4
116:16 149:17
157:23 164:9
306:5
**regulator**
148:21
**regulators**
116:16 145:13
235:8 239:22

247:22 474:9
**regulatory**
25:23 26:1 28:4
46:18 55:6,12
55:20,24 56:15
110:8,16
116:17 141:17
142:13 147:1
147:23 148:18
149:12 154:12
173:11,12
202:18,21
233:7,9 272:7
306:4,15,18
307:8,8 349:1
367:17 442:14
**reilly** 5:5
**reimagining**
341:18
**rejected** 254:3
**related** 17:4
33:8,8 43:23
48:21 49:10
56:3 58:5,22
61:2 70:5 91:4
127:9 174:20
184:18 201:13
213:7 248:10
342:1 399:18
432:8 442:13
442:24 444:10
471:17 473:3,4
474:10 486:5
486:21 497:14
498:2

**[relates - report]**

**relates** 69:6
316:7 436:19
487:3
**relating** 32:14
34:20 90:10
99:16 109:2
128:14 141:2
492:13
**relation** 212:17
**relationship**
9:2 212:16
224:20 302:21
447:13
**relative** 147:22
150:10 349:1
502:13,15
**relatively**
204:22 220:5
286:11
**release** 71:21
250:13 340:14
340:18
**released** 71:4
**releases** 263:21
**relevant** 149:12
149:12 150:14
150:14,17
307:19,20
309:13,14
411:10,16,20
411:22 442:13
**reliability**
391:18
**reliance** 122:11
184:16 450:2

**relied** 89:20
292:2 296:2
408:2
**rely** 189:15
405:9 413:13
**remember**
21:20,24 22:4
34:5,6,10,12
35:15 44:12
52:21 53:1
54:22 58:21
59:3,7 67:21
73:2 88:14
111:22 119:9
120:9,17,21
121:7,8,11,15
122:4 123:10
124:13 126:10
185:20 235:1
281:13 292:7
304:10 324:2,6
325:24 327:6
327:15 338:16
340:4,11,13
342:3 344:4
355:9 364:5,16
368:21,22
369:3,6 378:2
385:2,3 402:1,7
429:20,21
433:15,17
434:24 435:1
451:13 454:11
461:9 479:9
**remetrex**
184:11,17

**remind** 171:12
328:23 348:24
**remove** 389:8
**render** 152:10
**rendered** 84:5
**reorient** 341:21
**repeat** 437:19
459:11
**rephrase** 60:20
114:12,15
**replace** 193:8
332:18 333:9
334:13
**replacement**
39:1,21 40:9,20
42:8 140:17
342:9
**replacing** 17:10
**replied** 290:18
**report** 7:4,12
7:15 11:19 15:5
15:16,21 18:3
19:1,11 20:23
21:7,10,11,16
26:5 28:17,24
38:24 39:11
43:6,10 44:4
47:12 48:4,12
48:16 49:2,5,5
50:10 51:9
52:11 61:6,13
61:16,17 62:5,9
64:1,9 71:10
78:24 83:23
84:11,14,18
85:2,3,5 89:3

89:24 91:8,9,11
91:22,23,24
92:5,8 94:3
96:14 97:13
104:24 109:7
112:2 118:4
135:24 137:1
137:15,18
140:12 161:19
161:23 167:21
168:6 169:7
205:15 206:11
209:12 211:24
212:15 218:23
225:18 227:6
230:17 238:22
241:17 256:23
257:16,18
266:6 281:16
294:16 316:1
316:24 326:18
326:24 336:8
338:19 341:23
354:1 355:14
356:6 360:2,4,9
362:3,4 363:8
364:14 385:19
390:14 391:7
391:21 402:24
403:12 408:3,4
409:19 418:23
429:3 433:1,11
433:14,21
434:15 440:7
440:10,12
442:10 450:20

**[report - responsibility]**                                    Page 76

451:21 461:13
467:11 480:13
481:11 483:18
492:1,13,16,17
492:20 493:11
493:13,20,21
493:22 494:19
494:22 495:3,4
495:20 498:9
498:11,16
499:8
**reported**  1:23
228:10 268:23
331:14 401:12
**reporter**  2:21
2:22 54:8 93:16
118:22 200:5
337:5 345:6
351:2 352:13
431:12 480:3
492:3 502:1,4
**reporter's**
217:12
**reporting**
427:11,12
**reports**  7:19
20:18,21 21:20
21:23 22:3
84:20,21 97:14
163:1 184:10
331:11 433:9
494:17 495:16
495:18
**represent**  16:8
16:14,22 17:3
29:11 69:19

85:8 258:14
268:13 274:18
282:24 297:11
297:14 352:3
425:3
**representation**
84:23 388:7,13
392:8
**representations**
30:1
**represented**
31:24 32:8
84:14 256:16
256:18 299:20
392:1,9,17
**representing**
299:1 315:17
411:16
**request**  90:19
301:7 302:4,14
**requesting**
285:7,19
**require**  150:22
151:8 157:24
300:22 301:8
302:12 306:19
306:23 311:20
333:23 405:11
**requirement**
307:8 405:6
**requires**  62:12
192:21
**research**  68:11
68:14 76:16
77:7 115:3
205:19 206:2

209:12 225:23
227:16 229:19
233:6 235:6
237:2 239:18
239:21 255:6
257:14 259:14
259:23 260:2
262:17 271:24
274:5 278:10
279:13 327:24
363:10 364:7
388:24 471:13
474:15,20,21
478:9 483:8
496:24 497:19
498:3
**researcher**
207:8 211:14
272:7
**researchers**
208:6 210:8,11
211:17 222:1
232:24 235:18
238:20 241:1
246:9 263:12
483:22
**resolved**  40:19
109:3 140:20
**resource**  83:6
451:14
**resources**  26:11
292:10 478:20
**respect**  38:15
56:19 116:15
144:16 188:3,4
193:9 196:23

197:3 200:13
229:11 408:16
**respectfully**
143:15 149:4
361:22 366:22
**respects**  85:4
**respond**  174:5
176:3 298:14
299:18 442:23
**responded**
177:19 193:13
201:9 300:23
**responding**
301:7 302:14
306:22
**response**  90:23
176:8 177:5
218:18 260:21
285:9 286:3
319:7 324:13
325:12 358:11
405:2 485:24
**responsibilities**
57:24 60:23
67:13 150:10
186:1 187:8
**responsibility**
151:13 154:24
155:19 156:12
156:17,22
157:8 192:22
307:4,4 389:22
461:17 462:6
463:18 464:1
464:14 465:9

[responsible - right]                                                            Page 77

| | | | |
|---|---|---|---|
| **responsible** | **retype** 298:3 | **reviewed** 20:18 | **revised** 461:5 |
| 154:17 157:4 | **reveal** 25:12 | 20:22 21:7,11 | **revolve** 139:5 |
| 167:5 187:1,5 | **revealed** | 21:22 22:1,3,6 | **rewrite** 321:11 |
| 187:17,18,20 | 377:14 | 22:10 32:4,5 | **rgolomb** 4:10 |
| 189:21 308:4 | **revenue** 464:11 | 34:10 35:2 | **rice** 40:8 |
| 308:14 338:14 | **review** 12:5 | 50:23 61:7 | 387:21 |
| **responsive** | 21:10,15,19 | 74:16,17 93:9 | **rich** 25:13 |
| 188:18 219:19 | 22:11 35:19 | 94:21 119:2,15 | **richard** 4:5 |
| 219:22 220:4 | 41:1 42:22 | 119:18 120:3,7 | **rig** 7:14 |
| 233:13 | 45:12 46:2,12 | 120:14,24 | **right** 15:2 19:6 |
| **rest** 320:24 | 86:13 91:14,19 | 121:4 207:23 | 23:4 26:4,18 |
| 405:23 | 92:18 119:5,13 | 231:3 271:24 | 27:16 33:9 |
| **restate** 16:18 | 120:16 121:20 | 274:9,9,12 | 40:23 44:5 |
| **result** 26:12 | 122:6 157:1,3 | 275:24 304:24 | 49:12 50:13,16 |
| 170:17 223:2 | 162:6 182:6 | 323:1 335:24 | 54:20 61:22 |
| 355:22 456:21 | 186:10,18 | 337:16 362:24 | 65:18 72:4 74:2 |
| **resulted** 105:21 | 188:3 196:16 | 369:4 381:15 | 74:5,23 79:24 |
| **resulting** 178:3 | 198:11 206:16 | 401:10 402:1 | 81:2,16,24 82:1 |
| **results** 49:8 | 219:2,11,13 | 421:4 443:17 | 82:10,12,16,21 |
| 161:20 162:22 | 232:8,9 237:2 | 446:13 448:15 | 82:24 83:4,7,11 |
| 196:10 223:10 | 242:5,8 250:4 | 448:19,23 | 85:22 88:16 |
| 224:16 227:6 | 265:19 268:13 | 449:2,9,11 | 89:15 92:15 |
| 227:13,17 | 272:12 281:9 | 450:1,23 451:2 | 93:4,7,10 94:4 |
| 319:19 327:21 | 288:5 291:1 | 453:9 460:15 | 94:23 96:20 |
| 328:1 335:18 | 294:15 301:20 | 460:18 465:2 | 97:16 99:20 |
| 405:3 413:9,10 | 301:22 305:6 | 469:8,9 475:3 | 101:3,5 104:10 |
| 422:19 | 316:5,11,15,22 | **reviewing** | 104:12 105:4 |
| **resumé** 15:12 | 316:23 317:1,4 | 87:21 91:16 | 109:1,6,8,24 |
| **retained** 137:19 | 317:9 322:24 | 187:7 309:18 | 110:6,11,19 |
| 137:20 442:5,7 | 324:11 332:11 | 415:3 448:13 | 111:1 112:5 |
| 443:7,10 461:8 | 357:15 360:9 | 451:7,9 | 113:13 114:14 |
| 467:7 477:2 | 361:10,16,24 | **reviews** 221:14 | 115:19 129:16 |
| **retrospective** | 362:15 366:19 | 224:10 281:3 | 131:8,14 132:4 |
| 88:19 257:21 | 366:21 408:7 | 318:2 319:1 | 132:13,24 |
| 258:2 435:5 | 408:14 443:9 | 324:1 354:7 | 133:7,9 134:2,5 |
| 436:9 | 460:9,21,24 | 415:1 428:15 | 135:9 136:18 |

**[right - risk]** Page 78

138:14 142:10
142:15 143:7
144:8,10,11
145:22,23
146:7,17,20
147:6,9 152:21
152:23 161:6
165:21 170:8
170:11 171:7
171:10 173:6,7
173:14 177:10
179:1,19 180:1
180:4,6 181:23
182:2,23 183:2
184:23 185:3,4
191:18 192:23
196:22 203:23
204:11 205:13
206:22 207:9
207:24 208:9
209:7,7 210:12
210:15,15,18
210:23 211:22
211:23 212:4
212:10,21
213:21 214:4,4
214:8 215:7,14
216:14 218:7
219:10,11
222:3 223:7
224:14 230:1
230:15,21
232:2,24
238:16 240:2
240:10 242:2
244:20,24

246:19 247:9
249:12 250:22
251:19,21
252:6,8,10
253:5 254:7,18
255:15,16
257:18 259:5
259:23,24
260:11,16
262:13 264:7
265:9 267:6,9
267:20 269:20
270:24 272:21
273:12,21
274:9,14,22
276:1,15
278:16 279:13
281:20 282:10
284:21 285:11
286:12,14
287:17 288:9
291:1,10
292:20 295:20
296:4,7,19
297:24 298:7,9
298:11,12
301:6,11,20
302:3 303:23
304:5,20 313:2
316:5 319:22
321:3,17,21
324:18 326:16
327:15 328:4
330:11 334:9
334:11,20
337:4 339:8

