# EXHIBIT 2

Page 1

1

IN THE UNITED STATES DISTRICT COURT

2          FOR THE SOUTHERN DISTRICT OF OHIO

3

_____

4

IN RE DAVOL, INC./            )MDL Docket No.

5   C.R. BARD, INC.               )2846

POLYPROPYLENE HERNIA MESH     )

6   PRODUCT LIABILITY LITIGATION  )

LITIGATION, MDL 2817          )

7   _____)

8   THIS DOCUMENT RELATES TO:     )

JESUS CAMPOS                  )Case No. 2:18-cv-00915

9   STEVEN JOHNS                  )Case No. 2:18-cv-01509

THOMAS McCOURT                )Case No. 2:18-cv-01011

10  ANTONIO MILANESH              )Case No. 2:18-cv-01320

GREGORY MILLER                )Case No. 2:18-cv-01443

11  AARON STINSON                 )Case No. 2:18-cv-01022

_____)

12

13

14

15      Videotaped Deposition of David A. Kessler, M.D.

16               Washington, D.C.

17              January 31, 2020

18                 8:03 a.m.

19

20

21   Reported by:  Bonnie L. Russo

22

**Page 2**

1 Videotaped Deposition of David A. Kessler, M.D.

2 held at:

3

4

5      Cohen, Milstein, Sellers & Toll, PLLC

6      1100 New York Avenue, N.W.

7      Washington, D.C.

8

9

10

11 Pursuant to Notice, when were present on behalf

12 of the respective parties:

13

14

15

16

17

18

19

20

21

22

**Page 3**

1 APPEARANCES:
2 On behalf of Plaintiffs and PSC:
  KELSEY L. STOKES, ESQ.
3   FLEMING NOLEN JEZ LLP
  2800 Post Oak Boulevard
4   Suite 4000
  Houston, Texas 77056
5   713-621-7944
  kelsey_stokes@fleming-law.com
6    -and-
  PARVIN K. AMINOLROAYA, ESQ.
7   SEEGER WEISS, LLP
  55 Challenger Road
8   Ridgefield Park, New Jersey 07660
  212-584-0741
9   paminolroaya@seegerweiss.com
   -and-
10   NED McWILLIAMS, ESQ.
  LEVIN PAPANTONIO THOMAS MITCHELL
11   RAFFERTY & PROCTOR, P.A.
  316 S. Baylen Street
12   Suite 600
  Pensacola, Florida 32502
13   850-435-7074
  nmcwilliams@levinlaw.com
14
  On behalf of Defendants:
15   SEAN P. JESSEE, ESQ.
  JAMES FOSTER, ESQ.
16   GREENBERG TRAURIG, LLP
  Terminus 200
17   3333 Piedmont Road, NE
  Suite 2500
18   Atlanta, Georgia 30305
  678-553-7306
19   jessees@gtlaw.com
  fosterja@gtlaw.com
20
21 Also Present:
  Gerard Maglasang, Seeger Weiss, Paralegal
22   Daniel Russo, Videographer

**Page 4**

1     I N D E X

2 EXAMINATION OF DAVID A. KESSLER, M.D.   PAGE

3 BY MR. JESSEE       9

4 BY MS. STOKES      529

5

6     EXHIBITS

7

8 Exhibit 1  Notice of Videotaped    7
      Deposition of

9       David A. Kessler, M.D.

10 Exhibit 2  Expert Report of    7
      David Kessler, M.D.

11

   Exhibit 3  Dr. David Kessler Supplemental  7

12       Reliance List 1-30-20

13 Exhibit 4  Errata Sheet for the 12-4-18  7
      Expert Report of

14       David A. Kessler, M.D.

15 Exhibit 5  Invoice dated 12-10-19    7

16 Exhibit 6  General      14

17 Exhibit 7  510(k) Premarket Notification  72

18 Exhibit 8  3DMax      118

19 Exhibit 9  Quintiles     118

20 Exhibit 10  Large Ventralex Buckling   118

21 Exhibit 11  PerFix Plug     118

22 Exhibit 12  Ventralight ST    118

**Page 5**

1 EXHIBITS (CONTINUED):

2 Exhibit 13  MSDS      118

3 Exhibit 14  Ventralex Infection    118

4 Exhibit 15  Ventralight ST Large Printout  119

5 Exhibit 16  All Devices     119

6 Exhibit 17  9 Binders - Kessler    119
      Expert Report

7

   Exhibit 18  UCSF Department of Surgery   186

8       article entitled "Laparoscopic
      Ventral Hernia Repair"

9

   Exhibit 19  Article entitled "Complex   214

10       Ventral Hernia Repair Using
      Biologic or Synthetic Mesh"

11

   Exhibit 20  Defendants C.R. Bard, Inc.   279

12       and Davol, Inc.'s Responses
      to PSC's Second Set of

13       Interrogatories

14 Exhibit 21  MAUDE data     348

15 Exhibit 22  Guidance for Industry and   367
      Food and Drug Administration

16       Staff issued 7-28-14

17 Exhibit 23  Federal Register 1-19-82   375

18 Exhibit 24  Hernia Surgical Mesh Implants  375

19 Exhibit 25  FDA's Activities:    375
      Urogynecologic Surgical Mesh

20

   Exhibit 26  Guidance for the Preparation  375

21       of a Premarket Notification
      Application for a Surgical

22       Mesh issued 3-2-99

David Kessler , M.D.                                     January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

Page 6

1  EXHIBITS (CONTINUED):
2
   Exhibit 27  Labeling - Regulatory     417
3              Requirements for Medical Devices
4  Exhibit 28A Device Labeling Guidance   432
              #G91-1 (Blue Book Memo)
5
   Exhibit 28B Ventralight ST            432
6              Instructions for Use
7  Exhibit 29  510(k) Ventralight ST     432
              MPPE-05922391-5922488
8
   Exhibit 30  Attachment 6 - In-Vivo    469
9              Degradation Study in Rats
              MPPE-05921983-5922171
10
   Exhibit 31  Davol Hernia Device       490
11             History Review
              11-19-09
12
   Exhibit 32  Bard PerFix Plug          504
13             MPPE-05945763-5945806
14 Exhibit 33  Premarket Notification    507
              for the Marlex Mesh Dart
15
16
17
18
   (Exhibits 6, 8-16 retained by counsel.)
19
20
21
22

Page 7

1        P R O C E E D I N G S
2
3        (Deposition Exhibit 1 was marked for
4  identification.)
5        (Deposition Exhibit 2 was marked for
6  identification.)
7        (Deposition Exhibit 3 was marked for
8  identification.)
9        (Deposition Exhibit 4 was marked for
10 identification.)
11       (Deposition Exhibit 5 was marked for
12 identification.)
13
14
15       THE VIDEOGRAPHER:  Good morning.
16       We are going on the record at 8:03
17 a.m. on January 31st, 2020.
18       Please note that the microphones are
19 sensitive and may pick up whispering, private
20 conversations and cellular interference.
21 Please turn off all cell phones or place them
22 away from the microphones as they can interfere

Page 8

1  with the deposition audio.  Audio and video
2  recording will continue to take place unless
3  all parties agree to go off the record.
4        This is Media Unit 1 of the
5  video-recorded deposition of Dr. David A.
6  Kessler, taken by counsel for Defendant in the
7  matter of In Re Davol, Incorporated\C.R. Bard,
8  Incorporated, Polypropylene Hernia Mesh Product
9  Liability Litigation, filed in the United
10 States District Court for the Southern Division
11 of Ohio, Docket No. MDL 2846.
12       This deposition is being held at
13 Cohen Milstein Sellers & Toll, PLLC, located at
14 1100 New York Avenue, Northwest, Washington,
15 D.C.
16       My name is Daniel Russo from the
17 firm Veritext Legal Solutions.  The court
18 reporter is Bonnie Russo from the firm Veritext
19 Legal Solutions.
20       Counsel and all present in the room
21 will now state their appearances and
22 affiliations for the record, please.

Page 9

1        MS. STOKES:  Kelsey Stokes for the
2  plaintiffs and the PSC.
3        MS. AMINOLROAYA:  Parvin Aminolroaya
4  for the plaintiffs.
5        MR. McWILLIAMS:  Ned McWilliams,
6  Levin Papantonio, for the plaintiffs.
7        MR. JESSEE:  Sean Jessee for
8  defendants C.R. Bard and Davol.
9        MR. FOSTER:  James Foster for
10 defendants C.R. Bard and Davol.
11       THE VIDEOGRAPHER:  Will the court
12 reporter please swear in the witness.
13
14       DAVID A. KESSLER, M.D.,
15 was called for examination by counsel and,
16 after having been duly sworn by the Notary, was
17 examined and testified as follows:
18       EXAMINATION BY COUNSEL FOR DEFENDANT
19
20       BY MR. JESSEE:
21    Q.  Good morning, Doctor.
22    A.  Good morning, sir.

3 (Pages 6 - 9)

David Kessler , M.D.                          January 31, 2020
Davol, Inc./C. R. Bard, Inc. - MDL 2846

Page 10

1    Q.   We just met a few minutes ago.  But
2  just to reintroduce myself, my name's Sean
3  Jessee.  And I represent the defendants Bard
4  and Davol in this case.
5         And I might say "Bard," and you know
6  I'm referring to both Bard and Davol, correct?
7    A.   Of course.
8    Q.   And I know you've been deposed a
9  number of times before so I won't go over the
10  rules.  Just two things I wanted to point out.
11        If you need a break at any time,
12  just let me know.  I'm happy to accommodate.
13    A.   You're very kind.
14    Q.   And if at any point when -- and I'm
15  sure it'll happen -- if I ask a question that
16  you don't understand, if you could please just
17  let me know.  I'll try to ask a better
18  question.  If you don't say anything, I'll
19  assume that you understood the question I'm
20  asking.
21        Does that sound fair enough?
22    A.   Fine.  Perfect.

Page 11

1    Q.   To try to move things along here
2  today, I went ahead and marked several
3  documents that I had previously been provided
4  as exhibits just so we can get this out of the
5  way for the record.
6         The Exhibit 1 is the deposition
7  notice that was served in connection with your
8  deposition.  And that's something it looks like
9  you brought with you as well.
10    A.   I brought a copy, sir.
11    Q.   Okay.  So I take it that is
12  something you received?
13    A.   Yes, sir.
14    Q.   Exhibit No. 2 is the expert report
15  that you served -- or that was served on us in
16  this litigation.  It's dated December 4th,
17  2019.  And we'll just put this over here.
18        I understand that you've also
19  brought your own version of the report?
20    A.   I did.
21    Q.   And it's nicely bound there, it
22  looks like, and probably a lot easier to find

Page 12

1  what you need to.
2         Is this the same version that's
3  before -- that you have before you that was
4  served on December 4th, 2019?
5    A.   Correct.
6    Q.   And I see there's -- do you have the
7  different -- the way it's organized, it look
8  like, do you have it by the schedules and the
9  appendixes --
10    A.   Correct.
11    Q.    -- bound in there?
12        Very good.
13        Exhibit No. 3 was a document that
14  was provided to us yesterday by your counsel.
15  And this is a supplemental reliance list dated
16  January 30, 2020.
17        So I'm going to put this over here
18  for you.  And we'll talk about that here a
19  little later.
20        Exhibit No. 4 was another document
21  that was provided to us by your counsel
22  yesterday.  This is titled "Errata Sheet for

Page 13

1  the 12-4-2019 Expert Report of David A.
2  Kessler, MD."
3         And then Exhibit No. 5 is an invoice
4  that was provided to us today dated December
5  10th, 2019, in the amount of $237,264.93.
6         So I'll just put these all over
7  here.
8         And, Doctor, I can see that you
9  brought a number of documents with you today.
10  And so I just want to briefly walk through
11  those, what you brought with you.
12        So if you could, please, sir, just
13  starting with what's right in front of you.
14    A.   So I have a number of sheets in
15  front of me, number of sheets behind me.  These
16  are just cut and paste.  These are notes over
17  time.  Happy to have you look at them.
18        So there are sheets.  There are
19  different size sheets.  There's small sheets;
20  there's larger sheets; and there's even larger
21  sheets.  And they're all behind me.
22    Q.   Okay.  Well, what I'm going to do is

4 (Pages 10 - 13)

David Kessler , M.D.                                    January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

Page 14

1  mark these as an exhibit.
2         And we can see if these are-- are
3  these your working copy?
4     A.   Yes.
5     Q.   Okay.  Then we can see about maybe
6  making a copy of them.  I'm fine if we make --
7  if we can make a copy at the break, using those
8  as -- as an exhibit, and letting you keep your
9  original copies.
10        But I'm going to go ahead and mark
11  these as Exhibit No. 6, the documents you
12  brought here.
13        And so we will put it on this -- I
14  see you have a -- is that an index there that
15  says "General" on the top of it?
16    A.   There's an index to the sheets.
17        MR. JESSEE:  Okay.  So I'm going to
18  go ahead and mark that -- that index as Exhibit
19  No. 6.
20        (Deposition Exhibit 6 was marked for
21  identification.)
22        THE WITNESS:  Sure.  My only request

Page 15

1  is to -- so that I have these available.  You
2  may have to make special arrangement.  They're
3  sort of large.  The -- somehow you'll -- maybe
4  after you'll arrange with counsel to have them
5  copied.
6         MR. JESSEE:  Absolutely.
7         THE WITNESS:  Just -- they're not --
8  they're -- they're just not going to fit into a
9  normal copy machine.
10        MR. JESSEE:  Sure.  I'll tell you
11  what.  We'll work it out.  I'll work it out
12  with your counsel after -- or during a break.
13  But just want to make sure it's clear for the
14  record.
15        BY MR. JESSEE:
16    Q.   And so these documents, these large
17  sheets that you have with you, you -- you said
18  "cut and paste."
19        And are these cut and paste from
20  your report?
21    A.   They may be cut and paste from my
22  report.  You know, these are schedules.  For

Page 16

1  example, in front of me, the cut and paste,
2  they may be cut and paste from just documents
3  that are cited in my report.  They may be my
4  report.  They -- they may be documents that are
5  cited in my report, for example.
6         So they're -- but they're almost
7  everything -- I don't want to say "everything,"
8  but I -- they should be things that you
9  produced or in my report.
10        So -- and there may be notes on some
11  of these stuff, obviously.
12    Q.   How did you decide which parts to --
13  either parts of your report or documents to cut
14  out and put in -- paste in these documents you
15  brought with you today?
16    A.   There -- it's a period -- it's over
17  time.  It's what's salient in some ways at that
18  moment in time.  And there is no -- just -- you
19  would have to track the neural synapsis in my
20  brain firing at any given moment why certain
21  things were salient and why I said, "I'm going
22  to cut this out and put this down."

Page 17

1         But it's -- you know, it's what --
2  there are a lot of documents in this case.
3  I've had access to the entire database.  I've
4  searched the entire database.  But you know
5  there's a lot of documents in there.
6         And so this -- there's just a lot of
7  paper.  And some of this may be more salient
8  than other things.
9     Q.   Okay.  It's things thought at some
10  point in time at least you thought were
11  salient?
12    A.   Oh, it could have been, yeah, for
13  some reason, or things I just -- it's -- it's
14  hard to keep every fact in your head, every
15  number in your head.  That's impossible.  There
16  are a lot of devices in this case.  So there --
17  I think you -- you -- you articulated well.
18    Q.   And can you just walk me through --
19  I see you have a number of different of these
20  large sheets put together.  This one in front
21  of you right now, it says "General."
22        And what -- what does that indicate

5 (Pages 14 - 17)

David Kessler , M.D.
January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

**Page 18**

1 when it says "General"?

2    A.    So general, for example, this has

3 all -- this has, for example, five devices.  I

4 may have sets of sheets that are specific to

5 one device, right?  So this is general across

6 the devices, right?

7        Others may be labeled a collection

8 or Ventralight ST or Ventralex or PerFix Plug

9 that I may pull in front of me, you know, on a

10 specific device.

11        I don't want to -- these are all cut

12 and paste.  These are all sloppy.  This is not

13 meant for, you know, prime time but just --

14 these are just, again, different things that it

15 cited or saw, I mean, at different points in

16 time in working on this case.

17    Q.    And just -- so these other large

18 documents -- and I haven't had a chance to look

19 at these yet though.

20        But are these the ones that are

21 right behind you on the table?

22    A.    Yes, sir.

**Page 19**

1    Q.    And then there's a number -- I see

2 binders too.

3        Are those your counsel's, or are

4 those things that you brought?

5    A.    No.  Those are mine.

6    Q.    Those are things you brought too.

7        If you wouldn't mind, could you just

8 walk me through each of these sets of documents

9 and binders, and just tell me what they are?

10    A.    You -- how specific do you want me

11 to get?  Do you want --

12    Q.    Just, I think, a general overview.

13 And I'll let you know if I need any more

14 specificity.

15    A.    Great.

16        May I turn around?

17    Q.    Please.

18    A.    So as I said, you'll see that there

19 are sets of sheets on different topics, right?

20    Q.    Okay.

21    A.    So there's a set of sheets -- may I

22 stand?

**Page 20**

1    Q.    Yeah.  You don't need to ask

2 permission from me at all, Doctor.

3    A.    That's fine.

4        So, for example, you'll see there

5 are sets of sheets.  This is general because

6 it's multiple devices.  You see a set of sheets

7 on 3DMax, on Quintiles, on large Ventralex, on

8 material safety data sheet, on PerFix Plugs.

9        So you have a number of sheets on

10 different subjects.

11    Q.    Okay.

12    A.    Okay?

13    Q.    All right.  Thank you, Doctor.

14        And then -- so I see then there are

15 -- it looks like there's some --

16    A.    Larger sheets.

17    Q.    Larger sheets.  Okay.

18        And what -- why -- what are on

19 those?

20    A.    Those are just -- those are -- those

21 larger sheets couldn't be printed out.  I think

22 they're -- they're Excel spreadsheets.  They

**Page 21**

1 just need -- in order to be readable, they had

2 to be larger.

3    Q.    Oh.

4    A.    And so they are primarily a listing

5 of studies or animal studies or preclinical

6 studies on different devices.  So that's what

7 those are.  And those are spreadsheets of those

8 things.

9    Q.    Okay.  Is there anything in these

10 sheets that you've brought with you that is not

11 in your report?

12    A.    Perhaps.

13    Q.    Okay.  And would -- would it be fine

14 be with you at the next break if we just take a

15 look at those so I can determine if there are

16 any questions --

17    A.    Sure --

18    Q.    -- to ask about it?

19    A.    If you could just leave them intact

20 so I can use them and refer to them, I'm happy

21 to have you look and make copies of them.

22 They're certainly all available for you to

6 (Pages 18 - 21)

David Kessler , M.D.                                    January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

Page 22

1 review.
2    Q.   Okay.  Thank you very much.
3        Doctor, I want to talk a little bit
4 about your background and qualifications.
5        And you actually have a section in
6 your report titled "Qualifications," correct?
7    A.   Correct.
8    Q.   And that's in your report on Page
9 No. 1.  And --
10        MS. STOKES:  Can you give me a copy
11 of this, all the exhibits.
12        THE WITNESS:  Here.  I can give
13 you -- if you -- oh.
14        MS. STOKES:  I think he owes me
15 some.
16        Thank you.
17        MR. JESSEE:  Uh-huh.
18        Then the invoice he has just
19 provided, I don't -- I just have two --
20        MS. STOKES:  That's fine.
21        MR. JESSEE:  I just received two
22 copies.

Page 23

1        BY MR. JESSEE:
2    Q.   So, Dr. Kessler, obviously you're a
3 medical doctor, correct?
4    A.   Correct.
5    Q.   And your background is in
6 pediatrics?
7    A.   Correct.
8    Q.   And you did your internship and
9 residency both in pediatrics?
10    A.   Correct.
11    Q.   And I understand that at one time
12 you were board certified in pediatrics, but you
13 no longer are?
14    A.   Correct.
15    Q.   And --
16    A.   I'm board -- I mean I'm -- I am
17 still board eligible.  I just -- I mean I -- I
18 let it go.  I mean I -- I just didn't do my
19 recertification.  I can -- I'm eligible to do
20 that as soon as I can get time.  If you let me
21 out from here.
22    Q.   Sure.  And I understand --

Page 24

1    A.   I'm -- I'm happy to do that.
2    Q.   It's a voluntary decision.
3    A.   That's correct.
4    Q.   The -- when was the last time you
5 treated patients in a hospital setting?
6    A.   In a hospital setting?  Actually in
7 the hospital is the question.
8    Q.   In the hospital.  Yes, sir.
9    A.   Oh, probably -- I don't know --
10 early 2010.  Don't hold me to exactly.  20
11 teens is my guess.
12    Q.   Okay.  And do you regularly see
13 patients either in a hospital or office setting
14 at --
15    A.   I see --
16    Q.   -- currently?
17    A.   I -- I see patients but not in their
18 hospital setting.  And I don't have a
19 traditional office.  But I take care of
20 patients all of the time.
21    Q.   Okay.  And when you say you don't
22 have a traditional office, then where would you

Page 25

1 typically see a patient?
2    A.   I will see a patient where I could
3 see a patient.  Some of this is on the phone.
4 Mostly I -- you know, I mean I probably spent
5 two, three hours a day on -- don't want to
6 overstate it every day -- but taking care of
7 patients at one sort or another.
8    Q.   And I understand, as part of your
9 medical training, you have -- be involved with
10 and learn about surgery when you're back in --
11 doing your residency during your internship,
12 correct?
13    A.   So I certainly did a lot of
14 pediatric surge -- I was the one pediatrician
15 who was assigned -- I was the only one who
16 could deal with the surgeons.  So I was sort of
17 assigned to pediatric surgery division.  So I
18 did a good deal of surgery.
19    Q.   Okay.  Today though you don't
20 represent yourself as a surgeon.
21    A.   So --
22    Q.   Is that fair?

7 (Pages 22 - 25)

David Kessler, M.D.
Davol, Inc./C. R. Bard, Inc. - MDL 2846

January 31, 2020

Page 26

1    A.   So as my California license -- I
2 mean I think -- says -- it says "a licensed
3 physician" -- "physician and surgeon." But I
4 think that's somewhat anachronistic.
5        So in the State of California,
6 you're licensed as a physician and surgeon.
7 But you wouldn't want me taking care of you in
8 the operating room, I think would be fair.
9    Q.   Okay. And for purposes of this
10 litigation, your role in this litigation's not
11 as a surgeon; is that -- is that fair?
12    A.   So I think where my role in this
13 litigation, I probably have great expertise
14 certainly on the regulation of surgical
15 products. That I have great expertise.
16        So any medical device that would
17 involve surgeons or as it -- so it's that
18 interface between surgery and that product and
19 that regulation and that framework for
20 regulation that I probably have the -- the most
21 expertise on.
22    Q.   Okay. But not as far as actually

Page 27

1 implanting the device; you're not the person
2 who's going to actually go and implant a hernia
3 mesh device, correct?
4    A.   You do not want me to do that.
5    Q.   When was the last time that you
6 performed a surgery?
7    A.   You have to -- not to be -- quibble
8 with you, sir. You have to define "surgery."
9 The last time took out a splinter. So there's
10 a -- there's a range of -- of surgical
11 procedures.
12        Is a bone marrow a surgical
13 procedure? It -- it depends what you mean by
14 "surgical procedure."
15    Q.   Okay. When was the last time that
16 you implanted a medical device into a patient?
17    A.   I don't think -- I mean I worked in
18 a division of surgical research, but it was --
19 it would be decades ago where I was in the
20 operating room.
21        So you would, again -- that --
22 again, my expertise is on the regulation of

Page 28

1 implantable devices. I certainly can watch
2 tapes and understand that -- those aspects as
3 it relates to the regulation.
4        But I don't go -- you let the
5 surgeons talk about the practicalities of what
6 happens in the OR. But on the regulation and
7 the use, I would have expertise.
8    Q.   And do you know if you've ever
9 implanted a permanent medical device in a
10 patient?
11        MS. STOKES: Object to form.
12        Go ahead.
13        THE WITNESS: I'd have to go -- we'd
14 have to go back and look at -- I mean I would
15 not have done that alone. I think it would be
16 fair. I think that would be improper.
17        I may have been in the OR with a
18 implantable device. I may have done that in --
19 in animal models when I was in surgical
20 research. But I have no recollection, sitting
21 here, of doing that in recent years.
22    Q.   Okay. Would it be fair to say, if

Page 29

1 it did happen, it was back during your
2 residency or internship?
3    A.   I mean I was also medical director
4 of a -- may have been -- a medical director of
5 a hospital for a decade. So I may have been in
6 the OR.
7        But again, I -- that's not -- I -- I
8 don't actually do the implantation.
9    Q.   And so I take it that you've --
10 you've never yourself implanted a hernia mesh
11 in a patient?
12    A.   I think that would be a correct
13 statement.
14    Q.   Have you been in the OR when a
15 hernia mesh was implanted in a patient?
16    A.   I have no recollection, sir, of
17 that.
18    Q.   Okay. Is it -- it's possible,
19 though, that you have been; is that fair?
20    A.   It certainly is possible. I just
21 don't have a recollection, sir. It would be
22 decades ago.

8 (Pages 26 - 29)

David Kessler , M.D.                                    January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

Page 30

1   Q.   In addition to doing your medical
2   training, you also went to law school, correct?
3   A.   Correct.
4   Q.   And as I understand it, you -- while
5   you graduated from law school, obtained your
6   JD, you didn't actually take -- ever take the
7   bar to become a lawyer, right?
8   A.   I -- I did that deliberately.  I
9   resisted.
10   Q.   Smart move, I'd say.
11        But you -- you don't hold yourself
12   out to be a lawyer, right?
13   A.   I don't hold myself -- I've been a
14   -- I've taught at Columbia Law School.  I've
15   published law review articles.  I certainly
16   have engaged in that kind of scholarship.  You
17   know, I've had articles -- articles that I've
18   written in law review journals have been cited
19   before the court.
20        But I don't hold myself out as a
21   lawyer.  I'm not licensed deliberately.
22   Q.   What is your current occupation?

Page 31

1   A.   So I'm a physician.
2   Q.   Okay.  In your position, I also
3   understand that you're a professor of
4   pediatrics and epidemiology and biostatistics
5   at the University of California at
6   San Francisco?
7   A.   Correct.
8   Q.   And that's a institution that you've
9   been at for quite a while now?
10   A.   2003.
11   Q.   Okay.  And you serve -- you were the
12   dean there --
13   A.   Correct.
14   Q.   -- for a time period.  And then
15   you've served as -- you've had this --
16   positions as professors.
17        And when I say the professor of
18   pediatrics, is that separate then from
19   professor of epidemiology and biostatistics?
20   A.   They're -- they're different
21   departments and divisions.
22   Q.   Do you have an office at UCSF?

Page 32

1   A.   I had.  But there's some seismic
2   issue with the office.  So I had to give it up
3   for seis -- for earthquake reasons.  But happy
4   to go into those.
5   Q.   No.  We can probably, I think, skip
6   that -- that -- that part of it.
7   A.   Right.
8   Q.   I want to talk a little bit about
9   your time as commissioner of the FDA.  And I
10   understand that the -- that was from 1990 to
11   1997.
12        Can you give me a little more within
13   that -- exactly -- do you know the start and
14   end dates during that time period?
15   A.   Start is a little complicated.
16   Depends on your view of constitutional law, on
17   date of confirm, on date of oath, I mean.
18        But generally view December 1990 to,
19   I believe, the end of February '97.
20   Q.   And that was the -- that time when
21   you served as commissioner, that was the only
22   time during your career that you were an

Page 33

1   employee at the FDA, correct?
2   A.   Correct.
3   Q.   And you're not here speaking on
4   behalf of the FDA, obviously, right?
5   A.   Absolutely.  You could underline
6   that, put an asterisk.  I'm speaking here, you
7   know, just my own -- on my own.  I don't
8   represent the FDA.
9        I certainly have the experience of a
10   former FDA commissioner.  I could tell you what
11   I would do -- how things would be pertinent for
12   me if I were FDA commissioner.  You know, have
13   40 years of experience, probably more, in FDA
14   regulation.  But I do not speak for FDA.
15   Q.   Okay.  Right.
16        And you -- and you said you can say
17   what you would have done if you were
18   commissioner, but that's going to be your
19   opinion, not the FDA's official opinion, right?
20   A.   That's correct.  I mean the F -- the
21   FDA -- there may be documents that we can look
22   at where we can objectively determine what

9 (Pages 30 - 33)

David Kessler, M.D.                                January 31, 2020
Davol, Inc./C. R. Bard, Inc. - MDL 2846

<table>
<tr><td>

**Page 34**

1 FDA's opinion would have been. And I certainly
2 could tell you what FDA's opinion was when I
3 was there.
4    Q. Right.
5    And you're not though going to be
6 testifying about the FDA or an individual FDA
7 employee's state of mind, correct?
8    A. I wouldn't rep -- want to talk about
9 anyone's state of mind, the FDA's employees' or
10 anyone else's. I think that would be improper.
11    Q. Okay. That would be -- and that
12 would include Bard or Bard employees?
13    A. I -- I -- nothing on subjective
14 intent.
15    Q. Now, as commissioner, you --
16 obviously you oversaw the entire FDA operation,
17 right?
18    A. I was commissioner of the FDA.
19    Q. Yeah.
20    And that involved -- and I think you
21 have it here in your report -- that there were
22 five different divisions at that time when you

**Page 35**

1 were commissioner?
2    A. We can count them. I know foods,
3 drugs, medical devices, animal drugs, center
4 for veterinary -- I'm sorry -- National Center
5 For Toxicological Research and Center For
6 Biologics.
7    So depending on how you count, it's
8 five or six, whether you include NCTR or not.
9    Q. Okay. And it -- actually there's
10 another issue sort of outside of those five or
11 six areas that took up a large amount of your
12 time when you were commissioner, right?
13    MS. STOKES: Objection. Form.
14    THE WITNESS: Be -- be a little more
15 specific.
16    BY MR. JESSEE:
17    Q. Okay. What -- what would you say
18 was the biggest controversy when you were --
19 during your time as commissioner --
20    MS. STOKES: Objection. Form.
21    BY MR. JESSEE:
22    Q. -- of the FDA?

</td><td>

**Page 36**

1    MS. STOKES: Form.
2    THE WITNESS: I -- I -- it depends
3 on who you ask, I think.
4    BY MR. JESSEE:
5    Q. Okay. And I'm just going from some
6 of your prior testimony.
7    But do you have -- in your personal
8 opinion, what was the -- one of the biggest
9 controversies you had when you were --
10    A. Well, I mean, again, let --
11    MS. STOKES: Objection. Form.
12 Vague.
13    THE WITNESS: But -- but let me see
14 if I can help you --
15    MR. JESSEE: Sure.
16    THE WITNESS: -- I mean, and go
17 through it.
18    I mean if you were with HI -- if you
19 had HI -- if you were a patient with HIV, you
20 would say, during that period of time, HIV was
21 the most important, the most controversial
22 issue.

**Page 37**

1    If you're a person of the -- from
2 the food industry, you may say the food label
3 was the most important thing that we did, the
4 nutrition facts.
5    If you're a person from medical
6 devices, you may say it was breast implants or
7 our push to increase the scientific
8 underpinnings of devices and move toward
9 improved clinical trials.
10    I think what you're probably getting
11 at is the -- the regulation of cigarette --
12 nicotine as a drug, right, which would have
13 been done under the drug authority. So it --
14 it does have a place in FDA.
15    And that probably is probably the
16 most well known and may have, depending on
17 where you sit, I mean, as great an impact as
18 anything else.
19    BY MR. JESSEE:
20    Q. And I think you -- you made a good
21 point in -- in clarifying my question.
22    There was actually -- there was a

</td></tr>
</table>

10 (Pages 34 - 37)

David Kessler , M.D.                                January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

Page 38

1  lot of very important things that happened at
2  the FDA in a number of different areas when you
3  were commissioner there, correct?
4      A.   Correct.
5          MS. STOKES: Objection. Form.
6          THE WITNESS: Correct. I mean --
7  but -- as there always is.
8          BY MR. JESSEE:
9      Q.   Oh, sure. And I'm not -- yeah. I'm
10  not trying to suggests -- I mean -- and when
11  you say it always is, it's not just when you
12  were commissioner there.
13         There's been a lot of important
14  things that the FDA has done in these different
15  areas throughout the last 25 years and plus,
16  right?
17     A.   Correct.
18         MS. STOKES: Objection. Form.
19         THE WITNESS: I'm sure you'll -- at
20  one point you'll -- you'll have a question and
21  ask me whether it's the most important consumer
22  protection agency in the world, and I will say

Page 39

1  yes.
2          BY MR. JESSEE:
3      Q.   Okay. Well, maybe we can just skip
4  that question now.
5          The -- I was looking online at
6  the FDA web site. And they're -- they have
7  numbers for the total number of full-time
8  employees there for the last few years.
9          And the numbers that I saw from 2016
10  to 2018 were between -- each year was between
11  15,000 and 17,000 full-time employees.
12         Does that sound about right to you?
13     A.   Correct.
14     Q.   How many full-time FDA employees
15  were there when you were commissioner?
16         And I know it's been a while. But
17  if you could just give me best estimate.
18     A.   10,000.
19     Q.   You mentioned in some of the -- in
20  your listing just some of the important
21  accomplishments.
22         And I -- I would take it those

Page 40

1  were -- certainly weren't all the important
2  accomplishments that occurred while you were at
3  FDA, right?
4          MS. STOKES: Objection. Form.
5          THE WITNESS: There were a lot of
6  things that -- that went on. I mean there
7  were -- I mean we did -- for example, I cite
8  here, you know, the quality system, regulations
9  and devices.
10         MR. JESSEE: Right.
11         THE WITNESS: And there are -- there
12  are many things that we can talk about.
13         BY MR. JESSEE:
14     Q.   Sure. And that -- my only point --
15  I mean I didn't want to shortchange you. And I
16  am not trying to make it sound like that was
17  all you did, but --
18     A.   You're -- you're kind. I mean it --
19  I think you can -- it was an active period. I
20  was a pretty hands-on commissioner.
21     Q.   One of the -- when you were talking
22  about some of those important actions that

Page 41

1  occurred while you were commissioner, you
2  mentioned a push to increase scientific
3  underpinnings of medical devices.
4          Can you tell me a little more what
5  you mean by that?
6      A.   You could go -- I mean go read, for
7  example, the -- what's basically known as The
8  Temple Report. So we -- I think -- the
9  device -- the device center, device -- what was
10  passed in '76 and then reenacted in 1990 -- not
11  reenacted, sorry, but amended -- it was
12  primarily a grata to Bureau of Radiological
13  Health.
14         And it was primarily viewed and
15  staffed by engineers. Nothing wrong with
16  engineers. I mean we need engineers. And
17  they'd looked at the mechanical properties of
18  devices. And they were not as focused on the
19  clinical consequences of devices.
20         So we -- but there was a great deal
21  of push to improve the clinical evaluation of
22  medical devices. The -- the industry pushed

11 (Pages 38 - 41)

David Kessler , M.D.                                    January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

Page 42

1 back.  I think -- I mean Alan Magazine, who --
2 I mean when I -- the day I left, he handed me a
3 coffee cup that had my picture on it with a
4 circle and a line through that he had on his
5 desk.
6        Because, you know, we tried to
7 increase the -- the -- the scientific
8 underpinnings of how devices should be tested
9 in people.  The industry should have -- the --
10 the clinical -- the -- the -- the clinical
11 data, especially when you're dealing with
12 devices that impact cert -- health and that are
13 implantable.
14    Q.    And, in fact, one of the
15 accomplishments I think you list in your report
16 is you created the committee for clinical
17 review?
18    A.    That would be the Temple Committee.
19    Q.    Okay.  And this Temple Report that
20 you're referring to, that's something I'm not
21 familiar with.
22        What is that exactly?

Page 43

1    A.    So The Temple -- The Temple Report
2 basically looked at studies that the CDRH
3 device center had been doing and said the
4 quality of those devices were relatively poor;
5 they were not adequate and well controlled;
6 didn't have defined end points.
7        They -- they -- there -- there was
8 not the kind of testing that the agency had
9 grown up and had pioneered for drugs to assure
10 the safety on drugs.  And it was basically to
11 improve the scientific quality of device
12 studies.
13    Q.    Okay.  Then that would, in -- in
14 turn, have a positive impact on patient safety
15 and health, correct?
16    MS. STOKES:  Objection.  Form.
17    THE WITNESS:  Yes.  That was the
18 goal.
19    BY MR. JESSEE:
20    Q.    Another -- trying to think of the
21 best term to use here -- I guess accomplishment
22 or another thing that happened with regard to

Page 44

1 medical devices during your time as
2 commissioner was the MedWatch program was
3 established?
4    MS. STOKES:  Objection.  Form.
5    BY MR. JESSEE:
6    Q.    Is that correct?
7    A.    Correct.
8    Q.    And could you -- that was a -- a
9 program that involved the tracking of adverse
10 events that are happening in medical devices?
11    A.    So -- fair.
12    Q.    And maybe man -- maybe I should
13 expand that, say also the mandatory reporting?
14    MS. STOKES:  Objection.  Form.
15    THE WITNESS:  Yes and no.  So the
16 MedWatch really was to encourage voluntary
17 reporting.  It -- it -- it grew up certainly
18 with -- you know, the -- the largest tradition
19 was in drugs but did include all device -- all
20 products:  foods, biologics, devices.
21        It was try -- it was a recognition
22 that voluntary reporting is notoriously

Page 45

1 underreported.  And manufacturers have to
2 report -- there are -- I mean, in certain
3 instances, there are defined requirements.  And
4 then there were -- users had a -- user
5 facilities had a report.  There were certain
6 defined requirements.
7        But for the vast majority of
8 individuals, reporting was voluntary.  They
9 didn't know.  And if you said, you know,
10 there's -- the device complication rate is .04
11 percent, and that's what we get, and that's
12 notoriously underreported.
13        We don't know the exact something --
14 I mean somebody once said there was the Kessler
15 rule.  It's really not -- it wasn't me.  But
16 there's -- it was an effort to increase
17 reporting, I think was the --
18    BY MR. JESSEE:
19    Q.    Okay.  And again, in -- we'll --
20 we'll talk a little bit more about medical
21 device reports later.
22        But again, the real goal of the

12 (Pages 42 - 45)

David Kessler , M.D.  January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

Page 46

1 MedWatch program though is to help improve the
2 safety of these different product -- products
3 that you're regulating, right?
4     MS. STOKES: Objection. Form.
5     THE WITNESS: So it was to gather
6 information in a post-marketing environment.
7     BY MR. JESSEE:
8   Q.   And the goal of that gathering of
9 that information was to improve the consumer
10 and patient safety, correct?
11     MS. STOKES: Objection. Form.
12     THE WITNESS: As all FDA action
13 does. It was another -- it was another set of
14 data.
15     BY MR. JESSEE:
16   Q.   You mention in your report in
17 Paragraph 5 that you placed a high priority on
18 getting promising therapies for serious and
19 life threatening diseases to patients as
20 quickly as possible.
21     And can you tell me what you mean by
22 that sentence?

Page 47

1   A.   Sure. When I became FDA
2 commissioner in 1990, there was one drug for
3 HIV on the market. People were dying. It
4 didn't work very well.
5     By the time left in 1997, we had
6 enacted the accelerated approval regulations.
7 And there were -- I don't know the exact
8 number. There were some 17 drugs -- so the
9 effort of a lot of people. I don't want to
10 take credit there -- but some 17 drugs for HIV.
11     And that changed the course. It
12 wasn't a -- was not a cure but went from a --
13 pretty much a death sentence to something that
14 at least there was a -- a good chance of
15 meaningful life --
16   Q.   Okay. So --
17   A.   -- with those drugs.
18   Q.   And I apologize. I didn't mean to
19 interrupt you there, Doctor.
20     But the -- so, in general, the --
21 the purpose of the -- of that was to -- in
22 layperson's terms, I guess, you want to --

Page 48

1 there are certain drugs that you need a faster
2 approval process than others, that these are
3 drugs that patients need to be able the get --
4     MS. STOKES: Objection.
5     BY MR. JESSEE:
6   Q.   -- faster.
7     MS. STOKES: Objection. Form.
8     THE WITNESS: I think way to say --
9 there are certain conditions for serious and
10 life threatening conditions where there are not
11 alternative therapies, right? You -- there's
12 no other -- you're dying, and there's not an
13 alternative therapy.
14     So you can put certain forms of
15 cancer in there. And you can put some
16 neurodegenerative diseases in there, diseases
17 where there's a real dire need for new
18 therapies.
19     BY MR. JESSEE:
20   Q.   Well, and you also implemented
21 measures that offer all drugs to be reviewed
22 faster for -- procedures for that to take place

Page 49

1 as well, correct?
2     MS. STOKES: Objection. Form.
3     THE WITNESS: Little -- there's some
4 nuances in the way you phrased the questions.
5 I don't mean to be -- I think you're probably
6 get to the Prescription Drug User Fee Act.
7     Reviewed faster but hopefully as
8 thoroughly, right? I just -- I just want to do
9 that. But we did the prescription drug user
10 fee that had defined performance goals for the
11 agencies.
12     But in return the agency got more
13 resources in order to hire more people. So you
14 can get more done in shorter periods of time.
15     BY MR. JESSEE:
16   Q.   Right.
17     And I -- and so it's just as
18 thorough of a -- of a review. But with the fee
19 the manufacturer or whoever is submitting
20 it pays, then you're able to have more resource
21 -- resources review it quicker; is that --
22     MS. STOKES: Objection. Objection.

13 (Pages 46 - 49)

David Kessler , M.D.                    January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

---

Page 50

1  Form.
2       THE WITNESS:  The -- the -- we would
3  hope that what you just said happens in all
4  instances.  But it's complicated all the time.
5       BY MR. JESSEE:
6    Q.   Okay.  And actually, after the time
7  you were commissioner, there was a medical
8  device user fee system similar to what you had
9  implemented for the drugs that was put in
10  place, correct?
11      MS. STOKES: Objection.  Form.
12      THE WITNESS:  As there was a generic
13  drug user fee.  There were a number of users
14  fees that followed in those -- that kind of
15  model.
16      BY MR. JESSEE:
17    Q.   Okay.  And those, again, allow for
18  more resources for -- the review time may be
19  shorter, but it doesn't necessarily mean that
20  the -- it's not as thorough, the review that's
21  under -- being undertaken, right?
22      MS. STOKES: Objection.  Form.

Page 51

1       THE WITNESS:  Depends on the --
2  depends on the review.  And again, there's
3  complexities to that statement.
4       BY MR. JESSEE:
5    Q.   Okay.  And the -- you would agree
6  that, as a general proposition, that just --
7  that the review time isn't necessarily
8  indicative of how thoroughly a product is being
9  reviewed?
10      MS. STOKES: Objection.  Form.
11  Assume facts.
12      THE WITNESS:  I wouldn't agree with
13  that.
14      BY MR. JESSEE:
15    Q.   Okay.  So --
16    A.   I mean I'm happy -- happy to explain
17  why.  I don't mean to be --
18    Q.   No.  That's fine.  We'll -- I'll
19  tell you that.  We'll come back to that.
20      Let's talk a little bit about --
21  well, let me withdraw that and try it again.
22      Do you agree that, during your time

Page 52

1  as commissioner, the FDA played a crucial role
2  in ensuring the safety and well-being of people
3  all over the country?
4       MS. STOKES: Objection.  Form.
5       THE WITNESS:  You mean -- are you
6  quoting me?
7       BY MR. JESSEE:
8    Q.   I just want to know if you agree
9  with it, Doctor.  I'm not --
10    A.   I mean if you have a --
11    Q.   I'm not trying to trick you or
12  anything like that.
13    A.   If you -- if --
14      MS. STOKES: Same objection.
15      THE WITNESS:  If you have a
16  foundation for the statement.
17      BY MR. JESSEE:
18    Q.   No.  I -- No.  I just want to know
19  if you agree with it.  I'm...
20    A.   It's one of those general statements
21  that are -- that's made.  Again, there's
22  multiple aspects to that.

Page 53

1    Q.   Okay.  I mean and I understand, it's
2  a general statement that's made, like you said.
3       Is that though something that you
4  agree with?
5       MS. STOKES: Objection.  Form.
6       THE WITNESS:  Well, let's get the
7  exact -- just give me the exact quote again.
8    Q.   Sure.
9       Would you agree that the FDA plays a
10  crucial role in ensuring the safety and
11  well-being of people all over the country?
12      MS. STOKES: Objection.  Form.
13      THE WITNESS:  As -- sure, in
14  general, right?  But not in every single
15  product class.
16      So if you're talking about a NDA --
17  I'm sorry.  If you're talking new drug
18  application, I mean the FDA has thoroughly
19  reviewed.  If you're talking about a dietary
20  supplement where you don't have FDA review, in
21  essence, you -- that statement would not apply.
22      If you're talking about a PMA, that

14 (Pages 50 - 53)

David Kessler , M.D.                                    January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

Page 54

1 would apply, you know, to some extent depending
2 on what manufacturer -- so if you have a
3 510(k), you have less so.
4        So -- so you just have to be careful
5 about generalities as what it applies to. I
6 mean where -- I mean FDA's only as good as the
7 authority gets -- has under the statute and is
8 only as good as the information the
9 manufacturer has.
10       But there should be no doubt that
11 it's the manufacturer that has primary
12 responsibility to assure the safety of its
13 products.
14       BY MR. JESSEE:
15   Q.   Would you agree that your -- it was
16 your experience, when you were at the FDA, that
17 the FDA employees are full of dedicated
18 professionals who share a commitment to protect
19 and enhance the public health?
20   A.   Yeah.
21       MS. STOKES: Objection. Form.
22       THE WITNESS: I would ask, if you're

Page 55

1 quoting me, just to let me know.
2       BY MR. JESSEE:
3   Q.   And as far as I -- you know, I -- I
4 can't tell you if I'm quoting you or not.
5   A.   Well, it sounds like you're quoting
6 me.
7   Q.   Well, and so that sounds like
8 something you would say?
9   A.   It -- it --
10       MS. STOKES: Objection. Form.
11       THE WITNESS: -- it sounds like I'm
12 -- and if you have a foundation, just -- can
13 you be up -- I just appreciate if you'd be --
14 let me know if you're quoting me.
15       BY MR. JESSEE:
16   Q.   I -- I -- I will. I'll tell you I
17 -- I can't tell you -- I -- I honestly do not
18 know if I'm quoting you or not. I've -- I've
19 certainly though seen statements similar to
20 that in your prior testimony. I can't tell you
21 if that's exact words or not.
22   A.   Right. So -- so let -- so again, I

Page 56

1 -- I will assume that, if you're quoting me,
2 you'll let me know you're quoting me, just as a
3 foundation.
4        I think that it's fair to say -- I
5 mean those are the kinds of things that -- and
6 I -- I have enormous respect for people at the
7 agency. But it's, as you know, 10,000 people.
8 There are people who could out tomorrow and
9 earn five, ten times what their salary. Some
10 of them I've said publicly are national
11 resources. Others are clunkers.
12       I mean so -- I mean it's like any
13 large organization. Does FDA get everything
14 right? Absolutely not. But I think, in
15 general, it's an agency that is a very
16 important -- I have enormous respect for.
17   Q.   Okay. And certainly -- and I
18 completely understand what you're saying. With
19 a large organization like that, you're not --
20 you'll, you know, get a variety of different
21 people working there at different levels.
22       But you certainly, as commissioner,

Page 57

1 try to put competent and thorough people in
2 charge, in supervisory positions, right?
3       MS. STOKES: Objection. Form.
4       THE WITNESS: Yeah. I think that's
5 a generalization that -- I mean to name the
6 position -- I mean let's be specific. If you
7 want to name a person in a position, I'll tell
8 you whether I think they're competent.
9        I don't want to make a general -- I
10 mean a statement that everybody is competent
11 that was put in in -- in a general statement.
12 So just -- if you could be --
13       BY MR. JESSEE:
14   Q.   Well --
15   A.   -- a little more --
16   Q.   Well, let's go with -- I mean --
17   A.   -- focused in your question.
18   Q.   Which actually -- what levels of
19 physicians were you personally involved with
20 making -- with hiring or choosing who's going
21 to serve in that position?
22       MS. STOKES: Objection. Form.

15 (Pages 54 - 57)

David Kessler , M.D.                    January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

Page 58

1       THE WITNESS:  I -- I -- there --
2   we'd probably have to spend the rest of the
3   deposition I mean to go through --
4       BY MR. JESSEE:
5   Q.   Oh.  That's fair.  That's fair.
6   A.   I mean that kind of -- so there are
7   -- there are positions that reported to me,
8   right, that obviously I mean I would have been
9   involved in.  There were center directors that
10  I was involved in -- in naming.
11      But there were -- you take the
12  promotional branch.  I was involved in --
13  again, not -- you know, sort of as a team.  I
14  don't want to -- I never tried to usurp, and
15  was very careful, the person's supervisor.
16      But I would at times play at a
17  number of different layers of the organization.
18  So, for example, on drug promotion, I was -- I
19  was hands-on or promotional activities.  Or in
20  compliance, for example, in devices I may have
21  had some say.
22  Q.   Well, let's focus on devices.

Page 59

1       The -- the -- the division that
2   regulated back then and now medical devices is
3   the Center For Devices and Radiological Health
4   or CDRH?
5   A.   The center.  Yes, sir.
6   Q.   And that's the -- there is a --
7   within the CDRH a office of device evaluation,
8   correct?
9   A.   These come by different names
10  over -- over times.  But there is -- there are
11  -- there's a device evaluation center
12  divisions, yes.
13  Q.   Okay.  That division, whether it's
14  the device evaluation -- the office of device
15  evaluation or another name though, that's the
16  division that's responsible for reviewing
17  medical devices before they go to the market.
18      Is that a fair statement?
19  MS. STOKES:  Objection.  Form.
20  THE WITNESS:  Depending on the
21  statutory -- it depends on the statutory
22  structure of what they're responsible for.

Page 60

1       So again, the -- the -- there are
2   certain exempt devices that they would not be
3   responsible for, I mean because they don't have
4   authority.  But, you know, again, it depends on
5   what -- the class of devices we're talking
6   about.
7       BY MR. JESSEE:
8   Q.   Sure.
9       But for the majority of medical
10  devices that are going to market, those are
11  going to be reviewed by the Office of Device
12  Evaluation?
13  MS. STOKES:  Objection.  Form.
14  THE WITNESS:  Yeah.  I -- I -- I
15  don't mean to be -- to quibble.  But even
16  your -- the -- the word "review," right?  I
17  mean what does "review" mean?  There's review
18  for substantial equivalence.  There's review
19  for safety and effectiveness.
20      It becomes complicated because the
21  device -- there's different types of devices.
22      BY MR. JESSEE:

Page 61

1   Q.   Well, and absolutely.  And we're
2   going to talk -- I promise you we'll talk at
3   length about a 510(k) process and a PMA.
4       But you're not testifying that --
5   under either process there's still review of
6   the application or the PMA, right?
7   MS. STOKES:  Objection.  Form.
8       BY MR. JESSEE:
9   Q.   There's -- we can talk about --
10  we'll talk about the -- how in-depth it is.
11      But as far as -- you're not
12  suggesting that there's not a review at all,
13  are you?
14  MS. STOKES:  Objection.  Form.
15  THE WITNESS:  Well, in certain
16  exempt devices.  I mean certain Class I devices
17  there's not --
18  MR. JESSEE:  Right.
19  THE WITNESS:  -- a review.
20  BY MR. JESSEE:
21  Q.   But for Class II devices that are
22  subject to the 510(k) or Class III that are

16 (Pages 58 - 61)

David Kessler , M.D.                                                    January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

Page 62

1 subject to the PMA, there -- the FDA reviews
2 and they apply different standards, but they're
3 gong to review both those submissions, right?
4       MS. STOKES: Objection.  Form.
5       THE WITNESS:  So there -- there's a
6 notification. It's -- there's a notification.
7 And depending on who you ask what the
8 terminology is, some may use the word
9 "concurrence," others -- I mean so what the
10 exact terminology is on the 510(k).
11      BY MR. JESSEE:
12   Q.   Okay.  And when you say
13 "concurrence" though, that would be akin to
14 saying clearance, correct?
15   A.   Correct.
16      MS. STOKES: Objection.  Form.
17      BY MR. JESSEE:
18   Q.   And though -- again, just -- so my
19 question though is, with regard to whether
20 there's a review by the FDA of 510(k)
21 applications.
22      We can review there is a review --

Page 63

1 we can agree there's a review, right?
2       MS. STOKES: Objection.  Form.
3       THE WITNESS:  There is -- let's -- I
4 think it would be -- if you added that -- so
5 for clarity, there is a review for substantial
6 equivalence to see whether the device can be
7 cleared.  But there's not an approve -- a
8 review for approval based on safety and
9 effectiveness.
10      BY MR. JESSEE:
11   Q.   Sure.  And there's -- there's
12 primary reviewers though for 510(k)
13 applications that come in, correct?
14      MS. STOKES: Objection.  Form.
15      THE WITNESS:  I mean there -- there
16 are certain people assigned to applications.
17      BY MR. JESSEE:
18   Q.   And those are typically engineers or
19 scientists?
20      MS. STOKES: Objection.  Form.
21      THE WITNESS:  Not -- it depends.
22      BY MR. JESSEE:

Page 64

1   Q.   Okay.  What does it depend on?
2   A.   It depends on the -- the branch, the
3 staffing, the type of device that comes in.  So
4 it depends how the -- the nature of the device.
5   Q.   Okay.  There's a number of different
6 branches within the CDRH, right, with -- that
7 cover different types of devices?
8       MS. STOKES: Objection.  Form.
9       THE WITNESS:  Correct.
10      BY MR. JESSEE:
11   Q.   And depending on what the -- and
12 speaking about 510(k)s now, depending on what
13 type of products involved, that will determine
14 which branch is going to receive the
15 application, correct?
16   A.   Correct.  And at different points in
17 times those branches have gotten reorganized
18 and...
19   Q.   Sure.
20      And when we talk about the --
21 there's generally a primary reviewer assigned
22 for 510Kk) applications?

Page 65

1      Is that your experience?
2       MS. STOKES: Objection.  Form.
3       THE WITNESS:  There'll be a --
4 generally there'll be a person assigned, yes.
5       BY MR. JESSEE:
6   Q.   Okay.  But there's actually multiple
7 layers of review, correct?
8       MS. STOKES: Objection.  Form.
9       THE WITNESS:  Depends.  Depends on
10 the application.  There could be.  I mean
11 everyone has a supervisor.
12      BY MR. JESSEE:
13   Q.   Sure.
14      And so they might go up to their
15 supervisor and ask questions within their
16 division or even within the CDRH, right?
17      MS. STOKES: Objection.
18      THE WITNESS:  Or to me.  I mean I --
19 I would get questions from -- I mean on the
20 complicated -- on complicated devices they will
21 ask me.
22      BY MR. JESSEE:

17 (Pages 62 - 65)

David Kessler , M.D.                                    January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

Page 66

1    Q.   Okay.  For 510(k)s?
2    A.   I have to go -- some of the more
3 controversial may have been 510(k) that I --
4 that I certainly played on.
5    Q.   I'll tell you what.  I'll -- we'll
6 -- I'll -- this is a quote that I found from
7 you that says -- when talking about review --
8 FDA reviewers:  "When they didn't know the
9 answer on a clearance or on a device question,
10 it was brought to me.  And that was pretty
11 consistent.  I mean I would say there wasn't a
12 month that would go by there wasn't a device
13 question, device briefing where I was brought
14 questions."
15        Is that an accurate...
16        MS. STOKES:  Objection.
17        THE WITNESS:  That's a general
18 statement.  I don't -- I think I would
19 probably -- I don't think there would be -- did
20 I say every month?  I think that would be fair.
21 I would -- I would -- there would be a device
22 question probably much more often than that.

Page 67

1 And some were -- had all different legal
2 statuses where I was brought questions.
3        BY MR. JESSEE:
4    Q.   Was there ever a time when you would
5 actually review a 510(k) submission?
6        MS. STOKES:  Objection.  Improper
7 hypothetical.
8        Go ahead.
9        BY MR. JESSEE:
10   Q.   And -- and by that, let me -- let me
11 rephrase that just so I'm being a little
12 clearer here.
13        Obviously you were never the primary
14 reviewer for a 510(k) submission, correct?
15   A.   Somebody would -- I mean somebody
16 would usually bring me the question.  I think
17 that would be fair.
18   Q.   Okay.
19   A.   I mean -- and again, I was brought
20 the -- the difficult questions.
21   Q.   Okay.  So if they have -- if they --
22 a reviewer is looking at a 510(k), there are --

Page 68

1 maybe a question that their supervisor or their
2 supervisor can't answer where -- someone within
3 the CDRH can't answer, then there were certain
4 difficult questions that would make their way
5 up to you?
6        MS. STOKES:  Objection.  Form.
7        THE WITNESS:  I think they want --
8 you know, pretty collegial.  Things that might
9 have had policy implications; things that were
10 in the press.  There were major device issues
11 that were in the press, things that would be
12 the subject of congressional hearings.  Other
13 kinds of controversies would certainly work
14 their way up to me.
15        And they would have different
16 regulatory statuses, some 510(k)s, some
17 preamendments, some PMAs, some radiological
18 health.  So they were across the board.
19        BY MR. JESSEE:
20   Q.   And you'd agree that the vast
21 majority of devices that went to marketed when
22 you were commissioner went to the market

Page 69

1 through the 510(k) regulatory pathway, correct?
2        MS. STOKES:  Objection.  Form.
3 Vague.
4        THE WITNESS:  I think that's a fair
5 statement.
6        BY MR. JESSEE:
7    Q.   Did you ever -- during your time as
8 FDA commissioner, still focusing on -- on that
9 time, did you ever review the labeling for a
10 Class II device that was going through the
11 clearance process?
12        MS. STOKES:  Objection.  Form.
13        THE WITNESS:  Sure.  I mean in the
14 kind of questions -- I mean the labeling is
15 sometimes the intended use.  Sometimes the --
16 the safety, the warnings, the restricted use.
17        I'd have to go back and think which
18 classes -- which devices were which classes.  I
19 don't have those quite in my head.
20        But certainly what would be say --
21 what was said about a device was sometimes the
22 key issue.  The labeling was key to the

18 (Pages 66 - 69)

David Kessler , M.D.                                January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

| Page 70 | Page 72 |
|---|---|
| 1 agency's consideration of the device. | 1    Q.   And so what -- what we did in the |

Page 70

1 agency's consideration of the device.
2       BY MR. JESSEE:
3    Q.   Do you recall any specific 510(k)s
4 that you were consulted with while you were the
5 commissioner?
6       MS. STOKES: Objection. Form.
7       THE WITNESS: We'd have to go back
8 and look at the regulatory -- the issues
9 that -- but there were a whole bunch of
10 collagen, other type of devices that I were
11 involved in.
12       Some were -- there were certain
13 implants that were Class II at certain periods
14 of time, then were Class III or down-classed to
15 Class II. So there were -- there were
16 certainly certain sets of implants that's were
17 Class II. Some were Class III. And I just
18 don't have a perfect memory.
19       But I -- there were cert -- I don't
20 have a memory of exactly which ones were Class
21 II and which ones were Class III. And
22 sometimes they changed classes. And that's

Page 72

1 tend to remember the name of the device or the
2 type of product. The -- the -- I may not
3 remember the -- I don't remember the classes
4 and all the legal. But I would tend to -- and
5 I do not have any recollection of being
6 involved in any of the surgical mesh devices.
7       I -- I don't think there were any of
8 the preamendment devices. And most of the
9 devices I were involved in were -- were
10 preamendment devices that were Class III.
11       MR. JESSEE: Okay. And just to
12 maybe help out here, what I -- I'm going to
13 mark as Exhibit No. 7 a document that we put
14 together from the FDA web site.
15       (Deposition Exhibit 7 was marked for
16 identification.)
17       BY MR. JESSEE:
18    Q.   And, Dr. Kessler, you understand
19 obviously that there is a -- you can search the
20 different 510(k)s that have been cleared by the
21 FDA on the web site, right?
22    A.   Correct.

Page 71

1 what we did.
2    Q.   Sure. And I -- and I understand
3 this is 25 years ago, approximately. So I
4 understand it's a while ago.
5       Do you recall ever being consulted
6 with on a surgical mesh 510(k) while you were
7 --
8    A.   Surgical mesh?
9    Q.   Yes.
10    A.   I have no recollection. I guess
11 there were three surgical meshes from your
12 client during that period of time, if my memory
13 -- if I'm right.
14       I guess it was Visilex or the
15 original Kugel. I think it was right -- '96.
16 I don't recall being involved in any of them.
17    Q.   It's -- is it possible that you were
18 and just don't recall?
19       MS. STOKES: Objection. Form.
20       THE WITNESS: I have no
21 recollection. I mean I -- I would tend -- I
22 would -- I would tend to recommend -- I would

Page 73

1    Q.   And so what -- what we did in the
2 document that's before you is just go through
3 from the years 1990 to 1997 and searched for
4 the product code for surgical mesh, FTL. And
5 this is just a list of what came up on this
6 search.
7       MS. STOKES: I'm just going to
8 object to this document generally as
9 foundation.
10       Go ahead.
11       THE WITNESS: Yeah. I -- I -- I
12 understand the document.
13       MR. JESSEE: Okay.
14       THE WITNESS: And I -- I --
15       BY MR. JESSEE:
16    Q.   And in --
17    A.   I -- I take the document to be what
18 it is.
19    Q.   Right.
20       And as far as I mean the number, you
21 can see there's 51 surgical meshes there.
22       Do you have any reason to dispute

19 (Pages 70 - 73)

David Kessler , M.D.                                    January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

Page 74

1 that 51 surgical meshes were cleared during
2 your time as commissioner?
3        MS. STOKES: Objection. Form.
4        THE WITNESS: I -- again, I wouldn't
5 want to rely on this for the exact number. I
6 mean you -- you can -- the record can show what
7 the record shows.
8        MR. JESSEE: Okay.
9        THE WITNESS: I think there were
10 three Bard -- let's see -- just see.
11        How many Bard were there?
12        BY MR. JESSEE:
13    Q.    Well, why don't we walk through in
14 here what we have here.
15    A.    I mean -- I mean -- so I think there
16 were three Bard devices, if my memory serves me
17 right.
18    Q.    Okay. And when you say if your
19 memory serves you right, are you talking about
20 your memory from the time as commissioner or
21 your memory as part of the litigation work
22 here?

Page 75

1        MS. STOKES: Objection.
2        THE WITNESS: Part of the -- just
3 total memory, right? Because I don't remember
4 being involved in any mesh device --
5        MR. JESSEE: Okay.
6        THE WITNESS: -- issues.
7        BY MR. JESSEE:
8    Q.    And when we're talking about the
9 specific Bard surgical meshes that were cleared
10 while you were commissioner, we -- if you look
11 at the list we have here, in -- August 24th,
12 1992, we have the Bard Marlex Mesh Dart?
13    A.    Correct.
14    Q.    And do you recall being consulted on
15 that 510(k)?
16    A.    I was not, to the best of my
17 knowledge.
18    Q.    We also have listed here -- if
19 you'll go to -- the Visilex that I think you
20 talked about?
21    A.    Correct.
22    Q.    And that would have been in 1995?

Page 76

1    A.    Correct.
2    Q.    And do you recall being consulted on
3 that 510(k)?
4    A.    I have no recollection. I do not
5 believe I was.
6        And you should have the Kugel -- the
7 original Kugel should be here.
8    Q.    Okay. And that -- that actually
9 wasn't a Bard product when it was originally
10 cleared, correct?
11    A.    You know -- well, actually, here it
12 is. So you're right. So here it's a -- it's
13 a -- I'm not going to pronounce it right -- a
14 Douglas Bueshel. That -- that device was
15 cleared. That's the third one. It -- it
16 ultimately became Bard.
17    Q.    Do you know when the Kugel line was
18 acquired by Bard?
19        MS. STOKES: Objection. Form.
20        THE WITNESS: I do not.
21        BY MR. JESSEE:
22    Q.    Another one of the devices that's

Page 77

1 listed on this list a number of times,
2 different types of it, is the Gore-Tex device.
3        Is that a device you're familiar
4 with?
5        MS. STOKES: Objection. Form.
6        THE WITNESS: I am certainly
7 familiar with it. No, I do not believe I
8 was -- I was not involved with it. It's an
9 ePTFE. It was not a composite. It was just
10 two layers of ePTFE.
11        BY MR. JESSEE:
12    Q.    If we look again at the -- towards
13 the end of this list I have in front of you,
14 there is one that's listed in August 6, 1997,
15 Bard Composite Prothesis.
16        Do you see that?
17    A.    Yeah. It's after I left.
18    Q.    And that's what I was going to try
19 to get. Do you remember exactly or -- when you
20 left?
21    A.    I actually do.
22    Q.    When would that be, Doctor?

20 (Pages 74 - 77)

David Kessler , M.D.
Davol, Inc./C. R. Bard, Inc. -  MDL 2846
January 31, 2020

| Page 78 | Page 80 |
|---|---|
| 1 A. It was the last day -- actually, I | 1 appointed -- |
| 2 can remember -- it was a White House ceremony. | 2 Q. With regard -- and I'll just lump |
| 3 Off the record, I will tell you why I remember | 3 them together. Dr. Benson -- is it Dr. Benson? |
| 4 it, but if I -- if I'm correct, it was the last | 4 A. He was an engineer. |
| 5 day of February '97. | 5 Q. Okay. So Mr. Benson, Dr. |
| 6 So that device I did was not | 6 Burlington, and |
| 7 involved. I mean, I wasn't involved in any of | 7 Dr. Feigal, I take it you don't have any |
| 8 those, but that was not during my watch. | 8 criticisms of their fulfillment of their duties |
| 9 Q. Right. | 9 at the FDA? |
| 10 A. I mean -- and I think that's key, | 10 MS. STOKES: Objection. Form. |
| 11 because that is the -- that is the -- that was | 11 Vague. Argumentative. Compound. |
| 12 the composites, correct? | 12 Go ahead. |
| 13 Q. So what I'm looking at, actually, is | 13 THE WITNESS: Yeah. So that's -- I |
| 14 the one -- part of the composite? | 14 mean, I'm happy to discuss each one. |
| 15 A. Right. And that is the Marlex Plus. | 15 You can see in the shift, Jim, very |
| 16 That was based on a Marlex -- the predicates of | 16 dedicated FDA official for 30 years, was an |
| 17 Marlex Plus ePTFE in '97 in August, right? And | 17 engineer. |
| 18 so that was a -- that was a different type of | 18 And then you see, as we talked |
| 19 device. | 19 earlier, moving Bruce -- Bruce was in the |
| 20 Q. And so the -- who was the -- let me | 20 Center for Drugs. And moving Bruce over to |
| 21 strike that and try better. | 21 devices was, again, part of that effort to try |
| 22 Was Jim Benson the director of the | 22 to improve the science base so it was not just |

| Page 79 | Page 81 |
|---|---|
| 1 CDRH when you first began? | 1 engineering, but the clinical science. That |
| 2 A. I believe so. He was also deputy | 2 was one of the goals. |
| 3 commissioner. I think that's correct. | 3 BY MR. JESSEE: |
| 4 Q. And then I think Dr. Bruce | 4 Q. Okay. And, obviously, you want -- |
| 5 Burlington was the -- in charge of the CDR -- | 5 these are devices, a lot of times, that are |
| 6 excuse me -- CDRH for a period of time during | 6 going to be used by doctors. So you want a |
| 7 your -- | 7 more clinical input? |
| 8 MS. STOKES: Objection. Form. | 8 MS. STOKES: Objection. Form. |
| 9 THE WITNESS: Correct. | 9 Assumes facts. |
| 10 BY MR. JESSEE: | 10 THE WITNESS: These are devices |
| 11 Q. And who was in charge when you left, | 11 that -- you have to understand, when the act |
| 12 do you recall? | 12 was enacted in '76, all implantables were |
| 13 MS. STOKES: Objection. Form. | 13 classified as Class III. |
| 14 THE WITNESS: I don't know whether | 14 I mean, the real answer is not |
| 15 Dave Feigal was in charge or not. I'm blocking | 15 what -- they're going to be used by doctors. |
| 16 them. I'd have to go back and check. | 16 They're going to be put in the human body, and |
| 17 BY MR. JESSEE: | 17 they're there permanently. |
| 18 Q. And you're talking about David -- | 18 And, in some ways, drugs are easy, |
| 19 Dr. David Feigal? | 19 right? You take a drug. I take it for two |
| 20 A. Yeah. So Feigal was HIV. I believe | 20 weeks. It has a half-life of 6 hours to 12 |
| 21 he moved over at a certain point. Just don't | 21 hours. It's in. It's out. It's gone. It has |
| 22 hold me to it. Bruce, I remember. I | 22 its effect. An implantable is there for the |

21 (Pages 78 - 81)

David Kessler , M.D.     January 31, 2020
Davol, Inc./C. R. Bard, Inc. - MDL 2846

Page 82

1  duration.
2       BY MR. JESSEE:
3    Q.   Sure. And part of what you did
4  while you were commissioner was move doctors
5  over from the drug division to the device
6  division so they could be consulted with on
7  submissions that come in, right?
8       MS. STOKES: Objection. Form.
9       THE WITNESS: The real goal was not
10 just consultation. The real goal was trying,
11 right? I mean -- and this has been an effort
12 over the last -- I mean, to the point of the
13 Institute of Medicine, I guess, Sheila Burke,
14 right, the criticism of the 510(k) process?
15       It didn't have that kind of
16 clinical -- the clinical studies, for the most
17 part, the vast majority, are not there.
18       BY MR. JESSEE:
19    Q.   Right. I'm focusing on the
20 reviewers though. In fact, in some of the
21 510Ks you reviewed as part of this case, you
22 understand that they -- a physician was brought

Page 83

1  in to consult on their view of the 510(k),
2  right?
3       MS. STOKES: Objection. Form.
4  Assumes facts.
5       THE WITNESS: Well, I'm a physician.
6  So some of the views that I was done -- I'm a
7  physician, right? I mean, so, obviously, Dr.
8  Burlington, Susan Alpert, these were
9  physicians.
10       That was relatively new during my
11 tenure and done deliberately.
12       BY MR. JESSEE:
13    Q.   And I was actually focusing on the
14 hernia mesh products that we are talking about
15 here in your report.
16       You understand that -- and, with
17 regard to the hernia, there are four products
18 that you discuss in your report -- that there
19 were physicians who were brought in in
20 connection with those reviews?
21       MS. STOKES: Objection. Form.
22       THE WITNESS: But I -- because

Page 84

1  there's so many, if you could hand me the
2  510(k), we can determine that by who signed the
3  510(k). I just don't remember that.
4       BY MR. JESSEE:
5    Q.   We'll go through it.
6       And, just as we're sitting here
7  right now, do you recall if any physicians were
8  brought in?
9       MS. STOKES: Objection. Form.
10       THE WITNESS: I'd have to go back
11 and see. I mean, I have the 510Ks, and I'm
12 happy to pull them up. And I can tell you in a
13 couple of minutes, if you'd like, who signed
14 what and who was brought in. I just don't have
15 that sitting here. I'm happy to get you the
16 answer.
17       BY MR. JESSEE:
18    Q.   No. That's fair. I'll show it to
19 you. We can walk through those here in a
20 little bit.
21    A.   Correct.
22    Q.   And, Doctor, I want to ask you

Page 85

1  another -- I'll, again, give you the heads-up.
2  This is -- I'm quoting from your prior
3  testimony that said: "But the 510(k) process
4  was, you know, being used, certainly, when I
5  was commissioner for the vast majority of the
6  devices. And I was being asked questions about
7  those devices and their labels all the time."
8       Is that a true and accurate
9  statement?
10       MS. STOKES: Objection. Form.
11 Foundation.
12       THE WITNESS: Again, all the time?
13 You know, I -- obviously, I was asked about
14 other questions some of the time. So it can't
15 be all the -- it depends on what you mean by
16 all the time. I was doing some other stuff all
17 the time.
18       So, I mean, again, if you mean
19 pretty often, yes, over the seven years. It
20 was a pretty common event. I don't want to say
21 that I was doing it every moment of every day.
22       BY MR. JESSEE:

22 (Pages 82 - 85)

David Kessler, M.D.                                          January 31, 2020
Davol, Inc./C. R. Bard, Inc. - MDL 2846

Page 86

1    Q.   Fair.
2         And do you have any specific
3    recollection of mesh devices being cleared or
4    approved while you were commissioner?
5         MS. STOKES:  Objection.  Form.
6         THE WITNESS:  The mesh devices I
7    have -- I mean, I look at this list, and I -- I
8    mean, during my tenure, I don't have any
9    recollection sitting here.  None of this --
10   again, we probably have to formally check with
11   exec sec to see whether there is any -- what is
12   called a golden rod or something, some document
13   that passed my desk, but these were not the
14   devices that I recall being involved.
15        BY MR. JESSEE:
16   Q.   Okay.  And I completely understand
17   what you are saying, that it's possible there
18   was one document.  I'm just wanting to know
19   what your recollection is.
20   A.   These do not rise to the level of
21   congressional or public scrutiny in between the
22   six or plus years that I was there.

Page 87

1    Q.   Okay.  And when you say the
2    congressional or public scrutiny, do you
3    recall, at any point during your time as
4    commissioner, anyone voicing concerns to you
5    about hernia mesh products specifically?
6         MS. STOKES:  Objection.  Form.
7         THE WITNESS:  That's what I mean.  I
8    do not -- I mean, there were other devices that
9    certainly did fall into that.  You could go
10   Goggle, you know -- I guess, 1990's, we may not
11   have much of a Google record into that record,
12   right?
13        There may be some, but if you did
14   silicon breast implants, you'd find a lot.
15   There was a lot of congressional and public
16   involvement.
17        So you can -- this was a complicated
18   question that the center had, or there was
19   something -- there was some concern that was
20   being picked up that -- and these devices were
21   not of that nature, to the best of my
22   knowledge, in -- from 1990 to -- they were

Page 88

1    relatively straightforward devices, right?
2         They weren't complicated devices
3    that started even by '97, right, putting
4    together of -- or putting polypropylene in the
5    abdominal cavity, right, intraperitoneally?
6         Those things were not done.  They
7    were relatively simple mesh devices, to my
8    knowledge, I mean, in general.
9         BY MR. JESSEE:
10   Q.   And, Doctor, I'm looking back now at
11   your report.  I know we have been going --
12   talking about your time at the FDA, and I want
13   to focus just for a few minutes on the time
14   after you left the FDA.
15        And, specifically looking at the --
16   in your qualifications section of your report,
17   you talk about your -- in Paragraph 7 is where
18   I am looking, in case you want to check it out.
19        You talk about you're a senior
20   advisor at TPG Capital, a leading global
21   private equity firm that owns pharmaceutical
22   and biomedical companies?

Page 89

1    A.   Correct.
2    Q.   And that's a position you've held
3    for, I believe, quite a while?
4         MS. STOKES:  Objection.  Form.
5         THE WITNESS:  Don't hold me --
6    something -- 2010 or something like that
7    approximately.
8         BY MR. JESSEE:
9    Q.   And as a senior advisor, do you have
10   an ownership interest in the TPG Capital?
11   A.   No.
12   Q.   You listed a number of companies
13   that you've served on the board of as well?
14   A.   Correct.
15   Q.   And I believe that for -- let me
16   strike that and go through.
17        The ones you list is -- and please
18   correct me if I'm butchering the names, but
19   Aptalis Pharma?
20   A.   Aptalis.
21   Q.   Aptalis?  And that's a
22   pharmaceutical company?

23 (Pages 86 - 89)

David Kessler , M.D. January 31, 2020
Davol, Inc./C. R. Bard, Inc. - MDL 2846

Page 90

1    A.    That was.  It was acquired.
2    Q.    Okay.  And Tokai Pharmaceuticals?
3    A.    Also merged, a pharmaceutical of
4  prostate cancer.
5    Q.    Stoke Therapeutics?  Is that a --
6  what kind of company is that?
7    A.    It was a very early stage -- I was
8  only on the board for a short period of time.
9  It was a sort of gene recombinant therapy,
10  early stage company, more scientific.
11    Q.    And then you also have listed here
12  Immucor, Inc.  And that's a medical device and
13  biologics company?
14    A.    It's a blood banking reagent.  It's
15  a company that does testing for blood safety
16  and transplants.
17    Q.    And that's actually a company, I
18  know, that's right where -- around where I'm
19  from, Atlanta.  It's right around there is
20  where they're based, right?
21    A.    Norcross.
22    Q.    One of the suburbs.

Page 91

1        And the -- is that the only medical
2  device company that you've served on the board
3  of?
4        MS. STOKES:  Objection.
5        THE WITNESS:  Correct.
6        BY MR. JESSEE:
7    Q.    Okay.  When I --
8    A.    Yes.  I think that's correct.
9    Q.    All right.  And when I say medical
10  device company, obviously, they sort of go into
11  a little bit of that.
12    A.    This --
13    Q.    And maybe you can explain it better
14  to me.  I wouldn't consider them a traditional
15  medical device company.
16        Would that be fair?
17        MS. STOKES:  Objection.  Form.
18        THE WITNESS:  Well -- so their
19  equipment is medical devices, but their
20  reagents are biologics.
21        BY MR. JESSEE:
22    Q.    And how long have you been on the

Page 92

1  board at Immucor?
2    A.    The problem is, I don't know
3  exactly.  It's possible.  Five, six years.  I
4  don't remember exactly.
5    Q.    Okay.  And you note in your report
6  here that you have advised companies on the
7  standards and duties of care within the
8  pharmaceutical and medical device industry.
9        Do you see that?
10    A.    I do.
11    Q.    So when we are talking specifically
12  about the medical device industry and advising
13  companies, would that be at Immucor?
14    A.    Sure.
15    Q.    Any other companies?
16    A.    There may have been other device
17  companies.  Nothing, just sitting here, comes
18  to mind, but at TPG, there may have been other
19  questions that have come to me.
20    Q.    Okay.  And --
21    A.    In fact, I know there have been
22  other questions that have come to me on

Page 93

1  radiologic -- I mean, on other devices.  As I
2  sit here, my mind starts connecting, yes.
3  There have been other -- other device
4  companies.
5    Q.    Would that be more a situation where
6  it might be a specific question, where they
7  come and seek your input on?
8        MS. STOKES:  Objection.
9        THE WITNESS:  Set of questions, yes.
10        BY MR. JESSEE:
11    Q.    And TPG Capital actually has a
12  number that it owns or --
13    A.    A lot of companies.  I mean, there
14  are many -- I mean, I am only involved in the
15  companies, I mean, at a very select basis.  I
16  mean, there are some $60 billion, I think under
17  investment.  Don't hold me exactly to that.
18        So there is a broad range of
19  companies, but I am not involved across the
20  board.
21    Q.    Right.  And there's a number of
22  different companies.  Is it, typically, smaller

24 (Pages 90 - 93)

David Kessler , M.D.                                    January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

| Page 94 | Page 96 |
|---|---|
| 1 medical device and biologics companies, or is<br>2 it just all over the map?<br>3     MS. STOKES: Objection. Form.<br>4     THE WITNESS: Please ask your<br>5 question. Is what smaller? The ones that TPG<br>6 owns? The ones I'm involved in?<br>7     BY MR. JESSEE:<br>8  Q.  The ones that TPG owns.<br>9     MS. STOKES: Same objection.<br>10     THE WITNESS: So, I mean, if you<br>11 think about it, by its very nature, even though<br>12 $60 billion sounds -- is a lot of money --<br>13 sorry -- you know, a Pfizer that has a worth of<br>14 60, whatever it is, it is not going to be able<br>15 to buy the kind of companies that -- you know,<br>16 the very big, very large companies.<br>17     So I think -- you know, I am<br>18 involved in TPG Capital. You may have a<br>19 company that is worth hundreds of millions of<br>20 dollars. Maybe there is a billion dollar<br>21 company plus, but it's not going to be tens of<br>22 billions of dollars. | 1 compliance with the FDA laws and requirements"?<br>2  A.  Correct.<br>3  Q.  Can you just tell me a little bit<br>4 about that position as the quality committee?<br>5  A.  Sure. I want to be careful that --<br>6 I just want to be careful here, because counsel<br>7 for Immucor is not here. So let's -- I'll give<br>8 you a general sense.<br>9  Q.  Yeah. And I'll stop you. I don't<br>10 want to know any specifics about any specific<br>11 products or anything that's not publicly<br>12 available. Just more a general sense of what<br>13 your duties are.<br>14  A.  So, again, when one takes over<br>15 ownership of a company, one picks up -- you<br>16 know, there are complexities of a company<br>17 prior.<br>18     There may be issues that have<br>19 happened prior that -- quality issues, other<br>20 things -- I'm just giving general statements,<br>21 right -- that one has to -- and one going<br>22 forward on something like blood, you want to |
| **Page 95** | **Page 97** |
| 1     BY MR. JESSEE:<br>2  Q.  When you -- since we were just<br>3 looking at it a minute ago or since I have<br>4 advised companies on the standards of duty of<br>5 care within the pharmaceutical and medical<br>6 device industry, when we are talking about<br>7 the -- let's focus on the medical device<br>8 industry.<br>9     When you are advising Immucor on the<br>10 standards and duties of care for the medical<br>11 device industry, certainly, a part of that is<br>12 what the FDA requires, FDA regulations and<br>13 standards, correct?<br>14     MS. STOKES: Objection. Form.<br>15     THE WITNESS: Yes.<br>16     BY MR. JESSEE:<br>17  Q.  And, in fact, in this next sentence,<br>18 you note that you're -- you chaired the<br>19 compliance committee -- or excuse me.<br>20     Going to the second part of that<br>21 sentence, you note: "I chair the quality<br>22 committee of Immucor, which involves ensuring | 1 be -- so you want to have the highest standards<br>2 and work toward there.<br>3     And the reality is, you buy a<br>4 company, and there may be issues. And you have<br>5 to address those issues.<br>6  Q.  Okay. Because, I mean, in complying<br>7 with FDA laws and requirements, that's very<br>8 important for a medical device company?<br>9     MS. STOKES: Objection. Form.<br>10 Argumentative.<br>11     THE WITNESS: Sure.<br>12     BY MR. JESSEE:<br>13  Q.  And so you are being brought in as<br>14 the chair of the quality committee? And is<br>15 that essentially --<br>16  A.  No. I was brought in as a board<br>17 member.<br>18  Q.  And then you eventually became the<br>19 chair of the quality committee?<br>20  A.  The quality committee is the<br>21 committee of the board.<br>22  Q.  And the quality committee though -- |

25 (Pages 94 - 97)

David Kessler , M.D.                    January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

| Page 98 | Page 100 |
|---|---|
| 1 it's basically sort of -- is it similar to a | 1 here -- with any other companies besides |
| 2 compliance committee or its compliance with FDA | 2 Immucor on any either 510(k)s or premarket PMA |
| 3 regulations? | 3 applications? |
| 4      MS. STOKES:  Objection. | 4      MS. STOKES:  Objection.  Form. |
| 5      THE WITNESS:  It has to do with -- | 5 Compound.  Vague. |
| 6 but it's more focused on quality. | 6      THE WITNESS:  Yes. |
| 7      BY MR. JESSEE: | 7      BY MR. JESSEE: |
| 8    Q.   And are you regularly consulting | 8    Q.   Which are those? |
| 9 with either employees or management at Immucor | 9    A.   I'm not sure what's public.  And I |
| 10 in that position? | 10 would want to check with those companies to |
| 11      MS. STOKES:  Objection.  Form. | 11 what -- before I -- I would want to have |
| 12 Vague. | 12 counsel here, but they would probably be TPG |
| 13      THE WITNESS:  That would be fair. | 13 related is my guess. |
| 14      BY MR. JESSEE: | 14    Q.   And what -- and without identifying |
| 15    Q.   So, for example, with regard to | 15 a company, just generally, what would your role |
| 16 regulatory submissions, is that something that, | 16 have been in those instances? |
| 17 from time to time, you would get consulted | 17      MS. STOKES:  Objection. |
| 18 with? | 18      Answer only if you feel that you |
| 19      MS. STOKES:  Objection.  Form. | 19 can. |
| 20      THE WITNESS:  I may, yes. | 20      THE WITNESS:  Generally, they are |
| 21 Certainly. | 21 complex -- complex questions of regulatory -- |
| 22      BY MR. JESSEE: | 22 of what to do. |

| Page 99 | Page 101 |
|---|---|
| 1    Q.   And with respect to any of the -- | 1      BY MR. JESSEE: |
| 2 whether it's inspections or things of that | 2    Q.   In other words, you are not -- they |
| 3 nature by the FDA, would that be something you | 3 are not having you write the -- a 510(k) |
| 4 would be consulted with? | 4 submission or PMA or to -- are they? |
| 5    A.   Absolutely.  That may be the case. | 5      MS. STOKES:  Objection.  Form. |
| 6    Q.   And Immucor is -- they have actually | 6      THE WITNESS:  No.  I would not be |
| 7 submitted a number of 510(k) applications over | 7 sitting there, but I would be telling them -- |
| 8 the years, right? | 8 they may be asking me what they should be |
| 9      MS. STOKES:  Objection.  Form. | 9 writing. |
| 10      THE WITNESS:  A number of -- | 10      BY MR. JESSEE: |
| 11 including -- and PMAs. | 11    Q.   Okay.  And, basically, to get advice |
| 12      BY MR. JESSEE: | 12 on a specific topic? |
| 13    Q.   Were you involved in any of the | 13      MS. STOKES:  Objection.  Form. |
| 14 510(k) applications? | 14      THE WITNESS:  Specific topic, |
| 15      MS. STOKES:  Objection.  Form. | 15 strategy, you know.  It's vague, a little |
| 16      THE WITNESS:  I have to go back | 16 vague.  There were specific questions -- there |
| 17 and -- I'd have to refresh my memory, which | 17 were questions that I was asked in different |
| 18 ones were PMAs and which ones were 510(k)s.  I | 18 parts of the regulatory process. |
| 19 would want to refresh my memory. | 19      BY MR. JESSEE: |
| 20      BY MR. JESSEE: | 20    Q.   Okay.  How many times has that |
| 21    Q.   Is there -- have you consulted with | 21 happened outside of Immucor? |
| 22 -- we're talking about nonlitigation still | 22      MS. STOKES:  Objection.  Form. |

26 (Pages 98 - 101)

David Kessler , M.D.                                      January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

Page 102

1      THE WITNESS:  I mean, there is one
2  that happened pretty recently that's on top of
3  my mind.  I don't -- I'd have to go back and
4  think.  There was certainly one this year --
5  I'm sorry -- last year, because we are January,
6  one last year.
7      My guess is probably, of that kind
8  of nature, maybe one, two a year.
9      BY MR. JESSEE:
10     Q.   And the one from last year, was that
11  a PMA or 510(k) device?
12     MS. STOKES:  Objection.  Form.
13     You know, if this is confidential,
14  then don't answer.
15     THE WITNESS:  He is not asking me
16  what the name of the company is.
17     BY MR. JESSEE:
18     Q.   Yeah.  No.  I am trying to be very
19  careful, Doctor.
20     A.   And I appreciate that.  You are not
21  asking me the name of the company.
22     I don't recall specifically.  I'd

Page 103

1  have to go back and double-check.  I just don't
2  -- I don't have the file in front of me.
3     Q.   Oh, sure.
4     A.   I didn't think that's -- I don't --
5  that's not what I focused on to prepare here.
6     Q.   Understandable.  And, again, you
7  know, I am just trying to -- I want the best of
8  your recollection.
9     A.   Sure.
10     Q.   It's definitely not a memory test
11  here.
12     A.   Sure.
13     Q.   You are not critical of a company
14  that decides to use the 510(k) regulatory
15  pathway to bring a device to market, are you?
16     MS. STOKES:  Objection.  Form.
17  Vague.  Argumentative.
18     THE WITNESS:  The answer probably to
19  your question is, it depends.
20     BY MR. JESSEE:
21     Q.   What does it depend on?
22     MS. STOKES:  Same objections.

Page 104

1      THE WITNESS:  Give me -- give me
2  some more facts.  So if you -- if you have a
3  question that raises new questions of safety
4  and effectiveness, right.
5      Let me give you -- let's be direct.
6  If you -- take here, 1997, Bard Composite
7  Prothesis, 1997.
8      At that stage, I wouldn't want to
9  say always, but, in general, for example,
10  polypropylene was not used intraabdominally.  I
11  mean, there may have been some surgeons here or
12  there who used it, but it was not used
13  intraabdominally.
14     A company comes and says, Okay.
15  We're going to use the 510(k) process.  We had
16  Marlex, and that's polypropylene.  And we are
17  going to -- there's Gore-Tex, and that's ePTFE.
18     And we're going to put it -- make a
19  device now that has -- where we're going to
20  take that polypropylene, and we're going to
21  market it for intraperitoneal use.  And we
22  believe that the ePTFE is going to protect it.

Page 105

1      And when you look at the 510(k), the
2  question is, Are there new safety
3  characteristics to that device?  And they say,
4  Well, it's just Marlex, and it's just Gore-Tex.
5  We'll just put those things together.
6      I mean, that raises new safety and
7  effectiveness -- new safety and effectiveness
8  characteristics.  And it's going where no one
9  else went before, and it didn't get human
10  trials and yet went through 510(k).
11     So I would be critical of that,
12  because it would put patients at risk without
13  the kind of studies that should be done when
14  you do something new and you push the field.
15     So if you rely on something being
16  the same, which is substantial equivalence, but
17  if you take that device, for example, and you
18  look at the marketing for that device and it
19  says, Bard, you know, this device is the first
20  prothesis to directly address that concern with
21  something new, how could it be substantially
22  equivalent?

27 (Pages 102 - 105)

David Kessler , M.D.                    January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

Page 106

1       So I would be critical.  Substantial
2  equivalence should be used for something that
3  is the same.  It doesn't raise new questions.
4  It's as safe as something on the market.  It
5  doesn't raise new questions.
6       If you are saying it's substantially
7  equivalent and then go out to market it as new,
8  I would be critical.
9       BY MR. JESSEE:
10   Q.   Okay.  There is a lot in that answer
11  there.  So let's see if we can unpack it.
12       First, you mentioned that Marlex
13  hadn't been used intraabdominally.  I think the
14  example you were giving was the composite mesh
15  when it was cleared in 1997 right after -- a
16  couple months after you left your position?
17   A.   In August.  Correct.
18       MS. STOKES:  I'm going to object.
19  It misstates.
20       Go ahead.
21       THE WITNESS:  The date was in
22  August.  I was not there.

Page 107

1       BY MR. JESSEE:
2   Q.   Yeah.  A certain amount of months --
3  you left early in February, I think you said,
4  2000- --
5   A.   End of February.
6   Q.   1997.
7   A.   I'll tell you the day that I left
8  off the camera.
9   Q.   What is your understanding of when
10  Marlex mesh was used intraabdominally?
11       MS. STOKES:  Objection.  Form.
12       THE WITNESS:  My sense was, there
13  was a general view -- I would have to go back
14  and tell you -- that it was not to come into
15  contact with the bowel.
16       From the very beginning, there was
17  as this says there was concern that, you know,
18  the may shift, and you did not want it to come
19  in contact with the bowel.
20       And that was the general
21  understanding back in the 1990's.  So you
22  didn't use it.  And that was -- you couldn't

Page 108

1  use it.  You shouldn't use it.
2       Now, whether some surgeons used it
3  here or there, but the general position was
4  that you didn't use it for intraperitoneal use,
5  because it was known that it could cause
6  adhesions.
7       Exactly when in the history that was
8  known, I'm not sure, but, certainly, throughout
9  the 1990's, the reason for this Composix device
10  was, we need -- here -- Bard is basically
11  saying, We're going to give you something
12  unique that is new that is going to protect
13  that mesh.  You don't have to worry about that
14  polypropylene coming in contact with the body.
15       That was what the promotion said.
16       BY MR. JESSEE:
17   Q.   Okay.  Just so we're clear, when
18  you're saying new, ePTFE obviously is not new,
19  because there are a dozen ePTFE devices at
20  least that were cleared while you were
21  commissioner, right?
22       MS. STOKES:  Objection.  Form.

Page 109

1  Misstates.  Argumentative.
2       Go ahead.
3       THE WITNESS:  So ePTFE was not a
4  composite.  The issue was not ePTFE coming in
5  contact with the bowel.  The issue was
6  polypropylene coming in contact with the bowel.
7       And for this device, it says Bard --
8  the composite is the first prothesis to
9  directly address this concern, right?
10       And the composite mesh contains two
11  different clinically proven materials to
12  maximize tissue in growth in surrounding wall
13  mitigating the risk of visceral adhesion.
14       BY MR. JESSEE:
15   Q.   And can I ask what you are looking
16  at?
17   A.   It's part of the 510(k).  It's part
18  of the --
19   Q.   And would you mind -- is there a
20  Bates number on that?
21   A.   Yes, it is.  MPPE 13970570.  But
22  it's in the 510(k) application, I believe.

28 (Pages 106 - 109)

David Kessler , M.D.                    January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

Page 110

1    So this is clearly something new,
2  and it's -- I mean, you know, it says the first
3  composite mesh prothesis, and it's uniquely
4  designed.
5    So why is that going through a
6  510(k)?
7    Q.   And so this was in -- what you are
8  reading from is in the 510(k) submission.
9    Are you critical of the FDA
10  reviewers of that 510(k) submission?
11    MS. STOKES:  Objection.  Form.
12    THE WITNESS:  I am not here to
13  testify, I mean, I don't think, about FDA.  I
14  mean, I think that if you look at the
15  application, the 510(k) application, Bard did
16  not raise this issue of polypropylene coming in
17  contact with the bowel.
18    In the algorithm, it talked about
19  ePTFE  being new, right, but this risk of now
20  the polypropylene and that raising the safety
21  questions, that was not addressed by Bard in
22  its application.

Page 111

1    So is this one where the company
2  didn't bring this to FDA's attention?  Should
3  FDA have caught this?  Would I have liked FDA
4  to catch this?
5    If you go read that 510(k), it
6  doesn't say that, Hey, these are new -- these
7  are new questions, and this is the first time
8  we are doing this.  And this may lead to
9  problems.
10    That's not what -- when you read the
11  application, that's not what it says.
12    BY MR. JESSEE:
13    Q.   In looking at your testimony a
14  little while ago, you said that it was commonly
15  known during the 1990's about the
16  polypropylene.
17    If you place it intraabdominally,
18  then you have that risk of adhesion.
19    MS. STOKES:  Objection.  Form.
20    THE WITNESS:  So I think that was
21  fair in the industry, and I think that was fair
22  among hernia -- other surgeons can testify.

Page 112

1    I can't tell you what FDA knew --
2  what FDA knew exactly about that issue.  That
3  issue was not, I mean, raised in any -- with
4  any prominence when I go read the application
5  for this.
6    So, I mean, I think if you want to
7  be critical -- if you want to be critical, you
8  have to -- it's the obligation of the
9  manufacturer to raise these issues and say,
10  Hey, this is unique.  This is new.  This is the
11  first prothesis.
12    This raises, right, new safety
13  characteristics that have not been answered
14  before.  I mean, that's the real question.
15    I mean, has anyone really studied
16  this new device and -- in humans and answered
17  these questions?  And the answer was no.  And
18  that clearly should have been done before this
19  device got on the market, because it was
20  unique.  It was new.  You were adding new
21  risks.
22    There were some animal studies done.

Page 113

1  We could discuss those, but there were
2  certainly no human trials done.  And that
3  clearly should have been.
4    BY MR. JESSEE:
5    Q.   And so going back to my question --
6  if you can't answer it yes or no, that's fine,
7  but are you critical of the FDA reviewer for
8  that composite 510(k)?
9    MS. STOKES:  Objection.  Form.
10    THE WITNESS:  I think I answered
11  that.  I think based on the application of what
12  the company -- based on the fact that the
13  company didn't highlight this and didn't raise
14  these questions with FDA, it's hard to be
15  critical, because the responsibility rests with
16  the company.
17    Would I have liked FDA to catch it
18  and said, Hold it.  This is unique.  This is
19  new.  This raises new characteristics that have
20  not been studied in humans before?  Yes, I
21  would have liked FDA to catch that.
22    So is that being critical?  I mean,

29 (Pages 110 - 113)

David Kessler , M.D.
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

January 31, 2020

Page 114

1 again, I'm not -- that wasn't one of the
2 questions that I was assigned to ask, but I
3 would have certainly liked FDA to catch it, but
4 it's because your client didn't lay this out to
5 the FDA.  The FDA is only going to be as good
6 as what your company lays out.
7        BY MR. JESSEE:
8    Q.   And you understand that several of
9 the surgical mesh products on the sheet we
10 looked at that were cleared by your
11 commissioner were -- contained two different
12 mesh materials.
13        MS. STOKES:  Objection.  Form.
14 Assumes facts.
15        THE WITNESS:  Show me which
16 materials they contained.
17        BY MR. JESSEE:
18    Q.   Well, for example, let's just
19 look -- we can just look at the titles of them.
20 For example, we see -- I am looking at -- on
21 the second page of the document we have in
22 there.

Page 115

1    A.   Yes, sir.
2        MS. STOKES:  Just so the record is
3 clear, I just have a running objection on
4 this -- usage of this document period.
5        BY MR. JESSEE:
6    Q.   So, Doctor, do you see the -- where
7 it states -- I'm looking at the September 3rd,
8 1996, Gore-Tex dual mesh plus biomaterial with
9 holes?
10    A.   Yeah.  So as I understand it --
11 again, give me the 510(k), and we can -- why
12 don't you pull the 510(k) for it and I am happy
13 to discuss it.
14        As I understand this, okay, your
15 device, the Composix, was the first
16 polypropylene plus any PTFE layer.
17        As I understand, Gore-Tex -- and,
18 again, you would have to give me the 510(k),
19 but the Gore-Tex were different layers of
20 ePTFE.
21        Your company says this is the first
22 polypropylene ePTFE in this document.  Then I

Page 116

1 have no --
2    Q.   In the application to the FDA?
3    A.   In this promotional piece.
4    Q.   But you are reading from the 510(k),
5 I thought you said earlier.
6    A.   This is a piece in one of the -- one
7 of the fact materials.  And FDA raises
8 questions about this and says, You can't make
9 these claims about minimization of adhesion
10 risk.
11    Q.   Okay.  So FDA --
12    A.   The FDA caught that.
13    Q.   All right.  So they were aware of
14 that -- they were aware of that issue then when
15 they were reviewing the 510(k), correct?
16        MS. STOKES:  Objection.  Form.
17 Argumentative.
18        THE WITNESS:  You are now asking me
19 to do something that you asked me prior that I
20 said I would not do, but you are asking me for
21 FDA's subjective state of mind and what they
22 knew and what they were aware of.

Page 117

1        I can show you objectively that this
2 was -- this was one of the pieces of paper in
3 that application, and FDA objected to this, but
4 what it focused on here was that you can't say
5 minimize the risk of adhesion -- adherence to
6 the bowel.  That would be improper.
7        BY MR. JESSEE:
8    Q.   And I understand you are not
9 offering opinions on the FDA's state of mind or
10 knowledge.
11    A.   Thank you.
12        MS. STOKES:  Is there a question?
13        BY MR. JESSEE:
14    Q.   And you are not offering opinions
15 about Bard's state of mind or knowledge, are
16 you?
17    A.   Correct.
18        MR. JESSEE:  And, Doctor, we have
19 been going for an hour and a half.  I am happy
20 to keep pushing on, or if you want to take a
21 break, we can do that as well.
22        Anyone?

30 (Pages 114 - 117)

David Kessler , M.D.                           January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

| Page 118 | Page 120 |
|---|---|
| 1      THE REPORTER:  A break is good. | 1      And what I marked as Exhibit 8 is |
| 2      MR. JESSEE:  All right.  Let's take | 2 the -- |
| 3 just a couple minutes. | 3      A.   May I stand? |
| 4      THE VIDEOGRAPHER:  We are going off | 4      Q.   Please, please.  And, like I said, |
| 5 the record.  This is the end of Media Unit No. | 5 don't feel -- no need to ask me.  You are |
| 6 1. | 6 welcome to stand whenever you'd like. |
| 7      The time is 9:32. | 7      A.   May I get untangled? |
| 8      (A short recess was taken.) | 8      Q.   Yeah.  Let me see if I can help you |
| 9      (Deposition Exhibit 8 was marked for | 9 here. |
| 10 identification.) | 10      And I have marked as Exhibit 8 a |
| 11      (Deposition Exhibit 9 was marked for | 11 document that has a tag on the front that says |
| 12 identification.) | 12 "3DMax"? |
| 13      (Deposition Exhibit 10 was marked | 13      A.   Correct. |
| 14 for identification.) | 14      Q.   And is it -- so did you create this |
| 15      (Deposition Exhibit 11 was marked | 15 entire document? |
| 16 for identification.) | 16      A.   Yes. |
| 17      (Deposition Exhibit 12 was marked | 17      Q.   And that includes the cover page |
| 18 for identification.) | 18 that lists numbers on it? |
| 19      (Deposition Exhibit 13 was marked | 19      A.   No.  I dictated this.  This was |
| 20 for identification.) | 20 done -- somebody typed it, but I dictated -- I |
| 21      (Deposition Exhibit 14 was marked | 21 said -- I said exactly what these words are. |
| 22 for identification.) | 22      Q.   And who actually typed it up? |

| Page 119 | Page 121 |
|---|---|
| 1      (Deposition Exhibit 15 was marked | 1      A.   Gerard, at my request, but I said, |
| 2 for identification.) | 2 No. 1, this.  I just -- I had someone type it. |
| 3      (Deposition Exhibit 16 was marked | 3      Q.   And so that's someone from |
| 4 for identification.) | 4 plaintiffs' counsel -- |
| 5      (Deposition Exhibit 17 was marked | 5      A.   Yes, I actually did the typing, but |
| 6 for identification.) | 6 this is my -- I dictated this. |
| 7      THE VIDEOGRAPHER:  We are going back | 7      Q.   What about the cutting and pasting? |
| 8 on the record.  This is the start of Media Unit | 8 All you? |
| 9 No. 2. | 9      A.   Yes.  I mean, I'm not saying they |
| 10      The time is 9:49. | 10 didn't use some scotch tape here or there to -- |
| 11      BY MR. JESSEE: | 11      Q.   Make sure it stays there? |
| 12      Q.   Dr. Kessler, during the break, we've | 12      A.   Yeah.  Exactly.  That kind of stuff. |
| 13 had some discussions, and we've been discussing | 13 They did help me on that. |
| 14 with your counsel how we're going to deal with | 14      Q.   Did you determine what you cut out |
| 15 the numerous different large paper documents | 15 within there? |
| 16 you brought. | 16      A.   Oh, yeah. |
| 17      And we're going to continue to | 17      Q.   And is all that -- there's |
| 18 figure that out at the next break, but I want | 18 handwriting, and this is on a number of -- is |
| 19 to just -- I've marked them as exhibits. | 19 that all your handwriting? |
| 20      So I just want to briefly -- if you | 20      A.   We'd have to go through every page. |
| 21 could confirm for me that we're -- I have them | 21 I don't want to swear, but this is certainly my |
| 22 correct and what we're talking about. | 22 handwriting. |

31 (Pages 118 - 121)

David Kessler , M.D.                              January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

Page 122

1    Q.    So we have Exhibit 8, the 3DMax.
2          Exhibit 9 is the Quintiles?
3    A.    Correct.
4          Yes.  Exhibit 9 is Quintiles.  Yes,
5  sir.
6    Q.    Exhibit 10 is going to be large
7  Ventralex buckling?
8    A.    Yes.
9    Q.    Exhibit 11 is PerFix Plug?
10   A.    Yes.
11   Q.    Exhibit 12 is Ventralight ST?
12   A.    Yes, sir.
13   Q.    Exhibit 13 is MSDS?
14   A.    Yes, sir.
15   Q.    Exhibit 14 is infection?
16   A.    Ventralex infection.
17   Q.    Excuse me.  Yeah.  Thank you.
18         Ventralex infection?
19   A.    Yes.
20   Q.    Exhibit 15 is Ventralex ST?
21   A.    Yes, sir.
22   Q.    And then Exhibit 16 is the one

Page 123

1  that's titled "All devices"?
2    A.    Yeah.  They're really -- they're
3  just studies, just so we understand.
4    Q.    And then Exhibit 17 is just these
5  nine binders that you brought with you?
6    A.    It's the first of nine.
7    Q.    Right.
8          And is those -- are those binders --
9  I can tell from the cover of them.  Those look
10 like something the attorneys sent to you?
11      MS. STOKES:  Objection.
12      THE WITNESS:  Well -- so these were
13 done -- all these are, are for each paragraph,
14 what I asked to be made.  For every paragraph,
15 there is -- anything that is cited in that
16 paragraph is behind that tab, and anything that
17 is quoted in my report may be highlighted.
18      So -- but it's -- basically, it
19 matches my report.  It's just anything that is
20 cited in the report.  And if there is a
21 specific quote, that quote may be highlighted.
22      BY MR. JESSEE:

Page 124

1    Q.    So were those binders created after
2  your report was finished?
3    A.    Yes.
4    Q.    As far as --
5    A.    And you should have all those
6  documents, because -- I mean, if you want
7  copies, you -- but you already have everything
8  there.
9    Q.    Right.  And in those -- and just --
10 I just took a very quick look.
11         And feel free to sit down, Doctor.
12 You didn't think you would probably be getting
13 this much exercise during your deposition.
14   A.    That's fine.  Here is some exhibit
15 tabs.
16   Q.    I notice that there is some
17 highlighting and flags in those binders?
18   A.    Yes.  So that matches -- I said if
19 there's a quote that is quoted, that is the
20 page -- that flag identifies where that quote
21 is.
22   Q.    Right.  And the flag -- my question

Page 125

1  is, the flags and the highlighting, is that all
2  your doing, or is that counsel's?
3    A.    So I identified the quote, but they
4  identified where that -- I mean, again, when
5  they put the binders together, they highlighted
6  the quote that was in here.
7    Q.    Okay.
8    A.    Again, I don't want to get -- I want
9  to be careful on work product rules and what's
10 -- I mean, there is no secret here.
11   Q.    Yeah.  I just want to know -- all I
12 want to know is the timing --
13   A.    That just is -- if you ask me
14 Paragraph 22, this quote -- this document says
15 this, I can pull that up and turn to the flag,
16 and that's the actual document.
17   Q.    And did you use those binders in
18 preparing for your deposition today?
19   A.    I think that would be fair.
20   Q.    Did you review them?
21   A.    I didn't turn to every page.
22   Q.    So more as a resource as you were

32 (Pages 122 - 125)

David Kessler , M.D.                    January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

Page 126

1 going through your report?  If you had a
2 question, you could go look at them?
3    A.    That's exactly correct.
4    Q.    And as far as the large -- I don't
5 know if you have a better description than I
6 have -- the large --
7    A.    Sheets?
8    Q.    Yeah.  The collage with the
9 different pictures that you made, did you
10 determine what subject each of those would be?
11    A.    Absolutely.  That is only me.
12    Q.    Okay.
13    A.    Somebody may have -- again, may have
14 helped me tape or clip or helped me do the
15 index, but I dictated that.  That's all me.
16    Q.    Is that something you did after your
17 report was written or before?
18    A.    I don't remember exactly.  I mean, I
19 may have had sheets before.  I may have had
20 sheets after this.
21    Q.    Was the purpose to -- of making
22 those sheets just to help collect your thoughts

Page 127

1 on a particular issue and have a reference
2 or --
3    A.    That's a fair statement.
4    Q.    Did you use those in preparing for
5 your deposition today?
6    A.    I'm sure you're going to ask me --
7 to prepare for my deposition?  They were done.
8 I mean, what I mean, prepare, I mean, they were
9 part of the process of collective -- everything
10 in my brain.
11         I mean, they do affect what is in my
12 brain in some ways, because when you cut and
13 paste and you focus on certain things and you
14 put it down and you look at it, that certainly
15 helps me prepare, right?  So I guess the answer
16 would be yes.
17    Q.    On the large sheets that you have
18 there -- and we just walked through the
19 different topics -- one topic that I don't see
20 covered in your expert report is the MSDS or
21 material safety data sheet?
22    A.    Correct.  As you know, your expert,

Page 128

1 Donna B. Tillman raised that issue.  She was
2 the FDA -- I assume fair to refer to her as the
3 FDA expert from your side.
4         So she raises that issue, and that's
5 the reason I went to look at the MSDS question,
6 because your FDA expert raised that question.
7    Q.    Do you know if we have any other
8 experts that worked at the FDA besides Dr.
9 Tillman?
10    A.    That was the --
11         MS. STOKES:  Objection.  Form.
12         THE WITNESS:  I don't know the
13 answer to that question.  That was the one that
14 was identified for -- that was the one that was
15 -- that I knew.
16    BY MR. JESSEE:
17    Q.    Okay.  Is that the only defense
18 expert that you know in this case?
19         MS. STOKES:  Objection.  Form.
20         THE WITNESS:  I have to go back and
21 look.  You can look at my reliance list.  That
22 was the one that I focused on.

Page 129

1         BY MR. JESSEE:
2    Q.    Sure.  Why don't we take a quick
3 look at your supplemental revised list that was
4 provided to us and we've marked as Exhibit No.
5 3?
6    A.    Correct.
7    Q.    And this was a -- is, again, as I
8 mentioned earlier, a reliance list that was
9 provided to us yesterday.
10         And it lists at the end of it a
11 handful of depositions and two expert reports?
12    A.    Correct.
13    Q.    And the two expert reports listed
14 are expert report of Don B., which -- yeah.
15 It's a typo.
16    A.    It's Donna B.
17    Q.    Yeah.  It's Donna B. --
18    A.    Yeah.  I'm sorry.
19    Q.    -- Tillman.
20         And I think the date is wrong, but
21 you received --
22    A.    That was my -- in fact, that's the

33 (Pages 126 - 129)

David Kessler , M.D.                    January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

Page 130

1  date of my report, right?
2     Q.    Exactly.
3     A.    So I apologize.  I actually have it
4  here somewhere.
5     Q.    Did you -- did you type up this --
6     A.    No, I did not.
7     Q.    Did you dictate it?
8     A.    Yes.  Or I gave -- or I gave
9  materials.  I mean, I may have had materials
10  and said, Here is materials, etc.
11    Q.    And also listed here is the expert
12  report of John L. Quick?
13    A.    Correct.
14    Q.    And --
15    A.    But I had Quick's report.  It should
16  be on my original list.  It was -- I had
17  certainly -- I cited Quick's report in my
18  report, and I had it, I believe.  So it should
19  be on my original reliance list.
20    Q.    Did you request the report for
21  defendant's FDA experts?
22    A.    I don't recall whether I said it

Page 131

1  that way.  I don't remember what I exactly
2  said.
3     Q.    Well, did you request any expert
4  reports?
5        MS. STOKES:  Objection.  Form.
6        THE WITNESS:  I certainly requested
7  Quick, right, on defense side.  I may have
8  asked what came in after my -- I may have
9  phrased -- the question may have been to
10  counsel, Tell me what came in that is relevant
11  to me or to FDA.
12       Don't hold me to the exact question.
13       And, again, I want to be careful
14  under the federal rules.  I'm getting very
15  close --
16       MS. STOKES:  Yeah, yeah.  It's --
17       THE WITNESS:  I'm getting very close
18  to what I'm -- I'm having conversations with
19  counsel.
20       But this was -- on my initiation, I
21  asked the question, and I got Dr. Tillman's
22  report.

Page 132

1        BY MR. JESSEE:
2     Q.    Okay.  As far as the other -- while
3  we have this out, the other documents that are
4  listed on your supplemental reliance list, can
5  you -- the produced documents, the first
6  section in this document of Exhibit 3, is just
7  -- there's a number of Bates numbers listed.
8        Do you know what the -- any of these
9  documents are?
10    A.    I'm not -- I'd have to look.  I'm
11  sure I -- I'm sure I would know if I looked.  I
12  mean because I looked.  But I just don't know
13  the -- the Bates numbers.  Sorry.
14       I -- I -- I don't -- I have access,
15  and I requested access to the discovery
16  database.  And I have continued to search that
17  database.  And to the extent that -- you know,
18  you always get back hits.  I try to be -- to
19  make sure you have a sense of what I've seen or
20  seen -- think that's relevant or even
21  considered since my report.
22    Q.    Okay.  Is -- are these all

Page 133

1  documents, the documents listed in the
2  "Produced Documents" section of the
3  supplemental reliance list, documents that you
4  found?
5        MS. STOKES:  You're getting
6  dangerously close to work product here.
7        MR. JESSEE:  I'm happy to discuss.
8        MS. STOKES:  So --
9        MR. JESSEE:  I don't think -- I
10  think it's pretty clear in the rule though
11  about what he relied on and what he -- his
12  opinions are based on and the assumptions he
13  was given, too, are all not work product.
14       But I -- I -- I hear what you're
15  saying.  I'll be careful.  I'll --
16       MS. STOKES:  So try to --
17       MR. JESSEE:  And you're welcome
18  to --
19       MS. STOKES:  Please, Counsel.
20       MR. JESSEE:  Any -- I mean you're
21  welcome, if you think I cross a line, to
22  instruct him not to answer.  But I don't think

34 (Pages 130 - 133)

David Kessler , M.D.   January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

Page 134

1  I've gone there yet.
2       THE WITNESS:  So -- so they are --
3  the majority of documents -- I mean I do a
4  great deal of searching myself.
5       MR. JESSEE:  Uh-huh.
6       THE WITNESS:  I wouldn't -- would
7  not want to represent that I find every
8  document.  I think that would be a mistake.
9  But I -- I think I find the vast major -- I
10 mean the vast number of these documents I've
11 looked at are things that it find on the -- but
12 sometimes I -- my search capabilities are
13 limited sometimes.  And we can get into the
14 quality of the database and the quality of the
15 discovery.
16      So there are many time -- there were
17 many times where -- even last night where I
18 said -- I find a document, but I can't find --
19 it's -- it's only a partial document, and where
20 is the rest of the document.
21      So usually these things get
22 stimulated by me in some kind of format.

Page 135

1       BY MR. JESSEE:
2    Q.  Do you -- can you tell me, in
3  looking at the supplemental reliance list,
4  which ones that you independently found and
5  which ones were provided to you?
6       MS. STOKES:  You know what?  I'm
7  going to object and just -- this is -- we're --
8  we're too close to work product.  So I'm going
9  to instruct him --
10      MR. JESSEE:  Okay.  Are you
11 instructing him not to answer?
12      MS. STOKES:  Yeah.
13      MR. JESSEE:  All right.  And then we
14 can take this up with the Court.  That's fine.
15      BY MR. JESSEE:
16   Q.  The -- Doctor, what the -- the next
17 section's published literature, right?
18   A.  Again, just so you know, the -- the
19 -- the vast majority of documents I find myself
20 --
21   Q.  Okay.
22   A.  -- you know, on -- on discovery.

Page 136

1  But I -- but I do sometimes ask for people to
2  do searches and see if you can find me -- "Can
3  you find me these animal studies on this
4  device?"  Because I -- I see some reference to
5  them, but I don't see -- I can't find the
6  exact -- or I mean this exact study.
7       I would see a reference, for
8  example, on a 510(k) to an animal study.  And I
9  said, "Can you try to search for the original
10 study report?"  So that's the kind of back and
11 forth that -- that happens.
12   Q.  Okay.  With the produced documents
13 listed here, are these all documents then that
14 you would have reviewed after you wrote your
15 expert report?
16   A.  You know, again, these tend to be --
17 one of the problems when you get a lot of
18 documents is -- for example, the Quick
19 document.  I know you pointed to this.  But
20 Quick certainly did review, you know, the day
21 of and that section of Quick that I cite in the
22 reports.

Page 137

1       So there's a lot of paper.  I don't
2  want to say everything is since my report.
3    Q.  Well --
4    A.  There may be some overlap here.
5    Q.  And -- and I guess my -- I'm
6  focusing right now just on the "Produced
7  Documents" section.  And I'm just trying to
8  figure out if these are documents that you --
9  were just not -- accidently not included on
10 your original reliance list or if these are
11 documents that you have reviewed since then and
12 are -- have opinions on.
13      MS. STOKES:  Objection.  Form.
14      BY MR. JESSEE:
15   Q.  Do you understand what my question
16 is?
17   A.  Yeah.  I mean there's a number of
18 parts to your questions.
19      I'm not sure you should take home
20 that I have opinions on these, on all these
21 documents.  I -- I don't want you to think
22 that.

35 (Pages 134 - 137)

David Kessler , M.D.                              January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

| Page 138 | Page 140 |
|---|---|
| 1    I'm just trying to -- you want to --<br>2 I think your depo notice asked for -- I mean we<br>3 can go pull -- basically you're asking for<br>4 everything that I have.<br>5    So I'm trying to -- here's what I<br>6 have.  I don't want you to think -- there's<br>7 nothing here that -- well, the only thing here<br>8 that -- I don't want to say new opinions.  I'll<br>9 leave that to -- how you raise --<br>10   Q.   How -- and maybe -- if I could make<br>11 a suggestion, maybe we could say opinions not<br>12 in your report that you --<br>13   A.   Yeah.  So -- so -- so -- well --<br>14      MS. STOKES:  Yeah.  I'm going to<br>15 object to that.<br>16      THE WITNESS:  I mean I'll -- I'll<br>17 let the other lawyers characterize what's --<br>18 because there's opinions, there's subopinions.<br>19 There's -- this is, you know, what you're<br>20 asking me about.<br>21      I mean there's this issue of the<br>22 MSDS, right?  Tillman raised this MSDS, for | 1 statement "do not use."  So that would<br>2 certainly be a potential safety hazard that<br>3 should have been warned about.<br>4      I disagree with Tillman.  Those<br>5 documents are here.  I saw this issue because<br>6 Tillman raised it.  And you should know that<br>7 I -- you know, that that's -- those are my<br>8 comments and views on that.<br>9      And happy -- so I brought those -- I<br>10 wanted you to have those documents.  I brought<br>11 those documents.  And happy to discuss that<br>12 with you.<br>13   Q.   And, Doctor, we can agree that<br>14 material safety data sheet's not referenced in<br>15 your expert report.  All right?<br>16      MS. STOKES:  Objection.  Form.<br>17      THE WITNESS:  I'd have to go through<br>18 the entire reliance list.  It's -- it's not<br>19 discussed -- I mean I -- I didn't see the issue<br>20 -- I didn't see the issue -- I don't see the<br>21 issue discussed in my report.<br>22      It came to me -- I didn't discuss |

| Page 139 | Page 141 |
|---|---|
| 1 example, in her report.  I view -- she's the --<br>2 I view her as the, you know, defense's -- FDA<br>3 expert, right?  So obviously it was of special<br>4 interest to me.<br>5      So I went to study what Tillman<br>6 raised, right?  I disagree with Tillman, for<br>7 example.<br>8      BY MR. JESSEE:<br>9   Q.   On the MSDS issue?<br>10   A.   On the MSDS issue, right?  I mean --<br>11 and when I went to study it, I mean I certainly<br>12 see that, you know, there was a potential<br>13 safety hazard in the degradation issues in the<br>14 Phillips technical file that was linked to the<br>15 MSDS sheet and that that would -- and that<br>16 Tillman says FDA only requires studies on the<br>17 finished product.  That's not accurate.<br>18      Because ISO 10993, Part 18, requires<br>19 chemical characterization of each component.<br>20 And that chemical characterization showed --<br>21 that chemical characterization showed -- had<br>22 evidence of oxidative degradation and that | 1 the issue in my report.  It may be -- have some<br>2 references that go through the reliance list.<br>3 So I don't want to -- I'd have to check that.<br>4      But I -- I became aware of that<br>5 issue when Defense raised it in that.  And I<br>6 understand there's -- you know, I don't know<br>7 what the -- I'll leave it to lawyers.<br>8      I mean I just want to let you know I<br>9 disagree and view -- I think she's wrong.  And<br>10 I think there's an obligation and<br>11 responsibility to put potential safety hazards.<br>12 And there was a potential safety hazard in --<br>13 in that technical file about degradation and do<br>14 not use.  And that was not warned about.<br>15      MR. JESSEE:  Right.  And --<br>16      THE WITNESS:  You -- you should know<br>17 that --<br>18      MR. JESSEE:  No.  And I appreciate<br>19 you --<br>20      THE WITNESS:  -- that's the<br>21 responses to Tillman.  And the Court and you<br>22 can discuss is that rebuttal, is that -- |

36 (Pages 138 - 141)

David Kessler , M.D.                                   January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

| Page 142 | Page 144 |
|---|---|
| 1      MR. JESSEE: Sure. | 1  report. |
| 2      THE WITNESS: And you're -- I want | 2      BY MR. JESSEE: |
| 3  you to be able to inquire -- I want you to be | 3      Q.   You list out the issues you were |
| 4  able to ask me all questions about that.  But | 4  asked to look into, right? |
| 5  that's how I came to the issue. | 5      A.   Yeah.  But you -- you didn't ask the |
| 6      BY MR. JESSEE: | 6  -- you -- you didn't ask the question "At what |
| 7      Q.   Yeah.  And I appreciate your candor | 7  point in time did counsel instruct you?" |
| 8  there. | 8      So I mean, at that moment -- |
| 9      And what I -- my question, though, | 9      Q.   And -- |
| 10  very narrowly, is you don't offer any opinions | 10      A.   -- in time, no.  I mean -- so I was |
| 11  about the MSDS in your actual expert report | 11  -- I don't want to get yelled at by my counsel. |
| 12  that was served in this case; is that... | 12      THE WITNESS: And -- but -- just let |
| 13      MS. STOKES: Objection.  Form. | 13  me see if I can be helpful.  Okay? |
| 14      THE WITNESS: No.  But I think -- | 14      MS. STOKES: Go ahead. |
| 15  but -- that would be correct.  But I think in | 15      THE WITNESS: Okay.  So again, I was |
| 16  response to Tillman I certainly have that as an | 16  asked certain questions.  I responded to those |
| 17  opinion. | 17  questions.  I read the report that was |
| 18      BY MR. JESSEE: | 18  served -- that -- that criticized me.  I |
| 19      Q.   Have you supplemented your expert | 19  mean -- |
| 20  report? | 20      BY MR. JESSEE: |
| 21      A.   Just with this -- just with this -- | 21      Q.   Well, no.  I don't think that's |
| 22  just with the reliance list -- | 22  fair.  That -- that -- it does not -- does the |

| Page 143 | Page 145 |
|---|---|
| 1      Q.   Okay. | 1  report criticize you, or does it disagree with |
| 2      A.   -- and the MSDS documents. | 2  your opinions? |
| 3      Q.   And you actually did an errata sheet | 3      MS. STOKES: Objection.  Form. |
| 4  as well to your expert report, correct? | 4      Is there a question here? |
| 5      A.   Yeah.  I'm -- I'm happy to put it on | 5      THE WITNESS: I'm sorry. I don't |
| 6  the errata sheet if you'd like.  I mean I just | 6  mean to be -- it shouldn't be on me.  It -- it |
| 7  want to -- if want me to put -- list this as -- | 7  disagrees with my opinions.  But it's the -- |
| 8  I mean I'm not sure what the right -- tell me | 8  it's the -- I -- it's the report -- |
| 9  what the right way is.  Counsel can decide. | 9      BY MR. JESSEE: |
| 10      If you want me to supplement now | 10      Q.   I -- okay. |
| 11  and -- I just want to make sure you know I have | 11      A.   It's the -- |
| 12  this view in response to Tillman.  And this is | 12      Q.   I just want to make sure we're on -- |
| 13  an -- obviously it's an important issue to | 13      A.   -- matching report. |
| 14  counsel.  It was raised by Dr. Tillman.  And it | 14      Q.   I want to make sure we're on the |
| 15  should have been warned about. | 15  same page.  And -- because -- |
| 16      Q.   Okay.  And it's not an issue though | 16      A.   Yeah. |
| 17  that you were asked to look into by plaintiffs' | 17      Q.   You don't criticize Donna B. Tillman |
| 18  counsel, right? | 18  as a person or her qualifications; you disagree |
| 19      MS. STOKES: Objection.  Form. | 19  with her opinions, right? |
| 20      I'm going to instruct him not to | 20      MS. STOKES: Objection.  Form. |
| 21  answer. | 21  Argumentative. |
| 22      MR. JESSEE: Well, this is from his | 22      THE WITNESS: Yeah.  That's correct. |

37 (Pages 142 - 145)

David Kessler , M.D.

January 31, 2020

Davol, Inc./C. R. Bard, Inc. -  MDL 2846

| Page 146 | Page 148 |
|---|---|
| 1 I mean I'm -- I'm -- I'm not -- of course. I | 1 purpose of this deposition.  And we might -- |
| 2 would not -- that's not what this is about. | 2 we'll see if we get into that topics at all. |
| 3 This is this is about the substance of -- | 3      But -- |
| 4    Q.   Okay. | 4    A.   Right. |
| 5    A.   I mean -- | 5    Q.   -- just so I know, are there any |
| 6    Q.   I just wanted to make sure we were | 6 other issues or opinions you have that are not |
| 7 clear. | 7 in your expert report that you've developed |
| 8    A.   Yeah.  No.  I don't -- but -- but | 8 since you put the expert report together? |
| 9 she raised me in her report, right? | 9      MS. STOKES:  Objection.  Form. |
| 10    Q.   Your opinion -- your report and | 10      THE WITNESS:  So let me just say -- |
| 11 opinions, right? | 11      MS. STOKES:  Mischaracterizes. |
| 12    A.   She -- she -- my opinions were | 12      THE WITNESS:  -- I'm happy to sit |
| 13 raised in her report -- | 13 here during lunch or whatever and ask any -- |
| 14    Q.   Okay. | 14 answer any questions you have on MSDS.  I mean |
| 15    A.   -- that I read. | 15 I'll -- if -- if you want to -- |
| 16    Q.   Sure. | 16      BY MR. JESSEE: |
| 17    A.   She raises the MSDS.  I was not | 17    Q.   Well, and I know you're -- |
| 18 asked -- counsel certainly is aware that, | 18    A.   I -- |
| 19 because of Donna B. Tillman's report, I -- I | 19    Q.   But to be fair, Dr. Kessler, you |
| 20 looked at the MSDS.  So I mean -- and -- and, | 20 know, I didn't know about this opinion until I |
| 21 again, I don't want to relay private | 21 came in here today.  And so you know, I didn't |
| 22 conversations. | 22 get a chance to bring in documents that I would |

| Page 147 | Page 149 |
|---|---|
| 1      But it would be fair to assume | 1 want to ask you about when -- you understand |
| 2 because -- that -- I -- I don't -- I don't | 2 what I -- where I'm coming from? |
| 3 want -- she can -- | 3    A.   I -- I -- I -- |
| 4      MS. STOKES:  Yeah.  I -- | 4      MS. STOKES:  Is there a question? |
| 5      THE WITNESS:  -- represent what she | 5      THE WITNESS:  I -- I -- |
| 6 knows. | 6      MS. STOKES:  Objection. |
| 7      But what -- what she asked me since | 7      THE REPORTER:  I need everyone to |
| 8 then -- she can discuss whether I'm allowed to | 8 talk one at a time, please. |
| 9 talk about that. | 9      MR. JESSEE:  And -- but I appreciate |
| 10      But I do have issues with | 10 your offer.  Why don't we just say we'll move |
| 11 Dr. Tillman's on MSDS.  I have views of the | 11 on, and we can figure it out with the Court if |
| 12 MSDS.  I brought these MSDS sheets.  I put | 12 we need be on a -- |
| 13 these here.  Feel free to inquire about this. | 13      THE WITNESS:  Sure.  But -- but, |
| 14      I'm happy to answer everything | 14 again, you certainly knew that your expert |
| 15 about -- I think I've told you my views of MSDS | 15 raised this.  I mean -- and your expert raised |
| 16 and gave you -- | 16 it in the context of -- also of my -- my |
| 17      MR. JESSEE:  Yeah. | 17 testimony was in -- my opinions were in her |
| 18      THE WITNESS:  -- a snapshot.  And | 18 report, and she raised this issue. |
| 19 happy to discuss them more. | 19      So I don't think it's a new -- I |
| 20      BY MR. JESSEE: | 20 mean, again, I leave it to you and the lawyers |
| 21    Q.   And, Doctor, today I want to focus | 21 to work out. |
| 22 on your expert report.  Because that's the | 22      BY MR. JESSEE: |

38 (Pages 146 - 149)

David Kessler, M.D.                             January 31, 2020
Davol, Inc./C. R. Bard, Inc. - MDL 2846

Page 150

1   Q.   Do you know if plaintiffs' others
2 expert address MSDS in their reports served on
3 December 4th?
4      MS. STOKES: Objection. Form.
5      THE WITNESS: I -- I'd have --
6      MS. STOKES: Assumes facts.
7      THE WITNESS: I'd have to go back
8 and look and see whether Quick raised it. I
9 think it was raised in Quick, if my memory
10 serves me right. But I don't want to -- I
11 don't want to testify.
12     BY MR. JESSEE:
13   Q.   Okay. And we'll talk about Dr.
14 Quick.
15     And you relied on his opinions, in
16 part, in your -- in forming your opinions,
17 correct?
18     MS. STOKES: Objection. Form.
19     THE WITNESS: I think I -- I
20 certainly cite -- I think it's cite -- I cite
21 his opinion. And I think, as long as you
22 include, in part, I mean I'm happy to testify

Page 151

1 independently of Dr. Quick. I don't think I'm
2 dependent on Dr. Quick.
3      But I wanted -- you know, there
4 is -- he has certain expertise, and I do cite
5 that.
6      BY MR. JESSEE:
7   Q.   Well, and the point I was getting at
8 though is that you -- you saw his expert report
9 and cite to it in your expert report.
10     So you saw it at some point before
11 you put together your expert report finalized
12 right?
13   A.   I mean correct. I -- I -- but -- so
14 we can be -- well, again, I don't want to
15 violate Rule 26 here. So I want to be careful
16 of what -- yeah.
17     So I -- yes, I did see it. But
18 there's one section of Dr. Quick that I had
19 certain questions about. So there's one -- it
20 shouldn't be all of Dr. Quick.
21   Q.   Were you provided with all of Dr.
22 Quick's report or just that one -- just one

Page 152

1 specific section?
2   A.   So the answer is both, I think would
3 be accurate.
4   Q.   Okay. And we're talking about the
5 -- and just so we're clear, I'm talking about
6 the time period before your expert report was
7 finalized in December 4th, you had the whole
8 report.
9   A.   Can I explain?
10  Q.   Yes, sir.
11  A.   So a few days -- I had a specific
12 question, I believe, that focused relatively
13 narrowly on a certain issue. And I saw -- I
14 believe I saw that section of the report
15 several days before.
16     And then I saw the final report the
17 last day, I believe in the morning, whenever,
18 sometime. So I didn't see the whole report
19 until the end. But I saw the -- the -- that
20 relevant portion I had asked for before because
21 I had to prepare my report.
22  Q.   Okay. And was that e-mailed to you,

Page 153

1 the -- that portion that was before or --
2   A.   I -- I -- it probably was Webex or
3 something. I saw somehow. I don't recall.
4   Q.   So going back to the question I
5 asked a little while ago. I just want to make
6 sure I'm being clear here.
7      We've talked some about the MSDS,
8 this opinion that's not in your report.
9      Are there any other opinions that
10 you've developed since your report, besides the
11 MSDS, that are not in your report?
12     MS. STOKES: Objection. Form.
13     THE WITNESS: Well, it depends. I
14 mean -- so let -- can you re -- rephrase -- can
15 you ask -- the report -- I mean we talk --
16 we -- we've been on the record for two hours or
17 so. I mean I've given you certain testimony.
18     Is that testimony included in your
19 question?
20     BY MR. JESSEE:
21   Q.   Well, Doctor, you've done a number
22 of expert reports over your career, right?

39 (Pages 150 - 153)

David Kessler , M.D.                    January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

Page 154

1    A.   Right.
2         MS. STOKES:  Objection.  Form.
3         BY MR. JESSEE:
4    Q.   And I -- you understand that it's
5    important, in doing an expert report, to be
6    thorough and make sure your -- all your
7    opinions are contained in there, right?
8         MS. STOKES:  Objection.  Form.
9         THE WITNESS:  Correct.  But I also
10   understand that I'm here.  You're asking me
11   questions.  And during that testimony, I may
12   give you certain opinions.  There may be --
13   there may be subopinions or subsubopinions or
14   maybe an observation that relates or a set of
15   facts that relates.
16        So I -- so my goal was to put
17   everything as best I can, right, schedules and
18   every -- and four corners.
19        Had that report -- had you stopped
20   taking that report and said, "We're done,"
21   we -- we've been engaged in test -- in -- in
22   questions, I would say that reported reflects

Page 155

1    the four corners.
2         Your -- what I would say right now
3    is that my opinions reflect that report and
4    anything we've discussed on the record.
5         BY MR. JESSEE:
6    Q.   Okay.  Well --
7    A.   And -- and if we stop now, I would
8    say that -- that the four corners are that
9    report and -- and the record you've asked me
10   about.  And I won't have any more -- I won't
11   have anything else to say if you stop right
12   now.
13        But if you ask other questions, I
14   may have other opinions or subopinions or
15   characterize them as you want.  You know, I'm
16   answering your questions.
17   Q.   Are you trying to incentivize me to
18   stop now?  Is that what I'm -- what we're
19   getting at?
20        MS. STOKES:  Objection.
21        THE WITNESS:  I -- I -- I don't --
22        MR. JESSEE:  I'm just kidding.

Page 156

1         THE WITNESS:  I don't think you
2    would take that bait, sir.  I mean, if you'd
3    like, you know --
4         BY MR. JESSEE:
5    Q.   Let -- let me ask you a different
6    question that's a little better, I think, maybe
7    so we are on the same page.
8         The -- are there -- have you
9    developed opinions on any topics that are not
10   covered in your expert report since that time
11   other than the MSDS?
12        MS. STOKES:  Objection.  Form.
13        THE WITNESS:  I think we talked
14   about -- I mean we talked about composites this
15   morning, right?
16        BY MR. JESSEE:
17   Q.   Is that though -- is that an opinion
18   that you have had previously?
19   A.   You asked me --
20        MS. STOKES:  Objection.  Form.
21        THE WITNESS:  You asked me whether I
22   had criticisms of FDA, right?  And we -- you

Page 157

1    asked me whether I had -- you asked me whether
2    I would criticize a company for using
3    substantial equivalent.
4         I think that was your question,
5    right?
6         MR. JESSEE:  Something like that.
7         THE WITNESS:  And I answered that
8    question.
9         Now, is that an opinion?  You know,
10   the Court can character -- I mean I answered
11   your question.  That is something I -- did I
12   phrase it exactly that way in the report?
13   Probably not.  Because there's limitations.
14   But, you know, you could view that -- you view
15   that for what you want.
16        BY MR. JESSEE:
17   Q.   Okay.  And, Doctor -- and, to your
18   credit, you did an incredibly thorough report,
19   correct?
20        MS. STOKES:  Objection.  Form.
21        THE WITNESS:  There -- there's a --
22   I -- I appreciate the compliment.

40 (Pages 154 - 157)

David Kessler, M.D.                    January 31, 2020
Davol, Inc./C. R. Bard, Inc. - MDL 2846

Page 158

1    I mean I think the report's pretty
2 focused. Because there are five -- at least
3 five devices. And I try to be pretty focused
4 on there.
5        But, you know, there's no way I
6 could have -- you know, if I were completely
7 thorough, you wouldn't -- you wouldn't have any
8 questions of me. So I couldn't be that
9 thorough. Because I couldn't have answered all
10 your questions in the report.
11       But it just -- it's the nature of
12 these things. I mean there's things in the --
13 the schedules, right? I mean the -- the 510(k)
14 predicate charts. I mean there are issues
15 there, for example, we talked about this
16 morning, what things are relied upon.
17       So I mean is everything brought out
18 to the exact same degree of attention? No.
19 You -- you understand. But I'm just trying to
20 answer your question.
21       BY MR. JESSEE:
22    Q.   All right. Let's take a look at

Page 159

1 your report --
2    A.   Sure.
3    Q.   -- that was served in this case.
4        And I'm looking at Page 2, Scope of
5 Report.
6    A.   Correct.
7    Q.   And you list here five issues that
8 you were asked to address in your report?
9    A.   Correct.
10   Q.   And those issues were -- the first
11 one is the purpose of the 510(k) process, the
12 import of FDA clearance through the 510(k)
13 process, and FDA standards and regulations for
14 the inclusions -- the inclusion -- excuse me --
15 of warnings on device labeling?
16   A.   Yes.
17   Q.   That's the first issue you were
18 asked to address?
19   A.   Yeah.
20   Q.   Second issue was whether Bard
21 admitted certain warnings from the labeling of
22 the PerFix Plug, Ventralex and 3DMax device?

Page 160

1    A.   Correct.
2    Q.   The third issue is whether Bard's
3 marketing of the PerFix Plug and Ventralight
4 devices was misleading?
5    A.   Correct.
6    Q.   The fourth issue was whether Bard's
7 statement regarding reabsorption of the
8 hydrogel barrier in the Ventralight IFU was
9 misleading?
10   A.   Yes.
11   Q.   And the fifth issue you were asked
12 to address was whether Bard failed to follow
13 FDA design control requirements for the large
14 Ventralex and PET ring and Ventralex with PDO
15 ring.
16   A.   Correct.
17       MS. STOKES: You said "and PET."
18 It's with PET. I'm just...
19       MR. JESSEE: Oh, thank you. Yep.
20       BY MR. JESSEE:
21   Q.   The -- this Ventralex with PET ring
22 and Ventralex with PDO ring.

Page 161

1    A.   Sure.
2    Q.   Then at the end of your report, you
3 contain -- there's a section that's titled
4 "Conclusion"?
5    A.   Yes, sir.
6    Q.   And specifically that starts on Page
7 90?
8    A.   Yes, sir.
9    Q.   And in that conclusion, that's a
10 summary of the opinions that are expressed in
11 your report; is that fair?
12   A.   Yeah. They just pull down. It's a
13 -- don't view that as in -- I mean inclusive of
14 everything. You got to read -- read the whole
15 report and testimony. I just try to make it
16 easier. I try to give you some kind of road
17 signs, beginning, middle, end.
18   Q.   Right. And --
19   A.   Right.
20   Q.   And that's -- it's a -- of the
21 opinions, and obviously it doesn't encompass
22 all of them.

41 (Pages 158 - 161)

David Kessler , M.D.　　　　　　　　　　January 31, 2020
Davol, Inc./C. R. Bard, Inc. -　MDL 2846

| Page 162 | Page 164 |
|---|---|
| 1　　　But this is the summary of the big | 1　　　THE WITNESS: I'm sorry. What was |
| 2 points that you hit in your report, right? | 2 the instruction? |
| 3　　A.　These are just -- | 3　　　MR. JESSEE: -- with the -- |
| 4　　　MS. STOKES: Objection. Form. | 4　　　MS. STOKES: Not to answer. |
| 5　　　THE WITNESS: These -- these are the | 5　　　THE WITNESS: Okay. That's an easy |
| 6 -- I'm not sure big point. These are just | 6 instruction. |
| 7 things that are pulled down I mean to the end | 7　　　MR. JESSEE: I -- I disagree that |
| 8 to try to give you somewhat a sense of what's | 8 this is -- just for the record, and obviously I |
| 9 in the report. | 9 -- I disagree that this is privileged, |
| 10　　　BY MR. JESSEE: | 10 especially when we have in his report where |
| 11　　Q.　Okay. And these address the five | 11 it's asked what he was asked to look at. |
| 12 topics we -- that you were asked to look at, | 12　　　I'm entitled to explore those -- |
| 13 right? | 13 what exactly he was asked to look at. And so |
| 14　　　MS. STOKES: Objection. | 14 we would reserve to -- I'm going to -- plan to |
| 15　　　BY MR. JESSEE: | 15 raise this issue with the Court. And then we |
| 16　　Q.　That's what's in this Conclusion | 16 can, if we need to, reconvene. |
| 17 section? | 17　　　BY MR. JESSEE: |
| 18　　　MS. STOKES: Objection. Form. | 18　　Q.　The next issue, Doctor, on whether |
| 19　　　THE WITNESS: What I was asked to | 19 Bard's marketing of the PerFix Plug and |
| 20 look at when the report started, yes. | 20 Ventralight devices was misleading, were you |
| 21　　　BY MR. JESSEE: | 21 asked to look at it in any particular ways |
| 22　　Q.　All right. And when -- looking back | 22 whether it was misleading? |

| Page 163 | Page 165 |
|---|---|
| 1 at what you were asked to look at -- and this, | 1　　　MS. STOKES: Objection. Form. |
| 2 again, on Page 2 and 3. | 2 "Particular ways." But -- |
| 3　　A.　Sure. | 3　　　THE WITNESS: And I'm not sure I |
| 4　　Q.　And we'll look at specifically on | 4 understand the question. |
| 5 Page 3. It's Paragraph 9B. | 5　　　But -- but -- but the answer is no. |
| 6　　A.　Correct. | 6 I -- no. I -- there was no -- this -- no. The |
| 7　　Q.　Were you asked to look at whether | 7 answer is no to your question. |
| 8 Bard admitted any certain warnings in those -- | 8　　　BY MR. JESSEE: |
| 9 in the PerFix Plug, Ventralex and 3DMax | 9　　Q.　Okay. And this report though |
| 10 devices? | 10 contains your opinions as to in which ways |
| 11　　　MS. STOKES: I'm going to object to | 11 Bard's marketing of the PerFix Plug and |
| 12 that. | 12 Ventralight was misleading? |
| 13　　　I'm going to instruct you not to | 13　　　MS. STOKES: Objection. Form. |
| 14 answer. | 14　　　THE WITNESS: Including my testimony |
| 15　　　MR. JESSEE: Okay. | 15 here today. |
| 16　　　BY MR. JESSEE: | 16　　　BY MR. JESSEE: |
| 17　　Q.　Were you asked to look at whether | 17　　Q.　Okay. And what about -- going back |
| 18 the Ventralight ST was -- admitted any warnings | 18 to that previous point, 9B, have you included |
| 19 from its labeling? | 19 in your report all the ways you believe that |
| 20　　　MS. STOKES: Same instruction. | 20 Bard admitted warning -- all the warnings -- |
| 21　　　MR. JESSEE: Okay. I'd just note | 21 let me strike that and start over. |
| 22 that I disagree -- | 22　　　Have you included in your report all |

42 (Pages 162 - 165)

Case 2:18-cv-01509-AS-KRS Doc #: 92-6 Filed 03/02/20 Page 44 of 136 PageID #: 6840
Case 2:18-cv-01509-AS-KRS Doc #: 92-6 Filed 07/23/20 Page 44 of 136
PageID: 194194

David Kessler , M.D.      January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

---

Page 166

1 of the warnings that you believe Bard omitted
2 from the labeling in the PerFix Plug, Ventralex
3 and 3DMax devices?
4      MS. STOKES: Objection. Form.
5      THE WITNESS: If you include the
6 report and my testimony here today, yes, I've
7 tried to do that.
8      BY MR. JESSEE:
9    Q.   With the -- well, I -- and I want to
10 know just about the -- focus just on the
11 report.
12      Have you included in your report, as
13 we sit here today, the opinions you have on any
14 warnings that were omitted from the labelling
15 of the PerFix Plug, Ventralex and 3DMax
16 devices?
17      MS. STOKES: Objection. Asked and
18 answered.
19      THE WITNESS: Well, you'd have to
20 take into account my testimony today. I
21 mean in order --
22      BY MR. JESSEE:

Page 167

1    Q.   But -- I know. My question though
2 is not about the -- I'm just wanting to know
3 just about the report.
4      Have you included -- is there -- in
5 the report, can you show me a page -- is there
6 any other opinion, as we're sitting here right
7 now, this point in time, that's not in here on
8 the warnings?
9    A.   We -- we discussed --
10      MS. STOKES: Objection. Form.
11      THE WITNESS: We -- we discussed
12 things this morning.
13      BY MR. JESSEE:
14    Q.   About warnings that you think should
15 have been in these -- the labeling for these
16 devices?
17    A.   Yes. And we -- we just -- we just
18 spent time discussing, for example, the MSDS
19 issue. And Phillips had a -- a -- a warning
20 that said "do not use." And --
21    Q.   And so you're offering an
22 opinion that --

Page 168

1    A.   Wait. Can't I just finish my
2 answer?
3      MS. STOKES: Yeah. Let him finish.
4      MR. JESSEE: Sure.
5      THE WITNESS: Right. So Phillips
6 had a -- I guess two things. As I understand
7 it, Phillips had the issue of -- that it had
8 identified of oxidative degradation and had a
9 do-not-use warning in its MSDS.
10      So that is a -- and that was on
11 polypropylene. It was -- wasn't the only
12 supplier over Bard's history. But it was one
13 of the suppliers. And that went in -- to best
14 of my knowledge, into these devices.
15      And having become aware, through
16 Dr. Tillman, of the MSDS issues, that -- that
17 potential safety hazard of that degradation and
18 therefore do-not-use would rise to that
19 potential safety hazard should have been warned
20 about.
21      So that wasn't in my report as such.
22 And that's what we talked about earlier this

Page 169

1 morning.
2      BY MR. JESSEE:
3    Q.   Which devices -- can we agree that
4 your report is focused primarily -- your
5 opinions in the report and what you were asked
6 to look at were focused on four devices: the
7 PerFix Plug, Ventralight, 3DMax and Ventralex?
8      MS. STOKES: Objection. Form.
9 Mischaracterizes.
10      THE WITNESS: Yeah. So you've got
11 to be a little more specific. There's
12 different versions of Ventralex. Then -- and
13 we're talking about Ventralight ST. So -- in
14 certain portions. So just -- there's various
15 devices. So the report covers the devices
16 that -- that are covered.
17      But obviously those devices are made
18 out of material that Phillips supplied. And
19 whatever warning -- whatever potential safety
20 hazard that that raised, I mean, obviously
21 obviously be warned about.
22      BY MR. JESSEE:

43 (Pages 166 - 169)

David Kessler , M.D.                                      January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

| Page 170 | Page 172 |
|---|---|
| 1   Q.   All right.  Which of those devices | 1   A.   -- that -- that question. |
| 2   that are referenced on Page 3 were made out of | 2     So your specific question? |
| 3   the Phillips Marlex polypropylene material? | 3   Q.   Does Ventralight -- |
| 4   A.   So I have to -- I -- I don't want to | 4   A.   That's right. |
| 5   testify on supply chain here.  Because I think | 5   Q.   -- contain Marlex polypropylene? |
| 6   there are two -- two manufacturers over time at | 6   A.   Yeah.  Let me just give you exactly |
| 7   least.  And the documentation that I saw | 7   the answer to that question.  One second. |
| 8   certainly focused on the 2007, 2008 -- the | 8     MR. JESSEE:  And if it's going to |
| 9   documents about -- between Phillips and its -- | 9   take you a second, it's fine.  I might go use |
| 10   and what was told to Phillips.  I saw those | 10   -- let's -- let's go off the record for one |
| 11   documents.  And those primarily focused on the | 11   second, please, and... |
| 12   2006 to 2008 period. | 12     THE VIDEOGRAPHER:  We are going off |
| 13     So I'm only aware of -- you know, | 13   the record. |
| 14   obviously with devices that were used later. | 14     The time is 10:29. |
| 15   And I'd have to go back and check the actual | 15     (A short recess was taken.) |
| 16   supply chain. | 16     THE VIDEOGRAPHER:  We are going back |
| 17     But whichever devices used whatever | 17   on the record. |
| 18   those warnings were, that's what should attach. | 18     The time is 10:33. |
| 19   Q.   Can you name -- tell me one of the | 19     BY MR. JESSEE: |
| 20   devices that's listed on this page of your | 20   Q.   Doctor, before we went off the |
| 21   report that uses Marlex polypropylene? | 21   record for a couple minutes, you were -- I had |
| 22   A.   What -- | 22   asked about whether Ventralight contains Marlex |

| Page 171 | Page 173 |
|---|---|
| 1     MS. STOKES:  Objection.  Form. | 1   polypropylene in there. |
| 2     THE WITNESS:  Certainly Ventralex -- | 2     And during that time you've been |
| 3   my understanding was the PerFix and Ventralex. | 3   looking at your computer. |
| 4     I'd have -- I'd want to double-check | 4     And I didn't ask you about this |
| 5   some of this.  The -- the name changed to -- to | 5   earlier, but what -- what exactly are you |
| 6   Bard Mesh at certain times.  And there -- there | 6   looking at on your computer? |
| 7   were different names attached, as you're well | 7   A.   I'm looking at the 510(k). |
| 8   aware. | 8   Q.   Okay. |
| 9     BY MR. JESSEE: | 9   A.   And I'm looking at specifically the |
| 10   Q.   What about Ventralight; does that | 10   510(k) for Ventralight ST.  And during break -- |
| 11   contain Marlex polypropylene? | 11   there are two 510(k) numbers.  So I asked |
| 12   A.   I -- I -- I can answer that question | 12   counsel which one.  He wasn't sure.  But I'm |
| 13   if you give me a minute. | 13   looking at the 510(k) application for |
| 14   Q.   Well, Doctor, why don't we wait, and | 14   Ventralight ST. |
| 15   we'll come back to, and you can look at a break | 15   Q.   And do you know what type of |
| 16   if you want to look into that. | 16   polypropylene Ventralight ST uses? |
| 17   A.   I have -- I mean that -- that's just | 17   A.   So I just looked at the materials. |
| 18   -- I mean I -- I'm happy to answer that | 18   And from my -- I can't tell that from the poly |
| 19   question.  Just give me a minute.  And if you | 19   -- from the discussion in certain sections of |
| 20   don't want me to answer it, that's fine.  But | 20   the report.  It just uses the word |
| 21   I'm happy to answer -- | 21   "polypropylene."  It doesn't identify the |
| 22   Q.   Okay. | 22   supply chain. |

44 (Pages 170 - 173)

David Kessler , M.D.        January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

Page 174

1     I searched for the word "Marlex."
2 And I did not see the word "Marlex" in here.
3 So we'd have to go back to -- so the answer is
4 I -- I can't determine that from the 5 -- from
5 portions of the 510(k) that I looked at so far.
6    Q.  Okay.  And as we sit here today
7 right now, you can't -- you don't know whether
8 or not Marlex polypropylene was in the --
9    A.  Not -- I mean I --
10    MS. STOKES:  Objection.  Form.
11    THE WITNESS:  I'd have to go -- I --
12 I -- the answer is I -- not off the top of
13 mind.  I mean it's not the -- a fact that I --
14 I may have it in certain sheets.
15    Actually, why don't -- just -- I
16 don't want to waste time.
17    MR. JESSEE:  Yeah.
18    THE WITNESS:  But I mean I -- if
19 you'd just hand me my Ventralight section
20 behind.  Give me one more section --
21    MS. STOKES:  Sure.
22    THE WITNESS:  -- and see if I can

Page 175

1 get -- just give me Ventralight.
2    Let me see if I can give you the
3 answer.  Again, this has the 510(k).  And --
4 and let's just see if it identifies -- it just
5 uses the word "polypropylene monofilament used"
6 and then a knitted mesh with additional PGA
7 fibers added to the fill in the interlay --
8 hold on one second.
9    Manufacturer, Bard Shannon.  I don't
10 see -- let me make sure, see if there's another
11 sheet.
12    It just says -- give me one more
13 second.  It just uses the word "polypropylene."
14 It doesn't -- "polypropylene monofilament" is
15 what's told to FDA --
16    MS. STOKES:  Okay.
17    THE WITNESS:  -- in -- in this -- in
18 this part of the 510(k).
19    BY MR. JESSEE:
20    Q.  Let's look back at your report,
21 please.
22    A.  Sure.  Of course.

Page 176

1    Q.  And same page, on Page 3, where
2 the -- the issues you were asked to look into.
3    A.  Yes.
4    Q.  The -- on that number -- on
5 Paragraph 9E, you talk about design control
6 requirements for Ventralex with PET ring and
7 Ventralex with PDO ring.  And you talk about
8 that in your report.  We'll get into that.
9    Did you look at the design control
10 requirements and Bard's compliance with design
11 control compliance -- excuse me -- design
12 control requirements for any of the other
13 devices that you reviewed?
14    MS. STOKES:  Objection.  Form.
15    THE WITNESS:  I'm sure I did.  I
16 mean I -- it was -- it's part of the -- I'm
17 sure, in studying this, I -- I certainly looked
18 at the design history files.
19    I'm -- I'm not sure I got to a stage
20 of an opinion on that.
21    BY MR. JESSEE:
22    Q.  Okay.  Well --

Page 177

1    A.  But -- but I -- but I certainly
2 looked at -- whenever -- whenever you have a
3 design history file, you didn't always identify
4 it as a design history file.  Sometimes they
5 were called technical files.  I mean sometimes
6 they were -- you know, in different places.
7    But I -- I certainly looked at the
8 design history files of a range of devices.
9    Q.  Right.
10    And my -- my question is not whether
11 you looked at them.
12    But in -- in your report, there's
13 not opinions about the design history files or
14 the design control requirements related to
15 PerFix Plug, Ventralight or 3DMax.
16    Is that fair to say?
17    MS. STOKES:  Objection.  Form.
18 Mischaracterizes.
19    THE WITNESS:  Yeah.  We got to look
20 at individual paragraphs.  We certainly talk
21 about audit reports, like Quintiles and Post.
22 And they have applicability.  And even 483

45 (Pages 174 - 177)

David Kessler , M.D.                                   January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

Page 178

1 audits, they have applicability beyond any one
2 device.
3          So again, I would use these
4 questions for sort of sign posting, as my
5 editor would -- my late editor, who tragically
6 just died, would say to give you some sense of
7 what I'm doing.  But you got to read each
8 paragraph and my testimony here today.
9          I wouldn't -- don't -- don't view
10 this as -- as -- as sort of -- you've got to
11 read the whole report, read all the testimony.
12 And that -- that's where you -- don't -- don't
13 just read these as the -- the actual precisely
14 specific thing.  It's only addressed in the
15 report.  These are -- these are questions, but
16 there's a whole report here, and there's
17 testimony.
18          BY MR. JESSEE:
19     Q.   Right.  And there's conclusions in
20 the report.
21          And there's no -- in the Conclusion
22 section of your report, you don't talk at all

Page 179

1 about the design controls for PerFix Plug,
2 3DMax or Ventralight.
3     A.   I -- I -- I --
4          MS. STOKES:  Objection.  Form.
5          THE WITNESS:  I -- I -- I take that.
6 But on -- you know, there may be discussions of
7 design stuff and the -- the -- the Quintiles
8 audit or other things that may be discussed in
9 the body of the report that could have
10 relevance.
11          But you're -- you're correct.  I
12 tried to -- it tries to focus.  But just don't
13 -- read it -- read the report as a whole and
14 the testimony as a whole.
15          BY MR. JESSEE:
16     Q.   Let's switch gears a minute, Doctor.
17 I want to talk about your work at the
18 University of California San Francisco.
19     A.   Sure.
20     Q.   And we -- we talked briefly about it
21 earlier, that you were the dean for a period of
22 time; and then since then you've been a

Page 180

1 professor of pediatrics and of epidemiology and
2 biostatistics.
3     A.   Correct.
4     Q.   Are you teaching at all in either of
5 those positions?
6     A.   Yes.
7     Q.   In which one of those?
8     A.   I'm teaching in epi.
9     Q.   And what is that -- what do your
10 teaching duties consist of?
11     A.   A small group -- I have a upcoming
12 small group on causation, et cetera,
13 epidemiology.
14     Q.   Okay.  And is that -- is it in a
15 classroom setting?
16     A.   Yeah.  Will be.  Yeah.  It's small
17 group sessions with -- with medical students.
18 Medical school teaching is not exactly what --
19     Q.   Sure.
20          Not quite like law school, right?
21     A.   No.  It's not -- it's -- it's
22 different.

Page 181

1     Q.   The -- in the -- when you're -- and
2 that's something -- have you have been teaching
3 there for a while then?
4     A.   On -- on and off.  You know, there's
5 a faculty of several -- about -- I mean in the
6 thousands.  And there's only 150 medical
7 students a year.  So there's many more faculty
8 than there are student.
9          So at different years and different
10 times, I do different things.  Now I'm doing --
11 you know, I've been -- I've been asked to do
12 the causation and stuff like that and -- and
13 will do that.
14     Q.   Are -- are you involved at all in
15 any clinical studies that take place at UCSF?
16     A.   Not --
17          MS. STOKES:  Objection.  Form.
18          THE WITNESS:  Not currently.  I was.
19 I was head of the GCRC.  So I was principal
20 investigator of everything.  I was -- I was the
21 principal investigator of the GCRC through --
22 certainly through, my guess, what, 2007, 2008.

46 (Pages 178 - 181)

David Kessler , M.D.                                              January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

| Page 182 |
|---|
| 1 But -- I -- let me -- let me leave it at that. |
| 2     Q.    And that -- that -- okay.  Let me |
| 3 withdraw that. |
| 4        Are you in -- have -- are you |
| 5 involved -- currently involved in any clinical |
| 6 protocols? |
| 7        MS. STOKES:  Objection.  Form. |
| 8        THE WITNESS:  So I'm involved -- |
| 9 only to the extent -- I mean I -- the -- at |
| 10 UCSF are you asking? |
| 11     MR. JESSEE:  Yes? |
| 12       THE WITNESS:  Or are you asking on |
| 13 company stuff? |
| 14       MR. JESSEE:  UCSF. |
| 15       THE WITNESS:  UCSF I am not.  I mean |
| 16 I am -- I am focused primarily on my research. |
| 17 I have a book coming out next -- what month is |
| 18 this are we? -- end of March.  So I focused on |
| 19 my research. |
| 20       BY MR. JESSEE: |
| 21    Q.    What -- what's that book on, what |
| 22 topic? |

| Page 183 |
|---|
| 1    A.    It's -- |
| 2        MS. STOKES:  Form. |
| 3        Is that confidential?  Can you talk |
| 4 about it? |
| 5        THE WITNESS:  Yeah.  He's not going |
| 6 to -- he's not -- |
| 7        MR. JESSEE:  If you don't want to, |
| 8 that's fine.  May -- |
| 9        THE WITNESS:  I mean I'm happy to -- |
| 10 to break and -- |
| 11       MR. JESSEE:  That sounds good. |
| 12 That's fine. |
| 13       THE WITNESS:  And -- and -- and -- |
| 14       MR. JESSEE:  I -- I didn't mean -- |
| 15       THE WITNESS:  And -- and -- and -- |
| 16       MR. JESSEE:  -- to ask you -- |
| 17       THE WITNESS:  And I think I -- |
| 18       MR. JESSEE:  I was just curious. |
| 19       THE WITNESS:  I probably owe you |
| 20 a -- |
| 21       THE REPORTER:  I still need you guys |
| 22 to just one at a time, please. |

| Page 184 |
|---|
| 1        MR. JESSEE:  All right.  My -- sorry |
| 2 about that. |
| 3        BY MR. JESSEE: |
| 4    Q.    Doctor -- |
| 5    A.    Happy to tell you at the break. |
| 6    Q.    All right.  Doctor, are you familiar |
| 7 with UCSF's Center For Hernia Repair and |
| 8 Abdominal Wall Reconstruction? |
| 9    A.    I am not in that department.  I may |
| 10 be -- I may be aware of it, but I am not |
| 11 intimately aware of it. |
| 12    Q.    Okay.  Do you know who Dr. Hobart |
| 13 Harris is, who's the chief of general surgery |
| 14 at UCSF Medical Center? |
| 15    A.    Certainly. |
| 16    Q.    He's someone you worked with for a |
| 17 long time? |
| 18    A.    I do. |
| 19       MS. STOKES:  Objection.  Form. |
| 20       BY MR. JESSEE: |
| 21    Q.    Have you talked with Dr. Harris |
| 22 about hernia mesh at all? |

| Page 185 |
|---|
| 1        MS. STOKES:  Objection.  Form. |
| 2 Vague. |
| 3        THE WITNESS:  No.  And I |
| 4 deliberately did not. |
| 5        BY MR. JESSEE: |
| 6    Q.    And why is that? |
| 7    A.    Because I -- I wanted to -- I didn't |
| 8 think it would be appropriate.  I wanted to |
| 9 stay with the record that was before me.  And I |
| 10 didn't want to go extra -- outside of that |
| 11 record.  I mean I could, but I did not. |
| 12    Q.    With Dr. Harris, is he -- he's |
| 13 someone who you've interacted with during your |
| 14 time at UCSF? |
| 15    A.    Yes. |
| 16       MS. STOKES:  Objection.  Form. |
| 17       THE WITNESS:  Yeah.  Yes. |
| 18       BY MR. JESSEE: |
| 19    Q.    You're -- you're aware that at UCSF |
| 20 they -- the surgeons there like Dr. Harris |
| 21 implant hernia mesh to treat hernias, correct? |
| 22       MS. STOKES:  Objection.  Form. |

47 (Pages 182 - 185)

David Kessler , M.D.                                    January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

Page 186

1  Assumes facts.
2        THE WITNESS:  Yeah.  I'm -- I'm not
3  going to -- I -- please let Dr. Harris testify
4  what he does.  I -- I can't testify to what Dr.
5  Harris does.
6        MR. JESSEE:  Okay.  And I'm just --
7  all right.
8        I'll show you -- we'll go ahead and
9  mark as an exhibit -- we are now at 18.
10        (Deposition Exhibit 18 was marked
11  for identification.)
12        BY MR. JESSEE:
13    Q.    Doctor, have you ever looked at the
14  UCSF surgery web site?
15    A.   I have.
16    Q.    Okay.  And you see that this is from
17  actually the Center For Hernia Repair and
18  Abdominal Wall Reconstruction portion of the
19  web site.
20        MS. STOKES:  Just going to object to
21  foundation on this document.
22        BY MR. JESSEE:

Page 187

1    Q.    And, Doctor, you can see at the
2  bottom of the first page of the web site where
3  I got this from, the date.
4    A.   I see it.
5    Q.    This one is -- at the top it says
6  "UCSF Department of Surgery."
7        Do you see that?
8    A.   I see that.
9    Q.    And then it talks about laparoscopic
10  ventral hernia repair?
11    A.   That's what it says.
12    Q.    And the last sentence of the first
13  paragraph, when talking about the procedures
14  performed here, says:  "While viewing the
15  monitor, the surgeon uses instruments to
16  carefully repair the hernia using synthetic
17  mesh."
18    A.   I see that.
19    Q.    Do you see that?
20        And I mean -- so, if I understand
21  you, you didn't know one way or another whether
22  hernia mesh was being used at UCSF prior to

Page 188

1  looking at this?
2        MS. STOKES:  Objection.  Form.
3        THE WITNESS:  I -- I -- I --
4        MS. STOKES:  Misstates.
5        THE WITNESS:  -- would not want to
6  testify who uses what where.  It's a very
7  general statement.  Even the terms "mesh" is a
8  very general statement.  I mean the surgeons
9  can testify what they use.  And there will be
10  surgeons that testify.  They will testify.  I
11  can't -- I'm not going to testify what they
12  use.  You can -- you can ask them questions.
13        BY MR. JESSEE:
14    Q.    Well, and I -- I can -- I'm -- I'm
15  entitled to ask you questions that you -- about
16  what your knowledge is.
17        And I just want to know do you have
18  knowledge -- do you know whether hernia mesh is
19  used in the majority of hospitals in the
20  country?
21        MS. STOKES:  Objection.  Form.
22  Outside the scope.  Calls for speculation.

Page 189

1        Go ahead.
2        THE WITNESS:  Yeah.  So I don't have
3  the -- I mean I don't -- I don't have
4  epidemiological data that I reviewed here that
5  would tell me again -- I -- I -- your
6  question's so general.  What kind of hernia?
7  Where?  At what point in time?
8        I've reviewed certain documents.
9  But I don't -- I can't give you the
10  epidemiological data.  I don't know the studies
11  to tell me which hospitals use what for what
12  purposes at what points in time.  I just don't
13  have that data.
14        BY MR. JESSEE:
15    Q.    When you were at Yale as the dean of
16  that medical school, were they using synthetic
17  hernia mesh at that points?
18        MS. STOKES:  Objection.  Form.
19  Vague.  Calls for speculation.
20        Answer if you can.
21        THE WITNESS:  I --
22        MR. JESSEE:  And I would just --

48 (Pages 186 - 189)

David Kessler , M.D.                    January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

Page 190

1 object to form is fine.  The speaking
2 objections -- I've let it go for a while now,
3 but they're completely improper.
4        MS. STOKES:  Actually, CMO 22
5 specifically states that we can state the
6 basis.  So I would advise you to read the CMOs
7 in this --
8        MR. JESSEE:  And -- and I've read
9 it.  And we're -- that's fine.
10       BY MR. JESSEE:
11   Q.   Doctor, I -- I don't mean to --
12 please go ahead.  And I'd be happy to re-ask --
13   A.   Yeah.
14   Q.   -- too.
15   A.   I mean my -- my suggestions are --
16 my -- my -- my answer is -- I mean I would -- I
17 don't believe I have had -- I can't recall any
18 conversation I have had with my colleagues in
19 the department of surgery at Yale what hernia
20 mesh they had to answer that's question
21 precisely.  I don't recall any conversation.
22   Q.   Well, and I'm not asking about that

Page 191

1 even what hernia mesh but whether there was
2 hernia mesh in general being used there.
3   A.   I -- I --
4        MS. STOKES:  Objection.  Form.
5        BY MR. JESSEE:
6   Q.   Do you know one way or the other?
7   A.   I -- I didn't -- I have not had any
8 specific conversations.  So I would be -- that
9 I can recall that answers that question.
10       I mean I certainly am aware that
11 hernia mesh has been used.  I -- I -- I
12 recognize that from our -- from the record
13 here.  But I don't want to testify what the
14 views are and what they used.  They should
15 testify to that, right?
16   Q.   You're certainly not critical of
17 surgeons who use hernia mesh to hernia
18 repair --
19       MS. STOKES:  Objection.  Form.
20       BY MR. JESSEE:
21   Q.   -- hernias, correct?
22       MS. STOKES:  Objection.  Form.

Page 192

1   Argumentative.  Vague.
2        THE WITNESS:  So for what device and
3 what point in time?
4        BY MR. JESSEE:
5   Q.   Talking --
6   A.   What -- what -- what -- what --
7 what --
8   Q.   -- currently as we sit --
9   A.   Any hernia mesh, your question --
10  Q.   Synthetic hernia mesh.
11       MS. STOKES:  Same objections.
12       THE WITNESS:  In -- in any -- any
13 use?  Anywhere in the body?  In cancer surgery?
14 In hernia surgery?
15       MR. JESSEE:  I -- I --
16       THE WITNESS:  Intraabdominal?  Just
17 you -- I mean --
18       BY MR. JESSEE:
19  Q.   In -- to repair a hernia anywhere.
20       MS. STOKES:  Same objections.
21       BY MR. JESSEE:
22  Q.   Do you have criticisms of doctors

Page 193

1 that use synthetic mesh to repair a hernia?
2        MS. STOKES:  Same objections.
3        THE WITNESS:  I don't -- I didn't
4 come -- it's the almost like your question
5 about FDA to some extent.
6        I'm -- I'm happy to talk to you
7 about the consensus statements on the use of
8 hernia mesh.  I've studied those.  But I'm not
9 here to level any -- and I think it would be
10 inappropriate to be talking about criticisms of
11 individual doctors or doctors using certain
12 things.
13       I'm happy to talk about the
14 consensus statements and the field in general.
15       BY MR. JESSEE:
16  Q.   Do you know what Bard hernia mesh
17 products are used at UCSF Center For Hernia
18 Repair and Abdominal Wall Reconstruction?
19       MS. STOKES:  Object to form.  Calls
20 for speculation.
21       THE WITNESS:  I -- I could go in --
22 into the record and may be able to find the

49 (Pages 190 - 193)

David Kessler , M.D.
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

January 31, 2020

Page 194

1 ordering, I mean, on the record.  But I didn't
2 see any documents in the record that
3 specifically related to that.
4        BY MR. JESSEE:
5    Q.   Did you --
6    A.   And -- and -- and I'm not sure
7 that -- again, with all due respect, Counselor,
8 you're -- you're far away from -- I'm happy to
9 talk about the regulation of these devices and
10 the FDA regulation of these devices and the
11 warnings on these devices.  But -- and that's
12 why I'm here.
13        If you want to talk about UCSF
14 hernia's department, call them.  I mean I --
15 I'm not -- I've -- I've stayed with the record.
16 And I've tried to stay within the general
17 framework of F -- the interface between
18 regulation and these devices.
19        And you're asking me what individual
20 surgeons are using.  I mean I've looked at some
21 of the medical records, I mean, again, in this
22 case, just briefly, just to have some sense of

Page 195

1 them.
2        But I don't -- I'm not going to be
3 offering case-specific kinds of stuff.
4        BY MR. JESSEE:
5    Q.   Well --
6    A.   That's for the surgeons.
7    Q.   And we'll get into those medical
8 records.  Because I didn't see those in your
9 reliance list.
10        But the -- as far as -- are you
11 offering opinions on the risks and benefits of
12 hernia surgery?
13        MS. STOKES:  Objection.  Form.
14        THE WITNESS:  No.  I -- I -- I think
15 in the -- again, to -- to the extent that
16 there's issues of safety and effectiveness as
17 they meet the definition of -- in the Federal
18 Food, Drug, and Cosmetic Act, I'm happy to deal
19 with that.
20        In some global sense of whether
21 the -- I'm happy to discuss -- so I
22 understand -- and I understand what the general

Page 196

1 consensus is and where it's moving, happy to
2 discuss that because I've looked at that.
3        The -- at different points in times
4 outside of the regulatory interface between
5 surgery and -- and the regulation, I think it's
6 probably best to let others talk about it in
7 the more abstract sense of what the risks --
8 what the surgeons -- there will be surgical
9 experts, I believe, who talk about that.
10        BY MR. JESSEE:
11    Q.   Okay.  So the surgeons will cover
12 those topics?
13        Or -- or --
14    A.   I -- I --
15    Q.   -- do we need to you them today?
16 I'm just trying to --
17    A.   I -- I --
18        MS. STOKES:  Objection.  Form.
19        THE WITNESS:  I'm happy to talk
20 about -- you know, there certainly is the
21 movement -- if you -- you look at the latest
22 consensus guidelines, the European guidelines,

Page 197

1 the Hernia Society guidelines, what the role
2 of -- for example, preformed three
3 dimensional -- I mean plug-type -- for example,
4 European Hernia Society doesn't recommend using
5 plug-type, as I understand it.
6        But again, I think the surgeons are
7 probably better off talking about that.  But
8 as -- if it interfaces the regulatory context,
9 happy to discuss it.
10        BY MR. JESSEE:
11    Q.   Okay.  And I'm still just trying to
12 figure out what interfaces the regulatory
13 complex [sic].
14        So let's look back at this document
15 that I put in front of you.
16    A.   Uh-huh.
17    Q.   Exhibit No. -- is it 19?
18    A.   18.
19    Q.   18.  Thank you.
20        MS. STOKES:  It's 18.
21        Same objections with this document.
22        BY MR. JESSEE:

50 (Pages 194 - 197)

David Kessler , M.D.                    January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

Page 198

1    Q.    And --
2        MS. STOKES:  Foundation.
3        BY MR. JESSEE:
4    Q.    -- if you look at the section that's
5  titled "Potential Complications."
6        Do you see that, Doctor, bottom of
7  the page?
8    A.    I do there.
9    Q.    And it states:  "Surgery to repair a
10  ventral hernia is generally safe, and
11  complications are uncommon."
12        You agree or disagree with that
13  statement on the UCSF web site?
14        MS. STOKES:  Objection.  Form.
15  Argumentative.  Outside the scope.  This
16  document is -- lacks foundation.
17        Go ahead.
18        THE WITNESS:  Yeah.  I -- I don't
19  think it -- that's not -- I mean if the -- I'm
20  happy to talk about the IFU and promotional
21  materials and -- in the FDA context, in the
22  materials that FDA has looked at, I mean, or

Page 199

1  would be subject to that -- that scope.
2        This is -- this is not the IFU or
3  the company's promotional materials.  So I mean
4  that certainly is not a statement that would
5  appear in the IFU, or FDA would generally allow
6  a statement like that.
7        BY MR. JESSEE:
8    Q.    Are you offering an opinion in this
9  case that the Ventralight ST risks outweigh its
10  benefits?
11        MS. STOKES:  Objection.  Form.
12        THE WITNESS:  So I -- I -- I have a
13  very specific opinion on Ventralight and --
14  about misleading claims, about the complete
15  healing period, right?
16        And I think that was miss -- those
17  were misleading in the promotion.  To make the
18  claim that the -- the synthetic polymer, the
19  Sepramesh -- the Sepra coating lasts for -- and
20  protects for the complete healing period, that
21  is a misleading -- that's my opinion on -- on
22  Ventralight.

Page 200

1        And to the extent that there should
2  be -- as we've talked about the MSDS earlier, I
3  mean to the extent that there are warnings in
4  there, that -- that would also be related.
5        But I'm not talking -- in general,
6  again, happy to discuss -- I'm happy to discuss
7  the risk-benefits as they relate to the
8  regulatory and to -- to those -- to those
9  claims.
10        So to the extent that -- to the
11  extent that Ventralight was used
12  intraabdominally, and there is not evidence
13  that that claim -- that claim is misleading, I
14  think there's concerns about the risk-benefit
15  equation without human trial clinical trials
16  that shows that it actually lasts for -- I
17  mean -- I mean the -- the -- the Sepramesh
18  works and the Sepra film coating -- the ST
19  coating -- sorry -- for the polypropylene does
20  protect.
21        Without -- without better human
22  trials, I'm not sure that the risks are

Page 201

1  acceptable in light of the benefits.  And --
2  but that's in the FDA regulatory context.
3        BY MR. JESSEE:
4    Q.    Well, and you just said, "I'm not
5  sure that."
6        I mean do you have an opinion, as
7  you sit here today, that the risks outweigh the
8  benefits of the device, or is that a topic that
9  you're not opining on?
10        MS. STOKES:  Objection.  Form.
11  Misstates.
12        THE WITNESS:  So what I would opine
13  on is that, again, going back to -- again, in
14  the regulatory context -- let me just check one
15  thing, if I can.
16        Sorry.  Let me just pull it.  I
17  apologize.  Make sure I...
18        So to the extent that we're -- we're
19  talking about Ventralight ST; is that --
20        MR. JESSEE:  Uh-huh.
21        THE WITNESS:  -- fair?
22        So the -- to the extent that

51 (Pages 198 - 201)

David Kessler , M.D.                    January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

---

**Page 202**

1 Ventralight ST relied upon for its substantial
2 equivalence, right, the Bard Composix, which
3 relied upon Marlex and Gore-Tex --
4        THE REPORTER: I'm sorry. A couple
5 of words were missed because there was
6 interference with a cell phone.
7        So "which relied upon"?
8        Sorry for the interruption.
9        THE WITNESS: -- the -- the Bard
10 Composix and the Marlex Gore-Tex.
11       I don't think one could conclude --
12 because these are not -- these raise new
13 questions. Without human trials, I don't know
14 how you can get to the market without Ventralex
15 ST.
16       And without human trials, I don't
17 know how you can say the risks are acceptable
18 in light of the benefits, because that was
19 never done -- this was approved through
20 substantial equivalence.
21       BY MR. JESSEE:
22  Q.   And I'm talking about, as we sit

---

**Page 203**

1 here today, there's certainly been clinical
2 trials on the Ventralight as -- in here in
3 2020, right?
4        MS. STOKES: Objection. Form.
5        THE WITNESS: Not -- not that's
6 passed S -- FDA muster.
7        BY MR. JESSEE:
8   Q.   You don't -- so none of the clinical
9 trials to date here in 2020 have passed FDA
10 muster, is your opinion?
11  A.   So I'm happy to go through the --
12       THE WITNESS: Can you hand me my
13 Ventralight ST.
14       BY MR. JESSEE:
15  Q.   And so, Doctor, are you --
16  A.   Sir, just -- just hold -- just --
17 let me answer your -- your question. Let me
18 just...
19       MS. STOKES: I'm going to object to
20 the form of the question.
21       THE WITNESS: Yeah. So -- so human
22 studies that would show safe -- the risk are

---

**Page 204**

1 acceptable in light of the benefits, human
2 clinical trials on Ventralight ST were not done
3 that were submitted to the FDA to support, I
4 mean, its marketing. That I am sure of. Okay?
5        BY MR. JESSEE:
6   Q.   Yeah. And that wasn't my question.
7   A.   Adequate and well control -- no
8 adequate or well-controlled clinical trials
9 that support that Ventralight ST -- that
10 support the risks are acceptable in light of
11 the benefits.
12       BY MR. JESSEE:
13  Q.   And, again, not my question.
14       2020 is what we're talk about now.
15       Have you reviewed the clinical
16 literature on Ventralight ST up to 2020?
17  A.   I -- I --
18       MS. STOKES: Objection. Form.
19       THE WITNESS: I have -- I have
20 looked sub -- at a lot of the clinical
21 literature. And I have focused specifically on
22 the --

---

**Page 205**

1        Can -- do me a favor. Could you
2 hand me my Ventralight ST big chart.
3        BY MR. JESSEE:
4   Q.   Doctor, if you wouldn't mind, I want
5 to make sure I just know what exhibit number
6 we're looking at.
7   A.   I am happy to do this. So I have
8 here -- this is the Ventralight ST.
9        MS. STOKES: Exhibit 15.
10       THE WITNESS: Yeah. This is -- to
11 answer your question, this is Exhibit 15,
12 right?
13       And I don't -- let me just take a
14 look at this.
15       BY MR. JESSEE:
16  Q.   And just so I know, can you just
17 tell me what this table is that you are looking
18 at?
19  A.   So these are -- these are studies
20 that are done on Ventralight ST that I see, as
21 referenced in the record -- and let me just go
22 back for a second.

---

52 (Pages 202 - 205)

David Kessler , M.D.                                      January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

Page 206

1        And I see none of these studies in
2  humans that establish risks acceptable, in
3  light of the benefits, that were part of the
4  FDA record.
5     Q.   Doctor, is your opinion that the
6  Ventralight ST should be removed from the
7  market?
8        MS. STOKES: Objection. Form.
9        THE WITNESS: My view is that it was
10  -- that it was approved as substantially
11  equivalent and that that was a -- it is not
12  substantially equivalent in that chain,
13  because, as we talked earlier, the Composix,
14  the Marlex, and the Gore-Tex raised new
15  questions.
16        It was not substantially equivalent.
17  So it got on the market through the substantial
18  equivalence mechanism.  It should not have
19  gotten on through that mechanism, and it should
20  have had human trials that support the safety
21  and effectiveness, because it's -- there's no
22  way you can say this doesn't raise new

Page 207

1  questions of safety and effectiveness.
2        BY MR. JESSEE:
3     Q.   Doctor, I will try it again.  2020,
4  is it -- right now, is it your opinion that
5  they -- the Ventralight ST should be removed
6  from the market, either by the FDA or
7  voluntarily?
8        MS. STOKES: Objection. Form.
9        THE WITNESS: I don't see a basis
10  that showed -- I see a major flaw in how this
11  device got on to the market through the
12  substantial equivalence process.
13        It was not -- it should not -- the
14  reliance on Bard Composix that relies on
15  for its predicate chain was incorrect.  And I
16  don't see a basis for how it's on the market
17  when it raised new safety questions.
18        It got on the market.  We can go
19  back and -- happy to look at that 510(k).  I
20  don't see all the issues raised by your
21  company.  We discussed whether FDA could have
22  done a better job.

Page 208

1        The issues of what do you do once it
2  is on the market and it's been on the market,
3  but it shouldn't be on the market, because it
4  doesn't have a -- obviously, it raised new
5  questions.  It was a whole new technology of
6  putting this in the peritoneal cavity.
7        BY MR. JESSEE:
8     Q.   And you're talking about the
9  Composix device, right?
10        MS. STOKES: Objection. Form.
11        THE WITNESS: No.  But I'm -- no.
12  I'm talking about the Composix device --  well,
13  I'm talking about the Composix device, just so
14  there's no -- here we're talking about
15  Ventralight.
16        BY MR. JESSEE:
17     Q.   Right.  So Ventralight's --
18     A.   Let me finish.
19        Ventralight relied upon, in the
20  predicate chain, Composix.  That was key to
21  its -- and Composix dealt with Marlex mesh and
22  Gore-Tex.

Page 209

1        And that was never studied.  It
2  certainly was not studied in humans.  There
3  weren't adequate clinical trials for that.
4        If this doesn't hold, this rest
5  doesn't hold.
6     Q.   Doctor, the predicate device for the
7  Ventralight ST is what?
8        MS. STOKES: Objection. Form.
9  Vague.
10        THE WITNESS: So you have -- you
11  can't answer your question, because you put it
12  as the predicate device.  There are multiple
13  predicate devices, and they are all laid out
14  here.
15        And I'm happy to be corrected.  This
16  is the best, you know -- I mean, I could put --
17  assemble these.  You can see there are
18  predicate devices.  There are predicate
19  devices, and there's predicate devices.
20        So you have this whole chain, but
21  this whole chain got started because Bard said,
22  Well, we can't put Marlex in the abdomen, and

53 (Pages 206 - 209)

David Kessler , M.D.                                    January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

| Page 210 | Page 212 |
|---|---|
| 1 we have to find something to protect it.  So | 1     BY MR. JESSEE: |
| 2 let's come up with a new way to do that.  And | 2     Q.    So the information on the FDA web |
| 3 we are going to use -- we are going to say to | 3 site is misleading in that regard? |
| 4 FDA, Well, you take a little of Gore-Tex here, | 4     MS. STOKES:  Objection.  Form. |
| 5 and you take a little of Marlex, right, that | 5 Mischaracterizes.  Argumentative. |
| 6 are new devices, the same as those, but it's | 6     THE WITNESS:  If you want to |
| 7 not the same as those, because as the brochure | 7 understand the predicate device and how it is |
| 8 indicated, no one ever put this stuff in the | 8 substantially equivalent to a pre-'76 device, |
| 9 abdominal cavity before. | 9 which is what the law requires there are a |
| 10     BY MR. JESSEE: | 10 number of chains. |
| 11     Q.    When was the Ventralight ST cleared? | 11     And, therefore, if you -- that's |
| 12 Maybe that's one we can get a clear answer on. | 12 what I tried to do.  I am happy to take your |
| 13     A.    Sure.  It's in the report. | 13 version of it if you have a different one or |
| 14     MS. STOKES:  Object to that -- | 14 Dr. Tillman has one in her report, but it's |
| 15     THE WITNESS:  Hold on a second. | 15 very common that these are all the predicate |
| 16     MS. STOKES:  -- side comment. | 16 devices for the Ventralight ST to take you back |
| 17     THE WITNESS:  We will let him make | 17 to a pre-'76 device. |
| 18 comments.  That's fine. | 18     BY MR. JESSEE: |
| 19     Take this back.  I have the answer | 19     Q.    How long had the Composix that you |
| 20 right here.  Why don't we take these back. | 20 were talking about earlier -- that was in 1997, |
| 21 Just give me my predicate chain book. | 21 correct, when it was cleared? |
| 22     So the Ventralight ST -- the | 22     A.    Correct. |

| Page 211 | Page 213 |
|---|---|
| 1 clearance date was 7-15-2010. | 1     Q.    And the Ventralight, you just said, |
| 2     BY MR. JESSEE: | 2 ST was cleared in 2010? |
| 3     Q.    And what's listed in the 510(k) | 3     A.    Correct. |
| 4 submission for the Ventralight ST is the | 4     Q.    I think we can agree approximately |
| 5 Sepramesh IP, several of those 510(k)s, | 5 13 years that the -- these surgical meshes with |
| 6 correct? | 6 ePTFE and polypropylene layers have been, at |
| 7     MS. STOKES:  Objection.  Form. | 7 least that amount of time, implanted |
| 8     THE WITNESS:  I have it in front of | 8 abdominally? |
| 9 me.  We can go through and look at all the | 9     MS. STOKES:  Objection.  Form. |
| 10 devices that are listed, but, again, the | 10     THE WITNESS:  Yeah.  That's a new |
| 11 application can speak for the application. | 11 device that is not the same -- gone on through |
| 12     BY MR. JESSEE: | 12 the 510(k) process, yes. |
| 13     Q.    And, in fact, you can look at the | 13     BY MR. JESSEE: |
| 14 predicate device on the FDA web site right now | 14     Q.    And how many clinical studies were |
| 15 for the -- except for the Ventralight ST, can't | 15 performed on those devices during that 13-year |
| 16 you? | 16 period? |
| 17     A.    Right. | 17     MS. STOKES:  Objection.  Form. |
| 18     MS. STOKES:  Objection. | 18 Vague. |
| 19     THE WITNESS:  But the -- but that | 19     THE WITNESS:  I have the record.  I |
| 20 would be misleading, because you have to look | 20 can give you the record.  It's in the FDA |
| 21 at the predicate device for that predicate | 21 device.  And there are other -- if you look at |
| 22 device. | 22 my appendix, you can see other clinical |

54 (Pages 210 - 213)

David Kessler , M.D.                                     January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

| Page 214 | Page 216 |
|---|---|
| 1 studies. | 1  Vague. |
| 2       BY MR. JESSEE: | 2       THE WITNESS:  I have no -- I have |
| 3    Q.   Is it your opinion the Ventralight | 3  not talked to anyone since I have looked at the |
| 4  ST was not substantially equivalent with the | 4  record and have formed my opinions.  I have |
| 5  Sepramesh IP? | 5  deliberately not done that. |
| 6       MS. STOKES: Objection. Form. | 6       BY MR. JESSEE: |
| 7       THE WITNESS:  That's not my opinion, | 7    Q.   Even before you were hired for |
| 8  no.  That would be -- my opinion would be that | 8  litigation, have you ever expressed concerns to |
| 9  it would be -- it's not substantially | 9  anyone at UCSF about hernia mesh? |
| 10  equivalent to a pre-amendment device, which is | 10       MS. STOKES: Objection.  Form. |
| 11  the requirement. | 11       THE WITNESS:  I didn't -- I didn't |
| 12       You have to be substantially | 12  look at the record.  I had no basis -- I wasn't |
| 13  equivalent to a pre-amendment device.  There is | 13  involved in hernia mesh.  I didn't study this. |
| 14  nothing -- there is no pre-amendment device I | 14  I had nothing to do with hernia mesh at UCSF. |
| 15  would -- I would tell you that looks like | 15  I had no opinions on hernia mesh.  I had no |
| 16  Sepramesh Ventralight ST. | 16  dealings on hernia mesh before. |
| 17       (Deposition Exhibit 19 was marked | 17       BY MR. JESSEE: |
| 18  for identification.) | 18    Q.   So you had no experience with hernia |
| 19       BY MR. JESSEE: | 19  mesh prior to the litigation.  And so that's |
| 20    Q.   I'm going to show you Exhibit 19. | 20  when you -- |
| 21  This is another document from the UCSF web | 21       MS. STOKES: Objection. Form. |
| 22  site. | 22  Misstates. |

| Page 215 | Page 217 |
|---|---|
| 1       Did you know that there is a | 1       THE WITNESS:  I didn't study this |
| 2  Ventralight ST clinical study going on at UCSF | 2  record.  I didn't have -- I mean, I was asked |
| 3  right now? | 3  to study the record and to look at the |
| 4    A.  I do not. | 4  regulatory history, and I have done that. |
| 5       MS. STOKES:  I'm going to object to | 5       BY MR. JESSEE: |
| 6  foundation and also calls for speculation. | 6    Q.   Have you ever expressed any concern |
| 7  Form. | 7  about any hernia mesh product with anyone at |
| 8       THE WITNESS:  I do not know that. | 8  the FDA? |
| 9       BY MR. JESSEE: | 9       MS. STOKES: Objection. Form. |
| 10    Q.   Have you ever expressed any concerns | 10       THE WITNESS:  I have had no |
| 11  about hernia mesh to anyone at UCSF? | 11  discussion -- I have had no discussion with |
| 12       MS. STOKES: Objection. Form. | 12  anyone at the FDA.  I have not -- I mean, |
| 13       THE WITNESS:  I certainly would | 13  certainly, I had no discussion before, and I |
| 14  encourage studies to be -- I mean, a study like | 14  would not have any discussion now without |
| 15  this?  I am all in favor of studies -- human | 15  telling -- I deliberately stayed away from |
| 16  studies.  I think that's the way this should | 16  talking to FDA. |
| 17  have been done from the beginning. | 17       BY MR. JESSEE: |
| 18       BY MR. JESSEE: | 18    Q.   Have you spoken with anyone, outside |
| 19    Q.   That wasn't my question. | 19  of your attorneys who hired you, to express |
| 20       Have you ever expressed any concerns | 20  concern about hernia mesh products in general? |
| 21  about any hernia mesh to anyone at UCSF? | 21       MS. STOKES: Objection. Form. |
| 22       MS. STOKES: Objection.  Form. | 22       THE WITNESS:  I have not had any |

55 (Pages 214 - 217)

David Kessler , M.D.                    January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

| Page 218 | Page 220 |
|---|---|
| 1 conversation, outside of -- based on what I | 1 discussions. |
| 2 have -- what I have learned, with anyone. | 2    Q.   When you say in recent times, have |
| 3        Are you clearing me to have those | 3 you ever treated an adult patient -- a hernia |
| 4 discussions, based on the record, or am I under | 4 in an adult patient? |
| 5 protective order? | 5        MS. STOKES:  I'm just going to |
| 6    BY MR. JESSEE: | 6 object.  First of all, this is outside the |
| 7    Q.   So, Doctor, do you know anyone who | 7 scope.  And you are getting into confidential |
| 8 has been implanted with a hernia mesh device? | 8 information between a patient and a doctor. |
| 9        MS. STOKES:  Objection.  Form. | 9        MR. JESSEE:  Improper is the main |
| 10        THE WITNESS:  I have the medical | 10 objection. |
| 11 records.  Happy to go through the bellwethers | 11        BY MR. JESSEE: |
| 12 with you. | 12    Q.   Doctor? |
| 13        BY MR. JESSEE: | 13    A.   I don't recall advising anyone being |
| 14    Q.   I am not talking about the | 14 presented with anything in the hernia context |
| 15 plaintiffs in this litigation, the six | 15 on adult.  I do have some recollections in the |
| 16 plaintiffs. | 16 pediatric context, but those were years away. |
| 17        Do you know anyone besides them who | 17        And, again, just so -- if I can make |
| 18 has been implanted with a hernia mesh device? | 18 your life a little easier, Counselor, I'm happy |
| 19        MS. STOKES:  Objection.  Form. | 19 to -- I'm talking from a regulatory context. |
| 20 Vague.  Calls for speculation. | 20        So when you asked me whether it |
| 21        THE WITNESS:  Sitting here, I would | 21 should be on the market, you noticed I |
| 22 not -- nothing pops in my head and -- nothing | 22 referenced back to whether there was |

| Page 219 | Page 221 |
|---|---|
| 1 pops in my head. | 1 substantial equivalence and whether there were |
| 2        BY MR. JESSEE: | 2 human trials and adequate and well-controlled |
| 3    Q.   As a doctor who treats patients, | 3 evidence of -- to support risks and benefits. |
| 4 have you ever advised an adult patient that | 4        So I did it in the regulatory |
| 5 they should not have their hernia repaired with | 5 context.  With regard to the clinical use, let |
| 6 mesh? | 6 the surgeons testify. |
| 7        MS. STOKES:  Objection.  Form. | 7    Q.   Would it be fair, as to whether a |
| 8        THE WITNESS:  I have never been | 8 specific device, the risk/benefit analysis for |
| 9 asked that question.  I mean, it is not | 9 a specific patient, that's something that's |
| 10 something that I, you know -- it is not a | 10 outside of what you're offering opinions on? |
| 11 clinical question that I have been asked. | 11        MS. STOKES:  Objection.  Form. |
| 12        BY MR. JESSEE: | 12        THE WITNESS:  Yeah.  I don't -- I'm |
| 13    Q.   Okay.  You don't -- | 13 not going to be -- I mean, I asked for -- I |
| 14    A.   I have never -- I have not -- I | 14 have -- I'm not relying on -- I just don't want |
| 15 certainly have treated -- I mean, there are | 15 to, you know -- I want to have some context for |
| 16 hernias in the pediatric kind of context all | 16 what the case is about. |
| 17 the time. | 17        So, I mean, that's why I know |
| 18        Back when I was practicing, the | 18 something about, you know, the devices that |
| 19 different kinds of hernias, diaphragmatic | 19 were used, but I'm not going to be case |
| 20 hernias, et cetera, that I certainly have | 20 specific, Counselor.  You can ask the surgeons. |
| 21 consulted on, but I have not since -- not in | 21 Others will testify. |
| 22 recent times.  I have not had those | 22        Use me in the global sense.  I mean, |

Veritext Legal Solutions
800.808.4958                                      770.343.9696

David Kessler , M.D.                          January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

Page 222

1  I can -- if you want to ask about an op report
2  in one of the bellwethers, we can discuss it,
3  but that's not where we should be spending my
4  view -- my time.
5       BY MR. JESSEE:
6    Q.   I'm trying to just figure out what
7  your -- opinions you're going to offer at trial
8  so I know, but it sounds like though you're not
9  going to offer any opinions on the specific
10  plaintiff.
11   A.   Correct.
12    Q.   Right.  And you mentioned these
13  medical records.  I didn't recall seeing those
14  in your reliance list or in your report, a
15  reference to those.
16       And that's just -- so you're not --
17  it's not relevant to your opinions, those
18  medical records?
19       MS. STOKES:  Objection.  Form.
20       THE WITNESS:  They give me some -- I
21  asked counsel for them just so I have some
22  context, but I'm not -- it would be much

Page 223

1  better -- I mean, if the judge or you ask me a
2  basic -- what's a hernia, I will be happy to
3  answer to the court.
4       I mean, if you ask me whether
5  intraperitoneal was used and it's tied to the
6  IFU and what was used over time, I can answer
7  those questions, I mean, as a doc, but whether
8  this -- in this patient, this was the right
9  device, others will testify.
10       BY MR. JESSEE:
11    Q.   Okay.  And would it be fair to say
12  others besides you would testify as to whether
13  a specific Bard device caused an injury to a
14  specific plaintiff?
15       MS. STOKES:  Objection.  Form.
16       THE WITNESS:  Yeah.  I think that's
17  right.  I don't want to get into causation --
18  specific causation on a specific patient.
19  Surgeons will testify to that.
20       BY MR. JESSEE:
21    Q.   Do you believe that hernia mesh
22  devices in general should be banned from the

Page 224

1  market?
2       MS. STOKES:  Objection.  Form.
3  Vague.
4       THE WITNESS:  No.  But you've asked
5  me a very vague question.  I mean, if you --
6  you should -- I mean, I think questions like
7  that -- I mean, what kind of hernia mesh, where
8  that hernia mesh, for what plane we are talking
9  about, what kind of surgery we are talking
10  about, that, you know -- certainly, flat -- you
11  know, pari-peritoneal meshes, I have -- I have
12  no issue, pari-peritoneal.
13       It's as -- and the original surgical
14  mesh, as you know -- I mean, you know, there
15  were meshes that were approved under my watch,
16  and I don't see an issue.
17       It's when these meshes went to
18  different places and different planes and
19  different indications and were new and raised
20  new sets of questions and risks.  That's where
21  I become concerned.
22       BY MR. JESSEE:

Page 225

1    Q.   What specific hernia mesh devices do
2  you think should be banned by the FDA?
3       MS. STOKES:  Objection.  Form.
4       THE WITNESS:  I think any -- again,
5  I have not issued an opinion on that.  I'm
6  happy to discuss -- I mean, in general -- in
7  general, if there -- if a hernia mesh device
8  went into -- raised new questions of safety and
9  effectiveness and there weren't adequate human
10  trials to answer those questions, then I don't
11  think those devices should be on the market
12  until those human trials.
13       Banning is a much more complicated
14  question, and I have lived that.  And, you
15  know, sometimes something is on the market, and
16  you leave it on the market, even though it
17  shouldn't be on the market, because it's been
18  on the market, and it becomes complicated, but
19  that is a whole different story.
20       MR. JESSEE:  And I will just move to
21  strike after, "I have not issued an opinion on
22  that."

57 (Pages 222 - 225)

David Kessler , M.D.                                    January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

<table>
<tr><td>

Page 226

1    BY MR. JESSEE:
2    Q.   Doctor, are you offering any
3 opinions regarding the appropriate way to treat
4 or repair hernias --
5        MS. STOKES:  Objection.  Form.
6        BY MR. JESSEE:
7    Q.   -- or is that something that the
8 surgeons should talk about?
9        MS. STOKES:  Objection.
10       THE WITNESS:  Only in the FDA
11 context.  So if you want to talk about an
12 indicated use or intended use, I am willing to
13 talk about the intended use and whether that
14 would be appropriate in the regulatory context.
15       What an individual physician, in his
16 or her judgment, decides to do with a legally
17 marketed product, I'm not going to judge,
18 right, but I'm willing to certainly talk about
19 the intended use and the indication for use and
20 the scientific basis in the regulatory record.
21       BY MR. JESSEE:
22    Q.   Do you intend to offer any opinions

</td><td>

Page 228

1    Q.   The standard of care -- well, you
2 understand, from a physicians -- they have a
3 standard of care that is expected of them in
4 practicing and performing surgery?
5        MS. STOKES:  Objection.  Form.
6        THE WITNESS:  Sure.  I mean, I have
7 studied -- I mean, I understand interstate law
8 and common law.  I understand what you mean,
9 Counselor.
10       I think that there are certain -- I
11 could conceive of you asking me a question, as
12 it relates to the IFU, that may -- or the
13 regulatory context and confronted with this
14 device approved for this -- I'm sorry --
15 cleared for this or whatever in the abstract,
16 how does that affect the standard of care, but,
17 in general, unless it's in the FDA -- unless
18 you are asking me a question about the IFU or
19 the labeling or the promotional material, I'm
20 not going to get into that.  Just as -- it
21 could abut is what I am raising.
22       BY MR. JESSEE:

</td></tr>
<tr><td>

Page 227

1 on the risks and benefits of nonmesh hernia
2 repair procedures?
3        MS. STOKES:  Objection.  Form.
4        THE WITNESS:  I think that's
5 probably -- I think surgeons who have studied
6 that should testify to that.  So the answer
7 would be, I will let others -- again, your
8 questions are so general.
9        I mean, they should be, you know,
10 for intraabdominal, for pari-peritoneal,
11 inguinal.  I mean, I think you have to ask
12 those specific questions, but, in general,
13 non -- I'm going to stay to the regulatory
14 interface.
15       BY MR. JESSEE:
16    Q.   Would that include not offering any
17 opinions on the standard of care of any of the
18 implanting physicians in these cases?
19       MS. STOKES:  Objection.  Form.
20       THE WITNESS:  Be more specific when
21 you say standard of care.
22       BY MR. JESSEE:

</td><td>

Page 229

1    Q.   Are you -- well, then -- so since
2 I'm still not clear on the -- how you are
3 defining and differentiating that, do you have
4 any opinions -- standard of care opinions about
5 the specific implanting physicians in the Johns
6 case?
7        MS. STOKES:  Objection.  Form.
8 Asked and answered.
9        THE WITNESS:  I'm not going to -- as
10 a general basis, unless you ask me something
11 specific about the label or the promotional
12 materials, as it relates to that physician, I'm
13 not going -- I have no opinion.
14       BY MR. JESSEE:
15    Q.   Okay.  Any standard of care opinions
16 of the implanting physician in the Stinson
17 case?
18       MS. STOKES:  Objection.  Form.
19 Asked and answered.
20       THE WITNESS:  Again, you can take
21 the same answer in each one of those cases.
22 Save your time.  I mean, I --

</td></tr>
</table>

58 (Pages 226 - 229)

David Kessler , M.D.                                    January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

Page 230

BY MR. JESSEE:

2    Q.   I appreciate that.

3         We may have covered this earlier.
4 And if I did, I apologize, but you are not
5 offering legal opinions in this case, correct?
6    A.   I can't, and I won't. Now, I am
7 happy to explain to the Court, to the extent
8 the Court would like, the FDA regulatory
9 framework.
10        And as that's based on statute,
11 right, you know, I leave it to the judge, but
12 certainly not on ultimate legal questions. I'm
13 not going to do that.
14        I mean, the ultimate legal
15 questions, but each judge can instruct me how,
16 you know -- can I talk about the statute? I
17 would think so. Can I talk about the
18 appropriateness of conduct under the statute?
19        So those obviously have regulatory
20 -- those are regulatory issues, but ultimate
21 legal question, I would never want to get into.
22    Q.   For example, you wouldn't give an

Page 231

1 opinion on the ultimate legal question on
2 whether Bard is liable to any individual
3 plaintiff, correct?
4         MS. STOKES: Objection. Form.
5         THE WITNESS: Of course not.
6         BY MR. JESSEE:
7    Q.   And same thing. You're not going to
8 give an ultimate legal opinion that there is a
9 design defect in a specific product, correct?
10        MS. STOKES: Objection. Form.
11        THE WITNESS: It depends on how the
12 question is viewed. I mean, it depends on how
13 you ask the question exactly, right?
14        So if it's the ultimate legal
15 opinion for the jury, of course not. Whether
16 there were adequate -- whether you followed
17 adequate design controls, that's different than
18 a design defect kind of question.
19        BY MR. JESSEE:
20    Q.   Right. Exactly.
21    A.   So I think we understand. It's the
22 ultimate question I will certainly stay away

Page 232

1 from. And the judge -- you and the judge will
2 instruct me how -- how far or what I'm allowed
3 to go into in this regulatory construct. I
4 understand that, but some of these have, you
5 know -- they are regulatory questions.
6    Q.   You are not offering any opinions on
7 damages. We can agree on that.
8    A.   Of course.
9         MS. STOKES: Objection.
10        BY MR. JESSEE:
11    Q.   No opinions on the informed consent
12 discussions between any specific plaintiff in
13 this case and his physician?
14        MS. STOKES: Objection. Form.
15        THE WITNESS: I have great
16 expertise. I have served on IRBs. I was in
17 charge of -- if you show me a consent form, I'm
18 happy to, you know, give you an opinion, but I
19 have not specifically looked at -- I'm not
20 intending to do that. I certainly could, but I
21 don't -- I'm not planning to.
22        BY MR. JESSEE:

Page 233

1    Q.   What is -- I want to look into your
2 prior testimony. I believe it's Appendix B to
3 your report. And so this would be Exhibit No.
4 2, I believe.
5    A.   Let me just get my --
6    Q.   And this is -- obviously, I know you
7 have your own copies.
8    A.   Hopefully, I have a --
9    Q.   If not, we can --
10        THE WITNESS: Can you see if there
11 is an appendix?
12        I have my schedules. I have my
13 report. I thought I had a binder on --
14 actually, hold on a second. Give me one
15 second. It may be in here. I thought I
16 brought that.
17        BY MR. JESSEE:
18    Q.   You have it?
19    A.   I do, sir.
20    Q.   I was looking for it for you.
21        And this is a list of your prior
22 testimony that was served with your expert

59 (Pages 230 - 233)

David Kessler , M.D.                    January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

<table>
<tr><td>

Page 234

1 report.
2         Have you reviewed this?
3     A.   I have.  I have compiled it.
4     Q.   Is there anything that needs to be
5 added to this list of testimony since -- or I
6 will just stop there.
7         Anything that needs to be added to
8 this list of testimony right now?
9     A.   I may have testified -- I have to
10 check dates.  I may have testified -- I think
11 this was -- again, there is always a chance
12 something is wrong.  Something gets left off by
13 accident.
14         I don't want to represent -- I think
15 this is through the date of -- I think this is
16 accurate as it stays here, but there is always
17 a chance that something could get, you know --
18 I made mistakes before.
19     Q.   Oh, sure.  And I'm not suggesting
20 anything.  I'm just asking whether -- to the
21 best of your knowledge, is this accurate, as
22 you look at it?

</td><td>

Page 236

1 supplemental deposition.  There was a short
2 deposition of two hours in Essure.  It's
3 possible there was a secondary deposition.
4     Q.   That's Essure?
5     A.   That's on here.
6     Q.   Okay.
7     A.   It's on here, but I think there
8 was -- there was two more hours.  There was
9 some additional materials.  There was some
10 additional issues that came up post.
11     Q.   Okay.  I want to walk through the
12 list of prior testimony, certain ones, and I'm
13 going to ask you about them, whether they were
14 personal injury lawsuits involving a medical
15 device or a pharmaceutical?
16     A.   Sure.
17     Q.   And so the first one is in regard to
18 Risperdal?
19     A.   Pharmaceutical.
20     Q.   And that was a personal injury --
21     A.   Yes.
22     Q.   -- case?

</td></tr>
<tr><td>

Page 235

1     A.   Yes.  I think this is accurate, as
2 it -- as it states -- this document states.
3     Q.   And I understand that you were
4 deposed in the opioid litigation last week, was
5 it?
6     A.   So this document -- that is what I
7 was just going to -- I just looked at.  This
8 document is through November 26, and I believe
9 I was -- the opioid legislation is here, but I
10 was deposed in New York state, AG opioids, I
11 think, a couple weeks ago.
12     Q.   That was -- was that the last
13 deposition you have given?
14     A.   Yes, sir.
15     Q.   Was that in January?
16     A.   Yes.  I believe so.
17     Q.   Were you deposed at all in December
18 2019?
19     A.   I don't have a recollection.  I
20 don't -- I don't remember dates.  I'm sorry.  I
21 can remember so far two weeks back.
22         I -- there may have been a

</td><td>

Page 237

1     A.   Well, there is a plaintiff.  Let's
2 just define personal injury.  Some of these are
3 multiple plaintiffs or whatever.  They may have
4 been aggregated cases.  I just --
5     Q.   Right.  And my point --
6     A.   I just want to make sure I
7 understand your question.
8     Q.   My question -- if you remember back
9 to those tort classes in law school years ago,
10 about whether the plaintiff is alleging an
11 injury against a medical device or
12 pharmaceutical manufacturer.
13     A.   Yes.
14     Q.   Okay.  And would the same -- would
15 the -- both the Wells v. Allergan and Drake v.
16 Allergan be personal injury cases against a
17 pharmaceutical manufacturer?
18         MS. STOKES:  Objection.  Form.
19         THE WITNESS:  That was Botox.  And I
20 think Botox -- it may have been classified as a
21 biologic.  We'd have to go take a look.
22         It was Botox for seizures.  So it

</td></tr>
</table>

60 (Pages 234 - 237)

David Kessler , M.D.                                    January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

**Page 238**

1  was -- in developmentally disabled kids.  So I
2  am not sure how you want to characterize Botox
3  as drug device.  I have to go look.
4      BY MR. JESSEE:
5      Q.   And for both of those cases, you
6  were an expert for plaintiffs, correct?
7      A.   Correct.
8      Q.   And for the Risperdal, you were an
9  expert for plaintiffs?
10     A.   Correct.  The vast majority of
11 these, I will give you, to save you time.
12 There are some defendant cases, but the vast
13 majority are plaintiffs's cases.
14     Q.   And would you agree that, in every
15 personal injury case that you have testified,
16 you have testified for plaintiffs?
17         MS. STOKES:  Objection.  Form.
18         THE WITNESS:  No.
19         BY MR. JESSEE:
20     Q.   What case -- personal injury case
21 have you given testimony for the defendant
22 manufacturer?

**Page 239**

1          MS. STOKES:  Objection.  Form.
2          THE WITNESS:  I think if you look at
3  these endoscopy cases, they're sworn expert
4  statements.  Don't hold me to them, but I
5  believe Cordero was for the defense.  We'd have
6  to pull it up.
7          BY MR. JESSEE:
8      Q.   And I actually did look at that
9  Cordero one.  This is a sworn expert statement
10 that we're talking about, not testimony there,
11 right?
12     A.   I leave it to -- it says sworn
13 expert.
14     Q.   And it's a separate section of
15 your --
16     A.   I just want to make -- yes.
17     Q.   And that was actually -- you
18 mentioned Kessler a little earlier.  I believe
19 that was where you were asked to -- where you
20 gave a sworn statement, rebutting a statement
21 about what the Kessler rule was?
22     A.   For the defense, if I'm correct.

**Page 240**

1  Right.
2      Q.   Did you ever testify in a deposition
3  in that case?
4      A.   I don't think that I got called.
5  I'm not too sure.
6      Q.   Did you ever testify at trial?
7      A.   I don't believe it went -- I don't
8  believe, no.
9      Q.   Any personal injury case where you
10 actually testified at a trial or at a
11 deposition on behalf of the defendant
12 manufacturer?
13         MS. STOKES:  Objection.  Form.
14         THE WITNESS:  A number of cases for
15 defense, but I don't -- I don't think, if my
16 memory serves me right, they were, quote,
17 personal injury cases.  There were a number of
18 defense cases, but I don't believe personal
19 injury.
20         BY MR. JESSEE:
21     Q.   Okay.  So, for example, when we have
22 the pelvic -- C.R. Bard pelvic mesh litigation

**Page 241**

1  involving pelvic mesh, you testified for
2  plaintiffs in that case, right?
3      A.   And I was deposed by your colleague.
4  And I did not testify at trial.
5      Q.   Okay.  And in -- did you rely on any
6  of your documents, files from that litigation
7  in your opinions here?
8          MS. STOKES:  Objection.  Form.
9          THE WITNESS:  I don't -- there
10 are -- the answer is no.  I don't think I
11 relied on that.  Let me just give you a full
12 answer though.
13         There are -- there are certain
14 discussions of the statute, for example, that I
15 may have used in that matter that I used in
16 other matters that I -- I mean, defining Class
17 II and defining Class III would be applicable.
18         I didn't rely on anything specific
19 to that matter, but I may have -- I mean, if
20 you pulled that report, we may be able to see
21 something, I mean, in that report that matches
22 this in general about device framework.

61 (Pages 238 - 241)

David Kessler , M.D.  
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

January 31, 2020

Page 242

1     BY MR. JESSEE:
2     Q.   Sure.
3     A.   I mean, I don't want to say it's
4 boilerplate, but I think you understand what
5 I -- hoping -- and I would go on record saying,
6 hoping Ms. Cohen was going to depose me --
7     BY MR. JESSEE:
8     Q.   I don't need to hear that.
9     A.   Hoping that Ms. Cohen was going to
10 depose me, I did, last night, I will tell you,
11 look -- I only had the rough.  I looked at her
12 questions, I mean, in vaginal mesh, and it
13 brought back fond memories.
14     Q.   Well, I'm sure she will be glad to
15 hear that, but --
16     A.   So -- but I don't think that's --
17 that's not relying substantively.
18     Q.   And your -- do you keep an active
19 working file from your pelvic mesh?
20     A.   I did not.  I did -- I did have to
21 search out that deposition again just to
22 refresh, because I was hoping Ms. Cohen was

Page 243

1 going to come and ask me the same questions she
2 asked me last time.
3     Q.   I was really focusing more on like
4 as far as corporate documents though.
5     A.   No, no, no, no, no.  I mean, with
6 the exception of -- no, I don't.  The only
7 thing that -- again, just to be upfront, there
8 could be some discussion of medical device
9 regulation history that -- but, again, it
10 probably predates even mesh.
11     So I don't rely on that, but, you
12 know, I want to be consistent on what the
13 framework is, but what happened there is not --
14 has nothing to do with -- I don't rely on what
15 happened here.
16     Q.   You didn't offer, in that pelvic
17 mesh litigation, any opinions on the material
18 safety data sheet, did you?
19     MS. STOKES:  Objection.  Form.
20     THE WITNESS:  I did not.
21     BY MR. JESSEE:
22     Q.   Looking back to your prior testimony

Page 244

1 list, SB versus Ortho-McNeil, Janssen Pharma,
2 that would be a pharmaceutical personal injury
3 case?
4     A.   Just show me where we are.
5     Q.   Right after that pelvic mesh, pelvic
6 repair systems, five down.
7     A.   That's Risperdal.
8     Q.   And, again, you testified on behalf
9 of plaintiffs?
10     A.   Yes.  I'm sure I did.
11     Q.   And in regard to Yaz and Yasmin?
12     A.   Pharmaceutical.
13     Q.   You testified on behalf of
14 plaintiffs?
15     A.   Correct.
16     Q.   In regard to Actos, products
17 liability litigation?
18     MS. STOKES:  Objection.  Form.
19     THE WITNESS:  Show me where.
20     BY MR. JESSEE:
21     Q.   It is about halfway down.
22     A.   That was a -- Actos was a -- I think

Page 245

1 it was -- it was -- it was -- it was combined
2 MD.  It would fit your definition of plaintiff.
3 I believe it -- it's drug.
4     Q.   And you testified on behalf of
5 plaintiffs in that case?
6     A.   Correct.
7     Q.   In the Cabana versus Stryker case in
8 California -- and this is about five further
9 down.
10     A.   That -- if my memory serves me
11 right, that's medical device, but it could be
12 medical device biologic, if I'm -- it's an
13 infuse device, if my memory serves me right,
14 which is a combination product, biologic and
15 device.
16     Q.   And you testified on behalf of
17 plaintiffs in that?
18     A.   I did.
19     Q.   And Fosamax is a pharmaceutical
20 litigation?  You testified on behalf of
21 plaintiffs?
22     A.   Yeah.  But that was just on

62 (Pages 242 - 245)

David Kessler , M.D. January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

Page 246

1  preemption.  That was -- which one is that?
2  That's -- the New Jersey, yes, but that -- in
3  California.  That was limited to preemption.
4      Q.   It was -- the underlying case was a
5  personal injury --
6          MS. STOKES:  Objection.
7          THE WITNESS:  Yeah.  But I didn't
8  testify with regard to that liability.  It was
9  solely on the question of preemption under the
10 statute.  It was a lateral question.
11         BY MR. JESSEE:
12     Q.   On that question of preemption that
13 you testified on, you testified on behalf of
14 plaintiffs?
15     A.   Correct.
16     Q.   In the -- in regard to DePuy
17 Orthopedics, the Pinnacle hip implant
18 litigation, that was a personal injury case
19 that you testified on behalf of plaintiffs?
20         MS. STOKES:  Objection.  Form.
21         THE WITNESS:  Medical device, yes.
22         BY MR. JESSEE:

Page 247

1      Q.   We have Anders v. Medtronic in
2  Missouri.  I'm on the second page now, Doctor.
3      A.   I think that's similar to the --
4  that was another infuse.  That was infuse.
5      Q.   So medical device on behalf of
6  plaintiffs?
7      A.   Medical device biologic, yeah.
8      Q.   And in the Austin/C.R. Bard, that
9  was an IVC filter case, I believe; is that
10 correct?
11     A.   Correct.
12     Q.   And you testified on behalf of the
13 plaintiffs?
14     A.   Correct.
15     Q.   In the -- in regard to Bard IVC
16 filters products liability litigation, that's
17 another IVC filter litigation, correct?
18     A.   Yeah.  This was -- this was an
19 aggregated case, yes.
20     Q.   And you testified on behalf of the
21 plaintiffs?
22     A.   As in Austin, I believe.

Page 248

1      Q.   Zoloft litigation, that was a
2  pharmaceutical personal injury case you
3  testified on behalf of plaintiffs?
4          MS. STOKES:  Objection.  Form.
5          THE WITNESS:  Yes.  That would be
6  correct.  That's drug.  It was a consolidated
7  case.
8          BY MR. JESSEE:
9      Q.   And the testosterone replacement
10 therapy, products liability litigation, did you
11 testify on behalf of plaintiff in that case?
12     A.   I did.  And that was device.  Well,
13 it's AndroGel.  I'm embarrassed to say.  I
14 think it probably was AndroGel.  I mean, it had
15 components.
16     Q.   What about --
17     A.   It was a patch.  It was a drug
18 delivery device -- drug delivery system.
19     Q.   Any of the next -- were all the
20 next -- the next three cases that are listed
21 here, were they all testifying on behalf of
22 plaintiffs?

Page 249

1          MS. STOKES:  Objection.  Form.
2          THE WITNESS:  I believe so.  Some of
3  these are state AG cases, like the next one.
4          BY MR. JESSEE:
5      Q.   Which one is that?
6      A.   The State of Texas.  So these are --
7  there are a number of these cases where I have
8  testified.  So in the State of Texas, that was
9  for the AG.
10         The People of the State of
11 California, that was the recent -- I guess that
12 was the verdict yesterday on mesh.  I testified
13 in that for The People of the State of
14 California.
15     Q.   And I know you gave a deposition in
16 that case.  Did you also testify live at trial?
17     A.   Live at trial in mesh.
18     Q.   And the --
19     A.   It was a judge trial.
20     Q.   -- Taxotere litigation, that's a
21 case where you testified for plaintiffs both at
22 deposition and trial, correct?

63 (Pages 246 - 249)

David Kessler , M.D.                          January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

Page 250

1    A.    Correct.
2    Q.    And the opioid litigation, we
3 discussed, but that's -- you're testifying on
4 behalf of plaintiffs?
5    A.    No.  I'm testifying -- well, yes.
6 So sorry.  I'm testifying on behalf of cities
7 and counties.
8    Q.    In the -- in regard to Essure birth
9 control, that would be -- you are testifying on
10 behalf of plaintiffs?
11    A.    Correct.
12    Q.    In all of those cases that we just
13 discussed, where they're personal injury cases
14 and you're testifying on behalf of plaintiffs,
15 have you ever given the opinion that the
16 device, drug, or biologic labeling was
17 adequate?
18        MS. STOKES:  Objection.  Form.
19        THE WITNESS:  I don't believe -- I
20 mean, in some of these cases where that has
21 come up, I have given -- well, in some cases,
22 for example, in the antitrust, I have gone back

Page 251

1 and looked.
2        And I believe there are -- depending
3 on what section of the label I am looking at, I
4 think I have said I don't have a problem.
5 There have been times when I have said I don't
6 have a problem with the label.  I recall that.
7        Now, whether those were antitrust
8 cases, I'd have to go back exactly, where I
9 have said that, but I don't have problems with
10 every section of the label.
11        BY MR. JESSEE:
12    Q.    My focus is on the -- specifically
13 on the personal injury cases, where you
14 testified.
15        Have you ever said that the label
16 for the drug, device, or biologic was adequate,
17 and you had no criticisms of it?
18        MS. STOKES:  Objection.  Form.
19 Vague.  Compound.
20        THE WITNESS:  I would want to go
21 back and look.  For example, in the New York
22 opioid case that I just testified -- you know,

Page 252

1 I'm under oath.  I just -- I don't want to
2 misspeak here.
3        Did I -- I'm not sure I
4 criticized -- I'd have to go back.  Did I
5 criticize the label in the -- what was it?  The
6 marketing that I criticized.
7        I apologize.  I just -- I don't
8 know --
9        BY MR. JESSEE:
10    Q.    That's fine.
11    A.    -- specifically.
12    Q.    Are there any other ones beside the
13 opioid litigation, where you are not sure about
14 whether you criticized the label or not?
15        MS. STOKES:  Objection.  Form.
16        THE WITNESS:  Sure.  I know there
17 was -- well, I would want to look at the trial
18 testimony, I think, in some of these prograph
19 cases, et cetera, Nexium cases.  I'd have to go
20 back and take a look.
21        BY MR. JESSEE:
22    Q.    Can we agree that, in the vast

Page 253

1 majority of the cases we just discussed though,
2 you did -- you were critical of the label of
3 the drug or device?
4        MS. STOKES:  Objection.  Form.
5        THE WITNESS:  I wouldn't want to
6 make any general -- we'd have to go look at
7 specific -- just because I'm under oath,
8 exactly what I was critical of.  It may have
9 been the marketing.  It may be the labeling.  I
10 just don't want to make any general statements.
11        BY MR. JESSEE:
12    Q.    Well, can we agree that in each --
13 and we have the depositions, I think, or
14 transcripts of most of these here, but would
15 you agree that for -- in each of those cases,
16 you were critical of either the labeling or the
17 marketing of the defendant manufacturer?
18        MS. STOKES:  Objection.  Form.
19 Asked and answered.  Compound.
20        THE WITNESS:  Yeah.  I mean, I think
21 I'm -- I am under oath.  If you want to show me
22 a specific case and we can look at the

64 (Pages 250 - 253)

David Kessler , M.D.                    January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

| Page 254 | Page 256 |
|---|---|
| 1 deposition and my testimony or the transcript, | 1 have been moving around up here. |
| 2 I would be happy to answer.  I just don't want | 2     A.    Sure. |
| 3 to lump things together. | 3     Q.    Do you happen to have that handy? |
| 4         BY MR. JESSEE: | 4     A.    It's in the pile? |
| 5     Q.    Can you tell me a specific -- one of | 5     Q.    It should be.  We marked it right at |
| 6 those cases, as we sit here today, where you | 6 the beginning.  So I'd be happy to help you, if |
| 7 were not critical of the defendant | 7 you'd like.  I think it might be under there |
| 8 manufacturer's labeling or marketing? | 8 probably. |
| 9         MS. STOKES:  Objection.  Form. | 9     A.    It should be -- |
| 10 Asked and answered. | 10     Q.    3, 4, 5. |
| 11         THE WITNESS:  I just said I -- for | 11     A.    There you go. |
| 12 example, the opioid case.  I'd have -- I | 12     Q.    Doctor, this is the invoice that's |
| 13 just -- I mean, I can show you -- I just -- I | 13 dated December 10th, 2019? |
| 14 think -- I don't think I criticized the | 14     A.    Yes. |
| 15 labeling, but, again, I don't want to be -- I | 15     Q.    And it says via e-mail, and it lists |
| 16 don't want to say that under oath, because I | 16 two attorneys.  And one is Parvin. |
| 17 may -- there may have been a question, in ten | 17         MR. JESSEE:  And I apologize, but |
| 18 hours of testimony, where I said something.  So | 18 maybe someone can help me with the last name? |
| 19 I would have to go back and review to be | 19         MS. AMINOLROAYA:  Aminolroaya. |
| 20 specific. | 20         MR. JESSEE:  Okay.  Thank you. |
| 21         BY MR. JESSEE: | 21         BY MR. JESSEE: |
| 22     Q.    Okay.  So you can't tell me, as we | 22     Q.    And Kesley Stokes? |

| Page 255 | Page 257 |
|---|---|
| 1 sit here today, without going back and | 1     A.    The L is silent. |
| 2 reviewing, that there's a specific case where | 2     Q.    What was that? |
| 3 you testified for plaintiffs and weren't | 3     A.    The L is silent. |
| 4 critical of the labeling and marketing? | 4     Q.    Okay. |
| 5         MS. STOKES:  Objection.  Form. | 5         THE WITNESS:  Is that fair? |
| 6         THE WITNESS:  I mean, I tend to | 6         MS. STOKES:  Sure. |
| 7 remember those, but I don't want to swear under | 7         MR. JESSEE:  I didn't know we would |
| 8 oath until I confirm that.  I'm happy to do | 8 be going into this. |
| 9 that, sir. | 9         BY MR. JESSEE: |
| 10         BY MR. JESSEE: | 10     Q.    So these are two of the attorneys |
| 11     Q.    You are happy to do that? | 11 for plaintiffs, right? |
| 12     A.    I'm happy to go back and look | 12         MS. STOKES:  Except for the fact you |
| 13 specifically, but I'd have to review the | 13 mispronounced my name, but -- |
| 14 transcript so we can be clear. | 14         MR. JESSEE:  Okay.  I apologize. |
| 15     Q.    Okay. | 15         THE WITNESS:  Did I? |
| 16     A.    I just don't want to make a mistake. | 16         MS. STOKES:  No, no, no.  You |
| 17     Q.    All right.  Well, I'd appreciate | 17 didn't.  He did. |
| 18 that.  That would be very helpful. | 18         MR. JESSEE:  I apologize. |
| 19     A.    Happy to do that. | 19         MS. STOKES:  It's okay. |
| 20     Q.    And, Doctor, with the -- I've marked | 20         THE WITNESS:  Kelsey. |
| 21 as Exhibit 5 the invoice that was given us | 21         MS. STOKES:  You said Kesley. |
| 22 today.  I know we have a lot of documents that | 22 It's -- |

65 (Pages 254 - 257)

David Kessler , M.D.                                January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

| Page 258 | Page 260 |
|---|---|
| 1    MR. JESSEE: Oh, I did. | 1    MS. STOKES: Objection. Form. I |
| 2    MS. STOKES: Yeah. | 2 mean -- |
| 3    MR. JESSEE: Okay. I actually even | 3    THE WITNESS: You're going to make |
| 4 knew that too. I apologize for that. I got | 4 these attorneys -- |
| 5 thrown off. | 5    MS. STOKES: Yeah. I don't think |
| 6    THE WITNESS: I'm the Kessler. You | 6 that's -- |
| 7 are the Kelsey. | 7    THE WITNESS: No, no, no, no. I'm |
| 8    BY MR. JESSEE: | 8 happy to answer your question. I have |
| 9    Q.  Doctor, this is the invoice that was | 9 testified pro bono for the State of California. |
| 10 sent to attorneys for the plaintiffs in this | 10    BY MR. JESSEE: |
| 11 litigation, correct? | 11    Q.  I mean, that's public record too, |
| 12    A.  Correct. | 12 right? You testified at trial. |
| 13    Q.  And I understand though that your | 13    A.  I was asked the question, and it's |
| 14 wife typically does your invoicing for you? | 14 in the transcript. And you have done your |
| 15    A.  You read my depositions, or either | 15 homework. |
| 16 that a lawyer has told you. | 16    Q.  But you are not doing that in this |
| 17    Q.  I have read plenty of them, yes. | 17 case. You are not testifying pro bono in this |
| 18      And that is still the case? | 18 case. |
| 19    A.  Yes. Exactly. | 19    A.  No. Unfortunately, one can't do |
| 20    Q.  And this looks like -- it says | 20 that all the time. |
| 21 December 10th, 2019. Is that -- that's when it | 21    Q.  And, Doctor, what were the -- you |
| 22 would have been submitted? | 22 list here expenses in the amount of a little |

| Page 259 | Page 261 |
|---|---|
| 1    A.  Correct. | 1 over $5,000. |
| 2    Q.  And so it did count for your time up | 2      What did those expenses consist of? |
| 3 until that point? | 3    A.  They were probably travel. |
| 4    A.  Correct. | 4    Q.  Was your -- let me withdraw that and |
| 5    Q.  And the amount of this, as we | 5 start over. |
| 6 already mentioned, is $237,264.93? | 6      Keep in mind this is dated December |
| 7    A.  Correct. | 7 10th, 2019. |
| 8    Q.  And it notes below that the amount | 8      Was your expert report finished at |
| 9 of hours, where it says 232.25 hours -- | 9 this point in time? In other words, would this |
| 10    A.  Correct. | 10 amount constitute all the amount you put into |
| 11    Q.  -- at $1,000 per hour? | 11 putting together the expert report? |
| 12    A.  Correct. | 12    MS. STOKES: Objection. Form. |
| 13    Q.  And $1,000 per hour is the typical | 13    THE WITNESS: Fair. |
| 14 amount that you charge in serving as an expert | 14    BY MR. JESSEE: |
| 15 in litigation? | 15    Q.  So did you work on the expert |
| 16    MS. STOKES: Objection. Form. | 16 report -- and I am just talking about the |
| 17    THE WITNESS: It's been my standard | 17 expert report itself -- at any point after this |
| 18 fee for a decade or plus. | 18 invoice was submitted? |
| 19    BY MR. JESSEE: | 19    A.  No. Well, the expert report was |
| 20    Q.  There is certain litigations that | 20 signed December 4th, right? |
| 21 you have testified in and not charged the party | 21    Q.  Yes. |
| 22 any money, right? | 22    A.  So this is December 10th. So, I |

66 (Pages 258 - 261)

David Kessler , M.D.                              January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

---

Page 262

1 mean, the expert report was served on December
2 4th.
3    Q.   Okay.  So would this --
4    A.   Does that answer your question?
5    Q.   Yeah, it does.  And maybe I can ask
6 a better one.
7        This accounts for all your time up
8 to December 10?
9    A.   Yes.
10    Q.   And I know -- I can tell from the --
11 all the materials that you graciously brought
12 here today and our testimony earlier that you
13 have spent time on this litigation since
14 December 10th, correct?
15       MS. STOKES:  Objection.  Form.
16       THE WITNESS:  Correct.
17       BY MR. JESSEE:
18    Q.   How much time have you spent since
19 December 10th?
20    A.   I don't know.  I don't know exactly.
21 I mean -- I don't know exactly.  You could --
22 do you want me to guess?

---

Page 263

1    Q.   Sure.  And I won't hold you to it.
2 If you can just give me a rough estimate.
3    A.   Again, I have not compiled an
4 invoice.  So I'm just -- I mean, lit could be
5 100, 110 hours, but don't hold me to any
6 numbers here.
7    Q.   Okay.
8    A.   Not including today.
9    Q.   Right.
10        And for those 100 to 110 hours,
11 whatever the amount is, and for today, you are
12 being compensated for $1,000 an hour?
13       MS. STOKES:  Objection.  Form.
14       THE WITNESS:  I will submit an
15 invoice --
16       BY MR. JESSEE:
17    Q.   Okay.
18    A.   -- for that.  Yes, sir.
19    Q.   And I guess the point I was getting
20 at, for your testimony today, it's $1,000 an
21 hour as well?
22    A.   Are you paying me?

---

Page 264

1    Q.   I think we're still discussing that,
2 but regardless of who's paying you, does it
3 change if I am paying you?
4    A.   No, no.  I promise you to give you
5 and your colleague the same rate that I give
6 everyone else, except for the State of
7 California.
8    Q.   The -- so would it be -- let me
9 strike that.
10       Looking back to some of your older
11 transcripts, I noticed that when Laurie deposed
12 you in pelvic mesh, you were asked -- at that
13 point, you had billed approximately $400,000 in
14 that litigation?  Does that sound about right?
15       MS. STOKES:  Objection.  Form.  Do
16 you have the deposition transcript to show him?
17       THE WITNESS:  I'm not going to
18 dispute anything you have read.
19       BY MR. JESSEE:
20    Q.   And you read the deposition
21 transcript.
22    A.   I didn't get to that part.

---

Page 265

1    Q.   Okay.
2    A.   I had a rough.  I will admit I did
3 it -- I mean, I was skimming her questions.  So
4 I didn't get -- I didn't see everything.
5    Q.   In the IVC filter transcripts I
6 looked at, I saw, at one point, you had billed
7 $600,000 approximately in that litigation?
8       MS. STOKES:  Objection.  Form.  If
9 you have a document, show him.
10       THE WITNESS:  Yeah.  I don't
11 remember a bill for -- I mean, again, I don't
12 want to -- I don't remember a bill for 600.
13 I'm not saying, cumulatively, over -- you put
14 multiple bills together.
15       If you put multiple bills, maybe you
16 can get to something.  I don't remember a bill
17 for 600,000.  That would seem -- but over
18 multiple times and this one, this one, this
19 one, this one, I mean, it certainly could add
20 up.
21       BY MR. JESSEE:
22    Q.   The Taxotere trial, which was last

---

67 (Pages 262 - 265)

David Kessler , M.D.                          January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

Page 266

1  year, right?  The Taxotere trial was last year,
2  I believe?
3      A.   Yeah.
4      Q.   2019?
5      A.   That's right.
6      Q.   In the fall?
7          And in that case, you testified that
8  over the course of your litigation work for
9  plaintiffs, you made millions.
10         Do you recall that?
11     A.   Yeah.  I think the question was
12  millions and millions.  I said, one million --
13  millions is enough, I think, was the testimony.
14     Q.   Right.  You said -- yeah.  That's
15  exactly right.
16     A.   I think that was a little bit of a
17  redundant thing, I mean.  So yes.  I would -- I
18  have made millions -- I have made millions of
19  dollars in litigation.
20         I have made millions of dollars from
21  my books.  I have made millions of dollars from
22  my private equity.  So yes, I have made million

Page 267

1  of dollars.
2      Q.   With regard to your litigation work
3  for plaintiffs in personal injury cases, have
4  you made over $10 million?
5          MS. STOKES:  Objection.  Form.
6  Calls for speculation.
7          THE WITNESS:  You know, I don't -- I
8  don't know the answer to that question.  I
9  certainly have made millions of dollars.  I
10  just don't know what the total is over -- I've
11  never added it up.
12         BY MR. JESSEE:
13     Q.   Is it possible it's over $10
14  million?
15         MS. STOKES:  Objection.  Form.
16         THE WITNESS:  Again, I have no
17  ability to answer that question.  I just don't
18  have the answer.
19         BY MR. JESSEE:
20     Q.   Would your -- is that something your
21  wife keeps up with, as far as the billing
22  invoices and the tax returns, or is that --

Page 268

1          MS. STOKES:  Objection.  Form.
2          THE WITNESS:  I don't think anyone
3  has ever added it up on that kind of way over a
4  decade.  You know, this is going back over a
5  decade.
6          It's certainly in the millions of
7  dollars, but I can't tell you what the total
8  would be from every case.
9          BY MR. JESSEE:
10     Q.   Do you -- can you tell me how much
11  you made testifying as an expert for plaintiffs
12  in 2019?
13         MS. STOKES:  Objection.  Form.
14         THE WITNESS:  No.  I can't tell you
15  that.  I can tell you -- no.  I mean, I don't
16  have a total -- no idea what the total was.
17         BY MR. JESSEE:
18     Q.   Do you agree it's over a million
19  dollars?
20         MS. STOKES:  Objection.  Form.
21         THE WITNESS:  Yes.  Now, some of
22  that is a little skewed, because opioids was --

Page 269

1  it gets a little -- it depends.  Opioids was
2  work over five years, for example.
3          So I didn't submit a bill until the
4  end.  So it was work over five years.  And how
5  do you -- your question -- do you mean in 2019?
6  Sometimes -- I mean, you understand the answer.
7          BY MR. JESSEE:
8      Q.   Right.  As far as actually invoicing
9  and getting paid though, it would have been
10  over -- at some point, over a million dollars
11  last year?
12         MS. STOKES:  Objection.  Form.
13         THE WITNESS:  If you include the --
14  certainly, if you include the work for the
15  prior five years, because, I mean, the cash --
16  the receipt -- I'm not even sure.
17         I assume I was paid in 2019, but
18  that was -- I got paid in 2019 for work going
19  back to 20 -- don't hold me exactly -- to 2015.
20  So that's why it's not -- I mean, I can't just
21  do it precisely by the year.
22         BY MR. JESSEE:

68 (Pages 266 - 269)

David Kessler , M.D.                                     January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

| Page 270 | Page 272 |
|---|---|

Page 270

1    Q.   Do you have any other depositions or
2 trial testimony scheduled currently?
3    A.    There is a case -- there is one
4 other case that may happen that I'm not sure I
5 have been -- I'm not sure I can talk about.
6 There is one other that comes to mind.
7    Q.   And -- that's fair.
8        Other than the one you are not sure
9 whether you can talk about, are you planning --
10 do you have any plans to testify at any trials
11 coming up or --
12       MS. STOKES: Objection. Form.
13       THE WITNESS:  I don't -- I don't get
14 to make those decisions. I get called. So, I
15 mean, the answer is, will I get called in New
16 York state opioids? I don't know. I have done
17 the deposition.
18       I think the MDL opioids has probably
19 CT1. I mean, probably nothing else this year,
20 I mean, on the manufacturers.
21       Essure -- again, let me just not
22 talk.

Page 271

1       MS. STOKES: Yeah.
2       THE WITNESS:  I'm a little
3 uncomfortable.
4       MS. STOKES:  You can ask about
5 what's scheduled, but beyond that, this is
6 improper.
7       MR. JESSEE:  That is what I asked.
8       THE WITNESS:  And I don't know what
9 has been disclosed and what witness list or
10 whatever, but, again, you have a pretty good
11 sense of the cases I'm involved in. And you
12 can probably -- you can -- what I would suggest
13 is, just look at the cases I'm involved in.
14       And if there is trials, you can
15 guess whether -- are they going to be trialed
16 and I'm going to get called? And you know as
17 much as I do, but there is one I just don't
18 want to talk about.
19       BY MR. JESSEE:
20    Q.   That's fine.
21       Have you been disclosed as an expert
22 in any hernia mesh cases besides the ones we

Page 272

1 here for today?
2    A.   I hope not.
3    Q.    So not to your knowledge?
4    A.   Yeah.  There is always -- I say
5 that. You understand. Sometimes you end up
6 getting disclosed and you don't realize you are
7 disclosed, but I should not be.
8    Q.   You understand there's hernia mesh
9 litigation against other manufacturers besides
10 Bard?
11       MS. STOKES: Objection. Form.
12       THE WITNESS:  Yes. I think I have
13 seen that. I have not focused on it, and I
14 have not been involved.
15       BY MR. JESSEE:
16    Q.   You haven't reviewed the other
17 products information?
18       MS. STOKES: Objection. Form.
19 Vague.
20       THE WITNESS:  You used the word
21 hernia mesh.  So I certainly have, for example,
22 on Gore-Tex, on dual mesh.  For example, I

Page 273

1 have -- because of looking at the 510(k) for --
2 in this case, the Gore-Tex is included in that
3 510(k), as we talked earlier.
4       So I have reviewed some of that
5 stuff, because, obviously, it's in the
6 predicate chain, but the answer is only as it
7 relates to this matter.
8       BY MR. JESSEE:
9    Q.   Anything -- as far as other
10 products, would it be fair to say your review
11 is consistent --
12       THE WITNESS:  Is this mine?
13       MS. STOKES:  Yes.
14       THE WITNESS:  Thank you.  I'm sorry.
15       BY MR. JESSEE:
16    Q.   I will start over there.
17       With respect -- to the extent you
18 reviewed other products, would it have been in
19 connection with the regulatory submissions for
20 the products at issue in this litigation?
21       MS. STOKES: Objection. Form.
22       THE WITNESS:  Correct.  And we are

69 (Pages 270 - 273)

David Kessler , M.D.                    January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

Page 274

1 staying with hernia mesh, because, obviously,
2 the California case that I testified on was
3 vaginal mesh. I just want to be fair.
4        BY MR. JESSEE:
5    Q.   And to be fair, you're not -- are
6 any of the opinions that you offer -- or any of
7 the review and documents you reviewed as part
8 of that litigation, are you using any of that
9 here in this litigation?
10    MS. STOKES: Objection. Form.
11 Vague.
12       THE WITNESS: So there may be,
13 again, general statements about FDA review
14 process, right? I mean -- so not about
15 specific matters, not about the specific
16 devices, but the 510(k) process, substantial
17 equivalence.
18       I am sure I would -- if you asked me
19 questions, I would hopefully testify the way I
20 would testify there, not on product specific
21 matters, but on the regulatory framework, I
22 would testify.

Page 275

1        And I'm sure we could find
2 statements in this report that might match that
3 report, again, on the general statutory
4 regulatory framework.
5        BY MR. JESSEE:
6    Q.   Sure. I understand that.
7        And as far as product specific --
8 any product specific opinions from that
9 litigation not relevant to this litigation?
10    MS. STOKES: Objection. Form.
11    THE WITNESS: Different
12 manufacturer, different set of very specific
13 questions.
14       Again, I was testifying for the AG,
15 I think, on just very specific questions.
16    MR. JESSEE: Doctor, I think now
17 would be a good time to take a short break.
18       And we can talk about if we want to
19 try to do a quick lunch now or move on. I'm
20 fine either way.
21    MS. AMINOLROAYA: If you want, we
22 can set up lunch. It's here.

Page 276

1    MR. JESSEE: Oh, yeah. That would
2 be great. Why don't we go off the record.
3    THE VIDEOGRAPHER: We are going off
4 the record. This is the end of Media Unit 2.
5    The time is 11:57.
6    (A short recess was taken.)
7    THE VIDEOGRAPHER: We are going back
8 on the record. This is the start of Media Unit
9 No. 3. The time is 12:38.
10    BY MR. JESSEE:
11    Q.   Dr. Kessler, I want to ask you a few
12 questions about the supplemental -- or the
13 errata sheet that was served on us yesterday.
14 And this is going to be Exhibit No. 4. And I
15 believe there's actually a copy of it, sir,
16 right there for you to take a look at.
17       Is this a document that you put
18 together?
19    A.   It was -- it was under my direction
20 answered review.
21    Q.   Okay. And what was the purpose of
22 this document?

Page 277

1    A.   As you can see, I mean almost
2 everything here is -- is just to make sure the
3 report is accurate.
4    Q.   Okay. Was there just, when you were
5 reviewing the report in preparation for the
6 deposition, little things you noticed that
7 needed to be corrected?
8    A.   Yes and no. Yes, I mean I did
9 notice some things that needed to be corrected.
10 But when -- sometimes I had the document pulled
11 and underlined that it's not exactly in the
12 right same cite. So this was a lot of just
13 cite checking and typographical kind of stuff.
14    Q.   And would it be fair to say that
15 none of the issues that are addressed in this
16 errata sheet are a change in any substantive
17 opinions?
18    A.   I think that's -- I think that's
19 absolutely fair. They're just -- they're
20 mistakes.
21    Q.   Okay.
22    A.   They're just typographical mistakes.

70 (Pages 274 - 277)

David Kessler , M.D.                                    January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

Page 278

1       I have one correct -- not a
2   correction but one thing I promised earlier
3   this morning that I just need to respond to, if
4   can I --
5       Q.   Sure.
6       A.   Can I respond?
7       You asked me, and I said I think --
8   I don't know whether you said during your
9   lunch.  But you asked me, and I didn't have it
10  in my head the different materials that went
11  into the different devices, right?  And I was
12  looking.  And I didn't want to spend more time.
13  And I asked counsel.
14      And apparently there's a nice chart
15  that's produced in the interrogatories of which
16  materials are in which devices.  So -- you can
17  see that some of those devices -- you asked me
18  specific about Marlex and Ventralight.
19      And certain of these devices had
20  different materials at different times.  And
21  obviously I couldn't keep all of that in my
22  head.  So that -- that should be a fair record

Page 279

1   of what materials was used when.
2       Q.   Okay.  And is this the materials
3   that you reviewed when you were preparing your
4   report?
5       MR. JESSEE:  And what I'm going to
6   do, just so it's clear, I'll go ahead and mark
7   this as exhibit --
8       MS. STOKES:  It's going to be 20, I
9   think.
10      (Deposition Exhibit 20 was marked
11  for identification.)
12      BY MR. JESSEE:
13      Q.   This is 20.
14      And this is something that is
15  provided to you during lunch?
16      A.   At my request.
17      Q.   Yeah?
18      A.   To answer your question.
19      Q.   Okay.
20      A.   I -- I -- correct.
21      Q.   Do you know if you received that at
22  any point earlier before lunch today?

Page 280

1       A.   I don't recall seeing it, sir.
2       Q.   The report your -- itself -- we were
3   just talking about the errata sheet.
4       Was it a similar thing with the
5   report itself where someone else actually typed
6   it up under your direction?
7       A.   Dictated it.  Dictation is probably
8   the right -- the right way to say it.
9       Q.   Okay.  And who was it that typed it
10  when you dictated it?
11      MS. STOKES:  I'm going to -- I'm
12  going to object and instruct him not to answer
13  that.
14      MR. JESSEE:  Okay.
15      THE WITNESS:  I'm -- I've been -- I
16  have an instruction, right?  I'm not going
17  to --
18      BY MR. JESSEE:
19      Q.   And you -- you've certainly answered
20  that question before in your prior testimony.
21      A.   Yeah.  I mean I -- I -- I mean there
22  -- there -- there may be -- I -- so it's

Page 281

1   counsel.
2       There may be a different person in
3   the room at a different point in time.  And
4   somebody may get tired.  But I tend to dictate.
5   I may have typed a little, but I tend to
6   dictate.
7       Q.   The -- and do you know how many
8   expert reports you've authored over the course
9   of your litigation career?
10      A.   I have --
11      MS. STOKES:  Objection.  Form.
12      THE WITNESS:  I think you can -- I
13  mean I tend to be pretty strict if I'm going to
14  testify.  Even in the State of California,
15  where there's not reports required, I tend to
16  make myself do an expert report.
17      So I mean I don't -- I wouldn't say
18  count up the times I've test -- that -- it's
19  not true.  I wouldn't -- I wouldn't want to
20  state that every time there's an expert report.
21      But I -- I tend to over -- I tend to
22  do an expert report even when one is not

71 (Pages 278 - 281)

David Kessler , M.D.                     January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

Page 282

1 required, just because I don't think that's --
2 I think it's better for the -- the parties.
3 And it's also better for me.
4        BY MR. JESSEE:
5    Q.    And you tend to be very thorough
6 when you're putting those expert reports
7 together, correct?
8        MS. STOKES: Object to form.
9        THE WITNESS: So I -- I try.  Okay?
10 The problem is, as with anything, these are --
11 these are five devices, plus, right, over many
12 years.  A lot of material, issues upon issues.
13        And not everything -- I would not
14 say every issue gets identified perfectly the
15 first time.  I mean things get narrowed; other
16 issues come up, you know.
17        I mean there's only so much -- as
18 you know.  I mean I'm trying to get a book out.
19 There's only so much time one has, right?
20        I mean one could spend thousands of
21 hours on mesh.  I spent some -- 233 or
22 something like that doing this.  You know, you

Page 283

1 do what you can do.  I mean --
2        MR. JESSEE: Sure.
3        THE WITNESS:  -- that's reasonable.
4        I -- I try to do a good faith
5 effort.  But as you see, I -- someone caught an
6 issue that I had not caught.  And so let's
7 leave it at that.
8        BY MR. JESSEE:
9    Q.    When were you initially retained in
10 this litigation?
11    A.   If you can take -- if you can change
12 the word from -- take out the word "retained,"
13 I can answer your question.
14    Q.    Okay.  When were you initially
15 contacted?
16        Is that a better --
17    A.   Yeah.  That -- that would be fair.
18 Because I --
19    Q.    Okay.
20    A.    -- never know what the word
21 "retained" means.
22        I think it was March of '19.

Page 284

1    Q.    Who contacted you?
2    A.    I believe it was a -- the lawyer at
3 Levin Papantonio, Matt Schultz.
4    Q.    Would you agree that in the -- we --
5 we can agree with regard to the -- not the
6 exact number but that you've done a fair amount
7 of expert reports over the course of your
8 work -- litigation work?
9        MS. STOKES: Objection. Form.
10        THE WITNESS:  Over the last ten
11 years, that's -- that -- that's a -- it's a
12 significant list.
13        BY MR. JESSEE:
14    Q.    And you agree that it's important
15 not to cherry-pick the information that you
16 rely upon, correct?
17        MS. STOKES: Objection. Form.
18        THE WITNESS:  I try very hard to
19 make sure I understand all aspects of an issue.
20        BY MR. JESSEE:
21    Q.    Okay.  And that would be -- include
22 information that might be contrary to an

Page 285

1 ultimate opinion that you reach; it's important
2 to look at that information as well, right?
3    A.   I --
4        MS. STOKES: Objection. Form.
5        THE WITNESS: Absolutely.  Because I
6 know you're going to ask me about it.  And I
7 would -- would much rather -- I mean I tend to
8 -- I try hard -- as hard as I can to include as
9 much as I can within the limits of, you know,
10 time and -- and human ability.
11        BY MR. JESSEE:
12    Q.    And you understand, from your
13 time -- in time serving as an expert, too, and
14 as your -- from your law school days perhaps as
15 well, that the federal rules require in the
16 report a complete statement of all the opinions
17 a witness -- an expert witness will express,
18 right?
19        MS. STOKES: Objection. Form.
20        THE WITNESS:  You -- you could -- so
21 I -- I -- we can pull Rule 26.  What I
22 certainly know, and what I'm happy to -- what I

72 (Pages 282 - 285)

David Kessler , M.D.                                     January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

| Page 286 | Page 288 |

Page 286

1 certainly understand is my goal in that report
2 is to try to give you the four corners of my
3 report and, to the best of my ability,
4 recognizing that, you know, there are going to
5 be questions you're going to ask me and things
6 that are going to come up. And I'm going to be
7 responsive to.
8        So I -- I try very hard to -- to do
9 that.
10        BY MR. JESSEE:
11    Q.   Did you -- was there ever an
12 engagement letter that was sent to you?
13    A.   No. I don't believe so.
14    Q.   So it was just a verbal agreement
15 eventually that -- at one -- some point in time
16 that you would serve as an expert?
17    A.   I'm not even sure --
18        MS. STOKES: Yeah.
19        THE WITNESS: I'm not --
20        MS. STOKES: I'm going to object and
21 instruct him not to answer.
22        MR. JESSEE: As to whether they --

Page 287

1 when he became an expert?
2        MS. STOKES: That wasn't the
3 question.
4        BY MR. JESSEE:
5    Q.   Okay. So there's no --
6        MS. STOKES: If you want to ask a
7 more --
8        BY MR. JESSEE:
9    Q.   -- there's no engagement --
10        MS. STOKES: -- precise question.
11        BY MR. JESSEE:
12    Q.   -- no engagement letter?
13    A.   There's -- there -- there's --
14 there's no engagement letter.
15    Q.   All right.
16    A.   You know --
17    Q.   You did agree to serve as an expert
18 for plaintiffs' counsel at some point in time
19 in this litigation?
20    A.   I -- I think -- I think the day I
21 signed the report. Look, exactly what point
22 that is -- I mean, as always, there's a

Page 288

1 continuum.
2        I didn't know about this case when I
3 got the first phone call. I didn't know what
4 the issues were. I didn't know whether I would
5 have anything helpful that I would be able to
6 offer the court, right, to -- so I mean you
7 learn that over time.
8    Q.   Had you worked with counsel who
9 contacted you before?
10    A.   Counsel who contacted me, I had. I
11 had not been his -- he -- the counsel who
12 contacted me was just to make an introduction
13 to me to somebody else who I had not work --
14    Q.   And who was that that you were
15 introduced to?
16    A.   To Tim O'Brien.
17    Q.   Okay.
18    A.   I have no recollection of working
19 with Tim prior.
20    Q.   You ever designed a medical device?
21    A.   Yes.
22    Q.   Was that the syringe cap when you

Page 289

1 were -- back around when you were working in
2 the Bronx?
3    A.   You got it. Boy, you -- you really
4 have --
5    Q.   I've -- I've read the --
6    A.   Either that, or you had a camera in
7 my office in the Bronx when I was sitting there
8 trying to -- to do this.
9    Q.   Yeah. And did -- that never
10 actually though went to market, right?
11    A.   Yeah. I had -- I mean I've -- that
12 was -- were -- my preFDA days I was medical
13 director of a hospital trying to figure out how
14 medical staff would not get stuck.
15    Q.   Right. Exactly.
16        And that -- that never -- that --
17 you ever -- that -- did you file a patent for
18 that device?
19    A.   I may have got -- I don't think I
20 went that far. I mean I think I may have done
21 some steps. But I never went that far.
22    Q.   Okay.

73 (Pages 286 - 289)

David Kessler , M.D.                     January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

Page 290

1    A.   I mean I think I hired somebody to
2  do a patent search and --
3    Q.   Okay.
4    A.   -- et cetera.  But I don't believe
5  I...
6    Q.   Other than that -- and that was --
7  would have been, what, the -- that's 1980s, 19
8  --
9    A.   You have it.  Beginning of the AIDS
10  epidemiology.
11    Q.   Other than that -- the cap for the
12  syringe, have you ever designed a medical
13  device?
14    A.   So I -- so I have been part of
15  discussions you know, that have sat there and
16  talked about medical devices, certainly on
17  boards, et cetera.
18       But I don't want to -- I don't sit
19  there.  And I -- I didn't drew -- draw the
20  schematics.  I don't want you to leave that
21  impression.  That's not my area.
22    Q.   Have you ever tested a surgical

Page 291

1  mesh?
2       MS. STOKES:  Objection.  Form.
3       THE WITNESS:  I've done no trials
4  and studies of surgical mesh.
5       BY MR. JESSEE:
6    Q.   Okay.  And when -- just so we're
7  clear, when we're talking about studies, that
8  -- are we -- that would include -- you haven't
9  done any like mechanical testing or anything
10  like that of surgical mesh, correct?
11    A.   I'm in the -- I'm a regulatory
12  expert.  I mean so -- so the record is clear,
13  even FDA -- for the -- even FDA doesn't test
14  medical devices, I mean with -- with a few
15  exceptions.
16    Q.   Sure.
17       And -- yeah.
18       And then I'm just trying to clarify
19  then, you know, what areas -- and -- and I
20  think you've been consistent.
21       You're talking about the regulatory
22  set of things, not -- not going into the

Page 292

1  mechanical engineering side of things.
2    A.   Correct.
3       MS. STOKES:  Objection.  Form.
4       THE WITNESS:  Now -- now, to -- now
5  there are mechanical engineering things that
6  are part of the regulatory submissions.  And
7  I'm happy to go into it if it abuts that
8  regulatory submission.  But I would not be the
9  one who would do that -- those tests.
10       I mean I've done animal testing, not
11  of -- of -- in other contexts.  And I'm
12  imperfectly competent to discuss with you
13  animal studies.  But I didn't do any studying
14  here.  But I'm happy to discuss studies from a
15  regulatory context and what they mean.
16       BY MR. JESSEE:
17    Q.   The -- I see the -- and I didn't ask
18  about this earlier.  There is a PerFix Plug
19  that is here on the table.
20       Did -- is that something you brought
21  with you?
22    A.   I -- I just have -- I have all the

Page 293

1  devices with me.  They just happened to be -- I
2  just was -- I was looking at one thing about it
3  this morning.
4    Q.   Okay.  And those -- were those
5  provided to you by counsel?
6    A.   Yes.  I asked for it.  Yeah.  I -- I
7  don't think these are things I can go into the
8  Walgreens and buy.
9    Q.   No.  I mean -- no.
10       I mean they're obviously
11  prescription medical devices, right?
12    A.   Yes.  That -- that -- that's
13  correct.
14    Q.   And the --
15    A.   I -- I just asked to have them.
16    Q.   Any reason in particular the PerFix
17  one -- PerFix Plug plug one is on the table?
18    A.   Because I -- I wanted to see -- I
19  wanted to feel something this morning about
20  that device.  And I -- I just -- I mean
21  something popped in my head.  It's one of those
22  5:00 a.m. questions I had.  And I just wanted

74 (Pages 290 - 293)

David Kessler , M.D.                                    January 31, 2020
Davol, Inc./C. R. Bard, Inc. - MDL 2846

| Page 294 | Page 296 |
|---|---|
| 1 to check something. | 1   I believe you state in your report, the body of |
| 2   Q.   Did you have any experience with | 2 it, that this is a list of documents that were |
| 3 hernia mesh prior to your involvement in | 3 either provided to you or that you found |
| 4 litigation? | 4 independently? |
| 5      MS. STOKES: Objection. Form. | 5   A.   That's a fair statement. |
| 6      THE WITNESS: Not -- not -- I had -- | 6   Q.   Okay.  And would it be accurate to |
| 7 I had experience with some of the materials | 7 say that not -- you don't rely on every single |
| 8 that have been used, for example, and tested as | 8 one of those documents for your opinions? |
| 9 hernia meshes, et cetera, over time but not as | 9      MS. STOKES: Objection. Form. |
| 10 these products are designed. | 10      THE WITNESS: I -- I -- I think |
| 11      BY MR. JESSEE: | 11 that's probably well stated.  I specifically |
| 12   Q.   What about ePTFE; is that a material | 12 used the word "considered" rather than |
| 13 you had experience with prior to your | 13 "relied." I think that -- I think that -- the |
| 14 involvement in litigation? | 14 answer probably to your question is yes, I |
| 15   A.   I did not -- | 15 know.  I mean I... |
| 16      MS. STOKES: Objection. | 16      BY MR. JESSEE: |
| 17      Go ahead. | 17   Q.   Okay.  Did you review every one of |
| 18      THE WITNESS: Sorry. | 18 the documents listed in Appendix C? |
| 19   I did not have experience with ePTFE | 19   A.   At -- at some point I probably |
| 20 or PTFE before.  It was not something that rose | 20 touched, I mean, or scanned or -- I mean |
| 21 as an issue of when I was at FDA. | 21 probably more -- let me put it more -- be more |
| 22      BY MR. JESSEE: | 22 exact. |

| Page 295 | Page 297 |
|---|---|
| 1   Q.   What about the separate | 1      I didn't -- I mean there are a lot |
| 2 technology -- do you know -- you know -- | 2 of depositions, for example, here.  There are a |
| 3 understand -- | 3 lot of articles.  I would be on PubMed, or I |
| 4   A.   I -- I -- | 4 would even ask on depositions.  I would be |
| 5   Q.   -- what I refer to when I say -- | 5 searching multiple depositions for key words at |
| 6   A.   I -- happy to discuss that the rest | 6 different points in time. |
| 7 of the afternoon. | 7      So I think, again, some of this is |
| 8   Q.   Well, and we'll get there. | 8 the result of search -- or I would have |
| 9      But I just want to know -- just my | 9 searched for these things.  I don't want to |
| 10 question now is did you have experience with | 10 give you the impression -- there's no way that |
| 11 that prior to your involvement with litigation? | 11 I could have read thoroughly every single one |
| 12   A.   Not -- not -- | 12 of these documents.  But somehow they were |
| 13      MS. STOKES: Objection. Form. | 13 searched or -- or re -- you understand what I'm |
| 14      THE WITNESS: Not that specific | 14 saying. |
| 15 technology.  I don't remember it being -- | 15   Q.   Yes, I do. |
| 16 coming up as an issue.  And I don't remember | 16      And so I'm focusing -- so to just |
| 17 the dual -- the dual mesh application rising to | 17 sort of summarize this Appendix C, you have |
| 18 the commissioner. | 18 these Bates labeled corporate documents that |
| 19      BY MR. JESSEE: | 19 were produced by Bard as part of it, right? |
| 20   Q.   The -- I want to just briefly look | 20   A.   Correct. |
| 21 at Appendix C to your expert report. | 21   Q.   You have the literature as -- |
| 22      And in -- it's -- this is -- I | 22   A.   Correct. |

Veritext Legal Solutions
800.808.4958                                                    770.343.9696

David Kessler , M.D.        January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

**Page 298**

1    Q.    -- as a section in here.  You have
2  depositions.
3    A.    Correct.
4    Q.    And then you have I think a general
5  or sort of miscellaneous section at the end?
6    A.    Just the FDA documents after the --
7    Q.    Sure?
8    A.    -- depositions, yes.
9    Q.    So just with the -- have you -- just
10  focusing on the corporate documents listed
11  here, the Bates numbers one, have you reviewed
12  all the documents that's -- are listed there?
13    A.    I wouldn't want to --
14        MS. STOKES:  Objection.  Asked and
15  answered.
16        THE WITNESS:  I wouldn't want to
17  swear to you that I've reviewed every single
18  page of all those documents.  I mean I am a --
19  I'm an avid searcher, right?  I mean -- I mean
20  I think as the lawyers -- I mean, if you asked
21  the lawyers, no lawyer feeds me anything.
22        I mean I tend to search.  I ask for

**Page 299**

1  the database, and I search documents.  And the
2  reason there's so many documents here is
3  because, you know, you -- you get back -- you
4  see a lot of things.
5        BY MR. JESSEE:
6    Q.    Yeah.
7        Is it -- when -- when you access to
8  the database, is through Relatively that you go
9  in there and search?
10    A.    The -- the answer to your --
11        MS. STOKES:  Yeah.
12        THE WITNESS:  The answer to your
13  question is no.  But I'm not going to go there.
14  Because she's going to instruct me --
15        MS. STOKES:  Yeah.
16        THE WITNESS:  -- not to --
17        MR. JESSEE:  Okay.
18        THE WITNESS:  -- tell you the
19  actual -- probably the name of the database.
20        BY MR. JESSEE:
21    Q.    Oh, okay.  That's fine.  Are you
22  physically searching it, doing the searching

**Page 300**

1  yourself?
2    A.    Yes, sir.
3    Q.    Is there a record of your search
4  terms that you used?
5    A.    Not that I am aware of.  I -- I -- I
6  don't keep any record.
7    Q.    What -- what search terms did you
8  use?
9    A.    A lot.
10        MS. STOKES:  Objection.  Form.
11        BY MR. JESSEE:
12    Q.    Can you give an example of some of
13  them?
14    A.    Last night?  So I can tell you last
15  night I probably searched 160 --
16        MS. STOKES:  I --
17        THE WITNESS:  I'm sorry.
18        MS. STOKES:  I'm just going to
19  caution you that, to the extent that you were
20  consulting with counsel on -- I'm going to
21  instruct you not to answer.
22        So with that caution --

**Page 301**

1        THE WITNESS:  I can tell you I was
2  -- I searched 168 days.  I could -- 180 -- 68
3  day implant, a hundred and -- I mean there were
4  -- that -- I mean just that -- that's one that
5  -- I mean probably every version of that I was
6  searching last night.
7        BY MR. JESSEE:
8    Q.    Why were you searching for 168 days?
9    A.    I had found a document that was --
10  it was an animal study.  I had found a
11  document.  There was a partial document.  I
12  could never find the full report.  And I was
13  trying to understand the actual animal data at
14  168 days.
15    Q.    Did you ever find it?
16    A.    I found a table, yeah.
17    Q.    Did you ever find the full report?
18    A.    No.
19    Q.    The "Published Literature" section
20  of your appendix --
21    A.    Yeah.
22    Q.    -- were these -- is this a mix of

76 (Pages 298 - 301)

David Kessler , M.D.                                  January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

**Page 302**

1 documents that was provided to you and that was
2 -- you found on your own?
3    A.   That's a -- probably a fair
4 statement.  This is -- I tend to be cumulative,
5 right?
6        This is not of -- there are a lot of
7 documents here.  And I'm willing to -- you
8 know, so I do a lot of PubMed searching myself
9 over time.  But I tend to ask for documents
10 also.
11       So this is -- this is not meant to
12 be any -- don't read anything -- I just tend to
13 be cumulative.
14   Q.   And -- and you seem to be very
15 thorough.
16       And I'm -- given the volume of
17 literature here, I take it you didn't read
18 every single page of every one of the articles?
19    MS. STOKES:  Objection.  Form.
20    THE WITNESS:  That's a fair -- you
21 can be certain I searched that, right?  So I'm
22 -- I'm -- at a certain point in time, I'm

**Page 303**

1 looking at certain questions, you know, over a
2 period of months.  And so I am searching that
3 stuff.
4    BY MR. JESSEE:
5    Q.   If you --
6    A.   And I'm not saying anyone has -- you
7 know, are -- they're relevant or even -- not
8 that I'm relying on them.  But -- but somehow
9 I've touched them.  I've touched upon or
10 researched the documents that -- those words or
11 including those words.
12   Q.   Did you try to find all of the
13 studies related to the Ventralight?
14    MS. STOKES:  Objection.  Form.
15    THE WITNESS:  I try to be
16 comprehensive.  I would never -- all the
17 studies?  Say that again.
18    BY MR. JESSEE:
19   Q.   Did you try to find all of the
20 studies on -- and we are talking about the
21 clinical literature -- the published literature
22 here just -- let me -- I'll rephrase it.

**Page 304**

1        With regard to the published
2 literature, did you try to find all the
3 published literature on the Ventralight?
4    MS. STOKES:  Objection.  Form.
5 Assumes facts.
6        THE WITNESS:  No.  I was compulsive
7 and tried to find all the studies that -- and
8 you can see from my -- I tried to find all the
9 studies that Bard had done on Ventralight.
10       I tried to -- I tried to be
11 comprehensive.  So, I mean, I was obsessive
12 about trying to find every one of Bard's
13 studies.
14       Do you understand?
15       BY MR. JESSEE:
16   Q.   Uh-huh.
17    A.   And that takes a lot of time, right,
18 because there are studies done over time.  So
19 that, I can tell you, I worked very hard to try
20 to assure and probably accomplish that.
21       I tried to be comprehensive in
22 searching for Ventralight studies in clinical

**Page 305**

1 stuff, but I don't want to represent that I
2 have every study.
3        I did -- on the question that I
4 opine on -- one of the questions I opine on on
5 reabsorption, I tried to include all the
6 studies that I -- with regard to ST, the length
7 of reabsorption, the complete healing period.
8        So there, I tried to be more
9 focused, but I don't want to state that I did
10 every study.
11    Q.   What about -- the same question for
12 the Ventralex, in that with regard -- would it
13 be the same for the Ventralex, in that you made
14 a comprehensive search of Bard's studies, but
15 not the medical literature in general about
16 Ventralex?
17    MS. STOKES:  Objection.  Form.
18    THE WITNESS:  So there there were
19 two aspects of my report on -- or several
20 aspects.  Just as I may have focused more -- I
21 was very compulsive on making sure I had the
22 Ventralex studies by Bard.

Veritext Legal Solutions
800.808.4958                                          770.343.9696

David Kessler , M.D.                                    January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

Page 306

1    With regard to what was in the
2 medical literature, I worked -- I focused a
3 little more and was a little more comprehensive
4 when it came to Ventralex and, for example,
5 infection rate.
6    So there was a little more focus
7 there than on other aspects of Ventralex in the
8 clinical literature, but I was -- I mean, I was
9 as compulsive as I think anybody could be on
10 having all the studies of Bard.
11    BY MR. JESSEE:
12    Q.   What was the infection rates that
13 you saw for the Ventralex in the literature you
14 reviewed?
15    MS. STOKES:  Objection.  Form.
16    THE WITNESS:  The answer is, which
17 study?
18    BY MR. JESSEE:
19    Q.   Well, in the overall.  Can you
20 summarize what the overall infection rate for
21 Ventralex was?
22    A.   I can give you that.  Can I just get

Page 307

1 my Ventralex infection papers?
2    It depends on which study we are
3 dealing with, and I can give you --
4    Q.   This is Exhibit 14?
5    A.   Yeah.  You are ahead of me, right?
6 So you can see here --
7    Q.   It looks like, Doctor, that you have
8 several pages of different studies -- or
9 several studies pasted on this?
10    A.   Yeah.  So, again -- so you can -- if
11 you want the answer to your question, each one
12 -- we can spend 20 minutes on each one of these
13 studies, and they all had different numbers in
14 here.
15    And I tried to -- I think, on the
16 infection rate, I tried to include, you know --
17 PP meshes show infection rates ranging from 2.0
18 to 4.2 percent, you know.  Citation is omitted.
19    In contrast, ePTFE show more or wide
20 ranging infection rates ranging from 0 to 9.2
21 percent when open surgical approach is used --
22 again, citation is omitted -- and only 0.0 to

Page 308

1 percent when a laparoscopic approach.
2    So there are multiple different
3 rates.  There is a substantial infection rate,
4 8 percent in this series, particularly with
5 MRSA.
6    So the answer to your question, it
7 depends on which study.
8    Q.   In those two studies you're looking
9 at right there, those aren't specifically on
10 Ventralex, correct?
11    A.   They are on ePTF.  So let's just --
12 this is not, but these are on ePTFE.  And I
13 would have to go back and -- we'd have to pull
14 each one of these citations.  And I have each
15 one of these studies in a notebook.
16    Q.   What I am wondering is -- because I
17 didn't see in your report about a discussion of
18 the infection rates published for Ventralex and
19 studies looking at the Ventralex specifically.
20    MS. STOKES:  Objection.  Form.
21    BY MR. JESSEE:
22    Q.   Is that -- and correct me if I am

Page 309

1 wrong.  Was that -- do you have any specific
2 clinical studies in there, studying the
3 Ventralex, a discussion in your report?
4    A.   I would have to go back.  Let me go
5 back and check that specifically.  I have a
6 list of all the studies.  I don't have it in my
7 head, but, I mean, I am willing to -- whatever
8 the studies show the studies show.
9    Q.   Okay.  I mean, have you done a
10 comparison of the -- what the infection rate
11 for Ventralex is compared to other ePTFE
12 products?
13    MS. STOKES:  Objection.  Form.
14 Vague.
15    THE WITNESS:  Yeah.  So I choose my
16 words very carefully in the report.  Let me
17 just -- let me just go to the infection.
18    I am not aware of Bard doing any --
19 and this is one of the issues that I have.  I
20 think what the opinion is -- I have no -- I'm
21 not aware of Bard doing any infection,
22 antimicrobial sensitivity of microbes getting

78 (Pages 306 - 309)

David Kessler , M.D.        January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

---

Page 310

1 stuck, whatever the kind of -- the different
2 kind of tests to see whether material harbors
3 and infection stays collected in Ventralex. I
4 don't see those studies.
5      My opinion is, there certainly was a
6 recognition, because ePTFE was submicronic.
7 And there was an issue of clearance and a
8 general acceptance within Bard about a higher
9 infection rate with ePTFE that my issue is the
10 lack of doing the design control to determine
11 what -- I mean, to minimize the infection rate
12 and, if, in fact, it was higher, to warn.
13      So I think I am very -- I am very
14 careful in how I state my opinion, if my memory
15 serves me right.
16      BY MR. JESSEE:
17    Q.   And I think you are right. I'm just
18 looking at the summary, where you say: "To the
19 extent that Bard had evidence of higher
20 infection associated."
21      I'm looking at the summary of
22 Section No. 9 in your report.

---

Page 311

1    A.   Yes. If I can get there. Just give
2 me what page.
3    Q.   And I'm actually looking at the --
4 it is on Page 90. I was just looking at the
5 table of contents too.
6    A.   Just give me one second. What page,
7 sir?
8    Q.   90?
9    A.   Page 90. What paragraph?
10    Q.   Section 9, 262 and 263.
11    A.   Right. But there's also -- if you
12 look at -- infection begins a number of pages
13 earlier.
14    Q.   It does. I know. I am asking
15 though specifically about the language you
16 choose to use here, saying, "To the extent that
17 Bard had evidence."
18      You are not saying that -- you are
19 not going to offer an opinion that -- what the
20 infection rate in nonBard clinical literature
21 on the Ventralex is, right?
22      MS. STOKES: Objection. Form.

---

Page 312

1 Vague. Misstates.
2      THE WITNESS: I'm sorry. Just help
3 me understand. NonBard --
4      BY MR. JESSEE:
5    Q.   Medical literature, medical --
6    A.   NonePTFE devices?
7    Q.   No. I will ask a better one.
8      It sounds to me from what you are
9 saying, if I can summarize it, your focus has
10 been on the testing or lack of testing, in your
11 view, that Bard did on these products; is that
12 fair?
13      MS. STOKES: Objection. Form.
14      THE WITNESS: Yeah. I think that's
15 a significant part, yes.
16      BY MR. JESSEE:
17    Q.   And with regard to though the --
18 there is obviously -- there is for these
19 products -- like the Ventralex has been on the
20 market for a long time, correct?
21      MS. STOKES: Objection. Form.
22      THE WITNESS: Depending on what --

---

Page 313

1 we can have an exact date, '08 Ventralex,
2 depending on which one we are talking about,
3 PET was '01.
4      BY MR. JESSEE:
5    Q.   Right. And there has been -- in
6 clinical and peer reviewed medical literature,
7 there has been studies involving the Ventralex
8 over that time period, right?
9      MS. STOKES: Objection. Form.
10      THE WITNESS: We have -- we have
11 certain data on ePTFE. I am not sure I have
12 seen any Bard studies on infection rate.
13      BY MR. JESSEE:
14    Q.   I'm not talking about Bard studies.
15 I am talking about studies in peer-reviewed
16 medical journals, not that Bard did, but the
17 physicians using the advice data they published
18 on the Ventralex, are you aware of those
19 studies?
20      MS. STOKES: Objection. Form.
21 Assumes facts.
22      Go ahead.

---

79 (Pages 310 - 313)

David Kessler , M.D.    January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

Page 314

1    THE WITNESS:  So, again, I am aware
2  of general ranges of infection rates of ePTFE
3  implanted.  We can go -- we talked earlier.
4    If you have a specific Ventralex
5  infection rate in the literature that is only
6  Ventralex infection rate, I would be happy to
7  see it.
8    I have -- the studies I have seen
9  here -- let's just go back -- in the report are
10  on ePTFE implants and I don't believe are just
11  Ventralex.
12    Hold on one second.  Give me one
13  second.
14    I don't have readily at my
15  fingertips the kind of study that you are
16  talking about that just has Ventralex ePTFE.  I
17  certainly don't have it in the Bard record.
18    BY MR. JESSEE:
19    Q.    You have also looked at lit -- some
20  of this literature that you have isn't just all
21  stuff you found through Bard's files, right?
22    A.    That's correct, but I do that, not

Page 315

1  to get to a legal term, but that's sort of --
2  if you look at Badhwar's testimony, if you look
3  at Ciavarella even, I mean, they recognize
4  there was a higher infection rate in their
5  depositions.
6    And with that and with the general
7  numbers of -- in those studies, the company was
8  on notice that there were certainly issues of
9  higher infection rate.
10    And I said, Look, with that being
11  known out there by your own statements and your
12  own testimony and the general literature, there
13  was an obligation to be able to design -- to
14  have adequate design controls to test whether,
15  in fact, there was a higher level of infection
16  and to minimize that.
17    That's where my report is, but
18  others can talk about what the exact infection
19  rate, but I think the record shows the company
20  was on notice that there was a concern about
21  that.
22    Q.    Switching a little bit back to the

Page 316

1  line of questions I had, we have been talking
2  about -- just briefly about Ventralight and
3  Ventralex.
4    Would it be true for PerFix Plug and
5  3DMax as well, that your focus was more on the
6  Bard documents and case studies on those
7  devices as opposed to the medical literature
8  overall looking at those devices?
9    MS. STOKES:  Objection.  Form.
10    THE WITNESS:  No.  In that -- I
11  think that's a little different, if I may.  The
12  issue there was, again, PerFix Plug, more
13  material, more -- a different -- I mean, the
14  type of design.
15    I mean, there was more mesh, but I
16  certainly -- there, the issue and, I think, the
17  opinion among others is the failure to warn on
18  chronic pain.
19    And I do believe I cite studies --
20  happy to pull them for you -- in the medical
21  literature, where chronic pain -- not only the
22  complaints, not only in the company's own

Page 317

1  documents -- and I don't think there's any --
2  it was in the European label, I think.
3    It was in the European clinical
4  evaluation that there was chronic pain
5  associated with that device and, certainly, a
6  recognized adverse event and wasn't on the
7  label.
8    So I certainly -- I cite studies
9  just to show that chronic pain was well
10  established and should have been in the label.
11    BY MR. JESSEE:
12    Q.    So that's a little different than
13  the Ventralex and Ventralight that we were
14  talking about?
15    A.    Exactly.  You got it.  So there is a
16  little more emphasis.
17    Q.    Did you review the FDA review
18  memorandum for any of these 510(k)s?
19    A.    Yes.  When they're available.  Many
20  of them were FOI'd, but you have to be
21  specific.  I have tried to look at the FDA file
22  when it exists.  It doesn't always exist.

80 (Pages 314 - 317)

David Kessler , M.D.                                    January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

Page 318

1    Q.   Did you review any documents on the
2 physician training programs that Bard provided
3 for hernia mesh surgeons?
4        MS. STOKES: Objection.  Form.
5        THE WITNESS: Yeah, yes.  At certain
6 points, I was looking -- I forget the exact
7 context, but I was looking for slides that were
8 used in training programs and found some.  So I
9 was focused on training at some point.  I
10 looked at some of those decks, I believe.
11       BY MR. JESSEE:
12    Q.   That didn't make it into your report
13 though, right?
14    A.   That's correct, but just so -- for
15 the record, I do remember searching -- I can't
16 tell you exactly how my thought processes went,
17 but something took me to understanding about --
18 wanting to know that.  So I did search.
19    Q.   The schedules that are attached to
20 your report, there are six of them.  I'm not
21 going to go through -- yep.  Six of them.
22       I'm not going to go through them in

Page 319

1 detail this moment, but are these documents
2 that were created under your direction, or were
3 they provided to you?
4    A.   No.  These were done under my
5 direction and review, but they were not done by
6 me.  They are tend -- they are tended to be
7 objective facts.
8        If we want to talk about -- for
9 example, you asked me a date, right?  What
10 date?
11       And I just wanted to have those
12 things available so that I could refer to it
13 today or you and I could refer to it today, but
14 if there is any mistake in the -- they were
15 under my direction and review, but if there is
16 any mistake in there, I am happy to correct it.
17 It was just trying to get the core -- my head
18 around basic things about these devices.  So --
19    Q.   Okay.
20    A.   -- I mean, it's changes in the IFU,
21 some sense of the chronology of what happened
22 when.

Page 320

1        So those were specifically done at
2 my request, and I looked at them, but they are
3 not meant to be -- there is no buried opinions
4 in them.
5    Q.   And I guess I am just trying to make
6 sure I understand.  So, for example, the
7 changes in the IFU, did you ask, Can I see a
8 chronology, showing the different changes over
9 time, or did you walk through and say, Hey,
10 this is what this one says.  This is what you
11 asked for?
12    A.   I admit there wasn't time.  I mean I
13 may have done a little of the second, but it
14 was more of, Can we just -- I need to make sure
15 that I have a document that shows what the
16 label said at different points in time for this
17 device.  So it was a very specific instruction.
18    Q.   Okay.  So the same thing.  When we
19 are talking about Schedule 1, the device
20 history schedule, is that where you --
21 something where you asked for a basic sort of
22 chronology of this?

Page 321

1    A.   Of the different Bard devices and --
2 but I asked to make sure that they didn't --
3 that they were just quotes from the device --
4 from documents and just give us some sense of
5 when different things were, but I recognize,
6 you know, a full chronology of every
7 interaction with FDA would take, you know,
8 boxes and boxes.  So that is not -- that just
9 gives us some, you know --
10    Q.   So it's the same basic idea then for
11 the device schedule, the decision tree.  You
12 asked for these particular things, and they
13 provided you with --
14    A.   The predicate -- the predicate
15 things, yeah.  To the best -- and then I tried
16 to play some role in there, but, again, what it
17 does is, you just have to go through each
18 application, you know, and pull the predicate
19 and then pull the predicates of the predicate
20 of that other application.
21       So it's -- I mean, it's a pretty
22 regimented kind of operation, but I did not do

81 (Pages 318 - 321)

David Kessler , M.D.                                January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

| Page 322 | Page 324 |
|---|---|

Page 322

1  that myself.  I did review it.
2      Q.   Let's talk some about the FDA
3  regulation of medical devices.
4      A.   Happy to do that.
5      Q.   I know you know a thing or two about
6  that.
7          In the U.S., obviously, the FDA is
8  the agency that's -- who regulates medical
9  devices, correct?
10        MS. STOKES:  Objection.  Form.
11        THE WITNESS:  Yeah.  I don't think
12  that's a trick question.
13        BY MR. JESSEE:
14      Q.   I was hoping this would be
15  noncontroversial.
16      A.   I'm going, Well, is there any
17  National Bureau of Standards?  Is there
18  anything else that -- yeah.  I think that's a
19  fair standard -- a fair question.
20      Q.   Would you agree that the FDA is
21  charged with the responsibility for protecting
22  the public health by assuring the safety,

Page 324

1  specific.  You can't make that general
2  statement, based on the statute.
3          You know, I'm sure we will spend the
4  next 40 minutes discussing whether substantial
5  equivalence is safety and effectiveness.
6          BY MR. JESSEE:
7      Q.   Are you putting a time limit on me
8  here?
9      A.   I'm happy to do as much as you'd
10  like.  I'm happy to do as much as you'd like.
11        So the question is, is substantial
12  equivalence -- you can pick certain -- does it
13  go to safety and effectiveness?  Is it
14  substantial equivalence?  So you got to be
15  careful.  I'm not answering that.
16      Q.   I'll tell you.  That language I just
17  read is straight from the FDA web site.
18      A.   But be careful.  You know, the FDA
19  web site is -- some of that is apple pie and
20  motherhood and all things good and PR stuff.
21        I mean, I think if you want to know
22  what FDA is charged with, you have to look at

Page 323

1  efficacy, and security of human and veterinary
2  drugs, biological products, and medical
3  devices?
4        MS. STOKES:  Objection.  Form.
5        THE WITNESS:  Yeah.  You are quoting
6  me again on some FDA document, and that's fine.
7        Yeah.  That's general.  Let's just
8  see.
9        You said safety and -- can you just
10  -- this is rough.  What was --
11        BY MR. JESSEE:
12      Q.   Safety and efficacy and security
13  of --
14        MS. STOKES:  Same objection.
15        THE WITNESS:  Yeah.  So that's --
16  the answer is, it's complicated.
17        BY MR. JESSEE:
18      Q.   Okay.  Can you -- you don't agree
19  with that, that they are charged under the law
20  with that responsibility?
21        MS. STOKES:  Objection.  Form.
22        THE WITNESS:  The law is much more

Page 325

1  the statute and the regulatory history.
2          And as you know well, you know, over
3  your career, there are devices where you have
4  to affirmatively show safety and effectiveness
5  from premarket approval.
6          And the 510(k) process is based on
7  substantial equivalence, which has touches of
8  safety and effectiveness, but it's not the same
9  kind of review.  So that's where the rub is.
10      Q.   And I promise you.  I'm going to let
11  you -- we're going to get into that part of it
12  first.  And I just wanted to sort of start from
13  a little bit higher level here though.
14        With regard to the FDA's oversight
15  of medical devices specifically, one aspect of
16  it -- and we will talk about -- is the
17  premarket review of devices, correct?
18      A.   Yes, sir.
19      Q.   Another aspect of it would be
20  post-market surveillance involving devices,
21  correct?
22      A.   Correct.  Sure.

82 (Pages 322 - 325)

David Kessler , M.D.                    January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

---

Page 326

1    Q.    There is other aspects of the FDA's
2  regulation of medical devices that involve the
3  entire lifecycle of a product, right?
4        MS. STOKES: Objection. Form.
5        THE WITNESS: I'm not sure -- I
6  understand -- I understand clearance review,
7  post-market surveillance.
8        BY MR. JESSEE:
9    Q.    For example, quality system
10 regulations you are talking about.
11   A.    Sure. Well said, sir. That is
12 correct.
13   Q.    I am tempted to stop now with that
14 compliment, but I think we will keep going.
15   A.    No. You have that exactly right. I
16 mean, I think that is well said. I just wanted
17 to understand --
18   Q.    That's what I was getting at.
19   A.    -- what you were referring to in the
20 lifecycle.
21   Q.    And that would include then, as part
22 of that, inspections that FDA will do?

Page 327

1        MS. STOKES: Objection. Form.
2        THE WITNESS: It's all the 820 -- we
3  wrote the regs. What did we write? The final
4  regs were '96, I think, that we wrote. So it's
5  all those aspects of the QSM and QSRs.
6        BY MR. JESSEE:
7    Q.    So the -- and this is, I think,
8  mostly in your report. I just want to make
9  sure we are sort of walking through the time
10 line of the regulations.
11       We obviously have, in 1976, the
12 medical device amendments that set forth the
13 three classes of devices?
14       MS. STOKES: Objection. Form. Is
15 that a question?
16       THE WITNESS: I mean, there was a
17 number of different ways of slicing that world.
18       BY MR. JESSEE:
19   Q.    Okay. Maybe -- that probably wasn't
20 a good question. Let's look at your report.
21 Maybe it's easier.
22       Paragraph 14.

Page 328

1    A.    Thanks.
2    Q.    You say here that the FDA classifies
3  devices according to a level of regulatory
4  control necessary to provide a reasonable
5  assurance of safety and efficacy?
6    A.    Page 14?
7    Q.    No. I'm sorry. Paragraph 14.
8    A.    I apologize.
9    Q.    That's all right. Let me make sure
10 I have it, yeah. Actually, I guess you said --
11 let's make sure I read it correctly.
12       It says, "Congress established"
13 three levels -- "three classes of devices,
14 based on the regulatory requirements needed to
15 provide" a -- to provide "reasonable assurance
16 of their safety and effectiveness"?
17   A.    Correct.
18   Q.    And with Class III being the highest
19 risk, Class I being the lowest?
20   A.    Correct.
21   Q.    And it's the FDA then who determines
22 which class a device or a category devices will

Page 329

1  be classified in, right?
2        MS. STOKES: Objection. Form.
3        THE WITNESS: There were panels
4  going back to the '70s and '80s, but in the
5  end, you are correct.
6        BY MR. JESSEE:
7    Q.    Okay. In the process for
8  classifying a -- for determining what
9  classification a device will be in, there is
10 sort of different steps. And I think you laid
11 this out in the report.
12       The first step is that the FDA will
13 receive a recommendation from a device
14 classification panel, right?
15   A.    In some instances, yes. That was
16 the way it was done initially.
17   Q.    And those device classification
18 panels, those were, basically, advisory
19 committees?
20   A.    Fair. Actually, some were
21 intergovernmental, if my memory serves me
22 right.

83 (Pages 326 - 329)

David Kessler , M.D.                    January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

Page 330

1   Q.   And those will often be experts and
2   those the type of devices that are being
3   classified?
4       MS. STOKES: Objection. Form.
5       THE WITNESS: Yeah. There was
6   expertise, but some of these were not -- they
7   weren't the quite device panels as you have
8   today of the advisory committees. They were
9   certain groups that FDA put together, if my
10  memory serves me right.
11      BY MR. JESSEE:
12  Q.   They would certainly include
13  physicians who were using those types of
14  devices though, right?
15      MS. STOKES: Objection. Form.
16  Assumes facts.
17      THE WITNESS: Be careful. I mean,
18  you're testing my memory. I am not sure exact
19  -- some of those device panels were a little
20  strange.
21      BY MR. JESSEE:
22  Q.   We will look at the Federal Register

Page 331

1   for this hernia mesh in a second. I am just
2   trying to get an overall view first.
3   A.   Sure.
4   Q.   The next sort of step after the FDA
5   receives its recommendation from the advisory
6   committee is that they publish the panel's
7   recommendation for comment along with a
8   proposed regulation classifying the device?
9   A.   Sure.
10  Q.   And that can sometimes take several
11  years?
12      MS. STOKES: Objection. Form.
13      THE WITNESS: Absolutely.
14      BY MR. JESSEE:
15  Q.   The --
16  A.   Take preemptive devices, you can
17  probably substitute the word decades.
18  Q.   And after that time, where they're
19  for public comment, eventually, the FDA will
20  publish the final regulation classifying the
21  device?
22  A.   Hopefully.

Page 332

1   Q.   Ideally?
2   A.   Ideally. Again, sometimes after
3   decades and -- but, I mean, you have to
4   understand. There were a lot of devices on the
5   market beforehand.
6       And congress says, Oh, divide the
7   world up into classes. And all new device --
8   you know, it's just not as simple, because you
9   have all these grandfathered devices.
10      And then you have a device that
11  comes on the market the day after that
12  grandfathered device and is it different and --
13  I mean, it was a very complex and, in some
14  ways, cumbersome system.
15  Q.   You would agree that the vast
16  majority of devices classified as Class II are
17  then subject to the 510(k) pathway?
18      MS. STOKES: Objection. Form.
19      THE WITNESS: Yeah. I mean, that's
20  the way it turned out. It's not the way
21  congress originally wrote it.
22      BY MR. JESSEE:

Page 333

1   Q.   In 1976?
2   A.   Yeah. All implants were supposed to
3   be Class III. So it sort of -- you know,
4   everything sort of moved over time, I mean.
5   Q.   And you know that there were
6   implants that were going through the 510(k)
7   process while you were commissioner, right?
8       MS. STOKES: Objection. Form.
9       THE WITNESS: Well, congress changed
10  that standard in 1990, right? And there were
11  implants that I lived that hadn't -- you know,
12  the problem was the breast implants. They were
13  never tested.
14      They were premium Class III, and
15  they had never even gotten reviewed. So this
16  was a process that took decades.
17      BY MR. JESSEE:
18  Q.   And when you were talking about in
19  1990, that would be the Safe Medical Devices
20  Act or SMDA?
21  A.   Right. To which we wrote the
22  regulations.

84 (Pages 330 - 333)

David Kessler, M.D.                              January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

| Page 334 | Page 336 |
|---|---|

**Page 334**

1    Q.   Right.  And that was something that
2  was passed and went into effect when you were
3  commissioner, or was it before?
4    A.   I think it was right before, but I
5  think we did some of the 820, and those other
6  things were in response to the SMDA.
7    Q.   And the SMDA was certainly important
8  legislation for the FDA's regulation of medical
9  devices, right?
10       MS. STOKES:  Objection.  Form.
11       THE WITNESS:  The correct answer
12  would be, any legislation that congress passes
13  is important legislation, right?
14       BY MR. JESSEE:
15    Q.   Well, the SMDA in particular though,
16  it changed -- it changed several aspects of the
17  FDA's regulation of medical devices, like the
18  example you just gave, right?
19       MS. STOKES:  Objection.  Form.
20       THE WITNESS:  Sure.  I mean, it --
21  what was originally started -- both the
22  implants as well as substantial equivalence was

**Page 335**

1  further defined in the act.
2       BY MR. JESSEE:
3    Q.   And then in the SMDA, it required
4  the FDA to review pre-amendment devices and
5  either down classify them or require them to go
6  through the PMA process, correct?
7       MS. STOKES:  Objection.  Form.
8       THE WITNESS:  I've lived that, yes.
9  And that's a mess.
10       BY MR. JESSEE:
11    Q.   That's something you did with the
12  breast implants, right?
13    A.   Exactly.  And that took decades.
14  And that's still -- I think it's just about to
15  be cleaned up today.
16    Q.   In the SMDA, it also defined what
17  the standard for substantial equivalence is,
18  right?
19       MS. STOKES:  Objection.  Form.
20       THE WITNESS:  You'd have to pull --
21  I think you are right.  I think there is
22  language -- do you have the actual language of

**Page 336**

1  the SMDA?
2       BY MR. JESSEE:
3    Q.   I can tell you also that it's --
4  I'll tell you what.  We will pull it for you.
5       Do you have any reason to doubt
6  that?
7       MS. STOKES:  Objection.
8       THE WITNESS:  Whatever the statute
9  says, the statute says.  I will agree.  I'm
10  not, you know -- I mean, I just don't have -- I
11  mean, I don't remember exactly what was in
12  those amendments.
13       BY MR. JESSEE:
14    Q.   And there were also though in the
15  amendments -- I don't know if you remember.  If
16  you don't -- provisions relating to improved
17  post-market surveillance of devices?
18       MS. STOKES:  Objection.  Form.
19       THE WITNESS:  There was a shift
20  to -- Class II devices was supposed to have
21  performance standards in the '76 act.
22       BY MR. JESSEE:

**Page 337**

1    Q.   Right.  And then --
2    A.   And the problem was, they got around
3  to 1990, and none of Class II had -- there was
4  maybe one or two performance standards, and
5  that was it.
6       So we went, Holy, how are we going
7  to -- we are saying all these Class II are on
8  the market because there is performance
9  standards, but there is no performance
10  standards.
11       So they changed the terminology to
12  special controls, right, and said, Well, FDA --
13  they had to give the sense to the American
14  public that, Well, there is some level of
15  protection to these devices are -- come
16  through the 510(k) process, and said, Well,
17  there can be special controls.  And they
18  include a range of different tools, right?
19       BY MR. JESSEE:
20    Q.   Would you agree that the SMDA
21  authorized the FDA to require manufacturers to
22  perform post-market surveillance on permanently

85 (Pages 334 - 337)

David Kessler , M.D.                    January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

Page 338

1  implanted devices if --
2        MS. STOKES: Objection. Form.
3        THE WITNESS:  There were --
4  different tools were given to FDA at different
5  points in time.
6        BY MR. JESSEE:
7    Q.   And one of the things SMDA
8  authorized was the device recalls and civil
9  penalties for violations of the FDCA?
10    A.   That, I remember, yes.
11    Q.   And in your experience at the FDA,
12  if the FDA determines that a device poses a
13  safety risk, does it have the regulatory tools
14  needed to attempt to address that risk?
15        MS. STOKES: Objection. Form.
16  Improper hypothetical.
17        Go ahead.
18        THE WITNESS:  Not as much as you
19  would think.  I mean, once a device is on the
20  market, you know, FDA -- the burden falls on
21  FDA.
22        And, you know, I dealt with one --

Page 339

1  you know, just the breast implants took me four
2  or five years of enormous back and forth.  And
3  there is a lot of litigation.
4        So it's -- FDA -- it's not that FDA
5  can snap its fingers and say, The device is off
6  the market.  No problem.
7        BY MR. JESSEE:
8    Q.   But there are enforcement actions
9  that the FDA can take if it has concerns about
10  the safety of the device, right?
11        MS. STOKES: Objection. Form.
12        THE WITNESS:  Not -- I wouldn't
13  agree to the way you phrased it.
14        BY MR. JESSEE:
15    Q.   Would you agree that if the FDA is
16  concerned about the safety or efficacy of a
17  device, it can demand a recall of the device?
18        MS. STOKES: Objection. Form.
19        THE WITNESS:  I have to go back and
20  read the legal standard.  Most of the recalls
21  are -- I mean, I have to read the -- if you
22  give me the statutory standard on recall.

Page 340

1        I just want to be careful on what
2  has to be shown under the recall standard, what
3  FTCA has to show.  FDA can't -- FDA has to meet
4  certain standards once a device is on the
5  market in order to recall.  Most recalls are
6  voluntary.
7        BY MR. JESSEE:
8    Q.   Do you agree the FDA can ban devices
9  under certain circumstances?
10        MS. STOKES: Objection. Form.
11        THE WITNESS:  It depends -- again it
12  depends on the -- it has to meet certain
13  standards.
14        BY MR. JESSEE:
15    Q.   And do you agree that the FDA can
16  impose restrictions on the sale or distribution
17  of a device?
18    A.   It depends on -- you'd have to get
19  the exact standard.  It just can't snap its
20  fingers and do those things.
21    Q.   I am not saying that.  And,
22  obviously, there's -- but it's one of the

Page 341

1  options that the FDA may have to address a
2  safety problem, right?
3        MS. STOKES: Objection. Form.
4        THE WITNESS:  It may have -- again,
5  we'd have to -- you have to give me the statute
6  so we can be exact on --
7        BY MR. JESSEE:
8    Q.   So that one is in the Section 518A
9  of the FDCA.
10    A.   You give me -- is it in my report?
11  I mean, I just -- I'm happy to pull it up.
12  Whatever the statutory standard is, if you pull
13  up that language, I'm happy to agree with you
14  that the statute says what the statute says and
15  sets out the standard.
16        I am just saying that I had
17  problems -- concerns about the safety of
18  devices, and it's just not as simple -- does
19  FDA go ban it, does FDA just recall it?  The
20  device has been used; it's in people.
21        It's very hard to recall a device
22  that is in people, right?  I mean, it's very

86 (Pages 338 - 341)

David Kessler , M.D.
January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

Page 342

1  hard to ban a device that is in people, right?
2       So that's -- those are the
3  realities, because if you ban a device and it's
4  been implanted, you know -- I mean, I've had
5  people cut out devices out of their body.  So
6  you got to be very careful here.
7    Q.   Now, the FDA has the power to
8  require manufacturers to notify all healthcare
9  professionals who prescribe a device of its
10  health risks.
11       Do you agree with that?
12       MS. STOKES:  Objection.  Form.
13       THE WITNESS:  It depends.  Again,
14  whatever your list comes from the statute, I am
15  happy to agree to the --
16       BY MR. JESSEE:
17    Q.   That those are the powers the FDA
18  has?
19    A.   Those are the powers.  You are
20  reading portions of the statute and lists, but,
21  again, there is a standard that applies to each
22  one of those.  I just want to be careful.

Page 343

1    Q.   The FDA can issue public health
2  notifications for a device, right?
3    A.   Yes.  Again, within certain process
4  constraints.
5    Q.   And there is legal actions that can
6  be taken in connection with the Department of
7  Justice, such as seizures, injunctions,
8  prosecution, civil monetary penalties?
9       MS. STOKES:  Objection.  Form.
10       THE WITNESS:  If certain standards
11  and certain things are met.  Each one of those
12  requires enormous resources.  And, you know,
13  each one takes an enormous about of energy.
14       And, of course, there is a great --
15  I mean, each one consumes a great deal of
16  energy from the agency.  And there is a limit,
17  because of resources, to what the agency can do
18  and how many of these things it can actually
19  implement.
20       BY MR. JESSEE:
21    Q.   In one of your speeches that you
22  gave, the Hastings speech, when you -- I forget

Page 344

1  the time period, but you stated that when you
2  assume the position of FDA commissioner, one of
3  your top priorities was more vigorous
4  enforcement of the law.
5       Is that an accurate statement?
6       MS. STOKES:  Objection.  Form.
7       THE WITNESS:  Yes.
8       BY MR. JESSEE:
9    Q.   And that's -- basically, as FDA
10  commissioner, you are in charge of enforcing
11  FDCA, right?
12    A.   Correct.
13    Q.   The --
14    A.   I mean, I was the guy who ceased
15  orange juice.
16    Q.   And one aspect, again, and we are
17  now talking about the post-market side of FDA's
18  regulation is medical device reports and the
19  requirements that those must be submitted in
20  certain circumstances?
21    A.   Yes, sir.
22    Q.   And there is actually a MAUDE

Page 345

1  database that the FDA keeps of these medical
2  device reports that anyone can go and search?
3       MS. STOKES:  Objection.  Form.
4       THE WITNESS:  And I have done that
5  for medical devices.
6       BY MR. JESSEE:
7    Q.   You did that for the -- which
8  devices did you do that for?
9    A.   I did that -- I don't want to say I
10  did it for everything.  Actually, I did do it
11  for each of the devices in my report, I think,
12  but I only searched for -- I searched -- so I
13  searched deaths and your devices.
14       So I did it for each of the devices
15  in my report, the number of deaths and death
16  reports.
17    Q.   And you understand that the FDA's --
18  that MAUDE database -- there is a number of
19  statements on the web site about the
20  limitations of that data?
21       MS. STOKES:  Objection.  Form.
22       THE WITNESS:  As you would expect in

87 (Pages 342 - 345)

David Kessler , M.D.                    January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

| Page 346 | Page 348 |
|---|---|
| 1 any kind of adverse event reporting, there are | 1 It's not in the right place.  You don't need |
| 2 statements on the error system, and there are | 2 epidemiology to be able to do that.  So it |
| 3 statements on the adverse -- the MAUDE | 3 depends on the question you are asked. |
| 4 database. | 4 BY MR. JESSEE: |
| 5 BY MR. JESSEE: | 5 Q.  Well, let's just look at the web |
| 6 Q.  I mean, with those statements, | 6 site page then. |
| 7 instead of me going through each of them, would | 7 A.  Okay. |
| 8 you -- are there any that you disagree with the | 8 MR. JESSEE:  What number are we on? |
| 9 limitations on that data? | 9 THE REPORTER:  21. |
| 10 MS. STOKES:  Objection.  Form. | 10 (Deposition Exhibit 21 was marked |
| 11 THE WITNESS:  As an epidemiologist, | 11 for identification.) |
| 12 I would -- we could probably, on each one of | 12 BY MR. JESSEE: |
| 13 those, spend an hour, if you had to pull up the | 13 Q.  Dr. Kessler, this is something -- |
| 14 specific ones, because they tend to be | 14 this web site page, you have obviously seen |
| 15 generalities. | 15 before. |
| 16 And I think I know -- I certainly | 16 A.  Correct. |
| 17 know the ones in a drug sense almost by heart, | 17 MS. STOKES:  Objection.  Form. |
| 18 but this is -- on the MAUDE data sheet, I use | 18 Foundation. |
| 19 it, and I use the pulldowns. | 19 MR. JESSEE:  About him seeing it |
| 20 If you want to talk about a specific | 20 before? |
| 21 one, I'm happy to. | 21 MS. STOKES:  This exact -- |
| 22 BY MR. JESSEE: | 22 THE WITNESS:  There's actually |

| Page 347 | Page 349 |
|---|---|
| 1 Q.  Okay.  And you realize that there is | 1 pulldowns, I think, on the event type.  This |
| 2 certain -- that they don't establish -- based | 2 doesn't quite capture the screenshot.  I think |
| 3 on just what you see, the complaints in the | 3 there is pulldown menus, etc., but it's pretty |
| 4 MAUDE database aren't going to establish | 4 good. |
| 5 causation, for example, right? | 5 BY MR. JESSEE: |
| 6 MS. STOKES:  Objection.  Form. | 6 Q.  And I will represent to you I |
| 7 Argumentative. | 7 printed this off yesterday. |
| 8 THE WITNESS:  Maybe yes and no would | 8 A.  But you know for event type there is |
| 9 probably be the right answer to your question. | 9 a little arrow there. |
| 10 I mean, you know -- I mean, it's not rocket | 10 Q.  Right.  And that's just when you are |
| 11 science as it is. | 11 printing. |
| 12 Sometimes you take a drug.  You | 12 A.  Exactly.  That's the only point I am |
| 13 develop a heart attack.  There is a high | 13 making. |
| 14 incidence of -- there is a background | 14 Q.  Okay.  And it notes in here that |
| 15 incidence, a heart attack. | 15 there are limitations, like we said, to this |
| 16 You have a mesh.  It's in the | 16 passive surveillance system, right? |
| 17 intestine.  It perforates the intestine.  There | 17 MS. STOKES:  Where are you -- |
| 18 is not a question of causation there. | 18 objection.  Where are you talking about? |
| 19 So you have to be more specific when | 19 THE WITNESS:  So it's passive with |
| 20 you talk about causation, I mean, and what -- | 20 regard to users and physicians.  It's not |
| 21 and sometimes medical devices is easier, right? | 21 passive when it comes to manufacturers. |
| 22 I mean, the device has migrated. | 22 BY MR. JESSEE: |

88 (Pages 346 - 349)

David Kessler, M.D.                     January 31, 2020
Davol, Inc./C. R. Bard, Inc. - MDL 2846

Page 350

1    Q.   Okay.  And let's see.  I am reading
2  the second paragraph, where it says --
3    A.   Tell me which paragraph you're at.
4    Q.   Second.
5    "Although MDRs are a valuable source
6  of information, this passive surveillance
7  system has limitations, including the potential
8  submission of incomplete, inaccurate, untimely,
9  unverified, or biased data.  In addition, the
10  incidence or prevalence of an event cannot be
11  determined from this reporting system alone,
12  due to underreporting of events, inaccuracies
13  in reports, lack of verification that a device
14  causally reported event, and lack of
15  information about frequency of device used."
16    Do you disagree with any of that?
17    MS. STOKES:  Objection.
18    THE WITNESS:  I am happy to discuss
19  every single parenthetical with you.
20    BY MR. JESSEE:
21    Q.   My question is, do you disagree with
22  that statement that is on FDA's web site there?

Page 351

1    MS. STOKES:  Objection.  Form.
2    THE WITNESS:  Yes.  I mean, I don't
3  think all of it is accurate.  I think there is
4  nuances to each parenthetical that I am happy
5  to discuss with you.
6    BY MR. JESSEE:
7    Q.   Let's go down then.  I want to look
8  at the third bullet point, where it says -- I'm
9  sorry.  Let's look at the second bullet point,
10  where it says, "MDR data alone cannot be used
11  to establish rates of events, evaluate a change
12  in event rates over time, or compare event
13  rates between the devices."
14    Would you agree with that statement?
15    MS. STOKES:  Objection.  Form.
16  Compound.
17    THE WITNESS:  So, I mean, there is a
18  lot of truth in that statement.  There are
19  pharmacovigilance tools that have developed
20  that involve -- as long as you use the word
21  alone, I would agree with you in general part,
22  but there are very sophisticated statistical

Page 352

1  modeling tools that do allow you to use
2  databases to compare one versus the next.
3    Now, that is not this data alone,
4  but that would be -- I mean, people have spent
5  their -- I mean, there are statisticians who
6  are expert in world class, and there is
7  methodology to do that.
8    BY MR. JESSEE:
9    Q.   Would you agree that to establish a
10  complaint rate though, you can't just look at
11  the complaints in isolation?  You have to look
12  at the total number of uses of the device?
13    MS. STOKES:  Objection.  Form.
14    THE WITNESS:  I would even go one
15  step further.  I mean, because of the
16  underreporting of -- in general, you are not
17  going to get a true incidence rate.  You can
18  get a relative incidence rate.
19    There may be useful information that
20  you can pull by using those models, but that's
21  what pharmacovigilance -- pharmaco device
22  vigilance experts spend their careers working

Page 353

1  on.
2    BY MR. JESSEE:
3    Q.   Do you represent yourself to be a
4  pharma -- what was that phrase you used?
5    A.   Yeah.  I have been specially
6  trained.  I think that -- and I am a professor
7  of statistics.  I tend to allow some of the
8  statisticians to actually do the run, but I
9  have been specially trained, and I did the
10  MedWatch program.
11    Q.   Right.  But you didn't do that
12  analysis in this case though, right?
13    MS. STOKES:  Objection.  Form.
14    THE WITNESS:  I did not.  I don't
15  think I rely on the incidence rates.  There may
16  be some discussion.  We talked about an
17  infection, as far as notice of a higher
18  infection rate in the report, but I don't --
19  that's where it comes up, I believe.
20    BY MR. JESSEE:
21    Q.   Do you know the total number of
22  devices Bard has sold for any of the -- and I

89 (Pages 350 - 353)

David Kessler , M.D.                    January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

Page 354

1   am trying to say the -- when I say just maybe
2   the subject devices, I'm referring just to the
3   PerFix Plug, Ventralex.
4       A.   You know, I --
5           MS. STOKES:  Objection.  Form.
6   Vague.  Speculation.
7           BY MR. JESSEE:
8       Q.   I am happy to go through the whole
9   list for you, Doctor, but do you know what I'm
10  referring to?  The PerFix Plug, the Ventralight
11  ST, Ventralex, PET and PDO, and the 3DMax.
12          My question then is, do you, for
13  those subject devices, know the total number of
14  units that Bard sold of each of those?
15          MS. STOKES:  Objection.
16          THE WITNESS:  I mean, there are
17  sheets that I can pull that do have that data
18  at different points in time.  And, again, it's
19  a little -- it's not just implant -- is it
20  implanted?  Is it sold?  Is it on shelves?
21          Much of the Bard data is in terms of
22  revenue, but, certainly, in units sold.

Page 355

1           BY MR. JESSEE:
2       Q.   It's not in your expert report, as
3   far as the number of units sold?
4       A.   I'm certainly aware that that would
5   be -- that's potential denominated data, but,
6   again, because there's such underreporting, in
7   general, in medical devices, you focus on
8   complaints.
9           I mean, when I do quality control, I
10  mean, the FDA certainly wants MDR reports, but
11  it's really the trend you want to focus on.
12  Because there is a vast underreporting in
13  general, you tend to focus on complaints.
14      Q.   Let's talk about 510(k) for a little
15  bit.  I want to look at Page 10, Paragraph 31
16  of your report.
17      A.   Happy to do that.
18      Q.   Basically, you set forth a standard
19  that substantial equivalence means that the
20  device is at least as safe and effective as the
21  predicate, correct?
22          THE WITNESS:  He does talk fast.

Page 356

1           MS. STOKES:  What page are you on?
2           MR. JESSEE:  Paragraph 31, Page 6.
3           THE WITNESS:  That's why I am in
4   processing.
5           Page 31.
6           MS. STOKES:  Page 10.
7           THE WITNESS:  Page 10, Paragraph 31.
8   And the definition that you are quoting from is
9   which paragraph?  Paragraph 31.
10          BY MR. JESSEE:
11      Q.   Paragraph 31.
12      A.   Yeah.  I think that's fair.
13      Q.   Let's look at Page, this time, 38,
14  Paragraph 103.
15      A.   Correct.
16      Q.   All right.  In that paragraph, you
17  state that, "Obviously, FDA's review has an eye
18  towards" --
19      A.   Wait a second.  I'm on Paragraph 38.
20      Q.   We're getting a little confused
21  here.  This is Page 38.
22      A.   Sorry.

Page 357

1       Q.   That's all right.
2       A.   I'm sorry.
3       Q.   103 is the paragraph.
4           Dr. Kessler, in that paragraph, you
5   state that, "Obviously, FDA's review has an eye
6   towards safety and effectiveness, and FDA will
7   identify information that appears to be false
8   or misleading."
9           That's your statement in your
10  report, correct?
11      A.   Correct.
12      Q.   And while the standard of review is
13  certainly different and is not a finding that
14  the device is safe and effective though, safety
15  and effectiveness does factor into the FDA's
16  review.
17          It's on the reviewer's mind, right?
18          MS. STOKES:  Objection.
19  Argumentative.  Form.
20          THE WITNESS:  How much time do you
21  have?
22          BY MR. JESSEE:

90 (Pages 354 - 357)

David Kessler , M.D.                    January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

Page 358

1   Q.   Well, can you answer that yes or no?
2  Does safety and effectiveness factor into the
3  FDA's review?
4        MS. STOKES:  Objection.
5        THE WITNESS:  You asked me whether
6  it had an effect on someone's mind.
7        BY MR. JESSEE:
8    Q.   That is maybe a poor thing, but you
9  say here that it has an eye towards safety and
10 effectiveness.
11       What do you mean by that?
12   A.   The standard, as you cite -- cited
13 me correctly, is, are you as safe as something
14 on the market?
15   Q.   That's a substantial equivalence?
16   A.   Yeah.  So the whole premise, the
17 whole statute was based on, okay, especially
18 when you went through these classes, this whole
19 Class II, and if there is stuff on the market
20 that were grandfathered, if you are as safe as
21 something that's already on the market and that
22 was determined to be safe, right, then we are

Page 359

1  okay.  That's the hope.
2        The problem is, if you are as safe
3  as something on the market, but you never
4  established safety to begin with, how is that
5  okay?
6        So there is major criticism and
7  controversy, but the law is the law.  And FDA
8  is stuck with substantial equivalence.
9        And so FDA, because -- not just me
10 saying it, but the National Academic of
11 Sciences.  The IOM has said it.  FDA has come
12 under substantial criticism for allowing
13 devices to get on to this market without a
14 thorough -- without a safety and effectiveness
15 review under this -- where safety and
16 effectiveness was never established.
17       So to do that, you see at different
18 points in time -- you see it most recently, I
19 think, in Commissioner Gottlieb in 2018, 2019,
20 the last set of reviews, Okay.  We're going to
21 fix that.  We're going to try to incorporate
22 more -- if we see a safety problem, meaning

Page 360

1  substantial equivalence, if something comes to
2  our -- we will try to do more to establish
3  safety and effectiveness.
4        The problem is, you are trying to
5  put a round hole in a square peg, because the
6  standard is, you are as safe as something
7  already on the market, not that there is
8  independence.
9        So there is elements where you see
10 FDA sometimes doing a de novo 510(k), where you
11 say, Okay.  You can come on the market under
12 the 510(k), but you have to do human clinical
13 trial.
14       No one did that here, for example,
15 on the Composix mesh.  It was supposed to be as
16 safe as something on the market, but it was a
17 new use, and no one said you could, under the
18 510(k) process, have said here, Well, we're
19 going to put this in the intraperitoneal, and
20 no one put peritoneal -- a polypropylene and
21 ePTFE together in the abdominal cavity.  That's
22 a new issue.  We have not established the

Page 361

1  safety.  So let's do a de novo clinical trial
2  and do that under the 510(k) process.
3    Q.   So the FDA actually requires
4  clinical trials for some 510(k) devices, right?
5    A.   It can.
6    Q.   And it does.  It does for IVC
7  filters, for example.  It requires clinical
8  trials for quite a number of those, doesn't it?
9        MS. STOKES:  Objection.  Form.
10       THE WITNESS:  Again, what kind of
11 clinical trials, et cetera?
12       BY MR. JESSEE:
13   Q.   My question though is that it does
14 require clinical trials for IVC filters.  And I
15 have seen you testify to it, and I have seen --
16       MS. STOKES:  Let him answer.  Same
17 objection also.
18       THE WITNESS:  At different points in
19 time, there may have been certain human studies
20 done.  I don't believe in Bard IVC there were
21 adequate and well controlled clinical trials
22 that were required.

91 (Pages 358 - 361)

David Kessler , M.D.                                    January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

Page 362

1     BY MR. JESSEE:
2     Q.   That wasn't my question though.  It
3 is not just for Bard's IVC filters have been --
4 clinical trials have been required.  There is
5 -- it can require -- the FDA has the power to
6 require those clinical trials, both premarket
7 and postmarket, don't they?
8         MS. STOKES: Objection.  Form.
9         THE WITNESS:  Again, I'd have to
10 look at the statute.  The FDA has moved towards
11 the point where it says, In certain instances,
12 we're going to require more in the 510(k)
13 process to give the public confidence.
14        BY MR. JESSEE:
15    Q.   And there's certain information that
16 is submitted in the 510(k) process that goes to
17 safety of the device and irrelative to the
18 safety and effectiveness of the predicate.
19    Would you agree with that?
20        MS. STOKES: Objection.  Form.
21 Argumentative.
22        THE WITNESS:  Yeah.  I think that's

Page 363

1 fair.  I mean, it has to be as safe as the
2 predicate.
3         BY MR. JESSEE:
4     Q.   Right.  So like biocompatibility
5 testing, for example, that is not necessarily
6 -- often in 510(k)'s from implantable devices
7 there will be biocompatibility testing for that
8 device submitted with the 510(k), correct?
9         MS. STOKES: Objection.  Form.
10        THE WITNESS:  Well, biocompatibility
11 should be done as part of the GMP of all
12 510(k).  I mean, there should -- but that
13 doesn't tell you -- that is questioning
14 genicity, reproductive, tox --
15        That's not clinical testing.  That's
16 not telling you whether the device is going to
17 move, it's going to perforate.  It's going to
18 end up somewhere it shouldn't.  That is not
19 biocompatibility testing.
20        BY MR. JESSEE:
21    Q.   And I wasn't suggesting it was.  I'm
22 saying though that is one piece of the puzzle.

Page 364

1 That is safety data, biocompatibility testing,
2 isn't it?
3         MS. STOKES: Objection.  Form.
4         THE WITNESS:  Sure.  That is
5 standard carcinogenicity, reproductive, certain
6 mechanical testing, but that gets to the whole
7 point.
8         Those things don't go to, really,
9 the kind of clinic -- those don't go to the
10 major clinical questions that -- you know, that
11 you would get out of a human trial.
12        BY MR. JESSEE:
13    Q.   On Paragraph 104 of your report you
14 state that: "In my opinion, the information
15 required and not required to support a 510(k)
16 application is appropriate for the 510(k)
17 process because that process evaluates
18 substantial equivalence, specifically, whether
19 a device is as safe and effective as the
20 predicate device and if it raises new questions
21 of safety and effectiveness not present for the
22 predicate."

Page 365

1         Is that statement still accurate
2 today?
3     A.   Let me just read.
4         MS. STOKES:  Which paragraph were
5 you just reading from?
6         MR. JESSEE:  104.  Just the next one
7 down.
8         THE WITNESS:  Yeah.  So what this
9 means is that -- just so I can make sure
10 everyone -- that I am clear here, is what is
11 meant when FDA says it's going to -- the number
12 of times where FDA has upped the scientific
13 requirements of the 510(k) or even required de
14 novo clinical trials, those de novo clinical
15 trials are the result -- I mean, they are not
16 to determine independent safety and
17 effectiveness, but if you read FDA, they are
18 saying their authority to require those
19 clinical de novo clinical trials are to
20 determine whether that a new device raises new
21 questions of safety and effectiveness and goes
22 to substantial equivalence.  That's the

92 (Pages 362 - 365)

David Kessler , M.D.                                    January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

| Page 366 | Page 368 |
|---|---|
| 1 authority.<br>2    BY MR. JESSEE:<br>3    Q.  The premarket authority you are<br>4 talking about?<br>5    A.  That's the premarket -- the<br>6 authority to require de novo 510(k).<br>7    Q.  Right.  With clinical studies<br>8 though --<br>9    A.  De novo clinical studies.  Those<br>10 clinical studies are not -- FDA doesn't have<br>11 the authority to require them to establish<br>12 independent safety and effectiveness.<br>13    FDA has an ability to require those<br>14 studies to determine whether it's substantial<br>15 equivalence.  That's what I mean in that<br>16 statement.<br>17    Q.  We are talking about premarket<br>18 clinical studies in that context, because the<br>19 FDA has the authority to require postmarket<br>20 clinical studies as well?<br>21    A.  It has 522 orders, yes.  I mean --<br>22    Q.  And it can order those for | 1    A.  Sure.<br>2    Q.  And this is something I know you are<br>3 very familiar with.<br>4    A.  Sure.<br>5    Q.  And you will not be surprised to<br>6 know I have read a bunch of your testimony on<br>7 this, including stuff as recently as last year<br>8 about -- you agree with the statements in here<br>9 that the safety and effectiveness factor into<br>10 the FDA's review of 510(k)s, right?<br>11    MS. STOKES: Objection.  Form.<br>12    THE WITNESS:  I would phrase it the<br>13 way I have phrased it in the report and the way<br>14 I have talked about.  I think there is -- there<br>15 is an element -- there is an element of that.<br>16 I think FDA tries to incorporate that, but in<br>17 the end, it's substantially -- a substantial<br>18 equivalence standard.<br>19    BY MR. JESSEE:<br>20    Q.  So, for example, on Page 6 -- and,<br>21 again, I'll be happy to show it to you.  I know<br>22 you've read these.  You have been asked about |
| Page 367 | Page 369 |
| 1 implantable devices over a year.  It has the<br>2 authority to order those?<br>3    A.  And has done those.  For example, in<br>4 other contexts and other types of mesh, FDA has<br>5 done that.<br>6    Q.  But not in any of the Bard mesh<br>7 products, correct?<br>8    MS. STOKES:  Objection.  Form.<br>9    THE WITNESS:  Not that I am aware<br>10 of. It has done that in other kinds of Bard<br>11 mesh products.<br>12    MR. JESSEE:  All right.  I'm going<br>13 to go ahead and mark Exhibit 22.<br>14    (Deposition Exhibit 22 was marked<br>15 for identification.)<br>16    BY MR. JESSEE:<br>17    Q.  I'm not going to spend much time,<br>18 because I know you were asked about this a lot,<br>19 and I know you are familiar with it, but this<br>20 is the FDA's 2014 guidance on the 510(k)<br>21 program, evaluating substantial equivalence and<br>22 premarket notifications. | 1 these and read this extensively, but it says:<br>2 "The principles of safety and effectiveness<br>3 underlie the substantial equivalence<br>4 determination in every 510(k) review."<br>5    A.  Yes.  But you are reading a portion<br>6 of this, and there's other portions, but in the<br>7 end, it is a substantial equivalence<br>8 determination.  That's not changed.  You have<br>9 to be as safe as something already on the<br>10 market.<br>11    Q.  You mean -- I'll read the sentence<br>12 before it.<br>13    "The 510(k) review standard is<br>14 comparative, whereas the PMA standard relies on<br>15 an independent demonstration of safety and<br>16 effectiveness."<br>17    A.  Show me where you are.  I apologize.<br>18    Q.  Right here in the statutory<br>19 standard.<br>20    A.  Thanks.<br>21    Q.  I will try to slow down while I'm<br>22 reading this too.  I apologize. |

93 (Pages 366 - 369)

David Kessler , M.D.                                      January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

Page 370

1     "The 510(k) review standard is
2  comparative, whereas the PMA standard relies on
3  an independent demonstration of safety and
4  effectiveness.  Nonetheless, the principles of
5  safety and effectiveness underlie the
6  substantial equivalence determination in every
7  510(k) review."
8         Do you agree with those two
9  sentences?
10        MS. STOKES: Objection. Form.
11        THE WITNESS: As generalities, I
12  think that they -- I think that's aspirational.
13        BY MR. JESSEE:
14     Q.   So you don't believe that that is
15  accurate, that statement in this FDA guidance?
16        MS. STOKES: Objection. Asked and
17  answered.
18        THE WITNESS: I think it's -- the
19  answer is yes and no. I think it's
20  aspirational. I think that is what FDA would
21  like to be able to think. I think there is
22  substantial limitations of substantial

Page 371

1  equivalence, because that's the statutory
2  standard.
3         So you are trying to put -- either
4  the standard is, you have to be as safe as
5  something on the market or you got to be safe
6  and effective.
7         And you can't make 510(k) into an
8  independent determination as safe and
9  effective. The statute doesn't -- that is not
10  what the statute says.
11        So FDA is constantly criticized for
12  letting these devices on the market without
13  independent safety and effectiveness, and it
14  gets beaten up.
15        So it says, Well, we have an eye
16  towards safety and effectiveness, but, again,
17  it's more complicated than any one sentence
18  would have you -- that you can capture in one
19  sentence.
20        BY MR. JESSEE:
21     Q.   The -- you say in your report that
22  the 510(k) has undergone a number of statutory

Page 372

1  changes since its inception.
2         Do you agree with that?
3     A.   Well, we've talked about 1990 --
4     Q.   That was one -- the big one, right?
5     A.   That was -- exactly.
6     Q.   The -- and do you agree that the --
7  over the past decade the 510(k) reviewed has
8  become more stringent?
9         MS. STOKES: Objection. Form.
10        THE WITNESS: Over the last decade,
11  I'm not -- depends on what metric you use. I
12  think that the answer -- it would depend on the
13  individual review division. The -- the
14  answer's probably not. Because in the end you
15  see when -- when did Gottlieb say, "Hey" -- he
16  basically, you know, caved in 2018 and 2019.
17  And he said -- and said, "Look, we -- this --
18  this process has not worked."
19        I mean he didn't quite go that -- I
20  mean -- but -- but he basically said -- I'm
21  saying the ION come -- came out, said, "510(k)
22  has to be changed. It's not working. It's not

Page 373

1  an independent assurance to safety and
2  effectiveness."
3         FDA fought that. It did this in
4  2014. It issued this guidance. In 2018 there
5  was -- 2018, 2019, there was a plan. And right
6  before Scott left, there was a -- basically
7  saying, "Look, we have to -- we have to figure
8  out how to change the whole process."
9         So there -- there were -- there were
10  some changes over time. But I think it's -- I
11  don't think it's fundamentally different over
12  the last decade.
13        BY MR. JESSEE:
14     Q.   And you previously testified that --
15  and I think we can agree that the FDA can ask
16  for additional information when reviewing
17  510(k)s, and they -- they often do, right?
18     A.   Fair.
19        MS. STOKES: Objection. Form.
20        BY MR. JESSEE:
21     Q.   And I think your -- in specific
22  words I found, you said that you rarely see

94 (Pages 370 - 373)

David Kessler , M.D.                                      January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

Page 374

1  510(k) that the FDA asks no questions
2  whatsoever.
3        MS. STOKES:  Objection.  Form.
4        THE WITNESS:  That may be and over
5  -- I wouldn't wanted to say "never."  But --
6        BY MR. JESSEE:
7     Q.   I think "rarely" is the -- the word.
8     A.   Yeah.  I -- I think -- I think that
9  would be fair.
10    Q.   Okay.  The -- did you review the
11  Federal Register proposed rule for -- from 1982
12  related to a surgical mesh?
13    A.   The classification?
14    Q.   Yeah.  The proposed classification?
15    A.   I -- at some point in time.  It's
16  ringing a bell.  Because it wasn't just hernia
17  mesh, I believe, right?
18        MR. JESSEE:  Yep.  We'll take a look
19  at it.
20        Let's actually -- let's take a
21  couple-minute break so I can get my documents
22  in order.

Page 375

1        THE VIDEOGRAPHER:  We are going off
2  the record.
3        This is the end of Media Unit No. 3.
4        The time is 2:01.
5        (A short recess was taken.)
6        THE VIDEOGRAPHER:  We are going back
7  on the record.  This is the start of Media Unit
8  No. 4.
9        The time is 2:21.
10        (Deposition Exhibit 23 was marked
11  for identification.)
12        (Deposition Exhibit 24 was marked
13  for identification.)
14        (Deposition Exhibit 25 was marked
15  for identification.)
16        (Deposition Exhibit 26 was marked
17  for identification.)
18        BY MR. JESSEE:
19    Q.   Dr. Kessler, I'm going to hand you a
20  few exhibits, ask you questions about them.
21        The first one is going to be the
22  Federal Register that I referenced about the

Page 376

1  classification of surgical mesh as a Class II
2  device.
3        The second one is going to be a
4  document -- and FDA web site on hernia surgical
5  mesh implants.
6        And this is -- you've reviewed this
7  on the FDA web site, correct?
8        And let me --
9     A.   Yeah.
10    Q.   And -- I'm sorry.
11        You have?
12    A.   Yes.
13    Q.   And just --
14    A.   I -- I reviewed this.  I don't know
15  which version.  I assume this is the current
16  version.
17    Q.   Yeah.
18    A.   Yeah.  I've seen that.
19    Q.   Okay.  And I -- just for the record,
20  the first -- the Federal Register document I
21  handed was Exhibit 23.  The FDA remember web
22  site on hernia mesh is Exhibit 24.

Page 377

1        I'm now handing you Exhibit 25,
2  which is the FDA activities --
3     A.   Let's -- I want to make this look a
4  little better.
5     Q.   FD --
6     A.   127.
7     Q.   FDA activities on the
8  urogynecological mesh.  And this is, again,
9  from the FDA website.
10        And then Exhibit 26 is the Guidance
11  for Preparation of Premarket Notification
12  Application for Surgical Mesh.
13        And this is --
14    A.   This is --
15    Q.   -- Exhibit --
16    A.   -- the '99 document.
17    Q.   Yes.
18    A.   Sure.
19    Q.   And these are all documents that
20  you've reviewed?
21    A.   At different point in time.
22    Q.   Okay.  Let's focus on the Federal

95 (Pages 374 - 377)

David Kessler, M.D.                                   January 31, 2020
Davol, Inc./C. R. Bard, Inc. - MDL 2846

Page 378

1  Register classification. And if you could,
2  please, sir, it's on Page 2817 of the Federal
3  Register where it discusses the panel and FDA's
4  finding and classification of surgical mesh.
5     A.   Correct.
6     Q.   And do you see generally where that
7  starts at the bottom of the first column?
8     A.   FDA agrees? Is that what -- 2817?
9     Q.   I'm looking at the Section 878.3300,
10 the bottom of the --
11    A.   I'm sorry.
12    Q.   -- left-hand column.
13    A.   Page 2817?
14    A.   Yes. 2817.
15    A.   7. Bottom of --
16    Q.   Left -- left.
17    A.   Right. Left column, Section 873
18 [sic]. Okay.
19    Q.   Right.
20    A.   Surgical mesh.
21    Q.   And in this Federal Register,
22 there's a number of different device

Page 379

1  classification panels that make a
2  recommendation to the FDA on what
3  classifications surgical mesh should be.
4        MS. STOKES: Objection. Form.
5        MR. JESSEE: And, Doctor, if we need
6  to take -- go off the record again so you --
7        THE WITNESS: No. It's just --
8        MR. JESSEE: -- can take that, it's
9  fine.
10       THE WITNESS: That is actually a --
11 a patient. But I --
12       MR. JESSEE: I'm more than happy to
13 stop and let you take that. Why don't you --
14       THE WITNESS: Let -- let --
15       MR. JESSEE: Let's go off the
16 record, please.
17       THE WITNESS: That -- that -- that's
18 all right.
19       MR. JESSEE: You sure?
20       THE WITNESS: That's -- it's going
21 to be a patient, but that's --
22       MR. JESSEE: I certainly --

Page 380

1        THE WITNESS: No, no, no, no --
2        MR. JESSEE: -- by no means want to
3  interrupt --
4        THE WITNESS: -- no, no, no. That's
5  not what --
6        THE VIDEOGRAPHER: We are going off
7  the record.
8        The time is 2:24.
9        (A short recess was taken.)
10       THE VIDEOGRAPHER: We are going back
11 on the record.
12       The time is 2:26.
13       BY MR. JESSEE:
14    Q.   Doctor, in the 1982 Federal Register
15 discussing the classification of surgical mesh
16 as Class II, in the middle column you'll see at
17 the top of the page they give examples of
18 surgical mesh. And one of them is metallic and
19 polymeric mesh for hernia repair.
20       Do you see that?
21    A.   Correct.
22    Q.   And in this Federal Register, the

Page 381

1  FDA actually discusses specific articles
2  looking at hernia repair, right?
3     A.   Sure. It -- it -- it -- it has a
4  record of the -- based on the clinical views
5  back in the '80s.
6     Q.   Okay. At that time in 1982
7  polypropylene hernia mesh had been on the
8  market for quite a while, right?
9        MS. STOKES: Objection. Form.
10       THE WITNESS: Several decades.
11       BY MR. JESSEE:
12    Q.   The -- if you look in the middle
13 column again, the panel -- the panels that --
14 the FDA advisory committee panels recommended
15 Class II, and they state that --
16    A.   You're -- you're -- you're -- just
17 show me where you are. I'm sorry. You're --
18    Q.   Sure. Middle column where it says
19 "Recommended classification Class II."
20    A.   So I'm on middle column, No. 4? No.
21 3?
22    Q.   No. 2.

96 (Pages 378 - 381)

David Kessler , M.D.                    January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

| Page 382 | Page 384 |
|---|---|
| 1    A.   No. 2.  Thanks. | 1  -- states:  "Although this device is an |
| 2    Q.   Yep? | 2  implant" -- do you see where I'm reading, |
| 3    A.   Thank you. | 3  Doctor? |
| 4    Q.   And this is generally how these | 4    A.   Right. |
| 5  work, right, the federal registers, is that | 5    Q.   I'm sorry.  Did you -- |
| 6  they'll say the -- the panel's recommendation | 6    A.   I'm there.  Sure. |
| 7  for the classification, and then the FDA can | 7    Q.   Okay.  "Although this device is an |
| 8  either agree or disagree, right? | 8  implant, the panels believe that premarket |
| 9    A.   Correct. | 9  approval is not necessary to provide reasonable |
| 10    Q.   And here the panel states -- and I'm | 10  assurances of the safety and effectiveness of |
| 11  looking at No. 3 now, that they say the panels | 11  the device." |
| 12  believe the device has an established history | 12    A.   Uh-huh. |
| 13  of safe an effective use. | 13    Q.   See that part. |
| 14        Do you see that where I am? | 14        And that's the panel's conclusion? |
| 15    A.   The panels recommend that surgical | 15        MS. STOKES:  Objection. |
| 16  mesh be classified, believe the materials used | 16        THE WITNESS:  For -- |
| 17  in the device should -- should meet a generally | 17        MS. STOKES:  Form. |
| 18  accepted -- give me wherever you are. | 18        THE WITNESS:  For that device, for |
| 19    Q.   The -- in the -- | 19  its in -- as its -- for the intended uses for |
| 20    A.   Panels believe that general controls | 20  the way it was being used back in the '80s. |
| 21  alone would not -- | 21        BY MR. JESSEE: |
| 22    Q.   Yep.  Right before that. | 22    Q.   Yeah. |

| Page 383 | Page 385 |
|---|---|
| 1    A.   Sorry.  The orthopedic device panels | 1        And so in No. 4 here, it states -- |
| 2  recommend acetabular mesh -- | 2  you see "The summary of data on which the |
| 3    Q.   So if you look at No. 3, Doctor. | 3  recommendation is based"? |
| 4    A.   Yeah.  I'm in 3. | 4        And this is the panel's |
| 5    Q.   "Summaries of reason for | 5  recommendation? |
| 6  recommendation." | 6    A.   Right. |
| 7        Do you see that? | 7    Q.   It states:  "The panel based their |
| 8    A.   Just hold up yours so you can show | 8  recommendation on the panel members' personal |
| 9  me. | 9  knowledge of and clinical experiences with" -- |
| 10    Q.   Right -- right where the No. 3 is. | 10    A.   I see that. |
| 11    A.   Okay.  Summary of reasons.  Yeah. | 11    Q.   -- "the device and on a review of |
| 12    Q.   Yeah.  And they say -- | 12  the literature"? |
| 13    A.   Sorry. | 13    A.   Correct. |
| 14    Q.   -- "Panels recommend that surgical | 14    Q.   And if we go farther down on this -- |
| 15  meshes be classified as a Class II performance | 15  in the same column, it -- we get the FDA's |
| 16  standards.  Does the panels belive the device | 16  position on the classification of surgical |
| 17  has an established history of safe and | 17  mesh, right? |
| 18  effective use?" | 18    A.   FDA agrees? |
| 19        Do you see that? | 19    Q.   Right. |
| 20    A.   Correct. | 20        And that's that -- where it says |
| 21    Q.   The -- and if you go down a little | 21  "The FDA agrees that the panel's |
| 22  bit, about halfway down that paragraph, it talk | 22  recommendations"... |

97 (Pages 382 - 385)

David Kessler , M.D.
Davol, Inc./C. R. Bard, Inc. - MDL 2846

January 31, 2020

<table>
<tr><td>

Page 386

1    Do you see that part?
2    A.   Right.
3    Q.   And the next sentence states:
4  "Although the device is an implant, the agency
5  believes that premarket approval is not
6  necessary because of the extensive clinical
7  usage of surgical mesh over a long period of
8  time and because there is sufficient
9  information available to establish a
10 performance standard that would provide
11 reasonable assurance of safety and
12 effectiveness of the device"?
13   A.   As it was being used back then.
14 That's not the issue here.
15   Q.   And it was being used back then as a
16 polypropylene --
17   A.   Flat --
18   Q.   -- mesh, right?
19   A.   -- mesh.
20      MS. STOKES:  Objection.  Form.
21      THE WITNESS:  I mean -- well, first
22 of all, this was flat mesh.  You didn't have

</td><td>

Page 388

1      MS. STOKES:  Argumentative.
2      THE WITNESS:  This was based on how
3  the device was used back in 1982.  And if the
4  devices were the devices -- the same as the
5  devices in 1982, I don't think we would be
6  sitting here.
7  BY MR. JESSEE:
8    Q.   Do you know if the FDA has reviewed
9  clinical literature on hernia mesh more
10 recently?
11      MS. STOKES:  Objection.  Form.
12 Vague.  Calls for speculation.
13      THE WITNESS:  I can tell you there
14 is -- there's -- sometimes there's literature.
15 We'd have to go through each 510(k) and each
16 medical officer review.
17 BY MR. JESSEE:
18   Q.   Okay.  And I have an easier way we
19 can do it here.
20      But the -- looking just at here
21 though, we -- we mentioned there's actual
22 citations to specific references here in

</td></tr>
<tr><td>

Page 387

1  composite meshes.  You didn't have plugs.  You
2  didn't have intended uses interabdominal [sic].
3  This is just surgical mesh.  This is flat mesh
4  back then.
5      No -- no one's saying -- and -- and
6  all this says is, if you are as -- you have to
7  be substantially equivalent to -- this allows
8  it to be Class II, which says you got to be the
9  same as that flat mesh.
10     If you have a different intended
11 use, if you raise new safety questions, you
12 can't -- none of that -- this applies.
13     BY MR. JESSEE:
14   Q.   Do you see where it says the FDA has
15 reviewed pertinent clinical literature on
16 surgical meshes?
17   A.   Sure.
18   Q.   And that's something we can agree:
19 The FDA's reviewed clinical literature on
20 surgical mesh a number of occasions, right?
21      MS. STOKES:  Objection.  Form.
22      THE WITNESS:  As.

</td><td>

Page 389

1  literature?
2    A.   Sure.
3    Q.   Do you know how many of these deal
4  with the Bard Marlex mesh?
5    A.   I -- you can count them.  I have not
6  counted them.
7    Q.   Have you reviewed the literature
8  that the FDA cited in the classification --
9  proposed classification in 1982?
10   A.   I looked at a number of studies
11 historically.  I -- I've not necessarily looked
12 at this bibliography.  But as you know, I've
13 cited -- I've looked at a lot of the literature
14 historically.
15   Q.   Let's look at -- take a look at
16 Exhibit 24, which is the hernia surgical mesh
17 implants web page on the FDA web site.
18   A.   Right.
19   Q.   And the FDA often includes
20 information about categories of devices on its
21 web site, right?
22      MS. STOKES:  Objection.  Form.

</td></tr>
</table>

98 (Pages 386 - 389)

David Kessler , M.D.                             January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

Page 390

1    THE WITNESS:  Sure.  Because it's --
2  absolutely.
3    BY MR. JESSEE:
4    Q.   And the -- if you would look at the
5  second page -- bottom of the second page where
6  it says: "Hernia repair surgery
7  complications."
8    A.   Hernia -- treatment options for
9  hernias?
10    MS. STOKES:  Second page.
11    THE WITNESS:  Sorry.  Apologize.
12    MR. JESSEE:  It's all right.
13    THE WITNESS:  Right.
14    BY MR. JESSEE:
15    Q.   The -- it states:  Based on FDA's
16  analysis of medical device adverse event
17  reports in a peer-reviewed scientific
18  literature, the most common adverse event for
19  all surgical repair of hernias, with or without
20  mesh, are pain; infection; hernia recurrence;
21  scar-like tissue that sticks together;
22  adhesion; blockage of the large or small

Page 391

1  intestines, instruct -- obstruction in
2  parentheses; bleeding; abnormal connection
3  between organs, vessels or intestines, fistula
4  in parentheses; fluid buildup at the surgical
5  site, seroma in parentheses; and a hole in
6  neighboring tissues or organs, and then
7  perforation in parentheses.
8    Do you see that, Doctor?
9    A.   I see that.
10    Q.   And you -- you would agree that the
11  FDA has, in relation to hernia repair, reviewed
12  scientific literature?
13    MS. STOKES:  Objection.  Form.
14    THE WITNESS:  That -- that's what
15  this document says.  We don't have -- I -- I
16  wouldn't want to jump -- I've not seen a
17  document from FDA -- and maybe you have and can
18  show it to me -- of the FDA's review of
19  scientific literature on this.
20    I have not seen a White Paper or --
21  on hernia literature.  So I've not seen that.
22    BY MR. JESSEE:

Page 392

1    Q.   Would you expect the FDA to falsely
2  state that in their -- on their web site?
3    MS. STOKES:  Objection.  Form.
4  Argumentative.
5    THE WITNESS:  I -- you -- you have
6  my answer.  I mean -- I mean I don't expect FDA
7  to falsely state something.  But whether this
8  was based on a comprehensive scientific
9  literature review, it depend -- I mean I
10  haven't seen that comprehensive, nor has FDA
11  put that out.  That's all I'm saying.
12    BY MR. JESSEE:
13    Q.   You'd agree that, in the 510(k)s for
14  the subject devices in this litigation, that
15  there were clinical literatures submitted with
16  several of them?
17    MS. STOKES:  Objection.  Form.
18  Vague.
19    THE WITNESS:  I think that's
20  generally true.  There's literature cited, not
21  necessarily always comprehensive.  And that's
22  based on the man -- what the manufacturer does.

Page 393

1    But again, most of -- we'd have to
2  go through 510(k) by 510(k).  Some of the
3  initials -- again, the -- the -- the --
4  focus is on are you the same as something on
5  the market.
6    So most of the paragraphs are on
7  substantial equivalence.  It's not on a
8  comprehensive literature review.  But we can
9  pull them up and look at them individually if
10  you want.
11    BY MR. JESSEE:
12    Q.   And does that say in that --
13  anywhere in the -- this document talk about
14  substantial equivalence?
15    MS. STOKES:  Objection.  Form.
16    THE WITNESS:  You -- you can --
17    MS. STOKES:  You just gave it to
18  him.
19    MR. JESSEE:  No.  And he's reviewed
20  it before.
21    THE WITNESS:  Yeah.  I -- the -- the
22  -- I don't think substantial equivalence is --

99 (Pages 390 - 393)

David Kessler , M.D.        January 31, 2020

Davol, Inc./C. R. Bard, Inc. -  MDL 2846

---

**Page 394**

1 I mean is the kind of -- when you're talking to
2 the public, you know, talking about substantial
3 equivalence is not something FDA, you know --
4 FDA doesn't say that here.  That's not the
5 purpose.
6       These are the kinds of sheets that,
7 you know, hospitals put out on certain -- in
8 certain areas to give some general information.
9       BY MR. JESSEE:
10    Q.   And do you agree with the FDA's --
11 what they list, based on their review of
12 adverse event reports in peer-reviewed
13 scientific literature, the most common adverse
14 events for all surgery -- surgical repair of
15 hernias with or without mesh?
16       MS. STOKES:  Objection.  Form.
17       THE WITNESS:  I -- I --
18       MS. STOKES:  Compound.
19       THE WITNESS:  I mean, I would --
20 certainly I don't -- I would not agree -- I'm
21 prepared to talk about the -- the adverse event
22 profile per device.  I mean I -- this

**Page 395**

1 amalgamation I have not issued one set of
2 adverse events for all --
3       BY MR. JESSEE:
4    Q.   Okay.  Give --
5    A.   -- lots of -- it depends on the
6 hernia mesh, I think.  And I'm -- I'm --
7    Q.   Something surgeons would talk about
8 then?  The --
9    A.   Sorry?
10    Q.   Something that we -- the surgeons
11 could answer then, that question, whether this
12 is the accurate description of the --
13       MS. STOKES:  Were you done with your
14 answer, Doctor?
15       THE WITNESS:  No.  I -- I'm happy to
16 tell you what the answer -- it doesn't list
17 chronic pain.  Chronic -- I would disagree with
18 this.  Certainly when it comes, as you know, to
19 the PerFix Plug and 3DMax, chronic pain should
20 be listed.
21       Migration should be listed.  I don't
22 need the surgeons to tell me that.  This is

**Page 396**

1 from your own documents.  Those things should
2 be listed.
3       But again, this is a general
4 statement.  This is not -- all I'm saying is
5 this is not product by product.  This is --
6 some PR, public affairs person probably put
7 this together.
8       BY MR. JESSEE:
9    Q.   You're -- you're speculating on
10 that, right?
11       MS. STOKES:  Objection.
12       THE WITNESS:  No.  I'm -- I'm pretty
13 good at -- I mean -- the -- the --
14       BY MR. JESSEE:
15    Q.   All right.  Who -- what do you base
16 on who wrote this on -- who wrote this?
17    A.   Because I know who -- I mean at
18 least in -- in my history of public affairs and
19 FDA, these are the kind of things FDA tends to
20 do, the -- the public affairs --
21       BY MR. JESSEE:
22    Q.   Back when you were commissioner in

**Page 397**

1 1990 --
2    A.   Yeah.  I mean --
3    Q.   -- to 1997?
4    A.   -- I -- we -- we -- we can determine
5 who -- which division.  But this is not
6 specific.  This is not the medical review
7 officers who are writing this.
8    Q.   All right.  Let's look at Exhibit
9 25, which is the summary of the FDA's
10 activities on urogynecological surgical mesh.
11    A.   Correct.
12    Q.   And you're familiar with all these
13 activities, right?
14       You've offered opinions on them in
15 the past?
16    A.   I --
17       MS. STOKES:  Objection.  Form.
18 Compound.
19       THE WITNESS:  I'm not sure I've
20 offered opinions on every single one.  I'm
21 certainly familiar with this document.  And I
22 hope to forget this document.

100 (Pages 394 - 397)

David Kessler , M.D.                    January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

Page 398

1      BY MR. JESSEE:
2      Q.   Yeah.  And this document that talks
3   about -- you would agree there is a number of
4   activities the FDA took with respect to -- to
5   urogynecological surgical mesh, correct?
6      A.   Correct.
7      Q.   They convened -- they issued two
8   public health notifications?
9      A.   They did.
10     Q.   They convened an advisory panel to
11  review the --
12     A.   Correct.
13     Q.   -- urogynecologic meshes?
14     A.   Correct.
15     Q.   They required 522 studies for
16  classes of these devices?
17     A.   Eventually.
18     Q.   And those being post-market clinical
19  studies, right?
20     A.   Correct.
21     Q.   They end up reclassifying surgical
22  mesh devices for pelvis organ prolapse from

Page 399

1   Class II to Class III, requiring PMAs?
2      A.   Right.
3           And?
4      Q.   And they ended up eventually taking
5   them from the market, right?
6      A.   They pulled the -- all the products
7   from the market, right?
8      Q.   Right?
9      A.   So -- so -- but at an earlier stage,
10  FDA had certain pages where they didn't have
11  all this.
12     Q.   Yeah.
13          And these -- those -- for those
14  pelvic organ prolapse mesh products, those came
15  on the market in the 1990s beginning and then
16  passed -- and that was the earliest ones on the
17  market?
18          MS. STOKES:  Objection.  Form.
19          THE WITNESS:  You have those in your
20  head.  I don't have the history.
21          BY MR. JESSEE:
22     Q.   Okay.  And you're --

Page 400

1      A.   It's my -- no, no.  I -- I certainly
2   leave it to your expertise on --
3      Q.   And I actually --
4      A.   -- on POP.
5      Q.   And you did a report on it.  So it's
6   --
7      A.   No, no.  I mean we -- we don't
8   disagree.  I just don't have --
9      Q.   Okay.
10     A.   -- it in my head.
11     Q.   But can we agree that, with all the
12  activities we just talked about that the FDA
13  took with respect urogynecological surgical
14  mesh, they did -- have not taken any of those
15  activities with respect to hernia mesh?
16          MS. STOKES:  Objection.  Form.
17          BY MR. JESSEE:
18     Q.   And that's a simple question.
19          Have they taken any of those
20  activities with respect to hernia mesh?
21          MS. STOKES:  Objection.  Form.
22          THE WITNESS:  The answer is no.

Page 401

1      BY MR. JESSEE:
2      Q.   Okay.  The --
3      A.   I'm --
4      Q.   I thought you were done.  I'm sorry.
5      A.   No, no.  The -- the answer is no.
6   But understand that they spent -- they had an
7   enormous problem, I mean I think over -- we
8   span, what five years, probably longer, eight
9   years, nine years -- actually, this was eight
10  years where they were saying -- basically they
11  were -- if I remember, they weren't safety
12  questions back in '08 -- I mean, if you look at
13  the FDA web site.
14          It was a difficult period of time
15  with regard to urogynecological meshes that
16  ultimately left -- led to withdrawal.  So it
17  took them a decade to get there.  They -- and
18  that took an enormous amount of energy from the
19  agency.
20          And there's only so many -- and that
21  was -- to its credit, that's what it -- it got
22  to the right answer.  And -- but it took a

101 (Pages 398 - 401)

David Kessler , M.D.                                              January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

Page 402

1  decade.  And it -- it took a lot out of the
2  agency to get there.  And there's only certain
3  amount of resources the agency has on what it's
4  focused on.
5      Q.   The -- you mentioned earlier silicon
6  breast implants.  And that was something that
7  occurred when an issue -- a controversy
8  occurred while you were a commissioner of the
9  FDA, 1990 to 1997.
10      And you actually took action with
11  respect to silicon breast implants, correct?
12      MS. STOKES:  Objection.  Form.
13      THE WITNESS:  I did.
14      BY MR. JESSEE:
15      Q.   And you issued a -- a final rule was
16  issued calling for PMAs for silicon breast
17  implants in 1991, right?
18      A.   Please do the studies.  Yes.
19      Q.   And in January 1992, you requested a
20  moratorium on sales of silicon breast implants
21  except for certain circumstances?
22      A.   It was basically a time-out until

Page 403

1  those studies were done.
2      Q.   Okay.  And then these -- those
3  implants were subsequently limited to access to
4  silicon breast implants except -- or -- for
5  cosmetic purposes to clinical trials, right?
6      A.   Correct.
7      Q.   And --
8      A.   Except for cosmetic the purposes.  I
9  mean it -- it was -- it was always allowed in
10  -- for cancer patients.  And again, certain
11  types -- these were silicon.
12      Q.   So we can -- can we agree on a basic
13  level that there -- there are instances where
14  the FDA has taken action when they have seen
15  concerns with safety of medical devices that
16  are -- even medical devices classified as Class
17  II?
18      MS. STOKES:  Objection.  Form.
19      THE WITNESS:  So sure.  But
20  understand -- and that action -- just so the
21  record's fully clear, we now know those silicon
22  breast implants are associated with certain

Page 404

1  cancers, right?
2      So I mean we didn't know exactly the
3  science.  We pushed for that science.  And now
4  we -- we know that there are -- those risks are
5  very real with regard to causing cancer.
6      My point -- the -- I agree with you,
7  Counselor, that FDA can.  But there's a --
8  there's only so much energy and so much
9  resources and focus that the agency can do.
10      I can tell you, once we were focused
11  on breast implants, it didn't allow us to focus
12  on something else at that same time.  It -- it
13  just takes enormous amount -- I mean I don't
14  want to over -- that's -- that's probably a bit
15  of an overstatement.  There's only so many
16  devices you can focus on like that.
17      So I mean urogynecological, the
18  women's health issues, putting mesh in the
19  pelvis I mean certainly correctly preoccupied
20  the agency and should have.  But that -- that
21  sucks up a lot of energy.
22      That does -- don't -- the lack of

Page 405

1  the agency taking action doesn't mean the
2  agency thinks it's fine or has the resources or
3  even knows the full extent of the problem.  It
4  -- that's what it learned in urogynecological
5  mesh over the last decade.
6      BY MR. JESSEE:
7      Q.   Doctor, there is a -- the FDA has
8  regulations that apply to medical device
9  labeling, correct, and you discuss those in
10  your report?
11      A.   They're -- they're modeled after the
12  drug.  They were enacted -- they weren't
13  enacted, but there's guidance in 1991.  They're
14  -- they're -- they're -- they're modeled after
15  the drug regs.
16      Q.   Okay.  And I want to talk about
17  regulations first, and then we can look at the
18  guidances.  Because those are -- there's a
19  difference between regulations and guidances,
20  right?
21      A.   Sure.
22      Q.   The regulations are binding,

102 (Pages 402 - 405)

David Kessler , M.D.                                    January 31, 2020
Davol, Inc./C. R. Bard, Inc. - MDL 2846

Page 406

1 correct?
2    A.   Yes.
3    Q.   And the guidances are not binding,
4 right?
5    A.   That's -- that's a fair -- but they
6 usually followed.
7    Q.   Right.
8        And they offer the -- the FDA's
9 current thinking on a topic.
10    A.   That's what -- exactly.  And you're
11 reading from the quotes.  You're quoting from
12 the footnotes or whatever.
13    Q.   And one of the regulation -- the
14 regulation for prescription device labeling 21
15 CFR 801.109?
16    A.   You just have to give it to me.  I
17 don't have the number.  I mean I -- one point I
18 knew it.
19    Q.   Okay.  Well, and it's in your report
20 too.  We can look at it there.
21    A.   Yeah.  I -- I mean I just --
22    Q.   But it's -- you're familiar with the

Page 407

1 reg -- the -- what they -- what it requires and
2 what it doesn't, right?
3    A.   Yeah.  Be a little careful.
4 Prescription labeling in this -- you're talking
5 about the regulations.
6    Q.   Yes.  I'm talking about the
7 regulations and the exemption from the -- at --
8 at -- having to warn patients about --
9    A.   Because it's --
10    Q.   -- specific guidance.
11    A.   -- prescription.  So it's a
12 complicated -- it's a complicated statutory
13 maze in some ways.
14    Q.   Right.
15        And what it says, though, it says
16 that the medical device labeling for these
17 prescription devices, in order to meet the
18 exemption of the directly warning users --
19 patients, as it says, it must contain
20 information for use, including indications,
21 effects, routes, methods and frequency and
22 duration of administration and any relevant --

Page 408

1    A.   You want to just give me the reg.
2 Well, it's in my report.
3    Q.   Yeah.  You have it.  It's in your
4 report.  Do you -- we can --
5    A.   Just give me the paragraph.  Can
6 have the right --
7    Q.   Let's see.  I know it's in here
8 somewhere.  Okay.  And I know -- I'm fairly
9 confident it's in your report somewhere.  But
10 just to -- 109.  Let me see if I can find it.
11    A.   I'll get it.
12        801.109.
13    Q.   Yes, sir.
14    A.   Thank you, sir.
15        I should have it in a second.  I
16 have it here.
17    Q.   Okay.
18    A.   I have it here, sir.
19    Q.   All right.  So this regulation
20 requires information for use, including
21 indications, effects --
22    A.   Well, just -- just -- just read it

Page 409

1 to me.  So just -- you're under the A.
2        Which section are you reading?
3    Q.   I am under --
4    A.   You're under D?
5    Q.   This is C.
6    A.   Thank you, sir.
7    Q.   And This is a -- the section, again,
8 that you had fully discussed in your report.
9        Are you looking at your report right
10 now or the regulation?
11    A.   I'm looking at the regulation, sir.
12    Q.   Okay.  And it talks about them --
13 that -- the labeling, the information that must
14 be included on the prescription device
15 labeling, right?
16    A.   Right.
17    Q.   And it mentions, among other things,
18 any relevant hazards, contraindications, side
19 effects, precautions under which practitioners
20 licensed by law to administer the device can
21 use the device safely and for the purpose which
22 it's intended?

103 (Pages 406 - 409)

David Kessler , M.D.                    January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

Page 410

1    A.   That's the general -- that was
2  the -- again, pre-19 -- I believe that's
3  pre-1976 language.
4    Q.   Okay.  And there hasn't been though
5  any regulations to supplement -- to either
6  supplement or replace this regulation, right?
7    A.   It's -- it's -- it's -- it's a
8  pre -- it's a predevice amendment section of
9  the statute.
10   Q.   All right.  And it -- it
11 specifically references relevant hazards,
12 contraindications, side effects and
13 precautions, correct?
14   A.   Yes.
15   Q.   And the focus is on sufficient
16 information for physicians using the devices to
17 use it safely and for its intended purpose?
18     MS. STOKES: Objection.  Form.
19     THE WITNESS:  It's a general
20 statement on labeling, yes.
21     BY MR. JESSEE:
22   Q.   And this -- these -- this labeling

Page 411

1  regulation, it applies to prescription medical
2  devices regardless of what class they are,
3  right?
4    A.   It's -- again, it was -- I believe
5  the statement even pre -- it was amended --
6  I've studied the -- the history of this.  But
7  this -- this goes back -- even though this was
8  amended to include device, this is old
9  language.  This is general language that was
10 just sort of updated in '76.
11   Q.   Would you agree that the -- it's
12 important the information in IFU have a medical
13 or scientific basis?
14     MS. STOKES: Objection.  Form.
15     THE WITNESS:  What section of the
16 label are you talking about?
17     BY MR. JESSEE:
18   Q.   I'm just talking, in the
19 instructions for use, would you agree that
20 information contained in there, it's important
21 to have a medical or scientific basis?
22     MS. STOKES:  Objection.

Page 412

1      THE WITNESS:  It's a general --
2  there's multiple different sections of the
3  label.  And so, again, which section are you
4  talking about?
5      BY MR. JESSEE:
6    Q.   What about when we're talking about
7  warnings?
8      MS. STOKES:  Same objection.
9      THE WITNESS:  I think that the
10 warnings have to talk about any relevant
11 hazards.
12     BY MR. JESSEE:
13   Q.   Okay.  Do you --
14   A.   I mean I think that or potential
15 safety hazards.
16   Q.   Okay.  Do you agree that they --
17 that they have to have a -- that hay should
18 have a medical or scientific basis to be in the
19 warning section?
20     MS. STOKES: Objection.  Form.
21     THE WITNESS:  I think there has to
22 be -- I mean I think it has to either be a

Page 413

1  potential -- it has to be untoward adverse
2  effect, a -- an untoward adverse effect, a
3  potential safety hazard, or an association with
4  an adverse event.
5      I mean it has to be a -- it -- I
6  mean it has to conveyed the information that is
7  important to a physician to use these devices
8  safely.
9      BY MR. JESSEE:
10   Q.   Can you answer the question "yes" or
11 "no" whether a -- the warning -- for a warning
12 to be included in -- under FDA standards in a
13 prescription medical device instructions for
14 use, it need to have a medical or scientific
15 basis?
16   A.   I think it has to -- it has to -- I
17 think it should be based -- if it's on a -- if
18 it is a potential safety hazard, right, that
19 has -- you know, I -- within that potential
20 safety hazard has some -- has a basis, right,
21 that's scientific or medical, I think that -- I
22 wouldn't disagree.

104 (Pages 410 - 413)

David Kessler , M.D.                    January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

| Page 414 | Page 416 |
|---|---|
| 1    There's specific definitions of | 1    THE WITNESS:  -- misbranding, |
| 2 safety hazards.  And -- and there's reasonable | 2 whether the drugs are also devices.  It becomes |
| 3 -- there's association with at adverse event. | 3 complicated. |
| 4 There's -- it -- the statute is very specific | 4    So in general -- well, all -- all |
| 5 on what it -- and the regulations is very | 5 drugs were -- all devices were drugs originally |
| 6 specific on what it requires. | 6 under the Act. |
| 7    Q.   The -- | 7    MR. JESSEE:  Sure.  Yeah.  Yeah. |
| 8    A.   I mean it should -- it -- I mean it | 8    THE WITNESS:  And you have certain |
| 9 has to be -- has to be -- has to a relevant | 9 basic -- basic provisions, right?  So I mean -- |
| 10 hazard, right.  So -- I mean in -- this -- as | 10 and basically the guide -- the guidelines did |
| 11 far as this language, the language in the | 11 copy the drug regs. |
| 12 guidance I think is potential safety hazard. | 12    BY MR. JESSEE: |
| 13    Q.   Right. | 13    Q.   So, for example, a device is |
| 14    And then to determine whether | 14 reasonably associated -- you said a device is |
| 15 something's a hazard or not, you have to have | 15 reasonably associated with infection, you would |
| 16 valid scientific or medical evidence, right? | 16 have the duty to warn about infection, right? |
| 17    MS. STOKES:  Objection.  Form. | 17    MS. STOKES:  Objection.  Form. |
| 18    THE WITNESS:  Well, if the word is | 18    THE WITNESS:  You have -- you can |
| 19 "potential" or -- "potential safety hazard," | 19 pull the guidance.  If there is a -- a |
| 20 right, we can discuss what the standard is, | 20 safety -- |
| 21 right?  But -- | 21    BY MR. JESSEE: |
| 22    BY MR. JESSEE: | 22    Q.   And I don't -- I don't want to quiz |

| Page 415 | Page 417 |
|---|---|
| 1    Q.   And -- and I think you have that in | 1 you.  So I'll just give -- I'll give you this. |
| 2 your report, right? | 2    A.   Yeah.  You can -- you can quiz me. |
| 3    A.   Yeah.  But I mean if -- it has to be | 3 It's fine.  I mean but if -- it'll -- it'll be |
| 4 a relevant hazard or potential safety hazard. | 4 quicker if you give me the guidelines. |
| 5    Q.   Okay.  And "potential" is not in | 5    Q.   And there's two of them actually |
| 6 the -- in the -- the regulation language, | 6 that we had -- so there's two guidances that |
| 7 though, right? | 7 you referenced.  And I'm labeling one as the |
| 8    A.   It's in the -- it's in the guidance. | 8 one from 1989, which we've marked as Exhibit |
| 9    Q.   Right.  Okay.  More -- | 9 27. |
| 10    A.   It's in the labeling guidance. | 10    (Deposition Exhibit 27 was marked |
| 11 It's -- it's exactly -- | 11 for identification.) |
| 12    Q.   Would -- | 12    MS. STOKES:  Is that what you just |
| 13    A.   It's in the regulations, I believe, | 13 gave me? |
| 14 for drugs, which has basically been | 14    MR. JESSEE:  Yep.  I'm giving you. |
| 15 incorporated, I mean, in the -- | 15    BY MR. JESSEE: |
| 16    Q.   Well, you say "basically" though. | 16    Q.   The other one is the Blue Book |
| 17    There's no med -- there's no | 17 Device Labeling Guidance we looked over from |
| 18 regulation for medical devices that say that, | 18 1991? |
| 19 that uses the relevant. | 19    THE WITNESS:  Correct.  When I was |
| 20    A.   Well, you're going to get into the | 20 there. |
| 21 issue of whether -- | 21    BY MR. JESSEE: |
| 22    MS. STOKES:  Objection. | 22    Q.   And you're familiar with both these |

105 (Pages 414 - 417)

David Kessler , M.D.                    January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

1  and talk about them in your report?
2     A.   Yeah, I do.
3     Q.   And so --
4        MS. STOKES:  You need to and him 20
5  -- 28 is what you were saying, right?
6        MR. JESSEE:  Thank you.  That's the
7  second one.
8        THE WITNESS:  Should we pull up --
9  which one do you want me to go to, the later
10 one?
11       BY MR. JESSEE:
12    Q.   Whichever one you need to consult.
13       I guess, before we look at these,
14 just briefly though, let's look at 27 first,
15 the front of it.
16       And on the front of the document,
17 the guidance from 1997, it says:  This guidance
18 was written prior to the February 27, 1997,
19 implementation of FDA's good guidance
20 practices, GDPs.  It does not create or confer
21 rights for any -- for or on any person and does
22 not operate to bind the FDA or the public.  An

1  alternative approach may be used if such
2  approach satisfies the requirements of the
3  applicable statutes, regulations or both."
4        And that's true -- you agree with
5  that, right?
6     A.   Sure.  But I -- I think it's fair to
7  say that's general boilerplate that is correct.
8  And it usually more currently is described as
9  it describes the agency's -- not to get
10 subjective, but they use the term "current
11 thinking."
12    Q.   Right?
13    A.   Right.  And so that's what --
14    Q.   And -- and that would be what you
15 just said, and that would be true for this
16 guidance as well as the one that the -- the
17 Blue Book memo that we've marked as 28, right?
18    A.   Correct.
19    Q.   Okay.  Now, my question was in -- is
20 if a device is reasonably associated -- the use
21 of a device is reasonably associated with
22 infection, is -- is there a duty to worn of

1  that?
2     A.   Okay.  So --
3        MS. STOKES:  Objection.  Form.
4        THE WITNESS:  Okay.  So -- so the
5  answer is -- are you talking about a capital W
6  warning or a little W warning?  Because you --
7  you -- you're going to go to two different
8  sections here.
9        MR. JESSEE:  Okay.
10       THE WITNESS:  And let's just go to
11 the -- the labelling guidance may be a little
12 shorter, right, and may be easier to find.  So
13 let's take a -- let's take a little W warning.
14 Okay?  And let's just go to page -- it just
15 says 814.  But I assume everything is Page 814.
16       Is that just the printout page?  No.
17 Page 8 of 14.
18       MR. JESSEE:  Yep.
19       THE WITNESS:  Right?
20       BY MR. JESSEE:
21    Q.   Where we talk about adverse
22 reactions?

1     A.   Yeah.  So let's just -- you can lead
2  me through questions on --
3     Q.   Okay.  And it -- it states here in
4  this guidance -- the nonbinding guidance that:
5  An adverse reaction is an undesirable effect
6  reasonably associated with the use of the
7  device that may occur as part of the effect of
8  the device or may be unpredictable in its
9  occurrence."
10       That -- did I read that correctly?
11    A.   Yes.
12       And then you have to just go on.
13 Because you may want to deal with the last
14 paragraph.  Well, actually, you -- you want to
15 -- you -- you have both paragraphs too.
16    Q.   My -- my question is -- I want you
17 to assume that -- or a device infection
18 satisfies this standard here for when to
19 include an adverse reaction.
20       Is it your opinion that a medical
21 device manufacturer also has to warn doctors of
22 the symptoms of infection like fever?

Case 2:18-md-02846-EAS-KAJ Doc #: 926-6 Filed: 03/08/20 Page 108 of 136 PageID #: 6764
Case 2:18-cv-01509-EAS-KAJ Doc #: 92-6 Filed: 03/23/21 Page 108 of 136 PageID #: 6764
PageID: 194258

David Kessler , M.D.                    January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

| Page 422 | Page 424 |
|---|---|

**Page 422**

1      MS. STOKES: Objection. Form.
2  Improper hypothetical.
3      THE WITNESS: No. I -- I think if
4  you warn of infection, I don't think that has
5  -- I would not think that fever has to be one
6  of the...
7      BY MR. JESSEE:
8   Q.   Okay. Why is that?
9      Fever is certainly a symptom of
10  infection, right?
11   A.   Well, the -- if you're warning
12  about -- if you're warning about infection,
13  those things are relevantly synonymous.
14   Q.   And is it doctors know what type --
15  what in -- what symptoms infection can cause?
16      MS. STOKES: Objection. Form.
17  Calls for speculation.
18      THE WITNESS: I -- I -- I -- I think
19  that doctors would know that, if you put
20  infection down, you are talking the infection
21  could be caused by it -- would -- I mean
22  "infection" and "fever" would be synonymous

**Page 423**

1  here.
2      BY MR. JESSEE:
3   Q.   And would it be fair to say if --
4  for adverse events that you're -- that are
5  being warned about that doctors are aware of,
6  you don't have to list every single symptom
7  that an adverse event may actually cause in a
8  patient?
9      MS. STOKES: Objection. Form.
10  Improper hypothetical. Calls for speculation.
11      THE WITNESS: Yeah. I -- you're ask
12  -- now you're getting a little vague or -- give
13  me a specific -- I'm not very comfortable
14  answering infection and fever.
15   Q.   Okay. Well, what about --
16   A.   And now we're --
17   Q.   -- infection in -- and redness?
18      MS. STOKES: Objection. Form.
19  Improper hypothetical.
20      THE WITNESS: I think, if you had --
21  I think -- again, whether you have to have

**Page 424**

1  erythema, if you -- if you -- if you had
2  evidence of a skin infection in a derma --
3  dermatological infection, you'd probably want
4  to give evidence of dermatological infection if
5  -- if that would be useful to a doctor.
6      BY MR. JESSEE:
7   Q.   Okay. And you're saying "probably"
8  here.
9      I mean there's no clear
10  black-and-white rule, when it comes to
11  what -- the symptoms you should include at a --
12   A.   What --
13   Q.   -- form adverse events.
14      MS. STOKES: Objection. Form.
15  Vague.
16      THE WITNESS: Yeah. I mean it's --
17  it -- this is not -- this is pretty well agreed
18  to. I don't think this -- this is hard.  If
19  you look at -- it is the adverse reaction
20  that -- or the potential safety hazard or the
21  untoward effect, depending on which section
22  we're -- we're dealing with.

**Page 425**

1      So I think you -- the most important
2  thing is is this information that would be
3  relevant to a doctor, important to the doctor
4  and the patient to know about.
5      BY MR. JESSEE:
6   Q.   Okay. And --
7   A.   So -- so -- so -- so if, in fact,
8  right, that this caused a change in skin --
9  this drug caused a change in skin and a
10  redness, and that's something you should be
11  aware of, right, then you'd want to list
12  erythema.
13   Q.   And when you say it's for the -- the
14  physician using the device, in this case it's
15  going to be the hernia mesh -- the surgeon
16  who's using the hernia mesh, right?
17   A.   Well, you'd want -- yes and no. You
18  want to make sure that the -- that -- while the
19  IFU goes toward, in general, the physician,
20  this is also the basis for which the physician
21  and the patient determined informed consent,
22  right?

107 (Pages 422 - 425)

David Kessler , M.D.       January 31, 2020
Davol, Inc./C. R. Bard, Inc. - MDL 2846

Page 426

1       So this is information that is
2 useful that the physician has to be -- will use
3 sometimes to -- many times to have a discussion
4 with the patients.
5      Q.   And it's certainly -- we've -- I
6 know you've testified to this numerous times.
7       It's certainly not the only source
8 of information that physicians use for their
9 informed consent discussions, right?
10      A.   Correct. But --
11       MS. STOKES: Objection. Form.
12       THE WITNESS: Correct. But it -- it
13 is -- it's sort of the hub, right? I mean it
14 -- I mean there may be handbooks. There may be
15 other things written that use this. But this
16 is sort of central.
17       So the question is should you be on
18 the lookout. Is something going to present
19 with redness, and that's something you should
20 be on the lookout for? Is this going to be --
21 is this a chronic infection? I mean you have
22 to give me the specifics.

Page 427

1       BY MR. JESSEE:
2      Q.   Have you ever drafted an
3 instructions for use?
4      A.   I don't recall. I'm sure I've --
5 I'm sure I've been involved in labeling and
6 what the label says.
7      Q.   And I'm -- and I -- I'll tell you
8 you've previously testified you've never
9 drafted an instruction for use.
10       Is that accurate as we sit here
11 today?
12      A.   I --
13       MS. STOKES: Objection. Form.
14       THE WITNESS: I -- I -- I mean I --
15 I would rarely be the person who would sit
16 there and write the whole thing out. I am
17 sure, if you look at the breast implant labels
18 and other things and the IFU and -- as they
19 went out, I'm sure there were discussions that
20 I had input.
21       BY MR. JESSEE:
22      Q.   Okay. And that would have been,

Page 428

1 when you were at the FDA, you're providing
2 input on the labels?
3      A.   On the IFU. Sure.
4      Q.   The -- have you reviewed the IFUs
5 for any hernia mesh products not made by Bard?
6       MS. STOKES: Objection. Form.
7       THE WITNESS: I think some of them
8 are referred -- yes. I'm -- I -- I believe I
9 looked at some of the contraindications for
10 some of the other products, specifically what
11 they said about intraperitoneal use, et cetera,
12 over time.
13      Q.   And what -- what products would that
14 be?
15      A.   I think I probably looked at
16 Gore-Tek -- Gore-Tek had a dual mesh -- and
17 what was said and what were the
18 contraindications. And I think that's in the
19 510(k) -- again, in the Bard 510(k).
20      Q.   Outside of what the -- in the
21 510(k)s for predicate devices, have you
22 reviewed any hernia mesh labeling for other

Page 429

1 manufacturers?
2      A.   I mean I --
3       MS. STOKES: Objection. Form.
4       THE WITNESS: I think I probably --
5 I may have looked at some of the I -- I may
6 have typed in some of the IFU language on some
7 of the other devices into Google.
8       BY MR. JESSEE:
9      Q.   Well, and -- so you may have -- did
10 you -- I mean do you know if you did or not?
11      A.   I have a recollection of having
12 looked at. Because I was interested in what
13 some of the contraindications were.
14      Q.   Okay. And that's the -- your focus
15 of looking at those other labels was, the
16 contraindications?
17      A.   That's just what -- I mean and the
18 -- some of the warnings, yes.
19      Q.   Okay. Well, I don't see any of the
20 other IFUs listed on your long list of
21 materials provided. So I'm just trying to make
22 sure I understand.

108 (Pages 426 - 429)

David Kessler , M.D.                    January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

| Page 430 | Page 432 |
|---|---|
| 1      Did you rely on reviewing any other | 1  Ventralight ST. |
| 2  IFUs in coming to your opinions in this case? | 2      A.   Sure. |
| 3      A.   I -- I -- I -- | 3           THE WITNESS:  Let me just -- let me |
| 4           MS. STOKES:  Objection.  Form. | 4  just give -- if you can give me Ventralight I |
| 5           THE WITNESS:  I relied on what I | 5  will trade you, please. |
| 6  relied on in my reliance list.  I may have seen | 6           (Discussion held off the |
| 7  and I may have searched as I just told you. | 7  stenographic record.) |
| 8           BY MR. JESSEE: | 8           (Deposition Exhibit 28 was marked |
| 9      Q.   Have you reviewed the labels for | 9  for identification.) |
| 10  other medical devices that have an -- a | 10           (Deposition Exhibit 29 was marked |
| 11  resorption period listed? | 11  for identification.) |
| 12           MS. STOKES:  Objection.  Form. | 12           BY MR. JESSEE: |
| 13           THE WITNESS:  I've looked at | 13      Q.   Doctor, I'm going to hand you the |
| 14  specifically the -- the resorption studies that | 14  IFUs that we've marked as Exhibit 28. |
| 15  I cite are cited in my report.  And in | 15           And if you have them before you, |
| 16  statements -- are you asking me if I looked at | 16  that's fine too.  I just wanted the make |
| 17  any documents on complete healing periods and | 17  sure -- |
| 18  resorption periods? | 18      A.   I have the 510(k). |
| 19           BY MR. JESSEE: | 19      Q.   And Exhibit 29, which is the 510(k) |
| 20      Q.   No. | 20  for the Ventralex. |
| 21           I'm asking whether you've looked in | 21           And that's something you said you |
| 22  -- at other IFUs besides the Ventralight -- | 22  had -- |

| Page 431 | Page 433 |
|---|---|
| 1  besides the Sepramesh that -- to talk about | 1      A.   Ventralex or Ventralight? |
| 2  resorption periods in them? | 2      Q.   Excuse me.  I misspoke. |
| 3           MS. STOKES:  Objection.  Form. | 3  Ventralight ST. |
| 4           THE WITNESS:  I -- I don't recall | 4      A.   I have portions of the 510(k). |
| 5  sitting here specifically. | 5           MS. STOKES:  And you said 510(k). |
| 6           BY MR. JESSEE: | 6           MR. JESSEE:  No.  That's the -- I'm |
| 7      Q.   Okay.  I want to talk something | 7  giving you the -- |
| 8  about your opinions on the Ventralight. | 8           MS. STOKES:  Oh, I got you. |
| 9      A.   Ventralight? | 9           THE WITNESS:  You're giving me the |
| 10      Q.   Yep. | 10  510(k). |
| 11      A.   Sure. | 11           MS. STOKES:  Okay.  So IFU is 28. |
| 12      Q.   And so what I'm going to do now is | 12           MR. JESSEE:  Yes.  And -- let's see. |
| 13  just -- can you -- | 13           THE WITNESS:  Okay. |
| 14      A.   Can you just do me a favor? | 14           BY MR. JESSEE: |
| 15      Q.   Yeah. | 15      Q.   And your discussion in your expert |
| 16      A.   Can I just get Ventralight and -- | 16  report of the -- your opinions regarding the |
| 17      Q.   Sure.  Do you need a second or -- | 17  Ventralight ST, it starts on page -- we're on |
| 18      A.   No.  I'm -- keep on going. | 18  Page 61, I believe.  Maybe we can just turn |
| 19      Q.   What I'm -- what I was going to give | 19  there to orient ourselves. |
| 20  to you, too, just so you have it in front of | 20      A.   Sure. |
| 21  you, are the Ventralight IFUs and then the | 21           MS. STOKES:  What page are you on? |
| 22  510(k) that was submitted for the | 22           MR. JESSEE:  61. |

                                    109 (Pages 430 - 433)

David Kessler , M.D.      January 31, 2020

Davol, Inc./C. R. Bard, Inc. -  MDL 2846

---

**Page 434**

1      BY MR. JESSEE:

2    Q.   And this is Section 8 of your

3 report?

4    A.   This is page -- sorry?

5    Q.   61.

6    A.   Right. Correct. That's the

7 beginning.

8    Q.   And your opinion in this -- I

9 believe what you said earlier is there -- what

10 your focus was on on Ventralight ST was that

11 the Bard statement regarding reabsorption of

12 the hydrogel barrier in the Ventralight ST's

13 IFU is misleading because it could give the

14 surgeons the impression --

15    A.   What paragraph are you reading?

16    Q.   The header --

17    A.   You're at -- thank you.

18    Q.   -- right at the top of the page.

19    A.   Thanks.

20    Q.   Because it could give the surgeons

21 the impression that Ventralight ST's resorbable

22 barrier lasts for 30 days?

---

**Page 435**

1    A.   Correct.

2    Q.   And you note on here that -- the

3 510(k), that was cleared by the FDA in July

4 15th, 2010, correct?

5    A.   Just give me the paragraph number.

6    Q.   Sure. It was on -- Paragraph 170.

7    A.   Thank you, sir.

8    Q.   And we have handed you as an exhibit

9 also the 510(k).

10      And this is something obviously

11 you've reviewed, correct?

12    A.   I have looked at the 510(k), yes.

13    Q.   And the -- there are instructions

14 for use submitted with the 510(k), correct?

15    A.   Sure.

16    Q.   And that's something that's

17 typically submitted with 510(k)s?

18    A.   Sure.

19    Q.   And always in the case of surgical

20 mesh, correct?

21    A.   Sure.

22    Q.   And there also had the predicate

---

**Page 436**

1 devices 510(k) -- excuse me. I'll with -- try

2 that again.

3      The 510(k) also includes the

4 predicate device Sepramesh IP's IFU as well.

5    MS. STOKES: Objection. Form.

6    THE WITNESS: I'm sorry.

7    BY MR. JESSEE:

8    Q.   Sure.

9      You want me -- I can give you a

10 Bates number if that would help you find...

11    A.   Sure. We -- we did discuss the

12 definition that usually there are predicates

13 upon predicates.

14    Q.   Okay. And -- well, let's look at

15 the actual 510(k) submission --

16    A.   Sure.

17    Q.   -- here and see what's listed as the

18 predicate device.

19      Can you agree that it's a

20 requirement that a manufacturer, when it

21 submits a 510(k) must list what the predicate

22 device is, right?

---

**Page 437**

1    A.   Correct.

2    Q.   And the -- here are listed several

3 of the Sepramesh IP 510(k)s as a predicate

4 device.

5    A.   Can you just give me the page.

6    MS. STOKES: Objection.

7    THE WITNESS: There's multiple

8 places where this is.

9    BY MR. JESSEE:

10    Q.   Okay. And --

11    A.   Just give me the -- there's a page

12 on substantial equivalence and what the

13 predicate is. I just don't have that. We can

14 just get to it.

15    Q.   Sure.

16      So if you look at -- in -- it's Page

17 27 in -- of the 510(k). If you look at the

18 Bates number, it ends in 417.

19    A.   I'm there sir.

20    Q.   And this is the 510(k) summary.

21      That's one of the areas where a

22 manufacturers list the predicate device,

---

110 (Pages 434 - 437)

David Kessler , M.D.
January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

| Page 438 | Page 440 |
|---|---|

**Page 438**

1 correct?

2    A.   The immediate predicate. Correct.

3    Q.   Okay. And here we have listed as

4 the predicate device Sepramesh IP bioresorbable

5 coating/permanent mesh. And then there's three

6 different 510(k) numbers listed there, correct?

7    A.   Correct.

8    Q.   And the FDA, in the -- any of the

9 correspondence you've seen, have they suggested

10 that Bard's representation of those three

11 device -- those three 510(k)s as a predicate

12 was inaccurate?

13      MS. STOKES: Objection. Form.

14      THE WITNESS: I'm not sure I

15 understand the question.

16      BY MR. JESSEE:

17    Q.   Have you seen any communication from

18 the FDA stating -- telling Bard that they need

19 to be listing other devices as their predicate?

20    A.   I'm sorry. That's just not the way

21 it works. I -- I'm not sure --

22    Q.   I know. That's my question though.

**Page 440**

1 statute.

2      BY MR. JESSEE:

3    Q.   Okay. What -- what version -- what

4 section of the statue --

5    A.   This --

6    Q.   -- says predicate chain?

7    A.   Well, the -- the statute says you

8 have to be substantially equivalent to a device

9 that was on the market prior to 1976.

10    Q.   Okay. What -- what statutory

11 provision are you referring to?

12    A.   I -- you have to look at the

13 substantial equivalent. But it's always to a

14 device that was preamendment. So you're --

15 you're the same as something that was on the

16 market pre-'76. So there's always a predicate

17 chain.

18      It's a -- it's -- it's -- it's FDA

19 101 that -- I mean you're -- you're just not

20 substantially -- you have to -- when the acts

21 -- when the act got passed you have -- in '76,

22 and as the 1990 Act reflected, was as long as

**Page 439**

1 I'm just asking if you've seen those

2 communications.

3    A.   No. But --

4      MS. STOKES: Objection. Form.

5 Assumes facts.

6      THE WITNESS: Those certainly are

7 not predicate pre1997 devices, sir. But --

8 this is the immediate predicate that is listed

9 here. You have to be substantially equivalent

10 to a pre1976 device under the act.

11      So of course there's predicates to

12 the predicate to the predicate, right? So all

13 this is asking is what the -- you know, what

14 the immediate predicate is. This is not

15 listing all the predicates. Because these

16 predicates are based on other predicates.

17      BY MR. JESSEE:

18    Q.   And can you point me to a specific

19 FDA regulation that talks about the predicate

20 chain that you've been referring to?

21      MS. STOKES: Objection. Form.

22      THE WITNESS: Just go to the

**Page 441**

1 you're the same as and don't raise new

2 questions compared to something that was on the

3 market was grandfathered, you could get on the

4 market.

5      But the -- but the whole history of

6 this is I'm the same as something that's I'm

7 the same as that I'm the same as. That's

8 what's gone on with substantial equivalence.

9    Q.   Can you point me -- and my

10 question -- and I'm trying to be -- it's

11 getting -- I know -- late in the day.

12      I'm just -- I'm trying to just get

13 very simple -- can you point me to a regulation

14 that says -- FDA regulation that uses the term

15 "predicate chain"?

16    A.   I don't know if it's in a

17 regulation. But it's in -- I mean I've written

18 probably articles that talk about substantial

19 equivalence.

20      And the -- go to any basic medical

21 device law introduction to 510(k), and

22 substantial equivalence is based on predicates

111 (Pages 438 - 441)

David Kessler , M.D.                          January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

Page 442

1  that have to go -- you have to go back to
2  pre-'76. And you have to show you're the
3  same -- you don't raise any new safety
4  questions to that original device.
5      That's the whole premise. That's
6  the whole congressional premise.
7      Q.   Did you -- you can agree -- we can
8  agree that the Ventralight Sepramesh labeling
9  was included in this 510(k)?
10     A.   The IFU?
11     Q.   The IFUs, yes.
12     A.   Sure. The --
13     Q.   And the -- and specifically the
14  language that you take issue with was included
15  in these 510(k)s that were submitted to -- to
16  the FDA, right?
17     MS. STOKES: Objection. Form.
18     THE WITNESS: So -- so tell me what
19  the language is that I -- so -- so we can --
20     BY MR. JESSEE:
21     Q.   Sure.
22     Looking on Page 54 of the 510(k).

Page 443

1      A.   Okay. And keep on going. Show me
2  where, please.
3      Q.   The -- "Shortly after placement of
4  the biopolymer coating in this limited
5  description."
6      A.   Just show me where -- where we are
7  after -- i description?
8      Q.   Yeah. The very bottom last
9  sentence.
10     A.   Right. The bottom last sentence.
11     Q.   And that's -- that -- you can
12  correct me if I'm wrong, but I believe that's
13  the statement that you take issue with; is that
14  accurate?
15     A.   Well, it -- it --
16     MS. STOKES: Objection. Form.
17     THE WITNESS: It is -- that is
18  the -- the statement, in part. But I also take
19  issue with the fact that the claim as discussed
20  here talks about that -- that it lasts for the
21  complete healing period.
22     BY MR. JESSEE:

Page 444

1      Q.   Okay. And where is that in the IFU?
2      A.   That's -- that's in the -- that's in
3  promotional materials, I believe.
4      Q.   Right. That's a separate -- I'm
5  talking about the IFU opinions though, the --
6  this is the sentence that you take issue with,
7  correct?
8      MS. STOKES: Objection. Form.
9      THE WITNESS: I take issue with a
10  number of the claims.
11     BY MR. JESSEE:
12     Q.   Okay. And you didn't -- what -- you
13  didn't, in your report, address any other
14  issue, any other criticisms, or any other part
15  of the -- the -- the IFU except for this one
16  sentence.
17     A.   I -- I would have to go back
18  exactly. But I certainly -- any sentence that
19  this lasts for the complete healing period,
20  that's what I would take issue with.
21     Q.   Okay. What's the -- in your mind,
22  the complete healing period?

Page 445

1      A.   I mean as -- you know, the -- if you
2  look at -- in Bard's own -- let me just give
3  you a Bates number, if I have it. I may not
4  have it. May -- I don't have a Bates number.
5  I have a native document.
6      If you look at a Bard's document, as
7  of July 16, 2015, from Debbie Tripodi to Justin
8  Piza, and they -- and the subject is "Critical
9  Healing Period."
10     According to Bard it says that the
11  typical critical healing period is four weeks.
12  And it gives two cites, one to a textbook and
13  one to FDA meeting minutes.
14     And the FDA, in meeting minutes with
15  Bard on -- in a document that I'm happy to give
16  you, that is actually cited here and is part of
17  this attachment, says JN, who is one of the FDA
18  officials stated eight weeks is too long; four
19  to five weeks is preferable as the critical
20  healing period.
21     So one -- so Bard's conclusion is
22  the critical healing period is four weeks.

David Kessler , M.D.                    January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

Page 446

1   Q.   Okay.  And when you say Bard's
2  conclusion though, you're talking about a
3  specific person who's a specific employee?
4        MS. STOKES: Objection.  Form.
5        BY MR. JESSEE:
6   Q.   And -- and can you read me the --
7  since I don't have these in front of me, what
8  you're referring to?
9   A.   This -- this -- your database only
10  prints out the native.  I couldn't -- I tried
11  to print out a --
12   Q.   Okay.  Well, it's not our -- it's
13  not my database.
14   A.   No, no, no.  Your -- you -- the way
15  you -- sorry.
16   Q.   Well, I mean I'm able to --
17   A.   Your -- your -- your client produced
18  this --
19   Q.   Okay.  We --
20   A.    -- in the native.  You can just take
21  a picture of this.  This is -- this is -- this
22  is the native document.

Page 447

1   Q.   Can you just give me the date of it?
2   A.   Sure.  On July 16, 2015.
3   Q.   Okay.  And who is the document from?
4   A.   Debbie, T-R-I-P-O-D-I.
5   Q.   Okay.  And do you know what position
6  she has at -- at Bard?
7   A.   She's a senior product manager.
8   Q.   The -- is it -- would it be accurate
9  that, if there is scientific evidence that the
10  barrier -- the hydrated gel is resorbed in 30
11  days, then the -- that statement is not
12  misleading.
13        MS. STOKES: Objection.  Form.
14        THE WITNESS: I looked at the
15  studies, I mean one by one, and looked myself
16  at -- at the studies.  And I certainly didn't
17  see evidence that the ST layer stayed that --
18  that 30 days.
19        BY MR. JESSEE:
20   Q.   And respectfully though that wasn't
21  my question.
22        My question was, if there is

Page 448

1  evidence out there that shows that the barrier
2  lasts for 30 days, that statement's not
3  misleading.
4        We can agree on that, right?
5        MS. STOKES: Objection.  Form.
6        THE WITNESS:  Are you living in an
7  alternate reality world?
8        BY MR. JESSEE:
9   Q.   I'm -- can you answer the -- the
10  question?
11        If there is evidence -- how can --
12  is that statement misleading?
13        Because that's -- your criticism is
14  there's not evidence to -- that it support for
15  30 days.
16        If there is evidence --
17   A.   I'm --
18        MS. STOKES: Objection.  Form.
19        THE WITNESS:  What I'm saying is, if
20  it gives the impression that it let -- that
21  it's okay to use this in the intraperitoneal
22  space because this layer is around long enough

Page 449

1  and lasts longer than the healing period -- the
2   -- the healing is done, right, while the layer
3  is still there, it would be misleading.  That's
4  my concern.
5        I mean you can have scientists talk
6  about the resorption period.  I can tell you
7  I've looked at -- other scientists can also
8  add.  I've looked just what the studies show
9  and I don't see this layer -- the evidence of
10  this layer lasting 30 days.
11        BY MR. JESSEE:
12   Q.   And you haven't done testing
13  yourself on it though.
14        Can we agree on that?
15   A.   I -- I'm -- I -- that's correct.
16  But I have looked at every single one of Bard
17  and Genzyme's studies and have cited them.
18   Q.   And how many of those study that you
19  cited to involved the Ventralight ST?
20        THE WITNESS:  So can I have my
21  Ventralight.
22        BY MR. JESSEE:

113 (Pages 446 - 449)

David Kessler , M.D.                                    January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

Page 450

1    Q.   And would you mind just -- what --
2  what -- the one you have been looking at,
3  what's the exhibit number?
4       MS. STOKES:  12, I think.
5       THE WITNESS:  12, sir.
6       MR. JESSEE:  12.  Okay.
7       THE WITNESS:  So we can --
8       BY MR. JESSEE:
9    Q.   And -- and, Doctor, before we do
10  that, I still haven't gotten --
11    A.   You're -- you're -- you're asking a
12  lot of questions.  Let's stay with one question
13  at a time.
14    Q.   I know.  I still haven't got my one
15  question answered though --
16    A.   Okay.
17    Q.   -- is the problem though.
18       If -- if the -- there is scientific
19  evidence showing that the coating, when it
20  becomes a hydrated gel, is absorbed in 30 days,
21  is this statement "shortly after placement, the
22  biopolymer coating becomes a hydrated gel that

Page 451

1  is resorbed from the site in less than 30
2  days," is that misleading?
3       MS. STOKES:  Objection.  Form.
4       THE WITNESS:  If you -- if your
5  studies showed -- I mean let me make sure I
6  understand this.  If your study showed that
7  this coating lasted throughout, then
8  obviously -- I mean until complete healing,
9  then that would not be misleading if there were
10  studies that showed you lasted throughout that
11  complete healing period.
12       BY MR. JESSEE:
13    Q.   And it doesn't though here in this
14  -- I -- if you say "complete healing period."
15    A.   What I mean --
16    Q.   It says 30 days?
17    A.   Well, but that's the -- the --
18  the -- the concern --
19    Q.   And would you agree --
20    A.   Just -- just one second.
21    Q.   Yeah.  Sorry.  I didn't mean to
22  interrupt you.

Page 452

1    A.   Just -- okay.  I got to -- the --
2  just -- just hold on one second.
3       If, in fact, this -- well, I mean as
4  -- as -- as Bard's employees say, by saying
5  that it lasts up to 30 days, right, and if it,
6  in fact, only lasts seven days, that may
7  compromise what the surgeons' opinions of how
8  effective the barrier is.
9       So surgeons I mean want to make sure
10  that this barrier is there and is going to --
11  if you're going to -- if you're going to the
12  use this in the intraperitoneal space, you got
13  to make sure that it's going to protect against
14  those -- those adhesions and those other
15  consequences of mesh attaching to bowel until
16  that healing period.  That's what surgeons
17  want.
18    Q.   Have -- have you spoken with any
19  surgeons about the Ventralight ST?
20    A.   No.  No.  But I've read what Bard's
21  view of what the surgeons want.
22    Q.   Okay.  But you haven't spoken to

Page 453

1  them about the resorbable barrier, any
2  surgeons?
3    A.   No.  But -- but it -- but it -- it's
4  clear from Bard's own sales force that, if you
5  -- if the barrier only lasted seven days, that
6  that was too short, and you needed -- and
7  surgeons want to make sure that it can safely
8  put.
9       But the whole question is how could
10  this possibly be substantially equivalent when
11  these questions are not answered?  Why are we
12  putting this -- saying this is the same as
13  these other devices going all back the
14  predicate chain when there's all this
15  controversy on how long this lists, and that's
16  not been determined?
17    Q.   Do you know how -- how long
18  Sepramesh has been on the market, Sepramesh IP
19  -- IP?
20       MS. STOKES:  Objection.  Form.
21       THE WITNESS:  So I -- I'd have to
22  look that -- I have the -- the 510(k).  I can

114 (Pages 450 - 453)

David Kessler , M.D.                                    January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

| Page 454 | Page 456 |
|---|---|
| 1 look that date up. | 1 opinion that there is not, at this point in |
| 2      BY MR. JESSEE: | 2 time, clinical evidence of this device? |
| 3   Q.  Do you know how much -- | 3      MS. STOKES:  Objection.  Form. |
| 4   A.  But -- but -- please.  The issue is | 4 Argumentative. |
| 5 not Sepramesh.  The issue is how long will | 5      THE WITNESS:  You've not established |
| 6 Sepramesh, once it's attached to the | 6 the safety and effectiveness of the -- |
| 7 polypropylene, right -- the issue isn't | 7      BY MR. JESSEE: |
| 8 the -- the Sepramesh and the Genzyme.  It's | 8   Q.   No.  I'm asking you. |
| 9 whether it will protect the -- the | 9      Are you offering that opinion that's |
| 10 polypropylene.  And that's the key -- key | 10 it's unsafe? |
| 11 question. | 11   A.  My -- my -- |
| 12   Q.   Well, and the -- no the key question | 12      MS. STOKES:  Are you going to let |
| 13 is how is -- if -- if it's -- how it's | 13 him finish? |
| 14 impacting -- how it's working in -- in | 14      THE WITNESS:  My opinion is that, if |
| 15 patients, isn't it? | 15 you look at what Bard submitted to the agency, |
| 16   A.   Right.  And that's -- | 16 you've not established safety and |
| 17      MS. STOKES:  Objection.  Form. | 17 effectiveness.  You've established that it was |
| 18 Argumentative. | 18 substantially equivalent to Sepramesh, which -- |
| 19      THE WITNESS:  -- why you do human | 19 which was going back to Composix mesh, which |
| 20 trials before you experiment and do -- on -- | 20 was the same as Gore-Tex.  You've never |
| 21 using humans as guinea pigs. | 21 established safety and effectiveness.  And you |
| 22      BY MR. JESSEE: | 22 should have done human clinical trials. |

| Page 455 | Page 457 |
|---|---|
| 1   Q.   And right. | 1      BY MR. JESSEE: |
| 2      And how -- what are the -- what are | 2   Q.   So in the -- in the -- my answer to |
| 3 clinical studies on the Sepramesh and the | 3 my question, you can't say whether today the |
| 4 Ventralight ST, the numerous clinical studies, | 4 medical literature out there, the clinical |
| 5 what do they say about that? | 5 studies that have been done, establishes |
| 6   A.   I -- | 6 whether it's safe or not, Ventralight? |
| 7      MS. STOKES:  Objection.  Form. | 7      MS. STOKES:  Objection.  Form. |
| 8 Argumentative. | 8 Vague. |
| 9      THE WITNESS:  And -- and I can tell | 9      THE WITNESS:  You -- you -- your |
| 10 you, okay, that you don't have those human | 10 company did not establish that. |
| 11 studies that answer that question -- | 11      BY MR. JESSEE: |
| 12      MR. JESSEE:  Okay.  The -- | 12   Q.   Not my question, Doctor. |
| 13      THE WITNESS:  -- as part of the -- | 13   A.   Your company did not establish |
| 14 as part of the 510(k). | 14 safety and effectiveness of this device and |
| 15      BY MR. JESSEE: | 15 never under -- never undertook that. |
| 16   Q.   And I'm not talking about the 510(k) | 16   Q.   Doctor, that -- I think -- come on |
| 17 right now. | 17 now.  You understand what my question is here. |
| 18   A.   But that's -- | 18   A.   So -- |
| 19   Q.   I'm talking about 2020 in -- for | 19   Q.   Are you offering an opinion one way |
| 20 this device that's used at the University of | 20 or the other -- |
| 21 California San Francisco on a regular basis, | 21   A.   I'm -- I'm -- |
| 22 the -- as I say you're -- are you offering the | 22   Q.   -- on the clinical literature out |

115 (Pages 454 - 457)

David Kessler , M.D.                          January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

| Page 458 | Page 460 |
|---|---|

**Page 458**

1 there on Ventralight and Sepramesh?

2     MS. STOKES: Objection. Form.

3     THE WITNESS: The -- the -- the

4 general view and the consensus statements of

5 the -- certainly the European Hernia Society

6 is -- is that, if you're going to use these

7 kind of meshes, you should use them -- if

8 you're going to -- if you're going to use mesh

9 in these ventral hernias, you do it

10 pari-peritoneal, and you're careful about not

11 putting these in intraabdominally.

12     There is not safety and

13 effectiveness that is accepted about

14 intraperitoneal use of Ventralight or any of

15 these composites. That safety and

16 effectiveness has not been established. That's

17 why the consensus studies that has those

18 opinions are moving toward preperitoneal use.

19     MR. JESSEE: Let -- let's -- let's

20 take a break.

21     THE VIDEOGRAPHER: We are going off

22 the record. This is the end of Media Unit No.

**Page 459**

1 4.

2     The time is 6:01 -- I mean -- sorry.

3 Time is 3:27.

4     (A short recess was taken.)

5     THE VIDEOGRAPHER: We are going back

6 on the record. This is the start of Media Unit

7 No. 5.

8     The time is 3:43.

9     BY MR. JESSEE:

10     Q. Doctor, do you know what the

11 America's Hernia Society quality collaborative

12 is?

13     A. I did I read -- there were some

14 statements about certain -- in the record about

15 that.

16     Q. And what's your understanding of

17 what that is?

18     A. It was a group that -- I'd have

19 to -- I'd have to review to be exactly certain.

20 But it was -- the context was getting certain

21 data with Bard, as I -- as I understood it, at

22 a certain point in time.

**Page 460**

1     Q. Do you have an understanding of

2 whether it's just with Bard or with other

3 manufacturers?

4     A. I think it's with other

5 manufacturers.

6     Q. Do you know that the FDA has access

7 to that data?

8     MS. STOKES: Objection. Form.

9     THE WITNESS: I'm not sure I'm aware

10 of that. I just don't -- don't recall.

11     BY MR. JESSEE:

12     Q. Okay. So you don't know one way or

13 the other whether the FDA has access to the AHS

14 QC data?

15     A. No. I didn't study that.

16     Q. The -- turning back to the

17 Ventralight ST.

18     Do you know how many times the FDA

19 has reviewed the statement about resorption

20 within 30 days?

21     MS. STOKES: Objection. Form.

22 Calls for speculation.

**Page 461**

1     THE WITNESS: How many times the

2 510(k) has been looked at. I can tell you -- I

3 mean I -- I -- I think there's two Ventralight

4 510(k)s, if I -- but I -- I don't know

5 specifically. I don't have a record of -- of

6 how many times FDA has looked at that --

7     BY MR. JESSEE:

8     Q. Do you know --

9     A. -- specific --

10     Q. -- how many time -- how many

11 Ventralight 510(k)s are there?

12     A. So -- just give me one second.

13     Q. And can you tell me what you're --

14 I'm not -- can you tell me what you're looking

15 at right now, please.

16     A. I'm looking at -- I'm looking at my

17 own index of all the 510(k)s that I have

18 pulled.

19     Q. Okay. Is this -- so is this

20 separate from the documents that you -- hard

21 copy documents you brought with you today?

22     A. Yes.

116 (Pages 458 - 461)

David Kessler , M.D.                                                    January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

Page 462

1    Q.   All right.  And can we get a copy of
2  that index?
3    A.   Well, so here it is.  Here --
4  they're just PDFs into a folder of --
5    Q.   And --
6    A.   -- 5 -- 510(k)s.
7        Can you -- let me just answer one
8  question --
9    Q.   Sure.
10   A.   -- at a time, if I can.
11       Just give me one second.
12   Q.   And, Doctor, I just -- respectfully,
13 we can go off the record if you want to spend
14 time looking through this, but --
15   A.   But I -- I have -- I -- I have put
16 various 510(k)s in here under Ventralight.
17 Hold on a second.  And I'm happy to -- you
18 know, whenever you -- just give me one second.
19     I -- I don't want the take your
20 time.  But I do have -- and I -- for some
21 reason I thought there were at least two K
22 numbers.  But I -- I'd have to pull them up.

Page 463

1    Q.   Okay.  Have you reviewed every
2  510(k) for Ventralight?
3    A.   I have tried to view -- I can -- I
4  will tell you exactly what I reviewed when -- I
5  just missed it for some reason.  Here it is.
6  I'm sorry.  Here.
7        So what I have is -- here it is.  I
8  think this is -- so I have reviewed two
9  Ventralight 510(k)s.  One -- actually, they're
10 both the same K number.  So I have reviewed --
11 sorry -- K101851.
12   Q.   Okay.  And have you reviewed the
13 Sepramesh 510(k)s?
14     MS. STOKES:  Objection.  Form.
15     THE WITNESS:  So I have viewed --
16 sorry.  This is -- I have viewed --
17     MS. STOKES:  You're touching your
18 mouse.
19     BY MR. JESSEE:
20   Q.   And is what you're looking at a --
21 it's your list of the 510(k)s you've actually
22 reviewed and --

Page 464

1    A.   No.  It's actually the 510(k)s
2  themselves here.
3        So I have -- but my computer for
4  some reason is going kablooey.  Here it is.
5        So I have Sepramesh.  I have the
6  K053066.  I have that.  That's Sepramesh that
7  I've looked at one point in time.  That's
8  the -- and I have an -- a Sepramesh K40868
9  also.
10   Q.   Have you reviewed the FDA review
11 memorandum for any of the Ventralight or
12 Sepramesh?
13   A.   Yeah.  So I have the FOI documents
14 for Sepramesh.
15   Q.   Do you know whether Bard has ever
16 discussed the resorption rate or testing on
17 resorption with FDA?
18   A.   I -- I --
19     MS. STOKES:  Objection.  Form.
20     THE WITNESS:  I'd want to review
21 that.  I don't have a --
22     BY MR. JESSEE:

Page 465

1    Q.   You don't have it as we sit here
2  right now with you?
3    A.   I don't have that in -- it certainly
4  has -- I don't -- I don't know that
5  specifically.
6    Q.   Okay.  And that's fine.
7        Let's -- with the -- you'd agree
8  that there was -- in the 510(k) for the
9  Ventralight, Bard talked about an animal
10 testing that it had done, right?
11     MS. STOKES:  Objection.  Form.
12     THE WITNESS:  So -- hang on a
13 second.
14     So I have -- I mean it talked
15 about -- in the 510(k) on Ventralight, it
16 talked about the biocompatibility testing.  I
17 certainly have all the -- the biocompatibility
18 testing.
19     BY MR. JESSEE:
20   Q.   And did you review -- and the --
21 there's also preclinical testing discussed in
22 the -- in vivo preclinical testing four-week

117 (Pages 462 - 465)

Case 2:18-md-02738-MCA-LDW Doc #: 92 Filed 03/20/20 Page 119 of 136 PageID: 194269
Case 2:18-cv-11253-BRM-ESK Doc #: 2 Filed 07/23/24 Page 119 of 136 PageID: 6765
PageID: 194269

David Kessler , M.D.                                      January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

Page 466

1 implant in a pig discussed in the 510(k),
2 correct?
3    A.   So I have -- I have the subchronic
4 13-week in rats --
5    Q.   Okay.
6    A.   Here.
7    Q.   Do you know what --
8    A.   Hold on a second.  Let me just get
9 -- so I am aware of -- there are several -- I
10 think there are -- one, two -- one two, three,
11 four, five -- five -- well, some are Ventra --
12 Ventralight.  I'm sorry.
13       There's a Ventralight pig study -- a
14 porcine study with ten pigs that I'm aware of.
15    Q.   And what's the exhibit number you're
16 looking at, the sticker for this page?
17    A.   15.
18       MR. JESSEE:  Okay.  Let's quickly
19 mark exhibit --
20       BY MR. JESSEE:
21    Q.   What -- while we're looking for
22 that, the -- what's the -- in your opinion, the

Page 467

1 clinical significance if the resorbable gel
2 does not last for the 30 days?
3       MS. STOKES:  Objection.  Form.
4       THE WITNESS:  The -- the issue is
5 you can't -- you can't put mesh -- you're not
6 going to put polypropylene mesh into the bowel
7 unless you can protect the consequences of that
8 mesh.
9       BY MR. JESSEE:
10    Q.   Right.
11       And so my question is what is the
12 clinical consequences?
13    A.   Right.
14       MS. STOKES:  Objection.
15       THE WITNESS:  So the -- the -- you
16 can end up with mesh in the bowel, right?
17       BY MR. JESSEE:
18    Q.   Do you know what the rate -- and
19 that's commonly known as adhesion?
20    A.   Well, be -- be a little careful.
21 There's adheres.  There's intrusion.  There's
22 obstruction.  There's a number of different

Page 468

1 words.
2       But I mean there's -- I mean the --
3 the real issue is -- I mean the things -- the
4 downstream consequences of obstruction and
5 can -- and the mesh ends up in the bowel.
6    Q.   Do you know what the reported rate
7 in literature of the Ventralight of any kind of
8 mesh getting into the bowel -- any of the
9 issues you just described are?
10    A.   I'm not --
11       MS. STOKES:  Objection.  Form.
12       THE WITNESS:  I -- I -- I have
13 not -- we talked about reporting rates.
14       BY MR. JESSEE:
15    Q.   In literature, I'm talking about.
16    A.   I have not -- I do not have those
17 data.
18    Q.   Okay.
19    A.   You can ask the surgeons that.
20    Q.   Okay.  I'm going to go ahead and
21 just show you -- ask you have a few questions
22 about two documents.  Here you go.

Page 469

1       And this is just one of the studies
2 that I think you cite in your schedule, and
3 it's one you've seen before, right?
4    A.   Yeah.  I have to just get oriented
5 and see which study you're referring to.
6       (Deposition Exhibit 30 was marked
7 for identification.)
8       BY MR. JESSEE:
9    Q.   And this was actually submitted with
10 the Ventralex ST 510(k), as you can see?
11    A.   Yeah.  I'm not questioning -- I
12 don't question that.
13       So this is Davol -- what's the
14 report number -- ending in 35 -- 357.  Hold on
15 a second.  So this is not -- some of these have
16 multiple different numbers an DB numbers.  Hold
17 on one second.
18       MR. JESSEE:  All right.  Let's go
19 off the record, please.
20       THE VIDEOGRAPHER:  We are going off
21 the record.
22       THE WITNESS:  What -- what -- what's

118 (Pages 466 - 469)

David Kessler , M.D.                                                January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

Page 470

1  your question?
2        MR. JESSEE:  That's fine.  Why don't
3  you take a minute and look at --
4        THE VIDEOGRAPHER:  We are going off
5  the record.
6        The time is 3:53.
7        (A short recess was taken.)
8        THE VIDEOGRAPHER:  We are going back
9  on the record.
10       The time is 3:54.
11       BY MR. JESSEE:
12   Q.   Doctor, in the first page of the
13  document I handed you, you can see at the
14  bottom that this is part of the 510(k)
15  submission for the Ventralight -- or Ventralex
16  ST.  Excuse me.
17   A.   That's what it says, yes.
18   Q.   Did you review the 510(k)s for other
19  devices -- for the Ventralex ST?
20   A.   So this -- I'm sorry.  I have the
21  Ventralex, as I just said.  I have the 510(k).
22   Q.   Okay.  For the ST as well?

Page 471

1        And you understand --
2   A.   Yeah.
3   Q.   -- there's a difference between the
4  Ventralex and Ventralex ST?
5   A.   I'm sorry.  You -- you -- you just
6  now switched on me from Ventralight -- I
7  apologize.
8   Q.   Yeah.
9   A.   You went -- you went from
10  Ventralight.  You're now -- you're now going to
11  Ventralex.  I'm sorry.  I thought we were still
12  dealing -- that's why I couldn't find this
13  under my Ventralight.
14       This is -- you're -- this is from
15  Ventralex --
16   Q.   Yeah.
17   A.   -- 510(k).  Okay.
18   Q.   Ventralex ST.
19       THE WITNESS:  Keep on going.
20       Just -- just bring me my 510 -- my
21  510 -- my Ventralex studies.
22       BY MR. JESSEE:

Page 472

1   Q.   So, Doctor, if you could turn to
2  Page 850 of this or the -- the Bates --
3   A.   And this is -- this is not on
4  Ventralex or on Ventralight, correct?
5        This is Ventrio.
6   Q.   This is -- and if you look at the --
7  the device that's actually at issue here, it's
8  Sepramesh IP and Ventrio.
9   A.   It's Ventri -- so it's not -- we're
10  not talking about Ventralex or Ventralight.
11   Q.   Yeah.  We're talking about Sepramesh
12  IP.
13   A.   This is --
14   Q.   The one that you said is
15  substantially equivalent to Ventralex?
16       MS. STOKES:  I think we're very
17  confused here.  So this is a submission for
18  Ventralex ST?
19       MR. JESSEE:  Yeah.  It -- that's
20  what I was pointing out right at the bottom.
21       THE WITNESS:  Right.  But it's --
22  but it's -- but the -- but the device that's

Page 473

1  being tested is not Sepramesh, as you just told
2  me.
3        BY MR. JESSEE:
4   Q.   The -- all right.  We'll -- we'll
5  get there.
6   A.   The device on Page -- I mean --
7   Q.   If you look at --
8   A.   -- 834 says this is Ventrio ST.
9   Q.   That's what the report says.
10       If you go to 838.
11       MS. STOKES:  I'm sorry.  What page
12  now?
13       MR. JESSEE:  It's 838, Bates No.
14  988.
15       THE WITNESS:  I -- I see that.
16       BY MR. JESSEE:
17   Q.   Okay.  And you see the different
18  test controls, one being S -- Sepramesh IP?
19   A.   I -- I -- I see that.
20   Q.   Okay.  If you could turn to Page
21  850, Doctor.
22   A.   Correct.

119 (Pages 470 - 473)

Case 2:18-md-02846-EAS-KAJ Doc #: 92 Filed: 03/08/21 Page 07/13/24136 Page ID of: 677
Case 2:18-cv-01509-EAS-KAJ Doc #: 92 Filed: 03/08/21 Page 07/13/24136 Page ID of: 677
PageID: 194271

David Kessler , M.D.          January 31, 2020

Davol, Inc./C. R. Bard, Inc. -  MDL 2846

| Page 474 | Page 476 |
|---|---|

Page 474

1   Q.   This is "Histopathology Summary."
2     Do you see that?
3     Are you on that page?
4   A.   Let me just see. So this is
5 Sepramesh. Correct.
6   Q.   And if you look about halfway down,
7 there's a sentence that starts "However."
8     You see where I've started there,
9 "However a reduction in distance"?
10   A.   Right.
11   Q.   It says: "However a reduction in
12 distance between the polypropylene fibers and
13 the visceral surface of each device is
14 consistent with absorption of the hydrogel
15 barrier by 28 days."
16     Did I read that correctly?
17   A.   That's what this says.
18   Q.   If you could turn to Page 890.
19     And this is a report by DaVinci
20 Biomedical, right? Correct?
21   A.   That's what this said -- that's what
22 the heading is.

Page 475

1   Q.   And if you would read at the very --
2 the last sentence of this conclusion, it
3 starts -- the what sentence, it breaks into the
4 next page.
5     It says: "Furthermore a
6 reduction" --
7   A.   Wait. Wait a second. Just --
8   Q.   Sure.
9   A.   You're very good. But you just need
10 to point better where --
11   Q.   Yeah. Last sentence of the page
12 where it goes into the next page --
13   A.   Right.
14   Q.   -- is what I was trying to get at.
15     "Furthermore, a reduction in
16 distance between the polypropylene fibers and
17 visceral surface of Ventrio ST hernia patch and
18 Sepramesh IP composite by 28 days is consistent
19 with absorption of the hydrogel barrier."
20     Did I read that correctly?
21   A.   You did.
22   Q.   The are you aware of any preclinical

Page 476

1 published studies by people outside of Bard
2 looking at the absorption period for
3 Ventralight and Sepramesh?
4   A.   I cite this -- I cite -- yes. There
5 were Genzyme studies.
6   Q.   And I -- I should clarify. Outside
7 of Bard or -- or Genzyme. I'm talking about in
8 published -- published scientific literature?
9     MS. STOKES: Objection. Form.
10     THE WITNESS: No. I'm -- I -- I'm
11 not sitting here -- I mean I'm -- I'm aware of
12 what was in the record by the --
13     BY MR. JESSEE:
14   Q.   Okay. The -- on Page 75 of your
15 report -- we're switching tracks now to the
16 large Ventralex and your opinions on that.
17   A.   Okay.
18   Q.   Page 57 of your report, you talk
19 about that -- Paragraph 208.
20   A.   Yes, sir.
21   Q.   And it's your been -- been your
22 practice, both at FDA and afterwards, to rely

Page 477

1 on engineers to evaluate the adequacy of
2 mechanical as opposed to clinical design
3 characteristics of devices and to evaluate the
4 proper design control processes for assuring
5 proper performance of these devices.
6   A.   Correct.
7   Q.   And with regard to this issue of
8 ring buckling.
9     And that's a mechanical, not
10 clinical issue, right?
11     MS. STOKES: Objection. Form.
12     THE WITNESS: Not -- not entirely.
13 That -- that would be incorrect. As you --
14 your medical director, Dr. Ciavarella, has
15 testified, that obviously is a clinical --
16 that -- that has -- there's mechanical
17 components of that. But ultimately, I mean
18 he's the one who said that -- I think I cite
19 him -- recommended that additional testing --
20 long-term testing be done.
21     So it's -- it's the medical
22 director. And I think the -- the key aspect of

120 (Pages 474 - 477)

David Kessler , M.D.                     January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

**Page 478**

1 some of the -- so it's not just mechanical, is
2 the answer to your question.
3        BY MR. JESSEE:
4    Q.   Okay.  But you rely on a -- an
5 engineer for several opinions in this section,
6 do you not?
7        MS. STOKES:  Objection.  Form.
8        THE WITNESS:  I -- I think that I --
9 I think, if -- if you add the word "in part,"
10 okay, I do cite that.  But I mean there's also
11 the clinical aspects.  Ciavarella's not a
12 mechanical engineer.  He's -- he's a -- a
13 medical director.  And he -- it's -- it's -- I
14 mean, as he would -- I don't need a mechanical
15 engineer to basically agree with Ciavarella.
16        BY MR. JESSEE:
17    Q.   As a -- as we sit here without
18 looking into the documents, do you recall
19 whether any surgeons at the FDA provided input
20 on the labeling for the Ventralex device?
21        MS. STOKES:  Objection.  Form.
22        THE WITNESS:  I'd have to pull the

**Page 479**

1 Ventralex 510(k) correspondence on that to --
2        BY MR. JESSEE:
3    Q.   The --
4    A.   -- answer that question.
5    Q.   It says here you requested counsel
6 to engage quality system engineer John Quick?
7    A.   I did.  Well, I -- I -- I -- I asked
8 them to have somebody look at the QSM aspects
9 at Bard at -- at Bard as it relates to this
10 device.
11    Q.   Okay.  And there's not -- so there
12 wasn't -- you didn't specifically ask for Mr.
13 Quick then?
14    A.   I don't believe at any point that
15 I -- I used -- I didn't know Mr. Quick before.
16 I think it would -- I -- I think my request was
17 to have a quality system expert.
18    Q.   Did you talk with him at all on the
19 phone?
20    A.   I'm blocking.  I apologize.  I just
21 -- it's getting late.  I -- and so it's -- it's
22 not that late, but I -- it's late in the

**Page 480**

1 deposition.  So I -- I just -- I'd have to
2 refresh my memory.  I -- I don't know if I did.
3    Q.   Do you keep notes of any
4 conversations you would have had with other
5 people?
6    A.   I don't recall any.  I mean I
7 brought everything -- I -- I don't have any
8 notes with me.  And I would have had notes
9 if -- if I had kept -- I just don't recall.
10 I'd have to refresh my memory.
11    Q.   Would -- is there any other expert
12 that you talked to in relation to this case?
13    A.   No.
14    Q.   So it's possible you don't know
15 from --
16    A.   I just don't remember -- I -- I'm
17 just sitting here --
18    Q.   That's fine.
19    A.   -- right -- I'm --
20    Q.   I -- that's fine.
21    A.   I just --
22    Q.   You --

**Page 481**

1    A.   There's no -- I just -- I'd have to
2 just refresh.
3    Q.   And you expected Mr. Quick to be
4 qualified in quality systems to assess the
5 quality systems, right?
6        MS. STOKES:  Objection.  Form.
7        THE WITNESS:  Yeah.  He -- he had
8 run Baxter quality systems for decades, et
9 cetera.
10        BY MR. JESSEE:
11    Q.   And you were relying on his opinions
12 here that you cite these bullet point to be
13 accurate, correct?
14        MS. STOKES:  Objection.  Form.
15        THE WITNESS:  Well, I -- I -- I
16 certainly -- I -- I cite these.  But he cites
17 Ciavarella.  I don't -- I mean there's certain
18 things that I don't need Quick.  I mean I do
19 that for comp -- for the comp -- to be
20 comprehensive.  I don't need Quick to cite
21 Ciavarella.  I can cite Ciavarella.  I can talk
22 about the clinical aspects.  So there's a

121 (Pages 478 - 481)

David Kessler , M.D.                     January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

Page 482

1 little bit of redundancy there.
2    Q.   Do you know what the -- in the
3 clinical literature, what the -- have you seen,
4 in clinical literature on the Ventralex,
5 reports of buckling?
6      MS. STOKES:  Objection.  Form.
7      THE WITNESS:  I certainly have seen
8 in the Composix Kugel, et cetera, that history
9 of buckling being associated with the well.
10 But I -- I can't place it exactly sitting here
11 where I've seen -- referred to as different
12 terms by different -- buckling of kinking.
13      I'd have to go back and re -- remind
14 myself exactly whether I saw it specifically on
15 Ventralex large or whether I saw it on Composix
16 Kugel.
17      BY MR. JESSEE:
18    Q.   Would it be fair that, to the extent
19 you did see the instances, whether in
20 complaints or in the materials you reviewed, of
21 buckling in Ventralex large, it would be -- you
22 would -- be addressed in your report?

Page 483

1    A.   I think --
2      MS. STOKES:  Objection.  Form.
3      THE WITNESS:  I do cite complaints
4 here on Ventralex large, I believe on buckling,
5 et cetera.  And --
6      BY MR. JESSEE:
7    Q.   And what page are you looking at?
8    A.   I believe there's -- let's just get
9 this.  There are complaints, if my -- my memory
10 serves me right.  Unless my memory is off.
11      So I'd -- I'd have to go back --
12 I -- I see specifically where -- I -- I have a
13 recollection of certain spreadsheets on
14 complaints.  Bard received complaints of ring
15 buckling with the Composix Kugel and the
16 reduced diameter ring.
17      I certainly -- I think some of those
18 on that spreadsheet also had the word
19 Ventralex.  But I'd have to pull those
20 spreadsheets.
21    Q.   Okay.  So you don't know for sure as
22 we sit here right now?

Page 484

1    A.   I mean I -- I think -- I mean -- no.
2 I'd want -- I'd want to check it -- there's a
3 list of all the complaints and which ones --
4 but I think some of them overlap with the -- on
5 the -- if -- if I remember certain of the
6 complaint records, they were issues with
7 Ventralex large as well as Composix Kugel.  But
8 I need time to pull up those spreadsheets.
9    Q.   Can you tell me what the difference
10 between the ring and the Composix Kugel large
11 and the Ventralex large is?
12    A.   So there was a shift --
13      MS. STOKES:  Objection.  Form.
14      THE WITNESS:  So there was a
15 shift -- at what point in time?
16      BY MR. JESSEE:
17    Q.   In the time you're critical of the
18 large Ventralex.
19    A.   So -- so --
20      MS. STOKES:  Objection.  Form.
21      THE WITNESS:  So there was a shift
22 from, what, .0 -- 0.042 to .030?

Page 485

1      Is that what you're referring to?
2      BY MR. JESSEE:
3    Q.   I'm just asking you about your
4 knowledge.
5    A.   Yeah.  So there was a shift in
6 redesign in -- as far as diameter of the mesh
7 from point -- 0.042 to .030.
8      THE WITNESS:  Can I just have my
9 Ventralex sheets.
10      BY MR. JESSEE:
11    Q.   Do you -- have you reviewed Bard's
12 interactions with the FDA related to the
13 Composix Kugel recall?
14    A.   There's certainly -- yes.  I mean
15 there's -- there's numerous ones.  I've looked
16 at the 483s.  I've looked at the warning
17 letters.  I have studied that.
18    Q.   Okay.  And with respect to the
19 483s -- and that -- that's something that's
20 fairly common in medical devices -- in medical
21 -- for the medical device manufacturers that,
22 after an FDA inspection, they'll issue 483s?

122 (Pages 482 - 485)

David Kessler , M.D.                          January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

| Page 486 | Page 488 |
|---|---|
| 1    MS. STOKES: Objection. Form. | 1 -- is saying. And I mean it's part of the risk |
| 2    THE WITNESS: Yeah. I'm not going | 2 management and the quality assurance. |
| 3 to -- yes. I'm not going to -- 483 is not | 3    BY MR. JESSEE: |
| 4 going to -- 483s happen. And they -- there -- | 4    Q.   So you're of the opinion the 483 is |
| 5 there's no question. And -- in and of | 5 related to the -- the -- this testing, you're |
| 6 themselves. | 6 saying? |
| 7    Depends what it the 483 is about. I | 7    A.   If you don't define -- |
| 8 mean is it a 483 about a recall about devices | 8    MS. STOKES: Objection. Form. |
| 9 failing? What's the hazard of the device? 438 | 9    THE WITNESS: If you don't define -- |
| 10 alone is not going to -- you know, I'm not | 10 the -- the -- the 483s as a whole, if you look |
| 11 going to criticize somebody for getting a 438. | 11 at them and talk about the identification of |
| 12    BY MR. JESSEE: | 12 user needs -- user needs or safety. And the |
| 13    Q.   Okay. Because like Immucor has | 13 question is whether there is adequate design |
| 14 gotten 438s, correct? | 14 controls to assure user needs and safety |
| 15    A.   Exactly. | 15 issues. |
| 16    Q.   And even in the last couple years, | 16    And that was what the FDA was |
| 17 correct? | 17 saying. And there was not obviously the |
| 18    MS. STOKES: Objection. Form. | 18 adequate testing of the -- these vent -- I mean |
| 19    THE WITNESS: I'm sure we've gotten | 19 in the case of Ventralex before that shift was |
| 20 438s. | 20 made. |
| 21    BY MR. JESSEE: | 21    BY MR. JESSEE: |
| 22    Q.   And again, that's not a -- the 438s | 22    Q.   Do you know how many meetings FDA |

| Page 487 | Page 489 |
|---|---|
| 1 aren't an official FDA position that the -- | 1 had with Bard following the CK recall to |
| 2 there's some kind of safety issue with the | 2 discuss their other ring products? |
| 3 device or anything, right? | 3    MS. STOKES: Objection. Form. |
| 4    MS. STOKES: Objection. Form. | 4    THE WITNESS: I have -- I mean I -- |
| 5    THE WITNESS: The recall starts | 5 I have looked specifically, you know, and I've |
| 6 telling you -- I mean, when you start | 6 studied, and, you know, I have the slide decks |
| 7 recalling, that's when you start getting into | 7 and the -- the presentations that were made if |
| 8 those issues. | 8 you want to -- |
| 9    MR. JESSEE: Right. | 9    MR. JESSEE: Yeah. Let's mark that |
| 10    THE WITNESS: The -- the -- the 483s | 10 as an exhibit. |
| 11 have to do more here with, you know, the -- | 11    THE WITNESS: I tried to find the |
| 12 what the quality system was in place for these | 12 meeting minutes from these. And I couldn't |
| 13 devices and whether the quality system -- the | 13 find the meeting minutes. So I don't have a -- |
| 14 quality systems -- the QSMs -- the quality | 14 I may not have a full record. But I have tried |
| 15 management system -- sorry -- was -- allowed | 15 to -- |
| 16 these devices to make sure to minimize and -- | 16    MR. JESSEE: Okay. |
| 17 the hazards and -- and what should have been | 17    THE WITNESS: -- study this. |
| 18 done as the design controls when the company | 18    MR. JESSEE: We'll put that as |
| 19 shifted to the point -- from the 0.042 to the | 19 Exhibit -- I believe we're on 30 now. |
| 20 0.030 and should that have been tested be -- I | 20    THE REPORTER: 31. |
| 21 mean -- and -- in the long-term animal studies. | 21    MR. JESSEE: 31. Thank you. |
| 22    And that's what Ciavarella is -- is | 22    (Deposition Exhibit 31 was marked |

123 (Pages 486 - 489)

David Kessler , M.D.                    January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

Page 490

1 for identification.)
2       BY MR. JESSEE:
3    Q.   And, Doctor, have you -- let me
4 strike that.
5       The -- with respect to the Ventralex
6 large, FDA hasn't taken any enforcement action,
7 correct?
8       MS. STOKES:  Objection.  Form.
9       THE WITNESS:  What do you consider
10 enforcement action?
11       Sorry.  Do you consider a warning
12 letter --
13       BY MR. JESSEE:
14    Q.   Sure.  We can include warning
15 letters in there.
16    A.   So the -- the warning letter -- we
17 have to probably -- and -- and there's actually
18 two warning letters, if I think my memory
19 serves me right.  There was one in New England,
20 and there was one in Puerto Rico.
21       I have to look -- I think -- the the --
22 the way I read certain portions of those

Page 491

1 warning letters, they weren't -- they -- they
2 related to the quality assurance system across
3 the board.  They were not just specific to one
4 device.
5       But we'd have to pull those --
6 those -- that language --
7    Q.   Okay.
8    A.   -- to read.  But I -- I think they
9 -- I think they related across the board.
10    Q.   They -- the warning letter is not
11 discussed in your report, correct?
12    A.   The 483s are -- I think they're on
13 my reliance list.
14       THE WITNESS:  Can I get my
15 general --
16       BY MR. JESSEE:
17    Q.   And -- and I'm talking about the
18 body of your report.  The -- I'm talking about
19 the warning letter.
20    A.   The 483 is the warning letters.  I
21 think they're --
22    Q.   Well, it --

Page 492

1    A.   I think they're on the reliance
2 list.
3    Q.   Okay.  And I understand that.
4       The -- there's a difference between
5 a 438 and a warning letter?
6    A.   Absolutely, yeah.
7    Q.   Okay.  I jus5t want to make sure
8 we're -- we're clear here.
9    A.   The -- let me just --
10    Q.   And has any Immucor, the company
11 that you're the head of comp -- that you're on
12 the compliance committee for, gotten a warning
13 letter before?
14    A.   I'm sure --
15       MS. STOKES:  Objection.  Form.
16       THE WITNESS:  I'd have to go back
17 and look at the history.  But there were
18 certainly things that needed to be cleaned up
19 in that company.  So I would -- yeah.  Again, I
20 would not be surprised.  But I have to review
21 the record.
22       BY MR. JESSEE:

Page 493

1    Q.   Have you reviewed the records for
2 Bard as to the actions that were taken after
3 any of the -- the warning letter you referred,
4 the 483s, or any of the external audits?
5    A.   Yes.
6       MS. STOKES:  Objection.  Form.
7       THE WITNESS:  I did, sir.
8       BY MR. JESSEE:
9    Q.   Okay.  And are you critical the --
10 of the actions that Bard took in -- in response
11 to the different feedback that they received?
12       MS. STOKES:  Objection.  Form.
13       THE WITNESS:  Well, I mean you have
14 the warning letter, I think, in, what, '07.
15 And then you have, if I'm correct -- can I just
16 have my audit -- my Quintiles audit sheets.
17       BY MR. JESSEE:
18    Q.   And did you -- is -- did you know --
19    A.   Just -- just -- just let -- I
20 apologize.  I'm only as good -- I just need one
21 second to be able to answer your question.  I
22 just can't keep more than one question in my

124 (Pages 490 - 493)

David Kessler , M.D.                    January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

Page 494

1  head.
2       So if -- if I understand the record,
3  that post Quintile -- post warning letters,
4  there was mock FDA inspection again in '08 and
5  that there is still criticism that some --
6  there's -- there's issues with the quality
7  system post.  And that -- that's shown in the
8  -- in the -- in the mock FDA --
9    Q.   And did you know that Quintiles is
10  owned by TPG Capital?
11      MS. STOKES:  Objection.  Form.
12      THE WITNESS:  I'm -- I may have
13  known that.  I mean, again, I -- it has been
14  different -- Quintiles is now what?  I mean I
15  -- I've -- I have not been involved in
16  Quintiles and TPG Capital.  But I have made no
17  -- that -- but I've not been involved in that.
18      BY MR. JESSEE:
19    Q.   And you know that, from your
20  experience working with Immucor, that when the
21  FDA issues a 483 or a warning letter, that
22  they're going to follow up and make sure issues

Page 495

1  are addressed?
2      MS. STOKES:  Objection.  Form.
3      THE WITNESS:  Yeah.
4      MS. STOKES:  Assumes facts.
5      BY MR. JESSEE:
6    Q.   And have you seen the closeout
7  letter from the FDA for the warning letter at
8  issue for the -- in connection with the
9  Composix Kugel recall?
10    A.   Yeah.  So I -- I've specifically --
11  yes.  I have looked -- well, I have -- it's --
12  it's not labeled as closeout letter.  I -- I'm
13  aware of a December 17, 2008 letter.
14      Is that what we're referring to?
15    Q.   I'm -- have you reviewed what you --
16  a closeout letter to it?
17      I'm -- that's all I'm asking.
18    A.   So I -- I --
19      MS. STOKES:  Objection.  Form.
20      THE WITNESS:  I'm aware of a letter
21  that's dated December 17, 2008, that says:  If
22  you do what you say you would do, we will --

Page 496

1  that should -- we find the corrective actions
2  which you've propose.  Once they're fully
3  implemented, they should adequately address the
4  observations made.
5      BY MR. JESSEE:
6    Q.   Okay.  Are you aware of any
7  follow-up correspondence beyond that?
8    A.   That's the letter that I'm aware of.
9    Q.   Let's talk about the Ventralex
10  labeling.  And this -- I take it your Ventralex
11  labeling opinions are not limited to the large
12  Ventralex.
13      And the -- the issues we've just
14  been talking about, the buckling, that's
15  limited to the large Ventralex, correct?
16    A.   I'm -- I'm --
17      MS. STOKES:  Objection.  Form.
18      THE WITNESS:  That's a question
19  you're going to have to do slower.  I'm sorry.
20  I just --
21      BY MR. JESSEE:
22    Q.   The issue --

Page 497

1    A.   I mean I'm not sure I -- I'm --
2  it's -- it's associated with large; it's
3  nonassociated with large.
4    Q.   Right.
5      The -- the issue --
6    A.   I'm not trying to --
7    Q.   -- with buckling that we were just
8  talking about, that's -- and it -- according to
9  your report, you say the large Ventralex is
10  what the title says, Ventralex large?
11    A.   That's correct.
12    Q.   Okay.  And then -- so we're not
13  talking about -- when we're talking about that
14  issue is about the design controls; we're not
15  talking about the other size Ventralexes,
16  right?
17      MS. STOKES:  Objection.  Form.
18  Mischaracterizes.
19      THE WITNESS:  Sir, because there's a
20  -- there was a limited -- let me make just sure
21  I understand.
22      Because there was a limited amount

125 (Pages 494 - 497)

David Kessler , M.D.                    January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

| Page 498 | Page 500 |
|---|---|
| 1 of time that I -- you know, and multiple | 1 answer -- I'm not going to testify that they |
| 2 devices, it's my understanding that the | 2 should have gone to dual ring. But I'm aware |
| 3 bellwether involved the large Ventralex, so I | 3 that that was in -- that was one of -- one of |
| 4 looked at the large Ventralex. | 4 the considerations. |
| 5    BY MR. JESSEE: | 5    Q.   The -- is there -- for the Ventralex |
| 6    Q.   Okay.  Do you know if the bellwether | 6 IFU opinions you have in here, is there a |
| 7 cases involve any other Ventralex? | 7 particular warning you think -- |
| 8    A.   I -- I -- | 8    A.   That's the Ventralex -- |
| 9    MS. STOKES:  Objection.  Form. | 9    Q.   IFU. |
| 10    THE WITNESS:  If I'm -- the answer | 10    A.   Right.  So show me the I -- |
| 11 is I'm only aware that it involves large | 11 Ventralex IFU opinion I have here. |
| 12 Ventralex.  I mean so that's why I focused | 12    Q.   Sure.  It is in your section -- |
| 13 there. | 13 well, I -- I'll ask you. |
| 14    BY MR. JESSEE: | 14    Do you have Ventralex IFU opinions? |
| 15    Q.   Would it be fair to say, with regard | 15    A.   I have -- |
| 16 to the large Ventralex design, it's your | 16    MS. STOKES:  Objection.  Form. |
| 17 opinions you have in here that your criticisms | 17 Vague. |
| 18 of -- are of the testing and -- and compliance | 18    THE WITNESS:  Again, it's a -- it's |
| 19 with design controls as opposed to using | 19 a -- it's a broad question.  I'd have to go |
| 20 different designs should have been used? | 20 through the -- the report. |
| 21    MS. STOKES:  Objection.  Form. | 21    But I mean, as I understand my |
| 22    THE WITNESS:  Sorry.  I don't | 22 Ventralex section, it was a failure to assure |

| Page 499 | Page 501 |
|---|---|
| 1 understand the question. | 1 adequate testing and design controls.  And also |
| 2    BY MR. JESSEE: | 2 on the Ventralex, the issue similarly of |
| 3    Q.   Are you offering opinion as to a | 3 adequate design controls to assure testing and |
| 4 different design Bard should have used for the | 4 of the higher infection to where I do get to |
| 5 Ventralex large? | 5 the IFU. |
| 6    MS. STOKES:  Objection.  Form. | 6    And I think this is maybe -- you're |
| 7    THE WITNESS:  No, I don't think I'm | 7 referring -- there's two paragraphs we looked |
| 8 going to -- it's -- I'm not going to say what | 8 at earlier where I said specifically, if there |
| 9 they should have used.  I'm just going to say | 9 is evidence of a higher infection rate, then |
| 10 when you make -- when they made the switch to | 10 the IFU should have warned. |
| 11 the 0.030 and they changed those | 11    So I think that probably is the |
| 12 characteristics and the diameter of the ring. | 12 quote -- |
| 13 I'm -- I'm going to say they should have tested | 13    MR. JESSEE:  Okay. |
| 14 that. | 14    THE WITNESS:  -- for Ventralex IFU. |
| 15    I think there was some -- I mean I'm | 15    BY MR. JESSEE: |
| 16 aware that physician -- there was the issue of | 16    Q.   And that -- so you're not -- |
| 17 dual rings.  And there's some e-mail | 17    A.   But -- but -- but I -- but -- but |
| 18 correspondence saying that would require a new | 18 that is conditioned.  I'm not going -- I'm |
| 19 510(k), and that would add time.  And there was | 19 saying that is was noticed.  They should have |
| 20 a reluctance on the -- on the part of the | 20 tested.  They should have seen whether there |
| 21 company to do that. | 21 was high rate.  And if, in fact, there was a |
| 22    But I am not going to say that the | 22 higher rate, then it should have been warned |

126 (Pages 498 - 501)

David Kessler , M.D.                      January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

| Page 502 | Page 504 |
|---|---|
| 1  about.<br>2   Q.   Okay.  Thank you for clarifying<br>3  that.<br>4        PerFix Plug -- since we're running<br>5  low on time, we're going to go through these<br>6  products.<br>7    A.   My favorite.<br>8    Q.   And the -- have you -- you've<br>9  reviewed the -- you reviewed the FDA's review<br>10  memorandum for the Marlex mesh dart in the --<br>11    A.   I studied the dart extensively.  I'm<br>12  not sure -- the record is not -- I will tell<br>13  you your -- your -- your discovery database in<br>14  the early 19 -- going back to the 1990s is<br>15  limited.  So I -- I had some problems finding<br>16  some information on the dart, if my memory<br>17  serves me right.<br>18    Q.   Do you have any criticisms of the<br>19  dart?<br>20        MS. STOKES:  Objection.  Form.<br>21        THE WITNESS:  I'm going issue no<br>22  opinions on the dart.  I -- I issue no opinions | 1  ahead and mark it as 32.<br>2        Unfortunately, I only have one copy<br>3  of this.<br>4        (Deposition Exhibit 32 was marked<br>5  for identification.)<br>6        THE WITNESS:  Can I share with<br>7  counsel?<br>8        MR. JESSEE:  That's a good idea.<br>9        BY MR. JESSEE:<br>10    Q.   And if -- as I understand your<br>11  report, your criticism is that a -- the PerFix<br>12  Plug IFU does not warn of chronic pain or of<br>13  migration?<br>14        MS. STOKES:  Objection.  Form.<br>15        THE WITNESS:  Correct.<br>16        BY MR. JESSEE:<br>17    Q.   How do you define "chronic pain"?<br>18        MS. STOKES:  Objection.  Form.<br>19        THE WITNESS:  It's -- I feel like<br>20  I'm back in opioid land.<br>21        MR. JESSEE:  That's not good.<br>22        THE WITNESS:  I just -- I mean so |

| Page 503 | Page 505 |
|---|---|
| 1  on the dart.<br>2        BY MR. JESSEE:<br>3    Q.   Okay.  And that's the one we talked<br>4  about was cleared while you were FDA<br>5  commissioner, right?<br>6    A.   Correct.<br>7    Q.   And that's the one that's -- it's<br>8  polypropylene, correct?<br>9    A.   Yeah.  It's two layers rather than<br>10  three.  It's the mushroom cap.  It doesn't have<br>11  the needle.  It's not three layers.  It's -- it<br>12  doesn't have as much mesh.<br>13    Q.   Okay.  And I'm going to just show<br>14  you -- do you have the PerFix Plug IFU --<br>15    A.   Yeah.  It's --<br>16    Q.   -- with you?<br>17    A.   Oh, I thought you wanted the PerFix<br>18  Plug.<br>19    Q.   No.  Just the IFU.<br>20    A.   Yeah.  I should have the -- I have<br>21  the technical file.<br>22        MR. JESSEE:  I'm going to just go | 1  there are -- there are a host of different<br>2  definition by the different societies on<br>3  chronic pain.  I think that -- for the purposes<br>4  of this device, I think it needs to be -- I<br>5  think it -- it needs to be distinguished.<br>6        I mean there is pain that is usually<br>7  associated with surgery that is acute that<br>8  revolves.  And I think, when one uses the word<br>9  "pain" in surgical procedures, that there's<br>10  going to be a pain that's going to -- to<br>11  resolve.<br>12        I think chronic pain is<br>13  distinguished from the acute surgical pain<br>14  where -- the usual healing period is<br>15  over -- I'm not -- don't want to use the exact<br>16  same terms as mesotheliozation.  But -- and yet<br>17  there's chronic pain beyond that acute surgical<br>18  healing period.<br>19        BY MR. JESSEE:<br>20    Q.   Is there a particular amount of days<br>21  that you would consider to be chronic pain?<br>22        MS. STOKES:  Objection.  Form. |

127 (Pages 502 - 505)

David Kessler , M.D.                    January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

Page 506

1    THE WITNESS:  I think it's pain past
2 the acute surgical period.
3    BY MR. JESSEE:
4    Q.   Do you -- so you can't put a
5 particular date?
6    A.   I mean I can.  There's different --
7 there -- the -- the -- again, I would define it
8 as pain that doesn't resolve in the acute
9 surgical period.
10   Q.   Okay.  And in the different sources,
11 you're talking about there's different -- how
12 long it is, there's going to be different
13 numbers in there, right?
14   MS. STOKES:  Objection.
15   THE WITNESS:  I'm sorry?
16   BY MR. JESSEE:
17   Q.   Differing numbers in the different
18 sources you were talking about in --
19   A.   Yeah.  I mean I -- there are -- I
20 mean I've -- I've lived this.  But again, I
21 think in the surgical context, I think the best
22 definition of chronic pain is pain that remains

Page 507

1 past the acute surgical period.
2    Q.   How do you define migration in the
3 -- in context of your opinions in the PerFix
4 Plug?
5    A.   The device is not in the right
6 place.
7    Q.   The -- let's look at the IFUs for
8 the PerFix Plugs, the adverse events -- adverse
9 reactions section.
10   A.   I mean there's also this issue of --
11 this is not the same at dart.  I mean it -- and
12 there's issues on substantial equivalence.  I
13 just want to --
14   MR. JESSEE:  Okay.  Well, let's go
15 ahead -- we'll mark this then while we're --
16 while you're going to the adverse reaction.
17 We're still okay with it.  Adverse reaction.
18   THE WITNESS:  Great.  I -- I --
19   MR. JESSEE:  This is going to be 33.
20 And this will be the -- the mesh dart FOIA
21 510(k).
22       (Deposition Exhibit 33 was marked

Page 508

1 for identification.)
2    THE WITNESS:  Right.  Can you do me
3 a favor and just tell me what -- the adverse
4 reactions.  I have the Russian version here.
5    BY MR. JESSEE:
6    Q.   Yeah.  It's --
7    A.   Which page?
8    Q.   I'll -- I'll --
9    A.   The -- the Russian I'm not great at.
10   Q.   Yeah.  I'll -- I'll tell you what.
11 And I'll just represent to you they have in
12 here -- because I don't have the extra copy --
13 the -- one of the adverse reactions listed is
14 extrusion.
15       Is that -- I mean is that -- do you
16 have any reason to believe that that's not
17 accurate?
18   MS. STOKES:  Objection.  Form.
19   THE WITNESS:  Whether it is not --
20 I'm sorry.  What's the question?
21   BY MR. JESSEE:
22   Q.   No.  Whether an -- one of the

Page 509

1 adverse reactions listed is extrusion?
2    MS. STOKES:  Objection.  Form.
3    THE WITNESS:  I'm -- I'll take
4 your -- I'll take your --
5    MR. JESSEE:  Okay.
6    THE WITNESS:  -- representation.
7    BY MR. JESSEE:
8    Q.   What -- what does extrusion mean in
9 the inguinal hernia repair context?
10   A.   Extrusion usually means that it's
11 pushed outside.
12   Q.   Okay.
13   A.   It's pushed out -- it's pushed
14 outside of it's canal.
15   Q.   The -- would you agree that the IFUs
16 for PerFix -- and I don't know if you have a
17 better copy.  I apologize.  I know that's small
18 there to try to read -- talk about, though, how
19 the physician should pick the right size and
20 make sure it's fixated, the device?
21   A.   I have to look specifically.  I'm --
22 I -- I don't have -- I mean I -- at some points

128 (Pages 506 - 509)

David Kessler , M.D.       January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

Page 510

1 I looked at the fixation requirement on
2 lingual.  I don't want to make any
3 representations without having these out in
4 front of me.
5     Q.   Okay.  The --
6          MR. JESSEE:  Did I give you a copy
7 of that?  Yeah.
8          MS. STOKES:  Yes.
9          BY MR. JESSEE:
10     Q.   Exhibit 33 is the FOIA file for the
11 Marlex mesh dart.  And --
12     A.   Does this have an -- does this have
13 an MPPE?
14          Is this -- is this from the
15 database?
16     Q.   I don't -- these are one of the
17 publicly available things.  I'm not sure if
18 it's in the database or not.
19     A.   So it wasn't produced.
20     Q.   I -- I can't tell you.
21     A.   It doesn't have a -- it doesn't have
22 a Bates number.

Page 511

1     Q.   Do you know -- do you recall
2 reviewing the -- review memorandum from the
3 Bard Marlex mesh?
4     A.   I -- I looked for this stuff in the
5 database.  And I don't remember being able to
6 see it.  Let's me just -- let me just -- keep
7 on asking me, and I'll answer your --
8     Q.   Sure.
9     A.   Yeah.  So I did -- I was able to
10 finally --
11     Q.   You -- you under --
12     A.   I have the 1992 --
13     Q.   Okay.  And I -- I know you talk
14 about the note to file that was submitted.
15     A.   On PerFix.
16     Q.   On PerFix, right?
17     A.   Right.
18     Q.   And with that note to file, there
19 were submitted several clinical studies,
20 correct?
21          MS. STOKES:  Objection.  Form.
22 Vague.

Page 512

1          THE WITNESS:  So with that -- so let
2 me just answer that question.  So --
3          BY MR. JESSEE:
4     Q.   And actually, you know what?  It
5 might be easier, that document I gave you, if
6 we were to look at -- and it's double-sided.
7     A.   Hold on one second.  Well, I have
8 the letter file.  And I have all --
9     Q.   Okay.
10     A.   -- the testing that was done.
11          So what testing did you say?
12     Q.   Well, in the -- in the letter to the
13 file, do you see the executive summary --
14     A.   I have --
15     Q.   -- section?
16     A.   I have it right in front of me.
17     Q.   Okay.  And you see at the footnote
18 at the bottom of the page it talks about:
19 Formally known as Marlex mesh.  Marlex is a
20 trademark of Phillips Petroleum"?
21     A.   Correct.
22     Q.   And the -- right about that picture

Page 513

1 where I just read, the footnote says -- talking
2 about the Bard mesh and mesh dart.  And it
3 says:  Since that time, the safety and
4 effectiveness of the PerFix --
5     A.   Do -- only -- my only complaint to
6 your -- is you got to point me where I'm going.
7          MS. STOKES:  Yeah.  What page are
8 you on?
9          MR. JESSEE:  I am on the -- the --
10 in the executive summary there.
11          THE WITNESS:  Just which paragraph?
12          MS. STOKES:  On your document, which
13 page are you on?
14          MR. JESSEE:  With the -- I don't
15 think there's numbering.
16          THE WITNESS:  I'm only Page 2.
17          BY MR. JESSEE:
18     Q.   Let me just have a -- I'll do this
19 differently.
20          Can you just explain to me in your
21 own words what your criticisms of the note to
22 file are?

129 (Pages 510 - 513)

David Kessler , M.D.                                      January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

Page 514

1      MS. STOKES: Objection. Form.
2      THE WITNESS: My -- my real
3  criticism of this is Bard changed the
4  characteristics of the device in two ways.
5  One, it increased the amount of -- of mesh to
6  three layers.  And if you go feel it, you
7  can -- you know, this has -- you know, this
8  hasn't pointed -- has some kind of needle
9  stitch here.
10      And it certainly could raise
11  questions -- more mesh in that space, differing
12  configuration, a pointed needle stitch, that
13  could -- could raise safety questions.
14      So again, it's supposed to be the
15  same as the dart, but it's not the same as the
16  dart.
17    Q.    Did the FDA, when Bard submitted the
18  note to file, indicate -- give any indication
19  to Bard that they thought it was -- Bard's
20  actions were inappropriate?
21      MS. STOKES: Objection. Form.
22      THE WITNESS: It was the -- well,

Page 515

1  it -- it did say that you -- you should go back
2  and submit this stuff.  We can't approve the
3  like without having this note to the file and
4  this documentation.
5      It -- so it was inappropriate not to
6  have the documentation on the -- the -- this
7  PerFix was evaluated.  It couldn't move to
8  light.  The FDA was very clear on that.
9      BY MR. JESSEE:
10    Q.    And the FDA though didn't require
11  them to file a 510(k) for the PerFix Plug,
12  correct?
13    A.    No.  They had filed a 510(k) that
14  was a lighter mesh, right, which -- and the FDA
15  -- this was now how many -- this is, what, how
16  many years later, a decade-plus.  I forget
17  exactly. 2003. Light was when? I mean
18  2000 -- I -- I forget exactly what was the
19  date.
20    Q.    I mean that's -- that's fine.
21  We're --
22    A.    Was about -- about a decade later.

Page 516

1  And so FDA said, "Hey, we can't go ahead and
2  look at the light without looking at the --
3  having a regulatory record here."
4    Q.    Have you -- but they never acquired
5  a 510(k) for the -- can we agree on the -- for
6  the PerFix -- regular PerFix -- they never
7  acquired -- they -- the -- PerFix 510(k)?
8      MS. STOKES: Objection. Form.
9      THE WITNESS: That -- that --
10  that -- correct.  They let Bard get away with
11  -- because it was already -- it had already
12  been a decade with it.  You know, it was one of
13  those questions.
14      BY MR. JESSEE:
15    Q.    And the -- the FDA has never
16  required either premarket or postmarket
17  clinical studies for the PerFix, right.
18    A.    It's not -- there's been no 522
19  or --
20    Q.    And that's true for all the hernia
21  mesh devices we've talked about today, right?
22      MS. STOKES: Objection. Form.

Page 517

1      THE WITNESS: Not yet.
2      BY MR. JESSEE:
3    Q.    Right.
4      They -- as we sit here today, they
5  haven't -- you haven't seen any indication that
6  they're going to either, have you?
7      MS. STOKES: Objection. Form.
8      THE WITNESS: The -- that's correct.
9  But it's -- you know, we -- we've been through
10  this with urogynecological meshes and we --
11  there are -- when there are issues and when FDA
12  focuses.
13      But you are correct.  There is no
14  522 order.  And I don't see a FDA focus on
15  these devices at this moment in time.
16      BY MR. JESSEE:
17    Q.    And why do you say that?
18    A.    It's what I see from the record.
19    Q.    The -- have you reviewed labeling
20  for any other plug mesh devices?
21      MS. STOKES: Objection. Form.
22      THE WITNESS: Only dart and PerFix.

130 (Pages 514 - 517)

David Kessler , M.D.                        January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

| Page 518 | Page 520 |
|---|---|
| 1     BY MR. JESSEE:<br>2   Q.   Okay.  That's -- when you're saying<br>3 "dart," you mean the Marlex mesh dart?<br>4   A.   Yes, sir.<br>5   Q.   Okay.  The 3DMax, the -- your<br>6 opinion there, I believe, is --<br>7   A.   Similar.<br>8   Q.   Right.<br>9       In the -- in that you say they<br>10 admitted certain warnings from the labeling and<br>11 they --<br>12   A.   It's chronic pain.<br>13   Q.   Chronic pain is that what --<br>14   A.   Same thing.<br>15   Q.   Okay.  And you understand that --<br>16 that's -- is that the extent of your -- and<br>17 that's what I see in your report in there, the<br>18 extent of your criticisms of the 3DMax?<br>19       MS. STOKES:  Objection.  Form.<br>20       THE WITNESS:  Yeah.  I think that's<br>21 -- yeah.  I mean I think that there -- the<br>22 issue is simply the complaints and the -- the | 1 unfortunately.<br>2       The -- you know, I -- we've -- we've<br>3 talked about I think the -- have we talked<br>4 about your criticisms as they relate to the<br>5 four devices: the 3DMAX, the PerFix Plug, the<br>6 Ventralex, and the Ventralight ST?<br>7       MS. STOKES:  Objection.  Form.<br>8       THE WITNESS:  The two -- there's --<br>9 there's a Ventralex with PET and a Ventralex<br>10 with PDO.  And there's a shift.<br>11       Did we talk about -- I think we<br>12 talked about --<br>13       BY MR. JESSEE:<br>14   Q.   Well, do you have any criticisms of<br>15 the shift to the PDO ring?<br>16       Because I didn't see them in your<br>17 report.<br>18   A.   I think that the issues with --<br>19 certainly with infection -- the -- the --<br>20 anything that -- anything that applied on the<br>21 higher rate of infection would apply to the PDO<br>22 ring as well as the PET. |

| Page 519 | Page 521 |
|---|---|
| 1 concerns about long-term pain.<br>2       BY MR. JESSEE:<br>3   Q.   Okay.  And so -- again, with -- with<br>4 the 3DMax Light with PerFix Plug -- well, let<br>5 me just strike that.<br>6       With the 3DMax, the -- the -- Bard<br>7 did submit the IFU to the FDA, right?<br>8       MS. STOKES:  Objection.  Form.<br>9       THE WITNESS:  That was before my<br>10 time, I believe -- let's see.  What was the<br>11 date of 3DMax?<br>12       Can I have my general -- can I<br>13 please have my general sheet.  Let me just see.<br>14       Yeah.  So that is a -- that's a<br>15 1979.  I don't have the -- do I have -- I'm not<br>16 sure I have the 510(k).  I -- I'll answer that<br>17 in a second.<br>18       Yep.  I actually -- I have a tubular<br>19 510(k).  I can go through it and tell you what<br>20 they submitted.<br>21       BY MR. JESSEE:<br>22   Q.   I don't think we have time for that, | 1   Q.   Okay.  And you understand though<br>2 that the -- so your opinions about infection<br>3 with respect to the Ventralex relate to ePTFE,<br>4 not some other aspect of the device?<br>5       MS. STOKES:  Objection.  Form.<br>6       THE WITNESS:  I'm not sure I fully<br>7 understand the question.  I'm sorry.<br>8       BY MR. JESSEE:<br>9   Q.   Well, you're obviously -- if you're<br>10 saying that your opinions on infection are<br>11 applied to whether it's the PDO ring or the PET<br>12 ring, obviously the ring is not any -- not any<br>13 issue -- not related to the infection issue,<br>14 right?<br>15       MS. STOKES:  Objection.  Form.<br>16       THE WITNESS:  Yeah.  I'm not sure<br>17 you -- I mean you're -- you're correct --<br>18       MR. JESSEE:  Maybe I can ask a<br>19 better question.<br>20       THE WITNESS:  You're correct, in<br>21 part, that the things are connected.  So I just<br>22 don't want to -- |

131 (Pages 518 - 521)

David Kessler , M.D.                    January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

| Page 522 |
|---|
| 1      BY MR. JESSEE: |
| 2    Q.   Okay.  And your opinions on this |
| 3  ground are really about the design controls in |
| 4  place, right? |
| 5      MS. STOKES:  Objection.  Form. |
| 6      THE WITNESS:  Fair. |
| 7      BY MR. JESSEE: |
| 8    Q.   Okay.  But -- and there's actually |
| 9  different though -- does -- there a different |
| 10  design validation testing done for the PDO and |
| 11  PET, correct? |
| 12    A.   I believe that -- that's correct. |
| 13      I don't see infection -- the -- the |
| 14  infect -- evaluation of infection, |
| 15  susceptibility and holding the bacteria and |
| 16  clearance of bacteria in either. |
| 17    Q.   Okay.  And the -- have you reviewed |
| 18  the design history file for the PDO? |
| 19    A.   I'd have to go back and check.  I |
| 20  think I have the design history file. |
| 21    Q.   Okay.  Do you know what animal |
| 22  testing was done on that PDO ring? |

| Page 524 |
|---|
| 1  appropriate for a medical device company to |
| 2  bring in third-party companies or organizations |
| 3  to do audits of their quality systems? |
| 4    A.   Sure. |
| 5    Q.   Would you agree that it would be |
| 6  unreasonable for a medical device manufacturer |
| 7  to not consider FDA regulations and standard in |
| 8  bringing a device to market? |
| 9      MS. STOKES:  Objection.  Form. |
| 10      THE WITNESS:  Do it -- do it without |
| 11  a negative.  I'm sorry.  I just want to make |
| 12  sure.  You have "unreasonable" and then "not |
| 13  consider."  And my brain is not going process |
| 14  both words in the same sentence. |
| 15      BY MR. JESSEE: |
| 16    Q.   A -- a reasonable medical device |
| 17  manufacturer would consider FDA standards and |
| 18  regulations in bringing a medical device to |
| 19  market, correct? |
| 20      MS. STOKES:  Objection.  Form. |
| 21      THE WITNESS:  Well said. |
| 22      BY MR. JESSEE: |

| Page 523 |
|---|
| 1      MS. STOKES:  Objection.  Form. |
| 2  Vague. |
| 3      THE WITNESS:  I think you've -- I |
| 4  think you've -- I don't think -- I think you've |
| 5  stumped me.  I mean I -- I'd have to -- I'd |
| 6  have to go pull and sort it out. |
| 7      I have all -- I have all the testing |
| 8  -- I mean I have all the testing that was done |
| 9  on Ventralex over the years.  But I would have |
| 10  to sort out PDO and PET. |
| 11      BY MR. JESSEE: |
| 12    Q.   Would you agree that it's not -- |
| 13  it's not a good thing for medical device |
| 14  manufacturers to bring in third-party companies |
| 15  to do audits? |
| 16      MS. STOKES:  Objection.  Form. |
| 17      THE WITNESS:  I was fine until you |
| 18  have a negative in there.  So you lost me to -- |
| 19  can you do it in the -- without a negative |
| 20  there. |
| 21      BY MR. JESSEE: |
| 22    Q.   Would you agree that it's |

| Page 525 |
|---|
| 1    Q.   Okay.  And that's true whether it's |
| 2  through the 510(k) process or the PMA process, |
| 3  correct? |
| 4    A.   Of course. |
| 5      MS. STOKES:  Objection.  Form. |
| 6      BY MR. JESSEE: |
| 7    Q.   And it's be unreasonable for a |
| 8  manufacturer not to consider FDA standards in |
| 9  regulations, right? |
| 10    A.   Absolutely. |
| 11      MS. STOKES:  Objection.  Form. |
| 12      THE WITNESS:  I mean -- again, |
| 13  absolutely.  But the -- but the -- and just add |
| 14  to that and -- and ultimate patient safety, and |
| 15  we will -- I'm very happy to agree with you. |
| 16      BY MR. JESSEE: |
| 17    Q.   Okay.  And that -- we can agree.  I |
| 18  wasn't saying that was the only thing, but |
| 19  that's certainly one of the things -- |
| 20    A.   But -- but -- right.  But the -- the |
| 21  real issue is those standards as it relates to |
| 22  patient safety. |

132 (Pages 522 - 525)

David Kessler , M.D.                    January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

| Page 526 | Page 528 |
|---|---|
| 1   Q.   Okay.  In the -- you've testified at | 1  we've dealt with anything -- I think that we |
| 2  trials about the FDA's review of medical | 2  dealt earlier with some of the issues with |
| 3  devices before, right? | 3  regard to the -- Dr. Tillman's comments on the |
| 4   A.  I have. | 4  MSDS and my opinions or my -- my views, |
| 5   Q.   And that's including 5 -- trials | 5  whatever, of that.  And I put that on the |
| 6  involving 510(k) devices? | 6  record. |
| 7   A.  I'm sure. | 7   Save for that, I appreciate very |
| 8   Q.   And with your experience, you can -- | 8  much your -- |
| 9  you're -- you've been able to explain to a jury | 9   MR. JESSEE:  All right.  Thank you, |
| 10  about the 510(k) process? | 10  Doctor.  That's all the questions I have for |
| 11   MS. STOKES:  Objection.  Form. | 11  you. |
| 12   THE WITNESS:  I think so.  Yes. | 12   THE WITNESS:  Thank you very much, |
| 13   BY MR. JESSEE: | 13  sir.  I appreciate the -- the kindness. |
| 14   Q.   And it's -- | 14   MS. STOKES:  Let's take a quick |
| 15   A.   Yes.  And I'm not trying to | 15  break. |
| 16  understand your -- your question, what -- | 16   MR. JESSEE:  Well, and I should say |
| 17   Q.   Did you feel like you had any | 17  pending questions from your counsel. |
| 18  difficulty explaining the concept of 510(k) to | 18   THE VIDEOGRAPHER:  We are going off |
| 19  a jury? | 19  the record. |
| 20   MS. STOKES:  Objection.  Form. | 20   The time is 4:41. |
| 21   THE WITNESS:  I -- I -- if you give | 21   (A short recess was taken.) |
| 22  me a few minutes, I can explain it.  I'm -- to | 22   THE VIDEOGRAPHER:  We are going back |

| Page 527 | Page 529 |
|---|---|
| 1  explain it under rapid fire -- we could -- I | 1  on the record. |
| 2  mean maybe not.  But I'm sure you and I could | 2   The time is 4:57. |
| 3  do a module that we can explain it. | 3   EXAMINATION BY COUNSEL FOR PLAINTIFFS |
| 4   MR. JESSEE:  Okay. | 4   BY MS. STOKES: |
| 5   THE WITNESS:  I mean -- but it -- it | 5   Q.   Dr. Kessler, I just want to make |
| 6  -- I mean it takes a couple of minutes to | 6  sure that the record is clear. |
| 7  explain it.  It's not in a -- you know, it's | 7   What is your opinion on the MSDS? |
| 8  not something that someone's going to | 8   MR. JESSEE:  Objection to the form. |
| 9  understand. | 9   THE WITNESS:  Gerard, can just I |
| 10   But in -- in -- in five minutes, I | 10  trouble you for my MSDS sheets just so I can |
| 11  think I can explain it. | 11  have those in front of me. |
| 12   BY MR. JESSEE: | 12   So there's -- there's actually |
| 13   Q.   And, Dr. Kessler, again, I've tried | 13  several different sheets.  There -- there were |
| 14  to be thorough today.  I appreciate your -- | 14  early sheets.  There were 2004 sheets of |
| 15  your patience in doing that. | 15  Phillips -- I'm not going to pronounce it |
| 16   Any other opinions that either | 16  right -- Sumika.  There are -- I think I have |
| 17  aren't in the body of your report or that we | 17  -- I just get -- and I'm not going to pronounce |
| 18  haven't discussed today about the Bard's -- | 18  this one also -- Lyondellbasell. |
| 19  about Bard's hernia mesh products? | 19   So there are a number of different |
| 20   A.   I think -- I think we've -- | 20  suppliers counsel asked me earlier about which |
| 21   MS. STOKES:  Objection.  Form. | 21  was used at which points in time.  And that's |
| 22   THE WITNESS:  You know, I -- I think | 22  answered in the interrogatory questions. |

133 (Pages 526 - 529)

David Kessler , M.D.                        January 31, 2020
Davol, Inc./C. R. Bard, Inc. - MDL 2846

|  | Page 530 |
| --- | --- |

1   Because the -- the -- the FDA,
2   through ISO 10993, Part 18, concurs with the
3   ISO standard that each -- each material be well
4   characterized chemically, and because there is
5   in the technical file and in the MSDS issues
6   with regard to degradation of the material,
7   right?  I mean in these MSDS -- certainly in --
8   in -- in -- as I read it, there is -- and
9   there's also a warning -- I believe Marlex --
10  they're -- they're -- they're stated a little
11  differently.  Do not use -- the -- the -- the
12  Marlex says:  Do not use Phillips Sumika
13  polypropylene material in medical applications.
14  And it -- it -- goes on.  And I
15  think the Lyondell -- I'm -- the -- the -- the
16  other MDS -- the Pro-fax MDS I think states it
17  a little differently and says:  Don't use --
18  may not be used in U.S. -- This product may not
19  be used in the manufacture any of the following
20  without written prior approval for U.S. Class I
21  or Class II.
22  I mean, again, I'm -- I'm

|  | Page 531 |
| --- | --- |

1   summarizing.
2   But because of that issue of
3   oxidative damages as part of the chemical
4   characterization, that could present a
5   potential safety hazard and, therefore, should
6   be warned about.
7   MS. STOKES:  All right.  Thank you.
8   MR. JESSEE:  And I just want to note
9   on the record that it's Bard's position that
10  the -- this issue of the MSDS and the testimony
11  that was just given was not in Dr. Kessler's
12  expert report; it was not in his errata sheet
13  that was served on us yesterday.  We had no
14  notice whatsoever of this opinions regarding
15  MSDS, degradation, oxidation, raw materials
16  that was just testified to.
17  And we object and think it's
18  improper, those opinions.  To the extent Dr.
19  Kessler is allowed to give those opinions, we
20  reserve the right to depose him on those issues
21  at a time where we will -- as today, we don't
22  have the MSDS documents.  We don't have the

|  | Page 532 |
| --- | --- |

1   testimony.  We -- as I said, we had no notice
2   to do -- conduct a meaningful cross-examination
3   of those opinions.
4   And so we would reserve the right --
5   to the extent the opinions are allowed, which
6   we obviously suggest they should not be, we
7   reserve the right to conduct an additional
8   deposition on those opinions.
9   MS. STOKES:  Obviously plaintiffs
10  disagree.  But we can take it up with the
11  Court.
12  MR. JESSEE:  Oh, and let's -- I'm
13  sorry.  Just real fast then.
14  Doctor, we've discussed the -- about
15  the -- the documents you brought with us.  And
16  you're going to make your best faith effort,
17  after they are copied, to keep them until this
18  litigation's over, right?
19  THE WITNESS:  Yeah.  Absolutely.
20  They just keep me -- I will -- I promise to
21  try -- I will keep them in my garage as soon as
22  I have them and try to keep them in good

|  | Page 533 |
| --- | --- |

1   storage.
2   If you guys can -- if you can keep
3   me abreast of when this litigation is over.
4   Sometimes that's a nebulous term.
5   MR. JESSEE:  You're asking the wrong
6   person.
7   THE WITNESS:  I -- I -- I -- you
8   know --
9   MR. JESSEE:  Yeah, that's --
10  THE WITNESS:  What that point in
11  time is -- let's agree that I'm happy to keep
12  them -- pick a -- pick a -- pick a -- a fair
13  period of time.
14  You want three years?  What do you
15  want?
16  MR. JESSEE:  Whatever.  We can
17  figure that out.
18  THE WITNESS:  Yeah.  But just so you
19  understand "litigation over" is a --
20  MR. JESSEE:  Yeah.
21  THE WITNESS:  -- little vague.
22  MR. JESSEE:  I --

134 (Pages 530 - 533)

David Kessler , M.D.                    January 31, 2020
Davol, Inc./C. R. Bard, Inc. -  MDL 2846

---

Page 534

1    THE WITNESS:  I mean certainly, if
2  I'm involved -- I will keep them as long as I'm
3  involved.
4    MR. JESSEE:  Okay.  And then, Ms.
5  Stokes, we are agreeable that you're -- you'll
6  have -- send those exhibits that have been
7  here, make copies, and just make representation
8  that you're not going to make any changes to
9  them?
10    MS. STOKES:  Yeah.  We will
11  instruct -- we will be very careful to instruct
12  the vendor not to make any changes --
13    MR. JESSEE:  Okay.  What --
14    MS. STOKES:  -- and keep them in
15  order.
16    MR. JESSEE:  Great.  And that's
17  agreeable for us.
18    The one quick issue then on the
19  exhibits.  I accidentally labeled two exhibits
20  28.  So what we're going to do is label device
21  labeling guidance exhibit, which was the first
22  one marked Exhibit 28 is 28A.  And this is from

Page 535

1  1991.
2    And then the Ventralight ST
3  instructions for use we are going to label as
4  28B.
5    That's all I have.
6    MS. STOKES:  All right.
7    MR. JESSEE:  Okay.
8    THE VIDEOGRAPHER:  We are off the
9  record at 5:03 p.m.
10    And this concludes today's testimony
11  given by Dr. David A. Kessler.
12    The total number of Media Units used
13  was five and will be retained by Veritext Legal
14  Solutions.
15    (Whereupon, the proceeding was
16  concluded at 5:03 p.m.)
17
18
19
20
21
22

Page 536

1    CERTIFICATE OF NOTARY PUBLIC
2    I, Bonnie L. Russo, the officer before
3  whom the foregoing deposition was taken, do
4  hereby certify that the witness whose testimony
5  appears in the foregoing deposition was duly
6  sworn by me; that the testimony of said witness
7  was taken by me in shorthand and thereafter
8  reduced to computerized transcription under my
9  direction; that said deposition is a true
10  record of the testimony given by said witness;
11  that I am neither counsel for, related to, nor
12  employed by any of the parties to the action in
13  which this deposition was taken; and further,
14  that I am not a relative or employee of any
15  attorney or counsel employed by the parties
16  hereto, nor financially or otherwise interested
17  in the outcome of the action.
18
19    _Bonnie L. Russo_
20    Notary Public in and for
21    the District of Columbia
22  My Commission expires:  June 30, 2020

Page 537

1    ACKNOWLEDGMENT OF DEPONENT
2    I, DAVID A. KESSLER, M.D. do hereby certify
3  that I have read the foregoing transcript of my
4  testimony taken on 1/31/20, and further certify
5  that it is a true and accurate record of my
6  testimony (with the exception of the
7  corrections listed below):
8  Page    Line      Correction
9  ____  ____    _____
10  ____  ____    _____
11  ____  ____    _____
12  ____  ____    _____
13  ____  ____    _____
14  ____  ____    _____
15  ____  ____    _____
16  ____  ____    _____
17  ____  ____    _____
18    _____
19    DAVID A. KESSLER, M.D.
20  THIS ____ DAY OF _____, 2020.
   SUBSCRIBED AND SWORN TO BEFORE ME
21
   _____   _____
22  (NOTARY PUBLIC)    MY COMMISSION EXPIRES:

135 (Pages 534 - 537)