# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

IN RE JOHNSON & JOHNSON          §
TALCUM POWDER PRODUCTS           § MDL NO.:
MARKETING, SALES                 §
PRACTICES, AND PRODUCTS          § 16-2738(MAS)(RLS)
LIABILITY LITIGATION             §


*********************************************

REMOTE VIDEOCONFERENCED DEPOSITION OF

LAURA MASSEY PLUNKETT, PH.D.

1                    DECEMBER 21, 2023

1         *********************************************

1

1

1

1

1

1

1

1

2

2

2

2

2

2     Job No. 348854

Page 2

1    REMOTE VIDEOCONFERENCED DEPOSITION OF LAURA

2    MASSEY PLUNKETT, PH.D., produced as a witness at the

3    instance of the Defendants, and remotely duly sworn

4    by agreement of all counsel, was taken in the above-

5    styled and numbered cause on December 21, 2023, from

6    9:03 a.m. to 1:40 p.m., before Karen L. D. Schoeve,

7    RDR, CRR, RSA, reported remotely by computerized

8    machine shorthand, pursuant to the Federal Rules of

9    Civil Procedure and the provisions stated on the

10   record or attached hereto.

11

12

13       REPORTER'S NOTE:  Please note that due to the

14   quality of a Zoom videoconference and transmission

15   of data, overspeaking can cause audio distortion

16   which disrupts the process of preparing a

17   videoconference transcript.

18

19       Quotation marks are used for clarity and do

20   not necessarily reflect a direct quote.

21

22

23

24

25

Page 4

1                    I N D E X

2                              PAGE

3   Appearances                    3

4   Request for Production        52

5   Request for Production        53

6   Request for Production        56

7   Request for Production        56

8

9

10  LAURA MASSEY PLUNKETT, Ph.D.

11     Examination By Mr. Hegarty        9

12

13

14  Changes and Signature            200

15

16  Certified Stenographic

17  Court Reporter's Certificate     202

18

19

20

21

22

23

24

25

Page 3

1           A P P E A R A N C E S

2    ***********************************************

3        ALL PARTIES APPEARED REMOTELY VIA ZOOM

4    ***********************************************

5   FOR THE PLAINTIFFS and THE WITNESS:

6       TED G. MEADOWS, ESQUIRE
        LEIGH O'DELL, ESQUIRE
7       RYAN BEATTIE, ESQUIRE
        BEASLEY ALLEN, P.C.
8       218 Commerce Street
        Montgomery, Alabama 36104
9       T: 800.898.2034
        F: 888.212.9702
10      ted.meadows@beasleyallen.com
        leigh.odell@beasleyallen.com
11      ryan.beattie@beasleyallen.com

12   FOR THE PLAINTIFFS:

13      CHRISTOPHER V. TISI, ESQUIRE
        LEVIN PAPANTONIO RAFFERTY
14      316 South Baylen Street
        Pensacola, Florida 32502
15      T: 850.435.7000
        F: 850.435.7000
16      ctisi@levinlaw.com

17   FOR THE DEFENDANTS:

18      MARK C. HEGARTY, ESQUIRE
        SHOOK, HARDY & BACON L.L.P.
19      2555 Grand Boulevard
        Kansas City, Missouri 64108
20      T: 816.474.6550
        F: 816.421.5547
21      mhegarty@shb.com

22   ALSO PRESENT:

23      Katie Tucker, Paralegal
        Beasley Allen, P.C.
24
     CERTIFIED STENOGRAPHIC COURT REPORTER:
25      Karen L. D. Schoeve, CRR, RDR, RSA

Page 5

1           EXHIBIT INDEX

2

3   NO.   DESCRIPTION                 PAGE

4   Exhibit 1                          38
        Document titled "List of Testimony for
5       Dr. Laura M. Plunkett, Ph.D, DABT
        (7 pages)
6
7   Exhibit 2                          48
        Curriculum Vitae of Laura M. Plunkett,
8       Ph.D., D.A.B.T.
        (17 pages)
9
10  Exhibit 3                          68
        Document titled "Materials Considered
11      and/or relied on"
        (109 pages)
12
13  Exhibit 4                          70
        Invoices to Beasley Allen, P.C.
14      (6 pages)
15  Exhibit 5                          71
        Second Amended Expert Report of Laura
16      M. Plunkett, Ph.D., D.A.B.T., dated
        11/15/23
17      (110 pages)
18
19  Exhibit 6                         159
        Federal Register, dated 05/06/22
20      (22 pages)
21  Exhibit 7                         159
        Johnson & Johnson press release titled
22      "Johnson & Johnson Consumer Health to
        Transition Global Baby Powder
23      Portfolio to Cornstarch," dated
        08/11/22
24      (1 page)
25

Page 6

| | | |
|---|---|---|
| 1 | Exhibit 8 | 159 |
| 2 | Johnson & Johnson press release titled | |
| | "Johnson & Johnson Consumer Health | |
| 3 | Announces Discontinuation of | |
| | Talc-based Johnson's Baby Powder in | |
| 4 | U.S. and Canada," dated 05/19/20 | |
| | (1 page) | |
| 5 | Exhibit 9 | 160 |
| 6 | Medical literature titled "Effects of | |
| | risk factors for ovarian cancer in | |
| 7 | women with and without endometriosis," | |
| | dated 01/11/22 | |
| 8 | (16 pages) | |
| 9 | Exhibit 10 | 160 |
| 10 | Medical literature titled "Genital | |
| | Powder Use and Risk of Epithelial | |
| 11 | Ovarian Cancer in the Ovarian Cancer | |
| | in Women of African Ancestry | |
| 12 | Consortium," dated 2021 | |
| | (9 pages) | |
| 13 | Exhibit 11 | 160 |
| 14 | Medical literature titled | |
| | "Transcriptomic and epigenomic effects | |
| 15 | of insoluble particles on TH4 | |
| | macrophages," dated 07/17/20 | |
| 16 | (18 pages) | |
| 17 | Exhibit 12 | 160 |
| | Medical literature titled "Talc, body | |
| 18 | powder, and ovarian cancer: A summary | |
| | of the epidemiologic evidence," dated | |
| 19 | 04/11/58 | |
| | (10 pages) | |
| 20 | Exhibit 13 | 161 |
| 21 | FDA Compliance Policy for Cosmetic | |
| | Product Facility Registration and | |
| 22 | Cosmetic Product Listing, dated 11/23 | |
| | (5 pages) | |
| 23 | Exhibit 14 | 161 |
| 24 | Medical literature titled "Johnson & | |
| | Johnson 'regrets' 1971 study that | |
| 25 | injected asbestos into US prisoners" | |
| | dated 03/15/22 | |
| | (1 page) | |

Page 7

| | | |
|---|---|---|
| 1 | Exhibit 15 | 161 |
| 2 | Medical literature titled "A critical | |
| | review of talc and ovarian cancer" | |
| 3 | (31 pages) | |
| 4 | Exhibit 16 | 161 |
| 5 | Medical literature titled "Systemic | |
| | review of the association between talc | |
| 6 | and female reproductive tract | |
| | cancers," dated 02/03/23 (16 pages) | |
| 7 | Exhibit 17 | 161 |
| | Medical literature titled "Talc powder | |
| 8 | and ovarian cancer: What is the | |
| | evidence?" (3 pages) | |
| 9 | Exhibit 18 | 162 |
| 10 | Medical literature titled "Talcum | |
| | powder induces malignant | |
| 11 | transformation in normal human primary | |
| | ovarian epithelial cells," dated 04/23 | |
| 12 | (8 pages) | |
| 13 | Exhibit 19 | 162 |
| 14 | Medical literature titled "Insights | |
| | into the Role of Oxidative Stress in | |
| 15 | Ovarian Cancer," dated 05/08/21 | |
| | (20 pages) | |
| 16 | Exhibit 20 | 162 |
| 17 | Medical literature titled "Association | |
| | of Powder Use in the General Area With | |
| 18 | Risk of Ovarian Cancer | |
| | (18 pages) | |
| 19 | Exhibit 21 | 162 |
| 20 | Medical literature titled "Association | |
| | Between the Frequent Use of Perineal | |
| 21 | Talcum Powder Products and Ovarian | |
| | Cancer: A Systematic Review and | |
| 22 | Meta-analysis," dated 02/02/22 | |
| | (16 pages) | |
| 23 | Exhibit 22 | 163 |
| 24 | Second Amended Expert Report of Laura | |
| | M. Plunkett, Ph.D., D.A.B.T., dated | |
| 25 | (111 pages) | |

Page 8

| | | |
|---|---|---|
| 1 | Exhibit 23 | 163 |
| 2 | Document titled "Appendix C" | |
| | (11 pages) | |
| 3 | | |
| 4 | Exhibit 24 | 163 |
| | Invoices to Beasley Allen, P.C. | |
| 5 | (3 pages) | |
| 6 | Exhibit 25 | 163 |
| 7 | Curriculum Vitae of Laura M. Plunkett, | |
| | Ph.D., D.A.B.T. | |
| 8 | (17 pages) | |
| 9 | Exhibit 26 | 164 |
| 10 | Excerpts of depositions of Laura M. | |
| | Plunkett, Ph.D. | |
| 11 | (11 pages) | |
| 12 | Exhibit 27 | 164 |
| 13 | Notice of Oral Deposition of Laura M. | |
| | Plunkett, Ph.D. and Duces Tecum, dated | |
| 14 | 12/13/23 | |
| | (9 pages) | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

Page 9

```
 1              P R O C E E D I N G S
 2         THE COURT REPORTER:  Today is
 3 December 21st, 2023.  The time is 9:03 a.m.
 4         If the attorneys could please
 5 introduce themselves for the record and the parties
 6 on Zoom, then I'll swear in the witness.
 7         MR. MEADOWS:  Ted Meadows on behalf of
 8 MDL plaintiffs and with Dr. Laura Plunkett.
 9         MR. TISI:  Chris Tisi on behalf of MDL
10 plaintiffs.
11         MR. BEATTIE:  Ryan Beattie on behalf
12 of MDL plaintiffs.
13         MS. O'DELL:  Leigh O'Dell on behalf of
14 the MDL plaintiffs.
15         MR. HEGARTY:  Mark Hegarty on behalf
16 of the Johnson & Johnson defendants.
17         LAURA MASSEY PLUNKETT, PH.D.,
18 having been first duly sworn to tell the truth, the
19 whole truth, and nothing but the truth, so help her
20 God, testified as follows:
21              EXAMINATION
22 BY MR. HEGARTY:
23    Q.  Good morning, Dr. Plunkett.
24    A.  Good morning.
25    Q.  Would you please start by telling us your
```

Laura Massey Plunkett, Ph.D.

1    name.
2        A.   Laura Massey Plunkett.
3        Q.   Again, good morning.  My name is Mark
4    Hegarty.  I think you know that.  I represent the
5    Johnson & Johnson defendants.  We're here today to
6    take your deposition in the NRA Johnson & Johnson
7    talcum powder products' MDL action.  You and I have
8    been together for depositions before on several
9    occasions.
10        Do you recall that?
11        A.   I do.
12        Q.   We're here today to discuss the amendments
13    to your prior MDL report from June 2021 as set out
14    in your November 15th, 2023, second amended MDL
15    report.
16        Do you understand that?
17        A.   Yes, I do.
18        Q.   Related, we're here today to determine if
19    any of your opinions have changed or are new and/or
20    if you intend to refer to any additional literature
21    or materials that were not identified as of when you
22    were last deposed and testified in your MDL
23    deposition back in August of 2021.
24        Do you understand that?
25        A.   Yes, I do.

1        Q.   So are you prepared today to discuss the
2    latest amendments to your MDL report and -- as well
3    as any changed or new opinions and to identify any
4    additional literature or materials as support for
5    your opinions that were not identified as of your
6    last deposition?
7        A.   I am.
8        Q.   Where are you testifying from today?
9        A.   I'm in Houston, Texas, at a conference
10    room at a hotel, the JW Marriott, in the Galleria
11    area, Houston, Texas.
12        Q.   Is anyone with you in the room?
13        A.   Yes.
14        Q.   Who is with you?
15        A.   Mr. Meadows, who's already introduced
16    himself; Mr. Beattie; Mr. Tisi; and Ms. Tucker.
17        Q.   Did you bring any materials with you to
18    the deposition; that is, do you have copies of any
19    materials or documents with you?
20        A.   Yes, some.
21        Q.   What do you have with you today?
22        A.   I have a copy of my second amended expert
23    report.  I have a copy of my bills.  I have a copy
24    of the CV, the bills that we sent to you, the new --
25    the additional billing.

1        I have a copy of my revised CV, my new
2    CV, and I have a copy of the new articles,
3    scientific articles, that I identified that are
4    cited in the second amended report that weren't
5    cited in my report from June of 2021.
6        And I also have a copy of some
7    articles that were listed in my Appendix C reliance
8    list.  I also have that with me, the new one from
9    the second amended report as well.  So things that
10    were not listed in the Appendix C from the June 2021
11    report.
12        Q.   As far as the articles, approximately how
13    many articles do you have with you?
14        A.   There's seven articles that are cited in
15    the second amended report that were not cited in the
16    August 2021 report that are also listed in -- you
17    know, I have a reliance list for cited references,
18    those seven.
19        And then I have, in addition to that,
20    nine documents.  They're not all published articles,
21    but there's nine additional documents that are --
22    were cited in the Appendix C from the second amended
23    report that I also copied and brought.
24        Q.   Okay.  As far as the seven articles go,
25    can you read for me the first author's last name and

1    the date of publication?
2        A.   Yes, I can.  Do you want me to start?
3        Q.   Please.
4        A.   There's Harper -- Amy K. Harper, et al.,
5    2023.
6        There's Emi, E-m-i, initial T, et al.,
7    2021.
8        There's an article by Ding, D-i-n-g,
9    initials D. N., et al., from 2021.
10        There's an article by O'Brien, K. D.
11    M., from 2020 in JAMA.
12        There's an article by first author
13    Woolen, S., as in "Sam," A. initials, from 202- --
14    published 2022.
15        And there's an article Davis, C. P.,
16    the initials, et al., from 2021.
17        And finally, an article; last name
18    Phung, P-h-u-n-g; initials M. T., et al., from 2022.
19        Q.   Can you do the same for me with regard to
20    the nine articles that are not specifically called
21    out in the body of your report that are -- but that
22    are on your "Materials Considered" list?
23        A.   Sure.
24        Q.   Whatever shorthand way is best to identify
25    them.

Page 14

1    A.   Okay.  So I -- and actually, these --
2  these two -- first two are actually footnotes with
3  links in my report.
4        There's two printouts of press
5  releases from the Johnson & Johnson website.  One is
6  dated May 19th, 2020, and one is a media statement
7  dated August 11, 2022.  And they were cited through
8  a footnote in my report, but they're also in
9  Appendix C.
10        There's an article by Wentzensen,
11  W-e-n-t-z-e-n-s-e-n, and O'Brien from 2021.
12        There's the -- also, there was a link
13  to the FDA document called "Compliance Policy for
14  Cosmetic Product Facility Registration and Cosmetic
15  Product Listing, Guidance for Industry," November
16  2023.  It's five pages.  I printed that.
17        I cited to, I think, a link to the EPA
18  Federal Register Notice from May 6th, 2022, for a
19  proposed rule related to asbestos, and I printed
20  that.
21        There's an article by Dyer, D-y-e-r,
22  Owen, from BMJ from 2022.
23        There's an article -- the first author
24  Goodman, initials J. E., from 2020.
25        There's an article by Lynch,

Page 15

1  L-y-n-c-h, H. N., from 2023.
2        And there's an article by Micha,
3  M-i-c-h-a, J. P., et al., from 2022.
4        And I should also point out in my
5  Appendix C, for a couple of these articles, there
6  were supplemental materials.  And I also have those
7  printed and attached to the articles.
8    Q.   Thank you.
9        Have we now covered all of the
10  materials that you have brought with you to today's
11  deposition?
12    A.   Other than the CV -- oh, I have -- I have
13  one other thing.  I have the printout of three
14  different, I guess, sections of depositions, which
15  actually I believe were between you and I in 2017.
16  Three days we spent in St. Louis together.  And I
17  printed those out because they deal with some of the
18  opinions I had already expressed about misbranding.
19    Q.   So have we now covered all the materials
20  that you brought with you today?
21    A.   Yes.
22    Q.   Have you prepared any notes or other
23  materials for this case since your last MDL
24  deposition in 2021 besides your November 15, 2023,
25  MDL report?

Page 16

1    A.   No.
2    Q.   As we've been discussing, you have been
3  deposed prior to today in the MDL.
4        And do you recall that the last
5  deposition was back in August of 2021.
6    A.   I do.
7    Q.   Now, did you go back and review your
8  testimony from -- I'm sorry.
9        MR. MEADOWS:  Just for clarity's sake
10  for the record, and I -- I think I understand what
11  you're saying when you keep referring to the last
12  MDL deposition.  But there has been testimony given
13  since then, both in court and in depositions, as
14  recently as just a few weeks ago in this very same
15  hotel to J&J, at the request of J&J.
16        The last deposition was in Mississippi
17  AG case.  So I'm sure you're aware of that.  But I
18  just, for clarity's sake on the record, I just
19  wanted to make sure that -- so we're clear on that.
20        MR. HEGARTY:  And I was very, very
21  specific as to the MDL deposition in August 2021.
22  BY MR. HEGARTY:
23    Q.   Did you go back and review your August
24  2021 MDL deposition to prepare to testify today?
25    A.   No.

Page 17

1    Q.   Do you recall reviewing that testimony at
2  some point in time?
3    A.   I did.  After the deposition, I reviewed,
4  and I made -- may -- I think I may have even made
5  some small corrections to the transcript -- the copy
6  of the transcript that was submitted back to the
7  court.
8    Q.   Other than those few small corrections,
9  were you satisfied, as far as the accuracy goes, of
10  the transcription of that deposition?
11    A.   I guess so.  I don't -- don't know that I
12  would -- I mean, I don't think I -- it's an issue of
13  being satisfied.  But I believe it was -- reflected
14  what was discussed accurately at the deposition.
15    Q.   Was there any testimony that you recall
16  that you thought was inaccurate or that you wanted
17  to change?
18    A.   Only if I made a correction.  No, there
19  would be nothing else.
20    Q.   Thank you.
21        Have you reviewed any of your other
22  depositions in the talcum powder cases besides the
23  August 2021 MDL deposition -- that had occurred
24  since that date to prepare to testify here today?
25    A.   I didn't do -- not for the purpose of

Laura Massey Plunkett, Ph.D.

Page 18

1 preparing for today, but I have reviewed other
2 testimony since that time period.
3     Q.   What other testimony have you reviewed
4 since August of 2021 in talcum powder cases?
5     A.   So I -- okay.
6          (Speaking simultaneously.)
7     A.   Sorry, I didn't mean to talk over you.  I
8 apologize.
9          I reviewed the deposition from a few
10 weeks ago, I believe.  I think I have had that
11 deposition to look at.  I seem to recall that.  And
12 then I also would have reviewed -- so there were --
13 there was at least one trial that occurred after my
14 August 2021 deposition in the MDL.
15          And before that trial testimony, I
16 know I did look at transcripts of both -- some of my
17 previous trial testimony.  I can't tell you which
18 ones.  It's been a while.  But I did do that.  I
19 typically will -- when I'm getting ready for -- to
20 go on the stand in a trial.
21     Q.   Focusing just on your more -- most recent
22 deposition, which was in the Mississippi AG action,
23 which I believe was in October of 2023, do you
24 recall seeing any testimony that you thought was
25 inaccurate or that needed to be changed?

Page 19

1     A.   No.  I -- I believe I did make a few
2 typo-type corrections of misspellings to the
3 transcript and submitted those.  But, no, there was
4 nothing that I -- with that in mind, as long as
5 those changes were made, there's nothing else I
6 would point to.
7     Q.   Has there been any change in your
8 employment status since August of 2021?
9     A.   No.
10     Q.   Any change in your business or its
11 activity since August of 2021?
12     A.   So I need you to be clear what you mean by
13 "any changes."  I obviously have different clients
14 at all different periods of time.
15          But what are you asking?
16     Q.   Sure.  Let me ask and be more specific.
17          Has there been any change in the type
18 of business that you do or the type of business
19 activities that you do since August of 2021?
20     A.   In general terms, no.
21     Q.   Are you still working full-time?
22     A.   Yes, I am.
23     Q.   Has there been any changes in the number
24 of hours that you work on a weekly basis since
25 August of 2021?

Page 20

1     A.   Not in any general terms.  I mean, if you
2 ask me to -- if you're asking me is to describe what
3 I typically do and how -- and how I spend my time,
4 it would be essentially the same.
5     Q.   Has there been any change in terms of the
6 employees that you have in your business since
7 August of 2021?  Any additions, anyone no longer
8 working there as of August of 2021?
9     A.   The same people that are working there, I
10 do believe we added as a employee, an additional
11 person, Dr. Austin Mircheff because I don't think --
12 I don't -- you'd have to remind me.  I believe he
13 joined as an employee, before he was just a
14 contractor to us, after August of 2021.
15     Q.   What was his last name, or what is his
16 last name?
17     A.   Mircheff, M-i-r-c-h-e-f-f.  And I hope I'm
18 pronouncing that correctly.  He's Macedonian.
19     Q.   What type of work does he do for your
20 business?
21     A.   So he has a Ph.D. in cellular physiology,
22 and he does several things, depending on the need.
23 He will sometimes do research on topics related to
24 some of our clients in the regulatory space as far
25 as underlying mechanisms that could help support

Page 21

1 safety assessments for some of the product
2 assessments that I do in my practice and we do
3 as collectively as a company in our practice.
4          He also does do some article
5 retrievals from -- he has privileges at the
6 University of Southern California.  He is a retired
7 professor.  So he can sometimes get articles that we
8 can't get other places through his privileges at the
9 university library system.
10     Q.   Does he do any type of litigation work
11 through your business?
12     A.   No.  He works strictly either in our
13 intellectual property part of the practice, due
14 diligence with investors, or he works in the
15 regulatory part of the practice.
16     Q.   Did anyone at your business or otherwise
17 assist you with any amendments that you made to your
18 last MDL report as reflected in your November 15th,
19 2023, second amended report?
20     A.   Other than article retrieval, no.
21     Q.   What percentage of your business this
22 year, that is in 2023, have you spent on litigation
23 matters?
24     A.   It's probably a little more than in 2021
25 because some of the work has come back.  The courts

Laura Massey Plunkett, Ph.D.

Page 22

1  have opened back up.  So I'd say probably about
2  30 percent of my time again, just like it used to
3  be, at least in 2023.
4      Q.  Same question as to 2022:  What percentage
5  of your work in 2022 was spent on litigation
6  matters?
7      A.  Less.  Some -- I can't give you the exact
8  percentage, but it was less.  2023 is back to where
9  it was before COVID for me, before the shutdown in
10 2020.
11     Q.  What is the dollar figure of revenue
12 received by your company for the year of 2022?
13     A.  I don't have an exact figure for you.  It
14 was less than a million dollars, but I don't have an
15 exact figure.
16     Q.  Are you able to estimate what your
17 expected revenue is of your business for 2023?
18     A.  It's about the same.
19     Q.  When you say "about the same," the same as
20 what?
21     A.  I'm sorry.  It was -- it's less than a
22 million dollars.  I mean, I can't give you an exact
23 number, but it's somewhere between 800,000 and a
24 million dollars for the -- the revenues for the
25 company.

Page 23

1      Q.  With regard to the 30 percent of your time
2  spent on litigation matters in 2023, what percentage
3  of that time was spent on talc litigation?
4      A.  I can't tell you.  It's not been --
5  it's -- you have the bills.  I don't recall the
6  time, how many hours, but it's not been a major
7  driver other than preparing this report.  I took
8  some -- a little bit of time.  I haven't had any
9  trials or -- the only deposition, I think, in talc
10 in 2023, was the Mississippi AG case.
11     Q.  Did you spend any hours on talc cases in
12 2022?
13     A.  Not at trial or deposition that I recall,
14 no.  I would have done some work in 2022 keeping up
15 with the literature over time, some small amounts.
16 But it was not a major part of my practice in 2022
17 either.
18     Q.  You mentioned the bills or the invoices of
19 your talcum powder work, which we'll mark as
20 exhibits.
21          Does that reflect the hours you spent
22 since 2021, except for today, on talcum powder
23 cases?  That is, do they reflect the hours you've
24 spent since 2021 on talcum powder cases?
25     A.  They reflect the hours I billed, yes.

Page 24

1  There are hours I don't bill, so I don't charge all
2  the time for looking at -- doing a lit search.  If
3  it only takes me 30 or 40 minutes, I may not charge
4  for that.
5      Q.  As far as your consulting outside of
6  litigation, are you currently consulting as to any
7  cosmetic?
8      A.  Currently right now, no.  I have some work
9  for ingredients that may be used in cosmetics, but
10 they're also used in over-the-counter drugs.  And
11 the issue I'm addressing is an over-the-counter drug
12 issue, not a -- as regulation as an OTC versus as a
13 cosmetic.
14     Q.  What is it scientifically or medically in
15 terms of the issue you're addressing for that over-
16 the-counter ingredient in a drug?
17     A.  I'm looking -- okay.
18          (Speaking simultaneously.)
19     A.  Sorry.  Go ahead.  I didn't mean to talk
20 over you.
21     Q.  Yeah, let me restate the question.
22          What scientific or medical issue or
23 otherwise are you looking at with regard to the
24 ingredient in that over-the-counter product?
25     A.  Doing a safety assessment for an

Page 25

1  ingredient.
2      Q.  When you say "safety assessment," is that
3  the same thing that you have done in -- in the --
4  for purposes of your report in the MDL?
5      A.  It's not in the context of litigation.
6  But, yeah, same basic methods I would be using,
7  that's correct.  Yeah, looking at scientific
8  literature, routes of exposure.  The same kinds of
9  things would go into it, but this is not a
10 litigation project.  It's a regulatory project.
11     Q.  As far as your vernacular or terminology,
12 is "risk assessment" the same as a "safety
13 assessment"?
14     A.  No, they're not.  They're different.
15     Q.  How are they different?
16     A.  So it depends on the context of -- of what
17 you're -- what kind of product that you're doing
18 them for.
19          So, for example, if I'm doing a -- I'm
20 doing an assessment of risk, okay?  Not a risk
21 assessment, an assessment of risk.  Risk goes into
22 safety assessment, and also into risk safety
23 assessment.  If I'm doing that kind of assessment
24 for a food -- or an ingredient to be used in food,
25 there -- it's all about safety.

Laura Massey Plunkett, Ph.D.

Page 26

1      So in other words, it's -- it's about
2  the risk.  There's no weighing benefits.  So when I
3  do an over-the-counter drug product or I do a drug
4  and I'm doing a risk assessment, I'm looking at
5  risks and benefits.
6           It's just like cosmetics.  It's a
7  safety assessment using the tool of risk assessment,
8  but it -- there's no such thing as benefit.  It's
9  all about the risk.
10          Does that explain it for you?
11     Q.  Yes.  Thank you.
12          Are you able -- able to estimate the
13  percentage of times since August of 2021 through
14  today that you spent consulting outside of
15  litigation on cosmetic or an ingredient you know
16  that is going into a cosmetic?
17     A.  I certainly couldn't give you a
18  percentage, no.  In 2022, there were a couple of
19  projects I worked on that dealt with ingredients
20  used in cosmetics, but I can't give you a time right
21  now.
22     Q.  How about 2023?  Have you worked on any
23  projects dealing with any cosmetics or an ingredient
24  that you know is going into a cosmetic?
25     A.  So the project that I'm describing for

Page 27

1  you -- I mean, it is an ingredient found in
2  cosmetics.  Although, my issue is it's going into an
3  over-the-counter drug.  So if you count that
4  project, because it is something that's used in
5  cosmetics as well, it would probably be maybe --
6  I've spent -- maybe have spent 40 or 50 hours on
7  that project.  And it's something that just came up
8  about three months ago, so it's -- wasn't all year.
9     Q.  Is there anything confidential about the
10  ingredient?
11     A.  Yes, I have signed an NDA with the client,
12  so yes.
13     Q.  Is that the only project that you spent
14  time on this year that concerned an ingredient that
15  may go into a cosmetic?
16     A.  This year, that's what I can recall.  That
17  it -- but I will say, there are a number of
18  ingredients that I've looked at in the food space
19  that also have some use in cosmetic products as
20  well.  Many ingredients have multiple uses depending
21  on, you know, what they are.  Different
22  preservatives, for example, and things like that.
23  But as a focus of my work, it would be that -- that
24  project that I just spoke to.
25     Q.  Have you drafted any labels for a consumer

Page 28

1  product since the summer of 2021?
2     A.  I've given advice to clients on drafting
3  of labels, yes, for consumer products since then.
4  And told them, you know, what would be required
5  in terms of what the labeling would be.  It's for a
6  couple of different clients, the ingredients that
7  could have use in dietary supplement products.
8     Q.  Are you able to disclose what those
9  ingredients are or what the over the -- what the
10  consumer product is?
11     A.  Again, I have -- all my regulatory work, I
12  sign NDAs.  So I can tell you generally that they
13  are ingredients to be used in foods that are being
14  made by new technologies as either alternative
15  proteins in the food supply or as cell-based meat
16  products.
17     Q.  Since August of 2021, have you advised any
18  client to make changes to a warning statement,
19  pursuant to 21 CFR 740.1?
20     A.  Since August of 2021, no, I have not.
21     Q.  Have you done any consulting outside of
22  litigation since August of 2021 on any chemicals
23  that are not related to food, consumer products, or
24  cosmetics?
25     A.  Yes.

Page 29

1     Q.  Are you able to -- what are you able to
2  identify, based on your consulting arrangements, as
3  far as those chemicals?
4     A.  I can tell you that they're ingredients,
5  either inerts or actives, for use in pesticides or
6  biocides.
7     Q.  Are you able to describe generally what
8  type of work you've done with regard to those
9  materials?
10     A.  Yes, I can tell you generally.
11     Q.  What can you tell me generally?
12     A.  So my issue has been looking at new
13  toxicology -- helping to design toxicology studies
14  to address questions that have been raised by
15  regulators about the safety of an active ingredient
16  to be used in a pesticide product.
17          And then doing a safety assessment
18  under the auspices -- or the regulatory framework of
19  FIFRA for inert ingredients to be used in several
20  biochemical pesticide products.
21     Q.  What kind of toxicology study are you
22  talking about?
23     A.  We've designed toxicology studies that are
24  whole animal reproductive developmental studies I've
25  helped design recently.  I've also designed in vitro

Page 30

1 studies to look at the mechanism of cancer
2 development due to inflammatory process in the
3 stomach.
4     Q.   Are you talking about an inflammatory
5 process in the stomach from the ingredient of the
6 pesticide itself?
7     A.   From the active ingredient, yes, exactly.
8     Q.   What route of exposure would lead to in --
9 are you talking about -- let me start over.
10          Are you talking about ingestion of the
11 material?
12     A.   Yes, oral -- oral exposure.  That's
13 correct.
14     Q.   Are you able to identify the companies
15 that you're working for?
16     A.   Again, I have NDAs.  I can tell you that
17 the product is used -- I can tell you generally what
18 the product is used for.  But generally, the product
19 is being used to control fungal development on
20 spices and nuts.
21     Q.   Are you able to identify the name of the
22 pesticide?
23     A.   I'm trying to think if anything is public
24 that I've done.  I -- yeah, I've done some public
25 testimony or public things.  I've worked for years

Page 31

1 on this project.  It's propylene oxide.
2     Q.   Have you done any other consulting work
3 with regard to a chemical that's not a food additive
4 or an ingredient to an over-the-counter or cosmetic
5 since summer of -- since August of 2021?
6     A.   Could you repeat that?  I thought I
7 just --
8     Q.   Have you done any other -- have you done
9 any other work with a chemical since August of 2021
10 besides what you just discussed?
11     A.   Well, yes.  I've done some other
12 consulting related to industrial chemicals, things
13 that are workplace exposures -- or potential for
14 workplace exposures.  I've done some consulting
15 related to drugs that are being developed as --
16 and -- and they -- that work was on active
17 ingredients.
18     Q.   We're just strictly limiting my question
19 to chemicals that are not related to a cosmetic or a
20 drug or a food additive.
21          Anything besides what you've already
22 provided to us since August of 2021?
23     A.   It would -- it would be some of the work
24 I've done with some of the industrial chemicals
25 related to workplace safety.

Page 32

1     Q.   Are you able to identify the industrial
2 chemicals?
3     A.   No.  Again, having -- I -- all of my work
4 has been under an NDA.  It's nonlitigation but is
5 under an NDA.
6     Q.   Are you able to identify the -- any of the
7 safety concerns, if any, that you're looking at for
8 those industrial chemicals?
9     A.   I can tell you generally.
10     Q.   Okay.  Thank you.
11     A.   Generally, we'd be looking at the
12 potential for a dermal exposure and what -- and
13 I'm -- my issues relate to pharmacokinetics, which
14 is one of my expertise, in looking at pathways of
15 dermal exposure and whether or not the chemicals are
16 ones that would potentially cross the skin at a high
17 enough dose in order to elicit an adverse effect.
18     Q.   Have you consulted outside of litigation
19 with regard to any talcum powder product since
20 August 2021?
21     A.   No.
22     Q.   Since August of 2021, have you done any
23 consulting work outside of litigation with regard to
24 any type of heavy metal?
25     A.   Yes.

Page 33

1     Q.   What type of heavy metal, if you can
2 identify it?
3     A.   Heavy metals that are typically screened
4 for use in food.
5     Q.   Are you able to --
6     A.   Well, heavily screened for and not allowed
7 for use in food -- to be found in food.
8     Q.   Are you able to identify the types of
9 heavy metals that you've worked on since
10 August 2021?
11     A.   Yes.
12     Q.   What are they?
13     A.   Lead, mercury, cadmium, and arsenic.
14     Q.   Since August of 2021, have you done any
15 consulting work outside of litigation with regard to
16 any fragrance?
17     A.   I don't believe so, no.
18     Q.   Since August of 2021, have you done any
19 consulting work outside of litigation with regard to
20 any type of asbestos?
21     A.   No.
22     Q.   Other than the safety assessment that you
23 talked about earlier, have you conducted any other
24 safety assessments or risk assessments on any
25 product since August of 2021 outside of litigation?

Laura Massey Plunkett, Ph.D.

Page 34

1    A.  Well, everything in my regulatory practice
2  deals -- has dealt with safety assessment in some
3  way.  So I think I've covered the general topics for
4  you already, the types of products that we look at
5  in our practice.
6          But that's why they -- clients have
7  come to us, two reasons.  Either they're looking at
8  regulatory strategies for emerging technologies with
9  new ways to look at safety, as well as regulatory
10  approval pathways.  Or new ways to test products in
11  order to prove that things are safe to eat, for
12  example, or safe for human exposure.
13    Q.  Have you done any consulting work for the
14  American Chemistry Council since the summer of 2021?
15    A.  2021, no, I have not.
16    Q.  Have you done any consulting work for any
17  trade group or manufacturing group since August
18  of 2021?
19    A.  Yes.
20    Q.  Are you able to identify those trade or
21  manufacturing groups?
22    A.  I can't give you the exact -- I -- through
23  the NDAs.  I can tell you they're in the -- their
24  trade groups are related to products in the food
25  space.

Page 35

1    Q.  With regard to the consulting work you've
2  done, have you described that for us today?
3    A.  I've tried to, yes.  I think so.
4    Q.  In other words, have we covered generally
5  the type of work you've done that would have been
6  for the trade or manufacturing groups?
7    A.  I think so.  To clarify for you, the work
8  that I've done for trade groups has usually been in
9  conjunction with companies that are regulated.  So
10  it's a -- kind of a cooperative work, looking, you
11  know, interacting with the trade organization as
12  well as the individual companies at the same time.
13    Q.  Since August 2021, have you been doing the
14  patent work that you had previously discussed with
15  us?
16    A.  Yes, I still do that as well.
17    Q.  For the same law firm, Licata & Tyrrell?
18    A.  Yes, I work with them still.  I now,
19  though, do it on a contract basis versus a -- I
20  don't take a salary like I used to.
21    Q.  You previously told us that you typically
22  were making about 50,000 a year with regard to this
23  patent work.
24          Has that been true since August 2021?
25    A.  That was true -- that would have been true

Page 36

1  up to June or -- of 2022 or so, middle of 2022.
2  Since then, I've gone to contract work only with
3  that -- with the law firm.
4    Q.  Has that increased or decreased the
5  approximate 50,000 a year you were making prior to
6  the contract agreement?
7    A.  It's decreased it because I don't -- I'm
8  not on call with them for -- all the time.  But I
9  do -- still do projects with them.  And then in
10  addition to that, in my -- my company, BioPolicy
11  Solutions, we work on patent issues but not
12  necessarily drafting patent applications.
13          We do due diligence and freedom to
14  operate sometimes for investors and some of the
15  small companies that are coming to us for advice.
16    Q.  Have you communicated with any regulatory
17  agency that is public on behalf of a company or
18  trade group since August 2021?
19    A.  Yes.
20    Q.  What communications have you done that are
21  public with any regulatory agency on behalf of a
22  company or a trade group since August 2021?
23    A.  So I need you to clarify.  I didn't hear
24  the word "public."  So there would probably be a
25  public listing of some of these companies having had

Page 37

1  a meeting, but the discussions were not public.
2          So what are you asking me?
3    Q.  I'm asking you:  What is it you're able to
4  disclose as far as any communications you've had
5  with a regulatory body or agency on behalf of a
6  company or a trade group since August 2021?
7    A.  So I can tell you that I have had -- I
8  have multiple -- I've had multiple interactions.
9  And I would say in the last two years since that
10  or -- well, I guess it hasn't been -- yeah, it has
11  over two years now -- routine interactions with my
12  clients in the emerging technology space with the
13  Food and Drug Administration, as well as with the
14  Singapore Food Agency, as well as at least one
15  interaction with the European Food Safety
16  Administration, and also Health Canada.
17    Q.  Have you submitted any testimony or
18  provided any testimony to any regulatory group or
19  body since August 2021?
20    A.  Not testimony submitted, no.  I have had
21  discussions, interactions, submitted documents,
22  represented my clients, act as -- as an agent for a
23  client to submit a GRAS notice, for example, to the
24  FDA.
25    Q.  With regard to your consulting work,

Laura Massey Plunkett, Ph.D.

Page 38

1  you've provided to us as part of the -- a part of
2  your second amended MDL report, a list of your
3  testimony.
4          Do you recall preparing that list?
5      A.  Yes.
6      Q.  I'm going to share my screen with you
7  and show you that list.  (Shared screen.)
8          Just let me know if you can see the
9  document I'm showing you on the screen?
10     A.  (Examined exhibit.)  I see it, yes.
11 It's -- I don't -- it's -- I see part of it.  It --
12 you'll have to scroll if you want to ask me about a
13 specific page, but yes.
14     Q.  Understood.
15         MR. HEGARTY:  I'm gonna mark as
16 Exhibit Number 1 this "List of Testimony for
17 Dr. Laura Plunkett" that was provided to us
18 yesterday.
19         (Exhibit 1 marked.)
20 BY MR. HEGARTY:
21     Q.  I'm gonna scroll down to the testimony
22 listed starting with the Guilbault and Plaisance
23 versus 505(b)(2) defendants' deposition in 2021.
24         Do you see that entry, Dr. Plunkett?
25     A.  I do, yes.

Page 39

1      Q.  First of all, before I ask you about that
2  case, does this document represent all of your
3  testimony for the last four years through today?
4      A.  Yes.  It's actually five -- I always --
5  for some reason I give you five years.  But, yes, it
6  does.
7      Q.  As to the Guilbault case, who were you
8  testifying for in that case?
9      A.  I was testifying on behalf of the
10 plaintiffs, the injured parties.
11     Q.  Where was that -- let me start over again.
12         Do you know where that case was filed?
13     A.  It's in -- it's in New Orleans.  I assume
14 federal court in New Orleans, yes.
15     Q.  Is there a product or substance involved
16 in that case?
17     A.  Yes, this is the -- the 505(b)(2) are NDA
18 holders for a generic version of Taxotere or
19 docetaxel.
20     Q.  Did your testimony in that case touch on
21 any of the issues set out in your second amended MDL
22 report?
23     A.  There is certainly in that -- in that
24 testimony, and I certainly did talk about
25 limitations of the FDA generally.  I think that's in

Page 40

1  my second amended report.  But it's regulated as a
2  prescription drug, so it's a different regulatory
3  oversight issue.
4          And it is not -- it did not deal -- it
5  does -- it deals with the active ingredient, not
6  with talc or asbestos or heavy metals or fibers,
7  none of that.  And it is not a cancer issue.  I'm
8  dealing with -- the safety issue has to do with
9  permanent hair loss in women being treated for
10 adjuvant care for breast cancer.
11     Q.  Next case, Kahn versus Sanofi Aventis.
12 That was trial testimony.  Where was that testimony?
13     A.  So that is the -- also in New Orleans.
14 This litigation for Taxotere, it has involved both
15 the 505(b)(2) and Sanofi, who is the original NDA
16 holder.
17     Q.  The next case listed is State of
18 New Mexico versus Bristol-Myers Squibb.
19         Where was that case pending, if you
20 know?
21     A.  So that one has been settled, as far as I
22 know.  It was in New Mexico.  I was working on
23 behalf of the State AG, and it's my understanding a
24 settlement was reached.
25     Q.  Did that case involve a product or

Page 41

1  substance?
2      A.  Yes -- oh, I'm sorry.  It involved the
3  drug Plavix, and it had to do with consumer fraud,
4  consumer marketing of the product, and failure to
5  disclose information to consumers.
6      Q.  Were you testifying on behalf of the
7  plaintiff in that case?
8      A.  On behalf of the State, that's correct.
9      Q.  The next case is Moneyham -- or Mooneyham
10 versus Bactolac.
11         Where was that case pending -- or
12 where is that case pending?
13     A.  So I don't know where it was pending.  I
14 believe it has settled, but I do -- I -- you know
15 what, I -- I'm not positive.  And it involved a --
16 it involves a improper manufacturing of a product --
17 a dietary supplement product that injured -- caused
18 liver injury in an individual.
19     Q.  You testified on behalf of the plaintiff
20 in that case?
21     A.  Yes, the injured party.
22     Q.  Was that an over-the-counter product?
23     A.  It's a dietary supplement product.  So
24 it's not a drug, but it -- it's a consumer product
25 that's sold directly consume -- to consumers.

Laura Massey Plunkett, Ph.D.

Page 42

1    Q.   The next case is Earnest case.  That's
2  another Taxotere case; is that correct?
3    A.   Yes, that's correct.
4    Q.   The next case is Valsartan -- I mean, I'm
5  sorry.  Valsartan MDL, 2021.  Were you testifying on
6  behalf of the plaintiff in that case?
7    A.   So this is 2023?
8    Q.   I'm sorry.  2023.
9    A.   Yes.  So, yes, there's two -- there are
10  two entries together.  So there was a continuation
11  of the deposition.  It didn't finish in January.  We
12  had to carry over.  But, yes, I was working -- I'm
13  working there on behalf of the injured parties and
14  the MDL.
15    Q.   That involved the product valsartan?
16    A.   Yes, the drug valsartan, yes.
17    Q.   The next case on this list, 2023 again, is
18  the Earnest case, another Taxotere deposition; is
19  that correct?
20    A.   It's the same -- it's a continuation.
21  There was an Earnest deposition before, I believe,
22  so we continued it.
23    Q.   (Scrolling.)
24    A.   There you go, yes.
25    Q.   The next case listed is Norwood versus

Page 43

1  Albertson's, Inc.  Do you know where that case is
2  pending?
3    A.   Yes.  It's pending in Lake Charles,
4  Louisiana.  It's supposed to go to trial next year,
5  and I'm working on behalf of an injured party where
6  there was improper filling of a prescription related
7  to a drug and led to an overdose.
8    Q.   What drug did that involve?
9    A.   Levaquin, levofloxacin, a fluoroquinolone
10  drug.
11    Q.   The next case listed is Jackson versus
12  Bayer HealthCare Pharmaceuticals, Inc.  Where is
13  that case pending?
14    A.   It's in Florida in federal court.
15    Q.   What substance or product is involved in
16  that matter?
17    A.   So it involves multiple fluoroquinolone
18  drugs, both ciprofloxacin and levofloxacin.
19    Q.   Are you testifying on behalf of the
20  plaintiff in that case?
21    A.   Yes, the gentleman who was injured.
22    Q.   Next case is State of Hawaii versus
23  Bristol-Myers Squibb listing a deposition in
24  August 2023.  Where is that case pending?
25    A.   So that case has -- the trial happened

Page 44

1  already in October, I guess.  There it is down --
2  just down below.  So those -- we're waiting -- it's
3  a bench trial, so we're waiting on the judge's
4  decision.  And I was working on behalf of the State
5  of Hawaii.  Again, this is Plavix and a consumer
6  fraud issue in Hawaii.
7    Q.   Was that in state court in Hawaii?
8    A.   Yes.  It's -- yeah, it's in state court.
9  That's correct.
10    Q.   The next case -- case is Blakely, et al.,
11  versus LifeCell, a deposition back in October 2023.
12  Where is that case pending, if you know?
13    A.   I don't know where that is pending, to
14  tell you the truth.  Sorry.
15    Q.   Does that case involve a product or a
16  substance?
17    A.   It involves a medical device.
18    Q.   What medical device?
19    A.   I believe this is one of the -- you know
20  what, I believe this is -- one of the mesh cases.
21  Yes, it is.  It's a -- it's a hernia mesh case.
22    Q.   Are you testifying on behalf of the
23  plaintiff in that case?
24    A.   Yes, another injured party.
25    Q.   The last case is the Mississippi AG case,

Page 45

1  which we've mentioned already.
2       Do you -- have you -- do have any
3  other depositions that you've given, or have you
4  given any other testimony since October 24, 2023,
5  besides today?
6    A.   No, this is my first deposition since
7  then.
8    Q.   Have there been any cases where you have
9  been identified, that is disclosed as an expert
10  witness, since August of 2021 where you've not
11  testified or been deposed?
12    A.   That you've not already gone through on
13  this list?
14    Q.   Yes.  You should be --
15    A.   Oh, I guess -- no, I have been deposed --
16  I'm sorry.
17    Q.   These would be cases where you've been
18  disclosed or identified as an expert since August
19  of 2021.
20       But you've not been deposed or
21  otherwise given testimony in any of those cases?
22    A.   Okay.  So the reason I ask that
23  question -- and I realize I wasn't clear.  On some
24  of these cases that you've just gone over, there's
25  multiple cases in the litigation.  And I don't know

Page 46

1 all the names of the cases, but I'm sure there's
2 some others that I've been disclosed for other
3 cases, for example, in the -- with -- against
4 LifeCell for the hernia mesh product.
5        As far as different products, I have
6 been disclosed publicly in the -- against the same
7 manufacturer for different cases. So LifeCell for
8 multiple because I have a couple of depositions that
9 are coming up.
10    Q. Any other cases where you've been
11 identified since August of 2021 where you've not
12 been deposed or testified besides what you've told
13 us already?
14    A. I don't know if I -- I have some other
15 things I've been working on, but I don't know. I
16 can't tell you that I've been identified publicly,
17 so I would say I can't answer that at this point.
18    Q. Other than the depositions you just said
19 you have coming up, do you have any other
20 depositions scheduled in 2023 or 2024?
21    A. I am sure I will, but right now, the only
22 other things I have scheduled is I have -- as I
23 mentioned, I know that there's a trial coming up in
24 the Norwood case. And I believe there's some trials
25 coming up in talc.

Page 47

1    Q. Have you attended any meetings of any
2 professional organizations in 2023?
3    A. Yes.
4    Q. What professional organizations' meetings
5 have you attended in 2023?
6    A. The Society of Toxicology black -- back in
7 March of 2023. That should be in my new CV that I
8 believe I had that -- a poster or something there.
9 I need to look.
10        And then I've attended the -- a
11 cultured meat symposium about two months ago. I
12 went to SynBioBeta which is a meeting -- a
13 scientific meeting related to alternative proteins.
14        And I've attended -- I attended via
15 Zoom to a couple of sessions at the American
16 Association of Scientists, AAS, last spring.
17    Q. Have you presented at any professional
18 organization meetings since August of 2021?
19    A. Everything I've done would be listed in my
20 CV. So it would be best to go to there if you want
21 to find those to so -- to get a complete list.
22    Q. We'll go ahead and look at your CV. I'll
23 share my screen with you. (Shared screen.)
24        Please let me know if you can see the
25 CV shown on your screen.

Page 48

1    A. (Examined exhibit.) I can.
2        MR. HEGARTY: And I'll mark this CV as
3 Exhibit Number 2 for today's deposition.
4        (Exhibit 2 marked.)
5 BY MR. HEGARTY:
6    Q. (Scrolling.) This is the CV we were
7 provided last night.
8        Is this a current copy of your
9 curriculum vitae?
10    A. It is.
11    Q. Since August of 2021, have you developed
12 any new area of expertise?
13    A. I don't know quite how to answer that. I
14 had done research in some new areas, but I don't
15 know that -- I mean, my expertise remains the same
16 in terms of pharmacology, toxicology,
17 pharmacokinetics, regulation of products by the Food
18 and Drug Administration, regulation of food.
19        What are you asking, I guess?
20    Q. Well, have you developed any expertise
21 that is new to you, outside of studying a particular
22 product, that you did not have as of August 2021?
23    A. No, I don't think I have -- have done
24 any -- I have -- for example, I haven't -- I haven't
25 taken any courses that introduce me to a new topic

Page 49

1 generally that I haven't already covered before. I
2 haven't gotten any new certifications, those kinds
3 of things.
4    Q. That was gonna be my next more specific
5 question.
6        Do you have any certifications or
7 titles today that you didn't have back in August
8 2021?
9    A. No, I do not.
10    Q. Have you gone -- undergone any formal
11 training in any subject area since August 2021?
12    A. If by "formal training" you include
13 webinars that I have -- that I do in order to
14 maintain my toxicological certification, yes, I
15 have. I'm required to undertake educational courses
16 through the scientific meeting, the annual meeting,
17 and/or online in order to maintain my D.A.B.T. and I
18 have done that every year.
19    Q. Do you currently have any -- any
20 publications in the works, that is, planned
21 publications?
22    A. Yes.
23    Q. What planned publications do you have in
24 the works that would go under the section in your --
25 in your CV we're looking at called publications?

Page 50

1    A.  Yes, my peer-reviewed articles.  I have a
2  paper that my business partner and I are writing
3  right now we plan to submit, I think, to Nature Food
4  on the intersection of regulation, policy, and
5  science for emerging technologies.
6    Q.  Do you currently have plans as far as what
7  publication you're gonna submit that to?
8    A.  I said we were -- we're -- we would like
9  to get it into the journal Nature Food.
10    Q.  I'm sorry.  I misheard that.
11        When do you plan on submitting that
12  publication?
13    A.  Well, it -- I'm trying to light a fire
14  under my business partner.  We have to get it
15  submitted by February.
16    Q.  Do you have any other publications in the
17  works?
18    A.  That's the only one that's in the works
19  right now.
20    Q.  Do you have any presentations that you
21  know you're going to give in 2004 --
22    A.  Yes.
23    Q.  -- that are already scheduled?
24    A.  Yes.
25    Q.  What presentations do you have scheduled

Page 51

1  for 2024?
2    A.  I have two scheduled at the Society of the
3  Toxicology meeting in Salt Lake City in March.
4    Q.  What are those two presentations?
5    A.  I'm speaking to two different topics.  One
6  I'm speaking to -- there's a workshop where I'm
7  moderating and speaking on disparities in ethnicity
8  and gender in the -- in science.  And I'm speaking
9  to my experience as a woman in science and in
10  toxicology on some of the challenges in the area of
11  professional development.
12        And we also have speak -- we have a
13  Native American, a woman speaking.  We have a
14  consumer advocate that's speaking.  We have a person
15  who deals with research in the area of consumer
16  perception.
17        And then I have a second symposium I'm
18  speaking at.  And that one, I'm talking about my
19  work that I do in the area of forensic toxicology
20  with drugs of abuse; and particularly cannabis and
21  alcohol.
22        And I'll be speaking on the
23  pharmacokinetic challenges and the issue of
24  correlating impairment with measured levels of
25  different drugs.  And particularly, I'm gonna focus

Page 52

1  on -- in samples taken in autopsy.
2    Q.  Your CV lists three abstracts that are
3  2021 through today.
4        With regard to the first abstract,
5  lead author Woodall, what did that abstract concern?
6    A.  So George Woodall is -- all of these
7  individuals that are listed here where I'm listed
8  with, we're all been former members of the risk
9  assessment, specialty section executive committee.
10        I was president several years ago, and
11  we put together a training course called the Risk
12  Assessment Syllabus.  And so this -- at the annual
13  meeting, we were -- put together a presentation to
14  outline the topics we've covered, what topics we've
15  planned to cover, and described sort of the -- our
16  experience based upon the information we've gained
17  from the trainees.
18        We -- these webinars are trying to
19  provide additional scientific expertise to graduate
20  students and post-docs in the area of risk
21  assessment.
22    Q.  And do you have a copy of the abstract?
23    A.  I probably do, yes.
24    Q.  Did you prepare any type of PowerPoint or
25  other formal presentation in connection with that

Page 53

1  abstract?
2    A.  I'm sorry.  We had a poster that we put
3  together.  I may have a copy.  I'm not sure.
4    Q.  Other than the abstract and perhaps the
5  poster, do you have any other written materials
6  related to Abstract Number 1 in your CV?
7    A.  That would be all there would be.
8    Q.  Do the other two abstracts have something
9  to do with cannabis?
10    A.  Yes.  And now these were all before our
11  last deposition in August of --
12    Q.  Okay.
13    A.  -- yeah.  So -- but yes.
14    Q.  Good point.  Your CV also lists -- and I
15  scrolled down -- (scrolling) book chapters -- book
16  chapters since August of 2021.  Those all relate to
17  defending pesticides in litigation, or at least --
18  I'm sorry.  2 and 3 refer to that.
19        With regard to that book, is that an
20  update of the previous versions of those books -- of
21  that book?  I'm sorry.
22    A.  Yes.  Every year, I try to revamp -- I
23  have, like, ten chapters that I edit.  And every
24  year, I try to update and revamp several of them.
25  It's a big effort, so I don't do all ten every year.

Page 54

1 But yes, the 2024 version that will be coming out --
2 it's not out yet. That's why I didn't list it --
3 will have -- I updated that in 2023. And then for
4 2023 version, I update that in 2022, yes.
5    Q. Do you have one other book chapter listed
6 here? Do you have any other book chapters in the
7 works besides the "Defending Pesticides in
8 Litigation" 2024 version?
9    A. No. And the 2024 version is no longer in
10 process. It's -- I mean, I've completed my work.
11 It just won't come out until 2024.
12    Q. Okay. I gotcha. Thank you.
13        Since August of 2021, have you given any
14 presentations to any group where talcum powder
15 or talc was discussed?
16    A. No.
17    Q. Since August 2021, have you given any
18 presentation to any group where any of the following
19 subjects were discussed: ovarian cancer, asbestos,
20 heavy metals, silica, or fragrances?
21    A. Heavy metals, yes. The others, no.
22    Q. What presentation have you given since
23 August 2021 where heavy metals were discussed?
24    A. So I just -- and I just realized it should
25 have been on the CV you just put up there. I gave a

Page 55

1 lecture in the risk assessment course at NYU last
2 month, I guess in November, like three weeks ago.
3 And that should be on my CV. I apologize.
4        And there I talked -- I had some
5 published papers that I -- I gave a presentation.
6 It was mainly focusing on the regulation of
7 pesticides in the U.S. in the risk assessment
8 course.
9        But I had two papers, one of which --
10 that I discussed with the students, one of which was
11 talking about exposure and safety assessment and
12 had had a component of it related to heavy metals as
13 well.
14    Q. When you say "two papers," are you talking
15 about two published papers?
16    A. Yes. So in this course, I'm asked to give
17 a didactic lecture for about 20, 25 minutes. And
18 then their -- the idea is for these grad students to
19 teach them analytical skills in reviewing published
20 toxicology articles or risk assessment articles.
21        So I chose two, and those two papers I
22 discussed with them. One of them had information
23 about heavy metals in it as far as risk assessment
24 and exposure of individuals and the harm that it
25 could cause. It was not the focus of the paper, but

Page 56

1 it was in the paper.
2    Q. Do you recall the last name of the lead
3 authors and the year of those two papers?
4    A. No. I'd have to get those -- pull those
5 back out. I don't recall.
6    Q. Do you still have copies of them?
7    A. Yes, I do.
8    Q. Did you prepare any written materials for
9 this lecture at NYU?
10    A. PowerPoint, yes.
11    Q. Do you still have the PowerPoint?
12    A. Yes, I do.
13    Q. What heavy metals did you discuss at this
14 presentation?
15    A. I don't know that I -- I don't think I
16 went into the toxicology of any particular one.
17 Again, it was a discussion in the paper about heavy
18 metal exposure being relevant, as well as pesticide
19 exposure for some of the injuries.
20        It was an issue related to human
21 exposure through -- through the environmental
22 pathways to -- when things -- pesticides have been
23 placed historically. So arsenical pesticides, for
24 example, I think were mentioned. And then that's --
25 I'm trying to remember was anything else mentioned.

Page 57

1        But there have been problems in the
2 past with -- in soil that arsenic remains around and
3 can -- if you plant a crop in a -- in a place where
4 arsenic is in the soil, you can end up with
5 either -- arsenic either in the plants, but you also
6 have a groundwater contamination potential issue.
7        We don't use these lead, arsenical
8 pesticides anymore, but historically, they've been
9 used worldwide. And they were used very recently in
10 developing countries. And then that's -- I think
11 the paper was about Pakistan.
12        So a developing country where even
13 though we banned those things here in the U.S.,
14 there are still people around the world that it can
15 be exposed to those things.
16    Q. And since August 2021, have you discussed
17 your opinions in talcum powder cases with any
18 colleagues or groups that are not involved in the
19 talcum powder litigation?
20    A. Only my business partner. She and I may
21 have a conversation about it generally. But it's --
22 there's been -- she doesn't have input to my
23 reports.
24    Q. Since August 2021, have you communicated
25 with anyone outside of plaintiffs' counsel and

Page 58

1  perhaps your partner concerning any of the -- any of
2  the opinions you intend to offer in this case?
3      A.  No.
4      Q.  Since August 2021, have you communicated
5  with FDA about your opinions concerning talcum
6  powder products?
7      A.  No, not since August of 2021.
8      Q.  Since August 2021, have you communicated
9  with Health Canada or any other foreign regulatory
10  authority about talcum powder?
11      A.  No, I have not.
12      Q.  Since August 2021, have you communicated
13  with any scientific group or body regarding your
14  opinions in this case?
15      A.  No, I have not.
16      Q.  Since August 2021, has any regulatory
17  authority or scientific body reached out to you
18  about your opinions with regard to talcum powder
19  products?
20      A.  No.
21      Q.  Have you contacted any medical
22  organization or society about your opinions in this
23  case since August 2021?
24      A.  I have not.
25      Q.  Has FDA or any regulatory authority

Page 59

1  reached out to you about talc or talcum powder
2  products since August 2021?
3      A.  No, they have not.
4      Q.  Has any medical society, group, or
5  organization reached out to you about talcum powder
6  or ovarian cancer since August of 2021?
7      A.  No.
8      Q.  Since August of 2021, have you become
9  aware of any scientific or medical group or medical
10  or scientific entity or organization who has made
11  the statement that talcum powder use can cause
12  ovarian cancer?
13      A.  I don't know.  I'd have to look at my --
14  whether there were any exhibits or documents that
15  came up at trials.  I don't -- I don't recall.  I
16  haven't done any type of a -- of a search since
17  August of 2021 to look for such.
18      Q.  Since August 2021, have you become aware
19  of any regulatory authority who has stated that talc
20  can cause ovarian cancer or increases the risk of
21  ovarian cancer?  So this would be new statements by
22  regulatory authorities about talcum powder and
23  ovarian cancer?
24      A.  So the Health Canada, I don't know whether
25  that -- the Health Canada assessment came out before

Page 60

1  the -- I think after that or before that?
2          So the -- in my second amended report,
3  I think that's why I highlighted the Canadian
4  statements about this issue.  That's what I would
5  point to right now.
6      Q.  Since August of 2021, have you become
7  aware of any -- a regulatory authority who was
8  required warnings on talcum powder products with
9  regard to ovarian cancer?
10      A.  Well, they can't do that in the U.S.  So
11  other than that, I would say that in Canada, they
12  have -- have added information on their website
13  about warnings about the product.  So outside of
14  Canada, that's all I would point you to.
15      Q.  Since your last MDL deposition in
16  August 2021, have you had any interaction with EPA
17  with regard to talcum powder?
18      A.  No, not directly with EPA.  I have not.
19      Q.  Have you had any interaction since
20  August 2021 with EPA regarding asbestos?
21      A.  No, I have not.  That did not come up in
22  my interactions.
23      Q.  Since August of 2021, have you nominated
24  yourself or been nominated to any EPA committee?
25      A.  No, I have not.

Page 61

1      Q.  Since August of 2021, have you nominated
2  yourself or been nominated for any other group or
3  entity's committees?
4      A.  Yes.
5      Q.  What other group or entity's committees
6  have you been nominated for or nominated yourself
7  for since August of 2021?
8      A.  Yeah, so I -- I have -- I ran for
9  specialty section executive committee in the
10  eagle -- the ethical, legal, and forensic specialty
11  section at SOT, and I'm on that.  I have --
12          THE COURT REPORTER:  I'm sorry.
13  Doctor, I'm sorry.  I had some break up in that
14  answer there.  I want it to be clear.  Do you mind
15  repeating your answer, please.
16      A.  The -- the committee is -- I -- I ran for
17  and was -- I'm on the executive committee for the --
18  SOT specialty section called -- I'll just give you
19  the acronym.  It's easier.  ELFSI.  And I'm a
20  counselor to that.
21          I have been -- I have volunteered and,
22  I believe, been nominated for a different position
23  on that same executive committee when my term runs
24  up this year for the VP-elect position within that
25  different committee.

Laura Massey Plunkett, Ph.D.

Page 62

1    I was appointed to the subcommittee
2  within the risk assessment specialty section at SOT
3  dealing with this risk assessment webinar.  That's
4  an ongoing appointment since 2021.  So most of my
5  work on committees that I have been appointed to
6  would be within my professional societies and mostly
7  within the SOT.
8  BY MR. HEGARTY:
9    Q.  Have you spoken to any expert in this
10 case, that is the MDL litigation, regarding their
11 disclosure or testimony in the MDL since August
12 of 2021.
13   A.  I don't think so, no.
14   Q.  Since August 2021, have you reviewed any
15 other expert's amended or supplemental MDL reports?
16   A.  If it's -- if I have, it would be listed
17 in my Appendix C, so I can't know.  And actually,
18 let me say one thing.  I -- in the answer to the
19 question before.
20      I did attend a trial after August
21 of 2021 in the talc litigation, and I would have had
22 conversations with any other experts that were there
23 at the time.  And I don't recall if anybody was.
24 That's all I would say to you.
25      It would not have been about my

Page 63

1  specific testimony necessarily, but sometimes I
2  overlap with an expert, and I would have had
3  conversations generally with them.
4    Q.  Was that a talcum powder trial of this
5  year?
6    A.  No.  You said since August of 2021.  And
7  there was a September -- I was at a trial in
8  September of 2021 after my MDL deposition.  I want
9  to say it was in -- I don't -- was it -- in
10 St. Louis.  It was the St. Louis trial.
11   Q.  And my question was specifically if you
12 talked with any other MDL expert about any
13 amendments they had made to their MDL reports since
14 August of 2021.
15   A.  No, I would not have done that.  But I
16 don't -- again, I don't know whether these experts
17 that overlap, I think they may be MDL experts, so I
18 just wanted to be clear that when I'm at a trial,
19 sometimes I might have a conversation with an expert
20 if we overlap.
21   Q.  Since August of 2021, other than your own
22 testimony, have you reviewed any of the testimony of
23 any other witness in talcum powder cases?  That is,
24 reviewed for the first time?
25   A.  (Zoom frozen.)

Page 64

1    Q.  Oh, I'm seeing a frozen screen.
2      THE COURT REPORTER:  Correct.
3      Ted, can you hear us?
4      MR. HEGARTY:  Looks like they're all
5  frozen.
6      THE COURT REPORTER:  Ted, he can't --
7  yeah, he can't hear us because she's frozen.
8      Let's just wave at Ted.
9      Ted?  Hello?
10     MR. HEGARTY:  Let's go off the record.
11     THE COURT REPORTER:  We're going off
12 the record at 10:18 a.m.
13     (A recess was taken from 10:18 a.m. to
14     10:19 a.m.)
15     THE COURT REPORTER:  Back on the
16 record at 10:19 a.m.
17     MR. HEGARTY:  So let's go back on the
18 record.
19 BY MR. HEGARTY:
20   Q.  I believe I'd asked you at the time that
21 your screen froze whether you have reviewed any
22 other witness's testimony since August 2021 besides
23 yourself for purposes -- and to be more specific --
24 of preparing your MDL second amended report.
25   A.  Again, I -- I would say to you if I have,

Page 65

1  it would be in Appendix C listed for you.  I don't
2  think any of those fit.  I have think they're all
3  older than August of 2021.
4    Q.  Since August 2021, have you either spoken
5  to or done any work specific to the plaintiffs whose
6  case is in the MDL are being worked up for potential
7  trial?
8    A.  No, because I'm not case specific.  So I
9  don't know who those would be.
10   Q.  With regard to your second amended MDL
11 report, were you asked to do anything different in
12 updating that report than you had been asked to do
13 with regard to your prior reports?
14   A.  I don't believe so, no.
15   Q.  With regard to any additional medical or
16 scientific literature or research you did to prepare
17 your second amended supplemental report, can you
18 describe what you did?
19   A.  Yes.  So some of the research had been --
20 some of the articles that are added to my report, I
21 actually had -- I may have collected before I
22 drafted the MDL report.  Some of it was collected
23 after I began that work in the first -- right after
24 my -- I guess the -- the first of November.  I think
25 the billing reflects that around the first of

Page 66

1 November when I started.
2         So literature searches to look for
3 anything new related to the FDA website related to
4 talc or cosmetic regulation, I did pull some of that
5 into my second amended report.
6         I also pulled in the EPA statement on
7 asbestos at that point looking at other regulatory
8 bodies that might have had something to say about
9 talc or its -- or the toxic constituents, such as
10 asbestos.
11         And then the literature itself, I
12 would have just done a general search on talc and
13 looked for scientific papers that related to these
14 issues that I -- that I cover, which it has to do
15 with the hazard of talc or its constituents.
16         Any studies that may additionally have
17 been done, I pulled in an additional review article
18 on the role of inflammation in ovarian cancer
19 because I had a string of cites related to that. So
20 I pulled a more recent one in.
21         So that's mainly what I did in order
22 to prepare the report. It -- the -- there were -- I
23 don't think I've cited any new non -- nothing new
24 nonpublic. There are no new -- I don't think. I
25 think it's mainly new public sources. As a -- for

Page 67

1 example, the press releases by J&J and the -- the
2 testing that had been done since August of 2021 on
3 talc products.
4     Q.  And has plaintiff counsel, in this
5 litigation, provided you with any articles since
6 August of 2021?
7     A.  Yes. It's possible that they have sent
8 articles over time. Since then, I can't tell you
9 necessarily which one -- I think the Dyer article
10 actually was sent through plaintiffs' counsel.
11     Q.  Have you done any searching across company
12 documents produced in this -- in this litigation
13 since August of 2021?
14     A.  No, I have not. By myself, I have not.
15     Q.  You've provided as part of your second
16 amended MDL report a "Materials Considered" list; is
17 that correct?
18     A.  Yes, my -- what I call Appendix C, that's
19 correct.
20     Q.  I want to show you that appendix. (Shared
21 screen.) Please let me know if you can see
22 Appendix C on your screen.
23     A.  (Examined exhibit.) Yes, I can.
24         MR. HEGARTY: I'm gonna mark as
25 Exhibit Number 3 this appendix.

Page 68

1         (Exhibit 3 marked.)
2 BY MR. HEGARTY:
3     Q.  Generally what does this appendix
4 represent?
5     A.  It's a listing of documents that I have
6 reviewed in the case, some of which I have relied
7 upon and cited specifically in my reports. Others
8 of which I may have talked about specifically at
9 trial but not in the MDL report, for example, over
10 time. And different -- some of them are -- are
11 confidential documents, you notice the Bates
12 numbers. And then others are public documents and
13 published literature.
14     Q.  And what did you do to prepare for today's
15 deposition?
16     A.  So for that document, I did go and --
17     Q.  Now let me stop -- let me stop just -- let
18 me stop you there.
19     A.  Okay.
20     Q.  The question is a little bit different.
21         What did you do to prepare to come
22 today to testify? What materials did you look at?
23 What did you do to prepare?
24     A.  Okay. So I -- I read my report, and I
25 actually highlighted what was different in the new

Page 69

1 report, what language. So if you wanted to talk
2 about what's different, I can go right to it. I
3 know what language or words are different from my
4 August 20 -- no, I'm sorry, from my June 2021
5 report.
6         I did the same thing with Appendix C
7 to make it easy to know. That's why I was able to
8 give you a listing of exactly which documents I
9 brought, which were the ones that would be new
10 since 2021.
11         I re-reviewed those ones that were new
12 in that -- the literature articles that I already
13 dictated to you as well. And I gathered -- then I
14 gathered the things that were being asked for in the
15 subpoena notice. So I got my bills together that
16 were new, my new CV, my trial list. And then I had
17 a short meeting yesterday with counsel.
18     Q.  But who did you meet with yesterday in
19 that short meeting?
20     A.  Mr. Meadows mainly and Ms. Tucker. But
21 also Mr. Tisi was here and Mr. Beattie was here.
22     Q.  How long was that meeting?
23     A.  Probably two and a half to three hours.
24     Q.  Was that the only meeting that you would
25 characterize with plaintiffs' counsel as being in

Laura Massey Plunkett, Ph.D.

Page 70

1 preparation for today's deposition?
2     A.   Yes, and I should also say actually two
3 other attorneys Zoomed in.  I don't want to leave
4 them out.  Ms. O'Dell and Ms. Parfitt and Mr. Green
5 were also -- joined for a part of the time.  They
6 weren't here the whole time, but they did Zoom in
7 for an hour or so.
8     Q.   We talked earlier about the -- the
9 invoices that were provided, and I'll share my
10 screen with you with regard to those invoices.
11 (Shared screen.)  Please let me know if you can see
12 the invoices shown on my screen.
13     A.   (Examined exhibit.)  I do.
14         MR. HEGARTY:  I'm gonna mark the
15 entirety of the invoices provided -- there were
16 six -- as Exhibit Number 4.
17         (Exhibit 4 marked.)
18 BY MR. HEGARTY:
19     Q.   This is one invoice that is dated
20 October 2023.
21         And as you note in the invoice, it
22 concerns the Mississippi AG case; is that correct?
23     A.   Yes, this was the time preparing for the
24 deposition -- or actually, this was -- may have been
25 the deposition.  I -- you need to go down further.

Page 71

1 And there may be another one.  There may have been
2 two of these.
3     Q.   As far as the invoices that were provided,
4 they included the Mississippi AG case, two of them.
5 One MDL invoice, an invoice for the Cadagin case, an
6 invoice for the Giese case, an invoice for the
7 Kleiner case.
8         Are you aware of any other invoices
9 that you generated and submitted in connection with
10 your talcum powder casework since August of 2021
11 besides those?
12     A.   No, I'm not.  I -- we did a search of my
13 billing system and pulled out anything that was --
14 that was dated after that.
15     Q.   Have you been paid for all the amounts in
16 those invoices?
17     A.   Yes.
18         MR. HEGARTY:  The next document I'm
19 going to show you, which I'll mark as Exhibit
20 Number 5, is your November 15, 2023, MDL report.
21 (Shared screen.)
22         (Exhibit 5 marked.)
23 BY MR. HEGARTY:
24     Q.   Please let me know if you can see the
25 document on my screen.

Page 72

1     A.   (Examined exhibit.)  I do, but to confirm
2 what it is, I need to go a little further.
3     Q.   (Scrolling.)
4     A.   There.  Yes, that is it.  That's correct.
5     Q.   This is an update to your June 2021 MDL;
6 is that correct?
7     A.   Yes, that's correct.
8     Q.   Have you prepared any other reports for
9 any talc case different from your November 15, 2023,
10 report since August of 2021?
11     A.   No.
12     Q.   Have you changed or modified any of your
13 ultimate opinions from your June 2021 report?
14     A.   No.
15     Q.   You have testified several times that
16 you're not providing a causation opinion in this MDL
17 litigation.
18         Do you recall that?
19     A.   Yes.
20     Q.   Is that still true?
21     A.   Yes.
22     Q.   Do you intend to testify, as you have in
23 the -- in the past, that exposure to talc after
24 genital dusting increases the risk of ovarian
25 cancer?

Page 73

1     A.   Yes, I could if asked that question.  Yes.
2     Q.   Has this opinion changed or -- or been
3 modified since August of 2021?
4     A.   Not in terms of the opinions.  Certainly,
5 there's some additional documents that I believe
6 support that opinion.  But, no, the opinion is the
7 same.
8     Q.   We discussed at your August 2021
9 deposition, your review of Johnson & Johnson's
10 comprehensive review document.
11         Do you recall that?
12     A.   No, I don't recall that.  But I know that
13 there is such a document.  But I don't recall that
14 discussion.
15     Q.   Since August of 2021, have you formed any
16 additional opinions with regard to the Johnson &
17 Johnson comprehensive review document?
18     A.   No, because I don't believe I've looked at
19 it.  So it's --
20     Q.   Since August of 2021 -- I'm sorry.  I
21 didn't mean to interrupt.
22     A.   I -- I don't -- yeah, it's okay.  I don't
23 believe I've looked at it since.  If you've shared
24 it with me, that'd be the last time I would have
25 looked at it.

Page 74

1  Q.  Have you looked at any testimony by
2  Dr. Kuffner since August of 2021?
3  A.  No, I don't believe so, unless it's in my
4  Appendix C.  But I don't recall that, no.
5  Q.  We also discussed at your August 2021
6  deposition the 2020 Mandarino -- or I'm sorry,
7  Mandarino study.
8  Do you recall that?
9  A.  I do recall a study.  I don't recall you
10 and I talking about it.  But I do recall there is
11 such a study, yes.
12 Q.  Okay.  Are you able to recall -- or strike
13 that.
14 Do you have any additional opinions
15 you've developed concerning the Mandarino study
16 since August of 2021?
17 A.  No.  If a -- if I had, I believe I -- if I
18 had, I would have put that into my second amended
19 report.
20 Q.  We also discussed at your August 2021
21 deposition the 2019 Harper, Saed study.
22 Do you recall that?
23 A.  I don't really recall a specific
24 discussion.  I am aware of a -- of the 2019 Harper
25 and Saed that I -- then became a paper that I now

Page 75

1  have discussed a little bit in my report, which is
2  Harper, et al.  Saed is the final author -- 2023.
3  At least that's my understanding.
4  Q.  Outside of what you have in your current
5  report, do you have any other opinions with regard
6  to the 2019 Harper, Saed study?
7  A.  Unless -- unless I expressed them to -- I
8  can't think of her last name -- Jessica ... the
9  attorney who --
10 Q.  The attorney --
11 A.  Yes, who took my -- took my deposition
12 back in October.  She might have asked me questions
13 about that, so I'd refer you to that deposition
14 testimony, if I said anything.  But certainly, I
15 haven't added anything to my -- I think my MDL
16 report about those specific things.
17 Q.  Are there any opinions you have formed
18 with regard to Johnson's Baby Powder or talcum
19 powder that you intend to testify that are not
20 contained in your November 15, 2023, second amended
21 report?
22 A.  General areas, probably no, but I would --
23 it's my understanding that you're aware that I would
24 be relying upon and point you to any of the
25 testimony I have given.  In other words, any of the

Page 76

1  depositions or trial testimony I have given in
2  this -- in these cases.
3  So I'd say all of that, plus what is
4  in my report.  But I do believe this second amended
5  report covers all the general areas that I would be
6  prepared to discuss.
7  MR. HEGARTY:  If we can go off the
8  record; let's take a break, about five minutes or
9  so.
10 Does that sound all right for
11 everybody?
12 MR. MEADOWS:  Yeah, that's fine with
13 me.
14 THE COURT REPORTER:  All right.  We're
15 off the record at 10:34 a.m.
16 (A recess was taken from 10:34 a.m. to
17 10:44 a.m.)
18 THE COURT REPORTER:  We're back on the
19 record at 10:44 a.m.
20 BY MR. HEGARTY:
21 Q.  Dr. Plunkett, I want to walk through the
22 amendments to your -- at least many of the
23 amendments to your second amended expert report.
24 You indicate you have that with you;
25 is that correct?

Page 77

1  A.  Yes, I have the version.  And I -- and
2  like I said, the version I have I've marked --
3  highlighted in yellow what was different, so ...
4  Q.  And I'd previously designated that second
5  amended expert report as Exhibit Number 5.
6  Would you please turn to paragraph 18
7  to start?
8  A.  (Complied.)  Yes, I'm there.
9  Q.  You added a line at the end of that
10 paragraph that says, "This is true despite recent
11 changes to cosmetic law in 2022 (the Modernization
12 of Cosmetics Regulation Act of 2022 known as
13 MoCRA)."
14 Why did you add that reference at the
15 end of paragraph 18?
16 A.  Because I wanted to update so that
17 everyone understood that I'm aware of the fact that
18 there have been changes to the law that have
19 occurred since August of 2021.  And what was
20 important -- the reason I say, "This is true
21 despite," it's the issue that -- if you go and look
22 at those changes and I think I talk about this a
23 little later as well -- there's still -- it's still
24 the responsibility of the company, not the FDA, to
25 substantiate safety.

Page 78

1  There is no preapproval of a cosmetic
2  and cosmetic ingredients, even with the changes in
3  the law.
4  Q.  You may have just answered my next
5  question, but what comments do you have about these
6  changes that are pertinent to your opinions in this
7  case?
8  And, again, you may have just answered
9  it, but please let me know if there's anything else
10 pertinent to your opinions as it relates to these
11 amendments besides what you just told me.
12 A.  I think -- what I just said is my most
13 important observation by the law.  I would also
14 point out, however, unfortunately, even as of today,
15 the -- the provisions of the law, other than the
16 facility registration, have not really been mandated
17 or implemented.
18 So this is a work in progress, even
19 though it passed in 2022.  And I think if you
20 look -- go to the FDA website, they've even put off
21 implementation of this law until 2025.
22 Q.  Do these amendments, when enacted and put
23 in place, give FDA authority different from or in
24 addition to what it already has?
25 A.  Gave them some additional authority in

Page 79

1  terms of what they can require but not with the
2  issue of preapproval or of safety assessment.  But
3  yes, for example, they now have different recall
4  authority.  That's an example.
5  Q.  Please turn next to paragraph 21.
6  A.  (Complied.)  Okay.
7  Q.  You have added in this paragraph that with
8  regard to a manufacturer's "duty to conduct whatever
9  testing necessary to ensure the safety of their
10 product and ingredients."  The last line that reads,
11 "This has been confirmed in recent FDA statements as
12 well."
13 Do you see that?
14 A.  I do not have that highlighted, so where
15 are you?  I need to find that.  I apologize.
16 Q.  I'm at the end.
17 A.  Ah.  I -- yeah.  I see it now.  I'm sorry.
18 Yeah, with Footnote 14?
19 Q.  Yes.  And that is new to -- to your
20 report; is that correct?
21 A.  Yes, because I'm referring to the issues
22 related to the new law.
23 Q.  And when you say "the issues related to
24 the new -- new law" -- or let me just start over
25 again.

Page 80

1  What recent FDA statements are you
2  referring to?
3  A.  So if you go to this footnote where
4  that -- it's the page where they're talking about
5  the new law, they make the very specific statement
6  that even with the changes in the law, manufacturers
7  have a duty to not only establish safety, but to
8  conduct testing that is necessary to ensure safety.
9  So that page, that web page, has that
10 very specific information, and this is no different
11 than my original report.  That was my opinion.  That
12 was the way it was, even before the changes to
13 the -- the law -- the regulations haven't been
14 codified -- but the changes to the law in 2022.
15 Q.  Since August of 2021, have you kept
16 yourself up to date as far as what FDA has put on
17 its website concerning talcum powder products?
18 A.  Yes, I have tried to do that over time.
19 Q.  The FDA's website with regard to talcum
20 powder products, those comment on FDA's findings
21 with regard to the safety of talcum powder products;
22 is that correct?
23 A.  You'll need to show me what you're
24 pointing to.  They do talk about safety, but if you
25 have a specific statement, you'll need to point me

Page 81

1  to it.
2  Q.  Okay.  Let me share my screen with you.
3  (Shared screen.)  Please let me know if you can see
4  what I'm showing you on my screen.
5  A.  (Examined screen.)  I do see that, yes.
6  Q.  You're familiar with this web page we're
7  looking at, which is the FDA's website on talc?
8  A.  Yes.  This was as of -- this was the
9  content that -- they haven't updated it since, I
10 believe, this date, which I think they list as
11 December 2022.
12 Q.  Scrolling down in this part of FDA's
13 website (scrolling), it does make reference to
14 talcum powder and ovarian cancer, correct?
15 A.  Somewhere I believe it does, yes.
16 Q.  In particular, this website says that as
17 of December 7, 2022, "Published scientific
18 literature going back to the 1960s has suggested a
19 possible association between the use of powders
20 containing talc in the genital area and the
21 incidence of ovarian cancer.  However, these studies
22 have not conclusively demonstrated such a link, or
23 if such a link existed, what risk factors might be
24 involved."
25 Do you see where I'm reading?

Page 82

1    A.  I have -- I see that you have read that,
2  yes.
3    Q.  And is this -- you have seen this
4  statement before today, right?
5    A.  Yes, I've seen this statement before.  And
6  I would point to you that the statement by FDA is
7  consistent with my opinion when they mentioned
8  possible association and why there should have been
9  a warning on the product.
10    Q.  So do you agree with this statement?  That
11  is, the statement I just read?
12    A.  I don't agree or disagree with this
13  statement.  It is FDA's statement.  I'm not the
14  causation expert.  Others are addressing the issues
15  related to the strength of the evidence.  But as
16  I -- what I would use the statement for is -- I just
17  told you.  Is that it's -- when they describe it as
18  a "possible association," that is the warning --
19  that is the standard for adding a warning that a
20  company is supposed to comply with.
21    Q.  Do you make a reference anywhere in your
22  second amended MDL report to this FDA statement?
23    A.  No, although I do have in my reliance
24  materials things found at the FDA website, which
25  would -- this would be one of them.

Page 83

1    Q.  Well, under your methodology for your
2  opinions in this latest report, did you consider or
3  factor into your opinions this statement?
4    A.  From the -- from the -- what that I did,
5  yes, as I just said to you.  It is confirming the
6  issue of the fact that there's a recognition of
7  the -- of what FDA even has stated about the
8  relationship.
9         And I'm saying to you it's
10  consistent -- as I have stated, that's consistent
11  with the FDA standard for warnings.  However, I'm
12  not a causation expert.  So I think you should talk
13  to others to discuss whether or not they believe
14  that that is an appropriate statement based on the
15  weight of -- their weight of the evidence from the
16  literature.
17    Q.  You did not specifically reference in the
18  body of your second amended MDL report this
19  statement from FDA's website, correct?
20    A.  I already answered that for you.  I did
21  not.  I said -- but I do believe my reliance
22  materials point to the FDA website.  That they
23  even --
24    Q.  Did you -- I'm sorry.  I'm sorry to
25  interrupt.

Page 84

1    A.  That's all right.  That's okay.  That I
2  believe may reference this page because some of
3  the information that links through here goes to the
4  asbestos testing that the FDA has done.
5    Q.  You do reference specifically in the body
6  of your report statements from Health Canada's risk
7  assessment, correct?
8    A.  Yes, I do.  From their document, I do.
9    Q.  You found that -- did you find that
10  statements from Health Canada with regard to talcum
11  powder and ovarian cancer were relevant to your
12  opinions in this case?
13    A.  From the issues that I -- as I described
14  them, yes, I think I described it in my section
15  where I'm talking about the known hazard of talc.
16  And so, yes, I do think it's relevant to my opinions
17  related to the hazard that exist to human health and
18  in the duty of a company to ensure that products are
19  safe for consumers to be exposed to.
20    Q.  Do you agree that FDA and its finding are
21  as relevant to your opinions as Health Canada's
22  findings, correct?
23         MR. MEADOWS:  Objection.
24    A.  FDA's opinions were certainly part of the
25  information that I'm aware of and I have considered

Page 85

1  in forming my hazard opinions.  Yes, that is
2  correct.  And my issues related to increased risk,
3  yes.
4  BY MR. HEGARTY:
5    Q.  Well, do you agree that FDA's statements
6  as it relates to talc and ovarian cancer are as
7  relevant to your opinions as Health Canada's
8  statements relating to talc and ovarian cancer?
9    A.  No, I wouldn't say that.  Not necessarily.
10  What Health Canada has done is provide you with a
11  much more transparent discussion of all of the
12  literature that they've reviewed in a systematic
13  matter -- systematic manner to do a risk assessment
14  and safety assessment for talc.
15         This one statement by FDA does not
16  provide me with anywhere near the detail or the
17  information that Health Canada does.  So they're
18  both relevant, but I wouldn't say it's as relevant
19  because of the difference in the methodology or the
20  statement or the detail that I can get.
21    Q.  You do agree, though, that this statement
22  is relevant to a risk assessment with regard to
23  talcum powder and ovarian cancer?
24    A.  No.  I would say it's relevant to
25  understanding what FDA has stated about the hazard

Page 86

1 of the product. And that's how I am pointing you
2 to. I'm showing you that they are identifying a
3 hazard based upon the statement they have here.
4    Q. When you say you're "showing" me that, but
5 you did not show me or the court that in the body of
6 your current MDL report, correct?
7    A. I did not specifically point to this
8 statement. That is true. But I have many other
9 bases for -- for the statement I have made.
10      Did I include this one in the body of
11 my report? I did not. But it is not because it is
12 irrelevant.
13      It's just that I pointed to actual
14 data and information that provides a more detailed
15 analysis and also describe for you my method of
16 going through the information and actually looking
17 at the actual studies versus just making a summary
18 statement.
19    Q. Please turn next to paragraph 29 of your
20 report.
21    A. (Complied.) I'm there.
22    Q. You added several statements in that
23 paragraph concerning the October 2019 testing of
24 FDA -- by FDA -- by a lab hired by FDA.
25      And what followed was a recall of a

Page 87

1 lot of Johnson & Johnson Baby Powder, correct?
2    A. I did add a discussion of the testing that
3 FDA had done and their description of what they
4 found, yes, at -- at the second half of the
5 paragraph on page 19, paragraph 29.
6    Q. How many bottles of Johnson's Baby Powder
7 did FDA test in connection with that finding -- or
8 have tested, I should say?
9    A. So I can only -- I'll have to reread what
10 is here. So they had two, I believe, in -- in
11 October of 2019. They did not test Johnson &
12 Johnson Baby Powder in 2020, 2021. And they also
13 did not test it in 2022.
14      And I think as I told -- I think I
15 made this comment in my -- or statement in my
16 deposition back in October that the testing in 2022
17 for sure was done at a time when FDA was aware that
18 the company had stopped distribution of the product.
19 So that may have affected what was tested.
20    Q. My question is specifically as to the 2019
21 testing.
22      Do you know how many bottles of
23 Johnson's Baby Powder were tested in 2019?
24    A. I believe there were two is what I'm
25 saying to you based upon my sentence in that

Page 88

1 paragraph.
2    Q. You are not an expert in the TEM tests
3 conducted in 2019, correct?
4    A. I will not provide the expert opinions in
5 that area, that is true. I -- I know what TEM is,
6 but I'm not someone who would speak to that at
7 trial. That's correct.
8    Q. You have no personal knowledge of how
9 those tests were conducted, correct?
10    A. If by that you mean did I participate in
11 them, I did not. That is correct.
12    Q. Do you have any personal knowledge of any
13 of the methods used by the testing lab to try to
14 avoid contamination?
15    A. The only knowledge I would have is if they
16 describe it in the report, and I don't recall that.
17 So I -- but I was not there, so I wouldn't have been
18 involved with the test or have that kind of personal
19 knowledge.
20    Q. For purposes of your methodology in
21 preparing your second amended MDL report, did you
22 accept that any asbestos or talc fibers found came
23 from the bottle or bottles sampled?
24    A. Yes, I would -- I would assume because
25 that's consistent with what FDA reported. I accept

Page 89

1 FDA's findings as they report them, and that is what
2 they report.
3    Q. How did the test lab define "talc fibers"?
4    A. I'd have to go and pull the study to
5 answer that kind of question.
6    Q. Do you recall if you compared the -- or
7 let me back up.
8      Did you look at the testing lab report
9 as a -- or other documents from the testing lab as
10 to how they define "talc fibers"?
11    A. I looked at what was available through the
12 FDA website.
13    Q. Do you recall if you concluded that the
14 definition that the lab applied for talc fibers was
15 the same as your definition?
16    A. I didn't attempt to -- to make a
17 comparison because that wasn't the purpose of
18 looking at this -- that wasn't the purpose of what I
19 was doing in looking at the testing.
20      Do you want me to explain?
21    Q. No, I don't need that at the -- at the
22 moment. Thank you, though, for asking.
23      Is it your methodology in this case to
24 factor into your opinions about talc used in 2018
25 and before test results from two bottles in 2019?

Page 90

1    A.  I don't think I understand your question.
2        Could you repeat it?
3        (Speaking simultaneously.)
4    Q.  Sure.  Do you consider relevant -- then --
5   sure.  Let me start over again.
6        Do you consider relevant to your
7   opinions as to any talc used before 2018 test
8   results from talc on 2019 bottles?
9    A.  I consider it relevant in one aspect.
10       Would you like me to explain?
11   Q.  Please.
12   A.  So it's consistent with the fact that
13  the -- the records -- and this is not just -- this
14  isn't an issue of FDA testing.
15       Looking at all the records I've looked
16  at that go back in time in this case where it's
17  consistently showing -- it's consistent with the
18  showing that over time, there continue to be the
19  presence of asbestos and/or talc fibers, fibrous
20  talc, within talc: either talc powder before it was
21  processed, talc powder after it was processed, or
22  talc powder in bottles.
23       And I laid all that out and have
24  discussed that in great detail in my previous
25  testimony.

Page 91

1        (Speaking simultaneously.)
2    Q.  What way -- I'm sorry.
3    A.  Well, it's an issue -- I'm sorry.  As I --
4   the issue -- I guess the -- the short answer would
5   be the issue -- how I would say it to you is it's
6   relevant because it's not surprising to me that you
7   would have the existence of some talc with asbestos
8   or fibrous talc repeatedly over time.
9    Q.  As part of your methodology, what weight
10  did you place on this 2019 test result finding?
11   A.  I don't think I understand your question
12  because it's not just one finding.  It's you give
13  weight to all of the evidence as it accumulates over
14  time.
15       So I have in my hazard safety
16  assessment, I gave weight to the fact that there was
17  analytical data over time consistently showing the
18  presence of toxic constituents, such as asbestos,
19  fibrous talc, and different heavy metals.
20   Q.  Do you know if any MDL plaintiff used
21  Johnson's Baby Powder from the lot tested in 2019?
22   A.  I have no idea of that.  Again, I'm not
23  case specific, so I can't answer that.
24   Q.  Do you know what volume of asbestos in
25  talc fibers were found by the testing lab in 2019?

Page 92

1    A.  I'd have to go to the report and see what
2   they report.  I don't recall.
3    Q.  Do you know what type of asbestos they
4   reported finding?
5    A.  I think -- same answer.  I'd have to go
6   and look.
7    Q.  As part of your methodology, did you
8   consider whether the volume of asbestos reported as
9   being found in these test results was sufficient to
10  cause ovarian cancer?
11   A.  That's beyond the scope of what I did.
12  I'm not a causation.  I wasn't doing a causation
13  opinion.
14   Q.  As part of your methodology in preparing
15  your second amended report and adding this part to
16  your report, did you review the information
17  Johnson & Johnson provided with regard to its
18  testing of the contents of the same bottles?
19   A.  If it was on their website or it was a
20  document that I -- was -- is something that was
21  produced to me or shown to me at trial, I have.  I
22  don't recall.  I do think there was information
23  at -- on their website about some of this and maybe
24  even some discussion from them.
25       I went to the -- I presented at the

Page 93

1   public hearing that was back in -- in February
2   of 2020.  And I believe that either J&J or someone
3   from the company, an expert who was speaking on
4   behalf of the company, may have talked about that.
5   But I don't recall the details.
6    Q.  Let me share my screen with you.  (Shared
7   screen.)
8        Did you review as part of your
9   methodology in this case and in adding this portion
10  that we're talking about to your second amended MDL
11  report, the December 3rd, 2019, statement put out by
12  Johnson & Johnson regarding the 155 tests that it
13  conducted by two different third-party labs?
14   A.  (Examined exhibit.)  So this looks
15  familiar.  I can't tell you if it's in my reliance
16  list or not.  But I -- if it -- if -- this might be
17  a document that I was shown at a trial.  It looks
18  familiar.
19   Q.  You indicated, though, you can't recall if
20  you include it on your reliance list?
21   A.  No, I'd have to look.  And you -- if it's
22  there, it's something that I have -- I independently
23  would have reviewed or relied upon.  I -- again, it
24  looks very familiar.  My guess is this is something
25  I have seen brought before me at trial by Ms. Brown.

Laura Massey Plunkett, Ph.D.

Page 94

1    Q.  You included, as you mentioned -- as you
2  just talked about, a reference to the FDA's findings
3  as to its testing of the two bottles from the lots
4  that it -- that you reference.
5          Why did you not include the test
6  results that Johnson & Johnson provided with regard
7  to its testing of the same bottles?
8    A.  Because I don't have access to their
9  reports in the same way that I do -- do when I wrote
10 this report.  I -- you know, again, I -- I --
11 this -- the whole part of this paragraph is to show
12 that there is evidence that asbestos has been found
13 in talc over time.  And that's consistent with what
14 has been in my reports.
15         This section is called "Chemical
16 Components of Talcum Powder and Their Hazards."  And
17 so that's what I'm doing here.  I'm showing that --
18 that indeed over time, they either have or haven't
19 detected asbestos in talc.
20         But in addition to talc and asbestos,
21 if you want to talk asbestos, there's also other
22 things that I also discuss in my report, the issue
23 of fibrous talc versus different heavy metals.  And
24 that's all I'm doing in the paragraph.
25         I'm not trying to -- I'm not the

Page 95

1  person in the litigation who is providing all of the
2  opinions on -- related to detection of asbestos.
3  It's my understanding -- and I've -- I've read the
4  reports of some of those experts that will be
5  addressing these questions specifically for you.
6    Q.  Have you ever made a request for the
7  testing documents from these 155 tests that are
8  discussed in this December 3rd, 2019, document?
9    A.  I don't remember making a request, but I
10 also can't tell you that they're not somewhere in --
11 in the Bates numbered documents that I have
12 reviewed.  I can't answer that without looking.
13   Q.  Do you, as part of your methodology,
14 accept as true the results reported of these 155
15 tests?
16   A.  I don't think I've formed that opinion.
17   Q.  Do you have any opinion with regard to the
18 validity or accuracy of the 155 tests referenced in
19 this December 3rd, 2019, statement?
20   A.  So I've not -- I have not cited to or
21 stated such an opinion in my MDL report, and I don't
22 believe I have it in prior testimony either.  So
23 that has not changed at this time.
24   Q.  How have as part -- let me start over
25 again.

Page 96

1          As part of your methodology, how have
2  you factored into your opinions about whether talc
3  over the years has contained asbestos or fibrous
4  talc testing like what is reported here showing the
5  absence of asbestos in fibrous talc in Johnson's
6  Baby Powder?
7    A.  My methodology has to do with collecting
8  all of the information that I could from -- well, of
9  course, the initial work I did was well before 2019.
10         Looking at the testing that has -- was
11 accumulated in the files by the company over time
12 and looking at the description of the methodology
13 that they use, looking at the context related to the
14 limitations as FDA even describes it for the ability
15 of the testing methods to be able to detect asbestos
16 or fibers of talc.
17         This was the whole subject of that
18 meeting I participated in in February of 2020,
19 understanding that there's more than just chrysotile
20 asbestos that would be at issue based upon the
21 occurrence of fibers in the talc powder.  So all of
22 that information was part of my, quote/unquote,
23 "weight of the evidence" for my hazard analysis and
24 the development of my opinions about increased risk.
25         But as you know, as I have told you --

Page 97

1  I've told you specifically, Mr. Hegarty, during
2  deposition, you know, to me, the issue is not just
3  asbestos.
4          The issue is we have a complex mixture
5  of which all of the constituents within the mixture
6  contribute, in my view, to the hazard posed to the
7  consumer.  And all of those things contribute to the
8  increased risk, in my view, for ovarian cancer per
9  the opinions I have expressed.
10   Q.  As part of your methodology, do you accept
11 as true all of the negative test results you have
12 seen from your document review that is negative for
13 asbestos with regard to testing of Johnson's Baby
14 Powder?
15   A.  So I don't know what you mean by "true."
16 I'd say to you -- I would say the scientific way.
17 I'd say that I have -- I have looked across all the
18 studies, and I have considered all of them if I see
19 with the method some description of what was
20 actually done and whether there was any quality
21 control done.
22         So, for example, many of the older
23 test results that are within the files that I have
24 reviewed are ones where I see the laboratory that
25 did it.  I see the date of the report on the

Laura Massey Plunkett, Ph.D.

Page 98

1 background, the quality, the method.
2       So, yes, that goes into my weight of
3 the evidence. And so I accept those as valid
4 results in terms of being able to consider them
5 because there is a basis scientifically for why
6 the -- the studies were done in a manner that would
7 make them potentially reliable enough to include
8 within a weight of the evidence.
9       Q.  Are negative test results or test results
10 showing no presence of asbestos in Johnson's Baby
11 Power relevant to your methodology for your risk
12 assessment?
13      A.  I don't know what you mean by -- with that
14 specific question.
15      Do you want me to try to answer it? I
16 think I -- I would -- where you're trying to go.
17 But that -- that -- just the way you said it doesn't
18 quite make sense to me.
19      Q.  Sure.  Do you consider test results on
20 Johnson's Baby Powder showing no asbestos relevant
21 to your methodology for your risk assessment?
22      A.  I would say they're relevant to my
23 analysis.  That -- that's -- I'm having a little
24 problem with the methodology question.  Methodology
25 wouldn't just be limited to looking at positive or

Page 99

1 negative.  The methodology is looking at what you
2 can find, right?  What is available.
3       And then you -- then you weigh that
4 information, and you analyze it based upon do you
5 have enough information to know that the -- they
6 were done by a -- by a method that had the ability
7 to -- that's part of the problem with some of the
8 older data.
9       Did they have the ability to detect
10 certain things or not?  What was the limit of
11 detection?  What was the method of quantification?
12 All that goes into it.
13      But I -- to short-circuit this, that
14 is not the focus of my testimony.  There are others
15 I know that are going to be addressing the details
16 on the methods used and the reliability of the
17 methods.  For me, this information is relevant for
18 my weight of the evidence on hazard and increased
19 risk, however.
20      Q.  As part of your methodology, do you assume
21 that all of the Johnson's Baby Powder used over the
22 years by the plaintiffs in this litigation contained
23 asbestos in some amount?
24      A.  I have not assumed that, no.  But I have
25 assumed that they're all a mixture of toxic

Page 100

1 constituents that include talc, both platy and
2 fibrous, and as well as other things that can
3 potentially be there on -- at any given day on any
4 given lot.
5       Q.  Have you undertaken any methodology to
6 determine what percentage of Johnson's Baby Powder
7 sold over the years contain any amounts of asbestos
8 based on the test results you cite to?
9       A.  No, I haven't done that analysis.
10      Q.  You also make reference in this paragraph
11 to FDA testing of talcum powder products in 2020,
12 2021, and 2022, correct?
13      A.  Well, actually it was testing that was
14 reported, I believe, in 2021.  But some of the
15 testing may have been done in 2020, yes, and then
16 also 2022.
17      Q.  The products tested included loose and
18 body powders, correct?
19      A.  Yes, they included samples from the
20 marketplace that included a variety of different
21 talc-containing cosmetics.
22      Q.  These test results establish that talcum
23 powder product -- that the talcum powder products
24 tested did not contain asbestos, correct?
25      A.  Well, I need you to be more specific.

Page 101

1 They didn't test body powders.
2       But are you asking for -- by Johnson &
3 Johnson, are you just asking me about talc in a --
4 either a loose powder, not just a body powder form?
5 Is that what you're asking me?
6       Q.  I'm talking about the tests themselves on
7 the products tested.
8       Those test results establish that the
9 products tested did not contain asbestos, correct?
10      A.  I'd have to go look and see if they were
11 all negative.  That I can't recall without looking.
12 I didn't go into that in my -- in this paragraph, so
13 I'd have to go and refresh my memory.
14      Q.  As far as any test results that showed --
15 that reported negative, those test results show that
16 the products tested did not contain asbestos,
17 correct?
18      A.  If the -- I would say it this way:  If the
19 test result reported states a negative, it would be
20 based upon the method they used and the limited
21 detection they weren't detecting it.  That is
22 correct.
23      Q.  You are aware that there were talcum
24 powder products tested, as you reference in this
25 paragraph, by FDA after 2020 that did not -- where

Laura Massey Plunkett, Ph.D.

Page 102

1  they did not find asbestos.
2       You agree with that, correct?
3    A.   Yes, but I believe most of what they
4  tested was not body powders.  I believe they were
5  testing old school compacts with pressed powder to
6  put on the face, different things like that.
7    Q.   But as to these products, they were talcum
8  powder products, correct?
9    A.   Well, again, some people are gonna misuse
10  that term as body powder.  So I'm telling you that
11  they're talc-based cosmetic products and that talcum
12  body powder product were not tested.  But they
13  were -- I'm aware that they did test talc-containing
14  cosmetic products -- talc powder-containing cosmetic
15  products.
16    Q.   What do you define as a "loose powder"?
17    A.   So loose powder would be -- would be a a --
18  well, loose powder, typically, would be a body
19  powder that you shake, right, out of something.  But
20  there is also powders that can be used on the face
21  that -- that can be applied through a brush where
22  you go over the surface and then, you know,
23  different -- put different products on your face or
24  other parts of your body.
25       (Speaking simultaneously.)

Page 103

1    Q.   Is it your recollection -- I'm sorry.  I'm
2  sorry to interrupt.
3    A.   It's different than a body powder.  It's
4  different than the body powder.
5    Q.   Is it your recollection that no loose or
6  body powders were tested by FDA in any of the test
7  results you reference in this paragraph?
8    A.   There were no Johnson & Johnson body
9  powders tested, as I have stated.  In order to
10  answer it more specifically, I have to pull the
11  tests out.  That's what I'm answering for you.  I
12  don't recall all the things that were tested at that
13  period of time.  They had blushes and face powders
14  and a variety of other things tested.
15    Q.   Let me show you on my screen the FDA --
16       THE COURT REPORTER:  Excuse me.
17  Excuse me, Mark.  Mark, excuse me.  Leigh is trying
18  to join again, and I need to let her in.  But can
19  you take --
20       MR. HEGARTY:  Okay.  Let's go off the
21  record.
22       THE COURT REPORTER:  Okay.  We're off
23  the record at 11:18 a.m.
24       (A recess was taken from 11:18 a.m. to
25       11:19 a.m.)

Page 104

1       THE COURT REPORTER:  All right.  We're
2  back on the record at 11:19 a.m.
3       MR. MEADOWS:  So, Mark, if you will,
4  please, the documents that you're gonna put on the
5  screen, if you could drop those in the Chat for us
6  first so that Dr. Plunkett can have a chance to look
7  at those in total before you start asking questions.
8       MR. HEGARTY:  Yeah.  I appreciate
9  that.  One, I don't necessarily know how to do that.
10  And, two, I know it takes some time, but -- and --
11  and I'll do that to the extent necessary.  I promise
12  I'll let her review the documents to the extent they
13  need to -- she needs to.
14  BY MR. HEGARTY:
15    Q.   I'm showing you --
16       MR. MEADOWS:  I need you to figure
17  that out because I -- I think it's important that
18  she have an opportunity to see these documents
19  before you start asking her questions.
20       (Speaking simultaneously.)
21  BY MR. HEGARTY:
22    Q.   Dr. Plunkett, do you see the document I'm
23  showing on my screen?
24       MR. MEADOWS:  That's lawyer -- that's
25  lawyer talk.  So please -- please drop the document

Page 105

1  in the Chat.  And if you need to go take a lesson
2  from somebody on it -- on how to do it, please do.
3  We'll go off the record, and you go do that.  We
4  need to see the document before you're gonna start
5  asking her questions.
6       MR. HEGARTY:  So you're instructing
7  her not to answer my question unless I drop it in
8  Dropbox -- in the Chat room?
9       MR. MEADOWS:  We're not gonna go
10  forward with the deposition unless you can start
11  dropping these in the Dropbox so she can look at
12  them.
13       MR. HEGARTY:  Okay.
14       MR. MEADOWS:  I mean, if you want to
15  e-mail them to her, she can do that.  But we want
16  the document in our hand here or a way to look at it
17  before she's required to start -- before you start
18  asking her to answer your questions about it.
19  BY MR. HEGARTY:
20    Q.   Doctor, did you look at the test results
21  put -- put on the website by FDA of its talcum
22  powder products tested?
23    A.   The ones I'm referencing in this
24  paragraph 29?  Is that what you're asking me about?
25    Q.   Yes.

Laura Massey Plunkett, Ph.D.

1    A.  I did pull the documents and looked at
2  them, but I don't recall what's in them.  So if
3  you're gonna ask me questions about them, I would
4  need to look at them again.
5    Q.  You do agree that all the products tested
6  were talc-containing products, correct?
7    A.  Yes, based on the -- the -- based on the
8  description of FDA at their website, yes.
9    Q.  All of those talc-containing products
10  would have included talc from talc mines, correct?
11    A.  I would assume they should have all -- I
12  don't think there's synthetic talc available
13  commercially yet.  So, yes, they should have been
14  mined.
15    Q.  So you agree that talc can be mined and
16  used to make consumer products that contain talc
17  that do not contain asbestos, correct?
18    A.  I think that's beyond the scope.  I
19  haven't formed that opinion one way or the other.
20  I'm aware of the fact that there are testing showing
21  that at different times they don't find it under
22  certain conditions.
23        But it is -- as I -- as I tell you in
24  my report -- and this is well -- well -- these are
25  things that we've discussed multiple times at trial

1  in the past.  This is not something since August
2  of 2020.
3        But you -- you should know, I have the
4  opinion that it's a -- there -- that talc is
5  naturally occurring.  And when you mine it and you
6  process it, you end up with a mixture of
7  constituents, some of which are toxic.
8    Q.  You also reference in this paragraph the
9  EPA; is that correct?
10    A.  In paragraph 29?
11    Q.  Paragraph 29, you make reference towards
12  the end to an EPA proposed rule?
13    A.  Ah, yes.  Yes, that's correct.  I do.
14    Q.  And you have read that proposed rule,
15  correct?
16    A.  Yes, I have.
17    Q.  Did you --
18    A.  That was one of the documents I told I --
19  I brought with me.
20    Q.  And do you agree with EPA's definition of
21  "asbestos" as cited in the Federal Register that you
22  reference?
23    A.  I haven't formed an opinion one way or the
24  other whether I agree or disagree.  I'm aware they
25  define it.

1    Q.  Are you aware of any analysis EPA has done
2  on any talcum powder product?
3    A.  On EPA done -- doing?  Unless it's in the
4  Federal Register notice, I don't believe they have,
5  no.
6    Q.  What did the EPA cite or rely on, if
7  anything, regarding any potential human health
8  hazard of ovarian cancer as part of this proposed
9  rule?
10    A.  I'd have to go back and look.  You're
11  asking a question that -- that -- with that, I'd
12  have to go back and look at the rule -- the
13  document.
14        Do you want me to do that?
15    Q.  Would you have the -- do you have the
16  Federal Register document?
17    A.  Yes, I do.  That's one of the ones I read
18  to you that I brought.
19        (Speaking simultaneously.)
20    Q.  And if you look at that document and you
21  cite two references --
22        MR. MEADOWS:  You keep referring to
23  it --
24        THE COURT REPORTER:  Excuse me.
25  Excuse me.  Guys, guys.  Ted.  Ted.  Ted.  I can't

1  get anything that you're saying.  You're completely
2  cut out.  I can just -- I know that you are.  So I'm
3  not getting anything you're -- you're saying.  I
4  need you by the speaker, sorry, of the computer.
5        MR. MEADOWS:  Can you hear me now?
6        THE COURT REPORTER:  Yes, sir.
7        MR. MEADOWS:  Okay.  Mark, you keep
8  referring to the proposed EPA rule, and I think the
9  sentence makes clear that it -- maybe it was
10  proposed at once, but it's been made -- made final.
11  BY MR. HEGARTY:
12    Q.  Does your report refer to a proposed rule,
13  Doctor?
14    A.  It refers to both, and I printed out the
15  proposal.  But it hasn't made final, and I give you
16  this cite.
17    Q.  How are you using the EPA action that you
18  reference in this paragraph as part of methodology
19  with regard to Johnson's Baby Powder and ovarian
20  cancer?
21    A.  It has to do with the fact that they -- as
22  my sentence says, "In addition to the actions taken
23  by FDA, the EPA has recognized the potential human
24  health hazard posed by the presence of asbestos as
25  an impurity in talc."  And that's my citation to the

Laura Massey Plunkett, Ph.D.

1    rule.
2          I'm pointing out that it's -- there's
3    more than one regulatory agency that has identified
4    a potential human health hazard posed by the
5    presence of asbestos as an impurity in talc.
6    Q.   And did FDA -- I'm sorry.
7          Did EPA make any finding with regard
8    to any potential human health hazard of ovarian
9    cancer with asbestos?
10   A.   That's not -- to answer that question, I
11   need to go back and look what they state.  They
12   focus, I believe, on -- on work -- on mesothelioma.
13   But let me go and -- if you want me to answer that,
14   I need to look.
15   Q.   How long would it take you to look?
16   A.   Well, I need to pull up the -- the final
17   rule to see if it's changed.  But I have the
18   proposed rule.  It'll take me a couple of minutes if
19   you want me to look and see.
20   Q.   We'll come back to that if we need to, if
21   we have time.  But sitting here today -- or let me
22   back up.
23         You reviewed that proposed rule to
24   prepare for today's deposition, correct?
25   A.   And the -- well, I also reviewed the final

1    rule.  That's correct.
2    Q.   And do you recall any reference in that
3    proposed rule or final rule to any evaluation of a
4    health hazard that FDA did with regard to asbestos
5    related to ovarian cancer?
6    A.   I don't recall.  I'd have to look.
7    Q.   Do you recall that their risk assessment
8    or -- their health hazard assessment was limited to
9    lung and mesothelioma risks?
10   A.   I don't recall it was limited to that, but
11   I know that was the focus.  That is true.  That I
12   recall.
13   Q.   Was it limited to a particular type of
14   asbestos?
15   A.   I believe they looked at multiple types of
16   asbestos, but I'd need to go back and look.  Again,
17   you're -- that's beyond the scope of the way I'm
18   citing the document.  But I can go and look.
19   Q.   Please turn to paragraph 40 of your
20   report.
21   A.   (Complied.)  Okay.  I'm there.
22   Q.   You cite in that paragraph two new
23   references: Harper 2021 and Emi 2021, correct?
24   A.   Yes, but there's a typo.  It should be
25   Harper, et al., 2023.

1    Q.   What from the Harper 2023 study do you
2    rely on for your opinions in this case?
3    A.   For this particular study, it's a -- it's
4    a study that shows, as I cite in my bullet, that
5    a -- talc has adverse effects.  And this is a
6    cellular study.
7    Q.   Are you finished with what you rely on
8    from this article for purposes of your opinions in
9    this case?
10   A.   In this particular paragraph, that's what
11   I rely upon.  I cite it later, I think, as well when
12   I talk about adverse effects and tissues a little
13   further.  But if we're talking about this paragraph,
14   it's cited there for that purpose.  If you want to
15   go into detail on Harper, I'll pull it out.
16   Q.   Well, if we expand upon it, what in
17   totality do you rely on from the Harper article for
18   your opinions in this case?
19   A.   In -- in -- the totality of the article
20   shows that talc has adverse effects on macrophages.
21   And in this particular -- I'm sorry.  That's the Emi
22   study.  This is the one that's looking at primary
23   human ovarian cancer cells.
24         So this particular study is looking
25   at -- like Dr. Saed showed in his earlier work as

1    far back as, I think, 2017 -- that talc has adverse
2    effects on this these cells that are consistent with
3    types of effects that can lead to cellular changes
4    associated with the progression into cancer.
5    Q.   Are you an expert in the -- the assay used
6    by the authors in this study?
7    A.   I don't know what you mean by an "expert
8    in the assay."  Actually, though, this particular
9    paper, by I way, I did cover to some extent with --
10   in my previous deposition.  But -- so I'd point you
11   to that.  But I don't know what you mean by an
12   "expert in the assay."
13         I'm an expert in mechanisms that have
14   been associated with an increased risk of cancer
15   in -- in cells -- human cells and tissues, yes.  But
16   I'm not -- I don't -- have not ever performed this
17   assay.
18         Is that what you're asking me?
19   Q.   Well, what significance do you place on
20   the findings in this paper as to p53 and Ki-57?
21   A.   I -- I put no specific evidence on that
22   particular finding, if that's what you're asking me.
23   Again, as part of my overall evidence for the fact
24   that the effects -- adverse effects that talc has on
25   cells and tissues include the types of effects you

Page 114

1  would expect to see for a toxicant or a particle
2  that can initiate and then lead to cancer
3  development in tissues.
4       Q.  You mentioned that you discussed the --
5  the Harper paper at your October 2023 deposition?
6       A.  Yes.
7       Q.  Have you done any further analysis or
8  review of anything related to that study since your
9  October '23 -- 2023 deposition?
10      A.  No.
11      Q.  You were shown --
12      A.  Other than described -- other than
13  described and it add it into this report.
14      Q.  You were shown at that deposition comments
15  of reviewers.
16          Do you recall that?
17      A.  The confidential comments back and forth
18  between the editors and the reviewer -- of the
19  reviewers, yes.  To the author, yes, I have seen
20  those.
21      Q.  Have you done any further review of those
22  comments since your October 2023 deposition?
23      A.  No.  Again, it's not the kind of thing
24  that a scientist would have access to typically.  As
25  I told Ms. Davidson that the paper was published in

Page 115

1  a peer-reviewed journal that underwent peer review.
2  And as a result, it's -- it is an appropriate
3  relevant paper to consider as part of weight of the
4  evidence.
5       Q.  Is it relevant as part of your methodology
6  in citing this paper whether one of the authors was
7  a paid -- is a paid plaintiffs' expert in this
8  litigation?
9       A.  It is part of what you consider when you
10  look at -- at the papers.  Absolutely.  It doesn't
11  mean that it disqualifies a particular paper.  Like
12  it just -- like it would not necessarily disqualify
13  it if it had been written by a defense expert
14  either.
15      Q.  In fact, you reference in various parts of
16  your report studies that were funded by PCPC,
17  studies funded by Huncharek and Muscat, among
18  others.
19          Do you recall that?
20      A.  Yes, I do.
21      Q.  Do you make any reference in this part --
22  in your report to the fact that this study was
23  supported by -- or was supported by plaintiffs'
24  counsel in this litigation?
25      A.  I don't make that statement in my report,

Page 116

1  but the papers -- I would point you to the paper
2  where, I believe, he discloses that conflict.
3       Q.  Well, why did you refer to -- in your
4  report to studies funded by Johnson & Johnson or
5  PCPC, but you did not refer to your -- in your
6  report to this study being funded by counsel for
7  plaintiffs?
8       A.  It's a really long answer.
9          Would you like me to go ahead?  I can
10  tell you why very specifically.  We've discussed
11  this at trials, in fact, as well.
12      Q.  How long of an answer is it because my
13  time is limited.
14      A.  Well, that's why I'm -- I'm saying to you.
15  I believe I've told you this -- or I may not you
16  specifically, Mr. Hegarty.  I apologize.  I've said
17  this at trial.
18          The issue is with the PCPC study and
19  the work that was done was those studies were
20  being -- often being done or being initiated in
21  order to essentially change the narrative that the
22  industry was trying to change around talc.
23          So it's a different issue, in -- in my
24  view, than an investigator who may have been paid
25  to -- to do a scientific study.  And the study has a

Page 117

1  result, and he reports it as -- along with his
2  conflict.
3          I would also -- I think I also pointed
4  out in my testimony that there are papers by PCPC
5  funding that -- that were not disclosed as part of
6  the author's disclosure.  And so, again, I -- I have
7  to point you to my testimony.
8          I think this -- on direct and both on
9  cross, I've spent a lot of time talking about issues
10  related to the studies and the investigations and
11  the work that was done by industry to essentially
12  block the truth about the hazard posed by talc.
13      Q.  What from the Emi study do you rely on for
14  your opinions?
15      A.  For the Emi study, that was the one on
16  macrophages.  So this study is, again, showing that
17  there's an adverse effect in a cell, a macrophage
18  cell, by the exposure to talc.  They also compared
19  it with titanium dioxide.  I think this is the study
20  where they looked at it both with and without the
21  presence of estrogen as well.
22          What was interesting about this study
23  was it's just as consistent showing that talc has
24  adverse effects.  Like other studies that looked at
25  macrophages, they also are repeating, showing

Page 118

1 reproducibility of the ability of talc to cause
2 toxic effects to the macrophage cell.
3        And if you, again, remember my
4 testimony at trial, we've shown an animation video
5 where I've talked about the fact that toxic effects
6 of talc on macrophages would -- would be part of
7 this overall process where you get to an initiation
8 of the -- the carcinogenesis through -- and I also
9 think I had a -- I have a figure where I talk about
10 carcinogenesis and I talk about the role of
11 macrophages.
12        So this data's relevant to that.
13    Q.  What toxic effects did this paper show on
14 macrophages?
15    A.  It shows that it had -- it changes these
16 transcription and the function of the macrophages.
17 And that -- and if -- if you want more details, I'll
18 pull it back out because I don't -- I can't tell you
19 off the top of my head all the specific endpoints.
20        But it is looking at the function of
21 macrophages and their inability to respond in
22 certain ways when they've been -- when they have --
23 when there's -- there's an exposure to talc,
24 particularly in the -- in the presence of estrogen,
25 I believe, as well.

Page 119

1    Q.  Did this show the same changes in function
2 resulting from titanium and dioxide exposure?
3    A.  Titanium saw some of the -- some of the
4 same changes, yes.  So they talked about particles,
5 and I talked about that in my testimony.  The issue
6 of there can be an effect due to a particle alone.
7        But there's also very specific things
8 about talc that are unique as compared to titanium
9 dioxide.  The literature hasn't shown or hasn't gone
10 into the same routes as we have with the -- the
11 abundance of the literature looking at this issue.
12        What is the plausible mechanism behind
13 the ability of talc -- baby powder in particular, in
14 a mixture, chemical mixture -- to induce changes
15 that can lead you to an increased risk of cancer.
16    Q.  The Emi paper looked at mouse macrophages,
17 correct?
18    A.  I'll have to pull it out.  I think that's
19 correct, but hold on.
20        (Examined exhibit.)  Yes, they looked
21 at mouse cell lines.  That's correct.
22    Q.  Do mouse macrophages act the same as human
23 macrophages?
24    A.  So do you want an entire treatise about
25 changes and differences?

Page 120

1        They are an appropriate model to use
2 to look at predicting the effects of mammalian cells
3 to adverse effects with exposure to chemicals.
4 They're not gonna be exactly the same.  But they --
5 they are a valid model, and there have been others
6 that have looked at mouse models -- mouse macrophage
7 models in the same way.
8    Q.  The changes reported then publish with
9 regard to human macrophages.
10        In other words, how do you think -- go
11 ahead.  I'm sorry.
12    A.  I believe there is a -- oh, no.
13        I think one of my papers -- and I have
14 to pull them back out.  Let me -- if you want me to
15 look in my report.  I believe that there is a paper
16 that I have reviewed and relied upon that talks
17 about human macrophages.
18    Q.  Let me be more specific.
19        Have these same tests been done as to
20 human macrophages?
21    A.  The exact same methodology?  I haven't
22 seen them report that yet.  It doesn't mean that
23 they won't, but I haven't seen that -- that as -- as
24 exactly what they did.  No, I can't answer that
25 without looking.  But I haven't seen it that I

Page 121

1 recall.
2    Q.  And as far as Emi -- the Emi paper, did
3 you assess or evaluate the strengths and weaknesses
4 of the study?
5    A.  From its -- from my review of the paper, I
6 always do.  I read -- I read the materials and
7 methods.  I have read the overall discussion, look
8 at the conclusions whether or not -- my typical
9 weight of the evidence, yes.
10        It would go into my looking at the
11 quality of the paper, the way they describe the
12 data, whether they do appropriate statistics or not,
13 whether or not they can do a statistics or not based
14 on the endpoints they -- they report.
15        So, yes, I did do that.
16    Q.  Can you cite any study showing an
17 association between the findings from the Emi paper
18 and ovarian cancer risk?
19    A.  A single study?
20    Q.  Or other numbers.
21        (Speaking simultaneously.)
22    A.  On the macrophages -- do you want me to
23 explain why?
24    Q.  No.  I just want you to tell me if you can
25 cite to a study that is shown an association between

Page 122

1 the findings in the Emi paper and ovarian cancer
2 risk?
3    A.  And I'm saying to you that doesn't make
4 sense.
5        Do you want me to explain why?
6    Q.  My question does not make sense?
7    A.  No.  What you're asking for would not make
8 sense for a scientist to report.
9        Would you like me to explain why?
10    Q.  You're not aware of any science --
11 scientist reporting that the type of findings in the
12 Emi paper are related to ovarian cancer risk?
13    A.  I'm saying to you that's not an
14 appropriate question to ask.
15        Would you like me to explain why?
16    Q.  How long would it take you to explain why?
17    A.  Hopefully not too long.
18    Q.  Why isn't it an inappropriate question?
19    A.  So you're asking a -- about a cellular
20 study looking at transcription and epigenetic
21 changes, and then you're asking to extrapolate that
22 directly to ovarian cancer.
23        And I'm saying to you:  No one single
24 paper, one single opinion can do that.  Instead you
25 have to look across all of the evidence you have and

Page 123

1 look at what you know about the mechanism, whether
2 or not this fits.
3        So the question you're asking me
4 just -- I mean, it -- I -- I would never ask that
5 question, as a scientist.  That makes no sense.  I
6 would never expect to find a paper that says it the
7 way you're saying it.
8        What I would say instead is this is an
9 appropriate paper.  And it is entirely consistent
10 the way a scientist would go about the process
11 building from the bottom up, looking at, you know,
12 what is happening in cells and tissues.  Then what's
13 happening in tact animals.
14        I've talked about this before in my
15 testimony.  And then looking at the correlation of
16 all of that information and the concordance of that
17 information with what we know about how ovarian
18 cancer can occur in humans.
19    Q.  Please turn to paragraph 41 of your
20 report.
21    A.  (Complied.)  Okay.
22    Q.  You make reference to Health Canada or
23 Canada proposing to add --  or -- or amend its talc
24 listing on its cosmetic ingredient hot list; is that
25 correct?

Page 124

1    A.  Yes, and I added a clause because I'm
2 pointing you to the part of that hot list that talks
3 about perineal use of talc.
4    Q.  And to date, Canada has not implemented
5 any restrictions on talcum powder as it relates to
6 ovarian or other cancer, correct?
7    A.  What do you mean by "restrictions"?  Have
8 they banned it?  Is that what you're saying?
9    Q.  Well, have they restricted its use or
10 required any warnings on any talcum powder product
11 as it relates to ovarian cancer?
12    A.  Well, that's what this hot list is meant
13 to be.  It's -- it's meant to be a -- a description
14 of -- for consumers to see what they have -- they,
15 Health Canada -- has identified as a risk associated
16 with use of a product.
17        But if -- if you're asking about
18 requiring warning on a bottle, they've -- this --
19 these products are no longer distributed in Canada.
20 So I -- I -- that would also -- doesn't make sense
21 based on the -- when the decision was made.
22    Q.  Well, the reference you've added is to
23 potentially revising or amending its talc listing is
24 subject to a comment period, correct?
25    A.  Yes, that's correct.

Page 125

1    Q.  And did you submit any comment?
2    A.  No, I did not.
3    Q.  Do you know anyone who did?
4    A.  It's possible.  I remember talking about
5 this with someone at a deposition in the past.
6 Maybe it was the deposition I gave with Mr. Smith in
7 St. Louis, not with you, where we went over this --
8 these -- the Canadian report and the initial
9 Canadian actions.
10    Q.  Now my question is simply limited to the
11 proposed amendment to the hot list.
12        You agree that that's subject to
13 comment, correct?
14    A.  And I answered that for you.  And I'm
15 saying I'm -- I'd have to go back and look if I
16 know.  I believe this issue came up, though, in
17 another deposition.  And I'd have to go back and
18 look.  I'm -- I'm sure I know someone who has made a
19 comment, yes, because I'm aware of a number of
20 scientists who involve -- who are involved in this
21 area.
22    Q.  And what you're referring to in your
23 report is a proposal, correct?
24    A.  They still have -- have not finalized it.
25        Is that what you're asking me?  That

Laura Massey Plunkett, Ph.D.

Page 126

1  is a --
2      Q.  Well, that's another way of asking it.
3      A.  Well, that's how I would put it.  That is
4  correct.  It is -- it has not been -- and it's not
5  been identified yet as final.
6      Q.  You cannot say, sitting here today, that
7  the final entry for talc is going to be what has
8  been proposed, correct?
9      A.  I can -- I can't tell you for sure.  But I
10 can tell you that I believe it will, based upon my
11 experience with how this process goes and the fact
12 this is -- this is something that hasn't changed in
13 the two years, I think, that it's been on the -- on
14 the Health Canada website.
15     Q.  Please turn to paragraph 64 --
16     A.  Health Canada is consistent with their --
17 their screening assessment as well.
18     Q.  Please turn to paragraph 64.
19     A.  (Complied.)  Yes, I'm there.
20     Q.  You added a reference in that paragraph to
21 Ding 2021, correct?
22     A.  Yes, that's correct.
23     Q.  What does that paper add, or -- or in what
24 way do you rely on that paper for the opinions you
25 set out in this paragraph?

Page 127

1      A.  So these citations are all talking about
2  the fact that there appears to be a consensus on a
3  general mechanism about chronic inflammation and
4  cancer, including ovarian cancer.
5          It's another -- a more recent review
6  paper.  I think the -- the most recent things that I
7  had cited here as far as a review paper may have
8  been 2015.  So I'm citing something more recent
9  showing that over the years, that this is a
10 mechanism that appears to be a consensus or accepted
11 by the community in terms of ovarian cancer.
12         The idea that chronic inflammation and
13 oxidative stress are mechanism underlying certain --
14 certain forms of ovarian cancer.
15     Q.  The Ding paper makes no reference to
16 talcum powder or talc use, correct?
17     A.  I believe that's true, yes.  Again, it's
18 an overall mechanism, and I cite -- as I cite to the
19 issue of chronic inflammation, oxidative stress, and
20 ovarian cancer.
21     Q.  As you mention, this is a review paper.
22         It includes no original data, correct?
23     A.  It cites to original data, but it is -- it
24 is a review paper.  That is what review papers do.
25     Q.  Please turn to paragraph 72.

Page 128

1      A.  (Complied.)  Yes.
2      Q.  You make reference in this paragraph to
3  the Woolen 2022 article?
4      A.  Yes, it's one of the -- one of the three
5  new ones that are -- are listed in this paragraph.
6      Q.  And what does the Woolen 2022 article
7  contribute to your opinions in this case?
8      A.  Well, it's, as cited in this paragraph,
9  it's the idea that -- that scientists have found
10 that -- have -- have reported on an association of
11 an increased risk of ovarian cancer in women exposed
12 to talc.
13         So it is a study that was done.  And
14 what was important about this -- I cite it later in
15 my report because it also reports -- I believe this
16 is the one that reports on frequency abuse.  So the
17 issue of more frequent users being at a -- at a risk
18 of exposure -- I mean, sorry, at a risk of cancer
19 due to their exposure to talc.
20     Q.  As you just mentioned, this paper looks at
21 frequency of use, correct?
22     A.  Yes, that's correct.
23     Q.  It does not look at duration of use,
24 correct?
25     A.  It talks about frequency.  And then -- and

Page 129

1  the authors talk about why they did what they did,
2  but that's correct.  They talk -- their metric is
3  frequency.  I think greater than two times a week.
4      Q.  So looking just at frequency as a valid
5  measure of whether an association exists between
6  talcum powder use and ovarian cancer, correct?
7      A.  Well, I would say frequency and duration,
8  as I describe in my report, are valid measures.  And
9  in the Woolen paper, she relies on studies that
10 looked at both duration as well as frequency.
11         But she reports as her metric the
12 way -- the selection of studies that had at least
13 exposure for two times a week.  And all of those
14 people in those studies had years of exposure if I
15 remember.  You can -- we can look at them.
16         She has 10, 12 studies she relies upon
17 and looks at.  So it's not just two times a week for
18 two weeks.  It's much longer than that.
19     Q.  And you just said the metric -- the only
20 metric reported was the frequency of use, correct?
21     A.  Well, the only metric that she talks about
22 when -- when she -- so when the -- the Woolen
23 authors report their studies, they talk about
24 frequency in terms of greater than two times a week.
25         But they do a very good job of laying

Page 130

1 out for you what the basis of their data is. And
2 their data includes studies that look at duration
3 and frequency.
4         And these -- the -- the individuals in
5 the studies that are included in their analysis are
6 exposed for a very long period of time. Her
7 whole -- it -- it -- I don't -- I don't know the
8 person personally.
9         But, to me, when you read the article,
10 what's important about it is they're looking at
11 trying to assess and identify a signal -- what
12 cancer signal there would be in people that have
13 been exposed to a -- for a long period of time or to
14 a higher potential dose.
15         And "dose," as I say in my report, is
16 a function of both frequency and -- and duration of
17 use.
18    Q.  You also mention in this article a 2021
19 Davis paper, correct?
20    A.  Yes. Yes, that's correct.
21    Q.  And what from that paper do you rely upon
22 for your opinions in this case?
23    A.  Just the overall findings that it's a --
24 one of the largest studies that looked -- has looked
25 at this issue of ethnicity and looked at

Page 131

1 African-American versus white women.
2         It -- it is consistent with other
3 studies that appeared in the literature. So I'm
4 adding these, not that any one of these papers --
5 any one of these papers by themselves is the most
6 important, but they add to the weight of the
7 evidence, from my opinion, that there's an increased
8 risk of cancer with exposure to talc with perineal
9 use.
10    Q.  One of the authors is Patricia Moorman,
11 correct?
12    A.  To answer that, I've got to pull it out.
13 Hold on just a second. Yes, that's correct.
14    Q.  Are you aware that she's an expert, as you
15 are, in the MDL litigation?
16    A.  No, I don't know the names of all the
17 other experts.
18    Q.  If you look at the author's disclosure on
19 page 1667, her disclosure says (as read) "P. G.
20 Moorman reports grants from Duke University during
21 the conduct of the study, as well as personal fees
22 from Law Firm submitted -- Law Firm outside the
23 submitted work."
24         Do you see that?
25    A.  Yes.

Page 132

1    Q.  If Patricia Moorman is an MDL expert for
2 the plaintiffs in this litigation, is that a
3 sufficient disclosure for her?
4    A.  I haven't formed an opinion one way or the
5 other. She tells me that she has -- has -- she's
6 disclosed that she's working in litigation. So to
7 me, I don't think it would matter to me whether she
8 was plaintiffs or defense.
9         She's disclosed that she works with
10 law firms, and so that is part of your evaluation.
11 She's one of a group of -- of authors, though, so
12 she's not the only author in there. And if she's
13 the only one that has that affiliation, that's also
14 part of what you consider.
15    Q.  So as you said, you don't have an opinion
16 as to the adequacy or sufficiency of that
17 disclosure; is that correct?
18    A.  I have not formed an opinion one way or
19 the other, no.
20    Q.  You also cite in this part of your report
21 the Phung 2022 article?
22    A.  Yes.
23    Q.  What is it from the Phung 2022 article
24 that contributes to your opinions in this case?
25    A.  It's, again, another one of the studies

Page 133

1 that has come out more recently that shows that
2 there's an increased risk of cancer in women exposed
3 to talc.
4         This article also has a nice
5 discussion about -- we were talking a little earlier
6 about the Ding paper and inflammation. It's
7 talking -- when it talks about the issues of
8 underlying mechanism, as it has on page 964, a nice
9 discussion of the role of inflammation in ovarian
10 cancer.
11    Q.  This is a case-control study, correct?
12    A.  Yes, that's correct.
13    Q.  What does the findings with regard to --
14 with and without endometriosis contribute to your
15 opinions in this case?
16    A.  I haven't formed an opinion one way or the
17 other that -- about endometriosis by itself. So
18 you -- I would defer you to the epidemiologists that
19 I know are addressing those other risk factor
20 issues.
21         MR. HEGARTY: We've been going about
22 another hour and ten minutes. Let's go ahead and
23 take another break.
24         Go off the record.
25         THE COURT REPORTER: All right. We're

Laura Massey Plunkett, Ph.D.

Page 134

1  off the record at 11:53 a.m.
2       (A recess was taken from 11:53 a.m. to
3       12:02 p.m.)
4       THE COURT REPORTER:  All right.  We're
5  back on the record at 12:02 p.m.
6       MR. HEGARTY:  Dr. Plunkett, please
7  turn to paragraph 105 of your report.
8       A.  (Complied.)  Yes, I'm there.
9  BY MR. HEGARTY:
10      Q.  The last sentence of that paragraph makes
11  reference to the terms or phrases "misbranded
12  product" or "adulterated product."
13      Do you intend to testify in this case
14  that Johnson & Johnson's talcum powder products met
15  the regulatory definition of "misbranding"?
16      A.  I don't know what questions I'll be asked
17  at trial, so I can't answer that.
18      If asked the question, I would say
19  that -- that the weight of the evidence, the
20  information have I -- that I have seen as I describe
21  here, would be consistent with the FDA definition.
22  That's the word I would use.
23      Q.  Well, let me -- let me go to what you did
24  say.
25      Are you saying in this paragraph that

Page 135

1  Johnson & Johnson's talcum powder products met the
2  regulatory definition of "misbranding"?
3      A.  I'm saying that -- that the -- as I have
4  discussed here, the -- the talc constituents, the
5  fact that the -- those talc -- toxic constituents
6  are not on the label would be consistent with the
7  FDA's definition of a misbranded product as well as
8  an adulterated product.  I would state it
9  specifically how I have it here.
10      Q.  Do you intend to testify by this statement
11  that Johnson & Johnson violated FDA regulations with
12  regard to labeling or content of its talcum powder
13  product?
14      A.  So that's not typically the way the
15  question would be asked of me.  And so, as you would
16  see here, I don't believe that that is something I
17  have expressed at this period -- at this point in
18  time, no.
19      Q.  What should the label have said with
20  respect to each of these "constituents," as you call
21  them?
22      A.  So I haven't formed an opinion what the
23  label language specifically should state, as I've
24  told you before.  But in the issue of the
25  constituents, it's the issue of listing what was

Page 136

1  there that they knew existed.
2      Q.  And do you intend to testify that the --
3  that Johnson's Baby Powder should have listed on its
4  labeling asbestos, fibrous talc, nickel, chromium,
5  and cobalt?
6      A.  That is not what I'm stating here.  I
7  would -- I would -- again, I would point you to what
8  I've specific -- what I'm specifically saying.  I'm
9  specifically -- specifically saying to you with --
10  with the issue of these toxic constituents that
11  their presence is consistent with the FDA's
12  definition of a misbranded or adulterated product.
13      Where I have stated for you a more
14  positive or a, I guess, a more -- a different
15  opinion about what's on the labeling, as I've told
16  you, that they should have added -- at least to add
17  a warning to their product based on what they knew
18  many, many, many years ago, back in the ...
19      Oh, gosh.  I think I've -- we've --
20  we've talked about what they knew as far back as the
21  1930s, '40s, and '50s in terms of what could go on
22  the label.  And I still stand behind all those
23  opinions I've expressed at trial and deposition
24  about the warnings that needed to go on.
25      Q.  Can you cite for me any cosmetic product

Page 137

1  that -- that makes reference to any of the toxic
2  constituents you reference in this paragraph?
3      A.  That's beyond the scope of what I did.
4      Q.  Can you cite for me any food or beverage
5  product that makes reference to any of the toxic
6  constituents you reference in this product -- in
7  this paragraph?
8      A.  That was also beyond the scope of what I
9  did.
10      Q.  Is it your opinion -- let me -- let me
11  restate that.
12      Are you saying by this paragraph that
13  Johnson & Johnson Baby Powder and Shower to Shower
14  since the 1950s have been misbranded under FDA's
15  cosmetic regulations?
16      A.  No, that's not what I'm stating for you.
17      Go to what I am stating.  I am telling
18  you that -- that I -- I am very specific in -- in --
19  about what I am stating here based upon my opinions
20  that I have formed to date.
21      And my opinion would be that the
22  presence of these toxic constituents, such as -- I
23  list them for you -- in Johnson & Johnson's Baby
24  Powder and their failure to list them would be
25  consistent with the definition.

Laura Massey Plunkett, Ph.D.

Page 138

1    Q.  Can you cite for me any published
2  authority that you rely on to say that having
3  asbestos, fibrous talc, nickel, chromium, and cobalt
4  in the amounts you say in your report and not having
5  them listed in the label meet FDA's definition of
6  misbranding?
7    A.  I can't -- I haven't done a look for such.
8  I -- I don't know that there would be such.
9         All I can tell you is that in my
10 original report for the MDL, in paragraph 19 -- and
11 it's also in this report -- I define for you what
12 misbranding and adulteration are.
13        And I'm observing for you here, based
14 upon -- stating for you here, based upon what we
15 know, that the presence and the lack of description
16 would -- would be consistent with the definition
17 that FDA gives to miss -- a misbranded product or an
18 adulterated product.
19        And that's all I'm trying to say.
20    Q.  What is your standard for the volume of
21 each of the -- each of these constituents in a
22 product that constitutes adulteration?
23    A.  So for any particular constituent, it may
24 or may not be a volume.  It depends on what that
25 constituent does.  So if it's a constituent --

Page 139

1  and -- and what kind of a product it is.
2         So, again, I haven't formed an opinion
3  about any particular constituent in any known volume
4  at this particular point in time.
5         But, again, the mere presence of
6  these -- of a known carcinogen, such as asbestos,
7  for example, and the presence of known carcinogens
8  that are certain heavy metals -- and, again, I've
9  talked about this at trial before, what we know
10 about those and the hazards they posed.
11        Again, it would be consistent with the
12 FDA definition of a misbranded and/or adulterated
13 product, regardless of --
14    Q.  Is it your opinion -- I'm sorry to
15 interrupt.
16    A.  Okay.  Regardless of what particular level
17 you want to point to, if what you're asking me, are
18 there standards put in certain products for certain
19 things, there are.  Not for asbestos, however, in
20 terms of consumer products.
21    Q.  Is it your opinion that any cosmetic
22 product that contains any of these constituents at
23 any level is adulterated?
24    A.  Could be, yes.  I -- I haven't formed that
25 opinion.  You're asking something beyond what I've

Page 140

1  done today.
2         Is it possible that the answer to that
3  question be yes?  But it's beyond what I've done.
4    Q.  If there is a cosmetic product that
5  contains any level of these constituents that's not
6  referenced in the label, is that product misbranded?
7    A.  Say that again.
8    Q.  If there is a cosmetic product that had
9  any level of the toxic constituent you reference in
10 this label and that those constituents are not
11 listed in the label, is that product misbranded?
12    A.  I haven't formed that opinion.
13        Again, I would say to you that the
14 presence of these toxic constituents, if they
15 weren't in a label, could meet or would potentially
16 meet the FDA definition of misbranding.  But I
17 haven't formed an opinion as you're stating it.
18    Q.  Have you ever published a paper or an
19 article describing when a consumer product is
20 misbranded?
21    A.  I don't think the -- the papers and
22 articles or book chapters I've written on regulatory
23 matters address this specifically, no.
24    Q.  Same question as to adulterated:  Have you
25 ever written -- have you ever published any paper or

Page 141

1  article -- or article describing when a product, in
2  particular a cosmetic product, is adulterated?
3    A.  I don't think I have.  I -- I'd have to go
4  back and look at what I said in some of my papers
5  where I talked about silicone products.  But I don't
6  recall that, no.  I think that probably the answer
7  to that is probably no.
8    Q.  Have you ever lectured to your -- your
9  peers the standards for when a cosmetic is
10 misbranded?
11    A.  I have given lectures to students on
12 misbranding in either -- graduate students or
13 actually even -- we -- I talked about this years ago
14 in some of the classes I did for law students and
15 graduate students around products of biotechnology
16 because I -- we talk about adulteration and
17 misbranding for all classes of compounds, not just
18 cosmetics.  All classes of products, not just
19 cosmetics.
20    Q.  Outside of the classwork you just
21 referenced, have you ever lectured to your peers the
22 standards for when a cosmetic is misbranded or
23 adulterated?
24    A.  I don't think I have, no.
25    Q.  Has the FDA ever -- ever determined that

Page 142

1 any Johnson & Johnson talcum powder product contains
2 asbestos?
3     A.  Well, they detected it in their testing in
4 at least one lot in 2019.
5          Is that what you're asking me?
6          So they did.  And I think they
7 discussed some of this at -- I'd have to go back and
8 pull the transcripts from the February 2020
9 workshop.  I -- there were some people from the
10 agency -- or experts from the agency that were
11 talking about this issue of contamination of the
12 products with asbestos or asbestos-like materials.
13 But that's what I would point you to.
14     Q.  Has FDA ever found that any Johnson &
15 Johnson talcum powder product was misbranded?
16     A.  I haven't seen evidence for that, but I
17 can't tell you that they haven't ever gotten a
18 letter from FDA about something.  I don't know.
19          Because you're asking me about --
20 generally about this branding for the products, and
21 I don't know.  I'd have to go back.  That's a --
22 that's a search I'd have to do in Johnson &
23 Johnson's own files to answer that.
24     Q.  Has FDA ever found that any Johnson &
25 Johnson talcum powder product was adulterated?

Page 143

1     A.  Well, when they suggested a voluntary
2 recall with asbestos, I would say that was a finding
3 that if they hadn't have recalled, they would have
4 potentially gotten a warning letter.
5          That's my understanding of the
6 process.  But they did a voluntary recall, which is
7 all FDA could you actually ask for at that
8 particular time in 2019, so ...
9     Q.  My question is -- my question is
10 specifically as to whether you're aware if FDA ever
11 made a determination that any Johnson & Johnson
12 talcum powder product was adulterated?
13     A.  And I'm stating for you that that -- that
14 finding would be consistent with the testing that
15 FDA did.  And then the voluntary recall that
16 happened, I'm not aware of the specific conversation
17 they may or may not have had with FDA around that
18 time.  I'd have to go look and see if there's any
19 internal company documents where there was a
20 communication about that with them.
21     Q.  Did FDA ever request -- has FDA ever
22 requested a recall of any Johnson & Johnson talcum
23 powder product?
24     A.  Well, they can't -- they can't require it
25 or -- well, they're supposed to be able to have more

Page 144

1 authority now, but they've never been able to
2 require it.  But certainly, I -- I am sure they have
3 had conversations, based on what the company did
4 with the voluntary recall of the products in the
5 past.
6     Q.  My question is --
7     A.  So I can't answer -- I can't answer that
8 specifically without looking to see if there's an
9 e-mail communication or something that -- that uses
10 the words you're using.
11     Q.  Has the FDA ever -- ever determined any
12 Johnson & Johnson talcum powder product ever
13 contained nickel, chromium, or cobalt?
14     A.  I don't know.  I haven't seen FDA testing
15 for heavy metals.  I know the company has found it
16 in their own testing.
17     Q.  Is it your opinion that the components you
18 list that you say adulterated Johnson & Johnson's
19 talcum powder product can cause a user to develop
20 ovarian cancer?
21     A.  Say that again.
22     Q.  Is it your opinion that the "toxic
23 constituents" that you reference in this paragraph
24 that you say constituted or made Johnson & Johnson's
25 talcum powder products misbranded or adulterated can

Page 145

1 cause ovarian cancer?
2          MR. MEADOWS:  Objection.  It's not --
3 misstates her testimony.
4     A.  So I was gonna say:  I'm not a causation
5 expert, so I wouldn't have stated anything like
6 that.  What I said instead is that the presence of
7 the toxic constituents are consistent with a product
8 that poses a hazard for cancer and that overall
9 the -- the talcum powder product exposure in women
10 has been shown to increase the risk of ovarian
11 cancer.
12          But there is -- if -- if you ask me
13 about individual data points, there is data on all
14 of those toxic constituents individually showing
15 that they can lead to tissue changes, cellular
16 changes.
17          Or even there's studies in animals on
18 some of those as isolated constituents to show that
19 they're carcinogenic.  But the animal studies and
20 the tissue studies obviously are not human
21 epidemiological studies.
22          And the human epidemiological studies
23 have looked at the whole product, not just at an
24 individual constituent, except for -- as I pointed
25 out in my -- in my report and also in my discussions

Laura Massey Plunkett, Ph.D.

1  at trial -- with the issues related to the findings
2  in the 1950s with asbestos and ovarian cancer.
3      Asbestos itself has been identified as
4  a human carcinogen, and ovarian cancer is one of the
5  types of cancer that has been linked to exposure to
6  asbestos.
7  BY MR. HEGARTY:
8      Q.  Can you cite for me any authorities that
9  have determined or concluded that nickel, chromium,
10  or cobalt are carcinogenic with regard to ovarian
11  cancer?
12     A.  I'd have to go back and look at my files.
13  I would say to you I can't answer that without
14  looking at this point in time.
15      And I -- let me -- and can I add one
16  more thing, Mr. Hegarty?
17      When we were talking about the ovarian
18  cancer and -- and asbestos a minute ago, the --
19  during the break, I did look at the EPA rule, and it
20  does mention ovarian cancer in it.
21     Q.  What does it say?
22     A.  It says, (as read) "Asbestos is a hazard
23  to human health.  Some of the health effects caused
24  by exposure to asbestos are:  Lung cancer; Ovarian
25  cancer; Laryngeal cancer; and Mesothelioma, a cancer

1  of the thin lining -- lining of the lung, chest and
2  the abdomen and the heart."  And this is on page
3  27063 of --
4      Q.  Is there any citation -- I'm sorry.  Go
5  ahead?
6      A.  And that's of the proposed rule.
7      Q.  Is there any citation to authority for
8  that statement as it relates to ovarian cancer?
9      A.  It's through EPA's authority based on
10  their review of the evidence.
11      I mean, I would say to you -- are
12  you -- you're asking me do they state to studies?
13  I -- I have given you have those
14  studies in my report because in my report, I have a
15  specific section on asbestos -- and we've talked
16  about this at trial -- and ovarian cancer.  And
17  there are scientific studies that describe that.
18      Does -- does the case --
19     Q.  I did not ask you that question,
20  Dr. Plunkett.
21      My question was:  Does EPA cite to any
22  scientific or medical authorities in support of the
23  statement you said as it relates to ovarian cancer?
24     A.  They are citing their own authority;
25  they're not citing to an authority.  They're citing

1  their evaluation of the -- of the science and the
2  literature in this particular document.
3      Q.  Are you saying that the document you're
4  looking at includes a evaluation by EPA of the
5  literature on asbestos and ovarian cancer?
6      A.  Well, it's their summary under
7  "Background" of where they talk about what is
8  asbestos and what do we know about it.  So they
9  don't give all the details with all the references.
10      But I -- I can tell you there are
11  other documents that EPA has authored in the past
12  and other regulatory authorities have authored in
13  the past where it's very clear that asbestos poses a
14  risk of cancer.
15      And ovarian cancer is one of those
16  risks that the regulatory authorities are -- are
17  aware of in terms of risk to humans.
18     Q.  Please turn onto paragraph 121 of your
19  report.
20     A.  (Complied.)  Okay I'm there.
21     Q.  You added into that paragraph a reference
22  to "failure to meet the CIR standard."
23      Do you see that?
24     A.  Yes.
25     Q.  And why did you add that reference?

1      A.  To give clarity to things I've already
2  said at trial before in another testimony.  Almost
3  every time I testify about talc, I talk about what
4  they knew over time.  And the fact that they were
5  aware that -- I -- and I shouldn't say they are --
6  that Johnson & Johnson show -- the documents show
7  that Johnson & Johnson was -- was well aware that
8  corn starch was a safer alternative.
9      They even did studies and did -- did
10  work in order to look at the difference between
11  those and talk about in documents the differences
12  between talc and corn starch.  So that is -- that
13  part of the sentence is something that's been in my
14  testimony for a very long period of time.
15      And I added this sentence because
16  of -- at -- what was in the report before talks
17  about the -- the CIR standard states there is no
18  evidence to -- to demonstrate grounds.
19      And so I'm tying this in up now with
20  what I have said at trial, which is the issue of the
21  product was unsafe.  The product posed a hazard.
22  And it didn't even meet the CIR standard of no
23  evidence because we obviously know there's lots of
24  study of evidence that I cite in my report.
25      So I think I'm trying to bring in here

Page 150

1  at this time a very specific statement that is
2  consistent with things I've said and -- and
3  testified to -- to before.  I don't believe it's a
4  new opinion.  I believe it is a description of what
5  I've -- I've said in the past.
6      Q.  Who besides you, that you're aware of,
7  have -- has ever concluded that talcum powder
8  products do not meet the CIR standard for safety?
9      A.  I haven't done a look to see if there's a
10  variety of authorities.  I can tell you, however,
11  that it's not needing an authority to say it.  If
12  the standard has no evidence and I can point you to
13  lots of evidence about a hazard, then it makes no
14  sense.
15          If you read the CIR report on talc,
16  the reason that they draw the conclusions that they
17  do is because they assume that there is no
18  possibility of exposure.  And that is just not true,
19  as I also spent a whole lot of time in my report
20  talking about how we know that exposure can occur.
21          So if you -- so the issue here is just
22  an understanding -- this is not rocket science.
23  This doesn't even take a lot of toxicological
24  expertise to understand what no evidence means.
25          And then we have a -- you know, I've

Page 151

1  laid out for you in my report.  And you and I have
2  talked about it a lot of times all the evidence that
3  I believe shows that there's a hazard.
4      Q.  Here today, have you communicated your
5  findings or your opinions as a regard -- with regard
6  to the CIR report to CIR?
7      A.  No, I have not.
8      Q.  The public can make a request for a
9  subsequent review to CIR of an ingredient like talc,
10  correct?
11      A.  That's possible.  They could, yes.
12      Q.  Had you made a request that CIR review
13  talc again?
14      A.  No, I have not.
15      Q.  Do you have any plans to do so?
16      A.  Not with the situation that exists today
17  where we know that Johnson & Johnson is no longer
18  selling talc-based body powder and also has
19  replaced, based on the -- the most recent, is
20  transitioning away from talc to corn starch, which I
21  believe is the safer alternative.
22      Q.  You've been testifying in talc cases since
23  2016, correct?
24      A.  I have.
25      Q.  And between 2016 and when Johnson &

Page 152

1  Johnson determined to no longer sell Johnson's Baby
2  Powder, did you ever make a request to CIR to
3  re-review talcum powder?
4      A.  No.  And the answer I gave you before was
5  any point in time.  No, I have not.
6      Q.  Please look at paragraph 123 of your
7  report.
8      A.  (Complied.)  Yes.
9      Q.  Is there anything with regard to this
10  paragraph that we did not talk about earlier as it
11  relates to your opinions on the issue of misbranding
12  and adulteration?
13      A.  No.  Actually, I believe this is bringing
14  the same concept back.  This section -- this
15  paragraph is -- is occurring in what I call my
16  "Conclusion" section.  So I'm trying to bring out
17  the big points I think that I have covered in my
18  report.  And so I bring it forward here as well.
19      Q.  Turning back to paragraph 111 of your
20  report.
21      A.  (Complied.)  Almost there.  Yes.
22      Q.  You added at the end of this paragraph a
23  couple lines with regard to corn starch, but you
24  mentioned previously that that's referenced in your
25  previous reports.

Page 153

1          Why did you add these two lines at
2  this part of your report then?
3      A.  So it has to do with the fact that -- what
4  happened in 2022.  So I'm updating this paragraph to
5  link it into the issues with corn starch that --
6  that have now occurred.
7      Q.  Do you intend to testify that there were
8  Johnson & Johnson employees as of 2022 who believed
9  that corn starch was safer than talcum powder?
10      A.  Well, I -- I cannot speak for Johnson &
11  Johnson employees unless I have a document to speak
12  to it.  I would say that the documents that I have
13  seen in the past show that they were aware of the
14  issues.
15          And, in fact, in the patent
16  application from the -- the 1950s, they talk about
17  looking for an alternative to talc based on safety
18  concerns for patients.
19          So I -- I mean, again, it's -- it -- I
20  don't think I'll find the exact statement as you
21  just stated it.  But certainly, I think there are
22  documents I can point to that are Johnson & Johnson
23  documents that are consistent with my opinion and
24  would support the way I'm expressing it.
25      Q.  You made reference earlier to an

Page 154

1  April 2022 press release by Johnson & Johnson.
2       What did that press release say?
3       A.  That they were transitioning to talc
4  based -- they were transitioning to corn starch for
5  their body powders.
6       Q.  Did that statement say why they were doing
7  that?
8       A.  I have need to pull it to answer that.
9  I'm sure it does.  I'm sorry.  Got to take a second
10  to find it.  Oh, here it is.
11       So do you want me to read what they
12  say, or just tell you that they do give a reason,
13  yes?
14       Q.  Yeah, what's the reason -- what's the
15  reason given?
16       A.  They -- well, do you want me to read it?
17  That might be easiest.  I mean, I don't know how
18  earlier --
19       Q.  Yes, go ahead and read it.  Read it.
20       A.  They say that they (as read) "continuously
21  evaluate and optimize their portfolio for the best
22  position the business for long-term growth."  And
23  they say, "The transition will help simplify our
24  product offerings, deliver sustainable innovation,
25  and meet the needs of our consumers, customers and

Page 155

1  evolving global trends."
2       Q.  Do you intend to testify why Johnson &
3  Johnson made the transition in 2022 beyond what is
4  stated in that statement?
5       A.  Well, so that's an intent.  And I'm not
6  allowed to talk about intent.  I can tell you what
7  my -- what my opinion is based on what the evidence
8  shows in that particular point in time.  But I can't
9  talk about their intent.  That is -- that is up to
10  Johnson & Johnson to speak to.
11       Q.  Well, do you intend to say that Johnson &
12  Johnson may -- took this action because it believes
13  that corn starch is safer that than talcum powder?
14       A.  I would state as I have said right here in
15  this report.  I would say that these -- the actions,
16  as I go through, by Johnson & Johnson as early as
17  the '50s indicate the company was aware there was a
18  safer product.
19       And I have documents where they talk
20  about the difference between corn starch and talc.
21  There's one from the '60s, and there's also the
22  patent application where they talk about the
23  comparisons in terms of safety and toxicity.
24       And then I -- then I say, "Yet, it
25  wasn't until 2022" that they took the action to

Page 156

1  replace it.
2       Q.  Is corn starch safe to use in the perineal
3  layer?
4       A.  It's -- according to Johnson & Johnson's
5  own research, they believe it's safer in terms of --
6  of the adverse tissue reactions to use.
7       (Speaking simultaneously.)
8       Q.  I did not ask -- I asked --
9       A.  I don't know if that answers your
10  question.
11       Q.  It did not.
12       I asked:  In your opinion, is corn
13  starch body powder safe to use in the perineal area?
14       A.  I haven't done a full evaluation of corn
15  starch other than to tell you it definitely is safer
16  than talc in terms of the tissue toxicity
17  comparisons that we have and the fact that it can be
18  absorbed into -- other than sit in the tissue.
19       So from that aspect, I would, yes, I
20  believe my evaluation shows that it's a safer
21  alternative.
22       Q.  I didn't ask you that question.
23       My question is:  Do you have an
24  opinion as to whether corn starch body powder is
25  safe to use in the perineal area?

Page 157

1       A.  I already answered that for you.  I
2  thought I did.  I told you that --
3       Q.  Well, you --
4       A.  My opinion is -- well, I'm stating for you
5  the opinion as I would expect to express it.  My --
6  my opinion would be that the replacement of corn
7  starch in the talc-based body powders, which were
8  being used -- which can be used perineal, are a
9  safer -- or are safer for the -- for the person
10  who's using them.  It's a safer alternative to talc.
11       Q.  I'm not asking you if it's a safe --
12       A.  All of the -- all -- all exposures can
13  have risks.  But in the terms of ovarian cancer
14  risk, what we know about -- about corn starch, I
15  believe there's a difference, a big difference,
16  between what we know about corn starch and what we
17  know about talc.
18       But my risk assessment and safety
19  assessments have focused on the hazards and the
20  actions of the company around talc itself.
21       Q.  Does use of corn starch in the perineal
22  area increase the risk of ovarian cancer?
23       A.  None of the data that I have seen
24  indicated that it does based upon the literature
25  that's out there.

Page 158

1   Q.  Can corn starch cause inflammation if it
2   reaches the ovaries?
3       A.  If it was to reach -- could -- you asked
4   me could -- could it?
5       Q.  Yes.
6       A.  I don't know.  I haven't looked to see
7   whether there is any literature to show that it --
8   that it would do that.  I would argue that -- being
9   that it's absorbed and doesn't sit on the surface
10  like a particle that I believe it would not.  You're
11  asking for things that were beyond the -- the scope
12  of what I did at this point in time.
13      Q.  Can corn starch cause inflammation if it
14  reaches the abdominal cavity?
15      A.  All powders can cause inflammation if the
16  powder particles are sitting within the abdominal
17  cavity.  But that -- but as far as corn starch, it
18  tends to be absorbed and doesn't sit as a particle.
19          But corn starch, if you're talking
20  about the global literature, you're exactly right.
21  There's some literature out there that talks about
22  gloves and powders generally, potentially leading to
23  adverse tissue reactions surgically, internally.
24  I -- but I agree with you.  That does exist.
25      Q.  Just a little bit of housekeeping.

Page 159

1           Tell me again or walk me through again
2   each of the documents that you brought with you to
3   today's deposition.  I want to designate each one as
4   an exhibit.
5       A.  Are you gonna do them individually --
6   or together?
7       Q.  Individually.  Individually.
8       A.  Okay.  So I -- I have them mixed up.  So
9   I'm just -- they're just gonna go in my pile.
10          Is that all right?
11      Q.  That's fine.
12          THE WITNESS:  Okay.  So the EPA
13  Federal Registry Notice.
14          MR. HEGARTY:  We'll mark that as
15  Exhibit 6.
16          (Exhibit 6 marked.)
17          THE WITNESS:  The Johnson & Johnson
18  August 11, 2022, press release.
19          MR. HEGARTY:  We'll mark that as
20  Exhibit 7.
21          (Exhibit 7 marked.)
22          THE WITNESS:  May 19, 2020, Johnson &
23  Johnson press release.
24          MR. HEGARTY:  Mark that as Exhibit 8.
25          (Exhibit 8 marked.)

Page 160

1           THE WITNESS:  The paper by -- I'll
2   spell the name for the court reporter -- Phung,
3   P-h-u-n-g, et al., 2022.
4           MR. HEGARTY:  Mark that as Exhibit 9.
5           (Exhibit 9 marked.)
6           THE WITNESS:  And I have attached --
7   just to be clear, I have attached to that the
8   supplemental materials, too, as one file.
9           MR. HEGARTY:  Okay.
10          THE WITNESS:  The Davis paper --
11  Colette Davis paper from 2021.
12          MR. HEGARTY:  We'll mark that as
13  Exhibit 10.
14          (Exhibit 10 marked.)
15          THE WITNESS:  The Emi paper from 2021.
16          MR. HEGARTY:  Mark that as Exhibit 11.
17          (Exhibit 11 marked.)
18          THE WITNESS:  A paper by Wentzensen
19  and O'Brien dated 20 -- I'm not sure.  2021, I'm
20  sorry.
21          MR. HEGARTY:  Mark that Exhibit 12.
22          (Exhibit 12 marked.)
23          THE WITNESS:  The printout of the
24  FDA's website of the "Compliance Policy Guide for
25  Facilities" dated November 2023.

Page 161

1           MR. HEGARTY:  We'll designate that as
2   Exhibit 13.
3           (Exhibit 13 marked.)
4           THE WITNESS:  The paper by -- in
5   British Medical Journal by the author Dyer, D-y-e-r.
6           MR. HEGARTY:  Mark that as Exhibit 14.
7           (Exhibit 14 marked.)
8           THE WITNESS:  The paper by Goodman,
9   et al., 2020.
10          MR. HEGARTY:  We'll designate that as
11  Exhibit 15.
12          (Exhibit 15 marked.)
13          THE WITNESS:  The paper by Lynch,
14  et al., from 2023.
15          MR. HEGARTY:  Designate that as
16  Exhibit 16.
17          (Exhibit 16 marked.)
18          THE WITNESS:  The paper by Micha,
19  et al., 2022.
20          MR. HEGARTY:  Designate that as
21  Exhibit 17.
22          (Exhibit 17 marked.)
23          THE WITNESS:  The paper by Harper,
24  et al., 2023.
25          MR. HEGARTY:  Designate that as

Laura Massey Plunkett, Ph.D.

1  Exhibit 18.
2        (Exhibit 18 marked.)
3        THE WITNESS:  A paper by Ding, et al.,
4  2021.
5        MR. HEGARTY:  Designate that as
6  Exhibit 19.
7        (Exhibit 19 marked.)
8        THE WITNESS:  The paper by O'Brien and
9  JAMA in 2020.
10       MR. HEGARTY:  We'll designate that as
11  Exhibit 20.
12       (Exhibit 20 marked.)
13       THE WITNESS:  And the paper by Woolen,
14  et al., 2022.
15       MR. HEGARTY:  We'll designate that as
16  Exhibit 21.
17       (Exhibit 21 marked.)
18       THE WITNESS:  And let me see if I've
19  gotten all of it.
20       MR. HEGARTY:  You also have your
21  reports, your reliance list, those types of things?
22       THE WITNESS:  Yes, I think that's all
23  the publications or papers or documents other than
24  my report and reliance materials.
25       MR. HEGARTY:  Let's designate your

1  report that you have with you that you've marked on
2  as Exhibit 22.
3        (Exhibit 22 marked.)
4        MR. HEGARTY:  You also said you
5  brought your reliance list; is that correct?
6        THE WITNESS:  Yeah -- well, no.  I
7  didn't bring the whole reliance list.  I brought
8  pages that were changed.  So if you want to mark
9  that as an exhibit.
10       Do you want me to tell you what pages
11  it was?
12       MR. HEGARTY:  No.  No, we'll just mark
13  that as Exhibit 23.
14       (Exhibit 23 marked.)
15       MR. HEGARTY:  What other papers,
16  documents do you have with you that we had not just
17  gone through and marked as exhibits?
18       THE WITNESS:  I brought my bills.
19       MR. HEGARTY:  We'll mark those as
20  Exhibit 24.
21       (Exhibit 24 marked.)
22       THE WITNESS:  I brought a copy of my
23  CV, which you have, but I brought a copy of it.
24       MR. HEGARTY:  Mark that as Exhibit 25.
25       (Exhibit 25 marked.)

1        THE WITNESS:  And I brought the
2  page -- selected pages from my 2017 deposition on
3  three different days that discuss misbranding.
4        MR. HEGARTY:  So we'll mark that as
5  Exhibit 26.
6        (Exhibit 26 marked.)
7        THE WITNESS:  And -- oh, I brought
8  the -- the notice for the deposition.
9        MR. HEGARTY:  And we'll mark that
10  notice as Exhibit 27.
11       (Exhibit 27 marked.)
12  BY MR. HEGARTY:
13       Q.  And do you have that notice with you as
14  you read this?
15       A.  Yes.
16       Q.  Have you read through all of the
17  paragraphs in that notice?
18       A.  I have.
19       Q.  Have you seen the plaintiffs' objections
20  and their responses to that notice?
21       A.  No.  I talked about it with them, about it
22  in terms of what I had and what I didn't have.  But
23  I did not see that document.
24       Q.  And have you provided the documents that
25  you have that are described in these paragraphs

1  subject to the objections that -- that had been
2  asserted?
3        A.  Yes.
4        Q.  Another document I have not mentioned
5  previously was Appendix D, "Chemicals in the
6  Johnson & Johnson Body Powder Fragrant With Irritant
7  Properties."
8        Do you have a copy of that document,
9  or is that attached to your -- to the report you
10  brought with you?
11       A.  I don't have that attached, no, because
12  there were no changes to that.  So I didn't --
13  didn't print it out.
14       Q.  That was gonna be my next question.
15       Did you make any changes to Appendix D
16  to your amended report?
17       A.  No, I did not.
18       Q.  And with regard to the articles we just
19  went through, besides those we've talked about that
20  you referenced in your report -- that's Harper, Emi,
21  Ding, O'Brien, Woolen, Davis, and Phung -- do you
22  intend to make reference to or otherwise comment on
23  those articles as part of your opinions in this
24  case?
25       A.  It depends upon what questions are asked

Page 166

1  at trial.  I don't -- I can't predict that.  I mean,
2  I would be prepared to do that if counsel asks
3  questions consistent with how I have described or
4  used the papers in my report.
5      Q.  You did not specifically reference that
6  other set of papers in your report, correct?
7      A.  The others that we -- you didn't just
8  list, that is correct.
9      Q.  Why did you not do that?  In other words,
10  why are those different than the ones you included
11  in your report?
12      A.  Well, some of them are ones that I felt
13  like were beyond the scope of what I was asked to
14  do.  In other words, I'm not a causation expert.  So
15  my goal was not to find every paper, for example,
16  that might be used by a causation expert to -- to
17  build a story for causation.  So that explains some
18  of the papers.
19          I've already talked about the Goodman
20  paper at -- at -- actually at length, I thought,
21  with Ms. Davidson in my earlier testimony.  And I --
22  again, it's a -- it's a review paper of someone else
23  doing causation.  So that's beyond the scope of --
24  of, you know, again, what I -- what I am doing.
25          And one thing that I -- we didn't

Page 167

1  mention, the ones that we just listed, the published
2  articles, you should also mention the EPA document
3  because that one is actually discussed specifically
4  in my -- in my report.
5      Q.  Okay.
6      A.  So if asked about that one, I would be
7  prepared to address that.
8      Q.  You mentioned that you marked in your
9  report the substantive areas of changes from your
10  previous MDL report.
11          Do you recall telling me that?
12      A.  Actually, I tried to mark everything that
13  was different, even a one-word change.  Like on the
14  first page, I highlighted the word "second," and I
15  highlighted the date.  So, yeah, I tried -- I
16  attempted to do that, yes.
17      Q.  Are there any changes that to -- let me --
18  let me restate that.
19          Are there any additions to your
20  testimony, from a substantive standpoint, that you
21  have marked in your report that we have not talked
22  about?
23      A.  So there is the typo I gave you on Harper.
24  It should be 2023, not 2021.  And there are two
25  places, I believe, in my report.  For some reason

Page 168

1  when I edited it, I dropped the dates for the -- for
2  depositions.
3          And so if there's confusion, you want
4  me to tell you what those are so that you'll know?
5          They were in my original report
6  from -- well -- and they were in the June 2021
7  report cited properly, but for some reason, the
8  dates got dropped.
9      Q.  Let me ask it in a different way.
10          Are there any additional authorities
11  or citations in support of your opinions that you
12  have referenced in your second amended MDL report
13  that we have not talked about here today?
14      A.  No, I believe we've gone through all of
15  those.
16          MR. HEGARTY:  Let's go off the record.
17          THE COURT REPORTER:  Off the record at
18  12:41 p.m.
19          (A recess was taken from 12:41 p.m. to
20          12:57 p.m.)
21          THE COURT REPORTER:  We're back on the
22  record at 12:57 p.m.
23  BY MR. HEGARTY:
24      Q.  Going back to paragraph 29 of your report,
25  Dr. Plunkett, where you made reference to EPA's

Page 169

1  "proposed" and then "final" rule?
2      A.  (Complied.)  Yes.
3      Q.  Are you there?
4      A.  I am.
5      Q.  As for lung and mesothelioma risks
6  reported by EPA in its risk evaluation, would use of
7  Johnson's Baby Powder reach the levels discussed by
8  FDA in that risk evaluation?
9      A.  I haven't done that analysis because I
10  haven't done an analysis of mesothelioma risk.
11          But do you want me to look and see
12  what they say?  I'd -- I'd have stop and go back and
13  look.
14      Q.  I'm not sure we're connecting.
15          With regard to my question, as far as
16  the asbestos levels evaluated by EPA in its risk
17  evaluation, would a user of Johnson's Baby Powder
18  ever reach those -- that level of asbestos through
19  use?
20      A.  And I'm at -- I'm saying that I -- it's
21  beyond the scope of what I have done.  But I would
22  have to go look and see if they have any statements.
23  I can't recall that.
24          I did not do -- I'm not a case-
25  specific person, so I wasn't gonna do an exposure

Laura Massey Plunkett, Ph.D.

Page 170

1 assessment. And if you're asking me about -- you're
2 asking me about inhalation pathway, that's beyond
3 the scope of the work I've done for sure.
4     Q.  But do you know if any user of Johnson's
5 Baby Powder has ever been exposed to the levels and
6 types of asbestos as EPA discusses in its risk
7 evaluation document?
8     A.  It's beyond the scope of what I did.  But
9 I can -- what I can tell you is we do know that in
10 the trials I've been involved in, that users of baby
11 powder have detectable levels of not only talc
12 fibers, but some of them asbestos, in their tissues
13 of their ovarian tumors.  That's all I can tell you.
14 I -- I -- it's beyond the scope of what I did.
15     Q.  We talked earlier about the Woolen
16 article, and you also were asked about the Woolen
17 article at your October 2023 deposition.
18         Do you recall that?
19     A.  Yes.
20     Q.  I'm not sure if I asked you this question,
21 and I apologize if I already have.
22         Have you done any further analysis of
23 the Woolen paper since your October 2023 deposition?
24     A.  Excuse me.  No.  Other than to use it and
25 write the sentence -- I mean, I did compose a

Page 171

1 sentence on it to put in my report.  So -- and that
2 was after my depo, I decided how to describe it.
3         So that I did do, as far as made a
4 decision how I would describe the results.  But I
5 didn't do any analysis, if you're asking, or didn't
6 make any phone calls to anybody or discussed the
7 paper with anybody else.  No.
8     Q.  Let me ask in a little bit different way.
9         Do you have any opinions about the
10 Woolen paper that you have developed -- that you
11 developed since October -- since your October 2023
12 deposition?  In other words, opinions that you
13 didn't have as of that time?
14     A.  Only -- only the opinions as -- that I
15 expressed it specifically in my report.  How it fits
16 into my report.  And then I think I have a sentence
17 if you want me to find it.  There's a sentence where
18 I describe the results.
19         Do you want me to find it, or you know
20 where that is?
21     Q.  No.  My question is a little more general
22 than your report.
23         My question is whether you have formed
24 any opinions as to the Woolen paper since your
25 deposition October 2023 that you didn't have at the

Page 172

1 time.
2     A.  That's what I'm trying to answer for you.
3 I obviously hadn't decided at the time how I was
4 going to describe it in my report.  So that's -- I
5 mean, I don't know if that's an opinion.  But that
6 is what is stated in my report is how I describe it.
7 I think that opinion I expressed at the time is
8 consistent with what is in my report.  So I guess it
9 is not new.
10    Q.  Is that opinion -- are the opinions that
11 you testified in October 2023 consistent with what
12 you told me today about your opinions concerning the
13 Woolen study?
14    A.  Well, I said more -- different things, I'm
15 sure.  But, yes, I think it's consistent.  I mean, I
16 don't require -- I don't remember the exact -- I
17 answered a number of very specific questions from
18 Ms. Davidson about the paper.
19        And so obviously you haven't asked
20 those same ones.  But, I mean, I -- I don't -- I
21 wouldn't -- there's nothing else I would add.  Maybe
22 that's the way to answer it for you.
23    Q.  Do you have any intent -- intention here
24 today to do any further analysis of the reviewer
25 comments to the Harper paper than you made at the

Page 173

1 time of your October 2023 deposition?
2    A.  No, because I consider that inappropriate
3 based on the fact that those are confidential
4 comments between the reviewers and the author.  And
5 I typically would not do that.  So I haven't planned
6 to -- I don't think I even have a -- I don't even
7 have a copy of those.  I mean, maybe they were
8 marked as an exhibit to the depo, but I -- I don't
9 have those.
10    Q.  Have there been any studies that have been
11 published in the medical literature since August
12 of 2021 that included findings that did not show an
13 association between talc use in any type of ovarian
14 cancer?
15    A.  Are you asking me for epidemiological
16 studies?  What are you asking me for?  So I --
17    Q.  I'll be more specific.  Epidemiologic
18 studies.
19    A.  So I -- I need my pile of papers back.  I
20 think that's the -- maybe -- let me look at one of
21 the ones that's in my pile.  (Examined exhibit.)
22 No, the ones that I have in my pile are not
23 individual studies.  There are some -- some review
24 papers but not individual studies.
25    Q.  So are your notes about --

Laura Massey Plunkett, Ph.D.

1    A.  So I can't -- I did not do -- I did not do
2  it -- again, I wasn't a causation expert, so I
3  wasn't attempting to identify every study out there.
4  I'm aware of the fact that there was some positive,
5  and I've testified to this.
6        There are some positive epi.  There's
7  some negative epi.  But that's -- I believe that
8  is -- is the additional information around that
9  would be something that the epidemiologist would
10 address.
11   Q.  Since August of 2021, have you done any
12 research or analysis into the creation of the NCI
13 PDQ® on ovarian cancer?
14   A.  I don't believe I've done that since
15 August of 2- -- of 2021.  I know we did do that and
16 talked about that at trial before that time.
17   Q.  Since August of 2021, have you done any
18 research or analysis into the editorial boards for
19 the NCI PDQ®?
20   A.  I don't think there's been anything since
21 then.  But I -- again, that's something that we did
22 talk about at trial and maybe even in an earlier
23 deposition.  I don't know.  I don't recall anything
24 that I've done since August of 2021 in that.
25   Q.  Have you done any type of work with

1  respect to the NCI PDQ® and its -- in terms of
2  evaluating it and otherwise assessing it since
3  August 2021?
4    A.  I have looked at it.  I have looked at
5  them on the -- I mean, I've gone and looked at
6  different websites since then, yes.
7    Q.  Do you have any current opinions about the
8  NCI PDQ® that you have not previously testified to?
9    A.  I don't think so.  I mean -- I mean, I
10 would be prepared to testify as I have in the past.
11 And I haven't cited any new documents at this point.
12       So I'd say that my previous testimony,
13 I would have -- be prepared to testify as I did in
14 the past because my issues with it have been mainly
15 related with the changes that occurred in, what,
16 2014 and --
17       (Speaking simultaneously.)
18   Q.  And I'm not asking for anything you've
19 already said or anything you have already testified
20 to or reported.
21       My question is really limited to:
22 Sitting here today, are you aware of anything else
23 you would -- you would say about the NCI PDQ® that
24 you have not previously said?
25   A.  I don't believe so, no.

1    Q.  All right.  Turn to paragraph 110.
2    A.  (Complied.)  Okay.
3    Q.  You added a reference in this paragraph
4  to -- that added to your statements about other
5  manufacturers' talc-based body powders and adding
6  warnings to their labels.
7        Do you see that addition?
8    A.  Yes, that was something that I had
9  testified to at trial.
10   Q.  Since August of 2021, have you reviewed
11 any additional manufacturers' labels of any talcum
12 powder product for any warnings with regard to
13 ovarian cancer?
14   A.  I have -- every time I go out to the
15 store, I do look at -- at what I can find on the
16 shelf.  But it's not been a directed review in terms
17 of like I did back then where I was going to find as
18 many products as I could in looking at websites and
19 trying to determine when things were added.
20   Q.  Since August of -- I'm sorry.
21   A.  So not -- I could say to you, no, it would
22 probably be different other than having, you know,
23 aware of the fact that there are products that still
24 carry a label.
25   Q.  Since August 2021, have you found any

1  additional talcum powder products that contain a
2  warning with regard to ovarian cancer besides what
3  you list in your second amended report?
4    A.  I don't believe so, no.
5    Q.  Since August of 2021, have you done any
6  additional research, analysis, or undertaken any
7  effort to determine the reasoning for each
8  manufacturer's addition of any warning referring to
9  ovarian cancer to their talcum powder product label?
10   A.  I looked for -- well, back in -- before
11 2021, I looked for publicly available information
12 and didn't find such.  I haven't done any -- for
13 example, I don't have -- I don't have -- haven't
14 done -- or the attorneys I've worked with, I
15 don't -- I'm not aware of them having done discovery
16 or subpoenas or anything to try to get information.
17       So, no, I -- I have no additional
18 research I've done because I don't have access to
19 where that information would come from, which would
20 be typically internal company files.
21   Q.  You were asked at, I believe, the Giese
22 trial about websites looking for these
23 manufacturers.
24       Do you recall that?
25   A.  I don't -- sorry, I don't remember a

Laura Massey Plunkett, Ph.D.

Page 178

1 discussion at the Giese trial.  But if you -- I
2 mean, I believe you that we probably -- we discussed
3 it at every trial.  So I'm sure we did do something
4 like that.
5      Q.   Turn to paragraph 117, please.
6      A.   (Complied.)  Yes, I'm there.
7      Q.   The footnote at the end of that paragraph
8 is new, Footnote 68.
9           Why did you add that footnote?
10      A.   Because it's consistent with something
11 I've said at trial.  So I believe at trial when I
12 was asked about or answered questions either on
13 direct or cross about CDRH's actions versus
14 Cosmetics actions, I pointed out that there's
15 different regulatory authority and different
16 requirements.
17           And so I'm just -- there -- again,
18 this is -- several times in my report, I attempted
19 to make sure that I included the types of
20 clarifications or discussion that were specific to
21 trial testimony as well.  And that's one of them.
22      Q.   Well, you go out -- you actually say it's
23 important to realize that the group at FDA that
24 banned, et cetera.
25           Why did you use that language, and how

Page 179

1 does that factor into your opinions as referenced in
2 this paragraph?
3      A.   Because it has to do with the way that
4 devices are looked at versus -- so it's a different
5 regulatory standard and different regulatory
6 authority.  So CDRH has the authority and has had
7 the authority for years to actually ban substances.
8           And it's a much easier process versus
9 the rulemaking processes that the cosmetics group
10 would have to go through.  So it's the idea that an
11 action taken -- and I talk -- I talked about this,
12 that I know, at trial.
13           An action taken by CDRH and what they
14 can and can't do is very different than the -- than
15 the fact that in the cosmetics world, the -- the
16 responsibility is solely on the company to make sure
17 that if there's any possibility of a hazard, that
18 they either warn or don't have something in their
19 product.  That is their sole responsibility.
20           Whereas at CDRH, devices have both
21 risks and benefits.  And certain decisions can be
22 made by -- by companies or by FDA weighing more than
23 just the risks.
24      Q.   The reason you added this footnote was to
25 make your report consistent with your testimony in

Page 180

1 the past; is that fair?
2      A.   Yes.  And I kind of say it -- I -- I kind
3 of allude to that in that paragraph before I added
4 that.  But I know this is a very specific
5 description I've had at trial.
6           So, again, this is another example of
7 I'm trying to incorporate what I've said at trial to
8 make it very clear.  Although I'm sure, Mr. Hegarty,
9 you know what my opinion is.
10           But to make sure that anybody who
11 reads this report understands that some of the
12 nuances around some of the statements I make.
13      Q.   The Federal Register you cite states the
14 following as to the risk addressed.  It says, quote,
15 "In aggregate, the risk of powdered gloves include
16 severe airway inflammation, hypersensitivity
17 reactions, allergic reactions (including asthma),
18 allergic rhinitis, conjunctivitis, dyspnea, as well
19 as granuloma and adhesion -- adhesion formation when
20 exposed to internal tissue."  Does that -- close
21 quote.
22           Does that sound familiar to you?
23      A.   Yes, it does.
24      Q.   And is that a listing of the risks that --
25 that led to FDA to ban the use of powder on surgical

Page 181

1 gloves?
2      A.   I can't -- I can't get to the minds of the
3 FDA and tell you that that specifically is what led
4 to it.  But I would argue that when you read the --
5 the notice, that certainly that information you've
6 just read was part of the -- of the thought process
7 for why they took the action.
8           They also had a lot of, actually,
9 patient adverse experience reports that they talk
10 about those.  I mean, it -- there's a -- and they
11 also were aware that there was -- there was other --
12 the -- the gloves didn't have to have the powder on
13 it.
14           In other words, there's something you
15 could do.  It's not like you're gonna say, "If we
16 ban the powder on the gloves, we still can't use
17 sterile surgical gloves," because you could.
18      Q.   Since August of 2021, as part of your
19 literature -- you're -- you're keeping yourself
20 updated as far as literature.
21           Did you find any articles discussing
22 asbestos in ovarian cancer?  That is, articles you
23 found for the first time after August 2021?
24      A.   New articles?  So I -- I did not do a
25 directed search on that, although I am aware that

Page 182

1 some of those exist. And because I've heard them
2 discussed just kind of, you know, in conversation.
3 But I have not, no. I -- there's a a -- from my
4 understanding of what's there, there is some
5 literature that causation experts rely upon that is
6 post 2021.
7    Q.  And without disclosing any conversation
8 you've had with counsel, what articles are you aware
9 of that exist?
10    A.  I don't know the name of the article. I
11 just happen to know that there -- in conversations
12 I've had that there is some additional literature in
13 this area.
14    Q.  Same question as to heavy metals: Have
15 you found any articles since August of 2021 that
16 you've not seen before concerning heavy metal
17 exposure and risk of cancer?
18    A.  No. And on the heavy metals and actually
19 on the asbestos as well, don't forget that in my
20 discussion of my opinions, the issue is having
21 exposure to the entire mixture, not just to one
22 particular constituent.
23         So the epidemiological literature
24 related to perineal use of talc, it's talc with all
25 the things in it. And the asbestos literature is

Page 183

1 important in terms of notice and hazard, absolutely,
2 with my regulatory opinions.
3         But there is different issues if I was
4 doing causation analysis, which I'm not doing.
5    Q.  Just to circle --
6    A.  So I haven't done that because I was not
7 doing a causation analysis for -- for a particular
8 constituent only.
9    Q.  Just to circle back to the asbestos and
10 ovarian cancer literature that you said you heard
11 about, do you recall anything that you heard about
12 with regard to that asbestos and ovarian cancer
13 literature?
14    A.  Not -- no, not as I sit here. No, I
15 just -- I remember there being a conversation about
16 something.
17    Q.  Do you have any intent to go and find
18 any -- that article or any other articles as part of
19 your work on the MDL?
20    A.  No, I don't at this point in time.
21    Q.  Do you have any additional plans, that you
22 know of sitting here today, as far as additional
23 research you're going to do for purposes of your
24 opinions in the MDL?
25    A.  I -- I would expect -- as I said earlier

Page 184

1 in my report, I did add a sentence about I would
2 anticipate and plan to look at defense expert
3 reports, if there's any amendments made. So
4 absolutely that is one thing I would plan to do.
5         I would -- I do plan, as I typically
6 do on at least a monthly basis, to continue to watch
7 to see if there's any changes in terms of FDA
8 regulation of cosmetics or anything about talc that
9 FDA puts out.
10         And I do do literature searches, which
11 I will continue to do. Maybe not on a monthly, but
12 every other month basis, to look at what's new
13 that's directly relevant to my report.
14         But it's not like I can say to you, "I
15 plan to amend my report." At this point in time, I
16 have no plans to do that unless something very
17 important or different comes out.
18    Q.  Couple additional questions as it relates
19 to the Ding and Emi studies.
20         Do you have Ding and Emi there handy?
21    A.  I can get them. Just a second.
22 (Complied.) I have them, yes.
23    Q.  Looking first at the Ding study, the first
24 page, there's a reference to -- let me -- let me be
25 specific.

Page 185

1         You look at the second column, first
2 paragraph on the first page that begins, "Oxidative
3 stress"?
4    A.  Yes, I'm there.
5    Q.  That paragraph then below lists certain
6 reactive oxygen species.
7         Do you see those -- that listing?
8    A.  I do.
9    Q.  Are you aware of any studies that look at
10 levels for the reactive oxygen species in women
11 using talcum powder?
12    A.  I doubt you can do that study based upon
13 the invasive nature of the study in order to do --
14 but I am aware that such studies have been done in
15 isolated cell tissues in animals looking at reactive
16 oxygen species. So there is -- there is -- these
17 kinds of studies would typically be done either in
18 cell, tissues, or in animals, not in humans.
19    Q.  Are you aware of any animal studies that
20 have looked at these specific reactive oxygen
21 species? That is, those listed in that first
22 paragraph on the right-hand column?
23    A.  I'd have to go look, but it's possible. I
24 note some of these are from cells and tissue
25 studies. It's possible that some of the animal

Laura Massey Plunkett, Ph.D.

Page 186

1 studies may have looked at SODs, superoxide
2 dismutate levels, enzyme levels. But I don't know
3 that we've looked at the anions themselves.
4     Q.   And my question was specific as to the
5 listing of reactive oxygen species on page 1 and
6 that paragraph on the right-hand side.
7           It doesn't refer to SOD, right?
8     A.   I don't think -- well, that SOD is what
9 forms some of these. The activity of that forms
10 some of those. So I'm just trying to explain that
11 that's what the endpoint you might find versus the
12 actual measurement of -- of the species.
13           But to answer -- I can't answer
14 without looking at my animal studies. I -- it's
15 been a while since I've looked at -- at each of them
16 for all of the endpoints that are there. Some of
17 them do address this hypothesis, so I'd have to go
18 look.
19     Q.   If you would next turn to the Emi paper.
20     A.   (Complied.) Okay.
21     Q.   In the Emi paper, did the authors use the
22 same size of titanium dioxide particles as they used
23 for talc particles?
24     A.   I've had -- I'll have to look. Just a
25 second. (Examined exhibit.) No, it has to do with

Page 187

1 the source.
2     Q.   Can the size of the particle have an
3 effect on epigenetic changes in the cell?
4     A.   It can.
5     Q.   What does "methylization" mean?
6     A.   Demethylation, are you asking me? Where
7 are -- where are you reading?
8     Q.   Well, I'm asking you the term,
9 methylization, is that not a proper term?
10     A.   Well, methylization -- methylization
11 versus demethylization, demethylization is -- is
12 removal of methyl groups. Methylization would be
13 the addition of methyl groups just generally.
14           But where are you looking at in this
15 paper?
16     Q.   What does "demethylization" mean with
17 respect to the findings in this study?
18     A.   Has to do with changes in DNA, if I
19 remember correctly, but let me find it.
20     Q.   Well, let me change my question. Let me
21 withdraw that question.
22           Did this study find any mutations in
23 cells?
24     A.   I don't think they looked for that. But
25 let me look. Where are -- I mean, they were

Page 188

1 focusing not on mutagenic events but on
2 transcription and epigenomic changes, which is
3 different than mutagenesis. But maybe if there's
4 something you're -- you're pointing to.
5     Q.   Please look in the abstract towards the
6 end. This is on the first page. It says, "We found
7 a few loci where both the transcriptional changes
8 and epigenetic changes occurred in the pathways
9 involving immune and inflammatory signaling."
10           Do you see where I'm reading?
11     A.   I do.
12     Q.   What does that sentence mean, from your
13 reading of this paper?
14     A.   It's -- so to be simplistic, it means they
15 found changes in these cells in pathways that are
16 involved with immune and inflammatory signaling.
17           And that the endpoints they're looking
18 at is at the level of the cell as in gene
19 transcription -- taking the gene and producing a
20 protein -- or some other -- some other substance.
21 And then looking at epigenetic changes, they're
22 looking at changes downstream from that gene
23 transcription.
24           So looking at changes within the cell
25 itself, like the methylation, those kinds of things.

Page 189

1           But essentially, to me, the most
2 important thing in that sentence is telling me what
3 they found was they found places and changes in the
4 cells that -- and the -- the changes they were
5 seeing related to pathways for immune and
6 inflammatory signaling. Which is consistent with
7 the things that I've talked about in terms of what
8 the changes in the macrophages would be and their
9 inability to -- or either their -- their ability to
10 release a molecule or attract molecules that are
11 linked to inflammation and immune system changes or
12 their inability to function properly to engulf
13 particles and remove them from the site of action.
14     Q.   From your reading of this paper, what did
15 the authors mean when they say a "few loci"?
16     A.   Well, looking at places, so they're --
17 they have a very specific analytical method where
18 they're looking at different clusters of changes,
19 and they're finding the places where those changes
20 are occurring in the genome.
21           So it's -- it's an idea of mapping,
22 right? They do some mapping, and they're looking --
23 in those places, they're finding some of these
24 changes are places that are related to inflammation
25 and -- and inflammatory signaling pathways.

Laura Massey Plunkett, Ph.D.

Page 190

1   So things that when you alter those
2   locations in the genome, you could get functional
3   changes potentially in the cells as well.
4        Q.  Did the authors quantify the -- what they
5   characterize as "few loci"?
6        A.  I have to look.  I don't know.  That's a
7   detail I can't tell you without rereading the paper.
8   If you -- if there -- if you want me to do that, I
9   can take a minute to do that.
10       Q.  Well, in the -- in stating -- in staying
11  within the abstract, it refers to the author as
12  using "epigenome-wide bisulfite sequencing."
13           Do you see that?
14       A.  Looking at DNA methylation, yeah.  The way
15  they looked at it, yes.  That's correct.
16       Q.  What is "epigenome-wide bisulfite
17  sequencing"?
18       A.  So that's looked across the genome of the
19  cell.  And they're looking for, again, patterns in
20  the sequencing and whether or not they have these --
21  bisulphite sequencing crossed it has to do with
22  changes that would be related to methylation
23  patterns of the genome -- of the genes.
24           MR. HEGARTY:  Let's go off the record.
25           THE COURT REPORTER:  We're off the

Page 191

1   record at 1:25 p.m.
2           (A recess was taken from 1:25 p.m. to
3            1:26 p.m.)
4           THE COURT REPORTER:  We're back on the
5   record at 1:26 p.m.
6   BY MR. HEGARTY:
7        Q.  Going back to your report at paragraph 117
8   where we were talking about the footnote that you
9   added?
10       A.  Yes.
11       Q.  I read to you a list of conditions
12  referenced by FDA.  Those are airway inflammation
13  hypersensitivity reactions, allergic reactions
14  (including asthma), allergic rhinitis, conjuncti-
15  vitis, dyspnea, granuloma, adhesion formation.
16           Can you cite any medical or scientific
17  literature linking any of those conditions to
18  ovarian cancer?
19       A.  Before adhesions, what did you list?
20       Q.  Granuloma.
21       A.  So granuloma is -- granuloma is not a --
22  is not an ovarian cancer response.  But granulomas
23  are changes in tissue leading to proliferative
24  changes, which could, in some cases, be a lead to
25  changes in nearby cells to -- there's some

Page 192

1   literature on that issue of if you change
2   proliferation profiles, you can lead to something
3   different.
4           But, no, these are different
5   endpoints.  These are not cancer endpoints.  And
6   this glove literature is talking about more of the
7   acute responses that you get with surgical exposure
8   to powder on gloves.  Or to the physician's exposure
9   to the gloves.  Or the nurses in the -- in the suite
10  exposure to the powder on the gloves when they take
11  the gloves out of the box and put them on and off
12  and -- and doff and don and all those things.
13           So it's different.  It a different --
14  definitely a different endpoint.  It's a different
15  exposure pattern.  All those things that would occur
16  based upon a different way being exposed than we're
17  talking about here with ovarian cancer and perineal
18  exposure to talc.
19       Q.  Please look at paragraph -- again at
20  paragraph 111 of your report.
21       A.  (Complied.)  Okay.
22       Q.  Again, looking at the last couple of lines
23  that you added to that paragraph beginning, "These
24  actions by Johnson & Johnson"; do you see those two
25  sentences?

Page 193

1        A.  Yes.
2        Q.  And with regard to the reference to
3   Johnson & Johnson being aware that -- that corn
4   starch was a safer alternative product, what was
5   that awareness as far as how it was safer?
6        A.  Because it was a product that wasn't
7   associated with the toxic tissue responses that --
8   that the company was aware of.
9           So there you go back to -- let me see
10  what document is in this paragraph I'm talking
11  about.  Hold on a second.
12           So above, I had talked about internal
13  corporate documents earlier.  But now I'm talking
14  about the 1964 memo where they say that in -- in
15  condoms, corn starch replaced talc because it was
16  found to be safely absorbed when talc was not.
17           So that's the issue of -- of a safety
18  profile.  Something that can be removed away from
19  the site.  It isn't gonna lead to a long-term
20  irritative response or even exposure beyond the
21  vagina, which is what they're talking about there.
22           In the next one, they're talking --
23  it's an internal document where they're talking
24  about evidence that they -- they followed.  And then
25  in this particular memorandum, they say that that --

Laura Massey Plunkett, Ph.D.

Page 194

1 they talk about the -- their concern over the
2 conclusions drawn.
3        So, I mean, I'm -- I'm pointing you to
4 a variety of bullets that are gonna -- oh, I'm
5 sorry. I'm on paragraph -- wrong paragraph. I
6 apologize.
7    Q.  Yeah, I was trying to follow where you
8 were on, where you were on.
9    A.  Yeah, I know. I'm sorry. I -- I put this
10 together in a backwards way. Okay. Here we go.
11 I'm sorry.
12        So we're in 111; is that correct?
13    Q.  Yes. And to be -- and perhaps focus your
14 response, you made a reference to a phrase called
15 "toxic tissue responses" to how Johnson & Johnson
16 believed corn starch was safer. It was a safer
17 alternative.
18        What do you mean by "toxic tissue
19 response"?
20    A.  So that comes from the 1953 patent
21 application where they talk about the toxic tissue
22 reactions to talc versus corn starch. And that's
23 why they developed an alternative and patented an
24 alternative dusting powder internally for its --
25 it -- how -- how the tissue internally reacted to

Page 195

1 it.
2        So that's what I'm talking about in
3 the first part of paragraph 111. I also cite to a
4 variety of documents. And if you look at -- and
5 I -- I -- by looking at the numbers, I can't tell
6 you which ones they are.
7        But there's a number of documents
8 in -- in this period of time in the '60s and '70s
9 where the company is looking to replace talc with
10 corn starch.
11        And they -- they are doing the --
12 they're doing that type of research. And we have
13 that statement from '64 with the safe absorption in
14 the vagina where talc is not, right? So that --
15 that also kind of goes back to where I'm going.
16        And then I -- I go on here then into
17 this -- the FDA OTC Monograph where corn starch is
18 listed as GRASE for use in OTC being -- and it was
19 noted to be "superior to talc in terms of safety and
20 efficacy." And I refer to documents there.
21        So, I mean, I don't know. This
22 paragraph speaks for itself. So I point to the
23 evidence above as to why I believe I'm saying to you
24 in that paragraph later on that these actions by --
25 that they took to -- to study it.

Page 196

1        To do the things on synthetic talc
2 that they were looking at, as well as on corn starch
3 as a replacement indicate they were aware that there
4 was safer -- there was a safer alternative product.
5        And corn starch was something they
6 were looking at over and over again.
7    Q.  Do you have any additional comments or
8 testimony about the amendments to your last report
9 that you had anticipated talking about or planned on
10 talking about or expected to talk about that we have
11 not discussed today?
12    A.  I don't think I understand your question.
13        Are you asking me just I'm -- I'm not
14 going to be -- might be long.
15        You're asking me is there anything --
16    Q.  You can repeat it back to me.
17    A.  Okay. Is there anything that you -- we
18 have talked -- we haven't talked about today that I
19 would expect to talk about based upon what is in my
20 report? Is that what you're asking me?
21    Q.  That's another way to phrase my question.
22    A.  Okay. I think we've covered that I had --
23 had anticipated covering. And we've -- I think
24 you've been through almost every change I made. And
25 I've talked to you about it.

Page 197

1        The only thing you missed is, like I
2 told you, there are a couple of places where I have
3 left out dates that go to depositions. So if you
4 have any question, that will be in this copy of
5 exhibit that I'm gonna send you. I handwrote those
6 in.
7    Q.  And would you just take a moment with our
8 last time to just flip through the highlighted
9 portions of your -- of your report, which I -- I
10 don't have the opportunity to see. And just confirm
11 that, as far as any substantive areas of your
12 testimony -- of your report, that we -- you added,
13 that whether there's any of those we haven't talked
14 about.
15    A.  (Examined exhibits.) So I would just -- I
16 will just point out that at page 58, paragraph 75, I
17 think I've said all these things that are in this
18 paragraph where I mentioned specifically a sentence
19 about Davis, one about Woolen, about -- one about
20 Phung. But I would make sure you know that -- that
21 those are my opinion.
22    Q.  I did not stop at that paragraph because I
23 believe we had covered those opinions elsewhere.
24        Is that a fair statement?
25    A.  Yes, I think we have. But I just -- that

Laura Massey Plunkett, Ph.D.

Page 198

1  was the paragraph I was -- that I said to you
2  earlier, "I think I can find it for you," that was
3  it.
4          (Examined exhibits.)  No, I think
5  we've covered everything that I had highlighted.
6  We've touched on it or I've -- or you have -- you've
7  gone there or I've said it's there, so ...
8      Q.   Okay.
9          MR. HEGARTY:  Those are all the
10  questions I have for you, then, Doctor.
11          Thank you.
12          MR. MEADOWS:  Mark, if you'll give me
13  about five minutes.
14          MR. HEGARTY:  Sure.
15          MR. MEADOWS:  I may have some
16  questions.  I may not, but ...
17          MR. HEGARTY:  Okay.  All right.
18          Thank you.
19          THE COURT REPORTER:  All right.  We're
20  off the record at 1:37 p.m.
21          (A recess was taken from 1:37 p.m. to
22          1:40 p.m.)
23          THE COURT REPORTER:  We're back on the
24  record at 1:40 p.m.
25          Go ahead and close us out, Ted.

Page 199

1          MR. MEADOWS:  No questions on behalf
2  of plaintiffs.
3          I do think that Dr. Plunkett, in her
4  typical practice, is to read and sign, so ...
5          THE WITNESS:  Yes, I would like to,
6  please.
7          THE COURT REPORTER:  Yes, ma'am.  I'll
8  notify the office.
9          And, Mr. Meadows, would you like a
10  copy?
11          MR. MEADOWS:  Yes, I would like a
12  copy.
13          MR. HEGARTY:  All right.  Well, thank
14  you, everyone.
15          THE COURT REPORTER:  Thank you.  With
16  that, that concludes our deposition at 1:40 p.m.
17
18          (Remote deposition concluded at
19          1:40 p.m., December 21, 2023.)
20
21
22
23
24
25

Page 200

1          CHANGES AND SIGNATURE
2  WITNESS NAME:  LAURA MASSEY PLUNKETT, PH.D.
3  DATE:  DECEMBER 21, 2023
4  PAGE/LINE    CHANGE              REASON
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____

Page 201

1      I, LAURA MASSEY PLUNKETT, PH.D., have read the
2  foregoing deposition and hereby affix my signature
3  that same is true and correct, except as noted
4  above.
5
6          _____
7          LAURA MASSEY PLUNKETT, PH.D.
8  THE STATE OF _____)
9  COUNTY OF _____)
10
11      Before me, _____, on
12  this day personally appeared LAURA MASSEY PLUNKETT,
13  PH.D., known to me (or proved to me under oath or
14  through _____) (description of
15  identity card or other document) to be the person
16  whose name is subscribed to the foregoing instrument
17  and acknowledged to me that they executed the same
18  for the purposes and consideration therein
19  expressed.
20      Given under my hand and seal of office this
21  _____ day of _____, 2023.
22
23          _____
24          NOTARY PUBLIC IN AND FOR
25          THE STATE OF _____

Page 202

```
1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF NEW JERSEY
2
   IN RE JOHNSON & JOHNSON    §
3  TALCUM POWDER PRODUCTS     § MDL NO.:
   MARKETING, SALES           §
4  PRACTICES, AND PRODUCTS    § 16-2738(MAS)(RLS)
   LIABILITY LITIGATION       §
5

6

7    *******************************************

8      REMOTE VIDEOCONFERENCED DEPOSITION OF

9          LAURA MASSEY PLUNKETT, PH.D.

10            DECEMBER 21, 2023

11   *******************************************

12

13           CERTIFIED STENOGRAPHIC

14        COURT REPORTER'S CERTIFICATE

15

16    I, Karen L. D. Schoeve, RDR, CRR, RSA,

17 residing in the State of Texas, do hereby certify

18 that the foregoing proceedings were reported

19 remotely by me and that the foregoing transcript

20 constitutes a full, true, and correct transcription

21 of my stenographic notes, to the best of my ability

22 and hereby certify to the following:

23    By agreement of all attending attorneys, the

24 witness, LAURA MASSEY PLUNKETT, PH.D., was remotely

25 duly sworn by the officer and that the transcript of
```

Page 203

```
1  the oral deposition is a true record of the

2  testimony given by the witness;

3     That the original deposition was delivered to

4  Mark C. Hegarty, custodial attorney;

5     That a copy of this certificate was served on

6  all parties and/or the witness shown herein on

7  _____.

8     I further certify that the signature of the

9  witness was requested by the witness or a party

10 before the completion of the deposition and the

11 signature is to be returned within 30 days from date

12 of receipt of the transcript.

13    If returned, the attached Changes and

14 Signature Page contains any changes and the reasons

15 therefor.

16    That pursuant to information given to the

17 deposition officer at the time said testimony was

18 taken, the following includes counsel for all

19 parties of record:

20

21 FOR THE PLAINTIFFS and THE WITNESS:

22    TED G. MEADOWS, ESQUIRE
         BEASLEY ALLEN, P.C.
23
   FOR THE PLAINTIFFS:
24
      CHRISTOPHER V. TISI, ESQUIRE
25    LEVIN PAPANTONIO RAFFERTY
```

Page 204

```
1  FOR THE DEFENDANTS:

2     MARK C. HEGARTY, ESQUIRE
        SHOOK, HARDY & BACON L.L.P.
3

4     I further certify that I am neither counsel

5  for, related to, nor employed by any of the parties

6  in the action in which this proceeding was taken,

7  and further that I am not financially or otherwise

8  interested in the outcome of the action.

9

10    Subscribed and sworn to on this the 7th day of

11 January, 2024.

12

13

14

15

16

17

18

19

20

21

22

23

24

25 Job No. 348854
```

Karen L.D. Schoeve, RDR, CRR, RSA
NCRA Exp. Date: 09-30-24
Litigation Services
Firm Registration No. 726
3960 Howard Hughes Parkway, Suite 700
Las Vegas, Nevada 89169
T: 877.370.3377
F: 917.591.5672

**WORD INDEX**

**< § >**
§  1:*1, 3, 4*
 202:*1, 3, 4*

**< 0 >**
**01/11/22**  6:*7*
**02/02/22**
 7:*21*
**02/03/23**  7:*5*
**03/15/22**
 6:*24*
**04/11/21**
 6:*18*
**04/23**  7:*11*
**05/06/22**
 5:*19*
**05/08/21**
 7:*14*
**05/19/20**  6:*3*
**07/17/20**
 6:*14*
**08/11/22**
 5:*23*
**09-30-24**
 204:*17*

**< 1 >**
**1**  5:*1, 24*
 6:*4, 25*
 38:*16, 19*
 53:*6*  186:*5*
**1:25**  191:*1,
2*
**1:26**  191:*3,
5*
**1:37**  198:*20,
21*
**1:40**  2:*6*
 198:*22, 24*
 199:*16, 19*

**10**  6:*7, 18*
 129:*16*
 160:*13, 14*
**10:18**  64:*12,
13*
**10:19**  64:*14,
16*
**10:34**  76:*15,
16*
**10:44**  76:*17,
19*
**105**  134:*7*
**109**  5:*11*
**11**  6:*11*
 8:*2, 10*
 14:*7*
 159:*18*
 160:*16, 17*
**11/15/23**
 5:*16*  7:*24*
**11/23**  6:*21*
**11:18**
 103:*23, 24*
**11:19**
 103:*25*
 104:*2*
**11:53**  134:*1,
2*
**110**  5:*17*
 176:*1*
**111**  7:*24*
 152:*19*
 192:*20*
 194:*12*
 195:*3*
**117**  178:*5*
 191:*7*
**12**  6:*16*
 129:*16*
 160:*21, 22*
**12/13/23**
 8:*13*
**12:02**  134:*3,
5*

**12:41**
 168:*18, 19*
**12:57**
 168:*20, 22*
**121**  148:*18*
**123**  152:*6*
**13**  6:*18*
 161:*2, 3*
**14**  6:*21*
 79:*18*
 161:*6, 7*
**15**  7:*1*
 15:*24*
 71:*20*  72:*9*
 75:*20*
 161:*11, 12*
**155**  93:*12*
 95:*7, 14, 18*
**159**  5:*17, 21*
 6:*1*
**15th**  10:*14*
 21:*18*
**16**  6:*7*  7:*2,
5, 21*  161:*16,
17*
**160**  6:*5, 7,
11, 16*
**161**  6:*18, 21*
 7:*1, 2, 5*
**162**  7:*9, 11,
14, 17*
**16-
2738(MAS)(
RLS**  1:*4*
 202:*4*
**163**  7:*21*
 8:*1, 2, 6*
**164**  8:*9, 12*
**1667**  131:*19*
**17**  5:*8*  7:*5*
 8:*7*  161:*21,
22*
**18**  6:*15*
 7:*9, 17*

**77:**6, 15
 162:*1, 2*
**19**  7:*11*
 87:*5*
 138:*10*
 159:*22*
 162:*6, 7*
**1930s**
 136:*21*
**1950s**
 137:*14*
 146:*2*
 153:*16*
**1953**  194:*20*
**1960s**  81:*18*
**1964**  193:*14*
**1971**  6:*23*
**19th**  14:*6*

**< 2 >**
**2**  5:*5*  48:*3,
4*  53:*18*
 174:*15*
**20**  7:*14*
 55:*17*  69:*4*
 160:*19*
 162:*11, 12*
**200**  4:*14*
**2004**  50:*21*
**2014**  175:*16*
**2015**  127:*8*
**2016**  151:*23,
25*
**2017**  15:*15*
 113:*1*  164:*2*
**2018**  89:*24*
 90:*7*
**2019**  74:*21,
24*  75:*6*
 86:*23*
 87:*11, 20, 23*
 88:*3*  89:*25*
 90:*8*  91:*10,
21, 25*  93:*11*

**95:**8, 19
 96:*9*  142:*4*
 143:*8*
**202**  4:*17*
 13:*13*
**2020**  13:*11*
 14:*6, 24*
 22:*10*  74:*6*
 87:*12*  93:*2*
 96:*18*
 100:*11, 15*
 101:*25*
 107:*2*
 142:*8*
 159:*22*
 161:*9*  162:*9*
**2021**  6:*11*
 10:*13, 23*
 12:*5, 10, 16*
 13:*7, 9, 16*
 14:*11*
 15:*24*  16:*5,
21, 24*  17:*23*
 18:*4, 14*
 19:*8, 11, 19,
25*  20:*7, 8,
14*  21:*24*
 23:*22, 24*
 26:*13*  28:*1,
17, 20, 22*
 31:*5, 9, 22*
 32:*20, 22*
 33:*10, 14, 18,
25*  34:*14, 15,
18*  35:*13, 24*
 36:*18, 22*
 37:*6, 19*
 38:*23*  42:*5*
 45:*10, 19*
 46:*11*
 47:*18*
 48:*11, 22*
 49:*8, 11*
 52:*3*  53:*16*

54:*13, 17, 23*
57:*16, 24*
58:*4, 7, 8, 12,*
*16, 23* 59:*2,*
*6, 8, 17, 18*
60:*6, 16, 20,*
*23* 61:*1, 7*
62:*4, 12, 14,*
*21* 63:*6, 8,*
*14, 21* 64:*22*
65:*3, 4*
67:*2, 6, 13*
69:*4, 10*
71:*10* 72:*5,*
*10, 13* 73:*3,*
*8, 15, 20*
74:*2, 5, 16,*
*20* 77:*19*
80:*15*
87:*12*
100:*12, 14*
111:*23*
126:*21*
130:*18*
160:*11, 15,*
*19* 162:*4*
167:*24*
168:*6*
173:*12*
174:*11, 15,*
*17, 24* 175:*3*
176:*10, 25*
177:*5, 11*
181:*18, 23*
182:*6, 15*
**2022** 13:*14,*
*18* 14:*7, 18,*
*22* 15:*3*
22:*4, 5, 12*
23:*12, 14, 16*
26:*18* 36:*1*
54:*4* 77:*11,*
*12* 78:*19*
80:*14*

81:*11, 17*
87:*13, 16*
100:*12, 16*
128:*3, 6*
132:*21, 23*
153:*4, 8*
154:*1*
155:*3, 25*
159:*18*
160:*3*
161:*19*
162:*14*
**2023** 1:*10*
2:*5* 9:*3*
10:*14* 13:*5*
14:*16* 15:*1,*
*24* 18:*23*
21:*19, 22*
22:*3, 8, 17*
23:*2, 10*
26:*22* 42:*7,*
*8, 17* 43:*24*
44:*11* 45:*4*
46:*20* 47:*2,*
*5, 7* 54:*3, 4*
70:*20*
71:*20* 72:*9*
75:*2, 20*
111:*25*
112:*1*
114:*5, 9, 22*
160:*25*
161:*14, 24*
167:*24*
170:*17, 23*
171:*11, 25*
172:*11*
173:*1*
199:*19*
200:*3*
201:*21*
202:*10*
**2024** 46:*20*
51:*1* 54:*1,*

8, 9, 11
204:*11*
**2025** 78:*21*
**21** 1:*10*
2:*5* 7:*17*
28:*19* 79:*5*
162:*16, 17*
199:*19*
200:*3*
202:*10*
**218** 3:*8*
**21st** 9:*3*
**22** 5:*19*
7:*21* 163:*2,*
*3*
**23** 8:*1*
114:*9*
163:*13, 14*
**24** 8:*2*
45:*4*
163:*20, 21*
**25** 8:*6*
55:*17*
163:*24, 25*
**2555** 3:*19*
**26** 8:*9*
164:*5, 6*
**27** 8:*12*
164:*10, 11*
**27063** 147:*3*
**29** 86:*19*
87:*5*
105:*24*
107:*10, 11*
168:*24*

**< 3 >**
**3** 4:*3* 5:*8*
7:*8* 8:*4*
53:*18*
67:*25* 68:*1*
**30** 22:*2*
23:*1* 24:*3*

203:*11*
**31** 7:*2*
**316** 3:*14*
**32502** 3:*14*
**348854** 1:*25*
204:*25*
**36104** 3:*8*
**38** 5:*1*
**3960** 204:*18*
**3rd** 93:*11*
95:*8, 19*

**< 4 >**
**4** 5:*11*
70:*16, 17*
**40** 24:*3*
27:*6* 111:*19*
**40s** 136:*21*
**41** 123:*19*
**48** 5:*5*

**< 5 >**
**5** 5:*15*
6:*21* 71:*20,*
*22* 77:*5*
**50** 27:*6*
**50,000**
35:*22* 36:*5*
**505(b)(2**
38:*23*
39:*17* 40:*15*
**50s** 136:*21*
155:*17*
**52** 4:*4*
**53** 4:*5*
**56** 4:*6, 7*
**58** 197:*16*

**< 6 >**
**6** 5:*13, 17*
159:*15, 16*
**60s** 155:*21*
195:*8*

**64** 126:*15,*
*18* 195:*13*
**64108** 3:*19*
**68** 5:*8*
178:*8*
**6th** 14:*18*

**< 7 >**
**7** 5:*5, 21*
81:*17*
159:*20, 21*
**70** 5:*11*
**700** 204:*18*
**70s** 195:*8*
**71** 5:*15*
**72** 127:*25*
**726** 204:*18*
**740.1** 28:*19*
**75** 197:*16*
**7th** 204:*10*

**< 8 >**
**8** 6:*1* 7:*11*
159:*24, 25*
**800** 3:*9*
**800,000**
22:*23*
**816.421.5547**
3:*20*
**816.474.6550**
3:*20*
**850.435.7000**
3:*15*
**877.370.3777**
204:*19*
**888.212.9702**
3:*9*
**89169**
204:*19*
**898.2034** 3:*9*

**< 9 >**

Laura Massey Plunkett, Ph.D.

**9** 4:*11* 6:*5,*
*11* 8:*14*
160:*4, 5*
**9:03** 2:*6*
9:*3*
**917.591.5672**
204:*20*
**964** 133:*8*

**< A >**
**a.m** 2:*6*
9:*3* 64:*12,*
*13, 14, 16*
76:*15, 16, 17,*
*19* 103:*23,*
*24, 25* 104:*2*
134:*1, 2*
**AAS** 47:*16*
**abdomen**
147:*2*
**abdominal**
158:*14, 16*
**ability**
96:*14* 99:*6,*
*9* 118:*1*
119:*13*
189:*9*
202:*21*
**able** 22:*16*
26:*12* 28:*8*
29:*1, 7*
30:*14, 21*
32:*1, 6*
33:*5, 8*
34:*20* 37:*3*
69:*7* 74:*12*
96:*15* 98:*4*
143:*25*
144:*1*
**absence**
96:*5*
**Absolutely**
115:*10*
183:*1* 184:*4*

**absorbed**
156:*18*
158:*9, 18*
193:*16*
**absorption**
195:*13*
**abstract**
52:*4, 5, 22*
53:*1, 4, 6*
188:*5*
190:*11*
**abstracts**
52:*2* 53:*8*
**abundance**
119:*11*
**abuse** 51:*20*
128:*16*
**accept**
88:*22, 25*
95:*14*
97:*10* 98:*3*
**accepted**
127:*10*
**access** 94:*8*
114:*24*
177:*18*
**accumulated**
96:*11*
**accumulates**
91:*13*
**accuracy**
17:*9* 95:*18*
**accurately**
17:*14*
**acknowledge
d** 201:*17*
**acronym**
61:*19*
**act** 37:*22*
77:*12*
119:*22*
**action** 10:7
18:22
109:*17*

155:*12, 25*
179:*11, 13*
181:*7*
189:*13*
204:*6, 8*
**actions**
109:*22*
125:*9*
155:*15*
157:*20*
178:*13, 14*
192:*24*
195:*24*
**active** 29:*15*
30:7 31:*16*
40:*5*
**actives** 29:*5*
**activities**
19:*19*
**activity**
19:*11* 186:*9*
**actual**
86:*13, 17*
186:*12*
**acute** 192:7
**add** 77:*14*
87:*2*
114:*13*
123:*23*
126:*23*
131:*6*
136:*16*
146:*15*
148:*25*
153:*1*
172:*21*
178:9 184:*1*
**added**
20:*10*
60:*12*
65:*20*
75:*15* 77:*9*
79:7 86:22
124:*1, 22*

126:*20*
136:*16*
148:*21*
149:*15*
152:22
176:*3, 4, 19*
179:*24*
180:*3*
191:*9*
192:*23*
197:*12*
**adding**
82:*19*
92:*15* 93:9
131:*4* 176:*5*
**addition**
12:*19*
36:*10*
78:*24*
94:*20*
109:*22*
176:*7*
177:*8*
187:*13*
**additional**
10:*20* 11:*4,*
*25* 12:*21*
20:*10*
52:*19*
65:*15*
66:*17* 73:*5,*
*16* 74:*14*
78:*25*
168:*10*
174:8
176:*11*
177:*1, 6, 17*
182:*12*
183:*21, 22*
184:*18*
196:7
**additionally**
66:*16*

**additions**
20:7 167:*19*
**additive**
31:*3, 20*
**address**
29:*14*
140:*23*
167:*7*
174:*10*
186:*17*
**addressed**
180:*14*
**addressing**
24:*11, 15*
82:*14* 95:*5*
99:*15*
133:*19*
**adequacy**
132:*16*
**adhesion**
180:*19*
191:*15*
**adhesions**
191:*19*
**adjuvant**
40:*10*
**Administrati
on** 37:*13,*
*16* 48:*18*
**adulterated**
134:*12*
135:*8*
136:*12*
138:*18*
139:*12, 23*
140:24
141:2, *23*
142:25
143:*12*
144:*18, 25*
**adulteration**
138:*12, 22*
141:*16*
152:*12*

Laura Massey Plunkett, Ph.D.

adverse
32:17
112:5, 12, 20
113:1, 24
117:17, 24
120:3
156:6
158:23
181:9
advice 28:2
36:15
advised
28:17
advocate
51:14
affiliation
132:13
affix 201:2
African
6:10
African-
American
131:1
AG 16:17
18:22
23:10
40:23
44:25
70:22 71:4
agency
36:17, 21
37:5, 14
110:3
142:10
agent 37:22
aggregate
180:15
ago 16:14
18:10 27:8
47:11
52:10 55:2
136:18
141:13
146:18

agree 82:10,
12 84:20
85:5, 21
102:2
106:5, 15
107:20, 24
125:12
158:24
agreement
2:4 36:6
202:23
Ah 79:17
107:13
ahead
24:19
47:22
116:9
120:11
133:22
147:5
154:19
198:25
airway
180:16
191:12
al 13:4, 6, 9,
16, 18 15:3
44:10 75:2
111:25
160:3
161:9, 14, 19,
24 162:3, 14
Alabama
3:8
Albertson's
43:1
alcohol
51:21
ALLEN 3:7,
23 5:13
8:4 203:22
allergic
180:17, 18
191:13, 14

allowed
33:6 155:6
allude 180:3
alter 190:1
alternative
28:14
47:13
149:8
151:21
153:17
156:21
157:10
193:4
194:17, 23,
24 196:4
amend
123:23
184:15
Amended
5:15 7:23
10:14
11:22 12:4,
9, 15, 22
21:19 38:2
39:21 40:1
60:2 62:15
64:24
65:10, 17
66:5 67:16
74:18
75:20 76:4,
23 77:5
82:22
83:18
88:21
92:15
93:10
165:16
168:12
177:3
amending
124:23
amendment
125:11

amendments
10:12 11:2
21:17
63:13
76:22, 23
78:11, 22
184:3 196:8
American
34:14
47:15 51:13
amount
99:23
amounts
23:15
71:15
100:7 138:4
Amy 13:4
analysis
86:15
96:23
98:23
100:9
108:1
114:7
130:5
169:9, 10
170:22
171:5
172:24
174:12, 18
177:6
183:4, 7
analytical
55:19
91:17
189:17
analyze 99:4
Ancestry
6:10
and/or 5:10
10:19
49:17
90:19

139:12
203:6
animal
29:24
145:19
185:19, 25
186:14
animals
123:13
145:17
185:15, 18
animation
118:4
anions
186:3
Announces
6:2
annual
49:16 52:12
answer
46:17
48:13
61:14, 15
62:18 89:5
91:4, 23
92:5 95:12
98:15
103:10
105:7, 18
110:10, 13
116:8, 12
120:24
131:12
134:17
140:2
141:6
142:23
144:7
146:13
152:4
154:8
172:2, 22
186:13

Laura Massey Plunkett, Ph.D.

answered
78:*4, 8*
83:*20*
125:*14*
157:*1*
172:*17*
178:*12*
answering
103:*11*
answers
156:*9*
anticipate
184:*2*
anticipated
196:*9, 23*
anybody
62:*23*
171:*6, 7*
180:*10*
anymore
57:*8*
apologize
18:*8*  55:*3*
79:*15*
116:*16*
170:*21*
194:*6*

**Appearances**
4:*3*
**APPEARED**
3:*3*  131:*3*
201:*12*
appears
127:*2, 10*
**Appendix**
8:*1*  12:*7,*
*10, 22*  14:*9*
15:*5*  62:*17*
65:*1*  67:*18,*
*20, 22, 25*
68:*3*  69:*6*
74:*4*  165:*5,*
*15*

application
153:*16*
155:*22*
194:*21*
applications
36:*12*
applied
89:*14*
102:*21*
appointed
62:*1, 5*
appointment
62:*4*
appreciate
104:*8*
appropriate
83:*14*
115:*2*
120:*1*
121:*12*
122:*14*
123:*9*
approval
34:*10*
approximate
36:*5*
approximatel
y  12:*12*
April  154:*1*
Area  7:*16*
11:*11*
48:*12*
49:*11*
51:*10, 15, 19*
52:*20*
81:*20*  88:*5*
125:*21*
156:*13, 25*
157:*22*
182:*13*
areas  48:*14*
75:*22*  76:*5*
167:*9*
197:*11*

argue  158:*8*
181:*4*
**arrangement
s**  29:*2*
arsenic
33:*13*  57:*2,*
*4, 5*
arsenical
56:*23*  57:*7*
article  13:*8,*
*10, 12, 15, 17*
14:*10, 21, 23,*
*25*  15:*2*
21:*4, 20*
66:*17*  67:*9*
112:*8, 17, 19*
128:*3, 6*
130:*9, 18*
132:*21, 23*
133:*4*
140:*19*
141:*1*
170:*16, 17*
182:*10*
183:*18*
articles
12:*2, 3, 7, 12,*
*13, 14, 20, 24*
13:*20*  15:*5,*
*7*  21:*7*
50:*1*  55:*20*
65:*20*  67:*5,*
*8*  69:*12*
140:*22*
165:*18, 23*
167:*2*
181:*21, 22,*
*24*  182:*8, 15*
183:*18*
asbestos
6:*24*  14:*19*
33:*20*  40:*6*
54:*19*
60:*20*  66:*7,*

10  84:*4*
88:*22*
90:*19*  91:*7,*
*18, 24*  92:*3,*
*8*  94:*12, 19,*
*20, 21*  95:*2*
96:*3, 5, 15,*
*20*  97:*3, 13*
98:*10, 20*
99:*23*
100:*7, 24*
101:*9, 16*
102:*1*
106:*17*
107:*21*
109:*24*
110:*5, 9*
111:*4, 14, 16*
136:*4*
138:*3*
139:*6, 19*
142:*2, 12*
143:*2*
146:*2, 3, 6,*
*18, 22, 24*
147:*15*
148:*5, 8, 13*
169:*16, 18*
170:*6, 12*
181:*22*
182:*19, 25*
183:*9, 12*
**asbestos-like**
142:*12*
asked  55:*16*
64:*20*
65:*11, 12*
69:*14*  73:*1*
75:*12*
134:*16, 18*
135:*15*
156:*8, 12*
158:*3*
165:*25*

166:*13*
167:*6*
170:*16, 20*
172:*19*
177:*21*
178:*12*
asking
19:*15*  20:*2*
37:*2, 3*
48:*19*
89:*22*
101:*2, 3, 5*
104:*7, 19*
105:*5, 18, 24*
108:*11*
113:*18, 22*
122:*7, 19, 21*
123:*3*
124:*17*
125:*25*
126:*2*
139:*17, 25*
142:*5, 19*
147:*12*
157:*11*
158:*11*
170:*1, 2*
171:*5*
173:*15, 16*
175:*18*
187:*6, 8*
196:*13, 15,*
*20*
asks  166:*2*
aspect  90:*9*
156:*19*
assay  113:*5,*
*8, 12, 17*
asserted
165:*2*
assess  121:*3*
130:*11*
assessing
175:*2*

Laura Massey Plunkett, Ph.D.

assessment
24:25  25:2,
12, 13, 20, 21,
22, 23  26:4,
7  29:17
33:22  34:2
52:9, 12, 21
55:1, 7, 11,
20, 23  59:25
62:2, 3
79:2  84:7
85:13, 14, 22
91:16
98:12, 21
111:7, 8
126:17
157:18
170:1
assessments
21:1, 2
33:24
157:19
assist  21:17
associated
113:4, 14
124:15
193:7
association
7:4, 16, 19
47:16
81:19  82:8,
18  121:17,
25  128:10
129:5
173:13
assume
39:13
88:24
99:20
106:11
150:17
assumed
99:24, 25

asthma
180:17
191:14
attached
2:10  15:7
160:6, 7
165:9, 11
203:13
attempt
89:16
attempted
167:16
178:18
attempting
174:3
attend  62:20
attended
47:1, 5, 10,
14
attending
202:23
attorney
75:9, 10
203:4
attorneys
9:4  70:3
177:14
202:23
attract
189:10
audio  2:15
August
10:23
12:16  14:7
16:5, 21, 23
17:23  18:4,
14  19:8, 11,
19, 25  20:7,
8, 14  26:13
28:17, 20, 22
31:5, 9, 22
32:20, 22
33:10, 14, 18,
25  34:17

35:13, 24
36:18, 22
37:6, 19
43:24
45:10, 18
46:11
47:18
48:11, 22
49:7, 11
53:11, 16
54:13, 17, 23
57:16, 24
58:4, 7, 8, 12,
16, 23  59:2,
6, 8, 17, 18
60:6, 16, 20,
23  61:1, 7
62:11, 14, 20
63:6, 14, 21
64:22  65:3,
4  67:2, 6, 13
69:4  71:10
72:10  73:3,
8, 15, 20
74:2, 5, 16,
20  77:19
80:15
107:1
159:18
173:11
174:11, 15,
17, 24  175:3
176:10, 20,
25  177:5
181:18, 23
182:15
auspices
29:18
Austin
20:11
author
13:12
14:23  52:5
75:2

114:19
132:12
161:5
173:4
190:11
authored
148:11, 12
authorities
59:22
146:8
147:22
148:12, 16
150:10
168:10
authority
58:10, 17, 25
59:19  60:7
78:23, 25
79:4  138:2
144:1
147:7, 9, 24,
25  150:11
178:15
179:6, 7
authors
56:3  113:6
115:6
129:1, 23
131:10
132:11
186:21
189:15
190:4
author's
12:25
117:6
131:18
autopsy
52:1
available
89:11  99:2
106:12
177:11

Aventis
40:11
avoid  88:14
aware
16:17  59:9,
18  60:7
71:8  74:24
75:23
77:17
84:25
87:17
101:23
102:13
106:20
107:24
108:1
122:10
125:19
131:14
143:10, 16
148:17
149:5, 7
150:6
153:13
155:17
174:4
175:22
176:23
177:15
181:11, 25
182:8
185:9, 14, 19
193:3, 8
196:3
awareness
193:5

< B >
Baby  5:22
6:3  75:18
87:1, 6, 12,
23  91:21
96:6  97:13
98:10, 20

Laura Massey Plunkette, Ph.D.

99:21
100:6
109:19
119:13
136:3
137:13, 23
152:1
169:7, 17
170:5, 10
**back** 10:23
16:5, 7, 23
17:6  21:25
22:1, 8
44:11  47:6
49:7  56:5
64:15, 17
75:12
76:18
81:18
87:16  89:7
90:16  93:1
104:2
108:10, 12
110:11, 20,
22  111:16
113:1
114:17
118:18
120:14
125:15, 17
134:5
136:18, 20
141:4
142:7, 21
146:12
152:14, 19
168:21, 24
169:12
173:19
176:17
177:10
183:9
191:4, 7
193:9

195:15
196:16
198:23
**background**
98:1  148:7
**backwards**
194:10
**BACON**
3:18  204:2
**Bactolac**
41:10
**ban** 179:7
180:25
181:16
**banned**
57:13
124:8
178:24
**based** 29:2
52:16
83:14  86:3
87:25
96:20  99:4
100:8
101:20
106:7
121:13
124:21
126:10
136:17
137:19
138:13, 14
144:3
147:9
151:19
153:17
154:4
155:7
157:24
173:3
185:12
192:16
196:19

**bases** 86:9
**basic** 25:6
**basis** 19:24
35:19  98:5
130:1
184:6, 12
**Bates** 68:11
95:11
**Bayer** 43:12
**Baylen** 3:14
**BEASLEY**
3:7, 23
5:13  8:4
203:22
**BEATTIE**
3:7  9:11
11:16  69:21
**began** 65:23
**beginning**
192:23
**begins** 185:2
**behalf** 9:7,
9, 11, 13, 15
36:17, 21
37:5  39:9
40:23  41:6,
8, 19  42:6,
13  43:5, 19
44:4, 22
93:4  199:1
**believe**
15:15
17:13
18:10, 23
19:1  20:10,
12  33:17
41:14
42:21
44:19, 20
46:24  47:8
61:22
64:20
65:14  73:5,
18, 23  74:3,

*17* 76:4
81:10, 15
83:13, 21
84:2  87:10,
24  93:2
95:22
100:14
102:3, 4
108:4
110:12
111:15
116:2, 15
118:25
120:12, 15
125:16
126:10
127:17
128:15
135:16
150:3, 4
151:3, 21
152:13
156:5, 20
157:15
158:10
167:25
168:14
174:7, 14
175:25
177:4, 21
178:2, 11
195:23
197:23
**believed**
153:8
194:16
**believes**
155:12
**bench** 44:3
**benefit** 26:8
**benefits**
26:2, 5
179:21

**best** 13:24
47:20
154:21
202:21
**beverage**
137:4
**beyond**
92:11
106:18
111:17
137:3, 8
139:25
140:3
155:3
158:11
166:13, 23
169:21
170:2, 8, 14
193:20
**big** 53:25
152:17
157:15
**bill** 24:1
**billed** 23:25
**billing**
11:25
65:25  71:13
**bills** 11:23,
24  23:5, 18
69:15
163:18
**biochemical**
29:20
**biocides**
29:6
**BioPolicy**
36:10
**biotechnolog
y** 141:15
**bisulphite**
190:12, 16,
21
**bit** 23:8
68:20  75:1

Laura Massey Plunkett, Ph.D.

158:25
171:8
**black** 47:6
**Blakely**
44:10
**block**
117:12
**blushes**
103:13
**BMJ** 14:22
**boards**
174:18
**bodies** 66:8
**body** 6:16
13:21 37:5,
19 58:13, 17
83:18 84:5
86:5, 10
100:18
101:1, 4
102:4, 10, 12,
18, 24 103:3,
4, 6, 8
151:18
154:5
156:13, 24
157:7
165:6 176:5
**book** 53:15,
19, 21 54:5,
6 140:22
**books** 53:20
**bottle** 88:23
124:18
**bottles** 87:6,
22 88:23
89:25 90:8,
22 92:18
94:3, 7
**bottom**
123:11
**Boulevard**
3:19
**box** 192:11

**branding**
142:20
**break** 61:13
76:8
133:23
146:19
**breast** 40:10
**bring** 11:17
149:25
152:16, 18
163:7
**bringing**
152:13
**Bristol-**
**Myers**
40:18 43:23
**British**
161:5
**brought**
12:23
15:10, 20
69:9 93:25
107:19
108:18
159:2
163:5, 7, 18,
22, 23 164:1,
7 165:10
**Brown**
93:25
**brush**
102:21
**build** 166:17
**building**
123:11
**bullet** 112:4
**bullets**
194:4
**business**
19:10, 18
20:6, 20
21:11, 16, 21
22:17 50:2,

14 57:20
154:22

**< C >**
**Cadagin**
71:5
**cadmium**
33:13
**California**
21:6
**call** 36:8
67:18
135:20
152:15
**called** 13:20
14:13
49:25
52:11
61:18
94:15
194:14
**calls** 171:6
**Canada** 6:3
37:16 58:9
59:24, 25
60:11, 14
84:10
85:10, 17
123:22, 23
124:4, 15, 19
126:14, 16
**Canada's**
84:6, 21
85:7
**Canadian**
60:3 125:8,
9
**cancer** 6:6,
10, 17 7:2, 7,
14, 17, 20
30:1 40:7,
10 54:19
59:6, 12, 20,
21, 23 60:9

66:18
72:25
81:14, 21
84:11 85:6,
8, 23 92:10
97:8 108:8
109:20
110:9
111:5
112:23
113:4, 14
114:2
119:15
121:18
122:1, 12, 22
123:18
124:6, 11
127:4, 11, 14,
20 128:11,
18 129:6
130:12
131:8
133:2, 10
144:20
145:1, 8, 11
146:2, 4, 5,
11, 18, 20, 24,
25 147:8, 16,
23 148:5, 14,
15 157:13,
22 173:14
174:13
176:13
177:2, 9
181:22
182:17
183:10, 12
191:18, 22
192:5, 17
**cancers** 7:5
**cannabis**
51:20 53:9
**carcinogen**
139:6 146:4

**carcinogenesi**
**s** 118:8, 10
**carcinogenic**
145:19
146:10
**carcinogens**
139:7
**card** 201:15
**care** 40:10
**carry** 42:12
176:24
**case** 15:23
16:17
23:10 39:2,
7, 8, 12, 16,
20 40:11, 17,
19, 25 41:7,
9, 11, 12, 20
42:1, 2, 4, 6,
17, 18, 25
43:1, 11, 13,
20, 22, 24, 25
44:10, 12, 15,
21, 23, 25
46:24 58:2,
14, 23 62:10
65:6, 8
68:6 70:22
71:4, 5, 6, 7
72:9 78:7
84:12
89:23
90:16
91:23 93:9
112:2, 9, 18
128:7
130:22
132:24
133:15
134:13
147:18
165:24
169:24

Laura Massey Plunkett, Ph.D.

case-control 133:*11*
cases 17:*22* 18:*4* 23:*11, 23, 24* 44:*20* 45:*8, 17, 21, 24, 25* 46:*1, 3, 7, 10* 57:*17* 63:*23* 76:*2* 151:*22* 191:*24*
casework 71:*10*
causation 72:*16* 82:*14* 83:*12* 92:*12* 145:*4* 166:*14, 16, 17, 23* 174:*2* 182:*5* 183:*4, 7*
cause 2:*5, 15* 55:*25* 59:*11, 20* 92:*10* 118:*1* 144:*19* 145:*1* 158:*1, 13, 15*
caused 41:*17* 146:*23*
cavity 158:*14, 17*
CDRH 179:*6, 13, 20*
CDRH's 178:*13*
cell 117:*17, 18* 118:*2* 119:*21*

185:*15, 18* 187:*3* 188:*18, 24* 190:*19*
cell-based 28:*15*
cells 7:*11* 112:*23* 113:*2, 15, 25* 120:*2* 123:*12* 185:*24* 187:*23* 188:*15* 189:*4* 190:*3* 191:*25*
cellular 20:*21* 112:*6* 113:*3* 122:*19* 145:*15*
certain 99:*10* 106:*22* 118:*22* 127:*13, 14* 139:*8, 18* 179:*21* 185:*5*
certainly 26:*17* 39:*23, 24* 73:*4* 75:*14* 84:*24* 144:*2* 153:*21* 181:*5*
Certificate 4:*17* 202:*14* 203:*5*

certification 49:*14*
certifications 49:*2, 6*
CERTIFIED 3:*23* 4:*16* 202:*13*
certify 202:*17, 22* 203:*8* 204:*4*
cetera 178:*24*
CFR 28:*19*
challenges 51:*10, 23*
chance 104:*6*
change 17:*17* 19:*7, 10, 17* 20:*5* 116:*21, 22* 167:*13* 187:*20* 192:*1* 196:*24* 200:*4*
changed 10:*19* 11:*3* 18:*25* 72:*12* 73:*2* 95:*23* 110:*17* 126:*12* 163:*8*
Changes 4:*14* 19:*5, 13, 23* 28:*18* 77:*11, 18, 22* 78:*2, 6* 80:*6, 12, 14* 113:*3* 118:*15*

119:*1, 4, 14, 25* 120:*8* 122:*21* 145:*15, 16* 165:*12, 15* 167:*9, 17* 175:*15* 184:*7* 187:*3, 18* 188:*2, 7, 8, 15, 21, 22, 24* 189:*3, 4, 8, 11, 18, 19, 24* 190:*3, 22* 191:*23, 24, 25* 200:*1* 203:*13, 14*
chapter 54:*5*
chapters 53:*15, 16, 23* 54:*6* 140:*22*
characterize 69:*25* 190:*5*
charge 24:*1, 3*
Charles 43:*3*
Chat 104:*5* 105:*1, 8*
chemical 31:*3, 9* 94:*15* 119:*14*
chemicals 28:*22* 29:*3* 31:*12, 19, 24* 32:*2, 8, 15* 120:*3* 165:*5*
Chemistry 34:*14*
chest 147:*1*
chose 55:*21*
Chris 9:*9*

CHRISTOPHER 3:*13* 203:*22*
chromium 136:*4* 138:*3* 144:*13* 146:*9*
chronic 127:*3, 12, 19*
chrysotile 96:*19*
ciprofloxacin 43:*18*
CIR 148:*22* 149:*17, 22* 150:*8, 15* 151:*6, 9, 12* 152:*2*
circle 183:*5, 9*
citation 109:*25* 147:*4, 7*
citations 127:*1* 168:*11*
cite 100:*8* 108:*6, 21* 109:*16* 111:*22* 112:*4, 11* 121:*16, 25* 127:*18* 128:*14* 132:*20* 136:*25* 137:*4* 138:*1* 146:*8* 147:*21* 149:*24* 180:*13*

Laura Massey Plunkette, Ph.D.

191:*16*
195:*3*
**cited** 12:*4,*
*5, 14, 15, 17,*
*22* 14:*7, 17*
66:*23* 68:7
95:*20*
107:*21*
112:*14*
127:7
128:*8*
168:7
175:*11*
**cites** 66:*19*
127:*23*
**citing**
111:*18*
115:*6*
127:*8*
147:*24, 25*
**City** 3:*19*
51:*3*
**Civil** 2:*9*

**clarifications**
178:*20*
**clarify** 35:7
36:*23*
**clarity** 2:*19*
149:*1*
**clarity's**
16:*9, 18*
**classes**
141:*14, 17,*
*18*
**classwork**
141:*20*
**clause** 124:*1*
**clear** 16:*19*
19:*12*
45:*23*
61:*14*
63:*18*
109:*9*

148:*13*
160:7  180:*8*
**client** 27:*11*
28:*18* 37:*23*
**clients**
19:*13*
20:*24* 28:*2,*
*6* 34:*6*
37:*12, 22*
**close**
180:*20*
198:*25*
**clusters**
189:*18*
**cobalt**
136:*5*
138:*3*
144:*13*
146:*10*
**codified**
80:*14*
**Colette**
160:*11*
**colleagues**
57:*18*
**collected**
65:*21, 22*
**collecting**
96:7
**collectively**
21:*3*
**column**
185:*1, 22*
**come** 21:*25*
34:7 54:*11*
60:*21*
68:*21*
110:*20*
133:*1*
177:*19*
**comes**
184:*17*
194:*20*

**coming**
36:*15* 46:*9,*
*19, 23, 25*
54:*1*
**comment**
80:*20*
87:*15*
124:*24*
125:*1, 13, 19*
165:*22*
**comments**
78:*5*
114:*14, 17,*
*22* 172:*25*
173:*4* 196:7
**Commerce**
3:*8*

**commercially**
106:*13*
**committee**
52:*9* 60:*24*
61:*9, 16, 17,*
*23, 25*
**committees**
61:*3, 5* 62:*5*
**communicate**
**d** 36:*16*
57:*24* 58:*4,*
*8, 12* 151:*4*
**communicati**
**on** 143:*20*
144:*9*
**communicati**
**ons** 36:*20*
37:*4*
**community**
127:*11*
**compacts**
102:*5*
**companies**
30:*14* 35:*9,*
*12* 36:*15, 25*
179:*22*

**company**
21:*3* 22:*12,*
*25* 36:*10, 17,*
*22* 37:*6*
67:*11*
77:*24*
82:*20*
84:*18*
87:*18* 93:*3,*
*4* 96:*11*
143:*19*
144:*3, 15*
155:*17*
157:*20*
177:*20*
179:*16*
193:*8* 195:*9*
**compared**
89:*6*
117:*18*
119:*8*
**comparison**
89:*17*
**comparisons**
155:*23*
156:*17*
**complete**
47:*21*
**completed**
54:*10*
**completely**
109:*1*
**completion**
203:*10*
**complex**
97:*4*
**Compliance**
6:*20* 14:*13*
160:*24*
**Complied**
77:*8* 79:*6*
86:*21*
111:*21*
123:*21*

126:*19*
128:*1*
134:*8*
148:*20*
152:*8, 21*
169:*2*
176:*2*
178:*6*
184:*22*
186:*20*
192:*21*
**comply**
82:*20*
**component**
55:*12*
**Components**
94:*16*
144:*17*
**compose**
170:*25*
**compounds**
141:*17*
**comprehensi**
**ve** 73:*10, 17*
**computer**
109:*4*
**computerize**
**d** 2:7
**concept**
152:*14*
**concern**
52:*5* 194:*1*
**concerned**
27:*14*
**concerning**
58:*1, 5*
74:*15*
80:*17*
86:*23*
172:*12*
182:*16*
**concerns**
32:7 70:*22*
153:*18*

Laura Massey Plunkett, Ph.D.

concluded
89:*13*
146:*9*
150:*7*
199:*18*
concludes
199:*16*
Conclusion
152:*16*
conclusions
121:*8*
150:*16*
194:*2*
conclusively
81:*22*
concordance
123:*16*
conditions
106:*22*
191:*11, 17*
condoms
193:*15*
conduct
79:*8*  80:*8*
131:*21*
conducted
33:*23*  88:*3,
9*  93:*13*
conference
11:*9*
confidential
27:*9*  68:*11*
114:*17*
173:*3*
confirm
72:*1*  197:*10*
confirmed
79:*11*
confirming
83:*5*
conflict
116:*2*  117:*2*
confusion
168:*3*

conjuncti
191:*14*
conjunction
35:*9*

conjunctivitis
180:*18*
connecting
169:*14*
connection
52:*25*  71:*9*
87:*7*
consensus
127:*2, 10*
consider
83:*2*  90:*4,
6, 9*  92:*8*
98:*4, 19*
115:*3, 9*
132:*14*
173:*2*

consideration
201:*18*
Considered
5:*10*  13:*22*
67:*16*
84:*25*  97:*18*
consistent
82:*7*  83:*10*
88:*25*
90:*12, 17*
94:*13*
113:*2*
117:*23*
123:*9*
126:*16*
131:*2*
134:*21*
135:*6*
136:*11*
137:*25*
138:*16*
139:*11*

143:*14*
145:*7*
150:*2*
153:*23*
166:*3*
172:*8, 11, 15*
178:*10*
179:*25*
189:*6*
consistently
90:*17*  91:*17*
Consortium
6:*11*
constituent
138:*23, 25*
139:*3*
140:*9*
145:*24*
182:*22*
183:*8*
constituents
66:*9, 15*
91:*18*  97:*5*
100:*1*
107:*7*
135:*4, 5, 20,
25*  136:*10*
137:*2, 6, 22*
138:*21*
139:*22*
140:*5, 10, 14*
144:*23*
145:*7, 14, 18*
constituted
144:*24*
constitutes
138:*22*
202:*20*
consulted
32:*18*
consulting
24:*5, 6*
26:*14*
28:*21*  29:*2*

31:*2, 12, 14*
32:*23*
33:*15, 19*
34:*13, 16*
35:*1*  37:*25*
consume
41:*25*
Consumer
5:*22*  6:*2*
27:*25*  28:*3,
10, 23*  41:*3,
4, 24*  44:*5*
51:*14, 15*
97:*7*
106:*16*
139:*20*
140:*19*
consumers
41:*5, 25*
84:*19*
124:*14*
154:*25*
contacted
58:*21*
contain
100:*7, 24*
101:*9, 16*
106:*16, 17*
177:*1*
contained
75:*20*  96:*3*
99:*22*
144:*13*
containing
81:*20*
contains
139:*22*
140:*5*
142:*1*
203:*14*
contaminatio
n  57:*6*
88:*14*
142:*11*

content
81:*9*  135:*12*
contents
92:*18*
context
25:*5, 16*
96:*13*
continuation
42:*10, 20*
continue
90:*18*
184:*6, 11*
continued
42:*22*
continuously
154:*20*
contract
35:*19*  36:*2,
6*
contractor
20:*14*
contribute
97:*6, 7*
128:*7*
133:*14*
contributes
132:*24*
control
30:*19*  97:*21*
conversation
57:*21*
63:*19*
143:*16*
182:*2, 7*
183:*15*
conversation
s  62:*22*
63:*3*  144:*3*
182:*11*
cooperative
35:*10*
copied
12:*23*

Laura Massey Plunkett, Ph.D.

copies 11:*18* 56:6
copy 11:*22, 23* 12:*1, 2, 6*
17:5 48:8
52:*22* 53:*3*
163:*22, 23*
165:*8*
173:7
197:*4*
199:*10, 12*
203:*5*
corn 149:*8, 12* 151:*20*
152:*23*
153:*5, 9*
154:*4*
155:*13, 20*
156:*2, 12, 14, 24* 157:*6, 14, 16, 21* 158:*1, 13, 17, 19*
193:*3, 15*
194:*16, 22*
195:*10, 17*
196:*2, 5*
Cornstarch
5:*23*
corporate
193:*13*
correct
25:*7* 30:*13*
41:*8* 42:*2, 3, 19* 44:*9*
64:*2* 67:*17, 19* 70:*22*
72:*4, 6, 7*
76:*25*
79:*20*
80:*22*
81:*14*
83:*19* 84:*7, 22* 85:*2*
86:*6* 87:*1*

88:*3, 7, 9, 11*
100:*12, 18, 24* 101:*9, 17, 22* 102:*2, 8*
106:*6, 10, 17*
107:*9, 13, 15*
110:*24*
111:*1, 23*
119:*17, 19, 21* 123:*25*
124:*6, 24, 25*
125:*13, 23*
126:*4, 8, 21, 22* 127:*16, 22* 128:*21, 22, 24* 129:*2, 6, 20* 130:*19, 20* 131:*11, 13* 132:*17*
133:*11, 12*
151:*10, 23*
163:*5*
166:*6, 8*
190:*15*
194:*12*
201:*3*
202:*20*
correction
17:*18*
corrections
17:*5, 8* 19:*2*
correctly
20:*18*
187:*19*
correlating
51:*24*
correlation
123:*15*
Cosmetic
6:*20, 21*
14:*14* 24:*7, 13* 26:*15, 16, 24* 27:*15, 19*
31:*4, 19*

66:*4* 77:*11*
78:*1, 2*
102:*11, 14*
123:*24*
136:*25*
137:*15*
139:*21*
140:*4, 8*
141:*2, 9, 22*
cosmetics
24:*9* 26:*6, 20, 23* 27:*2, 5* 28:*24*
77:*12*
100:*21*
141:*18, 19*
178:*14*
179:*9, 15*
184:*8*
Council
34:*14*
counsel 2:*4*
57:*25* 67:*4, 10* 69:*17, 25*
115:*24*
116:*6*
166:*2*
182:*8*
203:*18*
204:*4*
counselor
61:*20*
count 27:*3*
countries
57:*10*
country
57:*12*
COUNTY
201:*7*
couple 15:*5*
26:*18* 28:*6*
46:*8* 47:*15*
110:*18*
152:*23*

184:*18*
192:*22*
197:*2*
course
52:*11* 55:*1, 8, 16* 96:*9*
courses
48:*25* 49:*15*
COURT
1:*1* 3:*23*
4:*17* 9:*2*
16:*13* 17:*7*
39:*14*
43:*14* 44:*7, 8* 61:*12*
64:*2, 6, 11, 15* 76:*14, 18*
86:*5*
103:*16, 22*
104:*1*
108:*24*
109:*6*
133:*25*
134:*4*
160:*2*
168:*17, 21*
190:*25*
191:*4*
198:*19, 23*
199:*7, 15*
202:*1, 14*
courts 21:*25*
cover 52:*15*
66:*14* 113:*9*
covered
15:*9, 19*
34:*3* 35:*4*
49:*1* 52:*14*
152:*17*
196:*22*
197:*23*
198:*5*
covering

196:*23*
covers 76:5
COVID
22:*9*
creation
174:*12*
critical 7:*1*
crop 57:*3*
cross 32:*16*
117:*9*
178:*13*
crossed
190:*21*
CRR 2:*7*
3:*25*
202:*16*
204:*16*
ctisi@levinlaw.com 3:*16*
cultured
47:*11*
current
48:*8* 75:*4*
86:*6* 175:*7*
currently
24:*6, 8*
49:*19* 50:*6*
Curriculum
5:*7* 8:*6*
48:*9*
custodial
203:*4*
customers
154:*25*
cut 109:*2*
CV 11:*24*
12:*1, 2*
15:*12* 47:*7, 20, 22, 25*
48:*2, 6*
49:*25* 52:*2*
53:*6, 14*
54:*25* 55:*3*

Laura Massey Plunkett, PH.D.

69:*16*
163:*23*

**< D >**
**D.A.B.T**
5:*7, 16*
7:*23*  8:*7*
49:*17*
**DABT**  5:*4*
**data**  2:*15*
86:*14*
91:*17*  99:*8*
121:*12*
127:*22, 23*
130:*1, 2*
145:*13*
157:*23*
**data's**
118:*12*
**date**  13:*1*
17:*24*
80:*16*
81:*10*
97:*25*
124:*4*
137:*20*
167:*15*
200:*3*
203:*11*
204:*17*
**dated**  5:*16,*
*19, 23*  6:*3, 7,*
*11, 14, 17, 21,*
*24*  7:*5, 11,*
*14, 21, 23*
*8:13*  14:*6,*
*7*  70:*19*
71:*14*
160:*19, 25*
**dates**  168:*1,*
*8*  197:*3*
**Davidson**
114:*25*

166:*21*
172:*18*
**Davis**  13:*15*
130:*19*
160:*10, 11*
165:*21*
197:*19*
**day**  100:*3*
201:*12, 21*
204:*10*
**days**  15:*16*
164:*3*
203:*11*
**deal**  15:*17*
40:*4*
**dealing**
26:*23*  40:*8*
62:*3*
**deals**  34:*2*
40:*5*  51:*15*
**dealt**  26:*19*
34:*2*

**DECEMBER**
1:*10*  2:*5*
9:*3*  81:*11,*
*17*  93:*11*
95:*8, 19*
199:*19*
200:*3*
202:*10*
**decided**
171:*2*  172:*3*
**decision**
44:*4*
124:*21*
171:*4*
**decisions**
179:*21*
**decreased**
36:*4, 7*
**Defendants**
2:*3*  3:*17*

9:*16*  10:*5*
38:*23*  204:*1*
**defending**
53:*17*  54:*7*
**defense**
115:*13*
132:*8*  184:*2*
**defer**  133:*18*
**define**  89:*3,*
*10*  102:*16*
107:*25*
138:*11*
**definitely**
156:*15*
192:*14*
**definition**
89:*14, 15*
107:*20*
134:*15, 21*
135:*2, 7*
136:*12*
137:*25*
138:*5, 16*
139:*12*
140:*16*
**deliver**
154:*24*
**delivered**
203:*3*
**Demethylatio
n**  187:*6*
**demethylizati
on**  187:*11,*
*16*
**demonstrate**
149:*18*
**demonstrate
d**  81:*22*
**depending**
20:*22*  27:*20*
**depends**
25:*16*
138:*24*
165:*25*

**depo**  171:*2*
173:*8*
**deposed**
10:*22*  16:*3*
45:*11, 15, 20*
46:*12*
**DEPOSITIO
N**  1:*8*  2:*1*
8:*12*  10:*6,*
*23*  11:*6, 18*
15:*11, 24*
16:*5, 12, 16,*
*21, 24*  17:*3,*
*10, 14, 23*
18:*9, 11, 14,*
*22*  23:*9, 13*
38:*23*
42:*11, 18, 21*
43:*23*
44:*11*  45:*6*
48:*3*  53:*11*
60:*15*  63:*8*
68:*15*  70:*1,*
*24, 25*  73:*9*
74:*6, 21*
75:*11, 13*
87:*16*  97:*2*
105:*10*
110:*24*
113:*10*
114:*5, 9, 14,*
*22*  125:*5, 6,*
*17*  136:*23*
159:*3*
164:*2, 8*
170:*17, 23*
171:*12, 25*
173:*1*
174:*23*
199:*16, 18*
201:*2*
202:*8*
203:*1, 3, 10,*
*17*

**depositions**
8:*9*  10:*8*
15:*14*
16:*13*
17:*22*  45:*3*
46:*8, 18, 20*
76:*1*  168:*2*
197:*3*
**dermal**
32:*12, 15*
**describe**
20:*2*  29:*7*
65:*18*
82:*17*
86:*15*
88:*16*
121:*11*
129:*8*
134:*20*
147:*17*
171:*2, 4, 18*
172:*4, 6*
**described**
35:*2*  52:*15*
84:*13, 14*
114:*12, 13*
164:*25*
166:*3*
**describes**
96:*14*
**describing**
26:*25*
140:*19*
141:*1*
**DESCRIPTI
ON**  5:*1*
87:*3*  96:*12*
97:*19*
106:*8*
124:*13*
138:*15*
150:*4*
180:*5*
201:*14*

Laura Massey Plunkett, Ph.D.

design
29:*13*, *25*
designate
159:*3*
161:*1*, *10*, *15*,
*20*, *25*  162:*5*,
*10*, *15*, *25*
designated
77:*4*
designed
29:*23*, *25*
despite
77:*10*, *21*
detail  85:*16*,
*20*  90:*24*
112:*15*
190:*7*
detailed
86:*14*
details  93:*5*
99:*15*
118:*17*
148:*9*
detect
96:*15*  99:*9*
detectable
170:*11*
detected
94:*19*  142:*3*
detecting
101:*21*
detection
95:*2*  99:*11*
101:*21*
determination
n  143:*11*
determine
10:*18*
100:*6*
176:*19*
177:*7*
determined
141:*25*

144:*11*
146:*9*  152:*1*
develop
144:*19*
developed
31:*15*
48:*11*, *20*
74:*15*
171:*10*, *11*
194:*23*
developing
57:*10*, *12*
development
30:*2*, *19*
51:*11*
96:*24*  114:*3*
development
al  29:*24*
device
44:*17*, *18*
devices
179:*4*, *20*
dictated
69:*13*
didactic
55:*17*
dietary
28:*7*  41:*17*,
*23*
difference
85:*19*
149:*10*
155:*20*
157:*15*
differences
119:*25*
149:*11*
different
15:*14*
19:*13*, *14*
25:*14*, *15*
27:*21*  28:*6*
40:*2*  46:*5*,
*7*  51:*5*, *25*

61:*22*, *25*
65:*11*
68:*10*, *20*, *25*
69:*2*, *3*
72:*9*  77:*3*
78:*23*  79:*3*
80:*10*
91:*19*
93:*13*
94:*23*
100:*20*
102:*6*, *23*
103:*3*, *4*
106:*21*
116:*23*
136:*14*
164:*3*
166:*10*
167:*13*
168:*9*
171:*8*
172:*14*
175:*6*
176:*22*
178:*15*
179:*4*, *5*, *14*
183:*3*
184:*17*
188:*3*
189:*18*
192:*3*, *4*, *13*,
*14*, *16*
diligence
21:*14*  36:*13*
Ding  13:*8*
126:*21*
127:*15*
133:*6*
162:*3*
165:*21*
184:*19*, *20*,
*23*
D-i-n-g  13:*8*

dioxide
117:*19*
119:*2*, *9*
186:*22*
direct  2:*20*
117:*8*
178:*13*
directed
176:*16*
181:*25*
directly
41:*25*
60:*18*
122:*22*
184:*13*
disagree
82:*12*
107:*24*
disclose
28:*8*  37:*4*
41:*5*
disclosed
45:*9*, *18*
46:*2*, *6*
117:*5*
132:*6*, *9*
discloses
116:*2*
disclosing
182:*7*
disclosure
62:*11*
117:*6*
131:*18*, *19*
132:*3*, *17*
Discontinuati
on  6:*2*
discovery
177:*15*
discuss
10:*12*  11:*1*
56:*13*  76:*6*
83:*13*
94:*22*  164:*3*

discussed
17:*14*
31:*10*
35:*14*
54:*15*, *19*, *23*
55:*10*, *22*
57:*16*  73:*8*
74:*5*, *20*
75:*1*  90:*24*
95:*8*
106:*25*
114:*4*
116:*10*
135:*4*
142:*7*
167:*3*
169:*7*
171:*6*
178:*2*
182:*2*
196:*11*
discusses
170:*6*
discussing
16:*2*  181:*21*
discussion
56:*17*
73:*14*
74:*24*
85:*11*  87:*2*
92:*24*
121:*7*
133:*5*, *9*
178:*1*, *20*
182:*20*
discussions
37:*1*, *21*
145:*25*
dismutate
186:*2*
disparities
51:*7*
disqualifies
115:*11*

disqualify
115:*12*
disrupts
2:*16*
distortion
2:*15*
distributed
124:*19*
distribution
87:*18*
**DISTRICT**
1:*1*  202:*1*
**DNA**
187:*18*
190:*14*
docetaxel
39:*19*
**Doctor**
61:*13*
105:*20*
109:*13*
198:*10*
**Document**
5:*4, 10*  8:*1*
14:*13*  38:*9*
39:*2*  68:*16*
71:*18, 25*
73:*10, 13, 17*
84:*8*  92:*20*
93:*17*  95:*8*
97:*12*
104:*22, 25*
105:*4, 16*
108:*13, 16,*
*20*  111:*18*
148:*2, 3*
153:*11*
164:*23*
165:*4, 8*
167:*2*
170:*7*
193:*10, 23*
201:*15*

documents
11:*19*
12:*20, 21*
37:*21*
59:*14*
67:*12*  68:*5,*
*11, 12*  69:*8*
73:*5*  89:*9*
95:*7, 11*
104:*4, 12, 18*
106:*1*
107:*18*
143:*19*
148:*11*
149:*6, 11*
153:*12, 22,*
*23*  155:*19*
159:*2*
162:*23*
163:*16*
164:*24*
175:*11*
193:*13*
195:*4, 7, 20*
doff  192:*12*
doing  24:*2,*
*25*  25:*17, 19,*
*20, 23*  26:*4*
29:*17*
35:*13*
89:*19*
92:*12*
94:*17, 24*
108:*3*
154:*6*
166:*23, 24*
183:*4, 7*
195:*11, 12*
dollar  22:*11*
dollars
22:*14, 22, 24*
don  192:*12*
dose  32:*17*
130:*14, 15*

doubt
185:*12*
downstream
188:*22*
**Dr**  5:*4*  9:*8,*
*23*  20:*11*
38:*17, 24*
74:*2*  76:*21*
104:*6, 22*
112:*25*
134:*6*
147:*20*
168:*25*
199:*3*
drafted
27:*25*  65:*22*
drafting
28:*2*  36:*12*
draw  150:*16*
drawn
194:*2*
driver  23:*7*
drop  104:*5,*
*25*  105:*7*
**Dropbox**
105:*8, 11*
dropped
168:*1, 8*
dropping
105:*11*
drug  24:*11,*
*16*  26:*3*
27:*3*  31:*20*
37:*13*  40:*2*
41:*3, 24*
42:*16*  43:*7,*
*8, 10*  48:*18*
drugs  24:*10*
31:*15*
43:*18*
51:*20, 25*
**Duces**  8:*13*
due  2:*13*
21:*13*  30:*2*

36:*13*
119:*6*
128:*19*
**Duke**
131:*20*
duly  2:*3*
9:*18*  202:*25*
duration
128:*23*
129:*7, 10*
130:*2, 16*
dusting
72:*24*
194:*24*
duty  79:*8*
80:*7*  84:*18*
Dyer  14:*21*
67:*9*  161:*5*
**D-y-e-r**
14:*21*  161:*5*
dyspnea
180:*18*
191:*15*

**< E >**
eagle  61:*10*
earlier
33:*23*  70:*8*
112:*25*
133:*5*
152:*10*
153:*25*
154:*18*
166:*21*
170:*15*
174:*22*
183:*25*
193:*13*
198:*2*
early  155:*16*
**Earnest**
42:*1, 18, 21*
easier  61:*19*
179:*8*

easiest
154:*17*
easy  69:*7*
eat  34:*11*
edit  53:*23*
edited  168:*1*
editorial
174:*18*
editors
114:*18*
educational
49:*15*
effect  32:*17*
117:*17*
119:*6*  187:*3*
**Effects**  6:*5,*
*13*  112:*5, 12,*
*20*  113:*2, 3,*
*24, 25*
117:*24*
118:*2, 5, 13*
120:*2, 3*
146:*23*
efficacy
195:*20*
effort  53:*25*
177:*7*
either  21:*12*
23:*17*
28:*14*  29:*5*
34:*7*  57:*5*
65:*4*  90:*20*
93:*2*  94:*18*
95:*22*
101:*4*
115:*14*
141:*12*
178:*12*
179:*18*
185:*17*
189:*9*
**ELFSI**
61:*19*
elicit  32:*17*

Laura Massey Plunkett, Ph.D.

e-mail
105:15
144:9
emerging
34:8  37:12
50:5
Emi  13:6
111:23
112:21
117:13, 15
119:16
121:2, 17
122:1, 12
160:15
165:20
184:19, 20
186:19, 21
E-m-i  13:6
employed
204:5
employee
20:10, 13
employees
20:6  153:8,
11
employment
19:8
enacted
78:22
endometriosi
s  6:6
133:14, 17
endpoint
186:11
192:14
endpoints
118:19
121:14
186:16
188:17
192:5
engulf
189:12

ensure  79:9
80:8  84:18
entire
119:24
182:21
entirely
123:9
entirety
70:15
entity  59:10
entity's
61:3, 5
entries
42:10
entry  38:24
126:7
environment
al  56:21
enzyme
186:2
EPA  14:17
60:16, 18, 20,
24  66:6
107:9, 12
108:1, 3, 6
109:8, 17, 23
110:7
146:19
147:21
148:4, 11
159:12
167:2
169:6, 16
170:6
EPA's
107:20
147:9
168:25
epi  174:6, 7
epidemiologi
c  6:17
173:17
epidemiologi
cal  145:21,

22  173:15
182:23
epidemiologi
st  174:9
epidemiologi
sts  133:18
epigenetic
122:20
187:3
188:8, 21
epigenome-
wide  190:12,
16
epigenomic
6:13  188:2
Epithelial
6:9  7:11
ESQUIRE
3:6, 7, 13, 18
203:22
204:2
essentially
20:4
116:21
117:11
189:1
establish
80:7
100:22
101:8
estimate
22:16  26:12
estrogen
117:21
118:24
et  13:4, 6, 9,
16, 18  15:3
44:10  75:2
111:25
160:3
161:9, 14, 19,
24  162:3, 14
178:24

ethical
61:10
ethnicity
51:7  130:25
European
37:15
evaluate
121:3
154:21
evaluated
169:16
evaluating
175:2
evaluation
111:3
132:10
148:1, 4
156:14, 20
169:6, 8, 17
170:7
events  188:1
everybody
76:11
evidence
6:17  7:8
82:15
83:15
91:13
94:12
96:23  98:3,
8  99:18
113:21, 23
115:4
121:9
122:25
131:7
134:19
142:16
147:10
149:18, 23,
24  150:12,
13, 24  151:2
155:7

193:24
195:23
evolving
155:1
exact  22:7,
13, 15, 22
34:22
120:21
153:20
172:16
exactly  30:7
69:8  120:4,
24  158:20
Examination
4:11  9:21
Examined
38:10  48:1
67:23
70:13  72:1
81:5  93:14
119:20
173:21
186:25
197:15
198:4
example
25:19
27:22
34:12
37:23  46:3
48:24
56:24  67:1
68:9  79:3,
4  97:22
139:7
166:15
177:13
180:6
Excerpts
8:9
Excuse
103:16, 17
108:24, 25
170:24

Laura Massey Plunkett, Ph.D.

executed
201:*17*
executive
52:*9*  61:*9,*
*17, 23*
**EXHIBIT**
5:*1, 5, 8, 11,*
*15, 17, 21*
6:*1, 5, 7, 11,*
*16, 18, 21*
7:*1, 2, 5, 9,*
*11, 14, 17, 21*
8:*1, 2, 6, 9,*
*12*  38:*10, 16,*
*19*  48:*1, 3, 4*
67:*23, 25*
68:*1*  70:*13,*
*16, 17*  71:*19,*
*22*  72:*1*
77:*5*  93:*14*
119:*20*
159:*4, 15, 16,*
*20, 21, 24, 25*
160:*4, 5, 13,*
*14, 16, 17, 21,*
*22*  161:*2, 3,*
*6, 7, 11, 12,*
*16, 17, 21, 22*
162:*1, 2, 6, 7,*
*11, 12, 16, 17*
163:*2, 3, 9,*
*13, 14, 20, 21,*
*24, 25*  164:*5,*
*6, 10, 11*
173:*8, 21*
186:*25*
197:*5*
exhibits
23:*20*
59:*14*
163:*17*
197:*15*
198:*4*

exist  84:*17*
158:*24*
182:*1, 9*
existed
81:*23*  136:*1*
existence
91:*7*
exists  129:*5*
151:*16*
Exp  204:*17*
expand
112:*16*
expect
114:*1*
123:*6*
157:*5*
183:*25*
196:*19*
expected
22:*17*
196:*10*
experience
51:*9*  52:*16*
126:*11*
181:*9*
Expert  5:*15*
7:*23*  11:*22*
45:*9, 18*
62:*9*  63:*2,*
*12, 19*  76:*23*
77:*5*  82:*14*
83:*12*  88:*2,*
*4*  93:*3*
113:*5, 7, 12,*
*13*  115:*7, 13*
131:*14*
132:*1*
145:*5*
166:*14, 16*
174:*2*  184:*2*
expertise
32:*14*
48:*12, 15, 20*

52:*19*
150:*24*
experts
62:*22*
63:*16, 17*
95:*4*
131:*17*
142:*10*
182:*5*
expert's
62:*15*
explain
26:*10*
89:*20*
90:*10*
121:*23*
122:*5, 9, 15,*
*16*  186:*10*
explains
166:*17*
exposed
57:*15*
84:*19*
128:*11*
130:*6, 13*
133:*2*
170:*5*
180:*20*
192:*16*
exposure
25:*8*  30:*8,*
*12*  32:*12, 15*
34:*12*
55:*11, 24*
56:*18, 19, 21*
72:*23*
117:*18*
118:*23*
119:*2*
120:*3*
128:*18, 19*
129:*13, 14*
131:*8*
145:*9*

146:*5, 24*
150:*18, 20*
169:*25*
182:*17, 21*
192:*7, 8, 10,*
*15, 18*
193:*20*
exposures
31:*13, 14*
157:*12*
express
157:*5*
expressed
15:*18*  75:*7*
97:*9*
135:*17*
136:*23*
171:*15*
172:*7*
201:*19*
expressing
153:*24*
extent
104:*11, 12*
113:*9*
extrapolate
122:*21*

< F >
face  102:*6,*
*20, 23*
103:*13*
**Facilities**
160:*25*
**Facility**
6:*20*  14:*14*
78:*16*
fact  77:*17*
83:*6*  90:*12*
91:*16*
106:*20*
109:*21*
113:*23*
115:*15, 22*

116:*11*
118:*5*
126:*11*
127:*2*
135:*5*
149:*4*
153:*3, 15*
156:*17*
173:*3*
174:*4*
176:*23*
179:*15*
factor  83:*3*
89:*24*
133:*19*
179:*1*
factored
96:*2*
factors  6:*6*
81:*23*
failure  41:*4*
137:*24*
148:*22*
fair  180:*1*
197:*24*
familiar
81:*6*  93:*15,*
*18, 24*
180:*22*
far  12:*12,*
*24*  17:*9*
20:*24*  24:*5*
25:*11*  29:*3*
37:*4*  40:*21*
46:*5*  50:*6*
55:*23*  71:*3*
80:*16*
101:*14*
113:*1*
121:*2*
127:*7*
136:*20*
158:*17*
169:*15*

Laura Massey Plunkett, Ph.D.

| | | | | |
|---|---|---|---|---|
| 171:*3* | 181:*3* | **figure** | 143:*2, 14* | **five** 14:*16* |
| 181:*20* | 184:*7, 9* | 22:*11, 13, 15* | 189:*19, 23* | 39:*4, 5* |
| 183:*22* | 191:*12* | 104:*16* | **findings** | 76:*8* 198:*13* |
| 193:*5* | 195:*17* | 118:*9* | 80:*20* | **flip** 197:*8* |
| 197:*11* | **FDA's** | **file** 160:*8* | 84:*22* 89:*1* | **Florida** |
| **FDA** 6:*20* | 80:*19, 20* | **filed** 39:*12* | 94:*2* | 3:*14* 43:*14* |
| 14:*13* | 81:*7, 12* | **files** 96:*11* | 113:*20* | **fluoroquinol** |
| 37:*24* | 82:*13* | 97:*23* | 121:*17* | **one** 43:*9, 17* |
| 39:*25* 58:*5,* | 83:*19* | 142:*23* | 122:*1, 11* | **focus** 27:*23* |
| *25* 66:*3* | 84:*24* 85:*5* | 146:*12* | 130:*23* | 51:*25* |
| 77:*24* | 89:*1* 94:*2* | 177:*20* | 133:*13* | 55:*25* |
| 78:*20, 23* | 135:*7* | **filling** 43:*6* | 146:*1* | 99:*14* |
| 79:*11* 80:*1,* | 136:*11* | **final** 75:*2* | 151:*5* | 110:*12* |
| *16* 82:*6, 22,* | 137:*14* | 109:*10, 15* | 173:*12* | 111:*11* |
| *24* 83:*7, 11,* | 138:*5* | 110:*16, 25* | 187:*17* | 194:*13* |
| *22* 84:*4, 20* | 160:*24* | 111:*3* | **fine** 76:*12* | **focused** |
| 85:*15, 25* | **February** | 126:*5, 7* | 159:*11* | 157:*19* |
| 86:*24* 87:*3,* | 50:*15* 93:*1* | 169:*1* | **finish** 42:*11* | **Focusing** |
| *7, 17* 88:*25* | 96:*18* 142:*8* | **finalized** | **finished** | 18:*21* 55:*6* |
| 89:*12* | **Federal** 2:*8* | 125:*24* | 112:*7* | 188:*1* |
| 90:*14* | 5:*19* 14:*18* | **finally** 13:*17* | **fire** 50:*13* | **follow** 194:*7* |
| 96:*14* | 39:*14* | **financially** | **firm** 35:*17* | **followed** |
| 100:*11* | 43:*14* | 204:*7* | 36:*3* | 86:*25* |
| 101:*25* | 107:*21* | **find** 47:*21* | 131:*22* | 193:*24* |
| 103:*6, 15* | 108:*4, 16* | 79:*15* 84:*9* | 204:*18* | **following** |
| 105:*21* | 159:*13* | 99:*2* 102:*1* | **firms** | 54:*18* |
| 106:*8* | 180:*13* | 106:*21* | 132:*10* | 180:*14* |
| 109:*23* | **fees** 131:*21* | 123:*6* | **first** 9:*18* | 202:*22* |
| 110:*6* | **felt** 166:*12* | 153:*20* | 12:*25* | 203:*18* |
| 111:*4* | **female** 7:*5* | 154:*10* | 13:*12* 14:*2,* | **follows** 9:*20* |
| 134:*21* | **fibers** 40:*6* | 166:*15* | *23* 39:*1* | **food** 25:*24* |
| 135:*11* | 88:*22* 89:*3,* | 171:*17, 19* | 45:*6* 52:*4* | 27:*18* |
| 138:*17* | *10, 14* 90:*19* | 176:*15, 17* | 63:*24* | 28:*15, 23* |
| 139:*12* | 91:*25* | 177:*12* | 65:*23, 24, 25* | 31:*3, 20* |
| 140:*16* | 96:*16, 21* | 181:*21* | 104:*6* | 33:*4, 7* |
| 141:*25* | 170:*12* | 183:*17* | 167:*14* | 34:*24* |
| 142:*14, 18,* | **fibrous** | 186:*11* | 181:*23* | 37:*13, 14, 15* |
| *24* 143:*7, 10,* | 90:*19* 91:*8,* | 187:*19, 22* | 184:*23* | 48:*17, 18* |
| *15, 17, 21* | *19* 94:*23* | 198:*2* | 185:*1, 2, 21* | 50:*3, 9* |
| 144:*11, 14* | 96:*3, 5* | **finding** | 188:*6* 195:*3* | 137:*4* |
| 169:*8* | 100:*2* | 84:*20* 87:*7* | **fit** 65:*2* | **foods** 28:*13* |
| 178:*23* | 136:*4* 138:*3* | 91:*10, 12* | **fits** 123:*2* | **footnote** |
| 179:*22* | **FIFRA** | 92:*4* 110:*7* | 171:*15* | 14:*8* 79:*18* |
| 180:*25* | 29:*19* | 113:*22* | | 80:*3* 178:*7,* |

*8, 9*  179:*24*
191:*8*
**footnotes**
14:*2*
**foregoing**
201:2, *16*
202:*18, 19*
**foreign**  58:*9*
**forensic**
51:*19*  61:*10*
**forget**
182:*19*
**form**  101:*4*
**formal**
49:*10, 12*
52:25
**formation**
180:*19*
191:*15*
**formed**
73:*15*
75:*17*
95:*16*
106:*19*
107:*23*
132:*4, 18*
133:*16*
135:22
137:20
139:2, *24*
140:*12, 17*
171:*23*
**former**  52:*8*
**forming**
85:*1*
**forms**
127:*14*
186:*9*
**forth**  114:*17*
**forward**
105:*10*
152:*18*
**found**  27:*1*
33:7  82:*24*

84:*9*  87:*4*
88:22
91:*25*  92:*9*
94:*12*
128:*9*
142:*14, 24*
144:*15*
176:25
181:*23*
182:*15*
188:6, *15*
189:*3*
193:*16*
**four**  39:*3*
**fragrance**
33:*16*
**fragrances**
54:*20*
**Fragrant**
165:*6*
**framework**
29:*18*
**fraud**  41:*3*
44:*6*
**freedom**
36:*13*
**frequency**
128:*16, 21,
25*  129:*3, 4,
7, 10, 20, 24*
130:*3, 16*
**Frequent**
7:*19*  128:*17*
**froze**  64:*21*
**frozen**
63:25  64:*1,
5, 7*
**full**  156:*14*
202:*20*
**full-time**
19:*21*
**function**
118:*16, 20*
119:*1*

130:*16*
189:*12*
**functional**
190:*2*
**funded**
115:*16, 17*
116:*4, 6*
**funding**
117:*5*
**fungal**  30:*19*
**further**
70:25  72:*2*
112:*13*
114:7, *21*
170:22
172:*24*
203:*8*
204:*4, 7*

**< G >**
**gained**
52:*16*
**Galleria**
11:*10*
**gathered**
69:*13, 14*
**gender**  51:*8*
**gene**  188:*18,
19, 22*
**General**
7:*16*  19:*20*
20:*1*  34:*3*
66:*12*
75:22  76:*5*
127:*3*
171:*21*
**generally**
28:*12*  29:*7,
10, 11*  30:*17,
18*  32:*9, 11*
35:*4*  39:25
49:*1*  57:*21*
63:*3*  68:*3*
142:*20*

158:22
187:*13*
**generated**
71:*9*
**generic**
39:*18*
**genes**
190:*23*
**Genital**  6:*9*
72:*24*  81:*20*
**genome**
189:*20*
190:2, *18, 23*
**gentleman**
43:*21*
**George**  52:*6*
**getting**
18:*19*  109:*3*
**Giese**  71:*6*
177:*21*
178:*1*
**give**  22:7,
*22*  26:*17, 20*
34:22  39:*5*
50:*21*
55:*16*
61:*18*  69:*8*
78:*23*
91:*12*
109:*15*
148:*9*
149:*1*
154:*12*
198:*12*
**given**  16:*12*
28:*2*  45:*3,
4, 21*  54:*13,
17, 22*  75:25
76:*1*  100:*3,
4*  141:*11*
147:*13*
154:*15*
201:*20*

203:2, *16*
**gives**  138:*17*
**Global**  5:22
155:*1*
158:*20*
**glove**  192:*6*
**gloves**
158:22
180:*15*
181:*1, 12, 16,
17*  192:*8, 9,
10, 11*
**go**  12:*24*
16:7, *23*
18:*20*
24:*19*  25:*9*
27:*15*
42:24  43:*4*
47:*20, 22*
49:*24*
64:*10, 17*
68:*16*  69:*2*
70:25  72:*2*
76:7  77:*21*
78:*20*  80:*3*
89:*4*  90:*16*
92:*1, 5*
98:*16*
101:*10, 12,
13*  102:22
103:*20*
105:*1, 3, 9*
108:*10, 12*
110:*11, 13*
111:*16, 18*
112:*15*
116:*9*
120:*10*
121:*10*
123:*10*
125:*15, 17*
133:22, *24*
134:*23*
136:*21, 24*

Laura Massey Plunkett, Ph.D.

137:*17*
141:*3*
142:*7, 21*
143:*18*
146:*12*
147:*4*
154:*19*
155:*16*
159:*9*
168:*16*
169:*12, 22*
176:*14*
178:*22*
179:*10*
183:*17*
185:*23*
186:*17*
190:*24*
193:*9*
194:*10*
195:*16*
197:*3*
198:*25*
**goal** 166:*15*
**God** 9:*20*
**goes** 17:*9*
25:*21* 84:*3*
98:*2* 99:*12*
126:*11*
195:*15*
**going** 26:*16,*
*24* 27:*2*
38:*6* 50:*21*
64:*11*
71:*19*
81:*18*
86:*16*
99:*15*
126:*7*
133:*21*
168:*24*
172:*4*
176:*17*
183:*23*

191:*7*
195:*15*
196:*14*
**gonna**
38:*15, 21*
49:*4* 50:*7*
51:*25*
67:*24*
70:*14*
102:*9*
104:*4*
105:*4, 9*
106:*3*
120:*4*
145:*4*
159:*5, 9*
165:*14*
169:*25*
181:*15*
193:*19*
194:*4* 197:*5*
**Good** 9:*23,*
*24* 10:*3*
53:*14*
129:*25*
**Goodman**
14:*24*
161:*8*
166:*19*
**gosh** 136:*19*
**gotcha**
54:*12*
**gotten** 49:*2*
142:*17*
143:*4*
162:*19*
**grad** 55:*18*
**graduate**
52:*19*
141:*12, 15*
**Grand** 3:*19*
**grants**
131:*20*

**granuloma**
180:*19*
191:*15, 20,*
*21*
**granulomas**
191:*22*
**GRAS**
37:*23*
**GRASE**
195:*18*
**great** 90:*24*
**greater**
129:*3, 24*
**Green** 70:*4*
**grounds**
149:*18*

**groundwater**
57:*6*
**group**
34:*17*
36:*18, 22*
37:*6, 18*
54:*14, 18*
58:*13* 59:*4,*
*9* 61:*2, 5*
132:*11*
178:*23*
179:*9*
**groups**
34:*21, 24*
35:*6, 8*
57:*18*
187:*12, 13*
**growth**
154:*22*
**guess** 15:*14*
17:*11*
37:*10* 44:*1*
45:*15*
48:*19* 55:*2*
65:*24* 91:*4*
93:*24*

136:*14*
172:*8*
**Guidance**
14:*15*
**Guide**
160:*24*
**Guilbault**
38:*22* 39:*7*
**Guys** 108:*25*

**< H >**
**hair** 40:*9*
**half** 69:*23*
87:*4*
**hand**
105:*16*
201:*20*
**handwrote**
197:*5*
**handy**
184:*20*
**happen**
182:*11*
**happened**
43:*25*
143:*16*
153:*4*
**happening**
123:*12, 13*
**HARDY**
3:*18* 204:*2*
**harm** 55:*24*
**Harper**
13:*4* 74:*21,*
*24* 75:*2, 6*
111:*23, 25*
112:*1, 15, 17*
114:*5*
161:*23*
165:*20*
167:*23*
172:*25*

**Hawaii**
43:*22* 44:*5,*
*6, 7*
**hazard**
66:*15*
84:*15, 17*
85:*1, 25*
86:*3* 91:*15*
96:*23* 97:*6*
99:*18*
108:*8*
109:*24*
110:*4, 8*
111:*4, 8*
117:*12*
145:*8*
146:*22*
149:*21*
150:*13*
151:*3*
179:*17*
183:*1*
**Hazards**
94:*16*
139:*10*
157:*19*
**head** 118:*19*
**Health** 5:*22*
6:*2* 37:*16*
58:*9* 59:*24,*
*25* 84:*6, 10,*
*17, 21* 85:*7,*
*10, 17* 108:*7*
109:*24*
110:*4, 8*
111:*4, 8*
123:*22*
124:*15*
126:*14, 16*
146:*23*
**HealthCare**
43:*12*

Laura Massey Plunkette, Ph.D.

hear 36:23
64:3, 7
109:5
heard 182:1
183:10, 11
hearing
93:1
heart 147:2
heavily 33:6
heavy 32:24
33:1, 3, 9
40:6 54:20,
21, 23 55:12,
23 56:13, 17
91:19
94:23
139:8
144:15
182:14, 16,
18
HEGARTY
3:18 4:11
9:15, 22
10:4 16:20,
22 38:15, 20
48:2, 5
62:8 64:4,
10, 17, 19
67:24 68:2
70:14, 18
71:18, 23
76:7, 20
85:4 97:1
103:20
104:8, 14, 21
105:6, 13, 19
109:11
116:16
133:21
134:6, 9
146:7, 16
159:14, 19,
24 160:4, 9,
12, 16, 21

161:1, 6, 10,
15, 20, 25
162:5, 10, 15,
20, 25 163:4,
12, 15, 19, 24
164:4, 9, 12
168:16, 23
180:8
190:24
191:6
198:9, 14, 17
199:13
203:4 204:2
Hello 64:9
help 9:19
20:25
154:23
helped
29:25
helping
29:13
hereto 2:10
hernia
44:21 46:4
high 32:16
higher
130:14
highlighted
60:3 68:25
77:3 79:14
167:14, 15
197:8 198:5
hired 86:24
historically
56:23 57:8
hold 119:19
131:13
193:11
holder
40:16
holders
39:18
hope 20:17

Hopefully
122:17
hot 123:24
124:2, 12
125:11
hotel 11:10
16:15
hour 70:7
133:22
hours 19:24
23:6, 11, 21,
23, 25 24:1
27:6 69:23

housekeeping
158:25
Houston
11:9, 11
Howard
204:18
Hughes
204:18
human 7:10
34:12
56:20
84:17
108:7
109:23
110:4, 8
112:23
113:15
119:22
120:9, 17, 20
145:20, 22
146:4, 23
humans
123:18
148:17
185:18
Huncharek
115:17
hypersensitiv
ity 180:16
191:13

hypothesis
186:17

< I >
idea 55:18
91:22
127:12
128:9
179:10
189:21
identified
10:21 11:5
12:3 45:9,
18 46:11, 16
110:3
124:15
126:5 146:3
identify
11:3 13:24
29:2 30:14,
21 32:1, 6
33:2, 8
34:20
130:11
174:3
identifying
86:2
identity
201:15
immune
188:9, 16
189:5, 11
impairment
51:24
implementati
on 78:21

implemented
78:17 124:4
important
77:20
78:13
104:17
128:14

130:10
131:6
178:23
183:1
184:17
189:2
improper
41:16 43:6
impurity
109:25
110:5
inability
118:21
189:9, 12
inaccurate
17:16 18:25
inappropriat
e 122:18
173:2
incidence
81:21
include
49:12
86:10
93:20 94:5
98:7 100:1
113:25
180:15
included
71:4 94:1
100:17, 19,
20 106:10
130:5
166:10
173:12
178:19
includes
127:22
130:2
148:4
203:18
including
127:4

Naura Massey Plunkette, Ph.D.

180:*17*
191:*14*
**incorporate**
180:*7*
**increase**
145:*10*
157:*22*
**increased**
36:*4*  85:*2*
96:*24*  97:*8*
99:*18*
113:*14*
119:*15*
128:*11*
131:*7*  133:*2*
**increases**
59:*20*  72:*24*
**independentl**
**y**  93:*22*
**INDEX**  5:*1*
**indicate**
76:*24*
155:*17*
196:*3*
**indicated**
93:*19*
157:*24*
**individual**
35:*12*
41:*18*
145:*13, 24*
173:*23, 24*
**individually**
145:*14*
159:*5, 7*
**individuals**
52:*7*  55:*24*
130:*4*
**induce**
119:*14*
**induces**  7:*10*
**industrial**
31:*12, 24*
32:*1, 8*

**Industry**
14:*15*
116:*22*
117:*11*
**inert**  29:*19*
**inerts**  29:*5*

**inflammation**
66:*18*
127:*3, 12, 19*
133:*6, 9*
158:*1, 13, 15*
180:*16*
189:*11, 24*
191:*12*
**inflammator**
**y**  30:*2, 4*
188:*9, 16*
189:*6, 25*
**information**
41:*5*  52:*16*
55:*22*
60:*12*
80:*10*  84:*3,*
*25*  85:*17*
86:*14, 16*
92:*16, 22*
96:*8, 22*
99:*4, 5, 17*
123:*16, 17*
134:*20*
174:*8*
177:*11, 16,*
*19*  181:*5*
203:*16*
**ingestion**
30:*10*
**ingredient**
24:*16, 24*
25:*1, 24*
26:*15, 23*
27:*1, 10, 14*
29:*15*  30:*5,*
*7*  31:*4*

40:*5*
123:*24*
151:*9*
**ingredients**
24:*9*  26:*19*
27:*18, 20*
28:*6, 9, 13*
29:*4, 19*
31:*17*  78:*2*
79:*10*
**inhalation**
170:*2*
**initial**  13:*6*
96:*9*  125:*8*
**initials**  13:*9,*
*13, 16, 18*
14:*24*
**initiate**
114:*2*
**initiated**
116:*20*
**initiation**
118:*7*
**injected**
6:*24*
**injured**
39:*10*
41:*17, 21*
42:*13*  43:*5,*
*21*  44:*24*
**injuries**
56:*19*
**injury**  41:*18*
**innovation**
154:*24*
**input**  57:*22*
**Insights**
7:*13*
**insoluble**
6:*14*
**instance**  2:*3*
**instructing**
105:*6*

**instrument**
201:*16*
**intellectual**
21:*13*
**intend**
10:*20*  58:*2*
72:*22*
75:*19*
134:*13*
135:*10*
136:*2*
153:*7*
155:*2, 11*
165:*22*
**intent**  155:*5,*
*6, 9*  172:*23*
183:*17*
**intention**
172:*23*
**interacting**
35:*11*
**interaction**
37:*15*
60:*16, 19*
**interactions**
37:*8, 11, 21*
60:*22*
**interested**
204:*8*
**interesting**
117:*22*
**internal**
143:*19*
177:*20*
180:*20*
193:*12, 23*
**internally**
158:*23*
194:*24, 25*
**interrupt**
73:*21*
83:*25*
103:*2*
139:*15*

**intersection**
50:*4*
**introduce**
9:*5*  48:*25*
**introduced**
11:*15*
**invasive**
185:*13*
**investigation**
**s**  117:*10*
**investigator**
116:*24*
**investors**
21:*14*  36:*14*
**invoice**
70:*19, 21*
71:*5, 6*
**Invoices**
5:*13*  8:*4*
23:*18*  70:*9,*
*10, 12, 15*
71:*3, 8, 16*
**involve**
40:*25*  43:*8*
44:*15*
125:*20*
**involved**
39:*15*
40:*14*  41:*2,*
*15*  42:*15*
43:*15*
57:*18*
81:*24*
88:*18*
125:*20*
170:*10*
188:*16*
**involves**
41:*16*
43:*17*  44:*17*
**involving**
188:*9*
**irrelevant**
86:*12*

**Irritant**
165:6
**irritative**
193:20
**isolated**
145:18
185:15
**issue** 17:12
24:11, 12, 15,
22 27:2
29:12 40:3,
7, 8 44:6
51:23
56:20 57:6
60:4 77:21
79:2 83:6
90:14 91:3,
4, 5 94:22
96:20 97:2,
4 116:18, 23
119:5, 11
125:16
127:19
128:17
130:25
135:24, 25
136:10
142:11
149:20
150:21
152:11
182:20
192:1
193:17
**issues** 32:13
36:11
39:21
66:14
79:21, 23
82:14
84:13 85:2
117:9
133:7, 20
146:1

153:5, 14
175:14
183:3
**It'll** 110:18
**its** 19:10
66:9, 15
80:17
84:20
92:17 94:3,
7 105:21
121:5
123:23, 24
124:9, 23
135:12
136:3
169:6, 16
170:6
175:1
194:24

< J >
**J&J** 16:15
67:1 93:2
**J774** 6:14
**Jackson**
43:11
**JAMA**
13:11 162:9
**January**
42:11
204:11
**JERSEY**
1:1 202:1
**Jessica** 75:8
**Job** 1:25
129:25
204:25
**JOHNSON**
1:1 5:21,
22 6:1, 2, 23
9:16 10:5,
6 14:5
73:9, 16, 17
87:1, 11, 12

92:17
93:12 94:6
101:2, 3
103:8
116:4
134:14
135:1, 11
137:13, 23
142:1, 14, 15,
22, 24, 25
143:11, 22
144:12, 18,
24 149:6, 7
151:17, 25
152:1
153:8, 10, 11,
22 154:1
155:2, 3, 10,
11, 12, 16
156:4
159:17, 22,
23 165:6
192:24
193:3
194:15
202:1
**Johnson's**
6:3 73:9
75:18 87:6,
23 91:21
96:5 97:13
98:10, 20
99:21
100:6
109:19
134:14
135:1
136:3
137:23
142:23
144:18, 24
152:1
156:4

169:7, 17
170:4
**join** 103:18
**joined**
20:13 70:5
**journal**
50:9 115:1
161:5
**judge's** 44:3
**June** 10:13
12:5, 10
36:1 69:4
72:5, 13
168:6
**JW** 11:10

< K >
**Kahn** 40:11
**Kansas** 3:19
**Karen** 2:6
3:25
202:16
204:16
**Katie** 3:23
**keep** 16:11
108:22
109:7
**keeping**
23:14
181:19
**kept** 80:15
**Ki-57**
113:20
**kind** 25:17,
23 29:21
35:10
88:18 89:5
114:23
139:1
180:2
182:2
195:15
**kinds** 25:8
49:2

185:17
188:25
**Kleiner** 71:7
**knew** 136:1,
17, 20 149:4
**know** 10:4
12:17
17:11
18:16
26:15, 24
27:21 28:4
35:11 38:8
39:12
40:20, 22
41:13, 14
43:1 44:12,
13, 19 45:25
46:14, 15, 23
47:24
48:13, 15
50:21
56:15
59:13, 24
62:17
63:16 65:9
67:21 69:3,
7 70:11
71:24
73:12 78:9
81:3 87:22
88:5 91:20,
24 92:3
94:10
96:25 97:2,
15 98:13
99:5, 15
102:22
104:9, 10
107:3
109:2
111:11
113:7, 11
123:1, 11, 17
125:3, 16, 18

| | | | | |
|---|---|---|---|---|
| 130:7 | < L > | 15  7:23 | 181:3 | 116:13 |
| 131:16 | **L.D**  204:16 | 8:6, 9, 12 | **left**  197:3 | 125:10 |
| 133:19 | **L.L.P**  3:18 | 9:8, 17 | **legal**  61:10 | 175:21 |
| 134:16 | 204:2 | 10:2  38:17 | **LEIGH**  3:6 | **limiting** |
| 138:8, 15 | **lab**  86:24 | 200:2 | 9:13  103:17 | 31:18 |
| 139:9 | 88:13  89:3, | 201:1, 7, 12 | leigh.odell@ | **line**  77:9 |
| 142:18, 21 | 8, 9, 14 | 202:9, 24 | beasleyallen. | 79:10 |
| 144:14, 15 | 91:25 | **law**  35:17 | com  3:10 | **lines**  119:21 |
| 148:8 | **label**  135:6, | 36:3  77:11, | **length** | 152:23 |
| 149:23 | 19, 23 | 18  78:3, 13, | 166:20 | 153:1 |
| 150:20, 25 | 136:22 | 15, 21  79:22, | **lesson**  105:1 | 192:22 |
| 151:17 | 138:5 | 24  80:5, 6, | **letter** | **lining**  147:1 |
| 154:17 | 140:6, 10, 11, | 13, 14 | 142:18 | **link**  14:12, |
| 156:9 | 15  176:24 | 131:22 | 143:4 | 17  81:22, 23 |
| 157:14, 16, | 177:9 | 132:10 | **Levaquin** | 153:5 |
| 17  158:6 | **labeling** | 141:14 | 43:9 | **linked** |
| 166:24 | 28:5 | **lawyer** | **level**  139:16, | 146:5 |
| 168:4 | 135:12 | 104:24, 25 | 23  140:5, 9 | 189:11 |
| 170:4, 9 | 136:4, 15 | **layer**  156:3 | 169:18 | **linking** |
| 171:19 | **labels**  27:25 | **laying** | 188:18 | 191:17 |
| 172:5 | 28:3  176:6, | 129:25 | **levels**  51:24 | **links**  14:3 |
| 174:15, 23 | 11 | **lead**  30:8 | 169:7, 16 | 84:3 |
| 176:22 | **laboratory** | 33:13  52:5 | 170:5, 11 | **List**  5:4 |
| 179:12 | 97:24 | 56:2  57:7 | 185:10 | 12:8, 17 |
| 180:4, 9 | **labs**  93:13 | 113:3 | 186:2 | 13:22  38:2, |
| 182:2, 10, 11 | **lack**  138:15 | 114:2 | **LEVIN** | 4, 7, 16 |
| 183:22 | **laid**  90:23 | 119:15 | 3:13  203:25 | 42:17 |
| 186:2 | 151:1 | 145:15 | **levofloxacin** | 45:13 |
| 190:6 | **Lake**  43:3 | 191:24 | 43:9, 18 | 47:21  54:2 |
| 194:9 | 51:3 | 192:2 | **LIABILITY** | 67:16 |
| 195:21 | **language** | 193:19 | 1:4  202:4 | 69:16 |
| 197:20 | 69:1, 3 | **leading** | **library**  21:9 | 81:10 |
| **knowledge** | 135:23 | 158:22 | **Licata**  35:17 | 93:16, 20 |
| 88:8, 12, 15, | 178:25 | 191:23 | **LifeCell** | 123:24 |
| 19 | **largest** | **leave**  70:3 | 44:11  46:4, | 124:2, 12 |
| **known** | 130:24 | **lecture**  55:1, | 7 | 125:11 |
| 77:12 | **Laryngeal** | 17  56:9 | **light**  50:13 | 137:23, 24 |
| 84:15 | 146:25 | **lectured** | **limit**  99:10 | 144:18 |
| 139:3, 6, 7 | **Las**  204:19 | 141:8, 21 | **limitations** | 162:21 |
| 201:13 | **latest**  11:2 | **lectures** | 39:25  96:14 | 163:5, 7 |
| **Kuffner** | 83:2 | 141:11 | **limited** | 166:8 |
| 74:2 | **LAURA** | **led**  43:7 | 98:25 | 177:3 |
| | 1:9  2:1 | 180:25 | 101:20 | 191:11, 19 |
| | 4:10  5:4, 7, | | 111:8, 10, 13 | |

Laura Massey Plunkett, Ph.D.

listed 12:7,
10, 16  38:22
40:17
42:25
43:11
47:19  52:7
54:5  62:16
65:1  128:5
136:3
138:5
140:11
167:1
185:21
195:18
Listing 6:21
14:15
36:25
43:23  68:5
69:8
123:24
124:23
135:25
180:24
185:7  186:5
lists 52:2
53:14  185:5
lit 24:2
literature
6:5, 9, 13, 16,
23  7:1, 4, 7,
9, 13, 16, 19
10:20  11:4
23:15  25:8
65:16  66:2,
11  68:13
69:12
81:18
83:16
85:12
119:9, 11
131:3
148:2, 5
157:24
158:7, 20, 21

173:11
181:19, 20
182:5, 12, 23,
25  183:10,
13  184:10
191:17
192:1, 6
LITIGATIO
N 1:4
21:10, 22
22:5  23:2,
3  24:6
25:5, 10
26:15
28:22
32:18, 23
33:15, 19, 25
40:14
45:25
53:17  54:8
57:19
62:10, 21
67:5, 12
72:17  95:1
99:22
115:8, 24
131:15
132:2, 6
202:4
204:17
little 21:24
23:8  68:20
72:2  75:1
77:23
98:23
112:12
133:5
158:25
171:8, 21
liver 41:18
locations
190:2

loci 188:7
189:15
190:5
long 19:4
69:22
110:15
116:8, 12
122:16, 17
130:6, 13
149:14
196:14
longer 20:7
54:9
124:19
129:18
151:17
152:1
long-term
154:22
193:19
look 18:11,
16  30:1
34:4, 9
47:9, 22
59:13, 17
66:2  68:22
77:21
78:20  89:8
92:6  93:21
101:10
104:6
105:11, 16,
20  106:4
108:10, 12,
20  110:11,
14, 15, 19
111:6, 16, 18
115:10
120:2, 15
121:7
122:25
123:1
125:15, 18
128:23

129:15
130:2
131:18
138:7
141:4
143:18
146:12, 19
149:10
150:9
152:6
169:11, 13,
22  173:20
176:15
184:2, 12
185:1, 9, 23
186:18, 24
187:25
188:5
190:6
192:19
195:4
looked
27:18
66:13
73:18, 23, 25
74:1  89:11
90:15
97:17
106:1
111:15
117:20, 24
119:16, 20
120:6
129:10
130:24, 25
145:23
158:6
175:4, 5
177:10, 11
179:4
185:20
186:1, 3, 15
187:24
190:15, 18

looking
24:2, 17, 23
25:7  26:4
29:12  32:7,
11, 14  34:7
35:10
49:25  66:7
81:7  86:16
89:18, 19
90:15
95:12
96:10, 12, 13
98:25  99:1
101:11
112:22, 24
118:20
119:11
120:25
121:10
122:20
123:11, 15
129:4
130:10
144:8
146:14
148:4
153:17
176:18
177:22
184:23
185:15
186:14
187:14
188:17, 21,
22, 24
189:16, 18,
22  190:14,
19  192:22
195:5, 9
196:2, 6
Looks 64:4
93:14, 17, 24
128:20
129:17

Laura Massey Plunkett, Ph.D.

loose
  100:*17*
  101:*4*
  102:*16, 17,*
  *18* 103:*5*
loss 40:*9*
lot 87:*1*
  91:*21*
  100:*4*
  117:*9*
  142:*4*
  150:*19, 23*
  151:*2* 181:*8*
lots 94:*3*
  149:*23*
  150:*13*
Louis 15:*16*
  63:*10* 125:*7*
Louisiana
  43:*4*
lung 111:*9*
  146:*24*
  147:*1* 169:*5*
Lynch
  14:*25*
  161:*13*
L-y-n-c-h
  15:*1*

< M >
ma'am
  199:*7*
Macedonian
  20:*18*
machine 2:*8*
macrophage
  117:*17*
  118:2 120:6
macrophages
  6:*14*
  112:*20*
  117:*16, 25*
  118:*6, 11, 14,*

*16, 21*
  119:*16, 22,*
  *23* 120:*9, 17,*
  *20* 121:*22*
  189:*8*
maintain
  49:*14, 17*
major 23:*6,*
  *16*
making
  35:*22* 36:*5*
  86:*17* 95:*9*
malignant
  7:*10*
mammalian
  120:*2*
Mandarino
  74:*6, 7, 15*
mandated
  78:*16*
manner
  85:*13* 98:*6*
manufacture
r 46:*7*
manufacture
rs 80:*6*
  176:*5, 11*
  177:*23*
manufacture
r's 79:*8*
  177:*8*
manufacturi
ng 34:*17,*
  *21* 35:*6*
  41:*16*
mapping
  189:*21, 22*
March 47:*7*
  51:*3*
MARK
  3:*18* 9:*15*
  10:*3* 23:*19*
  38:*15* 48:*2*
  67:*24*

70:*14*
  71:*19*
  103:*17*
  104:*3*
  109:*7*
  159:*14, 19,*
  *24* 160:*4, 12,*
  *16, 21* 161:*6*
  163:*8, 12, 19,*
  *24* 164:*4, 9*
  167:*12*
  198:*12*
  203:*4* 204:*2*
marked
  38:*19* 48:*4*
  68:*1* 70:*17*
  71:*22* 77:*2*
  159:*16, 21,*
  *25* 160:*5, 14,*
  *17, 22* 161:*3,*
  *7, 12, 17, 22*
  162:*2, 7, 12,*
  *17* 163:*1, 3,*
  *14, 17, 21, 25*
  164:*6, 11*
  167:*8, 21*
  173:*8*
MARKETIN
G 1:*3* 41:*4*
  202:*3*
marketplace
  100:*20*
marks 2:*19*
Marriott
  11:*10*
MASSEY
  1:*9* 2:*2*
  4:*10* 9:*17*
  10:*2* 200:*2*
  201:*1, 7, 12*
  202:*9, 24*
material
  30:*11*

Materials
  5:*10* 10:*21*
  11:*4, 17, 19*
  13:*22* 15:*6,*
  *10, 19, 23*
  29:*9* 53:*5*
  56:*8* 67:*16*
  68:*22*
  82:*24*
  83:*22*
  121:*6*
  142:*12*
  160:*8*
  162:*24*
matter
  43:*16*
  85:*13* 132:*7*
matters
  21:*23* 22:*6*
  23:*2* 140:*23*
MDL 1:*3*
  9:*8, 9, 12, 14*
  10:*7, 13, 14,*
  *22* 11:*2*
  15:*23, 25*
  16:*3, 12, 21,*
  *24* 17:*23*
  18:*14*
  21:*18* 25:*4*
  38:*2* 39:*21*
  42:*5, 14*
  60:*15*
  62:*10, 11, 15*
  63:*8, 12, 13,*
  *17* 64:*24*
  65:*6, 10, 22*
  67:*16* 68:*9*
  71:*5, 20*
  72:*5, 16*
  75:*15*
  82:*22*
  83:*18* 86:*6*
  88:*21*
  91:*20*

93:*10*
  95:*21*
  131:*15*
  132:*1*
  138:*10*
  167:*10*
  168:*12*
  183:*19, 24*
  202:*3*
MEADOWS
  3:*6* 9:*7*
  11:*15* 16:*9*
  69:*20*
  76:*12*
  84:*23*
  104:*3, 16, 24*
  105:*9, 14*
  108:*22*
  109:*5, 7*
  145:*2*
  198:*12, 15*
  199:*1, 9, 11*
  203:*22*
mean 17:*12*
  18:*7* 19:*12*
  20:*1* 22:*22*
  24:*19* 27:*1*
  42:*4* 48:*15*
  54:*10*
  73:*21*
  88:*10*
  97:*15*
  98:*13*
  105:*14*
  113:*7, 11*
  115:*11*
  120:*22*
  123:*4*
  124:*7*
  128:*18*
  147:*11*
  153:*19*
  154:*17*
  166:*1*

170:*25*
172:*5, 15, 20*
173:*7*
175:*5, 9*
178:*2*
181:*10*
187:*5, 16, 25*
188:*12*
189:*15*
194:*3, 18*
195:*21*
**means**
150:*24*
188:*14*
**meant**
124:*12, 13*
**measure**
129:*5*
**measured**
51:*24*

**measurement**
186:*12*
**measures**
129:*8*
**meat** 28:*15*
47:*11*
**mechanism**
30:*1*
119:*12*
123:*1*
127:*3, 10, 13,
18* 133:*8*
**mechanisms**
20:*25*
113:*13*
**media** 14:*6*
**Medical** 6:*5,
9, 13, 16, 23*
7:*1, 4, 7, 9,
13, 16, 19*
24:*22*
44:*17, 18*
58:*21* 59:*4,*

*9* 65:*15*
147:*22*
161:*5*
173:*11*
191:*16*
**medically**
24:*14*
**meet** 69:*18*
138:*5*
140:*15, 16*
148:*22*
149:*22*
150:*8*
154:*25*
**meeting**
37:*1* 47:*12,
13* 49:*16*
51:*3* 52:*13*
69:*17, 19, 22,
24* 96:*18*
**meetings**
47:*1, 4, 18*
**members**
52:*8*
**memo**
193:*14*
**memorandu
m** 193:*25*
**memory**
101:*13*
**mention**
127:*21*
130:*18*
146:*20*
167:*1, 2*
**mentioned**
23:*18* 45:*1*
46:*23*
56:*24, 25*
82:*7* 94:*1*
114:*4*
128:*20*
152:*24*
165:*4*

167:*8*
197:*18*
**mercury**
33:*13*
**mere** 139:*5*
**mesh** 44:*20,
21* 46:*4*
**mesotheliom
a** 110:*12*
111:*9*
146:*25*
169:*5, 10*
**met** 134:*14*
135:*1*
**Meta-
analysis**
7:*21*
**metal** 32:*24*
33:*1* 56:*18*
182:*16*
**metals** 33:*3,
9* 40:*6*
54:*20, 21, 23*
55:*12, 23*
56:*13*
91:*19*
94:*23*
139:*8*
144:*15*
182:*14, 18*
**method**
86:*15*
97:*19* 98:*1*
99:*6, 11*
101:*20*
189:*17*
**methodology**
83:*1* 85:*19*
88:*20*
89:*23* 91:*9*
92:*7, 14*
93:*9* 95:*13*
96:*1, 7, 12*
97:*10*

98:*11, 21, 24*
99:*1, 20*
100:*5*
109:*18*
115:*5*
120:*21*
**methods**
25:*6* 88:*13*
96:*15*
99:*16, 17*
121:*7*
**methyl**
187:*12, 13*
**methylation**
188:*25*
190:*14, 22*
**methylizatio
n** 187:*5, 9,
10, 12*
**metric**
129:*2, 11, 19,
20, 21*
**Mexico**
40:*18, 22*
**mhegarty@s
hb.com** 3:*21*
**Micha** 15:*2*
161:*18*
**M-i-c-h-a**
15:*3*
**middle** 36:*1*
**million**
22:*14, 22, 24*
**mind** 19:*4*
61:*14*
**minds** 181:*2*
**mine** 107:*5*
**mined**
106:*14, 15*
**mines**
106:*10*
**minute**
146:*18*
190:*9*

**minutes**
24:*3* 55:*17*
76:*8*
110:*18*
133:*22*
198:*13*
**Mircheff**
20:*11, 17*
**M-i-r-c-h-e-f-
f** 20:*17*
**misbranded**
134:*11*
135:*7*
136:*12*
137:*14*
138:*17*
139:*12*
140:*6, 11, 20*
141:*10, 22*
142:*15*
144:*25*
**misbranding**
15:*18*
134:*15*
135:*2*
138:*6, 12*
140:*16*
141:*12, 17*
152:*11*
164:*3*
**misheard**
50:*10*
**missed**
197:*1*
**Mississippi**
16:*16*
18:*22*
23:*10*
44:*25*
70:*22* 71:*4*
**Missouri**
3:*19*
**misspellings**
19:*2*

misstates 145:3
misuse 102:9
mixed 159:8
mixture 97:4, 5 99:25 107:6 119:14 182:21
MoCRA 77:13
model 120:1, 5
models 120:6, 7
moderating 51:7
Modernization 77:11
modified 72:12 73:3
molecule 189:10
molecules 189:10
moment 89:22 197:7
Moneyham 41:9
Monograph 195:17
Montgomery 3:8
month 55:2 184:12
monthly 184:6, 11
months 27:8 47:11
Mooneyham 41:9

Moorman 131:10, 20 132:1
morning 9:23, 24 10:3
mouse 119:16, 21, 22 120:6
multiple 27:20 37:8 43:17 45:25 46:8 106:25 111:15
Muscat 115:17
mutagenesis 188:3
mutagenic 188:1
mutations 187:22

< N >
name 10:1, 3 12:25 13:17 20:15, 16 30:21 56:2 75:8 160:2 182:10 200:2 201:16
names 46:1 131:16
narrative 116:21
Native 51:13
naturally 107:5
Nature 50:3, 9 185:13

NCI 174:12, 19 175:1, 8, 23
NCRA 204:17
NDA 27:11 32:4, 5 39:17 40:15
NDAs 28:12 30:16 34:23
near 85:16
nearby 191:25
necessarily 2:20 36:12 63:1 67:9 85:9 104:9 115:12
necessary 79:9 80:8 104:11
need 19:12 20:22 36:23 47:9 70:25 72:2 79:15 80:23, 25 89:21 100:25 103:18 104:13, 16 105:1, 4 106:4 109:4 110:11, 14, 16, 20 111:16 154:8 173:19
needed 18:25 136:24

needing 150:11
needs 104:13 154:25
negative 97:11, 12 98:9 99:1 101:11, 15, 19 174:7
neither 204:4
Nevada 204:19
never 123:4, 6 144:1
NEW 1:1 10:19 11:3, 24 12:1, 2, 8 28:14 29:12 34:9, 10 39:13, 14 40:13, 18, 22 47:7 48:12, 14, 21, 25 49:2 59:21 66:3, 23, 24, 25 68:25 69:9, 11, 16 79:19, 22, 24 80:5 111:22 128:5 150:4 172:9 175:11 178:8 181:24 184:12 202:1
nice 133:4, 8
nickel 136:4 138:3

144:13
146:9
night 48:7
nine 12:20, 21 13:20
nominated 60:23, 24 61:1, 2, 6, 22
non 66:23
nonlitigation 32:4
nonpublic 66:24
normal 7:10
Norwood 42:25 46:24
NOTARY 201:24
NOTE 2:13 70:21 185:24
noted 195:19 201:3
notes 15:22 173:25 202:21
Notice 8:12 14:18 37:23 68:11 69:15 108:4 159:13 164:8, 10, 13, 17, 20 181:5 183:1
notify 199:8
November 10:14 14:15 15:24 21:18 55:2 65:24 66:1

Laura Massey Plunkett, Ph.D.

| | | | | |
|---|---|---|---|---|
| 71:*20* 72:*9* | **observing** | **office** 199:*8* | **ones** 18:*18* | **opinions** |
| 75:*20* | 138:*13* | 201:*20* | 32:*16* 69:*9,* | 10:*19* 11:*3,* |
| 160:*25* | **obviously** | **officer** | *11* 97:*24* | *5* 15:*18* |
| **NRA** 10:*6* | 19:*13* | 202:*25* | 105:*23* | 57:*17* 58:*2,* |
| **nuances** | 145:*20* | 203:*17* | 108:*17* | *5, 14, 18, 22* |
| 180:*12* | 149:*23* | **oh** 15:*12* | 128:*5* | 72:*13* 73:*4,* |
| **number** | 172:*3, 19* | 41:*2* 45:*15* | 166:*10, 12* | *16* 74:*14* |
| 19:*23* | **occasions** | 64:*1* | 167:*1* | 75:*5, 17* |
| 22:*23* | 10:*9* | 120:*12* | 172:*20* | 78:*6, 10* |
| 27:*17* | **occur** | 136:*19* | 173:*21, 22* | 83:*2, 3* |
| 38:*16* 48:*3* | 123:*18* | 154:*10* | 195:*6* | 84:*12, 16, 21,* |
| 53:*6* 67:*25* | 150:*20* | 164:*7* 194:*4* | **one-word** | *24* 85:*1, 7* |
| 70:*16* | 192:*15* | **Okay** 12:*24* | 167:*13* | 88:*4* 89:*24* |
| 71:*20* 77:*5* | **occurred** | 14:*1* 18:*5* | **ongoing** | 90:*7* 95:*2* |
| 125:*19* | 17:*23* | 24:*17* | 62:*4* | 96:*2, 24* |
| 172:*17* | 18:*13* | 25:*20* | **online** 49:*17* | 97:*9* 112:*2,* |
| 195:*7* | 77:*19* | 32:*10* | **opened** 22:*1* | *8, 18* 117:*14* |
| **numbered** | 153:*6* | 45:*22* | **operate** | 126:*24* |
| 2:*5* 95:*11* | 175:*15* | 53:*12* | 36:*14* | 128:*7* |
| **numbers** | 188:*8* | 54:*12* | **opinion** | 130:*22* |
| 68:*12* | **occurrence** | 68:*19, 24* | 72:*16* 73:*2,* | 132:*24* |
| 121:*20* | 96:*21* | 73:*22* | *6* 80:*11* | 133:*15* |
| 195:*5* | **occurring** | 74:*12* 79:*6* | 82:*7* 92:*13* | 136:*23* |
| **nurses** | 107:*5* | 81:*2* 84:*1* | 95:*16, 17, 21* | 137:*19* |
| 192:*9* | 152:*15* | 103:*20, 22* | 106:*19* | 151:*5* |
| **nuts** 30:*20* | 189:*20* | 105:*13* | 107:*4, 23* | 152:*11* |
| **NYU** 55:*1* | **October** | 109:*7* | 122:*24* | 165:*23* |
| 56:*9* | 18:*23* 44:*1,* | 111:*21* | 131:*7* | 168:*11* |
| | *11* 45:*4* | 123:*21* | 132:*4, 15, 18* | 171:*9, 12, 14,* |
| **< O >** | 70:*20* | 139:*16* | 133:*16* | *24* 172:*10,* |
| **oath** 201:*13* | 75:*12* | 148:*20* | 135:*22* | *12* 175:*7* |
| **Objection** | 86:*23* | 159:*8, 12* | 136:*15* | 179:*1* |
| 84:*23* 145:*2* | 87:*11, 16* | 160:*9* | 137:*10, 21* | 182:*20* |
| **objections** | 114:*5, 9, 22* | 167:*5* | 139:*2, 14, 21,* | 183:*2, 24* |
| 164:*19* | 170:*17, 23* | 176:*2* | *25* 140:*12,* | 197:*23* |
| 165:*1* | 171:*11, 25* | 186:*20* | *17* 144:*17,* | **opportunity** |
| **O'Brien** | 172:*11* | 192:*21* | *22* 150:*4* | 104:*18* |
| 13:*10* | 173:*1* | 194:*10* | 153:*23* | 197:*10* |
| 14:*11* | **O'DELL** | 196:*17, 22* | 155:*7* | **optimize** |
| 160:*19* | 3:*6* 9:*13* | 198:*8, 17* | 156:*12, 24* | 154:*21* |
| 162:*8* | 70:*4* | **old** 102:*5* | 157:*4, 5, 6* | **Oral** 8:*12* |
| 165:*21* | **offer** 58:*2* | **older** 65:*3* | 172:*5, 7, 10* | 30:*12* 203:*1* |
| **observation** | **offerings** | 97:*22* 99:*8* | 180:*9* | **order** 32:*17* |
| 78:*13* | 154:*24* | **once** 109:*10* | 197:*21* | 34:*11* |

49:13, 17
66:21
103:9
116:21
149:10
185:13
**organization**
35:11
47:18
58:22  59:5, 10

**organizations**
47:2, 4
**original**
40:15
80:11
127:22, 23
138:10
168:5  203:3
**Orleans**
39:13, 14
40:13
**OTC**  24:12
195:17, 18
**outcome**
204:8
**outline**
52:14
**outside**
24:5  26:14
28:21
32:18, 23
33:15, 19, 25
48:21
57:25
60:13  75:4
131:22
141:20
**ovarian**  6:6, 10, 17  7:2, 7, 11, 14, 17, 20
54:19  59:6, 12, 20, 21, 23

60:9  66:18
72:24
81:14, 21
84:11  85:6, 8, 23  92:10
97:8  108:8
109:19
110:8
111:5
112:23
121:18
122:1, 12, 22
123:17
124:6, 11
127:4, 11, 14, 20  128:11
129:6
133:9
144:20
145:1, 10
146:2, 4, 10, 17, 20, 24
147:8, 16, 23
148:5, 15
157:13, 22
170:13
173:13
174:13
176:13
177:2, 9
181:22
183:10, 12
191:18, 22
192:17
**ovaries**
158:2
**overall**
113:23
118:7
121:7
127:18
130:23
145:8

**overdose**
43:7
**overlap**
63:2, 17, 20
**oversight**
40:3

**overspeaking**
2:15
**over-the-counter**
24:10, 11, 24
26:3  27:3
31:4  41:22
**Owen**  14:22
**Oxidative**
7:13
127:13, 19
185:2
**oxide**  31:1
**oxygen**
185:6, 10, 16, 20  186:5

**< P >**
**P.C**  3:7, 23
5:13  8:4
203:22
**p.m**  2:6
134:3, 5
168:18, 19, 20, 22  191:1, 2, 3, 5
198:20, 21, 22, 24
199:16, 19
**p53**  113:20
**PAGE**  4:2
5:1, 24  6:4, 25  38:13
80:4, 9
81:6  84:2
87:5
131:19

133:8
147:2
164:2
167:14
184:24
185:2
186:5
188:6
197:16
203:14
**PAGE/LINE**
200:4
**pages**  5:5, 8, 11, 13, 17, 19
6:7, 11, 15, 18, 21  7:2, 5, 8, 11, 14, 17, 21, 24  8:2, 4, 7, 10, 14
14:16
163:8, 10
164:2
**paid**  71:15
115:7
116:24
**Pakistan**
57:11
**PAPANTONIO**  3:13
203:25
**paper**  50:2
55:25  56:1, 17  57:11
74:25
113:9, 20
114:5, 25
115:3, 6, 11
116:1
118:13
119:16
120:15
121:2, 5, 11, 17  122:1, 12, 24  123:6, 9

126:23, 24
127:6, 7, 15, 21, 24
128:20
129:9
130:19, 21
133:6
140:18, 25
160:1, 10, 11, 15, 18  161:4, 8, 13, 18, 23
162:3, 8, 13
166:15, 20, 22  170:23
171:7, 10, 24
172:18, 25
186:19, 21
187:15
188:13
189:14
190:7
**papers**  55:5, 9, 14, 15, 21
56:3  66:13
115:10
116:1
117:4
120:13
127:24
131:4, 5
140:21
141:4
162:23
163:15
166:4, 6, 18
173:19, 24
**paragraph**
77:6, 10, 15
79:5, 7
86:19, 23
87:5  88:1
94:11, 24
100:10
101:12, 25

Laura Massey Plunkett, Ph.D.

103:7
105:24
107:8, 10, 11
109:18
111:19, 22
112:10, 13
123:19
126:15, 18, 20, 25
127:25
128:2, 5, 8
134:7, 10, 25
137:2, 7, 12
138:10
144:23
148:18, 21
152:6, 10, 15, 19, 22  153:4
168:24
176:1, 3
178:5, 7
179:2
180:3
185:2, 5, 22
186:6
191:7
192:19, 20, 23  193:10
194:5
195:3, 22, 24
197:16, 18, 22  198:1
**paragraphs**
164:17, 25
**Paralegal**
3:23
**Parfitt** 70:4
**Parkway**
204:18
**part** 21:13, 15  23:16
38:1, 11
67:15  70:5
81:12

84:24  91:9
92:7, 14, 15
93:8  94:11
95:13, 24
96:1, 22
97:10  99:7, 20  108:8
109:18
113:23
115:3, 5, 9, 21  117:5
118:6
124:2
132:10, 14, 20  149:13
153:2
165:23
181:6, 18
183:18
195:3
**participate**
88:10
**participated**
96:18
**particle**
114:1
119:6
158:10, 18
187:2
**particles**
6:14  119:4
158:16
186:22, 23
189:13
**particular**
48:21
56:16
81:16
111:13
112:3, 10, 21, 24  113:8, 22
115:11
119:13
138:23

139:3, 4, 16
141:2
143:8
148:2
155:8
182:22
183:7
193:25
**particularly**
51:20, 25
118:24
**PARTIES**
3:3  9:5
39:10
42:13
203:6, 19
204:5
**partner**
50:2, 14
57:20  58:1
**parts**
102:24
115:15
**party** 41:21
43:5  44:24
203:9
**passed**
78:19
**patent**
35:14, 23
36:11, 12
153:15
155:22
194:20
**patented**
194:23
**pathway**
170:2
**pathways**
32:14
34:10
56:22
188:8, 15
189:5, 25

**patient**
181:9
**patients**
153:18
**Patricia**
131:10
132:1
**pattern**
192:15
**patterns**
190:19, 23
**PCPC**
115:16
116:5, 18
117:4
**PDQ®**
174:13, 19
175:1, 8, 23
**peer** 115:1
**peer-reviewed**
50:1  115:1
**peers** 141:9, 21
**pending**
40:19
41:11, 12, 13
43:2, 3, 13, 24  44:12, 13
**Pensacola**
3:14
**people** 20:9
57:14
102:9
129:14
130:12
142:9
**percent**
22:2  23:1
**percentage**
21:21  22:4, 8  23:2
26:13, 18
100:6

**perception**
51:16
**performed**
113:16
**Perineal**
7:19  124:3
131:8
156:2, 13, 25
157:8, 21
182:24
192:17
**period** 18:2
103:13
124:24
130:6, 13
135:17
149:14
195:8
**periods**
19:14
**permanent**
40:9
**person**
20:11
51:14  95:1
130:8
157:9
169:25
201:15
**personal**
88:8, 12, 18
131:21
**personally**
130:8
201:12
**pertinent**
78:6, 10
**pesticide**
29:16, 20
30:6, 22
56:18
**pesticides**
29:5  53:17
54:7  55:7

Laura Massey Plunkett, Ph.D.

56:22, 23
57:8
**PH.D** 1:9
2:2 4:10
5:4, 7, 16
7:23 8:7,
10, 13 9:17
20:21
200:2
201:1, 7, 13
202:9, 24
**Pharmaceuti**
cals 43:12
**pharmacokin**
etic 51:23
**pharmacokin**
etics 32:13
48:17
**pharmacolog**
y 48:16
**phone** 171:6
**phrase**
194:14
196:21
**phrases**
134:11
**Phung**
13:18
132:21, 23
160:2
165:21
197:20
**P-h-u-n-g**
13:18 160:3
**physician's**
192:8
**physiology**
20:21
**pile** 159:9
173:19, 21,
22
**place** 57:3
78:23

91:10
113:19
**placed**
56:23
**places** 21:8
167:25
189:3, 16, 19,
23, 24 197:2
**plaintiff**
41:7, 19
42:6 43:20
44:23 67:4
91:20
**PLAINTIFF**
**S** 3:5, 12
9:8, 10, 12,
14 39:10
57:25 65:5
67:10
69:25
99:22
115:7, 23
116:7
132:2, 8
164:19
199:2
203:21, 22
**Plaisance**
38:22
**plan** 50:3,
11 184:2, 4,
5, 15
**planned**
49:20, 23
52:15
173:5 196:9
**plans** 50:6
151:15
183:21
184:16
**plant** 57:3
**plants** 57:5
**platy** 100:1

**plausible**
119:12
**Plavix** 41:3
44:5
**Please** 2:13
9:4, 25
13:3 47:24
61:15
67:21
70:11
71:24 77:6
78:9 79:5
81:3 86:19
90:11
104:4, 25
105:2
111:19
123:19
126:15, 18
127:25
134:6
148:18
152:6
178:5
188:5
192:19
199:6
**PLUNKETT**
1:9 2:2
4:10 5:4, 7,
16 7:23
8:6, 10, 13
9:8, 17, 23
10:2 38:17,
24 76:21
104:6, 22
134:6
147:20
168:25
199:3
200:2
201:1, 7, 12
202:9, 24
**plus** 76:3

**point** 15:4
17:2 19:6
46:17
53:14 60:5,
14 66:7
75:24
78:14
80:25 82:6
83:22 86:7
113:10
116:1
117:7
135:17
136:7
139:4, 17
142:13
146:14
150:12
152:5
153:22
155:8
158:12
175:11
183:20
184:15
195:22
197:16
**pointed**
86:13
117:3
145:24
178:14
**pointing**
80:24 86:1
110:2
124:2
188:4 194:3
**points**
145:13
152:17
**Policy** 6:20
14:13 50:4
160:24

**Portfolio**
5:23 154:21
**portion** 93:9
**portions**
197:9
**posed** 97:6
109:24
110:4
117:12
139:10
149:21
**poses** 145:8
148:13
**position**
61:22, 24
154:22
**positive**
41:15
98:25
136:14
174:4, 6
**possibility**
150:18
179:17
**possible**
67:7 81:19
82:8, 18
125:4
140:2
151:11
185:23, 25
**post** 182:6
**post-docs**
52:20
**poster** 47:8
53:2, 5
**potential**
31:13
32:12 57:6
65:6 108:7
109:23
110:4, 8
130:14

**potentially**
32:16  98:7
100:3
124:23
140:15
143:4
158:22
190:3
**POWDER**
1:3  5:22
6:3, 9, 17
7:7, 10, 16,
20  10:7
17:22  18:4
23:19, 22, 24
32:19
54:14
57:17, 19
58:6, 10, 18
59:1, 5, 11,
22  60:8, 17
63:4, 23
71:10
75:18, 19
80:17, 20, 21
81:14
84:11
85:23  87:1,
6, 12, 23
90:20, 21, 22
91:21
94:16  96:6,
21  97:14
98:20
99:21
100:6, 11, 23
101:4, 24
102:5, 8, 10,
12, 16, 17, 18,
19  103:3, 4
105:22
108:2
109:19
119:13

124:5, 10
127:16
129:6
134:14
135:1, 12
136:3
137:13, 24
142:1, 15, 25
143:12, 23
144:12, 19,
25  145:9
150:7
151:18
152:2, 3
153:9
155:13
156:13, 24
158:16
165:6
169:7, 17
170:5, 11
176:12
177:1, 9
180:25
181:12, 16
185:11
192:8, 10
194:24
202:3
**powder-
containing**
102:14
**powdered**
180:15
**powders**
81:19
100:18
101:1
102:4, 20
103:6, 9, 13
154:5
157:7
158:15, 22

176:5
**Power**  98:11
**PowerPoint**
52:24
56:10, 11
**practice**
21:2, 3, 13,
15  23:16
34:1, 5
199:4

**PRACTICES**
1:4  202:4
**preapproval**
78:1  79:2
**predict**
166:1
**predicting**
120:2
**preparation**
70:1
**prepare**
16:24
17:24
52:24  56:8
65:16
66:22
68:14, 21, 23
110:24
**prepared**
11:1  15:22
72:8  76:6
166:2
167:7
175:10, 13
**preparing**
2:16  18:1
23:7  38:4
64:24
70:23
88:21  92:14
**prescription**
40:2  43:6

**presence**
90:19
91:18
98:10
109:24
110:5
117:21
118:24
136:11
137:22
138:15
139:5, 7
140:14
145:6
**PRESENT**
3:22
**presentation**
52:13, 25
54:18, 22
55:5  56:14

**presentations**
50:20, 25
51:4  54:14
**presented**
47:17  92:25

**preservatives**
27:22
**president**
52:10
**press**  5:21
6:1  14:4
67:1  154:1,
2  159:18, 23
**pressed**
102:5
**previous**
18:17
53:20
90:24
113:10
152:25

167:10
175:12
**previously**
35:14, 21
77:4
152:24
165:5
175:8, 24
**primary**
7:10  112:22
**print**  165:13
**printed**
14:16, 19
15:7, 17
109:14
**printout**
15:13
160:23
**printouts**
14:4
**prior**  10:13
16:3  36:5
65:13  95:22
**prisoners**
6:24
**privileges**
21:5, 8
**probably**
21:24  22:1
27:5  36:24
52:23
69:23
75:22
141:6, 7
176:22
178:2
**problem**
98:24  99:7
**problems**
57:1
**Procedure**
2:9
**proceeding**
204:6

Naura Massey Plunkett, Ph.D.

proceedings
202:18
process
2:16  30:2,
5  54:10
107:6
118:7
123:10
126:11
143:6
179:8  181:6
processed
90:21
processes
179:9
produced
2:2  67:12
92:21
producing
188:19
Product
6:20, 21
14:14, 15
21:1  24:24
25:17  26:3
28:1, 10
29:16
30:17, 18
32:19
33:25
39:15
40:25  41:4,
16, 17, 22, 23,
24  42:15
43:15
44:15  46:4
48:22
60:13
79:10  82:9
86:1  87:18
100:23
102:12
108:2
124:10, 16

134:12
135:7, 8, 13
136:12, 17,
25  137:5, 6
138:17, 18,
22  139:1, 13,
22  140:4, 6,
8, 11, 19
141:1, 2
142:1, 15, 25
143:12, 23
144:12, 19
145:7, 9, 23
149:21
154:24
155:18
176:12
177:9
179:19
193:4, 6
196:4
Production
4:4, 5, 6, 7
PRODUCTS
1:3, 4  7:20
10:7  27:19
28:3, 7, 16,
23  29:20
34:4, 10, 24
46:5  48:17
58:6, 19
59:2  60:8
67:3  80:17,
20, 21  84:18
100:11, 17,
23  101:7, 9,
16, 24  102:7,
8, 11, 14, 15,
23  105:22
106:5, 6, 9,
16  124:19
134:14
135:1
139:18, 20

141:5, 15, 18
142:12, 20
144:4, 25
150:8
176:18, 23
177:1
202:3, 4
professional
47:2, 4, 17
51:11  62:6
professor
21:7
profile
193:18
profiles
192:2
progress
78:18
progression
113:4
project
25:10
26:25  27:4,
7, 13, 24
31:1
projects
26:19, 23
36:9
proliferation
192:2
proliferative
191:23
promise
104:11
pronouncing
20:18
proper
187:9
properly
168:7
189:12
Properties
165:7

property
21:13
proposal
109:15
125:23
proposed
14:19
107:12, 14
108:8
109:8, 10, 12
110:18, 23
111:3
125:11
126:8
147:6  169:1
proposing
123:23
propylene
31:1
protein
188:20
proteins
28:15  47:13
prove  34:11
proved
201:13
provide
52:19
85:10, 16
88:4
provided
31:22
37:18  38:1,
17  48:7
67:5, 15
70:9, 15
71:3  92:17
94:6  164:24
provides
86:14
providing
72:16  95:1
provisions
2:9  78:15

public
30:23, 24, 25
36:17, 21, 24,
25  37:1
66:25
68:12  93:1
151:8
201:24
publication
13:1  50:7,
12
publications
49:20, 21, 23,
25  50:16
162:23
publicly
46:6, 16
177:11
publish
120:8
published
12:20
13:14  55:5,
15, 19  68:13
81:17
114:25
138:1
140:18, 25
167:1
173:11
pull  56:4
66:4  89:4
103:10
106:1
110:16
112:15
118:18
119:18
120:14
131:12
142:8  154:8
pulled  66:6,
17, 20  71:13

Laura Massey Plunkett, Ph.D.

purpose
17:25
89:17, 18
112:14
purposes
25:4  64:23
88:20
112:8
183:23
201:18
pursuant
2:8  28:19
203:16
put  52:11,
13  53:2
54:25
74:18
78:20, 22
80:16
93:11
102:6, 23
104:4
105:21
113:21
126:3
139:18
171:1
192:11
194:9
puts  184:9

< Q >
quality  2:14
97:20  98:1
121:11
quantificatio
n  99:11
quantify
190:4
question
22:4  24:21
31:18
45:23  49:5
62:19

63:11
68:20  73:1
78:5  87:20
89:5  90:1
91:11
98:14, 24
105:7
108:11
110:10
122:6, 14, 18
123:3, 5
125:10
134:18
135:15
140:3, 24
143:9
144:6
147:19, 21
156:10, 22,
23  165:14
169:15
170:20
171:21, 23
175:21
182:14
186:4
187:20, 21
196:12, 21
197:4
questions
29:14
75:12  95:5
104:7, 19
105:5, 18
106:3
134:16
165:25
166:3
172:17
178:12
184:18
198:10, 16
199:1

quite  48:13
98:18
Quotation
2:19
quote  2:20
180:14, 21
quote/unquot
e  96:22

< R >
RAFFERTY
3:13  203:25
raised  29:14
ran  61:8, 16
RDR  2:7
3:25
202:16
204:16
reach  158:3
169:7, 18
reached
40:24
58:17  59:1,
5
reaches
158:2, 14
reacted
194:25
reactions
156:6
158:23
180:17
191:13
194:22
reactive
185:6, 10, 15,
20  186:5
read  12:25
68:24  82:1,
11  95:3
107:14
108:17
121:6, 7
130:9

131:19
146:22
150:15
154:11, 16,
19, 20
164:14, 16
181:4, 6
191:11
199:4  201:1
reading
81:25
187:7
188:10, 13
189:14
reads  79:10
180:11
ready  18:19
realize
45:23
178:23
realized
54:24
really  74:23
78:16
116:8
175:21
reason  39:5
45:22
77:20
150:16
154:12, 14,
15  167:25
168:7
179:24
200:4
reasoning
177:7
reasons
34:7  203:14
recall  10:10
16:4  17:1,
15  18:11, 24
23:5, 13
27:16  38:4

56:2, 5
59:15
62:23
72:18
73:11, 12, 13
74:4, 8, 9, 10,
12, 22, 23
79:3  86:25
88:16  89:6,
13  92:2, 22
93:5, 19
101:11
103:12
106:2
111:2, 6, 7,
10, 12
114:16
115:19
121:1
141:6
143:2, 6, 15,
22  144:4
167:11
169:23
170:18
174:23
177:24
183:11
recalled
143:3
receipt
203:12
received
22:12
recess
64:13
76:16
103:24
134:2
168:19
191:2
198:21
recognition
83:6

Laura Massey Plunkett, Ph.D.

recognized 109:*23*

recollection 103:*1, 5*

record 2:*10* 9:*5* 16:*10, 18* 64:*10, 12, 16, 18* 76:*8, 15, 19* 103:*21, 23* 104:*2* 105:*3* 133:*24* 134:*1, 5* 168:*16, 17, 22* 190:*24* 191:*1, 5* 198:*20, 24* 203:*1, 19*

records 90:*13, 15*

refer 10:*20* 53:*18* 75:*13* 109:*12* 116:*3, 5* 186:*7* 195:*20*

reference 77:*14* 81:*13* 82:*21* 83:*17* 84:*2, 5* 94:*2, 4* 100:*10* 101:*24* 103:*7* 107:*8, 11, 22* 109:*18* 111:*2* 115:*15, 21* 123:*22* 124:*22* 126:*20*

127:*15*
128:*2*
134:*11*
137:*1, 2, 5, 6*
140:*9*
144:*23*
148:*21, 25*
153:*25*
165:*22*
166:*5*
168:*25*
176:*3*
184:*24*
193:*2*
194:*14*

referenced 95:*18* 140:*6* 141:*21* 152:*24* 165:*20* 168:*12* 179:*1* 191:*12*

references 12:*17* 108:*21* 111:*23* 148:*9*

referencing 105:*23*

referring 16:*11* 79:*21* 80:*2* 108:*22* 109:*8* 125:*22* 177:*8*

refers 109:*14* 190:*11*

reflect 2:*20* 23:*21, 23, 25*

reflected 17:*13* 21:*18*

reflects 65:*25*

refresh 101:*13*

regard 13:*19* 23:*1* 24:*23* 29:*8* 31:*3* 32:*19, 23* 33:*15, 19* 35:*1, 22* 37:*25* 52:*4* 53:*19* 58:*18* 60:*9, 17* 65:*10, 13, 15* 70:*10* 73:*16* 75:*5, 18* 79:*8* 80:*19, 21* 84:*10* 85:*22* 92:*17* 94:*6* 95:*17* 97:*13* 109:*19* 110:*7* 111:*4* 120:*9* 133:*13* 135:*12* 146:*10* 151:*5* 152:*9, 23* 165:*18* 169:*15* 176:*12* 177:*2* 183:*12* 193:*2*

regarding 58:*13* 60:*20*

62:*10* 93:*12* 108:*7*

regardless 139:*13, 16*

Register 5:*19* 14:*18* 107:*21* 108:*4, 16* 180:*13*

Registration 6:*20* 14:*14* 78:*16* 204:*18*

Registry 159:*13*

regrets 6:*23*

regulated 35:*9* 40:*1*

regulation 24:*12* 48:*17, 18* 50:*4* 55:*6* 66:*4* 77:*12* 184:*8*

regulations 80:*13* 135:*11* 137:*15*

regulators 29:*15*

regulatory 20:*24* 21:*15* 25:*10* 28:*11* 29:*18* 34:*1, 8, 9* 36:*16, 21* 37:*5, 18* 40:*2* 58:*9, 16, 25* 59:*19, 22* 60:*7* 66:*7* 110:*3* 134:*15* 135:*2*

140:*22* 148:*12, 16* 178:*15* 179:*5* 183:*2*

relate 32:*13* 53:*16*

Related 10:*18* 14:*19* 20:*23* 28:*23* 31:*12, 15, 19, 25* 34:*24* 43:*6* 47:*13* 53:*6* 55:*12* 56:*20* 66:*3, 13, 19* 79:*22, 23* 82:*15* 84:*17* 85:*2* 95:*2* 96:*13* 111:*5* 114:*8* 117:*10* 122:*12* 146:*1* 175:*15* 182:*24* 189:*5, 24* 190:*22* 204:*5*

relates 78:*10* 85:*6* 124:*5, 11* 147:*8, 23* 152:*11* 184:*18*

relating 85:*8*

relationship 83:*8*

release 5:*21* 6:*1* 154:*1, 2* 159:*18, 23* 189:*10*

releases 14:5 67:1
relevant 56:18 84:11, 16, 21 85:7, 18, 22, 24 90:4, 6, 9 91:6 98:11, 20, 22 99:17 115:3, 5 118:12 184:13
reliability 99:16
reliable 98:7
reliance 12:7, 17 82:23 83:21 93:15, 20 162:21, 24 163:5, 7
relied 5:10 68:6 93:23 120:16
relies 129:9, 16
rely 108:6 112:2, 7, 11, 17 117:13 126:24 130:21 138:2 182:5
relying 75:24
remains 48:15 57:2
remember 56:25 95:9 118:3 125:4 129:15 172:16 177:25

183:15 187:19
remind 20:12
REMOTE 1:8 2:1 199:18 202:8
remotely 2:3, 7 3:3 202:19, 24
removal 187:12
remove 189:13
removed 193:18
repeat 31:6 90:2 196:16
repeatedly 91:8
repeating 61:15 117:25
replace 156:1 195:9
replaced 151:19 193:15
replacement 157:6 196:3
Report 5:15 7:23 10:13, 15 11:2, 23 12:4, 5, 9, 11, 15, 16, 23 13:21 14:3, 8 15:25 21:18, 19 23:7 25:4 38:2 39:22 40:1 60:2 64:24 65:11, 12, 17,

20, 22 66:5, 22 67:16 68:9, 24 69:1, 5 71:20 72:10, 13 74:19 75:1, 5, 16, 21 76:4, 5, 23 77:5 79:20 80:11 82:22 83:2, 18 84:6 86:6, 11, 20 88:16, 21 89:1, 2, 8 92:1, 2, 15, 16 93:11 94:10, 22 95:21 97:25 106:24 109:12 111:20 114:13 115:16, 22, 25 116:4, 6 120:15, 22 121:14 122:8 123:20 125:8, 23 128:15 129:8, 23 130:15 132:20 134:7 138:4, 10, 11 145:25 147:14 148:19 149:16, 24 150:15, 19 151:1, 6

152:7, 18, 20 153:2 155:15 162:24 163:1 165:9, 16, 20 166:4, 6, 11 167:4, 9, 10, 21, 25 168:5, 7, 12, 24 171:1, 15, 16, 22 172:4, 6, 8 177:3 178:18 179:25 180:11 184:1, 13, 15 191:7 192:20 196:8, 20 197:9, 12
reported 2:7 88:25 92:4, 8 95:14 96:4 100:14 101:15, 19 120:8 128:10 129:20 169:6 175:20 202:18

REPORTER 3:23 9:2 61:12 64:2, 6, 11, 15 76:14, 18 103:16, 22 104:1 108:24 109:6 133:25

134:4 160:2 168:17, 21 190:25 191:4 198:19, 23 199:7, 15
REPORTER'S 2:13 4:17 202:14
reporting 122:11
reports 57:23 62:15 63:13 65:13 68:7 72:8 94:9, 14 95:4 117:1 128:15, 16 129:11 131:20 152:25 162:21 181:9 184:3
represent 10:4 39:2 68:4
represented 37:22
reproducibility 118:1
reproductive 7:5 29:24
Request 4:4, 5, 6, 7 16:15 95:6, 9 143:21 151:8, 12 152:2

**requested**
143:*22*
203:*9*
**require**
79:*1*
143:*24*
144:*2*
172:*16*
**required**
28:*4* 49:*15*
60:*8*
105:*17*
124:*10*

**requirements**
178:*16*
**requiring**
124:*18*
**reread** 87:*9*
**rereading**
190:*7*
**re-review**
152:*3*
**re-reviewed**
69:*11*
**research**
20:*23*
48:*14*
51:*15*
65:*16, 19*
156:*5*
174:*12, 18*
177:*6, 18*
183:*23*
195:*12*
**residing**
202:*17*
**respect**
135:*20*
175:*1*
187:*17*
**respond**
118:*21*

**response**
191:*22*
193:*20*
194:*14, 19*
**responses**
164:*20*
192:*7*
193:*7*
194:*15*

**responsibility**
77:*24*
179:*16, 19*
**restate**
24:*21*
137:*11*
167:*18*
**restricted**
124:*9*
**restrictions**
124:*5, 7*
**result** 91:*10*
101:*19*
115:*2* 117:*1*
**resulting**
119:*2*
**results**
89:*25* 90:*8*
92:*9* 94:*6*
95:*14*
97:*11, 23*
98:*4, 9, 19*
100:*8, 22*
101:*8, 14, 15*
103:*7*
105:*20*
171:*4, 18*
**retired** 21:*6*
**retrieval**
21:*20*
**retrievals**
21:*5*
**returned**
203:*11, 13*

**revamp**
53:*22, 24*
**revenue**
22:*11, 17*
**revenues**
22:*24*
**review** 7:*2,
4, 20* 16:*7,
23* 66:*17*
73:*9, 10, 17*
92:*16* 93:*8*
97:*12*
104:*12*
114:*8, 21*
115:*1*
121:*5*
127:*5, 7, 21,
24* 147:*10*
151:*9, 12*
166:*22*
173:*23*
176:*16*
**reviewed**
17:*3, 21*
18:*1, 3, 9, 12*
62:*14*
63:*22, 24*
64:*21* 68:*6*
85:*12*
93:*23*
95:*12*
97:*24*
110:*23, 25*
120:*16*
176:*10*
**reviewer**
114:*18*
172:*24*
**reviewers**
114:*15, 19*
173:*4*
**reviewing**
17:*1* 55:*19*
**revised** 12:*1*

**revising**
124:*23*
**rhinitis**
180:*18*
191:*14*
**right** 24:*8*
26:*20*
46:*21* 50:*3,
19* 60:*5*
65:*23* 69:*2*
76:*10, 14*
82:*4* 84:*1*
99:*2*
102:*19*
104:*1*
133:*25*
134:*4*
155:*14*
158:*20*
159:*10*
176:*1*
186:*7*
189:*22*
195:*14*
198:*17, 19*
199:*13*
**right-hand**
185:*22*
186:*6*
**risk** 6:*6, 9*
7:*17* 25:*12,
20, 21, 22*
26:*2, 4, 7, 9*
33:*24* 52:*8,
11, 20* 55:*1,
7, 20, 23*
59:*20* 62:*2,
3* 72:*24*
81:*23* 84:*6*
85:*2, 13, 22*
96:*24* 97:*8*
98:*11, 21*
99:*19*
111:*7*

113:*14*
119:*15*
121:*18*
122:*2, 12*
124:*15*
128:*11, 17,
18* 131:*8*
133:*2, 19*
145:*10*
148:*14, 17*
157:*14, 18,
22* 169:*6, 8,
10, 16* 170:*6*
180:*14, 15*
182:*17*
**risks** 26:*5*
111:*9*
148:*16*
157:*13*
169:*5*
179:*21, 23*
180:*24*
**rocket**
150:*22*
**Role** 7:*13*
66:*18*
118:*10*
133:*9*
**room** 11:*10,
12* 105:*8*
**route** 30:*8*
**routes** 25:*8*
119:*10*
**routine**
37:*11*
**RSA** 2:*7*
3:*25*
202:*16*
204:*16*
**rule** 14:*19*
107:*12, 14*
108:*9, 12*
109:*8, 12*
110:*1, 17, 18,*

*23* 111:*1, 3*
146:*19*
147:*6* 169:*1*
**rulemaking**
179:*9*
**Rules** 2:*8*
**runs** 61:*23*
**RYAN** 3:*7*
9:*11*
**ryan.beattie**
**@beasleyalle**
**n.com** 3:*11*

< S >
**Saed** 74:*21,*
*25* 75:2, 6
112:*25*
**safe** 34:*11,*
*12* 84:*19*
156:2, *13, 25*
157:*11*
195:*13*
**safely**
193:*16*
**safer** 149:*8*
151:*21*
153:*9*
155:*13, 18*
156:*5, 15, 20*
157:*9, 10*
193:*4, 5*
194:*16*
196:*4*
**safety** 21:*1*
24:*25* 25:*2,*
*12, 22, 25*
26:7 29:*15,*
*17* 31:*25*
32:7 33:*22,*
*24* 34:2, *9*
37:*15* 40:8
55:*11*
77:*25* 79:*2,*
*9* 80:*7, 8, 21,*

*24* 85:*14*
91:*15*
150:8
153:*17*
155:*23*
157:*18*
193:*17*
195:*19*
**sake** 16:*9,*
*18*
**salary** 35:*20*
**SALES** 1:*3*
202:*3*
**Salt** 51:*3*
**Sam** 13:*13*
**sampled**
88:*23*
**samples**
52:*1* 100:*19*
**Sanofi**
40:*11, 15*
**satisfied**
17:*9, 13*
**saw** 119:*3*
**saying**
16:*11* 83:*9*
87:*25*
109:*1, 3*
116:*14*
122:*3, 13, 23*
123:*7*
124:*8*
125:*15*
134:*25*
135:*3*
136:*8, 9*
137:*12*
148:*3*
169:*20*
195:*23*
**says** 77:*10*
81:*16*
109:*22*
123:*6*

131:*19*
146:*22*
180:*14*
188:*6*
**scheduled**
46:*20, 22*
50:*23, 25*
51:*2*
**Schoeve** 2:*6*
3:*25*
202:*16*
204:*16*
**school** 102:*5*
**science** 50:*5*
51:*8, 9*
122:*10*
148:*1*
150:*22*
**scientific**
12:*3* 24:*22*
25:*7* 47:*13*
49:*16*
52:*19*
58:*13, 17*
59:*9, 10*
65:*16*
66:*13*
81:*17*
97:*16*
116:*25*
147:*17, 22*
191:*16*
**scientifically**
24:*14* 98:*5*
**scientist**
114:*24*
122:*8, 11*
123:*5, 10*
**Scientists**
47:*16*
125:*20*
128:*9*
**scope** 92:*11*
106:*18*

111:*17*
137:*3, 8*
158:*11*
166:*13, 23*
169:*21*
170:*3, 8, 14*
**screen** 38:*6,*
*7, 9* 47:*23,*
*25* 64:*1, 21*
67:*21, 22*
70:*10, 11, 12*
71:*21, 25*
81:2, *3, 4, 5*
93:*6, 7*
103:*15*
104:*5, 23*
**screened**
33:*3, 6*
**screening**
126:*17*
**scroll** 38:*12,*
*21*
**scrolled**
53:*15*
**Scrolling**
42:*23* 48:*6*
53:*15* 72:*3*
81:*12, 13*
**seal** 201:*20*
**search** 24:*2*
59:*16*
66:*12*
71:*12*
142:*22*
181:*25*
**searches**
66:*2* 184:*10*
**searching**
67:*11*
**Second**
5:*15* 7:*23*
10:*14*
11:*22* 12:*4,*
*9, 15, 22*

21:*19* 38:*2*
39:*21* 40:*1*
51:*17* 60:*2*
64:*24*
65:*10, 17*
66:*5* 67:*15*
74:*18*
75:*20* 76:*4,*
*23* 77:*4*
82:*22*
83:*18* 87:*4*
88:*21*
92:*15*
93:*10*
131:*13*
154:*9*
167:*14*
168:*12*
177:*3*
184:*21*
185:*1*
186:*25*
193:*11*
**section**
49:*24* 52:*9*
61:*9, 11, 18*
62:2 84:*14*
94:*15*
147:*15*
152:*14, 16*
**sections**
15:*14*
**see** 38:*8, 10,*
*11, 24* 47:*24*
67:*21*
70:*11*
71:*24*
79:*13, 17*
81:*3, 5, 25*
82:*1* 92:*1*
97:*18, 24, 25*
101:*10*
104:*18, 22*
105:*4*

Laura Massey Plunkett, Ph.D.

| | | | | |
|---|---|---|---|---|
| 110:*17, 19* | **sense** 98:*18* | **shake** | 91:*17* | 113:*19* |
| 114:*1* | 122:*4, 6, 8* | 102:*19* | 94:*17* 96:*4* | **silica** 54:*20* |
| 124:*14* | 123:*5* | **share** 38:*6* | 98:*10, 20* | **silicone** |
| 131:*24* | 124:*20* | 47:*23* 70:*9* | 104:*15, 23* | 141:*5* |
| 135:*16* | 150:*14* | 81:*2* 93:*6* | 106:*20* | **simplify** |
| 143:*18* | **sent** 11:*24* | **Shared** | 117:*16, 23,* | 154:*23* |
| 144:*8* | 67:*7, 10* | 38:*7* 47:*23* | *25* 121:*16* | **simplistic** |
| 148:*23* | **sentence** | 67:*20* | 127:*9* | 188:*14* |
| 150:*9* | 87:*25* | 70:*11* | 145:*14* | **simply** |
| 158:*6* | 109:*9, 22* | 71:*21* | **shown** | 125:*10* |
| 162:*18* | 134:*10* | 73:*23* 81:*3* | 47:*25* | **simultaneous** |
| 164:*23* | 149:*13, 15* | 93:*6* | 70:*12* | **ly** 18:*6* |
| 169:*11, 22* | 170:*25* | **shelf** 176:*16* | 92:*21* | 24:*18* 90:*3* |
| 176:*7* | 171:*1, 16, 17* | **SHOOK** | 93:*17* | 91:*1* |
| 184:*7* | 184:*1* | 3:*18* 204:*2* | 114:*11, 14* | 102:*25* |
| 185:*7* | 188:*12* | **short** 69:*17,* | 118:*4* | 104:*20* |
| 188:*10* | 189:*2* | *19* 91:*4* | 119:*9* | 108:*19* |
| 190:*13* | 197:*18* | **short-circuit** | 121:*25* | 121:*21* |
| 192:*24* | **sentences** | 99:*13* | 145:*10* | 156:*7* |
| 193:*9* | 192:*25* | **shorthand** | 203:*6* | 175:*17* |
| 197:*10* | **September** | 2:*8* 13:*24* | **shows** | **Singapore** |
| **seeing** | 63:*7, 8* | **show** 38:*7* | 112:*4, 20* | 37:*14* |
| 18:*24* 64:*1* | **sequencing** | 67:*20* | 118:*15* | **single** |
| 189:*5* | 190:*12, 17,* | 71:*19* | 133:*1* | 121:*19* |
| **seen** 82:*3, 5* | *20, 21* | 80:*23* 86:*5* | 151:*3* | 122:*23, 24* |
| 93:*25* | **served** | 94:*11* | 155:*8* | **sir** 109:*6* |
| 97:*12* | 203:*5* | 101:*15* | 156:*20* | **sit** 156:*18* |
| 114:*19* | **Services** | 103:*15* | **shutdown** | 158:*9, 18* |
| 120:*22, 23,* | 204:*17* | 118:*13* | 22:*9* | 183:*14* |
| *25* 134:*20* | **sessions** | 119:*1* | **side** 186:*6* | **site** 189:*13* |
| 142:*16* | 47:*15* | 145:*18* | **sign** 28:*12* | 193:*19* |
| 144:*14* | **set** 10:*13* | 149:*6* | 199:*4* | **sitting** |
| 153:*13* | 39:*21* | 153:*13* | **signal** | 110:*21* |
| 157:*23* | 126:*25* | 158:*7* | 130:*11, 12* | 126:*6* |
| 164:*19* | 166:*6* | 173:*12* | **signaling** | 158:*16* |
| 182:*16* | **settled** | **showed** | 188:*9, 16* | 175:*22* |
| **selected** | 40:*21* 41:*14* | 101:*14* | 189:*6, 25* | 183:*22* |
| 164:*2* | **settlement** | 112:*25* | **Signature** | **situation** |
| **selection** | 40:*24* | **Shower** | 4:*14* 200:*1* | 151:*16* |
| 129:*12* | **seven** 12:*14,* | 137:*13* | 201:*2* | **six** 70:*16* |
| **sell** 152:*1* | *18, 24* | **showing** | 203:*8, 11, 14* | **size** 186:*22* |
| **selling** | **severe** | 38:*9* 81:*4* | **signed** 27:*11* | 187:*2* |
| 151:*18* | 180:*16* | 86:*2, 4* | **significance** | **skills** 55:*19* |
| **send** 197:*5* | | 90:*17, 18* | | **skin** 32:*16* |

Laura Massey Plunkette, Ph.D.

small 17:5, 8 23:15 36:15
Smith 125:6
societies 62:6
Society 47:6 51:2 58:22 59:4
SOD 186:7, 8
SODs 186:1
soil 57:2, 4
sold 41:25 100:7
sole 179:19
solely 179:16
Solutions 36:11
somebody 105:2
sorry 16:8 18:7 22:21 24:19 41:2 42:5, 8 44:14 45:16 50:10 53:2, 18, 21 61:12, 13 69:4 73:20 74:6 79:17 83:24 91:2, 3 103:1, 2 109:4 110:6 112:21 120:11 128:18 139:14 147:4 154:9 160:20

176:20
177:25 194:5, 9, 11
sort 52:15
SOT 61:11, 18 62:2, 7
sound 76:10 180:22
source 187:1
sources 66:25
South 3:14
Southern 21:6
space 20:24 27:18 34:25 37:12
speak 51:12 88:6 153:10, 11 155:10
speaker 109:4
Speaking 18:6 24:18 51:5, 6, 7, 8, 13, 14, 18, 22 90:3 91:1 93:3 102:25 104:20 108:19 121:21 156:7 175:17
speaks 195:22
specialty 52:9 61:9, 10, 18 62:2

species 185:6, 10, 16, 21 186:5, 12
specific 16:21 19:16 38:13 49:4 63:1 64:23 65:5, 8 74:23 75:16 80:5, 10, 25 91:23 98:14 100:25 113:21 118:19 119:7 120:18 136:8 137:18 143:16 147:15 150:1 169:25 172:17 173:17 178:20 180:4 184:25 185:20 186:4 189:17
specifically 13:20 63:11 68:7, 8 83:17 84:5 86:7 87:20 95:5 97:1 103:10 116:10, 16 135:9, 23 136:8, 9 140:23

143:10
144:8
166:5
167:3
171:15
181:3
197:18
spell 160:2
spend 20:3 23:11
spent 15:16 21:22 22:5 23:2, 3, 21, 24 26:14 27:6, 13 117:9 150:19
spices 30:20
spoke 27:24
spoken 62:9 65:4
spring 47:16
Squibb 40:18 43:23
St 15:16 63:10 125:7
stand 18:20 136:22
standard 82:19 83:11 138:20 148:22 149:17, 22 150:8, 12 179:5
standards 139:18 141:9, 22
standpoint 167:20
starch 149:8, 12 151:20

152:23
153:5, 9
154:4
155:13, 20
156:2, 13, 15, 24 157:7, 14, 16, 21 158:1, 13, 17, 19 193:4, 15 194:16, 22 195:10, 17 196:2, 5
start 9:25 13:2 30:9 39:11 77:7 79:24 90:5 95:24 104:7, 19 105:4, 10, 17
started 66:1
starting 38:22
State 40:17, 23 41:8 43:22 44:4, 7, 8 110:11 135:8, 23 147:12 155:14 201:7, 25 202:17
stated 2:9 59:19 83:7, 10 85:25 95:21 103:9 136:13 145:5 153:21 155:4 172:6
statement 14:6 28:18 59:11 66:6 80:5, 25

82:4, 5, 6, 10, 11, 13, 16, 22
83:3, 14, 19
85:15, 20, 21
86:3, 8, 9, 18
87:15
93:11
95:19
115:25
135:10
147:8, 23
150:1
153:20
154:6
155:4
195:13
197:24
statements
59:21  60:4
79:11  80:1
84:6, 10
85:5, 8
86:22
169:22
176:4
180:12
STATES
1:1  101:19
149:17
180:13
202:1
stating
136:6
137:16, 17, 19  138:14
140:17
143:13
157:4
190:10
statistics
121:12, 13
status  19:8
staying
190:10

STENOGRA
PHIC  3:23
4:16
202:13, 21
sterile
181:17
stomach
30:3, 5
stop  68:17, 18  169:12
197:22
stopped
87:18
store  176:15
story  166:17
strategies
34:8
Street  3:8, 14
strength
82:15
strengths
121:3
Stress  7:13
127:13, 19
185:3
strictly
21:12  31:18
strike  74:12
string  66:19
students
52:20
55:10, 18
141:11, 12, 14, 15
studies
29:13, 23, 24
30:1  66:16
81:21
86:17
97:18  98:6
115:16, 17
116:4, 19
117:10, 24

129:9, 12, 14, 16, 23  130:2, 5, 24  131:3
132:25
145:17, 19, 20, 21, 22
147:12, 14, 17  149:9
173:10, 16, 18, 23, 24
184:19
185:9, 14, 17, 19, 25  186:1, 14
study  6:23
29:21  74:7, 9, 11, 15, 21
75:6  89:4
112:1, 3, 4, 6, 22, 24  113:6
114:8
115:22
116:6, 18, 25
117:13, 15, 16, 19, 22
121:4, 16, 19, 25  122:20
128:13
131:21
133:11
149:24
172:13
174:3
184:23
185:12, 13
187:17, 22
195:25
studying
48:21
styled  2:5
subcommitte
e  62:1
subject
49:11

96:17
124:24
125:12
165:1
subjects
54:19
submit
37:23  50:3, 7  125:1
submitted
17:6  19:3
37:17, 20, 21
50:15  71:9
131:22, 23
submitting
50:11
subpoena
69:15
subpoenas
177:16
subscribed
201:16
204:10
subsequent
151:9
substance
39:15  41:1
43:15
44:16
188:20
substances
179:7
substantiate
77:25
substantive
167:9, 20
197:11
sufficiency
132:16
sufficient
92:9  132:3
suggested
81:18  143:1

suite  192:9
204:18
summary
6:17  86:17
148:6
summer
28:1  31:5
34:14
superior
195:19
superoxide
186:1
supplement
28:7  41:17, 23
supplemental
15:6  62:15
65:17  160:8
supply
28:15
support
11:4  20:25
73:6
147:22
153:24
168:11
supported
115:23
supposed
43:4  82:20
143:25
Sure  13:23
16:17, 19
19:16  46:1, 21  53:3
87:17  90:4, 5  98:19
125:18
126:9
144:2
154:9
160:19
169:14

Laura Massey Plunkett, Ph.D.

170:*3, 20*
172:*15*
178:*3, 19*
179:*16*
180:*8, 10*
197:*20*
198:*14*
**surface**
102:*22*
158:*9*
**surgical**
180:*25*
181:*17*
192:*7*
**surgically**
158:*23*
**surprising**
91:*6*
**sustainable**
154:*24*
**swear** 9:*6*
**sworn** 2:*3*
9:*18*
202:*25*
204:*10*
**Syllabus**
52:*12*
**symposium**
47:*11* 51:*17*
**SynBioBeta**
47:*12*
**synthetic**
106:*12*
196:*1*
**system** 21:*9*
71:*13*
189:*11*
**Systematic**
7:*20* 85:*12,*
*13*
**Systemic**
7:*4*

**< T >**
**tact** 123:*13*
**take** 10:*6*
35:*20* 76:*8*
103:*19*
105:*1*
110:*15, 18*
122:*16*
133:*23*
150:*23*
154:*9*
190:*9*
192:*10*
197:*7*
**taken** 2:*4*
48:*25* 52:*1*
64:*13*
76:*16*
103:*24*
109:*22*
134:*2*
168:*19*
179:*11, 13*
191:*2*
198:*21*
203:*18*
204:*6*
**takes** 24:*3*
104:*10*
**Talc** 6:*16*
7:*2, 4, 7*
23:*3, 9, 11*
40:*6* 46:*25*
54:*15* 59:*1,*
*19* 62:*21*
66:*4, 9, 12,*
*15* 67:*3*
72:*9, 23*
81:*7, 20*
84:*15* 85:*6,*
*8, 14* 88:*22*
89:*3, 10, 14,*
*24* 90:*7, 8,*
*19, 20, 21, 22*

91:*7, 8, 19,*
*25* 94:*13, 19,*
*20, 23* 96:*2,*
*4, 5, 16, 21*
100:*1*
101:*3*
102:*14*
106:*10, 12,*
*15, 16* 107:*4*
109:*25*
110:*5*
112:*5, 20*
113:*1, 24*
116:*22*
117:*12, 18,*
*23* 118:*1, 6,*
*23* 119:*8, 13*
123:*23*
124:*3, 23*
126:*7*
127:*16*
128:*12, 19*
131:*8*
133:*3*
135:*4, 5*
136:*4*
138:*3*
149:*3, 12*
150:*15*
151:*9, 13, 20,*
*22* 153:*17*
154:*3*
155:*20*
156:*16*
157:*10, 17,*
*20* 170:*11*
173:*13*
182:*24*
184:*8*
186:*23*
192:*18*
193:*15, 16*
194:*22*

195:*9, 14, 19*
196:*1*
**Talc-based**
6:*3* 102:*11*
151:*18*
157:*7* 176:*5*
**talc-**
**containing**
100:*21*
102:*13*
106:*6, 9*
**TALCUM**
1:*3* 7:*9, 20*
10:*7* 17:*22*
18:*4* 23:*19,*
*22, 24* 32:*19*
54:*14*
57:*17, 19*
58:*5, 10, 18*
59:*1, 5, 11,*
*22* 60:*8, 17*
63:*4, 23*
71:*10*
75:*18*
80:*17, 19, 21*
81:*14*
84:*10*
85:*23*
94:*16*
100:*11, 22,*
*23* 101:*23*
102:*7, 11*
105:*21*
108:*2*
124:*5, 10*
127:*16*
129:*6*
134:*14*
135:*1, 12*
142:*1, 15, 25*
143:*12, 22*
144:*12, 19,*
*25* 145:*9*
150:*7*

152:*3*
153:*9*
155:*13*
176:*11*
177:*1, 9*
185:*11*
202:*3*
**talk** 18:*7*
24:*19*
39:*24* 69:*1*
77:*22*
80:*24*
83:*12*
94:*21*
104:*25*
112:*12*
118:*9, 10*
129:*1, 2, 23*
141:*16*
148:*7*
149:*3, 11*
152:*10*
153:*16*
155:*6, 9, 19,*
*22* 174:*22*
179:*11*
181:*9*
194:*1, 21*
196:*10, 19*
**talked**
33:*23* 55:*4*
63:*12* 68:*8*
70:*8* 93:*4*
94:*2* 118:*5*
119:*4, 5*
123:*14*
136:*20*
139:*9*
141:*5, 13*
147:*15*
151:*2*
164:*21*
165:*19*
166:*19*

Laura Massey Plunkett, Ph.D.

167:*21*
168:*13*
170:*15*
174:*16*
179:*11*
189:*7*
193:*12*
196:*18, 25*
197:*13*
**talking**
29:*22*  30:*4,*
*9, 10*  51:*18*
55:*11, 14*
74:*10*  80:*4*
84:*15*
93:*10*
101:*6*
112:*13*
117:*9*
125:*4*
127:*1*
133:*5, 7*
142:*11*
146:*17*
150:*20*
158:*19*
191:*8*
192:6, *17*
193:*10, 13,*
*21, 22, 23*
195:*2*
196:9, *10*
**talks**
120:*16*
124:*2*
128:*25*
129:*21*
133:*7*
149:*16*
158:*21*
**Taxotere**
39:*18*
40:*14*  42:*2,*

*18*
**teach**  55:*19*
**technologies**
28:*14*  34:*8*
50:*5*
**technology**
37:*12*
**Tecum**  8:*13*
**TED**  3:*6*
9:*7*  64:*3, 6,*
*8, 9*  108:*25*
198:*25*
203:*22*
**ted.meadows**
**@beasleyalle**
**n.com**  3:*10*
**tell**  9:*18*
18:*17*  23:*4*
28:*12*  29:*4,*
*10, 11*  30:*16,*
*17*  32:*9*
34:*23*  37:*7*
44:*14*
46:*16*  67:*8*
93:*15*
95:*10*
106:*23*
116:*10*
118:*18*
121:*24*
126:9, *10*
138:*9*
142:*17*
148:*10*
150:*10*
154:*12*
155:*6*
156:*15*
159:*1*
163:*10*
168:*4*
170:9, *13*
181:*3*
190:*7*  195:*5*

**telling**  9:*25*
102:*10*
137:*17*
167:*11*
189:*2*
**tells**  132:*5*
**TEM**  88:*2,*
*5*
**ten**  53:*23,*
*25*  133:*22*
**tends**
158:*18*
**term**  61:*23*
102:*10*
187:*8, 9*
**terminology**
25:*11*
**terms**  19:*20*
20:*1, 5*
24:*15*  28:*5*
48:*16*  73:*4*
79:*1*  98:*4*
127:*11*
129:*24*
134:*11*
136:*21*
139:*20*
148:*17*
155:*23*
156:5, *16*
157:*13*
164:*22*
175:*1*
176:*16*
183:*1*
184:*7*
189:*7*
195:*19*
**test**  34:*10*
87:7, *11, 13*
88:*18*  89:*3,*
*25*  90:*7*
91:*10*  92:*9*
94:*5*  97:*11,*

*23*  98:9, *19*
100:8, *22*
101:*1, 8, 14,*
*15, 19*
102:*13*
103:*6*
105:*20*
**tested**  87:*8,*
*19, 23*  91:*21*
100:*17, 24*
101:*7, 9, 16,*
*24*  102:*4, 12*
103:*6, 9, 12,*
*14*  105:*22*
106:*5*
**testified**
9:*20*  10:*22*
41:*19*
45:*11*
46:*12*
72:*15*
150:*3*
172:*11*
174:*5*
175:8, *19*
176:*9*
**testify**
16:*24*
17:*24*
68:*22*
72:*22*
75:*19*
134:*13*
135:*10*
136:*2*
149:*3*
153:*7*
155:*2*
175:*10, 13*
**testifying**
11:*8*  39:*8,*
*9*  41:*6*
42:*5*  43:*19*

44:*22*
151:*22*
**Testimony**
5:*4*  16:*8,*
*12*  17:*1, 15*
18:*2, 3, 15,*
*17, 24*  30:*25*
37:*17, 18, 20*
38:*3, 16, 21*
39:*3, 20, 24*
40:*12*  45:*4,*
*21*  62:*11*
63:*1, 22*
64:*22*  74:*1*
75:*14, 25*
76:*1*  90:*25*
95:*22*
99:*14*
117:*4, 7*
118:*4*
119:*5*
123:*15*
145:*3*
149:*2, 14*
166:*21*
167:*20*
175:*12*
178:*21*
179:*25*
196:*8*
197:*12*
203:2, *17*
**testing**  67:*2*
79:*9*  80:*8*
84:*4*  86:*23*
87:*2, 16, 21*
88:*13*  89:*8,*
*9, 19*  90:*14*
91:*25*
92:*18*  94:*3,*
*7*  95:*7*
96:*4, 10, 15*
97:*13*
100:*11, 13,*

Laura Massey Plunkett, Ph.D.

| | | | | |
|---|---|---|---|---|
| *15* 102:5 | 75:*16* | 84:*14, 16* | 166:*20* | 173:*1* |
| 106:*20* | 82:*24* | 87:*14* 90:*1* | 181:*6* | 174:*16* |
| 142:*3* | 94:*22* 97:*7* | 91:*11* 92:*5,* | **three** 15:*13,* | 176:*14* |
| 143:*14* | 99:*10* | *22* 95:*16* | *16* 27:*8* | 181:*23* |
| 144:*14, 16* | 100:*2* | 98:*16* | 52:*2* 55:*2* | 183:*20* |
| **tests** 88:*2, 9* | 102:*6* | 104:*17* | 69:*23* | 184:*15* |
| 93:*12* 95:*7,* | 103:*12, 14* | 106:*12, 18* | 128:*4* 164:*3* | 195:*8* |
| *15, 18* 101:*6* | 106:*25* | 109:*8* | **time** 9:*3* | 197:*8* |
| 103:*11* | 119:*7* | 112:*11* | 17:*2* 18:*2* | 203:*17* |
| 120:*19* | 127:*6* | 113:*1* | 19:*14* 20:*3* | **times** 26:*13* |
| **Texas** 11:*9,* | 139:*19* | 117:*3, 8, 19* | 22:*2* 23:*1,* | 72:*15* |
| *11* 202:*17* | 149:*1* | 118:*9* | *3, 6, 8, 15* | 106:*21, 25* |
| **Thank** 15:*8* | 150:*2* | 119:*18* | 24:*2* 26:*20* | 129:*3, 13, 17,* |
| 17:*20* | 158:*11* | 120:*10, 13* | 27:*14* | *24* 151:*2* |
| 26:*11* | 162:*21* | 126:*13* | 35:*12* 36:*8* | 178:*18* |
| 32:*10* | 172:*14* | 127:*6* | 62:*23* | **TISI** 3:*13* |
| 54:*12* | 176:*19* | 129:*3* | 63:*24* | 9:*9* 11:*16* |
| 89:*22* | 182:*25* | 132:*7* | 64:*20* 67:*8* | 69:*21* |
| 198:*11, 18* | 188:*25* | 136:*19* | 68:*10* 70:*5,* | 203:*22* |
| 199:*13, 15* | 189:*7* | 140:*21* | *6, 23* 73:*24* | **tissue** |
| **that'd** 73:*24* | 190:*1* | 141:*3, 6, 24* | 80:*18* | 145:*15, 20* |
| **the-counter** | 192:*12, 15* | 142:*6* | 87:*17* | 156:*6, 16, 18* |
| 24:*16* | 196:*1* | 149:*25* | 90:*16, 18* | 158:*23* |
| **therefor** | 197:*17* | 152:*17* | 91:*8, 14, 17* | 180:*20* |
| 203:*15* | **think** 10:*4* | 153:*20, 21* | 94:*13, 18* | 185:*24* |
| **thin** 147:*1* | 14:*17* | 162:*22* | 95:*23* | 191:*23* |
| **thing** 15:*13* | 16:*10* 17:*4,* | 171:*16* | 96:*11* | 193:*7* |
| 25:*3* 26:*8* | *12* 18:*10* | 172:*7, 15* | 103:*13* | 194:*15, 18,* |
| 62:*18* 69:*6* | 20:*11* 23:*9* | 173:*6, 20* | 104:*10* | *21, 25* |
| 114:*23* | 30:*23* 34:*3* | 174:*20* | 110:*21* | **tissues** |
| 146:*16* | 35:*3, 7* | 175:*9* | 116:*13* | 112:*12* |
| 166:*25* | 39:*25* | 186:*8* | 117:*9* | 113:*15, 25* |
| 184:*4* | 48:*23* 50:*3* | 187:*24* | 130:*6, 13* | 114:*3* |
| 189:*2* 197:*1* | 56:*15, 24* | 196:*12, 22,* | 135:*18* | 123:*12* |
| **things** 12:*9* | 57:*10* 60:*1,* | *23* 197:*17,* | 139:*4* | 170:*12* |
| 20:*22* 25:*9* | *3* 62:*13* | *25* 198:*2, 4* | 143:*8, 18* | 185:*15, 18* |
| 27:*22* | 63:*17* 65:*2,* | 199:*3* | 146:*14* | **titanium** |
| 30:*25* | *24* 66:*23, 24,* | **third-party** | 149:*3, 4, 14* | 117:*19* |
| 31:*12* | *25* 67:*9* | 93:*13* | 150:*1, 19* | 119:*2, 3, 8* |
| 34:*11* | 75:*8, 15* | **thought** | 152:*5* | 186:*22* |
| 46:*15, 22* | 77:*22* | 17:*16* | 155:*8* | **titled** 5:*4,* |
| 49:*3* 56:*22* | 78:*12, 19* | 18:*24* 31:*6* | 158:*12* | *10, 21* 6:*1, 5,* |
| 57:*13, 15* | 81:*10* | 157:*2* | 171:*13* | *9, 13, 16, 23* |
| 69:*14* | 83:*12* | | 172:*1, 3, 7* | 7:*1, 4, 7, 9,* |

Laura Massey Plunkette, Ph.D.

| | | | | |
|---|---|---|---|---|
| 13, 16, 19 8:1 | tool 26:7 | trainees 52:17 | 25 44:3 46:23 | truth 9:18, 19 44:14 |
| titles 49:7 | top 118:19 | training | 62:20 63:4, | 117:12 |
| Today 9:2 | topic 48:25 | 49:11, 12 | 7, 10, 18 | try 53:22, |
| 10:5, 12, 18 | topics 20:23 | 52:11 | 65:7 68:9 | 24 88:13 |
| 11:1, 8, 21 | 34:3 51:5 | transcript | 69:16 76:1 | 98:15 |
| 15:20 16:3, | 52:14 | 2:17 17:5, | 88:7 92:21 | 177:16 |
| 24 17:24 | total 104:7 | 6 19:3 | 93:17, 25 | trying |
| 18:1 23:22 | totality | 202:19, 25 | 106:25 | 30:23 |
| 26:14 35:2 | 112:17, 19 | 203:12 | 116:17 | 50:13 |
| 39:3 45:5 | touch 39:20 | | 118:4 | 52:18 |
| 49:7 52:3 | touched | transcription | 134:17 | 56:25 |
| 68:22 | 198:6 | 17:10 | 136:23 | 94:25 |
| 78:14 82:4 | toxic 66:9 | 118:16 | 139:9 | 98:16 |
| 110:21 | 91:18 | 122:20 | 146:1 | 103:17 |
| 126:6 | 99:25 | 188:2, 19, 23 | 147:16 | 116:22 |
| 140:1 | 107:7 | 202:20 | 149:2, 20 | 130:11 |
| 151:4, 16 | 118:2, 5, 13 | transcription | 166:1 | 138:19 |
| 168:13 | 135:5 | al 188:7 | 174:16, 22 | 149:25 |
| 172:12, 24 | 136:10 | Transcripto | 176:9 | 152:16 |
| 175:22 | 137:1, 5, 22 | mic 6:13 | 177:22 | 172:2 |
| 183:22 | 140:9, 14 | transcripts | 178:1, 3, 11, | 176:19 |
| 196:11, 18 | 144:22 | 18:16 142:8 | 21 179:12 | 180:7 |
| today's | 145:7, 14 | transformati | 180:5, 7 | 186:10 |
| 15:10 48:3 | 193:7 | on 7:10 | trials 23:9 | 194:7 |
| 68:14 70:1 | 194:15, 18, | Transition | 46:24 | Tucker |
| 110:24 | 21 | 5:22 | 59:15 | 3:23 11:16 |
| 159:3 | toxicant | 154:23 | 116:11 | 69:20 |
| told 28:4 | 114:1 | 155:3 | 170:10 | tumors |
| 35:21 | toxicity | transitioning | tried 35:3 | 170:13 |
| 46:12 | 155:23 | 151:20 | 80:18 | turn 77:6 |
| 78:11 | 156:16 | 154:3, 4 | 167:12, 15 | 79:5 86:19 |
| 82:17 | toxicological | transmission | true 35:24, | 111:19 |
| 87:14 | 49:14 | 2:14 | 25 72:20 | 123:19 |
| 96:25 97:1 | 150:23 | transparent | 77:10, 20 | 126:15, 18 |
| 107:18 | toxicology | 85:11 | 86:8 88:5 | 127:25 |
| 114:25 | 29:13, 21, 23 | treated 40:9 | 95:14 | 134:7 |
| 116:15 | 47:6 48:16 | treatise | 97:11, 15 | 148:18 |
| 135:24 | 51:3, 10, 19 | 119:24 | 111:11 | 176:1 |
| 136:15 | 55:20 56:16 | trends 155:1 | 127:17 | 178:5 |
| 157:2 | tract 7:5 | trial 18:13, | 150:18 | 186:19 |
| 172:12 | trade 34:17, | 15, 17, 20 | 201:3 | Turning |
| 197:2 | 20, 24 35:6, | 23:13 | 202:20 | 152:19 |
| | 8, 11 36:18, | 40:12 43:4, | 203:1 | |
| | 22 37:6 | | | |

**two**  14:*2, 4*
  34:*7*  37:*9,*
  *11*  42:*9, 10*
  47:*11*  51:*2,*
  *4, 5*  53:*8*
  55:*9, 14, 15,*
  *21*  56:*3*
  69:*23*  70:*2*
  71:*2, 4*
  87:*10, 24*
  89:*25*
  93:*13*  94:*3*
  104:*10*
  108:*21*
  111:*22*
  126:*13*
  129:*3, 13, 17,*
  *18, 24*  153:*1*
  167:*24*
  192:*24*
**tying**  149:*19*
**type**  19:*17,*
  *18*  20:*19*
  21:*10*  29:*8*
  32:*24*  33:*1,*
  *20*  35:*5*
  52:*24*
  59:*16*  92:*3*
  111:*13*
  122:*11*
  173:*13*
  174:*25*
  195:*12*
**types**  33:*8*
  34:*4*
  111:*15*
  113:*3, 25*
  146:*5*
  162:*21*
  170:*6*
  178:*19*
**typical**
  121:*8*  199:*4*

**typically**
  18:*19*  20:*3*
  33:*3*  35:*21*
  102:*18*
  114:*24*
  135:*14*
  173:*5*
  177:*20*
  184:*5*
  185:*17*
**typo**  111:*24*
  167:*23*
**typo-type**
  19:*2*
**Tyrrell**
  35:*17*

**< U >**
**U.S**  6:*3*
  55:*7*  57:*13*
  60:*10*
**ultimate**
  72:*13*
**undergone**
  49:*10*
**underlying**
  20:*25*
  127:*13*
  133:*8*
**understand**
  10:*16, 24*
  16:*10*  90:*1*
  91:*11*
  150:*24*
  196:*12*
**understanding**  40:*23*
  75:*3, 23*
  85:*25*  95:*3*
  96:*19*
  143:*5*
  150:*22*
  182:*4*

**understands**
  180:*11*
**Understood**
  38:*14*  77:*17*
**undertake**
  49:*15*
**undertaken**
  100:*5*  177:*6*
**underwent**
  115:*1*
**unfortunately**  78:*14*
**unique**
  119:*8*
**UNITED**
  1:*1*  202:*1*
**University**
  21:*6, 9*
  131:*20*
**unsafe**
  149:*21*
**update**
  53:*20, 24*
  54:*4*  72:*5*
  77:*16*
**updated**
  54:*3*  81:*9*
  181:*20*
**updating**
  65:*12*  153:*4*
**Use**  6:*9*
  7:*16, 19*
  27:*19*  28:*7*
  29:*5*  33:*4,*
  *7*  57:*7*
  59:*11*
  81:*19*
  82:*16*
  96:*13*
  120:*1*
  124:*3, 9, 16*
  127:*16*
  128:*21, 23*
  129:*6, 20*

130:*17*
  131:*9*
  134:*22*
  156:*2, 6, 13,*
  *25*  157:*21*
  169:*6, 19*
  170:*24*
  173:*13*
  178:*25*
  180:*25*
  181:*16*
  182:*24*
  186:*21*
  195:*18*
**user**  144:*19*
  169:*17*
  170:*4*
**users**
  128:*17*
  170:*10*
**uses**  27:*20*
  144:*9*
**usually**  35:*8*

**< V >**
**vagina**
  193:*21*
  195:*14*
**valid**  98:*3*
  120:*5*
  129:*4, 8*
**validity**
  95:*18*
**Valsartan**
  42:*4, 5, 15,*
  *16*
**variety**
  100:*20*
  103:*14*
  150:*10*
  194:*4*  195:*4*
**various**
  115:*15*

**Vegas**
  204:*19*
**vernacular**
  25:*11*
**version**
  39:*18*  54:*1,*
  *4, 8, 9*  77:*1,*
  *2*
**versions**
  53:*20*
**versus**
  24:*12*
  35:*19*
  38:*23*
  40:*11, 18*
  41:*10*
  42:*25*
  43:*11, 22*
  44:*11*
  86:*17*
  94:*23*
  131:*1*
  178:*13*
  179:*4, 8*
  186:*11*
  187:*11*
  194:*22*
**video**  118:*4*
**videoconference**  2:*14, 17*
**VIDEOCONFERENCED**
  1:*8*  2:*1*
  202:*8*
**view**  97:*6, 8*
  116:*24*
**violated**
  135:*11*
**Vitae**  5:*7*
  8:*6*  48:*9*
**vitis**  191:*15*
**vitro**  29:*25*
**volume**
  91:*24*  92:*8*

138:20, 24
139:3
**voluntary**
143:1, 6, 15
144:4
**volunteered**
61:21
**VP-elect**
61:24

**< W >**
**waiting**
44:2, 3
**walk** 76:21
159:1
**want** 13:2
38:12
47:20
61:14 63:8
67:20 70:3
76:21
89:20
94:21
98:15
105:14, 15
108:14
110:13, 19
112:14
118:17
119:24
120:14
121:22, 24
122:5
139:17
154:11, 16
159:3
163:8, 10
168:3
169:11
171:17, 19
190:8
**wanted**
16:19
17:16

63:18 69:1
77:16
**warn** 179:18
**warning**
28:18 82:9,
18, 19
124:18
136:17
143:4
177:2, 8
**warnings**
60:8, 13
83:11
124:10
136:24
176:6, 12
**watch** 184:6
**wave** 64:8
**way** 13:24
34:3 80:12
91:2 94:9
97:16
98:17
101:18
105:16
106:19
107:23
111:17
113:9
120:7
121:11
123:7, 10
126:2, 24
129:12
132:4, 18
133:16
135:14
153:24
168:9
171:8
172:22
179:3
190:14
192:16

194:10
196:21
**ways** 34:9,
10 118:22
**weaknesses**
121:3
**web** 80:9
81:6
**webinar**
62:3
**webinars**
49:13 52:18
**website**
14:5 60:12
66:3 78:20
80:17, 19
81:7, 13, 16
82:24
83:19, 22
89:12
92:19, 23
105:21
106:8
126:14
160:24
**websites**
175:6
176:18
177:22
**week** 129:3,
13, 17, 24
**weekly**
19:24
**weeks**
16:14
18:10 55:2
129:18
**weigh** 99:3
**weighing**
26:2 179:22
**weight**
83:15 91:9,
13, 16 96:23
98:2, 8

99:18
115:3
121:9
131:6
134:19
**well** 11:2
12:9 27:5,
20 31:11
33:6 34:1,
9 35:12, 16
37:10, 13, 14
48:20
50:13
55:13
56:18
60:10
69:13
77:23
79:12 83:1
85:5 91:3
96:8, 9
100:2, 13, 25
102:9, 18
106:24
110:16, 25
112:11, 16
113:19
116:3, 11, 14
117:21
118:25
124:9, 12, 22
126:2, 3, 17
128:8
129:7, 10, 21
131:21
134:23
135:7
142:3
143:1, 24, 25
148:6
149:7
152:18
153:10
154:16

155:5, 11
157:3, 4
163:6
166:12
168:6
172:14
177:10
178:21, 22
180:18
182:19
186:8
187:8, 10, 20
189:16
190:3, 10
196:2
199:13
**went** 47:12
56:16
92:25
125:7
165:19
**Wentzensen**
14:10
160:18
**W-e-n-t-z-e-
n-s-e-n**
14:11
**We're** 10:5,
12, 18 16:19
31:18 44:2,
3 49:25
50:8 52:8
64:11
76:14, 18
81:6 93:10
103:22
104:1
105:9
112:13
133:25
134:4
168:21
169:14
190:25

Laura Massey Plunkett, Ph.D.

| | | | | |
|---|---|---|---|---|
| 191:*4* | 128:*11* | 54:*10*  62:*5* | **wrong**  194:*5* | **Zoom**  2:*14* |
| 192:*16* | 131:*1* | 65:*5, 23* | **wrote**  94:*9* | 3:*3*  9:*6* |
| 194:*12* | 133:*2* | 78:*18*  83:*4* | | 47:*15* |
| 198:*19, 23* | 145:*9* | 96:*9* | **< Y >** | 63:*25*  70:*6* |
| **we've**  16:*2* | 185:*10* | 110:*12* | **Yeah**  24:*21* | **Zoomed** |
| 29:*23*  45:*1* | **Woodall** | 112:*25* | 25:*6, 7* | 70:*3* |
| 52:*14, 16* | 52:*5, 6* | 116:*19* | 30:*24* | |
| 106:*25* | **Woolen** | 117:*11* | 37:*10*  44:*8* | |
| 116:*10* | 13:*13* | 131:*23* | 53:*13*  61:*8* | |
| 118:*4* | 128:*3, 6* | 149:*10* | 64:*7*  73:*22* | |
| 133:*21* | 129:*9, 22* | 170:*3* | 76:*12* | |
| 136:*19, 20* | 162:*13* | 174:*25* | 79:*17, 18* | |
| 147:*15* | 165:*21* | 183:*19* | 104:*8* | |
| 165:*19* | 170:*15, 16,* | **worked** | 154:*14* | |
| 168:*14* | *23*  171:*10,* | 26:*19, 22* | 163:*6* | |
| 186:*3* | *24*  172:*13* | 30:*25*  33:*9* | 167:*15* | |
| 196:*22, 23* | 197:*19* | 65:*6*  177:*14* | 190:*14* | |
| 198:*5, 6* | **word**  36:*24* | **working** | 194:*7, 9* | |
| **white**  131:*1* | 134:*22* | 19:*21*  20:*8,* | **year**  21:*22* | |
| **withdraw** | 167:*14* | *9*  30:*15* | 22:*12*  27:*8,* | |
| 187:*21* | **words**  26:*1* | 40:*22* | *14, 16*  35:*22* | |
| **witness**  2:*2* | 35:*4*  69:*3* | 42:*12, 13* | 36:*5*  43:*4* | |
| 3:*5*  9:*6* | 75:*25* | 43:*5*  44:*4* | 49:*18* | |
| 45:*10* | 120:*10* | 46:*15*  132:*6* | 53:*22, 24, 25* | |
| 63:*23* | 144:*10* | **workplace** | 56:*3*  61:*24* | |
| 159:*12, 17,* | 166:*9, 14* | 31:*13, 14, 25* | 63:*5* | |
| *22*  160:*1, 6,* | 171:*12* | **works** | **years**  30:*25* | |
| *10, 15, 18, 23* | 181:*14* | 21:*12, 14* | 37:*9, 11* | |
| 161:*4, 8, 13,* | **work**  19:*24* | 49:*20, 24* | 39:*3, 5* | |
| *18, 23*  162:*3,* | 20:*19* | 50:*17, 18* | 52:*10*  96:*3* | |
| *8, 13, 18, 22* | 21:*10, 25* | 54:*7*  132:*9* | 99:*22* | |
| 163:*6, 18, 22* | 22:*5*  23:*14,* | **workshop** | 100:*7* | |
| 164:*1, 7* | *19*  24:*8* | 51:*6*  142:*9* | 126:*13* | |
| 199:*5* | 27:*23* | **world**  57:*14* | 127:*9* | |
| 200:*2* | 28:*11*  29:*8* | 179:*15* | 129:*14* | |
| 202:*24* | 31:*2, 9, 16,* | **worldwide** | 136:*18* | |
| 203:*2, 6, 9,* | *23*  32:*3, 23* | 57:*9* | 141:*13* | |
| *21* | 33:*15, 19* | **write**  170:*25* | 179:*7* | |
| **witness's** | 34:*13, 16* | **writing**  50:*2* | **yellow**  77:*3* | |
| 64:*22* | 35:*1, 5, 7, 10,* | **written** | **yesterday** | |
| **woman** | *14, 18, 23* | 53:*5*  56:*8* | 38:*18* | |
| 51:*9, 13* | 36:*2, 11* | 115:*13* | 69:*17, 18* | |
| **women**  6:*6,* | 37:*25* | 140:*22, 25* | | |
| *10*  40:*9* | 51:*19* | | **< Z >** | |