# EXHIBIT 11

```
                                          Page 1

1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF NEW JERSEY
2

     IN RE JOHNSON & JOHNSON        §
3    TALCUM POWDER PRODUCTS         § MDL NO.:
     MARKETING, SALES               §
4    PRACTICES, AND PRODUCTS        § 16-2738(MAS)(RLS)
     LIABILITY LITIGATION           §
5

6

7        *******************************************
8           REMOTE VIDEOCONFERENCED DEPOSITION OF
9                   WILLIAM SAGE, M.D.
10                    APRIL 1, 2024
11       *******************************************
12

13

14

15

16

17

18

19

20

21

22

23

24

25    Job No. 6485334
```

Page 2

```
 1      REMOTE VIDEOCONFERENCED DEPOSITION OF WILLIAM
 2   SAGE, M.D., produced as a witness at the instance
 3   of the Defendants, and remotely duly sworn by
 4   agreement of all counsel, was taken in the
 5   above-styled and numbered cause on April 1, 2024,
 6   from 9:25 a.m. to 12:27 p.m., before Karen L. D.
 7   Schoeve, RDR, CRR, RSA, reported remotely by
 8   computerized machine shorthand, pursuant to the
 9   Federal Rules of Civil Procedure and the provisions
10   stated on the record or attached hereto.
11
12
13      REPORTER'S NOTE:  Please note that due to the
14   quality of a Zoom videoconference and transmission
15   of data, overspeaking can cause audio distortion
16   which disrupts the process of preparing a
17   videoconference transcript.
18
19      Quotation marks are used for clarity and do
20   not necessarily reflect a direct quote.
21
22
23
24
25
```

Page 4

```
 1              I N D E X
 2                                PAGE
 3   Appearances                     3
 4
 5
 6   WILLIAM SAGE, M.D., J.D.
 7      Examination By Mr. Ewald      8
 8      Examination By Dr. Thompson  128
 9
10
11   Changes and Signature          131
12
13   Certified Stenographic
14   Court Reporter's Certificate   133
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1       A P P E A R A N C E S
 2   ************************************************
        ALL PARTIES APPEARED REMOTELY VIA ZOOM
 3   ************************************************
 4   FOR THE MDL PLAINTIFFS:
 5     MARGARET M. THOMPSON, ESQUIRE
       BEASLEY ALLEN, P.C.
 6     218 Commerce Street
       Montgomery, Alabama 36104
 7     T: 800.898.2034
       F: 888.212.9702
 8     m.thompsonmd@gmail.com
 9   FOR THE PLAINTIFF STEERING COMMITTEE:
10     MICHELLE A. PARFITT, ESQUIRE
       ASHCRAFT & GEREL
11     701 East Bay Street, Suite 411
       Charleston, South Carolina 29403
12     T: 843.699.8280
       F: 850.435.7000
13     mparfitt@ashcraftlaw.com
14   FOR PLAINTIFF NEW JERSEY STATE COURT:
15     RICHARD GOLOMB, ESQUIRE
       GOLOMB LEGAL
16     130 North 18th Street, 16th Floor
       Philadelphia, Pennsylvania 19103
17     T: 215.278.4449
18   FOR DEFENDANTS JOHNSON & JOHNSON:
19     JOHN EWALD, ESQUIRE
       KING & SPALDING LLP
20     1185 Avenue of the Americas, 34th Floor
       New York, New York 10036
21     D: 212.790.5341
       T: 212.556.2100
22     jewald@kslaw.com
23
       CERTIFIED STENOGRAPHIC COURT REPORTER:
24     Karen L. D. Schoeve, CRR, RDR, RSA
25
```

Page 5

```
 1             EXHIBIT INDEX
 2
     NO.  DESCRIPTION              PAGE
 3
     Exhibit 1           9
 4     Curriculum Vitae of William M. Sage,
       MD, JD
 5     (28 pages)
 6
     Exhibit 2           15
 7     Invoice, dated 10/01/21
       (1 page)
 8
     Exhibit 3           16
 9     Invoice, dated 01/15/24
       (1 page)
10
     Exhibit 4           19
11     Amended Rule 26 Expert Report of
       William Sage, MD, JD, dated 11/15/23
12     (99 pages)
13   Exhibit 5           31
       Amended Rule 26 Expert Report of
14     William Sage, MD, JD Amended Exhibit B
       - Materials Considered List, dated
15     03/27/24
       (24 pages)
16
     Exhibit 6           31
17     Amended Rule 26 Expert Report of
       William Sage, MD, JD Second Amended
18     Exhibit B - Materials Considered List,
       dated 03/27/24
19     (24 pages)
20   Exhibit 7           32
       Amended Rule 26 Expert Report of
21     William Sage, MD, JD Third Amended
       Exhibit B - Materials Considered List,
22     dated 03/31/24
       (24 pages)
23
24
25
```

2 (Pages 2 - 5)

Page 6

1  Exhibit 8                              32
      United States Government
2     Accountability Office Report to
      Congressional Requesters, titled
3     "Cosmetic Safety - Better Planning
      Would Enhance FDA Efforts to Implement
4     New Law"
      (77 pages)
5
   Exhibit 9                             35
6     Congressional Research Service
      document, titled "FDA Regulation of
7     Cosmetics and Personal Care Products
      Under the Modernization of Cosmetics
8     Regulation Act of 2022 (MoCRA)"
      (25 pages)
9
   Exhibit 10                            36
10    Expert Report of George E. Newman,
      Ph.D., dated 11/15/23
11    (83 pages)
12 Exhibit 11                            45
      White paper titled "IWGACP Scientific
13    Opinions on Testing Methods for
      Asbestos in Cosmetic Products
14    Containing Talc"
      (31 pages)
15
   Exhibit 12                            53
16    MAS report titled "Analysis of
      Non-Historical J&J's Talcum Powder
17    Consumer Product Containers and J&J
      Chinese Historical Talc Retain
18    Samples," dated 11/17/23
      (20 pages)
19
   Exhibit 13                            84
20    FDA Public Meeting transcript, dated
      02/04/20
21    (382 pages)
22 Exhibit 14                           104
      Johnson & Johnson letter to Windsor
23    Minerals, Inc, dated 02/23/1978
      Bates stamped JNJMX68 000003591 - 3592
24    Protected Document - Subject to
      Protective Order
25

Page 7

1  Exhibit 15                           120
      Article in Press, titled
2     "Characterization of elongate mineral
      particles including talc, amphiboles,
3     and biopyriboles..."
      (17 pages)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 8

```
1              P R O C E E D I N G S
2          THE COURT REPORTER:  If the
3   attorneys could please introduce
4   themselves for the record, then I will
5   swear in the witness.
6          DR. THOMPSON:  Hi.  This is
7   Margaret Thompson, with Beasley Allen, for
8   MDL plaintiffs.
9          MS. PARFITT:  Michelle Parfitt for
10  the plaintiff steering committee.
11         MR. EWALD:  And John Ewald for J&J.
12         DR. THOMPSON:  And while Richard
13  Golomb is not currently -- he will be
14  joining -- Sir Richard Golomb,
15  representing New Jersey State litigation.
16         THE COURT REPORTER:  Okay.  Thank
17  you, everyone.
18             WILLIAM SAGE M.D.,
19  having been first duly sworn to tell the truth, the
20  whole truth, and nothing but the truth, so help him
21  God, testified as follows:
22             EXAMINATION
23  BY MR. EWALD:
24     Q.  Good morning, Doctor.  Where are you
25  located today?
```

Page 9

```
1      A.  Good morning.  I am in a hotel room in
2   downtown Fort Worth, Texas.
3      Q.  And we've discussed this off the record
4   collectively, but who was in the room with you
5   currently?
6      A.  Currently, Margaret Thompson.
7      Q.  Okay.  Let's go ahead and start with your
8   CV.  We'll mark that as Exhibit 1.  First, let me
9   just pull it up, and you can let me know if it is
10  the current version.
11         (Exhibit 1 marked.)
12  BY MR. EWALD:
13     Q.  Okay.  Doctor, do you see that?
14     A.  (Examined exhibit.)  I do.
15     Q.  And this is what we were provided by
16  plaintiffs' counsel.  I'm not sure if there's a
17  date on it anywhere, but is -- does this appear to
18  be the current version of your CV?
19     A.  If you don't mind scrolling down to page
20  5, that's an easy check for me.
21     Q.  Okay.  (Scrolling.)
22     A.  So far so good.
23     Q.  (Scrolling.)
24     A.  Stop.
25     Q.  (Scrolling.)
```

Page 10

```
 1    A.  Stop.
 2    Q.  (Complied.)
 3    A.  That one.  Yep.  That --
 4    Q.  Okay.
 5    A.  -- that looks like my current CV.
 6    Q.  All right.  And while we're here it talks
 7  about -- where you said "Stop" -- "Book Chapters,"
 8  you're an author on "Private Law as Health Law:
 9  What It Means, Why It Matters, in Health Law as
10  Private Law."  It's forthcoming later this year;
11  is that correct?
12    A.  Yes.
13    Q.  And can you just, very briefly, just
14  describe what the nature is of that book chapter?
15    A.  This was an invited academic book,
16  looking at the ways in which U.S. health law is
17  driven by private parties.  Very little, if any,
18  of my book chapter has to do with product
19  liability or tort law.  Almost all of it has to do
20  with system issues in terms of how budgetary
21  allocations are made, what is done by direct
22  government, and what is done indirectly through
23  private parties.  And it's much more focused on
24  the private parties who comprise the healthcare
25  system, such as hospitals and physicians, than on
```

Page 11

```
 1  other private parties.
 2    Q.  To the extent that that chapter covers
 3  product liability litigation, can you give me a
 4  sense of what is discussed?
 5    A.  I suspect almost nothing.  I didn't go
 6  back to look at the most recent draft.  But that
 7  wasn't the import.  This is an overview
 8  introductory chapter I was invited to contribute
 9  to a book that's on many topics.  I don't think
10  any of the chapters, that I recall, are focused on
11  product liability or tort liability.
12    Q.  Thank you.  And so now we've moved down
13  to page 7 of the CV under "Articles," and there's
14  another submitted for publication where you are a
15  coauthor, and it's titled, "Public Investment in
16  MLP: Why It's Time to be Explicit that Legal Care
17  is Health Care."
18       Can you just describe again, very
19  generally, what that article's about?
20    A.  Certainly.  This was invited by the AMA's
21  journal of ethics.  It's now gone through most
22  stages of editing, and it is provisionally and
23  almost finally accepted in the usual course of
24  things.  Medicolegal partnership is a
25  collaboration between medical, legal, and other
```

Page 12

```
 1  social service professionals, usually to help
 2  patients from vulnerable communities to deal with
 3  what we call "health-harming legal needs."  And
 4  these fall in sort of income and insurance,
 5  education, employment, housing, legal status,
 6  whether it's immigration, veteran status or the
 7  like.  And then personal matters which are usually
 8  matters of family and personal -- and familial
 9  safety.  Again, nothing in this has anything to do
10  with tort liability or product liability.
11    Q.  Fair enough.  Let's go back to the top of
12  your CV.
13    A.  (Complied.)
14    Q.  And do you recall -- maybe not a specific
15  date -- but do you recall that you were deposed in
16  this case, for the first time, back in around
17  September 2021?  Does that sound right?
18    A.  Absolutely.
19    Q.  All right.
20    A.  I think it -- I think it was -- yeah, it
21  was, like, the last week of September.
22    Q.  And not -- wasn't going to be my next
23  question, but when I -- have you reviewed your
24  deposition transcript in preparation for today's
25  deposition?
```

Page 13

```
 1    A.  I have barely skimmed it.  It was not a
 2  focus of the preparation for today.
 3    Q.  All right.  Since you were deposed, it
 4  appears that you have made a change in your work,
 5  correct?
 6    A.  Yes.
 7    Q.  All right.  Can you describe what
 8  prompted the move from the University of Texas to
 9  Texas A&M?
10    A.  I was offered the opportunity to have
11  multiple-component academic appointment at A&M and
12  to have chancellor's funding to launch a health
13  policy institute which we call the Institute For
14  Healthcare Access.  I remain an academic in terms
15  of teaching and research, but -- so it's not a
16  major career change, but it is a change of
17  University and a great opportunity.
18    Q.  And it does sound like a good
19  opportunity, and as a undergraduate and law school
20  graduate of the University of Texas, I won't hold
21  it against you for going to A&M.
22    A.  I could make a hook 'em for you
23  (demonstrating).
24    Q.  Let the record reflect, he just did the
25  hook 'em sign.  My wife was born in College
```

4 (Pages 10 - 13)

Page 14

1 Station, so it's about even.
2         But I'm sorry.  I don't want to delve
3 too much into it, but if we're talking about the
4 teaching component in Texas A&M, how does that
5 differ, if at all, from what you were teaching in
6 2021 at the time of your first deposition?
7     A.  It doesn't differ much from what I was
8 teaching in 2021 because I was a visiting
9 professor at George Washington University that
10 fall, and that's why the deposition was taken in
11 Washington, D.C.
12         I am delighted that with A&M, I get
13 to teach half of 1L class, their required
14 legislation and regulation course, which is the
15 course I developed and taught for over a decade at
16 Columbia Law School, and it's the one that grounds
17 my expertise in regulatory theory and in aspects
18 of the regulatory state that are central to my
19 report.
20     Q.  All right.  During your first deposition,
21 you were asked some questions about the approval
22 requirements at University of Texas School of Law
23 for you to do consulting work.  You generally --
24 you don't need to remember the specific questions,
25 but do you recall being questioned on that?

Page 15

1     A.  Yes.
2     Q.  Okay.  How, if at all, does the
3 guidelines at Texas A&M on consulting work done by
4 you differ from the time that you were at
5 University of Texas?
6     A.  I wouldn't be able to make that
7 comparison for you casually.  But I will say that
8 before I did any work on this case, I went -- I
9 reviewed and went through the requirements for
10 Texas A&M University and received all the required
11 approvals.
12     Q.  And do all of the fees that you receive
13 in connection with this consulting work still go
14 directly to you?
15     A.  Yes.
16     Q.  And am I correct that your current hourly
17 rate is $900 per hour?
18     A.  Yes.
19     Q.  All right.  Okay.  Doctor, I want to show
20 you a couple of invoices that we've received from
21 plaintiffs' counsel.  We'll mark as Exhibit 2 this
22 invoice dated October 1st, 2021.
23         (Exhibit 2 marked.)
24     A.  (Examined exhibit.)
25 BY MR. EWALD:

Page 16

1     Q.  And the (as read) "For" is "Further
2 research in connection with deposition testimony,
3 deposition preparation, and deposition from
4 July 27th through September 30th, 2021?"
5         Did I read that correctly?
6     A.  Yes.
7     Q.  And for this time period between
8 July 27th to September 30th, 2021, you have billed
9 a total of 74 hours at your past rate of $800 an
10 hour for a total of 59,200, correct?
11     A.  Correct.
12     Q.  And have you been paid by counsel for
13 this invoice?
14     A.  For that one, yes.
15     Q.  Okay.  And this reflects preparation for
16 deposition, 46 hours, correct?
17     A.  That's what it says on the invoice, yes.
18     Q.  And -- all right.
19         We'll mark as Exhibit 3 another
20 invoice.
21         (Exhibit 3 marked.)
22     A.  (Examined exhibit.)
23 BY MR. EWALD:
24     Q.  And this invoice is dated January 15th,
25 2024, and it covers preparation of amended expert

Page 17

1 report from October 1st through November 15th,
2 2023, correct?
3     A.  Yes.
4     Q.  And so I want to talk about, before
5 getting into the time that is reflected on this
6 invoice and how you spent it, what, if anything,
7 did you do in connection with your work on this
8 case, from the date of your deposition on
9 September 2021, at some point in time, through the
10 initial meetings that are reflected here on
11 October 1st, 2023?
12     A.  Oh, I did not do paid work on the case.
13 As I recall, your client had several visits to the
14 bankruptcy court during that period.  I'm a law
15 professor and health policy academic.  I got
16 interested in this topic intensively in
17 preparation for the first deposition and that
18 work.  So obviously, I've -- I followed the case
19 and asked occasional questions and seeing what's
20 been in the news and looked at, you know,
21 whatever -- whatever was happening in the
22 regulatory world, largely, as I was preparing
23 academic material for teaching, occasionally, for
24 writing.
25     Q.  All right.  So then we have this time

5 (Pages 14 - 17)

Page 18

1  period of October 1st through November 15th with
2  two hours in initial meetings and case review.
3  What did you understand what your task was for
4  this amended report?
5     A.  Well, I'd love to look at what's stated
6  in the report so that I'm consistent with what's
7  stated in the report in terms of the questions I
8  was -- (overtalk distorted audio).
9     Q.  Sure.  Happy -- I'm going to pick that up
10  and should have asked, do you have any documents
11  in front of you?
12     A.  I have -- I have in front of me a binder
13  containing, I believe, all the documents that were
14  sent to you as well, but I don't do this often,
15  and I was a corporate lawyer, not a litigator in
16  practice.  So the rhythms of Zoom teaching are
17  great.  The rhythms of Zoom litigation are not.
18  So tell me what you need.
19     Q.  No, and that's just a matter of, as we go
20  through this, and supplement generally what have
21  in front of you, of course, we'll work through any
22  kind of pickups on any side.
23        But do you have a copy of your
24  report -- I'm going to put it up on the screen,
25  but I think it'll be helpful if you have it in

Page 19

1  front of you have, too?
2     A.  So I do -- I do have it in front of me.
3  If you want to put it up on the screen, that's
4  great.
5     Q.  Okay.  Okay.  So we'll go ahead and mark
6  Exhibit 4, the amended expert report of Dr. Sage,
7  which is dated November 15th, 2023.
8        (Exhibit 4 marked.)
9     A.  (Examined exhibit.)
10  BY MR. EWALD:
11     Q.  Okay.  Doctor, I'd asked you before
12  bringing this up, essentially, what did you
13  understand your task to be with respect to this
14  amended report?
15     A.  So on page 2 --
16        THE COURT REPORTER:  Excuse --
17     gentlemen, excuse me.  I've got people in
18     the waiting room I need to let in, and I
19     can't get to that screen.  If you could
20     please put your document down for me.
21        MR. EWALD:  Oh.  Oh, yeah.  Sure.
22        DR. THOMPSON:  That's Richard.  And
23     I also left to fix my microphone issue,
24     and I'm back on as well so you may have
25     both of us.

Page 20

1        THE COURT REPORTER:  Yes, ma'am.
2        MR. EWALD:  All right.
3        THE COURT REPORTER:  Okay.  Sorry
4     guys.  I couldn't do everything at once
5     there.
6        MR. EWALD:  No, you do everything
7     so well, so it's hard to do any more.
8        THE COURT REPORTER:  All right.
9     They're admitted, so sorry to interrupt.
10        Doctor, you may answer.
11        THE WITNESS:  Thanks.
12     A.  So under "B. Methodology" in paragraph
13  11, this, I believe, is unchanged from the first
14  report.  The questions I was asked to address in
15  the original and the revised report, "What are the
16  regulatory practices and standards under which
17  manufacturers of cosmetics operate? and Did
18  Johnson & Johnson comply with these standards in
19  its general development, manufacture, marketing,
20  and sale of talcum powder products?"
21        And it says, "I was not asked to give
22  an opinion as to whether talcum product -- powder
23  products cause cancer."
24        MR. EWALD:  Y'all are having
25     feedback issues.

Page 21

1        THE WITNESS:  Yes.  I --
2        DR. THOMPSON:  That was Richard.
3     He's fixing it.
4        MR. EWALD:  Okay.  Cool.  No
5     worries.
6  BY MR. EWALD:
7     Q.  All right.  And so --
8     A.  So that --
9     Q.  -- go ahead.
10     A.  I -- I was -- so the amended report,
11  after the delay and the progression of these
12  cases, was to make sure that my answer remained
13  the same, given developments in information and
14  particularly given developments in applicable
15  federal law.
16        THE COURT REPORTER:  Okay.  Sorry
17     to interrupt again, but I need you to put
18     the document down for me.
19        MR. EWALD:  Sure.
20        THE COURT REPORTER:  Okay.  One
21     more time.
22        Okay.  There you go.
23  BY MR. EWALD:
24     Q.  All right.  So understanding you
25  correctly, Doctor, the questions that you were

6 (Pages 18 - 21)

1  asked to answer were basically the same from the
2  first report to the second report, fair?
3      A.  That is correct.
4      Q.  All right.  And tell me then about your
5  process in determining what needed to be updated
6  from your prior report.
7      A.  My process is the same I would engage in
8  in all of my academic work and associated writing,
9  which meant reading carefully what I had written
10  before and asking whether there were documents
11  that plaintiffs' counsel thought I should review.
12  And most important for this, doing a careful
13  personal review of publicly available sources,
14  notably, the modernization of cosmetics before MAC
15  and associated regulation to the extent that
16  exists.
17      Q.  All right.  And so let's take those
18  separately.
19          The aspect of asking plaintiffs'
20  counsel whether there are any documents that you
21  should review.  What, if any, documents were
22  provided to you in connection with you preparing
23  the amended report?
24      A.  The two documents that come to mind were
25  the update of the, I guess, Longo report on

1  testing of talcum for presence of asbestos which
2  was an update of a report I had seen before.  I
3  also asked regarding marketing practices and the
4  like because that had been an area of relevance of
5  my report the first time and also an area defined
6  of great academic interest.  And I was given a
7  report by a Professor Newman that had to do with
8  Johnson & Johnson's marketing.
9      Q.  Okay.  And the -- sorry?
10      A.  I was also -- I was -- I mean, I guess
11  those were things I asked for, which was your
12  question.
13      Q.  Yes.  Yes.  And before we get to that
14  second bucket of what you found on your own, when,
15  approximately, did you receive the updated Longo
16  report?
17      A.  I don't recall.  I would have to go back
18  and find the day.
19      Q.  We'll get to it, but maybe this will ring
20  a bell.  I received an amended -- well, let me
21  withdraw the question.
22          I'll represent to you that I've
23  received from counsel three different amended
24  reliance lists -- or reference lists in connection
25  with your amended report.  Does that sound about

1  right?
2      A.  I don't know what you received from
3  counsel.
4      Q.  All right.  Did you play any role in
5  putting together a reference list for your report?
6      A.  The role -- yes.  The role I played was I
7  was asked to provide to counsel, to be provided to
8  you, documents that I had found on my own that
9  were relative to my report, and I used it as
10  preparation.  I sent a -- an e-mail attaching a
11  couple of those, and then I reviewed the list
12  yesterday and noticed something that seemed not to
13  be on the list that I had put in the original
14  e-mail, so I pointed that out, and I hope and
15  believe you were provided that.
16      Q.  I was.  Thank you.
17          On the Longo -- updated Longo report,
18  is that something that you received back in this
19  September 2023 time frame when you were preparing
20  your amended report?
21      A.  This -- I can't recall, actually.  I
22  don't remember the -- I don't remember the date.
23  So I don't remember whether it was before the
24  amended report submission or after.
25      Q.  And I'll -- well, we'll go through it

1  more in a little bit, but I want to circle back to
2  some basics.
3          The research you did on your own in
4  connection with your amended report, can you walk
5  me through generally what that was?
6      A.  Um-hum.  There's a leading text on food
7  and drug regulation by Hutt and Grossman and maybe
8  another author I can't recall.  I looked to see if
9  they had a section on the modernization's act that
10  was relevant and found what they had which was
11  minor, so I didn't specify that and there was not
12  a lot of development in it.  I did the basic
13  research for public documents.  I went to the FDA
14  website, read everything they had on what they had
15  done, subsequent to my 2021 involvement in this
16  litigation.  So that was all, just the FDA website
17  and any FDA website links that were provided
18  there.
19          Then I looked for other government
20  documents.  Found a couple of congressional
21  research service reports.  Looked at the 2023 one
22  which, as I was looking through it, said that it
23  was built on the 2022 one, so I did not look
24  separately at the 2022 one.  I found this
25  government accountability office report.  I read

7 (Pages 22 - 25)

Page 26

1  that.
2       And I think that's -- that's in
3  ess- -- oh, and, of course, you know, pulled the
4  text of the act.  Spent some time trying to figure
5  out whether there were constituent bills that had
6  gone into the act, but like most federal
7  legislation these days, it was done as a
8  consolidation app- -- consolidated appropriations
9  act, and it was passed at the very end of the year
10 in 2022 in the way that these things often are.
11 And I wasn't able to trace the origin of statutory
12 language, so I just worked directly from what the
13 final language was.
14     Q.  Have you reviewed any Johnson & Johnson
15 internal corporate documents since your deposition
16 in September 2021?
17     A.  There were documents referenced in the
18 Newman report, but I can't recall having reviewed
19 any internal documents.
20     Q.  And fair to say, as you sit here today,
21 you don't recall requesting or receiving any
22 internal Johnson & Johnson corporate documents
23 since your deposition that were not reflected on
24 your earlier reliance list?
25     A.  I don't recall that, no.

Page 27

1      Q.  Did anyone assist you, apart from
2  plaintiffs' counsel, in connection with the
3  preparation of your amended report?
4      A.  No.
5      Q.  You talked about one of the things that
6  you did on your own was to research what the FDA
7  had done in this area -- cosmetic regulation --
8  since your deposition in September 2021, correct?
9      A.  Correct.
10     Q.  And you have to -- tell me what you
11 found.  What would you say?
12     A.  I found that --
13         DR. THOMPSON:  Object to form.
14         You may answer.
15         THE WITNESS:  That means I go
16     ahead?
17 BY MR. EWALD:
18     Q.  Yes.
19     A.  Sorry.  This is not intuitive.
20     Q.  No, that's okay.
21     A.  What I found is the FDA had done quite a
22 lot.  They were doing quite a lot before the
23 Modernization Act was finalized, and then the
24 passage of the Modernization Act gave them
25 specific tasks, notably, developing a standardized

Page 28

1  testing method for asbestos and talc.
2       There were -- the FDA, in my
3  experience, is pretty good on its website at
4  directing you to their processes and their
5  documents and their guidances of this or that
6  sort, so there were a number of things to look at.
7      Q.  And what is your understanding of,
8  currently, the status of the FDA's development of
9  a standardized testing method for presence of
10 asbestos and talc?
11     A.  My understanding, absent any attempt to
12 find out beyond what is publicly available, is
13 that the interagency working group from a few
14 years ago raised this issue.  The Modernization
15 Act captured it in regulatory language, attached a
16 deadline at the end of 2023 for publication of
17 some type of proposal.  I can't remember the exact
18 administrative law form of that proposal of a
19 standardized testing method for public comment.
20 And when I have done searches and looked at the
21 FDA website, I do not find any information about
22 such a proposal or preliminary standard having
23 been yet released.
24     Q.  Okay.  And when you say "released," do
25 you have any understanding as to whether or not

Page 29

1  FDA has sent a proposed standardized testing
2  regulation for presence of asbestos and talc to
3  the proper governmental entities for review?
4      A.  I have no knowledge of that.
5      Q.  In preparing your amended expert report
6  in this case, was there anything that you were
7  asked at the first deposition, that caused you to
8  say to yourself, "I want to look into that
9  further"?
10         DR. THOMPSON:  Objection; form.
11     A.  I was disturbed in the first deposition
12 by how long the uncertainties and the scientific
13 knowledge about the risks associated with talcum
14 powder products had percolated in the regulatory
15 debate.  So I was attentive to what was happening
16 with the reform act, and I had told myself at the
17 time that regardless of whether I had litigation
18 involvement in this matter subsequently, I would
19 pay attention.  And as I thought proper for an
20 academic, I would incorporate it into my teaching
21 and work.
22 BY MR. EWALD:
23     Q.  And my question was broad to answer it
24 just right.  I'll ask a slightly more narrow
25 question, which is:  Is there anything that was

8 (Pages 26 - 29)

Page 30

1  discussed at your first deposition in this case,
2  that caused you to conduct further investigation
3  in preparation for your opinions in your amended
4  report?
5        DR. THOMPSON:  Same objection.
6     A.  As I said in response to your earlier
7  question, I barely skimmed my deposition
8  transcript, so I have very little direct recall.
9  There was certainly nothing at the time that made
10  me feel in the least uncomfortable with any of the
11  opinions I expressed in the preliminary report.
12  And, yes, I was seriously interested in this
13  matter since.  And, you know, I am a health policy
14  academic, and my work is broad, and my teaching
15  involves the fundamentals of legislation and
16  regulation, so of course, I was interested.
17  BY MR. EWALD:
18     Q.  Am I correct that you have not provided
19  any deposition or trial testimony in any other
20  litigation matter since you provided deposition in
21  September of 2021?
22     A.  That's correct.
23     Q.  Have -- since September of 2021, have you
24  been retained as an expert in any other matter?
25     A.  No.

Page 31

1     Q.  All right.
2        THE WITNESS:  I'm going to grab a
3     sip of water, so I'm going to leave my
4     screen.
5        MR. EWALD:  Go for it.
6  BY MR. EWALD:
7     Q.  Okay.  So I'm just gonna go ahead and
8  mark the three different Materials Considered
9  lists that I have received from counsel in
10  connection with your amended report.  I will mark
11  as Exhibit 5 the material -- "Amended Exhibit B -
12  Materials Considered List" that's dated
13  March 27th, 2024.
14        (Exhibit 5 marked.)
15     A.  (Examined exhibit.)
16  BY MR. EWALD:
17     Q.  Then I have here as Exhibit 6 the "Second
18  Amended Exhibit B - Materials Considered List"
19  which has a date of also March 27th, 2024.
20        (Exhibit 6 marked.)
21     A.  (Examined exhibit.)
22  BY MR. EWALD:
23     Q.  Then the "Third Amended Exhibit B -
24  Materials Considered List," which I received
25  yesterday, March 31st, 2024.

Page 32

1        (Exhibit 7 marked.)
2     A.  (Examined exhibit.)
3  BY MR. EWALD:
4     Q.  Okay.  Doctor, I'll scroll down to the
5  last page of Exhibit 7, the third amended
6  Materials Considered list.  There are a couple of
7  documents that were highlighted by counsel as new
8  materials that you reviewed.  First one I'll ask
9  you about is this "United States Government
10  Accountability Office, Report to Congressional
11  Requesters: Cosmetic Safety: Better Planning Would
12  Enhance Update Efforts to Implement New Law,"
13  December of 2023.  And I guess we'll go ahead and
14  mark that as Exhibit 8.
15        (Exhibit 8 marked.)
16     A.  (Examined exhibit.)
17  BY MR. EWALD:
18     Q.  Doctor, can you tell me what, if
19  anything, you are relying on this GA report -- GAO
20  report for in connection with the opinions in this
21  case?
22        DR. THOMPSON:  Can we put that on
23     the screen or in Chat?
24        MR. EWALD:  Sure.  Sure.
25        DR. THOMPSON:  Okay.  We don't have

Page 33

1  a copy of that.
2        THE WITNESS:  We do.
3        DR. THOMPSON:  Do we?
4        THE WITNESS:  Yep.  That one there.
5        DR. THOMPSON:  Oh, yes, we do.
6     Okay.
7        THE WITNESS:  That one we do.  The
8     other one we don't.
9  BY MR. EWALD:
10     Q.  All right.  Well, it's on the screen
11  regardless, so --
12        DR. THOMPSON:  Thank you.
13        MR. EWALD:  Of course.
14  BY MR. EWALD:
15     Q.  So, Doctor, I'll reask the question.
16        Basically, what, if anything, do you
17  rely on this GAO report, that we've marked as
18  Exhibit 7, for your opinions in this case?
19     A.  I was very interested in this report when
20  I did my search for government documents because
21  it was a December '23 date, and that was, you
22  know, among other things, the original
23  congressional deadline for issuing a preliminary
24  standard.
25        I've read this document.  GAO is now

9 (Pages 30 - 33)

Page 34

1 called the Government Accountability Office. It's
2 what most of us knew was the general accounting
3 office, and so kind of opportunities for
4 congressional and occasionally other requesters to
5 get information about pretty much anything, so I
6 was interested in what it contained.
7         I discovered that what it contained
8 was largely the assessor's opinions of how FDA's
9 process complied with whatever the standards they
10 would apply to kind of good government development
11 in terms of staffing, leadership, transparency,
12 and things like that. That was interesting to me,
13 but I didn't rely heavily on it for anything
14 specific to my report. It was more an impression
15 I had of the implementation efforts, but I was
16 grateful that it existed. If I'm -- I'm pretty
17 sure, from being able to read it.
18    Q.  All right. I'll probably get back to
19 that. But let's talk about the other document on
20 that page, the one we received last night.
21        First, let's go back to the third
22 amended. The last document that shows up on that
23 screen is a Nora Wells "FDA Regulation of
24 Cosmetics and Personal Care Products Under the
25 Modernization of Cosmetics Regulation Act of 2022.

