# EXHIBIT 14

Page 1

1          IN THE UNITED STATES DISTRICT COURT
                DISTRICT OF NEW JERSEY
2              MDL NO. 16-2738 (MAS)(RLS)
3

   IN RE:  JOHNSON & JOHNSON        :
4  TALCUM POWDER PRODUCTS           :
   MARKETING, SALES PRACTICES,      :
5  AND PRODUCTS LIABILITY           :
   LITIGATION                       :
6

7

8          Remote deposition of DAVID A.
9  KESSLER, M.D., taken in the above-entitled
10 matter before Suzanne J. Stotz, a Certified
11 Court Reporter (License No. 30XI00184500) and
12 Notary Public of the State of New Jersey, taken
13 on Monday, April 8, 2024, commencing at
14 9:09 a.m. EDT.
15

16

17

18

19

20

21

22

23

24

25

Page 2

```
 1  A P P E A R A N C E S:
 2  ATTORNEYS FOR PLAINTIFF:
 3    (Via videoconference)
      BEASLEY ALLEN LAW FIRM
 4    BY:  LEIGH O'DELL, ESQ., and
      BY:  MARGARET M. THOMPSON, ESQ., and
 5    BY:  KELLI ALFREDS, ESQ., and
      BY:  LEANNA PITTARD, ESQ.
 6    218 Commerce Street
      Montgomery, Alabama 36104
 7    (800) 898-2034
      leigh.odell@beasleyallen.com
 8
        - and -
 9
      (Via videoconference)
10    ASHCRAFT & GEREL, LLP
      BY:  MICHELLE A. PARFITT, ESQ.
11    4900 Seminary Road, Suite 650
      Alexandria, Virginia 22311
12    (844) 680-0339
      mparfitt@ashcraftlaw.com
13
        - and -
14
      (Via videoconference)
15    LEVIN PAPANTONIO RAFFERTY, P.A.
      BY:  CHRISTOPHER V. TISI, ESQ.
16    316 South Baylen Street
      Pensacola, Florida 32502
17    (850) 435-7000
      ctisi@levinlaw.com
18
        - and -
19
      (Via videoconference)
20    GOLOMB LEGAL
      BY:  RICHARD GOLOMB, ESQ.
21    1835 Market Street, Suite 2900
      Philadelphia, Pennsylvania 19103
22    (215) 278-4449
      rgolomb@golomblegal.com
23
        - and -
24
25
```

Page 3

```
 1  A P P E A R A N C E S (Continued):
 2
 3  ATTORNEYS FOR PLAINTIFF (Continued):
 4    (Via videoconference)
      WILLIAMS, HART & BOUNDAS, LLP
 5    BY:  BRIAN ABRAMSON, ESQ.
      8441 Gulf Freeway, #600
 6    Houston, Texas 77017
      (713) 230-2343
 7    babramson@whlaw.com
 8      - and -
 9    (Via videoconference)
      COHEN, PLACITELLA & ROTH, P.C.
10    BY:  CHRISTOPHER M. PLACITELLA, ESQ., and
      BY:  DREW M. RENZI, ESQ.
11    2001 Market Street, Suite 2900
      Philadelphia, Pennsylvania 19103
12    (215) 567-3500
      cplacitella@cprlaw.com
13    drenzi@cprlaw.com
14
15  ATTORNEYS FOR THE DEFENDANT:
16    (Via videoconference)
      KING & SPALDING LLP
17    BY:  JOHN EWALD, ESQ., and
      BY:  JACK KEESTER, ESQ.
18    1185 Avenue of the Americas, 34th Floor
      New York, New York 10036
19    (212) 556-2100
      jewald@kslaw.com
20    jkeester@kslaw.com
21      - and -
22    (Via videoconference)
      FAEGRE DRINKER BIDDLE & REATH LLP
23    BY:  SUSAN M. SHARKO, ESQ.
      600 Campus Drive
24    Florham Park, New Jersey 07932
      (973) 549-7000
25    susan.sharko@faegredrinker.com
```

Page 4

```
 1              I N D E X
 2
 3      EXAMINATION            Page No.
 4  DAVID A. KESSLER, M.D.
 5    BY MR. EWALD                8
 6
 7
 8          E X H I B I T S
 9
10  Exhibit    Description      Page No.
11  Exhibit 1   Curriculum Vitae of      14
            David A. Kessler
12
      Exhibit 2   Amended expert report    31
13            of David A. Kessler,
            M.D., dated November
14            15, 2023
15  Exhibit 3   Expert report of David    45
            A. Kessler, M.D.,
16            dated November 16,
            2018
17
      Exhibit 4   Invoice, dated      48
18            December 1, 2018
19  Exhibit 5   Photograph of      64
            materials the witness
20            has
21  Exhibit 6   Reliance List Initial    82
            Report
22
      Exhibit 7   First Amended      82
23            Appendix C Materials
            Considered
24
25
```

Page 5

```
 1        I N D E X (Continued)
 2
 3      E X H I B I T S (Continued)
 4  Exhibit
      Name   Description      Page No.
 5
 6  Exhibit 8   First Amended      83
            Appendix C Materials
 7            Considered
 8  Exhibit 9   White Paper: IWGACP      141
            Scientific Opinions on
 9            Testing Methods For
            Asbestos in Cosmetic
10            Products Containing
            Talca Bates labeled
11            P-2318 through
            P-2318_030
12
      Exhibit 10   World Health      142
13            Organization
            International Agency
14            for Research on
            Cancer, IARC
15            Monographs on the
            Evaluation of
16            Carcinogenic Risks to
            Humans, Volume 93,
17            Carbon Black, Titanium
            Dioxide, and Talc
18
      Exhibit 11   Johnson & Johnson      153
19            Consumer Products,
            Inc., Authorization
20            for Interim
            Specification, Bates
21            labeled
            JNJMX68_000000438
22            through
            JNJMX68_000000441
23
24
25
```

2 (Pages 2 - 5)

Page 6

1        I N D E X (Continued)
2
3        E X H I B I T S (Continued)
4    Exhibit
     Name    Description          Page No.
5
     Exhibit 12    Document entitled,    160
6                  "Asbestiform Amphibole
                   Minerals in Cosmetic
7                  Talc, Bates labeled
                   JNJ 000405219 through
8                  JNJ 000405228
9    Exhibit 13    Cancer Prevention    205
                   Coalition Citizen
10                 Petition Seeking
                   Carcinogenic Labeling
11                 on all Cosmetic Talc
                   Products, dated
12                 November 17, 1994
13   Exhibit 14    Letter dated    221
                   November 17, 1994,
14                 with enclosure of
                   Citizen Petition
15                 Seeking Carcinogenic
                   Labeling on all
16                 Cosmetic Talc Products
17   Exhibit 15    Document entitled,    240
                   "Talc:  Consumer Uses
18                 and Health
                   Perspectives," dated
19                 October 1, 1994,
                   cosponsored by the
20                 International Society
                   of Regulatory
21                 Toxicology &
                   Pharmacology and the
22                 United States Food and
                   Drug Administration
23
24
25

Page 7

1        I N D E X (Continued)
2
3        E X H I B I T S (Continued)
4    Exhibit
     Name    Description          Page No.
5
     Exhibit 16    The United States    250
6                  Food & Drug
                   Administration's
7                  response to the 1986
                   citizen's petition
8
     Exhibit 17    Article published in    280
9                  "The Microscope" in
                   Volume 38 Fourth
10                 Quarter 1990
11   Exhibit 18    Johnson & Johnson    285
                   document with the
12                 subject:  "Allegation
                   made by Dutch Consumer
13                 Organization of
                   Asbestos in our
14                 Overseas Talc -
                   Project No. 0936.00,"
15                 dated September 20,
                   1973
16
     Exhibit 19    Memorandum dated April    301
17                 13, 1994, Bates
                   labeled JNJ 000404835
18
     Exhibit 20    Memorandum dated    303
19                 July 1, 1994, Bates
                   labeled JNJ 000016687
20                 and JNJ 000016688
21
22
23
     (Exhibits attached to transcript.)
24
25

Page 8

1        D A V I D  A.  K E S S L E R, M. D.,
2    having first been duly sworn, was examined and
3    testified as follows:
4                EXAMINATION
5    BY MR. EWALD:
6        Q.    Good morning, Dr. Kessler.
7        A.    Good morning, Mr. Ewald.
8              I'm going to ask:  Can someone help
9    me just make Mr. Ewald center?  Is that
10   possible?
11             Is there any way on Zoom so I don't
12   see everybody?
13             (Discussion held off the record.)
14   BY MR. EWALD:
15       Q.    Just for the record, where are you
16   located today?
17       A.    I am in a conference room on the
18   seventh floor, I believe, on 1825 Case Street
19   at a law firm that you're aware of.
20       Q.    Okay.  Fair enough.
21             And just so I have a general sense
22   as we're going through, what materials, if any,
23   do you have in front of you?
24       A.    A lot of materials.  In front of
25   me, less.  Behind me on the side, a good deal.

Page 9

1    I'm happy to -- if you let me look off to the
2    side or behind me, I'm happy to look around and
3    give you a general description of this, sir.
4        Q.    Yeah.  I don't want to spend too
5    long with it; but if you can give me a general
6    overview, that would be great.
7        A.    Got it.  I'm not going to go
8    through the electronics.
9        Q.    Yeah.
10       A.    A couple of monitors.  My computer.
11   I have my report.  I have a pad with sheets
12   attached to it.  I'm happy to show you, hold
13   that up to the camera.
14             To my right of me, I have probably
15   25 different large, I would guess, 22 by
16   17 inch sheets of paper.  I don't know maybe
17   there's 25 different binder clips attached to
18   those sets of papers.  So there's a table set
19   up with large papers to the side of me.
20             Behind me, I have maybe -- I don't
21   know -- 15, 20 binders ranging in size, as I
22   am happy to walk -- at any time you would like
23   I will be happy to tell you what's in these
24   binders.  Nothing surprising.  Primarily
25   binders that are -- the documents that are

Page 10

1 cited in my report. There's a binder of epi
2 studies, a binder of lab test studies. There's
3 a binder of FDA documents. But I'm happy to
4 walk through.
5         Is that sufficient?
6         Does that give you a sense.
7    Q.   That's -- that's very helpful. And
8 it's, actually, the level I was looking for
9 right now.
10        You mentioned a pad with sheets
11 attached. I wasn't sure what you were
12 referring to when you said that.
13   A.   Yeah. So I mean, I have -- there
14 are large sheets of paper, and they're cut and
15 pastes and just things I taped to these large
16 sheets. So there's usually eight -- there may
17 be an 8 1/2 x 11 piece of paper that -- most of
18 these are materials from -- that have been
19 produced. And there's, you know, a page here,
20 a page there; and it's taped on this larger
21 sheet. And I'm happy to hold it up to you if
22 you'd like.
23   Q.   All right. What I would suggest is
24 if we can, please, get a copy of that during
25 the break, work with counsel so I can take a

Page 11

1 look at what you're -- what you're looking at?
2    A.   And I don't want to lawyer, sir,
3 but I'm happy -- there's a lot of materials
4 here --
5        MS. O'DELL: Let me weigh in on
6    that, John.
7        We're -- we're happy to -- I don't
8    believe there's a facility here to copy it
9    because they're quite large posters. And
10   so we're happy to provide a photo of it so
11   you can see --
12       MR. EWALD: Sure.
13       MS. O'DELL: -- what's here. After
14   the deposition, we can commission or you
15   can commission Golkow to -- to scan these
16   if you'd like; but -- but I don't
17   believe -- I don't want to assure you we
18   can get a copy because I don't --
19       MR. EWALD: No. I mean -- no. I
20   appreciate that. And also, I was thinking
21   generally about the size. So a picture
22   with enough resolution where I can look at
23   it during the break would be wonderful.
24   Thank you.
25       MS. O'DELL: Okay.

Page 12

1 BY MR. EWALD:
2    Q.   All right. And just as a general
3 matter, I understand you have the sheet in
4 front of you, which is sort of a compilation of
5 a variety of different things, fair?
6    A.   Yes, sir, exactly.
7    Q.   And are you aware of any materials
8 that are in paper in the room that are not
9 included in either your report or the materials
10 considered list?
11   A.   I think generally not. It's
12 possible. Anything's possible, you know. I
13 may have printed off a study, an epi study, or
14 something like that in the last couple of days
15 that ends up here and I've not checked it
16 against the reliance list. The reliance list,
17 as you know, is substantial.
18   Q.   It is.
19   A.   So I would -- let -- let -- let me
20 not make -- it's certainly possible there's
21 something not on the reliance list. That was
22 not my intent. My intent was to make sure, you
23 know, but some things could have been copied
24 and I printed off and, you know, and you know.
25   Q.   And to be clear, it's not a

Page 13

1 got-you.
2        I want to know as you sit here
3 today, are you aware of any materials that are
4 in the room that you've subscribed that are not
5 contained on your materials considered list.
6    A.   I'm happy to go over it through the
7 break and tell you what I printed off during
8 the last couple of days, and then we can check
9 to answer that question specifically.
10       But, you know, I took great pains
11 to make sure that the reliance list was --
12 with, -- you know, with legal staff; and you
13 have two updated reliance lists to -- you
14 should have. But I'm happy to rethink through
15 what I've printed off and I may have that could
16 potentially not be there.
17   Q.   Okay. Thanks.
18       So let's start with the most recent
19 CV that I received from counsel. I'm going to
20 put it on the screen there. Always good first
21 test.
22       Do you see that, Doctor?
23   A.   I see it -- yes, sir, I see
24 Appendix A. Good job.
25   Q.   Well, thank you. That's a good

4 (Pages 10 - 13)

Page 14

1 start. Good start.
2 So I'll mark this as Exhibit 1.
3 (Whereupon, Exhibit 1, Curriculum
4 Vitae of David A. Kessler, was marked for
5 identification.)
6 BY MR. EWALD:
7 Q. And this, I will represent, was
8 Appendix A to the Amended Report, sir, by
9 Dr. Kessler at the end of 2018.
10 A. And to make your lift -- I don't
11 mean to cut you off, but to make your life
12 easier, I just have a copy of my report with
13 the appendices in front of me too, sir.
14 Q. Okay.
15 A. So I'm happy to turn the page, but
16 also watch the screen.
17 Q. Yes. Whatever is -- whatever is
18 easiest for you. So get that in front of you.
19 Let me know when you have your CV in front of
20 you.
21 A. I have -- I'm looking at both sets
22 right now. Yes.
23 Q. Okay.
24 A. The screen and the spiral bound
25 report.

Page 15

1 Q. Good. And this was served along
2 with your report that was dated November 15th,
3 2023.
4 Is there a more recent CV of which
5 you are aware?
6 A. There is not that I'm aware of.
7 Q. Are you aware of any revisions that
8 should be made to this CV that's dated
9 November 15th, 2023?
10 A. So no revisions as of that date.
11 There may be some other stuff that has happened
12 subsequent to that.
13 I can think of one thing that may
14 have been -- you know, there may be updates,
15 you understand, things that happened that are
16 not on the CV; but the CV's right. CV's are
17 never right. There's always a mistake on the
18 CV. You know that.
19 Q. What updates are you referring to
20 since November 15th, 2023, that you add to the
21 CV?
22 A. Just for, you know, things like --
23 I can think of -- you can see that I was on a
24 board in 2020. I think it says in 2020 Ellodi.
25 If you go down on page 8, there are

Page 16

1 two things that are -- that I can think of. So
2 if you're on page 8 -- there you go, sir. So
3 that is -- that's correct, you know. I was on
4 the Ellodi board, and I have subsequently, in
5 the last month or so, gone back on the Ellodi
6 board.
7 Q. Okay.
8 A. All right. And it says senior
9 advisor TPG through 2020. Obviously I went off
10 when I went into -- I mean, at 2020. And then
11 I've just go back on as a senior advisor.
12 I think those things are in effect.
13 If not, they're going into effect.
14 Q. Okay.
15 A. Those -- those are two -- two that
16 I'm aware of, sir.
17 Q. And so with the caveat that it may
18 not fully been in effect, within the last month
19 or two, you have rejoined the boards of Ellodi
20 Pharmaceuticals and TPG?
21 A. One slight modification to your
22 statement. I don't mean to quibble.
23 Q. Sure.
24 A. TPG's not a board. Ellodi is a
25 board. TPG I'm just a senior advisor.

Page 17

1 Q. All right. An important
2 distinction, so I appreciate that.
3 Okay. Now, if we go back to the
4 first page, my understanding from your report
5 is that you left government service most
6 recently in January 19th, 2023.
7 Does that sound right?
8 A. That's exactly correct.
9 Q. Okay. So you leave government
10 service January 19th, 2023.
11 Do you take any well-deserved time
12 off?
13 A. A complicated answer.
14 Q. Okay. How is it complicated?
15 A. 600- -- I -- I don't mean to be
16 flip. All I mean is, the answer is -- the
17 answer is yes, not off; but I'm much more Zen,
18 sir.
19 I mean --
20 Q. Okay.
21 A. -- 656 million vaccines and
22 antivirals and an intense number of years for
23 all of us; is that fair?
24 So I think the -- that's behind us.
25 But when you use the word "off," I then

5 (Pages 14 - 17)

Page 18

1  resumed -- I was on leave, sir. I mean, if I
2  can jump ahead.
3      Q.   Sure.
4      A.   I was on leave from the University
5  of California, San Francisco; and, you know,
6  they've -- I'm -- I'm back on. I'm back on
7  teaching, et cetera.
8      Q.   Okay. And -- and that's really,
9  you know, I'm not trying to get into too much
10 while you were on vacation or anything like
11 that. I really just want to understand.
12          You leave January 19th, 2023.
13          When do you resume activities at
14 University of California?
15     A.   Pretty simultaneously. I was on
16 leave, so the leave stopped was I think the way
17 it worked. We can check that.
18     Q.   Okay. And so when you resumed
19 shortly after leaving the government in January
20 2023, what were -- what -- what were the
21 contours of your job?
22     A.   So I'm -- as it was before, I'm a
23 professor of pediatrics epidemiology and
24 biostat. I teach, and I do my research.
25     Q.   Okay. Are you teaching any classes

Page 19

1  this semester?
2      A.   I -- Well, semester's a little hard
3  in the medical world. We go more by -- by
4  years.
5          Yes, I was just teaching last week,
6  for example.
7      Q.   And since rejoining UCSF, have you
8  been teaching consistently over that period of
9  time?
10     A.   Yeah. I'm a medical
11 school teacher. Yes. I mean, I teach
12 epidemiology and biostat; and I -- you know, I
13 teach sections, et cetera, in the, you know,
14 the principles of epidemiology and biostat and
15 clinical decision-making.
16          And I've -- I've taught that pretty
17 consistently since I've -- I -- I left as I did
18 before I went in.
19     Q.   Okay. And in addition to teaching
20 classes, what other responsibilities do you
21 have at UCSF?
22     A.   So I -- I am currently -- you know,
23 I am on -- you know, I'm writing two books, to
24 get to the chase. I do my research. I do my
25 writing, you know. I mean, I have, you know,

Page 20

1  those -- those funds to do that, and I'm
2  working on that.
3      Q.   And can you tell me, generally, the
4  nature of the two books that you're currently
5  working on?
6      A.   I'm happy to. One is -- I mean,
7  they're consistent with, you know, things I've
8  done.
9          One is on obesity, weight, the
10 public health implications of cardiovascular,
11 metabolic. So I'm working on a research in
12 that area.
13          And I've recently agreed to do a
14 book with a number of historians on the
15 legacy operation -- I mean, putting down the
16 lessons learned from Operation Warp Speed.
17     Q.   All right. Apart from your
18 teaching obligations and your research as
19 reflected in part of these upon the two books,
20 any other responsibilities that you currently
21 have at UCSF?
22     A.   Just the usual responsibilities,
23 you know. I mean, I get called on to assist in
24 certain, you know, institutional matters to,
25 you know, mentor faculty and just do the --

Page 21

1  assist colleagues; and those -- those --
2  that's -- those are the primary. Most of my
3  job is research writing, obviously.
4      Q.   And I believe that your CV says you
5  have not been an attending pediatrician since
6  2013; is that correct?
7      A.   Correct. That's exactly right.
8      Q.   All right. So what about on the --
9  well, withdrawn.
10          When you get out of government most
11 recently on January 19th, 2023, we talked about
12 your UCSF.
13          At that point in time, did you also
14 resume working in connection with expert
15 witness work for litigation?
16     A.   I've done some, yes.
17     Q.   Okay.
18     A.   I don't -- I don't think
19 necessarily immediately. I don't want to, you
20 know -- but throughout -- throughout the year
21 I've done some. I'm trying to -- when I say
22 "year," you know, what -- what are we at now?
23 I'm at about 15 months --
24     Q.   Right.
25     A.   -- 16 months. Yes, I've done some,

Page 22

1  yes.
2      Q.    And I'm only looking for the -- the
3  cases that, you know, have been disclosed.
4          What expert witness work have you
5  done since you have come out of government?
6      A.    So my -- my -- here's my
7  recollection. Here's what I have in my head.
8          There were two matters that were --
9  let's call them legacy matters if that's okay.
10 These are matters before I went into
11 government; and then, you know, then when I
12 came out I got, you know, called again.
13         So obviously, this matter, you
14 know, that has a longer history going back, I
15 think, you know, your first report you're aware
16 of.
17         There was -- is a matter where I
18 testified at trial on a Bard mesh case in
19 Columbus, Ohio, last year. That was a legacy
20 case that, you know, I -- I believe I had filed
21 a report even before I went into government.
22         And then there is a lead in baby
23 foods case, Hain, Gerber, I don't know what the
24 exact status of that consolidation. I don't
25 know if there is an MDL that's been formed or

Page 23

1  not. I believe that was -- my recollection
2  that's -- that's new since. So it's those
3  three -- three matters, one of them including
4  this obviously, sir.
5      Q.    And are there any other, as you
6  said, legacy matters of which you are aware
7  that you're continuing to work or planning to
8  work on since you've come back into government
9  service?
10         MS. O'DELL: John, you understand
11 you're only asking for cases in which
12 Mr. Kessler knows --
13         MR. EWALD: Yes.
14         MS. O'DELL: -- he's been
15 disclosed.
16         MR. EWALD: Yes.
17         THE WITNESS: Known I've been
18 disclosed? I'm just trying to think, sir.
19         It's possible there's an antitrust
20 matter. Let me just not go any further
21 than that because I don't know the status
22 of disclosure. It may be an antitrust
23 matter where I have been contacted.
24 Nothing other than that that jumps out at
25 me, sir.

Page 24

1  BY MR. EWALD:
2      Q.    Except, for example, clinical work
3  in Johnson & Johnson subsidiaries; is that
4  something you continue to work on?
5      A.    I believe that they're -- the
6  answer is no -- well, the answer is no. There
7  may have been a phone call or two -- I don't
8  have a recollection -- from some counsel about
9  a question about Pinnacle in the last year, but
10 I don't have a firm recollection of that right
11 at this moment.
12     Q.    All right. And we'll get more in
13 to it as the deposition proceeds.
14         But do you recall approximately
15 when you were contacted, after leaving in
16 January 2023, by plaintiff's counsel in this
17 case about reengaging on this legacy matter?
18     A.    I apologize, I don't remember the
19 month. I'm blocking. You know, if I had to
20 guess -- I don't want to guess. I don't recall
21 exactly when that phone call came in last year,
22 but it obviously came in. You know, my guess
23 is it came in -- well, can I speculate, give
24 you an approximation?
25     Q.    Well, I would say I don't need a

Page 25

1  specific month. I'm generally looking for, you
2  know, month, range, or the seasons, whatever is
3  the --
4      A.    Yeah. Again, I could be off on
5  this; but my recollection, there was a phone
6  call in the spring of last year, right, on
7  these matters.
8      Q.    All right. So I'm not saying it's
9  anything close to exactly, but about a year
10 ago?
11     A.    Yeah. I mean, if I could refresh
12 my memory -- that's my recollection, yeah.
13     Q.    And how would you refresh your
14 memory?
15     A.    I would have to -- I would either
16 have to check my e-mail to see whether there
17 was an e-mail that said, you know, please call
18 me or something like that or I can ask.
19     Q.    Okay. Do you recall the name of
20 the plaintiff counsel that reached out to you
21 after you left government in January 2023?
22     A.    I do.
23     Q.    Who was it?
24     A.    So I need -- the reason I'm
25 hesitating, sir, is it was involving a talc

7 (Pages 22 - 25)

Page 26

1 case that was not this case, not the MDL,
2 right.
3    Q.   Okay.
4    A.   I just want to be careful on
5 whether I've been disclosed in that matter or
6 not. And if I give you the name of that
7 lawyer -- again, I'm happy to check at the
8 break with counsel to make sure I can reveal
9 that. But the phone call that came in was from
10 counsel. It was -- I'm not sure -- I mean, it
11 was a state case. It was not a --
12    Q.   Right.
13    A.   -- not an MDL case. That's why I'm
14 being a little -- being careful here, sir.
15    Q.   Understood. And so we may go back
16 to that if necessary.
17    A.   Could you do me a favor?
18         Could you take down, if possible,
19 my CV?
20         I'd love to see you --
21    Q.   Okay.
22    A.   -- otherwise in thumbnail.
23    Q.   I'm happy to do that.
24    A.   Thanks.
25    Q.   It's good practice anyway.

Page 27

1         So we may get back to the identity
2 of the lawyer if it matters; it may not.
3         So I take it, though, in that
4 conversation approximately a year ago, somehow
5 it was communicated to you in that conversation
6 by that unidentified plaintiff's lawyer that
7 the MDL plaintiffs were looking to work with
8 you further?
9    A.   Not exactly.
10    Q.   Okay. So how does that
11 conversation relate to being reengaged in the
12 MDL?
13    A.   I believe I raised the issue that I
14 had done a report in the MDL, and I just -- I
15 wanted to -- I wanted to make sure these things
16 were -- I apologize -- for lack of a better
17 word, synched or whatever. I didn't want to do
18 anything that was conflicted, et cetera.
19    Q.   Right.
20    A.   So that was how -- so I don't want
21 to use the word I "initiated," but I asked the
22 question then, I mean, if I proceed in this
23 other matter, how does that affect the MDL;
24 where is the MDL. I was not paying attention
25 at all, so I asked a question, I think is the

Page 28

1 right way to say it.
2    Q.   So then you asked that question.
3         What happens next as it relates to
4 your work on this case?
5    A.   I get called by either that
6 counsel, unnamed called MDL counsel, or I got
7 called by MDL counsel.
8    Q.   Okay. And what was the general
9 message that they communicated?
10    A.   I believe at that stage -- again,
11 don't hold me to this, but it was general --
12 the bankruptcy issues are being resolved. It
13 looks like this is moving ahead. Again, I
14 apologize for the timeframe. I'm not --
15    Q.   Sure.
16    A.   And obviously we would like to --
17 we would like you to continue your work,
18 whatever the word, reengage with the MDL. And
19 I asked -- then I asked State counsel who
20 called me to engage with MDL counsel and make
21 sure these things were -- what's the right
22 word, whatever the right terminology -- not in
23 conflict.
24    Q.   All right. I'm assuming, because
25 you're sitting here today, that you got the

Page 29

1 all-clear on the conflict?
2    A.   Yeah. I don't think it was -- it
3 wasn't -- there is not -- I don't think there
4 is an official conflict. I don't think there
5 is an official conflict, but I -- I had done
6 the work in the MDL.
7         And I -- while I stopped when I
8 went into government service and I said, hey, I
9 mean, is there -- where are we. They said we
10 want to engage you, engage you again, whatever
11 the right word is. And I said sure. And I
12 just -- I tend not to want to do -- again, I
13 don't want to bind myself exactly, but I don't
14 want to do one work for MDL and one work for
15 the State for the same issues. I want those
16 things to be coordinated.
17         In essence, anything that I say or
18 opinions, they should be good for all, you
19 know, I mean, all coordinated. I just wanted
20 them coordinated. That was what my goal was.
21    Q.   So the coordination happens to your
22 satisfaction.
23         And approximately when do you start
24 working in earnest again on this matter?
25    A.   It's -- I mean, I've got to work

8 (Pages 26 - 29)

Page 30

1  backwards from November.  My guess is it is
2  spring that it picks up, that it starts on the
3  MDL.
4      Q.   Are you talking, again, like
5  April-May time?
6      A.   Yeah.  Again, I would have to look
7  at my calendar.  It could have been May, June,
8  something like that.  But it was certainly of
9  that, my sense it was that order.  You know,
10  again, I don't know when the actual bankruptcy,
11  et cetera.  So that's why I just -- I
12  apologize.  I just don't know.
13      Q.   No need to apologize.  I
14  understand.
15          So what did you understand -- when
16  you started working again in earnest on this
17  matter after leaving government service in
18  January 2023, what did you understand the scope
19  of your work to be?
20      A.   I think probably -- if I can, I'm
21  happy to give it to you -- but I think there's
22  a paragraph I wrote in paragraph 22; is that
23  right?
24      Q.   Yes.
25      A.   I think that gives you the scope,

Page 31

1  sir, you know.  There was a scope in the
2  opening report back in, what, 2018, right, in a
3  paragraph, I think, if my memory serves,
4  paragraph 18.  But I think -- again, it is
5  the -- to look at the, you know, the
6  responsibilities of the defending cosmetic
7  companies, you know, to -- from a regulatory
8  perspective, based on my experience, and
9  looking at the food and drug statutes,
10  regulations, you know, industry, the guidances,
11  standards, and compliance thereof.
12      Q.   All right.
13          MR. EWALD:  While we're here on
14      paragraph 22 -- let's go ahead and mark as
15      Exhibit 2 Dr. Kessler's amended expert
16      report in this matter, which is dated
17      November 15, 2023.
18          (Whereupon, Exhibit 2, Amended
19      expert report of David A. Kessler, M.D.,
20      dated November 15, 2023, was marked for
21      identification.)
22  BY MR. EWALD:
23      Q.   And, Doctor, sticking with
24  paragraph 22, it states, as you referenced,
25  "Focusing on the regulatory interface between

Page 32

1  cosmetic manufacturers and the FDA as well as
2  industry standards," and it goes on to say, "I
3  have been asked to address the duties and
4  conduct of defendant cosmetic companies in the
5  face of a potential health hazard."
6          What defendant cosmetic companies
7  are you opining on in this case?
8      A.   I believe that the defending
9  companies are in paragraph 17, sir, of the
10  report.  I leave -- I'm aware that a number of
11  them are in bankruptcy.  So, you know, I leave
12  it to the lawyers, you know, which ones are at
13  issue and which ones are not.
14      Q.   All right.  And for purposes of
15  your report and your opinions, do you
16  distinguish between, say, Johnson & Johnson and
17  IMERYS?
18      A.   So I have this statement in my
19  report, I believe, somewhere where I say if I
20  referenced the defendant, it applies to the
21  defendants as a whole; but I'm not sure if that
22  is the most helpful to you.
23      Q.   Right.
24      A.   So there's that general statement.
25  You will see, I mean, in the record that, you

Page 33

1  know, I had available to me, a discovery record
2  there's obviously documents that are J&J,
3  IMERYS, the old CTFA; so there are different
4  documents.
5          And throughout the report, the
6  report will cite, you know -- I mean, that
7  document probably in the name of, you know,
8  what the institution was that, you know, that
9  that document was from.  But I think the -- the
10  major defendant here is J&J.  I think we all
11  know that.  And I think the others are in
12  bankruptcy, as far as I understand.
13      Q.   Well, from a perspective of -- we
14  can get into more detail, but would you agree
15  with me that amongst the documents you reviewed
16  in connection with this litigation, there were
17  some that were internal Luzenac/IMERYS
18  documents?
19      A.   There was some documents that were
20  Luzenac/IMERYS documents; is that the question?
21      Q.   But that are internal documents,
22  internal memos, internal e-mails that no
23  outside parties that were reflected on a paper
24  document.
25          Do you agree that you reviewed such

Page 34

1  documents?
2      A.    I'm not sure of the full scope of
3  who saw what documents.  I don't want to
4  represent whether J&J was cc'd, was a party.
5  Sometimes they have multiple parties on those
6  documents.  We would have to look document by
7  document.
8      Q.    So I guess my question is:  Are you
9  making any assumptions or your opinions in this
10  case that J&J was on notice of any
11  IMERYS/Luzenac document?
12          MS. O'DELL:  Object to the form.
13          THE WITNESS:  Yeah.  I think your
14      statement is -- you know, let's take --
15      first of all, let me -- my job is not -- I
16      don't want to make any assumptions, you
17      understand.  I mean, the facts are what
18      the facts are.
19          There are J&J documents.  There are
20      IMERYS documents.  Sometimes those
21      documents are the same documents just with
22      different Bates numbers, right.  I mean,
23      I've seen the same document, you know,
24      both.  It's an IMERYS document and a J&J
25      just with different Bates numbers.

Page 35

1          So I mean, there's no way to sort
2      out by a specific document, unless we
3      looked at it and really track whose files
4      they were in.
5          I'm making a general assumption
6      that when -- well, "assumption" may be the
7      wrong word -- but a general view that J&J
8      is a sophisticated, very, you know, expert
9      company.  And it has general
10      responsibilities over its suppliers and,
11      you know, its contractors in general, so
12      in the manufacture of its product.
13          So if -- with regard to the product
14      that's Johns- -- we're talking about baby
15      powder and the production thereof.  I
16      guess it's fair to say it filters up to
17      J&J.  They are the supplier -- if it has
18      their suppliers.  But I don't want to make
19      any specific assumptions.
20  BY MR. EWALD:
21      Q.    Well, we will go back to that in a
22  moment.
23          But you said that -- am I
24  understanding you correctly that you're not
25  making any assumptions in connection with

Page 36

1  opinions you're offering in this case?
2      A.    That's a general statement.  I
3  don't want to make any blanket statement about
4  any assumptions.  Let's talk about a specific
5  opinion, and we can look.  I don't want to make
6  a forever statement that there's no assumptions
7  on any opinion.  And, you know, there's always
8  some in some thought process, you know.  I
9  mean, there are judgments that are made.
10      Q.    Understood.  So is it your
11  testimony, though, that, as you sit here today,
12  you're not aware of any assumptions that you
13  are making with respect to the opinions in this
14  case?
15          MS. O'DELL:  Object to the form.
16          THE WITNESS:  I would have to think
17      about the answer to that question.
18          I didn't offer or make any
19      assumptions.  We all, in any thought
20      process, connect dots and make inferences.
21      I don't know whether those are assumptions
22      or inferences.  I would have to -- it's
23      just too abstract a statement for me to
24      make.  But I didn't offer it or make any
25      assumptions going in.

Page 37

1  BY MR. EWALD:
2      Q.    Did plaintiff's counsel ask you to
3  make any assumptions in connection with your
4  opinions in this case?
5      A.    Absolutely not.
6      Q.    On the Luzenac/IMERYS document
7  issue, I want to give you a hypothetical.
8          The hypothetical is that it's, on
9  the face of the document, an internal Luzenac
10  document, only Luzenac employees are, you know,
11  on the to or cc line; no indication on that
12  document that it was viewed externally from
13  IMERYS/Luzenac.
14          Are you with me so far?
15      A.    I think I understand those two
16  parts of your hypothetical.
17      Q.    If that -- if you look at a
18  document like that with no other evidence about
19  where the document went or who had knowledge of
20  it, are you assuming that J&J is aware of that
21  document?
22          MS. O'DELL:  Object to the form.
23      Incomplete hypothetical.
24          THE WITNESS:  So I hate to give
25      this answer.  It depends on context.

10 (Pages 34 - 37)

Page 38

1  BY MR. EWALD:
2      Q.   Okay.  What's the context?
3      A.   Well, so is this -- it depends on
4  what the other facts are.  Is this a -- are we
5  talking about -- are there other documents that
6  reference the facts in that document?
7          Is that a document that stands
8  alone on the subject matter that was never
9  within the purview of other documents?
10         Were there audits done?
11         Is this a subject matter that a
12  reasonable and responsible company who has its
13  supplier working on something would be involved
14  in?
15         There are a lot of issues that go
16  into the answer to that question.
17     Q.   Let's go back to paragraph 22 in
18  your amended report.  You state, "I have not
19  been asked to opine on causation issues."
20         What do you mean by that?
21     A.   Exactly what I say there.  I use
22  the word caus- -- well, I used the word
23  there -- again, I don't want to play lawyer;
24  but in any liability case, I mean, there's --
25  there are issues of causation, both general and

Page 39

1  specific.
2          Here, as I understand it, it's
3  talcum baby powder and ovarian cancer; and the
4  issues of general causation, you know, the
5  Bradford Hill issues and also in the specific
6  plaintiff matter was the plaintiff's cancer
7  cause -- or contributed to by the baby powder.
8          As far as those matters, while I'm
9  a professor of epidemiology, I am happy to
10  discuss Bradford Hill, you know, for the
11  entire -- you know, as long as you'd like.  I'm
12  not -- there are other experts that are
13  well-qualified that are handling -- that are
14  dealing with those issues.  And I have not
15  studied -- I have not delved into, certainly,
16  any specific causation matters.  I have not
17  looked at any medical records in this matter.
18  So I just wanted to upfront put that in.
19     Q.   Sure.  And so am I correct that
20  you're not going to be offering any opinions in
21  this case about whether exposure to talc can
22  cause ovarian cancer?
23     A.   If those issues go toward causation
24  and those elements of the tort, I will not do
25  that.  If there is something -- if those issues

Page 40

1  arise in our discussion or, you know,
2  regulatory context, I'm happy to discuss; but I
3  don't think my opinions go toward that.
4          But there's always -- you know, in
5  any regulatory matter, if you look at the FDA,
6  statutes may render the, you know, article
7  injurious.  There's obviously some hazard
8  analysis that goes into any regulatory
9  analysis.  I'm just staying away from causation
10  as a legal matter.  Again, I'm not wanting to
11  play lawyer here.
12     Q.   I appreciate here.
13         So when you say -- how would you
14  characterize the hazard analysis that you have
15  undertaken with respect to the question of
16  whether or not talc exposure can cause ovarian
17  cancer?
18     A.   Well, I have not done any
19  independent hazard analysis.  I mean, I have
20  cited the -- I mean, in this document, what the
21  federal agencies and others as a -- you know, I
22  mean, as it came up over the years, for
23  example, I have cited that asbestos is a
24  carcinogen.  I have not done an independent
25  analysis of that.  I have not done an

Page 41

1  independent hazard analysis of that, but that
2  does -- you know, my report does state that, I
3  believe.
4      Q.   So when you talk about -- well,
5  before we go to that, you also state, I believe
6  it's Footnote 31 -- I mean, it's page 31 --
7  Footnote 31 and page 31.
8      A.   Thanks.
9      Q.   In your report you say, "As I have
10  stated previously" --
11     A.   Wait a second.  Yes.
12     Q.   The bottom of page 31, Footnote --
13  page 31, "As I have stated previously, I am not
14  offering any causation opinions regarding the
15  health effects of cleavage requirements."
16         And that is an accurate statement
17  of your position in this matter?
18     A.   Yeah, I think that's fair.
19  Understanding causation is defined as we've
20  been discussing it, sure.
21     Q.   Okay.  And you have not undertaken
22  any independent hazard analysis of whether or
23  not cleavage fragments can cause health
24  effects?
25     A.   I mean, I've looked -- I have

11 (Pages 38 - 41)

Page 42

1 reviewed literature on that issue, but I have
2 not done an independent hazard analysis, I
3 mean, as you would testify on a hazard analysis
4 on cleavage fragments.
5    Q.    Okay. And you say you reviewed
6 literature on whether or not cleavage fragments
7 can cause health effects.
8         Are you going to be offering any
9 opinions about the health effects that can be
10 caused by exposure to cleavage requirements?
11    A.    I don't think in that, as you've
12 stated it, no, I don't intend to do anything
13 with regard to causation of whether cleavage
14 fragments -- I'm not aware of causation --
15 things that go to causation on cleavage.
16         In the clinical sense, I am aware
17 of certainly, you know, some pre-clinical, you
18 know, in vitro kind of work. I'm happy to talk
19 about cleavage fragments in the regulatory
20 context.
21    Q.    All right. There's going to be a
22 fair amount of flipping back and forth. I
23 apologize, Doctor. But if you go back to
24 paragraph 22 in your report.
25    A.    I'm happy to do that, sir.

Page 43

1    Q.    All right. And so when we have
2 that sentence that follows, "I have been asked
3 to address the duties and conduct of defendant
4 cosmetic companies in the face of a potential
5 health hazard," when you're referring to their
6 duties in that sentence, what duties are you
7 referring to?
8    A.    I mean, I think it -- I think I go
9 back to the -- I make reference to the second
10 line -- third line there. It's really the
11 interface between those manufacturers and the
12 FDA and the industry standards that pertain
13 thereto. So it's anything that derives from
14 the Federal Food, Drug, and Cosmetic Act and
15 the guidances, regulations, and industry
16 standards. So it's duties that flow there,
17 sir.
18    Q.    Then at the end of that sentence,
19 it talks about "in the face of a potential
20 health hazard."
21         Do you see that?
22    A.    Sure.
23    Q.    And so my question is: What are
24 you relying on for the proposition that there
25 is a potential health hazard relating to

Page 44

1 exposure to talc?
2    A.    I mean, hopefully, we can all agree
3 that asbestos has been determined to be a human
4 carcinogen, that there is -- that that is
5 accepted, that is, exposure to asbestos,
6 asbestiform and other fibrous materials.
7         And the question is: Does talc
8 present those risks.
9    Q.    Okay. And so when you're looking
10 at -- well, withdrawn.
11         So you identify -- you have stated
12 that you have not done an independent hazard
13 analysis as it relates to causation issues.
14         Are you relying on the regulatory
15 statements over time for the basis of there
16 being a potential health hazard relating to
17 cosmetic talc exposure?
18         MS. O'DELL: Object to the form.
19         THE WITNESS: I just need to -- if
20    you can pull up the question. Am I
21    relying on the regulatory statements over
22    time for the basis of there being a
23    potential -- I think I'm relying on the
24    scientific literature that the statement
25    by regulatory agencies, the general

Page 45

1    consensus, my 40, 50 years of medical
2    experience, my experience as FDA
3    commissioner, you know, et cetera, that,
4    you know, asbestos is a human carcinogen.
5    Again, I hope we don't have to spend a lot
6    of time on that point.
7 BY MR. EWALD:
8    Q.    All right. So I want to go back to
9 your preparation of the first report, and we
10 are going to mark that as Exhibit 3. And that
11 one is dated -- it was really helpful on your
12 amended report that it had the date on the
13 front page.
14         Here we go, Exhibit 3, November 16,
15 2018, first report.
16         (Whereupon, Exhibit 3, Expert
17    report of David A. Kessler, M.D., dated
18    November 16, 2018, was marked for
19    identification.)
20 BY MR. EWALD:
21    Q.    Do you have a recollection of
22 approximately when you were retained in
23 connection with that first report in this case?
24    A.    If you change that question, take
25 out the word "retained," and when I was first

12 (Pages 42 - 45)

Page 46

1  contacted -- and I don't have the definition of
2  the word "retained," but I can tell you my
3  recollection that it was probably 2016 when I
4  was first approached and first conversations.
5       I assume I was -- those were
6  covered -- you know, there was an attorney work
7  product to that.  I don't want to use the word
8  "retained."  You know, I don't think I agreed
9  to do a report or anything of that nature, you
10 know, instantaneous; but my recollection, it
11 was 2016, sir.
12     Q.   All right.  And so when did you
13 begin to work in earnest on the work that would
14 result in your November 2018 report?
15     A.   My guess is it was within the prior
16 12 months to the submission of the report.
17     Q.   Okay.  So approximately November
18 2017 or so is when you began to really work on
19 the report?
20     A.   That's my -- let me just look at
21 the signature line here.
22       So, again, my guess it was probably
23 2018 where most of the work was done.  There
24 was some -- but there was some initial
25 conversations maybe in 2016, in 2017.  But my

Page 47

1  sense is much of the work was done in 2018, but
2  I don't have a firm recollection, sir.
3      Q.   Did you draft the entire first
4  report?
5      A.   I dictated it, yes.
6      Q.   Okay.  And that applies to the
7  whole report?
8      A.   No.  I think that there is a -- I
9  think, as mentioned, there are schedules that I
10 had assistance done under my guidance.  But
11 hopefully.  The schedules are just objective
12 facts that I have directed, put together.  But
13 certainly, the report -- the report is my
14 report.
15     Q.   What about the materials considered
16 list for your first report, who created that?
17     A.   The materials considered list are
18 done certainly with my assistance, but that is
19 done with the assistance of counsel.  And
20 that's true on both reports.
21     Q.   So just while we're covering it --
22 you brought it up -- is it true that, apart
23 from the schedules and the materials considered
24 list, that you drafted the entirety of your
25 amended report in this matter?

Page 48

1      A.   Again, these are all my words.
2  This is my report.  So I dictated it.  I
3  don't -- I did not type it.
4      Q.   Okay.  Apart from assistance that
5  you received from counsel in connection with
6  the preparation of your report, did anyone else
7  assist in the preparation of either report in
8  this matter?
9      A.   No.
10       MR. EWALD:  I'm going to mark as
11 Exhibit 4 the invoice that we received
12 from counsel.  So the record is clear,
13 it's dated December 1, 2018.
14       (Whereupon, Exhibit 4, Invoice,
15 dated December 1, 2018, was marked for
16 identification.)
17       MS. O'DELL:  John, could we ask you
18 to put that in the chat, please, so
19 Dr. Kessler could put it on a larger
20 screen?
21       MR. EWALD:  Sure.
22       THE WITNESS:  By that means, she
23 means -- she's testing my ability to
24 navigate the computer screens in front of
25 me.  Watch, I will disconnect the

Page 49

1  entire -- can I ask counsel to just come
2  and show me where the chat button is?
3       I'm good at Zoom.  Can I go to Zoom
4  here?
5       MS. O'DELL:  John, I'm going to
6  help Dr. Kessler here for a second.
7       MR. EWALD:  Sure.
8       THE WITNESS:  Thank you.
9       MR. EWALD:  Let me know if you have
10 any problems dropping it in.
11       MR. KEESTER:  This is Jake jumping
12 in.  To drop something into the chat, is
13 there a privacy setting I need to undo
14 here?
15       It's not letting me copy and paste.
16       (Discussion held off the record.)
17       MR. EWALD:  If it's not for this
18 document, then it will be for something
19 else; so let's just figure it out.
20       How about this, we have been going
21 almost an hour, a little bit shorter, why
22 don't we go off the record.
23       THE WITNESS:  I'm happy to keep on
24 going.  Keep on going.  I don't want to
25 break before -- maybe we will break -- I

13 (Pages 46 - 49)

Page 50

1    don't know what time the eclipse is
2    hitting your area, but we can take five
3    minutes there.  Let's save it for the
4    eclipse break.
5         MR. EWALD:  Jake, are you having
6    any luck?
7         MR. KEESTER:  I think I might in a
8    second.  Hold on.  Let me try this.
9    BY MR. EWALD:
10    Q.    While Jake is doing that, I'm going
11    to put it back up; and we'll see what we can
12    accomplish.
13    A.    Just scroll down so I can see.
14    Thanks, sir.
15    Q.    And so, at least on this one, it's
16    a one-pager.  And do you see here -- as I
17    mentioned, the date December 1st, 2018.  And it
18    is for a total amount of $101,364.91.
19         Do you see that, sir?
20    A.    I do, sir.
21    Q.    And you explained that the total
22    arises from 101 hours at $1,000 per hour and
23    expenses and then totals up to $364.91,
24    correct?
25    A.    Correct.

Page 51

1    Q.    And fair to say that the invoice
2    that we are looking at here from December 1st,
3    2018, reflects the work through the preparation
4    of your November 2018 report?
5    A.    Well said, sir.
6    Q.    Have you issued any invoices on
7    work that was conducted after you reengaged in
8    the spring of last year?
9    A.    I have not.
10    Q.    All right.  And do you have a
11    standard practice on when you issue invoices in
12    your expert litigation work?
13    A.    My standard practice is not going
14    to be -- maybe a little vague.  It is usually
15    when I'm done.  But in litigation when you're
16    done is -- you know, has different meanings.
17    You know, whenever there's a segment of work
18    that is done, I tend not -- I do not invoice
19    along the way.  I tend to invoice after certain
20    segments of litigation.
21    Q.    So, for example, the December 1st,
22    2018, invoice would cover approximately six,
23    seven months of work?
24    A.    Probably -- again, let's assume
25    that that was the entirety of the work through

Page 52

1    the first report from my first contact with the
2    parties.  It probably was over an extended --
3    more extended six to seven months.  But, again,
4    I don't have a recollection of that, what went
5    into that invoice exactly.
6    Q.    All right.  And so then --
7    A.    But you can assume that everything
8    that pertained to the -- those -- that MDL or
9    whenever things got wrapped into that MDL,
10    everything was -- everything from the beginning
11    through the time of that invoice got wrapped
12    into that invoice.
13         So you could interpret it as over
14    two years or -- I mean, I don't know.  I don't
15    want to misspeak here, but you get the drift.
16    Q.    I do.  And so how do you keep track
17    of the time spent on this matter before you
18    actually issue the invoice?
19    A.    I just tend to write down, scribble
20    on a personal sheet of paper what -- the number
21    of hours that I spent.  So it's just a number
22    that is scribbled.
23    Q.    All right.  And so then you -- who
24    is responsible for issuing invoices?
25    A.    I turn it over to counsel, that

Page 53

1    counsel being my spouse.
2    Q.    And you hand her all the different
3    individual pieces of paper with your scribbles
4    on it?
5    A.    Yeah.  I hand her the paper.  And I
6    tend to -- she -- if you don't mind, just, if
7    you want to keep it up, I'd love to see it.  I
8    mean, if you don't mind.
9    Q.    Sure.
10    A.    Thanks.  She tends to ask me to do
11    the math and just give her the total number of
12    hours.
13    Q.    Okay.
14    A.    And she knows the rate.  She will
15    put the invoice together.
16    Q.    What is your current rate, Doctor?
17    A.    $1,250.
18    Q.    And what would be your estimate on
19    how many hours you spent in connection with the
20    work on this matter after being reengaged in
21    the spring of last year?
22    A.    So I think that -- let me just
23    break it up into -- again, I have not added it
24    up specifically.  There's no final tabulation.
25    But now that you asked me that question, I

Page 54

1  looked at it. I think it's fair to say through
2  the report I would say in the mid-500 hours.
3  And it's from November for the last six months.
4  Let's just round it off to about probably 300
5  hours. That would give you a good sense of the
6  number of hours. But, again, I don't have an
7  exact, but it should be in that ballpark.
8      Q.    All right. And so understanding
9  it's an estimate, as you sit here today, a
10  reasonable estimate, based on your review,
11  would be 850 hours spent from spring of last
12  year until today?
13     A.    It may not be quite that high.
14  Again, yes, as I understand it, you will -- as
15  soon as I do the invoices, you will get the
16  invoices. I leave that to counsel. So you
17  will get it exact. But, yeah, I think -- let's
18  work from 800. It's around that, I think,
19  would be fair.
20     Q.    All right. And that is the way it
21  works. But unless you want to come back and
22  see me again, this is my only time to ask you
23  questions. So I'm trying to get an estimate.
24  And I appreciate you having done some work to
25  try to get that estimate.

Page 55

1      A.    You sound like my dentist.
2      Q.    So the -- if you had to say what
3  went into that approximately 550 hours up to
4  the report November 2023, different buckets,
5  what would you say would be the different
6  buckets?
7      A.    What went into -- I'm sorry? What
8  did I do?
9      Q.    Yes. Let's say different
10  categories of stuff that you did that went
11  into, ultimately, the preparation of the
12  report?
13     A.    I mean, it's research and writing,
14  right. I mean, it's research and writing.
15  It's research, thinking, writing. Obviously,
16  there's conversations I'm dictating. But
17  there's -- I'm doing research. I'm reading.
18  I'm thinking. I'm doing more research. I'm
19  writing. There's conversations, as you know,
20  along the way; and I'm dictating.
21     Q.    All right. I'm not interested in
22  the content of the conversations.
23         When you're referring to
24  conversations, are you referring to
25  conversations with counsel?

Page 56

1      A.    Yeah, I think that -- yeah, of
2  course.
3      Q.    But just to clarify, in connection
4  with the preparation of your report --
5  withdrawn.
6         In connection with both reports
7  that you have issued in this matter, did you
8  consult with anybody else other than counsel?
9      A.    Not to my knowledge. Nothing that
10  I remember, sir.
11     Q.    And just to make sure the question
12  is clear, when I say "consult," I don't want
13  there to be some kind of specific term.
14         Did you communicate with anyone
15  other than counsel in preparation of your two
16  reports in this case about any substantive
17  issue?
18     A.    Not that I recall, no. I mean, I
19  did not talk to other experts in this matter.
20  I don't want to say that the word "talc" never
21  arose over the last six years in any other
22  conversation, whatever, not that I recall; but,
23  you know, I mean, this is the work of me, you
24  know, with the record in front of me as a
25  relatively solitary worker -- or solitary

Page 57

1  worker. I don't mean to add an adjective in
2  front of me. This is me and my computer
3  screen.
4      Q.    Okay. The 300 hours approximately
5  from November until today, if you would break
6  that down into how you spent that 300 hours,
7  what would you say?
8      A.    Again, I mean, obviously, there was
9  some -- everything is in preparation for you,
10  right. You know, there's no fine line. I knew
11  we were going to have this opportunity to talk.
12  But there were questions that I was still
13  interested in studying and trying to learn the
14  answers to even after my report was done. So I
15  continued to learn and to study.
16     Q.    Okay. And as you sit here today,
17  what were those questions that you continued to
18  learn more about after the issuance of your
19  report November 2023?
20     A.    There was one question that just
21  kept on puzzling me. And there was some subset
22  questions that I -- you know, these weren't new
23  questions, but they were questions that I was
24  still trying to learn.
25         And still to this day, sir -- let

Page 58

1 me just put on the record -- still trying to
2 learn, you know, the full answers. You know, I
3 think my report -- let me just say -- digress
4 for a second and get back to your question.
5        My opinions in the report, the last
6 report, are my opinions. I don't have new
7 opinions. But one always learns more in
8 things, you know, expand upon or give more
9 substance.
10       The question was -- the sort of
11 central question -- that in 1976 J&J, CTFA, I
12 mean, the cosmetic industry, the suppliers,
13 basically said to the agency and to the public
14 we're putting into this existence this
15 laboratory test method, this J4-1, that would
16 assure that talcum powder would be asbestos
17 free.
18       And that statement you can see
19 cited that that date is the agency -- everyone
20 said, okay, good. We now have this quality
21 control method in place in 1976. And then we
22 can, you know, be rest assured that's
23 assurances that the product can be used safely.
24       What puzzled me from -- again, I
25 don't know exactly when the question dawned on

Page 59

1 me, but it was how could you have a quality
2 system, right, in a J4-1 method and a testing
3 method that assures, okay, we are going to make
4 sure that there's no asbestos that gets in
5 there?
6        How can you never have a positive
7 result after?
8        There was never a quality control
9 rejected sample. And how could that be, right?
10       And then there was sort of -- this
11 sort of adjacent or, you know, associated
12 questions, you know, just in light of the known
13 geology, how could J&J and its suppliers, its
14 contractors, sort of be confident that there
15 was no asbestos in its mined product.
16       I saw that, you know, at various
17 times J&J and its suppliers put in place, you
18 know, a fiber management program, you know,
19 that included, you know, sort of selective
20 mining, et cetera. That program is
21 well-documented in the record.
22       You know, there's a fiber
23 management program. You're managing fibers,
24 but J&J kept on saying there's no asbestos;
25 we've never found asbestos. So that

Page 60

1 question -- that question plagued me for a
2 considerable time, and I wanted to get the
3 answer to that question.
4     Q.    And so how did you then -- what I'm
5 wondering, then, is, what additional -- well,
6 withdrawn.
7        Are the additional materials that
8 you reviewed in connection with that puzzling
9 question, as you put it, reflected in your
10 second amended materials considered list?
11    A.    Yeah. I mean, again -- I mean, I
12 had access -- the answer is yes, but let me
13 just -- so I had access, and I insisted upon
14 access. One, thank you, meaning the company.
15 You put on the -- in public health something
16 called Facts About Talc, which had thousands of
17 documents of evidence that you saw as relevant.
18 So I had that database. But I had the
19 discovery database.
20       And, you know, there were documents
21 that I had probably seen before doing that
22 report that I went back to, but I continued to
23 search that record to get the answers to that
24 question.
25       And, again, the answers, you

Page 61

1 know -- my opinions on the answer to those
2 questions are well laid out, I mean, in the
3 report; but I continued to research it, you
4 know, and to get to the basic -- I mean, as my
5 report says, I think, you know, throughout the
6 manufacturing process J&J, its suppliers, its
7 contractors, the trade association, masked the
8 presence of asbestos in talc throughout that
9 process. And I think my report deals with that
10 in great detail.
11       But that masking -- how that -- how
12 the -- how that got masked and that -- I mean,
13 I think that's the essential, you know --
14 that's my essential takeaway of what the last
15 50 years has been about.
16    Q.    And when you say the masking of the
17 presence of asbestos, are you referring to the
18 industry's use of J4-1 method?
19    A.    Let me give you what I think went
20 into that, the answer to that question.
21       So I think at first it was the ways
22 that asbestos and the fibers were masked. I
23 think the grinding and crushing and the milling
24 process. If you look at the Raymond roller, if
25 you look at -- if you know about the sieve, you

16 (Pages 58 - 61)

Page 62

1  know, what that grinds to. If you know that
2  the product specs for certainly of Grade 25
3  talc, certainly that is the latest talc that
4  I'm aware of, of the raw material, that -- you
5  know, that grinding and processing -- let me
6  expand.
7       So I think it's the grinding and
8  crushing and the milling process down to that
9  micron size of that particle distribution -- I
10 guess the median is, what, 10.9 from -- don't
11 hold me to it -- with a range of 7 to 14. Once
12 you grind it and you crush to that, the fact
13 the sample needs to be passed through this
14 minus 325 mesh prior to testing at further
15 impacts, you know, particle dimensions, the
16 extremely low sensitivity.
17      If you look at the how it was
18 validated of the test leading to a false
19 negative, the numerous requirements that had to
20 be met to report a positive finding, the
21 practice of retesting a positive result that
22 sort of -- the head scratcher, that J4-1 was
23 never set out. There was no adequate method to
24 detect chrysotile from the beginning.
25      The fact that improved sensitivity

Page 63

1  methods were never utilized. The fact that
2  testing was not reliable and companies knew
3  about it from laboratory to laboratory. The
4  fact that other methods were known to be more
5  sensitive, but were not used for many years. I
6  mean, you put all the totality together, you
7  know.
8       Back in 1973 you look at the
9  Federal Register. FDA says or the government
10 says it recognizes that asbestos -- it's
11 reasonable to expect asbestos is going to be in
12 talc. And put in method J4-1, and it's always
13 no asbestos is ever found, right. Asbestos has
14 always been there. It's just been masked in my
15 opinion.
16   Q.   Okay. Thank you.
17      And how about this -- it's not as
18 much for you, Dr. Kessler, as much for Suzanne,
19 the court reporter, to get a short break.
20      And how about this: Let's go off
21 the record. And I saw you a couple of times
22 looking down, which is totally fine, at what
23 was in front of you.
24      MR. EWALD: So, Leigh, if during
25 the break you can take pictures of the

Page 64

1  materials that Dr. Kessler has in front of
2  him, send them to my e-mail address or to
3  Suzanne, and she can forward them along,
4  that would be great.
5       MS. O'DELL: John, I will be happy
6  to do that.
7       We will take five minutes.
8       MR. EWALD: That's fine for me.
9       (Whereupon, a break was taken.)
10 BY MR. EWALD:
11   Q.   All right. Doctor, a couple of
12 things I wanted to clear up, and then we'll go
13 in a different direction.
14      First, let's mark as Exhibit 5 a
15 picture that counsel provided over the break
16 that reflects the materials that you have --
17 some of the materials you have.
18      Are the materials in front of you
19 or behind you?
20   A.   I have materials in front of me, to
21 the side of me, and behind me.
22      (Whereupon, Exhibit 5, Photograph
23 of materials the witness has, was marked
24 for identification.)
25

Page 65

1  BY MR. EWALD:
2   Q.   Understood. But the large paper
3  sheets with papers on them, is that actually in
4  front of you right now?
5   A.   I have papers in front of me and to
6  the side of me. I don't think any are behind
7  me. I have them to the front of me and to the
8  side of me is my understanding.
9   Q.   And so at least from the picture,
10 it appears that these are things, like your
11 report, there's a clamped set of documents with
12 an orange label on the front saying,
13 "Processing Windsor Mill," right?
14   A.   That's the -- again, I apologize.
15 I have not seen the pictures. Counsel took the
16 pictures. It's not shared with me. But,
17 processing, yes, that's to the side of me.
18 There are pictures of -- those are folders to
19 the side of me, yes, sir.
20   Q.   Okay. And so I don't want to get
21 too bogged down on this.
22      But the clipped sets of documents
23 with orange titles on the front, those are
24 located to your right?
25   A.   That's correct.

17 (Pages 62 - 65)

Page 66

1        I'm going ask to counsel just a
2   quick question.
3        MS. O'DELL:  John, one thing would
4   be helpful is if you're describing it, if
5   you put up the picture so he sees what
6   you're seeing, because I did not show
7   those to Dr. Kessler.
8        MR. EWALD:  Sure.
9        MS. O'DELL:  John, if you want
10  someone to have a more detailed look at
11  these, you're welcome to send someone
12  over.  Obviously, Johnson & Johnson is
13  quite close; and they can look at these
14  materials.
15       MR. EWALD:  I appreciate that.  And
16  I do think that after the deposition, I
17  would ask on the record that they be kept
18  where they are in the deposition.  And we
19  will have somebody either copy them or
20  take a look at them.
21  BY MR. EWALD:
22    Q.    But right now what I'm just trying
23  to figure out is what, if anything, do you have
24  in front of you right now, Dr. Kessler?
25    A.    So I have a pad that has about --

Page 67

1   don't hold it to me -- maybe it's 20 pages,
2   okay.  It's clipped with one clip, and there '
3   a page in front of me that says, "Folders."
4        And all those orange things that
5   are to the right of me have a name, and that
6   list of all those folders are there.  So -- and
7   then I have -- on the pad in front of me, I
8   have about 10, 15 pages of paper that have
9   various documents that are pasted on those
10  pieces of paper.
11       And the first page is -- that goes
12  to the -- what I think is the essential -- you
13  asked me about the question about what I have
14  been researching and studying, the ways
15  asbestos in fibers were masked in front of me.
16       MR. EWALD:  So we would request
17  over the next break pictures of the
18  15 pages that are actually in front of
19  Dr. Kessler.  The question --
20       MS. O'DELL:  I would say, John, we
21  provided a picture of that.  So I sent
22  three pictures, and I gave you a picture
23  of, not every page, but certainly what is
24  in front of him.  And so just trying to
25  short circuit this.

Page 68

1        MR. EWALD:  I understand.  I guess
2   I only received -- maybe we can do this
3   off the record.
4        THE COURT REPORTER:  Would you like
5   to go off the record?
6        MS. O'DELL:  No.
7        MR. EWALD:  Okay.  I got one
8   picture.  Over the break we'll figure this
9   out.
10  BY MR. EWALD:
11    Q.    Anyway, the orange piles with --
12    A.    Yes, sir.
13    Q.    -- or the piles with the orange
14  label in front, who put those documents
15  together?
16    A.    They were done with me, and I had
17  two -- I apologize for the term -- two task
18  rabbits that sometimes come to the house and
19  helped me paste papers on paper over the
20  weekend.
21    Q.    Okay.  On the preparation for
22  today's deposition, how many times did you meet
23  with counsel to prepare for today's deposition?
24    A.    I don't mean to be -- you know, I
25  don't mean to parse your question.  I mean,

Page 69

1   I've been preparing for the deposition for a
2   long time.  So I think what you mean,
3   Ms. O'Dell came to the house yesterday, I think
4   a little on Saturday; and Sunday Dr. Thompson
5   similarly arrived this weekend.  But, you know,
6   obviously, preparations over -- everything is
7   preparation.
8     Q.    Okay.  And did you meet with any
9   lawyers in preparation for today's deposition
10  last week?
11    A.    I'm sure there were calls on -- I'm
12  sure there were telephone calls last week.
13  Yes, I'm sure.
14    Q.    But were there -- there were not
15  any in-person meetings with counsel in
16  preparation for today's deposition last week?
17    A.    No.  Everything was -- my
18  recollection was Saturday and Sunday.
19    Q.    All right.  So before being
20  retained as an expert in this case, what did
21  you know about asbestos?
22    A.    I certainly knew about the asbestos
23  as a cause of mesothelioma.
24    Q.    Okay.  What else?
25    A.    I certainly -- you know, I had

18 (Pages 66 - 69)

Page 70

1  gone -- I had come out of a generation of -- I
2  mean, my work -- my early work was in
3  laboratories of cancer research. So I was
4  certainly -- I mean, always certainly aware
5  aware of the theories of carcinogenicity.
6      Q.    Did any of your lab research relate
7  to asbestos?
8      A.    Not the -- no. I mean, it was only
9  carcinogenicity and the mechanisms of
10  carcinogenicity. And certainly, you know, I
11  was involved in tobacco carcinogenicity.
12      Q.    Before you were retained as an
13  expert in this case, did you ever hear the word
14  "asbestiform"?
15      A.    I'm sure I've heard the word
16  "asbestiform." I don't have a specific
17  recollection, but I'm sure I've heard the word
18  "asbestiform."
19      Q.    Did you have an understanding --
20      A.    It --
21      Q.    Go ahead.
22      A.    I apologize. I stepped on you.
23      Q.    Did you have an understanding --
24  that wasn't the best question by me.
25          Did you have an understanding,

Page 71

1  before being retained as an expert in the case
2  here, as to what "asbestiform" meant?
3      A.    I don't remember exactly the
4  gradations of knowledge. I couldn't answer
5  that. I think the -- you know, other than
6  asbestos, it was a general understanding of
7  that. I don't recall exactly the line before
8  2016 and after 2016.
9          I have done enough, you know, that
10  I was in charge of the National Center for
11  Toxicological Research -- people don't realize
12  that -- at FDA. But I did a lot of
13  carcinogeneses research in fundamental
14  mechanisms, biological inflammatory, chronic
15  inflammatory, the particle-induced. So I mean,
16  there was a general understanding, but not more
17  than that.
18      Q.    But to be clear, you're not aware
19  of doing any research relating to asbestos
20  specifically at the time you were at the
21  National Center For Toxicological Research?
22      A.    I wasn't -- I was in charge of
23  that, NCTR, right, in Arkansas. But I did not
24  involve myself in any asbestos research.
25      Q.    Before being retained as an expert

Page 72

1  in this case, were you aware that there were
2  different types of asbestos?
3      A.    Again, I don't have an exact sense
4  of -- you know, I do -- there were different
5  minerals, et cetera, that were -- that could --
6  they were classified in fiber form. And as
7  asbestos, I don't remember exactly what I knew
8  before or afterwards. It's somewhat of a blur,
9  sir.
10      Q.    Do you -- before being retained as
11  an expert here, did you have an understanding
12  that there were non-asbestiform amphiboles?
13      A.    Probably not in any detail, I think
14  would be fair.
15      Q.    Did you have an understanding of
16  what an amphibole was before being retained as
17  an expert here?
18      A.    No. There's some geology, but --
19  and, again, other than -- and I've done, you
20  know -- I was certainly schooled in organic
21  chemistry, et cetera. So, again, I had some
22  basic -- you know, some basic fundamental
23  science knowledge, probably more than the
24  average person; but I don't remember exactly
25  what I knew.

Page 73

1      Q.    Okay. Before being retained as an
2  expert in this case, did you have any knowledge
3  regarding laboratory testing methodology for
4  the presence of asbestos?
5          MS. O'DELL: Object to the form.
6          THE WITNESS: Not -- only varied --
7      only very generally. Not in any great
8      form. I'm certainly familiar with the
9      different methods before.
10          But, again, my answer is the same.
11      It's vague of exactly how my knowledge
12      evolved by 2016. The general methods
13      probably, but I did not spend a lot of
14      time on methods; and it wasn't a prime
15      subject of my research.
16  BY MR. EWALD:
17      Q.    When you say "a general
18  understanding of the different methods," what
19  general understanding did you have in 2016?
20      A.    Well, I mean, I was trained in -- I
21  can -- you know, going back to the electron
22  microscope, TEM, my undergraduate days,
23  et cetera, so I have general knowledge of
24  different kinds of methods and as they could
25  apply to different kinds of biological agents;

19 (Pages 70 - 73)

Page 74

1  but it was a general scientific sense.
2      Q.   Okay.  And so I take it --
3      A.   I had not studied -- I'm sorry.
4  Let me stop there.  I apologize.
5      Q.   I was going to say that the -- am I
6  correct that before being retained as an expert
7  in this case, you were not aware of any testing
8  methods specifically as it relates to asbestos?
9          MS. O'DELL:  Object to the form.
10         THE WITNESS:  I don't -- I don't
11 recall what I knew exactly before.
12 BY MR. EWALD:
13     Q.   Okay.  Before being retained as an
14 expert in this case, did you know anything
15 about the chemical and geological relationship
16 between talc and asbestos?
17     A.   Not in exquisite form.  You know, I
18 had some general understanding of basic
19 principles but not in specific form.
20     Q.   What basic principles did you
21 understand before 2016 about the chemical and
22 geological relationship between talc and
23 asbestos?
24     A.   Well, there was probably some, you
25 know -- again, I apologize.  I just don't have

Page 75

1  a very clear demarcation in my knowledge.  I
2  mean, I was not -- the one thing -- I mean, I
3  had some general understanding of geology.  You
4  know, I come from a place that had a very
5  strong geology history.  But the -- there were
6  certainly gaps in my understanding prior to
7  involvement in this matter.
8      Q.   When you say you "come from a place
9  with a great geology history," where are you
10 referring to?
11     A.   Well, my college.  I mean, it has a
12 very strong -- some of the great geologists of
13 the prior two centuries come from that place.
14 You go up -- there was a very significant
15 investment in geology as a fundamental science
16 it was involved in.  But, again, I mean, I was
17 on the biological side of that; and there were
18 gaps in my understanding.
19     Q.   Did you take any geology courses in
20 college that you can remember?
21     A.   Not that I -- I took inorganic
22 chemical courses.
23     Q.   And you're not a geologist, right?
24     A.   I'm not a geologist.
25     Q.   And you're not a mineralogist,

Page 76

1  right?
2      A.   Well said.
3      Q.   And you're not a microscopist?
4      A.   Well, so let's just be careful.  I
5  am certainly -- you know, how do you want to
6  define a "microscopist"?
7          You have wonderful -- you and I am
8  sure both have qualified experts in all these
9  areas.  I'm not -- let me see if I can be
10 helpful to you.
11         I am not your geology, mineralogy,
12 microscopist expert, right.  My reg -- I can be
13 hopefully helpful as the intersection of those
14 areas with the regulatory world.  But I mean,
15 honest, pure geological question, while I had
16 in order to understand the regulations, as is
17 always is the case, you have to have an
18 understanding and study the geology.
19         Certainly, other experts should
20 testify, I mean, on the geology, mineralogy,
21 and microscopy aspects.  I do not want to get
22 involved.
23         As it relates to regulatory
24 questions and the opinions I've given, I have
25 to be comfortable in that intersection.  But

Page 77

1  that's been my whole life, and that's been my
2  whole training experience.
3      Q.   Okay.  So are you -- I'm not clear.
4          Are you suggesting that you are an
5  expert in microscopy?
6      A.   Well, I certainly have an
7  understanding of microscopy, a basic
8  understanding, right, more than the general
9  person.  I mean, I've done microscopy.  I've
10 done, right, but I will -- I'm not going to
11 testify on microscopy.
12         But obviously, if there's a lab
13 test that is regulated by the agency that
14 involves microscopy, then I have to understand
15 enough to understand that intersection.
16     Q.   When you say you have a basic
17 understanding of microscopy, you've done
18 microscopy, what microscopy have you done?
19     A.   If you want to give me a urine
20 sample, I can look and see whether you have a
21 bacterial infection.  I can do a basic gram
22 stain under a -- you know, under a microscope.
23 I can look at certain pathological fixated
24 slides stained with various chemicals.  I have
25 done that.

20 (Pages 74 - 77)

Page 78

1    Again, sir, I do not want -- I am
2  not going to be the microscopist, only to the
3  extent that you would expect a physician
4  scientist regulator, who is -- I mean, I spend
5  my life regulating diagnostic and laboratory
6  tests; and microscopy is a part of that.
7    The science of microscopy, please
8  have other experts.  If it relates to FDA and
9  diagnostic tests, I'm happy to discuss that.
10   Q.   Okay.  But it's fair to say that
11 you have never personally used any testing
12 method to attempt to detect the presence of
13 asbestos in any media?
14   A.   That would be fair.
15   Q.   And it's fair to say that you've
16 never witnessed someone else test media for the
17 presence of asbestos using a microscopy method?
18   A.   I reviewed, you know, hundreds and
19 hundreds of documents that, I mean, is part of
20 the record that involved that.  But the answer
21 to your question is no.  I mean, I have not.
22    But I have -- I mean, I am
23 certainly comfortable in reading reports that
24 result from tests where, the microscopy TEM.  I
25 mean, that's what I do.

Page 79

1    Q.   What, if anything, did you know
2  about the -- let's put it this way:  Before
3  being retained as an expert in 2016, what, if
4  anything, did you know about talc?
5    A.   I had a very basic knowledge of
6  talc.  It was just general knowledge of talc.
7    Q.   What did you generally understand
8  about talc?
9    A.   I had some general background
10 knowledge, and I can't quite remember it.  I
11 mean, I certainly was aware that there was some
12 controversy around talc.  I don't think I ever
13 dealt with that or studied that controversy.
14    But I think that I, you know -- I
15 mean, I'll tell you that I lived -- you know,
16 again, it's very hard to know exactly in 2016
17 what I knew when.  My brain just doesn't
18 compartmentalize that.  But generally, I mean,
19 I thought there was a world of asbestos and
20 there was a world of talc; and I didn't connect
21 them.  I never studied the relationship to have
22 any real deep appreciation of that.
23    Q.   All right.
24    A.   I think I had the general view of,
25 you know, the average doc, the average

Page 80

1  clinically trained scientist, doctor about
2  that.  I don't think I had any more knowledge
3  of that, sir.
4    Q.   Before the last break, you were
5  talking about certain things with respect to
6  the grinding, crushing, and milling process of
7  talc.
8    Before being retained as an expert
9  in this case, what, if anything, did you know
10 about the mining of talc?
11   A.   I had not spent time studying that
12 at all, so I mean, I did not study that.  I
13 could not tell you the particle size.  I could
14 not tell you the specifications.  I could not
15 tell you what the effects were of that process
16 before I -- before 2016.
17   Q.   All right.  Are let's talk about
18 your process for the work in this case.  And I
19 want to start with the more recent work you did
20 from approximately spring 2023 until today.
21 And I guess the question to you is, you were
22 asked -- well, let me pause for a moment.
23    If you go to paragraph 25 of your
24 report please.
25   A.   Yes, sir.

Page 81

1    Q.   All right.  So you say in
2  paragraph 25 that "after leaving government
3  service in January 2023, I have had the
4  opportunity to review more documents discussed
5  above."  Right?
6    A.   Yes, sir.
7    Q.   And is that in part at least
8  considered -- referring to paragraphs 12 and 13
9  in the preceding pages?
10   A.   I would have to look, sir.  I
11 don't --
12   Q.   Sure.
13   A.   Sure, sir.
14   Q.   Okay.  And so in paragraph 12 it
15 talks about what was available to you,
16 including the MDL discovery repository,
17 deposition transcripts and exhibits, trial
18 testimony and exhibits, all the documents
19 available on Johnson & Johnson's website Review
20 the Evidence page, it talks about talc, and
21 FDA's website, correct?
22   A.   Yes, sir.
23   Q.   All right.  And then you talk about
24 the documents you considered are listed in
25 Appendix C.  What I'm going to do is -- my

21 (Pages 78 - 81)

Page 82

1 understanding is that there was a materials
2 considered list that was included as an
3 appendix in your November 2023 report, right?
4    A.    Correct.
5          MR. EWALD:  We'll mark that one as
6 Exhibit 6.
7          (Whereupon, Exhibit 6, Reliance
8    List Initial Report, was marked for
9    identification.)
10 BY MR. EWALD:
11    Q.    And then there was a First Amended
12 Appendix C For Materials Considered after that,
13 correct?
14    A.    Correct.
15          MR. EWALD:  We'll mark that as
16 Exhibit 7.
17          (Whereupon, Exhibit 7, First
18    Amended Appendix C Materials Considered,
19    was marked for identification.)
20          MR. EWALD:  And then there was a
21    Second Amended Appendix C Materials
22    Considered dated April 1st, 2024.  We'll
23    mark that as Exhibit 8.
24
25

Page 83

1          (Whereupon, Exhibit 8, First
2    Amended Appendix C Materials Considered,
3    was marked for identification.)
4 BY MR. EWALD:
5    Q.    Is that the most recent materials
6 considered list that you have for this case,
7 sir?
8    A.    That all tracks with my
9 understanding, sir.
10    Q.    All right.  And the materials
11 considered list -- unless I say anything
12 differently, we'll work off of Exhibit 8, which
13 is the second amended.
14          And that one is 84 pages long,
15 correct?
16    A.    I take your stipulation.  Whatever
17 you stipulate, I'm happy to agree to.
18    Q.    Okay.  So given your knowledge
19 level of the topics that we discussed before
20 talking about the materials considered, walk me
21 through your process in how you researched the
22 questions that were posed to you in connection
23 with your November 2023 report?
24    A.    So I have a number of -- I mean,
25 you start with my -- opening report dealt, I

Page 84

1 think, pretty extensively with the frame- --
2 with the regulatory framework of cosmetics,
3 right.  So let's put that -- I mean, I start
4 with that.
5    Q.    Okay.
6    A.    I start with the basic Food and
7 Drug Regulatory framework, right.  And
8 certainly reviewed that again as I reentered
9 here, right.  So I wanted to see where I left
10 off.
11          As you can tell -- again, let me
12 just digress a little.  The opening report
13 dealt with a few -- besides the statutory
14 framework and what were the general
15 requirements, it dealt with a few of the key --
16 if my recollection is right, I mean, it based
17 my -- I based the report off some key -- what's
18 the right word -- key sentinel states of
19 pronouncement from the federal government to
20 other agencies.
21          So, for example, if my memory is
22 right, you know, I dealt with -- I looked at
23 the FDA's response in 2014.  I looked at IARC.
24 And so there was a general let's look at the
25 record that FDA put in that report.  I think I

Page 85

1 updated it from 2014 to be complete.  But I
2 didn't go beyond those, I mean, specific
3 sentinel events that were cited in that opening
4 report.  I did that in the beginning in spring
5 of 2023.
6          You know, the first question for me
7 was, well, what's the record here; how do I
8 make sure that I'm looking -- you know, I'm
9 basing opinions on a complete record,
10 recognizing there's no such thing as complete
11 information.
12          I don't think anyone has complete
13 information over a 50-year-history, you know.
14 There is documents, and you only have what's
15 produced and what people can find.  So the
16 first question was:  What's the evidentiary
17 base of which to look.
18          The thing that I sort of -- what is
19 the right word -- stumbled upon or I saw was,
20 in asking the question what's the record to
21 answer these questions, I found this, you know.
22          In the Facts About Talc there is --
23 if you put it up -- I think there's a section
24 there called "The Evidence" or something like
25 that where someone for the Johnson & Johnson

22 (Pages 82 - 85)

Page 86

1  says here is the evidence, go make up your own
2  mind. And there are a lot of documents. Most
3  of those are trial exhibits, but, again, put
4  together by the defendants.
5      And I think then there were a
6  series of Daubert hearings or whatever. I
7  focused primarily on the underlying documents
8  that were put on by the -- by Johnson &
9  Johnson. So that was the first bucket, as I
10 put in that footnote.
11     And then I asked for access to the
12 entire discovery database. And in that it
13 included all the materials produced as well as
14 there were -- you know, there are many
15 depositions and a lot of other documents that
16 went into that discovery database. So I
17 reviewed the Facts About Talc. I reviewed
18 those documents.
19     And then I did -- a majority of the
20 time would probably be -- you would say would
21 be -- the best way to characterize it is spent
22 searching a database for over the months, that
23 discovery database.
24   Q.    Okay. So it's your testimony that
25 the first thing you started researching was

Page 87

1  going to J&J's Facts About Talc website?
2    A.   I'm not sure first. That was
3  certainly right up there. I asked -- I wanted
4  to make sure I had access to, you know, all,
5  you know, what people considered to be the
6  record in this case. I mean, there's no -- so
7  I'm not saying, you know, the records are a
8  vast, you know, concept here; but that seemed
9  to be a good -- again, I don't want to say --
10 maybe I looked at the discovery database before
11 I looked at the Facts About Talc. I can't tell
12 you exactly the order.
13     But very early on from the
14 beginning, I wanted to see, all right, what is
15 the evidence that the defendants are putting
16 forward in this matter; and it was all there.
17 I mean, it wasn't all there, but there was a
18 lot there.
19   Q.    Well, is it your understanding that
20 Facts About Talc includes exhibits admitted at
21 trial by both parties?
22   A.    Yes, sir, exactly. I thought that
23 that was a good place to start, right. The
24 fact -- that was the assertion. Here's
25 something, go make up your own mind, right. So

Page 88

1  it was exactly that.
2      In fact, there were about five or
3  six different sets. You can tell they were
4  D documents or P -- I mean, I'd have to go
5  look. They were marked different ways. So
6  you've got to -- it was clear that they came
7  from a number of different sources.
8    Q.    Okay. And so did you conduct any
9  searches in that initial phase of looking at
10 Facts About Talc?
11   A.    My first effort that I recall was
12 to go through those documents.
13   Q.    When you say "go through those
14 documents," you reviewed every document that
15 talks about talc?
16   A.    I attempted to, yes. I attempted
17 to look at every -- that's why my numbers and
18 my hours are relatively high here. I actually
19 wanted to look at -- I mean, I don't want to
20 represent that I studied in detail every
21 document, but my goal was to at least scan
22 every document to the extent that my technology
23 allowed me to do that and my -- the numbers of
24 hours that I had. But I don't want to
25 represent, again, that I studied every

Page 89

1  document, but I attempted to do that.
2    Q.    Okay. And walk me through your
3  process when you're looking at these documents.
4      Are you taking notes along the way?
5    A.    You know, thanks to Apple and
6  whatever, we have iPads now; and there's a
7  swipe feature. And my recollection is that I
8  did mark documents.
9      I don't want to get too much into
10 the -- I don't want to cross the line -- let me
11 look at counsel -- of what's processed in
12 preparation of reports, et cetera.
13     MS. O'DELL:  We will take the
14     position, John, anything that are his
15     notes that ultimately became part of the
16     report would be work product and be
17     protected as part of drafts of the report.
18     That is my position on that.
19     MR. EWALD:  And I, at this point,
20     am not pushing for any of that. I'm
21     trying to understand what exists.
22 BY MR. EWALD:
23   Q.    And so without getting into the
24 content of that, you say you marked different
25 documents as you flipped through your iPad.

23 (Pages 86 - 89)

Page 90

1    Are you saying you marked -- let me
2  put it this way: What did you mean when you
3  said you marked the documents on your iPad?
4    A.    Exactly that. I mean, I used a
5  stylist, and I would circle -- I mean, it's
6  possible I -- you know, I mean, I actually
7  scribbled, right, something on a number of
8  those -- on those pages as I was going through
9  them. I actually marked those documents --
10  marked certain documents.
11    Q.    All right. So before actually
12  going into the discovery database or the Facts
13  About Talc website, did you review any, for
14  lack of a better word, background documents on
15  the topic?
16    A.    My opening report.
17    Q.    Okay. And so before going into the
18  Facts About Talc or the document discovery
19  database, you didn't receive sort of a starter
20  pack of materials from plaintiff's counsel
21  about the asbestos controversy?
22    A.    I can tell you I didn't want any
23  starter materials.
24    Q.    Okay.
25    A.    I mean, I resisted. Now, there may

Page 91

1  have been -- going back to 2016, you know, I
2  may have asked -- you know, in the opening
3  report it may have been a little different. I
4  may have asked for this CIR ingredient review.
5  I may have asked for the citizens' petitions.
6    I think I asked for all -- if my
7  recollection is right, I asked for all the
8  documents that were cited in the 2016 FDA
9  response. So there I did ask counsel, but
10  not -- I mean, for this -- for the -- for this
11  report that you have in front of me. It was
12  me and the databases.
13    Q.    So -- go ahead.
14    A.    Please.
15    Q.    When you went to the database, how
16  did you navigate your way through there to look
17  for documents?
18    A.    Well, again, there's multiple
19  databases, right. So Facts About Talc, Facts
20  About Talc -- I'm scrolling through these PDFs
21  ultimately or some kind of image, and I'm
22  marking them; and I'm swiping.
23    Q.    And, I'm sorry. I should have been
24  clearer. I understand the Facts About Talc.
25    What I unartfully meant to ask is,

Page 92

1  with respect to the MDL document discovery
2  database, how did you navigate your way through
3  that?
4    A.    There's a search bar.
5    Q.    Okay.
6    A.    Right. And, you know, 40 years of
7  experience of searching documents, you know,
8  I'm very comfortable, you know. I sometimes
9  have a hard time printing those documents. I
10  get stumped from those grainy PDFs. But,
11  otherwise, I'm comfortable searching terms.
12    Q.    What sort of search terms do you
13  remember entering?
14    A.    I have probably entered over at
15  times hundreds and hundreds of different search
16  terms. If there's a subject matter in my
17  report, you can look at any page; and I can
18  probably tell you in my report, you know,
19  generally. These are -- the stuff in my report
20  are the stuff that I searched. You can assume
21  that key words from these areas are the words
22  that I searched.
23    Q.    Do you have an understanding of
24  approximately how many documents are in the MDL
25  discovery database?

Page 93

1    A.    Not as many as I would have
2  expected.
3    Q.    Okay. Well, that means you have a
4  sense of how many are in there.
5    How many do you think are in there?
6    A.    I can only tell you what's not when
7  you're looking for stuff. I mean, this is
8  50 years, right. I mean, this is 50 years. So
9  I respect that.
10    But I'm -- you know, I assume that
11  there are millions of documents in that MDL.
12  But there are also areas that I couldn't find
13  stuff in the discovery database, but I assume
14  there's millions. I never actually looked at
15  the total count.
16    Q.    In connection with your searching
17  of the MDL and discovery database, at any point
18  in time -- I don't want to know the
19  specifics -- but at any point in time, did you
20  ask counsel for help on, you know, what to look
21  for?
22    A.    What to look for?
23    Q.    Yes.
24    A.    Yeah.
25    Q.    Okay.

24 (Pages 90 - 93)

Page 94

1    A.    I may have asked counsel if I
2  couldn't print the document or give them a
3  Bates number.  I had some problems at some
4  point getting PDF imaging.  There's always
5  natives that you get back and sometimes -- so I
6  would ask them to print off documents.  Let me
7  just -- I mean, I gave counsel documents.
8    Q.    Okay.  Let's look at your Second
9  Amended Appendix C, that's Exhibit 8.  Let me
10 know when you have it in front of you.
11   A.    Thanks, sir.  I do.
12   Q.    And if you turn to the first page,
13 my understanding from communications with
14 counsel is that the highlighted materials are
15 some of the newer materials that were added to
16 your list.
17       Do you have any understanding of
18 that?
19   A.    I do not know exactly the -- what's
20 been communicated.  I leave it to counsel to
21 represent exactly what was done here.  I can
22 tell you what I did.
23   Q.    First of all, do you -- have you
24 seen a version of this where certain entries
25 are highlighted in yellow?

Page 95

1    A.    I see that.  But, again, I leave
2  this -- the whole production of the considered
3  list to counsel.  I do see it, and I'm aware of
4  it.  And certainly, my goal --
5    Q.    Do you have -- I'm sorry.
6        Do you have an understanding of
7  the --
8        MS. O'DELL:  I think he wasn't
9    finished.
10 BY MR. EWALD:
11   Q.    Sorry.
12   A.    So my -- I'm sorry.  I apologize.
13 Let me just answer your question.
14   Q.    Sure.
15   A.    Just ask, again, your question.
16   Q.    My question was:  Do you have an
17 understanding of what the yellow highlighting
18 is intending to represent?
19       MS. O'DELL:  I will just represent
20   that by counsel that there was an effort
21   to identify newly added materials so it
22   would be apparent to you and others for
23   the defense.
24       THE WITNESS:  So I can add -- and,
25   again, I don't want to get into

Page 96

1  conversations, but I was literally
2  dictating to counsel or to legal staff
3  what documents I had -- at that period of
4  time, had looked at; and I wanted to make
5  sure it was on the list.  So I would tell
6  staff those.
7        And at one point I -- again, I
8  don't want to waive anything -- I said,
9  hey, just make sure to the other side,
10 they know -- I don't want them to have to
11 go through the whole list and have to go
12 search for everything again.  So I mean,
13 that was the import of that.
14 BY MR. EWALD:
15   Q.    If you also flip through this,
16 leaving aside the yellow highlighting, there
17 are some materials that are bolded.
18       Do you know anything about that,
19 why they are bolded?
20   A.    No, I have no idea.  Again, I did
21 not -- not at all.  Well, I have no idea how --
22 certainly, nothing from my perspective has any
23 significance.
24   Q.    If we look at page 2 -- this isn't
25 the only place that you identify it -- but

Page 97

1  there are a number of depositions listed there.
2        Do you see that?
3    A.    Correct.
4    Q.    We talked about the Facts About
5  Talc website.  We talked about the document
6  discovery database.
7        How did you go about identifying
8  deposition and exhibits to review?
9    A.    So there are, if I'm correct -- I
10 have to double check this -- the discovery -- I
11 have to go back and double check this and see
12 which database.  I believe the discovery
13 database has depositions in there and exhibits,
14 but I'd have to go back and double check that.
15       So there were clearly -- so these
16 were searched, I mean, at different points in
17 time.  And if I'm correct, I did amass
18 depositions in some kind of folder and just
19 searched them generally as I searched the whole
20 documents.  So if I was searching a term, I
21 would want to search the depositions too.
22       Certain depositions I read, you
23 understand.  But the majority of the time I'm
24 searching, I'm searching these documents.
25   Q.    And you mentioned the -- I believe

25 (Pages 94 - 97)

Page 98

1 that there was a folder that was amassed with a
2 number of these deposition transcripts.
3         How was that folder -- how were the
4 depositions collected into that folder?
5     A.    They're downloaded and put in and
6 moved in. And I kept -- I mean, I would
7 sometimes save documents and download them.
8 And there were occasional times where I asked
9 counsel could you send me in one place all the
10 exhibits to a deposition.
11     Q.    So --
12     A.    I mean, I would have the
13 deposition, but I could -- but as I'm reading
14 the deposition, I said could you send me the
15 bucket of all the exhibits that were attached
16 to that.
17     Q.    As you sit here today, can you
18 recall any instance in which you asked counsel
19 for help on identifying depositions for you to
20 review?
21     MS. O'DELL:  I object to that
22     question. You're asking for the content
23     of his conversations with counsel. I
24     think that's beyond what's appropriate.
25     MR. EWALD:  Well, to the extent

Page 99

1     that you're -- you, as counsel, are
2     providing materials to your expert, I
3     believe that's clearly within the bounds
4     of Rule 26. And so I guess maybe I will
5     slightly rephrase and see if you like this
6     one.
7 BY MR. EWALD:
8     Q.    Dr. Kessler, did counsel provide
9 you with any of the deposition transcripts that
10 you reviewed?
11     A.    I may have asked for certain
12 volumes. I mean, I -- one thing I am not good
13 at, I get very confused. I mean, I remember
14 was -- you know, how many days was this
15 deposition, and I get all the days of this
16 deposition, et cetera.
17         So, yes, counsel did provide me
18 with depositions because, I mean, I would see a
19 deposition or whatever. But there was --
20 sometimes there are multiple depositions, and I
21 got confused. Yes, counsel provided me with
22 depositions.
23     Q.    What about on the page 3, the next
24 page over, do you see where it says, "All
25 Matthew Sanchez deposition and trial testimony

Page 100

1 exhibits"?
2     A.    Yes.
3     Q.    Who is Matt Sanchez?
4     A.    So Sanchez, I believe, is the one
5 of the principals I think, if I'm right, at
6 RJ Lee.
7     Q.    Okay. And how did you decide to
8 review all of his deposition and trial
9 testimony exhibits?
10     MS. O'DELL:  Object to the form.
11     THE WITNESS:  I was probably
12     reading some kind of trial transcript and
13     some testimony in trying to understand
14     testing. And I wanted to understand -- I
15     wanted to understand everything he was
16     saying.
17 BY MR. EWALD:
18     Q.    Okay. Did you -- in your review of
19 trial transcripts, did you review any attorney
20 opening or closing statements?
21     A.    Possibly. Possibly. I think, you
22 know -- I mean, I have to go back. I have some
23 recollection at some point of Ms. Brown
24 maybe -- I mean, I think -- I forget exactly,
25 but I was interested in seeing what defense was

Page 101

1 saying.
2     Q.    All right. And when you say in
3 your materials considered "All Matthew Sanchez
4 depositions and trial testimony exhibits," does
5 that mean "all"?
6     A.    No. Nothing in life means "all,"
7 right. I mean, I -- I tried to, you know -- I
8 certainly wouldn't want to represent that I
9 have every deposition and every testimony, but
10 it was -- I mean, I asked counsel specifically
11 on Sanchez can I have all the exhibits and can
12 I have the various testimonies.
13         And, again, my recollection is
14 that -- I mean, I was getting confused what
15 gets -- what is this testimony here. Is it
16 getting played in here? So I'm not sorting
17 that out.
18         I just wanted to -- I wanted to
19 understand what Dr. Sanchez was saying. So I
20 mean, that was important to me.
21     Q.    Okay. And so you did receive some
22 testimony from plaintiff's counsel?
23     A.    I certainly -- my recollection is I
24 know I asked for it. My tendency -- what's on
25 the top of my head is I asked for exhibits. I

26 (Pages 98 - 101)

Page 102

1  rarely -- I wanted the exhibits in one place.
2  If I had a deposition or a trial testimony, I
3  wanted the exhibits to be able to review
4  simultaneously, right.
5       It's -- also, I'm sure, you know,
6  for convenience, I said can I get, you know,
7  all of Dr. Sanchez's testimony, all days of
8  that. I don't remember exactly what I said
9  along the way.
10     Q.   Just above that a couple of lines,
11  it says, "All expert reports filed in this
12  matter on November 15, 2023."
13          Do you see that?
14     A.   Yes.
15     Q.   And did you review all of the
16  expert reports filed in this matter on
17  November 15, 2023?
18     A.   I had them made available to me, I
19  believe, in a folder. And, again, I mean, the
20  reports that were done prior to -- let me be
21  exact here.
22          There were reports that were not
23  available to me that were submitted
24  simultaneously with my report, right. You
25  asked -- we are now looking at the Second

Page 103

1  Amended Complaint, right. My report goes in
2  end of last year. And I did ask for -- and I
3  have the -- the expert reports in a folder --
4  can you let me download so if there's anything
5  I want to look at. And that was -- that was
6  after my report.
7       Q.   And so what did you look at amongst
8  expert reports?
9       A.   I can't tell you. I don't have a
10  recollection of every -- I mean, for example --
11  I mean, I did look at Longo 3 after my report
12  was done. That's one that I remember looking
13  at.
14          But, again, you know, I remember
15  studying -- is it Laura Webb? I can't tell you
16  when I looked at what of hers along the way,
17  but I was very interested in what she had said.
18     Q.   Okay. When you say "Longo 3," is
19  that -- you're talking about -- what are you
20  talking about when you say "Longo 3"?
21     A.   So I mean, I believe there was -- I
22  mean, he has a third report. And I have it
23  pasted on -- I forget the date. I mean, I
24  think that was probably the report that got --
25  I don't want to guess.

Page 104

1          THE WITNESS: Could I just ask you
2  for my sheet?
3          I think there's a sheet with that
4  report. I can pull up exactly. I think
5  it is a referred to as the Third Amended
6  Report. I don't have the date in my head.
7  BY MR. EWALD:
8       Q.   That's fine.
9       A.   Actually, I do have it. Thank you.
10  I do. It's dated November 17, 2023.
11     Q.   All right. So you said -- I don't
12  mean to put words in your mouth.
13          Is that what you reviewed recently?
14     A.   It is certainly something that I
15  asked for after my report.
16     Q.   And what do you understand -- well,
17  first of all, what, if at all, do you rely on
18  Longo 3 for in connection with your opinions in
19  this case?
20     A.   So the only thing that I -- in
21  Longo 3, I don't rely on anything in Longo 3.
22     Q.   Okay. Why is that?
23     A.   Because my report was dated before
24  I read Longo 3.
25     Q.   So there's nothing that you

Page 105

1  reviewed after issuance of your report that you
2  are relying on for your opinions in this case?
3          MS. O'DELL: Object to the form.
4          THE WITNESS: From Dr. Longo that
5  I'm relying on? I mean --
6  BY MR. EWALD:
7       Q.   No. I'm asking more generally. I
8  asked you why you're not relying on Longo 3.
9  You said it was issued after your November 2023
10  report, correct?
11     A.   Yeah. There's nothing that --
12  there's none of my opinions that I'm relying on
13  Dr. Longo. There is nothing inconsistent here,
14  I mean, with Dr. Longo; but there's nothing,
15  right.
16          And I do cite -- I mean, you know,
17  I am generally aware and, you know, he's a
18  world-class expert and will testify. And
19  there's nothing I'm saying that I don't think
20  anything inconsistent, but I am not relying on
21  him. He is an expert; I am an expert.
22     Q.   What is your basis for you saying
23  he is a world-class expert?
24     A.   Well, I think that there is, you
25  know, I mean, a career dedicated to studying in

27 (Pages 102 - 105)

Page 106

1 depth these matters. I went back, you know --
2 I think, if I'm correct -- I mean, he goes back
3 to the -- I think he goes -- if you pull up his
4 CV -- I would have to have it in front of me --
5 but it's a relatively distinguished CV.
6        I have no disagreements, no
7 certainly -- but I am not relying on him, sir.
8 He is an expert. And I am just -- again, I'm
9 just an expert. I tend to -- there are
10 occasional times in my -- when I testify where
11 I will rely on an expert, just to be clear so
12 you understand, where my opinion is
13 necessitated or based on certain facts of
14 another expert, right; or I will make
15 assumptions based on another expert. I am not
16 making any assumption based on Dr. Longo or
17 anything like that.
18        He is not -- you know, he is not
19 necessary for any of my opinions. Again,
20 please full respect, full -- you know, no
21 disagreement. Don't read that I have any
22 distance or anything like that. That is not
23 the case. I'm just not relying on him as I am
24 using that word.
25    Q.    Do you consider Dr. Sanchez, Matt

Page 107

1 Sanchez, a world-class expert?
2    A.    You know, I'm sure -- again, I have
3 not studied his CV or looked at it. I have
4 nothing to -- again, I think there is a
5 complicated history with RJ Lee. I don't want
6 to get into it here.
7        So let me just not -- unless you
8 want me to get into that, you know, I have no
9 opinions. I don't think it's important to this
10 matter. I was very interested in the facts
11 that he -- you know, what he was saying.
12    Q.    Okay. And so what I'm hearing you
13 say is that you do think Dr. Longo is a
14 world-class expert, but not Dr. Sanchez; is
15 that what you're saying?
16        MS. O'DELL: Object to the form.
17 Misstates his testimony.
18        THE WITNESS: Yeah. I -- my -- if
19 you want to get into it, I'm happy to --
20 there were issues, very strong
21 disagreements between certain government
22 agencies and RJ Lee. I don't want to
23 implicate Mr. Sanchez in them. There is
24 references to the RJ Lee. Again, I'd like
25 to stay away from that. I think that

Page 108

1    those are distractions.
2        If you want me to -- if you are
3    pulling me in, I'm happy to be responsive.
4 BY MR. EWALD:
5    Q.    But are you referring to the
6 Region 9 discussions --
7    A.    That is one thing that is cited.
8 But, again, I think -- you know, again, I think
9 that's noise in the system. I am trying not to
10 pay attention to it.
11    Q.    I appreciate that. And more
12 broadly, though, do you have the expertise to
13 make a conclusion that you think that
14 Dr. Longo's conclusions are correct on testing
15 and mineralogy and Sanchez's are wrong?
16    A.    I think you have to -- again, I
17 didn't say that. Those are your words,
18 correct.
19    Q.    I didn't say you said that. I
20 didn't say you said that. It's a question.
21    A.    Do I have the expertise?
22        So it is, again, what's very
23 important here, what I think is -- what is
24 central here is the context of this, right.
25 The repeated statements over 50 years that no

Page 109

1 asbestos was ever found in any sample is just
2 not credible in my view.
3        And if you look at what happened
4 here, you would expect that certain samples
5 would have evidence of asbestos. Longo is
6 consistent with that.
7        And I am happy to go through in
8 detail what I think, you know; and I think it's
9 the central aspect, right. You don't take talc
10 from Vermont, right, and process it with that
11 kind of knowledge about the basic geology,
12 subject it to Raymond rollers and forces and
13 not have the effect on the type of fibers that
14 you would expect -- that should be expected
15 there.
16        That and what Dr. Longo did, right,
17 despite 50 years of what I think are statements
18 that are troublesome in light of the evidence,
19 I mean, he persisted as, you know, I mean,
20 others before him, right, in trying to
21 understand, right, what the public health risk
22 was. And I think that was -- in the face of
23 50 years of absolute denial, it was not
24 credible. I think this is one of the most
25 important public health stories. I mean, I

Page 110

1  think it's right up there.
2      Q.   Okay.  And so you do realize that
3  during the entire time that Dr. Longo was doing
4  what you described was being paid as a
5  plaintiff expert, correct?
6      A.   I'm being paid as a plaintiff's
7  expert, sir.  I think I can actually do your
8  company and your client -- to be honest, all I
9  can do is tell you what I see.  And that's all
10  Dr. Longo can tell you, what he sees, right.
11  But I can tell -- let me -- let me finish the
12  answer to my question -- to your question.
13      Q.   Yes, sir.
14      A.   Okay.  What -- what I see is in the
15  face of documents, right, that evidence of
16  fibers, asbestos fibers, asbestiform fibers,
17  were in talc.  And in the face of processes
18  that any -- if you think about it, you know,
19  grind this up to 10 microns, right, put it
20  through meshes of minus 325, send it -- if you
21  get a positive, send it to a different
22  laboratory, the variability between -- the lack
23  of reliability between these laboratories, the
24  sensitivity, I calculate at 14 percent.
25           And to be able to have -- to state

Page 111

1  no asbestos ever in front of the agency both in
2  1976 and in 2016, over 50 years, that's just
3  not credible.
4      Q.   What expertise do you have to reach
5  the conclusion that in 50 years of no asbestos
6  was not credible?
7           What specific expertise in your
8  background, beyond reviewing documents in this
9  litigation, do you have to reach that
10  conclusion, sir?
11      A.   I have led some of the most
12  important investigations on scientific
13  regulatory matters in this country.  Your
14  company knows that, okay.  And I have done
15  that.  I have done that.  That is what I am
16  good at.
17           I can sit here if you'd like -- and
18  I'm prepared to tell you, your company, your
19  board, what I see, right.  But it's not
20  credible, right, to say that there's never been
21  asbestos here over 50 years.  And I am happy to
22  show you the steps, right, that I put together.
23  I'm only as good as what the evidence shows.
24  And I'm happy to do that in detail with you.
25  That's what my report does.  And I'm happy to

Page 112

1  do that today.
2           But make no mistake.  I am very
3  confident, right, of my ability.  And, again,
4  I'm only as good as what the records show.
5           But when you look at that record
6  and you apply some basic scientific regulatory
7  principles and you just look at the document,
8  to go in in 1972 or '73 and tell FDA no
9  asbestos when you have Dr. Hutchinson,
10  et cetera, saying there is TEM and not playing
11  the agency straight, that is something that
12  should not have been done.  And that is
13  specifically within my expertise.
14           I know a misleading statement when
15  I see it, right, based on the evidence.
16      Q.   All right.  So we have been going
17  for about an hour and 15.  It is also here on
18  the east coast almost noon.  I am willing to do
19  whatever on the timing wise and lunch break and
20  everything else, Doctor.  I'm also sensitive,
21  again, to the court reporter's needs to make
22  sure she gets a good record.
23           So with that, let's go off the
24  record.  And we can talk about what we are
25  going to do next.

Page 113

1           (Whereupon, a break was taken.)
2  BY MR. EWALD:
3      Q.   Doctor, can you make sure you have
4  your amended report in front of you?
5      A.   Yes.
6      Q.   Okay.  And if you could go to
7  paragraph 67 on page 18.
8      A.   I'm there.
9      Q.   Okay.
10      A.   67?
11      Q.   Yes, sir.  In that paragraph you
12  state, "In my opinion, once JNJ had evidence of
13  a) the presence of asbestos because of its
14  known carcinogenicity and absence of a
15  threshold dose; or b) the presence of
16  non-asbestiform amphiboles or fibrous talc, the
17  safety of their product was not established."
18           Did I read that correctly?
19      A.   Yes.
20      Q.   Okay.  And so is it your -- are you
21  offering the opinion that J&J talc products
22  historically contained asbestos?
23      A.   There is no doubt in my mind that
24  J&J products, based on the record, contained
25  asbestos.

29 (Pages 110 - 113)

Page 114

1    Q.    Okay.  And when you talk about
2  under b) "the presence of non-asbestiform
3  amphiboles," is that the -- does that mean that
4  non-asbestiform amphiboles of any size and
5  shape?
6    A.    I don't draw a distinction.
7    Q.    Okay.  And is it your opinion
8  that -- well, do you have on the first one a)
9  about the presence of asbestos, I take it under
10 that opinion you also believe that J&J's talc
11 products have been misbranded?
12   A.    I don't want to -- I don't want to
13 give a legal opinion, okay.  I just want to be
14 careful that I'm not giving a legal opinion.
15 Because you have not substantiated -- I think
16 the answer was because you have not
17 substantiated safety and didn't have that
18 statutory warning, that safety was not
19 established.  That would probably be a
20 misbranding charge.
21   Q.    Okay.  And so I'm trying to
22 understand as to how you're framing it in your
23 mind, that you feel it is -- is it appropriate
24 to -- you feel it is not appropriate to offer
25 an opinion on whether certain parts of

Page 115

1  21 CFR §740.10 have been complied with but not
2  necessarily whether or not 21 USC §361 has
3  been?
4    A.    No.  I'm not drawing that
5  distinction.  I just want to be careful, you
6  know, what's a legal opinion and what's not.  I
7  don't think it is the ultimate legal opinions
8  in this case.  I mean, I think that I made it
9  very clear if this product contains asbestos,
10 it would be adulterated and the lack of the
11 warning would make it misbranded.
12   Q.    What about -- well, do you have a
13 particular time, a particular year in which you
14 say that this is when J&J talc products began
15 being misbranded?
16   A.    I think that there is evidence
17 certainly beginning in 1972.  I mean, I don't
18 give a -- I don't have a formal opinion.  I
19 have not ascribed a time period to this.  I
20 think that certainly there is evidence
21 beginning in 1972, if not before, where there
22 is strong evidence of the existence of
23 chrysotile in Vermont talc that would make the
24 product adulterated and, therefore, misbranded.
25     So I see that, you know, pretty

Page 116

1  strongly in '72, but I'm not saying it doesn't
2  exist earlier.
3    Q.    All right.  Is it your opinion that
4  the presence of non-asbestiform amphiboles in
5  Johnson & Johnson talc powders render them
6  misbranded?
7    A.    Let me just look at my report.
8  Certainly J&J did not substantiate the safety.
9  I mean, there is a lot of controversy
10 surrounding non-asbestiform amphiboles, and J&J
11 did not substantiate the safety of their -- of
12 that product.  I am certainly saying that in
13 this paragraph.
14   Q.    Okay.  But is it your testimony
15 that the presence of non-asbestiform amphiboles
16 in Johnson & Johnson talc is an adulterant?
17   A.    I would want to -- I just would
18 want to search for -- do me a favor.  If you
19 would be so kind -- I can search for it -- go
20 to that paragraph.  I want to be precise.
21     Can someone point me to the
22 paragraph where I use the word "adulterated"?
23     I want to be precise on what I have
24 concluded.  I can do it.  I want to be exactly
25 precise on that because you're asking me.

Page 117

1      Just for the record, I'm searching
2  the report.  I just want to see the paragraph
3  that you're referring to.
4    Q.    I appreciate you telling us that's
5  what you're doing.
6    A.    So I mean, I state exactly the way
7  139 is phrased.  I don't want to -- I base it
8  on the totality of the evidence.  I don't
9  believe I -- I say it is specifically
10 non-asbestiform amphiboles, the totality of the
11 evidence.
12   Q.    Okay.  So if I ask you do you have
13 an opinion whether or not J&J's talc products
14 were misbranded because they contain -- well,
15 withdrawn.
16     Do you have an opinion as to
17 whether or not J&J's talc products were
18 adulterated because of the presence of
19 non-asbestiform amphiboles?
20     Your answer is you don't have one?
21     MS. O'DELL:  Object to the form.
22 Mischaracterizes the testimony.
23     THE WITNESS:  I apologize.  139
24 goes to adulteration, and let me just
25 find -- let me do this again.

Page 118

1    You're asking me now on -- and,
2    again, I think my opinion on adulteration
3    is based on the totality of the evidence
4    that I think the product is adulterated.
5        Let me just see where I conclude in
6    a paragraph -- if anyone has it, I will
7    find it -- where it has any conclusion on
8    misbranded in the report. For some reason
9    I am not pulling it up.
10       Let me just go further. I have to
11   go -- again, if you can point me to where
12   my opinion that I'm saying it is
13   misbranded, I just want to -- I would
14   appreciate it.
15   BY MR. EWALD:
16   Q.    And my last question, which was
17   related to adulterated -- I think I understand
18   your position. We may get back to misbranded.
19       Let's turn to page 22 paragraph 78?
20   A.    Yes. Thank you, sir. Give me a
21   second. Thank you, sir.
22   Q.    Okay. And so we have here a
23   definition of asbestos, and you give a
24   definition of asbestos.
25       Is that your definition of asbestos

Page 119

1    that you are using when you use the term in
2    this report?
3    A.    I can pull up a -- I have a sheet
4    here that probably has maybe 50 different
5    definitions of asbestos. I am happy to go
6    through all of them. This is not my definition
7    of asbestos. I think I am comfortable with
8    J&J's definition in paragraph 79, which is what
9    I've been generally using is 79.
10   Q.    Okay. I am going to ask some more
11   questions, and I'm not suggesting anything at
12   all improper; but there's been a number of
13   times where Dr. Kessler has looked to his left,
14   which is where Ms. O'Dell is --
15   A.    I'm sorry --
16   Q.    Let me make my record.
17       I can't see Ms. O'Dell's face. I'm
18   not suggesting that anything improper is going
19   on, but it would be a heck of a lot better if I
20   can see Ms. O'Dell's face.
21       MS. O'DELL: John, as I mentioned,
22   my camera wasn't working. And so I've had
23   somebody bring an external camera to me in
24   the last few minutes. And I'm trying to
25   problem solve that right now.

Page 120

1        MR. EWALD: Okay.
2        MS. O'DELL: So I am not on camera
3    because I am choosing not to be. I am not
4    on camera because my camera is broken.
5        THE WITNESS: I'm --
6        MR. EWALD: Hold on. I'm not
7    suggesting anything improper.
8        MS. O'DELL: Excuse me. Let me be
9    clear. You know well enough, having been
10   in depositions with me before, I've always
11   been on camera. So this is a technical
12   problem. It is not a choice.
13       THE WITNESS: And I was --
14       MR. EWALD: I'm sorry.
15   Dr. Kessler, one other thing, and then you
16   can respond.
17       I was noting -- again, I will make
18   the record very clear. I am not
19   suggesting any ill intent as to
20   Ms. O'Dell. It is purely that any -- my
21   concern I have would be alleviated. And
22   now I see your face, and so all is well.
23   BY MR. EWALD:
24   Q.    And, Dr. Kessler, if you have
25   something you want to say, you are welcome to

Page 121

1    say it too.
2    A.    Just so you understand the
3    geography of the room, I have -- I am
4    distracted -- I have five screens in front of
5    me, okay. I have an iPad with the realtime. I
6    have three monitors. I have -- so my eyes are
7    right and left.
8        Anyway, Ms. O'Dell, if she wanted
9    to send me a signal, she would probably kick me
10   under the table. That was a joke, for the
11   record.
12       But it's just -- my eyes are being
13   distracted because I have the realtime right
14   here. So I'm looking at that. If I'm looking
15   to my left, that's between Ms. O'Dell and me.
16       MS. O'DELL: Let me say, for the
17   record, I have a camera on top of my
18   laptop. And if it falls, I have not
19   fallen, it's just the camera. So I am
20   just problem solving here.
21       MR. EWALD: I appreciate it. I
22   don't think there is any actual thing
23   going on. I just wanted to make sure of
24   that. So I appreciate people working with
25   that.

31 (Pages 118 - 121)

Page 122

BY MR. EWALD:

1  Q.    Now back to the questions.
2        Doctor, when we had the
3  discussion we just had, you had talked about a
4  list in front of you of 50 different
5  definitions of asbestos; is that what you said?
6  A.    No.  I have a list to my right.
7  And I am happy to pull all the -- you know,
8  there's a glossary -- I think it was done by
9  the National Geological Service -- of different
10  definitions over the decades of asbestos to the
11  point where you asked me what is my definition
12  of asbestos.
13  Q.    Okay.  And so what I want to know
14  is:  When you use the term "asbestos" in the
15  report without any citation to a specific
16  source, what definition of asbestos are you
17  using?
18  A.    Again, you have to be a little
19  careful, again, because sometimes the word
20  "asbestos" is used in a document, I mean, you
21  have to look at what the person who wrote the
22  document is referring to.
23        But I think we can -- I mean, I am
24  comfortable with 79.1 as a definition.

Page 123

1  Q.    Okay.  And let's start, though,
2  with when you gave the definition of asbestos,
3  you used IARC 1973, correct?
4  A.    No, I don't think I did.  I used
5  the word "defined" -- the first time I used the
6  definition -- well, I did definition -- I list
7  IARC, but I give J&J's use of the word they
8  defined.  There is a general discussion what
9  they designate it.
10       But then I used J&J -- I've always
11  used the J&J that was on J&J's specs,
12  et cetera, and I've always used that.  That's
13  what I mean, I think.
14  Q.    Okay.  So are you suggesting that
15  what occurs in paragraph 78 is not a definition
16  that you include of asbestos in your report?
17  A.    No.  Of course it's there.  I don't
18  think there's anything very controversial about
19  that.  But I'm telling you a very succinct
20  definition is in 79.1.
21  Q.    And why, though, in 78 did you
22  choose 1973 IARC for the asbestos definition?
23  A.    I was searching for --
24       THE WITNESS:  Do me a favor.  Can I
25  get my list of asbestos definitions?

Page 124

1        I am happy to discuss -- let me
2  look at this whole list.
3        I'm sure it probably comes -- so I
4  am happy to show you Figures 18 through 27
5  definitions of asbestos in regulatory over
6  the years; and I don't know whether I took
7  it from this list, but it was, you know, a
8  respected government agency.  And I took
9  the defendants -- I think you can pick
10  many different -- I think it's a credible
11  definition early on.
12       I don't give it any more import
13  than anything else.  I am very comfortable
14  with J&J's definition.
15  BY MR. EWALD:
16  Q.    You also cite in your report to
17  IARC 2010, correct?
18  A.    Well, there -- there are decisions
19  in IARC.  I could do 2010 and 2012, I believe;
20  both talc not containing asbestos, asbestiform
21  fibers, and then talc with.  So I cite to a
22  number of IARC documents.
23       THE WITNESS:  Could I have my IARC
24  sheets, please?
25       Thank you.

Page 125

1  BY MR. EWALD:
2  Q.    Okay.  And so can you explain to me
3  why you chose a 50-year-old definition of
4  asbestos for IARC when you had one from 2010,
5  for example, from IARC?
6  A.    I don't see any -- I see it -- to
7  be honest, I see 78 and 79 as very consistent.
8  So I mean, there is no specific rationale.
9        If you look at -- and, in fact, if
10  you look at the 2012 definition, I think that
11  '73 definition, 2012 definition -- we can go
12  look at it -- I think is cited in 2012.
13  Q.    What about this, do you have --
14  A.    IARC cites -- in IARC's 2012, you
15  know, that covers both, you know, asbestiform
16  talc, asbestos talc without -- it uses -- in
17  the sentence there, it says, "Asbestos is the
18  generic commercial designation for a group of
19  naturally occurring mineral silicate fibers of
20  the serpentine and amphophile series.  These
21  include the serpentine mineral chrysotile also
22  known as" -- I guess they added "white asbestos
23  and the five amphophile minerals actinolite,"
24  blah, blah, "and tremolite."
25       And then they cite, open

32 (Pages 122 - 125)

Page 126

1  parentheses, "(IARC 1973 USGS 2001)." So
2  IARC -- this is -- that is the definition that
3  IARC was using for over 50 years; and used it
4  again in 2012, as I see it.
5      Q.    Let's look at IARC 2010, which is
6  on -- it's mentioned in your report, correct?
7  And if we go to --
8          MS. O'DELL:  John, would you put
9      that in the chat, please.
10         MR. EWALD:  Yes.
11     Jake, please put it in chat.
12         THE WITNESS:  Could someone else
13     hand me the full document from 2010, the
14     full document?
15         MR. KEESTER:  Just checking.  It is
16     D-280, right, John?
17         MR. EWALD:  Yeah.
18         MR. KEESTER:  Okay.  Sending.
19 BY MR. EWALD:
20     Q.    Okay.  Doctor, I'm looking at the
21 Talc Not Containing Asbestiform Fibres Exposure
22 Data Introduction.  It's page 277.
23     A.    Got it.
24     Q.    IARC 280.  And there at the bottom.
25 Hold on.

Page 127

1          Do you see where it starts with
2  asbestos?
3      A.    Yes, sir.
4      Q.    Okay.  "Asbestos is a commercial
5  term that describes six minerals that occur in
6  the asbestiform habit:  actinolite,
7  anthophyllite, chrysotile, grunerite,
8  riebeckite and tremolite (IARC, 1977)."
9          Do you agree with that statement,
10 Doctor?
11     A.    I agree that you read that
12 correctly.  I don't have an opinion on whether
13 I agree with that statement.  IARC uses a
14 different statement in 2012 but I do cite in
15 '73.  So the '73 matches the 2012.
16         I am happy to spend -- I don't have
17 an opinion specifically on that statement.
18     Q.    Well, you don't have an opinion as
19 to which is the appropriate definition of
20 asbestos?
21     A.    I'm not -- again, as I said, there
22 are 50 different definitions that are recorded
23 by the National Geological Survey.  I am happy
24 to put those in the record.
25         The one that I am very comfortable,

Page 128

1  one that matches, IARC '73, IARC 2012, J&J for
2  50 years has a definition; and that was the one
3  that I felt most comfortable with.  I am happy
4  to discuss the merits of the 2010 one.  I
5  didn't -- I used the one that was in place for
6  50 years.
7      Q.    Are you comfortable discussing the
8  merits of IARC 2010 and whether or not it is an
9  appropriate definition of asbestos?
10     A.    If you want to spend the next two
11 hours, we can spend, you know, the -- discuss
12 the merits of using the terminology and the
13 semantics and the complexities of using
14 something like asbestiform.  I am happy to do
15 that.
16     Q.    My question, going line by line,
17 sir -- I think your answer is -- you don't have
18 an opinion one way or another about whether or
19 not the first sentence I read to you is
20 correct:  "Asbestos is a commercial term that
21 describes six minerals that occur in the
22 asbestiform habit:  actinolite, anthophyllite,
23 chrysotile, grunerite, riebeckite and
24 tremolite."
25         Do you agree with that, sir?

Page 129

1          MS. O'DELL:  Object to the form.
2          THE WITNESS:  I think I have
3      answered the question.  The definition
4      that I am using is the IARC definition
5      that is cited in 2012, and it was cited in
6      1973.  That's the definition that I am
7      most comfortable using.
8  BY MR. EWALD:
9      Q.    Why is that, sir?
10         What is the scientific basis for
11 that, sir?
12     A.    It's the -- the scientific basis of
13 that is, you know, you're asking me -- the word
14 asbestiform is close to Vicastinion [sic]
15 concept as far as semantics.  I mean, the
16 scientific basis is scientifically, you know,
17 the word "fibrous I" could understand.
18         Asbestiform has, obviously, a long
19 condition; but I certainly -- J&J's definition
20 is fibrous, serpentine, chrysotile, and fibrous
21 forms of the amphophile I think have great
22 scientific merit.  And that's been in place for
23 50 years.  And that, again, I'm very
24 comfortable aligning myself with J&J's
25 definition and IARC's '73 and 2012.

33 (Pages 126 - 129)

Page 130

1    Obviously, IARC must have had some
2 reason for changing -- to use different
3 terminology between 2010 and 2012. But the '73
4 that I cite is what IARC does in 2012, and I am
5 comfortable with that.
6    Q.   Okay. By the way, in talking about
7 whether asbestiform is a scientific merit as a
8 term, you have reached this opinion after not
9 even knowing what it was before being retained
10 as an expert in this case?
11    A.   I don't think -- let me just look
12 at your statement. If you go back, tell me
13 where I said I didn't know about asbestiform.
14    MS. O'DELL: Excuse me.
15    Suzanne, I had objected to the
16    question. I don't know if you heard me,
17    but I want to make sure that my objection
18    is noted for the record.
19    MR. EWALD: The record will reflect
20    what the record reflects here.
21 BY MR. EWALD:
22    Q.   So let's go to the second sentence,
23 "Similarly to talc, these six minerals occur
24 more commonly in a non-asbestiform habit, and
25 may also be elongated without being

Page 131

1 asbestiform."
2    Do you agree with that sentence?
3    MS. O'DELL: Okay. Do you have
4    that in front of you, Dr. Kessler?
5    Can you see it.
6    THE WITNESS: I actually have my
7    own copy of this. So just -- I mean, I
8    was able to pull that. I mean, I would
9    appreciate the whole report, if someone
10    could get me the whole document so we can
11    make sure I'm looking at the whole
12    document.
13    I think that's a complicated
14    sentence. I think there's a lot of
15    complexity to that sentence. Again, I'm
16    happy to discuss or happy to look at what
17    the geologist and mineralogist discuss.
18 BY MR. EWALD:
19    Q.   Well, you are the one who is using
20 the term "asbestos" throughout the report, and
21 I want to know what you mean when you use it.
22 And so I want to know whether or not you agree
23 with IARC 2010 that, "Similarly to talc, these
24 six minerals occur more commonly in a
25 non-asbestiform habit and may also be elongated

Page 132

1 without being asbestiform."
2    Do you agree with that?
3    MR. O'DELL: Object to the form.
4    Asked and answered.
5    THE WITNESS: I could not have been
6    more explicit on what my definition is.
7    There should be no complexity on what
8    definition I am using.
9 BY MR. EWALD:
10    Q.   How does your definition differ
11 from this one, sir?
12    A.   I don't see that as a definition.
13 It doesn't say define. J&J's definition in
14 79.1 gives you a definition. It says,
15 "Asbestos is defined."
16    I don't read your sentence that you
17 read as asbestiform is defined as -- the
18 sentence you just read, that is just a general
19 statement. I don't see the word "definition"
20 in that sentence at all.
21    Where is that definition?
22    Q.   Let's take that definition.
23    Do you agree with the statement
24 that "Similarly to talc, these six minerals
25 occur more commonly in a non-asbestiform habit,

Page 133

1 and may also be elongated without being
2 asbestiform"?
3    Do you agree with that, whether it
4 is a definition or not?
5    A.   I certainly agree that the first, I
6 think, is a very factual question, right. You
7 would have to give me what the writer's
8 definition of asbestiform that is used by IARC
9 in order for me to tell you whether I agree
10 with that or not.
11    Q.   Well, what is the definition of
12 "asbestiform" that you use?
13    A.   There again, I -- I define my terms
14 asbestos. I don't believe I set out an
15 asbestiform definition. I think that is more
16 appropriately discussed by the geologist and
17 mineralogist, and I think that's part of the
18 semantic -- semantics over the last 50 years.
19    Q.   Okay. So it's your view that it is
20 appropriate for you to define what asbestos is,
21 but asbestiform is something that's outside of
22 your area of expertise?
23    MS. O'DELL: Object to the form.
24    Misstates his testimony.
25    THE WITNESS: You're way off, sir.

34 (Pages 130 - 133)

Page 134

1    And please don't characterize me like
2    that. Okay?
3  BY MR. EWALD:
4    Q.   I'm trying to understand what your
5  testimony is. Your testimony, you said --
6    A.   Well --
7    Q.   Hold on, sir. The question is not
8  pending yet. I will tell you what the question
9  is. And you said I think that it is more
10 appropriate that the asbestiform, that
11 definition is something that is dealt with by
12 the mineralogist and geologist; and that is a
13 semantic argument.
14    That's what you said, sir, right?
15    A.   I responded to your question when
16 you asked me what the definition was of
17 asbestos, okay. You're asking me for the
18 definition of asbestos, was your question. I
19 gave you the definition of asbestos.
20    You wanted me to use this sentence
21 as the definition of asbestos, and I resisted
22 because I didn't think it was either meant by
23 IARC -- I think you are twisting those words,
24 right. And -- and I am using -- the definition
25 couldn't be more clear.

Page 135

1    I mean -- I mean, if you're the
2  chrysotile or you're the fibrous, one of those
3  five minerals, that's, in my view, asbestos.
4    Q.   Okay. And so I will have more
5  questions about asbestos definitions, but for
6  now I want to know what your definition of
7  asbestos is.
8    And am I correct you don't have
9  one?
10    MS. O'DELL: Object to the form.
11 Misstates his testimony.
12    THE WITNESS: I don't believe in
13 my -- I don't believe that I offer the
14 definition of asbestiform in my testimony.
15 I would have to double check --
16 BY MR. EWALD:
17    Q.   So --
18    A.   -- with my --
19    Q.   Go ahead.
20    Without -- so, sir, when you
21 read -- well, withdrawn.
22    Am I correct that you have read
23 documents, over the 830 hours that you've spent
24 on this second report, that have used the word
25 asbestiform?

Page 136

1    A.   I certainly have read documents
2  that have used the word asbestiform.
3    Q.   And so what -- when you read that
4  word, what meaning do you ascribe to it?
5    A.   It depends what the writer meant by
6  it. If you go back and look at -- and I'm
7  happy to provide you with a cite. The National
8  Geological Service has a glossary, a couple
9  of -- all where it has probably 20 pages of
10 definitions of asbestiform used by different
11 people over time that have been defined in
12 different characteristics by different
13 definitions.
14    So you've got to tell me who -- it
15 has to be read in context. You have to know
16 who's writing it, what definition they're using
17 over the 50 years. There's been many
18 definitions. I refer to that National
19 Geological Survey glossary.
20    Q.   Well, when you are going through a
21 document and it says asbestiform and it doesn't
22 define it, how do you decide what the writer
23 meant?
24    A.   You try to look at context, sir.
25    Q.   Okay. And what kind of context do

Page 137

1  you look for?
2    A.   You try to look at the rest of the
3  paper. You try to look at the era that it's
4  written in. You try to look at the other words
5  just as you try to ascribe meaning to any word.
6    Q.   Okay. So tell me how does the era
7  depend on what asbestiform means?
8    MS. O'DELL: John, would you mind
9  repeating the question please?
10 I didn't catch the first part.
11    MR. EWALD: What I understood from
12 Dr. Kessler is that one of the areas of
13 context is era.
14 BY MR. EWALD:
15    Q.   So what I want to know: How does
16 the era help impact the context of what
17 asbestiform means?
18    A.   If you look at the National
19 Geological Survey glossary, you will see by
20 different categories, different dates, right,
21 there are different definitions of asbestiform,
22 right, that have been utilized, that different
23 people have used; and meaning was ascribed at
24 different times.
25    Again, I am not going to sit here

35 (Pages 134 - 137)

Page 138

1  as an expert on the historical use of the word
2  asbestiform. I don't represent myself as that.
3      Q.    But you are an expert on
4  understanding the historical use of asbestos?
5          MS. O'DELL:  Object to the form.
6          THE WITNESS:  I am an expert on
7      when it comes to the regulatory interface
8      of carcinogens, potential carcinogens, in
9      products that are used under the
10     jurisdiction of the Federal Food Drug and
11     Cosmetic Act.
12 BY MR. EWALD:
13     Q.    I believe you said that use of the
14 term "asbestiform" is semantics; is that right?
15         MS. O'DELL:  Object to the form.
16     That's not what his testimony was.
17         THE WITNESS:  Every word has a
18     semantic derivation.
19 BY MR. EWALD:
20     Q.    What do you mean by that?
21     A.    Well, I mean, there -- there --
22 there's meaning to describe -- can I get -- if
23 you have -- I don't have it with me -- the
24 NGS Glossary, right.
25         I mean, by definition, language and

Page 139

1  the -- how -- I mean, the fact that the word
2  asbestiform can have different definitions
3  among the gee -- in that history and in that
4  glossary by definition is a -- is in the field
5  of semantics and have meaning.
6      Q.    And so is it your opinion, then,
7  that it is -- it's not important to you to
8  understand what semantics means because it's --
9  it's changed in your view over time?
10         MS. O'DELL:  Object to the form.
11         THE WITNESS:  No. I --
12         MS. O'DELL:  Excuse me.
13         Misstates his testimony.
14         THE WITNESS:  No, not at all.
15 BY MR. EWALD:
16     Q.    Okay. So let's look at -- you
17 spent a lot of time in your report quoting
18 from -- well, a lot of time -- you spend a
19 number a paragraphs quoting from the FDA white
20 paper 2021, right?
21     A.    There -- there are a lot of
22 different portions of that. There's a 2020.
23 There's the appendices, the white paper. Yes,
24 I do do that.
25     Q.    Okay.

Page 140

1      A.    I mean, there are -- there are
2  certainly statements from that.
3      Q.    Okay. And these --
4          MR. EWALD:  Can I have the IWG --
5      my IWG page, please?
6          Let's see here.
7          Thank you very much.
8  BY MR. EWALD:
9      Q.    Okay. I want to put up here on the
10 screen -- and this is a cite to this December
11 2021 white paper from the Interagency Working
12 Group on asbestos throughout your report,
13 right?
14     A.    Put that in the chat.
15         MS. O'DELL:  Yeah. You read my
16     mind.
17         John, are you marking this as an
18     exhibit?
19         And if so, I suppose this is
20     Exhibit 9. And then put it in the chat.
21         MR. EWALD:  We'll mark it as nine.
22     Thank you.
23
24
25

Page 141

1          (Whereupon, Exhibit 9, White Paper:
2      IWGACP Scientific Opinions on Testing
3      Methods For Asbestos In Cosmetic Products
4      Containing Talca Bates labeled P-2318
5      through P-2318_030, was marked for
6      identification.)
7          MR. EWALD:  And this one, Jake, is
8      P-2318.
9          MR. KEESTER:  I just put it in.
10         MR. EWALD:  Yes.
11         MR. KEESTER:  And, John, really
12     quick, did we mark D-280 as an exhibit?
13         MR. EWALD:  No. It's okay. I
14     don't want -- oh, we'll mark it. Why not?
15         We'll mark D-280 IARC 2010, if the
16     court reporter doesn't mind, we'll mark
17     that as 9, and apologies.
18         And then we'll do Exhibit 10 the
19     IWGACP 2021 document.
20
21
22
23
24
25

36 (Pages 138 - 141)

Page 142

1          (Whereupon, Exhibit 10, World
2      Health Organization International Agency
3      for Research on Cancer, IARC Monographs on
4      the Evaluation of Carcinogenic Risks to
5      Humans, Volume 93, Carbon Black, Titanium
6      Dioxide, and Talc, was marked for
7      identification.)
8  BY MR. EWALD:
9      Q.    Okay.
10     A.    What you put in front of me
11  includes the appendices?
12         I just want to make sure.
13     Q.    I can get there, yeah.  But right
14  now I'm going to show you the body of it.
15     A.    Yeah.
16     Q.    You reviewed the appendices, right?
17     A.    And -- and the appendices and the
18  2020 document, yeah.
19     Q.    Okay.
20         MS. O'DELL:  Doctor, are you okay
21  with that, or do we need to put it on the
22  big screen?
23         THE WITNESS:  No.  I -- yeah.  I --
24  I won't -- I'm fine.  Thank you, ma'am.
25         I have these documents in front of

Page 143

1      me.  I -- I -- I brought them.
2  BY MR. EWALD:
3      Q.    All right.  So we're here in the
4  glossary of terms section, page 25 of the main
5  document.  I want you to look at the
6  Interagency Working Group definition of
7  asbestiform there --
8      A.    I -- I don't -- I don't have that.
9         Can I get that, and can I get a
10  hard copy of that, please?
11         MS. O'DELL:  Yes.  I will -- we
12  will get --
13         THE WITNESS:  Yeah.  I -- I have
14  the white paper I have in front of me,
15  through 23; and I have the appendices.
16         But could you show me what page
17  you're -- you're -- where you are?
18         You're in the glossary at terms --
19  BY MR. EWALD:
20     Q.    Yeah.  Glossary of terms --
21     A.    Just so you can show me the index,
22  send me the table of contents so I can see
23  where 16 is in the contents, what page.
24         You're -- now, I stopped printing
25  at 23.  So I apologize.  I didn't bring -- I

Page 144

1  didn't bring 24 with me.
2         MS. O'DELL:  Okay.
3         THE WITNESS:  You can just show 24,
4  Mr. Ewald.  That's fine.
5  BY MR. EWALD:
6      Q.    Well, I'm happy you can see that
7  what we have on the other pages is more
8  definitions.  I'm asking you about the
9  definition of asbestiform, which states, "A
10  specific variety of a mineral or a type of
11  mineral fibrosity associated with a unique
12  fibrous habit of crystal growth, in which the
13  fibers are long and thin, that possess high
14  tensile strength and flexibility.  This unique
15  habit of growth is observed in fibrous
16  serpentine chrysotile and certain fibrous
17  amphophile minerals."
18         Do you agree with that definition
19  of asbestiform, sir, by the FDA?
20         MS. O'DELL:  Object to the form.
21         THE WITNESS:  So -- so let's be
22  clear.  IWGACP is not FDA.  Right.  I
23  mean, I think can we agree on that.  Those
24  are individuals in their individual
25  capacity.  But it was not a recognized FDA

Page 145

1  document.  I think it's so cited, right.
2         So you want to ask the question
3  again?
4  BY MR. EWALD:
5      Q.    Sure.  I'm more than happy, if
6  you're consistent with that one.
7         So are -- you agree with the
8  Interagency Working Group white paper
9  definition of asbestiform that I just read to
10  you and that appears on page 25 of the December
11  2021 white paper we have marked as Exhibit 10?
12     A.    I -- I think that is, again, one
13  definition that is advanced here that cites
14  Campbell.  I am not sure.  That's how they
15  define, so they're entitled to define it any
16  way they want, and that's what I mean by
17  "semantics."
18         But it's not that I agree or
19  disagree with the definition.  That's their
20  definition.  That's how they're using the term.
21  Again, if you -- if you refer to -- you know,
22  if you refer to the National Geological Survey,
23  there are other definitions of this asbestos
24  that are used.  I don't find anything -- you
25  know, I'm not going to object to this --

37 (Pages 142 - 145)

Page 146

1  there's nothing that I'm going to say is wrong
2  or I'm going to jump up and down; but I'm
3  defining it. That's their definition.
4      Q.    What expertise do you have to make
5  a determination as to whether or not one
6  definition of asbestiform is better than
7  another?
8      A.    I -- what I can do is, again, in
9  the regulatory context, okay, of reaching a
10 decision what -- how a substance should be
11 regulated under the act, right, the question is
12 to be able to bring basic, you know, scientific
13 and medical knowledge and what is -- you know,
14 how it gets applied in that framework.
15          I'm -- I'm not sure, you know --
16 I'm not sure when you say how do you have
17 scientific expertise, they define it like that.
18 That's how they're using the word -- again,
19 welcome to the -- you know, there's a whole
20 field of philosophy that deals with the
21 question of how you decide what definition
22 applies to what word here.
23     Q.    Well, I -- my question was: What
24 expertise do you have and you agree with me
25 that mineralogists and geologists have

Page 147

1  expertise to offer an opinion as to whether or
2  not the definition of asbestiform is an
3  accurate one; do you agree with that?
4          MR. O'DELL: Object to the form.
5          THE WITNESS: Bingo. I think
6  you've just put your -- your finger on an
7  essential point, right.
8          That is what mineralogists and
9  geologists don't have is the ability to
10 decide if you are going to link that term,
11 asbestiform, right, with a health hazard,
12 right, or how it should be regulated under
13 the act, right, that's the key here,
14 right.
15         I mean, if you look at the
16 definitions that were used and what
17 happened here is you see certain
18 epidemiological studies that link asbestos
19 in -- with hazards, right; and then you
20 have certain groups of individuals, right,
21 looking and redefining things not in the
22 context of the broader expertise, right,
23 and being able -- linking it to what that
24 ultimate health hazard is.
25         And I think that's one of the --

Page 148

1  the problems that we've encountered over
2  the last 50 years, right.
3          So I don't see -- I mean, as far as
4  whether asbestos -- asbestiform is meant
5  to imply that it has health hazards,
6  right, that should be ceded to the
7  mineralogists and geologists alone.
8  BY MR. EWALD:
9      Q.    Yeah. I'm not sure exactly I
10 understand what you were saying, but --
11     A.    I'm happy to explain it again.
12     Q.    No. What I -- what I -- what I
13 want to --
14         MS. O'DELL: I'm sorry, John. I'm
15 not sure if he was finished with his
16 answer. Excuse me.
17         MR. EWALD: He was -- he was
18 finished with his answer, and then he said
19 he'd explain it again; and I said no, he
20 doesn't need to explain it again. So --
21         MS. O'DELL: Let's pause just for a
22 moment.
23         Dr. Kessler, were you finished with
24 your answer?
25         If so, that's fine. If you are

Page 149

1  not, then please continue.
2          THE WITNESS: I think Mr. Ewald
3  understands the -- the point that I was
4  making.
5          The -- if asbestiform is in that
6  terminology meant to have any -- to be
7  informative in a regulatory sense of
8  whether it is hazardous or potential --
9  whether it presents a risk, right, that
10 definition, then, is not under -- should
11 not be under the purview of people who
12 don't have the expertise on the public
13 health side of your question.
14         It can't be set by the
15 mineralogists and geologists alone.
16 That's fine if they're living in a world
17 of just geology. But if, ultimately, in
18 the regulatory context, right, you're --
19 you're asking the issue of whether there's
20 potential human health implications,
21 right, that goes broader than just the
22 mineralogists and geologists. That's the
23 problem with terms that were defined as --
24 by the mineralogists and geologists and
25 used in ways that increase the specificity

38 (Pages 146 - 149)

Page 150

1    but decrease the sensitivity of the
2    analysis that have -- in the laboratory
3    tests that have implications for human
4    health and FDA regulation.
5    BY MR. EWALD:
6        Q.    Okay. So I want to make sure I
7    understand.
8            You are suggesting that the -- the
9    white paper, the Interagency Working Group that
10   defines asbestiform and defines asbestos is not
11   the appropriate one to use in the regulatory
12   context but is, in fact, should be used the
13   definition of an internal J&J document?
14           MS. O'DELL: Objection. Misstates
15   his testimony.
16           THE WITNESS: Yeah. Yeah. So
17   you're -- you're missing this entirely.
18   BY MR. EWALD:
19       Q.    I'm sure I am.
20       A.    What I'm saying, and I apologize if
21   I'm not clear.
22           I actually applaud the Interagency
23   Working Group where people with diverse
24   backgrounds and expertise that's -- and that's
25   what FDA does and FDA brings together those

Page 151

1    people in the various subject matter experts of
2    various government agencies to be able to deal
3    with these complex questions.
4            What I am objecting to -- and I
5    think they -- they certainly have good faith
6    and came up with a definition that they can,
7    you know -- they've listed it in their
8    glossary.
9            I don't think mineralogists and
10   geologists -- they certainly can define the
11   terms in their -- their field. What they can't
12   do is set the terms to have any meaning when it
13   comes to implications for public health, right.
14           So if there's fibers that are meant
15   to be asbestiform or not asbestiform or we're
16   going to define these as asbestiform and these
17   as non-asbestiform, and they make those
18   definitions based on geological and
19   mineralogical principles, right, and
20   morphological and microscopic characteristics,
21   those have to be correlated and validated on
22   the human health risk side.
23           And I think that was the -- the
24   great effort of the Interagency Working Group
25   tried to do and basically said get rid of all

Page 152

1    this language, right, elongated -- elongate
2    particles, I mean, are -- had the biological
3    activity. And we've been caught up in language
4    in semantics for, in essence, for 50 years; and
5    they're trying to clarify what has biological
6    activity. And I applaud that.
7        Q.    Okay.
8            MS. O'DELL: John, are you frozen?
9            MR. EWALD: Nope.
10           MS. O'DELL: Okay. Sorry.
11           MR. EWALD: No. No worries.
12           MS. O'DELL: We've had some blips
13   on the internet today. I thought there
14   was a problem.
15           MR. EWALD: No problem at all. I
16   was deciding where to go next.
17           Let's -- okay. Let's mark as
18   Exhibit 11 -- Jake, it's going to be
19   Exhibit 8179. If you can drop it in the
20   chat, please, this relates to -- the
21   highlighting -- it's not mine, but it's
22   reflected as highlighting on the document.
23   BY MR. EWALD:
24       Q.    And, Doctor, you --
25           MS. O'DELL: Hey, John, give us

Page 153

1    just a moment here. Excuse me for
2    interrupting.
3            Could you put it in the chat
4    where -- Dr. Kessler has it on the screen.
5    It's quite small. So we want to put it on
6    a larger screen so he can see it.
7            MR. EWALD: Sure. Jake, will get
8    it in there in a second.
9            MS. O'DELL: Give us a moment to
10   download it and put it on the screen.
11           (Whereupon, Exhibit 11, Johnson &
12   Johnson Consumer Products, Inc.,
13   Authorization for Interim Specification,
14   Bates labeled JNJMX68_000000438 through
15   JNJMX68_000000441, was marked for
16   identification.)
17           MS. O'DELL: Okay. So Dr. Kessler,
18   do you mind if I -- you can click on it
19   and see if it will open it up for you.
20   You may need to download it onto your
21   desktop, and then you'll need to go back
22   to your desktop and open it.
23           THE WITNESS: It's not -- it's not
24   fresh --
25           (Discussion held off the record.)

39 (Pages 150 - 153)

Page 154

1  MS. O'DELL: John, I'm going to
2  help him a little bit here.
3  MR. EWALD: Of course.
4  (Discussion held off the record.)
5  THE WITNESS: I didn't save it.
6  It's not on my -- it's saved in documents.
7  I want to switch it to desktop, and then I
8  have to --
9  MS. O'DELL: Okay.
10  THE WITNESS: Where is that
11  document?
12  Thank you. Thank you.
13  MS. O'DELL: Do you want it over
14  there?
15  THE WITNESS: Yeah. Over there
16  would be perfect. Thank you so much.
17  I'm looking to my left now.
18  MS. O'DELL: Okay. You're in
19  control, and you have your mouse.
20  THE WITNESS: Thank you so much.
21  MS. O'DELL: All right.
22  THE WITNESS: Thank you.
23  BY MR. EWALD:
24  Q. All right. Doctor, in that same
25  page of your report, 79.1, you're referring to

Page 155

1  what you call J&J's definition of asbestos.
2  And what I'm showing you, for the
3  record, we'll mark as Exhibit 11. This is --
4  it has a Bates Number JNJMX68_000000439 as --
5  it is the Authorization for Interim
6  Specification.
7  A. Got it.
8  Q. "Subject: Cyprus Windsor Minerals
9  Corporation Grade 66 Talc."
10  Do you see that?
11  A. I know this, yes.
12  Q. All right. And under Material
13  Specification, "Properties & Requirements, 2.1
14  Asbestos (CTFA/J4-1 and TM7024)."
15  Do you see that, sir?
16  A. I do.
17  Q. Okay. We know J4-1.
18  What is TM7024 refer to?
19  A. I believe that there's a -- there
20  was another policy that had to do with
21  transmission microscopy also in place.
22  Q. Okay. Well, what do you know, sir,
23  about J&J's testing methods for the presence of
24  talc over time?
25  MS. O'DELL: Object to the form.

Page 156

1  Vague.
2  THE WITNESS: Yeah. And I think
3  that word "vague" is also probably
4  applicable to my answer.
5  Can I have my testing folder, my --
6  my testing sheets?
7  I think -- let me tell you what --
8  it's -- it's well-summarized I think --
9  actually, if you have something called Rio
10  Tinto -- my Rio Tinto slides, there's an
11  excellent -- well, I mean, there's a slide
12  by Rio Tinto that summarizes the use of
13  various testing. Let me get it. Give me
14  a second.
15  There's -- there's something that
16  says TEM. Margaret -- just give me a
17  second please. There's a TEM. I
18  apologize. Let me just get it here.
19  It gives a chronology of what was
20  in place when -- I have a slide -- again,
21  just give me a second -- that has exactly
22  when was -- when what was used and when
23  TEM really was -- started to come in
24  place.
25  It may be here. Could you just

Page 157

1  fold this for a second?
2  I apologize I can't seem to find
3  that. It should be -- you know, there's a
4  Rio Tinto slide deck. It gives a very
5  good chronology. I'll get it in a second,
6  Mr. Ewald.
7  But when TEM really entered into
8  the picture, I found it to be pretty
9  informative because it was -- it's -- it's
10  a little complex exactly what was used by
11  J&J at what points in time. There's a --
12  there's a good summary of it, and it's in
13  one of the Rio Tinto presentations if
14  somebody will pull up for me once I get
15  it.
16  BY MR. EWALD:
17  Q. All right. Well, we'll get back to
18  that part.
19  My question -- so I have some more
20  questions on J&J testing.
21  But suffice it to say, sitting here
22  right now, you can't tell me what TM7024 is?
23  A. No. And again, I mean, it was a --
24  it was a -- it was a protocol for transmission
25  electron microscopy.

40 (Pages 154 - 157)

Page 158

1    Q.    So under --
2    A.    What's not clear to me exactly from
3  the record exactly when J&J used it. Okay. I
4  mean, it was not in use. I mean, certainly for
5  the -- well, 50 years of this. The use became
6  more common in the late '80s and '90s and was
7  not -- was not consistently used from what I
8  can deduce certainly over the 50-year period.
9        It's also not clear to me exactly
10  what was done by J&J and J&J inside versus what
11  J&J contracted out, I mean, over the 50 years
12  as far as transmission electron microscopy.
13    Q.    Do you have an understanding
14  through your research as to which external labs
15  were considered amongst the best labs for the
16  analysis by microscope of materials for the
17  presence of asbestos?
18    A.    I -- I don't -- I have no opinion
19  on what is the best laboratory that J&J used
20  over time. You know, we certainly see three
21  laboratories involved I believe in the
22  2018-2019. I have no opinion on what the best
23  laboratory was.
24    Q.    Okay. So going back to this --
25    A.    There are --

Page 159

1    Q.    Excuse me. What?
2    A.    I have no -- no opinion of what --
3  what -- to rank the J&J contractors.
4    Q.    All right. So Exhibit 11, we're
5  back to that. And next to asbestos (CTFA J4-1)
6  (TM7024). You have, "Nondetected. Asbestos is
7  defined to be the fibrous
8  serpentine, chrysotile and the fibrous forms of
9  the amphibole group as represented by amosite,
10  anthophyllite, crocidolite, tremolite and
11  actinolite."
12        Did I read that correctly?
13    A.    You did, sir.
14    Q.    And that is the part -- it's
15  something similar you quote in 79.1, correct?
16    A.    Yes, sir. And that definition, if
17  you go back, I actually remember searching that
18  definition. I mean, that -- that paragraph is
19  used over decades by J&J in -- in documents
20  like this.
21    Q.    Now, one of the tests procedures
22  that was identified there is J4-1.
23        Have you ever looked at the J4-1
24  testing procedure?
25    A.    In detail, sir.

Page 160

1    Q.    Okay. So does this look familiar
2  to you, CTFA method, J4-1, asbestiform,
3  amphibole minerals, and cosmetic talc?
4    A.    Yeah. Can we just put it -- is
5  there a date on this?
6        I mean, it has not been -- just
7  scroll -- scroll back up for a second. Please.
8    Q.    Issued 10/7/76.
9    A.    Yeah. That's the date I -- that's
10  the date I was just looking for. Yeah.
11    Q.    All right.
12        MR. EWALD: We'll mark this as
13  Exhibit 12.
14        (Whereupon, Exhibit 12, Document
15  entitled, "Asbestiform Amphibole Minerals
16  in Cosmetic Talc, Bates labeled
17  JNJ 000405219 through JNJ 000405228, was
18  marked for identification.)
19        MS. O'DELL: Could you kindly put
20  it in the chat for us again, please.
21        MR. EWALD: Sure. Let me know when
22  you have it.
23        MS. O'DELL: Okay.
24        THE WITNESS: I've got it. I'm
25  sorry to make you jump up.

Page 161

1        MS. O'DELL: You've already
2  clicked, so if you do save -- yeah. And
3  then open up the -- it should be in the
4  folder over there. Yeah. Right there.
5        THE WITNESS: It's opening up.
6  Thank you, sir. Give me a second. I have
7  it in front of me. Let me enlarge, if I
8  may, zoom, edit, zoom, view plus.
9        I'm almost there, sir. It's just
10  going to a different -- I just have to
11  make it a little larger. Is there a plus
12  sign?
13        Zoom to -- hold on a second -- to
14  page -- let's go to 100 percent,
15  125 percent.
16        Thank you, sir. Thanks for letting
17  me see it.
18  BY MR. EWALD:
19    Q.    Sure.
20    A.    I have it in front of me, and
21  that's a little too big; but that's okay.
22    Q.    All right. There's not much to ask
23  of this one other than you would agree with me,
24  Dr. Kessler, that the title of the method is
25  "Asbestiform Amphibole Minerals in Cosmetic

41 (Pages 158 - 161)

Page 162

1  Talc," correct?
2      A.    You know how to read.
3      Q.    Okay.  And if you go to --
4      A.    The specifications?  Yep.
5      Q.    And examine the ample -- the sample
6  for asbestiform fibrous amphibole minerals,
7  right?
8            It doesn't just say, examine the
9  sample for fibrous amphibole minerals, right?
10     A.    No.  Let me just get mine to the
11 right size.  Give me a second.  I expanded it
12 so it's more than a hundred percent.  So let's
13 get it.
14           No.  I think it's a more -- I think
15 that -- the way you phrased it, I would ask you
16 to clarify -- I mean, to be a little more
17 specific.
18           What page are we on?
19     Q.    Well, we're on page 9 out of 10.
20     A.    Hold on a second.  Let me get
21 there.  I'm getting there.
22           My -- my point exactly here.  There
23 could not be a better example of what we've
24 been talking about over -- since the break.
25     Q.    Okay.  My question was:  The title

Page 163

1  for this section is example -- "Examine the
2  Sample for Asbestiform Fibrous Amphibole
3  Minerals," correct?
4      A.    Correct.
5      Q.    And it doesn't just say, examine
6  the sample for fibrous amphibole minerals; it
7  doesn't say that, correct?
8      A.    You're missing what the import of
9  this section is.  You're focusing on a word,
10 right; but you're given instructions on
11 five character- -- you can ask your question,
12 but here is the point.
13           They are adding certain specific
14 characteristics to meet a definition of
15 asbestiform, right.  So these are five things
16 you have to look at to meet their
17 characteristics of a positive test, right.
18           So they are -- by doing this, the
19 geologists and others are increasing the
20 specificity of the test, right.  And this is
21 why you, in part, right, not the only reason,
22 but why you ended up with a sensitivity when
23 you tested it ultimately the year after of
24 14 percent.  This was absolutely useless,
25 right.

Page 164

1            I mean, a test at 14 percent -- a
2  sensitivity of 14 percent, you increase the
3  specificity here with great individual
4  variability, right.
5            And, again, as you pointed out, and
6  it was good to import to convince FDA this was
7  the test for the safety of asbestos when you
8  leave out this whole world the chrysotile,
9  right.  Sort of this -- that is the biggest
10 head-scratcher, right.
11           How do you convince FDA or the
12 world to go along with a test that doesn't even
13 test for chrysotile and yet you're putting in
14 place a test that has sensitivity that is 14 --
15 I mean, 14 percent by the one validation test
16 that I saw.
17     Q.    And what validation -- 14 percent,
18 I don't -- I don't see that in your report.
19 Maybe I missed it.
20           Is it in your report?
21     A.    Yeah.  I mean, it's right there.  I
22 mean, it's -- you know, it's -- I mean, I
23 taught it last -- you know, I -- I teach this
24 sensitivity and specificity.  Just look at the
25 round-robin in '77.  I think that was done on

Page 165

1  J4-T when they spiked it, and you had one --
2  one lab identify it; and six did not.  And just
3  do the math, and you'll see that in the
4  definition of laboratory tests, when six miss
5  it and one gets it in the spike sample, that's
6  a sensitivity of 14 percent.  The test is
7  useless.
8      Q.    Can you tell me again what
9  expertise you have to render an opinion that a
10 microscopy test for the presence of asbestos is
11 not reliable?
12     A.    Sir, I'm a professor of
13 epidemiology and biostat.  I mean, basics in
14 there -- as I taught medical students a lot
15 about sensitivity and specificity of different
16 kinds of tests, right.
17           When -- when you look at a
18 validation study as you do in that '77
19 round-robin and you see how many positives and
20 negatives you get, it's very easy to do, very
21 simple math, right.  One out of seven that got
22 it is 14 percent, and a 14-percent sensitivity,
23 right, no one's going to rely on that; yet, we
24 ended up relying on that for decades.
25           I mean, this was all a way -- how

42 (Pages 162 - 165)

Page 166

1  could you rely on a test that has a sensitivity
2  of 14 percent to protect the American public?
3          How could you rely on a test,
4  right --
5      Q.    There's no question pending.
6      A.    But --
7      Q.    There's no question pending.
8          MS. O'DELL:  He's not finished.
9          THE WITNESS:  How do you rely on a
10  test, right, that doesn't test for
11  chrysotile, right?
12          How do you -- how do you -- how do
13  you even convince an agency, right, that
14  you're giving -- you're giving the
15  American publish assurance with this J4-1
16  that doesn't test for chrysotile when you
17  know there's chrysotile in your product;
18  and yet, you say that chrysotile is not an
19  issue.
20  BY MR. EWALD:
21      Q.    Are you done, Doctor?
22      A.    I am -- no.  I -- what you're
23  hearing from me, right, is -- you want to put
24  up J4-1?
25          You should know the limitations of

Page 167

1  J4-1, right, and you should know what the
2  sensitivity is; and you should know that it did
3  not protect the American public.  I am not
4  done.
5      Q.    Okay.  Let's look -- so there's
6  some discussion that you feel like, you know,
7  maybe there's some J&J TM work in the late
8  '80s, '90.  You're not really sure.
9          And so I'm going to show you some
10  documents.  Maybe you've seen them before.
11      A.    That's not -- that's not what I
12  said.
13          MS. O'DELL:  Object to the form.
14          THE WITNESS:  Okay.  That's not
15  what I said.
16          What -- what's represented by your
17  companies and its contractors, if you look
18  at the testing history, okay, and there
19  are documents; and you can just see, there
20  are -- Rio Tinto, if I can just get that.
21  It's printing.
22          Why don't we just take a break for
23  a second, and let me just get this
24  document in front of me so the record can
25  be clear so I have it in front of us.

Page 168

1  BY MR. EWALD:
2      Q.    Okay.  I agree with that.  Two
3  things, though.
4          MR. EWALD:  If counsel can please
5  tell me what Bates number it is so I can
6  have what you're looking at when we come
7  back from the break.
8          It's also a good time for Suzanne,
9  I think, to at least get a glimpse of the
10  eclipse, right?  Suzanne, no?
11          THE COURT REPORTER:  It will be in,
12  like, another half hour.
13          (Discussion held off the record.)
14          THE WITNESS:  Do you want to go to
15  another subject.
16          MS. O'DELL:  That's fine.  And then
17  we'll have the document in just a moment,
18  and then I'll be happy to give you the
19  Bates number.
20          THE WITNESS:  You will put in the
21  chat.
22          MS. O'DELL:  Yeah.  We'll put it in
23  the chat as well.
24          MR. EWALD:  Perfect.
25

Page 169

1  BY MR. EWALD:
2      Q.    Let's talk about geology.  And
3  actually, is the -- if you go to paragraph 80.
4      A.    Yes.
5      Q.    Is that the Rio Tinto one you're
6  referring to or something else?
7      A.    No.  There's a -- there's a lot of
8  Rio Tinto.  There are a number of different
9  versions of that.  In fact, I think there's a
10  number of Julie Pier slide decks.  So we have
11  to find exactly.
12      Q.    Right.
13      A.    But the one at TEM is from a Julie
14  Tinto [sic] -- I apologize -- Julie Pier Rio
15  Tinto slides.  You are correct.
16      Q.    So on geology you cite a number of
17  pages of what goes in and then a variety of the
18  other sources.
19          How did you go about reviewing the
20  geological issues associated with talc and
21  asbestos?
22      A.    So there were a number of meetings,
23  including the IWGACP.  There were other
24  meetings that FDA held where they had
25  geologists come and present.

43 (Pages 166 - 169)

Page 170

1    I mean, this is the, you know, the
2  unique thing about FDA. FDA finds itself
3  regulating substances that intersect with
4  environmental, geological, mineralogical
5  substances all the time. You know, whether
6  it's lead, I mean, other -- other issues in
7  their products.
8    So the FDA would bring in the
9  geologists that there were a number of
10  geologists that I cite that were from FDA
11  presentations. So I looked at that.
12    I also went -- I wanted to see -- I
13  pulled the Laura Webb, who I believe is the
14  defendant expert witness. I went to see -- to
15  read her comments in response to the IWGACP
16  working group. She filed comments. I went to
17  read her expert report in part.
18    So I was interested in looking at
19  this the way FDA would look at this and have to
20  educate themselves from a geological point of
21  view. Again, not substituting myself for the
22  geology experts; but again, on that interface
23  when, as FDA did in this matter, to bring in
24  the geologists to understand the interface
25  between it's regulated products and the

Page 171

1  potentially hazardous products that are
2  geologically or mineralogically derived.
3    Q.    Okay. So for example, with your
4  discussion of Laura Webb, 83.15, page 26. Let
5  me know when you're there.
6    A.    Hold on a second 83 point --
7    Q.    15.
8    A.    Right.
9    Q.    Are you there?
10    A.    I am, sir.
11    Q.    Okay. I couldn't understand what
12  you said. So what is -- what does Laura Webb's
13  opinions that you're excerpting there impact
14  have on your opinions here?
15    A.    Yeah. So this is all under the
16  conclusion here. I mean, if you go to the --
17  to the section of this, I mean, as you know,
18  Dr. Van Gosen came to an FDA public meeting;
19  and he took -- he took -- he took FDA through
20  the interrelationship that drives from the
21  geological environment of talc. And, for
22  example, he did it on the anthophyllite forms
23  and how those were related. Dr. Webb agrees in
24  part, disagrees in part with Dr. Van Gosen.
25    And what you can see is, again,

Page 172

1  it's the starting place of what to expect, I
2  mean, in the -- in this material. Again, I
3  think that there is very little data if you
4  look at the -- the record here that the Vermont
5  mines -- again, I think probably what's being
6  printed -- we have that -- we'll show the
7  possibility of serpentine materials certainly
8  in those mines were to be anticipated.
9    And my only point is that the
10  safety, you know, that there's some debate
11  here, and I go in to it; but, you know, it's
12  not been established. So there's uncertainty,
13  and I recognize that; and I'm trying to
14  recognize the complexities that are associated
15  when you start with the geology and then
16  translate that into the mineralogy and then
17  into the epidemiology. And no one has anyway
18  cleared the non-asbestiform fibers to
19  substantiate the safety in my opinion.
20    Q.    So in 83.15 you're -- are you
21  suggesting that Dr. Van Gosen disagrees with
22  Dr. Webb, that one must, in fact, understand
23  the details of the local and regional geology
24  of any given mine, including the potential for
25  complex distribution of rocks at different

Page 173

1  metamorphic grades resulting from complex
2  tectonic history?
3    MS. O'DELL: Object to the form.
4    THE WITNESS: That's not
5  Dr. Van Gosen. That's Dr. Webb if I'm
6  correct.
7  BY MR. EWALD:
8    Q.    Do you think that -- is it your
9  opinion that Dr. Webb disagrees with -- sorry.
10    Is it your opinion that
11  Dr. Van Gosen disagrees with that quote from
12  Dr. Webb?
13    A.    I'm not saying she does -- he does.
14  I'm not -- I'm not saying there is a
15  disagreement there. I mean, I -- I put it in
16  there because I think, one -- I mean, I think
17  that is the view of the geologists. I think
18  that one has to take that into account.
19    And I mean, there are
20  certain things -- there -- you know, there are
21  certain categories that geologists, they -- the
22  people who are involved for 50 years expected
23  certain type of geological formations gave
24  potential for certain risks. But knowing the
25  local characteristics, I mean, is certainly

44 (Pages 170 - 173)

Page 174

1  something that was for important for the
2  totality of evidence here.
3      Q.    Well, you have on your materials
4  considered list an expert report, MDL from
5  Dr. Mary Poulton.
6          Did you review that expert report?
7      A.    I would have to -- I would want to
8  review -- I'd want to review that and pull that
9  in front of me.
10     Q.    Have you -- sitting here today, do
11 you recall reviewing the report of Dr. Mary
12 Poulton?
13     A.    I'd have to go back.  I'm drawing a
14 blank for the moment.
15     Q.    What are you relying on, if
16 anything, for your understanding of J&J's
17 mining practices over the years?
18     A.    So there is -- I mean, there's a
19 rich history of Bill Ashton.  There is a -- I
20 mean, there are documents that -- let me --
21         THE WITNESS:  Do you have my pie
22 chart?
23         I just -- I need my pie chart.
24         (Discussion held off the record.)
25         THE WITNESS:  I'm still told it's

Page 175

1      being printed.  This is the famous
2      document that's being printed.
3      I just need -- there's a pie chart
4      here, and there's a TEM chart.  And,
5      again, I apologize.  As soon as that's --
6      I'm just looking to look for it.
7  BY MR. EWALD:
8      Q.    While you're looking for --
9      A.    I mean, there's -- there's -- do
10 you want to -- can I just give you the --
11 thanks.  I just want to pull that in front of
12 me.
13     Q.    I'm sorry.  What are you doing now,
14 sir?
15     A.    I'm just looking at the materials
16 in front of me for -- here we go.  And there's
17 another version of this.  There are two
18 versions of this.  There's two versions of
19 this.  Yeah.  Can you just pull up -- let's
20 start with the pie chart there.  Just give me
21 one second.
22         And there's some different
23 footnotes on these different pages, and there
24 is another pie chart.  Yeah.  There's a
25 different pie chart.

Page 176

1      So for example, there's a pie chart
2  of Rio Tinto mineral slide deck talc deposit
3  mineralization by world production, and they
4  divide this up by world production; and they
5  employ the same pathway formation of talc.  And
6  they do 20 percent of the world production is
7  Serpentine Host Rock and RTM Vermont, and it
8  says potential for serpentine asbestos.  And
9  there are certain versions of this pie chart
10 that have a footnote that say that the --
11 exactly what's in that quote, that you should
12 suspect the possibility based on local
13 characteristics.
14         So I mean --
15         MS. O'DELL:  John, just for
16 verification purposes, this is an IMERYS
17 PowerPoint.  It's analytical capabilities
18 to test methods dated June 2009, and I'll
19 give the Bates number to you shortly.
20         THE WITNESS:  And then there is
21 also -- I owe Mr. Ewald a discussion of
22 the history of TEM, and there is that
23 slide too.  If you can just help me find
24 this slide deck.  There's a -- it's one of
25 the Rio Tinto slides.

Page 177

1      Yeah.  It's -- there's a Julie --
2  exactly.
3      Sorry, Mr. Ewald.  We'll get those
4  to you.
5  BY MR. EWALD:
6      Q.    All right.  So -- so let's, while
7  we're waiting for -- I'm not sure we're waiting
8  anymore.
9         MR. EWALD:  Jake, can you please
10 drop in the Mary Poulton report.  I'll pop
11 it on the screen.
12         THE WITNESS:  I do have the
13 footnotes here.  Here is one footnote
14 where on -- there's a slide deck,
15 analytical capabilities and test methods
16 June 2009 is talc deposit mineralization
17 by world production.
18         There's a note that says, "All talc
19 deposits have risk of localized asbestos
20 if isolated metamorphic events occur in or
21 near the deposit.
22         MS. O'DELL:  And I will --
23 Dr. Kessler, is this the one you would
24 like to put it in chat.
25         THE WITNESS:  Yeah.  I mean, I hope

45 (Pages 174 - 177)

Page 178

1   that's the -- it's this slide, Mr. Ewald,
2   please. Just make it has the footnote.
3   Some of them don't have the footnote
4   that -- I think that footnote
5   characterizes it pretty well.
6       MS. O'DELL: Okay.
7   BY MR. EWALD:
8       Q.   Okay. While we're putting that in
9   the chat, I put it in -- Jake put in the report
10  of Mary Poulton. I am not going to ask about
11  it in depth, but I do want you to have a chance
12  to take a look at it just to see if it's
13  something that you ended up reviewing.
14      MS. O'DELL: Just click it out of
15      the chat.
16      THE WITNESS: This is 2019-02. Is
17      that the document I'm doing?
18  BY MR. EWALD:
19      Q.   Yes.
20      A.   Thank you very much.
21      General causation -- one second.
22  Yeah. This is a response, I guess, to Cook and
23  Krekeler. I'm not going to pronounce it right.
24  It's a response to them.
25      I don't have a -- I don't know

Page 179

1   whether I -- I don't know -- I don't remember
2   studying it the same way that I studied Webb.
3       Q.   Okay. And --
4       A.   This response to Cook, right?
5       Q.   Right. And to the extent that
6   Dr. Poulton makes certain opinions regarding
7   selective mining, the ability of J&J to avoid
8   areas that may contain asbestos, you don't have
9   the expertise to disagree with her, correct?
10      MS. O'DELL: Object to the form.
11      THE WITNESS: I'm -- I'm not going
12      to -- you know, I'm not being going to --
13      just give me one second. Let me just --
14      let me just study this a little please.
15      Thank you.
16      Yeah. So she's focusing, if I'm
17      correct, how drill campaigns -- on drill
18      campaigns, mine planning, and how
19      effective the quality control is, right.
20      You know, I do -- I do want to put
21      on the -- well, let me just see something.
22      Let me just look at this.
23      Yeah. So let me just point out
24      what -- I think -- I mean, I have studied
25      this issue a little. I leave it to

Page 180

1   others. I think that the notion of
2   quality control in China is a very big
3   complex issue, right.
4       She -- I mean, she's talking about
5   I am sure -- you know, I have no opinions
6   on -- between her and cook. I mean, there
7   are other -- on -- you know, they can
8   discuss the Vermont mines.
9       I think where -- I think we would
10  all agree that complex -- the quality
11  control in China -- and I -- I've tried to
12  look at those documents. You know,
13  anything about quality control in China, I
14  think I -- I would -- I see she doesn't
15  get into that in any real significant way
16  if I remember because I was looking for
17  that.
18      You see there's one paragraph on
19  China, right. But to say -- to talk about
20  the quality control and selective mining,
21  you know, I don't think anyone is -- and I
22  tried to go back and look at those audits
23  and actual visits to China; and I think
24  there's -- there's great unknowns on the
25  quality there.

Page 181

1   BY MR. EWALD:
2       Q.   When you say "great unknowns,"
3   you're talking about any experience you might
4   have had in other areas relating to China, and
5   you haven't had any specific evidence about a
6   lock of quality control as it relates to China
7   top mines --
8       MS. O'DELL: Object to the form.
9       THE WITNESS: Yeah. So I -- so I
10      do have -- I mean, if you do look at the
11      amount of quality control data that is in
12      the administrative record on China, it
13      is -- I mean, I -- I was not -- there --
14      there is not a lot.
15      If you look at the total number of
16      samples that were tested in China in the
17      record over the years that J&J has put --
18      I mean, I think there's -- there's very
19      significant questions about the oversight
20      in China. And I -- and I see she cites
21      that stuff.
22  BY MR. EWALD:
23      Q.   Right. On the -- if you could
24  please turn --
25      A.   I just need one second to clean up

46 (Pages 178 - 181)

Page 182

1 here so I can --
2   Q.   Sure.
3   A.   -- keep track of the documents.
4 Thank you so much.
5   Q.   Sure.
6   A.   And I still need that TEM document.
7   Q.   I'm not going there yet. We'll do
8 that on the break.
9   A.   Thank you very much. Thanks for
10 waiting.
11  Q.   So turn, please, to the
12 Subsection A that starts on page 46.
13  A.   Yes.
14  Q.   All right. And you --
15       THE WITNESS: Can I just trouble
16  you. Can you hand me my lab binders -- my
17  lab test binders, please?
18       MS. O'DELL: Yep.
19       THE WITNESS: Just one second. Let
20  me just get my binder in front of me so I
21  don't have to jump up and down.
22       Thank you very much, sir. I'm
23  happy to discuss anything.
24 BY MR. EWALD:
25  Q.   Sure. You mentioned earlier in the

Page 183

1 day that, to the extent possible, it was
2 important for you to get a complete story on
3 issues that you're talking about in the report,
4 fair?
5   A.   That's a general -- general subject
6 of aspiration. I implored you, right. I try
7 to get as complete.
8   Q.   And you talked a little bit about
9 the steps you took to do that. At any point in
10 time did, when you were talking about some of
11 the incidents discussed starting on, let's say,
12 110, footnotes and ensuing paragraphs, asked
13 counsel if there were other documents that you
14 haven't identified that spoke to those
15 particular issues?
16       MS. O'DELL: Object to the form.
17       THE WITNESS: So whether there were
18  laboratory tests, we're talking about in
19  the sphere of testing; is that correct?
20       I just want to get the scope if
21  that's this section.
22 BY MR. EWALD:
23  Q.   Yeah. Right. For example, you --
24 let me give you an example. Sorry.
25       You reference the Hutchinson, which

Page 184

1 is in paragraph 114. Did you ask -- actually,
2 115. Sorry.
3       Did you ask plaintiff's counsel,
4 hey, do you know if there are any other
5 documents other than what I'm citing here
6 relating to that historical back-and-forth?
7   A.   Yes.
8   Q.   Okay.
9       THE WITNESS: Can I have my
10  Hutchinson binder please?
11       That is a good example, and it's
12  worth pointing out, yes. I was very
13  interested in that because that went to
14  the -- I -- I have a document. I
15  specifically asked for that because I was
16  trying to sort out the Dr. Lewin issues.
17 BY MR. EWALD:
18  Q.   Okay. And so what was your
19 thinking in setting out in your report that
20 discussion where you only discussed part of the
21 story in paragraph 115, fair?
22  A.   Which paragraph, sir?
23  Q.   115.
24       MS. O'DELL: Excuse me. Let me
25  make sure my objection is noted.

Page 185

1       Object to the form of the question.
2       THE WITNESS: I'm -- you know,
3  again, as this is the life I learned --
4  lead -- we all lead, right -- that I have
5  when I'm writing books is how much do you
6  put in and how much -- I can go into -- I
7  can write a report, and I have a -- I have
8  a binder that, you know, assembled that
9  has, you know, a reliance list.
10       I must have -- I don't know -- 20
11  documents or so that go into exquisite
12  detail exactly when Hutchinson at the
13  airport ends the reports the day before
14  they go into FDA. And say there's no
15  chrysotile when he says there's
16  chrysotile.
17       I can go into that story in
18  exquisite detail. The documents should be
19  on my reliance list. The question is how
20  much -- whatever you'd like to discuss. I
21  mean, I think -- I think it is an
22  important story.
23 BY MR. EWALD:
24  Q.   Well, I guess one question is in
25 reviewing some of the documents that you

47 (Pages 182 - 185)

Page 186

1  suggest that you have, does that impact your
2  assessment of the reliability of the results
3  that were initially reported and discussed
4  on -- in paragraph 115?
5       MS. O'DELL:  Objection.  Vague.
6       THE WITNESS:  Let me just -- let me
7  just read all of 115.  Give me one second
8  to review 115, and then I will tell you
9  the impacts.  I just need a second to
10 review this.
11      I mean, I've been focused on the...
12      This is Figure 17A and 18A.  Yeah.
13      So yeah.  I see that paragraph.
14 Ask your question again, sir, please.
15 BY MR. EWALD:
16  Q.    Well, so, for example, are you
17 aware that McCrone tested the same sample by
18 TEM and did not find any chrysotile?
19  A.   Sir, I can tell you in -- let's --
20 give me one second.  Give me one second.
21      So I'm aware that there are a lot
22 of people who testify -- there was Sperry Rand,
23 who did find -- I have a -- in this -- it
24 should be -- I have a handwritten chronology.
25 It must be -- did it fall out?

Page 187

1       I have a handwritten chronology.
2  Sperry Rand did find it.  And so, you know,
3  again -- here it is.  I'm sorry.  Thank you.
4       This is my notes.  And so I can
5  tell you on -- on what date would you -- what
6  date are you referring to of McCrone because I
7  can -- we can look at those documents?  I'm
8  happy to pull those up for you or with you.
9       We can look at what McCrone found.
10 We can look at what Sperry Rand found.  We can
11 look at what Dr. Hutchinson found.
12      But the fact is Hutchinson found
13 this, right.  Made sure J&J knew about this.
14 J&J walk in and say, no shred of evidence.
15      So it may be that McCrone found,
16 you know, McCrone found what, you know, what
17 McCrone found.  But if you're going to tell FDA
18 that there's no shred of evidence and they had
19 in their possession what Hutchinson said is
20 incontrovertible evidence, right, of
21 chrysotile, you know, you can draw whatever
22 conclusions you want.  I don't get that.  I
23 don't get that, how that happens.  I don't get
24 how the general would allow that to happen in
25 his company.

Page 188

1  Q.    Well, do you have any expertise as
2  to be able to decide whether, for example,
3  Dr. Hutchinson just got it wrong?
4       MS. O'DELL:  Object to the form.
5       THE WITNESS:  I have every
6  expertise in the world to know the answer
7  to the question is:  Do you have any shred
8  of evidence, right.
9       And, I mean, I think most people
10 would -- would agree that he may have --
11 you can decide, you know, exactly -- you
12 can be the arbitrator, who's right, who's
13 wrong.
14      But the answer to the question,
15 okay, that -- let's just look -- if you
16 look on at 11/1/72, right, there isn't a
17 shred of evidence, right, that there's
18 asbestos in Shower to Shower.
19      When you have that Hutchinson
20 come -- on, Mr. Ewald.  You don't
21 disagree.  You -- there's a shred --
22 there's not only a shred of evidence.
23 There was -- you could sit there, please,
24 I mean --
25

Page 189

1  BY MR. EWALD:
2   Q.    Listen, I'm not -- I'm not going to
3  tell you what you believe.  Don't tell me what
4  I believe.
5   A.    I'm not.
6   Q.    You just did.
7   A.    I'm telling you --
8   Q.    You just did.
9   A.    But I'm telling you that -- I'm
10 telling you the history is not very good for
11 your client.
12  Q.    Okay.  And --
13      MS. O'DELL:  John, excuse me.
14 We're -- we're at 2:26.  I think we agreed
15 to take a break for Suzanne.  I think she
16 was looking at being able to get up and
17 outside by 2:30.
18      So is this a good time for a break?
19      MR. EWALD:  Why not?
20      MS. O'DELL:  Okay.  We are off the
21 record.
22      THE COURT REPORTER:  Okay.  We're
23 off the record.
24      (Whereupon, a break was taken.)
25

48 (Pages 186 - 189)

Page 190

1  BY MR. EWALD:
2      Q.    All right.  Doctor, off the top,
3  we'll go back to the topic we left off later.
4  I want to talk about your Section 5, amongst
5  other things, which starts on page 58.
6      A.    Yeah.  Can I turn to my epi
7  binders?
8          Yes, sir.
9      Q.    And in particular, I want to start
10  with your concluding paragraph on 154.  It's
11  the end of that section on page 67.
12      A.    157?
13      Q.    154 on page 67.
14      A.    Thank you, sir.  Give me a second.
15      Q.    Of course.
16      A.    Yes, sir.
17      Q.    Okay.  And so in this concluding
18  paragraph, you identify three things that
19  supports your conclusion that plaintiffs failed
20  to substantiate the safety of its talcum powder
21  products.
22          First, is the FDA's 2014 petition
23  response acknowledging that there remains some
24  evidence to suspect or question the safety of
25  talcum powder products.  And on that I will

Page 191

1  pause.  There are a couple of different
2  paragraphs, but you note in paragraph 145 the
3  FDA's response noting the biological
4  plausibility of talc reaching the endometrial
5  cavity, fair?
6      A.    Yes, I cite that; yes, sir.
7      Q.    Okay.  And then you cite to the
8  totality of the medical literature.  It says
9  2014 that continues to raise safety questions;
10  and then within this section overall, you refer
11  to a number of such studies, fair?
12      A.    Yeah.  Tell me -- I'm a little
13  confused.  So you -- we're going back on 2014.
14  A is the FDA's petition itself acknowledges --
15      Q.    Right.
16      A.    -- that there -- there are some
17  evidence.  So you're citing some of the
18  evidence that they are citing some of the
19  evidence, but their review is that there is
20  some unanswered questions, right, I mean, about
21  this.  And you're picking out some of the
22  evidence in their response.
23          Are you under A, or are you under
24  all -- everything in my 154?  That's why -- I
25  apologize.

Page 192

1          Which one are you -- when you're
2  pointing out these paragraphs?
3      Q.    I'm going by specific paragraph
4  number.  I started out by focusing on the FDA
5  2014 petition response.  In particular, I noted
6  145 where the FDA responds -- or you quote from
7  it where it notes that it is plausible that
8  perineal talc has a particulate that reaches
9  the endometrial cavity, right?
10      A.    Yeah.  That is -- that is -- that
11  is part of the FDA response that acknowledges
12  that there are -- there's some evidence to
13  suspect a question of safety of talc products.
14      Q.    Okay.
15      A.    The FDA uses that.  I mean, it's
16  not that -- I mean, I am -- the reason I'm
17  being a little careful, I am not doing -- you
18  know, under 154A, FDA is doing that analysis of
19  those mechanisms of action, correct?
20      Q.    Right.
21      A.    I'm citing simply the fact that FDA
22  has said there are -- there's some evidence
23  with respect to your question of safety, right,
24  in that petition response.  And they use that
25  as a basis to do that.

Page 193

1      Q.    And then C on 154 refers to IARC's
2  classification as talc-based body powder as
3  possibly carcinogenic to humans, right?
4      A.    So can I just have my -- my art?
5          What you have is you have both a 2B
6  classification, and you have a 1 classification
7  for both 2010 and 2012.  So you have the 2B,
8  and then you have the Group 1 classification of
9  all forms of asbestos, right, in 2012.  I mean,
10  it deals with asbestiform talc and talc with
11  asbestos.  So you've got Group 1 and 2B for
12  IARC.
13      Q.    Right.  And all of the evidence
14  that you talk about in Section 5 starting
15  around 58 and summarize in that paragraph 154
16  conclusion ever since is publicly available
17  information, correct.
18      A.    Yeah.
19      Q.    Okay.  And is it -- do you have a
20  view as to when there was enough evidence as to
21  defendant's failing to substantiate the safety
22  of their talcum powder products?
23      A.    Yeah.
24      Q.    What date?
25      A.    I think if you go back to the

49 (Pages 190 - 193)

Page 194

1  original Tenovus finding of -- I mean, I'm not
2  sure I -- well, I give an -- I don't think I
3  give an opinion specifically on that.
4       But in response to your question, I
5  think once you find needles in Tenovus deep in
6  the ovary and they have evidence that their
7  product contained, quote, "the fibers," I think
8  there was -- there was not -- certainly there
9  was -- there was serious questions that were
10 raised that could not substantiate the safety
11 of the product back in the '70s.
12 Q.    Do you think from an
13 epidemiological standpoint, that the Cramer
14 1982 study was sufficient to raise enough
15 questions on the safety of talc products?
16     MS. O'DELL:  Object --
17     THE WITNESS:  I am not basing my
18 last answer on any one epidemiological
19 study.  I think, though, that once you
20 have -- again, I mean, failing to -- the
21 obligation was for J&J to substantiate the
22 safety, right.
23     You don't have to prove that -- you
24 don't have to prove the -- you don't need
25 epidemiological statistical significance

Page 195

1  to raise questions about safety.
2       I think in the '70s you didn't
3  have -- you couldn't substantiate the
4  safety.  Once you have Tenovus and once
5  you have fibers, how can you substantiate
6  the safety?  It raised enough questions to
7  undermine any substance to say you can
8  ensure the safety of the product.
9       That's not the same thing as, you
10 know, ruling something in, right.  I mean,
11 is the epidemiological -- we now know that
12 there's a small statistically significant
13 increased risk, I mean; but that's not the
14 same thing as failing to substantiate the
15 safety.
16     You understand what I'm saying, I
17 hope.
18 BY MR. EWALD:
19 Q.    I guess I'm unclear on the
20 epidemiology.  You note in 146 that you leave
21 to other experts to discuss in detail the
22 strengths weaknesses and specifics of the
23 scientific evidence.
24     What are you -- beyond what you
25 include in the report about epidemiology from

Page 196

1  147 concluding footnotes to 151, do you intend
2  to offer any other opinions regarding that
3  ovarian cancer epidemiology?
4       MS. O'DELL:  Object to the form.
5       THE WITNESS:  So again, I think you
6  have -- I won't use any adjectives.
7       You -- you have experts who will do
8  the epidemiology, meaning who can talk
9  about recall bias and never use and ever
10 use.
11     I'm happy to, again, as a professor
12 of epidemiology, if you want to ask me any
13 questions; but I leave it to those other
14 experts to talk about epidemiology
15 certainly as it relates to causation,
16 right.  I told you I wasn't going to do
17 causation.  I'm not going to do causation.
18     Where this epidemiology comes into
19 play, right, I -- you -- you certainly
20 have varying degree of biological
21 evidence, right.  You have the animal
22 pathological.  You have histological.  You
23 have epidemiological evidence.  Again, is
24 the interplay between that epidemiology
25 and responsibilities under the act.

Page 197

1       Again, the responsibility here is
2  J&J, as I understand, it has to
3  substantiate the safety of its product,
4  right.
5       Where epidemiology -- the
6  epidemiology cannot be said to
7  substantiate the safety of this product.
8  In fact, the epidemiology, you know,
9  certainly today, I mean, raises questions
10 about it; and it has raised questions for
11 several decades, right.
12     So what I will stay with the
13 opinions that are specifically -- you
14 know, the heading is a good example.  And
15 in 154 this is to support the fact that
16 they fail to substantiate the safety of
17 their talcum products.  I mean, I rely on
18 what FDA -- rely may be wrong, but I
19 reference what FDA has said.
20     I look at the evidence myself, feel
21 very comfortable, you know, discussing
22 what -- what the epidemiology is and what
23 international bodies and agencies have
24 said.
25     And I take that against the

50 (Pages 194 - 197)

Page 198

1  regulatory question: Did they
2  substantiate the safety of the talcum
3  product.
4          And in light of that, epidemiology
5  studies that still -- that show a small
6  significant -- significant increase.
7  Again, epidemiologists can spend their
8  careers discussing dispense and
9  limitations and exactly what all that
10  means.
11          I think there's no doubt in my
12  mind, in light of that record, the
13  defendants failed to substantiate the
14  safety of the product.
15          That's what I would offer.
16  BY MR. EWALD:
17      Q.    And when you -- when you say that
18  epidemiology has raised questions going back
19  several decades, how far back in your mind?
20      A.    Well, so let me -- hold on one
21  second.
22          So again, I'm not going to give an
23  exact, you know, I mean, opinion; but I think
24  you have certainly studies, you know, as you
25  reference of Cramer in '82, Hartge in '83. You

Page 199

1  have a whole bunch of case control studies in
2  the '80s that certainly, you know, at the very
3  least, even with their limitations, raise
4  questions about the safety.
5          But I think -- I think you have
6  that -- again, once you find -- once you find
7  needles, I mean as Tenovus in the -- in the
8  deep tissue, I think, you know, you don't need
9  epidemiology if you find the needle and you
10  have that pathology to raise questions.
11  Causation is a different mass.
12      Q.    Is it your opinion that at any
13  point in time, the FDA has concluded that
14  cosmetic talc manufacturers like J&J have
15  misbranded labels for not having a warning
16  substantiated?
17          MS. O'DELL:  Could you repeat the
18  question?
19          MR. EWALD:  Yeah.
20          THE WITNESS:  I want to -- I want
21  to study that question.
22  BY MR. EWALD:
23      Q.    Sir --
24          MS. O'DELL:  He's just reviewing
25  the question on realtime.

Page 200

1          THE WITNESS:  So this isn't --
2  yeah.
3  BY MR. EWALD:
4      Q.    Is it your -- I'm sorry.  Go ahead.
5      A.    I just want to -- I really
6  appreciate the question.  I just want to make
7  sure I get it.
8          Has the FDA concluded that -- has
9  FDA concluded that the companies have not
10  substantiated the safety?
11          Is that -- is that -- ever said the
12  companies have not substantiated the safety?
13      Q.    Well, that's one question.  That's
14  the first one.  Go ahead.
15      A.    So I don't -- I mean, I think that
16  if you look at the response to the petitions,
17  FDA got side -- sidetracked are two things and
18  did not look at that essential question under
19  the statute, which they should have done.
20          I think they looked at, in response
21  to Sam Epstein's petition, the question was,
22  you know, did they say whether there was
23  definitive evidence to -- whether there was
24  definitive evidence or evidence to definitively
25  say to require a warning.

Page 201

1          That's -- that was not the standard
2  for cosmetics, but that was the standard in the
3  petition; so they were answering the petition,
4  right.  But the -- the real question, right, I
5  mean, in front of FDA is, you know, for
6  50 years your company said -- told this agency
7  there's not asbestos in this product, right.
8          And I think that has -- that's
9  been -- that's shaped everything, and the --
10  the agency, you know, gives great -- put great
11  reliance in what the company said for 50 years
12  that there was no asbestos.
13          So I mean, if there's no asbestos,
14  then there's no issue of substantiating the
15  safety.  The FDA was completely misled here.
16      Q.    Okay.  So your -- it's your opinion
17  that if there is no asbestos determination,
18  that the safety has been substantiated for
19  talcum powder products?
20      A.    No.
21          MS. O'DELL:  Object to the form.
22          THE WITNESS:  You almost got it
23  right.  If there is -- if there is no
24  asbestos -- there's going to be two
25  negatives -- too many negatives in this.

51 (Pages 198 - 201)

1      But if there's no question about
2  asbestos -- if you say to the FDA, no --
3  we've taken care of the risk, right,
4  you're worried about asbestos. Asbestos
5  is a human carcinogen. We've taken care
6  of the risk. There's no asbestos. We've
7  closed down mines. We -- we have a -- we
8  have this under control. We've never
9  found it. No asbestos. No asbestos. No
10  asbestos, right.
11      You basically put FDA's mind at
12  ease, right, that they don't have to lose
13  sleep that this product is causing harm.
14      That is different, right, than
15  whether your company has substantiated the
16  safety. I just believe your company --
17  that there was no asbestos here. That was
18  the mistake.
19      So when Sam Epstein comes in and
20  says it requires a definitive warning,
21  FDA's going, uh, there's no asbestos here,
22  we can rest assured. What's the big deal?
23      That's what your company is saying.
24  BY MR. EWALD:
25  Q.    Okay. So I want you to leave aside

1  the asbestos point for a moment because, at
2  least as I understand it, the epidemiology
3  points that you're making in Section 5 of your
4  report are not dependant on whether or not
5  there's asbestos in Johnson & Johnson talc,
6  correct?
7      MS. O'DELL: Object to the form.
8      THE WITNESS: I -- I would have to
9  go back. I mean, the epidemiology
10  independently raises questions, such as
11  how the epidemiology negates your ability
12  to substantiate the safety in my view.
13      You can't say this product -- I
14  mean, in light of that epidemiology and
15  the totality of that evidence, right,
16  you've not -- you've not cleared this
17  product. You can't say this product --
18  you can't assure the safety of this
19  product in light of that epidemiology.
20  BY MR. EWALD:
21  Q.    And you're saying --
22  A.    That's what Section 5 says.
23  Q.    And you're saying that the 2014 FDA
24  response relied on the wrong standard; they
25  screwed up?

1  A.    No.
2      MS. O'DELL: Object to the form.
3      THE WITNESS: They --
4      MS. O'DELL: You may answer.
5      THE WITNESS: They missed it.
6  Okay.
7      Let's -- I mean, if you look at
8  their response -- let's just pull up --
9  and if I'm correct, they said in response
10  that there is not definitive evidence,
11  right. The science is not definitive.
12      Let me get exactly the words. Give
13  me one second. I just want to pull it up.
14      Do you mind -- if someone could
15  look for the word, whether FDA actually
16  said and the word definitive.
17      They're responding -- what they
18  have in front of them is a request from --
19  oh, I'm frozen now.
20  BY MR. EWALD:
21  Q.    I'm sorry. Before you go
22  further...
23      MR. EWALD: Jake, can you tell me
24  which number? I'm having trouble
25  finding -- never mind. I found it. Never

1  mind.
2      (Whereupon, Exhibit 13, Cancer
3  Prevention Coalition Citizen Petition
4  Seeking Carcinogenic Labeling on all
5  Cosmetic Talc Products, dated November 17,
6  1994, was marked for identification.)
7  BY MR. EWALD:
8  Q.    Go ahead, Doctor.
9  A.    Yeah. So here is -- FDA didn't --
10  I mean, we can all -- I don't want to be
11  critical of my former agency. But if you look
12  at Steven Musser's response, Dr. Musser's
13  response, I mean, the growing body of evidence
14  to support a possible association between
15  genital talc exposure and serious -- serous
16  ovarian cancer is difficult to dismiss. The
17  evidence is insufficient for FDA to require as
18  definitive a warning as you are seeking.
19      That is a standard that FDA is
20  using. This -- so they are -- they are adding
21  the -- they are responding to the petition
22  asking for a warning that was definitive.
23  Okay. FDA say -- said it could not do that.
24      FDA did not respond to the question
25  of whether J&J ever substantiated the safety of

Page 206

1 the product. And there's no need -- if -- if
2 FDA believes what your company said for
3 50 years that there's no asbestos in their,
4 right, we can discuss the role of fibrous talc.
5 Leave that aside for the moment. But FDA's
6 basically reassured for 50 years that there is
7 not a significant risk here because you don't
8 have asbestos in it.
9     Q.   So you keep going back to asbestos.
10        And I'm asking you in your
11 Section 5 of your report talking about
12 epidemiology, you agree with me that does not
13 have anything to do with whether or not there
14 is asbestos in J&J talc products, correct?
15        MS. O'DELL:  Object to the form.
16        You may answer.
17        THE WITNESS:  Yeah.  No.  I
18     apologize.
19        So I thought you took me out of
20     direction.  I thought we did five, and
21     then you took me outside of five, right,
22     to -- with regard to the questioning,
23     right?
24 BY MR. EWALD:
25     Q.   Right.

Page 207

1     A.   So you are right.  Five just says
2 in light of the -- in light of the
3 epidemiology, there are serious questions that
4 question the safety of this product.  You
5 can't -- you've not assured the safety of the
6 product.  That's all I say in five, right.
7     Q.   But --
8     A.   But the bigger question here -- I
9 mean, again -- I'm sorry.  Let me stop there,
10 sir.
11     Q.   It's all right.
12     A.   So the bigger question, right,
13 is -- I mean, why is FDA -- you know, I mean,
14 is what we've been talking about, which is that
15 the risk of the product, I mean, is -- the
16 major risk of this product is -- that FDA's
17 concerned about is whether asbestos -- there's
18 no asbestos.  There's no risk.  That's an
19 overstatement because there's fibrous talc, and
20 we have to consider that.
21        But the reason FDA's been in its
22 seat for 50 years, right, is that there's no --
23 you've been saying there's no asbestos in it,
24 and it believed you.
25     Q.   So in this 2014 response -- and I

Page 208

1 can't even remember what --
2     A.   So go to -- go to paragraph 144.
3     Q.   No.  Hold on.
4     A.   I'm sorry.  Yeah.  I thought you --
5 I thought you were asking.
6     Q.   No.
7     A.   I was trying to be helpful.  You
8 said -- I'm sorry, sir.  I apologize.
9     Q.   So I just want to note here you
10 talked about the couple of sentences in this
11 2014 paragraph in this 2014 response from FDA does
12 also note that we are committed to the
13 protection of the public health and share your
14 risk -- share your interest in reducing the
15 risk of ovarian cancer.
16        Current regulations state that
17 cosmetic products shall bear a warning
18 statement whenever necessary or appropriate to
19 prevent a health hazard that may be associated
20 with a product.
21        Do you agree that at the time in
22 2014, this was an accurate statement of at
23 least one of the regulations that could apply
24 to the warning statement on the cosmetic
25 product?

Page 209

1     A.   I'd have to go back and just --
2 you'd have to give me a couple of minutes to
3 compare that to the statute.  You know, again,
4 there's -- as you just correctly said, there is
5 this other sort of arcane requirement when you
6 don't substantiate, you have to say your
7 product is un- -- safety has not been
8 substantiated.  And that's what FDA is missing
9 here.
10        So this is only part of this --
11 part of the regulations as you eluded to in
12 your question.
13     Q.   Okay.  But do you agree that the
14 FDA --
15     A.   I -- I --
16     Q.   I'm sorry.  The FDA accurately
17 stated some -- at least one -- one requirements
18 in this letter and understood it?
19     A.   I'd have to go -- we'd have to --
20 you'd have to put up the statute and the regs
21 for me to opine on that officially on what the
22 actual standard.
23        I -- whenever necessary or
24 appropriate to prevent a health hazard, we just
25 have to look at the statute.  If that

53 (Pages 206 - 209)

Page 210

1  matches -- if those words are exactly out of
2  the statute, then that's fine.  I just -- I
3  don't have that committed to memory.
4      Q.    That's fine.  After the publication
5  of this response 2014, at any point in time did
6  you communicate to anyone past or present at
7  FDA that felt like they misunderstood the
8  standard?
9      A.    Did I communicate to anyone since
10 when -- since what -- since when?
11     Q.    Since the issuance of this letter
12 on April 1st, 2014.
13     A.    Well, I'm not aware of this letter
14 in 2014, I don't believe, okay.  I'm not
15 involved.
16     Q.    Have you seen this letter before?
17     A.    Have I seen it before?
18     Q.    I thought you quoted it in your
19 report.
20     A.    I'm not -- I'm sorry.  Maybe I'm
21 missing.
22           What I simply was saying, I'm
23 certainly aware of the FDA's response, okay, in
24 2014.  I'm not aware that I was aware of it on
25 April 1st when it came out.  I wasn't at the

Page 211

1  agency, and I wasn't involved in this matter.
2           I certainly became aware of this in
3  my studying, in my involvement of this matter.
4           Do you understand?
5           But I wasn't necessarily aware of
6  this in 2014.
7           Does that answer your question?
8      Q.    So am I understanding that you
9  weren't aware of this ruling until you started
10 working as an expert in this case, 2016?
11     A.    I -- I don't know exactly when I
12 knew that Sam Epstein's petition was turned
13 down.  I do not recall the date of that.
14           MR. O'DELL:  Hey, you guys, the
15 eclipse is happening now, I think.
16           Can we take a short break?
17           MR. EWALD:  Sure.
18           (Whereupon, a break was taken.)
19 BY MR. EWALD:
20     Q.    Okay.  Doctor, when we left off, we
21 were talking about what we had marked as
22 Exhibit 13, which is the FDA response to
23 citizens' petitions related to talc.
24           And you're aware, am I correct,
25 that this 2014 letter is in response to two

Page 212

1  citizens' petitions from Cancer Prevention
2  Coalition, one dated November 17th, 1994, and
3  the other dated May 13th, 2008, right?
4      A.    Yes, sir.
5      Q.    And in your report you state on two
6  occasions, in particular on page 59,
7  Footnote 55, that --
8      A.    Well, hold -- hold on.  Let me get
9  there.  I apologize.  Let me just get there.
10     Q.    Sure.
11     A.    Thank you very much.  59,
12 footnote --
13     Q.    55.
14     A.    Yes, sir.  I'm there.
15     Q.    Okay.  You state, "As I stated
16 above, based on my recollection, I was not
17 personally and substantially involved in talc
18 matters while commissioner.  There were certain
19 letters that were addressed to the commissioner
20 during that time period concerning talc."
21           Did I read that correctly?
22     A.    Yes, sir.
23     Q.    Okay.  And what, if anything, do
24 you remember about the 1994 citizen petition
25 letter relating to talc?

Page 213

1      A.    I remember nothing.  I have no
2  recollection about this while I was at FDA.  I
3  mean, I have no recollection about this issue
4  either now or then arising during the FDA.  I
5  don't have any recollection.
6      Q.    And so --
7      A.    I went back and checked my book and
8  my years at FDA.  I didn't see anything.  I
9  believe -- and I -- and I looked at the
10 database to see if I was involved in any
11 matters.
12           I was involved in cosmetic matters,
13 but not involved in talc as I -- as I can
14 recollect.
15     Q.    Okay.  And just so the record's
16 clear, when you say you were not involved in
17 talc during your tenure as commissioner of the
18 FDA, you're not just specifically talking about
19 the 1994 citizen's petition; you are referring
20 to any issues related to talc whatsoever?
21     A.    I have no recollection of any
22 issues pertaining to talc.
23           Now saying that, you know, if you
24 go to the national archives and we FOI it,
25 you're going to see my name on that letter.

54 (Pages 210 - 213)

Page 214

1 I'm aware of that. I mean, that came in, or
2 there may have been other correspondence.
3        But I don't remember being involved
4 at all in any matters. That doesn't mean my
5 memory's perfect.
6    Q.    Understood. You referred to your
7 book.
8        Just what book are you referring
9 to?
10    A.    So I -- I did a book called "A
11 Question of Intent." It was really --
12 primarily it was about my FDA term and
13 primarily about tobacco.
14    Q.    And you indicated that you went
15 back and looked at that to see if there was --
16    A.    I --
17    Q.    -- any mention of any talc?
18    A.    I believe I did. I've got to
19 double check, but I don't believe there's
20 anything about talc in that book. If there
21 were -- and it deals with most of the issues
22 that I dealt with while I was FDA commissioner.
23    Q.    And you said you also searched the
24 discovery MDL database?
25    A.    I just put my name in because I

Page 215

1 wanted to know whether my recollection was
2 correct, right, whether I -- you know, was I
3 involved.
4        I have -- you know, I didn't see
5 with regard to talc -- again, cosmetic issues,
6 my name came back on a number of cosmetic
7 issues that I remember that I allude to in this
8 report, not on talc.
9    Q.    What -- well, am I correct that you
10 were commissioner of the FDA from 1990 to 1997,
11 correct?
12    A.    You know, not the entire 1990 to
13 1997; but yes, you're correct.
14    Q.    Okay. And during that period of
15 time, what was the typical procedure in your
16 office if a citizen's petition came in on topic
17 addressed to you?
18    A.    There were -- I mean, I think I
19 once, in another matter, compiled all the
20 citizens' petitions. I mean, I think if my
21 recollection -- I'd have to go back. There was
22 no shortage of citizens' petitions. You're
23 dealing in quite a large number of citizens'
24 petitions that were -- that were filed, right.
25        And, you know, citizens' petitions

Page 216

1 usually got referred. It -- it was a long rich
2 history of citizens' petitions. I mean,
3 tobacco got started. I mean, I got involved.
4 There was a 1988 citizen's petition on tobacco
5 that got submitted that I picked up in 1992.
6        But for the most part, the
7 citizens' petitions will be dealt with by the
8 substantive center for which that petition will
9 be submitted with the subject matter. It will
10 be dealt with by the center and those experts
11 within the center that have, you know,
12 expertise on that matter.
13        And the administrative structure
14 around that center -- obviously, they can come
15 to the commissioner and ask for help; or there
16 are times when a matter, such as tobacco, I
17 mean, is in very significant public view where,
18 you know, I mean, I involve myself, okay, in
19 that matter.
20    Q.    All right. And so when this
21 citizen's petition came in and in 1994 to FDA
22 from the Cancer Prevention Coalition, what
23 would be the substantive center that would be
24 directed to you?
25    A.    It would -- it would be exec sec.

Page 217

1 It was an exec -- executive organization within
2 the commissioner's office. And it would be
3 assigned there, and it would go down to sift
4 sand; and then it would go to the cosmetic
5 branch within sift sand.
6    Q.    And is there any process while you
7 were at FDA in getting commissioner sign-off
8 for responding to a citizen's petition?
9    A.    Not that I'm -- not that I'm aware
10 of. That is a delegated authority, and it
11 would be done by the substantive center unless
12 -- unless the center asked for assistance or
13 the commissioner were involved.
14    Q.    Do you recall who would have been
15 the individual who ultimately had that
16 delegated authority at FDA when the citizen's
17 petition came in November 1994?
18    A.    So again, if you have the
19 response -- I mean, you note that the response
20 was not until 2014 or 1994, so it's a 20-year
21 history.
22        But my guess is what you will see,
23 for example, on the '88 response, there was a
24 response to a citizen's petition. On the last
25 page of that response, if you have an FDA

55 (Pages 214 - 217)

Page 218

1  internal copy, you will see all these codes,
2  right.
3         So I mean, I'm happy to bring it
4  up.
5         THE WITNESS: Do you have the '88
6    petition?
7         I can just use that.
8         You will see all these codes there
9    of different people who are involved in
10    the sign-off. So let me just pull that --
11  BY MR. EWALD:
12    Q.   I'm sorry. I want to make sure
13  we're on the same page.
14         You're talking about the calculated
15  one in '86?
16    A.   Yeah. What was -- what was the
17  response?
18         What year was the response? The
19  response was '86?
20    Q.   It was '86, I believe. I might be
21  wrong, but --
22    A.   The one by Dick Swanson.
23         When did Dick Swanson respond?
24    Q.   I believe '86.
25    A.   So you're right. I am -- it's '86.

Page 219

1  So if you go, for example, to page 4 of that,
2  right.
3    Q.   Hold on. Is that the page?
4    A.   Yeah. So just as an example, so
5  leave aside the cc's because that's where
6  copies went, right; and those are where it got
7  filed, but you can see who prepared it, who
8  initialed it and where it was circled, right.
9         So I'm blocking. Commissioner
10  Frank -- what was Frank's last name? I'm
11  blocking. I don't see the commissioner's name
12  here as having signed off on this, for example.
13         Most of these are either -- John
14  Taylor was regulatory affairs. Gary Flamm was
15  mostly -- Bob Lake -- this as all sift sand
16  directed people. Derfler was general counsel,
17  right. Linda Horton was general counsel,
18  right.
19         So this is general counsel, and the
20  center responded, with John Taylor at
21  regulatory affairs also taking the lead.
22         So that would give you a sense.
23  That was the process in '86.
24    Q.   Okay. And did -- are you aware of
25  any change -- well, are you aware of any change

Page 220

1  to that process when you came along as
2  commissioner in 1990?
3    A.   No. In fact, if anything, there
4  were -- there was a huge backlog on citizens'
5  petitions. I mean, there were petitions that
6  were held over from the '80s that I was dealing
7  with still that had never gotten answered.
8         And as you can see, the 1994
9  petition got answered in 2014.
10    Q.   So do you have any knowledge at all
11  how FDA was responding, if at all, to the 1994
12  citizens' petitions while you were commissioner
13  through some point in 1997?
14    A.   No. I -- as I said, I've had no --
15  I have no recollection of this issue whatsoever
16  during that time period.
17    Q.   The footnote that I read a few
18  moments ago on page 59 says that there were
19  certain letters that were addressed to the
20  commissioner during that time period concerning
21  talc.
22         I'm specifically looking at the
23  plural "letters."
24         Are you aware of any letters other
25  than the 1994 citizen's petition from Cancer

Page 221

1  Prevention Society relating to talc?
2    A.   You know, you're right. That could
3  be an error. That could be accurate. I'd have
4  to go back and check the database. I mean, it
5  would be in your discovery database. You can
6  just --
7         I mean, as we sit here right now,
8  the only one that I can visualize -- and I
9  mean, now from my studying this, not when the
10  time it came in -- more recently that was the
11  Sam Epstein that was addressed to me.
12    Q.   All right. So let's mark as
13  Exhibit 14, the 1994 letter. I will drop it in
14  the chat. Just give me a second.
15         MR. EWALD: I've got this one,
16    Jake.
17         (Whereupon, Exhibit 14, Letter
18    dated November 17, 1994, with enclosure of
19    Citizen Petition Seeking Carcinogenic
20    Labeling on all Cosmetic Talc Products,
21    was marked for identification.)
22         THE WITNESS: Can we get these
23    other screens going?
24         I'm afraid to touch anything.
25         MS. O'DELL: John, I'm just going

56 (Pages 218 - 221)

Page 222

1  to adjust something for a minute here, so
2  keep putting it in the chat.
3      THE WITNESS:  Yeah.  I've lost
4  those other monitors.
5      Does anyone have an iPad that I can
6  kindly pull up with the documents?
7  I've lost my two other monitors for
8  the moment.
9      So, Mr. Ewald, I'm going to borrow
10  someone else's iPad so I can look at this
11  document so I don't take you off the
12  screen.
13  BY MR. EWALD:
14     Q.   Sure.
15     A.   Thank you, sir.
16     Let me -- I'm happy if you could
17  try to do this without my flashing on the
18  screen, let's -- not to hold you up I'm
19  happy --
20     MR. EWALD:  There's two ways to do
21  it.  We can try going forward with that,
22  or we also can go off the record.  I just
23  don't want my time going into the
24  difficulties.  I'm not saying suggesting
25  you want that either.  I'm just saying

Page 223

1  it's up to you guys.
2      MS. O'DELL:  We've got it right
3  here.  So just give us a second.
4      MR. EWALD:  Okay.
5      MS. O'DELL:  Sorry.  I don't know
6  what happened to our screen.
7      (Discussion held off the record.)
8      THE WITNESS:  Okay.  Okay.  I'm
9  back.
10     MS. O'DELL:  It's opening now,
11  John.
12     MR. EWALD:  Leigh, let's go off the
13  record.
14     (Whereupon, a break was taken.)
15  BY MR. EWALD:
16     Q.   So I marked before the cutoff as
17  Exhibit 14 the 1994 citizen's petition.  I'll
18  pull it up on the screen.
19     A.   I have it, sir.
20     Q.   Great.  And so for the record, this
21  is from Cancer Prevention -- Cancer Prevention
22  Coalition, dated November 17th, 1994; and it's
23  directed to Commissioner Kessler, correct?
24     A.   It comes in as to the dockets
25  manager in brand, so it's specific -- it gets

Page 224

1  put on to a docket; yes, sir.
2      Q.   Okay.  And it states, among other
3  things, that this citizen's petition is based
4  on scientific papers dating back to the 1960s,
5  which warned of increased cancer rates
6  resulting from frequent exposure to cosmetica
7  grade talc.
8      That's what it says right?
9      A.   Right.
10     Q.   And then if we scroll down in the
11  formal -- formal part of the petition, it
12  states that research done as early as 1961 has
13  shown that particles similar to talc and
14  asbestos particles can translocate from the
15  exterior genital area to the ovaries in women.
16     Do you see that?
17     A.   I do.
18     Q.   "These findings provide support to
19  the unexpected high rate of mortality from
20  ovarian cancer in female asbestos workers.
21  Minute particles such as talc are able to
22  translocate through the female reproductive
23  tract and cause foreign body reactions in the
24  ovaries."
25     Did I read that correctly?

Page 225

1      A.   You did.
2      Q.   And then it goes on to say, "There
3  is a large body of scientific evidence dating
4  back 30 years on the toxicity and mineralogy of
5  cosmetic talc products.  As early as 1968,
6  Cralley, et al., concluded"; and there's an
7  entry there from Cralley.
8      And am I correct that you cite to
9  the Cralley article a couple of times in your
10  report?
11     A.   I think that's correct.
12     Q.   And then it also cites to a paper
13  from Rohl examining 21 samples of consumer
14  talcums and powders --
15     A.   Right.
16     Q.   -- which 1971 to 1975.
17     Is that an article you're familiar
18  with?
19     A.   Yep.
20     Q.   Okay.  And then it continues on
21  with discussion of the epidemiology, including
22  the Cramer 1982 study, correct?
23     A.   Let's see where you are, what page.
24  You're at Harlow on 4.
25     Q.   Right.

57 (Pages 222 - 225)

Page 226

1    A.    Cramer is cited in Number 17
2  footnote.
3    Q.    Right.  In your view is the
4  evidence that's presented in the citizen's
5  petition sufficient to show that there may
6  be -- that a warning label should have gone on
7  talcum powder products as of 1994?
8    A.    Let me understand your question.
9  You're asking whether the statement -- does it
10  support the evidence that talcum powder causes
11  cancer in laboratory animals.  Frequent talc
12  application in the female genital increases the
13  risk of ovarian cancer.  So you're asking for a
14  causation standard in laboratory animals where
15  the evidence --
16    Q.    No.
17    A.    -- supports that?  I'm sorry.
18    Q.    No.  I'm sorry.  And I -- it may
19  well -- the problem may be on my end.
20      I'm asking you, from the standards
21  that you are citing, the regulatory standards
22  from the FDCA and CFR that you quote in your
23  report relating to warning and substantiate
24  safety, does the evidence that's presented in
25  this 1994 citizen's petition directed to you,

Page 227

1  in your mind, require a warning on talcum
2  powder products?
3    A.    I'm confused because there's a
4  specific warning that it is requested that is
5  the subject of this.  You're asking me whether
6  it's -- whether there's a different warning --
7    Q.    Yes.
8    A.    -- that would be substantiated.
9    Q.    Yes.  I'm saying don't worry about
10  the specific warning that's asked.  I'm asking
11  you on the evidence that's presented in this
12  1994 letter directed to you, understanding that
13  it didn't go directly to you, but it's directed
14  to you, whether or not the evidence presented
15  there is sufficient --
16    A.    Yeah.
17    Q.    -- to require a warning under the
18  rules and regulations that you cite in your
19  report.
20    A.    So just to be clear on what warning
21  we're talking about that I am saying -- that we
22  are -- whether we are talking about the safety
23  of the product has not been substantiated, that
24  would be the warning.
25      Is there evidence in this that

Page 228

1  supported -- at this time that would support a
2  warning that the safety has not been
3  substantiated.
4      That's your question?
5    Q.    That's one of my questions.  Let's
6  start with that one.
7    A.    Feel free to ask any question you
8  want.  I don't want --
9    Q.    I said that's one of my questions,
10  so that's the question I'm asking first.
11    A.    So I believe that if you ask that
12  question -- and again, I'd have to -- I don't
13  want to -- I would want to go back and look
14  exactly what is cited in this letter, right.
15  I'd want to make a list of what is cited in
16  this letter.
17      But what I can tell you is that as
18  of 1994, certainly this is the -- the -- the
19  safety of the product was not substantiated and
20  would require a warning that it's not
21  substantiated.
22      It's a little arcane FDA
23  requirement in the act.  It's a -- in essence,
24  no one's going to want to put that statement
25  on.  You're going to pull the product.  I mean,

Page 229

1  that's the essence; but Congress, you know,
2  gets to set the standard, and they say if you
3  don't substantiate, you have to say you don't
4  substantiate.  Maybe a few people have done
5  that.  But that's -- you know, it's just
6  basically, you don't put a product on if you
7  can't substantiate its safety.
8      But there's no doubt by 1994 -- and
9  even we talked about in 1970 -- the product
10  safety was not assured; and therefore, you have
11  to, with the evidence that was in place and
12  certainly in the '70s, '80s, and '90s.
13      Once you know, okay, once you --
14  once you know that asbestos is in this product,
15  it becomes a slam-dunk, right, that not only
16  should there be a warning, the product
17  shouldn't be sold.
18      So by 1994 this product should --
19  once you recognize there's asbestos in this
20  product, okay, and you can't assure that
21  asbestos is not in this product, this product
22  shouldn't be sold.  1994, 1970.
23    Q.    Okay.
24    A.    That's not what FDA is focused on
25  because FDA is focused on whether the petition

58 (Pages 226 - 229)

Page 230

1 makes the support for the petitioner's --
2 petitioner's request, right. That's what FDA
3 is paying attention to.
4       And in the background of this, I
5 mean, certainly, we knew through the late '80s
6 we have evidence that FDA really thought that
7 there wasn't -- there was no asbestos in this
8 stuff. You -- the -- J&J, in essence,
9 convinced the agency that there's no asbestos
10 in this. They bought -- they bought that.
11    Q.   So we talked about the warning and
12 safety of this product has not been determined.
13       What about the requirement that you
14 talk about in your report that the cosmetics
15 label shall bear a warning statement whenever
16 necessary or appropriate to prevent a health
17 hazard that may be associated with the product?
18       Is it your view based on the
19 evidence that is described in this citizen's
20 petition letter of 1994 directed to you that it
21 is sufficient to require a warning statement
22 because it needs to prevent a health hazard
23 that may be associated with the product?
24    A.   Could you just show me the
25 paragraph --

Page 231

1       THE WITNESS: I'm sorry, Counsel.
2       MS. O'DELL: That is my question.
3 Yes.
4       THE WITNESS: Paragraph 31.
5       MS. O'DELL: Could you repeat your
6    question, please, John?
7       MR. EWALD: Sure.
8 BY MR. EWALD:
9    Q.   My question is: Based on the
10 evidence that is cited in this 1994 citizen's
11 petition letter directed to Dr. Kessler, is it
12 sufficient, in your mind, to require a label on
13 talc products that contains a warning statement
14 to prevent a health hazard that may be
15 associated with the product?
16    A.   Are you -- I'm not -- are you
17 saying that I made that as one of my opinions
18 in this report?
19       Are you asking a --
20    Q.   No. I'm asking you a hypothetical.
21    A.   So you're asking me to go beyond my
22 report and what's my opinion?
23    Q.   I'm asking a hypothetical, which
24 is, as you know, it's been done for a long
25 time. It's perfect for expert witnesses.

Page 232

1    A.   Absolutely. And I -- and I
2 appreciate your hypothetical, right. I
3 think -- I have no doubt in my mind, once you
4 understand that asbestos is in talc, right, you
5 have a duty, one, not to -- I mean, the product
6 becomes adulterated. And if you are so
7 misguided you continue to sell it, right -- I
8 mean, why would you want to sell an adulterated
9 product? So that's the first step here.
10       Now, so -- so you want to sell an
11 adulterated product, but you're going to -- of
12 course you would have to put that label on it,
13 but that doesn't get you out of the
14 adulteration.
15       Once your -- once there's asbestos
16 in this product, it's over, as your company has
17 finally recognized by pulling the product.
18       You don't -- in 2019 you didn't put
19 a label on it, oh, FDA found asbestos. You
20 pulled the product. That's what you would do.
21    A.   A hypothetical, you know, again, I
22 mean, it's an interesting -- you can talk about
23 a legal standard, but the core responsibility
24 is not to sell an adulterated product; and you
25 don't sell products that have asbestos in it,

Page 233

1 and it had asbestos in it.
2    Q.   Doctor, I'm not talking about 2019
3 right now. I'm not talking 2024.
4       I'm asking you, hypothetically, the
5 evidence that is contained in this citizen's
6 petition from 1994 directed to you, in your
7 mind, is it sufficient to require a warning at
8 that time that talc products implicates
9 21 CFR 740.10, there should a warning statement
10 whenever necessary appropriated to prevent a
11 health hazard that may be associated with a
12 product. That's my question.
13       MS. O'DELL: Object to the form.
14       THE WITNESS: And the point of
15    clarification that I would need to know
16    from you in your hypothetical is, is
17    asbestos in your product in your
18    hypothetical.
19 BY MR. EWALD:
20    Q.   I -- I am -- the only hypothetical
21 part about it is you making the decision on it.
22       I want you to assume that this
23 state of knowledge at the FDA and publicly is
24 the same as it actually historically was and is
25 reflected in this document.

59 (Pages 230 - 233)

Page 234

1    MS. O'DELL: Object to the form.
2    Incomplete hypothetical.
3    You may answer it anyway you'd
4    like, Doctor.
5    MR. EWALD: Well, he can't answer
6    any --
7    THE WITNESS: I'm happy --
8    MR. EWALD: He has --
9    THE WITNESS: I -- I'm happy to --
10    MR. EWALD: He has to answer it
11    truthfully.
12    BY MR. EWALD:
13    Q.    You have to answer it truthfully,
14    but go ahead.
15    MS. O'DELL: So that's not the
16    question, John. The question is you're
17    directing a certain response from
18    Dr. Kessler, and my instruction to him was
19    he may answer in any way he feels
20    appropriate. He doesn't have to comply
21    with your request, but he you object to the
22    form of the question.
23    THE WITNESS: In 1994, to answer
24    the question this way, if I were -- if I
25    were -- if I knew as commissioner, right,

Page 235

1    that talc had asbestos, if J&J walked in
2    and told me that, right, that product
3    would be off the market.
4    So I didn't know in 1994 that talc
5    contained asbestos. Okay. We know in
6    1988, if you look at the documents, right,
7    that we see that FDA believes that the
8    1976 testing J4-1 testing requirements
9    dealt with the issue and assured the
10    public there was no asbestos, right.
11    If there's asbestos in this product
12    and I were commissioner, there would be --
13    we're not talking about a warning -- the
14    product's not being sold.
15    And I mean, I'm sure your
16    company -- I mean, your company would not
17    have fought me on that. I mean, any
18    commissioner gets up, there's asbestos in
19    this product. It shouldn't be sold. I
20    mean, that's a given.
21    The central question is when --
22    when does FDA know that and is convinced
23    there's asbestos in this product. It had
24    a great deal of suspicion and evidence
25    that there was some problem in the early

Page 236

1    1970s. It got the testing results. The
2    industry walked in -- J&J walked in and
3    said, no problem, we've got this under
4    control; we have a testing method.
5    That statement's repeated in the
6    literature for decades. FDA believes
7    that. That's why your getting these --
8    FDA's responding like this. You know,
9    level with the agency. There's asbestos
10    in it. This is over.
11    BY MR. EWALD:
12    Q.    So we'll get to the agency's
13    response and what happened in 1970s, but you
14    keep on avoiding my question.
15    I want you to leave your
16    asbestos -- is your opinion that if there's no
17    asbestos, then there's no problem?
18    MS. O'DELL: Object to the form.
19    THE WITNESS: No. No, I didn't say
20    that. And as --
21    BY MR. EWALD:
22    Q.    Okay.
23    A.    I mean, I think that whenever
24    there's fibers -- mineralogical fibers that
25    have biological activity, there's an issue.

Page 237

1    I'm just saying let's leave that issue aside
2    for the moment, right.
3    This really depends on this last
4    50-year history is -- you know, FDA believing
5    there's no asbestos in this.
6    Q.    And what do you -- and you keep
7    saying that. But what -- well, let's break
8    that down.
9    From your time period, which you
10    have the, you know, most personal knowledge
11    presumably, from 1990 to 1997, your testimony's
12    been you have no idea that it was even possible
13    that there could be asbestos in talc, right?
14    A.    Possible, and I don't -- I don't
15    know whether I had that. I certainly did not
16    connect -- I did not connect that there was
17    asbestos in talc. That was not part of my --
18    my universe.
19    Q.    Okay. And so when it's responded
20    in 2014, you're intimating some under the
21    intent from the FDA about it being due to the
22    fact that they thought there was no asbestos;
23    yet, you didn't even know it was -- got issued
24    at the time was your prior testimony, correct.
25    MS. O'DELL: Object to --

60 (Pages 234 - 237)

Page 238

1    THE WITNESS: I'm out of the --
2    MS. O'DELL: -- object to the form.
3    THE WITNESS: I'm out of the
4    agency. I don't have a duty. I mean, I'm
5    not running the agency in 2014, so I'm not
6    sure I understand your question.
7    You look at the record --
8    BY MR. EWALD:
9    Q.    Let me --
10    A.    Let me finish the answer to my
11    question, please.
12    Q.    Okay.
13    A.    If you look at the record, what we
14    do have, okay, is in 1988 in the response; and
15    if you look at the record in 1988, right, FDA
16    believes -- just look at the -- just look at
17    the -- I mean, even just --
18    Q.    I'm looking at it. It's '86,
19    though, right?
20    A.    It's '86. I'm sorry. You're
21    right, Mr. Ewald. Thanks for the correction.
22    I appreciate it. You're absolutely right. I
23    stand corrected.
24    In that '86 letter, you look at
25    what Swanson says, right, it's that

Page 239

1    industry put into -- put in J4-1 and that
2    assures the public that the risk is minimized.
3    That was not the case.
4    And you see that that that -- the
5    support that there is not asbestos in the
6    product, right, is -- I mean, in that record to
7    that response. So again, it's all based on the
8    fact that you fixed the problem with J4-1, and
9    you didn't.
10    Q.    All right. Doctor, are you
11    familiar with a symposium held in October 1994
12    that was cosponsored by the FDA related to
13    talc?
14    A.    A workshop?
15    Q.    Yes.
16    A.    And I have my workshop notes, yes.
17    I have gone back and studied that, yes, sir.
18    Q.    Okay. And so I take it from your
19    earlier testimony that you have no recollection
20    whatsoever of having any involvement with that
21    workshop and any statements about that?
22    A.    I have no recollection of that
23    workshop taking place during the time I'm at
24    commissioner. I have studied that since then.
25    Q.    Okay.

Page 240

1    MR. EWALD: And this is "Talc:
2    Consumer Uses and Health Perspectives."
3    We'll make this Exhibit 15. It's dated
4    October 1, 1994. It's cosponsored by the
5    International Society of Regulatory
6    Toxicology & Pharmacology and the United
7    States Food and Drug Administration.
8    (Whereupon, Exhibit 15, Document
9    entitled, "Talc: Consumer Uses and Health
10    Perspectives," dated October 1, 1994,
11    cosponsored by the International Society
12    of Regulatory Toxicology & Pharmacology
13    and the United States Food and Drug
14    Administration, was marked for
15    identification.)
16    BY MR. EWALD:
17    Q.    And then you see, Doctor, on the
18    first two pages, you have a list of
19    participants, correct?
20    A.    Yep.
21    Q.    And the list of participants
22    include a number of folks from FDA, correct?
23    A.    Yep.
24    Q.    Including in that is someone from
25    your office, correct?

Page 241

1    A.    I think Merkatz is listed.
2    Q.    I see Carol Schmenan?
3    A.    Carol Schmenan, yeah.
4    Q.    It says Carol Schmenan, U.S. Food &
5    Drug Administration Commissioner's Office,
6    right.
7    A.    Right.
8    Q.    Do you remember Carol?
9    A.    Yes. She was there, yep.
10    Sorry?
11    Q.    Do you remember Carol?
12    A.    Yes.
13    Q.    Do you think highly of Carol.
14    A.    Very much so. Great public
15    servant.
16    Q.    So the executive summary -- this
17    is, by the way, published in the Regulatory
18    Toxicology and Pharmacology in 1995 and talks
19    about: "This issue of the journal is largely
20    dedicated to report on a January 31-February 1,
21    1994, workshop on talc organized in a joint
22    sponsorship of the U.S. Food & Drug
23    Administration; the Cosmetics, Toiletries, and
24    Fragrances Association (CTFA); and the
25    International Society of Regulatory Toxicology

Page 242

1  and Pharmacology (ISRTP).  Although not all
2  papers given at the meeting were made available
3  for publication, this offers a general overview
4  of the substance of the presentations and
5  discussions."
6        And after discussing some aspects,
7  it talks about Dr. Gilbertson.
8        Are you familiar with
9  Dr. Gilbertson?
10    A.    I know the name, certainly, yes.
11    Q.    Okay.  Do you have any -- what
12  is -- what is your recollection of what kind of
13  public servant Dr. Gilbertson was?
14    A.    I -- I'm -- I'm trying to place
15  him.  I'm drawing a blank for the moment.  I'm
16  sure he was a dedicated public servant.
17    Q.    And so it says here in these
18  minutes that Dr. Gilbertson FDA reviewed the
19  harmonization of international standards and
20  regulations for cosmetic talc in its consumer
21  application.  In their joint evaluation, talc
22  has proven to be among the safest of all
23  consumer products."
24        That's what is relayed, right?
25    A.    Yeah.  That's what's written there,

Page 243

1  sir.
2    Q.    Okay.  All right.  Now let's look
3  at --
4    A.    Are you implying -- I just want to
5  make sure --
6    Q.    There is no -- there's no question
7  pending, Doctor.
8    A.    Okay.  So you're not saying that
9  Carol Schmenan and Mr. Gilbertson had anything
10  to do with that -- that article?
11        I just want to make sure the
12  record's clear.
13    Q.    Well, are you suggesting that the
14  article misrepresents what was stated at the
15  workshop?
16    A.    Yes, I am.  And, in fact, if you go
17  back -- if you go back and you and I'm
18  referring you to draft minutes of the talc
19  interested party task force dated July 25th,
20  1994, right, of the CTFA, what is striking
21  about that article that you just showed me,
22  right, that that group of industry officials,
23  right, decide to pay for an overview.
24        The FDA is not at that meeting.
25  This article was paid for by the CTFA, and this

Page 244

1  document that's -- I'll give you the Bates
2  number.  It's a J&J document.  It's minutes,
3  talc-interested party, shows how that was
4  written, right, by the industry, paid for by
5  the industry.
6        And when you go through -- and I
7  did this because I was interested, and I give
8  it to you.  I mean, I just quickly tried to
9  compare what was done in the transcript of that
10  meeting to what was in that article, and they
11  don't match.
12        In fact, if you look at the
13  conclusion of that article, it says there was a
14  conclusion made.  In fact, there was no
15  conclusion made.  There was some independent
16  statements.  And if you look at individual --
17  how that article was -- what that article
18  alleges that certain people say, that's not
19  what their testimony said.
20        So there is a major problem with
21  that article, and you should just be aware of
22  that.
23    Q.    Okay.  And just so the record's
24  clear, you say what was the fact and what was
25  not.

Page 245

1        You were not at the meeting, right?
2        You have no recollection of ever
3  hearing about that meeting, correct?
4    A.    That's correct.  But what you do
5  have -- I mean, but what I can do right, I
6  think objectively, is we do -- I have the
7  transcript.  I've gone through the transcript
8  of that meeting and what was said.  So while I
9  wasn't there, I have the words of everything
10  that was said.
11        There was a verbatim transcript of
12  every presentation and of every word.  That's
13  usual for a workshop like that.  That -- that
14  work- -- that workshop transcript doesn't match
15  that article.  That's a head scratcher.
16        And then you go -- well, that's
17  not -- a workshop -- if you look at that
18  article, there's a conclusion that basically
19  was, well, safety is -- I forget what the last
20  paragraph exactly says.  But that was never --
21  that was never the conclusion at the meeting,
22  nor was -- so I go back and I go who paid for
23  this?  Who wrote this?
24        You just seem to imply that
25  Gilbertson and Schmenan were part of this.

Page 246

1 Yeah, they showed up at this meeting; but the
2 industry wrote this, and that article does not
3 represent what happened at that meeting. Go
4 look at the transcript.
5    Q.   Okay. So you are suggesting that
6 when the publicly available article's been out
7 there since 1995 says what Dr. Gilbertson and
8 the FDA says, that's just wrong?
9         MS. O'DELL: Object to the form.
10        THE WITNESS: I'm saying that I --
11    I mean, I can -- if you look, for example,
12    okay -- and I'm happy to give you -- just
13    compare what Hartge says with what is
14    reported to say. Look at the conclusion.
15    Try to find that conclusion in the
16    transcript. It doesn't exist.
17 BY MR. EWALD:
18    Q.   Doctor, I have limited time. I
19 just want to be --
20    A.   You're going to show me an article,
21 sir, and find --
22    Q.   Wait. The way this works, Doctor,
23 is your counsel can ask you questions about it,
24 but you can't go off on your own and --
25    A.   You showed me an article --

Page 247

1    Q.   Hold on.
2    A.   You showed me an article -- I'm
3 sorry. Let's not talk over each other.
4         You showed me an article, and you
5 implied that Carol Schmenan and Dr. Gilbertson
6 wrote -- I mean, wrote that article. And what
7 I'm making sure that the record is clear is
8 that article was paid for and written for by
9 the industry and doesn't represent, certainly,
10 the conclusions of what happened at that
11 meeting, and that's a problem.
12    Q.   What I asked you, Doctor, was
13 whether Carol Schmenan and, amongst others,
14 Dr. Gilbertson were workshop participants at
15 this workshop; and I read to you what was
16 represented in the publicly available published
17 article about what Dr. Gilbertson said.
18    A.   You didn't show me -- you did not
19 show me the transcript.
20    Q.   Excuse me. Excuse me. I am still
21 asking the question. I would ask for you to
22 please wait for my question to be finished.
23    A.   Of course.
24    Q.   This says, "In their joint
25 evaluation, talc has been proven to be among

Page 248

1 the safest of all consumer products."
2         So my question to you, Doctor, is:
3 Do you have any basis at this point in time to
4 tell me that Dr. Gilbertson didn't say what was
5 reported in his publicly available article?
6    A.   We can look exactly at the
7 transcript. I can tell you there are other
8 statements in that article, right, that were
9 never made. I can assure of that.
10    I can't -- I -- I will go back and
11 look at that statement. We can -- we can look
12 at that statement, but there are the statements
13 and the conclusion of that article is
14 misleading.
15    Q.   Okay.
16    A.   Because it never happened at that
17 meeting and that -- you just note that on the
18 record.
19    Q.   Okay. Let's do --
20        MR. EWALD: Jake, can you -- I'm
21    having trouble pulling up on page 88 of
22    the outline, starts at 17.04.
23        Do you have that?
24        MR. KEESTER: I can look. Hold on.
25        MR. EWALD: Jake, find that one,

Page 249

1    and also find the one on page 9017.007. I
2    want to move on to something else.
3        Thank you.
4 BY MR. EWALD:
5    Q.   Let's look at -- quickly at the FDA
6 1986 petition.
7        Sorry. What?
8    A.   I asked Margaret if I can just get
9 my copy of that. I was trying to help you.
10    Q.   No worries.
11    A.   I have the copy of the petition,
12 sir. No. I have the copy of the response. I
13 don't have a copy of the petition, sir.
14    Q.   Yeah. I'm just going over the
15 response, at least right now.
16    A.   Thank you, sir.
17        MR. EWALD: Okay. We'll mark this
18    as exhibit as -- is it -- Suzanne, is this
19    16?
20        I got distracted.
21        THE COURT REPORTER: This should be
22    16 according to my notes.
23        MR. EWALD: All right. Cool. So
24    this will be the 1986 FDA response to
25    citizen's petition.

63 (Pages 246 - 249)

Page 250

1        (Whereupon, Exhibit 16, The United
2    States Food & Drug Administration's
3    response to the 1986 citizen's petition,
4    was marked for identification.)
5    BY MR. EWALD:
6    Q.    All right.  And we talked about
7    this is a couple of times earlier today,
8    Doctor.
9        This is something that you have
10   reviewed at some level?
11   A.    Yes, sir.
12   Q.    All right.  I'm going to make it a
13   little bit larger.  So --
14   A.    But just for the sake of te -- just
15   put it in the chat if you don't mind so I can
16   put it up on the screen.  I have a copy, but
17   this would be very helpful.  Let me just --
18       THE WITNESS:  Could you close this?
19   I'm afraid -- there we go.  Thanks
20   so much.
21       You can keep on asking questions
22   while he does that.
23       MR. KEESTER:  That's fine.  I put
24   it in.
25       MR. EWALD:  Is this D-205?

Page 251

1        MS. O'DELL:  That was the previous.
2        MR. EWALD:  I'm sorry.  Thank you.
3    BY MR. EWALD:
4    Q.    This is --
5    A.    You love the red and gold?
6    Q.    Oh, yeah.  It's very official.
7    D-7214 and we go to the response to
8    the citizen's petition.  It shows up on page 3
9    of the PDF.
10       It says, "This responds to your
11   November 8, 1983, petition requesting that
12   cosmetic talc be labeled with an asbestos
13   warning statement."
14       And it talks about how "FDA
15   recognizes that asbestos inhalation over
16   extended periods is hazardous to humans.  The
17   agency is also aware that some cosmetic talc
18   produced in the 1960s and early 1970s did
19   contain asbestiform minerals.  However, your
20   petition has not persuaded us that the cosmetic
21   talc that is presently being produced contains
22   significant amounts of asbestiform minerals."
23       And on that point, Doctor, the
24   letter doesn't say that the cosmetic talc
25   contains no asbestiform minerals, but it

Page 252

1    says -- am I correct -- it contains -- does not
2    contain significant amounts of asbestiform
3    minerals, right?
4    A.    That's what it says, but keep on
5    reading --
6    Q.    Right.
7    A.    -- reading.
8    Q.    "During the early 1970s, FDA became
9    concerned about the possibility that cosmetic
10   talc that contains significant amounts of this
11   material.  The agency received several reports
12   about such contamination.  However, at that
13   time the analytical procedures for determining
14   asbestos in talc were not fully developed, and
15   most of the analytical work was conducted
16   without scientific agreement as to which
17   methods were well-suited for identification of
18   asbestiform minerals in talc.  Consequently FDA
19   considered all analytical results to be of
20   questionable reliability."
21       Did I read that correctly?
22   A.    You did, sir.
23   Q.    And did you conduct any kind of
24   investigation as to the reliability of test
25   results for the presence of asbestos in the

Page 253

1    early to mid-1970s?
2    A.    Which test results are we talking
3    about?
4    Q.    I'm talking about -- this is
5    referring to at that time in the early 1970s
6    the analytical procedures for determining
7    asbestos in talc were not fully developed and
8    most of the analytical work was conducted
9    without scientific agreement as to which
10   methods were well-suited for identification
11   asbestiform minerals in talc.
12       My question to you is:  Do you have
13   any basis to disagree with the FDA's statement
14   here in 1986 on that front?
15       MS. O'DELL:  Object to the form.
16       THE WITNESS:  Yeah.  I mean,
17   there's transmission electron microscopy.
18   I mean, with all due respect to Dick
19   Swanson, who wrote this letter, I know
20   others reviewed there was electron
21   microscopy in the early 1970s.
22       It wasn't -- the industry didn't
23   want to use it, but there was sensitive
24   methods that certainly could, in the words
25   of this, detect -- determine asbestos in

64 (Pages 250 - 253)

Page 254

1    talc. And there was transmission -- yeah,
2    so I would disagree. And that --
3    BY MR. EWALD:
4        Q.   Right. And -- go ahead.
5        A.   Keep on -- please, keep on going.
6        Q.   Just to be clear, though, that
7    disagreement is based on what you have learned,
8    basically, self-taught over the last 850 hours
9    in connection with your report in this case,
10   fair?
11       MS. O'DELL: Object to the form.
12       THE WITNESS: I mean, I had the
13   transmission electron microscopy --
14   microscope next to me, I mean, in the
15   1970s when was in college. So it's not
16   entirely true that I didn't know about
17   transmission electron microscopy.
18       But, you know, as far as -- and I'm
19   not there at the agency in '86.
20       Self-taught is a little --
21       MS. O'DELL: Pejorative?
22       THE WITNESS: Thank you, Counsel.
23   BY MR. EWALD:
24       Q.   I'm being descriptive.
25       A.   I know. I don't think he meant it

Page 255

1    that way. I actually think, you know,
2    self-learning is a pretty honorable sport; and
3    I'll take it any day.
4        Transmission electron microscopy
5    was available.
6        Q.   Okay. And you talk about
7    transmission electron microscopy being
8    available. But they're not only talking about
9    sensitivity here, right?
10       They're talking about how the
11   analytical procedures were not fully developed
12   and that most of the analytical work was
13   conducted without scientific agreement as to
14   which methods were well-suited to the
15   identification of asbestiform minerals in talc.
16       And have you conducted any
17   investigation into the adequacy of the
18   scientific test methods available in the early
19   1970s to identify talc?
20       A.   Why do you think --
21       MS. O'DELL: Object to the form.
22       THE WITNESS: Why do you think --
23   why do you think -- why do you think there
24   was that controversy, sir?
25

Page 256

1    BY MR. EWALD:
2        Q.   I'm asking the questions, and I
3    think you know that.
4        A.   Whatever. But do you know the
5    answer to my question?
6        The reason there was controversy
7    was that the industry didn't want to use the
8    most sensitive methods, and they resisted it.
9        Q.   Okay.
10       A.   Please go on -- on this -- please
11   go on on this document.
12       Q.   So I also want to ask you a
13   question.
14       In your -- would you agree with me
15   that the vast majority of incidence where there
16   is supposedly asbestos found in J&J's talc as
17   reported in your expert report are from the
18   1970s; would you agree with that?
19       MS. O'DELL: Object to the form.
20       THE WITNESS: Well, I -- I have a
21   pretty detailed list. I'm happy to pull
22   that up. You know what, let me pull that
23   up in order to answer that question. I
24   have a list of everything that is cited in
25   every test.

Page 257

1        Could you -- could you do me a
2    favor? Could I have my laboratory -- my
3    notebook?
4        Thank you.
5        Sir, I have a notebook. What was
6    your -- I have a notebook that is divided
7    between the '60s to '70s the '80s to '90s
8    and 2000. I'm happy to give you the
9    number of things that I cite in each
10   decade, right --
11   BY MR. EWALD:
12       Q.   Sir --
13       A.   -- that are here. You know, I mean
14   it's -- we can all count. I think you're
15   right. There's certainly enough positive tests
16   in the '70s that should have resolved this.
17       Q.   Okay. So let's go on the -- the
18   assessment proves to be correct -- well,
19   actually, hold on.
20       So the FDA says, "Consequently, FDA
21   considered all analytical results to be of
22   questionable reliability."
23       I take it you disagree with the FDA
24   on this as well and you --
25       A.   Give me just --

65 (Pages 254 - 257)

Page 258

1    Q.    You --
2    A.    Just read the whole letter.
3    Q.    Uh, uh, uh, uh.  I'm asking the
4  questions here.  Doctor I'm asking the
5  questions here.  Counsel for you is welcome to
6  ask you about other parts of the document.  We
7  might get there too.  I'm asking you a question
8  about one sentence.
9        I want you to answer that question,
10  which is:  Here the FDA considered all
11  analytical results to be a questionable
12  reliability from the early 1970s.  My question
13  is:  Do you disagree with the FDA on that?
14    A.    So in order to answer that
15  question, I would ask for sake of completeness,
16  that you read the next sentence.
17    Q.    Fine.  "This assessment proved to
18  be correct because many questions were
19  subsequently raised about results reported in
20  the literature (see enclosed copy of National
21  Bureau of Standards Special Publication 506
22  entitled, "Misidentification of Asbestos in
23  Talc").  Because of the questionable nature of
24  the analytical results, the agency was not able
25  to assess reliably the levels of asbestiform

Page 259

1  minerals in cosmetic talc then in the
2  marketplace."
3    A.    Thank you.  I appreciate that very
4  much.  Again, you get to ask the question, but
5  here's the rhetorical question:  Who do you
6  think wrote that article that's referenced that
7  FDA is relying on?
8    Q.    So, Doctor, my question to you is:
9  The FDA here is questioning the reliability --
10    A.    Yep.
11    Q.    -- of the test results in the 1970s
12  on the --
13    A.    Yep.
14    Q.    -- testing of -- sir, you know I'm
15  in the middle of a question.  Please let me
16  finish.
17    A.    Of course.
18    Q.    Here the FDA is questioning the
19  reliability of test results for the presence of
20  asbestos in talc in the 1970s based on
21  questions about the reliability of the
22  analytical procedures.
23        My question is:  Do you disagree
24  with the FDA on their assessment of the 1970s
25  talc testing for asbestos?

Page 260

1    A.    Well, you're missing my point, sir.
2  And I -- I do disagree because the -- the
3  question that I asked was who -- who wrote the
4  article that FDA is relying.
5        Let me answer that, sir, because I
6  know you get to ask me the questions; and I'm
7  respectful of that, right.
8        But FDA is citing an article in
9  this, right.  It says, "See enclosed copy of
10  the National Bureau of Standards Special
11  Publication 506 entitled, "Misidentification of
12  Asbestos."  That's the authority that FDA is
13  relying on.
14        If you turn to that article and you
15  see that it is authored by William H. Ashton.
16        So FDA is saying that all this
17  testing is screwed up.  Very nice it says it's
18  the National Bureau of Standards, but this is
19  J&J.  Somehow Bill Ashton worked his way in to
20  be able to write an article that gets -- it
21  says National Bureau of Standards, right.  But
22  this is J&J feeding the FDA that the testing is
23  not reliable.
24        And if you look at the record,
25  right, transmission microscopy could have been

Page 261

1  used.  This could have all been settled back
2  then, but the industry didn't want it because
3  it was picking up asbestos.
4    Q.    Do you have any basis to question
5  the mineralogical and microscopic capabilities
6  of Dr. Ashton during this time period other
7  than the fact he is a J&J employee?
8        MS. O'DELL:  Object to the form.
9        THE WITNESS:  I -- I don't want
10  to -- I didn't know Dr. Ashton.  I've
11  never met Dr. Ashton.
12        You know, you -- you feel when you
13  read, you know, somebody's historical --
14  the documents, you feel like you get a
15  sense of that person.  I don't want to
16  cast any aspersions on the clear
17  Bill Ashton.
18  BY MR. EWALD:
19    Q.    Let me ask you --
20    A.    Let me -- let me finish the answer.
21    Q.    Sure.
22    A.    Let me finish the answer to my
23  question.
24        It is inconceivable, okay, that --
25  let me put it this way:  It was masterful,

66 (Pages 258 - 261)

Page 262

1 right. I mean, this was -- I mean, the --
2 what -- substitute any word you want: Scheme,
3 story, narrative, that got Bill, right.
4       Turn to the -- if you turn to the
5 next page of this letter for completeness,
6 right, and you read the second paragraph,
7 right, it says --
8    Q.    I'm sorry. We are not --
9    A.    No. I get to answer my question.
10 I get to finish the answer to my question,
11 please.
12    Q.    Go ahead. Read the whole damn
13 thing. Go ahead.
14    A.    It says, "After FDA took these
15 actions many cosmetic manufacturers began to
16 analyze their talc for asbestiform minerals as
17 part of their quality control programs, and
18 talc suppliers began to sell higher purity
19 talcs to the cosmetic industry. By 1976,
20 asbestos analytical methodology was
21 sufficiently developed," right, "that
22 the...CTFA could issue a specification (copy
23 enclosed)" -- right, this is J4-1 -- "for
24 cosmetic talc. This specification required
25 that such talc be free of fibrous amphibole."

Page 263

1 That was the requirement. "Asbestos in the
2 form of asbestiform tremolite using a CTFA
3 method of analysis that is capable of detecting
4 0.5 percent of amphibole asbestos. This
5 specification contributed to the continued
6 improvement of the cosmetic talc quality."
7       You never had a positive test under
8 this and that protects. But the fallacy is
9 that if there's 5.5 percent -- .5 percent, you
10 scratch your head. How did Dick Swanson, whose
11 name was Dr. Doom -- that was his nickname if
12 you want to know the history, right -- how did
13 FDA -- how -- if there's .5 percent of
14 amphibole asbestos, how do you go and say there
15 is no asbestos?
16       There was never a reliable standard
17 put in place to say there was no asbestos.
18 There's been asbestos in his product since in
19 the 1970s, and it's continued; and it's all
20 been masked.
21    Q.    Okay. And so to summarize, you
22 feel like with your background, you are better
23 situated on assessing the reliability of the
24 analytical methods for testing talc, the
25 presence of asbestos, than Bill Ashton, fair?

Page 264

1       MS. O'DELL: Object to the form.
2       THE WITNESS: If you look -- go
3 further in this document, go into the
4 background documents, okay, look at memos
5 to Gary Flamm -- I'm sure you've seen
6 them -- where Flamm says there is a
7 consensus -- let me -- let me get it to
8 get the exact words.
9       Flamm is saying at FDA the fact --
10 it's a general consensus the current talc
11 mines are virtually free of asbestos.
12 Offending mines should -- have gradually
13 been abandoned, you know, and that any
14 residual silicates in talc are so -- are
15 finely and smoothly ground. So there's no
16 issue.
17       Did you close the mines?
18       You ground the stuff up to such a
19 level that it was all -- it was impossible
20 to clearly see it. Bill Ashton, did he
21 know that?
22       Of course he had to know that. I
23 don't know that he knew that, but anyone
24 who knows -- if you look at the specs and
25 you look at the size of asbestos fibers,

Page 265

1 you're grinding it up to 10 microns,
2 you're going to be grinding this stuff --
3 this was all -- this was all premised on
4 the fact that asbestos wasn't in there;
5 and, in fact, it was just masked.
6 BY MR. EWALD:
7    Q.    Are you done now?
8    A.    You have my answer. Thank you.
9    Q.    Sure.
10       THE WITNESS: Could I ask for a
11 time check, please.
12       MS. O'DELL: Yes. We've been on
13 the record for about an hour and 15
14 minutes. So why don't we -- do you want
15 to take a short break?
16       THE WITNESS: No. I can keep on
17 going.
18       MS. O'DELL: Suzanne, could you
19 give us a time check, please?
20       (Discussion held off the record.)
21       MR. EWALD: Let's take a break, and
22 then finish up the last hour and 15.
23       THE WITNESS: Thank you, sir, very
24 much. I appreciate it.
25       (Whereupon, a break was taken.)

67 (Pages 262 - 265)

Page 266

1  BY MR. EWALD:
2      Q.   Okay.  Doctor, when we were about
3  to come back on the record, you indicated that
4  there was something that you wanted to clarify.
5  Go ahead.
6      A.   Okay.  I'd just clarify, there's
7  a -- we need to get you -- there's a very minor
8  errata sheet.  There's -- I think I spelled the
9  word "fibers" wrong in the report, and there's
10  some missed Bates numbers.  There may be some
11  on certain cites.  So I'm just -- for the sake
12  of completeness.
13      And I also want to make sure
14  that -- I think I misspoke.  Obviously there
15  was the petition that got responded to in '86,
16  but then there was two petitions that got
17  responded to -- I think I was clear -- it was
18  in the '94 and then in 2008, both got responded
19  to in 2014, as I think I cited in the letter;
20  but I may have misspoke.  And I may have said
21  there was one, and we were actually talking
22  about a total of three petitions, I think,
23  historically.  I just wanted to make sure the
24  record was clear.  Thanks, sir.
25      Q.   Of course.  And not that it really

Page 267

1  matters that much, but I completely agree on
2  that point that there are three petitions that
3  we've talked about.  And I think it was clear
4  in the record, but extra clear now.
5      MS. O'DELL:  John, just to follow
6      up on what Dr. Kessler said, I'm putting
7      in the chat a short list of just typos and
8      other, like, transposed numbers,
9      et cetera, that are composed as errata for
10      his report.  And so you have it there in
11      the chat for your review.
12  BY MR. EWALD:
13      Q.   Okay.  Doctor, I want to jump
14  around a little bit here the last hour or so,
15  and I want to return to this question of what
16  testing J&J did historically.  Don't worry.  We
17  will get to your slide presentation, but first
18  I want to show you a couple of documents.
19      MR. EWALD:  Jake, can you please
20      drop in DX 17147.
21      MR. KEESTER:  Yep.
22  BY MR. EWALD:
23      Q.   And, Doctor, just let me know when
24  you have a chance to look on the screen --
25      A.   Do me a favor.  Can you please put

Page 268

1  it in.  It's too small for me to see right now.
2  Sir, I just need to get it put in the chat.
3      Thank you very much.  I appreciate
4  that.
5      Let me just see.  17147 coming up.
6  Got it.  I can read it; and yes, I have it,
7  sir.
8      Q.   And this is talking -- this is a
9  Johnson & Johnson memo dated February 23rd,
10  1978, to Windsor Minerals, Mr. Miller,
11  president.
12      It says, "As you know, Windsor
13  Minerals and the baby products company have
14  already authorized the documentation of a
15  no-detectable asbestos requirement in the
16  Windsor 66 Talc Material Specification.  In
17  this regard, the testing requirement is solely
18  for fibrous amphibole by the CTFA method J4-1
19  as intended to make the specification wholly
20  consistent with the CTFA standard for cosmetic
21  grade talc.  However, we need to recognize that
22  Windsor Minerals and Johnson & Johnson have
23  exercised more extensive controls and testing
24  in the past than just meeting the J4-1
25  requirement.  Furthermore, we intend continuing

Page 269

1  to surpass the industry standard of testing as
2  reflected by CTFA's J4-1.
3      "During the July 15, 1977, meeting
4  in your office, we had agreed to the need of
5  documenting the entire audit protocol, which
6  has been your standard operating policy and
7  procedure since August 1973 and it will be
8  continued to be practiced by Windsor Minerals
9  for Windsor 66 Talc."
10      Did I read that correctly?
11      A.   You did.
12      Q.   Is this a document you've seen
13  before?
14      A.   I believe so.  I mean, I believe
15  I've seen this before.
16      Q.   Okay.  So it talks about for sample
17  type ground or TM7024 --
18      A.   Whoa, whoa.  Wait a second.  I want
19  to make sure where you have me now.
20      Q.   Top of the second page.
21      A.   Yeah.  I'm not on the second page.
22  That's my problem.  Hold on a second.  Let me
23  get there.  Yep.
24      Q.   Okay.  Ground or TM7024 biweekly
25  composite samples by Windsor flash-dried talc

68 (Pages 266 - 269)

Page 270

1  CTFA J4-1, TM7019, positive samples by J&J.
2  And it includes here in the different
3  characteristics tests 7019.
4      You were complaining -- or you were
5  noting that J4-1 does not apply to chrysotile.
6      Are you, first, sir, aware that
7  chrysotile is a form of serpentine?
8      A.   Sure.
9      Q.   And this talks about a test
10  conducted by J&J TM7019, correct?
11     A.   I'm sorry.  You slurred.  I didn't
12  hear that clearly at the end.
13     Q.   This testing method, TM7019, that's
14  talked about here for the serpentine form is
15  discussed above for flash-dried talc, weekly
16  composite samples by J&J, correct?
17     A.   I see that well.
18     Q.   Okay.  And so, I guess, how does
19  this comport with your opinion about the lack
20  of TEM testing by J&J in the '70s?
21     A.   Well, you certainly -- a couple of
22  things.  One, I mean, it's not clear to me,
23  actually, who -- I think what you said is I'm
24  not -- it's not clear to me who did the TEM for
25  J&J.  I'm not sure that they consistently did

Page 271

1  it in-house.  Okay.  I -- I think McCrone may
2  have done that, but, again, I'm open to
3  whatever the facts are.
4      Number 2, if you look at Rio Tinto,
5  the TEM really only got accepted by the Rio
6  Tinto, Luzenac by the late 1980s and 1990s.  I
7  see this in there.  This was the weekly and
8  biweekly composites, right.
9      But understand, there was the -- it
10  was the five-fiber rule to this, which made
11  this, which you see in analysis by McCrone
12  where they find fibers and they throw it --
13  they don't -- your word "detectable," they said
14  it's only detectable if there's five fibers.
15  If you detect one, it's not detectable.
16     So this was all -- I mean, there
17  wasn't serious TEM with that five-fiber rule.
18     Q.   Okay.  So first of all, I want to
19  understand.
20     Are you saying that if J&J wasn't
21  doing the TEM testing itself but was having
22  someone else do it, that somehow is less valid?
23     A.   No.
24     MS. O'DELL:  Object to the form.
25     THE WITNESS:  No.  I just figure

Page 272

1  that it should be clarified exactly who
2  was doing TEM at the time.
3      We know from -- I know documents
4  that TEM was generally -- certainly, Rio
5  Tinto and Luzenac, the documents say that
6  that TEM was only beginning in the really
7  from Rio Tinto, Luzenac, Cyprus they
8  started in the late 1980s.
9      I -- I am aware of these two
10  policies TM7024 and 7019.  It's not clear
11  to me -- when you say Johnson & Johnson
12  did it, it's not clear who the Johnson &
13  Johnson actually did it and whether
14  McCrone did it, right, or J&J.
15     I am saying is that this was done
16  in a way that -- really you can use
17  whatever word you want -- made the test
18  very unsensitive.  Again, it masked the
19  presence of asbestos, right.  If you have
20  to show five, right, if you're detecting
21  one or two or three -- and I can take you
22  through examples where they detected
23  asbestos, but they didn't count it.
24  That's absurd, right.
25     And you didn't need to have that

Page 273

1  five rule for statistical methods.  You
2  know, that says that, and he publishes
3  that was -- that wasn't necessary for
4  statistical methodology, right.  So you
5  took a test that was very -- that was
6  sensitive, and you made it insensitive by
7  the rule.
8  BY MR. EWALD:
9      Q.   First of all, are you now
10  recognizing that Johnson & Johnson did TEM
11  testing in the 1970s?
12     A.   On biweekly composite.  I'm -- I'm
13  aware of this.  I'm not sure Johnson & Johnson
14  did it.  There's a sheet -- there is a in the
15  analytical that says transmission electronic
16  microscopy was begun and becoming more
17  generally accepted in the 1980s.
18     That's what's -- certainly, that's
19  the -- the Rio Tinto and Luzenac and Cyprus
20  companies generally viewed TEM as becoming more
21  generally used in their batch-by-batch analysis
22  and routinely used beginning more in the 1980s,
23  right.  That's what the record shows.
24     There was this TEM that was used.
25  I'm not sure exactly who did it; but from the

69 (Pages 270 - 273)

Page 274

1  protocols, it had this five-fiber rule. And it
2  certainly -- it didn't seem -- the mining
3  companies didn't seem to be -- the producers
4  didn't seem to be using it to assure the safety
5  of what they were giving J&J. This was done on
6  these big silos and these composites material.
7  That's what I know.
8      Q.    Okay. But you -- but you -- so
9  your point about -- you do realize that J&J is
10  a completely different entity than Luzenac or
11  IMERYS; you recognize that, right?
12      A.    Certainly, sir. But under the
13  Federal Food Drug and Cosmetic Act, who's
14  responsible for the production of the powder?
15          J&J. J&J audited the companies.
16  J&J found critical violations in companies like
17  RW -- RJ Lee. You raise that. J&J knew what
18  was going on.
19      Q.    But my point is that you are
20  somehow criticizing J&J for conducting its own
21  TEM work?
22          MS. O'DELL:  Object.
23          THE WITNESS:  No. We don't know
24      they were doing their own.
25          Who is this doing this for -- I

Page 275

1      mean, I'm not aware that this was done
2      in-house in J&J. I can't figure out
3      whether this was done consistently for
4      decades by J&J. I don't know that.
5  BY MR. EWALD:
6      Q.    I think --
7      A.    I --
8      Q.    -- for documents?
9          MS. O'DELL:  I'm sorry, John. I
10      don't think he was finished.
11  BY MR. EWALD:
12      Q.    Finish please.
13      A.    Yes. I'm trying to sort that out
14  because I've seen this. I've see a lot of
15  McCrone documents on TEM.
16          I think it was McCrone who did this
17  for J&J. Nevertheless, I mean, I'm not
18  disagreeing. I don't see quite records over
19  the 50 years of -- of this. I don't see that
20  database.
21          I think many of these results
22  were -- I mean, if I'm correct -- were held by
23  McCrone and Bain from what I can tell, but I do
24  know that when TEM was used, certainly by the
25  McCrone and certainly under these policies --

Page 276

1  you look at these policies, you only count if
2  there's five fibers.
3          I mean, I'm giving J&J no credit
4  for putting in place a policy that obscures the
5  presence of asbestos.
6      Q.    And so -- and you're saying that in
7  your view, based on your review of this case,
8  that there was no basis to have the five-fiber
9  detection limit.
10          That's your opinion?
11      A.    What I've read from -- in Millette
12  was to, again -- if you asked, again, what a
13  word means, right, whether something is
14  detectable, if you -- no detectable -- if you
15  go back to the first page of this, right, there
16  was no detectable asbestos.
17          To me, if you detect an asbestos
18  fiber, right, and you see it and you can
19  confirm it, that's detected. To make a rule
20  that says it has to be five, somebody came up
21  with a theory, well, we want to probably -- we
22  want to avoid a background and a statistical
23  methodology on -- so it had to be five.
24          What Millette says is there was no
25  basis for that, and it didn't need to be made.

Page 277

1  And to say you detect it, you don't need five
2  to detect it. You have a way of assuring
3  background noise through blinds.
4      Q.    All right. And so is this also
5  part of a conspiracy by Johnson & Johnson to
6  institute the five-fiber rule?
7          MS. O'DELL:  Objection. Form.
8          THE WITNESS:  That -- that's
9      between you, your client, and their gods.
10  BY MR. EWALD:
11      Q.    Do you -- is it your -- you've got
12  evidence, Doctor, that the five-fiber rule is
13  something that J&J created?
14          MS. O'DELL:  Object to the form.
15          THE WITNESS:  I can say -- saying
16      that five fibers had to be detected,
17      you've got to have five to detect asbestos
18      and asbestos fiber doesn't make any sense.
19      Millette said they got rid of it, right.
20      So you didn't need that.
21          Again, this is no detectable
22      asbestos. I mean, come on. You're an --
23      you're an excellent lawyer. You know that
24      that word "detectable" is in there for a
25      reason. It's in there to obscure it,

70 (Pages 274 - 277)

Page 278

1  right. If somebody came up with a
2  definition, we'll decide what is
3  detectable. That's the game that's being
4  played.
5  BY MR. EWALD:
6  Q.   Okay. So you talked a lot about
7  Millette.
8       What do know about Millette?
9  A.   Millette was a microscopist.
10 Q.   Okay. What else do you know about
11 him?
12 A.   I mean, he's published in this
13 area, and I've read some of his articles; and
14 he discusses the five-fiber rule.
15 Q.   And does it -- in your opinion, is,
16 based on your study over the last year, is
17 Dr. Millette a well-respected microscopist?
18 A.   Sure. I -- I was using that term,
19 you know, in a gentlemanly way. I don't
20 know -- I mean, I'll put him in -- I have no
21 reason to question his wonderful nature.
22 Q.   Is he world class like Dr. Longo?
23      What do you think?
24      MS. O'DELL: Object to the form.
25      THE WITNESS: I take -- I take the

Page 279

1  lateness of the hour, and I appreciate the
2  sense of humor.
3  BY MR. EWALD:
4  Q.   Well, is it a joke?
5       Which way is it silly?
6       Silly because Dr. Longo --
7  A.   No. I think from what I can tell
8  Millette was very serious and is in the
9  category of Longo, and I'm not having any -- I
10 have no problems. I think Millette contributed
11 to the field from everything I saw. I think he
12 is in that category.
13 Q.   Okay. And do you happen to know
14 what -- you talked about TM7024 in that last
15 document, right?
16      That's the J&J's TEM method?
17 A.   Yes.
18 Q.   In all of your research, did you
19 figure out where J&J got that TM7024 from?
20 A.   He got it from Millette, I believe.
21 Q.   Okay. So Millette --
22      MR. EWALD: Mark this as -- we'll
23 mark this as Exhibit 17. It's the
24 Millette 1990 article.
25

Page 280

1       (Whereupon, Exhibit 17, Article
2  published in "The Microscope" in Volume 38
3  Fourth Quarter 1990, was marked for
4  identification.)
5       MR. EWALD: And Kevin -- Kevin --
6  Jake, sorry. Can you please drop it in
7  the chat?
8       MR. KEESTER: I can, yes.
9       What's the -- sorry.
10      MR. EWALD: It is DX-19666.
11      MR. KEESTER: Sending now.
12      MR. EWALD: Thank you.
13 BY MR. EWALD:
14 Q.   Doctor, let me know when you have
15 it in front of you.
16 A.   Yeah. I'm just doing it.
17      I do. My copy is a little
18 different.
19      Where's that paragraph?
20 Q.   Yeah. So first of all, this is
21 published in "The Microscope" in 1990, correct?
22 A.   Correct. I have it -- mine's
23 formatted a little different from the one I
24 have, yes.
25 Q.   So it's called, "A Standard TEM

Page 281

1  Procedure for Identification and Quantitation
2  of Asbestiform Minerals in Talc," correct?
3  A.   Correct.
4  Q.   And amongst the co-authors is
5  James R. Millette, right?
6  A.   Correct.
7  Q.   Okay. And so if you scroll down
8  under "standard operating procedure" --
9       MS. O'DELL: Doctor -- excuse me.
10 Doctor --
11      THE WITNESS: What page are you on?
12 BY MR. EWALD:
13 Q.   I'm on page 10 carrying over to 11?
14 A.   Give me -- give me the page number
15 on the bottom.
16 Q.   463.
17 A.   463.
18 Q.   Section 6.
19 A.   Yeah.
20 Q.   "Limit of Quantifiable Detection,"
21 do you see that?
22 A.   Right.
23      MS. O'DELL: And if you need to
24 take time to read the article, feel free
25 to do so.

71 (Pages 278 - 281)

Page 282

BY MR. EWALD:

1   Q.    It states, "The detection of five
2   or more asbestos minerals of one variety in an
3   analysis constitutes a quantifiable level of
4   detection."  Do you see that?
5   A.    Correct.
6   Q.    And is that the same standard used
7   by J&J in the TM7024 method?
8   A.    Well, it's really -- this is 1990,
9   right.
10  Q.    Right.
11  A.    You're citing to a 1970 method.
12  Q.    Are you saying that the science --
13  well, let's -- let's toggle.  Okay.  Let's look
14  at 230.3 in your report.
15        Do you have that one on paper in
16  front of you?
17  A.    What paragraph, sir?
18  Q.    230.3.  It's on page 102?
19  A.    102, thanks.  Hold on a second.
20  230.3.
21  Q.    Yep.
22  A.    And that is -- that year is 2015,
23  right?
24  Q.    Right.  It's in 2015.  You quote

Page 283

1   Dr. Millette saying, "For lack of better
2   statistical information at the time in 1990,
3   the publication stated rule of thumb of the
4   detection of five or more asbestiform minerals
5   of one variety in an analysis constituted a
6   quantifiable level of detection.  Subsequent
7   method of development in the area of TEM
8   analysis for asbestos has shown that a
9   detection of less than five fibers in the
10  sample can provide a statistically valid
11  result."
12        So are you suggesting that it was a
13  method by Johnson & Johnson to mask asbestos
14  when it was using this method in the 1970s,
15  '80s, '90s?
16  A.    It did as a consequence of that.
17  Q.    And you're basing that on your
18  expertise in mineralogy and microscopy?
19  A.    No.  I'm basing that on your
20  ability to count.
21  Q.    Okay.  Okay.  I'll take that.
22        Now, let's go to something else.
23  Let's go to 121 in your report, page 50.
24  A.    121?
25  Q.    Yep.  Paragraph number -- or

Page 284

1   page 50.
2   A.    121.  Okay.  Thank you.
3   Q.    And this paragraph refers to the
4   Dutch Consumer Organization.
5        THE WITNESS:  Can I have my
6   paragraph 121, please, in the book?
7        Yes, sir.
8   BY MR. EWALD:
9   Q.    All right.  And does 121, the
10  paragraph, represent the complete story on what
11  happened with the analysis of the talc at issue
12  here?
13  A.    I'm pulling -- I'm pulling it up.
14  The complete story?  I'm happy to have you
15  expand.
16  Q.    Well, do you -- do you know
17  anything more than what's reflected there on
18  paragraph 121?
19  A.    I know -- I know what I see in the
20  Johnson & Johnson Dutch file by Mr. Homan.
21  Q.    All right.  Let me show you --
22        MR. EWALD:  Jake, can you drop
23  D-7070 into the chat, please.
24
25

Page 285

1        (Whereupon, Exhibit 18, Johnson &
2   Johnson document with the subject:
3   "Allegation made by Dutch Consumer
4   Organization of Asbestos in our
5   Overseas Talc - Project No. 0936.00,"
6   dated September 20, 1973, was marked for
7   identification.)
8   BY MR. EWALD:
9   Q.    And when you get a chance, Doctor,
10  take a look at this and see if this is a
11  document you've seen before.
12  A.    Let me just get it out of chat and
13  see if I remember.
14  Q.    Sure.
15  A.    7077?
16  Q.    Well, this one is DX -- yeah, 7070.
17  A.    Yeah.  Thanks.  Give me a second.
18  I need to look at this a second.
19  Q.    Sure.
20  A.    I -- I got it.  Let me just make it
21  a little bigger.
22  Q.    So does this document look
23  familiar?
24  A.    I have to review it.  I -- at this
25  hour my brain is not computing fully.  I'd --

72 (Pages 282 - 285)

Page 286

1  I'd want to look at the whole thing. I think
2  so. I think I've seen this, but I -- I'd have
3  to -- I don't -- I'd have to -- I'd have to
4  read the whole thing.
5      MS. O'DELL: So if you need a
6  minute, Doctor, take it.
7      THE WITNESS: Okay. Thanks. Hold
8  on a second.
9      Is it the use of the standing
10  electron microscopy issue?
11 BY MR. EWALD:
12     Q.   Well, it depends on --
13     A.   I'm sorry?
14     Q.   I'll ask you questions about it.
15 But finish reading the document, and then I'll
16 ask questions.
17     A.   Well, again, it's going to take me
18 about five, ten minutes to read this. I think
19 this is the SEM issue, right?
20     Q.   That's the SEM issue, yes?
21     A.   Right. Feel free to ask me the SEM
22 question, and I'll respond.
23     Q.   Well, I also have a question about
24 the definition, so just read it.
25     A.   Okay. Well...

Page 287

1      MS. O'DELL: Take your time.
2      THE WITNESS: And this is what
3  year?
4      This is -- what's the date of this?
5      This is '73, right.
6      Got it. Thank you.
7      Yeah. Do you see he's questioning
8  the questioning of the SEM and the
9  effectiveness of SEM as a microscopy
10  method?
11 BY MR. EWALD:
12     Q.   Well, so let's -- first, let's walk
13 through it.
14     First, turning to your
15 paragraph 121, you refer to an August 27th,
16 1973, internal J&J memorandum acknowledged that
17 the Dutch Consumer Organization analyzed
18 Johnson's Baby Powder and detected asbestos
19 content at 1.59 percent.
20     "Johnson & Johnson noted that the
21 organization's definition of asbestos could
22 cause some errors, and at this moment they are
23 analyzing our powder again because we remarked
24 that our powder was free of asbestos. However,
25 when they stick to the same method and

Page 288

1  definition, they might trace asbestos again and
2  publicize the results."
3      Did I read that correctly?
4      A.   Yes, sir.
5      Q.   Okay.
6      A.   I think --
7      Q.   And by the way --
8      A.   I -- I'm sorry.
9      Q.   Go ahead.
10     A.   I see those words in the underlying
11 document, yes.
12     Q.   All right. Okay.
13     And so by the way, I'm not sure how
14 much you paid attention to this. But 1.59
15 percent of asbestos, that's a pretty large
16 number relative to what, for example, Dr. Longo
17 was finding, right?
18     MS. O'DELL: Object to the form.
19     THE WITNESS: Yeah. I'm not --
20 I'm -- I'm not going to do math right
21 here, I mean, in a deposition. I'm not
22 prepared to answer -- I mean, I don't have
23 an opinion on that question.
24 BY MR. EWALD:
25     Q.   Okay. So do you have an

Page 289

1  understanding, as you sit here today, about the
2  average level of asbestos by volume?
3      A.   No. I --
4      Q.   Dr. Longo's finding?
5      A.   No. I --
6      MS. O'DELL: Object to the form.
7      THE WITNESS: No. What I'm doing
8  is -- I don't want -- without the
9  laboratory tests that support this, I
10  don't want to just comment on the
11  1.59 percent. I want to understand
12  exactly what the metrics are that are
13  being used and understand exactly what the
14  Dutch -- this is a J&J representation of
15  the Dutch. This is exactly what it said
16  here.
17     But if you want to get into the
18  metrics, let's pull up the underlying
19  Dutch study; and then we can understand
20  it.
21 BY MR. EWALD:
22     Q.   Well, you didn't apparently feel
23 the need to assess its accuracy before putting
24 it in your report, correct?
25     A.   No. I --

73 (Pages 286 - 289)

Page 290

1    MS. O'DELL:  Object to the form.
2    THE WITNESS:  So just let me
3 read -- what this -- this whole section is
4 about, if you go back to the heading,
5 right, what -- you didn't assure the
6 safety and this is -- these were all
7 questions that was raised.
8    So I mean, it goes to whether you
9 substantiated the safety of the product.
10 The responsibility of that falls with J&J.
11 Okay.
12 BY MR. EWALD:
13    Q.   Okay.  So --
14    A.   These were questions that were --
15 these were questions that were raised.  There's
16 no question that this Dutch agency raised that
17 question, but go ahead, please.
18    Q.   All right.  And so the Dutch agency
19 raises the question in August 27, 1973, as is
20 reflected in the internal J&J memorandum.
21    And then in September 20, 1973, a
22 little less than a month later, we have some
23 further responses from J&J where they, again,
24 talk about your reported 1.59-percent asbestos
25 content.

Page 291

1    "In this report I hope to show that
2 their definition of asbestos is incorrect, and
3 their analytical method for asbestos
4 determination in talc is not specific enough
5 and has severe limitations and the talc they
6 are using, Italian 0000, has been thoroughly
7 analyzed by different scientists in different
8 countries and by different methods, and no
9 detectable levels of asbestos have been found."
10 That's what he says there, right?
11    A.   That's what he's -- that's what
12 he's trying to -- that's the case he's trying
13 to make.
14    Q.   Okay.  And he goes on, on page 1
15 formally with the memo talking about definition
16 of asbestos.  And he says, "Talc is normally
17 defined simply as a natural hydrous magnesium
18 silicate usually occurring in a platy form."
19    And he talks about how, "Talc and
20 all the asbestos minerals can, however, be
21 unambiguously defined by determination of their
22 unique chemical structure of each mineral by
23 such methods as X-ray diffraction."
24    He talks about the unique chemical
25 structure of talc as it compares to different

Page 292

1 asbestos minerals.
2    And he goes on to say, "The
3 definition of asbestos offered by the Dutch
4 Consumer Organization is as follows:  All
5 needle and/or fibrous parts or composed units,
6 consisting of magnesium and silicon."
7    That's what he says, right?
8    MS. O'DELL:  Object to the form.
9 Compound.
10    THE WITNESS:  That's exact --
11 that's -- that's what he says.
12 BY MR. EWALD:
13    Q.   Okay.  And then he goes on to say,
14 "By this definition, if talc or the common
15 mineral impurity chlorite (a magnesium
16 silicate) appeared to look fibrous by their
17 analytical technique (see next section), then
18 it would be called asbestos.  However, if, for
19 example, tremolite and anthophyllite asbestos
20 were present in a fibrous form, then by their
21 definition, they would not be called asbestos
22 since they have elements other than just
23 magnesium and silicon.  Tremolite is a calcium
24 magnesium silicate, and anthophyllite is a
25 magnesium iron silicate."

Page 293

1    Did I read that correctly?
2    A.   You're correct.
3    Q.   Do you have any expertise to have
4 an opinion one way or the other as to whether
5 or not Dr. Rolle is correct here?
6    A.   Yeah.  We -- he's not correct
7 because he's not dealing with the biological
8 activity of fibers, and he's missing that.
9 He's trying to draw distinctions between
10 certain fibers and other fibers and not
11 recognizing what -- if you want to go back to
12 the IWGACP spent both -- their entire
13 appendices on was the exactly to say that
14 Dr. Rohl was wrong because we should be looking
15 at biological activity of fibers as it relates
16 to transformative potential.  And that's what
17 key, and not what's -- let's not do
18 definitions.  Let's look at the biological
19 activity of these fibers.
20    So he's wrong in that regard.
21    Q.   All right.  Doctor, is chlorite an
22 amphibole?
23    A.   No.  But again, if you have fibrous
24 material, you have to analyze that biological
25 activity.

74 (Pages 290 - 293)

Page 294

1    Q.    So should I add to your expert
2   report that it's not only that J&J was
3   misbranded because of not warning of asbestos
4   or nonasbestos form of amphibole, so should we
5   also add fibrous chlorite to that?
6         MS. O'DELL:  Object to the form.
7   Misstates his testimony.
8         THE WITNESS:  Come on, please.
9   We're -- we're not -- you know, you're --
10  you want to add it to what?
11  BY MR. EWALD:
12   Q.    You said let's -- no.  Hold on.
13  Hold on.  Hold on.
14        Let's look at 21, I think.  No.
15  That's too early.  Let me get to the right
16  spot.
17        Here we go.
18   A.    What paragraph?
19   Q.    Paragraph 67, on page 18.  Let me
20  know -- let me know when you're there?
21   A.    Right.
22   Q.    "In my opinion, once J&J had
23  evidence of, A, the presence of asbestos
24  because of its non-carcinogenicity and absence
25  of a threshold dose or the presence of

Page 295

1   non-asbestiform amphiboles or fibrous talc, the
2   safety of their product was not established."
3         My question to you is:  Should we
4   also add fibrous chlorite to that?
5    A.    No.
6    Q.    Okay.  So you're okay with fibrous
7   chlorite?
8         MS. O'DELL:  Object to the form.
9         THE WITNESS:  I'm sorry.
10        MS. O'DELL:  What is -- you know,
11   John, what's your question?
12        What's the topic here?
13        MR. EWALD:  The topic is -- is that
14   your witness is now saying that fibrous
15   chlorite has been identified by IWGACP as
16   something that's harmful, and he should
17   add it to the list, right?
18        THE WITNESS:  No, sir.  I mean,
19   again, I apologize if I wasn't clear.
20        The -- the -- what -- the working
21   group was very clear.  They are getting
22   into these -- this definition of
23   non-asbestiform or asbestiform has
24   obfuscated in the context of the minerals
25   amphiboles as well as talc, right, the

Page 296

1   biological activity of those fibers.
2         And they believe that elongate
3   particles, right, of a certain aspect
4   ratio of at least 3 to 1, right, should --
5   should be assessed for their biological
6   activity.
7         That's what the working group has
8   said in all this focus on if this is
9   asbestiform, we're going to look at this
10  way.  We're going to look it at that way.
11  We're going to define it this way.  We're
12  going to make it so specific, right.  It's
13  not sensitive enough.
14        This is the point when you're
15  dealing with these sets of minerals in
16  fibrous form, and we're talking about the
17  amphiboles; and we're talking about talc.
18  And that's what the working group is
19  doing.  Their focus is on elongate
20  particles.  That was my only point.
21  BY MR. EWALD:
22   Q.    So but the question is -- you
23  talked about the SEM issues.  Isn't the
24  question that's been raised in part B is:  Are
25  they really seeing fibers?

Page 297

1         Isn't that the question?
2    A.    It's reliability of the SEM method,
3   right?
4    Q.    Well, it goes on to say that on B,
5   "The Dutch Consumer Organization attempted to
6   determine the asbestos content by scanning
7   electron microscopy and X-ray energy dispersive
8   analysis."
9    A.    Right.
10   Q.    "By this combined technique, one
11  can look at the morphology of particles" -- and
12  it goes on to say, blah, blah, blah.  And "One,
13  when preparing talc for scanning electron
14  microscopy (SEM) analysis, many talc platelets
15  lie perpendicular to the viewing plane and thus
16  from an edge-on-view look like a fiber."
17   A.    Right.
18   Q.    But they're not a fiber?
19   A.    He's objecting to SEM, correct?
20        That's what Mr. Rolle is doing.
21  He's saying the SEM is not reliable here.
22   Q.    I think what he's saying, Doctor,
23  is that if you don't know what you're looking
24  at, you could be calling a talc platelet lying
25  perpendicular as a fiber; isn't that what he's

75 (Pages 294 - 297)

Page 298

1  saying there?
2       MS. O'DELL:  Object to the form.
3       THE WITNESS:  What he's saying is
4  that SEM is not a reliable method to do
5  that, fair?
6  BY MR. EWALD:
7    Q.    And what -- I'm not agreeing with
8  you one way or another.
9       But what is your opinion on whether
10  or not SEM is an appropriate analytical
11  technique for the presence of talc?
12    A.    Well, I know when -- I know when
13  Bill Ashton went to China and wanted to invest
14  J&J's money and shift that to Vermont to use
15  SEM.
16    Q.    Okay.  Do you understand that you
17  can use the right instrument but not know how
18  to use it to analyze the matrix appropriately?
19       Do you understand that's a
20  possibility?
21    A.    Exactly.  And if you look at Rio
22  Tinto's analysis and you look at the individual
23  variability between laboratories, you just hit,
24  right, another key element of why asbestos was
25  being masked.

Page 299

1       Whenever Rio Tinto had as positive,
2  they sent it to another lab.  Okay.  Not when
3  it was negative, but when it was positive.
4  They sent it to another lab, and they knew,
5  right, the reliability of the other labs was
6  great variability.  You can look at their own
7  assessments, right, and they did it for one
8  reason.  And they said it.  They did it for
9  liability reasons.  They found a positive.
10  They send it out, right.
11       And what you see the history of
12  retesting and retesting, right.  When you had a
13  positive, you retested it into a negative,
14  right.  That's how you get, along with all
15  these other methods, that's how you say there's
16  no asbestos here.
17       (Discussion held off the record.)
18       (Whereupon, a break was taken.)
19  BY MR. EWALD:
20    Q.    Dr. Kessler, I understand you have
21  something else you'd like to clarify.
22    A.    Yeah.  I just want to clarify.
23  You're very kind.  I appreciate it.
24       You should have in the chat --
25  we've been referring to it several times.  I've

Page 300

1  been referring to it.  This is on historical
2  development of the framework to the IMERYS
3  document on fiber management overview in 2011
4  on transmission electron microscopy, and it
5  says, "TEM has been used by Cyprus, Luzenac" --
6  blah, blah -- "in IMERYS personal care products
7  since 1990s.  TEM was incorporated to include
8  all other types in 2001.  TEM gained favor in
9  the 1990s as a technique with the lowest
10  limited detection, especially in the U.S." --
11  blah, blah.  "TEM is recognized as the best
12  method for chrysotile detection due to the
13  ultimate resolution crystal structure
14  determination lowest limited detection."
15       I just wanted to make sure that was
16  the context of how TEM was looked at certainly
17  by J&J suppliers.  I am not in any way
18  questioning J&J.  The documents you set out in
19  724, 719, they are what they are.
20       But just certainly, the people who
21  are producing this, basically, I mean, they
22  believe from this that they incorporated TEM in
23  the 1990s sort of routinely.  That's my only
24  point.
25    Q.    All right.  So I'm going to --

Page 301

1       MR. EWALD:  Jake, can you put in
2  17.04.  That 01 one.
3  BY MR. EWALD:
4    Q.    Doctor, let me know when you have a
5  chance to take a look at it.
6    A.    Yep.  Let me just get it.  Thank
7  you for putting it in.
8       MS. O'DELL:  Are you going to mark
9  this as an exhibit, John?
10       MR. EWALD:  Yes.  It will be, I
11  think, Exhibit 18.
12       MS. O'DELL:  Okay.
13       MR. EWALD:  And for the record,
14  it's -- hold on.
15       THE COURT REPORTER:  I think this
16  should be 19.
17       MR. EWALD:  Oh, really.  Sorry.
18       It's Bates Number JNJ 000404835
19  with the date of April 13th, 1994.
20  Subject:  Update on FDA/NTP.
21       (Whereupon, Exhibit 19, Memorandum
22  dated April 13, 1994, Bates labeled
23  JNJ 000404835, was marked for
24  identification.)
25

76 (Pages 298 - 301)

Page 302

1 BY MR. EWALD:
2    Q.    Do you have it in front of you,
3 Doctor?
4    A.    I do.
5    Q.    And this is discussing from Steven
6 Gettings to Talc Interested Party Task Force.
7        "We have learned the driving force
8 behind NTP's decision to analyze exposed
9 animals/human tissues for the presence of talc
10 is FDA.
11        "The issue has been discussed at
12 high level meetings at FDA between the
13 Commissioner and representatives of consumer
14 groups."
15        Did I read that correctly?
16    A.    Exactly.
17    Q.    Does that ring any bells about
18 meetings that you had with representatives of
19 consumer groups about concerns about talc?
20    A.    I have no -- no. I see this here.
21 It doesn't ring any bells whatsoever. I'm not
22 saying it didn't happen. Just I have no
23 recollection of this whatsoever. If you
24 have -- you know, I just don't see it.
25    Q.    Fair enough.

Page 303

1    A.    I don't recall, you know. I did
2 it -- the issue is -- I mean, I always like --
3 you -- it's amazing how people invoke, you
4 know, commissioner meetings. I mean, this is
5 a -- this is a J&J -- internal J&J meeting
6 memo.
7    Q.    It's at the top, Talc Interested
8 Party Task Force.
9    A.    I -- I have no idea. It could be
10 correct. It could not be correct. I just
11 don't know, sir. I have no recollection.
12    Q.    No worries.
13        MR. EWALD: So, Jake, now throw in
14 the 17.007.
15        For the record, we'll mark this
16 Exhibit 20, and it's Bates Number
17 JNJ 000016687.
18        (Whereupon, Exhibit 20, Memorandum
19 dated July 1, 1994, Bates labeled
20 JNJ 000016687 and JNJ 000016688, was
21 marked for identification.)
22        THE WITNESS: Hold on one second.
23        MS. O'DELL: Do you have it
24 downloaded?
25        THE WITNESS: Yeah. I'm going to

Page 304

1 do that.
2        MR. O'DELL: Okay.
3        THE WITNESS: Yeah. I have the
4 document.
5 BY MR. EWALD:
6    Q.    And this is from, again, Stephen
7 Gettings, dated July 1st, 1994, to the Talc
8 Interested Party Task Force, Meeting Summary
9 (FDA/NTP). It talks about a June 28th, 1994,
10 delegation from CTFA.
11        "Met with representatives of FDA
12 and NTP."
13        Discussed various issues relating
14 to talc. And if you scroll down to the first
15 bullet on the second page, it reads, "FDA
16 conceded that they are responding to pressure
17 from within the Commissioner's Office
18 (particularly from the Special Assistant to the
19 Commissioner on Women's Issues and from the FDA
20 Office of Public Affairs), to fully investigate
21 any association between the talc and the
22 etiology of ovarian cancer."
23        Did I read that correctly?
24    A.    They are good. I mean, I'm proud
25 of them. Now it makes sense. I think I

Page 305

1 figured -- go ahead. Keep on going.
2    Q.    Well, what's -- what's your
3 revelation?
4    A.    Remember you said there were two
5 FDA, besides Gilbertson, at the -- that
6 workshop?
7    Q.    Yes.
8    A.    That symposium, you remember you
9 mentioned Carol Schmenan?
10    Q.    Yes.
11    A.    Right. You remember I said Ruth
12 Merkatz was there, right?
13    Q.    Yes.
14    A.    Dr. Ruth Merkatz. Those are
15 highly, highly competent -- you know,
16 Dr. Merkatz is one of the great women health
17 professionals, worked at the FDA, worked at
18 Pfizer, did -- worked for the Population
19 Council, a leader in reproductive freedom for
20 women. Carol Schmenan equally, you know.
21 I'm glad while I'm doing other
22 stuff, they were focused on this apparently.
23 So I'm sure that's what -- that's what this
24 says.
25        So FDA conceded they were

77 (Pages 302 - 305)

Page 306

1  responding to Ruth -- you know, Special
2  Assistant to Commissioner of Women's Health,
3  Dr. Ruth Merkatz, and from the Office of Public
4  Affairs is Carol Schmenan.  They were the two
5  at the meeting, and they were -- yeah, they
6  were doing their jobs.
7      This is an important women's issue,
8  and they were apparently focused on it.
9      Q.  Okay.  And after fully
10  investigating any association between talc and
11  the etiology of ovarian cancer, there's no
12  action taken during your administration at the
13  FDA relating to that issue, correct?
14      MS. O'DELL:  Object to the form.
15      THE WITNESS:  You're telling the
16  FDA there's no asbestos in talc.  I mean,
17  I don't -- I don't believe -- I can go
18  back -- I'm happy to ask Ms. Schmenan and
19  Dr. Merkatz whether they were aware in
20  1994, right, that there was asbestos in
21  talc of the -- of the evidentiary record.
22  I was not.  I didn't -- you know, I
23  certainly didn't understand those issues.
24      So, you know, when you say
25  "investigating," I don't -- I mean,

Page 307

1      maybe -- you know, I can't -- you'd have
2      to ask them whether they understood at
3      that time the evidence was what we see
4      now.
5  BY MR. EWALD:
6      Q.  As you sit here today, you don't
7  know what they knew one way or another, right?
8      A.  I can't tell you what was in -- but
9  it makes a lot of sense that Dr. Merkatz and
10  Ms. Schmenan were attending these meetings.
11  And if they were looking for certain studies to
12  be done, then the agency, you know, they were
13  doing their jobs.
14      Q.  Okay.  On --
15      A.  Do you have other -- do you have
16  other documents?  I would love to see maybe to
17  clarify.
18      Q.  You're the one that's coming off of
19  seven hours so...
20      I might have more to show you.
21      A.  I'm happy to come to Brooklyn.
22      Q.  Just look at, if you wouldn't
23  mind --
24      MS. O'DELL:  That was an
25  unauthorized statement.

Page 308

1      THE WITNESS:  Yeah.  I'm sorry.
2  Now I just got kicked under the table.
3  BY MR. EWALD:
4      Q.  If you wouldn't mind turning to
5  187, paragraph 187 of your report, page 87.
6      A.  Sorry.  18- -- paragraph 187?
7      Q.  Yes.
8      A.  Thank you, sir.
9      Q.  Sure.  And it carries over to
10  page 88.  And it's talking about Vernon Zeitz
11  and a handwritten letter about the Department
12  of Health Education and Welfare contacting him
13  about a government study of Vermont talc
14  workers.
15      My first question is:  Have you
16  ever reviewed any materials relating to a
17  government study of Vermont talc workers?
18      A.  I -- I have -- yes.
19      Q.  Okay.
20      A.  I mean, in my late nights and early
21  mornings in front of relativity, I found myself
22  maybe, you know, a while back, I mean, in some
23  of those documents; but it's a blur right now.
24      Q.  All right.  And so --
25      A.  This was -- was this -- this was an

Page 309

1  NIH study if I'm correct.
2      Q.  And so the -- you have a quote here
3  from Vernon Zeitz in, say, the late '70s.  And
4  it talks about, amongst other things, your
5  legions, "If we are to be those legions, it is
6  imperative we overcome the inertia of our past
7  to modernize and mobilize our defenses and
8  offenses so we enter into battle with the
9  outcome assured," right?
10      A.  That's what it says.
11      Q.  Right.  And when you take that
12  letter and, say, in paragraph 188, "In my
13  opinion, J&J decided in 1970s to aggressively
14  defend its product.  That strategy kept their
15  product in the market for 50 years but put the
16  public's health at risk.  It may not have been
17  that way if J&J was willing to bear any
18  additional cost in reformulating the product."
19      That's what you write, right?
20      A.  That's what I write.
21      Q.  And are you suggesting in a Vernon
22  Zeitz's letter in the late 1970s was
23  internalized and held forth in the company over
24  the ensuing 50 years?
25      MS. O'DELL:  Object to the form.

78 (Pages 306 - 309)

Page 310

1    THE WITNESS:  No.  I -- I am not,
2    but I do have the impression that -- no,
3    I'm not -- I'm not implicating Mr. Zeitz.
4    I'm responsible for my -- my opinion
5    there.  I mean, this is the totality of
6    the picture that I see.
7  BY MR. EWALD:
8    Q.    Okay.  And you say that they put
9  the public health at risk because they weren't
10  willing to bear any additional costs to
11  reformulate the product.
12    That's what you write, right?
13    A.    Yeah.  I think "additional" may not
14  be the most artful word.  I mean, there was --
15  they didn't -- they didn't go -- you know, they
16  obviously didn't go to corn starch.  There was
17  a price differential there.  That's all I mean.
18    Q.    Okay.  And so is it the opinion
19  that you're offering to a reasonable degree of
20  certainty that J&J knew its product contained
21  asbestos, knew that it put the public at risk,
22  but just decided to sell it anyway; that's your
23  view?
24    A.    No.  I'm -- I am -- you're using
25  the word "knew," okay.  I'm not going to use

Page 311

1  the word -- I don't use the word "knew" there.
2    Okay.  Let's take --
3    Q.    I'm not --
4    A.    Let's take it out of the subjective
5  intent.  It depends how you use the word
6  "knew."  J&J knew.  J&J decided.
7    I mean, there was -- I don't think
8  there's any question -- you tell me if I'm
9  wrong -- aggressively defended its product,
10  right.  I mean, that has been the strategy for
11  50 years, right.
12    That strategy kept the -- their --
13  their product on the market for 50 years.
14  There's a strategy to switch to corn starch.
15  That strategy put the public health at risk.  I
16  don't think there's any question about that.
17    You look at the epidemiological
18  studies.  There is a small statistically
19  significant public health need.
20    It may not be that way.  It didn't
21  have to be that way.  J&J could have gone to
22  corn starch and reformulated its product.
23    I don't see how you can disagree
24  with anything in that statement.  It has
25  nothing to do with Johnson & Johnson knew.  I

Page 312

1  think every aspect of that sentence is -- you
2  know, I don't know how you -- tell me what you
3  dispute in that sentence or sentences.
4    Q.    Well, again, I know it's been a
5  long day, but I still don't have to answer your
6  questions.
7    My question to you, then, is:
8  Throughout the day you've returned to this idea
9  that J&J intentionally used test methods to
10  mask the presence of asbestos.
11    How is there any way to understand
12  that conclusion other than that J&J knowingly
13  put baby powder and other talc products on the
14  market that has asbestos in it?
15    MS. O'DELL:  Object to the form.
16    THE WITNESS:  So I -- there's
17  nothing I'm the talking about intent here.
18  Okay.
19    What I think -- and I'm very
20  serious about this.  You may not
21  understand that for anyone listening on
22  this phone, right.
23    I think if you look at the
24  evidence, okay, and you just look
25  objectively at the evidence -- and I don't

Page 313

1  think people are focused on this -- I
2  mean, and again, I'm still learning,
3  right.  I mean, and there's still -- you
4  know, there's still much to understand,
5  right.
6    But at every stage, just processing
7  it is going to mask it.  The way it was
8  tested, we spent -- you didn't ask me
9  anything about putting it through a 325
10  mesh, right.  325 mesh you're going to
11  diminish the pickup, right.  I mean, at
12  every stage here, right, you decrease the
13  chances of picking up asbestos, right.
14    What people intended, that's not my
15  job.  Okay.  But a reasonable -- let me
16  just finish.
17    A reasonable and sophisticated
18  company, right, when you look at the
19  grinding and the crushing and the milling,
20  when you look at the passing it through
21  these sieves, you look at the sensitivity,
22  you look at the five-counting rule, you
23  look at the retesting, you know, it -- you
24  see -- certainly J&J documents say, you
25  know, TEM, too sensitive.  Can't use it.

79 (Pages 310 - 313)



Page 314

1    Okay. Put it all together, one way
2    or another, detection of asbestos -- I am
3    100 percent confident -- was masked,
4    right. I mean, in this by a whole series
5    of steps.
6        When Ashton knew -- what Bill
7    Ashton knew, what he did, we're not going
8    to know, right.
9        But when you look at this, right,
10   there's no doubt that the manufacturing
11   process, right, and the testing and, you
12   know, the mask the presence of asbestos.
13   And that's -- I mean, that's -- that to me
14   is key here.
15       You keep on saying there's no
16   asbestos. There's never been asbestos.
17   There -- it makes no sense. You put in
18   place a method to detect it, and you never
19   detected it. So what good was the method
20   of detecting it. That was the fatal flaw,
21   right.
22       And you -- the last document you
23   talked about NTP, right. J&J's -- I mean,
24   the staff there wanted NTP not to classify
25   this as a carcinogen. They said there was

Page 315

1    a fatal flaw, right, and that's actually
2    one of the things that got me thinking
3    about this.
4        What was the fatal flaw to get NTP
5    not to classify it? And the
6    classification -- the fatal flaw that J&J
7    employees came up with to get NTP was --
8    you know, you can -- your epi is not right
9    because before 1976 there was asbestos in
10   there, right. And after 1976, we cleaned
11   it up; and there was no asbestos.
12       That was the fatal flaw NTP; and
13   therefore, you can't rely on the -- you
14   can't rely on it to classify it as a
15   possible carcinogen.
16       The fatal flaw here, as you put it,
17   was the industry in J&J putting J4-1,
18   screen out the asbestos and it never had a
19   positive. That's the fatal flaw in the
20   whole argument, right. That can't be, and
21   I don't understand that.
22       The only way to -- the answer to
23   that question, right, is that when you
24   look, the reason why you were able to say
25   no asbestos, no asbestos, no asbestos is

Page 316

1    for all the reasons we discussed today.
2        MR. EWALD: Okay. Doctor, I think
3    my time's up. Thanks.
4        THE WITNESS: Thank you, sir.
5        MS. O'DELL: I have no questions.
6        MR. EWALD: Thank you.
7        THE COURT REPORTER: Counsel,
8    before everybody leaves, regular delivery
9    on the transcript?
10       Mr. Ewald, regular delivery on the
11   transcript?
12       MR. EWALD: Yes.
13       (The witness is excused.)
14       (Deposition of David A. Kessler,
15   M.D., concluded at 7:15 p.m. EDT.)
16
17
18
19
20
21
22
23
24
25

Page 317

1        C E R T I F I C A T E
2
3
4        I, SUZANNE J. STOTZ, a Certified
5    Court Reporter, Registered Professional
6    Reporter, Certified Realtime Reporter, and
7    Notary Public in and for the State of New
8    Jersey, do hereby certify that the foregoing is
9    a true and accurate transcript of the
10   stenographic above-captioned matter.
11
12
13   _____
14       SUZANNE J. STOTZ, CCR, RPR, CRR
15       LICENSE NO. 30XI00184500
16
17
18   DATED: April 25, 2024
19
20
21   NOTE: THE CERTIFICATE APPENDED TO THIS
22   TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION
23   OF THE SAME BY ANY MEANS, UNLESS UNDER THE
24   DIRECT CONTROL AND/OR DIRECTION OF THE
25   CERTIFYING COURT REPORTER.

80 (Pages 314 - 317)

Page 318

```
1        E R R A T A   S H E E T
2     I have read my testimony in the foregoing
3  transcript and believe it to be true and
4  correct to the best of my knowledge and belief
5  with the following changes:
6  PAGE   LINE      CHANGE
7  _____ _____ _____
8  _____ _____ _____
9  _____ _____ _____
10 _____ _____ _____
11 _____ _____ _____
12 _____ _____ _____
13 _____ _____ _____
14 _____ _____ _____
15 _____ _____ _____
16 _____ _____ _____
17
18 _____ _____
19 WITNESS SIGNATURE         DATE
20
21 Sworn and subscribed to before me this
22 _____ day of _____ , 2024.
23
24 Notary Public of the
25 State of _____.
```

Golkow Technologies,
A Veritext Division

877-370-3377                                    www.veritext.com

[& - 17147]                                                                Page 1

| **&** | | | |
|---|---|---|---|
| **&** 1:3 2:10 3:4 3:9,16,22 5:18 6:21 7:6,11 24:3 32:16 66:12 81:19 85:25 86:8 116:5,16 153:11 155:13 203:5 240:6,12 241:4,22 250:2 268:9,22 272:11,12 273:10,13 277:5 283:13 284:20 285:1 287:20 311:25 | **000405228** 6:8 160:17<br>**01** 301:2<br>**030** 5:11 141:5<br>**07932** 3:24<br>**0936.00** 7:14 285:5 | **102** 282:19,20<br>**11** 5:18 10:17 152:18 153:11 155:3 159:4 281:13<br>**11/1/72** 188:16<br>**110** 183:12<br>**114** 184:1 | **145** 191:2 192:6<br>**146** 195:20<br>**147** 196:1<br>**15** 4:14 6:17 9:21 21:23 31:17,20 67:8 67:18 102:12 102:17 112:17 171:7 240:3,8 265:13,22 269:3 |

**000405228** 6:8 160:17
**01** 301:2
**030** 5:11 141:5
**07932** 3:24
**0936.00** 7:14 285:5

**1**

**1** 4:11,18 6:19 7:19 14:2,3 48:13,15 193:6 193:8,11 240:4 240:10 241:20 291:14 296:4 303:19
**1,000** 50:22
**1,250** 53:17
**1.59** 287:19 288:14 289:11 290:24
**1/2** 10:17
**10** 5:12 67:8 110:19 141:18 142:1 145:11 162:19 265:1 281:13
**10.9** 62:10
**10/7/76** 160:8
**100** 161:14 314:3
**10036** 3:18
**101** 50:22
**101,364.91.** 50:18

**0**

**0.5** 263:4
**0000** 291:6
**000000438** 5:21 153:14
**000000439** 155:4
**000000441** 5:22 153:15
**000016687** 7:19 303:17,20
**000016688** 7:20 303:20
**000404835** 7:17 301:18,23
**000405219** 6:7 160:17

**102** 282:19,20
**11** 5:18 10:17 152:18 153:11 155:3 159:4 281:13
**11/1/72** 188:16
**110** 183:12
**114** 184:1
**115** 184:2,21,23 186:4,7,8
**1185** 3:18
**12** 6:5 46:16 81:8,14 160:13 160:14
**121** 283:23,24 284:2,6,9,18 287:15
**12203** 317:12
**125** 161:15
**13** 6:9 7:17 81:8 205:2 211:22 301:22
**139** 117:7,23
**13th** 212:3 301:19
**14** 4:11 6:13 62:11 110:24 163:24 164:1,2 164:14,15,17 165:6,22,22 166:2 221:13 221:17 223:17
**141** 5:8
**142** 5:12
**144** 208:2

**145** 191:2 192:6
**146** 195:20
**147** 196:1
**15** 4:14 6:17 9:21 21:23 31:17,20 67:8 67:18 102:12 102:17 112:17 171:7 240:3,8 265:13,22 269:3
**151** 196:1
**153** 5:18
**154** 190:10,13 191:24 193:1 193:15 197:15
**154a** 192:18
**157** 190:12
**15th** 15:2,9,20
**16** 4:16 7:5 21:25 45:14,18 143:23 249:19 249:22 250:1
**16-2738** 1:2
**160** 6:5
**17** 6:12,13 7:8 9:16 32:9 104:10 205:5 221:18 226:1 279:23 280:1
**17.007.** 303:14
**17.04.** 248:22 301:2
**17147** 267:20 268:5

**[17a - 2016]**                                                    Page 2

**17a**   186:12
**17th**   212:2
  223:22
**18**   7:11 31:4
  113:7 124:4
  285:1 294:19
  301:11 308:6
**1825**   8:18
**1835**   2:21
**187**   308:5,5,6
**188**   309:12
**18a**   186:12
**19**   7:16 301:16
  301:21
**19103**   2:21 3:11
**1960s**   224:4
  251:18
**1961**   224:12
**19666**   280:10
**1968**   225:5
**1970**   229:9,22
  282:12
**1970s**   236:1,13
  251:18 252:8
  253:1,5,21
  254:15 255:19
  256:18 258:12
  259:11,20,24
  263:19 273:11
  283:14 309:13
  309:22
**1971**   225:16
**1972**   112:8
  115:17,21
**1973**   7:15 63:8
  123:3,22 126:1

129:6 269:7
  285:6 287:16
  290:19,21
**1975**   225:16
**1976**   58:11,21
  111:2 235:8
  262:19 315:9
  315:10
**1977**   127:8
  269:3
**1978**   268:10
**1980s**   271:6
  272:8 273:17
  273:22
**1982**   194:14
  225:22
**1983**   251:11
**1986**   7:7 249:6
  249:24 250:3
  253:14
**1988**   216:4
  235:6 238:14
  238:15
**1990**   7:10
  215:10,12
  220:2 237:11
  279:24 280:3
  280:21 282:9
  283:2
**1990s**   271:6
  300:7,9,23
**1992**   216:5
**1994**   6:12,13,19
  7:17,19 205:6
  212:2,24
  213:19 216:21

217:17,20
  220:8,11,25
  221:13,18
  223:17,22
  226:7,25
  227:12 228:18
  229:8,18,22
  230:20 231:10
  233:6 234:23
  235:4 239:11
  240:4,10
  241:21 243:20
  301:19,22
  303:19 304:7,9
  306:20
**1995**   241:18
  246:7
**1997**   215:10,13
  220:13 237:11
**19th**   17:6,10
  18:12 21:11
**1st**   50:17 51:2
  51:21 82:22
  210:12,25
  304:7

|  **2**  |
| :---: |

**2**   4:12 31:15,18
  96:24 271:4
**2.1**   155:13
**20**   7:15,18 9:21
  67:1 136:9
  176:6 185:10
  217:20 285:6
  290:21 303:16
  303:18

**2000**   257:8
**2001**   3:11 126:1
  300:8
**2008**   212:3
  266:18
**2009**   176:18
  177:16
**2010**   124:17,19
  125:4 126:5,13
  128:4,8 130:3
  131:23 141:15
  193:7
**2011**   300:3
**2012**   124:19
  125:10,11,12
  125:14 126:4
  127:14,15
  128:1 129:5,25
  130:3,4 193:7,9
**2013**   21:6
**2014**   84:23 85:1
  190:22 191:9
  191:13 192:5
  203:23 207:25
  208:11,11,22
  210:5,12,14,24
  211:6,25
  217:20 220:9
  237:20 238:5
  266:19
**2015**   282:23,25
**2016**   46:3,11,25
  71:8,8 73:12,19
  74:21 79:3,16
  80:16 91:1,8
  111:2 211:10

**[2017 - 55]**

**2017**  46:18,25
**2018**  4:16,18
  14:9 31:2 45:15
  45:18 46:14,23
  47:1 48:13,15
  50:17 51:3,4,22
**2018-2019**
  158:22
**2019**  232:18
  233:2
**2019-02**  178:16
**2020**  15:24,24
  16:9,10 139:22
  142:18
**2021**  139:20
  140:11 141:19
  145:11
**2023**  4:14 15:3
  15:9,20 17:6,10
  18:12,20 21:11
  24:16 25:21
  30:18 31:17,20
  55:4 57:19
  80:20 81:3 82:3
  83:23 85:5
  102:12,17
  104:10 105:9
**2024**  1:13 82:22
  233:3 317:18
  318:22
**205**  6:9 250:25
**21**  115:1,2
  225:13 233:9
  294:14
**212**  3:19

**215**  2:22 3:12
**218**  2:6
**22**  9:15 30:22
  31:14,24 38:17
  42:24 118:19
**221**  6:13
**22311**  2:11
**23**  143:15,25
**230-2343**  3:6
**230.3**  282:15
**230.3.**  282:19
  282:21
**2318**  5:11,11
  141:4,5,8
**23rd**  268:9
**24**  144:1,3
**240**  6:17
**25**  9:15,17 62:2
  80:23 81:2
  143:4 145:10
  317:18
**250**  7:5
**25th**  243:19
**26**  99:4 171:4
**27**  124:4 290:19
**277**  126:22
**278-4449**  2:22
**27th**  287:15
**280**  7:8 126:16
  126:24 141:12
  141:15
**285**  7:11
**28th**  304:9
**2900**  2:21 3:11
**2:26**  189:14

**2:30**  189:17
**2b**  193:5,7,11

**3**

**3**  4:15 45:10,14
  45:16 99:23
  103:11,18,20
  104:18,21,21
  104:24 105:8
  251:8 296:4
**30**  225:4
**300**  54:4 57:4,6
**301**  7:16
**303**  7:18
**30xi00184500**
  1:11 317:15
**31**  4:12 41:6,6,7
  41:7,12,13
  231:4 241:20
**316**  2:16
**325**  62:14
  110:20 313:9
  313:10
**32502**  2:16
**34th**  3:18
**361**  115:2
**36104**  2:6
**364.91**  50:23
**38**  7:9 280:2

**4**

**4**  4:17 48:11,14
  219:1 225:24
**40**  45:1 92:6
**435-7000**  2:17
**45**  4:15

**46**  182:12
**463**  281:16,17
**48**  4:17
**4900**  2:11

**5**

**5**  4:19 64:14,22
  190:4 193:14
  203:3,22
  206:11 263:9
  263:13
**5.5**  263:9
**50**  45:1 61:15
  85:13 93:8,8
  108:25 109:17
  109:23 111:2,5
  111:21 119:4
  122:5 125:3
  126:3 127:22
  128:2,6 129:23
  133:18 136:17
  148:2 152:4
  158:5,8,11
  173:22 201:6
  201:11 206:3,6
  207:22 237:4
  275:19 283:23
  284:1 309:15
  309:24 311:11
  311:13
**500**  54:2
**506**  258:21
  260:11
**549-7000**  3:24
**55**  212:7,13

**[550 - accomplish]**

**550**  55:3
**556-2100**  3:19
**567-3500**  3:12
**58**  190:5 193:15
**59**  212:6,11
   220:18

**6**

**6**  4:21 82:6,7
   281:18
**600**  3:5,23
   17:15
**60s**  257:7
**64**  4:19
**650**  2:11
**656**  17:21
**66**  155:9 268:16
   269:9
**67**  113:7,10
   190:11,13
   294:19
**680-0339**  2:12

**7**

**7**  4:22 62:11
   82:16,17
**7019**  270:3
   272:10
**7070**  284:23
   285:16
**7077**  285:15
**70s**  194:11
   195:2 229:12
   257:7,16
   270:20 309:3
**713**  3:6

**719**  300:19
**72**  116:1
**7214**  251:7
**724**  300:19
**73**  112:8 125:11
   127:15,15
   128:1 129:25
   130:3 287:5
**740.10**  115:1
   233:9
**77**  164:25
   165:18
**77017**  3:6
**78**  118:19
   123:15,21
   125:7
**79**  119:8,9
   125:7
**79.1**  122:25
   132:14 154:25
   159:15
**79.1.**  123:20
**7:15**  316:15

**8**

**8**  1:13 4:5 5:6
   10:17 15:25
   16:2 82:23 83:1
   83:12 94:9
   251:11
**80**  169:3
**800**  2:7 54:18
**80s**  158:6 167:8
   199:2 220:6
   229:12 230:5
   257:7 283:15

**8179**  152:19
**82**  4:21,22
   198:25
**83**  5:6 171:6
   198:25
**83.15**  171:4
   172:20
**830**  135:23
**84**  83:14
**844**  2:12
**8441**  3:5
**850**  2:17 54:11
   254:8
**86**  218:15,19,20
   218:24,25
   219:23 238:18
   238:20,24
   254:19 266:15
**87**  308:5
**88**  217:23 218:5
   248:21 308:10
**898-2034**  2:7

**9**

**9**  5:8 108:6
   140:20 141:1
   141:17 162:19
**90**  167:8
**9017.007.**  249:1
**90s**  158:6
   229:12 257:7
   283:15
**93**  5:16 142:5
**94**  266:18
**973**  3:24

**9:09**  1:14

**a**

**a.m.**  1:14
**abandoned**
   264:13
**ability**  48:23
   112:3 147:9
   179:7 203:11
   283:20
**able**  102:3
   110:25 131:8
   146:12 147:23
   151:2 188:2
   189:16 224:21
   258:24 260:20
   315:24
**above**  1:9 81:5
   102:10 212:16
   270:15 317:10
**abramson**  3:5
**absence**  113:14
   294:24
**absolute**  109:23
**absolutely**  37:5
   163:24 232:1
   238:22
**abstract**  36:23
**absurd**  272:24
**accepted**  44:5
   271:5 273:17
**access**  60:12,13
   60:14 86:11
   87:4
**accomplish**
   50:12

[account - agreement]                                                   Page 5

| | | | |
|---|---|---|---|
| **account**   173:18 | 104:9 110:7 | 241:5,23 | 201:10 205:11 |
| **accuracy** | 131:6 150:22 | 306:12 | 211:1 230:9 |
| 289:23 | 156:9 159:17 | **administratio...** | 236:9 238:4,5 |
| **accurate**   41:16 | 169:3 184:1 | 7:6 250:2 | 251:17 252:11 |
| 147:3 208:22 | 204:15 233:24 | **administrative** | 254:19 258:24 |
| 221:3 317:9 | 255:1 257:19 | 181:12 216:13 | 290:16,18 |
| **accurately** | 266:21 270:23 | **admitted**   87:20 | 307:12 |
| 209:16 | 272:13 315:1 | **adulterant** | **agency's** |
| **acknowledged** | **add**   15:20 57:1 | 116:16 | 236:12 |
| 287:16 | 95:24 294:1,5 | **adulterated** | **agents**   73:25 |
| **acknowledges** | 294:10 295:4 | 115:10,24 | **aggressively** |
| 191:14 192:11 | 295:17 | 116:22 117:18 | 309:13 311:9 |
| **acknowledging** | **added**   53:23 | 118:4,17 232:6 | **ago**   25:10 27:4 |
| 190:23 | 94:15 95:21 | 232:8,11,24 | 220:18 |
| **act**   43:14 | 125:22 | **adulteration** | **agree**   33:14,25 |
| 138:11 146:11 | **adding**   163:13 | 117:24 118:2 | 44:2 83:17 |
| 147:13 196:25 | 205:20 | 232:14 | 127:9,11,13 |
| 228:23 274:13 | **addition**   19:19 | **advanced** | 128:25 131:2 |
| **actinolite** | **additional**   60:5 | 145:13 | 131:22 132:2 |
| 125:23 127:6 | 60:7 309:18 | **advisor**   16:9,11 | 132:23 133:3,5 |
| 128:22 159:11 | 310:10,13 | 16:25 | 133:9 144:18 |
| **action**   192:19 | **address**   32:3 | **affairs**   219:14 | 144:23 145:7 |
| 306:12 | 43:3 64:2 | 219:21 304:20 | 145:18 146:24 |
| **actions**   262:15 | **addressed** | 306:4 | 147:3 161:23 |
| **activities**   18:13 | 212:19 215:17 | **affect**   27:23 | 168:2 180:10 |
| **activity**   152:3,6 | 220:19 221:11 | **afraid**   221:24 | 188:10 206:12 |
| 236:25 293:8 | **adequacy** | 250:19 | 208:21 209:13 |
| 293:15,19,25 | 255:17 | **agencies**   40:21 | 256:14,18 |
| 296:1,6 | **adequate**   62:23 | 44:25 84:20 | 267:1 |
| **actual**   30:10 | **adjacent**   59:11 | 107:22 151:2 | **agreed**   20:13 |
| 121:22 180:23 | **adjective**   57:1 | 197:23 | 46:8 189:14 |
| 209:22 | **adjectives** | **agency**   5:13 | 269:4 |
| **actually**   10:8 | 196:6 | 58:13,19 77:13 | **agreeing**   298:7 |
| 52:18 65:3 | **adjust**   222:1 | 111:1 112:11 | **agreement** |
| 67:18 88:18 | **administration** | 124:8 142:2 | 252:16 253:9 |
| 90:6,9,11 93:14 | 6:22 240:7,14 | 166:13 201:6 | 255:13 |

**agrees** 171:23
**ahead** 18:2
28:13 31:14
70:21 91:13
135:19 200:4
200:14 205:8
234:14 254:4
262:12,13
266:5 288:9
290:17 305:1
**airport** 185:13
**al** 225:6
**alabama** 2:6
**alexandria** 2:11
**alfreds** 2:5
**aligning** 129:24
**allegation** 7:12
285:3
**alleges** 244:18
**allen** 2:3
**alleviated**
120:21
**allow** 187:24
**allowed** 88:23
**allude** 215:7
**amass** 97:17
**amassed** 98:1
**amazing** 303:3
**amended** 4:12
4:22 5:6 14:8
31:15,18 38:18
45:12 47:25
60:10 82:11,18
82:21 83:2,13
94:9 103:1
104:5 113:4

**american** 166:2
166:15 167:3
**americas** 3:18
**amosite** 159:9
**amount** 42:22
50:18 181:11
**amounts**
251:22 252:2
252:10
**amphibole** 6:6
72:16 159:9
160:3,15
161:25 162:6,9
163:2,6 262:25
263:4,14
268:18 293:22
294:4
**amphiboles**
72:12 113:16
114:3,4 116:4
116:10,15
117:10,19
295:1,25
296:17
**amphophile**
125:20,23
129:21 144:17
**ample** 162:5
**analysis** 40:8,9
40:14,19,25
41:1,22 42:2,3
44:13 150:2
158:16 192:18
263:3 271:11
273:21 282:4
283:5,8 284:11

297:8,14
298:22
**analytical**
176:17 177:15
252:13,15,19
253:6,8 255:11
255:12 257:21
258:11,24
259:22 262:20
263:24 273:15
291:3 292:17
298:10
**analyze** 262:16
293:24 298:18
302:8
**analyzed**
287:17 291:7
**analyzing**
287:23
**animal** 196:21
**animals** 226:11
226:14 302:9
**answer** 13:9
17:13,16,17
24:6,6 36:17
37:25 38:16
60:3,12 61:1,20
71:4 73:10
78:20 85:21
95:13 110:12
114:16 117:20
128:17 148:16
148:18,24
156:4 188:6,14
194:18 204:4
206:16 211:7

234:3,5,10,13
234:19,23
238:10 256:5
256:23 258:9
258:14 260:5
261:20,22
262:9,10 265:8
288:22 312:5
315:22
**answered** 129:3
132:4 220:7,9
**answering**
201:3
**answers** 57:14
58:2 60:23,25
**anthophyllite**
127:7 128:22
159:10 171:22
292:19,24
**anticipated**
172:8
**antitrust** 23:19
23:22
**antivirals** 17:22
**anybody** 56:8
**anymore** 177:8
**anything's**
12:12
**anyway** 26:25
68:11 121:8
172:17 234:3
310:22
**apart** 20:17
47:22 48:4
**apologies**
141:17

**[apologize - asbestiform]** Page 7

| | | | |
|---|---|---|---|
| **apologize** 24:18 | **application** | **approximately** | 243:10,14,21 |
| 27:16 28:14 | 226:12 242:21 | 24:14 27:4 | 243:25 244:10 |
| 30:12,13 42:23 | **applied** 146:14 | 29:23 45:22 | 244:13,17,17 |
| 65:14 68:17 | **applies** 32:20 | 46:17 51:22 | 244:21 245:15 |
| 70:22 74:4,25 | 47:6 146:22 | 55:3 57:4 80:20 | 245:18 246:2 |
| 95:12 117:23 | **apply** 73:25 | 92:24 | 246:20,25 |
| 143:25 150:20 | 112:6 208:23 | **approximation** | 247:2,4,6,8,17 |
| 156:18 157:2 | 270:5 317:22 | 24:24 | 248:5,8,13 |
| 169:14 175:5 | **appreciate** | **april** 1:13 7:16 | 259:6 260:4,8 |
| 191:25 206:18 | 11:20 17:2 | 30:5 82:22 | 260:14,20 |
| 208:8 212:9 | 40:12 54:24 | 210:12,25 | 279:24 280:1 |
| 295:19 | 66:15 108:11 | 301:19,22 | 281:24 |
| **apparent** 95:22 | 117:4 118:14 | 317:18 | **article's** 246:6 |
| **apparently** | 121:21,24 | **arbitrator** | **articles** 278:13 |
| 289:22 305:22 | 131:9 200:6 | 188:12 | **asbestiform** 6:6 |
| 306:8 | 232:2 238:22 | **arcane** 209:5 | 44:6 70:14,16 |
| **appeared** | 259:3 265:24 | 228:22 | 70:18 71:2 |
| 292:16 | 268:3 279:1 | **archives** 213:24 | 72:12 110:16 |
| **appears** 65:10 | 299:23 | **area** 20:12 50:2 | 113:16 114:2,4 |
| 145:10 | **appreciation** | 133:22 224:15 | 116:4,10,15 |
| **appended** | 79:22 | 278:13 283:7 | 117:10,19 |
| 317:21 | **approached** | **areas** 76:9,14 | 124:20 125:15 |
| **appendices** | 46:4 | 92:21 93:12 | 126:21 127:6 |
| 14:13 139:23 | **appropriate** | 137:12 179:8 | 128:14,22 |
| 142:11,16,17 | 98:24 114:23 | 181:4 | 129:14,18 |
| 143:15 293:13 | 114:24 127:19 | **argument** | 130:7,13,24 |
| **appendix** 4:23 | 128:9 133:20 | 134:13 315:20 | 131:1,25 132:1 |
| 5:6 13:24 14:8 | 134:10 150:11 | **arises** 50:22 | 132:17,25 |
| 81:25 82:3,12 | 208:18 209:24 | **arising** 213:4 | 133:2,8,12,15 |
| 82:18,21 83:2 | 230:16 234:20 | **arkansas** 71:23 | 133:21 134:10 |
| 94:9 | 298:10 | **arose** 56:21 | 135:7,14,25 |
| **applaud** 150:22 | **appropriated** | **arrived** 69:5 | 136:2,10,21 |
| 152:6 | 233:10 | **art** 193:4 | 137:7,17,21 |
| **apple** 89:5 | **appropriately** | **artful** 310:14 | 138:2,14 139:2 |
| **applicable** | 133:16 298:18 | **article** 7:8 40:6 | 143:7 144:9,19 |
| 156:4 | | 225:9,17 | 145:9 146:6 |

**[asbestiform - asking]** Page 8

| | | | |
|---|---|---|---|
| 147:2,11 148:4 | 125:16,17,22 | 253:25 256:16 | 261:6,10,11,17 |
| 149:5 150:10 | 127:2,4,20 | 258:22 259:20 | 263:25 264:20 |
| 151:15,15,16 | 128:9,20 | 259:25 260:12 | 298:13 314:6,7 |
| 151:17 160:2 | 131:20 132:15 | 261:3 262:20 | **aside** 96:16 |
| 160:15 161:25 | 133:14,20 | 263:1,4,14,15 | 202:25 206:5 |
| 162:6 163:2,15 | 134:17,18,19 | 263:17,18,25 | 219:5 237:1 |
| 172:18 193:10 | 134:21 135:3,5 | 264:11,25 | **asked** 27:21,25 |
| 251:19,22,25 | 138:4 140:12 | 265:4 268:15 | 28:2,19,19 32:3 |
| 252:2,18 | 141:3 145:23 | 272:19,23 | 38:19 43:2 |
| 253:11 255:15 | 147:18 148:4 | 276:5,16,17 | 53:25 67:13 |
| 258:25 262:16 | 150:10 155:1 | 277:17,18,22 | 80:22 86:11 |
| 263:2 281:2 | 155:14 158:17 | 282:3 283:8,13 | 87:3 91:2,4,5,6 |
| 283:4 295:1,23 | 159:5,6 164:7 | 285:4 287:18 | 91:7 94:1 98:8 |
| 295:23 296:9 | 165:10 169:21 | 287:21,24 | 98:18 99:11 |
| **asbestos** 5:9 | 176:8 177:19 | 288:1,15 289:2 | 101:10,24,25 |
| 7:13 40:23 44:3 | 179:8 188:18 | 290:24 291:2,3 | 102:25 104:15 |
| 44:5 45:4 58:16 | 193:9,11 201:7 | 291:9,16,20 | 105:8 122:12 |
| 59:4,15,24,25 | 201:12,13,17 | 292:1,3,18,19 | 132:4 134:16 |
| 61:8,17,22 | 201:24 202:2,4 | 292:21 294:3 | 183:12 184:15 |
| 63:10,11,13,13 | 202:4,6,9,9,10 | 294:23 297:6 | 217:12 227:10 |
| 67:15 69:21,22 | 202:17,21 | 298:24 299:16 | 247:12 249:8 |
| 70:7 71:6,19,24 | 203:1,5 206:3,8 | 306:16,20 | 260:3 276:12 |
| 72:2,7 73:4 | 206:9,14 | 310:21 312:10 | **asking** 23:11 |
| 74:8,16,23 | 207:17,18,23 | 312:14 313:13 | 85:20 98:22 |
| 78:13,17 79:19 | 224:14,20 | 314:2,12,16,16 | 105:7 116:25 |
| 90:21 109:1,5 | 229:14,19,21 | 315:9,11,18,25 | 118:1 129:13 |
| 110:16 111:1,5 | 230:7,9 232:4 | 315:25,25 | 134:17 144:8 |
| 111:21 112:9 | 232:15,19,25 | **ascribe** 136:4 | 149:19 205:22 |
| 113:13,22,25 | 233:1,17 235:1 | 137:5 | 206:10 208:5 |
| 114:9 115:9 | 235:5,10,11,18 | **ascribed** 115:19 | 226:9,13,20 |
| 118:23,24,25 | 235:23 236:9 | 137:23 | 227:5,10 |
| 119:5,7 122:6 | 236:16,17 | **ashcraft** 2:10 | 228:10 231:19 |
| 122:11,13,15 | 237:5,13,17,22 | **ashcraftlaw.c...** | 231:20,21,23 |
| 122:17,21 | 239:5 251:12 | 2:12 | 233:4 247:21 |
| 123:2,16,22,25 | 251:15 252:14 | **ashton** 174:19 | 250:21 256:2 |
| 124:5,20 125:4 | 252:25 253:7 | 260:15,19 | 258:3,4,7 |

[aspect - baby]                                                                Page 9

**aspect** 109:9
296:3 312:1
**aspects** 76:21
242:6
**aspersions**
261:16
**aspiration**
183:6
**assembled**
185:8
**assertion** 87:24
**assess** 258:25
289:23
**assessed** 296:5
**assessing**
263:23
**assessment**
186:2 257:18
258:17 259:24
**assessments**
299:7
**assigned** 217:3
**assist** 20:23
21:1 48:7
**assistance**
47:10,18,19
48:4 217:12
**assistant**
304:18 306:2
**associated**
59:11 144:11
169:20 172:14
208:19 230:17
230:23 231:15
233:11

**association**
61:7 205:14
241:24 304:21
306:10
**assume** 46:5
51:24 52:7
92:20 93:10,13
233:22
**assuming** 28:24
37:20
**assumption**
35:5,6 106:16
**assumptions**
34:9,16 35:19
35:25 36:4,6,12
36:19,21,25
37:3 106:15
**assurance**
166:15
**assurances**
58:23
**assure** 11:17
58:16 203:18
229:20 248:9
274:4 290:5
**assured** 58:22
202:22 207:5
229:10 235:9
309:9
**assures** 59:3
239:2
**assuring** 277:2
**attached** 7:23
9:12,17 10:11
98:15

**attempt** 78:12
**attempted**
88:16,16 89:1
297:5
**attending** 21:5
307:10
**attention** 27:24
108:10 230:3
288:14
**attorney** 46:6
100:19
**attorneys** 2:2
3:3,15
**audit** 269:5
**audited** 274:15
**audits** 38:10
180:22
**august** 269:7
287:15 290:19
**authored**
260:15
**authority**
217:10,16
260:12
**authorization**
5:19 153:13
155:5
**authorized**
268:14
**authors** 281:4
**available** 33:1
81:15,19
102:18,23
193:16 242:2
246:6 247:16
248:5 255:5,8

255:18
**avenue** 3:18
**average** 72:24
79:25,25 289:2
**avoid** 179:7
276:22
**avoiding**
236:14
**aware** 8:19
12:7 13:3 15:5
15:6,7 16:16
22:15 23:6
32:10 36:12
37:20 42:14,16
62:4 70:5 71:18
72:1 74:7 79:11
95:3 105:17
186:17,21
210:13,23,24
210:24 211:2,5
211:9,24 214:1
217:9 219:24
219:25 220:24
244:21 251:17
270:6 272:9
273:13 275:1
306:19

**b**

**b** 4:8 5:3 6:3
7:3 113:15
114:2 296:24
297:4
**babramson** 3:7
**baby** 22:22
35:14 39:3,7

**[baby - believes]**

Page 10

268:13 287:18
312:13
**back**  16:5,11
17:3 18:6,6
22:14 23:8
26:15 27:1 31:2
35:21 38:17
42:22,23 43:9
45:8 50:11
54:21 58:4
60:22 63:8
73:21 91:1 94:5
97:11,14
100:22 106:1,2
118:18 122:2
130:12 136:6
153:21 157:17
158:24 159:5
159:17 160:7
168:7 174:13
180:22 184:6
190:3 191:13
193:25 194:11
198:18,19
203:9 206:9
209:1 213:7
214:15 215:6
215:21 221:4
223:9 224:4
225:4 228:13
239:17 243:17
243:17 245:22
248:10 261:1
266:3 276:15
290:4 293:11
306:18 308:22

**background**
79:9 90:14
111:8 230:4
263:22 264:4
276:22 277:3
**backgrounds**
150:24
**backlog**  220:4
**backwards**
30:1
**bacterial**  77:21
**bain**  275:23
**ballpark**  54:7
**bankruptcy**
28:12 30:10
32:11 33:12
**bar**  92:4
**bard**  22:18
**base**  85:17
117:7
**based**  31:8
54:10 84:16,17
106:13,15,16
112:15 113:24
118:3 151:18
176:12 193:2
212:16 224:3
230:18 231:9
239:7 254:7
259:20 276:7
278:16
**basic**  61:4
72:22,22 74:18
74:20 77:7,16
77:21 79:5 84:6
109:11 112:6

146:12
**basically**  58:13
151:25 202:11
206:6 229:6
245:18 254:8
300:21
**basics**  165:13
**basing**  85:9
194:17 283:17
283:19
**basis**  44:15,22
105:22 129:10
129:12,16
192:25 248:3
253:13 261:4
276:8,25
**batch**  273:21
273:21
**bates**  5:10,20
6:7 7:17,19
34:22,25 94:3
141:4 153:14
155:4 160:16
168:5,19
176:19 244:1
266:10 301:18
301:22 303:16
303:19
**battle**  309:8
**baylen**  2:16
**bear**  208:17
230:15 309:17
310:10
**beasley**  2:3
**beasleyallen....**
2:7

**becoming**
273:16,20
**began**  46:18
115:14 262:15
262:18
**beginning**
52:10 62:24
85:4 87:14
115:17,21
272:6 273:22
**begun**  273:16
**belief**  318:4
**believe**  8:18
11:8,17 21:4
22:20 23:1 24:5
27:13 28:10
32:8,19 41:3,5
97:12,25 99:3
100:4 102:19
103:21 114:10
117:9 124:19
133:14 135:12
135:13 138:13
155:19 158:21
170:13 189:3,4
202:16 210:14
213:9 214:18
214:19 218:20
218:24 228:11
269:14,14
279:20 296:2
300:22 306:17
318:3
**believed**  207:24
**believes**  206:2
235:7 236:6

**[believes - c]**                                                                Page 11

238:16
**believing** 237:4
**bells** 302:17,21
**best** 70:24
86:21 158:15
158:19,22
300:11 318:4
**better** 27:16
90:14 119:19
146:6 162:23
263:22 283:1
**beyond** 85:2
98:24 111:8
195:24 231:21
**bias** 196:9
**biddle** 3:22
**big** 142:22
161:21 180:2
202:22 274:6
**bigger** 207:8,12
285:21
**biggest** 164:9
**bill** 174:19
260:19 261:17
262:3 263:25
264:20 298:13
314:6
**bind** 29:13
**binder** 9:17
10:1,2,3 182:20
184:10 185:8
**binders** 9:21,24
9:25 182:16,17
190:7
**bingo** 147:5

**biological** 71:14
73:25 75:17
152:2,5 191:3
196:20 236:25
293:7,15,18,24
296:1,5
**biostat** 18:24
19:12,14
165:13
**bit** 49:21 154:2
183:8 250:13
267:14
**biweekly**
269:24 271:8
273:12
**black** 5:17
142:5
**blah** 125:24,24
297:12,12,12
300:6,6,11,11
**blank** 174:14
242:15
**blanket** 36:3
**blinds** 277:3
**blips** 152:12
**blocking** 24:19
219:9,11
**blur** 72:8
308:23
**board** 15:24
16:4,6,24,25
111:19
**boards** 16:19
**bob** 219:15
**bodies** 197:23

**body** 142:14
193:2 205:13
224:23 225:3
**bogged** 65:21
**bolded** 96:17
96:19
**book** 20:14
213:7 214:7,8
214:10,20
284:6
**books** 19:23
20:4,19 185:5
**borrow** 222:9
**bottom** 41:12
126:24 281:15
**bought** 230:10
230:10
**bound** 14:24
**boundas** 3:4
**bounds** 99:3
**bradford** 39:5
39:10
**brain** 79:17
285:25
**branch** 217:5
**brand** 223:25
**break** 10:25
11:23 13:7 26:8
49:25,25 50:4
53:23 57:5
63:19,25 64:9
64:15 67:17
68:8 80:4
112:19 113:1
162:24 167:22
168:7 182:8

189:15,18,24
211:16,18
223:14 237:7
265:15,21,25
299:18
**brian** 3:5
**bring** 119:23
143:25 144:1
146:12 170:8
170:23 218:3
**brings** 150:25
**broader** 147:22
149:21
**broadly** 108:12
**broken** 120:4
**brooklyn**
307:21
**brought** 47:22
143:1
**brown** 100:23
**bucket** 86:9
98:15
**buckets** 55:4,6
**bullet** 304:15
**bunch** 199:1
**bureau** 258:21
260:10,18,21
**button** 49:2

|   c   |
| :---: |

**c** 2:1 3:1 4:23
5:6 81:25 82:12
82:18,21 83:2
94:9 193:1
317:1,1

[calcium - certain]                                                      Page 12

| | | | |
|---|---|---|---|
| **calcium**  292:23 | 226:11,13 | **carol**  241:2,3,4 | **causation**  38:19 |
| **calculate** | 304:22 306:11 | 241:8,11,13 | 38:25 39:4,16 |
| 110:24 | **capabilities** | 243:9 247:5,13 | 39:23 40:9 |
| **calculated** | 176:17 177:15 | 305:9,20 306:4 | 41:14,19 42:13 |
| 218:14 | 261:5 | **carries**  308:9 | 42:14,15 44:13 |
| **calendar**  30:7 | **capable**  263:3 | **carrying** | 178:21 196:15 |
| **california**  18:5 | **capacity**  144:25 | 281:13 | 196:17,17 |
| 18:14 | **captioned** | **case**  8:18 22:18 | 199:11 226:14 |
| **call**  22:9 24:7 | 317:10 | 22:20,23 24:17 | **cause**  39:7,22 |
| 24:21 25:6,17 | **carbon**  5:17 | 26:1,1,11,13 | 40:16 41:23 |
| 26:9 155:1 | 142:5 | 28:4 32:7 34:10 | 42:7 69:23 |
| **called**  20:23 | **carcinogen** | 36:1,14 37:4 | 224:23 287:22 |
| 22:12 28:5,6,7 | 40:24 44:4 45:4 | 38:24 39:21 | **caused**  42:10 |
| 28:20 60:16 | 202:5 314:25 | 45:23 56:16 | **causes**  226:10 |
| 85:24 156:9 | 315:15 | 69:20 70:13 | **causing**  202:13 |
| 214:10 280:25 | **carcinogeneses** | 71:1 72:1 73:2 | **caveat**  16:17 |
| 292:18,21 | 71:13 | 74:7,14 76:17 | **cavity**  191:5 |
| **calling**  297:24 | **carcinogenic** | 80:9,18 83:6 | 192:9 |
| **calls**  69:11,12 | 5:16 6:10,15 | 87:6 104:19 | **cc**  37:11 |
| **camera**  9:13 | 142:4 193:3 | 105:2 106:23 | **cc'd**  34:4 |
| 119:22,23 | 205:4 221:19 | 115:8 130:10 | **cc's**  219:5 |
| 120:2,4,4,11 | **carcinogenicity** | 199:1 211:10 | **ccr**  317:14 |
| 121:17,19 | 70:5,9,10,11 | 239:3 254:9 | **ceded**  148:6 |
| **campaigns** | 113:14 294:24 | 276:7 291:12 | **center**  8:9 |
| 179:17,18 | **carcinogens** | **cases**  22:3 | 71:10,21 216:8 |
| **campbell** | 138:8,8 | 23:11 | 216:10,11,14 |
| 145:14 | **cardiovascular** | **cast**  261:16 | 216:23 217:11 |
| **campus**  3:23 | 20:10 | **catch**  137:10 | 217:12 219:20 |
| **cancer**  5:14 6:9 | **care**  202:3,5 | **categories** | **central**  58:11 |
| 39:3,6,22 40:17 | 300:6 | 55:10 137:20 | 108:24 109:9 |
| 70:3 142:3 | **career**  105:25 | 173:21 | 235:21 |
| 196:3 205:2,16 | **careers**  198:8 | **category**  279:9 | **centuries**  75:13 |
| 208:15 212:1 | **careful**  26:4,14 | 279:12 | **certain**  20:24 |
| 216:22 220:25 | 76:4 114:14 | **caught**  152:3 | 51:19 77:23 |
| 223:21,21 | 115:5 122:20 | **caus**  38:22 | 80:5 90:10 |
| 224:5,20 | 192:17 | | 94:24 97:22 |

**[certain - chrysotile]** Page 13

99:11 106:13
107:21 109:4
114:25 144:16
147:17,20
163:13 173:20
173:21,23,24
176:9 179:6
212:18 220:19
234:17 244:18
266:11 293:10
296:3 307:11
**certainly** 12:20
30:8 39:15
42:17 47:13,18
62:2,3 67:23
69:22,25 70:4,4
70:10 72:20
73:8 75:6 76:5
76:19 77:6
78:23 79:11
84:8 87:3 95:4
96:22 101:8,23
104:14 106:7
115:17,20
116:8,12
129:19 133:5
136:1 140:2
151:5,10 158:4
158:8,20 172:7
173:25 194:8
196:15,19
197:9 198:24
199:2 210:23
211:2 228:18
229:12 230:5
237:15 242:10

247:9 253:24
257:15 270:21
272:4 273:18
274:2,12
275:24,25
300:16,20
306:23 313:24
**certainty**
310:20
**certificate**
317:21
**certified** 1:10
317:4,6
**certify** 317:8
**certifying**
317:25
**cetera** 18:7
19:13 27:18
30:11 45:3
59:20 72:5,21
73:23 89:12
99:16 112:10
123:12 267:9
**cfr** 115:1
226:22 233:9
**chance** 178:11
267:24 285:9
301:5
**chances** 313:13
**change** 45:24
219:25,25
318:6
**changed** 139:9
**changes** 318:5
**changing** 130:2

**character**
163:11
**characteristics**
136:12 151:20
163:14,17
173:25 176:13
270:3
**characterize**
40:14 86:21
134:1
**characterizes**
178:5
**charge** 71:10
71:22 114:20
**chart** 174:22,23
175:3,4,20,24
175:25 176:1,9
**chase** 19:24
**chat** 48:18 49:2
49:12 126:9,11
140:14,20
152:20 153:3
160:20 168:21
168:23 177:24
178:9,15
221:14 222:2
250:15 267:7
267:11 268:2
280:7 284:23
285:12 299:24
**check** 13:8
18:17 25:16
26:7 97:10,11
97:14 135:15
214:19 221:4
265:11,19

**checked** 12:15
213:7
**checking**
126:15
**chemical** 74:15
74:21 75:22
291:22,24
**chemicals**
77:24
**chemistry**
72:21
**china** 180:2,11
180:13,19,23
181:4,6,12,16
181:20 298:13
**chlorite** 292:15
293:21 294:5
295:4,7,15
**choice** 120:12
**choose** 123:22
**choosing** 120:3
**chose** 125:3
**christopher**
2:15 3:10
**chronic** 71:14
**chronology**
156:19 157:5
186:24 187:1
**chrysotile**
62:24 115:23
125:21 127:7
128:23 129:20
135:2 144:16
159:8 164:8,13
166:11,16,17
166:18 185:15

[chrysotile - comfortable]                                             Page 14

185:16 186:18
187:21 270:5,7
300:12
**cir** 91:4
**circle** 90:5
**circled** 219:8
**circuit** 67:25
**citation** 122:16
**cite** 33:6 105:16
124:16,21
125:25 127:14
130:4 136:7
140:10 169:16
170:10 191:6,7
225:8 227:18
257:9
**cited** 10:1 40:20
40:23 58:19
85:3 91:8 108:7
125:12 129:5,5
145:1 226:1
228:14,15
231:10 256:24
266:19
**cites** 125:14
145:13 181:20
225:12 266:11
**citing** 184:5
191:17,18
192:21 226:21
260:8 282:12
**citizen** 6:9,14
205:3 212:24
221:19
**citizen's** 7:7
213:19 215:16

216:4,21 217:8
217:16,24
220:25 223:17
224:3 226:4,25
230:19 231:10
233:5 249:25
250:3 251:8
**citizens** 91:5
211:23 212:1
215:20,22,23
215:25 216:2,7
220:4,12
**clamped** 65:11
**clarification**
233:15
**clarified** 272:1
**clarify** 56:3
152:5 162:16
266:4,6 299:21
299:22 307:17
**class** 105:18,23
107:1,14
278:22
**classes** 18:25
19:20
**classification**
193:2,6,6,8
315:6
**classified** 72:6
**classify** 314:24
315:5,14
**clean** 181:25
**cleaned** 315:10
**clear** 12:25
29:1 48:12
56:12 64:12

71:18 75:1 77:3
88:6 106:11
115:9 120:9,18
134:25 144:22
150:21 158:2,9
167:25 213:16
227:20 243:12
244:24 247:7
254:6 261:16
266:17,24
267:3,4 270:22
270:24 272:10
272:12 295:19
295:21
**cleared** 172:18
203:16
**clearer** 91:24
**clearly** 97:15
99:3 264:20
270:12
**cleavage** 41:15
41:23 42:4,6,10
42:13,15,19
**click** 153:18
178:14
**clicked** 161:2
**client** 110:8
189:11 277:9
**clinical** 19:15
24:2 42:16,17
**clinically** 80:1
**clip** 67:2
**clipped** 65:22
67:2
**clips** 9:17

**close** 25:9 66:13
129:14 250:18
264:17
**closed** 202:7
**closing** 100:20
**coalition** 6:9
205:3 212:2
216:22 223:22
**coast** 112:18
**codes** 218:1,8
**cohen** 3:9
**colleagues** 21:1
**collected** 98:4
**college** 75:11
75:20 254:15
**columbus**
22:19
**combined**
297:10
**come** 22:5 23:8
49:1 54:21
68:18 70:1 75:4
75:8,13 156:23
168:6 169:25
188:20 216:14
266:3 277:22
294:8 307:21
**comes** 124:3
138:7 151:13
196:18 202:19
223:24
**comfortable**
76:25 78:23
92:8,11 119:7
122:25 124:13
127:25 128:3,7

**[comfortable - conclusion]**    Page 15

129:7,24 130:5
197:21
**coming** 268:5
307:18
**commencing**
1:13
**comment**
289:10
**comments**
170:15,16
**commerce** 2:6
**commercial**
125:18 127:4
128:20
**commission**
11:14,15
**commissioner**
45:3 212:18,19
213:17 214:22
215:10 216:15
217:7,13 219:9
220:2,12,20
223:23 234:25
235:12,18
239:24 302:13
303:4 304:19
306:2
**commissioner's**
217:2 219:11
241:5 304:17
**committed**
208:12 210:3
**common** 158:6
292:14
**commonly**
130:24 131:24

132:25
**communicate**
56:14 210:6,9
**communicated**
27:5 28:9 94:20
**communicati...**
94:13
**companies** 31:7
32:4,6,9 43:4
63:2 167:17
200:9,12
273:20 274:3
274:15,16
**company** 35:9
38:12 60:14
110:8 111:14
111:18 187:25
201:6,11
202:15,16,23
206:2 232:16
235:16,16
268:13 309:23
313:18
**compare** 209:3
244:9 246:13
**compares**
291:25
**compartment...**
79:18
**competent**
305:15
**compilation**
12:4
**compiled**
215:19

**complaining**
270:4
**complaint**
103:1
**complete** 85:1
85:9,10,12
183:2,7 284:10
284:14
**completely**
201:15 267:1
274:10
**completeness**
258:15 262:5
266:12
**complex** 151:3
157:10 172:25
173:1 180:3,10
**complexities**
128:13 172:14
**complexity**
131:15 132:7
**compliance**
31:11
**complicated**
17:13,14 107:5
131:13
**complied** 115:1
**comply** 234:20
**comport**
270:19
**composed**
267:9 292:5
**composite**
269:25 270:16
273:12

**composites**
271:8 274:6
**compound**
292:9
**computer** 9:10
48:24 57:2
**computing**
285:25
**conceded**
304:16 305:25
**concept** 87:8
129:15
**concern** 120:21
**concerned**
207:17 252:9
**concerning**
212:20 220:20
**concerns**
302:19
**conclude** 118:5
**concluded**
116:24 199:13
200:8,9 225:6
316:15
**concluding**
190:10,17
196:1
**conclusion**
108:13 111:5
111:10 118:7
171:16 190:19
193:16 244:13
244:14,15
245:18,21
246:14,15
248:13 312:12

**[conclusions - contributed]**                                                     Page 16

**conclusions**
108:14 187:22
247:10
**condition**
129:19
**conduct** 32:4
43:3 88:8
252:23
**conducted** 51:7
252:15 253:8
255:13,16
270:10
**conducting**
274:20
**conference**
8:17
**confident** 59:14
112:3 314:3
**confirm** 276:19
**conflict** 28:23
29:1,4,5
**conflicted**
27:18
**confused** 99:13
99:21 101:14
191:13 227:3
**congress** 229:1
**connect** 36:20
79:20 237:16
237:16
**connection**
21:14 33:16
35:25 37:3
45:23 48:5
53:19 56:3,6
60:8 83:22

93:16 104:18
254:9
**consensus** 45:1
264:7,10
**consequence**
283:16
**consequently**
252:18 257:20
**consider**
106:25 207:20
**considerable**
60:2
**considered**
4:23 5:7 12:10
13:5 47:15,17
47:23 60:10
81:8,24 82:2,12
82:18,22 83:2,6
83:11,20 87:5
95:2 101:3
158:15 174:4
252:19 257:21
258:10
**consistent** 20:7
109:6 125:7
145:6 268:20
**consistently**
19:8,17 158:7
270:25 275:3
**consisting**
292:6
**consolidation**
22:24
**conspiracy**
277:5

**constituted**
283:5
**constitutes**
282:4
**consult** 56:8,12
**consumer** 5:19
6:17 7:12
153:12 225:13
240:2,9 242:20
242:23 248:1
284:4 285:3
287:17 292:4
297:5 302:13
302:19
**contact** 52:1
**contacted**
23:23 24:15
46:1
**contacting**
308:12
**contain** 117:14
179:8 251:19
252:2
**contained** 13:5
113:22,24
194:7 233:5
235:5 310:20
**containing** 5:10
124:20 126:21
141:4
**contains** 115:9
231:13 251:21
251:25 252:1
252:10
**contamination**
252:12

**content** 55:22
89:24 98:22
287:19 290:25
297:6
**contents** 143:22
143:23
**context** 37:25
38:2 40:2 42:20
108:24 136:15
136:24,25
137:13,16
146:9 147:22
149:18 150:12
295:24 300:16
**continue** 24:4
28:17 149:1
232:7
**continued** 3:1,3
5:1,3 6:1,3 7:1
7:3 57:15,17
60:22 61:3
263:5,19 269:8
**continues** 191:9
225:20
**continuing** 23:7
268:25
**contours** 18:21
**contracted**
158:11
**contractors**
35:11 59:14
61:7 159:3
167:17
**contributed**
39:7 263:5
279:10

**[control - counsel]**

**control** 58:21 59:8 154:19 179:19 180:2 180:11,13,20 181:6,11 199:1 202:8 236:4 262:17 317:24

**controls** 268:23

**controversial** 123:18

**controversy** 79:12,13 90:21 116:9 255:24 256:6

**convenience** 102:6

**conversation** 27:4,5,11 56:22

**conversations** 46:4,25 55:16 55:19,22,24,25 96:1 98:23

**convince** 164:6 164:11 166:13

**convinced** 230:9 235:22

**cook** 178:22 179:4 180:6

**cool** 249:23

**coordinated** 29:16,19,20

**coordination** 29:21

**copied** 12:23

**copies** 219:6

**copy** 10:24 11:8 11:18 14:12 49:15 66:19 131:7 143:10 218:1 249:9,11 249:12,13 250:16 258:20 260:9 262:22 280:17

**core** 232:23

**corn** 310:16 311:14,22

**corporation** 155:9

**correct** 16:3 17:8 21:6,7 39:19 50:24,25 65:25 74:6 81:21 82:4,13 82:14 83:15 97:3,9,17 105:10 106:2 108:14,18 110:5 123:3 124:17 126:6 128:20 135:8 135:22 159:15 162:1 163:3,4,7 169:15 173:6 179:9,17 183:19 192:19 193:17 203:6 204:9 206:14 211:24 215:2,9 215:11,13 223:23 225:8

225:11,22 237:24 240:19 240:22,25 245:3,4 252:1 257:18 258:18 270:10,16 275:22 280:21 280:22 281:2,3 281:6 282:6 289:24 293:2,5 293:6 297:19 303:10,10 306:13 309:1 318:4

**corrected** 238:23

**correction** 238:21

**correctly** 35:24 113:18 127:12 159:12 209:4 212:21 224:25 252:21 269:10 288:3 293:1 302:15 304:23

**correlated** 151:21

**correspondence** 214:2

**cosmetic** 5:9 6:6,11,16 31:6 32:1,4,6 43:4 43:14 44:17 58:12 138:11 141:3 160:3,16 161:25 199:14

205:5 208:17 208:24 213:12 215:5,6 217:4 221:20 225:5 242:20 251:12 251:17,20,24 252:9 259:1 262:15,19,24 263:6 268:20 274:13

**cosmetica** 224:6

**cosmetics** 84:2 201:2 230:14 241:23

**cosponsored** 6:19 239:12 240:4,11

**cost** 309:18

**costs** 310:10

**council** 305:19

**counsel** 10:25 13:19 24:8,16 25:20 26:8,10 28:6,6,7,19,20 37:2 47:19 48:5 48:12 49:1 52:25 53:1 54:16 55:25 56:8,15 64:15 65:15 66:1 68:23 69:15 89:11 90:20 91:9 93:20 94:1 94:7,14,20 95:3 95:20 96:2 98:9

[counsel - david]                                          Page 18

| | | | |
|---|---|---|---|
| 98:18,23 99:1,8 | 316:7 317:5,25 | 243:20,25 | 92:2,25 93:13 |
| 99:17,21 | **cover**  51:22 | 262:22 263:2 | 93:17 97:6,12 |
| 101:10,22 | **covered**  46:6 | 268:18,20 | 97:13 213:10 |
| 168:4 183:13 | **covering**  47:21 | 270:1 304:10 | 214:24 221:4,5 |
| 184:3 219:16 | **covers**  125:15 | **ctfa's**  269:2 | 275:20 |
| 219:17,19 | **cplacitella**  3:12 | **ctisi**  2:17 | **databases** |
| 231:1 246:23 | **cprlaw.com** | **current**  53:16 | 91:12,19 |
| 254:22 258:5 | 3:12,13 | 208:16 264:10 | **date**  15:10 |
| 316:7 | **cralley**  225:6,7 | **currently**  19:22 | 45:12 50:17 |
| **count**  93:15 | 225:9 | 20:4,20 | 58:19 103:23 |
| 257:14 272:23 | **cramer**  194:13 | **curriculum** | 104:6 160:5,9 |
| 276:1 283:20 | 198:25 225:22 | 4:11 14:3 | 160:10 187:5,6 |
| **counting** | 226:1 | **cut**  10:14 14:11 | 193:24 211:13 |
| 313:22 | **created**  47:16 | **cutoff**  223:16 | 287:4 301:19 |
| **countries**  291:8 | 277:13 | **cv**  13:19 14:19 | 318:19 |
| **country**  111:13 | **credible**  109:2 | 15:4,8,16,18,21 | **dated**  4:13,16 |
| **couple**  9:10 | 109:24 111:3,6 | 21:4 26:19 | 4:17 6:11,13,18 |
| 12:14 13:8 | 111:20 124:10 | 106:4,5 107:3 | 7:15,16,18 15:2 |
| 63:21 64:11 | **credit**  276:3 | **cv's**  15:16,16 | 15:8 31:16,20 |
| 102:10 136:8 | **critical**  205:11 | **cyprus**  155:8 | 45:11,17 48:13 |
| 191:1 208:10 | 274:16 | 272:7 273:19 | 48:15 82:22 |
| 209:2 225:9 | **criticizing** | 300:5 | 104:10,23 |
| 250:7 267:18 | 274:20 | | 176:18 205:5 |
| 270:21 | **crocidolite** | **d** | 212:2,3 221:18 |
| **course**  56:2 | 159:10 | **d**  4:1 5:1 6:1 | 223:22 240:3 |
| 123:17 154:3 | **cross**  89:10 | 7:1 8:1,1,1 88:4 | 240:10 243:19 |
| 190:15 232:12 | **crr**  317:14 | 126:16 141:12 | 268:9 285:6 |
| 247:23 259:17 | **crush**  62:12 | 141:15 250:25 | 301:22 303:19 |
| 264:22 266:25 | **crushing**  61:23 | 251:7 284:23 | 304:7 317:18 |
| **courses**  75:19 | 62:8 80:6 | **damn**  262:12 | **dates**  137:20 |
| 75:22 | 313:19 | **data**  126:22 | **dating**  224:4 |
| **court**  1:1,11 | **crystal**  144:12 | 172:3 181:11 | 225:3 |
| 63:19 68:4 | 300:13 | **database**  60:18 | **daubert**  86:6 |
| 112:21 141:16 | **ctfa**  33:3 58:11 | 60:19 86:12,16 | **david**  1:8 4:4 |
| 168:11 189:22 | 155:14 159:5 | 86:22,23 87:10 | 4:11,13,15 14:4 |
| 249:21 301:15 | 160:2 241:24 | 90:12,19 91:15 | 31:19 45:17 |

316:14
**dawned** 58:25
**day** 57:25 183:1
185:13 255:3
312:5,8 318:22
**days** 12:14 13:8
73:22 99:14,15
102:7
**deal** 8:25 151:2
202:22 235:24
**dealing** 39:14
215:23 220:6
293:7 296:15
**deals** 61:9
146:20 193:10
214:21
**dealt** 79:13
83:25 84:13,15
84:22 134:11
214:22 216:7
216:10 235:9
**debate** 172:10
**decade** 257:10
**decades** 122:11
159:19 165:24
197:11 198:19
236:6 275:4
**december** 4:18
48:13,15 50:17
51:2,21 140:10
145:10
**decide** 100:7
136:22 146:21
147:10 188:2
188:11 243:23
278:2

**decided** 309:13
310:22 311:6
**deciding** 152:16
**decision** 19:15
146:10 233:21
302:8
**decisions**
124:18
**deck** 157:4
176:2,24
177:14
**decks** 169:10
**decrease** 150:1
313:12
**dedicated**
105:25 241:20
242:16
**deduce** 158:8
**deep** 79:22
194:5 199:8
**defend** 309:14
**defendant** 3:15
32:4,6,20 33:10
43:3 170:14
**defendant's**
193:21
**defendants**
32:21 86:4
87:15 124:9
198:13
**defended** 311:9
**defending** 31:6
32:8
**defense** 95:23
100:25

**defenses** 309:7
**define** 76:6
132:13 133:13
133:20 136:22
145:15,15
146:17 151:10
151:16 296:11
**defined** 41:19
123:5,8 132:15
132:17 136:11
149:23 159:7
291:17,21
**defines** 150:10
150:10
**defining** 146:3
**definition** 46:1
118:23,24,25
119:6,8 122:12
122:17,25
123:2,6,6,15,20
123:22 124:11
124:14 125:3
125:10,11,11
126:2 127:19
128:2,9 129:3,4
129:6,19,25
132:6,8,10,12
132:13,14,19
132:21,22
133:4,8,11,15
134:11,16,18
134:19,21,24
135:6,14
136:16 138:25
139:4 143:6
144:9,18 145:9

145:13,19,20
146:3,6,21
147:2 149:10
150:13 151:6
155:1 159:16
159:18 163:14
165:4 278:2
286:24 287:21
288:1 291:2,15
292:3,14,21
295:22
**definitions**
119:5 122:6,11
123:25 124:5
127:22 135:5
136:10,13,18
137:21 139:2
144:8 145:23
147:16 151:18
293:18
**definitive**
200:23,24
202:20 204:10
204:11,16
205:18,22
**definitively**
200:24
**degree** 196:20
310:19
**delegated**
217:10,16
**delegation**
304:10
**delivery** 316:8
316:10

**[delved - difficult]**                                                Page 20

| | | | |
|---|---|---|---|
| **delved** 39:15 | **derfler** 219:16 | 314:18 | **dictated** 47:5 |
| **demarcation** | **derivation** | **detectable** | 48:2 |
| 75:1 | 138:18 | 268:15 271:13 | **dictating** 55:16 |
| **denial** 109:23 | **derived** 171:2 | 271:14,15 | 55:20 96:2 |
| **dentist** 55:1 | **derives** 43:13 | 276:14,14,16 | **differ** 132:10 |
| **department** | **describe** 138:22 | 277:21,24 | **different** 9:15 |
| 308:11 | **described** 110:4 | 278:3 291:9 | 9:17 12:5 33:3 |
| **depend** 137:7 | 230:19 | **detected** 272:22 | 34:22,25 51:16 |
| **dependant** | **describes** 127:5 | 276:19 277:16 | 53:2 55:4,5,9 |
| 203:4 | 128:21 | 287:18 314:19 | 64:13 72:2,4 |
| **depends** 37:25 | **describing** 66:4 | **detecting** 263:3 | 73:9,18,24,25 |
| 38:3 136:5 | **description** | 272:20 314:20 | 88:3,5,7 89:24 |
| 237:3 286:12 | 4:10 5:4 6:4 7:4 | **detection** 276:9 | 91:3 92:15 |
| 311:5 | 9:3 | 281:20 282:2,5 | 97:16 110:21 |
| **deposit** 176:2 | **descriptive** | 283:4,6,9 | 119:4 122:5,10 |
| 177:16,21 | 254:24 | 300:10,12,14 | 124:10 127:14 |
| **deposition** 1:8 | **deserved** 17:11 | 314:2 | 127:22 130:2 |
| 11:14 24:13 | **designate** 123:9 | **determination** | 136:10,12,12 |
| 66:16,18 68:22 | **designation** | 146:5 201:17 | 137:20,20,21 |
| 68:23 69:1,9,16 | 125:18 | 291:4,21 | 137:22,24 |
| 81:17 97:8 98:2 | **desktop** 153:21 | 300:14 | 139:2,22 |
| 98:10,13,14 | 153:22 154:7 | **determine** | 161:10 165:15 |
| 99:9,15,16,19 | **despite** 109:17 | 253:25 297:6 | 169:8 172:25 |
| 99:25 100:8 | **detail** 33:14 | **determined** | 175:22,23,25 |
| 101:9 102:2 | 61:10 72:13 | 44:3 230:12 | 191:1 199:11 |
| 288:21 316:14 | 88:20 109:8 | **determining** | 202:14 218:9 |
| **depositions** | 111:24 159:25 | 252:13 253:6 | 227:6 270:2 |
| 86:15 97:1,13 | 185:12,18 | **developed** | 274:10 280:18 |
| 97:18,21,22 | 195:21 | 252:14 253:7 | 280:23 291:7,7 |
| 98:4,19 99:18 | **detailed** 66:10 | 255:11 262:21 | 291:8,25 |
| 99:20,22 101:4 | 256:21 | **development** | **differential** |
| 120:10 | **details** 172:23 | 283:7 300:2 | 310:17 |
| **deposits** 177:19 | **detect** 62:24 | **diagnostic** 78:5 | **differently** |
| **depth** 106:1 | 78:12 253:25 | 78:9 | 83:12 |
| 178:11 | 271:15 276:17 | **dick** 218:22,23 | **difficult** 205:16 |
| | 277:1,2,17 | 253:18 263:10 | |

**[difficulties - document]**                                               Page 21

**difficulties**
  222:24
**diffraction**
  291:23
**digress**  58:3
  84:12
**dimensions**
  62:15
**diminish**
  313:11
**dioxide**  5:17
  142:6
**direct**  317:24
**directed**  47:12
  216:24 219:16
  223:23 226:25
  227:12,13
  230:20 231:11
  233:6
**directing**
  234:17
**direction**  64:13
  206:20 317:24
**directly**  227:13
**disagree**  145:19
  179:9 188:21
  253:13 254:2
  257:23 258:13
  259:23 260:2
  311:23
**disagreeing**
  275:18
**disagreement**
  106:21 173:15
  254:7

**disagreements**
  106:6 107:21
**disagrees**
  171:24 172:21
  173:9,11
**disclosed**  22:3
  23:15,18 26:5
**disclosure**
  23:22
**disconnect**
  48:25
**discovery**  33:1
  60:19 81:16
  86:12,16,23
  87:10 90:12,18
  92:1,25 93:13
  93:17 97:6,10
  97:12 214:24
  221:5
**discuss**  39:10
  40:2 78:9 124:1
  128:4,11
  131:16,17
  180:8 182:23
  185:20 195:21
  206:4
**discussed**  81:4
  83:19 133:16
  183:11 184:20
  186:3 270:15
  302:11 304:13
  316:1
**discusses**
  278:14
**discussing**
  41:20 128:7

197:21 198:8
  242:6 302:5
**discussion**  8:13
  40:1 49:16
  122:4 123:8
  153:25 154:4
  167:6 168:13
  171:4 174:24
  176:21 184:20
  223:7 225:21
  265:20 299:17
**discussions**
  108:6 242:5
**dismiss**  205:16
**dispense**  198:8
**dispersive**
  297:7
**dispute**  312:3
**distance**  106:22
**distinction**  17:2
  114:6 115:5
**distinctions**
  293:9
**distinguish**
  32:16
**distinguished**
  106:5
**distracted**
  121:4,13
  249:20
**distractions**
  108:1
**distribution**
  62:9 172:25
**district**  1:1,1

**diverse**  150:23
**divide**  176:4
**divided**  257:6
**doc**  79:25
**docket**  224:1
**dockets**  223:24
**doctor**  13:22
  31:23 42:23
  53:16 64:11
  80:1 112:20
  113:3 122:3
  126:20 127:10
  142:20 152:24
  154:24 166:21
  190:2 205:8
  211:20 233:2
  234:4 239:10
  240:17 243:7
  246:18,22
  247:12 248:2
  250:8 251:23
  258:4 259:8
  266:2 267:13
  267:23 277:12
  280:14 281:9
  281:10 285:9
  286:6 293:21
  297:22 301:4
  302:3 316:2
**document**  6:5
  6:17 7:11 33:7
  33:9,24 34:6,7
  34:11,23,24
  35:2 37:6,9,10
  37:12,18,19,21
  38:6,7 40:20

49:18 88:14,21
88:22 89:1
90:18 92:1 94:2
97:5 112:7
122:21,23
126:13,14
131:10,12
136:21 141:19
142:18 143:5
145:1 150:13
152:22 154:11
160:14 167:24
168:17 175:2
178:17 182:6
184:14 222:11
233:25 240:8
244:1,2 256:11
258:6 264:3
269:12 279:15
285:2,11,22
286:15 288:11
300:3 304:4
314:22
**documentation**
268:14
**documented**
59:21
**documenting**
269:5
**documents**
9:25 10:3 33:2
33:4,15,18,19
33:20,21 34:1,3
34:6,19,20,21
34:21 38:5,9
60:17,20 65:11

65:22 67:9
68:14 78:19
81:4,18,24
85:14 86:2,7,15
86:18 88:4,12
88:14 89:3,8,25
90:3,9,10,14
91:8,17 92:7,9
92:24 93:11
94:6,7 96:3
97:20,24 98:7
110:15 111:8
124:22 135:23
136:1 142:25
154:6 159:19
167:10,19
174:20 180:12
182:3 183:13
184:5 185:11
185:18,25
187:7 222:6
235:6 261:14
264:4 267:18
272:3,5 275:8
275:15 300:18
307:16 308:23
313:24
**doing** 50:10
55:17,18 60:21
71:19 110:3
117:5 163:18
175:13 178:17
192:17,18
271:21 272:2
274:24,25
280:16 289:7

296:19 297:20
305:21 306:6
307:13
**doom** 263:11
**dose** 113:15
294:25
**dots** 36:20
**double** 97:10
97:11,14
135:15 214:19
**doubt** 113:23
198:11 229:8
232:3 314:10
**download** 98:7
103:4 153:10
153:20
**downloaded**
98:5 303:24
**dr** 8:6 14:9
31:15 48:19
49:6 63:18 64:1
66:7,24 67:19
69:4 99:8
101:19 102:7
105:4,13,14
106:16,25
107:13,14
108:14 109:16
110:3,10 112:9
119:13 120:15
120:24 131:4
137:12 148:23
153:4,17
161:24 171:18
171:23,24
172:21,22

173:5,5,9,11,12
174:5,11
177:23 179:6
184:16 187:11
188:3 205:12
231:11 234:18
242:7,9,13,18
246:7 247:5,14
247:17 248:4
261:6,10,11
263:11 267:6
278:17,22
279:6 283:1
288:16 289:4
293:5,14
299:20 305:14
305:16 306:3
306:19 307:9
**draft** 47:3
243:18
**drafted** 47:24
**drafts** 89:17
**draw** 114:6
187:21 293:9
**drawing** 115:4
174:13 242:15
**drenzi** 3:13
**drew** 3:10
**dried** 269:25
270:15
**drift** 52:15
**drill** 179:17,17
**drinker** 3:22
**drive** 3:23
**drives** 171:20

**[driving - environment]**                                                    Page 23

**driving** 302:7
**drop** 49:12
  152:19 177:10
  221:13 267:20
  280:6 284:22
**dropping** 49:10
**drug** 6:22 7:6
  31:9 43:14 84:7
  138:10 240:7
  240:13 241:5
  241:22 250:2
  274:13
**due** 237:21
  253:18 300:12
**duly** 8:2
**dunk** 229:15
**dutch** 7:12
  284:4,20 285:3
  287:17 289:14
  289:15,19
  290:16,18
  292:3 297:5
**duties** 32:3 43:3
  43:6,6,16
**duty** 232:5
  238:4
**dx** 267:20
  280:10 285:16

**e**

**e** 2:1,1 3:1,1 4:1
  4:8 5:1,3 6:1,3
  7:1,3 8:1,1
  25:16,17 33:22
  64:2 317:1,1
  318:1,1,1

**earlier** 116:2
  182:25 239:19
  250:7
**early** 70:2
  87:13 124:11
  224:12 225:5
  235:25 251:18
  252:8 253:1,5
  253:21 255:18
  258:12 294:15
  308:20
**earnest** 29:24
  30:16 46:13
**ease** 202:12
**easier** 14:12
**easiest** 14:18
**east** 112:18
**easy** 165:20
**eclipse** 50:1,4
  168:10 211:15
**edge** 297:16
**edit** 161:8
**edt** 1:14 316:15
**educate** 170:20
**education**
  308:12
**effect** 16:12,13
  16:18 109:13
**effective**
  179:19
**effectiveness**
  287:9
**effects** 41:15,24
  42:7,9 80:15
**effort** 88:11
  95:20 151:24

**eight** 10:16
**either** 12:9
  25:15 28:5 48:7
  66:19 134:22
  213:4 219:13
  222:25
**electron** 73:21
  157:25 158:12
  253:17,20
  254:13,17
  255:4,7 286:10
  297:7,13 300:4
**electronic**
  273:15
**electronics** 9:8
**element** 298:24
**elements** 39:24
  292:22
**ellodi** 15:24
  16:4,5,19,24
**elongate** 152:1
  296:2,19
**elongated**
  130:25 131:25
  133:1 152:1
**else's** 222:10
**eluded** 209:11
**employ** 176:5
**employee** 261:7
**employees**
  37:10 315:7
**enclosed**
  258:20 260:9
  262:23
**enclosure** 6:14
  221:18

**encountered**
  148:1
**ended** 163:22
  165:24 178:13
**endometrial**
  191:4 192:9
**ends** 12:15
  185:13
**energy** 297:7
**engage** 28:20
  29:10,10
**enlarge** 161:7
**ensuing** 183:12
  309:24
**ensure** 195:8
**enter** 309:8
**entered** 92:14
  157:7
**entering** 92:13
**entire** 39:11
  47:3 49:1 86:12
  110:3 215:12
  269:5 293:12
**entirely** 150:17
  254:16
**entirety** 47:24
  51:25
**entitled** 1:9 6:5
  6:17 145:15
  160:15 240:9
  258:22 260:11
**entity** 274:10
**entries** 94:24
**entry** 225:7
**environment**
  171:21

[environmental - ewald]                                                    Page 24

| | | | |
|---|---|---|---|
| **environmental** | **esq** 2:4,4,5,5,10 | 115:16,20,22 | 64:8,10 65:1 |
| 170:4 | 2:15,20 3:5,10 | 117:8,11 118:3 | 66:8,15,21 |
| **epi** 10:1 12:13 | 3:10,17,17,23 | 174:2 181:5 | 67:16 68:1,7,10 |
| 190:6 315:8 | **essence** 29:17 | 187:14,18,20 | 73:16 74:12 |
| **epidemiologi...** | 152:4 228:23 | 188:8,17,22 | 82:5,10,15,20 |
| 147:18 194:13 | 229:1 230:8 | 190:24 191:17 | 83:4 89:19,22 |
| 194:18,25 | **essential** 61:13 | 191:18,19,22 | 95:10 96:14 |
| 195:11 196:23 | 61:14 67:12 | 192:12,22 | 98:25 99:7 |
| 311:17 | 147:7 200:18 | 193:13,20 | 100:17 104:7 |
| **epidemiologi...** | **established** | 194:6 195:23 | 105:6 108:4 |
| 198:7 | 113:17 114:19 | 196:21,23 | 113:2 118:15 |
| **epidemiology** | 172:12 295:2 | 197:20 200:23 | 120:1,6,14,23 |
| 18:23 19:12,14 | **estimate** 53:18 | 200:24,24 | 121:21 122:1 |
| 39:9 165:13 | 54:9,10,23,25 | 203:15 204:10 | 124:15 125:1 |
| 172:17 195:20 | **et** 18:7 19:13 | 205:13,17 | 126:10,17,19 |
| 195:25 196:3,8 | 27:18 30:11 | 225:3 226:4,10 | 129:8 130:19 |
| 196:12,14,18 | 45:3 59:20 72:5 | 226:15,24 | 130:21 131:18 |
| 196:24 197:5,6 | 72:21 73:23 | 227:11,14,25 | 132:9 134:3 |
| 197:8,22 198:4 | 89:12 99:16 | 229:11 230:6 | 135:16 137:11 |
| 198:18 199:9 | 112:10 123:12 | 230:19 231:10 | 137:14 138:12 |
| 203:2,9,11,14 | 225:6 267:9 | 233:5 235:24 | 138:19 139:15 |
| 203:19 206:12 | **etiology** 304:22 | 277:12 294:23 | 140:4,8,21 |
| 207:3 225:21 | 306:11 | 307:3 312:24 | 141:7,10,13 |
| **epstein** 202:19 | **evaluation** 5:15 | 312:25 | 142:8 143:2,19 |
| 221:11 | 142:4 242:21 | **evidentiary** | 144:4,5 145:4 |
| **epstein's** | 247:25 | 85:16 306:21 | 148:8,17 149:2 |
| 200:21 211:12 | **events** 85:3 | **evolved** 73:12 | 150:5,18 152:9 |
| **equally** 305:20 | 177:20 | **ewald** 3:17 4:5 | 152:11,15,23 |
| **era** 137:3,6,13 | **everybody** 8:12 | 8:5,7,9,14 | 153:7 154:3,23 |
| 137:16 | 316:8 | 11:12,19 12:1 | 157:6,16 |
| **errata** 266:8 | **evidence** 37:18 | 14:6 23:13,16 | 160:12,21 |
| 267:9 | 60:17 81:20 | 24:1 31:13,22 | 161:18 166:20 |
| **error** 221:3 | 85:24 86:1 | 35:20 37:1 38:1 | 168:1,4,24 |
| **errors** 287:22 | 87:15 109:5,18 | 45:7,20 48:10 | 169:1 173:7 |
| **especially** | 110:15 111:23 | 48:21 49:7,9,17 | 175:7 176:21 |
| 300:10 | 112:15 113:12 | 50:5,9 63:24 | 177:3,5,9 178:1 |

| | | | |
|---|---|---|---|
| 178:7,18 181:1 | 288:24 289:21 | 289:13,15 | **excused** 316:13 |
| 181:22 182:24 | 290:12 292:12 | 293:13 298:21 | **exec** 216:25 |
| 183:22 184:17 | 294:11 295:13 | 302:16 | 217:1 |
| 185:23 186:15 | 296:21 298:6 | **examination** | **executive** 217:1 |
| 188:20 189:1 | 299:19 301:1,3 | 4:3 8:4 | 241:16 |
| 189:19 190:1 | 301:10,13,17 | **examine** 162:5 | **exercised** |
| 195:18 198:16 | 302:1 303:13 | 162:8 163:1,5 | 268:23 |
| 199:19,22 | 304:5 307:5 | **examined** 8:2 | **exhibit** 4:10,11 |
| 200:3 202:24 | 308:3 310:7 | **examining** | 4:12,15,17,19 |
| 203:20 204:20 | 316:2,6,10,12 | 225:13 | 4:21,22 5:4,6,8 |
| 204:23 205:7 | **exact** 22:24 | **example** 19:6 | 5:12,18 6:4,5,9 |
| 206:24 211:17 | 54:7,17 72:3 | 24:2 40:23 | 6:13,17 7:4,5,8 |
| 211:19 218:11 | 102:21 198:23 | 51:21 84:21 | 7:11,16,18 14:2 |
| 221:15 222:9 | 264:8 292:10 | 103:10 125:5 | 14:3 31:15,18 |
| 222:13,20 | **exactly** 12:6 | 162:23 163:1 | 45:10,14,16 |
| 223:4,12,15 | 17:8 21:7 24:21 | 171:3,22 176:1 | 48:11,14 64:14 |
| 231:7,8 233:19 | 25:9 27:9 29:13 | 183:23,24 | 64:22 82:6,7,16 |
| 234:5,8,10,12 | 38:21 52:5 | 184:11 186:16 | 82:17,23 83:1 |
| 236:11,21 | 58:25 71:3,7 | 188:2 197:14 | 83:12 94:9 |
| 238:8,21 240:1 | 72:7,24 73:11 | 217:23 219:1,4 | 140:18,20 |
| 240:16 246:17 | 74:11 79:16 | 219:12 246:11 | 141:1,12,18 |
| 248:20,25 | 87:12,22 88:1 | 288:16 292:19 | 142:1 145:11 |
| 249:4,17,23 | 90:4 94:19,21 | **examples** | 152:18,19 |
| 250:5,25 251:2 | 100:24 102:8 | 272:22 | 153:11 155:3 |
| 251:3 254:3,23 | 104:4 116:24 | **excellent** | 159:4 160:13 |
| 256:1 257:11 | 117:6 148:9 | 156:11 277:23 | 160:14 205:2 |
| 261:18 265:6 | 156:21 157:10 | **except** 24:2 | 211:22 221:13 |
| 265:21 266:1 | 158:2,3,9 | **excerpting** | 221:17 223:17 |
| 267:12,19,22 | 162:22 169:11 | 171:13 | 240:3,8 249:18 |
| 273:8 275:5,11 | 176:11 177:2 | **excuse** 120:8 | 250:1 279:23 |
| 277:10 278:5 | 185:12 188:11 | 130:14 139:12 | 280:1 285:1 |
| 279:3,22 280:5 | 198:9 204:12 | 148:16 153:1 | 301:9,11,21 |
| 280:10,12,13 | 210:1 211:11 | 159:1 184:24 | 303:16,18 |
| 281:12 282:1 | 228:14 245:20 | 189:13 247:20 | **exhibits** 7:23 |
| 284:8,22 285:8 | 248:6 272:1 | 247:20 281:9 | 81:17,18 86:3 |
| 286:11 287:11 | 273:25 289:12 | | 87:20 97:8,13 |

98:10,15 100:1
100:9 101:4,11
101:25 102:1,3
**exist**  116:2
246:16
**existence**  58:14
115:22
**exists**  89:21
**expand**  58:8
62:6 284:15
**expanded**
162:11
**expect**  63:11
78:3 109:4,14
172:1
**expected**  93:2
109:14 173:22
**expenses**  50:23
**experience**  31:8
45:2,2 77:2
92:7 181:3
**expert**  4:12,15
21:14 22:4
31:15,19 35:8
45:16 51:12
69:20 70:13
71:1,25 72:11
72:17 73:2 74:6
74:14 76:12
77:5 79:3 80:8
99:2 102:11,16
103:3,8 105:18
105:21,21,23
106:8,9,11,14
106:15 107:1
107:14 110:5,7

130:10 138:1,3
138:6 170:14
170:17 174:4,6
211:10 231:25
256:17 294:1
**expertise**
108:12,21
111:4,7 112:13
133:22 146:4
146:17,24
147:1,22
149:12 150:24
165:9 179:9
188:1,6 216:12
283:18 293:3
**experts**  39:12
56:19 76:8,19
78:8 151:1
170:22 195:21
196:7,14
216:10
**explain**  125:2
148:11,19,20
**explained**  50:21
**explicit**  132:6
**exposed**  302:8
**exposure**  39:21
40:16 42:10
44:1,5,17
126:21 205:15
224:6
**exquisite**  74:17
185:11,18
**extended**  52:2,3
251:16

**extensive**
268:23
**extensively**
84:1
**extent**  78:3
88:22 98:25
179:5 183:1
**exterior**  224:15
**external**  119:23
158:14
**externally**
37:12
**extra**  267:4
**extremely**
62:16
**eyes**  121:6,12

**f**

**f**  317:1
**face**  32:5 37:9
43:4,19 109:22
110:15,17
119:17,20
120:22
**facility**  11:8
**fact**  62:12,25
63:1,4 87:24
88:2 125:9
139:1 150:12
169:9 172:22
187:12 192:21
197:8,15 220:3
237:22 239:8
243:16 244:12
244:14,24
261:7 264:9

265:4,5
**facts**  34:17,18
38:4,6 47:12
60:16 85:22
86:17 87:1,11
87:20 88:10
90:12,18 91:19
91:19,24 97:4
106:13 107:10
271:3
**factual**  133:6
**faculty**  20:25
**faegre**  3:22
**faegredrinker...**
3:25
**fail**  197:16
**failed**  190:19
198:13
**failing**  193:21
194:20 195:14
**fair**  8:20 12:5
17:23 35:16
41:18 42:22
51:1 54:1,19
72:14 78:10,14
78:15 183:4
184:21 191:5
191:11 254:10
263:25 298:5
302:25
**faith**  151:5
**fall**  186:25
**fallacy**  263:8
**fallen**  121:19
**falls**  121:18
290:10

**[false - filed]**

| | | | |
|---|---|---|---|
| **false** 62:18 | 205:9,17,19,23 | 206:5 207:16 | 195:5 236:24 |
| **familiar** 73:8 | 205:24 206:2 | 207:21 210:23 | 236:24 264:25 |
| 160:1 225:17 | 207:13 208:11 | 236:8 253:13 | 266:9 271:12 |
| 239:11 242:8 | 209:8,14,16 | **fdca** 226:22 | 271:14 276:2 |
| 285:23 | 210:7 211:22 | **feature** 89:7 | 277:16 283:9 |
| **famous** 175:1 | 213:2,4,8,18 | **february** | 293:8,10,10,15 |
| **far** 33:12 37:14 | 214:12,22 | 241:20 268:9 | 293:19 296:1 |
| 39:8 129:15 | 215:10 216:21 | **federal** 40:21 | 296:25 |
| 148:3 158:12 | 217:7,16,25 | 43:14 63:9 | **fibres** 126:21 |
| 198:19 254:18 | 220:11 228:22 | 84:19 138:10 | **fibrosity** |
| **fatal** 314:20 | 229:24,25 | 274:13 | 144:11 |
| 315:1,4,6,12,16 | 230:2,6 232:19 | **feeding** 260:22 | **fibrous** 44:6 |
| 315:19 | 233:23 235:7 | **feel** 114:23,24 | 113:16 129:17 |
| **favor** 26:17 | 235:22 236:6 | 167:6 197:20 | 129:20,20 |
| 116:18 123:24 | 237:4,21 | 228:7 261:12 | 135:2 144:12 |
| 257:2 267:25 | 238:15 239:12 | 261:14 263:22 | 144:15,16 |
| 300:8 | 240:22 242:18 | 281:24 286:21 | 159:7,8 162:6,9 |
| **fda** 10:3 32:1 | 243:24 246:8 | 289:22 | 163:2,6 206:4 |
| 40:5 43:12 45:2 | 249:5,24 | **feels** 234:19 | 207:19 262:25 |
| 63:9 71:12 78:8 | 251:14 252:8 | **felt** 128:3 210:7 | 268:18 292:5 |
| 84:25 91:8 | 252:18 257:20 | **female** 224:20 | 292:16,20 |
| 112:8 139:19 | 257:20,23 | 224:22 226:12 | 293:23 294:5 |
| 144:19,22,25 | 258:10,13 | **fiber** 59:18,22 | 295:1,4,6,14 |
| 150:4,25,25 | 259:7,9,18,24 | 72:6 271:10,17 | 296:16 |
| 164:6,11 | 260:4,8,12,16 | 274:1 276:8,18 | **field** 139:4 |
| 169:24 170:2,2 | 260:22 262:14 | 277:6,12,18 | 146:20 151:11 |
| 170:8,10,19,23 | 263:13 264:9 | 278:14 297:16 | 279:11 |
| 171:18,19 | 301:20 302:10 | 297:18,25 | **figure** 49:19 |
| 185:14 187:17 | 302:12 304:9 | 300:3 | 66:23 68:8 |
| 192:4,6,11,15 | 304:11,15,19 | **fibers** 59:23 | 186:12 271:25 |
| 192:18,21 | 305:5,17,25 | 61:22 67:15 | 275:2 279:19 |
| 197:18,19 | 306:13,16 | 109:13 110:16 | **figured** 305:1 |
| 199:13 200:8,9 | **fda's** 81:21 | 110:16,16 | **figures** 124:4 |
| 200:17 201:5 | 84:23 190:22 | 124:21 125:19 | **file** 284:20 |
| 201:15 202:2 | 191:3,14 | 144:13 151:14 | **filed** 22:20 |
| 203:23 204:15 | 202:11,21 | 172:18 194:7 | 102:11,16 |

**[filed - forever]**                                                                    Page 28

170:16 215:24
219:7
**files**  35:3
**filters**  35:16
**final**  53:24
**finally**  232:17
**find**  85:15
  93:12 117:25
  118:7 145:24
  157:2 169:11
  176:23 186:18
  186:23 187:2
  194:5 199:6,6,9
  246:15,21
  248:25 249:1
  271:12
**finding**  62:20
  194:1 204:25
  288:17 289:4
**findings**  224:18
**finds**  170:2
**fine**  57:10
  63:22 64:8
  104:8 142:24
  144:4 148:25
  149:16 168:16
  210:2,4 250:23
  258:17
**finely**  264:15
**finger**  147:6
**finish**  110:11
  238:10 259:16
  261:20,22
  262:10 265:22
  275:12 286:15
  313:16

**finished**  95:9
  148:15,18,23
  166:8 247:22
  275:10
**firm**  2:3 8:19
  24:10 47:2
**first**  4:22 5:6
  8:2 13:20 17:4
  22:15 34:15
  45:9,15,23,25
  46:4,4 47:3,16
  52:1,1 61:21
  64:14 67:11
  82:11,17 83:1
  85:6,16 86:9,25
  87:2 88:11
  94:12,23
  104:17 114:8
  123:5 128:19
  133:5 137:10
  190:22 200:14
  228:10 232:9
  240:18 267:17
  270:6 271:18
  273:9 276:15
  280:20 287:12
  287:14 304:14
  308:15
**five**  50:2 64:7
  88:2 121:4
  125:23 135:3
  163:11,15
  206:20,21
  207:1,6 271:10
  271:14,17
  272:20 273:1

274:1 276:2,8
276:20,23
277:1,6,12,16
277:17 278:14
282:2 283:4,9
286:18 313:22
**fixated**  77:23
**fixed**  239:8
**flamm**  219:14
  264:5,6,9
**flash**  269:25
  270:15
**flashing**  222:17
**flaw**  314:20
  315:1,4,6,12,16
  315:19
**flexibility**
  144:14
**flip**  17:16 96:15
**flipped**  89:25
**flipping**  42:22
**floor**  3:18 8:18
**florham**  3:24
**florida**  2:16
**flow**  43:16
**focus**  296:8,19
**focused**  86:7
  186:11 229:24
  229:25 305:22
  306:8 313:1
**focusing**  31:25
  163:9 179:16
  192:4
**foi**  213:24
**fold**  157:1

**folder**  97:18
  98:1,3,4 102:19
  103:3 156:5
  161:4
**folders**  65:18
  67:3,6
**folks**  240:22
**follow**  267:5
**following**  318:5
**follows**  8:3 43:2
  292:4
**food**  6:22 7:6
  31:9 43:14 84:6
  138:10 240:7
  240:13 241:4
  241:22 250:2
  274:13
**foods**  22:23
**footnote**  41:6,7
  41:12 86:10
  176:10 177:13
  178:2,3,4 212:7
  212:12 220:17
  226:2
**footnotes**
  175:23 177:13
  183:12 196:1
**force**  243:19
  302:6,7 303:8
  304:8
**forces**  109:12
**foregoing**  317:8
  318:2
**foreign**  224:23
**forever**  36:6

**forget** 100:24
103:23 245:19
**form** 34:12
36:15 37:22
44:18 72:6 73:5
73:8 74:9,17,19
100:10 105:3
107:16 117:21
129:1 132:3
133:23 135:10
138:5,15
139:10 144:20
147:4 155:25
167:13 173:3
179:10 181:8
183:16 185:1
188:4 196:4
201:21 203:7
204:2 206:15
233:13 234:1
234:22 236:18
238:2 246:9
253:15 254:11
255:21 256:19
261:8 263:2
264:1 270:7,14
271:24 277:7
277:14 278:24
288:18 289:6
290:1 291:18
292:8,20 294:4
294:6 295:8
296:16 298:2
306:14 309:25
312:15

**formal** 115:18
224:11,11
**formally**
291:15
**formation**
176:5
**formations**
173:23
**formatted**
280:23
**formed** 22:25
**former** 205:11
**forms** 129:21
159:8 171:22
193:9
**forth** 42:22
184:6 309:23
**forward** 64:3
87:16 222:21
**fought** 235:17
**found** 59:25
63:13 85:21
109:1 157:8
187:9,10,11,12
187:15,16,17
202:9 204:25
232:19 256:16
274:16 291:9
299:9 308:21
**fourth** 7:9
280:3
**fragments**
41:23 42:4,6,14
42:19
**fragrances**
241:24

**frame** 84:1
**framework**
84:2,7,14
146:14 300:2
**framing** 114:22
**francisco** 18:5
**frank** 219:10
**frank's** 219:10
**free** 58:17
228:7 262:25
264:11 281:24
286:21 287:24
**freedom** 305:19
**freeway** 3:5
**frequent** 224:6
226:11
**fresh** 153:24
**front** 8:23,24
12:4 14:13,18
14:19 45:13
48:24 56:24
57:2 63:23 64:1
64:18,20 65:4,5
65:7,12,23
66:24 67:3,7,15
67:18,24 68:14
91:11 94:10
106:4 111:1
113:4 121:4
122:5 131:4
142:10,25
143:14 161:7
161:20 167:24
167:25 174:9
175:11,16
182:20 201:5

204:18 253:14
280:15 282:17
302:2 308:21
**frozen** 152:8
204:19
**full** 34:2 58:2
106:20,20
126:13,14
**fully** 16:18
252:14 253:7
255:11 285:25
304:20 306:9
**fundamental**
71:13 72:22
75:15
**funds** 20:1
**further** 23:20
27:8 62:14
118:10 204:22
264:3 290:23
**furthermore**
268:25

**g**

**gained** 300:8
**game** 278:3
**gaps** 75:6,18
**gary** 219:14
264:5
**gee** 139:3
**general** 8:21
9:3,5 12:2 28:8
28:11 32:24
35:5,7,9,11
36:2 38:25 39:4
44:25 70:4 71:6

71:16 73:12,17
73:19,23 74:1
74:18 75:3 77:8
79:6,9,24 84:14
84:24 123:8
132:18 178:21
183:5,5 187:24
219:16,17,19
242:3 264:10
**generally** 11:21
12:11 20:3 25:1
73:7 79:7,18
92:19 97:19
105:7,17 119:9
272:4 273:17
273:20,21
**generation** 70:1
**generic** 125:18
**genital** 205:15
224:15 226:12
**gentlemanly**
278:19
**geography**
121:3
**geological**
74:15,22 76:15
122:10 127:23
136:8,19
137:19 145:22
151:18 169:20
170:4,20
171:21 173:23
**geologically**
171:2
**geologist** 75:23
75:24 131:17

133:16 134:12
**geologists** 75:12
146:25 147:9
148:7 149:15
149:22,24
151:10 163:19
169:25 170:9
170:10,24
173:17,21
**geology** 59:13
72:18 75:3,5,9
75:15,19 76:11
76:18,20
109:11 149:17
169:2,16
170:22 172:15
172:23
**gerber** 22:23
**gerel** 2:10
**getting** 89:23
94:4 101:14,16
162:21 217:7
236:7 295:21
**gettings** 302:6
304:7
**gilbertson**
242:7,9,13,18
243:9 245:25
246:7 247:5,14
247:17 248:4
305:5
**give** 9:3,5 10:6
24:23 26:6
30:21 37:7,24
53:11 54:5 58:8
61:19 77:19

94:2 114:13
115:18 118:20
118:23 123:7
124:12 133:7
152:25 153:9
156:13,16,21
161:6 162:11
168:18 175:10
175:20 176:19
179:13 183:24
186:7,20,20
190:14 194:2,3
198:22 204:12
209:2 219:22
221:14 223:3
244:1,7 246:12
257:8,25
265:19 281:14
281:14 285:17
**given** 76:24
83:18 163:10
172:24 235:20
242:2
**gives** 30:25
132:14 156:19
157:4 201:10
**giving** 114:14
166:14,14
274:5 276:3
**glad** 305:21
**glimpse** 168:9
**glossary** 122:9
136:8,19
137:19 138:24
139:4 143:4,18
143:20 151:8

**go** 9:7 13:6
15:25 16:2,11
17:3 19:3 23:20
26:15 31:14
35:21 38:15,17
39:23 40:3 41:5
42:15,23 43:8
45:8,14 49:3,22
63:20 64:12
68:5 70:21
75:14 80:23
85:2 86:1 87:25
88:4,12,13
91:13 96:11,11
97:7,11,14
100:22 109:7
112:8,23 113:6
116:19 118:10
118:11 119:5
125:11 126:7
130:12,22
135:19 136:6
152:16 153:21
159:17 161:14
162:3 164:12
168:14 169:3
169:19 171:16
172:11 174:13
175:16 180:22
185:6,11,14,17
190:3 193:25
200:4,14 203:9
204:21 205:8
208:2,2 209:1
209:19 213:24
215:21 217:3,4

219:1 221:4
222:22 223:12
227:13 228:13
231:21 234:14
243:16,17
244:6 245:16
245:22,22
246:3,24
248:10 250:19
251:7 254:4
256:10,11
257:17 262:12
262:13 263:14
264:2,3 266:5
276:15 283:22
283:23 288:9
290:4,17
293:11 294:17
305:1 306:17
310:15,16
**goal** 29:20
88:21 95:4
**gods** 277:9
**goes** 32:2 40:8
67:11 103:1
106:2,3 117:24
149:21 169:17
225:2 290:8
291:14 292:2
292:13 297:4
297:12
**going** 8:8,22
9:7 13:19 16:13
22:14 36:25
39:20 42:8,21
45:10 48:10

49:5,20,24,24
50:10 51:13
57:11 59:3
63:11 66:1
73:21 74:5
77:10 78:2
81:25 87:1 90:8
90:12,17 91:1
112:16,25
119:10,18
121:23 128:16
136:20 137:25
142:14 145:25
146:1,2 147:10
151:16 152:18
154:1 158:24
161:10 165:23
167:9 178:10
178:23 179:11
179:12 182:7
187:17 189:2
191:13 192:3
196:16,17
198:18,22
201:24 202:21
206:9 213:25
221:23,25
222:9,21,23
228:24,25
232:11 246:20
249:14 250:12
254:5 265:2,17
274:18 286:17
288:20 296:9
296:10,11,12
300:25 301:8

303:25 305:1
310:25 313:7
313:10 314:7
**gold** 251:5
**golkow** 11:15
**golomb** 2:20,20
**golomblegal....**
2:22
**good** 8:6,7,25
13:20,24,25
14:1 15:1 26:25
29:18 49:3 54:5
58:20 87:9,23
99:12 111:16
111:23 112:4
112:22 151:5
157:5,12 164:6
168:8 184:11
189:10,18
197:14 304:24
314:19
**gosen** 171:18
171:24 172:21
173:5,11
**gotten** 220:7
**government**
17:5,9 18:19
21:10 22:5,11
22:21 23:8
25:21 29:8
30:17 63:9 81:2
84:19 107:21
124:8 151:2
308:13,17
**gradations** 71:4

**grade** 62:2
155:9 224:7
268:21
**grades** 173:1
**gradually**
264:12
**grainy** 92:10
**gram** 77:21
**great** 9:6 13:10
61:10 64:4 73:7
75:9,12 129:21
151:24 164:3
180:24 181:2
201:10,10
223:20 235:24
241:14 299:6
305:16
**grind** 62:12
110:19
**grinding** 61:23
62:5,7 80:6
265:1,2 313:19
**grinds** 62:1
**ground** 264:15
264:18 269:17
269:24
**group** 125:18
140:12 143:6
145:8 150:9,23
151:24 159:9
170:16 193:8
193:11 243:22
295:21 296:7
296:18
**groups** 147:20
302:14,19

[growing - help]                                                         Page 32

**growing** 205:13
**growth** 144:12
  144:15
**grunerite** 127:7
  128:23
**guess** 9:15
  24:20,20,22
  30:1 34:8 35:16
  46:15,22 62:10
  68:1 80:21 99:4
  103:25 125:22
  178:22 185:24
  195:19 217:22
  270:18
**guidance** 47:10
**guidances**
  31:10 43:15
**gulf** 3:5
**guys** 211:14
  223:1

**h**

**h** 4:8 5:3 6:3
  7:3 260:15
  318:1
**habit** 127:6
  128:22 130:24
  131:25 132:25
  144:12,15
**hain** 22:23
**half** 168:12
**hand** 53:2,5
  126:13 182:16
**handling** 39:13
**handwritten**
  186:24 187:1

308:11
**happen** 187:24
  279:13 302:22
**happened**
  15:11,15 109:3
  147:17 223:6
  236:13 246:3
  247:10 248:16
  284:11
**happening**
  211:15
**happens** 28:3
  29:21 187:23
**happy** 9:1,2,12
  9:22,23 10:3,21
  11:3,7,10 13:6
  13:14 14:15
  20:6 26:7,23
  30:21 39:9 40:2
  42:18,25 49:23
  64:5 78:9 83:17
  107:19 108:3
  109:7 111:21
  111:24,25
  119:5 122:8
  124:1,4 127:16
  127:23 128:3
  128:14 131:16
  131:16 136:7
  144:6 145:5
  148:11 168:18
  182:23 187:8
  196:11 218:3
  222:16,19
  234:7,9 246:12
  256:21 257:8

284:14 306:18
  307:21
**hard** 19:2 79:16
  92:9 143:10
**harlow** 225:24
**harm** 202:13
**harmful** 295:16
**harmonization**
  242:19
**hart** 3:4
**hartge** 198:25
  246:13
**hate** 37:24
**hazard** 32:5
  40:7,14,19 41:1
  41:22 42:2,3
  43:5,20,25
  44:12,16
  147:11,24
  208:19 209:24
  230:17,22
  231:14 233:11
**hazardous**
  149:8 171:1
  251:16
**hazards** 147:19
  148:5
**head** 22:7 62:22
  101:25 104:6
  164:10 245:15
  263:10
**heading** 197:14
  290:4
**health** 5:12
  6:18 20:10 32:5
  41:15,23 42:7,9

43:5,20,25
  44:16 60:15
  109:21,25
  142:2 147:11
  147:24 148:5
  149:13,20
  150:4 151:13
  151:22 208:13
  208:19 209:24
  230:16,22
  231:14 233:11
  240:2,9 305:16
  306:2 308:12
  309:16 310:9
  311:15,19
**hear** 70:13
  270:12
**heard** 70:15,17
  130:16
**hearing** 107:12
  166:23 245:3
**hearings** 86:6
**heck** 119:19
**held** 8:13 49:16
  153:25 154:4
  168:13 169:24
  174:24 220:6
  223:7 239:11
  265:20 275:22
  299:17 309:23
**help** 8:8 49:6
  93:20 98:19
  137:16 154:2
  176:23 216:15
  249:9

[helped - identification]                                                        Page 33

| | | | |
|---|---|---|---|
| **helped** 68:19 | 174:19 176:22 | 279:1 285:25 | 234:2 |
| **helpful** 10:7 | 189:10 216:2 | **hours** 50:22 | **hypothetically** |
| 32:22 45:11 | 217:21 237:4 | 52:21 53:12,19 | 233:4 |
| 66:4 76:10,13 | 263:12 299:11 | 54:2,5,6,11 | **i** |
| 208:7 250:17 | **hit** 298:23 | 55:3 57:4,6 | **iarc** 5:14 84:23 |
| **hesitating** | **hitting** 50:2 | 88:18,24 | 123:3,7,22 |
| 25:25 | **hold** 9:12 10:21 | 128:11 135:23 | 124:17,19,22 |
| **hey** 29:8 96:9 | 28:11 50:8 | 254:8 307:19 | 124:23 125:4,5 |
| 152:25 184:4 | 62:11 67:1 | **house** 68:18 | 125:14 126:1,2 |
| 211:14 | 120:6 126:25 | 69:3 271:1 | 126:3,5,24 |
| **high** 54:13 | 134:7 161:13 | 275:2 | 127:8,13 128:1 |
| 88:18 144:13 | 162:20 171:6 | **houston** 3:6 | 128:1,8 129:4 |
| 224:19 302:12 | 198:20 208:3 | **huge** 220:4 | 130:1,4 131:23 |
| **higher** 262:18 | 212:8,8 219:3 | **human** 44:3 | 133:8 134:23 |
| **highlighted** | 222:18 247:1 | 45:4 149:20 | 141:15 142:3 |
| 94:14,25 | 248:24 257:19 | 150:3 151:22 | 193:12 |
| **highlighting** | 269:22 282:20 | 202:5 302:9 | **iarc's** 125:14 |
| 95:17 96:16 | 286:7 294:12 | **humans** 5:16 | 129:25 193:1 |
| 152:21,22 | 294:13,13 | 142:5 193:3 | **idea** 96:20,21 |
| **highly** 241:13 | 301:14 303:22 | 251:16 | 237:12 303:9 |
| 305:15,15 | **homan** 284:20 | **humor** 279:2 | 312:8 |
| **hill** 39:5,10 | **honest** 76:15 | **hundred** | **identification** |
| **histological** | 110:8 125:7 | 162:12 | 14:5 31:21 |
| 196:22 | **honorable** | **hundreds** 78:18 | 45:19 48:16 |
| **historians** | 255:2 | 78:19 92:15,15 | 64:24 82:9,19 |
| 20:14 | **hope** 45:5 | **hutchinson** | 83:3 141:6 |
| **historical** 138:1 | 177:25 195:17 | 112:9 183:25 | 142:7 153:16 |
| 138:4 184:6 | 291:1 | 184:10 185:12 | 160:18 205:6 |
| 261:13 300:1 | **hopefully** 44:2 | 187:11,12,19 | 221:21 240:15 |
| **historically** | 47:11 76:13 | 188:3,19 | 250:4 252:17 |
| 113:22 233:24 | **horton** 219:17 | **hydrous** 291:17 | 253:10 255:15 |
| 266:23 267:16 | **host** 176:7 | **hypothetical** | 280:4 281:1 |
| **history** 22:14 | **hour** 49:21 | 37:7,8,16,23 | 285:7 301:24 |
| 75:5,9 85:13 | 50:22 112:17 | 231:20,23 | 303:21 |
| 107:5 139:3 | 168:12 265:13 | 232:2,21 | |
| 167:18 173:2 | 265:22 267:14 | 233:16,18,20 | |

**[identified - initial]**                                        Page 34

identified
159:22 183:14
295:15
identify  44:11
95:21 96:25
165:2 190:18
255:19
identifying
97:7 98:19
identity  27:1
image  91:21
imaging  94:4
imerys  32:17
33:3,17,20
34:11,20,24
37:6,13 176:16
274:11 300:2,6
immediately
21:19
impact  137:16
171:13 186:1
impacts  62:15
186:9
imperative
309:6
implicate
107:23
implicates
233:8
implicating
310:3
implications
20:10 149:20
150:3 151:13
implied  247:5

implored  183:6
imply  148:5
245:24
implying  243:4
import  96:13
124:12 163:8
164:6
important  17:1
101:20 107:9
108:23 109:25
111:12 139:7
174:1 183:2
185:22 306:7
impossible
264:19
impression
310:2
improper
119:12,18
120:7
improved
62:25
improvement
263:6
impurity
292:15
inch  9:16
incidence
256:15
incidents
183:11
include  123:16
125:21 195:25
240:22 300:7
included  12:9
59:19 82:2

86:13
includes  87:20
142:11 270:2
including  23:3
81:16 169:23
172:24 225:21
240:24
incomplete
37:23 234:2
inconceivable
261:24
inconsistent
105:13,20
incontroverti...
187:20
incorporated
300:7,22
incorrect  291:2
increase  149:25
164:2 198:6
increased
195:13 224:5
increases
226:12
increasing
163:19
independent
40:19,24 41:1
41:22 42:2
44:12 244:15
independently
203:10
index  143:21
indicated
214:14 266:3

indication
37:11
individual  53:3
144:24 164:3
217:15 244:16
298:22
individuals
144:24 147:20
induced  71:15
industry  31:10
32:2 43:12,15
58:12 236:2
239:1 243:22
244:4,5 246:2
247:9 253:22
256:7 261:2
262:19 269:1
315:17
industry's
61:18
inertia  309:6
infection  77:21
inferences
36:20,22
inflammatory
71:14,15
information
85:11,13
193:17 283:2
informative
149:7 157:9
ingredient  91:4
inhalation
251:15
initial  4:21
46:24 82:8 88:9

[initialed - issued]                                                    Page 35

| | | | |
|---|---|---|---|
| **initialed**  219:8 | **interagency** | **interrelations...** | 158:21 173:22 |
| **initially**  186:3 | 140:11 143:6 | 171:20 | 210:15 211:1 |
| **initiated**  27:21 | 145:8 150:9,22 | **interrupting** | 212:17 213:10 |
| **injurious**  40:7 | 151:24 | 153:2 | 213:12,13,16 |
| **inorganic**  75:21 | **interest**  208:14 | **intersect**  170:3 | 214:3 215:3 |
| **insensitive** | **interested** | **intersection** | 216:3 217:13 |
| 273:6 | 55:21 57:13 | 76:13,25 77:15 | 218:9 |
| **inside**  158:10 | 100:25 103:17 | **intimating** | **involvement** |
| **insisted**  60:13 | 107:10 170:18 | 237:20 | 75:7 211:3 |
| **instance**  98:18 | 184:13 243:19 | **introduction** | 239:20 |
| **instantaneous** | 244:3,7 302:6 | 126:22 | **involves**  77:14 |
| 46:10 | 303:7 304:8 | **invest**  298:13 | **involving**  25:25 |
| **institute**  277:6 | **interesting** | **investigate** | **ipad**  89:25 90:3 |
| **institution**  33:8 | 232:22 | 304:20 | 121:5 222:5,10 |
| **institutional** | **interface**  31:25 | **investigating** | **ipads**  89:6 |
| 20:24 | 43:11 138:7 | 306:10,25 | **iron**  292:25 |
| **instruction** | 170:22,24 | **investigation** | **isolated**  177:20 |
| 234:18 | **interim**  5:20 | 252:24 255:17 | **isrtp**  242:1 |
| **instructions** | 153:13 155:5 | **investigations** | **issuance**  57:18 |
| 163:10 | **internal**  33:17 | 111:12 | 105:1 210:11 |
| **instrument** | 33:21,22,22 | **investment** | **issue**  27:13 |
| 298:17 | 37:9 150:13 | 75:15 | 32:13 37:7 42:1 |
| **insufficient** | 218:1 287:16 | **invoice**  4:17 | 51:11 52:18 |
| 205:17 | 290:20 303:5 | 48:11,14 51:1 | 56:17 149:19 |
| **intend**  42:12 | **internalized** | 51:18,19,22 | 166:19 179:25 |
| 196:1 268:25 | 309:23 | 52:5,11,12,18 | 180:3 201:14 |
| **intended** | **international** | 53:15 | 213:3 220:15 |
| 268:19 313:14 | 5:13 6:20 142:2 | **invoices**  51:6 | 235:9 236:25 |
| **intending**  95:18 | 197:23 240:5 | 51:11 52:24 | 237:1 241:19 |
| **intense**  17:22 | 240:11 241:25 | 54:15,16 | 262:22 264:16 |
| **intent**  12:22,22 | 242:19 | **invoke**  303:3 | 284:11 286:10 |
| 120:19 214:11 | **internet**  152:13 | **involve**  71:24 | 286:19,20 |
| 237:21 311:5 | **interplay** | 216:18 | 302:11 303:2 |
| 312:17 | 196:24 | **involved**  38:13 | 306:7,13 |
| **intentionally** | **interpret**  52:13 | 70:11 75:16 | **issued**  51:6 |
| 312:9 | | 76:22 78:20 | 56:7 105:9 |

160:8 237:23
**issues**  28:12
   29:15 38:15,19
   38:25 39:4,5,14
   39:23,25 44:13
   107:20 169:20
   170:6 183:3,15
   184:16 213:20
   213:22 214:21
   215:5,7 296:23
   304:13,19
   306:23
**issuing**  52:24
**italian**  291:6
**iwg**  140:4,5
**iwgacp**  5:8
   141:2,19
   144:22 169:23
   170:15 293:12
   295:15

**j**

**j**  1:10 317:4,14
**j&j**  33:2,10
   34:4,10,19,24
   35:7,17 37:20
   58:11 59:13,17
   59:24 61:6
   113:21,24
   115:14 116:8
   116:10 123:10
   123:11 128:1
   150:13 157:11
   157:20 158:3
   158:10,10,11
   158:19 159:3

159:19 167:7
179:7 181:17
187:13,14
194:21 197:2
199:14 205:25
206:14 230:8
235:1 236:2
244:2 260:19
260:22 261:7
267:16 270:1
270:10,16,20
270:25 271:20
272:14 274:5,9
274:15,15,16
274:17,20
275:2,4,17
276:3 277:13
279:19 282:8
287:16 289:14
290:10,20,23
294:2,22
300:17,18
303:5,5 309:13
309:17 310:20
311:6,6,21
312:9,12
313:24 315:6
315:17
**j&j's**  87:1
114:10 117:13
117:17 119:8
123:7,11
124:14 129:19
129:24 132:13
155:1,23
174:16 256:16

279:16 298:14
314:23
**j4**  165:1
**j4-1**  58:15 59:2
   61:18 62:22
   63:12 155:14
   155:17 159:5
   159:22,23
   160:2 166:15
   166:24 167:1
   235:8 239:1,8
   262:23 268:18
   268:24 269:2
   270:1,5 315:17
**jack**  3:17
**jake**  49:11 50:5
   50:10 126:11
   141:7 152:18
   153:7 177:9
   178:9 204:23
   221:16 248:20
   248:25 267:19
   280:6 284:22
   301:1 303:13
**james**  281:5
**january**  17:6
   17:10 18:12,19
   21:11 24:16
   25:21 30:18
   81:3 241:20
**jersey**  1:1,12
   3:24 317:8
**jewald**  3:19
**jkeester**  3:20
**jnj**  6:7,8 7:17
   7:19,20 113:12

160:17,17
301:18,23
303:17,20,20
**jnjmx68**  5:21
   5:22 153:14,15
   155:4
**job**  13:24 18:21
   21:3 34:15
   313:15
**jobs**  306:6
   307:13
**john**  3:17 11:6
   23:10 48:17
   49:5 64:5 66:3
   66:9 67:20
   89:14 119:21
   126:8,16 137:8
   140:17 141:11
   148:14 152:8
   152:25 154:1
   176:15 189:13
   219:13,20
   221:25 223:11
   231:6 234:16
   267:5 275:9
   295:11 301:9
**johns**  35:14
**johnson**  1:3,3
   5:18,18 7:11,11
   24:3,3 32:16,16
   66:12,12 81:19
   85:25,25 86:8,9
   116:5,5,16,16
   153:11,12
   203:5,5 268:9,9
   268:22,22

**[johnson - know]**

Page 37

272:11,11,12
272:13 273:10
273:10,13,13
277:5,5 283:13
283:13 284:20
284:20 285:1,2
287:20,20
311:25,25
**johnson's** 81:19
287:18
**joint** 241:21
242:21 247:24
**joke** 121:10
279:4
**journal** 241:19
**judgments** 36:9
**julie** 169:10,13
169:14 177:1
**july** 7:19
243:19 269:3
303:19 304:7
**jump** 18:2
146:2 160:25
182:21 267:13
**jumping** 49:11
**jumps** 23:24
**june** 30:7
176:18 177:16
304:9
**jurisdiction**
138:10

**k**

**k** 8:1
**keep** 49:23,24
52:16 53:7

182:3 206:9
222:2 236:14
237:6 250:21
252:4 254:5,5
265:16 305:1
314:15
**keester** 3:17
49:11 50:7
126:15,18
141:9,11
248:24 250:23
267:21 280:8
280:11
**kelli** 2:5
**kept** 57:21
59:24 66:17
98:6 309:14
311:12
**kessler** 1:9 4:4
4:11,13,15 8:6
14:4,9 23:12
31:19 45:17
48:19 49:6
63:18 64:1 66:7
66:24 67:19
99:8 119:13
120:15,24
131:4 137:12
148:23 153:4
153:17 161:24
177:23 223:23
231:11 234:18
267:6 299:20
316:14
**kessler's** 31:15

**kevin** 280:5,5
**key** 84:15,17,18
92:21 147:13
293:17 298:24
314:14
**kick** 121:9
**kicked** 308:2
**kind** 42:18
56:13 91:21
97:18 100:12
109:11 116:19
136:25 242:12
252:23 299:23
**kindly** 160:19
222:6
**kinds** 73:24,25
165:16
**king** 3:16
**knew** 57:10
63:2 69:22 72:7
72:25 74:11
79:17 187:13
211:12 230:5
234:25 264:23
274:17 299:4
307:7 310:20
310:21,25
311:1,6,6,25
314:6,7
**know** 9:16,21
10:19 12:12,17
12:23,24,24
13:2,10,12
14:19 15:14,18
15:22 16:3 18:5
18:9 19:12,13

19:22,23,25,25
20:7,23,24,25
21:20,22 22:3
22:11,12,14,15
22:20,23,25
23:21 24:19,22
25:2,17 29:19
30:9,10,12 31:1
31:5,7,10 32:11
32:12 33:1,6,7
33:8,11 34:14
34:23 35:8,11
36:7,8,21 37:10
39:4,10,11 40:1
40:4,6,21 41:2
42:17,18 45:3,4
46:6,8,10 49:9
50:1 51:16,17
52:14 55:19
56:23,24 57:10
57:22 58:2,2,8
58:22,25 59:11
59:12,16,18,18
59:19,22 60:20
61:1,4,5,13,25
62:1,1,5,15
63:7 68:24 69:5
69:21,25 70:10
71:5,9 72:4,20
72:22 73:21
74:14,17,25
75:4 76:5 77:22
78:18 79:1,4,14
79:15,16,25
80:9 84:22 85:6
85:8,13,21

**[know - lack]**                                                    Page 38

| | | | **l** |
|---|---|---|---|
| 86:14 87:4,5,7 | 180:5,7,12,21 | 294:9,20,20 | **l** 8:1 |

86:14 87:4,5,7
87:8 89:5 90:6
91:1,2 92:6,7,8
92:18 93:10,18
93:20 94:10,19
96:10,18 99:14
100:22 101:7
101:24 102:5,6
103:14 105:16
105:17,25
106:1,18,20
107:2,8,11
108:8 109:8,19
110:18 112:14
115:6,25 120:9
122:8,14 124:6
124:7 125:15
125:15 128:11
129:13,16
130:13,16
131:21,22
135:6 136:15
137:15 145:21
145:25 146:12
146:13,15,19
151:7 155:11
155:17,22
157:3 158:20
160:21 162:2
164:22,23
166:17,25
167:1,2,6 170:1
170:5 171:5,17
172:10,11
173:20 178:25
179:1,12,20

180:5,7,12,21
184:4 185:2,8,9
185:10 187:2
187:16,16,21
188:6,11
192:18 195:10
195:11 197:8
197:14,21
198:23,24
199:2,8 200:22
201:5,10
207:13 209:3
211:11 213:23
215:1,2,4,12,25
216:11,18
221:2 223:5
229:1,5,13,14
231:24 232:21
233:15 235:4,5
235:22 236:8
237:4,10,15,23
242:10 253:19
254:16,18,25
255:1 256:3,4
256:22 257:13
259:14 260:6
261:10,12,13
263:12 264:13
264:21,22,23
267:23 268:12
272:3,3 273:2
274:7,23 275:4
275:24 277:23
278:8,10,19,20
279:13 280:14
284:16,19,19

294:9,20,20
295:10 297:23
298:12,12,17
301:4 302:24
303:1,4,11
305:15,20
306:1,22,24
307:1,7,12
308:22 310:15
312:2,2,4 313:4
313:23,25
314:8,12 315:8
**knowing** 130:9
173:24
**knowingly**
312:12
**knowledge**
37:19 56:9 71:4
72:23 73:2,11
73:23 75:1 79:5
79:6,10 80:2
83:18 109:11
146:13 220:10
233:23 237:10
318:4
**known** 23:17
59:12 63:4
113:14 125:22
**knows** 23:12
53:14 111:14
264:24
**krekeler** 178:23
**kslaw.com** 3:19
3:20

**l** 8:1
**lab** 10:2 70:6
77:12 165:2
182:16,17
299:2,4
**label** 65:12
68:14 226:6
230:15 231:12
232:12,19
**labeled** 5:10,21
6:7 7:17,19
141:4 153:14
160:16 251:12
301:22 303:19
**labeling** 6:10
6:15 205:4
221:20
**labels** 199:15
**laboratories**
70:3 110:23
158:21 298:23
**laboratory**
58:15 63:3,3
73:3 78:5
110:22 150:2
158:19,23
165:4 183:18
226:11,14
257:2 289:9
**labs** 158:14,15
299:5
**lack** 27:16
90:14 110:22
115:10 270:19

**[lack - list]**                                                                    Page 39

283:1
**laid**  61:2
**lake**  219:15
**language**
  138:25 152:1,3
**laptop**  121:18
**large**  9:15,19
  10:14,15 11:9
  65:2 215:23
  225:3 288:15
**largely**  241:19
**larger**  10:20
  48:19 153:6
  161:11 250:13
**late**  158:6 167:7
  230:5 271:6
  272:8 308:20
  309:3,22
**lateness**  279:1
**latest**  62:3
**laura**  103:15
  170:13 171:4
  171:12
**law**  2:3 8:19
**lawyer**  11:2
  26:7 27:2,6
  38:23 40:11
  277:23
**lawyers**  32:12
  69:9
**lead**  22:22
  170:6 185:4,4
  219:21
**leader**  305:19
**leading**  62:18

**leanna**  2:5
**learn**  57:13,15
  57:18,24 58:2
**learned**  20:16
  185:3 254:7
  302:7
**learning**  255:2
  313:2
**learns**  58:7
**leave**  17:9 18:1
  18:4,12,16,16
  32:10,11 54:16
  94:20 95:1
  164:8 179:25
  195:20 196:13
  202:25 206:5
  219:5 236:15
  237:1
**leaves**  316:8
**leaving**  18:19
  24:15 30:17
  81:2 96:16
**led**  111:11
**lee**  100:6 107:5
  107:22,24
  274:17
**left**  17:5 19:17
  25:21 84:9
  119:13 121:7
  121:15 154:17
  190:3 211:20
**legacy**  20:15
  22:9,19 23:6
  24:17
**legal**  2:20 13:12
  40:10 96:2

114:13,14
115:6,7 232:23
**legions**  309:5,5
**leigh**  2:4 63:24
  223:12
**leigh.odell**  2:7
**lessons**  20:16
**letter**  6:13
  209:18 210:11
  210:13,16
  211:25 212:25
  213:25 221:13
  221:17 227:12
  228:14,16
  230:20 231:11
  238:24 251:24
  253:19 258:2
  262:5 266:19
  308:11 309:12
  309:22
**letters**  212:19
  220:19,23,24
**letting**  49:15
  161:16
**level**  10:8 83:19
  236:9 250:10
  264:19 282:4
  283:6 289:2
  302:12
**levels**  258:25
  291:9
**levin**  2:15
**levinlaw.com**
  2:17
**lewin**  184:16

**liability**  1:5
  38:24 299:9
**license**  1:11
  317:15
**lie**  297:15
**life**  14:11 77:1
  78:5 101:6
  185:3
**lift**  14:10
**light**  59:12
  109:18 198:4
  198:12 203:14
  203:19 207:2,2
**limit**  276:9
  281:20
**limitations**
  166:25 198:9
  199:3 291:5
**limited**  246:18
  300:10,14
**linda**  219:17
**line**  37:11 43:10
  43:10 46:21
  57:10 71:7
  89:10 128:16
  128:16 318:6
**lines**  102:10
**link**  147:10,18
**linking**  147:23
**list**  4:21 12:10
  12:16,16,21
  13:5,11 47:16
  47:17,24 60:10
  67:6 82:2,8
  83:6,11 94:16
  95:3 96:5,11

**[list - looking]**

Page 40

| | | | |
|---|---|---|---|
| 122:5,7 123:6 | **lived**  79:15 | 88:19 89:11 | 264:2,4,24,25 |
| 123:25 124:2,7 | **living**  149:16 | 91:16 92:17 | 267:24 271:4 |
| 174:4 185:9,19 | **llp**  2:10 3:4,16 | 93:20,22 94:8 | 276:1 282:14 |
| 228:15 240:18 | 3:22 | 96:24 103:5,7 | 285:10,18,22 |
| 240:21 256:21 | **local**  172:23 | 103:11 109:3 | 286:1 292:16 |
| 256:24 267:7 | 173:25 176:12 | 112:5,7 116:7 | 293:18 294:14 |
| 295:17 | **localized** | 122:22 124:2 | 296:9,10 |
| **listed**  81:24 | 177:19 | 125:9,10,12 | 297:11,16 |
| 97:1 151:7 | **located**  8:16 | 126:5 130:11 | 298:21,22 |
| 241:1 | 65:24 | 131:16 136:6 | 299:6 301:5 |
| **listen**  189:2 | **lock**  181:6 | 136:24 137:1,2 | 307:22 311:17 |
| **listening** | **long**  9:5 39:11 | 137:3,4,18 | 312:23,24 |
| 312:21 | 69:2 83:14 | 139:16 143:5 | 313:18,20,21 |
| **lists**  13:13 | 129:18 144:13 | 147:15 160:1 | 313:22,23 |
| **literally**  96:1 | 216:1 231:24 | 163:16 164:24 | 314:9 315:24 |
| **literature**  42:1 | 312:5 | 165:17 167:5 | **looked**  35:3 |
| 42:6 44:24 | **longer**  22:14 | 167:17 170:19 | 39:17 41:25 |
| 191:8 236:6 | **longo**  103:11,18 | 172:4 175:6 | 54:1 84:22,23 |
| 258:20 | 103:20 104:18 | 178:12 179:22 | 87:10,11 93:14 |
| **litigation**  1:5 | 104:21,21,24 | 180:12,22 | 96:4 103:16 |
| 21:15 33:16 | 105:4,8,13,14 | 181:10,15 | 107:3 119:13 |
| 51:12,15,20 | 106:16 107:13 | 187:7,9,10,11 | 159:23 170:11 |
| 111:9 | 109:5,16 110:3 | 188:15,16 | 200:20 213:9 |
| **little**  19:2 26:14 | 110:10 278:22 | 197:20 200:16 | 214:15 300:16 |
| 49:21 51:14 | 279:6,9 288:16 | 200:18 204:7 | **looking**  10:8 |
| 69:4 84:12 91:3 | **longo's**  108:14 | 204:15 205:11 | 11:1 14:21 22:2 |
| 122:19 154:2 | 289:4 | 209:25 222:10 | 25:1 27:7 31:9 |
| 157:10 161:11 | **look**  9:1,2 11:1 | 228:13 235:6 | 44:9 51:2 63:22 |
| 161:21 162:16 | 11:22 30:6 31:5 | 238:7,13,15,16 | 85:8 88:9 89:3 |
| 172:3 179:14 | 34:6 36:5 37:17 | 238:16,24 | 93:7 102:25 |
| 179:25 183:8 | 40:5 46:20 | 243:2,17 | 103:12 121:14 |
| 191:12 192:17 | 61:24,25 62:17 | 244:12,16 | 121:14 126:20 |
| 228:22 250:13 | 63:8 66:10,13 | 245:17 246:4 | 131:11 147:21 |
| 254:20 267:14 | 66:20 77:20,23 | 246:11,14 | 154:17 160:10 |
| 280:17,23 | 81:10 84:24 | 248:6,11,11,24 | 168:6 170:18 |
| 285:21 290:22 | 85:17 88:5,17 | 249:5 260:24 | 175:6,8,15 |

**[looking - marketplace]**                                              Page 41

| | | | |
|---|---|---|---|
| 180:16 189:16 | **m.d.**   1:9 4:4,13 | 115:11,23 | **manufacturing** |
| 220:22 238:18 | 4:15 31:19 | 119:16 120:17 | 61:6 314:10 |
| 293:14 297:23 | 45:17 316:15 | 121:23 130:17 | **margaret**   2:4 |
| 307:11 | **ma'am**   142:24 | 131:11 142:12 | 156:16 249:8 |
| **looks**   28:13 | **made**   7:12 15:8 | 146:4 150:6 | **mark**   14:2 |
| **lose**   202:12 | 36:9 102:18 | 151:17 160:25 | 31:14 45:10 |
| **lost**   222:3,7 | 115:8 187:13 | 161:11 178:2 | 48:10 64:14 |
| **lot**   8:24 11:3 | 231:17 242:2 | 184:25 200:6 | 82:5,15,23 89:8 |
| 38:15 45:5 | 244:14,15 | 218:12 228:15 | 140:21 141:12 |
| 71:12 73:13 | 248:9 271:10 | 240:3 243:5,11 | 141:14,15,16 |
| 86:2,15 87:18 | 272:17 273:6 | 250:12 266:13 | 152:17 155:3 |
| 116:9 119:19 | 276:25 285:3 | 266:23 268:19 | 160:12 221:12 |
| 131:14 139:17 | **magnesium** | 269:19 276:19 | 249:17 279:22 |
| 139:18,21 | 291:17 292:6 | 277:18 285:20 | 279:23 301:8 |
| 165:14 169:7 | 292:15,23,24 | 291:13 296:12 | 303:15 |
| 181:14 186:21 | 292:25 | 300:15 | **marked**   14:4 |
| 275:14 278:6 | **mail**   25:16,17 | **makes**   179:6 | 31:20 45:18 |
| 307:9 | 64:2 | 230:1 304:25 | 48:15 64:23 |
| **love**   26:20 53:7 | **mails**   33:22 | 307:9 314:17 | 82:8,19 83:3 |
| 251:5 307:16 | **main**   143:4 | **making**   19:15 | 88:5 89:24 90:1 |
| **low**   62:16 | **major**   33:10 | 34:9 35:5,25 | 90:3,9,10 141:5 |
| **lowest**   300:9,14 | 207:16 244:20 | 36:13 106:16 | 142:6 145:11 |
| **luck**   50:6 | **majority**   86:19 | 149:4 203:3 | 153:15 160:18 |
| **lunch**   112:19 | 97:23 256:15 | 233:21 247:7 | 205:6 211:21 |
| **luzenac**   33:17 | **make**   8:9 12:20 | **management** | 221:21 223:16 |
| 33:20 34:11 | 12:22 13:11 | 59:18,23 300:3 | 240:14 250:4 |
| 37:6,9,10,13 | 14:10,11 26:8 | **manager** | 280:3 285:6 |
| 271:6 272:5,7 | 27:15 28:20 | 223:25 | 301:23 303:21 |
| 273:19 274:10 | 34:16 35:18 | **managing** | **market**   2:21 |
| 300:5 | 36:3,5,18,20,24 | 59:23 | 3:11 235:3 |
| **lying**   297:24 | 36:24 37:3 43:9 | **manufacture** | 309:15 311:13 |
| **m** | 56:11 59:3 85:8 | 35:12 | 312:14 |
| | 86:1 87:4,25 | **manufacturers** | **marketing**   1:4 |
| **m**   2:4 3:10,10 | 96:4,9 106:14 | 32:1 43:11 | **marketplace** |
| 3:23 8:1 | 108:13 112:2 | 199:14 262:15 | 259:2 |
| | 112:21 113:3 | | |

**[marking - mean]**                                                    Page 42

| | | | |
|---|---|---|---|
| **marking** 91:22 | 86:13 90:20,23 | **matthew** 99:25 | 69:2 70:2,4,8 |
| 140:17 | 94:14,15 95:21 | 101:3 | 71:15 73:20 |
| **mary** 174:5,11 | 96:17 99:2 | **mccrone** | 75:2,2,11,16 |
| 177:10 178:10 | 101:3 158:16 | 186:17 187:6,9 | 76:14,20 77:9 |
| **mas** 1:2 | 172:7 174:3 | 187:15,16,17 | 78:4,19,21,22 |
| **mask** 283:13 | 175:15 308:16 | 271:1,11 | 78:25 79:11,15 |
| 312:10 313:7 | **math** 53:11 | 272:14 275:15 | 79:18 80:12 |
| 314:12 | 165:3,21 | 275:16,23,25 | 83:24 84:3,16 |
| **masked** 61:7,12 | 288:20 | **mdl** 1:2 22:25 | 85:2 87:6,17 |
| 61:22 63:14 | **matrix** 298:18 | 26:1,13 27:7,12 | 88:4,19 90:2,4 |
| 67:15 263:20 | **matt** 100:3 | 27:14,23,24 | 90:5,6,25 91:10 |
| 265:5 272:18 | 106:25 | 28:6,7,18,20 | 93:7,8 94:7 |
| 298:25 314:3 | **matter** 1:10 | 29:6,14 30:3 | 96:12 97:16 |
| **masking** 61:11 | 12:3 22:13,17 | 52:8,9 81:16 | 98:6,12 99:12 |
| 61:16 | 23:20,23 24:17 | 92:1,24 93:11 | 99:13,18 |
| **mass** 199:11 | 26:5 27:23 | 93:17 174:4 | 100:22,24 |
| **masterful** | 29:24 30:17 | 214:24 | 101:5,7,10,14 |
| 261:25 | 31:16 38:8,11 | **mean** 10:13 | 101:20 102:19 |
| **match** 244:11 | 39:6,17 40:5,10 | 11:19 14:11 | 103:10,11,21 |
| 245:14 | 41:17 47:25 | 16:10,22 17:15 | 103:22,23 |
| **matches** 127:15 | 48:8 52:17 | 17:16,19 18:1 | 104:12 105:5 |
| 128:1 210:1 | 53:20 56:7,19 | 19:11,25 20:6 | 105:14,16,25 |
| **material** 62:4 | 75:7 87:16 | 20:15,23 25:11 | 106:2 109:19 |
| 155:12 172:2 | 92:16 102:12 | 26:10 27:22 | 109:19,25 |
| 252:11 268:16 | 102:16 107:10 | 29:9,19,25 | 114:3 115:8,17 |
| 274:6 293:24 | 151:1 170:23 | 32:25 33:6 | 116:9 117:6 |
| **materials** 4:19 | 211:1,3 215:19 | 34:17,22 35:1 | 122:21,24 |
| 4:23 5:6 8:22 | 216:9,12,16,19 | 36:9 38:20,24 | 123:13 125:8 |
| 8:24 10:18 11:3 | 317:10 | 40:19,20,22 | 129:15 131:7,8 |
| 12:7,9 13:3,5 | **matters** 20:24 | 41:6,25 42:3 | 131:21 135:1,1 |
| 44:6 47:15,17 | 22:8,9,10 23:3 | 43:8 44:2 52:14 | 138:20,21,25 |
| 47:23 60:7,10 | 23:6 25:7 27:2 | 53:8 55:13,14 | 139:1 140:1 |
| 64:1,16,17,18 | 39:8,16 106:1 | 56:18,23 57:1,8 | 144:23 145:16 |
| 64:20,23 66:14 | 111:13 212:18 | 58:12 60:11,11 | 147:15 148:3 |
| 82:1,12,18,21 | 213:11,12 | 61:2,4,12 63:6 | 152:2 156:11 |
| 83:2,5,10,20 | 214:4 267:1 | 68:24,25,25 | 157:23 158:4,4 |

**[mean - method]**                                                    Page 43

| | | | |
|---|---|---|---|
| 158:11 159:18 | 244:8 245:5 | **mechanisms** | **mention** 214:17 |
| 160:6 162:16 | 246:11 247:6 | 70:9 71:14 | **mentioned** |
| 164:1,15,21,22 | 253:16,18 | 192:19 | 10:10 47:9 |
| 164:22 165:13 | 254:12,14 | **media** 78:13,16 | 50:17 97:25 |
| 165:25 170:1,6 | 257:13 262:1,1 | **median** 62:10 | 119:21 126:6 |
| 171:16,17 | 269:14 270:22 | **medical** 19:3,10 | 182:25 305:9 |
| 172:2 173:15 | 271:16 275:1 | 39:17 45:1 | **mentor** 20:25 |
| 173:16,19,25 | 275:17,22 | 146:13 165:14 | **merit** 129:22 |
| 174:18,20 | 276:3 277:22 | 191:8 | 130:7 |
| 175:9 176:14 | 278:12,20 | **meet** 68:22 | **merits** 128:4,8 |
| 177:25 179:24 | 288:21,22 | 69:8 163:14,16 | 128:12 |
| 180:4,6 181:10 | 290:8 295:18 | **meeting** 171:18 | **merkatz** 241:1 |
| 181:13,18 | 300:21 303:2,4 | 242:2 243:24 | 305:12,14,16 |
| 185:21 186:11 | 304:24 306:16 | 244:10 245:1,3 | 306:3,19 307:9 |
| 188:9,24 | 306:25 308:20 | 245:8,21 246:1 | **mesh** 22:18 |
| 191:20 192:15 | 308:22 310:5 | 246:3 247:11 | 62:14 313:10 |
| 192:16 193:9 | 310:14,17 | 248:17 268:24 | 313:10 |
| 194:1,20 | 311:7,10 313:2 | 269:3 303:5 | **meshes** 110:20 |
| 195:10,13 | 313:3,11 314:4 | 304:8 306:5 | **mesothelioma** |
| 197:9,17 | 314:13,23 | **meetings** 69:15 | 69:23 |
| 198:23 199:7 | **meaning** 60:14 | 169:22,24 | **message** 28:9 |
| 200:15 201:5 | 136:4 137:5,23 | 302:12,18 | **met** 62:20 |
| 201:13 203:9 | 138:22 139:5 | 303:4 307:10 | 261:11 304:11 |
| 203:14 204:7 | 151:12 196:8 | **memo** 268:9 | **metabolic** |
| 205:10,13 | **meanings** 51:16 | 291:15 303:6 | 20:11 |
| 207:9,13,13,15 | **means** 48:22,23 | **memorandum** | **metamorphic** |
| 213:3 214:1,4 | 93:3 101:6 | 7:16,18 287:16 | 173:1 177:20 |
| 215:18,20 | 137:7,17 139:8 | 290:20 301:21 | **method** 58:15 |
| 216:2,3,17,18 | 198:10 276:13 | 303:18 | 58:21 59:2,3 |
| 217:19 218:3 | 317:23 | **memory** 25:12 | 61:18 62:23 |
| 220:5 221:4,7,9 | **meant** 71:2 | 25:14 31:3 | 63:12 78:12,17 |
| 228:25 230:5 | 91:25 134:22 | 84:21 210:3 | 160:2 161:24 |
| 232:5,8,22 | 136:5,23 148:4 | **memory's** | 236:4 263:3 |
| 235:15,16,17 | 149:6 151:14 | 214:5 | 268:18 270:13 |
| 235:20 236:23 | 254:25 | **memos** 33:22 | 279:16 282:8 |
| 238:4,17 239:6 | | 264:4 | 282:12 283:7 |

**[method - misbranded]**                                                Page 44

283:13,14
287:10,25
291:3 297:2
298:4 300:12
314:18,19
**methodology**
73:3 262:20
273:4 276:23
**methods** 5:9
63:1,4 73:9,12
73:14,18,24
74:8 141:3
155:23 176:18
177:15 252:17
253:10,24
255:14,18
256:8 263:24
273:1 291:8,23
299:15 312:9
**metrics** 289:12
289:18
**michelle** 2:10
**micron** 62:9
**microns** 110:19
265:1
**microscope** 7:9
73:22 77:22
158:16 254:14
280:2,21
**microscopic**
151:20 261:5
**microscopist**
76:3,6,12 78:2
278:9,17
**microscopy**
76:21 77:5,7,9

77:11,14,17,18
77:18 78:6,7,17
78:24 155:21
157:25 158:12
165:10 253:17
253:21 254:13
254:17 255:4,7
260:25 273:16
283:18 286:10
287:9 297:7,14
300:4
**mid** 54:2 253:1
**middle** 259:15
**mill** 65:13
**miller** 268:10
**millette** 276:11
276:24 277:19
278:7,8,9,17
279:8,10,20,21
279:24 281:5
283:1
**milling** 61:23
62:8 80:6
313:19
**million** 17:21
**millions** 93:11
93:14
**mind** 53:6,8
86:2 87:25
113:23 114:23
137:8 140:16
141:16 153:18
198:12,19
202:11 204:14
204:25 205:1
227:1 231:12

232:3 233:7
250:15 307:23
308:4
**mine** 152:21
162:10 172:24
179:18
**mine's** 280:22
**mined** 59:15
**mineral** 125:19
125:21 144:10
144:11 176:2
291:22 292:15
**mineralization**
176:3 177:16
**mineralogical**
151:19 170:4
236:24 261:5
**mineralogically**
171:2
**mineralogist**
75:25 131:17
133:17 134:12
**mineralogists**
146:25 147:8
148:7 149:15
149:22,24
151:9
**mineralogy**
76:11,20
108:15 172:16
225:4 283:18
**minerals** 6:6
72:5 125:23
127:5 128:21
130:23 131:24
132:24 135:3

144:17 155:8
160:3,15
161:25 162:6,9
163:3,6 251:19
251:22,25
252:3,18
253:11 255:15
259:1 262:16
268:10,13,22
269:8 281:2
282:3 283:4
291:20 292:1
295:24 296:15
**mines** 172:5,8
180:8 181:7
202:7 264:11
264:12,17
**minimized**
239:2
**mining** 59:20
80:10 174:17
179:7 180:20
274:2
**minor** 266:7
**minus** 62:14
110:20
**minute** 222:1
224:21 286:6
**minutes** 50:3
64:7 119:24
209:2 242:18
243:18 244:2
265:14 286:18
**misbranded**
114:11 115:11
115:15,24

**[misbranded - needs]**                                              Page 45

116:6 117:14
118:8,13,18
199:15 294:3
**misbranding**
114:20
**mischaracteri...**
117:22
**misguided**
232:7
**misidentificat...**
258:22 260:11
**misleading**
112:14 248:14
**misled** 201:15
**misrepresents**
243:14
**missed** 164:19
204:5 266:10
**missing** 150:17
163:8 209:8
210:21 260:1
293:8
**misspeak** 52:15
**misspoke**
266:14,20
**misstates**
107:17 133:24
135:11 139:13
150:14 294:7
**mistake** 15:17
112:2 202:18
**misunderstood**
210:7
**mobilize** 309:7
**modernize**
309:7

**modification**
16:21
**moment** 24:11
35:22 80:22
148:22 153:1,9
168:17 174:14
203:1 206:5
222:8 237:2
242:15 287:22
**moments**
220:18
**monday** 1:13
**money** 298:14
**monitors** 9:10
121:6 222:4,7
**monographs**
5:15 142:3
**montgomery**
2:6
**month** 16:5,18
24:19 25:1,2
290:22
**months** 21:23
21:25 46:16
51:23 52:3 54:3
86:22
**morning** 8:6,7
**mornings**
308:21
**morphological**
151:20
**morphology**
297:11
**mortality**
224:19

**mouse** 154:19
**mouth** 104:12
**move** 249:2
**moved** 98:6
**moving** 28:13
**mparfitt** 2:12
**multiple** 34:5
91:18 99:20
**musser's**
205:12,12

**n**

**n** 2:1 3:1 4:1
5:1 6:1 7:1
**name** 5:4 6:4
7:4 25:19 26:6
33:7 67:5
213:25 214:25
215:6 219:10
219:11 242:10
263:11
**narrative** 262:3
**national** 71:10
71:21 122:10
127:23 136:7
136:18 137:18
145:22 213:24
258:20 260:10
260:18,21
**natives** 94:5
**natural** 291:17
**naturally**
125:19
**nature** 20:4
46:9 258:23
278:21

**navigate** 48:24
91:16 92:2
**nctr** 71:23
**near** 177:21
**necessarily**
21:19 115:2
211:5
**necessary**
26:16 106:19
208:18 209:23
230:16 233:10
273:3
**necessitated**
106:13
**need** 24:25
25:24 30:13
44:19 49:13
142:21 148:20
153:20,21
174:23 175:3
181:25 182:6
186:9 194:24
199:8 206:1
233:15 266:7
268:2,21 269:4
272:25 276:25
277:1,20
281:23 285:18
286:5 289:23
311:19
**needle** 199:9
292:5
**needles** 194:5
199:7
**needs** 62:13
112:21 230:22

[negates - o'dell]                                                                      Page 46

| | | | |
|---|---|---|---|
| **negates** 203:11 | **non** 72:12 | **november** 4:13 | **numbers** 34:22 |
| **negative** 62:19 | 113:16 114:2,4 | 4:16 6:12,13 | 34:25 88:17,23 |
| 299:3,13 | 116:4,10,15 | 15:2,9,20 30:1 | 266:10 267:8 |
| **negatives** | 117:10,19 | 31:17,20 45:14 | **numerous** |
| 165:20 201:25 | 130:24 131:25 | 45:18 46:14,17 | 62:19 |
| 201:25 | 132:25 151:17 | 51:4 54:3 55:4 | |
| **never** 15:17 | 172:18 294:24 | 57:5,19 82:3 | **o** |
| 38:8 56:20 59:6 | 295:1,23 | 83:23 102:12 | **o'dell** 2:4 11:5 |
| 59:8,25 62:23 | **nonasbestos** | 102:17 104:10 | 11:13,25 23:10 |
| 63:1 78:11,16 | 294:4 | 105:9 205:5 | 23:14 34:12 |
| 79:21 93:14 | **nondetected** | 212:2 217:17 | 36:15 37:22 |
| 111:20 196:9 | 159:6 | 221:18 223:22 | 44:18 48:17 |
| 202:8 204:25 | **noon** 112:18 | 251:11 | 49:5 64:5 66:3 |
| 204:25 220:7 | **nope** 152:9 | **ntp** 301:20 | 66:9 67:20 68:6 |
| 245:20,21 | **normally** | 304:9,12 | 69:3 73:5 74:9 |
| 248:9,16 | 291:16 | 314:23,24 | 89:13 95:8,19 |
| 261:11 263:7 | **notary** 1:12 | 315:4,7,12 | 98:21 100:10 |
| 263:16 314:16 | 317:7 318:24 | **ntp's** 302:8 | 105:3 107:16 |
| 314:18 315:18 | **note** 177:18 | **number** 17:22 | 117:21 119:14 |
| **nevertheless** | 191:2 195:20 | 20:14 32:10 | 119:21 120:2,8 |
| 275:17 | 208:9,12 | 52:20,21 53:11 | 120:20 121:8 |
| **new** 1:1,12 3:18 | 217:19 248:17 | 54:6 83:24 88:7 | 121:15,16 |
| 3:18,24 23:2 | 317:21 | 90:7 94:3 97:1 | 126:8 129:1 |
| 57:22 58:6 | **notebook** 257:3 | 98:2 119:12 | 130:14 131:3 |
| 317:7 | 257:5,6 | 124:22 139:19 | 132:3 133:23 |
| **newer** 94:15 | **noted** 130:18 | 155:4 168:5,19 | 135:10 137:8 |
| **newly** 95:21 | 184:25 192:5 | 169:8,10,16,22 | 138:5,15 |
| **ngs** 138:24 | 287:20 | 170:9 176:19 | 139:10,12 |
| **nice** 260:17 | **notes** 89:4,15 | 181:15 191:11 | 140:15 142:20 |
| **nickname** | 187:4 192:7 | 192:4 204:24 | 143:11 144:2 |
| 263:11 | 239:16 249:22 | 215:6,23 226:1 | 144:20 147:4 |
| **nights** 308:20 | **notice** 34:10 | 240:22 244:2 | 148:14,21 |
| **nih** 309:1 | **noting** 120:17 | 257:9 271:4 | 150:14 152:8 |
| **nine** 140:21 | 191:3 270:5 | 281:14 283:25 | 152:10,12,25 |
| **noise** 108:9 | **notion** 180:1 | 288:16 301:18 | 153:9,17 154:1 |
| 277:3 | | 303:16 | 154:9,13,18,21 |

[o'dell - ohio]                                                              Page 47

155:25 160:19
160:23 161:1
166:8 167:13
168:16,22
173:3 176:15
177:22 178:6
178:14 179:10
181:8 182:18
183:16 184:24
186:5 188:4
189:13,20
194:16 196:4
199:17,24
201:21 203:7
204:2,4 206:15
211:14 221:25
223:2,5,10
231:2,5 233:13
234:1,15
236:18 237:25
238:2 246:9
251:1 253:15
254:11,21
255:21 256:19
261:8 264:1
265:12,18
267:5 271:24
274:22 275:9
277:7,14
278:24 281:9
281:23 286:5
287:1 288:18
289:6 290:1
292:8 294:6
295:8,10 298:2
301:8,12

303:23 304:2
306:14 307:24
309:25 312:15
316:5
**o'dell's**  119:17
119:20
**obesity**  20:9
**obfuscated**
295:24
**object**  34:12
36:15 37:22
44:18 73:5 74:9
98:21 100:10
105:3 107:16
117:21 129:1
132:3 133:23
135:10 138:5
138:15 139:10
144:20 145:25
147:4 155:25
167:13 173:3
179:10 181:8
183:16 185:1
188:4 194:16
196:4 201:21
203:7 204:2
206:15 233:13
234:1,21
236:18 237:25
238:2 246:9
253:15 254:11
255:21 256:19
261:8 264:1
271:24 274:22
277:14 278:24
288:18 289:6

290:1 292:8
294:6 295:8
298:2 306:14
309:25 312:15
**objected**
130:15
**objecting**  151:4
297:19
**objection**
130:17 150:14
184:25 186:5
277:7
**objective**  47:11
**objectively**
245:6 312:25
**obligation**
194:21
**obligations**
20:18
**obscure**  277:25
**obscures**  276:4
**observed**
144:15
**obviously**  16:9
21:3 22:13 23:4
24:22 28:16
33:2 40:7 55:15
57:8 66:12 69:6
77:12 129:18
130:1 216:14
266:14 310:16
**occasional**  98:8
106:10
**occasions**  212:6
**occur**  127:5
128:21 130:23

131:24 132:25
177:20
**occurring**
125:19 291:18
**occurs**  123:15
**october**  6:19
239:11 240:4
240:10
**offending**
264:12
**offenses**  309:8
**offer**  36:18,24
114:24 135:13
147:1 196:2
198:15
**offered**  292:3
**offering**  36:1
39:20 41:14
42:8 113:21
310:19
**offers**  242:3
**office**  215:16
217:2 240:25
241:5 269:4
304:17,20
306:3
**official**  29:4,5
251:6
**officially**
209:21
**officials**  243:22
**oh**  141:14
204:19 232:19
251:6 301:17
**ohio**  22:19

**[okay - opinion]**                                                                 Page 48

| | | | |
|---|---|---|---|
| **okay**  8:20 11:25 | 134:2,17 135:4 | 246:5,12 | **ones**  32:12,13 |
| 13:17 14:14,23 | 136:25 137:6 | 248:15,19 | **open**  125:25 |
| 16:7,14 17:3,9 | 139:16,25 | 249:17 255:6 | 153:19,22 |
| 17:14,20 18:8 | 140:3,9 141:13 | 256:9 257:17 | 161:3 271:2 |
| 18:18,25 19:19 | 142:9,19,20 | 261:24 263:21 | **opening**  31:2 |
| 21:17 22:9 | 144:2 146:9 | 264:4 266:2,6 | 83:25 84:12 |
| 25:19 26:3,21 | 150:6 152:7,10 | 267:13 269:16 | 85:3 90:16 91:2 |
| 27:10 28:8 38:2 | 152:17 153:17 | 269:24 270:18 | 100:20 161:5 |
| 41:21 42:5 44:9 | 154:9,18 | 271:1,18 274:8 | 223:10 |
| 46:17 47:6 48:4 | 155:17,22 | 278:6,10 | **operating** |
| 53:13 57:4,16 | 158:3,24 160:1 | 279:13,21 | 269:6 281:8 |
| 58:20 59:3 | 160:23 161:21 | 281:7 282:14 | **operation** |
| 63:16 65:20 | 162:3,25 167:5 | 283:21,21 | 20:15,16 |
| 67:2 68:7,21 | 167:14,18 | 284:2 286:7,25 | **opine**  38:19 |
| 69:8,24 73:1 | 168:2 171:3,11 | 288:5,12,25 | 209:21 |
| 74:2,13 77:3 | 178:6,8 179:3 | 290:11,13 | **opining**  32:7 |
| 78:10 81:14 | 184:8,18 | 291:14 292:13 | **opinion**  36:5,7 |
| 83:18 84:5 | 188:15 189:12 | 295:6,6 298:16 | 63:15 106:12 |
| 86:24 88:8 89:2 | 189:20,22 | 299:2 301:12 | 113:12,21 |
| 90:17,24 92:5 | 190:17 191:7 | 304:2 306:9 | 114:7,10,13,14 |
| 93:3,25 94:8 | 192:14 193:19 | 307:14 308:19 | 114:25 115:6 |
| 100:7,18 | 201:16 202:25 | 310:8,18,25 | 115:18 116:3 |
| 101:21 103:18 | 204:6 205:23 | 311:2 312:18 | 117:13,16 |
| 104:22 107:12 | 209:13 210:14 | 312:24 313:15 | 118:2,12 |
| 110:2,14 | 210:23 211:20 | 314:1 316:2 | 127:12,17,18 |
| 111:14 113:6,9 | 212:15,23 | **old**  33:3 125:3 | 128:18 130:8 |
| 113:20 114:1,7 | 213:15 215:14 | **once**  62:11 | 139:6 147:1 |
| 114:13,21 | 216:18 219:24 | 113:12 157:14 | 158:18,22 |
| 116:14 117:12 | 223:4,8,8 224:2 | 194:5,19 195:4 | 159:2 165:9 |
| 118:22 119:10 | 225:20 229:13 | 195:4 199:6,6 | 172:19 173:9 |
| 120:1 121:5 | 229:20,23 | 215:19 229:13 | 173:10 194:3 |
| 122:14 123:1 | 235:5 236:22 | 229:13,14,19 | 198:23 199:12 |
| 123:14 125:2 | 237:19 238:12 | 232:3,15,15 | 201:16 231:22 |
| 126:18,20 | 238:14 239:18 | 294:22 | 236:16 270:19 |
| 127:4 130:6 | 239:25 242:11 | **one's**  165:23 | 276:10 278:15 |
| 131:3 133:19 | 243:2,8 244:23 | 228:24 | 288:23 293:4 |

**[opinion - paragraph]**                                                    Page 49

294:22 298:9
309:13 310:4
310:18
**opinions** 5:8
29:18 32:15
34:9 36:1,13
37:4 39:20 40:3
41:14 42:9 58:5
58:6,7 61:1
76:24 85:9
104:18 105:2
105:12 106:19
107:9 115:7
141:2 171:13
171:14 179:6
180:5 196:2
197:13 231:17
**opportunity**
57:11 81:4
**orange** 65:12
65:23 67:4
68:11,13
**order** 30:9
76:16 87:12
133:9 256:23
258:14
**organic** 72:20
**organization**
5:13 7:13 142:2
217:1 284:4
285:4 287:17
292:4 297:5
**organization's**
287:21
**organized**
241:21

**original** 194:1
**outcome** 309:9
**outline** 248:22
**outside** 33:23
133:21 189:17
206:21
**ovarian** 39:3,22
40:16 196:3
205:16 208:15
224:20 226:13
304:22 306:11
**ovaries** 224:15
224:24
**ovary** 194:6
**overall** 191:10
**overcome**
309:6
**overseas** 7:14
285:5
**oversight**
181:19
**overstatement**
207:19
**overview** 9:6
242:3 243:23
300:3
**owe** 176:21
**own** 86:1 87:25
131:7 246:24
274:20,24
299:6

**p**

**p** 2:1,1 3:1,1
5:11,11 88:4
141:4,5,8

**p.a.** 2:15
**p.c.** 3:9
**p.m.** 316:15
**pack** 90:20
**pad** 9:11 10:10
66:25 67:7
**page** 4:3,10 5:4
6:4 7:4 10:19
10:20 14:15
15:25 16:2 17:4
41:6,7,12,13
45:13 67:3,11
67:23 81:20
92:17 94:12
96:24 99:23,24
113:7 118:19
126:22 140:5
143:4,16,23
145:10 154:25
161:14 162:18
162:19 171:4
182:12 190:5
190:11,13
212:6 217:25
218:13 219:1,3
220:18 225:23
248:21 249:1
251:8 262:5
269:20,21
276:15 281:11
281:13,14
282:19 283:23
284:1 291:14
294:19 304:15
308:5,10 318:6

**pager** 50:16
**pages** 67:1,8,18
81:9 83:14 90:8
136:9 144:7
169:17 175:23
240:18
**paid** 110:4,6
243:25 244:4
245:22 247:8
288:14
**pains** 13:10
**papantonio**
2:15
**paper** 5:8 9:16
10:14,17 12:8
33:23 52:20
53:3,5 65:2
67:8,10 68:19
137:3 139:20
139:23 140:11
141:1 143:14
145:8,11 150:9
225:12 282:16
**papers** 9:18,19
65:3,5 68:19
224:4 242:2
**paragraph**
30:22,22 31:3,4
31:14,24 32:9
38:17 42:24
80:23 81:2,14
113:7,11
116:13,20,22
117:2 118:6,19
119:8 123:15
159:18 169:3

**[paragraph - perspective]**                                    Page 50

180:18 184:1
184:21,22
186:4,13
190:10,18
191:2 192:3
193:15 208:2
208:11 230:25
231:4 245:20
262:6 280:19
282:18 283:25
284:3,6,10,18
287:15 294:18
294:19 308:5,6
309:12
**paragraphs**
81:8 139:19
183:12 191:2
192:2
**parentheses**
126:1
**parfitt** 2:10
**park** 3:24
**parse** 68:25
**part** 20:19 78:6
78:19 81:7
89:15,17
133:17 137:10
157:18 159:14
163:21 170:17
171:24,24
184:20 192:11
209:10,11
216:6 224:11
233:21 237:17
245:25 262:17
277:5 296:24

**participants**
240:19,21
247:14
**particle** 62:9,15
71:15 80:13
**particles** 152:2
224:13,14,21
296:3,20
297:11
**particular**
115:13,13
183:15 190:9
192:5 212:6
**particularly**
304:18
**particulate**
192:8
**parties** 33:23
34:5 52:2 87:21
**parts** 37:16
114:25 258:6
292:5
**party** 34:4
243:19 244:3
302:6 303:8
304:8
**passed** 62:13
**passing** 313:20
**past** 210:6
268:24 309:6
**paste** 49:15
68:19
**pasted** 67:9
103:23
**pastes** 10:15

**pathological**
77:23 196:22
**pathology**
199:10
**pathway** 176:5
**pause** 80:22
148:21 191:1
**pay** 108:10
243:23
**paying** 27:24
230:3
**pdf** 94:4 251:9
**pdfs** 91:20
92:10
**pediatrician**
21:5
**pediatrics**
18:23
**pejorative**
254:21
**pending** 134:8
166:5,7 243:7
**pennsylvania**
2:21 3:11
**pensacola** 2:16
**people** 71:11
85:15 87:5
121:24 136:11
137:23 149:11
150:23 151:1
173:22 186:22
188:9 218:9
219:16 229:4
244:18 300:20
303:3 313:1,14

**percent** 110:24
161:14,15
162:12 163:24
164:1,2,15,17
165:6,22,22
166:2 176:6
263:4,9,9,13
287:19 288:15
289:11 290:24
314:3
**perfect** 154:16
168:24 214:5
231:25
**perineal** 192:8
**period** 19:8
96:3 115:19
158:8 212:20
215:14 220:16
220:20 237:9
261:6
**periods** 251:16
**perpendicular**
297:15,25
**persisted**
109:19
**person** 69:15
72:24 77:9
122:22 261:15
**personal** 52:20
237:10 300:6
**personally**
78:11 212:17
**perspective**
31:8 33:13
96:22

**[perspectives - plus]**

Page 51

| | | | |
|---|---|---|---|
| **perspectives** 6:18 240:2,10 | **pfizer** 305:18 | **piece** 10:17 | **platelets** 297:14 |
| **persuaded** 251:20 | **pharmaceutic...** 16:20 | **pieces** 53:3 67:10 | **platy** 291:18 |
| **pertain** 43:12 | **pharmacology** 6:21 240:6,12 241:18 242:1 | **pier** 169:10,14 | **plausibility** 191:4 |
| **pertained** 52:8 | | **piles** 68:11,13 | **plausible** 192:7 |
| **pertaining** 213:22 | **phase** 88:9 | **pinnacle** 24:9 | **play** 38:23 40:11 196:19 |
| **petition** 6:10,14 | **philadelphia** 2:21 3:11 | **pittard** 2:5 | **played** 101:16 278:4 |

**perspectives**
6:18 240:2,10
**persuaded**
251:20
**pertain** 43:12
**pertained** 52:8
**pertaining**
213:22
**petition** 6:10,14
7:7 190:22
191:14 192:5
192:24 200:21
201:3,3 205:3
205:21 211:12
212:24 213:19
215:16 216:4,8
216:21 217:8
217:17,24
218:6 220:9,25
221:19 223:17
224:3,11 226:5
226:25 229:25
230:20 231:11
233:6 249:6,11
249:13,25
250:3 251:8,11
251:20 266:15
**petitioner's**
230:1,2
**petitions** 91:5
200:16 211:23
212:1 215:20
215:22,24,25
216:2,7 220:5,5
220:12 266:16
266:22 267:2

**pfizer** 305:18
**pharmaceutic...**
16:20
**pharmacology**
6:21 240:6,12
241:18 242:1
**phase** 88:9
**philadelphia**
2:21 3:11
**philosophy**
146:20
**phone** 24:7,21
25:5 26:9
312:22
**photo** 11:10
**photograph**
4:19 64:22
**phrased** 117:7
162:15
**physician** 78:3
**pick** 124:9
**picked** 216:5
**picking** 191:21
261:3 313:13
**picks** 30:2
**pickup** 313:11
**picture** 11:21
64:15 65:9 66:5
67:21,22 68:8
157:8 310:6
**pictures** 63:25
65:15,16,18
67:17,22
**pie** 174:21,23
175:3,20,24,25
176:1,9

**piece** 10:17
**pieces** 53:3
67:10
**pier** 169:10,14
**piles** 68:11,13
**pinnacle** 24:9
**pittard** 2:5
**place** 58:21
59:17 75:4,8,13
87:23 96:25
98:9 102:1
128:5 129:22
155:21 156:20
156:24 164:14
172:1 229:11
239:23 242:14
263:17 276:4
314:18
**placitella** 3:9
3:10
**plagued** 60:1
**plaintiff** 2:2 3:3
25:20 39:6
110:5
**plaintiff's**
24:16 27:6 37:2
39:6 90:20
101:22 110:6
184:3
**plaintiffs** 27:7
190:19
**plane** 297:15
**planning** 23:7
179:18
**platelet** 297:24

**platelets** 297:14
**platy** 291:18
**plausibility**
191:4
**plausible** 192:7
**play** 38:23
40:11 196:19
**played** 101:16
278:4
**playing** 112:10
**please** 10:24
25:17 48:18
78:7 80:24
91:14 106:20
124:24 126:9
126:11 134:1
137:9 140:5
143:10 149:1
152:20 156:17
160:7,20 168:4
177:9 178:2
179:14 181:24
182:11,17
184:10 186:14
188:23 231:6
238:11 247:22
254:5 256:10
256:10 259:15
262:11 265:11
265:19 267:19
267:25 275:12
280:6 284:6,23
290:17 294:8
**plural** 220:23
**plus** 161:8,11

**[point - pretty]**                                                                                      Page 52

point  21:13
  45:6 89:19
  93:17,19 94:4
  96:7 100:23
  116:21 118:11
  122:12 147:7
  149:3 162:22
  163:12 170:20
  171:6 172:9
  179:23 183:9
  199:13 203:1
  210:5 220:13
  233:14 248:3
  251:23 260:1
  267:2 274:9,19
  296:14,20
  300:24
pointed  164:5
pointing  184:12
  192:2
points  97:16
  157:11 203:3
policies  272:10
  275:25 276:1
policy  155:20
  269:6 276:4
pop  177:10
population
  305:18
portions  139:22
posed  83:22
position  41:17
  89:14,18
  118:18
positive  59:6
  62:20,21

110:21 163:17
257:15 263:7
270:1 299:1,3,9
299:13 315:19
positives
  165:19
possess  144:13
possession
  187:19
possibility
  172:7 176:12
  252:9 298:20
possible  8:10
  12:12,12,20
  23:19 26:18
  90:6 183:1
  205:14 237:12
  237:14 315:15
possibly  100:21
  100:21 193:3
posters  11:9
potential  32:5
  43:4,19,25
  44:16,23 138:8
  149:8,20
  172:24 173:24
  176:8 293:16
potentially
  13:16 171:1
poulton  174:5
  174:12 177:10
  178:10 179:6
powder  1:4
  35:15 39:3,7
  58:16 190:20
  190:25 193:2

193:22 201:19
226:7,10 227:2
274:14 287:18
287:23,24
312:13
powders  116:5
  225:14
powerpoint
  176:17
practice  26:25
  51:11,13 62:21
practiced  269:8
practices  1:4
  174:17
pre  42:17
preceding  81:9
precise  116:20
  116:23,25
premised  265:3
preparation
  45:9 48:6,7
  51:3 55:11 56:4
  56:15 57:9
  68:21 69:7,9,16
  89:12
preparations
  69:6
prepare  68:23
prepared
  111:18 219:7
  288:22
preparing  69:1
  297:13
presence  61:8
  61:17 73:4
  78:12,17

113:13,15
114:2,9 116:4
116:15 117:18
155:23 158:17
165:10 252:25
259:19 263:25
272:19 276:5
294:23,25
298:11 302:9
312:10 314:12
present  44:8
  169:25 210:6
  292:20
presentation
  245:12 267:17
presentations
  157:13 170:11
  242:4
presented
  226:4,24
  227:11,14
presently
  251:21
presents  149:9
president
  268:11
pressure
  304:16
presumably
  237:11
pretty  18:15
  19:16 84:1
  115:25 157:8
  178:5 255:2
  256:21 288:15

**[prevent - professionals]**                                                    Page 53

| | | | |
|---|---|---|---|
| **prevent** 208:19 | 74:24 86:20 | **processes** | 235:2,11,19,23 |
| 209:24 230:16 | 92:14,18 | 110:17 | 239:6 263:18 |
| 230:22 231:14 | 100:11 103:24 | **processing** 62:5 | 290:9 295:2 |
| 233:10 | 114:19 119:4 | 65:13,17 313:6 | 309:14,15,18 |
| **prevention** 6:9 | 121:9 124:3 | **produced** 10:19 | 310:11,20 |
| 205:3 212:1 | 136:9 156:3 | 85:15 86:13 | 311:9,13,22 |
| 216:22 221:1 | 172:5 276:21 | 251:18,21 | **product's** |
| 223:21,21 | **problem** | **producers** | 235:14 |
| **previous** 251:1 | 119:25 120:12 | 274:3 | **production** |
| **previously** | 121:20 149:23 | **producing** | 35:15 95:2 |
| 41:10,13 | 152:14,15 | 300:21 | 176:3,4,6 |
| **price** 310:17 | 226:19 235:25 | **product** 35:12 | 177:17 274:14 |
| **primarily** 9:24 | 236:3,17 239:8 | 35:13 46:7 | **products** 1:4,5 |
| 86:7 214:12,13 | 244:20 247:11 | 58:23 59:15 | 5:10,19 6:11,16 |
| **primary** 21:2 | 269:22 | 62:2 89:16 | 113:21,24 |
| **prime** 73:14 | **problems** 49:10 | 113:17 115:9 | 114:11 115:14 |
| **principals** | 94:3 148:1 | 115:24 116:12 | 117:13,17 |
| 100:5 | 279:10 | 118:4 166:17 | 138:9 141:3 |
| **principles** | **procedure** | 194:7,11 195:8 | 153:12 170:7 |
| 19:14 74:19,20 | 159:24 215:15 | 197:3,7 198:3 | 170:25 171:1 |
| 112:7 151:19 | 269:7 281:1,8 | 198:14 201:7 | 190:21,25 |
| **print** 94:2,6 | **procedures** | 202:13 203:13 | 192:13 193:22 |
| **printed** 12:13 | 159:21 252:13 | 203:17,17,19 | 194:15 197:17 |
| 12:24 13:7,15 | 253:6 255:11 | 206:1 207:4,6 | 201:19 205:5 |
| 172:6 175:1,2 | 259:22 | 207:15,16 | 206:14 208:17 |
| **printing** 92:9 | **proceed** 27:22 | 208:20,25 | 221:20 225:5 |
| 143:24 167:21 | **proceeds** 24:13 | 209:7 227:23 | 226:7 227:2 |
| **prior** 46:15 | **process** 36:8,20 | 228:19,25 | 231:13 232:25 |
| 62:14 75:6,13 | 61:6,9,24 62:8 | 229:6,9,14,16 | 233:8 242:23 |
| 102:20 237:24 | 80:6,15,18 | 229:18,20,21 | 248:1 268:13 |
| **privacy** 49:13 | 83:21 89:3 | 229:21 230:12 | 300:6 312:13 |
| **probably** 9:14 | 109:10 217:6 | 230:17,23 | **professional** |
| 30:20 33:7 46:3 | 219:23 220:1 | 231:15 232:5,9 | 317:5 |
| 46:22 51:24 | 314:11 | 232:11,16,17 | **professionals** |
| 52:2 54:4 60:21 | **processed** | 232:20,24 | 305:17 |
| 72:13,23 73:13 | 89:11 | 233:12,17 | |

[professor - quality]                                           Page 54

**professor** 18:23
  39:9 165:12
  196:11
**program** 59:18
  59:20,23
**programs**
  262:17
**project** 7:14
  285:5
**pronounce**
  178:23
**pronouncement**
  84:19
**properties**
  155:13
**proposition**
  43:24
**protect** 166:2
  167:3
**protected** 89:17
**protection**
  208:13
**protects** 263:8
**protocol** 157:24
  269:5
**protocols** 274:1
**proud** 304:24
**prove** 194:23
  194:24
**proved** 258:17
**proven** 242:22
  247:25
**proves** 257:18
**provide** 11:10
  99:8,17 136:7
  224:18 283:10

**provided** 64:15
  67:21 99:21
**providing** 99:2
**public** 1:12
  20:10 58:13
  60:15 109:21
  109:25 149:12
  151:13 166:2
  167:3 171:18
  208:13 216:17
  235:10 239:2
  241:14 242:13
  242:16 304:20
  306:3 310:9,21
  311:15,19
  317:7 318:24
**public's** 309:16
**publication**
  210:4 242:3
  258:21 260:11
  283:3
**publicize** 288:2
**publicly** 193:16
  233:23 246:6
  247:16 248:5
**publish** 166:15
**published** 7:8
  241:17 247:16
  278:12 280:2
  280:21
**publishes** 273:2
**pull** 44:20
  104:4 106:3
  119:3 122:8
  131:8 157:14
  174:8 175:11

  175:19 187:8
  204:8,13
  218:10 222:6
  223:18 228:25
  256:21,22
  289:18
**pulled** 170:13
  232:20
**pulling** 108:3
  118:9 232:17
  248:21 284:13
  284:13
**pure** 76:15
**purely** 120:20
**purity** 262:18
**purposes** 32:14
  176:16
**purview** 38:9
  149:11
**pushing** 89:20
**put** 13:20 39:18
  47:12 48:18,19
  50:11 53:15
  58:1 59:17 60:9
  60:15 63:6,12
  66:5 68:14 79:2
  84:3,25 85:23
  86:3,8,10 90:2
  98:5 104:12
  110:19 111:22
  126:8,11
  127:24 140:9
  140:14,20
  141:9 142:10
  142:21 147:6
  153:3,5,10

  160:4,19
  166:23 168:20
  168:22 173:15
  177:24 178:9,9
  179:20 181:17
  185:6 201:10
  202:11 209:20
  214:25 224:1
  228:24 229:6
  232:12,18
  239:1,1 250:15
  250:16,23
  261:25 263:17
  267:25 268:2
  278:20 301:1
  309:15 310:8
  310:21 311:15
  312:13 314:1
  314:17 315:16
**putting** 20:15
  58:14 87:15
  164:13 178:8
  222:2 267:6
  276:4 289:23
  301:7 313:9
  315:17
**puzzled** 58:24
**puzzling** 57:21
  60:8

**q**

**qualified** 39:13
  76:8
**quality** 58:20
  59:1,8 179:19
  180:2,10,13,20

**[quality - rate]**                                                                      Page 55

180:25 181:6
181:11 262:17
263:6
**quantifiable**
281:20 282:4
283:6
**quantitation**
281:1
**quarter**  7:10
280:3
**question**  13:9
24:9 27:22,25
28:2 33:20 34:8
36:17 38:16
40:15 43:23
44:7,20 45:24
53:25 56:11
57:20 58:4,10
58:11,25 60:1,1
60:3,9,24 61:20
66:2 67:13,19
68:25 70:24
76:15 78:21
80:21 85:6,16
85:20 95:13,15
95:16 98:22
108:20 110:12
110:12 118:16
128:16 129:3
130:16 133:6
134:7,8,15,18
137:9 145:2
146:11,21,23
149:13 157:19
162:25 163:11
166:5,7 185:1

185:19,24
186:14 188:7
188:14 190:24
192:13,23
194:4 198:1
199:18,21,25
200:6,13,18,21
201:4 202:1
205:24 207:4,8
207:12 209:12
211:7 214:11
226:8 228:4,7
228:10,12
231:2,6,9
233:12 234:16
234:16,22,24
235:21 236:14
238:6,11 243:6
247:21,22
248:2 253:12
256:5,13,23
258:7,9,12,15
259:4,5,8,15,23
260:3 261:4,23
262:9,10
267:15 278:21
286:22,23
288:23 290:16
290:17,19
295:3,11
296:22,24
297:1 308:15
311:8,16 312:7
315:23
**questionable**
252:20 257:22

258:11,23
**questioning**
206:22 259:9
259:18 287:7,8
300:18
**questions**  54:23
57:12,17,22,23
57:23 59:12
61:2 76:24
83:22 85:21
119:11 122:2
135:5 151:3
157:20 181:19
191:9,20 194:9
194:15 195:1,6
196:13 197:9
197:10 198:18
199:4,10
203:10 207:3
228:5,9 246:23
250:21 256:2
258:4,5,18
259:21 260:6
286:14,16
290:7,14,15
312:6 316:5
**quibble**  16:22
**quick**  66:2
141:12
**quickly**  244:8
249:5
**quite**  11:9
54:13 66:13
79:10 153:5
215:23 275:18

**quote**  159:15
173:11 176:11
192:6 194:7
226:22 282:25
309:2
**quoted**  210:18
**quoting**  139:17
139:19

**r**

**r**  2:1 3:1 8:1
281:5 317:1
318:1,1
**rabbits**  68:18
**rafferty**  2:15
**raise**  191:9
194:14 195:1
199:3,10
274:17
**raised**  27:13
194:10 195:6
197:10 198:18
258:19 290:7
290:15,16
296:24
**raises**  197:9
203:10 290:19
**rand**  186:22
187:2,10
**range**  25:2
62:11
**ranging**  9:21
**rank**  159:3
**rarely**  102:1
**rate**  53:14,16
224:19

**[rates - record]**                                                                    Page 56

| | | | |
|---|---|---|---|
| **rates** 224:5 | 293:1 302:15 | **reassured** | 24:10 25:5,12 |
| **ratio** 296:4 | 304:23 318:2 | 206:6 | 45:21 46:3,10 |
| **rationale** 125:8 | **reading** 55:17 | **reath** 3:22 | 47:2 52:4 69:18 |
| **raw** 62:4 | 78:23 98:13 | **recall** 24:14,20 | 70:17 84:16 |
| **ray** 291:23 | 100:12 252:5,7 | 25:19 56:18,22 | 89:7 91:7 |
| 297:7 | 286:15 | 71:7 74:11 | 100:23 101:13 |
| **raymond** 61:24 | **reads** 304:15 | 88:11 98:18 | 101:23 103:10 |
| 109:12 | **real** 79:22 | 174:11 196:9 | 212:16 213:2,3 |
| **reach** 111:4,9 | 180:15 201:4 | 211:13 217:14 | 213:5,21 215:1 |
| **reached** 25:20 | **realize** 71:11 | 303:1 | 215:21 220:15 |
| 130:8 | 110:2 274:9 | **receive** 90:19 | 239:19,22 |
| **reaches** 192:8 | **really** 18:8,11 | 101:21 | 242:12 245:2 |
| **reaching** 146:9 | 35:3 43:10 | **received** 13:19 | 302:23 303:11 |
| 191:4 | 45:11 46:18 | 48:5,11 68:2 | **record** 8:13,15 |
| **reactions** | 141:11 156:23 | 252:11 | 32:25 33:1 |
| 224:23 | 157:7 167:8 | **recent** 13:18 | 48:12 49:16,22 |
| **read** 97:22 | 200:5 214:11 | 15:4 80:19 83:5 | 56:24 58:1 |
| 104:24 106:21 | 230:6 237:3 | **recently** 17:6 | 59:21 60:23 |
| 113:18 127:11 | 266:25 271:5 | 20:13 21:11 | 63:21 66:17 |
| 128:19 132:16 | 272:6,16 282:9 | 104:13 221:10 | 68:3,5 78:20 |
| 132:17,18 | 296:25 301:17 | **recognize** | 84:25 85:7,9,20 |
| 135:21,22 | **realtime** 121:5 | 172:13,14 | 87:6 112:5,22 |
| 136:1,3,15 | 121:13 199:25 | 229:19 268:21 | 112:24 113:24 |
| 140:15 145:9 | 317:6 | 274:11 | 117:1 119:16 |
| 159:12 162:2 | **reason** 25:24 | **recognized** | 120:18 121:11 |
| 170:15,17 | 118:8 130:2 | 144:25 232:17 | 121:17 127:24 |
| 186:7 212:21 | 163:21 192:16 | 300:11 | 130:18,19,20 |
| 220:17 224:25 | 207:21 256:6 | **recognizes** | 153:25 154:4 |
| 247:15 252:21 | 277:25 278:21 | 63:10 251:15 | 155:3 158:3 |
| 258:2,16 | 299:8 315:24 | **recognizing** | 167:24 168:13 |
| 261:13 262:6 | **reasonable** | 85:10 273:10 | 172:4 174:24 |
| 262:12 268:6 | 38:12 54:10 | 293:11 | 181:12,17 |
| 269:10 276:11 | 63:11 310:19 | **recollect** | 189:21,23 |
| 278:13 281:24 | 313:15,17 | 213:14 | 198:12 222:22 |
| 286:4,18,24 | **reasons** 299:9 | **recollection** | 223:7,13,20 |
| 288:3 290:3 | 316:1 | 22:7 23:1 24:8 | 238:7,13,15 |

**[record - reliability]**                                    Page 57

239:6 247:7
248:18 260:24
265:13,20
266:3,24 267:4
273:23 299:17
301:13 303:15
306:21
**record's** 213:15
243:12 244:23
**recorded**
127:22
**records** 39:17
87:7 112:4
275:18
**red** 251:5
**redefining**
147:21
**reducing**
208:14
**reengage** 28:18
**reengaged**
27:11 51:7
53:20
**reengaging**
24:17
**reentered** 84:8
**refer** 136:18
145:21,22
155:18 191:10
287:15
**reference** 38:6
43:9 183:25
197:19 198:25
**referenced**
31:24 32:20
259:6

**references**
107:24
**referred** 104:5
214:6 216:1
**referring** 10:12
15:19 43:5,7
55:23,24 61:17
75:10 81:8
108:5 117:3
122:23 154:25
169:6 187:6
213:19 214:8
243:18 253:5
299:25 300:1
**refers** 193:1
284:3
**reflect** 130:19
**reflected** 20:19
33:23 60:9
152:22 233:25
269:2 284:17
290:20
**reflects** 51:3
64:16 130:20
**reformulate**
310:11
**reformulated**
311:22
**reformulating**
309:18
**refresh** 25:11
25:13
**reg** 76:12
**regard** 35:13
42:13 206:22
215:5 268:17

293:20
**regarding**
41:14 73:3
179:6 196:2
**region** 108:6
**regional** 172:23
**register** 63:9
**registered**
317:5
**regs** 209:20
**regular** 316:8
316:10
**regulated** 77:13
146:11 147:12
170:25
**regulating** 78:5
170:3
**regulation**
150:4
**regulations**
31:10 43:15
76:16 208:16
208:23 209:11
227:18 242:20
**regulator** 78:4
**regulatory** 6:20
31:7,25 40:2,5
40:8 42:19
44:14,21,25
76:14,23 84:2,7
111:13 112:6
124:5 138:7
146:9 149:7,18
150:11 198:1
219:14,21
226:21 240:5

240:12 241:17
241:25
**rejected** 59:9
**rejoined** 16:19
**rejoining** 19:7
**relate** 27:11
70:6
**related** 118:17
171:23 211:23
213:20 239:12
**relates** 28:3
44:13 74:8
76:23 78:8
152:20 181:6
196:15 293:15
**relating** 43:25
44:16 71:19
181:4 184:6
212:25 221:1
226:23 304:13
306:13 308:16
**relationship**
74:15,22 79:21
**relative** 288:16
**relatively** 56:25
88:18 106:5
**relativity**
308:21
**relayed** 242:24
**relevant** 60:17
**reliability**
110:23 186:2
252:20,24
257:22 258:12
259:9,19,21
263:23 297:2

[reliability - request]                                                    Page 58

299:5
**reliable**   63:2
   165:11 260:23
   263:16 297:21
   298:4
**reliably**   258:25
**reliance**   4:21
   12:16,16,21
   13:11,13 82:7
   185:9,19
   201:11
**relied**   203:24
**rely**   104:17,21
   106:11 165:23
   166:1,3,9
   197:17,18
   315:13,14
**relying**   43:24
   44:14,21,23
   105:2,5,8,12,20
   106:7,23
   165:24 174:15
   259:7 260:4,13
**remains**   190:23
**remarked**
   287:23
**remember**
   24:18 56:10
   71:3 72:7,24
   75:20 79:10
   92:13 99:13
   102:8 103:12
   103:14 159:17
   179:1 180:16
   208:1 212:24
   213:1 214:3

215:7 241:8,11
285:13 305:4,8
305:11
**remote**   1:8
**render**   40:6
   116:5 165:9
**renzi**   3:10
**repeat**   199:17
   231:5
**repeated**
   108:25 236:5
**repeating**   137:9
**rephrase**   99:5
**report**   4:12,15
   4:21 9:11 10:1
   12:9 14:8,12,25
   15:2 17:4 22:15
   22:21 27:14
   31:2,16,19
   32:10,15,19
   33:5,6 38:18
   41:2,9 42:24
   45:9,12,15,17
   45:23 46:9,14
   46:16,19 47:4,7
   47:13,13,14,16
   47:25 48:2,6,7
   51:4 52:1 54:2
   55:4,12 56:4
   57:14,19 58:3,5
   58:6 60:22 61:3
   61:5,9 62:20
   65:11 80:24
   82:3,8 83:23,25
   84:12,17,25
   85:4 89:16,17

90:16 91:3,11
92:17,18,19
102:24 103:1,6
103:11,22,24
104:4,6,15,23
105:1,10
111:25 113:4
116:7 117:2
118:8 119:2
122:16 123:16
124:16 126:6
131:9,20
135:24 139:17
140:12 154:25
164:18,20
170:17 174:4,6
174:11 177:10
178:9 183:3
184:19 185:7
195:25 203:4
206:11 210:19
212:5 215:8
225:10 226:23
227:19 230:14
231:18,22
241:20 254:9
256:17 266:9
267:10 282:15
283:23 289:24
291:1 294:2
308:5
**reported**   186:3
246:14 248:5
256:17 258:19
290:24

**reporter**   1:11
   63:19 68:4
   141:16 168:11
   189:22 249:21
   301:15 316:7
   317:5,6,6,25
**reporter's**
   112:21
**reports**   47:20
   56:6,16 78:23
   89:12 102:11
   102:16,20,22
   103:3,8 185:13
   252:11
**repository**
   81:16
**represent**   14:7
   34:4 88:20,25
   94:21 95:18,19
   101:8 138:2
   246:3 247:9
   284:10
**representation**
   289:14
**representatives**
   302:13,18
   304:11
**represented**
   159:9 167:16
   247:16
**reproduction**
   317:22
**reproductive**
   224:22 305:19
**request**   67:16
   204:18 230:2

[request - review]                                                    Page 59

234:21
**requested**
227:4
**requesting**
251:11
**require** 200:25
205:17 227:1
227:17 228:20
230:21 231:12
233:7
**required**
262:24
**requirement**
209:5 228:23
230:13 263:1
268:15,17,25
**requirements**
41:15 42:10
62:19 84:15
155:13 209:17
235:8
**requires** 202:20
**research** 5:14
18:24 19:24
20:11,18 21:3
55:13,14,15,17
55:18 61:3 70:3
70:6 71:11,13
71:19,21,24
73:15 142:3
158:14 224:12
279:18
**researched**
83:21
**researching**
67:14 86:25

**residual** 264:14
**resisted** 90:25
134:21 256:8
**resolution**
11:22 300:13
**resolved** 28:12
257:16
**respect** 36:13
40:15 80:5 92:1
93:9 106:20
192:23 253:18
**respected** 124:8
278:17
**respectful**
260:7
**respond** 120:16
205:24 218:23
286:22
**responded**
134:15 219:20
237:19 266:15
266:17,18
**responding**
204:17 205:21
217:8 220:11
236:8 304:16
306:1
**responds** 192:6
251:10
**response** 7:7
84:23 91:9
170:15 178:22
178:24 179:4
190:23 191:3
191:22 192:5
192:11,24

194:4 200:16
200:20 203:24
204:8,9 205:12
205:13 207:25
208:11 210:5
210:23 211:22
211:25 217:19
217:19,23,24
217:25 218:17
218:18,19
234:17 236:13
238:14 239:7
249:12,15,24
250:3 251:7
**responses**
290:23
**responsibilities**
19:20 20:20,22
31:6 35:10
196:25
**responsibility**
197:1 232:23
290:10
**responsible**
38:12 52:24
274:14 310:4
**responsive**
108:3
**rest** 58:22
137:2 202:22
**result** 46:14
59:7 62:21
78:24 283:11
**resulting** 173:1
224:6

**results** 186:2
236:1 252:19
252:25 253:2
257:21 258:11
258:19,24
259:11,19
275:21 288:2
**resume** 18:13
21:14
**resumed** 18:1
18:18
**retained** 45:22
45:25 46:2,8
69:20 70:12
71:1,25 72:10
72:16 73:1 74:6
74:13 79:3 80:8
130:9
**retested** 299:13
**retesting** 62:21
299:12,12
313:23
**rethink** 13:14
**return** 267:15
**returned** 312:8
**reveal** 26:8
**revelation**
305:3
**review** 54:10
81:4,19 90:13
91:4 97:8 98:20
100:8,18,19
102:3,15 174:6
174:8,8 186:8
186:10 191:19
267:11 276:7

**[review - right]**                                                    Page 60

| | | | |
|---|---|---|---|
| 285:24 | 42:21 43:1 45:8 | 145:1 146:11 | 203:15 204:11 |
| **reviewed**   33:15 | 46:12 51:10 | 147:7,11,12,13 | 206:4,21,23,25 |
| 33:25 42:1,5 | 52:6,23 54:8,20 | 147:14,19,20 | 207:1,6,11,12 |
| 60:8 78:18 84:8 | 55:14,21 57:10 | 147:22 148:2,6 | 207:22 212:3 |
| 86:17,17 88:14 | 59:2,9 63:13 | 149:9,18,21 | 215:2,24 |
| 99:10 104:13 | 64:11 65:4,13 | 151:13,19 | 216:20 218:2 |
| 105:1 142:16 | 65:24 66:22,24 | 152:1 154:21 | 218:25 219:2,6 |
| 242:18 250:10 | 67:5 69:19 | 154:24 155:12 | 219:8,17,18 |
| 253:20 308:16 | 71:23 75:23 | 157:17,22 | 221:2,7,12 |
| **reviewing** | 76:1,12 77:8,10 | 159:4 160:11 | 223:2 224:8,9 |
| 111:8 169:19 | 79:23 80:17 | 161:4,22 162:7 | 225:15,25 |
| 174:11 178:13 | 81:1,5,23 82:3 | 162:9,11 | 226:3 228:14 |
| 185:25 199:24 | 83:10 84:3,7,9 | 163:10,15,17 | 229:15 230:2 |
| **revisions**   15:7 | 84:16,18,22 | 163:20,21,25 | 232:2,4,7 233:3 |
| 15:10 | 85:19 87:3,14 | 164:4,9,10,21 | 234:25 235:2,6 |
| **rgolomb**   2:22 | 87:23,25 90:7 | 165:16,21,23 | 235:10 237:2 |
| **rhetorical** | 90:11 91:7,19 | 166:4,10,11,13 | 237:13 238:15 |
| 259:5 | 92:6 93:8 100:5 | 166:23 167:1 | 238:19,21,22 |
| **rich**   174:19 | 101:2,7 102:4 | 168:10 169:12 | 238:25 239:6 |
| 216:1 | 102:24 103:1 | 171:8 177:6 | 239:10 241:6,7 |
| **richard**   2:20 | 104:11 105:15 | 178:23 179:4,5 | 242:24 243:2 |
| **rid**   151:25 | 106:14 108:24 | 179:19 180:3 | 243:20,22,23 |
| 277:19 | 109:9,10,16,20 | 180:19 181:23 | 244:4 245:1,5 |
| **riebeckite** | 109:21 110:1 | 182:14 183:6 | 248:8 249:15 |
| 127:8 128:23 | 110:10,15,19 | 183:23 185:4 | 249:23 250:6 |
| **right**   9:14 10:9 | 111:19,20,22 | 187:13,20 | 250:12 252:3,6 |
| 10:23 12:2 | 112:3,15,16 | 188:8,12,16,17 | 254:4 255:9 |
| 14:22 15:16,17 | 116:3 119:25 | 190:2 191:15 | 257:10,15 |
| 16:8 17:1,7 | 121:7,13 122:7 | 191:20 192:9 | 260:7,9,21,25 |
| 20:17 21:7,8,24 | 126:16 133:6 | 192:20,23 | 262:1,3,6,7,21 |
| 24:10,12 25:6,8 | 134:14,24 | 193:3,9,13 | 262:23 263:12 |
| 26:2,12 27:19 | 137:20,22 | 194:22 195:10 | 268:1 271:8 |
| 28:1,21,22,24 | 138:14,24 | 196:16,19,21 | 272:14,19,20 |
| 29:11 30:23 | 139:20 140:13 | 197:4,11 201:4 | 272:24 273:4 |
| 31:2,12 32:14 | 142:13,16 | 201:4,7,23 | 273:23 274:11 |
| 32:23 34:22 | 143:3 144:22 | 202:3,10,12,14 | 276:13,15,18 |

**[right - satisfaction]**                                                    Page 61

277:4,19 278:1
279:15 281:5
281:22 282:10
282:11,24,25
284:9,21
286:19,21
287:5 288:12
288:17,20
290:5,18
291:10 292:7
293:21 294:15
294:21 295:17
295:25 296:3,4
296:12 297:3,9
297:17 298:17
298:24 299:5,7
299:10,12,14
300:25 305:11
305:12 306:20
307:7 308:23
308:24 309:9
309:11,19
310:12 311:10
311:11 312:22
313:3,5,10,11
313:12,13,18
314:4,8,9,11,21
314:23 315:1,8
315:10,20,23
**ring**   302:17,21
**rio**   156:9,10,12
157:4,13
167:20 169:5,8
169:14 176:2
176:25 271:4,5
272:4,7 273:19

298:21 299:1
**risk**   109:21
149:9 151:22
177:19 195:13
202:3,6 206:7
207:15,16,18
208:14,15
226:13 239:2
309:16 310:9
310:21 311:15
**risks**   5:16 44:8
142:4 173:24
**rj**   100:6 107:5
107:22,24
274:17
**rls**   1:2
**road**   2:11
**robin**   164:25
165:19
**rock**   176:7
**rocks**   172:25
**rohl**   225:13
293:14
**role**   206:4
**rolle**   293:5
297:20
**roller**   61:24
**rollers**   109:12
**room**   8:17 12:8
13:4 121:3
**roth**   3:9
**round**   54:4
164:25 165:19
**routinely**
273:22 300:23

**rpr**   317:14
**rtm**   176:7
**rule**   99:4
271:10,17
273:1,7 274:1
276:19 277:6
277:12 278:14
283:3 313:22
**rules**   227:18
**ruling**   195:10
211:9
**running**   238:5
**ruth**   305:11,14
306:1,3
**rw**   274:17

**s**

**s**   2:1 3:1 4:8 5:3
6:3 7:3 8:1,1
318:1
**safely**   58:23
**safest**   242:22
248:1
**safety**   113:17
114:17,18
116:8,11 164:7
172:10,19
190:20,24
191:9 192:13
192:23 193:21
194:10,15,22
195:1,4,6,8,15
197:3,7,16
198:2,14 199:4
200:10,12
201:15,18

202:16 203:12
203:18 205:25
207:4,5 209:7
226:24 227:22
228:2,19 229:7
229:10 230:12
245:19 274:4
290:6,9 295:2
**sake**   250:14
258:15 266:11
**sales**   1:4
**sam**   200:21
202:19 211:12
221:11
**sample**   59:9
62:13 77:20
109:1 162:5,9
163:2,6 165:5
186:17 269:16
283:10
**samples**   109:4
181:16 225:13
269:25 270:1
270:16
**san**   18:5
**sanchez**   99:25
100:3,4 101:3
101:11,19
106:25 107:1
107:14,23
**sanchez's**   102:7
108:15
**sand**   217:4,5
219:15
**satisfaction**
29:22

**[saturday - second]**                                              Page 62

**saturday** 69:4
  69:18
**save** 50:3 98:7
  154:5 161:2
**saved** 154:6
**saw** 34:3 59:16
  60:17 63:21
  85:19 164:16
  279:11
**saying** 25:8
  59:24 65:12
  87:7 90:1
  100:16 101:1
  101:19 105:19
  105:22 107:11
  107:15 112:10
  116:1,12
  118:12 148:10
  150:20 173:13
  173:14 195:16
  202:23 203:21
  203:23 207:23
  210:22 213:23
  222:24,25
  227:9,21
  231:17 237:1,7
  243:8 246:10
  260:16 264:9
  271:20 272:15
  276:6 277:15
  282:13 283:1
  295:14 297:21
  297:22 298:1,3
  302:22 314:15
**says** 15:24 16:8
  21:4 61:5 63:9

63:10 67:3 86:1
99:24 102:11
125:17 132:14
136:21 156:16
176:8 177:18
185:15 191:8
202:20 203:22
207:1 220:18
224:8 238:25
241:4 242:17
244:13 245:20
246:7,8,13
247:24 251:10
252:1,4 257:20
260:9,17,21
262:7,14 264:6
268:12 273:2
273:15 276:20
276:24 291:10
291:16 292:7
292:11 300:5
305:24 309:10
**scan** 11:15
  88:21
**scanning** 297:6
  297:13
**schedules** 47:9
  47:11,23
**scheme** 262:2
**schmenan**
  241:2,3,4 243:9
  245:25 247:5
  247:13 305:9
  305:20 306:4
  306:18 307:10

**school** 19:11
**schooled** 72:20
**science** 72:23
  75:15 78:7
  204:11 282:13
**scientific** 5:8
  44:24 74:1
  111:12 112:6
  129:10,12,16
  129:22 130:7
  141:2 146:12
  146:17 195:23
  224:4 225:3
  252:16 253:9
  255:13,18
**scientifically**
  129:16
**scientist** 78:4
  80:1
**scientists** 291:7
**scope** 30:18,25
  31:1 34:2
  183:20
**scratch** 263:10
**scratcher** 62:22
  164:10 245:15
**screen** 13:20
  14:16,24 48:20
  57:3 140:10
  142:22 153:4,6
  153:10 177:11
  222:12,18
  223:6,18
  250:16 267:24
  315:18

**screens** 48:24
  121:4 221:23
**screwed** 203:25
  260:17
**scribble** 52:19
**scribbled** 52:22
  90:7
**scribbles** 53:3
**scroll** 50:13
  160:7,7 224:10
  281:7 304:14
**scrolling** 91:20
**search** 60:23
  92:4,12,15
  96:12 97:21
  116:18,19
**searched** 92:20
  92:22 97:16,19
  97:19 214:23
**searches** 88:9
**searching**
  86:22 92:7,11
  93:16 97:20,24
  97:24 117:1
  123:23 159:17
**seasons** 25:2
**seat** 207:22
**sec** 216:25
**second** 41:11
  43:9 49:6 50:8
  58:4 60:10
  82:21 83:13
  94:8 102:25
  118:21 130:22
  135:24 153:8
  156:14,17,21

**[second - sensitivity]**                                                        Page 63

| | | | |
|---|---|---|---|
| 157:1,5 160:7 | 110:9,14 | 287:7 288:10 | 298:4,10,15 |
| 161:6,13 | 111:19 112:15 | 292:17 299:11 | **semantic** |
| 162:11,20 | 115:25 117:2 | 302:20,24 | 133:18 134:13 |
| 167:23 171:6 | 118:5 119:17 | 307:3,16 310:6 | 138:18 |
| 175:21 178:21 | 119:20 120:22 | 311:23 313:24 | **semantics** |
| 179:13 181:25 | 125:6,6,7 126:4 | **seeing** 66:6 | 128:13 129:15 |
| 182:19 186:7,9 | 127:1 131:5 | 100:25 296:25 | 133:18 138:14 |
| 186:20,20 | 132:12,19 | **seeking** 6:10,15 | 139:5,8 145:17 |
| 190:14 198:21 | 137:19 140:6 | 205:4,18 | 152:4 |
| 204:13 221:14 | 143:22 144:6 | 221:19 | **semester** 19:1 |
| 223:3 262:6 | 147:17 148:3 | **seem** 157:2 | **semester's** 19:2 |
| 269:18,20,21 | 153:6,19 | 245:24 274:2,3 | **seminary** 2:11 |
| 269:22 282:20 | 155:10,15 | 274:4 | **send** 64:2 66:11 |
| 285:17,18 | 158:20 161:17 | **seemed** 87:8 | 98:9,14 110:20 |
| 286:8 303:22 | 164:18 165:3 | **seen** 34:23 | 110:21 121:9 |
| 304:15 | 165:19 167:19 | 60:21 65:15 | 143:22 299:10 |
| **section** 85:23 | 170:12,14 | 94:24 167:10 | **sending** 126:18 |
| 143:4 163:1,9 | 171:25 178:12 | 210:16,17 | 280:11 |
| 171:17 183:21 | 179:21 180:14 | 264:5 269:12 | **senior** 16:8,11 |
| 190:4,11 | 180:18 181:20 | 269:15 275:14 | 16:25 |
| 191:10 193:14 | 186:13 213:8 | 285:11 286:2 | **sense** 8:21 10:6 |
| 203:3,22 | 213:10,25 | **sees** 66:5 | 30:9 42:16 47:1 |
| 206:11 281:18 | 214:15 215:4 | 110:10 | 54:5 72:3 74:1 |
| 290:3 292:17 | 217:22 218:1,8 | **segment** 51:17 | 93:4 149:7 |
| **sections** 19:13 | 219:7,11 220:8 | **segments** 51:20 | 219:22 261:15 |
| **see** 8:12 11:11 | 224:16 225:23 | **selective** 59:19 | 277:18 279:2 |
| 13:22,23,23 | 235:7 239:4 | 179:7 180:20 | 304:25 307:9 |
| 15:23 25:16 | 240:17 241:2 | **self** 254:8,20 | 314:17 |
| 26:20 32:25 | 258:20 260:9 | 255:2 | **sensitive** 63:5 |
| 43:21 50:11,13 | 260:15 264:20 | **sell** 232:7,8,10 | 112:20 253:23 |
| 50:16,19 53:7 | 268:1,5 270:17 | 232:24,25 | 256:8 273:6 |
| 54:22 58:18 | 271:7,11 | 262:18 310:22 | 296:13 313:25 |
| 76:9 77:20 84:9 | 275:14,18,19 | **sem** 286:19,20 | **sensitivity** |
| 87:14 95:1,3 | 276:18 281:21 | 286:21 287:8,9 | 62:16,25 |
| 97:2,11 99:5,18 | 282:5 284:19 | 296:23 297:2 | 110:24 150:1 |
| 99:24 102:13 | 285:10,13 | 297:14,19,21 | 163:22 164:2 |

**[sensitivity - silos]**                                                          Page 64

164:14,24
165:6,15,22
166:1 167:2
255:9 313:21
**sent** 67:21
299:2,4
**sentence** 43:2,6
43:18 125:17
128:19 130:22
131:2,14,15
132:16,18,20
134:20 258:8
258:16 312:1,3
**sentences**
208:10 312:3
**sentinel** 84:18
85:3
**september** 7:15
285:6 290:21
**series** 86:6
125:20 314:4
**serious** 194:9
205:15 207:3
271:17 279:8
312:20
**serous** 205:15
**serpentine**
125:20,21
129:20 144:16
159:8 172:7
176:7,8 270:7
270:14
**servant** 241:15
242:13,16
**served** 15:1

**serves** 31:3
**service** 17:5,10
23:9 29:8 30:17
81:3 122:10
136:8
**set** 9:18 62:23
65:11 133:14
149:14 151:12
229:2 300:18
**sets** 9:18 14:21
65:22 88:3
296:15
**setting** 49:13
184:19
**settled** 261:1
**seven** 51:23
52:3 165:21
307:19
**seventh** 8:18
**several** 197:11
198:19 252:11
299:25
**severe** 291:5
**shape** 114:5
**shaped** 201:9
**share** 208:13,14
**shared** 65:16
**sharko** 3:23
**sheet** 10:21
12:3 52:20
104:2,3 119:3
266:8 273:14
**sheets** 9:11,16
10:10,14,16
65:3 124:24
156:6

**shift** 298:14
**short** 63:19
67:25 211:16
265:15 267:7
**shortage**
215:22
**shorter** 49:21
**shortly** 18:19
176:19
**show** 9:12 49:2
66:6 111:22
112:4 124:4
142:14 143:16
143:21 144:3
167:9 172:6
198:5 226:5
230:24 246:20
247:18,19
267:18 272:20
284:21 291:1
307:20
**showed** 243:21
246:1,25 247:2
247:4
**shower** 188:18
188:18
**showing** 155:2
**shown** 224:13
283:8
**shows** 111:23
244:3 251:8
273:23
**shred** 187:14
187:18 188:7
188:17,21,22

**sic** 129:14
169:14
**side** 8:25 9:2,19
64:21 65:6,8,17
65:19 75:17
96:9 149:13
151:22 200:17
**sidetracked**
200:17
**sieve** 61:25
**sieves** 313:21
**sift** 217:3,5
219:15
**sign** 161:12
217:7 218:10
**signal** 121:9
**signature** 46:21
317:12 318:19
**signed** 219:12
**significance**
96:23 194:25
**significant**
75:14 180:15
181:19 195:12
198:6,6 206:7
216:17 251:22
252:2,10
311:19
**silicate** 125:19
291:18 292:16
292:24,25
**silicates** 264:14
**silicon** 292:6,23
**silly** 279:5,6
**silos** 274:6

**[similar - sort]**                                                                 Page 65

| | | | |
|---|---|---|---|
| **similar**  159:15 | 161:6,9,16 | 132:24 165:2,4 | 278:1 |
| 224:13 | 165:12 171:10 | **size**  9:21 11:21 | **somebody's** |
| **similarly**  69:5 | 175:14 182:22 | 62:9 80:13 | 261:13 |
| 130:23 131:23 | 184:22 186:14 | 114:4 162:11 | **somewhat**  72:8 |
| 132:24 | 186:19 190:8 | 264:25 | **soon**  54:15 |
| **simple**  165:21 | 190:14,16 | **slam**  229:15 | 175:5 |
| **simply**  192:21 | 191:6 199:23 | **sleep**  202:13 | **sophisticated** |
| 210:22 291:17 | 207:10 208:8 | **slide**  156:11,20 | 35:8 313:17 |
| **simultaneously** | 212:4,14,22 | 157:4 169:10 | **sorry**  55:7 74:3 |
| 18:15 102:4,24 | 222:15 223:19 | 176:2,23,24 | 91:23 95:5,11 |
| **sir**  9:3 11:2 | 224:1 239:17 | 177:14 178:1 | 95:12 119:15 |
| 12:6 13:23 14:8 | 243:1 246:21 | 267:17 | 120:14 148:14 |
| 14:13 16:2,16 | 249:12,13,16 | **slides**  77:24 | 152:10 160:25 |
| 17:18 18:1 23:4 | 250:11 252:22 | 156:10 169:15 | 173:9 175:13 |
| 23:18,25 25:25 | 255:24 257:5 | 176:25 | 177:3 183:24 |
| 26:14 31:1 32:9 | 257:12 259:14 | **slight**  16:21 | 184:2 187:3 |
| 42:25 43:17 | 260:1,5 265:23 | **slightly**  99:5 | 200:4 204:21 |
| 46:11 47:2 | 266:24 268:2,7 | **slurred**  270:11 | 207:9 208:4,8 |
| 50:14,19,20 | 270:6 274:12 | **small**  153:5 | 209:16 210:20 |
| 51:5 56:10 | 282:18 284:7 | 195:12 198:5 | 218:12 223:5 |
| 57:25 65:19 | 288:4 295:18 | 268:1 311:18 | 226:17,18 |
| 68:12 72:9 78:1 | 303:11 308:8 | **smoothly** | 231:1 238:20 |
| 80:3,25 81:6,10 | 316:4 | 264:15 | 241:10 247:3 |
| 81:13,22 83:7,9 | **sit**  13:2 36:11 | **society**  6:20 | 249:7 251:2 |
| 87:22 94:11 | 54:9 57:16 | 221:1 240:5,11 | 262:8 270:11 |
| 106:7 110:7,13 | 98:17 111:17 | 241:25 | 275:9 280:6,9 |
| 111:10 113:11 | 137:25 188:23 | **sold**  229:17,22 | 286:13 288:8 |
| 118:20,21 | 221:7 289:1 | 235:14,19 | 295:9 301:17 |
| 127:3 128:17 | 307:6 | **solely**  268:17 | 308:1,6 |
| 128:25 129:9 | **sitting**  28:25 | **solitary**  56:25 | **sort**  12:4 35:1 |
| 129:11 132:11 | 157:21 174:10 | 56:25 | 58:10 59:10,11 |
| 133:25 134:7 | **situated**  263:23 | **solve**  119:25 | 59:14,19 62:22 |
| 134:14 135:20 | **six**  51:22 52:3 | **solving**  121:20 | 85:18 90:19 |
| 136:24 144:19 | 54:3 56:21 88:3 | **somebody** | 92:12 164:9 |
| 155:15,22 | 127:5 128:21 | 66:19 119:23 | 184:16 209:5 |
| 159:13,16,25 | 130:23 131:24 | 157:14 276:20 | 275:13 300:23 |

**[sorting - statement]**                                   Page 66

**sorting**  101:16
**sound**  17:7 55:1
**source**  122:17
**sources**  88:7
  169:18
**south**  2:16
**spalding**  3:16
**special**  258:21
  260:10 304:18
  306:1
**specific**  25:1
  35:2,19 36:4
  39:1,5,16 56:13
  70:16 74:19
  85:2 111:7
  122:16 125:8
  144:10 162:17
  163:13 181:5
  192:3 223:25
  227:4,10 291:4
  296:12
**specifically**
  13:9 53:24
  71:20 74:8
  101:10 112:13
  117:9 127:17
  184:15 194:3
  197:13 213:18
  220:22
**specification**
  5:20 153:13
  155:6,13
  262:22,24
  263:5 268:16
  268:19

**specifications**
  80:14 162:4
**specificity**
  149:25 163:20
  164:3,24
  165:15
**specifics**  93:19
  195:22
**specs**  62:2
  123:11 264:24
**speculate**  24:23
**speed**  20:16
**spelled**  266:8
**spend**  9:4 45:5
  73:13 78:4
  127:16 128:10
  128:11 139:18
  198:7
**spent**  52:17,21
  53:19 54:11
  57:6 80:11
  86:21 135:23
  139:17 293:12
  313:8
**sperry**  186:22
  187:2,10
**sphere**  183:19
**spike**  165:5
**spiked**  165:1
**spiral**  14:24
**spoke**  183:14
**sponsorship**
  241:22
**sport**  255:2
**spot**  294:16

**spouse**  53:1
**spring**  25:6
  30:2 51:8 53:21
  54:11 80:20
  85:4
**staff**  13:12 96:2
  96:6 314:24
**stage**  28:10
  313:6,12
**stain**  77:22
**stained**  77:24
**stand**  238:23
**standard**  51:11
  51:13 201:1,2
  203:24 205:19
  209:22 210:8
  226:14 229:2
  232:23 263:16
  268:20 269:1,6
  280:25 281:8
  282:7
**standards**
  31:11 32:2
  43:12,16
  226:20,21
  242:19 258:21
  260:10,18,21
**standing**  286:9
**standpoint**
  194:13
**stands**  38:7
**starch**  310:16
  311:14,22
**start**  13:18 14:1
  14:1 29:23
  80:19 83:25

  84:3,6 87:23
  123:1 172:15
  175:20 190:9
  228:6
**started**  30:16
  86:25 156:23
  192:4 211:9
  216:3 272:8
**starter**  90:19
  90:23
**starting**  172:1
  183:11 193:14
**starts**  30:2
  127:1 182:12
  190:5 248:22
**state**  1:12 26:11
  28:19 29:15
  38:18 41:2,5
  110:25 113:12
  117:6 208:16
  212:5,15
  233:23 317:7
  318:25
**stated**  41:10,13
  42:12 44:11
  209:17 212:15
  243:14 283:3
**statement**
  16:22 32:18,24
  34:14 36:2,3,6
  36:23 41:16
  44:24 58:18
  112:14 127:9
  127:13,14,17
  130:12 132:19
  132:23 208:18

**[statement - substantially]**                                                                 Page 67

208:22,24
226:9 228:24
230:15,21
231:13 233:9
248:11,12
251:13 253:13
307:25 311:24
**statement's**
236:5
**statements**
44:15,21
100:20 108:25
109:17 140:2
239:21 244:16
248:8,12
**states**  1:1 6:22
7:5 31:24 84:18
144:9 224:2,12
240:7,13 250:2
282:2
**statistical**
194:25 273:1,4
276:22 283:2
**statistically**
195:12 283:10
311:18
**status**  22:24
23:21
**statute**  200:19
209:3,20,25
210:2
**statutes**  31:9
40:6
**statutory**  84:13
114:18

**stay**  107:25
197:12
**staying**  40:9
**stenographic**
317:10
**step**  232:9
**stephen**  304:6
**stepped**  70:22
**steps**  111:22
183:9 314:5
**steven**  205:12
302:5
**stick**  287:25
**sticking**  31:23
**stipulate**  83:17
**stipulation**
83:16
**stop**  74:4 207:9
**stopped**  18:16
29:7 143:24
**stories**  109:25
**story**  183:2
184:21 185:17
185:22 262:3
284:10,14
**stotz**  1:10 317:4
317:14
**straight**  112:11
**strategy**  309:14
311:10,12,14
311:15
**street**  2:6,16,21
3:11 8:18
**strength**  144:14
**strengths**
195:22

**striking**  243:20
**strong**  75:5,12
107:20 115:22
**strongly**  116:1
**structure**
216:13 291:22
291:25 300:13
**students**  165:14
**studied**  39:15
74:3 79:13,21
88:20,25 107:3
179:2,24
239:17,24
**studies**  10:2,2
147:18 191:11
198:5,24 199:1
307:11 311:18
**study**  12:13,13
57:15 76:18
80:12 165:18
179:14 194:14
194:19 199:21
225:22 278:16
289:19 308:13
308:17 309:1
**studying**  57:13
67:14 80:11
103:15 105:25
179:2 211:3
221:9
**stuff**  15:11
55:10 92:19,20
93:7,13 181:21
230:8 264:18
265:2 305:22

**stumbled**  85:19
**stumped**  92:10
**stylist**  90:5
**subject**  7:12
38:8,11 73:15
92:16 109:12
151:1 155:8
168:15 183:5
216:9 227:5
285:2 301:20
**subjective**
311:4
**submission**
46:16
**submitted**
102:23 216:5,9
**subscribed**  13:4
318:21
**subsection**
182:12
**subsequent**
15:12 283:6
**subsequently**
16:4 258:19
**subset**  57:21
**subsidiaries**
24:3
**substance**  58:9
146:10 195:7
242:4
**substances**
170:3,5
**substantial**
12:17
**substantially**
212:17

**substantiate**
116:8,11
172:19 190:20
193:21 194:10
194:21 195:3,5
195:14 197:3,7
197:16 198:2
198:13 203:12
209:6 226:23
229:3,4,7
**substantiated**
114:15,17
199:16 200:10
200:12 201:18
202:15 205:25
209:8 227:8,23
228:3,19,21
290:9
**substantiating**
201:14
**substantive**
56:16 216:8,23
217:11
**substitute**
262:2
**substituting**
170:21
**succinct**   123:19
**suffice**   157:21
**sufficient**   10:5
194:14 226:5
227:15 230:21
231:12 233:7
**sufficiently**
262:21

**suggest**   10:23
186:1
**suggesting**   77:4
119:11,18
120:7,19
123:14 150:8
172:21 222:24
243:13 246:5
283:12 309:21
**suite**   2:11,21
3:11
**suited**   252:17
253:10 255:14
**summarize**
193:15 263:21
**summarized**
156:8
**summarizes**
156:12
**summary**
157:12 241:16
304:8
**sunday**   69:4,18
**supplier**   35:17
38:13
**suppliers**   35:10
35:18 58:12
59:13,17 61:6
262:18 300:17
**support**   197:15
205:14 224:18
226:10 228:1
230:1 239:5
289:9
**supported**
228:1

**supports**
190:19 226:17
**suppose**   140:19
**supposedly**
256:16
**sure**   10:11
11:12 12:22
13:11 16:23
18:3 26:8,10
27:15 28:15,21
29:11 32:21
34:2 39:19
41:20 43:22
48:21 49:7 53:9
56:11 59:4 66:8
69:11,12,13
70:15,17 76:8
81:12,13 85:8
87:2,4 95:14
96:5,9 102:5
107:2 112:22
113:3 121:23
124:3 130:17
131:11 142:12
145:5,14
146:15,16
148:9,15 150:6
150:19 153:7
160:21 161:19
167:8 177:7
180:5 182:2,5
182:25 184:25
187:13 194:2
200:7 211:17
212:10 218:12
222:14 231:7

235:15 238:6
242:16 243:5
243:11 247:7
261:21 264:5
265:9 266:13
266:23 269:19
270:8,25
273:13,25
278:18 285:14
285:19 288:13
300:15 305:23
308:9
**surpass**   269:1
**surprising**   9:24
**surrounding**
116:10
**survey**   127:23
136:19 137:19
145:22
**susan**   3:23
**susan.sharko**
3:25
**suspect**   176:12
190:24 192:13
**suspicion**
235:24
**suzanne**   1:10
63:18 64:3
130:15 168:8
168:10 189:15
249:18 265:18
317:4,14
**swanson**
218:22,23
238:25 253:19
263:10

**[swipe - talk]**

| | | | |
|---|---|---|---|
| **swipe**  89:7 | 272:21 278:25 | 132:24 142:6 | 264:14 268:16 |
| **swiping**  91:22 | 278:25 281:24 | 155:9,24 160:3 | 268:21 269:9 |
| **switch**  154:7 | 283:21 285:10 | 160:16 162:1 | 269:25 270:15 |
| 311:14 | 286:6,17 287:1 | 169:20 171:21 | 281:2 284:11 |
| **sworn**  8:2 | 301:5 309:11 | 176:2,5 177:16 | 285:5 291:4,5 |
| 318:21 | 311:2,4 | 177:18 191:4 | 291:16,19,25 |
| **symposium** | **takeaway**  61:14 | 192:8,13 193:2 | 292:14 295:1 |
| 239:11 305:8 | **taken**  1:9,12 | 193:10,10 | 295:25 296:17 |
| **synched**  27:17 | 64:9 113:1 | 194:15 199:14 | 297:13,14,24 |
| **system**  59:2 | 189:24 202:3,5 | 203:5 205:5,15 | 298:11 302:6,9 |
| 108:9 | 211:18 223:14 | 206:4,14 | 302:19 303:7 |
| | 265:25 299:18 | 207:19 211:23 | 304:7,14,21 |
| **t** | 306:12 | 212:17,20,25 | 306:10,16,21 |
| | **talc**  5:17 6:7,11 | 213:13,17,20 | 308:13,17 |
| **t**  4:8 5:3 6:3 7:3 | 6:17 7:14 25:25 | 213:22 214:17 | 312:13 |
| 165:1 317:1,1 | 39:21 40:16 | 214:20 215:5,8 | **talca**  5:10 141:4 |
| 318:1,1 | 44:1,7,17 56:20 | 220:21 221:1 | **talcs**  262:19 |
| **table**  9:18 | 60:16 61:8 62:3 | 224:7,13,21 | **talcum**  1:4 39:3 |
| 121:10 143:22 | 62:3 63:12 | 225:5 226:11 | 58:16 190:20 |
| 308:2 | 74:16,22 79:4,6 | 231:13 232:4 | 190:25 193:22 |
| **tabulation** | 79:6,8,12,20 | 233:8 235:1,4 | 197:17 198:2 |
| 53:24 | 80:7,10 81:20 | 237:13,17 | 201:19 226:7 |
| **take**  10:25 | 85:22 86:17 | 239:13 240:1,9 | 226:10 227:1 |
| 17:11 26:18 | 87:1,11,20 | 241:21 242:20 | **talcums**  225:14 |
| 27:3 34:14 | 88:10,15 90:13 | 242:21 243:18 | **tale**  6:16 221:20 |
| 45:24 50:2 | 90:18 91:19,20 | 244:3 247:25 | **talk**  36:4 41:4 |
| 63:25 64:7 | 91:24 97:5 | 251:12,17,21 | 42:18 56:19 |
| 66:20 74:2 | 109:9 110:17 | 251:24 252:10 | 57:11 80:17 |
| 75:19 83:16 | 113:16,21 | 252:14,18 | 81:23 112:24 |
| 89:13 109:9 | 114:10 115:14 | 253:7,11 254:1 | 114:1 169:2 |
| 114:9 132:22 | 115:23 116:5 | 255:15,19 | 180:19 190:4 |
| 167:22 173:18 | 116:16 117:13 | 256:16 258:23 | 193:14 196:8 |
| 178:12 189:15 | 117:17 124:20 | 259:1,20,25 | 196:14 230:14 |
| 197:25 211:16 | 124:21 125:16 | 262:16,18,24 | 232:22 247:3 |
| 222:11 239:18 | 125:16 126:21 | 262:25 263:6 | 255:6 290:24 |
| 255:3 257:23 | 130:23 131:23 | 263:24 264:10 | |
| 265:15,21 | | | |

**[talked - tested]** Page 70

**talked** 21:11 97:4,5 122:4 183:8 208:10 229:9 230:11 250:6 267:3 270:14 278:6 279:14 296:23 314:23

**talking** 30:4 35:14 38:5 80:5 83:20 103:19 103:20 130:6 162:24 180:4 181:3 183:3,10 183:18 206:11 207:14 211:21 213:18 218:14 227:21,22 233:2,3 235:13 253:2,4 255:8 255:10 266:21 268:8 291:15 296:16,17 308:10 312:17

**talks** 43:19 81:15,20 88:15 241:18 242:7 251:14 269:16 270:9 291:19 291:24 304:9 309:4

**taped** 10:15,20

**task** 68:17 243:19 302:6 303:8 304:8

**taught** 19:16 164:23 165:14 254:8,20

**taylor** 219:14 219:20

**te** 250:14

**teach** 18:24 19:11,13 164:23

**teacher** 19:11

**teaching** 18:7 18:25 19:5,8,19 20:18

**technical** 120:11

**technique** 292:17 297:10 298:11 300:9

**technology** 88:22

**tectonic** 173:2

**telephone** 69:12

**tell** 9:23 13:7 20:3 46:2 79:15 80:13,14,15 84:11 87:11 88:3 90:22 92:18 93:6 94:22 96:5 103:9,15 110:9 110:10,11 111:18 112:8 130:12 133:9 134:8 136:14 137:6 156:7

157:22 165:8 168:5 186:8,19 187:5,17 189:3 189:3 191:12 204:23 228:17 248:4,7 275:23 279:7 307:8 311:8 312:2

**telling** 117:4 123:19 189:7,9 189:10 306:15

**tem** 73:22 78:24 112:10 156:16,17,23 157:7 169:13 175:4 176:22 182:6 186:18 270:20,24 271:5,17,21 272:2,4,6 273:10,20,24 274:21 275:15 275:24 279:16 280:25 283:7 300:5,7,8,11,16 300:22 313:25

**ten** 286:18

**tend** 29:12 51:18,19 52:19 53:6 106:9

**tendency** 101:24

**tends** 53:10

**tenovus** 194:1,5 195:4 199:7

**tensile** 144:14

**tenure** 213:17

**term** 56:13 68:17 97:20 119:1 122:15 127:5 128:20 130:8 131:20 138:14 145:20 147:10 214:12 278:18

**terminology** 28:22 128:12 130:3 149:6

**terms** 92:11,12 92:16 133:13 143:4,18,20 149:23 151:11 151:12

**test** 10:2 13:21 58:15 62:18 77:13 78:16 163:17,20 164:1,7,12,13 164:14,15 165:6,10 166:1 166:3,10,10,16 176:18 177:15 182:17 252:24 253:2 255:18 256:25 259:11 259:19 263:7 270:9 272:17 273:5 312:9

**tested** 163:23 181:16 186:17 313:8

**[testified - think]**

testified  8:3
  22:18
testify  42:3
  76:20 77:11
  105:18 106:10
  186:22
testimonies
  101:12
testimony
  36:11 81:18
  86:24 99:25
  100:9,13 101:4
  101:9,15,22
  102:2,7 107:17
  116:14 117:22
  133:24 134:5,5
  135:11,14
  138:16 139:13
  150:15 237:24
  239:19 244:19
  294:7 318:2
testimony's
  237:11
testing  5:9
  48:23 59:2
  62:14 63:2 73:3
  74:7 78:11
  100:14 108:14
  141:2 155:23
  156:5,6,13
  157:20 159:24
  167:18 183:19
  235:8,8 236:1,4
  259:14,25
  260:17,22
  263:24 267:16

268:17,23
269:1 270:13
270:20 271:21
273:11 314:11
tests  78:6,9,24
  150:3 159:21
  165:4,16
  183:18 257:15
  270:3 289:9
texas  3:6
thank  11:24
  13:25 49:8
  60:14 63:16
  104:9 118:20
  118:21 124:25
  140:7,22
  142:24 154:12
  154:12,16,20
  154:22 161:6
  161:16 178:20
  179:15 182:4,9
  182:22 187:3
  190:14 212:11
  222:15 249:3
  249:16 251:2
  254:22 257:4
  259:3 265:8,23
  268:3 280:12
  284:2 287:6
  301:6 308:8
  316:4,6
thanks  13:17
  26:24 41:8
  50:14 53:10
  89:5 94:11
  161:16 175:11

182:9 238:21
250:19 266:24
282:20 285:17
286:7 316:3
theories  70:5
theory  276:21
thereof  31:11
  35:15
thereto  43:13
thin  144:13
thing  15:13
  66:3 75:2 85:10
  85:18 86:25
  99:12 104:20
  108:7 120:15
  121:22 170:2
  195:9,14
  262:13 286:1,4
things  10:15
  12:5,23 15:15
  15:22 16:1,12
  20:7 27:15
  28:21 29:16
  42:15 52:9 58:8
  64:12 65:10
  67:4 80:5
  147:21 163:15
  168:3 173:20
  190:5,18
  200:17 224:3
  257:9 270:22
  309:4 315:2
think  12:11
  15:13,23,24
  16:1,12 17:24
  18:16 21:18

22:15 23:18
27:25 29:2,3,4
30:20,21,25
31:3,4 33:9,10
33:11 34:13
36:16 37:15
40:3 41:18
42:11 43:8,8
44:23 46:8 47:8
47:9 50:7 53:22
54:1,17,18 56:1
58:3 61:5,9,13
61:19,21,23
62:7 65:6 66:16
67:12 69:2,3
71:5 72:13
79:12,14,24
80:2 84:1,25
85:12,23 86:5
91:6 93:5 95:8
98:24 100:5,21
100:24 103:24
104:3,4 105:19
105:24 106:2,3
107:4,9,13,25
108:8,8,13,16
108:23 109:8,8
109:17,22,24
110:1,7,18
114:15 115:7,8
115:16,20
118:2,4,17
119:7 121:22
122:9,24 123:4
123:13,18
124:9,10

**[think - tm7024]**

125:10,12
128:17 129:2
129:21 130:11
131:13,14
133:6,15,17
134:9,22,23
144:23 145:1
145:12 147:5
147:25 149:2
151:5,9,23
156:2,7,8
162:14,14
164:25 168:9
169:9 172:3,5
173:8,16,16,17
178:4 179:24
180:1,9,9,14,21
180:23 181:18
185:21,21
188:9 189:14
189:15 193:25
194:2,5,7,12,19
195:2 196:5
198:11,23
199:5,5,8
200:15,20
201:8 211:15
215:18,20
225:11 232:3
236:23 241:1
241:13 245:6
254:25 255:1
255:20,22,23
255:23 256:3
257:14 259:6
266:8,14,17,19

266:22 267:3
270:23 271:1
275:6,10,16,21
278:23 279:7
279:10,11
286:1,2,18
288:6 294:14
297:22 301:11
301:15 304:25
310:13 311:7
311:16 312:1
312:19,23
313:1 316:2
**thinking**   11:20
55:15,18
184:19 315:2
**third**   43:10
103:22 104:5
**thompson**   2:4
69:4
**thoroughly**
291:6
**thought**   36:8
36:19 79:19
87:22 152:13
206:19,20
208:4,5 210:18
230:6 237:22
**thousands**
60:16
**three**   23:3,3
67:22 121:6
158:20 190:18
266:22 267:2
272:21

**threshold**
113:15 294:25
**throw**   271:12
303:13
**thumb**   283:3
**thumbnail**
26:22
**time**   9:22 17:11
19:9 21:13 30:5
44:15,22 45:6
50:1 52:11,17
54:22 60:2 69:2
71:20 73:14
80:11 86:20
92:9 93:18,19
96:4 97:17,23
110:3 115:13
115:19 123:5
136:11 139:9
139:17,18
155:24 157:11
158:20 168:8
170:5 183:10
189:18 199:13
208:21 210:5
212:20 215:15
220:16,20
221:10 222:23
228:1 231:25
233:8 237:9,24
239:23 246:18
248:3 252:13
253:5 261:6
265:11,19
272:2 281:24
283:2 287:1

307:3
**time's**   316:3
**timeframe**
28:14
**times**   59:17
63:21 68:22
92:15 98:8
106:10 119:13
137:24 216:16
225:9 250:7
299:25
**timing**   112:19
**tinto**   156:10,10
156:12 157:4
157:13 167:20
169:5,8,14,15
176:2,25 271:4
271:6 272:5,7
273:19 299:1
**tinto's**   298:22
**tisi**   2:15
**tissue**   199:8
**tissues**   302:9
**titanium**   5:17
142:5
**title**   161:24
162:25
**titles**   65:23
**tm**   167:7
**tm7019**   270:1
270:10,13
**tm7024**   155:14
155:18 157:22
159:6 269:17
269:24 272:10
279:14,19

**[tm7024 - turning]**

Page 73

282:8

**tobacco** 70:11
214:13 216:3,4
216:16

**today** 8:16 13:3
28:25 36:11
54:9,12 57:5,16
80:20 98:17
112:1 152:13
174:10 197:9
250:7 289:1
307:6 316:1

**today's** 68:22
68:23 69:9,16

**together** 47:12
53:15 63:6
68:15 86:4
111:22 150:25
314:1

**toggle** 282:14

**toiletries**
241:23

**told** 174:25
196:16 201:6
235:2

**took** 13:10
65:15 75:21
124:6,8 171:19
171:19,19
183:9 206:19
206:21 262:14
273:5

**top** 101:25
121:17 181:7
190:2 269:20
303:7

**topic** 90:15
190:3 215:16
295:12,13

**topics** 83:19

**tort** 39:24

**total** 50:18,21
53:11 93:15
181:15 266:22

**totality** 63:6
117:8,10 118:3
174:2 191:8
203:15 310:5

**totally** 63:22

**totals** 50:23

**touch** 221:24

**toward** 39:23
40:3

**toxicity** 225:4

**toxicological**
71:11,21

**toxicology** 6:21
240:6,12
241:18,25

**tpg** 16:9,20,25

**tpg's** 16:24

**trace** 288:1

**track** 35:3
52:16 182:3

**tracks** 83:8

**tract** 224:23

**trade** 61:7

**trained** 73:20
80:1

**training** 77:2

**transcript** 7:23
100:12 244:9

245:7,7,11,14
246:4,16
247:19 248:7
316:9,11 317:9
317:22 318:3

**transcripts**
81:17 98:2 99:9
100:19

**transformative**
293:16

**translate**
172:16

**translocate**
224:14,22

**transmission**
155:21 157:24
158:12 253:17
254:1,13,17
255:4,7 260:25
273:15 300:4

**transposed**
267:8

**tremolite**
125:24 127:8
128:24 159:10
263:2 292:19
292:23

**trial** 22:18
81:17 86:3
87:21 99:25
100:8,12,19
101:4 102:2

**tried** 101:7
151:25 180:11
180:22 244:8

**trouble** 182:15
204:24 248:21

**troublesome**
109:18

**true** 47:20,22
254:16 317:9
318:3

**truthfully**
234:11,13

**try** 50:8 54:25
136:24 137:2,3
137:4,5 183:6
222:17,21
246:15

**trying** 18:9
21:21 23:18
54:23 57:13,24
58:1 66:22
67:24 89:21
100:13 108:9
109:20 114:21
119:24 134:4
152:5 172:13
184:16 208:7
242:14 249:9
275:13 291:12
291:12 293:9

**turn** 14:15
52:25 94:12
118:19 181:24
182:11 190:6
260:14 262:4,4

**turned** 211:12

**turning** 287:14
308:4

**[twisting - unsensitive]**

**twisting** 134:23
**two** 13:13 16:1
    16:15,15,19
    19:23 20:4,19
    22:8 24:7 37:15
    52:14 56:15
    68:17,17 75:13
    128:10 168:2
    175:17,18
    200:17 201:24
    211:25 212:5
    222:7,20
    240:18 266:16
    272:9,21 305:4
    306:4
**type** 48:3
    109:13 144:10
    173:23 269:17
**types** 72:2
    300:8
**typical** 215:15
**typos** 267:7

**u**

**u.s.** 241:4,22
    300:10
**ucsf** 19:7,21
    20:21 21:12
**uh** 202:21
    258:3,3,3,3
**ultimate** 115:7
    147:24 300:13
**ultimately**
    55:11 89:15
    91:21 149:17
    163:23 217:15

**un** 209:7
**unambiguously**
    291:21
**unanswered**
    191:20
**unartfully**
    91:25
**unauthorized**
    307:25
**uncertainty**
    172:12
**unclear** 195:19
**under** 47:10
    77:22,22 114:2
    114:9 121:10
    138:9 146:11
    147:12 149:10
    149:11 155:12
    158:1 171:15
    191:23,23
    192:18 196:25
    200:18 202:8
    227:17 236:3
    237:20 263:7
    274:12 275:25
    281:8 308:2
    317:23
**undergraduate**
    73:22
**underlying**
    86:7 288:10
    289:18
**undermine**
    195:7
**understand**
    12:3 15:15

18:11 23:10
30:14,15,18
33:12 34:17
37:15 39:2
54:14 68:1
74:21 76:16
77:14,15 79:7
89:21 91:24
97:23 100:13
100:14,15
101:19 104:16
106:12 109:21
114:22 118:17
121:2 129:17
134:4 139:8
148:10 150:7
170:24 171:11
172:22 195:16
197:2 203:2
211:4 226:8
232:4 238:6
271:9,19
289:11,13,19
298:16,19
299:20 306:23
312:11,21
313:4 315:21
**understanding**
    17:4 35:24
    41:19 54:8 65:8
    70:19,23,25
    71:6,16 72:11
    72:15 73:18,19
    74:18 75:3,6,18
    76:18 77:7,8,17
    82:1 83:9 87:19

92:23 94:13,17
95:6,17 138:4
158:13 174:16
211:8 227:12
289:1
**understands**
    149:3
**understood**
    26:15 36:10
    65:2 137:11
    209:18 214:6
    307:2
**undertaken**
    40:15 41:21
**undo** 49:13
**unexpected**
    224:19
**unidentified**
    27:6
**unique** 144:11
    144:14 170:2
    291:22,24
**united** 1:1 6:22
    7:5 240:6,13
    250:1
**units** 292:5
**universe**
    237:18
**university** 18:4
    18:14
**unknowns**
    180:24 181:2
**unnamed** 28:6
**unsensitive**
    272:18

**[update - volume]** Page 75

| | | | |
|---|---|---|---|
| **update** 301:20 | 158:3,7,19 | **vague** 51:14 | **vernon** 308:10 |
| **updated** 13:13 | 159:19 261:1 | 73:11 156:1,3 | 309:3,21 |
| 85:1 | 273:21,22,24 | 186:5 | **version** 94:24 |
| **updates** 15:14 | 275:24 282:7 | **valid** 271:22 | 175:17 |
| 15:19 | 289:13 300:5 | 283:10 | **versions** 169:9 |
| **upfront** 39:18 | 312:9 | **validated** 62:18 | 175:18,18 |
| **urine** 77:19 | **useless** 163:24 | 151:21 | 176:9 |
| **usc** 115:2 | 165:7 | **validation** | **versus** 158:10 |
| **use** 17:25 27:21 | **uses** 6:17 | 164:15,17 | **vicastinion** |
| 38:21 46:7 | 125:16 127:13 | 165:18 | 129:14 |
| 61:18 116:22 | 192:15 240:2,9 | **van** 171:18,24 | **videoconfere...** |
| 119:1 122:15 | **usgs** 126:1 | 172:21 173:5 | 2:3,9,14,19 3:4 |
| 123:7 130:2 | **using** 78:17 | 173:11 | 3:9,16,22 |
| 131:21 133:12 | 106:24 119:1,9 | **variability** | **view** 35:7 79:24 |
| 134:20 138:1,4 | 122:18 126:3 | 110:22 164:4 | 109:2 133:19 |
| 138:13 150:11 | 128:12,13 | 298:23 299:6 | 135:3 139:9 |
| 156:12 158:4,5 | 129:4,7 131:19 | **varied** 73:6 | 161:8 170:21 |
| 192:24 196:6,9 | 132:8 134:24 | **variety** 12:5 | 173:17 193:20 |
| 196:10 218:7 | 136:16 145:20 | 144:10 169:17 | 203:12 216:17 |
| 253:23 256:7 | 146:18 205:20 | 282:3 283:5 | 226:3 230:18 |
| 272:16 286:9 | 263:2 274:4 | **various** 59:16 | 276:7 297:16 |
| 298:14,17,18 | 278:18 283:14 | 67:9 77:24 | 310:23 |
| 310:25 311:1,5 | 291:6 310:24 | 101:12 151:1,2 | **viewed** 37:12 |
| 313:25 | **usual** 20:22 | 156:13 304:13 | 273:20 |
| **used** 38:22 | 245:13 | **varying** 196:20 | **viewing** 297:15 |
| 58:23 63:5 | **usually** 10:16 | **vast** 87:8 | **violations** |
| 78:11 90:4 | 51:14 216:1 | 256:15 | 274:16 |
| 122:21 123:3,4 | 291:18 | **verbatim** | **virginia** 2:11 |
| 123:5,10,11,12 | **utilized** 63:1 | 245:11 | **virtually** |
| 126:3 128:5 | 137:22 | **verification** | 264:11 |
| 133:8 135:24 | | 176:16 | **visits** 180:23 |
| 136:2,10 | **v** | **vermont** | **visualize** 221:8 |
| 137:23 138:9 | **v** 2:15 8:1 | 109:10 115:23 | **vitae** 4:11 14:4 |
| 145:24 147:16 | **vacation** 18:10 | 172:4 176:7 | **vitro** 42:18 |
| 149:25 150:12 | **vaccines** 17:21 | 180:8 298:14 | **volume** 5:16 |
| 156:22 157:10 | | 308:13,17 | 7:9 142:5 280:2 |

Page 76

| | | | |
|---|---|---|---|
| 289:2 | 108:2 114:12 | 269:18 271:18 | **warp** 20:16 |
| **volumes** 99:12 | 114:12,13 | 272:17 276:21 | **watch** 14:16 |
| **w** | 115:5 116:17 | 276:22 286:1 | 48:25 |
| **wait** 41:11 | 116:18,20,23 | 289:8,10,11,17 | **way** 8:11 18:16 |
| 246:22 247:22 | 116:24 117:2,7 | 293:11 294:10 | 28:1 35:1 51:19 |
| 269:18 | 118:13 120:25 | 299:22 | 54:20 55:20 |
| **waiting** 177:7,7 | 122:14 128:10 | **wanted** 27:15 | 79:2 86:21 89:4 |
| 182:10 | 130:17 131:21 | 27:15 29:19 | 90:2 91:16 92:2 |
| **waive** 96:8 | 131:22 135:6 | 39:18 60:2 | 102:9 103:16 |
| **walk** 9:22 10:4 | 137:15 140:9 | 64:12 84:9 87:3 | 117:6 128:18 |
| 83:20 89:2 | 141:14 142:12 | 87:14 88:19 | 130:6 133:25 |
| 187:14 287:12 | 143:5 145:2,16 | 96:4 100:14,15 | 145:16 162:15 |
| **walked** 235:1 | 148:13 150:6 | 101:18,18 | 165:25 170:19 |
| 236:2,2 | 153:5 154:7,13 | 102:1,3 121:8 | 179:2 180:15 |
| **want** 9:4 11:2 | 166:23 168:14 | 121:23 134:20 | 234:19,24 |
| 11:17 13:2 | 174:7,8 175:10 | 170:12 215:1 | 241:17 246:22 |
| 18:11 21:19 | 175:11 178:11 | 266:4,23 | 255:1 260:19 |
| 24:20 26:4 | 179:20 183:20 | 298:13 300:15 | 261:25 272:16 |
| 27:17,20 29:10 | 187:22 190:4,9 | 314:24 | 277:2 278:19 |
| 29:12,13,14,15 | 196:12 199:20 | **wanting** 40:10 | 279:5 288:7,13 |
| 34:3,16 35:18 | 199:20 200:5,6 | **warned** 224:5 | 293:4 296:10 |
| 36:3,5 37:7 | 202:25 204:13 | **warning** 114:18 | 296:10,11 |
| 38:23 45:8 46:7 | 205:10 208:9 | 115:11 199:15 | 298:8 300:17 |
| 49:24 52:15 | 218:12 222:23 | 200:25 202:20 | 307:7 309:17 |
| 53:7 54:21 | 222:25 228:8,8 | 205:18,22 | 311:20,21 |
| 56:12,20 65:20 | 228:13,13,15 | 208:17,24 | 312:11 313:7 |
| 66:9 76:5,21 | 228:24 232:8 | 226:6,23 227:1 | 314:1 315:22 |
| 77:19 78:1 | 232:10 233:22 | 227:4,6,10,17 | **ways** 61:21 |
| 80:19 87:9 | 236:15 243:4 | 227:20,24 | 67:14 88:5 |
| 88:19,24 89:9 | 243:11 246:19 | 228:2,20 | 149:25 222:20 |
| 89:10 90:22 | 249:2 253:23 | 229:16 230:11 | **we've** 41:19 |
| 93:18 95:25 | 256:7,12 258:9 | 230:15,21 | 59:25 148:1 |
| 96:8,10 97:21 | 261:2,9,15 | 231:13 233:7,9 | 152:3,12 |
| 101:8 103:5,25 | 262:2 263:12 | 235:13 251:13 | 162:23 202:3,5 |
| 107:5,8,19,22 | 265:14 266:13 | 294:3 | 202:6,8 207:14 |
| | 267:13,15,18 | | 223:2 236:3 |

265:12 267:3
299:25
**weaknesses**
195:22
**webb** 103:15
170:13 171:4
171:23 172:22
173:5,9,12
179:2
**webb's** 171:12
**website** 81:19
81:21 87:1
90:13 97:5
**week** 19:5
69:10,12,16
**weekend** 68:20
69:5
**weekly** 270:15
271:7
**weigh** 11:5
**weight** 20:9
**welcome** 66:11
120:25 146:19
258:5
**welfare** 308:12
**went** 16:9,10
19:18 22:10,21
29:8 37:19 52:4
55:3,7,10 60:22
61:19 86:16
91:15 106:1
170:12,14,16
184:13 213:7
214:14 219:6
298:13

**whatsoever**
213:20 220:15
239:20 302:21
302:23
**white** 5:8
125:22 139:19
139:23 140:11
141:1 143:14
145:8,11 150:9
**whlaw.com** 3:7
**whoa** 269:18,18
**wholly** 268:19
**william** 260:15
**williams** 3:4
**willing** 112:18
309:17 310:10
**windsor** 65:13
155:8 268:10
268:12,16,22
269:8,9,25
**wise** 112:19
**withdrawn**
21:9 44:10 56:5
60:6 117:15
135:21
**witness** 4:19
21:15 22:4
23:17 34:13
36:16 37:24
44:19 48:22
49:8,23 64:23
73:6 74:10
95:24 100:11
104:1 105:4
107:18 117:23
120:5,13

123:24 124:23
126:12 129:2
131:6 132:5
133:25 135:12
138:6,17
139:11,14
142:23 143:13
144:3,21 147:5
149:2 150:16
153:23 154:5
154:10,15,20
154:22 156:2
160:24 161:5
166:9 167:14
168:14,20
170:14 173:4
174:21,25
176:20 177:12
177:25 178:16
179:11 181:9
182:15,19
183:17 184:9
185:2 186:6
188:5 194:17
196:5 199:20
200:1 201:22
203:8 204:3,5
206:17 218:5
221:22 222:3
223:8 231:1,4
233:14 234:7,9
234:23 236:19
238:1,3 246:10
250:18 253:16
254:12,22
255:22 256:20

261:9 264:2
265:10,16,23
271:25 274:23
277:8,15
278:25 281:11
284:5 286:7
287:2 288:19
289:7 290:2
292:10 294:8
295:9,14,18
298:3 303:22
303:25 304:3
306:15 308:1
310:1 312:16
316:4,13
318:19
**witnessed**
78:16
**witnesses**
231:25
**women** 224:15
305:16,20
**women's**
304:19 306:2,7
**wonderful**
11:23 76:7
278:21
**wondering** 60:5
**word** 17:25
27:17,21 28:18
28:22 29:11
35:7 38:22,22
45:25 46:2,7
56:20 70:13,15
70:17 84:18
85:19 90:14

**[word - yeah]**                                                                 Page 78

| | | | |
|---|---|---|---|

106:24 116:22
122:20 123:5,7
129:13,17
132:19 135:24
136:2,4 137:5
138:1,17 139:1
146:18,22
156:3 163:9
204:15,16
245:12 262:2
266:9 271:13
272:17 276:13
277:24 310:14
310:25 311:1,1
311:5
**words** 48:1
92:21,21
104:12 108:17
134:23 137:4
204:12 210:1
245:9 253:24
264:8 288:10
**work** 10:25
21:15 22:4 23:7
23:8 24:2,4
27:7 28:4,17
29:6,14,14,25
30:19 42:18
46:6,13,13,18
46:23 47:1 51:3
51:7,12,17,23
51:25 53:20
54:18,24 56:23
70:2,2 80:18,19
83:12 89:16
167:7 245:14

252:15 253:8
255:12 274:21
**worked** 18:17
260:19 305:17
305:17,18
**worker** 56:25
57:1
**workers** 224:20
308:14,17
**working** 20:2,5
20:11 21:14
29:24 30:16
38:13 119:22
121:24 140:11
143:6 145:8
150:9,23
151:24 170:16
211:10 295:20
296:7,18
**works** 54:21
246:22
**workshop**
239:14,16,21
239:23 241:21
243:15 245:13
245:14,17
247:14,15
305:6
**world** 5:12 19:3
76:14 79:19,20
105:18,23
107:1,14 142:1
149:16 164:8
164:12 176:3,4
176:6 177:17
188:6 278:22

**worried** 202:4
**worries** 152:11
249:10 303:12
**worry** 227:9
267:16
**worth** 184:12
**wrapped** 52:9
52:11
**write** 52:19
185:7 260:20
309:19,20
310:12
**writer** 136:5,22
**writer's** 133:7
**writing** 19:23
19:25 21:3
55:13,14,15,19
136:16 185:5
**written** 137:4
242:25 244:4
247:8
**wrong** 35:7
108:15 146:1
188:3,13
197:18 203:24
218:21 246:8
266:9 293:14
293:20 311:9
**wrote** 30:22
122:22 245:23
246:2 247:6,6
253:19 259:6
260:3

**x**

**x** 4:1,8 5:1,3 6:1
6:3 7:1,3 10:17
291:23 297:7

**y**

**yeah** 9:4,9
10:13 19:10
25:4,11,12 29:2
30:6 34:13
41:18 53:5
54:17 56:1,1
60:11 93:24
105:11 107:18
126:17 140:15
142:13,15,18
142:23 143:13
143:20 148:9
150:16,16
154:15 156:2
160:4,9,10
161:2,4 164:21
168:22 171:15
175:19,24
177:1,25
178:22 179:16
179:23 181:9
183:23 186:12
186:13 190:6
191:12 192:10
193:18,23
199:19 200:2
205:9 206:17
208:4 218:16
219:4 222:3
227:16 241:3

**[yeah - zoom]**                                         Page 79

242:25 246:1
249:14 251:6
253:16 254:1
269:21 280:16
280:20 281:19
285:16,17
287:7 288:19
293:6 299:22
303:25 304:3
306:5 308:1
310:13
**year**   21:20,22
22:19 24:9,21
25:6,9 27:4
51:8 53:21
54:12 85:13
103:2 115:13
125:3 158:8
163:23 217:20
218:18 237:4
278:16 282:23
287:3
**years**   17:22
19:4 40:22 45:1
52:14 56:21
61:15 63:5 92:6
93:8,8 108:25
109:17,23
111:2,5,21
124:6 126:3
128:2,6 129:23
133:18 136:17
148:2 152:4
158:5,11
173:22 174:17
181:17 201:6

201:11 206:3,6
207:22 213:8
225:4 275:19
309:15,24
311:11,13
**yellow**   94:25
95:17 96:16
**yep**   162:4
182:18 225:19
240:20,23
241:9 259:10
259:13 267:21
269:23 282:22
283:25 301:6
**yesterday**   69:3
**york**   3:18,18

**z**

**zeitz**   308:10
309:3 310:3
**zeitz's**   309:22
**zen**   17:17
**zoom**   8:11 49:3
49:3 161:8,8,13

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2)  Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.