Exhibit 3

## In The Matter Of:

*Kleiner v.*

*Johnson & Johnson*

---

*(Jury Trial - Afternoon Session)*

*September 13, 2021*

---

*John J. Kurz, RMR, CRR, Official Court Reporter*

*City of Philadelphia*

*First Judicial District Of Pennsylvania*

*100 South Broad Street, 2nd Floor*

*Philadelphia, PA 19110*

Original File 13SEPTEMBER-2021-AFTERNOON-FINISHED.txt

Min-U-Script® with Word Index

(Jury Trial - Afternoon Session) - September 13, 2021
Kleiner v. Johnson & Johnson

| - KLEINER -vs- JOHNSON & JOHNSON - | Page 1 |
|---|---|

```
 1   IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
          FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
 2                  CIVIL TRIAL DIVISION

 3                  - - -

 4   ELLEN KLEINER and      : JANUARY TERM, 2017
     YURY KLEINER, w/h,     :
 5              Plaintiff(s), :

 6        v.                :

 7                          :
     JOHNSON & JOHNSON, and :
 8   JOHNSON & JOHNSON      :
     CONSUMER COMPANIES, INC.,:
 9              Defendant(s). :  NO. 2505

10                  - - -

11         MONDAY, SEPTEMBER 13, 2021

12                  - - -

13              COURTROOM 653
                  CITY HALL
14         PHILADELPHIA, PENNSYLVANIA

15                  - - -

16   B E F O R E : THE HONORABLE CHARLES J. CUNNINGHAM, III,

17         and a Jury

18                  - - -

19              JURY TRIAL

20         (AFTERNOON SESSION)

21

22   REPORTED BY:

23   JOHN J. KURZ, RMR, CRR, CRC
     REGISTERED MERIT REPORTER
24   CERTIFIED REALTIME REPORTER
     CERTIFIED REALTIME CAPTIONER
25   OFFICIAL COURT REPORTER
```

| - KLEINER -vs- JOHNSON & JOHNSON - | Page 2 |
|---|---|

```
 1   A P P E A R A N C E S :

 2

 3   EISENBERG ROTHWEILER WINKLER EISENBERG & JECK, PC

 4        BY:  NANCY J. WINKLER, ESQUIRE

 5        BY:  TODD A. SCHOENHAUS, ESQUIRE

 6              1634 Spruce Street

 7         Philadelphia, Pennsylvania 19103

 8              T: 215-546-6636

 9   Email: Nancy@erlegal.com and Todd@erlegal.com

10         Counsel for Plaintiffs Kleiner

11

12

13

14         BEASLEY ALLEN LAW FIRM

15     BY:  DAVID DEARING, ESQUIRE (pro hac vice)

16     BY:  LEIGH O'DELL, ESQUIRE (pro hac vice)

17              218 Commerce Street

18         Montgomery, Alabama 36104

19              Email:

20     David.dearing@beasleyallen.com and

21       Leigh.odell@beasleyallen.com

22         Counsel for Plaintiffs Kleiner

23

24

25
```

| - KLEINER -vs- JOHNSON & JOHNSON - | Page 3 |
|---|---|

```
 1   A P P E A R A N C E S : (Continued)

 2

 3              BLANK ROME, LLP

 4        BY:  JAMES T. SMITH, ESQUIRE

 5        BY:  WILLIAM R. CRUSE, ESQUIRE

 6        BY:  REBECCA D. WARD, ESQUIRE

 7              One Logan Square

 8         Philadelphia, Pennsylvania 19103

 9              T: 215-569-5500

10         Email: smith-jt@blankrome.com and

11   cruse@blankrome.com and ward@blankrome.com

12   Counsel for Defendants Johnson & Johnson

13

14

15              SIDLEY AUSTIN, LLP

16     BY:  DEBRA E. POLE, ESQUIRE (pro hac vice)

17     BY:  ERIC B. SCHWARTZ, ESQUIRE (pro hac vice)

18        BY:  AMANDA BLAU, ESQUIRE

19         555 West 5th Street, Suite 4000

20         Los Angeles, California 90013

21              T: 213-896-6000

22   Email: dpole@sidley.com and eschwartz@sidley.com

23              and ablau@sidley.com

24   Counsel for Defendants Johnson & Johnson

25
```

