# EXHIBIT 16

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

IN RE:  JOHNSON & JOHNSON
TALCUM POWDER PRODUCTS
MARKETING, SALES PRACTICES,
AND PRODUCTS LIABILITY LITIGATION

MDL No. 16-2738 (FLW)(LHG)

THIS DOCUMENT RELATES TO:
ANNA GALLARDO,                  )
                                )
                                )
   Plaintiffs,                  )Case No. 3:18-cv-10840
v.                              )
                                )
JOHNSON & JOHNSON, et al.,      )
                                )
   Defendants.                  )


TUESDAY, JANUARY 12, 2021


        Remote Oral Deposition of ANNA GALLARDO, taken pursuant to notice and conducted at the location of the witness in the State of Missouri, commencing at 8:30 a.m. Central Time, on the above date, before Jennifer A. Dunn, Registered Professional Reporter, Certified Court Reporter.


GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Anna Gallardo

Page 2

1  A P P E A R A N C E S
2
3  COUNSEL ON BEHALF OF PLAINTIFF:
4  ONDER LAW FIRM
   BY: CYNTHIA GARBER, ESQUIRE
5  110 E. Lockwood Avenue
   St. Louis, Missouri 63119
6  Tel: 314.408.6136
   garber@onderlaw.com
7
8  COUNSEL ON BEHALF OF DEFENDANT:
9  SHOOK HARDY & BACON, LLP
   BY: LORI MCGRODER, ESQUIRE
10 2555 Grand Boulevard
   Kansas City, Missouri 64108
11 Tel: 816.474.6550
   lmcgroder@shb.com
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1  I N D E X
2
3  ANNA GALLARDO                               Page
4     Examination by Ms. McGroder               4
5     Examination by Ms. Garber               109
6     Examination by Ms. McGroder             123
7     Examination by Ms. Garber               131
8  Certificate of Court Reporter              133
9  Letter for Signature                       134
10 Signature Page                             135
11 Errata Sheet                               136
12
13
14    E X H I B I T S
15
16 NUMBER   DESCRIPTION                        PAGE
17 1     Amended Notice of Deposition           14
18 2     Plaintiff Profile Form                 27
19 3     Signed Declaration Page                84
20 4     Dr. Wasserman Medical Record           84
         GALLARDO_ANNA_DRWASSERMAN_00305
21       through 307
22 5     Dr. Wasserman Medical Record           84
         GALLARDO_ANNA_DRWASSERMAN_00015
23       through 23
24 6     Dr. Wasserman Medical Record           84
         GALLARDO_ANNA_DRWASSERMAN_00303
25

Page 4

1           PROCEEDINGS
2     (January 12, 2021 at 8:30 a.m., Central Time.)
3           ANNA GALLARDO,
4  of lawful age, having been first duly sworn to tell the
5  truth, the whole truth and nothing but the truth, deposes
6  and says on behalf of the Defendants, as follows:
7           EXAMINATION
8  BY MS. MCGRODER:
9     Q   Good morning, Ms. Gallardo. I am Lori McGroder,
10 and I represent Johnson & Johnson in a lawsuit you brought
11 involving Johnson's Baby Powder.
12    A   Okay.
13    Q   I want to thank you first for accommodating us a
14 30-minute earlier for this deposition this morning, very
15 much appreciated.
16    A   Sure.
17    Q   Can you please, for the record, give us your full
18 name?
19    A   Anna Marie Gallardo.
20    Q   Thank you. And have you ever gone by any other
21 names?
22    A   Ann. Or Annie, sometimes Annie.
23    Q   All right. And what was your maiden name?
24    A   Russo. R-U-S-S-O.
25    Q   Thank you. Have you ever been deposed before?

