# EXHIBIT 3

Page 1

Volume III  Pages 1-120

Exhibits 66-79

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

_____

IN RE JOHNSON & JOHNSON TALCUM

POWDER PRODUCTS MARKETING,          MDL NO.

SALES PRACTICES, AND PRODUCTS       16-2738(MAS)(RLS)

LIABILITY LITIGATION

_____

VIDEOCONFERENCE DEPOSITION OF

JOHN GODLESKI, M.D.

Friday, April 19, 2024, 8:56 a.m.

MARRIOTT BOSTON - QUINCY

1000 Marriott Drive

Quincy, Massachusetts  02169

-----REPORTER: Sonya Lopes, RPR, CSR-----

Page 2

```
 1  APPEARANCES:
 2
 3  Beasley Allen Law Firm
 4      David P. Dearing, Esq.
 5      218 Commerce Street
 6      Montgomery, Alabama  36103-4160
 7      334.269.2343
 8      david.dearing@beasleyallen.com
 9      for Plaintiffs
10
11  Anapol Weiss
12      Richard Golomb, Esq.
13      One Logan Square
14      130 N. 18th Street, Suite 1600
15      Philadelphia, Pennsylvania  19103
16      866.930.2217
17      rgolomb@anapolweiss.com
18      for Plaintiffs
19
20
21
22
23
24
25
```

Page 3

```
 1  APPEARANCES:
 2
 3  Shook, Hardy & Bacon LLP
 4      Mark Hegarty, Esq.
 5      2555 Grand Boulevard
 6      Kansas City, Missouri  64108-2613
 7      816.474.6550
 8      mhegarty@shb.com
 9      for Defendants
10
11  Also present:  Michelle Parfitt (via Zoom)
12              Gino Mecoli (via Zoom)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1            I N D E X
 2
 3  WITNESS:     JOHN GODLESKI, M.D.
 4
 5  EXAMINATION BY:              PAGE
 6  Mr. Hegarty            7
 7
 8  EXHIBIT                PAGE
 9  Exhibit 66, invoice for work done on MDL
10      cases from January 5, 2024
11      to March 29, 2024..............8
12  Exhibit 67, plaintiffs' steering
13      committee's response and
14      objections to defendant
15      Johnson & Johnson's second
16      set of requests for the
17      production of documents to
18      John J. Godleski..............48
19  Exhibit 68, document Bates-labeled TalcMDL-
20      Godleski-000024 to 000074.....50
21  Exhibit 69, document Bates-labeled TalcMDL-
22      Godleski-000117 to 000119.....53
23  Exhibit 70, document Bates-labeled TalcMDL-
24      Godleski-000075 to 000098.....60
25
```

Page 5

INDEX

EXHIBIT                         PAGE
Exhibit 71, document Bates-labeled TalcMDL-
    Godleski-000001 to 000023.....69
Exhibit 72, article titled "Identification
    of Foreign Particles in Human
    Tissues Using Raman
    Microscopy"...................72
Exhibit 73, document Bates-labeled TalcMDL-
    Godleski-000099 to 000116 and
    000120 to 000286..............84
Exhibit 74, document Bates-labeled TalcMDL-
    Godleski-000287 to 000340.....89
Exhibit 75, article by T. Emi.............92
Exhibit 76, article titled "Magnesium/
    silicon atomic weight percent
    ratio standards for the tissue
    identification of talc by
    scanning electron microscopy
    and energy dispersive X-ray
    analysis"....................94

Page 6

INDEX

EXHIBIT                          PAGE
Exhibit 77, article titled "Analysis of
    particles from hamster lungs
    following pulmonary talc
    exposures: implications for
    pathogenicity"...............102
Exhibit 78, article titled "Analytic
    comparison of talc in
    commercially available baby
    powder and in pelvic tissues
    resected from ovarian
    carcinoma patients"..........108
Exhibit 79, article titled "The effect of
    talc particles on phagocytes
    in co-culture with ovarian
    cancer cells"................114

*Exhibits returned to Mr. Hegarty

Page 7

1       JOHN GODLESKI, M.D.,
2   having been satisfactorily identified by means of a
3   driver's license, was duly sworn by the notary
4   public, examined, and testified as follows:
5               EXAMINATION
6   BY MR. HEGARTY:
7       Q. Good morning, Dr. Godleski.
8       A. Good morning.
9       Q. As we typically do, would you just start by
10  stating your full name?
11      A. John Godleski.
12      Q. Dr. Godleski, again, my name's Mark
13  Hegarty. I represent Johnson & Johnson in this
14  case. We're here today to continue your MDL
15  deposition from where we left off on March 29, 2024.
16  That was three weeks ago.
17          Have you made any further amendments to or
18  otherwise revised any of your reports in the five
19  cases we discussed on March 28th and 29th?
20      A. No.
21      Q. Have you done any additional work on the
22  five cases we discussed on March 28th and March 29th
23  since we were last together on those two days?
24      A. Not really. I billed for the time up to
25  and including those two days of deposition.

Page 8

1       Q. Did you prepare an invoice for that time?
2       A. Yes.
3       Q. Have you sent the invoices out?
4       A. Yes.
5       Q. Did you bring copies of the invoices?
6       A. I have it right here.
7       Q. Thank you.
8          MR. HEGARTY: I'm going to mark as
9   Exhibit 66 what you just handed me, Dr. Godleski.
10         (Invoice for work done on MDL cases from
11  January 5, 2024 to March 29, 2024, Exhibit 66,
12  marked)
13      Q. And tell me what Exhibit 66 is.
14      A. Exhibit 66 is the invoice for work done on
15  the MDL cases from January 5, 2024 to March 29,
16  2024.
17      Q. Thank you. Can I have it back, please?
18  Have you spent any additional time on the MDL cases
19  since March 29, 2024?
20      A. Maybe half-hour to an hour in preparation
21  for today.
22      Q. Have you received the amount invoiced in
23  Exhibit 66?
24      A. I have.
25      Q. Thank you. Did you bring any other

Page 9

1   materials with you to today's deposition?
2       A. I have -- well, not as applies to the MDL
3   cases.
4       Q. Okay.
5           MR. DEARING: These are documents
6   responsive to your notice for the next deposition.
7       A. To the most recent.
8       Q. For purposes of the MDL deposition, did you
9   bring any other materials with you?
10      A. No.
11      Q. Did you go back and review your testimony
12  from either -- I'm sorry. Start again.
13          Did you go back and review your testimony
14  in the MDL from either the March 29 -- March 28 or
15  March 29 dates?
16      A. I looked at the notes that I made of what
17  you asked me to search for, and I searched for and
18  didn't find anything more.
19      Q. Do you recall what it is you searched for?
20      A. No. Not right now.
21      Q. As far as the testimony goes, did you
22  receive the transcripts and review any of the
23  transcripts?
24      A. No, I have not.
25      Q. Reflecting on your testimony, did you come

Page 10

1   up with anything that you recalled that you wanted
2   to modify or revise or that you believe was
3   inaccurate?
4       A. No.
5       Q. Has there been any change in your work
6   activities in the last three weeks?
7       A. No.
8       Q. Any change in the number of hours you're
9   working?
10      A. No.
11      Q. You mentioned that any additional work you
12  did since March 29th for the MDL may have amounted
13  to a half an hour or an hour to prepare for today's
14  deposition. What did you do for that half an hour
15  or hour?
16      A. Just looked over the notes that I had, did
17  some looking for some of the notes that I had where
18  there were questions of materials that you were
19  asking for that I didn't find previously and I still
20  didn't find. That was pretty much it.
21      Q. Other than the looking for the notes and
22  looking over your notes, did you review any
23  documents or medical literature to prepare for
24  today's deposition?
25      A. No.

Page 11

1       Q. Did you meet with counsel for plaintiffs to
2   prepare for today's deposition?
3       A. We had dinner last night.
4       Q. When you say "we," who is "we"?
5       A. Myself and Mr. Dearing and Mr. Golomb.
6       Q. Did you have any discussions about today's
7   deposition at that dinner meeting last night?
8       A. I'm sorry?
9       Q. Did you have any discussion about today's
10  deposition at that dinner, without telling me what
11  you talked about? Just "yes" or "no."
12      A. Yes.
13      Q. Other than that dinner meeting you had with
14  Mr. Dearing and Mr. Golomb last night, did you meet
15  or otherwise talk with counsel for plaintiffs to
16  prepare for today's deposition in the last three
17  weeks?
18      A. Not really. A couple of minutes this
19  morning but really -- didn't really cover anything.
20      Q. I have a few additional questions regarding
21  some of the individual plaintiffs we discussed three
22  weeks ago.
23          First, as to Ms. Gallardo -- and I will
24  hand you back your report that we marked as
25  Exhibit 5 for Ms. Gallardo.

Page 12

1           MR. HEGARTY: Dave, I didn't bring an
2   extra copy.
3           MR. DEARING: I'm familiar.
4       Q. You testified when we were last together
5   that you did review her slides for endometriosis.
6   Do you remember telling me that?
7       A. Yes.
8       Q. Tell me, what is your methodology or what
9   was your methodology in Gallardo for reviewing her
10  slides for endometriosis? That is, what did you do?
11      A. Looked at them under the light microscope,
12  looking for areas with endometrial glands and stroma
13  outside of the -- in sections outside of the uterus
14  and endometrium.
15      Q. Did you review all of the slides that you
16  had by PLM for indications of endometriosis?
17      A. I believe so.
18      Q. Is it your typical methodology to review
19  all the slides that you have in a case like Gallardo
20  for endometriosis?
21      A. In instances where there's an endometrial
22  -- endometrioid carcinoma, yes.
23      Q. In cases where you have a diagnosis, where
24  you're looking at a patient with a diagnosis of
25  endometrial carcinoma, do you always look at all of

Page 13

1    the slides you have using PLM for endometriosis?
2        A. No, not -- you wouldn't be using PLM for
3    endometriosis.
4        Q. I'm sorry. I misspoke. You use normal
5    light microscopy.
6        A. Normal light microscopy.
7        Q. Let me go back. When you have a patient
8    who has a diagnosis of endometrioid carcinoma, do
9    you always look at all of the slides that you have
10   by regular microscopy, regular microscope, for
11   endometriosis?
12       A. Yes.
13       Q. With regard to Ms. Gallardo, do you have
14   any documentation of your review of her slides for
15   endometriosis?
16       A. We have pictures of the findings of the
17   case, which we have provided to you, light
18   micrographs of them. And none of those show
19   evidence of endometriosis. And if it were there, we
20   would have taken a picture.
21       Q. Other than the photographs that you take,
22   the photomicrographs, do you otherwise document --
23   did you otherwise document your review of
24   Ms. Gallardo's slides for endometriosis by preparing
25   notes or otherwise document what you were doing?

Page 14

1        A. Generally, if we say in the report there
2    was none -- which I believe we did -- then that's
3    the documentation.
4        Q. Please look at your report. I looked
5    particularly at page 2. Tell me if you did make any
6    note in your report of whether Ms. Gallardo's slides
7    had endometriosis.
8        A. I'm sorry. I was --
9        Q. Please review your report. I did not see
10   where there's a reference to confirming or reviewing
11   the slides for endometriosis. Please let me know if
12   you can see where that was noted in your report.
13       A. I don't see that we did.
14       Q. Was it your normal practice based on your
15   recollection to make note of reviewing, in a case
16   involving endometrioid carcinoma, the slides for
17   endometriosis and what you found?
18       A. Yes.
19       Q. But did you not do that here?
20       A. I didn't -- doesn't seem I put it in the
21   report.
22       Q. Are you able to recall, sitting here today,
23   your review of Ms. Gallardo's slides for
24   endometriosis?
25       A. I'm quite sure that I did.

Page 15

1        Q. Is that -- my question's a little bit
2    different than that. Do you have a specific memory
3    in the Gallardo case back in 2021 of reviewing her
4    slides for endometriosis?
5        A. No.
6        Q. You said you're sure you did because that
7    -- as you indicated, your methodology is when you
8    have a patient with an endometrioid adenocarcinoma,
9    you always look for endometriosis.
10       A. That's correct.
11       Q. You mentioned that when you do a slide
12   review for endometriosis, that you're looking for
13   endometrial glands and stroma.
14       A. Yes.
15       Q. Is there a particular textbook that you
16   rely on or are familiar with that describes what
17   endometriosis looks like by regular microscopy?
18       A. Almost every pathology textbook does.
19       Q. Do you have a favorite pathology textbook?
20       A. Robbins and Cotran but -- I'm sure it's
21   described in there.
22       Q. Had you ever published on your review of
23   slides in patients involving endometrioid
24   adenocarcinoma where you're looking at
25   endometriosis?

Page 16

1        A. No.
2        Q. Have you ever published any articles that
3    describe endometriosis or your review of
4    endometriosis on slides?
5        A. No.
6        Q. Same question as to patients with clear-
7    cell adenocarcinoma. Have you ever published
8    anything where you're commenting on reviewing
9    patients with clear-cell carcinoma for the presence
10   of endometriosis?
11       A. I'm not sure. I would have to -- I didn't
12   go back and review the cases that we talked about
13   that we published to see how many of those were
14   endometrioid and if we, in fact, in the papers
15   mentioned endometriosis.
16       Q. When you have reviewed slides or -- strike
17   that.
18          In connection with your publishing of
19   papers where you're reviewing tissue for particles
20   including talc, in those instances where you had a
21   patient with endometrioid carcinoma or clear-cell
22   carcinoma, did you always look for the presence of
23   endometriosis?
24       A. Yes. We look at the tumor, document the
25   tumor, compare it to what's in the pathology report.

