# EXHIBIT 8

Judith Zelikoff, Ph.D.

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NEW JERSEY

- - -

IN RE:  JOHNSON &      :
JOHNSON TALCUM POWDER  :
PRODUCTS MARKETING,    :
SALES PRACTICES, AND   :   NO. 16-2738
PRODUCTS LIABILITY     :   (FLW) (LHG)
LITIGATION             :
                       :
THIS DOCUMENT RELATES  :
TO ALL CASES           :

- - -

January 21, 2019

- - -

            Videotaped deposition of
JUDITH ZELIKOFF Ph.D., taken pursuant to
notice, was held at the Sheraton Mahwah
Hotel, 1 International Boulevard, Mahwah,
New Jersey, beginning at 9:11 a.m., on
the above date, before Michelle L. Gray,
a Registered Professional Reporter,
Certified Shorthand Reporter, Certified
Realtime Reporter, and Notary Public.

- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph| 917.591.5672
deps@golkow.com

Judith Zelikoff, Ph.D.

Page 2

```
1   APPEARANCES:
2
    BEASLEY ALLEN, P.C.
3   BY:  P. LEIGH O'DELL, ESQ.
    BY:  JENNIFER K. EMMEL, ESQ.
4   234 Commerce Street
    Montgomery, Alabama 36103
5   (334) 269-2343
    leigh.odell@beasleyallen.com
6   Jennifer.emmel@beasleyallen.com
7     - and -
8   LEVIN PAPANTONIO THOMAS
    MITCHELL RAFFERTY & PROCTOR, PA
9   BY:  CHRISTOPHER V. TISI, ESQ.
    316 South Baylen Street,
10  Suite 600
    Pensacola, Florida 32502
11  (888) 435-7001
    Ctisi@levinlaw.com
12
      - and -
13
    GOLOMB & HONIK P.C.
14  BY:  RICHARD M. GOLOMB, ESQ.
    1835 Market Street, Suite 2900
15  Philadelphia, PA 19103
    (215) 985.9177
16  Rgolomb@golombhonik.com
17    - and -
18  NAPOLI SHKOLNIK, PLLC
    BY:  ALASTAIR J.M. FINDEIS, ESQ.
19  400 Broadhollow Road, Suite 305
    Melville, New York 11747
20  (631) 224-1133
    afindeis@napolilaw.com
21  Representing the Plaintiffs'
    Steering Committee
22
23
24
```

Page 4

```
1   APPEARANCES:  (Cont'd.)
2
3   SEYFARTH SHAW, LLP
    BY:  THOMAS T. LOCKE, ESQ.
4   975 F Street, NW
    Washington, D.C. 20004
5   (202) 463-2400
    tlocke@seyfarth.com
6   Representing the Defendant, PCPC
7
    TUCKER ELLIS, LLP
8   BY:  JAMES W. MIZGALA, ESQ.
    233 South Wacker Drive, Suite 6950
9   Chicago, Illinois 60606
    (312) 624-6307
10  james.mizgala@tuckerellis.com
    Representing the Defendant, PTI
11  Royston LLC and PTI Union LLC
12
13
14  ALSO PRESENT:
15
    VIDEOTAPE TECHNICIAN:
16    Henry Marte
17
18
19
20
21
22
23
24
```

Page 3

```
1   APPEARANCES:  (Cont'd.)
2
    SHOOK, HARDY & BACON, LLP
3   BY:  MARK C. HEGARTY, ESQ.
    2555 Grand Boulevard
4   Kansas City, MO 64108
    (816) 474-6550
5   Mhegarty@shb.com
6     - and -
7   SKADDEN ARPS, LLP
    BY:  BENJAMIN S. HALPERIN, ESQ.
8   4 Times Square
    New York, New York 10036
9   (212) 735-2453
    Benjamin.halperin@skadden.com
10  Representing the Defendant, Johnson
    & Johnson entities
11
12  GORDON & REES, LLP
    BY:  KENNETH J. FERGUSON, ESQ.
13  816 Congress Avenue, Suite 1510
    Austin, Texas 78701
14  (512) 391.0183
    kferguson@gordonrees.com
15
      - and -
16
    COUGHLIN DUFFY, LLP
17  BY:  MARK K. SILVER, ESQ.
    350 Mount Kemble Avenue
18  Morristown, New Jersey 07962
    (973) 267-0058
19  msilver@coughlinduffy.com
    Representing the Defendant, Imerys
20  Talc America, Inc.
21
22
23
24
```

Page 5

```
1               - - -
2           I N D E X
3               - - -
4
    Testimony of:    JUDITH ZELIKOFF, Ph.D.
5
6     By Mr. Hegarty   14, 464, 523, 576
7
      By Mr. Ferguson          442
8
9     By Ms. O'Dell         486, 571
10
11            - - -
12         E X H I B I T S
13            - - -
14   NO.       DESCRIPTION      PAGE
15   Zelikoff-1  Compilation of      16
              Invoices of
16            Dr. Zelikoff
17   Zelikoff-2  Rule 26 Expert      35
              Report of Judith
18            Zelikoff, Ph.D.
              11/16/18
19
     Zelikoff-3  Longo & Rigler      36
20            Report
              1/15/19
21
     Zelikoff-4  Rule 26 Report      40
22              Of Michael Crowley
23   Zelikoff-5  Listing of Chemicals  43
24
```

Judith Zelikoff, Ph.D.

Page 6

- - -
E X H I B I T S (Cont'd.)
- - -

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Zelikoff-6 | Notice of Deposition Of Dr. Zelikoff | 50 |
| Zelikoff-7 | Thumb Drive | 53 |
| Zelikoff-8 | Molecular Basis Supporting the Association of Talcum Powder Use with Increased Risk of Ovarian Cancer (Saed) | 55 |
| Zelikoff-9 | Data Screening Assessment 12/2018 | 57 |
| Zelikoff-10 | Systematic Review and Meta-Analysis Of the Association Between Perineal Use of Talc And Risk of Ovarian Caner (Taher) | 60 |
| Zelikoff-11 | Exhibit C Listing of Bates Numbered Documents | 62 |
| Zelikoff-12 | Academic Integrity For Students at NYU | 78 |
| Zelikoff-13 | Comparison of Quotes with Shawn Levy | 83 |

Page 7

- - -
E X H I B I T S (Cont'd.)
- - -

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Zelikoff-14 | Comparison of Quotes with Smith-Bindman | 88 |
| Zelikoff-15 | Comparison of Quotes with Genetics Home Reference | 92 |
| Zelikoff-16 | Comparison of Quotes with Simone Reuter | 102 |
| Zelikoff-17 | Comparison of Quotes with Environmental Chemistry.com | 106 |
| Zelikoff-18 | Comparison of Quotes with Rakoff-Nahoum | 115 |
| Zelikoff-19 | Comparison of Quotes with Health Effects | 119 |
| Zelikoff-20 | Why Cancer Inflammation? (Rakoff-Nahoum) | 118 |
| Zelikoff-21 | Comparison of Quotes with Kasprzak | 121 |
| Zelikoff-22 | Curriculum Vitae Of Dr. Zelikoff | 175 |

Page 8

- - -
E X H I B I T S (Cont'd.)
- - -

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Zelikoff-23 | Ovarian, Fallopian Tube, and Primary Peritoneal Cancer Prevention NCI | 393 |
| Zelikoff-24 | (Skipped) | |
| Zelikoff-25 | Comparison of Quotes with Cancer Research How Cancer Starts | 125 |
| Zelikoff-26 | Comparison of Quotes with Safety Assessment of Talc as Used in Cosmetics | 125 |
| Zelikoff-27 | Comparison of Quotes with CSEM | 125 |
| Zelikoff-28 | Comparison of Quotes with NIH Public Access Chromium Toxicity | 125 |
| Zelikoff-29 | Comparison of Quotes with IARC Monograph | 125 |

Page 9

- - -
E X H I B I T S (Cont'd.)
- - -

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Zelikoff-30 | Comparison of Quotes with NIH Public Access Environmental Toxicants | 125 |
| Zelikoff-31 | Comparison of Quotes with Peters | 125 |
| Zelikoff-32 | Comparison of Quotes with Trabert | 125 |
| Zelikoff-33 | Response Letter To Citizen's Petition 4/1/14 | 430 |
| Zelikoff-34 | Perineal Talc Use And Ovarian Cancer (Penninkilampi) | 398 |
| Zelikoff-35 | Consumer Talcums And Powders (Rohl) | 405 |
| Zelikoff-36 | Arsenic, Metals Fibres Excerpt (IARC Monograph) | 457 |
| Zelikoff-37 | Ingredients Talc | 454 |

3 (Pages 6 to 9)

Judith Zelikoff, Ph.D.

Page 10

```
 1              - - -
 2       E X H I B I T S  (Cont'd.)
 3              - - -
 4
 5   NO.       DESCRIPTION          PAGE
 6   Zelikoff-38  Talcum Powder       469
              Chronic Pelvic
 7            Inflammation
              (Merritt)
 8
     Zelikoff-39  Markers of          471
 9            Inflammation
              And Risk
10            (Wu)
11   Zelikoff-40  Binder Labeled      480
              Saad 2010 -
12            Zambelli 2013
13   Zelikoff-41  Binder Labeled      480
              Production Documents
14
     Zelikoff-42  Binder Labeled      480
15            Depositions
              ACGIH 2010 -
16            Frank & Jorge 2011
17   Zelikoff-43  Binder Labeled      480
              IARC 1977 -
18            IARC 2006
19   Zelikoff-44  Binder Labeled      480
              Gamble 1979 -
20            IARC 1976
21   Zelikoff-45  Binder Labeled      480
              Ingersoll 2011 -
22            Marconi 1990
23
24
```

Page 12

```
 1              - - -
 2       DEPOSITION SUPPORT INDEX
 3              - - -
 4
 5   Direction to Witness Not to Answer
 6   PAGE   LINE
     None.
 7
 8   Request for Production of Documents
 9   PAGE   LINE
     None.
10
11   Stipulations
12   PAGE   LINE
     None.
13
     Questions Marked
14
     PAGE   LINE
15   None.
16
17
18
19
20
21
22
23
24
```

Page 11

```
 1              - - -
 2       E X H I B I T S  (Cont'd.)
 3              - - -
 4
 5   NO.       DESCRIPTION          PAGE
 6   Zelikoff-46  Binder Labeled      480
              Mattenklott 2007 -
 7            Rossi 2009
 8   Zelikoff-47  Binder Labeled      480
              IARC 2009 -
 9            IARC, 2012
10   Zelikoff-48  Alterations in      481
              Gene Expression
11            In Human Mesothelial
              Cells
12            (Shukla)
13   Zelikoff-49  Experts of Transcript 549
              Of Robert Glenn
14            10/18/18
15   Zelikoff-50  Presence of         562
              Talc in Pelvic
16            Lymph Nodes of a Woman
              (Cramer)
17
     Zelikoff-51  Does Long-Term      567
18            Talc Exposure
              Have a Carcinogenic
19            Effect
              (Keskin)
20
21
22
23
24
```

Page 13

```
 1              THE VIDEOGRAPHER:  We are on
 2   the record.  My name is Henry
 3   Marte.  I am a videographer with
 4   Golkow Litigation Services.
 5              Today is January 21st, 2019,
 6   and the time is 9:11 a.m.
 7              This video deposition is
 8   being held in Mahwah, New Jersey,
 9   in the matter of Talcum Powder
10   Litigation.
11              The deponent today is Dr.
12   Judith Zelikoff.
13              All appearances will be
14   noted on the stenographic record.
15   Will the court reporter please
16   administer the oath to the
17   witness.
18              - - -
19              ... JUDITH ZELIKOFF, Ph.D.,
20   having been first duly sworn, was
21   examined and testified as follows:
22              - - -
23              EXAMINATION
24              - - -
```

4 (Pages 10 to 13)

Judith Zelikoff, Ph.D.

Page 14

1  BY MR. HEGARTY:
2      Q.   Good morning, Dr. Zelikoff.
3      A.   Good morning.
4      Q.   My name is Mark Hegarty.  I
5  represent the J&J defendants in this
6  action.  Can you please state your full
7  name for the record, please?
8      A.   Judith Terri Zelikoff.
9      Q.   Dr. Zelikoff, who is your
10 current employer?
11     A.   New York University School
12 of Medicine, also known as NYU Langone
13 Health.
14     Q.   What is your title at New
15 York University School of Medicine?
16     A.   Professor with tenure.
17     Q.   How long have you held that
18 position?
19     A.   Since 1982.
20     Q.   Do you have any separate
21 personal consulting business for
22 litigation purposes?
23     A.   I do not.
24     Q.   Where do the fees that

Page 15

1  you earn as an expert witness in this
2  case?
3      A.   They go to household
4  expenses as well as charity.
5      Q.   But they go to you, correct?
6      A.   They go to me.
7      Q.   Other than your work at New
8  York University and the fees that you're
9  earning as part of this litigation, do
10 you have any other sources of income?
11     A.   Just income that I have from
12 advisory boards or -- when you -- when
13 you sit on panels, they also pay you.
14 But other than that, no.
15     Q.   Tell me an example of an
16 advisory board for which you receive
17 income.
18     A.   It's on a very sporadic
19 basis.  And it depends on what it is.
20 But the NIEHS, National Institute of
21 Environmental Health Sciences.  And it's
22 an NIH institute.  And I serve as a -- I
23 review grants for them.
24     Q.   What are you charging

Page 16

1  plaintiffs' counsel for your services in
2  this litigation?
3      A.   $350 per hour.
4      Q.   Is there any difference in
5  your rate depending on whether it's
6  literature review, sitting for a
7  deposition, trial testimony?
8      A.   Sitting for a deposition or
9  trial testimony is $450.
10     Q.   Did anyone outside of
11 plaintiffs' attorneys assist you in any
12 way with your expert report in this case?
13     A.   No one with my expert
14 report.
15     Q.   We were provided today a
16 copy of several invoices that you have
17 prepared for your work in this case.  I'm
18 going to mark as Exhibit Number 1 a copy
19 of those invoices.
20          (Document marked for
21       identification as Exhibit
22       Zelikoff-1.)
23 BY MR. HEGARTY:
24     Q.   Dr. Zelikoff, would you look

Page 17

1  at Exhibit Number 1 and tell me whether
2  those are all the invoices that you have
3  generated and provided to plaintiffs'
4  counsel in this case.
5      A.   It appears to be.
6      Q.   Thank you.  The last work
7  noted is December 24, 2018.
8          Have you spent any
9  additional time on this case for which
10 you intend to bill plaintiffs' counsel --
11     A.   Yes, I have.
12     Q.   -- that's not reflected in
13 the invoices?
14     A.   Yes, I have.
15     Q.   How much additional time?
16     A.   Approximately 25 to 30 hours
17 by the end of this deposition.  Not
18 including the deposition.
19     Q.   With regard to these
20 invoices, have they all been paid?
21     A.   Yes, they have.
22     Q.   Were you paid a retainer for
23 your work on this case?
24     A.   I don't recall.

5 (Pages 14 to 17)

Judith Zelikoff, Ph.D.

Page 18

1      Q.   Dr. Zelikoff, as you know
2   we're here to take your deposition in the
3   case of In Re Johnson & Johnson Talc
4   Litigation, which is an MDL setting.  Are
5   you aware you've been designated as an
6   expert in that case?
7      A.   I am aware.
8      Q.   When were you first
9   contacted about serving as an expert in
10  this case?
11     A.   Early 2017.  I was
12  requested -- I was requested if I had
13  interest in it.
14     Q.   The first invoice that you
15  provided has a date of April 5, 2017.
16  When in relation to the first invoice
17  entry was that initial contact?
18     A.   To the best of my knowledge,
19  it was January or February.
20     Q.   Of 2017?
21     A.   Of 2017, right.
22     Q.   Who contacted you?
23     A.   Jennifer Emmel.
24     Q.   Did you know her before she

Page 19

1   contacted you?
2      A.   Not at all.
3      Q.   How was the contact made, by
4   telephone?
5      A.   By telephone.
6      Q.   Apart from anything that
7   attorneys for plaintiffs may have told
8   you, do you know how she came to contact
9   you?
10     A.   I'm not aware as to how she
11  came to contact me.
12     Q.   Did you have any prior
13  litigation work with her?
14     A.   Not with Ms. Emmel, no.
15     Q.   How do you spell her name?
16     A.   How do I --
17     Q.   Yes.
18     A.   -- spell her name?
19     Q.   Yes.
20     A.   To the best of my knowledge,
21  it's E-M-M-E-L.
22     Q.   Have you had any prior
23  litigation work with any of the lawyers
24  with whom you have met that are

Page 20

1   representing plaintiffs?
2      A.   No, sir.
3      Q.   Did you agree to serve as an
4   expert witness at the time of Ms. Emmel's
5   first contact with you?
6      A.   No, sir.  I told her that I
7   would have to do some literature
8   searching myself and come up with a
9   conclusion as to whether or not I felt
10  comfortable based on the science in
11  serving in that capacity.
12     Q.   At one point -- at what
13  point between -- at what point did you
14  come to or did -- strike that.
15          At what point did you agree
16  to serve as an expert witness in this
17  litigation in relation to that first
18  call?
19     A.   Probably about a month
20  later.
21     Q.   What did Ms. Emmel tell you
22  at that first call about the litigation?
23          MS. O'DELL:  We just
24     instruct -- I mean conversations,

Page 21

1   in terms of -- let me just strike
2   that and say don't discuss
3   anything that you communicated to
4   us or we communicated to you after
5   you decided to become an expert in
6   the case.
7   BY MR. HEGARTY:
8      Q.   Correct.  I'm talking about,
9   right now I'm talking about that initial
10  phone call where you said you had not --
11  where you did not agree at that point in
12  time to serve as an expert witness.
13  That's the only call I'm talking about.
14          What did Ms. Emmel tell you
15  about the litigation or about what they
16  wanted you to do at that first call?
17     A.   Well, I don't remember the
18  details as it was about over a year ago.
19  But to the best of my knowledge and my
20  recollection, it was just that they
21  represented the plaintiffs in a case of
22  ovarian cancer and its relationship to
23  talcum powder products, and was I
24  familiar with it, did I know anything

6 (Pages 18 to 21)

Judith Zelikoff, Ph.D.

Page 22

1  about it, and did I have -- did I have
2  interest in being associated with, and I
3  responded to her that I follow the
4  science, that's all I do is I follow the
5  science.
6           And if the science leads me
7  in a direction that I would have interest
8  or that I felt comfortable in doing this,
9  then I would let her know.
10      Q.   What was your response when
11  she asked you if you were familiar with
12  the science of talc and ovarian cancer?
13      A.   I was familiar with it at
14  that time in a superficial manner.  I
15  work in a very high-powered department of
16  environmental medicine.  And we discuss
17  current events over lunch.
18      Q.   When you say in a
19  superficial manner, what do you mean?
20      A.   Certainly not to the depth
21  that I'm aware of the issue currently.
22      Q.   Is it correct that you had
23  not formed any opinions as to any link
24  between talc and ovarian cancer as of the

Page 23

1  time of that first call with Ms. Emmel?
2      A.   I had -- I had no opinion at
3  that time.
4      Q.   Did you have any discussions
5  with Ms. Emmel or any other lawyer
6  representing plaintiffs between that
7  initial phone call and when you agreed to
8  serve as an expert witness?
9      A.   To my -- to the best of my
10  knowledge, I had not spoken to
11  Ms. O'Dell.  So to the best of my
12  knowledge it was just Ms. Emmel.
13      Q.   Again, focusing on that
14  first phone call -- well, strike that.
15           Had you had any further
16  discussion with Ms. Emmel between the
17  time of that first call and the time you
18  agreed to serve as an expert witness?
19      A.   I'm sorry, between the time
20  of the first call and the time I agreed,
21  could you repeat the question please?
22      Q.   Sure.  Did you have any
23  additional discussions with Ms. Emmel
24  between the time of the first call and

Page 24

1  the time that you agreed to serve as an
2  expert witness in the case?
3      A.   No, not -- not to my
4  recollection.
5      Q.   Do you recall anything else
6  that you discussed with Ms. Emmel at that
7  first call besides what we talked about
8  already?
9      A.   No, sir.
10      Q.   Did Ms. Emmel at that first
11  call tell you anything about plaintiffs'
12  theory of causation or theory of
13  mechanism of action or biologic
14  plausibility?
15      A.   No, sir, not at all.
16      Q.   Did she send you any
17  documents before you agreed to serve as
18  an expert witness?
19      A.   Not to my knowledge.  I
20  think the -- I'm sure the literature
21  reviews that I did at that time were
22  solely my own.
23      Q.   Had you heard of lawsuits
24  involving talc and ovarian cancer before

Page 25

1  being contacted by Ms. Emmel?
2      A.   I actually had not.
3      Q.   What then were your sources
4  of knowledge about talc and ovarian
5  cancer as of the time of the first call?
6      A.   The media, whatever I might
7  have read in the paper and any
8  discussions that might have been brought
9  up by my colleagues.
10      Q.   Do you recall any colleague
11  who brought the -- anything up about talc
12  and ovarian cancer?
13      A.   I do not recall a specific
14  colleague.  Lunchroom chatter.
15      Q.   Did you form any opinions
16  from the material you did read in the
17  media or from discussion with your
18  colleagues?
19      A.   I had no opinion.
20      Q.   And you were ultimately
21  retained and asked to give expert
22  opinions in this case, correct?
23      A.   I was ultimately retained,
24  yes, correct.

7 (Pages 22 to 25)

Judith Zelikoff, Ph.D.

Page 26

1    Q.    The lawyers for the
2  plaintiffs in this case have paid you to
3  review materials and offer opinions,
4  correct?
5         MS. O'DELL:  Objection to
6    the form.
7         THE WITNESS:  Do I answer
8    the question?
9  BY MR. HEGARTY:
10   Q.    Yes.
11        MS. O'DELL:  Yes.
12        THE WITNESS:  They have
13    remunerated me for my time and
14    effort in reading hundreds of
15    articles.
16 BY MR. HEGARTY:
17   Q.    The opinions that you've
18  formulated were ultimately set out in
19  your November 16, 2018, MDL report,
20  correct?
21   A.    That's correct.
22   Q.    The hours you spent in
23  preparing that report are reflected in
24  the invoices we marked as Exhibit

Page 27

1  Number 1, correct?
2    A.    I don't recall what exhibit
3  number it is, but it is in one of the
4  invoices.
5    Q.    A description that you have
6  in your invoices includes report
7  preparation.  Is that a description which
8  describes your -- the time you spent
9  preparing your report?
10   A.    Yes, it is.
11   Q.    Every entry under report
12  preparation would be the time that you
13  spent preparing your report?
14   A.    Yes, that's true.  That
15  could include reading material, searching
16  for material or writing.
17   Q.    The invoices we marked as an
18  exhibit also reflect the time you spent
19  with lawyers for plaintiffs; is that
20  correct?
21   A.    It does.
22   Q.    With regard to your
23  deposition here today, how much time did
24  you spend preparing to come here and

Page 28

1  testify today?
2    A.    It would be in my invoice,
3  but if I had to approximate that without
4  the knowledge of having that in front of
5  me, I would say 30 to 50 hours.
6    Q.    What attorneys did you meet
7  with to prepare for your deposition here
8  today?
9    A.    I met with Ms. O'Dell and
10  Ms. Emmel.
11   Q.    Anyone else?
12   A.    In a face-to-face.
13   Q.    Face-to-face.  There were
14  phone calls as well?
15   A.    There were -- one of -- one
16  of the phone calls, it may have been two.
17  I also -- Chris, and I'm not familiar
18  with your last name, sorry.
19        Chris from the --
20        MS. O'DELL:  Tisi.
21        THE WITNESS:  Tisi?  Chris
22  Tisi and Alistair --
23        MR. FINDEIS:  Findeis.
24        MS. O'DELL:  Findeis.

Page 29

1        THE WITNESS:  Findeis -- was
2  on the phone, and there may have
3  been one or two others, but I
4  don't recall.
5  BY MR. HEGARTY:
6    Q.    Have you spoken with any of
7  your colleagues about your work in this
8  litigation?
9    A.    What -- can you explain what
10  you mean by colleagues?
11   Q.    Well, you mentioned
12  colleagues in discussing talc and ovarian
13  cancer.  So those colleagues.
14   A.    If -- do you mean other
15  faculty?
16   Q.    Correct.
17   A.    And the question again,
18  please?
19   Q.    Sure.  Have you spoken with
20  other faculty at New York University
21  regarding your work on this litigation?
22   A.    No, I have not.
23   Q.    Have you told any faculty at
24  New York University of your opinions in

8 (Pages 26 to 29)

Judith Zelikoff, Ph.D.

Page 30

1  this case?
2      A.   I have not.
3      Q.   Have you told anyone at NYU
4  School of Medicine of your opinions?
5      A.   I have not.  I have
6  discussed, not my opinion, but in my
7  class, my toxicology course, to graduate
8  students at NYU.
9          I have, in my course on
10  speaking about reproductive toxicology
11  and developmental toxicology, in
12  discussing risk factors, two graduate
13  students I have discussed -- I've
14  included talc as a potential risk factor.
15     Q.   When did you start including
16  talc as a potential risk factor in that
17  course?
18     A.   Prior -- if you're asking me
19  was it prior to or -- prior to my
20  retainment, it was prior to my
21  retainment.
22     Q.   So prior to your
23  retainment -- let me -- let me word it
24  differently.

Page 31

1          Prior to the call from
2  Ms. Emmel, you had included in your
3  course to -- your toxicology course a
4  discussion about talc and ovarian cancer?
5      A.   Not a discussion, just
6  didactic lecture saying that this is the
7  female reproductive tract.  Ovarian
8  cancer is part of an adverse outcome of
9  disease.  It's very prevalent.  And there
10  are factors including early menarche,
11  late menopause, and there's some issues
12  currently on the table as to whether
13  cosmetic talc also plays a role.
14         No opinion was given to my
15  class.  Just information.
16     Q.   Do you have any materials
17  for your course, whether in PowerPoint
18  form or other form that sets out that
19  discussion you just had?
20     A.   No.
21     Q.   Is that the extent of the
22  discussion that you had with your
23  toxicology students about talc and
24  ovarian cancer?

Page 32

1      A.   Yes.
2      Q.   Does that continue to be the
3  extent of any discussion you had with any
4  students at New York University about
5  talc and ovarian cancer?
6      A.   Well, right now we're on
7  break.  I -- I probably will -- I will
8  continue after the deposition to also
9  talk -- talk with them and list it as
10  a -- as a risk factor for ovarian cancer.
11     Q.   What about -- strike that.
12         Did you have discussions,
13  that same discussion with toxicology
14  students between -- I should say before
15  you were contacted by Ms. Emmel and
16  today, have you had -- continued to have
17  that same discussion with your toxicology
18  students?
19     A.   I've not --
20         MS. O'DELL:  Objection to
21  form.
22         Doctor, give me just a
23  moment after the question if I
24  need to object.  Thank you.

Page 33

1          THE WITNESS:  Shall I
2  continue?
3  BY MR. HEGARTY:
4      Q.   Sure.
5      A.   Could you repeat the
6  question, please?
7      Q.   Sure.  You mentioned that
8  the discussion that we just went over was
9  before your contact by Ms. Emmel,
10  correct?
11     A.   I said that it started.  My
12  lectures started prior to my conversation
13  with Ms. Emmel.
14     Q.   What was -- what was the
15  name of the course that you had that
16  lecture?
17     A.   Organ system toxicology.
18     Q.   Have you taught that course
19  since your call with Ms. Emmel?
20     A.   Actually it's coming up
21  this -- this semester, starting the 30th
22  of January.
23     Q.   So between -- as of the
24  first part of 2017 through today you have

9 (Pages 30 to 33)

Judith Zelikoff, Ph.D.

Page 34

1    not taught that same course?
2        A.    It's taught every other
3    year.
4        Q.    Have you communicated with
5    anyone outside of plaintiffs' counsel in
6    this case about your opinions in your
7    report?
8        A.    Not about my opinions, no.
9        Q.    Have you talked with anyone
10   outside of plaintiffs' counsel in this
11   case about your report?
12       A.    Only to say that I -- to my
13   friends, when I refuse to go anywhere
14   with them, because I have to stay home
15   and work, only to say that I'm working on
16   a report.
17       Q.    Have you discussed the
18   litigation or your report with any other
19   experts retained by the plaintiffs in
20   this case?
21       A.    No, sir, I have not.
22       Q.    Have you reviewed any of the
23   other plaintiffs' experts' MDL reports in
24   this litigation besides those referenced

Page 35

1    in your report?
2        A.    I reviewed Dr. Dydek's.  I
3    reviewed -- did you say the plaintiffs'
4    witnesses?
5        Q.    Yeah, let me -- let me -- in
6    your report -- and I can -- we can get it
7    out here in a moment.  But you list
8    the -- in your list of reports, you list
9    the report of Michael Crowley.
10       A.    I'm sorry, sir.  Can you --
11       Q.    It's in Exhibit B at the end
12   of Exhibit B of your report.  If you need
13   a copy I can give it to you now.
14       A.    Can you give me a copy.
15           (Document marked for
16           identification as Exhibit
17           Zelikoff-2.)
18   BY MR. HEGARTY:
19       Q.    I'm marking Exhibit 2 Dr.
20   Zelikoff's report that was provided to us
21   in this case.
22       A.    Thank you.  And what page
23   are you referring to?
24       Q.    It is the last page of

Page 36

1    Exhibit B.  It should be the very last
2    page of that document.
3        A.    Thank you.
4        Q.    The very last page of
5    Exhibit B of your report, you list a
6    number of expert reports, correct?
7        A.    I do.  Deposition and
8    exhibits.
9        Q.    Have you reviewed any other
10   expert reports -- strike that.
11           Did you review any other
12   expert reports for purposes of your
13   expert report besides those listed here?
14       A.    No, sir.  Unless --
15   Dr. Longo, December 2018 supplement, that
16   was a report, and I did review that.
17       Q.    We were provided today with
18   a copy of a report of Longo and Rigler,
19   January 15, 2019.  And I'm going to mark
20   that as Exhibit 3.
21           (Document marked for
22           identification as Exhibit
23           Zelikoff-3.)
24   BY MR. HEGARTY:

Page 37

1        Q.    Is that the supplemental
2    report that you described for us?
3        A.    It is, sir.  It's an
4    analysis Johnson & Johnson Historical
5    Product Containers and Imerys' Historical
6    Railroad Car Samples, etc..
7        Q.    That report is dated
8    January 15th, 2019, correct?
9        A.    Yes, sir.
10       Q.    When did you receive this
11   report?
12       A.    In January.
13       Q.    When in relation to
14   January 15, 2019?
15       A.    Today is the --
16       Q.    Is the 21st.
17       A.    Today is the 21st.  I would
18   say somewhere between the 15th and the
19   21st.  Actually it was this past Saturday
20   as it was placed in my Dropbox and I
21   could not open my Dropbox.
22       Q.    When did you review Exhibit
23   Number 3?
24       A.    That same report?

10 (Pages 34 to 37)

Judith Zelikoff, Ph.D.

Page 38

1    Q.   Yes.
2    A.   I received it on Saturday.
3    I reviewed it on Sunday.
4    Q.   How much time did you spend
5    reviewing this additional Longo and
6    Rigler report?
7    A.   Sorry.  About three hours.
8    Q.   Did you read every page?
9    A.   I read -- I reviewed each
10   page but I did not scrutinize every page.
11   Q.   Did you read the entirety of
12   the text in this supplemental report?
13   A.   May I see the report,
14   please.
15       MS. O'DELL:  Objection.
16       Asked and answered.  That's the
17       same question.
18       THE WITNESS:  Should I
19       answer?
20       MS. O'DELL:  Yes, you may.
21       THE WITNESS:  I reviewed the
22       text going up to Page 32 with
23       greater rigor than I did the
24       tables.

Page 39

1    BY MR. HEGARTY:
2    Q.   When you say "reviewed,"
3    does that mean that you read every -- all
4    the words on every page up to Page 32?
5    A.   I did.
6    Q.   You included in the list of
7    reports that you reviewed, the report of
8    Michael Crowley, correct?
9    A.   Every one of the reports
10   were not read with the -- read with
11   the -- sorry, I'm caught up in the
12   microphone -- were not read with the same
13   intensity and duration of time put into
14   it. I reviewed it.  To what extent, I'm
15   not clear at this moment.
16   Q.   The first report that you
17   list in the list of reports in Exhibit B
18   is the expert report of Michael M.
19   Crowley, correct?
20   A.   It's written that way, yes.
21   Q.   Did you prepare this list of
22   reports?
23   A.   I did not.
24   Q.   Who did?

Page 40

1    A.   The attorneys.
2    Q.   I'm going to show you --
3    A.   Plaintiffs' attorneys.
4       (Document marked for
5       identification as Exhibit
6       Zelikoff-4.)
7    BY MR. HEGARTY:
8    Q.   I'm going to show you what I
9    marked as Exhibit Number 4.  This is the
10   MDL report provided to us for Michael
11   Crowley.
12   A.   Mm-hmm.
13   Q.   Did you read the entirety of
14   that report?
15   A.   I cannot say that I read the
16   entirety of this report.  I reviewed the
17   report.
18   Q.   Okay.  Well, your report is
19   dated November 16, 2018.  And that report
20   is dated November 12, 2012, -- 2018.
21   When did you receive the report by
22   Dr. Crowley in relation to the date on
23   the first page, November 12th.
24   A.   I really cannot say with

Page 41

1    certainty.  It seems to me that I
2    received this prior to my report
3    conclusion.
4    Q.   There are 212 pages there.
5    Again, did you read every word of every
6    page?
7    A.   No, sir.  Did I look at
8    every word of every page?  Yes.
9    Q.   No, my question is did you
10   read every word of every page.
11   A.   My answer is --
12       MS. O'DELL:  She answered
13       your question.
14       THE WITNESS:  -- I looked at
15       every page.
16   BY MR. HEGARTY:
17   Q.   Did you read all the
18   references that he has in that report?
19   A.   I looked at the references.
20   Q.   Did you actually pull the
21   references and read the citations that he
22   refers to?
23   A.   No, sir.  I did my own -- my
24   own literature search in terms of

11 (Pages 38 to 41)

Judith Zelikoff, Ph.D.

Page 42

1  fragrance and chemicals within the
2  fragrances. And I did receive that as an
3  exhibit this morning.
4       Q. I'm sorry. What did you
5  say?
6       A. I said I did my own
7  literature search in terms of fragrances,
8  and I think you received a copy of that
9  this morning. In that report that I did,
10 that I prepared, I was assessing
11 carcinogenicity of each of the compounds.
12      Q. Going back to the Crowley
13 report, did you read all the tables in
14 that report?
15      A. I did not read. I reviewed.
16      Q. What is --
17      A. I looked at them.
18      Q. Okay. What is the
19 difference between reading and reviewing
20 to you?
21      A. In my mind, reading is
22 in-depth assessment, and whereas
23 reviewing is looking over. Reading is
24 more intense.

Page 43

1       Q. You pointed to us -- pointed
2  to us -- strike that.
3       You pointed to the document
4  that was provided to us this morning,
5  which you say is -- what I think you said
6  reflects your own literature search with
7  regard to fragrances; is that correct?
8       A. Mine and a student.
9       Q. What student?
10      A. A graduate student in my
11 laboratory.
12      (Document marked for
13      identification as Exhibit
14      Zelikoff-5.)
15 BY MR. HEGARTY:
16      Q. I've marked as Exhibit
17 Number 5 the document that was produced
18 to us this morning. Can you tell me what
19 Exhibit Number 5 is.
20      A. Exhibit Number 5 is -- is a
21 list of the chemicals that -- part of
22 which, if not in its entirety, were taken
23 from the fragrances that were -- and the
24 chemicals that were listed in

Page 44

1  Dr. Crowley's report. And with that I --
2  I used the case number. I reviewed each
3  one of the chemicals in terms of their
4  potential carcinogenicity by, number one,
5  putting -- writing down the chemical,
6  looking to see if there were other
7  structures or chemicals -- or chemicals
8  that had similar names.
9       I reviewed through Google,
10 through PubMed and through Tox Lit and
11 IARC reports to see whether or not there
12 was a listing for them in terms of
13 carcinogenicity. And that is the result.
14 This is the result.
15      Q. When did you do all of that?
16      A. I did that post the
17 report --
18      Q. When -- sorry.
19      A. -- as part of my preparation
20 for the deposition.
21      Q. When did you do it post
22 report in relation to today?
23      A. One to two weeks ago.
24      Q. Did you review -- strike

Page 45

1  that.
2       Did you read all the MSDSes
3  that you list in Exhibit Number 5?
4       A. I did not read all of the
5  MSDSes. But I did look at them. I
6  reviewed them to make sure they were
7  accurate.
8       Q. Did you -- did you look at
9  and review every MSDS listed in Exhibit
10 Number 5?
11      A. No, sir.
12      Q. I'm sorry?
13      A. No, sir.
14      Q. Approximately how many did
15 you look at in review?
16      A. I would say I looked at
17 perhaps half. Looked -- looked at, not
18 reviewed.
19      Q. But with regard to your
20 analysis of the fragrances that are
21 reportedly in Johnson's Baby Powder, you
22 did not do any of your own analysis as of
23 the time of your report, correct?
24      A. I --

12  (Pages 42 to 45)

Judith Zelikoff, Ph.D.

Page 46

1    MS. O'DELL: Objection to
2    the form.
3    THE WITNESS: I did no
4    analysis except to gather the
5    information that is out there by
6    reputable organizations.
7    BY MR. HEGARTY:
8    Q.    Well, did you gather that
9    information before you completed your
10    expert report?
11    A.    I did this after my expert
12    report.
13    Q.    And my question was, before
14    your expert report, did you do any of
15    your own analysis of the fragrances that
16    we -- are listed in Exhibit Number 5?
17    MS. O'DELL: Objection to
18    form.
19    THE WITNESS: I'm not sure
20    what you mean by analysis.
21    BY MR. HEGARTY:
22    Q.    Well, did you do any of your
23    own research, review of the literature,
24    anything with regard to fragrances as of

Page 47

1    the time of your signing of your expert
2    report November 16, 2018?
3    A.    I very briefly looked up
4    limonene and eugenol. And it wasn't in
5    regards to this case. It was in regards
6    to work that I do with electronic
7    cigarettes. They are being used as
8    flavorants.
9    Q.    Was that the extent of your
10    review of the fragrances as of the time
11    of your expert report, November 16, 2018?
12    MS. O'DELL: Object to form.
13    You may answer.
14    THE WITNESS: Whatever is in
15    the report from Dr. Crowley that
16    listed, I looked at those.
17    BY MR. HEGARTY:
18    Q.    But as you indicated, you
19    did not read all the citations, the
20    literature resources that Dr. Crowley
21    cites in his report and review them
22    yourself?
23    MS. O'DELL: Object to the
24    form.

Page 48

1    THE WITNESS: I --
2    post-report, I did my own search.
3    BY MR. HEGARTY:
4    Q.    But my question was, before
5    your report, with regard to Dr. Crowley's
6    report, did you actually pull the
7    literature references that he cites and
8    read them yourself?
9    A.    No, sir.
10    Q.    You also make reference to
11    reviewing Dr. Longo's report, MDL report,
12    which is dated November 14, 2018. That's
13    in the last page of Exhibit Number B. Do
14    you see that?
15    A.    I -- I see that, yes.
16    Q.    Did you read every page of
17    that report?
18    A.    No, sir, I did not. But I
19    did read every page of the December 2018
20    Longo mass supplement report.
21    Q.    Well, focusing on the
22    November 14, 2018, report, that report is
23    over 2,000 pages. Are you aware of that?
24    A.    Yes, sir.

Page 49

1    Q.    Did you read all 2,000
2    pages?
3    A.    No, sir. I did not.
4    Q.    Did you read any of those
5    2,000 pages?
6    A.    I reviewed several of those
7    pages.
8    Q.    Okay. How about the rest of
9    the reports that are listed there? Did
10    you read every page of the reports that
11    are listed there?
12    A.    I read every page of the
13    Dr. Thomas Dydek's report. And I read
14    two-thirds of Dr. Plunkett's.
15    Q.    As to the rest, did you
16    review the remaining reports?
17    MS. O'DELL: Object to the
18    form.
19    BY MR. HEGARTY:
20    Q.    Or not look at them at all?
21    A.    I glanced over them.
22    Q.    Do you recall if you were
23    ever provided any draft reports from any
24    of the plaintiffs' experts in the MDL,

13 (Pages 46 to 49)

Judith Zelikoff, Ph.D.

Page 50

1  where you understood them to be drafts?
2      A.   I never received anything
3  that I understood to be a draft document.
4          (Document marked for
5          identification as Exhibit
6          Zelikoff-6.)
7  BY MR. HEGARTY:
8      Q.   Dr. Zelikoff, I'm marking
9  Exhibit Number 6 a copy of your
10  deposition notice for purposes of today's
11  deposition.
12      A.   Yes, sir.  I see it.
13      Q.   Did you have a chance to
14  look at that before today?
15      A.   I did not.
16      Q.   What materials did you bring
17  with you to the deposition today?
18          MS. O'DELL:  I would just
19          reassert that the objections that
20          plaintiffs have served regarding
21          certain of the requests and would
22          state that Dr. Zelikoff has
23          brought binders of her cited
24          materials, and then I believe I

Page 51

1          gave you a jump drive of all the
2          reference materials.
3  BY MR. HEGARTY:
4      Q.   Let me go back to my
5  question.  Sitting to your right are
6  binders of materials.  Do you know what
7  those binders are, Dr. Zelikoff?
8      A.   I do know what those black
9  binders are to my right.
10      Q.   What are they?
11      A.   They are binders containing
12  materials, papers, literature --
13  literature, in alphabetical order of
14  papers that are relevant to my -- to my
15  testimony, as well as production
16  documents which include letters, reports
17  of internal documents.
18      Q.   Your Exhibit B in your
19  report starts with a page Materials and
20  Data Considered.  Do you see that?
21      A.   Page please?
22      Q.   It's Exhibit B.
23      A.   Materials and data
24  considered, I have it, yes, sir.

Page 52

1      Q.   Is it correct that the
2  binders to your right are copies of
3  everything in -- under the listing --
4  under the heading of Materials and Data
5  Considered?
6          MS. O'DELL:  Object to the
7          form.
8          THE WITNESS:  I cannot say
9          that every single paper in here is
10          in there.  Maybe in something that
11          I have looked up, but I can't say
12          with likely certainty that yes,
13          everything is in there.  Although
14          I cannot tell you that I reviewed
15          every single one and matched it to
16          this page.
17  BY MR. HEGARTY:
18      Q.   Who prepared -- who prepared
19  the document Materials and Data
20  Considered?
21      A.   What do you mean by
22  prepared?
23      Q.   Did you prepare it?
24          MS. O'DELL:  Object to the

Page 53

1          form.
2          THE WITNESS:  I supplied
3          data, references, and in
4          coordination and complementation
5          with the plaintiffs' attorneys,
6          they prepared this.
7          (Document marked for
8          identification as Exhibit
9          Zelikoff-7.)
10  BY MR. HEGARTY:
11      Q.   I'm marking as Exhibit
12  Number 7 a flash drive that we were
13  provided here today.  Do you know what
14  Exhibit Number 7 is?
15      A.   I do not.
16      Q.   Do you know what's contained
17  on the flash drive?
18      A.   I have not seen the data
19  within the flash drive.
20          MS. O'DELL:  I'll just
21          represent that I prepared the
22          flash drive and the flash drive
23          has all the materials on
24          Exhibit B, on behalf of

14 (Pages 50 to 53)

Judith Zelikoff, Ph.D.

Page 54

1      Dr. Zelikoff.
2  BY MR. HEGARTY:
3      Q.    Are the materials you also
4  cited -- I'm sorry.  Are the references
5  you also cited in the body of your report
6  contained in those notebooks to your
7  knowledge?
8      A.    To my knowledge, they are.
9      Q.    Are the materials that --
10  that are in those notebooks materials you
11  reviewed or had access to prior to
12  completion of your expert report?
13      A.    Prior to the completion.
14  However I also prepared my own.  So in
15  going through -- in coming to my
16  conclusion and opinion, I also went
17  through the literature using various
18  websites including, as I said Tox Lit,
19  Google and PubMed.  And I arranged my
20  documents that I thought were relevant
21  after reviewing all of the ones that came
22  up in my literature search, and I
23  reviewed the abstracts and if I found
24  them to be relevant, I placed them in --

Page 55

1  in order and in bins, in silos, in
2  different areas, and I prepared my own.
3      Q.    We were also provided today,
4  this morning, what I've marked as Exhibit
5  Number 8 which is a manuscript from a
6  publication called Reproductive Sciences.
7  The lead author, Ghassam Saed.
8          (Document marked for
9          identification as Exhibit
10          Zelikoff-8.)
11  BY MR. HEGARTY:
12      Q.    Can you tell me when you
13  received that manuscript?
14      A.    I received the manuscript in
15  December.
16      Q.    Approximately when in
17  December?
18      A.    Let me say that it was
19  either December or early January.  I
20  cannot be more exact than that.
21      Q.    Have you read that
22  manuscript?
23      A.    Have I -- yes, I've read
24  this manuscript.

Page 56

1      Q.    You had not read that
2  manuscript though at the time you
3  completed your report, correct?
4      A.    No, I did not, sir.
5      Q.    So that manuscript did not
6  inform the opinions set out in your
7  report, correct?
8          MS. O'DELL:  Objection to
9          form.
10          THE WITNESS:  Do I answer?
11          MS. O'DELL:  Yes, you may
12          answer.
13          THE WITNESS:  Okay.
14          MS. O'DELL:  Yes.
15          THE WITNESS:  I -- I had
16  access to an abstract from the
17  same author with emerging results
18  that was brought forward in larger
19  context and in greater detail in
20  the publication.  So I had -- so
21  the abstract did go into my
22  thinking.
23  BY MR. HEGARTY:
24      Q.    The manuscript though we

Page 57

1  marked as Exhibit 8 did not go into your
2  thinking?
3      A.    The manuscript -- no, sir,
4  it did not.  It did post my report and it
5  added supplementary and compelling
6  evidence for my opinion.
7          (Document marked for
8          identification as Exhibit
9          Zelikoff-9.)
10  BY MR. HEGARTY:
11      Q.    I've also marked as Exhibit
12  Number 9 another document we were
13  provided this morning which is -- which
14  is called Draft Screening Assessment.
15          When did you receive this
16  draft screening assessment?
17      A.    January.
18      Q.    Approximately when in
19  January?
20      A.    About two weeks ago.
21      Q.    Who -- what was your source
22  for getting that document?
23      A.    Ms. Emmel.
24      Q.    Did Ms. Emmel also provide

15 (Pages 54 to 57)

Judith Zelikoff, Ph.D.

Page 58

1    the -- the Saed manuscript?
2        A.    Yes, sir, she did.
3        Q.    So neither the Canadian
4    assessment nor Dr. Saed's manuscript were
5    materials you found on your own, correct?
6        A.    Correct.
7        Q.    Do you know how Ms. Emmel
8    came to receive an unpublished
9    manuscript, apart from any discussions
10   that you had with plaintiffs' counsel?
11       A.    Actually, which manuscript
12   are you referring to?
13       Q.    Well, there's only one
14   manuscript in front of you?
15       A.    Reproductive Science --
16       Q.    Dr. -- yes.
17       A.    -- Dr. Saed?
18            To my knowledge, this has --
19   and seeing the cover letter that was
20   associated with this, this is not a
21   manuscript.  This is an in-press
22   manuscript, and there is a very large
23   difference.
24       Q.    Okay.  Apart from anything

Page 59

1    that counsel for plaintiffs may have told
2    you, do you know how this manuscript
3    became available for you to review?
4        A.    I have no knowledge.
5        Q.    With regard to the
6    Canadian -- sorry, the draft screening
7    assessment, did you read the entirety of
8    this assessment?
9        A.    I'm looking for it right
10   now.
11       Q.    Sorry.
12       A.    Thank you.  Except for the
13   references, I read the entirety of the
14   text.
15       Q.    Did you pull the references
16   and review the references themselves?
17       A.    No, sir, I did not.
18       Q.    There are also supplemental
19   materials associated with this -- or do
20   you know whether there are supplemental
21   materials associated with this draft, or
22   with this draft screening assessment?
23       A.    I was also provided a
24   document by Dr. Taher.  I'm not sure if

Page 60

1    that is a supplement of that or a -- an
2    adjacent document.
3        Q.    Do you have that document
4    with you?
5        A.    Perhaps.  I do, yes, sir.
6        Q.    May I see it, please.
7            (Document marked for
8            identification as Exhibit
9            Zelikoff-10.)
10   BY MR. HEGARTY:
11       Q.    I'm going to mark as Exhibit
12   Number 10 what you just handed to me,
13   which is titled "Systematic Review and
14   Meta-Analysis of the Association Between
15   Perineal Use of Talc and Risk of Ovarian
16   Cancer," lead author Taher.
17            When did you receive Exhibit
18   Number 10?
19            MS. O'DELL:  Did we skip
20   nine?
21            MR. HEGARTY:  Exhibit 9 is
22   the draft screening assessment.
23            MS. O'DELL:  Okay.  I'm
24   sorry.  I had that as Number 8.

Page 61

1            MR. HEGARTY:  Number 8 is
2    the manuscript by Dr. Saed.
3            MS. O'DELL:  Okay.  I'm
4    sorry.
5    BY MR. HEGARTY:
6        Q.    Going back to my question,
7    when did you receive the article by
8    Taher?
9        A.    At the same time that I
10   received the health -- the screening
11   health assessment from Health Canada.
12       Q.    Who provided it to you?
13       A.    Ms. Emmel.
14       Q.    Did you read the entirety of
15   that document?
16       A.    I read the entirety of this
17   document minus the references.
18       Q.    Did you pull the literature
19   cited in the Taher article and review it
20   yourself?
21       A.    I may have looked at
22   references that have -- were on the
23   reference list of the Saed document, but
24   I did not go through each individual

16 (Pages 58 to 61)

Judith Zelikoff, Ph.D.

Page 62

1  reference in the document and pull it
2  specifically.
3      Q.   The Taher article -- strike
4  that.
5          You were provided the Taher
6  article after you completed your expert
7  report in this case, correct?
8      A.   That's correct.
9      Q.   So it's correct that it did
10 not inform your opinions in your report,
11 correct?
12     A.   It informed my opinions --
13 let me say that it added to my opinions
14 following the writing of my report.  It
15 supported my position.
16     Q.   Did the assessment conclude
17 that talc use causes ovarian cancer?
18 Strike that.  Let me strike that
19 question.  We'll come back to that.
20         (Document marked for
21         identification as Exhibit
22         Zelikoff-11.)
23 BY MR. HEGARTY:
24     Q.   I'm going to mark next as

Page 63

1  Exhibit Number 11 a copy of the Exhibit C
2  that's referenced in your report.
3          Did you prepare Exhibit
4  Number C?
5      A.   If you mean by preparation,
6  did I write it, did I prepare the
7  summary, no, sir I did not.
8      Q.   Do you know who prepared it?
9      A.   From my reading, it appears
10 as though the attorneys may have prepared
11 it based upon -- to my knowledge, based
12 upon other deponents.
13     Q.   Other than the documents
14 that we have talked about that are laid
15 out before us, did you bring any other
16 documents with you to the deposition?
17     A.   Other than the documents
18 that are to my right in the folders, my
19 health assessment from the -- the
20 screening health assessment from Canada,
21 Dr. Taher's paper, a letter -- this is in
22 the documents to my right, a letter from
23 Luzenac to Dr. Al Wehner, my CV, the
24 expert report, Exhibit B, my CV, no, sir.

Page 64

1      Q.   Have you reviewed any
2  materials since completion of your report
3  for purposes of your work on this case
4  that we have not talked about this
5  morning?
6      A.   I reviewed -- since my
7  report, I reviewed Dr. Pier's deposition.
8  Is that what you mean?
9      Q.   Dr. Julie Pier's deposition?
10     A.   Yes.  Three-quarters of it.
11 It is a very long deposition.
12     Q.   The second-to-last page of
13 Exhibit Number B under depositions makes
14 reference to depositions and exhibits of
15 Julie Pier dated 9/12 to 9/13/2018.
16         Do you see that?
17     A.   Sorry, sir.  Fifth line
18 down, deposition/exhibits of Julie Pier.
19     Q.   Is that the deposition to
20 which you just referred?
21     A.   To the best of my knowledge.
22     Q.   Anything else that you have
23 reviewed for purposes of your work on
24 this case that we have not talked about

Page 65

1  this morning or made reference to?
2      A.   I reviewed Dr. Hopkins'
3  report.
4      Q.   Let me ask it different.
5  Anything that you have reviewed that's
6  either not listed somewhere in your
7  report or we have not marked as an
8  exhibit?
9      A.   To the best of my knowledge,
10 no.
11     Q.   With regard to Exhibit C,
12 did you review all the documents that are
13 referenced in Exhibit Number C?
14     A.   Can I see that, please.
15     Q.   I think you still have a
16 copy in front of you.
17     A.   Okay.
18     Q.   It's Exhibit Number 11,
19 which is marked Exhibit -- which is
20 Exhibit C.  Did you actually pull the
21 documents and confirm the accuracy of the
22 information --
23     A.   No, sir.
24     Q.   -- contained in Exhibit C?

17 (Pages 62 to 65)

Judith Zelikoff, Ph.D.

Page 66

1      A.    There are no -- there are no
2  references in here, as I understand it.
3      Q.    Well, there are Bates
4  numbers --
5      A.    Bates numbers.
6      Q.    -- that are listed at the
7  right, which correspond to documents,
8  correct?
9      A.    Yes, but when I -- when I
10 hear references I think of citations,
11 papers.
12     Q.    Did you actually pull the
13 documents whose Bates numbers are listed
14 and confirm the accuracy of the
15 information contained in Exhibit C?
16     A.    I did not pull them as part
17 of reviewing this exhibit, but I have
18 looked at them, because I have gone
19 through all of the production documents.
20     Q.    With regard to your expert
21 report in this case, is it correct that
22 you prepared that report -- strike that.
23         With regard to your expert
24 report it defines the scope of your

Page 67

1  testimony in this case, correct?
2         MS. O'DELL:  Objection to
3      form.
4         THE WITNESS:  Yes, it does.
5  BY MR. HEGARTY:
6      Q.    And is it correct that the
7  report was prepared with the same
8  methodology and approach as you would
9  have prepared an article for publication
10 in a scientific journal?
11     A.    An article, a grant, a
12 review, an advisory board report, with
13 the same rigor and the same scrutiny,
14 yes.
15     Q.    In other words, is it
16 correct that you prepared this report in
17 the same manner as you had prepared all
18 of your articles for publication?
19         MS. O'DELL:  Asked and
20     answered.
21         THE WITNESS:  I used the
22     same methodology, the same
23     scrutiny and the same rigor to
24     prepare this, yes.

Page 68

1  BY MR. HEGARTY:
2      Q.    You agree that the standard
3  for proving biologic plausibility or any
4  other scientific issue in the medical
5  literature is the same one that applies
6  in litigation, correct?
7         MS. O'DELL:  Object to the
8      form.  If you know.
9         THE WITNESS:  Can you repeat
10     that, please.
11 BY MR. HEGARTY:
12     Q.    Sure.  You agree that the
13 standard for proving biologic
14 plausibility or any other scientific
15 issue in a medical literature or in
16 science should be the same that is
17 applied in litigation?
18         MS. O'DELL:  Object to the
19     form.
20         THE WITNESS:  I will use the
21     same scrutiny and rigor, as I said
22     before.
23 BY MR. HEGARTY:
24     Q.    You would -- you intend to

Page 69

1  apply the same standards to your report
2  and your opinions in this case as you
3  would apply if you were looking at this
4  as simply a professor at New York
5  University?
6      A.    Well, I don't see simply a
7  professor.
8         If I were -- I review
9  papers.  I think I've answered this
10 already.  But I review papers and
11 literature with the same scrutiny as I
12 prepared this report.
13     Q.    Did you apply the same
14 standard for assessing biologic
15 plausibility as you apply in your work at
16 NY University?
17     A.    I do.
18     Q.    Did you sign your report
19 dated November 16, 2018, with the same
20 intent as if signed under penalty of
21 perjury?
22     A.    Could you repeat that
23 please.
24     Q.    Sure.  Did you sign your

18 (Pages 66 to 69)

Judith Zelikoff, Ph.D.

Page 70

1    expert report dated November 16, 2018,
2    with the same intent as if signed under
3    penalty of perjury?
4            MS. O'DELL: Object to form.
5            THE WITNESS: I'm not sure I
6        understand what that question
7        means.
8    BY MR. HEGARTY:
9        Q.   Well, did you -- by signing
10   this report, did you confirm to the
11   accuracy of everything contained in the
12   report?
13       A.   To the best of my knowledge,
14   I signed this report knowing that I
15   prepared this report and there is -- with
16   the same intent of accuracy and rigor.
17       Q.   You understand this is
18   supposed to be your testimony as if on a
19   stand before a judge or a jury, correct?
20           MS. O'DELL: Object to the
21       form.
22           THE WITNESS: My
23       understanding of the deposition is
24       that it is a legal document and

Page 71

1        testifying my -- my opinion. And
2        that it has to be honest and
3        truthful and transparent.
4    BY MR. HEGARTY:
5        Q.   Well, this time I'm talking
6    about your report. Do you understand
7    your report is supposed to be your
8    testimony as if you are before a judge
9    and a jury?
10           MS. O'DELL: Object to the
11       form.
12           THE WITNESS: I -- I
13       understand that this has to be
14       honest and truthful, and this will
15       be -- could be, will be, the basis
16       for my testimony in a court trial,
17       if that is what you're asking.
18   BY MR. HEGARTY:
19       Q.   You understand it's supposed
20   to set out your -- the entirety of your
21   opinions in this case?
22           MS. O'DELL: Object to the
23       form.
24           THE WITNESS: I understand

Page 72

1        that these are my -- my report
2        reflects my opinion.
3    BY MR. HEGARTY:
4        Q.   Are they -- are there any
5    necessary changes, or revisions to your
6    report?
7        A.   Not to my knowledge.
8        Q.   And all the opinions that
9    you intend to offer in this litigation
10   are set out in your report, as you just
11   said, correct?
12       A.   To come to my decision or my
13   opinion, prior to -- included all the
14   documents that I had in my possession and
15   were -- had access to prior to my report.
16       Q.   My question is a little bit
17   different, Doctor. My question is, the
18   opinions that you intend to offer as you
19   just indicated, those are set out in your
20   report, correct?
21       A.   The opinions that I intend
22   to offer, yes.
23       Q.   As your report shows, you
24   don't intend to offer the opinion that

Page 73

1    use of Johnson's Baby Powder or Shower to
2    Shower causes ovarian cancer, correct?
3        A.   My mission, the question
4    that I was asked by plaintiff attorney
5    was to confer or to assess biological
6    plausibility in the causation of talc for
7    ovarian cancer.
8        Q.   And as your report shows,
9    you did not do a risk assessment or
10   Bradford Hill analysis of all the
11   literature looking at talc products and
12   ovarian cancer, correct?
13       A.   I think I answered that, but
14   I'm not an epidemiologist, and my -- my
15   question was to look at biological
16   plausibility.
17       Q.   And all the materials that
18   you intend to rely upon for purposes of
19   your opinions, are those set out in your
20   report, those we've talked about here
21   this morning, correct?
22       A.   Yes, including the
23   contributions that were made after my
24   report including Dr. Longo's supplement,

19 (Pages 70 to 73)

Judith Zelikoff, Ph.D.

Page 74

1  including Dr. Saed's paper. They added
2  to my opinion, supplemented them. But it
3  is -- but my -- my opinion stays the same
4  as the report.
5      Q.  Okay.
6          MR. HEGARTY: The next
7  section I have is pretty long. I
8  don't know if you want to take a
9  quick break now or just keep
10  going. It's up to you.
11         MS. O'DELL: We've been
12  going about an hour. I think
13  that's probably a good idea.
14         MR. HEGARTY: Because
15  otherwise it's not -- there's not
16  going to be a good break time. So
17  we should probably do it now.
18         MS. O'DELL: Well, we can
19  definitely do it now, but we'll --
20  of course we'll break when the
21  witness needs to break.
22         MR. HEGARTY: Understood.
23  Understood. But you know what I
24  mean.

Page 75

1          MS. O'DELL: Yeah.
2          THE VIDEOGRAPHER: Stand by
3  please. The time is 10:11 a.m.
4  Off the record.
5      (Short break.)
6          THE VIDEOGRAPHER: We are
7  back on the record. The time is
8  10:26 a.m.
9  BY MR. HEGARTY:
10     Q.  Dr. Zelikoff, with regard to
11  your expert report, do you have that in
12  front of you?
13     A.  I do now. Thank you.
14     Q.  We marked that as exhibit
15  what?
16     A.  Exhibit 2.
17     Q.  With regard to Exhibit
18  Number 2, is it your testimony that all
19  of the sentences in your report are your
20  own words and not copied from others,
21  except where you used quotations?
22     A.  Mm-hmm. The way I report
23  and write publications is if something
24  is, I feel, common knowledge or provided

Page 76

1  by more than one investigator, and is a
2  compilation of different points, then
3  I -- I will use -- I will not necessarily
4  put quotations around it. And I will not
5  necessarily reference it, because it's --
6  may have been taken from another document
7  but it's common knowledge.
8      Q.  What about --
9      A.  And it's --
10     Q.  I'm sorry. I didn't mean to
11  interrupt.
12     A.  I couldn't -- I'm sorry. I
13  couldn't write it any better than as it
14  was put.
15     Q.  What about if you take
16  materials from a published article for
17  purposes of your report, did you
18  reference those articles?
19     A.  In some cases, not. Again,
20  it's my opinion that if there is
21  something that is stated by an
22  investigator and it's written extremely
23  well, and it's common knowledge for
24  scientists in that area, as well as

Page 77

1  others, then I will -- I will use it.
2      Q.  That's not how you prepare
3  your report -- that's not how you prepare
4  your articles for journals though,
5  correct?
6      A.  No, that's the same way I
7  prepare them.
8          If they are -- if they are,
9  again, common knowledge, I will not
10  necessarily cite them.
11     Q.  Is it not your approach that
12  authors are to cite material to which
13  they are relying on or referring to in
14  published articles?
15     A.  Again, I think you're asking
16  me the same question. But again, if
17  something is well known, then I do not
18  necessarily reference it.
19     Q.  What is the definition --
20  what is your definition of well known?
21     A.  For example, if chromium --
22  let's use nickel instead. If nickel is
23  being spoken about by IARC, by U.S. EPA,
24  by National Toxicology Program, and

20 (Pages 74 to 77)

Judith Zelikoff, Ph.D.

Page 78

1   they're all saying the same thing, I in
2   some cases may take what the IARC has
3   said and put it in my reference.
4       Q.   And it's your testimony that
5   you do that in all -- you've done that in
6   all the articles that you've ever
7   published?
8           MS. O'DELL:  Objection to
9       form.
10          THE WITNESS:  I can't say
11      about all the articles.  I
12      published over 130 --
13          MR. HEGARTY:  Mark --
14          THE WITNESS:  --
15      publications and book chapters.
16          (Document marked for
17      identification as Exhibit
18      Zelikoff-12.)
19  BY MR. HEGARTY:
20      Q.   Let me mark as Exhibit
21  Number 12 the academic integrity for
22  students at NYU policy.  Is this the
23  policy applicable to your university?
24      A.   It appears to be that you've

Page 79

1   taken it off the website in the academic
2   integrity for students at NYU.
3       Q.   If you turn to the second
4   page, there is a definition of
5   plagiarism, that says, "Presenting
6   others' works without adequate
7   acknowledgment of its source as though it
8   were one's own."
9       A.   I'm sorry.
10      Q.   Do you agree with that
11  definition?
12      A.   I'm sorry.  What --
13      Q.   Second page of Exhibit 12.
14      A.   You mean on the back?  Is it
15  under Number 2, Number 1?
16      Q.   Number 1.  The definition of
17  plagiarism by your university for your
18  students is, "Presenting others' work
19  without adequate acknowledgment of its
20  source as though it were one's own."
21          Do you agree with that --
22  that definition?
23      A.   I agree that there's many
24  different ways to interpret that.

Page 80

1       Q.   Is that not -- is that a
2   definition you agree with?
3       A.   I agree that there's ways to
4   interpret that.
5       Q.   Is that -- is that the
6   definition New York University applies to
7   its students?
8       A.   This sentence, "Presenting
9   others' work without adequate
10  acknowledgment of its source as though it
11  were one's own," that is for students.
12  That is not what I'm doing in my opinion.
13          In my opinion, I'm taking
14  common knowledge and presenting it.
15      Q.   Well, they go on to give
16  examples of plagiarism that include, "A
17  sequence of words incorporated without
18  quotation marks."
19          Do you see where I'm
20  reading?
21      A.   I do see it.  "A sequence of
22  words incorporated without quotation
23  marks."
24      Q.   It also says that,

Page 81

1   "Plagiarism is an unacknowledged passage
2   paraphrased from another's work."
3           Do you see that?
4       A.   Some examples of plagiarism,
5   "Unacknowledged passage rephrased from
6   another's work."
7       Q.   Do you agree those are --
8   the two definitions that I just read from
9   your university's own policy for students
10  are examples of plagiarism?
11      A.   This is the NYU
12  interpretation or what they've put on the
13  website, yes.
14      Q.   Should this be a policy --
15  strike that.
16          Is this a policy that
17  applies to students at NY university?
18      A.   It applies -- it's an
19  academic integrity for students at NYU.
20      Q.   Do you agree that professors
21  at NY university should also conform to
22  this policy?
23      A.   I believe that honesty,
24  transparency is the key factor for all

21 (Pages 78 to 81)

Judith Zelikoff, Ph.D.

Page 82

1    scientists at any level.
2        Q.   You would agree that this
3    should apply to your work as well,
4    correct?
5        A.   I think that this definition
6    is open to interpretation.
7        Q.   Well, do you either agree or
8    disagree that this -- well, strike that.
9        Do you agree that this
10   policy should be applied to your work in
11   this case?
12       A.   I agree that plagiarism is
13   defined as presenting others' work
14   without adequate acknowledgment of its
15   source as though it were one's own.
16   That's the NYU policy for students.
17       Q.   Did you -- you did that in
18   your own report, correct?
19       MS. O'DELL:  Object to form.
20       THE WITNESS:  I did what in
21   my own report?
22   BY MR. HEGARTY:
23       Q.   You plagiarized portions of
24   other people's work without proper

Page 83

1    acknowledgment, correct?
2        MS. O'DELL:  Objection to
3    form.
4        THE WITNESS:  That is
5    totally incorrect.
6        I used sentences from other
7    people's -- other people's papers
8    because they were common knowledge
9    and contributed by multiple
10   authors.  And it was --
11   BY MR. HEGARTY:
12       Q.   I'm going to mark -- sorry.
13       A.   And it was stated in a way
14   that I couldn't have stated better.
15       Q.   I'm going to mark as
16   Exhibit 13 a report -- a portion of your
17   report dated November 16, 2018.  And the
18   back of that is a portion of Rule 26
19   expert report of an expert by the name of
20   Shawn Levy.
21       (Document marked for
22       identification as Exhibit
23       Zelikoff-13.)
24   BY MR. HEGARTY:

Page 84

1        Q.   Do you know who Shawn Levy
2    is?
3        A.   I do not.
4        Q.   Did you review Dr. Levy's
5    report for purposes of your -- preparing
6    your report in this case?
7        A.   I actually looked at it, but
8    did not -- did not read it.
9        Q.   When did you have a chance
10   to look at his expert report?
11       A.   I have looked at it -- I'm
12   trying to gather the knowledge.  I
13   actually do not recall when I looked at
14   it.
15       Q.   If you look at your report
16   on Page 20.  In that exhibit, Doctor.
17       A.   Oh okay.
18       Q.   Your report and the portion
19   of Dr. Levy's report is attached, and if
20   you look at your report Page 20 and his
21   report Page 5 --
22       MS. O'DELL:  I think, Mark,
23   I think there's confusion because
24   there's two documents put together

Page 85

1    in this --
2        MR. HEGARTY:  Right.  One is
3    her report and one is Levy's
4    report.
5        MS. O'DELL:  I just think
6    that that was the confusion.
7        THE WITNESS:  Thank you.
8    BY MR. HEGARTY:
9        Q.   So the -- do you see that
10   sentences marked as 1 and 2 from
11   Dr. Levy's report are identical to
12   sentences marked 1 and 2 in your report?
13       MS. O'DELL:  Object to form.
14       And, Doctor, if you need to
15       take the documents apart and
16       compare them, rather than flipping
17       back and forth, if that would be
18       helpful to you, feel free to do
19       that.
20       THE WITNESS:  Good idea.  I
21       actually don't recall.  Could
22       you -- could you tell me when my
23       report is dated please?
24   BY MR. HEGARTY:

22 (Pages 82 to 85)

Judith Zelikoff, Ph.D.

Page 86

1    Q.    November 16. His report is
2  also dated November 16.
3    A.    I did not actually see this
4  report until after mine.
5         However, let me address your
6  question to the best of my ability.
7         "Things stated as both
8  inherited and acquired gene mutations
9  work together to cause cancer."
10        Everyone from the time of
11  their scientific career back in college
12  knows that.
13        "While genetic testing" --
14  let me make sure I have both -- "both
15  inherited and acquired gene mutations
16  work together to cause cancer."
17        How -- there is no way for
18  me to say that differently. This is a
19  very well statement, very well put
20  statement. I used it without a
21  reference. Even if one --
22    Q.    My question -- I'm sorry. I
23  thought you were finished.
24    A.    "Even if one has inherited a

Page 87

1  genetic mutation that predisposes one's
2  chances, doesn't mean he or she has to
3  get cancer." Again, common knowledge
4  from everyone.
5    Q.    Well, Dr. Zelikoff, my
6  question is different than that.
7         My question is, can you
8  explain to us here today, given that you
9  did not see Dr. Levy's report until after
10  you completed your report, how you have
11  several identical sentences between your
12  report and Dr. Levy's report?
13        MS. O'DELL: Object to the
14        form.
15  BY MR. HEGARTY:
16    Q.    Dr. Levy's report.
17    A.    I cannot -- I -- I don't
18  know. The only -- what I can say is that
19  there was likely a publication. But that
20  is speculation, because I have not looked
21  that over.
22    Q.    But is it your testimony
23  here today that the words in your report
24  were solely your own words and not taken

Page 88

1  from either Dr. Levy's report or from
2  somewhere -- some other source?
3    A.    The thoughts are the same.
4  The words seem to be identical. And
5  again, if you interpret that one way and
6  I interpret it another, I certainly do
7  not interpret it as plagiarism.
8    Q.    Let me show you another
9  example.
10        (Document marked for
11        identification as Exhibit
12        Zelikoff-14.)
13  BY MR. HEGARTY:
14    Q.    I'm going to mark as
15  Exhibit 14, again a portion of your
16  report Page 12 and a portion of a report
17  by Rebecca Smith-Bindman. Do you know
18  who that is?
19    A.    Not at all.
20    Q.    Did you see her report in
21  this case before preparing your report?
22    A.    I never looked at her
23  report.
24    Q.    If you would look at the two

Page 89

1  reports side by side under the
2  definition -- under the heading
3  Fragrances --
4    A.    I'm sorry, I don't have her
5  report.
6    Q.    You have one page of her
7  report in that exhibit. You have the --
8  the front page and the one page of her
9  report, and you have Page 12 of your
10  report, correct?
11    A.    I see. Correct.
12    Q.    Do you see that the section
13  under the heading Fragrances is identical
14  between the two reports?
15    A.    Yes. They are identical
16  wording.
17    Q.    And none of those sentences
18  are common knowledge, correct?
19        MS. O'DELL: Object to the
20        form.
21        THE WITNESS: It's a
22        statement.
23  BY MR. HEGARTY:
24    Q.    But it's not common

23 (Pages 86 to 89)

Judith Zelikoff, Ph.D.

---

Page 90

```
 1   knowledge, correct, Doctor?
 2       A.   But it's a -- it is -- there
 3   are more than 150 different chemicals
 4   added to Johnson's Baby Powder and Shower
 5   to Shower products.  I reviewed the
 6   expert report from Dr. Crowley that
 7   concludes that some of these chemicals
 8   may contribute to the inflammatory
 9   response, toxicity, and potential
10   carcinogenicity.  I concur with his
11   opinion.
12           I say the same thing as
13   Dr. Smith-Bindman.
14       Q.   Is it your testimony that
15   you and Dr. Smith-Bindman came to the
16   exact same words just by coincidence?
17           MS. O'DELL:  Object to the
18       form.
19           THE WITNESS:  We came to the
20       same conclusions.
21   BY MR. HEGARTY:
22       Q.   That's not my question.  My
23   question is, is it your testimony here
24   today that you and Dr. Smith-Bindman came
```

Page 91

```
 1   to the exact -- to say the exact same
 2   thing under the section Fragrance simply
 3   by coincidence?
 4           MS. O'DELL:  Objection to
 5       form.
 6           THE WITNESS:  I don't do
 7       anything usually by coincidence.
 8   BY MR. HEGARTY:
 9       Q.   Okay.  Is it your testimony
10   that the words that you wrote under the
11   section Fragrances on Page 12 are your
12   words and came from nowhere else?
13       A.   I don't quite understand
14   where they could have come from because I
15   did not review her report.
16       Q.   Is it your testimony that
17   the words in your report under the
18   section Fragrances are your words and
19   your words alone from no other source?
20           MS. O'DELL:  Object to the
21       form.
22           THE WITNESS:  Could you
23       please repeat the question?
24   BY MR. HEGARTY:
```

Page 92

```
 1       Q.   Sure.  Is it your testimony
 2   that the words in your report under
 3   section -- under the section Fragrances
 4   are your words and your words alone from
 5   no other source?
 6           MS. O'DELL:  Object to the
 7       form.
 8           THE WITNESS:  I don't quite
 9       understand what you mean by no
10       other source.
11           These are my words.  They
12       confer my opinion.
13   BY MR. HEGARTY:
14       Q.   Well, did you copy those
15   words from some source besides
16   Smith-Bindman's report?
17       A.   I did not copy words.  I --
18   I don't know how this happened.
19           If I was in error, I own
20   that responsibility.
21           (Document marked for
22       identification as Exhibit
23       Zelikoff-15.)
24   BY MR. HEGARTY:
```

Page 93

```
 1       Q.   I'm going to show you what
 2   I'm next marking as Exhibit 15.
 3           MS. O'DELL:  Is this one
 4       exhibit?
 5           MR. HEGARTY:  That's one
 6       exhibit.
 7   BY MR. HEGARTY:
 8       Q.   Doctor, Exhibit Number 15 is
 9   again a portion of your report, and also
10   attached to it is a reference from
11   Genetics Home Reference dated June 27,
12   2017.  Do you see both documents?
13       A.   I do see both documents.
14       Q.   We have highlighted and
15   numbered in Exhibit 15 the portions from
16   your report which are taken word for word
17   from Genetics Home Reference without a
18   single reference to that authority
19   anywhere in your report, including in the
20   materials considered or reviewed.
21           MS. O'DELL:  Objection.
22   BY MR. HEGARTY:
23       Q.   Do you see that?
24           MS. O'DELL:  Objection to
```

24 (Pages 90 to 93)

Judith Zelikoff, Ph.D.

Page 94

1      form.
2            And -- and, Doctor, take a
3      moment to review both, because the
4      way this is put together is a
5      little confusing.
6            THE WITNESS:  I see what
7      you're referring to.
8      BY MR. HEGARTY:
9            Q.    And did you copy, for
10     purposes of your report, without citation
11     to this authority, the words that we've
12     identified from this reference to Genetic
13     Home Reference?
14           MS. O'DELL:  Objection to
15     the form.
16           THE WITNESS:  So when you
17     have things like, "Inherited
18     mutations are passed down from
19     parent to child and are present
20     throughout a person's life in
21     virtually in every cell of the
22     body."  Biology 101, basically,
23     where that came from.
24           "These mutations are called

Page 95

1      germ line mutations because
2      they're present in the parents'
3      egg or sperm, a germ cell."
4            Yes, some of these sentences
5      appear to be the same as what is
6      in here.
7            However, again, I stand on
8      the fact that all of these -- all
9      of my statements are common
10     knowledge that have come from
11     numerous references.  Although the
12     words may be the same, the
13     thoughts are -- are said as well
14     as they can be said.
15     BY MR. HEGARTY:
16           Q.    Dr. Zelikoff, have you ever
17     seen this reference to Genetic Home
18     Reference before right now?
19           A.    Not to my knowledge.
20           Q.    So is it your testimony that
21     you did not copy the words from Genetic
22     Home Reference that we have highlighted
23     that correspond by number to the portions
24     in your report for purposes of preparing

Page 96

1      your report in this case?
2            A.    I may have used -- it
3      appears that I have used the same words.
4            And if I did that, which it
5      appears that I have, then I've done it
6      with the intent to get those same points
7      across.
8            Q.    But you do agree that you
9      have included in your report a sequence
10     of words incorporated from another source
11     without quotation marks, correct?
12           MS. O'DELL:  Objection to
13     form.
14           THE WITNESS:  I don't use --
15     I don't usually use quotation
16     marks.
17     BY MR. HEGARTY:
18           Q.    Well, you have used other
19     people's words without acknowledging
20     where they came from, correct?
21           MS. O'DELL:  Object to the
22     form.
23           THE WITNESS:  I could have
24     used quotation marks.  And if I

Page 97

1      were to do this over, I would use
2      quotation marks.
3      BY MR. HEGARTY:
4            Q.    You're not telling us,
5      Doctor, that if you prepared an article
6      for publication in a journal, that you
7      would take references from another source
8      like Genetic Home Reference, include them
9      in the article, verbatim, not use
10     quotation marks and not reference that
11     cite.  Is that what you're saying?
12           MS. O'DELL:  Objection to
13     form.
14           THE WITNESS:  I'm standing
15     on my interpretation, and that is
16     that in a reference that I would
17     prepare in a publication, it would
18     be accepted for peer review if
19     there was something that I felt
20     was common knowledge, that I would
21     not reference it.
22           To your point, if I had to
23     do this over, I would have put
24     quotation marks around this.

25 (Pages 94 to 97)

Judith Zelikoff, Ph.D.

Page 98

1  BY MR. HEGARTY:
2      Q.   You would have cited to the
3  authority, as well, from which that --
4  those passages were lifted, correct?
5          MS. O'DELL:  Objection to
6      form.
7          THE WITNESS:  I certainly
8      could if that was a concern from
9      the journal or from the reviewer,
10     then I would definitely put in the
11     reference.
12 BY MR. HEGARTY:
13     Q.   If a student had prepared
14  this, and you became aware that the
15  student had lifted portions from Genetic
16  Home Reference without any citation,
17  without acknowledging where it came from,
18  would that be okay with you?
19         MS. O'DELL:  Objection to
20     form.
21         THE WITNESS:  There are --
22     this is a large document.  And in
23     order for something to be copied
24     or, as you put it, plagiarized,

Page 99

1      there has to be a certain amount
2      or percentage of the document that
3      has to be the same.
4          And this document, my
5      report, is quite large.  So if a
6      student prepared this, and their
7      term paper, for example, was 50
8      pages, I would let them know that
9      if prepared the next time they
10     might want to put in a reference.
11         But I would have to look at
12     the entire size of the document
13     and the percentage of it which had
14     similar -- similar statements and
15     sentences.
16 BY MR. HEGARTY:
17     Q.   You do agree that under the
18  policy we marked, we're talking about
19  what you did with regard to this Genetics
20  Home Reference cite, meets the definition
21  of plagiarism?
22         MS. O'DELL:  Objection to
23     form.
24         THE WITNESS:  I certainly

Page 100

1      will not -- this is the -- what
2      you gave me was an interpretation,
3      was NYU policy, an interpretation
4      of that, which is not the same as
5      mine.
6  BY MR. HEGARTY:
7      Q.   Well, you do agree, though,
8  that between the -- your report, the
9  portions taken from your report and the
10  Genetic Home Reference reference are
11  identical?
12         MS. O'DELL:  Object to the
13     form.
14         THE WITNESS:  I agree that
15     there are sentences that are
16     identical.  Yes.
17 BY MR. HEGARTY:
18     Q.   You did not acknowledge that
19  source anywhere in your report, correct?
20     A.   If you say so.
21     Q.   Do you think that's okay to
22  do that?
23         MS. O'DELL:  Objection to
24     form.

Page 101

1          THE WITNESS:  If I had not
2      thought it was okay, I would not
3      have done it.
4  BY MR. HEGARTY:
5      Q.   Would that -- would that be
6  acceptable for purposes of publishing
7  your report?
8          MS. O'DELL:  Objection to
9      the form.
10         THE WITNESS:  My opinion
11     stands.  And that is my
12     interpretation of what is okay to
13     do based on common knowledge and
14     multiple sources, stands the same.
15 BY MR. HEGARTY:
16     Q.   If you were to publish your
17  report, as it is, would you go back and
18  use quotation marks and cite the
19  reference that we just looked at --
20     A.   If I had --
21     Q.   -- Exhibit Number 16?
22         MS. O'DELL:  Excuse me,
23     Doctor.  Just let him finish.
24         THE WITNESS:  Of course.

26 (Pages 98 to 101)

Judith Zelikoff, Ph.D.

Page 102

1    I'm sorry.
2         MS. O'DELL:  Thank you.  And
3    just give me a moment to object.
4    Thank you.
5    BY MR. HEGARTY:
6         Q.    Did you hear my question?
7         A.    Could you repeat your
8    question, please?
9         Q.    Sure.  If you were to
10   publish a report as it is, would you go
11   back and use quotation marks and cite the
12   reference that we just looked at in
13   Exhibit Number 16?
14        A.    Now that you've pointed out
15   your interpretation of it, I would
16   certainly consider that.
17             (Document marked for
18             identification as Exhibit
19             Zelikoff-16.)
20   BY MR. HEGARTY:
21        Q.    Let me show you what I'm
22   next marking as Exhibit Number 16.
23             MS. O'DELL:  I'll reach
24        over, instead of you throwing it.

Page 103

1    BY MR. HEGARTY:
2         Q.    This is another portion of
3    your report which we've correspondingly
4    referenced to an article by Simone
5    Reuter.  And you can see where we've
6    identified six different times where
7    sentences have been copied verbatim from
8    this article without any quotation or any
9    acknowledgment of its -- of the source.
10            Do you see that?
11            MS. O'DELL:  Object --
12        excuse me.  Object to the form.
13        Feel free to review it, the
14        reference or the exhibit.  There
15        are two things paper clipped
16        together, if you need to look at
17        it in more detail.
18            THE WITNESS:  Again, there
19        are sentences such as, "During
20        inflammation macrophages, mast
21        cells, and neutrophils were
22        recruited at the site of damage,
23        leads to a respiratory burst and
24        increased uptake of oxygen, and an

Page 104

1    increased release of ROS."
2         That is a very common --
3    commonly known point.
4    BY MR. HEGARTY:
5         Q.    How about Point Number 4 in
6    the abstract?
7         A.    As --
8         Q.    That's -- is it your
9    testimony that Point Number 4 in the
10   abstract is what you consider common
11   knowledge?
12        A.    "Activation of the
13   transcription factors can lead to the
14   expression of over 500 genes, including
15   more for growth factors."  And I'm going
16   to read the entire abstract.
17            Actually this is a review
18   paper.  And this is not a unique finding
19   to this particular author.
20            And thus "Activation of
21   transcription factors," again as I read,
22   is an outcome of many, many authors.  And
23   as I said, is a review paper, not a
24   unique investigator-initiated outcome.

Page 105

1         Q.    You keep referring to common
2    knowledge.  Who is -- who has this common
3    knowledge?
4         A.    People who read scientific
5    journals.
6         Q.    So is it your testimony that
7    someone who would read your report would
8    understand that that is not -- those are
9    not your words but taken from
10   somewhere -- somewhere else?
11            MS. O'DELL:  Object to the
12        form.
13            THE WITNESS:  It would
14        depend upon who is reading it.
15   BY MR. HEGARTY:
16        Q.    Can you cite for me any
17   publication that you have ever written
18   where you have cited another authority
19   word for word and did not use quotation
20   marks and did not reference that
21   authority?
22        A.    Not off the top of my head.
23        Q.    But you did do that in your
24   expert report in this case, correct?

Judith Zelikoff, Ph.D.

Page 106

1    MS. O'DELL: Object to the
2    form.
3    THE WITNESS: It appears
4    from what you're showing me, that
5    in my interpretation of common
6    knowledge and multiple -- multiple
7    investigators, I have done that,
8    yes.
9    (Document marked for
10   identification as Exhibit
11   Zelikoff-17.)
12   BY MR. HEGARTY:
13   Q.   I'm going to mark next
14   Exhibit Number 17, another portion of
15   your report where you, again, take
16   sentences from a publication called
17   EnvironmentalChemistry.com.
18       You cite them word for word
19   in your report and you make no reference
20   anywhere in your report to this
21   authority.
22   A.   I said --
23       MS. O'DELL: Excuse me.
24   Excuse Me, Doctor. Excuse me.

Page 107

1    MR. HEGARTY: I'm not
2    finished with my question.
3    MS. O'DELL: I thought you
4    were finished with your question.
5    MR. HEGARTY: Because I just
6    made a statement.
7    MS. O'DELL: Well, I object
8    to the statement. You ask your
9    question, and I'll probably object
10   to that.
11       But give me a chance, the
12   two of you, please.
13   BY MR. HEGARTY:
14   Q.   Let me -- Doctor, this --
15   the reference that we have here in the
16   Exhibit Number 17 is to a website called
17   EnvironmentalChemistry.com. Did you
18   review this website in preparing your
19   report?
20   A.   I don't recall.
21   Q.   Do you see where we make
22   reference to five different places where
23   you copied word for word from
24   EnvironmentalChemistry.com?

Page 108

1    MS. O'DELL: Object to the
2    form.
3    THE WITNESS: Yes, I see
4    what you're saying.
5    BY MR. HEGARTY:
6    Q.   And nowhere in your report
7    do you give acknowledgment to
8    EnvironmentalChemistry.com as a source of
9    the information that you copied, correct?
10       MS. O'DELL: Object to the
11   form.
12       THE WITNESS: I do say the
13   U.S. EPA defines asbestos by
14   limiting the term to six specific
15   fibrous minerals from two distinct
16   groups. And I go on from there.
17   That is a referral to the U.S.
18   EPA.
19   BY MR. HEGARTY:
20   Q.   Doctor, nowhere in your
21   report, in those notebooks or anywhere do
22   you cite to EnvironmentalChemistry.com,
23   do you?
24       MS. O'DELL: Object. Object

Page 109

1    to the form.
2    THE WITNESS: Not to my
3    knowledge.
4    EnvironmentalChemistry.com, I
5    don't even recall reviewing it.
6    BY MR. HEGARTY:
7    Q.   But don't you agree that you
8    would have had to review it based on the
9    fact that there are identical sentences
10   taken from -- that are identical
11   sentences, in Environmental Chemistry and
12   in your report?
13       MS. O'DELL: Object to the
14   form.
15       THE WITNESS: This -- again,
16   this information is common
17   knowledge. This is not a creation
18   of EnvironmentalChemistry.com.
19   They are not an individual
20   investigator finding this data.
21   They are reporting this data on
22   the internet for people's review.
23   BY MR. HEGARTY:
24   Q.   Is

28 (Pages 106 to 109)

Judith Zelikoff, Ph.D.

Page 110

1  EnvironmentalChemistry.com a reliable
2  authority?
3          MS. O'DELL:  Object to the
4  form.
5          THE WITNESS:  I have no
6  idea -- sorry.
7          MS. O'DELL:  Go ahead.
8          THE WITNESS:  I have no idea
9  of the impact factor or the
10 reliability of this.  However, in
11 talking about this, and saying the
12 things that I -- that you have
13 said I have used identically,
14 which appear to be the case --
15 "while amphibole and serpentine
16 asbestos may have fibrous habits,
17 they have very different forms.
18 Amphibole are double-chain
19 silicates."
20      This is known in the
21 asbestos -- in the asbestos
22 literature.  And the basic
23 structural unit is silicone oxide.
24 This is not Environmental

Page 111

1  Chemistry's individual
2  investigator initiated.
3          I think you may be confusing
4  an individual paper where an
5  investigator sits down in the
6  laboratory and works out or comes
7  up with a fact and that it's his.
8  As opposed to data that's just out
9  there in the internet, out there
10 in the world, out there in book
11 chapters, out there everywhere,
12 that people know.
13          This is not an investigator
14 initiated, whether it's
15 EnvironmentalChemistry.com.
16          So I will -- I will say to
17 you that in many cases, I did use
18 the same sentence.  Certainly
19 EnvironmentalChemistry.com is not
20 an investigator-initiated point of
21 reference.  It's just facts that
22 are supported by other experts.
23 BY MR. HEGARTY:
24      Q.   Can you cite for me any

Page 112

1  published methodology which says that
2  your interpretation of what you are to
3  quote and what you are to cite in an
4  article is an accepted methodology in
5  publishing scientific literature?
6      A.   It's my professional opinion
7  after 30 years of work.
8      Q.   Well, can you cite for me
9  any published authority that says your
10 definition of what you are to cite and
11 what you are to reference is the
12 definition that's applicable to medical
13 literature?
14          MS. O'DELL:  Objection to
15 form.
16          THE WITNESS:  I have never
17 been accused or cited by any
18 publication in any of my 135
19 papers or my over 30 book chapters
20 of having anything that was of a
21 dubious nature, ever.
22 BY MR. HEGARTY:
23      Q.   That's not my question.  My
24 question was can you cite for me any

Page 113

1  written authority that says that in
2  publishing medical literature, if you're
3  citing what you call general knowledge
4  word for word from another source, you
5  don't have to quote it and you do not
6  have to give it any reference.
7      A.   Just my professional opinion
8  of 30 years of work.
9      Q.   Okay.  And in a -- and
10 you've never done that in any medical
11 article you -- any article you have
12 published, correct?
13     A.   I cannot -- I cannot speak
14 to all.
15     Q.   Well, if you were to write a
16 medical article -- a scientific article
17 today, and you were to quote something
18 from -- take something word for word from
19 EnvironmentalChemistry.com, is it your
20 testimony you wouldn't give any reference
21 to it or wouldn't use quotation marks?
22         MS. O'DELL:  Object to the
23 form.
24         THE WITNESS:  I -- I stand

29 (Pages 110 to 113)

Judith Zelikoff, Ph.D.

Page 114

1    on the opinion that I have, that
2    it would be common knowledge.
3    BY MR. HEGARTY:
4        Q.   That's not my question.  My
5    question is if you were to write an
6    article today and you were to cite
7    Environmental.com word for word, is it
8    your testimony you would not quote
9    that -- those words or give any reference
10   or acknowledgment to environmental --
11   to --
12       A.   EnvironmentalChemistry.com.
13       Q.   EnvironmentalChemistry.com?
14           MS. O'DELL:  Object to the
15       form.
16           THE WITNESS:  I would do the
17       same thing I've done for this
18       report.
19   BY MR. HEGARTY:
20       Q.   Okay.  And is that true for
21   every resource that we've looked at so
22   far?  You would -- if you were to write a
23   scientific journal today, you would --
24   and quoted from all those resources, you

Page 115

1    would not use quotation marks and you
2    would not give any acknowledgment in
3    any -- if you were to write a scientific
4    article today?
5           MS. O'DELL:  Object to form.
6       Misstates her testimony.
7           THE WITNESS:  I -- I did say
8       that there are certain cases that
9       if I had to do it over and based
10      upon your rigorous opinion of
11      this, that I would place quotation
12      marks or add a reference, yes.
13          (Document marked for
14      identification as Exhibit
15      Zelikoff-18.)
16   BY MR. HEGARTY:
17       Q.   I'm going to show you what
18   I'm next marking as Exhibit 18.
19          This is another portion of
20   your report.  In addition to that
21   exhibit -- or with that exhibit is a
22   reference to a publication by
23   Rakoff-Nahoum, where you again made
24   references to four different sentences

Page 116

1    that you have copied verbatim from that
2    publication without giving any
3    acknowledgment to Dr. Rakoff-Nahoum or
4    use any quotation marks.  Do you see
5    that?
6           MS. O'DELL:  Object to the
7       form.
8           THE WITNESS:  So on Page 124
9       of the review by Seth
10      Rakoff-Nahoum -- Nahoum, if you
11      look on -- under cancer and
12      inflammation, and one of the
13      points that you make here -- and
14      by the way, this is a review
15      paper, again not an independent
16      investigator-initiated data from
17      the laboratory -- "Epidemiological
18      evidence points to a connection
19      between inflammation and" -- "and
20      predisposition for the development
21      of cancer, i.e., long-term
22      inflammation leads to the
23      development of dysplasia," there's
24      no reference there.

Page 117

1           So this author also,
2       Dr. Rakoff-Nahoum -- sorry, I'm
3       murdering his name -- also gives
4       no reference to that.
5           Again, in this case, using
6       my analogy of something that has
7       been gathered by numerous other
8       investigators and is common
9       knowledge to the -- to the
10      scientific population, he did also
11      not use a reference.  And I did
12      not use a reference.
13   BY MR. HEGARTY:
14       Q.   But if -- but if you look at
15   his -- the last reference, Number 4, he
16   does acknowledge a resource for all of
17   those statements, Resource 20 in the
18   publication, correct?
19          MS. O'DELL:  Objection.
20      Could you provide, if you're
21      going to use this exhibit, provide
22      the full manuscript that
23      identifies Resource 20.
24          (Document marked for

30 (Pages 114 to 117)

Judith Zelikoff, Ph.D.

Page 118

1    identification as Exhibit
2    Zelikoff-20.)
3  BY MR. HEGARTY:
4    Q.   I'll mark as 20, the
5  entirety of the Rakoff-Nahoum article,
6  which does include 20, which is a
7  reference to Hussain, "Radical Causes of
8  Cancer."
9    A.   Citation 20 in Exhibit 20 is
10  also a review paper, and none of these
11  references are going back to the
12  independent investigator who actually
13  said this.
14    So these are reviewed in.
15  Again, standing by my opinion that
16  oftentimes in review articles which --
17  in -- in review articles, they often take
18  the liberty, as seen in your first point,
19  that you do not use a reference.
20    Now, I would have to read
21  Reference 20 in order to see whether
22  that, in fact, reviews Points 2, 3 and 4
23  in your "Why Cancer and Inflammation"
24  paper.

Page 119

1    I do not know that
2  Reference 20 actually reviews all of
3  these points and are the reference.
4    Also, many of these
5  points -- and again, another review
6  paper.
7    Many of these points, the
8  chronic inflammatory states associated
9  with infection, irritation, may lead to
10  environments that foster genomic lesions
11  in tumor initiation, no reference there.
12    One effect and mechanism, et
13  cetera, et cetera. Hydroxyl radicals,
14  reactive oxygen species, no reference
15  there. No quotation marks.
16    So I don't know whether he,
17  in fact, uses the same logic that I did.
18    (Document marked for
19    identification as Exhibit
20    Zelikoff-19.)
21  BY MR. HEGARTY:
22    Q.   I'm going to show you
23  Exhibit 19. This is another reference
24  where you copied portions of a

Page 120

1  publication by OSHA for purposes of your
2  report. Do you see that?
3    MS. O'DELL:  Objection to
4    form.
5    THE WITNESS:  I do see what
6    you're pointing to. I also will
7    tell you that Point 1 that you
8    point out in the OSHA United
9    States Department of Labor, on
10    hexavalent chromium, which is off
11    the internet, adverse health
12    effects associated, yes, I used
13    adverse health -- health effects
14    other than cancer, and then I had
15    these different words.
16    I'm just explaining what I
17    see.
18    With chromium-6, hexavalent
19    chromium exposure include
20    occupational asthma, eye
21    irritation and damage, perforated
22    ear drums, et cetera, et cetera.
23    This can be found in numerous,
24    numerous references. This again

Page 121

1  is common knowledge for anyone
2  doing chromium -- chromium
3  studies.
4    Again, did I use the same
5  words?  In many cases, I did here.
6    "Can also develop an
7  allergic skin reaction called
8  allergic contact dermatitis."  I'm
9  not quite sure how else you can
10  say that, that phrase.
11    So I still feel confident in
12  what I did was based upon my
13  professional judgment.
14    (Document marked for
15    identification as Exhibit
16    Zelikoff-21.)
17  BY MR. HEGARTY:
18    Q.   Okay. I'll show you what I
19  next marked as Exhibit 21. Exhibit 21 is
20  again a portion of your report where we
21  have identified statements that are taken
22  verbatim without acknowledgment from the
23  publication attached thereto by Kasprzak.
24    A.   Kasprzak. I'm sorry, sir.

31 (Pages 118 to 121)

Judith Zelikoff, Ph.D.

Page 122

1    MS. O'DELL: Did you finish
2    your question?
3    BY MR. HEGARTY:
4    Q.    No.  Do you see where I'm
5    talk -- do you see where I'm referencing?
6    MS. O'DELL: Object to form.
7    THE WITNESS: I --
8    MS. O'DELL: Take a moment
9    if you need to, Doctor.
10   THE WITNESS: So what I see
11   in the abstract of a paper, a
12   review paper called Nickel
13   Carcinogenesis by Kasprzak and
14   Sunderman and Konstantine
15   Salnikow, you say -- you're
16   pointing to, "The exact mechanisms
17   of nickel-induced carcinogenesis
18   are not known and have been
19   subject of numerous
20   epidemiological and experimental
21   investigations."
22   That is not -- that -- okay.
23   And what's in my paper is, "The
24   exact mechanisms of nickel-induced

Page 123

1    cainogenesis are not known but
2    likely involve genetic and
3    epigenetic routes."
4    That's not the same as this
5    sentence.  It has portions of the
6    same, but not the entire sentence
7    is the same.
8    "Are likely to evolve
9    genetic and epigenetic routes."
10   Not quite sure how else you would
11   say this.
12   And this again is a review
13   paper.  And going through it, here
14   I can cite a sentence.
15   "Occupational exposure to nickel
16   occurs predominately in mining,
17   refining, alloy production,
18   electroplating, and welding."
19   This is in the review by Kasprzak.
20   There's no reference there either.
21   In this sentence, "In 1990
22   the International Committee on
23   Nickel Carcinogenesis in Man
24   suggested that respiratory cancer

Page 124

1    risks are primarily related to
2    exposure to soluble nickel
3    concentrations," et cetera, et
4    cetera.
5    But in many cases throughout
6    this reference, I can also -- it
7    being a review paper, I can also
8    tell you there's epidemiological
9    evidence on possible cancer risk
10   from general environment and
11   dietary nickel exposures not cited
12   as a reference, not quoted.
13   BY MR. HEGARTY:
14   Q.    Are you finished?
15   A.    I am, thank you.
16   THE WITNESS: Excuse me.
17   May I just point out that it's
18   getting even colder in here and
19   I'm a bit uncomfortable.
20   (Whereupon, a discussion was
21   held off the record.)
22   THE WITNESS: May I go get
23   my scarf?
24   MR. HEGARTY: Off the

Page 125

1    record.
2    THE VIDEOGRAPHER: The time
3    is 11:11 a.m.  Off the record.
4    (Short break.)
5    THE VIDEOGRAPHER: The time
6    is 11:23 a.m.  Back on record.
7    (Documents marked for
8    identification as Exhibits
9    Zelikoff-25 through 32.)
10   MR. HEGARTY: We're back on
11   the record.  I'm going to mark --
12   I've marked as Exhibits 25 through
13   32, other examples taken from
14   Dr. Zelikoff's report where --
15   along with the references to which
16   they were taken.  And I'm just
17   going to mark those for purposes
18   of the deposition as those
19   exhibits.
20   MS. O'DELL: What's the
21   exhibit number?
22   MR. HEGARTY: Exhibits 25
23   through 32, and I did skip over
24   through 22 through 24, but I'll

32 (Pages 122 to 125)

Judith Zelikoff, Ph.D.

Page 126

1    come back to it. So we did get
2    kind of out of order in the way I
3    marked those.
4        MS. O'DELL: So plaintiff
5    objects to the Exhibit 25 through
6    32 being added to the record.
7    There's no testimony from
8    Dr. Zelikoff. So any assertion
9    that counsel has made that those
10   are relevant, we would object
11   and -- and oppose their being
12   included.
13   BY MR. HEGARTY:
14       Q. Doctor, if you would look at
15   your report which is Exhibit Number 2.
16       A. Yes, sir.
17       Q. On Page 2 of your report,
18   under the section Mandate and
19   Methodology?
20       A. Yes, sir, I see it.
21       Q. You say your mandate was to
22   look at the scientific literature and
23   assess whether there is biologic
24   plausibility for talc to cause ovarian

Page 127

1    cancer from perineal use; is that
2    correct?
3        MR. GOLOMB: I'm sorry.
4    What page are you on?
5        MR. HEGARTY: Page 2.
6        THE WITNESS: Are you done?
7    BY MR. HEGARTY:
8        Q. Yes.
9        A. My mandate was to review the
10   scientific literature and assess whether
11   there was biological plausible
12   explanation for the increased risk of
13   ovarian cancer with perineal use of
14   talcum powder products, yes, that is
15   correct.
16       Q. Who gave you that mandate?
17       A. That was the plaintiff
18   attorney, Ms. Emory [sic] and Ms. O'Dell.
19       Q. You say --
20       A. They -- I -- but let me add
21   they -- when you say gave me that
22   mandate, can you explain what you mean by
23   gave me that mandate?
24       Q. Well, from --

Page 128

1        A. That was my -- that was --
2    the request was to assess biological
3    plausibility.
4        Q. You say in that portion that
5    we just reviewed that -- you say for the
6    increased risk of ovarian cancer with
7    talc use. Did you assume for purposes of
8    your report that there is, in fact, an
9    increased risk of ovarian cancer with
10   talc use?
11       A. I'm sorry, sir, can you tell
12   me exactly which paragraph?
13       Q. In the first paragraph under
14   the section Mandate and Methodology, you
15   say "assess whether there is biologic
16   plausibility" -- "biologically plausible
17   explanation for the increased risk of
18   ovarian cancer with the perineal use of
19   talcum powder products."
20       Do you see that? See where
21   I'm reading?
22       A. I am sorry, sir, I do not.
23       Q. First paragraph under
24   page -- on Page 2 under mandate and

Page 129

1    methodology.
2        A. Is that the notion of
3    biological plausibility paragraph, or are
4    you --
5        Q. It's the first paragraph
6    under the section Mandate and
7    Methodology.
8        A. Well, sir, there are two,
9    two paragraphs. One says mandate. I was
10   asked to review the scientific
11   literature. Then there is another
12   paragraph that says the notion of
13   biological plausibility is
14   multifactorial.
15       Q. Doctor, if you'd listen to
16   my question. I said the first paragraph
17   under mandate and methodology. Do you
18   understand that?
19       A. I do not -- I do not see it
20   and you can --
21       Q. You don't see the first
22   paragraph that begins mandate?
23       A. I just read that to you,
24   sir.

Judith Zelikoff, Ph.D.

Page 130

1    Q.    And -- and you understand
2    that's the first paragraph of -- under
3    the section Mandate and Methodology?
4        A.    Under mandate it says, "I
5    was asked to review the scientific
6    literature and assess whether there is
7    biological plausible explanation for the
8    increased risk of ovarian cancer and the
9    perineal use of talcum powder products."
10       Q.    And for purposes of your
11   mandate, did you assume that there was,
12   in fact, an increased risk of ovarian
13   cancer with the perineal use of talcum
14   powder?
15       A.    I made no assumptions.
16       Q.    Did you individually assess
17   whether there is an increased risk of
18   ovarian cancer with the perineal use of
19   talcum powder products?
20       A.    Could you please slow down?
21   You are asking the question very quickly.
22       Q.    Okay.  Did you
23   individually -- did you do an analysis of
24   whether there's an increased risk of

Page 131

1    ovarian cancer with perineal use of
2    talcum powder products?
3        A.    No.  As you can see by the
4    mandate I was asked to assess the
5    biological plausibility.  I did no
6    analysis of causation.
7        Q.    You did no analysis of
8    whether there is, in fact, an increased
9    risk of ovarian cancer with the perineal
10   use of talcum powder products?
11       A.    I did no analysis of
12   causation.  I'm not an epidemiologist.
13       Q.    You also discuss in the
14   third paragraph, which begins "I
15   performed an independent comprehensive
16   literature review."
17       A.    I see that, yes.  Thank you.
18       Q.    That you did do a literature
19   search, correct?
20       A.    I did do a literature
21   search, correct.
22       Q.    Did you do this yourself?
23       A.    I did do this myself along
24   with several graduate students.

Page 132

1    Q.    What graduate students
2    assisted you?
3        A.    Are you asking me for their
4    names?
5        Q.    Yes.
6        A.    Nick Lawrence who was a
7    master student.  And Catherine Fecchi who
8    was my master student.  Both of them have
9    which graduated.
10       Q.    Did you bill plaintiffs'
11   counsel for their time?
12       A.    I paid them out of my
13   pocket.
14       Q.    And how much did you pay
15   them per hour?
16       A.    $25 per hour.
17       Q.    Do you describe -- strike
18   that.
19            Anyone else assist you with
20   your literature search?
21       A.    I'm sorry, anyone else?
22       Q.    Assist you in your
23   independent comprehensive literature
24   review.

Page 133

1        A.    No, sir.
2        Q.    So doing the searches was
3    part of your methodology for preparing
4    your report, correct?
5        A.    Doing the searches were my
6    initial, my initial, yes.
7        Q.    Did you prepare in advance a
8    written protocol on how you were going to
9    do the searches?
10       A.    I followed the same protocol
11   that I used for papers, publications,
12   advisory boards, grant -- grant reviews
13   and grants that I write.
14       Q.    That's not my question.  My
15   question is, did you prepare a written
16   protocol as far as how you were going to
17   do the literature review for purposes of
18   your report?
19       A.    I did not do a written
20   outline as to how to do this.  I've been
21   doing this for over 35 years.
22       Q.    You agree that it was part
23   of your methodology is -- for your
24   literature search, to find and review all

34 (Pages 130 to 133)

Judith Zelikoff, Ph.D.

Page 134

1  literature that touch on talc and its
2  biologic effects, correct?
3          MS. O'DELL:  Object to the
4  form.
5          THE WITNESS:  My purpose was
6  to examine the literature, assess
7  the literature, first identify the
8  literature that I felt was --
9  well, all -- all the literature
10  that I could find or that the
11  students could find, and from me
12  to review them in terms of
13  relevancy and pertinence to the
14  question that I was being asked.
15  BY MR. HEGARTY:
16      Q.   Did you do any testing of
17  your methodology of doing searches to
18  ensure that you had captured all the
19  relevant literature?
20          MS. O'DELL:  Object to the
21  form.
22          THE WITNESS:  What do you
23  mean by testing?
24  BY MR. HEGARTY:

Page 135

1      Q.   Well, I don't know.  Did you
2  do any tests, having someone else do
3  searches, repeating the searches, to see
4  if your original searches captured all of
5  the relevant literature?
6      A.   We did several searches
7  doing -- using different words and
8  different aspects, so that we could -- we
9  got numerous duplicates because we came
10  in with different words, and key --
11  keywords and key phrases.
12      Q.   You do agree that it would
13  be necessary for a proper methodology to
14  reach opinions about biologic
15  plausibility, that you have reviewed all
16  the pertinent literature, correct?
17          MS. O'DELL:  Object to the
18  form.
19          THE WITNESS:  To my
20  knowledge I reviewed the
21  literature that was pertinent to
22  the question that I was being
23  asked.
24          I am not stating that I

Page 136

1  reviewed all of the literature out
2  there.  I have no way of knowing
3  that I reviewed or have not.
4          I gathered the literature in
5  a systematic fashion and I
6  reviewed that literature.
7  BY MR. HEGARTY:
8      Q.   Did you read every paper
9  that you found from your literature
10  search?
11      A.   Only those that were
12  relevant.  I read the abstracts to
13  determine whether it was in fact related
14  to the question that I was being asked.
15          When you do a literature
16  search, you come up with things that are
17  related and some that are not related at
18  all.
19      Q.   Does your report anywhere
20  describe or include a description of how
21  you weighed the various authorities that
22  you reviewed?
23      A.   My report talks about under
24  mandate and methodology how I -- the last

Page 137

1  paragraph, and that begins more than 300
2  publications, will -- talks about how
3  I -- how I looked at the publications and
4  how I decided how to cut down or dismiss
5  certain papers based on a closer
6  scrutiny.  And I focused specifically for
7  biological plausibility and being a
8  toxicologist in vitro, in vivo, and ex
9  vivo studies as well as cell studies,
10  animal studies, and tissues.
11      Q.   Did you assign any numerical
12  value to each authority as they relate to
13  the importance to you?
14      A.   I did not assign any
15  numerical value.  There was no
16  quantitative measurement done.
17      Q.   Was it also part of your
18  methodology to review all expert reports
19  in the litigation that concerned biologic
20  plausibility?
21          MS. O'DELL:  Object to the
22  form.
23          THE WITNESS:  Can you ask me
24  that again, please.

35 (Pages 134 to 137)

Judith Zelikoff, Ph.D.

Page 138

1    BY MR. HEGARTY:
2        Q.   Sure. Was it part of your
3    methodology to review all expert reports
4    in the litigation concerning biologic
5    plausibility?
6        A.   I -- I looked at reports
7    that had relevancy in terms of animal
8    models, in vitro cultures or ex vivo
9    studies, yes. My opinion was formed
10   primarily by the publications and the
11   science that I reviewed.
12       Q.   Was it part of your
13   methodology for purposes of your opinions
14   to review the expert witness reports from
15   the litigation that touch on biologic
16   plausibility?
17           MS. O'DELL: Object to the
18       form. Asked and answered.
19           THE WITNESS: I reviewed the
20       publications and the book chapters
21       and information that I thought
22       would go towards my -- my opinion.
23   BY MR. HEGARTY:
24       Q.   Your expert report, as we

Page 139

1    have looked at, includes references to
2    several other experts' reports, correct?
3    We looked at that earlier.
4        A.   If you say so, yes.
5        Q.   Did you select those expert
6    reports for purposes of your review?
7            MS. O'DELL: Object to the
8        form.
9            THE WITNESS: I formed my
10       opinion with contributions from
11       some of the reports that I had.
12       But it was primarily based upon
13       literature reviews.
14   BY MR. HEGARTY:
15       Q.   The reports that you had
16   were provided to you by plaintiffs'
17   counsel, correct?
18       A.   Reports that I received was
19   supplied to me by plaintiffs' counsel.
20       Q.   They selected the reports
21   that they were going to provide to you,
22   correct?
23           MS. O'DELL: Object to the
24       form.

Page 140

1            THE WITNESS: To my
2        knowledge, I have no knowledge as
3        to how they selected the reports
4        or which reports they selected to
5        send.
6    BY MR. HEGARTY:
7        Q.   You didn't have -- get a
8    list of all expert reports and decide
9    which ones you wanted, correct?
10           MS. O'DELL: Object to the
11       form.
12           THE WITNESS: I -- no. I
13       did not get a list of an entirety.
14   BY MR. HEGARTY:
15       Q.   Do you know plaintiffs'
16   counsel methodology for purposes of
17   selecting the reports to provide to you?
18       A.   I do not know their
19   methodology, but I would guess since
20   papers were supplied to me that had both
21   opinions and conclusions that led to
22   either positive associations or lack of
23   positive or data from scientific in vivo
24   studies, et cetera, that showed effects

Page 141

1    and no effects, I would assume that I got
2    all the literature both -- from both
3    perceptions.
4        Q.   Can you identify any medical
5    literature that you had reviewed prior to
6    being contacted by Ms. Emmel?
7        A.   Medical literature on?
8        Q.   Let me finish my question.
9        A.   I'm sorry.
10       Q.   Can you identify any
11   scientific or medical literature that you
12   reviewed before being contacted by
13   Ms. Emmel concerning talc and ovarian
14   cancer?
15       A.   There is no literature that
16   I reviewed prior to me being contacted by
17   Ms. Emmel.
18       Q.   Also in Exhibit B --
19       A.   B as in boy?
20       Q.   -- boy -- to your report.
21   There is a listing of produced documents
22   by Bates number.
23       A.   Correct. I see it,
24   "materials and data considered."

36 (Pages 138 to 141)

Judith Zelikoff, Ph.D.

Page 142

1    Q.    Did the plaintiffs' counsel
2  provide you with copies of those
3  documents?
4    A.    I have not gone through
5  every paper in those multiple binders.  I
6  would assume that many of them are in
7  there.
8    Q.    That's not my question,
9  Doctor.  My question was, were those
10  documents provided to you by counsel for
11  plaintiffs?
12        MS. O'DELL:  What documents
13    are you referring to?
14        MR. HEGARTY:  The documents
15    that are listed by Bates number in
16    Exhibit B.
17        THE WITNESS:  Oh, you're
18    talking about produced documents?
19  BY MR. HEGARTY:
20    Q.    Yes.
21    A.    Repeat your question,
22  please.
23    Q.    Sure.  Were the documents
24  listed by Bates number under produced

Page 143

1  documents provided to you by counsel for
2  plaintiffs?
3    A.    Produced documents were
4  supplied to me in the folder that is
5  listed, production documents.
6    Q.    Did you ask for those
7  specific documents?
8    A.    I did not.
9    Q.    Do you know what the
10  methodology was for selecting those
11  specific documents to send to you?
12    A.    I do not.
13        MS. O'DELL:  Object to the
14    form.
15        THE WITNESS:  Sorry.
16  BY MR. HEGARTY:
17    Q.    Did you ask for any
18  additional documents that would fall
19  under the definition of produced
20  documents besides those plaintiffs'
21  counsel provided to you?
22    A.    Not to my knowledge.
23    Q.    Did you review all the
24  documents that are listed under the

Page 144

1  section "produced documents"?
2    A.    I reviewed all of the
3  documents that are in the binder listed
4  as production documents.  I did not check
5  one for another, so I cannot say I did
6  all of these --
7    Q.    Did you receive --
8    A.    -- or they did not.
9    Q.    I'm sorry.  Did you receive
10  from counsel from plaintiffs all the
11  documents that have been produced in this
12  litigation that concerned biologic
13  plausibility?
14        MS. O'DELL:  Object to the
15    form.
16        THE WITNESS:  I have no
17    knowledge of whether I received
18    every single document there is out
19    there.
20  BY MR. HEGARTY:
21    Q.    Did you ask for -- did you
22  ask counsel for plaintiffs to provide you
23  all the documents that have been produced
24  in this case concerning biologic

Page 145

1  plausibility?
2        MS. O'DELL:  Object to the
3    form.
4        THE WITNESS:  Did not ask it
5    in that manner.
6        I did ask for in vitro
7    studies that they could find, ex
8    vivo studies, and I also did my
9    own literature search.  Yes.
10  BY MR. HEGARTY:
11    Q.    Were you -- did you
12  understand that -- or do you understand
13  that you've been provided with all the
14  produced documents that concern biologic
15  plausibility?
16        MS. O'DELL:  Object to form.
17        THE WITNESS:  I have no
18    knowledge of whether I received
19    all documents.
20  BY MR. HEGARTY:
21    Q.    With regard to the produced
22  documents, did you sign a protective
23  order before reviewing those documents?
24    A.    Regarding these produced

37 (Pages 142 to 145)

Judith Zelikoff, Ph.D.

Page 146

1    documents --
2        Q.    Yes.
3        A.    -- did I sign a protective
4    order?
5        Q.    Yes.
6            MS. O'DELL:  Object to the
7        form.  It's a confidentiality
8        order in this litigation.  You may
9        not be aware of it.
10           MR. HEGARTY:  Okay, well,
11       confidentiality order.
12           MS. O'DELL:  Just so it's
13       not unclear to the witness.
14   BY MR. HEGARTY:
15       Q.    Did you sign a
16   confidentiality order before reviewing
17   the Bates-stamped documents?
18       A.    I signed a confidentiality
19   agreement early on.
20       Q.    Do you rely on any tests for
21   purposes of your opinions that are not
22   reported in the medical literature?
23       A.    Again --
24           MS. O'DELL:  Object to the

Page 147

1        form.
2            THE WITNESS:  Please
3        describe "tests."
4    BY MR. HEGARTY:
5        Q.    Well, did you rely on any
6    testing or tests for purposes of your
7    opinions that are not contained in the
8    medical literature --
9            MS. O'DELL:  Objection to
10       form.
11   BY MR. HEGARTY:
12       Q.    -- that we wouldn't have
13   access to but that you did?
14           MS. O'DELL:  Object to the
15       form.  Besides those produced in
16       the litigation?
17           MR. HEGARTY:  Yeah, that
18       goes without saying.
19           MS. O'DELL:  It doesn't go
20       without saying.  It's an unfair
21       question.
22           THE WITNESS:  So if I
23       understand your question to mean
24       are there any laboratory

Page 148

1        experiments that I'm aware of that
2        were done that I have knowledge
3        of?  No I have no knowledge of any
4        laboratory testing or experimental
5        testing in this field.
6    BY MR. HEGARTY:
7        Q.    You did not do any testing
8    yourself for purposes of developing your
9    opinions in this case, correct?
10       A.    I did not do any laboratory
11   tests.
12       Q.    All the opinions that are
13   set out in your report about biologic
14   plausibility between talc and ovarian
15   cancer were formed after being contacted
16   by counsel for plaintiffs about
17   testifying as an expert in this case,
18   correct?
19           MS. O'DELL:  Objection to
20       form.
21           THE WITNESS:  After being
22       contacted by the plaintiffs I did
23       a literature search and followed
24       the science.

Page 149

1    BY MR. HEGARTY:
2        Q.    That's not my question,
3    Doctor.
4            My question is, all the
5    opinions set out in your report about
6    biologic plausibility as they relate to
7    talc and ovarian cancer were formed after
8    being contacted by counsel for
9    plaintiffs, correct?
10       A.    That is correct.
11       Q.    Can you cite for us any
12   occasion where you've done the exact same
13   thing that you have done here to prepare
14   your report; that is, do an analysis of
15   the literature on the biologic
16   plausibility between the exposure to a
17   substance and a disease?
18       A.    Nothing has been done
19   exactly like it's been here, but for
20   advisory boards that I've been on,
21   including the National Toxicology Board,
22   the Institute of Medicine, the Institute
23   of Engineering for the National Academies
24   of Science, we have -- we were requested

38 (Pages 146 to 149)

Judith Zelikoff, Ph.D.

Page 150

1    to do literature reviews on the question
2    that's in front of them and come up with
3    an opinion based upon our literature
4    reviews.
5        Q.    Have you ever published an
6    article in the medical literature where
7    you've done the same thing that you've
8    done here, which is to review all the
9    literature on a substance and a disease
10   and offer opinions as to whether there's
11   biologic plausibility between that
12   substance and a disease?
13       A.    I have written reviews that
14   are a culmination of all of the
15   literature that I reviewed on topics.
16   Never one on ovarian cancer and talc.
17           And to my knowledge, I have
18   not offered an opinion, but followed a
19   conclusion from the science.
20       Q.    I think my question is a
21   little bit different.  My question is,
22   have you published any article in the
23   literature where you have done
24   essentially the same thing that you have

Page 151

1    done here, which is review all the
2    literature on an exposure and a disease
3    and offer opinions as to whether there's
4    biologic plausibility between the
5    exposure and the disease?
6        A.    Most of the papers that I
7    publish will offer a potential, whether a
8    speculative potential or one that is
9    defined within other published literature
10   as a potential mechanism of action or as
11   potential plausible outcome.
12           So for any published paper
13   from the research that I've done or that
14   people do, we explain an observation that
15   has been found in our laboratory from
16   testing, as you call it.  And we will
17   explain the observation in terms of
18   biological plausibility, if that's what
19   you're referring to.
20       Q.    Well, have you ever used the
21   phrase "biologic plausibility" in any
22   published article?
23       A.    I cannot cite them for you,
24   but I -- I am confident that I have used

Page 152

1    the words "biological feasibility" or
2    "potential mechanisms" or "plausible" --
3    I may have used the word "plausibility,"
4    but I have used words that are similar to
5    those.
6        Q.    Doctor, when did you first
7    become aware of an alleged link between
8    ovarian cancer and talc use?
9            MS. O'DELL:  Object to the
10   form.
11           THE WITNESS:  When did I
12   first become aware of the alleged
13   link between ovarian cancer and
14   talc use?  From -- from the media.
15   I would say maybe a year prior to
16   being contacted by Ms. Emmel.
17   BY MR. HEGARTY:
18       Q.    Can you cite for me any
19   scientific or medical group, entity or
20   organization who has concluded that
21   genital talc use causes ovarian cancer?
22       A.    I -- really, my opinion is
23   based on biological plausibility.
24       Q.    I understand that.  But my

Page 153

1    question is simply from your knowledge,
2    here today, can you cite for me any
3    scientific or medical group, entity or
4    organization who has concluded that
5    genital talc use causes ovarian cancer?
6            MS. O'DELL:  Object to the
7    form.
8            THE WITNESS:  Well,
9    concluded is -- is a word for
10   discussion.
11           IARC in the 1993 report from
12   inhalation toxicology and
13   inhalation of talc did show that
14   there was tumor induction in
15   female rats in the lungs and that
16   there was adrenal gland tumors
17   that were formed.
18   BY MR. HEGARTY:
19       Q.    Well, IARC has never
20   concluded that the use of talc in the
21   genital area causes ovarian cancer,
22   correct?
23       A.    You asked me whether there
24   was any body of literature or any

39 (Pages 150 to 153)

Judith Zelikoff, Ph.D.

Page 154

1  advisory boards or any institution which
2  has concluded that there is a causal
3  relationship.  And I've cited to you a
4  study --
5      Q.   That's not my question.  My
6  question was can you cite for me any
7  scientific or medical group, entity or
8  organization who has concluded that
9  genital talc use causes ovarian cancer.
10         MS. O'DELL:  Object to the
11     form.
12         THE WITNESS:  I have -- I
13     have given you information on a
14     study done at the national
15     toxicology program.
16 BY MR. HEGARTY:
17     Q.   Is that the extent of your
18 answer?
19     A.   There are -- to my
20 knowledge, that's the best study that I
21 can cite to you.
22     Q.   That's a study, correct?
23     A.   That was a study, and they
24 are also a body that makes conclusions.

Page 155

1      Q.   That study did not involve
2  any commentary on ovarian cancer,
3  correct?
4      A.   The study did not involve
5  commentary on that.
6      Q.   Can you name any regulatory
7  body who has stated that talc use is a
8  cause of ovarian cancer?
9      A.   Not as I sit here right now.
10 But again, making conclusions on
11 causation was not my question, is not
12 my -- is not within my purview.
13         And there are different
14 levels of cancer conclusion.  For
15 instance, IARC has several
16 classifications.  And -- as you know, I,
17 II-A, II-B, et cetera.
18     Q.   And what is IARC's
19 classification of talc use in the genital
20 area?
21         MS. O'DELL:  Object to the
22     form.
23         THE WITNESS:  To my
24     knowledge, I think it's a II-B.

Page 156

1  BY MR. HEGARTY:
2      Q.   II-B is possibly
3  carcinogenic, correct?
4      A.   To humans.
5      Q.   I'm sorry?
6      A.   To humans.  Possibly
7  carcinogenic to humans.  That doesn't
8  exclude the fact that there is animal
9  data supporting that conclusion.  If
10 there were no animal data it -- it would
11 not even be considered a II-B.  So
12 there -- there's evidence that the IARC
13 evaluated and came up with a II-B
14 classification.
15     Q.   Is it your opinion that the
16 biologic plausibility of talc products
17 causing ovarian cancer has been generally
18 accepted in the medical community?
19     A.   I think it depends on the
20 medical community.
21     Q.   Well, aside from any medical
22 community that has accepted that there is
23 biologic plausibility between the use of
24 talc products in -- in ovarian cancer.

Page 157

1  Let me -- let me restate that.
2          Can you cite for me any
3  medical community that has accepted that
4  there is biologic plausibility of talc
5  products causing ovarian cancer?
6      A.   I'm not knowledgeable at --
7  about all the medical communities and
8  what disciplines they are in.
9      Q.   Well, can you cite for me
10 any medical or scientific community that
11 has accepted that there is biologic
12 plausibility of talcum powder products
13 causing ovarian cancer?
14     A.   I have no knowledge of that.
15 That doesn't mean it's not out there.  It
16 means that I have no knowledge of that.
17     Q.   You have no knowledge --
18 you -- so you cannot testify that the
19 medical or scientific communities have
20 accepted that there is biologic
21 plausibility of talcum powder products
22 causing ovarian cancer?
23         MS. O'DELL:  Object to the
24     form.

40 (Pages 154 to 157)

Judith Zelikoff, Ph.D.

Page 158

1    THE WITNESS:  What I'm
2    saying is I have no knowledge of
3    the documents they have put out
4    with a conclusion as a white paper
5    or any other published literature
6    that has made that conclusion.
7    BY MR. HEGARTY:
8    Q.   What does -- sorry.
9    A.   Or has not made that
10   conclusion.
11   Q.   What does general acceptance
12   mean to you?
13   A.   General acceptance -- for
14   example, benzine, it causes leukemia and
15   other blood cancers.  That is a general
16   acceptance by the medical community which
17   we all adhere to, abide by, based upon
18   the excessive amount of literature that
19   is out there showing -- proving and
20   addressing Hill's criteria and coming up
21   with the fact that it is a -- it is a
22   carcinogen for blood cancers.
23   That is general knowledge.
24   General knowledge is something saying

Page 159

1    that nickel can be a carcinogen, nickel
2    is a carcinogen and is classified by IARC
3    as a I.  In that case, the general
4    population is aware of that.
5    Q.   Before being hired by the
6    plaintiffs' lawyers in this case, you had
7    never written anything about talc,
8    correct?
9    A.   That's correct.
10   Q.   Or commented on talc in any
11   setting, correct?
12   A.   Other than teaching?
13   Q.   Other than the teaching
14   reference you cited earlier?
15   A.   That's correct.
16   Q.   Before being hired by
17   plaintiffs' counsel you had never written
18   anything about any cosmetic, correct?
19   MS. O'DELL:  Object to the
20   form.
21   Could you please -- it's
22   vague in terms of cosmetic.  Do
23   you have a definition in mind?
24   THE WITNESS:  Exactly.

Page 160

1    Thank you.
2    BY MR. HEGARTY:
3    Q.   You don't -- you don't know
4    what a cosmetic is?
5    A.   I'm asking you what your
6    definition is.
7    Q.   Well, I -- what is your
8    definition?
9    A.   A definition of a cosmetic
10   is -- since I'm not in the cosmetic
11   field -- a cosmetic is something that is
12   used for hygiene or aesthetics and used
13   dermally.
14   Q.   Have you ever written any
15   scientific article about a cosmetic under
16   your definition?
17   A.   Not to my knowledge, but I
18   would have to look at all of my papers
19   again, if you'd like me to do that.
20   Q.   Can you cite for me any
21   publication of yours where you comment on
22   asbestos?
23   A.   I would have to look at my
24   references.  I go back from 1982.

Page 161

1    Q.   Sitting here today, can you
2    cite for us, without looking at any
3    references, any article you've ever
4    written about asbestos?
5    MS. O'DELL:  Doctor, if you
6    need to look at your CV, you're
7    welcome to do that.
8    BY MR. HEGARTY:
9    Q.   Well, my question didn't ask
10   about the CV.  I said just simply sitting
11   here today, just based on your memory --
12   A.   Okay.
13   Q.   -- are you able to recall
14   any article you've ever written about
15   asbestos.
16   MS. O'DELL:  If you would
17   like to look at your CV, it's in
18   front of you.  You are welcome
19   to -- to do that.
20   MR. HEGARTY:  I'll withdraw
21   the question.
22   BY MR. HEGARTY:
23   Q.   Doctor, have you ever
24   written any article about a fragrance?

41 (Pages 158 to 161)

Judith Zelikoff, Ph.D.

Page 162

1    A.    I would also like to look at
2  my CV.
3        Q.    Without looking at your CV,
4  you can't say one way or the other?
5        A.    I can't say conclusively.
6  My CV and my publications go back to
7  1982.  It was quite a while ago.
8        Q.    And you can't say
9  conclusively whether you've written an
10  article about asbestos?
11        A.    I would rather look at my --
12  my publications.
13        Q.    Okay.  Have you ever
14  written --
15        A.    Would you like me to do
16  that, sir?
17        Q.    No.  I'm not asking you to
18  do that right now.
19        A.    Thank you.
20        Q.    Sitting here today without
21  looking at your CV, can you cite for me
22  any article you've ever written about
23  asbestos?
24        MS. O'DELL:  Objection to

Page 163

1    form.
2        THE WITNESS:  To my
3    knowledge at this particular
4    moment, I cannot cite for you an
5    article that I specifically wrote
6    on asbestos.  Whether or not I was
7    a co-author on one, I cannot
8    recall.
9  BY MR. HEGARTY:
10        Q.    Would that be the same
11  answer as to a fragrance?
12        A.    I -- I would really rather
13  look at my CV and my publications and
14  book chapters.
15        Q.    Before being contacted by
16  counsel for plaintiffs in this case, you
17  had never developed or offered any
18  opinions about talc, correct?
19        A.    That is correct.
20        Q.    You've never written
21  anything about ovarian cancer, correct?
22        A.    Again, just to put on the
23  record, I would really like to look at my
24  CV and look at my publications.  We are,

Page 164

1    as scientists, involved as co-authors,
2  oftentimes.  And I do not recall back to
3  1982.
4        Q.    Well, for purposes of your
5  report, you do not cite to any of your
6  own work, correct?
7        A.    That is correct.
8        Q.    You've never written
9  anything about talc and ovarian cancer,
10  correct?
11        A.    I think I asked and answered
12  that.  I think I answered that.  But I
13  can repeat it.
14        Q.    No, you did not.  I did not
15  ask you that question, ma'am.
16        A.    So can --
17        Q.    I asked you had you ever
18  written anything about talc.  My question
19  that I just asked you is have you ever
20  written anything about talc and ovarian
21  cancer?
22        A.    To my knowledge, as I sit
23  here now without looking at my
24  publications, no.

Page 165

1        Q.    Prior to being contacted by
2  plaintiff's counsel have you ever
3  reviewed the body of literature on the
4  etiologies or biology related to ovarian
5  cancer?
6        A.    Not prior to being
7  contacted, no.
8        Q.    You've never published any
9  opinions about the causes of ovarian
10  cancer, correct?
11        A.    To my knowledge, sitting
12  here, no.
13        Q.    You never published any
14  opinions about the risk factors for
15  ovarian cancer, correct?
16        A.    I really -- I'm not sure.  I
17  know that I have given that information,
18  not an opinion, but have given that
19  information in teaching courses.
20        Q.    Have you ever taught any
21  courses on asbestos?
22        A.    Asbestos has been included.
23  I give lectures in my organ system
24  toxicology course as well as in my

42 (Pages 162 to 165)

Judith Zelikoff, Ph.D.

Page 166

1  toxicology course for biology masters.  I
2  give courses in air pollutants and
3  cancer-causing agents and the toxicology
4  of -- of airborne.
5      Q.   Have you ever taught in your
6  courses any discussion about fragrances
7  and toxicity?
8      A.   It may have come up as a
9  minor point.  We talk about pesticides,
10  we talk about air pollutants.  We talk
11  about metals.  Fragrances, we talked
12  about limonene, eugenol, menthol and
13  other fragrances in that realm in the
14  discussion of electronic cigarettes and
15  the aerosols produced by them.
16      Q.   And you provided to us all
17  the lectures or the content of lectures
18  that you've given where you mentioned
19  talc, correct?
20      A.   I was not asked to --
21          MS. O'DELL:  Object to the
22  form.
23          THE WITNESS:  I was not
24  asked to provide them.  But please

Page 167

1      let me explain my teaching style.
2          My teaching style is such
3      that I use few PowerPoints as
4      queues.  And much of my teaching
5      is done verbally, one-on-one.  And
6      they're not recorded.
7          So there is really not that
8      much -- there is nothing to supply
9      to counsel.
10  BY MR. HEGARTY:
11      Q.   Well, other than the
12  reference that you provided to us earlier
13  about talc and ovarian cancer, you have
14  not otherwise lectured regarding this
15  subject, correct?
16      A.   That is correct.
17      Q.   There are toxicologists who
18  focus on issues dealing with reproductive
19  medicine or reproductive sciences such as
20  ovarian cancer and uterine cancer,
21  correct?
22      A.   There are scientists whose
23  major focus is on talc and ovarian cancer
24  and there are OB/GYNs as well as

Page 168

1  reproductive docs who do focus on this,
2  yes.
3      Q.   And that has not been an
4  area of your focus, correct?
5      A.   Not -- not in past.  Has not
6  been a primary focus.
7      Q.   You have provided for us
8  your CV, correct?
9      A.   That is correct.
10      Q.   That's included as part of
11  Exhibit B to your expert report, correct?
12          MS. O'DELL:  Objection to
13  form.
14          THE WITNESS:  I think it's
15  stated here as Exhibit A.
16  BY MR. HEGARTY:
17      Q.   It's Exhibit A to your
18  expert report.  Is that a current CV of
19  yours?
20      A.   It was updated in
21  August 2018.  So it is not completely
22  updated as of January 2019.
23      Q.   Did you bring an updated CV
24  to your deposition?

Page 169

1      A.   I did not.
2      Q.   As you stated --
3      A.   I'm sorry.  I can provide
4  that.
5      Q.   Does your CV anywhere list
6  any professional experience on ovarian
7  cancer?
8      A.   Excuse me.  Not to my
9  knowledge, in briefly reviewing my CV,
10  and not to my knowledge as I sit here.
11      Q.   Does your CV list any
12  professional experience regarding
13  asbestos?
14      A.   Specifically, asbestos as I
15  review, no.  No, sir.
16      Q.   Does your CV list any
17  professional experience regarding
18  fragrances?
19      A.   Not to my knowledge, no,
20  sir.  But you're asking me only what's in
21  my CV.
22          I have -- I have worked -- I
23  have looked at or heard about from other
24  advisory boards things to do with

43 (Pages 166 to 169)

Judith Zelikoff, Ph.D.

| Page 170 | Page 172 |
|---|---|
| 1  flavorants, as I said with electronic<br>2  cigarettes, hookah and smokeless tobacco.<br>3  So I am familiar with other -- which may<br>4  not be listed here in detail, which is<br>5  not listed here in detail, on flavorants<br>6  and some of those same flavors used in<br>7  electronic cigarettes are also, I found,<br>8  listed here.<br>9      Q.    Has any entity or agency<br>10  consulted you with regard to diseases of<br>11  the female reproductive tract?<br>12          MS. O'DELL:  Object to the<br>13      form.<br>14          THE WITNESS:  Not to my<br>15      knowledge.<br>16  BY MR. HEGARTY:<br>17      Q.    And no one has ever asked<br>18  you to look into any of the issues set<br>19  out in your report besides plaintiffs'<br>20  counsel, correct?<br>21      A.    I'm sorry.  Again?<br>22      Q.    No one has asked you to look<br>23  at the issues set out in your expert<br>24  report in this case other than | 1  or scientist who believes that there is<br>2  biologic plausibility between use of<br>3  talcum powder and ovarian cancer?<br>4          MS. O'DELL:  Object to form.<br>5          THE WITNESS:  I have not<br>6      spoken to any doctors in that<br>7      regard.<br>8  BY MR. HEGARTY:<br>9      Q.    How about any scientists?<br>10      A.    I have not spoke to any<br>11  scientists in that regard.<br>12      Q.    Have you --<br>13      A.    My opinion was specifically<br>14  based upon the scientific literature that<br>15  I had access to.<br>16      Q.    Have you ever had your<br>17  deposition taken before?<br>18      A.    I have.  Yes, sir.<br>19      Q.    How many times?<br>20      A.    One that I can recall.  Two<br>21  that I'm now recalling.  One that was<br>22  in -- for Dow Chemical on breast implants<br>23  and relationship with autoimmune disease<br>24  and one from a personal attorney who |

| Page 171 | Page 173 |
|---|---|
| 1  plaintiffs' counsel, correct?<br>2      A.    This specific ovarian cancer<br>3  and asbestos, that is correct.<br>4      Q.    You have not submitted your<br>5  expert report in this case for peer<br>6  review, correct?<br>7      A.    The only ones who have seen<br>8  my report have been the plaintiff<br>9  attorneys, to my knowledge.<br>10          If that was given out to<br>11  others at that point, I do not -- I do<br>12  not have knowledge of that.<br>13      Q.    You certainly have not<br>14  submitted your report for peer review,<br>15  correct?<br>16      A.    I have not submitted my<br>17  report for peer review.<br>18      Q.    Have you spoken to any<br>19  physicians who treat ovarian cancer<br>20  regarding talc and ovarian cancer?<br>21      A.    I have not.<br>22      Q.    Other than experts<br>23  identified by plaintiffs in this<br>24  litigation, can you identify any doctor | 1  was -- who had a client who was exposed<br>2  to wood burning from a wood stove, an<br>3  outdoor wood stove.<br>4      Q.    As to the latter case, do<br>5  you know where that case was pending or<br>6  was filed?<br>7      A.    I was deposed in New York<br>8  City.<br>9      Q.    Do you know the name of the<br>10  case?<br>11      A.    I'm afraid not, sir.<br>12      Q.    How long ago was it?<br>13      A.    15 years.<br>14      Q.    You were testifying on<br>15  behalf of the plaintiff in that case?<br>16          MS. O'DELL:  Object to form.<br>17          THE WITNESS:  I was not<br>18      testifying.  I was deposed for<br>19      the -- sorry, for the person who<br>20      was making the claim that they had<br>21      increased asthma as a result of<br>22      neighbors use of a wood boiler.<br>23  BY MR. HEGARTY:<br>24      Q.    In the Dow Chemical breast |

44 (Pages 170 to 173)

Judith Zelikoff, Ph.D.

Page 174

1    implant case, were you testifying as an
2    expert witness?
3        A.   I was.
4        Q.   On behalf of the plaintiffs?
5        A.   If you're talking about on
6    the part of Dow, yes.
7        Q.   Well, on the part of Dow who
8    was the defendant or the plaintiffs?
9        A.   Dow was the defendant. I'm
10   sorry.
11       Q.   Were you testifying on
12   behalf of Dow?
13       A.   I was.
14       Q.   Any other cases you've been
15   deposed in?
16       A.   Not that I can recall.
17       Q.   Have you been identified in
18   any other cases as an expert witness
19   besides this one to your knowledge?
20       A.   I have done literature
21   reviews for a number of attorneys but
22   have not been deposed.
23       Q.   My question is specific to
24   whether you -- whether you are aware that

Page 175

1    you've been designated, identified, in
2    the case as a testifying expert besides
3    this case. Are you aware of any such
4    cases?
5        A.   Not to my knowledge.
6        Q.   I know I referred earlier to
7    your CV. But I'm marking it as
8    Exhibit 22. You can look at that one or
9    Exhibit 22.
10           (Document marked for
11           identification as Exhibit
12           Zelikoff-22.)
13   BY MR. HEGARTY:
14       Q.   Are there any publications
15   of yours that relate to any of the issues
16   in this case that are not included in
17   your CV?
18           MS. O'DELL:  Object to form.
19           THE WITNESS:  Let's talk
20       about the issues of the case. Can
21       you define them a little better?
22   BY MR. HEGARTY:
23       Q.   Yeah, let me ask you a
24   different question. Are there any

Page 176

1    cases -- are there any articles on which
2    you rely for purposes of your opinions --
3    strike that. Let me ask it a different
4    way.
5            How many articles have you
6    published since August of 2018?
7        A.   I'm going to look at the
8    last publication.
9            I have one that was accepted
10   in press on the Garfield community and
11   looking at chromium exposure and doing
12   community engagement for the community
13   and looking at blood level of
14   measurements -- or toenail measurements,
15   excuse me, toenail measurement of
16   chromium, as they're impacting
17   communities environmentally.
18           Also two publications have
19   come out with the lead author, my being a
20   corresponding author with the lead author
21   being from the University of Rochester in
22   the area of inhaled particulate matter
23   and -- during pregnancy and effects on
24   the -- on the offspring and on the fetus.

Page 177

1        Q.   You are not a medical
2    doctor, correct?
3        A.   I am not a medical doctor,
4    although I did go to medical school for
5    my Ph.D. training.
6        Q.   You can't treat patients,
7    correct?
8        A.   I do not treat patients.
9        Q.   You are not an oncologist,
10   correct?
11       A.   I am not an oncologist.
12       Q.   You have no training in
13   oncology, correct?
14       A.   I have no training in
15   oncology. I have training in pathology,
16   which is what I got my Ph.D. degree in at
17   a medical school.
18       Q.   You have never diagnosed or
19   treated a disease in a patient, including
20   cancer, correct?
21       A.   That is correct.
22       Q.   You have no expertise in
23   treating patients with ovarian cancer,
24   correct?

45 (Pages 174 to 177)

Judith Zelikoff, Ph.D.

| Page 178 | Page 180 |
|---|---|

**Page 178**

1     A.   I have no expertise in that,
2   no.
3     Q.   You have no expertise in
4   diagnosing ovarian cancer, correct?
5     A.   I do not.
6     Q.   You are not an expert on
7   asbestos, correct?
8     A.   I have not been classified
9   as an expert in asbestos, although as I
10   said, I do work in air pollution and if
11   asbestos is in the confines -- taken in
12   the confines of air pollution, I could
13   speak to that.  But I have not been
14   designated as an expert.
15     Q.   What's the difference
16   between amphibole and serpentine forms of
17   asbestos?
18     MS. O'DELL:  Object to form.
19   BY MR. HEGARTY:
20     Q.   You can answer.
21     A.   It depends on whether it's
22   asbestiform or non-asbestiform.
23     Q.   Okay.  Asbestiform.  What's
24   the difference between amphibole and

**Page 180**

1   those forms can exist both in
2   crystalline form or in a
3   non-asbestiform.
4     So they are both -- both
5   concluded to be asbestos.
6   BY MR. HEGARTY:
7     Q.   Well, are there any
8   differences between --
9     A.   By the EPA.
10     Q.   Are there any differences
11   between amphibole and serpentine forms of
12   asbestos?
13     MS. O'DELL:  Object to form.
14     THE WITNESS:  Well, they are
15   different -- they are different
16   minerals.  But they are both
17   classified as asbestos.
18   BY MR. HEGARTY:
19     Q.   Any other differences?
20     A.   It -- both of which contain
21   carcinogenic -- classified I, as IARC.
22   Both have within them carcinogenic
23   asbestos.  To my knowledge, that is --
24   that is all I --

| Page 179 | Page 181 |
|---|---|

**Page 179**

1   serpentine forms?
2     A.   Well --
3     MS. O'DELL:  Object to the
4   form.
5     THE WITNESS:  Amphibole
6   lists serpentine which is
7   associated with chrysotile.  They
8   all have an aspect ratio of,
9   depending on who you are looking
10   at, whether it's three to one or
11   five to one.  Johnson & Johnson
12   includes it as five to one, which
13   is length-to-width ratio.  They
14   both have the same length-to-width
15   ratio.
16     If they're asbestiform, then
17   they are fibers that are made up
18   of fibrils.  They both have that.
19     And they go in a
20   longitudinal manner and they are
21   in one direction.
22     Amphibole includes within it
23   the crocidolite, and as well as
24   tremolite, amosite, and some of

**Page 181**

1     Q.   What was the most
2   commercially used asbestos?
3     A.   Well, it -- it depends on
4   the time.  But for commercial use, in
5   paints and housing and insulation, it was
6   either chrysotile was used commercially
7   and crocidolite was also used
8   commercially.
9     Q.   Okay.  How did the supposed
10   toxicities various -- vary across the
11   various forms of asbestos?
12     MS. O'DELL:  Object to the
13   form.
14     THE WITNESS:  When you say
15   toxicity what do you mean?
16   BY MR. HEGARTY:
17     Q.   The -- the toxicities vary
18   across the various forms.
19     MS. O'DELL:  Object to the
20   form.
21     THE WITNESS:  Mm-hmm.  It
22   depends on the chemical
23   composition.  It depends on the
24   surface material.  It depends on

46 (Pages 178 to 181)

Judith Zelikoff, Ph.D.

Page 182

1    the amount of iron.  It depends on
2    the size of the fiber or the
3    crystal.
4         And so depending upon those
5    factors you are going to have
6    differences in toxicity.
7  BY MR. HEGARTY:
8    Q.   Well, how does -- does
9  tremolite asbestos compare to chrysotile
10  asbestos in terms of toxicity?
11    A.   I don't really -- I don't
12  think I can answer that in terms of
13  ranking it.  I can tell you that
14  chrysotile is a well-known carcinogen,
15  well-established carcinogen by the
16  agencies.  That tremolite is an amphibole
17  and it can exist in both forms, either
18  asbestiform in the long longitudinal
19  fibriles, or it can exist as a mineral
20  that has dimensions in all different
21  directions.
22         So tremolite -- it's
23  difficult to rank, but chrysotile appears
24  to be -- when you say more toxic, you

Page 183

1  have to understand what is the outcome
2  that you're looking at.  They can both
3  cause toxicity.  I don't know what you
4  exactly mean by more toxic.
5         Do you mean at a given
6  dose -- what -- what do you mean by --
7    Q.   I didn't -- I didn't use the
8  word "more toxic."  I just -- I asked you
9  how does tremolite asbestos compare to
10  chrysotile asbestos in terms of toxicity?
11    A.   I think I -- yeah, that's a
12  very difficult question to a
13  toxicologist.  Because when you compare
14  toxicity across -- across lines, you have
15  to somehow rank them based on a
16  particular outcome.
17         So toxicity could be does it
18  produce more lactate dehydrogenase when
19  put in a macrophages culture of -- of
20  pulmonary cells, or does it produce more
21  apoptosis.  You can't just say toxicity
22  in my opinion.  You have to give me an
23  outcome.  Does this produce more toxicity
24  in this area.

Page 184

1    Q.   You are not an expert in
2  fragrances, correct?
3         MS. O'DELL:  Object to form.
4         THE WITNESS:  I have -- I
5    have not been listed as an expert
6    in fragrances.
7  BY MR. HEGARTY:
8    Q.   Would you consider yourself
9  an expert in fragrances?
10    A.   I am a toxicologist so I can
11  review chemicals and make a decision or
12  assess their toxicity based on outcomes.
13    Q.   Before being contacted by
14  Ms. Emmel in this case, would you have
15  considered yourself an expert in
16  fragrances?
17         MS. O'DELL:  Objection.
18         THE WITNESS:  Expert in
19    fragrances.  It is not something I
20    studied in my own laboratory.
21         However, a toxicologist
22    should be able to go into the
23    literature and have a greater
24    knowledge than most people in

Page 185

1    looking up different chemicals.
2  BY MR. HEGARTY:
3    Q.   You are not an expert on
4  talc, correct?
5         MS. O'DELL:  Object to the
6    form.
7         THE WITNESS:  I have done
8    much work in dust, including the
9    World Trade Center dust.  I've
10    done work on diesel exhaust and
11    other things that are powders.  So
12    particularly talc, I don't think I
13    am classified as a talc expert.
14         But as I said I've done much
15    work in other dusts, other
16    aerosols, vapors, gases,
17    particles, and I am an expert in
18    particles.
19  BY MR. HEGARTY:
20    Q.   You are not a geneticist,
21  correct?
22    A.   I'm -- if a geneticist is
23  someone who has been trained specifically
24  in genetics, I have not been trained in

47 (Pages 182 to 185)

Judith Zelikoff, Ph.D.

Page 186

1    genetics.  I have had courses in
2    molecular toxicology and I do teach some
3    molecular toxicology.
4         Q.    You are not a mineralogist,
5    correct?
6         A.    I am not a mineralogist.
7         Q.    You are not an expert on
8    testing for the presence of asbestos,
9    correct?
10        A.    I am not a chemist.
11        Q.    You are not an expert on
12   testing the air for asbestos, correct?
13        A.    We collect -- I collect
14   particles in the air.  I do air
15   measurements.  That is the basis of my
16   research.
17            When it comes to asbestos,
18   we will send those -- those filters out
19   to be analyzed by an expert laboratory,
20   and then we will help interpret the data.
21        Q.    You are not an industrial
22   hygienist, correct?
23        A.    I work with industrial
24   hygienists, but I do not have a degree in

Page 187

1    it.
2         Q.    You are not an expert on
3    Johnson's Baby Powder, correct?
4             MS. O'DELL:  Objection to
5         form.
6             THE WITNESS:  I am not an
7         expert on -- I -- could you
8         rephrase that?
9    BY MR. HEGARTY:
10        Q.    I don't think I can.
11        A.    I don't know what you mean
12   by expert.  I mean I need to have -- I
13   think I need to have some criteria that
14   would make me an expert.  If you are
15   talking about the number of publications
16   I have or whether I've testified.
17            I -- the word "expert"
18   throws me off a bit.
19        Q.    Well, where is the talc for
20   J&J's Baby Powder been mined over the
21   years?
22        A.    In Vermont, in Italy, and
23   also in Korea.
24        Q.    What are the current

Page 188

1    components by percentage of Johnson's
2    Baby Powder?
3             MS. O'DELL:  Object to the
4         form.  Vague.
5             THE WITNESS:  I cannot --
6         although I have looked at it, I
7         cannot tell you that off the top
8         of my head.  I would have to
9         look -- refresh my memory by
10        looking at an exhibit or a
11        document.
12   BY MR. HEGARTY:
13        Q.    What were the current
14   components of Johnson's Baby Powder by
15   percentage from the 19 -- 1900s through
16   the present?
17        A.    I cannot --
18            MS. O'DELL:  Excuse me.
19        Excuse me.  Object to the form.
20        Vague.
21            THE WITNESS:  I cannot give
22        you percentages off the top of my
23        head.  If you allow me to look at
24        a document I -- I could tell you.

Page 189

1    BY MR. HEGARTY:
2         Q.    Are the opinions in your
3    report specific to particular
4    formulations of talcum powder consumer
5    products?
6             MS. O'DELL:  Object to the
7         form.
8             THE WITNESS:  Are the
9         opinions in your report specific
10        to particular formulations.
11            My opinion is based on
12        biological plausibility based on
13        studies that have used talcum
14        powder or talc or fibrous talc or
15        nonfibrous talc.
16   BY MR. HEGARTY:
17        Q.    Did you analyze specifically
18   the biologic plausibility of the
19   components of Johnson's Baby Powder for
20   purposes of your opinions?
21            MS. O'DELL:  Object to the
22        form.
23            THE WITNESS:  I looked at
24        the individual components that I

48  (Pages 186 to 189)

Judith Zelikoff, Ph.D.

Page 190

```
 1      was aware of.  And looked at their
 2      ability to cause inflammation,
 3      let's say, or their carcinogenic
 4      potential.
 5   BY MR. HEGARTY:
 6      Q.   But did you look
 7   specifically -- did you specifically
 8   analyze biologic plausibility specific to
 9   J&J's -- strike that.
10         Did you analyze biological
11   plausibility specific to Johnson's Baby
12   Powder in your report?
13      A.   If the literature was there,
14   there was some -- I'm sorry, I can't
15   remember the author now.  But there were
16   authors and investigators that did use
17   Johnson's Baby Powder in their studies,
18   and if they used those studies, and I
19   used that for -- to provide biological
20   plausibility, then yes.
21      Q.   What studies were done
22   specific to Johnson's Baby Powder?
23         MS. O'DELL:  Object to the
24      form.
```

Page 191

```
 1         THE WITNESS:  Of course all
 2      of the product documents.
 3         Sorry, I'm having difficulty
 4      recalling that -- the particular
 5      name.  It's not a memory test.
 6      I'm sorry.
 7   BY MR. HEGARTY:
 8      Q.   With regard to ovarian
 9   cancer, what are the subtypes of the
10   disease?
11      A.   Well, as -- as --
12         MS. O'DELL:  Object to the
13      form.
14         THE WITNESS:  -- was pointed
15      out, I'm not an OB/GYN.  I can
16      tell you just from cursory
17      knowledge that there are serous,
18      high grade, low grade serous,
19      endometrioid, mucous cell,
20      epithelioid.
21   BY MR. HEGARTY:
22      Q.   What are the differences in
23   subtypes?
24      A.   Again, this is not in my --
```

Page 192

```
 1   in the question that I was asked to
 2   comment on, but from cursory knowledge
 3   there are different cell types.
 4      Q.   What's the difference
 5   between a low grade and high grade tumor?
 6      A.   The induction of
 7   invasiveness and proliferation capacity.
 8      Q.   What is thought to be the
 9   primary origin of high-grade serous
10   ovarian cancer?
11         MS. O'DELL:  Object to the
12      form.
13         THE WITNESS:  Primary
14      origin.  I'm not sure what that
15      means.
16   BY MR. HEGARTY:
17      Q.   Well, what is -- what is
18   typically the primary location or origin
19   of high-grade serous?
20      A.   Do you mean in the ovary?
21      Q.   I don't think I can ask it
22   any different way.
23      A.   Well, I don't quite
24   understand your question.
```

Page 193

```
 1      Q.   What is the primary origin
 2   of clear cell carcinoma?
 3         MS. O'DELL:  Object to the
 4      form.
 5         THE WITNESS:  If you're
 6      asking me the types, I don't
 7      recall the type of cell for clear
 8      cell carcinoma.  Again, I'm not an
 9      OB/GYN, and I'm not a histologist.
10   BY MR. HEGARTY:
11      Q.   For purposes of your report,
12   did you analyze biologic plausibility for
13   each subtype of ovarian cancer?
14      A.   No, sir.
15      Q.   Is it your opinion that the
16   etiology of each of the subtypes of
17   ovarian cancer is the same?
18      A.   There are many
19   commonalities.
20         As I said, from my cursory
21      knowledge and my background, early
22      background in 1980, of being a --
23      pathology when this was not even
24      considered or thought about, there is
```

49 (Pages 190 to 193)

Judith Zelikoff, Ph.D.

Page 194

1 etiologies -- I'm sorry, I had to refresh
2 my memory of your question.
3          There are different
4 etiologies.  Many -- and many of the
5 same, and so I think that -- if I may
6 gather my thoughts and refresh your
7 question.
8          So as I said, in terms of my
9 opinion that the etiology in each of the
10 subtypes of ovarian cancer is the same,
11 there are many commonalities in --
12 etiology being the underlying reason.
13 There are many commonalities for the same
14 cancers, including things like cancer
15 stem cells in ovarian cancer, which are
16 now being identified in the literature as
17 a possibility for recurrence of ovarian
18 cancer.
19          So, yes, there are definite
20 commonalities in terms of the induction
21 of ovarian types of cancer.
22     Q.   Well, my question was, is it
23 your opinion that the etiologies of each
24 subtype are the same?

Page 195

1          MS. O'DELL:  Objection to
2 form.
3          THE WITNESS:  I have --
4          MS. O'DELL:  Asked and
5 answered.
6          THE WITNESS:  I have no
7 opinion on that.
8 BY MR. HEGARTY:
9     Q.   Is it your opinion --
10          MS. O'DELL:  Excuse me.
11          THE WITNESS:  Other than
12 what I --
13          MS. O'DELL:  Sorry.
14          THE WITNESS:  I'm sorry.
15          MS. O'DELL:  You may finish.
16 I didn't mean to cut you off.
17          THE WITNESS:  Other than
18 what I've just given.
19          MS. O'DELL:  So, Mark, we've
20 been going about an hour and ten
21 minutes, I think.
22          MR. HEGARTY:  Okay.  Take a
23 break.
24          THE VIDEOGRAPHER:  Stand by.

Page 196

1          Remove your microphones.  The time
2 is 12:22 p.m.  Off the record.
3          (Lunch break.)
4          THE VIDEOGRAPHER:  We are
5 back on the record.  The time is
6 1:17 p.m.
7 BY MR. HEGARTY:
8     Q.   Doctor, we're back on the
9 record.  I want to go back to something
10 we talked about at the beginning, that
11 is, the initial call that you had from
12 Ms. Emmel.
13          You mentioned that you
14 reviewed materials between the time of
15 the call and the time that you agreed to
16 serve as an expert witness.  Do you
17 recall saying that?
18     A.   I do recall.
19     Q.   What materials did you
20 review?
21     A.   Just random, whatever I got
22 from the -- that came out using keywords
23 of talc, talcum powder, ovarian cancer.
24 Those were my initial keywords.

Page 197

1     Q.   Do you recall, sitting here
2 today, any particular articles, whether
3 by author name or by name of that initial
4 search that you did before agreeing to
5 serve as an expert?
6     A.   I looked at Ghio, G-I --
7 G-H-I-O.  Did inhalation of talc and
8 airway cells in in vitro study.
9          I also looked at
10 Dr. De Boers and migration of carbon
11 black material.
12          I also looked at Dr. Venter
13 and Iturralde, who talked about
14 administered radiolabeled microspheres.
15          I read Dr. Weiner's --
16 Weiner's -- Dr. Weiner's publication.  I
17 read Dr. Epstein's letter.
18     Q.   Is that something that you
19 found on your own?
20     A.   Excuse me.  It wasn't
21 Dr. Epstein's letter.  I'm sorry.  I
22 stand corrected.
23          I read the National
24 Toxicology Report, the NTP 1993.

50 (Pages 194 to 197)

Judith Zelikoff, Ph.D.

Page 198

1     Q.   Did you do a more expansive
2   literature search and literature review
3   after agreeing to serve as an expert
4   witness?
5     A.   Of course.
6     Q.   Did you form any opinions,
7   though, from that initial search that you
8   performed?
9     A.   My opinion at that time was
10  that there was certainly -- I had a great
11  deal of interest in the topic, that there
12  was certainly enough information and
13  enough evidence to provide -- that was
14  provided by these publications that --
15  certainly that particles of the size of
16  talc can be -- can be translocated,
17  migrated, and that -- at least from the
18  lung, and so that there was biological
19  plausibility for movement within the
20  body.
21        And I found it convincing
22  that I could -- that I could get involved
23  in this case and that I believe that
24  there was, at that point with only

Page 199

1   superficial literature searching, that
2   there was indeed room for an opinion.
3   And that opinion being that there
4   certainly was information provided that
5   could lead me to provide biological
6   plausibility in that regard.  Otherwise,
7   I would not have taken the case.
8         What I would like to say is
9   that I would have done the same thing if
10  you had called me, sir, to answer the
11  question of what my beliefs are and where
12  the science is.
13        Q.   If you look at Page 2 again
14  of your expert report.
15        A.   Yes, sir.
16        Q.   That's Exhibit 2.  Again,
17  under the section mandate --
18        A.   Yes.
19        Q.   -- and methodology.
20        A.   I see it.
21        Q.   You say at the end of the
22  second paragraph that, "Biological
23  plausibility does not mean proof of
24  mechanism, but rather whether what is

Page 200

1   known about the product is consistent
2   with a cause-and-effect relationship."
3         Do you see that where I'm
4   reading?
5         A.   I see where you're reading.
6         Q.   Where does that definition
7   of biological plausibility come from?
8         A.   It is my professional
9   opinion.
10        Q.   Is there still biological
11  plausibility if what is known about a
12  substance and a disease is consistent
13  with no cause-and-effect relationship?
14        MS. O'DELL:  Object to the
15  form.
16        THE WITNESS:  Biological
17  plausibility, to me, as stated
18  here -- and I will state it a
19  different way, is that there is
20  actually literature and
21  information, reliable, sound
22  science that could -- that
23  provides evidence that there is a
24  mechanism or mechanisms as well as

Page 201

1   underlying information that could
2   prove the -- although it's not
3   necessary in Hill's criteria, that
4   could be used to prove a causal
5   relationship.
6         And in this case, that
7   talcum powder, in particular
8   Johnson & Johnson talcum powder,
9   can lead to ovarian cancer.
10  BY MR. HEGARTY:
11        Q.   Well, do you agree that the
12  finding of biologic plausibility by
13  itself does not mean causation?
14        A.   Biological plausibility is
15  used to supplement or to add on.  It is
16  actually one of Hill's criteria.  One
17  that he listed in his 1962 paper that is
18  not absolutely necessary but does provide
19  compelling evidence.  And I do believe
20  that biological plausibility is extremely
21  important, in my personal opinion, in
22  causal relationship.  And Hill agrees to
23  that as well.
24        Q.   You agree, though, that the

51 (Pages 198 to 201)

Judith Zelikoff, Ph.D.

Page 202

1    other Hill factors should be applied to
2    determine causality, other than -- in
3    addition to biological plausibility?
4         A.    Well, I really can't say.
5    Again, I know -- I know of Hill's work,
6    and I know of his groundbreaking
7    publication.  But again, I'm here to talk
8    about plausibility, not causation.
9         Q.    At the bottom of Page 2 you
10   say as part of your analysis you
11   reviewed, "Depositions and numerous
12   documents, internal memorandum and
13   published and unpublished studies and
14   testing results that I have found in my
15   own searches of documents, documents
16   provided by attorneys, and documents that
17   I requested."  That's carrying over to
18   Page 3.
19              Do you see that?
20        A.    Toxicological studies.  Are
21   we talking about toxicological studies
22   including in vivo and in vitro?
23        Q.    No.  I'm looking at the very
24   last sentence of the paragraph at the

Page 203

1    bottom of Page 2, carrying over to the
2    top of Page 3?
3         A.    In addition, I've reviewed
4    depositions and numerous documents
5    internal memorandum and published and
6    unpublished studies and testing results
7    that I have found in my own searches.
8         Q.    Correct.  In any scientific
9    analysis that you have done, have you
10   ever included as part of that analysis
11   documents provided by attorneys?
12        A.    In my -- when I publish, I
13   look at all relevant information that I
14   have access to.  It's about the science.
15        Q.    Not my question.  My
16   question is in any prior work that you
17   have done where you have published an
18   article, have you included in the review
19   for purposes of publishing that article,
20   documents provided by lawyers?
21        A.    No, sir, not to my
22   knowledge.
23        Q.    Have you ever included as
24   materials that you have reviewed for any

Page 204

1    publication of yours, depositions or
2    expert reports in a litigation?
3         A.    No.  However, there are
4    papers and regulatory -- regulatory
5    documents that are not considered
6    published, published.  If you mean
7    peer-reviewed literature, that's one way
8    of publishing.  But another way of
9    publishing is also documents that are in
10   a report.
11              And I have used reports in
12   my own publications, if they -- if they
13   are accessible to me.
14        Q.    Have you ever in a published
15   scientific article of yours cited to an
16   expert report from a doctor in a
17   litigation?
18        A.    I'm sorry.  I have to look
19   down at your question.
20              Not that I recall.  But
21   that's not to say that I would not.
22              If it was appropriate for
23   the paper that I was writing, I would
24   certainly use it.

Page 205

1         Q.    Can you identify any
2    scientific group -- strike that.
3              Before I ask you about
4    causation, now I want to ask you about
5    biological plausibility.  Can you cite
6    for me any scientific group, body, or
7    even paper that has concluded that there
8    is biological plausibility between
9    perineal talc use and ovarian cancer?
10        A.    Mm-hmm-hmm.  If you look at
11   -- I don't know what exhibit it is.  But
12   it is the Health Canada report.  And --
13   Canadian U.S. EPA.  And if you look at
14   Taher's paper, systemic review and
15   meta-analysis, in both of those -- okay.
16   So the environmental -- Health Canada and
17   Canadian EPA, they put out this -- this
18   document, which is an assessment, a
19   screening assessment document, to look at
20   biological plausibility as well as the
21   other epidemiological literature.
22              And they do speak to the
23   causation and they do speak to biological
24   plausibility of talc and its association

52 (Pages 202 to 205)

Judith Zelikoff, Ph.D.

Page 206

1  or talc and it's causation for ovarian
2  cancer. So they do in that document.
3        The systematic review and
4  meta-analysis 2018 of Taher also speaks
5  of it and reviews the 30 -- I think it's
6  30 -- 30 studies, of which there are 26
7  case-controls and -- studies, and I think
8  four cohort studies. And they do also
9  conclude that, by looking at the
10 meta-analysis, that there are -- that
11 there is causation associated -- that
12 there is causation for talcum powder and
13 ovarian cancer.
14      Q.   Actually, Doctor, both
15 documents to which you reference conclude
16 only that perineal use of talcum powder
17 is a possible cause of ovarian cancer,
18 correct?
19        MS. O'DELL: Object to the
20 form.
21        THE WITNESS: They state
22 cause. And if you give me a
23 moment, I can look for it, within
24 the document. So I'm looking at

Page 207

1  the Health Canada document.
2        Meta -- page -- I'm sorry.
3  Roman Numeral III, "Meta-analysis
4  of the available human studies in
5  the peer-reviewed literature
6  indicate a consistent and
7  statistically significant positive
8  association between perineal
9  exposure to talc and ovarian
10 cancer. Further available data
11 are indicative of causal effect."
12 BY MR. HEGARTY:
13      Q.   Okay. What is their
14 ultimate conclusion?
15      A.   This is part of their
16 conclusion.
17      Q.   Can I look at that document?
18      A.   Absolutely.
19        MR. TISI: Is this marked as
20 an exhibit, Mark?
21        MR. HEGARTY: Yes.
22        MR. FINDEIS: Sorry, which
23 number is it marked? So the
24 record is clear.

Page 208

1        MS. O'DELL: It's Exhibit 9.
2  BY MR. HEGARTY:
3      Q.   If you would look -- do you
4  have the Taher review?
5      A.   I do.
6      Q.   What's that marked as?
7      A.   That is Exhibit 10.
8      Q.   Exhibit 10?
9      A.   Based on your yellow mark,
10 yes.
11      Q.   If you look at the abstract
12 under the conclusion section, it
13 concludes that perineal use of talcum
14 powder is a possible cause of human
15 ovarian cancer.
16        Do you see that?
17      A.   Excuse me. I dropped my
18 microphone.
19        Okay. Please repeat your
20 question. Your comment.
21      Q.   Second page under the
22 conclusion section. The conclusion of
23 the Taher article is, "The perineal use
24 of talc powder is a possible cause of

Page 209

1  human ovarian cancer," correct?
2        MS. O'DELL: Objection to
3  form.
4        THE WITNESS: I see that
5  conclusion sentence.
6  BY MR. HEGARTY:
7      Q.   Nowhere in here do they say
8  that talcum powder causes ovarian cancer,
9  correct?
10        MS. O'DELL: Objection to
11 form.
12        THE WITNESS: If you're
13 looking for a specific sentence,
14 allow me to review.
15 BY MR. HEGARTY:
16      Q.   Well, are you going to need
17 to review the entirety of the paper?
18      A.   I may.
19      Q.   Okay. Well, I can't -- we
20 don't have time for you to review the
21 entirety of the paper so I'll withdraw
22 the question. If you need to review the
23 entirety of the paper.
24        Can you cite here without

53 (Pages 206 to 209)

Judith Zelikoff, Ph.D.

Page 210

1  reviewing it anywhere where they say
2  talcum powder causes ovarian cancer?
3      A.   I cannot --
4          MS. O'DELL:  Excuse me.  And
5      you're referring specifically to
6      Exhibit 10?
7          MR. HEGARTY:  Correct.
8          MS. O'DELL:  The Taher
9      paper?
10         THE WITNESS:  I can't say it
11     without looking at the paper.
12  BY MR. HEGARTY:
13     Q.   Has the Taher paper been
14  peer reviewed?
15     A.   The Taher paper has -- is a
16  document that, yes, has been peer
17  reviewed.  To my knowledge.
18     Q.   Okay.  What publication peer
19  reviewed that document?
20     A.   Excuse me?
21     Q.   Who peer reviewed that
22  document?
23     A.   I have -- I have no
24  knowledge of that.

Page 211

1      Q.   How do you know it's been
2  peer reviewed?
3      A.   The -- the plaintiff lawyers
4  have shown me a document, a cover letter,
5  information, I specifically asked that
6  question of them.
7      Q.   And are you relying on what
8  they provided to you for purposes of
9  saying it's peer reviewed?
10     A.   Please allow me to -- I'm
11  going to take a look into the document
12  again.  There may be evidence that's in
13  the document which says it's peer
14  reviewed.
15     Q.   Doctor, what are you looking
16  at for purposes of peer review?  I asked
17  you --
18     A.   I'm looking to see -- sorry,
19  please finish your question.
20     Q.   I asked you how do you know
21  it's been peer reviewed.
22     A.   And I stated that the
23  plaintiff lawyer -- the plaintiffs'
24  lawyers have shown me a document, a cover

Page 212

1  letter, information.  And I specifically
2  asked that same question.
3      Q.   Now, are you relying on the
4  fact it's been peer reviewed for your
5  opinions in this case?
6      A.   I'm relying on the science.
7      Q.   Well, are you relying on
8  whether -- on what plaintiffs' counsel
9  told you as far as whether it's been peer
10  reviewed?
11         MS. O'DELL:  Object to the
12     form.
13         THE WITNESS:  That is what
14     I'm trying to look, whether there
15     is an acknowledgment and whether
16     there is a statement within it
17     which says it's peer reviewed.
18         It -- it's stated that in
19     order for this -- in order for a
20     document such as this, and again
21     it depends on what you mean by
22     peer review, whether it's a
23     community or whether it's the
24     government.  The government has

Page 213

1      looked at this, and they were
2      submitted by Health Canada, and as
3      of now it's been submitted for
4      peer review, but it was looked at
5      by the Health Canada and by EPA.
6  BY MR. HEGARTY:
7      Q.   What document were you shown
8  that shows it's been peer reviewed?
9      A.   On the first page,
10  Exhibit 10, materials submitted to Health
11  Canada, materials submitted to journal
12  for peer review.
13     Q.   So it's not been peer
14  reviewed?
15     A.   To my knowledge, it has been
16  peer reviewed.  And again I'm relying on
17  plaintiffs' attorney with that
18  information.
19     Q.   Have you ever cited in a
20  scientific article of yours a publication
21  that's not been peer reviewed?
22     A.   All the time.
23     Q.   So that's something that --
24  that you have done as part of your

54 (Pages 210 to 213)

Judith Zelikoff, Ph.D.

Page 214

1  methodology?
2        MS. O'DELL:  Object to the
3  form.
4        THE WITNESS:  It's
5  something -- if there is -- based
6  on my opinion of the study design,
7  the information, the science, if
8  it -- if it needs to be stated, if
9  the science needs to be out there,
10  then I have cited numerous times
11  unpublished information.
12  BY MR. HEGARTY:
13     Q.   Do you understand that for
14  purposes -- that the -- strike that.
15        Do you understand that the
16  Health Canada risk assessment is a --
17  only a draft assessment at this point in
18  time?
19     A.   It is going to be reviewed,
20  yes.  I understand that it -- it is a
21  draft assessment.  I also understand that
22  it has gone through scrutiny by both
23  Health Canada and Canadian EPA.
24     Q.   Do you understand that

Page 215

1  there's a comment period that's going on
2  right now?
3     A.   I understand that, yes.
4     Q.   And that this is not a final
5  statement?
6     A.   Final statement.  In any
7  document, any regulatory document that --
8  those that are put out by the National
9  Academy of Science, whatever document
10  you're using, there's always a peer
11  review or comment period.
12        In my opinion, in my
13  professional career, documents do not
14  change that drastically based upon the
15  comments that come in.  Based upon
16  National Academy of Science, and the
17  National Toxicology Program.  There are
18  usually not -- there are no -- by the
19  time it reaches this point, there are no
20  substantive comments that allow for
21  extensive changes.
22     Q.   Other than the Canadian
23  documents you just cited, can you cite
24  for me any other scientific group, body

Page 216

1  or paper that has concluded that there is
2  biologic plausibility between talcum
3  powder use and ovarian cancer?
4     A.   Biological plausibility, in
5  my case, and for my review and for my
6  report, I'm looking at the inflammation
7  as a biological plausibility.
8        There is data going back and
9  scientific reviews and publications going
10  back to the '60s which implicate
11  inflammation as a biological mediator for
12  cancer.
13     Q.   Doctor, listen to my
14  question.  My question is very specific
15  to talc and the biologic plausibility
16  between talc and ovarian cancer.
17        Can you cite for me, besides
18  the Canadian documents you cited, any
19  scientific group, body or organization
20  that has concluded that there is biologic
21  plausibility between talcum powder use
22  and ovarian cancer?
23     A.   There is biological
24  plausibility and there is evidence that

Page 217

1  in Step 1, that talc causes inflammation.
2  In Step 2, that inflammation is a
3  well-known and well-established factor
4  in -- in cancer.
5     Q.   Doctor, you are not
6  answering my question.  Do you want to
7  read my question?  My question is very
8  specific.
9        Can you cite for me any
10  scientific body or group or organization,
11  other than what you say the Canadian
12  group or groups did, that has concluded
13  that there is biologic plausibility
14  between talcum powder use and ovarian
15  cancer?
16        MS. O'DELL:  Objection.
17  Objection to the question.  Asked
18  and answered.
19        THE WITNESS:  I stand by my
20  answer.  That, again, talc can
21  cause inflammation.  It's well
22  known.  And inflammation is an
23  underpinning for cancer.
24  BY MR. HEGARTY:

55 (Pages 214 to 217)

Judith Zelikoff, Ph.D.

Page 218

1    Q.   Okay. Cite for me any
2  scientific group, body or organization
3  who has said that.
4    A.   That is throughout
5  literature. If you go back to 1960 and
6  talk about the Vertel and the role of
7  inflammation in cancer, and numerous
8  other publications since that, if you
9  look at -- talc is used to induce
10 pleurodesis because of its inflammatory
11 responsiveness.
12   Q.   Doctor, you still are not
13 answering my question. My question is
14 name a scientific body, organization or
15 group who has concluded, as you have
16 done, or you say you do in your paper,
17 that there is biologic plausibility
18 between talc and ovarian cancer.
19      MS. O'DELL: Objection to
20   the form.
21      THE WITNESS: I gave you --
22 BY MR. HEGARTY:
23   Q.   Cite for me the groups.
24      MS. O'DELL: Excuse me. Let

Page 219

1  me -- objection to form. Asked
2  and answered. The doctor has
3  answered your question. You may
4  not like the answer, but she's
5  answered it.
6  BY MR. HEGARTY:
7    Q.   Cite for me the groups by
8  name.
9      MS. O'DELL: Objection to
10   form.
11      THE WITNESS: Ask the
12   question again?
13 BY MR. HEGARTY:
14   Q.   Cite for me any name of any
15 group that has reached the same opinion
16 as you?
17   A.   Besides the Health Canada?
18   Q.   Correct.
19   A.   There are -- I -- you're
20 asking for something that is not -- I'm
21 answering the question by telling you
22 that you have talc which is an
23 inflamagogue, and you have talc and its
24 relationship with cancer. And that is a

Page 220

1  biological mechanism that everyone
2  including the National Toxicology, the
3  IARC, the National Academy of Science,
4  EPA, all recognize.
5    Q.   Cite for me any group.
6  Again, you are not answering my question.
7      My answer --
8    A.   Okay.
9    Q.   -- my question is other than
10 the Canadian groups you've cited, cite
11 for me any group by name who has reached
12 the same opinion as you about biologic
13 plausibility.
14      MS. O'DELL: Objection to
15   form. Other than those she just
16   listed in her last answer?
17      MR. HEGARTY: Well, she
18   didn't list any. I think the
19   record shows that.
20      MS. O'DELL: Yes, she did.
21      MR. HEGARTY: Which ones did
22   she list?
23      MS. O'DELL: NTP. IARC.
24      MR. HEGARTY: Okay. Are you

Page 221

1  going on the record to say NTP has
2  concluded that talcum powder use
3  is a biologic
4  plausibility/plausible cause of
5  ovarian cancer?
6      THE WITNESS: We're not --
7      MS. O'DELL: She was talking
8   about inflammation and cancer, as
9   you well know.
10      MR. HEGARTY: Right, which
11   is why she's not answering my
12   question.
13      MS. O'DELL: No, no. Your
14   question was not in relation to
15   specific talc and biologic
16   plausibility.
17      So the doctor has answered
18   your question.
19      MR. HEGARTY: I think the
20   record will reflect otherwise.
21 BY MR. HEGARTY:
22   Q.   Doctor, listen to my
23 question --
24      MS. O'DELL: No, it will

56 (Pages 218 to 221)

Judith Zelikoff, Ph.D.

Page 222

1    not.
2    BY MR. HEGARTY:
3        Q.   Listen to my question.
4        Can you cite for me any
5    group besides the Canadian group who has
6    concluded that there is biologic
7    plausibility, who has made a statement
8    that there is biologic plausibility
9    between talcum powder use and ovarian
10   cancer?
11       A.   I'm telling -- as I said
12   before, you're leaving out the word
13   "inflammation."
14       Q.   Doctor, you -- you need to
15   answer the question I ask.
16       A.   I -- I --
17       Q.   Your counsel can come back
18   and ask you that question.  I under -- I
19   want to know the name of any organization
20   by name who has concluded that there is
21   biologic plausibility between perineal
22   use of talc and ovarian cancer.
23       A.   Anyone --
24       MS. O'DELL:  Other than the

Page 223

1    ones she -- she's listed.
2        THE WITNESS:  Anyone that
3    you say -- any -- I'll do it
4    again.  National Toxicology
5    Program.  IARC.  Institute of
6    Medicine.
7        They may not say the
8    sentence you are -- you are
9    implying or you're stating.  But
10   they all show that talc has --
11   produces inflammation.
12       I don't think that the -- I
13   think that's a very common
14   knowledge that talc or talcum
15   powder products does produce
16   inflammation.
17   BY MR. HEGARTY:
18       Q.   Doctor, where have you ever
19   published a methodology for determining
20   whether there is biologic plausibility
21   between an exposure and a disease?
22       A.   Almost every paper that I
23   have in my CV talks about the biological
24   plausibility for the observations that

Page 224

1    I've shown, whether it's in air pollution
2    or whether it's in tobacco products or
3    nicotine products or World Trade Center
4    dust or metal inhalation or nanoparticle
5    inhalation.  They all give biological
6    plausibility statements for the
7    observations that have been found in my
8    laboratory.
9        Q.   Where have you ever
10   published step-by-step methodology for
11   how you go about determining whether
12   there is biological plausibility between
13   a substance and a disease?
14       A.   I use my professional
15   judgment.
16       Q.   Have you ever published that
17   professional judgment?
18       MS. O'DELL:  Objection to
19   form.
20       THE WITNESS:  I don't think
21   that would be publishable
22   material.
23   BY MR. HEGARTY:
24       Q.   In the end, Doctor, your

Page 225

1    report is your subjective take on the
2    studies, correct?
3        MS. O'DELL:  Objection to
4    form.
5    BY MR. HEGARTY:
6        Q.   I mean, you don't speak for
7    any scientific group, do you?
8        A.   I'm an expert toxicologist,
9    recognized clearly by the Society of
10   Toxicology as an expert in my field.
11   And -- I'm sorry.  I --
12       Q.   Well, is your report
13   speaking for the society --
14       MS. O'DELL:  Excuse me.
15   BY MR. HEGARTY:
16       Q.   Is your report speaking for
17   the Society of Toxicology?
18       MS. O'DELL:  She wasn't
19   finished.
20       THE WITNESS:  I wasn't.  I
21   was --
22       MS. O'DELL:  She wasn't
23   finished.  Please let the witness
24   finish.

57 (Pages 222 to 225)

Judith Zelikoff, Ph.D.

---

Page 226

```
 1            MR. HEGARTY:  I'll withdraw
 2       the question.
 3   BY MR. HEGARTY:
 4       Q.   Doctor, do you speak for the
 5   Society of Toxicology for purposes of
 6   your opinions in your report?
 7       A.   No.
 8       Q.   Do you speak for any
 9   society, any toxicology society --
10   society for purposes of your opinions?
11       A.   You didn't let me finish my
12   answer.
13            I do not speak for the
14   society of toxicology.  But I am a
15   recognized toxicology expert, recognized
16   by the Society of Toxicology as an
17   expert.  And I have written this report
18   based upon literature, scientific
19   evidence, and my professional judgment.
20       Q.   What society has recognized
21   you as an expert in talc and ovarian
22   cancer?
23       A.   I'm recognized as expert in
24   toxicology.
```

Page 227

```
 1       Q.   What society has --
 2       A.   Society of Toxicology.
 3       Q.   Has the Society of
 4   Toxicology recognized you as an expert in
 5   talc and ovarian cancer?
 6            MS. O'DELL:  Objection to
 7       form.
 8            THE WITNESS:  I was
 9       recognized as an expert in tox and
10       ovarian cancer and talc by the
11       very basis that I'm sitting here.
12   BY MR. HEGARTY:
13       Q.   You don't speak for your
14   university, do you?
15       A.   No one -- no one speaks
16   directly for the university.  But what we
17   say, we understand our paychecks come
18   from the university, and we follow within
19   the university and the medical school
20   guidelines.
21       Q.   Are your opinions in this
22   case the opinions of New York University?
23       A.   This is my --
24            MS. O'DELL:  Objection to
```

Page 228

```
 1       form.
 2            You can answer.
 3            THE WITNESS:  This is my
 4       opinion based upon my systematic
 5       review of all the scientific
 6       literature.  And they -- by the
 7       nature of hiring me, they have
 8       approved of my -- my opinions.
 9       Maybe not specifically in this
10       case, but they would not have
11       hired me or kept me for 35 years
12       if they did not agree that I was a
13       well-known established
14       toxicologist whose opinions are
15       based in my professional judgment.
16   BY MR. HEGARTY:
17       Q.   Did you tell the university,
18   New York University, of your opinions in
19   this case?
20       A.   I did not.
21       Q.   Have you told them that
22   you're an expert witness for plaintiffs
23   in this litigation?
24       A.   I have, yes.
```

Page 229

```
 1       Q.   Have you reported, in your
 2   financial disclosure, the money that
 3   you've made in this litigation?
 4       A.   Up until -- we are asked
 5   that question -- we have to fill out
 6   reports on transparency and conflicts of
 7   interest.  And I think the last time I
 8   did it was in November of 2018.  And I
 9   reported up to that time, yes.  We are
10   required to do that and, yes, I am
11   completely transparent.
12            So any money that I've made
13   since November, or since the filing of
14   the confidentiality agreement has not
15   been reported but will be coming in March
16   or April.
17       Q.   You don't speak for any
18   journal for the purpose of your report,
19   do you?
20       A.   For purposes of this report
21   I do not speak for journals.  But I do
22   speak for journals because I'm an editor,
23   I'm an associate editor and on the
24   editorial boards for numerous
```

58 (Pages 226 to 229)

Judith Zelikoff, Ph.D.

| Page 230 |
|---|

1    environmental health and toxicology
2    journals.
3        Q.    At the top of Page 3 of your
4    report, you say in the first full
5    paragraph that you considered the studies
6    that did not find an increased risk of
7    ovarian cancer with talc use.
8            Do you see that?
9        MS. O'DELL:  What page are
10   you on?  I'm sorry.
11   BY MR. HEGARTY:
12       Q.    Page 3.
13       A.    I'm sorry.  I know we're on
14   Page 3.
15       Q.    The first full paragraph.
16       A.    My opinions below?
17       Q.    The first full paragraph.
18       A.    My opinions below.  "My
19   opinions below" --
20       Q.    At the very -- at the very
21   end, you say you considered those studies
22   that did not find an increased risk.
23           Do you see that?
24       A.    I'm reading it.

| Page 231 |
|---|

1            Yes, okay.  You were reading
2    in the middle of the sentence.  "To my
3    knowledge, I considered and evaluated the
4    majority of all available relevant
5    studies in the process of evaluating the
6    literature, including those that reported
7    an elevated risk of ovarian cancer with
8    exposure to talc and those where other
9    chemicals were reported within talc-based
10   body powders, including those that did
11   not find an increased risk."  Yes.
12       Q.    You did not cite a single
13   paper in your report that did not find an
14   increased risk of ovarian cancer with
15   talc use, did you?
16       MS. O'DELL:  Objection to
17   form.
18       THE WITNESS:  There were --
19   in reading over the meta-analysis
20   of -- I'm sorry, I'm probably
21   going to get his name wrong --
22   Penninkilampi.
23           In reading over the
24   meta-analysis of several -- from

| Page 232 |
|---|

1            several, there are case-control
2    studies as well as cohort studies
3    which showed negative
4    associations.
5    BY MR. HEGARTY:
6        Q.    You did not cite any of
7    those in your report, though, did you?
8        A.    No.  What I said -- I'm
9    sorry.  Let me try and make it clear.
10           Yes, those meta-analyses
11   were included in the report or -- I need
12   to find the names.  Systematic review
13   that I cited was
14   P-E-N-N-I-N-K-I-L-A-M-P-I 2018.  And that
15   was a meta-analysis which reviewed the
16   epidemiological case-control and cohort
17   studies which showed that there were
18   studies that had negative associations.
19       Q.    Is that the only reference
20   that you included in your report, to
21   studies that did not find an increased
22   risk of ovarian cancer with talc use?
23       MS. O'DELL:  Object to the
24   form.

| Page 233 |
|---|

1            THE WITNESS:  No.  No.
2        MS. O'DELL:  Excuse me.
3    Object to the form.
4        THE WITNESS:  No.  Under the
5    animal models on Page 13, there
6    were -- with rats that were
7    exposed by the peritoneum --
8    perineum, sorry, to either talc or
9    no treatment.  And while they did
10   find inflammatory response --
11   again, going back to my biological
12   plausibility -- they did not find
13   neoplasms.
14   BY MR. HEGARTY:
15       Q.    So that would be an example
16   of a study that did not show an increased
17   risk of ovarian cancer with talc use,
18   correct?
19       A.    That is --
20       MS. O'DELL:  Object to the
21   form.
22           Go ahead.
23   BY MR. HEGARTY:
24       Q.    Is that correct?

59 (Pages 230 to 233)

Judith Zelikoff, Ph.D.

Page 234

1      A.   Sorry.  Repeat the question.
2    Repeat the question, please.
3      Q.   Sure.  So that is an example
4    of a study that, in your opinion, does
5    not show an increased risk of ovarian
6    cancer with talc use?
7          MS. O'DELL:  Objection to
8    form.  Go ahead.  Sorry.
9          THE WITNESS:  Sorry.
10          This is a study which shows
11          biological plausibility by showing
12          that there is a foreign body
13          reaction and inflammatory
14          response.  However, it does not
15          show that there was any change in
16          neoplasm -- or any induction of
17          neoplasms or cancer.
18    BY MR. HEGARTY:
19      Q.   Did you read any cell study
20    that showed that talc is not cytotoxic?
21      A.   Can you please explain what
22    you mean by cytotoxic?  I want to answer
23    the question as you understand it.
24      Q.   What is your definition of

Page 235

1    cytotoxicity?
2      A.   I'd like to answer the
3    question that you're asking me.
4      Q.   I'm asking you your
5    definition.  The way a deposition works
6    is I ask you questions.  You don't ask me
7    questions.
8          MS. O'DELL:  Don't be --  be
9    courteous to the witness, please.
10          MR. HEGARTY:  I am.
11          THE WITNESS:  I appreciate
12          that.  I just want to, as a
13          toxicologist, the word
14          "cytotoxicity" carries many
15          meanings.
16    BY MR. HEGARTY:
17      Q.   What is your definition --
18    basic definition of cytotoxicity?
19      A.   There are many meanings.
20    Cytotoxicity taken literally meaning
21    toxicity to a cell.  Cyto, cell;
22    toxicity, toxic.  However, toxicity can
23    be measured by numerous endpoints.
24      Q.   Did you read any studies

Page 236

1    showing that talc was not toxic to cells?
2      A.   I read comparison studies.
3    Let me please find that, the exact names.
4      Q.   Let me withdraw the
5    question.  Doctor, in your opinion is
6    talc mutagenic?
7      A.   How do you define
8    "mutagenic"?
9      Q.   Doctor, what's your --
10    mutagenic is mutation to genes.  Does
11    talc mutate genes?
12      A.   Talc leads to changes in
13    gene expression which can be inferred as
14    a mutation.  However, when you talk about
15    mutation, you have many different
16    mechanisms of mutation.  Mutation can
17    occur as a result of a genotoxic or
18    direct impact on DNA, or it can occur as
19    a result of changes in the epigenome,
20    which leads to changes in expression of
21    the gene.
22      Q.   Does talc directly mutate
23    genes?
24      A.   Talc has been shown to

Page 237

1    cause -- to cause changes in particular
2    enzymes in the gene expression.  So a
3    mutation -- yes, it has been -- it has
4    been shown for mutation.  But I just
5    need -- I need the attorneys to
6    understand that there are many ways to
7    mutate a cell, not only can you do it by
8    chemical agent, but you can also -- it
9    occurs with aging.
10          So you do not need -- I'm
11    sorry.  You do not need genotoxicity to
12    produce mutagenesis.
13          Now, if you look at many
14    different assays such as the Ames assay
15    which uses bacteria to assess
16    mutagenicity, you are not going to see
17    that as a possibility for talc because
18    the bacteria cannot engulf the particle
19    and the particle needs to be ingested in
20    order to show mutagenesis.
21      Q.   Doctor, on Page 4 above your
22    section "fibrous talc" --
23      A.   I see it.
24      Q.   -- you refer to particle

60 (Pages 234 to 237)

Judith Zelikoff, Ph.D.

| Page 238 | Page 240 |
|---|---|

**Page 238**

1  size for talc.
2      A.   That's correct.
3      Q.   Is knowing particle size
4  part of your methodology for your
5  opinions in your report?
6      A.   I'm sorry.  I don't
7  understand what you mean by was it part
8  of my methodology.
9      Q.   Well, what is the threshold
10  size of a talc particle to establish
11  biologic plausibility?
12          MS. O'DELL:  Object to form.
13          THE WITNESS:  I don't think
14      you can answer that question.
15      In -- let me say this.
16          In doing my methodology and
17      accumulating literature, I -- as I
18      said, I binned or siloed
19      individual things.
20          And one of the silos and one
21      of the categories that I -- that I
22      wanted to read was size.  Size
23      makes a very big difference in
24      particles, and for example, if the

**Page 239**

1      particle is greater than
2      10 microns it's going to be what
3      we call inhalable as opposed to
4      respirable.  So where a particle
5      can go in terms of, and now I'm
6      using the lung as an example,
7      where the particle can go will
8      depend upon its size and how long
9      it will remain in a tissue.
10          So in my bins, in my silos
11      were -- certainly size was a
12      parameter.
13  BY MR. HEGARTY:
14      Q.   And what is the threshold
15  size of a talc particle to establish
16  biologic plausibility between talc and
17  ovarian cancer?
18          MS. O'DELL:  Objection to
19      the form.
20  BY MR. HEGARTY:
21      Q.   What size must the particle
22  be?
23          MS. O'DELL:  Objection to
24      form.

**Page 240**

1          THE WITNESS:  Establishing
2      my biological plausibility was --
3      was travel -- is traveling through
4      migration and the ability for a --
5      for the powder to migrate or the
6      constituents to migrate.  And --
7      and also the ability to be
8      inflammatory.
9  BY MR. HEGARTY:
10      Q.   Well, what size -- what size
11  of particle -- what size must the
12  particle be to cause inflammation that
13  leads to ovarian cancer?
14      A.   Particles of any --
15          MS. O'DELL:  Objection to
16      form.  You may go.
17          THE WITNESS:  Particles of
18      any size can cause inflammation.
19  BY MR. HEGARTY:
20      Q.   What about talc particles,
21  what size of talc particle must there be
22  to cause inflammation?
23      A.   Talc particles of any size
24  can cause inflammation.

**Page 241**

1      Q.   And is there --
2      A.   However, there are
3  differences, from reading the literature,
4  that indicates that the smaller the
5  particle the greater the inflammation.
6          And that's universally
7  known.
8      Q.   Was part of your analysis,
9  did you -- did that involve investigating
10  biologic plausibility as it relates to
11  particle size?
12      A.   That was -- that was part of
13  my reading and part of my -- my thought
14  process, my gathering of information,
15  yes.
16      Q.   And is there a certain size
17  of particle necessary to establish
18  biologic plausibility under your opinion?
19          MS. O'DELL:  Objection.
20      Asked and answered.
21          THE WITNESS:  Well, I do
22      think I answered that question.
23      But again there's really --
24      apart -- it is not just particle

61 (Pages 238 to 241)

Judith Zelikoff, Ph.D.

Page 242

1  size which is important in
2  producing an inflammation.  It is
3  many parameters.  And so there was
4  no one size or one cutoff that
5  induces inflammation or does not.
6  It's chemical composition, it's
7  shape of the particle, it's
8  bioavailability of the particle.
9  BY MR. HEGARTY:
10  Q.  Can you cite for me the --
11  the particle size for Johnson's Baby
12  Powder over the last 120 years?
13  MS. O'DELL:  Objection to
14  form.
15  THE WITNESS:  I'm not sure I
16  can cite it over the last
17  120 years.  But I can tell you
18  from the information in the
19  documents that I -- that I
20  reviewed, that particle size goes
21  from above 50 microns,
22  micrometers, microns, down to
23  0.3 micron with an average size of
24  10.5 to 11.5 depending on the

Page 243

1  document that you read.  So an
2  average or median size.
3  BY MR. HEGARTY:
4  Q.  So did you -- did you do
5  analysis for biologic plausibility
6  purposes of every size of talc particle?
7  MS. O'DELL:  Objection.
8  Asked and answered.
9  THE WITNESS:  Did I do
10  analysis -- I -- no, as I said, I
11  gave you the size of the -- of the
12  talcum that was reviewed, that I
13  reviewed within the documents.
14  BY MR. HEGARTY:
15  Q.  You, on -- on page -- strike
16  that.
17  Under the section Fibrous
18  Talc, you say that -- is it your
19  testimony that -- strike that.
20  Is it your opinion that
21  asbestiform talc is also called fibrous
22  talc?
23  A.  Talc and asbestos are -- are
24  different minerals.

Page 244

1  Q.  Well, fibrous talc is only
2  talc that grows in an -- in an
3  asbestiform habit, correct?
4  A.  Fibrous talc refers to the
5  shape and the longitudinal direction of
6  the fibers.  That's what fibrous talc is,
7  and asbestiform refers to the same
8  longitudinal pattern of the particular
9  fibrils and -- to form a bundle or to
10  form a fiber.
11  Q.  So you don't agree that
12  fibrous talc is only talc that grows in
13  an asbestiform habit?
14  MS. O'DELL:  Objection to
15  form.
16  THE WITNESS:  Fibrous talc
17  by its very nature is saying that
18  it grows in an asbestiform-like
19  phenotype or asbestiform-like
20  morphology.  That's the nature of
21  asbestiform.
22  Asbestiform is a form.
23  BY MR. HEGARTY:
24  Q.  You state in the middle

Page 245

1  paragraph, in that section, that talc in
2  its fibrous form has been classified by
3  IARC as Group I, a known carcinogen.
4  That's not correct, is it?
5  MS. O'DELL:  Objection to
6  form.
7  THE WITNESS:  I'm sorry,
8  could you say again?
9  BY MR. HEGARTY:
10  Q.  Well, you agree that only
11  talc containing asbestiform fibers has
12  been classified as Group I by IARC,
13  correct?
14  A.  Are you referring to in 2010
15  IARC expanded or -- I'm sorry, in its
16  fibrous form, talc has been classified as
17  a Group I known carcinogen?
18  Q.  Correct.
19  A.  Asbestiform fibers have been
20  listed by IARC as a carcinogen.
21  Q.  A talc containing
22  asbestiform fibers is the only form of
23  talc that's been designated as a class --
24  as a Category I carcinogen by IARC,

62 (Pages 242 to 245)

Judith Zelikoff, Ph.D.

Page 246

1   correct?
2       A.   It's not the only one that's
3   been associated with it, but for the
4   purpose of my report that I put down,
5   it's the asbestiform that has been
6   classified by the IARC.
7       Q.   Well, it's talc containing
8   asbestiform fibers, correct?
9           MS. O'DELL:  Objection to
10  form.
11          THE WITNESS:  It's -- it's
12  fibrous talc.
13  BY MR. HEGARTY:
14      Q.   Is that -- that's your --
15  your -- it's your opinion that IARC's
16  designation in 2012 is of asbestiform
17  talc?
18      A.   Their designations is
19  form -- is talc fibers, which are
20  asbestiform in nature.
21      Q.   Do you cite to any published
22  data in the medical literature that
23  asbestiform talc has been found in
24  Johnson's Baby Powder?

Page 247

1       A.   I'm sorry.
2           You cite -- do you cite to
3   any published data in the medical
4   literature that asbestiform talc...
5           The documents, the published
6   documents within Johnson & Johnson and
7   the Longo report, Longo's 2017, as well
8   as 2018 supplement from December, shows
9   asbestiform fibers.
10      Q.   My question though is can
11  you cite any data published in the
12  medical literature that has found
13  asbestiform talc in Johnson's Baby
14  Powder?
15      A.   I thought I just did in
16  terms of the Longo report.
17      Q.   Is the Longo report
18  published in the medical literature?
19      A.   It's -- I'm not sure whether
20  it's accessible in the medical -- medical
21  literature at this point.  But I'm sure
22  it could be gathered.
23      Q.   My -- my question is solely
24  as to the published medical literature.

Page 248

1   Can you cite for me any published medical
2   literature finding asbestiform talc in
3   Johnson's Baby Powder?
4       A.   Page 6 of my report speaks
5   of the Crowley report, and that the fiber
6   content ranged from 8 percent to
7   30 percent.  And that Pooley and Rohl
8   analyzed 27 talc powders and detected
9   tremolite fibers in three samples.
10      Q.   Is it your testimony that
11  Crowley -- Crowley's article refers to
12  Johnson's Baby Powder?
13      A.   I would have to see the
14  article.
15      Q.   How about Pooley and Rohl,
16  do they refer to Johnson's Baby Powder?
17      A.   I would have to see the
18  article.
19      Q.   In the end, for purposes of
20  your opinion as to asbestos and talc,
21  you're relying on the report of Longo and
22  Rigler, correct?
23          MS. O'DELL:  Objection to
24  form.

Page 249

1           THE WITNESS:  No, I rely on
2       the scientific literature, not on
3       any one paper.  I used weight of
4       evidence to come to my opinion.
5   BY MR. HEGARTY:
6       Q.   Did you include in your
7   weighing of evidence the expert reports
8   of Longo and Rigler?
9       A.   I read the Longo supplement
10  2018 after I wrote the report.
11      Q.   For purposes -- for purposes
12  of the opinions again in this case, do
13  you rely in any way on the Longo and
14  Rigler reports?
15          MS. O'DELL:  Objection to
16  form.
17          THE WITNESS:  I'm not sure I
18      understand your question.  As I
19      said, I wrote the report on
20      November 16th.  I read the Longo
21      supplement report in -- about two
22      weeks ago.
23  BY MR. HEGARTY:
24      Q.   But you cite in your report

63 (Pages 246 to 249)

Judith Zelikoff, Ph.D.

Page 250

1  the -- the MDL report of Longo and
2  Rigler, correct?
3      A.   What page is that please?
4      Q.   At the end of Exhibit B.
5      A.   I -- okay.
6           Excuse me.  I referred to
7  Longo on page -- there is no page.
8  Sorry.
9           The cosmetic talc in the
10 Lancet and cosmetic talc in -- and
11 ovarian cancer in the Lancet.  Those are
12 very early papers which I -- which I
13 reviewed.  Those papers were considered.
14 The latest papers from Longo were not
15 considered in my report.
16     Q.   Are you talking about the
17 latest --
18     A.   2017, 2018.  They were not
19 read until after the report was
20 finalized.
21     Q.   Do you know Longo and
22 Rigler?
23     A.   Not at all.
24          THE VIDEOGRAPHER:  Doctor,

Page 251

1      can you raise your microphone up?
2           THE WITNESS:  Oh, sure.
3  BY MR. HEGARTY:
4      Q.   Did you do anything to
5  assess their expertise in this area?
6      A.   I -- I --
7           MS. O'DELL:  Are you
8  referring to Dr. Longo and
9  Dr. Rigler?
10          MR. HEGARTY:  Yes.
11          THE WITNESS:  I read the --
12 the bio sketch, a brief, very
13 brief bio sketch of Ray Longo.
14 And I looked up his credentials in
15 terms of how long he's been in
16 the -- in this company, how he
17 started this company or at least
18 was president of this company for
19 a short period of time.
20          From what I know of my own
21 work in the laboratory and working
22 with other chemists and technical
23 instrumentation people in the
24 laboratory, I -- the XRD that they

Page 252

1      use, the polarized light
2  microscopy and the TEM all seem to
3  be the way he describes it.  His
4  methodologies were spot on in
5  terms of what other people do.
6  BY MR. HEGARTY:
7      Q.   Are you an expert in XRD?
8      A.   As I stated, I worked with
9  people who used the instrumentation.  An
10 expert, again, I'm not sure what you mean
11 by expert.  Have I done XRD on my own,
12 no.  But in our department we have
13 numerous people who -- who use that
14 instrumentation.
15     Q.   Are you an expert in TEM?
16     A.   I have done TEM for my Ph.D.
17 thesis.
18     Q.   Have you do TEM -- have you
19 ever done TEM to detect asbestos?
20     A.   I have not done TEM to
21 detect asbestos.  But I looked at his
22 methodologies, his study design, and the
23 instruments that he used.  And they are
24 state of the art.

Page 253

1      Q.   Have you ever performed the
2  test that he describes in his articles or
3  reports?
4      A.   I have used polarized light
5  microscopy.
6      Q.   That's not my question.  My
7  question is have you performed the same
8  tests in your lab or in any -- in your
9  experience that he has performed and
10 reported on in his reports?
11     A.   Personally, no.
12     Q.   Starting on Page 5, you talk
13 about asbestos.
14     A.   Page 5 of what?
15     Q.   Of your report.
16     A.   Thank you.
17     Q.   Is it your opinion that any
18 amount of exposure to asbestos, even to a
19 single fiber, can cause disease?
20     A.   From the scientific
21 literature it is -- it appears -- it
22 appears pretty conclusive that there is
23 no threshold for the amount of
24 asbestiform asbestos that is needed to at

64 (Pages 250 to 253)

Judith Zelikoff, Ph.D.

| Page 254 | Page 256 |
|---|---|
| 1  least start a disease process.<br>2      Q.   Before being contacted by<br>3  counsel for plaintiffs in this case, had<br>4  you read any literature concerning<br>5  asbestos and ovarian cancer?<br>6      A.   I have not read literature<br>7  prior to that on asbestos and ovarian<br>8  cancer.  However, I am familiar with, as<br>9  I said, other particles, other dusts,<br>10  other fibers that I have worked with in<br>11  the laboratory.<br>12      Q.   Had you even heard of a link<br>13  between asbestos and ovarian cancer<br>14  before being contacted by plaintiffs'<br>15  counsel?<br>16      A.   Yes.<br>17      Q.   Where did you hear that<br>18  from?<br>19      A.   Discussed it with my<br>20  colleagues.  As I said, I've listened to<br>21  the media on discussing it.  And my<br>22  colleagues are a very good source,<br>23  although they do not do this work in<br>24  their laboratory, we all try to keep up | 1      THE WITNESS:  I don't think<br>2  that's -- I don't think that's --<br>3  I don't personally think that's<br>4  the question.<br>5      The question is, asbestos is<br>6  well classified, well known as a<br>7  Class 1 carcinogen by IARC.  And<br>8  one fiber has the potential to<br>9  initiate the biological processes<br>10  or provides biological<br>11  plausibility that there, in fact,<br>12  by producing inflammation and<br>13  producing reactive oxygen<br>14  intermediates, one fiber can start<br>15  the process for ovarian cancer.<br>16      And again, let me just<br>17  repeat that my mission, my<br>18  question that was asked, was to<br>19  provide biological plausibility<br>20  for talc, not to define causation<br>21  as an epidemiologist.<br>22  BY MR. HEGARTY:<br>23      Q.   So it's your opinion that a<br>24  single fiber of asbestos in talc can |

| Page 255 | Page 257 |
|---|---|
| 1  with the latest emerging scientific<br>2  debates.<br>3      Q.   What is the minimum number<br>4  of asbestos fibers necessary to cause<br>5  ovarian cancer?<br>6      A.   Can -- do you mean -- I said<br>7  that there is really no threshold.  And<br>8  it can be one fiber.  It depends on the<br>9  individual and the susceptibilities of the<br>10  individual and the vulnerabilities of that particular<br>11  individual.<br>12      Q.   So it's your opinion that<br>13  one fiber of asbestos can cause ovarian<br>14  cancer?<br>15      A.   Under certain conditions,<br>16  yes, it is my opinion.<br>17      Q.   Can you cite for me any<br>18  authority for that opinion specific to<br>19  one fiber?<br>20      MS. O'DELL:  Object to form.<br>21  BY MR. HEGARTY:<br>22      Q.   And ovarian cancer.<br>23      MS. O'DELL:  Object to the<br>24  form. | 1  establish biological plausibility between<br>2  talc and ovarian cancer?<br>3      A.   My --<br>4      MS. O'DELL:  Object to the<br>5  form.<br>6      THE WITNESS:  My opinion is<br>7  that a single fiber can induce<br>8  inflammation and reactive oxygen<br>9  species and can change the cell<br>10  into a pro-oxidant cell that<br>11  starts the process for ovarian<br>12  cancer.<br>13  BY MR. HEGARTY:<br>14      Q.   Do you agree that there are<br>15  background rates of asbestos in certain<br>16  areas?<br>17      A.   Do you mean in the air?<br>18      Q.   In the air?<br>19      A.   In the air, it depends on<br>20  that area.  If that's an area where<br>21  there's mining and there's a house being<br>22  redone from the 1970s or 19 -- early '80s<br>23  that might have used asbestos, then there<br>24  will be asbestos in the air.  But not |

65 (Pages 254 to 257)

Judith Zelikoff, Ph.D.

Page 258

1  sitting in this room, unless there is
2  asbestos in the walls, which I doubt
3  because it was only built about ten years
4  ago.
5      Q.   Do the background rates of
6  asbestos in certain areas cause ovarian
7  cancer?
8      A.   Asbestos has been shown to
9  cause ovarian cancer by inhalation, yes.
10     Q.   Is it your opinion that
11 background rates of asbestos in the air
12 can cause ovarian cancer?
13     MS. O'DELL:  Object to the
14     form.
15     THE WITNESS:  I don't --
16     again, background rates, it has
17     been shown that workers that are
18     in places where asbestos is made
19     have a higher incidence of lung
20     cancer as shown by Dr. Selikoff
21     many, many years ago.
22 BY MR. HEGARTY:
23     Q.   Doctor, you know what a
24 background rate of -- background level of

Page 259

1  a particle in air is, right?
2      A.   Yes, sir, I do.
3      Q.   Okay.  And is it your
4  opinion that background levels of
5  asbestos in the air can cause ovarian
6  cancer?
7      MS. O'DELL:  Objection to
8      form.
9      THE WITNESS:  As I said,
10     sitting in this room, there should
11     not be any background level of
12     asbestos.  So if you're talking
13     about background level in a
14     particular institute or industry
15     where they're developing it, those
16     levels are quite high, and yes, I
17     do believe that those levels
18     within a working environment can
19     indeed cause inflammation that can
20     lead to causation.
21 BY MR. HEGARTY:
22     Q.   There are background levels
23 of asbestos in the air in New York City,
24 correct?

Page 260

1      A.   It depends.  After the World
2  Trade Center, there was.
3      Q.   Are those background
4  levels -- do those background levels
5  cause ovarian cancer?
6      MS. O'DELL:  Objection to
7      the form.
8      THE WITNESS:  The studies
9      that have been done by my
10     colleagues in the aftermath of the
11     World Trade Center disaster where
12     asbestos was generated have not at
13     this time -- and New York City
14     Public Health has not at this time
15     looked at ovarian cancer.  Ovarian
16     cancer occurs within 10 to 30, up
17     to 40 years later.  So since 9/11
18     was only 2001, there is -- there
19     is not sufficient time to have
20     developed ovarian cancer.
21 BY MR. HEGARTY:
22     Q.   Doctor, before 9/11 there
23 were background levels of asbestos in
24 certain parts of New York City, correct?

Page 261

1      A.   When there are houses that
2  were built with it.  There is -- asbestos
3  is not just -- should not be -- unless
4  there's a source, asbestos should not --
5  it would not be coming from jet engines.
6  It would not be coming from other
7  sources.  If it's there, it came from a
8  specific source.  It's like we should not
9  have lead in our body at all.  But we do
10 because the lead came from the air where
11 there was lead in the gasoline.
12     So there shouldn't be
13 background levels of asbestos just
14 hanging around unless there's an adequate
15 source that produced it.
16     Q.   Does EPA allow background
17 levels of asbestos in water?
18     A.   I'm not familiar with that
19 information.  That's in water.  You asked
20 me about air.
21     Q.   I asked you a different
22 question.  I can ask you a different
23 question, Doctor.
24     A.   I understand the question,

66 (Pages 258 to 261)

Judith Zelikoff, Ph.D.

Page 262

1    yes.
2        Q.    Does EPA allow background
3    levels of asbestos in water?
4        A.    I have not reviewed that
5    literature.
6        Q.    As a toxicologist, you agree
7    that dose or level of exposure determines
8    the toxicity of substances, correct?
9            MS. O'DELL:  Object to the
10           form.
11           THE WITNESS:  I believe that
12           dose as well as frequency,
13           duration, time of exposure are
14           all -- as well as dose contribute
15           to the toxicity of an agent.
16   BY MR. HEGARTY:
17       Q.    You agree that a substance
18   can produce a harmful effect only if it
19   reaches a susceptible biological system
20   within the body in high enough
21   concentration, correct?
22           MS. O'DELL:  Objection to
23           form.
24           THE WITNESS:  It depends on

Page 263

1            the -- let me read your question
2            over.  It was a lengthy question.
3            It depends on the -- on the
4            toxicant that you're talking
5            about.  There is dose that you're
6            exposed to, or concentration that
7            you're supposed to, and dose to
8            the target tissue.  And for every
9            different -- every different
10           chemical, there is a different
11           target dose that could start a
12           biological process.
13   BY MR. HEGARTY:
14       Q.    And what is the target dose
15   that is necessary to start the biologic
16   process of talc and ovarian cancer?
17           MS. O'DELL:  Object to the
18           form.
19           THE WITNESS:  Well, if
20           you -- if you look at talc as a
21           whole, to give you a
22           concentration, a threshold
23           concentration, I'm not sure that
24           has been -- I don't -- that has

Page 264

1            not been done.
2               There are -- there is
3            information on no observable
4            adverse effect level that has been
5            established using a dose-response
6            by the NTP, National Toxicology
7            Program.
8               And two milligrams of talc
9            that they used produced minimal --
10           minimal affects in the rats and
11           mice that they tested.  So
12           somewhere below at least, from an
13           inhalation perspective, is --
14           produces no effect.
15              However, they saw effects
16           even at the lowest, two milligrams
17           per.
18   BY MR. HEGARTY:
19       Q.    My question was specific to
20   ovarian cancer.  That study did not --
21   did not identify any ovarian cancers in
22   the mice -- in the mice or rats, correct?
23       A.    That's not what they looked
24   for.

Page 265

1        Q.    My question is specific to
2    ovarian cancer.
3        A.    Let me read your question
4    over again.  Could you repeat your
5    question.  It's already gone past.
6        Q.    What is the target dose that
7    is necessary to start the biologic
8    process of talc and ovarian cancer?
9        A.    Well, as I talked about, one
10   fiber of asbestos could start the
11   biological process.  It is not clear if
12   there is a threshold dose or a
13   concentration, or whether one -- and
14   we're talking about the whole talcum
15   powder product.  We're not talking about
16   any one product.  You're talking about
17   the whole process and how much it will
18   start the biological process.
19              It's unknown, it's not in
20   the literature.  But I will tell you that
21   even small doses that are used of the
22   talcum -- of a talcum product, if you
23   take a woman who takes a handful, if you
24   take a woman that takes a little bit on a

67 (Pages 262 to 265)

Judith Zelikoff, Ph.D.

| Page 266 | Page 268 |
|---|---|

**Page 266**

1  powder puff, that amount could even,
2  depending upon the woman, the
3  susceptibility, the vulnerability, can
4  all start the process.
5      We're talking about the
6  process, in my opinion. What you're
7  talking about and in the opinion that I
8  report here, is that that can start an
9  inflammatory process.
10     Q.   And what is the number of
11 particles of talc necessary to start the
12 biologic process?
13     MS. O'DELL: Object to form.
14     THE WITNESS: That is not in
15 the scientific literature.
16 BY MR. HEGARTY:
17     Q.   Over Pages 6 through 8 of
18 your report you discuss asbestos. Is the
19 presence of asbestos in talc necessary
20 for your biologic plausibility opinions?
21     A.   I looked at the entire
22 product.
23     Q.   Well, do you intend to
24 testify that there is biologic

**Page 268**

1      THE WITNESS: Can -- can you
2  address the question again?
3  BY MR. HEGARTY:
4      Q.   Is it your opinion that pure
5  talc does not exist?
6      When I say pure talc, I mean
7  talc without asbestos, without heavy
8  metals, without fragrance.
9      MS. O'DELL: Objection to
10 form.
11     THE WITNESS: The idea of
12 talc is that it has, within its
13 lattice, metals.
14     So platy talc refers to the
15 structure or the morphology of the
16 talc, how it looks, what
17 dimensions it's in.
18     So, do I think there is
19 platy talc? Of course there is
20 platy talc.
21 BY MR. HEGARTY:
22     Q.   Is there platy talc without
23 asbestos?
24     A.   Well, according to the

**Page 267**

1  plausibility between pure talc, the platy
2  talc, and ovarian cancer?
3      MS. O'DELL: Object to the
4  form.
5      THE WITNESS: I don't
6  think -- my opinion is that there
7  may not be anything such as platy
8  talc in a pure form.
9  BY MR. HEGARTY:
10     Q.   Okay. It's your opinion
11 that pure talc does not exist?
12     MS. O'DELL: I'm not sure
13 she -- she finished her answer.
14     Had you finished, Doctor,
15 before?
16     THE WITNESS: I actually
17 need a little water.
18     MS. O'DELL: Okay. Sure.
19     Had you finished your answer
20 before the second question was
21 asked?
22     THE WITNESS: No.
23     MS. O'DELL: Okay. You may
24 finish.

**Page 269**

1  studies out of Mossman's laboratories,
2  they used asbestos, they used talc that
3  contained nonfibrous talc.
4      Q.   Do you have an opinion on
5  whether there is talc without asbestos?
6      MS. O'DELL: Object to the
7  form.
8      THE WITNESS: In many of the
9  documents from Johnson & Johnson,
10 they measured fibrous talc as well
11 as other forms, non-asbestiform,
12 and they -- they found that there
13 were samples, individual samples
14 that they reported as
15 nondetectable as having
16 asbestiform talc.
17 BY MR. HEGARTY:
18     Q.   Well, do you have an opinion
19 of whether there is talc without
20 asbestos?
21     A.   It depends where -- where
22 it's mined. If it's mined in an area
23 where people were extremely cautious,
24 there could be.

68 (Pages 266 to 269)

Judith Zelikoff, Ph.D.

| Page 270 |
|---|

1    Q.   Did you do analysis of
2  biologic plausibility for talc without
3  asbestos?
4           MS. O'DELL:  Objection to
5       form.
6           THE WITNESS:  My biological
7       assessment, my -- my biological
8       plausibility was looking at the
9       entire product of talcum powder.
10  BY MR. HEGARTY:
11    Q.   And how do you define the
12  entire product?
13    A.   The entire product is
14  whatever are the ingredients or listed
15  within the documents or the test results
16  from Imerys that -- that indicate what
17  they measured, including the metals, the
18  asbestos, the -- the asbestiform fibers,
19  the fragrances.
20    Q.   So you did your biologic
21  plausibility analysis with -- based on
22  talc has asbestos, heavy metals and
23  fragrance in it, correct?
24           MS. O'DELL:  Objection to

| Page 271 |
|---|

1       form.
2           THE WITNESS:  I did my
3       biological plausibility on talcum
4       powder products.
5           I looked at individual
6       products, individual constituents
7       in adding to my -- to my report,
8       to my document.  But I looked at
9       the entire product.  And it is my
10       opinion that the entire product
11       causes inflammation and that
12       inflammation then goes on as a
13       triggering mechanism to turn on
14       certain genes and to bind iron
15       that can lead to the changes
16       needed for cancer in the ovary.
17  BY MR. HEGARTY:
18    Q.   You did not do a separate
19  analysis of talc without asbestos or
20  without -- and without heavy metals and
21  without fragrance, correct?
22           MS. O'DELL:  Object to the
23       form.
24           THE WITNESS:  I'm not even

| Page 272 |
|---|

1       sure how that would be done or I
2       don't think it could be done.
3           What I did was I did it for
4       the entire product.
5  BY MR. HEGARTY:
6    Q.   And what do you -- what do
7  you think -- what is your opinion --
8  strike that.
9           What is in the entire
10  product in your opinion?
11    A.   Based upon the Johnson &
12  Johnson documents.  That's where my --
13  that's where I will tell you what is in
14  there.
15           As -- as far as the product
16  documents, it indicates that there are
17  metals, including -- not -- not totally
18  inclusive of, but to mention a few of the
19  more well-known ones, cobalt, chromium
20  and nickel.
21           There are also, according to
22  the Crowley report, there are also many
23  chemicals that make up a fragrance.  And
24  there -- and in many of the samples

| Page 273 |
|---|

1  tested, there was asbestos or asbestiform
2  fibers, some of which were called fibrous
3  talc, others were called asbestiform and
4  others in which they were called asbestos
5  fibers, or amphiboles or anthophyllite.
6    Q.   Did you review all the
7  test --
8    A.   Anthophyllite.
9    Q.   I'm sorry.
10           Did you review all the
11  testing documents produced by Johnson &
12  Johnson and Imerys in this case?
13    A.   I reviewed the documents
14  that are in the production document black
15  binder to my right.
16    Q.   Those were provided to you
17  by plaintiffs' counsel, correct?
18    A.   That is correct.
19    Q.   Did you ask them if they
20  provided to you all testing documents
21  that had been produced in this case with
22  regard -- by Johnson & Johnson and
23  Imerys?
24    A.   I did not ask that question

69 (Pages 270 to 273)

Judith Zelikoff, Ph.D.

Page 274

1    specifically.
2        Q.   Do you know whether there
3    are additional documents of tests --
4    documents describing tests that were done
5    by Johnson & Johnson and/or Imerys with
6    regard to asbestos, heavy metals,
7    fragrances and talc?
8            MS. O'DELL:  Object to form.
9            THE WITNESS:  Plaintiff
10       counsels and myself did talk about
11       that, some of that information,
12       and --
13           MS. O'DELL:  Doctor,
14       don't -- in terms of our
15       conversations --
16           THE WITNESS:  I'm sorry.
17           MS. O'DELL:  -- those
18       conversations are our work
19       product.
20           But to the degree that your
21       answer doesn't depend on our
22       conversations, you may -- you may
23       answer.
24           THE WITNESS:  I -- I made it

Page 275

1        clear that I would like to see
2        documents that could go into my
3        assessment of biological
4        plausibility.
5    BY MR. HEGARTY:
6        Q.   Would you like to see
7    documents showing that there is no
8    asbestos in talcum powder, in particular
9    Johnson's Baby Powder?
10       A.   I will review any documents
11   that are provided to me, if asked to
12   review them.
13       Q.   Did you ask plaintiffs'
14   counsel to provide you documents of
15   testing showing no asbestos in Johnson's
16   Baby Powder?
17       A.   Many of those -- of the
18   documents that are in the product
19   production document show that there are
20   samples that do not contain asbestos, or
21   I will say asbestiform or talc fibers.
22   So there is information in there showing
23   when there is -- it is present and
24   information in there showing when it was

Page 276

1    not present.
2        Q.   You relied on plaintiffs'
3    counsel to select for you the testing
4    documents that you reviewed, correct?
5        A.   I -- I read and reviewed
6    whatever they sent me.
7        Q.   And did you do anything to
8    verify that you had all the documents
9    regarding the testing of Johnson's Baby
10   Powder?
11       A.   I did nothing personally
12   other than ask the -- the attorneys if
13   there was anything else I needed in
14   forming my opinion.  In -- of production
15   documents, if we're just referring to
16   that.
17           I have no access to
18   production documents on my own or through
19   the internet.  And I know none of the
20   other deposees.
21       Q.   Did you do a comparison of
22   biologic plausibility across various
23   brands of talcum powder products?
24       A.   I did not personally do any

Page 277

1    of that.  However many of the documents
2    and many of the studies including the
3    Longo supplement did compare, for
4    example, I think I misspoke when I said
5    one of the places that Johnson & Johnson
6    gets their talc is Korea.  What I meant
7    was China.  I should have said Asia.  So
8    Korea is also a mine that provided, but
9    not to Johnson & Johnson.
10           MS. O'DELL:  Hey, Mark,
11       we've been going about an hour and
12       15 minutes.
13           MR. HEGARTY:  Okay.
14           MS. O'DELL:  Can we take a
15       break?
16           MR. HEGARTY:  Yeah.
17           THE VIDEOGRAPHER:  The time
18       is 2:27 p.m.  Off the record.
19           (Short break.)
20           THE VIDEOGRAPHER:  We are
21       back on the record.  The time is
22       2:45 p.m.
23   BY MR. HEGARTY:
24       Q.   Doctor, if evidence was that

70 (Pages 274 to 277)

Judith Zelikoff, Ph.D.

| Page 278 | Page 280 |
|---|---|
| 1 there is no asbestos in Johnson's Baby<br>2 Powder, would that change your opinions<br>3 as to biological plausibility?<br>4    A.   No, sir, it would not.<br>5    Q.    Same question with regard to<br>6 heavy metals.  If there were no heavy<br>7 metals in Johnson's Baby Powder, would<br>8 that change your opinions on biological<br>9 plausibility?<br>10    A.   I looked at the entire<br>11 product and it would not -- it would not<br>12 change my opinion, as it exists<br>13 currently, with biological plausibility<br>14 that it would cause ovarian cancer<br>15 through -- through inflammation, is my<br>16 opinion.<br>17    Q.    In looking at your heavy<br>18 metals section, beginning at Page 8 of<br>19 your report -- are you there?<br>20    A.   I'm not.  I had to put my<br>21 glasses on.  Thank you.<br>22    Q.    There are no studies that<br>23 have looked at the effects of these<br>24 metals in powder dusted on the perineum, | 1 ludicrous actually.<br>2    Q.    None of the studies that you<br>3 cite in your heavy metals section link<br>4 the exposures that you discussed to<br>5 ovarian cancer risk, correct?<br>6       THE WITNESS:  I'm sorry.<br>7 This is not coming up.<br>8       (Whereupon, a discussion was<br>9 held off the stenographic record.)<br>10       THE WITNESS:  They -- the<br>11    studies that I list for the<br>12    individual metals talk about the<br>13    potential inflammatory and<br>14    carcinogenic potential of those<br>15    particular metals.  And based on<br>16    the Crowley report, there are, and<br>17    other production documents from<br>18    Johnson & Johnson, they list three<br>19    particular metals that are<br>20    associated with Johnson & Johnson<br>21    products, cobalt, nickel and<br>22    chromium.<br>23 BY MR. HEGARTY:<br>24    Q.    That was not my question. |

| Page 279 | Page 281 |
|---|---|
| 1 correct?<br>2    A.    Your question is there are<br>3 no studies looking at these individual<br>4 metals?<br>5    Q.    Correct?<br>6    A.    Perineal studies in the<br>7 ovarian --<br>8    Q.    No, my question is, there<br>9 are no studies that looked at the effects<br>10 of these metals in powder dusted on the<br>11 perineum, correct?<br>12    A.    I'm not sure I understand<br>13 your question.<br>14    Q.    You don't cite any studies<br>15 that have looked at the effect of<br>16 applying these metals to the perineum,<br>17 correct?<br>18    A.    To my knowledge, there are<br>19 no specific animal studies that show<br>20 nickel was applied to the perineal.<br>21    Q.    There are no human studies<br>22 either, correct?<br>23    A.    To my knowledge, there are<br>24 no human studies.  That would be | 1 My question is, none of the studies that<br>2 you cite --<br>3    A.    On the --<br>4    Q.    -- in your section on heavy<br>5 metals, evaluate ovarian carcinogenicity<br>6 potentials of these metals, correct?<br>7       MS. O'DELL:  Object to the<br>8    form.<br>9       THE WITNESS:  I do not talk<br>10    about ovarian cancer in particular<br>11    relation to these three metals<br>12    that I cited --<br>13 BY MR. HEGARTY:<br>14    Q.    No studies --<br>15    A.    -- in the report.<br>16    Q.    -- that you cite refer to<br>17 risk of ovarian cancer with exposure to<br>18 these metals, correct?<br>19    A.    With my charge being<br>20 biological plausibility, I thought that<br>21 it was my opinion -- my professional<br>22 opinion is that it was more important to<br>23 discuss the potential for inflammatory<br>24 responsiveness and carcinogenic |

71 (Pages 278 to 281)

Judith Zelikoff, Ph.D.

Page 282

1    potential.
2        Q.    Doctor, you don't cite any
3    studies that look at -- look at the
4    ovarian carcinogenicity potential of any
5    of these metals, correct?
6            MS. O'DELL:  Object to form.
7            THE WITNESS:  Not in my
8    report.
9    BY MR. HEGARTY:
10       Q.    What are the exposure levels
11   of these metals necessary to have
12   biologic plausibility of ovarian cancer?
13       A.    As far as biological
14   plausibility of these metals, these
15   metals are -- unless there are particular
16   standards for a particular metal, nothing
17   is really established for what it would
18   take for nickel to cause ovarian cancer.
19       However, the ability of
20   these metals to produce inflammation are
21   very, very low levels.  And if they
22   produce inflammation, then they have the
23   potential to go on to produce cancer.
24   And many of these metals do.

Page 283

1        Q.    Well, none of these studies
2    report a threshold level of exposure to
3    cobalt, chromium, or nickel to increase
4    the risk of ovarian cancer, correct?
5            MS. O'DELL:  Object to the
6    form.
7            THE WITNESS:  That was not
8        the purpose of my writing.
9            My -- my writing was to
10       exemplify the carcinogenic
11       potential and the inflammatory and
12       some of the human health effects
13       that are commonly seen.  Ovarian
14       cancer is not that common.  And so
15       it's not unusual that other --
16       that ovarian cancer was not looked
17       into in some of these studies.
18   BY MR. HEGARTY:
19       Q.    Well, you found no studies
20   looking at exposure to any of those
21   metals and risk of ovarian cancer,
22   correct?
23       A.    It's not that I didn't find
24   any.  I wasn't particularly looking for

Page 284

1    them.
2        Q.    Did you find any?
3        A.    Again, the purpose of
4    writing this section on heavy metals had
5    to do with bringing out the inflammatory
6    and the biological plausibility that in
7    my mind is linked to talc and ovarian
8    cancer.
9        Q.    Doctor, listen to my
10   question.  Did you find any studies
11   reporting on a risk of ovarian cancer
12   with exposure to any of those metals?
13           MS. O'DELL:  Objection to
14       form.
15           THE WITNESS:  I found in
16       cobalt, but it does not have to do
17       with ovarian cancer, but I did
18       find that the absorption of cobalt
19       is much higher in women than in
20       men.  And that many of these
21       studies show that you have
22       increased proliferation.  And as I
23       said, mine was -- my question that
24       I needed to address was biological

Page 285

1    plausibility.
2        So I did find many of these
3    factors, many of these metals, all
4    of these metals have the potential
5    to produce the changes that are in
6    the carcinogenic process.
7    BY MR. HEGARTY:
8        Q.    I'm going to ask the
9    question one more time.  And if we don't
10   get an answer I'm going to call Judge
11   Pisano.
12           Cite for me, which study did
13   you find that linked exposure to these
14   metals to ovarian cancer?
15           MS. O'DELL:  Objection to
16       the form.
17           Dr. Zelikoff has answered
18       your question multiple times.
19           But you may answer it again.
20   BY MR. HEGARTY:
21       Q.    Let me ask it differently.
22   Did you find any studies reporting on a
23   risk of ovarian cancer with exposure to
24   any of these metals, that being cobalt,

72 (Pages 282 to 285)

Judith Zelikoff, Ph.D.

Page 286

1  chromium, or nickel?
2      A.  I was not looking
3  specifically for that.  So, no, I did not
4  find that.
5      Q.   Which of the studies that
6  you report show that the exposure levels
7  evaluated in those studies are in any way
8  related to human exposure levels through
9  Johnson's Baby Powder?
10     MS. O'DELL:  Object to the
11     form.
12     THE WITNESS:  Are you
13     talking about inhalation or
14     perineal application?
15 BY MR. HEGARTY:
16     Q.   Either method of exposure.
17     A.   So many of the inhalation
18 numbers are concentrations, and looking
19 at the Johnson & Johnson documents in
20 terms of what is in the head and in the
21 face area after diapering as well as
22 during powdering, indicates that the
23 concentrations that are possibly inhaled
24 contain particles that can initiate a

Page 287

1  response.
2      Also, from looking at the
3  Johnson & Johnson documents, many of
4  those results indicate -- and I think we
5  have an exhibit here of the table of the
6  concentrations that were found.
7      Well, it's not at my local
8  fingertips here.  But --
9      MS. O'DELL:  Are you looking
10     for Exhibit C, Doctor, I think
11     it's right there with -- on
12     your -- on your paper clip.
13     MR. HEGARTY:  Let me
14     withdraw the question.
15 BY MR. HEGARTY:
16     Q.   Doctor, how much nickel,
17 cobalt and chromium reach the ovary with
18 one application of Johnson's Baby Powder
19 to the perineum?
20     MS. O'DELL:  Object to the
21     form.
22     THE WITNESS:  Since much of
23     the -- since Johnson's Baby Powder
24     has a high concentrations of some

Page 288

1      of these metals in terms of parts
2      per million, whatever talc reached
3      there, there's -- there is a
4      strong potential that that amount
5      of the concentration of the metal
6      would also reach the target organ.
7  BY MR. HEGARTY:
8      Q.   That's not my question,
9  Doctor.
10     How much nickel, cobalt and
11 chromium reached the ovary with a single
12 application of Johnson's Baby Powder to
13 the perineum?
14     A.   I don't have -- that
15 information is not available.
16     They did show in studies, in
17 a few studies, I think it was the
18 Hamilton study that -- or Henderson
19 study -- that there -- talc indeed does
20 reach the ovary from perineal application
21 or from intravaginal application.  And
22 whatever is -- whatever the concentration
23 is that reached the ovary, carried with
24 it these -- one -- one or more or all of

Page 289

1  these three metals.
2      Q.   You agree --
3      A.   So it was a similar
4  concentration.
5      Q.   You agree that all of the
6  metals you talk about are in -- are all
7  around us, they are in food, correct?
8      A.   The metals nickel, chromium,
9  cobalt can be in food, yes.
10     Q.   They are in the air,
11 correct?
12     A.   They are in certain ambient
13 environments.
14     Q.   These are metals that are
15 considered ubiquitous, correct?
16     MS. O'DELL:  Objection to
17     the form.
18     THE WITNESS:  They are --
19     chromium not as much -- I'm sorry,
20     cobalt not as much.  But chromium
21     and nickel, they are in the air,
22     and depending upon the environment
23     that is producing it, if you go to
24     Sundre, Canada, you can have lots

73 (Pages 286 to 289)

Judith Zelikoff, Ph.D.

Page 290

1    of nickel in the air.  But if you
2    go to New York City, concentrate
3    as we've measured in my laboratory
4    prior to this deposition, or prior
5    to this case, my involvement in
6    this case, you will see very small
7    concentrations of nickel.  There
8    should not be a lot in the air.
9        And we also measured
10   chromium, and it should not be --
11   unless you have a polluted
12   environment there should not be a
13   lot of these metals in the air.
14   BY MR. HEGARTY:
15       Q.   Is the metal are not -- the
16   metals that are in the air, nickel and
17   chromium, sufficient to have biologic
18   plausibility between those metals and
19   ovarian cancer?
20       A.   Those -- those metals, yes,
21   the metals in the air can cause an
22   inflammatory response.  The
23   concentrations of the metals in the air
24   can cause an inflammatory response and

Page 291

1    can start processes and change gene
2    expression within cells.
3        Q.   Cite for me any study that
4    shows that inflammatory response has ever
5    occurred in the ovary.
6        MS. O'DELL:  Objection to
7        form.
8        THE WITNESS:  There are
9        granulomas that have been found in
10       animal studies of -- in the lung.
11       You are talking about in the
12       ovary, I understand that.
13   BY MR. HEGARTY:
14       Q.   I'm talking about the
15   studies that have not looked at talc, but
16   have looked at cobalt, chromium --
17       A.   Okay.
18       Q.   -- nickel and cobalt without
19   regard to talc, cite for me any studies
20   that have shown that those metals have
21   caused inflammation in the ovary?
22       A.   By themselves, there are no
23   studies that demonstrate that, that I'm
24   aware of.

Page 292

1        Q.   Did you do an analysis
2    yourself of Johnson's Baby Powder for the
3    presence of these heavy metals?
4        A.   I did not do any
5    instrumentation studies measuring the
6    amount.  I -- I relied on the documents.
7        Q.   But you are capable of doing
8    that analysis, correct?
9        A.   We are capable, in my
10   laboratory, along with colleagues, of
11   measuring by XRF, x-ray fluorescence, and
12   by ICP mass spec, measuring the amounts
13   of metals in tissues, correct.
14       Q.   But you did not do that
15   testing here, correct?
16       A.   My job was to define
17   biological plausibility based upon
18   literature, relevant literature and
19   documents, internal documents.
20       Q.   Nowhere in your report do
21   you identify the exposure levels of any
22   of these metals that are necessary to
23   cause ovarian cancer, correct?
24       MS. O'DELL:  Objection to

Page 293

1        form.  Asked and answered.
2        THE WITNESS:  There is no
3        literature that says you need one
4        particle or ten particles.
5        The inflammatory response
6        that nickel causes is extremely
7        well established, even at very low
8        concentrations.  And -- and the
9        same is true for hexavalent
10       chromium and for chromium,
11       trivalent chromium.
12   BY MR. HEGARTY:
13       Q.   Are there any studies that
14   report on exposure of these metals to the
15   ovaries?
16       A.   Are you talking about alone?
17       Q.   Individually or together,
18   but the metals themselves.
19       A.   Just the metals --
20       MS. O'DELL:  Object --
21       objection to form.
22       THE WITNESS:  These metals
23       by themselves have been tested
24       extensively in cells and in -- in

74 (Pages 290 to 293)

Judith Zelikoff, Ph.D.

Page 294

1    animals to produce inflammation,
2    to change the epigenome of the
3    cells, to change gene expression.
4    And there was no -- there was no
5    reason to believe whether or not
6    there are specific studies
7    associated with the ovary. There
8    are no reason to believe that it
9    would not do the same effects in
10   cells as well as in the ovary, in
11   the lung, and the kidney and the
12   liver.
13   BY MR. HEGARTY:
14       Q.   Doctor, you are not aware of
15   any studies that have looked at the
16   effects of these metals on human ovarian
17   cells, correct?
18       MS. O'DELL:  Object to the
19   form.
20       THE WITNESS:  Again, I'm not
21   an epidemiologist, so -- and I'm
22   not a clinical toxicologist. So I
23   will have to stand by the -- the
24   data that I do know in -- in

Page 295

1    extensive -- have extensive
2    knowledge of.  And that's human ex
3    vivo and in vitro studies.  And I
4    am not aware.
5        That is not to say that they
6    are not out there.  And I
7    especially do not know about the
8    humans, because I focus as a
9    toxicologist.  I'm an animal
10   toxicologist.
11   BY MR. HEGARTY:
12       Q.   Did you do any comparison
13   between the doses of -- of the metals
14   reported in the studies that you cited to
15   those in women using talc?
16       A.   I did no calculations on --
17   on my own.
18       Q.   Did you do any calculations
19   that tested these metals in animals to
20   determine what the -- that -- that they
21   relate in any way to the dose that a
22   human would experience through Johnson's
23   Baby Powder use?
24       MS. O'DELL:  Objection to

Page 296

1    form.
2        THE WITNESS:  The exposures
3    are similar, or can be similar.
4        But as I stated before, for
5    these metals as well as for
6    asbestiform fibers, all it takes
7    is a small amount, if not just one
8    fiber, to cause the response and
9    to start the process of
10   inflammation, gene expression,
11   upregulation of genes that are
12   associated with biological
13   mediators, proinflammatory
14   cytokines.
15   BY MR. HEGARTY:
16       Q.   Yet you cite no study that
17   reports that response in human ovarian
18   cells, correct?
19       MS. O'DELL:  Object to the
20   form.
21       THE WITNESS:  I -- if you're
22   still talking about individual
23   metals, no.
24       But if you're talking about

Page 297

1    in vitro studies like those of
2    Saed who looked for oxidative
3    stress and -- and prooxidant
4    changes, and if you are talking
5    about Shukla study who also looked
6    at ovarian cells, human ovarian
7    cells, and looked at changes in
8    gene expression associated with
9    oxidant production and reactive
10   oxygen species production, then
11   yes, in cell culture using human
12   ovarian epithelial cells, because
13   that's what we are talking about
14   here.
15   BY MR. HEGARTY:
16       Q.   None of those studies
17   applied nickel to human ovarian cells,
18   did they?
19       A.   No, they did not.
20       Q.   None of those studies
21   applied cobalt to human ovarian cells,
22   correct?
23       A.   No, they did not.
24       Q.   None of those studies

75 (Pages 294 to 297)

Judith Zelikoff, Ph.D.

Page 298

1  applied chromium to ovarian -- human
2  ovarian cells, correct?
3      A.  Correct.  But what we're
4  talk -- what I'm talking about and the
5  basis of my opinion is the product in its
6  entirety, not breaking it down to
7  individual constituents.
8      Q.   Is it necessary for purposes
9  of your biologic plausibility opinion
10  that talc reach the ovary?
11     A.   Not necessarily.
12          Talc does -- talc and any
13  other particle does not have to reach the
14  site of deposition.  They can, and -- and
15  do, I believe that they not only migrate
16  to an area and they can get to an area
17  and then cause inflammation which then
18  can be -- the cytokines where there's
19  tumor necrosis factor, interleukin-1, or
20  any of the other proinflammatory
21  cytokines can then get to the air, the
22  site of this -- this target organ.
23          So you do not have to have,
24  in particle toxicology and in talc

Page 299

1  toxicology, you do not have to have the
2  presence.  Although, in early studies
3  they have found talc particles not only
4  in the ovary, but also in the lymph
5  node -- in the lymphatics that drain the
6  ovary.
7      Q.   Cite for me any study that
8  has reported inflammation in the ovaries
9  from inflammation of -- due to a particle
10  in the lung -- strike that.
11          Is it your contention that
12  inflammation in the lung due to a
13  particle will cause inflammation in the
14  ovaries?
15          MS. O'DELL:  Objection to
16  form.
17          THE WITNESS:  I'm telling
18  you that --
19          MS. O'DELL:  Go ahead.
20          THE WITNESS:  -- there's
21  biological plausibility to suggest
22  that.
23          When you have a particle
24  coming in and going to a local

Page 300

1  target site, let's say in the case
2  of inhalation or in the case of
3  direct application to the perineal
4  area, you will have the process of
5  impacting with those cells and
6  generating cell mediated reactions
7  and immunological reactions and
8  inflammatory responses.
9          And those inflammatory
10  responses and those reactive
11  oxygen species, except for
12  hydrogen peroxide which can't
13  travel a far distance, can get
14  into -- can and do get into the
15  blood circulation and then can
16  reach distant organs.
17  BY MR. HEGARTY:
18     Q.   Cite for me any published
19  authority that says that inflammation in
20  the lungs will cause inflammation in the
21  ovaries.
22          MS. O'DELL:  Object to the
23  form.  Misstates her testimony.
24          THE WITNESS:  To that

Page 301

1  specific question, no.  But I
2  can -- I can cite you many studies
3  that show in terms of other
4  particles for the lungs that has
5  been shown to cause inflammation
6  in other areas.
7          For example, in the case of
8  Ghio and other investigators, you
9  will find inflammation not only in
10  the blood by the measurement of
11  cytokines in the blood, even
12  though the first target organ was
13  the -- was the lungs.
14          Also, if you look at
15  obesity, obesity is a pro-oxidant
16  state, and that can generate --
17  the reason obesity causes other
18  health effects is because it's a
19  big mass of inflammation.  And the
20  inflammation in that particular
21  site of all those fatty cells,
22  they can release inflammatory
23  mediators that go all over.  And
24  that literature is out there.

76 (Pages 298 to 301)

Judith Zelikoff, Ph.D.

Page 302

1  BY MR. HEGARTY:
2      Q.   So is it your opinion for
3  purposes of your biological
4  plausibility -- strike that.
5          Is it -- is your biological
6  plausibility opinion that talc inhaled
7  and in the lungs causes inflammation in
8  the ovaries that can lead to ovarian
9  cancer?
10     A.   There's plausibility for
11 that, yes.
12     Q.   And can you cite for me any
13 published authority that says that talc
14 inhaled in the lungs will cause
15 inflammation in the ovaries that can lead
16 to ovarian cancer?
17     A.   There's multiple parts of
18 that question.
19     Q.   That's a very specific
20 question to that very specific subject
21 area.  Can you cite to me any published
22 literature that says that?
23         MS. O'DELL:  Would you mind
24     repeating the full question or

Page 303

1      read it.
2          THE WITNESS:  Any published
3      authority that says that -- that
4      says that talc inhaled in the
5      lungs will cause inflammation in
6      the ovaries that can lead to
7      ovarian cancer.
8          For that particular, and
9      that specific of a question, I
10     cannot cite you.
11 BY MR. HEGARTY:
12     Q.   You have published
13 extensively on particulates in the air
14 causing inflammation in the lungs,
15 correct?
16     A.   In the lungs and
17 systemically.
18     Q.   And those particulates
19 include?
20     A.   Air particulates;
21 particulate matter, called PM, ambient
22 PM; diesel exhaust particles.  I'm also
23 going to go to my CV.  Nanoparticles,
24 metal nanoparticles, specifically

Page 304

1  cadmium.
2      Q.   So in other words a lot of
3  particles besides talc, according to you,
4  can cause inflammation of the lungs,
5  correct?
6      A.   Many do.  There are others
7  that do not, like titanium dioxide which
8  were used in many studies as a control.
9      Q.   And those nanoparticles,
10 those air particles --
11     A.   In fact --
12     Q.   -- those diesel particles.
13     A.   I'm sorry.
14     Q.   Okay.  And those
15 nanoparticles, those diesel particles,
16 air particles that can cause inflammation
17 in the lungs, will also cause
18 inflammation in the ovaries, correct?
19         MS. O'DELL:  Objection to
20     form.
21         THE WITNESS:  I said they
22     will cause inflammation
23     systemically.  I did not indicate
24     the ovaries.

Page 305

1  BY MR. HEGARTY:
2      Q.   Well, there's no -- there's
3  nothing unique about talc particles
4  versus the other particles you mentioned,
5  correct?
6          MS. O'DELL:  Object to form.
7          THE WITNESS:  Size, chemical
8      composition, they -- they --
9      particles -- particles are -- they
10     can -- they can be different and
11     they can be the same.  So many
12     studies use model particles to
13     look at a negative effect like in
14     the Shukla study where they used
15     titanium dioxide particles of a
16     similar size in their -- as a
17     control and got no gene expression
18     changes.
19         Particles in the air, if
20     you're looking at -- there are
21     many factors that go into how a
22     particle behaves, including size,
23     including composition, including
24     morphology.

77 (Pages 302 to 305)

Judith Zelikoff, Ph.D.

Page 306

1    BY MR. HEGARTY:
2        Q.    Well, by your methodology,
3    any particle inhaled that causes
4    inflammation in the lungs is biologically
5    plausible, can lead to ovarian cancer,
6    correct?
7            MS. O'DELL: Object to form.
8            THE WITNESS: No, it can --
9        sorry. It can lead to
10       inflammation systemically.
11   BY MR. HEGARTY:
12       Q.    That can lead to ovarian
13   cancer, correct?
14       A.    Inflammation --
15           MS. O'DELL: Object to the
16       form.
17           Go ahead.
18           THE WITNESS: Sorry.
19           MS. O'DELL: Sorry.
20           THE WITNESS: Inflammation
21       is responsible for -- in my
22       opinion, is the underlying
23       mechanism, a key underlying
24       mechanism for the association for

Page 307

1        ovarian cancer, yes.
2    BY MR. HEGARTY:
3        Q.    And that mechanism can be
4    initiated by any particle inhaled into
5    the lungs, correct?
6        A.    No, it's --
7            MS. O'DELL: Objection to
8        form.
9            THE WITNESS: Sorry.
10           Well, as -- again, as I
11       stated, it depends on the -- it
12       depends on the particle. For
13       example, titanium dioxide will not
14       produce inflammation in the lungs.
15       However, other particles, many
16       other particles, including
17       cadmium, cadmium oxide particles
18       do cause inflammation, as well as
19       asbestos does, as well as talc has
20       been shown to.
21           They can all produce
22       inflammation or oxidative stress.
23   BY MR. HEGARTY:
24       Q.    Cadmium particles induce the

Page 308

1    same inflammation that you believe that
2    talc does, correct?
3        A.    Inflammation is
4    characterized by certain key components.
5    Inflammation -- whether it's an
6    inflammation in the ovary or an
7    inflammation in the lung or inflammation
8    in the kidney, inflammation is an immune
9    response. And it's going to involve key
10   cells, including the macrophage, the
11   neutrophil, the natural killer cell, all
12   of which can produce reactive oxygen
13   species -- well, primarily the
14   macrophages and neutrophils produce
15   oxygen radicals.
16           However, the natural killer
17   cell, they all produce cytokines, which
18   can produce inflammation. So
19   inflammation is characterized by the same
20   components.
21       Q.    And you can't cite for me
22   any different components of the
23   inflammation caused by cadmium as you
24   believe the inflammation that is caused

Page 309

1    by talc, correct?
2        A.    When I measured inflammatory
3    responses to the inhalation of cadmium
4    nanoparticles, I looked for the standard
5    inflammatory markers. So I measured in
6    the lung and in the circulation. I
7    measured the percentages of neutrophils,
8    which is a key indicator, key criteria
9    for inflammation. I determined
10   macrophage numbers as well as function in
11   terms of their ability to phagocytose, in
12   their ability to produce reactive oxygen
13   species. And I looked for lung injury,
14   as measured by lactose, lactate
15   dehydrogenase.
16           So when one looks for
17   inflammation in the body, whether it's an
18   animal or a human, C-reactive protein,
19   you are going to be looking for all the
20   same markers.
21       Q.    You identified, based on
22   your opinion, no difference in the
23   inflammation caused by talc and the
24   inflammation caused by cadmium, correct?

78 (Pages 306 to 309)

Judith Zelikoff, Ph.D.

Page 310

1      A.   I did not do talc inhalation
2   in my laboratory.  The studies
3   indicate -- looked for the same thing.
4   They look for changes in gene expression
5   of activating transcription factors.
6   They did in the Shukla study.
7          They look for the percentage
8   of neutrophils.  They look for macrophage
9   activation.  We all look at the same
10  thing when coming to the conclusion of
11  inflammation.
12     Q.   And according to you, talc
13  and cadmium act similarly with regard to
14  inducing inflammation in the lungs?
15         MS. O'DELL:  Objection to
16  form.
17         THE WITNESS:  Do they act
18  similarly?  Well, I think I
19  answered that question.
20         Inflammation is -- is the --
21  inflammation is modified by the
22  same components, the same soluble
23  factors, the same cell type
24  factors, including macrophages and

Page 311

1   neutrophils, dendritic cells,
2   whatever.  So inflammation,
3   whether it's acute or chronic
4   inflammation used the same
5   parameters.
6          We call inflammation -- we
7   call inflammation when you -- in a
8   tissue or in organs when you see
9   these characteristics.  And we say
10  these are markers indicative.
11  These are pathologies
12  indicative -- these are -- of an
13  inflammatory response.
14  BY MR. HEGARTY:
15     Q.   So according to your
16  opinion, that's biologic plausibility
17  between cadmium exposure and ovarian
18  cancer?
19         MS. O'DELL:  Objection to
20  form.
21         THE WITNESS:  I would have
22  to do more research on that to be
23  able to say that.  I would not say
24  biological plausibility, only

Page 312

1   because I haven't investigated
2   that literature.
3          But inflammation --
4   inflammation doesn't change.  It
5   can get out of the particular
6   local organ.  I don't think that
7   cadmium has been investigated in
8   terms of the ovary.  It's
9   certainly been investigated in
10  terms of the kidney, which is
11  local -- which is systemically a
12  distant organ from the local
13  target, which is the lung.  And it
14  can cause inflammation in the
15  kidney.
16  BY MR. HEGARTY:
17     Q.   You haven't identified any
18  differences between the inflammation
19  caused by other particulates and the
20  inflammation caused by talc, correct?
21         MS. O'DELL:  Objection to
22  form.
23         THE WITNESS:  Inflammation
24  is inflammation.

Page 313

1   BY MR. HEGARTY:
2      Q.   You referred to fragrances.
3      A.   I'm sorry.  Could you give
4   me a page?
5      Q.   Over on Page 12.  You cite
6   to a single study that discusses what
7   exposure levels of these fragrances have
8   been shown to induce a biologically
9   plausible effect in the ovary.
10         MS. O'DELL:  Object to the
11  form.
12         THE WITNESS:  Many of these
13  fragrances, many of these
14  chemicals within a specific
15  fragrance, it can consist of maybe
16  150 or even more chemicals within
17  any one given fragrance.  Many of
18  them have been shown to cause
19  inflammation.
20  BY MR. HEGARTY:
21     Q.   Have any of the chemicals in
22  the fragrances that you looked at been
23  reported in the medical literature to
24  induce inflammation in the ovaries?

79 (Pages 310 to 313)

Judith Zelikoff, Ph.D.

Page 314

1      A.   No one specifically -- to my
2   knowledge, no one specifically looked at
3   inflammation in the ovaries.  But again,
4   if you go back to the idea of
5   inflammation being caused by a particle
6   at a local site and then having the
7   potential -- or having the capacity I
8   should say, to -- to have that
9   inflammation go to a distant -- a more
10  distant site.
11      So the fact that no one has
12  looked at it does not delete the fact
13  that certainly inflammation can get to
14  distant sites, including the ovary.
15      Q.   Well, what is the dose of
16  nickel or -- and cobalt and chromium
17  individually that must -- that the woman
18  must be exposed to in vivo to induce
19  inflammation in the ovaries?
20      MS. O'DELL:  Object to the
21      form.  Asked and answered.
22      THE WITNESS:  There are --
23      as I said, there's really -- one
24      particle, one piece can start the

Page 316

1   metals, but there's also -- if you look
2   at nickel and it's a micronutrient, so
3   you can have very, very, very tiny
4   amounts in the body -- very tiny.  And it
5   can be used as a micronutrient.
6      You can have lead, but that
7   should not be in the body at all.  And
8   there is no safe level of lead.  So
9   despite what the regulatory agencies say,
10  there is no safe level which is what
11  their conclusion is moving towards.
12      And -- so a metal is not a
13  metal is not a metal.
14      Now, when you look at these
15  three metals, so for example you have
16  nickel which is classified as a 1A
17  carcinogen, but --
18      Q.   I'll withdraw the question.
19  You're not -- Doctor, you're not
20  answering my question.
21      MS. O'DELL:  She is
22      answering your question.
23      MR. HEGARTY:  No, she is
24      not.

Page 315

1      process for inflammation.
2   BY MR. HEGARTY:
3      Q.   So it --
4      A.   It could be one.
5      Q.   -- it's your opinion that
6   one particle of nickel will induce
7   inflammation in the ovaries?
8      MS. O'DELL:  Objection.
9   BY MR. HEGARTY:
10      Q.   Is that correct?
11      A.   Will?  I can't -- I haven't
12  gone through the literature, but could,
13  certainly.
14      Q.   And what literature can you
15  cite that would say that one particle of
16  nickel could cause inflammation in the
17  ovary?
18      A.   It's my professional
19  judgment being an expert toxicologist in
20  the area of metals.
21      Q.   Okay.  Same question as to
22  cobalt and chromium.
23      A.   Well, metals can't be lumped
24  together like that.  Metals are indeed

Page 317

1      MS. O'DELL:  Yes, she is.
2   And if you don't -- let her
3   finish.
4      MR. HEGARTY:  Okay.
5   We'll -- we'll call Judge Pisano
6   and he'll see if we're asking the
7   question -- if she's answering the
8   question.
9      MS. O'DELL:  Are you
10  threatening the witness by saying
11  that?
12      MR. HEGARTY:  No, I'm
13  talking to you.  We'll go off the
14  record --
15      MS. O'DELL:  You're
16  threatening the witness and -- no,
17  we're not going off the record.
18      MR. HEGARTY:  Go off the
19  record, let's go off the record.
20      MS. O'DELL:  No, we are not
21  going off the record.
22      MR. HEGARTY:  Yes, let's go
23  off the record.
24      MS. O'DELL:  If she's

80 (Pages 314 to 317)

Judith Zelikoff, Ph.D.

| | Page 318 |
|---|---|

1  answering your question, she --
2  she gets the right to finish her
3  answer.  You don't cut her off,
4  Mark.
5      MR. HEGARTY:  Let's go off
6  the record.
7      MS. O'DELL:  No, we're not
8  going off the record.  She's
9  finishing her answer.
10      MR. HEGARTY:  Let's go off
11  the record.  I'm not --
12      MS. O'DELL:  And then you
13  can ask her another question.
14      MR. HEGARTY:  Let's go off
15  the record.  It's my deposition.
16      MS. O'DELL:  No.  It's your
17  deposition, but it's not fair to
18  mistreat this witness if she is
19  answering your question.
20      MR. HEGARTY:  I'm not
21  mistreating the witness.
22      MS. O'DELL:  Yes, you are.
23      MR. HEGARTY:  We'll go off
24  the record and call Judge Pisano.

| | Page 319 |
|---|---|

1      MS. O'DELL:  You are
2  mistreating the witness by not
3  allowing her to finish her --
4      MR. HEGARTY:  I withdrew the
5  question.
6      MS. O'DELL:  Well, okay.
7  The with -- the question was
8  withdrawn.  Ask a question, let
9  her --
10      MR. HEGARTY:  No, we're off
11  the record.  We're going to call
12  Judge Pisano.
13      MS. O'DELL:  Okay.  Great.
14      THE VIDEOGRAPHER:  Off the
15  record.  The time is 3:21 p.m.
16  Off the record.
17      (Whereupon, a discussion was
18  held off the record.)
19      THE VIDEOGRAPHER:  We are
20  back on the record.  The time is
21  3:23 p.m.
22  BY MR. HEGARTY:
23      Q.   Dr. Zelikoff, is it your
24  opinion that one particle of nickel

| | Page 320 |
|---|---|

1  either inhaled or applied to the perineum
2  will induce inflammation in the ovaries?
3      A.   It's my opinion that it
4  could.
5      Q.   What literature do you have
6  to support that opinion?
7      A.   My professional opinion as a
8  toxicologist in metals with over
9  30 years.
10      Q.   Next question.  Is it your
11  opinion that one particle of cobalt,
12  either inhaled or applied to the
13  perineum, will induce inflammation in the
14  ovaries?
15      A.   Again, it's my opinion that
16  it -- it could.  It has the biological
17  plausibility to, because inflammation,
18  although not as toxic in many ways as
19  it's classified as a 2B -- 2B by IARC
20  is -- has the potential -- does cause
21  inflammation, and that inflammation can
22  leave the site of the target site.
23      Q.   What authority do you have
24  for that opinion?

| | Page 321 |
|---|---|

1      A.   My professional opinion.
2      Q.   Is it your opinion that one
3  particle of chromium, either inhaled or
4  applied to the perineum, will induce
5  inflammation in the ovaries?
6      MS. O'DELL:  Objection to
7  the form.
8      THE WITNESS:  It depends on
9  the form of the chromium.
10  BY MR. HEGARTY:
11      Q.   What form of chromium does
12  it need to be?
13      A.   A trivalent chromium
14  which -- I'm sorry, hexavalent chromium
15  which will then get into the cell, start
16  the process and -- and convert to
17  chromium-3, 4 and 5.
18      Q.   That's chromium-6, correct?
19      A.   Hexavalent chromium is
20  chromium-6, right.
21      Q.   Is it your opinion that one
22  particle of chromium-6, either inhaled or
23  applied to the perineum, will induce
24  inflammation in the ovaries?

81 (Pages 318 to 321)

Judith Zelikoff, Ph.D.

| | Page 322 |
|---|---|

1      MS. O'DELL: Objection to
2   form.
3      THE WITNESS: It could,
4   because inflammation again could
5   leave the target site. And it
6   depends on the form of the metal.
7      So we have soluble metals --
8   I don't want to go on too long.
9   You have soluble metals and
10   insoluble metals. Some of them
11   are more toxic and more -- and
12   potentially more carcinogenic than
13   other forms. There are many salts
14   within those metals that you gave.
15  BY MR. HEGARTY:
16      Q.   And what authority do you
17  have for the statement that one particle
18  of chromium, either inhaled or applied to
19  the perineum, will induce inflammation in
20  the ovaries?
21      A.   My professional judgment.
22      Q.   Will one particle of the
23  fragrance of the chemicals that you list
24  from the fragrances, either inhaled or

| | Page 323 |
|---|---|

1   applied to the perineum, cause
2   inflammation to the ovaries?
3      MS. O'DELL: Objection to
4   the form.
5      THE WITNESS: If -- I -- I
6   don't have the knowledge, I don't
7   have the literature knowledge to
8   answer that question.
9   BY MR. HEGARTY:
10      Q.   Will one -- will one
11  particle of -- of cadmium, either inhaled
12  or applied to the perineum, cause
13  inflammation in the ovaries?
14      A.   It can cause --
15      MS. O'DELL: Objection to
16   form. You can answer.
17      THE WITNESS: It can cause
18   inflammation in the area if it's
19   inhaled in the lung and that
20   inflammation can get out
21   systemically.
22      Now it depends, again, on
23   the size of the particle. Metals,
24   as I said before, cannot be

| | Page 324 |
|---|---|

1   lumped. And particles oftentimes,
2   if they're different in size, if
3   they're different in chemical
4   structure, if they have iron or
5   don't have iron, you have -- you
6   may have differences.
7   BY MR. HEGARTY:
8      Q.   Will one particle from
9   diesel exhaust, inhaled or applied to the
10  perineum, cause inflammation in the
11  ovary?
12      MS. O'DELL: Object to the
13   form.
14      THE WITNESS: Again, same
15   answer, it could. Depends on the
16   particle size, the particle type,
17   the particle morphology. And it
18   has the potential to induce
19   inflammation as shown in cells.
20   And can produce an oxidant state.
21  BY MR. HEGARTY:
22      Q.   Doesn't inflammation just
23  reflect the body's normal response to the
24  presence of the particles?

| | Page 325 |
|---|---|

1      A.   There are two -- there are
2   two forms of -- well, there are multiple
3   forms of inflammation. But the two that
4   are of concern and in -- in response to
5   your question, is that they are acute
6   inflammation and there is chronic
7   inflammation.
8      And with acute inflammation,
9   the first response to a foreign -- a
10  foreign particle or an antigen on a
11  bacterial cell or an infectious agent, is
12  for the body to mount an immune response.
13      How it does that is through
14  the same cell types that I just
15  mentioned. Polymorphonucleocytes, also
16  known as neutrophil. Macrophages, and
17  those are the two key players, but
18  natural killer cells all come into it.
19      That involves the innate
20  immune system. And so the first thing to
21  protect the body, whether it's a viral
22  infection or whether it's a bacterial
23  infection or whether it's a foreign
24  particle, is to mount that kind of immune

82 (Pages 322 to 325)

Judith Zelikoff, Ph.D.

Page 326

1  response to kill or negatively impact
2  that particular particle.
3         That will then -- that's an
4  innate immune response being active.
5  That will then, in some cases, upregulate
6  the T-cell and -- and humoral or -- and
7  cell-mediated immune response.
8         Now, that is, in terms of
9  cancers and in terms of tumors, that is
10  called immunosurveillance and that's the
11  first thing.  And you're absolutely
12  right.  The purpose of the immune system
13  is to protect the body.  That is the
14  function.
15         However, there are three
16  stages or three types of processes for
17  the immune system in carcinogenesis.  The
18  second being immuno equilibrium.  But the
19  part that is the last part is that the
20  tumor can actually quiet or cause
21  immunosenescence of the immune system.
22         So in a chronic
23  inflammation, it does not always act in
24  the best interest of the -- of the host

Page 327

1  but in the best interest of the tumor.
2         So your -- the answer to
3  your question is yes, that's the function
4  of it.  But it can behave, it's a
5  two-prong sword.
6     Q.  You said there are multiple
7  types of inflammation and you listed two
8  types:  Acute and chronic.  Are there any
9  other types besides those two?
10    A.  Well, you have the reactions
11  to those inflammation in terms of having
12  a foreign body reaction.  That is part of
13  an inflammatory response.  So in terms of
14  temporality or timing, inflammation is
15  acute and is chronic.
16         What occurs during that
17  time, such as a foreign body reaction
18  where macrophages all come together and
19  engulf the particle or the fiber and try
20  to keep it within a localized space, that
21  is a process that can occur within
22  inflammation.
23         So my answer to you is that
24  there are two major types of

Page 328

1  inflammation.  Not that they involve
2  different cell types or different
3  mechanisms.  But they are called, in
4  terms of timing or temporality, acute
5  which will kill whatever right away and
6  then chronic which unfortunately keeps
7  playing back on itself and the
8  inflammation will continue.
9     Q.  Granulomas which you just
10  mentioned don't cause cancer, correct?
11    A.  Granulomas do not -- I'm
12  sorry.
13    Q.  Granulomas which you just
14  mentioned don't cause cancer, correct?
15    A.  Granulomas are in response
16  to a foreign body.  In the case of
17  asbestos or in the case of another type
18  of fiber, macrophage will come over and
19  their normal process in what we call
20  innate immunity is to engulf the fiber.
21  And unfortunately, many times the fiber
22  cannot be engulfable or the particle
23  cannot be engulfable.
24         And so many macrophage will

Page 329

1  come over, and they will try to engulf it
2  as a body.  And that is called a
3  granulomatous reaction.
4         And that's what happens
5  during tuberculosis when the organism
6  forms, many macrophages come over to kill
7  the organism, but it can't, and so they
8  form granulomas.
9     Q.  Doctor, listen to my
10  question.  I didn't ask you what a
11  granuloma was.  I asked you, granulomas
12  don't cause cancer, correct?
13         MS. O'DELL:  Object to form.
14         THE WITNESS:  There is no
15  literature to my knowledge that
16  shows a granuloma, meaning immune
17  response, forming macrophages
18  engulfing, can cause cancer.
19  BY MR. HEGARTY:
20    Q.  And a reaction to
21  inflammation can include the development
22  of fibrosis or scar tissue, correct?
23    A.  That is a long-term chronic
24  response associated with chronic

83 (Pages 326 to 329)

Judith Zelikoff, Ph.D.

Page 330

1  inflammation.
2      Q.    And there's no literature
3  linking fibrosis to cancer, correct?
4          MS. O'DELL:  Object to the
5  form.
6          THE WITNESS:  My
7  professional opinion is that there
8  is literature -- let me just read
9  over the question, please.
10      So fibrosis is produced by
11  release of factors from the
12  macrophage.  And it causes
13  scarring within that particular
14  target organ.
15          Now, whether or not that --
16  those -- that scarring can
17  actually make that site more
18  vulnerable to cancer, like in the
19  case of hepatitis, where you get
20  scarring, and you get cancer as a
21  result of that particular
22  fibrosis, but they are two
23  different diseases.
24          But whether the area of

Page 331

1      fibrosis creates a more vulnerable
2      tissue base that can -- that can
3      progress or go to cancer is a
4      question that there is some
5      examples of, but -- in the liver
6      in particular.
7  BY MR. HEGARTY:
8      Q.    Well, there's no literature
9  reporting an increased risk of cancer in
10  any organ because there's fibrosis in
11  that organ, correct?
12      A.    What I'm saying is that in
13  terms of the liver and in terms of
14  fibrosis, let's say from ethanol or
15  acetaminophen ingestion, you get fibrosis
16  which is a whole disease or symptomology
17  by itself, and then you have cancer,
18  which is another disease.  But what I'm
19  saying is that in the area where the
20  injury and the fibrosis occurs, in the
21  liver there is a higher risk of getting
22  cancer.
23      Q.    Fibrosis doesn't morph or
24  turn into cancer?

Page 332

1      A.    Fibrosis does not morph or
2  turn into cancer.  That is correct.
3      Q.    In Section 12 -- I'm sorry.
4  On Page 12, under your section
5  "exposure," talc particle access to the
6  body.
7          Do you see that section?
8      A.    Is this Paragraph 1, 2, or
9  3?
10      Q.    Well, I'm looking just at
11  the Section Number 4 right now.
12      A.    Yes.  Okay.  Section Number
13  6 is on Page 12.
14      Q.    Section 6.  I'm sorry.  I
15  had those transposed.
16      A.    And please repeat your
17  question.
18      Q.    You never -- prior to being
19  contacted by counsel for plaintiffs, you
20  never looked at the studies reporting on
21  whether talc can reach the ovaries via
22  inhalation or perineal application,
23  correct?
24      A.    I did not study the

Page 333

1  literature or review the literature prior
2  to being contacted.  But I studied it and
3  reviewed it extensively after being
4  contacted.
5      Q.    On Page 12 of the last
6  paragraph -- I'm sorry -- second-to-last
7  paragraph, which begins, "A common
8  exposure route."
9          Do you see that paragraph?
10      A.    I do.  Thank you.
11      Q.    You write, "Again, a common
12  exposure route for cosmetic talc is via
13  the dermal route including vaginally
14  after perineal application."
15      A.    Yes.
16      Q.    Is it your testimony that
17  there's biologic plausibility with talc
18  applied to the skin?
19      A.    Applied to the skin, talc
20  does not -- is not absorbed into the skin
21  or through the skin, although there is
22  some question as to whether if there's
23  injury or scratch or openings in the
24  skin, whether the talc can penetrate.

84 (Pages 330 to 333)

Judith Zelikoff, Ph.D.

Page 334

1  But in and of itself talc cannot
2  penetrate through the skin.
3      However, we're not -- when
4  we're talking about perineal or vaginal
5  application, you are not talking about an
6  epidermal subcutaneous keratinized skin.
7      Q.  None of the studies that you
8  cite in this paragraph researched
9  particle transport through the
10  reproductive tract through perineal
11  application, correct?
12      MS. O'DELL:  Object to the
13      form.
14      THE WITNESS:  These -- it is
15      extremely technically difficult,
16      from my knowledge as an animal
17      toxicologist, to do perineal
18      application to a mouse.
19  BY MR. HEGARTY:
20      Q.  I'm going to withdraw the
21  question.  Doctor, you will not respond
22  to my question.  My question is simply,
23  none of the studies that you cite in this
24  paragraph researched particle transport

Page 335

1  through the reproductive tract through
2  perineal application.  That's correct?
3      A.  There is a study, and I'm
4  afraid the name of the author does not
5  come to me.  So allow me to look at my
6  report.
7      Q.  And I'm just talking about
8  the authorities that you cite in the
9  second paragraph beginning, "A common
10  exposure route."
11      MS. O'DELL:  Feel free to
12      look at your report if you need
13      to, Doctor.
14      THE WITNESS:  I understand.
15      On Page 13, animal models --
16  BY MR. HEGARTY:
17      Q.  Doctor, that's not my
18  question.  My question is in the
19  paragraph that I referenced beginning a
20  common exposure route, none of those
21  authorities looked at transport of the
22  particles via application of those
23  particles to the perineum?
24      MS. O'DELL:  Objection to

Page 336

1  the form.
2  BY MR. HEGARTY:
3      Q.  Correct?
4      MS. O'DELL:  Excuse me.  You
5      may answer his question any way
6      you'd want to, Doctor.
7      THE WITNESS:  None of these
8      that I have stated on Page 12
9      refer to perineal exposure in the
10      second paragraph in terms of
11      Venter, Iturralde, Sjosten and
12      Heller.
13      However, on Page -- on Page
14      13, there is a study by Keskin,
15      who used rats and did a vaginal or
16      perineum to talc.
17  BY MR. HEGARTY:
18      Q.  I'm going to move to strike.
19  We're going to go off the record.
20      MR. HEGARTY:  We're going to
21      call Judge Pisano.  There's no
22      reason to add that additional part
23      to the answer to that question.
24      And I'm not -- I'm tired of that

Page 337

1  happening.  So we'll call him
2  unless you're going to talk to the
3  witness.
4      MS. O'DELL:  Is your
5      objection she didn't answer your
6      question?  Because she -- you
7      asked her about the paragraph.
8      She said "no; however" --
9      MR. HEGARTY:  We're off the
10      record.
11      MS. O'DELL:  No, we're not
12      off the record.
13      MR. HEGARTY:  We're off the
14      record.
15      MS. O'DELL:  No, we --
16      MR. HEGARTY:  We're going
17      off the record.
18      MR. LOCKE:  We are off.  Let
19      me throw out something.  We've got
20      seven hours.  I think there's a
21      plan here to stall, and we need to
22      do a better job of keeping things
23      moving, or we are going to have to
24      ask the court for more time.

85 (Pages 334 to 337)

Judith Zelikoff, Ph.D.

| | Page 338 |
|---|---|

1    MR. HEGARTY: Let's go off
2  the record.
3    MS. O'DELL: The suggestion
4  that there's -- let me just --
5  before we go off the record, the
6  suggestion that there's somehow a
7  plan to -- is incorrect, and
8  improper. So if you want to go
9  off the record, I think you've got
10  an answer to your question, which
11  was, "No, not in the paragraph."
12    However, she has a right to
13  point to evidence in her report.
14  That's perfectly appropriate.
15    MR. HEGARTY: We'll let
16  Judge Pisano decide. We'll go off
17  the record.
18    THE VIDEOGRAPHER: The time
19  is 3:39 p.m. Going off the
20  record.
21    (Short break.)
22    THE VIDEOGRAPHER: The time
23  is 4:04 p.m. Back on the record.
24    MR. HEGARTY: We're back on

| | Page 339 |
|---|---|

1  the record and we're going to
2  continue without calling Judge
3  Pisano at this time. But we do
4  reserve the right to ask Judge
5  Pisano for more time based on our
6  belief that Dr. Zelikoff has many
7  occasions over the course of this
8  deposition not been responsive to
9  the questions asked and as a
10  result has -- has wasted the
11  defendant's time and to our
12  prejudice.
13    So -- but we're going to go
14  forward and see if we can finish
15  this deposition.
16    MS. O'DELL: Plaintiffs will
17  obviously oppose that -- that
18  motion. Dr. Zelikoff has been
19  responsive to your questions.
20  BY MR. HEGARTY:
21    Q. Dr. Zelikoff, we're talking
22  about the section on talc particle's
23  access to the body. There have been no
24  studies in either animals or humans that

| | Page 340 |
|---|---|

1  have looked at transport of dry powder
2  talc to the perineum showing that the --
3  that talc transports to the ovaries,
4  correct?
5    MS. O'DELL: Object to the
6  form.
7    THE WITNESS: When we say --
8  when you say talc, you're
9  referring to talcum powder
10  products?
11  BY MR. HEGARTY:
12    Q. Correct, correct.
13    A. That's correct to my
14  knowledge.
15    Q. And are you aware that talc
16  is in toilet paper?
17    A. Yes, I just learned that
18  recently.
19    Q. Can talc in toilet paper
20  migrate to the ovaries?
21    MS. O'DELL: Object to the
22  form.
23    THE WITNESS: Can -- my
24  knowledge is that talc in toilet

| | Page 341 |
|---|---|

1  paper is -- is bound to the
2  other -- the other components
3  there. So unless it becomes
4  bioavailable it cannot migrate
5  from the toilet paper.
6  BY MR. HEGARTY:
7    Q. How about talc -- talc in
8  soap, is there talc in soaps?
9    A. To my knowledge there is.
10    Q. Can talc in soaps, if
11  applied to the perineum, migrate to the
12  ovaries?
13    A. If it becomes --
14    MS. O'DELL: Object to form.
15    THE WITNESS: If it becomes
16  bioavailable. Likely bound up to
17  the other components.
18  BY MR. HEGARTY:
19    Q. When you say bioavailable,
20  what do you mean?
21    A. To me, "bioavailable" means
22  that the body can see it, and it
23  becomes -- it becomes -- it has access to
24  biological responsiveness.

86 (Pages 338 to 341)

Judith Zelikoff, Ph.D.

Page 342

1     Q.    And do you know a
2  Dr. Benjamin Neel at NY University -- New
3  York University?
4     A.    Dr. Neel, isn't he the head
5  of the cancer center?
6     Q.    He is.
7     A.    He is the head of the cancer
8  center.
9     Q.    Do you know him?
10    A.    I do not know him.
11    Q.    Does he know more about
12 cancer biology than you do?
13       MS. O'DELL:  Object to the
14    form.
15       THE WITNESS:  I've not seen
16    his CV.  I would assume as head of
17    the cancer center, that he
18    probably does.  Since that is not
19    my area of study.
20 BY MR. HEGARTY:
21    Q.    Are dose-response
22 relationships important in evaluating
23 potential carcinogenicity of a substance?
24    A.    Dose-response --

Page 343

1  dose-responses are -- contribute to, as I
2  said frequency, duration, exposure route.
3  They all contribute to carcinogenicity.
4     Q.    In other words, in
5  evaluating the carcinogenicity of a
6  substance, it's important to look at dose
7  relationships, correct?
8     A.    Are you speaking about
9  dose-response, or more than one dose?
10    Q.    Let me ask it again.  In
11 evaluating the substance for
12 carcinogenicity purposes, it's important
13 to look at dose-response relationships,
14 correct?
15    A.    It's important to look at
16 dose-response relationships, but it's not
17 the only factor, is what I'm saying.
18    Q.    In your report, you cite a
19 number of reactions to talc that have
20 been reported, pleural inflammation,
21 granulomas, pulmonary
22 interstitial fibrosis --
23    A.    What page are you referring
24 to?

Page 344

1     Q.    You need a specific page?
2  Over on Page 16.  Over the course of this
3  page and carrying over to the next page,
4  you cite a number of studies that refer
5  to talc causing pleural inflammation,
6  correct?
7     A.    Yes.
8     Q.    Talc causing granulomas,
9  correct?
10    A.    Yes.
11    Q.    Talc causing pulmonary
12 interstitial fibrosis, correct?
13    A.    Talcum powder can do those
14 things, yes.
15    Q.    And talc causing
16 carcinogenic activity in the lungs,
17 correct?
18    A.    Are you referring to a
19 specific line?
20    Q.    No, I'm not referring to a
21 specific line.  I'm talking about
22 generally from this part of your report.
23    A.    In general, this is the
24 section on inhalation.  I'm talking

Page 345

1  about -- yes, I'm talking about talcum
2  powder and its ability to bring about
3  changes in the lungs that could lead to
4  carcinogenic -- carcinogenesis.
5     Q.    Of the reactions that we
6  just talked about, have any of those been
7  reported in women using talc on the
8  perineum?
9     A.    There have been no studies
10 to my knowledge showing that application
11 of perineal talc can produce -- produces
12 lesions in the lungs.
13    Q.    And there's been no studies
14 that you are -- of which you are aware
15 that have reported findings of granulomas
16 in women using talc in the perineum,
17 correct?
18    A.    There is evidence of
19 inflammation clearly, but there -- to my
20 knowledge, I have not seen any of the
21 literature which shows a granuloma in the
22 ovary.
23    Q.    What studies have you seen
24 that have reported seeing inflammation in

87 (Pages 342 to 345)

Judith Zelikoff, Ph.D.

Page 346

1  the ovaries of women using talc on the
2  perineum?
3        MS. O'DELL:  Object to the
4  form.
5        THE WITNESS:  I'm just
6  trying to find the section.
7        There were many studies, I
8  can't right now, without finding
9  it in my report, identify any one
10  in particular.
11  BY MR. HEGARTY:
12     Q.   Well, sitting here today,
13  can you cite any study that has reported
14  on finding inflammation of the ovaries
15  following perineal application of talc?
16     A.   As I said, there are many --
17  there are many examples in animal models
18  that was not perineal, that was vaginal,
19  as you stated.
20        There were studies --
21  study -- an early study which identified
22  talcum powder particles in the ovary with
23  inflammatory responsiveness or
24  inflammatory responses.  That was a

Page 347

1  very -- that was a very early study.  I'm
2  not sure if it was Hamilton or Henderson.
3  If I may.
4        I'm sorry it's not coming to
5  mind now.
6     Q.   Okay.  Over on Page 20 you
7  discuss the role of the immune system --
8     A.   Yes, sir.
9     Q.   -- correct?
10     A.   I see that, yes.
11     Q.   You agree that it's not
12  generally accepted by the medical or
13  scientific communities that all cancers
14  are caused by chronic inflammation,
15  correct?
16     A.   There are other mechanisms
17  that are associated with carcinogenesis
18  and the process of carcinogenesis.  If
19  you'd like, I can identify those.
20     Q.   You agree that there are
21  types of chronic inflammation that are
22  not related to cancer.  Rheumatoid
23  arthritis is one, correct?
24     A.   That's an autoimmune

Page 348

1  disease.
2     Q.   Okay.  Rheumatoid arthritis
3  does not increase the risk of cancer,
4  correct?
5     A.   Rheumatoid arthritis, for
6  what's known now, does not increase the
7  risk of cancer.
8     Q.   Psoriasis is another chronic
9  inflammatory process, correct?
10     A.   Another autoimmune disease
11  and another inflammatory process, yes.
12     Q.   Having psoriasis does not
13  increase the risk of any form of cancer,
14  correct?
15     A.   Not that -- not that we know
16  with the current knowledge.
17     Q.   So just having chronic
18  inflammation does not mean cancer will
19  develop, correct?
20        MS. O'DELL:  Object to the
21  form.
22        THE WITNESS:  Just having
23  chronic inflammation does not have
24  to indicate.  It's one -- again,

Page 349

1  it's one mechanism that provides
2  biological plausibility for the
3  cancer induction.
4        If I may give an example.
5  BY MR. HEGARTY:
6     Q.   Well, let me -- that's not
7  what I asked you for.
8     A.   Okay.  I thought I answered
9  your question.
10     Q.   Does having pelvic
11  inflammatory disease cause ovarian
12  cancer?
13     A.   The inflammation has been
14  linked with ovarian cancer, yes.
15     Q.   In your opinion is there a
16  biologically plausible mechanism between
17  PID and ovarian cancer?
18     A.   Well, PID is usually
19  associated with an infection.  And what's
20  related to cancer and why there's higher
21  risk in inflammatory diseases of
22  endometriosis and pelvic inflammatory
23  disease is through a mechanism of
24  inflammation.

88 (Pages 346 to 349)

Judith Zelikoff, Ph.D.

Page 350

1      Q.    Your biologically plausible
2    mechanism for talc and ovarian cancer is
3    inflammation, correct?
4      A.    That's primary, yes.
5      Q.    You make reference to MUC-1.
6    That's not your biological plausibility
7    mechanism, is it?
8      A.    You mean MUC-1 --
9      Q.    Yes.
10     A.    -- antibodies?
11     Q.    Correct?
12     A.    MUC-1, if I may explain it,
13   is mucin.  And --
14     Q.    I don't want to interrupt.
15   I'm not after an explanation.  I just
16   wanted to know whether it's part --
17   whether the references you include in
18   your report to MUC-1 are included in your
19   biologically plausible opinion?
20     A.    It is included in my -- in
21   reaching my opinion, yes.
22     Q.    Is that a separate mechanism
23   from inflammation?
24     A.    It is a separate mechanism

Page 351

1    from inflammation.  It's seen in ovarian
2    cancer as a marker.  And when you have --
3    evidence has shown that if you have
4    antibodies to MUC-1, and if they're
5    decreased as is seen in response to talc,
6    that you will have less of an immune
7    response and protection.
8      Q.    Can you cite for me any
9    study that has correlated MUC-1 levels
10   with ovarian cancer risk?
11          MS. O'DELL:  Object to form.
12          THE WITNESS:  They use it as
13     a marker.  The literature uses
14     MUC-1 as a marker of cancer.  Can
15     I cite you any studies that links
16     it with ovarian cancer?  No, I
17     cannot.
18   BY MR. HEGARTY:
19     Q.    Are there any studies that
20   link the levels of MUC-1 to ovarian
21   cancer risk?
22     A.    Do you mean human studies or
23   animal?
24     Q.    Yes, human studies only.

Page 352

1      A.    It's -- the only evidence
2    out there that addresses this is when
3    they do correlation studies with the
4    level of antibodies to MUC-1.  And when
5    the antibody levels are decreased, then
6    you have -- they found that you have an
7    increased risk of ovarian cancer.
8      Q.    There are no studies
9    reporting or correlating MUC-1 levels in
10   talcum powder users to ovarian cancer
11   risk, correct?
12          MS. O'DELL:  Object to form.
13          THE WITNESS:  Not to my
14     knowledge.
15          MS. O'DELL:  Sorry.
16   BY MR. HEGARTY:
17     Q.    And measuring MUC-1 is not
18   used to diagnose ovarian cancer, correct?
19     A.    MUC-1 is also known as
20   CA-125, and it is used as a marker.
21     Q.    My question is, is MUC-1
22   used to -- levels -- strike that.
23          Are MUC-1 levels used to
24   diagnose a woman with ovarian cancer?

Page 353

1      A.    My response to that is MUC-1
2    is synonymous with CA-125.  CA-125 is a
3    shed marker in the blood associated with
4    ovarian cancer, so yes.
5      Q.    Okay.  Is it your testimony
6    that for purposes of -- strike that.
7          Is it your testimony that
8    CA-125 levels are used to diagnose
9    ovarian cancer?
10          MS. O'DELL:  Object to the
11     form.
12          THE WITNESS:  I'm saying
13     that CA-125 is used as a
14     biological marker of progression,
15     extent, and intensity and whether
16     ovarian cancer is present.
17   BY MR. HEGARTY:
18     Q.    My question is, in a woman
19   who comes in complaining of symptoms that
20   might be ovarian cancer, is CA-125 used
21   to diagnose ovarian cancer?
22     A.    I'm sorry, I'm not a
23   physician.  I can't answer that question
24   in terms of what -- what an OB/GYN or an

89 (Pages 350 to 353)

Judith Zelikoff, Ph.D.

Page 354

1    oncologist would do.
2        Q.   And measuring CA-125 levels
3    does not give you any evidence of the
4    etiology of the ovarian cancer, correct?
5        A.   Not to the etiology.
6    However, it is an epithelial-associated
7    protein.
8            So if we are talking about
9    epithelial, and we are talking about
10   epithelial ovary carcinoma, it is related
11   to -- to that.
12       Q.   Does all types -- do all
13   types of inflammation irreparably damage
14   tissue?
15       A.   Irreparably.  Do you mean
16   persistently without -- is there
17   recovery?
18       Q.   No, my question is do all
19   types of inflammation, all acute, all
20   chronic inflammation, damage tissue where
21   it's not repaired?
22       A.   Where it's not repaired?
23       Q.   Yes.
24       A.   No, you can have -- with

Page 355

1    acute inflammation, of course you can
2    have repair of -- it's there to protect
3    against the invader.
4        Q.   Does having inflammation in
5    one organ or one tissue in the body
6    always mean that other tissues in the
7    body will be inflamed?
8        A.   It does not always mean
9    that.
10       Q.   The medical community has
11   not generally accepted that chronic
12   inflammation is a cause of ovarian
13   cancer, correct?
14           MS. O'DELL:  Objection to
15   form.
16           THE WITNESS:  Again, I'm not
17   quite sure what you mean by
18   generally accepted.  Everyone
19   has -- every medical community has
20   its own opinion.  I'm sure there
21   are many doctors who do embrace
22   it.  And I'm sure there are many
23   doctors who do not.  I'm not sure
24   whether they've done the extent of

Page 356

1    the systematic review of the
2    literature as I have.  But each
3    doctor, I'm sure, makes their own
4    opinion.
5    BY MR. HEGARTY:
6        Q.   Can you cite any doctor who
7    treats ovarian cancer or researches
8    ovarian cancer who believes that the
9    biological plausible mechanism of ovarian
10   cancer is inflammation?
11       A.   I have not spoken to any
12   doctors in that regard.
13       Q.   What does the inflammation
14   in the ovary look like in your opinion
15   from talc exposure?
16       A.   It looks like any other
17   local target of inflammation, in that
18   there are neutrophils, immune cells that
19   migrate into the area.  There are
20   macrophages that migrate into the area.
21   There can be higher levels of cytokines
22   like interleukin and chemotactic factor,
23   growth factor.
24       Q.   Such inflammation, if it was

Page 357

1    occurring would be visible, correct?
2        A.   Not necessarily.  In a -- in
3    a chronic -- first of all, you can get
4    different time periods.  So
5    inflammation -- if it's chronic
6    inflammation you are talking about one
7    thing.  And then you might see some
8    remnants of the inflammation.
9            But if you look at a period
10   of time, you can miss the inflammatory
11   response.  It can be there, impact the
12   cells and then be gone.
13       Q.   Even with chronic
14   inflammation?
15       A.   With chronic inflammation,
16   if you looked hard enough you would find
17   the remnants of its presence and you will
18   also likely find neutrophilic
19   infiltration.
20       Q.   Has that --
21       A.   That does not last forever.
22       Q.   Has that ever -- that --
23   those findings ever been reported in
24   women using talc in the perineum?

Judith Zelikoff, Ph.D.

Page 358

1    A.   The inflammatory response?
2    Q.   Correct.
3    A.   Or the infiltration?  Not
4  that I'm aware of.  Not in my report.
5    Q.   How many applications of
6  talc to the perineum does it take to
7  cause chronic inflammation in the
8  ovaries?
9    A.   That's -- that
10  information -- that is not known how many
11  applications, whether it could be one or
12  it needs to be over a period of three
13  years or a period of ten years.  Some of
14  the meta-analysis evaluations indicated
15  that there were some temporal
16  associations with it, and that it needed
17  to be used longer than ten years, where
18  you saw responsiveness.  And others
19  indicated less than ten years.
20    So it's -- it's difficult to
21  say, and it's also associated with the
22  woman.
23    Q.   Does acute inflammation
24  cause cancer?

Page 359

1    A.   Acute inflammation has not
2  been linked to my knowledge to cancer.
3  As I said, it's used as an immune
4  surveillance and protective mechanism as
5  you pointed out.
6    Q.   Over on Pages 20 and 21 of
7  your report you refer to CRP and other
8  inflammatory markers, cytokines,
9  inflammatory mediators.  Do you see the
10  section I'm referring to?
11    A.   I -- roles of the immune
12  system, and then Section E, ovarian
13  cancer inflammation?
14    Q.   Correct.
15    A.   Which section are you
16  referring to?
17    Q.   Well, the section ovarian
18  cancer inflammation at the bottom of
19  Page 20, carrying over to the top of
20  Page 21.
21    A.   I see that.
22    Q.   And there you talk about a
23  number of inflammatory markers, correct?
24    A.   Correct.

Page 360

1    Q.   None of those inflammatory
2  markers are tested to diagnose or monitor
3  a woman for developing ovarian cancer,
4  correct?
5    A.   To my knowledge, tumor
6  necrosis factors, C-reactive protein,
7  none of the interleukins are monitored.
8    But again, I have to say
9  that I'm not an OB/GYN and so I'm not --
10  I'm not familiar with what their -- what
11  they are using other than what's in the
12  literature.
13    Q.   And no study has clinically
14  correlated those markers with ovarian
15  cancer or ovarian cancer risk, correct?
16    MS. O'DELL:  Objection to
17  form.
18    THE WITNESS:  In looking at
19  biological plausibility, which
20  I'm -- which I'm focused on, the
21  indication of those elevated
22  levels as well as decreased levels
23  of antioxidants are associated
24  with inflammation and are

Page 361

1  associated with ovarian cancer.
2  BY MR. HEGARTY:
3    Q.   Well, can you cite for me
4  any study that has clinically correlated
5  those findings to ovarian cancer risk?
6    MS. O'DELL:  Objection.
7  Asked and answered.
8    THE WITNESS:  First of all,
9  I'm not -- and again, not an
10  OB/GYN.
11    I can tell you that those
12  risk factors, which are
13  inflammatory markers, are used as
14  an indicator of inflammation as a
15  biological plausible mechanism.
16  BY MR. HEGARTY:
17    Q.   Well, do you cite in your
18  paper any studies that have --
19    A.   I'm sorry, do you mean the
20  report?
21    Q.   In your report.  Do you cite
22  in your report any studies that have
23  found that women with these markers have
24  a higher -- higher or an increased risk

91 (Pages 358 to 361)

Judith Zelikoff, Ph.D.

Page 362

1  of ovarian cancer?
2      A.   Well, what I -- no.  But
3  what I have found is that in women who
4  have ovarian cancer, when they measure
5  concurrently or subsequently, that the
6  levels of certain inflammatory markers
7  are elevated.
8      Q.   My question was specific to
9  women prior to being diagnosed with
10  ovarian cancer, has any study shown that
11  women with higher levels of these
12  inflammatory markers have an increased
13  risk of ovarian cancer?
14      MS. O'DELL:  Objection to
15      form.
16      THE WITNESS:  Not in that
17      particular context.  But again I'm
18      not an OB/GYN.
19  BY MR. HEGARTY:
20      Q.   Has any study shown that
21  these inflammatory factors are elevated
22  in women using talc on the perineum?
23      MS. O'DELL:  Objection to
24      the form.

Page 363

1      THE WITNESS:  It's not a
2      common thing to measure
3      inflammatory mediators as a result
4      of the common use of talcum powder
5      products.  So there is no
6      indication of that because there
7      are no studies of that.
8  BY MR. HEGARTY:
9      Q.   If you look over on Page 24
10  of your report under the section Role of
11  Oxidants in Ovarian Cancer.  Do you see
12  that section?
13      A.   Section C on Page 24?
14      Q.   Correct.
15      A.   Yes.
16      Q.   All the processes that you
17  describe in this section occur in
18  everyone everyday, correct?
19      MS. O'DELL:  Object to the
20      form.
21      THE WITNESS:  To a degree,
22      yes.
23  BY MR. HEGARTY:
24      Q.   The reactive oxygen species

Page 364

1  are a normal product of cell activity,
2  correct?
3      A.   That is correct --
4      Q.   For example, for many --
5      A.   -- for many cells.
6      Q.   -- reactive oxygen species
7  increase if we exercise, correct?
8      A.   As well as antioxidants
9  increase, yes.
10      Q.   The same is true for
11  reactive nitrogen species, correct?
12      A.   Yes.
13      Q.   These --
14      A.   It's a matter of degree.
15      Q.   Reactive oxygen species and
16  reactive nitrogen species increase if
17  we're under stress, correct?
18      A.   They have been shown to do
19  that, yes.
20      Q.   And the body has defense
21  mechanisms to handle this increase in
22  reactive oxygen species and reactive
23  nitrogen species, correct?
24      MS. O'DELL:  Objection to

Page 365

1      form.
2      THE WITNESS:  The body has
3      antioxidant mechanisms, including
4      superoxide dismutase, catalase, et
5      cetera, that are -- that elevate
6      in response to reactive oxygen
7      species.  But they can be
8      overwhelmed by the amount of ROS
9      release.
10  BY MR. HEGARTY:
11      Q.   But it would be improper to
12  say that simply by the generation of
13  reactive oxygen species or reactive
14  nitrogen species, DNA mutations and tumor
15  development will occur, correct?
16      MS. O'DELL:  Object to form.
17      THE WITNESS:  One couldn't
18      say that just by the -- as you
19      point out, as the normal -- under
20      normal circumstances, endogenously
21      within the body, and not in
22      response to a particular agent
23      does produce these.  So one cannot
24      say, to answer your question, that

92 (Pages 362 to 365)

Judith Zelikoff, Ph.D.

Page 366

1    it -- just the presence of
2    reactive oxygen species will lead
3    to cancer.
4    BY MR. HEGARTY:
5        Q.   What data shows that the
6    body's response system to reactive oxygen
7    species and reactive nitrogen species is
8    unable to handle those species that might
9    be generated by talc exposure?
10       A.   Numerous cell studies and
11   numerous animal studies.  And you would
12   look at that by the level of antioxidants
13   that are also present.  And if a
14   substance such as talcum powder product
15   reduces antioxidants, then the cell or
16   the tissue is going to be overwhelmed by
17   that product.
18       Q.   Has that process ever been
19   shown in vivo?
20       A.   In a -- I'm not sure if this
21   answers your question.  I'll do my best
22   to answer it.  And your question was has
23   that process, meaning the process of
24   antioxidant change -- is that your

Page 367

1    question?
2        Q.   No.  The process where the
3    cell or the tissue is going to be
4    overwhelmed, has that process ever been
5    shown in vivo in women?
6        A.   In women?
7        Q.   Yes.
8        MS. O'DELL:  Object to the
9    form.  You can answer.
10       THE WITNESS:  Certainly in
11   animals, but not to my knowledge
12   in women.
13       I'm sorry.  I'm still
14   thinking.
15       Whenever the antioxidant
16   levels are decreased, that is an
17   indicator of being overwhelmed by
18   the reactive oxygen species or the
19   oxidation stress.
20   BY MR. HEGARTY:
21       Q.   And what studies have shown
22   the antioxidant levels are decreased in
23   women using talc?
24       A.   In women using talc -- most

Page 368

1    of the literature comes from in vivo
2    animal studies as well as in vitro cell
3    studies.  But my role is to -- is to look
4    at biological plausibility.  And so
5    studies that reveal or indicate that
6    response in an animal model and in cell
7    culture indicates to me that there's no
8    likely reason why it could not happen in
9    women.
10       Q.   Okay.  At the top of Page 25
11   of your report, you say that even a
12   single dose of a carcinogen can produce
13   effects that are adverse to cells and
14   tissue at the site of exposure.
15       Do you see where I'm
16   reading?
17       A.   Yes.
18       Q.   When you say dose, do you
19   mean exposure at a dose or volume of
20   exposure to a substance that studies have
21   proven are adverse to cells and tissues?
22       MS. O'DELL:  Object to the
23   form.
24       THE WITNESS:  That's a

Page 369

1    multiple question.  But when I
2    refer to even a single dose, I
3    mean even a single exposure.
4    BY MR. HEGARTY:
5        Q.   Are you saying there a
6    single molecule of the substance?
7        A.   What I meant in this report
8    is even a single exposure.  The
9    concentration of which could be unknown.
10   A single exposure to a certain
11   concentration, whatever that
12   concentration is, can produce effects.
13   I'm not saying can produce cancer.  What
14   I'm saying is can start the process of
15   either inflammation or oxidative stress.
16       Q.   And to what tissue does that
17   single dose need to reach to have the
18   adverse effects that you describe?
19       MS. O'DELL:  Object to the
20   form.
21       THE WITNESS:  Whatever that
22   particular -- it depends upon the
23   carcinogen or the inflammagogue
24   that one is looking at in terms of

93 (Pages 366 to 369)

Judith Zelikoff, Ph.D.

Page 370

1    a single exposure. And it depends
2    on the susceptibility of the
3    tissue. So to answer your
4    question, doses or concentration
5    to the target tissue is unknown or
6    open.
7  BY MR. HEGARTY:
8      Q.    You're not saying that a
9  single application of talc to the
10 perineum can produce effects that are
11 adverse to cells and tissue in the
12 ovaries, correct?
13         MS. O'DELL: Object to the
14         form.
15         THE WITNESS: I'm not saying
16         that it can't. I think I
17         testified earlier that a single --
18         depending upon what that product
19         is -- in this case we're talking
20         about talcum powder product --
21         that one exposure, one
22         application, one perineal direct
23         exposure could in fact trigger the
24         cells to start a process leaning

Page 371

1      towards inflammation.
2  BY MR. HEGARTY:
3      Q.    And where the talc -- where
4  does the talc need to go in the body to
5  trigger that mechanism?
6      A.    Well, once it gets -- once
7  it's applied to the perineal region, it's
8  my belief that it then migrates up to
9  the -- to the vaginal area. And in the
10 vaginal area, it could also start
11 mechanisms, gene expression changes in
12 the vaginal tissues that could lead to
13 inflammation, or it could get to the
14 point of the cervix or to the fallopian
15 tubes. It causes changes in cells,
16 whether it's gene expression or an
17 inflammation, at any one of those
18 upward -- upward reproductive tract organ
19 systems or tissues. They're all made up
20 of cells that are susceptible to oxidant
21 stress.
22     Q.    Can you cite to us any study
23 that has shown that process in women
24 using talc to the perineum?

Page 372

1      A.    In women?
2      Q.    Yes.
3      A.    I can -- I cannot off the
4  top of my head or looking at my report
5  tell you that. Again, I just want to
6  repeat that my charge was to look at
7  biological plausibility and I -- I see
8  those effects or processes that you're
9  indicating in cells and animal models,
10 but I do not have that information with
11 humans.
12     Q.    Are you aware of any study
13 correlating the exposures used in those
14 cell and animal models to the exposures
15 that women would experience with perineal
16 application of talc?
17         MS. O'DELL: Object to the
18         form.
19         THE WITNESS: Well, in my
20         mind, and in reality, women use
21         different amounts, whether it's
22         different handfuls. So I can't
23         really give you a concentration.
24         But there are studies, the in

Page 373

1      vitro studies, that did use more.
2          However, when you're looking
3      at toxicology and you're looking
4      to define a mechanism or a
5      potential mechanism, if you use
6      even a higher dose, you're
7      still -- you still can elicit the
8      same mechanism.
9          So perineal application --
10     to answer your question, perineal
11     application can put a lot or a
12     little. But it also depends on
13     the frequency and the duration of
14     the use.
15 BY MR. HEGARTY:
16     Q.    Doctor, my question, though,
17 was, has any study correlated the
18 exposures in the animal or cell studies
19 to which you are referring to, to show
20 that those same exposures are occurring
21 in women applying talc to the perineum?
22     A.    No.
23     Q.    For purposes of your
24 opinions on biological plausibility, do

94 (Pages 370 to 373)

Judith Zelikoff, Ph.D.

Page 374

1  you rely on the studies that you cite in
2  your report done by Dr. Saed?
3      A.   I relied on the information
4  from Dr. Saed.  It went into making up my
5  opinion, yes.
6      Q.   If those studies were not
7  available to you, would your opinions
8  still be the same?
9      A.   As I said, one of the -- one
10  of the manuscripts came after my report.
11  And it was -- I looked at an abstract, so
12  I had information.  And other -- others
13  of Dr. Saed's I reviewed.  But I would
14  have come to the same conclusion.  That
15  was just -- that was supplemental and
16  complementary and compelling.
17      Q.   Have you ever cited an
18  abstract in any published article of
19  yours?
20      A.   Yes, I have.
21      Q.   Are you an expert in the
22  kinds of testing that Dr. Saed has
23  reported in the materials you reviewed?
24      A.   Yes, I am.

Page 375

1      Q.   Do you understand that
2  Dr. Saed is an expert for the plaintiffs
3  in this litigation?
4      A.   I do understand that from
5  looking at his publication.
6      Q.   Did you do anything yourself
7  to verify the reliability of the testing
8  that he performed whose results you have
9  read in his publications?
10      A.   I focused my review and
11  reading of the study design, which is --
12  and the experimental approach, which are
13  key factors for evaluating any study.
14  And I agree with the experimental
15  approach and the study design that he
16  used.
17          He used proper controls.  He
18  used a dose-response.  He used the proper
19  techniques in analyzing for cell
20  survivability as well as for oxidative
21  stress and gene expression changes.
22      Q.   Have you ever done studies
23  using epithelial cell lines?
24      A.   MS. O'DELL:  Ovarian or

Page 376

1      just?
2  BY MR. HEGARTY:
3      Q.   Ovarian epithelial -- thank
4  you.
5          Have you ever done studies
6  using any type of ovarian epithelial cell
7  lines?
8      A.   I have not.
9      Q.   Have you ever done any study
10  using ovarian cancer cell lines?
11      A.   I have not.  Not personally.
12      Q.   What data shows that the
13  doses that Dr. Saed used in his studies
14  are comparable to those to which
15  epithelial ovarian cells would be exposed
16  to via perineal application of talc?
17          MS. O'DELL:  Objection to
18      form.
19          THE WITNESS:  There was no
20      comparison in his study directly.
21      But if I may, I just want to say,
22      when you're looking at biological
23      plausibility, which was the
24      question that I was asked,

Page 377

1      oftentimes higher doses in vitro
2      studies are used to provide a
3      mechanism or a plausibility or
4      feasibility that that can -- that
5      that product, in this case, talcum
6      powder product, can induce
7      inflammation, inflammatory
8      responses and changes in
9      antioxidant levels.
10          So it is not uncommon to use
11      higher doses in in vitro studies
12      than what might be seen in a human
13      for biological plausibility
14      studies.
15  BY MR. HEGARTY:
16      Q.   Can you cite any study that
17  has shown the results reported in
18  Dr. Saed's studies in vivo in women using
19  talc?
20          MS. O'DELL:  Objection to
21      form.
22          THE WITNESS:  May I get
23      Dr. Saed's paper?
24  BY MR. HEGARTY:

95 (Pages 374 to 377)

Judith Zelikoff, Ph.D.

Page 378

1     Q.   Well, I'm actually not
2  asking about Dr. Saed's paper.
3     A.   Okay.
4     Q.   But my question is -- you've
5  read Dr. Saed's papers, correct?
6     A.   Yes, I have.
7     Q.   Can you cite for me any
8  study that has shown the results he
9  reports in his studies in women using
10 talc?
11           MS. O'DELL:  Object to form.
12           THE WITNESS:  His studies
13 were in vitro studies.
14 BY MR. HEGARTY:
15    Q.   Are there any such studies
16 looking at the effects in vivo of talc?
17           MS. O'DELL:  Objection.
18           THE WITNESS:  In vivo in
19 humans or in vivo in animals?
20 BY MR. HEGARTY:
21    Q.   In humans.
22           MS. O'DELL:  Object to the
23 form.
24           THE WITNESS:  When you refer

Page 379

1      to such studies, can you tell me
2      which studies -- which types of
3      studies again are you referring
4      to?
5  BY MR. HEGARTY:
6     Q.   The cell studies that you
7  reference by Dr. Saed on Page 25 of your
8  report.
9     A.   And the question is are
10 there any?
11    Q.   Studies in humans showing
12 such effects following application of
13 talc to the perineum.
14           MS. O'DELL:  Objection to
15 form.
16           THE WITNESS:  Not to my
17 knowledge.
18      Excuse me.  You said that
19      was on Page 25 that you were
20      referring to?
21 BY MR. HEGARTY:
22    Q.   Correct.
23      Have you ever published a
24 paper discussing single nucleotide

Page 380

1  polymorphisms?
2     A.   I need to look at my CV
3  again, as being co-investigator.  I've
4  worked with other people.  I have not
5  performed studies looking at single
6  nucleotide polymorphisms.  But I have
7  worked with people who have -- have done
8  them.  And if I look at my curriculum
9  vitae, I can tell you if I've been on any
10 publications.
11    Q.   Okay.  Because of time, just
12 sitting here today, recognizing for the
13 record you haven't looked at your CV, do
14 any such studies come to mind?
15    A.   I don't -- I have not done
16 those studies in my own laboratory.
17 Although I'm -- I'm just saying that I
18 may have been on a publication where
19 colleagues of mine have used that -- that
20 method, those methods.
21    Q.   Do you have an opinion about
22 talc in single nucleotide polymorphisms
23 or SNPs?
24           MS. O'DELL:  Objection.

Page 381

1           THE WITNESS:  I think
2      there -- there is literature
3      showing, including in Dr. Saed's
4      papers, that there are single --
5      and in -- in a paper that looked
6      at women and looked at antioxidant
7      enzymes and they showed there was
8      single nucleotide polymorphism
9      changes in those women.
10      Looking at, I think it was
11      glutathione S-transferase M 1.
12      So what is my -- so if your
13      question is what is my opinion on
14      single nucleotide polymorphisms in
15      ovarian cancer?
16 BY MR. HEGARTY:
17    Q.   Well, let me ask a different
18 question.  Is your biologic mechanism --
19 I'm sorry.  Is your biologic plausibility
20 opinion between talc and ovarian cancer
21 the process or action that Dr. Saed
22 describes in his studies?
23    A.   I believe that it could be
24 adding to the -- the plausibility of the

96 (Pages 378 to 381)

Judith Zelikoff, Ph.D.

Page 382

1  relationship or of the causation between
2  ovarian cancer and talcum powder
3  products.
4       Q.   Well, is it your opinion
5  that the mechanism by which talc can be
6  biologically -- be a biological plausible
7  cause of ovarian cancer, that's cited by
8  Dr. Saed in his cell studies?
9       MS. O'DELL:  Objection to
10          form.
11          THE WITNESS:  I believe
12          that -- in my opinion and what I'm
13          stating here in the report, is
14          that inflammation is the
15          primary -- one of the primary
16          biological mechanisms.
17          Whether it appears from the
18          literature that single nucleotide
19          polymorphisms may, in fact, play a
20          role.
21  BY MR. HEGARTY:
22       Q.   Okay.  But is -- is that --
23  is it your opinion that -- not that they
24  play -- just that they play a role, but

Page 383

1  that is the mechanism for biologic
2  plausibility between talc and ovarian
3  cancer?
4       A.   I -- I do not believe it
5  is -- it is not my opinion that -- it is
6  my opinion that single nucleotide
7  polymorphisms, along with inflammation
8  and -- and perhaps other mechanisms may
9  be involved that talc is associated with.
10          I focused my -- my opinion
11  on the assessment of inflammation and its
12  role.
13          MR. HEGARTY:  Off the record
14          for a minute.
15          THE VIDEOGRAPHER:  The time
16          is 4:48 p.m.  We are off the
17          record.
18          (Short break.)
19          THE VIDEOGRAPHER:  We are
20          back on the record.  The time is
21          5:08 p.m.
22  BY MR. HEGARTY:
23       Q.   Dr. Zelikoff, I'm going to
24  jump around a little bit from topic to

Page 384

1  topic.  I'll introduce the topic each
2  time that I ask you a question.
3          Going back to the Canadian
4  health assessment that you provided to us
5  at the beginning of the day.
6       A.   Yes.
7          (Brief interruption.)
8  BY MR. HEGARTY:
9       Q.   Doctor, we talked earlier
10  about Canada's health assessment with
11  regard to talc.  Are you familiar with
12  the process by which the Canadian
13  authorities do that health assessment?
14       A.   I am -- only from what is in
15  the document.
16       Q.   Have you ever been a part of
17  that, of a Canadian health assessment
18  like the one shown with talc?
19       A.   I've worked with Health
20  Canada.
21       Q.   Okay.  Have you ever worked
22  with Health Canada on doing a health
23  assessment like that reflected in the
24  document we looked at earlier today?

Page 385

1       A.   No, I have not.
2       Q.   Do you know what kind of
3  standards that they apply in determining
4  whether to call -- whether to say whether
5  there's a potential for harm with a
6  substance?
7       A.   Just what is in the
8  document.  And then I use my own
9  professional judgment, whether I agree
10  with that or not.
11       Q.   Did plaintiff's counsel
12  provide you with some scientific and
13  medical literature with regard to talc or
14  ovarian cancer?
15       A.   So the question is whether I
16  was provided with some scientific and
17  medical literature with regard -- yes,
18  many of the articles in the binders were
19  provided to me by them.
20       Q.   Are you able to identify
21  which of those articles came from
22  plaintiffs' counsel versus which you
23  found on your own?
24       A.   I may be able to do that

97 (Pages 382 to 385)

Judith Zelikoff, Ph.D.

Page 386

1   with some, yes. But this is over a
2   period of, as I said, 2017 to now.
3        Q.   With regard to your
4   invoices -- do you have your invoices
5   there?
6        A.   I do not.
7        Q.   They've been marked as an
8   exhibit.
9        A.   Oh.
10       Q.   Can someone help her find
11  those invoices?
12       MS. O'DELL:  Did you take
13       them back?  I don't know that --
14       there was only one copy.
15       MR. HEGARTY:  I don't think
16       I did.  I think it was Exhibit 1.
17       MS. O'DELL:  The reason I
18       say that is I did not see it
19       during the lunch break when I
20       looked at --
21       THE WITNESS:  I do have the
22       invoices in my binder here.
23  BY MR. HEGARTY:
24       Q.   Okay.  If you can turn to

Page 387

1   your binder, please.
2        A.   If I recall.
3        Q.   If we can find that exhibit,
4   that would be helpful?
5        MS. O'DELL:  I'm not sure
6        there are any invoices in her
7        binder.
8        Is it in the stack that's
9        right there?
10       MR. HEGARTY:  No, I don't
11       think so.
12  BY MR. HEGARTY:
13       Q.   Yeah invoices.  I found it.
14       Your invoices, Doctor,
15  reflect that you prepared a final report
16  delivered on February 4, 2018.
17       Do you see that?
18       A.   I do see that.
19       Q.   That was almost a year ago,
20  correct?
21       MS. O'DELL:  Objection to
22       form.
23       THE WITNESS:  Yes.
24  BY MR. HEGARTY:

Page 388

1        Q.   What are the differences
2   between your current report dated
3   November 16, 2018, and the final report
4   that you provided as shown here back in
5   February of 2018?
6        A.   It was -- I own that.  It
7   should have said draft report.  And the
8   difference is that that's more literature
9   and more time had gone by for the
10  emergence and review of more literature.
11       Q.   You go from a reference on
12  February 4, 2018, to the next reference
13  on September 20th -- I'm sorry.  Did I
14  say -- let me back up.
15       You go form a reference on
16  February 4, 2018, to the next cite for
17  time on September 20, 2018.  Did you
18  review any additional literature between
19  February 4th and September 20, 2018?
20       A.   Yes, I'm sure I did.  And I
21  also reviewed the production documents
22  within that time.  More of the production
23  documents.
24       Q.   Your report doesn't show any

Page 389

1   time invoiced between February 4, 2018,
2   and September 20, 2018.  Did you spend
3   time reviewing literature or otherwise
4   working on your report that's not
5   contained in your invoices?
6        A.   It -- I may have.  I did not
7   always invoice for something that I spent
8   maybe an hour on.
9        Q.   Are you able to cite for me
10  the sections in your report that you
11  added or changed between the report that
12  you prepared on February 4, 2018, and the
13  November 16, 2018, report?
14       A.   Not without seeing both
15  reports side by side.
16       Q.   Do you still have a copy of
17  the February 4, 2018, report?
18       A.   Not with me.
19       Q.   Does it exist?
20       A.   It likely does on my
21  computer, yes.
22       Q.   You mentioned that you
23  referred to -- that you reviewed Julie
24  Pier's deposition testimony?

98 (Pages 386 to 389)

Judith Zelikoff, Ph.D.

| Page 390 | Page 392 |
|---|---|
| 1     A.  I said three-quarters of the | 1  Canada, like Exhibit Number 9? |
| 2  deposition, half to three-quarters. | 2     A.  I'm sorry. |
| 3     Q.  That was provided to you by | 3     MS. O'DELL:  Objection to |
| 4  counsel for plaintiffs, correct? | 4  form. |
| 5     A.  Yes, correct. | 5     THE WITNESS:  All I can say |
| 6     Q.  Do you know how they went | 6  is that in working with Health |
| 7  about selecting the deposition | 7  Canada on immunology in my early |
| 8  transcripts to provide to you for | 8  career days, that I may have used |
| 9  purposes of your review in this case? | 9  an assessment like that. |
| 10     A.  I do not. | 10  BY MR. HEGARTY: |
| 11     Q.  Did you ask for any | 11     Q.  Can you cite for me, sitting |
| 12  deposition -- did you ask for the | 12  here today, anytime that you -- your |
| 13  depositions of all experts who have | 13  opinions were informed by a Health Canada |
| 14  testified in this litigation? | 14  safety assessment or screening |
| 15     MS. O'DELL:  Objection to | 15  assessment? |
| 16  form. | 16     MS. O'DELL:  Object to the |
| 17     THE WITNESS:  I did not ask | 17  form.  Other than what she said? |
| 18  for depositions. | 18     THE WITNESS:  Except for |
| 19  Let me -- let me retract | 19  what I said, I cannot recall. |
| 20  that, please.  If in reading my | 20  BY MR. HEGARTY: |
| 21  literature there was something | 21     Q.  Did you review for purposes |
| 22  that I thought might be in a | 22  of your opinions in this case the current |
| 23  deposition of someone, I asked the | 23  National Cancer Institutes position -- |
| 24  plaintiff attorneys if they had | 24  healthcare -- healthcare -- health |

| Page 391 | Page 393 |
|---|---|
| 1  anything in that regard that would | 1  professional PDQ, or the NCI PDQ? |
| 2  lend to my opinion. | 2     A.  I have seen that recently. |
| 3  BY MR. HEGARTY: | 3     Q.  I'll mark as Exhibit Number |
| 4     Q.  And did you ever ask for any | 4  23, a copy of the NCI PDQ that mentions |
| 5  additional depositions beyond those that | 5  talc. |
| 6  were provided? | 6     (Document marked for |
| 7     A.  No, I did not. | 7  identification as Exhibit |
| 8     Q.  Going back to the Health | 8  Zelikoff-23.) |
| 9  Canada assessment.  Have you ever cited | 9  BY MR. HEGARTY: |
| 10  to a Health Canada assessment in any | 10     Q.  Have you seen what I marked |
| 11  written publication of yours? | 11  as Exhibit 23 before -- or as of the time |
| 12     A.  Without looking at my | 12  that you drafted your report? |
| 13  publications, I cannot.  But I can tell | 13     A.  No, sir. |
| 14  you that coming to mind just sitting | 14     Q.  Plaintiffs' counsel did not |
| 15  here, as I said, I worked with Health | 15  provide you a copy of that? |
| 16  Canada, and I worked with them on my | 16     A.  Not prior to my report, no. |
| 17  research in fish immunology, and it is | 17     Q.  How did you happen -- who -- |
| 18  possible that I cited Health Canada -- | 18  strike that. |
| 19  Health Canada literature in those | 19  Did -- from where did you |
| 20  publications concerning fish. | 20  receive a copy of Exhibit 23 after |
| 21     Q.  Sitting here today, can you | 21  preparing your report? |
| 22  recall at any point in time when you -- | 22     A.  From the plaintiff attorney. |
| 23  when your opinions were informed by a | 23     Q.  Did you ask for it? |
| 24  draft screening assessment by Health | 24     A.  In general, I asked for all |

99 (Pages 390 to 393)

Judith Zelikoff, Ph.D.

Page 394

1  relevant literature and internal
2  information.  But I did not specifically
3  ask for the NCI report.
4      Q.   When you asked for all
5  relevant information, internal
6  information, was that prior to preparing
7  your expert report?
8      A.   That's pretty much on a
9  chronic level, in other words from the
10  time that I was recruited or asked to
11  participate in this, I always asked, "Is
12  there literature?  Is there more
13  literature?  Here is the literature that
14  I have found," which were quite a number.
15  "Is there anything else that you can add
16  to this?"  So I provided literature, and
17  they provided me with literature.
18      Q.   You did not find the NCI's
19  PDQ yourself?
20      A.   I did not find it myself.
21      Q.   Did the NCI PDQ statements
22  on perineal talc exposure inform your
23  opinions in this case?
24      A.   As I said, I only saw it

Page 395

1  within the last few days.
2      Q.   Understood.  But you also
3  reviewed the Saed manuscript, you
4  reviewed the Canadian health assessment.
5  You said both those documents informed
6  your opinions.
7          So my question is, did the
8  NCI PDQ also inform your opinions.
9          MS. O'DELL:  Object to the
10  form.
11          THE WITNESS:  Well, the --
12      the documents that you previously
13      mentioned do not inform my opinion
14      prior to my report of
15      November 16th.  However, it's
16      information that has added to me
17      to get to this place where I am
18      right now.
19          So my opinion has not
20      changed from my report until
21      sitting here today.
22  BY MR. HEGARTY:
23      Q.   Did the NCI PDQ add to your
24  opinions in this case?

Page 396

1      A.   I reviewed their opinions.
2  I have many questions about how they
3  reached their opinions and what studies
4  they used.
5          If we can just be on the
6  same page in terms of what their opinion
7  is?
8      Q.   I'm looking at the section
9  under perineal talc exposure.  And my --
10  my question is -- strike that.
11          I'm looking at the section
12  on perineal talc exposure which is about
13  four pages from the end.
14      A.   I see.
15      Q.   And my question is only
16  whether that section informed your
17  opinions in this case.
18          MS. O'DELL:  Object to the
19      form.
20          THE WITNESS:  I reviewed it.
21      It did not change my opinion.
22      Did -- did it inform my opinion?
23      It did not change my opinion.
24  BY MR. HEGARTY:

Page 397

1      Q.   Do you agree with the NCI
2  PDQ statement on perineal talc exposure?
3      A.   If we are talking about
4  their final conclusion?
5      Q.   I'm talking -- yes.  We can
6  talk about their final conclusion.
7      A.   Okay.  If I'm recalling
8  this, their final conclusion that -- was
9  that there was no causal relationship
10  between talc -- talcum powder exposure
11  and ovarian cancer.  Is that --
12      Q.   Well, the -- the weight of
13  the evidence does not support an
14  association between perineal talc
15  exposure and an increased risk of ovarian
16  cancer.  Do you agree with that
17  statement?
18      A.   I do not agree with that
19  statement.
20          And I find, in reading this
21  document, that I'm not sure how they
22  reached that conclusion.  On several
23  points, if you're interested.
24          One is --

Judith Zelikoff, Ph.D.

Page 398

1    Q.   No, I'm just asking you
2  whether you agreed with it.
3         A.   I do not agree with their
4  final conclusion.
5         Q.   Neither FDA nor any
6  scientific regulatory or other group has
7  ever sought out your opinions with regard
8  to the biologic plausibility of talc and
9  ovarian cancer, correct?
10        A.   That is correct.
11        Q.   You made reference earlier
12 to the Penninkilampi article.  Do you
13 recall that?
14        A.   I recall mentioning it, yes.
15        Q.   I'm going to mark as
16 Exhibit 34 a copy of the Penninkilampi
17 article.  That's the article that you
18 were talking about earlier, correct?
19        A.   2018, correct.
20            (Document marked for
21            identification as Exhibit
22            Zelikoff-34.)
23 BY MR. HEGARTY:
24        Q.   If you turn over to page --

Page 399

1  strike that.
2            This is an article that you
3  rely on for purposes of your opinions in
4  this case, correct?
5         A.   This is an article that I
6  reviewed and played into, yes, informed
7  my opinions.
8         Q.   Did you find it to be a
9  reliable source of information?
10            MS. O'DELL:  Object to the
11            form.
12            THE WITNESS:  I found no
13        problems in the study design as I
14        read it.
15            Again, I'm not an
16        epidemiologist.  So getting into
17        the nuances of this.  I'm a
18        toxicologist and I depend on my
19        epidemiology colleagues to fill in
20        the gaps.
21 BY MR. HEGARTY:
22        Q.   Over on Page 45, under the
23 section Discussion.  Do you see that
24 section?

Page 400

1         A.   Yes, I do.
2         Q.   Third line down it says,
3  "The mechanism by which perineal talc use
4  may increase the risk of ovarian cancer
5  is uncertain."
6            Do you agree with that
7  statement?
8            MS. O'DELL:  Objection to
9            form.
10            THE WITNESS:  I think
11        there's no -- in providing
12        biological plausibility,
13        biological plausibility, in and of
14        itself, says that there is a
15        possible mechanism or action that
16        could provide evidence for the
17        causation.
18            So the mechanism by which
19        perineal talc use may increase the
20        risk of ovarian cancer is
21        uncertain.  It does not mean
22        it's -- it means it's uncertain,
23        that there are many viewpoints on
24        it.

Page 401

1  BY MR. HEGARTY:
2         Q.   At the very -- in the very
3  last line of that article -- I'm sorry,
4  the very last line of that paragraph it
5  says, "The potential mechanism by which
6  genital talc is associated with an
7  increased risk of ovarian cancer hence
8  remains unclear."
9            Do you agree with that
10 statement?
11        A.   I think there is -- in -- in
12 regards to your previous questions that
13 asked me if it was -- if there was an
14 agreement among the medical population,
15 and I said that I didn't know that there
16 was agreement or was not agreement.  I
17 thought that there were not agreement.
18 So I agree with the statement that there
19 is still room for further study.
20            Unclear does not mean
21 unknown or that there are not biological
22 plausible mechanisms that could be
23 entertained.
24        Q.   Is inflammation part of a

101 (Pages 398 to 401)

Judith Zelikoff, Ph.D.

Page 402

1  normal mechanism of response to the
2  presence of particles in the lungs?
3       A.   Depending upon the particle,
4  inflammation can be a normal part of a
5  response, yes.
6       Q.   Can tumors occur in the
7  respiratory system with very high
8  exposure to particles that overwhelm the
9  body's clearance mechanisms and lead to
10  particle overload of lung macrophages?
11       A.   Are you referring to the NTP
12  study?
13       Q.   I'm not referring to any
14  study in particular.  That was just a
15  question in general.
16       A.   Okay.  Can you repeat the
17  question?
18       Q.   Yeah.  Can tumors occur in
19  the respiratory system with very high
20  exposure to particles that overwhelm the
21  body's clearance mechanisms and lead to
22  particle overload of lung macrophages?
23       MS. O'DELL:  Object to form.
24       THE WITNESS:  That is a --

Page 403

1       that has been seen as a
2       potential -- as a potential to
3       occur, yes.
4  BY MR. HEGARTY:
5       Q.   Are there any publications
6  that indicate such a mechanism of
7  particle overload can occur in the
8  ovaries?
9       MS. O'DELL:  Objection to
10       form.
11       THE WITNESS:  No studies
12       that I'm aware of that -- that
13       refer to particle overload in the
14       ovaries in this regard, in regard
15       to talcum powder.  There's
16       evidence, of course, as I said
17       that there is talcum powder in the
18       ovary.
19  BY MR. HEGARTY:
20       Q.   Over on Page 5 of your
21  report, Exhibit 2.
22       A.   Page headed by Section 4,
23  Asbestos?
24       Q.   Correct.  You make a

Page 404

1  statement in the third paragraph at the
2  end that says even incidental -- the
3  third paragraph at the end.
4       A.   I was looking for a pen.
5  Excuse me.
6       Okay.  Go ahead.
7       Q.   Says, "Even incidental
8  contamination by amphibole forms of
9  asbestos is hazard enough to cause
10  asbestos-related illnesses."
11       Do you see where I'm
12  reading?
13       A.   I'm sorry, are you in the
14  first paragraph?
15       Q.   Third paragraph.
16       A.   Third paragraph.
17       Q.   At the end.
18       A.   At the -- traces of these
19  types of asbestos are --
20       Q.   No, third paragraph.
21  Even -- the last line.  "Even incidental
22  contamination by amphibole forms of
23  asbestos is hazard enough to cause
24  cancer-related illnesses."

Page 405

1       Do you see where I'm
2  reading?
3       A.   Says, "Cause
4  asbestos-related illnesses."
5       Q.   I'm sorry.  "Can cause
6  asbestos-related illnesses."  You cite --
7       A.   I see where you are reading.
8       Q.   -- the Rohl and Langer
9  paper?
10       A.   Yes.
11       Q.   I'll mark as Exhibit 35 the
12  Rohl and Langer paper that you've cited.
13       (Document marked for
14       identification as Exhibit
15       Zelikoff-35.)
16  BY MR. HEGARTY:
17       Q.   Doctor, nowhere in that
18  paper did the author say that incidental
19  contamination by amphibole forms of
20  asbestos is hazard enough -- hazardous
21  enough to cause asbestos-related
22  illnesses, do they?
23       MS. O'DELL:  Objection to
24       form.

102 (Pages 402 to 405)

Judith Zelikoff, Ph.D.

Page 406

1        THE WITNESS:  I'm sorry, I'm
2   not certain that this is the same
3   paper.  This is Rohl, et al.  The
4   paper that I cited is Rohl and
5   Langer.
6   BY MR. HEGARTY:
7        Q.   It's dated 1976 --
8        A.   1976.
9        Q.   -- correct?
10       A.   That's correct.
11       Q.   If you look in the abstract
12  of that paper --
13       A.   Yes.  The paper --
14       Q.   -- the paper that I marked
15  as Exhibit 35.
16       A.   Rohl, et al, yes.
17       Q.   Yes.  It says, "It's
18  possible adverse health effects from
19  intermittent use of these products,
20  especially those that contain asbestiform
21  and fragmented anthophyllite, tremolite,
22  chrysotile, quartz, and trace minerals
23  are presently unknown and warrant
24  evaluation."

Page 407

1        Did I read that correctly?
2        A.   I'm sorry, you are in the
3   abstract, but I don't know what line you
4   are on.
5        Q.   The very last line of the
6   abstract.
7        A.   "Possible adverse health
8   effects from intermittent use of these
9   products especially those that contain
10  asbestiform and fragmented anthophyllite,
11  tremolite, chrysotile, quartz, and trace
12  minerals are presently unknown and
13  warrant evaluation."
14       Yes.  This is also dated
15  1976.
16       Q.   Which is the date that you
17  cite to the Rohl and Langer paper?
18       A.   Yes, I -- I understand that,
19  sir.  However, because this is a Rohl et
20  al., it is certainly possible that I
21  miscited and it was Rohl et al.  But my
22  citation in there is Rohl and Langer.  So
23  it may have been an error on my part.
24  However, there's pause.

Page 408

1        Many investigators,
2   including myself, have papers that come
3   out the same year but with different
4   authors.
5        Q.   If you -- you turn over to
6   Page 6 of your report.
7        A.   Yes, sir.
8        Q.   At the end of the first
9   paragraph, at the top of the page.
10       A.   Yes.
11       Q.   You say that "the close
12  proximity of asbestos in talc and mineral
13  deposits makes extraction of either
14  material alone difficult, if not
15  impossible."
16       Do you see where I'm
17  reading?
18       A.   Yes, I do.
19       Q.   Is it your testimony that it
20  is impossible to extract talc from
21  mineral deposits without asbestos?
22       MS. O'DELL:  Objection to
23  form.
24       THE WITNESS:  I'm not a --

Page 409

1   I'm not a geologist.  I cannot --
2   I can only rely on the references
3   that are there.
4   BY MR. HEGARTY:
5        Q.   Can you list all the steps
6   used in the processing of pharmaceutical
7   grade talc?
8        A.   I can give you an overview.
9   But again, I'm not a commercial talc
10  production person, nor am I a geologist,
11  nor am I in the industry.  So I can only
12  give you a superficial glimpse.
13       Q.   Can you describe the
14  benefication for talc?
15       MS. O'DELL:  Objection to
16  form.  Asked and answered.
17       THE WITNESS:  Not in -- not
18  in detail.  I only know in general
19  that there is -- actually, I
20  prefer not to answer that at all
21  because I don't want to be
22  inaccurate.  It's not my field.
23  BY MR. HEGARTY:
24       Q.   Can you turn over to Page 7

103 (Pages 406 to 409)

Judith Zelikoff, Ph.D.

Page 410

1  of your report.
2           In the second paragraph you
3  refer to the deposition of Alice Blount.
4           Do you see that?
5       A.   Yes, I do.  Second sentence.
6       Q.   And you contend that the
7  sample she tested claimed to include
8  asbestos, including asbestos in Johnson's
9  Baby Powder.  Do you see where you make
10  that reference?
11      A.   Yes, I'm citing her
12  deposition.
13      Q.   Did you read the entirety of
14  her deposition?
15      A.   No, sir.
16      Q.   What testing method did she
17  use?
18      A.   I'd like to see the
19  deposition again.
20      Q.   Did you see from her
21  deposition where she testified that her
22  results published in 1991 came from a
23  Johnson's Baby Powder bottle purchased in
24  1996?

Page 411

1       A.   You know, I'm waiting for
2  the -- see the article, please.
3       Q.   Let me withdraw the
4  question.  I don't have time to cover
5  that.
6           If you turn over to -- if
7  you look at Page 7, the second-to-last
8  paragraph you make reference there to the
9  testimony of Dr. Hopkins and the
10  testimony of Julie Pier.
11          Do you see that?
12      A.   I see reference to
13  Dr. Hopkins in the third sentence.  And
14  in the same paragraph, I see on the last
15  sentence, deposition of Julie Pier,
16  corporate representative of Imerys.
17      Q.   You've already testified
18  that you have not completed reading the
19  deposition of Julie Pier, correct?
20      A.   I have testified to that,
21  yes.
22      Q.   Did you read the entirety of
23  the deposition of Dr. Hopkins?
24      A.   I read the entirety, yes.

Page 412

1       Q.   You read every word of it?
2       A.   I reviewed it.  And I read
3  it to the best of my ability.
4       Q.   You make reference there to
5  Exhibits 47 and 28, 47 from Julie Pier
6  deposition and 28 from Dr. Hopkins'
7  deposition.
8           Do you see that?
9       A.   Yes, I do.
10      Q.   Do you know who prepared
11  those exhibits?
12      A.   I do not.  I would make an
13  assumption that it was attorneys.
14      Q.   Were you aware that they
15  were prepared by counsel for plaintiffs?
16          MS. O'DELL:  Objection to
17  form.
18          THE WITNESS:  As the
19  questions were asked by some of
20  the attorneys for the plaintiff, I
21  would make that assumption.
22  BY MR. HEGARTY:
23      Q.   Did you do anything yourself
24  to verify the accuracy of the information

Page 413

1  in any of those exhibits?
2       A.   I'm not sure what you mean
3  did I do anything myself.  I read them,
4  and I did not do any further literature
5  searching, if that's what you mean.
6       Q.   Did you review the test
7  results themselves that are supposedly
8  reported in those two exhibits?
9           MS. O'DELL:  Objection to
10  form.
11          THE WITNESS:  Did I review
12  the testing methodology?  I did
13  not review it in the sense that I
14  did further literature searching,
15  but I -- I looked at and reviewed
16  the testing methods that they --
17  that they said they used.
18  BY MR. HEGARTY:
19      Q.   Did you actually pull the
20  tests that are referenced in those
21  exhibits and look at the test results
22  yourself?
23      A.   I did not.
24      Q.   Are you aware that in 2009

104 (Pages 410 to 413)

Judith Zelikoff, Ph.D.

Page 414

1  FDA pulled -- did its own testing with
2  regard to asbestos and talc?
3      A.  I am aware of that.
4      Q.  Did you review the results
5  of those tests?
6      A.  I did review the results.
7  It doesn't come to mind right now.  I'd
8  like to see a copy of it, if I may.
9      Q.  Nowhere in your report do
10  you cite those test results, do you?
11      A.  Not that I can recall.
12      I do cite a paper or a
13  comment by Epstein writing to the FDA in
14  here.  And the FDA's response in terms of
15  migration.
16      But in answer to your
17  question -- can you repeat your question?
18      Q.  Sure.  Did you cite -- you
19  agree that you didn't cite anywhere --
20  strike that.
21      You did not cite anywhere in
22  your report the results of the FDA's
23  testing of talc in 2009, correct?
24      A.  It doesn't appear so, no.

Page 415

1      Q.  Did you have that
2  information before you finalized your
3  report?
4      A.  I'm not certain.  Probably
5  yes.
6      Q.  Did you review all the
7  epidemiologic literature looking at
8  asbestos exposure and ovarian cancer?
9      A.  Well, as I said, I'm not an
10  epidemiologist.  So I looked at several
11  of the meta-analyses, including
12  Dr. Taher.
13      Q.  Did you read all the
14  meta-analyses that had been published
15  with regard to asbestos and ovarian
16  cancer?
17      A.  No, I have not.
18      Q.  The medical literature
19  looking at asbestos exposure and ovarian
20  cancer was based on exposure to -- was
21  based on a heavy industrial exposure,
22  correct?
23      MS. O'DELL:  Objection to
24      form.

Page 416

1      THE WITNESS:  There are many
2      studies that IARC used, not just
3      worker study populations.
4  BY MR. HEGARTY:
5      Q.  But their conclusion with
6  regard to designating talc -- sorry,
7  designating asbestos as Category 1 was
8  based on five cohort studies involving
9  heavy industrial exposure, correct?
10      A.  The preponderance -- or the
11  weight -- the weight of evidence was
12  contributed among all studies, but it's
13  my -- it's my thought that the worker
14  studies were probably weighted as heavy
15  as any others.
16      Q.  You agree -- you agree that
17  nowhere in your report do you analyze
18  what asbestos exposure levels had been
19  shown to induce a biologically plausible
20  effect in tissues, correct?
21      MS. O'DELL:  Object to the
22      form.
23      THE WITNESS:  Again, what do
24      you mean by analyze?

Page 417

1  BY MR. HEGARTY:
2      Q.  Well, nowhere do you cite
3  studies in your report reporting on the
4  effect of asbestos in tissues, correct?
5      A.  I certainly do talk about
6  asbestos.  If you give me a minute to
7  review.
8      I talk about it on Page 7
9  being listed as a Group 1 carcinogen.
10      Q.  My question is nowhere in
11  your report do you analyze the studies
12  that look at the toxicity or discuss the
13  toxicity of asbestos in human tissue,
14  correct?
15      MS. O'DELL:  Object to the
16      form.
17      THE WITNESS:  I -- I did not
18      look at -- I did not analyze in
19      depth, no, the studies that are
20      associated with the IARC report,
21      if that's what you're asking.
22  BY MR. HEGARTY:
23      Q.  What type of chromium --
24  strike that.

105 (Pages 414 to 417)

Judith Zelikoff, Ph.D.

Page 418

1          Is chromium-6 in Johnson's
2  Baby Powder?
3          A.   Chromium is in Johnson's
4  Baby Powder.
5          Q.   I'm sorry?
6          A.   Chromium is present.
7          Q.   Is chromium-6 present in
8  Johnson's Baby Powder?
9          A.   There are indications.  They
10 just discuss total chromium.
11         Q.   Can you testify here today
12 that Johnson's Baby Powder has chromium-6
13 in it?
14         MS. O'DELL:  Object to the
15 form.
16         THE WITNESS:  Again, not
17 being a geologist and only going
18 by the internal documents, and if
19 I may also look at one of the
20 exhibits that has the data for the
21 metals.  I'm sorry.
22         MS. O'DELL:  It's Exhibit C
23 that was marked.
24         THE WITNESS:  I don't want

Page 419

1  to go by my memory alone.  I'd
2  like to see that.
3          Thank you very much.
4          In the document prepared as
5  Exhibit C, chromium has not been
6  speciated and it's listed as total
7  chromium.  I would make the
8  assumption from my professional
9  opinion that in mining, you do get
10 both chromium-6 and chromium-3
11 when you have -- when you're
12 mining talc.  But I'm not a
13 geologist.
14 BY MR. HEGARTY:
15         Q.   Does chromium-6 only come
16 through industrial processing?
17         A.   No.  It can actually be
18 found in the soil as a product of
19 contamination.
20         Q.   If you look over --
21         A.   And it can be re-oxidized.
22 Yes.
23         Q.   If you look over on Page 9?
24         A.   Of?

Page 420

1          Q.   Of your report.  The third
2  paragraph from the bottom where it
3  begins, "Chromium-3."
4          A.   Yes.
5          Q.   You say, "Chromium-3 has
6  weak cell membrane permeability, allowing
7  it to cross the cell membrane in order to
8  bind to DNA and cause lesions."  That's
9  not correct, is it?
10         A.   That is not correct.  That
11 is an error on my part in the report.
12 Chromium-3 has strong membrane
13 permeability.  And when you asked me the
14 question initially whether there was an
15 error in my report, I should have looked
16 at it, and that is an error.  Yes.
17         Q.   In fact chromium-3 does not
18 cross the cell membrane, correct?  It's
19 unable to cross the cell membrane?
20         A.   Chromium-6 crosses the cell
21 membrane and then converts into -- is
22 oxidized to chromium-3.  And chromium-3
23 is the actual component which causes the
24 instability.

Page 421

1          Q.   But chromium-3 is unable to
2  cross the cell membrane, correct?
3          A.   Completely.  To some degree
4  it has -- it can cross to some -- some
5  minimal degree.  But it's hexavalent
6  chromium which can cross -- which has
7  great capacity to cross the cell
8  membrane, yes.
9          May I take a minute, please.
10         Let me -- let me restate
11 based upon the third paragraph that
12 starts, "Chromium-3 has weak cell
13 membrane permeability."
14         It has weak to no cell
15 membrane permeability.
16         It is the active oxidized
17 product of hexavalent chromium or
18 chromium-6, that along with chromium-4
19 and chromium-5 which is responsible for
20 genetic instability and oxidative stress.
21 So it's chromium-3.
22         Q.   If you turn over to Page
23 13 -- I'm sorry, Page 12 of your report.
24 Section entitled C, Fragrances?

106 (Pages 418 to 421)

Judith Zelikoff, Ph.D.

Page 422

1    A.   Yes.
2    Q.   As of the time you prepared
3  your report, your entire opinions with
4  regard to fragrances was based on the
5  report by Michael Crowley, correct?
6    A.   That is correct.
7    Q.   You understand --
8    A.   And, and what I know about
9  some of the components from other --
10  other studies.
11    Q.   Have you had any prior work
12  experience with him?
13    A.   Dr. Michael Crowley?
14    Q.   Yes.
15    A.   No.
16    Q.   Do you know anything about
17  his qualifications beyond -- beyond what
18  you read in his report?
19    A.   No.  Just in his report and
20  the information that he gives about
21  himself.  And the questions that were
22  asked to him and the responses.
23    Q.   You say that you concur --
24  "I concur with his opinion."  Does that

Page 423

1  mean that you agreed with everything that
2  he says in his report?
3      MS. O'DELL:  Object to the
4    form.
5      THE WITNESS:  I concur with
6    his statement which says that
7    "some of these chemicals in
8    fragrances may contribute to the
9    inflammatory response, toxicity
10    and potential carcinogenicity of
11    Johnson & Johnson talcum powder
12    products."
13      And that's based on the
14    knowledge of some of the chemicals
15    as I said that I've reviewed for
16    other studies and personal
17    studies.  And they are indeed
18    inflammatory and can cause
19    toxicity.
20  BY MR. HEGARTY:
21    Q.   Prior to reading
22  Dr. Crowley's report, had you ever
23  concurred with a finding as to toxicity
24  of a substance based on the reading of an

Page 424

1  expert witness report in litigation?
2      MS. O'DELL:  Object to the
3    form.
4      THE WITNESS:  I am trying to
5    recall whether or not I have ever
6    had that opportunity.
7  BY MR. HEGARTY:
8    Q.   Sitting here right now, can
9  you recall when you had such an
10  opportunity?
11    A.   In this particular setting
12  of being deposed?
13    Q.   Or in any -- in any setting
14  where you are concurring with the opinion
15  of someone who -- who comments on
16  toxicity in an expert witness report
17  written for litigation?
18      MS. O'DELL:  Objection to
19    form.
20      THE WITNESS:  I would --
21    I -- I would comment on it if I
22    agreed.
23      And in this case, you know,
24    having the knowledge base that I

Page 425

1    have, not on -- certainly not on
2    all 150 different chemicals, which
3    is why I did my own literature
4    search, but on the chemicals that
5    I do know, I did agree with the
6    fact that they -- they do
7    contribute to inflammatory
8    responses, toxicity, some are
9    cytotoxic and produce cell injury
10    and potential carcinogenicity.
11      So as ethyl benzene as one
12    of the ingredients or one of the
13    constituents in fragrances, is
14    listed as a type -- as a Class 2
15    carcinogen.  So I did agree with
16    it.
17      If I had any question, I did
18    my own search.
19  BY MR. HEGARTY:
20    Q.   Over on page -- Pages 12 and
21  13, again you discuss exposure routes of
22  talc either through perineal exposure or
23  through inhalation, correct?  And that
24  carries over to Pages 14 and 15, and 16

107 (Pages 422 to 425)

Judith Zelikoff, Ph.D.

Page 426

1  and 17.
2        A.    Okay.
3        Q.    So in that section, did you
4  in any way analyze whether the particles
5  that -- whether talc can transport in the
6  same way that the particles do in the
7  studies that you cite?
8            MS. O'DELL:  Objection to
9  form.
10  BY MR. HEGARTY:
11        Q.    In other words, did you cite
12  any authority showing that talc particles
13  transport in the same way as the
14  particles you reference in these studies?
15        A.    Not conclusively.  But as I
16  said, if the particles are of similar
17  sizes, which they are in these -- in
18  these animal studies, then I would have
19  no reason to believe that the talc
20  particles did not move in the same
21  manner.
22        Q.    Well, do you agree that it
23  is important when talking about transport
24  of particles, that -- strike that.  Let

Page 427

1  me ask it a different way.
2            You cite to an authority
3  that makes the following statement, I
4  don't want to ask you -- I want to ask
5  you if you agree with it.
6        A.    Okay.
7        Q.    In an experiment to
8  evaluate --
9        A.    I'm sorry.  What page?
10        Q.    It's -- it's not on -- it's
11  not in your report.  It's part of my
12  question.
13        A.    Okay.
14        Q.    Do you agree that in an
15  experiment to evaluate the translocation
16  of solid particles, the characteristics
17  of the particle, i.e., size and material,
18  should be considered carefully?
19        A.    I agree that the size should
20  be considered very carefully.
21        Q.    And did you do any
22  comparison with the size of particles
23  that are referenced in the literature
24  that you cite, to the size of particles

Page 428

1  that are applied to talc via the perineal
2  route?
3        A.    What I did was I looked at
4  the internal documents, found that the --
5  according to the -- the instrumentation
6  and the graphics that they did, as well
7  as Dr. Longo, and looked at the size
8  range of the particles.  As I said, the
9  median and the average is around 10.5 to
10  11.5, but there were particle size range
11  in the talc -- talcum powder products
12  that range all the way from 50 microns or
13  larger all the way down to 0.3 microns or
14  300 nanometers.
15        Q.    Well, did you do any
16  correlation to determine whether the --
17  the size of the particles studied in
18  the -- in the articles you cite in any
19  way correlate or relate to the particle
20  sizes in Johnson's Baby Powder?
21            MS. O'DELL:  Object to the
22  form.
23            THE WITNESS:  The size of
24  particles that were used in many

Page 429

1  of the animal studies certainly
2  fall within the range that I just
3  gave you.
4  BY MR. HEGARTY:
5        Q.    Well, a number of the animal
6  studies used nanoparticles, correct?
7        A.    They used .1 micron, but
8  they also used larger particles.
9        Q.    Is it your testimony that
10  there are nanoparticles of talc in
11  Johnson's Baby Powder?
12        A.    If a particle -- a particle
13  is considered an ultra fine particle if
14  it's .1 micron or less.
15        Q.    But my question is as to
16  nanoparticles.  Are there nanoparticles
17  in Johnson's Baby Powder?
18        A.    Not that your literature
19  showed.  But ultra fines are also -- can
20  be called nanoparticles because they go
21  as low as .1.
22        Q.    If you look over on Page 14
23  of your report, you cite in the second
24  paragraph a letter from FDA to

108 (Pages 426 to 429)

Judith Zelikoff, Ph.D.

Page 430

1    Dr. Epstein, correct?
2        A.    That's correct.
3        Q.    I marked as Exhibit
4    Number 33 a copy of that letter.
5            (Document marked for
6            identification as Exhibit
7            Zelikoff-33.)
8    BY MR. HEGARTY:
9        Q.    Is that a copy of the letter
10   that you are referencing in that
11   paragraph?
12       A.    If you could point me to the
13   paragraph, please.
14       Q.    Well, it's the second --
15   it's the second paragraph at the top of
16   Page 14.
17       A.    Stating "further evidence
18   for migration"?
19       Q.    Correct.
20       A.    Okay.  Yes.  This is the
21   letter that I'm referring to.
22       Q.    In the same paragraph that
23   you reference, where you make -- where
24   you -- in the same paragraph where you

Page 431

1    pull out the statement that you cite
2    here, "FDA states that while there exists
3    no direct proof of talc in ovarian
4    carcinogenesis" --
5        A.    Genesis?
6        Q.    Genesis, carcinogenesis.
7    It's getting late for me too.
8            Did you cite that finding by
9    FDA in this paragraph?
10       A.    No.  What I was trying to
11   cite was referring to migration through
12   the upper genital tract.  So citing the
13   information on carcinogenesis would not
14   have been appropriate in that paragraph.
15       Q.    If you turn over to Page 4
16   of the FDA's letter.  At the very bottom
17   FDA states, "A cogent biological
18   mechanism by which talc might lead to
19   ovarian cancer is lacking."
20           Do you see that?
21       A.    I do see that.
22       Q.    You do not cite that
23   statement anywhere in your report,
24   correct?

Page 432

1        A.    I did not.
2        Q.    Why not?
3        A.    And in terms of my report,
4    and talking about migration, again, the
5    ovarian cancer and cogent biological
6    mechanism was not appropriate for that,
7    where I cited the original statement.
8        Q.    But you cite elsewhere in
9    your report statements and studies you
10   contend support your opinion that there
11   is a biologically plausible mechanism
12   between talc and ovarian cancer, correct?
13       A.    Yes, I do.
14       Q.    This statement by FDA
15   concerns whether there's a biologically
16   plausible mechanism between talc and
17   ovarian cancer, correct?
18       A.    That is -- that is what the
19   FDA says, yes.
20       Q.    Did you cite FDA's statement
21   about -- as to its view of whether a
22   cogent biological mechanism exists
23   anywhere in your report?
24       A.    I did not cite this

Page 433

1    statement.
2        Q.    You cite one statement by
3    FDA that you believe they are correct
4    about?
5        A.    They put a lot of weight
6    into that statement and...
7        Q.    Well, how did you weigh that
8    statement versus the other statement that
9    I read at the bottom of Page 4?
10       A.    Sorry, I'd like to find it.
11           And repeat the question
12   please.
13       Q.    How did you weigh the
14   statements you cite about migration
15   versus the other statement that I read at
16   the bottom of Page 4 about a cogent
17   biologic mechanism?
18       A.    In terms of the migration,
19   this is something that not only has been
20   found by the FDA and -- and is being
21   reiterated as a result of numerous
22   studies, this, Number 4, a cogent
23   biological mechanism by which talc led to
24   ovarian cancer is lacking is the FDA's

109 (Pages 430 to 433)

Judith Zelikoff, Ph.D.

Page 434

1  opinion in 19 -- in 2014, and I did not
2  know at all how they came to that
3  conclusion.
4          So in terms of migration,
5  that's been ferreted out and it's well
6  known in the literature for migration of
7  particles.  But the -- their opinion, the
8  FDA's opinion on this, I could not
9  substantiate in terms of what they were
10 basing that conclusion on.
11     Q.   What methodology did you use
12 to determine which of the statements by
13 FDA in this letter you believed are
14 correct and which you believed are not
15 correct?
16         MS. O'DELL:  Object to the
17 form.
18         THE WITNESS:  Well, if it
19         was a common finding such as that
20         which particles can migrate which
21         has been shown since late 1990s,
22         versus information that is given
23         in this report and is the basis --
24         and is what the FDA is opining on,

Page 435

1          however, I don't know what the --
2          what the literature is that they
3          reached in that conclusion.
4  BY MR. HEGARTY:
5     Q.   IARC includes a citation in
6  its 2010 monograph saying essentially
7  that the evidence of migration to the
8  ovaries is weak.  Do you recall reading
9  that?
10    A.   I do not recall reading
11 that.  I've reviewed the IARC paper, but
12 I -- I do not recall.  And I could look
13 at it and tell you what I thought.
14    Q.   You made reference earlier
15 in the deposition to the 1992 NTP study,
16 correct?
17    A.   Yes.
18    Q.   Do you find that to be a
19 well-done study?
20    A.   For what it was, I do find
21 it to be a well-done study.  I've worked
22 with the NTP.  I've served as an advisory
23 board member.  And I think that the work
24 they do are -- is with rigor and

Page 436

1  scrutiny.  I think that for what they
2  did, they did a good study.
3     Q.   If you look at Page 3 of the
4  FDA letter.
5     A.   Okay.
6     Q.   At the bottom, do you see
7  they comment on the very NTP study --
8     A.   Yes.
9     Q.   -- that you just mentioned,
10 right?
11         MS. O'DELL:  Which page are
12 you on?
13         MR. HEGARTY:  Page 3.
14         THE WITNESS:  There were a
15         number --
16 BY MR. HEGARTY:
17    Q.   I'm not -- I'm haven't asked
18 a question.
19    A.   Oh, I'm sorry.
20    Q.   My question was simply, do
21 you see where they comment on that NTP
22 study?
23    A.   I see that, yes.
24    Q.   Do you cite anywhere in your

Page 437

1  report FDA's commentary on the NTP study?
2     A.   I can find it in my report.
3  I did comment on some of the other that
4  there's been some controversy by
5  Dr. Warheit and Dr. Goodman.  They had
6  some pushback on this.  I think I
7  commented on that, but I'd like to find
8  the page where I said that.
9     Q.   You agree that you didn't
10 cite to FDA's commentary about the NTP
11 study in its February 14, 2014, letter?
12    A.   Not -- not that I recall,
13 no.  But as I said, I did comment on
14 other -- their -- the FDA's comments are
15 very similar to those made by other
16 scientists.
17    Q.   You say the FDA's comments
18 are very similar to those made by other
19 scientists.  You are talking about the
20 comments on Page 3?
21    A.   I am.  And I'm talking about
22 the comments made by Dr. Jay Goodman and
23 Dr. David Warheit that pushed back on the
24 studies by the NTP and the conclusion.

110 (Pages 434 to 437)

Judith Zelikoff, Ph.D.

| | Page 438 |
|---|---|

1    Q.    For purposes of your
2  analysis in this case, did you review all
3  the studies on talc miners and millers?
4    A.    No, I did not.
5    Q.    For purposes --
6    A.    I am not an epidemiologist.
7    Q.    For purposes of your
8  analysis in this case, did you look at
9  all the studies looking at talc --
10  looking at long-term effects of talc
11  pleurodesis?
12      MS. O'DELL:  Object to the
13      form.
14      THE WITNESS:  It was -- it
15      was not my question to look at --
16      only to bring the pulmonary
17      aspects in in manners that relate
18      to ovarian effects and
19      inflammation and plausibility.
20      So, no, I did not.  I
21      reviewed several studies on
22      pleurodesis, in terms of
23      understanding it, why talcum
24      powder is used, and the effect of

| | Page 439 |
|---|---|

1      talcum powder on pleurodesis.
2  BY MR. HEGARTY:
3    Q.    What is the volume of talc
4  that gets introduced in vivo with a
5  single application to the perineum?
6      MS. O'DELL:  In pleurodesis?
7      THE WITNESS:  For
8      pleurodesis?
9  BY MR. HEGARTY:
10    Q.    No, just in women in
11  applying -- strike that.
12      MS. O'DELL:  I'm sorry.
13  BY MR. HEGARTY:
14    Q.    What is the volume of talc
15  that gets introduced in vivo with a
16  single application of talc to the
17  perineum?
18      MS. O'DELL:  Objection to
19      form.
20      THE WITNESS:  I do not know
21      the concentration.  It depends on
22      the person and how they're using
23      it.  It also depends on the
24      frequency that they are using it.

| | Page 440 |
|---|---|

1      So when you're looking at
2      toxicology, it's not just the
3      concentration that you use.  It's
4      also the length and duration and
5      frequency of the use and their
6      cumulative effects.
7  BY MR. HEGARTY:
8    Q.    Is it your opinion that a
9  single particle of talc is sufficient for
10  biologic plausibility?
11      MS. O'DELL:  Objection to
12      form.
13      THE WITNESS:  I'm pretty
14      sure I answered that question
15      before.  But I will -- again,
16      talcum powder is known to produce
17      inflammation, and inflammation is
18      known to be a biological mechanism
19      for cancer.
20  BY MR. HEGARTY:
21    Q.    My question is, is a single
22  particle of talc in vivo sufficient for
23  your biologic plausibility opinion in
24  this case?

| | Page 441 |
|---|---|

1    A.    If it produces inflammation,
2  it could be used that way.  As a matter
3  of relevancy, I don't think that there's
4  anyone who produces -- who uses a single
5  molecule.  But in answer to your
6  question, if that single talc -- talcum
7  powder product produced inflammation,
8  then yes, it could -- it could be related
9  to biological plausibility.
10    Q.    Can you cite any published
11  authority that supports that opinion?
12    A.    That shows me that one
13  particle could produce inflammation?
14    Q.    That could lead to cancer.
15    A.    That could lead to cancer.
16  I cannot show you.  It's not that I don't
17  know if it's there or not there.  I just,
18  to my knowledge, I am not aware.
19      MR. HEGARTY:  I'm going to
20      let Mr. Ferguson ask you some
21      questions for a little bit.  Then
22      I will come back and finish up.
23      THE WITNESS:  Okay.  Thank
24      you.

111 (Pages 438 to 441)

Judith Zelikoff, Ph.D.

Page 442

1    THE VIDEOGRAPHER:  The time
2    is 6:00 p.m.  Off the record.
3    (Short break.)
4    THE VIDEOGRAPHER:  The time
5    is 6:25 p.m.  Back on the record.
6    - - -
7    EXAMINATION
8    - - -
9    BY MR. FERGUSON:
10    Q.    Hello, Dr. Zelikoff.
11    A.    Hello.
12    Q.    How are you?
13    A.    Good, thank you.
14    Q.    My name is Ken Ferguson, and
15    I represent Imerys, one of the parties to
16    this litigation.  Do you understand that?
17    A.    I understand what you said,
18    yes.
19    Q.    Okay.  And I'm going to have
20    some questions for you, which I'm going
21    to maybe try to go through pretty
22    quickly.  But just stop me if I speed up
23    too much.  I'm told that I talk slowly.
24    So maybe I won't be speeding up too much.

Page 443

1    So first of all, let me just
2    go back briefly to your background and
3    qualifications.
4    A.    Okay.
5    Q.    Just briefly, do you
6    currently have a laboratory?
7    A.    I do have a laboratory.
8    Q.    And how many personnel do
9    you have employed in the laboratory?
10    A.    Today?
11    Q.    Yes, ma'am.
12    A.    Today I have no one
13    employed, but three graduate students.
14    Q.    And where does the funding
15    come from to support that laboratory?
16    A.    It comes from the NIEHS,
17    National Institute of Environmental
18    Health Sciences from a center grant.  And
19    that is the main source at this moment.
20    Q.    Are you the principal
21    investigator of any extramural or
22    intramural funding at the current time?
23    A.    I have -- as of today, I'm
24    not.

Page 444

1    Q.    Have you ever been elected
2    to membership in any of the national
3    academies, for example the National
4    Academy of Science?
5    A.    I've not been elected as a
6    member, but I have served on the advisory
7    body numerous times.
8    Q.    Okay.  But you haven't been
9    elected to membership; is that right?
10    A.    No, that is correct.
11    Q.    Dr. Zelikoff, have you
12    communicated with any regulatory bodies
13    of any country regarding the issue of
14    talc and ovarian cancer that we've been
15    discussing today?
16    A.    I have not.
17    Q.    Have you communicated with
18    any scientific journals or publications
19    regarding talc and ovarian cancer?
20    A.    I have not.
21    Q.    So, can you turn to your
22    report, which is Exhibit Number 2.
23    A.    I have it.
24    Q.    Okay.  Can you look at the

Page 445

1    top of Page 3, please.
2    A.    Yes, sir.
3    Q.    And in the first full
4    paragraph on that page, it says, "My
5    opinions below are based upon my
6    experience as a toxicologist and research
7    scientist and have been reached through
8    employing the same scientific methodology
9    and rigor that I employ in my academic
10    research and professional duties."
11    Correct?
12    A.    Yes, sir, I see that.
13    Q.    And is that true?
14    A.    That is true.
15    Q.    And in your professional
16    duties and academic research, do you
17    customarily rely on peer-reviewed
18    publications in the scientific literature
19    for your research?
20    A.    I do -- peer reviews, I rely
21    on.  Abstracts come into play.
22    Documents.  Whatever is needed, I will
23    use and cite in my publications.
24    Q.    Do you customarily rely on

112 (Pages 442 to 445)

Judith Zelikoff, Ph.D.

Page 446

1  non-peer-reviewed research that is paid
2  for by a party that has a direct
3  financial interest in the outcome of the
4  study?
5          MS. O'DELL: Object to the
6  form.
7          THE WITNESS: I go by the
8  science. I don't look at the
9  funding. Many scientists do. But
10 I think if the science is sound, I
11 look at the science -- I go by the
12 science.
13 BY MR. FERGUSON:
14     Q.   Look at -- look at Page 8,
15 please.
16     A.   Yes, sir.
17     Q.   There in the first full
18 paragraph, you talk about recent TEM
19 testing on historic samples.
20         Do you see that sentence?
21     A.   Recent TEM testing on
22 historic samples, yes.
23     Q.   And you cite Longo and
24 Rigler from 2018, correct?

Page 447

1      A.   Mm-hmm-hmm, yes.
2      Q.   Okay. And are you aware
3  that Longo and Rigler are paid expert
4  witnesses who were hired by plaintiffs'
5  counsel to testify in talc litigation,
6  including this matter you're working on?
7      A.   I understand -- I understand
8  today that they are plaintiffs'
9  witnesses, experts.
10     Q.   Can you cite any scientific
11 articles that you've authored in the past
12 in which you cited an unpublished paper
13 that was authored by expert witnesses
14 hired by a party in litigation on the
15 very topic that you're writing on?
16         MS. O'DELL: Objection to
17 form.
18         THE WITNESS: I relied
19 primarily on Longo. But it is, as
20 I said, or as I will say, it's a
21 Johnson & Johnson product that
22 they are testing, so in my
23 opinion, who better to know what's
24 there than someone who did the

Page 448

1          testing from the company?
2  BY MR. FERGUSON:
3      Q.   And my question was, can you
4  cite any scientific articles that you've
5  authored in which you cited an
6  unpublished paper authored by an expert
7  witness who is being paid in the
8  litigation on the very topic that you're
9  writing on?
10     A.   I have not had that
11 opportunity so the answer is no.
12     Q.   So, you've never done that
13 in your academic writings, correct?
14     A.   If you mean that -- by that,
15 that I have never cited an unpublished
16 paper authored by an expert witness?
17     Q.   Yes, ma'am.
18     A.   I have not done -- I have
19 not had the opportunity to do that. My
20 publications are primarily, if not
21 solely, based either on reviews or -- or
22 results that have emerged from my own
23 laboratory or a colleague's laboratory.
24         I've not had that

Page 449

1  opportunity. So the answer is no.
2      Q.   If you look at Page 7.
3      A.   Of the report?
4      Q.   Of -- of your report. Yes
5  please.
6          On Page 7 you say, "In 2004,
7  a television station reported that
8  Johnson's Baby Powder had been analyzed
9  and found anthophyllite asbestos at
10 0.2 percent," correct?
11     A.   I see that. That's in the
12 last paragraph. The second sentence: In
13 2004, a television station reported
14 Johnson's Baby Powder had been analyzed
15 and found anthophyllite asbestos at
16 0.2 percent, yes.
17     Q.   In your previous academic
18 research, have you ever cited to stories
19 run on local television stations?
20     A.   I have.
21     Q.   And is that something that
22 you think shows scientific rigor?
23         MS. O'DELL: Objection to
24 form.

113 (Pages 446 to 449)

Judith Zelikoff, Ph.D.

| Page 450 | Page 452 |
|---|---|
| 1     THE WITNESS:  It depends on<br>2   the scientific paper.  And it --<br>3   it depends on the source of the<br>4   media.<br>5   BY MR. FERGUSON:<br>6     Q.   If we go to Pages 6 --<br>7     A.   If -- if I may add to that,<br>8   my recollection is that that television<br>9   station data was given to Johnson &<br>10  Johnson and it was not -- I did not cite<br>11  television station itself, but the -- the<br>12  document that was turned over to Johnson<br>13  & Johnson.<br>14    Q.   If you go to Page 6 of<br>15  your --<br>16    A.   Page what, I'm sorry?<br>17    Q.   6.<br>18    A.   6?<br>19    Q.   So on Pages 6 to 8 you cite<br>20  documents or other sources that you claim<br>21  show the presence of asbestos in talc<br>22  powder, correct?  You --<br>23    A.   Pages 6 to 8?<br>24    Q.   Yeah.  Why don't you go to | 1   BY MR. FERGUSON:<br>2     Q.   And that's in your report,<br>3   correct?<br>4     A.   On Page 7 at the top.<br>5     Q.   Then you also cited<br>6   Dr. Blount's paper that you and<br>7   Mr. Hegarty talked about, correct?<br>8     A.   I'm sorry, can you give me a<br>9   location?<br>10    Q.   Sure.  It's the second<br>11  paragraph on Page 7.<br>12    A.   Van Gosen?<br>13    Q.   No, the second full<br>14  paragraph, cosmetic and pharmaceutical<br>15  talc products, et cetera --<br>16    A.   Yes, deposition of Alice<br>17  Blount.  Yes.<br>18    Q.   Correct.<br>19    A.   Sorry to interrupt.<br>20    Q.   And Dr. Blount's paper was<br>21  some 30 or so years ago, correct?<br>22    A.   1991.<br>23    Q.   And -- and I won't go<br>24  through this in detail, but Mr. Hegarty |

| Page 451 | Page 453 |
|---|---|
| 1   the top of 7.  Let me go to it<br>2   specifically.<br>3       One of the things you cite<br>4   to is Paoletti in 1984?<br>5     A.   Yes, sir.<br>6     Q.   Okay.  And the Paoletti<br>7   study was completed -- I don't know if I<br>8   can do my math very well, but is that<br>9   36 years ago?<br>10    A.   36, yes.<br>11    Q.   And you notice they have<br>12  assessed, according to your own report,<br>13  contamination in industrial and cosmetic<br>14  talcs, correct?<br>15    A.   9 of the 24 pharmaceutical<br>16  and cosmetic grade talcs contain<br>17  tremolite fibers.<br>18    Q.   And they are from the<br>19  Italian market, correct?<br>20    A.   From the Italian market.<br>21    MS. O'DELL:  Objection to<br>22  form.<br>23    THE WITNESS:  And the<br>24  European pharmacopeia. | 1   discussed with you the fact that U.S.<br>2   Food and Drug Administration conducted a<br>3   survey of cosmetic grade raw material<br>4   talc and some cosmetic products<br>5   containing talc.  And you were generally<br>6   aware of that, correct?<br>7     A.   The FDA report that he -- he<br>8   pointed me to, yes.<br>9     Q.   Okay.  You were aware but<br>10  you didn't cite it, correct?<br>11    A.   I was aware but I did not<br>12  cite it.<br>13    Q.   And that came from 2010 as<br>14  opposed to 1984 or 1991, correct?<br>15    MS. O'DELL:  Objection --<br>16    THE WITNESS:  Yes --<br>17    MS. O'DELL:  Excuse me.<br>18  Objection to form.<br>19      If you're going to ask a<br>20  specific -- about a specific date,<br>21  I would ask -- or a specific item<br>22  of that -- in that document I<br>23  would just ask that you show the<br>24  witness. |

114 (Pages 450 to 453)

Judith Zelikoff, Ph.D.

---

Page 454

1    BY MR. FERGUSON:
2        Q.   Do you -- do you recall when
3    that survey was from?
4        A.   The FDA was 2014.  I don't
5    recall a specific.
6        Q.   Well, okay.  Counsel's
7    suggested it.  Why don't we go ahead and
8    mark as Exhibit 37.
9            (Document marked for
10           identification as Exhibit
11           Zelikoff-37.)
12   BY MR. FERGUSON:
13       Q.   And is this a document that
14   you've reviewed before?
15       A.   This is a document that I
16   have reviewed, yes.
17       Q.   Okay.  If you look at Page 2
18   at the top of the page, in the second
19   paragraph there, it says, "The study ran
20   from September 28, 2009, to September 27,
21   2010," correct?
22       A.   So I'm trying to put that
23   sentence into context.  So I need to read
24   the above sentences.

---

Page 456

1    Luzenac America, correct?
2        A.   Correct.  On the left side.
3        Q.   On the left side.  And on
4    the right side there are two columns that
5    say percentage asbestos by PLM and
6    percentage asbestos by TEM, correct?
7        A.   I see that.
8        Q.   And each of those says NAD,
9    correct?
10       A.   They say NAD.
11       Q.   And from your review of
12   this, do you know that NAD means no
13   asbestos detected?
14       A.   Yes, I do.  That means that
15   the measurements that they had and the
16   scientific -- and the sensitivities that
17   they were using at the given time, they
18   did not see any, is my interpretation of
19   that.
20       Q.   According to the paper that
21   you said, NAD means no asbestos detected,
22   correct?
23       A.   In this study, yes, correct.
24       Q.   Let's take a look.  You've

---

Page 455

1            I assume that the study they
2    are talking about was the contract with
3    the AMA analytical services to conduct
4    the laboratory survey.
5            Is that the study that they
6    are referring to?  It's unclear.
7        Q.   And in your review of this
8    document, did you read that there was no
9    asbestos detected by the survey by the
10   FDA in either the cosmetic grade raw
11   material talc, or the finished product
12   cosmetic products containing talc,
13   correct?
14       A.   I'm trying to find where
15   that was stated.
16       Q.   If you look at Page 3?
17       A.   Yes, sir.
18       Q.   See where it says at the top
19   of the page, "Cosmetic raw material
20   talc"?
21       A.   I see that, yes, sir.
22       Q.   Correct?
23           Then there is a list of
24   suppliers called Rio Tinto Minerals

---

Page 457

1    cited to IARC several times during
2    your -- in your report, correct?
3        A.   Yes, I did.
4        Q.   And let's look at the IARC
5    monograph 100 C, which was published in
6    2012 that I've marked as Exhibit 36.
7            (Document marked for
8            identification as Exhibit
9            Zelikoff-36.)
10           THE WITNESS:  Entitled
11           Arsenic Metals, Fibrous and Dusts?
12   BY MR. FERGUSON:
13       Q.   Correct.
14           And if you -- I've provided
15   you a page there, correct?
16       A.   You've provided me with
17   three pages.
18       Q.   Okay.  And was that
19   Page 225?
20       A.   225 starts 1.5 human
21   exposure.
22       Q.   Okay.  If you look at the
23   top of 225.  Do you have that page?
24       A.   Yes, sir.

---

115 (Pages 454 to 457)

Judith Zelikoff, Ph.D.

Page 458

1    Q.   In an exposure it says,
2  "Inhalation and ingestion are the primary
3  routes of exposure to asbestos," correct?
4        MS. O'DELL:  Objection to
5  form.
6  BY MR. FERGUSON:
7    Q.   The very first sentence.
8    A.   Mm-hmm-hmm.  I cannot attest
9  to ingestion, but certainly inhalation is
10 a primary.
11   Q.   But you'd agree that -- that
12 this is what IARC said, correct?
13   A.   I agree that this is what's
14 in IARC, yes, 2012.
15   Q.   And then there's another
16 section called exposure of the general
17 population, correct?
18   A.   Yes, sir.
19   Q.   And in the second paragraph
20 under that, do you see that paragraph
21 starts in studies of asbestos
22 concentrations?
23   A.   I do.
24   Q.   Okay.  And -- and let's --

Page 459

1  let's read it and see if it -- you and I
2  agree on what it says.
3        "In studies of asbestos
4  concentrations in outdoor air, chrysotile
5  is the predominant fiber detected.  Low
6  levels of asbestos have been measured in
7  outdoor air in rural locations; typical
8  concentration, 10 fibers per cubic meter.
9  Typical concentrations are about tenfold
10 higher in urban locations and about 1,000
11 times in close proximity to industrial
12 sources of exposure, e.g., asbestos mine
13 or factory demolition site, or improperly
14 protected asbestos-containing waste
15 site," correct?
16   A.   That's what's written here,
17 yes.
18   Q.   Okay.  And if you go down to
19 the first sentence of the next paragraph,
20 it says, "In indoor air, for example in
21 homes, schools and other buildings,
22 measured concentrations of asbestos are
23 in the range of 30 to 6,000 fibers per
24 cubic meter," correct?

Page 460

1    A.   That's what's here, yes.
2    Q.   Okay.  So certainly based on
3  what IARC has said, a person could inhale
4  or ingest one or more asbestos fibers
5  from the air that they breathe, correct?
6        MS. O'DELL:  Objection to
7  form.
8        THE WITNESS:  Based on the
9        measurements, I can't really tell
10       where they took these, where they
11       took the measurements or how they
12       measured them, from this Page 225,
13       but based on what they are saying
14       here, they have measured in
15       outdoor air and rural locations,
16       10 fibers per cubic meter, yes.
17       As I said, if you look down
18       in that paragraph it also
19       indicates that asbestos has been
20       measured in the air in a disaster
21       such as the World Trade Center, in
22       higher concentrations by
23       Dr. Longo.
24 BY MR. FERGUSON:

Page 461

1    Q.   And then if you look at
2  Page 229.  Are you with me?
3    A.   Yes, I am.
4    Q.   Under B, dietary exposure.
5    A.   Yes.
6    Q.   It says in the first
7  sentence under that paragraph heading,
8  "The general population can be exposed to
9  asbestos in drinking water," correct?
10   A.   It can happen under certain
11 conditions, yes.  It says, "The general
12 population can be exposed to asbestos in
13 drinking water."
14   Q.   And then below it says about
15 nine lines down, "In the U.S.A., the
16 concentration of asbestos in most
17 drinking water supplies is less than one
18 fiber per milliliter even in areas with
19 asbestos deposits or with asbestos cement
20 water supply pipes."  Correct?
21   A.   That's what it says here.
22   Q.   And then it says, "However,
23 in some locations the concentration in
24 water may be extremely high containing 10

116 (Pages 458 to 461)

Judith Zelikoff, Ph.D.

1  to 300 million fibers per liter or even
2  higher." Correct?
3        MS. O'DELL: Objection to
4  form.
5        THE WITNESS: That's what it
6  says here.
7  BY MR. FERGUSON:
8        Q.  So --
9        A.  But it's talking about --
10  it's talking about specific locations and
11  it's also saying "can." This is not a
12  normal situation. Normal -- this is a
13  contaminated situation.
14        Q.  But as IARC said, in the
15  first line we talked about, inhalation
16  and ingestion can be routes of exposure
17  to asbestos for the general population,
18  correct?
19        A.  It can be. Can being the
20  keyword.
21        Q.  I've got some more questions
22  that I could ask. But I'm going to pass
23  it back to Mr. Hegarty.
24        THE WITNESS: Hello again.

1        MR. HEGARTY: Hello again.
2        MS. O'DELL: So are you
3  finished with your questions?
4        MR. FERGUSON: I have other
5  questions that I could ask. But
6  I'm trying to share the limited
7  time that we have.
8        MS. O'DELL: I understand.
9  I'm just trying -- typically we
10  don't go back and forth between
11  the parties. The plaintiffs' side
12  has had time to ask questions. So
13  I guess I'm just trying to figure
14  out what y'all are doing.
15        MR. HEGARTY: Let's go off
16  the record real quick and have a
17  discussion. Because what we
18  planned to do, I took the time
19  that Ken was using to organize my
20  notes and to finish up the
21  remaining time.
22        Go off the record.
23        THE VIDEOGRAPHER: The time
24  is 6:45 p.m. Off the record.

1        (Whereupon, a discussion was
2  held off the record.)
3        THE VIDEOGRAPHER: The time
4  is 6:46 p.m. Back on the record.
5              - - -
6            EXAMINATION
7              - - -
8  BY MR. HEGARTY:
9        Q.  Doctor, you have done a
10  number of studies looking at inhalation
11  of particles in animal species primarily,
12  correct?
13        A.  In animal species primarily,
14  but also I have done studies in cell
15  culture, yes.
16        Q.  In any of the studies where
17  you have looked at inhalation of
18  particles in animals, have you reported
19  finding those particles in the ovaries?
20        A.  I did not look in the
21  ovaries.
22        Q.  So have you ever evaluated
23  the ovaries in any study that you have
24  done?

1        A.  I have evaluated -- in the
2  cadmium particle studies, we looked for
3  the soluble ions, that's what we
4  measured, using atomic absorption and ICT
5  mass spec. And we did find cadmium --
6  sorry. Sorry. We did find soluble
7  cadmium ions in the -- in the tissue --
8  in the ovaries.
9        Q.  Of what animal?
10        A.  Mice.
11        Q.  So there's nothing unique
12  with regard to talc in your opinion with
13  regard to its ability to transport within
14  the body, correct?
15        MS. O'DELL: Object to the
16  form.
17        THE WITNESS: Talc is a
18  fiber and will transport as a
19  fiber. It's also hydrophilic so
20  it will require some time for the
21  other products within the talc
22  molecule to be released. I am not
23  sure if I answered your question.
24  BY MR. HEGARTY:

Judith Zelikoff, Ph.D.

Page 466

1    Q.    What about platy talc?  Will
2  platy talc travel in the body as cadmium
3  would travel?
4    A.    Cadmium is a -- has traveled
5  as a soluble ion.  So platy talc --
6  neither platy talc nor asbestos will
7  travel as a soluble ion.  They are
8  fibers.
9    Q.    Have you done --
10   A.    They are -- I'm sorry, platy
11 talc is a crystal with different forms.
12 But my understanding is that platy talc
13 can fracture and also form fragments and
14 they could travel, given their size.
15   Q.    Could they travel as cadmium
16 has traveled in your studies, if that
17 happens?
18   A.    No, in -- in my studies we
19 did not measure -- we did not look for
20 the presence of the particle -- of the
21 nanoparticle in the tissues.  We measured
22 for the metal in those tissues.
23       So we are of the opinion
24 that it was the soluble ion that was

Page 467

1  released, and in this case, I know of no
2  studies off the top of my head that
3  measured how much of the other components
4  were released.
5    Q.    Can any particle that's
6  inhaled reach the ovary?
7    A.    If it -- if it meets certain
8  size constituents.  There's no reason why
9  a particle could not reach the ovary or
10 the kidney or the liver or -- under
11 proper circumstances.
12   Q.    Is there a certain size
13 limitation?
14   A.    Well, something that's
15 inhaled, is that what you're talking
16 about?
17   Q.    Yes.
18   A.    Something that's inhaled, if
19 it's 10 micrometers or greater, it's
20 going to be caught in the upper airways
21 and probably dismissed through the
22 mucociliary escalator.  If it's of a
23 smaller nature, then depending on where
24 the impaction is for the lung, it's going

Page 468

1  to reach -- it can reach the deep lung,
2  if it's five micrometers or smaller.
3  And --
4    Q.    Go ahead.
5    A.    And in that case since it's
6  not disposed of through the mucociliary
7  escalator, then it is in the other parts
8  of the lung and it can reach the
9  capillaries.  And once it gets into the
10 bloodstream, it can be transported.
11 Certain particles have predilections for
12 where they go.
13   Q.    When you say it can be
14 transported, does that include to the
15 ovaries?
16   A.    Are you asking specifically
17 about talc or particles in general?
18   Q.    Particles in general that
19 meet the size standards that you just
20 referenced of getting into the deep lung?
21   A.    Mm-hmm-hmm.  There's no
22 reason not to believe that it couldn't
23 get into the ovaries.
24   Q.    Did you examine, for

Page 469

1  purposes of your biological plausibility
2  opinion, all the studies looking at
3  NSAIDs and use of aspirin in women with
4  ovarian cancer?
5    A.    I looked at several studies.
6  I'm sure I --
7       (Document marked for
8        identification as Exhibit
9        Zelikoff-38.)
10 BY MR. HEGARTY:
11   Q.    I'm going to show you what I
12 marked as Exhibit 38, which is a study
13 that you cited by Wu 2009.
14   A.    Actually, it's Merritt.
15   Q.    I'm sorry.  It's Merritt
16 2008, correct?
17   A.    Yes.  And let me find it in
18 my report.
19   Q.    You cite it on Page 26.
20 Above the italicized paragraph --
21 italicized paragraph at the bottom.
22   A.    I see it.  "At high
23 concentrations with chronic exposure,
24 reactive oxygen species, known as ROS,

118 (Pages 466 to 469)

Judith Zelikoff, Ph.D.

Page 470

1 can damage cellular macromolecules and
2 contribute to neoplastic transformation
3 and/or tumor growth. Other likely
4 manifestations of talc." That's the
5 paragraph that you're referring to.
6     Q.   You do agree that a relevant
7 body of literature is whether NSAIDs or
8 aspirin have an effect on ovarian cancer
9 risk, if you're considering inflammation
10 as a biologically plausibility mechanism.
11     A.   NSAIDs being an -- one type
12 of anti-inflammatory, it could reduce
13 oxidative stress, yes, to different
14 degrees.
15     Q.   If you look at the abstract
16 on the first page of the Merritt paper.
17     A.   Yes.
18     Q.   At the very end, they say,
19 "We conclude that on balance chronic
20 inflammation does not play a major role
21 in the development of ovarian cancer."
22     Do you see where I'm
23 reading?
24     A.   I'm seeing the last

Page 471

1 sentence, yes.
2     Q.   Do you agree with that
3 statement in general?
4     A.   I do not agree with that
5 statement. That's -- my biological
6 plausibility is associated with the
7 oxidative stress and inflammation. Also
8 this paper was written in 2008.
9     Q.   Did you cite that finding
10 that I just read anywhere in your report?
11     A.   I cite Merritt.
12     Q.   Do you cite for the reader
13 of your report the statement that I just
14 read in the abstract?
15     A.   Not to my recollection.
16     (Document marked for
17     identification as Exhibit
18     Zelikoff-39.)
19 BY MR. HEGARTY:
20     Q.   I'm showing you what I've
21 marked as Exhibit Number 39. That is the
22 Wu paper.
23     A.   Mm-hmm-hmm.
24     Q.   You cite the Wu paper over

Page 472

1 on Page 21 of your report?
2     A.   Can you direct me to it?
3 Oh, I see it. Second paragraph. "Wu, et
4 al, 2009, performed a study to determine
5 the role of talc in the development of
6 ovarian cancer considering the history of
7 endometriosis."
8     Q.   If you look at the abstract
9 of the Wu paper, about two-thirds of the
10 way down, it reads, "Contrary to the
11 hypothesis."
12     Do you see that start of the
13 sentence?
14     A.   I do.
15     Q.   "Contrary to the hypothesis
16 that risk of ovarian cancer may be
17 reduced by use of NSAIDs, risk increased
18 with increasing the frequency in years of
19 NSAID use," citing the relative risk, the
20 confidence intervals. "This was
21 consistent across types of incident."
22     Do you see where I'm
23 reading?
24     A.   I do see where you're

Page 473

1 reading.
2     Q.   That finding is inconsistent
3 with inflammation as a mechanism by which
4 ovarian cancer can occur, correct?
5     MS. O'DELL: Object to the
6     form.
7     THE WITNESS: This -- NSAIDs
8     are known as antioxidants. And
9     yes, that's true, but there are
10     other antioxidants from other
11     papers that demonstrate that it
12     does indeed reduce inflammation.
13 BY MR. HEGARTY:
14     Q.   Well, did you cite the
15 finding of the Wu paper with regard to
16 its data on NSAID use and the risk of
17 ovarian cancer?
18     A.   I did have a section, to my
19 recollection, on the papers of Wu and
20 Merritt.
21     Q.   Well, in the section that I
22 was referring to, in the middle of the
23 paragraph on Page 21, middle paragraph on
24 Page 21, you don't cite that study's

119 (Pages 470 to 473)

Judith Zelikoff, Ph.D.

Page 474

1    findings as to NSAIDs and risk of ovarian
2    cancer, correct?
3        A.    I do not cite that
4    particular sentence, no.
5        Q.    Over on Page 23, you refer
6    to the Shukla study?
7        A.    Yes, sir.
8        Q.    That's second to the last
9    paragraph?
10       A.    "In a molecular cell study
11   by Shukla"?
12       Q.    Yes.  The -- strike that.
13           Gene expressions like those
14   measured in the Shukla study occur
15   everyday in everyone, correct?
16           MS. O'DELL:  Objection to
17   form.
18           THE WITNESS:  There are
19           changes in genes per day.  But
20           I'm -- I'm not -- I do not know
21           nor do I have knowledge of whether
22           the gene for ATF2 or ATF1 is
23           changed everyday by no exposure.
24   BY MR. HEGARTY:

Page 475

1        Q.    But the -- the fact of gene
2    expression is not a -- strike that.
3            The fact that gene
4    expression occurs does not mean that
5    cancer will occur, correct?
6        A.    No.  My role is to look for
7    biological plausibility, and when you
8    have a transcription factor which is so
9    well immersed into oxidation and reactive
10   oxygen species and inflammation, and I
11   would say that changes or upregulation of
12   the -- of the ATF gene certainly is
13   linked with inflammation.
14       Q.    Can you cite for me any
15   studies that have used measurements of
16   level -- of the levels of ATF3 to assess
17   ovarian cancer risk?
18       A.    I cannot cite those studies
19   to you, but again, going back to
20   biological plausibility, I can tell you
21   that this gene is extremely important in
22   growth factors and proinflammatory
23   cytokines.  So an upregulation is going
24   to lead to the production of

Page 476

1    proinflammatory cytokines and oxidase,
2    yes.
3        Q.    Is there any study that
4    sites the clinical significance of ATF as
5    it relates to ovarian cancer risk?
6            MS. O'DELL:  Object to the
7            form.
8            THE WITNESS:  No study that
9            I'm currently aware of.  But there
10           are many studies that link ATF
11           upregulation to inflammation and
12           then inflammation to -- in the
13           process of carcinogenesis, both
14           progression and initiation.
15   BY MR. HEGARTY:
16       Q.    If you turn over to the
17   second to the last page of your report,
18   Page 27.
19           In Paragraph 3, you say that
20   exposure to talcs --
21       A.    Excuse me, Number 3?
22       Q.    I called it Paragraph 3.
23   You can call it Number 3.
24       A.    It's listed as Number 3.

Page 477

1        Q.    3.  You state that "exposure
2    to talcum powder products causes an
3    inflammatory tissue reaction which may
4    result in the following," and then you
5    list --
6        A.    Elevation.
7        Q.    -- a number of -- of events
8    that you label as A through F -- I'm
9    sorry, A through G carrying over to the
10   top of the next page.
11       A.    I see that, thank you.
12       Q.    Can you cite for me any
13   studies showing any of that activity in
14   women using talc on the perineum?
15           MS. O'DELL:  Object to the
16           form.
17           THE WITNESS:  If I can
18           recall the Health Canada study, I
19           think they looked at -- they also
20           included inflammatory responses
21           that are seen in some of their
22           meta-analysis.
23   BY MR. HEGARTY:
24       Q.    Well, the Health Canada

120 (Pages 474 to 477)

Judith Zelikoff, Ph.D.

Page 478

1    study, the Taher study, was a
2    meta-analysis, correct?
3        A.   Yes, correct.
4        Q.   Can you cite for me any
5    studies reporting that -- reporting these
6    events occurring in women using talc on
7    the perineum?
8            MS. O'DELL: Object to the
9        form.
10           THE WITNESS: If you're
11       asking me if gene alterations or
12       mutations or the level of
13       apoptosis has been measured in any
14       women exposed, no, I do not recall
15       that.
16   BY MR. HEGARTY:
17       Q.   Have any of the processes --
18       A.   Excuse me. If I may add.
19   But inflammatory markers have been looked
20   at in women with ovarian cancer and they
21   are elevated.
22       Q.   And my question, as you'll
23   recall, is specific to talc users,
24   correct?

Page 479

1            MS. O'DELL: Objection to
2        form.
3            THE WITNESS: Talc -- yes,
4        talc products.
5    BY MR. HEGARTY:
6        Q.   Can you -- can you cite to
7    me any studies showing elevations of any
8    of these processes in women using talc?
9            MS. O'DELL: Object to the
10       form.
11           THE WITNESS: Well,
12       neoplastic transformation and
13       proliferation is clearly seen
14       in -- obviously if there's a
15       variant answer, you've had
16       neoplastic transformation
17       proliferation.
18   BY MR. HEGARTY:
19       Q.   Well, my question is
20   specific to women using talc prediagnosis
21   of ovarian cancer.
22       A.   I see. No, sir.
23           MR. HEGARTY: For purposes
24       of the deposition, we want to mark

Page 480

1    as exhibit -- Exhibits 40 through
2    48 -- I'm sorry, 47 -- the
3    notebooks that had been produced
4    for purposes of the deposition
5    here today.
6            (Documents marked for
7        identification as Exhibits
8        Zelikoff-40 through 47.)
9    BY MR. HEGARTY:
10       Q.   Over on Page 23, you --
11       A.   Of my report?
12       Q.   Of your report, with regard
13   to the Shukla study.
14           I'm sorry, over on Page 26.
15   You cite again the Shukla study. Do you
16   see that where -- do you see where you
17   say "nonfibrous talc at low in vitro
18   exposure concentrations caused increased
19   expression of transcription factors
20   associated with the inflammatory process
21   in a time and dose dependent manner"?
22       A.   I'm sorry, I'm not clear
23   on --
24       Q.   Middle of the second full

Page 481

1    paragraph.
2        A.   Not -- after the Mori
3    citation?
4        Q.   Yes.
5        A.   "Nonfibrous talc at low in
6    vitro exposure concentrations caused
7    increased expression of transcription
8    factors associated with the inflammatory
9    process in a time and dose dependent
10   manner." Yes, I see that.
11       Q.   What did you mean by say --
12   by time and dose manner?
13       A.   May I see the paper?
14           (Document marked for
15       identification as Exhibit
16       Zelikoff-48.)
17   BY MR. HEGARTY:
18       Q.   Marking as Exhibit 49 -- 48
19   that paper.
20       A.   Thank you.
21           MR. TISI: We are at seven
22       hours by the way.
23           MS. O'DELL: We are at seven
24       hours?

121 (Pages 478 to 481)

Judith Zelikoff, Ph.D.

Page 482

1      MR. TISI:  Yes, we are.
2      MS. O'DELL:  We're at seven
3  hours, Mark.
4      MR. HEGARTY:  Okay.  Are you
5  going to instruct her not to
6  answer that question?
7      MS. O'DELL:  Well, the
8  federal rules limit this
9  deposition to seven hours and --
10     MR. HEGARTY:  No, I
11 understand, but I also remember a
12 deposition where I think I let
13 Chris go over about two or
14 three minutes.
15     MR. TISI:  Yeah, but you are
16 using a whole new exhibit.
17     MS. O'DELL:  You just marked
18 it --
19     MR. HEGARTY:  I just want to
20 make sure that was --
21     MR. TISI:  Are you going to
22 suggest --
23     MR. HEGARTY:  No, I just
24 want to know if that -- if you

Page 483

1  want to end the deposition for me
2  right here?
3      MR. TISI:  That was a fact
4  witness, as you know.
5  I leave it to Leigh.  If
6  we're going to -- if we're going
7  to have this rule, we need to kind
8  of be consistent with it.
9      MR. HEGARTY:  No, I'm not
10 looking to apply another rule.
11 Just tell me whether you'll let
12 her answer the question or if the
13 time -- because the time is up,
14 that question will not be
15 answered.
16     MS. O'DELL:  The time -- the
17 time is up.  What is your -- what
18 was your question?
19     MR. HEGARTY:  My question
20 was, "What do you mean where you
21 say time and dose dependent
22 manner."  But I'm not going to
23 insist on any applicable rule.
24 I'll let you decide whether you

Page 484

1  want to let her answer or not.
2  It's simply up to you.  If you say
3  we're done, then I will -- I'm not
4  going to dispute it.
5      MS. O'DELL:  We are -- I
6  will let you answer that question.
7  But after that, we're -- we're
8  done.
9      MR. HEGARTY:  Okay.  Thank
10 you.
11     MS. O'DELL:  Do you recall
12 the question, Dr. Zelikoff?
13     THE WITNESS:  Yes.  The
14 question is -- what -- I'll repeat
15 it from here.
16     What did I mean by a time
17 and dose dependent manner?
18 BY MR. HEGARTY:
19 Q.   Yes.
20 A.   In the Shukla study?
21 Q.   Correct.
22 A.   Well, if we look at Figure 2
23 concerning cell viability in the Shukla
24 paper, Page 117.

Page 485

1      So we can see, I'm trying to
2  find the exact one that I want to refer
3  to.  Figure A, one can see that in terms
4  of the concentration and over time, that
5  the number -- total number of viable
6  cells were altered.  And in Figure 2, 15
7  and 75 -- no, scratch Figure 2, sorry.
8      So on Page 118, in looking
9  at number of genes that were
10 significantly changed, we can see looking
11 at the concentration -- and this is for
12 asbestos -- there was a change in effect
13 in asbestos.  If one looks at -- I think
14 that's it.  That's what I meant.
15     MR. HEGARTY:  Okay.  Thank
16 you.
17     MS. O'DELL:  Off the record.
18     THE VIDEOGRAPHER:  The time
19 is 7:07 p.m.  Off the record.
20     (Short break.)
21     THE VIDEOGRAPHER:  We are
22 back on the record.  The time is
23 7:30 p.m.
24        - - -

122 (Pages 482 to 485)

Judith Zelikoff, Ph.D.

Page 486

1          EXAMINATION
2              - - -
3   BY MS. O'DELL:
4       Q.   Dr. Zelikoff, I have a few
5   follow-up questions for you.
6          Prior to your involvement in
7   litigation, this litigation, did you hold
8   the opinion that inflammation causes
9   cancer?
10         MR. HEGARTY:  Objection to
11      form.
12         THE WITNESS:  Yes.  I held
13      the opinion for a very long time
14      that inflammation causes cancer.
15  BY MS. O'DELL:
16      Q.   And in terms of your
17  knowledge and opinion prior to your
18  involvement in the litigation, did you --
19  did you have an opinion regarding the
20  role of oxidative stress in the
21  development of cancer?
22      A.   Yes, I did.  My opinion was
23  that oxidative stress was closely
24  involved with the causation of cancer.

Page 487

1       Q.   So to the degree that your
2   work in this case addressed new
3   considerations, were those considerations
4   primarily focused on talc and its ability
5   to cause inflammation and oxidative
6   stress?
7          MR. HEGARTY:  Objection to
8       form.
9          THE WITNESS:  That is
10      correct.
11  BY MS. O'DELL:
12      Q.   Can you -- if I could ask
13  you to take your report.  I think it's
14  right to your left.  I'm going to ask
15  you -- if you'll turn to Page 12.  Do you
16  see that?  The subsection involving
17  fragrance, fragrance chemicals?
18      A.   Yeah.  C, fragrances.
19      Q.   And did you rely on
20  Dr. Crowley's report and his review of
21  the relevant literature and other
22  information regarding the chemicals that
23  are included in the fragrance for Baby
24  Powder and Shower to Shower?

Page 488

1       A.   I relied on his report, yes.
2       Q.   And did Dr. Crowley conclude
3   that the chemicals involved in the
4   fragrances for both Johnson & Johnson's
5   Baby Powder and Shower to Shower may
6   contribute to the inflammatory response,
7   toxicity and potential carcinogenicity of
8   Johnson & Johnson's talcum powder
9   products?
10         MR. HEGARTY:  Objection to
11      form.
12         THE WITNESS:  Yes.  I concur
13      with that whole opinion.
14  BY MS. O'DELL:
15      Q.   And in fact, that's the
16  specific opinion he included in his
17  report that you relied on?
18      A.   Yes, that's correct.
19         MR. HEGARTY:  Objection to
20      form.
21  BY MS. O'DELL:
22      Q.   And so if another expert was
23  also relying on Dr. Crowley's analysis,
24  it wouldn't be surprising that the same

Page 489

1   wording was used?
2          MR. HEGARTY:  Objection to
3       form.
4          THE WITNESS:  Absolutely
5       not.
6   BY MS. O'DELL:
7       Q.   Let me ask you other
8   questions about the general principles in
9   your report.  I think you testified, you
10  were asked a number of questions about
11  general principals.  And in your
12  judgment, is it generally accepted to --
13  to use common phrasing for general
14  principles in scientific publications?
15      A.   Yes.
16         MR. HEGARTY:  Objection to
17      form.
18         THE WITNESS:  I answered
19      that question before, and yes.
20      Common, well-publicized,
21      well-established concepts, yes.
22  BY MS. O'DELL:
23      Q.   You were asked during the
24  early part of the day certain questions

123 (Pages 486 to 489)

Judith Zelikoff, Ph.D.

Page 490

1  about whether you were an expert in areas
2  such as talc and inflammation?
3      A.  Yes.
4      Q.  And I think if you recall
5  the response you answered you were not
6  classified as an expert.  What did you
7  mean by that?
8          MR. HEGARTY:  Objection to
9      form.
10         THE WITNESS:  What I meant
11     was in terms of legal, whether --
12     one of the questions that arose
13     was, in the past, have I been
14     listed as an expert in other
15     cases.  And so I followed that
16     line of thought and thought that
17     we were still talking about
18     litigation and formal declaration
19     as an expert in that area.
20 BY MS. O'DELL:
21     Q.  Are you an expert in the
22 toxicological effects of minerals on
23 the -- on humans?
24         MR. HEGARTY:  Objection to

Page 491

1      form.
2          THE WITNESS:  I'm expert in
3      toxicology of environmental
4      chemicals, including mixtures,
5      including fibers, including
6      particles, including talc.
7  BY MS. O'DELL:
8      Q.  And would that -- would that
9  also include -- when you said fibers,
10 would that also include asbestos and
11 fibrous talc?
12         MR. HEGARTY:  Objection to
13     form.
14         THE WITNESS:  Yes.
15 BY MS. O'DELL:
16     Q.  Are you an expert in the
17 toxicological effects of heavy metals on
18 the humans?
19         MR. HEGARTY:  Objection to
20     form.
21         THE WITNESS:  Yes, I am.
22 BY MS. O'DELL:
23     Q.  And what do you base that
24 statement on?

Page 492

1      A.  My numerous publications in
2  that area of metal toxicology that I've
3  been doing for many, many, many years.
4      Q.  And in addition to your
5  training, experience, do you also make
6  those statements based on your review of
7  the available scientific and medical
8  literature?
9      A.  In regards to metals?
10     Q.  In all the environmental
11 exposures we've just discussed?
12     A.  Yes.  I rely on
13 literature --
14     Q.  You were asked questions --
15     A.  -- as well as my own
16 scientific research.
17     Q.  Excuse me.  I didn't mean to
18 cut you off, Doctor.
19         You were asked questions
20 about whether there were any studies or
21 evidence that you relied on involving
22 Johnson's Baby Powder.
23         Do you recall that?
24     A.  I do recall that question,

Page 493

1  yes.
2      Q.  And do the -- strike that
3  and start again.
4          Did Dr. Saed in the testing
5  that was done and reported in not only
6  the abstracts but also his manuscript,
7  involve Johnson's Baby Powder?
8          MR. HEGARTY:  Objection to
9      form.
10         THE WITNESS:  Yes.
11     Dr. Saed's did.  Thank you for
12     reminding me.
13 BY MS. O'DELL:
14     Q.  Was Dr. Longo and Rigler's
15 testing of historical samples of talcum
16 powder products produced in this
17 litigation, including Johnson's Baby
18 Powder and Shower to Shower?
19     A.  Dr. Longo stated he did use
20 products over time from Johnson & Johnson
21 talcum powders.
22     Q.  And was the evidence that
23 was presented in Hopkins Exhibit 28, did
24 it involve Johnson's talcum powder

124 (Pages 490 to 493)

Judith Zelikoff, Ph.D.

| Page 494 |
| --- |

1  products?
2      A.  Yes, it did.
3      Q.  Was evidence that you relied
4  on in the form of Pier Exhibit 47, did
5  those also involve talc that was taken
6  from sources used to supply Johnson's
7  talcum powder products?
8          MR. SILVER:  Objection to
9  form.
10         MR. HEGARTY:  Objection to
11  form.
12         THE WITNESS:  Dr. Pier?
13  BY MS. O'DELL:
14     Q.  Yes.
15     A.  To my recollection, yes.  If
16  you'd like, I can look at the paper and
17  confirm that.
18     Q.  Let me ask you about
19  Dr. Blount.  You were asked previously
20  about her publication in 1991.
21         Did Dr. Blount test
22  Johnson's Baby Powder?
23     A.  Yes.  But again, if I looked
24  at the reference I could give you -- I

| Page 495 |
| --- |

1  could give you specifics.
2      Q.  Okay.  And do you recall
3  that that -- did -- let me just ask it
4  this way.
5          Did Dr. Blount find that
6  there was asbestos in the Johnson's Baby
7  Powder samples that she tested?
8      A.  Yes.  To my recollection,
9  she did, yes.
10     Q.  You were asked about some
11  testing that had been done by the FDA on
12  certain cosmetic powders.  Do you
13  remember that?  It was Exhibit 37.
14         MS. O'DELL:  And is that in
15  the bottom of that stack, 37?
16         Thanks, Mark.  If you'll
17  hand those to me.  I appreciate
18  it.
19         THE WITNESS:  Sorry.  My
20  microphone.
21         MS. O'DELL:  Oh, did it come
22  off?
23         THE VIDEOGRAPHER:  Raise it
24  up as high as possible.  There you

| Page 496 |
| --- |

1      go.
2  BY MS. O'DELL:
3      Q.  Did the FDA conclude in
4  Exhibit 37 that -- well, let me just ask
5  the question this way.
6          If you'll turn to Page 2 of
7  Exhibit 37, what was the FDA's conclusion
8  regarding the testing that they had
9  performed on the cosmetic powders?
10         Doctor, I'll direct you to
11  the second-to-the-last paragraph at the
12  bottom of the page, the middle sentence.
13  Do you see that, "Beginning for these
14  reasons"?
15     A.  Yes, I see that.
16     Q.  And what was the FDA's
17  conclusion?
18     A.  "For these reasons, while
19  FDA finds these results informative, they
20  do not prove that most or all talc or
21  talc-containing cosmetic products that
22  are currently or currently marketed in
23  the United States are likely to be free
24  of asbestos contamination."

| Page 497 |
| --- |

1      Q.  You were also asked a number
2  of questions regarding the FDA response
3  to Dr. Epstein's letter in April of 2014,
4  Exhibit 33.
5          Do you recall those
6  questions?
7      A.  I recall that questions were
8  asked in this regard, yes.
9      Q.  While at this point in the
10  day, I wouldn't expect you to recall the
11  specific question, but you recall those
12  general discussions?
13     A.  Yes, I do.
14     Q.  All right.  Let me ask you,
15  if you wouldn't mind, to turn to Page 3
16  of -- of Exhibit 33.
17         And the second paragraph.
18     A.  Starting, "The survey
19  found"?
20     Q.  Yes.  Yes, ma'am.
21         And as of April 2014, was it
22  the FDA's conclusion that their testing
23  results did not prove that
24  talc-containing cosmetic powders

125 (Pages 494 to 497)

Judith Zelikoff, Ph.D.

Page 498

1  currently marketed in the U.S. are free
2  of asbestos contamination?
3        MR. HEGARTY:  Objection to
4  form.
5        THE WITNESS:  Yes.  I can
6        read the sentence, "While FDA
7        found this data informative, the
8        results were limited by the fact
9        that only four suppliers submitted
10       samples and the number of products
11       used.  They do not prove that all
12       talc containing cosmetic products
13       currently marketed in the United
14       States are free of asbestos
15       contamination."
16 BY MS. O'DELL:
17       Q.   Okay.  While we are on this
18 Exhibit 33, Doctor, if you'll turn to
19 Page 5 of the exhibit.  About two-thirds
20 of the way down, the paragraph beginning,
21 "While."
22       A.   "While there exists no
23 direct proof"?
24       Q.   Yes.  And would you mind

Page 499

1  reading, you know, the -- the -- those
2  first two sentences of that paragraph,
3  please?
4        A.   "While there exists no
5  direct proof of talc and ovarian
6  carcinogenesis, the potential for
7  particulates to migrate from the
8  peritoneum" -- "the perineum and vagina
9  to the peritoneal cavity is
10 indisputable."
11       Q.   And then if you'll read the
12 next sentence?
13       A.   "It is, therefore, plausible
14 that perineal talc and other particulate
15 that reaches the endometrial cavity, the
16 fallopian tubes and ovaries and the
17 peritoneum may elicit a foreign body-type
18 reaction and an inflammatory response
19 that in some exposed women may progress
20 to epithelial cancers."
21       Q.   And are those statements
22 written by the FDA consistent with your
23 opinions regarding the biologic
24 plausibility of talcum powder products

Page 500

1  causing ovarian cancer?
2        MR. HEGARTY:  Objection to
3  form.
4        THE WITNESS:  They are
5        consistent with my opinion, yes.
6  BY MS. O'DELL:
7        Q.   Let me ask you if you would,
8  Doctor, to -- I'll do it for you.
9  Because it was marked here.
10       I'm going to hand to you the
11 Health Canada draft screening assessment
12 that was marked previously as Exhibit 9.
13       A.   I see it.
14       Q.   And let me ask you if you
15 would please, Doctor, first, did you
16 submit your report in this case prior to
17 Health Canada issuing the draft causal
18 assessment?
19       A.   I submitted my -- my final
20 report November 15th or 16th.  I'm not
21 quite clear on the date.  And received
22 this or saw it for the first time in
23 January.  So it did not go into my -- it
24 was not cited in my report and was not

Page 501

1  reviewed for my report.
2        Q.   And by virtue of the fact
3  that came out after your report, did --
4  did the health -- strike that and start
5  again.
6        Did the Health Canada
7  assessment inform your opinions in this
8  case?
9        A.   It -- it could not have
10 informed my opinion that's written out in
11 the report.  It was compelling evidence
12 that helped support the opinion that I
13 came to.
14       Q.   Did it confirm your
15 opinions?
16       MR. HEGARTY:  Objection to
17       form.
18       THE WITNESS:  Yes.  It
19       confirmed my opinions on many
20       lines, including methodology.
21 BY MS. O'DELL:
22       Q.   If you'll look at Page 18 of
23 the assessment.
24       A.   Yes.  I see it.

126 (Pages 498 to 501)

Judith Zelikoff, Ph.D.

Page 502

1    Q.   And looking at the
2   literature that is cited in this section,
3   did you cite in support of your opinions
4   Keskin 2009?
5    A.   Keskin 2009, yes.
6    Q.   And did you -- of course we
7   talked about it before.  You cited
8   Penninkilampi 2018?
9    A.   Yes, I did.
10    Q.   And did you cite other
11   references included in the mode of action
12   discussion that was undertaken by Health
13   Canada on Pages 18, 19 and, you know, 20
14   of the Health Canada assessment?
15    A.   Yes, I did.  Do you want me
16   to tell you which ones?
17    Q.   Just give us a few.  Just
18   give us a few.
19    A.   Henderson 1971.  These are
20   the ones that come to mind readily.
21   Edelstam 1997.  Egli and Newton 1961.  De
22   Boer in 1972.  Venter and Iturralde,
23   1979.  Heller 1996.  Cramer in 2007.
24       Would you like me to go on?

Page 503

1    Q.   So it's fair to say that
2   many of the references that you read,
3   reviewed, relied on in your report are
4   some of the same studies that Health
5   Canada relied on in their causal
6   assessment?
7       MR. HEGARTY:  Objection to
8       form.
9       THE WITNESS:  Yes.  This was
10       very validating for my -- my
11       report in my opinion.
12   BY MS. O'DELL:
13    Q.   Were you aware of the -- of
14   the assessment prior to it being issued
15   to the public?
16    A.   Not at all.  It was -- it
17   came out in late 2018, in December.
18    Q.   In the assessment that was
19   undertaken by Health Canada, did they
20   assign any numerical weights in the
21   causal assessment to certain studies?
22    A.   No, they do not.
23    Q.   Did they discuss
24   inflammation as a sort of recognized

Page 504

1   mechanism for the cause of cancer?
2       MR. HEGARTY:  Objection to
3       form.
4       THE WITNESS:  Biological
5       plausibility.
6   BY MS. O'DELL:
7    Q.   They -- let me ask a better
8   question.  Did they -- did they discuss
9   chronic inflammation, inflammation as a
10   biologically plausible mechanism for the
11   development of ovarian cancer?
12    A.   Yes, they did.
13    Q.   Did they discuss the role of
14   reactive oxygen species as part of the
15   biologically plausible mechanism of talc
16   in the development of ovarian cancer?
17       MR. HEGARTY:  Objection to
18       form.
19       THE WITNESS:  Oxidative
20       stress, yes.  Yeah.  React -- ROS.
21       Oxidative stress.
22       May I give the statement?
23   BY MS. O'DELL:
24    Q.   Yes.

Page 505

1    A.   With respect to talc,
2   specifically local chronic irritation
3   leading to inflammatory response is one
4   possible mechanism of tumor progression
5   that is frequently hypothesized.
6    Q.   And that's consistent with
7   your -- with your opinion in this case?
8       MR. HEGARTY:  Objection to
9       form.
10       THE WITNESS:  Yes.
11   BY MS. O'DELL:
12    Q.   Is that consistent with your
13   opinion in this case?
14    A.   Yes, it is.
15    Q.   Did they discuss migration
16   as part of the biologically plausible
17   mechanism for the connection between
18   perineal use of talc and development of
19   ovarian cancer?
20    A.   Yes, they did.
21    Q.   Okay.  Did they, on Page 15
22   and 16, did they discuss some of the
23   animal studies that you reference and
24   rely on in reaching your opinions in this

127 (Pages 502 to 505)

Judith Zelikoff, Ph.D.

Page 506

1  case?
2      A.    Yes, they do.
3          MR. HEGARTY:  Objection to
4  form.
5          THE WITNESS:  And --
6  BY MS. O'DELL:
7      Q.    Excuse me.
8      A.    They include Hamilton et
9  al., 1984.  Keskin 2009.  Hamilton 1984
10  again.  Keskin again.
11      Q.    Okay.  And if you'll turn to
12  Page 21.  You'll see at the top of the
13  page, they have a section on biologic
14  plausibility.
15      A.    Yes, they do.
16      Q.    Is -- is their discussion of
17  biological plausibility as outlined on
18  Page 21 consistent with your opinions in
19  this case?
20          MR. HEGARTY:  Objection to
21  form.
22          THE WITNESS:  Definitely
23  consistent.  Particles of talc are
24  hypothesized to migrate into the

Page 508

1      Q.    Counsel directed your
2  attention to the sentence -- counsel for
3  Johnson & Johnson -- direct -- directed
4  your attention to the sentence near the
5  bottom of the left column.
6      A.    An important finding of this
7  study is that talc use?
8      Q.    Yeah, the -- the potential
9  mechanism by which genital talc is
10  associated with an increased risk of
11  ovarian cancer --
12      A.    I'm sorry.  Again,
13  discussion on the left side?
14      Q.    Yes.  At the bottom of the
15  first paragraph, the last sentence.
16      A.    Okay.  I'm sorry.
17  "Potential mechanism by which general
18  talc associated with an increased risk of
19  ovarian cancer hence remains unclear."
20      Q.    And Johnson & Johnson's
21  counsel asked you about that sentence.
22      A.    Yes, they did.
23      Q.    But they didn't ask you
24  about other sentences in this -- this

Page 507

1      pelvis and ovarian tissue causing
2      irritation and inflammation.  And
3      the presence of talc in the
4      ovaries as I discussed previously
5      has been documented by Heller in
6      1996.
7  BY MS. O'DELL:
8      Q.    Great.  Thank you.
9          Doctor, you were also asked
10  some questions about the Penninkilampi
11  paper.
12          Do you recall those?
13      A.    I do recall being asked,
14  yeah, from that.
15      Q.    Potentially the most
16  difficult name to pronounce in the
17  litigation.
18          The Penninkilampi paper
19  was -- was marked as Exhibit 34.  Do you
20  recall that?
21      A.    I see, I see it here.  Yes.
22      Q.    And if I can ask you to turn
23  to Page 45.
24      A.    I see Page 45.

Page 509

1  paper, fair?
2      A.    That's fair.
3      Q.    So if you'll look to the
4  right column on Page 45.  Do you see the
5  sentence beginning "if chronic
6  inflammation"?
7      A.    I do.  "If chronic
8  inflammation due to ascending foreign
9  bodies is indeed the mechanism by which
10  talc use is associated with increased
11  ovarian cancer risks, then the results
12  fit the picture."
13      Q.    Is -- is that statement that
14  the authors of the Penninkilampi study
15  included in their report, excuse me, in
16  their article, is that consistent with
17  your opinions in this case?
18      A.    It is consistent.
19      Q.    And does it confirm the
20  opinions that you reached in this case?
21      A.    It acts to confirm, yes, it
22  does.
23      Q.    Okay.  You were asked
24  about -- a number of questions about

128 (Pages 506 to 509)

Judith Zelikoff, Ph.D.

| Page 510 | Page 512 |
|---|---|
| 1 asbestos and the specific amount of<br>2 asbestos that would be introduced with<br>3 the perineal application of -- of talc.<br>4     A. Yes --<br>5     Q. And let me ask you --<br>6     A. -- I recall.<br>7     Q. You recall those questions?<br>8     A. Yes, I do.<br>9     Q. Is there any safe level of<br>10 asbestos --<br>11     MR. HEGARTY: Objection to<br>12 form.<br>13 BY MS. O'DELL:<br>14     Q. -- in the perineum?<br>15     A. My opinion and conclusion is<br>16 no.<br>17     Q. Is asbestos a known potent<br>18 carcinogen?<br>19     A. It is. According --<br>20     Q. Excuse me. Please go ahead.<br>21     A. According to the regulators<br>22 and the documents, it is, yes, a known<br>23 carcinogen, and it's extremely potent.<br>24 If you look at the effects that it causes | 1 deposition of Robert Glenn in your<br>2 report?<br>3     A. I'm sorry, the deposition of<br>4 who?<br>5     Q. Robert Glenn. Page 6, about<br>6 midway down.<br>7     A. Yes, I did. "Because<br>8 asbestos is a known carcinogen, its<br>9 presence in cosmetic talc is<br>10 unacceptable, FDA 2012, FDA 2015."<br>11     Q. And do you recall that --<br>12 was Mr. Glenn a former director of the<br>13 National Institute for Occupational<br>14 Safety and Health or NIOSH?<br>15     A. Yes.<br>16     Q. And what did Mr. Glenn<br>17 testify to regarding the presence of<br>18 asbestos in talc-based products?<br>19     A. He says, "As stated in a<br>20 recent deposition, that if there were a<br>21 fiber of asbestos in talcum-based<br>22 products, it would certainly 'provide a<br>23 biologically plausible mechanism for<br>24 increased lung disease' and that he |

| Page 511 | Page 513 |
|---|---|
| 1 and at the dose levels that it causes<br>2 these effects.<br>3     Q. And of course IARC has --<br>4     A. IARC has classified it as a<br>5 Class 1A.<br>6     Q. And did you review and rely<br>7 on IARC's conclusion regarding asbestos?<br>8     A. I did.<br>9     Q. Excuse me. And its<br>10 contribution to the -- to the development<br>11 of ovarian cancer?<br>12     A. Yes, I did.<br>13     Q. Did you review and rely on<br>14 IARC's conclusions regarding fibrous talc<br>15 or talc in an asbestiform habit regarding<br>16 its ability to cause ovarian cancer?<br>17     MR. HEGARTY: Objection to<br>18 form.<br>19     THE WITNESS: I did.<br>20 BY MS. O'DELL:<br>21     Q. If you'll turn to Page 6 in<br>22 your report.<br>23     A. Yes, I see it.<br>24     Q. Did you -- did you cite the | 1 suspected that it would also have a<br>2 similar mechanism of disease in other<br>3 tissues and organs."<br>4     Q. And you were asked a number<br>5 of questions about the different<br>6 constituents of talcum powder products.<br>7     A. Yes.<br>8     Q. If talcum powder products<br>9 did not contain asbestos, would that<br>10 change your opinion about the biological<br>11 plausible mechanism of -- that explains<br>12 talc -- talc-based products causing<br>13 ovarian cancer?<br>14     A. No, it would not.<br>15     Q. You were asked questions<br>16 about a Dr. Neel from NYU.<br>17     A. The NYU Cancer Center.<br>18     Q. And you were asked if you<br>19 knew Dr. Neel.<br>20     A. Yes, I recall the question.<br>21     Q. And what's your<br>22 understanding of Dr. Neel's position?<br>23     A. My understanding is that he<br>24 is the chair -- he may not be called the |

Judith Zelikoff, Ph.D.

Page 514

1  chair -- but he is the director of the
2  cancer center for NYU Langone Health and
3  NYU Medical School. It morphs into
4  different names.
5      Q.    And in regard to the
6  toxicity of talcum powder products and
7  its effects, toxicological effects,
8  would -- would you be more knowledgeable
9  about those particular effects than a
10  clinician who diagnoses and treats
11  ovarian cancer?
12          MR. HEGARTY: Objection to
13      form.
14  BY MS. O'DELL:
15      Q.    Like Dr. Neel?
16      A.    I'm a toxicologist, and so
17  my main area of focus and understanding
18  and literature has to do with toxicology,
19  toxicological mechanisms, toxicological
20  effects.
21      Q.    So --
22      A.    So my knowledge base in
23  those areas would -- I would suspect very
24  strongly would exceed that of Dr. Neel's,

Page 515

1  who is a clinician.
2      Q.    You were asked some
3  questions about the Shukla paper.
4      A.    Yes.
5      Q.    And -- and the Shukla paper
6  involved the use of talcum powder?
7      A.    Yes.
8      Q.    And if the --
9      A.    Do you recall what exhibit
10  that was?
11      Q.    I think it was the last
12  exhibit.
13      A.    May I have a copy?
14      Q.    48. And did the Shukla
15  study involve the testing of, or the use
16  of talcum powder?
17      A.    Yes. As they call it,
18  non-fibrous talc.
19      Q.    And if the talcum powder
20  used in the Shukla study contained
21  nickel, that would be -- the data that
22  was reported in that study would be
23  relevant for the effects of nickel, fair?
24          MR. HEGARTY: Objection to

Page 516

1      form.
2          THE WITNESS: Could you
3      clarify that question?
4  BY MS. O'DELL:
5      Q.    Yeah. It was a bad
6  question. I'm sorry. I'm getting tired.
7      A.    If you're asking -- would
8  you like to ask -- rephrase it, or should
9  I give you my thought of what you were
10  trying to ask?
11      Q.    Well, why don't you
12  interpret my question, and I'll follow
13  up.
14      A.    If you're asking me if
15  nickel was a component of the non-fibrous
16  talc, then was nickel also in place when
17  it was treated, when the cells were
18  treated?
19      Q.    That's correct.
20      A.    Yes, if nickel was in the
21  non-fibrous talc then, yes, it was also
22  there when the cells were being exposed.
23      Q.    And so -- and that would be
24  true of chromium and cobalt?

Page 517

1      A.    Yes.
2      Q.    And so, the results from the
3  Shukla study would have bearing on the
4  effect of those heavy metals if contained
5  in talcum powder?
6          MR. HEGARTY: Objection to
7      form.
8          THE WITNESS: Yes, if they
9      were -- yes, as constituents, they
10      would -- I would imagine and know
11      that they would play -- they could
12      be playing a role in the
13      toxicity -- the cell toxicity or
14      the gene expression changes that
15      were observed.
16  BY MS. O'DELL:
17      Q.    Thank you. And in regard to
18  your opinions related to cobalt,
19  chromium, and nickel, you were asked a
20  number of questions about whether there
21  were any human studies measuring the
22  effect of -- of nickel at -- in the
23  ovary. Do you recall that?
24      A.    I recall that question --

130 (Pages 514 to 517)

Judith Zelikoff, Ph.D.

Page 518

1  those questions.
2      Q.    Would it be possible to
3  design a study in humans where nickel was
4  deposited at their ovary to see if a
5  female would develop ovarian cancer?
6      A.    I think I answered and said
7  that would be ridiculous in the sense
8  that this would be totally unethical to
9  take a known carcinogen or a classified
10  1A carcinogen and use it for experimental
11  studies in humans by placing it in the
12  perineal -- or anywhere within the body
13  intentionally.
14      Q.    And would that also be true
15  for similar reasons for cobalt and
16  chromium?
17      A.    Yes.
18      Q.    Would the same also be true
19  of designing a study that applied
20  asbestos to a female's ovary for purposes
21  of seeing if she developed cancer?
22      A.    I'm smiling because it holds
23  true for any -- any known or suspected
24  carcinogen cannot be used intentionally

Page 519

1  on a human being for testing.  It's
2  unethical, and would probably in all
3  likelihood not be approved by the
4  institutional review board of academic
5  institutions or any reputable scientists.
6      Q.    Would that be true of
7  fibrous talc?
8          MR. HEGARTY:  Objection to
9  form.
10  BY MS. O'DELL:
11      Q.    You may answer.
12      A.    That would be true of
13  fibrous talc.
14      Q.    Would it be true of platy
15  talc, if there is such a thing as pure
16  platy talc?
17      A.    If there is a -- if there is
18  any suspicion that any product, including
19  platy talc, might be involved in
20  producing inflammation or any other type
21  of adverse health effect, then it would
22  be very unethical to go ahead and
23  intentionally use that in a human study,
24  in my opinion, and in the opinion of most

Page 520

1  IRBs.
2      Q.    Okay.  You looked at, as I
3  understand it, for your purposes of your
4  task in this case, you looked at the
5  issue of biologic plausibility for
6  perineal talc use and ovarian cancer.
7      A.    Yes, I did.
8      Q.    Did you -- did you -- was
9  that inquiry focused on epithelial
10  ovarian cancer in particular?
11      A.    It -- it was -- most, if not
12  all the studies I looked at in animals
13  and -- were associated with epithelial
14  ovarian cancer.
15          Some studies in humans did
16  look -- did break out the differences.
17      Q.    Let me ask you if you
18  wouldn't mind, to turn to Page 8 of your
19  report.  And you'll look at the top of
20  the page.  In the first full paragraph,
21  middle of the -- that paragraph discusses
22  Dr. Longo and Rigler's recent report that
23  reports that talcum powder products
24  manufactured by Johnson's Baby Powder and

Page 521

1  Shower to Shower have contained and
2  continue to contain asbestos.  Do you see
3  that sentence?
4      A.    Yes, I do.
5      Q.    And then it goes on, you go
6  on to report his results from test of
7  samples manufactured from the 1960s and
8  1990s.
9      A.    Through -- through the
10  1990s.
11      Q.    Through the 1990s, that's
12  correct.
13          And you -- you have a
14  footnote here to Footnote 7?
15      A.    Yes.
16      Q.    And Dr. Longo and Rigler's
17  report is noted in the footnote and it's
18  dated November 14, 2018.
19      A.    Yes.
20      Q.    Do you see that?
21      A.    Yes.
22      Q.    And just, did you have in
23  your possession and review Dr. Rigler and
24  Longo's November 14, 2018, report during

131 (Pages 518 to 521)

Judith Zelikoff, Ph.D.

Page 522

1  the completion of your own report?
2      A.   I had it available prior to
3  the submission of my final report, yes.
4          The only thing I did not
5  have was the December 2018 supplement.
6      Q.   His most recent supplement?
7      A.   His most recent supplement,
8  yes.
9      Q.   I think just to be clear,
10  that -- was his most recent supplemental
11  report you're referring to, was that the
12  report dated in January, I think 16th or
13  15th of this month?
14      A.   It was sometime in January.
15      Q.   Okay.
16      A.   Yes.  I could answer that
17  question specifically if I saw the
18  exhibit.
19      Q.   And I've handed you what's
20  been marked I think as Exhibit --
21      A.   3.
22      Q.   3.  And is Exhibit 3 the
23  supplemental report --
24      A.   Yes, it is.

Page 523

1      Q.   -- that you reviewed
2  recently?
3      A.   I'm sorry, yes.
4      Q.   And what's the date on the
5  report?
6      A.   January 15, 2019.
7          MS. O'DELL:  Okay.  I have
8  nothing further, Doctor.  Thank
9  you.
10          MR. HEGARTY:  Take a break.
11  I need to use the restroom.
12          THE VIDEOGRAPHER:  The time
13  is 8:10 p.m.  Going off the
14  record.
15          (Short break.)
16          THE VIDEOGRAPHER:  We are
17  back on the record.  The time is
18  8:16 p.m.
19              - - -
20          EXAMINATION
21              - - -
22  BY MR. HEGARTY:
23      Q.   Dr. Zelikoff, I have some
24  questions in follow-up to the questions

Page 524

1  that Ms. O'Dell asked you.
2          First of all, you were
3  referred to Page 12 of your report
4  under -- under Section C, Fragrances.
5  Would you go to that portion of your
6  report please?
7      A.   I will, thank you.  Yes.
8  I'm here.
9      Q.   You were asked about this
10  part of your report being identical to
11  the same part of Smith-Bindman's report.
12  Do you recall being asked those
13  questions?
14          MS. O'DELL:  Object to the
15  form.
16          THE WITNESS:  Smith --
17  Smith-Bindman report?  I'm sorry,
18  I don't recall -- oh, in the
19  beginning of the deposition?
20  BY MR. HEGARTY:
21      Q.   Yes.
22      A.   Okay.  That was a long time
23  ago.
24      Q.   First of all, are you aware

Page 525

1  that Dr. Crowley has been deposed in this
2  litigation?
3      A.   Yes.
4      Q.   Did you read his deposition?
5      A.   I did.
6      Q.   When did you read his
7  deposition?
8      A.   I'm sorry, I don't recall
9  the exact date.
10          May I see Dr. Crowley's
11  deposition?
12      Q.   Well, I just asked you if
13  you had read it.  That's my only
14  question.
15          Other than Dr. Crowley's
16  deposition, have you read the depositions
17  of any other plaintiffs' experts deposed
18  in the MDL, this litigation?
19      A.   Any of the other plaintiffs'
20  depositions?
21      Q.   Correct.
22      A.   Dr. Dydek.
23      Q.   Anybody else?
24      A.   I'm looking to see the

132 (Pages 522 to 525)

Judith Zelikoff, Ph.D.

Page 526

1    others.
2        Q.    It's at the end of Exhibit
3    B.
4        A.    Okay.  Thank you.  Thank
5    you.
6        Q.    Well, my question -- let me
7    ask a different question.  Let me ask
8    whether you have reviewed the MDL
9    depositions; that is, the depositions
10   that plaintiffs' experts have taken in
11   this litigation over their expert reports
12   besides Dr. Crowley?
13           MS. O'DELL:  Object to form.
14           THE WITNESS:  Dr. Longo.
15   Sorry.
16   BY MR. HEGARTY:
17       Q.    Dr. Longo has not yet been
18   deposed in --
19       A.    I read his report.
20       Q.    -- for his MDL report.
21           No, I'm talking about the
22   deposition --
23       A.    I'm sorry.
24       Q.    -- of an expert who has

Page 527

1    been -- who is being deposed about their
2    report in the MDL.
3           You said Dr. Crowley.  Have
4    you read anyone else's deposition that
5    have discussed their report in the MDL?
6           MS. O'DELL:  I think there
7        may be some confusion between
8        report and deposition.
9           THE WITNESS:  Yes.  There
10       was.
11   BY MR. HEGARTY:
12       Q.    Did you read Dr. Crowley's
13   deposition over his report?
14       A.    I read Dr. Crowley's report.
15   I'm sorry.  I stand corrected.
16       Q.    Dr. Crowley's report does
17   not contain the sentences that you've
18   included under your Section C,
19   fragrances, correct?
20           MS. O'DELL:  Object to the
21       form.
22           THE WITNESS:  What page are
23       we going back to, please?
24   BY MR. HEGARTY:

Page 528

1        Q.    Page 12.
2        A.    "There are more than 150
3    different chemicals"?
4        Q.    Those four sentences, or
5    three -- or strike that.
6           The second sentence in that
7    section is not in Dr. Crowley's report.
8    He did not write, "I reviewed the expert
9    report of Dr. Michael Crowley that
10   concludes that some of these chemicals
11   may contribute to the inflammatory
12   response, toxicity, and potential
13   toxicity of Johnson & Johnson's talcum
14   powder products."
15           MS. O'DELL:  Objection.
16   BY MR. HEGARTY:
17       Q.    That sentence is not in
18   Dr. Crowley's report?
19           MS. O'DELL:  Objection.
20           THE WITNESS:  I'm terribly
21       sorry.  I'm going to silence that
22       or we can and talk over it.
23           MS. O'DELL:  Go ahead and
24       silence it.

Page 529

1           (Brief interruption.)
2           MR. HEGARTY:  Let's go off
3        the record.
4           THE VIDEOGRAPHER:  The time
5        is 8:21 p.m.  Off the record.
6           (Whereupon, a discussion was
7        held off the record.)
8           THE VIDEOGRAPHER:  The time
9        is 8:21 p.m.  Back on the record.
10   BY MR. HEGARTY:
11       Q.    The second sentence under
12   your section fragrances is nowhere in
13   Dr. Crowley's report?
14       A.    That --
15           MS. O'DELL:  Objection to
16       form.
17           THE WITNESS:  That sentence
18       is not there, but I concluded that
19       when he talked about the
20       fragrances, I concluded that -- I
21       inferred from his -- from his
22       report, that these chemicals do
23       contribute to the inflammatory
24       response, toxicity and potential

133 (Pages 526 to 529)

Judith Zelikoff, Ph.D.

Page 530

1    carcinogenicity.
2  BY MR. HEGARTY:
3      Q.   The sentence, "I concur with
4  his opinion," is not in Dr. Crowley's
5  report, is it?
6      A.   No.  That was my opinion.
7      Q.   That same opinion, stated
8  exactly the same way, is in the
9  Dr. Smith-Bindman report, correct?
10     A.   Can I see that report?
11     Q.   Do you recall without
12 looking at it, that that same section is
13 in her report?
14     A.   I do not.  I do not recall.
15     Q.   Okay.  Did you -- do you
16 know -- have you ever spoken to
17 Dr. Smith-Bindman?
18     A.   Not at all.
19     Q.   Do you know who she is?
20     A.   I don't.
21     Q.   Do you know her expertise?
22     A.   I do not.
23     Q.   Have you ever heard her name
24 before today?

Page 531

1      A.   Not -- not to my knowledge.
2  But I would like to see -- to refresh my
3  memory, if it's available.
4      Q.   You were asked about your
5  expertise as it relates to talc and
6  inflammation.  Before you were contacted
7  by Ms. Emmel, you had no expertise in
8  talc, correct?
9          MS. O'DELL:  Objection to
10 form.
11         THE WITNESS:  I performed no
12 scientific studies in it.
13 BY MR. HEGARTY:
14     Q.   You also reviewed no
15 scientific studies concerning talc,
16 correct?
17         MS. O'DELL:  Objection to
18 form.
19         THE WITNESS:  I have
20 reviewed papers.  I am editor and
21 associate editor on an editorial
22 board so that in my past
23 experience, I likely reviewed
24 papers --

Page 532

1  BY MR. HEGARTY:
2      Q.   Doctor, you --
3      A.   -- that included talc.
4      Q.   Doctor, you testified
5  earlier in this deposition that your
6  information as it relates to talc and
7  ovarian cancer came from the media and
8  discussion with colleagues, correct?
9      A.   Prior to being contacted.
10     Q.   Right.  So prior to being
11 contacted for counsel for plaintiffs, you
12 had no expertise in talc and ovarian
13 cancer, correct?
14     A.   As a toxicologist -- I'm
15 sorry.  I'm getting hung up on the word
16 "expert" as you're using it.  As a
17 toxicologist, I am familiar with talc.  I
18 am familiar with much of the toxicity of
19 it.  But the primary -- in discussing
20 talc and its relationship to cancer, it
21 was through colleagues and the media,
22 yes, correct.
23     Q.   You had not studied, prior
24 to being contacted by plaintiffs'

Page 533

1  counsel, any issues reported in the
2  medical literature with regard to talc
3  and ovarian cancer, correct?
4      A.   I have not studied in my
5  laboratory, that's correct.
6      Q.   You also did not review any
7  literature discussing talc and ovarian
8  cancer prior to being contacted by
9  counsel for plaintiff?
10     A.   That is correct.
11     Q.   Prior to being contacted by
12 counsel for plaintiffs you had not
13 studied the toxicology -- toxic aspects,
14 if any, of talc, correct?
15         MS. O'DELL:  Object to the
16 form.
17         THE WITNESS:  I have -- as I
18 stated, I have reviewed papers
19 that have looked at it.  And I've
20 reviewed them for acceptance into
21 journals.
22 BY MR. HEGARTY:
23     Q.   Can you cite for us today
24 any such papers?

134 (Pages 530 to 533)

Judith Zelikoff, Ph.D.

Page 534

1        A.    Over my career, I cannot.
2   Sorry.
3        Q.    Can you identify any study
4   you have published that investigated or
5   discussed the toxicity of cobalt?
6        A.    I've written review articles
7   on the toxicology of metals in general
8   and cobalt was in there, and in book
9   chapters.
10       Q.    But it's your testimony that
11  you have written review papers where you
12  discussed the toxicity of cobalt?
13       A.    I did not say review papers.
14  I said book chapters.
15       Q.    So you had written a book
16  chapter to discuss the toxicity of
17  cobalt?
18            MS. O'DELL:  Objection to
19       form.
20            THE WITNESS:  I was an
21       editor of a book, several books --
22       two books actually, which looked
23       at the toxicity of cobalt --
24       looked at the toxicity of metals.

Page 535

1       And cobalt, to my recollection,
2   was in both of those books.
3   BY MR. HEGARTY:
4        Q.    Did you write those
5   chapters?
6        A.    I reviewed those chapters
7   for publication in those books.
8        Q.    My question was did you
9   write those chapters?
10       A.    I'm sorry.  Did I write
11  those chapters on cobalt?  No, I did not.
12       Q.    Have you ever written any
13  published chapter or article discussing
14  the toxicity of cobalt?
15       A.    I have not --
16            MS. O'DELL:  Objection.
17            THE WITNESS:  -- written an
18       article in the area of cobalt, but
19       I am familiar with metals, very
20       much so from the department and
21       the research that I do.
22  BY MR. HEGARTY:
23       Q.    Have you written any
24  published article discussing toxicity of

Page 536

1   nickel?
2        A.    Yes.
3        Q.    What published article have
4   you -- have you written discussing the
5   toxicity of nickel?
6        A.    One that comes to my mind,
7   without looking at my CV, is an early
8   publication associated with the
9   immunology and immunotoxicity of nickel
10  in fish.
11       Q.    What nickel -- was it a
12  nickel compound?
13       A.    It was a nickel chloride, a
14  soluble nickel compound.
15       Q.    Are nickel compounds in
16  Johnson's Baby Powder?
17       A.    Nickel -- according to the
18  J&J documents and other -- other internal
19  documents, yes.
20       Q.    Okay.  What nickel compounds
21  are in Johnson's Baby Powder?
22       A.    The report indicates nickel.
23  It does not break it down to a particular
24  salt or a particular compound of nickel.

Page 537

1        Q.    Have you written any papers
2   looking at the toxicity of chromium-3?
3        A.    I'm going to look in my --
4   in my CV.
5        Q.    Well, without looking at
6   your CV, for purposes of time, can you
7   recall any such article?
8            MS. O'DELL:  If you need to
9       take a moment, Doctor, feel free
10      to.
11            MR. HEGARTY:  We'll go off
12      the record if she needs to take a
13      moment.
14  BY MR. HEGARTY:
15       Q.    Because I qualified my
16  question by asking you, without looking
17  at your CV, are you able to cite an
18  article that you've written?
19       A.    I want to give actual data
20  to you.  In my mind, I recall a paper
21  that I wrote with Dr. Max Costa on
22  chromium.  And -- and possibly with Toby
23  Rossman.  But without looking, I can't be
24  absolutely sure.

135 (Pages 534 to 537)

Judith Zelikoff, Ph.D.

| Page 538 | Page 540 |
|---|---|
| 1  Q.   You refer over on pages -- | 1  the statements that you were asked about |
| 2  or on Page 25 of your report -- | 2  by plaintiffs' counsel in your expert |
| 3  A.   Yes. | 3  report, correct? |
| 4  Q.   -- to -- | 4       MS. O'DELL:  Object to form. |
| 5  A.   Talc-induced inflammation. | 5       THE WITNESS:  Not without |
| 6  Q.   Well, let me finish my | 6  checking my document, I can't |
| 7  question. | 7  answer conclusively. |
| 8  A.   Oh, I'm sorry. | 8  BY MR. HEGARTY: |
| 9  Q.   You refer over on Page 25 in | 9  Q.   You did not rely on this |
| 10  the fourth paragraph to an abstract and | 10  portion of the FDA's letter for purposes |
| 11  other material by Dr. Harper and | 11  of your opinions in this case, correct? |
| 12  Dr. Saed, correct? | 12       MS. O'DELL:  Regarding the |
| 13  A.   Yes.  In the last -- in the | 13  asbestos testing? |
| 14  last paragraph, in the last sentence. | 14  BY MR. HEGARTY: |
| 15  Q.   And none of those | 15  Q.   The portion that I just |
| 16  publications refer to testing using | 16  referred you to, the top two paragraphs |
| 17  Johnson's Baby Powder, correct? | 17  at Page 3. |
| 18       MS. O'DELL:  Objection to | 18  A.   They do not prove that all |
| 19  form. | 19  talc-containing cosmetic products |
| 20       THE WITNESS:  To my | 20  currently marketed in the United States |
| 21  knowledge, no, but I would have to | 21  are free of asbestos.  Is that -- |
| 22  look at the paper to be absolutely | 22  Q.   Yes. |
| 23  sure.  But they did use talc, | 23  A.   Okay.  And the question was? |
| 24  yes -- talcum powder. | 24  Q.   You did not refer to that |

| Page 539 | Page 541 |
|---|---|
| 1  BY MR. HEGARTY: | 1  statement in your report, correct? |
| 2  Q.   Can you cite for me any | 2  A.   That is correct, yes. |
| 3  animal or cell studies that you reviewed | 3  Q.   Also you did not cite on |
| 4  for purposes of preparing your report | 4  Page 5 in your report the statement that |
| 5  that tested Johnson's Baby Powder other | 5  "it is, therefore, plausible that |
| 6  than Dr. Saed's recent manuscript? | 6  perineal talc and other particulate that |
| 7  A.   I know I have, I just can't | 7  reaches the endometrial cavity, et |
| 8  recall. | 8  cetera, may elicit foreign body-type |
| 9       You are talking about | 9  reaction and inflammatory response that |
| 10  publications, correct? | 10  in some exposed women may progress to |
| 11  Q.   Yes.  That you've cited in | 11  epithelial cancers." |
| 12  your report. | 12       You did not cite that |
| 13  A.   I can't find it at the | 13  sentence in your report either, correct? |
| 14  moment, so I would have to say no. | 14  A.   I did not -- |
| 15  Q.   Did you find Exhibit 33, the | 15       MS. O'DELL:  Objection to |
| 16  FDA's response letter to Dr. Epstein. | 16  form. |
| 17  A.   Thank you. | 17       THE WITNESS:  I did not cite |
| 18  Q.   You were referred to Page 3 | 18  that sentence in my report either. |
| 19  in FDA's statement with regard to its | 19  However, this document was in |
| 20  testing of samples of cosmetic grade raw | 20  my -- in my citations in the |
| 21  material talc and cosmetic products for | 21  overall reliance -- reliance |
| 22  asbestos? | 22  document. |
| 23  A.   Yes, I did. | 23  BY MR. HEGARTY: |
| 24  Q.   You did not refer to any of | 24  Q.   With regard to the draft |

136 (Pages 538 to 541)

Judith Zelikoff, Ph.D.

Page 542

1  screening assessment by Canada, Canada
2  employs a precautionary principle. Are
3  you aware of that?
4      A.  Yes.
5      Q.  Do you know what a
6  precautionary principle is?
7      A.  I do know what a
8  precaution --
9      Q.  What is it?
10     A.  A precautionary principle is
11 one where you -- in my -- in my opinion
12 and what -- to my knowledge, it's a
13 principle in which you use every
14 precaution in terms of assessment, in
15 terms of use in animal models and human
16 models. You follow precaution.
17     Q.  Okay. The draft screenings
18 assessment, Exhibit Number 9, contains
19 the following statement -- and I only --
20 I only have your copy.
21     A.  Oh okay.
22     Q.  I'm going to read it to you
23 and tell me whether you agree with it.
24     A.  Okay.

Page 543

1      Q.  "The etiology of most
2  ovarian tumors in general has not been
3  well established."
4          MS. O'DELL: What page are
5  you on, please?
6          MR. HEGARTY: Page 18.
7  BY MR. HEGARTY:
8      Q.  Do you agree with that
9  statement?
10     A.  Please read it again.
11     Q.  "The etiology of most
12 ovarian tumors in general has not been
13 well established."
14     A.  The etiology is -- has not
15 been well established. But it has been
16 studied. But there -- okay. I'm done.
17     Q.  The -- on page -- strike
18 that. On Page 21 --
19     A.  Of my report?
20     Q.  No, of the --
21     A.  Health Canada.
22     Q.  -- health assessment states
23 the following statement and tell me
24 whether you agree with it.

Page 544

1          "The specific mechanisms and
2  cascade of molecular events by which talc
3  might cause ovarian cancer have not been
4  identified."
5          MS. O'DELL: Wait. Do you
6  mind showing Dr. Zelikoff?
7          MR. HEGARTY: Well, then I
8  won't have -- I'm just reading
9  this statement.
10         MS. O'DELL: Well, but if
11 you're reading from the draft
12 assessment --
13         MR. HEGARTY: You know what,
14 I -- this is the only copy I have.
15 If you want to hand me your copy.
16         MR. TISI: I have my copy.
17 It has my notes on it. If you...
18         Do you want it?
19         MS. O'DELL: You're welcome
20 to my copy.
21         MR. HEGARTY: Thank you.
22 BY MR. HEGARTY:
23     Q.  Page 18, second paragraph.
24 I was on Page 18, Doctor.

Page 545

1      A.  You handed it to me like
2  this, sir.
3      Q.  Right. On page -- I'm
4  sorry, Page 21.
5      A.  This is Page 21.
6      Q.  Sorry. Page 21, second
7  paragraph. The statement at the end
8  reads, "However, the specific mechanisms
9  and cascade of molecular events by which
10 talc might cause ovarian cancer have not
11 been identified."
12         Do you agree with that
13 statement?
14         MS. O'DELL: Objection to
15 form.
16         THE WITNESS: That's a
17 statement here.
18 BY MR. HEGARTY:
19     Q.  Do you agree with that
20 statement?
21     A.  Oh, I'm sorry. I'm sorry,
22 I've lost -- Page 21, what --
23     Q.  Page 21, second paragraph --
24     A.  -- what paragraph?

137 (Pages 542 to 545)

Judith Zelikoff, Ph.D.

| Page 546 | Page 548 |
|---|---|
| 1     Under -- | 1   today it's not -- you're not using it to |
| 2    Q.   Last two lines. | 2   inform your opinions, correct? |
| 3    A.   Under -- | 3    A.   It is -- it is support and |
| 4    Q.   Under -- in the biologic | 4   validation of my opinions. |
| 5   plausibility section. | 5    Q.   You referenced IARC and its |
| 6    A.   I see it. Thank you. | 6   designation of asbestos. What has IARC |
| 7    Q.   It read -- the statement | 7   designated talc for genital uses as? |
| 8   reads: The specific mechanisms and | 8      MS. O'DELL: Objection. |
| 9   cascade of molecular events by which talc | 9      THE WITNESS: I -- in -- in |
| 10   might cause ovarian cancer have not been | 10   terms of classification, may I |
| 11   identified. | 11   look at the document? |
| 12      Do you agree with that | 12   BY MR. HEGARTY: |
| 13   statement? | 13    Q.   Well, they've designated |
| 14    A.   Yes, they have not been | 14   talc used -- |
| 15   clearly and conclusively identified. | 15    A.   Fibrous -- fibrous -- |
| 16    Q.   But that's not what that | 16    Q.   -- for perineal use as 2B, |
| 17   sentence reads. My question was do you | 17   correct? |
| 18   agree with the sentence that I just read | 18    A.   2B, yes. Fibrous talc, |
| 19   to you. | 19   correct. |
| 20    A.   It is -- I think it's a | 20    Q.   You were asked about the |
| 21   sentence taken out of text. | 21   deposition of Robert Glenn, correct? |
| 22      Do I agree with the sentence | 22    A.   The past manager and |
| 23   as it is written? No. I would have to | 23   director of NIOSH. |
| 24   add the words, "have not been clearly | 24    Q.   Yes. |

| Page 547 | Page 549 |
|---|---|
| 1   identified." | 1    A.   Yes. |
| 2    Q.   So you don't agree with | 2    Q.   Did you read the entirety of |
| 3   everything in the -- | 3   his deposition? |
| 4    A.   Or established. | 4    A.   No, I did not. |
| 5    Q.   So you don't agree with | 5    Q.   Did you agree with |
| 6   everything in Health Canada's risk | 6   everything he said in his deposition? |
| 7   assessment, correct? | 7    A.   I said I did not read the |
| 8      MS. O'DELL: Objection to | 8   entirety. I can't answer. |
| 9   form. | 9      (Document marked for |
| 10      THE WITNESS: I -- I do not | 10   identification as Exhibit |
| 11   agree with this sentence, correct. | 11   Zelikoff-49.) |
| 12   BY MR. HEGARTY: | 12   BY MR. HEGARTY: |
| 13    Q.   You do rely on, for purposes | 13    Q.   I'm going to mark as |
| 14   of your opinions in this case, the draft | 14   Exhibit 49, portions of the deposition of |
| 15   screening assessment, correct? | 15   Dr. Robert Glenn. If you turn to the |
| 16      MS. O'DELL: Objection. | 16   first page of that exhibit, Page 482. |
| 17      THE WITNESS: No. That came | 17    A.   Page 482, yes. |
| 18   out well after I handed in my | 18    Q.   Yes. Mr. Glenn was asked in |
| 19   final report, so it was not used | 19   the middle of the page, Lines 12 to 14, |
| 20   to inform my opinion. It was | 20   "Has the data also showed that talcum |
| 21   supporting validation for my | 21   powder is not cytotoxic, meaning it |
| 22   opinion. | 22   doesn't damage cells?" |
| 23   BY MR. HEGARTY: | 23      Mr. Glenn answer's, "Yes." |
| 24    Q.   So still -- still through | 24    A.   Yes. |

138 (Pages 546 to 549)

Judith Zelikoff, Ph.D.

|  | Page 550 |
|---|---|

1    Q.    Did you cite that portion of
2  his testimony in your expert report?
3         MS. O'DELL:  Objection to
4  form.
5         THE WITNESS:  No.
6  BY MR. HEGARTY:
7    Q.    Did you read it?
8    A.    I said that I did not read
9  this in its -- in its entirety.
10    Q.    Do you agree with that
11  sentence?
12         I'm sorry, do you agree with
13  his answer to that question?
14         MS. O'DELL:  Objection to
15  form.
16         THE WITNESS:  To the
17  question, "Has the data also
18  showed that talcum powder is not
19  cytotoxic, meaning it doesn't
20  damage cells?"
21         So if the question is do I
22  agree with that sentence -- do I
23  agree with his answer of yes,
24  there have been data showing, in

|  | Page 551 |
|---|---|

1         certain circumstances, in certain
2         cell lines, that talcum powder has
3         not been shown to be cytotoxic at
4         certain concentrations.
5  BY MR. HEGARTY:
6    Q.    Looking down at the next
7  question, 18 through 21, he's asked, "And
8  has the data also showed that talcum
9  powder is not mutagenic, meaning it
10  doesn't mutate genes?"
11         "Answer:  Yes."
12         Do you agree with his answer
13  to that question?
14    A.    I do not agree.  I think
15  that the -- I do not agree with his
16  answer.  I think that his -- that the
17  question has to be -- the question in my
18  opinion, it was ambiguous.  And I'm not
19  sure what he was basing that on in terms
20  of his response.
21         If you -- if he was looking
22  at mutagenicity in terms of Ames assays
23  or yes, they have not shown mutagenicity.
24         So is there data that also

|  | Page 552 |
|---|---|

1  shows that talcum powder is not
2  mutagenic?  There is.
3    Q.    Did you cite that portion of
4  Mr. Glenn's testimony in your report?
5    A.    No, I did not.
6    Q.    If you look at the next page
7  at the top.  The question, 2 through 7,
8  with the answer on 8.
9    A.    Mm-hmm-hmm.
10    Q.    Did you cite that question
11  and answer in your report?
12         MS. O'DELL:  Object to the
13  form.
14         THE WITNESS:  I did not cite
15  any of Dr. Glenn's information
16  because I -- I did not read it in
17  detail.
18  BY MR. HEGARTY:
19    Q.    You can put that aside.
20         Is it your testimony that
21  you're more knowledgeable regarding talc
22  and ovarian cancer than Dr. Neel?
23    A.    No, what my testimony is to
24  is that I have extensive knowledge in

|  | Page 553 |
|---|---|

1  toxicological aspects, the cytotoxicity
2  of it, and the inflammatory responses
3  from an -- from an academic perspective
4  and a biological mechanism perspective.
5    Q.    What is Dr. Neel's knowledge
6  of the toxicological aspects and the
7  toxicity of talc?
8    A.    I do not know.
9    Q.    What's his -- is he a
10  cancer -- strike that.
11         He is a cancer biologist,
12  correct?
13         MS. O'DELL:  Objection to
14  form.
15         THE WITNESS:  The only thing
16  I know about Dr. Neel is that he
17  is the director of the Cancer
18  Institute.  I am not familiar with
19  his research.
20  BY MR. HEGARTY:
21    Q.    Have you ever evaluated his
22  qualifications?
23    A.    No.  I was not on the search
24  committee nor do I have access to his CV.

139 (Pages 550 to 553)

Judith Zelikoff, Ph.D.

Page 554

1    Q.    You made statements
2  indicating that you believe that you are
3  more knowledgeable than Dr. Neel
4  regarding the toxicities of talc.  Is
5  that true?
6    A.    What I do know is that he is
7  not a toxicologist.
8    Q.    Do you know what his area of
9  expertise is?
10    A.    He's -- OB/GYN and oncology.
11    Q.    Do you know what his level
12  of knowledge is in the area of
13  toxicology?
14    A.    I do not.
15    Q.    Have you ever met him?
16    A.    Yes, I have met him.
17    Q.    Have you ever talked to him
18  about his qualifications in the area of
19  toxicology?
20    A.    No, I have not.  But I know
21  he is not a -- he is not considered a
22  toxicologist by his peers, by colleagues.
23  He is known as a cancer oncologist.  He
24  is not known or recognized as a

Page 555

1  toxicologist.
2    Q.    Who have you ever asked --
3  who have you ever spoken with regarding
4  to Dr. Neel's qualifications as it
5  relates to toxicology?
6    A.    I have not spoken to him
7  about his qualifications.  My answer
8  comes from the fact that I am an active
9  member in the Society of Toxicology, but
10  nationwide and internationally.  And also
11  I'm an active member in the International
12  Union of Toxicology and active member in
13  the other -- other toxicology programs
14  and societies.
15          And I have -- I have not
16  seen Dr. Neel at any of these, nor have I
17  heard of him being spoken at or about in
18  these -- in these meetings.
19    Q.    Do you go to OB/GYN
20  conferences?
21    A.    I do not.
22    Q.    Do you go to oncology
23  conferences?
24    A.    I do not.

Page 556

1    Q.    Are you a board-certified
2  oncologist?
3    A.    I am not, never claimed to
4  be.
5    Q.    Are you a board-certified
6  gynecologic oncologist?
7          MS. O'DELL:  Wait a minute.
8          THE WITNESS:  I am not, nor
9    have I ever claimed to be.
10          Because --
11  BY MR. HEGARTY:
12    Q.    You were asked -- you were
13  asked about whether you could do --
14  whether there could be studies looking at
15  risk of cancer in women exposed to
16  cobalt, chromium, and nickel.  Do you
17  recall those questions?
18    A.    I do.
19    Q.    Studies looking at exposures
20  of metals in humans are done all the
21  time.  They are called retrospective
22  case-control studies, correct?
23    A.    They are not done in a
24  laboratory nor is there insertion of

Page 557

1  those metals into humans.
2    Q.    That's not my question.  You
3  said -- you testified that there is no
4  way that you can do a study looking at
5  the effect of nickel in humans.  That's
6  not true, is it?
7          MS. O'DELL:  Objection to
8    form.  Misstates --
9          THE WITNESS:  I'm sorry.
10          MS. O'DELL:  -- the question
11    and the testimony.
12          Excuse me, Doctor.
13          THE WITNESS:  I was -- I was
14    talking about clinical studies and
15    studies in people.
16  BY MR. HEGARTY:
17    Q.    There are retrospective
18  case-control studies looking at exposure
19  of humans to nickel, correct?
20    A.    That is -- those are
21  epidemiological studies.  My
22  understanding of the question that was
23  asked of me had to do with laboratory
24  studies and intentional exposure.

140 (Pages 554 to 557)

Judith Zelikoff, Ph.D.

Page 558

1    Q.   Well, can you cite for me
2  any epidemiologic studies showing an
3  increased risk of ovarian cancer in women
4  exposed to nickel?
5    A.   Nickel alone, I have not
6  reviewed that.  But I do know the IARC
7  document talks about it as a Class 1
8  carcinogen.
9    Q.   Can you cite for me, any
10  retrospective case-control studies,
11  showing an increased risk of ovarian
12  cancer in women exposed to chromium?
13    A.   Chromium alone?
14    Q.   Yes.
15    A.   No, I cannot.
16    Q.   Same question as to cobalt?
17    A.   No, I cannot.
18    Q.   Can you cite for me any
19  case-control studies looking at whether
20  there's an increased risk of ovarian
21  cancer in women exposed to nickel,
22  chromium, and cobalt in combination?
23    A.   I hope I understand your
24  question right.  But what I am -- what

Page 559

1  I'm saying is yes, there is an increased
2  risk in exposure to talc because talc
3  contains, according to the J&J documents,
4  and according to other studies that just
5  looked at talcum powder products,
6  contains nickel, cobalt, and chromium in
7  elevated levels.
8    Q.   My question is specific to
9  looking only at exposure to cobalt,
10  nickel, and chromium.  Can you cite for
11  me any case-control studies showing an
12  increased risk of ovarian cancer in women
13  exposed to those three metals in
14  combination?
15    A.   No, I can't.
16    MS. O'DELL:  Objection.
17    Asked and answered.
18  BY MR. HEGARTY:
19    Q.   It would not be unethical to
20  do such a case-control study, correct?
21    MS. O'DELL:  Objection.
22    THE WITNESS:  A case-control
23    study or an epidemiological study
24    which uses data from populations

Page 560

1    is not unethical, but to use it in
2    a clinical study would be
3    extremely unethical.
4  BY MR. HEGARTY:
5    Q.   It would also be appropriate
6  to do cell studies looking at nickel,
7  cobalt, and chromium in ovarian cancer
8  cells, correct?
9    MS. O'DELL:  Objection to
10    form.
11    THE WITNESS:  Alone -- I'm
12    sorry.  Alone or in combination?
13  BY MR. HEGARTY:
14    Q.   Or all of the above.
15    A.   Your question was it would
16  be unethical to do cell culture studies?
17    Q.   Would it be unethical in
18  your opinion?
19    A.   Not to do cell culture
20  studies.
21    Q.   Have such studies been done?
22    A.   I'm not sure about the
23  combination.  There have been studies, a
24  number of studies that have been done in

Page 561

1  cell culture.  I can't cite them all,
2  because there are numerous that have
3  looked at nickel or cobalt or chromium in
4  cell culture studies, and many that have
5  been done in my own laboratory.
6    Q.   Can you cite to me any such
7  studies that have done those tests in
8  ovarian cells?
9    A.   I'm sorry.  When you say
10  "any such studies," do you mean cell
11  culture studies?
12    Q.   Yes.
13    A.   Well, the Shukla study, the
14  Saed studies.
15    Q.   So the Shukla and Saed
16  studies applied nickel, chromium and
17  cobalt to the cells?
18    A.   I'm sorry.  I'm sorry.  I
19  thought you said talcum powder.
20    Q.   Doctor, listen to my
21  question.  My question is can, you cite
22  for me any culture studies that have
23  applied nickel, cobalt, or chromium or
24  all three to ovarian cancer cells?

141 (Pages 558 to 561)

Judith Zelikoff, Ph.D.

|  | Page 562 |
|---|---|

```
 1        A.   I cannot -- I have not seen
 2   that literature, no.
 3        Q.   Those studies could be done,
 4   correct?
 5        A.   Those studies could be done.
 6        Q.   They could be done in your
 7   laboratory, couldn't they?
 8        A.   I have the facilities to
 9   carry out those studies.
10        Q.   You have not done those
11   studies?
12             MS. O'DELL:  Objection to
13        form.
14             THE WITNESS:  Correct.
15   BY MR. HEGARTY:
16        Q.   You cited to the Cramer 2007
17   study, which I'm marking as Exhibit
18   Number 40.
19             (Whereupon, a discussion was
20        held off the stenographic record.)
21             (Document marked for
22        identification as Exhibit
23        Zelikoff-50.)
24   BY MR. HEGARTY:
```

|  | Page 564 |
|---|---|

```
 1   of the first page on the right-hand
 2   column.
 3        A.   Yes.
 4        Q.   The authors state that
 5   the -- "First, the association is a
 6   relatively weak" -- "a relatively weak
 7   one; i.e., summary relative risk of
 8   approximately 1.3."
 9             Do you agree with that
10   statement?
11             MS. O'DELL:  Objection to
12        form.
13             THE WITNESS:  Number one, I
14        am not an epidemiologist so I'm
15        not testifying to epidemiological
16        odds ratio, whether that is weak
17        or not weak.
18   BY MR. HEGARTY:
19        Q.   The next sentence says,
20   "Second, no clear increase in risk or
21   duration of use has been found in most
22   studies."
23             Do you agree with that
24   sentence?
```

|  | Page 563 |
|---|---|

```
 1        Q.   I'm marking as Exhibit
 2   Number 50 the Cramer 2007 study that you
 3   referred to in response to counsel's
 4   questions.
 5        A.   Mm-hmm-hmm.
 6             MS. O'DELL:  Objection.
 7        That misstates the record.  I
 8        never referred to the Cramer
 9        study.
10             MR. HEGARTY:  She cited it
11        in response to your questions.
12             MS. O'DELL:  No, she did
13        not.  But you may ask questions
14        about it, but that's not a proper.
15             MR. HEGARTY:  Well, she
16        cited the Cramer 2007 article.
17   BY MR. HEGARTY:
18        Q.   Do you find this article to
19   be a credible source of information for
20   you?
21        A.   It was published in
22   Obstetrics and Gynecology.  That is good
23   journal, reputable journal.
24        Q.   And if you look at the top
```

|  | Page 565 |
|---|---|

```
 1             MS. O'DELL:  Objection to
 2        form.
 3             THE WITNESS:  There are many
 4        studies that do show that duration
 5        plays a role.
 6   BY MR. HEGARTY:
 7        Q.   That's not my question.  My
 8   question is do you agree with that
 9   sentence?
10        A.   I see.
11             MS. O'DELL:  Objection to
12        form.  Asked and answered.
13             THE WITNESS:  I do not agree
14        that there is no clear -- there is
15        some evidence that leads to an
16        increase in risk associated with
17        duration of use.
18   BY MR. HEGARTY:
19        Q.   So you don't agree with that
20   sentence?
21        A.   So I do not completely agree
22   with that sentence.
23        Q.   The next sentence reads,
24   "Third, the ability of talc used in the
```

142 (Pages 562 to 565)

Judith Zelikoff, Ph.D.

Page 566

1  genital area to enter the pelvic cavity
2  has not been conclusively proven."
3       Do you agree with that
4  sentence?
5      A.  None of these are -- none of
6  these sentences are cited or referenced
7  by the way.
8       It has not been conclusively
9  proven. I agree with the sentence.
10     May I --
11     Q.  You cited as well to the
12 Keskin paper. You cited that several
13 times, including in response to counsel's
14 questions.
15     A.  Yes, I did. I recall that.
16     Q.  The Keskin paper was an
17 animal study that did not show tumor
18 formation from application of talc,
19 correct?
20     MS. O'DELL:  Object to the
21 form.
22     THE WITNESS:  If you allow
23 me to specifically look for that,
24 please.

Page 568

1  findings that led to inflammation
2  including an increased number of
3  follicles, and that goes to
4  biological plausibility.
5  BY MR. HEGARTY:
6      Q.  Did you agree with that
7  finding?
8      A.  That there were increased
9  number of follicles?
10     Q.  Yes.
11     A.  And the histopathology?
12     That there was foreign body
13 reactions and that there were infections,
14 I agree with those studies.
15     Q.  Do you agree with the
16 statement that the author made that this
17 effect seems to be in the form of foreign
18 body reaction or infection rather than a
19 neoplastic change?
20     A.  I'm sorry, could you tell me
21 where that might be?
22     Q.  Again, in the conclusion
23 section that we have just been looking
24 at.

Page 567

1  BY MR. HEGARTY:
2      Q.  I'll mark it as Exhibit 51.
3      (Document marked for
4      identification as Exhibit
5      Zelikoff-51.)
6  BY MR. HEGARTY:
7      Q.  The Keskin paper over in the
8  conclusion section on Page 927 says that
9  with regard to the reported effects of
10 talc, "This effect seems to be in the
11 form of foreign body reaction or
12 infection rather than a neoplastic
13 change."
14     A.  Which is inflammation.
15     Q.  And in this study it showed
16 no neoplastic changes in any of the
17 animal study, correct?
18     MS. O'DELL:  Object to the
19 form.
20     You may answer.
21     THE WITNESS:  It was -- he
22 did not find or they did not find
23 that there was neoplastic changes,
24 but they did find a number of

Page 569

1      A.  Mm-hmm-hmm.
2      Well, a foreign body
3  reaction can -- is an immunological
4  response. Whether it's considered a
5  neoplastic change, likely not. A foreign
6  body reaction does not necessarily -- is
7  not necessarily known as a neoplastic
8  response, correct.
9      Q.  And you -- you didn't cite
10 that statement from the Keskin paper in
11 your report, did you?
12     A.  Not that I recall.
13     Q.  Do you agree with the --
14     A.  But my -- my role was to
15 define biological plausibility. So what
16 I did -- what I did put in my report were
17 the things that indicated to me that
18 there was inflammation.
19     Q.  You agree with the
20 conclusions from the Taher paper?
21     MS. O'DELL:  Object to the
22 form.
23     Doctor, it's in this stack.
24     THE WITNESS:  Okay. Thank

143 (Pages 566 to 569)

Judith Zelikoff, Ph.D.

| Page 570 | Page 572 |
|---|---|
| 1    you.  Oh, thank you. | 1    counsel has it.  I'll hand it to you.  If |
| 2  BY MR. HEGARTY: | 2  you'll -- |
| 3    Q.    Second page, Line 34, on the | 3    A.    Oh.  You mean the draft |
| 4  second page. | 4  screening assessment? |
| 5    A.    In the abstract? | 5    Q.    Yes.  Sorry, I was going to |
| 6    Q.    Yes. | 6  it by the wrong name.  It is Exhibit -- |
| 7      MS. O'DELL:  Give me just a | 7    A.    9. |
| 8    moment, I'm sorry.  I'll pull out | 8    Q.    Thank you. |
| 9    my copy. | 9      If you'll turn to Page 16. |
| 10      THE WITNESS:  I'm sorry, | 10    A.    I see that, Keskin et al., |
| 11    should I wait? | 11  2009, it's the first statement under |
| 12      MR. HEGARTY:  I think Leigh | 12  human studies. |
| 13    wants you to wait. | 13    Q.    Yes.  Right above that when |
| 14      MS. O'DELL:  Okay.  Go | 14  it refers to the Keskin and colleagues |
| 15    ahead.  I'm sorry. | 15  2009.  What was the conclusion that the |
| 16  BY MR. HEGARTY: | 16  sentence beginning "while no cancer"?  Do |
| 17    Q.    Do you agree with the | 17  you see that above human studies on |
| 18  statement made in Line 34? | 18  Page 16? |
| 19    A.    Perineal use of talc powder | 19    A.    The conclusion, "while no |
| 20  is a possible cause of human ovarian | 20  cancer"? |
| 21  cancer? | 21    Q.    Yes. |
| 22    Q.    Yes. | 22    A.    "While no cancer/precancer |
| 23    A.    I believe that it's more | 23  effects were observed, Keskin and |
| 24  than a possible cause.  I believe that | 24  colleagues noted the study's duration may |

| Page 571 | Page 573 |
|---|---|
| 1  there's biological plausibility which | 1  have been too short to note these types |
| 2  shows that it -- it could be, it is | 2  of effects." |
| 3  linked to human ovarian cancer. | 3    Q.    And in regard to -- and |
| 4    Q.    So you don't -- you disagree | 4  that -- that statement's consistent with |
| 5  with that statement? | 5  the statements that you've included in |
| 6    A.    One could say that, taking | 6  your report, fair? |
| 7  it literally, that it is certainly a | 7      MR. HEGARTY:  Objection to |
| 8  possible cause.  I just believe that it | 8    form. |
| 9  is greater than a possible cause. | 9      THE WITNESS:  Yeah. |
| 10      MR. HEGARTY:  Okay.  Thank | 10  BY MS. O'DELL: |
| 11    you.  I think that's it for my | 11    Q.    And then secondly you were |
| 12    time. | 12  asked a question, several questions about |
| 13      MS. O'DELL:  Okay. | 13  the actual Keskin paper itself.  And I |
| 14        - - - | 14  think it's still in front of you.  Do you |
| 15      EXAMINATION | 15  see that?  It's Exhibit 51.  Yeah, |
| 16        - - - | 16  Exhibit 51. |
| 17  BY MS. O'DELL: | 17    A.    This is it, thank you. |
| 18    Q.    Doctor, I just have two | 18    Q.    Okay.  And I'll turn you to |
| 19  questions for you. | 19  the conclusion please, Dr. Zelikoff. |
| 20      I think you had the causal | 20    A.    That is on Page 930? |
| 21  assessment in front of you. | 21    Q.    It's 927 actually.  One of |
| 22    A.    Do you mean the Taher? | 22  the conclusions, at least the ones I -- I |
| 23    Q.    No, ma'am.  The actual | 23  was looking at. |
| 24  causal assessment -- actually I think | 24      927.  Do you see that? |

144 (Pages 570 to 573)

Judith Zelikoff, Ph.D.

| Page 574 | Page 576 |
|---|---|
| 1    A.   I see. | 1   dissolved in DMSO. |
| 2    Q.   And counsel directed your | 2       Q.   Is -- is the data included |
| 3   attention to the sentence that said, | 3   in this manuscript, was that part of |
| 4   "However this effect seems to be in the | 4   the -- the data you relied on in abstract |
| 5   form of foreign body reaction or | 5   in reaching your opinions in this case? |
| 6   infection rather than neoplastic change." | 6       A.   In abstract form, yes.  That |
| 7       Do you see that?  Recall | 7   was all that was -- that was available |
| 8   those questions -- | 8   since this only came out a few weeks ago. |
| 9    A.   In the conclusion section? | 9       MS. O'DELL:  Okay.  I have |
| 10    Q.   Yes. | 10   nothing further. |
| 11    A.   On Page -- | 11       THE WITNESS:  Accepted for |
| 12    Q.   927. | 12   E-press a few weeks ago. |
| 13    A.   "However this effect seems | 13       MS. O'DELL:  Okay.  I have |
| 14   to be in the form of a foreign body | 14   nothing further. |
| 15   reaction or infection rather than a | 15       - - - |
| 16   neoplastic change." | 16       EXAMINATION |
| 17       Yes, I see that. | 17       - - - |
| 18    Q.   And if you'll look to the | 18   BY MR. HEGARTY: |
| 19   next sentence, what also did the authors | 19    Q.   Dr. Zelikoff, in looking at |
| 20   conclude? | 20   the Keskin paper, in -- in particular at |
| 21    A.   "Results of previous studies | 21   the portion of the conclusions section |
| 22   are in favor of a neoplastic effect, | 22   that counsel asked you to read -- |
| 23   particularly in the ovaries." | 23    A.   Yes. |
| 24       And they conclude that more | 24    Q.   -- the results of previous |

| Page 575 | Page 577 |
|---|---|
| 1   experimental and clinical studies are | 1   studies, that sentence? |
| 2   warranted. | 2    A.   Yes, I see it on Page 927. |
| 3    Q.   All right.  And one other | 3    Q.   Can you cite for me any |
| 4   question.  You were asked about the Saed | 4   previous studies to Keskin which were in |
| 5   studies regarding talc and cell culture, | 5   favor of a neoplastic effect? |
| 6   both ovarian cancer cells and regular | 6    A.   Culture cell studies that |
| 7   cells. | 7   have looked at proliferation, increased |
| 8    A.   Yes.  I recall. | 8   proliferation which was seen in the Saed |
| 9    Q.   And you were asked earlier | 9   studies and in the abstract. |
| 10   about the manuscript that's been marked | 10   Proliferation is one hallmark of the |
| 11   as -- | 11   carcinogenic process. |
| 12    A.   Exhibit 8. | 12    Q.   Doctor, listen to my |
| 13    Q.   -- Exhibit 8. | 13   question.  This publication was in 2008. |
| 14       Is it -- is it -- turn to | 14    A.   Okay.  I'm sorry. |
| 15   Page 5 of the manuscript please. | 15       MS. O'DELL:  2009 I believe, |
| 16    A.   I see it. | 16   but go ahead. |
| 17    Q.   And looking at the top, did | 17       THE WITNESS:  2009. |
| 18   Dr. Saed use Johnson's Baby Powder as a | 18   BY MR. HEGARTY: |
| 19   part of the -- his treatment of cells? | 19    Q.   Received December 2009. |
| 20    A.   Yes.  It's Page 5, top, | 20   Published 2009. |
| 21   treatment of cells, talcum powder from | 21       The sentence reads:  The |
| 22   Fisher -- Fisher Scientific or Baby | 22   results of previous studies before 2009 |
| 23   Powder from Johnson & Johnson, and the | 23   are in favor of neoplastic effect. |
| 24   numbers of the lots are given were | 24       What studies are they |

Judith Zelikoff, Ph.D.

Page 578

1  referring to?
2         A.   I don't know because it's
3  not referenced.
4                MR. HEGARTY:  I don't have
5  any additional questions.
6                MS. O'DELL:  Nothing
7  further, Doctor.
8                THE VIDEOGRAPHER:  Stand by
9  please.  This marks the end of
10  today's deposition.  The time is
11  9:03 p.m.  Off the record.
12                (Excused.)
13                (Deposition concluded at
14  approximately 9:03 p.m.)
15
16
17
18
19
20
21
22
23
24

Page 580

1         INSTRUCTIONS TO WITNESS
2
3         Please read your deposition
4  over carefully and make any necessary
5  corrections.  You should state the reason
6  in the appropriate space on the errata
7  sheet for any corrections that are made.
8         After doing so, please sign
9  the errata sheet and date it.
10         You are signing same subject
11  to the changes you have noted on the
12  errata sheet, which will be attached to
13  your deposition.
14         It is imperative that you
15  return the original errata sheet to the
16  deposing attorney within thirty (30) days
17  of receipt of the deposition transcript
18  by you.  If you fail to do so, the
19  deposition transcript may be deemed to be
20  accurate and may be used in court.
21
22
23
24

Page 579

1
2         CERTIFICATE
3
4
5         I HEREBY CERTIFY that the
   witness was duly sworn by me and that the
6  deposition is a true record of the
   testimony given by the witness.
7
         It was requested before
8  completion of the deposition that the
   witness, JUDITH ZELIKOFF Ph.D., have the
9  opportunity to read and sign the
   deposition transcript.
10
11
12  _____
   MICHELLE L. GRAY,
13  A Registered Professional
   Reporter, Certified Shorthand
14  Reporter, Certified Realtime
   Reporter and Notary Public
15  Dated:  January 23, 2019
16
17
18         (The foregoing certification
19  of this transcript does not apply to any
20  reproduction of the same by any means,
21  unless under the direct control and/or
22  supervision of the certifying reporter.)
23
24

Page 581

1         - - - - - -
          E R R A T A
2         - - - - - -
3
4  PAGE  LINE  CHANGE
5  ____  ____  _____
6         REASON: _____
7  ____  ____  _____
8         REASON: _____
9  ____  ____  _____
10         REASON: _____
11  ____  ____  _____
12         REASON: _____
13  ____  ____  _____
14         REASON: _____
15  ____  ____  _____
16         REASON: _____
17  ____  ____  _____
18         REASON: _____
19  ____  ____  _____
20         REASON: _____
21  ____  ____  _____
22         REASON: _____
23  ____  ____  _____
24         REASON: _____

Judith Zelikoff, Ph.D.

Page 582

```
 1
 2          ACKNOWLEDGMENT OF DEPONENT
 3
 4          I,_____, do
 5   hereby certify that I have read the
 6   foregoing pages, 1 - 583, and that the
 7   same is a correct transcription of the
 8   answers given by me to the questions
 9   therein propounded, except for the
10   corrections or changes in form or
11   substance, if any, noted in the attached
12   Errata Sheet.
13
14
15   _____
16   JUDITH ZELIKOFF Ph.D.        DATE
17
18
19   Subscribed and sworn
     to before me this
20   _____ day of _____, 20____.
21   My commission expires:_____
22
     _____
23   Notary Public
24
```

Page 583

```
 1          LAWYER'S NOTES
 2   PAGE  LINE
 3   ____  ____  _____
 4   ____  ____  _____
 5   ____  ____  _____
 6   ____  ____  _____
 7   ____  ____  _____
 8   ____  ____  _____
 9   ____  ____  _____
10   ____  ____  _____
11   ____  ____  _____
12   ____  ____  _____
13   ____  ____  _____
14   ____  ____  _____
15   ____  ____  _____
16   ____  ____  _____
17   ____  ____  _____
18   ____  ____  _____
19   ____  ____  _____
20   ____  ____  _____
21   ____  ____  _____
22   ____  ____  _____
23   ____  ____  _____
24   ____  ____  _____
```

147 (Pages 582 to 583)