# EXHIBIT 29

1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF NEW JERSEY

3     *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

4

   IN RE JOHNSON & JOHNSON TALCUM POWDER PRODUCTS

5  MARKETING, SALES PRACTICES AND PRODUCTS

   LIABILITY LITIGATION,

6

               MDL No. 16-2738-(FLW)(LHG)

7

8

       *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

9

10

11   REMOTE DEPOSITION OF ANNE MCTIERNAN, M.D., Ph.D.

12

               August 19, 2021

13            10:39 a.m. to 3:41 p.m.

14         REPORTED BY ANITA KORNBURGER

           REGISTERED PROFESSIONAL REPORTER

15

16

17

       *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

18

19

20

21

22

23

24

25

Page 2

A P P E A R A N C E S
SKADDEN ARPS, SLATE, MEAGHER & FLOM, LLP, by
  Mr. Joshua Schoch
  Ms. Allison Brown
  Ms. Stephanie Martin
  One Manhattan West
  New York, New York  10001-8602
  212-735-3222
  allison.brown@skadden.com
  Appearing by videoconference on behalf of the
  Defendants.

ASHCRAFT & GEREL, LLP, by
  Ms. Michelle A. Parfitt
  1825 K Street NW, Suite 700
  Washington, DC 20006
  202-759-7648
  mparfitt@ashcraftlaw.com
  Appearing by videoconference on behalf of the
  Plaintiffs.
FAEGRE DRINKER BIDDLE & REATH, LLP, by
  Mr. Eric Friedman
  300 North Meridian Street, Suite 2500
  Indianapolis, Indiana 46204
  317-237-0300
  eric.friedman@faegredrinker.com
  Appearing by videoconference on behalf of the
  Defendants.

LEVIN PAPANTONIO RAFFERTY, by
  Mr. Christopher V. Tisi
  316 South Baylen Street
  Pensacola, Florida 32502
  850-435-7000
  ctisi@levinlaw.com
  Appearing by videoconference on behalf of the
  Plaintiffs.
GOLOMB HONIK, P.C., by
  Mr. Richard Golomb
  1835 Market Street, Suite 2900
  Philadelphia, Pennsylvania 19103
  (215) 985-9177
  rgolomb@golombhonik.com
  Appearing by videoconference on behalf of the
  Plaintiffs.

Page 3

I N D E X

Examination by                    Page

Ms. Brown. . . . . . . . . . . . . . . 5

E X H I B I T S
                                   Page
Exhibit No.  Description         Identified

  1    Letter from Ms. Parfitt dated
       August 16, 2020. . . . . . . . . . 7
  2    Amended report. . . . . . . . . . . 9
  3    Amended report with red lines. . . 9
  4    4/1/2014 letter to Sam Epstein. . . 43
  5    Tab 24. . . . . . . . . . . . . . 50
  6    Invoices. . . . . . . . . . . . . 65
  7    Invoices. . . . . . . . . . . . . 75
  8    E-mail dated October 28, 2019. . . .84
  9    RJ Lee letters and reports from
       October 28, 2019. . . . . . . . . 109

 10    Not properly identified. . . . . . 122

 11    Article from Canadian Urological
       Association. . . . . . . . . . . . 125
 12    Article:  Scientists:  Facts Fail
       to Support Some Conclusions in
       JAMA Article on Talc Use, Ovarian
       Cancer. . . . . . . . . . . . . . 127

 13    O'Brien paper. . . . . . . . . . . 135

 14    O'Brien article. . . . . . . . . . 151

 15    Editorial regarding the O'Brien
       paper. . . . . . . . . . . . . . 163

Page 4

E X H I B I T S
                                   Page
Exhibit No.  Description         Identified

16    Reuters article. . . . . . . . . 179

R E Q U E S T S

(There were no requests made.)

Page 5

TRANSCRIPT OF PROCEEDINGS

          ANNE MCTIERNAN, M.D., Ph.D., called as a
    witness herein, having been first duly sworn on
    oath, was examined and testified as follows:
          E X A M I N A T I O N
BY MS. BROWN:
    Q.  Good morning, Dr. McTiernan.  How are
you?
    A.  Fine.  Thank you.  How are you?
    Q.  Good.  It's nice to see you again.  A lot
has changed since the last time you and I saw each
other in person.
          You -- can you tell us where you are
appearing from today?
    A.  I'm appearing from my home in Seattle.
    Q.  Okay.  And I understand, understandably
given the pandemic, you are not traveling right
now; is that right?
    A.  That's correct.
    Q.  Okay.  And does that mean that in terms
of your work, you are not going into the office, or
are you working from home?
    A.  I'm working from home, yes.
    Q.  And has that been the case pretty much
entirely since the start of the pandemic?

Anne McTiernan, M.D., Ph.D.

Page 6

1    A.  Yes.  My institution instituted something
2  very early, and so I've been working from home
3  since March of a year-and-a-half ago.  And my
4  institution doesn't allow us to travel for work,
5  and they asked us not to travel for personal
6  reasons.
7    Q.  Understood.  And would that apply to any
8  future trial appearances you may have, those
9  restrictions would apply to those as well?
10      MS. PARFITT:  Objection.
11      THE WITNESS:  The --
12      MS. PARFITT:  You may answer.
13      THE WITNESS:  Okay.  So the question
14  again was?
15 BY MS. BROWN:
16    Q.  Sure.  Yeah.  Can you help me understand
17  a little more what is the policy of your
18  institution in terms of travel right now?
19    A.  Right now it says no work for
20  travel -- sorry -- no travel for work.  And they're
21  asking us not to travel for personal reasons.  And
22  so for that, plus our -- my family's high risk
23  status, we're choosing not to travel for personal
24  reasons:  no flights, no boats, no trains.
25    Q.  Sure.  I understand.  And is there a time

Page 7

1  limit on that restriction from your institution or
2  is that sort of an open-ended policy as of right
3  now?
4    A.  The institution is trying to work things
5  out.  They were getting closer to being able to
6  lift some restrictions, including working at the
7  office, but with the delta variant, they moved back
8  again.  So we're hopeful that with new vaccines,
9  boosters coming out, and with time, that things
10  will get better.
11    Q.  Understood.  Do you have plans to testify
12  remotely in any upcoming trials?
13    A.  If needed, I would testify remotely.  I
14  would love to be able to travel to testify if
15  that's possible.  It depends entirely on timing and
16  on what the COVID situation is.
17    Q.  Let's -- what I'd like to do,
18  Dr. McTiernan, is mark as Exhibit 1 to your
19  deposition a letter that we received from
20  Ms. Parfitt on August 16, 2020 that included a
21  number of documents that were produced in response
22  to our deposition notice.
23      And what I'll do, for the record, is
24  leave that as a place holder exhibit, and we'll
25  fill it in with all of those documents.  You should

Page 8

1  have a hard copy binder of all of the documents
2  that were produced to us.
3      And I think what will likely happen,
4  Dr. McTiernan, through the course of the deposition
5  is that I'll want to remark individually some of
6  those documents and ask you specific questions
7  about them.
8      But both you and Michelle should have
9  a binder titled Documents Produced By Plaintiff in
10  Advance of Dr. McTiernan's Deposition.  And again,
11  for your record, we'll mark the totality of that as
12  Exhibit 1.  And for the court reporter, we'll
13  follow up with those documents.
14    A.  So I don't have any binder that says
15  that.  Oh, wait a minute.  Yeah, there's one that
16  says Documents Produced by Plaintiff.  The other
17  one says Deposition.
18    Q.  Sure.  So the one I'm referring to that
19  we're marking as Exhibit 1, Doctor, is the one that
20  says Documents Produced By Plaintiff.
21    A.  Okay.
22    Q.  Okay?  And then what I'd like to -- in
23  the second binder you will have -- you will find a
24  tab one, your amended expert report, and a tab two,
25  a red line of that amended report to your initial

Page 9

1  report in the MDL.  And what I'd like to do is mark
2  the amended report as Exhibit 2 and the red line as
3  Exhibit 3.
4      And let me start by asking you,
5  Dr. McTiernan, why did you amend your expert report
6  in this litigation?
7    A.  I amended it because there was a couple
8  of new pieces of information that I thought was
9  useful for this -- these issues.  One was to add a
10  new pooled study that had been published, and
11  another was to add the final screening report of
12  Health Canada.
13    Q.  Was it your idea to amend your report?
14      MS. PARFITT:  Objection.  You may answer,
15  Dr. McTiernan.  Dr. McTiernan, again, throughout
16  this deposition I may object to form.  You may
17  proceed unless I tell you otherwise with your
18  responses.
19      THE WITNESS:  Okay.
20      MS. PARFITT:  Thank you.
21      THE WITNESS:  So that was -- I missed the
22  last thing that --
23 BY MS. BROWN:
24    Q.  No problem.  No problem, Doctor.  Was it
25  your idea to amend your expert report?

Page 10

1     MS. PARFITT: Objection, form.
2     THE WITNESS: Ms. Parfitt asked me to
3 amend it.
4 BY MS. BROWN:
5     Q. Okay. Was it your idea to include the
6 pooled study and Health Canada in your amended
7 report?
8     A. I believe it was my idea to add the
9 pooled study. I had seen that published in JAMA.
10 The final screening report I believe was --
11 Ms. Parfitt informed me that it was available and
12 suggested that it be added to the report.
13     Q. Fair to say you learned of Health
14 Canada's final report from Ms. Parfitt?
15     MS. PARFITT: Objection.
16     THE WITNESS: I believe so. I'm
17 hesitating because I've also been following the
18 progress for these various things for talc and
19 ovarian cancer, so every couple weeks or so I do a
20 Google search and a PubMed search.
21     So I believe that if I had not seen
22 the Canada result, as soon as Ms. Parfitt notified
23 me, I soon after saw some press about it. So
24 that's why I'm hesitating. I can't remember which
25 came first, whether I saw the press first or

Page 11

1 Ms. Parfitt notified me.
2 BY MS. BROWN:
3     Q. You mentioned every couple of weeks you
4 do a Google search or a PubMed search. Can you
5 tell me a little bit about that and what that
6 entails?
7     A. Just -- I just look at -- just simple
8 words, just "talc" and "ovarian cancer." I do that
9 in both.
10     Q. And other than the pool study and the
11 Health Canada assessment, have you found anything
12 from your Google searching that informs your
13 opinions in this case?
14     A. I don't believe that, from my Google
15 searching, I saw something that informed the case.
16     Q. Okay. Have you printed out any articles
17 or any information from this Google searching that
18 we're talking about?
19     A. From Google search, I'm not sure if I
20 printed Health Canada from that, if I could link to
21 that. The articles I printed not from a Google
22 search.
23     Q. Okay. Have you printed any particular
24 articles from your PubMed searching?
25     A. Yes. And I would need to go through my

Page 12

1 list to show, but I printed off the JAMA article by
2 O'Brien, et al; the editorial by, I believe it was
3 Gossett, some letters from the editor about that
4 article, letters to the JAMA editor, and recently a
5 review article by Wentzensen and O'Brien. And then
6 from that I identified one of their references of a
7 new case control study published this summer by
8 Davis on ovarian cancer and -- and powder use in
9 African American and white women.
10     Q. Any other articles or information you
11 have found from Google searching or PubMed
12 searching that inform your opinion in this case?
13     A. If it's okay, I could look through my
14 materials, but I can't think right now of others.
15     Q. Sure. I think that's fine. And I have
16 some specific questions for you, so we'll take a
17 look at the list in a moment.
18     But just sitting here right now,
19 anything else that comes to your mind in terms of
20 additional materials you found either from Google
21 or PubMed?
22     A. I can't think of anything right now.
23     Q. Fair enough. If I could direct your
24 attention, Doctor, to -- I'm going to use the red
25 line, which is what we marked as Exhibit 3, 'cause

Page 13

1 I have a couple of questions about some things that
2 have changed in your report.
3     And when you have a moment to get to
4 that, I would direct you to page 4. And if you
5 look under Credentialed Expertise and Experience, I
6 see that you've changed the title of full member at
7 the Fred Hutch Center to full professor. And I
8 wanted to ask you why that change, and what's the
9 significance of that change.
10     A. So this is not a promotion, this
11 is -- Fred Hutchinson Cancer Research Center, they
12 originally used a title called member. It was a
13 member track. You start off as assistant member,
14 then go to associate member, and then full member.
15 So I've been a full member for, I don't know, 10 or
16 15 years. I'd have to look at my CV to see.
17     And then a couple of years ago, I
18 believe it was the director of the center,
19 spearheaded changing all of our titles to
20 professor -- the professor track. And so these
21 were not promotions for us, these were change of
22 name to be more in line with our academic
23 credentials. So I've always been on the professor
24 track -- the research professor track at the
25 university, but now this changes the actual title

Anne McTiernan, M.D., Ph.D.

Page 14

¹ of what my position is.
²     Q.   And has anything other than the title
³ changed for you at Fred Hutch?
⁴     A.   No, my -- I can't recall what percent
⁵ time I was when I last testified. Right now I'm
⁶ 60 percent. It might have been a little more than
⁷ that. And then the other thing is because of state
⁸ laws, they changed me to an hourly worker rather
⁹ than non-hourly. So anybody that's part-time is
¹⁰ considered an hourly worker. Those are the only
¹¹ changes.
¹²     Q.   Are you considered a part-time employee
¹³ of the Fred Hutchinson Cancer Center?
¹⁴     A.   Yes.
¹⁵     Q.   And when did you become a part-time
¹⁶ employee?
¹⁷     A.   I'd have to look through my CV. It's
¹⁸ quite a while ago. I started out as -- I was a
¹⁹ hundred percent for quite awhile, and then it went
²⁰ to 90 percent, and then gradually moved down.
²¹     Q.   Okay. And are you a tenured professor?
²²     A.   We do not have tenure at Fred Hutchinson.
²³ We go through reviews every five years, and
²⁴ continued lab and other support if that review goes
²⁵ well, but it's not a tenure.

Page 15

¹     Q.   Okay. Are you currently teaching any
² courses at Fred Hutchinson Cancer Center?
³     A.   No, I'm not.
⁴     Q.   Okay. Have you ever had teaching
⁵ responsibilities?
⁶     A.   I have done teaching of individual
⁷ students, post-docs, pre-docs, from the university,
⁸ and so they come over and they work with me and
⁹ they have independent credit. So -- and
¹⁰ undergraduates, too. So quite a bit of that over
¹¹ the years. And then also giving guest lectures at
¹² the university.
¹³     Q.   Okay. Have you ever been the professor
¹⁴ of a regular class that meets every semester or
¹⁵ something like that?
¹⁶     A.   Where I've been responsible for the
¹⁷ class?
¹⁸     Q.   Correct.
¹⁹     A.   No.
²⁰     Q.   Okay. Have you ever been a professor at
²¹ a university?
²²     A.   I am a professor. It's called the
²³ research professor at the University of Washington
²⁴ School of Public Health and the School of Medicine.
²⁵     Q.   And as a research professor there, do you

Page 16

¹ teach students in a formal class that meets every
² semester?
³     A.   No. I teach individual students.
⁴     Q.   And are you currently doing that right
⁵ now, Doctor?
⁶     A.   No, I don't have any students right now.
⁷     Q.   Okay. So going back then if we could,
⁸ let's just start with what you're doing now as a
⁹ professor at the Fred Hutchinson Cancer Research
¹⁰ Center. You said you're working there about 60 --
¹¹ 60 percent; is that right?
¹²     A.   That's correct.
¹³     Q.   Okay. And tell me what you do during the
¹⁴ time that you're working there.
¹⁵     A.   I direct studies and I direct analyses of
¹⁶ research data and writing up papers, presenting
¹⁷ data at conferences -- right now it's virtual --
¹⁸ and administering grants and -- so pretty much the
¹⁹ same thing I've been doing all along.
²⁰     Q.   Have you had any discussions with the
²¹ Fred Hutchinson Cancer Research Center since your
²² MDL testimony regarding your expert witness work in
²³ the talcum powder litigation?
²⁴     MS. PARFITT: Objection, vague.
²⁵     THE WITNESS: When you say discussions,

Page 17

¹ what do you mean?
² BY MS. BROWN:
³     Q.   Yeah, let's break it down. I'm
⁴ interested in discussions generally, but let's talk
⁵ about does the Fred Hutchinson institution require
⁶ you to disclose your expert consulting work?
⁷     A.   Yes. I have to ask permission before
⁸ doing this work. And so I asked and received
⁹ permission at the time when I had my -- did my
¹⁰ first work with Ms. Parfitt in providing
¹¹ consultation.
¹²          And then as this continues each year,
¹³ I have to report what kind of funding I'm getting
¹⁴ from this outside work.
¹⁵     Q.   And how do you do that? Is it a written
¹⁶ document that discloses the funding?
¹⁷     A.   It's online now. Every year I have to
¹⁸ complete that.
¹⁹     Q.   Okay. Do you keep a copy of this funding
²⁰ disclosure that you file annually?
²¹     A.   I believe it's online. I don't keep a
²² paper copy of it myself.
²³     Q.   Okay. Could you access it today if you
²⁴ wanted to look at your past disclosures?
²⁵     A.   It might be difficult for me to do it

Anne McTiernan, M.D., Ph.D.

Page 18

1 quickly, but I could do it at some point, sure.
2    Q.  Okay.  And other than disclosing the
3 amount of money you've received, do you have to
4 disclose anything else?
5       MS. PARFITT:  And Alli, if I can just get
6 a clarification.  You're talking about any
7 disclosures of funding since the time of her last
8 deposition, correct?
9       MS. BROWN:  Correct.  And thanks,
10 Michelle.
11 BY MS. BROWN:
12    Q.  And Dr. McTiernan, just so you know, the
13 focus of my questioning today is going to be new
14 parts of your report, new reliance materials and
15 things that have happened since you testified in
16 the Daubert hearing in the summer of 2019, okay?
17    A.  Uh-huh.  Okay.
18    Q.  So in terms of disclosures you've made
19 since that time, do you need to give a description
20 of the type of work you're doing or anything other
21 than the amount of money you've received?
22    A.  They just ask for what the entity is.
23 And in this case it's Ms. Parfitt's firm, but she's
24 handling all of the -- the work that I do.  They
25 ask specific questions about whether the work I'm

Page 19

1 doing is related to the work I do at the -- my
2 institution in terms of what grants I hold.  They
3 ask if -- they ask the particular position -- so
4 for any outside work, they want to know if you're a
5 CEO of something or if you get patent -- you know,
6 so those -- those types of specific questions they
7 have in mind.  Yeah.
8    Q.  Okay.
9    A.  So those are the things I have to
10 disclose to them.
11    Q.  And when they asked if the expert work
12 that you're doing for Ms. Parfitt's firm is related
13 to the work that you do at the institution, how did
14 you answer that question?
15       MS. PARFITT:  Objection.
16       THE WITNESS:  So the way they ask it is
17 is it related to the work I do with -- with grants
18 in which I'm dealing with patients directly or
19 human subjects, is how they word it.  And since I
20 do not have studies of talcum powder products and
21 ovarian cancer risk, then that's how I am able to
22 answer that as no, I don't.
23 BY MS. BROWN:
24    Q.  On this disclosure statement you answer
25 that the work you're doing as an expert witness is

Page 20

1 not related to the work you're doing at Fred
2 Hutchinson; is that right?
3       MS. PARFITT:  Objection, misstates her
4 testimony.
5       THE WITNESS:  What I -- say -- could you
6 say your question again?
7 BY MS. BROWN:
8    Q.  Sure.  When you fill out these
9 disclosures at the Fred Hutchinson Center, you
10 answer -- or you disclose that the work you're
11 doing as an expert witness in the talcum powder
12 litigation is not related to the work you're doing
13 at the Fred Hutchinson Cancer Research Center;
14 correct?
15       MS. PARFITT:  Object, vague and misstates
16 her testimony.
17       THE WITNESS:  It's not quite the way you
18 stated it.  It's -- they're asking me -- and it's
19 just something you check off, is your work -- is
20 the outside work related directly to the studies in
21 which I'm working with human subjects.  And so
22 since I don't have studies specifically on talcum
23 powder product use and ovarian cancer, then I say
24 no to that question.
25 BY MS. BROWN:

Page 21

1    Q.  Can you think of any other questions on
2 the form that we're discussing?
3    A.  I believe it's a broad question.  They
4 ask about spouse also, close family members,
5 and -- and I think that's -- I think that covers
6 it.
7    Q.  Okay.  And do you receive additional
8 correspondence either approving or denying your
9 continued work as an expert after you fill out this
10 form?
11    A.  I'm trying to recall.  There is -- there
12 is a form on record that it's approved.  And I
13 can't recall if every year I receive something, but
14 if there is an issue, then I hear from them.
15    Q.  Has there -- have you ever heard from
16 them in follow up?
17    A.  There -- not for this issue.
18    Q.  Okay.  You mentioned -- it sounds like
19 that you have a time in your mind when you did hear
20 from them; is that fair?
21    A.  It was on a different issue.  It was --
22 it was for another request that I had, and they
23 asked a question and determined that I did not have
24 a conflict.
25    Q.  Okay.  Was that a different expert

Page 22

1 witness work you were doing?
2   A.  No, it was not.
3   Q.  Did that have to do with talcum powder?
4   A.  No.
5   Q.  What was it?
6      MS. PARFITT:  Objection, relevancy.
7      THE WITNESS:  It was for a book that I
8 had written, and they determined that it was not
9 related to my work.
10 BY MS. BROWN:
11   Q.  And I understand actually you have -- you
12 have just published a book, right, called Cured; is
13 that right?
14   A.  That's correct.
15   Q.  And you previously published a book
16 called Starved; is that right?
17   A.  That was in 2016.
18   Q.  Okay.  And both of those books deal with
19 sort of your personal experiences; is that right?
20   A.  That's correct.
21   Q.  Do either of those books talk at all
22 about talcum powder?
23      MS. PARFITT:  Objection to the extent
24 counsel had the opportunity to inquire about the
25 2016 book Starved.  Certainly as to the more recent

Page 23

1 book, Cured, that's an area of inquiry.
2 BY MS. BROWN:
3   Q.  Sure.  So let's talk about Cured.  Cured
4 is a book that you recently published, right,
5 Doctor?
6   A.  Yes.
7   Q.  And as I understand it, you disclosed
8 that to your institution; is that right?
9   A.  Yes.
10   Q.  Okay.  And they had a follow-up question
11 to you.  What was that question?
12   A.  I don't recall the exact wording of it,
13 but I believe it was along the lines of does this
14 have anything to do with my work -- my current work
15 at Fred Hutchinson.
16   Q.  Okay.  And how did you respond to that
17 question?
18   A.  I responded no, it did not.
19   Q.  Okay.  And in terms of the proceeds from
20 your new book, Cured, do they go entirely to you?
21   A.  I don't have proceeds from it.  It was an
22 advance, which went to me.
23   Q.  Okay.  Describe that to me.  The
24 publishing company paid you an advance to write the
25 book?

Page 24

1   A.  That's right.
2   Q.  Okay.  And how much was that?
3   A.  I don't recall -- I don't recall the
4 exact amount.  I believe it was about $1,500.
5   Q.  Okay.  And the book is now being sold;
6 right?
7   A.  Correct.
8   Q.  And if enough copies are sold, do you
9 stand to make money from the book?
10   A.  I could, yes.
11   Q.  And does that money go to you or do you
12 have to share that with your institution, Fred
13 Hutchinson?
14   A.  It goes to me.  The institution did not
15 consider it something that they needed to -- to be
16 involved with.
17   Q.  And in terms of your expert witness work
18 regarding talcum powder, do the fees that you make
19 go to you, or do you have to share a portion of
20 that with the Fred Hutchinson Center?
21   A.  They go just to me.
22   Q.  And what percentage right now in 2021,
23 what percentage of your time is devoted to expert
24 witness work?
25   A.  Expert witness?  So this -- you're

Page 25

1 talking about cases where I've been disclosed as an
2 expert witness?
3   Q.  Well, that's a fair question.  Let me see
4 if I can make it easier.
5      Are you doing any other expert work
6 other than talcum powder?
7      MS. PARFITT:  And Dr. McTiernan, I would
8 object to the extent it's relevant to any
9 disclosure of your name.  If you're not being
10 disclosed as an expert, you're certainly not to
11 discuss that matter if it's relevant.
12      THE WITNESS:  Okay.  So the question then
13 is for this -- this talc work?
14 BY MS. BROWN:
15   Q.  Let's break it down even a little more.
16 You are currently working as an expert witness in
17 the talc litigation, fair?
18   A.  Yes.
19   Q.  Okay.  Are you doing any other expert
20 witness work outside of talc?
21   A.  I've not been disclosed for any other
22 work.
23   Q.  Okay.  Understood.  Have you been
24 disclosed in any other expert witness work having
25 nothing to do with talc?

Anne McTiernan, M.D., Ph.D.