343:13 344:19
345:17 346:13
351:6 353:1,7
353:11 354:5
356:6,18
358:22 359:8
359:12,16,22
362:5 365:9,11
367:20 371:3
373:4 375:23
376:16,20
377:1 378:3
379:6,18 381:8
382:4,8,8 384:9
385:5 388:17
389:12 391:6
392:4 393:20
394:10,12,15
394:16,24
401:19 403:17
405:19,20
406:19 409:2
409:16 411:14
412:10,21
413:2 414:3
416:12 418:16
422:11 424:9
429:10,14,22
429:23 430:4,9
432:5,9,14,15
433:16 435:17
435:22 441:20
445:16 447:14
450:19 452:15
452:16 455:7
455:22 459:13

460:15 461:4
461:19 467:6
468:4 475:3
482:6,9 483:18
486:18 487:24
488:13 492:10
492:11,14,15
492:23 493:5
495:6,8,15
496:15

**rigid** 166:20
167:6

**rigidity** 166:22

**rigorously**
170:15 247:20

**rio** 12:15
409:14 414:15
418:13

**risk** 8:17,20 9:5
9:8,11,17,19
16:16 17:19
34:21 59:13,19
112:22,24
138:11,13
174:9,11 183:4
185:16,16
186:13 187:2,6
187:9,10,17
189:6,7,22,22
190:14,15,23
190:23,23
193:9,24
198:16 214:24
215:11 222:18
223:1 224:8
226:7,13,23

**[risk - safety]**                                                                    Page 79

227:3,12,14
229:22 231:2
231:20 233:3
236:3 237:4,15
241:1 242:9,20
242:23 244:16
245:4,17,23
246:15 247:2
256:4 258:17
259:15 260:2
263:6,10,11
277:18 293:23
302:24 305:21
310:5 325:3
327:22 331:2
331:18 365:14
366:3,12
367:22,23
368:20
**risks**  16:17,24
17:9 138:5,7,22
139:2,9 175:14
231:22 320:10
497:7
**rj**  376:14
**rls**  1:4
**rmh**  5:10
**rmr**  1:23
502:21
**robin**  402:11
478:10
**role**  71:23
117:9 146:12
148:18 175:15
175:16 177:15
180:23 236:17

236:24 237:24
258:6 270:2
288:19,22
304:2 305:9,10
313:7 322:17
323:6,11
325:22
**roles**  185:24
**room**  372:19
373:2,9,10,11
373:12
**rosenblatt**  8:24
223:23
**round**  402:11
478:10
**routine**  410:2
**routines**  146:15
**rule**  374:10
**ruled**  439:23
**rules**  63:3
**run**  11:19
248:20
**rush**  317:18,20
317:22,24
**rushing**  245:13
**ryan**  3:15
**ryan.beattie**
3:21

**s**

**s**  14:1
**sachs**  69:12
**safe**  141:10,13
144:16 154:4,6
165:2 251:4
252:17 255:10

256:6,13
266:10 267:15
267:20 268:1
269:9 270:6
271:3,4,18
272:8 303:13
314:8 371:16
371:18,19,24
372:2,5 380:22
380:24 381:3,6
381:7 385:8
387:18 389:12
389:23
**safer**  125:15
324:24
**safety**  7:18 17:6
32:14 33:9 39:2
71:10,12,16,20
71:24 72:8,11
99:16 105:17
106:3,21 113:6
113:7,8,11
117:17,23
118:17 121:24
126:20 127:9
128:24 130:18
131:1,4 133:14
140:20 145:14
146:13,21
147:2 151:13
152:1 154:18
154:24 155:6
155:10,14,19
156:12,17,22
157:4,9,12,14
157:24 158:6

160:3 162:3
163:20,21,22
164:6,10,12,16
165:22 167:5
169:8,13,15,16
169:22 170:16
171:18,19,21
172:1,12,14,21
174:20 175:1,7
175:9,17,21,21
177:5,20
180:19 183:5
183:15 184:10
184:12,18
186:10,18,24
187:8 188:4
194:3 196:11
196:18 197:5
197:14,19
198:6 199:1
201:9,15
203:15,23
204:6 208:10
209:9 210:21
211:2 227:20
229:11 231:12
239:12 241:2
241:20 244:23
247:14 270:19
277:22 284:14
286:7,21
293:24 305:12
305:18 307:5
307:15 308:10
309:24 313:18
323:4 325:9

**[safety - says]**                                                                Page 80

| | | | |
|---|---|---|---|
| 326:4 328:14 | 246:24 247:17 | 312:21 321:8 | 202:7,8,13,16 |
| 336:15,18 | 253:23 260:21 | 321:10,12 | 203:11,12,13 |
| 338:4 339:16 | 261:2 274:8 | 349:8,11 366:6 | 203:13 205:17 |
| 346:17 349:5 | 281:10 295:22 | 366:8,11 | 206:7 207:12 |
| 369:15 370:13 | 304:22 307:2,2 | 377:17 379:19 | 207:19 208:2 |
| 371:12 386:12 | 323:9 339:22 | 379:21 385:8 | 209:3,6,6 |
| 389:16 427:24 | 343:17 368:17 | 388:12 395:7 | 211:14 212:21 |
| 428:4 431:5 | 368:24 369:9 | 395:20 396:6,7 | 214:20 216:5 |
| 432:4,6,7,11 | 466:21 468:18 | 396:19 397:4 | 216:22 217:1,2 |
| 442:19,21,23 | 471:24 475:24 | 397:12 401:2,4 | 218:6 222:10 |
| 462:4 467:14 | 475:24 476:5 | 411:18 418:9 | 223:9 224:14 |
| 469:24,24,24 | **saying**  31:12 | 426:20 428:22 | 224:15 229:10 |
| 471:2,17 473:5 | 72:10 78:1 | 456:14 462:11 | 229:21 230:3,9 |
| 473:16 497:1,7 | 82:13 85:21 | 465:4 466:11 | 230:14,23 |
| **sake**  126:21 | 106:11 121:15 | 466:15 468:18 | 235:24 236:15 |
| **sale**  140:16 | 126:20 142:23 | 488:1 | 236:23 243:17 |
| **sales**  1:5 | 143:5 145:14 | **says**  28:17 29:4 | 243:21 244:13 |
| **sample**  400:21 | 148:17 153:13 | 32:3 39:13 84:4 | 244:21 245:1 |
| 423:3,24 429:5 | 155:24 167:11 | 112:8 132:11 | 249:17,20 |
| 429:11 | 191:3 200:8 | 132:12 137:19 | 250:18 251:2,8 |
| **samples**  429:15 | 201:4,6,24 | 139:4 140:14 | 253:13,13 |
| **san**  294:2 | 208:14 209:21 | 146:6 150:20 | 254:19 255:5 |
| **sandoval** | 210:8,20 | 150:21,21 | 255:22,22 |
| 493:20 495:2 | 212:20 219:1 | 151:7,23 152:7 | 258:17,21 |
| **sat**  322:11 | 223:4 228:20 | 153:15,20 | 260:1 263:3,4 |
| 323:2 361:15 | 228:21 233:10 | 154:1,15,16,21 | 277:7,14 278:6 |
| **saturday**  77:23 | 239:8,23 246:4 | 155:16,21,23 | 282:5 284:13 |
| 122:10 | 246:17,17 | 156:14,15,19 | 285:1,3,5,14,23 |
| **save**  338:22 | 248:13 253:6,8 | 159:23 161:4,5 | 286:1 287:12 |
| 501:8 | 253:11 257:12 | 169:8 170:3 | 293:17,19 |
| **saw**  17:1 181:4 | 259:21 261:12 | 172:19 174:16 | 294:7 296:2 |
| 192:23 198:10 | 262:19 268:22 | 179:5 182:13 | 300:20 302:4 |
| 198:12 233:5 | 269:15 278:15 | 184:22,23 | 302:19 303:22 |
| 234:17 235:5 | 285:8 295:22 | 185:24 186:9 | 303:22 318:11 |
| 241:16 246:22 | 296:1 303:13 | 186:23 193:23 | 318:12,13,22 |
| 246:22,23,23 | 303:14 306:18 | 196:7 198:23 | 319:6 320:16 |

**[says - see]**                                                   Page 81

| | | | |
|---|---|---|---|
| 320:17 324:10 | **scan** 243:21 | 313:12,18,19 | 217:10 219:18 |
| 324:16,16,17 | **schmidt** 8:3 | 322:2 326:4,8 | 224:15 237:22 |
| 327:20 328:9,9 | 195:20 | 326:14 327:3 | 263:1 283:4 |
| 328:10,10 | **school** 207:14 | 347:10 348:14 | 298:15 318:20 |
| 330:22 331:9 | 221:17,24 | 361:5,21 | 319:9,10,14 |
| 331:13,22,24 | 243:24 261:24 | 362:16 366:15 | 324:17 333:12 |
| 332:2,9,22 | 263:9 | 369:16 383:13 | 345:5 353:12 |
| 333:13,23 | **schools** 66:1 | 385:14 389:13 | 353:16 355:12 |
| 334:2 340:23 | **science** 14:21 | 417:2 442:14 | 375:12 378:15 |
| 340:24,24 | 20:16 25:8,8 | 471:16 473:4 | 425:13 446:2 |
| 341:7,8 346:14 | 163:16,19 | 474:5 483:4 | 498:11 |
| 347:5,7,18,24 | 231:11 244:22 | 485:1 | **secondary** |
| 348:11,19 | 474:23,24 | **scientist** 58:15 | 427:12 |
| 350:12 351:13 | 475:1,8 496:23 | 115:7 147:5 | **secondly** |
| 352:7 353:18 | 497:18 | 308:3 389:11 | 229:15 |
| 354:1,9,15,21 | **scientific** 12:8 | **scientists** 45:23 | **section** 19:2 |
| 357:12 365:4,4 | 22:20 24:13,19 | 145:13 162:15 | 92:10 133:24 |
| 365:10,13,15 | 24:19 25:18,21 | 314:6 361:15 | 134:3 137:17 |
| 375:5,7,16 | 32:13 35:2,19 | 396:12 474:8 | 163:13 182:13 |
| 376:15 379:11 | 41:14 105:17 | 474:12 475:9 | 202:2 225:10 |
| 380:4,20 | 106:21 116:14 | 476:2 | 226:17 262:21 |
| 381:23 382:10 | 126:5 143:9,19 | **scope** 137:18 | 414:21 |
| 387:14 388:3 | 144:14 157:14 | 161:9 | **secured** 41:14 |
| 393:22 394:7,7 | 196:10 197:19 | **screening** 9:18 | **see** 15:20 18:16 |
| 394:21 399:14 | 197:23 198:24 | 11:10 238:7 | 26:16 29:8 |
| 403:1 406:8,10 | 201:14 202:18 | 258:18 364:15 | 39:13 40:24 |
| 408:4 409:5,7 | 206:16 214:7 | 364:23 405:10 | 41:23 43:19 |
| 414:21 415:18 | 215:17 219:2,3 | 405:13 | 51:11,20 86:18 |
| 416:4,24 | 239:21 244:10 | **search** 47:16 | 86:20 89:6 |
| 422:15,19 | 247:21 251:23 | 48:1 51:2 | 106:24 112:14 |
| 423:15,19,19 | 273:9 274:2 | 442:11 | 112:15 122:15 |
| 425:13 426:8 | 279:8 286:7,11 | **searching** | 124:19 127:2 |
| 428:23 429:2 | 289:13,24 | 103:13 | 131:15 132:15 |
| 446:21 453:12 | 290:19,23 | **second** 30:17 | 132:16,19 |
| 453:12 459:17 | 307:12 308:6 | 39:14 81:22,23 | 136:10 139:10 |
| | 308:16 309:24 | 86:19 95:5,9 | 140:21 149:24 |