Page 35

1 (MoCRA)."
2         (Exhibit 9 marked.)
3    A.  (Examined exhibit.)
4 BY MR. EWALD:
5    Q.  Is that something that you reviewed in
6 connection with your opinions in this case,
7 Doctor?
8    A.  Yes.
9         DR. THOMPSON: And if we could have
10    that up as well.
11         MR. EWALD: Sure.
12         DR. THOMPSON: Are these being
13    marked as exhibits or --
14         MR. EWALD: They are. The GAO is
15    Exhibit 8.
16         DR. THOMPSON: And this is
17    Exhibit 9? Thank you.
18         MR. EWALD: Of course.
19 BY MR. EWALD:
20    Q.  What, if anything, did you rely on
21 Ms. Wells' article we've marked as Exhibit 9 for
22 your opinions in this case?
23    A.  I relied on it as a verification of my
24 own insights from reading the text of the new law
25 and from reviewing the FDA's website on what they

Page 36

1 had done in these areas subsequent to my last
2 deposition. That's the short answer.
3    Q.  Is there anything you can recall from the
4 Nora Wells article that provided you with new
5 information that you previously weren't aware of,
6 that you are relying on in this case?
7    A.  This was an extremely well done, in my
8 view, review of the law and the changes that had
9 been made from the premodernization version of
10 cosmetics regulation. It wasn't something that
11 drew heavily from outside empirical work or
12 scholarly work or any other source that I would
13 have relied on. So I used it, as I said, as
14 another way of feeling fully confident that my
15 statements in my report were an accurate
16 reflection of the legal change.
17    Q.  All right. Marking as Exhibit 10 the
18 expert report of George Newman, Ph.D., dated
19 November 15th, 2023.
20         (Exhibit 10 marked.)
21    A.  (Examined exhibit.)
22 BY MR. EWALD:
23    Q.  And this is something that you reviewed,
24 Doctor, in connection with the preparation of your
25 amended report?

Page 37

1    A.  This is something I received subsequent
2 to the submission of the revised report but prior
3 to today.
4    Q.  Okay. And when did -- (overtalk
5 distorted audio).
6    A.  And I did review it.
7    Q.  All right. You said you did review it?
8    A.  Yes.
9    Q.  Great. And when, approximately, did you
10 receive a copy of this expert report from
11 Dr. Newman?
12    A.  In the last two weeks or so. I don't
13 know more specifically than that.
14    Q.  Okay. And how, if at all, does the
15 report of Dr. Newman inform the opinions that
16 you're offering in this case?
17    A.  Many of the opinions I offer have to do
18 with the informational environment that Johnson &
19 Johnson has created and maintained around its
20 talcum powder products and its marketing
21 activities. Both the history of those marketing
22 activities and more recent versions of those
23 marketing activities are directly relevant.
24    Q.  All right. And so because this came in
25 after your drafting of the amended expert report

10 (Pages 34 - 37)

1 that you've submitted in this case, I'm trying to
2 get a sense of -- of how, if at all, you were
3 going to rely on Dr. Newman's report for any of
4 the specific opinions that you are including in
5 your report.
6    A.  My litigation experience doesn't allow --
7 isn't sufficient to answer that question.  My
8 understanding was that my -- this deposition
9 reflects my opinions about my report up to the
10 date of the deposition.  I don't know beyond that
11 what -- who's supposed to do what, but ...
12    Q.  And that's fine.  And here's what I'm
13 trying to understand is -- if we go back to your
14 amended report -- your amended report in this
15 case.
16        Let me know when you have it in front
17 of you.
18        THE WITNESS:  Where'd my report go?
19   It needs to produce -- here we go.  Thank
20   you.  No.  That's the old one.  Thanks.
21    A.  Yes, I have it in front of me.
22 BY MR. EWALD:
23    Q.  For which sections in your expert report
24 are you relying on the opinions contained in
25 Dr. Newman's report?

1    A.  Again, your question reflects the report
2 as it reflects my opinions as I sit here.
3 Obviously, I can't rely on a written document
4 dated previously to today on something I've
5 received subsequently to that date.
6    Q.  I understand.  And maybe it was just a
7 bad question on my part.  What I'm trying to
8 figure out is -- you have a --
9    A.  So with that -- with that --
10    Q.  Yeah.  I'm sorry --
11        (Speaking simultaneously.)
12    A.  With that understanding, I'm happy to
13 answer the question.
14    Q.  Yeah.  And before you answer, let me just
15 try to make it a little clearer.  I may fail.
16 But, you know, you have a, you know, 32-page
17 report, and the first question is:  I assume that
18 you are not relying on Dr. Newman's report to
19 further support every single opinion contained
20 over these 33 pages, correct?
21        DR. THOMPSON:  Object to form.
22    A.  Correct.
23 BY MR. EWALD:
24    Q.  And so I'm not asking you to identify
25 every single paragraph that the report that they

1 rely on, but I'm trying to get a sense from you.
2 You have the expert report -- amended expert
3 report we've marked as Exhibit 4.  If you had to
4 say, "This section is primarily what I'm also
5 relying on Dr. Newman's report to support."  That
6 is what I'm asking.
7        DR. THOMPSON:  Object to form.
8    A.  Absolutely.  The -- this report is
9 relevant to many of the sections that have to do
10 with Johnson & Johnson's informational obligations
11 which go to the term of art labeling but also go,
12 in general, to their corporate reputation, their
13 stated corporate intent.  Representations they've
14 made to -- specifically to consumers and to the
15 broader public about their level of transparency
16 and their understanding of risks and uncertainties
17 around their talcum powder products at the time.
18        And so, therefore, you know, it goes
19 to almost all of the material that has to do with
20 misbranding.  It goes to the sections that have to
21 do with Johnson & Johnson's communications as it
22 learned various types of scientific information.
23 And it goes to the section that begins on
24 paragraph 109 where Johnson & Johnson claims it
25 has a robust ethics and compliance program that

1 goes above and beyond legal requirements.  It goes
2 to the next section about resistance to testing,
3 though less so to that one.  And it goes heavily
4 to the sections that have to do with
5 misrepresentations and the like that Johnson &
6 Johnson has, in my opinion, made in its marketing
7 material.
8        I'm also very happy to talk about
9 specific insights gained from the Newman report,
10 if you'd like.
11 BY MR. EWALD:
12    Q.  Yes.  So first of all, thank you.  That
13 was an extremely helpful overview.  And please --
14 if you have certain specific insights in mind from
15 Newman, what are they?
16        DR. THOMPSON:  Object to form.
17    A.  Well, you know, in this case, I have to
18 say, you know, this protracted resistance by
19 Johnson & Johnson to honoring its legal and
20 corporate ethical obligations to be forthcoming
21 with the public about the risks of talcum powder
22 and the uncertainties in assessing those risks
23 was, you know, confirmed and made worse for me by
24 what I read in the Newman report.  In particular,
25 the Newman report talks about Johnson & Johnson's

11 (Pages 38 - 41)

Page 42

1  belief as a corporate matter that perfect trust in
2  the maternal child bond transferred to Johnson &
3  Johnson as a corporate entity was essential to how
4  the corporation thought about itself and its
5  long-term business product -- prospects.  Excuse
6  me.  And I have to say, I found a deep and
7  disturbing irony in the fact that Johnson &
8  Johnson's communications, conduct that was
9  intended to preserve that relationship of trust
10  was accomplished by completely violating that
11  relationship of trust.  I was very -- I mean,
12  there were things in the Newman report that I
13  found incredibly disturbing.
14  BY MR. EWALD:
15      Q.  After reading the Newman report -- well,
16  not "after."  Have you spoken with Dr. Newman at
17  any point in time?
18      A.  No.
19      Q.  After reviewing Dr. Newman's report, did
20  you ask plaintiffs' counsel to review any
21  additional documents?
22      A.  To review any additional documents?
23  Could you give me an example of what you mean by
24  that?
25      Q.  Sure.  What I'm trying to get at is you

Page 43

1  talked about some things that you read in
2  Dr. Newman's report that concerned you, Fair?
3      A.  Fair.
4      Q.  Did -- at any point in time after
5  reviewing Dr. Newman's report, did you ask
6  plaintiffs' counsel for more information about a
7  particular topic that was raised in Dr. Newman's
8  report?
9      A.  No.
10      Q.  Have you reviewed a report from a
11  Dr. David Kessler in this case?
12      A.  No.
13      Q.  In preparing your amended report in this
14  case, did you ask plaintiffs' counsel for any
15  information about the defendant's, Johnson &
16  Johnson, position on any particular matter?
17          DR. THOMPSON:  Object to form.
18      A.  I'm not exactly sure how to answer that.
19  Could you break that down into categories?  I
20  mean, for example, I haven't read any Johnson &
21  Johnson legal motions if you're asking about.
22  BY MR. EWALD:
23      Q.  That's a fair question.  And I -- you
24  know, I would leave aside the sort of legal
25  motions.

Page 44

1          For example -- we'll get to it -- but
2  you were given testing from Dr. Longo's updated
3  report, correct?
4      A.  Correct.
5      Q.  Did you ask plaintiffs' counsel for
6  anything that they're aware of, that gives any
7  critiques of Dr. Longo's testing that's reflected
8  in that report?
9      A.  In connection with the preparation of my
10  amended report, no.
11      Q.  No?
12      A.  The original report included review of
13  many documents that had both similar and less
14  similar findings on many levels.
15      Q.  Okay.  But with respect to the amended
16  report and the testing given to you by Dr. Longo,
17  did you not ask from plaintiffs' counsel any
18  information that is responding to and/or
19  critiquing the opinions in the report that you
20  received, correct?
21      A.  Correct.
22      Q.  All right.  You also mentioned earlier
23  the interagency working group and their efforts
24  over the past couple of years, right?
25      A.  Yes.

Page 45

1      Q.  Okay.  And amongst other things in your
2  amended report, you cite to the white paper that
3  was released in 2021, correct?
4      A.  Correct.
5      Q.  We will mark as Exhibit 11 the white
6  paper "IWGACP Scientific Opinions On Testing
7  Methods For Asbestos in Cosmetic Products
8  Containing Talc.  Interagency Working Group On
9  Asbestos In Consumer Products," dated
10  December 2021.
11          (Exhibit 11 marked.)
12  BY MR. EWALD:
13      Q.  Is this the white paper you're aware of,
14  sir?
15      A.  (Examined exhibit.)  As best I can tell,
16  yes.  I don't know if I have a copy in front of
17  me.
18      Q.  Okay.  And do you recall citing to this
19  document in your amended report?
20      A.  Yes.
21      Q.  Let's look at what you said there.  I
22  believe it is on -- yeah, page 20, paragraph 123.
23          Let me know when you're there.
24      A.  (Complied.)  Yes.
25      Q.  Okay.  And specifically in paragraph 123,

12 (Pages 42 - 45)

Page 46

1  you discuss the J4-1 method and then go on and
2  state, (as read) "The peculiarity of retaining
3  without reconsideration for nearly half a century
4  the testing method clearly at odds with current
5  science is repeatedly noted in the White Paper
6  issued in late 2021 by the federal government's
7  Interagency Working Group on Asbestos in Consumer
8  Products."
9       Did I read that correctly?
10  A.  You did.
11  Q.  All right.  And so what are you -- what
12  are you getting at with that sentence there in
13  connection with the J4-1 method?
14  A.  In all my work, I take note of time
15  frames associated with regulatory change,
16  particularly scientific regulatory change, and I
17  always take note of areas where, undoubtedly,
18  science and technology have advanced but
19  regulatory and self-regulatory standards have not,
20  and that seem to be a very strong example for
21  that.
22  Q.  Okay.
23       DR. THOMPSON:  And, Doctor, you
24     need to review that document.  If there
25     are going to be more questions, you can do

Page 47

1     that.
2  A.  If there --
3  BY MR. EWALD:
4  Q.  Certainly.
5  A.  -- if you were planning to ask me, you
6  know, to find the specific quotes in a document
7  that I read first a while back and then reread in
8  direct preparation for the report, I, you know,
9  would have to take time to do that.
10  Q.  Sure.  And I may ask more questions about
11  it a little bit later.  What I'm trying to figure
12  out right now is just kind of the basics.  And so
13  I understand what you just said.
14       With respect to the white paper, do
15  you have any opinions as to the testing methods
16  that were recommended by the interagency working
17  group in the December 2021 white paper?
18       DR. THOMPSON:  Object to form.
19  A.  My view of the interagency working group
20  white paper was that it was a clear indication
21  that improvements were necessary in testing
22  methods for asbestos and similar substances that
23  could be harm-producing in cosmetic talc.  I don't
24  have specific opinions on what they said.  I did
25  have the additional knowledge that -- especially

Page 48

1  in preparing the amended report this year and, I
2  guess, late last year -- that there had been
3  legislation.  The legislation had included a
4  direct instruction to the FDA to develop a
5  standardized method, and this was part of that
6  regulatory story.
7  BY MR. EWALD:
8  Q.  Do you have any criticisms of the FDA
9  white paper?
10  A.  I didn't read it with criticisms in mind.
11  I read it for context and direction and reform.
12  Q.  And beyond the context that you just
13  discussed, do -- does the FDA white paper inform
14  any of your other opinions that you're offering in
15  this case?
16       DR. THOMPSON:  Object to form.
17  A.  Certainly.  I mean, it informs opinions
18  on levels of scientific risk, of scientific
19  uncertainty regarding the risk, on insufficiency
20  of the industry-developed standards to reflect the
21  underlying risks and materials.  And it supported
22  various inferences about Johnson & Johnson's lack
23  of interest in finding out current scientific fact
24  about its products over this long period of time.
25  So it goes quite directly to many of the opinions

Page 49

1  in the report.
2  BY MR. EWALD:
3  Q.  And the -- that last point you made,
4  the -- going to the Johnson & Johnson's
5  inferences -- I'm sorry.  I don't want to put
6  words in your mouth.
7       The last part you talked about with
8  Johnson & Johnson and how it impacted inferences
9  that -- about Johnson & Johnson's testing
10  approach.  Can you describe what you were -- are
11  referring to?
12  A.  Again, this is, you know, qualitative,
13  not quantitative.  But my core expertise in
14  legislation regulation and its development and
15  change in the associated obligations, it matters
16  to me when I see a -- an agency that is newly
17  invigorated, whether it's by an FDA finding of
18  asbestos in a Johnson & Johnson talcum powder
19  sample by congressional hearings, recognizing that
20  the self-regulatory models of cosmetic regulation
21  were not sufficiently enforced in order for the
22  modern risks of the globalized, industrialized
23  cosmetic sector to be properly safe.  Yes, all of
24  this goes to that, but it goes in a qualitative
25  fashion.

13 (Pages 46 - 49)

1    Q.  And then, specifically, you were talking
2   about Johnson & Johnson's, I guess, lack of, in
3   your mind, of dedication to current testing
4   technologies.  Is that a fair understanding of
5   what you're saying?
6        DR. THOMPSON:  Object to form.
7    A.  Not exactly.
8   BY MR. EWALD:
9    Q.  Okay.
10   A.  What I'm concerned with in my expert
11  report is whether Johnson & Johnson has complied
12  with its self-regulatory obligations under federal
13  cosmetics law which I believe it has not.  And,
14  particularly, its obligations regarding
15  information, labeling, warning, and other
16  communications, and many of those communications
17  have to do with its assertions of having
18  asbestos-free talcum powder products to which this
19  report goes directly.
20   Q.  And about to take a break because we've
21  been going about an hour.  But I just want to
22  finish off this line of questioning.
23       When you say that this white paper
24  goes directly to the asbestos-free talcum powder
25  representations by Johnson & Johnson, what do you

1   mean?
2        DR. THOMPSON:  Objection; form.
3    A.  I mean, that this is a federal
4   interagency working group doing, as far as I can
5   tell, the most systematic and thoughtful review of
6   the current state of science, in combination with
7   congressional investigations, that led to a
8   regulatory modernization and reform law.  And when
9   you put it all together in that way, it's pretty
10  clear to me that Johnson & Johnson took comfort
11  that was not justified in stand- -- testing
12  practices for asbestos that were questionable when
13  adopted but had been in place for so long that
14  they did not keep up with science.
15       MR. EWALD:  All right.  Like I
16   said, we've been going about an hour.  I
17   was thinking we'd take, like, a five-
18   minute break.  We can take a little bit
19   longer if folks need to grab coffee or
20   anything like that.  Just let me know.
21       THE COURT REPORTER:  Yeah.  Just
22   a --
23       THE WITNESS:  Whatever you like.
24   Whatever you need.
25       THE COURT REPORTER:  Just a touch

1   longer than that.  Okay.
2        MR. GOLOMB:  Can we -- just before
3   we go off the record.  This is Richard
4   Golomb.  I'm here for the State court
5   plaintiffs.  I apologize for entering
6   late.  But I just want to make sure the
7   record's clear.  I'm here now.  And I
8   reserve the right to make objections based
9   on the coordination order.
10       Can we agree that any objections
11  that Ms. Thompson makes applies to the
12  State court as well so my objections will
13  be minimal?
14       MR. EWALD:  Sure.
15       MR. GOLOMB:  Thank you.
16       MR. EWALD:  So I -- and,
17  Dr. Thompson, I didn't hear you.  Do you
18  want five or ten?
19       DR. THOMPSON:  I -- we could
20  probably do five.  We'll just come back as
21  soon as we're ready.  We'll --
22       MR. EWALD:  Right.  It's -- I think
23  my general experience is that when people
24  say "five," they don't get back --
25       (Speaking simultaneously.)

1        DR. THOMPSON:  Yeah.  Let's say --
2   let's say no more than ten.
3        MR. EWALD:  Let's shoot for five
4   but no more than ten.  Correct.  Thanks.
5        DR. THOMPSON:  All right.  That
6   sounds good.
7        THE COURT REPORTER:  We're off the
8   record at 10:29.
9        (A recess was taken from 10:29 a.m. to
10   10:36 a.m.)
11       THE COURT REPORTER:  And we are
12  back on the record at 10:36.
13  BY MR. EWALD:
14   Q.  All right.  I want to mark as Exhibit 12
15  the new report of -- well, the newest report from
16  Dr. Longo.  Let me just identify it so that we're
17  all on the same page.
18       (Exhibit 12 marked.)
19  BY MR. EWALD:
20   Q.  All right.  So I've shared my screen.  I
21  have what's identified as the "3rd Supplemental
22  MDL Report.  Analysis of Non-Historical J&J's
23  Talcum Powder Consumer Product Containers and J&J
24  Chinese Historical Talc Retain Samples,"
25  November 17th 2023.  It's marked as Exhibit 12.

Page 54

1    Is this, Doctor, the Longo report
2 that you were referring to that you received?
3    A.  (Examined exhibit.)  Yes.  This is --
4 this is the report that I have looked at most
5 recently.
6    Q.  All right.  And I understand that you
7 previously had received a -- an earlier version of
8 an MDL report from Dr. Longo, and you include that
9 in your amended expert report, correct?
10    A.  Yes.
11    Q.  And am I correct that you do not cite to
12 this November 17th, 2023, test results in your
13 amended expert report, correct?
14    A.  I just looked at my amended report, and
15 it's dated November, 15th and this is dated
16 November 17th.  This doesn't necessarily mean that
17 it's the days we saw things.  But, you know, let's
18 say that -- well, I'm gonna agree with -- I'm
19 gonna agree with you for now, absent
20 more information.
21    Q.  I wasn't sure if they, you know,
22 successfully created time travel back down at A&M.
23    A.  (Laughing.)
24    Q.  All right.  So what I'm trying to figure
25 out is -- I asked this a little bit earlier, but

Page 55

1 approximately when you did receive it -- so let me
2 show you just show you something.  The -- if I go
3 back to what we've marked as Exhibit 5, which is
4 the Amended Exhibit B dated March 27th, 2024, and
5 I show on the screen here, word searching, I get
6 one hit which is to the 2019 report.
7    Do you see that?
8    A.  Yes.
9    Q.  Okay.  And then I look at --
10    MR. EWALD:  I'm starting to get a
11    little feedback somewhere.  Maybe Richard?
12    MR. GOLOMB:  I don't think it's
13    feedback as much as it is skipping, it
14    sounds like.
15    MR. EWALD:  All right.  I think
16    it's feedback.  All right.  We'll
17    continue.
18 BY MR. EWALD:
19    Q.  Then if we look at the second amended,
20 which we've marked as Exhibit 6, also dated
21 March 27, 2024, we then see that it has both the
22 2019 version of the report and the November 2023.
23    Do you see that?
24    A.  Yes.
25    Q.  Okay.  And so understanding you're not

Page 56

1 going to be able to pinpoint a specific day in
2 which you received it, I'm trying to get a sense
3 -- is -- you get the Dr. Longo November 2023
4 report around the same time you got the Newman
5 report, or is this something that happened a
6 number of months ago?
7    A.  I believe it was shortly after I got the
8 Newman report.
9    Q.  All right.  And so we're talking roughly
10 a couple weeks ago approximately?
11    A.  I don't know.
12    Q.  All right.
13    A.  What I can -- what I can say is that the
14 Newman and the Longo reports were interesting and
15 relevant for me in preparing for today.
16    Q.  All right.  So then let's talk a little
17 bit about the report from Dr. Longo that we've
18 marked as Exhibit 12.  And this is something, I
19 believe you testified earlier today, that
20 plaintiffs' counsel provided to you, correct?
21    A.  Correct.
22    DR. THOMPSON:  And, again, could
23    you put that in Chat or -- he's gonna need
24    to review it if you're gonna ask specific
25    questions -- or if you would like to

Page 57

1    review it.
2    THE WITNESS:  Sure.
3    DR. THOMPSON:  You could have it in
4    front of you.  I'm just saying.
5    THE WITNESS:  Yes.
6    MR. EWALD:  Okay.  It should be in
7    the Chat.  While people are pulling that
8    up, I will also put it on the screen.
9    THE WITNESS:  Thank you.  I'm a
10    Windows user, and the computer in front of
11    me is a Mac, so I have very few buttons I
12    can push without worrying.
13    (Speaking simultaneously.)
14    THE WITNESS:  He'll put it on the
15    screen.
16    DR. THOMPSON:  Yeah, but if you
17    want to look at the whole thing, you'll
18    need it in Chat rather than...
19 BY MR. EWALD:
20    Q.  Yeah.  At any point in time, Doctor,
21 yeah, you want to look at something else, you can
22 either direct me -- I will be your page scroller
23 -- or if you want to look on your own with
24 counsel, that's also fine.
25    Okay.  So have you heard anything

15 (Pages 54 - 57)

Page 58

1 about the November 2023 Longo report before
2 receiving it from counsel?
3    A.  "Heard anything" is a little vague in the
4 sense that I think I'm not supposed to tell you
5 about conversations.  But the easy answer to the
6 question is I heard there was one and nothing
7 more.
8    Q.  All right.  Okay.  So you received the
9 report that we've marked as Exhibit 12.  How, if
10 at all, does this report from Dr. Longo inform the
11 opinions that you're offering in this case?
12    A.  It's confirmatory regarding the presence
13 of asbestos in talcum powder samples and
14 containers.  My understanding was that this was
15 Dr. Longo's testing of samples that came from
16 Chinese mines rather than domestic U.S. mines.
17 And my understanding, if I recall correctly, is
18 that Johnson & Johnson started sourcing its
19 talcum -- its talc for talcum powder products from
20 China in -- somewhere in the early 2000s, I
21 believe, which makes it overall relevant to the
22 issues of adulteration and violation of legal
23 obligation.
24    Q.  What is your understanding of the method
25 of testing that Dr. Longo is using in this report?

Page 59

1       DR. THOMPSON:  Object to form.
2    A.  I rely on the methods in the report as
3 stated.  I don't have detailed recollection of
4 them, and I wouldn't have a way to endorse or
5 critique them.
6 BY MR. EWALD:
7    Q.  So if you don't have a way to endorse or
8 critique the testing methods by Dr. Longo, on what
9 basis are you relying on them for your opinions in
10 this case?
11       DR. THOMPSON:  Object to form.
12    A.  I rely on them as reflecting the
13 scientific expertise Dr. Longo brings to this
14 tasks.  The same way I would, you know, rely on
15 statements of science in a lot of context from a
16 lot of sources.  "Relying" of course does not mean
17 accepting without thought.  "Relying" means I
18 found them relevant and scientifically grounded to
19 the extent that I understood them.
20 BY MR. EWALD:
21    Q.  Okay.  And so what did you know about
22 Dr. Longo's scientific expertise?
23       DR. THOMPSON:  Object to form.
24    A.  I cannot recall in that -- in preparation
25 for the original report, I believe I had copies of

Page 60

1 not only Dr. Longo's report, but you would have to
2 go search the list, possibly a deposition or
3 something else and some statement of expertise at
4 the time.  Again, you know, what is relevant here
5 is that this is a -- a scientific assessment, and
6 I have no reason to question Dr. Longo's
7 expertise.
8 BY MR. EWALD:
9    Q.  Well, you said that you -- it's not like
10 you said -- well, you indicated relying is not
11 accepting without thought, so what thought did you
12 apply to this, Exhibit 12, in reviewing in
13 connection with your opinions in this case?
14       DR. THOMPSON:  Object to form;
15    asked and answered.
16    A.  At this point in my involvement with the
17 subject matter, I have read a number of reports
18 that have to do with different testing methods,
19 assay methods, microscopy, crystallography,
20 various other things.  I find them all interesting
21 to read.  This seemed to be a sophisticated method
22 brought very recently to bear on a relevant topic,
23 and I rely on it as any expert would rely on other
24 peoples' expertise.
25 BY MR. EWALD:

Page 61

1    Q.  Are you aware of any lab -- testing lab
2 outside of MAS that has confirmed the PLM
3 chrysotile findings reflected in this report?
4       DR. THOMPSON:  And can you give a
5    time frame on that?
6       MR. EWALD:  Doesn't matter.  It
7    does not.
8 BY MR. EWALD:
9    Q.  But go ahead.  How would you --
10    (Speaking simultaneously.)
11       DR. THOMPSON:  Yeah.  Are you
12    talking about since November of 2023 when
13    the -- or September of 2023 when the
14    report was submitted?
15       MR. EWALD:  Well, as Dr. Longo
16    reflects here, this testing that's
17    contained here was produced in various
18    litigations at various points in time
19    before November of 2023.  But I will
20    ask -- so I'm not limiting it to time.
21 BY MR. EWALD:
22    Q.  I'm asking, Doctor, are you aware of any
23 testing lab -- outside of MAS -- that has ever
24 validated the PLM chrysotile findings of Dr. Longo
25 in this report?

16 (Pages 58 - 61)

Page 62

1    DR. THOMPSON:  Object to form.  And
2 that would encompass old ground that could
3 have been questioned.  That was questioned
4 previously.
5 BY MR. EWALD:
6    Q.  Well, I'll go ahead and respond to that
7 before you answer, Doctor.
8    MR. EWALD:  Previous to this,
9 Dr. Sage had not been relying on any PLM
10 chrysotile testing of Dr. Longo.  He'd
11 only been relying on the report as
12 reflected on his prior reliance list which
13 only led to amphibole testing.
14    DR. THOMPSON:  Your question as --
15 BY MR. EWALD:
16    Q.  So from that side now, Doctor --
17    MR. EWALD:  Excuse me?
18    DR. THOMPSON:  Excuse me.  Go
19 ahead, finish.
20    MR. EWALD:  What?
21    THE WITNESS:  It's a "Go ahead.
22 Please finish."
23    DR. THOMPSON:  Yeah.  Go ahead and
24 finish.  I didn't mean to interrupt you.
25    MR. EWALD:  Oh, I thought I was

Page 63

1 done.  I'm done that -- are you referring
2 to -- was that something that was on his
3 list?
4    DR. THOMPSON:  So I think it's --
5 the question of whether Dr. Longo's
6 findings of chrysotile have been confirmed
7 implies that that would only be since
8 Dr. Longo's chrysotile findings have been
9 available.  So the question would be:
10 Have there been findings of chrysotile
11 from other sources prior to this?  And I
12 think that would be off-limits.
13    MR. EWALD:  Okay.  But that's not
14 what I'm asking, and the record will
15 reflect when the first Dr. Longo testing
16 results for chrysotile PLM were made
17 available in litigation which is around
18 2020.  But, again, my question is not
19 limited to time.  So you shouldn't have a
20 problem with it.
21 BY MR. EWALD:
22    Q.  My question is:  Dr. Sage, are you aware
23 of any laboratory -- outside of MAS -- that has
24 ever validated Dr. Longo's PLM findings of
25 chrysotile that are reflected in this report?

Page 64

1    DR. THOMPSON:  Object to form.
2    A.  This is the only report, in preparation
3 for revising my report in this deposition on this
4 particular testing, that I have read.
5    I have also read various FDA
6 statements and other reports on all of their
7 testing from the 2019 finding of asbestos to the
8 present.  I have not focused, other than in this
9 report, on amphibole asbestos versus chrysotile
10 asbestos.
11    I also have noted the EPA's recent --
12 I don't remember if it was a guidance or a
13 regulation -- proposing the complete prohibition
14 of chrysotile asbestos in consumer products and
15 occupational exposure.  But I -- again, there
16 would be no reason for me, in preparation for my
17 report, to survey every testing lab.  As I said in
18 my first deposition, now that I recall, if you'd
19 like to provide me with something that is contrary
20 to something I state and you would like me to
21 consider that, I would be happy to do so.
22 BY MR. EWALD:
23    Q.  Well, do you -- on that front, do you
24 perceive -- well, let me put it back to your
25 academic career in context.