| - KLEINER -vs- JOHNSON & JOHNSON - | Page 4 |
|---|---|

```
 1   A P P E A R A N C E S : (Continued)

 2

 3              Also Present:

 4         Kristian Benz, Law Clerk

 5         Demetrius Pavlo, Law Clerk

 6         Mr. and Mrs. Kleiner

 7         Melisa Bruner, Paralegal

 8     Ryan Beattie, Esquire, Beasley Allen

 9   Jennifer K. Emmel, Esquire, Beasley Allen

10         Michael Bagdon, Trial Technician

11         Michael Kauffmann, Trial Technician

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

- KLEINER -vs- JOHNSON & JOHNSON -                    Page 5

1                  - I N D E X -

2  WITNESSES:              VD    DR    CR    RDR

3  TERI LONGACRE, M.D.

4    By Mr. Dearing                      7

5    By Ms. Pole                              75

6

7  MATTHEW SANCHEZ, Ph.D.

8    By Ms. Pole            102

9    By Mr. Dearing         130

10

11          E X H I B I T S

12  N O.                        P A G E   N O.

13  P-1664        O'Brien Study: Association    27
14                of Powder Use in the Genital
               Area with Risk of Ovarian
15                Cancer

16  P-1935        Study: Paradigm Shift in the   39
17                Management Strategy for
               Epithelial Ovarian Cancer,
18                by Fujiwara and others

19  P-460         Publication entitled: Ovarian  50
20                Cancers: Evolving Paradigms in
               Research and Care, published by
               National Academies of Sciences
21

22  DX-3136       Dr. Longacre's report dated    76
23                11/3/2019

24  DX-3137       PowerPoint presentation       106
25                prepared by Dr. Sanchez

- KLEINER -vs- JOHNSON & JOHNSON -                    Page 6

1                  * * *

2          P R O C E E D I N G S

3                  * * *

4       (1:48 p.m.; Afternoon Session)

5                  * * *

6          (All parties present and

7  participating in the following proceedings are

8  wearing masks pursuant to First Judicial

9  District of Pennsylvania protocol.)

10          LAW CLERK: All rise.  Court is back

11  in session.

12          You may be seated.

13          COURT REPORTER: Good afternoon, Your

14  Honor.

15          THE COURT: Good afternoon.

16          LAW CLERK: All rise as the jury

17  enters.

18                  - - -

19          (Whereupon the jury panel entered the

20  courtroom at 1:49 p.m.)

21                  - - -

22          LAW CLERK: You may be seated.

23          THE COURT: Okay.  When we left off,

24  it was about to be plaintiffs'

25  cross-examination, right?

- TERI LONGACRE, M.D. (Cross) -                    Page 7

1          MR. DEARING: Yes, sir.

2       Testing.  Can everybody hear me?

3          THE COURT: It sounds fine.

4          MR. DEARING: I'm going to lower my

5  mask because my glasses keep fogging up.  I

6  can't see what I'm doing.

7       Good afternoon.

8          JURY PANEL: Good afternoon.

9                  - - -

10       ... TERI LONGACRE, M.D., after having

11  been previously sworn, was examined and

12  testified as follows:

13                  - - -

14          CROSS-EXAMINATION

15                  - - -

16  BY MR. DEARING:

17  Q.  Good afternoon, Doctor.

18  A.  Good afternoon.

19  Q.  So my name is David Dearing; and we've never

20  met before, have we?

21  A.  No, I don't think so.

22  Q.  And I've never taken your deposition or

23  anything like that?

24  A.  No.

25  Q.  In this case, you provided three reports; do

- TERI LONGACRE, M.D. (Cross) -                    Page 8

1  you remember that?

2  A.  Yes.  I think there was an initial and two

3  supplemental.  I believe so, yes.

4  Q.  Right.

5       One was provided on November 3rd,

6  2019; one was provided June 9th, 2020; and then

7  another one was provided right before trial.  Do

8  you remember that?

9  A.  Yes.

10  Q.  I'm just curious -- well, each report was a

11  little different.  And I assume that's why you were

12  writing new ones.  But, for example, in the second

13  report you added a paragraph to page 4 and another

14  paragraph on page 6, and then in the third report we

15  got right before trial, you added a whole new

16  section on Dr. Godleski and your criticisms of

17  Dr. Godleski.

18       I'm just curious, why so many

19  reports?  Did you just have an epiphany right before

20  trial to think, oh, I should criticize Dr. Godleski?

21  What's that about?

22  A.  As you mentioned, this started way back in

23  2019, and, yeah, I supplemented, edited, whatever

24  term that you -- we use.  Things change over time,

25  and my thoughts on things change over time.  I edit

- TERI LONGACRE, M.D. (Cross) -                                    Page 9

1  my chapters.  That doesn't mean I had an epiphany.
2  Just over time things change.  It's an updating.
3  Q.  Well, why did you decide it wasn't really
4  necessary in your first two reports to put a whole
5  section criticizing Dr. Godleski and then in your
6  third report right before trial decide, oh, I better
7  add that section?
8  A.  I think it was more -- just being more
9  specific, more addressing the point.  There was no
10  sudden change of anything.
11  Q.  Well, there was no section at all about
12  Dr. Godleski in the first two reports, so you're not
13  just changing something, you're adding a whole
14  section?
15  A.  Correct.
16  Q.  Is that just something you decided you thought
17  you should do right before trial?
18  A.  I think the attorneys asked me to reflect more
19  on his report; and I did.  That's -- I mean --
20  Q.  That's what I thought.  That's where I'm going
21  with this.
22          The fact of the matter is, you're not
23  here to testify that Dr. Godleski did not find talc
24  in Ms. Kleiner's gynecologic tissue, are you?  Your
25  only dispute is how it got there, right?

- TERI LONGACRE, M.D. (Cross) -                                    Page 10

1  A.  Uhmm, I'm here -- well, I'm here to testify
2  about the pathology, everything that I testified
3  earlier.
4  Q.  Let's get to -- I know.  Let's talk about talc
5  though.
6  A.  Okay.
7  Q.  You're not here to say Dr. Godleski did not
8  find talc in the tissue, are you?
9  A.  No.
10  Q.  Okay.  Because you can't refute that, can you?
11  You're not qualified to refute that?
12  A.  No.
13  Q.  And that's because you don't study particles in
14  tissue like he does, right?
15  A.  That's correct.
16  Q.  And you don't study anything with scanning
17  electron microscopy, right?
18  A.  That's correct.
19  Q.  And you're not even knowledgeable enough to
20  operate a scanning electron microscope --
21  microscope; am I right?
22  A.  That's correct.
23  Q.  However, Stanford Medical School, where you
24  work, has an electron microscopy lab, doesn't it?
25  A.  Oh, of course.  That's state of the art.

- TERI LONGACRE, M.D. (Cross) -                                    Page 11

1  Q.  It has --
2  A.  They have state-of-the-art equipment, yes,
3  absolutely.
4  Q.  It has --
5  A.  But that's not routine diagnostic technology --
6  Q.  Oh, I know.
7  A.  -- that we use.  And so of course I'm not
8  trained in it.  I don't need to be trained in it.
9  No gynecologic pathologist needs to be trained in
10  it.  But that doesn't mean that it's not a
11  technology that's used more often than not in a
12  research setting.
13  Q.  Right.
14          So Stanford has a state-of-the-art
15  electron microscopy lab with scanning electron -- at
16  least a scanning electron microscope, right?
17  A.  I'm sure they do.  Multiple I would suspect.
18  Q.  And of course we've already established, you're
19  not a talc expert, right?
20  A.  That's correct, I'm not.
21  Q.  You never even studied talc until Johnson &
22  Johnson came to you to be an expert witness in talc
23  litigation, right?
24  A.  I don't know that I ever studied talc per se.
25  Q.  Okay.  And you've certainly never studied how

- TERI LONGACRE, M.D. (Cross) -                                    Page 12

1  talc affects epithelial human tissue, right, before
2  you got involved in this litigation?
3  A.  I reviewed papers, but not -- no, I have not
4  conducted scientific studies on talc and tissue.  I
5  think I've already testified to that.
6  Q.  And you've never published on talc, right?
7  A.  That's correct.  I already testified to that as
8  well.
9  Q.  And you said something interesting.  You said
10  I've never published on talc because talc has no
11  role in ovarian cancer.  Was that your statement?
12  A.  In my opinion, reading the literature, it's
13  not -- I don't believe it has a role in ovarian
14  carcinoma, correct.
15  Q.  But you have read literature about talc and
16  ovarian cancer, right?
17  A.  Yes.
18  Q.  So you know there are hundreds of scientists
19  and pathologists just like you who have studied talc
20  and who completely disagree with you, right?
21          MS. POLE:  Objection, Your Honor.
22  It's vague in terms of hundreds.
23          THE COURT:  Overruled.
24          THE WITNESS:  Well, there are
25  definitely scientific studies looking at talc

(Jury Trial - Afternoon Session) - September 13, 2021
Kleiner v. Johnson & Johnson

---

- TERI LONGACRE, M.D. (Cross) -                                    Page 13

1  with respect to ovarian cancer.  And some
2  conclude that there is a role and some do not;
3  there definitely are.  You're right.
4  **BY MR. DEARING:**
5  **Q.  I'm not talking about studies.  I'm talking**
6  **about people.**
7  A.  Well, of course, people --
8  **Q.  There are hundreds of scientists and**
9  **pathologists just like you that completely disagree**
10  **with your position on talc, right?**
11  A.  I don't know if there's hundreds, but there
12  certainly are some.
13  **Q.  And you're not saying all those hundreds of**
14  **scientists are wrong, are you?  You're just saying**
15  **you disagree with them?**
16  A.  I think they're incorrect, yes.
17  **Q.  You're saying they're all wrong?**
18  A.  I think they're incorrect, yes.  I think that
19  if they were correct, after the amount -- the
20  literature that's been accumulated looking at talc
21  with respect to ovarian carcinoma, that would have
22  meant thresholds where groups such as the WHO with
23  the blue books that I talked about, the American
24  Cancer Society, all of these societies would be
25  making statements about the risk of talc with

---

- TERI LONGACRE, M.D. (Cross) -                                    Page 14

1  ovarian cancer; and that simply is not the case.
2  **Q.  Right.  We're going to talk more about that in**
3  **a minute.  You're getting ahead of me a little bit.**
4  **So I'm clear, it's your testimony**
5  **under oath to this jury that the hundreds of**
6  **scientists and pathologists who have studied about**
7  **this issue --**
8  **THE COURT:** Excuse me, Mr. Dearing.
9  **MR. DEARING:** Am I arguing?
10  **THE COURT:** No.  It -- you're doing
11  two things.  One is, you're arguing with the
12  witness.
13  **MR. DEARING:** Okay.
14  **THE COURT:** You're not going to beat
15  her into submission.  She's not going to finally
16  say: "Okay, okay, I give up, you're right."
17  That only happens on Perry Mason.
18  **MR. DEARING:** No.  I think we
19  actually agree on this.
20  **THE COURT:** And second, we'd like to
21  finish this trial in September.
22  (Laughter.)
23  **MR. DEARING:** I hear you.  Okay.
24  **THE COURT:** So if you keep going over
25  the same thing over and over again, we might not

---

- TERI LONGACRE, M.D. (Cross) -                                    Page 15

1  succeed with that.
2  **MR. DEARING:** I think I'm going to
3  finish in under an hour actually, so.  But
4  I'll -- I'll try to --
5  **THE COURT:** An hour spent asking the
6  same question over and over again is an hour
7  misspent.
8  **MR. DEARING:** Okay.
9  **BY MR. DEARING:**
10  **Q.  Doctor, you've never tried to publish or have**
11  **anyone peer review -- have any of your peers review**
12  **the testimony that you gave today about talc and**
13  **ovarian cancer, right?**
14  A.  I've never published my testimony today?  No.
15  **Q.  Not just your testimony, your opinions about**
16  **talc and ovarian cancer.  You've never tried to**
17  **publish those?**
18  A.  No.
19  **Q.  Never had them peer reviewed?**
20  A.  No.
21  **Q.  You know, Johnson & Johnson has teams of**
22  **scientists that work for them.  Have you seen any of**
23  **their scientific documents about talc and ovarian**
24  **cancer or tissue studies?**
25  A.  What -- by Johnson & Johnson, the company?

---

- TERI LONGACRE, M.D. (Cross) -                                    Page 16

1  **Q.  Yeah.**
2  A.  No.  No.
3  **Q.  The lawyers didn't show you any of their**
4  **internal science documents?**
5  A.  No.
6  **Q.  Let's talk about your analysis of Ms. Kleiner's**
7  **tissue.**
8  **So as I understand it, you reviewed**
9  **the hospital pathology reports.  You reviewed the**
10  **pathology slides that the hospitals prepared.  And**
11  **you read Dr. Godleski's report and looked at his**
12  **data, right?**
13  A.  Yes.
14  **Q.  And because you looked at Dr. Godleski's**
15  **report, you know that he provided to the defense,**
16  **and presumably to you, he disclosed all of his**
17  **relevant findings in this case with the precise**
18  **locations of the talc particles and fibers that he**
19  **found in the blocks, right?  You know that, right?**
20  A.  Yes.
21  **Q.  And you did not study the blocks at all, did**
22  **you?**
23  A.  No, that's incorrect.  I studied the -- I have
24  reviewed the slides that were obtained from the
25  blocks.

---

(Jury Trial - Afternoon Session)- September 13, 2021
Kleiner v. Johnson & Johnson

- TERI LONGACRE, M.D. (Cross) -                                    Page 17

1  Q.  Right.
2  A.  Which is essentially the same thing.  In fact,
3  I looked at recuts of some of those blocks.  So
4  that's incorrect.  I did examine them.
5  **Q.  Okay.  You looked at slides the hospital made**
6  **from the blocks that Dr. Godleski studied before he**
7  **studied the blocks, right?  The slides in the recuts**
8  **you described were made before he studied the**
9  **blocks, right?**
10 A.  I don't know about the recuts, but certainly
11 the original slides would have been obtained before
12 he studied the blocks.
13              That being said, the slides are
14 representative of the blocks.  And that's -- that's
15 just common.  That's knowledge.  That's just the way
16 it works in surgical pathology.
17 **Q.  I understand that's true when you're diagnosing**
18 **cancers, okay.  I understand that routine light**
19 **microscopy can look at little slivers of a block.**
20              **My question to you is:  You did**
21 **nothing to go to the very coordinates that**
22 **Dr. Godleski pointed you to to verify whether**
23 **there's talc in the blocks and even see what the**
24 **tissue in the blocks is responding to, if it's**
25 **responding to the talc, right?  You didn't look**

- TERI LONGACRE, M.D. (Cross) -                                    Page 18

1  **there, right?**
2  A.  No, that's incorrect.  As I said, I looked at
3  the slides that were removed from the blocks.  I did
4  see refractile material.  It would be impossible for
5  me to say whether or not that refractile material
6  was talc or not.  I've already testified to that as
7  well.  So there's no way I could corroborate one way
8  or the other his identification of talc.  And I
9  think I already mentioned that earlier this
10 afternoon.
11 **Q.  Doctor, you can't look at blocks of material**
12 **with a routine light microscope, right?**
13 A.  (No response.)
14 **Q.  That's the advantage -- one advantage of**
15 **scanning electron microscopy is you could look at**
16 **the whole block, right?**
17 A.  I don't know that he's looking at the whole
18 block.  I think --
19 **Q.  But that's not --**
20 A.  -- he's looking at a very small area of the
21 block.
22 **Q.  But --**
23              MS. POLE:  Your Honor, I think she
24 should be allowed to complete her answer.
25 Objection; argumentative.

- TERI LONGACRE, M.D. (Cross) -                                    Page 19

1              MR. DEARING:  I agree she should
2  answer my question.
3              THE COURT:  Well, we'll never know if
4  she's going to answer your question if you cut
5  her off before she finishes the answer.
6              MR. DEARING:  Okay.
7              THE COURT:  So just let her give her
8  answer.  And if there's something objectionable,
9  make an objection.
10             MR. DEARING:  Thank you, Judge.
11 BY MR. DEARING:
12 **Q.  My question is:  You cannot study tissue blocks**
13 **with a light microscope, right, a routine light**
14 **microscope like the one you use?**
15 A.  That's correct.  You wouldn't examine the
16 entire tissue block; sections from them, which, by
17 all our practices, are considered entirely
18 representative.
19 **Q.  If you wanted to study the blocks to see if**
20 **there was talc in the blocks, you certainly could**
21 **have had one of your colleagues at Stanford in the**
22 **electron microscopy lab study the blocks for you,**
23 **right?**
24 A.  I think I mentioned earlier this morning in my
25 testimony, on my review of these studies that

- TERI LONGACRE, M.D. (Cross) -                                    Page 20

1  Dr. Godleski and others have performed doing this
2  technology, my opinion was that it was not relevant,
3  and so I would never ask -- as I've mentioned, I had
4  a consult asking me to do that, and I would never do
5  it with good -- in good conscience because I don't
6  think it's an appropriate technology for this.
7  **Q.  And --**
8  A.  I don't think it establishes causation.  Just
9  identifying a little bit of talc material in some
10 tissue that could be a contaminant I think is
11 extraordinarily misleading.  So I would never have
12 done that to begin with.
13 **Q.  So the answer is, no, you didn't ask your**
14 **colleague to --**
15 A.  No, I would not.  I would never do that.  I
16 wouldn't do it even before I was working for Johnson
17 & Johnson, as you heard me testify this morning.  I
18 would not do it.
19 **Q.  Wouldn't you also -- wouldn't you want to know**
20 **whether the talc in the blocks is in a macrophage or**
21 **is evidencing some kind of inflammatory reaction?**
22 **You don't even want to know that?**
23 A.  As I already mentioned, you would notice --
24 know that best by looking under light microscopy to
25 see if that material was actually in a cell or

(Jury Trial - Afternoon Session) - September 13, 2021
Kleiner v. Johnson & Johnson

---

- TERI LONGACRE, M.D. (Cross) -                                    Page 21

1 associated with a foreign body reaction.
2 Q. Yeah.
3 A. And the pictures that are in his report showing
4 SEM, you cannot make out cells. So there's no way
5 to determine whether or not that material is in a
6 cell or associated with a foreign body reaction. So
7 the technology is not appropriate to address that.
8 It would be a light microscopic examination.
9 Q. You're gauging the value of scanning electron
10 microscopy on a two-dimensional photograph that's on
11 a piece of paper or on your computer somebody sent
12 you?
13 A. I'm -- no. I'm basing it on the technology
14 itself.
15 Q. You looked at -- you just said you looked at
16 Dr. Godleski's photographs and said you didn't see
17 macrophages, right?
18 A. That's correct. I don't --
19 Q. You realize a scanning electron microscope lets
20 you look in three dimensions and lets you see
21 super-high resolution, hundreds of times higher than
22 a routine light microscope like you're using, right?
23 You know that much about SEMs?
24 A. Yes. It's a -- it is a higher resolution.
25 That being said, I think that it's such a -- the

---

- TERI LONGACRE, M.D. (Cross) -                                    Page 22

1 standard method to identify cells is a light
2 microscopy in macrophages. It is not
3 ultra-structural analysis. You do ultra-structural
4 analysis to look inside of cells, not actual, you
5 know, in full-blown cells. You look at the cell
6 organelles. That's a much higher detail, and so you
7 look at an internal structure of a cell. More often
8 than not, you can't be certain even what kind of
9 cell you're looking at. On rare exceptions, it's
10 possible.
11      So it's really -- it's too high
12 magnification, as you say, to be able to determine
13 whether or not -- what kind of cell you're looking
14 at.
15 Q. So you realize that Dr. Godleski has spent a
16 lifetime, a career using scanning electron
17 microscopy to study tissue and cells and particles
18 in tissue; you know that, right?
19 A. I think he's using it to study particles, yes.
20 Q. In tissue, right?
21 A. Yes, in tissue. But what tissue it's in, I
22 don't know that you can necessarily identify based
23 on that technology.
24 Q. I know you think that. But you're not an SEM
25 expert. He's the SEM expert, right? So isn't he in

---

- TERI LONGACRE, M.D. (Cross) -                                    Page 23

1 the best position to decide what SEM is good for and
2 what it can't be used for?
3      MS. POLE: Objection; argumentative.
4      THE COURT: Yeah. I mean, you're
5 right on the border of "na-na, na-na, na-na."
6      (Laughter.)
7      MR. DEARING: I don't mean to be.
8      THE COURT: No, no, serious. It's
9 just arguing. It's not questioning. So take a
10 deep breath, come up with a question, and full
11 speed ahead.
12 BY MR. DEARING:
13 Q. You've obviously read Dr. Godleski's testimony
14 because Ms. Pole went over some of it with you,
15 right?
16 A. Yes.
17 Q. Okay. And you know in his testimony he
18 testified that one of the advantages of SEM is that
19 you can see the cell structures in the tissue,
20 right?
21 A. I think he -- well, I don't know what he meant.
22 But I think the advantage would be the ultra -- the
23 internal structures of the cell, because as you
24 said, it's a higher resolution.
25      The best way to identify cells is

---

- TERI LONGACRE, M.D. (Cross) -                                    Page 24

1 still light microscopy, it just -- it is.
2 Q. It is --
3 A. It is.
4 Q. -- unless you're also trying to identify
5 particles.
6      Do you know enough about SEM to know
7 that the scanning electron microscopy with the
8 energy diffractive X-ray spectroscopy that's
9 attached to it can actually identify what the
10 particle is? It identifies the atomic composition
11 of the particle, right? That's another advantage to
12 SEM that routine light microscopy doesn't have,
13 right?
14 A. Yes. I think that's -- that is probably the
15 advantage in this, is that you, as best as I can
16 understand, that you can identify these particles.
17 But this is not what you were asking me. You were
18 asking me identifying cells. And identification of
19 cells is best done on light microscopy.
20 Q. So, again, when Dr. Godleski came in here --
21      THE COURT: Excuse me. Excuse me.
22 You know, every question that begins with
23 "again" should be a red flag. "Again." It's
24 already been asked and answered.
25      MR. DEARING: This one hasn't.

---

(Jury Trial - Afternoon Session) - September 13, 2021
Kleiner v. Johnson & Johnson

- TERI LONGACRE, M.D. (Cross) -                                    Page 25

1        THE COURT: Well, then why is it
2   again?
3        MR. DEARING: I don't know.
4        THE COURT: Neither do I.  So move on
5   to something else.
6   BY MR. DEARING:
7   Q.  When Dr. Godleski testified that he saw talc
8   particles in the cells in macrophages, in the
9   blocks, are you telling this jury right now he was
10  just wrong?
11  A.  I don't think that you can make -- I don't -- I
12  could not -- I don't think that identification of
13  cells is best determined on scanning EM.  Particles,
14  perhaps.  The best -- I would -- I'm not convinced
15  by that, no.  I would be convinced if I saw a light
16  microscopic picture of a cell and I saw particles
17  within the cell, which I did not see.  That is the
18  gold standard, not SEM.  That's my answer.
19  Q.  I don't even know if you said he was wrong or
20  not.  Is he wrong or is he not wrong?
21  A.  I -- I wouldn't know.  There's no evidence.
22  Q.  In your report, and I'm referring to the third
23  report, you make this sweeping statement, and I want
24  to ask you about it.  You say: "Although the early
25  literature hypothesizes a possible role of talc in

- TERI LONGACRE, M.D. (Cross) -                                    Page 26

1   the development of ovarian cancer, subsequent
2   accumulated data have not been able to substantiate
3   the [sic] link."
4        Do you remember that statement?
5   A.  Yes.  Yes.
6   Q.  And then right behind that you put a
7   parentheses with some studies purporting to support
8   that proposition.  Do you remember doing that?
9   A.  Yes, I think so.
10  Q.  Okay.  And so I just picked, because you wrote
11  "subsequent accumulated data," I assume you're
12  applying to the most -- you're referring to the most
13  recent data.  And so I've just pulled the three most
14  recent studies that you cite, and I want to ask you
15  about them.
16       One of them was the O'Brien study
17  from 2020.  Do you remember citing that for the
18  proposition that subsequent accumulated data have
19  not been able to substantiate the link?
20  A.  I have to -- I don't recall the O'Brien paper
21  specifically now.
22  Q.  Okay.  Well, I pulled it from your report.  I
23  can show you your report, if you like.
24  A.  I would rather see the paper.
25  Q.  Well, I'll show you the paper.

- TERI LONGACRE, M.D. (Cross) -                                    Page 27

1   A.  Sure.
2        MR. DEARING: May I approach, Your
3   Honor?
4        THE COURT: Sure.
5        (Counsel approached the witness.)
6        (Handing document to the witness.)
7        THE WITNESS: Thank you.
8   BY MR. DEARING:
9   Q.  So this has already been marked for
10  identification as P-1664.
11       MR. DEARING: Mike, can you put that
12  on the screen; but just show the title and the
13  authors?
14       (Exhibit P-1664, O'Brien Study:
15  Association of Powder Use in the Genital Area
16  with Risk of Ovarian Cancer, marked for
17  identification.)
18  BY MR. DEARING:
19  Q.  I really only have one question, so it's not
20  going to take very long.
21  A.  Okay.  Sure.
22  Q.  The question is:  Isn't it true that this study
23  determined or demonstrated that women who use talc
24  in the genital region have a 13 percent increased
25  risk of getting ovarian cancer if they have a patent

- TERI LONGACRE, M.D. (Cross) -                                    Page 28

1   or open reproductive tract?
2        MS. POLE: Objection, Your Honor;
3   relevancy.
4        MR. DEARING: I'm cross-examining her
5   on her own report.
6        THE COURT: Yeah.  Overruled.
7        (Document published on screen.)
8   BY MR. DEARING:
9   Q.  If you need me to direct you, turn over to
10  page --
11  A.  No.  No.  You don't need to direct me.  It's
12  okay.
13  Q.  Okay.
14  A.  So --
15  Q.  Do you agree with that statement?
16  A.  No, not entirely.
17       This did not meet statistical
18  significance, this study.  And that's -- that's
19  the -- that's the bottom line on this.
20       Yes, there was a -- appeared to be an
21  association, but the power was insufficient, and it
22  was not statistically significant.  So it really
23  didn't provide any proof one way or the other.
24  Q.  I agree the overall study didn't provide any
25  proof one way or the other.  I totally agree with

---

- TERI LONGACRE, M.D. (Cross) -                                    Page 29

1  you.
2          But on this particular point,
3  referring to women who have ever used powder, the
4  women who had a patent or open reproductive tract,
5  there was a statistically significant increased risk
6  of 13 percent of ovarian cancer.
7          If you'd look on page 54 of the
8  study, you can either read it in the text in the
9  second column or you could look at the table right
10 above it.
11         In fact, I'll just put it on the
12 ELMO.
13         Will you -- I don't want you to think
14 for a second I'm misleading you, so let me just put
15 it up.
16         And I'm displaying the table that I'm
17 referring to.  And I know we're not supposed to
18 display the text of the study, so I'm just putting
19 the table up.  And I'm going to blow it up.
20         And do you see that bottom line that
21 I have highlighted?
22 A.  (No response.)
23 Q.  First of all, let's look at the title so we
24 know what we're talking about.  This is a study and
25 it's entitled:  "Subgroup analysis for the

---

- TERI LONGACRE, M.D. (Cross) -                                    Page 30

1  association between ever use of powder in the
2  genital area and risk of ovarian cancer, pooled
3  hazard ratios."
4          And hazard ratios are the relative
5  risks we've been talking about, right?
6  A.  Yes.
7  Q.  All right.  And if you look at the bottom of
8  this --
9  A.  Well, I haven't been talking -- we haven't
10 really been talking about hazard ratios.
11 Q.  I'm sorry.
12 A.  But you've been, I assume.  But we have not
13 been this morning.
14 Q.  You're right.  We've been talking about it in
15 this trial for weeks.
16         So you see where it says under the
17 patency category?
18 A.  Yes.
19 Q.  So that's talking about women with patent
20 reproductive tracts?
21 A.  Uh-huh.
22 Q.  Which means they still have their ovaries,
23 tubes --
24 A.  Right.
25 Q.  -- uterus?

---

- TERI LONGACRE, M.D. (Cross) -                                    Page 31

1  A.  Sure.
2  Q.  Everything, right?
3  A.  Sure.  Yeah.
4  Q.  And you see it showed a 13 percent increased
5  risk?
6  A.  Uh-huh.
7  Q.  That is statistically significant, right?
8  A.  No.  P-value is .15.  That's not statistically
9  significant.  It's the p-value that you're looking
10 at.  It should be .05 or less.  This is not a
11 statistically significant result.
12 Q.  Well, do you agree that the hazard ratio is
13 13 percent?
14 A.  Sure.  But -- but really what I'm talking about
15 is the p-value.
16 Q.  Well, I have a feeling we're going to learn a
17 lot more about p-values with our -- with the
18 epidemiologist, so.
19 A.  Sure.  Yeah.  You should have them discuss
20 that.  But this is not statistically significant
21 results.
22 Q.  Okay.  We can agree to disagree on that.
23         Let me talk about another study.
24 Another study you offered to support your
25 proposition that subsequent accumulated data have

---

- TERI LONGACRE, M.D. (Cross) -                                    Page 32

1  not been able to substantiate this link between talc
2  use and ovarian cancer.
3  A.  Uh-huh --
4  Q.  -- was the Taher study from 2018.  You remember
5  that study?
6  A.  Yeah.  We'll have to look at that again.
7  Q.  Okay.  My biggest fear is putting the jury to
8  sleep with epidemiology studies after lunch, so I'm
9  going to breeze through these.  Here's the Taher
10 study.
11 A.  Thank you.
12 Q.  I figured since you cited it in your report,
13 you were familiar enough to just talk about it.
14         But as you know, the Taher study
15 combined 27 other studies, right?  This is a
16 meta-analysis, right?
17 A.  Right.
18 Q.  Right.
19 A.  Right.
20 Q.  And it determined that women who used talc in
21 the genital area have a 28 percent increased risk of
22 ovarian cancer, right?
23 A.  (No response.)
24 Q.  Do I need to point you to it?
25         You can really look right to the

---

(Jury Trial - Afternoon Session) - September 13, 2021
Kleiner v. Johnson & Johnson

1  abstract where it says "results." A positive
2  association between perineal use of talc powder and
3  ovarian cancer was found.
4  A.  Uh-huh.
5  Q.  And it gives you an odds ratio of 1.28. That
6  was statistically significant, right?
7  A.  Correct.
8  Q.  Okay. And then you also refer to a third study
9  to support your statement, and that's the
10  Penninkilampi study from 2018.
11        Do you remember that one, or would
12  you like me to provide it to you?
13  A.  No; you'll have to show that to me again, too.
14  Q.  Okay.
15  A.  So once again, just to keep things moving, when
16  I cite literature, I'm not just citing the, you
17  know, the pros or the cons. It's an attempt to
18  represent the cumulative literature. And so if you
19  cherry-pick out little statements and little
20  comments here and there, you will "buffet" your
21  argument.
22        The point is, if you put all of these
23  sort of the literature together, you end up sort of
24  with a -- I think a plus/minus. There's no
25  definitive evidence to support this.

1  Q.  So I --
2  A.  And that's the point of what I'm doing. I'm
3  not trying to bias my report by only citing the
4  things that support my opinion.
5  Q.  Right. Well, your statement --
6  A.  So you will definitely be able to cherry-pick
7  out things that don't necessarily agree with what
8  I'm saying. But the point is, if you -- if you put
9  all the information together, my opinion still
10  holds; that there's no substantial significant
11  scientific evidence to support talc causing ovarian
12  cancer.
13  Q.  Do you think I cherry-picked the findings of
14  Penninkilampi a minute ago when I just read it to
15  you?
16  A.  To a certain extent, yes. You're not listening
17  to what I'm saying. I'm putting forward the recent
18  literature. And on balance, if you look at the
19  recent literature, as well as the remote literature,
20  I don't think there's overwhelming evidence to
21  support this at all.
22  Q.  I understand. And I only pulled these three
23  because of what your statement was.
24  A.  But --
25  Q.  You said subsequent accumulated data --

1  A.  Accumulate. Cumulative.
2  Q.  -- has not been able to substantiate the link,
3  and then you put these studies right behind that as
4  if it supports it. And these studies don't, right?
5  A.  No. I think it does. I think the cumulative
6  data, if you put them all together, doesn't provide
7  a lot of strong evidence one way or the other.
8  Q.  Okay. Well, you have Penninkilampi in your
9  hand.
10        And I should go back. The Taher
11  study is P-1045. Penninkilampi is P-1013. And of
12  course, you know Penninkilampi determined or
13  demonstrated -- and this was another meta-analysis.
14  They combined 24 case-control studies and the three
15  cohort studies that we've already heard about. And
16  they determined that women who used talc in their
17  genital region for more than ten years, like
18  Ms. Kleiner, had a 42 percent increased risk of
19  ovarian cancer.
20        That's what the Penninkilampi authors
21  determined, right?
22  A.  So these are meta-analyses of epidemiologic
23  literature.
24  Q.  Yeah.
25  A.  Correct.

1  Q.  Yeah.
2  A.  Okay.
3  Q.  You cited them in your report.
4  A.  Yes, of course. There is epidemiology -- I am
5  not an epidemiologist. I'm well aware of the
6  literature. And I understand -- there's -- you guys
7  are going to hear, if you haven't already,
8  epidemiology experts. Listen to them. This is not
9  my area. But I am cognizant of this literature.
10        That being said, there is still no --
11  there's no demonstrable evidence of cause and effect
12  of talc, perineal talc exposure with ovarian cancer.
13  These papers themselves say that. More studies need
14  to be done. There's no causative effect. We
15  haven't figured out the cause yet, if this is true.
16  And that's basically what I'm saying. I'm trying to
17  prevent -- present a very balanced view on this
18  topic.
19  Q.  That may be what you're trying to say, but we
20  read already what you did say, but let me switch
21  gears entirely.
22        You also said today --
23        MS. POLE: Your Honor, objection to
24  the gratuitous comments from counsel as
25  argumentative.

- TERI LONGACRE, M.D. (Cross) -                                    Page 37

1      THE COURT: Yeah. You've had enough
2  strikes that we're at the point now you do it