Page 5

1     A   No, I have not.
2     Q   All right. Well, just as an introduction, I'll
3  give you a few of the ground rules for a deposition, which
4  possibly your lawyer has gone over with you, and we'll just
5  run through these really quickly.
6         Okay?
7     A   Okay.
8     Q   You need to answer verbally as in yes or no. Nods
9  of the head are difficult for the court reporter to take
10 down, especially in this virtual environment, so be sure and
11 answer verbally, okay?
12    A   Okay.
13    Q   Also, allow me to finish my question before you
14 begin your answer, even if you know what the end of my
15 sentence is going to be, that way we're not talking over
16 each other in the transcript; is that okay?
17    A   Sure, it is.
18    Q   If you don't understand something I ask, will you
19 please let me know that, otherwise I'll assume you
20 understood the question.
21        Okay?
22    A   Yes.
23    Q   If you need a break at any time, let me know. We
24 have the full day, and it does get a little tedious doing
25 these online and virtually, so just let me know if you need

2 (Pages 2 to 5)

Anna Gallardo

Page 38

1  not have Johnson's Baby Powder in your home?
2      A   I -- I think -- I'm -- I can't remember if we had
3  it in our home or not.
4      Q   Do you remember when in 1988 you stopped using
5  Johnson's Baby Powder?
6      A   No, I just remember it was around 1988.
7      Q   So your son would have been about 10 or 11?
8      A   10 or 11 years old, mm-hmm.
9      Q   And when you stopped using Johnson's Baby Powder,
10 did you replace talc usage in your genital area with any
11 other product?
12     A   No, I didn't use anything.  I decided that I
13 wasn't going to use anything.
14     Q   Did you have any concerns at the time that you
15 stopped using Johnson's Baby Powder?
16     A   No.  No, none at all.
17     Q   Did you talk to anyone about stopping your use of
18 Johnson's Baby Powder?
19     A   No.
20     Q   You didn't have any conversations about the fact
21 you weren't going to use Johnson's Baby Powder anymore?
22     A   No, no conversations.
23     Q   Have you ever told anyone not to use Johnson's
24 Baby Powder?
25     A   No.

Page 39

1      Q   And is your son married?
2      A   Yes, he is.
3      Q   And what's his wife's name?
4      A   Taneya.  T as in Tom, A-N-E-Y-A.
5      Q   And do they have children?
6      A   No.
7      Q   Have you ever talked to Taneya about your use of
8  Johnson's Baby Powder?
9      A   No.
10         MS. MCGRODER:  Are you good to go for a
11 little while longer or do you need a break?
12         THE WITNESS:  I'm okay.  I'll let you know
13 when I have to use the restroom, but I'm okay.
14         MS. MCGRODER:  I'll probably have to before
15 you do.  Cynthia, are you --
16         MS. GARBER:  Yeah, I was just going to say
17 why don't we try to break every hour or so, but we're not
18 quite there yet.
19         Are you going into another long topic?
20         MS. MCGRODER:  Not long, but another topic,
21 yes.
22         MS. GARBER:  Okay.  Good.  Let's maybe finish
23 that and maybe take a break.  If you're okay.
24         THE WITNESS:  I am for the moment.
25 BY MS. MCGRODER:

Page 40

1      Q   So you're a life-long St. Louis resident; is that
2  correct?
3      A   That's correct.
4      Q   And when you were growing up and you went to high
5  school in the city, were you also living in the city?
6      A   Yes.
7      Q   Where did you live growing up?
8      A   On Goodfellow Boulevard.
9      Q   Is the high school that you went to still there?
10     A   It's not called Laboure anymore, but the building
11 is still there.
12     Q   What is it called now?
13     A   I think it's called Cardinal Institute.  It was, I
14 don't know if it still is.
15     Q   So were you actually downtown St. Louis growing
16 up?
17     A   No, no, I was in North St. Louis City.
18     Q   And while you were growing up, who lived in your
19 residence with you?
20     A   My mother and father and my sister.
21     Q   And your sister's name is?
22     A   Patricia Opie, O-P-I-E.
23     Q   Thank you.  Anyone else ever live with you while
24 you were growing up?
25     A   No.