Page 17

1  If the pathology report says there's no
2  endometriosis or doesn't mention endometriosis, we
3  would still look for it.
4      Q.  Other than your publications that discuss
5  your review of particles in tissue, do you recall
6  any other publications of yours where you're
7  commenting on looking for endometriosis in patients
8  with either endometrioid or clear-cell
9  adenocarcinoma?
10     A.  No.
11     Q.  Prior to getting involved in litigation
12 involving claims of ovarian cancer from talcum
13 powder exposure, how many times a month did you
14 review slides for endometriosis?
15     A.  In the first five years of my career, I was
16 at Medical College of Pennsylvania, which was also
17 known as Women's Medical College.  And a lot of our
18 -- a lot of our surgical pathology was
19 gynecological.  And so in that period of time, it
20 would be fairly frequent.
21         Once I went to Brigham and Women's Hospital
22 where I was recruited to be the pulmonary
23 pathologist, I was not doing gynecologic pathology.
24     Q.  Do you recall ever reviewing tissue for the
25 presence of endometriosis between when you became

Page 18

1  the head of pulmonary pathology at Brigham and
2  Women's and when you started working on cases
3  involving talcum powder use and ovarian cancer -- in
4  that stretch of time -- do you recall ever reviewing
5  slides for endometriosis?
6      A.  No.  That wouldn't be something that I
7  would do.
8      Q.  Since you started working on cases
9  involving talcum powder use and ovarian cancer,
10 outside of your review of cases involving
11 endometrioid and clear-cell adenocarcinoma -- that
12 is, your normal work practice -- have you reviewed
13 slides for endometriosis?
14     A.  Some of the work that I've done in
15 collaboration with Dr. Cramer involved me looking at
16 his cases that had various ovarian tumors.  And if
17 there was an endometrioid carcinoma in that group,
18 it's likely that I also looked for endometriosis in
19 those.
20     Q.  When you say "his cases," are you talking
21 about cases that he's working on to prepare a paper
22 or litigation cases?
23     A.  Paper -- cases that either he was working
24 on for a paper or that we were working on and that I
25 was working on and using his cases as -- for the

Page 19

1  studies.  So not litigation cases but Brigham and
2  Women's Hospital patients that were -- where he had
3  defined the exposure to talc.
4      Q.  Can you estimate how many of those cases
5  there were?
6      A.  Maybe 20 or 30.
7      Q.  Since your initial five years where you
8  were -- of work where you were involved in
9  gynecologic pathology, since that time, how many
10 cases of endometrioid adenocarcinoma have you
11 diagnosed as a pathologist?
12     A.  As a primary diagnosis for looking at the
13 case as a pathologist at Brigham and Women's
14 Hospital?
15     Q.  Yes, Doctor.
16     A.  None.
17     Q.  None?
18     A.  None.
19     Q.  Same question as to clear-cell carcinoma.
20     A.  None.
21     Q.  Endometriosis can be obscured or
22 obliterated by the cancer itself.  Is that a fair
23 statement?
24     A.  Within -- if the endometriosis was in the
25 ovary and the cancer was in the ovary and the cancer

Page 20

1  caused necrosis of both -- there was necrosis of the
2  tumor as well as some surrounding ovarian tissue,
3  that's one way where it could be obscured.
4      Q.  Do you agree that not finding endometriosis
5  after cancer diagnosis in surgery does not rule out
6  that the patient had an endometrioid carcinoma or
7  clear-cell carcinoma that arose out of
8  endometriosis?
9      A.  Generally by not -- generally, there's not
10 just one small focus of endometriosis in an ovary
11 that becomes malignant.  Generally, if there's
12 endometriosis, you're going to see it in more than
13 one location so that it would be exceedingly rare to
14 have an instance where there's one single focus of
15 endometriosis in the ovary that becomes malignant so
16 that I think the answer to your question is that
17 that would be exceedingly, exceedingly rare.
18     Q.  You did mention, though, a moment ago that
19 you could have a case of endometrioid
20 adenocarcinoma, clear-cell carcinoma that
21 obliterated or obscured existing endometriosis.  In
22 such a case, you couldn't rule out that there was
23 endometriosis that preceded the cancer; correct?
24         MR. DEARING:  Objection.  Form.
25     A.  Again, you're talking about an exceedingly,

Page 21

1    exceedingly rare situation.  That is possible, but
2    the chances are -- of this being something that
3    would be found -- it's just so rare that it would be
4    reportable.
5        Q.  When you do a review of slides for
6    endometriosis, you're only able to review what --
7    the portion of tissue that the slides represent;
8    right?
9        A.  That's correct.
10       Q.  So you're not looking at all the tissue
11   that's removed from the patient's -- removed as part
12   of the patient's surgery; correct?
13       A.  That's correct.
14       Q.  Certainly is possible, do you agree, that
15   there can be endometriosis in tissue from which
16   slides were not made?
17       A.  Well, what you're suggesting is that an
18   incompetent pathologist failed to see a focus of
19   endometriosis and sample it.  And generally, it's
20   not that you find endometriosis on a random sample.
21   It's because you see a small discoloration, either a
22   brownish color from old blood or a focus of blood,
23   that you then sample and take a section of.  And
24   that's the basis of finding the endometriosis.
25        So it's actually a two-step process.  One

Page 22

1    is, in taking the section, looking carefully,
2    grossly at the section and then also seeing what's
3    taken under the microscope.
4        So these are not random sections.  These
5    would be directed sections, and you're suggesting
6    not seeing that.  That possibility would be really
7    an incompetent pathologist.
8        Q.  Is endometriosis always visible on gross
9    examination?
10       A.  Not always.  But very often there can be
11   obvious findings or fairly subtle findings that most
12   pathologists are trained to be able to spot.
13       Q.  If there is no gross evidence of
14   endometriosis, wouldn't you have to have taken a
15   slide from the portion of the tissue where there is
16   endometriosis to be able to see it?
17       A.  Yeah.  But, again, you're -- what you're
18   sampling -- and most of these cases have fairly
19   extensive sampling.  You know, they have 30, 50
20   slides on them.  And that's more than enough to be
21   able to detect something that may be there randomly
22   and not visible to the naked eye.
23        But generally, even a very small focus of
24   brown discoloration would be something worth
25   sampling, especially -- and in most cases, the

Page 23

1    pathologist has either done a frozen section or
2    there's previous evidence that the underlying
3    diagnosis is endometrioid cancer.
4        Q.  Do you agree, though, that a diagnosis of
5    endometrioid carcinoma -- as in Ms. Gallardo -- is
6    at least consistent with endometriosis-associated
7    endometrioid carcinoma?
8            MR. DEARING:  Objection.  Form.
9        Q.  You can answer.
10       A.  Ask that again.
11       Q.  Sure.  Do you agree that a finding -- as in
12   Ms. Gallardo -- of poorly differentiated
13   endometrioid adenocarcinoma, as you confirmed in
14   your report, is at least consistent with an
15   endometriosis-associated endometrioid carcinoma?
16           MR. DEARING:  Objection.  Form.
17       A.  It's true those two are associated.  But at
18   the same time, in Ms. Gallardo, where we have an
19   enormous number of amounts of talc in the case, the
20   possibility of -- if there even were endometriosis,
21   the overwhelming amount of talc here certainly
22   suggests talc having a very significant role in the
23   development of her cancer.
24       Q.  Do you recall mentioning, though, last time
25   we were together that if you would have a case of

Page 24

1    endometrioid adenocarcinoma and you would see
2    endometriosis that you would question whether this
3    is a case that should be pursued?  Do you remember
4    telling me that?
5        A.  Yes.  And I still stand by that statement.
6    But in this particular case where there's an
7    overwhelming amount of talc present, I mean, you
8    can't ascribe her cancer to some other cause.
9        Q.  I want to show you next a pathology report
10   we marked --
11           MR. HEGARTY:  I do have an extra copy of
12   this one, David.
13       Q.  -- for Ms. Gallardo.  It was Exhibit 3 --
14   is Exhibit 3, Dr. Godleski, the pathology report for
15   Ms. Gallardo's case?
16       A.  Yes.
17       Q.  Looking at the first page, under the
18   section "uterus," slash -- "uterus," comma,
19   "hysterectomy," do you see there's a finding of
20   adenomyosis?
21       A.  Yes.
22       Q.  Are you aware of studies showing that
23   adenomyosis has been shown to be associated with
24   endometriosis?
25           MR. DEARING:  Objection.  Form.

Page 25

```
 1        A. Some people go so far as to say that
 2   adenomyosis is a form of endometriosis.  But it's
 3   confined to the muscle of the uterus so that it's
 4   generally not considered evidence of endometriosis
 5   outside of the uterus. That's why it has the name
 6   "adenomyosis," because it's a distinct histologic
 7   pattern of glands extending down into the uterine
 8   muscle.
 9        Q. As part of your analysis of Ms. Gallardo's
10   tissues, did you do any research on adenomyosis and
11   endometriosis?
12        A. Did I do any --
13        Q. Sure.  As part of your work on the Gallardo
14   case, when you saw adenomyosis or otherwise, did you
15   do any research of literature discussing adenomyosis
16   and endometriosis?
17        A. Not specifically.  This is pretty much
18   accepted knowledge.
19        Q. Staying in the same part of the report.  It
20   also refers to Ms. Gallardo having a uterine polyp
21   and weakly proliferative endometrium.  Do you see
22   that?
23        A. Yes.
24        Q. Are you aware of literature discussing that
25   women with endometriosis are more likely to have
```

Page 26

```
 1   endometrial polyps and increased cellular
 2   proliferation of the endometrium?
 3             MR. DEARING:  Objection to form.
 4        A. I haven't specifically looked at that.
 5        Q. Are chronic pain in the pelvis or lower
 6   back and infertility associated with endometriosis?
 7        A. Yes.  Pain can be associated with
 8   endometriosis.
 9        Q. How about infertility?  Are you aware of
10   any association between infertility and
11   endometriosis?
12        A. That's -- that can also be part of the
13   reason for infertility.
14        Q. I believe you told me that you didn't
15   review any other records for Ms. Gallardo besides
16   what you're looking at, the pathology report.
17        A. That's correct.
18        Q. Do you know whether Ms. Gallardo had pelvic
19   or back pain or infertility prior to her diagnosis
20   of endometrioid adenocarcinoma?
21        A. No.  But those symptoms are not specific to
22   endometriosis.  They can be a number of other
23   things, including ovarian tumors and all that goes
24   with it.
25        Q. Is estrogen a known driver of
```

Page 27

```
 1   endometriosis?
 2             MR. DEARING:  Objection. Form.
 3        A. Endometriosis can cycle with the menstrual
 4   -- with the woman's menstrual cycle.  And so
 5   estrogen plays a role in all of that.
 6        Q. Do you know whether exogenous estrogen used
 7   by women after they're in menopause can drive
 8   endometriosis?
 9        A. I haven't really looked at that question.
10        Q. You can put that aside.  Next, as to
11   Ms. Newsome, I'm going to show you what we marked
12   previously as Exhibit 12.  That's your report for
13   Ms. Newsome.  Is Exhibit 12 your report for
14   Ms. Newsome, Dr. Godleski?
15        A. Yes.
16        Q. If you look at the second page, you can see
17   that -- just as Ms. Gallardo was -- Ms. Newsome was
18   diagnosed with endometrioid carcinoma.  Do you see
19   that?
20        A. Yes.
21        Q. Did you review her slides for
22   endometriosis?
23        A. Yes.
24        Q. Do you have a memory -- specific memory
25   sitting here today of reviewing her slides for
```

Page 28

```
 1   endometriosis?
 2        A. Not specifically, but I'm sure that I did.
 3        Q. Do you describe anywhere in your report for
 4   Ms. Newsome whether or not she had endometriosis in
 5   the slides you reviewed?
 6        A. In a quick look through the -- it doesn't
 7   appear that I did.
 8        Q. Outside of the report -- and you told me a
 9   short time ago you would have the photomicrographs
10   -- do you have any other documentation of your
11   review of her slides for endometriosis?
12        A. No.  It would be in the report.
13        Q. The only records you reviewed for
14   Ms. Newsome was the pathology report; is that right?
15        A. Yes.
16        Q. Is the finding of adhesions during the
17   surgery of -- for a patient who has endometrioid
18   carcinoma consistent with the patient having
19   endometriosis?
20             MR. DEARING:  Objection. Form.
21        A. Not necessarily.  Adhesions can develop
22   with endometriosis, but there are other reasons for
23   adhesions that do not involve endometriosis.
24        Q. You mentioned, though, that ad --
25   endometriosis can cause adhesions in the pelvis;
```

Page 29

1  correct?
2  A. Yes.
3  Q. In Ms. Newsome's case where you reported
4  finding a total of 31 talc particles -- that's over
5  on page 3 of your report at the bottom --
6  A. Yes.
7  Q. -- if you did find endometriosis in her
8  situation, would this be a case that you would
9  question whether it should go forward?
10  MR. DEARING: Objection. Form.
11  A. No.
12  Q. Is that because of the volume of talc you
13  found?
14  A. Again, yes. If we find 30 or 31 particles
15  within a single plane or section, you know, that
16  multiplies by 500 or more. And you really get very
17  big numbers. You can see the particles in the
18  histologic section. We're then looking at a
19  different plane of the same tissue by SEM. We're
20  only looking at a 2-micron-thick plane. And if we
21  find 30 particles within the blocks, that's a
22  substantial amount.
23  Q. Why does the volume of talc you found in
24  Ms. Newsome and that you found in Ms. Gallardo have
25  any effect on your thinking about whether the tumor

Page 30

1  was a talc-associated tumor or the tumor was an
2  endometriosis-associated tumor, that is, assuming
3  that there was endometriosis? Do you follow my
4  question? Let me start over again.
5  In Ms. Newsome's case, if you did find
6  endometriosis -- it's a hypothetical -- why would
7  the number of talc particles have an effect on your
8  opinion as to whether the endometrioid carcinoma
9  arose out of the endometriosis or was because of the
10  talc use?
11  A. Well, in fact, it would be almost
12  impossible to know for sure. But the fact that we
13  have more than enough talc particles to cause the
14  tumor suggests that they played a role in it,
15  perhaps along with the endometriosis.
16  If there's obvious endometriosis and few or
17  no talc particles, that would be a case that would
18  be unlikely to go forward. But when you have a lot,
19  it's very possible that the two processes are acting
20  synergistically.
21  Q. When you say "synergistically," what do you
22  mean?
23  A. Both the talc as well as the endometriosis
24  -- or perhaps even the presence of talc is enhancing
25  the response of endometriosis toward malignancy.