Page 26

1    MS. PARFITT: Objection.
2    THE WITNESS: No.
3 BY MS. BROWN:
4    Q.  When did you start doing the other expert
5 witness work for which you have not been disclosed?
6    MS. PARFITT: Objection.  And
7 Dr. McTiernan, again, I'd counsel you with regard
8 to any discussions about the nature of that work,
9 names of individuals, all that would be frankly, at
10 this time, proprietary and not information to
11 disclose to Ms. Brown.
12    THE WITNESS: Oh, okay.  So I'm going to
13 decline to disclose it then.
14 BY MS. BROWN:
15    Q.  Yeah, except I didn't ask anything
16 Ms. Parfitt objected to.  I asked when you started
17 doing the other expert work for which you have not
18 been disclosed.
19    MS. PARFITT: That's fair, Alli.  Go
20 ahead, Dr. McTiernan.
21    THE WITNESS: Okay.  Now I have to try to
22 remember.  And I don't have the date in mind.  I
23 could look it up, but I don't have it in mind.  I'm
24 sorry.
25 BY MS. BROWN:

Page 27

1    Q.  Okay.
2    A.  But it's -- but it's been within the last
3 half year, approximately.
4    Q.  Within the last six months you have
5 started to do non-talc-related expert witness work;
6 is that fair?
7    A.  I don't know if I can call myself expert
8 witness work -- call it expert witness work, yeah.
9    Q.  Well, would you call it consulting work?
10 How would you describe it?
11    A.  Yes.
12    Q.  Okay.  Within the last six months you
13 have started to do consulting work for something
14 that you haven't been disclosed in yet; is that
15 fair?
16    A.  Yes.
17    Q.  Okay.  Is that consulting work related to
18 litigation?
19    MS. PARFITT: Objection.
20    THE WITNESS: I don't know if it's yet
21 related to litigation.
22 BY MS. BROWN:
23    Q.  Okay.
24    A.  I don't really understand how to answer
25 that question.

Page 28

1    Q.  Sure.  Well, you understand you're an
2 expert here in lawsuits filed against Johnson &
3 Johnson, and the consulting work you're doing, is
4 that in the context of lawsuits filed against
5 another company?
6    MS. PARFITT: Objection.  Dr. McTiernan,
7 to the extent you know.
8    THE WITNESS: From my perspective, it's
9 reviewing science.
10 BY MS. BROWN:
11    Q.  Okay.  Are you doing that work for
12 Ms. Parfitt or somebody at her firm?
13    MS. PARFITT: Objection.
14    THE WITNESS: No.
15 BY MS. BROWN:
16    Q.  How did you -- strike that.  So what
17 percent of your time is spent on either consulting
18 or export work like the kind of work you're doing
19 in this litigation?
20    A.  I can't calculate that right now.  I
21 wouldn't be able to calculate that.
22    Q.  And why is that?  Like what's the problem
23 with that?
24    A.  Because in my scientific work where I'm
25 paid 60 percent, it's never exactly that

Page 29

1 proportion.  It's often higher.  And so therefore,
2 to say what percent of my time is paid from my
3 institutional work and what percent is on this
4 consulting work is very difficult to estimate.
5    What I do have -- I believe you have
6 the invoices that I've submitted for -- for the
7 talc case -- cases, but in terms of how much
8 I -- what percent for that plus my other -- plus
9 Fred Hutch, I think it's very difficult to -- to
10 calculate that.  I think, you know, if you look at
11 what my hours are, I think that's the best answer I
12 could get for talcum powder product use.
13    Q.  What's the estimate of the number of
14 hours you spend per week on expert or consulting
15 work?
16    A.  I don't have that information right now.
17 I would have to go back and calculate it.  You do
18 have what I've done for talcum powder product use,
19 so that -- that would be useful for that.  And then
20 I don't have a calculation right in front of me for
21 any outside otherwise consulting work.
22    Q.  Sure.  And I think what you're telling
23 me, Dr. McTiernan, is even though you're
24 60 percent, you wind up doing more work than that
25 at Fred Hutch?  Is that what you're saying?

Anne McTiernan, M.D., Ph.D.

1  A.  It can be.

2  Q.  Okay.  And I'm not trying to hold you to

3  any exact percentage, but some people would say,

4  you know, I do about half of my work at Fred

5  Hutchinson; I do about half consulting or

6  litigation work.  Do those general 50/50

7  percentages apply in your case?

8      MS. PARFITT:  Objection, misstates her

9  testimony.

10     THE WITNESS:  The only thing I can say is

11 that at Fred Hutchinson I'm a 60 percent person.

12 So 60 percent of my time overall is Fred

13 Hutchinson.

14 BY MS. BROWN:

15 Q.  Okay.  That's fair.  And what about in

16 terms of percentage of your income from consulting

17 or litigation work, what's your best estimate

18 there?

19 A.  I don't have that information.  I could

20 calculate that, but I don't have that in my head

21 right now.

22 Q.  So I looked at your invoices, and it

23 looks like in the talcum powder litigation you made

24 close to $300,000.  Does that sound right to you?

25     MS. PARFITT:  Objection.  Is that from

1  the beginning, or --

2      MS. BROWN:  Correct.

3      MS. PARFITT:  -- or --

4      MS. BROWN:  Correct.

5      MS. PARFITT:  And we're supposed to be

6  inquiring about from the last deposition, forward,

7  but that's fair.  Go ahead.

8  BY MS. BROWN:

9  Q.  Does that sound about right to you,

10 Dr. McTiernan?

11 A.  I would -- again, I apologize, but I

12 didn't know I was going to be asked this specific

13 question, so I haven't calculated that.  But you

14 have the invoices, so you can see that.  I don't

15 have in my head what my Fred Hutchinson salary is.

16 I could get that for you and then you could do that

17 calculation.

18 Q.  Okay.  You don't know how much money you

19 make in your regular job at Fred Hutchinson?

20 A.  I don't have it in my head.

21 Q.  No, do you have an estimate?

22 A.  I need to get out my records and look at

23 it.

24 Q.  Okay.  So in terms of what you would tell

25 a jury, it's that you don't even have an estimate

1  of how much money you make at Fred Hutchinson?

2      MS. PARFITT:  Objection, misstates her

3  testimony.

4      THE WITNESS:  I don't have it in my head.

5  If I was to answer that for anybody, I would need

6  to look at my records, and then I would have it.

7  BY MS. BROWN:

8  Q.  Do you enlist the assistance of anyone at

9  Fred Hutchinson to help you with the work you do as

10 an expert witness in the talcum powder litigation?

11 A.  No.

12 Q.  Do you use any Fred Hutchinson resources

13 or services in terms of working as an expert

14 witness in the talcum powder litigation?

15 A.  I use the Fred Hutchinson library.

16 Q.  Is that an electronic library or a

17 physical library?

18 A.  Electronic.

19 Q.  And so do you download articles from the

20 Fred Hutchinson electronic library for use as your

21 work as an expert witness in the talcum powder

22 litigation?

23 A.  Yes.

24 Q.  And I noticed on some of your invoices

25 you've actually charged the plaintiffs' lawyers for

1  downloading articles or things like that.  Do you

2  give that money back to Fred Hutch?

3  A.  If there was a charge that Hutch had to

4  pay and then I received money back, then yes, I

5  would pay that back.

6  Q.  Does Fred Hutchinson know that you use

7  their library to access articles for your expert

8  witness work?

9  A.  They allow me to use it for any reason.

10 I also can use the University of Washington

11 library.

12 Q.  Do either Fred Hutchinson or the

13 University of Washington have written policies

14 concerning expert witness work of employees?

15     MS. PARFITT:  Objection.

16     THE WITNESS:  The policies, to my

17 knowledge, don't refer to the use of the libraries.

18 Those are considered intellectual services.  And to

19 my knowledge, they've never told me that I'm

20 restricted on how I can use them.

21 BY MS. BROWN:

22 Q.  But are there written policies -- are you

23 aware of written policies at either Fred Hutchinson

24 or University of Washington governing employees'

25 work as an expert witness or a consultant?

1    A.   I haven't seen specific things that talk
2  just about an expert witness in terms of the
3  library use.
4    Q.   And putting aside the library, are there
5  written policies that govern employees' work at
6  Fred Hutch or the University of Washington as an
7  expert witness?
8    A.   I don't -- for the Fred Hutchinson, I
9  don't believe there are.  I haven't -- I don't
10 recall seeing that.  With the university, for
11 expert witness, since I'm not an employee of the
12 university, I have an appointment there.  I'm not
13 an employee.  I have not searched for employee
14 regulations.
15   Q.   Okay.  What do you mean, you're not an
16 employee?  How are you affiliated?
17   A.   I have an affiliated appointment as a
18 faculty member, but I do not receive a salary from
19 them.  I'm considered a University of Washington
20 employee.
21   Q.   Okay.  Who appointed you?
22   A.   The -- it was a faculty search process
23 years ago through the -- primarily through the
24 department of epidemiology and the school of public
25 health.  So it would be the chair at that time, and

1  then the dean of the school of public health at
2  that time, and then that's renewed yearly.
3    Q.   Are you currently doing any work at the
4  University of Washington School of Public Health?
5    A.   No.
6    Q.   Okay.  And what about the University of
7  Washington Department of Medicine, are you
8  currently doing any work there?
9    A.   No.
10   Q.   When's the last time you did work at
11 either of those institutions?
12   A.   I don't do work at them.  I have had
13 students in the past from both of those
14 institutions that have come to Fred Hutchinson to
15 work with me.
16   Q.   And when's the last time that happened?
17   A.   I don't know.  I'd have to look at my CV.
18   Q.   Okay.  Within the last five years have
19 you had students from either of those institutions
20 come to work with you at Fred Hutch?
21   MS. PARFITT:  Objection with regard to
22 the timing.  Anything since the time of your last
23 deposition, Dr. McTiernan.
24   THE WITNESS:  Not since the time of my
25 last deposition, no.

1  BY MS. BROWN:
2    Q.   Okay.  Since the time of your last
3  deposition have you done any work with the American
4  College of Epidemiology?
5    A.   No.
6    Q.   What about The Obesity Society?
7    A.   No.
8    Q.   What about the American College of
9  Sports Medicine?
10   A.   So since the last deposition, I gave a
11 talk -- and I think I mention it in my CV -- The
12 Wolf Talk.  It's an honor talk, although you do not
13 have to be a member in order to give that talk.
14 But I don't have -- I'd have to look at my CV and
15 see the date and see if that was before or after
16 the last deposition.
17   Q.   Since your last deposition,
18 Dr. McTiernan, have you had any conversations with
19 anyone at the Fred Hutchinson Cancer Research
20 Center regarding talcum powder?
21   A.   Yes.
22   Q.   And tell me about that, please.
23   A.   There were two occasions.  One was when I
24 was asked to present to US Congress on talcum
25 powder product use and ovarian cancer.  And so we

1  have that information.  I believe it was
2  March 2019.  So when I was asked to do that by the
3  US Congress subcommittee, I went to the Fred
4  Hutchinson -- I contacted the Fred Hutchinson vice
5  president for government affairs and then worked
6  with her.
7        So I talked with her about this
8  request, and then she helped me through it.  She
9  had experience with the US Congress, and so I had
10 several conversations with her about the process.
11 And then she saw this and helped me with the
12 statement that I made to them and then saw and
13 reviewed the report that they asked me to provide
14 them.  She also was there with me throughout the
15 time both before and after the actual testimony.
16   Q.   Okay.
17   A.   So I had a conversation with her.
18   Q.   What's her name, Doctor?
19   A.   I believe it's Jennifer Griffith.  I
20 would need to look that up.
21   Q.   Okay.  I'm sorry.  Go ahead, you were
22 going to describe a second --
23   A.   Start again?
24   Q.   I interrupted you.  I'm sorry.  You were
25 going to describe the second instance where you had

Page 38

1 a conversation with someone at Fred Hutchinson
2 regarding talcum powder.
3     A.  The second was when I was asked to speak
4 with our public health science faculty meeting.  So
5 this was a -- they call it a mini Ted talk.  It was
6 about five minutes long.  And they asked me to talk
7 about something that I've been doing recently, so I
8 talked about this issue of talking with Congress
9 for a specific issue related to epidemiology
10 related to public health.
11     Q.  And do you recall when the public health
12 sciences mini Ted talk took place?
13     A.  I don't.  I'd have to look that up.  I
14 don't have it in my head.
15     Q.  Did you --
16     A.  But -- I'm sorry.  It was after the
17 presentation to Congress.
18     Q.  Okay.  Did you prepare any notes or
19 slides to use at the mini Ted talk?
20     A.  I believe I had slides.
21         MS. BROWN:  I'll request production of
22 those slides.  And I'll follow up with Ms. Parfitt.
23 And for the record, we'll also request production
24 of the expert witness disclosures we were talking
25 about this morning.

Page 39

1 BY MS. BROWN:
2     Q.  Tell me what you recall about what you
3 said in the mini Ted talk regarding talc.
4     A.  I can't recall exactly, but the gist was
5 the ways that we communicate in public health, that
6 we do it through writing, through giving talks and,
7 in this case, I gave testimony to Congress.  So
8 that -- from my recollection, that was what I
9 talked about.
10     Q.  Do you recall discussing the substance of
11 the talc ovarian cancer epidemiology?
12     A.  I don't believe that I did, but I would
13 need to look at my slides to see if I did.
14     Q.  Do you recall any questions that you
15 received during that talk?
16     A.  I don't.  It was a pretty quick talk, and
17 part of a big meeting.
18     Q.  Fair enough.  Other than the two
19 instances you just described, since your last
20 deposition have you had any discussions with anyone
21 else at Fred Hutchinson regarding talc?
22     A.  I don't believe I have, no.
23     Q.  What about any of the other institutions
24 you're affiliated with -- including the University
25 of Washington -- have you spoken to anyone since

Page 40

1 your last deposition regarding talc?
2     A.  No, I don't believe I have.  No.
3     Q.  Since your last deposition have you
4 spoken to anyone at Health Canada regarding talc?
5     A.  I submitted public comments.  And we have
6 provided a document of what I submitted, and the
7 date of that is on there.  I believe it was
8 February 2019, perhaps.  But I would need to check
9 the date.
10         So I submitted my comments.  And a few
11 weeks after that I received an e-mail from one of
12 their Health Canada staff people asking me if I
13 would be interested in helping them with any
14 further issues or questions they might have.  And I
15 said I'd be happy to help, but I heard nothing else
16 from them until later I received a request from
17 them for release of documents.
18         They said they had a third party that
19 wanted all of the documents that I had provided.
20 In this case it was just -- I believe the only
21 issues that they were asking about was those public
22 comments that I submitted.
23     Q.  Okay.  Let me see if I can understand
24 that.  Was it your idea to reach out to Health
25 Canada initially?

Page 41

1     A.  I believe it was.  There was a -- I knew
2 that there was a public commentary period, because
3 it's obvious on their website, and so I submitted
4 comments.
5     Q.  Did you have discussions with the lawyers
6 representing plaintiffs in this litigation prior to
7 submitting these comments?
8         MS. PARFITT:  Objection.
9         THE WITNESS:  I believe that we did talk
10 about it, that -- that we talked about that it was
11 a possibility.  I was not asked to specifically do
12 it.  It wasn't one of my -- one of my -- it wasn't
13 asked of me as a consultant.  I wasn't paid for
14 anything I did with Health Canada.  I was -- I
15 think we just talked about it that it was a
16 possibility.
17 BY MS. BROWN:
18     Q.  Okay.  And you said that you received
19 some follow-up correspondence asking if you would
20 be willing to help Health Canada; is that right?
21     A.  Yes.  And I believe we have those exact
22 questions in the documents that we submitted.
23     Q.  Yep.  And we'll take a look at that in a
24 second.  And then I understand at some point you
25 received a request to release documents.  Is that

Page 42

1 how you described it?
2     A.  To release any of my communications with
3 them.  There was a third party asking to release
4 these -- any communications, and the only thing
5 that they note that they wanted to release of mine
6 was my -- those public comments that I had
7 submitted.
8     Q.  I understand.  Okay.  Any other
9 discussions or correspondence with Health Canada
10 since your last deposition?
11     A.  I believe that's it.
12     Q.  Have you, since your last deposition, had
13 any correspondence with the United States Food and
14 Drug Administration regarding talc?
15     A.  No, I haven't.
16     Q.  Okay.  One of the documents that you
17 produced, Dr. McTiernan, in advance of your
18 deposition is a document from the FDA to a
19 citizens -- to a citizen regarding a citizens'
20 petition regarding talc.  Do you recall looking at
21 that document?
22         MS. PARFITT:  Could you identify the
23 document you're speaking of, please, Ms. Brown?
24         MS. BROWN:  Sure.
25         MS. PARFITT:  And Dr. McTiernan, you can

Page 43

1 look at the notebooks that you have in front of you
2 once Ms. Brown identifies it.
3 BY MS. BROWN:
4     Q.  So -- and I misspoke, Dr. McTiernan.  One
5 of the documents that appears as a new document in
6 your amended expert report can be found at tab
7 three in the deposition binder.  And for the
8 record, we will mark this as Exhibit 4.
9         And it is an April 1, 2014 letter to
10 Sam Epstein at the Cancer Prevention Coalition,
11 signed by Dr. Steven Musser from -- the director of
12 scientific operations, Center for Food, Safety, and
13 Applied Nutrition.  Do you see that document,
14 ma'am?
15     A.  Yes, I do.
16     Q.  When is the first time you saw this
17 document?
18     A.  I don't recall, but I believe it was
19 prior to my first deposition at -- I base that in
20 part on the date of this.
21     Q.  So this document appears for the first
22 time on your reliance list in the amended report.
23 Do you know why that is?
24     A.  Can you show me where you're talking
25 about?  Is it on the reliance list or in a

Page 44

1 reference?
2     Q.  In your amended report, Dr. McTiernan,
3 which we've marked as Exhibit 2, if you take a look
4 at the amended report red line, at the very end it
5 includes an Exhibit C, and that's titled Materials
6 Considered.  Do you see that?
7     A.  Yes.
8     Q.  Okay.  Did you type this Exhibit C in
9 materials considered?
10     A.  So I see an Exhibit C.  I don't see
11 anything that says materials -- in my case it's
12 purple and it says a document -- oh, yeah, I see
13 it.  Okay.  No, I did not type this.
14     Q.  Okay.  Have you ever seen Exhibit C
15 before today?
16     A.  I'm not sure if I have.  I think -- you
17 know, I think I have in a different format.  I knew
18 what all of these exhibits were.  And I have a
19 note -- I remember making myself a note to look at
20 it, so I must have.
21     Q.  Okay.  So Exhibit C, which is attached to
22 your amended report, is not something you created;
23 is that fair?
24         MS. PARFITT:  Objection, misstates her
25 testimony.

Page 45

1 BY MS. BROWN:
2     Q.  Well, I don't want to misstate it.
3 Dr. McTiernan, did you create Exhibit C to your
4 amended report?
5     A.  I did not create it.
6     Q.  Okay.  And prior to today have you ever
7 seen Exhibit C to your amended report?
8         MS. PARFITT:  Objection.  She stated
9 she's seen it in some form.
10         THE WITNESS:  Much of these are
11 references from my report -- from the old report as
12 well as the new report.
13 BY MS. BROWN:
14     Q.  You're telling me, Doctor, 'cause I had
15 to go back and forth to figure out what was new.
16 So I hear you on that.  I just want to understand
17 how this thing got put together.  And it sounds
18 like you don't know; is that fair?
19     A.  So it was put together by Ms. Parfitt's
20 team, and it consists of references plus additional
21 documents.
22     Q.  And if you go to page 9 of Exhibit C,
23 just a little bit under halfway down the page, you
24 see -- actually towards the bottom, letter from
25 Steve Musser, FDA, to Samuel Epstein dated April 1,

Page 46

1  2014.  Do you see that?
2      A.  Yes.
3      Q.  Okay.  And I'll represent to you, after
4  going back and forth a hundred times with this and
5  your original report, this is new to your exhibit,
6  your materials considered.
7          So my question to you is:  When did
8  you first see this letter?
9      A.  I believe I saw it prior to my first
10 report.  I'm surprised that it wasn't included on
11 materials for the first report.
12     Q.  And are you relying on this letter from
13 the FDA to Mr. Epstein in 2014 for your opinions in
14 this case?
15         MS. PARFITT:  I'm going to object to the
16 extent that I believe -- and I'll check her
17 transcript -- that there was an inquiry about the
18 2014 letter to the FDA.  So I will -- I would
19 object to any further inquiry about that.  Why it
20 didn't appear in the earlier reliance list, Alli,
21 I'm not certain.  But as Dr. McTiernan said, it was
22 something she had looked at.
23         MS. BROWN:  Okay.  Well, all I can go on
24 is the amended report produced to me.  And I'm
25 telling you, after a lot of back and forth to

Page 47

1  figure out what's new, this is something new.  And
2  my question --
3          MS. PARFITT:  And Alli, just finish my
4  statement.  I'm not suggesting that you're wrong
5  with regard to the exploration between the two
6  reports.  What I am suggesting is this was
7  something, as Dr. McTiernan has indicated, she did
8  have prior to her first report.  And I will check
9  the transcript, but I believe that there was even a
10 question about the FDA letter.
11         MS. BROWN:  Okay.
12 BY MS. BROWN:
13     Q.  So Dr. McTiernan, you did not add this to
14 your amended report; correct?
15     A.  I can't say yes or no 'cause I don't
16 recall not having it for the first report, so
17 that's why I can't recall if it's something added
18 to the amended.
19     Q.  Okay.  Do you agree with the FDA's
20 conclusion in this report regarding the talc
21 epidemiology?
22         MS. PARFITT:  Objection to the very broad
23 nature of that question concerning their
24 conclusions.  And again, I object to the extent it
25 was inquired of at her deposition of January 28th.

Page 48

1          MS. BROWN:  Listen, here's how we're
2  doing this deposition.  If there's something new,
3  I'm going to ask you about it.  I'm being real
4  careful to keep it to something new.  And I
5  appreciate the objection, but we need to move on.
6          MS. PARFITT:  Well, Alli, we do, but if
7  there was an inquiry at her deposition, we aren't
8  going to move on with regard to this particular
9  document.  I'm not doubting that it may not have
10 been put on a reliance list.  What I am checking is
11 that it was inquired about at her deposition, which
12 is really what one of the guardrails was for this
13 deposition.
14         MS. BROWN:  So you'll check back if you
15 have a further objection.
16 BY MS. BROWN:
17     Q.  Dr. McTiernan, have you contacted the FDA
18 since your previous deposition to discuss any
19 issues of talc and ovarian cancer?
20     A.  No, I have not.
21     Q.  Have you informed the United States Food
22 and Drug Administration that you are of the opinion
23 that talc causes ovarian cancer since the time of
24 your last deposition?
25     A.  No, I have not.

Page 49

1      Q.  Have you had any conversations with the
2  Centers For Disease Control since your last
3  deposition?
4      A.  No.
5      Q.  Have you informed the scientists at the
6  Centers For Disease Control that you are of the
7  view that talcum powder causes ovarian cancer?
8      A.  Was that different from the last
9  question?
10     Q.  Yes, it was, 'cause now I'm asking about
11 the CDC.  Have you informed anyone at the CDC about
12 the opinions that you're giving in this lawsuit,
13 that talc causes ovarian cancer?
14     A.  I'm just confused, because there were two
15 questions about the FDA, and then there was another
16 question about the CDC.  And I thought this is the
17 same question.  So is this a second CDC question
18 that's asking the same?
19     Q.  So here's the question, Dr. McTiernan.  I
20 noticed in a number of your materials produced and
21 materials relied on that you cite to a number of
22 CDC documents; correct?
23     A.  Yes.
24     Q.  You consider the CDC to be a respected
25 public health authority in the United States of

Page 50

1 America; correct?
2   A.  For specific issues they are an
3 authority, yes.
4   Q.  Since the time of your last deposition,
5 have you called up or corresponded with anyone at
6 the CDC to inform them that you are of the opinion
7 that talc causes ovarian cancer?
8   A.  No.
9   Q.  One of the documents that is new to your
10 materials considered is a document called the NCI
11 PDQ.  Are you familiar with that document?
12   A.  Yes.
13   Q.  And when's the first time you saw that
14 document?
15   A.  This most recent version of PDQ I've seen
16 within the last couple of months.  I can't remember
17 what the date was for this particular one.
18   Q.  Okay.  And it's actually tab 24 in the
19 binder of materials that you produced in advance of
20 your deposition.  And we'll mark that as Exhibit 5.
21   A.  Tab 24?
22   Q.  Yep, in the binder that says "Documents
23 produced by plaintiff."  Okay.  And the date of the
24 printout of this document is August 5, 2021.  And
25 I'll give you a second to get there.