**[see - see]**                                                                 Page 82

| | | | |
|---|---|---|---|
| 152:4,6,14,15 | 225:15,16 | 294:13 295:10 | 354:12 355:3,4 |
| 154:7,8,19 | 227:24 228:2 | 295:15,16 | 355:12,17,18 |
| 155:2,3,13,21 | 229:13,19,24 | 296:5 302:16 | 355:24 356:1,1 |
| 155:23 156:15 | 231:6,7,13,24 | 303:5,10,11,17 | 356:11,12,19 |
| 158:2,3 160:6 | 232:1,3,12,22 | 303:19 307:6 | 356:20,23 |
| 165:9,18 | 233:3 234:2,13 | 311:10,14,15 | 357:18,19,23 |
| 168:20 170:18 | 236:4,9,10,12 | 319:22 320:8 | 359:1,13,13 |
| 171:22 172:3 | 236:20,21 | 320:14,15,17 | 364:12 365:7 |
| 172:23 174:1,6 | 237:6,7,12,13 | 320:19 322:16 | 365:12,18,19 |
| 175:23 177:3 | 237:18 238:12 | 322:24 323:5 | 365:22 366:1,6 |
| 179:1,15 181:1 | 238:13,18 | 323:24 325:4,5 | 366:8,11 |
| 181:4,11 | 240:19 241:10 | 328:3,11 | 368:15 375:20 |
| 183:14 184:13 | 242:6 243:14 | 330:18 331:3,4 | 375:21 378:20 |
| 184:14,22 | 243:14,16,19 | 331:19,20 | 379:3 380:2,17 |
| 185:5,6 186:15 | 243:22 244:4,5 | 332:4,5,13,14 | 380:18 382:18 |
| 186:16 187:3,4 | 244:6,18,19 | 332:21,22 | 382:19 387:2 |
| 192:13,14 | 247:4,10 | 333:2,3,11,14 | 388:1,2 389:18 |
| 195:13,14,22 | 249:15 250:2,3 | 333:15,20 | 389:19 391:8 |
| 195:23 196:2 | 250:4,15,21,23 | 334:1,2,10,15 | 394:5,18,19,20 |
| 196:13,14,19 | 251:6,7,15,16 | 334:16,18 | 395:3,13 396:3 |
| 198:3 199:4,15 | 252:23,24 | 335:1,2 336:10 | 401:20 405:18 |
| 202:9,10,13,15 | 253:6,20,24 | 336:11,12 | 406:13,19,20 |
| 202:15 203:4,5 | 255:2,3,19 | 338:8 340:20 | 406:22 407:6 |
| 203:8,10,10,17 | 256:9 258:19 | 341:4,5,6,7,14 | 408:15 410:21 |
| 203:18 204:11 | 261:1 262:22 | 342:11,16,18 | 410:22 414:21 |
| 205:20 206:6 | 266:6 275:8 | 343:20,22 | 415:18,22 |
| 207:21,22 | 276:2,22 277:4 | 346:4,11,22,23 | 417:5,6 422:24 |
| 208:7,8,14,21 | 277:5,12,24 | 347:13,23 | 423:14,15 |
| 212:6,19 | 278:12,17,20 | 348:4,5,9,17 | 425:10,17,18 |
| 213:20 215:15 | 278:22 279:18 | 349:6,7,16 | 427:16 428:16 |
| 216:12,13,20 | 281:11,12 | 350:3,4,10,11 | 428:21,22 |
| 216:23 218:14 | 284:17,18,22 | 350:16 351:17 | 429:1,8 431:6 |
| 218:19 220:24 | 286:4,8,15 | 351:22,23 | 440:16 442:2 |
| 222:19,20 | 287:8,18 | 352:9 353:5,6,9 | 449:18 470:10 |
| 223:3,11,12 | 292:12,16,19 | 353:15,20,23 | 470:15 471:20 |
| 224:7,11,21,22 | 293:3,8 294:10 | 353:24 354:3,8 | 495:13 497:2 |

**[seeing - seriously]**

**seeing** 96:12
191:16,16
199:9 235:1
346:7 358:4
368:22
**seek** 157:13
467:24
**seeking** 8:13
105:13 143:9
201:13 251:23
302:13 311:21
326:3,8,14
327:2 369:16
**seeks** 170:16
174:19
**seem** 336:13
431:22
**seems** 349:10
464:4
**seen** 30:20 31:1
31:5,8 32:22
33:7,7 42:3,12
42:22 46:3,11
46:13,20 64:6
70:3 74:14 88:6
95:4 96:10,10
162:6 163:1
180:16 183:3
184:15 185:15
186:17 190:13
191:4 193:23
218:17 224:8
232:8 242:3,18
248:1,2,4,5
256:10 261:4,6
270:22 271:13

281:7 287:10
288:1,6,10
290:10,15
292:3 315:13
318:8 322:6
323:23 324:13
325:9,17
330:20 335:18
335:22 341:16
343:17 346:5
357:24 359:19
360:17,21
361:8,23 365:2
365:3 368:8
372:1,1 374:15
374:24 381:15
385:5,10
386:19 399:14
402:4 420:24
423:10 424:14
425:5 428:13
430:9,13,24
433:9 471:22
**self** 349:3
**selling** 387:16
**send** 81:8,9
95:13 96:1,15
96:24 487:17
**sends** 487:21
**sense** 27:2 40:1
45:16 46:5
79:11 80:2
100:14,23
142:11 166:23
167:3 208:16
228:6 343:12

400:4 469:23
470:16
**sensemaking**
19:23 23:20,22
23:23 24:1,4
25:12 38:6
39:19,23 45:1
56:19 61:15
98:4 99:1,5
101:16,24
103:2 104:10
104:18 123:14
130:8 167:3
197:24 228:5
238:22 241:18
273:3,5 307:13
314:17 343:12
427:23 435:3,4
435:8,12,23
436:17 437:2,8
467:23 468:10
468:17,22,23
469:1,2,19
470:3,9,13,18
470:24 471:9
472:7,13,21
486:15
**sensitive** 52:17
383:2,4,5
391:13 407:15
407:17 430:14
**sensitivity**
391:17 395:10
395:23 397:3
405:15 406:12
406:17 407:2

407:12 408:5,9
**sent** 97:5
444:13,15
**sentence** 18:2
29:4 140:13
157:19,22
159:24 203:2
208:2 215:21
226:9,24 231:9
231:14 236:8
237:22 251:9
255:22 278:2,6
279:4 302:4,6
302:18 308:22
311:15 319:14
320:24 331:11
332:8,14 333:3
350:4,11,15
422:14 429:1
436:3
**sentences** 226:9
226:19
**separate** 85:9
93:24 94:2
144:9,10
495:16,17,19
**separately**
298:24 480:22
**separation**
419:6
**september** 8:15
316:4
**serious** 238:5
263:24 371:12
**seriously** 212:1
406:21

**[serous - single]**                                                    Page 84

**serous** 302:10
303:1,8 311:11
311:18
**serpentine**
51:17
**served** 84:13
85:2
**serves** 348:24
**services** 84:5
95:20 463:21
**serving** 462:7
**session** 6:4
265:1
**set** 123:16
175:1 357:12
443:8,11,14
444:4,5,7,12
502:10
**setting** 474:10
**several** 17:10
19:10 107:18
118:11,13
140:7 166:5
177:15 193:20
206:20 208:6
210:10 211:17
220:15 227:2
232:4 239:6,7
240:24 246:9
323:7 346:18
360:5 363:14
365:15 377:20
461:23
**shape** 348:21
451:22

**share** 456:1,9
456:23
**shareholders**
465:19
**shares** 169:13
**sheet** 500:1
501:11
**shied** 346:20
**shift** 250:1
253:9,18 341:3
341:12,18,24
342:24 343:18
344:15
**shifting** 342:14
**short** 179:17
220:5
**shortcoming**
383:21
**shortcomings**
383:19 384:6
384:18 405:15
406:11,16
407:2,11 408:5
408:8,16
**shoulder**
346:16,16
**show** 32:2
37:18 38:3,4,7
51:15 86:8
150:8 168:2
181:14 194:24
196:10 214:12
258:7 274:14
274:17 275:7
275:15 276:20
302:23 305:14

320:4 323:13
323:15 328:14
328:19 345:10
351:7 352:17
378:4 384:23
386:17,22
392:20 414:8
419:21 433:20
481:20 482:21
**showed** 115:7
281:7 296:6
305:20 306:3
307:2 327:4
338:3 344:14
368:1,7 413:8
471:6
**shower** 55:10
55:10 392:2,2
392:10,10
**showing** 243:3
249:5 273:6
303:15 308:13
**shown** 239:20
256:19 263:14
327:8 375:9,18
**shows** 41:18
198:24 245:3
245:16 273:22
285:8 296:4
**sick** 380:13
**side** 43:18
184:23 185:3
230:15,21,22
235:23 236:4,6
236:7 365:9
389:7

**signal** 183:5
186:13 187:1
**signals** 110:9
**signature**
499:15 502:20
**signed** 84:18
91:10 501:15
**significant**
231:1 302:24
320:5 332:18
333:8 334:13
471:7
**silicates** 208:5
**similar** 405:5
405:16 445:17
445:17 446:9
446:11 447:19
447:20,24
497:24
**simply** 136:19
389:15
**sinai** 244:1
**single** 173:5
180:16 190:13
190:22 191:6
200:9 220:3
233:21 242:12
250:11,11
254:5 272:7
283:8,13 312:2
339:5,19
358:15 380:8
433:18 457:17
475:23 476:7,8
476:14 491:4
492:21

[sir - specific]                                                                    Page 85

**sir** 380:16,23
**sit** 58:20 158:9
   187:15 190:21
   190:24 191:5
   191:10,13
   205:11 234:24
   323:9 333:17
   333:17 334:20
   335:4 389:23
   433:19 463:8
   467:2 476:20
**site** 236:18
**sitting** 270:11
   288:9 334:22
   469:7
**situation** 98:16
**situations** 99:8
   134:9 438:4,16
**six** 298:15
**size** 98:15
   189:20 401:14
   401:16 422:22
**skadden** 2:14
**skip** 255:21
   323:14
**skipped** 7:8,21
   11:5,13 12:3,13
   12:14 13:9
**slate** 2:14
**slide** 202:8
**slight** 259:14,21
   260:2 272:19
**slightly** 145:19
**sloan** 244:2
**small** 244:16
   245:4,17 487:1

**smart** 430:7
**smile** 430:6
**snapshot**
   238:16
**social** 173:16
   173:21
**society** 250:14
   251:3,10 252:1
   252:19 254:21
   254:22 260:22
   263:22 339:23
   341:1 344:14
   367:2 368:24
**sold** 398:1
**sole** 151:13
   307:4
**solely** 113:3
   118:15
**solid** 143:11
**solvejg** 483:19
**somebody**
   159:22 161:2,4
   173:11 185:6
   189:4,18
   210:16 228:4
   239:11 336:14
   446:3 453:7
**someone's**
   438:22
**soothe** 29:22
**sop** 7:17 192:16
   193:7
**sophistication**
   189:20
**sops** 58:22
   133:8 135:16

   165:10
**sorry** 27:1
   28:20 31:22
   58:3 68:23 69:1
   71:7 80:17
   81:20 85:14
   86:18 95:7
   99:23 113:17
   114:2,10
   121:18 138:2,2
   139:12 166:3
   169:2 176:21
   191:23 194:18
   194:19 217:19
   222:6 230:16
   245:7 249:19
   259:1 262:24
   278:4 279:21
   292:1,22
   294:24 307:22
   312:20 316:8
   334:24 337:21
   344:11,24
   345:1,1,20
   347:14,16
   351:1 362:14
   374:22 375:11
   377:18 381:22
   382:1 387:3
   393:8 395:15
   395:17 411:15
   432:18 435:10
   478:2 480:14
   480:17,18
   488:19 496:11
   498:6

**sought** 158:22
**sound** 274:22
**sounds** 82:20
   121:10
**source** 89:19
   90:1 113:23
   114:11 118:18
   143:3 373:21
**sources** 99:17
   101:19 102:4
   104:3,3 113:9
   113:12 193:20
   309:21
**south** 3:7
**southern** 244:1
**space** 492:21
**spalding** 4:16
**speak** 18:9
   129:19 135:14
   218:8 266:20
   266:22 345:20
**speaking** 61:4
   62:2 79:11 90:8
   101:23 104:24
   105:2 118:1
   126:23 165:6
   165:19 177:21
   195:24
**special** 497:11
   497:11
**specialist** 60:4
**specialties**
   46:20
**specialty** 46:23
**specific** 18:1
   36:17 66:21