Page 65

1    When you are drafting up an article
2 for peer-reviewed publication, is it your position
3 that you don't need to worry about any potential
4 criticisms unless somebody writes a letter to the
5 editor?
6    DR. THOMPSON:  Object to form.
7    A.  I actually spend a lot of time
8 interpreting my own work and anticipating and
9 responding to criticisms of that work.  In this
10 instance, the court questioned regarding testing
11 has to do with the presence of asbestos and
12 asbestiform fibers in talc and talcum powder
13 products and whether Johnson & Johnson has
14 complied with its legal and ethical corporate
15 obligations, which I conclude that it has not.  I
16 believe that my review of this material, absent
17 something else you would like to show me, is
18 completely consistent with how I would approach
19 this as an academic matter.
20 BY MR. EWALD:
21    Q.  All right.  And just to be clear -- and
22 we'll get there.  But just to be clear:  At no
23 point in time after receiving and reading this
24 report from Dr. Longo from 2023 did you ask
25 plaintiffs' counsel, "Can you give me anything

17 (Pages 62 - 65)

1  that may be out there that criticizes the testing
2  method of Dr. Longo that is reflected in this
3  report?"
4      A.  It's import- --
5          DR. THOMPSON:  Object to form.
6      A.  -- it's important to remember here that
7  Johnson & Johnson's legal obligations do not
8  require a certainty of anything.  They require
9  information that is suggestive of risk, and
10 certainly, the presence of asbestos and any sample
11 at any time is suggestive of risk.  The
12 uncertainty surrounding that risk is also the
13 subjective legal obligation of disclosure by
14 Johnson & Johnson.  So I stand by my statement.
15 Everything I read here was sufficient to ground my
16 opinions.  I'm happy to look at contrary
17 information, should you like to provide it.
18 BY MR. EWALD:
19     Q.  And we'll get there.  But --
20         DR. THOMPSON:  And, John, the 2019
21     FDA findings and Longo's first report were
22     covered in the previous 2021 report in
23     deposition, so I don't think we can really
24     go into anything that's ever happened in
25     the whole history of asbestos testing

1      today.
2          MR. EWALD:  I don't believe I
3      mentioned anything about Longo's 2019
4      report or the FDA findings.  That's what
5      you're talking about.
6          I'm talking about specifically the
7      PLM chrysotile findings that are reflected
8      in the report that Dr. Sage is relying on
9      for the very first time.  I'm asking
10     questions about that, and I'm going to
11     continue asking questions about that.
12 BY MR. EWALD:
13     Q.  Okay.  So, Doctor --
14         DR. THOMPSON:  But so -- but wait a
15     minute.  You're saying the validation of a
16     chrysotile finding by Dr. Longo.  If
17     you're talking about a validation of
18     Dr. Longo's findings, it would just be
19     since those findings.  If you're talking
20     about others finding chrysotile, then that
21     has been covered previously in 2021 in
22     Dr. Sage's deposition report.
23         MR. EWALD:  I agree with you.
24         THE WITNESS:  Could I ask, John, if
25     it's --

1          DR. THOMPSON:  Wait.  Okay.
2      There's no question on -- there's no
3      question up.
4          MR. EWALD:  I agree with you,
5      Dr. Thompson, and I think the only
6      disagreement we have on that is whether
7      the PLM chrysotile testing that is
8      reflected in this report, which is a
9      compilation of a number of expert reports
10     from Dr. Longo, had previously been
11     available before the date of this report,
12     November 2023.  And I am confident that
13     that is the case.  I understand that you
14     may not be so confident.  And so that's
15     why my question does not have a particular
16     date.
17         But, yes, you are correct.  I'm
18     asking about any validation by any testing
19     lab in the world of the findings of
20     chrysotile by using its PLM testing in
21     Dr. Longo -- in this report.  That's what
22     I'm asking.
23         DR. THOMPSON:  And Dr. Sage has
24     already testified that he is not offering
25     any -- any critique or opinions as to

1  Dr. Longo's methods of testing.
2          MR. EWALD:  Oh, I know, but he has
3      also said --
4          DR. THOMPSON:  But you --
5      (Speaking simultaneously.)
6          MR. EWALD:  And, really, as far as
7      the speaking objections and because we
8      are -- you know, if you'd like to proceed
9      with my examination, there's been a lot of
10     colloquy with counsel and a lot of
11     speaking objections on your end.  And I
12     appreciate you may not understand the
13     intricacies and details of this, but I
14     would like to ask the questions of
15     Dr. Sage and not of Dr. Thompson, okay?
16         DR. THOMPSON:  Okay.  Well, if
17     you're talking about the methods, it's one
18     thing.  If you're talking about the
19     findings of chrysotile, it's another
20     thing, and -- and so we'll see what the
21     question is and --
22         MR. EWALD:  Yes, we will.
23         DR. THOMPSON:  -- and what his
24     answer is.
25         MR. EWALD:  Okay.

18 (Pages 66 - 69)

Page 70

1  BY MR. EWALD:
2      Q.  So, Doctor, before all that, we were
3  talking about -- well, actually, that's always a
4  problem with all the wordy colloquies.  I lose my
5  train of thought.  Just give me one moment.
6      A.  Sure.
7      Q.  Oh, all right.  You were talking about
8  self-regulatory obligations, and I sense that you
9  were suggesting that there is some reporting
10  obligation from Johnson & Johnson on the findings
11  from Dr. Longo here, regardless of whether or not
12  they are reliable, scientific findings.  Is that
13  your testimony?
14          DR. THOMPSON:  Object to form.
15      A.  That is not my testimony.
16  BY MR. EWALD:
17      Q.  What is your testimony?
18      A.  What is my testimony on what point?  I'd
19  be happy to tell you, if it's helpful, what I,
20  with respect to my report, thought I got out of
21  the Longo report.  But the things that I don't
22  talk about are just -- don't have any particular
23  negative conclusion to them.  They're simply
24  things that did not strike me as important to my
25  report from this material.

Page 71

1      Q.  Okay.  I'm going to get to that.
2          But I'm trying to get a sense of you
3  talked about, in the prior answer, this
4  suggestion of risk and a lack of certainty doesn't
5  really mean -- a lack of ambiguity does not free
6  the cosmetic company from reporting the adverse
7  event, fair?
8          DR. THOMPSON:  Object to form.
9      A.  As a general matter, fair.
10  BY MR. EWALD:
11      Q.  Okay.  And so I'm trying to get -- from
12  your perspective, you see this expert report from
13  Dr. Longo, and it reports chrysotile findings
14  using PLM.  And is this something that need to, in
15  your mind, be reported out immediately as a
16  finding of asbestos in Johnson & Johnson talc?
17          DR. THOMPSON:  Object to form.
18      A.  I don't know what the basis would be for
19  the reporting out.  I don't -- I'm really not sure
20  what the question is.  Again, I'm happy to tell
21  you in what way this report informs my testimony
22  today, and what it does is give me continued and
23  greater confidence in the adulteration of talcum
24  powder products with asbestos.
25  BY MR. EWALD:

Page 72

1      Q.  Okay.  So tell me what you want to say
2  about that.
3      A.  As I said when we first mentioned this
4  Longo report, my understanding was that this
5  report was Chinese-sourced talc as opposed to, I
6  believe, Vermont-sourced talc that it preceded in
7  Johnson & Johnson's business practices.
8      Q.  (Scrolling.)
9      A.  All right.  Thank you.
10          I see Vermont and Chinese on the --
11  on the screen.  And given that there now is a
12  roughly 20 year history of Chinese-sourced talc,
13  it seemed relevant to me to know what an expert
14  laboratory detected in terms of asbestos.  My
15  understanding is that the Vermont-sourced talc had
16  not been tested -- at least by this lab -- for
17  chrysotile serpentine asbestos.  And so, yes, that
18  is, you know, an interesting finding for me.  It
19  is not a dispositive finding in some way, which a
20  lot of your questions seem to be kind of centered
21  around.  That was interesting to me.
22          More interesting to me was that the
23  overall prevalence, in terms of percentage of
24  samples that had some form of detectable asbestos,
25  was at least as high in the Chinese sourced talc

Page 73

1  as it was in the Vermont sourced talc, and it
2  seemed actually to be significantly higher.  I
3  believe the Vermont source talc had something like
4  68 percent of samples tested, and this one had
5  90 percent of samples tested.
6          And I also drew the inference that
7  asbestiform fibrous talc, not mineral asbestos,
8  was prevalent in all of the samples and, you know,
9  was ubiquitous and, therefore, didn't even bear
10  reporting.  And those were the things that were
11  relevant to me, and It really had to do with the
12  shift in Johnson & Johnson's business practices
13  from Vermont to China sourcing and whether that
14  would influence the risk and uncertainty around
15  adulteration of talcum powder products.  That's
16  it.
17      Q.  Okay.  And you mentioned the difference
18  in percentage of positives from 68 percent, which
19  I believe that's when you -- that's what you
20  include in your report for Italy and Vermont,
21  right?
22      A.  It's what's in my re- -- it's what's in
23  my report, and it was -- you know, again, no
24  number above zero would be reassuring here.  So
25  these are sort of significant findings that don't

19 (Pages 70 - 73)

Page 74

1 seem to me to be sample-dependent.
2    Q.   And --
3    A.   And I just wanted to make sure that this
4 later report with Chinese-sourced talc was also
5 insignificant nonsample dependent sort of ballpark
6 for my purposes.
7    Q.   And when you see -- for Chinese talc,
8 according to this MAS PLM chrysotile analysis,
9 93 percent are positive.  Does the delta between
10 the 93 percent and the 68 percent of the prior
11 findings have any impact whatsoever on your
12 assessment of the reliability of Dr. Longo's PLM
13 chrysotile analysis?
14        DR. THOMPSON:  Object to form.
15    A.   I don't think you're accurately reading
16 the statement here, at least here as you have it
17 on the screen.  40 of the 43 talcum powder samples
18 from -- with Chinese-sourced talc were positive
19 for either amphibole or chrysotile.  It doesn't
20 say "for chrysotile" which is what your question
21 said.
22        With that modification to your
23 question, 68 and 93 are both concerning numbers,
24 and the difference between them does not affect my
25 opinion.

Page 75

1 BY MR. EWALD:
2    Q.   Oh, yeah.
3        All right.  So scrolling up a little
4 bit on the report from Dr. Longo, here we have --
5 on page 2, you see the second full paragraph.
6 "Also, when the last MDL report was issued, MAS
7 was not analyzing cosmetic talc samples for
8 chrysotile using the heavy liquid separation
9 sample preparation method.  After reviewing the
10 Colorado School of Mines (CSM) protocol for the
11 analysis of chrysotile using a HLS sample
12 preparation method with PLM analysis, MAS worked
13 on developing a more efficient protocol for the
14 detection of chrysotile in cosmetic talc samples.
15 The Colorado School of Mines developed this
16 method."
17        Did I read that correctly?
18    A.   Yes.
19    Q.   And is that your understanding of the
20 test method that Dr. Longo was using in this
21 report?
22        DR. THOMPSON:  Objection.  He's
23    already testified that he does not have
24    opinions as to Dr. Longo's testing
25    methodology.

Page 76

1    A.   This -- this is --
2        MR. EWALD:  Thank you for the
3    speaking.  We are still in federal court.
4 BY MR. EWALD:
5    Q.   Dr. Sage, what's your answer?
6    A.   This is the statement Dr. Longo puts in
7 the report.  I have, you know, the scientific
8 background to understand something that is, I
9 believe, referring to polarized light microscopy
10 and something -- and I'm not -- I can't right now
11 remember what HLS stands for.  But, you know,
12 there are liquid sampling analyses and things like
13 that I don't remember.
14        What I do from this paragraph, when I
15 read it and I do recall reading it, was an
16 impression that it was saying that this was a
17 newly developed method by an academic reputable
18 institution that, to my knowledge, is not
19 connected to this litigation.  That is what I drew
20 from this paragraph.
21 BY MR. EWALD:
22    Q.   Okay.  Do you have an understanding as to
23 whether or not the Colorado School of Mines method
24 has ever been published, peer-reviewed?
25        DR. THOMPSON:  Object to form.

Page 77

1    A.   I have no knowledge one way or the other.
2 BY MR. EWALD:
3    Q.   Okay.  Does that matter to your
4 assessment as to whether or not it is a reliable
5 method?
6        DR. THOMPSON:  Object to form.
7    A.   I'm sorry.  If you tell me that the
8 Colorado School of Mines has developed a testing
9 method in its core sweet spot of geological
10 science, I am inclined to believe it.  I can't say
11 more than that.
12 BY MR. EWALD:
13    Q.   Okay.  Well, if we go down a little
14 further in the report, it talks about the Colorado
15 School of Mines with HLS, heavy liquid separation,
16 sample preparation of cosmetic talc.  And
17 specifically talks about documents from the 1970s.
18        Here you see, "The sample preparation
19 part of the MAS chrysotile analysis is based on
20 the work done by the CSMP in the early 1970's for
21 the detection specifically for possible chrysotile
22 and amphibole asbestos in J&J sourced Vermont
23 talcum powder."
24        Do you see that?
25    A.   I do.

20 (Pages 74 - 77)

Page 78

1    DR. THOMPSON: And, you know, I'm
2 going to object to this being way beyond
3 the scope of a amended report submitted in
4 September of 2023.
5    MR. EWALD: Excuse me? This is
6 a -- this is a testing report that you
7 guys showed him a couple weeks ago, that's
8 not even a report -- let me finish my
9 answer, please.
10    (Speaking simultaneously.)
11    MR. EWALD: Do not interrupt me.
12 I'll let you give as long a speech as you
13 want to. I'm not done.
14    This is reflecting a report that
15 was in November 2023, that you provided
16 your expert, Mr. Sage -- Dr. Sage.
17 Apologies.
18    THE WITNESS: That's okay.
19    MR. EWALD: Two weeks ago --
20    (Speaking simultaneously.)
21    THE WITNESS: When I taught -- when
22 I taught at Colombia Law School, "Mr." was
23 the honorific that was this lack of
24 respect.
25    MR. EWALD: Right.

Page 79

1    THE WITNESS: I didn't know what to
2 make with even "professor."
3    MR. EWALD: Nonetheless, something
4 that is not reflected in his report and
5 I'm asking him questions about, so how
6 could it possibly be something that is
7 beyond the scope of a report that's
8 reflected in September 2023?
9    DR. THOMPSON: Because this
10 information was in previous Longo reports
11 and available at Dr. Sage's previous
12 deposition and could have been asked about
13 then.
14    MR. EWALD: All right.
15    DR. THOMPSON: To -- with that
16 caveat and his statement that he's not
17 commenting at all on any methodology or
18 giving opinions, we can proceed, I
19 suppose.
20    MR. EWALD: Okay. And I just want
21 to be clear. Is it your position that
22 I --
23    (Speaking simultaneously.)
24    MR. GOLOMB: Wait. Wait. Is there
25 a question on the table? Let him answer.

Page 80

1 Just let him answer the question.
2    MR. EWALD: No. I will not let him
3 answer the question when his -- when your
4 counsel -- your co-counsel keeps on
5 interrupting me. So I'm more than happy
6 to proceed, but I want to make clear about
7 what plaintiffs' position is in this
8 matter.
9    Is it plaintiffs' position that
10 Mr. Hegarty, who took Day 1 of Dr. Sayta's
11 deposition in 2021, should have questioned
12 Dr. Sage about Dr. Longo's chrysotile
13 opinions which were not included in the
14 only report that Dr. -- that Dr. Longo and
15 Dr. Sage received? Is that plaintiffs'
16 position?
17    MR. GOLOMB: We're not here to
18 answer questions. Dr. Sage is here to
19 answer questions. Ask your question, and
20 we'll make an objection when appropriate,
21 and he can answer.
22    MR. EWALD: Okay. I will be more
23 than happy to proceed when you guys -- if
24 you guys want to just make your objections
25 to "form" or "asked and answered" and not

Page 81

1 always give these long speaking
2 objections. If you're going to continue
3 with speaking objections, I'm going to
4 continue to say why your speaking
5 objections do not have any merit. So if
6 we have an agreement, no speaking
7 objections, I'll agree not to explain why
8 they're wrong.
9    MR. GOLOMB: Just ask your next
10 question.
11    DR. THOMPSON: Just ask the
12 question. But if we're talking about a
13 1973 document, and I -- we can certainly
14 go back and pull that document and see
15 whether it was covered in all sorts of --
16 whether it's Hopkins or other J&J expert
17 or 30(b)(6) witnesses, et cetera. I don't
18 think it's worth taking the time to do
19 that. So he can answer, but I do -- would
20 still take the position that -- that a
21 1973 document about asbestos is in the
22 scope of what this deposition should be
23 about today.
24    MR. EWALD: Okay. So -- and I
25 genuinely do not remember, Madam Court

21 (Pages 78 - 81)

Page 82

1    Reporter, what the pending question was,
2    if there was one. Would you mind trying
3    to find it after all those pages of
4    colloquy?
5         THE COURT REPORTER: Yes, sir. It
6    will take me a minute.
7         MR. EWALD: No problem.
8         THE COURT REPORTER: The last
9    pending question I have has to do with
10   reading the section in the Colorado School
11   of Mines with the HSL, heavy liquid
12   separation. You read that paragraph. And
13   then you said, "Do you see that?" And he
14   said, "I do." And then the objections
15   started. Do you want me to --
16        MR. EWALD: Well, thanks.
17        THE COURT REPORTER: Okay. Thank
18   you.
19   BY MR. EWALD:
20   Q. So my only follow-up question on that,
21   Doctor, is you had mentioned that you thought it
22   was a recent Colorado School of Mines method.
23   This, at least, is -- saying 1970s. Do you have
24   an understanding, one way or another, which is
25   right?

Page 83

1    A. All right. That's what I thought you
2    were -- you're getting at with the question.
3         So if the thing is my prior answer is
4    that I read the introduction to suggest that this
5    was a recent method, you've now shown me a part of
6    the report that says at least part of it is not a
7    recent method. But the difference between is not
8    something that I considered earlier, and I cannot
9    imagine that it would change the way in which this
10   report bears on my opinion. Painful as that was.
11   Q. Okay. So you, in your report, mention
12   the -- let's pull up here -- okay. I'm going back
13   to your Materials Considered list, Doctor. This
14   would be, again, the third amended, Exhibit 7.
15   And amongst the materials that you see here, you
16   have the "U.S. Food and Drug Administration Public
17   Meeting: Testing Methods for Asbestos in Talc and
18   Cosmetic Products Containing Talc," February 4th
19   of 2020.
20        Do you see that, Doctor?
21   A. Yes.
22   Q. And that's something -- a testimony,
23   something that you considered in preparing your
24   earlier report, correct?
25   A. Yes.

Page 84

1    Q. Is that something you looked at in
2    connection with your amended report?
3    A. No.
4    Q. Okay. Do you recall whether or not
5    Dr. Longo presented any of his PLM chrysotile
6    heavy liquid separation findings at that
7    February 4th, 2020, meeting?
8         DR. THOMPSON: Object to form.
9    A. I don't recall.
10   BY MR. EWALD:
11   Q. Okay.
12   A. I do remember going through that public
13   meeting material at the time, but I don't remember
14   any of the --
15   Q. Sure. All right. And we'll mark as
16   Exhibit 13.
17        (Exhibit 13 marked.)
18   BY MR. EWALD:
19   Q. Here we have the February 4th, 2020,
20   transcript of the meeting we were just referring
21   to, and I just have a couple of questions on this
22   one, Doctor.
23        First of all --
24        DR. THOMPSON: If you can put that
25        in Chat also --

Page 85

1         MR. EWALD: Sure.
2         DR. THOMPSON: -- so that he can --
3    we can see the entire document.
4         MR. EWALD: No problem. Just a
5    moment because it's a long document.
6         THE WITNESS: No worries.
7    BY MR. EWALD:
8    Q. And while we're doing that, actually, as
9    a general matter, Doctor, do you have an
10   understanding as to what the purpose of that
11   February 4th, 2020, meeting with the FDA was?
12   A. I cannot recall right now what that
13   purpose was.
14        MR. EWALD: Okay. I'm getting an
15        error message when I try to attach it.
16        THE WITNESS: I'm just going to
17        stand up for a moment.
18   BY MR. EWALD:
19   Q. Let's go ahead now. It's a document --
20        MR. EWALD: Why don't we just take
21        a five-minute break? And then we can get
22        it sorted out by then.
23        DR. THOMPSON: Excuse me. Can you
24        give me the Bates number or the name of
25        that document you're gonna put up?

22 (Pages 82 - 85)

Page 86

1      MR. EWALD:  It's -- there's not a
2  Bates number.  It's the direct link from
3  his Materials Considered list --
4      DR. THOMPSON:  Okay.
5      MR. EWALD:  -- with the FDA
6  website.
7      DR. THOMPSON:  FDA website?
8      MR. EWALD:  Yep.
9      THE COURT REPORTER:  All right.
10  We're off the record at 11:21 here.
11      (A recess was taken from 11:21 a.m. to
12      11:26 a.m.)
13      THE COURT REPORTER:  We're back on
14      the record at 11:26.
15  BY MR. EWALD:
16      Q.  Okay.  Thanks for the break.  I was able
17  to sort out the current issue.  I uploaded in the
18  Chat both the February 4th, 2020, transcript of
19  the FDA meeting, also the -- just so you have
20  it -- the FDA interagency white paper,
21  December 2021.
22      The -- going back do Exhibit 13 which
23  is the transcript.
24      A.  You want me to click on these?  Or will
25  you show them to me?

Page 87

1      Q.  I'm going to show it, and you're welcome
2  to spend as much time as you want looking at it.
3  I'm just going to -- I'm really going to ask you
4  two questions about two parts.  That doesn't mean
5  that you can -- can't look at the other parts.
6      But I first want to direct your
7  attention to page 3, and we see comments from
8  Ms. Kari Barrett, and she says, "The purpose of
9  today's public meeting is to discuss and obtain
10  scientific information on topics related to
11  testing methods for asbestos in talc and cosmetic
12  products containing talc.  We expect this meeting
13  to be an important step in our continued efforts
14  to gather information on this topic, and we thank
15  all thank of you in the room and online for
16  joining us today."
17      First, did I read that correctly?
18      A.  (Examined exhibit.)  Yes.
19      Q.  All right.  And is that generally
20  consistent with your understanding of what the
21  February 4th, 2020, meeting from the FDA was
22  geared towards?
23      DR. THOMPSON:  Object to form.  And
24      this was included in his original report
25      in deposition.

Page 88

1      MR. EWALD:  And I'm relating it to
2      something they concluded in the Zoom
3      deposition -- in the new report.
4  BY MR. EWALD:
5      Q.  Go ahead.
6      A.  I reviewed this in connection with the
7  first report.  I did not look at it again in
8  connection with the second.
9  BY MR. EWALD:
10      Q.  All right.  And as you sit here today,
11  you have no reliable understanding as to the
12  purpose of this February 4th, 2020, meeting?
13      DR. THOMPSON:  Object to form.
14      A.  You just read me the statement in
15  convening the meeting by the convenor.  I have no
16  reason to doubt that.
17  BY MR. EWALD:
18      Q.  Okay.
19      A.  This meeting is, as you know, one step in
20  a long chain that, among other things, resulted in
21  a direct congressional instruction to FDA to
22  develop a standardized testing method.
23      Q.  Understood.  Okay.  So -- and, of course,
24  when I try to search it, it's crashing my Adobe.
25  Hold on one second.

Page 89

1      All right.  Now, Doctor, we're on
2  page 176 of the transcript, and do you see that
3  Ms. Kari Barrett, the convenor, as you said, is
4  introducing William Longo?
5      Do you see that, sir?
6      A.  I do.
7      Q.  And he starts off his comments, after
8  introducing himself, with the statement, "I would
9  like to comment today on the research that we have
10  done using heavy liquid separation for both
11  amphibole asbestos, as well as our chrysotile
12  asbestos that we have recently cracked the code,
13  so to speak, where we can now do both."
14      Did I read that correctly?
15      A.  Yes.
16      Q.  And with respect to his representation in
17  February 2020 to the FDA in this public forum that
18  they have "cracked the code" on heavy liquid
19  separation for chrysotile asbestos, in your review
20  of the December 2021 white paper from the
21  interagency working group, did they adopt the
22  heavy liquid separation chrysotile method
23  discussed by Dr. Longo?
24      DR. THOMPSON:  Object to form.
25      A.  I do not know.  I do not recall.  Again,

Page 90

1  you're pointing out steps in a process that led
2  from acceptance in the 1970s of an industry
3  proposed testing approach to a congressional
4  mandate in 2022 for FDA to finalize, by federal
5  regulation, a testing approach. I am shocked it
6  took that long to deal with something that
7  everyone understands causes cancer. But it did.
8         I am not quite understanding where
9  your questions are directed in terms of a
10 particular FDA meeting and interagency working
11 group. I will repeat, I have had no direct --
12 I've had no contact of any sort with the officials
13 participating in this or personal contact with the
14 people testifying in this.
15 BY MR. EWALD:
16    Q.  Okay. And I wasn't suggesting that you
17 had.
18         My question is: You've read -- and
19 you cite in your most recent report the
20 December 2021 interagency white paper, correct?
21    A.  Yes.
22    Q.  Okay. And my question is: In that
23 report where there are recommendations made, does
24 the interagency working group recommend the use of
25 heavy liquid separation for chrysotile asbestos,

Page 91

1  based on Dr. Longo's supposedly "crack the code"
2  method that he described in February 2020?
3         DR. THOMPSON: And object to form.
4     And if you're talking about the
5     interagency working group, we need to have
6     that document up.
7     MR. EWALD: We'll get there.
8    A.  In answering your question, I do not
9  recall, but I imagine you will show me.
10 BY MR. EWALD:
11    Q.  All right. So now I put the interagency
12 working group in the Box where it had previously
13 been marked as Exhibit 11. I'll also put it up on
14 the screen here.
15         Okay. So here we have the white
16 paper cited in your amended report and goes down
17 to, "Through its deliberations" -- we're on the
18 page, for the record, 5 -- "the IWGACP developed
19 the following scientific opinions and related
20 advice to help ensure reliable detection and
21 comprehensive reporting of asbestos and other
22 amphibole particles when testing cosmetic products
23 containing talc and talc intended for use in
24 cosmetics."
25         Did I read that correctly?

Page 92

1    A.  Yes.
2    Q.  And looking through these specific
3  opinions that are recommended by IWGACP, do you
4  see any reference to a adoption of a chrysotile
5  heavy liquid separation method?
6    A.  Would you like to --
7         DR. THOMPSON: Object to form.
8    A.  Would you like to go through them one by
9  one as I read them? I have no other basis for
10 forming an opinion as to what's in the document
11 beyond using the document.
12 BY MR. EWALD:
13    Q.  Sure.
14    A.  Okay. So -- actually, would you scroll
15 up a little bit so I can see how they frame this
16 list --
17    Q.  (Complied.) Sure.
18         (Speaking simultaneously.)
19         DR. THOMPSON: And if you want to
20     go off the record and look at the entire
21     document, you're permitted to do that.
22    A.  "opinions and related advice." Okay.
23 Now I see what they are trying to do. (Examined
24 exhibit.) Could there be something beyond
25 Number 5?

Page 93

1  BY MR. EWALD:
2    Q.  There is.
3    A.  Thank you for showing it to me.
4    Q.  I wasn't sure you were done. Just tell
5  me where to scroll. I'll scroll.
6    A.  Okay. (Examined exhibit.) I do not see
7  any reference in this list of eight items to heavy
8  liquid separation.
9    Q.  Okay. I do want to talk a little bit
10 about -- did you recommend -- you do recommend
11 here, am I correct, "Use both PLM and TEM methods
12 to identify/report, at minimum, the presence
13 asbestos, other amphibole minerals, and talc
14 particles exhibiting non-platy morphology,"
15 correct?
16    A.  Yes.
17    Q.  And this is something that you talked
18 about in your amended report. If you go a little
19 bit up, it's talking about the J4-1 method, and
20 that's something that is discussed, correct?
21    A.  The J4-1 method is discussed.
22    Q.  All right. And this white paper talks
23 about how -- with a J4-1 method relies on
24 "screening techniques, [X-ray diffraction (XRD) or
25 infrared (IR) spectroscopy] and requires optical

24 (Pages 90 - 93)

Page 94

1 microscopy [i.e. polarized light microscopy] only
2 if the screening test is positive."
3          That's what it reads, correct?
4    A.  (Examined exhibit.)  Yes.
5    Q.  And it goes on to say that, "These two
6 published protocols have long-recognized
7 shortcomings and specificity and sensitivity to
8 detect the presence of asbestos and similar
9 mineral particles that may pose a health concern
10 (see Appendix F)."
11          And it goes on to say, "For example,
12 recent testing in cosmetics by a private
13 laboratory under contract with FDA using
14 transmission electron microscopy (TEM) revealed
15 the presence of asbestos in samples that had
16 negative findings for the same products using PLM,
17 highlighting the shortcomings of optical
18 microscopy methods," correct?
19    A.  It says that.
20    Q.  And it goes on to say, "Thus, the
21 Interagency Working Group on Asbestos in Consumer
22 Products (IWGACP) advises that electron
23 microscopy-based methods are preferred where the
24 objective is to determine if asbestos is present,"
25 correct?

Page 95

1    A.  I'm sorry.  The "determine is best," I'm
2 not seeing it as a --
3          (Speaking simultaneously.)
4    Q.  "determine if" --
5    A.  -- "is present."  I'm sorry.
6    Q.  "asbestos."  I was talking too fast.
7    A.  I'm sorry.
8    Q.  Yeah, that's not your fault.
9    A.  That's --
10   Q.  That's what it reads, right?
11   A.  That's -- yes.  That's what it says.
12   Q.  All right.  And -- and you talk about
13 this in your amended report, right?  That the J4-1
14 method, the white paper states that it is
15 inadequate and that it should use TEM in addition
16 to PLM, correct?
17   A.  I don't believe I say anything that
18 specific about testing methods in my report.
19   Q.  Okay.
20   A.  I do -- what I talk about --
21      DR. THOMPSON:  Did -- again, we're
22   using his 2021 report.  I just want to put
23   that on the record.
24      MR. EWALD:  I'm talking about his
25   amended 2023 report which is the same

Page 96

1 paragraph that he's discussing this white
2 paper.  And I would appreciate you don't
3 interrupt the witness mid answer.
4      DR. THOMPSON:  I apologize -- I
5   apologize for interrupting the witness.  I
6   didn't realize I was doing it.
7 BY MR. EWALD:
8    Q.  Doctor --
9      DR. THOMPSON:  You can go ahead and
10   answer.  My fault.
11   A.  What my expert impressions are -- my
12 expert opinions are -- have to do with regulatory
13 stasis.  Has to do with a self-regulatory regime
14 that was reliant on an industry process, an
15 industry process that has been called into
16 question in many ways.
17          And then for whatever reasons,
18 whether they be budgetary concerns, issues of
19 institutional capacity at the time, or
20 interventions by the regulated parties, there is
21 essentially no progress in asbestos testing
22 methods for talc during a long period when
23 asbestos is known to be a carcinogen-including,
24 with respect to ovarian cancer.
25          And then breaking out from that

Page 97

1 recent stasis -- from that stasis in recent years,
2 through a combination of things, which include the
3 convening of the working group, the working group
4 report, subsequent actions by other regulatory
5 agencies, the cosmetics regulation Modernization
6 Act, the congressional directive.
7          And then we shall see what comes out
8 of that directive, if and when -- I will say, when
9 FDA actually publishes a proposed testing method.
10 At which point, I would consider that regulation,
11 though not incontestable -- and I am sure that
12 your client as -- well as other parties -- will
13 make plenty of public comments on whatever is
14 proposed.
15          But at that point, I think we can
16 reengage this methodological question.  I don't
17 see what I can add to your -- your store of
18 knowledge from this text that the -- you know, in
19 the way it's being presented to me.
20 BY MR. EWALD:
21   Q.  Well, and this is -- I'm not looking for
22 you to add to my store of knowledge.  I'm looking
23 to have an understanding of what you understand
24 and the basis for your expert opinions in this
25 case.