3  one more time, that is the end of your
4  cross-examination.
5      MR. DEARING: Okay.
6      THE COURT: There's no editorial
7  comment before the question, after the question.
8  If you hear yourself making a statement that
9  ends in a period, you've probably stepped out of
10 bounds. Ask questions, that's it, or that's the
11 end of your cross-examination.
12     MR. DEARING: Yes, sir.
13 BY MR. DEARING:
14 Q.  Doctor, did you also say that inflammation is
15 not associated with ovarian cancer?
16 A.  Correct.
17 Q.  And I read your resume. And you are a -- are
18 you a longstanding member of the American Society of
19 Clinical Oncology?
20 A.  I have been a member. I'm not sure I'm
21 currently a member. But, yes, I was a member of
22 ASCO.
23 Q.  According to your resume, you were a member in
24 2004.
25 A.  Oh, yes, definitely.

---

- TERI LONGACRE, M.D. (Cross) -                                    Page 38

1  Q.  And you've already even served on a review
2  panel for them just two years ago, right?
3  A.  Yes. That's for their ovarian -- or, yeah.
4  Actually, it's an ovarian cancer review panel, yes.
5  Q.  And the American Society of Clinical Oncology
6  is a very large global network of oncology
7  professionals, right?
8  A.  Yes.
9  Q.  In fact, according to their website, they have
10 over 45,000 oncology professionals as members. Does
11 that sound about right to you?
12 A.  Sure. I don't -- yeah. I -- it's a very big
13 organization. I don't know the numbers.
14 Q.  Okay. And the mission statement on the website
15 says: "The American Society of Clinical Oncology is
16 dedicated to providing the highest quality resources
17 in education, policy, the pioneering of clinical
18 research, and above all, advancing the care for
19 patients with cancer."
20      Do you agree that that's the mission
21 of the American Society of Clinical Oncology?
22 A.  Yeah, I think so.
23 Q.  Have you seen the study published by the
24 American Society of Clinical Oncology entitled:
25 "Paradigm Shift in the Management Strategy for

---

- TERI LONGACRE, M.D. (Cross) -                                    Page 39

1  Epithelial Ovarian Cancer," by Dr. Fujiwara and
2  others?
3  A.  Uhmm, I'm not sure I have. Can you show it to
4  me?
5  Q.  Sure. I'd like to --
6  A.  It sounds vaguely familiar, but I don't know.
7  Q.  The study I'm referring to is Plaintiffs'
8  Exhibit 1935.
9      (Handing document to the witness.)
10 A.  Yes.
11     (Exhibit P-1935, Study: Paradigm
12 Shift in the Management Strategy for Epithelial
13 Ovarian Cancer, by Fujiwara and others, marked
14 for identification.)
15 BY MR. DEARING:
16 Q.  Does that study ring a bell now that you've
17 looked at it?
18 A.  Yes.
19 Q.  And of course, this study published by the
20 American Society of Clinical Oncology states, among
21 other things, in the right-hand column, it concludes
22 that [reading]: Long-substantiated risk factors for
23 ovarian cancer makes sense in the context of the
24 critical role of the Fallopian tube -- that the
25 Fallopian tube plays in ovarian cancer.

---

- TERI LONGACRE, M.D. (Cross) -                                    Page 40

1      And to put some context to this, this
2  is a study about the management of ovarian cancer
3  and the benefits of --
4      MS. POLE: Your Honor, objection.
5  There is no question to the last sentence that
6  counsel made. So I don't know if he's getting
7  ready to ask another question or make a
8  statement.
9      THE COURT: I don't know.
10     MR. DEARING: I'm getting to my
11 question.
12     THE COURT: Yeah. Well, confine
13 yourself to questions.
14 BY MR. DEARING:
15 Q.  Do you know what this study is about?
16 A.  This -- so, it's not really a study. It's a
17 review article.
18 Q.  All right. Is this review article about
19 managing ovarian cancer risk through either tubal
20 ligation or salpingectomy, removing of the Fallopian
21 tubes altogether?
22 A.  Yes. That's part of it. Yes. It's a whole --
23 yeah. There's a -- as I mentioned, our thoughts
24 about ovarian cancer have shifted dramatically in
25 the last several decades, and this is addressing

(Jury Trial - Afternoon Session - September 13, 2021
Kleiner v. Johnson & Johnson

- TERI LONGACRE, M.D. (Cross) -                                    Page 41

1   that.
2   Q.  Right.
3            And do you agree with the statement
4   that inflammatory conditions, such as pelvic
5   inflammatory disease, incessant ovulation, or
6   irritants such as talc that have ascended from the
7   lower genital tract via the Fallopian tube to the
8   tubo-ovarian junction, increase mutagenesis and
9   increase the risk of ovarian cancer?  Do you agree
10  with that statement?
11  A.  No, I don't.  It's a very complicated and
12  multi-part statement.
13           Are there -- and these are not long
14  substantiated.  The only long-substantiated risk
15  factor, as I mentioned earlier this morning in my
16  testimony, is incessant ovulation.  Inflammation has
17  certainly been promulgated as a possible etiology in
18  ovarian cancer.  That's not been conclusive.  The
19  talc story we've already -- I've already discussed
20  has not been conclusive.
21           Definitely incessant ovulation or
22  late childbirth, without a doubt, those are risk
23  factors, as I mentioned, as well as hereditary.  All
24  of these others have been kind of tossed in there.
25  And there's only one citation to support that.  So

- TERI LONGACRE, M.D. (Cross) -                                    Page 42

1   there's not a lot of literature to support that.
2            In these introductory review
3   articles, they often put in these sweeping
4   statements, and you have to be really careful about
5   which ones are really supported by the scientific
6   data and which ones are, you know, maybe we think
7   about it, we're not sure.
8            This has not been written -- this is
9   not a very clear or concise or correct statement by
10  any stretch of the imagination.
11           And, yes, it may be by ASCO, but that
12  doesn't mean that it's not completely -- it doesn't
13  mean it's correct.
14  Q.  Okay.  That was a long answer.
15           Do you agree with the part that
16  says -- it refers to the talc that has ascended from
17  the lower genital tract via the Fallopian tube to
18  the tubo-ovarian junction, increase mutagenesis and
19  increase the risk of ovarian cancer?
20           In other words, do you agree or
21  disagree with their proposition that talc can ascend
22  the reproductive tract to the ovaries?
23  A.  I disagree.  I think I've already made -- I
24  already had testimony to that.  I haven't changed my
25  mind about that since lunch.

- TERI LONGACRE, M.D. (Cross) -                                    Page 43

1   Q.  If you would, turn to the second page.
2   Actually, is that right?  Yeah, the second page.
3   There's a diagram on the second page.
4   A.  Third for me; but got it.
5   Q.  Okay.
6   A.  Uh-huh.
7            (Document published on screen.)
8   BY MR. DEARING:
9   Q.  And this is a diagram that sort of explains
10  that last sentence.  And on the left it says the
11  "role of the Fallopian tube in ovarian cancer," and
12  then it has an example of a tubal ligation and where
13  that ligation would occur.  And then on the right
14  side of it, it has an example of where the excision
15  would be if you were to remove the Fallopian tube;
16  is that right?
17  A.  Yes.
18  Q.  And if you look in the middle, it's showing the
19  reproductive tract and it's talking about retrograde
20  menstruation.
21  A.  Uh-huh.
22  Q.  And as a pathologist, just do you know that
23  retrograde menstruation is where occasionally women
24  will experience a retrograde flow of menstrual fluid
25  instead of, sort of, an outward flow?

- TERI LONGACRE, M.D. (Cross) -                                    Page 44

1   A.  Yes.  I think I testified earlier this morning
2   that that's one of the possible causes of
3   endometriosis.
4   Q.  Right.
5   A.  Yes.
6   Q.  And you see how it also includes irritants like
7   talc where that retrograde menstruation may also
8   bring talc particles up into the Fallopian tubes and
9   ovaries; do you see that?
10  A.  Yes.  That's on that diagram, yes.
11  Q.  So do you disagree that talc can flow through
12  the reproductive tract through retrograde
13  menstruation?
14  A.  Yes, I do.
15  Q.  Okay.  I didn't see it in your report where you
16  suggested that talc cannot migrate to the ovaries.
17  But I do -- but I did hear you say it today.  So let
18  me ask you:
19           Are you saying that talc or materials
20  applied to the exterior genitalia can never migrate
21  or that they didn't migrate in this case?
22  A.  I don't think they do, based -- and this is
23  based on all my years of experience of looking at
24  tissues removed from women who either have cancer or
25  don't have cancer.

(Jury Trial - Afternoon Session) - September 13, 2021
Kleiner v. Johnson & Johnson

---

- TERI LONGACRE, M.D. (Cross) -                                    Page 45

1    If there was talc or particle
2  migration through the Fallopian tube, at some point
3  in time I would see particulate material in
4  macrophages or a foreign body reaction, which we
5  discussed more than probably anybody wants to hear
6  from this morning.  And I just -- I have never seen
7  it.  I don't see it.
8    Do I see endometriosis in women?
9  Yes, we see that, not infrequently.  And that is
10  thought to be -- arise from this retrograde flow.
11  So we do see that.  So if talc is migrating up
12  there, why am I not seeing the reaction to that?  I
13  see the endometriosis.  I don't see that.
14    Bacterial infection, occasionally
15  bacteria ascend through the Fallopian tube and you
16  see pelvic inflammatory disease, and you see a
17  definite inflammatory response.  Why do I not see
18  it?  If talc is migrating, why have, not just me,
19  but why have no gynecologic pathologists ever seen a
20  response to it?  It's not -- it's just not there.
21  Q.  So are you saying that a tubal ligation does
22    not protect a woman from the ascension of potential
23    environmental carcinogens into the reproductive
24    tract?
25  A.  I don't think I was talking about carcinogens

---

- TERI LONGACRE, M.D. (Cross) -                                    Page 46

1  at all at this point.  We were talking about
2  particles, talc, ascending through the Fallopian
3  tube.
4  Q.  Okay.  Well, let me ask you --
5  A.  And ideally, I would think a -- a good tubal
6  ligation might prevent that.  Might even prevent,
7  you know, any flow.  I mean, that's the point, to
8  prevent -- to sterilize, to prevent sperm
9  fertilizing an egg.  So, yes.
10  Q.  So -- and I'm just trying to understand your
11    answer -- you're saying talc cannot migrate from the
12    vagina to the ovaries.  Are you saying nothing can
13    or just talc?  Can other potential carcinogens other
14    than talc migrate to the ovaries?
15  A.  Once again, no, we're not talking -- no.  I'm
16  not going to do this potential "what if" anything.
17  We're talking specifically about retrograde
18  menstruation, endometriosis, inflammation, and this
19  latest one, talc.
20    I have seen evidence of retrograde
21  menstruation causing endometriosis.  I have seen
22  ascending inflammation causing pelvic inflammatory
23  disease.  I have not seen talc in pelvic tissues
24  associated with macrophages or foreign body
25  response.  I have never seen that.  And surely, if

---

- TERI LONGACRE, M.D. (Cross) -                                    Page 47

1  that's happening, I would have seen it in all my
2  years that I've been practicing.
3  Q.  Are you familiar with Blaustein's Pathology of
4    the Female Genital Tract?
5  A.  Yes, I am.  That's an old version.  Where did
6    you get that?
7  Q.  This is the most recent version.
8  A.  Is it?
9  Q.  Seventh edition.
10  A.  Oh, my goodness.  Well, I guess I haven't got
11    it yet.
12  Q.  I only know because I have the others, but --
13  A.  Uh-huh.
14  Q.  Do you agree this is an authoritative treatise
15    on pathology, particularly female gynecologic
16    pathology?
17  A.  It's one of the textbooks that deals with GYN
18    pathology, yes, it is.
19  Q.  So are you telling us that you disagree with
20    the statement that hysterectomy and tubal ligation
21    reduce or prevent potential environmental
22    carcinogens from entering the peritoneal cavity and
23    thereby contacting tubal and ovarian tissue?  Are
24    you saying you disagree with that statement?
25  A.  Tubal ligation and hysterectomy will prevent --

---

- TERI LONGACRE, M.D. (Cross) -                                    Page 48

1  should prevent anything going -- getting -- or
2  rising, carcinogenic or noncarcinogenic.  So it's,
3  you know...
4  Q.  So is that a yes or no?  I'm confused.
5  A.  Sure.  I mean, it doesn't -- it's not saying a
6  whole lot basically.
7    If you remove -- if you ligate the
8  tubes, yeah, that's the whole point, to prevent
9  anything reaching beyond the -- beyond that ligation
10  procedure, carcinogenic or noncarcinogenic.  So it
11  doesn't make any difference.  The idea is, it's
12  supposed to stop everything.
13  Q.  Right.
14  A.  Right.
15  Q.  But if your opinion is things can't get up
16    through there anyway, it's not really stopping
17    anything, is it?
18  A.  That's right.  That's why I'm answering the way
19  I'm answering.
20  Q.  Okay.
21  A.  Yeah.
22  Q.  Do you agree with the next sentence:
23    "Opportunistic salpingectomy" -- the removal of the
24    tubes -- "greatly reduces the risk of ovarian cancer
25    as demonstrated in several recent studies"?

---

- TERI LONGACRE, M.D. (Cross) -                                    Page 49

1 A.   Yeah.  That's pretty -- yeah, that's
2 interesting.  I think that it -- I think it does.  I
3 think that data supports it.  I think there's also
4 recent data that suggests that it may not be so much
5 that it's blocking, you know, preventing, you know,
6 carcinogenic events, if you will, but it's actually
7 preventing cellular proliferation of the tubal
8 epithelium itself.  And it's that cellular
9 proliferation that some people think excessive
10 cellular proliferation ultimately can lead to
11 carcinogenesis.  So, yes, I think that, yeah, it's a
12 complicated issue.
13         Tubal ligation definitely, I think,
14 is protective against ovarian cancer.  But I'm not
15 sure that it's just that it's blocking it.  That's
16 what we used to say.  I think it's a lot more
17 complicated than that.
18 Q.   Doctor, are you familiar with the National
19 Academy of Sciences?
20 A.   Yes.
21 Q.   Are you familiar with this Publication
22 entitled:  "Ovarian Cancers: Evolving Paradigms in
23 Research and Care," published by the National
24 Academies of Sciences?
25 A.   You have to refresh my -- I'm not sure I do or

- TERI LONGACRE, M.D. (Cross) -                                    Page 50

1 not.
2 Q.   Okay.  I'm showing the witness what's been
3 marked as P-460 for identification.
4         (Exhibit P-460, Publication entitled:
5         "Ovarian Cancers: Evolving Paradigms in Research
6         and Care," published by the National Academies
7         of Sciences, marked for identification.)
8         (Handing document to witness.)
9         THE WITNESS:  Oh, thank you.
10        Now, I'm not going to be able to read
11 all this; or you'll be in the trial till
12 November.
13 BY MR. DEARING:
14 Q.   And I'll represent to you, it's 400 pages long.
15 A.   Yeah.  Uh-huh.
16 Q.   And I've only pulled a portion of it because I
17 was trying to not overwhelm anybody.
18        But let's just look at it.  We're not
19 going to go through all of it, but I want to talk
20 specifically about one section of it, but to orient
21 everybody about it.
22        This is the cover page.  And you can
23 see this is from the committee on the state of the
24 science in ovarian cancer research; the Board on
25 Healthcare Services; Institute of Medicine; National

- TERI LONGACRE, M.D. (Cross) -                                    Page 51

1 Academies of Sciences, Engineering, and Medicine.
2 Do you see that?
3 A.   Yes.
4 Q.   And it also says that it's sponsored -- on the
5 next page -- by the Centers for Disease Control and
6 Prevention, right?  It's partially funded by the
7 CDC; do you see that?
8 A.   Uh-huh.
9 Q.   And so we're clear, the committee on the state
10 of the science in the ovarian cancer research that
11 produced this position statement is a list of
12 scientists, pathologists, medical professionals from
13 all over the country, right?  There's the dean of
14 the School of Medicine from Virginia.  There is a
15 gynecologic oncologist; the professor and vice chair
16 for research at the University of Pittsburgh; the
17 professor and chair of epidemiology and
18 biostatistics at UC San Francisco; the University of
19 California Los Angeles is represented; UNC Chapel
20 Hill is represented; the National Cancer Institute
21 has a scientist involved in this.
22        Anyway, and the list goes on.  The
23 point is:  This committee is made up of reputable
24 scientists, cancer scientists and medical
25 professionals, right?

- TERI LONGACRE, M.D. (Cross) -                                    Page 52

1 A.   Yes.
2 Q.   And in the preface it says that --
3         MS. POLE:  Your Honor, objection to
4 showing this document.  It's not in evidence.
5 It's a learned treatise.  If he's claiming that
6 it's a learned treatise, then it shouldn't be
7 published.
8         MR. DEARING:  Right.  I don't intend
9 to publish the contents, Your Honor.  I'm just
10 setting up what it is we're looking at.
11        THE COURT:  Sure.  Objection is
12 overruled.
13 BY MR. DEARING:
14 Q.   And now if you would look to page 110, which
15 I've inserted on the very back because I didn't want
16 to copy this whole textbook or this whole
17 publication, but there's a section on inflammation.
18 Are you familiar with that section?  Have you read
19 that before?
20 A.   No, I have not read this.
21 Q.   Okay.  Well, tell me if you agree with the
22 statement that, in the section under inflammation,
23 that studies of talc -- and I'm sorry.  It's about
24 halfway through -- halfway down the first paragraph.
25        It says:  "Studies of talc use, which

(Jury Trial - Afternoon Session) - September 13, 2021
Kleiner v. Johnson & Johnson

- TERI LONGACRE, M.D. (Cross) -                    Page 53

1  is chemically similar to asbestos and can cause an
2  inflammatory response. The use of perineal talcum
3  powder has been associated with a 20 to 30 percent
4  increased risk of ovarian cancer, although it has
5  been shown to vary by histologic subtype."
6          Do you agree with that statement?
7          MS. POLE: Objection, Your Honor, no
8  foundation. Witness has not seen this. It
9  calls for her to speculate; and relevancy.
10         THE COURT: Overruled.
11  BY MR. DEARING:
12  Q.  Do you agree with that statement, Doctor?
13  A.  Which statement again? I'm sorry. I have to
14  admit, I was reading it while you were talking.
15  I'll pay attention now.
16  Q.  I'll read it again.
17         And it's referring to the studies.
18  It says: "This has lead to studies of talc use,
19  which is chemically similar to asbestos and can
20  cause an inflammatory response. The use of perineal
21  talcum powder has been associated with a 20 to
22  30 percent increased risk of ovarian cancer,
23  although it has been shown to vary by histologic
24  subtype."
25  A.  That's correct. And they're citing two papers.

- TERI LONGACRE, M.D. (Cross) -                    Page 54

1  Q.  Right. Both of which you cited in your report
2  as well, right?
3  A.  Right. But there's other papers that have not
4  identified that elevated risk.
5  Q.  So my question is: Do you agree or disagree
6  with that statement?
7  A.  I think in those two -- I agree that in those
8  two papers that they identify that increased risk.
9  That has not been substantiated in many other
10  papers.
11  Q.  Okay. Thank you, Doctor.
12         Moving on to a different topic. You
13  testified quite a bit about inflammation and
14  macrophages on direct exam. And let me just ask you
15  a hypothetical.
16         If talc was observed in a macrophage
17  in gynecologic tissue, that would rule out the
18  possibility of contamination, right?
19         MS. POLE: Objection; incomplete
20  hypothetical.
21         THE COURT: Overruled.
22         THE WITNESS: If -- you would still
23  have contamination. It doesn't rule out
24  contamination. But if, in fact, there was
25  particulate material, as I mentioned, in a

- TERI LONGACRE, M.D. (Cross) -                    Page 55

1  macrophage or associated with a foreign body
2  reaction, that would not -- that would imply
3  that material was introduced while the tissue
4  was in situ or in the body. It would not be
5  post-surgical contamination. You're correct.
6  But you could still have contamination. It
7  doesn't exclude it. Yeah.
8  BY MR. DEARING:
9  Q.  I understand.
10  A.  I agree with you.
11  Q.  But if talc is actually observed in a
12  macrophage --
13  A.  Or particulate material of any kind. You
14  cannot --
15  Q.  I'm just referring to talc --
16  A.  On light microscopy, I could not determine what
17  kind of particulate material is in a macrophage. If
18  I see particulate material in a macrophage or
19  associated with a foreign body reaction, that tells
20  me that that was there, you know, it was not a
21  contaminant. Yes, I agree. That's what I've been
22  saying, uh-huh.
23  Q.  Right.
24  A.  So it's really not a hypothetical. If I saw
25  it, that would be the case. But I have not seen it.

- TERI LONGACRE, M.D. (Cross) -                    Page 56

1  Q.  And if you observed talc or if a scientist
2  observed talc in a macrophage in ovarian tissue from
3  a woman who used baby powder or talc for feminine
4  hygiene, wouldn't that suggest to you that the route
5  of exposure that led to the talc being deposited in
6  the macrophage and the ovarian tissue was from that
7  genital application?
8  A.  Not necessarily. It could occur -- I mean,
9  you'd have to exclude a prior surgical intervention.
10  Q.  Okay.
11  A.  And --
12  Q.  Let's exclude that then, okay. So let me
13  repeat it without that.
14  A.  And, I mean, we've talked ad nauseam about
15  particulate material throughout the environment. If
16  there was one particle of material in a macrophage
17  in the pelvis, I think that I don't know how you
18  could exclude it having arisen in the absence of use
19  of Johnson & Johnson's baby powder.
20         Most of those studies that have
21  looked at controls, they found particulate material,
22  some of which they identified as talc in women who
23  were not reported users of baby powder. So even
24  having it there does not mean that it came from
25  talc, you know, perineal talc exposure. There's too

- TERI LONGACRE, M.D. (Cross) -                              Page 57

1  many other variables involved.
2  Q.  Do you agree that macrophages can handle
3    particles 20 microns or less?
4  A.  I'm not -- I'm not going to be precise on the
5    size.  But generally, the smaller the particle, the
6    more likely a single macrophage would be able to
7    engulf it, yes.
8  Q.  Well, if Dr. Godleski has studied macrophages
9    for 40 or 50 years and his testimony is that
10   macrophages can easily sequester or handle particles
11   20 microns or less, do you have any reason to
12   disagree with that?
13 A.  No, I don't.
14 Q.  Do you also agree that macrophages have a
15   relatively short life span of 30 days or so?  And if
16   you're not sure, that's a --
17 A.  Well, I don't know.  Is this a question or a
18   statement?
19 Q.  No.  I asked you --
20 A.  Are you asking me a question just now?
21 Q.  I asked you:  Do you agree that macrophages --
22 A.  Yes.
23 Q.  -- have a life span of about 30 days?
24 A.  Yes.  Yes.  They're not immortal, that's
25   correct.

- TERI LONGACRE, M.D. (Cross) -                              Page 58

1  Q.  And have you seen the studies that showed that
2    talc, when it's engulfed by a macrophage, actually
3    damages the macrophage; it inhibits phagocytosis and
4    damages the macrophage?  Have you seen that study?
5  A.  Yes.  I think we discussed that this morning.
6    There are studies out there that -- and of course
7    they're not in humans.  They're in other organs or
8    cell culture material.  But, yes, there's been data
9    that suggests that on occasion, talc can damage or
10   cause the demise of a macrophage.
11 Q.  Right.
12 A.  But as I mentioned this morning, in the human
13   body, you don't just -- the body doesn't just give
14   up.  Additional macrophages are in fact recruited.
15   They don't just let that particle just sit there
16   free in the tissue and say, oh, wow, it's not going
17   to work.
18 Q.  I --
19 A.  So additional macrophages are recruited.  And
20   if the -- and maybe it takes multiple macrophages to
21   wall off those.  So, in fact, maybe it is a small
22   particle, but it requires a foreign body reaction
23   because a single macrophage is being destroyed by
24   it.
25 Q.  So if a macrophage engulfed a talc particle --

- TERI LONGACRE, M.D. (Cross) -                              Page 59

1  well, let me back up.
2         You said something on direct.  You
3    said that suture material, and I think you even said
4    silicon, stays in the body forever, right?  I think
5    you said sutures are forever maybe.
6  A.  Well, suture material, it's -- it's hard for
7    the body to break it down.  Those foreign body
8    granulomas are -- they're in there for a long, long
9    time.
10 Q.  Right.  And by "long, long time," you mean like
11   20, 30, 40 years, right?
12 A.  Yes.  Yes.
13 Q.  And you know that's also true about talc
14   particles?
15 A.  I don't know that that's true because I don't
16   see talc particles or talc granulomas in my GYN
17   practice.
18 Q.  Well, if talc -- I'm sorry.  I thought you were
19   finished.
20 A.  No.  But that's okay.  Go ahead.
21 Q.  If talc particles stay in the body 20, 30, 40
22   years like suture material and a macrophage which
23   only lives 30 days comes and sequesters it and for
24   whatever reason, either dies before it can dissolve
25   it or carry it off to a lymph node and another

- TERI LONGACRE, M.D. (Cross) -                              Page 60

1  macrophage has not yet come to take its place, that
2    particle would be sitting there outside of a
3    macrophage, right?
4  A.  (No response.)
5  Q.  Did that question make sense?
6  A.  Yeah.  I -- it's a pretty rapid response.
7  Q.  It is.
8  A.  Once -- once foreign material is introduced
9    into the body, it's really a pretty rapid response.
10   It's not a -- it doesn't sit there for a couple of
11   hours.  Lymphocytes and macrophages are recruited
12   almost immediately.
13        So, yes, if we hypothesize the
14   macrophage dies and the talc has not been enveloped
15   and it's re-exposed to the -- and it would be in the
16   lymph node by then, the lymph node, and there are
17   macrophages already sitting in the lymph node, so it
18   wouldn't take that long for another macrophage.  I
19   feel like we're doing comic stuff now.  But, you
20   know, it would be very similarly re-engulfed or
21   re-phagocytized by another macrophage.
22 Q.  Sure.
23 A.  It wouldn't be just sitting there.
24 Q.  Do you agree that once tissue is taken out of
25   the body, everything sort of stops moving, stops

- TERI LONGACRE, M.D. (Cross) -                                          Page 61

1   responding, stops acting?
2   A.  Yes.
3   Q.  Because the tissue dies?
4   A.  Yes.
5   Q.  So it's sort of a snapshot in time when you
6   remove something from the body, right?
7   A.  Yes.
8   Q.  A piece of tissue.
9           Have you read Dr. Godleski's study on
10  the particle size and shape distribution of talc
11  that's in a bottle of Johnson's baby powder?  Have
12  you read that study?
13  A.  I don't recall which study that would be.
14  Q.  Well, do you know that the particles typically
15  found even in this case by Dr. Godleski are
16  10 microns or smaller?
17  A.  Yes.  My understanding is that that's what he
18  reports, yes.
19  Q.  So if a macrophage can engulf and handle a
20  particle 20 microns or smaller and these talc
21  particles, to Dr. Godleski's finding, are 10 microns
22  and smaller, a couple of them are even 1 micron --
23  A.  Uh-huh.
24  Q.  -- that's a size a macrophage can handle,
25  right?

- TERI LONGACRE, M.D. (Cross) -                                          Page 62

1   A.  Yes.  It -- yes, you're absolutely right.  But
2   if you go back and you look at his pictures of his
3   refractile material, he's got clumps of refractile
4   material.  And a single macrophage is not going to
5   be capable of engulfing that.  And those clumps
6   should be associated with a foreign body response.
7           So, yes, an isolated small particle,
8   yes, a macrophage should be able to engulf it.  But
9   if you're talking about clumps of particles that
10  he's actually showing on his report, that just
11  defies common sense, common pathologic sense.  There
12  needs to be -- there should have been a foreign body
13  response.  That tells me that's just artifact and
14  contaminant.
15  Q.  You know that Dr. Godleski testified that the
16  talc that he positively identified was not the talc
17  in the slides you're referring to.  It was the talc
18  in the blocks that he studied by scanning electron
19  microscopy, right?  You read his testimony.  You
20  know that to be true, right?
21  A.  So this gets a really -- his method gets very
22  complicated right now.  He used -- yes.  Don't look
23  at me like that.  I read his report.
24          He looks at the -- at the glass
25  slides, and where -- the slides that he sees the

- TERI LONGACRE, M.D. (Cross) -                                          Page 63

1   most refractile material, that's in the blocks that
2   he chose to work on.
3   Q.  Right.
4   A.  And on those, again, it's not clear what the
5   correlation is between what he's seeing on light
6   microscopy versus his scanning electron microscopy.
7   There's no way to know because it's two different
8   technologies.  But he is definitely guiding which
9   blocks he looks at on the basis of that refractile
10  material that he's showing on his photographs where
11  there's large clumps.
12          I didn't see him say in a report, oh,
13  but it's never those pictures that I'm showing these
14  clumps on.  And, in fact, why would I put these
15  pictures in because that's not them, the talc is
16  somewhere else.  And he doesn't do that.  So it's
17  very misleading what he's doing.
18          But suffice it to say, if he's going
19  to show me a picture of a light microscopy with
20  clumps of refractile material and there's no foreign
21  body response, that is an artifact.  That's
22  contaminant.
23  Q.  I'm going to repeat my question.
24          You're aware --
25          THE COURT:  No, you're not.

- TERI LONGACRE, M.D. (Cross) -                                          Page 64

1           MR. DEARING:  She didn't answer the
2   question, Your Honor.
3           THE COURT:  Yes, she did.
4   BY MR. DEARING:
5   Q.  If talc -- if granuloma -- if macrophages can
6   take up particles 20 microns or smaller, you
7   wouldn't expect to see granulomas trying to take up
8   the small particle, would you?
9   A.  Unless they're large aggregates of them, large
10  clumps or aggregates of them, like he's showing, of
11  those particles that he's showing, yes, then you
12  would.  Because one macrophage, yes, one particle.
13  But after you get a large clump of them, you would
14  recruit multiple macrophages and you'd get that
15  foreign body reaction.
16  Q.  And you said on direct identifying or
17  recognizing a macrophage is basic I think you said
18  elemental science.  It's something anybody could do,
19  right, any pathologist could do, right?
20  A.  I think --
21  Q.  Let me actually --
22  A.  -- identifying cells is done on light
23  microscopy.
24  Q.  Right.  I think you said --
25  A.  Macrophages -- actually, sometimes you need

(Jury Trial - Afternoon Session) - September 13, 2021
Kleiner v. Johnson & Johnson

- TERI LONGACRE, M.D. (Cross) -                              Page 65

1   immunohistochemical markers to definitively identify
2   a macrophage.  So if I said that, I misspoke.
3   Q.  What I wrote down was you said identifying a
4   macrophage was easy, basic science.
5   A.  I don't think I said that.  That doesn't sound
6   like something that I would say.
7   Q.  Well, let me ask you:  You would certainly
8   expect someone like Dr. Godleski who has studied
9   macrophages most of his career would recognize a
10  macrophage when he saw one, right?
11  A.  Again, as I just mentioned, it can be difficult
12  identifying macrophages.  Sometimes you need -- it
13  can be difficult to identify macrophage.
14              (Static in microphone.)
15              Is that me?
16  Q.  If your microphone is bumping into your
17  sweater, it might be.
18  A.  Sorry.
19              So it can be difficult identifying
20  macrophages in some instances.  And you on occasion
21  will perform immunohistochemical studies to confirm
22  whether or not a cell is in fact a macrophage as
23  opposed to a stromal cell.  So it's not -- it's not
24  a definitive light microscopic assessment.  But you
25  can -- that's true.

- TERI LONGACRE, M.D. (Cross) -                              Page 66

1   Q.  I'm just trying to hear you.
2   A.  Oh.
3   Q.  Now I'm trying to think if you answered the
4   question.
5              Would you expect someone with
6   Dr. Godleski's experience to recognize a macrophage
7   when he sees one?
8   A.  He has --
9              MS. POLE:  Your Honor, objection.
10  Calls for speculation.
11              THE WITNESS:  Look, listen, he has no
12  more experience looking at macrophages in tissue
13  than I do.  Perhaps I have more because of my
14  hematology training.  And what I'm saying is,
15  yes, I'm pretty good, I'm pretty darn good at
16  identifying macrophages.
17              That being said, there are instances,
18  and it's not that rare, where I will use a
19  immunohistochemical stain to determine is that
20  really a macrophage that I'm looking at or is it
21  some other kind of mononuclear cell.  And I
22  don't think that he has any more expertise than
23  me at identifying that.  So that's my answer.
24              Certainly, you should be able to tell
25  whether a refractile material is in a cell.  And

- TERI LONGACRE, M.D. (Cross) -                              Page 67

1   on the basis of his pictures, I'm not able to
2   make that determination.
3   BY MR. DEARING:
4   Q.  Okay.  Well, let's look at one of your
5   pictures.  I'm referring to Slide 9 in this picture
6   of a multi-nucleated giant cell that you showed the
7   jury earlier today.
8   A.  Sure.
9   Q.  You remember that?
10  A.  Yeah.
11  Q.  Was that a picture you provided to defense --
12  A.  Yes.
13  Q.  -- to show the jurors?
14  A.  Yes.
15  Q.  And you testified that this is the type of
16  inflammatory response you would expect to see with
17  talc, right?  Did I write that right, or is this not
18  what --
19  A.  I said -- no.  I said, foreign material when
20  it's introduced into the body incites a response.
21  And the macrophages, the fundamental cell that
22  responds and tries to sequester the foreign
23  material.  If it's small enough and it can engulf
24  it, it will, and it will take it to the lymph node
25  sinuses.  If it's large, as you see here, or

- TERI LONGACRE, M.D. (Cross) -                              Page 68

1   multiple aggregates of it, then you will form a
2   foreign body reaction associated with
3   multi-nucleated giant cells.  That's what I said,
4   yes.
5   Q.  So you're not suggesting this is how the body