Page 41

1      Q   What did your father do for a living?
2      A   He was also in the restaurant business.
3      Q   What type?
4      A   It was a restaurant now, slash, bar.  He was, you
5  know, a bartender, restaurant, lunch and dinner.
6      Q   Did your parents own -- or your father own a
7  restaurant business?
8      A   Yes.
9      Q   And what was the name of it?
10     A   Coronado.
11     Q   And was that also in the City of St. Louis?
12     A   That was downtown City of St. Louis, yes.
13     Q   All right.  Did your mother work outside the home
14 while you were growing up?
15     A   She would work periodically at the restaurant as a
16 server.
17     Q   All right.  And were you in your parents' home,
18 did you live with your parents continuously until you
19 married Ramon?
20     A   Yes.
21     Q   Was the home that you grew up in, was it the same,
22 a single family dwelling, and was it the same one throughout
23 your entire childhood?
24     A   Yes.
25     Q   Did it ever undergo remodeling or construction at

11 (Pages 38 to 41)

Anna Gallardo

Page 130

```
 1    Q   So you wouldn't have a genetic test, and then
 2  Dr. Wasserman -- I'm sorry, Dr. Mutch told you the results
 3  of the test?
 4    A   Right. I went to someone else in his office to
 5  have the -- I guess she was a genetic counselor, I don't
 6  know her name. But I did go see her, but that was at Dr.
 7  Mutch's office.
 8    Q   And have you ever actually looked at the genetic
 9  test report?
10    A   It's been a while since I've looked at it.
11    Q   Okay. I'm going to read the language of the
12  genetic test report to you and ask you if you've ever heard
13  this, okay?
14    A   Okay.
15    Q   It says: "███████████████████████
16  ████████████████████████████████
17  ██████████████████████
18         Were you aware of that language in this test
19  report?
20    A   I don't remember it saying that.
21    Q   Okay. Has -- did anyone talk with you about
22  the -- the fact that the genetic test that you took does not
23  cover every possible gene associated with elevated risk of
24  gynecologic cancers?
25    A   I was not aware of that either.
```

Page 131

```
 1         MS. MCGRODER: Okay. Those are all the
 2  questions I have.
 3             EXAMINATION
 4  BY MS. GARBER:
 5    Q   With regard to the ███ use, I think counsel was
 6  asking you and I think you said you took the advice of your
 7  friend over Dr. Wasserman.
 8         Was Dr. Wasserman aware of your decision to not
 9  take ███ any longer based on whatever the basis was?
10    A   Right. He was aware. Yeah, he knew I wanted to
11  get off of it.
12    Q   Was he okay with it or was he upset by it?
13    A   He was fine with it. He said it was my decision.
14    Q   When you had the conversation with Dr. Wasserman
15  about the potential cause of your ovarian cancer, was that
16  at the time of your diagnosis of cancer?
17    A   Yes, it was right after -- right after my ███,
18  my next appointment with him.
19    Q   And that was in 2013; is that right?
20    A   Correct, yes. And that's when I brought up how
21  could this happen to me.
22         MS. GARBER: I don't have anything further.
23         MS. MCGRODER: I have no further questions.
24  Thank you so much, Ms. Gallardo, it was very nice to meet
25  you.
```

Page 132

```
 1         THE WITNESS: Thank you.
 2         MS. GARBER: Thank you.
 3         (Deposition concluded at 12:04 p.m.)
```

Page 133

```
 1                    CERTIFICATE
 2         I, Jennifer A. Dunn, Registered Professional
 3  Reporter and Certified Court Reporter, do hereby certify
 4  that prior to the commencement of the examination,
 5  ANN GALLARDO, was duly remotely sworn by me to testify to
 6  the truth, the whole truth and nothing but the truth.
 7         I DO FURTHER CERTIFY that the foregoing is a
 8  verbatim transcript of the testimony as taken
 9  stenographically by me at the time, place and on the date
10  hereinbefore set forth, to the best of my ability.
11         I DO FURTHER CERTIFY that I am neither a
12  relative nor employee nor attorney nor counsel of any of the
13  parties to this action, and that I am neither a relative nor
14  employee of such attorney or counsel, and that I am not
15  financially interested in the action.
16
17
18
19             "/s/JENNIFER A. DUNN"
20             Registered Professional Reporter
21             Certified Court Reporter
22
23         Dated: January 22, 2020
```

34 (Pages 130 to 133)