Page 31

1  Q. Can you cite for me any literature that you
2  would rely on to testify in any particular case?
3  A. No one has studied that.
4  Q. What's that?
5  A. No one has studied that.
6  Q. You can put that report for Ms. Newsome
7  aside. I want to next show you the report that we
8  marked as Exhibit 42 for Ms. Converse.
9  If you look over at page 2, Ms. Converse
10  was diagnosed with -- if I can find it here --
11  clear-cell carcinoma; correct?
12  A. Yes.
13  Q. I believe you told me that you also, in a
14  case involving clear-cell carcinoma, look for the
15  presence of endometriosis; correct?
16  A. Yes.
17  Q. Did you in the case of Ms. Converse review
18  her slides for endometriosis?
19  A. I'm sure I did.
20  Q. Do you have a specific memory here today of
21  reviewing her slides for endometriosis?
22  A. Not specifically.
23  Q. When you say you're sure you did, is that
24  because your methodology is -- in a case like hers
25  where there's a diagnosis of clear-cell carcinoma,

Page 32

1  you always review the slides for endometriosis?
2  A. Yes.
3  Q. Did you make reference in your report to
4  your review of her slides for endometriosis?
5  A. It doesn't appear that we did.
6  Q. Other than the photomicrographs that you
7  took, do you have any other documentation of any
8  analysis you did of Ms. Converse's slides for
9  endometriosis?
10  A. Not that I know of.
11  Q. In Ms. Converse's case, you only reviewed
12  the pathology report -- is that correct --
13  A. Yes.
14  Q. -- and her medical records?
15  A. I want to show you what we marked as
16  Exhibit 40 the last time, which is the pathology
17  report for Ms. Converse.
18  If you look over at the -- at page 3 of 4,
19  Dr. Godleski, do you see where the frozen section
20  description, which is about two thirds down, says
21  "adenocarcinoma favor high-grade endometrioid"? Do
22  you see that section?
23  A. Yes.
24  Q. From your experience, does clear-cell and
25  endometrioid look similar on frozen section?

Page 33

1    A.  They could.
2    Q.  Ultimately, though, the diagnosis was
3  clear-cell carcinoma; correct?
4    A.  Yes.
5    Q.  Is a diagnosis of clear-cell carcinoma with
6  an initial frozen section indication of high-grade
7  endometrioid at least consistent with a case where
8  you have endometriosis-associated cancer?
9        MR. DEARING:  Objection.  Form.
10    A.  No.  I think the -- actually, in terms of
11  this frozen section diagnosis, it's -- the diagnosis
12  is adenocarcinoma.  And favoring high-grade
13  endometrioid isn't really a hard-and-fast diagnosis.
14  It's more or less a suggestion.
15        But the fact that endomet -- or clear-cell
16  is considered a variant of endometrioid, one would
17  look for endometriosis in those cases.
18    Q.  You agree -- because of your methodology --
19  that when you do have a case of clear-cell carcinoma
20  or endometrioid carcinoma that you suspect that
21  there could be endometriosis in the tissue.
22    A.  We would look for it, yes.
23        MR. DEARING:  Objection.  Form.
24    Q.  In Ms. Converse's case, if you look at your
25  report over on page 4, you found a total of 4 talc

Page 34

1  particles for her.
2    A.  Yes.
3    Q.  Please let me known when you've confirmed
4  that.  Do you see that?
5    A.  Yes.
6    Q.  In the case of Ms. Converse, only finding
7  four talc particles, if you did find endometriosis
8  in her tissue, would you question whether this is a
9  case that should go forward?
10        MR. DEARING:  Objection.  Form.
11    A.  More likely, yes.
12    Q.  We've been talking about your review of
13  particles in tissue as to the five cases -- five MDL
14  cases.  You also did that same review for some of
15  the -- some of your publications; correct?
16    A.  Yes.
17    Q.  Did you use the same methodology in your
18  review of the five cases as you did in the
19  publications where you were describing your review
20  or where you did your review of tissue -- particles
21  -- tissue for particles -- let me start over again.
22        In the publications of yours, did you apply
23  the same methodology that you did in reviewing --
24  let me start over again as well.
25        In your publications where you talk about

Page 35

1  reviewing patients' tissues for particles, did you
2  apply the same methodology that you did in the five
3  cases we've been talking about for the MDL?
4    A.  Yes.
5    Q.  In particular, for your publications, did
6  you confirm in each case of a patient the diagnosis
7  of ovarian cancer?
8    A.  Yes.
9    Q.  In each of the cases that you comment on in
10  your publications, did you obtain the original
11  pathology tissue?
12    A.  Yes.
13    Q.  Did you make recuts in every situation?
14    A.  Wait a minute.
15        MR. DEARING:  Objection.
16    Q.  Let me go back.  Sounds like you didn't
17  understand.  Let me start over again.
18    A.  Okay.
19    Q.  In your publications where you're reviewing
20  the tissue of patients for particles, did you obtain
21  the original pathology in each case?
22        MR. DEARING:  Can I just ask for a point
23  of clarification?  Are you talking about all of his
24  publications in his career?
25        MR. HEGARTY:  I'm talking about the

Page 36

1  publications where he's looking at reproductive
2  tract tissue for the presence of particles, really
3  the publications in the last four, five years.
4        MR. DEARING:  He's been doing it since
5  the early '80s, so.
6        MR. HEGARTY:  Understood.
7    Q.  But my questions are specifically as it
8  relates to your more recent publications where
9  you're looking at reproductive tissue for particles.
10        And in all those cases, do you always get
11  the original pathology or -- did you always get the
12  original pathology?
13    A.  No.  We more often have recuts in cases
14  that have come from other hospitals.  In cases that
15  were Brigham and Women's Hospital cases that were
16  part of publications, there, we were looking at
17  original slides because we had access to them,
18  whereas the cases that come as consults -- whether
19  from legal matters or as other consults -- more
20  often than not you get recuts.
21    Q.  In your publications, whether they came as
22  consults -- regular consults or came as legal
23  consults, how did you go about obtaining either the
24  original pathology or the recuts?  Who obtained that
25  for you?

Page 37

1    A. If they're legal cases, they came from law
2  firms. If they were consults, they may have come
3  from pathologists.
4    Q. If they were consults that came from
5  pathologists, did you get any type of informed
6  consent or release from the patients as part of your
7  publications?
8    A. Brigham cases always have consent for
9  publication of the case. It's part of the general
10  consent forms that the patients sign. In the case
11  of the legal cases, we did not go to the people or
12  their relatives to get specific public -- permission
13  for publication.
14    Q. Do you know whether anyone got, from legal
15  consult cases, consent or permission to comment on
16  their tissues in your publications?
17    A. No. But at the same time, those were
18  de-identified completely so that, in fact, many of
19  the hours spent in this effort was because you
20  wanted to know what the billings were for any legal
21  cases. And re-linking them was not easy even for us
22  to do so that, for anybody else, being able to
23  identify these cases would be near impossible.
24    Q. My question, though -- I think you answered
25  it originally -- was simply whether, if you know, if

Page 38

1  in the legal consult cases, whether any
2  authorization was consent -- or consent was obtained
3  for their tissues to be described in your
4  publications.
5    A. No, not to my knowledge.
6    Q. In any of your -- for any of your
7  publications, did you seek IRB review or approval
8  for your protocols?
9    A. Yes. Yes.
10    Q. For all of the publications involving
11  talcum powder -- review of tissues for talc?
12    A. We had IRB approval from the Brigham where
13  we used -- Brigham cases were in any way part of the
14  study. In those instances where we were doing
15  either in vitro or animal studies, which are some of
16  the work that we published, we did not need to have
17  the human studies approval for those.
18    Q. But if you used a Brigham and Young
19  (verbatim) patient -- patient's tissue as a
20  reference in your publications, that was through IRB
21  approval?
22    A. That was IRB approval that Dr. Cramer had.
23    Q. As to the patients who you comment on in
24  your publications, as it relates to your review of
25  their tissues for talcum powder use, do you still

Page 39

1  have any of the slides that were reviewed or the
2  tissue blocks that were reviewed?
3    A. On some of them.
4    Q. On the ones that you don't have and even --
5  let me start over again.
6      On the ones you still have and the ones
7  that you have returned, do you have chain of custody
8  documentation for all?
9    A. Yes.
10    Q. And do you keep that record of that chain
11  of custody in your files somewhere?
12    A. Yes.
13    Q. We talked about this a moment ago. But in
14  all the patients whose tissue you talk about in your
15  publications, did you review their tissues for the
16  original diagnosis of ovarian cancer?
17    A. Yes.
18    Q. Did you also have the original pathology
19  reports for each of the patients?
20    A. Yes.
21    Q. Did you compare what you found to the
22  pathology reports?
23    A. Yes.
24    Q. Did you ever find a difference in
25  diagnosis?

Page 40

1    A. No major differences.
2    Q. In all of the cases that you comment on in
3  your publications where you're looking at
4  reproductive tract tissue for particles -- in
5  particular, talc particles -- did you take
6  photomicrographs of the slides you reviewed?
7    A. Yes.
8    Q. Do you still have those photomicrographs?
9    A. Yes.
10    Q. Are you able to link those photomicrographs
11  to particular patients?
12    A. Yes.
13    Q. In some of the publications where you show
14  the photomicrographs, are you showing them all or
15  just a selected portion?
16    A. I'm not sure I understand.
17    Q. Sure. In any publication where you have a
18  photomicrograph of reproductive tract tissue, did
19  you include all the photomicrographs or just a
20  selective -- selected ones?
21      MR. DEARING: Objection. Form.
22    A. We're showing selected ones. And in some
23  cases, we're even cropping them so that you have the
24  picture of the most important finding rather than
25  material that's not necessarily contributory to the

Page 41

1    point that's being made so that I would say they
2    were selected.
3        Q.  For all the patients who you talk about in
4    your publications where you're looking at
5    reproductive tract tissue for particles, did you
6    look at the slides using polarized light microscopy?
7        A.  Yes.
8        Q.  Did you document anywhere -- either by
9    handwritten notes or otherwise -- the presence of
10   and also the number of birefringent particles for
11   each of the slides you reviewed?
12       A.  We always identified the slides with
13   birefringent particles.  If we're looking to either
14   use the data in terms of the numbers of birefringent
15   particles, we then count those and have those
16   numbers.  If we're not doing that, then we wouldn't
17   have those numbers.
18       Q.  Do you have -- did you document the number
19   of particles you saw -- that is, the birefringent
20   particles you saw -- by polarized light microscopy,
21   if that's what you were doing for that paper?
22       A.  Yes.
23       Q.  Do you still have that documentation
24   somewhere?
25       A.  Yes.

Page 42

1        Q.  Did you document it by the same type of
2    handwritten notes we looked at for the five MDL
3    cases?
4        A.  It would be a documentation that we had
5    counted the number of particles in each -- in the
6    tissue and would have that documentation.
7        Q.  Did you take photomicrographs of the PLM
8    images that showed birefringent particles as you do
9    for the litigation cases and in particular the five
10   cases we've been talking about?
11       A.  Yes.
12           MR. DEARING:  Objection.  Form.
13       Q.  Do you still have those photomicrographs?
14       A.  Yes.
15       Q.  Did you, based on the number of particles
16   you saw in the slides, make a request for the blocks
17   that correspond to those slides?
18       A.  Yes.
19           MR. DEARING:  I'm sorry.  Are we talking
20   about in his studies --
21       Q.  In your studies.
22           MR. DEARING:  -- or in his cases --
23       Q.  These questions all relate to your studies.
24           MR. DEARING:  I got confused.
25       A.  Yeah.

Page 43

1        Q.  That's a fair point.  Did you prepare for
2    each of the patients who you comment on in your
3    studies where you're looking at reproductive tract
4    tissue and the presence of particles, including
5    talc, an analysis summary like you prepared for the
6    five MDL cases?
7        A.  Yes.
8        Q.  Is that in a PowerPoint presentation format
9    like you have for each of the five MDL cases?
10       A.  Most likely, yes.
11       Q.  Do you still have those analysis summaries?
12       A.  Yes.
13       Q.  Do you have documentation of the particular
14   pathology blocks that were requested for each of the
15   patients who you comment on in your publications
16   where you're looking at reproductive tract tissue
17   and talc?
18       A.  Yes.
19       Q.  As you did in your analysis summary, do you
20   have documentation that is like the type we looked
21   at in the analysis summary where there's a yellow
22   dot showing the part of the tissue where you
23   documented the most particles by -- most
24   birefringent particles?
25       A.  Most likely.

Page 44

1        Q.  Do you still have those as well?
2        A.  Yes.
3        Q.  And with regard to the patients whose
4    tissue you looked at by SEM/EDS, if you did receive
5    blocks of tissue, did you look at all the blocks or
6    only selected blocks?
7        A.  Depends on the case.  Some we looked at
8    all.  Some we looked at selected ones.
9        Q.  In the -- in your publications, did you use
10   the same microscopic -- same electron -- scanning
11   electron microscopy technique that's described in
12   Abraham and Thakral that you talked about in your
13   publications?
14       A.  Yes.
15       Q.  I'm sorry.  You talked about in your
16   reports.
17       A.  Yes.
18       Q.  In each of the cases where you're looking
19   at a patient's tissue for purposes of your -- I'm
20   sorry.
21       A.  We have one publication where we use
22   digestion, which would be different from the Abraham
23   and Thakral approach.
24       Q.  Thank you for pointing that out.
25           In each of the publications where you did

Page 45

1  SEM and EDS, did you also examine the tissue at
2  higher magnifications for morphological
3  characteristics of the tissue?
4      A. Yes.
5      Q. Do you still have the images -- any images
6  you would have taken from that higher magnification
7  review?
8      A. Yes.
9      Q. For all the patients whose tissue you
10 comment on in the publications of yours where you're
11 looking at reproductive tract tissue for the
12 presence of particles, do you still have the -- do
13 you report on the results using the same electron
14 image and spectrum-type images you used for the five
15 cases here?
16     A. Some of them have not been reported because
17 a report was not asked for if they were legal cases
18 for whatever reason. So there may not have been a
19 finalized written report done on some of them.
20     Q. I'm sorry. My question was a little bit
21 confusing.
22         Do you identify each spectrum and each
23 image for the patients who are part of the
24 publications, just like you do for your litigation
25 cases?