Page 51

1   A.  Okay.
2   Q.  When's the first time you saw this
3 document at tab 24, Exhibit 5?
4   A.  I can't recall the exact time, because I
5 believe that I looked online for NCI PDQ, but also
6 Ms. Parfitt's team provided this as a PDF.  So
7 that's why I'm hesitating.  I can't remember, even
8 though this says produced on the 21st, I may have
9 looked myself.  So I'm not sure exactly when I
10 first saw this version of it.
11   Q.  Okay.  Did the document that you produced
12 to us, which is -- looks like it was printed on
13 August 5, 2021, was that given to you by the
14 lawyers?
15   A.  I believe that this was, but I think that
16 I independently looked online, okay?
17   Q.  And do you regularly check the NCI
18 website for information regarding ovarian cancer?
19   A.  No, I do not.
20   Q.  Why were you looking online for this
21 document?
22   A.  I believe -- well, first of all, I don't
23 look because they're not -- they don't do
24 systematic reviews.  So it's not an up-to-date
25 comprehensive review of issues.  So I wouldn't look

Page 52

1 at PDQ for any reason.  I didn't look for ovarian
2 cancer for the most up-to-date research.
3       What I do is if somebody notifies me,
4 in this case Ms. Parfitt or her team notified me
5 that it had been updated, then I will look at it.
6   Q.  Okay.  So the reason you looked at the
7 NCI PDQ is because the lawyers notified you it had
8 been updated?
9   A.  Yes, because they thought I might be
10 interested to see what is currently on that site.
11   Q.  Okay.  And if you look at the very, very
12 last page of the document, this document was
13 updated July 8, 2021.  Do you see that?
14   A.  Yes.
15   Q.  And if you look at page 13 of 20, you see
16 that this document from the NCI lists doctors with
17 inadequate evidence of an association risk of
18 ovarian, fallopian tube, and primary peritoneal
19 cancer; correct?
20   A.  I just want to clarify that this is not
21 an NCI statement, it's an independent board.  PDQ
22 is an independent group of scientists.  So it's not
23 an NCI document.  It's not policy of NCI.  I think
24 it's produced on PDQ.
25   Q.  So there are a couple of things, though,

Page 53

1 that are different.  And let's make sure we're
2 clear.  This is not a policy statement of the
3 National Cancer Institute according to the document
4 itself; correct?
5   A.  Well, I haven't looked through it to see
6 if it talks about document, but I do -- they do
7 disclose that -- somewhere -- that it's a separate
8 board and it is not an NCI document.
9   Q.  Okay.  Have you looked to see the
10 scientists that make up the board that puts
11 together the NCI PDQ?
12   A.  I did look this time.  I don't routinely
13 look and see who's on the board for all of these
14 PDQ productions.  They produce things from numbers
15 of different cancers.
16   Q.  And how many board members are employed
17 by the National Cancer Institute?
18   A.  I don't know.
19   Q.  Are you aware that several of the board
20 members work at the NCI?
21   A.  I don't know.
22       MS. PARFITT:  Objection.
23 BY MS. BROWN:
24   Q.  This document, which is titled NHI,
25 National Cancer Institute -- do you see that on the

**Page 54**

1 first page?
2     A.  They use the logo, but they do later, on
3 page 18, say that it's editorially independent of
4 NCI.
5     Q.  The document has the logo NIH National
6 Cancer Institute; correct?
7         MS. PARFITT:  Asked and answered.  Go
8 ahead, Dr. McTiernan.
9         THE WITNESS:  It has the logo, yes.
10 BY MS. BROWN:
11     Q.  Okay.  And you understand the document is
12 accessible from the National Cancer Institute's
13 website; right?
14         MS. PARFITT:  Objection.
15         THE WITNESS:  I haven't looked for it
16 that way.  I think I looked -- I Googled NCI PDQ,
17 and that's how I got it.
18 BY MS. BROWN:
19     Q.  Did you understand that when you Googled
20 it, you gotta go to the NCI's website to get this
21 thing?
22     A.  I'll take your word for it.  I did not
23 look to see what group it was that I found.
24     Q.  All right.  On page 13 you see factors
25 with inadequate evidence of an association with the

**Page 55**

1 ovarian, fallopian tube and primary peritoneal
2 cancer.  Do you see that?
3     A.  Yes.
4     Q.  Okay.  And one of the factors in
5 inadequate evidence is listed perineal talc
6 exposure; correct?
7     A.  Yes.  And I disagree that that is under
8 that classification.  And I disagree for other
9 things that they classify that way.  I think that
10 their opinion is not based on systematic reviews
11 and full analysis.
12     Q.  All right.  So the very first sentence
13 says, "The weight of the evidence does not support
14 an association between perineal talc exposure and
15 an increased risk of ovarian cancer."  And I
16 understand you, Doctor, to be saying you disagree;
17 right?
18     A.  Yes.
19     Q.  Okay.  And you would agree that ovarian
20 cancer is a serious women's health issue; correct?
21     A.  Yes.
22     Q.  And you understand that at the very end
23 of this document the authors invite people to
24 comment, to contact them with any information they
25 might want to say about what's in this document;

**Page 56**

1 right?  Comments, questions, submit to the NCI;
2 right?
3     A.  Are you talking about the section that
4 says "contact us"?
5     Q.  If you look at page 19 of 20, "any
6 comments or questions about the summary content
7 should be submitted to cancer.gov through the NCI's
8 website."  Do you see that?
9     A.  No.  Maybe you can point me --
10     Q.  Yeah, let me put it up on the -- I'm
11 going to share my screen and try and make this
12 easier for us.
13         So, Doctor, on -- I am on page 19 of
14 20 to help orient you.  And right -- we're looking
15 at a page that talks about this PDQ summary.  Do
16 you see that?
17     A.  Yes.
18     Q.  Okay.  And in the middle of the page it
19 says, "Any comments or questions about this summary
20 consent should be submitted to cancer.gov through
21 the NCI's website"; right?
22     A.  I see it now that you're highlighting.
23 It was kind of buried there.
24     Q.  Have you, since the time of your last
25 deposition, submitted any comments or questions

**Page 57**

1 about this summary through the NCI's website?
2     A.  No, I have not.
3     Q.  Yet you are of the opinion that talcum
4 powder is causing a fatal cancer and you disagree
5 with the conclusions in this document that we're
6 looking at, Exhibit 5; correct?
7     A.  You mentioned a fatal cancer.  Are you
8 saying all cases of ovarian cancer are fatal?
9     Q.  I think we can agree, Dr. McTiernan, that
10 ovarian cancer is a very serious and oftentimes
11 fatal disease; correct?
12     A.  Correct.
13     Q.  And you are disagreeing with the
14 conclusions of this document that there is
15 inadequate evidence of perineal talc use causes
16 ovarian cancer; correct?
17     A.  Yes.
18     Q.  Okay.  And you have not made any effort
19 to contact or comment -- comment on this document;
20 correct?
21     A.  Correct.
22     Q.  Have you, Dr. McTiernan, since the time
23 of your last deposition, contacted any United
24 States public health authority to share your view
25 that perineal talc exposure causes ovarian cancer?

Page 58

1    A.  I'm trying to think.  I don't -- so
2  contacted -- say it again.  Contacted -- better
3  repeat the question again.
4  BY MS. BROWN:
5    Q.  Sure.  Since the time of your last
6  deposition have you corresponded with, contacted,
7  alerted any public health authority that you
8  are -- United States public health authority that
9  you are of the view that perineal talc exposure
10  causes ovarian cancer?
11      MS. PARFITT:  And you're -- with the
12  exception of Health Canada, which you've talked
13  about.
14  BY MS. BROWN:
15    Q.  Right.  So let me ask the question again,
16  'cause I was pretty clear about the time and the
17  scope.
18      Since the time of your last
19  deposition, have you contacted any United States
20  public health authorities to tell them that you are
21  of the view that perineal talc exposure causes
22  ovarian cancer?
23    A.  I can't recall doing that.
24    Q.  Have you had -- other than the
25  discussions we spoke about earlier today regarding

Page 59

1  your congressional testimony, have you had
2  discussions with anyone at all, other than the
3  lawyers, about talcum powder and your belief that
4  it causes ovarian cancer since the time of your
5  last deposition?
6      MS. PARFITT:  Objection.
7      THE WITNESS:  I believe the -- that
8  I -- when I talked to the -- my department
9  epidemiologist -- sorry -- the division of public
10  health, when I gave that talk, I believe I did
11  there talk to that group about ovarian cancer and
12  talcum powder product use.  I believe there was
13  follow up with my own program chair as well with
14  another cancer epidemiologist.
15  BY MS. BROWN:
16    Q.  Are you recalling discussions with your
17  program chair since the time of your last
18  deposition about your opinions regarding talcum
19  powder?
20    A.  It would have been.  It was after that
21  talk that I gave for my program.
22    Q.  And tell me what you recall about that
23  discussion.
24    A.  It was brief.  I believe it was by
25  e-mail.  And I believe she said she agreed with my

Page 60

1  interpretations.
2    Q.  What's her name?
3    A.  Concerning the association of talcum
4  powder product use and ovarian cancer.
5    Q.  Okay.  And what's the name of this
6  program chair?
7    A.  So it's Kathy Malone, M-A-L-O-N-E.
8    Q.  And what was the nature of your
9  statements to Dr. or Ms. Malone?
10    A.  I don't believe I made statements to her.
11  I believe she was following up on the talk.
12    Q.  Have you requested the opportunity to
13  give any presentations about your opinions that
14  talc causes ovarian cancer from any of the
15  institutions you're affiliated with?
16    A.  No, I have not.  Not other than that one.
17    Q.  In your correspondence with your program
18  chair, did you ask for any opportunities to spread
19  the word that you believe talcum powder is causing
20  ovarian cancer?
21    A.  I don't believe I have.
22    Q.  Have you done anything, Dr. McTiernan, at
23  all since your last deposition to get the word out
24  that you believe talcum powder causes ovarian
25  cancer?

Page 61

1      MS. PARFITT:  Objection to the extent
2  it's in addition to the comments that you have made
3  to Ms. Brown about your activities.
4      THE WITNESS:  I gave comment for a press
5  release -- and we provided that as well, the press
6  release -- on the association of talcum powder
7  product use and ovarian cancer.  So that's in
8  your -- in the materials we released.  And
9  it's -- I think it was -- it was published in one
10  or maybe more public venues.
11  BY MS. BROWN:
12    Q.  And what you're referring to,
13  Dr. McTiernan, is a Beasley Allen law firm press
14  release; is that right?
15      MS. PARFITT:  Objection, mischaracterizes
16  the press release.
17  BY MS. BROWN:
18    Q.  Is that the one you're talking about?
19  We'll take a look at it in a sec.  I just want to
20  make sure we're on the same page.
21    A.  Yes.
22    Q.  Okay.
23    A.  Well, I think that what we provided is
24  the actual media.  I don't think it's actually a
25  press release what we provided, but I'd have to

Page 62

1  look at that again.
2      Q.  Okay.  We'll take a look at that in one
3  sec.  Other than the press release that says the
4  law firm name Beasley Allen on it, have you done
5  any other -- have you engaged in any other media to
6  get the word out that you believe talc causes
7  ovarian cancer?
8          MS. PARFITT:  Objection to the
9  characterization of the PRN news wire.  You may
10  answer, Dr. McTiernan.
11          THE WITNESS:  I'm trying to recall.  I
12  can't recall.  I have answered press media on this
13  issue, but I don't think the dates were since the
14  last deposition.  I think they preceded it.
15  BY MS. BROWN:
16      Q.  Do you think it's important,
17  Dr. McTiernan, to sort of spread the word or sound
18  the alarm that you believe talcum powder is causing
19  ovarian cancer?
20          MS. PARFITT:  Objection, argumentative.
21          THE WITNESS:  I believe that when I
22  talked to the US Congress about my opinion, that
23  was quite a lot of public exposure and it was --
24  there was a report available.  My statement was
25  available.  It was televised and -- widely

Page 63

1  televised.  So I think that that's pretty much
2  making a very public statement of my opinion.
3  BY MS. BROWN:
4      Q.  Okay.  And so my question was just do you
5  think it's important -- do you think it's important
6  to make your opinion known publicly?
7      A.  I believe that what I did was important,
8  yes.
9      Q.  And I understand representatives from
10  Congress contacted you about that appearance;
11  correct?
12      A.  It was a staffer for the chair of that
13  subcommittee.
14      Q.  Okay.  And so what I'm interested in is
15  have you, of your own volition and motivation, done
16  anything to get the word out about your opinions in
17  this litigation?
18          MS. PARFITT:  Objection, form.
19          THE WITNESS:  So you're talking about
20  whether I have published?  I have -- I don't put
21  out press releases for myself.  I do help if others
22  ask for help in press releases, whether it's from
23  my institution or other organizations.
24          MS. PARFITT:  Alli, I don't want to
25  interrupt --

Page 64

1          MS. BROWN:  No, you're totally right,
2  Michelle.  We -- and Doctor, I apologize.  We've
3  been going over an hour.  So this would be a great
4  time, if it works for everyone, to take a
5  ten-minute break.
6          MS. PARFITT:  That would be great.  And
7  I'm going to adjust some cameras while we're there.
8  So I'll let you go on mute, and we'll get back on.
9          MS. BROWN:  Okay.  Thanks very much.
10          (Break taken.)
11  BY MS. BROWN:
12      Q.  Welcome back, Dr. McTiernan.  As we
13  discussed off the record, we'll try and go another
14  hour and take another break.  And please let me
15  know if you need a break before then.
16      A.  Okay.
17      Q.  What I'd like to do now, Dr. McTiernan,
18  is talk to you about some of the invoices that you
19  produced to us prior to the deposition.  And what
20  I'll mark separately as Exhibit 6 and 7 is what
21  appears as tab 14 and 15 of your binders of
22  documents that you produced in advance of this
23  deposition.  And I'll also -- I'll give you a
24  chance to get there.
25          So Dr. McTiernan, I want to start with

Page 65

1  Exhibit 6, which appears to be some invoices.  The
2  cover letter is dated October 26, 2019.  Do you see
3  that?
4      A.  Yes.
5      Q.  Okay.  And I'm going to share my screen
6  too in case that makes it easier for you, rather
7  than having to switch back and forth.  So this is
8  an invoice since your last deposition submitted to
9  Ms. Parfitt.  And this is, I guess, your letterhead
10  up here, Anne McTiernan, MD, PhD; right?
11      A.  Yes.
12      Q.  Do you currently hold an active medical
13  license?
14      A.  Yes, I do.
15      Q.  Okay.  Do you treat patients?
16      A.  No, I don't.
17      Q.  Okay.  Since the time of your last
18  deposition you haven't treated any patients; is
19  that fair?
20      A.  That's correct.
21      Q.  Okay.  Where do you currently have an
22  active medical license?
23      A.  Washington state.
24      Q.  Okay.  Anywhere else?
25      A.  No.

Page 66

1    Q.   And this title, internal medicine, cancer
2 epidemiology and women's health, where does that
3 come from?
4    A.   Those are the topics I cover for
5 consulting.
6    Q.   This -- is this a title that you inserted
7 here?
8    A.   It's not a title, it's -- these are the
9 things that I cover.  It's not a company name.
10 It's -- these are the issues that I'll cover in
11 consulting.
12    Q.   Understood.  And is this your home
13 address here?
14    A.   Yes.
15    Q.   Okay.  And you say you're submitting this
16 invoice to Ms. Parfitt for the period
17 September 29th to October 26th, and you reference
18 that it's for meeting --
19    A.   Hold on.  You said September 29th?
20 Which --
21    Q.   This is what we've marked as Exhibit 6.
22 It's part of the materials you produced in advance
23 of the deposition.  And it can be found in your
24 binders at tab 14, in the binder titled documents
25 produced by plaintiff.  And I also have it up on

Page 67

1 the screen if that's helpful.  And my question,
2 Dr. McTiernan, is --
3    A.   Hold it.  Ms. Brown, I'm still not able
4 to find it.  The one that I have in this binder, it
5 says July 28th through October 12, 2019.
6        MS. PARFITT:  Alli, mine does as well.
7        MS. BROWN:  Okay.  Well, that must be a
8 printing issue.  These are the invoices that you
9 produced to us.
10 BY MS. BROWN:
11    Q.   And it sounds like, Dr. McTiernan, there
12 might have been some printing.  So what I'll do is
13 give you as much time as you need and just ask if
14 you could look at the screen for the questions
15 since it doesn't seem like it printed in your
16 binder.
17    A.   I'm looking at the screen.
18    Q.   Okay.  Great.  So on Exhibit 6, my
19 question for you, your first paragraph here says
20 that you're submitting invoices for work including
21 e-mails, literature review, document review, and
22 for something called special research.  Do you see
23 that?
24    A.   Yes.
25    Q.   What is special research?

Page 68

1    A.   I believe it was -- oh, this is -- this
2 was for -- for doing research on the causation.
3 But I believe it's -- these were different sources
4 of funds.  So that's -- I'm a little confused with
5 why that ended up in your packet versus what's here
6 in what I have.
7        So I believe it was a way to
8 differentiate it from two different sources of
9 funds, one being MDL, one being another case.
10    Q.   I understand.  This special research that
11 you did was for something other than the MDL; is
12 that right?
13    A.   I believe that's -- yeah, that's the term
14 we used.
15    Q.   Okay.  Did you -- are you the person who
16 came up with the term special research?
17    A.   I don't think so.  I think Ms. Parfitt
18 came up with that.
19    Q.   Okay.  And in terms of the substance of
20 what this special research was, what did you do?
21        MS. PARFITT:  Objection to the extent
22 it's proprietary with regard to a matter,
23 Dr. McTiernan, for which you've yet been disclosed.
24 BY MS. BROWN:
25    Q.   And just to clear it up, this is work you

Page 69

1 did in September 29, 2019 to October 26, 2019.  Can
2 you describe to me what the special research was?
3        MS. PARFITT:  Again, objection.  Just
4 caution you, Dr. McTiernan, if it has to do with
5 something in a matter where you have not been
6 disclosed as an expert.
7        THE WITNESS:  Okay.  This was further
8 research in relation to -- it was not a
9 case-specific research, it was more considering
10 issues of the science of epidemiology, general
11 causation.  That may have had special reference
12 to -- to that particular.  So it's not MDL.  And I
13 think today we're being -- we're reviewing for MDL;
14 is that correct?
15 BY MS. BROWN:
16    Q.   Well, actually we're reviewing all the
17 stuff you've produced since your last deposition
18 and all of the work that relates to that.  So was
19 this special research regarding clear cell cancer?
20    A.   I can't recall.  I would have to go and
21 review that case again to see, or review the exact
22 things that I was looking at.
23    Q.   And if you go to the second page,
24 Dr. McTiernan, it looks like you charge -- first of
25 all, your hourly rate at the time was $450; right?

Page 70

1    A.   Yes.
2    Q.   And that has since increased to 500; is
3  that right?
4    A.   Yes.
5    Q.   Okay.  And it looks like here you have
6  the total of this invoice $4,500; right?
7    A.   Yes.
8    Q.   And the only thing on here is special
9  research and some lunch meetings; right?
10   A.   Looks like one meeting, yes.
11   Q.   Okay.  So how do you know what you did
12  for the $4,500?  Do you have other records that
13  would let anybody know what you did?
14   A.   I would need to review what I was looking
15  at at that time.
16   Q.   And how would you do that?
17   A.   I could look back in my computer and see
18  what -- what -- what sort of things I was looking
19  at or going through.
20   Q.   Do you keep some kind of a document that
21  would allow you to correspond what you did on the
22  days referenced in this invoice?
23   A.   No, I don't.
24   Q.   So how could you go back and try and
25  figure out what special research totaling ten hours

Page 71

1  you did that resulted in an invoice for $4,500?
2    A.   I do these by day.  So at the end of the
3  day, if I've spent an hour working on these issues,
4  then I would insert it into my spreadsheet.
5    Q.   Do you have a spreadsheet that includes
6  details of what -- what you do that allows you to
7  generate those invoices?
8    A.   It's no different than that.  I abstract
9  from that directly into this table.
10   Q.   Okay.  Are there more details contained
11  in your spreadsheet than we're seeing right here?
12   A.   No.
13       MS. PARFITT:  Objection, asked and
14  answered.
15  BY MS. BROWN:
16   Q.   So sitting here today, you're not aware
17  of anything more than what you already told us that
18  resulted in a $4,500 payment for special research?
19   A.   That's correct.
20   Q.   And flipping to the next page of this
21  document, which is a letter dated December 19,
22  2019, I have a couple of questions about some of
23  your charges here on the next page.
24       You charge the lawyers for travel
25  time; is that right?

Page 72

1    A.   Yes.
2    Q.   And you charge them at a rate of $225 per
3  hour of travel?
4    A.   Yes.
5    Q.   And are you -- do you happen to be
6  working during that time or is it any kind of
7  travel in connection with your expert witness work?
8    A.   It's travel time.
9    Q.   Okay.  So are you working during the
10  travel time or not?
11   A.   If I only charged that, then I would not
12  be doing work for -- for this case.
13   Q.   Okay.  If you're traveling and doing
14  work, you would charge your $500 an hour rate; is
15  that fair?
16   A.   Not then.  That was 450.
17   Q.   Okay.  At the time of this invoice, if
18  you had been, for example, reading something on a
19  plane, you would charge $450 an hour; correct?
20   A.   That's correct.
21   Q.   But if you're just sitting on the plane
22  reading the newspaper, you charge $225 an hour;
23  right?
24   A.   That's correct.
25   Q.   Okay.  Now, a lot of the entries on this

Page 73

1  invoice use the term "review documents."  Do you
2  see that kind of all over this document?
3    A.   Yes.
4    Q.   What documents are those?
5    A.   If this was related to a deposition or to
6  testimony, then I would be reviewing the documents
7  that -- that I had looked at previously, or the
8  documents that are referenced in my report.
9  the -- any documents that were provided for me by
10  Ms. Parfitt's firm.  So quite varied, but I would
11  review several times the epidemiologic studies that
12  I was reporting on.
13   Q.   This invoice that we're looking at totals
14  $75,000.  Do you see that?
15   A.   Yes.
16   Q.   Is there any way for anyone to know what
17  documents you reviewed for $75,000 here?
18       MS. PARFITT:  Objection.
19       THE WITNESS:  I would have to see -- I
20  would have to look back and see exactly which trial
21  it was, which deposition it was, and then look back
22  and see what -- what documents there were for
23  those.
24  BY MS. BROWN:
25   Q.   Okay.  Do you have a list or some kind of

Page 74

1 writing or documents that would allow you to figure
2 out what all of these entries titled "review
3 documents" refer to?
4     A.   That would be primarily the references
5 from my expert report.
6     Q.   When you review documents like you have
7 noted in this invoice, do you review them
8 electronically or in hard copy?
9     A.   Either.  If I'm traveling, then they --
10 many of them may be electronic, but anything could
11 be paper as well.
12     Q.   Okay.
13     A.   These are the documents that I would have
14 testified at that time about the documents that I
15 would have had the deposition about.
16     Q.   Is it -- is it your idea to submit
17 invoices like the one we're looking at with no
18 description other than "review documents"?
19         MS. PARFITT:  Objection.
20         THE WITNESS:  Was it my idea?
21 BY MS. BROWN:
22     Q.   Yes.
23     A.   Yes.  And I -- yes.
24     Q.   Okay.  Have you ever considered including
25 more detail in your invoices so the people paying

Page 75

1 you know what you were doing?
2         MS. PARFITT:  Objection, argumentative.
3         THE WITNESS:  If they ask me to, I will.
4 BY MS. BROWN:
5     Q.   Okay.  Let's take a look at what is the
6 second set of invoices that were produced that we
7 marked as Exhibit 7, which should be tab 15 in that
8 binder, Dr. McTiernan.
9         Though I appreciate we may have some
10 difficulty with the invoice printing.  This one
11 appears to start -- it's a packet of invoices, and
12 it appears to start with a cover letter dated
13 February 24, 2018.  Do you see that?
14     A.   This was the one submitted before
15 my -- before when I had those -- the last
16 deposition?
17     Q.   I don't know.  This is the stuff we got
18 from you in advance of the deposition.
19     A.   Okay.  I have this.
20     Q.   Okay.  And one of the things I want to
21 ask you about, if you go to the letter of
22 February 5, 2019, do you see that letter somewhere
23 in the documents you have there?  And I have it up
24 on the screen if that's helpful.
25     A.   Yes.

Page 76

1     Q.   Okay.  On January 25, 2019 you submitted
2 a bill for over $1,000 for a call.  Do you see
3 that?
4     A.   Yes.
5     Q.   Do you have any idea what the call -- the
6 $1000 call from January 25, 2019 was about?
7         MS. PARFITT:  And again, you're referring
8 to the two-and-a-half hour call?  Is that what
9 you're talking about on January --
10         MS. BROWN:  Ms. Parfitt, is that really
11 fair?  Come on now.  Let's -- let's -- I understand
12 you want to contextualize.  Your witness is doing
13 just fine.  Let her hold her own and please conform
14 your objections to the rules.
15 BY MS. BROWN:
16     Q.   Dr. McTiernan, do you have any idea what
17 the call from January 25, 2019 was about?
18     A.   These conference calls are all with
19 Ms. Parfitt and her team, or Ms. Parfitt alone.
20 Given the time --
21         MS. PARFITT:  I would object.  And Alli,
22 I obviously would object other than a general
23 reference, I mean, as to our specific --
24         MS. BROWN:  Understood.
25         MS. PARFITT:  -- Dr. McTiernan is not to

Page 77

1 go into that, nor would that be proper to make that
2 inquiry.
3         MS. BROWN:  Yes.
4         MS. PARFITT:  So Dr. McTiernan, you can
5 reference it was a call.  If you recall with whom,
6 that's appropriate.
7         THE WITNESS:  Okay.  I'll stop there
8 then.
9 BY MS. BROWN:
10     Q.   Okay.  And that's a fair objection.  Your
11 recollection is this call from January 25, 2019 was
12 a call with lawyers; is that fair?
13     A.   Yes.
14     Q.   Okay.  And in terms of -- setting aside
15 any discussions you might have had with lawyers, in
16 terms of any addition details about entries like
17 this one that just say "call," do you have any
18 documents or any source of finding out what took
19 place on some of these days that are referenced in
20 your invoices?
21     A.   So you're not talking about the call,
22 you're talking about the -- the other dates?
23     Q.   Well, I mean, there are other entries
24 that say things like "call" in your invoices.  And
25 I want to know is there a source, a log, a diary,

Anne McTiernan, M.D., Ph.D.