**[specific - statement]**                                                          Page 86

| | | | |
|---|---|---|---|
| 80:7 125:9,11 | **specifics** 186:21 | **spot** 248:15,21 | **starch** 387:18 |
| 125:23 126:13 | 435:2 | **sprays** 387:20 | **starches** 40:7 |
| 127:11 148:3,7 | **specified** | **spreadsheet** 8:5 | **start** 36:24 |
| 148:10,11 | 428:20,24 | **spring** 92:23 | 75:14 346:21 |
| 150:4 157:24 | **spectroscopy** | 478:19 | 432:2 |
| 178:19 179:5 | 405:11 | **square** 4:6 | **started** 43:14 |
| 186:19 199:21 | **speculation** | **squarely** 253:2 | 75:8,21 88:12 |
| 200:20 300:22 | 62:15 288:15 | **stability** 204:21 | 111:23 125:5 |
| 301:8 312:16 | 312:13 | **stable** 204:22 | 129:4 135:7 |
| 313:24 314:21 | **speculative** | 205:5 | 262:16 296:14 |
| 315:1,4 335:20 | 339:1 | **stake** 76:18 | 461:16 467:24 |
| 335:21 392:6 | **speed** 443:12 | 486:20 | 482:8 |
| 446:10,12 | **spend** 451:7,8 | **stakeholders** | **starting** 65:2 |
| 448:1,14 458:3 | **spending** | 22:21 465:19 | 304:7 |
| 488:19 | 456:18 | **stamp** 401:15 | **starts** 237:22 |
| **specifically** | **spent** 75:12 | **stance** 369:18 | 311:15 |
| 34:9 37:12 | 97:12 116:2 | **standard** 55:14 | **state** 14:13 |
| 52:14 61:5 62:4 | 329:3 447:9 | 55:17 58:7,14 | 412:11,15,21 |
| 62:6 127:15 | 448:3,13 453:8 | 123:16 133:10 | **stated** 139:20 |
| 128:13 129:7 | 453:23 480:12 | 158:24 159:9 | 140:7 209:11 |
| 153:9 183:9 | 491:21 | 168:10 184:20 | 211:24 326:17 |
| 193:1 326:23 | **spill** 80:10 | 193:24 247:12 | 426:12 442:10 |
| 329:23 356:8 | **spoke** 88:11,13 | 248:6 383:16 | 498:24 |
| 382:17 427:13 | 279:10 282:3 | 400:10 411:13 | **statement** |
| 433:15 436:19 | 454:6 | **standards** | 132:15 134:19 |
| 447:12 448:7,8 | **sponsor** 328:8 | 55:20 413:18 | 134:20 179:22 |
| 448:23 461:22 | 330:23 | 416:8 477:17 | 179:23,24 |
| 463:1 486:23 | **sponsored** | 479:5 | 180:9,10 |
| 487:2 | 207:19 225:22 | **standing** | 195:18 198:9 |
| **specifications** | 227:19 228:10 | 479:11 | 211:1 215:20 |
| 403:14 | 293:24 327:5 | **standpoint** | 252:9 319:7 |
| **specificity** | 327:19 328:4 | 148:19 323:8 | 320:1 340:23 |
| 405:15 406:11 | **sponsoring** | **stands** 423:20 | 353:13 354:10 |
| 406:16 407:2 | 287:7 | **stanford** 244:2 | 354:15 355:20 |
| 407:12 408:5,9 | **sponsors** 229:9 | 246:10 | 388:8,10,11,14 |
| | | | 417:3 435:14 |

**[statement - study]**                                                    Page 87

| | | | |
|---|---|---|---|
| 435:22 437:19 | **sticking** 429:23 | **structured** | 137:2,5 141:11 |
| 437:24 438:8 | **stimulate** | 127:2,7 330:24 | 189:5 196:10 |
| 438:13,21,24 | 212:15 | 333:7 334:12 | 208:18 209:23 |
| 459:13 460:2 | **stockholders** | **structures** | 212:9,22,23 |
| 464:6 499:1 | 464:1,15 465:9 | 109:22 188:7 | 220:11,15 |
| **statements** | **stood** 346:16 | **student** 388:24 | 222:4,11 227:2 |
| 121:13 154:5 | **stop** 85:21 | **students** 59:5 | 227:21 228:8 |
| 180:13 395:12 | 93:12 184:1,2 | 66:18 69:20 | 229:16 230:6 |
| 396:2 461:6,6 | 261:17 405:19 | **studied** 42:6,16 | 232:4 233:1,2 |
| 481:12 | **stopping** 85:22 | 43:1 53:12 | 236:16 238:1 |
| **states** 1:1 | 163:5 | 102:7,11 | 239:1,15 |
| 252:19 254:22 | **story** 24:8,9 | 106:20 154:13 | 240:23 241:4 |
| 312:23 405:6 | 100:7 429:22 | 158:13 190:3 | 245:3,16 |
| **statistically** | **strategies** | 199:11,21,22 | 256:17 263:11 |
| 302:23 320:5 | 366:13 367:22 | 203:1,19 | 264:6 287:12 |
| 471:7 | 367:23 | 208:22 228:1 | 287:14,18 |
| **statistician** | **strategy** 246:1 | 253:12 272:11 | 289:19 290:3,9 |
| 53:16 | **street** 3:7,18 | 288:23 289:1 | 295:13,20 |
| **statistics** 53:16 | 4:7 | 307:7 308:3 | 305:7,7,8,23 |
| **stay** 213:15 | **stressed** 196:8 | 309:14 349:17 | 318:23 319:18 |
| 249:23 253:16 | **strike** 41:20 | 350:22 358:3 | 319:20 320:3 |
| 341:11 496:13 | 157:20 188:17 | 359:3 371:5,6 | 327:8,16 |
| **steady** 91:20 | 233:12 361:6 | 373:17 385:24 | 334:14 335:21 |
| 238:7 | 384:2 443:5,23 | 386:8,9,10 | 336:6 339:10 |
| **stenographic...** | 460:7 470:4 | 413:3 472:22 | 361:2,11 |
| 502:9 | **stringent** 416:8 | 476:13 484:21 | 469:14,15 |
| **stephen** 277:8 | **strong** 163:22 | **studies** 34:13 | 471:6 472:18 |
| **steps** 36:12 | 169:13 263:7 | 34:19 35:1,4,9 | 472:19,20,23 |
| 37:5 | **struck** 72:22 | 35:14 38:4 | **study** 8:10 |
| **steve** 287:4 | 73:4,5,7,12,19 | 54:15,16,23 | 10:20 17:23 |
| 332:16 | 73:22 | 60:5 98:11 | 34:7,15 38:11 |
| **stewardship** | **structure** | 109:21 110:4 | 42:1 108:4,5,8 |
| 8:6 201:24 | 128:23 130:21 | 110:15 112:21 | 110:15 115:2 |
| 202:2 | 182:21 187:11 | 112:23 113:22 | 116:9 187:18 |
| **stick** 270:3 | 187:19 | 125:5,9,11 | 198:24 201:6 |
| | | 126:1,8,9 128:8 | 206:21 208:17 |

**[study - suppliers]**                                                                 Page 88

209:19 210:5,6
210:21 212:9
212:16 213:18
213:20 214:10
214:21 221:12
223:24 224:9
224:16,19,23
225:7,9 226:15
227:7,19
228:10 230:4
230:13 231:10
231:11 236:1
238:2 239:4
240:22 244:21
246:11 248:9
254:5 263:9
271:6 272:9
287:7,10
288:10 290:10
290:15,16,22
290:24 291:5
296:11 302:17
327:4,6,15,18
328:4,5,13
330:17,24
331:6,12 332:1
332:2,6,12,18
332:23,24
333:1,6,8,13,23
334:3,7,13
335:17,19
336:4,17
337:11,13
338:2,4,10,11
338:21 339:5
339:19 385:17

413:16 432:3,6
461:21 467:13
472:4 473:12
**studying**   21:23
50:15,17,17
131:3 177:13
180:22 187:10
194:4,6 196:20
197:18 200:23
201:11,12
202:24 254:8
260:12 261:9
271:5,11
306:16 310:9
312:2 322:18
370:4 413:4
428:4 441:11
**stuff**   90:9
127:23 232:7
316:7,13
363:13 397:10
408:13
**stupid**   102:24
**sturpin**   5:10
**subcommittee**
11:22
**subject**   10:2,5
10:20 11:2,7
13:15 27:17,23
28:11 68:11
90:23 97:21
121:22 129:18
152:18 226:13
476:11,18
477:1

**subjects**   331:16
**submit**   94:14
447:20 455:17
458:6,18
**submits**   458:7
487:19
**submitted**
300:24 355:7
447:6,7 454:18
455:14 457:17
**subpoena**   74:18
**subpoenaed**
454:23
**subsequent**
108:5
**subset**   331:16
**subsets**   484:8
**substance**
152:10,18
**substances**
11:18,21
226:12,21
**substantiating**
154:18
**substantively**
321:8
**substitute**
241:14 324:23
387:18
**substituting**
252:21
**subtypes**
244:17
**successful**   29:6
238:9

**sudden**   188:10
**sufficient**   389:6
**sugar**   160:19
160:20
**suggest**   224:17
227:14 327:22
**suggested**
141:17 143:6
143:10 198:12
266:13 301:4
306:5 319:18
376:13 392:13
**suggesting**
220:12 273:6
381:16 460:3
**suggestion**   42:4
344:15
**suggestive**
237:23
**suggests**   294:2
**suite**   3:7 4:7 5:7
**summarize**
295:2
**summary**
137:16 244:14
353:22 446:2
446:20 447:1
447:17 456:8
**summer**   498:11
**superior**   1:8
**supervise**
451:16
**supplier**   413:17
413:18
**suppliers**   405:4

**[supplying - taken]** Page 89

**supplying**
409:24
**support** 6:17
78:18 214:22
215:9 223:10
227:11 236:1
236:11 301:4
302:9 303:7
311:7,17
318:23 321:16
328:7
**supported**
210:6 225:12
225:23 328:6
**supports**
227:22
**sure** 20:21
39:12 45:18
47:3 95:7 100:1
109:19 111:12
118:14 122:9
134:15 137:17
168:23 205:2
268:21 274:23
276:4,6 281:2
297:16 369:5
377:16 379:15
383:12 385:21
392:22 419:19
449:18 460:11
475:6 490:6
**surprise** 51:3
108:24 283:19
398:14 438:10
**surprised**
107:21

**surveillance**
7:18 184:10
**susan** 453:16
460:23
**suspect** 387:22
**suspected**
389:8
**sutcliffe** 1:21
2:12 6:2 7:1,5
7:13,16 14:3,14
15:8,24 63:12
74:9 78:4 86:11
150:6 169:5
181:18 183:20
194:22 201:20
207:5 214:15
221:9 224:3
225:5 230:11
235:15 243:10
249:3 258:12
261:15 265:3
275:19 277:2
279:24 291:18
297:4 315:22
323:18 328:21
345:13 351:11
364:20 374:13
378:6 386:15
393:2 401:22
404:5 414:11
420:20,22
424:23 428:11
440:13 445:5
445:12 455:11
456:22 485:23
496:7 501:19

**sutcliffe's** 18:6
**suzanne** 5:6
**switch** 145:18
193:4 218:16
232:11 235:3,3
253:9 260:23
261:7,9 355:2
355:21 358:6
359:23 369:2,8
**switched**
414:17,18,20
**switching** 254:3
304:9,13,16
340:1
**sworn** 14:5
265:5 502:6
**symposium**
10:2 277:9
**system** 136:20
184:18 468:3
**systematic**
38:13 116:9
126:3,11 239:1
242:4,5,7 257:1
257:14 272:12
291:2 305:6
309:17 366:18
366:21 471:12
**systematically**
226:4