25 (Pages 94 - 97)

Page 98

1 And so you're citing to the white
2 paper, and I want to make sure that we're on the
3 same page, that what the white paper recommends is
4 that you don't just use PLM, you also use TEM,
5 correct?
6 DR. THOMPSON: Object to form.
7 A. That is what you have shown me. That is
8 a level of detail. I do know what a transmission
9 as opposed to a scanning electron microscope can
10 do. I know a little bit about, you know, geologic
11 crystal formation and plate structures for various
12 minerals -- not a lot -- might. I know much more
13 about the biomedical side of these things.
14 But I'm here as an expert in
15 regulation, regulatory obligation, particularly
16 information in self-regulatory methods. We can
17 talk about this. I'm very happy to. I certainly
18 will renew the offer -- if there is something that
19 you think refutes my opinions regarding regulatory
20 stasis and emergence from regulatory stasis, I am
21 absolutely willing to look at it.
22 BY MR. EWALD:
23 Q. And we're getting there.
24 So the -- you would agree with me
25 that the -- at least for the white paper, the

Page 99

1 understanding -- the FDA's understanding of the
2 J4-1 method included XRD or infrared and PLM,
3 correct? That's what it states?
4 DR. THOMPSON: Objection; form.
5 A. I do not know the answer to that without
6 additional research. I will note that the
7 interagency working group does not say, "We
8 endorse the J4-1 method."
9 BY MR. EWALD:
10 Q. I didn't say that they did.
11 I'm saying that what the white paper
12 that you cite in your report states, the testing
13 method used for the J4-1 method were XRD or IR and
14 PLM. That's what it states right here, right?
15 DR. THOMPSON: Object to form.
16 A. I would have to do additional review
17 specific to which testing methods come in which
18 report at which time.
19 BY MR. EWALD:
20 Q. Okay.
21 A. If you'd like me to do that, I guess we
22 can set aside some time for doing it.
23 Q. Not -- won't be necessary.
24 I want to put back up your amended
25 report. Okay. Back to the amended report

Page 100

1 we're -- we marked as Exhibit 4. And this is the
2 paragraph that we were talking about. On
3 paragraph 123, that refers to the J4-1 method, and
4 the white paper -- or repealing noting --
5 according to your paragraph of the "peculiarity of
6 retaining without considera- -- reconsideration
7 for nearly half a century a testing method clearly
8 at odds with current science."
9 That's what you state, correct?
10 A. Yes.
11 Q. Okay. And you go on to state in 124, "At
12 no point has the FDA issued any regulation
13 dictating testing specifications for detecting
14 asbestos and talc and instead has relied on
15 industry substantiation of safety. Recognizing
16 the inadequacy of the situation given industry's
17 poor track record of incorporating established
18 science into testing talc-based cosmetic products
19 for potentially harmful components or contaminants
20 the Regulation Modernization Act requires FDA to
21 develop and issue regulations for asbestos
22 testing."
23 That -- that's your opinion, and that
24 we've talked about earlier today, correct?
25 A. Correct.

Page 101

1 Q. Okay. And then you conclude, on the
2 basis of the foregoing, that, "In sum, Johnson &
3 Johnson manipulated asbestos testing and
4 associated publicity so that 'none detectable'
5 would be interpreted as 'none,' distancing itself
6 from allegations of asbestos contamination but
7 never actually eliminating asbestos
8 contamination."
9 That's your concluding sentence in
10 paragraph 125, correct?
11 A. Correct.
12 Q. All right. When you're preparing your
13 amended report and you're looking at the white
14 paper, did you conduct any research to understand
15 what testing methods Johnson & Johnson actually
16 used?
17 DR. THOMPSON: Object to form.
18 A. I conducted no additional review of those
19 matters, beyond what I might have done in
20 connection with the first report.
21 BY MR. EWALD:
22 Q. Right. And if we look at the first
23 report -- I'm sorry. If we look at the earlier
24 paragraph, which appears in the first report, you
25 have certain documents -- internal J&J documents

26 (Pages 98 - 101)

Page 102

1  -- in the early '70s time frame, correct?
2      A.  Yes.
3      Q.  And those are all documents that are
4  provided to you by plaintiffs' counsel, correct?
5      A.  Some may have been from publicly
6  available sources, but the majority were likely
7  from plaintiffs' counsel.
8      Q.  And that's fair.
9          So here if we're seeing what -- I'm
10  not sure if corporate attorneys -- I don't mean
11  any disrespect.  Do you know what a Bates number
12  is?
13     A.  Only in passing, to be honest.
14     Q.  On these par- -- on these footnotes, you
15  do have 33, the Hutt article, but which is a
16  publicly available source, correct?
17     A.  Yes.
18     Q.  Okay.  But if we're talking about J&J
19  Bates number documents in 30, 31, 32, those are
20  the things that you would have received from
21  plaintiffs' counsel, fair?
22     A.  I'll take your word for it.
23     Q.  Okay.
24         DR. THOMPSON:  Are we going to have
25     something that's relevant to the amended

Page 103

1     report and reliance?
2         MR. EWALD:  Yes, we are.  Yes.
3  BY MR. EWALD:
4      Q.  So in connection with your amended report
5  and looking at the white paper and talking
6  about -- well, you -- you called it a "systematic
7  thoughtful review," right?
8      A.  I'm sorry?  Say again.
9      Q.  Earlier in the deposition, you called the
10  white paper a "systematic thoughtful review" by
11  the interagency working group, right?
12     A.  Using those terms in normal parlance,
13  yes.
14     Q.  Sure.  Okay.  So -- I may have already
15  asked this.  I apologize.  But I got distracted.
16         The story that you give here, the
17  chronology ends in 1976, right, with respect to
18  the Johnson & Johnson and internal company
19  documents and testing methods, correct?
20     A.  In the paragraph you showed me, it does,
21  yes.
22     Q.  Okay.  I just put a two-page document in
23  Chat.  And, Doctor, take as long as you want to
24  review it.  Is this something that you've seen
25  before?  There's a Bates number there at the

Page 104

1  bottom, JNJMX68 and then 3591.
2         (Exhibit 14 marked.)
3      A.  (Examined exhibit.)
4         DR. THOMPSON:  And I'm going to
5     object to a 1978 document in this
6     deposition --
7         MR. EWALD:  Okay.
8         DR. THOMPSON:  -- which is covered
9     in his amended report and additional
10     reliance.
11        MR. EWALD:  Okay.  Objection noted.
12  BY MR. EWALD:
13     Q.  Dr. Sage, have you seen this before?
14     A.  I don't recall.
15        DR. THOMPSON:  We'll see what
16     that -- we'll see what the question is.
17     A.  I don't recall.
18  BY MR. EWALD:
19     Q.  All right.  Well, this is, you see, a --
20  it has a Johnson & Johnson header -- letterhead,
21  rather, dated February 23rd, 1978, and it's to
22  R.N. Miller, president of Windsor Minerals.
23        Do you know who Windsor Minerals are?
24     A.  I don't.  But I see "Vermont," so let me
25  assume it's somebody has to do with the mine.

Page 105

1      Q.  And that assumption would be correct.
2         And it says, "As you know, Windsor
3  Minerals and the Baby Products Company have
4  already authorized the documentation of a 'no
5  detectable asbestos' requirement in the Windsor 66
6  Talc Material Specification.  In this regard, the
7  testing requirement is solely for fibrous
8  amphibole by the CTFA Method J4-1 and is intended
9  to make the specification wholly consistent with
10  the CTFA standard for cosmetic grade talc.
11        "However, we need to recognize that
12  Windsor Minerals and Johnson and Johnson have
13  exercised more extensive controls and testing in
14  the past than just meeting the J4-1 requirement.
15  Furthermore, we intend continuing to surpass the
16  industry standards -- testing as reflected by
17  CTFA's J4-1.  During the July 15th, 1977 meeting
18  in your office, we had agreed to the need of
19  documenting the entire audit protocol which has
20  been your standard operating policy and procedure
21  since August 1973 and will continue to be
22  practised by Windsor Materials for Windsor 66
23  Talc."
24        Did I read that correctly?
25     A.  As best I can keep up with it, yes.

27 (Pages 102 - 105)

Page 106

1    Q.  Yeah.
2          DR. THOMPSON:  Are you marking this
3    as an exhibit?
4          MR. EWALD:  Yes, I am.  That's a
5    good suggestion.  We'll mark this as
6    Exhibit 14.
7          DR. THOMPSON:  And I, as of yet,
8    don't have the relevance of this document
9    for his amended report.
10          MR. EWALD:  Okay.  I will explain
11    it after -- I think it's obvious, but
12    we'll continue on.
13    BY MR. EWALD:
14    Q.  Then it goes on to then state the testing
15    methods.  And do you see here test CTFA J4-1 for
16    fibrous amphibole forms; and then serpentine
17    forms, TM 7019; and asbestiform minerals, TM 7024?
18          Do you see that there?
19    A.  Yes.
20          DR. THOMPSON:  Could you show the
21    Bates number on that document?
22          MR. EWALD:  I did.  Yeah, I read
23    into the records there at the bottom.
24          DR. THOMPSON:  Okay.  Yeah.
25    This --

Page 107

1          MR. EWALD:  JNJMX68_3592.
2    BY MR. EWALD:
3    Q.  Going back up to this first paragraph
4    where they're talking about surpassing industry
5    testing as reflected in in J4-1, do you know
6    anything about that?
7    A.  I do not know how to answer this
8    question.  If you want to ask me a question such
9    as how do I interpret in light of my report this
10    assertion and internal correspondence of Johnson &
11    Johnson's desire to comply with a higher standard
12    than J4-1, please ask me that question.
13          I don't know how to respond to a
14    question about this document otherwise.
15    Q.  Well --
16    A.  It's like -- to my knowledge, I'm seeing
17    it for the first time.  I may have seen it before.
18    Q.  Well, and, you know, my question to you
19    is:  As you sit here today, do you have any
20    knowledge about Johnson & Johnson's testing
21    methods and whether or not they did, in fact,
22    exceed industry testing reflected in J4-1?
23          DR. THOMPSON:  Object to form.
24    A.  You've shown me a document that I'm happy
25    to engage with on its face.  Is that what you

Page 108

1    would like?
2    BY MR. EWALD:
3    Q.  I would like you first to answer my
4    question which is a straightforward "yes" or "no."
5          Were you aware of any -- were you
6    aware of anything about Johnson & Johnson's
7    testing methods and whether or not they exceeded
8    the industry J4-1 testing standard?
9    A.  I have been a- --
10          DR. THOMPSON:  Object to form.
11    A.  I have been aware, whether it was, I
12    think, all for the first report, maybe, you know,
13    referred to in passing in materials reviewed for
14    the revised report.  I have been aware of
15    different moments in Johnson & Johnson's corporate
16    history where it has been more or less attentive
17    to the issue of asbestos in its product.
18    BY MR. EWALD:
19    Q.  Okay.  Are you aware of -- at any
20    point -- well, are you aware of how often
21    Johnson & Johnson conducted TEM testing of its
22    talc with presence of asbestos?
23    A.  No.
24          DR. THOMPSON:  Objection.
25    BY MR. EWALD:

Page 109

1    Q.  Okay.  And do you see here on -- the
2    "Material will be tested for conformance on audit
3    basis, frequencies noted according to sample types
4    described and tests required"?
5          Ground ore.  TM 7024 tests.  Biweekly
6    composite samples by Windsor.
7          Do you see that?
8    A.  Yes.
9    Q.  Okay.  And flash dried talc, test CTFA
10    J4-1, TM 7019, weekly composite samples by J&J,
11    correct?
12    A.  Yes.
13          DR. THOMPSON:  Objection.  And
14    objection to all the questions regarding
15    this document.  He's not seen the '78.
16          MR. EWALD:  Okay.
17          THE COURT REPORTER:  Margaret,
18    you're getting very garbled, just so you
19    know.
20          DR. THOMPSON:  Okay.  I will try
21    not to garble.  I don't know --
22          (Speaking simultaneously.)
23          MR. EWALD:  That's better.
24          DR. THOMPSON:  -- garbley.
25          Do I need to repeat anything for

28 (Pages 106 - 109)

Page 110

1    you?
2        THE COURT REPORTER:  Yeah.  Go
3    ahead and repeat your objection.
4        DR. THOMPSON:  The objection was to
5    all the questions regarding this document
6    that Dr. Sage testified that he had not
7    seen before, and it's dated 1978.
8        THE COURT REPORTER:  Thank you.
9        DR. THOMPSON:  And having relevance
10   to his amended report or additional
11   opinions contained in that report.
12       MR. EWALD:  All right.
13   BY MR. EWALD:
14   Q.  Back to the --
15       (Speaking simultaneously.)
16       MR. EWALD:  I'm sorry.  What?
17       DR. THOMPSON:  I was just asking
18   the court reporter if that was any better.
19       MR. EWALD:  Oh.
20       THE COURT REPORTER:  Yes.
21       MR. EWALD:  Yes.
22       DR. THOMPSON:  Okay.  Thank you.
23   BY MR. EWALD:
24   Q.  And then just returning to your amended
25   expert report, I want you to assume, for purposes

Page 111

1    of my question, that in addition to J4-1,
2    Johnson & Johnson tested its talc for presence of
3    asbestos using TEM.
4        You with me so far?
5    A.  I will assume that it used TEM at some
6    point.  I don't have knowledge, unless you want me
7    to review a lot more information about when it
8    used transmission microscopy and when it didn't.
9    Q.  That's fair enough.  That's why it's a
10   hypothetical.  I'm asking you to assume a
11   hypothetical.
12       Assuming that Johnson & Johnson used
13   TEM to test its talc for the presence of asbestos
14   in addition to the J4-1 method, is it your opinion
15   that Johnson & Johnson manipulated asbestos
16   testing in associated publicities, but "none
17   detectable" would be interpreted as "none"?
18       DR. THOMPSON:  Object to form.
19       MR. GOLOMB:  Objection.  Can I --
20   what is the time frame you're limiting
21   your question to?
22       MR. EWALD:  His paragraph is not
23   limited to a time frame.  So my question
24   is unlimited time frame.
25   BY MR. EWALD:

Page 112

1    Q.  Answer the question, please.
2        DR. THOMPSON:  I think --
3        (Speaking simultaneously.)
4        MR. GOLOMB:  Well, except that --
5    Wait.  Wait.  Wait.  Wait.  Wait.  Wait.
6        Except that this question was
7    available to him in 2021 when he testified
8    previously.  It's not anything that's
9    updated in the new report.
10       We've given you a lot of leeway
11   here today.  So I'll explain the time
12   frame that you're referring to.  If you're
13   referring to a time period before November
14   of 2021 when this deposition was taken
15   previously, then we're gonna object.
16       MR. EWALD:  Okay.  And your
17   objection's noted.
18   BY MR. EWALD:
19   Q.  Answer the question.
20       DR. THOMPSON:  If you know -- have
21   knowledge based on your report.
22   A.  I stand -- I stand by my statement in
23   light of the totality of the information that I
24   have been presented with and reviewed in the
25   course of reviewing the original -- preparing the

Page 113

1    original on the amended reports.
2        It is in my expert experience in
3    regulatory matters, not unusual for corporations,
4    to take different positions and different
5    practices over time with respect to risks to the
6    public.
7        General Motors had one of the early
8    patents on airbags and was a supporter of airbag
9    technology for many years when other auto makers
10   were resistant.
11       I notice that J&J in the 1950s had a
12   patent on corn starch for use in talcum powder --
13   powder products and seemed to be very open to a
14   reformulation at that time.  Subsequently, it
15   wasn't.
16       In the 1970s, as we all know, public
17   attention on asbestos was extreme in many forms,
18   and corporations of many types appeared to have
19   made efforts to reassure their consuming public
20   regarding asbestos.
21       Now, that does not mean that that was
22   the position throughout Johnson & Johnson
23   corporate history, and I've certainly reviewed
24   plenty of information to the contrary.
25       And, frankly, I was offended in

29 (Pages 110 - 113)

Page 114

1  preparing the first report by the conclusory
2  nature by which Johnson & Johnson, on its website,
3  which constitutes part of its product labeling,
4  was reassuring its mothers and children about the
5  purity and asbestos-free nature of their talcum
6  powder products.
7      So I can assume that at some point in
8  Johnson & Johnson's corporate history, it
9  attempted to behave responsibly with respect to
10 both testing and the use of testing. But I have
11 seen nothing to indicate that that was a
12 consistent practice, and I stand by my opinion.
13 BY MR. EWALD:
14     Q.  Well, so you are assuming that it behaved
15 responsibly at some point in time, but you
16 haven't -- you don't know how much. That's
17 because you have not asked for documentation from
18 plaintiffs' counsel as to how frequently Johnson &
19 Johnson tested its talc and in what manner,
20 correct?
21     DR. THOMPSON:  Object to form.
22     A.  As I've said before, anything you would
23 like to show me I will be happy to review.
24 BY MR. EWALD:
25     Q.  Okay. I've shown you some stuff, and I

Page 115

1  have limited time.
2      I want to know, based on what you
3  have reviewed for your deposition today and for
4  the expert opinions that you are offering, to a
5  reasonable degree of scientific certainty, am I
6  correct that you have not reviewed and not
7  received from plaintiffs' counsel documents that
8  indicate how often and in what manner Johnson &
9  Johnson tested its talc with the presence of
10 asbestos?
11     DR. THOMPSON:  Object to form and
12     beyond the scope of his amended report.
13     A.  I have not received documents for my
14 amended report. I received many documents from my
15 original report. The details of them I do not
16 recall.
17 BY MR. EWALD:
18     Q.  Okay. We talked about the white paper
19 that you cite in your amended report the first
20 time, and if -- you know, if you assume,
21 hypothetically, if --
22     A.  One moment. Dealing with an unattended
23 computer and an echo.
24     Q.  Oh, I'm sorry.
25     A.  Try again.

Page 116

1      Q.  Better?
2      DR. THOMPSON:  Sorry, guys.
3      Richard walked out for a minute, and I --
4      he had it unmuted, but I turned down the
5      volume. That should help.
6      MR. EWALD:  All right. That sounds
7      better. Sorry about that.
8      DR. THOMPSON:  Sorry.
9      MR. EWALD:  No.
10 BY MR. EWALD:
11     Q.  So the white paper, we went over it, and
12 I understand -- well, the testimony will speak for
13 itself.
14     I want you to assume that -- for
15 purposes of my question -- that the white paper
16 from December of 2021 is recommending that in
17 order to test for the presence of asbestos in
18 cosmetic talc, that companies use both TEM and
19 PLM.
20     Do you have that hypothetical in your
21 head?
22     DR. THOMPSON:  Object to form.
23     A.  To some extent, yes, but I'm not
24 following the purpose of the question.
25 BY MR. EWALD:

Page 117

1      Q.  Well, that's coming.
2      So with that hypothetical, is it your
3  opinion that the interagency working group, by
4  recommending testing for the presence of asbestos
5  in cosmetic talc by using TEM and PLM, is
6  manipulating asbestos testing and associating
7  publicities that "none detectable" would be
8  interpreted as "none"?
9      DR. THOMPSON:  Object to form as to
10     the assumption and as to the relevance to
11     the amended report.
12     A.  You were quoting a paragraph in my
13 original report that was unaltered in the
14 amendment.
15 BY MR. EWALD:
16     Q.  Yes.
17     A.  That is explicitly and, by location, a
18 summary of material that preceded it, not limited
19 to a single paragraph, and I stand by it.
20     Q.  But I didn't ask you about Johnson &
21 Johnson.
22     I said, if FDA is recommending the
23 use of TEM and PLM for testing the presence of
24 cosmetic talc -- presence of asbestos in cosmetic
25 talc, is it your opinion that FDA is

30 (Pages 114 - 117)

Page 118

1 manipulating asbestos testing?
2        DR. THOMPSON:  Same objection.
3    A.  That would be a peculiar inference, and I
4 don't have a better answer to the question.  I
5 don't believe there is a question here as to the
6 good faith of the post-2019 FDA.
7 BY MR. EWALD:
8    Q.  Is there a question about the good faith
9 of post- -- pre- -- 2019 FDA?
10   A.  You're asking me about a 2020 interagency
11 working group.
12   Q.  I know.  I'm asking you --
13   A.  I -- I have seen -- as I said, a long
14 period of regulatory stasis poses questions to an
15 expert on regulatory processes, regulation, and
16 legislation.  So yes, there are questions, as I
17 said before.  The more -- the inferences one draws
18 are arranged from budgetary considerations to
19 industry involvement to several other things.
20       And I have certainly seen enough
21 material with public and nonpublic in preparing
22 the original report as well as the amendment that
23 make me be inter- -- make me quite interested in
24 the knowing as much as possible about that
25 history.

Page 119

1        I really struggle with your client's
2 approach to being forthcoming about the risks it
3 just created with its hazardous products.
4    Q.  All right.  Whoops.  I can't share my
5 screen yet.  You'll see all my secrets.
6    A.  No worries on that.
7    Q.  All right.  I'm putting in the Chat --
8 all right.  Okay, I put in the Chat a scientific
9 article -- although I didn't give you the -- the
10 way, you know, the lead -- I basically just want
11 to know whether you've seen this before.  And if
12 you haven't, maybe it'll be good reading for
13 later --
14   A.  Was this Sanchez that -- in this one?
15   Q.  Yes.
16   A.  Okay.
17   Q.  Okay.  First, we mark it.  Let's goes
18 through the normal process.
19       I'm marking as Exhibit 15 an article,
20 "Environmental Research," from Matthew Sanchez,
21 amongst others.  "Characterization of elongate
22 mineral particles including talc, amphiboles, and
23 biopyriboles observed in mineral derived powders:
24 Comparisons of analysis of the same talcum powders
25 sampled by two laboratories."

Page 120

1        (Exhibit 15 marked.)
2    A.  Date?
3 BY MR. EWALD:
4    Q.  2023 [sic-2022].
5    A.  Okay.
6    Q.  Doctor, is this something you've seen
7 before?
8    A.  (Examined exhibit.)  No.
9    Q.  Okay.  All right.
10       Now I want to go to the GAO report.
11 (Short pause.)  Give me just a moment.
12       Okay.  My .pdf -- Acrobat crashed
13 earlier, so I had to recover some things.
14       Okay.  The GAO report, which we've
15 marked as Exhibit 8 --
16       MR. GOLOMB:  What is the date of
17    the report?
18       MR. EWALD:  The date of the report
19 is December 2023.  And --
20       DR. THOMPSON:  What?
21       MR. EWALD:  I'm sorry?  What?
22       DR. THOMPSON:  Are we still talking
23 about Sanchez?
24       MR. EWALD:  No.
25       DR. THOMPSON:  Okay.  I don't see

Page 121

1 anything else in yet.
2        THE WITNESS:  We had it as an
3 exhibit already.  We went back to the GAO
4 report.
5        DR. THOMPSON:  Oh, I'm sorry.
6        (Speaking simultaneously.)
7        MR. EWALD:  It's Exhibit -- yes,
8 yes, so this is the GAO report.
9        DR. THOMPSON:  Oh, the GAO.  Okay.
10 I'm sorry.
11       MR. EWALD:  No worries.
12 BY MR. EWALD:
13   Q.  If we go --
14       MS. PARFITT:  Is it Exhibit 8?
15       MR. EWALD:  Yes.
16 BY MR. EWALD:
17   Q.  If you will go to page 19 -- actually,
18 .pdf page 23, but the actual page on the paper
19 version is 19.  Let me blow it up here a little
20 bit.
21       In this discussion, it talks about,
22 you see, Doctor, "In addition, some studies
23 suggest associations between asbestos
24 contamination of talc and negative health
25 effects."

31 (Pages 118 - 121)

Page 122

1    You see where I'm talking about?
2    A.   Yes.
3    Q.   And it says, "Specifically, one study we
4  reviewed suggested the talc used in cosmetics -
5  also known as talcum powder - may sometimes be
6  contaminated with asbestos," and it has a footnote
7  cite to -- 47.
8    Do you see that?
9    A.   Yes.
10    Q.   If we go down, is -- the cite is to
11  "Jacqueline Moline, Kesha Patel, and Arthur L.
12  Frank, 'Exposure to cosmetic talc and
13  mesothelioma,' Journal of Occupational Medicine
14  and Toxicology,'" in 2023.
15    Do you see that?
16    A.   Yes.
17    Q.   Have you -- are you familiar with that
18  article from Dr. Moline?
19    A.   No.
20    Q.   Are you familiar with an article that she
21  published on cosmetic talc and mesothelioma in
22  2020?
23    A.   If it had been -- I read several
24  scientific articles on various aspects of health
25  risks from talcum powder, asbestos, and other

Page 123

1  things in connection with my first report.  I, in
2  fact, requested them of counsel and went
3  through -- I don't know -- 10 or 15 peer-reviewed
4  articles at the time.  I would have to look at a
5  list to know if that was among them.
6    Q.   And I'm not trying to tread that ground.
7    But would -- if you had reviewed it,
8  would it be on your Materials Considered list from
9  your first report?
10    A.   It should have been.  Those were all my
11  articles that were provided on my request by
12  counsel.
13    Q.   Okay.  And the GAO report goes on a
14  little bit further in that last paragraph.  Starts
15  there in the middle, "However, one study reviewed
16  suggested that the inhalation of talc contaminated
17  with asbestos may be associated with mesothelioma,
18  a type of cancer that develops on the thin layer
19  of tissue that lines the lungs, chest wall, and
20  many internal organs," and it cites to
21  Footnote 48, right?
22    A.   Yes.
23    Q.   Okay.  And then Footnote 48 is "Moline,
24  Patel, and Frank."  The same article.  Goes on to
25  state that, "The authors noted several limitations

Page 124

1  to this study, including potential biases inherent
2  inherent in studies of cases for which data were
3  collected as part of litigation.  Patients'
4  exposure history was collected in sworn testimony
5  from patients and patients' families as part of
6  the litigation's and medical-legal review."
7    And goes on and -- I'm sorry.  I
8  guess it should be one more sentence from the
9  text.  "This case study in patients with a
10  mesothelioma diagnosis found that in 122 of 166
11  cases, the only known exposure to asbestos was
12  from cosmetic talc."
13    That's what it reads in the text,
14  right?
15    A.   It does.
16    Q.   All right.  And do -- in this section of
17  the GAO report that you put on your Materials
18  Considered list, does -- does it list any article,
19  other than Moline in 2023, in talking about
20  potential studies suggesting associations between
21  asbestos contamination and talc and negative
22  health effects?
23    A.   I would have to reread the report to see.
24  But in my expert opinion, it does not matter
25  because my expert review of the GAO report showed

Page 125

1  that the GAO report's strength was the expertise
2  brought to bear on compliance with government
3  processes.  Its handling of the context and
4  science is abbreviated and not particularly
5  compelling.
6    Q.   Correct.  At least from what we've looked
7  at in Footnotes 47, 48, 49, the only scientific
8  article that's included there is the Moline
9  article, correct?
10    A.   I will take your word for it.  What you
11  read me, that's the only scientific article.  But
12  as I said before, I don't think anyone would rely
13  on this report for the analysis of the underlying
14  science.  The utility of this report, for my
15  amendment and the revision, was the FDA's ongoing
16  efforts to comply with the Modernization Act, and
17  it's really the second half of the report that
18  goes to that.  The first part of the report is
19  something I did read, but I did not rely on.  It
20  is not that type of expertise.
21    Q.   After -- at any point in time after your
22  deposition in September of 2021, did you
23  communicate with Dr. Longo?
24    A.   No.
25    Q.   At any point in time after your

32 (Pages 122 - 125)

Page 126

1 deposition in September of 2021 -- 2021, did you
2 communicate in any way with Dr. Mark Rigler?
3     A.  No.  I'm not sure I remember who that is.
4 Is that the other author on the report?
5     Q.  He is the author on the Longo report that
6 you had earlier, yes.
7         In preparing for today's deposition,
8 did you -- well, let me rephrase the question.
9         In preparing your opinions contained
10 in your amended expert report, did you communicate
11 with any individuals, apart from plaintiffs'
12 counsel, about those opinions?
13     A.  No.
14     Q.  Approximately how much time did you spend
15 preparing for today's deposition?
16     A.  Preparing for today's deposition?  And
17 I'm not hesitating to answer.  I'm trying to think
18 about it in my mind.
19     Q.  That's fine.
20     A.  I mean, that required looking at what I
21 had done before, reading my report, you know,
22 several times to -- and then rereading the
23 Modernization Act and the cited materials from CRS
24 and making sure I had it all in my head.  So
25 probably the answer to that is between 10 and 15

Page 127

1 hours.
2     Q.  And did you meet with counsel in
3 preparation for today's deposition?
4     A.  Yes.
5     Q.  And I don't want to know anything about
6 the content of those communications.  I just want
7 to know approximately how long those meetings
8 were.
9     A.  We probably had an hour to an hour and a
10 half of calls and two hours of face-to-face.
11     Q.  Okay.  And who participated -- which
12 counsel participated in those preparation
13 sections?
14     A.  Dr. Thompson, Mr. Golomb.  And that's
15 really it.  Ms. O'Dell very, very briefly.  But it
16 wasn't really a part of the preparation.
17         MR. EWALD:  Doctor, subject to any
18     questions that your counsel -- or
19     plaintiffs' counsel may have, I don't have
20     any further questions at this time.  Thank
21     you for your time.
22         THE WITNESS:  Thank you so much.
23         DR. THOMPSON:  Could we just take a
24     five-minute break --
25         MR. EWALD:  Sure.