6   would react to a 10-micron talc particle, right?
7   A.  This would -- this may -- this would be
8   expected to react to multiple 10-micron talc
9   particles in aggregate, yes.
10  Q.  Right.  This silicon particle right here, you
11  didn't put a scale on there, but judging by the size
12  of the nuclei, that's probably, what, 500 microns?
13  A.  Probably.  It's quite large.
14  Q.  Yeah.
15              And suture material that you were
16  referring to earlier that would cause a granuloma
17  dose response, that would be something in the
18  neighborhood of 5,000 microns, right?  I mean, you
19  could see sutures with the naked eye, right?
20  A.  Yes.
21  Q.  You also mentioned on direct exam this
22  procedure called "pleurodesis."  Do you remember
23  that?
24  A.  Yes.
25  Q.  And that was the procedure where a

(Jury Trial - Afternoon Session) - September 13, 2021
Kleiner v. Johnson & Johnson

- TERI LONGACRE, M.D. (Cross) -                    Page 69

1  pulmonologist will inject the pleural space into the
2  lung to sort of fill the space with the inflammatory
3  reaction so that that space can't be filled with
4  fluid; is that right?  I know that's a layman's
5  explanation, but am I close?
6  A.  Yes.
7  Q.  Okay.  And because Dr. Godleski is a pulmonary
8  pathologist --
9  A.  Uh-huh.
10  Q.  -- we asked him about that.
11  A.  Uh-huh.
12  Q.  And you would agree with me that the type of
13  talc that's used in pleurodesis is very large
14  pharmaceutical-grade talc.  It's not the same talc
15  that goes in baby powder.
16  A.  Yes.  I think that's correct.
17  Q.  Okay.
18  A.  It -- yes.
19          Either way, regardless of the size,
20  the foreign material will still incite a response by
21  the macrophage, either single cell macrophages, in
22  which case the material is removed from the pelvic
23  tissue and sequestered in the lung and there is no
24  chronic ongoing inflammatory response; or it's not
25  able to be digested by a single macrophage, in which

- TERI LONGACRE, M.D. (Cross) -                    Page 70

1  case you would expect to see a foreign body
2  reaction, in which case that material would be again
3  sequestered from the surrounding tissue and there
4  would not be an ongoing inflammatory response.
5  Either way, the response is to remove that foreign
6  material from the surrounding tissues.
7  Q.  When you come into court and you say something
8  like "talc has no role in ovarian cancer," you're
9  not speaking on behalf of Stanford University, are
10  you?
11  A.  I'm not speaking on behalf of Stanford
12  University at all in this testimony.  I'm speaking
13  on the basis of my training and expertise.
14  Q.  Okay.  And you know there are pathologists and
15  professionals at Stanford who completely disagree
16  with you on that?
17  A.  I'm well aware of that.
18  Q.  In fact, one of them is Dr. Dean Felsher, who's
19  testified probably 22 times under oath that
20  Johnson's baby powder causes ovarian cancer.  You're
21  aware of that, right?
22  A.  Yes, I'm very well aware of that.
23          MS. POLE:  Your Honor, objection.
24  It's hearsay.  No role in this litigation.  And
25  also, no foundation and calls for total

- TERI LONGACRE, M.D. (Cross) -                    Page 71

1  speculation.
2          MR. DEARING:  It's not speculation.
3  She just said she knew it.
4          MS. POLE:  She said she knew him,
5  Your Honor.  She said she knew what he said.
6          THE COURT:  No.  I think she said she
7  was aware that he disagreed with her; is that
8  right?
9          THE WITNESS:  Yes; I'm aware of this.
10          THE COURT:  Okay.  And that doesn't
11  affect your opinion?
12          THE WITNESS:  No, at all.  Not at
13  all.  Dr. Felsher is --
14          THE COURT:  Objection is overruled.
15          THE WITNESS:  Dr. Felsher is not a
16  gynecologic pathologist.  He doesn't see
17  gynecologic patients.  He's not an expert in
18  ovarian cancer.  He -- no.  This is -- when
19  he -- with all -- no.  I'm not even going to say
20  with "due respect."  When he testifies, he's not
21  testifying out of -- in his area of expertise at
22  all.  So, no, his opinions do not impact my
23  opinion in any what so way, not on this, not on
24  this issue.  Perhaps other scientific issues;
25  but certainly not this.  He is not an expert in

- TERI LONGACRE, M.D. (Cross) -                    Page 72

1  this area, even though I'm well aware he offers
2  himself regularly as an expert.  He is not.
3  BY MR. DEARING:
4  Q.  Okay.  Well, I wasn't going to go into all of
5  that, but since you brought it up, he's a professor
6  of medicine in oncology and pathology at Stanford,
7  right, the School of Medicine, where you teach?
8  A.  Yes.
9  Q.  And he's the director of translational research
10  and applied medicine?
11  A.  Correct.
12  Q.  And has been for over ten years, right?
13  A.  (Witness nodding.)
14  Q.  And he's also the codirector of the cancer
15  nanotechnology program in the department of
16  radiology at Stanford, right?
17  A.  All of those things are true.  But that does
18  not make him an expert in this area.
19  Q.  And he's the 2020 recipient of the NCI
20  Outstanding Investigator award.  Do you know that?
21  A.  Yes.  Again, none of this has any -- it doesn't
22  relate to talc and ovarian cancer.  He's not an
23  expert in this at all.  His affiliation with the
24  department of pathology is by -- what's the word?
25  He's a primary.  It's not his primary appointment.

(Jury Trial - Afternoon Session) - September 13, 2021
Kleiner v. Johnson & Johnson

- TERI LONGACRE, M.D. (Cross) -                                    Page 73

1  He's not a pathologist.
2        So it -- so his opinions don't have
3  a -- don't impact mine at all.
4  Q.  Well, he's a professor of medicine in
5  pathology, right?
6  A.  There's a lot of professors, yeah.  He's a
7  professor of medicine.
8        THE COURT: Excuse me.  Now you're
9  arguing with the witness again.  You asked the
10  question.  She gave the answer.  I think you
11  asked it again and she gave the answer.
12        MR. DEARING: I thought she changed
13  her answer.  That's why I asked it again.  I'm
14  sorry.
15        THE COURT: Well, if you think that
16  she changed it, you can ask her about the
17  change.
18        MR. DEARING: Well, I'm going to move
19  on, Your Honor.
20        THE COURT: Okay.
21  BY MR. DEARING:
22  Q.  I only have one more -- a couple things to ask
23  you.
24        You said that when the Johnson &
25  Johnson lawyers approached you the first time about

- TERI LONGACRE, M.D. (Cross) -                                    Page 74

1  testifying in talc cases you said no; is that
2  correct?
3  A.  Well, I don't know -- so attorneys have
4  approached me in the past.  I don't know who they
5  were representing.  It may have been Johnson &
6  Johnson.  It could have been.  I don't know.
7  Q.  And I think you testified that this is your
8  first talc case, first talc trial testifying, right?
9  A.  Yes.  Yes.
10  Q.  But it's certainly not your first testimony for
11  Johnson & Johnson, right?  You've been testifying
12  defending Johnson & Johnson on other products for
13  years, right?
14  A.  This is my first court testimony for Johnson &
15  Johnson ever, yes.
16  Q.  Have you given sworn testimony defending
17  Johnson & Johnson products in other cases?
18  A.  I have done depositions; I made depositions
19  with pelvic mesh, yes, but I've never testified.
20  Q.  In other words -- well, this is not the first
21  time you've testified for Johnson & Johnson?  That's
22  what I'm trying to ask, right?
23  A.  If you --
24        THE COURT: I think you've already
25  established that.

- TERI LONGACRE, M.D. (Cross) -                                    Page 75

1        MR. DEARING: Okay.
2        THE COURT: She has testified
3  before -- this is the first time testifying in
4  court?
5        THE WITNESS: Yes.  Thank you.
6        THE COURT: She has testified before
7  for Johnson & Johnson, never in court, but at
8  depositions.
9        THE WITNESS: Yes.
10        THE COURT: The depositions had to do
11  with pelvic mesh.
12        Now, if I can repeat that --
13        MR. DEARING: Sorry?
14        THE COURT: -- if I can repeat that
15  testimony, you should be able to repeat it as
16  well.  And if you know that she said it already,
17  stop asking the same question.
18        MR. DEARING: That's why I'm sitting
19  down, Your Honor.
20  I don't have any other questions.
21        THE COURT: Any redirect?
22        MS. POLE: Yes.  Yes, Your Honor.
23  Yes, sir.
24              - - -
25        REDIRECT EXAMINATION

- TERI LONGACRE, M.D. (Redirect) -                                 Page 76

1              - - -
2  BY MS. POLE:
3  Q.  Dr. Longacre, I have just a few questions.
4        Mr. Dearing asked you about your
5  first report.  And do you recall that that was
6  November 3, 2019?
7  A.  I recall it was sometime in November of 2019,
8  yes.
9  Q.  And it is marked as Defendants' DX-3136.  And I
10  will bring a copy to counsel.
11        (Exhibit DX-3136, Dr. Longacre's
12  report dated 11/3/2019, marked for
13  identification.)
14        MS. POLE: And approaching the
15  witness, Your Honor; bring a copy to you.
16        (Handing document to the witness.)
17        THE WITNESS: Thank you.
18        MS. POLE: I have a copy for the
19  Court.
20  BY MS. POLE:
21  Q.  And do you recall that Mr. Dearing asked you if
22  in your first report why you did not criticize or
23  have any comments about Dr. Godleski; do you recall
24  that?
25  A.  Yes, I do.

---

- TERI LONGACRE, M.D. (Redirect) -                              Page 77

1  Q.  I'd like for you to go to page 8 of your expert
2  report, the first one, and the section that's styled
3  "response to plaintiffs' expert."
4  A.  Yes.
5  Q.  Do you see that?
6  A.  Yes, I do.
7  Q.  And plaintiffs' expert, were you referring to
8  Dr. John Godleski there?
9  A.  Yes, I do.
10 Q.  Okay.  And you said that plaintiffs' pathology
11 expert asserts that there are talc particles and
12 fibers, and you put that in quotes, in lymph node
13 and cancer tissue removed from Ms. Kleiner.
14 A.  Yes.
15 Q.  And then did you also say that plaintiffs'
16 expert did not control for the tissue processing
17 following surgery and prior to his receipt of the
18 paraffin blocks?  Was that your -- that was part of
19 your first report?
20 A.  Yes, it was.
21 Q.  And so that was your critique or criticism of
22 Dr. Godleski, correct?
23 A.  Correct.
24 Q.  And so is it fair to say that you did have
25 criticism of him in your first report; is that true?

---

- TERI LONGACRE, M.D. (Redirect) -                              Page 78

1  A.  Yes, it is.
2  Q.  Now, Mr. Dearing asked you whether or not you
3  could state definitively that Dr. Godleski did not
4  find talc in Ms. Kleiner's tissue.
5          Was it your testimony earlier today
6  that Dr. Godleski saw birefringent particles?
7  A.  (No response.)
8  Q.  Well, let me strike that.
9          When you looked at the tissues under
10 polarizing light, did you see birefringent
11 particles?
12 A.  Yes.
13 Q.  And is it your testimony that you could not
14 determine whether or not they were talc particles;
15 is that correct?
16 A.  That's correct, yes.
17 Q.  But you knew -- but it's your understanding, is
18 it not, that talc particles are birefringent under
19 polarized light?
20 A.  Yes.
21 Q.  So Mr. Dearing showed you a number of articles.
22 I'm not going to go through each one of them.  But
23 does any one of those documents change your opinions
24 that you gave to the jury this morning?
25 A.  No.

---

- TERI LONGACRE, M.D. (Redirect) -                              Page 79

1  Q.  And Mr. Dearing showed you the Penninkilampi
2  study, which is P-1013.  Do you remember that?
3  A.  Yes.
4  Q.  And so is that a meta-analysis?
5  A.  Yes.
6  Q.  And do you recall that in that meta-analysis
7  these authors did not include the Gates study, which
8  was ten years after Gertig, using the same cohort;
9  do you recall that?
10 A.  Uhmm, I believe so, yes.  Again, I -- it's been
11 a while since I've read this paper.
12 Q.  So if you turn -- I just have one or two
13 questions about P-460, which is the thick document
14 you have from the National Academies Press.
15 A.  Yes.  Yes.
16 Q.  Do you have that?
17 A.  Yes.
18 Q.  If you look at the last page, I think that's a
19 page that Mr. Dearing referenced under
20 "inflammation."
21 A.  Yeah.  Uh-huh.
22 Q.  And it states:  "Studies of the inflammatory
23 marker C-reactive protein suggest a possible
24 association."
25          Is a possible association merely an

---

- TERI LONGACRE, M.D. (Redirect) -                              Page 80

1  hypothesis?
2  A.  Yes.
3  Q.  So just a couple of more questions, Doctor.
4          Well, sometimes a couple is more than
5  two, but -- so let me take two or three more
6  questions for you.
7          Can you tell the jury, give them a
8  sense of how many macrophages float around in the
9  human body?
10 A.  Oh, tens of thousands; a thousand.  I don't
11 know.  Many.
12 Q.  So if a macrophage dies while it has ingested
13 or engulfed a talc particle, how quickly will
14 another macrophage respond to that particle?
15 A.  Virtually immediately.  There -- most
16 macrophages are -- come from the blood, the bone
17 marrow and the blood.  But there are tissue
18 macrophages.  And as I mentioned earlier, there's
19 macrophages residing within lymph nodes.  And so the
20 recruitment would be quite rapid.
21 Q.  Okay.  And just one final question, Doctor.
22 You were asked about the O'Brien study and what
23 those authors found.
24          Are you familiar with the response to
25 O'Brien that was done by Gossett and others in an

---

- TERI LONGACRE, M.D. (Redirect) -                          Page 81

1  editorial:  Use of powder in the genital area and
2  ovarian cancer risk, examining the evidence?  Were
3  you familiar with that one?
4  A.  Yes.  Again, I am familiar with it.  But,
5  again, we need to read it in detail if you want me
6  to.
7  Q.  No, I don't.
8  A.  Okay.
9  Q.  Let me just ask you one question about it and
10  see if this recalls -- if this refreshes your
11  recollection.  If not, I have a copy for you.
12       But in the study, in the -- I'm
13  sorry, in the editorial, the authors note that the
14  subgroup analysis suggesting that women with intact
15  reproductive tracts who used powder in the perineal
16  area develop ovarian cancer more frequently than
17  nonusers is below the effect size that
18  epidemiologists generally consider important and
19  should not be selectively highlighted by the
20  statistically unsophisticated reader as evidence of
21  a relationship.
22       Do you remember that part of the
23  editorial?
24  A.  Yes, I do.
25  Q.  And do you agree with that?

- TERI LONGACRE, M.D. (Redirect) -                          Page 82

1  A.  Yes, I do.
2  Q.  Thank you.
3       MS. POLE: I have --
4       THE COURT: Excuse me.  Can you
5  explain to us what that means?
6       THE WITNESS: It's basically, you
7  know -- well, it's a little more inflammatory
8  than what I was saying, but it's basically and
9  actually, it says it in the article, it doesn't
10  reach the power that it should.  So it's -- it's
11  interesting, but it's not to the level that it
12  means much of anything.  It needs to be a larger
13  study, a larger cohort.  It doesn't -- it's not
14  the power.  The numbers are too small.  It's not
15  significant.
16  BY MS. POLE:
17  Q.  Do you need a copy of --
18  A.  No.
19       MS. POLE: Okay.  I have nothing
20  further from the witness, Your Honor.
21       And I would pass.
22       THE COURT: Any recross?
23       MR. DEARING: No, sir.
24       THE COURT: All right.  You're done
25  on the witness stand.  You can step down.

- KLEINER -vs- JOHNSON & JOHNSON -                          Page 83

1       THE WITNESS: Thank you.
2       THE COURT: You're excused.
3       This might be a good time to take a
4  break, afternoon recess.  We'll resume in ten
5  minutes.
6       (Witness excused.)
7       MS. POLE: How many minutes, Your
8  Honor?
9       THE COURT: Ten.
10       MS. POLE: Thank you.
11       THE COURT: Which will take us till
12  twenty after 3:00.  That will be ten minutes.
13  Just follow the court officer's direction.
14       LAW CLERK: All rise as the jury
15  exits.
16                  - - -
17       (Whereupon the jury panel exited the
18  courtroom at 3:09 p.m.)
19                  - - -
20       (Whereupon a recess was taken.)
21                  - - -
22       (The following transpired in open
23  court outside the presence of the jury panel:)
24                  - - -
25       THE COURT: Counsel, when you're

- KLEINER -vs- JOHNSON & JOHNSON -                          Page 84

1  whispering at counsel table, don't forget that
2  you're mic'd up.  And if you want to talk to
3  each other at counsel table, maybe you should
4  turn off your microphone when you sit down or --
5       MS. POLE: Yes, sir.
6       THE COURT: Just a suggestion.
7       I was thinking of asking this jury if
8  5:00 would be okay.  I don't like to do it
9  without asking them because we told them at the
10  outset 4:30.  Is 5:00 okay with everybody if
11  it's okay with the jury?
12       MS. POLE: Yes, sir.
13       THE COURT: Okay.  When they come in,
14  I'll ask them about 5:00.
15       MS. WINKLER: That's fine with us.  I
16  think that one of the jurors had to be out by
17  4:45 every day, if I remember correctly.
18  Demetrius might know better.
19       THE COURT: Oh, okay.
20       MS. WINKLER: But it might give us a
21  little more latitude.
22       THE COURT: Well, maybe that juror is
23  gone.
24       MR. SCHOENHAUS: Oh, it was Juror 1.
25       MS. WINKLER: Oh, yeah.  You're

(Jury Trial - Afternoon Session) - September 13, 2021
Kleiner v. Johnson & Johnson

- KLEINER -vs- JOHNSON & JOHNSON -                                Page 85

1    right.
2              **LAW CLERK:** All rise as the jury
3    enters.
4                   - - -
5         (Whereupon the jury panel reentered
6    the courtroom at 3:25 p.m.)
7                   - - -
8         (The following transpired in open
9    court in the presence of the jury panel:)
10                  - - -
11             **MS. O'DELL:** Your Honor, may we have
12   a brief sidebar before we start the witness?
13   Sorry.
14             **THE COURT:** We sat here for ten
15   minutes.
16             **MS. O'DELL:** I'm sorry.  We just -- I
17   just realized it.
18             **THE COURT:** Sure.
19             **LAW CLERK:** You may be seated.
20                  - - -
21        (The following discussion transpired
22   at sidebar, out of the hearing of the jury
23   panel:)
24                  - - -
25             **MS. O'DELL:** My apologies, Your

- KLEINER -vs- JOHNSON & JOHNSON -                                Page 86

1    Honor.  We just got this PowerPoint, and we were
2    going through it during the break as quick as we
3    can.  There are two references that are not on
4    Dr. Sanchez's reliance materials, the first
5    being the IARC 2012 Monograph is not part of his
6    materials, nor is this listing of agents
7    classified by IARC Monographs.  It's not listed
8    anywhere in the reports that I can find.
9              And so we --
10             **THE COURT:** Okay.  So let me find out
11   from you, from the defense, what's the story.
12             **MS. POLE:** Yes.  We were responding
13   to Dr. Rigler's opinions when he was on the
14   witness stand, and I think we have a right to do
15   that.
16             **THE COURT:** What opinions did he
17   express related to these two PowerPoint slides?
18             **MS. POLE:** He talked about the 2012
19   IARC report, and he talked about -- let's see
20   your second one that you talked about.
21             **MS. O'DELL:** He did not talk about
22   this, Your Honor, the agents classified by IARC
23   Monographs.  It's the whole listing.
24             **THE COURT:** But he talked about the
25   first one.

- KLEINER -vs- JOHNSON & JOHNSON -                                Page 87

1              **MS. POLE:** He did.  He talked
2    about --
3              **THE COURT:** Wait.
4              **MS. O'DELL:** I'm sorry.
5              **THE COURT:** But he did talk about
6    this other slide?
7              **MS. O'DELL:** Oh, it's a separate
8    objection.  This slide is a separate objection,
9    so.
10             But my point being --
11             **THE COURT:** How would I know that's
12   what you were showing me when you came up?
13             **MS. O'DELL:** I'm sorry.  I just had
14   this one that was one on top.
15             **THE COURT:** Okay.
16             **MS. O'DELL:** So the point being,
17   Dr. Rigler had disclosed this opinion, IARC 2012
18   has been on his reliance materials since
19   November of 2018.  Dr. Wolf's opinions on IARC
20   2012 has --
21             **THE COURT:** Okay.  How are you
22   prejudiced by this?
23             **MS. O'DELL:** Because we --
24   Dr. Sanchez has never disclosed any opinions
25   whatsoever about talc fibers, ever.  There's

- KLEINER -vs- JOHNSON & JOHNSON -                                Page 88

1    none in his report, either his November 2019
2    report or his May 2020 report --
3              **THE COURT:** So what's he here to
4    testify about?
5              **MS. O'DELL:** He's going to testify
6    about talc fibers.
7              **THE COURT:** Well, then how can it be
8    that he's never expressed an opinion about talc
9    fibers?
10             **MS. O'DELL:** To my knowledge, in his
11   report, and Ms. Pole can disagree with me,
12   Dr. Rigler had a whole section on fibrous talc
13   in his report.
14             **THE COURT:** Uh-huh.
15             **MS. O'DELL:** It's not here
16   (indicating).
17             This is about --
18             **THE COURT:** Indicating what?  What
19   are you holding up?
20             **MS. O'DELL:** This is his report.
21             **THE COURT:** Who's "his"?
22             **MS. O'DELL:** This is Dr. Sanchez,
23   who's the upcoming witness.
24             **THE COURT:** Okay.
25             **MS. O'DELL:** His report is dated

(Jury Trial - Afternoon Session) - September 13, 2021
Kleiner v. Johnson & Johnson

- KLEINER -vs- JOHNSON & JOHNSON -                                    Page 89

1    May 8, 2020.  This is his employer, RJ Lee
2    Group.
3           THE COURT:  Okay.  So what are you
4    calling Dr. Sanchez to testify to?
5           MS. POLE:  He's going to testify --
6    this is what the plaintiff put up, Demonstrative
7    No. 1 means -- Ms. O'Dell wrote this up.
8    Dr. Rigler talked about IARC 2012; that it was a
9    Group 1 known carcinogen.  He talked about talc
10   fibers, asbestiform talc, and Dr. Sanchez is
11   going to rebut that.  This is what she put up.
12   This was the exhibit that she created during
13   Dr. Rigler's testimony, and we have a right to
14   come in and rebut that.  And that's one of the
15   things that he's going to do.  And that's why
16   he's going to refer to IARC 2012.
17          THE COURT:  But what about the
18   objection that you had all this information
19   before Dr. Sanchez wrote his expert report and
20   he doesn't address it in his expert report?
21          I agree that you have a right to have
22   someone rebut what Rigler said.  But why is it
23   Sanchez if Sanchez never talked about this stuff
24   in his report?
25          MS. POLE:  Sanchez does talk about it

- KLEINER -vs- JOHNSON & JOHNSON -                                    Page 90

1    in his expert report.
2           THE COURT:  Just tell me where.
3           MS. POLE:  I'll -- I don't have it up
4    here with me.
5           MR. SCHWARTZ:  I have it.
6           MS. POLE:  You have it?
7           MS. O'DELL:  If you can tell me where
8    2012, IARC 2012 --
9           THE COURT:  Okay.  All right.  Let's
10   go back to our respective corners.
11          MS. POLE:  Okay.
12          THE COURT:  Go ahead.
13                   - - -
14          (Sidebar discussion concluded.)
15                   - - -
16          (The following transpired in open
17   court in the presence of the jury panel:)
18                   - - -
19          THE COURT:  The lawyers actually
20   weren't ready for you to come back in.  So we'll
21   have to put you back in the jury room for
22   another ten minutes or so.
23          JURY PANEL:  Okay.
24          THE COURT:  It shouldn't be too long.
25   We might be able to bring you back sooner.  Just

- KLEINER -vs- JOHNSON & JOHNSON -                                    Page 91

1    follow the court officer's direction.
2           LAW CLERK:  All rise as the jury
3    exits.
4                   - - -
5           (Whereupon the jury panel exited the
6    courtroom at 3:30 p.m.)
7                   - - -
8           (The following transpired in open
9    court outside the presence of the jury panel:)
10                   - - -
11          LAW CLERK:  You may be seated.
12          THE COURT:  Okay.  Where we left off
13   at sidebar, the plaintiff has an objection
14   saying that Dr. Sanchez, the next witness up,
15   never expressed an opinion in his expert report
16   regarding "fibrous talc."  And the defense says
17   yes, he did.  So now we're going to let the
18   defense demonstrate where it appears in the
19   report.
20          You ready to do that?
21          MR. SCHWARTZ:  Yes, Your Honor.
22          This -- he's -- Dr. Sanchez has
23   submitted two expert reports in this case.  One
24   on November 4th, 2019, and one on May 8, 2020.
25   And these studies go through in detail about the

- KLEINER -vs- JOHNSON & JOHNSON -                                    Page 92

1    fact that talc is not asbestos.  It's not in --
2           THE COURT:  I'm sorry.  What studies
3    are you talking about?
4           MR. SCHWARTZ:  I'm sorry?
5           THE COURT:  The subject of the
6    sentence was his reports, and then you shifted
7    to "these studies."  What studies are you
8    talking about?
9           MR. SCHWARTZ:  Oh, these reports.
10   Excuse me.  They talk about where talc is mined,
11   how it is mined.  They talk about the different
12   kinds of fibers that you can find in talc,
13   asbestiform particles, and what have you.
14          And I don't know if he uses "fibrous
15   talc."  I can look.  But that's a made-up term
16   that they're using.  And that's what he's going
17   to come up here and explain, the difference
18   between talc particles and talc fibers and
19   asbestiform talc.  And that's what Dr. Rigler
20   came up here and testified about.
21          His opinions are primarily about
22   asbestos, but then he has these opinions about
23   talc fibers that he brought to the Court, so --
24          THE COURT:  Who's "he"?
25          MR. SCHWARTZ:  Dr. Sanchez is going

(Jury Trial - Afternoon Session) - September 13, 2021
Kleiner v. Johnson & Johnson

1  to respond to all those.
2       THE COURT: When you say "he" has,
3  who's he?
4       MR. SCHWARTZ: Dr. Sanchez is going
5  to come testify.
6       THE COURT: Yeah. But you said he
7  has opinions about asbestos and about something
8  else. Are you talking about Sanchez or are you
9  still talking about Rigler?
10       MR. SCHWARTZ: Okay. So Dr. Sanchez
11  issued reports that go through in detail how
12  talc particles are mined, the kinds of
13  particles --
14       THE COURT: I got that the first
15  time.
16       MR. SCHWARTZ: Okay. So I'll slow
17  down. And I've lost you. I'm sorry.
18       THE COURT: No. It's not a question
19  of slowing down. It's a question of pretending
20  you're writing instead of just speaking. We're
21  more casual when we speak. But you shifted
22  pronouns to "he." And I don't know who the "he"
23  referred to, Rigler or Sanchez.
24       MR. SCHWARTZ: And I don't know where
25  I lost you, so I'm sorry. That's why I was

1  reorienting.
2       The point is, Dr. Sanchez has these
3  very detailed reports where he talks about the
4  mining and the contents of talc. Dr. Rigler
5  came and talked about the contents of talc and
6  that he found all these talc fibers. And
7  Dr. Sanchez, consistent with these opinions,
8  he's going to explain it. These aren't
9  asbestiform fibers that he found. These are
10  talc particles that he found; that he being
11  Dr. Rigler found. They're talc particles that
12  Dr. Rigler found.
13       So this is within the fair scope of
14  his report. They knew that's what he's going to
15  come talk about today. And, you know, we can
16  provide the report to you so you can look at it.
17  But this would be all in the fair scope of his
18  report 100 percent.
19       THE COURT: And these two slides are
20  based on what you just described?
21       MR. SCHWARTZ: I don't know what
22  specific slides are being objected to. I also
23  heard an objection to IARC 2012, so --
24       MS. O'DELL: And, yes, Your Honor,
25  let me just --

1       THE COURT: Well, for the record, the
2  two slides that are objected to are what?
3       MS. O'DELL: Slide No. 31, and I have
4  a question for defense regarding Slide No. 17,
5  and then there's also a slide that I don't have
6  the slide number for.
7       THE COURT: Did you want us to hear
8  all of that? Because the last part was
9  delivered away from the microphone.
10       MS. O'DELL: Excuse me, Your Honor.
11  I apologize.
12       So we have an objection to Slide No.
13  31 that mentioned IARC 2012, and also to Slide
14  No. 10 that mentions the IARC Monograph dated
15  2012, which is not listed in Dr. Sanchez's
16  reliance materials, in any of his reports, to my
17  review. And if counsel can point me to where
18  I'm in error, I'll acknowledge that. But I have
19  looked everywhere, and it's not there.
20       And so our objection is that he
21  shouldn't be able to come in and testify to IARC
22  2012, because the defendants have been on notice
23  since 2018 about those opinions in relation to
24  talc fibers and asbestos from all of the
25  plaintiffs' experts.

1       And so Dr. Sanchez has not disclosed
2  any specific opinions about talc fibers.
3  Certainly his report covers talcum powder
4  generally. But he's really focused on in his
5  report asbestos solely. Certainly the mining,
6  I'm not disagreeing with counsel on that. And
7  then he has some comments about Dr. Godleski's
8  findings in this case.
9       So the nature of our objection is
10  focused on his opinions regarding talc fibers
11  and taking Dr. Rigler's photo micrographs and
12  criticizing them here first, and then second,
13  his opinions regarding IARC 2012.
14       MR. SCHWARTZ: So, Your Honor, IARC
15  2012 is not in his report. IARC 2010 regarding
16  talc is in his report.
17       And I just want to explain to you --
18       THE COURT: Well, the slide is IARC
19  2012.
20       MR. SCHWARTZ: Right. But I'm going
21  to tie this all up so you can understand what
22  we're trying to do here and what we're
23  responding to.
24       THE COURT: Okay.
25       MR. SCHWARTZ: So first they had

(Jury Trial - Afternoon Session) - September 13, 2021
Kleiner v. Johnson & Johnson

- KLEINER -vs- JOHNSON & JOHNSON -                                    Page 97

1    Dr. Wolf come testify that IARC 2012 -- which he
2    wasn't responding to Dr. Wolf.  This is their
3    gyn-onc.  Dr. Wolf came in and testified that
4    IARC 2012 says that talc fiber equals
5    asbestiform talc.  That's what they had her say.
6    And then they said that that's a Class 1
7    carcinogen.  And Dr. Sanchez is going to explain
8    why that's wrong.
9         And then they had Dr. Rigler come in
10   and testify, Question:  "Are those items, talc
11   fibers, fibrous talc and asbestiform talc, all
12   the same substance?
13        "Answer:  Yes.  You could call them
14   that, yes."
15        And so they're going to tie these two
16   things together and say that Johnson & Johnson's
17   talcum powder are full of cancerous asbestiform
18   talc.  And Dr. Rigler [sic], who is a geologist
19   and a mineralogist and testified about these
20   things in his report, he's going to explain why
21   that's not true; that they are -- the jury is
22   being mislead in his expert opinion.  So I think
23   it's fair under Pennsylvania rules for him to
24   come in and respond to those opinions.
25        THE COURT: Sanchez?

- KLEINER -vs- JOHNSON & JOHNSON -                                    Page 98

1         MR. SCHWARTZ: Sanchez.
2         MS. O'DELL: And, Your Honor, he
3    certainly had opportunity to respond to those
4    opinions which were disclosed in the --
5         THE COURT: Yeah.  What about the
6    objection that if you wanted to bring it in, you
7    should have brought it in through a supplemental
8    report?
9         MR. SCHWARTZ: Your Honor, Dr. Wolf
10   brought this in on her direct testimony.  I
11   don't know where this is in Dr. wolf's expert
12   report for him to respond to.
13        MS. O'DELL: That's just a
14   demonstrative, Your Honor.  In Dr. Wolf's
15   report, she references both IARC 2010, which is
16   platy talc, and IARC 2012, which is talc fibers.
17   And that's been in there since November of 2018;
18   and I know that personally.
19        And so if they wanted Dr. Sanchez to
20   respond to those opinions, they had full
21   opportunity to do that, and they could have had
22   him amend his report.  He did two in this case.
23   One in November of 2019, another in May of 2020.
24   And there's nothing in there about that, and we
25   feel like that's improper.

- KLEINER -vs- JOHNSON & JOHNSON -                                    Page 99

1         MR. SCHWARTZ: Your Honor, they
2    didn't tie this up until this trial, like this.
3    And that's what they're doing.  They're going to
4    show this testimony to the jury at closing and
5    they're going to show them this demonstrative
6    and they're going to tie it up and say there's
7    these cancerous asbestiform talc particles.
8    And, you know, we should have a fair opportunity
9    to respond to that.
10        And I submit that if you look at his
11   report --
12        THE COURT: Yeah.  I'm going to
13   overrule the objection.
14        MR. SCHWARTZ: Thank you, Your Honor.
15        THE COURT: I think they're entitled
16   to a fair opportunity to respond.
17        MS. O'DELL: Your Honor, if I could
18   just note for the record, they've had full
19   disclosure of this.  We've had a trial with
20   these.
21        THE COURT: You're just repeating
22   yourself.
23        MS. O'DELL: Excuse me, Your Honor.
24   Just want to make sure the record is clear.
25        THE COURT: Okay.

- KLEINER -vs- JOHNSON & JOHNSON -                                    Page 100

1         Was there anything else objected to
2    in those slides?  So you can cover it now before
3    we bring back the jury.
4         You can go get the jury.
5         MS. O'DELL: Thank you, Your Honor.
6         MR. SCHWARTZ: Thank you, Your Honor.
7                   - - -
8         (Pause in proceedings.)
9                   - - -
10        LAW CLERK: All rise as the jury
11   enters.
12                  - - -
13        (Whereupon the jury panel reentered
14   the courtroom at 3:45 p.m.)
15                  - - -
16        (The following transpired in open
17   court in the presence of the jury panel:)
18                  - - -
19        LAW CLERK: You may be seated.
20        THE COURT: All right.  It's still
21   the defense's turn.
22        You have a witness.
23        MS. POLE: Yes, Your Honor.
24        The Johnson & Johnson defendants
25   would call Dr. Matthew Sanchez to the stand,

(Jury Trial - Afternoon Session) - September 13, 2021
Kleiner v. Johnson & Johnson

- KLEINER -vs- JOHNSON & JOHNSON -                    Page 101

1    please.
2          (Witness took the stand.)
3          THE COURT: Oh, before we get
4    started, let me ask the jury.
5          You can have a seat.