Page 46

1      A. Yes.
2      Q. Do you still have the spectrums and images?
3      A. Yes.
4      Q. Did you use the same plus or minus 5
5  percent in identifying talc particles from your
6  confirmed number for talc?
7      A. Yes.
8      Q. That's .649?
9      A. Yes.
10     Q. Did you ever apply any other plus-or-minus
11 standard in any of your publications where you're
12 identifying talc particles in tissue?
13     A. I don't think we specifically used the plus
14 or minus 5 percent in the 2007 paper that we did,
15 which was the first one. I think there, we did not
16 do that as part of our approach.
17         I think we -- it turns out that certainly
18 what we showed in the paper and what we talked about
19 where -- we didn't give exact numbers of particles
20 in that case report, nor did we talk about 5 percent
21 plus or minus 6 -- .649.
22     Q. In your other papers --
23     A. In all the others we have.
24     Q. -- after the 2007 paper, did you apply the
25 same plus or minus 5 percent to the .649 talc

Page 47

1  number?
2      A. Yes.
3      Q. Did you apply the same procedures for
4  handling the tissue in your publications where
5  you're looking at reproductive tract tissue for talc
6  as you did in the five MDL cases?
7      A. Yes.
8      Q. Did you deviate in any way from the
9  protocol -- from the tissue-handling protocol that
10 you describe in your reports for the five MDL cases
11 in your publications?
12     A. No.
13     Q. To the extent you made recuts or got recuts
14 of slides, is it the case where you talked about a
15 moment ago either you sent those recuts back or you
16 still have them?
17         MR. DEARING: Objection. Form.
18     A. I'm not sure what you're asking.
19     Q. Let me ask a different way.
20         If you had a case where you only got
21 recuts, did you retain the recuts? Or did you send
22 those back?
23     A. Most of them have been sent back, but some
24 have not been requested back so that we still have
25 them.

Page 48

1      Q. In all of the cases that you looked at for
2  your publications where you're looking at
3  reproductive tract tissue, did you digitize the
4  photos of all the slides that you received?
5      A. Most likely, yes.
6      Q. Would you still have all those digital
7  images?
8      A. Yes.
9         MR. HEGARTY: Why don't we go off the
10 record real quick.
11         (A break was taken.)
12         MR. HEGARTY: We are back on the record.
13 Dr. Godleski, I next want to walk through the
14 documents we received in response to a Johnson &
15 Johnson second set of requests for production of
16 documents directed to materials that you have.
17         I want to mark the responses we received
18 to those second set of requests for production that
19 were provided by the plaintiffs' steering committee
20 at Exhibit 67.
21         (Plaintiffs' steering committee's
22 response and objections to defendant Johnson &
23 Johnson's second set of requests for the production
24 of documents to John J. Godleski, Exhibit 67,
25 marked)

Page 49

1    Q. I'm going to walk through these as I walked
2    through the first set of document requests when I
3    talked about when we were last together. If you can
4    turn over to page 2. Under the section "responses
5    and objections to document requested" -- do you see
6    that section --
7    A. Yes.
8    Q. -- Request No. 1 asks to "Produce all
9    documents related to any funding received for any
10   portion of the work described or discussed in the
11   articles."
12       Do you remember, when we talked about it
13   the last time, the definition of "articles" were all
14   your articles that have been really in the last five
15   years since 2019, the Johnson, McDonald, Sato,
16   Mandarino articles? Do you understand that that's
17   what the articles --
18   A. Yes.
19   Q. Those are the articles that this is talking
20   about?
21   A. Yes.
22   Q. And the response was "None. All
23   publications list sources of funding. There are no
24   other sources." Is that an accurate answer?
25   A. Yes.

Page 50

1    Q. No. 2 -- Request No. 2 says "Produce all
2    drafts, edits, and revisions of the articles."
3    Response is "Produced herewith is Dr. Godleski's
4    copy of a draft of the Mandarino article, Bates-
5    numbered as TalcMDL," dash, "Godleski," dash,
6    "000024 to 000074. Dr. Godleski has no other
7    drafts, edits, or revisions in his possession." Did
8    I read that correctly?
9    A. Yes.
10   Q. I'm going to show you what was produced to
11   us that are -- that was Bates numbered or is Bates
12   numbered 024 to 074.
13       MR. HEGARTY: I will mark this Bates
14   range of numbered documents as Exhibit 68.
15       (Document Bates-labeled TalcMDL-
16   Godleski-000024 to 000074, Exhibit 68, marked)
17   Q. Please look through Exhibit 68,
18   Dr. Godleski. And tell me if that is the draft of
19   the Mandarino article that you were able to locate.
20   A. I think so.
21   Q. Of all the articles that we've defined as
22   "articles," is this the only draft, edit, or
23   revision you were able to locate in your file?
24   A. I think so.
25   Q. Who was the lead author on the Mandarino

Page 51

1    article?
2    A. Mandarino.
3    Q. Was he -- I'm sorry. Is it he or she?
4    A. It's a he.
5    Q. Was he the one who dealt with the journal
6    directly, if you know?
7    A. I think Dr. Fedulov dealt with the journal.
8    Q. Do you know whether any of the other
9    authors of the Mandarino paper or of your other
10   authors on your other papers have any drafts, edits,
11   or revisions to those articles?
12   A. No.
13   Q. Did you ask any of the other -- your other
14   authors on any of the articles whether they had
15   drafts, edits, or revisions?
16   A. Generally -- yes. But, generally, the way
17   we do it -- the way we do it is we discuss the
18   article and do an in-depth discussion of what's
19   going to be in the article so that when who's ever
20   writing it sits down to write it, it pretty much is
21   -- there's not much to change, not much to -- many
22   things to make.
23       Then they get submitted. And some come
24   back not reviewed because the editors didn't feel it
25   was right for their journal, and some get accepted

Page 52

1    straightaway. Some have some minor corrections. We
2    make the minor corrections. It's usually made by
3    the author. And whether they have those -- they may
4    not.
5    Q. In your review of your documents to find
6    the Mandarino draft that we marked as Exhibit 68,
7    did you reach out to any of your other authors on
8    your -- on the publications of the articles to see
9    if they had any drafts or revisions or edits?
10   A. No.
11   Q. You can put that one aside, Dr. Godleski.
12   Request No. 3 asked to "Produce all communications
13   between you and any third parties concerning the
14   articles or any drafts of the articles, including
15   but not limited to any communications with journals
16   to which any drafts of the articles were submitted,
17   any communications with the journals in which the
18   articles were published, and all comments from peer
19   reviewers of any drafts of the articles."
20       The response reads "Produced herewith,
21   Bates numbered as TalcMDL," dash, "Godleski," dash,
22   000117 to 000119.
23       MR. HEGARTY: I'm going to mark as our
24   next exhibit, Exhibit 69, that Bates range of
25   documents that Response No. 37 describes.

Page 53

1          (Document Bates-labeled TalcMDL-
2   Godleski-000117 to 000119, Exhibit 69, marked)
3          Q.  Is Exhibit 69 the documents that you found
4   to -- that were responsive to Request No. 3?
5          A.  Yes.
6          Q.  I may have given you more than one copy.
7   Did I give you more than one copy?
8          A.  Yeah.
9          Q.  The e-mail at the top is an e-mail from you
10  to Dr. Fedulov; is that correct?
11         A.  Yes.
12         Q.  If you look at the e-mail below that one
13  dated June 18, 2019 where it looks like a forwarded
14  message, is this e-mail string discussing a
15  rejection of the -- of this paper?
16         A.  Yes.
17         Q.  And is this paper the Mandarino article?
18         A.  Yes.
19         Q.  This was a rejection from the journal
20  Particle and Fibre Technology -- I'm sorry --
21  Toxicology.
22         A.  Toxicology, yes.
23         Q.  Was this -- was that the first journal that
24  the Mandarino article was submitted to?
25         A.  Yes.

Page 54

1          Q.  Do you know why that journal was chosen?
2          A.  Yeah.  It's a good journal.  It's an online
3   journal.  I actually know the editor very well.  And
4   I was -- I thought his response was kind of funny.
5          And I thought the whole exchange was kind
6   of funny and embarrassing to them because he first
7   said that they reviewed it but they didn't have any
8   critique, except for the English of it.  And then
9   they -- then, in fact, they had to admit that it was
10  an editorial decision made by the editor not -- to
11  reject it and that it hadn't been sent out for peer
12  review, and so that -- I kind of thought that it was
13  kind of a funny exchange.
14         And that's why I kept it and that I thought
15  it reflected badly on the journal and its editor.
16  And, I mean, it's -- he's visited my lab.  I visited
17  his lab and spent a fair amount of time with him.
18  We've collaborated on things, and so that -- the
19  whole exchange I thought was kind of amusing.
20         Q.  Are you referring to Dr. Cassee?
21         A.  Yeah.  Flemming Cassee.
22         Q.  Your interpretation of the e-mail string on
23  the first page of No. 69 is that there was no peer
24  review done of your -- of this submission?
25         A.  Right.

Page 55

1          Q.  Did you next submit the Mandarino article
2   to the journal that published it, Environmental
3   Research?
4          MR. DEARING:  Objection.  Form.
5          Q.  There was no other --
6          MR. DEARING:  You said did he submit it.
7   I don't think he submitted it to anybody.
8          A.  No.  Dr. Fedulov submitted it.
9          Q.  Was the -- Environmental Research was the
10  second journal that this was -- article was
11  submitted to?
12         A.  If that's where it was published, yes.
13  That was -- the second place it was submitted
14  published it.
15         Q.  Please look at the bottom of the first page
16  carrying over to the second page.  Dr. Cassee did
17  send a communication where he said, in connection
18  with this submission, that the results presented are
19  too preliminary to conclude that talc combined with
20  estrogen affects the immunosurveillance of cancer
21  cells.  Do you see where I'm reading?
22         A.  Yes.
23         Q.  Your study -- that is, the Mandarino study
24  -- didn't show that talc combined with estrogen
25  affects the immunosurveillance of ovarian cancer

Page 56

1   cells; correct?
2          A.  Yeah.  That's what it showed.
3          Q.  You disagree with Dr. Cassee's opinion?
4          A.  Yeah.
5          Q.  Did you ever respond or talk to Dr. Cassee
6   about this comment in this e-mail?
7          A.  No.  Actually, I haven't seen him in a
8   while.
9          Q.  I believe you told me that Dr. Mandarino
10  was the primary author of the Mandarino paper.
11         A.  Yes.
12         Q.  Are we looking at the only set of
13  communications that you had that involved the
14  submission of the journal -- of the article between
15  the journal of Particle and Fibre Toxicology and the
16  journal that it was published in?
17         A.  To my knowledge, yes.
18         Q.  Did you search all of the sources of
19  location where you might have any further
20  communications on any submission communications via
21  further documents of any commission communication
22  concerning the Mandarino article?
23         A.  Yes.
24         Q.  This is the only one you found?
25         A.  This is what I found, yes.

1      Q. Did you search for any communications like
2  this for all of the articles as was defined in the
3  request for production?
4      A. Yes.
5      Q. Were these the only communications you
6  found?
7      A. Yes.
8      Q. As far as the documents -- documentation of
9  the submission to where this article was published,
10  you don't have any documentation of that; is that
11  correct?
12      A. No.
13      Q. Do you know whether there were any reviewer
14  comments from the submission of the Mandarino
15  article to the second journal where it was
16  ultimately published?
17      A. I don't know that there were. Dr. Fedulov
18  handled it. And they were very minor, as I recall.
19      Q. Do you recall ever seeing any reviewer
20  comments from the second journal where it was
21  ultimately published?
22      A. No.
23      Q. In connection with your looking at your
24  files to provide documents in response to this
25  request, did you ask any of the other authors of any

1  of the other articles whether they had responsive
2  documents?
3      A. On this, no, I didn't.
4      Q. You can put that one aside. Going back to
5  the requests. We're now in Request No. 4. It asks
6  "Produce all documents relating to presentations you
7  have made regarding the subject matter of the
8  articles, including but not limited to
9  communications, notes, slide decks, and handouts."
10      The response was "None." So have you
11  prepared any presentations where you're discussing
12  the subject matter of the articles besides, perhaps,
13  what we marked the last time?
14      A. No.
15      Q. No. 5 -- Request No. 5 asks "Produce copies
16  of all current laboratory accreditations and
17  certifications for the facilities used to conduct
18  any sample preparation, testing, and/or analysis
19  described or discussed in the articles."
20      Response is "None in Dr. Godleski's
21  possession. He does not have copies or access to
22  these documents. They are maintained independently
23  by the institutions." Is that a correct response?
24      A. Yes.
25      Q. Request No. 6 asked to "Produce copies of

1  all current technical certifications held by you or
2  anyone working under your direction that relate to
3  the sample preparation, testing, and/or analysis
4  described or discussed in the articles"; the
5  response, "None." There are no responsive documents
6  to that request?
7      A. That's correct.
8      Q. None of the -- neither you nor none of the
9  folks that work under your direction have any such
10  technical certifications?
11      A. No.
12      Q. Request No. 7 asked to "Produce all
13  documents that relate to the testing or analysis of
14  pathology specimens for the articles, including but
15  not limited to SEM/EDS spectra, photomicrographs,
16  digital images, lab notebooks, analysis summaries,
17  backup data, count sheets, photographs, videos, raw
18  data reports, testing protocols, and documents that
19  include the background fiber counts for the
20  laboratory performing the testing."
21      The response is "Requested materials
22  pertaining to the Mandarino article --
23  photomicrographs -- are produced herewith, Bates
24  numbered TalcMDL," dash, "Godleski," dash, "000075
25  to 000098." Did I read that response correctly?

1      A. Yes.
2      MR. HEGARTY: I'm going to mark as
3  Exhibit No. 7 -- I'm sorry -- mark as the next
4  exhibit, Exhibit 70, the documents that were
5  produced in response to this request, which are
6  Bates numbered 75 to --
7      MR. DEARING: 98.
8      MR. HEGARTY: -- 98.
9      (Document Bates-labeled TalcMDL-
10  Godleski-000075 to 000098, Exhibit 70, marked)
11      Q. What is Exhibit No. 70, Dr. Godleski?
12      A. This is a figure that I created for the
13  Mandarino article. And these are all the pictures
14  that I had taken of the slides that were used in
15  that article. And so that composite is -- are cells
16  that are taken from all of the other pictures.
17      So all the other pictures are the areas,
18  and then these were cropped from those pictures in
19  order to make this composite figure that was in the
20  paper.
21      Q. We talked a little bit ago about generally
22  your methodology, your protocols for your published
23  papers. And in talking about that, you told me you
24  still have the SEM/EDS images; you have, perhaps,
25  photomicrographs; you have PLM photos.