Page 78

1  something that you maintained that contained
2  additional information about the work you were
3  doing on the case?
4        MS. PARFITT:  Objection.
5        THE WITNESS:  If it says "review
6  documents," these are documents that I have used
7  and referenced in my expert report.  If it says
8  "call," it's a call with Ms. Parfitt and other
9  lawyers or Ms. Parfitt alone.  That's it.
10 BY MS. BROWN:
11     Q.  Do you, since the time of your last
12 deposition, submit an invoice for time preparing
13 for your testimony to Congress?
14     A.  No, I did not submit an invoice for
15 preparation for Congress.
16     Q.  Okay.  The lawyers reimbursed your travel
17 expenses to testify in front of Congress; correct?
18     A.  Yes.
19     Q.  So if we turn to the next page, this is
20 actually a request for reimbursement.  This is some
21 supplemental information that you provided
22 regarding your trip from Seattle to Washington,
23 D.C.; correct?
24     A.  Yes.
25     Q.  Okay.  The lawyers paid for you to travel

Page 79

1  from Seattle to Washington in connection with the
2  congressional testimony; correct?
3      A.  They paid for flight and the Seattle
4  taxi.
5      Q.  And in fact, they paid for you to fly
6  first class from Seattle to Washington; correct?
7      A.  Yes.
8      Q.  And you were asked in the past about
9  whether or not you were compensated for your
10 testimony in front of Congress; right?
11     A.  I believe I was asked at a trial, yes.
12     Q.  And you were asked were you paid by the
13 plaintiff's counsel to show up for Congress; right?
14 Do you remember that question?
15     A.  I don't remember the exact question.
16     Q.  And you remember your answer was no;
17 right?
18     A.  Yes.  I believe there was a follow-up
19 asking about expenses.
20     Q.  Well, there wasn't.  I mean, the truth
21 is, you were reimbursed to fly first class from the
22 west coast to the east coast for this appearance;
23 right?
24        MS. PARFITT:  Objection, misstates her
25 testimony.  Mischaracterizes testimony.

Page 80

1  BY MS. BROWN:
2      Q.  Right, Dr. McTiernan?  I mean, the
3  truthful answer to that question is that the
4  lawyers paid for you to fly first class to testify;
5  right?
6        MS. PARFITT:  Objection.  Same objection.
7        THE WITNESS:  I don't have the wording of
8  what -- what was asked at the trial.  I thought
9  that it was -- I was asked about payment, and I
10 thought that there was a follow-up, if not then, at
11 least another time, about expenses.
12 BY MS. BROWN:
13     Q.  Did the lawyers pay for any other
14 expenses connected to your congressional testimony?
15     A.  I'm trying to recall.  They may have paid
16 for hotel, but -- I don't recall.
17     Q.  Do you recall what hotel you stayed at?
18     A.  I don't.
19     Q.  Okay.  When you travel for your work in
20 the talcum powder litigation, do you always fly
21 first class?
22     A.  I do.  I do for other work purposes as
23 well.  My institution allows that for medical
24 reasons.
25     Q.  Your general travel policy is that you

Page 81

1  always travel first class; is that fair?
2      A.  Yes.
3      Q.  And you submit reimbursement to the
4  lawyers for all of your first class travel; is that
5  correct?
6      A.  If it's for work for them.
7      Q.  Okay.
8      A.  With the exception of this one instance
9  where I did ask them if they would pay for my
10 consult reporting.
11     Q.  Okay.  Did you ask them to pay for
12 anything else in addition to your flight?
13     A.  Just the other expenses, the cab, and I
14 think they covered the hotel.
15     Q.  Okay.  And do you have a receipt for that
16 hotel?
17     A.  I do not.
18     Q.  Was it charged directly to the lawyers?
19     A.  If they covered it, it would have been.
20 I don't have a receipt, so that must have been how
21 that one -- how it worked.
22     Q.  When you traveled to DC for work as an
23 expert witness in the talcum powder litigation, is
24 there a particular hotel that has a charge account
25 directly to the lawyers where you normally stay?

Page 82

1    MS. PARFITT:  Objection.
2    THE WITNESS:  I've never traveled to DC
3 to work with -- on this expert report or as an
4 expert witness.  I've traveled to New Jersey, and
5 then for another case I traveled to Missouri.
6 BY MS. BROWN:
7    Q.  And so the next page, Dr. McTiernan,
8 would include some of your cab transportation in
9 connection with your congressional testimony; is
10 that right?
11    A.  I'm not sure what you're looking at,
12 but --
13    Q.  So the next page right after the plane
14 ticket, the next page of Exhibit 7 is an invoice
15 from City Cars, it looks like located in
16 Washington, picking you up.  Is that your home,
17 7755 57th Avenue?
18    A.  Yes.  So that's direct trip cab fare
19 within Seattle.
20    Q.  Okay.  And that also is something that
21 was reimbursed by the lawyers; correct.
22    A.  Yes.
23    Q.  Okay.  Other than, I guess, food, hotel,
24 cab, flight, did the lawyers provide any other
25 financial assistance in connection with your

Page 83

1 congressional testimony?
2    A.  No.
3    Q.  Did the lawyers approve or edit or review
4 your comments to Congress before you made them?
5    A.  I believe that I asked Ms. Parfitt if she
6 had any -- if she could review the comments.  I
7 don't believe she had input, but I can't recall
8 most of that -- or otherwise that work was done
9 with our -- my institution's vice president of
10 government affairs.
11    (Interruption by the reporter.)
12    THE WITNESS:  So that was probably me
13 mumbling.  I apologize.  I'll try harder.
14 BY MS. BROWN:
15    Q.  Did you, Dr. McTiernan, put the vice
16 president from your institution in touch with the
17 lawyers who reimbursed your travel expenses at all
18 in connection with the testimony?
19    A.  No, not at all.
20    Q.  Did your institution -- was your
21 institution aware that the lawyers were reimbursing
22 your travel to Congress?
23    A.  Yes.  I think so.
24    Q.  Did you have to get approval for that?
25    A.  I believe that I put it in to accounting

Page 84

1 the next time that I had to report.
2    Q.  Okay.
3    A.  I -- go ahead.
4    Q.  No, no.  Please, go ahead.
5    A.  No.  I have nothing to add.  Sorry.
6    Q.  Okay.  Do you recall any follow up when
7 you made your institution aware that the lawyers
8 had reimbursed you to travel for Congress?
9    A.  I don't recall anything.  I recall that
10 my institution said that they would not be able to
11 pay for my travel.  I do recall that.
12    Q.  Have you had any follow-up communications
13 with any congressional staffer or anyone associated
14 with Congress since the time of your testimony?
15    A.  The same staffer who contacted me to
16 begin with, William Cunningham, did send an e-mail
17 afterwards -- we provided them.  I don't have the
18 date in mind -- asking to talk with me.
19    Q.  Okay.  And why don't we mark that as
20 Exhibit 8.  It is tab three in the binder of
21 documents that you provided to us in advance of the
22 deposition.  Is this what I'm showing on the
23 screen, the e-mail from Monday October 28, 2019, is
24 that what you're referring to?
25    A.  Yes.

Page 85

1    Q.  And is it your testimony that prior to --
2 strike that.
3    It looks like Mr. Cunningham was
4 following up on an e-mail he had sent to you from
5 May 5, 2019.  Do you see that down at the bottom?
6    A.  Yes.
7    Q.  Okay.  And if we just take a look back at
8 the chain, on May 5th you actually heard from this
9 staffer, and he said, "Hi, Anne.  I hope you're
10 well.  I recall in our e-mail exchanges in March
11 you sending me a handful of findings, summaries,
12 reports from Health Canada."  What's that?
13    A.  What I recall sending him was what was
14 available on the Health Canada website.  So there
15 were -- there was some things that they had drafted
16 for public consumption.  I don't -- I don't have
17 those in front of me right now, so I can't recall
18 exactly what they said.  I don't know if those were
19 updated with the screening update.  I didn't go
20 look them up.
21    But also their draft screening
22 document, which we previously provided.  And so I
23 believe I sent him those and on his request of any
24 additional documents I might have.
25    Q.  Okay.

Page 86

1    A.  But these were publicly available from
2  the Canadian website.
3    Q.  Okay.  And Mr. Cunningham, in May of
4  2019, says he's trying to get additional insight
5  into what next steps they, Health Canada, have
6  taken or plan to take; right?
7    A.  Yes.
8    Q.  And he asks anything you can share or a
9  contact that would be privy, question mark; right?
10    A.  Yes.
11    Q.  And you respond looks like on Sunday
12  the 5th, that same day; right?
13    A.  Yes.
14    Q.  And your signature block has a website,
15  Anne McTiernan.com. Do you have your own website?
16    A.  Yes.  It's a personal website.
17    Q.  What is the purpose of your personal
18  website?
19        MS. PARFITT:  Objection.
20        THE WITNESS:  Oh.  Creative writing.  I
21  had a blog at one point, which I don't add to
22  anymore.  I put things about the books I've
23  published.
24  BY MS. BROWN:
25    Q.  Have you ever put any information about

Page 87

1  your opinions regarding talc and ovarian cancer on
2  your website?
3    A.  No.
4    Q.  You respond and you say, "Hi Will.  I
5  forwarded you the contact info for a person from
6  Health Canada who contacted me.  They have not yet
7  asked me to do anything specific.  Anne."  Do you
8  see that?
9    A.  Yes.
10    Q.  Were you aware at the time you provided
11  this contact information that the public comment
12  period had ended regarding Health Canada's
13  assessment?
14    A.  He wasn't asking about public comment, he
15  was asking about who to contact, I believe, to see
16  what they are doing.  He wasn't asking for making
17  comment.
18    Q.  Yeah, my question was just when you
19  provided this information, did you know that the
20  public comment period was closed?
21    A.  I don't think that I put the two and two
22  together.  It was -- he wanted a name, and I said I
23  would send it.  So I must have sent -- I only had
24  one name, so I must have sent him the name and
25  e-mail address of that one person who contacted me.

Page 88

1    Q.  And your signature block here lists you,
2  of course, MD, PhD, author of Starved, a nutrition
3  doctor's journey from MD to full.  Do you see that?
4    A.  Yes.
5    Q.  Do you consider yourself a nutrition
6  doctor?
7    A.  Yes.
8        MS. PARFITT:  Objection.  These questions
9  have been asked prior.
10  BY MS. BROWN:
11    Q.  And does your -- does the signature block
12  you use today look the same as the one in this
13  document?
14    A.  No, I change them once in a while.  That
15  one may have been from a cell phone.  This doesn't
16  look like the one that I usually use for my e-mail.
17  But what I have now is different from these, yes.
18    Q.  Do you know what your signature block
19  says today?
20    A.  I'd have to open it up to see.
21    Q.  And then it looks like the next
22  correspondence in this chain is from Mr. Cunningham
23  to you again, this time dated Monday, October 28,
24  2019.  Do you see that?
25    A.  Yes.

Page 89

1    Q.  Did you have any correspondence with
2  Mr. Cunningham or any other staffers in between
3  May 5, 2019 and October 28, 2019?
4    A.  No.
5    Q.  Okay.  He says, "Hi, Anne.  I hope you're
6  well.  I'm sure you've heard the news about the
7  FDA's recall announcement earlier this month after
8  it discovered asbestos in J and J's powder.  I'm
9  under the impression FDA continues to use the J41
10  testing method, but wanted to make sure that
11  assumption was correct.  It would be great to chat
12  and get a sense of your thoughts on this recent
13  revelation.  Are you free this week?"
14        Do you see that?
15    A.  Yes.
16    Q.  Okay.  Did you -- first of all, what is
17  the J41 testing method?
18        MS. PARFITT:  Objection.  This type of
19  inquiry was made at the prior deposition, and I
20  believe that Dr. McTiernan had testified that she
21  was an epidemiologist and was not an expert on
22  fibrous testing.
23        MS. BROWN:  Yeah.  And to be fair,
24  Michelle, it couldn't have been made because this
25  e-mail comes both after her MDL deposition as well

Anne McTiernan, M.D., Ph.D.

1  as after her MDL testimony.  So the e-mail --
2      MS. PARFITT:  The e-mail does, Alli.  The
3  content doesn't.
4      MS. BROWN:  Well, I'm asking about the
5  e-mail that came after her --
6      MS. PARFITT:  I'm sorry, Alli.  I thought
7  you were asking her knowledge about the J41 testing
8  method.
9      MS. BROWN:  Sure.
10 BY MS. BROWN:
11     Q.  Well, I want to know, as referenced in
12 this e-mail that came to you on October 28, 2019,
13 you knew what he was talking about when he
14 referenced the J41 testing method?
15     A.  I do not know what J41 testing is.
16     Q.  Okay.  He says "it would be great to
17 chat."  Did you ever chat with Mr. Cunningham after
18 this e-mail?
19     A.  Yes.
20     Q.  And tell me about that.
21     A.  I believe it was that week.  And it was
22 an extremely short call.  He was on the call, and
23 one other person.  I don't recall their name.  And
24 his questions were all about the FDA and testing.
25 And I said I just -- I couldn't answer.  I didn't

1  have that information.  He asked if I knew of
2  anybody that might know.  I believe I gave him the
3  name from somebody I had learned about in
4  litigation, Dr. Longo.
5      But I -- and I said that --
6      (Interruption by the reporter.)
7      THE WITNESS:  Sorry.  I said there was
8  publicly available information about these experts,
9  but that I had no information I could give him.
10 BY MS. BROWN:
11     Q.  Did you respond to Mr. Cunningham's
12 e-mail?
13     A.  I don't recall.  I didn't see another
14 e-mail, so I'm not sure.  If I responded it would
15 be only about the call, or if I just called his
16 number.  I don't remember.  But we did speak that
17 week.
18     Q.  What's all this up here that's blacked
19 out?
20     A.  I don't know.
21     Q.  Do you think that it might be your e-mail
22 response?
23     MS. PARFITT:  Objection.  Alli, I will
24 represent that that's probably a communication from
25 Ashcraft & Gerel to Dr. McTiernan asking that --

1  for something, either more copies, additional
2  copies or, frankly, even your question, whether or
3  not there was a response in writing to
4  Mr. Cunningham.
5      MS. BROWN:  I see.  So Michelle, your
6  representation is this is a resend as you guys were
7  collecting these documents?
8      MS. PARFITT:  Exactly.  And frankly, I
9  can't remember whether it was -- you know, we asked
10 the same question you did and we just asked her to
11 send all the communications.
12     MS. BROWN:  Okay.  Fair enough, if that's
13 the representation.
14 BY MS. BROWN:
15     Q.  Had you ever spoken to Mr. Cunningham on
16 the phone prior to the follow-up to this e-mail
17 here from October of 2019?
18     A.  Prior to this?
19     Q.  Yes.
20     A.  We did speak by phone several times when
21 he was asking me first to give testimony, then when
22 he was telling me about when the testimony would
23 be, what to expect, and then who -- when to arrive,
24 who to contact, though -- and then, you know, how
25 long I would have.  All of the logistics we did

1  speak by phone with him.
2      Q.  Is there a reason that rather than reply
3  to Mr. Cunningham by e-mail you would have picked
4  up the phone and called him?
5      A.  That's what I don't recall.  I didn't see
6  another e-mail of my own, but -- and so that's why
7  I don't recall how it happened.  I knew -- I do
8  remember the call being extremely brief, that once
9  I was able to -- once I told him I was not an
10 expert in this area and couldn't give him any
11 information, pretty much the call ended.  He
12 wasn't -- he didn't have anything else he wanted to
13 ask me.
14     Q.  Okay.  Did you call Mr. Cunningham to set
15 up a call to discuss this, or you just called him
16 once and said basically, I don't know about this?
17     A.  I don't recall.  I don't remember.
18     Q.  And in terms of how this e-mail got
19 produced to us, did you physically go through your
20 e-mail and try and collect any correspondence with
21 Mr. Cunningham or Congress?
22     A.  Yes.
23     Q.  And do you sometimes delete your e-mails?
24 Is it possible you deleted your response to
25 Mr. Cunningham?

Page 94

1    MS. PARFITT: Objection.
2    THE WITNESS: It's possible. I do clean
3 things out.
4 BY MS. BROWN:
5    Q. Okay. Was there anybody else on the call
6 with Mr. Cunningham regarding his questions about
7 talc testing?
8    A. There was one other person. I believe it
9 was from his committee, his office. I don't recall
10 their name.
11    Q. Okay. Did you speak to the lawyers prior
12 to talking to Mr. Cunningham about talc testing?
13    A. I don't believe I did.
14    Q. And you referenced that you referred
15 Mr. Cunningham to Dr. Longo; is that right?
16    A. I think that's the name I used, but I
17 don't quite -- I don't recall exactly. I didn't
18 take notes of the meeting. It was so quick. It
19 was -- it was too quick to really recall or to make
20 any notes.
21    Q. And how do you know about who Dr. Longo
22 is and what his experience is?
23    A. From the litigation. After I had -- I
24 submitted a report, I was able to see some of his
25 expert reports.

Page 95

1    Q. And I noticed, Dr. McTiernan, that some
2 of the Longo reports appear on your -- as cited in
3 your expert report; is that right?
4    A. Yes.
5    Q. And one thing I wanted to ask you about
6 is in the red line of your expert report at
7 page 150 and 151.
8    A. So which -- which -- are we in the
9 deposition binder or the plaintiff's binder?
10    Q. So we should be in the deposition binder.
11 We should be at tab two, which is the red line of
12 your report. And I'll put it up on the screen to
13 just ask the question.
14    MS. PARFITT: And Alli, again, I'm sorry,
15 could you just give her the page number for that?
16    MS. BROWN: So sure thing. So it's 150.
17 My questions are 150 and 151.
18    MS. PARFITT: Thank you.
19 BY MS. BROWN:
20    Q. One of the changes, Dr. McTiernan, that
21 was made in this red line is that these Longo
22 reports used to -- used to include a coauthor
23 Rigler. And your red line deletes Rigler in a
24 number of entries. Did you do that?
25    A. I would have no reason to. I'm wondering

Page 96

1 if other things changed, but I don't think they
2 did. I'm trying to see where those are referenced
3 or if I added things.
4    Q. Yeah, we're on 5151 of the red lines.
5 And in at least four or five spots somebody has
6 deleted Dr. Longo's coauthor Dr. Rigler. Help us
7 understand why that happened.
8    A. I don't know, 'cause they're not
9 additional -- they would have to be part of my end
10 note. And whether the end note -- whether the end
11 note was using a different method of literature
12 reference, I don't know. It's not -- it's not been
13 added as additional materials, but --
14    (Interruption by the reporter.)
15    THE WITNESS: Okay. Sorry, it
16 hasn't -- my knowledge it hasn't -- that these were
17 from -- these were generated by my end note
18 program, which is a referencing program. And so I
19 don't know why a name would just disappear unless I
20 somehow pressed a different button for the style of
21 the end note. That's all I can think of. All the
22 references look like they're not changed in the
23 same way.
24 BY MS. BROWN:
25    Q. Okay. You did not intentionally delete

Page 97

1 Dr. Rigler from all of those entries; is that fair?
2    A. That's correct.
3    Q. Do you know who Dr. Rigler is?
4    A. No, I don't.
5    Q. Have you ever read those reports that you
6 cite here from Dr. Longo and Dr. Rigler?
7    MS. PARFITT: Again, I would object,
8 Alli. Many of those reports were available at the
9 time of her deposition, and there was inquiry, or
10 at least the opportunity for inquiry.
11    MS. BROWN: Yeah, I appreciate that. And
12 Michelle, it's just really one question to help
13 understand why Rigler's all of a sudden deleted.
14 BY MS. BROWN:
15    Q. Is there something that you learned in
16 reading those reports, Dr. McTiernan, that caused
17 you to delete Dr. Rigler in this version of your
18 report?
19    MS. PARFITT: And I'll just object to the
20 extent that I think Dr. McTiernan has tried very
21 hard to say that she doesn't believe she
22 intentionally deleted Dr. Rigler. It may be
23 something in her end notes.
24    And again, Alli, just trying to be
25 fair -- and I know you are as well. I think that

Anne McTiernan, M.D., Ph.D.

Page 98

1 we're just trying to understand what happened here,
2 and Dr. McTiernan is trying to understand there why
3 it's gone.
4      MS. BROWN:  We're all trying to
5 understand it.
6 BY MS. BROWN:
7   Q.  And I'm really not trying to suggest
8 anything untoward, Dr. McTiernan.  I'm just trying
9 to understand why this guy is missing here.  So
10 just fair to say not something you did or have
11 knowledge of why it happened?
12   A.  That's correct.  I don't understand why
13 it's changed.
14   Q.  Let's -- other than this conversation
15 we've been discussing, Exhibit 8, which is your
16 correspondence with Mr. Cunningham in October of
17 2019, other than the conversation you just
18 described to me, have you had any additional
19 correspondence with any congressional staffer or
20 congressional representative regarding talc?
21   A.  No.
22   Q.  Since your last deposition,
23 Dr. McTiernan -- let me just check one thing.
24 Before we do that, Dr. McTiernan, I have one other
25 question for you on the invoices, and we can move

Page 99

1 past that.
2      We were talking about Exhibit 7.  And
3 I noticed one of your invoices from January 2020
4 references something called Communicate
5 Perspective.  And I don't want to know about
6 discussions you had with lawyers, but putting that
7 aside, can you tell me what you were referring to
8 here, "communicate perspective" in January of 2020?
9      MS. PARFITT:  Objection to the extent it
10 involves any discussions with counsel.
11      THE WITNESS:  I -- I can't recall.
12 January 2020.  I would need to look back and see
13 what I was doing at that point.
14 BY MS. BROWN:
15   Q.  Okay.  And in terms of where you would go
16 to figure that out, where was that, ma'am?
17   A.  I think I'd go look through e-mails or
18 look at my calendar and see if I had any conference
19 calls.  I'm not sure.
20   Q.  Since your Daubert deposition,
21 Dr. McTiernan, the court and the parties have
22 been --
23   A.  I'm sorry.  You said two words.  After
24 the deposition?
25   Q.  I'll rephrase.  If you're having trouble

Page 100

1 hearing me, just let me know, okay?
2   A.  Yes.
3   Q.  Okay.  Since the time of your last
4 deposition, do you understand that the parties are
5 conducting discovery in a small number of potential
6 trial cases in the MDL?
7   A.  Yes.
8   Q.  Do you have any info about the -- any
9 information about the individual plaintiffs in
10 those cases?
11      MS. PARFITT:  Counsel would represent
12 that Dr. McTiernan is a general causation expert
13 and she will not be giving any case-specific
14 opinions.
15      MS. BROWN:  I appreciate that.  Thanks,
16 Ms. Parfitt.
17 BY MS. BROWN:
18   Q.  So let me just ask you a few quick
19 questions, and we will move on.
20      Are you aware of the names of any of
21 the plaintiffs in the smaller potential trial pool
22 cases, Dr. McTiernan?
23      MS. PARFITT:  Objection.
24      THE WITNESS:  No.  Sorry.
25 BY MS. BROWN:

Page 101

1   Q.  Have you reviewed any medical records
2 from any of the plaintiffs in the pool of potential
3 trial cases?
4      MS. PARFITT:  Same objection.
5      THE WITNESS:  No.
6 BY MS. BROWN:
7   Q.  Have you requested the opportunity,
8 Dr. McTiernan, to look at the medical records of
9 any of the plaintiffs in this smaller set of
10 potential trial cases?
11      MS. PARFITT:  Objection, argumentative.
12 .I think Dr. McTiernan or I at least have made
13 clear she's not going to be a case-specific expert.
14 She's a general causation expert.
15      MS. BROWN:  Michelle, let's be fair.  You
16 made your record.
17 BY MS. BROWN:
18   Q.  Dr. McTiernan --
19      MS. PARFITT:  I don't want -- I don't
20 think we want to be abusive, though, with regard to
21 these questions.  She's made it clear she's not
22 reviewing case-specific expert.  Alli, you have
23 limited time to ask a limited number of questions,
24 so I'm trying to move it along so that we ask that
25 which is relevant.

Page 102

1     MS. BROWN:  Respectfully, Michelle -- and
2  I do respect you very much -- you are really going
3  overboard with the speaking objections today.  And
4  I would request that you conform your objections to
5  the federal rules, and I'm certainly conforming my
6  questions to things that have happened since the
7  last deposition, and you know that.
8     MS. PARFITT:  Right.
9     MS. BROWN:  And I'll --
10     MS. PARFITT:  I'm sorry --
11     MS. BROWN:  -- representation that she is
12  giving a certain type of opinion.  I am absolutely
13  entitled to ask more questions, which is all it is,
14  about what she has or has not done and has asked to
15  do.  So let's finish these four questions and
16  let's --
17     MS. PARFITT:  Sure.  But let me just
18  say --
19     MS. BROWN:  -- been doing that all day.
20     MS. PARFITT:  Sure.  Ms. Brown, the only
21  thing I would say is that I don't think I've been
22  overly exhausting with my objections.  It's only
23  been when you go into areas like this where I think
24  we can get clear what her testimony is or isn't.
25  But Dr. McTiernan, you can answer that last

Page 103

1  question so hopefully we can move on to relevant
2  material.
3  BY MS. BROWN:
4     Q.   And Dr. McTiernan, have you requested the
5  opportunity to look at the medical records of any
6  of the plaintiffs in the pool of potential trial
7  cases?
8     A.  No.
9     Q.  Are you aware of the types of cancers
10  that any of the plaintiffs in the pool of potential
11  trial cases have?
12     MS. PARFITT:  Objection.
13     THE WITNESS:  No.
14     MS. PARFITT:  And Alli, before you move
15  on to another subject, maybe to clear up any
16  mistake with regard to the Cunningham letter that
17  you asked about and the redacted portion.  I did go
18  back and check the original, and it was a
19  communication from Dr. McTiernan to us, and it just
20  had her name and her university status.  So I just
21  wanted to clear that up.  I didn't want, frankly,
22  the lack of that to suggest that there was
23  something more.
24     MS. BROWN:  I appreciate that.  Thank
25  you.