**t**

**table** 160:17
241:12 278:16
284:15 285:2
295:19 366:4

401:16 423:3
**tables** 49:5,6,9
390:13
**take** 32:18 34:4
53:10,18 85:23
90:21 93:14
97:20 98:17
124:18 135:10
148:22 171:20
174:3,10 176:6
177:4 186:4
192:22 193:9
195:16 196:12
197:15 198:4,8
199:2 215:21
217:13 233:3
234:5 242:9
243:21 247:1
247:14 248:17
264:8 275:10
280:24 282:23
315:17 317:3
317:14,16
323:2 335:7
347:6 352:11
369:10 391:7
400:18 415:4
415:14 417:11
418:21 419:18
420:4,5,6
431:10 449:4
473:10,11
485:9 495:13
496:2
**taken** 36:12
37:5 41:16 53:6

**[taken - talc]**                                                                 Page 90

| | | | |
|---|---|---|---|
| 53:15,19,20 | 140:2,18,20 | 256:5 257:7 | 343:19 345:18 |
| 54:20 64:14 | 141:2,10,13,18 | 262:18 263:10 | 345:21 347:2 |
| 115:6 119:6 | 142:17 143:21 | 263:12,20 | 347:22 348:8 |
| 130:7 136:17 | 144:15,19 | 264:1 265:14 | 349:11,24 |
| 146:14 157:13 | 145:7,14 | 265:23 266:1,4 | 350:9,19 |
| 157:15 176:19 | 158:18 159:2 | 266:10,13 | 351:16 353:3,8 |
| 178:15 242:20 | 161:5 162:7,7 | 267:2,15 268:1 | 353:10,13 |
| 244:23 264:11 | 186:18 188:4 | 268:6,15,17 | 354:23,23 |
| 308:9 319:19 | 195:21 196:11 | 269:9,17 270:6 | 356:10,16 |
| 334:19 358:19 | 196:18 198:7 | 271:3,4,4,15 | 357:15 358:11 |
| 386:11 455:4 | 199:1 203:23 | 272:2,8 277:9 | 358:23 360:10 |
| 501:6 502:9 | 204:24 208:5 | 277:22 283:17 | 365:17,21,23 |
| **takes**   176:16 | 208:10,19 | 284:14 285:8 | 366:1 367:8 |
| 299:24 349:3 | 209:5,10 | 285:20 286:7 | 368:11,19 |
| **talc**   1:12,17 8:1 | 210:10,21 | 286:21 287:6 | 369:15 373:16 |
| 8:9,14,16 9:3,5 | 211:2,16 | 287:19 288:11 | 373:20 374:6 |
| 9:7,15 10:2,5 | 212:16 214:23 | 290:11 291:21 | 375:8,9,17,18 |
| 10:20 11:3,7,11 | 215:10 216:10 | 293:20,22,24 | 375:23 376:3 |
| 12:11,15 13:10 | 216:19 217:7 | 294:4 296:9,15 | 377:2,12,14,24 |
| 13:15 16:15,23 | 218:4,15 219:2 | 301:2 302:10 | 378:19 379:14 |
| 17:10,15 30:24 | 219:4 220:21 | 302:22 303:8 | 379:16,21 |
| 31:2,17,18,24 | 222:14,23 | 303:13 304:8 | 380:1,6,13 |
| 32:8,10,14,23 | 226:11,12,21 | 305:1 310:6,15 | 383:19 384:6 |
| 32:24 33:6,10 | 226:21 227:4 | 311:8,18 | 384:18 385:8,9 |
| 33:16 34:2,7,20 | 227:11,15,20 | 312:22 314:7 | 385:19 386:13 |
| 35:13 39:1 44:9 | 229:11,22 | 314:11 318:23 | 387:16,16,19 |
| 49:20,22 50:5 | 231:1,15,19,22 | 320:6,10 | 387:21,21 |
| 66:10 68:14 | 232:12 234:12 | 322:15,19 | 392:18,19 |
| 75:12 99:16 | 236:2,17 | 323:10 324:20 | 396:13,14,19 |
| 109:24 112:10 | 237:11,15 | 324:22 325:11 | 396:20,21 |
| 112:12 114:21 | 245:22 246:16 | 327:23 328:14 | 398:1,4,10,15 |
| 116:1,20 118:7 | 247:3 249:9 | 329:10 330:8 | 398:21 399:2 |
| 118:17 121:24 | 250:1,6 251:4 | 330:17 331:1 | 399:10 400:11 |
| 129:5 130:18 | 252:14,22 | 333:1 335:9 | 400:22 401:1,9 |
| 138:4,20 139:3 | 253:5,9,17,18 | 340:3 341:3,12 | 402:8 405:1,3,5 |
| 139:18,21,24 | 254:3 255:1,7 | 342:15,24 | 406:3,18 410:1 |

**[talc - teaspoons]**                                                    Page 91

| | | | |
|---|---|---|---|
| 410:16,18 | 118:13 122:22 | 61:18 68:21 | 270:24 274:23 |
| 411:2 414:2,2,3 | 125:4,6 135:23 | 88:15,17 98:1 | 287:15 295:7 |
| 414:3,6,6 | 137:23 140:10 | 99:10 107:17 | 304:8,12 |
| 415:23 417:19 | 144:23 145:18 | 109:1 116:13 | 312:19 330:7 |
| 417:23 419:7 | 150:19 154:16 | 126:19 127:6 | 342:4 349:19 |
| 419:15 422:8 | 158:14 159:24 | 145:20 146:24 | 356:15,24 |
| 423:4 426:1,1 | 161:19,23 | 165:10 208:13 | 361:14 367:4 |
| 426:16 428:18 | 163:16 164:19 | 232:3 241:8 | 376:4,5 385:6 |
| 429:6 439:14 | 165:20 167:22 | 246:11 254:10 | 399:6 418:7 |
| 439:19,20,23 | 168:2 169:7 | 256:14 261:7 | 425:21 426:20 |
| 441:6,13,14 | 172:18 181:20 | 272:13,14 | 493:9 498:4 |
| 442:15,24 | 191:21 204:12 | 287:12 305:19 | **talks**  51:17 |
| 470:1 471:3,8 | 206:10,18,19 | 327:19 331:12 | 67:13 150:10 |
| 471:17,18 | 206:20,23 | 338:13,17 | 152:2 236:13 |
| 473:5,14 | 209:23 214:3 | 339:20 340:22 | 347:18 356:9 |
| 475:21 476:4 | 224:7 225:20 | 341:23 365:14 | 394:6 406:2,4 |
| 476:10 | 228:23,24 | 369:7 372:10 | **task**  287:6 |
| **talc's**  394:1 | 232:5,6 234:9 | 390:20 451:1 | **tasked**  151:17 |
| **talcs**  12:19 | 261:18 265:9 | 467:5 470:18 | **taught**  60:6,15 |
| 422:4 | 272:4,15,15,18 | 476:8 480:11 | 60:24 61:3,5 |
| **talcum**  1:4 | 280:7,9,12 | **talking**  36:3 | 66:17 67:16 |
| 27:12 40:20 | 284:11 285:21 | 43:4 60:13,14 | **teach**  66:23 |
| 125:16 237:24 | 287:2,16,17 | 62:2,7 67:23 | **teaching**  60:22 |
| 238:10 251:13 | 290:6,8 327:1 | 68:2,13 75:5,6 | 67:11 70:4 |
| 252:18 258:21 | 339:21 342:12 | 88:18 99:14 | **team**  77:7 82:9 |
| 258:24 259:2 | 342:20 359:22 | 107:8 116:3,4 | 94:21 111:24 |
| 259:16 260:3 | 359:23 370:18 | 143:21 155:15 | 186:11 445:23 |
| 262:21 263:5 | 381:20 399:20 | 169:9 176:22 | 447:18 451:2 |
| 303:3 325:2 | 404:17 420:9 | 176:23 194:12 | 451:15,16,16 |
| 341:18 425:14 | 420:11 422:7 | 208:23 212:12 | 451:16 456:5 |
| **talk**  35:8 47:2,5 | 424:17 451:1 | 214:3,5,6 | 456:18 458:17 |
| 55:1 61:16 | 476:10 477:7 | 232:20 246:14 | 481:15,17 |
| 68:17 69:9 | 493:7 | 247:1 249:8 | 482:7,11 |
| 88:17 92:10 | **talked**  23:21 | 257:6,9 258:3 | 489:22 |
| 97:24 98:2 | 34:7 35:11 | 260:18 262:24 | **teaspoons** |
| 104:15 109:23 | 52:10 55:2 | 265:18 269:5,6 | 398:15 |

[technical - tests]                                                              Page 92

technical   455:4
  455:8 483:4
  485:2
technique
  159:9
techniques
  405:10
technology
  418:14
tell   24:3 26:15
  88:5 97:9,11
  100:13 101:11
  127:8,10 128:7
  128:7,8,8,10,12
  191:5 233:17
  271:17 285:12
  309:12 310:8
  312:9,17
  315:10 368:14
  369:11 374:5
  394:9,23
  395:14 397:2
  397:11 400:11
  404:11 417:19
  424:6 442:8
  451:23 453:5
  453:13 459:22
  466:22 497:4
telling   369:12
  369:12 395:8
  395:21
telofski   88:2
  121:9
tem   52:16
  383:1 409:7
  410:20 411:7

478:15,21
  479:12
temporal   136:6
  136:12
ten   458:15
term   98:6
  102:19 470:12
terms   30:10
  33:5 88:10
  99:14,15
  147:22 498:4
terry   9:14
  243:12 246:23
  254:13
test   49:8 52:15
  158:5,14,16
  159:1,10,11
  162:14,22
  377:2 392:6
  397:3 400:6
  403:14 404:24
  405:2,13
  408:11,11
  411:13 413:8
  413:10 422:10
tested   375:23
  376:1,2 398:10
  398:15,22
  399:3,10
  400:12,23
  401:1,6,9
  410:19 425:22
testified   14:5
  71:11 129:17
  130:24 161:18
  265:5 406:24

417:22 458:22
  459:1,4,12
testify   47:6
  138:24 466:7
testifying   80:20
  129:14 131:7
  131:20 289:2
  397:9
testimony   18:6
  64:1 72:22,24
  73:4,5,7,9,11
  73:15,21 74:1
  78:24 79:7
  119:2,13,15,18
  121:13 130:24
  141:14,15
  204:1 271:21
  299:11 362:21
  363:8 377:19
  381:12 384:2
  386:17 391:23
  393:6 434:12
  471:11 472:9
  473:20 502:9
testing   12:9
  40:4,5 48:24
  49:7,22 50:4,6
  50:9,20,21
  52:14 120:18
  120:22 158:19
  158:22 159:19
  159:19 160:2
  161:20,21,22
  161:24 162:2
  205:5 370:21
  370:22 383:6

383:19 384:6,9
  384:18,20
  391:11,17,18
  398:10,24
  399:5,7,9,18,21
  400:7,8 401:14
  401:15,18
  402:11,17
  403:2 405:18
  406:3,10,17
  407:20,22
  408:17,23
  410:2,4,10,16
  411:6,9,12
  412:12,13,19
  412:20,22
  413:7,14,15,19
  413:20 414:2,5
  414:7 416:10
  417:15,16
  418:16 422:8
  422:13 430:12
  431:8 474:11
  476:5 477:12
  477:13,14,17
  477:18 478:24
  479:2,11
testings   377:10
  392:13
tests   157:24
  159:16 376:12
  383:2,10,12
  384:12 386:10
  395:9,22
  398:12 401:11
  402:12,13