Page 128

1         DR. THOMPSON:  -- and come back?  I
2 don't expect to have much, but --
3         MR. EWALD:  Sure.
4         DR. THOMPSON:  -- I want to
5 converse with co-counsel.  Thanks.
6         MR. EWALD:  Sure.
7         DR. THOMPSON:  I got it.
8         THE COURT REPORTER:  All right.
9 We're off the record at 12:22.
10         (A recess was taken from 12:22 p.m. to
11         12:25 p.m.)
12         THE COURT REPORTER:  Back on the
13 record at 12:25 p.m.
14             EXAMINATION
15 BY DR. THOMPSON:
16     Q.  Dr. Sage, was there anything that you
17 heard in this morning's deposition from counsel,
18 that changes the opinions that you have in your
19 previous testimony?
20     A.  No.
21     Q.  And you stand by the opinions that you've
22 provided in your initial expert report, your
23 amended expert report, and these two depositions?
24     A.  Yes.
25         DR. THOMPSON:  No further

Page 129

1 questions.
2         MR. EWALD:  I have nothing further.
3         MR. GOLOMB:  No further questions.
4
5         (Following discussion had for
6         administrative purposes.)
7
8         THE COURT REPORTER:  I have a
9 couple admin questions for y'all.
10         Mr. Ewald, would you like a rough
11 draft with your transcript?
12         MR. EWALD:  Yes, I would.  And I
13 believe we can follow the standing order.
14         THE COURT REPORTER:  Yes, sir, I
15 would, but the entire standing order is
16 struck-through.
17         MR. EWALD:  Well, you can go with
18 it not being struck-through, and I would
19 like the standing order.
20         THE COURT REPORTER:  Yes, sir.
21 That would be a rough draft and regular
22 delivery of the final transcript.
23         MR. EWALD:  Yes, ma'am.  Correct.
24         THE COURT REPORTER:  Dr. Thompson,
25 I have your standing order down for a

33 (Pages 126 - 129)

Page 130

1  rough draft and regular delivery.
2      DR. THOMPSON:  Yes, ma'am.  That is
3  correct.  Thank you.
4      THE COURT REPORTER:  And may I send
5  you signature for the witness?
6      DR. THOMPSON:  Yes, you can.  And
7  I'll take care of it with the witness.
8      THE COURT REPORTER:  Yes, ma'am.
9      Mr. Golomb, would you like a copy
10  of the transcript?
11      MR. GOLOMB:  No thank you.  I don't
12  need a copy.
13      THE COURT REPORTER:  Yes, sir.
14  Thank you.
15      With that, that concludes our
16  deposition today.
17
18      (Remote deposition concluded at
19      12:27 p.m., April 1, 2024.)
20
21
22
23
24
25

Page 131

1      CHANGES AND SIGNATURE
2  WITNESS NAME:  WILLIAM SAGE, M.D.
3  DATE:  APRIL 1, 2024
4  PAGE/LINE    CHANGE                REASON
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____

Page 132

1      I, WILLIAM SAGE, M.D., J.D., have read the
2  foregoing deposition and hereby affix my signature
3  that same is true and correct, except as noted
4  above.
5      _____
6          WILLIAM SAGE, M.D., J.D.
7
      THE STATE OF _____)
8
      COUNTY OF _____)
9
10      Before me, _____, on
11  this day personally appeared WILLIAM SAGE, M.D.,
12  J.D., known to me (or proved to me under oath or
13  through _____) (description
14  of identity card or other document) to be the
15  person whose name is subscribed to the foregoing
16  instrument and acknowledged to me that they
17  executed the same for the purposes and
18  consideration therein expressed.
19      Given under my hand and seal of office this
20  _____ day of _____, 2024.
21
22
23      _____
24      NOTARY PUBLIC IN AND FOR
25      THE STATE OF _____

Page 133

1      IN THE UNITED STATES DISTRICT COURT
       FOR THE DISTRICT OF NEW JERSEY
2
   IN RE JOHNSON & JOHNSON        §
3  TALCUM POWDER PRODUCTS         § MDL NO.:
   MARKETING, SALES               §
4  PRACTICES, AND PRODUCTS        § 16-2738(MAS)(RLS)
   LIABILITY LITIGATION           §
5
6
7  ********************************************
8  REMOTE VIDEOCONFERENCED DEPOSITION OF
9          WILLIAM SAGE, M.D.
10          APRIL 1, 2024
11  ********************************************
12
13      CERTIFIED STENOGRAPHIC
14      COURT REPORTER'S CERTIFICATE
15
16      I, Karen L. D. Schoeve, RDR, CRR, RSA,
17  residing in the State of Texas, do hereby certify
18  that the foregoing proceedings were reported
19  remotely by me and that the foregoing transcript
20  constitutes a full, true, and correct transcription
21  of my stenographic notes, to the best of my ability
22  and hereby certify to the following:
23      By agreement of all attending attorneys, the
24  witness, WILLIAM SAGE, M.D., was remotely duly
25  sworn by the officer and that the transcript of the

34 (Pages 130 - 133)

Page 134

1   oral deposition is a true record of the testimony
2   given by the witness;
3       That the original deposition was delivered to
4   John Ewald, custodial attorney;
5       That a copy of this certificate was served on
6   all parties and/or the witness shown herein on
7   _____.
8       I further certify that the signature of the
9   witness was requested by the witness or a party
10  before the completion of the deposition and the
11  signature is to be returned within 30 days from
12  date of receipt of the transcript.
13      If returned, the attached Changes and
14  Signature Page contains any changes and the reasons
15  therefor.
16      That pursuant to information given to the
17  deposition officer at the time said testimony was
18  taken, the following includes counsel for all
19  parties of record:
20
21  FOR THE MDL PLAINTIFFS:
22      MARGARET M. THOMPSON, ESQUIRE
        BEASLEY ALLEN, P.C.
23
        FOR THE PLAINTIFF STEERING COMMITTEE:
24
        MICHELLE A. PARFITT, ESQUIRE
25      ASHCRAFT & GEREL

Page 135

1   FOR PLAINTIFF NEW JERSEY STATE COURT:
2       RICHARD GOLOMB, ESQUIRE
        GOLOMB LEGAL
3
4   FOR DEFENDANT JOHNSON & JOHNSON:
5       JOHN EWALD, ESQUIRE
        KING & SPALDING LLP
6
7
8       I further certify that I am neither counsel
9   for, related to, nor employed by any of the parties
10  in the action in which this proceeding was taken,
11  and further that I am not financially or otherwise
12  interested in the outcome of the action.
13
14      Subscribed and sworn to on this the 11th day
15  of April, 2024.
16
17
18
19  _____
    Karen L.D. Schoeve, RDR, CRR, RSA
20  NCRA Exp. Date:  09-30-24
    Litigation Services
21  Firm Registration No. 726
    3960 Howard Hughes Parkway, Suite 700
22  Las Vegas, Nevada 89169
    T: 877.370.3777
23  F: 917.591.5672
24  Job No. 6485334
25

35 (Pages 134 - 135)

[& - 2021]                                                                    Page 1

| & | 1 | 12:25  128:11,13 | 1976  103:17 |
|---|---|---|---|

**&**   1:2 3:10,18
3:19 6:22 20:18
23:8 26:14,22
37:18 40:10,21
40:24 41:5,19
41:25 42:2,7
43:15,20 48:22
49:4,8,9,18
50:2,11,25
51:10 58:18
65:13 66:7,14
70:10 71:16
72:7 73:12
101:2,15
103:18 104:20
107:10,20
108:6,15,21
111:2,12,15
113:22 114:2,8
114:18 115:8
117:20 133:2
134:25 135:4,5

**0**

**000003591**   6:23
**01/15/24**   5:9
**02/04/20**   6:20
**02/23/1978**   6:23
**03/27/24**   5:15
5:18
**03/31/24**   5:22
**09-30-24**
135:20

**1**   1:10 2:5 5:3,7
5:9 9:8,11
80:10 130:19
131:3 133:10
**10**   6:9 36:17,20
123:3 126:25
**10/01/21**   5:7
**10036**   3:20
**104**   6:22
**109**   40:24
**10:29**   53:8,9
**10:36**   53:10,12
**11**   6:12 20:13
45:5,11 91:13
**11/15/23**   5:11
6:10
**11/17/23**   6:18
**1185**   3:20
**11:21**   86:10,11
**11:26**   86:12,14
**11th**   135:14
**12**   6:15 53:14
53:18,25 56:18
58:9 60:12
**120**   7:1
**122**   124:10
**123**   45:22,25
100:3
**124**   100:11
**125**   101:10
**12597**   135:18
**128**   4:8
**12:22**   128:9,10

**12:25**   128:11,13
**12:27**   2:6
130:19
**13**   6:19 84:16
84:17 86:22
**130**   3:16
**131**   4:11
**133**   4:14
**14**   6:22 104:2
106:6
**15**   5:6 7:1
119:19 120:1
123:3 126:25
**15th**   16:24 17:1
18:1 19:7 36:19
54:15 105:17
**16**   5:8
**16-2738**   1:4
133:4
**166**   124:10
**16th**   3:16
**17**   7:3
**176**   89:2
**17th**   53:25
54:12,16
**18th**   3:16
**19**   5:10 121:17
121:19
**19103**   3:16
**1950s**   113:11
**1970's**   77:20
**1970s**   77:17
82:23 90:2
113:16
**1973**   81:13,21
105:21

**1976**   103:17
**1977**   105:17
**1978**   104:5,21
110:7
**1l**   14:13
**1st**   15:22 17:1
17:11 18:1

**2**

**2**   5:6 15:21,23
19:15 75:5
**20**   6:18 45:22
72:12
**2000s**   58:20
**2019**   55:6,22
64:7 66:20 67:3
118:6,9
**2020**   63:18
83:19 84:7,19
85:11 86:18
87:21 88:12
89:17 91:2
118:10 122:22
**2021**   12:17 14:6
14:8 15:22 16:4
16:8 17:9 25:15
26:16 27:8
30:21,23 45:3
45:10 46:6
47:17 66:22
67:21 80:11
86:21 89:20
90:20 95:22
112:7,14
116:16 125:22
126:1,1

[2022 - a&m]                                                    Page 2

**2022**   6:8 25:23
25:24 26:10
34:25 90:4
120:4
**2023**   17:2,11
19:7 24:19
25:21 28:16
32:13 36:19
53:25 54:12
55:22 56:3 58:1
61:12,13,19
65:24 68:12
78:4,15 79:8
95:25 120:4,19
122:14 124:19
**2024**   1:10 2:5
16:25 31:13,19
31:25 55:4,21
130:19 131:3
132:20 133:10
135:15
**212.556.2100**
3:21
**212.790.5341**
3:21
**215.278.4449**
3:17
**218**   3:6
**23**   33:21 121:18
**23rd**   104:21
**24**   5:15,19,22
**25**   6:8
**26**   5:11,13,17
5:20
**27**   55:21

**27th**   16:4,8
31:13,19 55:4
**28**   5:5
**29403**   3:11

**3**

**3**   4:3 5:8 16:19
16:21 87:7
**30**   81:17 102:19
134:11
**30th**   16:4,8
**31**   5:13,16 6:14
102:19
**31st**   31:25
**32**   5:20 6:1
39:16 102:19
**33**   39:20 102:15
**34th**   3:20
**35**   6:5
**3591**   104:1
**3592**   6:23 107:1
**36**   6:9
**36104**   3:6
**382**   6:21
**3960**   135:21
**3rd**   53:21

**4**

**4**   5:10 19:6,8
40:3 100:1
**40**   74:17
**411**   3:11
**43**   74:17
**45**   6:12
**46**   16:16
**47**   122:7 125:7

**48**   123:21,23
125:7
**49**   125:7
**4th**   83:18 84:7
84:19 85:11
86:18 87:21
88:12

**5**

**5**   5:13 9:20
31:11,14 55:3
91:18 92:25
**53**   6:15
**59,200**   16:10

**6**

**6**   5:16 31:17,20
55:20 81:17
**6485334**   1:25
135:24
**66**   105:5,22
**68**   73:4,18
74:10,23

**7**

**7**   5:20 11:13
32:1,5 33:18
83:14
**700**   135:21
**701**   3:11
**7019**   106:17
109:10
**7024**   106:17
109:5
**70s**   102:1
**726**   135:21

**74**   16:9
**77**   6:4
**78**   109:15

**8**

**8**   4:7 6:1 32:14
32:15 35:15
120:15 121:14
**800**   3:7 16:9
**83**   6:11
**84**   6:19
**843.699.8280**
3:12
**850.435.7000**
3:12
**877.370.3777**
135:22
**888.212.9702**
3:7
**89169**   135:22
**898.2034**   3:7

**9**

**9**   5:3 6:5 35:2
35:17,21
**90**   73:5
**900**   15:17
**917.591.5672**
135:23
**93**   74:9,10,23
**99**   5:12
**9:25**   2:6

**a**

**a&m**   13:9,11
13:21 14:4,12
15:3,10 54:22

[a.m. - amendment]                                                                Page 3

**a.m.** 2:6 53:9
  53:10 86:11,12
**abbreviated**
  125:4
**ability** 133:21
**able** 15:6 26:11
  34:17 56:1
  86:16
**above** 2:5 41:1
  73:24 132:4
**absent** 28:11
  54:19 65:16
**absolutely**
  12:18 40:8
  98:21
**academic** 10:15
  13:11,14 17:15
  17:23 22:8 23:6
  29:20 30:14
  64:25 65:19
  76:17
**acceptance**
  90:2
**accepted** 11:23
**accepting** 59:17
  60:11
**access** 13:14
**accomplished**
  42:10
**accountability**
  6:2 25:25 32:10
  34:1
**accounting**
  34:2
**accurate** 36:15

**accurately**
  74:15
**acknowledged**
  132:16
**acrobat** 120:12
**act** 6:8 25:9
  26:4,6,9 27:23
  27:24 28:15
  29:16 34:25
  97:6 100:20
  125:16 126:23
**action** 135:10
  135:12
**actions** 97:4
**activities** 37:21
  37:22,23
**actual** 121:18
**actually** 24:21
  65:7 70:3 73:2
  85:8 92:14 97:9
  101:7,15
  121:17
**add** 97:17,22
**addition** 95:15
  111:1,14
  121:22
**additional**
  42:21,22 47:25
  99:6,16 101:18
  104:9 110:10
**address** 20:14
**admin** 129:9
**administration**
  83:16
**administrative**
  28:18 129:6

**admitted** 20:9
**adobe** 88:24
**adopt** 89:21
**adopted** 51:13
**adoption** 92:4
**adulteration**
  58:22 71:23
  73:15
**advanced** 46:18
**adverse** 71:6
**advice** 91:20
  92:22
**advises** 94:22
**affect** 74:24
**affix** 132:2
**agencies** 97:5
**agency** 49:16
**ago** 28:14 56:6
  56:10 78:7,19
**agree** 52:10
  54:18,19 67:23
  68:4 81:7 98:24
**agreed** 105:18
**agreement** 2:4
  81:6 133:23
**ahead** 9:7 19:5
  21:9 27:16 31:7
  32:13 61:9 62:6
  62:19,21,23
  85:19 88:5 96:9
  110:3
**airbag** 113:8
**airbags** 113:8
**alabama** 3:6
**allegations**
  101:6

**allen** 3:5 8:7
  134:22
**allocations**
  10:21
**allow** 38:6
**ama's** 11:20
**ambiguity** 71:5
**amended** 5:11
  5:13,14,17,17
  5:20,21 16:25
  18:4 19:6,14
  21:10 22:23
  23:20,23,25
  24:20,24 25:4
  27:3 29:5 30:3
  31:10,11,18,23
  32:5 34:22
  36:25 37:25
  38:14,14 40:2
  43:13 44:10,15
  45:2,19 48:1
  54:9,13,14 55:4
  55:19 78:3
  83:14 84:2
  91:16 93:18
  95:13,25 99:24
  99:25 101:13
  102:25 103:4
  104:9 106:9
  110:10,24
  113:1 115:12
  115:14,19
  117:11 126:10
  128:23
**amendment**
  117:14 118:22

[amendment - asking]                                                    Page 4

125:15
**americas** 3:20
**amphibole**
62:13 64:9
74:19 77:22
89:11 91:22
93:13 105:8
106:16
**amphiboles** 7:2
119:22
**analyses** 76:12
**analysis** 6:16
53:22 74:8,13
75:11,12 77:19
119:24 125:13
**analyzing** 75:7
**answer** 20:10
21:12 22:1
27:14 29:23
36:2 38:7 39:13
39:14 43:18
58:5 62:7 69:24
71:3 76:5 78:9
79:25 80:1,3,18
80:19,21 81:19
83:3 96:3,10
99:5 107:7
108:3 112:1,19
118:4 126:17
126:25
**answered** 60:15
80:25
**answering** 91:8
**anticipating**
65:8

**apart** 27:1
126:11
**apologies** 78:17
**apologize** 52:5
96:4,5 103:15
**app** 26:8
**appear** 9:17
**appearances**
4:3
**appeared** 3:2
113:18 132:11
**appears** 13:4
101:24
**appendix** 94:10
**applicable**
21:14
**applies** 52:11
**apply** 34:10
60:12
**appointment**
13:11
**appreciate**
69:12 96:2
**approach** 49:10
65:18 90:3,5
119:2
**appropriate**
80:20
**appropriations**
26:8
**approval** 14:21
**approvals**
15:11
**approximately**
23:15 37:9 55:1
56:10 126:14

127:7
**april** 1:10 2:5
130:19 131:3
133:10 135:15
**area** 23:4,5
27:7
**areas** 36:1
46:17
**arranged**
118:18
**art** 40:11
**arthur** 122:11
**article** 7:1
35:21 36:4 65:1
102:15 119:9
119:19 122:18
122:20 123:24
124:18 125:8,9
125:11
**article's** 11:19
**articles** 11:13
122:24 123:4
123:11
**asbestiform**
65:12 73:7
106:17
**asbestos** 6:13
23:1 28:1,10
29:2 45:7,9
46:7 47:22
49:18 50:18,24
51:12 58:13
64:7,9,10,14
65:11 66:10,25
71:16,24 72:14
72:17,24 73:7

77:22 81:21
83:17 87:11
89:11,12,19
90:25 91:21
93:13 94:8,15
94:21,24 95:6
96:21,23
100:14,21
101:3,6,7 105:5
108:17,22
111:3,13,15
113:17,20
114:5 115:10
116:17 117:4,6
117:24 118:1
121:23 122:6
122:25 123:17
124:11,21
**ashcraft** 3:10
134:25
**ashcraftlaw.c...**
3:13
**aside** 43:24
99:22
**asked** 14:21
17:19 18:10
19:11 20:14,21
22:1 23:3,11
24:7 29:7 54:25
60:15 79:12
80:25 103:15
114:17
**asking** 22:10,19
39:24 40:6
43:21 61:22
63:14 67:9,11

68:18,22 79:5
110:17 111:10
118:10,12
**aspect** 22:19
**aspects** 14:17
122:24
**assay** 60:19
**assertion**
107:10
**assertions**
50:17
**assessing** 41:22
**assessment**
60:5 74:12 77:4
**assessor's** 34:8
**assist** 27:1
**associated** 22:8
22:15 29:13
46:15 49:15
101:4 111:16
123:17
**associating**
117:6
**associations**
121:23 124:20
**assume** 39:17
104:25 110:25
111:5,10 114:7
115:20 116:14
**assuming**
111:12 114:14
**assumption**
105:1 117:10
**attach** 85:15
**attached** 2:10
28:15 134:13

**attaching** 24:10
**attempt** 28:11
**attempted**
114:9
**attending**
133:23
**attention** 29:19
87:7 113:17
**attentive** 29:15
108:16
**attorney** 134:4
**attorneys** 8:3
102:10 133:23
**audio** 2:15 18:8
37:5
**audit** 105:19
109:2
**august** 105:21
**author** 10:8
25:8 126:4,5
**authorized**
105:4
**authors** 123:25
**auto** 113:9
**available** 22:13
28:12 63:9,17
68:11 79:11
102:6,16 112:7
**avenue** 3:20
**aware** 36:5
44:6 45:13 61:1
61:22 63:22
108:5,6,11,14
108:19,20

**b**

**b** 5:14,18,21
20:12 31:11,18
31:23 55:4
81:17
**baby** 105:3
**back** 11:6 12:11
12:16 19:24
23:17 24:18
25:1 34:18,21
38:13 47:7
52:20,24 53:12
54:22 55:3
64:24 81:14
83:12 86:13,22
99:24,25 107:3
110:14 121:3
128:1,12
**background**
76:8
**bad** 39:7
**ballpark** 74:5
**bankruptcy**
17:14
**barely** 13:1
30:7
**barrett** 87:8
89:3
**based** 52:8
77:19 91:1
94:23 100:18
112:21 115:2
**basic** 25:12
**basically** 22:1
33:16 119:10

**basics** 25:2
47:12
**basis** 59:9
71:18 92:9
97:24 101:2
109:3
**bates** 6:23
85:24 86:2
102:11,19
103:25 106:21
**bay** 3:11
**bear** 60:22 73:9
125:2
**bears** 83:10
**beasley** 3:5 8:7
134:22
**begins** 40:23
**behave** 114:9
**behaved** 114:14
**belief** 42:1
**believe** 18:13
20:13 24:15
45:22 50:13
56:7,19 58:21
59:25 65:16
67:2 72:6 73:3
73:19 76:9
77:10 95:17
118:5 129:13
**bell** 23:20
**best** 45:15 95:1
105:25 133:21
**better** 6:3 32:11
109:23 110:18
116:1,7 118:4

| | | | |
|---|---|---|---|
| **beyond** 28:12 38:10 41:1 48:12 78:2 79:7 92:11,24 101:19 115:12 | **bringing** 19:12 **brings** 59:13 **broad** 29:23 30:14 **broader** 40:15 **brought** 60:22 125:2 | **careful** 22:12 **carefully** 22:9 **carolina** 3:11 **case** 12:16 15:8 17:8,12,18 18:2 29:6 30:1 32:21 | **certainty** 66:8 71:4 115:5 **certificate** 4:14 133:14 134:5 **certified** 3:23 4:13 133:13 |
| **biases** 124:1 **billed** 16:8 **bills** 26:5 **binder** 18:12 **biomedical** 98:13 | **bucket** 23:14 **budgetary** 10:20 96:18 118:18 **built** 25:23 | 33:18 35:6,22 36:6 37:16 38:1 38:15 41:17 43:11,14 48:15 58:11 59:10 60:13 68:13 | **certify** 133:17 133:22 134:8 135:8 **cetera** 81:17 **chain** 88:20 **chancellor's** |
| **biopyriboles** 7:3 119:23 **bit** 25:1 47:11 51:18 54:25 56:17 75:4 | **business** 42:5 72:7 73:12 **buttons** 57:11 | 97:25 124:9 **cases** 21:12 124:2,11 **casually** 15:7 | 13:12 **change** 13:4,16 13:16 36:16 46:15,16 49:15 |
| 92:15 93:9,19 98:10 121:20 123:14 | **c** | **categories** 43:19 **cause** 2:5,15 20:23 | 83:9 131:4 **changes** 4:11 36:8 128:18 |
| **biweekly** 109:5 **blow** 121:19 **bond** 42:2 **book** 10:7,14,15 | **c** 3:1 8:1 **call** 12:3 13:13 **called** 34:1 96:15 103:6,9 | **caused** 29:7 30:2 **causes** 90:7 **caveat** 79:16 | 131:1 134:13 134:14 **chapter** 10:14 10:18 11:2,8 |
| 10:18 11:9 **born** 13:25 **bottom** 104:1 106:23 | **calls** 127:10 **cancer** 20:23 90:7 96:24 123:18 | **centered** 72:20 **central** 14:18 **century** 46:3 | **chapters** 10:7 11:10 **characterizati...** 7:2 119:21 |
| **box** 91:12 **break** 43:19 50:20 51:18 85:21 86:16 | **capacity** 96:19 **captured** 28:15 **carcinogen** 96:23 | 100:7 **certain** 41:14 101:25 **certainly** 11:20 | **charleston** 3:11 **chat** 32:23 56:23 57:7,18 84:25 86:18 |
| 127:24 **breaking** 96:25 **briefly** 10:13 127:15 | **card** 132:14 **care** 6:7 11:16 11:17 34:24 130:7 **career** 13:16 64:25 | 30:9 47:4 48:17 66:10 81:13 98:17 113:23 118:20 | 103:23 119:7,8 **check** 9:20 **chest** 123:19 **child** 42:2 |

**[children - concludes]**                                                      Page 7

**children** 114:4
**china** 58:20
  73:13
**chinese** 6:17
  53:24 58:16
  72:5,10,12,25
  74:4,7,18
**chronology**
  103:17
**chrysotile** 61:3
  61:24 62:10
  63:6,8,10,16,25
  64:9,14 67:7,16
  67:20 68:7,20
  69:19 71:13
  72:17 74:8,13
  74:19,20 75:8
  75:11,14 77:19
  77:21 80:12
  84:5 89:11,19
  89:22 90:25
  92:4
**circle** 25:1
**cite** 45:2 54:11
  90:19 99:12
  115:19 122:7
  122:10
**cited** 91:16
  126:23
**cites** 123:20
**citing** 45:18
  98:1
**civil** 2:9
**claims** 40:24
**clarity** 2:19

**class** 14:13
**clear** 47:20
  51:10 52:7
  65:21,22 79:21
  80:6
**clearer** 39:15
**clearly** 46:4
  100:7
**click** 86:24
**client** 17:13
  97:12
**client's** 119:1
**coauthor** 11:15
**code** 89:12,18
  91:1
**coffee** 51:19
**collaboration**
  11:25
**collected** 124:3
  124:4
**collectively** 9:4
**college** 13:25
**colloquies** 70:4
**colloquy** 69:10
  82:4
**colombia** 78:22
**colorado** 75:10
  75:15 76:23
  77:8,14 82:10
  82:22
**columbia** 14:16
**combination**
  51:6 97:2
**come** 22:24
  52:20 99:17
  128:1

**comes** 97:7
**comfort** 51:10
**coming** 117:1
**comment** 28:19
  89:9
**commenting**
  79:17
**comments** 87:7
  89:7 97:13
**commerce** 3:6
**committee** 3:9
  8:10 134:23
**communicate**
  125:23 126:2
  126:10
**communicati...**
  40:21 42:8
  50:16,16 127:6
**communities**
  12:2
**companies**
  116:18
**company** 71:6
  103:18 105:3
**comparison**
  15:7
**comparisons**
  119:24
**compelling**
  125:5
**compilation**
  68:9
**complete** 64:13
**completely**
  42:10 65:18

**completion**
  134:10
**compliance**
  40:25 125:2
**complied** 10:2
  12:13 34:9
  45:24 50:11
  65:14 92:17
**comply** 20:18
  107:11 125:16
**component**
  13:11 14:4
**components**
  100:19
**composite**
  109:6,10
**comprehensive**
  91:21
**comprise** 10:24
**computer**
  57:10 115:23
**computerized**
  2:8
**concern** 94:9
**concerned** 43:2
  50:10
**concerning**
  74:23
**concerns** 96:18
**conclude** 65:15
  101:1
**concluded** 88:2
  130:18
**concludes**
  130:15

**[concluding - correct]**                                                    Page 8

**concluding**
101:9
**conclusion**
70:23
**conclusory**
114:1
**conduct**  30:2
42:8 101:14
**conducted**
101:18 108:21
**confidence**
71:23
**confident**  36:14
68:12,14
**confirmatory**
58:12
**confirmed**
41:23 61:2 63:6
**conformance**
109:2
**congressional**
6:2,6 25:20
32:10 33:23
34:4 49:19 51:7
88:21 90:3 97:6
**connected**
76:19
**connection**
15:13 16:2 17:7
22:22 23:24
25:4 27:2 31:10
32:20 35:6
36:24 44:9
46:13 60:13
84:2 88:6,8
101:20 103:4

123:1
**consider**  64:21
97:10
**considera**
100:6
**consideration**
132:18
**considerations**
118:18
**considered**
5:14,18,21 31:8
31:12,18,24
32:6 83:8,13,23
86:3 123:8
124:18
**consistent**  18:6
65:18 87:20
105:9 114:12
**consolidated**
26:8
**consolidation**
26:8
**constituent**
26:5
**constitutes**
114:3 133:20
**consulting**
14:23 15:3,13
**consumer**  6:17
45:9 46:7 53:23
64:14 94:21
**consumers**
40:14
**consuming**
113:19

**contact**  90:12
90:13
**contained**  34:6
34:7 38:24
39:19 61:17
110:11 126:9
**containers**  6:17
53:23 58:14
**containing**  6:14
18:13 45:8
83:18 87:12
91:23
**contains**  134:14
**contaminants**
100:19
**contaminated**
122:6 123:16
**contamination**
101:6,8 121:24
124:21
**content**  127:6
**context**  48:11
48:12 59:15
64:25 125:3
**continue**  55:17
67:11 81:2,4
105:21 106:12
**continued**
71:22 87:13
**continuing**
105:15
**contract**  94:13
**contrary**  64:19
66:16 113:24
**contribute**  11:8

**controls**  105:13
**convening**
88:15 97:3
**convenor**  88:15
89:3
**conversations**
58:5
**converse**  128:5
**cool**  21:4
**coordination**
52:9
**copies**  59:25
**copy**  18:23 33:1
37:10 45:16
130:9,12 134:5
**core**  49:13 77:9
**corn**  113:12
**corporate**
18:15 26:15,22
40:12,13 41:20
42:1,3 65:14
102:10 108:15
113:23 114:8
**corporation**
42:4
**corporations**
113:3,18
**correct**  10:11
13:5 15:16
16:10,11,16
17:2 22:3 27:8
27:9 30:18,22
39:20,22 44:3,4
44:20,21 45:3,4
53:4 54:9,11,13
56:20,21 68:17

**[correct - dated]**    Page 9

| | | | |
|---|---|---|---|
| 83:24 90:20 | **counsel** 2:4 | 82:8,17 86:9,13 | **ctfa** 105:8,10 |
| 93:11,15,20 | 9:16 15:21 | 109:17 110:2,8 | 106:15 109:9 |
| 94:3,18,25 | 16:12 22:11,20 | 110:18,20 | **ctfa's** 105:17 |
| 95:16 98:5 99:3 | 23:23 24:3,7 | 128:8,12 129:8 | **current** 9:10,18 |
| 100:9,24,25 | 27:2 31:9 32:7 | 129:14,20,24 | 10:5 15:16 46:4 |
| 101:10,11 | 42:20 43:6,14 | 130:4,8,13 | 48:23 50:3 51:6 |
| 102:1,4,16 | 44:5,17 56:20 | 133:1,14 135:1 | 86:17 100:8 |
| 103:19 105:1 | 57:24 58:2 | **covered** 66:22 | **currently** 8:13 |
| 109:11 114:20 | 65:25 69:10 | 67:21 81:15 | 9:5,6 28:8 |
| 115:6 125:6,9 | 80:4,4 102:4,7 | 104:8 | **curriculum** 5:4 |
| 129:23 130:3 | 102:21 114:18 | **covers** 11:2 | **custodial** 134:4 |
| 132:3 133:20 | 115:7 123:2,12 | 16:25 | **cv** 9:8,18 10:5 |
| **correctly** 16:5 | 126:12 127:2 | **crack** 91:1 | 11:13 12:12 |
| 21:25 46:9 | 127:12,18,19 | **cracked** 89:12 | |
| 58:17 75:17 | 128:5,17 | 89:18 | **d** |
| 87:17 89:14 | 134:18 135:8 | **crashed** 120:12 | **d** 2:6 3:21,24 |
| 91:25 105:24 | **county** 132:8 | **crashing** 88:24 | 4:1 8:1 133:16 |
| **correspondence** | **couple** 15:20 | **created** 37:19 | **d.c.** 14:11 |
| 107:10 | 24:11 25:20 | 54:22 119:3 | **data** 2:15 124:2 |
| **cosmetic** 6:3,13 | 32:6 44:24 | **criticisms** 48:8 | **date** 9:17 12:15 |
| 27:7 32:11 45:7 | 56:10 78:7 | 48:10 65:4,9 | 17:8 24:22 |
| 47:23 49:20,23 | 84:21 129:9 | **criticizes** 66:1 | 31:19 33:21 |
| 71:6 75:7,14 | **course** 11:23 | **critique** 59:5,8 | 38:10 39:5 |
| 77:16 83:18 | 14:14,15 18:21 | 68:25 | 68:11,16 120:2 |
| 87:11 91:22 | 26:3 30:16 | **critiques** 44:7 | 120:16,18 |
| 100:18 105:10 | 33:13 35:18 | **critiquing** | 131:3 134:12 |
| 116:18 117:5 | 59:16 88:23 | 44:19 | 135:20 |
| 117:24,24 | 112:25 | **crr** 2:7 3:24 | **dated** 5:7,9,11 |
| 122:12,21 | **court** 1:1 3:14 | 133:16 135:19 | 5:14,18,22 6:10 |
| 124:12 | 3:23 4:14 8:2 | **crs** 126:23 | 6:18,20,23 |
| **cosmetics** 6:7,7 | 8:16 17:14 | **crystal** 98:11 | 15:22 16:24 |
| 20:17 22:14 | 19:16 20:1,3,8 | **crystallography** | 19:7 31:12 |
| 34:24,25 36:10 | 21:16,20 51:21 | 60:19 | 36:18 39:4 45:9 |
| 50:13 91:24 | 51:25 52:4,12 | **csm** 75:10 | 54:15,15 55:4 |
| 94:12 97:5 | 53:7,11 65:10 | **csmp** 77:20 | 55:20 104:21 |
| 122:4 | 76:3 81:25 82:5 | | 110:7 |