6          I was talking to the lawyers about
7    scheduling while you were out of the room.  And
8    if possible, everybody would like to go past
9    4:30 to 5:00.  But I won't do that if anybody
10   objects, because I know at the outset we
11   promised you 4:30.  Just raise your hand if
12   5:00 is a problem.
13         A couple hands went up.  So regular
14   quitting time, 4:30.
15         MS. POLE: Yes, sir.
16         LAW CLERK: Please stand and raise
17   your right hand.
18         Do you swear or affirm the testimony
19   you're about to give is the truth, the whole
20   truth, and nothing but the truth?
21         THE WITNESS: Yes.
22         LAW CLERK: Thank you.  Please state
23   your full name for the record.
24         THE WITNESS: Matthew Spencer
25   Sanchez.

- MATTHEW SANCHEZ, Ph.D. (Voir Dire) -              Page 102

1              - - -
2          ... MATTHEW SANCHEZ, Ph.D., after
3    having been first duly sworn, was examined and
4    testified as follows:
5              - - -
6          LAW CLERK: Thank you very much.  You
7    may be seated.
8          MS. POLE: May I proceed, Your Honor?
9              - - -
10         V O I R   D I R E
11             - - -
12   BY MS. POLE:
13   Q.  Good afternoon, Dr. Sanchez.
14   A.  Good afternoon.
15   Q.  Would you please introduce yourself to the jury
16    and tell the jury what you do for a living?
17   A.  Yes.
18         So my name, as I stated earlier, is
19   Matthew Sanchez.  I have a Ph.D. in geology with
20   emphasis in a field called mineralogy.  I've been
21   working professionally since about 2007.  A lot of
22   my work primary -- the primary focus of my work is
23   the identification of minerals, testing of minerals
24   like talc, looking for asbestiform particles, things
25   of that nature, as well as kind of doing general

- MATTHEW SANCHEZ, Ph.D. (Voir Dire) -              Page 103

1    microscopy to identify particulate.
2    Q.  Are you a geologist?
3    A.  I am.
4    Q.  Are you a mineralogist?
5    A.  I am.
6    Q.  Can you tell -- describe what it means to be a
7    geologist?  And what is geology?
8    A.  I'll try to be succinct with this.
9          Geology is a broad field of study.
10   Roughly it's the study of the Earth.  So within
11   geology, there's all sorts of subdisciplines in
12   areas where you could do research and you could, you
13   know, focus your attention.  Some geologists will
14   study, you know, volcanos.  Some geologists study
15   specific types of rocks.  Other geologists may study
16   earthquakes.  Again, my focus is in minerals and
17   then certain types of mineral groups.
18   Q.  So your subspecialty is in the field of
19    mineralogy --
20   A.  Right.
21   Q.  -- is that right?
22   A.  That's correct.
23   Q.  Would you explain to the jury what that field
24    means?  What is mineralogy?
25   A.  Yes.

- MATTHEW SANCHEZ, Ph.D. (Voir Dire) -              Page 104

1          So whenever you go out and you pick
2    up a rock, it's going to -- a lot of rocks, you'll
3    see it will have different colored crystals inside
4    of it.  Those crystals are different minerals.  So
5    that's what I would be -- that's what I study.  You
6    know, whether you get into, you know, soil or dirt,
7    it's going to be composed of a lot of minerals, you
8    know, these rocks that have broken down.  So the
9    study of mineralogy is these minerals, the crystal
10   structures of the minerals; what the minerals are
11   made out of; what makes them a certain color; what
12   makes them certain shapes; how the minerals may
13   break; what we can use the minerals for.
14         Some minerals we can use for, you
15   know, to refine to use for getting raw materials to
16   make electronics.  Some minerals we just use to make
17   roads out of.  So, again, there's a whole host of
18   areas of how we use minerals in our society.
19   Q.  So plaintiffs have offered -- well, plaintiff
20    did offer the testimony of a microbiologist in this
21    case, Dr. Mark Rigler, who testified or claimed to
22    find talc fibers in J&J talcum powder.
23         Are you familiar with Dr. Rigler?
24   A.  Generally, yes.
25   Q.  And are you also aware that the plaintiffs have

(Jury Trial - Afternoon Session) - September 13, 2021
Kleiner v. Johnson & Johnson

---

- MATTHEW SANCHEZ, Ph.D. (Voir Dire) -                    Page 105

1  been raising issues about talc fibers and
2  asbestiform talc in this case?
3  A.  I am.
4  Q.  Did we ask you to come here today to talk to
5  the jury about talc fibers and asbestiform talc?
6  A.  Yes, you did.
7  Q.  And will you be talking about testing of
8  Johnson & Johnson talcum powder products for talc
9  fibers and asbestiform talc?
10 A.  I will be.
11 Q.  And are you also familiar with plaintiffs'
12 expert lung pathologist, Dr. John Godleski?
13 A.  In as far as his SEM analyses for the presence
14 of talc in tissue, yes.
15 Q.  Will you be discussing your opinions about
16 whether Dr. Godleski found talc particles and a talc
17 fiber in Ms. Kleiner's tissue?
18 A.  I will be.
19 Q.  Dr. Sanchez, did you assist the Johnson &
20 Johnson defendants in preparing a PowerPoint
21 presentation?
22 A.  I did.
23 Q.  And will this presentation assist you in giving
24 your opinions to the jury?
25 A.  In part, yes.

---

- MATTHEW SANCHEZ, Ph.D. (Voir Dire) -                    Page 106

1          MS. POLE:  Your Honor, we have marked
2  this PowerPoint presentation as Defendants'
3  3137.  We've provided a copy to plaintiff
4  counsel.  And we'd ask that we be allowed to
5  display it for the jury as Dr. Sanchez
6  testifies.
7          MR. DEARING:  No objection, other
8  than the ones we've already made, Your Honor.
9          (Exhibit DX-3137, PowerPoint
10 presentation prepared by Dr. Sanchez, marked for
11 identification.)
12         THE COURT:  Okay.  Have you qualified
13 him as an expert?
14         MS. POLE:  I am going -- I was about
15 to.  No, I haven't at this point.  I have not
16 yet, Your Honor.
17         THE COURT:  Okay.  Just checking.  I
18 thought maybe I missed something.
19         MS. POLE:  No, you didn't miss it.
20 No, you did not.
21         THE COURT:  All right.
22 BY MS. POLE:
23 Q.  So I'd like to discuss your qualifications.
24         Can we have Slide 1, please?
25         (Technician complies with request.)

---

- MATTHEW SANCHEZ, Ph.D. (Voir Dire) -                    Page 107

1          (Document published on screen.)
2  BY MS. POLE:
3  Q.  Dr. Sanchez, does this slide accurately reflect
4  your educational background?
5  A.  Yes, it does.
6  Q.  And can you describe for the jury, please, your
7  course of study and research from your undergraduate
8  studies through your master's and then your
9  doctorate?
10 A.  Yeah.
11         So my formal education, as I stated
12 again, is in geology with emphasis in mineralogy.
13 The work I did towards the end of my bachelor's
14 degree and then as part of the requirements for the
15 master's and doctorate degrees in geology requires
16 dissertations.  The focus of the dissertation was
17 primarily dealing with asbestiform minerals about a
18 mine in Northern Montana, near Libby, Montana.
19         But as far as the coursework, the
20 coursework was heavily focused in mineral sciences.
21 This deals with characterization, how to identify
22 minerals, differences in different mineral systems,
23 and also the analytical instrumentation, the types
24 of microscopes, so the different types of -- there's
25 all sorts of different ways we study minerals,

---

- MATTHEW SANCHEZ, Ph.D. (Voir Dire) -                    Page 108

1  including, you know, with different types of
2  microscopy, both light and electron microscopy.
3          As far as my employment history, when
4  I completed my master's degree, I went to work for
5  the same company I work for now, called the RJ Lee
6  Group.  I was primarily hired on because of my
7  knowledge of microscopy and minerals, how they
8  relate to each other.
9          Through time within the company, I've
10 had different promotions as opportunities allowed
11 and things have presented themselves to me.  In
12 about 2015, I started accepting some work as an
13 expert witness in litigation, primarily dealing with
14 talc issues.  And since about that time, I've been
15 heavily involved in various litigation for Johnson &
16 Johnson and other -- and another client.
17         Part of the work that I do is also
18 attending and participating in different
19 professional societies.  My role in those societies
20 varies.  I've given presentations at their meetings.
21 I review papers for peer review in order for
22 publications.  I also work with a few different
23 entities working on standards for primarily
24 microscopy test methods.
25 Q.  So is it true that you've published more than

---

(Jury Trial - Afternoon Session) - September 13, 2021
Kleiner v. Johnson & Johnson

---

- MATTHEW SANCHEZ, Ph.D. (Voir Dire) -                    Page 109

1  **30 publications, including on the identification,**
2  **characterization, and quantification of asbestiform**
3  **fibers and other minerals?**
4  A.  In part, yeah.  So just make a distinction, I
5  have I think it's a little over -- it's over 12
6  peer-reviewed publications dealing with mineral
7  identification and asbestiform minerals.  As we move
8  the rest of those -- the rest of those are like
9  presentations at professional conferences.
10 Q.  **Okay.  So where did you receive your degrees?**
11 A.  Oh, sorry.  So as I mentioned the years, I
12 received all my degrees, I finished my bachelor's at
13 the University of Idaho.  It's up in the panhandle
14 up in Northern Idaho.  And I also completed my
15 master's and Ph.D. there as well.
16 Q.  **Okay.  So let's briefly talk about the**
17 **memberships listed on this slide.**
18      The first one is the -- the first one
19 **that I can see is the USP talc expert panel.  That's**
20 **the last one actually.  Do you see that one?**
21 A.  I do.
22 Q.  **Can you tell the jury what that is and what**
23 **your role is?**
24 A.  Yes.  The "USP" stands for the United States
25 Pharmacopeia.  And that probably didn't help.  But

---

- MATTHEW SANCHEZ, Ph.D. (Voir Dire) -                    Page 110

1  what it is, is it's a standard setting organization
2  that works with the FDA for all -- all ingredients
3  and things that go into pharmaceuticals, into drugs.
4  I'm part of an expert panel.  We're working through
5  what's the -- how talc is tested in order to bring
6  that method up to date and modernize that.  So I'm
7  part of a group of other -- part of a group of
8  expert panel, as it's called, while working on that
9  effort for the past, I guess, six years now.
10 Q.  **So how are you ultimately selected to**
11 **participate in this USP talc expert panel?**
12 A.  Yeah.  The USP had put out a kind of a call for
13 experts.  They were looking for individuals with
14 expertise in this area to help them go through and
15 do what the FDA had asked them to do.  So it was
16 similar to like applying for a job.  I sent in my
17 resume.  I sent in, you know, a what do you call it?
18 Statement of interest or that's -- I think that's
19 not the right word I'm looking for, but statement of
20 intent, as well as my, you know, kind of my
21 Curriculum Vitae or my background information.  And
22 then there was some panel within USP that chose me
23 and got back with me and accepted me onto that.
24 Q.  **Did you disclose that you are an expert in talc**
25 **litigation?**

---

- MATTHEW SANCHEZ, Ph.D. (Voir Dire) -                    Page 111

1  A.  I did.  And I do.  That's part of the process
2  is also disclosure of potential conflicts of
3  interest.
4  Q.  **So what is the American Society for Testing**
5  **Materials, or ASTM?  I see that under memberships on**
6  **this slide.**
7  A.  Yeah.  That's a very large organization, but it
8  deals with standardizing test methodologies.  And
9  the -- I guess an example of that would be if -- I
10 think the organization started years ago when there
11 was issues with steel manufacturing.  So years ago
12 if you would buy steel from one company versus
13 another company, the quality of that product, that
14 steel, would be vastly different.  So if you
15 actually need steel to perform in a certain way for
16 a certain application, you know, you never knew what
17 you were going to get depending on which
18 manufacturer you may be getting it from.
19 Q.  **So --**
20 A.  One of the reasons for that is different
21 manufacturers at that time would have used different
22 types of testing, different test methods to give
23 results to their clients.  So the ASTM purpose is to
24 try to get standardized tests.  So different people,
25 different laboratories doing -- are doing the same

---

- MATTHEW SANCHEZ, Ph.D. (Voir Dire) -                    Page 112

1  test, therefore, the results would be comparable,
2  and kind of trying to create a standardization
3  across industries.
4  Q.  **So how are you involved in ASTM?**
5  A.  Right.  My involvement deals with air quality
6  committees dealing with asbestiform minerals,
7  primarily dealing with microscopy and different ways
8  that we can test for asbestiform minerals in
9  different matrices, be it air, be it water, soil,
10 dust, both mineral powders like talc or other
11 minerals.
12 Q.  **And there are two others on the membership on**
13 **this slide anyway.**
14      **What is the Mineralogical Society of**
15 **America?**
16 A.  It's a scientific organization.  It just had
17 its 100th birthday two years ago, which is devoted
18 primarily to the mineralogical sciences.  So, again,
19 it's the advancement educational outreach that
20 provides a journal for publication.  That's one of
21 the premier mineralogical organizations in the
22 world.
23      So, again, it's a place where
24 scientific information is shared.  They do have
25 conferences where researchers can come and present

---

- MATTHEW SANCHEZ, Ph.D. (Voir Dire) -                    Page 113

1  information and, you know, share information and
2  work through problems.
3  Q.  So how are you involved in the Mineralogical
4    Society of America?
5  A.  Yeah.  My involvement at this point is
6    primarily I'm a member.  We pay dues every year.
7    Part of my interest, I also get involved with what I
8    mentioned earlier, some of the peer-review process
9    there, where there are papers that are submitted for
10   publication and areas where I have interest and
11   expertise, I will -- occasionally I'll be asked to
12   actually review those anonymously to help improve
13   and try to make sure those publications are as
14   correct as possible.
15  Q.  Okay.  And finally, what is the Geologic
16    Society of America?
17  A.  It's similar to the Mineralogical Society in
18    function.  It's just a much larger organization.
19    You're much more likely to encounter, you know,
20    geology -- in my area of study of the Earth, you
21    know, mineralogy is a very -- is a narrow
22    subdiscipline.  Geology is concerned about kind of
23    the whole science.  So it's a much larger
24    organization, much broader focus.
25  Q.  So how are you involved in this organization,

- MATTHEW SANCHEZ, Ph.D. (Voir Dire) -                    Page 114

1    the Geologic Society of America?
2  A.  Similar to what I described with the MSA, or
3    Mineralogical Society of America, attending meetings
4    when asked.  They have various publications through
5    the GSA.  If asked, I could serve as a peer reviewer
6    if appropriate.
7  Q.  GSA meaning Geological Society of America?
8  A.  Yes.
9  Q.  Okay.  So I think you mentioned that you became
10   employed by RJ Lee in 2007?
11  A.  That's correct.
12  Q.  And that was after you completed your master's;
13    would that be correct?
14  A.  That's correct, yes.
15  Q.  How did you end up starting your career at RJ
16    Lee?
17  A.  Just -- I mean, it's a long story in itself.
18    But I was doing research as a graduate student on my
19    master's dealing with this mine -- this mining
20    environment up in Northern Montana, a few hours from
21    where I lived at that time.  The owner of the RJ Lee
22    Group, his name is Richard Lee.  He came to the
23    University of Idaho to get some samples, some
24    specimens from that mine from my -- my graduate
25    advisor.  So I met Dr. Lee at that point.  And then

- MATTHEW SANCHEZ, Ph.D. (Voir Dire) -                    Page 115

1    he actually -- he encouraged me to apply for a job
2    at his company when I finished; and I did.  And I
3    felt that was the best offer I had at the time.
4  Q.  Okay.  So this slide, and to the extent that
5    you have not already gone over that, but this slide
6    lists different levels of experience and positions
7    that you've held at RJ Lee over the years.
8          So can you just briefly describe how
9    your career has advanced at RJ Lee over the years
10    since you've been employed there?
11  A.  Yeah.  I mean, I started there as kind of as a
12    staff scientist working in certain areas as support
13    for various work that was being done.  Over time,
14    other opportunities presented themselves.  There
15    were some retirements, and I was -- and they asked
16    if I would fulfill these other roles within the
17    company.  And for some of them I've agreed to; and
18    they're listed here.
19  Q.  Okay.  So you started as a scientist in 2007.
20    And your present position is principal investigator?
21  A.  That's correct.
22  Q.  And that's something you've held -- a position
23    you've held since 2015; is that right?
24  A.  That's correct.
25  Q.  So does RJ Lee -- well, what is the business of

- MATTHEW SANCHEZ, Ph.D. (Voir Dire) -                    Page 116

1    RJ Lee Group?
2  A.  We do -- the company does a lot of things.  My
3    area that I focus in deals in microscopy with
4    minerals, you know, geologic materials.  I've also
5    been involved with issues involving coal as part of
6    my work.  I've done a variety of things there.  As a
7    company on a whole, we -- we do a lot of particle
8    characterization.  This could be from air samples.
9    We do a lot of failure analysis, meaning, you know,
10    if you have a bridge and it's collapsed, we've
11    gotten involved in some of those cases where what is
12    the cause, why did it fail, you know, things of that
13    nature.
14          After, you know, it just comes to
15    mind with the anniversary of 9/11.  After 9/11, RJ
16    Lee Group was heavily involved with understanding
17    the World Trade Center dusts next to Ground Zero and
18    some other buildings close to there that were
19    heavily impacted with that.  That work went on for
20    years.
21          We have areas of the company that
22    work hand in hand with the Department of Defense
23    doing database management with software systems.  So
24    we do quite a few different things.
25  Q.  So does RJ Lee have any accreditations?  And if

(Jury Trial - Afternoon Session) - September 13, 2021
Kleiner v. Johnson & Johnson

---

- MATTHEW SANCHEZ, Ph.D. (Voir Dire) -                    Page 117

1 so, what are they?
2 A.  Yeah.  We hold many accreditations depending on
3 the area of focus.  So laboratories that I work in,
4 we have accreditations for through the American
5 Industrial Hygiene Association, through NIST.  We
6 have ISO accreditation for certain analyses as well.
7 Q.  So are you accredited through various state
8 environmental accreditation programs?
9 A.  Yes.  We have accreditations with the
10 Pennsylvania Department of Environmental Protection,
11 as well as New York state and some -- and various
12 other states around the country.
13 Q.  And where is RJ Lee principally located?
14 A.  Yeah.  We're located just outside of
15 Pittsburgh, on the other side of the state.
16 Q.  So is RJ Lee also a registered FDA laboratory?
17 A.  For certain -- certain departments, yes.
18 Q.  And what does that mean?
19 A.  There are certain -- we have a group that works
20 with some pharmaceutical clients, where some of the
21 testing they perform on behalf of that client
22 requires them to be FDA registered.
23 Q.  So --
24             MS. POLE:  May I have the next slide,
25 please?

---

- MATTHEW SANCHEZ, Ph.D. (Voir Dire) -                    Page 118

1             (Technician complies with request.)
2             (Document published on screen.)
3 BY MS. POLE:
4 Q.  So has RJ Lee and have you done work for
5 government agencies?
6 A.  Yes.
7 Q.  And is that work reflected on the slide that
8 the jury is looking at now?
9 A.  Some of the entities we've done work with in
10 the past, yes.
11 Q.  So would it be fair to say that the National
12 Institutes of Health, the National Institute for
13 Occupational Safety and Health, the EPA, the CDC,
14 NASA, and other prominent government organizations
15 listed on this slide have come to you and RJ Lee for
16 analysis of particles; would that be fair?
17 A.  Some of them, yes.  Some of this work is
18 outside of the microscopy work we would do.  They
19 would be more database management work.  Or in some
20 instances, we've actually managed laboratories at
21 various sites for like the Department of Energy
22 through contracting, where we're doing the
23 management of the laboratory structure on their
24 behalf.
25 Q.  All right.

---

- MATTHEW SANCHEZ, Ph.D. (Voir Dire) -                    Page 119

1             MS. POLE:  So may I have the next
2 slide, please, Slide 3?  And that's Slide 3 in
3 Defendants' 3137.
4             (Technician complies with request.)
5             (Document published on screen.)
6 BY MS. POLE:
7 Q.  So you see some tools there.  Are these
8 analytical tools that geologists like yourself use
9 to identify particles?
10 A.  These are some of them.  These are the primary
11 ones that we would use to deal with ground mineral
12 powders.
13 Q.  Okay.  So the jury has heard about polarized
14 light microscopy and X-ray diffraction.  They've
15 heard about scanning electron microscopy and
16 transmission electron microscopy.  Are you
17 proficient, Dr. Sanchez, at using all of those
18 analytical tools?
19 A.  I am.
20 Q.  Do you regularly personally yourself use all of
21 those tools to analyze microscopic particles?
22 A.  I've used all these tools.  Most of my work now
23 I don't spend as much time on the microscopes as I
24 would have five, six, seven years ago.  But I am
25 familiar with all these tools and how they're used.

---

- MATTHEW SANCHEZ, Ph.D. (Voir Dire) -                    Page 120

1 I routinely review data from these instruments.  I'm
2 capable of going and using all these instruments to
3 get the data I need as well.
4 Q.  So are you qualified to use these tools to
5 analyze microscopic particles?
6 A.  Yes, I am.
7 Q.  Now, the jury has not heard much about
8 macroscopic examination.  Are you familiar with that
9 type of examination?
10 A.  Yes, I am.
11 Q.  What is macroscopic examination?
12 A.  Yeah.  In the context of here, you know, we're
13 talking about -- when we talk about a talcum powder,
14 you know, at one point that was a rock that has just
15 been ground into a powder.  So the macroscopic
16 examination, this is something that would be
17 happening, this would be work that would be done
18 before those rocks were ever processed, before those
19 rocks were ever crushed up to create that finished
20 powder.
21 Q.  Why is macroscopic examination relevant in your
22 field?
23 A.  Yeah.  If you -- in many ways, if you want to
24 know what something is, it's easier to know what it
25 is before you crush it into small particles,

---

(Jury Trial - Afternoon Session - September 13, 2021
Kleiner v. Johnson & Johnson

---

- MATTHEW SANCHEZ, Ph.D. (Voir Dire) -                Page 121

1  especially when we start talking about the
2  morphology or the shape.  A term will come up is
3  "habit."
4           When we want to know how these
5  crystals have formed in nature, the easiest way to
6  do it is to look at them before you've turned them
7  into a fine powder.
8           Also, as you're going in the mining
9  environment and selecting your ores, selecting where
10 you're mining, you do that in part through this
11 physical examination of the rocks before you would
12 ever process it.
13 Q.  So you mentioned a term that we'll probably get
14 to again, and that is "habit."
15          What does that term mean in geology
16 or mineralogy?
17 A.  Yeah.  So the term -- the term "habit" deals
18 with how a mineral is crystallized in nature,
19 meaning how did it form?  How did -- what does it
20 look like?  If you go pick up a rock, what do the
21 minerals look like?
22          So there's all sorts of conditions
23 and factors that go into that control how minerals
24 grow, what minerals appear to be.  So the habit is a
25 term used when you're describing what that is.

---

- MATTHEW SANCHEZ, Ph.D. (Voir Dire) -                Page 122

1           So the term "asbestiform" is
2  describing a habit, meaning how did the mineral
3  crystallize in the rock.  These terms like "platy"
4  or "lamellar" or -- there's all sorts of terms that
5  convey meaning without having to actually see
6  something.
7           And, again, this -- this -- this
8  arrives from the nature of mineralogy and geology
9  being a natural science.  Like, as a mineralogist,
10 I'm describing nature.  So as you pick up a rock, as
11 you look under microscopes, you're describing
12 natural things, and so there's a whole set of
13 vocabulary that is associated with that, that
14 conveys meaning to other scientists trained in that
15 field.
16 Q.  When you say "habit," H-A-B-I-T, that's what
17 you're discussing?
18 A.  That's correct.
19 Q.  And it has a meaning for geologists and
20 mineralogists; is that right?
21 A.  That's correct.
22 Q.  Are you proficient at macroscopic examination?
23 A.  Yes, I am.
24 Q.  Has RJ Lee performed work for Johnson & Johnson
25 over the years?

---

- MATTHEW SANCHEZ, Ph.D. (Voir Dire) -                Page 123

1  A.  Yes, we have.
2  Q.  And what kinds of materials have you tested for
3  J&J over the years?
4  A.  My personal involvement has been primarily
5  talc, looking at pretty much their talc powders,
6  testing the talc powders in various ways.  I mean,
7  before Johnson & Johnson accepts a talc for use in
8  production, they have a series of requirements that
9  it must meet.  Those are laid out in part by the USP
10 that I discussed earlier.  But, again, they have
11 requirements that must be met in order for that talc
12 to be accepted for use.
13          So the role of RJ Lee Group starting
14 in about 2009 was testing of those -- of the talc
15 for various attributes in order for Johnson &
16 Johnson to accept it for use.
17 Q.  When you were working for J&J testing talc,
18 before your work as an expert in litigation, what
19 tools did you use?
20 A.  My involvement primarily dealt with powder
21 X-ray diffraction, polarized light microscopy and
22 transmission electron microscopy.
23 Q.  And have you used those same tools in your
24 expert analyses?
25 A.  Yes, I have.

---

- MATTHEW SANCHEZ, Ph.D. (Voir Dire) -                Page 124

1  Q.  Did RJ Lee ever find asbestiform talc in J&J's
2  talc supply under this program?
3  A.  No.
4  Q.  So has J&J from time to time performed audits
5  on RJ Lee itself?
6  A.  Yes, they have.
7  Q.  And has J&J ever identified issues of
8  deficiencies in its audits of the RJ Lee lab?
9  A.  Yes; on occasion.
10 Q.  And were those deficiencies dealt with by RJ
11 Lee?
12 A.  Yes.  As part of the audit process, it requires
13 a response.  And from the laboratory's perspective,
14 again, when we have audits from any -- whether it's
15 an accrediting body or a client like Johnson &
16 Johnson, where they raise concerns about either our
17 procedures or practices or other things that they
18 observe, you know, we work to correct those things
19 through training, potentially through purchase of
20 new equipment, or whatever it takes to resolve those
21 deficiencies through the audits in order to continue
22 that relationship.
23 Q.  So what does it say to you, as a person testing
24 J&J's talc, that J&J performs regular audits of RJ
25 Lee?

---

- MATTHEW SANCHEZ, Ph.D. (Voir Dire) -                    Page 125

1  A.  Well, from my -- I mean, we do -- we do work
2  for a lot of different companies.  They're one of
3  the few that actually come in and audit us
4  independently that don't just rely upon our audits
5  through our accreditations.
6  Q.  So does that mean to you that J&J takes its
7  talc safety seriously?
8  A.  Again, I can't speak for J&J, but as I -- my
9  experience is very few of our clients will come in
10  and spend the money, spend the time to come and
11  audit us for the work that we do for them.  They're
12  one of the few that do that on a regular basis.
13  Q.  Okay.  So at some point you began to perform
14  expert work for Johnson & Johnson.
15          Did you become a geologist, a
16  mineralogist with a Ph.D. so that you could become
17  an expert in litigation?
18  A.  No.  That was not my -- that was not the reason
19  I switched majors and became -- and focused on
20  mineralogy.
21  Q.  Did J&J ask you, as someone who has tested its
22  talc products, to come and explain to juries what
23  might be in the product and your conclusions about
24  the geologic attributes of talc?
25  A.  Yes, they did.  The main reason I accepted this

- MATTHEW SANCHEZ, Ph.D. (Voir Dire) -                    Page 126

1  work was the fact that I had tested their talc for
2  years at that point.  And hearing some of the
3  allegations that were brought up, that was not --
4  that is not what I had seen in their talc.  And that
5  was one of the reasons I agreed to begin working in
6  this field.
7  Q.  And accepting some of those assignments?
8  A.  Accept some of the retentions, yes.
9  Q.  Are you being compensated for your time today,
10  Dr. Sanchez?
11  A.  Yes, I am.
12  Q.  And what does RJ Lee charge Johnson & Johnson
13  for this time -- your time away from your
14  laboratory?
15  A.  Yeah.  I believe that my company charges for --
16  my billable rate in litigation, I think it's $550 an
17  hour.
18  Q.  Are you a salaried employee at RJ Lee?
19  A.  I am.
20  Q.  Is any of your compensation tied to your
21  litigation work?
22  A.  Some of it is, yes.  I have a base salary, and
23  then I have a bonus structure based upon bill -- all
24  billable work that I have, be it in litigation or
25  outside of.

- MATTHEW SANCHEZ, Ph.D. (Voir Dire) -                    Page 127

1  Q.  Do you have any ownership interest in RJ Lee?
2  A.  I do not.
3  Q.  So circling back to the concept of macroscopic
4  examination, have you personally visited some of the
5  talc mines that you're going to discuss today?
6  A.  Yes, I have.
7          MS. POLE: If we could have Slide 4,
8  please, of DX-3137.
9          (Technician complies with request.)
10          (Document published on screen.)
11  BY MS. POLE:
12  Q.  Is that you in this picture?
13  A.  Yes.  That is me from work I did -- I'm not
14  going to talk specifically about this mine.  But
15  this was me at a talc mine in Italy back in 2015.
16  Q.  And so what is that behind you?
17  A.  That is talc.
18  Q.  Okay.  And that's it in nature?
19  A.  Right.  There's some other things there as well
20  that -- well, it's kind of hard to see there.
21  There's some darker mineralization here and a little
22  kind of a lentil-shaped or kidney-shaped piece
23  there.  Those are non-talc rocks.  But the majority
24  of what's behind me is the talc ore.
25  Q.  Okay.  And if we could have Slide 5 of DX-3137,

- MATTHEW SANCHEZ, Ph.D. (Voir Dire) -                    Page 128

1  please.
2          And where -- I take it that's you,
3  the tall one?
4  A.  Well, it's all relative to who I'm standing
5  next to, but...
6  Q.  Yeah.  And where are you, in terms of
7  geographically, where are you in this picture?
8  A.  This is one of the -- this is a mine in -- one
9  of the talc mines in Guangxi, China.  This is one of
10  the mines or the main mine that supplies talc to
11  Johnson & Johnson.
12  Q.  And what is that on the right?  What's
13  happening there?
14  A.  Yeah.  So that's my hand.  That's -- yeah, my
15  hand.  Again, this is the -- this is the talc ore.
16  This is actually down in the talc pit, which is hard
17  to see, but it's behind us there from that
18  viewpoint.  That's me actually climbing over the
19  talc ore looking -- looking at the talc before it's
20  processed and crushed.
21  Q.  And to your understanding, Dr. Sanchez, has
22  Dr. Mark Rigler ever been to any of the talc mines
23  at issue in this case?
24  A.  Not to my knowledge.
25  Q.  Is Dr. Rigler a geologist?

---

**- MATTHEW SANCHEZ, Ph.D. (Voir Dire) -**    Page 129

1  A.  He is not.
2  Q.  Is he a mineralogist?
3  A.  He is not.
4  Q.  So if we could have Slide 6, please, of
5      DX-3137.
6           (Technician complies with request.)
7           (Document published on screen.)
8  BY MS. POLE:
9  Q.  So in this slide before the jury, is it
10     accurate with respect to who is a geologist, who is
11     a mineralogist, and who has been to the talc mines?
12 A.  Yeah, based on my understanding, yes.
13 Q.  Okay.  And in your opinion, why is it important
14     that the jury hear from a geologist and a
15     mineralogist who has actually visited mines?
16 A.  Well, two main reasons.  We're talking about
17     talc.  We're talking about minerals that may occur
18     in talc.  Again, we're talking about minerals.
19     We're talking about something that occurs naturally
20     in geologic environments.  We're also talking --
21     we're going to be talking about particles that are
22     very, very small, microscopic particles seen under
23     very high magnifications, and trying to understand
24     what those particles are and where those particles
25     came from.  Understanding the whole process,

---

**- MATTHEW SANCHEZ, Ph.D. (Voir Dire Cross) -**    Page 130

1      understanding the big picture down into the finest
2      particles is critical to understanding what is
3      actually in the talcum powders.
4  Q.  So based upon your education, training, and
5      years of experience, are you expert in geology,
6      mineralogy, microscopy, and identifying particles
7      including asbestiform in talcum powder?
8  A.  Yes, I am.
9           MS. POLE:  Your Honor, at this time,
10     Johnson & Johnson defendants offer Dr. Sanchez
11     as an expert in geology, mineralogy, microscopy,
12     and identifying particles including asbestiform
13     in talcum powder.
14          MR. DEARING:  May I just clarify one
15     area of expertise, Your Honor?
16          THE COURT:  Sure.
17               - - -
18     CROSS-EXAMINATION ON QUALIFICATIONS
19               - - -
20 BY MR. DEARING:
21 Q.  Good afternoon.
22 A.  Good afternoon.
23 Q.  I'm David Dearing.
24          THE COURT:  Why don't you pick up the
25     microphone and stand up straight.

---

**- MATTHEW SANCHEZ, Ph.D. (Voir Dire Cross) -**    Page 131

1           MR. DEARING:  Okay.
2           I don't have that much cord.  I'm
3      afraid I'm going to rip it out of the wall.
4  BY MR. DEARING:
5  Q.  Just one question.
6           When you say you're an expert in
7      identifying particles, that does not include
8      particles in human tissue, right?
9  A.  It depends on the nature of the particle.  If
10     the particles are mineral in nature, then, yes, I
11     would consider myself an expert.  If you're talking
12     about some organic molecule and some tissue
13     reaction, I have no expertise in that area.  But as
14     far as mineral particles in human tissue, the
15     identification of minerals in human tissue is the
16     same as whether it's in a different -- it's the same
17     thing you're looking at.  It's just in a different
18     matrix.
19 Q.  Well, let's be specific.  Are you claiming to
20     be an expert in the field of identifying talc in