Page 61

```
 1        This request we just reviewed asked to
 2   produce all the documents that you have related to
 3   the articles that include SEM/EDS spectra,
 4   photomicrographs, et cetera.  Why did you not
 5   provide all that other material?
 6        MR. DEARING:  Objection.  Form.
 7        A.  We produced the billing for the -- all
 8   those cases.  We found all those cases.  Those cases
 9   would have needed to be redacted if they were not
10   within litigation now.
11        So some of them have already been produced
12   because they have been litigated.  Some have not
13   been litigated, have not even been taken to the next
14   step so that they would have needed extensive
15   redaction.
16        Q.  My question, though, I think, is a little
17   bit different.
18        In your articles, you include other photos
19   of PLM images, SEM/EDS spectra.  You did not produce
20   any of those other photos.
21        A.  They're all in the articles.
22        Q.  Do you have photos of PLM images, SEM/EDS
23   spectra from your work on those articles besides
24   what's shown in the articles themselves?
25        A.  Yes.
```

Page 62

```
 1        Q.  And you did not produce any of that
 2   material; correct?
 3        A.  That's correct.
 4        Q.  You still do have it, though; right?
 5        A.  Yes.
 6        Q.  Just as we are looking at images -- the
 7   images in No. 70, you do have images that are of PLM
 8   review, are of SEM/EDS review, are perhaps of
 9   regular microscopy review that you did for those
10   articles that you have in your files.  But you did
11   not produce those.
12        A.  That's correct.
13        Q.  Can you still produce those?
14        A.  They would -- they would, again, require
15   redaction of the -- all identifiers from them.
16        Q.  Do the SEM/EDS images, for example, have
17   identifiers that identify who the patient is?
18        A.  Yes.  All of them do.
19        Q.  They all have the patient's name on them?
20        A.  Well, they have the pathology number, which
21   is easy enough to trace back to individual cases.
22        Q.  Other than the -- redacting the pathology
23   number, would you need to do anything else for
24   confidentiality to produce those images?
25        A.  We would have to go over every image, every
```

Page 63

```
 1   file name, every -- yeah.  It would be an enormous
 2   effort.
 3        Q.  Can you give me any kind of estimate of the
 4   number of images we're talking about that would
 5   include the PLM, the regular microscopy images, the
 6   SEM/EDX images?
 7        A.  Thousands.
 8        Q.  More than 10,000?
 9        A.  At least 10,000.
10        Q.  These are all stored electronically?
11        A.  Yes.
12        Q.  Why for purposes of your response to this
13   request did you just produce these images in
14   Exhibit 70?
15        A.  That's what I had in relationship to that
16   particular paper where I had that -- where I made
17   the images and I produced the composite so that I
18   was able to produce that.
19        Q.  There are, though, in your other articles
20   that we defined in this request images that are of
21   PLM review and regular microscopy review and EDS --
22   SEM/EDS review.  Do you still have those images?
23        A.  Yes.
24        Q.  Why was it that you picked out these images
25   from just the Mandarino article for purposes of this
```

Page 64

```
 1   response?
 2        A.  That's what I had in my -- on my computer.
 3   And the others, because their case is not filed or
 4   their case is in litigation, would have, you know,
 5   just taken an enormous amount of time to redact
 6   everything in them.
 7        Q.  Okay.  Can you estimate how much time it
 8   would take to do per patient?
 9        A.  30, 40 hours per patient.
10        Q.  Okay.  Let's look back at the request for
11   production.  We're on Request No. 8, "Produce copies
12   of all invoices, bills, estimates, cost ledgers, and
13   any other accounting information for any work
14   performed to date by you relating to the work
15   described or discussed in the articles, including
16   but not limited to literature review, lab work,
17   microscopic analysis, and tissue analysis performed
18   at the request of or on behalf of a lawyer or law
19   firm."  The response is "None."  Is that accurate?
20        MR. DEARING:  He produced one today.
21        MR. HEGARTY:  This request is focused on
22   the work done for the articles.  The one produced
23   today is for the MDL work.
24        Q.  I know we're going to look here in a moment
25   at some invoices that were provided -- were
```

Page 65

1    produced. Do you know why Request No. 8 was
2    responded to by saying "None"?
3                MR. DEARING: Objection. Form.
4        A. No.
5        Q. We'll circle back to this in a moment.
6    Request No. 9 asks to "Produce all slides, blocks,
7    tissue samples, pathology materials, and photographs
8    relating to the articles and referenced in the
9    articles"; response, "None. All the pathology" --
10   "All of the pathologist materials associated with
11   the published studies are no longer in
12   Dr. Godleski's possession." Based on what you told
13   me earlier, is that an accurate response?
14       A. Largely. I think there may be one or two
15   that I still have, but I think most of them are no
16   longer in my possession.
17       Q. This description, though, of what to
18   provide does include photographs. We've talked
19   earlier. You do have all the photographs that you
20   generated in connection with your work on the
21   articles; correct?
22       A. Yes.
23       Q. But in terms of slides, blocks, tissue
24   samples, pathology materials, you think you might
25   have maybe one or two?

Page 66

1        A. Yeah.
2        Q. Did you go back in response to this
3    request, do any kind of inventory of what you still
4    had?
5        A. No, not specifically.
6        Q. Request No. 10 asked to "Produce all
7    documents evidencing the receipt of pathology
8    specimens for the articles, including but not
9    limited to correspondence, chain of custody forms,
10   photographs, videos, laboratory notebooks, log
11   sheets, and database entries." The response is
12   "None."
13           Do you recall telling me a short time ago
14   that you still have chain of custody documents for
15   the pathology materials that were reviewed for your
16   articles? Is that still accurate?
17       A. I think so.
18       Q. Are those also kept electronically?
19       A. They're probably paper form.
20       Q. Those would be original chain of custody
21   documents?
22       A. They would be copies of anything that went
23   through our office.
24       Q. These are documents that you still have,
25   that is, the chain of custody documents?

Page 67

1        A. Chain of custody we should have.
2        Q. Do you know why those were not produced?
3        A. Again, it would involve a lot of redaction.
4        Q. For your articles, do you remember or --
5    are you able to recall the total number of patients
6    that are in those five or six articles?
7        A. Right off, I don't. I think it was more
8    than 20, when it comes all down to it.
9        Q. But it's not the total universe of consults
10   or patients who you've -- whose tissue you reviewed
11   for the presence of talc; correct?
12       A. That's correct.
13       Q. I think you told me that that number might
14   exceed 200.
15       A. Yes.
16       Q. It's not -- we're talking about a number of
17   chain of custody forms that you have to look at for
18   your articles -- it wouldn't be over 200. It would
19   just be for the patients who you talk about in the
20   articles; right?
21       A. Yes.
22       Q. Request No. 11 asked to "Produce all
23   documents within your possession, custody, or
24   control that are responsive to Request Nos. 1, 2, 3,
25   4, and/or 8 of Defendants Johnson & Johnson Consumer

Page 68

1    Inc. and Johnson & Johnson's first set of requests
2    for the production of documents to John J. Godleski
3    dated July 16, 2021, pursuant to Special Master
4    Order No. 10, Docket 24974."
5            Response is "First request for production
6    No. 1: Dr. Godleski received no funding for working
7    on or writing or publishing the articles. Some, but
8    not all, of the tissue described in the articles is
9    tissue from plaintiffs or prospective plaintiffs in
10   the talc litigation.
11           "Dr. Godleski was compensated for his time
12   analyzing the tissues of plaintiffs or prospective
13   plaintiffs for purposes of litigation only, not for
14   writing or publishing any articles. So as not to
15   reveal otherwise privileged, confidential, or
16   protected medical information, the patient names
17   have been redacted from the litigation invoices
18   provided herewith and Bates numbered as TalcMDL,"
19   dash, "Godleski," dash, "000001 to 000023." Did I
20   read that correctly?
21       A. Yes.
22           MR. HEGARTY: I'm going to mark as
23   Exhibit 71 that Bates range of documents that that
24   response described, 1 to 23.
25           (Document Bates-labeled TalcMDL-

Page 69

1    Godleski-000001 to 000023, Exhibit 71, marked)
2    Q. Is Exhibit No. 71 the invoices that you
3    provided for purposes of responding to this
4    discovery request?
5    A. Yes.
6    Q. These are not all of the invoices of all
7    your talc work --
8    A. No.
9    Q. -- correct?
10    A. No. These are the ones used in the
11    publications. And there were a couple of instances
12    where the same patient was used in a couple of
13    publications. So if you add all these up and the --
14    all the list of patients within the papers, it comes
15    to a few less because some of them were used
16    multiple times.
17    Q. If you look at Bates Page No. 1 and Bates
18    Page No. 2, in particular as to Bates 2, you include
19    entries for drafting and completing a report. On
20    Bates 1, there is no reference to drafting or
21    completing a report. Does that mean you didn't do a
22    report for the case shown as Bates No. 1?
23    A. That's correct.
24    Q. When you in these set of documents didn't
25    prepare a report, do you know why that was?

Page 70

1    MR. DEARING: Objection. Form. That
2    may call for privileged communications.
3    Q. Would that require you, to answer my
4    question, to disclose communication you had with
5    counsel?
6    A. Yes.
7    Q. Look at Bates 2, for example, as well as
8    Bates 18 and 19. There are references at least on
9    page -- I'm sorry. Start over again.
10    Look at Bates page 2 and page 19. There is
11    a reference towards the end of "Amount charged to
12    Beasley Allen retainer and paid with Beasley Allen
13    retainer to Dr. Godleski's lab." Do you see those?
14    A. Yes.
15    Q. Those are two different retainer amounts.
16    Do you see that? One's 7200. One's 7750.
17    A. Yeah.
18    Q. Did you receive multiple retainers from
19    Beasley Allen?
20    A. No. I received one retainer and the -- we
21    -- what we would bill is half to the retainer and
22    half otherwise. And so the numbers that you see are
23    half the total amount.
24    Q. How much was the original retainer?
25    A. I believe it was $75,000.

Page 71

1    Q. Did you continue to work from that retainer
2    until it was exhausted?
3    A. Yes.
4    Q. Have you received any other retainers?
5    A. No.
6    Q. From any law firm?
7    A. Yes. If I get a request from a law firm
8    that I haven't previously worked with, I request a
9    retainer.
10    Q. How much do you request?
11    A. Whatever -- it varies, depending on what
12    I'm going to be expected to do. It could be as
13    little as 3,000, as much as 20,000, depending on
14    what's being asked of me and what I have to do.
15    Q. Bates No. 2 is an invoice that goes back to
16    the first activity of November 2015. Did you
17    receive the original retainer of 75,000 going back
18    to 2015?
19    A. I would think so.
20    Q. Please turn over to Bates 22 and 23. Are
21    all the entries on Bates 22 and 23 in connection
22    with your work on an article you did with Dr.
23    Campion where he was the lead article?
24    A. Yes.
25    MR. DEARING: You mean "lead author"?

Page 72

1    MR. HEGARTY: Lead author. I said
2    "article." Lead author. I'm going to mark as the
3    next exhibit, Exhibit 72, the Campion article.
4    (Article titled "Identification of
5    Foreign Particles in Human Tissues Using Raman
6    Microscopy," Exhibit 72, marked)
7    Q. Is Exhibit No. 72 the article that you
8    worked on with Dr. Campion that -- where the work is
9    referenced in Bates Nos. 22 and 23?
10    A. Yes.
11    Q. Going back to the invoices. Some of the
12    invoices were directed at payment to president and
13    fellow of Harvard University, others are to John J.
14    Godleski, M.D., PLLC. How did that switch or -- how
15    did that come about, that you had two different
16    payables to?
17    A. Well, you look at the dates. And since --
18    I retired in January of 2017, and I formed my
19    company shortly after that. And once my company was
20    formed, I was able to -- I was getting money into
21    the company.
22    Before that, we were doing work at Harvard
23    School of Public Health, and Dr. Fan was an employee
24    of Harvard School of Public Health rather than my
25    company. And the work that we were doing and the

1 instruments that we were using were in my lab there,
2 and so the money was going there rather than to my
3 company.
4     Q.  Looking back at Bates Nos. 22 and 23 of
5 Exhibit 71, are there any entries on those two Bates
6 numbered documents that are not related to
7 preparation of the Campion article I marked as
8 Exhibit 72?
9     A.  I'm --
10        MR. DEARING:  Objection.  Form.
11     Q.  Are there any entries on Exhibit 22 -- that
12 are on -- that are in Bates Nos. 22 and 23 that are
13 not related to preparation of the Campion article?
14     A.  No.
15     Q.  Do you know whether Dr. Campion submitted
16 invoices to Beasley Allen for his work on the
17 Campion article?
18     A.  I don't know what his arrangements were.
19     Q.  Did any of the amounts that you received by
20 these invoices go to Dr. Campion?
21     A.  No.
22     Q.  Did Beasley Allen or any other law firm
23 provide compensation for your work on any of the
24 other articles as you described in these two Bates
25 numbered documents?