Page 104

1     MS. PARFITT:  You are welcome.
2     MS. BROWN:  And Dr. McTiernan, I'm going
3  to move to another area.  And I see we're just
4  about at another hour, so if everyone thinks this
5  makes sense, why don't we take a short break
6  and we'll meet again.
7     MS. PARFITT:  Alli, that would be great.
8     MS. BROWN:  Okay.
9        (Break taken.)
10  BY MS. BROWN:
11     Q.  So back on the record.  Welcome back,
12  Dr. McTiernan.  I have a couple of questions for
13  you again about Exhibit C to your amended report,
14  and I'll share my screen to the extent it helps.
15        And again, that is -- I think we've
16  marked it as Exhibit 3.  And I want to ask you some
17  questions about some of the documents that appear
18  right at the very top of page 1 of the Exhibit C.
19  For example, Doctor, the very first document listed
20  on Exhibit C is an October 11, 2019 AMA Analytical
21  Services, Inc. certificate of analysis.  Do you see
22  that?
23     A.  Yes.
24     Q.  Do you know what that is?
25     A.  I don't.  I'd have to look at it again.

Page 105

1     Q.  Is this a document that you had added to
2  your report?
3     A.  I think it was added to my report, but I
4  didn't put it together.
5     Q.  Do you know what AMA Analytical Services,
6  Inc. is?
7     A.  I would have to look at the document to
8  determine what -- to jog my memory.
9     Q.  Okay.  Similarly, October 27, 2019, it's
10  a Bureau Veritas letter re Johnson's baby powder
11  finished goods, lot number 22318RB.  Do you see
12  that?
13     A.  Yes.
14     Q.  And do you know who Bureau Veritas is?
15     A.  Again, I'd have to look at the document.
16     Q.  This is not a document -- this is a
17  document that was given to you by the lawyers?
18     A.  It would have been, yes.
19     Q.  And same with the AMA Analytical
20  Services, that's a document from the lawyers?
21     A.  Yes.
22     Q.  Okay.  What about these RJ Lee letters
23  and reports that are listed here on October 28,
24  2019?  Do you know what they are?
25     A.  I would need to look at them.

Page 106

1    Q.  Okay.  Have you reviewed any -- do you
2 know who RJ Lee is?
3    A.  No, I don't.
4    Q.  Okay.  Have you reviewed any testing of
5 talc for asbestos that was conducted in the fall of
6 2019?
7       MS. PARFITT:  Objection.
8       THE WITNESS:  I don't recall.  I looked
9 at some documents about the testing of talc
10 products, but I don't remember the exact date of
11 those documents.
12 BY MS. BROWN:
13    Q.  Okay.  Well, I'm trying to understand why
14 these things are on -- do you have an opinion about
15 any of the testing that was done on Johnson's baby
16 powder in the fall of 2019?
17    A.  Again, I'd have --
18       MS. PARFITT:  Dr. McTiernan, let me just
19 register my objection to the extent that this
20 inquiry was made prior to this deposition.
21 BY MS. BROWN:
22    Q.  Go ahead, Dr. McTiernan.
23    A.  Okay.  So the question, again, was?
24    Q.  Well, the question is do you have -- do
25 you intend to offer an opinion in the MDL about any

Page 107

1 of the testing that was done on Johnson's baby
2 powder in the fall of 2019?
3       MS. PARFITT:  Again, I will object to the
4 extent, Alli, as you know, we have some testing
5 reports that Dr. McTiernan relied on by Longo and
6 Rigler at the time of her first deposition, and
7 then there were some additional ones.
8 BY MS. BROWN:
9    Q.  Okay, let's be very clear, and let's
10 focus on the question.  We have a supplemental
11 reliance list here from you, Doctor, and it
12 includes, as the very first ten or so documents, in
13 part testing that was done on Johnson's baby powder
14 in the fall of 2019.  And I want to know if you
15 intend to offer an opinion about that testing.
16       MS. PARFITT:  If you're referring --
17 again, be very specific, Alli -- you're referring
18 to just that which is in this -- it's a fair
19 question as materials considered, the ones she just
20 talked about, fair?
21       MS. BROWN:  Right.  That's the question.
22       MS. PARFITT:  All right.  Just want to
23 make sure it's clear.
24       MS. BROWN:  Okay.  It's very clear.  I've
25 asked it three times.  We got a supplemental list

Page 108

1 with a bunch of testing from the fall of 2019.
2 BY MS. BROWN:
3    Q.  And Dr. McTiernan, as I understand it,
4 these documents all came to you from the lawyers;
5 right?
6    A.  I have not reviewed these in depth.  I
7 would need to do that before I could decide if
8 that's going to be part of an opinion.
9    Q.  Okay.  Well, let's try to understand
10 that.  Because I only get one shot to find out what
11 your opinion is going to be, and this is it.  And
12 so it sounds like, sitting here today, fair to say
13 you don't have an opinion about any of the testing
14 that was done on Johnson's baby powder in the fall
15 of 2019?
16       MS. PARFITT:  Objection, broad.
17 Misstates testimony.
18       THE WITNESS:  I think that what I put
19 into my amended report did not directly reference
20 testing.  What I put into my report was new
21 information about epidemiology results and the new
22 Canada screening trial -- screening document.
23 BY MS. BROWN:
24    Q.  Yep.  And that's why I have these
25 questions, because in your new Exhibit C, there's a

Page 109

1 bunch of testing reports, and it sounds like you
2 haven't seen those; is that fair?
3    A.  If I've looked at them, it's not been
4 recently enough for me to recall what they are.
5    Q.  Okay.  Well, let's just look at one of
6 them so we can make sure we're on the same page.
7 Let's mark as Exhibit 9 one of these RJ Lee letters
8 and reports from October 28, 2019.  And I think
9 this would have come to you in loose copy, but
10 for -- I'm not going to ask you in-depth questions.
11 I just want to know if this is something you have
12 reviewed before.
13    A.  Is this document in this folder?
14 BY MS. BROWN:
15    Q.  It should be in a loose copy that came to
16 you in your materials.  A manila folder.
17    A.  There's several that just say JNT.  Which
18 one should I be looking at?
19    Q.  It's towards the back, I'm told.
20    A.  October 28th.  Yes, I have that.  Okay.
21    Q.  Have you ever seen this document before?
22    A.  It doesn't look familiar.  But I could
23 have reviewed it in the past.  We're talking quite
24 a few months ago.
25    Q.  So here's what I'm struggling with.  And

Page 110

1 maybe it's some wrong stuff got added to your list,
2 but we got a list of materials considered by you
3 that has this document on it. So you think that
4 might be in error?
5      MS. PARFITT: Objection to whether or not
6 it's in error. Alli, again, I'll take
7 responsibility for this. We provided these
8 materials to Dr. McTiernan --
9      MS. BROWN: Michelle, we can't hear you.
10      MS. PARFITT: I'm sorry. This better?
11 Alli, can you hear a little bit better? Let me get
12 a little bit closer.
13      I'm trying to clear it up, and I'm
14 not trying to make a speaking objection. We --
15      MS. BROWN: It sounds like a speaking
16 objection.
17      MS. PARFITT: No, no, I think it'll give
18 some clarity, and hopefully will do just that. If
19 you want me to stop, I will go ahead and stop --
20      MS. BROWN: I do, Michelle. I do because
21 you've been doing it a lot, and we just have to get
22 through these four hours. The question is to the
23 doctor, to be fair, and if you have --
24      MS. PARFITT: It is.
25      MS. BROWN: -- your objection is to form.

Page 111

1      MS. PARFITT: It is.
2      MS. BROWN: So that should put us back to
3 the doctor.
4      MS. PARFITT: Sure. Go ahead. If you
5 want an informed answer, I'm about to give you
6 some --
7      MS. BROWN: I don't want it from you
8 because you're not under oath.
9      MS. PARFITT: I'm not. But if you want
10 to know -- you asked whether or not Dr. McTiernan
11 has said to you that a lot of documents were sent
12 by counsel. You already asked that question.
13      MS. BROWN: Okay. So let's get back to
14 the question to the doctor, which is that this
15 document that we're looking at is Exhibit 9 is a
16 letter from the RJ Lee group dated October 28,
17 2019.
18 BY MS. BROWN:
19      Q. This document appears on a list of
20 materials considered by you, Dr. McTiernan. And my
21 question is just is that a mistake or is this
22 legitimately a document you have considered in
23 forming your opinions?
24      MS. PARFITT: Objection. You can answer.
25      THE WITNESS: So if these were sent to

Page 112

1 me, then I would have looked at them. But since
2 this is not my area of expertise, I wouldn't have
3 looked beyond the first page. I don't have the
4 expertise to interpret these -- these graphs and
5 all of this data.
6 BY MS. BROWN:
7      Q. Okay.
8      A. So it would have just been to have some
9 knowledge that this testing company tested samples
10 for J and J. I did not reference these for
11 my -- in the changes that I made to my expert
12 report. The changes I made were in reference to
13 adding in the new screening document from Health
14 Canada and adding in a new pooled epidemiologic
15 study.
16 BY MS. BROWN:
17      Q. And that sounds fair, Dr. McTiernan.
18 What I'm hearing you say is that you don't intend
19 to offer any opinions about testing of Johnson's
20 baby powder for asbestos; is that fair?
21      MS. PARFITT: Objection. That is not her
22 testimony. You know darn well --
23      MS. BROWN: You have to stop. Literally,
24 Michelle, it's too much.
25      MS. PARFITT: Alli, I don't -- don't try

Page 113

1 mischaracterizing what she said.
2      MS. BROWN: Then your objection is form,
3 mischaracterizes. You have to stop speaking. It's
4 too much. Please.
5      MS. PARFITT: Alli, I'll do it as long as
6 you're trying to force feed Dr. McTiernan
7 information that's --
8      MS. BROWN: Listen. Listen. Here's
9 where we are, Michelle. You gave her stuff. You
10 served a list. And I want to get to the bottom of
11 whether she has an opinion on it.
12      MS. PARFITT: Then say --
13      MS. BROWN: No more talking. No more.
14      MS. PARFITT: Then say 2019. Don't say
15 testing. Say testing in 2019 as referenced in this
16 document and I'm not going to say anything. That's
17 fair.
18      MS. BROWN: But you're still talking.
19 Please stop.
20      MS. PARFITT: You're still misleading.
21      MS. BROWN: Then your objection is to
22 form.
23 BY MS. BROWN:
24      Q. Now, Dr. McTiernan --
25      MS. PARFITT: Objection, misleading.

Page 114

1 BY MS. BROWN:

2    Q.  -- you do intend to offer an opinion at

3 trial regarding Exhibit 9 which is the RJ Lee

4 report from October 28, 2019; correct?

5    A.  I don't intend to offer an opinion on

6 this document's scientific content.

7    Q.  Okay.  And can you confirm that

8 this -- that you have ever seen this document

9 before sitting here today?

10    MS. PARFITT:  Objection, asked and

11 answered.

12    THE WITNESS:  If it was sent to me, then

13 I would have just looked at it in general.  I would

14 not have looked in detail and the scientific

15 content.

16 BY MS. BROWN:

17    Q.  Do you know sitting here today if this

18 document was sent to you in hard copy or

19 electronically?

20    A.  It would have been sent electronically.

21    Q.  Okay.  Are documents sent to you via a

22 Dropbox or some kind of shared file, or are they

23 sent by e-mail?

24    A.  Could be either.

25    Q.  Do you keep the correspondence

Page 115

1 transmitting to you documents that you review in

2 connection with your expert witness work?

3    A.  I keep them -- I keep them all in my

4 files.  On occasions I keep the e-mails they're

5 attached to, but usually I file them on my

6 computer.

7    Q.  Okay.  So I'll request production of the

8 correspondence transmitting Exhibit 9 to you as

9 well as all of the documents listed at the

10 beginning of your materials considered that we've

11 been discussing, starting with October 11, 2019 AMA

12 Analytical Services through October 28, 2019 RJ Lee

13 letter and report.

14    MS. PARFITT:  And we'll take it under

15 advisement.  Thank you.

16 BY MS. BROWN:

17    Q.  Since the time of your last deposition,

18 Dr. McTiernan, have you asked to see any testing

19 results of Johnson's baby powder for asbestos or

20 heavy metals or other impurities?

21    MS. PARFITT:  Objection.

22    THE WITNESS:  No.

23 BY MS. BROWN:

24    Q.  Do you feel as an epidemiologist you

25 would be qualified to review that type of

Page 116

1 documentation?

2    MS. PARFITT:  Objection, form, broad.

3    THE WITNESS:  I could review them.  The

4 content of scientific data of that type is not in

5 my area of expertise.

6 BY MS. BROWN:

7    Q.  Another document I want to ask you about

8 on this Exhibit C can be found on page 11,

9 Dr. McTiernan.  And towards the very bottom of the

10 page you've listed here on Exhibit C OSHA

11 Section 1910.001 asbestos, OSHA fed reg excerpts,

12 OSHA's position on risks associated with asbestos

13 exposure at the current PEL.  Do you see those

14 three entries?

15    A.  Yes.

16    Q.  Okay.  What's OSHA?

17    A.  Occupational Safety and Health

18 Administration.  I believe that's what it stands

19 for.  It's a US government organization.

20    Q.  Okay.  Did you add OSHA Section 1910.001

21 to your expert report?

22    A.  Are you saying did I add it since the

23 last expert report?

24    Q.  Yep.

25    A.  I'm not sure.  I know that there's some

Page 117

1 issues that -- with OSHA that I considered, but I

2 don't remember the exact name and number of the

3 document.

4    Q.  Have you ever seen this regulation

5 before?

6    A.  I didn't know it was a regulation,

7 so -- so that that -- I don't -- I don't know what it

8 refers to.  I'd need to look at the actual

9 document.

10    Q.  So this OSHA regulation appears on a list

11 of materials considered by you.  Was it added by

12 someone other than yourself?

13    MS. PARFITT:  Objection.

14    THE WITNESS:  I don't --

15    MS. PARFITT:  You can answer.

16    THE WITNESS:  Yeah, I'm not sure.  I know

17 that I, in my overall opinion, have considered what

18 OSHA considers acceptable or not acceptable for

19 asbestos because it is a known carcinogen.  And so

20 what I don't know is what, if any, I've referenced

21 in my report.

22 BY MS. BROWN:

23    Q.  Okay.  So we'll take a look at it in a

24 second.  The next document is OSHA fed reg

25 excerpts.  What's that?

Page 118

1    A.  The same thing:  I'd need to look at it
2  in order to be able to respond.
3    Q.  But where would you go?  How do we look
4  at that and how -- who excerpted it?
5    A.  I don't know.
6    Q.  How are we going to figure that out?
7  'Cause I don't know either.
8        MS. PARFITT:  Is that a question for
9  Dr. McTiernan?
10  BY MS. BROWN:
11    Q.  Yes.  So Dr. McTiernan, here's the
12  problem I have.  I got a list of materials
13  considered by you that has a document called OSHA
14  fed reg excerpts.  How will we find out what that
15  document is and who excerpted it?
16        MS. PARFITT:  Objection to the question.
17        THE WITNESS:  I don't know.  If this
18  isn't in the materials considered, then is it -- I
19  don't know if this is one of the materials that are
20  available in these two binders.
21  BY MS. BROWN:
22    Q.  So the -- it's not a document that you
23  gave to us in advance of your deposition.  Would
24  you know where to go to find something called OSHA
25  fed reg excerpts that's listed as something you

Page 119

1  considered?
2    A.  No, I would not.
3    Q.  Okay.  Do you know who came up with the
4  entry on your materials considered list called OSHA
5  fed reg excerpts?
6        MS. PARFITT:  Objection.
7        THE WITNESS:  No, I don't.
8  BY MS. BROWN:
9    Q.  Okay.  Are you relying at all on
10  something called OSHA fed reg excerpts in
11  connection with your testimony in the MDL?
12    A.  I would need to see what it is.
13    Q.  Right.  But as we just talked about,
14  nobody knows what it is.
15        MS. PARFITT:  Objection.
16  BY MS. BROWN:
17    Q.  I mean, sitting here today, it's not
18  something you're relying on; is that fair?
19    A.  I don't know what -- what the document
20  is.  I would need to see what it is.
21    Q.  Okay.  So -- so would I.  How -- if
22  someone asked you, Dr. McTiernan, I would like to
23  see this document that you considered called OSHA
24  fed reg excerpts, how would you go about showing
25  them that?

Page 120

1    A.  I would have to go through the documents
2  that I have saved.  Anything that was related to
3  OSHA, I would have to look for that.  I would have
4  to look at what OSHA has said on asbestos and the
5  acceptable amount of asbestos that can be contained
6  in products and -- because it was a carcinogen.  So
7  I'd need to look through that and then determine
8  which of those documents was named to this.  So
9  that's what I would have to do.
10    Q.  Okay.  So to the extent you're going to
11  rely on OSHA fed reg excerpts in connection with
12  your opinion in the MDL, I'll request production of
13  whatever that is.
14        And then, finally, OSHA's position on
15  the risks associated with asbestos exposure at the
16  current PEL.  Do you know what that document is?
17    A.  No, I don't.
18    Q.  Okay.  It's not something that rings a
19  bell to you; right?
20    A.  The title does not, that's right.
21    Q.  Okay.  Do you know what the current PEL,
22  what that means?
23    A.  I don't.
24    Q.  Do you know --
25    A.  I would need to look it up.

Page 121

1    Q.  You don't know what PEL even stands for?
2    A.  I do not.
3    Q.  Okay.  In terms of this regulation here,
4  the first one we were talking about, OSHA 1910, are
5  you aware that this includes OSHA's definition of
6  asbestos?
7    A.  I don't know.
8    Q.  Okay.
9    A.  I would need to look at it.
10    Q.  Do you agree with how OSHA defines
11  asbestos?
12        MS. PARFITT:  Objection.  This area of
13  testimony with regard to asbestos fibrous topics
14  was inquired at the time of her deposition and
15  thereafter.
16        MS. BROWN:  This is a brand-new entry to
17  your brand-new report.  I'm trying to understand --
18        MS. PARFITT:  An entry of an article that
19  she's already told you, Alli, that she'd have to
20  look at in order to comment.
21        MS. BROWN:  Okay.  So let's mark it and
22  let's find out why it's here.  So Stef, remind me
23  what tab OSHA -- oh.  So it would be 25A in the
24  deposition binder.  And I'll just put it up.  What
25  was cited as something you considered is this

Page 122

1 Occupational Safety and Health Administration
2 regulation 1910.1001.
3 BY MS. BROWN:
4     Q.  Does this look familiar?  And let's mark
5 this as Exhibit 10, please, to your deposition.
6     A.  It doesn't look familiar.
7     Q.  Okay.  One of the things that's listed as
8 something you considered says at page 65 is that
9 for purposes of regulation, the mineral must be in
10 one of the six minerals covered and must be in the
11 asbestos growth habit.  Do you agree with that?
12     MS. PARFITT:  Objection.  Dr. McTiernan
13 has already been inquired of with regard to her
14 opinions as they relate to this litigation, and
15 she's already just told you, Alli, she doesn't
16 remember reading this document.
17 BY MS. BROWN:
18     Q.  Do you agree with that statement in the
19 document you added to your reliance list in your
20 amended report?
21     MS. PARFITT:  Objection.  Dr. McTiernan's
22 indicated she hasn't reviewed the document and did
23 not form part of her opinions in this case which
24 were already inquired of.
25 BY MS. BROWN:

Page 123

1     Q.  Do you agree with this statement in the
2 document that you listed as a material you
3 considered in your amended report, Doctor?
4     MS. PARFITT:  Objection.
5 BY MS. BROWN:
6     Q.  You can go ahead and answer, Doctor.  Is
7 that something you agree with?
8     MS. PARFITT:  Objection.
9     THE WITNESS:  I don't have the expertise
10 to answer that question.
11 BY MS. BROWN:
12     Q.  Would it be fair, Dr. McTiernan, to make
13 some edits to this Exhibit C materials considered?
14     MS. PARFITT:  Objection.
15     THE WITNESS:  I'm not sure what you mean,
16 make --
17 BY MS. BROWN:
18     Q.  Did you really consider OSHA 191.1001,
19 the regulation we were just looking at, did you
20 really consider that in connection with your
21 opinions?
22     MS. PARFITT:  Objection, argumentative.
23     THE WITNESS:  I don't recall looking at
24 this entire -- it looks like whatever this entire
25 document, I don't know if I referenced something

Page 124

1 that was a shorter version of this, so I can't -- I
2 can't -- I can't recall.  But it was in the -- it
3 was not something that I wrote about in my revised
4 report.
5 BY MS. BROWN:
6     Q.  Did you, Dr. McTiernan, approve this
7 Exhibit C, the materials considered list, before it
8 was served in this litigation?
9     MS. PARFITT:  Objection, argumentative.
10     THE WITNESS:  Pardon?  What was that?
11 BY MS. BROWN:
12     Q.  Did you approve the Exhibit C to your
13 amended report before it was served in this
14 litigation?
15     MS. PARFITT:  Objection, argumentative.
16     THE WITNESS:  I believe I -- I am not
17 sure where the final listing was.  I did talk with
18 Ms. Parfitt and her staff about the things that
19 would be added, but I don't know if I very
20 last-minute reviewed it in detail.
21 BY MS. BROWN:
22     Q.  There's an entry on your Exhibit C, an
23 article by Karen Psooy called Vaginal Entrapment of
24 Bath Water, a Source of Extra-Urethral
25 Incontinence.  Do you see that?

Page 125

1     A.  Yes.
2     Q.  Have you ever seen that document before?
3     A.  I don't think I referenced it in the --
4 my report, but it does sound familiar.
5     Q.  Okay.  Is this a document that you
6 considered in connection with your opinions in this
7 case?
8     A.  I'd need to look at the document.
9     Q.  Okay.  Let's mark it as Exhibit 11.
10 We'll have to put it up here.  I don't think we
11 have a hard copy for you, Doctor, and so if you
12 need more time, let me know.  This is the article.
13 It's from something called the Canadian Urological
14 Association.  What's that?
15     A.  I don't know.  And I'd need to see
16 the -- the -- the actual whole paper if I'm asked
17 to comment on it.
18     Q.  Okay.  Well, it's listed as something you
19 considered.  Did you consider it?
20     A.  I can't recall.  It sounds familiar.  I
21 did not write about it in the new version of the
22 report.
23     Q.  Okay.  Do you intend to offer any
24 opinions at trial about a Canadian Urological
25 Association document called Vaginal Entrapment of

Page 126

1 Bath Water?
2     A.  I'm not sure.  I'd need to review it.
3     Q.  Okay.  But I have a list that says you
4 considered it.  Is that not true?
5         MS. PARFITT:  Objection, argumentative.
6         THE WITNESS:  I can't recall if I looked
7 at it.  I need to review it again before I'd know
8 what -- whether it's going to affect my opinion.
9 BY MS. BROWN:
10     Q.  Okay.  Sitting here today at your
11 deposition on your new opinions, the Canadian
12 Urological Association's paper called Vaginal
13 Entrapment of Bath Water is not something you're
14 familiar with; is that fair?
15         MS. PARFITT:  Objection.
16         THE WITNESS:  It sounds familiar, but I
17 would want to re-review it before commenting on it.
18 BY MS. BROWN:
19     Q.  Let's talk about a document,
20 Dr. McTiernan, that you produced to us before your
21 deposition that we will mark as Exhibit 12.  And it
22 can be found at tab two in your binder.  So we're
23 going to mark as Exhibit 12 the document found at
24 tab two in your binder.
25     A.  Which binder?

Page 127

1     Q.  The binder of documents produced before
2 the deposition.
3     A.  Okay.
4     Q.  All right.  Exhibit 12 is a document
5 titled Scientists:  Facts Fail to Support Some
6 Conclusions in JAMA Article on Talc Use, Ovarian
7 Cancer.  Do you see that?
8     A.  Yes.
9     Q.  Okay.  And it says here that this is news
10 provided by Beasley Allen.  Do you see that?
11     A.  Yes.
12     Q.  Okay.  And Beasley Allen is a law firm
13 representing plaintiffs in the MDL; right?
14     A.  Yes.
15     Q.  Okay.  And you are one of the scientists
16 quoted in this article; is that right?
17     A.  Yes.
18     Q.  Okay.  So tell me if you would -- and
19 this article is referring to the 2020 article by
20 Dr. O'Brien and others; correct?
21     A.  Yes.
22     Q.  Okay.  And so tell me if you would what
23 facts are referred to here in the title that fail
24 to support some of the conclusions in the JAMA
25 article?