**[tests - think]**                                                    Page 93

| | | | |
|---|---|---|---|
| 403:10,15 | 213:15 214:9 | 258:3 260:15 | 166:13,17 |
| 407:12 477:21 | 258:2,6 316:15 | 273:19 278:13 | 167:10,12,13 |
| 478:8 | 451:13 495:21 | 279:14 281:5 | 167:17 172:6 |
| **tethered**  113:3 | **things**  17:10 | 281:16 295:22 | 173:3 176:2,4 |
| 113:5 | 24:11,15,20 | 305:19 342:22 | 179:10 180:7 |
| **texas**  480:12,15 | 25:20 33:8 | 343:1 365:15 | 185:11 188:14 |
| 480:16 482:18 | 35:10 39:24 | 366:14 368:8 | 191:1 199:14 |
| **text**  384:20 | 47:6 52:2 57:13 | 391:4 397:1 | 204:14 205:4 |
| **thank**  31:15 | 61:19 64:17 | 437:10,16 | 206:10 209:11 |
| 53:22 54:13 | 88:17,18 90:4 | 441:19 443:17 | 209:17 211:2,6 |
| 118:8,10 169:3 | 91:14,16 93:9 | 450:2 455:9 | 211:8 221:19 |
| 192:5 216:4 | 95:13 99:12 | 467:13 475:23 | 225:19 247:22 |
| 225:13 248:22 | 101:10,15 | 476:2,5 477:8 | 256:5 265:10 |
| 259:12 266:23 | 102:13 103:1 | 479:4 | 266:16 267:13 |
| 291:22 327:11 | 106:5,8 108:15 | **think**  18:8 33:3 | 267:22 272:6 |
| 327:13 387:5 | 108:19,21 | 44:16,17 47:21 | 297:10 309:12 |
| 391:21 393:15 | 109:14 110:8 | 52:9 57:10 | 315:10 316:21 |
| 472:13 485:11 | 116:16 120:7 | 58:13 62:3,8,11 | 318:7 335:11 |
| **thanks**  276:8 | 121:16 125:3 | 63:2 64:11,11 | 337:15 338:6 |
| **theory**  14:16,20 | 127:1,16 129:1 | 65:2 66:20 72:6 | 338:20 340:12 |
| 14:22 23:24 | 131:15 136:1,6 | 73:1 75:15 | 342:4,21 344:1 |
| 65:21 98:12 | 145:12 146:11 | 76:13,15 78:19 | 360:24 369:17 |
| **therapy**  238:9 | 146:24 164:24 | 78:23 80:7 | 369:20,22 |
| **thereof**  152:12 | 166:5 167:1 | 87:23 88:13,15 | 370:10,14 |
| **thimble**  400:24 | 171:14 173:19 | 88:23 92:11 | 375:12 389:20 |
| **thin**  427:18 | 177:16 189:6 | 101:24 106:14 | 401:24 404:7 |
| **thing**  15:15 | 189:11,13 | 108:8,10,22 | 406:6 407:14 |
| 69:6 132:13 | 190:11 194:6 | 109:12,16 | 409:4 410:14 |
| 133:1 153:14 | 203:12 204:21 | 111:21 119:3 | 411:21 414:17 |
| 157:5 159:23 | 205:6 207:16 | 123:8 124:10 | 414:17 421:7 |
| 163:14,23 | 210:10,11,17 | 129:22,23 | 422:9 426:13 |
| 164:17 166:16 | 211:16 213:5 | 136:9 141:1 | 427:4 428:3,4 |
| 174:12,16 | 213:16,24 | 151:21,22 | 432:8 433:11 |
| 179:5,5 182:13 | 214:1 228:13 | 152:24 155:24 | 435:12,24 |
| 190:4,5 198:18 | 228:24 232:5 | 163:22 164:2 | 436:16 438:2 |
| 198:21 213:1 | 239:16 240:16 | 164:15 165:12 | 438:19 440:2 |

**[think - time]**                                                     Page 94

| | | | |
|---|---|---|---|
| 441:19 444:24 | 193:13 198:13 | 75:11 76:1 77:4 | 240:21 241:18 |
| 445:2 450:15 | 205:12 237:9 | 78:14 83:5 87:9 | 241:21 242:8 |
| 451:3 452:1 | 265:17 309:8,9 | 90:6 91:21 | 242:12,16,17 |
| 454:24 459:18 | 329:15 381:17 | 93:11 96:5,11 | 242:17 247:11 |
| 459:20,20 | 415:9 478:3 | 97:11 98:23 | 248:13 249:7 |
| 460:2 462:20 | 491:5 | 99:4 101:13 | 249:11 250:5,5 |
| 464:5 465:14 | **thousand** 80:16 | 104:11,17 | 253:3 255:1 |
| 465:16 467:3 | 94:17 329:16 | 106:10 107:2 | 256:11 257:12 |
| 467:12 472:6 | 329:17 335:15 | 107:16 108:15 | 257:16,20 |
| 479:8 484:7,19 | **thousands** 32:5 | 108:19,21 | 261:7,13 |
| 484:24 497:24 | 42:23 45:12 | 109:20 111:19 | 262:15 263:18 |
| 498:9 | 50:17 198:11 | 116:2,3 126:9 | 264:8 266:19 |
| **thinking** 25:1 | 308:7 309:18 | 126:13 127:12 | 270:6,23 282:1 |
| 61:4 87:15 | 322:24 338:23 | 128:11 130:18 | 289:10 299:24 |
| 103:6 107:11 | 381:14 401:11 | 136:7,8,11 | 301:4 307:11 |
| 107:12 128:20 | 460:18 465:1 | 140:19 141:9 | 307:15 310:11 |
| 129:1 130:22 | 473:1 | 142:16,22 | 312:4,10,16 |
| 199:12 205:10 | **three** 78:6 | 148:24 162:22 | 314:24 315:2 |
| 241:22 249:23 | 100:12,15 | 175:5,18 177:8 | 315:13 317:4 |
| 253:16 341:11 | 169:14 223:1 | 180:19 184:24 | 317:13,14,16 |
| 342:19 353:3 | 291:24 292:1 | 187:6,7,16 | 320:2 321:23 |
| 356:10 384:10 | 295:11 412:19 | 188:2,8,15 | 322:6,6 323:1 |
| 436:7 437:1 | 413:19 418:15 | 193:8 201:12 | 334:14 335:7 |
| **thinks** 128:24 | 420:2 445:20 | 204:15 205:9 | 341:15,17 |
| **third** 32:11 | 471:5 479:22 | 206:13 210:19 | 342:8,15 348:1 |
| 140:13 174:16 | **threefold** | 213:3 216:15 | 350:19 352:5 |
| 187:23 196:7 | 331:17 | 218:19,24 | 358:18 359:15 |
| 252:10 285:14 | **thursday** | 219:8,10 220:3 | 360:22 361:2 |
| 319:14 355:12 | 249:17 | 220:19 223:20 | 369:15,18 |
| 404:19,21 | **time** 22:22 23:8 | 223:21 228:6 | 370:12 371:17 |
| 446:6 452:14 | 23:9,12,14 | 228:15 229:7,7 | 377:9 384:13 |
| **thompson** 3:16 | 25:10 38:7 | 230:2 232:15 | 386:11 388:5 |
| **thought** 87:13 | 39:16 41:3 | 232:21,22 | 388:23 392:13 |
| 109:13 111:15 | 43:11,16,17 | 233:23 234:5 | 410:7 411:10 |
| 123:22 135:2 | 44:15 45:2,13 | 234:20 238:15 | 411:16,19,22 |
| 142:3 193:12 | 71:16 72:1 | 238:16 239:19 | 412:3,23 |

| | | | |
|---|---|---|---|
| 413:21 417:9 | **tisi**   3:6 6:3,6,9 | 149:19 150:2,7 | 258:13 259:5,9 |
| 424:11 431:16 | 14:10 15:2,9,18 | 151:19 153:11 | 259:12,19 |
| 434:14 437:2 | 16:1 18:19,24 | 158:11 160:16 | 261:11,16 |
| 442:17 448:15 | 21:14 28:22 | 160:18 161:1 | 262:11 264:7 |
| 451:7,8,15 | 29:1 33:24 35:6 | 161:13 162:10 | 265:8 266:21 |
| 453:8,22 | 35:22 36:6 | 163:6,10 166:6 | 266:24 268:8 |
| 456:17 461:5 | 37:17,24 39:9 | 166:18 167:19 | 269:3,13 |
| 461:14,20,23 | 40:15 48:2,10 | 169:2,6 176:24 | 270:13 272:3 |
| 462:10 463:2 | 48:20,23 54:6 | 177:1 178:10 | 272:21,22 |
| 466:2 467:14 | 54:12 57:4 | 178:24 181:19 | 274:13 275:7 |
| 469:6 473:3,24 | 60:16 62:22 | 183:10,13,21 | 275:21 276:10 |
| 477:6 479:24 | 63:7,17 71:18 | 184:1,6 192:8 | 276:20 277:3 |
| 480:2,12 | 72:18 74:5,10 | 193:16 194:16 | 279:20 280:1 |
| 483:15 484:8 | 75:22 77:8,19 | 194:23 195:4,6 | 283:15 284:3 |
| 489:20 491:14 | 77:22 78:5 | 195:10,11 | 288:20 291:15 |
| 492:18 493:1,2 | 79:19 81:22 | 197:9 199:16 | 291:19 292:20 |
| 495:13 502:10 | 82:3 83:18 | 199:18 200:3 | 293:5,8,12 |
| **times**   19:10 | 84:22 85:6,10 | 200:10,16 | 297:1,5 298:3,6 |
| 33:3 36:3 47:18 | 85:13,18,24 | 201:7,17,21 | 299:16 300:4 |
| 66:10 107:18 | 86:5,12 89:22 | 204:8 205:23 | 305:16 307:23 |
| 118:12,13 | 91:1 93:10,14 | 206:1,8 207:1,6 | 308:23 309:3,8 |
| 140:4,7 177:15 | 93:20,21 94:2,5 | 214:8,16 216:2 | 309:10 310:20 |
| 271:14 280:3 | 97:23 110:5 | 217:20,23,24 | 311:2,5,13 |
| 323:7 329:16 | 113:2 114:12 | 219:21 220:9 | 312:14,24 |
| 430:17 439:8 | 114:15,17 | 221:1,7,10 | 314:2,10,23 |
| 441:2 461:23 | 116:10 117:7 | 222:8,9 223:18 | 315:8,9,16,23 |
| **timesheets** | 117:21 118:21 | 223:21,23 | 316:17 317:5 |
| 446:16,18 | 119:1 122:5,14 | 224:4 225:2,6 | 317:11,15,21 |
| 448:12 449:1 | 122:20,21 | 228:3 230:8,12 | 318:4,16,19 |
| 451:12 452:5 | 124:15 127:21 | 232:16,19 | 319:10,12 |
| **timing**   333:23 | 129:3 131:13 | 235:11,16,20 | 321:1,4,7 |
| **tinto**   12:15 | 131:23 132:10 | 235:22 243:5 | 323:13,19 |
| 409:14 414:15 | 132:20 135:1 | 243:11 245:11 | 327:9,14 |
| 418:13 | 137:13 140:9 | 247:8 248:17 | 328:18,22 |
| **tiny**   372:21 | 141:23 142:3,9 | 248:22 249:4 | 329:10,14 |
| 373:3,10 | 148:6,9 149:10 | 255:20 258:7 | 330:12,14 |

[tisi - toxicologic]                                            Page 96

335:6 337:3,9
337:19,22
339:6 340:9,19
344:22 345:10
345:14 349:20
350:24 351:6
351:12 352:11
352:17,23
354:19 357:4
357:10 359:21
363:3 364:17
364:21 367:19
370:17 374:9
374:14,17,21
375:15 376:24
378:3,7,13,24
379:7 381:5
382:7,9 385:13
386:16 387:11
388:9,15,18,20
390:7,22
391:19,24
392:22 393:3
393:14,16
394:17 397:18
399:8 400:1,17
401:4,7,19,23
402:19 403:23
404:2,6 407:9
410:8 411:18
411:21 412:1,4
412:6 413:24
414:8,14 415:6
415:11,17
416:2,20,23
419:21 420:4,8

420:13,15,21
424:17,24
425:12 427:1
428:7,12 430:3
430:8 431:10
431:16 439:12
477:11 480:1,5
480:10 484:16
485:11,15
486:14 488:11
489:5,12
490:17 491:7
491:15,18,23
492:9,12,16,21
492:24 493:6,9
493:14,24
494:4,12,18
495:5,9,15,22
496:1 499:12
**tissue**  222:16
222:24
**tissues**  237:11
**titled**  292:9
**today**  15:14,17
33:15 35:24
58:20 59:8
84:13 85:3 98:8
100:5 124:2
130:9 187:16
190:21 191:5
191:13 204:16
235:1 271:1
304:7 305:20
316:24 322:2
325:7 334:20
334:23 335:4