**[david - discuss]**                                                     Page 10

**david** 43:11
**day** 23:18 56:1
  80:10 132:11
  132:20 135:14
**days** 26:7 54:17
  134:11
**deadline** 28:16
  33:23
**deal** 12:2 90:6
**dealing** 115:22
**debate** 29:15
**decade** 14:15
**december**
  32:13 33:21
  45:10 47:17
  86:21 89:20
  90:20 116:16
  120:19
**dedication** 50:3
**deep** 42:6
**defendant**
  135:4
**defendant's**
  43:15
**defendants** 2:3
  3:18
**defined** 23:5
**degree** 115:5
**delay** 21:11
**deliberations**
  91:17
**delighted** 14:12
**delivered** 134:3
**delivery** 129:22
  130:1

**delta** 74:9
**delve** 14:2
**demonstrating**
  13:23
**dependent** 74:1
  74:5
**deposed** 12:15
  13:3
**deposition** 1:8
  2:1 12:24,25
  14:6,10,20 16:2
  16:3,3,16 17:8
  17:17 26:15,23
  27:8 29:7,11
  30:1,7,19,20
  36:2 38:8,10
  60:2 64:3,18
  66:23 67:22
  79:12 80:11
  81:22 87:25
  88:3 103:9
  104:6 112:14
  115:3 125:22
  126:1,7,15,16
  127:3 128:17
  130:16,18
  132:2 133:8
  134:1,3,10,17
**depositions**
  128:23
**derived** 119:23
**describe** 10:14
  11:18 13:7
  49:10
**described** 91:2
  109:4

**description** 5:2
  132:13
**desire** 107:11
**detail** 98:8
**detailed** 59:3
**details** 69:13
  115:15
**detect** 94:8
**detectable**
  72:24 101:4
  105:5 111:17
  117:7
**detected** 72:14
**detecting**
  100:13
**detection** 75:14
  77:21 91:20
**determine**
  94:24 95:1,4
**determining**
  22:5
**develop** 48:4
  88:22 100:21
**developed**
  14:15 48:20
  75:15 76:17
  77:8 91:18
**developing**
  27:25 75:13
**development**
  20:19 25:12
  28:8 34:10
  49:14
**developments**
  21:13,14

**develops**
  123:18
**diagnosis**
  124:10
**dictating**
  100:13
**differ** 14:5,7
  15:4
**difference**
  73:17 74:24
  83:7
**different** 23:23
  31:8 60:18
  108:15 113:4,4
**diffraction**
  93:24
**direct** 2:20
  10:21 30:8 47:8
  48:4 57:22 86:2
  87:6 88:21
  90:11
**directed** 90:9
**directing** 28:4
**direction** 48:11
**directive** 97:6,8
**directly** 15:14
  26:12 37:23
  48:25 50:19,24
**disagreement**
  68:6
**disclosure**
  66:13
**discovered** 34:7
**discuss** 46:1
  87:9

[discussed - draws]                                                    Page 11

| | | | |
|---|---|---|---|
| **discussed** 9:3 | 127:17 | **downtown** 9:2 | 79:15 80:10,12 |
| 11:4 30:1 48:13 | **document** 6:6 | **dr** 4:8 8:6,12 | 80:12,14,14,15 |
| 89:23 93:20,21 | 6:24 19:20 | 19:6,22 21:2 | 80:18 81:11 |
| **discussing** 96:1 | 21:18 33:25 | 27:13 29:10 | 84:5,8,24 85:2 |
| **discussion** | 34:19,22 39:3 | 30:5 32:22,25 | 85:23 86:4,7 |
| 121:21 129:5 | 45:19 46:24 | 33:3,5,12 35:9 | 87:23 88:13 |
| **dispositive** | 47:6 81:13,14 | 35:12,16 37:11 | 89:23,24 91:1,3 |
| 72:19 | 81:21 85:3,5,19 | 37:15 38:3,25 | 92:7,19 95:21 |
| **disrespect** | 85:25 91:6 | 39:18,21 40:5,7 | 96:4,9 98:6 |
| 102:11 | 92:10,11,21 | 41:16 42:16,19 | 99:4,15 101:17 |
| **disrupts** 2:16 | 103:22 104:5 | 43:2,5,7,11,17 | 102:24 104:4,8 |
| **distancing** | 106:8,21 | 44:2,7,16 46:23 | 104:13,15 |
| 101:5 | 107:14,24 | 47:18 48:16 | 106:2,7,20,24 |
| **distorted** 18:8 | 109:15 110:5 | 50:6 51:2 52:17 | 107:23 108:10 |
| 37:5 | 132:14 | 52:19 53:1,5,16 | 108:24 109:13 |
| **distortion** 2:15 | **documentation** | 54:8 56:3,17,22 | 109:20,24 |
| **distracted** | 105:4 114:17 | 57:3,16 58:10 | 110:4,6,9,17,22 |
| 103:15 | **documenting** | 58:15,25 59:1,8 | 111:18 112:2 |
| **district** 1:1,1 | 105:19 | 59:11,13,22,23 | 112:20 114:21 |
| 133:1,1 | **documents** | 60:1,6,14 61:4 | 115:11 116:2,8 |
| **disturbed** 29:11 | 18:10,13 22:10 | 61:11,15,24 | 116:22 117:9 |
| **disturbing** 42:7 | 22:20,21,24 | 62:1,9,10,14,18 | 118:2 120:20 |
| 42:13 | 24:8 25:13,20 | 62:23 63:4,5,8 | 120:22,25 |
| **doctor** 8:24 | 26:15,17,19,22 | 63:15,22,24 | 121:5,9 122:18 |
| 9:13 15:19 | 28:5 32:7 33:20 | 64:1 65:6,24 | 125:23 126:2 |
| 19:11 20:10 | 42:21,22 44:13 | 66:2,5,20 67:8 | 127:14,23 |
| 21:25 32:4,18 | 77:17 101:25 | 67:14,16,18,22 | 128:1,4,7,15,16 |
| 33:15 35:7 | 101:25 102:3 | 68:1,5,10,21,23 | 128:25 129:24 |
| 36:24 46:23 | 102:19 103:19 | 68:23 69:1,4,15 | 130:2,6 |
| 54:1 57:20 | 115:7,13,14 | 69:15,16,23 | **draft** 11:6 |
| 61:22 62:7,16 | **doing** 22:12 | 70:11,14 71:8 | 129:11,21 |
| 67:13 70:2 | 27:22 51:4 85:8 | 71:13,17 74:12 | 130:1 |
| 82:21 83:13,20 | 96:6 99:22 | 74:14 75:4,20 | **drafting** 37:25 |
| 84:22 85:9 89:1 | **domestic** 58:16 | 75:22,24 76:5,6 | 65:1 |
| 96:8 103:23 | **doubt** 88:16 | 76:25 77:6 78:1 | **draws** 118:17 |
| 120:6 121:22 | | 78:16 79:9,11 | |

**drew** 36:11
73:6 76:19
**dried** 109:9
**driven** 10:17
**drug** 25:7 83:16
**due** 2:13
**duly** 2:3 8:19
133:24

**e**

**e** 3:1,1 4:1 6:10
8:1,1 24:10,14
**earlier** 26:24
30:6 44:22 54:7
54:25 56:19
83:8,24 100:24
101:23 103:9
120:13 126:6
**early** 58:20
77:20 102:1
113:7
**east** 3:11
**easy** 9:20 58:5
**echo** 115:23
**editing** 11:22
**editor** 65:5
**education** 12:5
**effects** 121:25
124:22
**efficient** 75:13
**efforts** 6:3
32:12 34:15
44:23 87:13
113:19 125:16
**eight** 93:7

**either** 57:22
74:19
**electron** 94:14
94:22 98:9
**eliminating**
101:7
**elongate** 7:2
119:21
**em** 13:22,25
**emergence**
98:20
**empirical** 36:11
**employed**
135:9
**employment**
12:5
**encompass**
62:2
**endorse** 59:4,7
99:8
**ends** 103:17
**enforced** 49:21
**engage** 22:7
107:25
**enhance** 6:3
32:12
**ensure** 91:20
**entering** 52:5
**entire** 85:3
92:20 105:19
129:15
**entities** 29:3
**entity** 42:3
**environment**
37:18

**environmental**
119:20
**epa's** 64:11
**error** 85:15
**especially**
47:25
**esquire** 3:5,10
3:15,19 134:22
134:24 135:2,5
**ess** 26:3
**essential** 42:3
**essentially**
19:12 96:21
**established**
100:17
**et** 81:17
**ethical** 41:20
65:14
**ethics** 11:21
40:25
**event** 71:7
**ewald** 3:19 4:7
8:11,11,23 9:12
15:25 16:23
19:10,21 20:2,6
20:24 21:4,6,19
21:23 27:17
29:22 30:17
31:5,6,16,22
32:3,17,24 33:9
33:13,14 35:4
35:11,14,18,19
36:22 38:22
39:23 41:11
42:14 43:22
45:12 47:3 48:7

49:2 50:8 51:15
52:14,16,22
53:3,13,19
55:10,15,18
57:6,19 59:6,20
60:8,25 61:6,8
61:15,21 62:5,8
62:15,17,20,25
63:13,21 64:22
65:20 66:18
67:2,12,23 68:4
69:2,6,22,25
70:1,16 71:10
71:25 75:1 76:2
76:4,21 77:2,12
78:5,11,19,25
79:3,14,20 80:2
80:22 81:24
82:7,16,19
84:10,18 85:1,4
85:7,14,18,20
86:1,5,8,15
88:1,4,9,17
90:15 91:7,10
92:12 93:1
95:24 96:7
97:20 98:22
99:9,19 101:21
103:2,3 104:7
104:11,12,18
106:4,10,13,22
107:1,2 108:2
108:18,25
109:16,23
110:12,13,16
110:19,21,23

**[ewald - fault]**                                              Page 13

111:22,25
112:16,18
114:13,24
115:17 116:6,9
116:10,25
117:15 118:7
120:3,18,21,24
121:7,11,12,15
121:16 127:17
127:25 128:3,6
129:2,10,12,17
129:23 134:4
135:5
**exact**  28:17
**exactly**  43:18
  50:7
**examination**
  4:7,8 8:22 69:9
  128:14
**examined**  9:14
  15:24 16:22
  19:9 31:15,21
  32:2,16 35:3
  36:21 45:15
  54:3 87:18
  92:23 93:6 94:4
  104:3 120:8
**example**  42:23
  43:20 44:1
  46:20 94:11
**exceed**  107:22
**exceeded**  108:7
**except**  112:4,6
  132:3
**excuse**  19:16,17
  42:5 62:17,18

78:5 85:23
**executed**
  132:17
**exercised**
  105:13
**exhibit**  5:1,3,6
  5:8,10,13,14,16
  5:18,20,21 6:1
  6:5,9,12,15,19
  6:22 7:1 9:8,11
  9:14 15:21,23
  15:24 16:19,21
  16:22 19:6,8,9
  31:11,11,14,15
  31:17,18,20,21
  31:23 32:1,2,5
  32:14,15,16
  33:18 35:2,3,15
  35:17,21 36:17
  36:20,21 40:3
  45:5,11,15
  53:14,18,25
  54:3 55:3,4,20
  56:18 58:9
  60:12 83:14
  84:16,17 86:22
  87:18 91:13
  92:24 93:6 94:4
  100:1 104:2,3
  106:3,6 119:19
  120:1,8,15
  121:3,7,14
**exhibiting**
  93:14
**exhibits**  35:13

**existed**  34:16
**exists**  22:16
**exp**  135:20
**expect**  87:12
  128:2
**experience**  28:3
  38:6 52:23
  113:2
**expert**  5:11,13
  5:17,20 6:10
  16:25 19:6 29:5
  30:24 36:18
  37:10,25 38:23
  40:2,2 50:10
  54:9,13 60:23
  68:9 71:12
  72:13 78:16
  81:16 96:11,12
  97:24 98:14
  110:25 113:2
  115:4 118:15
  124:24,25
  126:10 128:22
  128:23
**expertise**  14:17
  49:13 59:13,22
  60:3,7,24 125:1
  125:20
**explain**  81:7
  106:10 112:11
**explicit**  11:16
**explicitly**
  117:17
**exposure**  64:15
  122:12 124:4
  124:11

**expressed**
  30:11 132:18
**extensive**
  105:13
**extent**  11:2
  22:15 59:19
  116:23
**extreme**  113:17
**extremely**  36:7
  41:13

**f**

**f**  3:7,12 94:10
  135:23
**face**  107:25
  127:10,10
**fact**  42:7 48:23
  107:21 123:2
**fail**  39:15
**fair**  12:11 22:2
  26:20 43:2,3,23
  50:4 71:7,9
  102:8,21 111:9
**faith**  118:6,8
**fall**  12:4 14:10
**familial**  12:8
**familiar**  122:17
  122:20
**families**  124:5
**family**  12:8
**far**  9:22 51:4
  69:6 111:4
**fashion**  49:25
**fast**  95:6
**fault**  95:8 96:10

[fda - frame]                                                    Page 14

**fda**  6:3,6,20
  25:13,16,17
  27:6,21 28:2,21
  29:1 34:23 48:4
  48:8,13 49:17
  64:5 66:21 67:4
  85:11 86:5,7,19
  86:20 87:21
  88:21 89:17
  90:4,10 94:13
  97:9 100:12,20
  117:22,25
  118:6,9
**fda's**  28:8 34:8
  35:25 99:1
  125:15
**february**  83:18
  84:7,19 85:11
  86:18 87:21
  88:12 89:17
  91:2 104:21
**federal**  2:9
  21:15 26:6 46:6
  50:12 51:3 76:3
  90:4
**feedback**  20:25
  55:11,13,16
**feel**  30:10
**feeling**  36:14
**fees**  15:12
**fibers**  65:12
**fibrous**  73:7
  105:7 106:16
**figure**  26:4
  39:8 47:11
  54:24

**final**  26:13
  129:22
**finalize**  90:4
**finalized**  27:23
**finally**  11:23
**financially**
  135:11
**find**  23:18
  28:12,21 47:6
  60:20 82:3
**finding**  48:23
  49:17 64:7
  67:16,20 71:16
  72:18,19
**findings**  44:14
  61:3,24 63:6,8
  63:10,24 66:21
  67:4,7,18,19
  68:19 69:19
  70:10,12 71:13
  73:25 74:11
  84:6 94:16
**fine**  38:12
  57:24 126:19
**finish**  50:22
  62:19,22,24
  78:8
**firm**  135:21
**first**  8:19 9:8
  12:16 14:6,20
  17:17 20:13
  22:2 23:5 29:7
  29:11 30:1 32:8
  34:21 39:17
  41:12 47:7
  63:15 64:18

66:21 67:9 72:3
  84:23 87:6,17
  88:7 101:20,22
  101:24 107:3
  107:17 108:3
  108:12 114:1
  115:19 119:17
  123:1,9 125:18
**five**  51:17 52:18
  52:20,24 53:3
  85:21 127:24
**fix**  19:23
**fixing**  21:3
**flash**  109:9
**floor**  3:16,20
**focus**  13:2
**focused**  10:23
  11:10 64:8
**folks**  51:19
**follow**  82:20
  129:13
**followed**  17:18
**following**  91:19
  116:24 129:5
  133:22 134:18
**follows**  8:21
**food**  25:6 83:16
**footnote**  122:6
  123:21,23
**footnotes**
  102:14 125:7
**foregoing**  101:2
  132:2,15
  133:18,19
**form**  27:13
  28:18 29:10

39:21 40:7
  41:16 43:17
  47:18 48:16
  50:6 51:2 59:1
  59:11,23 60:14
  62:1 64:1 65:6
  66:5 70:14 71:8
  71:17 72:24
  74:14 76:25
  77:6 80:25 84:8
  87:23 88:13
  89:24 91:3 92:7
  98:6 99:4,15
  101:17 107:23
  108:10 111:18
  114:21 115:11
  116:22 117:9
**formation**
  98:11
**forming**  92:10
**forms**  106:16
  106:17 113:17
**fort**  9:2
**forthcoming**
  10:10 41:20
  119:2
**forum**  89:17
**found**  23:14
  24:8 25:10,20
  25:24 27:11,12
  27:21 42:6,13
  59:18 124:10
**frame**  24:19
  61:5 92:15
  102:1 111:20
  111:23,24

[frame - government]                                        Page 15

112:12
**frames** 46:15
**frank** 122:12
123:24
**frankly** 113:25
**free** 50:18,24
71:5 114:5
**frequencies**
109:3
**frequently**
114:18
**front** 18:11,12
18:21 19:1,2
38:16,21 45:16
57:4,10 64:23
**full** 75:5 133:20
**fully** 36:14
**fundamentals**
30:15
**funding** 13:12
**further** 16:1
29:9 30:2 39:19
77:14 123:14
127:20 128:25
129:2,3 134:8
135:8,11
**furthermore**
105:15

**g**

**g** 8:1
**ga** 32:19
**gained** 41:9
**gao** 32:19 33:17
33:25 35:14
120:10,14

121:3,8,9
123:13 124:17
124:25 125:1
**garble** 109:21
**garbled** 109:18
**garbley** 109:24
**gather** 87:14
**geared** 87:22
**general** 20:19
34:2 40:12
52:23 71:9 85:9
113:7
**generally** 11:19
14:23 18:20
25:5 87:19
**gentlemen**
19:17
**genuinely**
81:25
**geologic** 98:10
**geological** 77:9
**george** 6:10
14:9 36:18
**gerel** 3:10
134:25
**getting** 17:5
46:12 83:2
85:14 98:23
109:18
**give** 11:3 20:21
42:23 61:4
65:25 70:5
71:22 78:12
81:1 85:24
103:16 119:9
120:11

**given** 21:13,14
23:6 44:2,16
72:11 100:16
112:10 132:19
134:2,16
**gives** 44:6
**giving** 79:18
**globalized**
49:22
**gmail.com** 3:8
**go** 9:7 11:5
12:11 15:13
18:19 19:5 21:9
21:22 23:17
24:25 27:15
31:5,7 32:13
34:21 38:13,18
38:19 40:11,11
46:1 52:3 55:2
60:2 61:9 62:6
62:18,21,23
66:24 77:13
81:14 85:19
88:5 92:8,20
93:18 96:9
100:11 110:2
120:10 121:13
121:17 122:10
129:17
**god** 8:21
**goes** 40:18,20
40:23 41:1,1,3
48:25 49:24,24
50:19,24 91:16
94:5,11,20
106:14 119:17

123:13,24
124:7 125:18
**going** 12:22
13:21 18:9,24
31:2,3 38:3
46:25 49:4
50:21 51:16
56:1 67:10 71:1
78:2 81:2,3
83:12 84:12
85:16 86:22
87:1,3,3 102:24
104:4 107:3
**golomb** 3:15,15
8:13,14 52:2,4
52:15 55:12
79:24 80:17
81:9 111:19
112:4 120:16
127:14 129:3
130:9,11 135:2
135:2
**gonna** 31:7
54:18,19 56:23
56:24 85:25
112:15
**good** 8:24 9:1
9:22 13:18 28:3
34:10 53:6
106:5 118:6,8
119:12
**government**
6:1 10:22 25:19
25:25 32:9
33:20 34:1,10
125:2

[government's - identify]                                                    Page 16

| government's | h | hear 52:17 | hls 75:11 76:11 |
|---|---|---|---|
| 46:6 | | heard 57:25 | 77:15 |
| **governmental** | **half** 14:13 46:3 | 58:3,6 128:17 | **hold** 13:20 |
| 29:3 | 100:7 125:17 | **hearings** 49:19 | 88:25 |
| **grab** 31:2 51:19 | 127:10 | **heavily** 34:13 | **honest** 102:13 |
| **grade** 105:10 | **hand** 132:19 | 36:11 41:3 | **honorific** 78:23 |
| **graduate** 13:20 | **handling** 125:3 | **heavy** 75:8 | **honoring** 41:19 |
| **grateful** 34:16 | **happened** 56:5 | 77:15 82:11 | **hook** 13:22,25 |
| **great** 13:17 | 66:24 | 84:6 89:10,18 | **hope** 24:14 |
| 18:17 19:4 23:6 | **happening** | 89:22 90:25 | **hopkins** 81:16 |
| 37:9 | 17:21 29:15 | 92:5 93:7 | **hospitals** 10:25 |
| **greater** 71:23 | **happy** 18:9 | **hegarty** 80:10 | **hotel** 9:1 |
| **grossman** 25:7 | 39:12 41:8 | **help** 8:20 12:1 | **hour** 15:17 |
| **ground** 62:2 | 64:21 66:16 | 91:20 116:5 | 16:10 50:21 |
| 66:15 109:5 | 70:19 71:20 | **helpful** 18:25 | 51:16 127:9,9 |
| 123:6 | 80:5,23 98:17 | 41:13 70:19 | **hourly** 15:16 |
| **grounded** | 107:24 114:23 | **hereto** 2:10 | **hours** 16:9,16 |
| 59:18 | **hard** 20:7 | **hesitating** | 18:2 127:1,10 |
| **grounds** 14:16 | **harm** 47:23 | 126:17 | **housing** 12:5 |
| **group** 28:13 | **harmful** 100:19 | **hi** 8:6 | **howard** 135:21 |
| 44:23 45:8 46:7 | **harming** 12:3 | **high** 72:25 | **hsl** 82:11 |
| 47:17,19 51:4 | **hazardous** | **higher** 73:2 | **hughes** 135:21 |
| 89:21 90:11,24 | 119:3 | 107:11 | **hum** 25:6 |
| 91:5,12 94:21 | **he'll** 57:14 | **highlighted** | **hutt** 25:7 |
| 97:3,3 99:7 | **head** 116:21 | 32:7 | 102:15 |
| 103:11 117:3 | 126:24 | **highlighting** | **hypothetical** |
| 118:11 | **header** 104:20 | 94:17 | 111:10,11 |
| **guess** 22:25 | **health** 10:8,9 | **historical** 6:16 | 116:20 117:2 |
| 23:10 32:13 | 10:16 11:17 | 6:17 53:22,24 | **hypothetically** |
| 48:2 50:2 99:21 | 12:3 13:12 | **history** 37:21 | 115:21 |
| 124:8 | 17:15 30:13 | 66:25 72:12 | |
| **guidance** 64:12 | 94:9 121:24 | 108:16 113:23 | **i** |
| **guidances** 28:5 | 122:24 124:22 | 114:8 118:25 | |
| **guidelines** 15:3 | **healthcare** | 124:4 | **i.e.** 94:1 |
| **guys** 20:4 78:7 | 10:24 13:14 | **hit** 55:6 | **identified** 53:21 |
| 80:23,24 116:2 | | | **identify** 39:24 |
| | | | 53:16 93:12 |

[identity - interesting]                                    Page 17

**identity** 132:14
**imagine** 83:9
  91:9
**immediately**
  71:15
**immigration**
  12:6
**impact** 74:11
**impacted** 49:8
**implement** 6:3
  32:12
**implementation**
  34:15
**implies** 63:7
**import** 11:7
  66:4
**important**
  22:12 66:6
  70:24 87:13
**impression**
  34:14 76:16
**impressions**
  96:11
**improvements**
  47:21
**inadequacy**
  100:16
**inadequate**
  95:15
**inclined** 77:10
**include** 54:8
  73:20 97:2
**included** 44:12
  48:3 80:13
  87:24 99:2
  125:8

**includes** 134:18
**including** 7:2
  38:4 96:23
  119:22 124:1
**income** 12:4
**incontestable**
  97:11
**incorporate**
  29:20
**incorporating**
  100:17
**incredibly**
  42:13
**index** 5:1
**indicate** 114:11
  115:8
**indicated** 60:10
**indication**
  47:20
**indirectly**
  10:22
**individuals**
  126:11
**industrialized**
  49:22
**industry** 48:20
  90:2 96:14,15
  100:15 105:16
  107:4,22 108:8
  118:19
**industry's**
  100:16
**inference** 73:6
  118:3
**inferences**
  48:22 49:5,8

  118:17
**influence** 73:14
**inform** 37:15
  48:13 58:10
**information**
  21:13 28:21
  34:5 36:5 40:22
  43:6,15 44:18
  50:15 54:20
  66:9,17 79:10
  87:10,14 98:16
  111:7 112:23
  113:24 134:16
**informational**
  37:18 40:10
**informs** 48:17
  71:21
**infrared** 93:25
  99:2
**inhalation**
  123:16
**inherent** 124:1
  124:2
**initial** 17:10
  18:2 128:22
**insights** 35:24
  41:9,14
**insignificant**
  74:5
**instance** 2:2
  65:10
**institute** 13:13
  13:13
**institution**
  76:18

**institutional**
  96:19
**instruction**
  48:4 88:21
**instrument**
  132:16
**insufficiency**
  48:19
**insurance** 12:4
**intend** 105:15
**intended** 42:9
  91:23 105:8
**intensively**
  17:16
**intent** 40:13
**inter** 118:23
**interagency**
  28:13 44:23
  45:8 46:7 47:16
  47:19 51:4
  86:20 89:21
  90:10,20,24
  91:5,11 94:21
  99:7 103:11
  117:3 118:10
**interest** 23:6
  48:23
**interested**
  17:16 30:12,16
  33:19 34:6
  118:23 135:12
**interesting**
  34:12 56:14
  60:20 72:18,21
  72:22

[internal - july]                                                           Page 18

| | | | |
|---|---|---|---|
| **internal** 26:15 | **invited** 10:15 | **j&j's** 6:16 | 48:22 49:4,8,8 |
| 26:19,22 | 11:8,20 | 53:22 | 49:9,18,18 50:2 |
| 101:25 103:18 | **invoice** 5:7,9 | **j.d.** 4:6 132:1,6 | 50:11,11,25,25 |
| 107:10 123:20 | 15:22 16:13,17 | 132:12 | 51:10,10 58:18 |
| **interpret** 107:9 | 16:20,24 17:6 | **j4-1** 46:1,13 | 58:18 65:13,13 |
| **interpreted** | **invoices** 15:20 | 93:19,21,23 | 66:7,14,14 |
| 101:5 111:17 | **involvement** | 95:13 99:2,8,13 | 70:10,10 71:16 |
| 117:8 | 25:15 29:18 | 100:3 105:8,14 | 71:16 72:7 |
| **interpreting** | 60:16 118:19 | 105:17 106:15 | 73:12 101:2,3 |
| 65:8 | **involves** 30:15 | 107:5,12,22 | 101:15,15 |
| **interrupt** 20:9 | **ir** 93:25 99:13 | 108:8 109:10 | 103:18,18 |
| 21:17 62:24 | **irony** 42:7 | 111:1,14 | 104:20,20 |
| 78:11 96:3 | **issue** 19:23 | **jacqueline** | 105:12,12 |
| **interrupting** | 28:14 86:17 | 122:11 | 107:10,20 |
| 80:5 96:5 | 100:21 108:17 | **january** 16:24 | 108:6,15,21,21 |
| **interventions** | **issued** 46:6 | **jd** 5:4,11,14,17 | 111:2,2,12,12 |
| 96:20 | 75:6 100:12 | 5:21 | 111:15,15 |
| **intricacies** | **issues** 10:20 | **jersey** 1:1 3:14 | 113:22,22 |
| 69:13 | 20:25 58:22 | 8:15 133:1 | 114:2,2,8,18,19 |
| **introduce** 8:3 | 96:18 | 135:1 | 115:8,9 117:20 |
| **introducing** | **issuing** 33:23 | **jewald** 3:22 | 117:21 133:2,2 |
| 89:4,8 | **it'll** 18:25 | **jnjmx68** 6:23 | 135:4,4 |
| **introduction** | 119:12 | 104:1 107:1 | **johnson's** 23:8 |
| 83:4 | **italy** 73:20 | **job** 1:25 135:24 | 40:10,21 41:25 |
| **introductory** | **items** 93:7 | **john** 3:19 8:11 | 42:8 48:22 49:4 |
| 11:8 | **iwgacp** 6:12 | 66:20 67:24 | 49:9 50:2 66:7 |
| **intuitive** 27:19 | 45:6 91:18 92:3 | 134:4 135:5 | 72:7 73:12 |
| **investigation** | 94:22 | **johnson** 1:2,2 | 107:11,20 |
| 30:2 | | 3:18,18 6:22,22 | 108:6,15 114:8 |
| **investigations** | **j** | 20:18,18 23:8 | **joining** 8:14 |
| 51:7 | | 26:14,14,22,22 | 87:16 |
| **investment** | **j&j** 6:17 8:11 | 37:18,19 40:10 | **journal** 11:21 |
| 11:15 | 53:23 77:22 | 40:21,24,24 | 122:13 |
| **invigorated** | 81:16 101:25 | 41:5,6,19,19,25 | **july** 16:4,8 |
| 49:17 | 102:18 109:10 | 42:2,3,7 43:15 | 105:17 |
| | 113:11 | 43:16,20,21 | |

**[justified - list]**                                                                  Page 19

**justified**  51:11

**k**

**karen**  2:6 3:24
    133:16 135:19
**kari**  87:8 89:3
**keep**  51:14
    105:25
**keeps**  80:4
**kesha**  122:11
**kessler**  43:11
**kind**  18:22 34:3
    34:10 47:12
    72:20
**king**  3:19 135:5
**knew**  34:2
**know**  9:9 17:20
    24:2 26:3 30:13
    33:22 37:13
    38:10,16 39:16
    39:16 40:18
    41:17,18,23
    43:24 45:16,23
    47:6,8 49:12
    51:20 54:17,21
    56:11 59:14,21
    60:4 69:2,8
    71:18 72:13,18
    73:8,23 76:7,11
    78:1 79:1 88:19
    89:25 97:18
    98:8,10,10,12
    99:5 102:11
    104:23 105:2
    107:5,7,13,18
    108:12 109:19

109:21 112:20
    113:16 114:16
    115:2,20
    118:12 119:10
    119:11 123:3,5
    126:21 127:5,7
**knowing**
    118:24
**knowledge**  29:4
    29:13 47:25
    76:18 77:1
    97:18,22
    107:16,20
    111:6 112:21
**known**  96:23
    122:5 124:11
    132:12
**kslaw.com**  3:22

**l**

**l**  2:6 3:24
    122:11 133:16
**l.d.**  135:19
**lab**  61:1,1,23
    64:17 68:19
    72:16
**labeling**  40:11
    50:15 114:3
**laboratories**
    119:25
**laboratory**
    63:23 72:14
    94:13
**lack**  48:22 50:2
    71:4,5 78:23