21     human tissue?
22 A.  Yes.
23 Q.  Is that by -- which microscopy method?
24 A.  Any.
25          MR. DEARING:  I guess -- well,

---

**- KLEINER -vs- JOHNSON & JOHNSON -**    Page 132

1      there's no foundation for that, so I would
2      object to that.  But otherwise, I don't object
3      to his qualifications.
4           THE COURT:  So my understanding of
5      that qualification is you're saying if you look
6      at a Chevy on the beach, you recognize it as a
7      Chevy.  If you look at a Chevy on the highway,
8      you recognize it as a Chevy.  If you look at a
9      Chevy in someone's garage, you recognize it as a
10     Chevy.  Is that what you're saying?
11          THE WITNESS:  Yes.  A is A, right?
12     If it's talc in the rock and it's talc in a
13     tissue, it is still talc, yes.  So your analogy
14     was good.
15          THE COURT:  Yeah.  Okay.
16          MR. DEARING:  Your Honor, just unless
17     I missed it, I didn't hear any training or
18     education or experience with identifying
19     particles in tissue.
20          THE COURT:  He says it doesn't matter
21     whether it's sitting in tissue or if it's parked
22     in my garage.  He knows a Chevy when he sees
23     one.
24          MR. DEARING:  Okay.  Your Honor, I'll
25     address it later.

---

- KLEINER -vs- JOHNSON & JOHNSON -                    Page 133

1    Thank you.
2        **THE COURT:** Okay.
3    So what are we doing?
4        **MS. POLE:** Thank you.
5    May I proceed, Your Honor?
6        **THE COURT:** You're offering him again
7    as an expert in what?
8        **MS. POLE:** I'm offering him, Your
9    Honor, as an expert in geology, in mineralogy,
10   in microscopy, and in identifying particles,
11   including asbestiform, in talcum powder.
12       **THE COURT:** Every time I hear that
13   word "microscopy," I mean, you talk about trying
14   to make something sound bigger than it is.
15   Microscopy just means looking through a
16   microscope, right?
17       **MS. POLE:** Well, it's the science of
18   looking into a microscope.
19       **THE COURT:** Ah, yes. Okay.
20   (Laughter.)
21       **THE COURT:** He's accepted as an
22   expert.
23       **MS. POLE:** Thank you.
24   So, what? I got time?
25       **THE COURT:** Some of the people at

- KLEINER -vs- JOHNSON & JOHNSON -                    Page 134

1    counsel table have been looking at their watch
2    figuring out the same thing I did, which was --
3        **MS. POLE:** I'm getting ready to go
4    into another area, Your Honor. If this is a
5    good time to break, it's fine with me.
6        **THE COURT:** Well, you just got into
7    the area. He just got qualified.
8    (Laughter.)
9        **MS. POLE:** Yes.
10       **THE COURT:** All the rest of this
11   stuff was interesting, but why don't we do that,
12   why don't we call it a day. He's been qualified
13   now as an expert. We'll come back tomorrow and
14   see what he has to say.
15   I remind the jury that you're not to
16   discuss this case with anyone, not even each
17   other. You can't discuss it until the trial is
18   over and you go out to deliberate. If anyone
19   tries to talk to you about this case, you should
20   report it first chance you get. Do not, do not
21   read anything in the papers or go on the
22   Internet, or if there's a mention of anything
23   about talcum powder, litigation, anything on TV,
24   just change the channel. It's just not fair to
25   either side for you to be getting additional

- KLEINER -vs- JOHNSON & JOHNSON -                    Page 135

1    information outside of this courtroom.
2    The information you get outside of
3    this courtroom is not subject to the Rules of
4    Evidence. It's not coming from people who have
5    been sworn to tell the truth. It's not subject
6    to cross-examination or rebuttal. You just
7    can't trust it.
8    So does anyone have anything
9    additional before the jury is released for the
10   day?
11       **MS. POLE:** No, sir.
12       **THE COURT:** Follow the court
13   officer's direction.
14       **LAW CLERK:** All rise as the jury
15   exits.
16            - - -
17   (Whereupon the jury panel exited the
18   courtroom at 4:24 p.m.)
19            - - -
20   (The following transpired in open
21   court outside the presence of the jury panel:)
22            - - -
23       **THE COURT:** All right. The witness
24   is excused. You can step down.
25       **THE WITNESS:** Thank you, Your Honor.

- KLEINER -vs- JOHNSON & JOHNSON -                    Page 136

1    (Witness left the stand.)
2        **THE COURT:** If you want to take any
3    of your things with you...
4        **THE WITNESS:** It's white papers and
5    two pens. I think that would be okay.
6        **THE COURT:** Okay. So is there
7    anything you want to do, guys? Anything we can
8    do without the jury? They're out of the room
9    now. We can discuss any objections you
10   anticipate. Or if nothing, that's fine. We'll
11   call it a day.
12       **MR. SMITH:** I always have a few
13   things.
14       **THE COURT:** Okay. Go ahead.
15       **MR. SMITH:** I'll be quick.
16   So, Your Honor, this is in connection
17   with just wrapping up the orders for
18   Smith-Bindman, Dr. Smith-Bindman. I think
19   there's one order that we all agree to.
20       **THE COURT:** Mr. Pavlo, he's calling
21   your name. Come on up.
22       **LAW CLERK:** Okay.
23       **MR. SMITH:** There's another order,
24   because we need two orders on this. I don't
25   know if there's agreement on this or not. I

(Jury Trial - Afternoon Session) - September 13, 2021
Kleiner v. Johnson & Johnson

1    sent this. If not, I think you're just going to
2    have to decide because we keep going round and
3    round, Judge. But here's a copy of it. I
4    provided a copy to opposing counsel.
5         (Handing documents to the Court.)
6         THE COURT: Why don't you tell me
7    what these orders are about.
8         MR. SMITH: They're -- one is about
9    striking Dr. Smith-Bindman's opinion, the
10   opinion relating to the systematic review and
11   the meta-analysis. And then the other is
12   denying the motion for reconsideration of the
13   order striking the opinion about the systematic
14   review and the meta-analysis.
15        You have both orders. The one
16   dealing with the motion for reconsideration I
17   think is agreed upon.
18        The one dealing with striking the
19   opinion, I gave you my order. I haven't seen an
20   alternative order.
21        MR. SCHOENHAUS: Sure. I sent it to
22   you yesterday.
23        MR. SMITH: I don't recall getting
24   it.
25        MR. SCHOENHAUS: Here.

1         (Handing documents to counsel and the
2    Court.)
3         MR. SMITH: And then the other issue,
4    Judge, is the curative instruction. And we
5    can't seem to agree on what the curative
6    instruction should say.
7         So my recommendation was that we both
8    give to you what we think is the appropriate
9    curative instruction and then you decide which
10   one you want to give.
11        THE COURT: Okay. Do you both have a
12   proposal?
13        MS. O'DELL: We do, Your Honor.
14   Mr. Pavlo put ours on top of your book on
15   your -- just to your right there, both our
16   alternative order and the curative instruction,
17   which we think is more closely tailored to the
18   Court's order.
19        THE COURT: All right. So defendant
20   handed up an order denying reconsideration, and
21   that's agreed, I denied reconsideration; is that
22   right?
23        MS. O'DELL: Correct. Yes, Your
24   Honor.
25        MR. SCHOENHAUS: The only thing I

1    would say on that one, Your Honor, we'll figure
2    out a way. If you recall, we actually attempted
3    to file a motion for reconsideration, and the
4    clerk's office rejected it because there was no
5    initial order. So I guess we'll figure out a
6    way once we have an initial order.
7         THE COURT: I guess this is the
8    initial order I'm looking at now, right, the two
9    proposals?
10        MR. SCHOENHAUS: Right. And then
11   once we have that order and that order gets
12   docketed, we'll be able to file our
13   reconsideration.
14        THE COURT: Okay. Well, while you're
15   speaking, tell me the difference between these
16   two proposed orders. They both say granted in
17   part and denied in part.
18        MR. SCHOENHAUS: Right. So I --
19        THE COURT: And then they diverge.
20        MR. SCHOENHAUS: Right.
21        So what happened is, J&J made a
22   proposal, and our problem with it is it's far
23   too broad. And Ms. O'Dell can address more
24   specifics. But this pertains to a witness who
25   testified over two weeks ago, and the way that

1    order is written, our concern is this jury is
2    not going to be able to figure out the specifics
3    of what Your Honor really excluded. It was a
4    limited ruling, and they're going to read
5    that --
6         THE COURT: No. They're never going
7    to read anything.
8         MR. SCHOENHAUS: Well, but the
9    concern is they're viewed in tandem. It's hard
10   to separate the order.
11        THE COURT: You're talking about the
12   corrective instruction?
13        MR. SCHOENHAUS: The curative
14   instruction, right. So whatever language we
15   have in the order --
16        THE COURT: Yeah. So let's just talk
17   about the order for the moment.
18        MR. SCHOENHAUS: All right.
19        THE COURT: You say the order should
20   be limited to the specific study about women who
21   use talc daily.
22        The J&J order says the risk of
23   1.43 --
24        MR. SMITH: No; that's not my order.
25        MR. SCHOENHAUS: That was ours, the

(Jury Trial - Afternoon Session) - September 13, 2021
Kleiner v. Johnson & Johnson

1    43 percent, Your Honor.
2         THE COURT: Oh.
3         MR. SCHOENHAUS: Theirs is the ten
4    studies.
5         MR. SMITH: My order says:
6    Defendants' motion is granted as to the specific
7    opinion of Dr. Rebecca Smith-Bindman regarding
8    her systematic review and meta-analysis.
9         THE COURT: I don't know what you're
10   reading from. I don't see that language at all.
11        MR. SMITH: You got it on your --
12   I'll give you another one.
13        THE COURT: Is that the curative
14   instruction?
15        MR. SMITH: No. I thought we were on
16   the order.
17        THE COURT: We are on the order, but
18   where is that?
19        MR. SMITH: I gave it to Mr. Pavlo.
20        THE COURT: Well, I must have it then
21   because I have the two.
22        MR. SMITH: Yeah, you got it. But
23   we'll give you another one. There you go. He
24   just handed you another one.
25        THE COURT: I don't need another one.

1    Yes. Okay.
2         MR. SMITH: And that's the opinion
3    that you struck.
4         MS. O'DELL: Your Honor, when you're
5    ready, we can lay out the reasons we think
6    that's too broad and unclear.
7         THE COURT: Sure. Go ahead.
8         MS. O'DELL: Well, there's no -- we
9    understand that --
10        THE COURT: I thought I only forbade
11   the 43 percent.
12        MS. O'DELL: That's our
13   understanding.
14        MR. SMITH: No. You --
15        THE COURT: I mean, I said that a
16   couple of times. I said she could testify to
17   everything else. The statistician, I have no
18   problem with the statistician indicating a
19   direction or -- but the specific calculation of
20   43 percent, if they want that in, they have to
21   call the statistician.
22        MR. SMITH: So you did, Judge. And
23   let me just show you, remember I put -- her
24   opinion was on a slide about the ten studies.
25        THE COURT: Uh-huh.

1         MR. SMITH: And the calculation she
2    did about the ten studies.
3         THE COURT: Okay.
4         MR. SMITH: And then the calculation
5    that she did about those calculations. You
6    struck all that.
7         THE COURT: No.
8         MR. SMITH: I can show you. Just
9    give me a second.
10        THE COURT: If that's what it sounded
11   like, I don't think that's what I intended. I
12   think my intention was to just strike the
13   43 percent.
14        MR. SMITH: Well, let me get --
15        THE COURT: And I think I
16   specifically said that at least twice.
17        MR. SMITH: No. I don't think you
18   did, Your Honor.
19        MS. O'DELL: You did, Your Honor. We
20   were very focused on that obviously because this
21   is important from our perspective. You said --
22        THE COURT: You wanted to say 43
23   percent increase, and I said no, you can't do
24   that. That's a statistic that you need a
25   statistician for. Your expert can rely on

1    hearsay and on opinions not seen by the jury,
2    but not when you come down to a specific
3    mathematical calculation that hasn't been
4    explained by anyone except the statistician who
5    wasn't called.
6         MS. O'DELL: Yes, sir.
7         MR. SMITH: Judge --
8         MS. O'DELL: We understand that that
9    was your ruling, Your Honor, and that all of her
10   other opinions remained.
11        THE COURT: Yes.
12        Let me find out from Mr. Smith why.
13        MR. SMITH: I'm not attacking -- I'm
14   not moving for any of her other opinions other
15   than, if you recall, there were two opinions.
16   There was one relating to how the confidence
17   intervals and the relative risks were calculated
18   for the ten studies. Remember she had them on a
19   chart up there?
20        THE COURT: Uh-huh.
21        MR. SMITH: And I showed you the
22   testimony where she said: You'll have to ask
23   Jane Hall. And then she took calculations from
24   those calculations and did the 44 percent
25   calculation.

(Jury Trial - Afternoon Session) - September 13, 2021
Kleiner v. Johnson & Johnson

1  I moved to strike both the ten study
2  calculations and the 44 percent for the same
3  reason. She couldn't explain how any of those
4  calculations were derived because they were Jane
5  Hall's calculations. That's all I'm asking.
6  And that's what you ruled upon. So you're only
7  focused on one of those documents.
8      THE COURT: Yeah. But you don't say
9  that.
10     MR. SMITH: No. But I do say it.
11 And what I'm looking for is the exhibit that I
12 used to show you --
13     THE COURT: Well, just give me the
14 notes of testimony. Just show me in the notes
15 of testimony.
16     MR. SMITH: Can we do it in the
17 morning because I left it back at the hotel?
18     THE COURT: Yeah.
19     MR. SMITH: Okay.
20     THE COURT: Of course, that means
21 we'll have to start this over again because I
22 won't remember tomorrow where we left off. Then
23 again, I might. Who knows. We'll see.
24     MR. SMITH: I'll bring it tomorrow
25 and show you the notes of testimony, Judge.

1      THE COURT: Okay.
2      MR. SMITH: Because I got them all
3  highlighted.
4      MR. SCHOENHAUS: We have it.
5      THE COURT: Anything else we can do
6  today?
7      MR. SMITH: I don't think so. Do you
8  want to talk scheduling just to get a preview of
9  what we think is coming, or is that not --
10     THE COURT: No. Go ahead. You have
11 this witness, and then what else?
12     MR. SMITH: Yeah. So tomorrow, we
13 think we'll have this witness off the stand in
14 less than an hour tomorrow morning. I don't
15 know how long his cross is going to be. We'll
16 have Diette waiting outside. We'll finish him
17 up. I think direct should be somewhere around
18 an hour and a half. We'll pass him for cross.
19 And that will only leave us one more witness to
20 call, which is Dr. Boyd. I'll have him waiting
21 outside. If we get to him, that will be awfully
22 optimistic. But I'll have him here. If not,
23 assuming we finish Diette tomorrow, we could
24 start with him first thing on Wednesday morning.
25 I think the direct will be somewhere around two

1  and a half to three hours. I don't know,
2  though. I'm going to try to cut it back. But
3  it's possible that we can finish on Wednesday.
4  And I didn't know if you wanted to -- maybe the
5  jury just can't stay past 4:30; and if that's
6  the case, I get it, and I'm not asking. But if
7  you give gave them a little notice, if we wanted
8  to try to finish on Wednesday to see if they
9  plan to go a little bit later and we all hustled
10 to try to get done, I think it's doable. But
11 obviously things change quickly in our business,
12 and you know that better than anybody. But
13 that's our plan. And we got a little bit, like
14 five minutes worth of testimony that you let in
15 on Dr. Hopkins, the guy from the UK. And that's
16 it. We rest.
17     THE COURT: And then is there going
18 to be some kind of rebuttal?
19     MS. O'DELL: Your Honor, we're still
20 considering that. After today we're still
21 Dr. Sanchez's sort of expansive testimony beyond
22 what we had expected, we need to give that some
23 thought.
24     THE COURT: Okay.
25     MR. SMITH: So that's the plan.

1      THE COURT: And we're off on
2  Thursday.
3      MR. SMITH: Yeah.
4      THE COURT: That brings us to Friday.
5      MR. SMITH: Yeah. And one of the
6  things we talked about -- and I just don't know
7  if it's doable, and I'm not being disrespectful
8  of Thursday, and I disclosed my own situation --
9  but I don't know if it's possible if some of the
10 members of the respective team could meet with
11 you on Thursday for a charging conference. And
12 even if we finished with Dr. Boyd on Friday
13 morning, we could go right into closings on
14 Friday.
15     MS. O'DELL: Your Honor, we would not
16 be in a position to do that.
17     THE COURT: Well, what would be
18 helpful would be if you have proposed points for
19 charge. The sooner you submit them, I could
20 start looking over them. And I assume you've
21 already compared them to see if you can reach
22 agreement.
23     MR. SCHOENHAUS: Right. So the
24 original charge that we proposed to start the
25 case, we are working on revising.

(Jury Trial - Afternoon Session) - September 13, 2021
Kleiner v. Johnson & Johnson

- KLEINER -vs- JOHNSON & JOHNSON -                    Page 149

1  **THE COURT:** That's kind of an Amish
2  look.  Have you seen yourself in the mirror
3  lately?
4  (Laughter.)
5  **MR. SCHOENHAUS:** What about that?
6  **THE COURT:** No.  No.  That's Amish.
7  That's a Band-Aid.
8  **MR. SCHOENHAUS:** Can I go with the
9  transparent one?
10  **THE COURT:** Go ahead.
11  **MR. SCHOENHAUS:** The original
12  proposal we made, we are in the process of
13  revising because we are going to voluntary
14  nonsuit some of our claims.
15  **THE COURT:** Okay.
16  **MR. SCHOENHAUS:** And we have not
17  gotten that new proposed charge to the defense.
18  We intend to do that, I believe, tomorrow.
19  **THE COURT:** Well, I'm not putting you
20  under the gun.  I'm just saying that if you want
21  to make progress, letting me look them over
22  ahead of time, especially if you put on some
23  more boring witnesses who only speak in jargon.
24  I know it was her first time in court, but she
25  said some -- some things that were just

- KLEINER -vs- JOHNSON & JOHNSON -                    Page 150

1  indecipherable.
2  But it will give me something to do
3  up here, you know, read the proposed points for
4  charge.  All right.
5  **MR. SCHOENHAUS:** That makes good
6  sense.  We'll get that in your hands and defense
7  counsels' hands I believe for tomorrow.
8  As to Mr. Smith's proposal, while we
9  would be very optimistic to do that, too,
10  unfortunately, Ms. Winkler and myself are
11  observant on Thursday, and that boxes us out all
12  day.  And obviously, we are the PA attorneys and
13  we're dealing with PA law here on the charge.
14  **THE COURT:** Okay.
15  **MR. SCHOENHAUS:** So we don't want to
16  handicap our Alabama colleagues.  So that's just
17  unworkable as a suggestion, unfortunately.
18  **THE COURT:** Okay.  That's fine.
19  **MR. SMITH:** So, Judge, we also, and
20  maybe it sounds like Friday will be the day for
21  this, but we've got the 230.1 motion, too, that
22  we wanted to get some time with you on.  We made
23  the motion.  We filed a brief.  I don't know if
24  you had a chance to read it.  We served the
25  other side.

- KLEINER -vs- JOHNSON & JOHNSON -                    Page 151

1  **THE COURT:** What's the 230.1 motion?
2  **MR. SMITH:** It's the compulsory
3  nonsuit.  We want to make some arguments that
4  certain claims --
5  **THE COURT:** First it was DV.  Now
6  it's code sections.  Okay.
7  **MR. SMITH:** I got this one right this
8  time, so.
9  (Laughter.)
10  **MR. SMITH:** Anyway.  So I take it on
11  Friday we will not close, is that -- is that --
12  **THE COURT:** I don't know.  I don't
13  know what we're going to do.  But it sounds like
14  probably not.
15  **MR. SMITH:** Okay.
16  **THE COURT:** It sounds like it would
17  be Tuesday for closings.
18  **MR. SMITH:** Okay.  Well, maybe things
19  will move more quickly, and that possibility
20  will --
21  **THE COURT:** And remember, Wednesday
22  one of the jurors has a wedding.
23  **MR. SMITH:** Right.
24  **MR. SCHOENHAUS:** Right.  Next
25  Wednesday.

- KLEINER -vs- JOHNSON & JOHNSON -                    Page 152

1  **THE COURT:** Unless you want to get
2  rid of that juror.  I mean, somebody who cannot
3  participate in deliberations, maybe you want to
4  just excuse her before the jury goes out to
5  deliberate, and then they can deliberate on
6  Wednesday.  Just something to think about.
7  Okay.
8  **MR. SCHOENHAUS:** Cross that bridge.
9  **THE COURT:** No.  We're crossing that
10  bridge before the jury goes out to deliberate.
11  **MR. SCHOENHAUS:** Yeah.
12  **THE COURT:** Yes.  Okay.
13  **MR. SMITH:** Understood.
14  **THE COURT:** All right.  We'll see you
15  tomorrow.
16  **MS. O'DELL:** Judge --
17  **THE COURT:** Oh.
18  **MS. O'DELL:** -- just in case, we were
19  able to find the transcript on
20  Dr. Smith-Bindman, just to back up, see if we
21  could get that done.  And on August the 30th,
22  the Court addressed the motion.  And on page 155
23  of the transcript, you say: "I'm not going to
24  strike her testimony.  She has a reasonable
25  basis for her other conclusions that she stated

(Jury Trial - Afternoon Session - September 13, 2021
Kleiner v. Johnson & Johnson

- KLEINER -vs- JOHNSON & JOHNSON -                          Page 153

1   to the jury.  She can say that there's an
2   increased likelihood based on those studies, but
3   no numbers.  No 43 percent.  Nothing that was
4   derived from Jane Hall."
5         And I think that's the ruling that
6   Your Honor was remembering, and we think our
7   order reflects Your Honor's ruling and --
8         THE COURT: Okay.  So it wasn't just
9   the 43 percent.  "No numbers" is what I said.
10        MS. O'DELL: That's right.  And I
11  think that -- I think that our order reflects
12  that ruling.
13        THE COURT: Well, I'll give you a
14  chance.  You wanted to go through the
15  transcripts.
16        MR. SMITH: Yeah.  I'm not sure we're
17  that far apart.  But I want to show you what
18  that means and tie it to why I think the
19  language in my order is appropriate.  And I'll
20  bring my stuff tomorrow and be ready to explain
21  to you why.
22        THE COURT: Okay.  See you tomorrow.
23                - - -
24        (Court adjourned at 4:42 p.m.)
25                - - -

                                                          Page 154

1   C E R T I F I C A T I O N
2
3         I hereby certify that the proceedings
4   and evidence are contained fully and accurately
5   in the stenographic notes taken by me on the
6   trial of the above cause, and that this copy is
7   a correct transcript of the same.
8         I further certify that I am not a
9   relative or employee of any attorney or counsel
10  employed in this case.
11
12
13        _____
14        John J. Kurz, RMR, CRR, CRC
15        Registered Merit Reporter
16        Certified Realtime Reporter
17        Certified Realtime Captioner
18        Official Court Reporter
19
20        (The foregoing Certification of this
21  transcript does not apply to any reproduction of
22  the same by any means unless under the direct
23  control and/or supervision of the certifying
24  reporter.)
25

**$**

**$550 (1)**
126:16

**[**

**[reading] (1)**
39:22
**[sic] (2)**
26:3;97:18

**A**

**able (18)**
22:12;26:2,19;32:1;
34:6;35:2;50:10;57:6;
62:8;66:24;67:1;
69:25;75:15;90:25;
95:21;139:12;140:2;
152:19
**above (3)**
29:10;38:18;154:6
**absence (1)**
56:18
**absolutely (2)**
11:3;62:1
**abstract (1)**
33:1
**Academies (4)**
49:24;50:6;51:1;
79:14
**Academy (1)**
49:19
**accept (2)**
123:16;126:8
**accepted (4)**
110:23;123:12;
125:25;133:21
**accepting (2)**
108:12;126:7
**accepts (1)**
123:7
**According (2)**
37:23;38:9
**accreditation (2)**
117:6,8
**accreditations (5)**
116:25;117:2,4,9;
125:5
**accredited (1)**
117:7
**accrediting (1)**
124:15
**Accumulate (1)**
35:1
**accumulated (6)**
13:20;26:2,11,18;
31:25;34:25
**accurate (1)**
129:10
**accurately (2)**

107:3;154:4
**acknowledge (1)**
95:18
**across (1)**
112:3
**acting (1)**
61:1
**actual (1)**
22:4
**actually (26)**
14:19;15:3;20:25;
24:9;38:4;43:2;49:6;
55:11;58:2;62:10;
64:21,25;82:9;90:19;
109:20;111:15;
113:12;115:1;118:20;
122:5;125:3;128:16,
18;129:15;130:3;
139:2
**ad (1)**
56:14
**add (1)**
9:7
**added (2)**
8:13,15
**adding (1)**
9:13
**Additional (4)**
58:14,19;134:25;
135:9
**address (4)**
21:7;89:20;132:25;
139:23
**addressed (1)**
152:22
**addressing (2)**
9:9;40:25
**adjourned (1)**
153:24
**admit (1)**
53:14
**advanced (1)**
115:9
**advancement (1)**
112:19
**advancing (1)**
38:18
**advantage (5)**
18:14,14;23:22;
24:11,15
**advantages (1)**
23:18
**advisor (1)**
114:25
**affect (1)**
71:11
**affects (1)**
12:1
**affiliation (1)**
72:23
**affirm (1)**
101:18
**afraid (1)**

131:3
**Afternoon (13)**
6:4,13,15;7:7,8,17,
18;18:10;83:4;102:13,
14;130:21,22
**again (37)**
14:25;15:6;24:20,
23,23;25:2,3;2:6;33:13,
15;46:15;53:13,16;
63:4;65:11;70:2;
72:21;73:9,11,13;
79:10;81:4,5;103:16;
104:17;107:12;112:18,
23;121:14;122:7;
123:10;124:14;125:8;
128:15;129:18;133:6;
145:21,23
**against (1)**
49:14
**agencies (1)**
118:5
**agents (2)**
86:6,22
**aggregate (1)**
68:9
**aggregates (3)**
64:9,10;68:1
**ago (7)**
34:14;38:2;111:10,
11;112:17;119:24;
139:25
**agree (31)**
14:19;19:1;28:15,
24,25;31:12,22;34:7;
38:20;41:3,9;42:15,20;
47:14;48:22;52:21;
53:6,12;54:5,7;55:10,
21;57:2,14,21;60:24;
69:12;81:25;89:21;
136:19;138:5
**agreed (4)**
115:17;126:5;
137:17;138:21
**agreement (2)**
136:25;148:22
**Ah (1)**
133:19
**ahead (9)**
14:3;23:11;59:20;
90:12;136:14;142:7;
146:10;149:10,22
**air (3)**
112:5,9;116:8
**Alabama (1)**
150:16
**allegations (1)**
126:3
**allowed (3)**
18:24;106:4;108:10
**almost (1)**
60:12
**alternative (2)**
137:20;138:16

**Although (3)**
25:24;53:4,23
**altogether (1)**
40:21
**always (1)**
136:12
**amend (1)**
98:22
**America (6)**
112:15;113:4,16;
114:1,3,7
**American (9)**
13:23;37:18;38:5,
15,21,24;39:20;111:4;
117:4
**Amish (2)**
149:1,6
**among (1)**
39:20
**amount (1)**
13:19
**analogy (1)**
132:13
**analyses (3)**
105:13;117:6;
123:24
**analysis (7)**
16:6;22:3,4;29:25;
81:14;116:9;118:16
**analytical (3)**
107:23;119:8,18
**analyze (2)**
119:21;120:5
**and/or (1)**
154:23
**Angeles (1)**
51:19
**anniversary (1)**
116:15
**anonymously (1)**
113:12
**answered (2)**
24:24;66:3
**anticipate (1)**
136:10
**apart (1)**
153:17
**apologies (1)**
85:25
**apologize (1)**
95:11
**appear (1)**
121:24
**appeared (1)**
28:20
**appears (1)**
91:18
**application (2)**
56:7;111:16
**applied (2)**
44:20;72:10
**apply (2)**
115:1;154:21

**applying (2)**
26:12;110:16
**appointment (1)**
72:25
**approach (1)**
27:2
**approached (3)**
27:5;73:25;74:4
**approaching (1)**
76:14
**appropriate (5)**
20:6;21:7;114:6;
138:8;153:19
**area (18)**
18:20;27:15;30:2;
32:21;36:9;71:21;
72:1,18;81:1,16;
110:14;113:20;116:3;
117:3;130:15;131:13;
134:4,7
**areas (5)**
103:12;104:18;
113:10;115:12;116:21
**arguing (4)**
14:9,11;23:9;73:9
**argument (1)**
33:21
**argumentative (3)**
18:25;23:3;36:25
**arguments (1)**
151:3
**arise (1)**
45:10
**arisen (1)**
56:18
**around (4)**
80:8;117:12;146:17,
25
**arrives (1)**
122:8
**art (1)**
10:25
**article (3)**
40:17,18;82:9
**articles (2)**
42:3;78:21
**artifact (2)**
62:13;63:21
**asbestiform (22)**
89:10;92:13,19;
94:9;97:5,11,17;99:7;
102:24;105:2,5,9;
107:17;109:2,7;112:6,
8;122:1;124:1;130:7,
12;133:11
**asbestos (7)**
53:1,19;92:1,22;
93:7;95:24;96:5
**ascend (1)**
42:21;45:15
**ascended (2)**
41:6;42:16
**ascending (2)**

46:2,22
**ascension (1)**
  45:22
**ASCO (2)**
  37:22;42:11
**asserts (1)**
  77:11
**assessment (1)**
  65:24
**assignments (1)**
  126:7
**assist (2)**
  105:19,23
**associated (11)**
  21:1,6;37:15;46:24;
  53:3,21;55:1,19;62:6;
  68:2;122:13
**Association (7)**
  27:15;28:21;30:1;
  33:2;79:24,25;117:5
**assume (4)**
  8:11;26:11;30:12;
  148:20
**assuming (1)**
  146:23
**ASTM (3)**
  111:5,23;112:4
**atomic (1)**
  24:10
**attached (1)**
  24:9
**attacking (1)**
  144:13
**attempt (1)**
  33:17
**attempted (1)**
  139:2
**attending (2)**
  108:18;114:3
**attention (2)**
  53:15;103:13
**attorney (1)**
  154:9
**attorneys (3)**
  9:18;74:3;150:12
**attributes (2)**
  123:15;125:24
**audit (3)**
  124:12;125:3,11
**audits (6)**
  124:4,8,14,21,24;
  125:4
**August (1)**
  152:21
**authoritative (1)**
  47:14
**authors (5)**
  27:13;35:20;79:7;
  80:23;81:13
**award (1)**
  72:20
**aware (9)**
  36:5;63:24;70:17,

21,22;71:7,9;72:1;
  104:25
**away (1)**
  95:9;126:13
**awfully (1)**
  146:21

**B**

**baby (6)**
  56:3,19,23;61:11;
  69:15;70:20
**bachelor's (2)**
  107:13;109:12
**back (18)**
  6:10;8:22;35:10;
  52:15;59:1;62:2;
  90:10,20,21,25;100:3;
  110:23;127:3,15;
  134:13;145:17;147:2;
  152:20
**background (2)**
  107:4;110:21
**bacteria (1)**
  45:15
**Bacterial (1)**
  45:14
**balance (1)**
  34:18
**balanced (1)**
  36:17
**Band-Aid (1)**
  149:7
**base (1)**
  126:22
**based (8)**
  22:22;44:22,23;
  94:20;126:23;129:12;
  130:4;153:2
**basic (2)**
  64:17;65:4
**basically (1)**
  36:16;48:6;82:6,8
**basing (1)**
  21:13
**basis (5)**
  63:9;67:1;70:13;
  125:12;152:25
**beach (1)**
  132:6
**beat (1)**
  14:14
**became (2)**
  114:9;125:19
**become (2)**
  125:15,16
**began (1)**
  125:13
**begin (2)**
  20:12;126:5
**begins (1)**
  24:22
**behalf (4)**

70:9,11;117:21;
  118:24
**behind (5)**
  26:6;35:3;127:16,
  24;128:17
**bell (1)**
  39:16
**below (1)**
  81:17
**benefits (1)**
  40:3
**best (8)**
  20:24;23:1,25;
  24:15,19;25:13,14;
  115:3
**better (3)**
  9:6;84:18;147:12
**beyond (3)**
  48:9,9;147:21
**bias (1)**
  34:3
**big (2)**
  38:12;130:1
**bigger (1)**
  133:14
**biggest (1)**
  32:7
**bill (1)**
  126:23
**billable (2)**
  126:16,24
**biostatistics (1)**
  51:18
**birefringent (3)**
  78:6,10,18
**birthday (1)**
  112:17
**bit (5)**
  14:3;20:9;54:13;
  147:9,13
**Blaustein's (1)**
  47:3
**block (5)**
  17:19;18:16,18,21;
  19:16
**blocking (2)**
  49:5,15
**blocks (23)**
  16:19,21,25;17:3,6,
  7,9,12,14,23,24;18:3,
  11;19:12,19,20,22;
  20:20;25:9;62:18;
  63:1,9;77:18
**blood (2)**
  80:16,17
**blow (1)**
  29:19
**blue (1)**
  13:23
**Board (1)**
  50:24
**body (27)**
  21:1,6;45:4;46:24;

55:1,4,19;58:13,13,22;
  59:4,7,7,21;60:9,25;
  61:6;62:6,12;63:21;
  64:15;67:20;68:2,5;
  70:1;80:9;124:15
**bone (1)**
  80:16
**bonus (1)**
  126:23
**book (1)**
  138:14
**books (1)**
  13:23
**border (1)**
  23:5
**boring (1)**
  149:23
**Both (10)**
  54:1;98:15;108:2;
  112:10;137:15;138:7,
  11,15;139:16;145:1
**bottle (1)**
  61:11
**bottom (3)**
  28:19;29:20;30:7
**bounds (1)**
  37:10
**boxes (1)**
  150:11
**Boyd (2)**
  146:20;148:12
**break (5)**
  59:7;83:4;86:2;
  104:13;134:5
**breath (1)**
  23:10
**breeze (1)**
  32:9
**bridge (3)**
  116:10;152:8,10
**brief (2)**
  85:12;150:23
**briefly (2)**
  109:16;115:8
**bring (9)**
  44:8;76:10,15;
  90:25;98:6;100:3;
  110:5;145:24;153:20
**brings (1)**
  148:4
**broad (3)**
  103:9;139:23;142:6
**broader (1)**
  113:24
**broken (1)**
  104:8
**brought (5)**
  72:5;92:23;98:7,10;
  126:3
**buffet (1)**
  33:20
**buildings (1)**
  116:18

**bumping (1)**
  65:16
**business (2)**
  115:25;147:11
**buy (1)**
  111:12

**C**

**calculated (1)**
  144:17
**calculation (5)**
  142:19;143:1,4;
  144:3,25
**calculations (6)**
  143:5;144:23,24;
  145:2,4,5
**California (1)**
  51:19
**call (8)**
  97:13;100:25;
  110:12,17;134:12;
  136:11;142:21;146:20
**called (5)**
  68:22;102:20;108:5;
  110:8;144:5
**calling (1)**
  89:4;136:20
**calls (3)**
  53:9;66:10;70:25
**came (9)**
  11:22;24:20;56:24;
  87:12;92:20;94:5;
  97:3;114:22;129:25
**Can (79)**
  7:2;10:10;17:19;
  22:22;23:19;24:9,15,
  16;25:11;26:23;27:11;
  29:8;31:22;32:25;
  39:3;42:21;44:11,20;
  46:12,13;50:22;53:1,
  19;57:2,10;58:9;
  59:24;61:19,24;64:5;
  65:11,13,19,25;67:23;
  73:16;75:12,14;80:7;
  82:4,25;86:3,8;88:7,
  11;90:7;92:12,15;
  94:15,16;95:17;96:21;
  100:2,4;101:5;103:6;
  104:13,14;106:24;
  107:6;109:19,22;
  112:8,25;115:8;
  135:24;136:7,9;
  139:23;142:5;143:8,
  25;145:16;146:5;
  147:3;148:21;149:8;
  152:5;153:1
**cancer (51)**
  12:11,16;13:1,24;
  14:1;15:13,16,24;26:1;
  27:16,25;29:6;30:2;
  32:2,22;33:3;34:12;
  35:19;36:12;37:15;

38:4,19;39:1,13,23,25;
40:2,19,24;41:9,18;
42:19;43:11;44:24,25;
48:24;49:14;50:24;
51:10,20,24;53:4,22;
70:8,20;71:18;72:14,
22;77:13;81:2,16
**cancerous (2)**
97:17;99:7
**cancers (3)**
17:18;49:22;50:5
**capable (2)**
62:5;120:2
**Captioner (1)**
154:17
**carcinogen (2)**
89:9;97:7
**carcinogenesis (1)**
49:11
**carcinogenic (3)**
48:2,10;49:6
**carcinogens (4)**
45:23,25;46:13;
47:22
**carcinoma (2)**
12:14;13:21
**care (3)**
38:18;49:23;50:6
**career (4)**
22:16;65:9;114:15;
115:9
**careful (1)**
42:4
**carry (1)**
59:25
**case (22)**
7:25;14:1;16:17;
44:21;55:25;61:15;
69:22;70:1,2;74:8;
91:23;96:8;98:22;
104:21;105:2;128:23;
134:16,19;147:6;
148:25;152:18;154:10
**case-control (1)**
35:14
**cases (3)**
74:1,17;116:11
**casual (1)**
93:21
**category (1)**
30:17
**causation (1)**
20:8
**causative (1)**
36:14
**cause (8)**
36:11,15;53:1,20;
58:10;68:16;116:12;
154:6
**causes (2)**
44:2;70:20
**causing (3)**
34:11;46:21,22

**cavity (1)**
47:22
**CDC (2)**
51:7;118:13
**cell (18)**
20:25;21:6;22:5,7,9,
13;23:19,23;25:16,17;
58:8;65:22,23;66:21,
25;67:6,21;69:21
**cells (12)**
21:4;22:1,4,5,17;
23:25;24:18,19;25:8,
13;64:22;68:3
**cellular (3)**
49:7,8,10
**Center (1)**
116:17
**Centers (1)**
51:5
**certain (13)**
22:8;34:16;103:17;
104:11,12;111:15,16;
115:12;117:6,17,17,
19;151:4
**certainly (12)**
11:25;13:12;17:10;
19:20;41:17;65:7;
66:24;71:25;74:10;
96:3,5;98:3
**Certification (1)**
154:20
**Certified (2)**
154:16,17
**certify (2)**
154:3,8
**certifying (1)**
154:23
**chair (2)**
51:15,17
**chance (3)**
134:20;150:24;
153:14
**change (8)**
8:24,25;9:2,10;
73:17;78:23;134:24;
147:11
**changed (3)**
42:24;73:12,16
**changing (1)**
9:13
**channel (1)**
134:24
**Chapel (1)**
51:19
**chapters (1)**
9:1
**characterization (3)**
107:21;109:2;116:8
**charge (6)**
126:12;148:19,24;
149:17;150:4,13
**charges (1)**
126:15

**charging (1)**
148:11
**chart (1)**
144:19
**checking (1)**
106:17
**chemically (2)**
53:1,19
**cherry-pick (2)**
33:19;34:6
**cherry-picked (1)**
34:13
**Chevy (7)**
132:6,7,7,8,9,10,22
**childbirth (1)**
41:22
**China (1)**
128:9
**chose (2)**
63:2;110:22
**chronic (1)**
69:24
**circling (1)**
127:3
**citation (1)**
41:25
**cite (2)**
26:14;33:16
**cited (3)**
32:12;36:3;54:1
**citing (4)**
26:17;33:16;34:3;
53:25
**claimed (1)**
104:21
**claiming (2)**
52:5;131:19
**claims (2)**
149:14;151:4
**clarify (1)**
130:14
**Class (1)**
97:6
**classified (2)**
86:7,22
**clear (5)**
14:4;42:9;51:9;63:4;
99:24
**CLERK (15)**
6:10,16,22;83:14;
85:2,19;91:2,11;
100:10,19;101:16,22;
102:6;135:14;136:22
**clerk's (1)**
139:4
**client (3)**
108:16;117:21;
124:15
**clients (3)**
111:23;117:20;
125:9
**climbing (1)**
128:18

**Clinical (7)**
37:19;38:5,15,17,21,
24;39:20
**close (3)**
69:5;116:18;151:11
**closely (1)**
138:17
**closing (1)**
99:4
**closings (2)**
148:13;151:17
**clump (1)**
64:13
**clumps (7)**
62:3,5,9;63:11,14,
20;64:10
**coal (1)**
116:5
**code (1)**
151:6
**codirector (1)**
72:14
**cognizant (1)**
36:9