1     A.  No.
2     Q.  Why for the Campion article did you invoice
3 your work?
4     A.  Because, for the Campion article, we ended
5 up having to use instruments in Chicago.  And so we
6 had to fly to Chicago, do the work there, and incur
7 a lot of expenses along the way.  So we were trying
8 to develop a new methodology, and the methodology
9 worked but was not convenient.  So we haven't really
10 used it.  However, technology has been improving
11 over the years since we did this.  And there is now
12 technology that may actually be useful.
13        I think we mentioned this in the last
14 deposition.  But when we did this, we were really
15 developing a new technique and a new approach.  And
16 we did that.  We did that with a number of different
17 sources of talc.
18        In the Campion paper, we used talc used for
19 pleurodesis.  We used some talc case material from
20 ovarian cancer.  We did a lot of different things to
21 try and develop this technique.  And it turned out
22 there were very large amounts because we didn't have
23 either -- there are just -- logistics in getting the
24 specimen from where you could see the particles to
25 how you would see them by Raman spectroscopy was a

1 difficult bridge.
2     Q.  Did you have an agreement in advance with
3 Beasley Allen to compensate you for your work on the
4 Campion article?
5     A.  If we did, it was a verbal agreement.  I
6 don't recall exactly what we agreed to.
7     Q.  As you mentioned, though, you don't -- you
8 did not bill or you did not invoice your work as you
9 invoiced here on any of the other articles,
10 including Mandarino, McDonald, and Sato or anything
11 else.
12     A.  Exactly.
13     Q.  Were you paid for the amounts shown in
14 these invoices?
15     A.  Yes.
16     Q.  If you look at the January 3 and 7 entries
17 over on Bates 23, do you see there's a reference to
18 writing, reviewing, and preparing the manuscript for
19 the American Journal of Surgical Pathology?  Was
20 this paper actually submitted to that journal?  Was
21 it published in Analytical Chemistry?
22     A.  Yes.  It -- I believe it was submitted
23 there and not reviewed.  They didn't feel it was in
24 their area.
25     Q.  Do you have any documentation of its

1 submission or the rejection by the American Journal
2 of Surgical Pathology?
3     A.  No.
4     Q.  Who is the corresponding author?
5     A.  It would have been Dr. Campion.
6     Q.  Did you ever see any documentation related
7 to its submission or its rejection?
8     A.  No.  He just said it was sent back not
9 reviewed.
10     Q.  When you say he said that, Dr. Campion told
11 you that?
12     A.  Dr. Campion.
13     Q.  He told you it was not even -- not peer
14 reviewed?
15     A.  It was not peer reviewed.  It was sent back
16 like the Mandarino article.  But they didn't tell us
17 to improve the English, as far as I know.
18     Q.  Was the only other journal that you
19 submitted to -- submitted this article to Analytical
20 Chemistry?
21        MR. DEARING:  Objection to form.  He
22 didn't submit any articles.
23        With that clarification, you can answer.
24     A.  When Pathology sent it back as not
25 interested, Dr. Campion said "We got to submit this

Page 77

1    to a chemistry journal. I'll take care of it," and
2    he did.
3        Q. Did you have any discussions with any
4    attorney for plaintiffs about the content or the
5    substance of the article before it was submitted for
6    publication?
7        A. No. None whatever.
8        Q. Did you provide counsel for any plaintiffs
9    in the talc litigation a draft of this article in
10   advance of its publication?
11       A. No.
12       Q. Does the amounts shown in Bates 22 and 23
13   account for all that you invoiced and received for
14   your work on the Campion article?
15       A. Yes.
16       Q. Please look back at the article,
17   Dr. Godleski, that I marked as Exhibit 72. Please
18   look over at the second-to-the-last page. Under the
19   section "acknowledgments," do you see that section?
20       A. Yes.
21       Q. That section begins by saying "This study
22   was supported in part by a pilot project grant and
23   the Particles Research Core of the Harvard Center
24   for Environmental Health, supported by NIEHS ES,"
25   dash, "000002." What part or percentage of this

Page 78

1    work was supported by this pilot project grant?
2        A. It had to do with the in vitro part where
3    we were having cells take up talc. For example,
4    Figure 1 shows cells that had taken up talc. And so
5    Dr. Fedulov would provide the cells and grow them up
6    and do the tissue culture work. And so he had a
7    pilot grant to do that.
8        He was doing a number of other studies, but
9    this was one of the things that he did as part of
10   the pilot grant that he had to provide support for
11   us.
12       Q. Did you have a chance to review the
13   acknowledgment section prior to it being published?
14       A. Yes.
15       Q. Did you -- do you note or -- did you note
16   then and do you note now that there's no reference
17   to any of your work being compensated by Beasley
18   Allen? Do you see there's no reference there?
19       A. Right.
20       Q. Should there be a reference, in your view,
21   to funding for your work on this paper as coming
22   from Beasley Allen?
23       A. Yeah. There could have been.
24       Q. If you were to do this paper again and have
25   a chance to do the "acknowledgment" section again,

Page 79

1    would you include a reference to your work being
2    funded by Beasley Allen?
3        MR. DEARING: Objection. Form.
4        A. I'm looking to see if that -- if this
5    billing wasn't, in fact, after the paper had been
6    submitted. I think it was. So it was submitted
7    January 17, 2018. And this bill was done in
8    February of 2018.
9        So this billing was done after the paper.
10   And perhaps at the time that we were doing the
11   paper, it wasn't clear that we were even going to
12   get paid for it.
13       Q. Your entries in Bates Nos. 22 and 23 for
14   your work on the paper go back to 2017, though;
15   correct?
16       A. Yes.
17       Q. You had recorded those entries back at the
18   time you -- of the work and then later transferred
19   those to the invoices; correct?
20       MR. DEARING: Objection. Form.
21       A. Yes.
22       Q. So at the time that the paper was
23   submitted, you had entries for work done that you
24   intended to invoice Beasley Allen about; correct?
25       A. The time was kept, yes.

Page 80

1        Q. You anticipated that you would get
2    reimbursed for that time. Fair?
3        A. I don't know that I did.
4        Q. You don't know if you were going to get
5    paid for the work that you reported in Bates No. 22
6    and 23?
7        A. I don't know actually when we -- actually,
8    it was after it was submitted to this journal that
9    we billed it. So we may have learned that or -- I
10   may have learned that we would get paid for the time
11   that was put in on this after the paper was
12   submitted.
13       Q. Do you remember thinking, though, that you
14   weren't -- when you looked at the "acknowledgment"
15   section had not reported the funding, that you were
16   not going to get paid or might not get paid? Is
17   that -- that's why you didn't --
18       A. I didn't know.
19       Q. Now, some six years later --
20       A. Yeah. I don't recall.
21       Q. Right. But six years later, looking back,
22   do you think it would have been appropriate for you
23   to at some point -- either at the time of submission
24   or before it actually got into press -- for you to
25   make reference to funding or at least anticipation

Page 81

1    of funding by Beasley Allen?
2        MR. DEARING: Objection. Form.
3        A. Well, all I can say is that, you know, it
4    was submitted more than a month before it was
5    billed. So I don't recall what happened. But the
6    fact is that this was, in fact, paid. And we've
7    disclosed it.
8        Q. You didn't disclose it in this article,
9    though.
10        A. No. The article was submitted before even
11    an invoice was made.
12        Q. If you believed at the time the article was
13    submitted you would have been -- you were going to
14    get reimbursed for your work --
15        A. I really --
16        Q. -- should you then have disclosed it --
17        A. I really don't recall.
18        Q. Let me finish my hypothetical, if it is a
19    hypothetical.
20        If you had believed prior to this article
21    submission that you were going to get reimbursed for
22    your work on it, should you have included that
23    funding source in the "acknowledgment" section?
24        MR. DEARING: Objection. Form.
25        A. Yes. If we were going to be paid for this,

Page 82

1    it would have been appropriate to include it.
2        Q. Looking at the "author contribution"
3    section, it notes that "AC" -- that's Alan Campion
4    -- "and JJG" -- that's you -- "have served as
5    consultants and provided expert testimony in talc
6    and other environmental litigation." Do you see
7    that reference?
8        A. Yes.
9        Q. Wouldn't it be appropriate -- sorry.
10    Strike that.
11        Would it have been appropriate to have made
12    reference in that disclosure to who you were
13    providing expert testimony for, that is, plaintiffs
14    or defendants?
15        MR. DEARING: Objection. Form.
16        A. No.
17        Q. Why not?
18        A. Well, it's a long list. I've worked for
19    many law firms in environmental litigation so that
20    it -- this seemed to be the most appropriate way to
21    disclose that.
22        Q. Go back to the request for production,
23    Dr. Godleski, and look back at Request No. 8.
24        MR. DEARING: Original 8 or first 8?
25        MR. HEGARTY: Request No. 8 in the

Page 83

1    Exhibit 67.
2        Q. Do you see where, when we talked about that
3    one, it did ask for invoices related to your work
4    described or discussed in the articles? And the
5    response was "None." Should that response have made
6    reference to the invoices we just looked at for the
7    Campion article?
8        MR. DEARING: Objection. Form.
9        A. Yeah. As well as all the others. And it
10    -- we've produced it in relationship to No. 11. I'm
11    not sure what the difference between the two is.
12        Q. Go back to page 5. That is the response to
13    the Request No. 11. We finished by looking at that
14    Bates range of documents that we just talked about
15    that were the invoices.
16        The next one talks about First Request for
17    Production No. 12 where it says "Produced herewith,
18    Bates numbered as TalcMDL," dash, "Godleski," dash,
19    "000099 to 000116 and TalcMDL," dash, "Godleski,"
20    dash, "000120," dash, "000286."
21        MR. HEGARTY: And I'll mark as the next
22    exhibit the -- that set of Bates range documents.
23    Those will be marked as Exhibit 73.
24        (Document Bates-labeled TalcMDL-
25    Godleski-000099 to 000116 and 000120 to 000286,

Page 84

1    Exhibit 73, marked)
2        Q. Exhibit 73, Dr. Godleski, are the Bates
3    range of documents described in that response to
4    that request. And looking through those documents,
5    can you tell me what those are?
6        A. They look like all of our papers.
7        Q. Do they appear to be either the papers
8    themselves or, perhaps, drafts or manuscripts of the
9    papers?
10        A. Yes.
11        Q. Were these documents that you found in your
12    files?
13        A. Yes.
14        Q. Just walking through these documents, look
15    at Bates 99 to 106. Is this a draft of the Campion
16    article we just talked about?
17        A. It's the published paper.
18        Q. The published paper. Look at Bates 107 to
19    115. Is that also the published Campion paper
20    without the Analytical Chemistry heading on it at
21    the top?
22        A. Yeah.
23        Q. Look at Bates 120 to 137. Is that the 2019
24    McDonald article "Migration of Talc From the
25    Perineum to Multiple Pelvic Organ Sites"?

Page 85

1    A. Yes.
2    Q. As we continue to look at Bates 138 and
3    139, what are those two documents?
4    A. These are disclosures of relevant financial
5    relationships for the American Society for Clinical
6    Pathology. That is the organization that publishes
7    the American Journal of Clinical Pathology.
8    Q. This is your disclosure for the McDonald
9    article?
10    A. Yes.
11    Q. Did you prepare this disclosure?
12    A. I signed it. So I think the -- it's
13    basically filling in an article or a blank form
14    prepared by the American Journal of Clinical
15    Pathology.
16    Q. Continuing. Exhibits (verbatim) 140 to 155
17    are copies of the McDonald article, "Correlative
18    polarizing light and scanning electron microscopy
19    for the assessment of talc in pelvic region lymph
20    nodes."
21    A. Yes.
22    Q. Bates 156 to 188 are -- is that a
23    manuscript or a draft of that same -- of the
24    McDonald article, "Migration of talc from the
25    perineum to multiple pelvic organ sites"?

Page 86

1    A. Yes.
2    Q. If you look over at Bates 163, there's a
3    comment. Do you know whose comment that is?
4    A. Actually, no, I don't.
5    Q. Bates 189 to 195 are for the Johnson
6    article; is that right?
7    A. Yes.
8    Q. Bates 196 through 202 are also the McDonald
9    -- I mean the Johnson article?
10    A. Yes.
11    Q. When I say "the Johnson article," it's the
12    article "Analytical (verbatim) comparison of talc in
13    commercially available baby powder and in pelvic
14    tissues resected from ovarian carcinoma patients"?
15    A. Yes.
16    Q. Bates Nos. 203 to 205 are what?
17    A. Looks like response to reviewers for the
18    Johnson article.
19    Q. Did you look for any similar response to
20    reviewer documents for any of your other articles
21    that looked at reproductive tissue for talc?
22    A. Yeah. I looked for all of them.
23    Q. Were these the only ones you found?
24    A. Yes.
25    Q. Do you know who prepared this response to

Page 87

1    reviewers?
2    A. Wait a minute. They -- the first looks
3    like the Johnson article on 203, 204. And 205, 206
4    is the McDonald article, the American Journal of
5    Clinical Pathology.
6    Q. Thank you for that clarification.
7    So that it looks like there were two
8    comments to the HACP article. And we dealt with
9    those and that -- and so these are actually reviews
10    of two papers that I had.
11    Q. Who prepared the response to reviewers on
12    Bates 203 and 204?
13    A. Dr. Johnson.
14    Q. Who prepared the response to reviewers on
15    pages 205 and 206?
16    A. Dr. McDonald.
17    Q. Did you look for the actual reviewer
18    comments themselves?
19    A. The reviewer comments are restated here.
20    Q. Understood. But did you look for the
21    actual incoming reviewer documentation of the
22    documents -- let me start over again.
23    Did you actually look for the --
24    A. Yes, I did.
25    Q. -- reviewer comments that came in?

Page 88

1    A. Yes. I didn't have a copy of that.
2    Q. Please look at 204.
3    MR. GOLOMB: Can I just say -- how long
4    have we been on the record?
5    MR. HEGARTY: Off record.
6    (A break was taken.)
7    MR. HEGARTY: We're back on the record.
8    Q. Let's finish up with this set of documents
9    that you're looking at, Dr. Godleski. Look at Bates
10    206. What is this document, if you know?
11    A. 206 -- 205 and 206 is the response to the
12    American Journal of Clinical Pathology and revising
13    the paper and sending it back in for publication.
14    Q. You can see on 205 and 206, it doesn't
15    include the reviewer comments themselves, unlike the
16    previous two Bates numbers. Did you ever see the
17    reviewer comments themselves?
18    A. I don't believe so. I didn't -- I may have
19    seen them, but I didn't have a copy of them.
20    Q. Look at 207 through 239. Are these the
21    only materials you have related to the 2019 McDonald
22    article on correlative polarized light and scanning
23    electron microscopy for the assessment of talc in
24    pelvic regional lymph nodes?
25    A. Yes. This is the paper that was submitted.

Page 89

1    Q. And Bates 240 through 258, is this the
2  Johnson paper submission?
3    A. This looks like a -- the Johnson paper that
4  -- and I was adding some comments in red. I think
5  those are my comments.
6    Q. And then Bates 259 through 286, is that an
7  additional draft of the Johnson paper?
8    A. Yes.
9    Q. Do you know whose redlining comments those
10  are?
11    A. I suspect they're mine.
12    Q. You can put that document to the side.
13  Going back to the Request for Production No. 2, the
14  last page. We were looking at No. 5. It refers to
15  First Request for Production No. 4, "Produced
16  herewith, Bates numbered TalcMDL," dash, "Godleski,"
17  dash, "000287 to 000340."
18    MR. HEGARTY: I'll mark that set of
19  documents as our next exhibit, Exhibit 74.
20    (Document Bates-labeled TalcMDL-
21  Godleski-000287 to 000340, Exhibit 74, marked)
22    Q. I don't know who stapled those. They
23  stapled them on the other side. But what are these
24  two presentations?
25    A. This is a presentation that I gave.