Page 128

1         MS. PARFITT:  Object to the question.
2 You may answer, Dr. McTiernan, if you can.
3         THE WITNESS:  So you're asking about the
4 title.  I didn't make up that title, so that's what
5 I'm confused about.
6 BY MS. BROWN:
7     Q.  Do you agree with the title of the
8 article that you're quoting in that "facts fail to
9 support some conclusions in JAMA article on talc
10 use, ovarian cancer"?
11     A.  It would depend on what the facts are and
12 what the conclusions are in the article.
13     Q.  Did you see this article before it was
14 provided to news outlets by Beasley Allen?
15     A.  I provided my thoughts on that paper for
16 Beasley Allen in the form of something that could
17 be used for a press release.  I don't believe I saw
18 a final press release.
19     Q.  Okay.  Do you --
20     A.  This is not a press release.  This is a
21 media publication.
22     Q.  Okay.  And the news here says that it's
23 provided by the law firm Beasley Allen; right?
24         MS. PARFITT:  Objection, misstates the
25 document.

Page 129

1         THE WITNESS:  It says news provided by.
2 BY MS. BROWN:
3     Q.  The document states "news provided by
4 Beasley Allen"; correct?
5     A.  That's what it states.
6     Q.  Okay.  The title states Facts Failed to
7 Support Some Conclusions in JAMA Article.  Do you
8 agree with that?
9     A.  Do I agree that that's what it says or do
10 I agree with the concept?
11     Q.  Do you agree with the statement that
12 facts failed to support some conclusions in the
13 O'Brien JAMA article?
14         MS. PARFITT:  Objection, asked and
15 answered.
16         THE WITNESS:  My answer's the same as it
17 was before, depends on what facts we're talking
18 about in an article and what the conclusion was.
19 BY MS. BROWN:
20     Q.  Okay.  Are you, sitting here today,
21 Dr. McTiernan, aware of any facts that fail to
22 support some of Dr. O'Brien and colleagues'
23 conclusions in their JAMA article from 2020?
24         MS. PARFITT:  Objection.
25         THE WITNESS:  Yes.

Page 130

1  BY MS. BROWN:
2      Q.  And what are those, Doctor?
3          MS. PARFITT:  Objection, overly broad.
4          THE WITNESS:  I would want to look at the
5  article and go into that in detail.
6  BY MS. BROWN:
7      Q.  Okay.  I'm not sure I'm following.  Let's
8  carry along here in the document we're looking at
9  and see if we can understand what's going on here.
10         You are quoted in the second
11  paragraph; correct?
12     A.  Yes.
13     Q.  Okay.  Have you seen this document in
14  this form that we're looking at here, which has a
15  media contact and a source, Beasley Allen.  Have
16  you seen this document before it was published?
17         MS. PARFITT:  Objection, asked and
18  answered just 30 seconds ago.
19         THE WITNESS:  Did I see it before it was
20  published, or --
21  BY MS. BROWN:
22     Q.  Right.
23     A.  -- after it was published?
24     Q.  Before.
25     A.  I don't believe I saw this before.  I saw

Page 131

1  the materials that I prepared, but after I found
2  this on Google News.
3      Q.  Okay.  And when you say the materials you
4  prepared, what are those?
5      A.  I believe the lawyers asked me to
6  summarize my -- some of my thoughts on the O'Brien
7  paper.
8      Q.  And in what form did you create that
9  summary?
10     A.  Some paragraphs.  Yeah.
11     Q.  Did you type up a summary of the O'Brien
12  paper?
13         MS. PARFITT:  Objection.
14         THE WITNESS:  I don't recall if it was a
15  full summary.  I think that it's very similar to
16  what I ended up putting into my amended report.  So
17  my thoughts on the O'Brien paper are here in my
18  amended expert report.
19  BY MS. BROWN:
20     Q.  You are quoted as saying, "This article
21  is an update of previously published cohort studies
22  which didn't collect information on lifetime use."
23  Correct?
24     A.  That's what it says, yes.
25     Q.  And you say, "Because of this, the risks

Page 132

1  from talcum powder exposure seen in this paper are
2  likely underestimates of their true size."  Do you
3  see that?
4      A.  Yes.
5      Q.  And you agree with that, and that's your
6  opinion?
7      A.  Yes.
8          MS. PARFITT:  Objection.
9          THE WITNESS:  Yes.
10  BY MS. BROWN:
11     Q.  Okay.  The article goes on to say,
12  "Dr. McTiernan and other clinicians point out, and
13  the JAMA authors acknowledge, that there are
14  limitations with the cohort studies.  For example,
15  in the studies, the 'specific exposure windows
16  could not be examined, nor could type of powder
17  used or patency status at time of powder use.'"
18         Do you see that?
19     A.  Yes.
20     Q.  And that's your quote; right?
21     A.  I'm not sure if it is.  It's -- it's not
22  a specific attribution.  If you read the first
23  sentence, it says, "Dr. McTiernan and other
24  clinicians point out."  So I'm not sure if that's
25  an exact quote from me or from one of the other

Page 133

1  clinicians.
2      Q.  Okay.
3      A.  And it says "for example," so I'm not
4  sure.
5      Q.  Right.  It's hard to tell whoever -- we
6  don't know who wrote this.  Was it the people at
7  Beasley Allen, do you know?
8          MS. PARFITT:  Objection.
9          THE WITNESS:  I don't know.
10  BY MS. BROWN:
11     Q.  Do you agree with whomever is quoted here
12  that specific exposure windows could not be
13  examined?
14     A.  It's hard to -- it's hard to tell.  When
15  we talk about the paper I'll be able to talk about
16  my things that I've noticed or in my expert report
17  I talked about the type of exposure and type of
18  dose response relationship that is or is not able
19  to be seen from that paper.
20     Q.  Okay.  Sitting here today, you can't
21  comment one way or another whether specific
22  exposure windows could or could not be examined; is
23  that what you're saying?
24         MS. PARFITT:  Objection, misstates her
25  testimony.  She said she needed to see the paper.

Page 134

BY MS. BROWN:
2    Q.   Yeah, we're going to get to the paper,
3 don't worry.  I just want to know, sitting here
4 today -- first of all, this might be your quote;
5 right?
6        MS. PARFITT:  Objection, asked and
7 answered.
8 BY MS. BROWN:
9    Q.   It might be, right, Doctor?
10    A.   I don't recall.
11    Q.   Right.  So I'm just -- I wanted to know
12 if you still agree with it, or, if it's not your
13 quote, if you would agree with it?
14        MS. PARFITT:  Objection.  Objection,
15 argumentative.
16 BY MS. BROWN:
17    Q.   And is your answer that you don't have
18 enough information right now just looking at this
19 paragraph?
20        MS. PARFITT:  Objection, misstates her
21 testimony.  She said she wants to look at the
22 article, not that she doesn't have enough
23 information.
24 BY MS. BROWN:
25    Q.   Okay.  Why don't we mark the article

Page 135

then.  Dr. McTiernan, we can mark as Exhibit 13 the
2 O'Brien paper.  And I think in your deposition
3 binder you'll find that at tab 22, Doctor.  Have
4 you found the article, Doctor?
5    A.   Yes, it looks like it's number 22 in your
6 deposition binder.
7    Q.   Right.  Do you agree with whomever is
8 quoted in the document we're looking at as
9 Exhibit 12 that specific exposure windows could not
10 be examined?
11        MS. PARFITT:  Objection.  Asked and
12 answered.
13        THE WITNESS:  I think I'd want to
14 know -- I think it's alluding to dose response and
15 on timing of exposure, so I'd want to see in here
16 where the study talks about this.  I know that they
17 did not have the same dose response data for
18 everybody.  They did not have the same exposure
19 information on -- in all these studies either, so,
20 you know, I'm not sure exactly what that quote is
21 referring to.
22        But my own thoughts are that this
23 study is not able to answer questions about
24 lifetime use of talcum powder product use and risk
25 of ovarian cancer, nor is it able to really address

Page 136

the issue of whether somebody had used this
2 particular numbers of year.
3        So I think -- I think that's
4 talking about -- it's not clear what this means,
5 specific exposure windows.  I'm not sure which
6 exposure windows they're talking about.
7 BY MS. BROWN:
8    Q.   Okay.  Do you agree that the O'Brien
9 authors were unable to determine patency status at
10 time of powder use?
11        MS. PARFITT:  Objection.
12        THE WITNESS:  They did look at patency
13 status for a subgroup, and they were able to
14 determine that those people -- those women who had
15 patent fallopian tubes, as far as they knew, had
16 increased risk of ovarian cancer by 13 percent, and
17 it fell in their statistical significance category.
18 BY MS. BROWN:
19    Q.   But my question's a little different.
20 And we're going to talk about those findings.  The
21 patency status, right, whether a woman has patent
22 or not patent tubes at the time of powder use, was
23 not information the O'Brien authors had; correct?
24        MS. PARFITT:  Objection, misstates the
25 article.

Page 137

THE WITNESS:  I would need to look
2 through this again.  It's a very specific question
3 you're getting at.  But I'm not sure that they
4 really did determine for all of those studies
5 exactly when somebody was using powder versus when
6 they had some procedure of surgery that stopped the
7 fallopian tubes from being patent.
8 BY MS. BROWN:
9    Q.   The next paragraph of this document that
10 we're looking at as Exhibit 2 says, "Even with
11 those limitations, the JAMA study found a
12 heightened risk among certain women who use their
13 products.  The data showed that women who had used
14 talcum powder products in the genital area at
15 sometime in their lives had eight percent increased
16 risk of developing ovarian cancer."
17        Do you see that in this article in
18 which you're quoted?
19    A.   Yes.
20    Q.   Do you believe that that is a fair
21 statement of the O'Brien authors' findings?
22        MS. PARFITT:  Objection.
23        THE WITNESS:  I'm just looking -- before
24 I respond, I'm looking to see what the relative
25 risks were.  Yeah, the hazard ratio is 1.08, so

Page 138

1  it's an eight percent increased risk.
2  BY MS. BROWN:
3      Q.  You see the confidence interval is .99 to
4  1.17; right?
5      A.  Yes.
6      Q.  And do you agree that a relative risk of
7  1.08 with a confidence interval of .99 to 1.17
8  should be described as an eight percent increased
9  risk?
10     A.  The increase in risk refers to what a
11 relative risk says or, in this case, a hazard
12 ratio.  It's measuring relative risk in a different
13 way.  And that -- that is what the eight percent
14 increased risk means.  The confidence interval just
15 tells us about sample size and standard deviations.
16         So it's a statistical test about the
17 effect size.  The effect size is what measured the
18 eight percent increased risk.  The confidence
19 interval is just a statistical test.
20     Q.  Okay.  And Dr. McTiernan, over the course
21 of your career you have written many articles
22 discussing findings just like this one, right, with
23 relative risks or odds ratios of 1.08; correct?
24     A.  I'm not -- I can't -- I can't tell you
25 how many of them said 1.08 and how many did not.

Page 139

1      Q.  Okay.  There are many times over the
2  course of your career in publications that you've
3  had to interpret a confidence interval, a relative
4  risk finding like this one, 1.08, with a confidence
5  interval that crosses one; right?
6          MS. PARFITT:  Ms. Brown, I'm going to
7  object to this line of questioning.  You had an
8  opportunity at the time of her deposition at the
9  Daubert hearing and at trial to make inquiry with
10 regard to her interpretation of hazard risk, hazard
11 ratios and relative risk.  We're not going to spend
12 time today doing and redoing that information.
13         MS. BROWN:  Please conform your
14 objections to the rules.
15 BY MS. BROWN:
16     Q.  Dr. McTiernan --
17         MS. PARFITT:  Objection.
18 BY MS. BROWN:
19     Q.  -- this is not the first time that you
20 have interpreted findings like those in O'Brien; is
21 that fair?
22         MS. PARFITT:  Objection, broad,
23 nonsensical.
24 BY MS. BROWN:
25     Q.  Dr. McTiernan, this is not the first time

Page 140

1  that you've looked at a finding like those in
2  O'Brien and written about it; correct?
3          MS. PARFITT:  Objection.
4          THE WITNESS:  Epidemiologists are always
5  looking at relative risk.  If the relative risk is
6  above one, then it shows that the association is
7  positive, and that's associated with that kind of
8  an increased risk.
9  BY MS. BROWN:
10     Q.  And is it your testimony, Doctor, that
11 that has always been your interpretation of
12 relative risks and confidence intervals like the
13 one we're talking about?
14         MS. PARFITT:  Objection.  Alli, if you're
15 going to continue down this road we're going to
16 have to reach out to the judge.  This has been
17 exhausted.
18         MS. BROWN:  I think we should, Michelle,
19 because I've really tried to be so patient, but
20 this is just -- it's gone too far with the speaking
21 objections.
22         MS. PARFITT:  Well, it has.  And Alli,
23 and I don't think my speaking objections -- but I
24 really, if your -- wait, let me finish.  If your
25 intention --

Page 141

1          MS. BROWN:  This has to be done off the
2  record because you're eating my time.  And I want
3  to call the judge because --
4          MS. PARFITT:  Okay.  Off the record.
5          MS. BROWN:  -- I've been enormously
6  patient, and I've had it, okay?
7          MS. PARFITT:  Well, I've actually had it
8  as well.
9          MS. BROWN:  Okay.  So let's get the judge
10 and let's explain what's going on and get some
11 clarity.
12         MS. PARFITT:  Absolutely.  I've got the
13 number right here.  So we'll go ahead and call.
14         (Break taken.)
15         MS. BROWN:  Judge Schneider?
16         JUDGE SCHNEIDER:  Speaking.
17         MS. PARFITT:  This is Michelle Parfitt.
18 And actually, Alli Brown is -- hopefully can hear
19 our conversation.  We are at the deposition of
20 Dr. McTiernan.  And I'm not sure if we're catching
21 you at an inopportune time or not, but we did have
22 a question for you.
23         JUDGE SCHNEIDER:  Let's do it.
24         MS. PARFITT:  Thank you.
25         MS. BROWN:  Hi, Judge.  Nice to hear you

Page 142

¹ again.
²        JUDGE SCHNEIDER:  Hi.
³        MS. PARFITT:  Can you hear Alli?
⁴        JUDGE SCHNEIDER:  Hi.  Are we on the
⁵ record?
⁶        MS. PARFITT:  We are on the record.
⁷        MS. BROWN:  We are.
⁸        MS. PARFITT:  Thank you.
⁹        JUDGE SCHNEIDER:  Okay.  Let's talk.
¹⁰        MS. PARFITT:  Okay.  Judge --
¹¹        JUDGE SCHNEIDER:  -- during a deposition?
¹²        MS. PARFITT:  We are.  We are in a
¹³ deposition of Dr. Anne McTiernan.  And it is the
¹⁴ supplemental deposition.  As you have ordered, they
¹⁵ have four hours to visit with regard to any new
¹⁶ materials since the deponent's last deposition.
¹⁷        And this particular case,
¹⁸ Dr. McTiernan was deposed back in 2019 and her
¹⁹ report, her first report, was November 16, 2018.
²⁰ And I'll let Ms. Brown speak for herself, but she
²¹ believes that my speaking objections have been too
²² plentiful for her.
²³        And we're currently in an area of
²⁴ examination wherein Dr. McTiernan has been
²⁵ exhaustively examined with regard to her

Page 143

¹ interpretation of epidemiological principles such
² as hazard risk, risk ratio, confidence intervals,
³ what is a positive association and what is not.
⁴ That has been generally examined by J and J on
⁵ numerous occasions, not only at her Daubert
⁶ hearing, but at trial, at deposition, and then in
⁷ her report.
⁸        And we are now starting to go back
⁹ into that information.  Ms. Brown has every right
¹⁰ to examine Dr. McTiernan with regard to what the
¹¹ relative risk is and what it is not, but not to go
¹² back into the principles of epidemiology with
¹³ regard to -- which could go on for hours, quite
¹⁴ frankly -- whether she believes that it's positive,
¹⁵ it needs to be statistically significant to be
¹⁶ relevant -- all of that was done exhaustively.
¹⁷        I'm going to stop here for a minute
¹⁸ in fairness to let Ms. Brown speak.  There you go,
¹⁹ Alli.
²⁰        JUDGE SCHNEIDER:  Can I just ask a
²¹ question and then we'll get to Ms. Brown?
²²        MS. PARFITT:  Yes.
²³        JUDGE SCHNEIDER:  Clearly, Ms. Brown only
²⁴ has four hours; right?
²⁵        MS. PARFITT:  Correct.

Page 144

¹        JUDGE SCHNEIDER:  If she wants to waste
² her time going over old ground -- I guess I'm
³ asking a rhetorical question -- why would you
⁴ object to her wasting her time on going over old
⁵ ground?
⁶        But as I expect when we hear
⁷ Ms. Brown -- I don't mean to take the wind out of
⁸ your sails -- but I totally expect you're going to
⁹ say it's not old ground.  The floor to you,
¹⁰ Ms. Brown.
¹¹        MS. BROWN:  Thanks so much, Judge.  Can
¹² you hear me okay?
¹³        JUDGE SCHNEIDER:  I can hear you great.
¹⁴        MS. BROWN:  Okay, great.  Nice to hear
¹⁵ you again.  And thanks for helping us out here.
¹⁶ Just to follow up on what Your Honor's saying:
¹⁷ Absolutely I have four hours.  And I don't intend
¹⁸ to go a minute over pursuant to the Court's order.
¹⁹ We are carefully tracking the time on the record.
²⁰        I am being very mindful of the
²¹ Court's instruction that we are only to be
²² exploring new opinions and things that took place
²³ after Dr. McTiernan's testimony at deposition in
²⁴ the MDL.  I am currently in the middle of
²⁵ questioning about Exhibit 12, which is, in fact, a

Page 145

¹ document that was produced by plaintiff in
² anticipation of the deposition three days ago.
³        It's a 2020 article, Your Honor, in
⁴ which Dr. McTiernan is quoted.  It's an article
⁵ that purports to have news provided by Beasley
⁶ Allen.  And the subject matter of the article is,
⁷ in fact, the subject matter of a four-page
⁸ supplement to Dr. McTiernan's report.  That
⁹ supplement is the O'Brien JAMA article from 2020.
¹⁰        There are four pages with numerous
¹¹ discussions of the O'Brien findings which are also
¹² the subject of this new document that was produced
¹³ in advance of this deposition.
¹⁴        I am questioning or attempting to
¹⁵ question Dr. McTiernan on statements not only in
¹⁶ the article that plaintiffs produced in advance of
¹⁷ the deposition, but also new statements in
¹⁸ Dr. McTiernan's amended expert report regarding the
¹⁹ findings in this JAMA article and how they
²⁰ are -- how Dr. McTiernan interprets and relies on
²¹ those findings in connection with her amended and
²² supplemental report.
²³        So I believe I am very carefully
²⁴ abiding by the Court's order to cover only
²⁵ supplemental materials.  These questions are

Page 146

¹ grounded in her amended expert report and
² supplemental document.  And as the Court wisely
³ points out, at the end of the day I only have four
⁴ hours, and certainly will not go a moment beyond
⁵ that.
⁶         JUDGE SCHNEIDER:  Ms. Brown, the bottom
⁷ line is was I correct in predicting that you were
⁸ going to say that it's not old ground but instead
⁹ it's new ground?
¹⁰         MS. BROWN:  Yes, Your Honor, completely
¹¹ new.  The subject of four new pages of her expert
¹² report.
¹³         JUDGE SCHNEIDER:  You know what's
¹⁴ interesting?  Just as an aside, I was just reading
¹⁵ this morning, or yesterday morning -- you know that
¹⁶ trial is going on in Philadelphia?
¹⁷         MS. PARFITT:  Yes.
¹⁸         JUDGE SCHNEIDER:  And I think it was J
¹⁹ and J who said Dr. Nicholson wasn't available
²⁰ because of her medical condition, and they wanted
²¹ to use her testimony across from another trial.
²² Plaintiff objected because they said there's new
²³ information that we -- if she testifies by
²⁴ transcript or video, we wouldn't have an
²⁵ opportunity to cross-examine her on the trends

Page 147

¹ today or yesterday that the judge ruled that they
² wouldn't permit the old testimony because the
³ science in this area is an evolving development.
⁴ And because there's always new information coming
⁵ out, it wouldn't be fair to the plaintiffs to
⁶ permit the old testimony to come in.
⁷         And it just sounds to me like -- I
⁸ don't have the record in front of me -- but
⁹ defendant, Ms. Brown, is making a good faith
¹⁰ representation that it's not old ground, it's new
¹¹ ground.  She only has four hours.  So if I'm asked
¹² to rule on whether to limit or bar this line of
¹³ questioning, my answer would be I wouldn't do that
¹⁴ because I have to accept -- as I would plaintiffs,
¹⁵ if the shoe was on the other foot -- I have to
¹⁶ accept plaintiff's representation.
¹⁷         MS. PARFITT:  Your Honor --
¹⁸         JUDGE SCHNEIDER:  And I don't have the
¹⁹ transcript in front of me.
²⁰         MS. PARFITT:  Sure.  And Your Honor, this
²¹ is Michelle.  And I certainly understand that.  And
²² I am not objecting.  I want this to be very clear.
²³ We absolutely expected defendants and would have
²⁴ been surprised if they would not inquire about the
²⁵ O'Brien study.  That is perfectly appropriate and

Page 148

¹ in line with what Your Honor has ordered.
²         My simple objection was not a full
³ inquiry, a fulsome inquiry into O'Brien, my
⁴ objection was simply as why are we spending time
⁵ going through epidemiological principles, basic epi
⁶ 101, which --
⁷         JUDGE SCHNEIDER:  Okay.
⁸         MS. PARFITT:  And I'm sorry if I didn't
⁹ make that clear, but I absolutely agree with the
¹⁰ Court and with Ms. Brown.  She's entitled to
¹¹ examine the witness on the O'Brien and any evolving
¹² science since that deposition.
¹³         So if I didn't make it clear, my
¹⁴ objection was simply to reviewing epidemiological
¹⁵ principles 101 with Dr. McTiernan, areas of
¹⁶ testimony that have been examined at trial.  So I
¹⁷ apologize if I didn't make that clear.
¹⁸         JUDGE SCHNEIDER:  No, you did.
¹⁹ Ms. Brown, I know you have to make a foundation,
²⁰ but do you think you could move this along a little
²¹ bit and get to the meat of it?
²²         MS. BROWN:  Yeah.  And Your Honor, I
²³ do -- I hear counsel's objection.  I am not going
²⁴ to re-plow all of the old grounds.  But there are
²⁵ specific findings in this new study that are the

Page 149

¹ subject of her amended report that she has
² interpreted in a certain way that I need to
³ understand the basis for.  And I am certainly
⁴ mindful of doing that in a way that does not
⁵ re-plow old ground.  And that is tied directly to
⁶ the new opinions and the new article.
⁷         MS. PARFITT:  With the representation
⁸ that will be tied to the new articles, that's --
⁹ that's certainly appropriate, Your Honor.  We
¹⁰ didn't object to that and would have expected only
¹¹ that.  It's just that we were hearing otherwise.
¹² So again, I just want that for the record.
¹³         JUDGE SCHNEIDER:  So just like if the
¹⁴ shoe was on the other foot --
¹⁵         MS. PARFITT:  Yes.
¹⁶         JUDGE SCHNEIDER:  -- I'd -- it would be
¹⁷ the same thing.  I have to accept Ms. Brown's
¹⁸ representation.  I accept both your representations
¹⁹ because I just know you.  And it sounds like she's
²⁰ going to move this along.  She only has four hours.
²¹ But you have my phone number.  I'm free all
²² afternoon.  You can give a call if there's a
²³ problem.  And if it means I have to Zoom in or
²⁴ listen to the testimony, I'm happy to do it.
²⁵         MS. PARFITT:  Well, we thank you.  I hope

1 that's not necessary.  Ms. Brown and I are trying
2 very hard not to interrupt your day.  So thank you.
3 Alli, anything more for the judge?
4        MS. BROWN:  No.  I appreciate it, Judge.
5 Thank you.
6        MS. PARFITT:  Thank you very much.
7        JUDGE SCHNEIDER:  Good luck to both of
8 you.
9        MS. PARFITT:  Thank you.
10        MS. BROWN:  Thanks, Judge.
11        MS. PARFITT:  Bye-bye.
12        MS. BROWN:  Are we -- do you want to take
13 five or do you want to keep going?
14        MS. PARFITT:  You know, Alli, I'm good,
15 but, more importantly, Dr. McTiernan, are you good
16 to keep going, Dr. McTiernan, or do you want to
17 take a break?
18        THE WITNESS:  I could use a break.
19        MS. BROWN:  Okay.
20        MS. PARFITT:  Let's do --
21        MS. BROWN:  As I understand it, we're
22 just under three hours on the record.  So we could
23 take a break and come back and just finish up if
24 that works for everyone.
25        MS. PARFITT:  That's perfect.  Five,

1 ten minutes?  What would you like?
2        THE WITNESS:  Ten.
3        MS. BROWN:  Sure.
4        MS. PARFITT:  Very good.
5        (Break taken.)
6 BY MS. BROWN:
7    Q.  Back on the record.  Welcome back,
8 Dr. McTiernan.
9        We left off discussing Exhibit 12,
10 which deals in part with some comments you and
11 others made regarding the O'Brien article.  And we
12 have marked the O'Brien article itself as
13 Exhibit 14.  And I understand, Dr. McTiernan, it
14 was your idea to update your report with
15 information regarding the O'Brien article; correct?
16    A.  I believe it was.
17    Q.  Okay.  And one of the things that you say
18 in your report is that there was an eight percent
19 increased risk for ever use versus never use;
20 correct?
21    A.  Yes.
22    Q.  Okay.  And that is -- the hazard ratio is
23 1.08, and the confidence interval is .99 to 1.17;
24 correct?
25    A.  Yes.