339:10 343:1
366:24 368:1,7
368:9 369:5
383:3 407:15
433:19 434:12
440:4 463:6,8,9
469:7,16 499:6
**together**  43:23
82:23 104:4
167:24 215:8
218:14 244:23
319:19 346:19
347:17 348:2
355:13 356:13
361:15 373:17
379:8 381:12
404:16 413:2
463:11
**told**  125:2
130:16 131:24
161:2 271:14
280:4 296:22
301:17,17,21
344:13 369:24
370:1,5,5,6
373:9 377:14
378:18 379:12
419:13,13,14
428:17 429:20
452:11,17,20
**tolerance**
377:24 378:18
379:13,20,24
**tons**  398:4,4,4,4
401:9

**took**  26:12 45:3
53:16 64:12
89:13,15
113:16 143:12
212:1 298:13
298:22,23
299:18,23
300:16 310:6
401:11 409:11
409:11 428:5
451:23 454:7
471:19
**tool**  238:7
**toothless**  156:5
**top**  9:15 13:14
67:6 213:16
220:18 230:14
243:15 244:12
259:6,7,10
340:10 464:3
**topic**  420:10,12
**topics**  60:3
359:23
**total**  249:24
341:11 358:14
447:4
**totally**  277:18
335:12 426:21
468:3
**tough**  346:20
347:12 348:16
**toward**  442:19
**towards**  342:15
**toxic**  11:17,21
**toxicologic**
237:10

**toxicologist**
  50:1 53:3,5,8
  159:7 173:10
  269:21 396:9
  400:13 407:18
  471:23
**toxicologists**
  46:16 403:22
  484:17
**toxicology**
  10:14 53:7,11
  53:12,19,21
  173:9 187:24
  188:2 277:9
**toyota**  102:11
  102:11 146:23
  147:4,18
  467:16,17,19
  467:21,22
  470:18
**trace**  424:12
  425:16 426:3
  426:10 427:10
  428:18
**track**  363:1
**trade**  345:23
**traditional**
  429:6
**traffic**  147:2
**tragic**  320:18
  321:14
**transcript**  12:1
  13:22 378:8
  393:19 501:5
  502:8

**transcripts**
  377:20
**translocation**
  318:23
**transmitted**
  77:16
**transportation**
  496:24 497:19
**treatise**  332:19
  333:9
**tree**  240:1,6,9
**tremendous**
  142:7
**tremolite**  51:19
**trends**  203:15
  497:1
**trial**  12:1
  283:20 363:7
  393:18 459:2
**triangulating**
  89:5
**tried**  155:7
**trillion**  188:24
**trouble**  101:21
**true**  33:17 37:7
  37:8 40:21,21
  40:22 43:13
  48:4 49:1 52:4
  53:4 57:9,19,20
  59:24 61:8,9
  65:7 70:18,21
  71:2,5,22 72:9
  74:21 76:11
  78:18 81:13
  101:9 103:4
  104:6,9 105:7

106:10 107:10
108:20 113:4
113:24 116:5
117:2 130:18
137:8 138:11
140:2,23,24
144:17 145:3
145:15 146:13
147:12 156:14
156:18 157:9
159:3,17
161:22 164:5
164:12 166:9
166:21 167:7
168:10 169:17
169:17,19
170:1,2,4,10
171:8 173:1
174:11 175:5
176:20 177:20
178:16 179:9
189:1,15,23,23
189:24 190:1,8
190:16,16
204:16 206:14
211:18,18
213:3 216:19
218:5 223:2,4
227:22 228:10
229:12,12,14
229:18,18,23
238:17,19,19
239:17 240:16
240:17 241:3,5
246:6,16,18
250:24 256:15

256:19 257:20
258:4 260:18
262:6 277:22
283:8 284:9
289:3,19 294:8
300:22 302:15
305:22 318:14
318:24 321:9
339:11 343:14
349:12 355:8
357:1 360:12
366:17 367:3
372:1,8 377:4
382:21 390:15
394:4 410:1
417:14 419:16
423:4,22
489:17 493:24
501:8
**truly**  166:23
**truth**  382:13
  394:8,22 395:8
  395:21
**try**  18:18 104:4
  149:4,5 171:1
  443:6 444:3
**trying**  99:12
  100:13 101:13
  102:16 105:15
  106:12 108:17
  110:14 112:22
  123:14 131:12
  149:21 175:20
  177:24 179:3
  182:9,10 228:5
  248:15 266:16

**[trying - understanding]**

297:16 315:14
343:11 369:19
464:20,21,23
474:23,24
475:19 489:14
**tsca** 11:18
**tuesday** 1:22
2:8
**tumors** 222:15
245:20
**turn** 205:13
454:16
**turned** 18:8
454:13,15
490:22,24
**turpin** 5:6 18:4
266:18,23
**two** 24:7 73:1
78:23 87:7 88:6
88:8,9 89:6
129:23 144:10
196:3 221:2
222:24 226:9
226:18 252:13
252:15 274:20
278:13 279:4
298:10 300:16
304:18 330:9
331:10,11
333:23 334:6,7
334:17 369:10
376:2 377:2,2
395:12,12
396:2,2 397:1
405:13 428:4
451:16 452:12

453:9 456:9
471:22 472:17
473:11 485:18
491:9,19 495:3
**type** 237:4
**types** 252:15
474:3
**typical** 165:11
165:13 422:22
**typically** 94:15
178:15

### u

**u.s.** 7:19 184:11
354:24 355:1
**uh** 24:23 46:15
47:8 51:1 53:17
66:16 78:8
87:20 92:12
102:22 111:19
112:3 121:17
131:17 139:11
150:12 167:23
169:11 171:3
175:3 182:16
185:8 196:6
202:14 205:16
212:14 244:7
262:3 275:20
277:13 321:24
325:16 330:1
330:19 354:14
360:1 378:16
379:10 404:22
433:2 446:5
447:3 448:10

449:6 452:13
452:23 453:6
453:21 481:22
**ultimate** 467:8
467:21
**unable** 466:15
**unbending**
346:17
**uncertain**
237:24
**uncertainty**
107:24 108:3
369:1
**uncle** 24:2 98:6
**unclear** 481:18
**uncomfortable**
105:8
**under** 11:17
57:24 90:21
97:21 135:21
152:11,12
153:16,19,21
214:20 215:5
456:24 496:20
501:1,4,12
**undergraduate**
66:18 485:4
**understand**
16:13,21 17:2,7
17:8,12,13,16
17:17,21,22
18:2 23:5 27:11
27:14,20,22
28:1 29:10,23
30:23 31:16,23
38:6,10 39:17

41:6 62:20
98:16,18 99:5,6
100:6 104:19
108:17 112:23
115:23 137:17
149:22 153:13
155:4,7,8 157:3
157:11 158:4
164:9 168:12
175:20 177:24
182:9,10
185:13,13
198:1 200:22
201:8,10,14
213:12 228:11
245:20 268:21
306:1 308:9,10
309:15 310:5
314:6,18
343:13 347:1,3
360:7 363:16
371:10 373:19
384:3,5,10,11
391:7 403:13
419:1 460:9
462:21 468:2
469:21 474:23
476:4 490:20
499:2
**understanding**
25:13 29:13,15
39:8 98:19
101:22 102:16
107:15 111:7
112:16 115:3
130:11 155:22

**[understanding - vague]**                                             Page 99

156:24 196:15
369:14 383:18
384:8 386:12
442:18,22
462:15 468:7
473:2 501:11
**understood**
209:20 290:6
336:2 384:17
384:19 412:24
417:8 426:19
**undertook**
326:5
**underwear**
310:7
**unequivocally**
190:4,6 227:10
**unfold** 174:5
348:24
**unintended**
467:24
**unique** 67:13
**united** 1:1
312:23 405:6
**university** 66:4
66:9 221:17,22
244:1 257:11
257:11 258:8
258:10 259:20
260:9,10
368:17 369:12
369:24 370:1,5
**unknown**
371:18 372:4
**unsafe** 115:5,11
115:12,14

139:7,19
389:24
**untrue** 238:14
**unwanted**
49:23
**unwise** 349:23
**updated** 122:11
415:20 416:5
461:13
**updating**
415:22
**upper** 357:1
358:1
**urge** 325:1
**urges** 324:22
**urticaria** 29:20
**use** 9:11 11:17
16:2,9 17:14
31:6 52:8 99:9
115:12 126:21
139:8,19
152:11,12
154:4,6 160:2
211:7,10
214:23 215:10
216:10 217:7
218:15 226:11
226:21 227:4
227:11,15
231:1,22 236:2
238:3,11
239:14 241:15
244:14 245:18
247:2 249:9
250:19 251:5
251:12 252:17

254:23,24
256:3,4 259:15
260:3 263:5
265:20,24
268:6 281:24
282:2 286:18
301:2 305:1
319:5 320:6
331:1 338:15
341:2 349:24
354:23 380:6
383:21 385:9
385:23 386:5,6
387:20,23,24
389:7 405:4
433:1 439:20
450:9 463:20
471:8
**used** 20:11,15
20:15 51:22
52:6 90:1 98:4
99:2 102:19
109:12 131:4
136:5,22
168:19 172:6
176:4 197:22
220:22 239:14
259:23 293:20
293:21 309:21
310:6 333:6
391:11 398:11
406:17 407:13
408:10 409:8
429:16 434:1,4
434:11 439:8

**users** 139:8
152:10 238:2
**uses** 13:10
29:17 155:12
**using** 35:12,13
41:22 106:12
130:12 144:16
168:15 199:3
216:15 231:19
246:16 253:4,4
253:5,5 255:7
263:10 307:12
308:7 313:4
339:24 398:10
399:4,10 405:2
408:17 409:2
410:19 411:2
411:12 412:19
412:23 413:21
430:15 479:12
487:15 497:22
498:1
**usp's** 405:6
**usual** 152:13
**usually** 238:6
480:24

**v**

**v** 1:12,17 3:6
12:1
**vagina** 222:13
**vague** 116:7
166:1,11 167:9
312:20 390:17
413:23 457:21

**[valid - water]**                                                      Page 100

**valid**  321:15
  322:13 479:10
**validity**  391:18
**valley**  9:9
**value**  134:18,20
  179:21,24
  180:9,10
  459:13,15,21
  459:21,23,24
  461:6 464:6
**values**  135:6
**variety**  178:20
  293:21 484:1
**various**  32:22
  33:2 61:14,17
  61:19 65:6,7
  66:1 68:17
  78:18 81:12,18
  99:17 101:18
  135:19 208:4
  218:13 313:15
  368:8 474:12
**vary**  167:16
**vast**  219:2
  410:3 411:10
  411:23
**veering**  390:5
**verbatim**  502:8
**vermont**
  396:13 418:12
  425:24 428:18
  429:6
**version**  360:8
  461:12
**versus**  150:11

**viable**  41:24
**vickery**  1:23
  2:21 502:3,21
**view**  196:21
  291:21 308:5
  308:12 321:14
  326:5 390:8,10
  390:11 473:9
**vision**  179:20
  179:21,22,23
**vitae**  7:3 15:6
  15:11 496:19
**voice**  266:15
  347:11 348:15
**volume**  12:2
  18:8
**voluntarily**
  154:10 373:2
  404:24

**w**

**w**  471:24
**wait**  86:19
  482:1
**waiting**  322:9
**waived**  499:15
**walk**  372:19
  373:2,2,8,11,12
**wang**  225:13
**want**  19:13
  26:7 32:2,19,19
  36:16 40:2,6
  47:3,5 66:21
  75:2,11 77:18
  84:23 101:11
  102:15 107:5