**language**  26:12
    26:13 28:15
**largely**  17:22
    34:8
**las**  135:22
**late**  46:6 48:2
    52:6
**laughing**  54:23
**launch**  13:12
**law**  6:4 10:8,8,9
    10:10,16,19
    13:19 14:16,22
    17:14 21:15
    28:18 32:12
    35:24 36:8
    50:13 51:8
    78:22
**lawyer**  18:15
**layer**  123:18
**lead**  119:10
**leadership**
    34:11
**leading**  25:6
**learned**  40:22
**leave**  31:3
    43:24
**led**  51:7 62:13
    90:1
**leeway**  112:10
**left**  19:23
**legal**  3:15 11:16
    11:25 12:3,5
    36:16 41:1,19
    43:21,24 58:22
    65:14 66:7,13
    124:6 135:2

**legislation**
    14:14 26:7
    30:15 48:3,3
    49:14 118:16
**letter**  6:22 65:4
**letterhead**
    104:20
**level**  40:15 98:8
**levels**  44:14
    48:18
**liability**  1:4
    10:19 11:3,11
    11:11 12:10,10
    133:4
**light**  76:9 94:1
    107:9 112:23
**likely**  102:6
**limitations**
    123:25
**limited**  63:19
    111:23 115:1
    117:18
**limiting**  61:20
    111:20
**limits**  63:12
**line**  50:22 131:4
**lines**  123:19
**link**  86:2
**links**  25:17
**liquid**  75:8
    76:12 77:15
    82:11 84:6
    89:10,18,22
    90:25 92:5 93:8
**list**  5:14,18,21
    24:5,11,13

**[list - margaret]** Page 20

26:24 31:12,18
31:24 32:6 60:2
62:12 63:3
83:13 86:3
92:16 93:7
123:5,8 124:18
124:18
**lists** 23:24,24
31:9
**litigation** 1:4
8:15 11:3 18:17
25:16 29:17
30:20 38:6
63:17 76:19
124:3 133:4
135:20
**litigation's**
124:6
**litigations**
61:18
**litigator** 18:15
**little** 10:17 25:1
30:8 39:15
47:11 51:18
54:25 55:11
56:16 58:3 75:3
77:13 92:15
93:9,18 98:10
121:19 123:14
**llp** 3:19 135:5
**located** 8:25
**location** 117:17
**long** 29:12 42:5
48:24 51:13
78:12 81:1 85:5
88:20 90:6 94:6

96:22 103:23
118:13 127:7
**longer** 51:19
52:1
**longo** 22:25
23:15 24:17,17
44:16 53:16
54:1,8 56:3,14
56:17 58:1,10
58:25 59:8,13
61:15,24 62:10
63:15 65:24
66:2 67:16
68:10,21 70:11
70:21 71:13
72:4 75:4,20
76:6 79:10
80:14 84:5 89:4
89:23 125:23
126:5
**longo's** 44:2,7
58:15 59:22
60:1,6 63:5,8
63:24 66:21
67:3,18 69:1
74:12 75:24
80:12 91:1
**look** 11:6 18:5
25:23 28:6 29:8
45:21 55:9,19
57:17,21,23
66:16 87:5 88:7
92:20 98:21
101:22,23
123:4

**looked** 17:20
25:8,19,21
28:20 54:4,14
84:1 125:6
**looking** 10:16
25:22 87:2 92:2
97:21,22
101:13 103:5
126:20
**looks** 10:5
**lose** 70:4
**lot** 25:12 27:22
27:22 59:15,16
65:7 69:9,10
72:20 98:12
111:7 112:10
**love** 18:5
**lungs** 123:19

**m**

**m** 3:5 5:4
134:22
**m.d.** 1:9 2:2 4:6
8:18 131:2
132:1,6,11
133:9,24
**m.thompson...**
3:8
**ma'am** 20:1
129:23 130:2,8
**mac** 22:14
57:11
**machine** 2:8
**madam** 81:25
**made** 10:21
13:4 30:9 36:9

40:14 41:6,23
49:3 63:16
90:23 113:19
**mail** 24:10,14
**maintained**
37:19
**major** 13:16
**majority** 102:6
**make** 13:22
15:6 21:12
39:15 52:6,8
74:3 79:2 80:6
80:20,24 97:13
98:2 105:9
118:23,23
**makers** 113:9
**makes** 52:11
58:21
**making** 126:24
**mandate** 90:4
**manipulated**
101:3 111:15
**manipulating**
117:6 118:1
**manner** 114:19
115:8
**manufacture**
20:19
**manufacturers**
20:17
**march** 31:13,19
31:25 55:4,21
**margaret** 3:5
8:7 9:6 109:17
134:22

[mark - mineral]                                              Page 21

**mark**  9:8 15:21
16:19 19:5 31:8
31:10 32:14
45:5 53:14
84:15 106:5
119:17 126:2
**marked**  9:11
15:23 16:21
19:8 31:14,20
32:1,15 33:17
35:2,13,21
36:20 40:3
45:11 53:18,25
55:3,20 56:18
58:9 84:17
91:13 100:1
104:2 120:1,15
**marketing**  1:3
20:19 23:3,8
37:20,21,23
41:6 133:3
**marking**  36:17
106:2 119:19
**marks**  2:19
**mas**  1:4 6:16
61:2,23 63:23
74:8 75:6,12
77:19 133:4
**material**  17:23
31:11 40:19
41:7 65:16
70:25 84:13
105:6 109:2
117:18 118:21
**materials**  5:14
5:18,21 31:8,12

31:18,24 32:6,8
48:21 83:13,15
86:3 105:22
108:13 123:8
124:17 126:23
**maternal**  42:2
**matter**  18:19
29:18 30:13,20
30:24 42:1
43:16 60:17
61:6 65:19 71:9
77:3 80:8 85:9
124:24
**matters**  10:9
12:7,8 49:15
101:19 113:3
**matthew**
119:20
**md**  5:4,11,14
5:17,21
**mdl**  1:3 3:4 8:8
53:22 54:8 75:6
133:3 134:21
**mean**  23:10
42:11,23 43:20
48:17 51:1,3
54:16 59:16
62:24 71:5 87:4
102:10 113:21
126:20
**means**  10:9
27:15 59:17
**meant**  22:9
**medical**  11:25
124:6

**medicine**
122:13
**medicolegal**
11:24
**meet**  127:2
**meeting**  6:20
83:17 84:7,13
84:20 85:11
86:19 87:9,12
87:21 88:12,15
88:19 90:10
105:14,17
**meetings**  17:10
18:2 127:7
**mention**  83:11
**mentioned**
44:22 67:3 72:3
73:17 82:21
**merit**  81:5
**mesothelioma**
122:13,21
123:17 124:10
**message**  85:15
**method**  28:1,9
28:19 46:1,4,13
48:5 58:24
60:21 66:2 75:9
75:12,16,20
76:17,23 77:5,9
82:22 83:5,7
88:22 89:22
91:2 92:5 93:19
93:21,23 95:14
97:9 99:2,8,13
99:13 100:3,7
105:8 111:14

**methodological**
97:16
**methodology**
20:12 75:25
79:17
**methods**  6:13
45:7 47:15,22
59:2,8 60:18,19
69:1,17 83:17
87:11 93:11
94:18,23 95:18
96:22 98:16
99:17 101:15
103:19 106:15
107:21 108:7
**michelle**  3:10
8:9 134:24
**microphone**
19:23
**microscope**
98:9
**microscopy**
60:19 76:9 94:1
94:1,14,18,23
111:8
**mid**  96:3
**middle**  123:15
**miller**  104:22
**mind**  9:19
22:24 41:14
48:10 50:3
71:15 82:2
126:18
**mine**  104:25
**mineral**  7:2
73:7 94:9

[mineral - november]                                                         Page 22

119:22,23
**minerals** 6:23
93:13 98:12
104:22,23
105:3,12
106:17
**mines** 58:16,16
75:10,15 76:23
77:8,15 82:11
82:22
**minimal** 52:13
**minimum**
93:12
**minor** 25:11
**minute** 51:18
67:15 82:6
85:21 116:3
127:24
**misbranding**
40:20
**misrepresent...**
41:5
**mlp** 11:16
**mocra** 6:8 35:1
**models** 49:20
**modern** 49:22
**modernization**
6:7 22:14 27:23
27:24 28:14
34:25 51:8 97:5
100:20 125:16
126:23
**modernizatio...**
25:9
**modification**
74:22

**moline** 122:11
122:18 123:23
124:19 125:8
**moment** 70:5
85:5,17 115:22
120:11
**moments**
108:15
**montgomery**
3:6
**months** 56:6
**morning** 8:24
9:1
**morning's**
128:17
**morphology**
93:14
**mothers** 114:4
**motions** 43:21
43:25
**motors** 113:7
**mouth** 49:6
**move** 13:8
**moved** 11:12
**mparfitt** 3:13
**multiple** 13:11

**n**

**n** 3:1 4:1 8:1
**name** 85:24
131:2 132:15
**narrow** 29:24
**nature** 10:14
114:2,5
**ncra** 135:20

**nearly** 46:3
100:7
**necessarily**
2:20 54:16
**necessary**
47:21 99:23
**need** 14:24
18:18 19:18
21:17 46:24
51:19,24 56:23
57:18 65:3
71:14 91:5
105:11,18
109:25 130:12
**needed** 22:5
**needs** 12:3
38:19
**negative** 70:23
94:16 121:24
124:21
**neither** 135:8
**nevada** 135:22
**never** 101:7
**new** 1:1 3:14,20
3:20 6:4 8:15
32:7,12 35:24
36:4 53:15 88:3
112:9 133:1
135:1
**newest** 53:15
**newly** 49:16
76:17
**newman** 6:10
23:7 26:18
36:18 37:11,15
41:9,15,24,25

42:12,15,16
56:4,8,14
**newman's** 38:3
38:25 39:18
40:5 42:19 43:2
43:5,7
**news** 17:20
**night** 34:20
**non** 6:16 53:22
93:14
**nonpublic**
118:21
**nonsample**
74:5
**nora** 34:23 36:4
**normal** 103:12
119:18
**north** 3:16
**notably** 27:25
**notary** 132:24
**note** 2:13,13
46:14,17 99:6
**noted** 46:5
64:11 104:11
109:3 112:17
123:25 132:3
**notedly** 22:14
**notes** 133:21
**notice** 113:11
**noticed** 24:12
**noting** 100:4
**november** 17:1
18:1 19:7 36:19
53:25 54:12,15
54:16 55:22
56:3 58:1 61:12

[november - opinion]                                                Page 23

61:19 68:12
78:15 112:13
**number**  28:6
56:6 60:17 68:9
73:24 85:24
86:2 92:25
102:11,19
103:25 106:21
**numbered**  2:5
**numbers**  74:23

o

**o**  8:1
**o'dell**  127:15
**oath**  132:12
**object**  27:13
39:21 40:7
41:16 43:17
47:18 48:16
50:6 59:1,11,23
60:14 62:1 64:1
65:6 66:5 70:14
71:8,17 74:14
76:25 77:6 78:2
84:8 87:23
88:13 89:24
91:3 92:7 98:6
99:15 101:17
104:5 107:23
108:10 111:18
112:15 114:21
115:11 116:22
117:9
**objection**  29:10
30:5 51:2 75:22
80:20 99:4

104:11 108:24
109:13,14
110:3,4 111:19
118:2
**objection's**
112:17
**objections**  52:8
52:10,12 69:7
69:11 80:24
81:2,3,5,7
82:14
**objective**  94:24
**obligation**
58:23 66:13
70:10 98:15
**obligations**
40:10 41:20
49:15 50:12,14
65:15 66:7 70:8
**observed**
119:23
**obtain**  87:9
**obvious**  106:11
**obviously**  17:18
39:3
**occasional**
17:19
**occasionally**
17:23 34:4
**occupational**
64:15 122:13
**october**  15:22
17:1,11 18:1
**odds**  46:4 100:8
**offended**
113:25

**offer**  37:17
98:18
**offered**  13:10
**offering**  37:16
48:14 58:11
68:24 115:4
**office**  6:2 25:25
32:10 34:1,3
105:18 132:19
**officer**  133:25
134:17
**officials**  90:12
**oh**  17:12 19:21
19:21 26:3 33:5
62:25 69:2 70:7
75:2 110:19
115:24 121:5,9
**okay**  8:16 9:7
9:13,21 10:4
15:2,19 16:15
19:5,5,11 20:3
21:4,16,20,22
23:9 27:20
28:24 31:7 32:4
32:25 33:6 37:4
37:14 44:15
45:1,18,25
46:22 50:9 52:1
55:9,25 57:6,25
58:8 59:21
63:13 67:13
68:1 69:15,16
69:25 71:1,11
72:1 73:17
76:22 77:3,13
78:18 79:20

80:22 81:24
82:17 83:11,12
84:4,11 85:14
86:4,16 88:18
88:23 90:16,22
91:15 92:14,22
93:6,9 95:19
99:20,25
100:11 101:1
102:18,23
103:14,22
104:7,11
106:10,24
108:19 109:1,9
109:16,20
110:22 112:16
114:25 115:18
119:8,16,17
120:5,9,12,14
120:25 121:9
123:13,23
127:11
**old**  38:20 62:2
**once**  20:4
**ongoing**  125:15
**online**  87:15
**open**  113:13
**operate**  20:17
**operating**
105:20
**opinion**  20:22
39:19 41:6
74:25 83:10
92:10 100:23
111:14 114:12
117:3,25

[opinion - passed]                                                    Page 24

124:24
**opinions**  6:13
  30:3,11 32:20
  33:18 34:8 35:6
  35:22 37:15,17
  38:4,9,24 39:2
  44:19 45:6
  47:15,24 48:14
  48:17,25 58:11
  59:9 60:13
  66:16 68:25
  75:24 79:18
  80:13 91:19
  92:3,22 96:12
  97:24 98:19
  110:11 115:4
  126:9,12
  128:18,21
**opportunities**
  34:3
**opportunity**
  13:10,17,19
**opposed**  72:5
  98:9
**optical**  93:25
  94:17
**oral**  134:1
**order**  6:24
  49:21 52:9
  116:17 129:13
  129:15,19,25
**ore**  109:5
**organs**  123:20
**origin**  26:11
**original**  20:15
  24:13 33:22

44:12 59:25
87:24 112:25
113:1 115:15
117:13 118:22
134:3
**outcome**
  135:12
**outside**  36:11
  61:2,23 63:23
**ovarian**  96:24
**overall**  58:21
  72:23
**overspeaking**
  2:15
**overtalk**  18:8
  37:4
**overview**  11:7
  41:13
**own**  23:14 24:8
  25:3 27:6 35:24
  57:23 65:8

**p**

**p**  3:1,1 8:1
**p.c.**  3:5 134:22
**p.m.**  2:6 128:10
  128:11,13
  130:19
**page**  4:2 5:2,7,9
  9:19 11:13
  19:15 32:5
  34:20 39:16
  45:22 53:17
  57:22 75:5 87:7
  89:2 91:18 98:3
  103:22 121:17

121:18,18
131:4 134:14
**pages**  5:5,12,15
  5:19,22 6:4,8
  6:11,14,18,21
  7:3 39:20 82:3
**paid**  16:12
  17:12
**painful**  83:10
**paper**  6:12 45:2
  45:6,13 46:5
  47:14,17,20
  48:9,13 50:23
  86:20 89:20
  90:20 91:16
  93:22 95:14
  96:2 98:2,3,25
  99:11 100:4
  101:14 103:5
  103:10 115:18
  116:11,15
  121:18
**par**  102:14
**paragraph**
  20:12 39:25
  40:24 45:22,25
  75:5 76:14,20
  82:12 96:1
  100:2,3,5
  101:10,24
  103:20 107:3
  111:22 117:12
  117:19 123:14
**parfitt**  3:10 8:9
  8:9 121:14
  134:24

**parkway**
  135:21
**parlance**
  103:12
**part**  39:7 48:5
  49:7 77:19 83:5
  83:6 114:3
  124:3,5 125:18
  127:16
**participated**
  127:11,12
**participating**
  90:13
**particles**  7:2
  91:22 93:14
  94:9 119:22
**particular**
  41:24 43:7,16
  64:4 68:15
  70:22 90:10
**particularly**
  21:14 46:16
  50:14 98:15
  125:4
**parties**  3:2
  10:17,23,24
  11:1 96:20
  97:12 134:6,19
  135:9
**partnership**
  11:24
**parts**  87:4,5
**party**  134:9
**passage**  27:24
**passed**  26:9

**passing** 102:13
108:13
**past** 16:9 44:24
105:14
**patel** 122:11
123:24
**patent** 113:12
**patents** 113:8
**patients** 12:2
124:3,5,5,9
**pause** 120:11
**pay** 29:19
**pdf** 120:12
121:18
**peculiar** 118:3
**peculiarity**
46:2 100:5
**peer** 65:2 76:24
123:3
**pending** 82:1,9
**pennsylvania**
3:16
**people** 19:17
52:23 57:7
90:14
**peoples** 60:24
**perceive** 64:24
**percent** 73:4,5
73:18 74:9,10
74:10
**percentage**
72:23 73:18
**percolated**
29:14
**perfect** 42:1

**period** 16:7
17:14 18:1
48:24 96:22
112:13 118:14
**permitted**
92:21
**person** 132:15
**personal** 6:7
12:7,8 22:13
34:24 90:13
**personally**
132:11
**perspective**
71:12
**ph.d.** 6:10
36:18
**philadelphia**
3:16
**physicians**
10:25
**pick** 18:9
**pickups** 18:22
**pinpoint** 56:1
**place** 51:13
**plaintiff** 3:9,14
8:10 134:23
135:1
**plaintiffs** 3:4
8:8 9:16 15:21
22:11,19 27:2
42:20 43:6,14
44:5,17 52:5
56:20 65:25
80:7,9,15 102:4
102:7,21
114:18 115:7

126:11 127:19
134:21
**planning** 6:3
32:11 47:5
**plate** 98:11
**platy** 93:14
**play** 24:4
**played** 24:6
**please** 2:13 8:3
19:20 41:13
62:22 78:9
107:12 112:1
**plenty** 97:13
113:24
**plm** 61:2,24
62:9 63:16,24
67:7 68:7,20
71:14 74:8,12
75:12 84:5
93:11 94:16
95:16 98:4 99:2
99:14 116:19
117:5,23
**point** 17:9
42:17 43:4 49:3
57:20 60:16
65:23 70:18
97:10,15
100:12 108:20
111:6 114:7,15
125:21,25
**pointed** 24:14
**pointing** 90:1
**points** 61:18
**polarized** 76:9
94:1

**policy** 13:13
17:15 30:13
105:20
**poor** 100:17
**pose** 94:9
**poses** 118:14
**position** 43:16
65:2 79:21 80:7
80:9,16 81:20
113:22
**positions** 113:4
**positive** 74:9,18
94:2
**positives** 73:18
**possible** 77:21
118:24
**possibly** 60:2
79:6
**post** 118:6,9
**potential** 65:3
124:1,20
**potentially**
100:19
**powder** 1:3
6:16 20:20,22
29:14 37:20
40:17 41:21
49:18 50:18,24
53:23 58:13,19
65:12 71:24
73:15 74:17
77:23 113:12
113:13 114:6
122:5,25 133:3
**powders**
119:23,24

**practice** 18:16
114:12
**practices** 1:4
20:16 23:3
51:12 72:7
73:12 113:5
133:4
**practised**
105:22
**pre** 118:9
**preceded** 72:6
117:18
**preferred**
94:23
**preliminary**
28:22 30:11
33:23
**premoderniza...**
36:9
**preparation**
12:24 13:2 16:3
16:15,25 17:17
24:10 27:3 30:3
36:24 44:9 47:8
59:24 64:2,16
75:9,12 77:16
77:18 127:3,12
127:16
**preparing** 2:16
17:22 22:22
24:19 29:5
43:13 48:1
56:15 83:23
101:12 112:25
114:1 118:21
126:7,9,15,16

**presence** 23:1
28:9 29:2 58:12
65:11 66:10
93:12 94:8,15
108:22 111:2
111:13 115:9
116:17 117:4
117:23,24
**present** 64:8
94:24 95:5
**presented** 84:5
97:19 112:24
**preserve** 42:9
**president**
104:22
**press** 7:1
**pretty** 28:3
34:5,16 51:9
**prevalence**
72:23
**prevalent** 73:8
**previous** 62:8
66:22 79:10,11
128:19
**previously** 36:5
39:4 54:7 62:4
67:21 68:10
91:12 112:8,15
**primarily** 40:4
**prior** 22:6 37:2
62:12 63:11
71:3 74:10 83:3
**private** 10:8,10
10:17,23,24
11:1 94:12

**probably** 34:18
52:20 126:25
127:9
**problem** 63:20
70:4 82:7 85:4
**procedure** 2:9
105:20
**proceed** 69:8
79:18 80:6,23
**proceeding**
135:10
**proceedings**
133:18
**process** 2:16
22:5,7 34:9
90:1 96:14,15
119:18
**processes** 28:4
118:15 125:3
**produce** 38:19
**produced** 2:2
61:17
**producing**
47:23
**product** 6:17
10:18 11:3,11
12:10 20:22
42:5 53:23
108:17 114:3
**products** 1:3,4
6:7,13 20:20,23
29:14 34:24
37:20 40:17
45:7,9 46:8
48:24 50:18
58:19 64:14

65:13 71:24
73:15 83:18
87:12 91:22
94:16,22
100:18 105:3
113:13 114:6
119:3 133:3,4
**professionals**
12:1
**professor** 14:9
17:15 23:7 79:2
**program** 40:25
**progress** 96:21
**progression**
21:11
**prohibition**
64:13
**prompted** 13:8
**proper** 29:3,19
**properly** 49:23
**proposal** 28:17
28:18,22
**proposed** 29:1
90:3 97:9,14
**proposing**
64:13
**prospects** 42:5
**protected** 6:24
**protective** 6:24
**protocol** 75:10
75:13 105:19
**protocols** 94:6
**protracted**
41:18
**proved** 132:12

**[provide - reading]**                                                    Page 27

**provide**  24:7
   64:19 66:17
**provided**  9:15
   22:22 24:7,15
   25:17 30:18,20
   36:4 56:20
   78:15 102:4
   123:11 128:22
**provisionally**
   11:22
**provisions**  2:9
**public**  6:20
   11:15 25:13
   28:19 40:15
   41:21 83:16
   84:12 87:9
   89:17 97:13
   113:6,16,19
   118:21 132:24
**publication**
   11:14 28:16
   65:2
**publicities**
   111:16 117:7
**publicity**  101:4
**publicly**  22:13
   28:12 102:5,16
**published**
   76:24 94:6
   122:21
**publishes**  97:9
**pull**  9:9 81:14
   83:12
**pulled**  26:3
**pulling**  57:7

**purity**  114:5
**purpose**  85:10
   85:13 87:8
   88:12 116:24
**purposes**  74:6
   110:25 116:15
   129:6 132:17
**pursuant**  2:8
   134:16
**push**  57:12
**put**  18:24 19:3
   19:20 21:17
   24:13 32:22
   49:5 51:9 56:23
   57:8,14 64:24
   84:24 85:25
   91:11,13 95:22
   99:24 103:22
   119:8 124:17
**puts**  76:6
**putting**  24:5
   119:7

**q**

**qualitative**
   49:12,24
**quality**  2:14
**quantitative**
   49:13
**question**  12:23
   23:12,21 29:23
   29:25 30:7
   33:15 38:7 39:1
   39:7,13,17
   43:23 58:6 60:6
   62:14 63:5,9,18

63:22 68:2,3,15
69:21 71:20
74:20,23 79:25
80:1,3,19 81:10
81:12 82:1,9,20
83:2 90:18,22
91:8 96:16
97:16 104:16
107:8,8,12,14
107:18 108:4
111:1,21,23
112:1,6,19
116:15,24
118:4,5,8 126:8
**questionable**
   51:12
**questioned**
   14:25 62:3,3
   65:10 80:11
**questioning**
   50:22
**questions**  14:21
   14:24 17:19
   18:7 20:14
   21:25 46:25
   47:10 56:25
   67:10,11 69:14
   72:20 79:5
   80:18,19 84:21
   87:4 90:9
   109:14 110:5
   118:14,16
   127:18,20
   129:1,3,9
**quite**  27:21,22
   48:25 90:8

118:23
**quotation**  2:19
**quote**  2:20
**quotes**  47:6
**quoting**  117:12

**r**

**r**  3:1 8:1
**r.n.**  104:22
**raised**  28:14
   43:7
**rate**  15:17 16:9
**rather**  57:18
   58:16 104:21
**ray**  93:24
**rdr**  2:7 3:24
   133:16 135:19
**read**  16:1,5
   25:14,25 33:25
   34:17 41:24
   43:1,20 46:2,9
   47:7 48:10,11
   60:17,21 64:4,5
   66:15 75:17
   76:15 82:12
   83:4 87:17
   88:14 89:14
   90:18 91:25
   92:9 105:24
   106:22 122:23
   125:11,19
   132:1
**reading**  22:9
   35:24 42:15
   65:23 74:15
   76:15 82:10

**[reading - regulation]**                                                    Page 28

119:12 126:21

**reads**  94:3
  95:10 124:13

**ready**  52:21

**realize**  96:6

**really**  66:23
  69:6 71:5,19
  73:11 87:3
  119:1 125:17
  127:15,16

**reask**  33:15

**reason**  60:6
  64:16 88:16
  131:4

**reasonable**
  115:5

**reasons**  96:17
  134:14

**reassure**
  113:19

**reassuring**
  73:24 114:4

**recall**  11:10
  12:14,15 14:25
  17:13 23:17
  24:21 25:8
  26:18,21,25
  30:8 36:3 45:18
  58:17 59:24
  64:18 76:15
  84:4,9 85:12
  89:25 91:9
  104:14,17
  115:16

**receipt**  134:12

**receive**  15:12
  23:15 37:10
  55:1

**received**  15:10
  15:20 23:20,23
  24:2,18 31:9,24
  34:20 37:1 39:5
  44:20 54:2,7
  56:2 58:8 80:15
  102:20 115:7
  115:13,14

**receiving**  26:21
  58:2 65:23

**recent**  11:6
  37:22 64:11
  82:22 83:5,7
  90:19 94:12
  97:1,1

**recently**  54:5
  60:22 89:12

**recess**  53:9
  86:11 128:10

**recognize**
  105:11

**recognized**
  94:6

**recognizing**
  49:19 100:15

**recollection**
  59:3

**recommend**
  90:24 93:10,10

**recommendat...**
  90:23

**recommended**
  47:16 92:3

**recommending**
  116:16 117:4
  117:22

**recommends**
  98:3

**reconsideration**
  46:3 100:6

**record**  2:10 8:4
  9:3 13:24 52:3
  53:8,12 63:14
  86:10,14 91:18
  92:20 95:23
  100:17 128:9
  128:13 134:1
  134:19

**record's**  52:7

**records**  106:23

**recover**  120:13

**reengage**  97:16

**reference**  23:24
  24:5 92:4 93:7

**referenced**
  26:17

**referred**  108:13

**referring**  49:11
  54:2 63:1 76:9
  84:20 112:12
  112:13

**refers**  100:3

**reflect**  2:20
  13:24 48:20
  63:15

**reflected**  17:5
  17:10 26:23
  44:7 61:3 62:12
  63:25 66:2 67:7

68:8 79:4,8
  105:16 107:5
  107:22

**reflecting**  59:12
  78:14

**reflection**  36:16

**reflects**  16:15
  38:9 39:1,2
  61:16

**reform**  29:16
  48:11 51:8

**reformulation**
  113:14

**refutes**  98:19

**regard**  105:6

**regarding**  23:3
  48:19 50:14
  58:12 65:10
  98:19 109:14
  110:5 113:20

**regardless**
  29:17 33:11
  70:11

**regime**  96:13

**registration**
  135:21

**regular**  129:21
  130:1

**regulated**  96:20

**regulation**  6:6
  6:8 14:14 22:15
  25:7 27:7 29:2
  30:16 34:23,25
  36:10 49:14,20
  64:13 90:5 97:5
  97:10 98:15

[regulation - report]                                                    Page 29

| | | | |
|---|---|---|---|
| 100:12,20 | **reliable** 70:12 | **repeat** 90:11 | 59:25 60:1 61:3 |
| 118:15 | 77:4 88:11 | 109:25 110:3 | 61:14,25 62:11 |
| **regulations** | 91:20 | **repeatedly** 46:5 | 63:25 64:2,3,9 |
| 100:21 | **reliance** 23:24 | **rephrase** 126:8 | 64:17 65:24 |
| **regulatory** | 26:24 62:12 | **report** 5:11,13 | 66:3,21,22 67:4 |
| 14:17,18 17:22 | 103:1 104:10 | 5:17,20 6:2,10 | 67:8,22 68:8,11 |
| 20:16 28:15 | **reliant** 96:14 | 6:16 14:19 17:1 | 68:21 70:20,21 |
| 29:14 46:15,16 | **relied** 35:23 | 18:4,6,7,24 | 70:25 71:12,21 |
| 46:19,19 48:6 | 36:13 100:14 | 19:6,14 20:14 | 72:4,5 73:20,23 |
| 49:20 50:12 | **relies** 93:23 | 20:15 21:10 | 74:4 75:4,6,21 |
| 51:8 70:8 96:12 | **rely** 33:17 | 22:2,2,6,23,25 | 76:7 77:14 78:3 |
| 96:13 97:4 | 34:13 35:20 | 23:2,5,7,16,25 | 78:6,8,14 79:4 |
| 98:15,16,19,20 | 38:3 39:3 40:1 | 24:5,9,17,20,24 | 79:7 80:14 83:6 |
| 113:3 118:14 | 59:2,12,14 | 25:4,25 26:18 | 83:10,11,24 |
| 118:15 | 60:23,23 | 27:3 29:5 30:4 | 84:2 87:24 88:3 |
| **related** 87:10 | 125:12,19 | 30:11 31:10 | 88:7 90:19,23 |
| 91:19 92:22 | **relying** 32:19 | 32:10,19,20 | 91:16 93:12,18 |
| 135:9 | 36:6 38:24 | 33:17,19 34:14 | 95:13,18,22,25 |
| **relating** 88:1 | 39:18 40:5 59:9 | 36:15,18,25 | 97:4 99:12,18 |
| **relationship** | 59:16,17 60:10 | 37:2,10,15,25 | 99:25,25 |
| 42:9,11 | 62:9,11 67:8 | 38:3,5,9,14,14 | 101:13,20,23 |
| **relative** 24:9 | **remain** 13:14 | 38:18,23,25 | 101:24 103:1,4 |
| **released** 28:23 | **remained** 21:12 | 39:1,17,18,25 | 104:9 106:9 |
| 28:24 45:3 | **remember** | 40:2,3,5,8 41:9 | 107:9 108:12 |
| **relevance** 23:4 | 14:24 24:22,22 | 41:24,25 42:12 | 108:14 110:10 |
| 106:8 110:9 | 24:23 28:17 | 42:15,19 43:2,5 | 110:11,25 |
| 117:10 | 64:12 66:6 | 43:8,10,13 44:3 | 112:9,21 114:1 |
| **relevant** 25:10 | 76:11,13 81:25 | 44:8,10,12,16 | 115:12,14,15 |
| 37:23 40:9 | 84:12,13 126:3 | 44:19 45:2,19 | 115:19 117:11 |
| 56:15 58:21 | **remote** 1:8 2:1 | 47:8 48:1 49:1 | 117:13 118:22 |
| 59:18 60:4,22 | 130:18 133:8 | 50:11,19 53:15 | 120:10,14,17 |
| 72:13 73:11 | **remotely** 2:3,7 | 53:15,22 54:1,4 | 120:18 121:4,8 |
| 102:25 | 3:2 133:19,24 | 54:8,9,13,14 | 123:1,9,13 |
| **reliability** | **renew** 98:18 | 55:6,22 56:4,5 | 124:17,23,25 |
| 74:12 | **repealing** 100:4 | 56:8,17 58:1,9 | 125:13,14,17 |
| | | 58:10,25 59:2 | 125:18 126:4,5 |