**cohort (3)**
35:15;79:8;82:13
**collapsed (1)**
116:10
**colleague (1)**
20:14
**colleagues (2)**
19:21;150:16
**color (1)**
104:11
**colored (1)**
104:3
**column (2)**
29:9;39:21
**combined (2)**
32:15;35:14
**comic (1)**
60:19
**coming (2)**
135:4;146:9
**comment (1)**
37:7
**comments (4)**
33:20;36:24;76:23;
96:7
**committee (3)**
50:23;51:9,23
**committees (1)**
112:6
**common (3)**
17:15;62:11,11
**companies (1)**
125:2
**company (11)**
15:25;108:5,9;
111:12,13;115:2,17;
116:2,7,21;126:15
**comparable (1)**
112:1

**compared (1)**
148:21
**compensated (1)**
126:9
**compensation (1)**
126:20
**complete (1)**
18:24
**completed (3)**
108:4;109:14;
114:12
**completely (4)**
12:20;13:9;42:12;
70:15
**complicated (4)**
41:11;49:12,17;
62:22
**complies (5)**
106:25;118:1;119:4;
127:9;129:6
**composed (1)**
104:7
**composition (1)**
24:10
**compulsory (1)**
151:2
**computer (1)**
21:11
**concept (1)**
127:3
**concern (2)**
140:1,9
**concerned (1)**
113:22
**concerns (1)**
124:16
**concise (1)**
42:9
**conclude (1)**
13:2
**concluded (1)**
90:14
**concludes (1)**
39:21
**conclusions (2)**
125:23;152:25
**conclusive (2)**
41:18,20
**conditions (2)**
41:4;121:22
**conducted (1)**
12:4
**conference (1)**
148:11
**conferences (2)**
109:9;112:25
**confidence (1)**
144:16
**confine (1)**
40:12
**confirm (1)**
65:21
**conflicts (1)**

111:2
confused (1)
48:4
connection (1)
136:16
cons (1)
33:17
conscience (1)
20:5
consider (2)
81:18;131:11
considered (1)
19:17
considering (1)
147:20
consistent (1)
94:7
consult (1)
20:4
contacting (1)
47:23
contained (1)
154:4
contaminant (4)
20:10;55:21;62:14;
63:22
contamination (5)
54:18,23,24;55:5,6
contents (3)
52:9;94:4,5
context (3)
39:23;40:1;120:12
continue (1)
124:21
contracting (1)
118:22
Control (4)
51:5;77:16;121:23;
154:23
controls (1)
56:21
convey (1)
122:5
conveys (1)
122:14
convinced (2)
25:14,15
coordinates (1)
17:21
copy (10)
52:16;76:10,15,18;
81:11;82:17;106:3;
137:3,4;154:6
cord (1)
131:2
corners (1)
90:10
corrective (1)
140:12
correctly (1)
84:17
correlation (1)
63:5

corroborate (1)
18:7
Counsel (14)
27:5;36:24;40:6;
76:10;83:25;84:1,3;
95:17;96:6;106:4;
134:1;137:4;138:1;
154:9
counsels' (1)
150:7
country (2)
51:13;117:12
couple (7)
60:10;61:22;73:22;
80:3,4;101:13;142:16
course (10)
10:25;11:7,18;13:7;
35:12;36:4;39:19;
58:6;107:7;145:20
coursework (2)
107:19,20
Court (199)
6:10,13,15,23;7:3;
12:23;14:8,10,14,20,
24;15:5;19:3,7;23:4,8;
24:21;25:1,4;27:4;
28:6;37:1,6;40:9,12;
52:11;53:10;54:21;
63:25;64:3;70:7;71:6,
10,14;73:8,15,20;
74:14,24;75:2,4,6,7,10,
14,21;76:19;82:4,22,
24;83:2,9,11,13,23,25;
84:6,13,19,22;85:9,14,
18;86:10,16,24;87:3,5,
11,15,21;88:3,7,14,18,
21,24;89:3,17;90:2,9,
12,17,19,24;91:1,9,12;
92:2,5,23,24;93:2,6,14,
18;94:19;95:1,7;96:18,
24;97:25;98:5;99:12,
15,21,25;100:17,20;
101:3;106:12,17,21;
130:16,24;132:4,15,
20;133:2,6,12,19,21,
25;134:6,10;135:12,
12,21,23;136:2,6,14,
20;137:5,6;138:2,11,
19;139:7,14,19;140:6,
11,16,19;141:2,9,13,
17,20,25;142:7,10,15,
25;143:3,7,10,15,22;
144:11,20;145:8,13,
18,20;146:1,5,10;
147:17,24;148:1,4,17;
149:1,6,10,15,19,24;
150:14,18;151:1,5,12,
16,21;152:1,9,12,14,
17,22;153:8,13,22,24;
154:18
courtroom (8)
6:20;83:18;85:6;
91:6;100:14;135:1,3,

18
Court's (1)
138:18
cover (2)
50:22;100:2
covers (1)
96:3
CRC (1)
154:14
C-reactive (1)
79:23
create (2)
112:2;120:19
created (1)
89:12
critical (2)
39:24;130:2
criticism (2)
77:21,25
criticisms (1)
8:16
criticize (2)
8:20;76:22
criticizing (2)
9:5;96:12
critique (1)
77:21
cross (3)
146:15,18;152:8
cross-examination (6)
6:25;7:14;37:4,11;
130:18;135:6
cross-examining (1)
28:4
crossing (1)
152:9
CRR (1)
154:14
crush (1)
120:25
crushed (2)
120:19;128:20
crystal (1)
104:9
crystallize (1)
122:3
crystallized (1)
121:18
crystals (3)
104:3,4;121:5
culture (1)
58:8
cumulative (3)
33:18;35:1,5
curative (6)
138:4,5,9,16;140:13;
141:13
curious (2)
8:10,18
currently (1)
37:21
Curriculum (1)
110:21

cut (2)
19:4;147:2

D

daily (1)
140:21
damage (1)
58:9
damages (2)
58:3,4
darker (1)
127:21
darn (1)
66:15
data (14)
16:12;26:2,11,13,18;
31:25;34:25;35:6;
42:6;49:3,4;58:8;
120:1,3
database (2)
116:23;118:19
date (1)
110:6
dated (3)
76:12;88:25;95:14
David (2)
7:19;130:23
day (6)
84:17;134:12;
135:10;136:11;150:12,
20
days (3)
57:15,23;59:23
deal (1)
119:11
dealing (9)
107:17;108:13;
109:6;112:6,7;114:19;
137:16,18;150:13
deals (6)
47:17;107:21;111:8;
112:5;116:3;121:17
dealt (2)
123:20;124:10
dean (2)
51:13;70:18
DEARING (67)
7:1,4,16,19;13:4;
14:8,9,13,18,23;15:2,8,
9;19:1,6,10,11;23:7,
12;24:25;25:3,6;27:2,
8,11,18;28:4,8;37:5,
12,13;39:15;40:10,14;
43:8;50:13;52:8,13;
53:11;55:8;64:1,4;
67:3;71:2;72:3;73:12,
18,21;78:2,21;79:1,19;
82:23;106:7;130:14,
20,23;131:1,4,25;
132:16,24
decades (1)

40:25
decide (5)
9:3,6;23:1;137:2;
138:9
decided (1)
9:16
dedicated (1)
38:16
deep (1)
23:10
defendant (1)
138:19
defendants (4)
95:22;100:24;
105:20;130:10
Defendants' (2)
76:9;106:2;119:3;
141:6
defending (1)
74:12,16
defense (7)
16:15;67:11;86:11;
91:16,18;95:4;116:22;
149:17;150:6
defense's (1)
100:21
deficiencies (3)
124:8,10,21
defies (1)
62:11
definite (1)
45:17
definitely (7)
12:25;13:3;34:6;
37:25;41:21;49:13;
63:8
definitive (2)
33:25;65:24
definitively (2)
65:1;78:3
degree (2)
107:14;108:4
degrees (3)
107:15;109:10,12
deliberate (4)
134:18;152:5,5,10
deliberations (1)
152:3
delivered (1)
95:9
Demetrius (1)
84:18
demise (1)
58:10
demonstrable (1)
36:11
demonstrate (1)
91:18
demonstrated (3)
27:23;35:13;48:25
Demonstrative (3)
89:6;98:14;99:5
denied (2)

138:21;139:17
**denying (2)**
137:12;138:20
**department (5)**
72:15,24;116:22;
117:10;118:21
**departments (1)**
117:17
**depending (2)**
111:17;117:2
**depends (1)**
131:9
**deposited (1)**
56:5
**deposition (1)**
7:22
**depositions (4)**
74:18,18;75:8,10
**derived (2)**
145:4;153:4
**describe (3)**
103:6;107:6;115:8
**described (3)**
17:8;94:20;114:2
**describing (4)**
121:25;122:2,10,11
**destroyed (1)**
58:23
**detail (4)**
22:6;81:5;91:25;
93:11
**detailed (1)**
94:3
**determination (1)**
67:2
**determine (5)**
21:5;22:12;55:16;
66:19;78:14
**determined (6)**
25:13;27:23;32:20;
35:12,16,21
**develop (1)**
81:16
**development (1)**
26:1
**devoted (1)**
112:17
**diagnosing (1)**
17:17
**diagnostic (1)**
11:5
**diagram (3)**
43:3,9;44:10
**dies (3)**
59:24;60:14;61:3;
80:12
**Diette (2)**
146:16,23
**difference (7)**
48:11;92:17;139:15
**differences (1)**
107:22
**different (26)**

8:11;54:12;63:7;
92:11;104:3,4;107:22,
24,25;108:1,10,18,22;
111:14,20,21,22,24,25;
112:7,9;115:6;116:24;
125:2;131:16,17
**difficult (3)**
65:11,13,19
**diffraction (2)**
119:14;123:21
**diffractive (1)**
24:8
**digested (1)**
69:25
**dimensions (1)**
21:20
**direct (10)**
28:9,11;54:14;59:2;
64:16;68:21;98:10;
146:17,25;154:22
**direction (4)**
83:13;91:1;135:13;
142:19
**director (1)**
72:9
**dirt (1)**
104:6
**disagree (13)**
12:20;13:9,15;
31:22;42:21,23;44:11;
47:19,24;54:5;57:12;
70:15;88:11
**disagreed (1)**
71:7
**disagreeing (1)**
96:6
**disclose (1)**
110:24
**disclosed (6)**
16:16;87:17,24;
96:1;98:4;148:8
**disclosure (2)**
99:19;111:2
**discuss (6)**
31:19;106:23;127:5;
134:16,17;136:9
**discussed (4)**
41:19;45:5;58:5;
123:10
**discussing (2)**
105:15;122:17
**discussion (2)**
85:21;90:14
**disease (4)**
41:5;45:16;46:23;
51:5
**display (2)**
29:18;106:5
**displaying (1)**
29:16
**dispute (1)**
9:25
**disrespectful (1)**

148:7
**dissertation (1)**
107:16
**dissertations (1)**
107:16
**dissolve (1)**
59:24
**distinction (1)**
109:4
**distribution (1)**
61:10
**District (1)**
6:9
**diverge (1)**
139:19
**doable (2)**
147:10;148:7
**docketed (1)**
139:12
**Doctor (9)**
7:17;15:10;18:11;
37:14;49:18;53:12;
54:11;80:3,21
**doctorate (2)**
107:9,15
**document (13)**
27:6;28:7;39:9;43:7;
50:8;52:4;76:16;
79:13;107:1;118:2;
119:5;127:10;129:7
**documents (6)**
15:23;16:4;78:23;
137:5;138:1;145:7
**done (14)**
20:12;24:19;36:14;
64:22;74:18;80:25;
82:24;115:13;116:6;
118:4,9;120:17;
147:10;152:21
**dose (1)**
68:17
**doubt (1)**
41:22
**down (13)**
52:24;59:7;65:3;
75:19;82:25;84:4;
93:17,19;104:8;
128:16;130:1;135:24;
144:2
**Dr (98)**
8:16,17,20;9:5,12,
23;10:7;16:11,14;17:6,
22;20:1;21:16;22:15;
23:13;24:20;25:7;
39:1;57:8;61:9,15,21;
62:15;65:8;66:6;69:7;
70:18;71:13,15;76:3,
11,23;77:8,22;78:3,6;
86:4,13;87:17,19,24;
88:12,22;89:4,8,10,13,
19;91:14,22;92:19,25;
93:4,10;94:2,4,7,11,
12;95:15;96:1,7,11;

97:1,2,3,7,9,18;98:9,
11,14,19;100:25;
102:13;104:21,23;
105:12,16,19;106:5,
10;107:3;114:25;
119:17;126:10;128:21,
22,25;130:10;136:18;
137:9;141:7;146:20;
147:15,21;148:12;
152:20
**dramatically (1)**
40:24
**drugs (1)**
110:3
**due (1)**
71:20
**dues (1)**
113:6
**duly (1)**
102:3
**during (2)**
86:2;89:12
**dust (1)**
112:10
**dusts (1)**
116:17
**DV (1)**
151:5
**DX-3136 (2)**
76:9,11
**DX-3137 (4)**
106:9;127:8,25;
129:5

**E**

**earlier (12)**
10:3;18:9;19:24;
41:15;44:1;67:7;
68:16;78:5;80:18;
102:18;113:8;123:10
**early (1)**
25:24
**Earth (2)**
103:10;113:20
**earthquakes (1)**
103:16
**easier (1)**
120:24
**easiest (1)**
121:5
**easily (1)**
57:10
**easy (1)**
65:4
**edit (1)**
8:25
**edited (1)**
8:23
**edition (1)**
47:9
**editorial (4)**
37:6;81:1,13,23

**education (4)**
38:17;107:11;130:4;
132:18
**educational (2)**
107:4;112:19
**effect (3)**
36:11,14;81:17
**effort (1)**
110:9
**egg (1)**
46:9
**either (10)**
29:8;40:19;44:24;
59:24;69:19,21;70:5;
88:1;124:16;134:25
**electron (18)**
10:17,20,24;11:15,
15,16;18:15;19:22;
21:9,19;22:16;24:7;
62:18;63:6;108:2;
119:15,16;123:22
**electronics (1)**
104:16
**elemental (1)**
64:18
**elevated (1)**
54:4
**ELMO (1)**
29:12
**else (7)**
25:5;63:16;93:8;
100:1;142:17;146:5,11
**EM (1)**
25:13
**emphasis (2)**
102:20;107:12
**employed (3)**
114:10;115:10;
154:10
**employee (2)**
126:18;154:9
**employer (1)**
89:1
**employment (1)**
108:3
**encounter (1)**
113:19
**encouraged (1)**
115:1
**end (5)**
33:23;37:3,11;
107:13;114:15
**endometriosis (5)**
44:3;45:8,13;46:18,
21
**ends (1)**
37:9
**energy (2)**
24:8;118:21
**Engineering (1)**
51:1
**engulf (4)**
57:7;61:19;62:8;

67:23
**engulfed (3)**
58:2,25;80:13
**engulfing (1)**
62:5
**enough (5)**
10:19;24:6;32:13;
37:1;67:23
**entered (1)**
6:19
**entering (1)**
47:22
**enters (3)**
6:17;85:3;100:11
**entire (1)**
19:16
**entirely (3)**
19:17;28:16;36:21
**entities (2)**
108:23;118:9
**entitled (5)**
29:25;38:24;49:22;
50:4;99:15
**enveloped (1)**
60:14
**environment (3)**
56:15;114:20;121:9
**environmental (4)**
45:23;47:21;117:8,
10
**environments (1)**
129:20
**EPA (1)**
118:13
**epidemiologic (1)**
35:22
**epidemiologist (2)**
31:18;36:5
**epidemiologists (1)**
81:18
**epidemiology (4)**
32:8;36:4,8;51:17
**epiphany (2)**
8:19;9:1
**epithelial (3)**
12:1;39:1,12
**epithelium (1)**
49:8
**equals (1)**
97:4
**equipment (2)**
11:2;124:20
**error (1)**
95:18
**especially (2)**
121:1;149:22
**essentially (1)**
17:2
**established (2)**
11:18;74:25
**establishes (1)**
20:8
**etiology (1)**

**even (17)**
10:19;11:21;17:23;
20:16,22;22:8;25:19;
38:1;46:6;56:23;59:3;
61:15,22;71:19;72:1;
134:16;148:12
**events (1)**
49:6
**everybody (4)**
7:2;50:21;84:10;
101:8
**everywhere (1)**
95:19
**evidence (12)**
25:21;33:25;34:11,
20;35:7;36:11;46:20;
52:4;81:2,20;135:4;
154:4
**evidencing (1)**
20:21
**Evolving (2)**
49:22;50:5
**exam (2)**
54:14;68:21
**examination (10)**
21:8;75:25;120:8,9,
11,16,21;121:11;
122:22;127:4
**examine (2)**
17:4;19:15
**examined (2)**
7:11;102:3
**examining (1)**
81:2
**example (4)**
8:12;43:12,14;111:9
**except (1)**
144:4
**exceptions (1)**
22:9
**excessive (1)**
49:9
**excision (1)**
43:14
**exclude (4)**
55:7;56:9,12,18
**excluded (1)**
140:3
**Excuse (9)**
14:8;24:21,21;73:8;
82:4;92:10;95:10;
99:23;152:4
**excused (3)**
83:2,6;135:24
**Exhibit (8)**
27:14;39:8,11;50:4;
76:11;89:12;106:9;
145:11
**exited (3)**
83:17;91:5;135:17
**exits (3)**
83:15;91:3;135:15

**expansive (1)**
147:21
**expect (5)**
64:7;65:8;66:5;
67:16;70:1
**expected (2)**
68:8;147:22
**experience (8)**
43:24;44:23;66:6,
12;115:6;125:9;130:5;
132:18
**expert (43)**
11:19,22;22:25,25;
71:17,25;72:2,18,23;
77:1,3,7,11,16;89:19,
20;90:1;91:15,23;
97:22;98:11;105:12;
106:13;108:13;
109:19;110:4,8,11,24;
123:18,24;125:14,17;
130:5,11;131:6,11,20;
133:7,9,22;134:13;
143:25
**expertise (7)**
66:22;70:13;71:21;
110:14;113:11;
130:15;131:13
**experts (3)**
36:8;95:25;110:13
**explain (10)**
82:5;92:17;94:8;
96:17;97:7,20;103:23;
125:22;145:3;153:20
**explained (1)**
144:4
**explains (1)**
43:9
**explanation (1)**
69:5
**exposure (3)**
36:12;56:5,25
**express (1)**
86:17
**expressed (2)**
88:8;91:15
**extent (2)**
34:16;115:4
**exterior (1)**
44:20
**extraordinarily (1)**
20:11
**eye (1)**
68:19

**F**

**fact (12)**
9:22;17:2;29:11;
38:9;54:24;58:14,21;
63:14;65:22;70:18;
92:1;126:1
**factor (1)**
41:15

**factors (3)**
39:22;41:23;121:23
**fail (1)**
116:12
**failure (1)**
116:9
**fair (9)**
77:24;94:13,17;
97:23;99:8,16;118:11,
16;134:24
**Fallopian (11)**
39:24,25;40:20;
41:7;42:17;43:11,15;
44:8;45:2,15;46:2
**familiar (13)**
32:13;39:6;47:3;
49:18,21;52:18;80:24;
81:3,4;104:23;105:11;
119:25;120:8
**far (6)**
105:13;107:19;
108:3;131:14;139:22;
153:17
**FDA (4)**
110:2,15;117:16,22
**fear (1)**
32:7
**feel (2)**
60:19;98:25
**feeling (1)**
31:16
**Felsher (3)**
70:18;71:13,15
**felt (1)**
115:3
**Female (2)**
47:4,15
**feminine (1)**
56:3
**fertilizing (1)**
46:9
**few (8)**
76:3;108:22;114:20;
116:24;125:3,9,12;
136:12
**fiber (2)**
97:4;105:17
**fibers (21)**
16:18;77:12;87:25;
88:6,9;89:10;92:12,18,
23;94:6,9;95:24;96:2,
10;97:11;98:16;
104:22;105:1,5,9;
109:3
**fibrous (4)**
88:12;91:16;92:14;
97:11
**field (8)**
102:20;103:9,18,23;
120:22;122:15;126:6;
131:20
**figure (3)**
139:1,5;140:2

**figured (2)**
32:12;36:15
**figuring (1)**
134:2
**file (2)**
139:3,12
**filed (1)**
150:23
**fill (1)**
69:2
**filled (1)**
69:3
**final (1)**
80:21
**finally (2)**
14:15;113:15
**find (10)**
9:23;10:8;78:4;86:8,
10;92:12;104:22;
124:1;144:12;152:19
**finding (1)**
61:21
**findings (3)**
16:17;34:13;96:8
**fine (6)**
7:3;84:15;121:7;
134:5;136:10;150:18
**finest (1)**
130:1
**finish (6)**
14:21;15:3;146:16,
23;147:3,8
**finished (5)**
59:19;109:12;115:2;
120:19;148:12
**finishes (1)**
19:5
**First (29)**
6:8;9:4,12;29:23;
52:24;73:25;74:8,8,10,
14,20;75:3;76:5,22;
77:2,19,25;86:4,25;
93:14;96:12,25;102:3;
109:18,18;134:20;
146:24;149:24;151:5
**five (2)**
119:24;147:14
**flag (1)**
24:23
**float (1)**
80:8
**flow (5)**
43:24,25;44:11;
45:10;46:7
**fluid (2)**
43:24;69:4
**focus (7)**
102:22;103:13,16;
107:16;113:24;116:3;
117:3
**focused (2)**
96:4,10;107:20;
125:19;143:20;145:7

fogging (1)
7:5
follow (3)
83:13;91:1;135:12
following (9)
6:7;77:17;83:22;
85:8,21;90:16;91:8;
100:16;135:20
follows (2)
7:12;102:4
forbade (1)
142:10
foregoing (1)
154:20
foreign (19)
21:1,6;45:4;46:24;
55:1,19;58:22;59:7;
60:8;62:6,12;63:20;
64:15;67:19,22;68:2;
69:20;70:1,5
forever (2)
59:4,5
forget (1)
84:1
form (2)
68:1;121:19
formal (1)
107:11
formed (1)
121:5
forward (1)
34:17
found (11)
16:19;33:3;56:21;
61:15;80:23;94:6,9,10,
11,12;105:16
foundation (3)
53:8;70:25;132:1
Francisco (1)
51:18
free (1)
58:16
frequently (1)
81:16
Friday (5)
148:4,12,14;150:20;
151:11
Fujiwara (2)
39:1,13
fulfill (1)
115:16
full (5)
23:10;97:17;98:20;
99:18;101:23
full-blown (1)
22:5
fully (1)
154:4
function (1)
113:18
fundamental (1)
67:21
funded (1)

51:6
further (2)
82:20;154:8

## G

garage (2)
132:9,22
Gates (1)
79:7
gauging (1)
21:9
gave (7)
15:12;73:10,11;
78:24;137:19;141:19;
147:7
gears (1)
36:21
general (1)
102:25
generally (4)
57:5;81:18;96:4;
104:24
Genital (10)
27:15,24;30:2;
32:21;35:17;41:7;
42:17;47:4;56:7;81:1
genitalia (1)
44:20
geographically (1)
128:7
Geologic (5)
113:15;114:1;116:4;
125:24;129:20
Geological (1)
114:7
geologist (7)
97:18;103:2,7;
125:15;128:25;129:10,
14
geologists (5)
103:13,14,15;119:8;
122:19
geology (13)
102:19;103:7,9,11;
107:12,15;113:20,22;
121:15;122:8;130:5,
11;133:9
Gertig (1)
79:8
gets (3)
62:21,21;139:11
giant (2)
67:6;68:3
given (2)
74:16;108:20
gives (1)
33:5
giving (1)
105:23
glass (1)
62:24
glasses (1)

7:5
global (1)
38:6
Godleski (25)
8:16,17,20;9:5,12,
23;10:7;16,2,20:1;
22:15;24:20;25:7;
57:8;61:15;62:15;
65:8;69:7;76:23;77:8,
22;78:3,6;105:12,16
Godleski's (8)
16:11,14;21:16;
23:13;61:9,21;66:6;
96:7
goes (4)
51:22;69:15;152:4,
10
gold (1)
25:18
Good (20)
6:13,15;7:7,8,17,18;
20:5,5;23:1;46:5;
66:15,15;83:3;102:13,
14;130:21,22;132:14;
134:5;150:5
goodness (1)
47:10
Gossett (1)
80:25
government (2)
118:5,14
graduate (2)
114:18,24
granted (2)
139:16;141:6
granuloma (2)
64:5;68:16
granulomas (3)
59:8,16;64:7
gratuitous (1)
36:24
greatly (1)
48:24
Ground (3)
116:17;119:11;
120:15
Group (10)
89:2,9;108:6;110:7,
7;114:22;116:1,16;
117:19;123:13
groups (2)
13:22;103:17
grow (1)
121:24
GSA (2)
114:5,7
Guangxi (1)
128:9
guess (6)
47:10;110:9;111:9;
131:25;139:5,7
guiding (1)
63:8

gun (1)
149:20
guy (1)
147:15
guys (2)
36:6;136:7
GYN (2)
47:17;59:16
gynecologic (8)
9:24;11:9;45:19;
47:15;51:15;54:17;
71:16,17
gyn-onc (1)
97:3

## H

habit (6)
121:3,14,17,24;
122:2,16
H-A-B-I-T (1)
122:16
half (2)
146:18;147:1
halfway (2)
52:24,24
Hall (2)
144:23;153:4
Hall's (1)
145:5
hand (7)
35:9;101:11,17;
116:22,22;128:14,15
handed (2)
138:20;141:24
handicap (1)
150:16
Handing (6)
27:6;39:9;50:8;
76:16;137:5;138:1
handle (4)
57:2,10;61:19,24
hands (3)
101:13;150:6,7
happened (1)
139:21
happening (3)
47:1;120:17;128:13
happens (1)
14:17
hard (4)
59:6;127:20;128:16;
140:9
hazard (4)
30:3,4,10;31:12
Health (2)
118:12,13
Healthcare (1)
50:25
hear (11)
7:2;14:23;36:7;37:8;
44:17;45:5;66:1;95:7;
129:14;132:17;133:12

heard (6)
20:17;35:15;94:23;
119:13,15;120:7
hearing (2)
85:22;126:2
hearsay (2)
70:24;144:1
heavily (4)
107:20;108:15;
116:16,19
held (3)
115:7,22,23
help (3)
109:25;110:14;
113:12
helpful (1)
148:18
hematology (1)
66:14
hereby (1)
154:3
hereditary (1)
41:23
Here's (2)
32:9;137:3
high (2)
22:11;129:23
higher (4)
21:21,24;22:6;23:24
highest (1)
38:16
highlighted (3)
29:21;81:19;146:3
highway (1)
132:7
Hill (1)
51:20
himself (1)
72:2
hired (1)
108:6
histologic (2)
53:5,23
history (1)
108:3
hold (1)
117:2
holding (1)
88:19
holds (1)
34:10
Honor (62)
6:14;12:21;18:23;
27:3;28:2;36:23;40:4;
52:3,9;53:7;64:2;66:9;
70:23;71:5;73:19;
75:19,22;76:15;82:20;
83:8;85:11;86:1,22;
91:21;94:24;95:10;
96:14;98:2,9,14;99:1,
14,17,23;100:5,6,23;
102:8;106:1,8,16;
130:9,15;132:16,24;

133:5,9;134:4;135:25;
136:16;138:13,24;
139:1;140:3;141:1;
142:4;143:18,19;
144:9;147:19;148:15;
153:6
**Honor's (1)**
153:7
**Hopkins (1)**
147:15
**hospital (2)**
16:9;17:5
**hospitals (1)**
16:10
**host (1)**
104:17
**hotel (1)**
145:17
**hour (6)**
15:3,5,6;126:17;
146:14,18
**hours (3)**
60:11;114:20;147:1
**human (7)**
12:1;58:12;80:9;
131:8,14,15,21
**humans (1)**
58:7
**hundreds (7)**
12:18,22;13:8,11,13;
14:5;21:21
**hustled (1)**
147:9
**hygiene (2)**
56:4;117:5
**hypothesis (1)**
80:1
**hypothesize (1)**
60:13
**hypothesizes (1)**
25:25
**hypothetical (3)**
54:15,20;55:24
**hysterectomy (2)**
47:20,25

**I**

**IARC (21)**
86:5,7,19,22;87:17,
19;89:8,16;90:8;
94:23;95:13,14,21;
96:13,14,15,18;97:1,4;
98:15,16
**Idaho (3)**
109:13,14;114:23
**idea (1)**
48:11
**ideally (1)**
46:5
**identification (14)**
18:8;24:18;25:12;
27:10,17;39:14;50:3,7;

76:13;102:23;106:11;
109:1,7;131:15
**identified (4)**
54:4;56:22;62:16;
124:7
**identifies (1)**
24:10
**identify (12)**
22:1,22;23:25;24:4,
9,16;54:8;65:1,13;
103:1;107:21;119:9
**identifying (15)**
20:9;24:18;64:16,
22;65:3,12,19;66:16,
23;130:6,12;131:7,20;
132:18;133:10
**imagination (1)**
42:10
**immediately (2)**
60:12;80:15
**immortal (1)**
57:24
**immunohistochemical (3)**
65:1,21;66:19
**impact (2)**
71:22;73:3
**impacted (1)**
116:19
**imply (1)**
55:2
**important (3)**
81:18;129:13;
143:21
**impossible (1)**
18:4
**improper (1)**
98:25
**improve (1)**
113:12
**incessant (3)**
41:5,16,21
**incite (1)**
69:20
**incites (1)**
67:20
**include (2)**
79:7;131:7
**includes (1)**
44:6
**including (5)**
108:1;109:1;130:7,
12;133:11
**incomplete (1)**
54:19
**incorrect (5)**
13:16,18;16:23;
17:4;18:2
**increase (5)**
41:8,9;42:18,19;
143:23
**increased (9)**
27:24;29:5;31:4;
32:21;35:18;53:4,22;

54:8;153:2
**indecipherable (1)**
150:1
**independently (1)**
125:4
**indicating (3)**
88:16,18;142:18
**individuals (1)**
110:13
**Industrial (1)**
117:5
**industries (1)**
112:3
**infection (1)**
45:14
**inflammation (8)**
37:14;41:16;46:18,
22;52:17,22;54:13;
79:20
**inflammatory (14)**
20:21;41:4,5;45:16,
17;46:22;53:2,20;
67:16;69:2,24;70:4;
79:22;82:7
**information (8)**
34:9;89:18;110:21;
112:24;113:1,1;135:1,
2
**infrequently (1)**
45:9
**ingested (1)**
80:12
**ingredients (1)**
110:2
**inhibits (1)**
58:3
**initial (4)**
8:2;139:5,6,8
**inject (1)**
69:1
**inserted (1)**
52:15
**inside (2)**
22:4;104:3
**instances (3)**
65:20;66:17;118:20
**instead (2)**
43:25;93:20
**Institute (3)**
50:25;51:20;118:12
**Institutes (1)**
118:12
**instruction (7)**
138:4,6,9,16;140:12,
14;141:14
**instrumentation (1)**
107:23
**instruments (2)**
120:1,2
**insufficient (1)**
28:21
**intact (1)**
81:14

**intend (2)**
52:8;149:18
**intended (1)**
143:11
**intent (1)**
110:20
**intention (1)**
143:12
**interest (5)**
110:18;111:3;113:7,
10;127:1
**interesting (4)**
12:9;49:2;82:11;
134:11
**internal (3)**
16:4;22:7;23:23
**Internet (1)**
134:22
**intervals (1)**
144:17
**intervention (1)**
56:9
**into (21)**
14:15;44:8;45:23;
60:9;65:16;67:20;
69:1;70:7;72:4;104:6;
110:3,3;120:15,25;
121:7,23;130:1;
133:18;134:4,6;148:13
**introduce (1)**
102:15
**introduced (3)**
55:3;60:8;67:20
**introductory (1)**
42:2
**Investigator (2)**
72:20;115:20
**involved (11)**
12:2;51:21;57:1;
108:15;112:4;113:3,7,
25;116:5,11,16
**involvement (4)**
112:5;113:5;123:4,
20
**involving (1)**
116:5
**irritants (2)**
41:6;44:6
**ISO (1)**
117:6
**isolated (1)**
62:7
**issue (5)**
14:7;49:12;71:24;
128:23;138:3
**issued (1)**
93:11
**issues (6)**
71:24;105:1;108:14;
111:11;116:5;124:7
**Italy (1)**
127:15
**items (1)**

97:10

**J**

**J&J (11)**
104:22;123:3,17;
124:4,7,24;125:6,8,21;
139:21;140:22
**J&J's (2)**
124:1,24
**Jane (3)**
144:23;145:4;153:4
**jargon (1)**
149:23
**job (2)**
110:16;115:1
**John (3)**
77:8;105:12;154:14
**Johnson (50)**
11:21,22;15:21,21,
25,25;20:16,17;56:19;
73:24,25;74:5,6,11,11,
12,12,14,15,17,17,21,
21;75:7,7;97:16;
100:24,24;105:8,8,19,
20;108:15,16;122:24,
24;123:7,7,15,16;
124:15,16;125:14,14;
126:12,12;128:11,11;
130:10,10
**Johnson's (4)**
56:19;61:11;70:20;
97:16
**journal (1)**
112:20
**Judge (8)**
19:10;137:3;138:4;
142:22;144:7;145:25;
150:19;152:16
**judging (1)**
68:11
**Judicial (1)**
6:8
**junction (2)**
41:8;42:18
**June (1)**
8:6
**juries (1)**
125:22
**juror (3)**
84:22,24;152:2
**jurors (3)**
67:13;84:16;151:22
**jury (57)**
6:16,19;7:8;14:5;
25:9;32:7;67:7;78:24;
80:7;83:14,17,23;84:7,
11;85:2,5,9,22;90:17,
21,23;91:2,5,9;97:21;
99:4;100:3,4,10,13,17;
101:4;102:15,16;
103:23;105:5,24;
106:5;107:6;109:22;

118:8;119:13;120:7;
129:9,14;134:15;
135:9,14,17,21;136:8;
140:1;144:1;147:5;
152:4,10;153:1

## K

keep (4)
  7:5;14:24;33:15;
  137:2
kidney-shaped (1)
  127:22
kind (17)
  20:21;22:8,13;
  41:24;55:13,17;66:21;
  102:25;110:12,20;
  112:2;113:22;115:11;
  127:20,22;147:18;
  149:1
kinds (3)
  92:12;93:12;123:2
Kleiner (2)
  35:18;77:13
Kleiner's (4)
  9:24;16:6;78:4;
  105:17
knew (6)
  71:3,4,5;78:17;
  94:14;111:16
knowledge (4)
  17:15;88:10;108:7;
  128:24
knowledgeable (1)
  10:19
known (1)
  89:9
knows (2)
  132:22;145:23
Kurz (1)
  154:14

## L

lab (4)
  10:24;11:15;19:22;
  124:8
laboratories (3)
  111:25;117:3;
  118:20
laboratory (3)
  117:16;118:23;
  126:14
laboratory's (1)
  124:13
laid (1)
  123:9
lamellar (1)
  122:4
language (3)
  140:14;141:10;
  153:19
large (9)

38:6;63:11;64:9,9,
13;67:25;68:13;69:13;
111:7
larger (4)
  82:12,13;113:18,23
last (6)
  40:5,25;43:10;
  79:18;95:8;109:20
late (1)
  41:22
lately (1)
  149:3
later (2)
  132:25;147:9
latest (1)
  46:19
latitude (1)
  84:21
Laughter (6)
  14:22;23:6;133:20;
  134:8;149:4;151:9
LAW (16)
  6:10,16,22;83:14;
  85:2,19;91:2,11;
  100:10,19;101:16,22;
  102:6;135:14;136:22;
  150:13
lawyers (4)
  16:3;73:25;90:19;
  101:6
lay (1)
  142:5
layman's (1)
  69:4
lead (1)
  53:18
leads (1)
  49:10
learn (1)
  31:16
learned (2)
  52:5,6
least (2)
  11:16;143:16
leave (1)
  146:19
led (1)
  56:5
Lee (27)
  89:1;108:5;114:10,
  16,21,22,25;115:7,9,
  25;116:1,16,25;
  117:13,16;118:4,15;
  122:24;123:13;124:1,
  5,8,11,25;126:12,18;
  127:1
left (6)
  6:23;43:10;91:12;
  136:1;145:17,22
lentil-shaped (1)
  127:22
less (4)
  31:10;57:3,11;

146:14
lets (2)
  21:19,20
letting (1)
  149:21
level (1)
  82:11
levels (1)
  115:6
Libby (1)
  107:18
life (2)
  57:15,23
lifetime (1)
  22:16
ligate (1)
  48:7
ligation (9)
  40:20;43:12,13;
  45:21;46:6;47:20,25;
  48:9;49:13
light (22)
  17:18;18:12;19:13,
  13;20:24;21:8,22;
  22:1;24:1,12,19;25:15;
  55:16;63:5,19;64:22;
  65:24;78:10,19;108:2;
  119:14;123:21
likelihood (1)
  153:2
likely (1)
  57:6;113:19
limited (2)
  140:4,20
line (2)
  28:19;29:20
link (4)
  26:3,19;32:1;35:2
list (2)
  51:11,22
listed (5)
  86:7;95:15;109:17;
  115:18;118:15
Listen (2)
  36:8;66:11
listening (1)
  34:16
listing (2)
  86:6,23
lists (1)
  115:6
literature (14)
  12:12,15;13:20;
  25:25;33:16,18,23;
  34:18,19,19;35:23;
  36:6,9;42:1
litigation (12)
  11:23;12:2;70:24;
  108:13,15;110:25;
  123:18;125:17;126:16,
  21,24;134:23
little (13)
  8:11;14:3;17:19;

20:9;33:19,19;82:7;
84:21;109:5;127:21;
147:7,9,13
lived (1)
  114:21
lives (1)
  59:23
living (1)
  102:16
located (2)
  117:13,14
locations (1)
  16:18
long (12)
  27:20;41:13;42:14;
  50:14;59:8,8,10,10;
  60:18;90:24;114:17;
  146:15
LONGACRE (2)
  7:10;76:3
Longacre's (1)
  76:11
longstanding (1)
  37:18
Long-substantiated (2)
  39:22;41:14
look (35)
  17:19,25;18:11,15;
  21:20;22:4,5,7;29:7,9,
  23;30:7;32:6,25;
  34:18;43:18;50:18;
  52:14;62:2,22;66:11;
  67:4;79:18;92:15;
  94:16;99:10;121:6,20,
  21;122:11;132:5,7,8;
  149:2,21
looked (11)
  16:11,14;17:3,5;
  18:2;21:15,15;39:17;
  56:21;78:9;95:19
looking (26)
  12:25;13:20;18:17,
  20;20:24;22:9,13;
  31:9;44:23;52:10;
  66:12,20;102:24;
  110:13,19;118:8;
  123:5;128:19,19;
  131:17;133:15,18;
  134:1;139:8;145:11;
  148:20
looks (2)
  62:24;63:9
Los (1)
  51:19
lost (2)
  93:17,25
lot (13)
  31:17;35:7;42:1;
  48:6;49:16;73:6;
  102:21;104:2,7;116:2,
  7,9;125:2
lower (3)
  7:4;41:7;42:17

lunch (2)
  32:8;42:25
lung (3)
  69:2,23;105:12
lymph (7)
  59:25;60:16,16,17;
  67:24;77:12;80:19
Lymphocytes (1)
  60:11

## M

macrophage (39)
  20:20;54:16;55:1,
  12,17,18;56:2,6,16;
  57:6;58:2,3,4,10,23,
  25;59:22;60:1,3,14,18,
  21;61:19,24;62:4,8;
  64:12,17;65:2,4,10,13,
  22;66:6,20;69:21,25;
  80:12,14
macrophages (30)
  21:17;22:2;25:8;
  45:4;46:24;54:14;
  57:2,8,10,14,21;58:14,
  19,20;60:11,17;64:5,
  14,25;65:9,12,20;
  66:12,16;67:21;69:21;
  80:8,16,18,19
macroscopic (6)
  120:8,11,15,21;
  122:22;127:3
made-up (1)
  92:15
magnification (1)
  22:12
magnifications (1)
  129:23
main (3)
  125:25;128:10;
  129:16
majority (1)
  127:23
majors (1)
  125:19
makes (4)
  39:23;104:11,12;
  150:5
making (2)
  13:25;37:8
managed (1)
  118:20
Management (6)
  38:25;39:12;40:2;
  116:23;118:19,23
managing (1)
  40:19
manufacturer (1)
  111:18
manufacturers (1)
  111:21
manufacturing (1)
  111:11

many (8)
   8:18;54:9;57:1;80:8,
   11;83:7;117:2;120:23
Mark (2)
   104:21;128:22
marked (9)
   27:9,16;39:13;50:3,
   7;76:9,12;106:1,10
marker (1)
   79:23
markers (1)
   65:1
marrow (1)
   80:17
mask (1)
   7:5
masks (1)
   6:8
Mason (1)
   14:17
master's (6)
   107:8,15;108:4;
   109:15;114:12,19
material (33)
   18:4,5,11;20:9,25;
   21:5;45:3;54:25;55:3,
   13,17,18;56:15,16,21;
   58:8;59:3,6,22;60:8;
   62:3,4;63:1,10,20;
   66:25;67:19,23;68:15;
   69:20,22;70:2,6
materials (9)
   44:19;86:4,6;87:18;
   95:16;104:15;111:5;
   116:4;123:2
mathematical (1)
   144:3
matrices (1)
   112:9
matrix (1)
   131:18
matter (2)
   9:22;132:20
Matthew (4)
   100:25;101:24;
   102:2,19
may (27)
   6:12,22;27:2;36:19;
   42:11;44:7;49:4;68:7;
   74:5;85:11,19;88:2;
   89:1;91:11,24;98:23;
   100:19;102:7,8;
   103:15;104:12;
   111:18;117:24;119:1;
   129:17;130:14;133:5
maybe (11)
   42:6;58:20,21;59:5;
   84:3,22;106:18;147:4;
   150:20;151:18;152:3
MD (1)
   7:10
mean (24)
   9:1,19;11:10;23:4,7;

42:12,13;46:7;48:5;
   56:8,14,24;59:10;
   68:18;114:17;115:11;
   117:18;121:15;123:6;
   125:1,6;133:13;
   142:15;152:2
meaning (7)
   114:7;116:9;121:19;
   122:2,5,14,19
means (10)
   30:22;82:5,12;89:7;
   103:6,24;133:15;
   145:20;153:18;154:22
meant (2)
   13:22;23:21
Medical (3)
   10:23;51:12,24
Medicine (8)
   50:25;51:1,14;72:6,
   7,10;73:4,7
meet (3)
   28:17;123:9;148:10
meetings (2)
   108:20;114:3
member (6)
   37:18,20,21,23;
   113:6
members (2)
   38:10;148:10
membership (1)
   112:12
memberships (2)
   109:17;111:5
menstrual (1)
   43:24
menstruation (6)
   43:20,23;44:7,13;
   46:18,21
mention (1)
   134:22
mentioned (18)
   8:22;18:9;19:24;
   20:3,23;40:23;41:15,
   23;54:25;58:12;65:11;
   68:21;80:18;95:13;
   109:11;113:8;114:9;
   121:13
mentions (1)
   95:14
merely (1)
   79:25
Merit (1)
   154:15
mesh (2)
   74:19;75:11
met (3)
   7:20;114:25;123:11
meta-analyses (1)
   35:22
meta-analysis (7)
   32:16;35:13;79:4,6;
   137:11,14;141:8
method (4)

22:1;62:21;110:6;
   131:23
methodologies (1)
   111:8
methods (2)
   108:24;111:22
mic'd (1)
   84:2
microbiologist (1)
   104:20
micrographs (1)
   96:11
micron (1)
   61:22
microns (8)
   57:3,11;61:16,20,21;
   64:6;68:12,18
microphone (5)
   65:14,16;84:4;95:9;
   130:25
microscope (9)
   10:21;11:16;18:12;
   19:13,14;21:19,22;
   133:16,18
microscopes (3)
   107:24;119:23;
   122:11
microscopic (6)
   21:8;25:16;65:24;
   119:21;120:5;129:22
microscopy (40)
   10:17,20,24;11:15;
   17:19;18:15;19:22;
   20:24;21:10;22:2,17;
   24:1,7,12,19;55:16;
   62:19;63:6,6,19;64:23;
   103:1;108:2,2,7,24;
   112:7;116:3;118:18;
   119:14,15,16;123:21,
   22;130:6,11;131:23;
   133:10,13,15
middle (1)
   43:18
might (10)
   14:25;46:6,6;65:17;
   83:3;84:18,20;90:25;
   125:23;145:23
migrate (5)
   44:16,20,21;46:11,
   14
migrating (2)
   45:11,18
migration (1)
   45:2
Mike (1)
   27:11
mind (2)
   42:25;116:15
mine (8)
   73:3;107:18;114:19,
   24;127:14,15;128:8,10
mined (3)
   92:10,11;93:12

mineral (10)
   103:17;107:20,22;
   109:6;112:10;119:11;
   121:18;122:2;131:10,
   14
mineralization (1)
   127:21
Mineralogical (6)
   112:14,18,21;113:3,
   17;114:3
mineralogist (7)
   97:19;103:4;122:9;
   125:16;129:2,11,15
mineralogists (1)
   122:20
mineralogy (12)
   102:20;103:19,24;
   104:9;107:12;113:21;
   121:16;122:8;125:20;
   130:6,11;133:9
minerals (29)
   102:23,23;103:16;
   104:4,7,9,10,10,12,13,
   14,16,18;107:17,22,
   25;108:7;109:3,7;
   112:6,8,11;116:4;
   121:21,23,24;129:17,
   18;131:15
mines (6)
   127:5;128:9,10,22;
   129:11,15
mining (5)
   94:4;96:5;114:19;
   121:8,10
minute (2)
   14:3;34:14
minutes (6)
   83:5,7,12;85:15;
   90:22;147:14
mirror (1)
   149:2
mislead (1)
   97:22
misleading (3)
   20:11;29:14;63:17
miss (1)
   106:19
missed (2)
   106:18;132:17
mission (2)
   38:14,20
misspent (1)
   15:7
misspoke (1)
   65:2
modernize (1)
   110:6
molecule (1)
   131:12
moment (1)
   140:17
money (1)
   125:10

Monograph (2)
   86:5;95:14
Monographs (2)
   86:7,23
mononuclear (1)
   66:21
Montana (3)
   107:18,18;114:20
more (33)
   9:8,8,9,18;11:11;
   14:2;22:7;31:17;
   35:17;36:13;37:3;
   45:5;49:16;57:6;
   66:12,13,22;73:22;
   80:3,4,5;81:16;82:7;
   84:21;93:21;108:25;
   113:19;118:19;
   138:17;139:23;
   146:19;149:23;151:19
morning (13)
   19:24;20:17;30:13;
   41:15;44:1;45:6;58:5,
   12;78:24;145:17;
   146:14,24;148:13
morphology (1)
   121:2
most (9)
   26:12,12,13;47:7;
   56:20;63:1;65:9;
   80:15;119:22
motion (8)
   137:12,16;139:3;
   141:6;150:21,23;
   151:1;152:22
move (4)
   25:4;73:18;109:7;
   151:19
moved (1)
   145:1
moving (4)
   33:15;54:12;60:25;
   144:14
MSA (1)
   114:2
much (13)
   21:23;22:6;49:4;
   82:12;102:6;113:18,
   19,23,24;119:23;
   120:7;123:5;131:2
multi-nucleated (2)
   67:6;68:3
multi-part (1)
   41:12
Multiple (5)
   11:17;58:20;64:14;
   68:1,8
must (3)
   123:9,11;141:20
mutagenesis (2)
   41:8;42:18
myself (2)
   131:11;150:10

# N

naked (1)
68:19
name (5)
7:19;101:23;102:18;
114:22;136:21
na-na (3)
23:5,5,5
nanotechnology (1)
72:15
narrow (1)
113:21
NASA (1)
118:14
National (8)
49:18,23;50:6,25;
51:20;79:14;118:11,12
natural (2)
122:9,12
naturally (1)
129:19
nature (10)
96:9;102:25;116:13;
121:5,18;122:8,10;
127:18;131:9,10
nauseam (1)
56:14
NCI (1)
72:19
near (1)
107:18
necessarily (3)
22:22;34:7;56:8
necessary (1)
9:4
need (15)
11:8;28:9,11;32:24;
36:13;64:25;65:12;
81:5;82:17;111:15;
120:3;136:24;141:25;
143:24;147:22
needs (3)
11:9;62:12;82:12
neighborhood (1)
68:18
Neither (1)
25:4
network (1)
38:6
new (5)
8:12,15;117:11;
124:20;149:17
next (8)
48:22;51:5;91:14;
116:17;117:24;119:1;
128:5;151:24
NIST (1)
117:5
nodding (1)
72:13
node (6)

59:25;60:16,16,17;
67:24;77:12
nodes (1)
80:19
noncarcinogenic (2)
48:2,10
none (2)
72:21;88:1
nonsuit (2)
149:14;151:3
non-talc (1)
127:23
nonusers (1)
81:17
nor (1)
86:6
Northern (3)
107:18;109:14;
114:20
note (2)
81:13;99:18
notes (4)
145:14,14,25;154:5
notice (3)
20:23;95:22;147:7
November (9)
8:5;50:12;76:6,7;
87:19;88:1;91:24;
98:17,23
nuclei (1)
68:12
number (2)
78:21;95:6
numbers (4)
38:13;82:14;153:3,9

# O

oath (2)
14:5;70:19
object (2)
132:2,2
objected (3)
94:22;95:2;100:1
Objection (25)
12:21;18:25;19:9;
23:3;28:2;36:23;40:4;
52:3,11;53:7;54:19;
66:9;70:23;71:14;
87:8,8;89:18;91:13;
94:23;95:12,20;96:9;
98:6;99:13;106:7
objectionable (1)
19:8
objections (1)
136:9
objects (1)
101:10
O'Brien (5)
26:16,20;27:14;
80:22,25
observant (1)
150:11

observe (1)
124:18
observed (4)
54:16;55:11;56:1,2
obtained (2)
16:24;17:11
obviously (3)
23:13;143:20;
147:11;150:12
occasion (3)
58:9;65:20;124:9
occasionally (3)
43:23;45:14;113:11
Occupational (1)
118:13
occur (3)
43:13;56:8;129:17
occurs (1)
129:19
odds (1)
33:5
O'DELL (39)
85:11,16,25;86:21;
87:4,7,13,16,23;88:5,
10,15,20,22,25;89:7;
90:7;94:24;95:3,10;
98:2,13;99:17,23;
100:5;138:13,23;
139:23;142:4,8,12;
143:19;144:6,8;
147:19;148:15;152:16,
18;153:10
off (9)
6:23;19:5;58:21;
59:25;84:4;91:12;
145:22;146:13;148:1
offer (3)
104:20;115:3;
130:10
offered (2)
31:24;104:19
offering (2)
133:6,8
offers (1)
72:1
office (1)
139:4
officer's (3)
83:13;91:1;135:13
Official (1)
154:18
often (3)
11:11;22:7;42:3
old (1)
47:5
once (3)
33:15;46:15;60:8,8,
24;139:6,11
oncologist (1)
51:15
Oncology (9)
37:19;38:5,6,10,15,
21,24;39:20;72:6

One (81)
8:5,6,7;14:11;18:7,
14;19:14,21;23:18;
24:25;26:16;27:19;
28:23,25;33:11;35:7;
37:3;41:25;44:2;
46:19;47:17;50:20;
56:16;64:12,12;65:10;
66:7;67:4;70:18;
73:22;77:2;78:22,23;
79:12;80:21;81:3,9;
84:16;86:20,25;87:14,
14;89:14;91:23,24;
98:23;109:18,18,20,
20;111:12,20;112:20;
120:14;125:2,12;
126:5;128:3,8,8,9;
130:14;131:5;132:23;
136:19;137:8,15,18;
138:10;139:1;141:12,
23,24,25;144:16;
145:7;146:19;148:5;
149:9;151:7,22
ones (5)
8:12;42:5,6;106:8;
119:11
ongoing (2)
69:24;70:4
only (16)
9:25;14:17;27:19;
34:3,22;41:14,25;
47:12;50:16;59:23;
73:22;138:25;142:10;
145:6;146:19;149:23
onto (1)
110:23
open (8)
28:1;29:4;83:22;
85:8;90:16;91:8;
100:16;135:20
operate (1)
10:20
opinion (19)
12:12;20:2;34:4,9;
48:15;71:11,23;87:17;
88:8;91:15;97:22;
129:13;137:9,10,13,
19;141:7;142:2,24
opinions (25)
15:15;71:22;73:2;
78:23;86:13,16;87:19,
24;92:21,22;93:7;
94:7;95:23;96:2,10,13;
97:24;98:4,20;105:15,
24;144:1,10,14,15
Opportunistic (1)
48:23
opportunities (2)
108:10;115:14
opportunity (4)
98:3,21;99:8,16
opposed (1)
65:23

opposing (1)
137:4
optimistic (1)
146:22;150:9
order (31)
108:21;110:5;
123:11,15;124:21;
136:19,23;137:13,19,
20;138:16,18,20;
139:5,6,8,11,11;140:1,
10,15,17,19,22,24;
141:5,16,17;153:7,11,
19
orders (5)
136:17,24;137:7,15;
139:16
ore (3)
127:24;128:15,19
ores (1)
121:9
organelles (1)
22:6
organic (1)
131:12
organization (8)
38:13;110:1;111:7,
10;112:16;113:18,24,
25
organizations (2)
112:21;118:14
organs (1)
58:7
orient (1)
50:20
original (3)
17:11;148:24;
149:11
others (7)
20:1;39:2,13;41:24;
47:12;80:25;112:12
otherwise (1)
132:2
ours (2)
138:14;140:25
out (31)
21:4;33:19;34:7;
36:15;37:9;54:17,23;
58:6;60:24;71:21;
84:16;85:22;86:10;
101:7;104:1,11,17;
110:12;123:9;131:3;
134:2,18;136:8;139:2,
5;140:2;142:5;144:12;
150:11;152:4,10
outreach (1)
112:19
outset (2)
84:10;101:10
outside (11)
60:2;83:23;91:9;
117:14;118:18;
126:25;135:1,2,21;
146:16,21

**Outstanding (1)**
72:20
**outward (1)**
43:25
**ovarian (51)**
12:11,13,16;13:1,21;