Page 90

1    Q. Let me break that down. There's a
2  presentation that's Bates 287 to 326, then a
3  presentation from 327 to the end.
4    Is the first presentation or -- let me
5  start over again.
6    Where is -- where did you give the first
7  presentation?
8    A. I think this was the New England Society
9  for Microscopy.
10    Q. When did you give that presentation, if you
11  can recall?
12    A. It's in my CV.
13    Q. And then the second presentation is the one
14  we talked about the last time? That was your
15  presentation to FDA?
16    A. Yes.
17    Q. In your presentation to the FDA, did you
18  read off of a statement?
19    A. Did I what?
20    Q. Did you read from a statement that you
21  wrote --
22    A. No.
23    Q. -- to present to FDA?
24    A. No.
25    Q. In the first presentation -- Bates range

Page 91

1  287 to 326 -- is the second page the only disclosure
2  you provided at that presentation?
3    A. Yes.
4    Q. Look at page -- Bates page 298. There's a
5  reference on that page to a talc miners study. Have
6  you continued to keep yourself up to date on the
7  studies looking at talc miners, millers, and
8  diseases in those workers?
9    A. I haven't looked at it recently.
10    Q. Please look over at 310. That's Bates 310.
11  Are you there?
12    A. Yeah.
13    Q. You have percentages of the cases that
14  you've reviewed that identify, for example, the
15  lymph nodes taken during surgery that had
16  birefringent particles that had no identifiable
17  talc, that had anywhere from 1 to 300 talc particles
18  in four tissue blocks. How did you come up with
19  these percentages?
20    A. From the data that we have, had collected.
21  And I had -- I had pulled it together for the FDA
22  meeting.
23    Q. Do you actually have your data broken out
24  where you can calculate numbers like this by
25  percentages?

Page 92

1    A. Yeah. I went -- for the FDA meeting, I
2  went through all of our data and had the -- I had --
3  I provided a table that -- summary of our experience
4  with talc and asbestos in pelvic tissues of patients
5  with perineal exposure. That's 338. And this is
6  kind of a summary of that.
7    Q. Understood. But what did you have to look
8  at to come up with these percentages?
9    A. I looked through all the data of the cases
10  that we had.
11    Q. How long did it take you to look through
12  the data to come up with these percentages, if you
13  can recall?
14    A. Oh, I spent several days on the talk for
15  the FDA. And so these were -- this talk that's
16  listed first -- I don't know. I'd have to check my
17  CV. But I'm sure it was given after the -- if it
18  wasn't given after the FDA talk, it was just before.
19    Q. You can put that document aside. I want to
20  mark next an article, just ask you if you're
21  familiar with it.
22    (Article by T. Emi, Exhibit 75, marked)
23    Q. I marked as Exhibit No. 75 an article with
24  the first author of Emi. Are you familiar at all
25  with this article?

Page 93

1    A. No.  I learned about this article when you
2 asked about it.
3    Q. You had no involvement in its preparation?
4    A. None whatsoever.
5    Q. Okay.  Thank you.  You can put that aside.
6       MR. DEARING:  I am curious about what
7 your interest is in that article.  We got so many
8 questions about it.
9    Q. With regard to the McDonald article on
10 correlative polarized light, that was published in
11 the journal of Ultrastructural Pathology?
12    A. Yes.
13    Q. You previously testified that the names of
14 the plaintiffs -- I'm sorry -- the names of the
15 patients that are in that study are available to
16 you; is that correct?
17    A. Yes.  That's how we were able to get all
18 the billing.
19    Q. You also had previously testified that you
20 invoiced at least some of your work in reviewing
21 information on some of the patients reported in the
22 articles as part of your litigation work.  Are those
23 the invoices you provided?
24    A. Yes.
25    Q. With regard to the second -- well, one of

Page 94

1 the other McDonald papers --
2       MR. HEGARTY:  I'll go ahead and mark it
3 as Exhibit 76.
4       (Article titled "Magnesium/silicon
5 atomic weight percent ratio standards for the tissue
6 identification of talc by scanning electron
7 microscopy and energy dispersive X-ray analysis,"
8 Exhibit 76, marked)
9    Q. It's the "Magnesium," slash, "silicon
10 atomic weight percentage ratio standards for the
11 tissue identification of talc by scanning electron
12 microscopy and energy dispersive X-ray analysis."
13 If you turn over to page 251, do you see on -- tell
14 me when you're there.
15    A. Okay.
16    Q. Do you see, on the right-hand side, you
17 wrote down the particle size range from 2 to 70
18 microns?
19    A. Yes.
20 *   Q. Do you have documented anywhere the
21 percentage of talc particles that fall within that
22 range?
23       MR. DEARING:  Will you read back the
24 last question?
25    Q. Did you understand the question,

Page 95

1 Dr. Godleski?
2       MR. DEARING:  Let her read back.
3       * (Question read back)
4    Q. What I mean is that were 5 microns or 10
5 microns, that were 20 microns?  What percentage fell
6 across the various micron sizes between 2 and 70?
7    A. I thought there was a figure.  It may be in
8 supplemental data, but it was a distribution like
9 this one of the magnesium-silicon ratio.
10    Q. You're pointing to Figure 5?
11    A. Yeah.  But there's a distribution
12 somewhere.  It may be in the -- in supplemental
13 data.
14    Q. Please turn over to the "discussion"
15 section on page 256.
16    A. Okay.
17    Q. Do you see, about halfway down, there's a
18 statement that says "The common sizes of talc
19 particles found within human pelvic tissues overlaps
20 with but is typically smaller than the particle size
21 range found in talc powder material intended for
22 consumer sale for hygiene use.  The likely reason is
23 that smaller talc particles are the ones that most"
24 -- "that" -- "the ones thought most able to gain
25 access to reproductive tract space or especially

Page 96

1 into small submucosal lymphatics when applied to the
2 perineum."  Do you see where I'm reading?
3    A. Yes.
4    Q. Do you have any published authority for
5 that second statement where you comment on the
6 likely reason for the smaller talc particles seen?
7    A. No.  That's our best estimate of why
8 they're smaller.
9    Q. Are you saying in the couple sentences that
10 I read that the particles that you're finding in
11 tissue are typically smaller than the ones that you
12 looked at in this study?
13    A. Yes.  Slightly smaller and that although
14 the Johnson paper suggests they're similar size,
15 this -- the other thing is that we're talking about
16 the different sources of -- yeah.  This was Johnson
17 & Johnson.
18    Q. I'm sorry.  Did you finish the answer?
19    A. Huh?
20    Q. Did you finish your answer?
21    A. Yeah.
22    Q. On the right-hand side, there's a reference
23 to the standard deviation you applied --
24    A. Yes.
25    Q. -- as it relates to the talc particles

Page 97

1  you're looking for.
2      A.  Yes.
3      Q.  And that's -- you use -- did you use the
4  same measure as you do in your reports?  Or is this
5  a different measure?
6      A.  I'm sorry?
7      Q.  Do you -- are you talking about the same
8  measure here that you used in your reports for the
9  MDL?
10     A.  Okay.  Yes, in terms of it being the
11 spectrum and the atomic weight percent.  What we've
12 done here is looked at one and two standard
13 deviations.
14         Now, usually, two standard deviations is
15 acceptable for identification of a material.  And
16 the fact that our 5 percent is much closer to one
17 standard deviation suggests that this is a very
18 conservative measure.
19     Q.  We talked about in some of the cases your
20 finding of tremolite or tremolite particle or
21 tremolite fiber.
22     A.  Yeah.
23     Q.  Have you done an analysis looking at the
24 acceptable standard deviation from tremolite as you
25 just -- as you have done for talc?

Page 98

1      A.  I know labs use different amounts.  Some
2  use as much as 10 percent variation.  We generally
3  also use 5 percent for tremolite.  But that, again,
4  is a very conservative measure.
5      Q.  In one of your papers, you actually looked
6  at talc particles and compared it to what you were
7  seeing in tissue to determine whether your standard
8  deviation was appropriate; correct?
9      A.  Yes.
10     Q.  Did you do that for tremolite, or have you
11 ever done it for tremolite or any form of asbestos?
12     A.  We have a bottle of asbestos that is --
13 that was sold by Fisher Scientific probably about 40
14 or 50 years ago that we happened to buy at an
15 auction.  And we actually looked at it, and it turns
16 out it was all tremolite in this bottle.
17         And I know we have done some analysis with
18 it.  I'm not sure that we've ever then taken that
19 data and determined the standard deviation exactly
20 the same way as we did here.  We keep that well
21 secured, obviously.  However, it ended up in a
22 notch.  And I had no idea
23     Q.  When did you do that analysis?
24     A.  Huh?
25     Q.  When did you do the analysis you just

Page 99

1  described?
2      A.  About ten years ago at least.
3      Q.  Have you ever done any formal analysis for
4  standard deviation for tremolite as you did for
5  talc?
6      A.  No.  I don't think we ever did exactly the
7  same thing.
8      Q.  Did you come up with a plus or minus 5
9  percent for tremolite based on what you did with
10 talc?
11     A.  No.  No.  We have not done that.
12     Q.  But in terms of when you're finding
13 tremolite in the cases you're working on, did you
14 come up with a plus or minus 5 percent deviation
15 using the same standard that you used for talc?
16     A.  We usually use 5 percent.
17     Q.  We talked last time about the McDonald
18 migration-of-talc-from-the-perineum study.  I'd
19 asked you at another deposition whether you had ever
20 communicated with plaintiffs' counsel about that
21 paper before it was published.  And you said that
22 once it was accepted, you would have sent it to
23 Mr. Dearing.  Did you look -- did you ever look for
24 that correspondence?
25     A.  No.

Page 100

1      Q.  You also testified previously that you had
2  trouble getting the blocks for the control patients
3  in this study.  Did you look for any communication
4  about this from Brigham and Women's Hospital?
5      A.  No.
6      Q.  You've also testified previously that you
7  may have corresponded in writing with the attorneys
8  for the patients to get more information about their
9  prior surgeries.  Do you remember telling me that?
10     A.  Yes.
11     Q.  Did you look for any such correspondence?
12     A.  No.
13     Q.  You also indicated that you would still
14 have documentation of particle counts for this
15 paper.  Did you look for those -- that
16 documentation?
17     A.  No.
18     Q.  You had also testified previously that you
19 had a detailed protocol for the Campion paper.  Do
20 you remember telling me that?
21     A.  I have what?
22     Q.  You had testified that there was a very
23 detailed protocol for the Campion paper before you
24 -- as part of your work on it.  Do you remember
25 telling me that?

1    A. Yes.
2    Q. Do you still have that protocol?
3    A. Possibly. I really don't know.
4    Q. At one of the depositions, you testified
5  that you were working with Dr. Cramer on a study to
6  measure inflammation in relation to particles in the
7  female genital tract. Do you remember talking about
8  that with me?
9    A. Vaguely.
10    Q. Has anything been done in the last five
11  years to move that work along?
12    A. No.
13    Q. In the PowerPoint presentation we just
14  talked about where you talked about the 170-plus
15  patients whose tissue you reviewed -- do you
16  remember looking at that?
17    A. Yes.
18    Q. Were those all consultations between you
19  and attorneys in cases involving patients --
20    A. Yes.
21    Q. -- with ovarian cancer? Did you find talc
22  in all 170 or more patients' tissues?
23    A. No. We, in fact, had the data that said
24  that about -- there were a percentage that we didn't
25  find birefringent particles. And then -- and those

1  that we found birefringent particles, I think it was
2  10 percent that we didn't find talc.
3    Q. That's 310? That is Bates No. 310 is where
4  you were referencing?
5    A. Yes.
6    Q. The third bullet point is saying how many
7  -- what percentage of patients --
8    A. Yeah. 21 percent didn't have birefringent
9  particles. So it was below the level of detection.
10  Then of those cases with birefringent particles on
11  light microscopy, there are no identifiable talc by
12  EDX in just under 10 percent of the cases.
13    Q. It's your understanding, as to those 10
14  percent of cases, those were also women who at least
15  contacted a lawyer about their use of talcum powder
16  and developing ovarian cancer.
17    A. That's correct.
18    Q. I want to next mark as Exhibit 77 your
19  article with Dr. Sato.
20    A. Yeah.
21    (Article titled "Analysis of particles
22  from hamster lungs following pulmonary talc
23  exposures: implications for pathogenicity,"
24  Exhibit 77, marked)
25    Q. This article did not involve looking at any

1  reproductive or ovarian tissue; correct?
2    A. That's correct.
3    Q. It looked at hamster lung tissue.
4    A. Yes.
5    Q. This was a -- looking back at another study
6  that had been done; is that correct?
7    A. That's correct.
8    Q. If you look in the "results" section, the
9  first line says that "SEM/EDX analyses" -- this is
10  on the first page. Says "SEM/EDX analyses showed
11  that asbestos fibers, quartz, and toxic metal
12  particulates were below the level of detection."
13  Does that mean they were not detected?
14    A. Yes.
15    Q. Please look over at page 5 of 16. Are you
16  there?
17    A. Yes.
18    Q. In the right-hand column, first full
19  paragraph at the end, your study reported finding
20  that in some of the tissue you looked at, you did
21  see multinucleated giant cells. That's a foreign-
22  body response; correct?
23    A. Yes.
24    Q. That was in response to a talc particle; is
25  that correct?

1    A. Yes.
2    Q. And you look at the bottom of that part of
3  the paper, the paragraph begins "Table 3." In the
4  first few lines, are you saying that the majority of
5  particles that you analyzed were less than 6
6  microns?
7    A. Where are you?
8    Q. I'm at the bottom paragraph on the right-
9  hand column. Are you saying in the first several
10  lines there that the majority of the particles that
11  you analyzed were less than 6 microns?
12    A. Yes.
13    Q. And that particles greater than 6 microns
14  were uncommon and ranged from 2 percent to 3.7
15  percent?
16    A. Yes.
17    Q. Looking over to the next page. In the
18  figures, you report a giant cell forming; is that
19  correct?
20    A. Yes.
21    Q. Did you record to what size particle that
22  giant cell formed as to?
23    A. Looks like there are a few fibers within
24  it.
25    Q. Do you record the size of the fiber?