1    Q.  When you say there's -- in your report
2 that there's an increased risk, you are
3 interpreting this finding as an association; right?
4        MS. PARFITT:  Objection.
5        THE WITNESS:  What I said -- I don't know
6 what I say in the report.  I'll have to look there.
7 But I -- typically if the relative risk is above
8 one you say it's positive.  And that number refers
9 to the percent increase.  In this case it's eight
10 percent.  This is similar to how Dr. O'Brien
11 interprets too.  You see her response, her letter
12 response, it says that they never equated the lack
13 of statistical significance to evidence of no
14 association.  So she's agreeing with -- that this
15 is a real association, eight percent increase.
16 BY MS. BROWN:
17    Q.  And do you agree, Dr. McTiernan, that a
18 hazard ratio of 1.08, with a confidence interval of
19 .99 to 1.17, shows an association?
20    A.  Yes.
21        MS. PARFITT:  Objection.
22        THE WITNESS:  Yes, it shows an eight
23 percent increased risk in -- a positive
24 association.
25 BY MS. BROWN:

1    Q.  Okay.  And that is an opinion that you
2 hold now as an expert witness in the talcum powder
3 litigation; correct?
4    A.  Yes.
5    Q.  And in terms of whether or not -- strike
6 that.
7        How does the O'Brien article impact
8 your opinions in this case?
9    A.  It confirms my opinion that there's an
10 association between use of talcum powder products
11 and risk of ovarian cancer.  Overall, they're
12 rel -- their increase showed eight percent, but
13 also they specifically looked at their a priori
14 hypothesis, the prior hypothesis, that women with a
15 patent reproductive tract would have increased
16 risk.  And they did find that.  They confirmed
17 that, a 13 percent increased risk.
18    Q.  Okay.  And the patent finding as well as
19 the overall finding, neither of those are based on
20 medically confirmed cases; correct?
21        MS. PARFITT:  Objection.
22        THE WITNESS:  I believe -- you're talking
23 about medical confirmation of whether or not the
24 women had ovarian cancer?
25 BY MS. BROWN:

Anne McTiernan, M.D., Ph.D.

---

Page 154

1    Q.   Correct.

2    A.   Nurses Health Study has a medical

3  committee that reviews medical charts to confirm

4  the -- whether or not a cancer has occurred.  The

5  Women's Health Initiative has a similar system.  I

6  used to be head of the outcomes committee, so I

7  know what they did, and they have local physicians

8  at each clinic review documents to confirm that a

9  case occurred, and then also a central coding group

10  that codes according to a standard system.  So

11  those are confirmed cases.

12         Sisters, I can't recall what system

13  they have, what they're called.

14  BY MS. BROWN:

15    Q.   Yeah, my question was just the numbers

16  you gave us and the numbers that are called out in

17  the results, are, by admission of O'Brien herself,

18  not numbers based on medically confirmed cases.

19  Did you know that?

20       MS. PARFITT:  Objection.

21       THE WITNESS:  I would have to see what it

22  is you're referring to.

23  BY MS. BROWN:

24    Q.   Take a look at page 56 of O'Brien, where

25  she tells us that when we limit the outcome to

---

Page 155

1  medically confirmed cases, the hazard ratio is

2  attenuated.  Did you know that?

3    A.   I see that, but that's not clear what the

4  numbers were.  Maybe she tells us somewhere.

5    Q.   Did you consider, in forming your

6  supplemental opinion regarding O'Brien, the

7  analysis using just medically confirmed cases?

8    A.   Well, I used the main results that this

9  study provided.  So I believe that since they put

10  that into the abstract, they must be confident in

11  their eight percent increase.  And it's not clear

12  why the numbers went down a little bit.  Yeah, I

13  can't -- I can't -- I can't comment on that.  The

14  number went to 1.05.  So that's a five percent

15  increase risk.

16  BY MS. BROWN:

17    Q.   Did you know that when you formed your

18  opinions?

19    A.   Did I -- did I look at this?  I read the

20  whole paper, yes.

21    Q.   Sure.  So why would you include in your

22  report the eight percent number when the medically

23  confirmed analysis would show five percent?

24       MS. PARFITT:  Objection, argumentative.

25       THE WITNESS:  Just like for all the

---

Page 156

1  papers that I looked at, I looked at the main

2  results that were reported by the authors as well

3  as any subgroup analyses that were particularly

4  biologically relevant.  And in this case, it's the

5  women with patent tubes.

6  BY MS. BROWN:

7    Q.   Did you -- do you believe that the

8  analysis limited to medically confirmed cases is

9  more reliable than the analysis that is not limited

10  to medically confirmed cases?

11       MS. PARFITT:  Objection.

12       THE WITNESS:  I think it's difficult to

13  say.  I know from my work on the Women's Health

14  Initiative when we didn't have confirmed cases it's

15  because we didn't have the medical records.  They

16  just couldn't be obtained from the hospital.

17  BY MS. BROWN:

18    Q.   Did you --

19    A.   I just want to add that in the cases of

20  the Nurses Health Study, those women, being highly

21  medically educated, had a very good grasp on what

22  their answers were, so -- and they compared

23  self-report in Nurses Health with their medically

24  confirmed cases and had a very high concordance.

25         So -- so I'm not as concerned with

---

Page 157

1  these because I know the reasons for the -- for

2  when they didn't have confirmation, mostly because

3  they didn't get the medical record.

4    Q.   Did you read and consider Dr. O'Brien's

5  explanation of what they did to confirm the cases?

6    A.   Where are you referring to?

7    Q.   In the article, did you read the outcome

8  assessment and what was done regarding the

9  confirmation?

10    A.   Maybe you can point out what you're

11  talking about.

12    Q.   Well, I just -- I'm wondering where

13  you're getting this information from.  Did you

14  consider what Dr. O'Brien said about medically

15  conform -- how they got medical confirmation?

16    A.   Oh, so she's reporting here, similar to

17  what we found in Women's Health Initiative, that

18  delays in confirmation process was because of

19  getting medical records.

20    Q.   So did you consider that in reporting the

21  non-medically confirmed numbers?

22       MS. PARFITT:  Objection, asked and

23  answered.

24       THE WITNESS:  I reported the overall

25  number, not -- I don't think she has data for those

---

Anne McTiernan, M.D., Ph.D.

Page 158

1  ones that were not medically confirmed, did she?
2  BY MS. BROWN:
3     Q.  Well, she --
4     A.  She looked at the overall and then she
5  looked at those that were confirmed.
6     Q.  Right.  So did you look at -- for
7  example, Dr. O'Brien says this was true for
8  analyses limited to women with patent reproductive
9  tracts, eTable 4 in the supplement.  Did you see
10  that?
11     A.  I'm sure that I looked at it.  I don't
12  see the data right here.
13     Q.  Why would you include in your report
14  numbers of non-medically confirmed analyses when
15  the information regarding medically confirmed
16  analyses is included in the paper?
17        MS. PARFITT:  Objection to form.
18  Argumentative.
19        THE WITNESS:  I provided the result,
20  which was the main result given in the paper.
21  BY MS. BROWN:
22     Q.  Dr. O'Brien says that -- in her paper
23  that "In this analysis, there was a possible
24  positive association among women with patent
25  reproductive tracts, although because the

Page 159

1  association was not significantly different from
2  that observed in women with nonpatent reproductive
3  tracts, this finding should be considered only
4  exploratory and hypothesis generated."
5        Do you agree with that?
6     A.  Well, it's odd to say hypothesis
7  generating when they were confirming their a priori
8  hypothesis.  So I don't understand why they said
9  this.  In the beginning of the paper they said they
10  had a priori hypothesis testing within that special
11  group.  They did that.  They found an association.
12  They also determined it was statistically
13  significant.  And then now I'm not sure why they're
14  saying it was exploratory and hypothesis
15  generating.  That doesn't make sense to me.
16     Q.  Well, do you understand they say that
17  because there was no difference between the two
18  groups?
19        MS. PARFITT:  Objection.
20  BY MS. BROWN:
21     Q.  It says that right here.  Do you see
22  that?
23        MS. PARFITT:  Objection.  Sorry.
24        THE WITNESS:  I'm saying they're
25  not -- following the usual procedure would be you

Page 160

1  have an a priori hypothesis, you confirm it, you
2  report it.
3  BY MS. BROWN:
4     Q.  Okay.  Do you understand what she says
5  is -- she gives the reason why she thinks this is
6  just exploratory.  She says, "because the
7  association was not significantly different from
8  that observed in women with nonpatent reproductive
9  tracts."  Do you see that?
10     A.  I see what she says.  I don't know if
11  that means statistically significant.  But it's
12  mixing statistical significance with actual
13  association.  So it's -- it's -- it's mixing two
14  different things.  But she's confirmed she, they,
15  confirmed their a priori hypothesis, which was that
16  there was -- they would see an association in women
17  with patent reproductive tract tubes, and they did.
18     Q.  Did this study include information on
19  when women with nonreproductive patent tracts may
20  have used talcum powder?
21     A.  I don't recall that they had that
22  information.  Not all of the cohorts had length of
23  use.  And if those -- if some women -- they were
24  asked at particular points.  So Nurses Health
25  Study -- first of all, they lost a third of the

Page 161

1  women in those cohorts, so it's missing a lot of
2  data.
3        But in the two-thirds of women that
4  they had information, they asked about whether they
5  were using currently.  So if they're using
6  currently, two of the cohorts asked about length of
7  use.  Two of them did not.  So only in two studies
8  did they have any possibility of finding out some
9  early use.
10        In -- but if a woman had used it when
11  she was younger and then stopped using it, she
12  would have been counted as a non-user.  So that's a
13  type of misclassification error that happens with
14  people whether they're a case or a non-case, and
15  that underestimates the relative risk.  So that
16  would underestimate the ability to -- to
17  see -- sorry -- it would underestimate how large
18  that relative risk is.
19     Q.  You believe that lack of information
20  about the timing of exposure as it relates to
21  patency underestimates the risk?
22     A.  If it's underestimating exposure, then it
23  would underestimate the relative risk.
24     Q.  Did you read and consider the editorial
25  from Dr. Gossett?

Page 162

1    A.  Yes.
2    Q.  Let's take a look at that.  First of all,
3  do you know any of the authors of the O'Brien
4  paper?
5    A.  Let me see.  I believe I do, yes.
6  Dr. Harris is a colleague at Fred Hutchinson.
7  Dr. Anderson is the head of my division.  And
8  Dr. Kaunitz was a WHI gynecologist.  I knew him
9  back then when I was at WHI.  Oh, Dr. Tworoger was
10  a student with me before she went on to Nurses
11  Health Study.
12    Q.  Have you spoken to any of them about the
13  O'Brien paper?
14    A.  I asked Dr. Tworoger or Harris, when I
15  saw that there was an abstract, it was an abstract
16  presented of these data at one of the cancer
17  prevention meetings.  And when I saw that, I asked
18  them if the paper was being -- had been written up
19  and submitted.  And they said yes, it was in
20  process.  And so that's all I knew.  They didn't
21  inform me when it was coming out.  I didn't see the
22  early results until it was published.
23    Q.  Do you -- I'm sorry if you answered this.
24  Do you know Dr. Dana Gossett?
25    A.  No, I do not.

Page 163

1    Q.  Okay.  She is from the MSCI department of
2  obstetrics and gynecology at the University of
3  California-San Francisco.  Are you familiar with
4  that institution?
5    A.  Actually, I looked -- I think she's left
6  there.  But that's where she was.  And I don't know
7  that institution, but you said UCSF?
8    Q.  Yep.
9    A.  Yes, I know that university.  Can you
10  tell me, 'cause it's not in -- I can't find it in
11  my documents, the Gossett, can you tell me where it
12  is in yours?
13    Q.  Sure.  Let's take a look and mark it as
14  Exhibit 15.  And in the deposition binder,
15  tab eight.
16    A.  Okay.
17    (Interruption by the reporter.)
18  BY MS. BROWN:
19    Q.  Okay.  So this is an editorial regarding
20  the O'Brien paper we've been discussing; correct?
21    A.  Yes.
22    Q.  Okay.  And in fact, there were a number
23  of letters to the editors and similar writing that
24  went on following that; correct?
25    A.  I believe there were two or three letters

Page 164

1  to the editor, and then a response to Dr. O'Brien,
2  Sandler and Wentzensen.
3    Q.  Okay.  And what Dr. Gossett says, she has
4  a paragraph towards the end that starts, "Given the
5  putative mechanism."  Do you see that?
6    A.  Yes.
7    Q.  Okay.  And she says, "Given this putative
8  mechanism of exposure, the subgroup of women with
9  patent reproduction tracts is of particular
10  interest."  Do you agree with that?
11    A.  Yes.
12    Q.  Okay.  "However, it's not possible to
13  equate a patent reproductive tract with exposure,
14  and a nonpatent reproductive tract with
15  nonexposure."  Would you agree with that?
16    A.  It's a perfect example of underestimating
17  exposure, which is going to underestimate the
18  relative risk.
19    Q.  She goes on to say that "Women who
20  undergo tubal ligation and use powders in the
21  genital area cannot be assumed to have started them
22  only after the surgery.  In fact, this is highly
23  unlikely, as women often begin use of powder in the
24  genital area during adolescence."  Do you agree?
25    A.  Let me see again.  I don't know what she

Page 165

1  is referencing for when women begin use of them.
2  It says they often -- it would be nice to know the
3  statistics that she's referring to.  I would
4  imagine that that would vary greatly by cohort and
5  by availability of these products and by marketing.
6  So I can't respond to what she's saying there.
7    Q.  Have you not considered the scientific
8  literature noting that women often begin using
9  powder in adolescence or at a younger age?
10    A.  I haven't seen statistics on that, on
11  exactly when they start, when they stop and -- you
12  know, there's going to be a cohort effect.  So we
13  know that cohort in terms of population cohort, we
14  know Women's Health Initiative had higher use than
15  did some of these other cohorts.  May have been
16  either marketing in the area or could have just
17  been when they were born.
18    So what I don't know is what
19  this -- what she's referring to, what numbers.  But
20  the whole issue is underestimation of the relative
21  risk because of underestimation of exposure.  So
22  that's -- that's the -- that's what I'm taking away
23  from this.
24    Q.  You do not agree with the proposition
25  that women often begin using powder during

Anne McTiernan, M.D., Ph.D.

Page 166

1  adolescence; is that fair, Dr. McTiernan?
2      A.  I just don't understand the word often.
3  I think I would like to see what she's talking
4  about in terms of numbers.
5      Q.  Okay.  Have you reviewed IR from Kramer
6  2016 on that point?
7      A.  I reviewed -- yeah, one study, Kramer
8  2016.  But most of the studies don't have that type
9  of detail.  And Kramer was in Boston area in older
10  women.  And so I don't -- I don't know what she's
11  referring to.
12      Q.  So do you disagree with Dr. Kramer's
13  conclusion that would support that statement?
14          MS. PARFITT:  Objection, misstates her
15  testimony.
16          THE WITNESS:  I'm not sure if
17  Dr. Kramer's statement -- I'm not sure what you're
18  talking about.
19  BY MS. BROWN:
20      Q.  About the time, the age, that women begin
21  using talcum powder, do you agree or disagree with
22  Dr. Kramer who says that early in life, including
23  adolescence?
24          MS. PARFITT:  Objection.
25          THE WITNESS:  Does he say that every

Page 167

1  woman -- you know, I just don't know what
2  statement.  I'd need to see the statement.
3  BY MS. BROWN:
4      Q.  Dr. Gossett says, "The stratification of
5  the groups as patent and nonpatent does not clearly
6  group women into exposed and unexposed categories."
7  And you would agree with that; correct?
8      A.  She's talking about underestimation of
9  exposure.  I would agree with that.
10      Q.  "The fact that there are no significant
11  differences in the HRs, the hazard ratios in the
12  patent and nonpatent subgroups, confirms the
13  overall conclusion that there is no demonstrable
14  statistically significant association between use
15  of powder in the genital area and ovarian cancer
16  risk."  Do you agree?
17          MS. PARFITT:  Objection.
18          THE WITNESS:  I disagree.  It's a
19  misrepresentation of statistical testing.  And I
20  believe the American Statistical Association
21  statements on what -- of not interpreting -- not
22  misinterpreting statistical testing as -- will give
23  us some support here, in that you just don't say
24  that that statistical significance is something
25  that is a bright line that you accept or reject

Page 168

1  something based on a statistical test.  It just
2  tells you additional information.
3          The fact is, you can't change those
4  relative risks.  The relative risk of one group is
5  .13 and the other is .99.  That's -- that's the
6  relevant number to look at.
7  BY MS. BROWN:
8      Q.  Your critique of Dr. Gossett's statement
9  is her inclusion and reliance on statistical
10  significance; is that fair?
11      A.  I'd say it's misrepresentation of what
12  statistical significance is telling us.
13      Q.  Dr. Gossett says, "The subgroup analysis
14  suggesting that women with intact reproductive
15  tracts who use powder in the perineal area
16  developed ovarian cancer more frequently than
17  non-users is below the effect size that
18  epidemiologists generally consider important and
19  should not be selectively highlighted by the
20  statistically unsophisticated reader as evidence of
21  a relationship."  Do you agree with that?
22          MS. PARFITT:  Objection.
23          THE WITNESS:  No.  No, I do not.  And I
24  don't -- is she a statistician?
25  BY MS. BROWN:

Page 169

1      Q.  Do you agree -- well, you don't know her;
2  right?
3      A.  I don't know.  I don't know if she's a
4  statistician.  I don't know what a sophisticated --
5  statistically unsophisticated reader is.
6      Q.  Well, do you believe that the patent
7  subgroup analysis is below the effect size that
8  epidemiologists generally consider important?
9      A.  I don't know what an effect size an
10  epidemiologist would generally consider important
11  is.  To my knowledge, there is no defined level of
12  risk that is considered important or not important
13  in epidemiology.
14      Q.  What about the number of women included
15  in those subgroup analyses?  Do you believe that
16  enough women were included in the patent/nonpatent
17  subgroup analyses to provide a meaningful result?
18      A.  I would need to look.  First of all, she
19  has -- they had an a priori hypothesis, so it's not
20  clear if they had specific numbers that they would
21  expect of the numbers they had.  So the a priori
22  hypothesis was to look at association within women
23  who had patent tubes, and they did, and they had
24  1,384 women with ovarian cancer in that subgroup.
25  So yes, they had enough numbers there.

Anne McTiernan, M.D., Ph.D.

1    Q.  Dr. Gossett says, "In addition, the
2  investigators conducted multiple subgroup analyses
3  increasing the risk of a type one error."  Do you
4  agree with that, Dr. McTiernan?
5        MS. PARFITT:  Objection.
6        THE WITNESS:  That, again, only refers to
7  a statistical test.  It doesn't affect the relative
8  risk.  Type one error is only statistical testing.
9  BY MS. BROWN:
10    Q.  Do you agree that multiple subgroup
11  analyses increase the risk of a type one error?
12    A.  Over the universe, then all of these
13  cohort studied look at multiple, multiple
14  predicting variables and multiple subgroup
15  analyses.  So this is a statement that doesn't
16  really make sense in the context of epidemiology.
17  And it's clearly referring to statistical
18  significance.  It's not referring to the relative
19  risk.
20  BY MS. BROWN:
21    Q.  Two of the articles that you included on
22  your Exhibit C materials considered deal with an
23  article published in Nature called Retire
24  Statistical Significance.  Are you familiar with
25  that?

1    A.  Yes.
2        MS. PARFITT:  Objection.
3  BY MS. BROWN:
4    Q.  And one of the documents you included on
5  Exhibit C was a petition that multiple individuals
6  signed in support of that article.  Are you
7  familiar with that?
8    A.  Yes.
9    Q.  Okay.  And I noticed, Dr. McTiernan, you
10  did not sign that petition, true?
11        MS. PARFITT:  Objection.
12        THE WITNESS:  I did not know about it in
13  order to sign it.  So no, I did not.
14  BY MS. BROWN:
15    Q.  Did you learn about the Nature articles
16  from the lawyers in the litigation?
17    A.  No, I did not.
18    Q.  How did you come to learn about the
19  Nature article and the petition?
20    A.  I can't recall.  It could have been
21  through searching, reading -- searching on some of
22  the researchers that have spent a lot of time
23  thinking about statistical testing and relative
24  risks.  But I just -- I can't recall how I saw it,
25  but it would have been through my own searching.

1  Most likely a PubMed search.
2    Q.  Have you ever written an article
3  regarding issues concerning retiring statistical
4  significance or abandoning statistical
5  significance?
6        MS. PARFITT:  Objection.
7        THE WITNESS:  I'm not a statistician.
8  I've not written that type of article.
9  BY MS. BROWN:
10    Q.  Have you ever taught a class or given a
11  presentation regarding those themes that we should
12  abandon or retire statistical significance?
13    A.  I'm not a statistician.  I've not given
14  that type of talk.
15    Q.  In writing your own articles over the
16  years which interpret epidemiology findings, have
17  you ever written that we should rely on findings
18  that are not statistically significant?
19    A.  I can't recall.  I can't recall what I've
20  done over the years.  The way I learned about
21  interpreting relative risks and confidence
22  intervals and P-values are that you report what the
23  relative risk is.  I'm sure that for several
24  journals -- and journals have requirements -- I
25  probably did put emphasis on the ERP value or

1  confidence interval.
2        I don't now, especially since the
3  American Statistical Association has given specific
4  guidance about this.  But it's in line with the way
5  I first learned many years ago how to interpret
6  relative risk.
7    Q.  For many years, Dr. McTiernan, you
8  published and conducted research and reported
9  research based on whether or not results achieved
10  or did not achieve statistical significance, true?
11        MS. PARFITT:  Objection.
12        THE WITNESS:  I can't recall.  I'd have
13  to go through and look.  Many times it depended on
14  how a journal wanted things interpreted.
15  BY MS. BROWN:
16    Q.  And many times in fact, Dr. McTiernan,
17  you interpreted statistical findings like the very
18  ones contained in the O'Brien paper and concluded
19  that they showed no association; isn't that right?
20        MS. PARFITT:  Objection, overly broad.
21        THE WITNESS:  I can't recall.  I would
22  need to look through articles.
23  BY MS. BROWN:
24    Q.  Are you surprised to know that,
25  Dr. McTiernan, that in the past you have

Anne McTiernan, M.D., Ph.D.

1  interpreted a 1.08 relative risk, a .99 to .1, .12
2  confidence interval as a finding that shows no
3  association?
4      MS. PARFITT:  Objection, argumentative.
5      THE WITNESS:  I don't recall.  And I know
6  that Dr. O'Brien did not say that there's no
7  association for a relative risk for 1.08.  She
8  specifically said that in her response to a letter.
9  BY MS. BROWN:
10     Q.  But my question was --
11     A.  Talking about this specific article, this
12  specific case, I think it's very telling what
13  Dr. O'Brien has stated.
14     Q.  I want to talk a little bit more about
15  some more of Dr. O'Brien's more recent statements,
16  but let's just finish up with the editorial from
17  Dr. Gossett.
18         The study -- she goes on to state,
19  "The study by O'Brien, et al., represents the
20  largest cohort to date to examine whether an
21  association exists between powder use in the
22  genital area and ovarian cancer risk.  And the
23  findings are overall reassuring."
24         Do you agree with that, Dr. McTiernan?
25     A.  I disagree that it's a cohort.  It's four

1  cohort studies.  That's the first part of the
2  statement I disagree with.  And I find that the
3  findings are similar to what I would expect, a
4  pooled study where three of them have previously
5  published showing similar results and one study,
6  nurses health two, which actually was in the gates,
7  though, even that was published previously, and so
8  it's not surprising but they did find confirmation
9  of positive association, and particularly
10  confirmation of women with patent fallopian tubes.
11     Q.  Do you believe that the O'Brien study was
12  underpowered to identify a small increase in risk?
13     MS. PARFITT:  Objection.
14     THE WITNESS:  Even Dr. O'Brien believes
15  that.  And I believe it could have been as well.  I
16  wouldn't use the word small, because we don't
17  know -- we don't have exact definitions of the word
18  small for any particular descriptives in
19  epidemiology.
20         But as Dr. O'Brien said, it may be
21  that relative risk of the size seen, that it was
22  underpowered to see statistical significance with
23  that.
24  BY MS. BROWN:
25     Q.  In the past you've testified that a

1  cohort would need more than 140,000 participants to
2  be able to detect a risk.  Do you still believe
3  that that's true?
4      MS. PARFITT:  Objection, asked and
5  answered.  Previously asked in the last deposition.
6  BY MS. BROWN:
7      Q.  Is that still your opinion, Doctor?
8      A.  I believe you're talking about a power
9  calculation.
10     Q.  Correct.
11     A.  And that's if the power calculation makes
12  the assumption of the certain number of cases
13  occurring.  If you don't have those number of
14  cases -- the number of cases provides power to
15  determine statistical significance.  If you don't
16  have cases occurring, it doesn't matter how big
17  your cohort was.  You could have a cohort with
18  140,000 women in it.  If none of them gets ovarian
19  cancer, you have no study.  So these power
20  calculations make the assumption of a certain
21  number of cases occurring.
22     Q.  Have you conducted any power calculations
23  since your last deposition?
24     A.  No, I have not.
25     Q.  Okay.  Do you believe that the O'Brien

1  study was sufficiently powered to pick up a
2  relative risk of 1.2?
3      MS. PARFITT:  Objection, asked and
4  answered.
5      THE WITNESS:  I didn't do calculations.
6  The calculations look different for a pooled study
7  than for a whole new cohort study would be.  It's
8  not just adding together the number of those
9  individual cohorts.  I'm not sure if Dr. O'Brien
10  and colleagues did power calculations, but they
11  state in their paper that it may have been
12  underpowered.
13  BY MS. BROWN:
14     Q.  Are there any other opinions that you
15  have about the O'Brien study that we have not
16  discussed or that are not contained in your amended
17  report?
18     MS. PARFITT:  Objection, form, broad.
19     THE WITNESS:  I can't think of anything
20  right now to add.
21  BY MS. BROWN:
22     Q.  How do you believe the O'Brien study
23  supports your opinion that talcum powder causes
24  ovarian cancer?
25     MS. PARFITT:  Objection, asked and

Anne McTiernan, M.D., Ph.D.