118:14 122:9
128:4 132:13
132:22,24
133:14 137:17
138:17,24
148:10 154:16
176:13,14
178:8 180:5
186:2 239:4
248:20 249:22
253:8,15
287:16 294:14
294:23,23
309:11 314:22
315:4 319:5
320:23 323:2
336:3 341:10
343:12,13
368:15 369:2
372:7,11,15,22
373:1,8,12
384:23 392:5
392:20 405:23
412:2 415:4,9
419:17 431:22
431:23 432:2
433:20 455:8
459:10,11
479:23 486:6
494:14,15
495:12 496:13
497:16 498:13
**wanted**  23:5
  85:11 128:19
  128:22 158:6
  195:3 272:15

280:2 294:21
322:18,21
343:14 405:24
442:11 448:6,8
448:22 462:21
486:3 496:17
**wanting**  296:21
**warn**  17:18
  38:11 139:8
  241:14
**warned**  239:13
  305:1
**warning**  55:15
  56:16,19 57:8
  154:5,10 235:4
  248:8 299:19
  300:22 301:5,8
  302:12,15
  311:20 325:11
  479:15
**warnings**  35:11
  56:4,13 57:11
  154:14 231:5
  231:21 232:11
  233:19 285:7
  285:19 304:9
  479:19,20
**warranted**
  227:16 229:20
  327:24
**warrants**  231:4
**washington**
  2:15,17 222:2
**waste**  317:13
**water**  144:8,10

**way**   24:3,4
  28:16 56:18
  57:6 59:1 62:20
  68:7 98:19 99:5
  100:5 105:9
  108:22 109:13
  109:23 123:3
  127:7 132:8
  133:16 147:21
  150:4 158:10
  179:9 186:22
  187:13 188:18
  205:12 263:10
  274:7 284:10
  289:16 294:9
  296:7 313:20
  314:15 324:15
  328:23 336:7
  350:21 359:5
  362:11 369:20
  371:21 385:20
  386:3,4,6 399:5
  421:15 423:24
  431:3 438:5,17
  441:4,15
  444:17 447:7
  447:11 450:19
  451:10,20,22
  453:4 462:22
  470:10 479:21
  495:6
**ways**   133:17
  135:4,10,19
  164:15 170:13
  172:17 173:16
  173:22 179:7

  188:13 190:1,2
  190:5 199:12
  243:2 287:21
  288:4 289:21
  339:18 350:1
  435:11,24
  436:16 438:2,9
**we've**   23:21
  98:1 136:16
  163:3 183:24
  232:2,3 246:9
  248:15 249:8
  254:10 256:10
  263:18 272:13
  304:6 321:21
  325:7 336:24
  343:1 346:15
  346:19 359:15
  365:14 366:24
  415:3 416:11
  425:5 486:1
  487:15
**weak**   286:10,11
  319:18
**website**   150:9
  368:18 369:13
**websites**   263:21
  363:14 394:9
  394:23
**week**   75:15
  329:3
**weekend**   77:17
**wehner**   10:13
  225:14,17
  315:18 318:12
  322:14 471:23

**wehner's**   229:9
**weick**   435:18
**weigh**   110:16
  110:17
**weird**   464:4
**weiss**   4:4
**welcome**
  496:14
**went**   123:7
  128:9 158:23
  159:9 205:6,7
  383:15 400:9
  409:17 454:21
  455:20 462:12
  476:9 477:17
  479:5 482:11
**wewel**   483:3,19
**whatsoever**
  29:14 177:18
**white**   12:8
  108:12
**whysner's**
  255:23
**widely**   249:22
  253:15 341:9
**wille**   88:3
  119:16
**willing**   271:17
  279:2,4,6
**windsor**   423:13
  423:20
**wiring**   446:6
  452:15
**wise**   80:3
**wish**   99:2
  252:20 254:23

  256:2 262:5
  414:24
**withdraw**
  60:19 234:8,8,9
  234:11 235:3
  306:12 319:3,4
  324:22
**withdrawal**
  43:21 44:1
  358:23
**withdrawn**
  43:7,11
**withdrew**   44:9
**witness**   18:11
  18:14,18 28:23
  33:19 34:24
  35:18 37:21
  39:7 47:23 48:8
  54:10 57:1
  60:12 62:17
  63:13 71:14
  75:20 79:16
  82:1 83:15
  85:14 89:18
  110:3 116:8
  117:16 122:3
  124:10 128:19
  131:10 132:7
  132:19 137:11
  140:6 142:6
  148:2 149:16
  151:16 153:6
  158:9 160:22
  161:11 163:8
  166:2,13
  167:10 178:18

| | | | |
|---|---|---|---|
| 183:8 193:12 | 388:19 390:4 | 239:14 241:14 | 75:5 82:11 |
| 197:3 200:7 | 390:19 391:16 | 250:19 251:12 | 91:20 92:1,21 |
| 201:4 204:2 | 393:15 394:16 | 252:16,20 | 92:22,22 93:5 |
| 217:15,19 | 399:24 400:15 | 253:2 254:23 | 94:10 97:9,12 |
| 220:7 227:24 | 401:5 403:20 | 255:10 256:2 | 131:5 149:14 |
| 245:9 247:6 | 407:6 410:6 | 259:15,22 | 183:1 245:20 |
| 255:15,17 | 414:12 415:16 | 260:3 263:15 | 277:19 350:7 |
| 259:13 264:5 | 416:21 425:10 | 303:2 304:24 | 435:9,16,18 |
| 266:19,20 | 433:22 434:3,6 | 313:4 324:18 | 436:18 439:8 |
| 268:3,20 | 441:1 457:23 | 368:14 369:1 | 446:17,19 |
| 269:11 270:9 | 458:5 464:19 | 374:3,5 | 447:8,13 448:5 |
| 270:11 271:23 | 465:14 472:12 | **women's** 87:15 | 448:6 449:15 |
| 274:11 275:20 | 473:22 475:5 | 226:21 | 451:15 456:18 |
| 276:5,8 279:17 | 478:4 486:10 | **won** 349:2 | 457:4,8 458:21 |
| 283:12 284:1 | 487:7 488:15 | **word** 47:16,18 | 480:19 481:23 |
| 288:17 292:18 | 489:7 490:19 | 48:1 51:2,3 | 482:8,22 487:3 |
| 292:24 293:4 | 491:5 493:4 | 52:6 89:13,15 | 488:21 489:1,2 |
| 297:22 298:1,5 | 494:20,23 | 98:4 99:9 146:6 | 489:9,19 490:3 |
| 299:12 300:3 | 502:6 | 152:4 153:8 | 491:14 494:6 |
| 305:5 307:22 | **witnesses** 88:23 | 155:12 212:21 | 497:23 |
| 308:19 309:5 | 88:24 121:7 | 259:23 281:24 | **worked** 58:13 |
| 310:23 313:23 | 124:5 | 282:2 311:12 | 59:4,22 62:19 |
| 314:20 316:10 | **woman** 308:15 | 332:4 382:6 | 62:23 63:15 |
| 316:14 318:1 | 386:5 | 383:21 433:1 | 66:3 67:4 72:20 |
| 318:17 319:11 | **woman's** 31:7 | 434:2,4,11 | 72:21 75:7 |
| 327:13 328:16 | 222:17 | 449:5 | 76:11 78:14,17 |
| 329:9,12 | **women** 16:8 | **words** 51:22 | 78:20 81:12 |
| 330:11 335:1 | 17:14,18 34:3,8 | 52:4 92:2 | 109:14 111:16 |
| 336:22 339:3 | 35:12 37:6 | 106:12 170:10 | 162:14 330:8 |
| 340:12,17 | 115:12 126:20 | 171:15 176:4 | 371:8 408:21 |
| 349:16 354:18 | 144:16 207:14 | 449:24 462:1 | 446:3,21 447:1 |
| 359:18 362:23 | 216:17,18 | 465:10 | 482:11 483:11 |
| 367:16 370:10 | 218:3,15 | **work** 19:21 | 483:15,17,23 |
| 374:20 378:11 | 220:21 223:2 | 43:14 65:2,12 | 484:1,3,6,7 |
| 379:3,6 381:3 | 226:13 227:11 | 67:24 69:3 | **working** 43:17 |
| 382:3,5 387:8 | 231:21 239:13 | 70:15 74:21 | 43:22 44:8,13 |

**[working - year]**                                    Page 103

44:19 75:8
76:12 80:4,6
83:22 101:8
103:17 108:23
111:23 308:16
383:13 413:1
446:14 448:4
481:15,17
**works** 28:10
420:14 489:10
**workshop**
206:5 273:1
293:24 319:16
319:17
**workshops**
233:8
**world** 108:23
218:24 265:10
266:9,11
378:18 379:13
379:16 393:23
394:9,23
396:12 439:10
476:3
**worldwide** 44:9
**worth** 189:2,3
**wrap** 101:13
179:16
**wright** 5:15
173:12
**write** 48:8,11
387:23 446:13
**writes** 428:16
**writing** 84:21
106:5 476:24

**written** 52:1
60:2 92:1
115:18 118:3
129:6 154:8
164:4,6 166:19
170:9 174:22
188:9 194:8
196:20 203:18
211:19 216:20
216:23,24
220:24 223:3,6
223:17 228:1,2
229:13,24
237:19 238:18
244:19 253:20
261:2 278:17
278:20,22
286:4,8,15
294:13 295:15
296:5 302:16
303:17 333:11
335:2 341:5,7
341:14 343:20
347:23 349:17
350:16 356:2
356:23 390:12
396:3 406:13
406:14,15,19
406:20,22
407:7 461:2,12
476:18
**wrong** 116:24
195:3 260:9,11
284:23 303:16
326:20 345:1
469:13 477:10

**wrote** 84:11
124:2 172:4
176:4 218:23
238:20 326:12
424:13 457:17
457:18 463:10
476:11,17
477:16
**ww** 202:19
**wynder** 287:5

**x**

**x** 405:10 447:2
**xerox** 69:13
**xii** 12:6
**xrd** 50:8 405:10
409:7 410:20
411:2,6

**y**

**y** 447:2,2
**y'all** 394:9,23
**yale** 244:3
246:10
**yeah** 18:15,21
22:1 26:17
51:16 56:24
60:12 63:13
75:20 82:2 84:8
87:22 94:20
108:18 111:12
114:14 132:19
132:22 135:4
138:9 159:6
161:12 162:1
168:23 171:23
181:23 182:1

185:14 206:10
210:1 221:19
221:23 223:22
234:22 245:9
255:12,19,24
275:4 276:9
293:2,6 295:10
304:12 315:8
316:2,21
319:23 328:10
336:9,23
345:18 364:11
366:9,23
374:23 378:12
379:19 383:23
385:16 389:2
393:11,15
394:5 395:3,16
404:10,12
409:20,22
410:14,24
416:15 421:11
421:21 433:22
435:23 443:4
445:24 450:15
452:10,20
453:24 478:18
485:8,17,17
486:11 487:9
**year** 92:7,8,17
232:21 235:2
241:11 242:9
242:15,16
247:11 269:7
284:21 295:17
334:4,5,8

**[year - zoom]**                                          Page 104

344:12,16,20
344:21 398:16
455:13 464:10
479:9 489:16
**years**   21:23
30:18,24 41:4,9
50:12 58:14
74:24 78:15,16
79:1 80:2,6
96:9 104:24
112:20 116:5
120:15 144:19
168:6 203:22
206:21 214:10
219:11,14
220:8 221:2,6,7
240:21 249:8
254:16 283:20
291:24 292:1
298:14,16
299:18 304:22
309:16 310:7
312:7,8 333:23
334:6,8,17
346:15 360:19
366:4,16 368:1
371:2 377:8
412:8,9,14,19
462:2 467:11
473:23 475:10
481:10 482:2
489:24 490:1
490:11
**yep**   26:20 29:3
112:6 205:16
276:9 283:5

352:10 379:5
**yesterday**
77:11
**york**   2:16 4:20
**young**   388:24

**z**

**zero**   160:12,15
160:16,20,20
161:6,7 377:24
378:18 379:13
379:17,20,22
379:24
**zoom**   3:13 5:4

Federal Rules of Civil Procedure

Rule 30


(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2)  Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.