[report - right]                                                              Page 30

126:10,21
128:22,23
**report's** 125:1
**reported** 2:7
71:15 133:18
**reporter** 3:23
8:2,16 19:16
20:1,3,8 21:16
21:20 51:21,25
53:7,11 82:1,5
82:8,17 86:9,13
109:17 110:2,8
110:18,20
128:8,12 129:8
129:14,20,24
130:4,8,13
**reporter's** 2:13
4:14 133:14
**reporting** 70:9
71:6,19 73:10
91:21
**reports** 25:21
56:14 60:17
64:6 68:9 71:13
79:10 113:1
**represent** 23:22
**representation**
89:16
**representations**
40:13 50:25
**representing**
8:15
**reputable**
76:17
**reputation**
40:12

**request** 123:11
**requested**
123:2 134:9
**requesters** 6:2
32:11 34:4
**requesting**
26:21
**require** 66:8,8
**required** 14:13
15:10 109:4
126:20
**requirement**
105:5,7,14
**requirements**
14:22 15:9 41:1
**requires** 93:25
100:20
**reread** 47:7
124:23
**rereading**
126:22
**research** 6:6
13:15 16:2 25:3
25:13,21 27:6
89:9 99:6
101:14 119:20
**reserve** 52:8
**residing** 133:17
**resistance** 41:2
41:18
**resistant**
113:10
**respect** 19:13
44:15 47:14
70:20 78:24
89:16 96:24

103:17 113:5
114:9
**respond** 62:6
107:13
**responding**
44:18 65:9
**response** 30:6
**responsibly**
114:9,15
**resulted** 88:20
**results** 54:12
63:16
**retain** 6:17
53:24
**retained** 30:24
**retaining** 46:2
100:6
**returned**
134:11,13
**returning**
110:24
**revealed** 94:14
**review** 18:2
22:11,13,21
29:3 36:8 37:6
37:7 42:20,22
44:12 46:24
51:5 56:24 57:1
65:16 89:19
99:16 101:18
103:7,10,24
111:7 114:23
124:6,25
**reviewed** 12:23
15:9 24:11
26:14,18 32:8

35:5 36:23
43:10 65:2
76:24 88:6
108:13 112:24
113:23 115:3,6
122:4 123:3,7
123:15
**reviewing**
35:25 42:19
43:5 60:12 75:9
112:25
**revised** 20:15
37:2 108:14
**revising** 64:3
**revision** 125:15
**rhythms** 18:16
18:17
**richard** 3:15
8:12,14 19:22
21:2 52:3 55:11
116:3 135:2
**right** 10:6
12:17,19 13:3,7
14:20 15:19
16:18 17:25
20:2,8 21:7,24
22:4,17 24:1,4
29:24 31:1
33:10 34:18
36:17 37:7,24
44:22,24 46:11
47:12 51:15
52:8,22 53:5,14
53:20 54:6,24
55:15,16 56:9
56:12,16 58:8

**[right - sections]**                                               Page 31

65:21 70:7 72:9
73:21 75:3
76:10 78:25
79:14 82:25
83:1 84:15
85:12 86:9
87:19 88:10
89:1 91:11
93:22 95:10,12
95:13 99:14,14
101:12,22
103:7,11,17
104:19 110:12
116:6 119:4,7,8
120:9 123:21
124:14,16
128:8
**rigler** 126:2
**ring** 23:19
**risk** 48:18,19
66:9,11,12 71:4
73:14
**risks** 29:13
40:16 41:21,22
48:21 49:22
113:5 119:2
122:25
**rls** 1:4 133:4
**robust** 40:25
**role** 24:4,6,6
**room** 9:1,4
19:18 87:15
**rough** 129:10
129:21 130:1
**roughly** 56:9
72:12

**rsa** 2:7 3:24
133:16 135:19
**rule** 5:11,13,17
5:20
**rules** 2:9

**s**

**s** 3:1 8:1
**safe** 49:23
**safety** 6:3 12:9
32:11 100:15
**sage** 1:9 2:2 4:6
5:4,11,14,17,21
8:18 19:6 62:9
63:22 67:8
68:23 69:15
76:5 78:16,16
80:12,15,18
104:13 110:6
128:16 131:2
132:1,6,11
133:9,24
**sage's** 67:22
79:11
**sale** 20:20
**sales** 1:3 133:3
**sample** 49:19
66:10 74:1 75:9
75:11 77:16,18
109:3
**sampled** 119:25
**samples** 6:18
53:24 58:13,15
72:24 73:4,5,8
74:17 75:7,14
94:15 109:6,10

**sampling** 76:12
**sanchez** 119:14
119:20 120:23
**saw** 54:17
**saying** 50:5
57:4 67:15
76:16 82:23
99:11
**says** 16:17
20:21 83:6 87:8
94:19 95:11
105:2 122:3
**sayta's** 80:10
**scanning** 98:9
**schoeve** 2:7
3:24 133:16
135:19
**scholarly** 36:12
**school** 13:19
14:16,22 75:10
75:15 76:23
77:8,15 78:22
82:10,22
**science** 46:5,18
51:6,14 59:15
77:10 100:8,18
125:4,14
**scientific** 6:12
29:12 40:22
45:6 46:16
48:18,18,23
59:13,22 60:5
70:12 76:7
87:10 91:19
115:5 119:8
122:24 125:7

125:11
**scientifically**
59:18
**scope** 78:3 79:7
81:22 115:12
**screen** 18:24
19:3,19 31:4
32:23 33:10
34:23 53:20
55:5 57:8,15
72:11 74:17
91:14 119:5
**screening** 93:24
94:2
**scroll** 32:4
92:14 93:5,5
**scroller** 57:22
**scrolling** 9:19
9:21,23,25 72:8
75:3
**seal** 132:19
**search** 33:20
60:2 88:24
**searches** 28:20
**searching** 55:5
**second** 5:17
22:2 23:14
31:17 55:19
75:5 88:8,25
125:17
**secrets** 119:5
**section** 25:9
40:4,23 41:2
82:10 124:16
**sections** 38:23
40:9,20 41:4

[sections - sorry]                                                     Page 32

127:13
**sector** 49:23
**see** 9:13 25:8
    49:16 55:7,21
    55:23 69:20
    71:12 72:10
    74:7 75:5 77:18
    77:24 81:14
    82:13 83:15,20
    85:3 87:7 89:2
    89:5 92:4,15,23
    93:6 94:10 97:7
    97:17 104:15
    104:16,19,24
    106:15,18
    109:1,7 119:5
    120:25 121:22
    122:1,8,15
    124:23
**seeing** 17:19
    95:2 102:9
    107:16
**seem** 46:20
    72:20 74:1
**seemed** 24:12
    60:21 72:13
    73:2 113:13
**seen** 23:2
    103:24 104:13
    107:17 109:15
    110:7 114:11
    118:13,20
    119:11 120:6
**self** 46:19 49:20
    50:12 70:8
    96:13 98:16

**send** 130:4
**sense** 11:4 38:2
    40:1 56:2 58:4
    70:8 71:2
**sensitivity** 94:7
**sent** 18:14
    24:10 29:1
**sentence** 46:12
    101:9 124:8
**separately**
    22:18 25:24
**separation** 75:8
    77:15 82:12
    84:6 89:10,19
    89:22 90:25
    92:5 93:8
**september**
    12:17,21 16:4,8
    17:9 24:19
    26:16 27:8
    30:21,23 61:13
    78:4 79:8
    125:22 126:1
**seriously** 30:12
**serpentine**
    72:17 106:16
**served** 134:5
**service** 6:6 12:1
    25:21
**services** 135:20
**set** 99:22
**several** 17:13
    118:19 122:23
    123:25 126:22
**share** 119:4

**shared** 53:20
**shift** 73:12
**shocked** 90:5
**shoot** 53:3
**short** 36:2
    120:11
**shortcomings**
    94:7,17
**shorthand** 2:8
**shortly** 56:7
**show** 15:19
    55:2,2,5 65:17
    86:25 87:1 91:9
    106:20 114:23
**showed** 78:7
    103:20 124:25
**showing** 93:3
**shown** 83:5
    98:7 107:24
    114:25 134:6
**shows** 34:22
**sic** 120:4
**side** 18:22
    62:16 98:13
**sign** 13:25
**signature** 4:11
    130:5 131:1
    132:2 134:8,11
    134:14 135:18
**significant**
    73:25
**significantly**
    73:2
**similar** 44:13
    44:14 47:22
    94:8

**simply** 70:23
**simultaneously**
    39:11 52:25
    57:13 61:10
    69:5 78:10,20
    79:23 92:18
    95:3 109:22
    110:15 112:3
    121:6
**single** 39:19,25
    117:19
**sip** 31:3
**sir** 8:14 45:14
    82:5 89:5
    129:14,20
    130:13
**sit** 26:20 39:2
    88:10 107:19
**situation**
    100:16
**skimmed** 13:1
    30:7
**skipping** 55:13
**slightly** 29:24
**social** 12:1
**solely** 105:7
**somebody** 65:4
    104:25
**soon** 52:21
**sophisticated**
    60:21
**sorry** 14:2 20:3
    20:9 21:16 23:9
    27:19 39:10
    49:5 77:7 95:1
    95:5,7 101:23

**[sorry - studies]**                                                    Page 33

103:8 110:16
115:24 116:2,7
116:8 120:21
121:5,10 124:7
**sort**   12:4 28:6
43:24 73:25
74:5 86:17
90:12
**sorted**   85:22
**sorts**   81:15
**sound**   12:17
13:18 23:25
**sounds**   53:6
55:14 116:6
**source**   36:12
73:3 102:16
**sourced**   72:5,6
72:12,15,25
73:1 74:4,18
77:22
**sources**   22:13
59:16 63:11
102:6
**sourcing**   58:18
73:13
**south**   3:11
**spalding**   3:19
135:5
**speak**   89:13
116:12
**speaking**   39:11
52:25 57:13
61:10 69:5,7,11
76:3 78:10,20
79:23 81:1,3,4
81:6 92:18 95:3

109:22 110:15
112:3 121:6
**specific**   12:14
14:24 27:25
34:14 38:4 41:9
41:14 47:6,24
56:1,24 92:2
95:18 99:17
**specifically**
37:13 40:14
45:25 50:1 67:6
77:17,21 122:3
**specification**
105:6,9
**specifications**
100:13
**specificity**   94:7
**specify**   25:11
**spectroscopy**
93:25
**speech**   78:12
**spend**   65:7 87:2
126:14
**spent**   17:6 26:4
**spoken**   42:16
**spot**   77:9
**staffing**   34:11
**stages**   11:22
**stamped**   6:23
**stand**   51:11
66:14 85:17
112:22,22
114:12 117:19
128:21
**standard**   28:22
33:24 105:10

105:20 107:11
108:8
**standardized**
27:25 28:9,19
29:1 48:5 88:22
**standards**
20:16,18 34:9
46:19 48:20
105:16
**standing**
129:13,15,19
129:25
**stands**   76:11
**starch**   113:12
**start**   9:7
**started**   58:18
82:15
**starting**   55:10
**starts**   89:7
123:14
**stasis**   96:13
97:1,1 98:20,20
118:14
**state**   3:14 8:15
14:18 46:2 51:6
52:4,12 64:20
100:9,11
106:14 123:25
132:7,25
133:17 135:1
**stated**   2:10 18:5
18:7 40:13 59:3
**statement**   60:3
66:14 74:16
76:6 79:16
88:14 89:8

112:22
**statements**
36:15 59:15
64:6
**states**   1:1 6:1
32:9 95:14 99:3
99:12,14 133:1
**station**   14:1
**status**   12:5,6
28:8
**statutory**   26:11
**steering**   3:9
8:10 134:23
**stenographic**
3:23 4:13
133:13,21
**step**   87:13
88:19
**steps**   90:1
**stop**   9:24 10:1,7
**store**   97:17,22
**story**   48:6
103:16
**straightforward**
108:4
**street**   3:6,11,16
**strength**   125:1
**strike**   70:24
**strong**   46:20
**struck**   129:16
129:18
**structures**
98:11
**struggle**   119:1
**studies**   121:22
124:2,20

**[study - talcum]**                                                     Page 34

| | | | |
|---|---|---|---|
| **study**  122:3 | **suggesting**  70:9 | 102:10 103:14 | **talc**  6:14,17 7:2 |
| 123:15 124:1,9 | 90:16 124:20 | 126:3,24 | 28:1,10 29:2 |
| **stuff**  114:25 | **suggestion**  71:4 | 127:25 128:3,6 | 45:8 47:23 |
| **styled**  2:5 | 106:5 | **surpass**  105:15 | 53:24 58:19 |
| **subject**  6:24 | **suggestive**  66:9 | **surpassing** | 65:12 71:16 |
| 60:17 127:17 | 66:11 | 107:4 | 72:5,6,12,15,25 |
| **subjective** | **suite**  3:11 | **surrounding** | 73:1,3,7 74:4,7 |
| 66:13 | 135:21 | 66:12 | 74:18 75:7,14 |
| **submission** | **sum**  101:2 | **survey**  64:17 | 77:16 83:17,18 |
| 24:24 37:2 | **summary** | **suspect**  11:5 | 87:11,12 91:23 |
| **submitted** | 117:18 | **swear**  8:5 | 91:23 93:13 |
| 11:14 38:1 | **supplement** | **sweet**  77:9 | 96:22 100:14 |
| 61:14 78:3 | 18:20 | **sworn**  2:3 8:19 | 100:18 105:6 |
| **subscribed** | **supplemental** | 124:4 133:25 | 105:10,23 |
| 132:15 135:14 | 53:21 | 135:14 | 108:22 109:9 |
| **subsequent** | **support**  39:19 | **system**  10:20 | 111:2,13 |
| 25:15 36:1 37:1 | 40:5 | 10:25 | 114:19 115:9 |
| 97:4 | **supported** | **systematic**  51:5 | 116:18 117:5 |
| **subsequently** | 48:21 | 103:6,10 | 117:24,25 |
| 29:18 39:5 | **supporter** | | 119:22 121:24 |
| 113:14 | 113:8 | **t** | 122:4,12,21 |
| **substances** | **suppose**  79:19 | **t**  3:7,12,17,21 | 123:16 124:12 |
| 47:22 | **supposed**  38:11 | 135:22 | 124:21 |
| **substantiation** | 58:4 | **table**  79:25 | **talcum**  1:3 6:16 |
| 100:15 | **supposedly** | **take**  22:17 | 20:20,22 23:1 |
| **successfully** | 91:1 | 46:14,17 47:9 | 29:13 37:20 |
| 54:22 | **sure**  9:16 18:9 | 50:20 51:17,18 | 40:17 41:21 |
| **sufficient**  38:7 | 19:21 21:12,19 | 81:20 82:6 | 49:18 50:18,24 |
| 66:15 | 32:24,24 34:17 | 85:20 102:22 | 53:23 58:13,19 |
| **sufficiently** | 35:11 42:25 | 103:23 113:4 | 58:19 65:12 |
| 49:21 | 43:18 47:10 | 125:10 127:23 | 71:23 73:15 |
| **suggest**  83:4 | 52:6,14 54:21 | 130:7 | 74:17 77:23 |
| 121:23 | 57:2 70:6 71:19 | **taken**  2:4 14:10 | 113:12 114:5 |
| **suggested** | 74:3 84:15 85:1 | 53:9 86:11 | 119:24 122:5 |
| 122:4 123:16 | 92:13,17 93:4 | 112:14 128:10 | 122:25 133:3 |
| | 97:11 98:2 | 134:18 135:10 | |

[talk - things]                                                                Page 35

| | | | |
|---|---|---|---|
| **talk**  17:4 34:19 | **technology** | **testimony**  16:2 | **texas**  9:2 13:8,9 |
| 41:8 56:16 | 46:18 113:9 | 30:19 70:13,15 | 13:20 14:4,22 |
| 70:22 93:9 | **tell**  8:19 18:18 | 70:17,18 71:21 | 15:3,5,10 |
| 95:12,20 98:17 | 22:4 27:10 | 83:22 116:12 | 133:17 |
| **talked**  27:5 | 32:18 45:15 | 124:4 128:19 | **text**  25:6 26:4 |
| 43:1 49:7 71:3 | 51:5 58:4 70:19 | 134:1,17 | 35:24 97:18 |
| 93:17 100:24 | 71:20 72:1 77:7 | **testing**  6:13 | 124:9,13 |
| 115:18 | 93:4 | 23:1 28:1,9,19 | **thank**  8:16 |
| **talking**  14:3 | **tem**  93:11 | 29:1 41:2 44:2 | 11:12 24:16 |
| 50:1 56:9 61:12 | 94:14 95:15 | 44:7,16 45:6 | 33:12 35:17 |
| 67:5,6,17,19 | 98:4 108:21 | 46:4 47:15,21 | 38:19 41:12 |
| 69:17,18 70:3,7 | 111:3,5,13 | 49:9 50:3 51:11 | 52:15 57:9 72:9 |
| 81:12 91:4 | 116:18 117:5 | 58:15,25 59:8 | 76:2 82:17 |
| 93:19 95:6,24 | 117:23 | 60:18 61:1,16 | 87:14,15 93:3 |
| 100:2 102:18 | **ten**  52:18 53:2 | 61:23 62:10,13 | 110:8,22 |
| 103:5 107:4 | 53:4 | 63:15 64:4,7,17 | 127:20,22 |
| 120:22 122:1 | **term**  40:11 | 65:10 66:1,25 | 130:3,11,14 |
| 124:19 | 42:5 | 68:7,18,20 69:1 | **thanks**  20:11 |
| **talks**  10:6 41:25 | **terms**  10:20 | 75:24 77:8 78:6 | 38:20 53:4 |
| 77:14,17 93:22 | 13:14 18:7 | 83:17 87:11 | 82:16 86:16 |
| 121:21 | 34:11 72:14,23 | 88:22 90:3,5 | 128:5 |
| **task**  18:3 19:13 | 90:9 103:12 | 91:22 94:12 | **theory**  14:17 |
| **tasks**  27:25 | **test**  54:12 75:20 | 95:18 96:21 | **therefor**  134:15 |
| 59:14 | 94:2 106:15 | 97:9 99:12,17 | **thin**  123:18 |
| **taught**  14:15 | 109:9 111:13 | 100:7,13,18,22 | **thing**  57:17 |
| 78:21,22 | 116:17 | 101:3,15 | 69:18,20 83:3 |
| **teach**  14:13 | **tested**  72:16 | 103:19 105:7 | **things**  11:24 |
| **teaching**  13:15 | 73:4,5 109:2 | 105:13,16 | 23:11 26:10 |
| 14:4,5,8 17:23 | 111:2 114:19 | 106:14 107:5 | 27:5 28:6 33:22 |
| 18:16 29:20 | 115:9 | 107:20,22 | 34:12 42:12 |
| 30:14 | **testified**  8:21 | 108:7,8,21 | 43:1 45:1 54:17 |
| **techniques** | 56:19 68:24 | 111:16 114:10 | 60:20 70:21,24 |
| 93:24 | 75:23 110:6 | 114:10 117:4,6 | 71:3 73:10 |
| **technologies** | 112:7 | 117:23 118:1 | 76:12 88:20 |
| 50:4 | **testifying**  90:14 | **tests**  109:4,5 | 97:2 98:13 |
| | | | 102:20 118:19 |

[things - transcription]                                                    Page 36

| | | | |
|---|---|---|---|
| 120:13 123:1 | 74:14 75:22 | **time**  11:16 | 89:9 100:24 |
| **think**  11:9 | 76:25 77:6 78:1 | 12:16 14:6 15:4 | 107:19 112:11 |
| 12:20,20 18:25 | 79:9,15 81:11 | 16:7 17:5,9,25 | 115:3 130:16 |
| 26:2 52:22 | 84:8,24 85:2,23 | 21:21 23:5 | **today's**  12:24 |
| 55:12,15 58:4 | 86:4,7 87:23 | 24:19 26:4 | 87:9 126:7,15 |
| 63:4,12 66:23 | 88:13 89:24 | 29:17 30:9 | 126:16 127:3 |
| 68:5 74:15 | 91:3 92:7,19 | 40:17 42:17 | **together**  24:5 |
| 81:18 97:15 | 95:21 96:4,9 | 43:4 46:14 47:9 | 51:9 |
| 98:19 106:11 | 98:6 99:4,15 | 48:24 54:22 | **told**  29:16 |
| 108:12 112:2 | 101:17 102:24 | 56:4 57:20 60:4 | **took**  51:10 |
| 125:12 126:17 | 104:4,8,15 | 61:5,18,20 | 80:10 90:6 |
| **thinking**  51:17 | 106:2,7,20,24 | 63:19 65:7,23 | **top**  12:11 |
| **third**  5:21 | 107:23 108:10 | 66:11 67:9 | **topic**  17:16 |
| 31:23 32:5 | 108:24 109:13 | 81:18 84:13 | 43:7 60:22 |
| 34:21 83:14 | 109:20,24 | 87:2 96:19 | 87:14 |
| **thompson**  3:5 | 110:4,9,17,22 | 99:18,22 102:1 | **topics**  11:9 |
| 4:8 8:6,7,12 9:6 | 111:18 112:2 | 107:17 111:20 | 87:10 |
| 19:22 21:2 | 112:20 114:21 | 111:23,24 | **tort**  10:19 |
| 27:13 29:10 | 115:11 116:2,8 | 112:11,13 | 11:11 12:10 |
| 30:5 32:22,25 | 116:22 117:9 | 113:5,14 | **total**  16:9,10 |
| 33:3,5,12 35:9 | 118:2 120:20 | 114:15 115:1 | **totality**  112:23 |
| 35:12,16 39:21 | 120:22,25 | 115:20 123:4 | **touch**  51:25 |
| 40:7 41:16 | 121:5,9 127:14 | 125:21,25 | **towards**  87:22 |
| 43:17 46:23 | 127:23 128:1,4 | 126:14 127:20 | **toxicology** |
| 47:18 48:16 | 128:7,15,25 | 127:21 134:17 | 122:14 |
| 50:6 51:2 52:11 | 129:24 130:2,6 | **times**  126:22 | **trace**  26:11 |
| 52:17,19 53:1,5 | 134:22 | **tissue**  123:19 | **track**  100:17 |
| 56:22 57:3,16 | **thought**  22:11 | **titled**  6:2,6,12 | **train**  70:5 |
| 59:1,11,23 | 29:19 42:4 | 6:16 7:1 11:15 | **transcript**  2:17 |
| 60:14 61:4,11 | 59:17 60:11,11 | **tm**  106:17,17 | 6:20 12:24 30:8 |
| 62:1,14,18,23 | 62:25 70:5,20 | 109:5,10 | 84:20 86:18,23 |
| 63:4 64:1 65:6 | 82:21 83:1 | **today**  8:25 13:2 | 89:2 129:11,22 |
| 66:5,20 67:14 | **thoughtful**  51:5 | 26:20 37:3 39:4 | 130:10 133:19 |
| 68:1,5,23 69:4 | 103:7,10 | 56:15,19 67:1 | 133:25 134:12 |
| 69:15,16,23 | **three**  23:23 | 71:22 81:23 | **transcription** |
| 70:14 71:8,17 | 31:8 | 87:16 88:10 | 133:20 |

[transferred - version]                                              Page 37

| transferred | u | understanding | 117:23 |
|---|---|---|---|
| 42:2 | | 21:24 28:7,11 | **used** 2:19 24:9 |
| **transmission** | **u.s.** 10:16 58:16 | 28:25 38:8 | 36:13 99:13 |
| 2:14 94:14 98:8 | 83:16 | 39:12 40:16 | 101:16 111:5,8 |
| 111:8 | **ubiquitous** 73:9 | 50:4 55:25 | 111:12 122:4 |
| **transparency** | **um** 25:6 | 58:14,17,24 | **user** 57:10 |
| 34:11 40:15 | **unaltered** | 72:4,15 75:19 | **using** 58:25 |
| **travel** 54:22 | 117:13 | 76:22 82:24 | 68:20 71:14 |
| **tread** 123:6 | **unattended** | 85:10 87:20 | 75:8,11,20 |
| **trial** 30:19 | 115:22 | 88:11 90:8 | 89:10 92:11 |
| **true** 132:3 | **uncertainties** | 97:23 99:1,1 | 94:13,16 95:22 |
| 133:20 134:1 | 29:12 40:16 | **understands** | 103:12 111:3 |
| **trust** 42:1,9,11 | 41:22 | 90:7 | 117:5 |
| **truth** 8:19,20 | **uncertainty** | **understood** | **usual** 11:23 |
| 8:20 | 48:19 66:12 | 59:19 88:23 | **usually** 12:1,7 |
| **try** 39:15 85:15 | 73:14 | **undoubtedly** | **utility** 125:14 |
| 88:24 109:20 | **unchanged** | 46:17 | |
| 115:25 | 20:13 | **united** 1:1 6:1 | v |
| **trying** 26:4 | **uncomfortable** | 32:9 133:1 | **vague** 58:3 |
| 38:1,13 39:7 | 30:10 | **university** 13:8 | **validated** 61:24 |
| 40:1 42:25 | **under** 6:7 11:13 | 13:17,20 14:9 | 63:24 |
| 47:11 54:24 | 20:12,16 34:24 | 14:22 15:5,10 | **validation** |
| 56:2 71:2,11 | 50:12 94:13 | **unlimited** | 67:15,17 68:18 |
| 82:2 92:23 | 132:12,19 | 111:24 | **various** 40:22 |
| 123:6 126:17 | **undergraduate** | **unmuted** 116:4 | 48:22 60:20 |
| **turned** 116:4 | 13:19 | **unusual** 113:3 | 61:17,18 64:5 |
| **two** 18:2 22:24 | **underlying** | **update** 22:25 | 98:11 122:24 |
| 37:12 78:19 | 48:21 125:13 | 23:2 32:12 | **vegas** 135:22 |
| 87:4,4 94:5 | **understand** | **updated** 22:5 | **verification** |
| 103:22 119:25 | 18:3 19:13 | 23:15 24:17 | 35:23 |
| 127:10 128:23 | 38:13 39:6 | 44:2 112:9 | **vermont** 72:6 |
| **type** 28:17 | 47:13 54:6 | **uploaded** 86:17 | 72:10,15 73:1,3 |
| 123:18 125:20 | 68:13 69:12 | **use** 90:24 91:23 | 73:13,20 77:22 |
| **types** 40:22 | 76:8 97:23 | 93:11 95:15 | 104:24 |
| 109:3 113:18 | 101:14 116:12 | 98:4,4 113:12 | **version** 9:10,18 |
| | | 114:10 116:18 | 36:9 54:7 55:22 |

**[version - working]**                                                    Page 38

121:19
**versions**  37:22
**versus**  64:9
**veteran**  12:6
**videoconfere...**
  2:14,17
**videoconfere...**
  1:8 2:1 133:8
**view**  36:8 47:19
**violating**  42:10
**violation**  58:22
**visiting**  14:8
**visits**  17:13
**vitae**  5:4
**volume**  116:5
**vulnerable**  12:2

**w**

**wait**  67:14 68:1
  79:24,24 112:5
  112:5,5,5,5,5
**waiting**  19:18
**walk**  25:4
**walked**  116:3
**wall**  123:19
**want**  14:2
  15:19 17:4 19:3
  25:1 29:8 49:5
  50:21 52:6,18
  53:14 57:17,21
  57:23 72:1
  78:13 79:20
  80:6,24 82:15
  86:24 87:2,6
  92:19 93:9
  95:22 98:2

99:24 103:23
  107:8 110:25
  111:6 115:2
  116:14 119:10
  120:10 127:5,6
  128:4
**wanted**  74:3
**warning**  50:15
**washington**
  14:9,11
**water**  31:3
**way**  26:10
  36:14 51:9 59:4
  59:7,14 71:21
  72:19 77:1 78:2
  82:24 83:9
  97:19 119:10
  126:2
**ways**  10:16
  96:16
**we've**  9:3 11:12
  15:20 33:17
  35:21 40:3
  50:20 51:16
  55:3,20 56:17
  58:9 100:24
  112:10 120:14
  125:6
**website**  25:14
  25:16,17 28:3
  28:21 35:25
  86:6,7 114:2
**week**  12:21
**weekly**  109:10
**weeks**  37:12
  56:10 78:7,19

**welcome**  87:1
**wells**  34:23
  35:21 36:4
**went**  15:8,9
  25:13 116:11
  121:3 123:2
**whatsoever**
  74:11
**where'd**  38:18
**white**  6:12 45:2
  45:5,13 46:5
  47:14,17,20
  48:9,13 50:23
  86:20 89:20
  90:20 91:15
  93:22 95:14
  96:1 98:1,3,25
  99:11 100:4
  101:13 103:5
  103:10 115:18
  116:11,15
**wholly**  105:9
**whoops**  119:4
**wife**  13:25
**william**  1:9 2:1
  4:6 5:4,11,14
  5:17,21 8:18
  89:4 131:2
  132:1,6,11
  133:9,24
**willing**  98:21
**windows**  57:10
**windsor**  6:22
  104:22,23
  105:2,5,12,22
  105:22 109:6

**withdraw**
  23:21
**witness**  2:2 8:5
  20:11 21:1
  27:15 31:2 33:2
  33:4,7 38:18
  51:23 57:2,5,9
  57:14 62:21
  67:24 78:18,21
  79:1 85:6,16
  96:3,5 121:2
  127:22 130:5,7
  131:2 133:24
  134:2,6,9,9
**witnesses**  81:17
**word**  55:5
  102:22 125:10
**words**  49:6
**wordy**  70:4
**work**  13:4
  14:23 15:3,8,13
  17:7,12,18
  18:21 22:8
  29:21 30:14
  36:11,12 46:14
  65:8,9 77:20
**worked**  26:12
  75:12
**working**  28:13
  44:23 45:8 46:7
  47:16,19 51:4
  89:21 90:10,24
  91:5,12 94:21
  97:3,3 99:7
  103:11 117:3
  118:11

[world - zoom]                                                    Page 39

| | |
|---|---|
| **world**  17:22 | 113:9 |
| 68:19 | **yep**  10:3 33:4 |
| **worries**  21:5 | 86:8 |
| 85:6 119:6 | **yesterday** |
| 121:11 | 24:12 31:25 |
| **worry**  65:3 | **york**  3:20,20 |
| **worrying**  57:12 | **z** |
| **worse**  41:23 | |
| **worth**  9:2 | **zero**  73:24 |
| 81:18 | **zoom**  2:14 3:2 |
| **writes**  65:4 | 18:16,17 88:2 |
| **writing**  17:24 | |
| 22:8 | |
| **written**  22:9 | |
| 39:3 | |
| **wrong**  81:8 | |

**x**

**x**  4:1 93:24
**xrd**  93:24 99:2
99:13

**y**

**y'all**  20:24
129:9
**yeah**  12:20
19:21 39:10,14
45:22 51:21
53:1 57:16,20
57:21 61:11
62:23 75:2 95:8
106:1,22,24
110:2
**year**  10:10 26:9
48:1,2 72:12
**years**  28:14
44:24 97:1

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2)  Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.