14:1;15:13,16,23;26:1;
27:16,25;29:6;30:2;
32:2,22;33:3;34:11;
35:19;36:12;37:15;
38:3,4;39:1,13,23,25;
40:2,19,24;41:9,18;
42:19;43:11;47:23;
48:24;49:14,22;50:5,
24;51:10;53:4,22;56:2,
6;70:8,20;71:18;
72:22;81:2,16
**ovaries (6)**
30:22;42:22;44:9,
16;46:12,14
**over (27)**
8:24,25;9:2;14:24,
25,25;15:6,6;23:14;
28:9;38:10;51:13;
72:12;109:5,5;115:5,7,
9,13;122:25;123:3;
128:18;134:18;
139:25;145:21;
148:20;149:21
**overall (1)**
28:24
**overrule (1)**
99:13
**Overruled (6)**
12:23;28:6;52:12;
53:10;54:21;71:14
**overwhelm (1)**
50:17
**overwhelming (1)**
34:20
**ovulation (3)**
41:5,16,21
**own (2)**
28:5;148:8
**owner (1)**
114:21
**ownership (1)**
127:1

**P**

**P-1013 (2)**
35:11;79:2
**P-1045 (1)**
35:11
**P-1664 (2)**
27:10,14
**P-1935 (1)**
39:11
**P-460 (3)**
50:3,4;79:13
**PA (2)**
150:12,13

**page (14)**
8:13,14;28:10;29:7;
43:1,2,3;50:22;51:5;
52:14;77:1;79:18,19;
152:22
**pages (1)**
50:14
**panel (22)**
6:19;7:8;38:2,4;
83:17,23;85:5,9,23;
90:17,23;91:5,9;
100:13,17;109:19;
110:4,8,11,22;135:17,
21
**panhandle (1)**
109:13
**paper (5)**
21:11;26:20,24,25;
79:11
**papers (10)**
12:3;36:13;53:25;
54:3,8,10;108:21;
113:9;134:21;136:4
**Paradigm (2)**
38:25;39:11
**Paradigms (2)**
49:22;50:5
**paraffin (1)**
77:18
**paragraph (3)**
8:13,14;52:24
**parentheses (1)**
26:7
**parked (1)**
132:21
**part (21)**
40:22;42:15;77:18;
81:22;86:5;95:8;
105:25;107:14;
108:17;109:4;110:4,7,
7;111:1;113:7;116:5;
121:10;123:9;124:12;
139:17,17
**partially (1)**
51:6
**participate (2)**
110:11;152:3
**participating (2)**
6:7;108:18
**particle (20)**
24:10,11;45:1;
56:16;57:5;58:15,22,
25;60:2;61:10,20;
62:7;64:8,12;68:6,10;
80:13,14;116:7;131:9
**particles (54)**
10:13;16:18;22:17,
19;24:5,16;25:8,13,16;
44:8;46:2;57:3,10;
59:14,16,21;61:14,21;
62:9;64:6,11;68:9;
77:11;78:6,11,14,18;
92:13,18;93:12,13;

94:10,11;99:7;102:24;
105:16;118:16;119:9,
21;120:5,25;129:21,
22,24,24;130:2,6,12;
131:7,8,10,14;132:19;
133:10
**particular (1)**
29:2
**particularly (1)**
47:15
**particulate (8)**
45:3;54:25;55:13,
17,18;56:15,21;103:1
**parties (1)**
6:6
**pass (2)**
82:21;146:18
**past (5)**
74:4;101:8;110:9;
118:10;147:5
**patency (1)**
30:17
**patent (3)**
27:25;29:4;30:19
**pathologic (1)**
62:11
**pathologist (7)**
11:9;43:22;64:19;
69:8;71:16;73:1;
105:12
**pathologists (6)**
12:19;13:9;14:6;
45:19;51:12;70:14
**pathology (12)**
10:2;16:9,10;17:16;
47:3,15,16,18;72:6,24;
73:5;77:10
**patients (2)**
38:19;71:17
**Pause (1)**
100:8
**Pavlo (3)**
136:20;138:14;
141:19
**pay (2)**
53:15;113:6
**peer (4)**
15:11,19;108:21;
114:5
**peer-review (1)**
113:8
**peer-reviewed (1)**
109:6
**peers (1)**
15:11
**pelvic (7)**
41:4;45:16;46:22,
23;69:22;74:19;75:11
**pelvis (1)**
56:17
**Penninkilampi (7)**
33:10;34:14;35:8,
11,12,20;79:1

**Pennsylvania (3)**
6:9;97:23;117:10
**pens (1)**
136:5
**people (6)**
13:6,7;49:9;111:24;
133:25;135:4
**per (1)**
11:24
**percent (18)**
27:24;29:6;31:4,13;
32:21;35:18;53:3,22;
94:18;141:1;142:11,
20;143:13,23;144:24;
145:2;153:3,9
**perform (4)**
65:21;111:15;
117:21;125:13
**performed (3)**
20:1;122:24;124:4
**performs (3)**
124:24
**perhaps (3)**
25:14;66:13;71:24
**perineal (6)**
33:2;36:12;53:2,20;
56:25;81:15
**period (1)**
37:9
**peritoneal (1)**
47:22
**Perry (1)**
14:17
**person (1)**
124:23
**personal (1)**
123:4
**personally (3)**
98:18;119:20;127:4
**perspective (2)**
124:13;143:21
**pertains (1)**
139:24
**phagocytosis (1)**
58:3
**pharmaceutical (1)**
117:20
**pharmaceutical-grade (1)**
69:14
**pharmaceuticals (1)**
110:3
**Pharmacopeia (1)**
109:25
**PhD (4)**
102:2,19;109:15;
125:16
**photo (1)**
96:11
**photograph (1)**
21:10
**photographs (2)**
21:16;63:10
**physical (1)**

**121:11**
**pick (4)**
104:1;121:20;
122:10;130:24
**picked (1)**
26:10
**picture (7)**
25:16;63:19;67:5,
11;127:12;128:7;
130:1
**pictures (6)**
21:3;62:2;63:13,15;
67:1,5
**piece (3)**
21:11;61:8;127:22
**pioneering (1)**
38:17
**pit (1)**
128:16
**Pittsburgh (2)**
51:16;117:15
**place (2)**
60:1;112:23
**plaintiff (4)**
89:6;91:13;104:19;
106:3
**plaintiffs (2)**
104:19,25
**plaintiffs' (8)**
6:24;39:7;77:3,7,10,
15;95:25;105:11
**plan (3)**
147:9,13,25
**platy (2)**
98:16;122:3
**plays (1)**
39:25
**please (11)**
101:1,16,22;102:15;
106:24;107:6;117:25;
119:2;127:8;128:1;
129:4
**pleural (1)**
69:1
**pleurodesis (2)**
68:22;69:13
**plus/minus (1)**
33:24
**pm (8)**
6:4,20;83:18;85:6;
91:6;100:14;135:18;
153:24
**point (22)**
9:9;29:2;32:24;
33:22;34:2,8;37:2;
45:2;46:1,7;48:8;
51:23;87:10,16;94:2;
95:17;106:15;113:5;
114:25;120:14;
125:13;126:2
**pointed (1)**
17:22
**points (2)**

148:18;150:3
**polarized (3)**
78:19;119:13;
123:21
**polarizing (1)**
78:10
**POLE (58)**
12:21;18:23;23:3,
14;28:2;36:23;40:4;
52:3;53:7;54:19;66:9;
70:23;71:4;75:22;
76:2,14,18,20;82:3,16,
19;83:7,10;84:5,12;
86:12,18;87:1;88:11;
89:5,25;90:3,6,11;
100:23;101:15;102:8,
12;106:1,14,19,22;
107:2;117:24;118:3;
119:1,6;127:7,11;
129:8;130:9;133:4,8,
17,23;134:3,9;135:11
**policy (1)**
38:17
**pooled (1)**
30:2
**portion (1)**
50:16
**position (6)**
13:10;23:1;51:11;
115:20,22;148:16
**positions (1)**
115:6
**positive (1)**
33:1
**positively (1)**
62:16
**possibility (2)**
54:18;151:19
**possible (10)**
22:10;25:25;41:17;
44:2;79:23,25;101:8;
113:14;147:3;148:9
**post-surgical (1)**
55:5
**potential (5)**
45:22;46:13,16;
47:21;111:2
**potentially (1)**
124:19
**Powder (27)**
27:15;29:3;30:1;
33:2;53:3,21;56:3,19,
23;61:11;69:15;70:20;
81:1,15;96:3;97:17;
104:22;105:8;120:13,
15,20;121:7;123:20;
130:7,13;133:11;
134:23
**powders (5)**
112:10;119:12;
123:5,6;130:3
**power (3)**
28:21;82:10,14

**PowerPoint (5)**
86:1,17;105:20;
106:2,9
**practice (1)**
59:17
**practices (2)**
19:17;124:17
**practicing (1)**
47:2
**precise (2)**
16:17;57:4
**preface (1)**
52:2
**prejudiced (1)**
87:22
**premier (1)**
112:21
**prepared (2)**
16:10;106:10
**preparing (1)**
105:20
**presence (7)**
83:23;85:9;90:17;
91:9;100:17;105:13;
135:21
**present (4)**
6:6;36:17;112:25;
115:20
**presentation (4)**
105:21,23;106:2,10
**presentations (2)**
108:20;109:9
**presented (2)**
108:11;115:14
**Press (1)**
79:14
**presumably (1)**
16:16
**pretending (1)**
93:19
**pretty (6)**
49:1;60:6,9;66:15,
15;123:5
**prevent (9)**
36:17;46:6,6,8,8;
47:21,25;48:1,8
**preventing (1)**
49:5,7
**Prevention (1)**
51:6
**preview (1)**
146:8
**previously (1)**
7:11
**primarily (10)**
92:21;107:17;108:6,
13,23;112:7,18;113:6;
123:4,20
**primary (5)**
72:25,25;102:22,22;
119:10
**principal (1)**
115:20

**principally (1)**
117:13
**prior (2)**
56:9;77:17
**probably (9)**
24:14;37:9;45:5;
68:12,13;70:19;
109:25;121:13;151:14
**problem (3)**
101:12;139:22;
142:18
**problems (1)**
113:2
**procedure (3)**
48:10;68:22,25
**procedures (1)**
124:17
**proceed (2)**
102:8;133:5
**proceedings (3)**
6:7;100:8;154:3
**process (6)**
111:1;113:8;121:12;
124:12;129:25;149:12
**processed (2)**
120:18;128:20
**processing (1)**
77:16
**produced (1)**
51:11
**product (2)**
111:13;125:23
**production (1)**
123:8
**products (4)**
74:12,17;105:8;
125:22
**professional (2)**
108:19;109:9
**professionally (1)**
102:21
**professionals (5)**
38:7,10;51:12,25;
70:15
**professor (5)**
51:15,17;72:5;73:4,
7
**professors (1)**
73:6
**proficient (2)**
119:17;122:22
**program (2)**
72:15;124:2
**programs (1)**
117:8
**progress (1)**
149:21
**proliferation (3)**
49:7,9,10
**prominent (1)**
118:14
**promised (1)**
101:11

**promotions (1)**
108:10
**promulgated (1)**
41:17
**pronouns (1)**
93:22
**proof (2)**
28:23,25
**proposal (4)**
138:12;139:22;
149:12;150:8
**proposals (1)**
139:9
**proposed (5)**
139:16;148:18,24;
149:17;150:3
**proposition (4)**
26:8,18;31:25;42:21
**pros (1)**
33:17
**protect (1)**
45:22
**Protection (1)**
117:10
**protective (1)**
49:14
**protein (1)**
79:23
**protocol (1)**
6:9
**provide (5)**
28:23,24;33:12;
35:6;94:16
**provided (8)**
7:25;8:5,6,7;16:15;
67:11;106:3;137:4
**provides (1)**
112:20
**providing (1)**
38:16
**Publication (5)**
49:21;50:4;52:17;
112:20;113:10
**publications (5)**
108:22;109:1,6;
113:13;114:4
**publish (3)**
15:10,17;52:9
**published (16)**
12:6,10;15:14;28:7;
38:23;39:19;43:7;
49:23;50:6;52:7;
107:1;108:25;118:2;
119:5;127:10;129:7
**pulled (4)**
26:13,22;34:22;
50:16
**pulmonary (1)**
69:7
**pulmonologist (1)**
69:1
**purchase (1)**
124:19

**purporting (1)**
26:7
**purpose (1)**
111:23
**pursuant (1)**
6:8
**put (21)**
9:4;26:6;27:11;
29:11,14;33:22;34:8;
35:3,6;40:1;42:3;
63:14;68:11;77:12;
89:6,11;90:21;110:12;
138:14;142:23;149:22
**putting (4)**
29:18;32:7;34:17;
149:19
**P-value (3)**
31:8,9,15
**p-values (1)**
31:17

---

## Q

**qualification (1)**
132:5
**qualifications (3)**
106:23;130:18;
132:3
**qualified (5)**
10:11;106:12;120:4;
134:7,12
**quality (3)**
38:16;111:13;112:5
**quantification (1)**
109:2
**quick (2)**
86:2;136:15
**quickly (3)**
80:13;147:11;
151:19
**quite (4)**
54:13;68:13;80:20;
116:24
**quitting (1)**
101:14
**quotes (1)**
77:12

---

## R

**radiology (1)**
72:16
**raise (3)**
101:11,16;124:16
**raising (1)**
105:1
**rapid (3)**
60:6,9;80:20
**rare (2)**
22:9;66:18
**rate (1)**
126:16
**rather (1)**

26:24
**ratio (2)**
31:12;33:5
**ratios (3)**
30:3,4,10
**raw (1)**
104:15
**reach (2)**
82:10;148:21
**reaching (1)**
48:9
**react (2)**
68:6,8
**reaction (13)**
20:21;21:1,6;45:4,
12;55:2,19;58:22;
64:15;68:2;69:3;70:2;
131:13
**read (22)**
12:15;16:11;23:13;
29:8;34:14;36:20;
37:17;50:10;52:18,20;
53:16;61:9,12;62:19,
23;79:11;81:5;134:21;
140:4,7;150:3,24
**reader (1)**
81:20
**reading (3)**
12:12;53:14;141:10
**ready (6)**
40:7;90:20;91:20;
134:3;142:5;153:20
**realize (2)**
21:19;22:15
**realized (1)**
85:17
**really (17)**
9:3;22:11;27:19;
28:22;30:10;31:14;
32:25;40:16;42:4,5;
48:16;55:24;60:9;
62:21;66:20;96:4;
140:3
**Realtime (2)**
154:16,17
**reason (5)**
57:11;59:24;125:18,
25;145:3
**reasonable (1)**
152:24
**reasons (4)**
111:20;126:5;
129:16;142:5
**Rebecca (1)**
141:7
**rebut (3)**
89:11,14,22
**rebuttal (2)**
135:6;147:18
**recall (11)**
26:20;61:13;76:5,7,
21,23;79:6,9;137:23;
139:2;144:15

**recalls (1)**
81:10
**receipt (1)**
77:17
**receive (1)**
109:10
**received (1)**
109:12
**recent (7)**
26:13,14;34:17,19;
47:7;48:25;49:4
**recess (2)**
83:4,20
**recipient (1)**
72:19
**recognize (5)**
65:9;66:6;132:6,8,9
**recognizing (1)**
64:17
**recollection (1)**
81:11
**recommendation (1)**
138:7
**reconsideration (6)**
137:12,16;138:20,
21;139:3,13
**record (4)**
95:1;99:18,24;
101:23
**recross (1)**
82:22
**recruit (1)**
64:14
**recruited (3)**
58:14,19;60:11
**recruitment (1)**
80:20
**recuts (3)**
17:3,7,10
**red (1)**
24:23
**redirect (2)**
75:21,25
**reduce (1)**
47:21
**reduces (1)**
48:24
**re-engulfed (1)**
60:20
**reentered (2)**
85:5;100:13
**re-exposed (1)**
60:15
**refer (2)**
33:8;89:16
**referenced (1)**
79:19
**references (2)**
86:3;98:15
**referred (1)**
93:23
**referring (11)**
25:22;26:12;29:3,

17;39:7;53:17;55:15;
62:17;67:5;68:16;77:7
**refers (1)**
42:16
**refine (1)**
104:15
**reflect (2)**
9:18;107:3
**reflected (1)**
118:7
**reflects (2)**
153:7,11
**refractile (8)**
18:4,5;62:3,3;63:1,9,
20;66:25
**refresh (1)**
49:25
**refreshes (1)**
81:10
**refute (2)**
10:10,11
**regarding (6)**
91:16;95:4;96:10,
13,15;141:7
**regardless (1)**
69:19
**region (2)**
27:24;35:17
**registered (3)**
117:16,22;154:15
**regular (3)**
101:13;124:24;
125:12
**regularly (2)**
72:2;119:20
**rejected (1)**
139:4
**relate (2)**
72:22;108:8
**related (1)**
86:17
**relating (2)**
137:10;144:16
**relation (1)**
95:23
**relationship (2)**
81:21;124:22
**relative (4)**
30:4;128:4;144:17;
154:9
**relatively (1)**
57:15
**released (1)**
135:9
**relevancy (2)**
28:3;53:9
**relevant (3)**
16:17;20:2;120:21
**reliance (3)**
86:4;87:18;95:16
**rely (2)**
125:4;143:25
**remained (1)**

144:10
**remember (16)**
8:1,8;26:4,8,17;
32:4;33:11;67:9;
68:22;79:2;81:22;
84:17;142:23;144:18;
145:22;151:21
**remembering (1)**
153:6
**remind (1)**
134:15
**remote (1)**
34:19
**removal (1)**
48:23
**remove (4)**
43:15;48:7;61:6;
70:5
**removed (4)**
18:3;44:24;69:22;
77:13
**removing (1)**
40:20
**reorienting (1)**
94:1
**repeat (5)**
56:13;63:23;75:12,
14,15
**repeating (1)**
99:21
**re-phagocytized (1)**
60:21
**report (55)**
8:10,13,14;9:6,19;
16:11,15;21:3;25:22,
23;26:22,23;28:5;
32:12;34:3;36:3;
44:15;54:1;62:10,23;
63:12;76:5,12,22;77:2,
19,25;86:19;88:1,2,2,
11,13,20,25;89:19,20,
24;90:1;91:15,19;
94:14,16,18;96:3,5,15,
16;97:20;98:8,12,15,
22;99:11;134:20
**reported (1)**
56:23
**REPORTER (5)**
6:13;154:15,16,18,
24
**reports (13)**
7:25;8:19;9:4,12;
16:9;61:18;86:8;
91:23;92:6,9;93:11;
94:3;95:16
**represent (2)**
33:18;50:14
**representative (2)**
17:14;19:18
**represented (2)**
51:19,20
**representing (1)**
74:5

**reproduction (1)**
154:21
**reproductive (8)**
28:1;29:4;30:20;
42:22;43:19;44:12;
45:23;81:15
**reputable (1)**
51:23
**request (5)**
106:25;118:1;119:4;
127:9;129:6
**requirements (3)**
107:14;123:8,11
**requires (4)**
58:22;107:15;
117:22;124:12
**research (11)**
11:12;38:18;49:23;
50:5,24;51:10,16;72:9;
103:12;107:7;114:18
**researchers (1)**
112:25
**residing (1)**
80:19
**resolution (3)**
21:21,24;23:24
**resolve (1)**
124:20
**resources (1)**
38:16
**respect (4)**
13:1,21;71:20;
129:10
**respective (2)**
90:10;148:10
**respond (8)**
80:14;93:1;97:24;
98:3,12,20;99:9,16
**responding (6)**
17:24,25;61:1;
86:12;96:23;97:2
**responds (1)**
67:22
**response (25)**
18:13;29:22;32:23;
45:17,20;46:25;53:2,
20;60:4,6,9;62:6,13;
63:21;67:16,20;68:17;
69:20,24;70:4,5;77:3;
78:7;80:24;124:13
**rest (4)**
109:8,8;134:10;
147:16
**result (1)**
31:11
**results (4)**
31:21;33:1;111:23;
112:1
**resume (4)**
37:17,23;83:4;
110:17
**retentions (1)**
126:8

**retirements (1)**
115:15
**retrograde (8)**
43:19,23,24;44:7,12;
45:10;46:17,20
**review (16)**
15:11,11;19:25;
38:1,4;40:17,18;42:2;
95:17;108:21,21;
113:12;120:1;137:10,
14;141:8
**reviewed (5)**
12:3;15:19;16:8,9,
24
**reviewer (1)**
114:5
**revising (2)**
148:25;149:13
**Richard (1)**
114:22
**rid (1)**
152:2
**right (162)**
6:25;8:4,7,15,19;9:6,
17,25;10:14,17,21;
11:13,16,19,23;12:1,6,
16,20;13:3,10;14:2,16;
15:13;16:12,19,19;
17:1,7,9,25;18:1,12,
16;19:13,23;21:17,22;
22:18,20,25;23:5,15,
20;24:11,13;25:9;
26:6;29:9;30:5,7,14,
24;31:2,7;32:15,16,17,
18,19,22,25;33:6;34:5;
35:3,4,21;38:2,7,11;
40:18;41:2;42:2,13,16,
44:4;48:13,14,18;51:6,
13,25;52:8;54:1,2,3,
18;55:23;58:11;59:4,
10,11;60:3;61:6,25;
62:1,19,20,22;63:3;
64:19,19,24;65:10,
67:17,17;68:6,10,10,
18,19;69:4;70:21;
71:8;72:7,12,16;73:5;
74:8,11,13,22;82:24;
85:1;86:14;89:13,21;
90:9;96:20;100:20;
101:17;103:20,21;
106:21;110:19;112:5;
115:23;118:25;
122:20;127:19;
128:12;131:8;132:11;
133:16;135:23;138:15,
19,22;139:8,10,18,20;
140:14,18;148:13,23;
150:4;151:7,23,24;
152:14;153:10
**right-hand (1)**
39:21
**Rigler (16)**
87:17;88:12;89:8,

22;92:19;93:9,23;94:4,
11,12;97:9,18;104:21,
23;128:22,25
**Rigler's (3)**
86:13;89:13;96:11
**ring (1)**
39:16
**rip (1)**
131:3
**rise (7)**
6:10,16;83:14;85:2;
91:2;100:10;135:14
**rising (1)**
48:2
**risk (21)**
13:25;27:16,25;
29:5;30:2;31:5;32:21;
35:18;39:22;40:19;
41:9,14,22;42:19;
48:24;53:4,22;54:4,8;
81:2;140:22
**risks (2)**
30:5;144:17
**RJ (25)**
89:1;108:5;114:10,
15,21;115:7,9,25;
116:1,15,25;117:13,
16;118:4,15;122:24;
123:13;124:1,5,8,10,
24;126:12,18;127:1
**RMR (1)**
154:14
**roads (1)**
104:17
**rock (6)**
104:2;120:14;
121:20;122:3,10;
132:12
**rocks (7)**
103:15;104:2,8;
120:18,19;121:11;
127:23
**role (11)**
12:11,13;13:2;
25:25;39:24;43:11;
70:8,24;108:19;
109:23;123:13
**roles (1)**
115:16
**room (3)**
90:21;101:7;136:8
**Roughly (1)**
103:10
**round (2)**
137:2,3
**route (1)**
56:4
**routine (6)**
11:5;17:18;18:12;
19:13;21:22;24:12
**routinely (1)**
120:1
**rule (2)**

54:17,23
**ruled (1)**
145:6
**rules (2)**
97:23;135:3
**ruling (5)**
140:4;144:9;153:5,
7,12

## S

**Safety (2)**
118:13;125:7
**salaried (1)**
126:18
**salary (1)**
126:22
**salpingectomy (2)**
40:20;48:23
**same (16)**
14:25;15:6;17:2;
69:14;75:17;79:8;
97:12;108:5;111:25;
123:23;131:16,16;
134:2;145:2;154:7,22
**samples (2)**
114:23;116:8
**San (1)**
51:18
**Sanchez (35)**
87:24;88:22;89:4,
10,19,23,23,25;91:14,
22;92:25;93:4,8,10,23;
94:2,7;96:1;97:7,25;
98:1,19;100:25;
101:25;102:2,13,19;
105:19;106:5,10;
107:3;119:17;126:10;
128:21;130:10
**Sanchez's (3)**
86:4;95:15;147:21
**sat (1)**
85:14
**saw (6)**
25:7,15,16;55:24;
65:10;78:6
**saying (19)**
13:13,14,17;34:8,17;
36:16;44:19;45:21;
46:11,12;47:24;48:5;
55:22;66:14;82:8;
91:14;132:5,10;149:20
**scale (1)**
68:11
**scanning (13)**
10:16,20;11:15,16;
18:15;21:9,19;22:16;
24:7;25:13;62:18;
63:6;119:15
**scheduling (2)**
101:7;146:8
**SCHOENHAUS (23)**
84:24;137:21,25;

138:25;139:10,18,20;
140:8,13,18,25;141:3;
146:4;148:23;149:5,8,
11,16;150:5,15;
151:24;152:8,11
**School (3)**
10:23;51:14;72:7
**SCHWARTZ (18)**
90:5;91:21;92:4,9,
25;93:4,10,16,24;
94:21;96:14,20,25;
98:1,9;99:1,14;100:6
**science (8)**
16:4;50:24;51:10;
64:18;65:4;113:23;
122:9;133:17
**Sciences (6)**
49:19,24;50:7;51:1;
107:20;112:18
**scientific (8)**
12:4,25;15:23;
34:11;42:5;71:24;
112:16,24
**scientist (4)**
51:21;56:1;115:12,
19
**scientists (9)**
12:18;13:8,14;14:6;
15:22;51:12,24,24;
122:14
**scope (2)**
94:13,17
**screen (8)**
27:12;28:7;43:7;
107:1;118:2;119:5;
127:10;129:7
**se (1)**
11:24
**seat (1)**
101:5
**seated (6)**
6:12,22;85:19;
91:11;100:19;102:7
**second (10)**
8:12;14:20;29:9,14;
43:1,2,3;86:20;96:12;
143:9
**section (11)**
8:16;9:5,7,11,14;
50:20;52:17,18,22;
77:2;88:12
**sections (2)**
19:16;151:6
**seeing (2)**
45:12;63:5
**seem (1)**
138:5
**sees (3)**
62:25;66:7;132:22
**selected (1)**
110:10
**selecting (2)**
121:9,9

**selectively (1)**
81:19
**SEM (9)**
21:4;22:24,25;23:1,
18;24:6,12;25:18;
105:13
**SEMs (1)**
21:23
**sense (6)**
39:23;60:5;62:11,
11;80:8;150:6
**sent (5)**
21:11;110:16,17;
137:1,21
**sentence (4)**
40:5;43:10;48:22;
92:6
**separate (3)**
87:7,8;140:10
**September (1)**
14:21
**sequester (2)**
57:10;67:22
**sequestered (2)**
69:23;70:3
**sequesters (1)**
59:23
**series (1)**
123:8
**serious (1)**
23:8
**seriously (1)**
125:7
**serve (1)**
114:5
**served (2)**
38:1;150:24
**Services (1)**
50:25
**Session (2)**
6:4,11
**set (1)**
122:12
**setting (3)**
11:12;52:10;110:1
**seven (1)**
119:24
**Seventh (1)**
47:9
**several (2)**
40:25;48:25
**shape (2)**
61:10;121:2
**shapes (1)**
104:12
**share (1)**
113:1
**shared (1)**
112:24
**Shift (2)**
38:25;39:12
**shifted (3)**
40:24;92:6;93:21

**short (1)**
57:15
**show (16)**
16:3;26:23,25;
27:12;33:13;39:3;
63:19;67:13;99:4,5;
142:23;143:8;145:12,
14,25;153:17
**showed (6)**
31:4;58:1;67:6;
78:21;79:1;144:21
**showing (10)**
21:3;43:18;50:2;
52:4;62:10;63:10,13;
64:10,11;87:12
**shown (2)**
53:5,23
**side (4)**
43:14;117:15;
134:25;150:25
**sidebar (4)**
85:12,22;90:14;
91:13
**significance (1)**
28:18
**significant (9)**
28:22;29:5;31:7,9,
11,20;33:6;34:10;
82:15
**silicon (2)**
59:4;68:10
**similar (5)**
53:1,19;110:16;
113:17;114:2
**similarly (1)**
60:20
**simply (1)**
14:1
**single (5)**
57:6;58:23;62:4;
69:21,25
**sinuses (1)**
67:25
**sit (3)**
58:15;60:10;84:4
**sites (1)**
118:21
**sitting (5)**
60:2,17,23;75:18;
132:21
**situ (1)**
55:4
**situation (1)**
148:8
**six (2)**
110:9;119:24
**size (6)**
57:5;61:10,24;
68:11;69:19;81:17
**sleep (1)**
32:8
**Slide (28)**
67:5;87:6,8;95:3,4,5,

6,12,13;96:18;106:24;
107:3;109:17;111:6;
112:13;115:4,5;
117:24;118:7,15;
119:2,2,2;127:7,25;
129:4,9;142:24
**slides (15)**
16:10,24;17:5,7,11,
13;18:3;62:17,25,25;
86:17;94:19,22;95:2;
100:2
**slivers (1)**
17:19
**slow (1)**
93:16
**slowing (1)**
93:19
**small (8)**
18:20;58:21;62:7;
64:8;67:23;82:14;
120:25;129:22
**smaller (5)**
57:5;61:16,20,22;
64:6
**SMITH (43)**
136:12,15,23;137:8,
23;138:3;140:24;
141:5,11,15,19,22;
142:2,14,22;143:1,4,8,
14,17;144:7,12,13,21;
145:10,16,19,24;
146:2,7,12;147:25;
148:3,5;150:19;151:2,
7,10,15,18,23;152:13;
153:16
**Smith-Bindman (4)**
136:18,18;141:7;
152:20
**Smith-Bindman's (1)**
137:9
**Smith's (1)**
150:8
**snapshot (1)**
61:5
**societies (3)**
13:24;108:19,19
**Society (16)**
13:24;37:18;38:5,
15,21,24;39:20;
104:18;111:4;112:14;
113:4,16,17;114:1,3,7
**software (1)**
116:23
**soil (2)**
104:6;112:9
**solely (1)**
96:5
**somebody (2)**
21:11;152:2
**someone (4)**
65:8;66:5;89:22;
125:21
**someone's (1)**

132:9
**sometime (1)**
76:7
**sometimes (3)**
64:25;65:12;80:4
**somewhere (3)**
63:16;146:17,25
**sooner (2)**
90:25;148:19
**sorry (17)**
30:11;52:23;53:13;
59:18;65:18;73:14;
75:13;81:13;85:13,16;
87:4,13;92:2,4;93:17,
25;109:11
**sort (8)**
33:23,23;43:9,25;
60:25;61:5;69:2;
147:21
**sorts (4)**
103:11;107:25;
121:22;122:4
**sound (3)**
38:11;65:5;133:14
**sounded (1)**
143:10
**sounds (5)**
7:3;39:6;150:20;
151:13,16
**space (3)**
69:1,2,3
**span (2)**
57:15,23
**speak (3)**
93:21;125:8;149:23
**speaking (5)**
70:9,11,12;93:20;
139:15
**specific (9)**
9:9;94:22;96:2;
103:15;131:19;
140:20;141:6;142:19;
144:2
**specifically (5)**
26:21;46:17;50:20;
127:14;143:16
**specifics (2)**
139:24;140:2
**specimens (1)**
114:24
**spectroscopy (1)**
24:8
**speculate (1)**
53:9
**speculation (3)**
66:10;71:1,2
**speed (1)**
23:11
**Spencer (1)**
101:24
**spend (3)**
119:23;125:10,10
**spent (2)**

15:5;22:15
**sperm (1)**
46:8
**sponsored (1)**
51:4
**staff (1)**
115:12
**stain (1)**
66:19
**stand (8)**
82:25;86:14;100:25;
101:2,16;130:25;
136:1;146:13
**standard (3)**
22:1;25:18;110:1
**standardization (1)**
112:2
**standardized (1)**
111:24
**standardizing (1)**
111:8
**standards (1)**
108:23
**standing (1)**
128:4
**stands (1)**
109:24
**Stanford (8)**
10:23;11:14;19:21;
70:9,11,15;72:6,16
**start (6)**
85:12;121:1;145:21;
146:24;148:20,24
**started (6)**
8:22;101:4;108:12;
111:10;115:11,19
**starting (2)**
114:15;123:13
**state (8)**
10:25;50:23;51:9;
78:3;101:22;117:7,11,
15
**stated (3)**
102:18;107:11;
152:25
**statement (25)**
12:11;25:23;26:4;
28:15;33:9;34:5,23;
37:8;38:14;40:8;41:3,
10,12;42:9;47:20,24;
51:11;52:22;53:6,12,
13;54:6;57:18;110:18,
19
**statements (3)**
13:25;33:19;42:4
**state-of-the-art (2)**
11:2,14
**states (4)**
39:20;79:22;109:24;
117:12
**Static (1)**
65:14
**statistic (1)**

143:24
**statistical (1)**
28:17
**statistically (8)**
28:22;29:5;31:7,8,
11,20;33:6;81:20
**statistician (5)**
142:17,18,21;
143:25;144:4
**stay (2)**
59:21;147:5
**stays (1)**
59:4
**steel (4)**
111:11,12,14,15
**stenographic (1)**
154:5
**step (2)**
82:25;135:24
**stepped (1)**
37:9
**sterilize (1)**
46:8
**still (11)**
24:1;30:22;34:9;
36:10;54:22;55:6;
69:20;93:9;100:20;
132:13;147:19
**stop (2)**
48:12;75:17
**stopping (1)**
48:16
**stops (2)**
60:25,25;61:1
**story (3)**
41:19;86:11;114:17
**straight (1)**
130:25
**Strategy (2)**
38:25;39:12
**stretch (1)**
42:10
**strike (4)**
78:8;143:12;145:1;
152:24
**strikes (1)**
37:2
**striking (3)**
137:9,13,18
**stromal (1)**
65:23
**strong (1)**
35:7
**struck (2)**
142:3;143:6
**structure (3)**
22:7;118:23;126:23
**structures (3)**
23:19,23;104:10
**student (1)**
114:18
**studied (13)**
11:21,24,25;12:19;

14:6;16:23;17:6,7,8,
12;57:8;62:18;65:8
**studies (34)**
12:4,25;13:5;15:24;
19:25;26:7,14;32:8,15;
35:3,4,14,15;36:13;
48:25;52:23,25;53:17,
18;56:20;58:1,6;
65:21;79:22;91:25;
92:2,7,7;107:8;141:4;
142:24;143:2;144:18;
153:2
**study (54)**
10:13,16;16:21;
19:12,19,22;22:17,19;
26:16;27:14,22;28:18,
24;29:8,18,24;31:23,
24;32:4,5,10,14;33:8,
10;35:11;38:23;39:7,
11,16,19;40:2,15,16;
58:4;61:9,12,13;79:2,
7;80:22;81:12;82:13;
103:9,10,14,14,15;
104:5,9;107:7,25;
113:20;140:20;145:1
**stuff (4)**
60:19;89:23;134:11;
153:20
**styled (1)**
77:2
**subdiscipline (1)**
113:22
**subdisciplines (1)**
103:11
**Subgroup (2)**
29:25;81:14
**subject (3)**
92:5;135:3,5
**submission (1)**
14:15
**submit (2)**
99:10;148:19
**submitted (2)**
91:23;113:9
**subsequent (5)**
26:1,11,18;31:25;
34:25
**subspecialty (1)**
103:18
**substance (1)**
97:12
**substantial (1)**
34:10
**substantiate (4)**
26:2,19;32:1;35:2
**substantiated (2)**
41:14;54:9
**subtype (2)**
53:5,24
**succeed (1)**
15:1
**succinct (1)**
103:8

**sudden (1)**
9:10
**suffice (1)**
63:18
**suggest (2)**
56:4;79:23
**suggested (1)**
44:16
**suggesting (2)**
68:5;81:14
**suggestion (2)**
84:6;150:17
**suggests (2)**
49:4;58:9
**super-high (1)**
21:21
**supervision (1)**
154:23
**supplemental (2)**
8:3;98:7
**supplemented (1)**
8:23
**supplies (1)**
128:10
**supply (1)**
124:2
**support (10)**
26:7;31:24;33:9,25;
34:4,11,21;41:25;42:1;
115:12
**supported (1)**
42:5
**supports (2)**
35:4;49:3
**supposed (2)**
29:17;48:12
**sure (27)**
11:17;27:1,4,21;
31:1,3,14,19;37:20;
38:12;39:3,5;42:7;
48:5;49:15,25;52:11;
57:16;60:22;67:8;
85:18;99:24;113:13;
130:16;137:21;142:7;
153:16
**surely (1)**
46:25
**surgery (1)**
77:17
**surgical (2)**
17:16;56:9
**surrounding (2)**
70:3,6
**suspect (1)**
11:17
**suture (4)**
59:3,6,22;68:15
**sutures (2)**
59:5;68:19
**swear (1)**
101:18
**sweater (1)**
65:17

**sweeping (2)**
25:23;42:3
**switch (1)**
36:20
**switched (1)**
125:19
**sworn (4)**
7:11;74:16;102:3;
135:5
**systematic (3)**
137:10,13;141:8
**systems (2)**
107:22;116:23

## T

**table (6)**
29:9,16,19;84:1,3;
134:1
**Taher (4)**
32:4,9,14;35:10
**tailored (1)**
138:17
**talc (187)**
9:23;10:4,8;11:19,
21,22,24;12:1,4,6,10,
10,15,19,25;13:10,20,
25;15:12,16,23;16:18;
17:23,25;18:6,8;19:20;
20:9,20;25:7,25;27:23;
32:1,20;33:2;34:11;
35:16;36:12,12;41:6,
19;42:16,21;44:7,8,11,
16,19;45:1,11,18;46:2,
11,13,14,19,23;52:23,
25;53:18;54:16;55:11,
15;56:1,2,3,5,22,25,25;
58:2,9,25;59:13,16,16,
18,21;60:14;61:10,20;
62:16,16,17;63:15;
64:5;67:17;68:6,8;
69:13,14,14;70:8;
72:22;74:1,8,8;77:11;
78:4,14,18;80:13;
87:25;88:6,8,12;89:9,
10;91:16;92:1,10,12,
15,18,18,19,23;93:12;
94:4,5,6,10,11;95:24;
96:2,10,16;97:4,5,10,
11,11,18;98:16,16;
99:7;102:24;104:22;
105:1,2,5,5,8,9,14,16,
16;108:14;109:19;
110:5,11,24;112:10;
123:5,5,6,7,11,14,17;
124:1,2,24;125:7,22,
24;126:1,4;127:5,15,
17,24;128:9,10,15,16,
19,19,22;129:11,17,
18;131:20;132:12,12,
13;140:21
**talcum (12)**
53:2,21;96:3;97:17;

104:22;105:8;120:13;
130:3,7,13;133:11;
134:23
**talk (21)**
10:4;14:2;16:6;
31:23;32:13;50:19;
84:2;86:21;87:5;
89:25;92:10,11;94:16;
105:4;109:16;120:13;
127:14;133:13;
134:19;140:16;146:8
**talked (12)**
13:23;56:14;86:18,
19,20,24;87:1;89:8,9,
23;94:5;148:6
**talking (32)**
13:5,5;29:24;30:5,9,
10,14,19;31:14;43:19;
45:25;46:1,15,17;
53:14;62:9;92:3,8;
93:8,9;101:6;105:7;
120:13;121:1;129:16,
17,18,19,20,21;
131:11;140:11
**talks (1)**
94:3
**tall (1)**
128:3
**tandem (1)**
140:9
**teach (1)**
72:7
**team (1)**
148:10
**teams (1)**
15:21
**Technician (5)**
106:25;118:1;119:4;
127:9;129:6
**technologies (1)**
63:8
**technology (7)**
11:5,11;20:2,6;21:7,
13;22:23
**telling (2)**
25:9;47:19
**tells (2)**
55:19;62:13
**ten (13)**
35:17;72:12;79:8;
83:4,9,12;85:14;90:22;
141:3;142:24;143:2;
144:18;145:1
**tens (1)**
80:10
**TERI (1)**
7:10
**term (9)**
8:24;92:15;121:2,
13,15,17,17,25;122:1
**terms (4)**
12:22;122:3,4;128:6
**test (5)**

108:24;111:8,22;
112:1,8
**tested (4)**
110:5;123:2;125:21;
126:1
**testified (23)**
7:12;10:2;12:5,7;
18:6;23:18;25:7;44:1;
54:13;62:15;67:15;
70:19;74:7,19,21;75:2,
6;92:20;97:3,19;
102:4;104:21;139:25
**testifies (2)**
71:20;106:6
**testify (12)**
9:23;10:1;20:17;
88:4,5;89:4,5;93:5;
95:21;97:1,10;142:16
**testifying (5)**
71:21;74:1,8,11;
75:3
**testimony (30)**
14:4;15:12,14,15;
19:25;23:13,17;41:16;
42:24;57:9;62:19;
70:12;74:10,14,16;
75:15;78:5,13;89:13;
98:10;99:4;101:18;
104:20;144:22;145:14,
15,25;147:14,21;
152:24
**Testing (10)**
7:2;102:23;105:7;
111:4,22;117:21;
123:6,14,17;124:23
**tests (1)**
111:24
**textbook (1)**
52:16
**textbooks (1)**
47:17
**Theirs (1)**
141:3
**thereby (1)**
47:23
**therefore (1)**
112:1
**thick (1)**
79:13
**thinking (1)**
84:7
**third (5)**
8:14;9:6;25:22;33:8;
43:4
**though (3)**
10:5;72:1;147:2
**thought (9)**
9:16,20;45:10;
59:18;73:12;106:18;
141:15;142:10;147:23
**thoughts (2)**
8:25;40:23
**thousand (1)**

80:10

**thousands (1)**
80:10

**three (7)**
7:25;21:20;26:13;
34:22;35:14;80:5;
147:1

**thresholds (1)**
13:22

**throughout (1)**
56:15

**Thursday (4)**
148:2,8,11;150:11

**tie (5)**
96:21;97:15;99:2,6;
153:18

**tied (1)**
126:20

**till (2)**
50:11;83:11

**times (3)**
21:21;70:19;142:16

**tissue (43)**
9:24;10:8,14;12:1,4;
15:24;16:7;17:24;
19:12,16;20:10;22:17,
18,20,21,21;23:19;
47:23;54:17;55:3;
56:2,6;58:16;60:24;
61:3,8;66:12;69:23;
70:3;77:13,16;78:4;
80:17;105:14,17;
131:8,12,14,15,21;
132:13,19,21

**tissues (4)**
44:24;46:23;70:6;
78:9

**title (2)**
27:12;29:23

**today (12)**
15:12,14;36:22;
44:17;67:7;78:5;
94:15;105:4;126:9;
127:5;146:6;147:20

**together (4)**
33:23;34:9;35:6;
97:16

**told (1)**
84:9

**tomorrow (11)**
134:13;145:22,24;
146:12,14,23;149:18;
150:7;152:15;153:20,
22

**took (2)**
101:2;144:23

**tools (9)**
119:7,8,18,21,22,25;
120:4;123:19,23

**top (2)**
87:14;138:14

**topic (2)**
36:18;54:12

**tossed (1)**
41:24

**total (1)**
70:25

**totally (1)**
28:25

**towards (1)**
107:13

**tract (9)**
28:1;29:4;41:7;
42:17,22;43:19;44:12;
45:24;47:4

**tracts (2)**
30:20;81:15

**Trade (1)**
116:17

**trained (4)**
11:8,8,9;122:14

**training (5)**
66:14;70:13;124:19;
130:4;132:17

**transcript (4)**
152:19,23;154:7,21

**transcripts (1)**
153:15

**translational (1)**
72:9

**transmission (2)**
119:16;123:22

**transparent (1)**
149:9

**transpired (7)**
83:22;85:8,21;
90:16;91:8;100:16;
135:20

**treatise (3)**
47:14;52:5,6

**trial (13)**
8:7,15,20;9:6,17;
14:21;30:15;50:11;
74:8;99:2,19;134:17;
154:6

**tried (2)**
15:10,16

**tries (2)**
67:22;134:19

**true (11)**
17:17;27:22;36:15;
59:13,15;62:20;65:25;
72:17;77:25;97:21;
108:25

**trust (1)**
135:7

**truth (4)**
101:19,20,20;135:5

**try (7)**
15:4;103:8;111:24;
113:13;147:2,8,10

**trying (14)**
24:4;34:3;36:16,19;
46:10;50:17;64:7;
66:1,3;74:22;96:22;
112:2;129:23;133:13

**tubal (9)**
40:19;43:12;45:21;
46:5;47:20,23,25;49:7,
13

**tube (9)**
39:24,25;41:7;
42:17;43:11,15;45:2,
15;46:3

**tubes (5)**
30:23;40:21;44:8;
48:8,24

**tubo-ovarian (2)**
41:8;42:18

**Tuesday (1)**
151:17

**turn (5)**
28:9;43:1;79:12;
84:4;100:21

**turned (1)**
121:6

**TV (1)**
134:23

**twenty (1)**
83:12

**twice (1)**
143:16

**two (30)**
8:2;9:4,12;14:11;
38:2;53:25;54:7,8;
63:7;79:12;80:5,5;
86:3,17;91:23;94:19;
95:2;97:15;98:22;
112:12,17;129:16;
136:5,24;139:8,16,25;
141:21;144:15;146:25

**two-dimensional (1)**
21:10

**type (3)**
67:15;69:12;120:9

**types (6)**
103:15,17;107:23,
24;108:1;111:22

**typically (1)**
61:14

**U**

**UC (1)**
51:18

**Uhmm (3)**
10:1;39:3;79:10

**UK (1)**
147:15

**ultimately (2)**
49:10;110:10

**ultra (1)**
23:22

**ultra-structural (2)**
22:3,3

**UNC (1)**
51:19

**unclear (1)**
142:6

**under (16)**
14:5;15:3;20:24;
30:16;52:22;70:19;
78:9,18;79:19;97:23;
111:5;122:11;124:2;
129:22;149:20;154:22

**undergraduate (1)**
107:7

**Understood (1)**
152:13

**unfortunately (2)**
150:10,17

**United (1)**
109:24

**University (6)**
51:16,18;70:9,12;
109:13;114:23

**unless (5)**
24:4;64:9;132:16;
152:1;154:22

**unsophisticated (1)**
81:20

**unworkable (1)**
150:17

**up (51)**
7:5;14:16;23:10;
29:15,19,19;33:23;
44:8;45:11;48:15;
51:23;52:10;58:14;
59:1;64:6,7;72:5;84:2;
87:12;88:19;89:6,7,11;
90:3;91:14;92:17,20;
96:21;99:2,6;101:13;
104:2;109:13,14;
110:6;114:15,20;
120:19;121:2,20;
122:10;126:3;130:24,
25;136:17,21;138:20;
144:19;146:17;150:3;
152:20

**upcoming (1)**
88:23

**updating (1)**
9:2

**upon (5)**
125:4;126:23;130:4;
137:17;145:6

**use (29)**
8:24;11:7;19:14;
27:15,23;30:1;32:2;
33:2;52:25;53:2,18,20;
56:18;66:18;81:1;
104:13,14,15,16,18;
119:8,11,20;120:4;
123:7,12,16,19;140:21

**used (16)**
11:11;23:2;29:3;
32:20;35:16;49:16;
56:3;62:22;69:13;
81:15;111:21;119:22,
25;121:25;123:23;
145:12

**users (1)**

**V**

**vagina (1)**
46:12

**vague (1)**
12:22

**vaguely (1)**
39:6

**value (1)**
21:9

**variables (1)**
57:1

**varies (1)**
108:20

**variety (1)**
116:6

**various (8)**
108:15;114:4;
115:13;117:7,11;
118:21;123:6,15

**vary (2)**
53:5,23

**vastly (1)**
111:14

**verify (1)**
17:22

**version (2)**
47:5,7

**versus (2)**
63:6;111:12

**via (2)**
41:7;42:17

**vice (1)**
51:15

**view (1)**
36:17

**viewed (1)**
140:9

**viewpoint (1)**
128:18

**Virginia (1)**
51:14

**Virtually (1)**
80:15

**visited (2)**
127:4;129:15

**Vitae (1)**
110:21

**vocabulary (1)**
122:13

56:23

**uses (1)**
92:14

**using (7)**
21:22;22:16,19;
79:8;92:16;119:17;
120:2

**USP (6)**
109:19,24;110:11,
12,22;123:9

**uterus (1)**
30:25

**volcanos (1)**
103:14
**voluntary (1)**
149:13

## W

**Wait (1)**
87:3
**waiting (2)**
146:16,20
**wall (2)**
58:21;131:3
**wants (1)**
45:5
**watch (1)**
134:1
**water (1)**
112:9
**way (19)**
8:22;17:15;18:7,7;
21:4;23:25;28:23,25;
35:7;48:18;63:7;
69:19;70:5;71:23;
111:15;121:5;139:2,6,
25
**ways (4)**
107:25;112:7;
120:23;123:6
**wearing (1)**
6:8
**website (2)**
38:9,14
**wedding (1)**
151:22
**Wednesday (6)**
146:24;147:3,8;
151:21,25;152:6
**weeks (2)**
30:15;139:25
**weren't (1)**
90:20
**What's (9)**
8:21;50:2;72:24;
86:11;88:3;110:5;
127:24;128:12;151:1
**whatsoever (1)**
87:25
**whenever (1)**
104:1
**Whereupon (7)**
6:19;83:17,20;85:5;
91:5;100:13;135:17
**whispering (1)**
84:1
**white (1)**
136:4
**whole (18)**
8:15;9:4,13;18:16,
17;40:22;48:6,8;52:16,
16;86:23;88:12;
101:19;104:17;
113:23;116:7;122:12;

129:25
**who's (5)**
70:18;88:21,23;
92:24;93:3
**WINKLER (4)**
84:15,20,25;150:10
**within (7)**
25:17;80:19;94:13;
103:10;108:9;110:22;
115:16
**without (5)**
41:22;56:13;84:9;
122:5;136:8
**witness (46)**
11:22;12:24;14:12;
27:5,6,7;39:9;50:2,8,9;
53:8;54:22;66:11;
71:9,12,15;72:13;73:9;
75:5,9;76:15,16,17;
82:6,20,25;83:1,6;
85:12;86:14;88:23;
91:14;100:22;101:2,
21,24;108:13;132:11;
135:23,25;136:1,4;
139:24;146:11,13,19
**witnesses (1)**
149:23
**Wolf (4)**
97:1,2,3;98:9
**Wolf's (3)**
87:19;98:11,14
**woman (2)**
45:22;56:3
**women (12)**
27:23;29:3,4;30:19;
32:20;35:16;43:23;
44:24;45:8;56:22;
81:14;140:20
**word (3)**
72:24;110:19;
133:13
**words (2)**
42:20;74:20
**work (36)**
10:24;15:22;58:17;
63:2;102:22,22;
107:13;108:4,5,12,17,
22;113:2;115:13;
116:6,19,22;117:3;
118:4,7,9,17,18,19;
119:22;120:17;
122:24;123:18;
124:18;125:1,11,14;
126:1,21,24;127:13
**working (9)**
20:16;102:21;
108:23;110:4,8;
115:12;123:17;126:5;
148:25
**works (3)**
17:16;110:2;117:19
**world (2)**
112:22;116:17

**worth (1)**
147:14
**wow (1)**
58:16
**wrapping (1)**
136:17
**write (1)**
67:17
**writing (2)**
8:12;93:20
**written (2)**
42:8;140:1
**wrong (7)**
13:14,17;25:10,19,
20,20;97:8
**wrote (4)**
26:10;65:3;89:7,19

## X

**X-ray (3)**
24:8;119:14;123:21

## Y

**year (1)**
113:6
**years (23)**
35:17;38:2;44:23;
47:2;57:9;59:11,22;
72:12;74:13;79:8;
109:11;110:9;111:10,
11;112:17;115:7,9;
116:20;119:24;
122:25;123:3;126:2;
130:5
**yesterday (1)**
137:22
**York (1)**
117:11

## Z

**Zero (1)**
116:17

## 0

**05 (1)**
31:10

## 1

**1 (6)**
61:22;84:24;89:7,9;
97:6;106:24
**1.28 (1)**
33:5
**1.43 (1)**
140:23
**1:48 (1)**
6:4
**1:49 (1)**

6:20
**10 (3)**
61:16,21;95:14
**100 (1)**
94:18
**100th (1)**
112:17
**10-micron (2)**
68:6,8
**11/3/2019 (1)**
76:12
**110 (1)**
52:14
**12 (1)**
109:5
**13 (4)**
27:24;29:6;31:4,13
**15 (1)**
31:8
**155 (1)**
152:22
**17 (1)**
95:4
**1935 (1)**
39:8

## 2

**20 (8)**
53:3,21;57:3,11;
59:11,21;61:20;64:6
**2004 (1)**
37:24
**2007 (3)**
102:21;114:10;
115:19
**2009 (1)**
123:14
**2010 (2)**
96:15;98:15
**2012 (18)**
86:5,18;87:17,20;
89:8,16;90:8,8;94:23;
95:13,15,22;96:13,15,
19;97:1,4;98:16
**2015 (3)**
108:12;115:23;
127:15
**2018 (5)**
32:4;33:10;87:19;
95:23;98:17
**2019 (7)**
8:6,23;76:6,7;88:1;
91:24;98:23
**2020 (7)**
8:6;26:17;72:19;
88:2;89:1;91:24;98:23
**22 (1)**
70:19
**230.1 (2)**
150:21;151:1
**24 (1)**
35:14

**27 (1)**
32:15
**28 (1)**
32:21

## 3

**3 (3)**
76:6;119:2,2
**3:00 (1)**
83:12
**3:09 (1)**
83:18
**3:25 (1)**
85:6
**3:30 (1)**
91:6
**3:45 (1)**
100:14
**30 (8)**
53:3,22;57:15,23;
59:11,21,23;109:1
**30th (1)**
152:21
**31 (2)**
95:3,13
**3137 (2)**
106:3;119:3
**3rd (1)**
8:5

## 4

**4 (2)**
8:13;127:7
**4:24 (1)**
135:18
**4:30 (5)**
84:10;101:9,11,14;
147:5
**4:42 (1)**
153:24
**4:45 (1)**
84:17
**40 (3)**
57:9;59:11,21
**400 (1)**
50:14
**42 (1)**
35:18
**43 (7)**
141:1;142:11,20;
143:13,22;153:3,9
**44 (2)**
144:24;145:2
**45,000 (1)**
38:10
**4th (1)**
91:24

## 5

**5 (1)**

(Jury Trial - Afternoon Session) September 13, 2021
Kleiner v. Johnson & Johnson

127:25
**5,000 (1)**
  68:18
**5:00 (5)**
  84:8,10,14;101:9,12
**50 (1)**
  57:9
**500 (1)**
  68:12
**54 (1)**
  29:7

### 6

**6 (2)**
  8:14;129:4

### 8

**8 (3)**
  77:1;89:1;91:24

### 9

**9 (1)**
  67:5
**9/11 (2)**
  116:15,15
**9th (1)**
  8:6