---

Page 105

1    A. Well, we have a marker of size. Let's see.
2  It's -- a bar on each image represents 10
3  micrometers. So it looks like the one fiber in that
4  giant cell is almost 10 micrometers.
5    Q. In response to that 10-micrometer fiber,
6  there was a giant cell generated; correct?
7    A. Yeah. There's a multinucleate giant cell
8  with several particles in it, but there's at least
9  one fiber that's 10 microns.
10   Q. Please look over at pages -- page 11 of 16.
11 You see the second paragraph on the right-hand
12 column, Dr. Godleski, that says "The International
13 Agency for Research on Cancer"? Right here.
14   A. Where are we? Okay. Yeah.
15   Q. That part of your study says "The
16 International Agency for Research on Cancer -- IARC
17 -- lists talc containing asbestiform fibers defined
18 by IARC as talc containing mineral fibers as
19 asbestiform in their mineral habit, not talc
20 containing asbestiform" -- "asbestos as a Class 1
21 carcinogen." Did I read that correctly?
22   A. Yes.
23   Q. That's an accurate statement; correct?
24     MR. DEARING: You didn't read it
25 correctly. You transposed two words.

---

Page 106

1     MR. HEGARTY: Which two words did I
2  transpose? Let me do it again.
3     Q. That part of the paper reads "The
4  International Agency for Research on Cancer-- IARC
5  -- lists talc containing asbestiform fibers," paren,
6  "defined by IARC as talc-forming mineral fibers that
7  are asbestiform in their mineral habit, not talc
8  containing asbestos," closed paren, "as a Class 1
9  carcinogen." Did I read that correctly?
10    A. Yes.
11    Q. Is that your understanding of what -- of
12 the IARC's classification?
13    A. Yes.
14     MR. HEGARTY: Let's go off the record.
15     (A break was taken)
16     MR. HEGARTY: Back on the record.
17    Q. Please look again at the McDonald migration
18 of talc study. What was your involvement in
19 preparing this article?
20    A. I discussed it, laid it out with
21 Dr. McDonald. We had a lot of discussions about it
22 all the way through, having helped her to choose the
23 images, suggested some of the cases that she
24 consider using, and then reading and overseeing the
25 final article.

---

Page 107

1    Q. Who is the principal author?
2    A. Dr. McDonald.
3    Q. Are you aware of any documentation about
4  how much funding was used for this article, in other
5  words, how much it cost to create?
6    A. I have no idea.
7    Q. Was there any --
8    A. Dr. McDonald is salaried. Dr. Fan is
9  salaried. And I'm salaried. So we didn't keep the
10 -- didn't keep time of what we were doing.
11   Q. On this article and the other articles
12 we've been talking about that you've done the last
13 several years looking at particles in reproductive
14 tract tissue, do you start each of the papers with a
15 protocol, that is, a written protocol?
16   A. In a paper like this where we're describing
17 five cases, it's not a matter of protocol. It's a
18 matter of the proper description of the cases. So
19 no, I wouldn't say we had a protocol for it. It's
20 not like we're doing an experimental study.
21   Q. On any of the five or six articles we've
22 been talking about, did you have any communication
23 with any attorneys for plaintiffs while the article
24 was being prepared and written and submitted?
25   A. No.

---

Page 108

1    Q. Did you share any drafts or commune -- or
2  information about the articles with any --
3    A. No.
4    Q. -- attorney for plaintiffs? Do you know
5  whether any of the five plaintiffs we talked about
6  in the MDL are included in any of the articles we've
7  been talking about?
8    A. I really don't know the answer to that.
9    Q. Going to mark as Exhibit 78 your Johnson
10 article.
11     (Article titled "Analytic comparison of
12 talc in commercially available baby powder and in
13 pelvic tissues resected from ovarian carcinoma
14 patients," Exhibit 78, marked)
15   Q. Who is the lead author of this article?
16   A. Kurt Johnson.
17   Q. What was your role?
18   A. I was the senior author and provided the
19 comparisons with the human tissue. He did the work
20 characterizing the talcum powder samples.
21   Q. If you look over at the second page under
22 the section "resected tissue from ovarian carcinoma
23 patients" --
24   A. Yes.
25   Q. -- in the first part of that, are you

Page 109

1 describing that all of the patients studied were
2 patients from -- whom you became aware of or had
3 information about from attorneys representing them
4 in cases involving talcum powder use and ovarian
5 cancer?
6     A. Yes.
7     Q. Are you able to, if you needed to, identify
8 the patients that you're talking about in this
9 study?
10     A. Yes. We went back and identified those
11 patients, and their billing was included in the
12 materials that we gave you.
13     Q. If you look at the very bottom paragraph on
14 the right-hand side of the same page we were looking
15 at, do you see where there's a reference to removing
16 30 microns of tissue from the blocks prior to their
17 analysis? Do you see that?
18     A. Yes.
19     Q. Do you recall, in your reports that we
20 looked at, you referred to removing 50 microns of
21 tissue? Do you remember that?
22     A. Yes.
23     Q. Why the difference?
24     A. We often say "30 to 50." It's an estimate.
25 What we're -- you can never put a block on -- back

Page 110

1 on a microtome in exactly the same position that it
2 was the last time it was cut. So as you start
3 cutting, you may be a little bit different from the
4 last time.
5         And so as you cut, you'll start often with
6 a portion of the, you know -- if previously it was
7 oriented this way and you orient it perfectly
8 square, you're going to cut off the excess that was
9 at the slight angle in the previous cut. And so
10 depending on how much of that you take off, it can
11 be 30 or 60.
12         What we try to do is make sure we have
13 several sections of the full face of the block
14 that's cleared away so that we can say with
15 certainty that we're beyond where any particles
16 could have been placed on the surface or pushed into
17 the surface by handling and so that we're at a point
18 where any particles that we're studying were truly
19 within that block.
20     Q. What is the minimum amount of tissue you
21 need to dissect off to feel comfortable that you're
22 past contamination?
23     A. At least 20.
24     Q. Please look over at Table 2 on page 529.
25 What is Table 2 showing?

Page 111

1     A. It shows the 11 cases, the patients' age,
2 the type of tumor, their anatomic stage, and what
3 sites were used for the studies that were done.
4     Q. What's reported on the very right-hand side
5 -- the two columns on the very right-hand side?
6     A. The average area of particles and the
7 average aspect ratio of the particles.
8     Q. Do you have any measurement in here of the
9 micron size of the particles?
10     A. Well, this is square -- no. We're
11 reporting this as square microns so that it's an
12 average area.
13     Q. But did you record the -- somewhere --
14     A. Yes.
15     Q. If not here, did you record the micron
16 size?
17     A. I would think so, yes.
18     Q. But this, as you mentioned, is measuring
19 the surface area of the particle.
20     A. Yes.
21     Q. And if you look at the paragraph just below
22 that figure, what are you describing in that
23 paragraph just below the figure on the right-hand
24 side?
25     A. The aspect ratio, the area, and in general

Page 112

1 what the shape of the particles were.
2     Q. Please look over at page 530 on the right-
3 hand column. Under the "analysis of talc particles
4 in ovarian carcinoma" section, it reads "It was
5 essential to gather morphological measurements on
6 talc particles found in surgically resected tissues
7 from ovarian carcinoma patients. All ovarian
8 carcinoma patients had a substantial long-term
9 exposure to either baby powder or Shower to Shower
10 talc-containing products manufactured by Johnson &
11 Johnson."
12         Where did that information come from that's
13 described in that portion of the document I just
14 read?
15     A. That information would have come from the
16 fact that we had these patients that were involved
17 in litigation.
18     Q. Did you get information on each of the
19 patients as to the frequency, duration, or volume of
20 their actual use of baby powder or Shower to Shower?
21     A. No.
22     Q. So from your having these cases, you assume
23 for purposes of your article that they all were --
24 they all had substantial long-term exposure to
25 either baby powder or Shower to Shower?

## Page 113

1    A. Yes.

2    Q. You did not have actual data on what their

3    exposures were.

4    A. No.

5    Q. Please look over at the last page of the

6    article. Under the "financial support" section,

7    says "Support for this study was provided by the

8    authors." What does that mean?

9    A. There was no funding of this study. No

10    money was paid to do this study.

11    Q. So was this study done on everyone's time

12    for their -- for their employer?

13    A. Yeah, basically.

14    Q. And did you employ all these folks on this

15    paper?

16    A. No. Dr. Fan, Dr. McDonald, and I are

17    employed by my company.

18    Q. And who are Dr. Johnson and Dr. Popratiloff

19    employed by?

20    A. They're employed by George Washington

21    University.

22    Q. So is it your understanding that they did

23    this work while -- as part of their employment for

24    George Washington?

25    A. Yes.

## Page 114

1    Q. No other funds except the -- what they were

2    paid hourly or however they were paid were used for

3    this paper?

4    A. As far as I know.

5    Q. And your -- was your time compensated in

6    any way?

7    A. No, not for any work. Well, as we've

8    provided, any of these cases that were worked up as

9    a legal case was paid for that work-up. The

10    involvement of the -- that -- in this paper was not

11    compensated in any way.

12    MR. HEGARTY: Last article, last

13    question. I'll mark it as Exhibit 79, Mandarino

14    article.

15    (Article titled "The effect of talc

16    particles on phagocytes in co-culture with ovarian

17    cancer cells," Exhibit 79, marked)

18    Q. This is an article that studied mouse

19    ovarian epithelial cells; is that correct?

20    A. Yes.

21    Q. Have you done any prior study that involved

22    mouse cells?

23    A. Yeah. I've done mouse studies before.

24    Q. Have you done studies on mouse ovarian

25    epithelial cells?

## Page 115

1    A. No.

2    Q. What was your role in this paper?

3    A. My role was basically to -- as senior

4    author and really providing some of the ideas and

5    the concepts for what was done. But this was mostly

6    Dr. Fedulov and all the other authors on here other

7    than myself.

8    Q. This is a study that looks at gene

9    expression response. Is that fair?

10    A. Yes.

11    Q. It doesn't show mutation of cells; correct?

12    A. No. It shows gene responses.

13    Q. Gene expression can change due to exercise;

14    correct?

15    A. Gene expression?

16    Q. In an individual, a human, exercising can

17    affect gene expression; correct?

18    A. Much can affect gene expression.

19    Q. Including exercise.

20    A. Well, but if you have macrophages taking up

21    particles, you're going to see some degree of gene

22    expression.

23    Q. Understood. I'm talking about just gene

24    expression generally can be affected by exercise.

25    A. Yes.

## Page 116

1    Q. Can be affected by stress.

2    A. Yes.

3    Q. Can be affected by an infection that the

4    body has.

5    A. Yes.

6    Q. Can be affected by the process of eating;

7    right?

8    A. Yes. That's why you do in vitro studies.

9    Q. If you look at the second page, do you know

10    what talc dose was applied to the mouse cells?

11    A. Must say in here somewhere, but I've not

12    seen it yet.

13    Q. That's the reason I ask. I couldn't tell

14    when I read it what the dosage was that was applied

15    and ask whether you could tell or whether you recall

16    what dosage was applied.

17    A. Oh, yeah. .1 to 20 micrograms per well. So

18    there were multiple doses used. And they were --

19    the highest dose was 20 micrograms per well or -- in

20    dose response experiments and a dose of 10

21    micrograms per well in all other situations.

22    Q. Did you have any involvement in deciding

23    what the dose would be for this study?

24    A. No.

25    Q. If you turn over to the very last --

Page 117

1  second-to-last page, the funding part of the
2  article.  There's a reference at the end that says
3  "Funding for JJG in his role in this research was
4  provided through John J. Godleski, M.D., PLLC."
5  Does that mean that that accounts for your time on
6  this paper?
7      A. Yeah.
8      Q. Are you able to estimate how many hours you
9  spent on this paper?
10     A. No.  No.
11     Q. To your knowledge, the other funding for
12 the paper is what is described in that paragraph?
13     A. Is what?
14     Q. Is it your understanding that the remaining
15 funding for this paper is described in this
16 paragraph?
17     A. Yes.
18     Q. Are you aware of any other funding?
19     A. No.
20     Q. Does this mean that you essentially paid
21 for your own time?
22     A. Yes.
23     Q. Finally, look over at the second -- page
24 just before that.  The paragraph at the lower left-
25 hand column says "In conclusion, our gene expression

Page 118

1  did indicate both an outward effect."
2      MR. DEARING:  "In combination."
3      MR. HEGARTY:  "Induction" -- am I --
4      MR. DEARING:  You said "In conclusion."
5  It says "In combination."
6      MR. HEGARTY:  I'm sorry.  Thank you.
7  Let me start over again.
8      Q. "In combination, our gene expression data
9  indicate both an outward effect, induction of
10 releasable extracellular deleterious factors, as
11 well as an internal effect, inhibition of important
12 intracellular factors."
13     Are you aware of any literature that has
14 shown a link between the gene expression data
15 reported here and ovarian cancer risk?
16     A. I think what we're showing here is that
17 there's an effect on the macrophages in their
18 ability to inhibit the growth of cancer, and so
19 that's the finding here.  I'm not aware of other
20 studies that have shown similar things, but that's
21 not my area.
22     Q. Are you aware of any studies that have
23 shown an effect on macrophages as shown here and a
24 link to ovarian cancer risks?
25     A. Not that I'm aware of.

Page 119

1      MR. HEGARTY:  Okay.  Let's go ahead and
2  go off the record.
3      (A break was taken.)
4      MR. HEGARTY:  Back on the record.
5  Dr. Godleski, I think I'm at my end of my time for
6  your MDL deposition.  I appreciate your time and
7  attention.  Thank you.
8      THE WITNESS:  Thank you.
9      (Deposition concluded at 12:13 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 120

1      REPORTER'S CERTIFICATE
2
3      I, SONYA LOPES, Registered Professional
4  Reporter and Notary Public in and for the
5  Commonwealth of Massachusetts, certify;
6      That the foregoing proceedings were taken
7  before me at the time and place therein set forth,
8  at which time the witness was properly identified
9  and put under oath by me;
10     That the testimony of the witness, the
11 questions propounded, and all objections and
12 statements made at the time of the examination were
13 recorded stenographically by me and were thereafter
14 transcribed;
15     That the foregoing is a true and correct
16 transcript of my shorthand notes so taken.
17     I further certify that I am not a relative or
18 employee of any attorney of the parties, nor
19 financially interested in the action.
20     I declare under penalty of perjury that the
21 foregoing is true and correct.
22     Dated this 30th day of April, 2024.
23
24 Sonya Lopes          My Commission Expires:
25 Notary Public        October 28, 2027