Page 178

1 answered.
2       THE WITNESS:  I should answer?
3 BY MS. BROWN:
4    Q.  Yes, please.
5    A.  It confirms the results that were seen in
6 previous cohort studies, and it confirms the
7 hypothesis that women with patent tubes would
8 have -- show increased risk with the use of talcum
9 powder products.
10    Q.  Going back to Exhibit 12, which was that
11 document with news provided by Beasley Allen.  I
12 have one other question for you.
13       Do you recall -- and I thought it was
14 in this document, but maybe it's in another one.  I
15 know where it is.  One of the things that this
16 Exhibit 12 does is it cites a Reuters article where
17 Dr. O'Brien was quoted.  Do you see that here?
18       It says, "This was the largest study
19 ever done, but because ovarian cancer is such a
20 rare disease, it was still not big enough to detect
21 a very small change in risk."  And it cites a
22 Reuters article.  Do you see that?
23    A.  Yes.
24    Q.  Okay.  Did you look at that actual
25 Reuters article in which Dr. O'Brien was quoted?

Page 179

1    A.  I don't know.  I don't know which article
2 it's referring to.
3    Q.  Okay.  Let's mark as Exhibit 16 what is
4 tab five in your deposition binder.  And it is that
5 Reuters article.  And I want to just ask you a
6 question about it.  This is the article.  It's
7 entitled Largest Study Yet Offers No Clear Talc
8 Link to Ovarian Cancer.  Do you agree with that
9 statement, Dr. McTiernan?
10       MS. PARFITT:  Objection.
11       THE WITNESS:  I don't really understand
12 what it refers to.  I just -- I know what the data
13 showed.
14 BY MS. BROWN:
15    Q.  Okay.  Do you agree that the O'Brien
16 study does not show a clear link between talc and
17 ovarian cancer?
18       MS. PARFITT:  Objection, asked and
19 answered.
20       THE WITNESS:  I think the O'Brien study
21 shows that use of talcum powder products increases
22 risk by eight percent, and for women with patent
23 tubes, increases by 13 percent.
24 BY MS. BROWN:
25    Q.  And in your mind does the O'Brien study

Page 180

1 clearly link perineal talc exposure to ovarian
2 cancer?
3       MS. PARFITT:  Objection.
4       THE WITNESS:  It's a positive
5 association.  It confirms what was shown before in
6 those individual studies and in the studies
7 overall.
8 BY MS. BROWN:
9    Q.  What I wanted to ask you about was a
10 statement by Dr. O'Brien that is:  "Given that
11 ovarian cancer is rare," O'Brien says, "that
12 amounts to an additional nine ovarian cancer cases
13 for 10,000 women.  That's pretty small."  Do you
14 see that?
15    A.  Yes.
16    Q.  Since your last deposition,
17 Dr. McTiernan, have you formed an opinion about how
18 many annual cases of ovarian cancer in your view
19 can be attributed to perineal use of talc?
20       MS. PARFITT:  Objection.
21       THE WITNESS:  No, I have not.
22 BY MS. BROWN:
23    Q.  Do you agree with Kramer 99 that posits
24 that ten percent of the annual incidence rate of
25 ovarian cancer is due to talc?

Page 181

1       MS. PARFITT:  Objection.
2       THE WITNESS:  I would have to look at
3 those data to see what it is that's referring to.
4 BY MS. BROWN:
5    Q.  Since your last deposition, have you
6 attempted to -- in any way to calculate how the
7 relative risk reported in the epidemiology
8 translates to a quantifiable number of increased
9 numbers of ovarian cancer each year?
10       MS. PARFITT:  Objection.
11       THE WITNESS:  No.
12 BY MS. BROWN:
13    Q.  Is that an important analysis, in your
14 view?
15       MS. PARFITT:  Objection, argumentative.
16       THE WITNESS:  It's not related to
17 causality.  And I believe they state that in the
18 O'Brien paper as well, that it's not related to
19 causality.  I may be misremembering.
20 BY MS. BROWN:
21    Q.  As an expert -- sorry.  Go ahead.
22    A.  I would have to look through.  But it's
23 not relevant to causality.
24    Q.  As an expert witness in a mass
25 litigation, have you attempted to figure out

Page 182

1 whether the number of cases -- have you -- strike
2 that.
3           As an expert witness in a mass
4 litigation, have you attempted to compare the
5 number of cases that you believe the data shows to
6 be caused by talc each year and the number of
7 lawsuits that have been filed against Johnson &
8 Johnson each year?
9       MS. PARFITT: Objection.
10      THE WITNESS: No.
11 BY MS. BROWN:
12   Q. Let's take a look, if we could, at a more
13 recent paper with O'Brien as one of the co-authors.
14 If you could go to tab 50 in the deposition binder,
15 which is a 2021 paper by Nicholas Wentzensen and
16 Katie O'Brien titled --
17   A. Which number?
18   Q. It's 50, five-zero -- no. Sorry. It's
19 the last tab of the deposition binder. Sorry.
20      MS. PARFITT: While you're doing that,
21 Alli, can we just get a time from Anita?
22      MS. BROWN: Sure. I think it's been
23 3:38, Michelle. So I have 22 minutes.
24      MS. PARFITT: Okay. Thank you.
25 BY MS. BROWN:

Page 183

1   Q. I'm sorry. Doctor, I think it's in your
2 documents that you produced to us, the very last
3 one.
4      MS. PARFITT: Yeah, it looks like it's
5 last in both binders.
6      MS. BROWN: There we go. Easy.
7 BY MS. BROWN:
8   Q. Okay. Are you familiar with this 2021
9 article in part by Dr. O'Brien?
10   A. Yes, I read through it.
11   Q. Okay. And I want to ask you some
12 questions about information that Dr. O'Brien and
13 her colleague write on page 6 and over onto page 7.
14 I direct your attention to the section entitled
15 Associations of Genital Powder Use and Ovarian
16 Cancer Risk By Histotype. Do you see that?
17   A. Yes.
18   Q. They write, "As discussed previously,
19 ovarian cancers encompass several different
20 histotypes which may have different cells of origin
21 and unique risk factors." Do you agree with that?
22   A. Some could be unique, some could be in
23 common.
24   Q. "The identification of subtype specific
25 associations would strengthen the argument for the

Page 184

1 existence of a causal relationship." Do you agree
2 with that?
3   A. It depends. It may or may not. You can
4 have one carcinogen causing more than one type of
5 cancer, more than one histotype of cancer. So it's
6 not necessarily something -- it's not required for
7 causality. It's biologically interesting, I would
8 say, rather than it's needed for causality.
9   Q. O'Brien goes on to review some of the
10 findings in the epidemiology regarding different
11 histologic subtypes. Do you see that?
12   A. Yes.
13   Q. Okay. And then they go on to talk about
14 the findings of their own pooled data; correct?
15   A. You're referring to?
16   Q. On page 7 in the pooled analysis that
17 included updated data from the prospective cohorts.
18 Do you see that?
19   A. Yes.
20   Q. Okay. They say that: "O'Brien observed
21 elevated but not statistically significant hazard
22 ratios for the association with serous"; right?
23   A. Yes.
24   Q. "And estimates were also elevated for
25 endometrioids and clear cell. Neither of those

Page 185

1 were -- but not statistically significant"; right?
2   A. They were probably smaller numbers which
3 determines statistical significance.
4   Q. "Ever genital powder use was not
5 associated with mucinous tumors." Do you see that?
6   A. I see that.
7   Q. Okay. Are you aware of any epidemiology
8 study that associates talcum powder with mucinous
9 tumors?
10      MS. PARFITT: Objection.
11      THE WITNESS: I would have to go through
12 the reports again. I believe one of the -- one of
13 the studies -- one of the meta-analysis do say
14 something with use of this, but I can't recall
15 where I saw it.
16 BY MS. BROWN:
17   Q. Do you believe talcum powder causes
18 mucinous tumors?
19   A. I would have to --
20      MS. PARFITT: Objection.
21      THE WITNESS: I would have to review the
22 data before I could answer that. One thing I want
23 to say is that there -- in the sentence right
24 above -- so this is referring to the -- it looks
25 like the Berg and not the tear man analysis, found

Page 186

1 mucinous the odds ratio 1.09. So that is elevated.
2 I just don't know -- oh, sorry, that was the Terry,
3 et al, pooled analysis, the 1.09. So it's
4 elevated. And so I couldn't say there's no
5 association for mucinous.
6 BY MS. BROWN:
7 Q. Okay. What O'Brien says in this article
8 from 2021 is that: "Overall, these results
9 consistently demonstrate a positive association
10 between talc and serous cancer, and possibly
11 endometrioid tumors. The relationship between talc
12 use and the rarer mucinous or clear cell tumor
13 histotypes is more ambiguous."
14 Do you agree with that, Dr. McTiernan?
15 MS. PARFITT: Objection. You haven't
16 read the entire statement.
17 MS. BROWN: I'm going to get to the rest
18 of it. I want to pause and see if you agree with
19 that.
20 MS. PARFITT: Objection.
21 THE WITNESS: I don't know what she
22 means -- what they mean by the word ambiguous. I
23 would say there were fewer cases in all of these
24 studies for mucinous or clear cell. So they may
25 not have had enough numbers to have the power to

Page 187

1 see statistical significance in all of these
2 studies.
3 I don't have in mind exactly what
4 the relative risks were, so we need to see that.
5 But in some studies there was very few cases that
6 they couldn't even test. They sometimes didn't
7 even include them. So it's not possible for me to
8 make -- to agree or disagree with this.
9 BY MS. BROWN:
10 Q. Okay. And one of the things you're
11 recognizing, Dr. McTiernan, is that mucinous
12 ovarian cancer is a rare histologic subtype;
13 correct?
14 A. From my knowledge. From my knowledge,
15 yeah.
16 Q. Clear cell tumors are also pretty rare;
17 correct?
18 MS. PARFITT: Objection.
19 THE WITNESS: From my knowledge of
20 looking at those papers, yes.
21 BY MS. BROWN:
22 Q. And it sounds like one of the issues that
23 you're raising is that there simply may not have
24 been enough people who have gotten those cancers in
25 the epidemiology to properly study whether or not

Page 188

1 talcum powder use is associated with those cancers;
2 correct?
3 A. For the individual studies, they might
4 not have even looked at them, which is why the pool
5 studies is helpful. So the pool Terry analysis,
6 for example, was able to look at some of these and
7 did see some elevated risks.
8 So I have not done a detailed study of
9 the individual relative risk for these particular
10 subtypes, but that's something that would be needed
11 before answering that question.
12 Q. Okay. The O'Brien authors go on to say,
13 the rest of that sentence, they say, "The
14 relationship between talc use and the rarer
15 mucinous or clear cell tumors histotypes is more
16 ambiguous, so it's not clear whether this is due to
17 true etiologic differences or because their rarity
18 makes them more difficult to study."
19 Would you agree with that?
20 A. I would say that rarity means they
21 haven't been studied as well.
22 Q. Have you formed the opinion, based on the
23 existing epidemiology, that talcum powder use
24 causes clear cell cancer?
25 MS. PARFITT: Objection, asked and

Page 189

1 answered. She testified to.
2 THE WITNESS: I would need to go look at
3 my report what I said about specific histotypes,
4 and then I would need to update that looking at
5 this -- these pooled studies.
6 BY MS. BROWN:
7 Q. So sitting here today, though, at your
8 deposition, are you of the opinion that perineal
9 exposure to talcum powder causes clear cell ovarian
10 cancer?
11 MS. PARFITT: Objection.
12 THE WITNESS: I'm of the opinion that
13 exposure to talcum powder products causes
14 epithelial ovarian cancer, of which all of these
15 subtypes are a type. I'd say that some of them
16 have not been studied as much as others, but
17 certainly they're all part of the epithelial
18 ovarian cancer grouping.
19 BY MS. BROWN:
20 Q. Which subtypes have not been studied as
21 much as others, in your view?
22 A. It depends on the study. There's some
23 studies that only looked at serous versus other.
24 And some had enough cases that they could subtype
25 into a variety of types. And we can see already

Page 190

1 here when they've outlined for as to things are
2 accurate, that Terry was able to look at clear cell
3 on a relative risk of 1.24, and also was able to
4 look at mucinous at a relative risk of 1.09.  So
5 that's a pooled study, had enough cases to be able
6 to look at those particular subtypes.
7     Q.  And for the record, Doctor, what you've
8 pointed to is table two on page 6 of what we are
9 looking at as the O'Brien article that we've marked
10 as Exhibit 16.  Is that right, everyone, 16?
11 O'Brien 2021 should be marked as Exhibit 16?
12     A.  Okay.  I was also looking at the write-up
13 on the next page, but tables -- correct.
14     Q.  Okay.  And so one of the things you were
15 pointing to, Doctor, is O'Brien's reported
16 estimates of the association between ever versus
17 never powder use by histotype; correct?
18     A.  Yes.
19     Q.  Okay.  And based on the information
20 contained here, do you believe that there is enough
21 information in the epidemiology to conclude, for
22 example, that perineal exposure to talc causes
23 low-grade serous carcinoma?
24     MS. PARFITT:  Objection.
25     THE WITNESS:  I don't see low grade

Page 191

1 listed in this table.  Is that what you're talking
2 about?
3 BY MS. BROWN:
4     Q.  Yeah.  I mean, are you familiar with any
5 epidemiology that investigates low-grade serous
6 cancer versus high-grade serous?
7     A.  I would need to review whichever papers
8 you're talking about that classified them that way.
9     Q.  So sitting here today are you aware of
10 the difference in the epidemiology between exposure
11 to talcum powder and high-grade serous carcinoma
12 versus exposure to talcum powder and low-grade
13 serous carcinoma?
14     MS. PARFITT:  Objection.
15     THE WITNESS:  I would need to look at
16 details of the studies.  And overall these are all
17 part of epithelial ovarian cancer, so I would say
18 that yes, there is an association with -- between
19 talcum powder use and risk of epithelial ovarian
20 cancer.
21         These various histotypes have been
22 looked at in some studies and -- but not in others.
23 So it really depends on the particular study.
24 BY MS. BROWN:
25     Q.  Do you agree with the authors, though,

Page 192

1 here, that ovarian cancer is not one disease; that
2 there are different causes and different cells of
3 origin of different types of ovarian cancer?
4     MS. PARFITT:  Objection, previously asked
5 and answered.
6     THE WITNESS:  The operative word, I would
7 say, is that it may have different cells of origin.
8 We don't even know, from what I've read -- I'm not
9 an ovarian biologist or a gynecologist -- but what
10 I've read, the cells of origin are not even really
11 established in all of these types -- subtypes of
12 ovarian cancer.
13         And certainly we -- this is reason
14 to believe that some risk factors are going to go
15 across the board any type of histology of ovarian
16 cancer and -- as may some other risk factors.  So
17 it's -- I'd say there may be unique risk factors,
18 but there may be several in common.
19 BY MS. BROWN:
20     Q.  Health Canada determined that there was
21 not enough evidence to determine whether perineal
22 exposure to talc causes individual histological
23 subtypes of ovarian cancer.  Do you agree with
24 that?
25     MS. PARFITT:  Objection.

Page 193

1     THE WITNESS:  Agree with what they said
2 or agree with the concept?
3 BY MS. BROWN:
4     Q.  I think it's one and the same.  But do
5 you agree with the concept that there's not enough
6 evidence to be able to say that peroneal exposure
7 to talc causes any one of these individual subtypes
8 of ovarian cancer?
9     MS. PARFITT:  Objection, asked and
10 answered.
11     THE WITNESS:  I think I did answer
12 earlier by stating that it's my opinion that use of
13 talcum powder products causes epithelial ovarian
14 cancer, of which there are several subtypes.  That
15 any one of those subtypes is still an epithelial
16 ovarian cancer.
17 BY MS. BROWN:
18     Q.  And so in forming that opinion,
19 Dr. McTiernan, you're relying on data that groups
20 all epithelial cancers together; is that right?
21     MS. PARFITT:  Objection.
22     THE WITNESS:  Almost all of the studies
23 I've looked at, almost all have combined everybody
24 together into an overall estimate and then
25 separately looked at whichever subtypes they were

Anne McTiernan, M.D., Ph.D.

Page 194

1 able to look at.
2 BY MS. BROWN:
3    Q.  Let me read you what Health Canada said
4 and tell me if you agree.  Tumor subtypes --
5    A.  Can you show me --
6       MS. PARFITT:  I was going to ask --
7 BY MS. BROWN:
8    Q.  Yeah, let's try to do it quick.  I'm
9 running out of time.  If you go to tab ten in the
10 deposition binder.  We'll mark Health Canada as
11 next in order.  And we'll sort that out afterwards,
12 'cause I think I messed up the numbering.
13       And I'll direct you to page 17 of the
14 Health Canada screening assessment.  Do you have
15 that, Dr. McTiernan?
16    A.  Yes.
17    Q.  I'll put it up right here.  And at the
18 bottom of 17 they say, "Tumor subtypes are one of
19 the many subgroup analyses conducted in several of
20 the epidemiology studies in review; however, there
21 was very little consistency in whether or how these
22 subgroup analyses were conducted across the
23 available studies, thereby leaving the analysis
24 limited and likely underpowered (low sample size)."
25 Do you agree with that?

Page 195

1    A.  Yes.  For some of the subtypes, yes.
2    Q.  "Furthermore, there's considerable
3 uncertainty for how subgroup data should be
4 examined, in particular for the tumor subtypes.
5 Therefore, subgroup analyses will not be further
6 examined in this assessment."  Do you see that?
7    A.  Yes.
8    Q.  Do you agree that for some of the
9 subtypes, any analysis that was done was limited
10 and likely underpowered, true?
11       MS. PARFITT:  Objection.
12       THE WITNESS:  I think I said for -- I
13 agreed for some subtypes.  For serous, which is the
14 most common subtypes, there was -- many studies
15 have large numbers of cases.  And we're able to
16 look with some precision at that subtype.  Some
17 studies, the smaller studies, couldn't look at
18 anything but that.
19 BY MS. BROWN:
20    Q.  And what about for clear cell ovarian
21 cancer, for example, do you believe that's one of
22 the subtypes where the analyses were limited and
23 likely underpowered?
24       MS. PARFITT:  Objection, misstates her
25 testimony.

Page 196

1       THE WITNESS:  In individual studies, it
2 may have been limited.  In the pool studies, they
3 had more data available.  So that the pool studies
4 are more helpful.
5 BY MS. BROWN:
6    Q.  For subtypes that are not examined in the
7 pooled studies, do you agree that there is
8 insufficient evidence on those particular
9 histologic subtypes?
10       MS. PARFITT:  Objection, vague, broad,
11 lacks specificity.
12       THE WITNESS:  I would have to see what
13 those subtypes are.
14 BY MS. BROWN:
15    Q.  Well, like low-grade serous cell off the
16 top of your head, are you aware of any data that
17 would support the claim that talcum powder causes
18 low-grade serous carcinoma?
19       MS. PARFITT:  Excuse me, Alli.
20 Objection, that question was asked and answered
21 just a few minutes ago.
22       THE WITNESS:  I'm not --
23 BY MS. BROWN:
24    Q.  Just off the top of your head.
25    A.  I'm not able to determine things off the

Page 197

1 top of my head.  I'd have to look back at the
2 studies and look at subgroup data to see what
3 you're referring to.
4    Q.  Okay.  When you did -- there is -- did
5 you add any information to your report or do any
6 analysis since the time of your last deposition
7 regarding whether or not perineal use of talc
8 causes individual specific subtypes such as clear
9 cell or low -- low-grade serous carcinoma?
10       MS. PARFITT:  Objection, form.
11       THE WITNESS:  In my report?  Let's look
12 at it.
13 BY MS. BROWN:
14    Q.  Well, just off the top of your head,
15 because we only have five minutes.
16    A.  I'm not good at -- comfortable with doing
17 things off the top of my head.  I like to look at
18 what I've written and what the data look like.
19    Q.  Okay.  Well, let's skip it and do one
20 last question and then I'm going to have you let go
21 'cause my time's up.
22       Let's mark next in order what is an
23 article by Gene Henley.  It was included on your
24 supplemental list.  And it can be found on the very
25 next tab, tab 11 in that deposition binder.  And

Anne McTiernan, M.D., Ph.D.

Page 198

1  we'll mark it as next in order.
2       It's called Geographic Co-Occurrence
3  of Mesothelioma and Ovarian Cancer.
4       And Dr. McTiernan, do you recall
5  reviewing this article and adding it to your
6  materials considered?
7    A.  I can't -- I can't quite remember.
8    Q.  Okay.  One of the things -- let's take a
9  look at figure one at page 4.  One of the things
10 this article does is compare states with high rates
11 of mesothelioma to states with high rates of
12 ovarian cancer.  Do you recall that about this
13 article?
14   A.  I see it here.
15   Q.  Okay.  And my question for you,
16 Dr. McTiernan, is have you undertaken any
17 investigation into whether or not states with high
18 rates of ovarian cancer are states with high rates
19 of talcum powder use?
20      MS. PARFITT:  Objection.
21      THE WITNESS:  I don't know of data on
22 talcum powder use by state.  I would imagine that
23 that would be proprietary information by companies
24 selling talcum powder.  I don't know of any that I
25 could have access to.

Page 199

1  BY MS. BROWN:
2    Q.  Have you --
3    A.  But if -- if it was available, it's one
4  more piece of information.  But it would be an
5  ecological analysis, not a case control or cohort
6  study.
7    Q.  Have you investigated whether or not
8  talcum powder use is greater, for example, in
9  warmer climates?
10      MS. PARFITT:  Objection, asked and
11 answered.
12      THE WITNESS:  I don't know of -- I don't
13 know if I have access -- would have access to that
14 kind of data.
15 BY MS. BROWN:
16   Q.  Have you asked the lawyers who hired you
17 in this litigation if they're aware of any data
18 showing rates of talcum powder sales or use by
19 state or climate or geological region?
20   A.  I would probably not do that type of
21 analysis.  I mentioned it's called ecological
22 analysis, and it doesn't give us the same
23 information that a case control or cohort study
24 gives us.
25   Q.  If talcum powder really caused ovarian

Page 200

1  cancer, you would expect to see higher rates of
2  ovarian cancer in place where people are using more
3  talcum powder; right?
4       MS. PARFITT:  Objection.  Objection.
5       THE WITNESS:  It's not clear.  You would
6  really need to have individual level data so that
7  you could look at potential other factors that
8  influence both.
9  BY MS. BROWN:
10   Q.  One of the things the article -- the
11 press release from Beasley Allen, Exhibit 12 that
12 we were looking at stated was that talcum powder
13 users are predominantly African American women who
14 qualify as obese.  Do you agree with that statement
15 in the Exhibit 12?
16   A.  I haven't looked at data looking at
17 population-based use of these products.  I don't
18 know if that data exists.
19   Q.  Are you aware of where the folks at
20 Beasley Allen would have gotten that information?
21      MS. PARFITT:  Objection.
22      THE WITNESS:  No.
23      MS. BROWN:  Dr. McTiernan, I am out of
24 time.  Thank you so much for your patience,
25 particularly in this remote environment.  I know

Page 201

1  it's a little challenging with exhibits and
2  documents.  It was nice to see you again, and I
3  appreciate you answering my questions.
4       THE WITNESS:  Thank you.
5       MS. PARFITT:  Thank you, Dr. McTiernan.
6  Thank you, Ms. Brown, as well.
7       MS. BROWN:  Thanks, Ms. Parfitt.  Nice to
8  see you too.
9       MS. PARFITT:  Good to see you.
10      MS. BROWN:  Alli Brown, we would like a
11 rough, please.
12      MS. PARFITT:  And I would as well.
13      (Deposition concluded at 3:41 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25

Page 202

```
 1            CERTIFICATE
 2
 3      I, ANITA KORNBURGER, Registered
 4  Professional Reporter, do hereby certify that
 5  the preceding deposition was recorded by me and
 6  reduced to writing under my personal direction.
 7      I further certify that said deposition was
 8  taken remotely, with all parties appearing by
 9  videoconference, on August 19, 2021, commencing
10  at 10:39 a.m. and concluding at 3:41 p.m.
11      I further certify that I am not a relative
12  or employee or attorney or counsel of any of
13  the parties, or a relative or employee of such
14  attorney or counsel, or financially interested
15  directly or indirectly in this action.
16      In witness whereof, I have hereunto set my
17  hand and affixed my seal this 23rd day of August,
18  2021.
19
20
21  _____
22  ANITA KORNBURGER, RPR
23
24  My certification expires February 28, 2023.
25
```