# EXHIBIT 33

Page 1

1        IN THE UNITED STATES DISTRICT COURT
2          FOR THE DISTRICT OF NEW JERSEY
3

4    IN RE:  JOHNSON &        )   MDL No.
                              )   16-2738 (MAS)(RLS)
     JOHNSON TALCUM POWDER    )
                              )
5    PRODUCTS MARKETING,      )
                              )
     SALES PRACTICES, AND     )
                              )
6    PRODUCTS LIABILITY       )
                              )
     LITIGATION,              )
                              )
7    _____ )
8
9
10
11
12
13          Deposition of SHAWN LEVY, M.D., via
14    Zoom Videoconference, taken at Blood Hurst &
15    O'Reardon, 501 West Broadway, Suite 1490,
16    San Diego, California, commencing at
17    9:11 a.m., on Wednesday, May 8, 2024,
18    reported stenographically by Lisa Moskowitz,
19    California CSR 10816, Nevada CCR 991,
20    Washington CCR 21001437, Certified Realtime
21    Reporter, RPR, CLR, NCRA Realtime Systems
22    Administrator.
23                  - - -
24          GOLKOW, a Veritext Division
          877.370.3377 ph | 917.591.5672 fax
25

**Page 2**

```
 1   APPEARANCES:
 2
 3   On behalf of Plaintiffs:
 4      BEASLEY ALLEN LAW FIRM
          BY: P. Leigh O'Dell
 5          leigh.odell@beasleyallen.com
        BY: JENNIFER EMMEL, PH.D.
 6          jennifer.emmel@beasleyallen.com
        BY: MARGARET M. THOMPSON (Remote)
 7          margaret.thompson@beasleyallen.com
        218 Commerce Street
 8      Montgomery, Alabama 36103-4160
        (334) 269-2343
 9
10
        On behalf of MDL Plaintiffs:
11
        ASHCRAFT & GEREL, LLP
12      BY: MICHELLE A. PARFITT (Remote)
          mparfitt@ashcraftlaw.com
13      1825 K Street NW
        Suite 700
14      Washington, DC 20006
        (202) 759-7648
15
16
        On behalf of New Jersey Plaintiffs:
17
        ANAPOL WEISS
18      BY: RICHARD GOLOMB (Remote)
          rgolomb@anapolweiss.com
19      130 North 18th Street
        Suite 1600
20      Philadelphia, Pennsylvania 19103
        (215) 608-9645
21
22
23
24
25
```

**Page 3**

```
 1   APPEARANCES (Continued):
 2
 3   On behalf of Defendants Johnson & Johnson and
     Johnson & Johnson Consumer, Inc.:
 4
        SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
 5      BY: JESSICA DAVIDSON (Remote)
          jessica.davidson@skadden.com
 6      BY: NOAH EPSTEIN (Remote)
          noah.epstein@skadden.com
 7      BY: ASHER TRANGLE (Remote)
          asher.trangle@skadden.com
 8      One Manhattan West
        New York, New York 10001
 9      (212) 735-3000
10
11   On behalf of Personal Care Products Council:
12      REILLY MCDEVITT & HENRICH
          BY: SUZANNE I. TURPIN (Remote)
13          sturpin@rmh-law.com
          BY: KEVIN KOTCH (Remote)
14          kkotch@rmh-law.com
        3 Executive Campus
15      Suite 310
        Cherry Hill, New Jersey 08002
16      (856) 317-7180
17
18   ALSO PRESENT:
19      PAULA BROWN (Remote)
20
            – – –
21
22
23
24
25
```

**Page 4**

```
 1             I N D E X
 2   EXAMINATION OF              PAGE
 3   SHAWN LEVY, M.D.
 4      By Attorney Davidson    6, 331, 360
 5      By Attorney O'Dell      293, 354
 6
 7
 8         DEPOSITION EXHIBITS
 9   NUMBER        DESCRIPTION        PAGE
10   1    Curriculum Vitae           22
11   2    Amended Rule 26 Expert Report    56
          of Shawn Levy, Ph.D.
12
     3    Materials and Data Considered    74
13
     4    Amended Rule 26 Expert Report    100
14        of Shawn Levy, Ph.D.
15   5    Fletcher Article           160
16   6    Mandarino Article          164
17   7    Emi Article                194
18   8    Harper Article             207
19   9    Taher Article              234
20   10   O'Brien 2020 Article       247
21   11   Wentzensen Article         248
22   12   O'Brien 2019 Article       257
23   13   Chang Article              261
24   14   Chang Article, Supplemental    262
          Table S4
25
```

**Page 5**

```
 1        DEPOSITION EXHIBITS (Continued)
 2   NUMBER        DESCRIPTION        PAGE
 3   15   Linda Bondurant Plaintiff    278
          Profile Form
 4
     16   Oncology Genetic Test Report,    283
 5        dated 1/14/14
 6   17   Bhatia Article             293
 7   18   Das Article                295
 8   19   Brieger Article            302
 9   20   Hurwitz 2023 Article       306
10   21   Gabriel Article            311
11   22   Hurwitz 2023 Article       331
12   23   Papanek Article            342
13   24   Hurwitz 2022 Article       357
14
15
16
17
18        QUESTIONS NOT ANSWERED
19        PAGE  LINE
20         116   18
21
22
23
24
25
```

Page 6

1       WEDNESDAY, MAY 8, 2024
2       SAN DIEGO, CALIFORNIA
3         9:11 A.M.
4
5       SHAWN LEVY, M.D.,
6 after having been duly sworn, was examined
7   and testified as follows:
8       - - -
9       EXAMINATION
10 BY ATTORNEY DAVIDSON:
11   Q. Good morning, Dr. Levy. Is it Levy
12 or Levy?
13   A. Levy.
14   Q. Good morning, Dr. Levy.
15   A. Good morning.       09:11
16   Q. You've been deposed before in this
17 litigation; right?
18   A. I have.
19   Q. Did you bring any materials with
20 you today to your deposition?     09:11
21   A. Yes.
22   Q. What did you bring?
23   A. The background materials and copies
24 of the report and the materials that were
25 used in the generation of the report, as   09:11

Page 7

1 well as the materials that were provided as
2 part of this process, some of the other
3 expert reports, et cetera.
4   Q. What's the difference between
5 background materials -- I'm just a little   09:12
6 confused. First you said background
7 materials, and then you said the
8 materials --
9   A. I'm sorry. The materials cited in
10 the report, copies of those materials.   09:12
11   Q. Did you bring anything other than
12 materials cited in the report?
13   A. No. I'd have to -- all the
14 supporting -- when I say background and
15 supporting literature, is the material cited  09:12
16 in the report as well as the other materials
17 provided, such as the testing records for
18 some of the plaintiffs, some of the other
19 expert witness reports that were also
20 produced.       09:12
21     ATTORNEY O'DELL: And we have, in
22 response to the notice of deposition,
23 invoices that were provided in the
24 Dropbox. And those documents that
25 were not objected to, we have     09:12

Page 8

1 available electronically and many of
2 them hard copy as well.
3 BY ATTORNEY DAVIDSON:
4   Q. When you say the materials that
5 were provided, do you mean provided by   09:13
6 Ms. O'Dell or Ms. Parfitt?
7   A. Yes, that's correct.
8   Q. Did Ms. Parfitt and Ms. O'Dell
9 provide you with the scientific literature
10 that you cite in your report?     09:13
11     ATTORNEY O'DELL: Object to form.
12   Let me just ask the question to make
13   sure we're clear on the ground rules,
14   Jessica. This is not a --
15     ATTORNEY DAVIDSON: No --     09:13
16     ATTORNEY O'DELL: Let me finish.
17   Just, again, just to make sure we're
18   clear, this deposition is for purposes
19   of any new materials in Dr. Levy's
20   report since his 2018 report. So     09:13
21   just, again, to set the expectation,
22   that's what we're talking about here
23   today, not a retread of all literature
24   that he's reviewed at any point in the
25   litigation.     09:14

Page 9

1 BY ATTORNEY DAVIDSON:
2   Q. Dr. Levy, did plaintiff's counsel
3 provide you with the scientific literature
4 that you reviewed?
5   A. No.     09:14
6     ATTORNEY O'DELL: Object to the
7   form.
8 BY ATTORNEY DAVIDSON:
9   Q. I'm sorry? I didn't hear your
10 answer.     09:14
11   A. I said: No.
12   Q. So every scientific article cited
13 in your report you found on your own?
14     ATTORNEY O'DELL: Object to the
15   form.     09:14
16     THE WITNESS: For the new
17   literature that was reviewed as part
18   of this process that is contained in
19   the peer-reviewed section, meaning
20   materials that were not, say, private   09:14
21   to a plaintiff, for example, testing
22   records, et cetera, things that I
23   wouldn't have access to, I obviously
24   couldn't provide those.
25   ///

3 (Pages 6 - 9)

Page 10

1 BY ATTORNEY DAVIDSON:
2    Q. Is it your testimony, sitting here
3 today, that every scientific article cited
4 in your materials and data considered list
5 that we received, I think it was on          09:15
6 Saturday, is something that you identified
7 and found on your own?
8    A. To answer that completely, I'd have
9 to review the entire list to make that
10 confirmation.                               09:15
11    Q. So is it possible that plaintiff's
12 counsel provided you with some of the
13 scientific literature cited in your
14 materials and data considered list?
15    A. Again, I'd have to ask you for a      09:15
16 specific example.
17    Q. Well, you said a minute ago that
18 you had found it all.
19       Are you changing that testimony?
20       ATTORNEY O'DELL: Object to the        09:15
21 form.
22       THE WITNESS: I'm not changing.
23 BY ATTORNEY DAVIDSON:
24    Q. I'm sorry, sir?
25    A. No, I'm not changing the testimony.   09:15

Page 11

1 You asked if every scientific piece of
2 literature cited, and so --
3    Q. A minute ago you said yes.
4       ATTORNEY O'DELL: I'm sorry,
5 Jessica. He was not finished with his       09:16
6 answer.
7       ATTORNEY DAVIDSON: You're
8 interrupting me, Leigh.
9       ATTORNEY O'DELL: No. You
10 interrupted me. Let's just try to           09:16
11 start better than normal. He was not
12 finished with his answer. Dr. Levy --
13 BY ATTORNEY DAVIDSON:
14    Q. You testified a minute ago --
15       (Parties speaking simultaneously.     09:16
16 Record unattainable.)
17       ATTORNEY O'DELL: Let him finish.
18       ATTORNEY DAVIDSON: Please
19 don't --
20       ATTORNEY O'DELL: Don't stop his       09:16
21 answer. You please finish your
22 answer, Dr. Levy, and then you can ask
23 a follow-up question after that.
24       But you may finish.
25       THE WITNESS: For the scientific       09:16

Page 12

1 literature, as I referenced in the
2 report that was discovered as part of
3 the request made, that was scientific
4 literature that I found. Your
5 question was, was all of the            09:16
6 literature cited in the report
7 literature that I found in all of it,
8 and my answer is I would need to
9 specifically review that entire list
10 to give you that answer to be           09:16
11 encompassing of all.
12 BY ATTORNEY DAVIDSON:
13    Q. What is the difference between
14 those two things?
15    A. Because this was an amended report;  09:17
16 so there's quite a bit of literature that
17 was from earlier, from the earlier
18 development of the report and other
19 materials cited in the report, as I said.
20 Some of it being testing materials and other 09:17
21 things that are non-public. So I would
22 ask --
23    Q. Is everything that you --
24       ATTORNEY O'DELL: I'm not sure
25 he's finished.                             09:17

Page 13

1 BY ATTORNEY DAVIDSON:
2    Q. Is every new scientific article
3 cited in your materials and data considered
4 list something that you found on your own?
5    A. Again, definition of a scientific    09:17
6 article is?
7    Q. Something published in a journal.
8    A. Then I would say yes, I believe so.
9 But without reviewing the entire list or a
10 specific example of one -- certainly as we  09:17
11 go through sections to highlight to you
12 anything that was not something that I found
13 on my own.
14    Q. Let's just ask the question
15 differently.                               09:18
16       Did plaintiff's counsel provide you
17 with any scientific literature as you
18 prepared your amended report?
19       ATTORNEY O'DELL: Object to the
20 form.                                      09:18
21       THE WITNESS: Not that I recall.
22 BY ATTORNEY DAVIDSON:
23    Q. Okay. Have you reviewed any
24 defense expert reports in this litigation?
25    A. I have.                             09:18

4 (Pages 10 - 13)

Page 14

1    Q. I'm sorry?
2    A. Yes, I have.
3    Q. Which ones?
4    A. The two that are most -- the few
5  that are most recent, it would be from        09:18
6  Dr. Longo, Dr. Wolf, Dr. Godleski.
7    Q. Did you understand my question?
8    A. Yes. And I --
9    Q. What was my question -- I'm sorry,
10 sir.                                            09:19
11    A. You asked if I had reviewed other
12 expert witness reports and who, and I had
13 provided you some of the answers. And I was
14 looking to see if I'm missing one.
15    Q. Dr. Levy, I'm sorry. My question    09:19
16 was: Have you reviewed any defense expert
17 reports?
18    A. Yes, I think -- and I answered
19 Dr. Longo is one. Is that not --
20    Q. That's a plaintiff.                       09:19
21    A. Oh, sorry. I'm sorry. Yes, thank
22 you for the clarification. I apologize
23 for -- let me -- I did --
24       ATTORNEY O'DELL: If you need to
25    see your materials considered list,         09:19

Page 15

1  Dr. Levy, we can provide that to you.
2       THE WITNESS: I think I have that.
3  The answer is still yes. It's a
4  shorter list.
5  BY ATTORNEY DAVIDSON:                          09:20
6    Q. Without looking at your materials
7  considered list, do you recall reading any
8  expert reports by defense experts in the
9  MDL?
10    A. Yes.                                      09:20
11    Q. What do you recall?
12    A. A report by Dr. Chodosh and a
13 report by Dr. Boyd.
14    Q. Is it your understanding that those
15 were in this proceeding?                        09:20
16       ATTORNEY O'DELL: Do you mean the
17    MDL proceeding? Jessica, when you say
18    "this proceeding," are you referring
19    to the MDL or New Jersey or what?
20       ATTORNEY DAVIDSON: I'm asking the   09:20
21    questions today.
22       ATTORNEY O'DELL: It's unclear
23    what the question is.
24       ATTORNEY DAVIDSON: If it's
25    unclear, you know how to object to a         09:20

Page 16

1    question.
2       ATTORNEY O'DELL: Object to the
3    form.
4       ATTORNEY DAVIDSON: Thank you,
5    Leigh.                                        09:20
6       ATTORNEY O'DELL: You're welcome.
7  BY ATTORNEY DAVIDSON:
8    Q. Doctor, I'm not in the room with
9  you today; so if you're looking at
10 something, I can't know that. So I              09:20
11 appreciate the courtesy of letting me know.
12    A. No. As I said, I gave you the two
13 that I recall.
14    Q. And what do you have in front of
15 you right now? Because it does look like    09:21
16 you're looking at something.
17    A. My computer.
18    Q. You have a computer in front of you
19 today?
20    A. That's where the camera is, yes.        09:21
21    Q. What's up at your computer?
22    A. I opened up the defense experts
23 folder that I have as part of the materials.
24    Q. Okay. I had asked you if you could
25 remember anything without looking, and you   09:21

Page 17

1  said yes.
2       But actually, you were looking at
3  something?
4    A. Yes. I had already had it open.
5    Q. Okay. So when you said you could    09:21
6  answer without looking, actually you were
7  looking at something; correct?
8       ATTORNEY O'DELL: Object. That
9    misstates his testimony. Object to
10    the form.                                    09:21
11 BY ATTORNEY DAVIDSON:
12    Q. Correct, sir?
13       ATTORNEY O'DELL: Object to the
14    form. It misstates his testimony.
15 BY ATTORNEY DAVIDSON:                           09:21
16    Q. Correct, sir?
17    A. No. Incorrect.
18    Q. Why is it incorrect?
19    A. As I already answered, I already
20 had it open.                                    09:21
21    Q. So you were looking at it; correct?
22    A. I had looked at it.
23    Q. My question was: Can you tell me
24 what defense expert reports you reviewed
25 without looking at it? And you said: Yes.  09:22

5 (Pages 14 - 17)

Page 18

1    But, in fact, you were looking at
2  something; right?
3    ATTORNEY O'DELL:  Object to the
4  form.
5    THE WITNESS:  Again, I had    09:22
6  previously -- I had already opened it
7  prior to your question.
8  BY ATTORNEY DAVIDSON:
9    Q.  I understand.
10    So your answer was inaccurate;    09:22
11  correct?
12    A.  No, it was not.
13    ATTORNEY O'DELL:  Object to the
14  form.
15  BY ATTORNEY DAVIDSON:    09:22
16    Q.  I would appreciate the courtesy, if
17  you are looking at a document at this
18  deposition, to tell me.
19    Because, again, my question was:
20  Can you tell me what defense expert reports    09:22
21  you looked at without looking at anything?
22  And you said:  Yes.
23    But, in fact, you were looking at
24  something.  So please, going forward in this
25  deposition, if you are looking at something    09:22

Page 19

1  on your computer, please make that clear for
2  accuracy in your testimony.  Thank you.
3    ATTORNEY O'DELL:  Objection to the
4  narrative and it misstates his
5  testimony.    09:22
6  BY ATTORNEY DAVIDSON:
7    Q.  Have you reviewed your January 29
8  deposition?
9    ATTORNEY O'DELL:  2019?  January,
10  2019?    09:23
11  BY ATTORNEY DAVIDSON:
12    Q.  January, 2019, deposition.
13    Did you review it preparing for
14  today?
15    A.  I did.    09:23
16    Q.  Is there anything you want to
17  change in your testimony?
18    A.  No.  Nothing.  Nothing that I saw
19  during the review.
20    Q.  Do you stand by everything you    09:23
21  said?
22    A.  Yes.
23    Q.  Did you meet with any lawyers to
24  prepare for today?
25    A.  I did.    09:23

Page 20

1    Q.  Who did you meet with?
2    A.  Leigh and Jennifer who are here in
3  the room.
4    Q.  When did you meet with them?
5    A.  We met in person yesterday.    09:23
6    Q.  For how long?
7    A.  From approximately 9:30 a.m. until
8  4:15 p.m.  There were a couple of hours of
9  breaks in there where I had some other
10  meetings.  Two hours specifically.    09:23
11    Q.  And did you meet with them any
12  other times by phone or Zoom to prepare?
13    A.  We did.  We met by Zoom -- we met
14  by Zoom two or three times for an hour to an
15  hour and a half each, roughly once a week    09:24
16  over the last couple of weeks.  I have some
17  records on that, if it's helpful, to be
18  specific.
19    Q.  Did they show you any documents you
20  haven't previously listed on your materials    09:24
21  considered?
22    ATTORNEY O'DELL:  Object to the
23  form.
24    THE WITNESS:  No, not that I'm
25  aware.    09:24

Page 21

1  BY ATTORNEY DAVIDSON:
2    Q.  Do you have any notes that are not
3  contained in your report?
4    A.  I have made some notes in terms of
5  for our discussions yesterday, just in    09:24
6  things we discussed, you know, taking notes
7  for myself in terms of things to review.
8    ATTORNEY DAVIDSON:  Okay.  Leigh,
9  those should be produced to us.
10    ATTORNEY O'DELL:  I'll review them    09:24
11  and -- for purposes of determining if
12  they capture any of the attorney work
13  product communications.  If they do,
14  we'll provide that responsive
15  information that's not privileged.    09:25
16    ATTORNEY DAVIDSON:  I'm sure you
17  know the rule, which is that experts
18  have to provide notes.
19    ATTORNEY O'DELL:  Experts do not
20  have to provide notes of what their    09:25
21  counsel have said.  So I do know the
22  rules.  We'll comply with those.
23  BY ATTORNEY DAVIDSON:
24    Q.  I'd like to mark as Exhibit 1 your
25  amended -- Exhibit A to your amended expert    09:25

6 (Pages 18 - 21)

Page 22

1 report, which is your CV.
2      (Exhibit Number 1 was marked for
3 identification.)
4      ATTORNEY O'DELL: Jessica, you'll
5 be putting all the exhibits in the      09:25
6 chat?
7      ATTORNEY DAVIDSON: Yes, but it
8 sounds like Dr. Levy has his computer
9 in front of him; so I'm guessing he
10 has his CV in front of him. But yes,      09:26
11 we'll put it in the chat.
12 BY ATTORNEY DAVIDSON:
13      Q. Is your CV a complete and accurate
14 accounting of your professional work and
15 publications?      09:26
16      A. It is.
17      Q. Have you prepared it yourself?
18      A. I'm sorry?
19      Q. Did you prepare it yourself?
20      A. Did I prepare it myself?      09:26
21      Q. Yes.
22      A. Yes.
23      Q. Are there any changes or updates
24 you want to make to it?
25      A. No.      09:26

Page 23

1      Q. You started a new job in February
2 of 2022 at Element Biosciences?
3      A. That's correct.
4      Q. When you started your employment
5 there, did you disclose your work as a talc      09:26
6 expert?
7      A. Not at that time, but it has been
8 disclosed since. At that time I had not
9 been in touch with anything after the 2019
10 deposition.      09:27
11      ATTORNEY O'DELL: Dr. Levy, I'm
12 going to stop you. Don't disclose any
13 communications you've had with
14 counsel, but you're free to --
15      THE WITNESS: It has been      09:27
16 disclosed since, when there was other
17 activity initiated relative to what
18 we're talking about today.
19 BY ATTORNEY DAVIDSON:
20      Q. Your job at HudsonAlpha does not      09:27
21 focus on talc; correct?
22      A. That's correct.
23      Q. It does not focus on asbestos;
24 correct?
25      ATTORNEY O'DELL: Object to the      09:27

Page 24

1      form. Are you talking about -- you
2      said his job at HudsonAlpha --
3 BY ATTORNEY DAVIDSON:
4      Q. Your job at Element Biosciences
5 does not focus on talc; correct?      09:27
6      ATTORNEY O'DELL: Object to the
7      form.
8      THE WITNESS: Not specifically
9      talc, no.
10 BY ATTORNEY DAVIDSON:      09:27
11      Q. And your job at Element Biosciences
12 does not focus on asbestos; correct?
13      ATTORNEY O'DELL: Object to the
14      form.
15      THE WITNESS: Not specifically on      09:28
16      asbestos.
17 BY ATTORNEY DAVIDSON:
18      Q. And the same is true of your job at
19 HudsonAlpha?
20      A. That's correct.      09:28
21      Q. Your CV states that you're an
22 adjunct professor; is that correct?
23      A. That is correct.
24      Q. Are you aware that your name does
25 not appear on any faculty list at any branch      09:28

Page 25

1 of the University of Alabama under the
2 department of epidemiology, department of
3 genetics, or the department of biological
4 sciences?
5      A. No, I wasn't aware of that.      09:28
6      Q. Are you surprised to hear that?
7      A. Not entirely. Most of the time,
8 any faculty lists are primary faculty or
9 secondary faculty. Adjunct are often not
10 included on those lists.      09:28
11      Q. When's the last time you taught a
12 course at the University of Alabama?
13      A. I'd be happy to tell you
14 specifically. There's -- but I would need
15 to look at some of my notes in terms of the      09:29
16 presentation. There was a DNA sequencing
17 course as part of the department of
18 epidemiological that I taught annually. I
19 think the last time I taught that -- I,
20 again, would need to verify -- was probably      09:29
21 2020 or 2021. It was prior to relocating to
22 San Diego. That's an approximate time. Now
23 that I think about it, given the timing of
24 the pandemic, it was probably 2020.
25      Q. When did you move to San Diego?      09:29

7 (Pages 22 - 25)

Page 26

1  2020?
2     A.  No.  In June of 2022.
3     Q.  So since 2020, you haven't actually
4  taught a course at University of Alabama?
5     A.  That's correct.                    09:29
6     Q.  Have you been paid?
7     A.  I have not.  My appointment at UAB
8  was never a paid appointment.
9     Q.  So what is the -- what does your
10  current -- what are your current duties at   09:30
11  the University of Alabama?
12     A.  I have no direct specific
13  responsibilities.  What opportunity I have
14  is I continue to have -- to be able to
15  access their libraries is one example.  I   09:30
16  continue to be available to their other
17  researchers.  The cancer center is the
18  center that I interact most with.  I still
19  have some relationships and collaborations
20  there.  I have an email address.  I have no   09:30
21  specific direct day-to-day responsibilities
22  at that university.
23     Q.  What collaborations do you have
24  there currently?
25     A.  Oh, a couple of scientific          09:30

Page 27

1  collaborations.
2     Q.  What does that mean?
3     A.  Meaning I can get access to samples
4  or other projects there.
5        One investigator that I work         09:31
6  closely with is a woman named Dr. Beth
7  Brown.  She studies multiple myeloma.  She
8  and I have been collaborators.  I'd have to
9  look at my literature list for sure.  I want
10  to say we have two or three publications     09:31
11  together over the years.
12        Bruce Korf is another colleague.
13  He and I have worked closely together on
14  different clinical initiatives, specifically
15  in the state of Alabama.                     09:31
16     Q.  When you say collaborations, you're
17  not currently doing any work for the
18  University of Alabama; correct?
19        ATTORNEY O'DELL:  Object to the
20     form.                                     09:31
21        THE WITNESS:  When I say
22     collaborations, I mean a -- work or a
23     project that we are both
24     intellectually contributing to.  As of
25     today, I am not actively working on      09:31

Page 28

1     anything with Dr. Korf, but I have
2     been actively in touch with Dr. Brown
3     in regards to the multiple myeloma
4     project that I mentioned.
5  BY ATTORNEY DAVIDSON:                         09:32
6     Q.  But that's not for the University
7  of Alabama; correct?
8     A.  I think it depends on how you
9  define "for."
10     Q.  University of Alabama is not paying   09:32
11  you for that; correct?
12     A.  No.
13        ATTORNEY O'DELL:  Let him finish,
14     please.
15  BY ATTORNEY DAVIDSON:                         09:32
16     Q.  The last time you --
17        (Parties speaking simultaneously.
18     Record unattainable.)
19        ATTORNEY O'DELL:  You may finish
20     your answer when you're ready.           09:32
21  BY ATTORNEY DAVIDSON:
22     Q.  The last time you were paid by the
23  University of Alabama was sometime before
24  2020?
25        ATTORNEY O'DELL:  Object to the       09:32

Page 29

1     form.
2        THE WITNESS:  To be clear, I have
3     never been paid by the University of
4     Alabama.
5  BY ATTORNEY DAVIDSON:                         09:32
6     Q.  So when you taught a course there,
7  it was for free?
8     A.  Correct.
9     Q.  I see.  Okay.
10     A.  The adjunct appointment was          09:32
11  primarily to provide mentorship and
12  oversight as part of the graduate program.
13        When I was a faculty member at the
14  HudsonAlpha Institute For Biotechnology,
15  they have a formal relationship with        09:32
16  University of Alabama Huntsville and
17  University of Alabama Birmingham.  By having
18  an adjunct appointment at those two
19  institutions, we were able to participate in
20  the graduate programs.                       09:33
21        We would often teach courses or
22  part of courses and then mentor graduate
23  students.  There was a number of graduate
24  students.  Three, I think, to be exact.
25  Although, again, I would have to refresh my  09:33

8 (Pages 26 - 29)

Page 30

1  memory where I was participating on their
2  thesis committee at UAB. It was -- there
3  was not a formal employment relationship
4  from a -- that you may be referring to.
5      Q. If I were to call the University of    09:33
6  Alabama and ask: Is Dr. Shawn Levy employed
7  as an adjunct faculty member at your
8  university, would they say yes or no?
9      A. If you ask if I was employed, they
10 would certainly say no.                        09:33
11     Q. If I were to call the University of
12 Alabama and ask: Is Dr. Shawn Levy
13 currently appointed as an adjunct faculty
14 member at your university, would they say
15 yes or no?                                     09:34
16     A. They would say yes.
17     Q. Are you sure?
18     A. Pretty sure because I can tell you
19 as of in the -- certainly in the last 14 to
20 21 days, I can log in with my University of    09:34
21 Alabama ID and review my faculty profile
22 which carries my adjunct appointment.
23     Q. Doctor, your current CV lists 221
24 peer-reviewed publications; is that correct?
25     A. It currently lists -- yes, that is      09:34

Page 31

1  correct. As of November, 2023.
2      Q. And you are either an author or
3  co-author of each of these publications?
4      A. That is correct.
5      Q. Is it customary in your field to      09:35
6  list yourself as a co-author on your CV when
7  you're not listed as a co-author in the
8  actual publication?
9      A. Could you provide an example of
10 one?                                           09:35
11     Q. I'm asking you: Is it customary in
12 your field to list yourself as a co-author
13 in your CV when you're not listed as a
14 co-author in the actual publication?
15     ATTORNEY O'DELL: Object to the            09:35
16 form.
17     THE WITNESS: No, not customary.
18 BY ATTORNEY DAVIDSON:
19     Q. Do you believe it would be
20 unethical to claim authorship of an article   09:35
21 when you're not actually listed as a
22 co-author?
23     ATTORNEY O'DELL: Object to the
24 form.
25     THE WITNESS: I think it --               09:35

Page 32

1  certainly -- unethical? I'm not sure
2  I would agree with.
3      I would provide one point of
4  clarification that some of the
5  publications, particularly the ones           09:36
6  that are involved in a consortia
7  basis, the author list, rather than
8  listing all individuals, will
9  occasionally -- in some examples, will
10 list the name of a specific consortia.        09:36
11 BY ATTORNEY DAVIDSON:
12     Q. Do you know how many articles there
13 are listed in your 221 peer-reviewed
14 publications where you're not actually
15 listed either as an author or a co-author?    09:36
16     ATTORNEY O'DELL: Object to the
17 form.
18     THE WITNESS: My understanding --
19 my testimony would be zero. As I
20 said, none that I'm aware of.                  09:36
21 BY ATTORNEY DAVIDSON:
22     Q. Let's look at number 141.
23     A. Number 141?
24     Q. Uh-huh.
25     A. I have it, yeah.                        09:37

Page 33

1      Q. This lists 23 authors.
2      Do you see your name there?
3      A. I do not.
4      Q. Let's look at 142.
5      ATTORNEY O'DELL: If you need to           09:37
6  see the actual paper, Dr. Levy, I'm
7  sure Jessica can provide it to you or
8  you can pull it up.
9  BY ATTORNEY DAVIDSON:
10     Q. 142.                                     09:37
11     A. I see it.
12     Q. Let's look at 142.
13     There's eight authors listed there;
14 right?
15     A. Correct.                                 09:37
16     Q. Do you see your name?
17     A. I do not.
18     Q. Let's look at 167.
19     A. So 167 is an example, as I said, of
20 a consortia.                                   09:37
21     Do you see the notation of members
22 of the Undiagnosed Disease Network? There
23 will be a number of publications listing
24 that as an author. I was a member of that
25 consortia.                                     09:38

9 (Pages 30 - 33)

Page 34

1    Q. What work did you do as a member of
2 that consortia on this?
3    A. I was a co-investigator on the
4 Undiagnosed Disease Network grant.
5    Q. Did you actually write any part of    09:38
6 this article?
7    A. I would have to look. Did I write
8 any part of this article? I would have to
9 look closely at the article. But given my
10 role in that particular grant, the most    09:38
11 likely contribution was in the method
12 sections and some of the interpretation of
13 the genetic testing.
14    Q. Are you able to say here today how
15 many of the articles out of these 221 you    09:38
16 actually contributed to the writing of?
17        ATTORNEY O'DELL: Object to the
18    form.
19 BY ATTORNEY DAVIDSON:
20    Q. As a co-author or author?        09:39
21        ATTORNEY O'DELL: Object to the
22    form.
23        THE WITNESS: They're represented
24    in the CV as that participation.
25 BY ATTORNEY DAVIDSON:            09:39

Page 35

1    Q. I'm sorry?
2    A. The reason they're on the CV was
3 due to that contribution as part of that --
4 as being a co-author or author on the paper.
5    Q. But we just -- I pointed you to two    09:39
6 where you're not even listed as a member of
7 a consortium; right?
8        ATTORNEY O'DELL: Object to the
9    form.
10        THE WITNESS: As I said, I'd have    09:39
11    to review those.
12 BY ATTORNEY DAVIDSON:
13    Q. Okay. Do you know how many members
14 there are of the Undiagnosed Diseases
15 Network?            09:39
16    A. Yes, it's substantial.
17    Q. How many?
18    A. I'm not sure. It's been a number
19 of years since participating in that, but I
20 would guess probably something in the range    09:40
21 of a hundred.
22    Q. Do you think all hundred members of
23 the non-diagnosed -- Undiagnosed Diseases
24 Network are authors or co-authors of this
25 paper?            09:40

Page 36

1        ATTORNEY O'DELL: Object to the
2    form.
3        THE WITNESS: Yes.
4 BY ATTORNEY DAVIDSON:
5    Q. Okay. How about 154? Papanek,    09:40
6 O'Dell. I'm pretty sure it's a different
7 O'Dell. Manga, Giannone, Klingeman,
8 Hettich, Brown, and Guss.
9        Does that say Levy anywhere?
10        ATTORNEY O'DELL: Object to the    09:40
11    form.
12        THE WITNESS: It does not.
13 BY ATTORNEY DAVIDSON:
14    Q. So you are not listed as a
15 co-author or author on 154 either; correct?    09:40
16        ATTORNEY O'DELL: Object to the
17    form.
18        THE WITNESS: Again, I'd have to
19    review the paper.
20 BY ATTORNEY DAVIDSON:            09:41
21    Q. What's the RNA Communication
22 Consortium?
23    A. So that consortium was a -- I'm
24 trying to think. How many? Five or six
25 centers that were studying RNA biology under    09:41

Page 37

1 a fairly wide variety of conditions.
2    Q. How many members in that
3 consortium?
4    A. Again, I'd have to -- I would have
5 to review, but I would estimate 30 or so.    09:41
6 Again, I would have to review.
7    Q. Is it your testimony that every
8 single member of that consortium was an
9 author or co-author of item 169 on your CV?
10        ATTORNEY O'DELL: I'm sorry. Did    09:41
11    you mean 169 or 154? I thought that
12    was what you were asking about.
13        ATTORNEY DAVIDSON: I meant 169.
14        ATTORNEY O'DELL: So that's
15    different than what you were just    09:42
16    asking about.
17        ATTORNEY DAVIDSON: We're done
18    with 154.
19        ATTORNEY O'DELL: All right.
20    We're on 169.            09:42
21 BY ATTORNEY DAVIDSON:
22    Q. Is it your testimony that every
23 member of the RNACC was an author or
24 co-author of item 169?
25    A. To the best of my knowledge,    09:42

10 (Pages 34 - 37)

Page 38

1 particularly that publication since it was
2 describing the consortia.
3    Q. Can you tell me today what you
4 specifically contributed to this paper?
5       ATTORNEY O'DELL: Dr. Levy, if you    09:42
6    need to pull up the paper and review
7    it in order to describe your
8    contributions, you're welcome to do
9    that. If you don't, of course, you
10    may give your answer.              09:42
11 BY ATTORNEY DAVIDSON:
12    Q. I'm asking you, if you can
13 remember, sitting here today --
14       ATTORNEY O'DELL: To be clear --
15 BY ATTORNEY DAVIDSON:              09:42
16    Q. When Leigh questions you, you're
17 welcome to pull up the paper. I'm asking
18 you if you can recall any contribution you
19 made to the paper.
20       ATTORNEY O'DELL: If that's the    09:42
21    question, if he recalls, he's welcome
22    to pull up the paper to refresh his
23    recollection if he needs to do that.
24    If he doesn't, that's fine.
25       THE WITNESS: So my recollection,    09:43

Page 39

1    in looking at the timing of this
2    paper, is my laboratory was
3    participating in this as a
4    methodological and technology provider
5    in terms of methods for sequencing    09:43
6    extracellular RNAs from extracellular
7    vesicles. This was an offshoot from
8    some of the work that began earlier at
9    Vanderbilt University, where I believe
10    there was another publication on the    09:43
11    CV discussing urine microvesicles that
12    began in my work there.
13 BY ATTORNEY DAVIDSON:
14    Q. What did you, Dr. Levy, contribute
15 to this actual paper?              09:43
16    A. Commentary around the
17 methodological details and some of the goals
18 of the consortia. I would have to review
19 the paper in more detail to provide you a
20 more precise answer.              09:43
21    Q. If you were interviewing an
22 employee who listed articles on his or her
23 CV in which he or she was not an author or
24 co-author, would that disqualify that
25 person, in your view, from employment?    09:44

Page 40

1       ATTORNEY O'DELL: Object to the
2    form.
3       THE WITNESS: Not necessarily. I
4    think it would depend on the
5    circumstances.              09:44
6 BY ATTORNEY DAVIDSON:
7    Q. If a graduate student at the
8 University of Alabama fabricated authorship
9 of articles on their CV, would they be
10 subject to disciplinary action?              09:44
11       ATTORNEY O'DELL: Objection.
12    Incomplete hypothetical, misstates
13    prior testimony.
14       THE WITNESS: How would you define
15    "fabricates"? You mean an article    09:44
16    being listed incorrectly but an
17    otherwise accurate author list? Or
18    somebody representing themselves as an
19    author when they were not?
20 BY ATTORNEY DAVIDSON:              09:44
21    Q. Someone representing on their CV
22 that they're an author of publications,
23 which they are not.
24    A. Again, it would depend on -- I
25 think it would depend on the circumstances.  09:45

Page 41

1    Q. Do you know what the University of
2 Alabama Birmingham authorship policy states?
3    A. I've not reviewed it, no.
4       ATTORNEY O'DELL: Excuse me,
5    Jessica. While you're looking at your    09:45
6    notes, Lisa, Paula Brown is waiting in
7    the waiting room. Would you mind
8    letting her in, please.
9 BY ATTORNEY DAVIDSON:
10    Q. Is there a difference between    09:45
11 authoring a paper and being acknowledged in
12 a paper?
13    A. Yes.
14    Q. Have you ever authored any
15 publications concerning ovarian cancer?    09:46
16    A. I'd have to review the list. But
17 none specifically on ovarian cancer that
18 come to mind.
19    Q. Do you recall authoring any papers
20 regarding talc or asbestos?              09:46
21    A. No, I have not authored papers
22 regarding talc or asbestos.
23    Q. Are you currently working on any
24 papers regarding talc, asbestos, or ovarian
25 cancer?              09:46

11 (Pages 38 - 41)

Page 42

1    A. Not currently.
2    Q. Have you spoken in any public
3 forums about talc or ovarian cancer since
4 2019?
5    A. I have not.              09:46
6    Q. Have you made any public statements
7 concerning talc or ovarian cancer or written
8 anything publicly about talc or ovarian
9 cancer since 2019?
10   A. I have not.              09:46
11   Q. Are you currently, or have you been
12 in the last four years, retained as an
13 expert in any other litigation?
14   A. No.
15   Q. Have you ever reached out to any    09:47
16 health organization to express your concerns
17 about talc and ovarian cancer?
18   A. I have not reached out, no.
19   Q. Are you offering the opinion in
20 this litigation that talc causes ovarian    09:47
21 cancer?
22   A. That wasn't what I was requested to
23 provide an opinion on.
24   Q. Is the answer to my question "no"
25 then?                       09:47

Page 43

1     ATTORNEY O'DELL: Object to the
2 form. He gave you his answer to the
3 question.
4     THE WITNESS: I wasn't asked to
5 provide an opinion on any causation.    09:47
6 BY ATTORNEY DAVIDSON:
7    Q. I understand.
8     Does that mean you're not offering
9 the opinion that talc causes ovarian cancer?
10   A. No. I'm answering your question,    09:47
11 which is I was not asked to offer an opinion
12 on causation. So, therefore, to offer such
13 an opinion to give you a yes-or-no answer
14 would be a different -- it's certainly a
15 different exercise than what I was asked to    09:47
16 do.
17   Q. There were a lot of negatives in
18 that sentence.
19     Do I understand your testimony to
20 be that you will not come to court and say    09:48
21 that talc causes ovarian cancer?
22   A. That I will not say talc causes
23 ovarian cancer?
24   Q. Yes.
25   A. I would only be able to offer -- I    09:48

Page 44

1 would defer to some of the other reports
2 that were specifically developed to make
3 that assessment. On my own review of those
4 reports, I'm supportive of their
5 conclusions.                  09:48
6    Q. What do you mean by you're
7 supportive of their conclusions?
8    A. Meaning that I found the reports to
9 be thorough and grounded in good scientific
10 methodology to develop that conclusion.    09:48
11   Q. So you are offering an opinion on
12 the other experts' reports?
13     ATTORNEY O'DELL: Objection to the
14 form.
15     THE WITNESS: No. I said that I    09:49
16 found their reports to be compelling,
17 but again --
18 BY ATTORNEY DAVIDSON:
19   Q. Whose reports are those?
20     ATTORNEY O'DELL: Excuse me. Let    09:49
21 him finish, please.
22     THE WITNESS: I found the reports
23 to be compelling in terms of the
24 materials and the way they were
25 presented. I have not taken the time    09:49

Page 45

1 to delve into those reports in an
2 extensive enough manner to say that I
3 concur wholeheartedly with all of the
4 conclusions. But I found them to be
5 well supported by reference materials    09:49
6 and drawing reasonable conclusions
7 from those materials. But I have not
8 yet had the opportunity to review all
9 of them.
10 BY ATTORNEY DAVIDSON:              09:49
11   Q. Which reports are you talking about
12 that you found so compelling?
13   A. Dr. Wolf's report.
14   Q. Any others?
15   A. I've not reviewed others on    09:49
16 causation. If you're asking: Did I find
17 any other plaintiff expert reports
18 compelling? Is that your question?
19   Q. Sure.
20   A. I also found Dr. Godleski's report    09:50
21 also quite interesting, primarily around the
22 findings of fibrous material in the
23 pathology slides.
24   Q. You agree as a scientist,
25 it's important to look at the totality of    09:50

12 (Pages 42 - 45)

Page 46

1 the scientific evidence on a topic; right?
2    A.  I do.
3    Q.  And you would agree it's important
4 as a scientist not to just look at one-sided
5 scientific evidence; right?          09:50
6    A.  When available, yes.
7    Q.  So did you ask plaintiff's counsel
8 to provide you with the defense reports that
9 respond to Dr. Wolf and Dr. Godleski?
10     ATTORNEY O'DELL:  Object to the    09:50
11    form.
12     THE WITNESS:  I did not
13    specifically ask that question.
14 BY ATTORNEY DAVIDSON:
15    Q.  Have you reviewed any defense    09:50
16 expert reports responding to any of
17 plaintiff's expert reports throughout the
18 course of this MDL regarding general
19 causation?
20     ATTORNEY O'DELL:  Object to the    09:51
21    form.  As you know, they're not
22    defense expert reports --
23     ATTORNEY DAVIDSON:  Leigh, you are
24    not testifying in this case.
25     ATTORNEY O'DELL:  Don't interrupt    09:51

Page 47

1 me.  I'm not.  Exactly.  I'm lodging
2    an objection.
3     ATTORNEY DAVIDSON:  That's not an
4    objection, Leigh.
5     ATTORNEY O'DELL:  It is an    09:51
6    objection.
7 BY ATTORNEY DAVIDSON:
8    Q.  Dr. Levy, I'm going to ask the
9 question again.
10    Throughout the course of this MDL    09:51
11 proceeding, have you reviewed any defense
12 expert reports related to the question of
13 general causation?
14     ATTORNEY O'DELL:  Object to the
15    form.                  09:51
16     THE WITNESS:  We discussed earlier
17    which expert reports you had asked
18    that I had reviewed.  So outside of
19    those -- and, again, I would need to
20    look at them again to recall if they    09:51
21    were specifically about causation.
22    Again, I don't recall if they were.
23    But outside of the ones we earlier
24    discussed, no, I have not.
25 ///

Page 48

1 BY ATTORNEY DAVIDSON:
2    Q.  Do you know how many defense
3 epidemiology expert reports have been
4 submitted in the MDL proceeding?
5    A.  I do not.                  09:52
6    Q.  Have you had the opportunity to
7 look at the National Cancer Institute PDQ on
8 ovarian cancer since your last deposition?
9    A.  The PDQ.  I'm not -- that doesn't
10 sound familiar.  Is there -- could that be    09:52
11 provided in the chat, and I can give you a
12 better answer if I can take a look at it?
13    Q.  Do you recall being asked about the
14 NCI PDQ at your last deposition?
15    A.  Sorry.  What is PDQ?          09:52
16    Q.  Have you heard of the National
17 Cancer Institute PDQ?
18    A.  Again, I'd ask what -- I don't
19 recall what PDQ is.
20    Q.  You're not familiar with that    09:53
21 document?
22    A.  No.
23     ATTORNEY O'DELL:  He's requested
24    to see the document you're asking him
25    about, Jessica.  Are you refusing to    09:53

Page 49

1    provide it to him to review?
2     ATTORNEY DAVIDSON:  Leigh, let me
3    take the deposition.
4     ATTORNEY O'DELL:  Answer my
5    question.                  09:53
6     ATTORNEY DAVIDSON:  And when you
7    have a chance to question him, you can
8    show him whatever documents you want.
9     ATTORNEY O'DELL:  I sure will, but
10    a deposition like this is not -- you    09:53
11    cannot ask questions without providing
12    any context or documents.  It's unfair
13    to the witness, as you know.  He asked
14    to see it, and you refused to provide
15    it to him.                  09:53
16     ATTORNEY DAVIDSON:  Okay.  Thank
17    you, Leigh.
18 BY ATTORNEY DAVIDSON:
19    Q.  Are you familiar that NCI puts out
20 a document called the NCI PDQ or not?    09:53
21 That's all I'm asking.
22     ATTORNEY O'DELL:  And if you need
23    to see it to refresh your
24    recollection, Dr. Levy, I'm sure
25    counsel will comply with your request.    09:54

13 (Pages 46 - 49)

Page 50

1    THE WITNESS:  As I said, I was
2  just asking for either a reference to
3  the document or a definition of what
4  PDQ is.  My answer is perhaps, without
5  looking at it in more detail.        09:54
6    As I'm sure you're aware, the NCI
7  produces a tremendous amount of
8  educational information in a wide
9  variety of formats, both for their
10  funded investigators as well as lay    09:54
11  audiences.  So I would need to see
12  what you're referring to.
13  BY ATTORNEY DAVIDSON:
14    Q.  In preparation for this deposition,
15  did you do any research into NCI, American    09:54
16  Cancer Institute, CDC, or any major United
17  States public health organization and their
18  views on talc and ovarian cancer?
19    ATTORNEY O'DELL:  Object to the
20  form.  Vague.        09:54
21    THE WITNESS:  I performed as broad
22  a search in the scientific literature.
23  In general, websites for associations
24  between talc and a variety of
25  phenotypes, including cancer.  So I am    09:55

Page 51

1  sure that I have -- that I did review
2  materials from some or all of those
3  organizations you've mentioned.
4  BY ATTORNEY DAVIDSON:
5    Q.  Do you know what the positions are    09:55
6  of the National Cancer Institute, the CDC,
7  the American Cancer Society, the Society of
8  Gynecologic Oncology, or ACOG with respect
9  to the allegation that perineal talc causes
10  ovarian cancer?        09:55
11    ATTORNEY O'DELL:  Object to the
12  form.  Vague and compound.
13    THE WITNESS:  Am I aware of each
14  one of those individually?  And
15  specifically?        09:55
16  BY ATTORNEY DAVIDSON:
17    Q.  Any of them.
18    A.  I don't recall finding a specific
19  statement regarding causation on any of
20  those sites.        09:56
21    Q.  Okay.
22    A.  To any cause of ovarian cancer.
23    Q.  But it's your testimony that you
24  checked the websites of all those
25  organizations?        09:56

Page 52

1    ATTORNEY O'DELL:  Object to the
2  form.
3    THE WITNESS:  No.  My testimony
4  was that I did a broad review of both
5  scientific literature and searches,        09:56
6  and in doing so, recall seeing
7  materials from some or all of those
8  organizations.  But I can't tell you
9  specifically which page or other
10  material if it wasn't cited in the        09:56
11  report.
12  BY ATTORNEY DAVIDSON:
13    Q.  My question is different.
14    My question is:  Do you know
15  whether the National Cancer Institute, the    09:56
16  American Cancer Society, the CDC, ACOG, or
17  SGO has made any statement about the
18  allegation that perineal talc use causes
19  ovarian cancer?
20    ATTORNEY O'DELL:  Object to the        09:56
21  form.  Compound.
22    THE WITNESS:  No, not that I'm
23  aware.  But as I said, I don't know of
24  any statements from those
25  organizations on any causative aspects    09:57

Page 53

1  of nearly any disease.  Those
2  organizations generally don't make
3  definitive statements as to areas of
4  causation.
5  BY ATTORNEY DAVIDSON:        09:57
6    Q.  If you're not giving an opinion on
7  general causation, why are you addressing
8  epidemiology in your report?
9    A.  Because I was asked to provide an
10  opinion as to the totality of the        09:57
11  information available relative to risk and
12  biological plausibility of talc contributing
13  to the initiation, progression, or overall
14  phenotype of ovarian cancer.  So the
15  epidemiology certainly plays into that        09:57
16  opinion.
17    Q.  Is it your testimony that you have
18  done a complete comprehensive evaluation of
19  the epidemiology?
20    A.  I would say I have done a thorough    09:58
21  evaluation of the epidemiology.
22    Q.  Does your report address all of the
23  major epidemiological studies on talc use
24  and ovarian cancer?
25    A.  The report wasn't asked to, again,    09:58

14 (Pages 50 - 53)

Page 54

1 provide an epidemiology review. The report
2 was asked to provide a biological -- two
3 things. One was updates to the biological
4 plausibility, meaning more on the
5 mechanistic effect and biology there.          09:58
6 Separately, I was asked to provide some
7 opinions around the genetic testing results
8 of a specific subset of plaintiffs.
9     Q. So how did you decide which
10 epidemiologic studies to mention in your       09:58
11 report and which not to mention?
12     A. I tried to reference more of the
13 encompassing review articles and
14 meta-analysis, and then also some of the
15 cohort and case-control studies that were      09:59
16 larger, meaning encompassing more patients
17 or more participants.
18     Q. Did you address the largest pooled
19 analysis of cohort studies done to date?
20     ATTORNEY O'DELL: Object to the          09:59
21 form.
22     THE WITNESS: I would have to
23 review to answer the -- to give you an
24 answer as to largest.
25 ///

Page 55

1 BY ATTORNEY DAVIDSON:
2     Q. And it's your testimony that you
3 decided that you identified all the epi
4 studies yourself and that you decided which
5 ones to include in your report, not counsel? 09:59
6     A. I decided which ones to include in
7 my report -- as part of the preparation for
8 this deposition, I was provided the report
9 of -- again, I would have to look. I'm not
10 looking at the moment. I believe it was      10:00
11 contained in Dr. Wolf's expert report.
12 There were force plots summarizing a large
13 number of studies. What I recall in my
14 report is the -- there were two review
15 articles. And in that review article were a 10:00
16 number of references for both cohort as well
17 as meta-analysis studies. I was not
18 provided specific scientific literature by
19 the plaintiff attorneys to be included in
20 the report.                               10:00
21     Q. Let's mark your report as
22 Exhibit 2. Amended Rule 26 expert report
23 Shawn Levy, dated November 15 as Exhibit 2,
24 and let's turn to page 15.
25 ///

Page 56

1     (Exhibit Number 2 was marked for
2 identification.)
3 BY ATTORNEY DAVIDSON:
4     Q. Actually --
5     A. Sorry, which page? 15?          10:01
6     Q. Top of 15.
7     A. I have it. I'm looking at a paper
8 copy.
9     Q. On pages 14 and 15 you say: A more
10 recent meta-analysis focusing on frequent    10:01
11 use (at least twice per week) concluded the
12 increased risk of ovarian cancer with
13 perineal exposure was 31 to 65 percent
14 (Woolen, Lazar and Smith-Bindman 2022).
15     Do you see that?          10:01
16     A. I do see that.
17     Q. Are you aware that that
18 meta-analysis grew out of work that was done
19 for this litigation by a plaintiff's expert?
20     ATTORNEY O'DELL: Object to the          10:02
21 form.
22     THE WITNESS: I am aware of that
23 now.
24 BY ATTORNEY DAVIDSON:
25     Q. How did you become aware of that?   10:02

Page 57

1     A. It came up in my discussions.
2     ATTORNEY O'DELL: You may say
3 that, but you can't go beyond that in
4 terms of discussions with --
5     ATTORNEY DAVIDSON: I'm not asking   10:02
6 about your discussions with counsel.
7 That is privileged.
8     THE WITNESS: I was not aware of
9 that when it was referenced. I became
10 aware of it after the report was          10:02
11 drafted.
12 BY ATTORNEY DAVIDSON:
13     Q. When you put this in your expert
14 report, you didn't realize that
15 Dr. Smith-Bindman is a plaintiff's expert?   10:02
16     A. No, I had no knowledge of that at
17 the time.
18     Q. Did you read the paper?
19     A. Yes.
20     Q. Did you read the conflict of       10:02
21 interest disclosure?
22     A. Again, I'd have to look at the
23 paper. If I did read it, it didn't stand
24 out.
25     Q. Okay.          10:03

Page 58

1    A.  During my review, I may not -- I
2  would say -- it would be fair to say I did
3  not look at every conflict of interest
4  statement or necessarily reference material
5  or even author affiliations, as an example,    10:03
6  as when I was reviewing some of this
7  literature.
8    Q.  Do you know how many papers you
9  cited in your amended report that were, in
10  fact, authored or coauthored by paid    10:03
11  plaintiff's experts in this litigation?
12    ATTORNEY O'DELL:  Object to the
13  form.
14    THE WITNESS:  No, I do not.  I
15  don't know that.  I don't know the    10:03
16  identity of all of the plaintiff's
17  witnesses.
18  BY ATTORNEY DAVIDSON:
19    Q.  Did you notice the conflict of
20  interest disclosures in any of the papers    10:03
21  you read?
22    A.  None stood out to me.
23    Q.  And you located the Woolen paper by
24  yourself?
25    A.  As far as I recall, yes.    10:03

Page 59

1    Q.  When you did your search, did you
2  locate a paper by O'Brien from NIH
3  addressing a pooled cohort of -- a pooled
4  analysis of cohort studies?
5    A.  I believe so.  O'Brien sounds    10:04
6  familiar.  I would need to double-check if
7  I've cited that in the report or not.
8    Q.  You did not cite it in this report.
9    Do you know why?
10    ATTORNEY O'DELL:  Object to the    10:04
11  form.
12    THE WITNESS:  No.  I would have to
13  see if it was part of the -- again, I
14  would need to review their -- as I
15  mentioned in the earlier part of the    10:04
16  testimony, there were some review
17  articles as well as some of the more
18  encompassing papers that may have
19  included that in that.  I do believe
20  it was in the summary force plots that    10:04
21  I mentioned as well.
22  BY ATTORNEY DAVIDSON:
23    Q.  But you got the force plot after
24  you wrote this report.
25    A.  Correct.    10:04

Page 60

1    Q.  My question is:  Do you know why
2  you didn't cite O'Brien 2020 in this report?
3    ATTORNEY O'DELL:  Objection to the
4  form.  Asked and answered.
5    THE WITNESS:  No.  Again, I'd have    10:05
6  to look at the paper to give you an
7  answer.
8  BY ATTORNEY DAVIDSON:
9    Q.  You'd have to look at the paper to
10  tell me why it wasn't cited?    10:05
11    ATTORNEY O'DELL:  Object to the
12  form.
13    THE WITNESS:  To tell you if I had
14  seen it and whether or not I chose not
15  to include it or whether I didn't find    10:05
16  the paper.  Again, that's why -- I
17  would need to look -- that's why I'm
18  saying I need to review.
19  BY ATTORNEY DAVIDSON:
20    Q.  What was the search term you used?    10:05
21    A.  There were several --
22    Q.  That pulls up Woolen?
23    A.  I can't answer.  I can't give you
24  an accurate answer to that to know
25  specifically.  I generally was using terms    10:05

Page 61

1  such as ovarian cancer, talc, and things
2  along those lines.
3    Q.  And you searched in PubMed?
4    A.  PubMed, Google Scholar.
5    Q.  Any paper in PubMed that had talc    10:05
6  and ovarian cancer in the title, it's fair
7  to assume, would have been picked up?
8    ATTORNEY O'DELL:  Object to the
9  form.
10    THE WITNESS:  Fair to assume.    10:06
11  BY ATTORNEY DAVIDSON:
12    Q.  Okay.
13    A.  Now, my search was biased towards
14  more recent references, again, given the
15  requests of what I was asked to provide an    10:06
16  opinion on in terms of the update to the
17  report.
18    Q.  But you did add papers from 2019;
19  right?  On page 14 you added Taher, which
20  was 2019; right?    10:06
21    A.  Correct.
22    Q.  And O'Brien --
23    ATTORNEY O'DELL:  I'm sorry.  Let
24  him finish.
25    THE WITNESS:  The focus was on    10:06

16 (Pages 58 - 61)

Page 62

1    more references current from the
2    timing of the last deposition until
3    now or the last report until now. So
4    roughly 2019 through 2023.
5 BY ATTORNEY DAVIDSON:                    10:06
6    Q. But the paper I'm asking about is
7    2020.
8    A. Right. I'd have to review the
9    paper to provide you a more complete answer.
10   Q. Did you conduct a systematic review    10:06
11   of epidemiologic literature?
12   A. I conducted a review of the
13   epidemiologic literature, as I answered. As
14   far as using terms like "complete" or
15   "systemic," I think that would be open to    10:07
16   probably opinion.
17   Q. Would it be open to --
18   A. I found --
19   Q. Hold on.
20      You said it would be open to          10:07
21   opinion?
22   A. Yes. The word "complete," meaning
23   fully comprehensive. Is there the
24   possibility of seeing every single piece of
25   literature in epidemiology? Certainly.    10:07

Page 63

1    But, again, it's a very -- it's a broad
2    question.
3    Q. The word I used was "systematic";
4    right?
5    A. Yes. I would characterize my        10:07
6    review as systematic.
7    Q. What is a systematic review?
8    A. One that follows a process.
9    Q. Could you define for me what a
10   systematic review is in the scientific    10:07
11   community and explain how you followed one?
12      ATTORNEY O'DELL: Object to the
13   form.
14      THE WITNESS: I can provide an
15   answer of how I followed one. I would    10:07
16   say it would be generally accepted
17   that it would begin with a search.
18   And then starting through those
19   papers, there's a process of reviewing
20   for older papers, what they have been    10:08
21   cited by. And then for papers that
22   are newer, what there are citations
23   of. And then continuing that with, as
24   I said, review articles or other
25   materials that have had an opportunity    10:08

Page 64

1    to synthesize additional conclusions
2    or information from that work.
3 BY ATTORNEY DAVIDSON:
4    Q. Is the systematic review you
5    conducted of the epidemiological literature    10:08
6    all set forth on pages 14 through 16?
7       ATTORNEY O'DELL: Object to the
8    form.
9       THE WITNESS: No, I wouldn't -- is
10   it all set forth? I would say during    10:08
11   my review, the literature that was
12   supportive of my opinion and also
13   supportive of the -- of that review is
14   contained. And then there's -- and
15   for many of these papers, it's          10:09
16   literature cited therein.
17 BY ATTORNEY DAVIDSON:
18   Q. How can I see the steps you took in
19   your systematic review?
20      ATTORNEY O'DELL: Objection to      10:09
21   form.
22      THE WITNESS: Well, I think that's
23   what we're discussing today.
24 BY ATTORNEY DAVIDSON:
25   Q. Are the steps in your systematic    10:09

Page 65

1    review laid out somewhere?
2    A. No, I didn't -- I wasn't -- I did
3    not include, nor was I asked to provide, the
4    steps that were taken in the systematic
5    review.                                 10:09
6    Q. Did you follow a specific protocol
7    for your systematic review?
8       ATTORNEY O'DELL: Object to the
9    form.
10      THE WITNESS: I mean, I followed a    10:10
11   generally accepted process, I would
12   say, in the scientific world or with
13   some of my background and experience
14   as to reviewing materials in a
15   specific subject area to develop an      10:10
16   opinion on the materials that I was
17   asked to develop an opinion on.
18   Again, that included reviewing the
19   available peer-reviewed literature as
20   well as the available materials that     10:10
21   are outside of the peer-reviewed
22   literature that I could also find via
23   searching through either Web-based or
24   materials that were available to me.
25 ///

17 (Pages 62 - 65)

Page 66

1 BY ATTORNEY DAVIDSON:
2   Q. So did you review a lot of epi
3 studies that aren't actually listed under
4 materials reviewed?
5       ATTORNEY O'DELL: Object to the    10:10
6   form.
7       THE WITNESS: No, I wouldn't say a
8   lot. Again, I was reviewing the
9   available -- the materials I could
10   find and that I was able to access,    10:11
11   either through library access through
12   papers or things that were available
13   in the public domain as well as some
14   of the websites that we were talking
15   about earlier. I didn't necessarily    10:11
16   reference -- if I did not pull a fact
17   or an opinion or a conclusion or a
18   piece of data from a paper, then I
19   would not have referenced it in the
20   report; therefore, not necessarily    10:11
21   everything I looked at is contained in
22   the report.
23 BY ATTORNEY DAVIDSON:
24   Q. This is what I'm confused about.
25 You said you did a systematic review.    10:11

Page 67

1       You said it was a comprehensive
2 review of the epidemiological literature;
3 correct?
4       ATTORNEY O'DELL: Object to the
5   form.    10:11
6       THE WITNESS: No. I said I
7   performed a review that was
8   systematic, yes. I did not make an
9   assessment as to how comprehensive it
10   may have been with respect to    10:11
11   specifically the epidemiology
12   literature. I was not searching with
13   any specificity towards epidemiology
14   in my report. I was doing a general
15   review of the literature and what was    10:12
16   found in the ovarian cancer and talc
17   area.
18 BY ATTORNEY DAVIDSON:
19   Q. So your review of the epidemiologic
20 literature was systematic but not    10:12
21 comprehensive?
22       ATTORNEY O'DELL: Object to the
23   form. Misstates his testimony.
24 BY ATTORNEY DAVIDSON:
25   Q. Is that your testimony?    10:12

Page 68

1   A. No, it's not my testimony.
2   Q. I'm confused.
3   A. I said it was systematic, but I did
4 not make --
5   Q. Your review of the epidemiologic    10:12
6 literature was systematic?
7       ATTORNEY O'DELL: Let him finish
8   his answer, please.
9       THE WITNESS: Your specific
10   question is on: Was my review of the    10:12
11   epidemiological literature systematic
12   and comprehensive? And my response is
13   that my review of the literature, in
14   general, and that review was not
15   specific to epidemiology.    10:12
16 BY ATTORNEY DAVIDSON:
17   Q. But it included epidemiology?
18   A. Yes, correct.
19   Q. As part of that review, did you
20 review all the relevant epidemiology?    10:13
21   A. As far as I know.
22   Q. So is it your testimony here today
23 that your materials reviewed list includes
24 all the relevant epidemiology?
25       ATTORNEY O'DELL: Object to the    10:13

Page 69

1   form.
2       THE WITNESS: Again, I can't
3   answer that because I don't know what
4   the universe of epidemiological
5   literature is in relation to this.    10:13
6 BY ATTORNEY DAVIDSON:
7   Q. Is it your testimony that your
8 materials reviewed list includes all the
9 epidemiology that would be pulled up by
10 doing a search in PubMed for talc and    10:13
11 ovarian cancer?
12       ATTORNEY O'DELL: Objection to the
13   form.
14       THE WITNESS: Again, I wasn't
15   asked to make that assessment. I    10:13
16   wasn't asked to assess all of the
17   epidemiological literature that's
18   available, but given the meta-analysis
19   and the review articles that are
20   cited, I would have to go back through    10:13
21   those papers, not only those
22   individual citations but all of the
23   materials cited therein, to be able to
24   provide you an answer.
25       Again, I didn't perform an    10:14

18 (Pages 66 - 69)

Page 70

1 analysis to answer the question: Is
2 my materials cited list comprehensive
3 as it relates to talc and ovarian
4 cancer epidemiological data?
5     From looking at the -- I would say    10:14
6 it is systematic. And I would say it
7 is reasonably comprehensive, given the
8 studies that were found and the more
9 recent ones that are encompassing to
10 the older studies, but I can't give    10:14
11 you an answer as to how complete that
12 may be in relation to all of the
13 available literature because I didn't
14 perform that analysis.
15 BY ATTORNEY DAVIDSON:    10:14
16 Q. So just to make sure I understand,
17 your testimony today is that you did a
18 systematic analysis, but you don't know how
19 complete it was?
20     ATTORNEY O'DELL: Objection to the    10:14
21 form.
22 BY ATTORNEY DAVIDSON:
23 Q. I believe that's what you just
24 said.
25 A. No. I said I did an analysis of    10:14

Page 71

1 the available literature to develop the
2 opinions that are expressed in the report,
3 and I believe that that analysis is complete
4 with respect to those opinions. But your
5 question was: Was it fully comprehensive to    10:15
6 all of the literature available? And I
7 didn't perform that analysis.
8 Q. Is it your opinion that you can do
9 a systematic review while only reviewing
10 some of the available literature?    10:15
11     ATTORNEY O'DELL: Objection to the
12 form. That's not what he said.
13     THE WITNESS: Well, you can
14 certainly perform a systematic review
15 that is not comprehensive. They're    10:15
16 not mutually inclusive of each other.
17 A systematic process doesn't
18 necessarily have to be comprehensive.
19 As I stated, the focus was on the more
20 current literature, which by its    10:15
21 nature, at least in the scientific
22 literature space, is generally
23 inclusive of previously referenced
24 materials.
25     ATTORNEY O'DELL: Jessica, we've    10:15

Page 72

1 been going about an hour and five
2 minutes. Can we take a five-minute --
3     ATTORNEY DAVIDSON: I just have
4 one more question, and we can take a
5 break.    10:16
6     ATTORNEY O'DELL: Sure.
7 BY ATTORNEY DAVIDSON:
8 Q. Dr. Levy, are the steps of your
9 systematic review written anywhere?
10     ATTORNEY O'DELL: Object to the    10:16
11 form.
12     THE WITNESS: Are you asking: Did
13 I write down the specific methodology
14 that I used in this particular search?
15 BY ATTORNEY DAVIDSON:    10:16
16 Q. Yes.
17 A. No, I did not.
18 Q. And did you follow any written
19 systematic review guidelines that are
20 contained anywhere in the textbook or    10:16
21 guidebook?
22 A. Do you have an example of such
23 guidelines, and I can tell you if they were
24 the same -- if they were similar to or what
25 percentage I followed of them? But I    10:16

Page 73

1 used --
2 Q. I'm asking --
3     ATTORNEY O'DELL: Please continue.
4     THE WITNESS: I would say I used
5 generally accepted methodological and    10:16
6 tools available for performing a
7 scientific literature review to
8 provide an opinion on a specific
9 subject, that I would expect it to be
10 viewed by colleagues in the field to    10:17
11 be, you know, in a standard and
12 acceptable practice for this with
13 someone with my experience and
14 background.
15 BY ATTORNEY DAVIDSON:    10:17
16 Q. Can you point to any citation for
17 the fact that your systematic review is one
18 that's accepted in the scientific community?
19     ATTORNEY O'DELL: Object to the
20 form.    10:17
21     THE WITNESS: No. I'm not aware
22 of any documented process that would
23 be generally accepted for that. I
24 don't know that one exists.
25     ATTORNEY DAVIDSON: Okay. We can    10:17

19 (Pages 70 - 73)

Page 74

1  take our break now, Leigh.
2      (Recess taken from 10:17 a.m. to
3  10:32 a.m.)
4  BY ATTORNEY DAVIDSON:
5      Q. Dr. Levy, is there anywhere where    10:32
6  you saved the searches you did?
7      ATTORNEY O'DELL: Object to the
8  form. Vague.
9      THE WITNESS: No, not specifically
10  the searches that I performed. The    10:33
11  closest thing to saved would be
12  browser history.
13  BY ATTORNEY DAVIDSON:
14      Q. Your most recent materials and data
15  considered list was produced on May 4th.    10:33
16  Let's mark that as Exhibit 3.
17      (Exhibit Number 3 was marked for
18  identification.)
19  BY ATTORNEY DAVIDSON:
20      Q. Did you personally create this    10:33
21  list, or was it created by the plaintiff's
22  lawyers?
23      A. I'm looking at the list now. This
24  summary format of the list I did not create.
25      Q. Okay.    10:33

Page 75

1      ATTORNEY DAVIDSON: Noah, if you
2  could put that up on the screen. Can
3  you put it in the chat as well?
4      ATTORNEY EPSTEIN: I believe it's
5  in the chat.    10:34
6  BY ATTORNEY DAVIDSON:
7      Q. One of the papers you added was
8  Gabriel 2019.
9      ATTORNEY DAVIDSON: Noah, do you
10  want to go to that paper?    10:35
11  BY ATTORNEY DAVIDSON:
12      Q. It might actually be easier to mark
13  as an exhibit or red line, but for now, are
14  you aware of whether any of the authors of
15  that paper are plaintiff's experts?    10:35
16      A. No, I'm not. I'm not aware.
17      Q. Let's go to Phung 2022.
18      ATTORNEY O'DELL: If you need to
19  see any of these publications,
20  Dr. Levy, if counsel for Johnson &    10:35
21  Johnson won't provide them, we'll try
22  to do that.
23      THE WITNESS: What was the second
24  one? Phung, yes. Got it.
25  ///

Page 76

1  BY ATTORNEY DAVIDSON:
2      Q. Do you know whether any of the
3  authors of this paper are plaintiff's
4  experts?
5      ATTORNEY O'DELL: Object to the    10:36
6  form.
7      THE WITNESS: No. I don't see any
8  names that I recognize as a
9  plaintiff's witness.
10  BY ATTORNEY DAVIDSON:    10:36
11      Q. Okay. Let's look at Davis, 2021.
12      Same here? Don't recognize any --
13  do you recognize any names here?
14      ATTORNEY O'DELL: Objection to the
15  form.    10:36
16  BY ATTORNEY DAVIDSON:
17      Q. As plaintiff's experts?
18      A. Not specifically as a plaintiff's
19  expert. But I would have to -- again, I
20  would have to clarify. The Beeghly-Fadiel    10:37
21  name is familiar, but I don't know if it's
22  from seeing that name in other publications
23  or -- I don't think it's a plaintiff's
24  witness. That's the only one for this
25  particular paper that looks familiar.    10:37

Page 77

1  Again, I'd have to -- nothing else is
2  familiar.
3      Q. So my question is this: You added
4  six epi studies to your materials reviewed;
5  four of them were co-authored by plaintiff's    10:37
6  experts.
7      It's your testimony that you
8  identified these papers on your own and
9  added them of your own selection; is that
10  correct?    10:37
11      A. Which were the ones? I'm just
12  looking briefly.
13      ATTORNEY O'DELL: I think you're
14  looking at your --
15  BY ATTORNEY DAVIDSON:    10:38
16      Q. Dr. Levy, you're really not
17  supposed to talk to your counsel during the
18  deposition if you have a question.
19      A. So the materials and data
20  considered list, materials and data    10:38
21  considered, given that was just
22  produced in May, you're asking if all of
23  those or any of those were ones that I
24  provided or were provided by --
25      Q. That was not my question. I said    10:38

Page 78

1 that you added six epidemiologic studies;
2 four of them were authored by or co-authored
3 by plaintiff's experts.
4       Is it your testimony that you
5 decided to add those four on your own and       10:38
6 that you found them through your own
7 research?
8       ATTORNEY O'DELL: Object to the
9 form.
10      THE WITNESS: I'm not sure if I       10:39
11 found those or if they were provided.
12 That's why I was asking -- my question
13 to the counsel was more on the
14 cross-references between this and my
15 literature cited. If it's on my       10:39
16 literature cited list, I may answer
17 the question differently.
18 BY ATTORNEY DAVIDSON:
19 Q. Right. This is your deposition; so
20 obviously you can't talk to Ms. O'Dell in       10:39
21 the middle of it.
22 A. I understand.
23      ATTORNEY O'DELL: Object to the
24 form. I think he was asking what the
25 exhibit was that was being referred       10:39

Page 79

1 to, and I can certainly do that.
2 BY ATTORNEY DAVIDSON:
3 Q. Dr. Levy?
4 A. Yes.
5 Q. If we can turn to --       10:39
6       ATTORNEY DAVIDSON: Noah, can we
7 turn to O'Brien 2020.
8       ATTORNEY EPSTEIN: Do you want me
9 to put that in chat and then share my
10 screen?       10:39
11      ATTORNEY DAVIDSON: No, no. I
12 mean on this list.
13      ATTORNEY EPSTEIN: Okay. Sorry.
14 BY ATTORNEY DAVIDSON:
15 Q. Dr. Levy?       10:40
16 A. Yes.
17 Q. We received a materials considered
18 list with your report November, 2023, and
19 this paper, O'Brien 2020, was not on there.
20 It was first added to your materials       10:40
21 considered list on Saturday.
22      Do you know why it was added to
23 your materials considered list on Saturday?
24 A. I'd have to look at the paper, if
25 you can give me just a moment.       10:40

Page 80

1 Q. I'm not asking you to look at your
2 paper right now. You can look at it later.
3 I'm asking you to look at this entry on your
4 materials considered list and tell me, it
5 was just this week on Saturday, why you       10:40
6 added this on Saturday to your materials
7 considered list.
8       ATTORNEY O'DELL: Object to the
9 form. Asked and answered.
10      THE WITNESS: So there was --       10:40
11 yeah. It was added because it was
12 either something we discussed or it
13 was something that was considered.
14 BY ATTORNEY DAVIDSON:
15 Q. Did you make the decision to add       10:41
16 that to your materials considered list on
17 Saturday?
18 A. I don't recall if I made the
19 decision to add it or not.
20 Q. Do you know when you first read it?       10:41
21 A. I'd have to look at the paper to
22 tell you for sure.
23 Q. So you're not sure when you first
24 read O'Brien and Wentzensen's 2020 paper in
25 JAMA entitled: Association of Powder Use in       10:41

Page 81

1 the Genital Area With Risk of Ovarian
2 Cancer; correct?
3       ATTORNEY O'DELL: Objection to the
4 form. Misstates his testimony. He's
5 asked to see the reference.       10:41
6       ATTORNEY DAVIDSON: I understand.
7       ATTORNEY O'DELL: Let me finish.
8 He's asked to see the reference. Are
9 you refusing to provide it to him so
10 he can see it?       10:41
11 BY ATTORNEY DAVIDSON:
12 Q. Dr. Levy --
13      ATTORNEY O'DELL: No, no, no. I'm
14 asking you a question. Are you
15 refusing to provide --       10:42
16      ATTORNEY DAVIDSON: I'm not
17 answering your questions, Leigh. I'm
18 not being deposed.
19      ATTORNEY O'DELL: Dr. Levy, if you
20 need to see the reference, then you       10:42
21 may see it, and you just need to ask.
22      ATTORNEY DAVIDSON: Leigh, these
23 games are really not appreciated --
24      ATTORNEY O'DELL: Your games --
25 ///

21 (Pages 78 - 81)

Page 82

1 BY ATTORNEY DAVIDSON:
2   Q. Dr. Levy, do you recall what my
3 question was?
4       Dr. Levy, if you're looking at
5 something that I didn't ask you to look at,    10:42
6 that is a violation of ethics?
7       ATTORNEY O'DELL: No, it's not.
8 He's looking at his report.
9       ATTORNEY DAVIDSON: Certainly it
10 is.                10:42
11       ATTORNEY O'DELL: He's looking at
12 his report, Jessica. He's entitled to
13 do that --
14       ATTORNEY DAVIDSON: He's not
15 entitled to look at something without    10:42
16 telling me. That's not appropriate in
17 a deposition.
18       ATTORNEY O'DELL: You can be here
19 in the room, and you could see him
20 reviewing his own report, which is    10:42
21 perfectly appropriate. So don't
22 suggest anything otherwise because you
23 know that's not correct.
24 BY ATTORNEY DAVIDSON:
25   Q. Dr. Levy, do you recall when you    10:42

Page 83

1 read O'Brien 2020 or not? Without looking
2 at anything.
3   A. No, I can't give you a date of when
4 I read that without looking at it.
5   Q. And do you recall, without looking    10:43
6 at that paper, generally what that paper is?
7   A. It's part of the epidemiology
8 literature. If I remember right, it was
9 more along the lines of general use of talc,
10 and I believe this was with a mild positive    10:43
11 association, but I may be thinking of the
12 other O'Brien paper that was a summary of
13 the epidemiology literature. Again, I can
14 take a moment and review the paper to give
15 you a better answer.              10:43
16   Q. Do you know what sort of
17 epidemiological study it was?
18   A. To give you a correct answer, I'm
19 going to look at the paper, if you'll give
20 me a moment.            10:43
21   Q. I don't want to look at the paper
22 right now. Thank you. Let's move on.
23       Are you familiar with a 2024 paper
24 by Chang that reports on talc use and
25 ovarian cancer?            10:44

Page 84

1   A. 2024. What's the first author?
2   Q. Chang.
3   A. Chang.
4   Q. What are you looking at now?
5   A. The exhibit, the materials list,    10:44
6 what you've provided in the chat.
7   Q. It's not on there.
8   A. Okay. Again, if you could show me
9 the complete reference, I can give you an
10 answer.                10:44
11   Q. Do you recall reading a 2024 paper
12 by an author named Chang about Douching,
13 Talc Use and Ovarian Cancer?
14       ATTORNEY O'DELL: Objection.
15 Asked and answered.            10:44
16       THE WITNESS: If I can see ideally
17 the paper or the complete reference.
18 BY ATTORNEY DAVIDSON:
19   Q. I'll take that as a no.
20       ATTORNEY O'DELL: Objection.    10:44
21 That's not what his answer was.
22 BY ATTORNEY DAVIDSON:
23   Q. Do you recall it without looking at
24 a reference?
25       ATTORNEY O'DELL: He's asked to    10:45

Page 85

1   see the reference.
2       ATTORNEY DAVIDSON: Oh, my God.
3       ATTORNEY O'DELL: He has hundreds
4   of articles on his materials list.
5   He's asked to see it to confirm        10:45
6   whether he's seen it or not. If you
7   want to ask him a question, provide
8   the reference or the document.
9 BY ATTORNEY DAVIDSON:
10   Q. Dr. Levy, do you recall reading a    10:45
11 2024 paper by Chang addressing potential
12 association between talc use and douching
13 and talc use and ovarian cancer?
14       ATTORNEY O'DELL: Objection to
15 form. Asked and answered.            10:45
16       THE WITNESS: I read a variety of
17 literature and saw a reference to a
18 variety of literature on that precise
19 subject, but answering whether it was
20 that specific paper or not, I would    10:45
21 need to see the paper to give you an
22 answer.
23       ATTORNEY DAVIDSON: Thank you,
24 Leigh, for feeding that answer to your
25 witness.                10:45

22 (Pages 82 - 85)

Page 86

1  BY ATTORNEY DAVIDSON:
2     Q. Dr. Levy, when was the last time
3  you did a search of new literature? Have
4  you done any search of literature since 2024
5  that would have picked up 2024 literature?    10:46
6     A. In preparation for this, as I was
7  reading some of the material referenced as
8  well as some of the other expert reports, I
9  did review -- my process was to review two
10  things. One is literature cited in those    10:46
11  reports and then asking a -- doing a more
12  current search to verify if there was any
13  materials that cited those papers. And so
14  in that sense, I had seen some additional
15  literature that may have been dated 2023 or    10:46
16  2024. I have not -- I did not repeat the
17  same process I used during the generation of
18  the report -- in a systematic way to
19  evaluate any new literature that may have
20  come out since the report draft.    10:46
21     Q. If you recently identified a report
22  and read it, it would be in your materials
23  considered list; correct?
24     A. The only exception would be a
25  couple of references that were from the last    10:47

Page 87

1  day or two.
2     Q. What did you review in the last day
3  or two that's not in your materials
4  referenced list?
5     A. Again, it would be some of the    10:47
6  literature cited. It's in my notes, which
7  you've asked for. You can see it there, or
8  I'm happy to show you on the screen.
9     Q. I'd like to know what literature
10  you've reviewed in the last few days that's    10:47
11  not on your materials referenced list.
12     A. There were two. Let me make
13  sure -- let me actually just make sure that
14  it's not on the list. It didn't look
15  familiar when I looked at it. Yeah, so    10:47
16  there was a McDonald American Journal of
17  Clinical Pathology 2019 which came up as, I
18  believe, citing one of the studies that --
19  one of the studies from Dr. Godleski. And
20  then Ogunsina and Sandler. This was    10:48
21  actually from Dr. O'Brien's lab. This was a
22  2023 paper. On the association of genital
23  talc and douche in early adolescence or
24  adulthood. This was focusing on fibroid
25  diagnoses rather than ovarian cancer.    10:48

Page 88

1     Those were two pieces of literature
2  that was reviewed very recently,
3  specifically in the last couple of days.
4  Obviously they're not contained or
5  referenced in the report, certainly given    10:48
6  the timeline I just explained.
7     Q. Are you aware that four of the five
8  mechanistic studies added to your materials
9  and data considered list were authored by
10  scientists who are being paid by plaintiffs    10:49
11  as experts in this litigation?
12     ATTORNEY O'DELL: Object to the
13  form.
14     THE WITNESS: I can't specifically
15  say on the numbers, but yes, I am    10:49
16  aware of how some of that research was
17  supported.
18  BY ATTORNEY DAVIDSON:
19     Q. Which research was that?
20     A. From Dr. Saed.    10:49
21     Q. Are you aware that the Mandarino
22  paper is co-authored by plaintiff's experts
23  in addition to the Saed paper?
24     A. That sounds familiar, yes.
25     Q. Are you aware that the Brieger    10:49

Page 89

1  paper is co-authored by plaintiff's experts?
2     ATTORNEY O'DELL: Object to the
3  form.
4     THE WITNESS: Which Brieger paper?
5  That one doesn't sound as familiar,    10:49
6  but I want to make sure I give you
7  the -- the Brieger 2022? Is that the
8  paper you're referring to?
9     ATTORNEY DAVIDSON: Uh-huh.
10     THE WITNESS: I don't recall    10:50
11  discussing that as being supported
12  research from the plaintiff's experts,
13  but if that's -- it wouldn't -- it
14  wouldn't be surprising, I suppose, if
15  it was.    10:50
16  BY ATTORNEY DAVIDSON:
17     Q. If we could turn to the Rs in this
18  reliance list.
19     A. Okay.
20     Q. Go up to Rothman. Go down to    10:50
21  Rothman.
22     Do you see this entry of Rothman,
23  KJ: Six Persistent Research Misconceptions
24  J Gen Internal Medicine (2014)?
25     A. I do.    10:51

23 (Pages 86 - 89)

Page 90

1    Q. Did this come up in your PubMed
2  research?
3    A. I don't recall that coming up in
4  the PubMed search.
5    Q. How did you find it?        10:51
6    A. I don't know that I found it
7  specifically. Again, this being the
8  materials and data considered, it would have
9  also contained other materials that was
10 discussed outside of the report.        10:51
11    Q. I don't understand. Your testimony
12 earlier was that you identified the
13 scientific literature cited in this report.
14    Is this not scientific literature?
15    ATTORNEY O'DELL: Objection to the    10:51
16  form.
17    THE WITNESS: That's not cited in
18  the report.
19 BY ATTORNEY DAVIDSON:
20    Q. I believe you also testified that    10:52
21 you identified the scientific literature
22 cited in your materials reviewed list.
23    ATTORNEY O'DELL: Objection to
24  form. Misstates his testimony.
25    THE WITNESS: Yeah, I provided a    10:52

Page 91

1    different answer.
2  BY ATTORNEY DAVIDSON:
3    Q. Who identified this for you?
4    A. The Rothman paper?
5    Q. Uh-huh.        10:52
6    A. I can't say for sure who identified
7  it.
8    Q. You have this paper in your
9  materials reviewed and you don't know why
10 you looked at it?        10:52
11    ATTORNEY O'DELL: Objection to
12  form. That's a different question.
13    THE WITNESS: I'd like to look at
14  it again, and I can give you an
15  answer.        10:52
16 BY ATTORNEY DAVIDSON:
17    Q. You need to look at the paper to
18 tell me why you -- please stop looking at
19 Leigh for answers to your questions.
20    ATTORNEY O'DELL: Objection to the    10:52
21  characterization. That is inaccurate.
22 BY ATTORNEY DAVIDSON:
23    Q. You're telling me that you need to
24 look at the Rothman paper to tell me why you
25 looked at it? I'm not asking you what it    10:53

Page 92

1  says. I'm asking you -- I'm trying to
2  understand the nature of your scientific
3  exploration and what got you to this paper.
4  Reading the paper is not going to tell you
5  what made you read the paper in the first    10:53
6  place.
7    I'm trying to understand: Did
8  counsel give you this paper or how you got
9  this paper in the first place? Because, in
10 my opinion, it wouldn't have come up by    10:53
11 searching in PubMed "talc and ovarian
12 cancer."
13    ATTORNEY O'DELL: Objection to
14  form.
15    Dr. Levy, if you need to look at    10:53
16  the paper, you may look at the paper,
17  the reference or the actual document,
18  to answer counsel's questions
19  accurately.
20 BY ATTORNEY DAVIDSON:        10:53
21    Q. We are not pulling up the paper at
22 this point, Dr. Levy.
23    I am asking you: How did you
24 obtain this reference? And if you don't
25 know the answer, you can just tell me you    10:54

Page 93

1  don't know.
2    ATTORNEY O'DELL: That's a
3    different question. And if he needs
4    to --
5  BY ATTORNEY DAVIDSON:        10:54
6    Q. Doctor --
7    ATTORNEY O'DELL: Excuse me. This
8  is not a memory test of hundreds of
9    references. These are materials that
10  are part of his considered list.        10:54
11    Dr. Levy, if you need to see them,
12  any one of them, you are entitled to
13  do that, and we can put it in front of
14  you. You just let me know what would
15  assist you in answering counsel's        10:54
16  questions accurately.
17 BY ATTORNEY DAVIDSON:
18    Q. Dr. Levy, I am asking you: Do you
19 recall, sitting here today, how you came to
20 be aware of this paper?        10:54
21    A. I don't recall.
22    Q. Thank you.
23    Do you know whether it was brought
24 to your attention by plaintiff's counsel?
25    A. As I said, I'd have to look at it    10:54

24 (Pages 90 - 93)

Page 94

1 to give you an answer. To be clear, talc
2 and ovarian cancer were certainly not the
3 only search terms that I used in this
4 review, both during the report and post.
5    Q. What other things did you search?    10:55
6    A. A wide reaching methodology, as I
7 was explaining. Some of it was looking at
8 cited literature from other material; so
9 there wasn't a specific search term. It was
10 based on the cited material. Some of it was    10:55
11 based on other terms observing in the
12 papers, including some of the epidemiology
13 research, some of the mechanistic research.
14 I was also exploring what was available from
15 a -- at least opinions on causation or    10:55
16 progression or initiation. So there's a
17 wide variety of terms that were used in
18 various combinations.
19    Q. So is it now your testimony that
20 you may have identified this document on    10:55
21 your own?
22        ATTORNEY O'DELL: Objection to the
23    form. Misstates his testimony.
24        THE WITNESS: I provided -- my
25    answer stands as I don't recall.    10:55

Page 95

1 BY ATTORNEY DAVIDSON:
2    Q. You don't recall what?
3    A. I don't recall exactly how this
4 paper was found.
5    Q. Do you know whether you found it or    10:56
6 someone else found it?
7        ATTORNEY O'DELL: Objection.
8    Asked and answered.
9        THE WITNESS: I don't know.
10        ATTORNEY DAVIDSON: Noah, can you    10:56
11    go up to A. AM.
12 BY ATTORNEY DAVIDSON:
13    Q. Let's look at this paper, Amrhein,
14 Greenland, and McShane: Retire Statistical
15 Significance. Springer Nature Limited.    10:56
16        Do you see that entry, Doctor?
17    A. I do.
18    Q. Did you identify that on your own?
19    A. I don't recall. I am aware of, or
20 had been familiar with, this paper in the    10:56
21 past. I don't recall if I brought it in in
22 this particular case.
23    Q. If you didn't bring it in, who
24 would have brought it in?
25    A. As part of the data or materials    10:56

Page 96

1 considered.
2    Q. I'm sorry?
3    A. It would have been one of the
4 plaintiff's attorneys in terms of the --
5    Q. I see.    10:57
6    A. Yeah.
7    Q. When did you read Dr. Chodosh's
8 deposition?
9    A. I can't recall the first time I saw
10 it. I honestly don't remember when he was    10:57
11 deposed. What was the date of the
12 deposition?
13    Q. 2016.
14    A. So probably then prior -- again, I
15 don't recall if I had access to it prior to    10:57
16 the last deposition.
17    Q. Was it on your reliance list in
18 2019? That's what I'm asking.
19    A. Then I don't recall if I read it
20 then. Between that time or between the last    10:57
21 deposition and now.
22    Q. Have you read it in the last six
23 months?
24    A. I have at least looked at it in the
25 last six months.    10:58

Page 97

1    Q. Do you know whether there is a
2 defense expert report that responds to
3 Dr. Longo's 2019 expert report?
4    A. That responds to? I believe so.
5    Q. But you haven't read it; correct?    10:58
6    A. So I don't recall seeing any
7 defense expert reports that were to refute
8 Dr. Longo's analysis of the contents of the
9 talc.
10    Q. And you never asked to see that;    10:58
11 correct?
12        ATTORNEY O'DELL: Object to the
13    form.
14        THE WITNESS: No, I didn't -- I
15    haven't specifically asked for any    10:58
16    defense expert reports.
17 BY ATTORNEY DAVIDSON:
18    Q. At your last deposition, you may
19 recall that you were questioned about a
20 number of lines in your expert report that    10:59
21 were quite similar, indeed identical, to
22 various websites.
23        Do you recall that?
24    A. I do.
25        ATTORNEY O'DELL: Object to the    10:59

25 (Pages 94 - 97)

Page 98

1    form.
2 BY ATTORNEY DAVIDSON:
3    Q.  And in your current report, your
4 amended report, you changed a few words to
5 address the plagiarism; correct?        10:59
6        ATTORNEY O'DELL:  Object to the
7    form.  Misstates his prior testimony
8    and misstates the report.
9        THE WITNESS:  Similar to this
10    report, I was asked to provide a        10:59
11    review of the available information on
12    a variety of areas related to talc and
13    ovarian cancer and the mechanistic --
14    the biological plausibility of a
15    mechanistic relationship.  In the        10:59
16    context of writing that report, that
17    information came from a variety of
18    sources; so it's -- whether it's
19    discussed as -- or characterized one
20    way or the other, is there a question        11:00
21    about the accuracy of the fact that
22    was stated or more just a debate about
23    where that fact came from?
24 BY ATTORNEY DAVIDSON:
25    Q.  My question was:  You changed some    11:00

Page 99

1 wording in your current report to address
2 the problem in your prior report that
3 various sentences were plagiarized from
4 websites; correct?
5        ATTORNEY O'DELL:  Objection to        11:00
6    form.  Misstates his testimony from
7    his last deposition and misstates the
8    report itself.
9        ATTORNEY DAVIDSON:  I didn't
10    mention any testimony.        11:00
11        ATTORNEY O'DELL:  It doesn't
12    matter.
13        ATTORNEY DAVIDSON:  How could I
14    misstate testimony if I didn't
15    reference it?        11:00
16        ATTORNEY O'DELL:  It was a part of
17    the prior context of the question, as
18    you know.
19        THE WITNESS:  I went through -- as
20    you can see, I revised substantial        11:00
21    portions of the report.
22 BY ATTORNEY DAVIDSON:
23    Q.  One of the things you did was
24 change some of the sentences that were
25 plagiarized from various websites, like Mayo  11:01

Page 100

1 Clinic, Wikipedia, and a few others;
2 correct?
3        ATTORNEY O'DELL:  Objection to
4    form.  Misstates the prior report, his
5    testimony in his last deposition.        11:01
6        THE WITNESS:  I didn't make
7    specific edits to address specifically
8    the things you were just describing.
9 BY ATTORNEY DAVIDSON:
10    Q.  Well, let's take a look at a        11:01
11 redline of the report then, Exhibit 3.
12 Let's go to the page 8 of that redline.
13        ATTORNEY DAVIDSON:  Noah, can you
14    please put it up on the screen.  Let's
15    mark as Exhibit 3 --        11:01
16        ATTORNEY EPSTEIN:  You're on
17    Exhibit 4.
18        ATTORNEY DAVIDSON:  Noah, I'm
19    going to mark them as separate
20    exhibits by the page.  I think it's        11:02
21    Exhibit 4.  I'm sorry.  Is that what
22    somebody was trying to say?
23        (Exhibit Number 4 was marked for
24    identification.)
25 ///

Page 101

1 BY ATTORNEY DAVIDSON:
2    Q.  DNA repair genes.  Let's look at
3 that sentence:  DNA repair genes detect
4 errors in cellular DNA and correct them.
5        Why did you change "DNA repair        11:02
6 genes look for" and change it to "detect"?
7    A.  Because detect is a more accurate
8 description.  As you see -- I'm sure as you
9 have the compare, you see that there was a
10 variety of grammatical and stylistic changes  11:02
11 done through the report.
12    Q.  So you didn't make that change
13 because this was copied straight from the
14 Mayo Clinic and you wanted to change the
15 words of the Mayo Clinic website?  It's just  11:03
16 coincidence?
17        ATTORNEY O'DELL:  Object to the
18    form.  It misstates his testimony.
19        THE WITNESS:  Again, I made
20    wide-ranging changes to the report for        11:03
21    stylistic and grammatical and flow and
22    just overall improving the content and
23    readability of the report.
24 BY ATTORNEY DAVIDSON:
25    Q.  I just want to make sure I        11:03

26 (Pages 98 - 101)

Page 102

1 understand your testimony.
2     Your testimony is that the reason
3 you changed three words in this sentence had
4 nothing to do with the fact that this
5 sentence was identical to a sentence on the    11:03
6 Mayo Clinic website?
7     ATTORNEY O'DELL: Objection.
8 Asked and answered.
9     THE WITNESS: That's correct, yes.
10 BY ATTORNEY DAVIDSON:    11:03
11     Q. Do you believe that changing three
12 words in a sentence would address
13 plagiarizing something from a website?
14     ATTORNEY O'DELL: Objection.
15 Misstates his prior report and his    11:03
16 prior testimony.
17     You may answer.
18     THE WITNESS: This is a general
19 background sentence. There are only
20 so many ways to say: DNA repair genes    11:04
21 correct error in cellular DNA.
22 BY ATTORNEY DAVIDSON:
23     Q. Doctor, if detect is better
24 language than look for, why didn't you say
25 it the first time?    11:04

Page 103

1     A. I don't have an answer as to why I
2 chose any given word.
3     Q. How come you and the Mayo Clinic --
4     ATTORNEY O'DELL: He's not
5 finished, Jessica.    11:04
6 BY ATTORNEY DAVIDSON:
7     Q. How come you and the Mayo Clinic
8 both coincidentally happened to choose the
9 less accurate or correct word "look for" the
10 first time, but then the second time around,    11:04
11 you managed to think of the word "detect"?
12     ATTORNEY O'DELL: Object. Counsel
13 cut off the witness from answering the
14 question previously.
15     Dr. Levy, you may complete your    11:05
16 prior answer.
17     THE WITNESS: When I was asked to
18 develop the background material and
19 how -- knowing that this report was
20 going to be read by people with a    11:05
21 wide-ranging backgrounds and not
22 specifically peers in the area of
23 science, particularly for background
24 material. As I was reviewing a wide
25 variety of literature, websites,    11:05

Page 104

1     et cetera, I'm sure that there was
2 content sentences or even contexts
3 that were picked up directly or
4 indirectly to state these facts, these
5 very simple background facts in the    11:05
6 first report. And then going through
7 the second report, revising it for, as
8 I said, grammatical or stylistic or,
9 even just in this case, making it a
10 bit more technical. A variety of    11:05
11 changes were made.
12     I certainly didn't take the time
13 to review, nor was I given a compare
14 of the document of where specific
15 sentences may or may not have been    11:06
16 pulled from the first time, to then go
17 in and specifically correct them.
18 BY ATTORNEY DAVIDSON:
19     Q. Actually at your deposition, which
20 you testified that you have reviewed, my    11:06
21 colleague pointed you to the plagiarized
22 sentences, didn't she?
23     ATTORNEY O'DELL: Objection.
24 Misstates his prior report and
25 misstates his prior testimony.    11:06

Page 105

1     THE WITNESS: There was discussion
2 of this same question for the same
3 background information. Again, I had
4 asked briefly at that time and would
5 ask again -- or I believe I'd asked    11:06
6 briefly at that time, if there was a
7 question about the accuracy of the
8 information, given that I was asked to
9 perform a review of the material, not
10 synthesize novel conclusions or novel    11:06
11 opinions that would fall under that
12 same -- the accusation of plagiarism.
13 These are, at least in the scientific
14 area, widely known simple sentences
15 describing basic concepts for    11:07
16 introductory materials.
17 BY ATTORNEY DAVIDSON:
18     Q. Dr. Levy, if a student submits
19 sentences that are taken full clock from the
20 Mayo Clinic website and Wikipedia, the    11:07
21 student is disciplined regardless of whether
22 they're accurate because they are
23 plagiarized; correct?
24     ATTORNEY O'DELL: Object to the
25 form. Incomplete hypothetical,    11:07

27 (Pages 102 - 105)

Page 106

1  improper characterization of his
2  testimony.
3      You may answer.
4      THE WITNESS: Depends what the
5  student was asked to do.          11:07
6  BY ATTORNEY DAVIDSON:
7  Q. Doctor, why didn't you add proper
8  citations to the Mayo Clinic and Wikipedia
9  in your revised paper?
10     ATTORNEY O'DELL: Objection to the   11:07
11 form.
12     THE WITNESS: Again, I generally
13 did not provide citations for facts
14 that are generally acceptable or basic
15 background information throughout the   11:07
16 report.
17 BY ATTORNEY DAVIDSON:
18 Q. So sitting here today, it is your
19 sworn testimony that you and the Mayo Clinic
20 happened to come up with the words "look    11:08
21 for," "a cell's," and make corrections the
22 first time you wrote your report
23 independently, and that this time you wrote
24 your report --
25     ATTORNEY DAVIDSON: Leigh, please   11:08

Page 107

1      stop whispering.
2      ATTORNEY O'DELL: (Inaudible.)
3  BY ATTORNEY DAVIDSON:
4  Q. And at this time you wrote your
5  report, you changed it to "detect,"    11:08
6  "cellular" and "correct," independently of
7  the plagiarism allegations? That's your
8  sworn testimony sitting here today?
9      ATTORNEY O'DELL: First, I did not
10 say a word; so don't mischaracterize    11:08
11 what's happening on the record.
12 Second, I object to the question. It
13 misstates his prior testimony, his
14 prior report.
15     If you understand the question,    11:08
16 Dr. Levy, you may answer.
17     THE WITNESS: No. I understand
18 the question. I just want to clarify
19 that through the review and reading of
20 a wide variety of sources, which I'm    11:08
21 sure included the Mayo Clinic,
22 Wikipedia, and other sources, it's
23 certainly possible and plausible that
24 the wording and context on some of
25 those sources was carried over into    11:09

Page 108

1  the port as I was reading and writing
2  and reading and writing. Same thing
3  in the revisions. It wasn't
4  necessarily the same -- it was the
5  same process. Reading new, changing    11:09
6  terminology, improving flow, five more
7  years of writing experience and just
8  changes in perspective, better
9  grammatical tools, and features like
10 Word to improve flow, et cetera. So    11:09
11 all those things come to bear.
12 BY ATTORNEY DAVIDSON:
13 Q. Are you aware that the proper
14 procedure in the scientific community and
15 scientific literature, even for basic    11:09
16 concepts, when you take a sentence from a
17 website is to attribute that sentence to the
18 website?
19     ATTORNEY O'DELL: Objection to the
20 form.                11:09
21     THE WITNESS: It certainly depends
22 on the context.
23 BY ATTORNEY DAVIDSON:
24 Q. What is your basis for saying it
25 depends on the context?          11:10

Page 109

1  A. Because in this specific report,
2  the request was to perform a review and
3  provide that summary. The instructions
4  didn't also include to be sure that every
5  fact and every statement was cited    11:10
6  specifically and comprehensively of wherever
7  that may have come from, whether it be
8  generally accepted or not.
9      So this report was written -- this
10 report was meant to convey information    11:10
11 representing the state of knowledge at that
12 time. And as is the updated reports do much
13 the same thing.
14 Q. Is it your understanding that the
15 standards for academic honesty are different   11:10
16 in an expert report in court than they are
17 for scientific publication?
18     ATTORNEY O'DELL: Object to the
19 form. Misstates his testimony.
20     THE WITNESS: Could you say the    11:11
21 question again or I can look at the --
22     ATTORNEY DAVIDSON: Court
23 Reporter, can you repeat it?
24     THE WITNESS: I see it on the
25 screen here.              11:11

28 (Pages 106 - 109)

Page 110

1 BY ATTORNEY DAVIDSON:
2    Q.  You have a screen in front of you
3 with the questions?
4        ATTORNEY O'DELL:  He has realtime.
5        THE WITNESS:  I'm not aware of        11:11
6    what the standards for academic
7    honesty are in expert reports and how
8    they may be different than scientific
9    literature.
10 BY ATTORNEY DAVIDSON:                        11:11
11    Q.  Do you have a view that they are
12 different or the same?
13    A.  Since I don't know what the
14 standards are for expert reports, I don't
15 have an answer.                              11:11
16    Q.  If you were writing a paper for a
17 scientific journal and it had a sentence
18 taken from the Mayo Clinic website, would
19 you cite the Mayo Clinic website?
20        ATTORNEY O'DELL:  Object to the      11:12
21    form.
22        THE WITNESS:  It would depend on
23    the sentence.  Again, generally
24    acceptable background fact that's been
25    known in the literature, then perhaps    11:12

Page 111

1    not.  I would say the more informal
2    language that may generally be
3    involved in a website similar to this
4    first draft, certainly that would be
5    unlikely that I would include that in    11:12
6    a scientific paper.
7 BY ATTORNEY DAVIDSON:
8    Q.  It's unlikely that you would copy
9 the Mayo Clinic, or it's unlikely that if
10 you copy the Mayo Clinic, you wouldn't cite  11:12
11 it?
12        ATTORNEY O'DELL:  Object to the
13    form.  Misstates his testimony.
14        THE WITNESS:  It's unlikely that I
15    would use a more conversational or       11:12
16    informal tone in a scientific paper.
17 BY ATTORNEY DAVIDSON:
18    Q.  If you were to use the language of
19 the Mayo Clinic in the scientific paper, my
20 question is:  Would you cite it?            11:12
21    A.  Again, I said it depends on how the
22 material -- the specific material.
23    Q.  Is there any circumstance in which
24 you would use direct language from the Mayo
25 Clinic in a scientific paper and not cite   11:13

Page 112

1 the Mayo Clinic?
2        ATTORNEY O'DELL:  Object to the
3    form.  Asked and answered.
4        THE WITNESS:  As I explained,
5    generally acceptable facts or            11:13
6    materials that are not in question,
7    that are not being developed or
8    synthesized as novel material for that
9    scientific paper, then I would not
10    give concern to the form or source of    11:13
11    every specific sentence and make sure
12    that there is not a copy of a sentence
13    that's in the same wording or similar
14    wording on the internet, particularly
15    sources like Wikipedia which pull        11:13
16    from -- anyone can add or take away
17    material.  From any source.
18 BY ATTORNEY DAVIDSON:
19    Q.  Is the fact that anyone can add or
20 take away material from Wikipedia makes it   11:13
21 all the more dangerous to plagiarize from
22 there, doesn't it?
23        ATTORNEY O'DELL:  Object to the
24    form.  Misstates his prior report,
25    misstates his testimony from his         11:14

Page 113

1    previous deposition, and misstates
2    what he just said.
3        THE WITNESS:  Correct.  It could
4    also be that somebody puts in
5    Wikipedia content that they             11:14
6    plagiarized from somewhere else, and
7    then we get into a circular argument
8    of who said it first.
9 BY ATTORNEY DAVIDSON:
10    Q.  Is it your testimony that the        11:14
11 language you copied from Wikipedia was
12 actually language you put into Wikipedia?
13        ATTORNEY O'DELL:  Objection to the
14    form.  Misstates his prior report, his
15    prior testimony, and what he just said   11:14
16    a moment ago.
17        THE WITNESS:  I guess do you
18    want -- should we go to the specific
19    sentences from Wikipedia?  Then we can
20    discuss that.                            11:14
21 BY ATTORNEY DAVIDSON:
22    Q.  Is it your testimony that any of
23 the language in your expert report was
24 language that you had placed in Wikipedia?
25    A.  No, I'm not making that testimony.   11:14

29 (Pages 110 - 113)

Page 114

1    Q. Okay. Have you had the opportunity
2 since your last deposition to figure out why
3 you and Dr. Zelikoff had identical language
4 in your original reports?
5        ATTORNEY O'DELL: Let me just --    11:14
6    object to the form. Jessica, you're
7    reviewing his prior testimony, and as
8    you know, this deposition is for new
9    material. If you want to ask has he
10    done anything since, I think that's a    11:15
11    fair objection. If you want to go back
12    through that subject matter and that
13    testimony, that's not in keeping with
14    the order, as you know.
15        ATTORNEY DAVIDSON: Hey, Leigh,    11:15
16    what was my question?
17        ATTORNEY O'DELL: I heard your
18    question, and I made my objection.
19        ATTORNEY DAVIDSON: Okay. I don't
20    think you heard my question.    11:15
21        ATTORNEY O'DELL: I do believe I
22    did.
23        ATTORNEY DAVIDSON: It was not
24    objectionable. If you heard my
25    question, your objection was    11:15

Page 115

1    frivolous.
2 BY ATTORNEY DAVIDSON:
3    Q. Doctor, since you have the realtime
4 in front of you, I assume I don't need to
5 repeat my question. Can you answer it?    11:15
6    A. So you said Dr. Sell? That's
7 what's on the realtime.
8    Q. Zelikoff.
9    A. I don't recall Dr. Zelikoff's
10 report or seeing it.    11:15
11    Q. That's not my question. My
12 question is you did recall -- you told me
13 that you reread your deposition. You do
14 recall that at your last deposition, you
15 were asked why there was language identical    11:16
16 in your report and Dr. Zelikoff's report.
17    My question is: Have you had an
18 opportunity, since your deposition in 2019,
19 to conduct any sort of investigation into
20 why your report and Dr. Zelikoff's report    11:16
21 had the same language in it?
22    A. So I have not specifically
23 conducted that investigation, nor do I
24 recall that specific language.
25    Q. You don't recall that testimony?    11:16

Page 116

1        ATTORNEY O'DELL: He just answered
2    the question. He just said that.
3 BY ATTORNEY DAVIDSON:
4    Q. You don't recall being questioned
5 about similarities in your report and    11:16
6 Dr. Zelikoff's report?
7    A. I recall generally. I don't recall
8 the specific language that was asked.
9    Q. I see.
10    Did you call Dr. Zelikoff after    11:16
11 your deposition and say: Hey, how come your
12 report and my report had the same language?
13        ATTORNEY O'DELL: Object to the
14    form.
15        THE WITNESS: I did not make a    11:17
16    call.
17 BY ATTORNEY DAVIDSON:
18    Q. Did you go to plaintiff's counsel
19 and say: Hey, what the heck, why did she
20 copy my report?    11:17
21        ATTORNEY O'DELL: Objection to the
22    question.
23    Do not respond to that question as
24    it seeks communications between
25    counsel and yourself.    11:17

Page 117

1 BY ATTORNEY DAVIDSON:
2    Q. So your testimony is that you took
3 no steps to determine why you and
4 Dr. Zelikoff had the same language in your
5 expert reports after learning about that at    11:17
6 your last deposition; correct?
7        ATTORNEY O'DELL: Objection to the
8    form. Misstates the prior testimony.
9 BY ATTORNEY DAVIDSON:
10    Q. Is that correct, Doctor?    11:17
11    A. I've not reached out to
12 Dr. Zelikoff for any reason.
13    Q. At your last deposition, you were
14 asked about two sentences from your report
15 that were identical to language from a 2002    11:18
16 article by Coussens called Inflammation in
17 Cancer.
18    Is there a reason why you didn't
19 add a citation to Coussens' Inflammation in
20 Cancer in your amended report?    11:18
21    A. No, no specific reason. Do you
22 have those sentences -- is that available as
23 an exhibit? Maybe I'll be able to give you
24 a better answer.
25    Q. I think you answered my question.    11:18

30 (Pages 114 - 117)

Page 118

1    Are you offering any opinions about
2  asbestos?
3    A. I'm not sure I understand your
4  question. Am I offering any opinions about
5  specifically asbestos in isolation or          11:19
6  asbestos in the context of this bio -- of
7  the biological plausibility?
8    Q. Either one.
9    A. I think my report contains an
10  opinion as to the totality of the components    11:19
11  within talc, of which asbestos is one. If
12  that aligns with your question, then yes,
13  I'm offering -- but I'm offering an opinion
14  on the totality of talc and its components.
15  I have not performed an analysis to           11:19
16  specifically break apart the relative
17  contributions of any components that may or
18  may not be present in talc.
19    Q. Are you offering an opinion that
20  Johnson's Baby Powder contained talc?          11:20
21    ATTORNEY O'DELL: Object to the
22  form.
23  BY ATTORNEY DAVIDSON:
24    Q. I'm sorry. That Johnson's Baby
25  Powder contained asbestos. Sorry.             11:20

Page 119

1    ATTORNEY O'DELL: Again, Jessica,
2  this goes back to language that was
3  included in his 2018 report. If you
4  have something new you want to ask
5  him, he's certainly here to answer           11:20
6  your questions, but he's not here to
7  go back over previous aspects of his
8  report that have not been amended or
9  changed.
10  BY ATTORNEY DAVIDSON:                        11:20
11    Q. Dr. Levy, are you offering the
12  opinion in 2024 that Johnson's Baby Powder
13  contained asbestos?
14    A. I wasn't asked to provide an
15  opinion on whether Johnson's Baby Powder       11:20
16  contained asbestos.
17    Q. Excellent. That will shorten your
18  deposition today.
19    A. My only opportunity in that subject
20  has been the review of the other reports       11:20
21  from Dr. Longo's report.
22    Q. And we established that you did not
23  conduct a complete review because you never
24  looked at the responsive reports; correct?
25    ATTORNEY O'DELL: Objection to the     11:21

Page 120

1  form.
2    THE WITNESS: I'm only able to
3  review the materials that I have
4  available.
5  BY ATTORNEY DAVIDSON:                         11:21
6    Q. And you also didn't ask for
7  additional materials; correct?
8    ATTORNEY O'DELL: Object to the
9  form.
10    THE WITNESS: Did I ask for          11:21
11  additional material specifically that
12  refutes Dr. Longo's report?
13  BY ATTORNEY DAVIDSON:
14    Q. Uh-huh.
15    A. No, I didn't make that request. I    11:21
16  guess I have not generally made the request
17  for anything that would be in the negative
18  in the sense that I also didn't ask for
19  other reports that support Dr. Longo's
20  testimony or his report either.             11:22
21    Q. You're also not offering any
22  opinions in 2024 with respect to cleavage
23  fragments or fibrous talc; correct?
24    ATTORNEY O'DELL: That's a -- in
25  2024, is that what your question was?        11:22

Page 121

1    ATTORNEY DAVIDSON: I added 2024
2  so you wouldn't tell me that it was
3  asked in 2019. I need to know what
4  the current opinions are.
5    ATTORNEY O'DELL: As you know, his   11:22
6  opinions are outlined in his report.
7    ATTORNEY DAVIDSON: Thanks.
8    THE WITNESS: Again, my report did
9  not attempt to separate any specific
10  components or subcomponents or          11:22
11  structures within. It was more to
12  consider the biological plausibility
13  of talc as a whole, the product as a
14  whole.
15  BY ATTORNEY DAVIDSON:                       11:22
16    Q. Great. So you don't have separate
17  opinions about fragrances or heavy metals
18  either?
19    ATTORNEY O'DELL: Objection to the
20  form. Misstates his prior testimony.     11:23
21    THE WITNESS: I mean, I -- again,
22  I have opinions on both of those
23  subjects, but are we asking about the
24  content of the report? So within my
25  report, I did not specifically           11:23

31 (Pages 118 - 121)

Page 122

1  differentiate the relative risk or
2  other components of any of those
3  things because, again, that wasn't the
4  request, nor did my literature review
5  provide a clear separation of those          11:23
6  subcomponents and then the testing of
7  them relative to cancer. Certainly my
8  opinions based on the review of other
9  materials, including the expert
10  reports of other witnesses, allow me          11:23
11  to generate an opinion in that area.
12  BY ATTORNEY DAVIDSON:
13  Q. What do you mean by you have
14  opinions that are not set forth in your
15  report?                                      11:24
16      ATTORNEY O'DELL: Objection.
17  That's not what he said.
18      ATTORNEY DAVIDSON: That is what
19  he said.
20      ATTORNEY O'DELL: No, it's not.       11:24
21      THE WITNESS: I said my report had
22  the request of focusing in specific
23  areas, which it does. But you're
24  asking -- you didn't ask if -- you
25  asked if I have an opinion.                   11:24

Page 123

1  BY ATTORNEY O'DELL:
2  Q. Do you plan to offer any expert
3  opinions at trial besides those set forth in
4  your report?
5  A. I guess it depends on what           11:24
6  questions I'm asked. If those questions
7  come for subjects that are outside the
8  report but it's an area that I can provide
9  an opinion on based on my background and
10  experience or based on other information, I   11:24
11  suppose I would have to ask for
12  clarification on that from a procedural
13  perspective. I guess I don't -- I guess I
14  don't know what is fair game outside of
15  what's contained in a report at trial.        11:24
16  Q. When you say you have opinions on
17  heavy metals and fragrances, what are those
18  opinions?
19      ATTORNEY O'DELL: Objection to the
20  form. He said he had it -- he              11:25
21  expressed it in his report, and those
22  are --
23      ATTORNEY DAVIDSON: He said he has
24  opinions.
25      ATTORNEY O'DELL: Those are the       11:25

Page 124

1  same opinions he offered in his 2018
2  report.
3      ATTORNEY DAVIDSON: How do you
4  know? How do you know it's the same
5  opinions, Leigh? You're testifying        11:25
6  now.
7      ATTORNEY O'DELL: No, I'm not.
8  I'm just saying you're asking him a
9  general question about heavy metals.
10  And what I'm trying to do, Jessica,        11:25
11  is --
12      ATTORNEY DAVIDSON: Leigh --
13      ATTORNEY O'DELL: What I'm trying
14  to do is make clear that the purpose
15  of this deposition is for new             11:25
16  materials. And so for you to ask --
17      ATTORNEY DAVIDSON: He just told
18  me that he has opinions on heavy
19  metals and fragrances that aren't in
20  his report.                                11:25
21      ATTORNEY O'DELL: He did not say
22  that.
23      ATTORNEY DAVIDSON: Yes, he did.
24      ATTORNEY O'DELL: He said they
25  were in his report.                        11:25

Page 125

1      ATTORNEY DAVIDSON: That they
2  weren't in his report.
3      ATTORNEY O'DELL: They are in his
4  report. It's on page 18.
5      ATTORNEY DAVIDSON: That's not       11:26
6  what he said. He said he has opinions
7  on heavy metals and fragrance that are
8  not in his report.
9      ATTORNEY O'DELL: You're
10  intentionally trying to confuse what       11:26
11  he was explaining.
12      ATTORNEY DAVIDSON: Intentionally?
13  I'm intentionally telling you he said
14  aren't when I thought I heard are?
15  Are you out of your mind? He said        11:26
16  aren't.
17      ATTORNEY O'DELL: You're trying --
18      ATTORNEY DAVIDSON: I'm trying?
19  Leigh, I heard him say aren't. If he
20  said are in his report, great. Then       11:26
21  we can move on.
22      ATTORNEY O'DELL: Just ask the
23  question, Jessica.
24      ATTORNEY DAVIDSON: I thought he
25  said aren't.                               11:26

32 (Pages 122 - 125)

Page 126

1    ATTORNEY O'DELL: Why don't you
2 ask the question.
3    ATTORNEY DAVIDSON: The problem,
4 Leigh, is that you are over and over
5 telling Dr. Levy what you want him to        11:26
6 say. This has been ongoing.
7    ATTORNEY O'DELL: That is
8 incorrect.
9    ATTORNEY DAVIDSON: Since 10
10 o'clock in the -- 12 o'clock. I'm        11:26
11 confused by the time zones.
12    For two hours, you have been
13 trying to feed testimony to Dr. Levy
14 in the most transparent way I've ever
15 seen.        11:26
16    ATTORNEY O'DELL: That's
17 incorrect.
18 BY ATTORNEY DAVIDSON:
19    Q. Dr. Levy, maybe I misunderstood.
20 So let's let Dr. Levy speak for        11:26
21 himself. He's a grown man.
22    Dr. Levy, what were you trying to
23 say? And I apologize if I misunderstood. I
24 was trying to sort of figure out what you're
25 not talking about so we can shorten this        11:27

Page 127

1 deposition because it's three hours later
2 here. So maybe I did misunderstand you.
3 Why don't you explain what you were trying
4 to say.
5    A. You were asking about fragrance        11:27
6 specifically separate from heavy metals,
7 specifically separate from other components
8 of talc.
9    Q. Correct.
10    A. And I was trying to explain that I        11:27
11 had, in detail, considered that as the
12 totality of the product. In my report,
13 there are subreferences to other materials,
14 Dr. Crowley specifically, where there was
15 other opinions offered in more detail about        11:27
16 the components such as fragrances and their
17 potential to have carcinogenic compounds and
18 heavy metals and their known
19 carcinogenicity. But I was not attempting
20 to tease those out and offer a relative risk        11:27
21 or a relative contribution to those --
22 meaning prioritizing which is the most
23 significant to least significant -- because
24 that wasn't part of my analysis.
25    Q. So you mentioned them as some sort        11:28

Page 128

1 of background, but your opinions are about
2 talc as a whole?
3    A. Yes, my opinions are -- were
4 focusing on the totality of the product. I
5 wasn't asked to offer an opinion breaking        11:28
6 those things apart.
7    Q. Okay. Great. That will shorten
8 this deposition.
9    ATTORNEY DAVIDSON: Leigh, I was
10 not trying to confuse anything. I was        11:28
11 absolutely certain he said not when
12 you heard him say was.
13    ATTORNEY O'DELL: Maybe the
14 vagaries of a Zoom deposition and not
15 being able to hear; so maybe that's        11:28
16 what caused the confusion.
17    ATTORNEY DAVIDSON: I would never
18 do something like that. I want that
19 to be clear.
20    Why don't we take -- it's been        11:29
21 about an hour. I can't remember if we
22 came back at 1:30. Why don't we take
23 ten minutes or five. Seven?
24    ATTORNEY O'DELL: Yeah, five,
25 seven minutes, that would be great.        11:29

Page 129

1    (Recess taken from 11:29 a.m. to
2    11:40 a.m.)
3 BY ATTORNEY DAVIDSON:
4    Q. Doctor, can you cite any evidence
5 to support the theory that environmental        11:41
6 carcinogens increase the likelihood that
7 BRCA1 or 2 mutation will lead to ovarian
8 cancer?
9    A. I'm just rereading your question.
10    Q. Okay.        11:41
11    A. So the -- and this wasn't part of
12 the report, but there's an interesting
13 observation relative to BRCA1 and 2
14 mutations that was made by the discoverer of
15 those mutations, Mary Claire King, in 1990.        11:41
16 And that is, as time has gone on, the impact
17 or the relative risk that BRCA1 and 2
18 mutations impart for both breast and ovarian
19 cancer has increased, meaning the age has
20 gotten younger, but it's not known at this        11:42
21 time whether that's due to environmental
22 factors or whether that's due to things like
23 less women getting pregnant or women having
24 children at later ages.
25    So more research needs to be done,        11:42

33 (Pages 126 - 129)

Page 130

1 but there does appear to be an association
2 that BRCA1 and 2 mutations are increasing in
3 their impact in cancer risk as time goes on.
4 That's, again, broadly summarizing that
5 literature.                    11:42
6    Q. But are you aware of any scientific
7 evidence that an environmental carcinogen
8 like talc would increase the likelihood that
9 a BRCA1 or 2 mutation would lead to ovarian
10 cancer?                      11:42
11    A. So they're not -- so indirectly
12 the -- and what I was asked to do is, in the
13 provision of that evidence, indirectly there
14 are kind of two different components to a
15 complex outcome being cancer. So BRCA1 and    11:43
16 2 inhibit DNA repair. That inhibition of
17 DNA repair would then likely make external
18 factors, regardless of source, whether it be
19 talc or other sources. Your initiation
20 events or other things can be -- it's kind    11:43
21 of -- or maybe an analogy is the BRCA1 and 2
22 mutation are like putting a snowball at the
23 top of the hill, and that external insult,
24 whether it be talc or other carcinogens, can
25 kind of help kick that snowball down the    11:43

Page 131

1 hill.
2    Q. But my question is -- I understand
3 the theory.
4      My question is: Can you point to
5 any scientific literature supporting that    11:43
6 theory?
7      ATTORNEY O'DELL: Objection to
8    form.
9      THE WITNESS: There's been -- I'm
10 trying to think if any of the studies    11:44
11 had BRCA1 and 2. I don't recall if
12 the studies had that as a -- had the
13 BRCA1 and 2 mutational statuses.
14 Certainly the epidemiology studies I
15 don't think did, but the remainder of    11:44
16 the studies, I don't recall seeing any
17 direct literature to answer that
18 question.
19 BY ATTORNEY DAVIDSON:
20    Q. Similarly, are you -- can you point    11:44
21 to any scientific literature supporting the
22 theory that carcinogens would increase the
23 penetrants of Lynch syndrome mutations?
24      ATTORNEY O'DELL: Object to the
25    form.                    11:44

Page 132

1      THE WITNESS: Not directly.
2 BY ATTORNEY DAVIDSON:
3    Q. Is it your opinion that talc causes
4 malignant transformation in normal human
5 ovarian cells?                  11:45
6    A. As I think we mentioned before, I
7 wasn't asked to provide an opinion on
8 causation; so I would not use the word
9 cause.
10    Q. Are you providing an opinion on    11:45
11 malignant transformation?
12    A. My opinions are based on the
13 totality of the process. Can talc create an
14 environment that can contribute to malignant
15 transformation?                 11:45
16      I am aware of Buz'Zard. We can
17 find the exact reference to give you the
18 specific answer, but there have been studies
19 both in vivo and more so in vitro looking at
20 the role that talc may play in malignant    11:46
21 transformation.
22    Q. Did the Buz'Zard paper show
23 malignant transformation?
24    A. I believe markers of that. I think
25 that was an in vitro study.          11:46

Page 133

1    Q. Has any scientist ever shown that
2 talc causes malignant transformation?
3      ATTORNEY O'DELL: Object to the
4    form, other than what he just
5    testified to.                  11:46
6      THE WITNESS: Sorry. Your
7    question was has any scientist shown
8    that talc causes --
9 BY ATTORNEY DAVIDSON:
10    Q. Ever shown that talc causes    11:46
11 malignant transformation in ovarian cells.
12    A. In in vitro experiments, as far as
13 the ability of those in vitro experiments to
14 mimic malignant transformation, yes, there
15 have been studies that have shown that. I    11:46
16 am not aware of a study that has shown that
17 in vivo.
18    Q. What studies have shown that talc
19 can cause malignant transformation in
20 ovarian cells in vitro?              11:47
21    A. Let me look to get you the
22 reference. I'm trying to think where that
23 was.
24      So the Harper 2023, there's the
25 Buz'Zard and Lau, Shukla, et al. This is a    11:47

34 (Pages 130 - 133)

Page 134

1  summary of references; so I know that these
2  are the in vitro studies. Fletcher
3  described induction of point mutations after
4  exposure.
5      It would be fair -- yeah. So those    11:48
6  are the -- and I think the Harper described
7  the neoplastic transformation. Whether you
8  consider that malignant transformation is,
9  of course, debatable.
10     Q. So I'm not sure what your answer    11:48
11 is. I just want to make sure I have a clean
12 answer to my question.
13     What papers would you say show
14 malignant transformation in vitro to ovarian
15 cells?                        11:48
16     ATTORNEY O'DELL: Objection to the
17 form. Asked and answered.
18     THE WITNESS: So as I said, if
19 there's been -- the paper's focused on
20 neoplastic transformation. So you're    11:48
21 asking about malignant transformation.
22 Are you suggesting there's a
23 difference, or are you interested in
24 if there's a difference, or are you
25 looking for the change in cellular    11:49

Page 135

1  behavior based on exposure to talc
2  that has the markers that are similar
3  to or would be considered in the same
4  biological process as a transformative
5  event?                        11:49
6  BY ATTORNEY DAVIDSON:
7      Q. If you prefer to use the term
8  "neoplastic transformation," I'm happy to
9  ask the question as: What papers do you
10 believe have shown that talc causes    11:49
11 neoplastic transformation in normal human
12 ovarian cells?
13     A. I'd have to look back at the papers
14 in more detail to make sure specifically
15 when you're saying "normal human ovarian    11:49
16 cells."
17     Q. Do you know that -- we'll look at
18 the papers. I promise.
19     But do you know whether there are
20 any papers have shown that talc causes    11:50
21 malignant transformation or neoplastic
22 transformation in normal human ovarian
23 cells?
24     ATTORNEY O'DELL: Object to the
25 form.                        11:50

Page 136

1      THE WITNESS: Again, I'd say we
2  can answer that question as we look at
3  the papers.
4  BY ATTORNEY DAVIDSON:
5      Q. Is there a reason why you don't    11:50
6  discuss Harper 2023 in your report?
7      A. I'd have to look at Harper again.
8  No specific reason comes to mind. I'd have
9  to look at the paper to either remind myself
10 why or indicate.                11:50
11     Q. It's on page 7 of your materials
12 and data considered list, Harper -- I think
13 you were just -- when I just asked you that
14 question, were you looking at your materials
15 and data considered list?          11:50
16     A. (No verbal response.)
17     Q. Sir?
18     A. Yes.
19     Q. Is that what you were looking at?
20 I assume that's what you were looking at to    11:51
21 answer my prior question; correct?
22     A. That's correct.
23     Q. And you were looking at the Harper
24 paper published in Minerva Obstetrics and
25 Gynecology 2023; correct?          11:51

Page 137

1      ATTORNEY O'DELL: Objection to the
2  form.
3      THE WITNESS: No.
4  BY ATTORNEY DAVIDSON:
5      Q. You were looking at the entry in    11:51
6  your materials and data considered for
7  Harper 2023 Minerva Obstetrics and
8  Gynecology, no?
9      A. I wasn't looking at that specific
10 entry.                        11:51
11     Q. When you said Harper 2023, what
12 were you reading from?
13     A. I was looking at notes and then my
14 report.
15     Q. What notes were you looking at?    11:51
16     A. The ones we were talking about
17 earlier.
18     ATTORNEY DAVIDSON: Okay. Let's
19 take a break. Let's go off the
20 record.                        11:51
21     (Recess taken from 11:51 a.m. to
22 12:11 p.m.)
23 BY ATTORNEY DAVIDSON:
24     Q. Dr. Levy, I'm confused a little bit
25 because -- so when I was asking you what    12:11

35 (Pages 134 - 137)

Page 138

1 articles support -- provide evidence that
2 talc can cause malignant transformation,
3 ovarian cells, you pointed to three papers.
4 And I said: Were you looking at your
5 materials considered when you cited those    12:11
6 papers? I thought you said: No, I was
7 looking at my notes. But during the break,
8 counsel produced your notes and your notes
9 don't mention those papers. So now I'm just
10 confused, and I'm afraid I misunderstood.    12:12
11     ATTORNEY O'DELL: Objection to
12 form.
13 BY ATTORNEY DAVIDSON:
14    Q. So can you explain what you were
15 looking at when you listed Harper 2023,    12:12
16 Buz'Zard, Lau, and Fletcher?
17    A. I mentioned Buz'Zard, Lau, and
18 Fletcher and I misread Harper. I had pulled
19 it up on the materials list and in my
20 report. If you look on page 15 of the    12:12
21 report, that section is what I was looking
22 at when I was answering the question. You
23 see it says Fletcher Harper 2019. But then
24 the Harper -- it was just my mistake. I
25 read Fletcher, Harper as two papers; so    12:12

Page 139

1 that's Fletcher and Harper as one, and then
2 Harper coincidentally is the 2023. So it's
3 a misunderstanding.
4    Q. So when you said you were looking
5 at your notes, you weren't actually looking    12:12
6 at your notes?
7     ATTORNEY O'DELL: Objection.
8     THE WITNESS: No. I said I was
9 looking at materials and my notes. It
10 was not either/or. I was looking at    12:13
11 those items.
12 BY ATTORNEY DAVIDSON:
13    Q. So where were you reading Harper
14 2023 from because it's not in your paper,
15 and it's not on your notes?    12:13
16    A. No. I read Harper on page 15 of
17 the report. The materials referenced list
18 is an easier one to look at as far as
19 finding a reference; so I turned to that.
20 That's why I said the confusion is Harper    12:13
21 2023 is a separate paper from Fletcher and
22 Harper. So when I stated Fletcher and
23 Harper as two separate papers, it was my
24 error.
25    Q. Fletcher and Harper are or are not    12:13

Page 140

1 two separate papers?
2    A. No. There's a paper that the
3 authors are Fletcher and Harper, and there's
4 a separate paper where Harper is the first
5 author. When I was looking between the    12:13
6 report and the materials cited list, I
7 looked at -- my reference to Fletcher and
8 Harper 2019 as two separate papers. When I
9 looked to get the complete reference in the
10 material list rather than the bibliography.    12:14
11 Harper --
12    Q. It's your testimony -- sorry.
13    A. Harper 2023 is on the materials
14 cited list, but it's not referenced in the
15 report.    12:14
16    Q. But it's your testimony that both
17 Harper 2023 and Fletcher 2019 show
18 neoplastic transformation in normal ovarian
19 cells?
20     ATTORNEY O'DELL: Objection to    12:14
21 form.
22     THE WITNESS: No.
23 BY ATTORNEY DAVIDSON:
24    Q. What's your --
25    A. We were discussing more about in    12:14

Page 141

1 vitro studies, and I was giving references
2 to some of the in vitro studies like the
3 Buz'Zard, the Fletcher, and others. So it
4 wasn't specifically the neoplastic
5 transformation.    12:14
6     Then in looking at the Harper, of
7 course, the title of that paper is Malignant
8 Transformation of Human Primary Normal
9 Ovarian Epithelial Cells. Since these are
10 all from the same laboratory group, it was    12:15
11 just a confusion between telling you
12 Fletcher and Harper is two papers, and then
13 looking at Harper and then seeing that in
14 the title. So it answers the two different
15 questions.    12:15
16    Q. Let's just start over. I'm trying
17 to find out: You are offering an opinion on
18 biological plausibility. I want to
19 understand whether it is your testimony that
20 any scientific papers have shown that talc    12:15
21 can cause neoplastic transformation in
22 ovarian cells, and if so, what those papers
23 are.
24     ATTORNEY O'DELL: Object to the
25 form. Asked and answered.    12:15

36 (Pages 138 - 141)

Page 142

1    THE WITNESS: So I answered that
2    question with there's a number of
3    papers that show the in vitro effects
4    of talc on cells with various markers
5    that could be interpreted as          12:15
6    transformation. The only paper that
7    directly has that in the title is the
8    Harper 2023 paper, but that is not
9    referenced in the report.
10 BY ATTORNEY DAVIDSON:                   12:16
11    Q. I'm not asking whether it's in the
12 title.
13    I'm asking: Has any scientist
14 shown that talc can cause neoplastic
15 transformation in ovarian cells?        12:16
16    A. The Harper paper.
17    Q. And is it your testimony that the
18 Harper paper shows neoplastic transformation
19 in ovarian cells?
20    A. Correct.                          12:16
21    Q. Did you evaluate whether the Harper
22 paper is reliable?
23    A. In what way?
24    Q. In any way.
25    A. Not any more so than I did any of  12:17

Page 143

1 the other literature review.
2    Q. Are you familiar with Minerva
3 Obstetrics and Gynecology?
4    A. Not in detail. I believe it's an
5 Italian journal, but I'm not --          12:17
6    Q. Do you know if it's a --
7    A. No, I'm not familiar with the
8 journal or their policies in detail.
9    Q. Do you know if it's a
10 well-respected journal?                  12:17
11    A. I don't know.
12    Q. Do you know whether the Harper 2023
13 paper was rejected by numerous journals
14 prior to its publication?
15    A. I would have no way of knowing     12:17
16 that.
17    Q. Did plaintiff's lawyers provide you
18 with comments from all of the journals that
19 rejected the paper?
20    A. No.                               12:17
21    Q. Are you aware that plaintiff's
22 lawyers have peer-reviewed comments heavily
23 criticizing the Harper 2023 paper from
24 reproductive scientists, gynecologic
25 oncology, and PLOS1 scientific journals? 12:18

Page 144

1    A. No, I'm not aware.
2    Q. I take it that you're not aware
3 that one of those peer-reviewed comments
4 refers to the author's conclusions as
5 outrageous?                              12:18
6    ATTORNEY O'DELL: Object to the
7 form. Object to the form. Assumes
8 facts not in evidence. If you want to
9 show him something to review, he can
10 read it.                                12:18
11    THE WITNESS: I'm not aware.
12 BY ATTORNEY DAVIDSON:
13    Q. You're not aware that the peer
14 reviewer said that the conclusions are not
15 supported by the manuscript's data; correct? 12:18
16    ATTORNEY O'DELL: Object to the
17 form.
18    THE WITNESS: I would have no way
19 of accessing those comments or those
20 reviews.                                12:18
21 BY ATTORNEY DAVIDSON:
22    Q. If your lawyers have them, then you
23 would have a way of accessing them; right?
24    ATTORNEY O'DELL: Object to the
25 form.                                   12:19

Page 145

1    THE WITNESS: I certainly didn't
2    ask the lawyers if they had review
3    comments on the body of literature
4    that I had reviewed. That wouldn't be
5    a standard typical request.           12:19
6 BY ATTORNEY DAVIDSON:
7    Q. And they didn't offer them to you?
8    A. No. For that study or any other
9 study.
10    Q. Do you believe the authors of this 12:19
11 paper had sufficient data to claim a finding
12 of malignancy?
13    A. Again, my earlier question about
14 malignancy versus neoplastic, et cetera.
15 It's a complicated conclusion to derive in 12:19
16 vitro because in vitro is not in vivo. As
17 I'm sure you're now well aware, the process
18 of cells transforming and then becoming
19 malignant and becoming metastatic is quite
20 complex and relies on a number of factors, 12:19
21 including a very complex tumor
22 microenvironment; therefore, most in vitro
23 studies have to rely on markers of that.
24 Now, whether the --
25    Q. Do you think --                   12:20

37 (Pages 142 - 145)

Page 146

1    ATTORNEY O'DELL: Let him finish.
2    THE WITNESS: It's really up to
3  the authors' and reviewers' opinions
4  if those markers represent enough of
5  a -- to represent malignant          12:20
6  transformation in an in vitro study.
7 BY ATTORNEY DAVIDSON:
8    Q. Do you think the authors provided
9 sufficient data to claim a finding of
10 neoplastic transformation?          12:20
11    ATTORNEY O'DELL: Objection.
12    Asked and answered.
13    THE WITNESS: I have no other
14  evidence to refute what the authors
15  are claiming.                      12:20
16 BY ATTORNEY DAVIDSON:
17    Q. Have you ever submitted an article
18 to a peer-reviewed journal and received a
19 comment saying that the science cannot be
20 trusted?                             12:20
21    ATTORNEY O'DELL: Objection to the
22    form.
23    THE WITNESS: No, I have not.
24 BY ATTORNEY DAVIDSON:
25    Q. Have you ever submitted a paper to    12:20

Page 147

1 a journal and received a comment that said
2 the problems with your submission are too
3 numerous to count and the science,
4 methodology, and data cannot be trusted?
5    ATTORNEY O'DELL: Object to the    12:21
6    form.
7    THE WITNESS: No, I have not.
8 BY ATTORNEY DAVIDSON:
9    Q. Do you have enough experience with
10 cell biology to know whether the science    12:21
11 methodology and data in the Harper 2023
12 paper can be trusted?
13    A. I would have to review the paper in
14 more detail to give you an answer to that
15 question.                            12:21
16    Q. If the science, methodology, and
17 data of Harper 2023 cannot be trusted, then
18 the authors would not have shown neoplastic
19 transformation; correct?
20    ATTORNEY O'DELL: Objection to the    12:21
21    form. Incomplete hypothetical,
22    misstates the record.
23    THE WITNESS: I can't answer that.
24 BY ATTORNEY DAVIDSON:
25    Q. So if the authors -- you can't tell   12:21

Page 148

1 me whether if the authors --
2    A. Is your question if the -- if all
3 of the content of the paper is false or
4 unreliable, could they then draw that
5 conclusion? Is that your question?    12:22
6    Q. If the science, methodology, and
7 data of the paper cannot be trusted, can you
8 still draw the conclusion that the authors
9 have shown neoplastic transformation?
10    ATTORNEY O'DELL: Object to the    12:22
11    form. Incomplete hypothetical.
12    THE WITNESS: What do you mean by
13    "cannot be trusted"? Meaning, needs
14    to be confirmed? We're talking about
15    a -- so the process of science is    12:22
16    continual evaluation and revision to
17    observations that are made and
18    published. That's the whole spirit of
19    peer review.
20 BY ATTORNEY DAVIDSON:                12:22
21    Q. Do you have sufficient experience
22 in cell biology to know whether the science
23 and methodology -- whether the methodology
24 used in Harper 2023 was appropriate and
25 sufficient to find neoplastic            12:23

Page 149

1 transformation?
2    A. Again, happy to review the paper to
3 provide an answer. Generally speaking, yes,
4 I have experience -- deep experience in cell
5 biology, but I have not -- I would need to    12:23
6 relook at the paper to answer that question
7 as if my specific experience aligns well
8 enough to their methodology to answer that
9 question.
10    Q. Prior to telling me --          12:23
11    A. I would --
12    ATTORNEY O'DELL: Excuse me. Just
13    because of Zoom, I don't think you
14    heard. He was still answering the
15    question.                         12:23
16    ATTORNEY DAVIDSON: It's very hard
17    because he stops and then he suddenly
18    starts again. So it's impossible to
19    know when he's done.
20    ATTORNEY O'DELL: Just give him a    12:23
21    moment. He's trying to do the very
22    best he can; so if you just give him a
23    moment to finish.
24    ATTORNEY DAVIDSON: Prior to
25    telling you --                    12:23

38 (Pages 146 - 149)

Page 150

1    ATTORNEY O'DELL:  No, no.  He's
2  not finished with his answer.  Please
3  continue.
4  BY ATTORNEY DAVIDSON:
5    Q.  Are you still answering the        12:23
6  question?
7    A.  You two were talking.  I didn't
8  want to interrupt and start again.
9    My ending thought was the same
10  comment about whether I had the experience        12:24
11  to make that evaluation would need to be
12  applied to the reviewers that made the
13  statements that you described that were in
14  those reviews.  Did they have the same
15  opportunity to review the paper, and did        12:24
16  they have the experience to come to those
17  conclusions?  Again, this is the entire
18  spirit and process of peer review.
19    Q.  Have you ever been asked to be a
20  reviewer for Gynecologic Oncology?        12:24
21    A.  No, I don't believe so.
22    Q.  Have you ever been asked to be a
23  reviewer for Reproductive Sciences?
24    A.  No.
25    Q.  Have you ever been asked to be a        12:24

Page 151

1  reviewer for PLOS1?
2    A.  Yes.
3    Q.  Before telling me that these
4  authors found neoplastic transformation, did
5  you evaluate what methodology they used?        12:24
6    A.  In general.
7    Q.  Before telling me that these
8  authors found neoplastic transformation, did
9  you assess whether the dose they used is
10  likely to ever replicate physiologic dosing?  12:25
11    ATTORNEY O'DELL:  Dr. Levy, if you
12    need to review the paper to remind
13    yourself of the dose, it's here.  We
14    can put it in front of you.
15  BY ATTORNEY DAVIDSON:        12:25
16    Q.  I'm not asking you to review the
17  paper.
18    I'm asking whether you personally,
19  Dr. Levy, considered whether the dose they
20  used is likely to ever replicate physiologic  12:25
21  dosing?
22    ATTORNEY O'DELL:  Object to the
23    form.  Different question.
24    THE WITNESS:  Routinely dosing in
25    in vitro studies is vastly different        12:25

Page 152

1  than dosing -- than would be expected
2  dosing in in vivo studies.  They're
3  two different questions.
4    The question being asked by this
5  paper is:  Can talc cause neoplastic        12:25
6  transformation?  It's a different
7  question whether the dosing that
8  causes that is physiological or not.
9  BY ATTORNEY DAVIDSON:
10    Q.  Are you familiar with the assay        12:26
11  that was used in the study?
12    A.  I'd need to take a moment to look
13  at the paper to remind myself.
14    Q.  When you read "the paper," did you
15  research the assay that was used?        12:26
16    A.  Again, I'll have to take a moment
17  to look.
18    Q.  I'm asking you:  When you read the
19  paper, did you go and research the assay?
20    ATTORNEY O'DELL:  His work on this        12:26
21    case has been going on for --
22    ATTORNEY DAVIDSON:  Leigh --
23    ATTORNEY O'DELL:  Let me finish.
24    His report --
25    ATTORNEY DAVIDSON:  That's not a        12:26

Page 153

1    proper objection.
2    ATTORNEY O'DELL:  Well, I believe
3    it is.  You're asking him define --
4    specific questions about in vitro
5    study, and he's entitled to look at it        12:26
6    if he's going to respond to your
7    questions.  It's not fair to ask him a
8    question in isolation about dose when
9    he's asked to look at the paper.  He
10    has these materials available, and        12:26
11    he's going to look at them if he needs
12    it to answer your question.
13    Dr. Levy, take a moment if you
14    need it.
15  BY ATTORNEY DAVIDSON:        12:27
16    Q.  We're not looking at the paper
17  right now, Dr. Levy.  You can look at the
18  paper when Leigh asks you questions.
19    ATTORNEY O'DELL:  No, no, no.
20    He's entitled --        12:27
21    ATTORNEY DAVIDSON:  He can look at
22    it when you ask him a question about
23    it.  I'm allowed to ask a question
24    about whether he recalls, and he's
25    allowed to say no, and then I'm        12:27

39 (Pages 150 - 153)

Page 154

1    allowed to move on.
2        And we will move on if you don't
3    recall.
4  BY ATTORNEY DAVIDSON:
5    Q. Without looking at the paper, you    12:27
6  do not recall whether you researched the
7  assay; correct?
8    A. I do not recall.
9    Q. Thank you. Let's move on.
10        If we can turn to page 13 of your    12:27
11  amended expert report, you cite Trabert Ness
12  2014 for the proposition that a more recent
13  pooled analysis examining 12 case-control
14  studies found that aspirin could reduce
15  ovarian cancer risk by 20 to 34 percent.    12:28
16        You see that; right?
17    A. Yes, I see that sentence.
18    Q. Are you aware that Trabert
19  published another study in 2019 titled
20  Analgesic Use in Ovarian Cancer Risk: An    12:28
21  Analysis in the Ovarian Cancer Cohort
22  Consortium?
23    A. If it's not in the material list,
24  then no.
25    Q. When you wrote this report, did you    12:28

Page 155

1  do research to update your paragraph about
2  NSAIDs and ovarian cancer?
3    A. Did I do research to update the
4  report -- I'm just rereading your question.
5    Q. The realtime doesn't often    12:29
6  accurately transcribe questions.
7    A. So not specific -- I did not
8  specifically look at NSAIDs as they relate
9  to ovarian cancer --
10    Q. You did not attempt to update the    12:29
11  research for this section of your report
12  that we're looking at on page 13; is that
13  correct?
14        ATTORNEY O'DELL: Objection to the
15    form. Your question related to    12:29
16    Trabert, not this whole page of the
17    report.
18  BY ATTORNEY DAVIDSON:
19    Q. Dr. Levy?
20    A. Yes.    12:29
21        ATTORNEY O'DELL: Objection to
22    form.
23  BY ATTORNEY DAVIDSON:
24    Q. Did you do research to update this
25  paragraph of your report in which you    12:29

Page 156

1  address findings related to NSAID use and
2  the development of ovarian cancer?
3    A. Again, I was performing the
4  totality of the literature report. I didn't
5  specifically look at NSAIDs. I didn't    12:30
6  specifically look at heavy metals. I didn't
7  specifically look at any of the subjects
8  we've been talking about. It's when I did
9  the searches and through that systematic
10  process we were talking earlier, I provided    12:30
11  updates when I found things that were
12  available that I found to be relevant.
13    Q. That really doesn't answer my
14  question, Doctor.
15        My question is: Did you attempt to    12:30
16  update your discussion of NSAIDs and the
17  development of ovarian cancer? Did you
18  attempt to update your research on that
19  topic?
20        ATTORNEY O'DELL: Objection --    12:30
21        THE WITNESS: I attempted to --
22        ATTORNEY O'DELL: Excuse me.
23    Object to the form. Asked and
24    answered.
25        THE WITNESS: I attempted to    12:30

Page 157

1    update my research throughout the
2    report.
3  BY ATTORNEY DAVIDSON:
4    Q. So do you know why you didn't
5  identify and cite the later paper by Trabert    12:30
6  on the same topic?
7        ATTORNEY O'DELL: Object to the
8    form.
9        THE WITNESS: No, I don't have an
10    answer at the moment.    12:31
11  BY ATTORNEY DAVIDSON:
12    Q. Okay. Is it possible that the
13  reason you don't cite the updated Trabert
14  paper is that they found no decrease in
15  ovarian cancer risk with the use of    12:31
16  anti-inflammatories?
17        ATTORNEY O'DELL: Objection to the
18    form.
19        THE WITNESS: Sorry. You're
20    saying that they found no decrease in    12:31
21    ovarian cancer risk with the use of
22    anti-inflammatories?
23  BY ATTORNEY DAVIDSON:
24    Q. Is that perhaps the reason why you
25  chose --    12:31

40 (Pages 154 - 157)

Page 158

1    A. No.
2    Q. -- not to cite the later paper?
3    A. No, certainly not.
4    Q. Okay. Good to hear.
5    A. As I think the last paragraph on    12:31
6 page 13 I think alludes to having a balanced
7 discussion in the report.
8    Q. Do you know how changes in levels
9 of mRNA would indicate an increased
10 pro-oxidant state in a cell?    12:32
11    A. How changes in levels of mRNA would
12 indicate a pro-oxidant state?
13    Q. Uh-huh.
14    A. Certainly.
15    Q. Can you explain?    12:32
16    A. You'd have to be specific of which
17 mRNA to indicate --
18    Q. Do you --
19    A. So you have -- it's just part of
20 the central dogma of biology. There can be    12:32
21 a cellular influence, whether it be
22 pro-oxidant, other insults, et cetera,
23 triggers a regulatory change in the nucleus
24 which results in transcription of RNA of
25 which mRNA, of course, is the protein coding    12:32

Page 159

1 component, which then translates to final
2 proteins which end up being the effector
3 molecules.
4        There are nuances there, of course,
5 that RNAs can act in a more direct fashion,    12:33
6 but you specifically asked mRNA being the
7 protein coding RNAs. So depending on which
8 mRNAs are up or down regulated could
9 indicate a specific cellular state. That is
10 why they accept it as a profiling mechanism    12:33
11 to characterize cellular states under any
12 wide variety of conditions.
13    Q. How would you observe a pro-oxidant
14 state?
15    A. Again, it would depend on the    12:33
16 totality of whatever the -- what the
17 specific question being asked and what the
18 experimental system is.
19    Q. How would you measure it?
20    ATTORNEY O'DELL: Objection.    12:33
21 Asked and answered.
22    THE WITNESS: Again, I need more
23 detail to provide you an answer. You
24 could -- there's -- again, you could
25 measure pro-oxidant states -- it's a    12:33

Page 160

1 chicken or the egg question. Are you
2 measuring the final effects of that,
3 meaning the final cellular changes, or
4 are you measuring the initial
5 transcriptional response to a    12:34
6 pro-oxidant state? It depends. These
7 are reasonably complex pathways with
8 pro- and antioxidant systems within
9 the cells. It would also depend on
10 the cell type as to how you'd measure    12:34
11 a pro-oxidant state. There isn't an
12 answer.
13 BY ATTORNEY DAVIDSON:
14    Q. In Fletcher 2019, how did they
15 observe or measure an increased pro-oxidant    12:34
16 state?
17    A. Again, I'd have to look at the
18 paper to give you an accurate answer.
19    ATTORNEY DAVIDSON: Let's mark it.
20 Are we up to 5?    12:34
21    THE CERTIFIED STENOGRAPHER: 5.
22    (Discussion off the record.)
23    (Exhibit Number 5 was marked for
24 identification.)
25    ATTORNEY O'DELL: Are you going to    12:36

Page 161

1 mark Fletcher as the next exhibit?
2    ATTORNEY DAVIDSON: We marked it
3 as Exhibit 5.
4    ATTORNEY O'DELL: Okay. It's
5 there in the chat. If you need to    12:36
6 look at it, Dr. Levy, you can download
7 it.
8    THE WITNESS: Got it.
9 BY ATTORNEY DAVIDSON:
10    Q. Doctor, do you remember the pending    12:37
11 question?
12    A. I have the paper open now, if you
13 don't mind restating.
14    Q. I just want to make sure you know
15 there's a pending question.    12:37
16    A. If you can state it again.
17    ATTORNEY DAVIDSON: Let's go off.
18    (Recess taken from 12:39 p.m.
19 12:39 p.m.)
20    (Record read by the Certified    12:39
21 Stenographer as follows:
22    "QUESTION:In Fletcher 2019,
23    how did they observe or measure
24    an increased pro-oxidant state?"
25    THE WITNESS: They measured -- I    12:39

41 (Pages 158 - 161)

Page 162

1    just had it here. I was looking at
2    the -- trying to see the -- it used --
3    they looked at iNOS levels by realtime
4    PCR and then nitric oxide levels
5    before and after 72 hours of talc         12:40
6    treatment. The nitric oxide assays
7    were specific to NO2 minus and NO3 or
8    nitric and nitrous oxide.
9  BY ATTORNEY DAVIDSON:
10    Q. Is that a proper way to measure an    12:40
11  increased pro-oxidant state?
12    A. It's one way to measure.
13    Q. Are you sure?
14    A. They also looked at expression of
15  antioxidant enzymes, but your question was    12:41
16  specific about the increased expression of
17  pro-oxidants.
18    Q. What's your basis for saying that's
19  a proper way to measure increased
20  pro-oxidant state?                          12:41
21    A. I guess I don't have any reason to
22  say it's not a proper way to measure
23  pro-oxidants.
24    Q. Do you have a reason other than the
25  fact that it says that in this article to    12:41

Page 163

1  say it is a proper way to measure it?
2      ATTORNEY O'DELL: Object to the
3    form.
4      THE WITNESS: No.
5  BY ATTORNEY DAVIDSON:                        12:41
6    Q. Okay. Is CA125 approved for early
7  detection of ovarian cancer?
8    A. I'm not aware of approved. I
9  believe it's present in roughly 80 percent
10  on the cell surface. So roughly 80 percent   12:42
11  of ovarian cancers, if I remember the basic
12  research on it. I'm not aware of its
13  approval or regulatory status as an early
14  detection mechanism.
15    Q. Is it an appropriate way to test      12:42
16  whether talc initiates ovarian cancer?
17      ATTORNEY O'DELL: Objection to
18    form.
19      THE WITNESS: It's -- I would say
20    it is a potential biomarker as a cell    12:42
21    status readout. But as with many
22    things in biology, it's done by --
23    it's early phases for this as a
24    biomarker. So there's a fairly rich
25    literature of its association and,       12:42

Page 164

1    therefore, reasonable to offer that as
2    a biomarker in the evolving research
3    space.
4  BY ATTORNEY DAVIDSON:
5    Q. Do you know if ovarian cancer        12:43
6  researchers consider the expression C125 to
7  be an appropriate way to research ovarian
8  cancer causation?
9      ATTORNEY O'DELL: Object to the
10    form.                                    12:43
11      THE WITNESS: I've not
12    specifically reviewed the causation
13    literature.
14      ATTORNEY DAVIDSON: Okay. Let's
15    mark as Exhibit 6 Mandarino 2020.       12:43
16      (Exhibit Number 6 was marked for
17    identification.)
18  BY ATTORNEY DAVIDSON:
19    Q. Before we move on, can I ask you a
20  question? I just have one more question on   12:44
21  this paper actually.
22      Is the change in gene expression
23  levels the same as an altered state of
24  oxidative stress?
25    A. Potentially.                         12:44

Page 165

1    Q. Explain.
2    A. So a change in gene expression
3  levels, depending on what genes are changed
4  in their expression, similar to the CA125
5  discussion, that could be a biomarker of a    12:44
6  change in oxidative state. It depends on
7  what is changed, the magnitude of change.
8  With any of these discussions of cellular
9  states, pro-oxidant, antioxidant, et cetera,
10  where you're all discussing in any of these   12:44
11  papers that there's a methodology used to
12  make that measurement, and generally that
13  methodology is either a direct or an
14  indirect measurement. Using molecular
15  biology, you can argue it's a more indirect    12:44
16  measurement.
17      But nonetheless, with appropriate
18  experimental design and controls, it
19  would -- certainly could be a very
20  reasonable approach. Again, it's going to     12:45
21  be dependent on how the study was designed
22  and how it was executed.
23    Q. Can you use ELISA to measure
24  reactive oxygen species?
25    A. Sure. Potentially. ELISA is         12:45

42 (Pages 162 - 165)

Page 166

1 simply a linkage of an enzyme to a reporter.
2 If you had a -- whether it be an antibody or
3 other reporter that can measure the change
4 in oxidative state of a protein or other
5 detector, it could certainly be.        12:45
6     Q. Even if the oxygen species are
7 unstable?
8     A. Correct. Whether they're stable or
9 not depends on the sensitivity of the assay
10 and the design of the assay.        12:45
11     Q. Okay. Let's talk about Mandarino
12 2020. If we could turn to page 10 of that
13 report -- of that paper. We're marking it
14 as Exhibit 6, Mandarino, The Effect of Talc
15 Particles on Phagocytes in Co-Culture with    12:46
16 Ovarian Cancer Cells.
17        If you could look at the
18 declaration of interest.
19     A. I see it.
20     Q. It says: JJG has served as an    12:46
21 independent expert and provided expert
22 testimony in talc and other environmentally
23 related litigation.
24        Do you see that?
25     A. I do.        12:46

Page 167

1     Q. Does that disclosure tell you which
2 side of the litigation Dr. Godleski is
3 testifying for?
4     A. It does not.
5     Q. Someone reading this paper would    12:46
6 have no idea from the conflict of interest
7 statement what the actual conflict of
8 interest is; correct?
9        ATTORNEY O'DELL: Objection to
10 form.        12:46
11        THE WITNESS: So it would be
12 common practice, particularly in the
13 academic setting -- which I believe
14 Dr. Godleski is a retired pathologist
15 from Harvard -- that you would not    12:47
16 necessarily disclose -- you're
17 disclosing a conflict. And that
18 conflict is saying that he served as
19 an independent expert and provided
20 expert testimony in talc and other    12:47
21 environmentally related litigation.
22        The declaration of interest
23 doesn't have to disclose on which side
24 of that discussion or trial or
25 whatever, or any more detail about    12:47

Page 168

1     what the depth of that independent
2     expert is.
3 BY ATTORNEY DAVIDSON:
4     Q. What's your basis for that
5 statement?        12:47
6     A. Standard practice and my experience
7 through my career with colleagues as they
8 disclaim interest in companies and interest
9 in -- in other consulting activities. For
10 example --        12:47
11     Q. When you --
12     A. -- it's not uncommon for someone to
13 disclose that they're a Wall Street
14 consultant, but they also do not include in
15 that whether they're on the pro side of a    12:47
16 company or buy side of a company or sell
17 side of a company. It's just -- it's
18 indicating that there is a potential --
19 there are those potential competing
20 interests.        12:48
21        Again, why it's called a
22 declaration of interest. It's not called
23 declaration -- or a conflict of interest.
24 It's a declaration of interest, of which
25 he's now made that declaration.        12:48

Page 169

1     Q. If you're associated with a
2 company, there's no two sides; there's just
3 one company; right?
4        ATTORNEY O'DELL: Object to the
5     form.        12:48
6        THE WITNESS: There are two sides.
7     There's whether or not you are
8     associated with the company in a
9     manner that could influence the
10     research or you're associated with the    12:48
11     company for any number -- there's any
12     number of reasons. It very much
13     depends on the situation. I think
14     it's more the declaration of that
15     interest is the key.        12:48
16 BY ATTORNEY DAVIDSON:
17     Q. Can you point me to any journal
18 that says that, it is declaration of
19 interest procedures?
20     A. That says what?        12:48
21     Q. You don't have to explain the
22 nature of your interest.
23        ATTORNEY O'DELL: Objection to
24     form.
25        THE WITNESS: We would have to    12:49

43 (Pages 166 - 169)

Page 170

1  review the journal instructions, but
2  in my recollection, most journals have
3  a threshold at which if you're above
4  that threshold, you make the
5  declaration. But I've never seen a          12:49
6  declaration of interest that states
7  the magnitude of financial interest in
8  a company or the pro- or anti-position
9  on any issue that, if it's relevant to
10 the research, it mainly just states      12:49
11 that there is an interest.
12 BY ATTORNEY DAVIDSON:
13     Q. You've never seen a declaration
14 that says, for a -- an expert in litigation,
15 which side of the litigation they're an      12:49
16 expert for?
17     A. No, no. I'm not saying I've never
18 seen that. I've not seen that as a
19 requirement that it has to be -- it's up to
20 the discretion of the author and what the      12:49
21 journal policies are.
22     Q. How often have you read conflicts
23 of interest by experts in litigation?
24     A. Again, my experience there is
25 limited to this -- to this case. As we      12:49

Page 171

1  talked about earlier, I did not spend a
2  significant amount of time evaluating the
3  declaration -- you know, conflict or
4  declarations of interest through the
5  literature review; therefore, I don't have a      12:50
6  quantitative answer to provide, other than
7  it's not something that I routinely pay
8  attention to.
9      Q. So you don't actually know what
10 percentage of study authors who are experts      12:50
11 in litigation identify which side of the
12 litigation they're on and which percentage
13 don't; correct?
14     ATTORNEY O'DELL: Objection to
15 form.      12:50
16     THE WITNESS: No, I do not know.
17 BY ATTORNEY DAVIDSON:
18     Q. Okay. Let's move on.
19     Are you aware that the authors of
20 Mandarino reported that talc by itself,      12:50
21 without the presence of immune cells, did
22 not significantly affect the number of MOSEC
23 cells after 72 hours?
24     ATTORNEY O'DELL: Which type of
25 cells? Would you mind repeating the      12:51

Page 172

1  question, please?
2      ATTORNEY DAVIDSON: Court
3  Reporter.
4      (Record read by the Certified
5  Stenographer as follows:      12:51
6      "QUESTION: Are you aware
7      that the authors of Mandarino
8      reported that talc by itself,
9      without the presence of immune
10     cells, did not significantly      12:51
11     affect the number of MOSEC cells
12     after 72 hours?"
13     ATTORNEY O'DELL: Object to the
14 form.
15     THE WITNESS: Just let me -- so      12:51
16 there's the -- are you referring to
17 macrophages?
18     ATTORNEY O'DELL: Can you clarify
19 your question? Dr. Levy asked you.
20 BY ATTORNEY DAVIDSON:      12:52
21     Q. Did you not understand my question?
22     A. No. I was asking you to confirm
23 the cell type.
24     Q. Why don't you tell me your
25 understanding.      12:52

Page 173

1      ATTORNEY O'DELL: He's trying to
2  answer your question.
3      THE WITNESS: I'm doing that.
4  Just give me a moment.
5  BY ATTORNEY DAVIDSON:      12:52
6      Q. You tell me.
7      What kind of cells did they use?
8      A. Sorry. Yeah. I wanted to
9  explicitly confirm that their abbreviation,
10 the MO, as you said, was indeed macrophages.      12:52
11 And yes, they are.
12     Q. I assume you know what MOSEC cells
13 are because you cited this paper?
14     A. Correct.
15     Q. Okay.      12:53
16     A. As with all abbreviations, to be
17 thorough, I was confirming the meaning of
18 that abbreviation. There are some standard
19 and some left standard abbreviations.
20     Q. Do you recall my question?      12:53
21     A. Your question was would I be
22 surprised that there was --
23     Q. No, I didn't say anything about
24 being surprised.
25     A. Oh.      12:53

44 (Pages 170 - 173)

Page 174

1    Q.  Are you aware that the authors
2  reported that talc by itself, without the
3  presence of immune cells, did not
4  significantly affect the number of MOSEC
5  cells after 72 hours?                12:53
6        ATTORNEY O'DELL:  Object to the
7    form.
8        THE WITNESS:  Again, I'm looking
9    at the paper to understand that
10   result.                          12:54
11  BY ATTORNEY DAVIDSON:
12   Q.  Okay.
13   A.  Is your question referring to the
14  MOSEC cells that remain surviving after
15  72 hours, based on the GFP positive flow   12:55
16  cytometry results?
17   Q.  Doctor, I'm asking you a simple
18  question.  I'm asking you whether the
19  authors reported that talc by itself,
20  without the presence of immune cells, did  12:55
21  not significantly affect the number of MOSEC
22  cells after 72 hours.
23       ATTORNEY O'DELL:  Object to the
24   form.
25       THE WITNESS:  And, again, I'm      12:55

Page 175

1    clarifying -- trying to clarify the
2    specific results.
3  BY ATTORNEY DAVIDSON:
4    Q.  If you don't know the answer and
5    can't figure it out on the spot, you can  12:55
6    just say so.
7        ATTORNEY O'DELL:  Object to the
8    form.  I think his -- the concern is
9    confusion over the question because
10   it's -- so he's asked you to clarify    12:56
11   it.
12       ATTORNEY DAVIDSON:  It couldn't be
13   clearer.
14       THE WITNESS:  And the reason I was
15   asking for the clarification is       12:56
16   because my reading of the results is
17   that the proliferation ratio show that
18   the combination of talc and E2 allowed
19   a larger proportion of MOSEC cells
20   than either agent alone shown in      12:56
21   Figure S3, which is a supplementary
22   figure and, therefore, not in the
23   paper.
24  ///
25  ///

Page 176

1  BY ATTORNEY DAVIDSON:
2    Q.  Was that my question?
3    A.  Your question was in the absence of
4  immune cells.
5    Q.  Uh-huh.                      12:56
6    A.  And I was clarifying which results
7  section, to which you said it was a simple
8  answer.  So in the effort to try to be
9  thorough, I was either asking for the
10  clarification of the specific -- because in  12:56
11  my reading, that result would indicate the
12  answer to your question would seem to be no
13  because E2 is estradiol.  It's not a cell
14  type.
15   Q.  I just ask -- I'm asking you:  Do   12:57
16  you know whether the authors reported that
17  talc by itself, without the presence of
18  immune cells, did not significantly affect
19  the number of MOSEC cells after 72 hours?
20   A.  No.  I would need to -- I would say   12:57
21  I'm not sure.  I would need to look at the
22  paper in more detail.
23   Q.  If talc did not significantly
24  affect the number of MOSEC cells after
25  72 hours, would that weigh in favor of    12:57

Page 177

1  carcinogenicity or against carcinogenicity?
2        ATTORNEY O'DELL:  Object to the
3    form.
4        THE WITNESS:  It would depend on
5    what the control experiments showed     12:57
6    without the talc.
7  BY ATTORNEY DAVIDSON:
8    Q.  Can you explain what you mean?
9    A.  So you're asking a question on
10  the -- of the experiment in isolation being  12:58
11  that under -- generally speaking, if the
12  number of MOSEC cells does not change, what
13  is that indicative of?  That essentially is
14  your question.  But the -- I'm not -- my
15  reading of this is I'm not sure that the    12:58
16  number of MOSEC cells is actually the
17  variable that's under study in this case.
18   Q.  Are you aware that the authors --
19       ATTORNEY O'DELL:  I'm sorry,
20   Jessica.  I'm not sure he's done.      12:58
21       ATTORNEY DAVIDSON:  I thought he
22   was done.
23  BY ATTORNEY DAVIDSON:
24   Q.  Are you aware that the authors
25  state you did not investigate the       12:58

45 (Pages 174 - 177)

Page 178

1 carcinogenic properties of talc?
2     ATTORNEY O'DELL: If you're not
3 finished with your prior answer,
4 Dr. Levy, you may continue. She did
5 not give you an opportunity to respond    12:59
6 if you need to.
7     THE WITNESS: In this review,
8 looking at the paper again, the
9 carcinogenicity of talc was not the
10 primary question that was being asked    12:59
11 in this study.
12 BY ATTORNEY DAVIDSON:
13     Q. Is it your testimony that the
14 authors don't provide a control?
15     A. No. That's not what I said.    12:59
16     Q. I didn't understand.
17     What were you saying about control?
18     A. You were asking a comparative --
19 you asked is it -- if the MOSEC cells did
20 not change number after 72 hours in the    12:59
21 absence of immune cells, would that
22 indicate -- essentially you were asking:
23 Would that indicate that talc did not have
24 an effect on the MOSEC cells? And my answer
25 was that evaluation would need to be taken    12:59

Page 179

1 with the context of appropriate controls to
2 evaluate what the actual changes were.
3     Q. But did --
4     A. Again, in my reading of these
5 results, this was looking -- this is a    01:00
6 phagocytic assay, not a carcinogenic assay.
7 Trying to evaluate whether the cells take up
8 the foreign particles.
9     Q. But didn't the authors use a proper
10 control?    01:00
11     A. So, again, that's -- I didn't say
12 they did or didn't. You asked a question in
13 isolation. I said the answer to that
14 question would have to come with comparison
15 to controls. I also explained that they --    01:00
16 to answer your question, you're asking a
17 very general question in the context of a
18 more complex experiment.
19     Q. So how does this paper support your
20 opinions?    01:00
21     A. Which opinions?
22     Q. Any of your opinions.
23     A. So specifically this paper is -- so
24 this -- I think this paper continues to
25 support aspects of the biologically    01:01

Page 180

1 plausible mechanism of talc contributing to
2 inflammatory responses. And in this case,
3 through the use of an in vitro experiment
4 looking at phagocytosis of talc and then
5 what some of those cell interactions are    01:01
6 following that.
7     Q. Does this paper show anything about
8 carcinogenesis?
9     ATTORNEY O'DELL: Objection to the
10 form.    01:02
11     THE WITNESS: This paper wasn't
12 designed to show anything about
13 carcinogenesis. This is more
14 mechanistic paper evaluating one small
15 component that may contribute to the    01:02
16 underlying mechanisms in a more
17 complex organism or individual.
18     I think also worth noting in this
19 paper is that the controls were not no
20 treatment whatsoever. The controls    01:02
21 used other particulate matter,
22 titanium dioxide, concentrated urban
23 air particulates, or diesel exhaust
24 particles, and then used that as a
25 comparison to using -- relative to    01:02

Page 181

1     talc particles.
2 BY ATTORNEY DAVIDSON:
3     Q. Does this paper involve human
4 cells?
5     A. The MOSEC cells are mirroring; so    01:03
6 they're mouse. And then the -- I'd have to
7 look at the methods to confirm that the
8 macrophages were also -- so they use
9 mirroring cell lines J774 and IC21 and then
10 some experiments RAW 264.7. These are all    01:03
11 available cell lines from the American
12 tissue type collection. It looks like these
13 are all mouse cells.
14     Q. So the study didn't even consider
15 human cells; correct?    01:04
16     ATTORNEY O'DELL: Object to form.
17     THE WITNESS: It looks like this
18 study used mouse cells as a model
19 system.
20 BY ATTORNEY DAVIDSON:    01:04
21     Q. So I didn't understand what you
22 were saying.
23     You don't think the study has
24 proper controls?
25     ATTORNEY O'DELL: Objection.    01:04

46 (Pages 178 - 181)

Page 182

1   Misstates his testimony.
2       THE WITNESS:  No.  I didn't make
3   that statement at all.
4   BY ATTORNEY DAVIDSON:
5       Q.  Is titanium a proper control or    01:04
6   not?
7       A.  So the study was examining the
8   ability of cells to phagocytize particulate
9   matter, of which there was at least four
10  that I mentioned.  Some from air particles,    01:04
11  which appear to be defined purely as their
12  source, titanium dioxide as one and then
13  talc as another.
14      I did not recall -- or do not
15  recall seeing in the methods even a further    01:05
16  description of the specific components of
17  the talc, whether it was pure talc or it was
18  talc that was measured for other potential
19  contribution such as asbestos or other
20  material.  I didn't see that noted.    01:05
21      Q.  Dr. Levy, can you try to answer my
22  questions so we can get home tonight.
23      My question was:  Is titanium
24  dioxide a proper control?
25      ATTORNEY O'DELL:  Objection to the    01:05

Page 183

1   commentary.  The question was asked
2   and answered.
3       THE WITNESS:  As a control
4   particle for a phagocytic assay, it
5   appears to be an appropriate control.    01:05
6   BY ATTORNEY DAVIDSON:
7       Q.  If there's evidence that titanium
8   dioxide induces changes, would that make it
9   an improper control?
10      ATTORNEY O'DELL:  Objection to    01:06
11  form.
12      THE WITNESS:  Induces what kind of
13  changes?  Any changes?  It may or may
14  not be.  It may be a -- if all of the
15  particles have the same effect, then    01:06
16  you conclude that the phagocytic
17  process and the influence of estradiol
18  is the same regardless of particulate
19  matter.  The question in the study
20  isn't:  Is any one of -- is    01:06
21  concentrated urban air or diesel
22  exhaust particles an appropriate
23  control, or is titanium dioxide an
24  appropriate control to talc?  The
25  question is:  Is there a difference    01:06

Page 184

1   between the reaction of the cells
2   under these experimental conditions
3   across those four particulates.
4       So asking whether one is an
5   appropriate control over the other,    01:06
6   that's not -- that's not how this
7   study -- that's not what this study
8   was designed to evaluate.  It was
9   designed to evaluate:  Is there a
10  difference between those four?    01:07
11  BY ATTORNEY DAVIDSON:
12      Q.  How can we tell whether the effects
13  were specific to talc?
14      ATTORNEY O'DELL:  Object to the
15  form.    01:07
16      THE WITNESS:  Sorry.  Were
17  specific to tell if there's a
18  difference?
19  BY ATTORNEY DAVIDSON:
20      Q.  To talc.    01:07
21      A.  Oh, to talc.  Well, to talc is what
22  was tested.  Do you mean which component of
23  talc?  I think they make reference that
24  the -- that this was a modern sample of
25  talc.  And they state in the introduction    01:07

Page 185

1   that there's an assumption that it's thought
2   to be asbestos free, but no notation was
3   made whether that was confirmed or not.
4       So if your question is, was it
5   specific to talc versus components of talc,    01:08
6   that wasn't -- that wasn't part of this
7   experimental design.  This was testing the
8   specific sample of talc they used under the
9   experimental conditions as described.
10      Sorry.  Allow me to correct that.    01:08
11  In the method to talc that was used in this
12  study, was obtained via JT Baker with a
13  specific batch notation and was certified as
14  asbestos free.
15      Q.  Are you looking at the paper on a    01:08
16  computer screen?
17      A.  I'm looking at the paper as it was
18  provided as the exhibit.
19      Q.  I see.  In the chat?
20      A.  Correct.  They performed some    01:09
21  controls to have the -- they filtered the
22  talc through a 30 micron nylon mesh,
23  presumably to avoid -- and they note that
24  they did not use any commercial talc
25  products as the talc source.    01:09

47 (Pages 182 - 185)

Page 186

1  Q. Did I have a question pending?
2  A. You had asked about the talc.
3  Q. My question is simple.
4     Is it your opinion that this study
5  can tell us whether the facts found are        01:09
6  specific to talc as opposed to other types
7  of particles?
8     ATTORNEY O'DELL: Object to the
9  form. Asked and answered.
10    THE WITNESS: Given my comments        01:10
11 about talc, in this study that was
12 studying the ability of these cells to
13 phagocytize talc, given that the
14 authors went to lengths to use the
15 talc, as I just described, and its        01:10
16 source and indicating it was certified
17 as asbestos free, it would appear to
18 me in reviewing this paper that this
19 was specific to talc.
20 BY ATTORNEY DAVIDSON:        01:10
21 Q. We're having a misunderstanding.
22    I mean, does this study tell us
23 whether the effects found were specific to
24 talc, whatever its components, as opposed to
25 completely other types of substances and        01:10

Page 187

1 particles?
2     ATTORNEY O'DELL: Object to the
3  form.
4     THE WITNESS: I'm not trying to be
5  obtuse about this, but you're -- the        01:10
6  study specifically compared talc to
7  titanium dioxide to two other
8  particulate sources provided by the
9  EPA. You're asking: Did they
10 specifically look at talc? So the        01:11
11 answer is yes, they specifically
12 looked at talc.
13    If I understand your question
14 correctly, you're asking: Is the
15 effects they observed specific to        01:11
16 talc? And I guess if I'm
17 understanding your question correctly,
18 I'm not sure how it could not be
19 specific to talc because that's what
20 was tested.        01:11
21 BY ATTORNEY DAVIDSON:
22 Q. Okay. Do you think gene expression
23 is the same as a mutation?
24 A. No. They're fundamentally
25 different things.        01:11

Page 188

1  Q. And changes in gene expression are
2  different from mutations?
3     ATTORNEY O'DELL: Objection.
4  Asked and answered.
5     THE WITNESS: Well, I think --        01:11
6  important to clarify. Yes, changes in
7  gene expression are absolutely
8  different than mutations. They're in
9  two separate biological processes.
10 One can impact the other certainly,        01:12
11 but they are not the same.
12 BY ATTORNEY DAVIDSON:
13 Q. And Mandarino studied gene
14 expression?
15 A. No. The primary -- I think the        01:12
16 primary assay they were using was GFP
17 expression in the MOSEC cells.
18 Q. Okay. What's the difference
19 between neoplastic transformation and
20 malignant transformation? You mentioned        01:12
21 earlier that they differ. Can you explain?
22 A. Well, I was clarifying if you've
23 considered those equal.
24 Q. I'm asking you. You're the expert.
25 I'm certainly not.        01:12

Page 189

1     ATTORNEY O'DELL: Objection.
2     THE WITNESS: Yeah, I was
3  asking -- I asked you that question to
4  clarify the meaning behind your
5  question at the time.        01:12
6  BY ATTORNEY DAVIDSON:
7  Q. Okay. So now I'm asking you the
8  question.
9  A. Which is? What's the difference
10 between malignant transformation and        01:13
11 neoplasm?
12 Q. And neoplastic transformation.
13 A. Depends on the specificity of your
14 question. In either case, it indicates a
15 cellular transformation where generally a        01:13
16 loss of growth inhibition. But beyond that,
17 it very much depends on the conditions in
18 which it's being asked. And the cell types,
19 et cetera.
20    So a malignancy is a more general        01:13
21 term. And then a neoplastic transformation
22 is generally more specific.
23    But in both cases, they indicate
24 cells with aberrant growth. And that
25 aberrant growth may be caused by any number   01:13

48 (Pages 186 - 189)

Page 190

1  of initiating or driver mechanisms as well
2  as passenger effects that happen as the
3  cells evolve.
4      Q.  Can there be benign neoplastic
5  transformation?                          01:14
6      A.  Certainly.  Well, you can have
7  benign neoplasms, yes, where you have
8  unregulated cell growth, but that cell
9  growth may be slow and that cell growth may
10 have zero metastatic potential.  There are    01:14
11 certain types of renal carcinoma that fall
12 into this category.  There are cysts that
13 form in karyocytes in the skin that fall
14 into this potential.  That's why I say in
15 terms of malignant transformation, generally  01:14
16 we refer to something that has that
17 metastatic potential.
18     Q.  Is carcinogenesis caused by changes
19 in gene expression levels or by mutations?
20     A.  Well, carcinogenesis doesn't         01:15
21 have -- it's not an either/or.  So you --
22 something that is carcinogenic could do
23 either of those things.  You could have a
24 change in gene expression.  You could also
25 have a change in gene regulation, such as     01:15

Page 191

1  methylation changes in epigenetics.  You can
2  also have the inducement of a mutation
3  through any number of mechanisms.  It's not
4  an either/or.
5      Q.  What makes something metastatic       01:15
6  above and beyond neoplastic transformation?
7      ATTORNEY O'DELL:  Objection to
8  form.
9      THE WITNESS:  Again, it could be
10 any number of things.  But                    01:15
11 generally -- if I answer this in terms
12 of the progression of cancer, as I
13 said, there are different cancer
14 types.  And as we know, there are more
15 aggressive and less aggressive forms          01:16
16 of disease, and then there are
17 recurrent disease, et cetera.
18     The point being is one of the key
19 hallmarks of cancer progression is a
20 transition from aberrant cell growth,         01:16
21 meaning something that is neoplastic
22 to a -- that then becomes metastatic
23 or becomes a non-local disease.  It's
24 no longer localized to the organ or
25 tissue that it began in.  And then            01:16

Page 192

1  there are, again, driver and passenger
2  mutations and changes in gene
3  expression and changes in gene
4  regulation that drive that, and it's a
5  very tumor-type, genetic              01:16
6  background-type specific.
7      We understand some aspects of it,
8  but many of those areas are still
9  misunderstood, which is why cancer
10 remains such a challenging space.       01:16
11 BY ATTORNEY DAVIDSON:
12     Q.  How do researchers determine in an
13 in vitro cell culture whether something has
14 become cancerous?
15     A.  Well, I wouldn't say that that       01:17
16 would be a common experimental design to
17 conclude that when something becomes
18 cancerous.  Saying cancerous is not a
19 descriptor that would be relevant to an in
20 vitro assay.                            01:17
21     ATTORNEY DAVIDSON:  Leigh, you
22 sounded like you were about to say
23 something.
24     ATTORNEY O'DELL:  We've been going
25 about an hour and ten minutes.  It's     01:17

Page 193

1  1:20 here, right at 1:20.  If we can
2  go off the record and take a short
3  break for lunch.
4      (Recess taken from 1:18 p.m. to
5  1:57 p.m.)                            01:57
6  BY ATTORNEY DAVIDSON:
7      Q.  Dr. Levy, on page 15 of your expert
8  report -- amended expert report -- just so I
9  don't have to say the word amended all day,
10 if I say "expert report," I mean amended.     01:58
11     You cite ME2021 for your biological
12 plausibility opinion.  Why do you say the ME
13 paper?
14     A.  Did you say page 15?  Oh, I see.
15 I'd have to look at ME.  It's in the same --   01:58
16 similar to Mandarino in terms of an immune
17 modulating effect, as I stated in the
18 report.  I'd have to remind myself of the
19 content of that paper.
20     Q.  You don't remember what that paper     01:58
21 is about?
22     ATTORNEY O'DELL:  Object to the
23 form.
24     THE WITNESS:  I want to make sure
25 I give an accurate answer; so I'd have   01:59

49 (Pages 190 - 193)

Page 194

1  to look at it. It will just take a
2  second.
3  BY ATTORNEY DAVIDSON:
4      Q. I understand.
5         Do you remember at all what that    01:59
6  paper is about, without looking at it?
7      A. Not off the top of my head, beyond
8  what it states in the one sentence.
9      Q. What does it state in the one
10 sentence?                                  01:59
11     A. That supporting observations of the
12 immune modulating effect of talc were made
13 by Emi and colleagues in a separate study.
14     Q. Okay. Let's mark the Emi paper.
15        ATTORNEY DAVIDSON: Noah, what      01:59
16 number is it?
17        ATTORNEY EPSTEIN: Exhibit 7.
18        (Exhibit Number 7 was marked for
19 identification.)
20 BY ATTORNEY DAVIDSON:                      01:59
21     Q. We're marking as Exhibit 7,
22 Transcriptomic and Epigenomic Effects of
23 Insoluble Particles on J774
24 Macrophages, by Emi, et al.
25        Can you now tell me how this paper  02:00

Page 195

1  supports your opinions?
2      A. Sure. So this -- I think this
3  paper continues to support the
4  proinflammatory and immune modulating
5  effects of talc particles. In this         02:00
6  particular paper, they looked at a gene
7  expression readout primarily by using
8  microarray technology, and they report that
9  there's a sustainably more prominent gene
10 expression change in talc compared to       02:00
11 titanium dioxide.
12        The paper goes on to describe the
13 nature of those gene changes in terms of a
14 pathway and ontology perspective, and then
15 they -- because of an unexpected result in  02:00
16 some of those gene expression changes, they
17 also looked at DNA methylation profiles
18 using a genomewide bisulfite sequencing
19 technique.
20     Q. Does this paper study ovarian       02:01
21 cells?
22     A. It studies the J774 macrophage.
23     Q. So that's not ovarian cells; right?
24     A. No, it is not. It's a murine cell
25 line. It's a --                            02:01

Page 196

1      Q. And the authors --
2      A. It's a female cell line, but it is
3  not an ovarian cell line. It's a macrophage
4  phagocytic model cell line.
5      Q. And the authors found that titanium  02:01
6  dioxide also leads to gene expression and
7  transcription changes in phagocytes; right?
8      A. They found gene expression changes
9  in both conditions, but they -- what they --
10 they found an enhanced response based on     02:02
11 talc compared to -- so yes. The answer to
12 your question is yes, but there was not an
13 equal response.
14     Q. Is titanium dioxide biologically
15 inert?                                      02:02
16     A. Clearly in these results, it would
17 indicate it is not inert, meaning it doesn't
18 impart a change. Inert is not necessarily
19 the same as having a specific effect.
20     Q. Does this show that talc caused any  02:02
21 mutations?
22     A. This paper wasn't assaying if it
23 caused mutations or not. This paper doesn't
24 attempt to answer that question.
25     Q. And it also doesn't tell us          02:02

Page 197

1  anything about carcinogenesis; right?
2      ATTORNEY O'DELL: Object to the
3  form.
4      THE WITNESS: So, again, the
5  purpose of this paper was looking at,       02:02
6  as I think the title reasonably
7  clearly states, looking specifically
8  at transcriptomic and epigenomic
9  effects on a specific cell type, the
10 J774 macrophages. It didn't attempt          02:03
11 to examine carcinogenesis. And based
12 on the results of the paper, it also
13 did not attempt to assay mutations,
14 although mainly primarily because the
15 technologies used would be insensitive       02:03
16 to mutation, for the most part.
17     You could argue the bisulfite
18 sequencing may be able to detect
19 mutations, but they did not indicate
20 they did that in the analysis section.       02:03
21 BY ATTORNEY DAVIDSON:
22     Q. Can in vitro acids be used to
23 determine malignancy?
24     A. Malignancy with the definition of
25 able to invade away from the site of origin, 02:03

50 (Pages 194 - 197)

Page 198

1 an in vitro assay can't directly measure
2 malignancy, but an in vitro assay may be
3 able to provide, in detail, markers that are
4 similar to from the mechanistic standpoint
5 to malignancy.                          02:04
6      You can't prove malignancy with an
7 in vitro assay, not without taking those
8 same cells into xenograph model or some
9 other common techniques like that. Again,
10 that was not done in this paper.          02:04
11     Q. I think that was a no?
12        ATTORNEY O'DELL: Object to the
13 form. His answer was what his answer
14 was.
15        THE WITNESS: This paper did not   02:04
16 attempt to study malignancy.
17 BY ATTORNEY DAVIDSON:
18     Q. I just want to make clear you agree
19 that malignancy cannot be demonstrated just
20 by an in vitro study; correct?          02:05
21     A. Malignant potential can be
22 demonstrated by an in vitro assay, but
23 malignancy cannot be proven in a simple
24 single -- a cell culture -- simple cell
25 culture-based assay. There are in vitro   02:05

Page 199

1 models that allow malignancy to be measured,
2 but the systems used in this particular case
3 are not those.
4      Q. What in vitro models allow
5 malignancy to be measured?               02:05
6      A. There are reasonably novel
7 three-dimensional cell structures,
8 hydrogels, and multiple layer cell materials
9 that are now being viewed as accurate
10 measures for malignancy, meaning the ability 02:05
11 for cells to transfer through, say, cell
12 monolayers or mimic some tissues or
13 artificial organs. Technically, those are
14 in vitro assays, and those most closely are
15 viewed as mimicking malignant -- malignant 02:06
16 potential or malignancy, but that's as close
17 as I've seen.
18     Q. And you've never seen that done in
19 any talc studies; right?
20     A. I have not.                       02:06
21     Q. On page 16 of your report, you add
22 a reference to a Brieger study.
23        Do you recall that study?
24     A. Brieger, yes.
25     Q. Why did you cite that study?     02:06

Page 200

1      A. This one was a somewhat newer study
2 that I had found through the literature
3 search, and I thought it was a relevant
4 study, given that it was looking at
5 survivorship of ovarian cancer relative to a 02:06
6 variety of usages, talc included.
7      Q. Does data on survivorship tell you
8 anything about initiation?
9      A. Initiation, no, not necessarily.
10 Or I would say: Does data on survivorship   02:07
11 explain initiation? No, it does not.
12     Q. So this study doesn't tell you
13 about the causes of ovarian cancer; correct?
14        ATTORNEY O'DELL: Object to the
15 form.                                   02:07
16        THE WITNESS: This study was not
17 examining causative. This study was
18 purely a survivorship study, meaning
19 inclusion in the study meant you
20 already had the disease.                 02:07
21 BY ATTORNEY DAVIDSON:
22     Q. So it's not relevant to whether or
23 not talc can cause ovarian cancer; correct?
24        ATTORNEY O'DELL: Object to the
25 form.                                   02:07

Page 201

1        THE WITNESS: I found it relevant
2 to the subject that I was asked to
3 provide an opinion around the general
4 biological plausibility for talc and
5 disease progression. And the reason      02:08
6 it's included is if talc has an
7 amplifying effect on disease
8 progression or other roles, the
9 opportunity to include a survivorship
10 study is certainly relevant as to be     02:08
11 examining as comprehensive review of
12 the literature as possible.
13 BY ATTORNEY DAVIDSON:
14     Q. How is a study on survivorship
15 relevant to your opinions on causation?   02:08
16     A. To be clear, my opinions are not
17 focused on causation. But part of my
18 opinions are the progression and severity of
19 the disease. And survivorship certainly is
20 an indicator, and potentially a helpful   02:08
21 indicator as to -- any compound, whether it
22 influences disease progression and
23 survivorship, is a very good surrogate for
24 progression.
25     Q. Are the plaintiffs in this        02:09

51 (Pages 198 - 201)

Page 202

1  litigation alleging that talc caused them to
2  have a worse prognosis after they were
3  already diagnosed with ovarian cancer?
4      ATTORNEY O'DELL:  Object to the
5  form.                              02:09
6      THE WITNESS:  Again, my focus has
7  been limited to the areas that we've
8  been discussing around the biological
9  plausibility.  I'm not aware of what
10 plaintiffs may or may not be alleging.   02:09
11 BY ATTORNEY DAVIDSON:
12     Q.  Are you offering an opinion in this
13 case that exposure to talc can result in a
14 worse prognosis for somebody who's diagnosed
15 with ovarian cancer?                02:09
16     ATTORNEY O'DELL:  Objection.
17 Asked and answered.
18     THE WITNESS:  I'm offering an
19 opinion as to the totality of the
20 impact of talc throughout the ovarian   02:09
21 cancer process when possible.  And so
22 in the spirit of that literature
23 review, I found this study as, and at
24 least in my searches, as one of the
25 few or only survivorship studies that   02:10

Page 203

1  also looked at talc in addition to a
2  number of other inflammatory-related
3  exposures.  So, therefore, given the
4  nature of my previous report and
5  amended report, found this study to be   02:10
6  relevant to be included.  But it
7  doesn't -- I'm not drawing any
8  specific conclusions from this study
9  and this study alone.
10 BY ATTORNEY DAVIDSON:                02:10
11     Q.  Can you point to a single paper in
12 the entire body of scientific literature by
13 an ovarian cancer researcher that relies on
14 research regarding ovarian cancer
15 progression to address potential causes of   02:10
16 ovarian cancer?
17     ATTORNEY O'DELL:  Objection to the
18 form.
19     THE WITNESS:  Most commonly,
20 studies of progression and studies of   02:10
21 causation would generally be done
22 independent from each other.  Although
23 certainly as is the case in other
24 areas perhaps of more common
25 conditions, when you can link   02:11

Page 204

1      contributing factors or other
2      activities that may either inhibit
3      treatment options or enhance disease
4      progression, they're certainly
5      relevant in the overall milieu of that   02:11
6      disease.
7  BY ATTORNEY DAVIDSON:
8      Q.  My question was:  Can you point to
9  a single paper in the body of scientific
10 literature by an ovarian cancer researcher   02:11
11 that considers evidence related to the
12 progression of ovarian cancer in
13 determining -- in assessing potential causes
14 or biological mechanisms for the initiation
15 of ovarian cancer?                  02:11
16     ATTORNEY O'DELL:  Object to the
17 form.  Asked and answered.
18     THE WITNESS:  So you're asking
19 three different questions.  Is
20 there --                           02:11
21 BY ATTORNEY DAVIDSON:
22     Q.  I'm asking one question.
23     ATTORNEY O'DELL:  Let him finish,
24 please.
25     THE WITNESS:  By the form of your   02:11

Page 205

1      question, you're asking about
2      progression, initiation, and I think
3      you also said one other which --
4      progression, initiation, and
5      survivorship.  Those are -- they're   02:12
6      independent events.  The initiation of
7      the cancer is independent from the
8      progression of the cancer, which is
9      independent but related to the
10     survivorship of the cancer.         02:12
11         I can't point you to a single
12     paper that connects all three of those
13     in ovarian cancer as it relates to
14     talc because that would be an
15     unusual -- very unusual study.      02:12
16 BY ATTORNEY DAVIDSON:
17     Q.  That wasn't my question.  I've got
18 eight hours.  I can ask this question as
19 many times as it takes for you to answer it.
20     Can you point to a single paper by   02:12
21 an ovarian cancer researcher that looks at
22 research related to the progression of
23 ovarian cancer and factors that affect the
24 progression of ovarian cancer in attempting
25 to understand what causes or leads to the   02:12

52 (Pages 202 - 205)

Page 206

1 initiation of ovarian cancer?
2     ATTORNEY O'DELL:  Objection to the
3 form.
4     That's a different question, but
5 go ahead.                    02:13
6     THE WITNESS:  So I cannot point
7 you to one today, but that would be
8 something that would be -- I recall
9 some -- I have seen some body of
10 literature, perhaps not in ovarian     02:13
11 cancer which is why I would need to
12 take a novel -- or take another
13 look -- that factors that influence
14 progression are often looked at in the
15 context of initiation as well;     02:13
16 however, I cannot point you to a paper
17 in ovarian cancer by an ovarian cancer
18 researcher that connects initiation to
19 progression.
20 BY ATTORNEY DAVIDSON:          02:13
21     Q.  My question is about ovarian
22 cancer, though.
23     A.  Correct.
24     Q.  And you can't point to anything;
25 right?                    02:13

Page 207

1     ATTORNEY O'DELL:  Object to the
2 form.
3     THE WITNESS:  No, I can't.
4 BY ATTORNEY DAVIDSON:
5     Q.  Let's move on.          02:14
6     ATTORNEY DAVIDSON:  Let's mark as
7 Exhibit 8 Harper 2023.
8     (Exhibit Number 8 was marked for
9 identification.)
10 BY ATTORNEY DAVIDSON:          02:15
11     Q.  I was asking you earlier about the
12 assay that was used in this paper, and you
13 said you had to look at the paper to refresh
14 your recollection.
15     So you've got the paper now.  Can     02:16
16 you tell me --
17     A.  Sorry.  It was just opening.  Okay.
18 It's open now.
19     Q.  Can you tell me what assay was used
20 by the authors of the study?          02:17
21     A.  Which assay?  So they used human
22 primary ovarian epithelial cells as well as
23 ovarian epithelial cells and primary
24 fibroblast treated with two different doses
25 of talc or titanium dioxide and then     02:17

Page 208

1 assessed them with a cell transformation
2 assay.
3     Q.  That's my question.
4     Which cell transformation assay did
5 they use?                    02:17
6     A.  That's what I'm looking at.
7     They used a -- it looks like
8 basically an agarose invasion assay, it
9 appears, where they cultured the cells on a
10 base agarose mix.                02:18
11     Q.  Are you looking at page 152?
12     A.  Yes.
13     Q.  The assay they used was
14 Abcam-235698; correct?
15     A.  I'm not seeing where --          02:19
16     Q.  Abcam, A-b-c-a-m, that's the kit
17 they used; right?
18     A.  Yes, it appears.  So describing the
19 kit information sheet, yeah.
20     Q.  Are you familiar with that kit?     02:19
21     A.  Not specifically, no.
22     Q.  Have you reviewed the kit
23 information sheet?
24     A.  I have not reviewed the kit
25 information sheet.                02:19

Page 209

1     Q.  Do you know if that kit information
2 sheet says that the assay is validated for
3 the purpose of showing malignant
4 transformation?
5     A.  No, I'm not aware if it does say or     02:19
6 doesn't say that.  I'd be surprised if it
7 specifically stated that it's designed to do
8 that.
9     Q.  Does it say that it's validated to
10 show neoplastic transformation?          02:20
11     ATTORNEY O'DELL:  Are you
12 asking -- I'm sorry.  The question
13 was:  Does it say it's validated?  Are
14 you talking about --
15     ATTORNEY DAVIDSON:  I'll ask the     02:20
16 question again, Leigh.
17     ATTORNEY O'DELL:  Thank you.
18 BY ATTORNEY DAVIDSON:
19     Q.  Do you know whether this assay is
20 validated to show neoplastic transformation?  02:20
21     A.  So the assay is meant to show
22 cellular transformation.
23     Q.  Have you looked at the -- have you
24 researched this assay to know what it is
25 validated to do or not do?          02:20

53 (Pages 206 - 209)

Page 210

1    A. I've not specifically looked at
2 the -- if the manufacturer gave any
3 indication of any validation for any
4 purposes. As an RUO product, I would expect
5 then that they likely do not provide any         02:21
6 validation information for any given
7 purpose, other than a product description.
8    Q. And you and I agree that cell
9 transformation is not the same as malignant
10 transformation; right?                          02:21
11    A. Cellular transformation is not the
12 same as malignant transformation; however,
13 these agarose-based or agar-based assays,
14 this kit as well as earlier referenced in
15 the paper, the soft agar assay, which is a      02:21
16 longer standing, more traditional method,
17 those are meant to be in vitro mimics that
18 more closely allow malignant transformation
19 potential to be measured because the cells
20 have to move through the agar, which is         02:21
21 more -- again, it's a model system to
22 evaluate and compare neoplastic to
23 potentially malignant cells.
24        Importantly, these assays as a
25 standalone would not necessarily prove the      02:22

Page 211

1 ability of any given cell to be malignant.
2 But the point of the paper is to show the
3 relative differences in this assay of
4 different treatment conditions.
5    Q. Is it your testimony that it would       02:22
6 be accurate to use an Ab-235698 assay, and
7 based on the results of that assay, to say
8 that something induces malignant
9 transformation?
10        ATTORNEY O'DELL: Object to the         02:22
11    form.
12        THE WITNESS: So this particular
13    kit -- the kit version of this as well
14    as the soft agar assay also mentioned
15    in the paper is meant to be an in        02:22
16    vitro model system for malignant
17    transformation.
18 BY ATTORNEY DAVIDSON:
19    Q. I thought you said you're not
20 familiar with this kit?                        02:23
21    A. I'm describing the way it's
22 presented in the paper, which is the kit
23 information sheet, as you just described,
24 with that product number, and then earlier
25 in that same column indicating why they used   02:23

Page 212

1 the Abcam assay saying it's more stable,
2 faster, and more sensitive than the
3 traditional soft agar assay. Both of those
4 kits -- or both of those procedures are
5 meant to mimic malignant transformation in     02:23
6 an in vitro system to allow different
7 experimental conditions to be compared.
8        In the case of this paper,
9 comparing talc and titanium dioxide and
10 perhaps other conditions, I'd have to look     02:23
11 at the methods.
12    Q. So is it your testimony that --
13        ATTORNEY O'DELL: Excuse me.
14    Jessica, I apologize. I'm not sure
15    Dr. Levy was finished. But if you         02:24
16    are?
17        THE WITNESS: I'm finished.
18        ATTORNEY O'DELL: Sorry. Go
19    ahead.
20        ATTORNEY DAVIDSON: I think he was      02:24
21    finished.
22 BY ATTORNEY DAVIDSON:
23    Q. Is it your testimony today that
24 it's accurate, based on the results of this
25 assay, to say: To use the phrase induces      02:24

Page 213

1 malignant transformation in normal human
2 primary ovarian epithelial cells?
3        That's my question.
4        ATTORNEY O'DELL: Object to the
5    form.                                      02:24
6        THE WITNESS: Based on the
7    findings in the paper with the assays
8    that were produced and the purposes
9    behind the assays, the authors have
10    drawn the conclusion as stated in the     02:24
11    title.
12 BY ATTORNEY DAVIDSON:
13    Q. I'm aware. I'm asking you if
14 that's accurate.
15    A. Based on what's shown in the paper    02:24
16 and the results shown, it appears that
17 they're drawing a reasonably accurate
18 conclusion, again, based on the information
19 here in this paper.
20    Q. So you think without having          02:25
21 actually researched this assay, that this
22 assay suffices to show malignant
23 transformation?
24        ATTORNEY O'DELL: Object to the
25    form.                                    02:25

54 (Pages 210 - 213)

Page 214

1        THE WITNESS:  So as close to being
2    able to do so in an in vitro model
3    system, yes.
4    BY ATTORNEY DAVIDSON:
5        Q.  I thought you testified earlier        02:25
6    that in an in vitro model system, you can't
7    show malignant transformation?
8        A.  No.  I testified earlier that you
9    can't prove malignant transformation that
10    would occur in a disease state.  But, again,    02:25
11    in a model system, you're modeling as
12    closely as possible a biological process
13    under study, generally something that you
14    can't do either in a live animal or in a
15    person.  You develop conditions that are       02:25
16    reasonably close or as close as possible,
17    and then you have to draw conclusions from
18    there.  There would be an iterative process
19    to either replicate those studies
20    independently, typical of the scientific       02:26
21    method, or determine -- extend those studies
22    to determine if the markers and other things
23    that are observed are, in fact, indicative
24    of malignant transformation.
25        Q.  You're taking it on faith from          02:26

Page 215

1    these authors that this assay is capable of
2    doing that?
3        ATTORNEY O'DELL:  Object to the
4    form.
5        THE WITNESS:  As in any scientific         02:26
6    literature, the body of that
7    literature is taken on faith and then
8    allowed, by evaluation of readers and
9    reviewers and others, to -- as to how
10    they weight the evidence that's              02:26
11    observed in the paper.
12    BY ATTORNEY DAVIDSON:
13        Q.  In order to weight the evidence in
14    the paper, you need to understand the
15    methodologies used; right?                   02:26
16        A.  Sure.  At least in terms of what
17    those methodologies -- the purposes of those
18    methodologies and what they're showing.
19        Q.  So in order to really understand
20    whether the methodology here was proper,       02:27
21    you'd need to understand exactly what this
22    assay was, wouldn't you?
23        ATTORNEY O'DELL:  Object to the
24    form.
25        THE WITNESS:  You'd have to             02:27

Page 216

1    understand the intent of the assay.
2    BY ATTORNEY DAVIDSON:
3        Q.  How do scientists normally assess
4    whether cells are malignant?
5        A.  I would say the most rigorous, in      02:27
6    my opinion, would be through xenograph
7    models, meaning the implantation of human
8    cells, whether they be treated or from
9    primary tumors, into mouse models;
10    therefore, the tumor initiation progression    02:27
11    and the metastatic potential can all be
12    viewed in the context of an entire organism.
13        But as I mentioned earlier, there
14    are various levels of sophistication for in
15    vitro assays to look at cellular invasion.      02:28
16    I would say there's a rich body of
17    literature that if a cell, when put on
18    either another monolayer or
19    three-dimensional support where that cell
20    then invades, either directly or via           02:28
21    cellular processes, that's considered a
22    measure of malignant transformation or
23    malignant potential.
24        Depending on the experimental
25    design and the interpretation, the authors     02:28

Page 217

1    draw conclusions as to does that reach a --
2    does that suffice for what they would
3    consider as malignant transformation.
4        Q.  When you say "what they would
5    consider as malignant transformation," isn't   02:28
6    malignant transformation an objective
7    scientific term?
8        A.  Correct.  It means the cell is
9    transformed to allow or support growth away
10    from the initial site in terms of cancer       02:28
11    biology.  And these in vitro assays, the bar
12    that these authors have set is that if those
13    same cells are able to invade through an
14    agarose-based assay, that is indicative of
15    that malignant potential and, therefore,       02:29
16    they're characterizing it as malignant
17    transformation.
18        Q.  When you say "they're
19    characterizing it as a malignant
20    transformation," is a malignant               02:29
21    transformation a subjective term that can be
22    characterized in different ways by different
23    people?
24        ATTORNEY O'DELL:  Object to the
25    form.  Asked and answered.           02:29

55 (Pages 214 - 217)

Page 218

1    THE WITNESS: Malignant
2    transformation, as I've said a few
3    times, is -- indicates that a cell is
4    able to grow away from its primary
5    site. So when the authors are calling    02:29
6    something that is -- you have the
7    transformation event, meaning the cell
8    has the potential to do that, and then
9    you have the metastatic event where
10   the cell actually does -- it becomes    02:29
11   malignant or becomes metastatic; it
12   actually moves away. So it's
13   semantics to say: Does transformation
14   mean only the potential to invade into
15   a substrate or into a tissue area, or    02:30
16   is it malignant transformation when
17   you evaluate it after the fact because
18   it's been detected at a remote site,
19   say, in a lymph node or others if we
20   look at this in a whole person.    02:30
21   BY ATTORNEY DAVIDSON:
22   Q. Does this study show anything about
23   invading?
24   A. That is the purpose of that agar
25   assay. That's to mimic the cells invading    02:30

Page 219

1    into a substrate. That's the nature of that
2    assay. Growing in that three dimensional
3    space. Most cells are inhibited by contact
4    inhibition. One of the hallmarks of
5    malignant transformation is you lose that    02:30
6    contact inhibition. But that can also be
7    that neoplastic transformation, a benign
8    transformation where the cell's just
9    aberrantly growing.
10   So, generally, you look more at the    02:30
11   invasion, meaning that the cells are
12   actually invading through a substrate.
13   This agar assay is meant to mimic,
14   again, in an in vitro setting, certainly
15   does not have all of the components of a    02:31
16   biological setting. And it certainly
17   doesn't mean it's a perfect model system.
18   Q. How long did it take these cells to
19   transform in this study?
20   A. They did a -- I thought I saw the    02:31
21   data. Six to eight days. Incubated six to
22   eight days? Yeah. About a week, roughly.
23   Q. It took a week for the malignant
24   transformation?
25   A. No. They performed -- they    02:31

Page 220

1    measured the assay after a week. They did
2    not perform time points to -- at least at a
3    glance here, I don't believe they performed
4    time points to measure the timing of that
5    transformation or whether it was different    02:32
6    over time. They only report the results on
7    a percentage of transformed cells at dose,
8    not time, and that was after six days.
9    There was no timing information as far as
10   the timing of that transformation that was    02:32
11   reported in the paper. Indicating that that
12   transformation would have occurred at any
13   point from the initiation of the assay to
14   just before measurement, but there was no
15   investigation done as to -- at least not    02:32
16   reported that I see.
17   I'm looking at the results. They
18   mainly based this based on colony formation.
19   Q. I just want to make sure I
20   understand your testimony.    02:33
21   Your testimony is that the authors
22   of this paper claim that they found
23   malignant transformation after six to eight
24   days?
25   A. They performed treatments of the    02:33

Page 221

1    cells with talcum powder or titanium dioxide
2    for 72 hours and then placed the cells into
3    the agar assay for six days and then
4    measured the colormetric assay, which is
5    part of the Abcam kit, as well as the colony    02:34
6    formation and compared the control, which
7    was the titanium dioxide to the talc
8    treatment under different cell lines. And
9    then followed that up with some
10   immunohistochemistry on sections of those    02:34
11   colonies for two specific markers.
12   Q. What's anchorage-independent
13   growth?
14   ATTORNEY O'DELL: We didn't hear
15   that clearly, Jessica. Would you    02:35
16   please repeat the question?
17   BY ATTORNEY DAVIDSON:
18   Q. What is anchorage-independent
19   growth?
20   A. Cells that are able to grow without    02:35
21   being anchored to a surface or a matrix.
22   Q. Is anchorage-independent growth
23   sufficient evidence to show malignant
24   transformation?
25   A. Potentially. It's certainly --    02:35

56 (Pages 218 - 221)

Page 222

1  it's certainly a marker of . . .
2      Q.  I understand you're saying it's a
3  marker of, but is it sufficient to show
4  malignancy?
5      A.  It would depend on the cell line,    02:35
6  and it would depend on -- that would require
7  a different experiment or a further
8  experiment to prove malignancy.
9      Q.  Can you look at Figure 4.
10     A.  Uh-huh.                02:36
11     Q.  Where does it say in Figure 4 that
12  the staining was done after six to eight
13  days?
14     A.  I thought the method said that the
15  staining in Figure 4 was done from the --    02:36
16  oh, I see.
17      So looking at the method -- so my
18  first reading of this was that they used
19  the -- essentially fixed and sectioned the
20  colonies from the agar assay, but in reading    02:37
21  this now, it appears they performed
22  immunohistochemistry on the normal human
23  primary epithelial cells, the ovarian
24  epithelial cells, before treatment and after
25  treatment for 72 hours.  They reported    02:37

Page 223

1  changes in staining with P53 and KI67.
2      So the agar assay was done for six
3  days.  It looks like the secondary assay
4  shown in Figure 4 was a treatment for
5  72 hours.                02:37
6      Q.  Is 72 hours sufficient time to
7  convert normal cells into malignant cells?
8      A.  Under these specific experimental
9  conditions and without those specific time
10  points done, we can't say.            02:38
11     Q.  Have you ever seen another paper in
12  your entire scientific career in which
13  normal cells were turned into malignant
14  cells in 72 hours?
15      ATTORNEY O'DELL:  Object to the    02:38
16  form.
17      THE WITNESS:  So the timing -- I'm
18  thinking through different literature
19  or papers or studies that I recall.
20  I'd have to consider it and give that    02:38
21  some thought.  I cannot think of a
22  reason why 72 hours, more or less,
23  would have any reasoning behind the --
24  it really depends on the mechanism of
25  transformation in those events.  It    02:39

Page 224

1  can happen very rapidly.  It can
2  happen over long periods of time.
3      But generally, I see no
4  mechanistic or plausible reason why it
5  couldn't be much, much faster than    02:39
6  those 72 hours, or in other
7  conditions, much longer.  I think
8  that's a relatively artificial or
9  arbitrary time number.
10  BY ATTORNEY DAVIDSON:                02:39
11     Q.  So you think regular cells could
12  transform to malignant cells after they're
13  treated in less than 72 hours?
14     A.  Depending on the treatment.
15  Certainly it did.  Again, it depends on the    02:39
16  mechanism of those transformative events.
17     Q.  Can you point me to any example of
18  a study in which it was found that cells
19  were converted into malignant cells in less
20  than 72 hours?                02:39
21      ATTORNEY O'DELL:  Object to the
22  form.
23      THE WITNESS:  Again, it would be
24  very dependent on exactly how it was
25  designed and exactly how it was    02:40

Page 225

1  measured.  So back to the xenograph
2  example I gave before, certainly
3  72 hours would be a short time frame
4  for that model to develop.  But you're
5  asking a very different question.        02:40
6      The question you're asking is:
7  Does it -- can you get -- can cells be
8  transformed in less than 72 hours to
9  have metastatic potential or malignant
10  potential?  Again, there's no        02:40
11  plausible reason why that
12  transformation cannot occur in a very
13  short time frame, but as far as --
14  BY ATTORNEY DAVIDSON:
15     Q.  I'm actually asking --        02:40
16      ATTORNEY O'DELL:  I'm sorry.  He's
17  not finished.
18      THE WITNESS:  But pointing you to
19  a study that proves from start to
20  finish, from the transformation of the    02:40
21  cells to proving that they are
22  malignant and have that metastatic
23  potential, that, I'm not aware of.
24  But I --
25  BY ATTORNEY O'DELL:

57 (Pages 222 - 225)

Page 226

1  Q. So you can't --
2      ATTORNEY O'DELL: I'm sorry. He
3  wasn't finished.
4  BY ATTORNEY DAVIDSON:
5      Q. You just always seem like you're      02:40
6  stopping, and then you keep going.
7      ATTORNEY O'DELL: You may
8  continue.
9      THE WITNESS: No, I can't point
10  you to a study where from cell      02:40
11  treatment through proof of metastatic
12  or malignant potential occurred in
13  72 hours or less.
14  BY ATTORNEY DAVIDSON:
15      Q. So this is the only paper you've      02:41
16  ever read in your entire experience as a
17  scientist that claimed to demonstrate
18  malignant transformation within 72 hours of
19  treatment; correct?
20      ATTORNEY O'DELL: Object to the      02:41
21  form.
22      THE WITNESS: No, that's not
23  correct. What this study is showing
24  is the markers for having that
25  transformation. I would be confident      02:41

Page 227

1  that there's other studies that used
2  other markers for cellular
3  transformation that occurred in time
4  frames at or less than 72 hours.
5  Again, I would have to specifically      02:41
6  review for those types of studies.
7  But my confidence comes from,
8  again, mechanistically the treatment
9  or methodology to perturb a cell to
10  allow it to undergo a malignant      02:41
11  transformation can happen on a very
12  rapid time course. Some examples of
13  those rapid time courses would be done
14  with radiation or done with severe
15  mutagenesis or done with other      02:42
16  treatments. The 72-hour window is not
17  a -- again, there's nothing
18  technically or mechanistically that
19  would require that time frame to be
20  longer or shorter.      02:42
21  BY ATTORNEY DAVIDSON:
22      Q. I'm just asking you for a paper.
23  Name one paper you've read where malignant
24  transformation was claimed in 72 hours or
25  less.      02:42

Page 228

1      ATTORNEY O'DELL: Objection to the
2  form. Asked and answered.
3      THE WITNESS: I'd have to get back
4  to you on that.
5  BY ATTORNEY DAVIDSON:      02:42
6      Q. Okay. I just want to clarify;
7  right? These authors didn't say in their
8  title: Biomarkers of potential malignant
9  transformation were shown in our paper.
10      Just to look again, they said:      02:43
11  Talc powder induces malignant transformation
12  in normal human primary ovarian epithelial
13  cells; correct?
14      A. Your reading of the title is
15  correct.      02:44
16      Q. And you take no issue with that
17  title?
18      A. Do I take issue with the title?
19  No, I don't take issue with the title.
20      Q. And let's go to the conclusion.      02:44
21      A. Okay. Page 156.
22      Q. This study clearly demonstrates
23  that talcum powder exposure induced
24  malignant transformation of normal ovarian
25  cells and culture, which adds to the strong      02:44

Page 229

1  evidence of causal relationship between
2  genital use of talcum powder and ovarian
3  cancer.
4      Do you agree with the authors that
5  this study clearly demonstrates -- there's a      02:44
6  typo there -- that talcum powder exposure
7  induced malignant transformation of normal
8  ovarian cells in culture?
9      ATTORNEY O'DELL: Object to the
10  form.      02:44
11      THE WITNESS: As with any
12  scientific study, as a scientist, I
13  would not use that one sentence or
14  that brief paragraph. What I would
15  agree with is the totality of the      02:45
16  paragraph, if you include the next
17  sentence that starts with: Therefore,
18  we consider that future studies should
19  aim to evaluate this finding utilizing
20  animal models. And --      02:45
21  BY ATTORNEY DAVIDSON:
22      Q. Does this study --
23      ATTORNEY O'DELL: Excuse me. He's
24  not finished.
25      THE WITNESS: Taking out one      02:45

58 (Pages 226 - 229)

Page 230

1  sentence of the conclusions. And so I
2  would consider the conclusions and the
3  totality of the work rather than
4  whether or not one sentence is an
5  accurate representation of the work.    02:45
6  BY ATTORNEY DAVIDSON:
7    Q. That's great, but that's not my
8  question.
9      My question is: Do you think this
10 study clearly demonstrates that talcum    02:45
11 powder exposure induced malignant
12 transformation of normal ovarian cells?
13   A. This study shows data supporting
14 that the cells may have been malignantly
15 transformed.    02:46
16   Q. But it does not clearly demonstrate
17 that talcum powder exposure induced
18 malignant transformation of normal ovarian
19 cells; correct?
20   A. Again, I can't refute what the    02:46
21 authors are saying given that what they
22 defined -- their definition of malignant
23 transformation in this in vitro model as
24 described in the paper, which is where
25 they're drawing this conclusion from, and I    02:46

Page 231

1  think rightly recognize that further studies
2  have to exist.
3      So I can't give you an answer to
4  your question because you're -- that's not
5  an accurate representation of what the paper    02:46
6  is trying to say.
7    Q. There's an accurate --
8      ATTORNEY O'DELL: Excuse me. He's
9  not finished.
10     THE WITNESS: I realize pulling    02:46
11   out those words and asking: Does this
12   paper show that? But it's --
13 BY ATTORNEY DAVIDSON:
14   Q. Forget what the author is saying,
15 Doctor. I'm just asking you a question --    02:46
16     ATTORNEY O'DELL: He's not
17   finished.
18 BY ATTORNEY DAVIDSON:
19   Q. Do you think this paper
20 demonstrates that talcum powder exposure    02:46
21 induced malignant transformation of normal
22 ovarian cells?
23     ATTORNEY O'DELL: Dr. Levy, you
24   were cut off. You may finish your
25   answer.    02:47

Page 232

1      THE WITNESS: This paper shows a
2  significant difference in cells
3  treated with talc and not talc and
4  warrants further investigation to
5  validate that from a malignant    02:47
6  transformation perspective.
7  BY ATTORNEY DAVIDSON:
8    Q. I understand.
9    A. Your question doesn't have a
10 yes-or-no answer.    02:47
11   Q. My question doesn't have a yes or
12 no answer? You can't tell me whether this
13 paper clearly demonstrates that talcum
14 powder exposure induced malignant
15 transformation of normal ovarian cells?    02:47
16     Does it or doesn't it?
17   A. Based on the data in the paper and
18 what the authors claim, that is their
19 conclusion.
20   Q. Do you believe that this paper    02:47
21 clearly demonstrates that talcum powder
22 exposure induced malignant transformation?
23     ATTORNEY O'DELL: Asked and
24   answered.
25     THE WITNESS: Again, in the in    02:47

Page 233

1  vitro model system that was used,
2  under the conditions in this paper,
3  the authors' conclusions were
4  reasonable.
5  BY ATTORNEY DAVIDSON:    02:48
6    Q. Do you agree with the authors, that
7  this study clearly demonstrates that talcum
8  powder exposure induced malignant
9  transformation?
10   A. Again, I find the authors'    02:48
11 conclusions in the context of this paper to
12 be reasonable.
13   Q. And you disagree with the peer
14 reviewers who found the authors' conclusions
15 to be outrageous?    02:48
16     ATTORNEY O'DELL: Object to the
17   form.
18     THE WITNESS: Again --
19     ATTORNEY O'DELL: Facts outside of
20   evidence.    02:48
21     THE WITNESS: I haven't had the
22   opportunity to review both the version
23   of the paper that those reviewers saw
24   as well as the specific comments that
25   they provided. For the --    02:48

59 (Pages 230 - 233)

Page 234

1 BY ATTORNEY DAVIDSON:
2    Q. Do you intend to ask --
3       ATTORNEY O'DELL: I'm sorry. He's
4 not finished.
5       THE WITNESS: For all I know --    02:48
6       ATTORNEY DAVIDSON: He's never --
7       THE WITNESS: -- this paper is
8 substantially revised from the version
9 that those comments were made.
10 BY ATTORNEY DAVIDSON:    02:48
11    Q. It actually is not.
12       But do you intend to ask counsel
13 after this deposition for all the drafts and
14 the peer-reviewed comments?
15    A. I'd welcome the opportunity to see    02:49
16 those.
17    Q. Your counsel has them.
18       ATTORNEY DAVIDSON: Are we up to
19 Exhibit 9, Noah?
20       ATTORNEY EPSTEIN: Yes.    02:49
21       ATTORNEY DAVIDSON: Let's mark
22 Taher 2019 as Exhibit 9.
23       (Exhibit Number 9 was marked for
24 identification.)
25       ATTORNEY DAVIDSON: Noah, make    02:50

Page 235

1 sure it's the right version.
2       ATTORNEY EPSTEIN: Yeah, I just
3 pulled it. Let me . . .
4       ATTORNEY DAVIDSON: I don't know
5 why the wrong version was sent to me.
6 It's not the right version.
7 BY ATTORNEY DAVIDSON:
8    Q. Before we move on, Dr. Levy, would
9 you be comfortable putting your name as a
10 co-author of a paper that claimed to have    02:50
11 proven malignant transformation based on the
12 data we just saw in the Harper paper?
13       ATTORNEY O'DELL: Object to the
14 form. Incomplete hypothetical.
15       THE WITNESS: It's a hypothetical    02:50
16 question. If I was -- I don't know.
17 Again, it would depend on the totality
18 of the experiments. I would certainly
19 value the opinions of peers during
20 that review process.    02:51
21       ATTORNEY O'DELL: I believe the
22 paper that's put in the chat was not
23 the final; is that right?
24       ATTORNEY DAVIDSON: That's what I
25 just told -- didn't you hear me say    02:51

Page 236

1 that to Noah?
2       ATTORNEY O'DELL: I didn't hear --
3       ATTORNEY EPSTEIN: I'll put it in
4 the chat.
5       ATTORNEY DAVIDSON: I said that    02:51
6 three minutes ago. I said we're
7 putting in a different version.
8       ATTORNEY O'DELL: You said -- you
9 asked him if it was the right version.
10       ATTORNEY DAVIDSON: No. I told    02:51
11 him it was the wrong version.
12       ATTORNEY O'DELL: I'm sorry. I
13 misunderstood what you were trying to
14 say. I'm happy to put the right
15 version in the chat if you don't have    02:52
16 it.
17       ATTORNEY DAVIDSON: I've got it.
18 This is Noah's second deposition ever.
19 I would say he's -- Leigh, were you at
20 the first or was that Michelle?    02:52
21       ATTORNEY O'DELL: I'm not sure.
22       ATTORNEY DAVIDSON: I think that
23 was Michelle. I think you were
24 probably at Sugarman. He's improved
25 by leaps and bounds, and we're all    02:52

Page 237

1 very proud.
2       (Discussion off the record.)
3       ATTORNEY O'DELL: I have no
4 criticism of Noah. I was just looking
5 for the right version.    02:52
6       So, Noah, I hope you didn't take
7 it that way.
8       ATTORNEY DAVIDSON: We have a
9 paralegal who keeps sending us the old
10 Taher.    02:52
11       ATTORNEY O'DELL: I understand
12 your pain. I have one that keeps
13 sending me the old Phung, and that
14 doesn't work either. So we
15 understand.    02:52
16 BY ATTORNEY DAVIDSON:
17    Q. Let me try to make that
18 parenthetical a little more concrete before
19 we move on to Taher.
20       Would you be comfortable putting    02:53
21 your name on a paper that claims to have
22 clearly demonstrated malignant
23 transformation based solely on IHC staining
24 and the Abcam assay used here?
25       ATTORNEY O'DELL: Object to the    02:53

Page 238

```
1    form.
2        THE WITNESS: Again, it's --
3    possibly.
4  BY ATTORNEY DAVIDSON:
5    Q. Okay. Nothing more would need to    02:53
6  be done for you to be comfortable putting
7  your name on such a paper?
8        ATTORNEY O'DELL: Object to the
9    form. Incomplete hypothetical.
10       THE WITNESS: I would have to    02:53
11   evaluate that at the time of the
12   experiments and the results and being
13   involved in that process. I wasn't
14   involved in this, and so inappropriate
15   for me to say whether or not I would    02:54
16   be a co-author or where in the
17   co-authorship it would belong.
18 BY ATTORNEY DAVIDSON:
19   Q. Just so you know, it is appropriate
20 to ask experts hypothetical questions.    02:54
21 That's one of the rules of the Federal Rules
22 of Procedure. So it is appropriate to ask
23 an expert if he would be comfortable with
24 something like this.
25       I'm trying to understand what would    02:54
```

Page 239

```
1  have to be done in a study for you to be
2  comfortable putting your name on a paper
3  that claims to have clearly demonstrated
4  malignant transformation.
5        What would you want to be done on    02:54
6  such a paper for you to feel comfortable
7  using the term "clearly demonstrated
8  malignant transformation"?
9    A. Again, it's not necessarily what
10 would have to be done or not have to be    02:54
11 done. It would be, again, being able to
12 evaluate the totality of that work in the
13 context of the experiments and having that
14 discussion with the other authors and
15 participants in that experiment. The    02:54
16 writing of the paper and the summary of
17 those results is only a small part of the
18 overall process, especially of that that
19 warrants co-authorship. So that's why I
20 say, therefore, my answer is possibly.    02:55
21       ATTORNEY DAVIDSON: Can you read
22 back that answer.
23       (Record read by the Certified
24 Stenographer as follows:
25       "ANSWER: It's not    02:54
```

Page 240

```
1    necessarily what would have to
2    be done and not have to be done.
3    It would be evaluating the
4    totality of that work in the
5    context of these experiments and    02:54
6    discussion with the other
7    authors and participants in that
8    experiment. The writing of the
9    paper and results is a small
10   process, especially of that that    02:55
11   warrants co-authors. So that's
12   why I say, therefore, my answer
13   is possibly.")
14 BY ATTORNEY DAVIDSON:
15   Q. So is the same true of this study?    02:57
16 That you can't really evaluate its
17 reliability without reviewing all the tests
18 and results that they conducted and set
19 forth in their paper?
20       ATTORNEY O'DELL: Objection.    02:57
21   Asked and answered.
22       THE WITNESS: No, I wouldn't
23   characterize it as that.
24 BY ATTORNEY DAVIDSON:
25   Q. Why is that?    02:57
```

Page 241

```
1    A. Because the scientific literature
2  is a -- as you know, is a continually
3  evolving set of observations and tests and
4  experiments. So we're asking very discrete
5  questions in different ways and that    02:57
6  evaluating this paper as it stands is what
7  we've been discussing. And we've, you know,
8  asked and answered a number of questions
9  around that. It's a completely separate
10 discussion as to how do we change this study    02:58
11 to warrant co-authorship or participation in
12 the study. So they're independent from each
13 other.
14       So I'm not sure -- so the -- to
15 answer it differently, the level of rigor    02:58
16 that I would apply in answering your
17 question about being a co-author and what
18 would have to be done on a study is a
19 different question than asking what
20 information or inferences or observations    02:58
21 can be drawn from a publication.
22   Q. To what extent are you relying on
23 Harper 2023 in forming your opinions in this
24 case?
25   A. As a part of the overall literature    02:58
```

61 (Pages 238 - 241)

Page 242

1 review, and as a new piece of literature
2 added after the writing of the last report
3 to contribute to, as stated in the report,
4 some of the -- some of the mechanistic and
5 in vitro support for the overall biological    02:59
6 plausibility.
7    Q. I assume if your opinions on the
8 paper change after you read the
9 peer-reviewed comments, that you'll either
10 submit a amended report or otherwise let us    02:59
11 know, and I think we can move on.
12    ATTORNEY O'DELL: Object to the
13    commentary.
14 BY ATTORNEY DAVIDSON:
15    Q. Let's talk about the Taher paper,    02:59
16 which we've put in the chat, and I think you
17 now have the right one. I wanted to look at
18 page 98. If you'd like, we can put it up on
19 the screen.
20    A. I have it.    03:00
21    Q. I wanted to look in particular at
22 Table 4.
23    Do you know what GRADE is, capital
24 G-R-A-D-E?
25    A. Not off the top of my head.    03:00

Page 243

1    Q. Do you see in Table 4 where the
2 authors rate the certainty of the evidence
3 in their meta-analysis?
4    A. The certainty of the evidence, yes,
5 based on GRADE where they note it as very    03:00
6 low?
7    Q. Yes.
8    A. I see that.
9    Q. And do you see how, if you have
10 either better eyesight than I do or reading    03:01
11 glasses, they explain GRADE -- what GRADE
12 is, GRADE Working Group grades of evidence
13 are a high certainty, low certainty, and
14 very low certainty?
15    Do you see that?    03:01
16    A. I see that.
17    Q. Footnote, maybe it's an A?
18    A. Yeah, it is A.
19    Q. And can you read for me what they
20 say after "very low certainty"? In    03:01
21 parentheses.
22    A. We have very little confidence in
23 the effect estimate. The true effect is
24 likely to be substantially different from
25 the estimate of effect.    03:01

Page 244

1    Q. And did you notice this when you
2 read the Taher paper that you cited in your
3 report?
4    A. I don't specifically recall
5 noticing this, but I understand what it's    03:02
6 saying.
7    Q. Did you mention in your report when
8 you cited the Taher paper: Oh, by the way,
9 the authors say very low certainty of the
10 evidence, we have very little confidence in    03:02
11 our findings?
12    ATTORNEY O'DELL: Object to the
13    form.
14    THE WITNESS: So the -- I think
15    you also have to consider the    03:02
16    footnotes C and D as well as part of
17    that.
18 BY ATTORNEY DAVIDSON:
19    Q. My question was -- wait a minute,
20 Doctor, you've got to answer my questions.    03:02
21    ATTORNEY O'DELL: No --
22 BY ATTORNEY DAVIDSON:
23    Q. My question was: Did you mention
24 in your report -- no, no, no. If you want
25 to talk about what else it says in there,    03:02

Page 245

1 Leigh is going to ask you any questions she
2 wants.
3    ATTORNEY O'DELL: Don't instruct
4    the witness, Jessica. Just ask your
5    question. He can respond to your    03:03
6    question.
7    ATTORNEY DAVIDSON: No, he cannot
8    respond to other questions.
9 BY ATTORNEY DAVIDSON:
10    Q. My question is: Did you mention in    03:03
11 your report that Taher refers to the
12 certainty of evidence as very low?
13    ATTORNEY O'DELL: That's a
14    different question you asked before --
15    ATTORNEY DAVIDSON: No, it's not a    03:03
16    different question. It's exactly the
17    question I asked.
18    ATTORNEY O'DELL: Please don't
19    interrupt me, Jessica.
20    THE WITNESS: I'd have to look at    03:03
21    what my exact wording was in the
22    report.
23 BY ATTORNEY DAVIDSON:
24    Q. You're welcome to look at your
25    report. It's at the bottom of page 14.    03:03

Page 246

1    A.  I see that now.
2    Q.  I just want to know if you
3  mentioned the very low certainty of the
4  evidence is referenced in Table 4 anywhere in
5  your report.                        03:03
6    A.  I did not specifically reference
7  Table 4 anywhere in the report.
8    Q.  Nor did you, anywhere in your
9  report, reference the authors' concerns
10  about the very low certainty of the evidence  03:04
11  in that paper; correct?
12      ATTORNEY O'DELL:  Object to the
13    form.
14  BY ATTORNEY DAVIDSON:
15    Q.  Correct, Doctor?        03:04
16    A.  So your statement is correct, but
17  your reasoning for the statement is
18  incorrect.
19    Q.  There is no reasoning in my
20  statement.                        03:04
21    Let's move on.
22      ATTORNEY DAVIDSON:  You can take
23    this down, Noah.  If we could -- let's
24    go off the record.  I need five
25    minutes.                        03:05

Page 247

1      (Recess taken from 3:05 p.m. to
2    3:19 p.m.)
3  BY ATTORNEY DAVIDSON:
4    Q.  Dr. Levy, earlier today I was
5  asking you why O'Brien 2020 was added to      03:19
6  your reliance list only this Saturday, and
7  you said you couldn't answer without seeing
8  it.  So we put in the chat O'Brien 2020.
9      And I'm wondering if that refreshes
10  your recollection as to why it's a recent      03:19
11  addition to your reliance list.
12      (Exhibit Number 10 was marked for
13    identification.)
14      THE WITNESS:  Yeah, you can hear
15    me; right, Jessica?        03:20
16  BY ATTORNEY DAVIDSON:
17    Q.  Sure can.
18    A.  Okay.  Just want to make sure.
19      No specific reasoning.  I think
20  the -- I believe this was added after the      03:20
21  fact, but it is referenced and included in
22  one of the -- I think it is included in
23  the -- one of the meta-analysis or cohort
24  references that is referenced in my report.
25  So I think it was just -- no specific reason  03:20

Page 248

1  other than trying to be more comprehensive
2  with all the materials as it relates to some
3  of the epidemiology.
4    Q.  When did you read this?
5    A.  Reviewed it as part of the overall    03:21
6  preparation for today.
7    Q.  So, like, you read it for the first
8  time in the last few weeks?
9    A.  I'd have to give that some thought.
10  It was added to the list more recently in      03:21
11  terms of cleaning up the list, but I can't
12  say for sure if it was -- a lot of things
13  kind of ran together as a -- or started to
14  run together as I was preparing for today.
15    Q.  So you're not sure when you read      03:21
16  this?
17    A.  No, I'm not sure.
18    Q.  Okay.  Let's move on.
19      ATTORNEY DAVIDSON:  Let's mark as
20    Exhibit 11 Wentzensen and O'Brien.        03:21
21    2021, I think.
22      (Exhibit Number 11 was marked for
23    identification.)
24  ///
25  ///

Page 249

1  BY ATTORNEY DAVIDSON:
2    Q.  Talc, body powder, and ovarian
3  cancer:  A summary of the epidemiologic
4  evidence.
5      This paper is cited in your report      03:22
6  on page --
7    A.  16.
8    Q.  -- 16, top of page 16.
9      Do you see that, Dr. Levy?
10    A.  I do.                        03:22
11    Q.  So you cite this paper after a
12  sentence that says:  Multiple
13  epidemiological studies examine aggregate
14  data from large cohorts of patients have
15  consistently found an increased risk of talc  03:22
16  use in ovarian cancer.
17      Do you see that?
18    A.  I do.
19    Q.  First of all, is this an
20  epidemiological study?                    03:22
21    A.  It's a summary of epidemiology
22  studies.
23    Q.  This would be called a review
24  paper; right?
25    A.  Sure, yeah.                    03:23

63 (Pages 246 - 249)

Page 250

1    Q. So have you read this paper in
2 full?
3    A. I have.
4    Q. What's the ultimate conclusion of
5 the authors?                          03:23
6       ATTORNEY O'DELL: Object to the
7 form. Excuse me. Sorry.
8       THE WITNESS: I think -- so this
9 was -- I'd say the authors have a few
10   different conclusions. One is they    03:24
11   indicated, as was referenced in the
12   paper, a positive association between
13   general powder use and ovarian cancer.
14 BY ATTORNEY DAVIDSON:
15   Q. Can you point me to where they say  03:24
16 that?
17   A. Sure. So it's in the abstract
18 about halfway down, starting with: Taken
19 together, the epidemiological data from case
20 control and cohort studies suggest there may  03:24
21 be a small positive association.
22   Q. I'm sorry. You left out the word
23 "may."
24      There may be a small positive
25 association; right?                    03:24

Page 251

1    A. Correct. That's what it states.
2    Q. Okay. So they don't find an
3 association. They say there may be an
4 association. I just want to make sure.
5       ATTORNEY O'DELL: Object to the    03:24
6 form.
7 BY ATTORNEY DAVIDSON:
8    Q. Continue.
9       ATTORNEY O'DELL: What's your
10 question, please?                      03:25
11      THE WITNESS: I think their
12   conclusions were also noting some of
13   the limitations of study design,
14   particularly under cohort or other
15   studies. I think this is something    03:25
16   that was observed in a few of the
17   literature pieces.
18 BY ATTORNEY DAVIDSON:
19   Q. Do you recall the authors stating
20 it is difficult to conclude that the   03:25
21 observed associations are causal?
22   A. I believe the authors stated that
23 more research was needed to confirm if
24 the -- if this was causal.
25   Q. Do you recall the authors saying it  03:25

Page 252

1 is difficult to conclude that the observed
2 associations are causal?
3    A. I don't recall that specific
4 sentence. I wouldn't be surprised that it
5 was phrased that way.                  03:25
6    Q. The authors also state that the
7 experimental and animal carcinogenicity data
8 for talc are limited and inconclusive, and
9 there are currently no good animal or
10 experimental models of ovarian          03:26
11 carcinogenesis that can be used to more
12 directly test biological effects of talc.
13      Do you agree with them on that?
14      ATTORNEY O'DELL: I'm sorry,
15 Jessica. Would you tell us where        03:26
16   you're reading, please?
17      ATTORNEY DAVIDSON: Page 8.
18      ATTORNEY O'DELL: Which column?
19      ATTORNEY DAVIDSON: Noah, do you
20   want to put it up. Right at the       03:26
21   bottom on the right.
22 BY ATTORNEY DAVIDSON:
23   Q. Do you agree with the authors that
24 the experimental and animal carcinogenicity
25 data for talc are limited and inconclusive,  03:26

Page 253

1 and there are currently no good animal or
2 experimental models of ovarian
3 carcinogenesis that could be used to more
4 directly test biological effects of talc?
5    A. I'm sorry. Where on the --       03:27
6    Q. Can you just --
7    A. Is it in that second column?
8       ATTORNEY DAVIDSON: Can you just
9 highlight it, Noah.
10      THE WITNESS: I'm sorry.          03:27
11      ATTORNEY EPSTEIN: Let me know if
12   you want me to zoom in more.
13      ATTORNEY DAVIDSON: Yeah, let's
14   just zoom in on that.
15      THE WITNESS: So I am now aware     03:27
16   that they make this statement.
17 BY ATTORNEY DAVIDSON:
18   Q. I'm asking if you agree or disagree
19 with it.
20   A. So I would say I disagree with the  03:27
21 qualification in the sense that they
22 reference a single IARC working group from
23 2010 in support of that statement. I would
24 have assumed that such a conclusive and
25 broad-ranging statement would have been  03:28

64 (Pages 250 - 253)

Page 254

1 supported by more literature references,
2 particularly in light of everything we've
3 been discussing today, that there are
4 numerous publications or numerous things
5 that could -- I'm not saying the authors          03:28
6 have to cite them.  It's up to the
7 discretion of the author as to what
8 conclusions they draw, as we were just
9 discussing with the last paper; however, I
10 think a broad-ranging statement like that          03:28
11 with a single reference is a little bit
12 surprising, especially given the somewhat
13 conservative nature of the way the authors
14 have worded some of their other conclusions.
15      Based on my review of the          03:28
16 literature, I would disagree with that
17 statement.
18      Q.  Do you know what Drs. Wentzensen
19 and O'Brien do with their lives?
20      A.  I don't know specifically.  I          03:28
21 would -- looking at their affiliations.
22      Q.  Let's go to page 1.
23      A.  Looking at their affiliations,
24 they're epidemiologists.
25      Q.  One of them is at the American          03:29

Page 255

1 Cancer Institute and the other is at the
2 NIH, National Institute of Environmental
3 Health Sciences; correct?
4      A.  NIHS, yeah.
5      Q.  And unlike many of the other          03:29
6 experts whose papers you've cited today and
7 throughout your report, they're not experts
8 for plaintiffs hired in this litigation;
9 correct?
10      ATTORNEY O'DELL:  Object to the          03:29
11 form.
12      THE WITNESS:  Again, I'm not aware
13 of their relationship to plaintiffs or
14 defense.  I've not -- certainly they
15 have not been stated to be associated          03:29
16 with this litigation in any way.
17 BY ATTORNEY DAVIDSON:
18      Q.  In fact, these --
19      ATTORNEY O'DELL:  I'm sorry.
20 Excuse me.  Have you finished?          03:29
21      THE WITNESS:  Yeah, I finished.
22      ATTORNEY O'DELL:  Thank you.
23 BY ATTORNEY DAVIDSON:
24      Q.  These are scientists who devoted
25 their careers to cancer research; right?          03:30

Page 256

1      ATTORNEY O'DELL:  Object to the
2 form.  Assumes facts not in evidence.
3      THE WITNESS:  So these are
4 intramural scientists at the National
5 Institute of Health and NIHS, as you          03:30
6 stated.  What their -- I don't have
7 any information on what their career
8 path or trajectory may have been.
9 BY ATTORNEY DAVIDSON:
10      Q.  Do you believe that you are more          03:30
11 knowledgeable about ovarian cancer,
12 epidemiology, and biology than Drs.
13 Wentzensen and O'Brien?
14      A.  I don't have a basis on which to
15 make that comparison, but I am not an          03:30
16 epidemiologist.
17      Q.  Okay.  Let's look at page 16 of
18 your report.
19      A.  Okay.
20      Q.  You say:  Two independent research          03:31
21 studies examined cohorts of women with
22 self-reported use of talc, store-bought
23 douches, or a combination of both.
24 (Gabriel, Vitonis et al. 2019, O'Brien,
25 D'Aloisio et al. 2019)  The two studies          03:31

Page 257

1 found a positive association between talc
2 use or without douching and ovarian cancer.
3      Do you see that?
4      A.  I do.
5      Q.  Yes?          03:32
6      A.  Yes, I do.
7      Q.  How did you identify the O'Brien
8 2019 paper?
9      A.  I'm not sure specifically.
10      Q.  Can we pull it up, please.          03:32
11      A.  I don't recall if it was through
12 one of the review articles or meta-analysis
13 or through a search.  I'm not sure.
14      ATTORNEY DAVIDSON:  What exhibit
15 number would that be?          03:32
16      ATTORNEY EPSTEIN:  Exhibit 12.
17      ATTORNEY DAVIDSON:  Let's mark
18 O'Brien 2019 Exhibit 12.
19      (Exhibit Number 12 was marked for
20 identification.)          03:32
21      ATTORNEY DAVIDSON:  Do you want to
22 put it up on the screen as well?
23 BY ATTORNEY DAVIDSON:
24      Q.  Dr. Levy, O'Brien 2019 actually had
25 nothing to do with ovarian cancer; right?          03:33

65 (Pages 254 - 257)

Page 258

1 That's just a mistake in your report?
2    A. So this was uterine, correct.
3 Yeah, uterine cancer.
4    Q. So these two sentences are
5 erroneous?                          03:33
6       ATTORNEY O'DELL: Object to the
7    form.
8 BY ATTORNEY DAVIDSON:
9    Q. Actually three sentences.
10    A. So the first sentence is not    03:33
11 incorrect. It's beginning with two
12 independent research studies.
13    Q. Why did you include a study about
14 uterine cancer in your report?
15    A. I think just through the overall  03:34
16 review of talc and its association with
17 cancer.
18    Q. Did you intend to include this
19 paper in your report?
20    A. I think I intended to include this  03:34
21 paper, but just as I was summarizing in the
22 report, I just misstated or should have made
23 clear ovarian or uterine cancer. Should
24 have been more clear in the description of
25 the studies as it relates to their findings.  03:34

Page 259

1    Q. Did this paper find a statistically
2 significant association between talc use and
3 uterine cancer?
4    A. Yes, it looks like an adjusted
5 hazard ratio of 1.2.                  03:34
6    Q. Was it statistically significant?
7    A. It looks like when you include the
8 dose response curve.
9    Q. Doctor, what's the 95 percent
10 confidence interval?                  03:35
11    A. It's a -- the confidence in the
12 data to being -- that you have confidence
13 that you're 95 chances out of a hundred that
14 you're correct.
15    Q. What is the 95 percent confidence  03:35
16 interval in this paper for the 1.2
17 association?
18    A. 0.94.
19    Q. So it's not statistically
20 significant, the 1.2; correct?        03:36
21    A. At the 95th percentile confidence
22 interval for this study.
23    Q. So this paper did not find a
24 statistically significant association
25 between talc use and the risk of uterine  03:36

Page 260

1 cancer; correct?
2    A. Correct. I think this study found
3 a positive association as was stated in the
4 report.
5    Q. The report actually talks about    03:36
6 ovarian cancer, not uterine cancer. So not
7 as was stated in the report. Are you aware
8 of any paper that has found a positive
9 statistically significant association
10 between talc use and uterine cancer?    03:36
11    A. Not outside of this paper, no. Not
12 that I'm aware.
13    Q. Including this paper, are you aware
14 of any paper that has found a statistically
15 significant positive association between    03:37
16 talc use and uterine cancer?
17    A. Again, not that I've found, but I
18 wasn't searching for -- specifically for
19 uterine cancer studies.
20    Q. If you weren't searching for        03:37
21 uterine cancer studies, why did you cite
22 this study?
23       ATTORNEY O'DELL: Objection.
24    Asked and answered.
25       THE WITNESS: This study came up    03:37

Page 261

1    as part of the review, but I didn't
2    extend that search to include
3    additional uterine cancer studies as
4    well.
5 BY ATTORNEY DAVIDSON:                  03:37
6    Q. Do you consider a 1.2 association
7 with a confidence level of .94 to 1.6 to be
8 a positive association?
9    A. Yes, I would say that's a positive
10 association.                          03:37
11    Q. I see. I asked you earlier if you
12 had read the Chang study which also
13 addresses douching and ovarian cancer in
14 contrast to the O'Brien study which does not
15 actually address ovarian cancer. And you    03:38
16 said you couldn't tell me if you had seen it
17 or not, but it was not on your reliance
18 list; correct?
19    A. I believe that's correct.
20    Q. Let's put up the Chang study. 13.    03:38
21    (Exhibit Number 13 was marked for
22    identification.)
23       ATTORNEY EPSTEIN: Exhibit 13,
24    yes.
25 ///

66 (Pages 258 - 261)

Page 262

1 BY ATTORNEY DAVIDSON:
2    Q. Does seeing this paper refresh your
3 recollection that you've never seen it?
4    A. It just popped up for me. Okay. I
5 have it now.                    03:39
6        No, I don't believe I've seen this
7 study in 2024. I know I've seen another
8 work -- other work from the sister study but
9 not this one. Perhaps not this one.
10    Q. Let's go -- let's look at the       03:39
11 supplemental table.
12        ATTORNEY O'DELL: If you need a
13 moment to review it, Dr. Levy, please
14 take your time.
15        ATTORNEY DAVIDSON: Noah, can you    03:39
16 put supplemental table S4 up on the
17 screen.
18        ATTORNEY EPSTEIN: Do you want me
19 to put it in the chat as well?
20        ATTORNEY DAVIDSON: Yeah, I          03:40
21 thought you had it attached all as one
22 doc. If not, let's mark the
23 supplemental tables as Exhibit 14.
24        (Exhibit Number 14 was marked for
25 identification.)                03:41

Page 263

1 BY ATTORNEY DAVIDSON:
2    Q. All right, Doctor, let's look at --
3        ATTORNEY DAVIDSON: Noah, the way
4 you've got this it's kind of hard to
5 read. I assume you have it in the       03:41
6 chat so maybe you can -- oh, my God.
7 I wanted to look at the hygiene
8 products.
9        ATTORNEY O'DELL: What page,
10 please?                         03:41
11        THE WITNESS: This is the --
12 BY ATTORNEY DAVIDSON:
13    Q. Table S4 shows the association
14 between one frequency category increased in
15 use of single personal care product and    03:41
16 breast, ovarian, and uterine cancer for
17 proportioned hazard models.
18        Do you see that?
19        ATTORNEY O'DELL: So this is just
20 one of the tables? This is just S4?        03:42
21 This is not all the tables,
22 supplemental tables to Chang; correct?
23        ATTORNEY DAVIDSON: Are you
24 testifying, Leigh?
25        ATTORNEY O'DELL: No I'm asking     03:42

Page 264

1    because what I'm seeing on my screen
2    or what downloaded was only table S4,
3    and I believe there are multiple
4    tables -- supplemental tables. I just
5    want the record to be clear.        03:42
6        ATTORNEY DAVIDSON: You're welcome
7    to ask, Dr. Levy, about any
8    supplemental tables in this paper.
9 BY ATTORNEY DAVIDSON:
10    Q. Let's look at hygiene.        03:42
11        ATTORNEY O'DELL: So the record
12    will be clear, it's not the
13    supplemental tables. It's just that
14    particular one.
15 BY ATTORNEY DAVIDSON:            03:42
16    Q. So --
17    A. Yeah, specifically rows 56 through
18 61.
19    Q. I want to look at ovarian cancer
20 which is I believe the second column, like    03:42
21 the second -- yeah, this is the ovarian
22 cancer numbers.
23        ATTORNEY DAVIDSON: Noah, it's
24 really hard because how do we show the
25 headings? I have it on my -- my        03:43

Page 265

1    printout is so much easier to read.
2 BY ATTORNEY DAVIDSON:
3    Q. I wanted to ask you what is the
4 age-adjusted hazard ratio for bath gel and
5 ovarian cancer?                03:43
6    A. If you're referring to row 46 for
7 ovarian cancer, the age-adjusted hazard
8 ratio is 1.06.
9    Q. And is that statistically
10 significant?                    03:43
11    A. The 95th confidence interval is .98
12 to 1.14.
13    Q. So that means no, not statistically
14 significant; right?
15        ATTORNEY O'DELL: Object to the    03:44
16    form.
17        THE WITNESS: Correct.
18 BY ATTORNEY DAVIDSON:
19    Q. And for deodorant, what's the
20 association?                    03:44
21    A. .96.
22    Q. For douching, what's the
23 association?
24    A. 1.37.
25    Q. Is that statistically significant?    03:44

67 (Pages 262 - 265)

Page 266

1    A.  So the 95th percent confidence
2 interval is from 1.12 to 1.68.
3    Q.  And that is statistically
4 significant; correct?
5    A.  So it's statistically significant    03:44
6 meaning it's over a hazard ratio of 1 at the
7 95th confidence interval, but my
8 interpretation would still be this is a
9 positive association.
10    Q.  Doctor, you're aware that in the    03:44
11 field of epidemiology, statistical
12 significance means that the confidence
13 interval doesn't cross 1; right?
14    A.  Uh-huh.
15    Q.  Okay.  You just keep hesitating    03:45
16 when I ask you if something was
17 statistically significant; so I wasn't sure
18 if you're aware of that.
19    ATTORNEY O'DELL:  Objection.
20 BY ATTORNEY DAVIDSON:    03:45
21    Q.  Mouthwash does not show positive
22 association; right?
23    A.  Mouthwash shows 0.98 with a
24 confidence interval of .91 to 1.07.
25    Q.  That is not a positive association;    03:45

Page 267

1 correct?
2    A.  Correct.
3    Q.  Shaving cream shows a 1.03
4 non-statistically significant association;
5 correct?    03:45
6    A.  That's correct.
7    Q.  Talc under the arm, 1.07
8 non-statistically significant association;
9 correct?
10    ATTORNEY O'DELL:  Object to the    03:45
11    form.
12    THE WITNESS:  Based on the -- in
13    the 95th confidence interval, that's
14    correct.
15 BY ATTORNEY DAVIDSON:    03:45
16    Q.  Same for talc vaginal; correct?
17    ATTORNEY O'DELL:  Object to the
18    form.
19    THE WITNESS:  So those numbers are
20    the same.    03:46
21 BY ATTORNEY DAVIDSON:
22    Q.  And then talc other is 1.01
23 non-statistically significant; correct?
24    ATTORNEY O'DELL:  Object to the
25    form.    03:46

Page 268

1    THE WITNESS:  Yes, that's what
2    this study is reporting.
3 BY ATTORNEY DAVIDSON:
4    Q.  So the only exposure with a
5 statistically significant increased risk is    03:46
6 douching at 1.37 with a 1.12 to 1.68
7 confidence interval; correct?
8    ATTORNEY O'DELL:  Objection to the
9    form.
10    THE WITNESS:  In this table that    03:46
11    is what the summary results are
12    indicating.
13 BY ATTORNEY DAVIDSON:
14    Q.  But when you talk about cohorts of
15 women with self-reported use of talc and    03:46
16 douching, you don't mention this paper;
17 correct?
18    A.  Correct.  As I said, I'd have to --
19 I think I did reference one of the sister
20 study papers.  I'd have to check.    03:47
21    Q.  Can genetically changing form cause
22 ovarian cancer?
23    A.  Genetic mutations -- the
24 preponderance of the literature indicates
25 that genetic mutations can provide an    03:47

Page 269

1 increased risk for ovarian cancer.  I'm not
2 aware of any specific mutations that have
3 been proven to be causative for ovarian
4 cancer.
5    Q.  Would you agree that the science    03:47
6 and technology --
7    ATTORNEY DAVIDSON:  By the way,
8    Noah, you can take that down.
9 BY ATTORNEY DAVIDSON:
10    Q.  You would agree that the science    03:48
11 and technology that are being used to detect
12 cancer-causing genetic mutations is
13 evolving -- are evolving?
14    A.  Yes, I would agree.
15    Q.  So there are likely cancer-causing    03:48
16 genetic mutations that we don't know about
17 yet?
18    A.  You know, again, the use of the
19 word "causing," I would say associated
20 variants to cancer.  There are certainly    03:48
21 relevant genetic changes to cancer that we
22 don't know yet, but there's an important
23 clarification around that.  If we use BRCA1
24 and 2 as two examples, I think it's unlikely
25 that we will find -- extremely unlikely that    03:48

68 (Pages 266 - 269)

Page 270

1 we will find single gene, highly penetrant
2 mutations that say -- identified as
3 causative, meaning they, in and of
4 themselves, cause cancer that have yet to be
5 discovered yet. We've done enough genomes.    03:49
6 We've done enough exomes. We've done enough
7 cancer profiling that we likely have found
8 those. It still remains an evolving field
9 to understand the complex relationship
10 between any given mutation, the background    03:49
11 genetics of that individual, and then the
12 resulting initiation and progression of
13 disease. Especially in cancer but certainly
14 exists in many other common disorders that
15 we know have a genetic -- that genetics    03:49
16 plays a role.
17    Q. Do ovarian cancer researchers agree
18 with you on that?
19    A. I would think so.
20    Q. Have you seen any papers by ovarian    03:49
21 cancer researchers saying what you just
22 said?
23       ATTORNEY O'DELL: Object to the
24    form. Vague.
25       THE WITNESS: Stating that -- have    03:49

Page 271

1    I seen any -- well, I don't know of
2    any papers making those similar
3    summary statements. That would be
4    unusual.
5 BY ATTORNEY DAVIDSON:    03:50
6    Q. Is there actually a whole field of
7 ovarian cancer researchers looking for new
8 genetic mutations to understand hereditary
9 breast and ovarian cancer syndrome?
10    A. Certainly.    03:50
11    Q. Has our knowledge of mutations and
12 what mutations are associated with ovarian
13 cancer increased since your deposition in
14 2019?
15       ATTORNEY O'DELL: Object to the    03:50
16    form. Vague.
17       THE WITNESS: I would be confident
18    to say yes, our -- that it has changed
19    over the last five years.
20 BY ATTORNEY DAVIDSON:    03:50
21    Q. Do you, sitting here today, have a
22 full range of genes that predispose someone
23 to developing ovarian cancer?
24    A. I'm sorry. Is your question do I
25 know the full range of genes predisposing    03:51

Page 272

1 somebody? No, I don't know the full range
2 of what -- certainly the full range of what
3 would predispose someone to ovarian cancer
4 or, on the contrary, the corollary to that,
5 protect them from ovarian cancer. That is    03:51
6 not completely understood.
7    Q. Are you aware that your employer
8 has Tweeted that hereditary breast and
9 ovarian cancer testing remains inadequate?
10    A. Correct. But importantly the    03:51
11 context.
12    Q. Do you agree with that statement?
13    A. I do.
14    Q. Do you agree that hereditary breast
15 and ovarian cancer testing has been plagued    03:51
16 by high test costs and challenges in data
17 quality?
18    A. With important -- from a testimony
19 perspective I agree with that, but there's a
20 number of important footnotes to those    03:52
21 statements. It shouldn't be taken in
22 isolation. For example, access,
23 socioeconomic status, et cetera. That
24 statement is a -- not an incorrect
25 statement, but it's also not one that is    03:52

Page 273

1 fair to the entire testing field, meaning
2 that there are quality tests on the market,
3 and there are also tests that have
4 questionable quality.
5    Q. Do you agree that challenges in    03:52
6 next gen sequencing data quality affect
7 testing for hereditary breast and ovarian
8 cancer syndrome or however you want to . . .
9       ATTORNEY O'DELL: Object to the
10    form.    03:52
11       THE WITNESS: I don't think next
12    generation sequencing technology is
13    the root cause of that; so I would say
14    no.
15 BY ATTORNEY DAVIDSON:    03:52
16    Q. Is next generation sequencing data
17 still being improved and worked on?
18    A. The totality of the testing methods
19 are being worked on.
20    Q. Have you reviewed the medical    03:53
21 records of all six plaintiffs in this case?
22    A. I've reviewed the materials that
23 were provided on the six plaintiffs in this
24 case.
25    Q. What materials have you reviewed    03:53

69 (Pages 270 - 273)

Page 274

1 with respect to each of them?
2     A.  In most it's been their genetic
3 testing results, but I think if there's -- I
4 would have just the materials that were
5 provided on each of those six.  In some          03:53
6 cases there were multiple testing results,
7 and in other cases there were single testing
8 results.  It depends on which patient you're
9 referring to.
10     Q.  Have you ever done --          03:54
11     A.  But --
12     ATTORNEY O'DELL:  I'm sorry.
13 He's --
14     THE WITNESS:  I just wanted to
15 clarify in no cases was I provided a          03:54
16 complete medical record on any of the
17 individuals.
18     ATTORNEY DAVIDSON:  I want to make
19 clearly that Dr. Levy has a habit of
20 stopping and then thinking of          03:54
21 something else he wants to say after I
22 start asking a question.
23 BY ATTORNEY DAVIDSON:
24     Q.  Have you ever done genetic
25 counseling in your life?          03:54

Page 275

1     A.  I'm not a genetic counselor.
2     Q.  Genetic counseling typically
3 involves interviewing patients; right?
4     A.  Genetic counselors generally act as
5 the individual that works directly with the          03:54
6 patient, so yes.  During my time at
7 HudsonAlpha, I employed genetic counselors
8 that were under my supervision.
9     Q.  Did you interview any of the
10 plaintiffs in this case?          03:54
11     A.  I did not.
12     Q.  Do you know how long each plaintiff
13 used Johnson's Baby Powder?
14     A.  I don't believe those details were
15 in the materials.          03:55
16     Q.  Okay.  Do you know whether they
17 smoked?
18     A.  I would have to review them.
19 Again, I don't recall if smoking status was
20 indicated in any of the test results.          03:55
21     Q.  Do you recall whether any of them
22 had a tubal ligation?
23     A.  I don't recall if that was the
24 case.  But again --
25     Q.  Do you recall whether --          03:55

Page 276

1     ATTORNEY O'DELL:  Excuse me.  He
2 wasn't finished.  Were you finished?
3     ATTORNEY DAVIDSON:  I'm sorry.  I
4 just assume that a period was the end.
5 BY ATTORNEY DAVIDSON:          03:55
6     Q.  Do you recall whether Dr. Godleski
7 found talc particles in all of the
8 plaintiff's tissues?
9     A.  I recall I reviewed a plaintiff
10 that he had also performed that analysis on.  03:56
11 I'm not aware if he had the opportunity to
12 analyze all six plaintiffs.  I don't know if
13 pathology material was actually available
14 for all six or not.  I would defer --
15 certainly defer to Dr. Godleski on that.          03:56
16     Q.  Are you aware of whether
17 Dr. Godleski looked at any of the
18 plaintiffs' ovary tissues and actually found
19 no talc particles?
20     ATTORNEY O'DELL:  Objection to          03:56
21 form.
22     THE WITNESS:  I would have to
23 review Dr. Godleski's report.  I
24 believe just from memory that he found
25 that there were either sections or          03:56

Page 277

1 blocks where talc particles were not
2 found.  As reported in his report, it
3 was six out of seven or four out of
4 seven or something in that range.
5 But, again, I would have to review his          03:57
6 report to give you an accurate
7 statement.
8 BY ATTORNEY DAVIDSON:
9     Q.  What do you mean by "four out of
10 seven"?          03:57
11     A.  Meaning his review of multiple
12 slides or multiple sections, how many he
13 found talc particles in.
14     Q.  Were there any plaintiffs in which
15 he did not find talc particles in their          03:57
16 ovary tissues?
17     ATTORNEY O'DELL:  Objection.
18 Asked and answered.
19     THE WITNESS:  I'd have to look at
20 his report again to remind myself of          03:57
21 that.  I don't recall if it was within
22 the same patient or in different
23 patients.  Again, I would have to look
24 at his report.
25 ///

70 (Pages 274 - 277)

Page 278

1 BY ATTORNEY DAVIDSON:
2    Q.  Did the six plaintiffs all have the
3 same genetic testing or they had different
4 genetic tests?
5    A.  The six plaintiffs did not have all    03:57
6 the same genetic testing.
7    Q.  You would agree that genetic
8 testing available on the market varies,
9 especially -- has varied over time and that
10 these plaintiffs had their genetic testing    03:58
11 at different periods of time; correct?
12    A.  I would agree.
13    Q.  Do you agree that Ms. Bondurant has
14 a strong family history of cancer?
15       Let's mark her amended PFS, Noah,    03:58
16 as Exhibit?
17       ATTORNEY EPSTEIN:  Exhibit 15.
18       (Exhibit Number 15 was marked for
19 identification.)
20 BY ATTORNEY DAVIDSON:    03:59
21    Q.  Would you consider this to be a
22 strong family history of cancer?
23       ATTORNEY O'DELL:  Object to the
24 form.
25       THE WITNESS:  Just one second.    03:59

Page 279

1    It's still downloading on my end.
2 BY ATTORNEY DAVIDSON:
3    Q.  Isn't it on the screen?
4    A.  Oh, sorry.  I was looking at the
5 chat.    03:59
6       ATTORNEY O'DELL:  If you need to
7 pull it down from the chat, Dr. Levy,
8 feel free to do that.
9       ATTORNEY DAVIDSON:  It's right up
10 on the screen.    03:59
11       ATTORNEY O'DELL:  It is, but it's
12 available to him in the chat if he'd
13 like to review the entire document.
14       THE WITNESS:  I wouldn't -- I'd
15 say this is certainly a family history    04:00
16 of cancer.  Given the timing and
17 types, I'd say not unusual for an
18 extended family.
19 BY ATTORNEY DAVIDSON:
20    Q.  So you don't consider this to be a    04:00
21 strong family history of cancer?
22       ATTORNEY O'DELL:  Objection to
23 form.  Asked and answered.
24       THE WITNESS:  I'd say I agree
25 there is a family history of cancer.    04:00

Page 280

1 BY ATTORNEY DAVIDSON:
2    Q.  How many first and second degree
3 relatives of Ms. Bondurant have cancer
4 diagnosis?
5    A.  Based on what's on the screen, six.    04:01
6    Q.  Is that above average?
7       ATTORNEY O'DELL:  Object to the
8 form.
9       THE WITNESS:  I'm not -- I'm
10 actually -- I would say -- I would    04:01
11 have to confirm the relative -- couple
12 of things.  One would be the smoking
13 history and in other history as well
14 as age for some of these, but I can't
15 say it's above or below average.    04:01
16 BY ATTORNEY DAVIDSON:
17    Q.  Is that something a genetic
18 counselor would know better?
19       ATTORNEY O'DELL:  Object to the
20 form.    04:01
21       THE WITNESS:  I think a -- well, a
22 genetic counselor may offer their
23 perspectives on the same, but again,
24 these are family incidences with no
25 connection to genetic testing results    04:02

Page 281

1 in any of these extended family
2 members.  So a genetic counselor would
3 certainly consider this family history
4 in combination with the genetic
5 testing results from Ms. Bondurant.    04:02
6 BY ATTORNEY DAVIDSON:
7    Q.  Does having a mother with breast
8 cancer and an aunt with ovarian cancer
9 increase your risk of ovarian cancer?
10    A.  I think in this case in combination    04:02
11 with the genetic testing, yes, it allows you
12 to make a more complete evaluation.
13    Q.  That wasn't my question.  My
14 question is: Does having a mother with
15 breast cancer and an aunt with ovarian    04:02
16 cancer increase a woman's risk of having
17 ovarian cancer?
18    A.  Yes.
19    Q.  Thank you.  We can take that down.
20       Let's talk about Ms. Converse.    04:03
21 Ms. Converse had both a mother and an aunt
22 with ovarian cancer; correct?
23       ATTORNEY O'DELL:  Object to the
24 form.
25       THE WITNESS:  I'd have to pull up    04:03

71 (Pages 278 - 281)

Page 282

1  her report. I don't recall if she --
2  if the family history was in the --
3  BY ATTORNEY DAVIDSON:
4    Q. Well, let me ask the question
5  differently so we can move things along.    04:03
6      Would having a mother and an aunt
7  with breast cancer increase your risk of
8  having breast or ovarian cancer?
9      ATTORNEY O'DELL: Objection to
10  form.                               04:04
11     THE WITNESS: Yes, potentially.
12  BY ATTORNEY DAVIDSON:
13    Q. Let's go on to Ms. Gallardo. If we
14  could look at page 22 of your report. You
15  know that Ms. Gallardo was tested on eleven  04:04
16  genes; correct?
17    A. Correct.
18     ATTORNEY O'DELL: And if you need
19  to see any of the medical records,
20  Dr. Levy, just let us know.          04:04
21  BY ATTORNEY DAVIDSON:
22    Q. I know mutations were found in
23  these eleven genes according to your report;
24  correct?
25    A. That's correct.               04:04

Page 283

1    Q. Are you aware that the panel that
2  she had was done for endometrial cancer and
3  not ovarian cancer?
4    A. I would have to -- let me look at
5  the --                             04:05
6    Q. I could put it up.
7    A. Sure.
8     ATTORNEY DAVIDSON: Noah, do you
9  want to put the exhibit? Would that
10  be 14? I'm lost.
11     ATTORNEY EPSTEIN: That would be
12  16. I'm putting it in the chat right
13  now.
14     (Exhibit Number 16 was marked for
15  identification.)                   04:05
16  BY ATTORNEY DAVIDSON:
17    Q. Do you see where it says
18  endometrial cancer panel?
19    A. I do.
20    Q. Do you know whether or not she    04:05
21  received BART testing, B-A-R-T?
22    A. I'm not aware if she did or did
23  not, but certainly the endometrial cancer
24  panel of the eleven genes, at least nine of
25  the eleven would be also strongly relevant  04:05

Page 284

1  to ovarian cancer as well.
2    Q. Are there genetic mutations known
3  to be pathogenic for ovarian cancer that are
4  only found by BART testing?
5     ATTORNEY O'DELL: Object to the    04:06
6  form.
7     THE WITNESS: Specific to ovarian
8  cancer, I'm not aware of -- I'm not
9  aware of any specific mutations that
10  are based on rearrangements in BRCA1   04:06
11  and 2 that are pathogenic strictly to
12  ovarian cancer.
13  BY ATTORNEY DAVIDSON:
14    Q. You're not aware of genetic
15  mutations in BRCA genes known to be    04:06
16  pathogenic for ovarian cancer that are only
17  found by BART testing?
18     ATTORNEY O'DELL: Object to the
19  form.
20     THE WITNESS: I said specific to   04:06
21  ovarian cancer. BRCA1 has a risk for
22  both breast and ovarian cancer. As
23  long as that satisfies the requirement
24  for being pathogenic to ovarian,
25  then -- there is a growing body of    04:06

Page 285

1  evidence now that the technical
2  capabilities allow BART testing to
3  occur, then in addition to single
4  nucleotide variants, there are now
5  rearrangements and other structural    04:07
6  variants that are beginning to be
7  associated with both breast and
8  ovarian cancer. The body of that
9  evidence is evolving.
10  BY ATTORNEY DAVIDSON:                 04:07
11    Q. Are you aware that over 10 percent
12  of genetic mutations in BRCA genes that are
13  known to be pathogenic for ovarian cancer
14  can only be found by BART testing?
15     ATTORNEY O'DELL: Object to the     04:07
16  form.
17     THE WITNESS: As I said, yes, that
18  will be a continually evolving number
19  as far as an absolute percentage --
20  BY ATTORNEY DAVIDSON:                04:07
21    Q. Is this --
22     ATTORNEY O'DELL: I'm sorry. He's
23  not finished.
24  BY ATTORNEY DAVIDSON:
25    Q. Ms. Gallardo was not tested for   04:07

72 (Pages 282 - 285)

Page 286

1  RAD51; correct?
2      A.  RAD51 was not part of the oncogene
3  DX panel, the endometrial panel.
4      Q.  That would be part of comprehensive
5  panel for ovarian cancer; right?          04:08
6      ATTORNEY O'DELL:  Object to the
7  form.
8      THE WITNESS:  It may be part,
9  certainly.  As we discussed earlier,
10  the genetic testing field is evolving,    04:08
11  and I think unfortunately most of
12  these patients, you know, are
13  observing that evolution in real time.
14  BY ATTORNEY DAVIDSON:
15      Q.  Her panel also did not include    04:08
16  BRIP1; right?
17      A.  That's correct.
18      Q.  Also relevant to ovarian cancer;
19  right?
20      A.  Yes, potentially.               04:08
21      Q.  Are you familiar with PALB2?
22      A.  PAL2, yes.
23      Q.  Also relevant to ovarian cancer?
24      A.  I'd have to remind myself of the
25  details of that gene to give you an idea of   04:08

Page 287

1  how relevant relative to some of the others
2  that were tested for.  Again, there's a
3  continually growing list of genes involved
4  in the initiation and progression of cancer,
5  both well known and, therefore, on these    04:09
6  panels and then becoming more well known as
7  more and more evidence is derived from
8  genomic technologies.
9      Q.  So you can't rule out genetic
10  mutations as a cause of Ms. Gallardo's     04:09
11  ovarian cancer because she wasn't tested for
12  every possible gene; right?
13      ATTORNEY O'DELL:  Object to the
14  form.
15      THE WITNESS:  So, again, I'm not    04:09
16  aware of any gene mutation, whether it
17  be rearrangement or single nucleotide
18  genes that is directly causative of
19  ovarian cancer.  There's a large body
20  of evidence, as we've been discussing,    04:09
21  around genetic testing and variance
22  that increase the risk of.
23  BY ATTORNEY DAVIDSON:
24      Q.  You can't rule out that
25  Ms. Gallardo had genetic mutations that are   04:10

Page 288

1  associated with ovarian cancer because she
2  wasn't tested for all of those genetic
3  mutations; correct?
4      A.  Yeah, I can only evaluate the
5  testing results that were provided for    04:10
6  Ms. Gallardo.
7      Q.  Okay.  Let's move on to
8  Ms. Judkins.  You say in your report that
9  she had a VUS; right?  Ovarian of unknown
10  significance and PTEN?                04:10
11      A.  That's correct.
12      Q.  You concluded that her specific
13  mutation is not associated with an increased
14  risk of ovarian cancer; right?
15      A.  Well, I reported that there is no    04:10
16  evidence to define that specific mutation as
17  being a pathogenic variant or has yet to be
18  associated with an increased risk of ovarian
19  cancer.  As I discussed in some of those
20  supporting sentences as to why, just given    04:11
21  the number of variants that have -- that are
22  known in PTEN being over 1,000 and an
23  additional little over 1,000 being annotated
24  as variants of unknown significance so that
25  I think those statements remain as stated.    04:11

Page 289

1      Q.  Can you cite any scientific
2  literature supporting your statements?
3      A.  So I cited -- 26 is the report from
4  Judkins.  These numbers were pulled from
5  ClinVar.                          04:11
6      Q.  My question is:  Can you cite
7  anything in the scientific literature to
8  support your position that her VUS was not a
9  pathogenic variant?
10      ATTORNEY O'DELL:  Objection.         04:12
11  Asked and answered.
12      THE WITNESS:  Yes, I can provide
13  that citation.
14  BY ATTORNEY DAVIDSON:
15      Q.  What is that?                   04:12
16      A.  Again, based on the information
17  that's available in ClinVar, which is --
18  included appropriate references when
19  applicable.
20      Q.  Now, Ms. Judkins also had tumor    04:12
21  testing done; right?
22      A.  I'm trying to recall.  I didn't
23  mention the tumor testing in the report.
24  Are you referring to the genomic instability
25  test?                             04:13

73 (Pages 286 - 289)

Page 290

1    Q.  Uh-huh.  What causes genomic
2  instability in a tumor?
3    A.  Generally it's -- I'm trying to
4  think of the most appropriate way to phrase
5  it succinctly.  So generally a loss of DNA    04:13
6  repair of specific types can result in a
7  genomic instability measure, which is then
8  looked at when there's either clear evidence
9  of a homologous recombination deficiency or
10  other DNA repair or DNA maintenance,    04:14
11  deficiencies that exist in the tumor.
12       Because those pathways are not as
13  well understood, a surrogate for that is
14  looking at various targets across the
15  genome, so not specific to any one gene, and    04:14
16  looking at those targets across the genome
17  to see what the stability of microsatellite
18  sites, small repeats, et cetera, and that
19  the stability or lack of stability in those
20  sites gives an indication of the overall    04:14
21  genomic instability and then can be
22  summarized as a high, medium, low marker,
23  again, depending on the test and how it's
24  done.
25    Q.  Can genomic instability be    04:14

Page 291

1  indicative of a germline mutation?
2    A.  So certainly having genomic
3  instability as a germline mutation, there
4  may be an association with a germline
5  mutation, but it also may be a somatic or    04:15
6  spontaneous mutations as well.
7    Q.  Let's talk about Ms. Newsome for a
8  minute.  She underwent testing on 25 genes;
9  right?
10    A.  Using the MyRisk test from Myriad    04:15
11  Genetics, correct.
12    Q.  Her genetic testing revealed a
13  variant known as MUTYH; right?
14    A.  Correct.
15    Q.  And that's associated with an    04:15
16  increased risk of some cancers; right?
17    A.  That's correct.
18    Q.  And you concluded that that's not
19  associated with an increased risk of ovarian
20  cancer; right?    04:15
21    A.  Correct.  I made that conclusion
22  based on this mutation being annotated as a
23  VUS as well as the conflicting findings with
24  respect to breast cancer as well.  So it's
25  primarily because of her specific mutation    04:15

Page 292

1  was located in a region of poor
2  conservation.
3    Q.  Did you research whether there are
4  any papers that tie MUTYH mutations to
5  ovarian cancer?    04:16
6    A.  I believe I looked.  That's where I
7  found the Rodriguez and Rojas, the Condello
8  paper from 2023.
9    Q.  Are there any other papers that
10  find that MUTYH mutations carry an increased    04:16
11  risk of ovarian cancer?
12    A.  I didn't find any for this specific
13  variant.
14       ATTORNEY DAVIDSON:  I've got
15  nothing else at the moment.    04:17
16       ATTORNEY O'DELL:  Okay.
17       ATTORNEY DAVIDSON:  Do you want to
18  take a break?
19       ATTORNEY O'DELL:  Let's take a
20  short five-minute break, and we'll    04:17
21  come back.
22       ATTORNEY DAVIDSON:  Great.
23       (Recess taken from 4:17 p.m. to
24  4:51 p.m.)
25                                    04:52

Page 293

1       EXAMINATION
2  BY ATTORNEY O'DELL:
3    Q.  Dr. Levy, I have a couple of
4  follow-up questions, a few follow-up
5  questions.    04:52
6       First, let me take you back to some
7  questions that were asked about your CV and
8  specifically number 167 on your CV listing
9  your published literature.  167 you were
10  asked about -- first author is Bhatia, and    04:52
11  the name of the study is:  Magnetic
12  Resonance Imaging Characteristics in Case of
13  TOR1AIP1 Muscular Dystrophy published in
14  2019.
15       I'm going to mark that for the    04:52
16  record as Exhibit 17.
17       (Exhibit Number 17 was marked for
18  identification.)
19  BY ATTORNEY O'DELL:
20    Q.  Jennifer is going to put it in the    04:52
21  chat.
22       Dr. Levy, was this a published as a
23  part of the work of a consortium?
24    A.  It was.
25    Q.  What was the name of the    04:53

74 (Pages 290 - 293)

Page 294

1  consortium?
2      A.  This was part of the Undiagnosed
3  Disease Network.  I think we covered this a
4  bit earlier.  I think in this case now being
5  able to see some of the members, I think I    04:53
6  was roughly correct in the estimate of the
7  size of the consortium as was talked about
8  around a hundred or so members.  And you can
9  also see the notation of some of the
10  affiliations being both Vanderbilt    04:53
11  University, which was the main clinical site
12  that we supported.  As I mentioned, I was a
13  co-investigator on this grant for a period
14  of about four years while I was at
15  HudsonAlpha.    04:53
16      Q.  Were you one of the collaborators
17  on this paper?
18      A.  Correct.  That's right.
19      Q.  As a collaborator and as one of the
20  principal investigators of the research,    04:54
21  would it be appropriate for you to list this
22  publication on your curriculum vitae?
23      A.  Again, it's a project I'd supported
24  and was part of on an ongoing basis.  For
25  those not familiar with the Undiagnosed    04:54

Page 295

1  Disease Network, very briefly this is a
2  national consortium that provides advanced
3  genetic testing to patients that have
4  undergone a diagnostic odyssey.  It's mainly
5  very rare disease for both adults and    04:54
6  pediatric cases.
7      Q.  I'd like to now talk to you about
8  what was publication number 169 on your CV.
9  First author was Das, D-a-s, and it was
10  published in 2019.  It's entitled:  The    04:54
11  Extracellular RNA Communication Consortium:
12  Establishing Foundational Knowledge and
13  Technologies for Extracellular RNA Research,
14  published in Cell.
15      We'll mark that as Exhibit 18.    04:54
16      (Exhibit Number 18 was marked for
17      identification.)
18  BY ATTORNEY O'DELL:
19      Q.  I'll provide you with a copy.  Was
20  this paper published by a consortium?    04:55
21      A.  It was.
22      Q.  Which consortium?
23      A.  The Extracellular RNA Communication
24  Consortium of which I was a member.  Very
25  similar to what we just discussed with the    04:55

Page 296

1  UDN paper.  This was a multi-author paper
2  where rather than indicating each of the
3  authors individually in the author line, it
4  was indicated as a consortium.  This and the
5  previous paper do, in fact -- if you search    04:55
6  my name in PubMed, these papers come up
7  because the full consortia author list is
8  indexed in PubMed.
9      Q.  Is that a reference that's
10  appropriately included in your curriculum    04:55
11  vitae?
12      A.  It is.
13      Q.  I'd also like to have you turn in
14  your curriculum vitae, if you wouldn't mind,
15  Dr. Levy, to references 141 and 142.  Just    04:56
16  let me know when you get there.
17      A.  One second.
18      Q.  141 and 142.
19      A.  I'm looking at it in the amended
20  report on page 64.    04:56
21      Q.  Okay.  And are these two
22  references -- first Da Mesquita published in
23  2018 and Dickinson published also in 2018.
24  Are those papers that were published while
25  you were head of HudsonAlpha?    04:56

Page 297

1      A.  They were.  And so in looking at
2  these more carefully -- and I don't have a
3  specific mechanistic explanation for the
4  author line.  But if you look in the PubMed
5  central reference, which these papers are in    04:57
6  full text in there, you can find
7  acknowledgments in both of my laboratory at
8  HudsonAlpha.
9      So this was either a misannotation
10  as -- typically in a laboratory mine is    04:57
11  you would annotate all the publications that
12  you supported as a laboratory and a subset
13  of those publications you had more
14  involvement with as a co-author.
15      What I would have to carefully go    04:57
16  back in my records and find out is if I was
17  potentially an author on an earlier version
18  of the paper or if this was a misannotation
19  from both the laboratory versus my
20  participation.    04:57
21      But in these two examples there's
22  clear annotation of the participation of the
23  laboratory directly in these publications as
24  it's acknowledged.  This was either a
25  misannotation or a change in authorship from    04:57

75 (Pages 294 - 297)

Page 298

1  a pre-print and when it evolved into a final
2  peer-reviewed version.  I'd have to
3  potentially make that correction.
4      Q.  So let me ask you now to turn --
5      A.  Maybe just address since it was      04:58
6  mentioned as -- questioned as whether or not
7  this was ethical or not during the --
8  certainly as a -- it's something that needs
9  to be addressed from an annotation
10  perspective, but from an ethics perspective,  04:58
11  there's a very clear and reasonable
12  explanation as to how these got included.
13      Q.  Dr. Levy, let me ask you to turn in
14  your report, please, to page 2.
15      A.  Okay.                    04:58
16      Q.  And ask you what was your
17  assignment?  What were you asked to do in
18  this case?
19      A.  Oh, so I was asked to -- specific
20  to this report?                  04:58
21      Q.  Yes.
22      A.  It was to update the previous
23  report with respect to the literature
24  supporting the biological plausibility of
25  talc playing a role in ovarian cancer.    04:59

Page 299

1      Q.  Were you also asked to evaluate the
2  genetic testing of six plaintiffs?
3      A.  That's correct.  The six plaintiffs
4  we discussed earlier.
5      Q.  And what was your methodology?  In    04:59
6  terms of your general opinions, what was
7  your methodology in reaching those opinions?
8      A.  The general methodology was I think
9  fairly standard in that it was a literature
10  review of the peer-reviewed literature      04:59
11  primarily, but secondarily to that also a
12  review of other available sources, again,
13  depending on whether I was looking at
14  citations, whether I was looking at
15  additional material in databases like      04:59
16  ClinVar.
17      Overall, it was meant to be a
18  systematic and as comprehensive as possible
19  review with a focus on that particular
20  request, which is evidence supporting the    05:00
21  role that talc may play in ovarian cancer.
22  I was not asked to provide opinions on
23  causation or focus on any one specific area
24  of the field.
25      Q.  And specifically did you review the    05:00

Page 300

1  totality of evidence to evaluate the
2  biologically plausible mechanism or
3  mechanisms by which talc can result in
4  ovarian cancer?
5      A.  I did.                    05:00
6      Q.  You were asked a number of
7  questions about epidemiology and
8  epidemiologic studies.  As a part of your
9  review, did you review the epidemiologic
10  literature?                    05:00
11      A.  I did.
12      Q.  Specifically I'd like to ask you to
13  turn in your report to page 15 and 16,
14  actually looking at 16.  Do you cite a
15  review paper I think was marked as an      05:01
16  exhibit, Exhibit 11, Wentzensen and O'Brien
17  published in 2021?
18      A.  Yeah, the top of page 16, yeah.
19      Q.  And I'd like to ask you to look at
20  the Wentzensen and O'Brien publication.    05:01
21  Does it contain a comprehensive summary of
22  the epidemiologic data as of 2021?
23      A.  Yes, it appeared -- it appears to
24  be a, as the title suggests, a summary of
25  the epidemiological evidence at the time of    05:02

Page 301

1  publication which, as you stated, was 2021.
2      Q.  Is it fair to say that the prior
3  studies that have been published on the
4  question of the genital use of talc and
5  ovarian cancer, the results were summarized    05:02
6  in the Wentzensen and O'Brien review paper?
7      A.  That's correct.  Mostly in table
8  form.
9      Q.  If you'll look at Table 3 of the
10  paper, does it include the data and results    05:02
11  from the O'Brien pooled study of -- pooled
12  analysis of cohort studies?
13      A.  It does.
14      Q.  And is that something you
15  considered in reaching your opinions in this    05:02
16  case?
17      A.  It does as part of the overall
18  literature and overall data that was
19  summarized in this paper.
20      Q.  And specifically I'd like to direct    05:02
21  you to language on the same page, which is
22  page 7 of the copy I have of the paper.  As
23  it relates to the association of genital use
24  of talc and serous ovarian cancer, what does
25  it say?                        05:03

76 (Pages 298 - 301)

Page 302

1    A. At the bottom of the first
2 column above Table 3 quoting the paper it
3 says: Overall these results consistently
4 demonstrate that there was a positive
5 association between talc use and serous    05:03
6 ovarian cancers and possibly also
7 endometrial tumors.
8    Q. Thank you.
9        Then I'd like to direct you now to
10 page -- also page 16, sorry, of your report.    05:03
11 And you cite the Brieger study. Do you
12 recall that discussion?
13    A. I do.
14    Q. I'm not sure it was marked for the
15 record. We will do that and put it in the    05:04
16 chat and mark it as Exhibit 19.
17        (Exhibit Number 19 was marked for
18    identification.)
19 BY ATTORNEY O'DELL:
20    Q. Let me ask you, Dr. Levy, why did    05:04
21 you include the Brieger paper as part of
22 your report?
23    A. With the remit as we were talking
24 about earlier of having as comprehensive a
25 review of the evidence regarding the role of    05:04

Page 303

1 talc in ovarian cancer, one of the themes
2 that continually came up in that was the
3 role of inflammation in cancer progression,
4 and seeing -- and part of that searching
5 discovered or came across this particular    05:04
6 paper which was looking at
7 inflammation-related risk scores associated
8 with ovarian cancer survival. I thought it
9 was relevant to that same area of biological
10 plausibility; so I included it as a    05:05
11 reference in the report.
12    Q. And on page -- on my copy, page 4,
13 the paper in the introduction, do the
14 authors specifically talk about chronic
15 inflammation and its role in initiation of    05:05
16 cancer?
17    A. The authors do, and they cite
18 chronic inflammation as being able to --
19 quoting the paper, chronic inflammation can
20 directly cause DNA damage, which is    05:05
21 particularly relevant for cancer initiation
22 and progression.
23    Q. You were also asked a number of
24 questions about your report from 2018, and
25 counsel for Johnson & Johnson essentially    05:06

Page 304

1 accused you of plagiarizing aspects of your
2 report.
3        So let me ask you: Did you
4 plagiarize any aspect of your expert report,
5 either the 2018 version or the 2023 version?    05:06
6    A. To directly answer, no. To be
7 clear, the questions focused on single and
8 individual sentences, not paragraphs or
9 passages. In both cases, again, getting
10 back to what was asked in the 2018, 2019    05:06
11 report and in this report, the request was a
12 review of the totality of information
13 available. So that meant reviewing and
14 reading and then consolidating a variety of
15 sources.    05:06
16        So for facts that were -- that are
17 generally acceptable or quite well known, I
18 did not make an effort to make sure that
19 those were all specifically cited. It's not
20 a surprise that, again, those individual or    05:07
21 singular sentences are worded in a similar
22 manner to what may appear -- what may have
23 been appeared in websites or other resources
24 that were reviewed during that process.
25    Q. Would it be fair to say for    05:07

Page 305

1 fundamental definitions that are just basic
2 definitions, that the same definition often
3 appears in many citations, whether it be a
4 scientific reference, a website, or
5 something else?    05:07
6    A. That's correct. For specific, I
7 think, summary facts, particularly as they
8 relate to either scientific principles or
9 simple medical positioning, the wording is
10 often very similar or the same across those    05:07
11 types of resources.
12    Q. Now, I ask you now to turn to
13 page 13 of your report, please.
14    A. Okay.
15    Q. And you were asked in the second    05:08
16 paragraph about a reference to Trabert 2014
17 in regard to the use of aspirin. Do you see
18 that? The second paragraph, second to last
19 line.
20    A. Yes. Yeah.    05:08
21    Q. And counsel for Johnson & Johnson
22 suggested that you had not included more
23 recent studies that evaluated the uses --
24 use of NSAIDs and the risk of ovarian
25 cancer.    05:08

77 (Pages 302 - 305)

Page 306

1    Do you recall those questions?
2    A. I do.
3    Q. And, in fact, you know, looking at
4 your paragraph, have you cited up-to-date
5 literature regarding the use of aspirin and    05:09
6 ovarian cancer?
7    A. There's a second reference, the
8 Hurwitz and Webb 2023 reference that's at
9 the bottom of that paragraph.
10    Q. I'm going to hand you the Hurwitz    05:09
11 paper. We'll mark that as Exhibit 20.
12    (Exhibit Number 20 was marked for
13    identification.)
14 BY ATTORNEY O'DELL:
15    Q. Is Exhibit 20 the paper that you    05:09
16 reference there?
17    A. Yes.
18    Q. And when was it published?
19    A. July 2022. First online. I think
20 that's where the disconnect is to the final    05:09
21 print date which is later in 2023.
22    Q. Okay. And was this a study that
23 examined aspirin to determine if the use of
24 aspirin could decrease the risk of ovarian
25 cancer?    05:10

Page 307

1    A. It was a meta-analysis looking at
2 that question.
3    Q. And -- and what were the
4 conclusions?
5    A. The conclusions were that this was    05:10
6 the largest to date aspirin use and ovarian
7 cancer study, and the authors conclude,
8 quoting the authors, provides evidence that
9 frequent aspirin use is associated with
10 lower ovarian cancer risk regardless of the    05:10
11 presence of most other ovarian cancer risk
12 factors.
13    Q. And is that paper supportive of
14 your opinions in this case that one of the
15 biologic mechanisms of ovarian cancer is    05:10
16 chronic inflammation?
17    A. Correct, it is. It is supportive
18 of that. If chronic inflammation plays a
19 significant role in -- an aspect, not the
20 only aspect, but an aspect, that you would    05:11
21 expect at some level is if you can diminish
22 inflammation, then you may change in some
23 cases the overall either progression or risk
24 for the disease. I would say that would
25 become likely most apparent in a cohort or    05:11

Page 308

1 meta-analysis like was done in this paper.
2    Q. Thank you.
3    Then I'd like now to turn your
4 attention to the Taher paper, and Taher was
5 marked previously as Exhibit 9 to the    05:11
6 deposition. I'll hand it to you.
7    On page 98 you were asked about
8 Table 4 and specifically the GRADE analysis,
9 G-R-A-D-E analysis. You offered to explain
10 your opinion about the relevance of that,    05:12
11 and you didn't have an opportunity. So I
12 wanted to give that to you now.
13    Does what was stated in the paper
14 about the GRADE analysis affect your opinion
15 that this is something that should be    05:12
16 considered in reaching your conclusions in
17 this case?
18    A. Well, I think the totality of the
19 information in the paper is important. The
20 earlier questions focused on the specific    05:12
21 grades that are part of the GRADE working
22 group. I think it was certainly appropriate
23 for a paper like this to provide a clear
24 framework and reference to that framework
25 and detail that framework appropriately for    05:12

Page 309

1 their conclusions. And appropriate to how
2 they applied them.
3    The opportunity that we didn't have
4 to address at the earlier question was the
5 other two footnotes that were provided,    05:13
6 footnotes C and D in Table 4, which those
7 begin to describe that the -- two things.
8 Footnote C quotes 24 studies were case
9 control studies indicating recall bias may
10 be an issue given long latency periods.    05:13
11    That's always going to be a
12 challenge with a framework like GRADE.
13 Anything with long latency periods or cohort
14 studies by the nature of the GRADE framework
15 are going to be -- you're going to see a    05:13
16 lower overall score in terms of the
17 certainty of the evidence through the GRADE
18 framework. GRADE frameworks, stated simply,
19 are most appropriate for randomized control
20 trials. The totality of the evidence now    05:13
21 regarding talc, it would be impossible or
22 unethical to run a randomized control trial
23 based on talc exposure. You do the best you
24 can with what you have.
25    The other footnote D was that three    05:13

78 (Pages 306 - 309)

Page 310

1  studies were indeed cohort studies and were
2  assessed as having a relatively short
3  follow-up period. So, therefore, latency
4  again comes into play here. The conclusions
5  in the paper indicating that there remains a  05:14
6  positive association, even though the GRADE
7  score was indicated as very low, the authors
8  took quite a bit of effort to explain why it
9  was low and indicate the relative
10 positioning on the application of the GRADE  05:14
11 framework to the study design.
12     Q. Thank you. You were also asked
13 about -- on page 16 of your report,
14 specifically studies that looked at talc and
15 the use of not only talc but store-bought  05:14
16 douches, as well as a combination of both.
17 Do you see that? You cited Gabriel and
18 Vitonis in 2019 and O'Brien and D'Aloisio in
19 2019.
20     Do you see that?          05:15
21     A. I do.
22     Q. I want to mark for the record what
23 is going to be Exhibit 21, which is the
24 Gabriel 2019 study.
25 ///

Page 311

1     (Exhibit Number 21 was marked for
2     identification.)
3  BY ATTORNEY O'DELL:
4     Q. Dr. Levy, take a look at that for a
5  moment. When you have time to take a look,  05:15
6  I'll ask you a question.
7     A. Okay.
8     Q. Does the Gabriel 2019 find a
9  positive association between talc use with
10 or without douching in ovarian cancer?  05:15
11     A. It does.
12     Q. Are the sentences you included in
13 your report regarding douching and talc
14 use -- are they supported by the Vitonis
15 2019 reference?          05:16
16     A. That's correct. Quoting the paper
17 to be sure that there's clarity, the results
18 of this paper as far as an odds ratio for
19 women who had douched but never used talc
20 was .94 with a 95 percent confidence  05:16
21 interval of .76 to 1.16.
22     However, in women who used talc but
23 never douched, the odds ratio was 1.28, the
24 95th confidence interval being 1.09 to 1.51.
25 As we discussed earlier in the testimony,  05:16

Page 312

1  from an epidemiology perspective by not
2  crossing the 95th confidence interval 1,
3  that's a positive association.
4     Then for women who regularly used
5  talc or douched, that rose to 1.53 with a  05:16
6  95th percent confidence interval of 1.11 to
7  2.10.
8     Q. Was the inclusion of O'Brien and
9  D'Aloisio 2019 simply an error in citation?
10     A. It was an error in wording in  05:17
11 the -- either in wording or in citation,
12 since that was uterine cancer. It was in
13 the same methodological space or the same
14 biological space looking at talc use and
15 douching.          05:17
16     Q. You were also asked a series of
17 questions about some Tweets. I think they
18 were asked in the framework of whether it
19 was your current employer. One, are you
20 familiar with the Tweets that were being  05:17
21 referenced?
22     A. I'm assuming -- since we didn't
23 introduce the Tweets as an exhibit, I am
24 aware, though. There was a long-standing
25 series of what I actually think we were  05:18

Page 313

1  quite proud of when I was at HudsonAlpha.
2  This was work that was done in collaboration
3  with my group. That was providing access to
4  genetic testing to women actually -- men
5  were eligible as well. They were in later  05:18
6  years. It was to make breast and ovarian
7  risk testing more accessible.
8     First we did that across the state
9  of Alabama and then expanded that more
10 broadly throughout the Southeast actually  05:18
11 for a number of years. Ultimately it was
12 being processed in a company called Kailos
13 Genetics, and they continued that even after
14 as a private company for a period of time.
15     But those Tweets were mainly  05:18
16 focused, or my recollection of those Tweets
17 that they were mainly focused around the
18 promotion of that program as well as making
19 announcements through HudsonAlpha's social
20 media channels, which are of course directed  05:18
21 at collaborators and other scientists as
22 well, highlighting those programs and
23 highlighting some of these program features.
24     Q. Based on your knowledge and
25 recollection of those Tweets or that  05:19

79 (Pages 310 - 313)

Page 314

1 information that was being provided to the
2 public and collaborators, was the focus on
3 the information that genetic testing was
4 inaccurate as was suggested?
5    A. No, I think the focus wasn't on the    05:19
6 accuracy or inaccuracy of a specific test.
7 It was more a focus on highlighting that
8 rapid revolution of testing technologies.
9 And in this case, the testing was done
10 across a cohort of genes. From a technical    05:19
11 perspective, BRCA1 and 2 and even genes like
12 P53, there are challenges to testing them
13 accurately and testing them comprehensively
14 just because of the challenges around their
15 sequences. There is a lot of those releases    05:19
16 and things were really indicating the
17 advancements that were being made in the
18 testing space.
19        We were trying to be attractive to
20 the public in terms of accessibility of        05:20
21 testing so that those that were interested
22 in it could know that they could access it,
23 and they were also trying to address
24 technological questions about are we doing
25 it accurately, why have it done at            05:20

Page 315

1 HudsonAlpha, questions like that. We would
2 have to go through specifics of each of
3 those Tweets, but that was the general
4 spirit of that.
5    Q. There was a question that was asked    05:20
6 about women with BRCA1 and 2 mutations, and
7 I believe I took down the question or
8 Jennifer took down the question
9 specifically. Are you aware of any
10 scientific evidence that an environmental    05:20
11 carcinogen in talc like talc would increase
12 the likelihood that BRCA1 and 2 mutation
13 would led to ovarian cancer? Do you recall
14 that question?
15    A. I do.                              05:20
16    Q. Would you explain your answer to
17 that question? Would you give us your
18 analysis --
19    A. Sure.
20    Q. -- of how talc as an environmental    05:21
21 carcinogen impacts a patient who may have
22 BRCA1 and 2 mutations?
23    A. BRCA1 and 2 are two examples. The
24 rest of the mutations we've discussed under
25 the six specific plaintiffs would fall into    05:21

Page 316

1 the same category.
2        My analysis and the effort of this
3 report was, again, as been stated numerous
4 times, was not meant to provide a causation
5 linkage between any specific mutation or        05:21
6 even specific environmental exposure to an
7 exact causative event or initiation event or
8 even progression event. It was instead
9 focusing on that biologically plausible
10 mechanism.                                05:21
11        So the way that I -- and based on
12 my experience and what we've been talking
13 about in my past history and career in terms
14 of research into different genetic risk
15 factors for a variety of diseases, including    05:21
16 different cancer types, the way I looked at
17 this was the presence or absence of those
18 mutations would, of course, impact the
19 baseline relative risk to a patient.
20        Or another way to state that is a    05:22
21 patient with a BRCA1 or 2 mutation, just
22 using those as two simple examples, would be
23 more vulnerable. If that person is more
24 vulnerable to other exposures, if you
25 introduce a mechanism of chronic            05:22

Page 317

1 inflammation, like we have provided that
2 plausible mechanism for talc inducing that.
3        To use an analogy, I use the
4 snowball rolling down the hill. It creates
5 a lottery ticket. By having BRCA1 or 2        05:22
6 mutations, you've already punched the first
7 three numbers in the lottery ticket. You
8 add the environmental exposure, and you only
9 have to punch three more numbers before you
10 have that initiation event.                05:22
11        I looked at the totality of that
12 testing as not necessarily one or the other;
13 right? If you have a BRCA1 mutation, you're
14 destined to 100 percent get cancer. We know
15 that's not true. But instead looking at it    05:22
16 as if you have a genetic susceptibility to
17 cancer and you then add an environmental
18 exposure on top of that, that you're just --
19 it's a step function. If your baseline risk
20 was X and your baseline risk because of        05:23
21 genetic components was 1.3X, you add the
22 environmental exposure and both of those
23 would rise by the same relative proportion.
24        But you're still at a higher risk
25 as an individual with those genetic        05:23

80 (Pages 314 - 317)

Page 318

1 variants. It wasn't meant to be -- it's not
2 an either/or. In fact, I would look at this
3 as those individuals with those mutations
4 would very much be more susceptible to any
5 of the negative effects of these          05:23
6 environmental factors.
7      Q. So you were asked a question
8 about -- and it was marked as Exhibit 15 --
9 Ms. Bondurant's plaintiff fact sheet. I'll
10 share my screen to show the chart that I    05:23
11 believe that counsel for Johnson & Johnson
12 showed you.
13     Do you recall this?
14     A. I do.
15     Q. How many first degree relatives are   05:24
16 listed in this chart?
17     A. Two.
18     Q. Okay. Thank you.
19     I'm going to ask you --
20     (Discussion off the record.)      05:24
21 BY ATTORNEY O'DELL:
22     Q. I want to ask you, Dr. Levy,
23 specifically about Ms. Judkins. You were
24 asked a series of questions about
25 Ms. Judkins and specifically that there was   05:25

Page 319

1 a report in her medical records, and we'll
2 turn to it. It was -- I'm not sure it was
3 marked, but it was entitled Myriad Genomic
4 Instability Status Test Results.
5     Do you recall that?          05:25
6     A. Yes, I do.
7     Q. And if you want to turn to it,
8 Doctor, and whatever you're ready, just let
9 me know.
10     A. I thought we had it open from    05:25
11 before. Here it is, yeah.
12     Q. Let me just ask the question:
13 What's the relevance of this test? What
14 does it mean in relation to your evaluation
15 of Ms. Judkins' genetic testing?    05:26
16     A. Well, so this is specifically
17 performed on the tumor. So you would not be
18 able to infer anything about the -- her
19 germline genetics specifically from this
20 test, other than what may appear in the    05:26
21 background kind of the normal. This
22 specific test, the Myriad genomic
23 instability status as explained on the paper
24 that it is a measure of three biomarkers,
25 loss of heterozygosity, telomeric allelic    05:26

Page 320

1 imbalance, and large scale state transition.
2     So those three biomarkers -- again,
3 I'm just quoting from the paper or the
4 results -- are associated with essentially a
5 DNA repair defect. Stated in laymen's    05:27
6 terms, this is a measure of how damaged the
7 overall genome is in the tumor. This is
8 used as an indicator that may modulate
9 specifically what chemotherapeutic agents or
10 what targeted therapies the patient may be    05:27
11 eligible for. As more and more evidence
12 becomes available, it is associated with
13 different expectations for outcome in
14 survivorship.
15     Q. Does this test result have any    05:27
16 relevance to whether she had an inherited
17 mutation?
18     A. No. So my reading of this, because
19 they're specifically targeting single
20 nucleotide polymorphisms, which are variants   05:27
21 that have a higher prevalence in the overall
22 population. Think of this as more they're
23 kind of looking at the structure of the
24 genome rather than the function of the
25 genome, at least in this case. I'm not    05:28

Page 321

1 aware of the ability to use this as a
2 testing modality for germline mutations.
3     Q. You referenced during your
4 testimony earlier ClinVar. What is ClinVar?
5     A. So ClinVar is a public database    05:28
6 that is contributed to by all of the
7 laboratories that we've talked about today,
8 whether it be Myriad, GDX, Invitae, academic
9 laboratories, government laboratories.
10     What it acts as is it's a    05:28
11 repository of variants that either are known
12 to have clinical significance or where
13 there's gathering evidence on a clinical
14 significance. What it provides is almost a
15 realtime resource to evaluate the    05:28
16 probability or the likelihood that a variant
17 may or may not be associated.
18     There's three broad classifications
19 of variants: Things that are known to be
20 pathogenic meaning that there's strong    05:29
21 evidence to associate them to one or more
22 diseases, variants that are likely
23 pathogenic so still evidence but it may not
24 be as strong, and then variants of unknown
25 significance which means it's a variant    05:29

81 (Pages 318 - 321)

Page 322

1  where evidence is still building.
2      It could go either way.  It could
3  be benign.  It could be significant, may
4  depend on the genetic background, may depend
5  on the presence of other variants.  There's    05:29
6  just not enough evidence to conclusively
7  determine simply based on the presence or
8  absence of that variant what that variant is
9  doing.
10      And then finally the last category
11 is benign.  It's a variant that's known to
12 be -- or I should say likely benign.  Again,
13 any of those variant classifications can
14 change.  And what you see evolving in
15 ClinVar as more and more evidence and more    05:29
16 and more sequencing and more and more
17 testing is done is now the growing need to
18 have ClinVar separated soon by ancestry or
19 ethnicity because variants that have better
20 significance in one population may be either    05:30
21 higher or lower significance in other
22 populations.
23      For the time being it just fills a
24 need of having a publicly available
25 reasonably comprehensive resource.  Most    05:30

Page 323

1  importantly for the lines of evidence that
2  are put in there are, they're traceable.
3  You can see who put them in, what it was
4  based on, how many patients, what the
5  frequency of these variants are.  I would    05:30
6  say most clinicians, genetic counselors, and
7  researchers will use ClinVar in combination
8  with databases like EB SNP or a variety of
9  other sequencing databases to make a final
10 assessment as to a variant's likelihood or    05:30
11 non-likelihood of contributing to a
12 particular genotype.
13     Q.  Is it generally accepted in your
14 field to use ClinVar as a repository of
15 information that's known about a specific    05:31
16 mutation?
17     A.  It is.  You can imagine if genetic
18 testing results were purely just on paper,
19 and their association with a particular
20 phenotype would become extraordinarily    05:31
21 onerous to keep track of even in a single
22 laboratory.
23     So by creating this public
24 resource, there's been wide adoption and, in
25 fact, substantial contribution.  Anyone can    05:31

Page 324

1  review the contributions and see who are the
2  most common contributors to that.  It's not
3  surprising that it's consortia based.  The
4  Undiagnosed Disease Consortium has
5  contributed many, many variants.  My time at    05:31
6  HudsonAlpha as part of some of our clinical
7  or pediatric sequencing efforts where we've
8  helped diagnose a little over 300 children
9  with a variety of pediatric disorders, those
10 variants are contributed.                 05:31
11     So it's a necessity.  It's a
12 necessity to continue to evolve to allow any
13 reasonable assessment of these variants.
14     Maybe to describe it a little
15 differently, in the absence of ClinVar the    05:32
16 only avenue you'd have is waiting for
17 publications to come out.  As we know from a
18 study initiation all way through peer review
19 to publication can be many months.  So you
20 can imagine the time delay that would         05:32
21 happen.  You still would have to be able to
22 find that variant and find that association.
23     So for all of those reasons,
24 ClinVar has become a significant value in
25 the space and used at a much, much higher    05:32

Page 325

1  frequency than waiting for a particular
2  study to come out and say prove an
3  association or disprove an association with
4  a particular variant.
5      Q.  Who maintains ClinVar?                05:32
6      A.  It's a government resource; so the
7  NIH maintains it.
8      Q.  Just in summary, based on your
9  review of the medical records that you had
10 for these six bellwether plaintiffs, what is    05:33
11 your opinion about whether there was
12 evidence that they had a pathogenic mutation
13 that related to ovarian cancer or even had
14 an association for an increased risk of
15 ovarian cancer?                           05:33
16     A.  Yeah, so I think if you look at
17 this, the testing that was done in the
18 context of the types of testing modalities
19 including clinical testing that my primary
20 experience is in, my bias has always been to    05:33
21 more comprehensive testing, whole genome
22 sequencing, whole exome sequencing, et
23 cetera, where you can then better answer the
24 question have you left any stones unturned.
25     The reality of these plaintiffs are    05:33

82 (Pages 322 - 325)

Page 326

1  that the testing that was done is what it
2  is. It is what was available. In many
3  cases as was discussed, 11 to 25 genes.
4  These are limited perspectives on testing.
5  So it is difficult to be able to give a      05:34
6  comprehensive and conclusive genetic
7  predisposition score to any of these
8  patients.
9       What we know is that the genes that
10  are most strongly associated and most      05:34
11  clearly annotated in ClinVar, these
12  six individuals had variants in those genes.
13  Again, it doesn't indicate that they don't
14  have other risk wheels and genes that were
15  untested. They weren't tested. Therefore,   05:34
16  it wasn't able to be evaluated.
17       As I said earlier, I think the
18  status of that is not unimportant, but it
19  doesn't change the opinions or the
20  biological plausibility or mechanistic      05:34
21  aspects that were discussed in the report.
22  It would only change, as I mentioned
23  earlier, that relative risk as it relates to
24  environmental exposures like we've been
25  discussing around talc.                     05:35

Page 327

1       Q. Last question. You were asked
2  about genetic counseling and whether you're
3  a genetic counselor. Would you tell us your
4  experience with genetic counselors,
5  overseeing genetic counselors. What's your   05:35
6  expertise as a person with your training,
7  experience, and position whether at
8  HudsonAlpha or at Element, how is your
9  expertise as it relates to genetic
10  counseling?                                  05:35
11       A. Sure. So my -- I would say my
12  career has been -- at least for an academic
13  has been somewhat non-standard in the types
14  of laboratories that I run. My research has
15  broadly been interested in the development   05:35
16  and application of technologies, but then
17  the application of those technologies to
18  further advance understanding of human
19  health and disease.
20       I was fortunate when I was at          05:35
21  Vanderbilt, I was very clinically involved
22  in both Vanderbilt-Ingram Cancer Center, the
23  digestive disease center, the diabetes
24  center, et cetera. So I was immersed into
25  what I would characterize as very           05:36

Page 328

1  translational medicine. I drove an interest
2  in developing resources to have a closer
3  connection to patient care.
4       So while I was at HudsonAlpha, I
5  was fortunate to have actually founded a     05:36
6  clinical laboratory while there. That
7  clinical laboratory was licensed and
8  accredited as a clinical lab. We supported
9  the, of course, Undiagnosed Disease Network
10  that did involve return of results. I was   05:36
11  also fortunate to have colleagues that were
12  genetic counselors and physicians that were
13  under my supervision as participants in that
14  lab.
15       Through some generous donations        05:36
16  there's a Smith Family Clinic for Genomic
17  Medicine that now exists at HudsonAlpha. I
18  know it's the only one in the southeast.
19  It's one of the only ones in the country
20  that is a clinic specifically focused on     05:36
21  genomic medicine and precision medicine.
22       As I've mentioned, we've had
23  hundreds of pediatric cases and many adult
24  cases as well through these different
25  consortia analyzed there. What was very      05:37

Page 329

1  rewarding for me was I sat very much on the
2  technology side, continually pushing the
3  accessibility, the reliability, and the
4  resolution of that technology forward.
5       As evidence of that, my laboratory     05:37
6  was one of the -- I think was the first in
7  the United States to be CAP accreted for
8  whole genome sequencing, and this was in
9  2014 or so. I think that's correct. I'd
10  have to double-check. It was early in that   05:37
11  process.
12       And there are a number of examples
13  that you can find. Press. And it's been
14  rewarding from a career perspective because
15  I remember the names of some of the children 05:37
16  that we worked directly with. The first one
17  was at Vanderbilt while I was there, and the
18  next couple have been at HudsonAlpha.
19       As I said, not a genetics
20  counselor, but my career has been focused    05:37
21  primarily in the application of technology
22  and making sure it stays closely connected.
23       My role at Element is very simple
24  in that I oversee the scientific strategy of
25  the company. The reason that's relevant to   05:38

83 (Pages 326 - 329)

Page 330

1  this career progression is why I
2  transitioned to Element is very simple. As
3  was asked in the earlier questions, there
4  are limitation to current genetic testing.
5  There are limitations to our ability to          05:38
6  assay residual disease and other things.
7      What I'm able to help Element do as
8  a private company is we're bringing forward
9  novel technologies that are not only looking
10 at nucleic acid or only looking at protein.    05:38
11 We're looking at a full spectrum and a
12 multi-ohmic perspective including cell
13 morphology and the ability to detect
14 individual cells. Instead of looking for
15 one needle in a haystack, say a specific       05:38
16 mutation, we're looking for all of them.
17 We're looking at a multi-modal fashion.
18     We publicly released information on
19 the platforms that will be launched later
20 this year, but our goal is to fundamentally    05:38
21 change the resolution with which we can do
22 particularly cancer analysis.
23     I fully expect at some point I'll
24 likely go back to an academic pursuit, but
25 in the meantime now I'm able to transition     05:39

Page 331

1  to developing technology that, when widely
2  deployed, can help an even greater number of
3  patients or researchers than I've been able
4  to do so far.
5      Q. Thank you. I don't think I have      05:39
6  anything further, Doctor. Thank you.
7      ATTORNEY DAVIDSON: What exhibit
8  number are we up to?
9      THE CERTIFIED STENOGRAPHER: We've
10 marked up through 21.                          05:39
11     ATTORNEY DAVIDSON: What number
12 was Hurwitz?
13     ATTORNEY EMMEL: 20.
14     ATTORNEY DAVIDSON: 20?
15     ATTORNEY EPSTEIN: 20.               05:39
16     ATTORNEY DAVIDSON: I'd like to
17 mark as Exhibit 22 a paper from
18 Papanek that's item 154 on your CV.
19     (Exhibit Number 22 was marked for
20 identification.)
21
22          FURTHER EXAMINATION
23 BY ATTORNEY DAVIDSON:
24     Q. Dr. Levy, what was your role in
25 this paper?                                    05:40

Page 332

1      ATTORNEY O'DELL: Noah, I'm sure
2  you're putting it in the chat as well.
3  I see it now. Thank you.
4      ATTORNEY EPSTEIN: Yeah, it should
5  be there.                                      05:40
6      ATTORNEY O'DELL: Thank you.
7      ATTORNEY EPSTEIN: No problem.
8      THE WITNESS: Again, I'd have to
9  look. I think this was similar to
10 what we discussed earlier. Yes, same.          05:41
11 So if you notice on page 1009, under
12 library prep and sequencing where it
13 references the HudsonAlpha Genomic
14 Services Laboratory, Huntsville,
15 Alabama, my laboratory supported the           05:41
16 sequencing work.
17     As I was explaining about the
18 other two, this is a similar situation
19 where either a change in authorship or
20 misannotation from a                           05:41
21 laboratory-supported publication
22 rather than one I was a co-author on.
23 BY ATTORNEY DAVIDSON:
24     Q. So is it your position that it's
25 appropriate for you to list on your CV that    05:42

Page 333

1  you were an author of any paper that happens
2  to mention your laboratory?
3      ATTORNEY O'DELL: Objection to
4  form.
5      THE WITNESS: No, not at all. In        05:42
6  fact, there's roughly 400 papers that
7  would fall into this type of category.
8  As I said, I think this was either a
9  misannotation or a change in
10 authorship during the development of           05:42
11 the paper.
12 BY ATTORNEY DAVIDSON:
13     Q. What's a misannotation?
14     A. So in the process of gathering
15 papers that have citations like this as well   05:42
16 as doing searches for papers that come out
17 during -- as we've been describing, the
18 development of papers there's initiation of
19 project especially if it's a multiple
20 institution or multiple authors, and then      05:42
21 there's a period of time of that
22 development, submission, revision.
23     During revisions it's often that
24 some experiments are removed. Others are
25 added. So the papers evolve over that time. 05:42

84 (Pages 330 - 333)

Page 334

1 In the case of -- certainly as not appearing
2 on the author list, this should not be
3 indicated as part of the CV as an author or
4 co-author on that paper, and I'll have to
5 make that adjustment.                    05:43
6     But in explaining as to how this
7 arrived there and just providing that
8 explanation as to where this may have come
9 from.  So it's not that I had no involvement
10 in this paper.  It's that the paper      05:43
11 ultimately in its final peer-reviewed form,
12 I was not an author on that paper.
13    Q.  But you testified that you were
14 listed as an author in a draft of this
15 paper, Doctor?                            05:43
16    A.  No, I wouldn't testify to that
17 today.
18    Q.  Okay.  Are you aware, Doctor, that
19 there's 36 papers on your CV where you're
20 not listed as an author?                  05:43
21        ATTORNEY O'DELL:  Object to the
22    form.
23 BY ATTORNEY DAVIDSON:
24    Q.  Not just the four or five we
25 discussed today?                          05:43

Page 335

1        ATTORNEY O'DELL:  Object to the
2    form.
3        THE WITNESS:  No, I'd be very
4    surprised that there's that number.
5    In fact, I would be very confident    05:44
6    that that's a vast overestimation of
7    these type of events.
8 BY ATTORNEY DAVIDSON:
9    Q.  Do you consider yourself to be an
10 author of a paper if HudsonAlpha Genomic  05:44
11 Services Laboratory is listed in the
12 acknowledgements?
13        ATTORNEY O'DELL:  Object to the
14    form.  Misstates his testimony.
15        You can answer.                    05:44
16        THE WITNESS:  As I stated, no.  I
17    was providing an explanation as to how
18    these became there, but I would also
19    clarify that the consortia-based
20    papers, of which there are several, to  05:44
21    make sure that your characterization
22    of those 36 papers do not include the
23    consortia-based papers we described a
24    few moments ago.
25 ///

Page 336

1 BY ATTORNEY DAVIDSON:
2    Q.  You consider yourself to be a
3 co-author of any paper that lists the
4 consortium which you were one of up to a
5 hundred members?                          05:44
6        ATTORNEY O'DELL:  Object to the
7    form.
8        THE WITNESS:  As a member of that
9    consortium -- as a member of that
10    consortium, then yes, I am a co-author  05:44
11    on the paper per the policies that
12    were described for those consortia and
13    the relative contributions.
14 BY ATTORNEY DAVIDSON:
15    Q.  Doctor, we talked about the Hurwitz  05:45
16 paper, Exhibit 20.  Does that paper indicate
17 anywhere that the protective effects of
18 aspirin have to do with inflammation?
19    A.  Does it indicate that the
20 protective effects of aspirin have to do   05:45
21 with inflammation?
22    Q.  Or anti-inflammation?
23    A.  That is the only known activity of
24 aspirin that's been -- is as a non-steroidal
25 anti-inflammatory.                        05:45

Page 337

1    Q.  Is there any reference to
2 inflammation in that paper?
3    A.  Yes.  Reference 3.
4    Q.  In the paper itself?
5    A.  Correct.                           05:45
6    Q.  I didn't ask in the references.  I
7 asked in the paper itself.  Is there any
8 reference to inflammation?
9    A.  There is, yes.
10    Q.  Where?                             05:46
11    A.  In the introduction where chronic
12 inflammation likely plays a key role in
13 ovarian carcinogenesis.
14    Q.  I'm sorry.  Where are you reading?
15    A.  The very beginning of the         05:46
16 introduction.  The third sentence.
17    Q.  The third sentence of the
18 introduction says:  In a pooled analysis of
19 17 cohort studies?
20    A.  No, I quoted chronic inflammation  05:47
21 likely plays a key role in ovarian
22 carcinogenesis.  That was your question.
23    Q.  Where is that?  Where in the paper
24 are you reading from?
25    A.  This is Trabert.                   05:47

85 (Pages 334 - 337)

Page 338

1    ATTORNEY O'DELL: No, it's
2 Hurwitz.
3    THE WITNESS: We're talking about
4 the Hurwitz paper; correct.
5 BY ATTORNEY DAVIDSON:            05:47
6    Q. Yeah, third sentence of the
7 introduction says: In a pooled analysis in
8 17 cohort and case-controlled studies. I'm
9 just trying to see where in the Hurwitz
10 paper are you reading that sentence.    05:47
11    ATTORNEY O'DELL: Let me make sure
12 the right paper was put in the chat
13 because I didn't open that. Hurwitz,
14 Modification of the Association
15 between Frequent Aspirin Use and --    05:47
16    ATTORNEY DAVIDSON: Association of
17 Frequent Aspirin --
18    ATTORNEY O'DELL: Forgive me.
19 Just for a moment. Let me finish.
20 We're just confirming what I intended    05:47
21 to go in the chat was the Modification
22 of the Association between Frequent
23 Aspirin Use and Ovarian Cancer Risks.
24 Is that what was put in the chat?
25    ATTORNEY EMMEL: I have the    05:47

Page 339

1 Association of --
2    ATTORNEY DAVIDSON: The paper I
3 got was the Association of Frequent
4 Aspirin Use with Ovarian Cancer Risk
5 According to Genetic Susceptibility.    05:48
6    ATTORNEY O'DELL: Yes,
7 Modification of Association is 2022 --
8 we just -- the wrong paper was put in
9 the chat. We'll correct that and in
10 fact --                05:48
11    ATTORNEY DAVIDSON: Wait a minute.
12    ATTORNEY O'DELL: Let me just
13 correct the record. What should have
14 been marked as Exhibit 20 is what I'm
15 putting in the chat.            05:48
16    ATTORNEY DAVIDSON: But that's not
17 what he cited. He cited Hurwitz Webb.
18 No? I'm confused. Weren't you
19 putting in the chat the paper that he
20 cited in his report?            05:48
21    ATTORNEY O'DELL: I believe so.
22    ATTORNEY DAVIDSON: It says here
23 Hurwitz Webb 2023.
24    ATTORNEY O'DELL: Let me make
25 sure.                05:48

Page 340

1    ATTORNEY DAVIDSON: Genetic
2 susceptibility. That's the paper you
3 put in the chat is the one he cites in
4 his report.
5    ATTORNEY O'DELL: I'm sorry.    05:48
6 Jennifer put the paper in the chat; so
7 I didn't open it. The one I asked him
8 about was Hurwitz 2022, and I think it
9 was published in 2023. It's called
10 Modification of the Association    05:49
11 between Frequent Aspirin Use in
12 Ovarian Cancer Risk, a Meta-Analysis.
13    ATTORNEY DAVIDSON: That's not the
14 one he cites in his report.
15    ATTORNEY O'DELL: I believe it is.    05:49
16    THE WITNESS: Let me make sure.
17    ATTORNEY DAVIDSON: No. He
18 testified that that's what he cites in
19 his report in response to your
20 questions.                05:49
21    ATTORNEY O'DELL: Okay. Finish
22 your examination, and then I'll follow
23 up to correct that.
24 BY ATTORNEY DAVIDSON:
25    Q. So Dr. Levy, when you testified a    05:49

Page 341

1 few minutes ago in response to Ms. O'Dell's
2 questions and said that you had cited a
3 meta-analysis about -- from Hurwitz from
4 2023 in your expert report, that actually
5 wasn't true; right?            05:50
6    ATTORNEY O'DELL: Object to the
7 form.
8    THE WITNESS: We were discussing a
9 different paper.
10 BY ATTORNEY DAVIDSON:            05:50
11    Q. But you actually did not cite a
12 2023 meta-analysis in your expert report?
13    ATTORNEY O'DELL: Object to the
14 form.
15    THE WITNESS: So the paper that --    05:50
16 again, I haven't -- let me take a
17 minute to --
18 BY ATTORNEY DAVIDSON:
19    Q. Let's mark the paper you actually
20 cited as Exhibit 23, and Noah can put it    05:50
21 back up on the screen because you were
22 led -- you were asked leading questions
23 about having cited a meta-analysis that you
24 didn't actually cite; correct?
25    ATTORNEY O'DELL: Object to the    05:50

86 (Pages 338 - 341)

Page 342

1    form.
2        (Exhibit Number 23 was marked for
3    identification.)
4  BY ATTORNEY DAVIDSON:
5    Q. Doctor?                          05:51
6    A. I'm looking.
7    Q. Okay.
8    A. Correct. The reference in the
9  report is what was shown -- is it still --
10 it's still on the screen, correct. But the   05:51
11 paper --
12   Q. When counsel asked --
13       ATTORNEY O'DELL: He's not
14 finished, please.
15       THE WITNESS: I was just saying we   05:51
16 were discussing a different paper, not
17 this paper.
18 BY ATTORNEY DAVIDSON:
19   Q. So when counsel asked whether you
20 cited a 2023 meta-analysis in your report   05:51
21 and you said yes, that was not true;
22 correct?
23       ATTORNEY O'DELL: Object to form.
24       THE WITNESS: There was a
25 misunderstanding of the citation.          05:52

Page 343

1  BY ATTORNEY DAVIDSON:
2    Q. When counsel asked you whether you
3  cited a 2023 meta-analysis in your report
4  and you said you did, in fact, you did not
5  cite a 2023 meta-analysis in your report   05:52
6  having to do with aspirin use; correct?
7        ATTORNEY O'DELL: Objection.
8  Misstates the record.
9        THE WITNESS: The paper we're
10 looking at is a analysis of aspirin       05:52
11 use.
12 BY ATTORNEY DAVIDSON:
13   Q. Is it a meta-analysis?
14   A. It's a pooled analysis of eight
15 case-control studies.                      05:52
16   Q. Is this the paper that you
17 testified several minutes ago that you
18 relied on in your report and cited in your
19 report?
20   A. So this was a paper cited in the   05:52
21 report, but our discussion was on a
22 different paper.
23   Q. So you testified that you cited a
24 paper in your report that's different from
25 the paper you actually cited in your report;   05:52

Page 344

1  correct?
2        ATTORNEY O'DELL: Objection to the
3  form.
4        THE WITNESS: The paper we were
5  discussing is not the same as the         05:53
6  paper cited in the report.
7  BY ATTORNEY DAVIDSON:
8    Q. Doctor, you testified a few minutes
9  ago that it's often -- there will often be
10 similar language to addressing basic        05:53
11 concepts when it comes to cancer science;
12 correct?
13   A. Correct.
14   Q. But, in fact, your language was
15 identical, not similar, to language on      05:53
16 certain websites; correct?
17       ATTORNEY O'DELL: Objection to the
18 form.
19       THE WITNESS: As we discussed in a
20 single sentence.                           05:53
21 BY ATTORNEY DAVIDSON:
22   Q. And you say that similar language
23 would be found in multiple places, but the
24 fact is that the language you had that was
25 identical to the language on the Mayo Clinic   05:53

Page 345

1  website is not identical to any other
2  language on the internet, is it?
3    A. I haven't looked.
4    Q. You're not aware of any other
5  publications or websites that have the same   05:53
6  language that you used in your report that
7  we found in Wikipedia, the Mayo Clinic, and
8  a scientific article; correct?
9        ATTORNEY O'DELL: Object to the
10 form.                                       05:54
11       THE WITNESS: Again, I haven't
12 looked to see if those -- what the
13 instances of similar wording. But I
14 would disagree. There's absolutely
15 similar wording, but you're focused on     05:54
16 the exact. Again, as was stated
17 earlier, the question -- my question
18 would be is there a question about the
19 accuracy or other aspect of the
20 statement and whether or not that         05:54
21 statement is generally accepted.
22 BY ATTORNEY DAVIDSON:
23   Q. Dr. Levy, does plagiarism -- is the
24 definition of plagiarism turn on whether
25 information is accurate, or does it turn on   05:54

Page 346

1 whether information is properly cited?
2     ATTORNEY O'DELL: Object to the
3 form.
4     THE WITNESS: So, again, as we
5 discussed and as we covered earlier,    05:55
6 depending on the requested format or
7 type of information that's being
8 asked, depending on the assignment, it
9 would be whether or not -- it would
10 have a significant bearing on whether    05:55
11 that would be a plagiarism event or
12 otherwise.
13 BY ATTORNEY DAVIDSON:
14 Q. Were you told in this assignment
15 that you didn't have to have proper    05:55
16 scientific citations and that you could cite
17 from sources without proper citation?
18     ATTORNEY O'DELL: Object to the
19 form.
20     THE WITNESS: No, but that's not    05:55
21 what I'm saying. There's a -- you're
22 pulling a single sentence which was
23 having no significant bearing in terms
24 of the conclusions of the report and
25 stating that because it wasn't cited    05:55

Page 347

1 as far as having the same wording for
2 that single sentence, whether it be
3 from any publicly available website,
4 that the attribution for that website
5 for that specific generally understood    05:56
6 fact, it would be indicative of
7 plagiarism.
8 BY ATTORNEY DAVIDSON:
9 Q. Do you know what happens to a
10 student who submits a paper in college that    05:56
11 has a sentence from the Mayo Clinic that's
12 not cited and a sentence from Wikipedia
13 that's not cited and yet two more sentences
14 from a scientific article that aren't cited?
15     ATTORNEY O'DELL: Objection to the    05:56
16 form.
17     THE WITNESS: No, I've not
18 attempted to look at that.
19 BY ATTORNEY DAVIDSON:
20 Q. You testified in a very long-winded    05:56
21 answer to Ms. O'Dell that genetic mutations
22 can make you more susceptible to
23 environmental factors. You provided an
24 analogy to lottery tickets and snowballs or
25 something like that.    05:57

Page 348

1     What scientific literature can you
2 cite in support of that testimony?
3     ATTORNEY O'DELL: Object to the
4 form.
5     THE WITNESS: Well, certainly many    05:57
6 of the studies that we've been talking
7 about today are appropriate for that
8 very same thing when we're discussing
9 the role of environmental factors in
10 the progression of disease. None of    05:57
11 the case control or meta-analysis or
12 other epidemiological studies we've
13 look at for the most part excluded or
14 included individuals with any specific
15 mutation or absence of mutation.    05:57
16     I would say there's a tremendous
17 amount of literature indicating the
18 increase -- the increased risk that
19 would be from environmental factors in
20 light of genetic testing as well.    05:57
21 BY ATTORNEY DAVIDSON:
22 Q. Can you point me to any scientific
23 studies that address -- or scientific
24 papers, treatises, et cetera, that support
25 your theory about the lottery ticket and the    05:58

Page 349

1 punches and the genetic mutations make you
2 more susceptible to environmental factors?
3     ATTORNEY O'DELL: Objection.
4     Asked and answered.
5     THE WITNESS: There's a --    05:58
6 certainly. I mean, I would have to --
7 BY ATTORNEY DAVIDSON:
8 Q. Great. Can you list them?
9     ATTORNEY O'DELL: Don't interrupt,
10 please.    05:58
11     THE WITNESS: Again, I'd have to
12 provide them. There's a rich
13 literature on cancer evolution and
14 progression that the presence or
15 inhibit -- and there's even many    05:58
16 mechanistic studies when DNA repair
17 genes like BRCA1 and 2 are inhibited,
18 you see a rise in mutation rate.
19     Again, there's ample evidence to
20 suggest and support that statement    05:58
21 that with a decrease in call it DNA
22 integrity or cellular integrity, then
23 you have a higher probability of that
24 cell progressing that's been done in
25 in vitro studies as well as in vivo    05:59

88 (Pages 346 - 349)

Page 350

1  studies.
2      Again, it would be a different
3  question than I was asked in this
4  report, and I would have to develop a
5  new report to that, but that          05:59
6  literature absolutely exists.
7  BY ATTORNEY DAVIDSON:
8      Q. You testified -- you gave this
9  opinion that genetic mutations make you more
10 susceptible to environmental factors. I     05:59
11 need to know what your basis is for that.
12 What is your scientific basis? What studies
13 are you relying on? What science are you
14 relying on for that opinion?
15     ATTORNEY O'DELL: Objection.     05:59
16 Compound, asked and answered.
17     THE WITNESS: I gave an opinion
18 that genetic mutations which increase
19 susceptibility to cancer as we've been
20 discussing that -- and I was very     05:59
21 specific when I gave the example of
22 the step function. I didn't indicate
23 that it modified the risk from where
24 you began at, say, a baseline of no
25 mutation.          06:00

Page 351

1      I think I was quite specific in my
2  explanation that I did not state in
3  that genetic mutations made you more
4  susceptible to environmental factors.
5  In fact, I was very careful to state     06:00
6  that those genetic variants had set
7  you at an already higher risk for
8  cancer. I think that is not an
9  arguable point. That's exactly what
10 we've been discussing about these     06:00
11 different mutations.
12     But then the environmental factor
13 would have the same added risk whether
14 you had those mutations or you didn't.
15 Whatever that is is added on top of     06:00
16 that. Now, it means with the mutation
17 you're climbing higher on the risk
18 scale if you assume that environmental
19 exposure has the same additive risk.
20 I think it sounds like we're arguing a     06:00
21 little bit about semantics. Again, I
22 think I was quite clear in that
23 example.
24 BY ATTORNEY DAVIDSON:
25     Q. I am asking for a scientific     06:01

Page 352

1  article or treatise in support of your
2  lottery ticket theory.
3      ATTORNEY O'DELL: Objection to
4  form.
5  BY ATTORNEY DAVIDSON:          06:01
6      Q. Your lottery punch, whatever it is.
7      ATTORNEY O'DELL: Objection to
8  form. Asked and answered.
9      THE WITNESS: As I said, that was
10 an example that was provided to     06:01
11 indicate a summary of my knowledge in
12 the field and my experiences to try to
13 make it more relatable. I cannot
14 direct you to a scientific paper that
15 would support the precise analogy that     06:01
16 I provided as far as the lottery
17 ticket, but I certainly will make an
18 effort to look for one.
19 BY ATTORNEY DAVIDSON:
20     Q. I don't need a scientific paper     06:01
21 that supports the analogy, and you know
22 that. I need a scientific that supports the
23 underlying scientific theory.
24     ATTORNEY O'DELL: Objection.
25 ///

Page 353

1  BY ATTORNEY DAVIDSON:
2      Q. Can you provide one or not?
3      ATTORNEY O'DELL: Objection.
4  Asked and answered. He's answered
5  your question four times now. You can     06:02
6  keep asking.
7      ATTORNEY DAVIDSON: He has not
8  given me a scientific paper yet.
9      ATTORNEY O'DELL: Well, he has
10 answered your question and responded     06:02
11 in terms of his expertise, experience,
12 and knowledge of the field. I mean,
13 he doesn't have to give you a specific
14 reference.
15 BY ATTORNEY DAVIDSON:          06:02
16     Q. Dr. Levy, can you point to any
17 scientific literature that supports your
18 theory that genetic mutations can make you
19 more susceptible to environmental factors?
20     ATTORNEY O'DELL: Objection.     06:02
21 Asked and answered, misrepresents what
22 he said just a few minutes ago.
23     THE WITNESS: I would need to
24 perform -- I would need to gather some
25 of those references to provide them.     06:02

89 (Pages 350 - 353)

Page 354

1  BY ATTORNEY DAVIDSON:
2      Q. Is it your testimony that those
3  references exist?
4      A. Yes.
5      Q. Okay. We'll ask your counsel to    06:03
6  have you provide them along with your fixed
7  CV after this deposition.
8          At this point I don't have any
9  further questions unless Ms. O'Dell does.
10         ATTORNEY O'DELL: I have just one    06:03
11     area of follow-up.
12
13         FURTHER EXAMINATION
14  BY ATTORNEY O'DELL:
15     Q. Dr. Levy, I want to direct you back    06:03
16  to the Hurwitz paper that was marked as
17  Exhibit 20 originally in the chat and that
18  was a paper titled Association of Frequent
19  Aspirin Use with Ovarian Cancer Risk
20  According to Genetic Susceptibility,    06:03
21  published in 2023.
22         Do you see that?
23     A. Uh-huh.
24     Q. And I created the confusion in my
25  questions, and I wanted to straighten it    06:04

Page 355

1  out. First, is this the paper that you cite
2  in -- you actually specifically cite in your
3  report?
4      A. Yes, the title Association of
5  Frequent Aspirin Use is the paper I cite in    06:04
6  the report.
7      Q. And is this paper published --
8  excuse me.
9          Is this paper the work of -- from
10  the Ovarian Cancer Association Consortium?    06:04
11     A. I'm just confirming the -- I'm just
12  looking at the authors' affiliations. I'm
13  not familiar with the -- with that
14  consortium, but I was looking to see if they
15  reference that in the --    06:05
16     Q. If you look on page 1 of the
17  exhibit under the section Design, Setting,
18  and Participants, does this indicate that
19  this was from the Ovarian Cancer Association
20  Consortium?    06:05
21     A. The population-based case-control
22  studies were from the Ovarian Cancer
23  Association Consortium. I was looking at
24  the author affiliations to see if they were
25  affiliated with that same.    06:05

Page 356

1      Q. I see. I'm sorry.
2      A. The studies are from the Ovarian
3  Cancer Association Consortium.
4      Q. I could ask a better question.
5          Is this a pooled analysis of eight    06:06
6  individual studies?
7      A. According to paper, it is.
8      Q. And what did they conclude, or what
9  was the meaning of the paper?
10     A. So they were looking at the genetic    06:06
11  susceptibility to ovarian cancer based on
12  identified common genetic variants and then
13  evaluating if the presence of those variants
14  alters or modifies the protective
15  association with aspirin use or other    06:06
16  NSAIDs.
17     Q. Did they conclude that there was a
18  protective effect of aspirin?
19     A. Yes. Their conclusion was that the
20  identified genetic variants do not appear to    06:06
21  modify that protective effect.
22     Q. And is that consistent with the
23  manner in which -- their finding, is that
24  consistent with the manner in which you
25  cited it in your report on page 13?    06:07

Page 357

1      A. Sorry. I'm just looking at to
2  confirm on 13. Yes, it is. The quote from
3  my report is: Moreover the protective
4  effect of aspirin is maintained even in
5  individuals with genetic susceptibility to    06:07
6  ovarian cancer.
7      Q. Okay. I now want to mark as an
8  Exhibit 24 the Hurwitz paper published in
9  2022 entitled Modification of the
10  Association Between Frequent Aspirin Use and    06:08
11  Ovarian Cancer Risk.
12         (Exhibit Number 24 was marked for
13     identification.)
14  BY ATTORNEY O'DELL:
15     Q. Doctor, is that paper also    06:08
16  published as a result of the work of the
17  Ovarian Cancer Consortium?
18     A. The Ovarian Cancer Cohort
19  Consortium, correct, as well as the Ovarian
20  Cancer Association Consortium. There are    06:08
21  two closely named consortia that contributed
22  to studies in the second paper, the paper
23  that is in Exhibit 24.
24     Q. In this paper from that group of
25  researchers or those two groups of    06:08

90 (Pages 354 - 357)

Page 358

1 researchers, do they comment on whether
2 ovarian cancer is associated with chronic
3 inflammation?
4     A. They do comment that in the
5 introduction.                    06:08
6     Q. Is that what you were referring to
7 before in your prior testimony?
8     A. That's correct.
9     Q. And what do they say?
10     A. So they -- quoting from the        06:09
11 introduction: Chronic inflammation likely
12 plays a key role in ovarian carcinogenesis.
13     Q. In the conclusion of the paper, do
14 they conclude that frequent aspirin use is
15 associated with lower ovarian cancer risk?    06:09
16     A. That's correct.
17     Q. You were asked a series of
18 questions about whether mutations make an
19 individual more -- inherited mutations make
20 an individual more susceptible to ovarian    06:09
21 cancer and specifically to the increased
22 risk associated with environmental agents
23 such as talc.
24     Do you recall those questions?
25     A. I do.                    06:09

Page 359

1     Q. And you were asked over and again
2 if there were specific scientific references
3 that you could name here today.
4     Do you recall that?
5     A. Yes, I do.                    06:10
6     Q. Is the principle that you testified
7 to generally accepted in your field of
8 genetics?
9     A. So cancer has had a long-standing
10 principle of a multi-hit hypothesis, meaning    06:10
11 that you need multiple errors and multiple
12 genes to overcome the usual growth
13 inhibition or self-cycle control that exists
14 in normal cells.
15     So when those things begin to break    06:10
16 down, you have defects in DNA repair. We've
17 been talking about BRCA1 and 2. My analogy
18 was building on that level of understanding,
19 building on the basic mechanisms of cancer
20 initiation and progression from a molecular    06:10
21 standpoint.
22     Q. Is that basic understanding
23 something that is well known, well
24 established, and generally accepted in your
25 field of expertise?                    06:10

Page 360

1     A. It is.
2     ATTORNEY O'DELL: I have nothing
3 further.
4     ATTORNEY DAVIDSON: I just have a
5 few more questions.                    06:11
6
7     FURTHER EXAMINATION
8 BY ATTORNEY DAVIDSON:
9     Q. Dr. Levy, the questions you just
10 answered about cancer, are those specific to    06:11
11 ovarian cancer?
12     A. No, they are not.
13     Q. Do you know if everything you just
14 said is accepted by ovarian cancer
15 researchers?                    06:11
16     ATTORNEY O'DELL: Object to form.
17     THE WITNESS: So I would be very
18 confident in stating that most ovarian
19 cancer researcher would no longer
20 characterize things based on ovarian        06:11
21 or an organ-specific cancer. In fact,
22 they would characterize them based on
23 the cell type of initiation whether it
24 be epithelial or et cetera. I think
25 that has now become the standard in        06:11

Page 361

1 the cancer field.
2     That would be my expectation is
3 they would agree with my foundational
4 description in terms of cancer
5 initiation and progression from a cell    06:11
6 mechanism perspective, but I don't
7 think you'd see a lot of enthusiasm
8 for limiting that or being as
9 imprecise as stating ovarian versus --
10 I think that's certainly what the        06:12
11 molecular understanding of cancer has
12 shown us is that it is more important
13 of cells of origin or cell type of
14 origin than origin of origin.
15 BY ATTORNEY DAVIDSON:                    06:12
16     Q. Do ovarian cancer researchers --
17 hey, did everybody else just go black on
18 their screen?
19     ATTORNEY O'DELL: No.
20     ATTORNEY DAVIDSON: My screen is    06:12
21 pitch black. I don't know why. My
22 computer really wants this deposition
23 to end.
24     THE WITNESS: Your picture
25 actually froze.                    06:12

91 (Pages 358 - 361)

Page 362

1    ATTORNEY DAVIDSON:  My whole
2  computer is black.
3    ATTORNEY O'DELL:  We can hear you,
4  Jessica; so you can continue.
5    ATTORNEY DAVIDSON:  Okay.  Great.    06:12
6  I'm almost done.
7  BY ATTORNEY DAVIDSON:
8    Q.  Can you point me to any ovarian
9  cancer researchers who have adopted the
10  approach that you just laid out in terms of    06:12
11  hits combining genetics and environmental
12  factors?
13    A.  I would have to -- not off the top
14  of my head as far as specific names, but I
15  would fully expect that all ovarian cancer    06:13
16  researchers will -- would absolutely embrace
17  a version of what I just described as far as
18  the initiation and progression of cancer
19  from a cell -- from a mechanistic
20  standpoint.                06:13
21    Q.  Would you defer to an ovarian
22  cancer researcher to address those types of
23  questions?
24    ATTORNEY O'DELL:  Object to form.
25    THE WITNESS:  Would I defer to an    06:13

Page 363

1  ovarian cancer -- I wouldn't -- no, I
2  don't think I would defer to an
3  ovarian cancer expert to answer those
4  questions.  I think I'm confident
5  enough in my knowledge in this field    06:14
6  to know that this is foundationally
7  correct and that should any ovarian
8  cancer researcher or any researcher
9  for that matter disagree with the very
10  broad summary mechanistic aspects we    06:14
11  were just discussing, then I would
12  take exception with that position.
13  BY ATTORNEY DAVIDSON:
14    Q.  The Hurwitz paper is co-authored by
15  O'Brien and Wentzensen; right?    06:14
16    ATTORNEY O'DELL:  I'm sorry.  I
17  missed the first part, Jessica.  What
18  did you say?
19  BY ATTORNEY DAVIDSON:
20    Q.  The Hurwitz paper was co-authored    06:14
21  by O'Brien and Wentzensen?
22    ATTORNEY O'DELL:  Which one were
23  you referring to?
24    THE WITNESS:  Exhibit 24 is, yes.
25  ///

Page 364

1  BY ATTORNEY DAVIDSON:
2    Q.  Both Hurwitz papers were
3  co-authored by O'Brien and Wentzensen;
4  correct?
5    A.  I can confirm looking at    06:14
6  Exhibit 24, yes.
7    Q.  Great.  Okay.  And that's the same
8  O'Brien and Wentzensen who wrote that it is
9  difficult to conclude that the observed
10  associations in some studies related to talc    06:14
11  and ovarian cancer are causal; correct?
12    ATTORNEY O'DELL:  Object to the
13  form.
14    THE WITNESS:  So Hurwitz and
15  Wentzensen are also co-authors on the    06:15
16  reference paper.  I don't see O'Brien
17  as a co-author on that.
18  BY ATTORNEY DAVIDSON:
19    Q.  I'm talking about 24.
20    A.  Yeah.  So 24, yes, but not the --    06:15
21    ATTORNEY O'DELL:  Not Exhibit 20.
22    THE WITNESS:  Not Exhibit 20.
23  BY ATTORNEY DAVIDSON:
24    Q.  I'm talking about Exhibit 24.
25  That's the same O'Brien and Wentzensen who    06:15

Page 365

1  also wrote a paper in which they stated it
2  is difficult to conclude that the observed
3  associations are causal; correct?
4    ATTORNEY O'DELL:  Object to the
5  form.                06:15
6    THE WITNESS:  Which exhibit was
7  the -- are you referring to for the --
8  for their other paper?
9  BY ATTORNEY DAVIDSON:
10    Q.  You don't recall that they wrote    06:15
11  that?
12    ATTORNEY O'DELL:  Object to the
13  form.
14    THE WITNESS:  We've been -- again,
15  I'm asking to confirm.  We've been    06:15
16  talking about a lot of papers today.
17  BY ATTORNEY DAVIDSON:
18    Q.  Okay.  If you don't recall, you can
19  just let me know that.
20    ATTORNEY O'DELL:  Which exhibit    06:16
21  are you referring to, please?
22  BY ATTORNEY DAVIDSON:
23    Q.  Do you not recall that?
24    ATTORNEY O'DELL:  Object to the
25  form.                06:16

92 (Pages 362 - 365)

Page 366

1    THE WITNESS: Again, I was asking
2 to -- I'd like to answer your question
3 completely.
4 BY ATTORNEY DAVIDSON:
5    Q. I'm asking if you recall that that    06:16
6 is the same Wentzensen and O'Brien who have
7 written that it is difficult to conclude
8 that the observed associations are causal?
9    ATTORNEY O'DELL: If you're
10 reading from a particular paper that's    06:16
11 been marked or not marked, would you
12 please identify.
13    ATTORNEY DAVIDSON: Actually I
14 just remembered it.
15 BY ATTORNEY DAVIDSON:    06:16
16    Q. Did you remember it, Doctor, or
17 not?
18    ATTORNEY O'DELL: Objection to the
19 form.
20    THE WITNESS: As we were talking    06:16
21 about on a number of subjects today
22 from plagiarism to others, I try to be
23 more precise than just pulling out
24 single sentences.
25 ///

Page 367

1 BY ATTORNEY DAVIDSON:
2    Q. I see. So you do not recall that
3 Doctors O'Brien and Wentzensen published a
4 review paper cited in your report that said
5 they do not -- that it is difficult to    06:16
6 conclude that the observed association is
7 causal?
8    ATTORNEY O'DELL: Asking him to
9 confirm a quote from a paper is
10 improper, but thank you for    06:17
11 identifying it. He can look it since
12 it's been marked as an exhibit.
13 BY ATTORNEY DAVIDSON:
14    Q. Do you recall it or not, Doctor?
15    ATTORNEY O'DELL: The paper or the    06:17
16 quote, Jessica?
17 BY ATTORNEY DAVIDSON:
18    Q. Doctor, if you cannot tell me
19 whether O'Brien and Wentzensen have stated
20 that it's difficult to conclude that the    06:17
21 associations are causal, just say so. Do
22 you recall that they said that or not?
23    A. I recall from that same -- in
24 looking at that same paper.
25    Q. What do you mean that same paper?    06:17

Page 368

1 I'm asking you what you recall. How can you
2 recall something and looking a paper?
3 That's not a recollection.
4    ATTORNEY O'DELL: You referred to
5 the Wentzensen and O'Brien review just    06:17
6 a moment ago. That's the paper.
7 BY ATTORNEY DAVIDSON:
8    Q. I'm asking if you recall that these
9 are the same two people who have said that
10 it is difficult to conclude that the    06:18
11 associations that have been observed are
12 causal.
13    A. So I recall the two individuals and
14 us discussing their papers. I do not recall
15 that they were associated with the specific    06:18
16 quote that you just described.
17    Q. Okay. I have no more questions.
18    ATTORNEY O'DELL: Nothing further.
19 Thank you. We're off the record.
20    (Whereupon the deposition
21 concluded at 6:18 p.m.)
22
23
24
25

Page 369

1    REPORTER'S CERTIFICATE
2
3    The undersigned Certified Shorthand
4 Reporter licensed in the states of
5 California, Nevada, and Washington does
6 hereby certify:
7    That the foregoing deposition was
8 taken before me at the time and place
9 therein set forth, at which time the witness
10 was duly sworn by me;
11    That the testimony of the witness
12 and all objections made at the time of the
13 examination were recorded stenographically
14 by me and were thereafter transcribed, said
15 transcript being a true copy of my shorthand
16 notes thereof.
17    I further declare that I have no
18 interest in the outcome of the action.
19    In witness whereof, I have
20 subscribed my name this 17th day of May,
21 2024
22
23 _____
   LISA MOSKOWITZ
24 California CSR 10816, RPR, CRR, CLR
   Washington CCR 21001437, Nevada CCR 991
25 NCRA Realtime Systems Administrator

93 (Pages 366 - 369)

Page 370

INSTRUCTIONS TO WITNESS

3        Please read your deposition over
4  carefully and make necessary corrections.
5  You should state the reason in the
6  appropriate space on the errata sheet for
7  any corrections that are made.
8        After doing so, please sign the
9  errata sheet and date it.
10       You are signing same subject to the
11  changes you have noted on the errata sheet,
12  which will be attached to your deposition.
13       It is imperative that you return
14  the original errata sheet to the deposing
15  attorney within thirty (30) days of receipt
16  of the deposition transcript by you.  If you
17  fail to do so, the deposition transcript may
18  be deemed to be accurate and may be used in
19  court.

Page 372

ACKNOWLEDGMENT OF DEPONENT

3        I, SHAWN LEVY, M.D., do hereby
4  certify that I have read the foregoing
5  pages, 1-372, and that the same is a correct
6  transcription of the answers given by me to
7  the questions therein propounded, except for
8  the corrections or changes in form or
9  substance, if any, noted in the attached
10  Errata Sheet.
11
12  _____  _____

13  SHAWN LEVY, M.D.              DATE

Page 371

E R R A T A  S H E E T

         - - - - - -

4  PAGE    LINE   CHANGE
5  _____  _____  _____
6      REASON: _____
7  _____  _____  _____
8      REASON: _____
9  _____  _____  _____
10     REASON: _____
11  _____  _____  _____
12     REASON: _____
13  _____  _____  _____
14     REASON: _____
15  _____  _____  _____
16     REASON: _____
17  _____  _____  _____
18     REASON: _____
19  _____  _____  _____
20     REASON: _____
21  _____  _____  _____
22     REASON: _____
23  _____  _____  _____
24     REASON: _____

Page 373

LAWYER'S NOTES

2  PAGE     LINE
3  _____  _____  _____
4  _____  _____  _____
5  _____  _____  _____
6  _____  _____  _____
7  _____  _____  _____
8  _____  _____  _____
9  _____  _____  _____
10  _____  _____  _____
11  _____  _____  _____
12  _____  _____  _____
13  _____  _____  _____
14  _____  _____  _____
15  _____  _____  _____
16  _____  _____  _____
17  _____  _____  _____
18  _____  _____  _____
19  _____  _____  _____
20  _____  _____  _____
21  _____  _____  _____
22  _____  _____  _____
23  _____  _____  _____
24  _____  _____  _____
25  _____  _____  _____

94 (Pages 370 - 373)

[& - 2016]                                                                    Page 1

| & | | | |
|---|---|---|---|
| **&**  1:4,14 2:11 3:3,3,4,12 75:20 303:25 305:21 318:11 | **1.3x**  317:21 **1.51.**  311:24 **1.53**  312:5 **1.6**  261:7 **1.68**  268:6 **1.68.**  266:2 **1/14/14**  5:5 | **142**  33:4,10,12 296:15,18 **1490**  1:15 **15**  5:3 55:23,24 56:5,6,9 138:20 139:16 193:7 | **18th**  2:19 **19**  5:8 302:16 302:17 **19103**  2:20 **194**  4:17 **1990**  129:15 |

**0**

**0.94.**  259:18
**0.98**  266:23
**08002**  3:15

**1**

**1**  4:10 21:24 22:2 254:22 266:6,13 312:2 355:16
**1,000**  288:22,23
**1-372**  372:5
**1.01**  267:22
**1.03**  267:3
**1.06.**  265:8
**1.07**  267:7
**1.07.**  266:24
**1.09**  311:24
**1.11**  312:6
**1.12**  266:2 268:6
**1.14.**  265:12
**1.16.**  311:21
**1.2**  259:16,20 261:6
**1.2.**  259:5
**1.28**  311:23
**1.37**  268:6
**1.37.**  265:24

**10**  4:20 126:9 166:12 247:12 285:11
**100**  4:13 317:14
**10001**  3:8
**1009**  332:11
**10816**  1:19 369:24
**11**  4:21 248:20 248:22 300:16 326:3
**116**  5:20
**11:40**  129:2
**12**  4:22 126:10 154:13 257:16 257:18,19
**13**  4:23 154:10 155:12 158:6 261:20,21,23 305:13 356:25 357:2
**130**  2:19
**14**  4:24 30:19 56:9 61:19 64:6 245:25 262:23 262:24 283:10
**141**  32:22,23 296:15,18

193:14 278:17 278:18 283:10 300:13 318:8
**152**  208:11
**154**  36:5,15 37:11,18 331:18
**156**  228:21
**16**  5:4 64:6 199:21 249:7,8 249:8 256:17 283:12,14 300:13,14,18 302:10 310:13
**16-2738**  1:4
**160**  4:15
**1600**  2:19
**164**  4:16
**167**  33:18,19 293:8,9
**169**  37:9,11,13 37:20,24 295:8
**17**  5:6 293:16 293:17 337:19 338:8
**17th**  369:20
**18**  5:7,20 125:4 295:15,16
**1825**  2:13

**1:18**  193:4
**1:20**  193:1,1
**1:30**  128:22

**2**

**2**  4:11 55:22,23 56:1 129:7,13 129:17 130:2,9 130:16,21 131:11,13 269:24 284:11 298:14 314:11 315:6,12,22,23 316:21 317:5 349:17 359:17
**2.10.**  312:7
**20**  5:9 154:15 306:11,12,15 331:13,14,15 336:16 339:14 354:17 364:21 364:22
**20006**  2:14
**2002**  117:15
**2010**  253:23
**2014**  89:24 154:12 305:16 329:9
**2016**  96:13

**[2018 - 4th]**                                                      Page 2

**2018**   8:20 119:3
124:1 296:23
296:23 303:24
304:5,10
**2019**   4:22 19:9
19:10,12 23:9
42:4,9 61:18,20
62:4 75:8 87:17
96:18 97:3
115:18 121:3
138:23 140:8
140:17 154:19
160:14 161:22
234:22 256:24
256:25 257:8
257:18,24
271:14 293:14
295:10 304:10
310:18,19,24
311:8,15 312:9
**202**   2:14
**2020**   4:20 25:21
25:24 26:1,3
28:24 60:2 62:7
79:7,19 80:24
83:1 164:15
166:12 247:5,8
**2021**   25:21
76:11 248:21
300:17,22
301:1
**2022**   5:13 23:2
26:2 56:14
75:17 89:7
306:19 339:7
340:8 357:9

**2023**   5:9,11
31:1 62:4 79:18
86:15 87:22
133:24 136:6
136:25 137:7
137:11 138:15
139:2,14,21
140:13,17
142:8 143:12
143:23 147:11
147:17 148:24
207:7 241:23
292:8 304:5
306:8,21
339:23 340:9
341:4,12
342:20 343:3,5
354:21
**2024**   1:17 6:1
83:23 84:1,11
85:11 86:4,5,16
119:12 120:22
120:25 121:1
262:7 369:21
**207**   4:18
**21**   5:10 30:20
310:23 311:1
331:10
**21001437**   1:20
369:24
**212**   3:9
**215**   2:20
**218**   2:7
**22**   4:10 5:11
282:14 331:17
331:19

**221**   30:23 32:13
34:15
**23**   5:12 33:1
341:20 342:2
**234**   4:19
**235698**   208:14
211:6
**24**   5:13 309:8
357:8,12,23
363:24 364:6
364:19,20,24
**247**   4:20
**248**   4:21
**25**   291:8 326:3
**257**   4:22
**26**   4:11,13
55:22 289:3
**261**   4:23
**262**   4:24
**264.7.**   181:10
**269-2343**   2:8
**278**   5:3
**283**   5:4
**29**   19:7
**293**   4:5 5:6
**295**   5:7

| 3 |
| --- |

**3**   3:14 4:12
74:16,17
100:11,15
301:9 302:2
337:3
**30**   37:5 185:22
370:15

**300**   324:8
**302**   5:8
**306**   5:9
**31**   56:13
**310**   3:15
**311**   5:10
**317-7180**   3:16
**331**   4:4 5:11
**334**   2:8
**34**   154:15
**342**   5:12
**354**   4:5
**357**   5:13
**36**   334:19
335:22
**360**   4:4
**36103-4160**   2:8
**3:05**   247:1
**3:19**   247:2

| 4 |
| --- |

**4**   4:13 100:17
100:21,23
222:9,11,15
223:4 242:22
243:1 246:4,7
303:12 308:8
309:6
**400**   333:6
**46**   265:6
**4:15**   20:8
**4:17**   292:23
**4:51**   292:24
**4th**   74:15

**[5 - accounting]**                                                                 Page 3

| **5** |
| :---: |
| **5**   4:15 160:20 |
| 160:21,23 |
| 161:3 |
| **501**   1:15 |
| **56**   4:11 264:17 |

| **6** |
| :---: |
| **6**   4:4,16 164:15 |
| 164:16 166:14 |
| **608-9645**   2:20 |
| **61**   264:18 |
| **64**   296:20 |
| **65**   56:13 |
| **6:18**   368:21 |

| **7** |
| :---: |
| **7**   4:17 136:11 |
| 194:17,18,21 |
| 301:22 |
| **700**   2:13 |
| **7102**   369:22 |
| **72**   162:5 171:23 |
| 172:12 174:5 |
| 174:15,22 |
| 176:19,25 |
| 178:20 221:2 |
| 222:25 223:5,6 |
| 223:14,22 |
| 224:6,13,20 |
| 225:3,8 226:13 |
| 226:18 227:4 |
| 227:16,24 |
| **735-3000**   3:9 |
| **74**   4:12 |

**759-7648**   2:14
**76**   311:21

| **8** |
| :---: |
| **8**   1:17 4:18 6:1 |
| 100:12 207:7,8 |
| 252:17 |
| **80**   163:9,10 |
| **856**   3:16 |
| **877.370.3377** |
| 1:24 |

| **9** |
| :---: |
| **9**   4:19 234:19 |
| 234:22,23 |
| 308:5 |
| **91**   266:24 |
| **917.591.5672** |
| 1:24 |
| **94**   261:7 311:20 |
| **95**   259:9,13,15 |
| 311:20 |
| **95th**   259:21 |
| 265:11 266:1,7 |
| 267:13 311:24 |
| 312:2,6 |
| **96**   265:21 |
| **98**   242:18 |
| 265:11 308:7 |
| **991**   1:19 369:24 |
| **9:11**   1:17 6:3 |
| **9:30**   20:7 |

| **a** |
| :---: |
| **a.m.**   1:17 6:3 |
| 20:7 74:2,3 |
| 129:1,2 137:21 |

**ab**   211:6
**abbreviation**
173:9,18
**abbreviations**
173:16,19
**abcam**   208:14
208:16 212:1
221:5 237:24
**aberrant**
189:24,25
191:20
**aberrantly**
219:9
**ability**   133:13
182:8 186:12
199:10 211:1
321:1 330:5,13
**able**   26:14
29:19 34:14
43:25 66:10
69:23 117:23
120:2 128:15
197:18,25
198:3 214:2
217:13 218:4
221:20 239:11
294:5 303:18
319:18 324:21
326:5,16 330:7
330:25 331:3
**above**   170:3
191:6 280:6,15
302:2
**absence**   176:3
178:21 316:17
322:8 324:15

348:15
**absolute**   285:19
**absolutely**
128:11 188:7
345:14 350:6
362:16
**abstract**   250:17
**academic**
109:15 110:6
167:13 321:8
327:12 330:24
**accept**   159:10
**acceptable**
73:12 106:14
110:24 112:5
304:17
**accepted**   63:16
65:11 73:5,18
73:23 109:8
323:13 345:21
359:7,24
360:14
**access**   9:23
26:15 27:3
66:10,11 96:15
272:22 313:3
314:22
**accessibility**
314:20 329:3
**accessible**
313:7
**accessing**
144:19,23
**accounting**
22:14

[accredited - agar]                                                    Page 4

accredited
  328:8
accreted   329:7
accuracy   19:2
  98:21 105:7
  314:6 345:19
accurate   22:13
  40:17 60:24
  101:7 103:9
  105:22 160:18
  193:25 199:9
  211:6 212:24
  213:14,17
  230:5 231:5,7
  277:6 345:25
  370:18
accurately
  92:19 93:16
  155:6 314:13
  314:25
accusation
  105:12
accused   304:1
acid   330:10
acids   197:22
acknowledged
  41:11 297:24
acknowledge...
  335:12
acknowledg...
  372:1
acknowledg...
  297:7
acog   51:8 52:16
act   159:5 275:4

action   40:10
  369:18
actively   27:25
  28:2
activities   168:9
  204:2
activity   23:17
  336:23
acts   321:10
actual   31:8,14
  33:6 39:15
  92:17 167:7
  179:2
actually   17:2,6
  26:3 31:21
  32:14 34:5,16
  56:4 66:3 75:12
  87:13,21
  104:19 113:12
  139:5 164:21
  171:9 177:16
  213:21 218:10
  218:12 219:12
  225:15 234:11
  257:24 258:9
  260:5 261:15
  271:6 276:13
  276:18 280:10
  300:14 312:25
  313:4,10 328:5
  341:4,11,19,24
  343:25 355:2
  361:25 366:13
add   61:18 78:5
  80:15,19 106:7
  112:16,19

117:19 199:21
  317:8,17,21
added   61:19
  75:7 77:3,9
  78:1 79:20,22
  80:6,11 88:8
  121:1 242:2
  247:5,20
  248:10 333:25
  351:13,15
addition   88:23
  203:1 247:11
  285:3
additional   64:1
  86:14 120:7,11
  261:3 288:23
  299:15
additive   351:19
address   26:20
  53:22 54:18
  98:5 99:1 100:7
  102:12 156:1
  203:15 261:15
  298:5 309:4
  314:23 348:23
  362:22
addressed
  298:9
addresses
  261:13
addressing   53:7
  59:3 85:11
  344:10
adds   228:25
adjunct   24:22
  25:9 29:10,18

30:7,13,22
adjusted   259:4
  265:4,7
adjustment
  334:5
administrator
  1:22 369:25
adolescence
  87:23
adopted   362:9
adoption
  323:24
adult   328:23
adulthood
  87:24
adults   295:5
advance   327:18
advanced   295:2
advancements
  314:17
affect   171:22
  172:11 174:4
  174:21 176:18
  176:24 205:23
  273:6 308:14
affiliated
  355:25
affiliations   58:5
  254:21,23
  294:10 355:12
  355:24
afraid   138:10
agar   210:13,15
  210:20 211:14
  212:3 218:24
  219:13 221:3

[agar - answer]                                                    Page 5

222:20 223:2
**agarose** 208:8
208:10 210:13
217:14
**age** 129:19
265:4,7 280:14
**agent** 175:20
**agents** 320:9
358:22
**ages** 129:24
**aggregate**
249:13
**aggressive**
191:15,15
**ago** 10:17 11:3
11:14 113:16
236:6 335:24
341:1 343:17
344:9 353:22
368:6
**agree** 32:2
45:24 46:3
198:18 210:8
229:4,15 233:6
252:13,23
253:18 269:5
269:10,14
270:17 272:12
272:14,19
273:5 278:7,12
278:13 279:24
361:3
**ahead** 206:5
212:19
**aim** 229:19

**air** 180:23
182:10 183:21
**al** 133:25
194:24 256:24
256:25
**alabama** 2:8
25:1,12 26:4,11
27:15,18 28:7
28:10,23 29:4
29:16,17 30:6
30:12,21 40:8
41:2 313:9
332:15
**aligns** 118:12
149:7
**allegation** 51:9
52:18
**allegations**
107:7
**alleging** 202:1
202:10
**allelic** 319:25
**allen** 2:4
**allow** 122:10
185:10 199:1,4
210:18 212:6
217:9 227:10
285:2 324:12
**allowed** 153:23
153:25 154:1
175:18 215:8
**allows** 281:11
**alludes** 158:6
**altered** 164:23
**alters** 356:14

**amended** 4:11
4:13 12:15
13:18 21:25,25
55:22 58:9 98:4
117:20 119:8
154:11 193:8,9
193:10 203:5
242:10 278:15
296:19
**american** 50:15
51:7 52:16
87:16 181:11
254:25
**amount** 50:7
171:2 348:17
**ample** 349:19
**amplifying**
201:7
**amrhein** 95:13
**analgesic**
154:20
**analogy** 130:21
317:3 347:24
352:15,21
359:17
**analysis** 54:14
54:19 55:17
56:10,18 59:4
69:18 70:1,14
70:18,25 71:3,7
97:8 118:15
127:24 154:13
154:21 197:20
243:3 247:23
257:12 276:10
301:12 307:1

308:1,8,9,14
315:18 316:2
330:22 337:18
338:7 340:12
341:3,12,23
342:20 343:3,5
343:10,13,14
348:11 356:5
**analyze** 276:12
**analyzed**
328:25
**anapol** 2:17
**anapolweiss....**
2:18
**ancestry**
322:18
**anchorage**
221:12,18,22
**anchored**
221:21
**animal** 214:14
229:20 252:7,9
252:24 253:1
**annotate**
297:11
**annotated**
288:23 291:22
326:11
**annotation**
297:22 298:9
**announcements**
313:19
**annually** 25:18
**answer** 9:10
10:8 11:6,12,21
11:22 12:8,10

**[answer - arbitrary]**                                                    Page 6

| | | | |
|---|---|---|---|
| 15:3 17:6 18:10 | 232:12 239:20 | 372:6 | **apply**  241:16 |
| 28:20 38:10 | 239:22,25 | **anti**  157:16,22 | **appointed** |
| 39:20 42:24 | 240:12 241:15 | 170:8 336:22 | 30:13 |
| 43:2,13 48:12 | 244:20 247:7 | 336:25 | **appointment** |
| 49:4 50:4 54:23 | 304:6 315:16 | **antibody**  166:2 | 26:7,8 29:10,18 |
| 54:24 60:7,23 | 325:23 335:15 | **antioxidant** | 30:22 |
| 60:24 62:9 | 347:21 363:3 | 160:8 162:15 | **appreciate** |
| 63:15 68:8 69:3 | 366:2 | 165:9 | 16:11 18:16 |
| 69:24 70:1,11 | **answered**  5:18 | **apart**  118:16 | **appreciated** |
| 78:16 83:15,18 | 14:18 17:19 | 128:6 | 81:23 |
| 84:10,21 85:22 | 60:4 62:13 80:9 | **apologize**  14:22 | **approach** |
| 85:24 91:1,15 | 84:15 85:15 | 126:23 212:14 | 165:20 362:10 |
| 92:18,25 94:1 | 95:8 102:8 | **apparent** | **appropriate** |
| 94:25 102:17 | 112:3 116:1 | 307:25 | 82:16,21 |
| 103:1,16 106:3 | 117:25 134:17 | **appear**  24:25 | 148:24 163:15 |
| 107:16 110:15 | 141:25 142:1 | 130:1 182:11 | 164:7 165:17 |
| 115:5 117:24 | 146:12 156:24 | 186:17 304:22 | 179:1 183:5,22 |
| 119:5 131:17 | 159:21 183:2 | 319:20 356:20 | 183:24 184:5 |
| 132:18 134:10 | 186:9 188:4 | **appearances** | 238:19,22 |
| 134:12 136:2 | 202:17 204:17 | 2:1 3:1 | 289:18 290:4 |
| 136:21 147:14 | 217:25 228:2 | **appeared** | 294:21 308:22 |
| 147:23 149:3,6 | 232:24 240:21 | 300:23 304:23 | 309:1,19 |
| 149:8 150:2 | 241:8 260:24 | **appearing** | 332:25 348:7 |
| 153:12 156:13 | 277:18 279:23 | 334:1 | 370:6 |
| 157:10 159:23 | 289:11 349:4 | **appears**  183:5 | **appropriately** |
| 160:12,18 | 350:16 352:8 | 208:9,18 | 296:10 308:25 |
| 171:6 173:2 | 353:4,4,10,21 | 213:16 222:21 | **approval** |
| 175:4 176:8,12 | 360:10 | 300:23 305:3 | 163:13 |
| 178:3,24 | **answering** | **applicable** | **approved**  163:6 |
| 179:13,16 | 43:10 81:17 | 289:19 | 163:8 |
| 182:21 187:11 | 85:19 93:15 | **application** | **approximate** |
| 191:11 193:25 | 103:13 138:22 | 310:10 327:16 | 25:22 |
| 196:11,24 | 149:14 150:5 | 327:17 329:21 | **approximately** |
| 198:13,13 | 241:16 | **applied**  150:12 | 20:7 |
| 205:19 231:3 | **answers**  14:13 | 309:2 | **arbitrary**  224:9 |
| 231:25 232:10 | 91:19 141:14 | | |

**[area - asks]** Page 7

| | | | |
|---|---|---|---|
| **area** 65:15 | 257:12 | 136:13 141:25 | 38:12,17 45:16 |
| 67:17 81:1 | **artificial** | 146:12 150:19 | 48:24 49:21 |
| 103:22 105:14 | 199:13 224:8 | 150:22,25 | 50:2 57:5 62:6 |
| 122:11 123:8 | **asbestos** 23:23 | 152:4 153:9 | 72:12 73:2 |
| 218:15 299:23 | 24:12,16 41:20 | 156:23 159:6 | 77:22 78:12,24 |
| 303:9 354:11 | 41:22,24 118:2 | 159:17,21 | 80:1,3 81:14 |
| **areas** 53:3 | 118:5,6,11,25 | 172:19 175:10 | 86:11 91:25 |
| 98:12 122:23 | 119:13,16 | 178:10,19 | 92:1,23 93:18 |
| 192:8 202:7 | 182:19 185:2 | 179:12 183:1 | 96:18 121:23 |
| 203:24 | 185:14 186:17 | 186:2,9 188:4 | 122:24 124:8 |
| **arguable** 351:9 | **ashcraft** 2:11 | 189:3,18 201:2 | 127:5 134:21 |
| **argue** 165:15 | **ashcraftlaw.c...** | 202:17 204:17 | 137:25 142:11 |
| 197:17 | 2:12 | 217:25 228:2 | 142:13 151:16 |
| **arguing** 351:20 | **asher** 3:7 | 232:23 236:9 | 151:18 152:18 |
| **argument** | **asher.trangle** | 240:21 241:8 | 153:3 172:22 |
| 113:7 | 3:7 | 245:14,17 | 174:17,18 |
| **arm** 267:7 | **asked** 11:1 | 260:24 261:11 | 175:15 176:9 |
| **arps** 3:4 | 14:11 16:24 | 277:18 279:23 | 176:15 177:9 |
| **arrived** 334:7 | 43:4,11,15 | 289:11 293:7 | 178:18,22 |
| **article** 4:15,16 | 47:17 48:13 | 293:10 298:17 | 179:16 184:4 |
| 4:17,18,19,20 | 49:13 53:9,25 | 298:19 299:1 | 187:9,14 |
| 4:21,22,23,24 | 54:2,6 60:4 | 299:22 300:6 | 188:24 189:3,7 |
| 5:6,7,8,9,10,11 | 61:15 65:3,17 | 303:23 304:10 | 204:18,22 |
| 5:12,13 9:12 | 69:15,16 80:9 | 305:15 308:7 | 205:1 207:11 |
| 10:3 13:2,6 | 81:5,8 84:15,25 | 310:12 312:16 | 209:12 213:13 |
| 31:20 34:6,8,9 | 85:5,15 87:7 | 312:18 315:5 | 225:5,6,15 |
| 40:15 55:15 | 95:8 97:10,15 | 318:7,24 327:1 | 227:22 231:11 |
| 117:16 146:17 | 98:10 102:8 | 330:3 337:7 | 231:15 241:4 |
| 162:25 345:8 | 103:17 105:4,5 | 340:7 341:22 | 241:19 247:5 |
| 347:14 352:1 | 105:8 106:5 | 342:12,19 | 253:18 263:25 |
| **articles** 32:12 | 112:3 115:15 | 343:2 346:8 | 274:22 351:25 |
| 34:15 39:22 | 116:8 117:14 | 349:4 350:3,16 | 353:6 365:15 |
| 40:9 54:13 | 119:14 121:3 | 352:8 353:4,21 | 366:1,5 367:8 |
| 55:15 59:17 | 122:25 123:6 | 358:17 359:1 | 368:1,8 |
| 63:24 69:19 | 128:5 130:12 | **asking** 15:20 | **asks** 153:18 |
| 85:4 138:1 | 132:7 134:17 | 31:11 37:12,16 | |

**[aspect - attorney]**                                                    Page 8

| | | | |
|---|---|---|---|
| **aspect** 304:4 | 220:13 221:3,4 | **association** | **assumed** |
| 307:19,20,20 | 222:20 223:2,3 | 80:25 83:11 | 253:24 |
| 345:19 | 237:24 330:6 | 85:12 87:22 | **assumes** 144:7 |
| **aspects** 52:25 | **assaying** | 130:1 163:25 | 256:2 |
| 119:7 179:25 | 196:22 | 250:12,21,25 | **assuming** |
| 192:7 304:1 | **assays** 162:6 | 251:3,4 257:1 | 312:22 |
| 326:21 363:10 | 199:14 210:13 | 258:16 259:2 | **assumption** |
| **aspirin** 154:14 | 210:24 213:7,9 | 259:17,24 | 185:1 |
| 305:17 306:5 | 216:15 217:11 | 260:3,9,15 | **attached** |
| 306:23,24 | **assess** 69:16 | 261:6,8,10 | 262:21 370:12 |
| 307:6,9 336:18 | 151:9 216:3 | 263:13 265:20 | 372:9 |
| 336:20,24 | **assessed** 208:1 | 265:23 266:9 | **attempt** 121:9 |
| 338:15,17,23 | 310:2 | 266:22,25 | 155:10 156:15 |
| 339:4 340:11 | **assessing** | 267:4,8 291:4 | 156:18 196:24 |
| 343:6,10 | 204:13 | 301:23 302:5 | 197:10,13 |
| 354:19 355:5 | **assessment** | 310:6 311:9 | 198:16 |
| 356:15,18 | 44:3 67:9 69:15 | 312:3 323:19 | **attempted** |
| 357:4,10 | 323:10 324:13 | 324:22 325:3,3 | 156:21,25 |
| 358:14 | **assignment** | 325:14 338:14 | 347:18 |
| **assay** 152:10,15 | 298:17 346:8 | 338:16,22 | **attempting** |
| 152:19 154:7 | 346:14 | 339:1,3,7 | 127:19 205:24 |
| 166:9,10 179:6 | **assist** 93:15 | 340:10 354:18 | **attention** 93:24 |
| 179:6 183:4 | **associate** | 355:4,10,19,23 | 171:8 308:4 |
| 188:16 192:20 | 321:21 | 356:3,15 | **attorney** 4:4,5 |
| 197:13 198:1,2 | **associated** | 357:10,20 | 6:10 7:21 8:3 |
| 198:7,22,25 | 169:1,8,10 | 367:6 | 8:11,15,16 9:1 |
| 207:12,19,21 | 255:15 269:19 | **associations** | 9:6,8,14 10:1 |
| 208:2,4,8,13 | 271:12 285:7 | 50:23 251:21 | 10:20,23 11:4,7 |
| 209:2,19,21,24 | 288:1,13,18 | 252:2 364:10 | 11:9,13,17,18 |
| 210:15 211:3,6 | 291:15,19 | 365:3 366:8 | 11:20 12:12,24 |
| 211:7,14 212:1 | 303:7 307:9 | 367:21 368:11 | 13:1,19,22 |
| 212:3,25 | 320:4,12 | **assume** 61:7,10 | 14:24 15:5,16 |
| 213:21,22 | 321:17 326:10 | 115:4 136:20 | 15:20,22,24 |
| 215:1,22 216:1 | 358:2,15,22 | 173:12 242:7 | 16:2,4,6,7 17:8 |
| 217:14 218:25 | 368:15 | 263:5 276:4 | 17:11,13,15 |
| 219:2,13 220:1 | | 351:18 | 18:3,8,13,15 |

| | | | |
|---|---|---|---|
| 19:3,6,9,11 | 64:20,24 65:8 | 103:4,6,12 | 138:11,13 |
| 20:22 21:1,8,10 | 66:1,5,23 67:4 | 104:18,23 | 139:7,12 |
| 21:12,16,19,23 | 67:18,22,24 | 105:17,24 | 140:20,23 |
| 22:4,7,12 23:11 | 68:7,16,25 69:6 | 106:6,10,17,25 | 141:24 142:10 |
| 23:19,25 24:3,6 | 69:12 70:15,20 | 107:2,3,9 | 144:6,12,16,21 |
| 24:10,13,17 | 70:22 71:11,25 | 108:12,19,23 | 144:24 145:6 |
| 27:19 28:5,13 | 72:3,6,7,10,15 | 109:18,22 | 146:1,7,11,16 |
| 28:15,19,21,25 | 73:3,15,19,25 | 110:1,4,10,20 | 146:21,24 |
| 29:5 31:15,18 | 74:4,7,13,19 | 111:7,12,17 | 147:5,8,20,24 |
| 31:23 32:11,16 | 75:1,4,6,9,11 | 112:2,18,23 | 148:10,20 |
| 32:21 33:5,9 | 75:18 76:1,5,10 | 113:9,13,21 | 149:12,16,20 |
| 34:17,19,21,25 | 76:14,16 77:13 | 114:5,15,17,19 | 149:24 150:1,4 |
| 35:8,12 36:1,4 | 77:15 78:8,18 | 114:21,23 | 151:11,15,22 |
| 36:10,13,16,20 | 78:23 79:2,6,8 | 115:2 116:1,3 | 152:9,20,22,23 |
| 37:10,13,14,17 | 79:11,13,14 | 116:13,17,21 | 152:25 153:2 |
| 37:19,21 38:5 | 80:8,14 81:3,6 | 117:1,7,9 | 153:15,19,21 |
| 38:11,14,15,20 | 81:7,11,13,16 | 118:21,23 | 154:4 155:14 |
| 39:13 40:1,6,11 | 81:19,22,24 | 119:1,10,25 | 155:18,21,23 |
| 40:20 41:4,9 | 82:1,7,9,11,14 | 120:5,8,13,24 | 156:20,22 |
| 43:1,6 44:13,18 | 82:18,24 84:14 | 121:1,5,7,15,19 | 157:3,7,11,17 |
| 44:20 45:10 | 84:18,20,22,25 | 122:12,16,18 | 157:23 159:20 |
| 46:10,14,20,23 | 85:2,3,9,14,23 | 122:20 123:1 | 160:13,19,25 |
| 46:25 47:3,5,7 | 86:1 88:12,18 | 123:19,23,25 | 161:2,4,9,17 |
| 47:14 48:1,23 | 89:2,9,16 90:15 | 124:3,7,12,13 | 162:9 163:2,5 |
| 49:2,4,6,9,16 | 90:19,23 91:2 | 124:17,21,23 | 163:17 164:4,9 |
| 49:18,22 50:13 | 91:11,16,20,22 | 124:24 125:1,3 | 164:14,18 |
| 50:19 51:4,11 | 92:13,20 93:2,5 | 125:5,9,12,17 | 167:9 168:3 |
| 51:16 52:1,12 | 93:7,17 94:22 | 125:18,22,24 | 169:4,16,23 |
| 52:20 53:5 | 95:1,7,10,12 | 126:1,3,7,9,16 | 170:12 171:14 |
| 54:20 55:1 56:3 | 97:12,17,25 | 126:18 128:9 | 171:17,24 |
| 56:20,24 57:2,5 | 98:2,6,24 99:5 | 128:13,17,24 | 172:2,13,18,20 |
| 57:12 58:12,18 | 99:9,11,13,16 | 129:3 131:7,19 | 173:1,5 174:6 |
| 59:10,22 60:3,8 | 99:22 100:3,9 | 131:24 132:2 | 174:11,23 |
| 60:11,19 61:8 | 100:13,16,18 | 133:3,9 134:16 | 175:3,7,12 |
| 61:11,23 62:5 | 101:1,17,24 | 135:6,24 136:4 | 176:1 177:2,7 |
| 63:12 64:3,7,17 | 102:7,10,14,22 | 137:1,4,18,23 | 177:19,21,23 |

**[attorney - attorney]** Page 10

| | | | |
|---|---|---|---|
| 178:2,12 180:9 | 229:9,21,23 | 262:20 263:1,3 | 332:1,4,6,7,23 |
| 181:2,16,20,25 | 230:6 231:8,13 | 263:9,12,19,23 | 333:3,12 |
| 182:4,25 183:6 | 231:16,18,23 | 263:25 264:6,9 | 334:21,23 |
| 183:10 184:11 | 232:7,23 233:5 | 264:11,15,23 | 335:1,8,13 |
| 184:14,19 | 233:16,19 | 265:2,15,18 | 336:1,6,14 |
| 186:8,20 187:2 | 234:1,3,6,10,18 | 266:19,20 | 338:1,5,11,16 |
| 187:21 188:3 | 234:20,21,25 | 267:10,15,17 | 338:18,25 |
| 188:12 189:1,6 | 235:2,4,7,13,21 | 267:21,24 | 339:2,6,11,12 |
| 191:7 192:11 | 235:24 236:2,3 | 268:3,8,13 | 339:16,21,22 |
| 192:21,24 | 236:5,8,10,12 | 269:7,9 270:23 | 339:24 340:1,5 |
| 193:6,22 194:3 | 236:17,21,22 | 271:5,15,20 | 340:13,15,17 |
| 194:15,17,20 | 237:3,8,11,16 | 273:9,15 | 340:21,24 |
| 197:2,21 | 237:25 238:4,8 | 274:12,18,23 | 341:6,10,13,18 |
| 198:12,17 | 238:18 239:21 | 276:1,3,5,20 | 341:25 342:4 |
| 200:14,21,24 | 240:14,20,24 | 277:8,17 278:1 | 342:13,18,23 |
| 201:13 202:4 | 242:12,14 | 278:17,20,23 | 343:1,7,12 |
| 202:11,16 | 244:12,18,21 | 279:2,6,9,11,19 | 344:2,7,17,21 |
| 203:10,17 | 244:22 245:3,7 | 279:22 280:1,7 | 345:9,22 346:2 |
| 204:7,16,21,23 | 245:9,13,15,18 | 280:16,19 | 346:13,18 |
| 205:16 206:2 | 245:23 246:12 | 281:6,23 282:3 | 347:8,15,19 |
| 206:20 207:1,4 | 246:14,22 | 282:9,12,18,21 | 348:3,21 349:3 |
| 207:6,10 | 247:3,16 | 283:8,11,16 | 349:7,9 350:7 |
| 209:11,15,17 | 248:19 249:1 | 284:5,13,18 | 350:15 351:24 |
| 209:18 211:10 | 250:6,14 251:5 | 285:10,15,20 | 352:3,5,7,19,24 |
| 211:18 212:13 | 251:7,9,18 | 285:22,24 | 353:1,3,7,9,15 |
| 212:18,20,22 | 252:14,17,18 | 286:6,14 | 353:20 354:1 |
| 213:4,12,24 | 252:19,22 | 287:13,23 | 354:10,14 |
| 214:4 215:3,12 | 253:8,11,13,17 | 289:10,14 | 357:14 360:2,4 |
| 215:23 216:2 | 255:10,17,19 | 292:14,16,17 | 360:8,16 |
| 217:24 218:21 | 255:22,23 | 292:19,22 | 361:15,19,20 |
| 221:14,17 | 256:1,9 257:14 | 293:2,19 | 362:1,3,5,7,24 |
| 223:15 224:10 | 257:16,17,21 | 295:18 302:19 | 363:13,16,19 |
| 224:21 225:14 | 257:23 258:6,8 | 306:14 311:3 | 363:22 364:1 |
| 225:16,25 | 260:23 261:5 | 318:21 331:7 | 364:12,18,21 |
| 226:2,4,7,14,20 | 261:23 262:1 | 331:11,13,14 | 364:23 365:4,9 |
| 227:21 228:1,5 | 262:12,15,18 | 331:15,16,23 | 365:12,17,20 |

[attorney - back]                                                    Page 11

365:22,24
366:4,9,13,15
366:18 367:1,8
367:13,15,17
368:4,7,18
370:15
**attorneys**  55:19
  96:4
**attractive**
  314:19
**attribute**
  108:17
**attribution**
  347:4
**audiences**
  50:11
**aunt**  281:8,15
  281:21 282:6
**author**  31:2,3,6
  31:7,12,14,22
  32:7,15,15
  33:24 34:20,20
  35:4,4 36:15,15
  37:9,9,23,24
  39:23,24 40:17
  40:19,22 58:5
  84:1,12 140:5
  170:20 231:14
  235:10 238:16
  241:17 254:7
  293:10 295:9
  296:1,3,7 297:4
  297:14,17
  332:22 333:1
  334:2,3,4,12,14
  334:20 335:10

336:3,10
355:24 364:17
**author's**  144:4
**authored**  41:14
  41:21 58:10
  77:5 78:2,2
  88:9,22 89:1
  363:14,20
  364:3
**authoring**
  41:11,19
**authors**  33:1,13
  35:24,24 75:14
  76:3 140:3
  145:10 146:3,8
  146:14 147:18
  147:25 148:1,8
  151:4,8 171:10
  171:19 172:7
  174:1,19
  176:16 177:18
  177:24 178:14
  179:9 186:14
  196:1,5 207:20
  213:9 215:1
  216:25 217:12
  218:5 220:21
  228:7 229:4
  230:21 232:18
  233:3,6,10,14
  239:14 240:7
  240:11 243:2
  244:9 246:9
  250:5,9 251:19
  251:22,25
  252:6,23 254:5

254:13 296:3
303:14,17
307:7,8 310:7
333:20 355:12
364:15
**authorship**
  31:20 40:8 41:2
  238:17 239:19
  241:11 297:25
  332:19 333:10
**available**  8:1
  26:16 46:6
  53:11 65:19,20
  65:24 66:9,12
  69:18 70:13
  71:1,6,10 73:6
  94:14 98:11
  117:22 120:4
  153:10 156:12
  181:11 276:13
  278:8 279:12
  289:17 299:12
  304:13 320:12
  322:24 326:2
  347:3
**avenue**  324:16
**average**  280:6
  280:15
**avoid**  185:23
**aware**  20:25
  24:24 25:5
  32:20 50:6
  51:13 52:23
  56:17,22,25
  57:8,10 73:21
  75:14,16 88:7

88:16,21,25
93:20 95:19
108:13 110:5
130:6 132:16
133:16 143:21
144:1,2,11,13
145:17 154:18
163:8,12
171:19 172:6
174:1 177:18
177:24 202:9
209:5 213:13
225:23 253:15
255:12 260:7
260:12,13
266:10,18
269:2 272:7
276:11,16
283:1,22 284:8
284:9,14
285:11 287:16
312:24 315:9
321:1 334:18
345:4

| b |
| --- |

**b**  208:16 283:21
**baby**  118:20,24
  119:12,15
  275:13
**back**  69:20
  114:11 119:2,7
  128:22 135:13
  225:1 228:3
  239:22 292:21
  293:6 297:16

**[back - biologically]**

Page 12

304:10 330:24
341:21 354:15
**background**
6:23 7:5,6,14
65:13 73:14
102:19 103:18
103:23 104:5
105:3 106:15
110:24 123:9
128:1 192:6
270:10 319:21
322:4
**backgrounds**
103:21
**baker** 185:12
**balanced** 158:6
**bar** 217:11
**bart** 283:21
284:4,17 285:2
285:14
**base** 208:10
**based** 65:23
94:10,11 122:8
123:9,10
132:12 135:1
174:15 196:10
197:11 198:25
210:13,13
211:7 212:24
213:6,15,18
217:14 220:18
220:18 232:17
235:11 237:23
243:5 254:15
267:12 280:5
284:10 289:16

291:22 309:23
313:24 316:11
322:7 323:4
324:3 325:8
335:19,23
355:21 356:11
360:20,22
**baseline** 316:19
317:19,20
350:24
**basic** 105:15
106:14 108:15
163:11 305:1
344:10 359:19
359:22
**basically** 208:8
**basis** 32:7
108:24 162:18
168:4 256:14
294:24 350:11
350:12
**batch** 185:13
**bath** 265:4
**bear** 108:11
**bearing** 346:10
346:23
**beasley** 2:4
**beasleyallen....**
2:5,6,7
**becoming**
145:18,19
287:6
**beeghly** 76:20
**began** 39:8,12
191:25 350:24

**beginning**
258:11 285:6
337:15
**behalf** 2:3,10
2:16 3:3,11
**behavior** 135:1
**believe** 13:8
31:19 39:9
55:10 59:5,19
70:23 71:3 75:4
83:10 87:18
90:20 97:4
102:11 105:5
114:21 132:24
135:10 143:4
145:10 150:21
153:2 163:9
167:13 220:3
232:20 235:21
247:20 251:22
256:10 261:19
262:6 264:3,20
275:14 276:24
292:6 315:7
318:11 339:21
340:15
**bellwether**
325:10
**belong** 238:17
**benign** 190:4,7
219:7 322:3,11
322:12
**best** 37:25
149:22 309:23
**beth** 27:6

**better** 11:11
48:12 83:15
102:23 108:8
117:24 243:10
280:18 322:19
325:23 356:4
**beyond** 57:3
189:16 191:6
194:7
**bhatia** 5:6
293:10
**bias** 309:9
325:20
**biased** 61:13
**bibliography**
140:10
**bindman** 56:14
57:15
**bio** 118:6
**biologic** 307:15
**biological** 25:3
53:12 54:2,3
98:14 118:7
121:12 135:4
141:18 188:9
193:11 201:4
202:8 204:14
214:12 219:16
242:5 252:12
253:4 298:24
303:9 312:14
326:20
**biologically**
179:25 196:14
300:2 316:9

**biology**  36:25
54:5 147:10
148:22 149:5
158:20 163:22
165:15 217:11
256:12
**biomarker**
163:20,24
164:2 165:5
**biomarkers**
228:8 319:24
320:2
**biosciences**
23:2 24:4,11
**biotechnology**
29:14
**birmingham**
29:17 41:2
**bisulfite**  195:18
197:17
**bit**  12:16
104:10 137:24
254:11 294:4
310:8 351:21
**black**  361:17,21
362:2
**blocks**  277:1
**blood**  1:14
**body**  145:3
203:12 204:9
206:9 215:6
216:16 249:2
284:25 285:8
287:19
**bondurant**  5:3
278:13 280:3

281:5
**bondurant's**
318:9
**bottom**  245:25
252:21 302:1
306:9
**bought**  256:22
310:15
**bounds**  236:25
**boyd**  15:13
**branch**  24:25
**brca**  284:15
285:12
**brca1**  129:7,13
129:17 130:2,9
130:15,21
131:11,13
269:23 284:10
284:21 314:11
315:6,12,22,23
316:21 317:5
317:13 349:17
359:17
**break**  72:5 74:1
118:16 137:19
138:7 193:3
292:18,20
359:15
**breaking**  128:5
**breaks**  20:9
**breast**  129:18
263:16 271:9
272:8,14 273:7
281:7,15 282:7
282:8 284:22
285:7 291:24

313:6
**brief**  229:14
**briefly**  77:12
105:4,6 295:1
**brieger**  5:8
88:25 89:4,7
199:22,24
302:11,21
**bring**  6:19,22
7:11 95:23
**bringing**  330:8
**brip1**  286:16
**broad**  50:21
52:4 63:1
253:25 254:10
321:18 363:10
**broadly**  130:4
313:10 327:15
**broadway**  1:15
**brought**  93:23
95:21,24
**brown**  3:19
27:7 28:2 36:8
41:6
**browser**  74:12
**bruce**  27:12
**building**  322:1
359:18,19
**buy**  168:16
**buz'zard**
132:16,22
133:25 138:16
138:17 141:3

**c**

**c**  208:16 244:16
309:6,8
**c125**  164:6
**ca125**  163:6
165:4
**california**  1:16
1:19 6:2 369:5
369:24
**call**  30:5,11
116:10,16
349:21
**called**  49:20
117:16 168:21
168:22 249:23
313:12 340:9
**calling**  218:5
**camera**  16:20
**campus**  3:14
**cancer**  26:17
41:15,17,25
42:3,7,9,17,21
43:9,21,23 48:7
48:8,17 50:16
50:18,25 51:6,7
51:10,22 52:15
52:16,19 53:14
53:24 56:12
61:1,6 67:16
69:11 70:4 81:2
83:25 84:13
85:13 87:25
92:12 94:2
98:13 117:17
117:20 122:7

129:8,19 130:3
130:10,15
154:15,20,21
155:2,9 156:2
156:17 157:15
157:21 163:7
163:16 164:5,8
166:16 191:12
191:13,19
192:9 200:5,13
200:23 202:3
202:15,21
203:13,14,16
204:10,12,15
205:7,8,10,13
205:21,23,24
206:1,11,17,17
206:22 217:10
229:3 249:3,16
250:13 255:1
255:25 256:11
257:2,25 258:3
258:14,17,23
259:3 260:1,6,6
260:10,16,19
260:21 261:3
261:13,15
263:16 264:19
264:22 265:5,7
268:22 269:1,4
269:12,15,20
269:21 270:4,7
270:13,17,21
271:7,9,13,23
272:3,5,9,15
273:8 278:14

278:22 279:16
279:21,25
280:3 281:8,8,9
281:15,16,17
281:22 282:7,8
283:2,3,18,23
284:1,3,8,12,16
284:21,22
285:8,13 286:5
286:18,23
287:4,11,19
288:1,14,19
291:20,24
292:5,11
298:25 299:21
300:4 301:5,24
303:1,3,8,16,21
305:25 306:6
306:25 307:7
307:10,11,15
311:10 312:12
315:13 316:16
317:14,17
325:13,15
327:22 330:22
338:23 339:4
340:12 344:11
349:13 350:19
351:8 354:19
355:10,19,22
356:3,11 357:6
357:11,17,18
357:20 358:2
358:15,21
359:9,19
360:10,11,14

360:19,21
361:1,4,11,16
362:9,15,18,22
363:1,3,8
364:11
**cancerous**
  192:14,18,18
**cancers**  163:11
  291:16 302:6
**cap**  329:7
**capabilities**
  285:2
**capable**  215:1
**capital**  242:23
**capture**  21:12
**carcinogen**
  130:7 315:11
  315:21
**carcinogenesis**
  180:8,13
  190:18,20
  197:1,11
  252:11 253:3
  337:13,22
  358:12
**carcinogenic**
  127:17 178:1
  179:6 190:22
**carcinogenicity**
  127:19 177:1,1
  178:9 252:7,24
**carcinogens**
  129:6 130:24
  131:22
**carcinoma**
  190:11

**care**  3:11
  263:15 328:3
**career**  168:7
  223:12 256:7
  316:13 327:12
  329:14,20
  330:1
**careers**  255:25
**careful**  351:5
**carefully**  297:2
  297:15 370:4
**carried**  107:25
**carry**  292:10
**case**  46:24
  54:15 95:22
  104:9 152:21
  154:13 170:25
  177:17 180:2
  189:14 199:2
  202:13 203:23
  212:8 241:24
  250:19 273:21
  273:24 275:10
  275:24 281:10
  293:12 294:4
  298:18 301:16
  307:14 308:17
  309:8 314:9
  320:25 334:1
  338:8 343:15
  348:11 355:21
**cases**  189:23
  274:6,7,15
  295:6 304:9
  307:23 326:3
  328:23,24

**[category - certainly]**                                    Page 15

| | | | |
|---|---|---|---|
| **category** | 52:18 132:3 | **cells**   132:5 | 225:21 228:13 |
| 190:12 263:14 | 133:2,8,10 | 133:11,20 | 228:25 229:8 |
| 316:1 322:10 | 135:10,20 | 134:15 135:12 | 230:12,14,19 |
| 333:7 | 152:8 200:13 | 135:16,23 | 231:22 232:2 |
| **causal**   229:1 | 203:15 204:13 | 138:3 140:19 | 232:15 330:14 |
| 251:21,24 | 205:25 290:1 | 141:9,22 142:4 | 359:14 361:13 |
| 252:2 364:11 | **causing**   269:12 | 142:15,19 | **cellular**   101:4 |
| 365:3 366:8 | 269:15,19 | 145:18 160:9 | 102:21 107:6 |
| 367:7,21 | **ccr**   1:19,20 | 166:16 171:21 | 134:25 158:21 |
| 368:12 | 369:24,24 | 171:23,25 | 159:9,11 160:3 |
| **causation**   43:5 | **cdc**   50:16 51:6 | 172:10,11 | 165:8 189:15 |
| 43:12 45:16 | 52:16 | 173:7,12 174:3 | 209:22 210:11 |
| 46:19 47:13,21 | **cell**   147:10 | 174:5,14,20,22 | 216:15,21 |
| 51:19 53:4,7 | 148:22 149:4 | 175:19 176:4 | 227:2 349:22 |
| 94:15 132:8 | 158:10 160:10 | 176:18,19,24 | **center**   26:17,18 |
| 164:8,12 | 163:10,20 | 177:12,16 | 327:22,23,24 |
| 201:15,17 | 172:23 176:13 | 178:19,21,24 | **centers**   36:25 |
| 203:21 299:23 | 180:5 181:9,11 | 179:7 181:4,5 | **central**   158:20 |
| 316:4 | 189:18 190:8,8 | 181:13,15,18 | 297:5 |
| **causative**   52:25 | 190:9 191:20 | 182:8 184:1 | **certain**   128:11 |
| 200:17 269:3 | 192:13 195:24 | 186:12 188:17 | 190:11 344:16 |
| 270:3 287:18 | 196:2,3,4 197:9 | 189:24 190:3 | **certainly**   13:10 |
| 316:7 | 198:24,24 | 195:21,23 | 30:10,19 32:1 |
| **cause**   51:22 | 199:7,8,11 | 198:8 199:11 | 43:14 53:15 |
| 132:9 133:19 | 208:1,4 210:8 | 207:22,23 | 62:25 71:14 |
| 138:2 141:21 | 211:1 216:17 | 208:9 210:19 | 79:1 82:9 88:5 |
| 142:14 152:5 | 216:19 217:8 | 210:23 213:2 | 94:2 104:12 |
| 200:23 268:21 | 218:3,7,10 | 216:4,8 217:13 | 107:23 108:21 |
| 270:4 273:13 | 221:8 222:5 | 218:25 219:3 | 111:4 119:5 |
| 287:10 303:20 | 226:10 227:9 | 219:11,18 | 122:7 131:14 |
| **caused**   128:16 | 295:14 330:12 | 220:7 221:1,2 | 145:1 158:3,14 |
| 189:25 190:18 | 349:24 360:23 | 221:20 222:23 | 165:19 166:5 |
| 196:20,23 | 361:5,13 | 222:24 223:7,7 | 188:10,25 |
| 202:1 | 362:19 | 223:13,14 | 190:6 201:10 |
| **causes**   42:20 | **cell's**   106:21 | 224:11,12,18 | 201:19 203:23 |
| 43:9,21,22 51:9 | 219:8 | 224:19 225:7 | 204:4 219:14 |

219:16 221:25
222:1 224:15
225:2 235:18
255:14 269:20
270:13 271:10
272:2 276:15
279:15 281:3
283:23 286:9
291:2 298:8
308:22 334:1
348:5 349:6
352:17 361:10
**certainty** 243:2
243:4,13,13,14
243:20 244:9
245:12 246:3
246:10 309:17
**certificate**
369:1
**certified** 1:20
160:21 161:20
172:4 185:13
186:16 239:23
331:9 369:3
**certify** 369:6
372:4
**cetera** 7:3 9:22
104:1 108:10
145:14 158:22
165:9 189:19
191:17 272:23
290:18 325:23
327:24 348:24
360:24
**challenge**
309:12

**challenges**
272:16 273:5
314:12,14
**challenging**
192:10
**chance** 49:7
**chances** 259:13
**chang** 4:23,24
83:24 84:2,3,12
85:11 261:12
261:20 263:22
**change** 19:17
99:24 101:5,6
101:12,14
134:25 158:23
164:22 165:2,6
165:7 166:3
177:12 178:20
190:24,25
195:10 196:18
241:10 242:8
297:25 307:22
322:14 326:19
326:22 330:21
332:19 333:9
371:4
**changed** 98:4
98:25 102:3
107:5 119:9
165:3,7 271:18
**changes** 22:23
101:10,20
104:11 108:8
158:8,11 160:3
179:2 183:8,13
183:13 188:1,6

190:18 191:1
192:2,3 195:13
195:16 196:7,8
223:1 269:21
370:11 372:8
**changing** 10:19
10:22,25
102:11 108:5
268:21
**channels**
313:20
**characteristics**
293:12
**characterizati...**
91:21 106:1
335:21
**characterize**
63:5 159:11
240:23 327:25
360:20,22
**characterized**
98:19 217:22
**characterizing**
217:16,19
**chart** 318:10,16
**chat** 22:6,11
48:11 75:3,5
79:9 84:6 161:5
185:19 235:22
236:4,15
242:16 247:8
262:19 263:6
279:5,7,12
283:12 293:21
302:16 332:2
338:12,21,24

339:9,15,19
340:3,6 354:17
**check** 59:6
268:20 329:10
**checked** 51:24
**chemotherap...**
320:9
**cherry** 3:15
**chicken** 160:1
**children** 129:24
324:8 329:15
**chodosh** 15:12
**chodosh's** 96:7
**choose** 103:8
**chose** 60:14
103:2 157:25
**chronic** 303:14
303:18,19
307:16,18
316:25 337:11
337:20 358:2
358:11
**circular** 113:7
**circumstance**
111:23
**circumstances**
40:5,25
**citation** 73:16
117:19 289:13
312:9,11
342:25 346:17
**citations** 63:22
69:22 106:8,13
299:14 305:3
333:15 346:16

**[cite - coincidentally]**

**cite** 8:10 59:8
60:2 110:19
111:10,20,25
129:4 154:11
157:5,13 158:2
193:11 199:25
249:11 254:6
260:21 289:1,6
300:14 302:11
303:17 341:11
341:24 343:5
346:16 348:2
355:1,2,5
**cited** 7:9,12,15
9:12 10:3,13
11:2 12:6,19
13:3 52:10 58:9
59:7 60:10
63:21 64:16
69:20,23 70:2
78:15,16 86:10
86:13 87:6
90:13,17,22
94:8,10 109:5
138:5 140:6,14
173:13 244:2,8
249:5 255:6
289:3 304:19
306:4 310:17
339:17,17,20
341:2,20,23
342:20 343:3
343:18,20,23
343:25 344:6
346:1,25
347:12,13,14

356:25 367:4
**cites** 340:3,14
340:18
**citing** 87:18
**claim** 31:20
145:11 146:9
220:22 232:18
**claimed** 226:17
227:24 235:10
**claiming**
146:15
**claims** 237:21
239:3
**claire** 129:15
**clarification**
14:22 32:4
123:12 175:15
176:10 269:23
**clarify** 76:20
107:18 172:18
175:1,10 188:6
189:4 228:6
274:15 335:19
**clarifying**
175:1 176:6
188:22
**clarity** 311:17
**classifications**
321:18 322:13
**clean** 134:11
**cleaning** 248:11
**clear** 8:13,18
19:1 29:2 38:14
94:1 122:5
124:14 128:19
198:18 201:16

258:23,24
264:5,12 290:8
297:22 298:11
304:7 308:23
351:22
**clearer** 175:13
**clearly** 196:16
197:7 221:15
228:22 229:5
230:10,16
232:13,21
233:7 237:22
239:3,7 274:19
326:11
**cleavage**
120:22
**climbing**
351:17
**clinic** 100:1
101:14,15
102:6 103:3,7
105:20 106:8
106:19 107:21
110:18,19
111:9,10,19,25
112:1 328:16
328:20 344:25
345:7 347:11
**clinical** 27:14
87:17 294:11
321:12,13
324:6 325:19
328:6,7,8
**clinically**
327:21

**clinicians** 323:6
**clinvar** 289:5
289:17 299:16
321:4,4,5
322:15,18
323:7,14
324:15,24
325:5 326:11
**clock** 105:19
**close** 199:16
214:1,16,16
**closely** 27:6,13
34:9 199:14
210:18 214:12
329:22 357:21
**closer** 328:2
**closest** 74:11
**clr** 1:21 369:24
**coauthored**
58:10
**coding** 158:25
159:7
**cohort** 54:15,19
55:16 59:3,4
154:21 247:23
250:20 251:14
301:12 307:25
309:13 310:1
314:10 337:19
338:8 357:18
**cohorts** 249:14
256:21 268:14
**coincidence**
101:16
**coincidentally**
103:8 139:2

collaboration
  313:2
collaborations
  26:19,23 27:1
  27:16,22
collaborator
  294:19
collaborators
  27:8 294:16
  313:21 314:2
colleague   27:12
  104:21
colleagues
  73:10 168:7
  194:13 328:11
collection
  181:12
college   347:10
colonies   221:11
  222:20
colony   220:18
  221:5
colormetric
  221:4
column   211:25
  252:18 253:7
  264:20 302:2
combination
  175:18 256:23
  281:4,10
  310:16 323:7
combinations
  94:18
combining
  362:11

come   41:18
  43:20 86:20
  90:1 92:10
  103:3,7 106:20
  108:11 109:7
  116:11 123:7
  150:16 179:14
  292:21 296:6
  324:17 325:2
  333:16 334:8
comes   136:8
  227:7 310:4
  344:11
comfortable
  235:9 237:20
  238:6,23 239:2
  239:6
coming   90:3
commencing
  1:16
comment
  146:19 147:1
  150:10 358:1,4
commentary
  39:16 183:1
  242:13
comments
  143:18,22
  144:3,19 145:3
  186:10 233:24
  234:9,14 242:9
commerce   2:7
commercial
  185:24
committee   30:2

common
  167:12 192:16
  198:9 203:24
  270:14 324:2
  356:12
commonly
  203:19
communication
  36:21 295:11
  295:23
communicati...
  21:13 23:13
  116:24
community
  63:11 73:18
  108:14
companies
  168:8
company
  168:16,16,17
  169:2,3,8,11
  170:8 313:12
  313:14 329:25
  330:8
comparative
  178:18
compare   101:9
  104:13 210:22
compared
  187:6 195:10
  196:11 212:7
  221:6
comparing
  212:9
comparison
  179:14 180:25

256:15
compelling
  44:16,23 45:12
  45:18
competing
  168:19
complete   22:13
  53:18 62:9,14
  62:22 70:11,19
  71:3 84:9,17
  103:15 119:23
  140:9 274:16
  281:12
completely
  10:8 186:25
  241:9 272:6
  366:3
complex   130:15
  145:20,21
  160:7 179:18
  180:17 270:9
complicated
  145:15
comply   21:22
  49:25
component
  159:1 180:15
  184:22
components
  118:10,14,17
  121:10 122:2
  127:7,16
  130:14 182:16
  185:5 186:24
  219:15 317:21

**[compound - consider]**                                    Page 19

**compound**
　51:12 52:21
　201:21 350:16
**compounds**
　127:17
**comprehensive**
　53:18 62:23
　67:1,9,21 68:12
　70:2,7 71:5,15
　71:18 201:11
　248:1 286:4
　299:18 300:21
　302:24 322:25
　325:21 326:6
**comprehensi...**
　109:6 314:13
**computer**
　16:17,18,21
　19:1 22:8
　185:16 361:22
　362:2
**concentrated**
　180:22 183:21
**concepts**
　105:15 108:16
　344:11
**concern**　112:10
　175:8
**concerning**
　41:15 42:7
**concerns**　42:16
　246:9
**conclude**
　183:16 192:17
　251:20 252:1
　307:7 356:8,17

　358:14 364:9
　365:2 366:7
　367:6,20
　368:10
**concluded**
　56:11 288:12
　291:18 368:21
**conclusion**
　44:10 66:17
　145:15 148:5,8
　213:10,18
　228:20 230:25
　232:19 250:4
　291:21 356:19
　358:13
**conclusions**
　44:5,7 45:4,6
　64:1 105:10
　144:4,14
　150:17 203:8
　214:17 217:1
　230:1,2 233:3
　233:11,14
　250:10 251:12
　254:8,14 307:4
　307:5 308:16
　309:1 310:4
　346:24
**conclusive**
　253:24 326:6
**conclusively**
　322:6
**concrete**
　237:18
**concur**　45:3

**condello**　292:7
**conditions**　37:1
　159:12 184:2
　185:9 189:17
　196:9 203:25
　211:4 212:7,10
　214:15 223:9
　224:7 233:2
**conduct**　62:10
　115:19 119:23
**conducted**
　62:12 64:5
　115:23 240:18
**confidence**
　227:7 243:22
　244:10 259:10
　259:11,12,15
　259:21 261:7
　265:11 266:1,7
　266:12,24
　267:13 268:7
　311:20,24
　312:2,6
**confident**
　226:25 271:17
　335:5 360:18
　363:4
**confirm**　85:5
　172:22 173:9
　181:7 251:23
　280:11 357:2
　364:5 365:15
　367:9
**confirmation**
　10:10

**confirmed**
　148:14 185:3
**confirming**
　173:17 338:20
　355:11
**conflict**　57:20
　58:3,19 167:6,7
　167:17,18
　168:23 171:3
**conflicting**
　291:23
**conflicts**　170:22
**confuse**　125:10
　128:10
**confused**　7:6
　66:24 68:2
　126:11 137:24
　138:10 339:18
**confusion**
　128:16 139:20
　141:11 175:9
　354:24
**connected**
　329:22
**connection**
　280:25 328:3
**connects**
　205:12 206:18
**conservation**
　292:2
**conservative**
　254:13
**consider**
　121:12 134:8
　164:6 181:14
　217:3,5 223:20

**[consider - copies]**                                                    Page 20

229:18 230:2
244:15 261:6
278:21 279:20
281:3 335:9
336:2
**considered**
4:12 10:4,14
13:3 14:25 15:7
20:21 74:15
77:20,21 79:17
79:21,23 80:4,7
80:13,16 86:23
88:9 90:8 93:10
96:1 127:11
135:3 136:12
136:15 137:6
138:5 151:19
188:23 216:21
301:15 308:16
**considers**
204:11
**consistent**
356:22,24
**consistently**
249:15 302:3
**consolidating**
304:14
**consortia** 32:6
32:10 33:20,25
34:2 38:2 39:18
296:7 324:3
328:25 335:19
335:23 336:12
357:17,21
**consortium**
35:7 36:22,23

37:3,8 154:22
293:23 294:1,7
295:2,11,20,22
295:24 296:4
324:4 336:4,9
336:10 355:10
355:14,20,23
356:3 357:19
357:20
**consultant**
168:14
**consulting**
168:9
**consumer** 3:3
**contact** 219:3,6
**contain** 300:21
**contained** 9:18
21:3 55:11
64:14 66:21
72:20 88:4 90:9
118:20,25
119:13,16
123:15
**contains** 118:9
**content** 101:22
104:2 113:5
121:24 148:3
193:19
**contents** 97:8
**context** 49:12
98:16 99:17
107:24 108:22
108:25 118:6
179:1,17
206:15 216:12
233:11 239:13

240:5 272:11
325:18
**contexts** 104:2
**continual**
148:16
**continually**
241:2 285:18
287:3 303:2
329:2
**continue** 26:14
26:16 73:3
150:3 178:4
226:8 251:8
324:12 362:4
**continued** 3:1
5:1 313:13
**continues**
179:24 195:3
**continuing**
63:23
**contrary** 272:4
**contrast** 261:14
**contribute**
39:14 132:14
180:15 242:3
**contributed**
34:16 38:4
321:6 324:5,10
357:21
**contributing**
27:24 53:12
180:1 204:1
323:11
**contribution**
34:11 35:3
38:18 127:21

182:19 323:25
**contributions**
38:8 118:17
324:1 336:13
**contributors**
324:2
**control** 54:15
154:13 177:5
178:14,17
179:10 182:5
182:24 183:3,5
183:9,23,24
184:5 221:6
250:20 309:9
309:19,22
343:15 348:11
355:21 359:13
**controlled**
338:8
**controls** 165:18
179:1,15
180:19,20
181:24 185:21
**conversational**
111:15
**converse**
281:20,21
**convert** 223:7
**converted**
224:19
**convey** 109:10
**copied** 101:13
113:11
**copies** 6:23
7:10

[copy - crossing]                                                    Page 21

**copy** 8:2 56:8
  111:8,10
  112:12 116:20
  295:19 301:22
  303:12 369:15
**corollary** 272:4
**correct** 8:7
  17:7,12,16,21
  18:11 23:3,21
  23:22,24 24:5
  24:12,20,22,23
  26:5 27:18 28:7
  28:11 29:8
  30:24 31:1,4
  33:15 36:15
  59:25 61:21
  67:3 68:18
  77:10 81:2
  82:23 83:18
  86:23 97:5,11
  98:5 99:4 100:2
  101:4 102:9,21
  103:9 104:17
  105:23 107:6
  113:3 117:6,10
  119:24 120:7
  120:23 127:9
  136:21,22,25
  142:20 144:15
  147:19 154:7
  155:13 166:8
  167:8 171:13
  173:14 181:15
  185:10,20
  198:20 200:13
  200:23 206:23

  208:14 217:8
  226:19,23
  228:13,15
  230:19 246:11
  246:15,16
  251:1 255:3,9
  258:2 259:14
  259:20 260:1,2
  261:18,19
  263:22 265:17
  266:4 267:1,2,5
  267:6,9,14,16
  267:23 268:7
  268:17,18
  272:10 278:11
  281:22 282:16
  282:17,24,25
  286:1,17 288:3
  288:11 291:11
  291:14,17,21
  294:6,18 299:3
  301:7 305:6
  307:17 311:16
  329:9 337:5
  338:4 339:9,13
  340:23 341:24
  342:8,10,22
  343:6 344:1,12
  344:13,16
  345:8 357:19
  358:8,16 363:7
  364:4,11 365:3
  372:5
**correction**
  298:3

**corrections**
  106:21 370:4,7
  372:8
**correctly**
  187:14,17
**costs** 272:16
**council** 3:11
**counsel** 9:2
  10:12 13:16
  21:21 23:14
  46:7 49:25 55:5
  57:6 75:20
  77:17 78:13
  92:8 93:24
  103:12 116:18
  116:25 138:8
  234:12,17
  303:25 305:21
  318:11 342:12
  342:19 343:2
  354:5
**counsel's** 92:18
  93:15
**counseling**
  274:25 275:2
  327:2,10
**counselor**
  275:1 280:18
  280:22 281:2
  327:3 329:20
**counselors**
  275:4,7 323:6
  327:4,5 328:12
**count** 147:3
**country** 328:19

**couple** 20:8,16
  26:25 86:25
  88:3 280:11
  293:3 329:18
**course** 25:12,17
  26:4 29:6 38:9
  46:18 47:10
  134:9 141:7
  158:25 159:4
  227:12 313:20
  316:18 328:9
**courses** 29:21
  29:22 227:13
**court** 1:1 43:20
  109:16,22
  172:2 370:19
**courtesy** 16:11
  18:16
**coussens**
  117:16,19
**covered** 294:3
  346:5
**cream** 267:3
**create** 74:20,24
  132:13
**created** 74:21
  354:24
**creates** 317:4
**creating** 323:23
**criticism** 237:4
**criticizing**
  143:23
**cross** 78:14
  266:13
**crossing** 312:2

[crowley - davidson]                                              Page 22

**crowley**  127:14
**crr**  369:24
**csr**  1:19 369:24
**culture**  166:15
  192:13 198:24
  198:25 228:25
  229:8
**cultured**  208:9
**current**  26:10
  26:10 30:23
  62:1 71:20
  86:12 98:3 99:1
  121:4 312:19
  330:4
**currently**  26:24
  27:17 30:13,25
  41:23 42:1,11
  252:9 253:1
**curriculum**
  4:10 294:22
  296:10,14
**curve**  259:8
**customary**  31:5
  31:11,17
**cut**  103:13
  231:24
**cv**  22:1,10,13
  24:21 30:23
  31:6,13 34:24
  35:2 37:9 39:11
  39:23 40:9,21
  293:7,8 295:8
  331:18 332:25
  334:3,19 354:7
**cycle**  359:13

**cysts**  190:12
**cytometry**
  174:16

**d**

**d**  4:1 242:24
  244:16 295:9
  308:9 309:6,25
**d'aloisio**  256:25
  310:18 312:9
**da**  296:22
**damage**  303:20
**damaged**  320:6
**dangerous**
  112:21
**das**  5:7 295:9
**data**  4:12 10:4
  10:14 13:3
  66:18 70:4
  74:14 77:19,20
  88:9 90:8 95:25
  136:12,15
  137:6 144:15
  145:11 146:9
  147:4,11,17
  148:7 200:7,10
  219:21 230:13
  232:17 235:12
  249:14 250:19
  252:7,25
  259:12 272:16
  273:6,16
  300:22 301:10
  301:18
**database**  321:5

**databases**
  299:15 323:8,9
**date**  54:19 83:3
  96:11 306:4,21
  307:6 370:9
  372:13
**dated**  5:5 55:23
  86:15
**davidson**  3:5
  4:4 6:10 8:3,15
  9:1,8 10:1,23
  11:7,13,18
  12:12 13:1,22
  15:5,20,24 16:4
  16:7 17:11,15
  18:8,15 19:6,11
  21:1,8,16,23
  22:7,12 23:19
  24:3,10,17 28:5
  28:15,21 29:5
  31:18 32:11,21
  33:9 34:19,25
  35:12 36:4,13
  36:20 37:13,17
  37:21 38:11,15
  39:13 40:6,20
  41:9 43:6 44:18
  45:10 46:14,23
  47:3,7 48:1
  49:2,6,16,18
  50:13 51:4,16
  52:12 53:5 55:1
  56:3,24 57:5,12
  58:18 59:22
  60:8,19 61:11
  62:5 64:3,17,24

66:1,23 67:18
  67:24 68:16
  69:6 70:15,22
  72:3,7,15 73:15
  73:25 74:4,13
  74:19 75:1,6,9
  75:11 76:1,10
  76:16 77:15
  78:18 79:2,6,11
  79:14 80:14
  81:6,11,16,22
  82:1,9,14,24
  84:18,22 85:2,9
  85:23 86:1
  88:18 89:9,16
  90:19 91:2,16
  91:22 92:20
  93:5,17 95:1,10
  95:12 97:17
  98:2,24 99:9,13
  99:22 100:9,13
  100:18 101:1
  101:24 102:10
  102:22 103:6
  104:18 105:17
  106:6,17,25
  107:3 108:12
  108:23 109:22
  110:1,10 111:7
  111:17 112:18
  113:9,21
  114:15,19,23
  115:2 116:3,17
  117:1,9 118:23
  119:10 120:5
  120:13 121:1,7

| | | | |
|---|---|---|---|
| 121:15 122:12 | 183:6 184:11 | 248:19 249:1 | 341:10,18 |
| 122:18 123:23 | 184:19 186:20 | 250:14 251:7 | 342:4,18 343:1 |
| 124:3,12,17,23 | 187:21 188:12 | 251:18 252:17 | 343:12 344:7 |
| 125:1,5,12,18 | 189:6 192:11 | 252:19,22 | 344:21 345:22 |
| 125:24 126:3,9 | 192:21 193:6 | 253:8,13,17 | 346:13 347:8 |
| 126:18 128:9 | 194:3,15,20 | 255:17,23 | 347:19 348:21 |
| 128:17 129:3 | 197:21 198:17 | 256:9 257:14 | 349:7 350:7 |
| 131:19 132:2 | 200:21 201:13 | 257:17,21,23 | 351:24 352:5 |
| 133:9 135:6 | 202:11 203:10 | 258:8 261:5 | 352:19 353:1,7 |
| 136:4 137:4,18 | 204:7,21 | 262:1,15,20 | 353:15 354:1 |
| 137:23 138:13 | 205:16 206:20 | 263:1,3,12,23 | 360:4,8 361:15 |
| 139:12 140:23 | 207:4,6,10 | 264:6,9,15,23 | 361:20 362:1,5 |
| 142:10 144:12 | 209:15,18 | 265:2,18 | 362:7 363:13 |
| 144:21 145:6 | 211:18 212:20 | 266:20 267:15 | 363:19 364:1 |
| 146:7,16,24 | 212:22 213:12 | 267:21 268:3 | 364:18,23 |
| 147:8,24 | 214:4 215:12 | 268:13 269:7,9 | 365:9,17,22 |
| 148:20 149:16 | 216:2 218:21 | 271:5,20 | 366:4,13,15 |
| 149:24 150:4 | 221:17 224:10 | 273:15 274:18 | 367:1,13,17 |
| 151:15 152:9 | 225:14 226:4 | 274:23 276:3,5 | 368:7 |
| 152:22,25 | 226:14 227:21 | 277:8 278:1,20 | **davis** 76:11 |
| 153:15,21 | 228:5 229:21 | 279:2,9,19 | **day** 26:21,21 |
| 154:4 155:18 | 230:6 231:13 | 280:1,16 281:6 | 87:1,2 193:9 |
| 155:23 157:3 | 231:18 232:7 | 282:3,12,21 | 369:20 |
| 157:11,23 | 233:5 234:1,6 | 283:8,16 | **days** 30:20 |
| 160:13,19 | 234:10,18,21 | 284:13 285:10 | 87:10 88:3 |
| 161:2,9,17 | 234:25 235:4,7 | 285:20,24 | 219:21,22 |
| 162:9 163:5 | 235:24 236:5 | 286:14 287:23 | 220:8,24 221:3 |
| 164:4,14,18 | 236:10,17,22 | 289:14 292:14 | 222:13 223:3 |
| 168:3 169:16 | 237:8,16 238:4 | 292:17,22 | 370:15 |
| 170:12 171:17 | 238:18 239:21 | 331:7,11,14,16 | **dc** 2:14 |
| 172:2,20 173:5 | 240:14,24 | 331:23 332:23 | **debatable** |
| 174:11 175:3 | 242:14 244:18 | 333:12 334:23 | 134:9 |
| 175:12 176:1 | 244:22 245:7,9 | 335:8 336:1,14 | **debate** 98:22 |
| 177:7,21,23 | 245:15,23 | 338:5,16 339:2 | **decide** 54:9 |
| 178:12 181:2 | 246:14,22 | 339:11,16,22 | **decided** 55:3,4 |
| 181:20 182:4 | 247:3,16 | 340:1,13,17,24 | 55:6 78:5 |

[decision - designed]

Page 24

decision   80:15
80:19
declaration
166:18 167:22
168:22,23,24
168:25 169:14
169:18 170:5,6
170:13 171:3
declarations
171:4
declare   369:17
decrease
157:14,20
306:24 349:21
deemed   370:18
deep   149:4
defect   320:5
defects   359:16
defendants   3:3
defense   13:24
14:16 15:8
16:22 17:24
18:20 46:8,15
46:22 47:11
48:2 97:2,7,16
255:14
defer   44:1
276:14,15
362:21,25
363:2
deficiencies
290:11
deficiency
290:9
define   28:9
40:14 63:9

153:3 288:16
defined   182:11
230:22
definition   13:5
50:3 197:24
230:22 305:2
345:24
definitions
305:1,2
definitive   53:3
degree   280:2
318:15
delay   324:20
delve   45:1
demonstrate
226:17 230:16
302:4
demonstrated
198:19,22
237:22 239:3,7
demonstrates
228:22 229:5
230:10 231:20
232:13,21
233:7
deodorant
265:19
department
25:2,2,3,17
depend   40:4,24
40:25 110:22
159:15 160:9
177:4 222:5,6
235:17 322:4,4
dependent
165:21 224:24

depending
159:7 165:3
216:24 224:14
290:23 299:13
346:6,8
depends   28:8
106:4 108:21
108:25 111:21
123:5 160:6
165:6 166:9
169:13 189:13
189:17 223:24
224:15 274:8
deployed   331:2
deponent   372:1
deposed   6:16
81:18 96:11
deposing
370:14
deposition   1:13
4:8 5:1 6:20
7:22 8:18 18:18
18:25 19:8,12
23:10 48:8,14
49:3,10 50:14
55:8 62:2 77:18
78:19 82:17
96:8,12,16,21
97:18 99:7
100:5 104:19
113:1 114:2,8
115:13,14,18
116:11 117:6
117:13 119:18
124:15 127:1
128:8,14

234:13 236:18
271:13 308:6
354:7 361:22
368:20 369:7
370:3,12,16,17
depth   168:1
derive   145:15
derived   287:7
describe   38:7
195:12 309:7
324:14
described   134:3
134:6 150:13
185:9 186:15
211:23 230:24
335:23 336:12
362:17 368:16
describing   38:2
100:8 105:15
208:18 211:21
333:17
description   4:9
5:2 101:8
182:16 210:7
258:24 361:4
descriptor
192:19
design   165:18
166:10 185:7
192:16 216:25
251:13 310:11
355:17
designed
165:21 180:12
184:8,9 209:7
224:25

**[destined - disclosures]**                                                    Page 25

**destined** 317:14
**detail** 39:19
　　50:5 127:11,15
　　135:14 143:4,8
　　147:14 159:23
　　167:25 176:22
　　198:3 308:25
**details** 39:17
　　275:14 286:25
**detect** 101:3,6,7
　　102:23 103:11
　　107:5 197:18
　　269:11 330:13
**detected** 218:18
**detection** 163:7
　　163:14
**detector** 166:5
**determine**
　　117:3 192:12
　　197:23 214:21
　　214:22 306:23
　　322:7
**determining**
　　21:11 204:13
**develop** 44:10
　　65:15,17 71:1
　　103:18 214:15
　　225:4 350:4
**developed** 44:2
　　112:7
**developing**
　　271:23 328:2
　　331:1
**development**
　　12:18 156:2,17
　　327:15 333:10

333:18,22
**devoted** 255:24
**diabetes** 327:23
**diagnose** 324:8
**diagnosed**
　　35:23 202:3,14
**diagnoses** 87:25
**diagnosis** 280:4
**diagnostic**
　　295:4
**dickinson**
　　296:23
**diego** 1:16 6:2
　　25:22,25
**diesel** 180:23
　　183:21
**differ** 188:21
**difference** 7:4
　　12:13 41:10
　　134:23,24
　　183:25 184:10
　　184:18 188:18
　　189:9 232:2
**differences**
　　211:3
**different** 27:14
　　36:6 37:15
　　43:14,15 52:13
　　91:1,12 93:3
　　109:15 110:8
　　110:12 130:14
　　141:14 151:23
　　151:25 152:3,6
　　187:25 188:2,8
　　191:13 204:19
　　206:4 207:24

211:4 212:6
217:22,22
220:5 221:8
222:7 223:18
225:5 236:7
241:5,19
243:24 245:14
245:16 250:10
277:22 278:3
278:11 316:14
316:16 320:13
328:24 341:9
342:16 343:22
343:24 350:2
351:11
**differentiate**
122:1
**differently**
　　13:15 78:17
　　241:15 282:5
　　324:15
**difficult** 251:20
　　252:1 326:5
　　364:9 365:2
　　366:7 367:5,20
　　368:10
**digestive**
　　327:23
**dimensional**
　　199:7 216:19
　　219:2
**diminish**
　　307:21
**dioxide** 180:22
　　182:12,24
　　183:8,23 187:7

195:11 196:6
196:14 207:25
212:9 221:1,7
**direct** 26:12,21
　　111:24 131:17
　　159:5 165:13
　　301:20 302:9
　　352:14 354:15
**directed** 313:20
**directly** 104:3
　　132:1 142:7
　　198:1 216:20
　　252:12 253:4
　　275:5 287:18
　　297:23 303:20
　　304:6 329:16
**disagree** 233:13
　　253:18,20
　　254:16 345:14
　　363:9
**disciplinary**
　　40:10
**disciplined**
　　105:21
**disclaim** 168:8
**disclose** 23:5,12
　　167:16,23
　　168:13
**disclosed** 23:8
　　23:16
**disclosing**
　　167:17
**disclosure**
　　57:21 167:1
**disclosures**
　　58:20

**[disconnect - dr]**                                                    Page 26

| | | | |
|---|---|---|---|
| **disconnect** | 302:12 318:20 | **doc** 262:22 | **donations** |
| 306:20 | 343:21 | **doctor** 16:8 | 328:15 |
| **discovered** 12:2 | **discussions** | 30:23 93:6 | **dose** 151:9,13 |
| 270:5 303:5 | 21:5 57:1,4,6 | 95:16 102:23 | 151:19 153:8 |
| **discoverer** | 165:8 | 106:7 115:3 | 220:7 259:8 |
| 129:14 | **disease** 33:22 | 117:10 129:4 | **doses** 207:24 |
| **discrete** 241:4 | 34:4 53:1 | 156:14 161:10 | **dosing** 151:10 |
| **discretion** | 191:16,17,23 | 174:17 231:15 | 151:21,24 |
| 170:20 254:7 | 200:20 201:5,7 | 244:20 246:15 | 152:1,2,7 |
| **discuss** 113:20 | 201:19,22 | 259:9 263:2 | **double** 59:6 |
| 136:6 | 204:3,6 214:10 | 266:10 319:8 | 329:10 |
| **discussed** 21:6 | 270:13 294:3 | 331:6 334:15 | **douche** 87:23 |
| 47:16,24 80:12 | 295:1,5 307:24 | 334:18 336:15 | **douched** |
| 90:10 98:19 | 324:4 327:19 | 342:5 344:8 | 311:19,23 |
| 286:9 288:19 | 327:23 328:9 | 357:15 366:16 | 312:5 |
| 295:25 299:4 | 330:6 348:10 | 367:14,18 | **douches** 256:23 |
| 311:25 315:24 | **diseases** 35:14 | **doctors** 367:3 | 310:16 |
| 326:3,21 | 35:23 316:15 | **document** | **douching** 84:12 |
| 332:10 334:25 | 321:22 | 18:17 48:21,24 | 85:12 257:2 |
| 344:19 346:5 | **disorders** | 49:20 50:3 85:8 | 261:13 265:22 |
| **discussing** | 270:14 324:9 | 92:17 94:20 | 268:6,16 |
| 39:11 64:23 | **disprove** 325:3 | 104:14 279:13 | 311:10,13 |
| 89:11 140:25 | **disqualify** | **documented** | 312:15 |
| 165:10 202:8 | 39:24 | 73:22 | **download** |
| 241:7 254:3,9 | **district** 1:1,2 | **documents** | 161:6 |
| 287:20 326:25 | **division** 1:24 | 7:24 20:19 49:8 | **downloaded** |
| 341:8 342:16 | **dna** 25:16 | 49:12 | 264:2 |
| 344:5 348:8 | 101:2,3,4,5 | **dogma** 158:20 | **downloading** |
| 350:20 351:10 | 102:20,21 | **doing** 27:17 | 279:1 |
| 363:11 368:14 | 130:16,17 | 52:6 67:14 | **dr** 6:11,14 8:19 |
| **discussion** | 195:17 290:5 | 69:10 86:11 | 9:2 11:12,22 |
| 105:1 156:16 | 290:10,10 | 173:3 215:2 | 14:6,6,6,15,19 |
| 158:7 160:22 | 303:20 320:5 | 314:24 322:9 | 15:1,12,13 22:8 |
| 165:5 167:24 | 349:16,21 | 333:16 370:8 | 23:11 27:6 28:1 |
| 237:2 239:14 | 359:16 | **domain** 66:13 | 28:2 30:6,12 |
| 240:6 241:10 | | | 33:6 38:5 39:14 |

**[dr - either]**

45:13,20 46:9,9
47:8 49:24
55:11 57:15
72:8 74:5 75:20
77:16 79:3,15
81:12,19 82:2,4
82:25 85:10
86:2 87:19,21
88:20 92:15,22
93:11,18 96:7
97:3,8 103:15
105:18 107:16
114:3 115:6,9
115:16,20
116:6,10 117:4
117:12 119:11
119:21 120:12
120:19 126:5
126:13,19,20
126:22 127:14
137:24 151:11
151:19 153:13
153:17 155:19
161:6 167:2,14
172:19 178:4
182:21 193:7
212:15 231:23
235:8 247:4
249:9 257:24
262:13 264:7
274:19 276:6
276:15,17,23
279:7 282:20
293:3,22
296:15 298:13
302:20 311:4

318:22 331:24
340:25 345:23
353:16 354:15
360:9
**draft** 86:20
111:4 334:14
**drafted** 57:11
**drafts** 234:13
**draw** 148:4,8
214:17 217:1
254:8
**drawing** 45:6
203:7 213:17
230:25
**drawn** 213:10
241:21
**drive** 192:4
**driver** 190:1
192:1
**dropbox** 7:24
**drove** 328:1
**drs** 254:18
256:12
**due** 35:3 129:21
129:22
**duly** 6:6 369:10
**duties** 26:10
**dx** 286:3
**dystrophy**
293:13

**e**

**e** 4:1 242:24
308:9 371:1,1,1
**e2** 175:18
176:13

**earlier** 12:17,17
39:8 47:16,23
59:15 66:15
90:12 137:17
145:13 156:10
171:1 188:21
207:11 210:14
211:24 214:5,8
216:13 247:4
261:11 286:9
294:4 297:17
299:4 302:24
308:20 309:4
311:25 321:4
326:17,23
330:3 332:10
345:17 346:5
**early** 87:23
163:6,13,23
329:10
**easier** 75:12
139:18 265:1
**eb** 323:8
**edits** 100:7
**educational**
50:8
**effect** 54:5
166:14 178:24
183:15 193:17
194:12 196:19
201:7 243:23
243:23,25
356:18,21
357:4
**effector** 159:2

**effects** 142:3
160:2 184:12
186:23 187:15
190:2 194:22
195:5 197:9
252:12 253:4
318:5 336:17
336:20
**effort** 176:8
304:18 310:8
316:2 352:18
**efforts** 324:7
**egg** 160:1
**eight** 33:13
205:18 219:21
219:22 220:23
222:12 343:14
356:5
**either** 31:2
32:15 36:15
50:2 65:23
66:11 80:12
118:8 120:20
121:18 136:9
139:10 165:13
175:20 176:9
189:14 190:21
190:23 191:4
204:2 214:14
214:19 216:18
216:20 237:14
242:9 243:10
276:25 290:8
297:9,24 304:5
305:8 307:23
312:11 318:2

**[either - established]**                                                           Page 28

321:11 322:2
322:20 332:19
333:8
**electronically**
8:1
**element** 23:2
24:4,11 327:8
329:23 330:2,7
**eleven** 282:15
282:23 283:24
283:25
**eligible** 313:5
320:11
**elisa** 165:23,25
**email** 26:20
**embrace**
362:16
**emi** 4:17 194:13
194:14,24
**emmel** 2:5
331:13 338:25
**employed** 30:6
30:9 275:7
**employee** 39:22
**employer** 272:7
312:19
**employment**
23:4 30:3 39:25
**encompassing**
12:11 54:13,16
59:18 70:9
**endometrial**
283:2,18,23
286:3 302:7
**enhance** 204:3

**enhanced**
196:10
**enthusiasm**
361:7
**entire** 10:9 12:9
13:9 150:17
203:12 216:12
223:12 226:16
273:1 279:13
**entirely** 25:7
**entitled** 80:25
82:12,15 93:12
153:5,20
295:10 319:3
357:9
**entry** 80:3
89:22 95:16
137:5,10
**environment**
132:14
**environmental**
129:5,21 130:7
255:2 315:10
315:20 316:6
317:8,17,22
318:6 326:24
347:23 348:9
348:19 349:2
350:10 351:4
351:12,18
353:19 358:22
362:11
**environmenta...**
166:22 167:21
**enzyme** 166:1

**enzymes**
162:15
**epa** 187:9
**epi** 55:3 66:2
77:4
**epidemiologic**
54:10 62:11,13
67:19 68:5 78:1
249:3 300:8,9
300:22
**epidemiologi...**
25:18 53:23
64:5 67:2 68:11
69:4,17 70:4
83:17 249:13
249:20 250:19
300:25 348:12
**epidemiologist**
256:16
**epidemiologi...**
254:24
**epidemiology**
25:2 48:3 53:8
53:15,19,21
54:1 62:25
67:11,13 68:15
68:17,20,24
69:9 83:7,13
94:12 131:14
248:3 249:21
256:12 266:11
300:7 312:1
**epigenetics**
191:1
**epigenomic**
194:22 197:8

**epithelial** 141:9
207:22,23
213:2 222:23
222:24 228:12
360:24
**epstein** 3:6 75:4
79:8,13 100:16
194:17 234:20
235:2 236:3
253:11 257:16
261:23 262:18
278:17 283:11
331:15 332:4,7
**equal** 188:23
196:13
**errata** 370:6,9
370:11,14
372:10
**erroneous**
258:5
**error** 102:21
139:24 312:9
312:10
**errors** 101:4
359:11
**especially**
239:18 240:10
254:12 270:13
278:9 333:19
**essentially**
177:13 178:22
222:19 303:25
320:4
**established**
119:22 359:24

**establishing**
295:12
**estimate** 37:5
243:23,25
294:6
**estradiol**
176:13 183:17
**et** 7:3 9:22
104:1 108:10
133:25 145:14
158:22 165:9
189:19 191:17
194:24 256:24
256:25 272:23
290:18 325:22
327:24 348:24
360:24
**ethical** 298:7
**ethics** 82:6
298:10
**ethnicity**
322:19
**evaluate** 86:19
142:21 151:5
179:2,7 184:8,9
210:22 218:17
229:19 238:11
239:12 240:16
288:4 299:1
300:1 321:15
**evaluated**
305:23 326:16
**evaluating**
171:2 180:14
240:3 241:6
356:13

**evaluation**
53:18,21
148:16 150:11
178:25 215:8
281:12 319:14
**event** 135:5
218:7,9 316:7,7
316:8 317:10
346:11
**events** 130:20
205:6 223:25
224:16 335:7
**everybody**
361:17
**evidence** 46:1,5
129:4 130:7,13
138:1 144:8
146:14 183:7
204:11 215:10
215:13 221:23
229:1 233:20
243:2,4,12
244:10 245:12
246:4,10 249:4
256:2 285:1,9
287:7,20
288:16 290:8
299:20 300:1
300:25 302:25
307:8 309:17
309:20 315:10
320:11 321:13
321:21,23
322:1,6,15
323:1 325:12
329:5 349:19

**evolution**
286:13 349:13
**evolve** 190:3
324:12 333:25
**evolved** 298:1
**evolving** 164:2
241:3 269:13
269:13 270:8
285:9,18
286:10 322:14
**exact** 29:24
132:17 245:21
316:7 345:16
**exactly** 47:1
95:3 215:21
224:24,25
245:16 351:9
**examination**
4:2 6:9 293:1
331:22 340:22
354:13 360:7
369:13
**examine** 197:11
249:13
**examined** 6:6
256:21 306:23
**examining**
154:13 182:7
200:17 201:11
**example** 9:21
10:16 13:10
26:15 31:9
33:19 58:5
72:22 168:10
224:17 225:2
272:22 350:21

351:23 352:10
**examples** 32:9
227:12 269:24
297:21 315:23
316:22 329:12
**excellent**
119:17
**except** 372:7
**exception** 86:24
363:12
**excluded**
348:13
**excuse** 41:4
44:20 93:7
149:12 156:22
212:13 229:23
231:8 250:7
255:20 276:1
355:8
**executed**
165:22
**executive** 3:14
**exercise** 43:15
**exhaust** 180:23
183:22
**exhibit** 21:24
21:25 22:2
55:22,23 56:1
74:16,17 75:13
78:25 84:5
100:11,15,17
100:21,23
117:23 160:23
161:1,3 164:15
164:16 166:14
185:18 194:17

**[exhibit - exposures]**                                                   Page 30

| | | | |
|---|---|---|---|
| 194:18,21 | **exomes** 270:6 | 235:18 238:12 | 238:20 255:6,7 |
| 207:7,8 234:19 | **expanded** 313:9 | 239:13 240:5 | **explain** 63:11 |
| 234:22,23 | **expect** 73:9 | 241:4 333:24 | 127:3,10 |
| 247:12 248:20 | 210:4 307:21 | **expert** 4:11,13 | 138:14 158:15 |
| 248:22 257:14 | 330:23 362:15 | 7:3,19 13:24 | 165:1 169:21 |
| 257:16,18,19 | **expectation** | 14:12,16 15:8 | 177:8 188:21 |
| 261:21,23 | 8:21 361:2 | 17:24 18:20 | 200:11 243:11 |
| 262:23,24 | **expectations** | 21:25 23:6 | 308:9 310:8 |
| 278:16,17,18 | 320:13 | 42:13 45:17 | 315:16 |
| 283:9,14 | **expected** 152:1 | 46:16,17,22 | **explained** 88:6 |
| 293:16,17 | **experience** | 47:12,17 48:3 | 112:4 179:15 |
| 295:15,16 | 65:13 73:13 | 55:11,22 56:19 | 319:23 |
| 300:16,16 | 108:7 123:10 | 57:13,15 76:19 | **explaining** 94:7 |
| 302:16,17 | 147:9 148:21 | 86:8 97:2,3,7 | 125:11 332:17 |
| 306:11,12,15 | 149:4,4,7 | 97:16,20 | 334:6 |
| 308:5 310:23 | 150:10,16 | 109:16 110:7 | **explanation** |
| 311:1 312:23 | 168:6 170:24 | 110:14 113:23 | 297:3 298:12 |
| 318:8 331:7,17 | 226:16 316:12 | 117:5 122:9 | 334:8 335:17 |
| 331:19 336:16 | 325:20 327:4,7 | 123:2 154:11 | 351:2 |
| 339:14 341:20 | 353:11 | 166:21,21 | **explicitly** 173:9 |
| 342:2 354:17 | **experiences** | 167:19,20 | **exploration** |
| 355:17 357:8 | 352:12 | 168:2 170:14 | 92:3 |
| 357:12,23 | **experiment** | 170:16 188:24 | **exploring** 94:14 |
| 363:24 364:6 | 177:10 179:18 | 193:7,8,10 | **exposure** 56:13 |
| 364:21,22,24 | 180:3 222:7,8 | 238:23 304:4 | 134:4 135:1 |
| 365:6,20 | 239:15 240:8 | 341:4,12 363:3 | 202:13 228:23 |
| 367:12 | **experimental** | **expertise** 327:6 | 229:6 230:11 |
| **exhibits** 4:8 5:1 | 159:18 165:18 | 327:9 353:11 | 230:17 231:20 |
| 22:5 100:20 | 184:2 185:7,9 | 359:25 | 232:14,22 |
| **exist** 231:2 | 192:16 212:7 | **experts** 15:8 | 233:8 268:4 |
| 290:11 354:3 | 216:24 223:8 | 16:22 21:17,19 | 309:23 316:6 |
| **exists** 73:24 | 252:7,10,24 | 44:12 58:11 | 317:8,18,22 |
| 270:14 328:17 | 253:2 | 75:15 76:4,17 | 351:19 |
| 350:6 359:13 | **experiments** | 77:6 78:3 88:11 | **exposures** |
| **exome** 325:22 | 133:12,13 | 88:22 89:1,12 | 203:3 316:24 |
| | 177:5 181:10 | 170:23 171:10 | 326:24 |

[express - financial]                                                          Page 31

express  42:16
expressed  71:2
  123:21
expression
  162:14,16
  164:6,22 165:2
  165:4 187:22
  188:1,7,14,17
  190:19,24
  192:3 195:7,10
  195:16 196:6,8
extend  214:21
  261:2
extended
  279:18 281:1
extensive  45:2
extent  241:22
external  130:17
  130:23
extracellular
  39:6,6 295:11
  295:13,23
extraordinarily
  323:20
extremely
  269:25
eyesight  243:10

          f

fabricated  40:8
fabricates
  40:15
fact  18:1,23
  58:10 66:16
  73:17 98:21,23
  102:4 109:5

110:24 112:19
162:25 214:23
218:17 247:21
255:18 296:5
306:3 318:2,9
323:25 333:6
335:5 339:10
343:4 344:14
344:24 347:6
351:5 360:21
factor  351:12
factors  129:22
  130:18 145:20
  204:1 205:23
  206:13 307:12
  316:15 318:6
  347:23 348:9
  348:19 349:2
  350:10 351:4
  353:19 362:12
facts  104:4,5
  106:13 112:5
  144:8 186:5
  233:19 256:2
  304:16 305:7
faculty  24:25
  25:8,8,9 29:13
  30:7,13,21
fadiel  76:20
fail  370:17
fair  58:2 61:6
  61:10 114:11
  123:14 134:5
  153:7 273:1
  301:2 304:25

fairly  37:1
  163:24 299:9
faith  214:25
  215:7
fall  105:11
  190:11,13
  315:25 333:7
false  148:3
familiar  48:10
  48:20 49:19
  59:6 76:21,25
  77:2 83:23
  87:15 88:24
  89:5 95:20
  143:2,7 152:10
  208:20 211:20
  286:21 294:25
  312:20 355:13
family  278:14
  278:22 279:15
  279:18,21,25
  280:24 281:1,3
  282:2 328:16
far  58:25 62:14
  68:21 133:12
  139:18 220:9
  225:13 285:19
  311:18 331:4
  347:1 352:16
  362:14,17
fashion  159:5
  330:17
faster  212:2
  224:5
favor  176:25

fax  1:24
features  108:9
  313:23
february  23:1
federal  238:21
feed  126:13
feeding  85:24
feel  239:6 279:8
female  196:2
fibroblast
  207:24
fibroid  87:24
fibrous  45:22
  120:23
field  31:5,12
  73:10 266:11
  270:8 271:6
  273:1 286:10
  299:24 323:14
  352:12 353:12
  359:7,25 361:1
  363:5
figure  114:2
  126:24 175:5
  175:21,22
  222:9,11,15
  223:4
fills  322:23
filtered  185:21
final  159:1
  160:2,3 235:23
  298:1 306:20
  323:9 334:11
finally  322:10
financial  170:7

**[find - form]**

Page 32

| | | | |
|---|---|---|---|
| **find**  45:16 | 231:17 234:4 | 161:22 | **force**  55:12 |
| 60:15 65:22 | 255:20,21 | **flom**  3:4 | 59:20,23 |
| 66:10 90:5 | 276:2,2 285:23 | **flow**  101:21 | **foregoing**  369:7 |
| 132:17 141:17 | 342:14 | 108:6,10 | 372:4 |
| 148:25 233:10 | **firm**  2:4 | 174:15 | **foreign**  179:8 |
| 251:2 259:1,23 | **first**  7:6 79:20 | **focus**  23:21,23 | **forget**  231:14 |
| 269:25 270:1 | 80:20,23 84:1 | 24:5,12 61:25 | **forgive**  338:18 |
| 277:15 292:10 | 92:5,9 96:9 | 71:19 202:6 | **form**  5:3 8:11 |
| 292:12 297:6 | 102:25 103:10 | 299:19,23 | 9:7,15 10:21 |
| 297:16 311:8 | 104:6,16 | 314:2,5,7 | 13:20 16:3 |
| 324:22,22 | 106:22 107:9 | **focused**  134:19 | 17:10,14 18:4 |
| 329:13 | 111:4 113:8 | 201:17 304:7 | 18:14 20:23 |
| **finding**  51:18 | 140:4 222:18 | 308:20 313:16 | 24:1,7,14 27:20 |
| 139:19 145:11 | 236:20 248:7 | 313:17 328:20 | 29:1 31:16,24 |
| 146:9 229:19 | 249:19 258:10 | 329:20 345:15 | 32:17 34:18,22 |
| 356:23 | 280:2 293:6,10 | **focusing**  56:10 | 35:9 36:2,11,17 |
| **findings**  45:22 | 295:9 296:22 | 87:24 122:22 | 40:2 43:2 44:14 |
| 156:1 213:7 | 302:1 306:19 | 128:4 316:9 | 46:11,21 47:15 |
| 244:11 258:25 | 313:8 317:6 | **folder**  16:23 | 50:20 51:12 |
| 291:23 | 318:15 329:6 | **follow**  11:23 | 52:2,21 54:21 |
| **fine**  38:24 | 329:16 355:1 | 65:6 72:18 | 56:21 58:13 |
| **finish**  8:16 | 363:17 | 293:4,4 310:3 | 59:11 60:4,12 |
| 11:17,21,24 | **five**  36:24 72:1 | 340:22 354:11 | 61:9 63:13 64:8 |
| 28:13,19 44:21 | 72:2 88:7 108:6 | **followed**  63:11 | 64:21 65:9 66:6 |
| 61:24 68:7 81:7 | 128:23,24 | 63:15 65:10 | 67:5,23 69:1,13 |
| 146:1 149:23 | 246:24 271:19 | 72:25 221:9 | 70:21 71:12 |
| 152:23 204:23 | 292:20 334:24 | **following**  180:6 | 72:11 73:20 |
| 225:20 231:24 | **fixed**  222:19 | **follows**  6:7 63:8 | 74:8 76:6,15 |
| 338:19 340:21 | 354:6 | 161:21 172:5 | 78:9,24 80:9 |
| **finished**  11:5 | **fletcher**  4:15 | 239:24 | 81:4 85:15 |
| 11:12 12:25 | 134:2 138:16 | **footnote**  243:17 | 88:13 89:3 |
| 103:5 150:2 | 138:18,23,25 | 309:8,25 | 90:16,24 91:12 |
| 178:3 212:15 | 139:1,21,22,25 | **footnotes** | 92:14 94:23 |
| 212:17,21 | 140:3,7,17 | 244:16 272:20 | 97:13 98:1,7 |
| 225:17 226:3 | 141:3,12 | 309:5,6 | 99:6 100:4 |
| 229:24 231:9 | 160:14 161:1 | | 101:18 105:25 |

**[form - frequent]**                                                      Page 33

| | | | |
|---|---|---|---|
| 106:11 108:20 | 223:16 224:22 | **formats** 50:9 | **foundational** |
| 109:19 110:21 | 226:21 228:2 | **forming** 241:23 | 295:12 361:3 |
| 111:13 112:3 | 229:10 233:17 | **forms** 191:15 | **foundationally** |
| 112:10,24 | 235:14 238:1,9 | **forth** 64:6,10 | 363:6 |
| 113:14 114:6 | 244:13 246:13 | 122:14 123:3 | **founded** 328:5 |
| 116:14 117:8 | 250:7 251:6 | 240:19 369:9 | **four** 42:12 77:5 |
| 118:22 120:1,9 | 255:11 256:2 | **fortunate** | 78:2,5 88:7 |
| 121:20 123:20 | 258:7 265:16 | 327:20 328:5 | 182:9 184:3,10 |
| 131:8,25 133:4 | 267:11,18,25 | 328:11 | 277:3,9 294:14 |
| 134:17 135:25 | 268:9,21 | **forums** 42:3 | 334:24 353:5 |
| 137:2 138:12 | 270:24 271:16 | **forward** 18:24 | **fragments** |
| 140:21 141:25 | 273:10 276:21 | 329:4 330:8 | 120:23 |
| 144:7,7,17,25 | 278:24 279:23 | **found** 9:13 10:7 | **fragrance** |
| 146:22 147:6 | 280:8,20 | 10:18 12:4,7 | 125:7 127:5 |
| 147:21 148:11 | 281:24 282:10 | 13:4,12 44:8,16 | **fragrances** |
| 151:23 155:15 | 284:6,19 | 44:22 45:4,12 | 121:17 123:17 |
| 155:22 156:23 | 285:16 286:7 | 45:20 62:18 | 124:19 127:16 |
| 157:8,18 163:3 | 287:14 301:8 | 67:16 70:8 78:6 | **frame** 225:3,13 |
| 163:18 164:10 | 333:4 334:11 | 78:11 90:6 95:4 | 227:19 |
| 167:10 169:5 | 334:22 335:2 | 95:5,6 151:4,8 | **frames** 227:4 |
| 169:24 171:15 | 335:14 336:7 | 154:14 156:11 | **framework** |
| 172:14 174:7 | 341:7,14 342:1 | 156:12 157:14 | 308:24,24,25 |
| 174:24 175:8 | 342:23 344:3 | 157:20 186:5 | 309:12,14,18 |
| 177:3 180:10 | 344:18 345:10 | 186:23 196:5,8 | 310:11 312:18 |
| 181:16 183:11 | 346:3,19 | 196:10 200:2 | **frameworks** |
| 184:15 186:9 | 347:16 348:4 | 201:1 202:23 | 309:18 |
| 187:3 190:13 | 352:4,8 360:16 | 203:5 220:22 | **free** 23:14 29:7 |
| 191:8 193:23 | 362:24 364:13 | 224:18 233:14 | 185:2,14 |
| 197:3 198:13 | 365:5,13,25 | 249:15 257:1 | 186:17 279:8 |
| 200:15,25 | 366:19 372:8 | 260:2,8,14,17 | **frequency** |
| 202:5 203:18 | **formal** 29:15 | 270:7 276:7,18 | 263:14 323:5 |
| 204:17,25 | 30:3 | 276:24 277:2 | 325:1 |
| 206:3 207:2 | **format** 74:24 | 277:13 282:22 | **frequent** 56:10 |
| 211:11 213:5 | 346:6 | 284:4,17 | 307:9 338:15 |
| 213:25 215:4 | **formation** | 285:14 292:7 | 338:17,22 |
| 215:24 217:25 | 220:18 221:6 | 344:23 345:7 | 339:3 340:11 |

354:18 355:5
357:10 358:14

**frivolous** 115:1

**front** 16:14,18
22:9,10 93:13
110:2 115:4
151:14

**froze** 361:25

**full** 105:19
250:2 271:22
271:25 272:1,2
296:7 297:6
330:11

**fully** 62:23 71:5
330:23 362:15

**function** 317:19
320:24 350:22

**fundamental**
305:1

**fundamentally**
187:24 330:20

**funded** 50:10

**further** 182:15
222:7 231:1
232:4 327:18
331:6,22 354:9
354:13 360:3,7
368:18 369:17

**future** 229:18

**g**

**g** 242:24 308:9

**gabriel** 5:10
75:8 256:24
310:17,24
311:8

**gallardo** 282:13
282:15 285:25
287:25 288:6

**gallardo's**
287:10

**game** 123:14

**games** 81:23,24

**gather** 353:24

**gathering**
321:13 333:14

**gdx** 321:8

**gel** 265:4

**gen** 89:24 273:6

**gene** 164:22
165:2 187:22
188:1,7,13
190:19,24,25
192:2,3 195:6,9
195:13,16
196:6,8 270:1
286:25 287:12
287:16 290:15

**general** 46:18
47:13 50:23
53:7 67:14
68:14 83:9
102:18 124:9
151:6 179:17
189:20 201:3
250:13 299:6,8
315:3

**generally** 53:2
60:25 63:16
65:11 71:22
73:5,23 83:6
106:12,14

109:8 110:23
111:2 112:5
116:7 120:16
149:3 165:12
177:11 189:15
189:22 190:15
191:11 203:21
214:13 219:10
224:3 275:4
290:3,5 304:17
323:13 345:21
347:5 359:7,24

**generate**
122:11

**generation** 6:25
86:17 273:12
273:16

**generous**
328:15

**genes** 101:2,3,6
102:20 165:3
271:22,25
282:16,23
283:24 284:15
285:12 287:3
287:18 291:8
314:10,11
326:3,9,12,14
349:17 359:12

**genetic** 5:4
34:13 54:7
192:5 268:23
268:25 269:12
269:16,21
270:15 271:8
274:2,24 275:1

275:2,4,7 278:3
278:4,6,7,10
280:17,22,25
281:2,4,11
284:2,14
285:12 286:10
287:9,21,25
288:2 291:12
295:3 299:2
313:4 314:3
316:14 317:16
317:21,25
319:15 322:4
323:6,17 326:6
327:2,3,4,5,9
328:12 330:4
339:5 340:1
347:21 348:20
349:1 350:9,18
351:3,6 353:18
354:20 356:10
356:12,20
357:5

**genetically**
268:21

**genetics** 25:3
270:11,15
291:11 313:13
319:19 329:19
359:8 362:11

**genital** 81:1
87:22 229:2
301:4,23

**genome** 290:15
290:16 320:7
320:24,25

[genome - grown]                                                    Page 35

325:21 329:8
**genomes** 270:5
**genomewide**
  195:18
**genomic** 287:8
  289:24 290:1,7
  290:21,25
  291:2 319:3,22
  328:16,21
  332:13 335:10
**genotype**
  323:12
**gerel** 2:11
**germline** 291:1
  291:3,4 319:19
  321:2
**getting** 129:23
  304:9
**gfp** 174:15
  188:16
**giannone** 36:7
**give** 12:10
  38:10 43:13
  48:11 54:23
  60:6,23 70:10
  79:25 83:3,14
  83:18,19 84:9
  85:21 89:6
  91:14 92:8 94:1
  112:10 117:23
  132:17 147:14
  149:20,22
  160:18 173:4
  178:5 193:25
  223:20 231:3
  248:9 277:6

286:25 308:12
315:17 326:5
353:13
**given** 25:23
  34:9 61:14
  69:18 70:7
  77:21 88:5
  103:2 104:13
  105:8 186:10
  186:13 200:4
  203:3 210:6
  211:1 230:21
  254:12 270:10
  279:16 288:20
  309:10 353:8
  372:6
**gives** 290:20
**giving** 53:6
  141:1
**glance** 220:3
**glasses** 243:11
**go** 13:11 57:3
  69:20 75:10,17
  89:20,20 95:11
  100:12 104:16
  113:18 114:11
  116:18 119:7
  137:19 152:19
  161:17 193:2
  206:5 212:18
  228:20 246:24
  254:22 262:10
  282:13 297:15
  315:2 322:2
  330:24 338:21
  361:17

**goal** 330:20
**goals** 39:17
**god** 85:2 263:6
**godleski** 14:6
  46:9 87:19
  167:2,14 276:6
  276:15,17
**godleski's**
  45:20 276:23
**goes** 119:2
  130:3 195:12
**going** 18:24
  23:12 47:8 72:1
  83:19 92:4
  100:19 103:20
  104:6 152:21
  153:6,11
  160:25 165:20
  192:24 226:6
  245:1 293:15
  293:20 306:10
  309:11,15,15
  310:23 318:19
**golkow** 1:24
**golomb** 2:18
**good** 6:11,14,15
  44:9 158:4
  201:23 252:9
  253:1
**google** 61:4
**gotten** 129:20
**government**
  321:9 325:6
**grade** 242:23
  243:5,11,11,12
  308:8,14,21

309:12,14,17
309:18 310:6
310:10
**grades** 243:12
  308:21
**graduate** 29:12
  29:20,22,23
  40:7
**grammatical**
  101:10,21
  104:8 108:9
**grant** 34:4,10
  294:13
**great** 121:16
  125:20 128:7
  128:25 230:7
  292:22 349:8
  362:5 364:7
**greater** 331:2
**greenland**
  95:14
**grew** 56:18
**ground** 8:13
**grounded** 44:9
**group** 141:10
  243:12 253:22
  308:22 313:3
  357:24
**groups** 357:25
**grow** 218:4
  221:20
**growing** 219:2
  219:9 284:25
  287:3 322:17
**grown** 126:21

**[growth - hour]**

**growth** 189:16
189:24,25
190:8,9,9
191:20 217:9
221:13,19,22
359:12
**guess** 35:20
113:17 120:16
123:5,13,13
162:21 187:16
**guessing** 22:9
**guidebook**
72:21
**guidelines**
72:19,23
**guss** 36:8
**gynecologic**
51:8 143:24
150:20
**gynecology**
136:25 137:8
143:3

**h**

**h** 371:1
**habit** 274:19
**half** 20:15
**halfway** 250:18
**hallmarks**
191:19 219:4
**hand** 306:10
308:6
**happen** 190:2
224:1,2 227:11
324:21

**happened**
103:8 106:20
**happening**
107:11
**happens** 333:1
347:9
**happy** 25:13
87:8 135:8
149:2 236:14
**hard** 8:2 149:16
263:4 264:24
**harper** 4:18
133:24 134:6
136:6,7,12,23
137:7,11
138:15,18,23
138:24,25
139:1,2,13,16
139:20,22,23
139:25 140:3,4
140:8,11,13,17
141:6,12,13
142:8,16,18,21
143:12,23
147:11,17
148:24 207:7
235:12 241:23
**harvard** 167:15
**haystack**
330:15
**hazard** 259:5
263:17 265:4,7
266:6
**head** 194:7
242:25 296:25
362:14

**headings**
264:25
**health** 42:16
50:17 255:3
256:5 327:19
**hear** 9:9 25:6
128:15 158:4
221:14 235:25
236:2 247:14
362:3
**heard** 48:16
114:17,20,24
125:14,19
128:12 149:14
**heavily** 143:22
**heavy** 121:17
123:17 124:9
124:18 125:7
127:6,18 156:6
**heck** 116:19
**help** 130:25
330:7 331:2
**helped** 324:8
**helpful** 20:17
201:20
**henrich** 3:12
**hereditary**
271:8 272:8,14
273:7
**hesitating**
266:15
**heterozygosity**
319:25
**hettich** 36:8
**hey** 114:15
116:11,19

361:17
**high** 243:13
272:16 290:22
**higher** 317:24
320:21 322:21
324:25 349:23
351:7,17
**highlight** 13:11
253:9
**highlighting**
313:22,23
314:7
**highly** 270:1
**hill** 3:15 130:23
131:1 317:4
**hired** 255:8
**history** 74:12
278:14,22
279:15,21,25
280:13,13
281:3 282:2
316:13
**hit** 359:10
**hits** 362:11
**hold** 62:19
**home** 182:22
**homologous**
290:9
**honestly** 96:10
**honesty** 109:15
110:7
**hope** 237:6
**hour** 20:14,15
72:1 128:21
192:25 227:16

[hours - improved]                                                                Page 37

**hours** 20:8,10
  126:12 127:1
  162:5 171:23
  172:12 174:5
  174:15,22
  176:19,25
  178:20 205:18
  221:2 222:25
  223:5,6,14,22
  224:6,13,20
  225:3,8 226:13
  226:18 227:4
  227:24
**hudsonalpha**
  23:20 24:2,19
  29:14 275:7
  294:15 296:25
  297:8 313:1
  315:1 324:6
  327:8 328:4,17
  329:18 332:13
  335:10
**hudsonalpha's**
  313:19
**huh** 32:24 89:9
  91:5 120:14
  158:13 176:5
  222:10 266:14
  290:1 354:23
**human** 132:4
  135:11,15,22
  141:8 181:3,15
  207:21 213:1
  216:7 222:22
  228:12 327:18

**hundred** 35:21
  35:22 259:13
  294:8 336:5
**hundreds** 85:3
  93:8 328:23
**huntsville**
  29:16 332:14
**hurst** 1:14
**hurwitz** 5:9,11
  5:13 306:8,10
  331:12 336:15
  338:2,4,9,13
  339:17,23
  340:8 341:3
  354:16 357:8
  363:14,20
  364:2,14
**hydrogels**
  199:8
**hygiene** 263:7
  264:10
**hypothesis**
  359:10
**hypothetical**
  40:12 105:25
  147:21 148:11
  235:14,15
  238:9,20

**i**

**iarc** 253:22
**ic21** 181:9
**idea** 167:6
  286:25
**ideally** 84:16

**identical** 97:21
  102:5 114:3
  115:15 117:15
  344:15,25
  345:1
**identification**
  22:3 56:2 74:18
  100:24 160:24
  164:17 194:19
  207:9 234:24
  247:13 248:23
  257:20 261:22
  262:25 278:19
  283:15 293:18
  295:17 302:18
  306:13 311:2
  331:20 342:3
  357:13
**identified** 10:6
  55:3 77:8 86:21
  90:12,21 91:3,6
  94:20 270:2
  356:12,20
**identify** 95:18
  157:5 171:11
  257:7 366:12
**identifying**
  367:11
**identity** 58:16
**ihc** 237:23
**imagine** 323:17
  324:20
**imaging** 293:12
**imbalance**
  320:1

**immersed**
  327:24
**immune** 171:21
  172:9 174:3,20
  176:4,18
  178:21 193:16
  194:12 195:4
**immunohisto...**
  221:10 222:22
**impact** 129:16
  130:3 188:10
  202:20 316:18
**impacts** 315:21
**impart** 129:18
  196:18
**imperative**
  370:13
**implantation**
  216:7
**important**
  45:25 46:3
  188:6 269:22
  272:18,20
  308:19 361:12
**importantly**
  210:24 272:10
  323:1
**impossible**
  149:18 309:21
**imprecise**
  361:9
**improper** 106:1
  183:9 367:10
**improve** 108:10
**improved**
  236:24 273:17

**[improving - induced]**                                              Page 38

improving
  101:22 108:6
inaccuracy
  314:6
inaccurate
  18:10 91:21
  314:4
inadequate
  272:9
inappropriate
  238:14
inaudible 107:2
incidences
  280:24
include 55:5,6
  60:15 65:3
  109:4 111:5
  168:14 201:9
  229:16 258:13
  258:18,20
  259:7 261:2
  286:15 301:10
  302:21 335:22
included 25:10
  55:19 59:19
  65:18 68:17
  107:21 119:3
  200:6 201:6
  203:6 247:21
  247:22 289:18
  296:10 298:12
  303:10 305:22
  311:12 348:14
includes 68:23
  69:8

including 50:25
  94:12 122:9
  145:21 260:13
  316:15 325:19
  330:12
inclusion
  200:19 312:8
inclusive 71:16
  71:23
incomplete
  40:12 105:25
  147:21 148:11
  235:14 238:9
inconclusive
  252:8,25
incorrect 17:17
  17:18 126:8,17
  246:18 258:11
  272:24
incorrectly
  40:16
increase 129:6
  130:8 131:22
  281:9,16 282:7
  287:22 315:11
  348:18 350:18
increased 56:12
  129:19 158:9
  160:15 161:24
  162:11,16,19
  249:15 263:14
  268:5 269:1
  271:13 288:13
  288:18 291:16
  291:19 292:10
  325:14 348:18

  358:21
increasing
  130:2
incubated
  219:21
independent
  166:21 167:19
  168:1 203:22
  205:6,7,9
  221:12,18,22
  241:12 256:20
  258:12
independently
  106:23 107:6
  214:20
indexed 296:8
indicate 136:10
  158:9,12,17
  159:9 176:11
  178:22,23
  189:23 196:17
  197:19 310:9
  326:13 336:16
  336:19 350:22
  352:11 355:18
indicated
  250:11 275:20
  296:4 310:7
  334:3
indicates
  189:14 218:3
  268:24
indicating
  168:18 186:16
  211:25 220:11
  268:12 296:2

  309:9 310:5
  314:16 348:17
indication
  210:3 290:20
indicative
  177:13 214:23
  217:14 291:1
  347:6
indicator
  201:20,21
  320:8
indirect 165:14
  165:15
indirectly
  104:4 130:11
  130:13
individual
  69:22 180:17
  270:11 275:5
  304:8,20
  317:25 330:14
  356:6 358:19
  358:20
individually
  51:14 296:3
individuals
  32:8 274:17
  318:3 326:12
  348:14 357:5
  368:13
induced 228:23
  229:7 230:11
  230:17 231:21
  232:14,22
  233:8

**inducement**
191:2
**induces** 183:8
183:12 211:8
212:25 228:11
**inducing** 317:2
**induction** 134:3
**inert** 196:15,17
196:18
**infer** 319:18
**inferences**
241:20
**inflammation**
117:16,19
303:3,7,15,18
303:19 307:16
307:18,22
317:1 336:18
336:21,22
337:2,8,12,20
358:3,11
**inflammatories**
157:16,22
**inflammatory**
180:2 203:2
336:25
**influence**
158:21 169:9
183:17 206:13
**influences**
201:22
**informal** 111:1
111:16
**information**
21:15 50:8
53:11 64:2

98:11,17 105:3
105:8 106:15
109:10 123:10
208:19,23,25
209:1 210:6
211:23 213:18
220:9 241:20
256:7 289:16
304:12 308:19
314:1,3 323:15
330:18 345:25
346:1,7
**ingram** 327:22
**inherited**
320:16 358:19
**inhibit** 130:16
204:2 349:15
**inhibited** 219:3
349:17
**inhibition**
130:16 189:16
219:4,6 359:13
**initial** 160:4
217:10
**initiated** 23:17
**initiates** 163:16
**initiating** 190:1
**initiation** 53:13
94:16 130:19
200:8,9,11
204:14 205:2,4
205:6 206:1,15
206:18 216:10
220:13 270:12
287:4 303:15
303:21 316:7

317:10 324:18
333:18 359:20
360:23 361:5
362:18
**initiatives**
27:14
**inos** 162:3
**insensitive**
197:15
**insoluble**
194:23
**instability**
289:24 290:2,7
290:21,25
291:3 319:4,23
**instances**
345:13
**institute** 29:14
48:7,17 50:16
51:6 52:15
255:1,2 256:5
**institution**
333:20
**institutions**
29:19
**instruct** 245:3
**instructions**
109:3 170:1
370:1
**insult** 130:23
**insults** 158:22
**integrity**
349:22,22
**intellectually**
27:24

**intend** 234:2,12
258:18
**intended**
258:20 338:20
**intent** 216:1
**intentionally**
125:10,12,13
**interact** 26:18
**interactions**
180:5
**interest** 57:21
58:3,20 166:18
167:6,8,22
168:8,8,22,23
168:24 169:15
169:19,22
170:6,7,11,23
171:4 328:1
369:18
**interested**
134:23 314:21
327:15
**interesting**
45:21 129:12
**interests**
168:20
**internal** 89:24
**internet** 112:14
345:2
**interpretation**
34:12 216:25
266:8
**interpreted**
142:5
**interrupt** 46:25
150:8 245:19

349:9
**interrupted**
  11:10
**interrupting**
  11:8
**interval** 259:10
  259:16,22
  265:11 266:2,7
  266:13,24
  267:13 268:7
  311:21,24
  312:2,6
**interview** 275:9
**interviewing**
  39:21 275:3
**intramural**
  256:4
**introduce**
  312:23 316:25
**introduction**
  184:25 303:13
  337:11,16,18
  338:7 358:5,11
**introductory**
  105:16
**invade** 197:25
  217:13 218:14
**invades** 216:20
**invading**
  218:23,25
  219:12
**invasion** 208:8
  216:15 219:11
**investigate**
  177:25

**investigation**
  115:19,23
  220:15 232:4
**investigator**
  27:5 34:3
  294:13
**investigators**
  50:10 294:20
**invitae** 321:8
**invoices** 7:23
**involve** 181:3
  328:10
**involved** 32:6
  111:3 238:13
  238:14 287:3
  327:21
**involvement**
  297:14 334:9
**involves** 275:3
**isolation** 118:5
  153:8 177:10
  179:13 272:22
**issue** 170:9
  228:16,18,19
  309:10
**italian** 143:5
**item** 37:9,24
  331:18
**items** 139:11
**iterative** 214:18

**j**

**j** 89:24
**j774** 181:9
  194:23 195:22
  197:10

**jama** 80:25
**january** 19:7,9
  19:12
**jennifer** 2:5
  20:2 293:20
  315:8 340:6
**jennifer.emmel**
  2:6
**jersey** 1:2 2:16
  3:15 15:19
**jessica** 3:5 8:14
  11:5 15:17 22:4
  33:7 41:5 48:25
  71:25 82:12
  103:5 114:6
  119:1 124:10
  125:23 177:20
  212:14 221:15
  245:4,19
  247:15 252:15
  362:4 363:17
  367:16
**jessica.davids...**
  3:5
**jjg** 166:20
**job** 23:1,20
  24:2,4,11,18
**johnson** 1:4,4
  3:3,3,3,3 75:20
  75:21 303:25
  303:25 305:21
  305:21 318:11
  318:11
**johnson's**
  118:20,24
  119:12,15

275:13
**journal** 13:7
  87:16 110:17
  143:5,8,10
  146:18 147:1
  169:17 170:1
  170:21
**journals** 143:13
  143:18,25
  170:2
**jt** 185:12
**judkins** 288:8
  289:4,20
  318:23,25
  319:15
**july** 306:19
**june** 26:2

**k**

**k** 2:13
**kailos** 313:12
**karyocytes**
  190:13
**keep** 226:6
  266:15 323:21
  353:6
**keeping** 114:13
**keeps** 237:9,12
**kevin** 3:13
**key** 169:15
  191:18 337:12
  337:21 358:12
**ki67** 223:1
**kick** 130:25
**kind** 130:14,20
  130:25 173:7

183:12 248:13
263:4 319:21
320:23
**king**  129:15
**kit**  208:16,19
208:20,22,24
209:1 210:14
211:13,13,20
211:22 221:5
**kits**  212:4
**kj**  89:23
**kkotch**  3:14
**klingeman**  36:7
**know**  15:25
16:10,11 21:6
21:17,21 32:12
35:13 41:1
46:21 48:2
49:13 51:5
52:14,23 58:8
58:15,15 59:9
60:1,24 68:21
69:3 70:18
73:11,24 76:2
76:21 79:22
80:20 82:23
83:16 87:9 90:6
91:9 92:25 93:1
93:14,23 95:5,9
97:1 99:18
110:13 114:8
114:14 121:3,5
123:14 124:4,4
134:1 135:17
135:19 143:6,9
143:11,12

147:10 148:22
149:19 157:4
158:8 161:14
164:5 171:3,9
171:16 173:12
175:4 176:16
191:14 209:1
209:19,24
234:5 235:4,16
238:19 241:2,7
242:11,23
246:2 253:11
254:18,20
262:7 269:16
269:18,22
270:15 271:1
271:25 272:1
275:12,16
276:12 280:18
282:15,20,22
283:20 286:12
296:16 306:3
314:22 317:14
319:9 324:17
326:9 328:18
347:9 350:11
352:21 360:13
361:21 363:6
365:19
**knowing**
103:19 143:15
**knowledge**
37:25 57:16
109:11 271:11
295:12 313:24
352:11 353:12

363:5
**knowledgeable**
256:11
**known**  105:14
110:25 127:18
129:20 284:2
284:15 285:13
287:5,6 288:22
291:13 304:17
321:11,19
322:11 323:15
336:23 359:23
**korf**  27:12 28:1
**kotch**  3:13

**l**

**lab**  87:21 328:8
328:14
**laboratories**
321:7,9,9
327:14
**laboratory**  39:2
141:10 297:7
297:10,12,19
297:23 323:22
328:6,7 329:5
332:14,15,21
333:2 335:11
**lack**  290:19
**laid**  65:1
362:10
**language**
102:24 111:2
111:18,24
113:11,12,23
113:24 114:3

115:15,21,24
116:8,12 117:4
117:15 119:2
301:21 344:10
344:14,15,22
344:24,25
345:2,6
**large**  55:12
249:14 287:19
320:1
**larger**  54:16
175:19
**largest**  54:18
54:24 307:6
**latency**  309:10
309:13 310:3
**lau**  133:25
138:16,17
**launched**
330:19
**law**  2:4
**law.com**  3:13
3:14
**lawyer's**  373:1
**lawyers**  19:23
74:22 143:17
143:22 144:22
145:2
**lay**  50:10
**layer**  199:8
**laymen's**  320:5
**lazar**  56:14
**lead**  129:7
130:9
**leading**  341:22

**[leads - listed]**                                                                    Page 42

**leads** 196:6
  205:25
**leaps** 236:25
**learning** 117:5
**led** 315:13
  341:22
**left** 173:19
  250:22 325:24
**leigh** 2:4 11:8
  16:5 20:2 21:8
  38:16 46:23
  47:4 49:2,17
  74:1 81:17,22
  85:24 91:19
  106:25 114:15
  124:5,12
  125:19 126:4
  128:9 152:22
  153:18 192:21
  209:16 236:19
  245:1 263:24
**leigh.odell** 2:5
**lengths** 186:14
**letting** 16:11
  41:8
**level** 241:15
  261:7 307:21
  359:18
**levels** 158:8,11
  162:3,4 164:23
  165:3 190:19
  216:14
**levy** 1:13 4:3,11
  4:14 6:5,11,11
  6:12,13,14 9:2
  11:12,22 14:15

15:1 22:8 23:11
30:6,12 33:6
36:9 38:5 39:14
47:8 49:24
55:23 72:8 74:5
75:20 77:16
79:3,15 81:12
81:19 82:2,4,25
85:10 86:2
92:15,22 93:11
93:18 103:15
105:18 107:16
119:11 126:5
126:13,19,20
126:22 137:24
151:11,19
153:13,17
155:19 161:6
172:19 178:4
182:21 193:7
212:15 231:23
235:8 247:4
249:9 257:24
262:13 264:7
274:19 279:7
282:20 293:3
293:22 296:15
298:13 302:20
311:4 318:22
331:24 340:25
345:23 353:16
354:15 360:9
372:3,13
**levy's** 8:19
**liability** 1:6

**libraries** 26:15
**library** 66:11
  332:12
**licensed** 328:7
  369:4
**life** 274:25
**ligation** 275:22
**light** 254:2
  348:20
**likelihood**
  129:6 130:8
  315:12 321:16
  323:10,11
**likely** 34:11
  130:17 151:10
  151:20 210:5
  243:24 269:15
  270:7 307:25
  321:22 322:12
  330:24 337:12
  337:21 358:11
**limitation**
  330:4
**limitations**
  251:13 330:5
**limited** 95:15
  170:25 202:7
  252:8,25 326:4
**limiting** 361:8
**linda** 5:3
**line** 5:19 75:13
  195:25 196:2,3
  196:4 222:5
  296:3 297:4
  305:19 371:4
  373:2

**lines** 61:2 83:9
  97:20 181:9,11
  221:8 323:1
**link** 203:25
**linkage** 166:1
  316:5
**lisa** 1:18 41:6
  369:23
**list** 10:4,9,14
  12:9 13:4,9
  14:25 15:4,7
  24:25 27:9 31:6
  31:12 32:7,10
  40:17 41:16
  68:23 69:8 70:2
  74:15,21,23,24
  77:20 78:16
  79:12,18,21,23
  80:4,7,16 84:5
  85:4 86:23 87:4
  87:11,14 88:9
  89:18 90:22
  93:10 96:17
  136:12,15
  138:19 139:17
  140:6,10,14
  154:23 247:6
  247:11 248:10
  248:11 261:18
  287:3 294:21
  296:7 332:25
  334:2 349:8
**listed** 20:20
  31:7,13,21
  32:13,15 33:13
  35:6 36:14

**[listed - looked]**                                                      Page 43

39:22 40:16
66:3 138:15
318:16 334:14
334:20 335:11
**listing**  32:8
33:23 293:8
**lists**  25:8,10
30:23,25 33:1
336:3
**literature**  7:15
8:9,23 9:3,17
10:13 11:2 12:1
12:4,6,7,16
13:17 27:9
50:22 52:5
55:18 58:7
62:11,13,25
64:5,11,16
65:19,22 67:2
67:12,15,20
68:6,11,13 69:5
69:17 70:13
71:1,6,10,20,22
73:7 78:15,16
83:8,13 85:17
85:18 86:3,4,5
86:10,15,19
87:6,9 88:1
90:13,14,21
94:8 103:25
108:15 110:9
110:25 122:4
130:5 131:5,17
131:21 143:1
145:3 156:4
163:25 164:13

171:5 200:2
201:12 202:22
203:12 204:10
206:10 215:6,7
216:17 223:18
241:1,25 242:1
251:17 254:1
254:16 268:24
289:2,7 293:9
298:23 299:9
299:10 300:10
301:18 306:5
348:1,17
349:13 350:6
353:17
**litigation**  1:6
6:17 8:25 13:24
42:13,20 56:19
58:11 88:11
166:23 167:2
167:21 170:14
170:15,23
171:11,12
202:1 255:8,16
**little**  7:5 137:24
237:18 243:22
244:10 254:11
288:23 324:8
324:14 351:21
**live**  214:14
**lives**  254:19
**llp**  2:11 3:4
**local**  191:23
**localized**
191:24

**locate**  59:2
**located**  58:23
292:1
**lodging**  47:1
**log**  30:20
**long**  20:6
219:18 224:2
275:12 284:23
309:10,13
312:24 347:20
359:9
**longer**  191:24
210:16 224:7
227:20 360:19
**longo**  14:6,19
119:21
**longo's**  97:3,8
120:12,19
**look**  16:15
25:15 27:9
32:22 33:4,12
33:18 34:7,9
45:25 46:4
47:20 48:7,12
55:9 57:22 58:3
60:6,9,17 76:11
79:24 80:1,2,3
80:21 82:5,15
83:19,21 87:14
91:13,17,24
92:15,16 93:25
95:13 100:10
101:2,6 102:24
103:9 106:20
109:21 133:21
135:13,17

136:2,7,9
138:20 139:18
152:12,17
153:5,9,11,17
153:21 155:8
156:5,6,7
160:17 161:6
166:17 176:21
181:7 187:10
193:15 194:1
206:13 207:13
212:10 216:15
218:20 219:10
222:9 228:10
242:17,21
245:20,24
256:17 262:10
263:2,7 264:10
264:19 277:19
277:23 282:14
283:4 297:4
300:19 301:9
311:4,5 318:2
325:16 332:9
347:18 348:13
352:18 355:16
367:11
**looked**  17:22
18:21 66:21
87:15 91:10,25
96:24 119:24
140:7,9 162:3
162:14 187:12
195:6,17 203:1
206:14 209:23
210:1 276:17

290:8 292:6
310:14 316:16
317:11 345:3
345:12
**looking** 14:14
15:6 16:9,16,25
17:2,6,7,21,25
18:1,17,21,23
18:25 39:1 41:5
50:5 55:10 56:7
70:5 74:23
77:12,14 82:4,8
82:11 83:1,4,5
84:4,23 91:18
94:7 132:19
134:25 136:14
136:19,20,23
137:5,9,13,15
138:4,7,15,21
139:4,5,9,10
140:5 141:6,13
153:16 154:5
155:12 162:1
174:8 178:8
179:5 180:4
185:15,17
194:6 197:5,7
200:4 208:6,11
220:17 222:17
237:4 254:21
254:23 271:7
279:4 290:14
290:16 296:19
297:1 299:13
299:14 300:14
303:6 306:3

307:1 312:14
317:15 320:23
330:9,10,11,14
330:16,17
342:6 343:10
355:12,14,23
356:10 357:1
364:5 367:24
368:2
**looks** 76:25
181:12,17
205:21 208:7
223:3 259:4,7
**lose** 219:5
**loss** 189:16
290:5 319:25
**lost** 283:10
**lot** 43:17 66:2,8
248:12 314:15
361:7 365:16
**lottery** 317:5,7
347:24 348:25
352:2,6,16
**low** 243:6,13,14
243:20 244:9
245:12 246:3
246:10 290:22
310:7,9
**lower** 307:10
309:16 322:21
358:15
**lunch** 193:3
**lymph** 218:19
**lynch** 131:23

**m**

**m** 2:6 208:16
**m.d.** 1:13 4:3
6:5 372:3,13
**macrophage** 195:22 196:3
**macrophages** 172:17 173:10
181:8 194:24
197:10
**made** 12:3 21:4
38:19 42:6
52:17 80:18
92:5 101:19
104:11 114:18
120:16 129:14
148:17 150:12
168:25 185:3
194:12 234:9
258:22 291:21
314:17 351:3
369:12 370:7
**magnetic** 293:11
**magnitude** 165:7 170:7
**main** 294:11
**maintained** 357:4
**maintains** 325:5,7
**maintenance** 290:10
**major** 50:16
53:23

**make** 8:12,17
10:9 19:1 22:24
44:2 53:2 67:8
68:4 69:15
70:16 80:15
87:12,13 89:6
100:6 101:12
101:25 106:21
112:11 116:15
120:15 124:14
130:17 134:11
135:14 150:11
161:14 165:12
170:4 182:2
183:8 184:23
193:24 198:18
220:19 234:25
237:17 247:18
251:4 253:16
256:15 274:18
281:12 298:3
304:18,18
313:6 323:9
334:5 335:21
338:11 339:24
340:16 347:22
349:1 350:9
352:13,17
353:18 358:18
358:19 370:4
**makes** 112:20
191:5
**making** 104:9
113:25 271:2
313:18 329:22

**[malignancy - materials]** Page 45

| | | | |
|---|---|---|---|
| **malignancy** | 231:21 232:5 | 295:15 302:16 | **mary** 129:15 |
| 145:12,14 | 232:14,22 | 306:11 310:22 | **mas** 1:4 |
| 189:20 197:23 | 233:8 235:11 | 331:17 341:19 | **material** 7:15 |
| 197:24 198:2,5 | 237:22 239:4,8 | 357:7 | 45:22 52:10 |
| 198:6,16,19,23 | **malignantly** | **marked** 22:2 | 58:4 86:7 94:8 |
| 199:1,5,10,16 | 230:14 | 56:1 74:17 | 94:10 103:18 |
| 222:4,8 | **man** 126:21 | 100:23 160:23 | 103:24 105:9 |
| **malignant** | **managed** | 161:2 164:16 | 111:22,22 |
| 132:4,11,14,20 | 103:11 | 194:18 207:8 | 112:8,17,20 |
| 132:23 133:2 | **mandarino** | 234:23 247:12 | 114:9 120:11 |
| 133:11,14,19 | 4:16 88:21 | 248:22 257:19 | 140:10 154:23 |
| 134:8,14,21 | 164:15 166:11 | 261:21 262:24 | 182:20 276:13 |
| 135:21 138:2 | 166:14 171:20 | 278:18 283:14 | 299:15 |
| 141:7 145:19 | 172:7 188:13 | 293:17 295:16 | **materials** 4:12 |
| 146:5 188:20 | 193:16 | 300:15 302:14 | 6:19,23,24 7:1 |
| 189:10 190:15 | **manga** 36:7 | 302:17 306:12 | 7:5,7,8,9,10,12 |
| 198:21 199:15 | **manhattan** 3:8 | 308:5 311:1 | 7:16 8:4,19 |
| 199:15 209:3 | **manner** 45:2 | 318:8 319:3 | 9:20 10:4,14 |
| 210:9,12,18,23 | 169:9 304:22 | 331:10,19 | 12:19,20 13:3 |
| 211:1,8,16 | 356:23,24 | 339:14 342:2 | 14:25 15:6 |
| 212:5 213:1,22 | **manufacturer** | 354:16 357:12 | 16:23 20:20 |
| 214:7,9,24 | 210:2 | 366:11,11 | 44:24 45:5,7 |
| 216:4,22,23 | **manuscript's** | 367:12 | 51:2 52:7 63:25 |
| 217:3,5,6,15,16 | 144:15 | **marker** 222:1,3 | 65:14,16,20,24 |
| 217:19,20 | **margaret** 2:6 | 290:22 | 66:4,9 68:23 |
| 218:1,11,16 | **margaret.tho...** | **markers** | 69:8,23 70:2 |
| 219:5,23 | 2:7 | 132:24 135:2 | 71:24 74:14 |
| 220:23 221:23 | **mark** 21:24 | 142:4 145:23 | 77:4,19,20 |
| 223:7,13 | 55:21 74:16 | 146:4 198:3 | 79:17,20,23 |
| 224:12,19 | 75:12 100:15 | 214:22 221:11 | 80:4,6,16 84:5 |
| 225:9,22 | 100:19 160:19 | 226:24 227:2 | 85:4 86:13,22 |
| 226:12,18 | 161:1 164:15 | **market** 273:2 | 87:3,11 88:8 |
| 227:10,23 | 194:14 207:6 | 278:8 | 90:8,9,22 91:9 |
| 228:8,11,24 | 234:21 248:19 | **marketing** 1:5 | 93:9 95:25 |
| 229:7 230:11 | 257:17 262:22 | **marking** | 105:16 112:6 |
| 230:18,22 | 278:15 293:15 | 166:13 194:21 | 120:3,7 122:9 |

**[materials - mentioned]**                                           Page 46

124:16 127:13
136:11,14
137:6 138:5,19
139:9,17 140:6
140:13 153:10
199:8 248:2
273:22,25
274:4 275:15
**matrix** 221:21
**matter** 99:12
114:12 180:21
182:9 183:19
363:9
**mayo** 99:25
101:14,15
102:6 103:3,7
105:20 106:8
106:19 107:21
110:18,19
111:9,10,19,24
112:1 344:25
345:7 347:11
**mcdevitt** 3:12
**mcdonald**
87:16
**mcshane** 95:14
**mdl** 1:4 2:10
15:9,17,19
46:18 47:10
48:4
**me2021** 193:11
**meagher** 3:4
**mean** 8:5 15:16
27:2,22 37:11
40:15 43:8 44:6
65:10 79:12

121:21 122:13
148:12 177:8
184:22 186:22
193:10 218:14
219:17 277:9
319:14 349:6
353:12 367:25
**meaning** 9:19
27:3 44:8 54:4
54:16 62:22
127:22 129:19
148:13 160:3
173:17 189:4
191:21 196:17
199:10 200:18
216:7 218:7
219:11 266:6
270:3 273:1
277:11 321:20
356:9 359:10
**means** 217:8
265:13 266:12
321:25 351:16
**meant** 37:13
109:10 200:19
209:21 210:17
211:15 212:5
219:13 299:17
304:13 316:4
318:1
**measure**
159:19,25
160:10,15
161:23 162:10
162:12,19,22
163:1 165:23

166:3 198:1
216:22 220:4
290:7 319:24
320:6
**measured**
161:25 182:18
199:1,5 210:19
220:1 221:4
225:1
**measurement**
165:12,14,16
220:14
**measures**
199:10
**measuring**
160:2,4
**mechanism**
159:10 163:14
180:1 223:24
224:16 300:2
316:10,25
317:2 361:6
**mechanisms**
180:16 190:1
191:3 204:14
300:3 307:15
359:19
**mechanistic**
54:5 88:8 94:13
98:13,15
180:14 198:4
224:4 242:4
297:3 326:20
349:16 362:19
363:10

**mechanistically**
227:8,18
**media** 313:20
**medical** 273:20
274:16 282:19
305:9 319:1
325:9
**medicine** 89:24
328:1,17,21,21
**medium** 290:22
**meet** 19:23
20:1,4,11
**meetings** 20:10
**member** 29:13
30:7,14 33:24
34:1 35:6 37:8
37:23 295:24
336:8,9
**members** 33:21
35:13,22 37:2
281:2 294:5,8
336:5
**memory** 30:1
93:8 276:24
**men** 313:4
**mention** 54:10
54:11 99:10
138:9 244:7,23
245:10 268:16
289:23 333:2
**mentioned** 28:4
51:3 59:15,21
127:25 132:6
138:17 182:10
188:20 211:14
216:13 246:3

**[mentioned - modality]**                                                  Page 47

294:12 298:6
326:22 328:22
**mentor**  29:22
**mentorship**
  29:11
**mesh**  185:22
**mesquita**
  296:22
**met**  20:5,13,13
**meta**  54:14
  55:17 56:10,18
  69:18 243:3
  247:23 257:12
  307:1 308:1
  340:12 341:3
  341:12,23
  342:20 343:3,5
  343:13 348:11
**metals**  121:17
  123:17 124:9
  124:19 125:7
  127:6,18 156:6
**metastatic**
  145:19 190:10
  190:17 191:5
  191:22 216:11
  218:9,11 225:9
  225:22 226:11
**method**  34:11
  185:11 210:16
  214:21 222:14
  222:17
**methodological**
  39:4,17 73:5
  312:13

**methodologies**
  215:15,17,18
**methodology**
  44:10 72:13
  94:6 147:4,11
  147:16 148:6
  148:23,23
  149:8 151:5
  165:11,13
  215:20 227:9
  299:5,7,8
**methods**  39:5
  181:7 182:15
  212:11 273:18
**methylation**
  191:1 195:17
**michelle**  2:12
  236:20,23
**microarray**
  195:8
**microenviron...**
  145:22
**micron**  185:22
**microsatellite**
  290:17
**microvesicles**
  39:11
**middle**  78:21
**mild**  83:10
**milieu**  204:5
**mimic**  133:14
  199:12 212:5
  218:25 219:13
**mimicking**
  199:15

**mimics**  210:17
**mind**  41:7,18
  125:15 136:8
  161:13 171:25
  296:14
**mine**  297:10
**minerva**  136:24
  137:7 143:2
**minus**  162:7
**minute**  10:17
  11:3,14 72:2
  244:19 291:8
  292:20 339:11
  341:17
**minutes**  72:2
  128:23,25
  192:25 236:6
  246:25 341:1
  343:17 344:8
  353:22
**mirroring**
  181:5,9
**misannotation**
  297:9,18,25
  332:20 333:9
  333:13
**mischaracterize**
  107:10
**misconceptions**
  89:23
**misread**  138:18
**misrepresents**
  353:21
**missed**  363:17
**missing**  14:14

**misstate**  99:14
**misstated**
  258:22
**misstates**  17:9
  17:14 19:4
  40:12 67:23
  81:4 90:24
  94:23 98:7,8
  99:6,7 100:4
  101:18 102:15
  104:24,25
  107:13 109:19
  111:13 112:24
  112:25 113:1
  113:14 117:8
  121:20 147:22
  182:1 335:14
  343:8
**mistake**  138:24
  258:1
**misunderstand**
  127:2
**misunderstan...**
  139:3 186:21
  342:25
**misunderstood**
  126:19,23
  138:10 192:9
  236:13
**mix**  208:10
**mo**  173:10
**modal**  330:17
**modalities**
  325:18
**modality**  321:2

[model - mutyh]                                                    Page 48

**model**  181:18
  196:4 198:8
  210:21 211:16
  214:2,6,11
  219:17 225:4
  230:23 233:1
**modeling**
  214:11
**models**  199:1,4
  216:7,9 229:20
  252:10 253:2
  263:17
**modern**  184:24
**modification**
  338:14,21
  339:7 340:10
  357:9
**modified**
  350:23
**modifies**
  356:14
**modify**  356:21
**modulate**  320:8
**modulating**
  193:17 194:12
  195:4
**molecular**
  165:14 359:20
  361:11
**molecules**
  159:3
**moment**  55:10
  79:25 83:14,20
  113:16 149:21
  149:23 152:12
  152:16 153:13

157:10 173:4
  262:13 292:15
  311:5 338:19
  368:6
**moments**
  335:24
**monolayer**
  216:18
**monolayers**
  199:12
**montgomery**
  2:8
**months**  96:23
  96:25 324:19
**morning**  6:11
  6:14,15
**morphology**
  330:13
**mosec**  171:22
  172:11 173:12
  174:4,14,21
  175:19 176:19
  176:24 177:12
  177:16 178:19
  178:24 181:5
  188:17
**moskowitz**  1:18
  369:23
**mother**  281:7
  281:14,21
  282:6
**mouse**  181:6,13
  181:18 216:9
**mouthwash**
  266:21,23

**move**  25:25
  83:22 125:21
  154:1,2,9
  164:19 171:18
  207:5 210:20
  235:8 237:19
  242:11 246:21
  248:18 282:5
  288:7
**moves**  218:12
**mparfitt**  2:12
**mrna**  158:9,11
  158:17,25
  159:6
**mrnas**  159:8
**multi**  296:1
  330:12,17
  359:10
**multiple**  27:7
  28:3 199:8
  249:12 264:3
  274:6 277:11
  277:12 333:19
  333:20 344:23
  359:11,11
**murine**  195:24
**muscular**
  293:13
**mutagenesis**
  227:15
**mutation**  129:7
  130:9,22
  187:23 191:2
  197:16 270:10
  287:16 288:13
  288:16 291:1,3

291:5,22,25
  315:12 316:5
  316:21 317:13
  320:17 323:16
  325:12 330:16
  348:15,15
  349:18 350:25
  351:16
**mutational**
  131:13
**mutations**
  129:14,15,18
  130:2 131:23
  134:3 188:2,8
  190:19 192:2
  196:21,23
  197:13,19
  268:23,25
  269:2,12,16
  270:2 271:8,11
  271:12 282:22
  284:2,9,15
  285:12 287:10
  287:25 288:3
  291:6 292:4,10
  315:6,22,24
  316:18 317:6
  318:3 321:2
  347:21 349:1
  350:9,18 351:3
  351:11,14
  353:18 358:18
  358:19
**mutually**  71:16
**mutyh**  291:13
  292:4,10

**[myeloma - noah]**                                         Page 49

**myeloma**  27:7
  28:3
**myriad**  291:10
  319:3,22 321:8
**myrisk**  291:10

| **n** |

**n**  4:1
**name**  24:24
  32:10 33:2,16
  76:21,22
  227:23 235:9
  237:21 238:7
  239:2 293:11
  293:25 296:6
  359:3 369:20
**named**  27:6
  84:12 357:21
**names**  76:8,13
  329:15 362:14
**narrative**  19:4
**national**  48:7
  48:16 51:6
  52:15 255:2
  256:4 295:2
**nature**  71:21
  92:2 95:15
  169:22 195:13
  203:4 219:1
  254:13 309:14
**nci**  48:14 49:19
  49:20 50:6,15
**ncra**  1:21
  369:25
**nearly**  53:1

**necessarily**
  40:3 58:4 66:15
  66:20 71:18
  108:4 167:16
  196:18 200:9
  210:25 239:9
  240:1 317:12
**necessary**
  370:4
**necessity**
  324:11,12
**need**  12:8 14:24
  25:14,20 33:5
  38:6 47:19
  49:22 50:11
  59:6,14 60:17
  60:18 75:18
  81:20,21 85:21
  91:17,23 92:15
  93:11 115:4
  121:3 149:5
  150:11 151:12
  152:12 153:14
  159:22 161:5
  176:20,21
  178:6,25
  206:11 215:14
  215:21 238:5
  246:24 262:12
  279:6 282:18
  322:17,24
  350:11 352:20
  352:22 353:23
  353:24 359:11
**needed**  251:23

**needle**  330:15
**needs**  38:23
  93:3 129:25
  148:13 153:11
  298:8
**negative**  120:17
  318:5
**negatives**  43:17
**neoplasm**
  189:11
**neoplasms**
  190:7
**neoplastic**
  134:7,20 135:8
  135:11,21
  140:18 141:4
  141:21 142:14
  142:18 145:14
  146:10 147:18
  148:9,25 151:4
  151:8 152:5
  188:19 189:12
  189:21 190:4
  191:6,21
  209:10,20
  210:22 219:7
**ness**  154:11
**network**  33:22
  34:4 35:15,24
  294:3 295:1
  328:9
**nevada**  1:19
  369:5,24
**never**  26:8 29:3
  97:10 119:23
  128:17 170:5

  170:13,17
  199:18 234:6
  262:3 311:19
  311:23
**new**  1:2 2:16
  3:8,8,15 8:19
  9:16 13:2 15:19
  23:1 86:3,19
  108:5 114:8
  119:4 124:15
  242:1 271:7
  350:5
**newer**  63:22
  200:1
**newsome**  291:7
**nih**  59:2 255:2
  325:7
**nihs**  255:4
  256:5
**nine**  283:24
**nitric**  162:4,6,8
**nitrous**  162:8
**no2**  162:7
**no3**  162:7
**noah**  3:6 75:1,9
  79:6 95:10
  100:13,18
  194:15 234:19
  234:25 236:1
  237:4,6 246:23
  252:19 253:9
  262:15 263:3
  264:23 269:8
  278:15 283:8
  332:1 341:20

**[noah's - o'dell]**                                                    Page 50

| | | | |
|---|---|---|---|
| **noah's** 236:18 | **notice** 7:22 | 194:16,18 | 261:14 300:16 |
| **noah.epstein** | 58:19 244:1 | 203:2 207:8 | 300:20 301:6 |
| 3:6 | 332:11 | 211:24 224:9 | 301:11 310:18 |
| **node** 218:19 | **noticing** 244:5 | 234:23 241:8 | 312:8 363:15 |
| **non** 12:21 | **noting** 180:18 | 247:12 248:22 | 363:21 364:3,8 |
| 35:23 191:23 | 251:12 | 257:15,19 | 364:16,25 |
| 267:4,8,23 | **novel** 105:10,10 | 261:21 262:24 | 366:6 367:3,19 |
| 323:11 327:13 | 112:8 199:6 | 272:20 278:18 | 368:5 |
| 336:24 | 206:12 330:9 | 283:14 285:18 | **o'brien's** 87:21 |
| **normal** 11:11 | **november** 31:1 | 288:21 293:8 | **o'clock** 126:10 |
| 132:4 135:11 | 55:23 79:18 | 293:17 295:8 | 126:10 |
| 135:15,22 | **nsaid** 156:1 | 295:16 300:6 | **o'dell** 2:4 4:5 |
| 140:18 141:8 | **nsaids** 155:2,8 | 302:17 303:23 | 7:21 8:6,8,11 |
| 213:1 222:22 | 156:5,16 | 306:12 311:1 | 8:16 9:6,14 |
| 223:7,13 | 305:24 356:16 | 313:11 329:12 | 10:20 11:4,9,17 |
| 228:12,24 | **nuances** 159:4 | 331:2,8,11,19 | 11:20 12:24 |
| 229:7 230:12 | **nucleic** 330:10 | 335:4 342:2 | 13:19 14:24 |
| 230:18 231:21 | **nucleotide** | 357:12 366:21 | 15:16,22 16:2,6 |
| 232:15 319:21 | 285:4 287:17 | **numbers** 88:15 | 17:8,13 18:3,13 |
| 359:14 | 320:20 | 264:22 267:19 | 19:3,9 20:22 |
| **normally** 216:3 | **nucleus** 158:23 | 289:4 317:7,9 | 21:10,19 22:4 |
| **north** 2:19 | **number** 4:9 5:2 | **numerous** | 23:11,25 24:6 |
| **notation** 33:21 | 22:2 29:23 | 143:13 147:3 | 24:13 27:19 |
| 185:2,13 294:9 | 32:22,23 33:23 | 254:4,4 316:3 | 28:13,19,25 |
| **note** 185:23 | 35:18 55:13,16 | **nw** 2:13 | 31:15,23 32:16 |
| 243:5 | 56:1 74:17 | **nylon** 185:22 | 33:5 34:17,21 |
| **noted** 182:20 | 97:20 100:23 | **o** | 35:8 36:1,6,7 |
| 370:11 372:9 | 142:2 145:20 | **o'brien** 4:20,22 | 36:10,16 37:10 |
| **notes** 21:2,4,6 | 160:23 164:16 | 59:2,5 60:2 | 37:14,19 38:5 |
| 21:18,20 25:15 | 169:11,12 | 61:22 79:7,19 | 38:14,20 40:1 |
| 41:6 87:6 | 171:22 172:11 | 80:24 83:1,12 | 40:11 41:4 43:1 |
| 137:13,15 | 174:4,21 | 247:5,8 248:20 | 44:13,20 46:10 |
| 138:7,8,8 139:5 | 176:19,24 | 254:19 256:13 | 46:20,25 47:5 |
| 139:6,9,15 | 177:12,16 | 256:24 257:7 | 47:14 48:23 |
| 369:16 373:1 | 178:20 189:25 | 257:18,24 | 49:4,9,22 50:19 |
| | 191:3,10 | | 51:11 52:1,20 |

[o'dell - o'dell]                                                    Page 51

| | | | |
|---|---|---|---|
| 54:20 56:20 | 122:20 123:1 | 192:24 193:22 | 268:8 270:23 |
| 57:2 58:12 | 123:19,25 | 197:2 198:12 | 271:15 273:9 |
| 59:10 60:3,11 | 124:7,13,21,24 | 200:14,24 | 274:12 276:1 |
| 61:8,23 63:12 | 125:3,9,17,22 | 202:4,16 | 276:20 277:17 |
| 64:7,20 65:8 | 126:1,7,16 | 203:17 204:16 | 278:23 279:6 |
| 66:5 67:4,22 | 128:13,24 | 204:23 206:2 | 279:11,22 |
| 68:7,25 69:12 | 131:7,24 133:3 | 207:1 209:11 | 280:7,19 |
| 70:20 71:11,25 | 134:16 135:24 | 209:17 211:10 | 281:23 282:9 |
| 72:6,10 73:3,19 | 137:1 138:11 | 212:13,18 | 282:18 284:5 |
| 74:7 75:18 76:5 | 139:7 140:20 | 213:4,24 215:3 | 284:18 285:15 |
| 76:14 77:13 | 141:24 144:6 | 215:23 217:24 | 285:22 286:6 |
| 78:8,20,23 80:8 | 144:16,24 | 221:14 223:15 | 287:13 289:10 |
| 81:3,7,13,19,24 | 146:1,11,21 | 224:21 225:16 | 292:16,19 |
| 82:7,11,18 | 147:5,20 | 225:25 226:2,7 | 293:2,19 |
| 84:14,20,25 | 148:10 149:12 | 226:20 228:1 | 295:18 302:19 |
| 85:3,14 88:12 | 149:20 150:1 | 229:9,23 231:8 | 306:14 311:3 |
| 89:2 90:15,23 | 151:11,22 | 231:16,23 | 318:21 332:1,6 |
| 91:11,20 92:13 | 152:20,23 | 232:23 233:16 | 333:3 334:21 |
| 93:2,7 94:22 | 153:2,19 | 233:19 234:3 | 335:1,13 336:6 |
| 95:7 97:12,25 | 155:14,21 | 235:13,21 | 338:1,11,18 |
| 98:6 99:5,11,16 | 156:20,22 | 236:2,8,12,21 | 339:6,12,21,24 |
| 100:3 101:17 | 157:7,17 | 237:3,11,25 | 340:5,15,21 |
| 102:7,14 103:4 | 159:20 160:25 | 238:8 240:20 | 341:6,13,25 |
| 103:12 104:23 | 161:4 163:2,17 | 242:12 244:12 | 342:13,23 |
| 105:24 106:10 | 164:9 167:9 | 244:21 245:3 | 343:7 344:2,17 |
| 107:2,9 108:19 | 169:4,23 | 245:13,18 | 345:9 346:2,18 |
| 109:18 110:4 | 171:14,24 | 246:12 250:6 | 347:15,21 |
| 110:20 111:12 | 172:13,18 | 251:5,9 252:14 | 348:3 349:3,9 |
| 112:2,23 | 173:1 174:6,23 | 252:18 255:10 | 350:15 352:3,7 |
| 113:13 114:5 | 175:7 177:2,19 | 255:19,22 | 352:24 353:3,9 |
| 114:17,21 | 178:2 180:9 | 256:1 258:6 | 353:20 354:9 |
| 116:1,13,21 | 181:16,25 | 260:23 262:12 | 354:10,14 |
| 117:7 118:21 | 182:25 183:10 | 263:9,19,25 | 357:14 360:2 |
| 119:1,25 120:8 | 184:14 186:8 | 264:11 265:15 | 360:16 361:19 |
| 120:24 121:5 | 187:2 188:3 | 266:19 267:10 | 362:3,24 |
| 121:19 122:16 | 189:1 191:7 | 267:17,24 | 363:16,22 |

**[o'dell - observing]**                                            Page 52

| | | | |
|---|---|---|---|
| 364:12,21 | 120:8 131:24 | 335:13 336:6 | 183:10 188:3 |
| 365:4,12,20,24 | 133:3 135:24 | 341:6,13,25 | 189:1 191:7 |
| 366:9,18 367:8 | 141:24 144:6,7 | 342:23 345:9 | 202:16 203:17 |
| 367:15 368:4 | 144:16,24 | 346:2,18 348:3 | 206:2 228:1 |
| 368:18 | 147:5 148:10 | 360:16 362:24 | 240:20 260:23 |
| **o'dell's** 341:1 | 151:22 156:23 | 364:12 365:4 | 266:19 268:8 |
| **o'reardon** 1:15 | 157:7 163:2 | 365:12,24 | 276:20 277:17 |
| **object** 8:11 9:6 | 164:9 169:4 | **objected** 7:25 | 279:22 282:9 |
| 9:14 10:20 | 172:13 174:6 | **objection** 19:3 | 289:10 333:3 |
| 13:19 15:25 | 174:23 175:7 | 40:11 44:13 | 343:7 344:2,17 |
| 16:2 17:8,9,13 | 177:2 181:16 | 47:2,4,6 60:3 | 347:15 349:3 |
| 18:3,13 20:22 | 184:14 186:8 | 64:20 69:12 | 350:15 352:3,7 |
| 23:25 24:6,13 | 187:2 193:22 | 70:20 71:11 | 352:24 353:3 |
| 27:19 28:25 | 197:2 198:12 | 76:14 81:3 | 353:20 366:18 |
| 31:15,23 32:16 | 200:14,24 | 84:14,20 85:14 | **objectionable** |
| 34:17,21 35:8 | 202:4 204:16 | 90:15,23 91:11 | 114:24 |
| 36:1,10,16 40:1 | 207:1 211:10 | 91:20 92:13 | **objections** |
| 43:1 46:10,20 | 213:4,24 215:3 | 94:22 95:7 99:5 | 369:12 |
| 47:14 50:19 | 215:23 217:24 | 100:3 102:7,14 | **objective** 217:6 |
| 51:11 52:1,20 | 223:15 224:21 | 104:23 106:10 | **observation** |
| 54:20 56:20 | 226:20 229:9 | 108:19 113:13 | 129:13 |
| 58:12 59:10 | 233:16 235:13 | 114:18,25 | **observations** |
| 60:11 61:8 | 237:25 238:8 | 116:21 117:7 | 148:17 194:11 |
| 63:12 64:7 65:8 | 242:12 244:12 | 119:25 121:19 | 241:3,20 |
| 66:5 67:4,22 | 246:12 250:6 | 122:16 123:19 | **observe** 159:13 |
| 68:25 72:10 | 251:5 255:10 | 131:7 134:16 | 160:15 161:23 |
| 73:19 74:7 76:5 | 256:1 258:6 | 137:1 138:11 | **observed** |
| 78:8,23 80:8 | 265:15 267:10 | 139:7 140:20 | 187:15 214:23 |
| 88:12 89:2 | 267:17,24 | 146:11,21 | 215:11 251:16 |
| 97:12,25 98:6 | 270:23 271:15 | 147:20 153:1 | 251:21 252:1 |
| 101:17 103:12 | 273:9 278:23 | 155:14,21 | 364:9 365:2 |
| 105:24 107:12 | 280:7,19 | 156:20 157:17 | 366:8 367:6 |
| 109:18 110:20 | 281:23 284:5 | 159:20 163:17 | 368:11 |
| 111:12 112:2 | 284:18 285:15 | 167:9 169:23 | **observing** |
| 112:23 114:6 | 286:6 287:13 | 171:14 180:9 | 94:11 286:13 |
| 116:13 118:21 | 334:21 335:1 | 181:25 182:25 | |

**[obstetrics - opportunity]** Page 53

**obstetrics**
136:24 137:7
143:3
**obtain** 92:24
**obtained**
185:12
**obtuse** 187:5
**obviously** 9:23
78:20 88:4
**occasionally**
32:9
**occur** 214:10
225:12 285:3
**occurred**
220:12 226:12
227:3
**odds** 311:18,23
**odyssey** 295:4
**offer** 43:11,12
43:25 123:2
127:20 128:5
145:7 164:1
280:22
**offered** 124:1
127:15 308:9
**offering** 42:19
43:8 44:11
118:1,4,13,13
118:19 119:11
120:21 141:17
202:12,18
**offshoot** 39:7
**ogunsina** 87:20
**oh** 14:21 26:25
85:2 173:25
184:21 193:14

222:16 244:8
263:6 279:4
298:19
**ohmic** 330:12
**okay** 13:23
16:24 17:5 21:8
29:9 35:13 36:5
49:16 51:21
57:25 61:12
73:25 74:25
76:11 79:13
84:8 89:19
114:1,19 128:7
129:10 137:18
157:12 158:4
161:4 163:6
164:14 166:11
171:18 173:15
174:12 187:22
188:18 189:7
194:14 207:17
228:6,21 238:5
247:18 248:18
251:2 256:17
256:19 262:4
266:15 275:16
288:7 292:16
296:21 298:15
305:14 306:22
311:7 318:18
334:18 340:21
342:7 354:5
357:7 362:5
364:7 365:18
368:17

**old** 237:9,13
**older** 63:20
70:10
**once** 20:15
**oncogene** 286:2
**oncology** 5:4
51:8 143:25
150:20
**onerous** 323:21
**ones** 14:3 32:5
47:23 55:5,6
70:9 77:11,23
137:16 328:19
**ongoing** 126:6
294:24
**online** 306:19
**ontology**
195:14
**open** 17:4,20
62:15,17,20
161:12 207:18
319:10 338:13
340:7
**opened** 16:22
18:6
**opening** 207:17
**opinion** 42:19
42:23 43:5,9,11
43:13 44:11
53:6,10,16
61:16 62:16,21
64:12 65:16,17
66:17 71:8 73:8
92:10 118:10
118:13,19
119:12,15

122:11,25
123:9 128:5
132:3,7,10
141:17 186:4
193:12 201:3
202:12,19
216:6 308:10
308:14 325:11
350:9,14,17
**opinions** 54:7
71:2,4 94:15
105:11 118:1,4
120:22 121:4,6
121:17,22
122:8,14 123:3
123:16,18,24
124:1,5,18
125:6 127:15
128:1,3 132:12
146:3 179:20
179:21,22
195:1 201:15
201:16,18
235:19 241:23
242:7 299:6,7
299:22 301:15
307:14 326:19
**opportunity**
26:13 45:8 48:6
63:25 114:1
115:18 119:19
150:15 178:5
201:9 233:22
234:15 276:11
308:11 309:3

**opposed** 186:6
186:24
**options** 204:3
**order** 38:7
114:14 215:13
215:19
**organ** 191:24
360:21 361:14
**organism**
180:17 216:12
**organization**
42:16 50:17
**organizations**
51:3,25 52:8,25
53:2
**organs** 199:13
**origin** 197:25
361:13,14,14
**original** 114:4
370:14
**originally**
354:17
**outcome**
130:15 320:13
369:18
**outlined** 121:6
**outrageous**
144:5 233:15
**outside** 47:18
47:23 65:21
90:10 123:7,14
233:19 260:11
**ovarian** 41:15
41:17,24 42:3,7
42:8,17,20 43:9
43:21,23 48:8

50:18 51:10,22
52:19 53:14,24
56:12 61:1,6
67:16 69:11
70:3 81:1 83:25
84:13 85:13
87:25 92:11
94:2 98:13
129:7,18 130:9
132:5 133:11
133:20 134:14
135:12,15,22
138:3 140:18
141:9,22
142:15,19
154:15,20,21
155:2,9 156:2
156:17 157:15
157:21 163:7
163:11,16
164:5,7 166:16
195:20,23
196:3 200:5,13
200:23 202:3
202:15,20
203:13,14,16
204:10,12,15
205:13,21,23
205:24 206:1
206:10,17,17
206:21 207:22
207:23 213:2
222:23 228:12
228:24 229:2,8
230:12,18
231:22 232:15

249:2,16
250:13 252:10
253:2 256:11
257:2,25
258:23 260:6
261:13,15
263:16 264:19
264:21 265:5,7
268:22 269:1,3
270:17,20
271:7,9,12,23
272:3,5,9,15
273:7 281:8,9
281:15,17,22
282:8 283:3
284:1,3,7,12,16
284:21,22,24
285:8,13 286:5
286:18,23
287:11,19
288:1,9,14,18
291:19 292:5
292:11 298:25
299:21 300:4
301:5,24 302:6
303:1,8 305:24
306:6,24 307:6
307:10,11,15
311:10 313:6
315:13 325:13
325:15 337:13
337:21 338:23
339:4 340:12
354:19 355:10
355:19,22
356:2,11 357:6

357:11,17,18
357:19 358:2
358:12,15,20
360:11,14,18
360:20 361:9
361:16 362:8
362:15,21
363:1,3,7
364:11
**ovary** 276:18
277:16
**overall** 53:13
101:22 204:5
239:18 241:25
242:5 248:5
258:15 290:20
299:17 301:17
301:18 302:3
307:23 309:16
320:7,21
**overcome**
359:12
**overestimation**
335:6
**oversee** 329:24
**overseeing**
327:5
**oversight** 29:12
**own** 9:13 10:7
13:4,13 44:3
77:8,9 78:5,6
82:20 94:21
95:18
**oxidant** 158:10
158:12,22
159:13,25

**[oxidant - paper]**                                                    Page 55

160:6,11,15
161:24 162:11
162:20 165:9
**oxidants** 162:17
162:23
**oxidative**
164:24 165:6
166:4
**oxide** 162:4,6,8
**oxygen** 165:24
166:6

**p**

**p** 2:4
**p.m.** 20:8
137:22 161:18
161:19 193:4,5
247:1,2 292:23
292:24 368:21
**p53** 223:1
314:12
**page** 4:2,9 5:2
5:19 52:9 55:24
56:5 61:19
100:12,20
125:4 136:11
138:20 139:16
154:10 155:12
155:16 158:6
166:12 193:7
193:14 199:21
208:11 228:21
242:18 245:25
249:6,8 252:17
254:22 256:17
263:9 282:14

296:20 298:14
300:13,18
301:21,22
302:10,10
303:12,12
305:13 308:7
310:13 332:11
355:16 356:25
371:4 373:2
**pages** 56:9 64:6
372:5
**paid** 26:6,8
28:22 29:3
58:10 88:10
**pain** 237:12
**pal2** 286:22
**palb2** 286:21
**pandemic**
25:24
**panel** 283:1,18
283:24 286:3,3
286:5,15
**panels** 287:6
**papanek** 5:12
36:5 331:18
**paper** 33:6 35:4
35:25 36:19
38:4,6,17,19,22
39:2,15,19
41:11,12 56:7
57:18,23 58:23
59:2 60:6,9,16
61:5 62:6,9
66:18 75:10,15
76:3,25 79:19
79:24 80:2,21

80:24 83:6,6,12
83:14,19,21,23
84:11,17 85:11
85:20,21 87:22
88:22,23 89:1,4
89:8 91:4,8,17
91:24 92:3,4,5
92:8,9,16,16,21
93:20 95:4,13
95:20 106:9
110:16 111:6
111:16,19,25
112:9 132:22
136:9,24
139:14,21
140:2,4 141:7
142:6,8,16,18
142:22 143:13
143:19,23
145:11 146:25
147:12,13
148:3,7 149:2,6
150:15 151:12
151:17 152:5
152:13,14,19
153:9,16,18
154:5 157:5,14
158:2 160:18
161:12 164:21
166:13 167:5
173:13 174:9
175:23 176:22
178:8 179:19
179:23,24
180:7,11,14,19
181:3 185:15

185:17 186:18
193:13,19,20
194:6,14,25
195:3,6,12,20
196:22,23
197:5,12
198:10,15
203:11 204:9
205:12,20
206:16 207:12
207:13,15
210:15 211:2
211:15,22
212:8 213:7,15
213:19 215:11
215:14 220:11
220:22 223:11
226:15 227:22
227:23 228:9
230:24 231:5
231:12,19
232:1,13,17,20
233:2,11,23
234:7 235:10
235:12,22
237:21 238:7
239:2,6,16
240:9,19 241:6
242:8,15 244:2
244:8 246:11
249:5,11,24
250:1,12 254:9
257:8 258:19
258:21 259:1
259:16,23
260:8,11,13,14

**[paper - passenger]**                                                     Page 56

| | | | |
|---|---|---|---|
| 262:2 264:8 | 366:10 367:4,9 | **parentheses** | 297:20,22 |
| 268:16 292:8 | 367:15,24,25 | 243:21 | **particle** 183:4 |
| 294:17 295:20 | 368:2,6 | **parenthetical** | **particles** |
| 296:1,1,5 | **paper's** 134:19 | 237:18 | 166:15 179:8 |
| 297:18 300:15 | **papers** 41:19 | **parfitt** 2:12 8:6 | 180:24 181:1 |
| 301:6,10,19,22 | 41:21,24 58:8 | 8:8 | 182:10 183:15 |
| 302:2,21 303:6 | 58:20 59:18 | **part** 7:2 9:17 | 183:22 186:7 |
| 303:13,19 | 61:18 63:19,20 | 12:2 16:23 | 187:1 194:23 |
| 306:11,15 | 63:21 64:15 | 25:17 29:12,22 | 195:5 276:7,19 |
| 307:13 308:1,4 | 66:12 69:21 | 34:5,8 35:3 | 277:1,13,15 |
| 308:13,19,23 | 75:7 77:8 86:13 | 55:7 59:13,15 | **particular** |
| 310:5 311:16 | 94:12 134:13 | 68:19 83:7 | 34:10 72:14 |
| 311:18 319:23 | 135:9,13,18,20 | 93:10 95:25 | 76:25 95:22 |
| 320:3 323:18 | 136:3 138:3,6,9 | 99:16 127:24 | 195:6 199:2 |
| 331:17,25 | 138:25 139:23 | 129:11 158:19 | 211:12 242:21 |
| 333:1,11 334:4 | 140:1,8 141:12 | 185:6 197:16 | 264:14 299:19 |
| 334:10,10,12 | 141:20,22 | 201:17 221:5 | 303:5 323:12 |
| 334:15 335:10 | 142:3 165:11 | 239:17 241:25 | 323:19 325:1,4 |
| 336:3,11,16,16 | 223:19 255:6 | 244:16 248:5 | 366:10 |
| 337:2,4,7,23 | 268:20 270:20 | 261:1 286:2,4,8 | **particularly** |
| 338:4,10,12 | 271:2 292:4,9 | 293:23 294:2 | 32:5 38:1 |
| 339:2,8,19 | 296:6,24 297:5 | 294:24 300:8 | 103:23 112:14 |
| 340:2,6 341:9 | 333:6,15,16,18 | 301:17 302:21 | 167:12 251:14 |
| 341:15,19 | 333:25 334:19 | 303:4 308:21 | 254:2 303:21 |
| 342:11,16,17 | 335:20,22,23 | 324:6 334:3 | 305:7 330:22 |
| 343:9,16,20,22 | 348:24 364:2 | 348:13 363:17 | **particulate** |
| 343:24,25 | 365:16 368:14 | **participants** | 180:21 182:8 |
| 344:4,6 347:10 | **paragraph** | 54:17 239:15 | 183:18 187:8 |
| 352:14,20 | 155:1,25 158:5 | 240:7 328:13 | **particulates** |
| 353:8 354:16 | 229:14,16 | 355:18 | 180:23 184:3 |
| 354:18 355:1,5 | 305:16,18 | **participate** | **parties** 11:15 |
| 355:7,9 356:7,9 | 306:4,9 | 29:19 | 28:17 |
| 357:8,15,22,22 | **paragraphs** | **participating** | **passages** 304:9 |
| 357:24 358:13 | 304:8 | 30:1 35:19 39:3 | **passenger** |
| 363:14,20 | **paralegal** 237:9 | **participation** | 190:2 192:1 |
| 364:16 365:1,8 | | 34:24 241:11 | |

**[past - physiologic]** Page 57

**past** 95:21
316:13
**path** 256:8
**pathogenic**
284:3,11,16,24
285:13 288:17
289:9 321:20
321:23 325:12
**pathologist**
167:14
**pathology**
45:23 87:17
276:13
**pathway**
195:14
**pathways** 160:7
290:12
**patient** 274:8
275:6 277:22
315:21 316:19
316:21 320:10
328:3
**patients** 54:16
249:14 275:3
277:23 286:12
295:3 323:4
326:8 331:3
**paula** 3:19 41:6
**pay** 171:7
**paying** 28:10
**pcr** 162:4
**pdq** 48:7,9,14
48:15,17,19
49:20 50:4
**pediatric** 295:6
324:7,9 328:23

**peer** 9:19 30:24
32:13 65:19,21
143:22 144:3
144:13 146:18
148:19 150:18
233:13 234:14
242:9 298:2
299:10 324:18
334:11
**peers** 103:22
235:19
**pending** 161:10
161:15 186:1
**penetrant**
270:1
**penetrants**
131:23
**pennsylvania**
2:20
**people** 103:20
217:23 368:9
**percent** 56:13
154:15 163:9
163:10 259:9
259:15 266:1
285:11 311:20
312:6 317:14
**percentage**
72:25 171:10
171:12 220:7
285:19
**percentile**
259:21
**perfect** 219:17
**perfectly** 82:21

**perform** 69:25
70:14 71:7,14
105:9 109:2
220:2 353:24
**performed**
50:21 67:7
74:10 118:15
185:20 219:25
220:3,25
222:21 276:10
319:17
**performing**
73:6 156:3
**perineal** 51:9
52:18 56:13
**period** 276:4
294:13 310:3
313:14 333:21
**periods** 224:2
278:11 309:10
309:13
**persistent**
89:23
**person** 20:5
39:25 214:15
218:20 316:23
327:6
**personal** 3:11
263:15
**personally**
74:20 151:18
**perspective**
108:8 123:13
195:14 232:6
272:19 298:10
298:10 312:1

314:11 329:14
330:12 361:6
**perspectives**
280:23 326:4
**perturb** 227:9
**pfs** 278:15
**ph** 1:24
**ph.d.** 2:5 4:11
4:14
**phagocytes**
166:15 196:7
**phagocytic**
179:6 183:4,16
196:4
**phagocytize**
182:8 186:13
**phagocytosis**
180:4
**phases** 163:23
**phenotype**
53:14 323:20
**phenotypes**
50:25
**philadelphia**
2:20
**phone** 20:12
**phrase** 212:25
290:4
**phrased** 252:5
**phung** 75:17,24
237:13
**physicians**
328:12
**physiologic**
151:10,20

**physiological**
  152:8
**picked** 61:7
  86:5 104:3
**picture** 361:24
**piece** 11:1
  62:24 66:18
  242:1
**pieces** 88:1
  251:17
**pitch** 361:21
**place** 92:6,9
  369:8
**placed** 113:24
  221:2
**places** 344:23
**plagiarism** 98:5
  105:12 107:7
  345:23,24
  346:11 347:7
  366:22
**plagiarize**
  112:21 304:4
**plagiarized**
  99:3,25 104:21
  105:23 113:6
**plagiarizing**
  102:13 304:1
**plagued** 272:15
**plaintiff** 5:3
  9:21 14:20
  45:17 55:19
  275:12 276:9
  318:9
**plaintiff's** 9:2
  10:11 13:16

46:7,17 56:19
57:15 58:11,16
74:21 75:15
76:3,9,17,18,23
77:5 78:3 88:22
89:1,12 93:24
96:4 116:18
143:17,21
276:8
**plaintiffs** 2:3
  2:10,16 7:18
  54:8 88:10
  201:25 202:10
  255:8,13
  273:21,23
  275:10 276:12
  276:18 277:14
  278:2,5,10
  299:2,3 315:25
  325:10,25
**plan** 123:2
**platforms**
  330:19
**plausibility**
  53:12 54:4
  98:14 118:7
  121:12 141:18
  193:12 201:4
  202:9 242:6
  298:24 303:10
  326:20
**plausible**
  107:23 180:1
  224:4 225:11
  300:2 316:9
  317:2

**play** 132:20
  299:21 310:4
**playing** 298:25
**plays** 53:15
  270:16 307:18
  337:12,21
  358:12
**please** 11:18,21
  18:24 19:1
  28:14 41:8
  44:21 68:8 73:3
  91:18 100:14
  106:25 150:2
  172:1 204:24
  221:16 245:18
  251:10 252:16
  257:10 262:13
  263:10 298:14
  305:13 342:14
  349:10 365:21
  366:12 370:3,8
**plos1** 143:25
  151:1
**plot** 59:23
**plots** 55:12
  59:20
**point** 8:24 32:3
  73:16 92:22
  131:4,20 134:3
  169:17 191:18
  203:11 204:8
  205:11,20
  206:6,16,24
  211:2 220:13
  224:17 226:9
  250:15 330:23

348:22 351:9
353:16 354:8
362:8
**pointed** 35:5
  104:21 138:3
**pointing** 225:18
**points** 220:2,4
  223:10
**policies** 143:8
  170:21 336:11
**policy** 41:2
**polymorphisms**
  320:20
**pooled** 54:18
  59:3,3 154:13
  301:11,11
  337:18 338:7
  343:14 356:5
**poor** 292:1
**popped** 262:4
**population**
  320:22 322:20
  355:21
**populations**
  322:22
**port** 108:1
**portions** 99:21
**position** 170:8
  289:8 327:7
  332:24 363:12
**positioning**
  305:9 310:10
**positions** 51:5
**positive** 83:10
  174:15 250:12
  250:21,24

**[positive - pro]**                                                      Page 59

257:1 260:3,8
260:15 261:8,9
266:9,21,25
302:4 310:6
311:9 312:3
**possibility**
62:24
**possible**  10:11
107:23 157:12
201:12 202:21
214:12,16
287:12 299:18
**possibly**  238:3
239:20 240:13
302:6
**post**  94:4
**potential**  85:11
127:17 163:20
168:18,19
182:18 190:10
190:14,17
198:21 199:16
203:15 204:13
210:19 216:11
216:23 217:15
218:8,14 225:9
225:10,23
226:12 228:8
**potentially**
164:25 165:25
201:20 210:23
221:25 282:11
286:20 297:17
298:3
**powder**  1:4
80:25 118:20

118:25 119:12
119:15 221:1
228:11,23
229:2,6 230:11
230:17 231:20
232:14,21
233:8 249:2
250:13 275:13
**practice**  73:12
167:12 168:6
**practices**  1:5
**pre**  298:1
**precise**  39:20
85:18 352:15
366:23
**precision**
328:21
**predispose**
271:22 272:3
**predisposing**
271:25
**predisposition**
326:7
**prefer**  135:7
**pregnant**
129:23
**prep**  332:12
**preparation**
50:14 55:7 86:6
248:6
**prepare**  19:24
20:12 22:19,20
**prepared**  13:18
22:17
**preparing**
19:13 248:14

**preponderance**
268:24
**presence**
171:21 172:9
174:3,20
176:17 307:11
316:17 322:5,7
349:14 356:13
**present**  3:18
118:18 163:9
**presentation**
25:16
**presented**
44:25 211:22
**press**  329:13
**presumably**
185:23
**pretty**  30:18
36:6
**prevalence**
320:21
**previous**  113:1
119:7 203:4
296:5 298:22
**previously**  18:6
20:20 71:23
103:14 308:5
**primarily**
29:11 45:21
119:21 195:7
197:14 291:25
299:11 329:21
**primary**  25:8
141:8 178:10
188:15,16
207:22,23

213:2 216:9
218:4 222:23
228:12 325:19
**principal**
294:20
**principle**  359:6
359:10
**principles**
305:8
**print**  298:1
306:21
**printout**  265:1
**prior**  18:7
25:21 40:13
96:14,15 98:7
99:2,17 100:4
102:15,16
103:16 104:24
104:25 107:13
107:14 112:24
113:14,15
114:7 117:8
121:20 136:21
143:14 149:10
149:24 178:3
301:2 358:7
**prioritizing**
127:22
**private**  9:20
313:14 330:8
**privileged**
21:15 57:7
**pro**  158:10,12
158:22 159:13
159:25 160:6,8
160:11,15

**[pro - provide]**

Page 60

161:24 162:11
162:17,20,23
165:9 168:15
170:8
**probability**
321:16 349:23
**probably**  25:20
25:24 35:20
62:16 96:14
236:24
**problem**  99:2
126:3 332:7
**problems**  147:2
**procedural**
123:12
**procedure**
108:14 238:22
**procedures**
169:19 212:4
**proceeding**
15:15,17,18
47:11 48:4
**process**  7:2
9:18 63:8,19
65:11 71:17
73:22 86:9,17
108:5 132:13
135:4 145:17
148:15 150:18
156:10 183:17
202:21 214:12
214:18 235:20
238:13 239:18
240:10 304:24
329:11 333:14

**processed**
313:12
**processes**  188:9
216:21
**produced**  7:20
21:9 74:15
77:22 138:8
213:8
**produces**  50:7
**product**  21:13
121:13 127:12
128:4 210:4,7
211:24 263:15
**products**  1:5,6
3:11 185:25
263:8
**professional**
22:14
**professor**  24:22
**profile**  5:3
30:21
**profiles**  195:17
**profiling**
159:10 270:7
**prognosis**  202:2
202:14
**program**  29:12
313:18,23
**programs**
29:20 313:22
**progressing**
349:24
**progression**
53:13 94:16
191:12,19
201:5,8,18,22

201:24 203:15
203:20 204:4
204:12 205:2,4
205:8,22,24
206:14,19
216:10 270:12
287:4 303:3,22
307:23 316:8
330:1 348:10
349:14 359:20
361:5 362:18
**proinflammat...**
195:4
**project**  27:23
28:4 294:23
333:19
**projects**  27:4
**proliferation**
175:17
**prominent**
195:9
**promise**  135:18
**promotion**
313:18
**proof**  226:11
**proper**  106:7
108:13 153:1
162:10,19,22
163:1 179:9
181:24 182:5
182:24 215:20
346:15,17
**properly**  346:1
**properties**
178:1

**proportion**
175:19 317:23
**proportioned**
263:17
**proposition**
154:12
**propounded**
372:7
**protect**  272:5
**protective**
336:17,20
356:14,18,21
357:3
**protein**  158:25
159:7 166:4
330:10
**proteins**  159:2
**protocol**  65:6
**proud**  237:1
313:1
**prove**  198:6
210:25 214:9
222:8 325:2
**proven**  198:23
235:11 269:3
**proves**  225:19
**provide**  8:9 9:3
9:24 13:16 15:1
21:14,18,20
29:11 31:9 32:3
33:7 39:19
42:23 43:5 46:8
49:1,14 53:9
54:1,2,6 61:15
62:9 63:14 65:3
69:24 73:8

**[provide - question]**

75:21 81:9,15
85:7 98:10
106:13 109:3
119:14 122:5
123:8 132:7
138:1 143:17
149:3 159:23
171:6 178:14
198:3 201:3
210:5 268:25
289:12 295:19
299:22 308:23
316:4 349:12
353:2,25 354:6
**provided**  7:1,17
7:23 8:5,5
10:12 14:13
48:11 55:8,18
77:24,24 78:11
84:6 90:25
94:24 146:8
156:10 166:21
167:19 185:18
187:8 233:25
273:23 274:5
274:15 288:5
309:5 314:1
317:1 347:23
352:10,16
**provider**  39:4
**provides**  295:2
307:8 321:14
**providing**
49:11 132:10
313:3 334:7
335:17

**proving**  225:21
**provision**
130:13
**pten**  288:10,22
**public**  12:21
42:2,6 50:17
66:13 314:2,20
321:5 323:23
**publication**
31:8,14 38:1
39:10 109:17
143:14 241:21
294:22 295:8
300:20 301:1
324:19 332:21
**publications**
22:15 27:10
30:24 31:3 32:5
32:14 33:23
40:22 41:15
75:19 76:22
254:4 297:11
297:13,23
324:17 345:5
**publicly**  42:8
322:24 330:18
347:3
**published**  13:7
136:24 148:18
154:19 293:9
293:13,22
295:10,14,20
296:22,23,24
300:17 301:3
306:18 340:9
354:21 355:7

357:8,16 367:3
**pubmed**  61:3,4
61:5 69:10 90:1
90:4 92:11
296:6,8 297:4
**pull**  33:8 38:6
38:17,22 66:16
112:15 257:10
279:7 281:25
**pulled**  69:9
104:16 138:18
235:3 289:4
**pulling**  92:21
231:10 346:22
366:23
**pulls**  60:22
**punch**  317:9
352:6
**punched**  317:6
**punches**  349:1
**pure**  182:17
**purely**  182:11
200:18 323:18
**purpose**  124:14
197:5 209:3
210:7 218:24
**purposes**  8:18
21:11 210:4
213:8 215:17
**pursuit**  330:24
**pushing**  329:2
**put**  22:11 57:13
75:2,3 79:9
93:13 100:14
113:12 151:14
216:17 235:22

236:3,14
242:16,18
247:8 252:20
257:22 261:20
262:16,19
283:6,9 293:20
302:15 323:2,3
338:12,24
339:8 340:3,6
341:20
**puts**  49:19
113:4
**putting**  22:5
130:22 235:9
236:7 237:20
238:6 239:2
283:12 332:2
339:15,19

**q**

**qualification**
253:21
**quality**  272:17
273:2,4,6
**quantitative**
171:6
**question**  8:12
11:23 12:5
13:14 14:7,9,15
15:23 16:1
17:23 18:7,19
38:21 42:24
43:3,10 45:18
46:13 47:9,12
49:5,7 52:13,14
60:1 63:2 68:10

| | | questionable | quoted 337:20 |
|---|---|---|---|
| 70:1 71:5 72:4 | 174:13,18 | 273:4 | quotes 309:8 |
| 77:3,18,25 | 175:9 176:2,3 | questioned | quoting 302:2 |
| 78:12,17 81:14 | 176:12 177:9 | 97:19 116:4 | 303:19 307:8 |
| 82:3 85:7 91:12 | 177:14 178:10 | 298:6 | 311:16 320:3 |
| 93:3 98:20,25 | 179:12,14,16 | questions 5:18 | 358:10 |
| 99:17 103:14 | 179:17 182:23 | 15:21 38:16 | **r** |
| 105:2,7 107:12 | 183:1,19,25 | 49:11 81:17 | r 242:24 283:21 |
| 107:15,18 | 185:4 186:1,3 | 91:19 92:18 | 308:9 371:1,1 |
| 109:21 111:20 | 187:13,17 | 93:16 110:3 | rad51 286:1,2 |
| 112:6 114:11 | 189:3,5,8,14 | 119:6 123:6,6 | radiation |
| 114:16,18,20 | 196:12,24 | 141:15 152:3 | 227:14 |
| 114:25 115:5 | 204:8,22 205:1 | 153:4,7,18 | ran 248:13 |
| 115:11,12,17 | 205:17,18 | 155:6 182:22 | randomized |
| 116:2,22,23 | 206:4,21 208:3 | 204:19 238:20 | 309:19,22 |
| 117:25 118:4 | 209:12,16 | 241:5,8 244:20 | range 35:20 |
| 118:12 120:25 | 213:3 221:16 | 245:1,8 293:4,5 | 271:22,25 |
| 124:9 125:23 | 225:5,6 230:8,9 | 293:7 300:7 | 272:1,2 277:4 |
| 126:2 129:9 | 231:4,15 232:9 | 303:24 304:7 | ranging 101:20 |
| 131:2,4,18 | 232:11 235:16 | 306:1 308:20 | 103:21 253:25 |
| 133:7 134:12 | 241:17,19 | 312:17 314:24 | 254:10 |
| 135:9 136:2,14 | 244:19,23 | 315:1 318:24 | rapid 227:12,13 |
| 136:21 138:22 | 245:5,6,10,14 | 330:3 340:20 | 314:8 |
| 142:2 145:13 | 245:16,17 | 341:2,22 354:9 | rapidly 224:1 |
| 147:15 148:2,5 | 251:10 271:24 | 354:25 358:18 | rare 295:5 |
| 149:6,9,15 | 274:22 281:13 | 358:24 360:5,9 | rate 243:2 |
| 150:6 151:23 | 281:14 282:4 | 362:23 363:4 | 349:18 |
| 152:4,7 153:8 | 289:6 301:4 | 368:17 372:7 | rather 32:7 |
| 153:12,22,23 | 307:2 309:4 | quite 12:16 | 87:25 140:10 |
| 155:4,15 | 311:6 315:5,7,8 | 45:21 97:21 | 230:3 296:2 |
| 156:14,15 | 315:14,17 | 145:19 304:17 | 320:24 332:22 |
| 159:17 160:1 | 318:7 319:12 | 310:8 313:1 | ratio 175:17 |
| 161:11,15,22 | 325:24 327:1 | 351:1,22 | 259:5 265:4,8 |
| 162:15 164:20 | 337:22 345:17 | quote 357:2 | 266:6 311:18 |
| 164:20 172:1,6 | 345:17,18 | 367:9,16 | 311:23 |
| 172:19,21 | 350:3 353:5,10 | 368:16 | |
| 173:2,20,21 | 356:4 366:2 | | |

**[raw - recently]**

Page 63

| | | | |
|---|---|---|---|
| **raw** 181:10 | 175:16 176:11 | 162:24 175:14 | 97:19,23 115:9 |
| **reach** 217:1 | 177:15 179:4 | 201:5 223:22 | 115:12,14,24 |
| **reached** 42:15 | 222:18,20 | 224:4 225:11 | 115:25 116:4,7 |
| 42:18 117:11 | 228:14 243:10 | 247:25 329:25 | 116:7 131:11 |
| **reaching** 94:6 | 252:16 304:14 | 370:5 371:6,8 | 131:16 154:3,6 |
| 299:7 301:15 | 320:18 337:14 | 371:10,12,14 | 154:8 173:20 |
| 308:16 | 337:24 338:10 | 371:16,18,20 | 182:14,15 |
| **reaction** 184:1 | 366:10 | 371:22,24 | 199:23 206:8 |
| **reactive** 165:24 | **readout** 163:21 | **reasonable** | 223:19 244:4 |
| **read** 57:18,20 | 195:7 | 45:6 164:1 | 251:19,25 |
| 57:23 58:21 | **ready** 28:20 | 165:20 233:4 | 252:3 257:11 |
| 80:20,24 83:1,4 | 319:8 | 233:12 298:11 | 275:19,21,23 |
| 85:16 86:22 | **real** 286:13 | 324:13 | 275:25 276:6,9 |
| 92:5 96:7,19,22 | **reality** 325:25 | **reasonably** | 277:21 282:1 |
| 97:5 103:20 | **realize** 57:14 | 70:7 160:7 | 289:22 302:12 |
| 138:25 139:16 | 231:10 | 197:6 199:6 | 306:1 309:9 |
| 144:10 152:14 | **really** 77:16 | 213:17 214:16 | 315:13 318:13 |
| 152:18 161:20 | 81:23 146:2 | 322:25 | 319:5 358:24 |
| 170:22 172:4 | 156:13 215:19 | **reasoning** | 359:4 365:10 |
| 226:16 227:23 | 223:24 240:16 | 223:23 246:17 | 365:18,23 |
| 239:21,23 | 264:24 314:16 | 246:19 247:19 | 366:5 367:2,14 |
| 242:8 243:19 | 361:22 | **reasons** 169:12 | 367:22,23 |
| 244:2 248:4,7 | **realtime** 1:20 | 324:23 | 368:1,2,8,13,14 |
| 248:15 250:1 | 1:21 110:4 | **recall** 13:21 | **recalls** 38:21 |
| 261:12 263:5 | 115:3,7 155:5 | 15:7,11 16:13 | 153:24 |
| 265:1 370:3 | 162:3 321:15 | 38:18 41:19 | **receipt** 370:15 |
| 372:4 | 369:25 | 47:20,22 48:13 | **received** 10:5 |
| **readability** | **rearrangement** | 48:19 51:18 | 79:17 146:18 |
| 101:23 | 287:17 | 52:6 55:13 | 147:1 283:21 |
| **readers** 215:8 | **rearrangements** | 58:25 80:18 | **recent** 14:5 |
| **reading** 15:7 | 284:10 285:5 | 82:2,25 83:5 | 56:10 61:14 |
| 84:11 85:10 | **reason** 35:2 | 84:11,23 85:10 | 70:9 74:14 |
| 86:7 92:4 | 102:2 117:12 | 89:10 90:3 | 154:12 247:10 |
| 107:19 108:1,2 | 117:18,21 | 93:19,21 94:25 | 305:23 |
| 108:5 137:12 | 136:5,8 157:13 | 95:2,3,19,21 | **recently** 86:21 |
| 139:13 167:5 | 157:24 162:21 | 96:9,15,19 97:6 | 88:2 248:10 |

**[recess - relationship]**

**recess** 74:2
129:1 137:21
161:18 193:4
247:1 292:23
**recognize** 76:8
76:12,13 231:1
**recollection**
38:23,25 49:24
170:2 207:14
247:10 262:3
313:16,25
368:3
**recombination**
290:9
**record** 11:16
28:18 107:11
137:20 147:22
160:22 161:20
172:4 193:2
237:2 239:23
246:24 264:5
264:11 274:16
293:16 302:15
310:22 318:20
339:13 343:8
368:19
**recorded**
369:13
**records** 7:17
9:22 20:17
273:21 282:19
297:16 319:1
325:9
**recurrent**
191:17

**red** 75:13
**redline** 100:11
100:12
**reduce** 154:14
**refer** 190:16
**reference** 45:5
50:2 54:12 58:4
66:16 81:5,8,20
84:9,17,24 85:1
85:8,17 92:17
92:24 99:15
132:17 133:22
139:19 140:7,9
184:23 199:22
246:6,9 253:22
254:11 268:19
296:9 297:5
303:11 305:4
305:16 306:7,8
306:16 308:24
311:15 337:1,3
337:8 342:8
353:14 355:15
364:16
**referenced**
12:1 57:9 66:19
71:23 86:7 87:4
87:11 88:5
139:17 140:14
142:9 210:14
246:4 247:21
247:24 250:11
312:21 321:3
**references**
55:16 61:14
62:1 78:14

86:25 93:9
134:1 141:1
247:24 254:1
289:18 296:15
296:22 332:13
337:6 353:25
354:3 359:2
**referred** 78:25
368:4
**referring** 15:18
30:4 50:12 89:8
172:16 174:13
265:6 274:9
289:24 358:6
363:23 365:7
365:21
**refers** 144:4
245:11
**refresh** 29:25
38:22 49:23
207:13 262:2
**refreshes** 247:9
**refused** 49:14
**refusing** 48:25
81:9,15
**refute** 97:7
146:14 230:20
**refutes** 120:12
**regard** 305:17
**regarding**
41:20,22,24
46:18 51:19
203:14 302:25
306:5 309:21
311:13

**regardless**
105:21 130:18
183:18 307:10
**regards** 28:3
**region** 292:1
**regular** 224:11
**regularly** 312:4
**regulated** 159:8
**regulation**
190:25 192:4
**regulatory**
158:23 163:13
**reilly** 3:12
**rejected** 143:13
143:19
**relatable**
352:13
**relate** 155:8
305:8
**related** 47:12
98:12 155:15
156:1 166:23
167:21 203:2
204:11 205:9
205:22 303:7
325:13 364:10
**relates** 70:3
205:13 248:2
258:25 301:23
326:23 327:9
**relation** 69:5
70:12 319:14
**relationship**
29:15 30:3
98:15 229:1
255:13 270:9

[relationships - report]                                                            Page 65

**relationships**
26:19
**relative** 23:17
53:11 118:16
122:1,7 127:20
127:21 129:13
129:17 180:25
200:5 211:3
280:11 287:1
310:9 316:19
317:23 326:23
336:13
**relatively** 224:8
310:2
**relatives** 280:3
318:15
**released** 330:18
**releases** 314:15
**relevance**
308:10 319:13
320:16
**relevant** 68:20
68:24 156:12
170:9 192:19
200:3,22 201:1
201:10,15
203:6 204:5
269:21 283:25
286:18,23
287:1 303:9,21
329:25
**reliability**
240:17 329:3
**reliable** 142:22
**reliance** 89:18
96:17 247:6,11

261:17
**relied** 343:18
**relies** 145:20
203:13
**relocating**
25:21
**relook** 149:6
**rely** 145:23
**relying** 241:22
350:13,14
**remain** 174:14
288:25
**remainder**
131:15
**remains** 192:10
270:8 272:9
310:5
**remember**
16:25 38:13
83:8 96:10
128:21 161:10
163:11 193:20
194:5 329:15
366:16
**remembered**
366:14
**remind** 136:9
151:12 152:13
193:18 277:20
286:24
**remit** 302:23
**remote** 2:6,12
2:18 3:5,6,7,12
3:13,19 218:18
**removed**
333:24

**renal** 190:11
**repair** 101:2,3
101:5 102:20
130:16,17
290:6,10 320:5
349:16 359:16
**repeat** 86:16
109:23 115:5
221:16
**repeating**
171:25
**repeats** 290:18
**replicate**
151:10,20
214:19
**report** 4:11,13
5:4 6:24,25
7:10,12,16 8:10
8:20,20 9:13
12:2,6,15,18,19
13:18 15:12,13
21:3 22:1 45:13
45:20 52:11
53:8,22,25 54:1
54:11 55:5,7,8
55:11,14,20,21
55:22 57:10,14
58:9 59:7,8,24
60:2 61:17 62:3
66:20,22 67:14
71:2 79:18 82:8
82:12,20 86:18
86:20,21 88:5
90:10,13,18
94:4 97:2,3,20
98:3,4,8,10,16

99:1,2,8,21
100:4,11
101:11,20,23
102:15 103:19
104:6,7,24
106:16,22,24
107:5,14 109:1
109:9,10,16
112:24 113:14
113:23 115:10
115:16,16,20
115:20 116:5,6
116:12,12,20
117:14,20
118:9 119:3,8
120:12,20
121:6,8,24,25
122:15,21
123:4,8,15,21
124:2,20,25
125:2,4,8,20
127:12 129:12
136:6 137:14
138:20,21
139:17 140:6
140:15 142:9
152:24 154:11
154:25 155:4
155:11,17,25
156:4 157:2
158:7 166:13
193:8,8,10,18
195:8 199:21
203:4,5 220:6
242:2,3,10
244:3,7,24

[report - response]                                                      Page 66

245:11,22,25
246:5,7,9
247:24 249:5
255:7 256:18
258:1,14,19,22
260:4,5,7
276:23 277:2,6
277:20,24
282:1,14,23
288:8 289:3,23
296:20 298:14
298:20,23
300:13 302:10
302:22 303:11
303:24 304:2,4
304:11,11
305:13 310:13
311:13 316:3
319:1 326:21
339:20 340:4
340:14,19
341:4,12 342:9
342:20 343:3,5
343:18,19,21
343:24,25
344:6 345:6
346:24 350:4,5
355:3,6 356:25
357:3 367:4
**reported**   1:18
171:20 172:8
174:2,19
176:16 220:11
220:16 222:25
256:22 268:15
277:2 288:15

**reporter**   1:21
109:23 166:1,3
172:3 369:4
**reporter's**
369:1
**reporting**   268:2
**reports**   7:3,19
13:24 14:12,17
15:8 17:24
18:20 44:1,4,8
44:12,16,19,22
45:1,11,17 46:8
46:16,17,22
47:12,17 48:3
83:24 86:8,11
97:7,16 109:12
110:7,14 114:4
117:5 119:20
119:24 120:19
122:10
**repository**
321:11 323:14
**represent**   146:4
146:5
**representation**
230:5 231:5
**represented**
34:23
**representing**
40:18,21
109:11
**reproductive**
143:24 150:23
**request**   12:3
49:25 109:2
120:15,16

122:4,22 145:5
299:20 304:11
**requested**
42:22 48:23
346:6
**requests**   61:15
**require**   222:6
227:19
**requirement**
170:19 284:23
**reread**   115:13
**rereading**
129:9 155:4
**research**   50:15
78:7 88:16,19
89:12,23 90:2
94:13,13
129:25 152:15
152:19 155:1,3
155:11,24
156:18 157:1
163:12 164:2,7
169:10 170:10
203:14 205:22
251:23 255:25
256:20 258:12
292:3 294:20
295:13 316:14
327:14
**researched**
154:6 209:24
213:21
**researcher**
203:13 204:10
205:21 206:18
360:19 362:22

363:8,8
**researchers**
26:17 164:6
192:12 270:17
270:21 271:7
323:7 331:3
357:25 358:1
360:15 361:16
362:9,16
**residual**   330:6
**resolution**
329:4 330:21
**resonance**
293:12
**resource**
321:15 322:25
323:24 325:6
**resources**
304:23 305:11
328:2
**respect**   51:8
67:10 71:4
120:22 274:1
291:24 298:23
**respected**
143:10
**respond**   46:9
116:23 153:6
178:5 245:5,8
**responded**
353:10
**responding**
46:16
**responds**   97:2,4
**response**   7:22
68:12 136:16

**[response - richard]**                                                    Page 67

| | | | |
|---|---|---|---|
| 160:5 196:10 | **retained**  42:12 | 148:19 149:2 | 273:22,25 |
| 196:13 259:8 | **retire**  95:14 | 150:15,18 | 276:9 298:2 |
| 340:19 341:1 | **retired**  167:14 | 151:12,16 | 299:10 304:24 |
| **responses** | **retread**  8:23 | 170:1 171:5 | 334:11 |
| 180:2 | **return**  328:10 | 178:7 201:11 | **reviewer** |
| **responsibilities** | 370:13 | 202:23 227:6 | 144:14 150:20 |
| 26:13,21 | **revealed** | 233:22 235:20 | 150:23 151:1 |
| **responsive** | 291:12 | 242:1 249:23 | **reviewers** |
| 21:14 119:24 | **review**  10:9 | 254:15 257:12 | 146:3 150:12 |
| **rest**  315:24 | 12:9 19:13,19 | 258:16 261:1 | 215:9 233:14 |
| **restating** | 21:7,10 30:21 | 262:13 275:18 | 233:23 |
| 161:13 | 35:11 36:19 | 276:23 277:5 | **reviewing**  13:9 |
| **result**  174:10 | 37:5,6 38:6 | 277:11 279:13 | 58:6 63:19 |
| 176:11 195:15 | 39:18 41:16 | 299:10,12,19 | 65:14,18 66:8 |
| 202:13 290:6 | 44:3 45:8 49:1 | 299:25 300:9,9 | 71:9 82:20 |
| 300:3 320:15 | 51:1 52:4 54:1 | 300:15 301:6 | 103:24 114:7 |
| 357:16 | 54:13,23 55:14 | 302:25 304:12 | 186:18 240:17 |
| **resulting** | 55:15 58:1 | 324:1,18 325:9 | 304:13 |
| 270:12 | 59:14,16 60:18 | 367:4 368:5 | **reviews**  144:20 |
| **results**  54:7 | 62:8,10,12 63:6 | **reviewed**  8:24 | 150:14 |
| 158:24 174:16 | 63:7,10,24 64:4 | 9:4,17,19 13:23 | **revised**  99:20 |
| 175:2,16 176:6 | 64:11,13,19 | 14:11,16 17:24 | 106:9 234:8 |
| 179:5 196:16 | 65:1,5,7 66:2 | 19:7 30:24 | **revising**  104:7 |
| 197:12 211:7 | 66:25 67:2,7,15 | 32:13 41:3 | **revision**  148:16 |
| 212:24 213:16 | 67:19 68:5,10 | 45:15 46:15 | 333:22 |
| 220:6,17 | 68:13,14,19,20 | 47:11,18 65:19 | **revisions**  108:3 |
| 238:12 239:17 | 69:19 71:9,14 | 65:21 66:4 | 333:23 |
| 240:9,18 | 72:9,19 73:7,17 | 68:23 69:8 77:4 | **revolution** |
| 268:11 274:3,6 | 83:14 86:9,9 | 87:10 88:2 | 314:8 |
| 274:8 275:20 | 87:2 94:4 98:11 | 90:22 91:9 | **rewarding** |
| 280:25 281:5 | 104:13 105:9 | 104:20 143:22 | 329:1,14 |
| 288:5 301:5,10 | 107:19 109:2 | 144:3 145:4 | **rgolomb**  2:18 |
| 302:3 311:17 | 119:20,23 | 146:18 164:12 | **rich**  163:24 |
| 319:4 320:4 | 120:3 122:4,8 | 208:22,24 | 216:16 349:12 |
| 323:18 328:10 | 143:1 144:9 | 234:14 242:9 | **richard**  2:18 |
| | 145:2 147:13 | 248:5 273:20 | |

**[right - saying]**

**right**  6:17
  16:15 18:2
  33:14 35:7
  37:19 46:1,5
  61:19,20 62:8
  63:4 78:19 80:2
  83:8,22 144:23
  153:17 154:16
  169:3 193:1
  195:23 196:7
  197:1 199:19
  206:25 208:17
  210:10 215:15
  228:7 235:1,6
  235:23 236:9
  236:14 237:5
  242:17 247:15
  249:24 250:25
  252:20,21
  255:25 257:25
  263:2 265:14
  266:13,22
  275:3 279:9
  283:12 286:5
  286:16,19
  287:12 288:9
  288:14 289:21
  291:9,13,16,20
  294:18 317:13
  338:12 341:5
  363:15
**rightly**  231:1
**rigor**  241:15
**rigorous**  216:5
**rise**  317:23
  349:18

**risk**  53:11
  56:12 81:1
  122:1 127:20
  129:17 130:3
  154:15,20
  157:15,21
  249:15 259:25
  268:5 269:1
  281:9,16 282:7
  284:21 287:22
  288:14,18
  291:16,19
  292:11 303:7
  305:24 306:24
  307:10,11,23
  313:7 316:14
  316:19 317:19
  317:20,24
  325:14 326:14
  326:23 339:4
  340:12 348:18
  350:23 351:7
  351:13,17,19
  354:19 357:11
  358:15,22
**risks**  338:23
**rls**  1:4
**rmh**  3:13,14
**rna**  36:21,25
  158:24 295:11
  295:13,23
**rnacc**  37:23
**rnas**  39:6 159:5
  159:7
**rodriguez**
  292:7

**rojas**  292:7
**role**  34:10
  132:20 270:16
  298:25 299:21
  302:25 303:3
  303:15 307:19
  329:23 331:24
  337:12,21
  348:9 358:12
**roles**  201:8
**rolling**  317:4
**room**  16:8 20:3
  41:7 82:19
**root**  273:13
**rose**  312:5
**rothman**  89:20
  89:21,22 91:4
  91:24
**roughly**  20:15
  62:4 163:9,10
  219:22 294:6
  333:6
**routinely**
  151:24 171:7
**row**  265:6
**rows**  264:17
**rpr**  1:21 369:24
**rs**  89:17
**rule**  4:11,13
  21:17 55:22
  287:9,24
**rules**  8:13
  21:22 238:21
  238:21
**run**  248:14
  309:22 327:14

**ruo**  210:4

**s**

**s**  295:9 371:1
**s3**  175:21
**s4**  4:24 262:16
  263:13,20
  264:2
**saed**  88:20,23
**sales**  1:5
**sample**  184:24
  185:8
**samples**  27:3
**san**  1:16 6:2
  25:22,25
**sandler**  87:20
**sat**  329:1
**satisfies**  284:23
**saturday**  10:6
  79:21,23 80:5,6
  80:17 247:6
**saved**  74:6,11
**saw**  19:18
  85:17 96:9
  219:20 233:23
  235:12
**saying**  60:18
  108:24 124:8
  135:15 146:19
  157:20 162:18
  167:18 170:17
  178:17 181:22
  192:18 212:1
  222:2 230:21
  231:14 244:6
  251:25 254:5

**[saying - see]**                                        Page 69

270:21 342:15
346:21
**says**  30:22 92:1
138:23 162:25
166:20 169:18
169:20 170:14
209:2 244:25
249:12 283:17
302:3 337:18
338:7 339:22
**scale**  320:1
351:18
**scholar**  61:4
**science**  103:23
146:19 147:3
147:10,16
148:6,15,22
269:5,10
344:11 350:13
**sciences**  25:4
150:23 255:3
**scientific**  8:9
9:3,12 10:3,13
11:1,25 12:3
13:2,5,17 26:25
44:9 46:1,5
50:22 52:5
55:18 63:10
65:12 71:21
73:7,18 90:13
90:14,21 92:2
105:13 108:14
108:15 109:17
110:8,17 111:6
111:16,19,25
112:9 130:6

131:5,21
141:20 143:25
203:12 204:9
214:20 215:5
217:7 223:12
229:12 241:1
289:1,7 305:4,8
315:10 329:24
345:8 346:16
347:14 348:1
348:22,23
350:12 351:25
352:14,20,22
352:23 353:8
353:17 359:2
**scientist**  45:24
46:4 133:1,7
142:13 226:17
229:12
**scientists**  88:10
143:24 216:3
255:24 256:4
313:21
**score**  309:16
310:7 326:7
**scores**  303:7
**screen**  75:2
79:10 87:8
100:14 109:25
110:2 185:16
242:19 257:22
262:17 264:1
279:3,10 280:5
318:10 341:21
342:10 361:18
361:20

**search**  50:22
59:1 60:20
61:13 63:17
69:10 72:14
86:3,4,12 90:4
94:3,5,9 200:3
257:13 261:2
296:5
**searched**  61:3
**searches**  52:5
74:6,10 156:9
202:24 333:16
**searching**
65:23 67:12
92:11 260:18
260:20 303:4
**second**  75:23
103:10 104:7
107:12 194:2
236:18 253:7
264:20,21
278:25 280:2
296:17 305:15
305:18,18
306:7 357:22
**secondarily**
299:11
**secondary**  25:9
223:3
**section**  9:19
138:21 155:11
176:7 197:20
355:17
**sectioned**
222:19

**sections**  13:11
34:12 221:10
276:25 277:12
**see**  14:14,25
29:9 33:2,6,11
33:16,21 48:24
49:14,23 50:11
56:15,16 59:13
64:18 75:19
76:7 81:5,8,10
81:20,21 82:19
84:16 85:1,5,21
87:7 89:22
93:11 95:16
96:5 97:10
99:20 101:8,9
109:24 116:9
138:23 154:16
154:17 162:2
166:19,24
182:20 185:19
193:14 220:16
222:16 224:3
234:15 243:1,8
243:9,15,16
246:1 249:9,17
257:3 261:11
263:18 282:19
283:17 290:17
294:5,9 305:17
309:15 310:17
310:20 322:14
323:3 324:1
332:3 338:9
345:12 349:18
354:22 355:14

355:24 356:1
361:7 364:16
367:2
**seeing**  52:6
62:24 76:22
97:6 115:10
131:16 141:13
182:15 208:15
247:7 262:2
264:1 303:4
**seeks**  116:24
**seem**  176:12
226:5
**seen**  60:14 85:6
86:14 126:15
170:5,13,18,18
199:17,18
206:9 223:11
261:16 262:3,6
262:7 270:20
271:1
**selection**  77:9
**self**  256:22
268:15 359:13
**sell**  115:6
168:16
**semantics**
218:13 351:21
**sending**  237:9
237:13
**sense**  86:14
120:18 253:21
**sensitive**  212:2
**sensitivity**
166:9

**sent**  235:5
**sentence**  43:18
101:3 102:3,5,5
102:12,19
108:16,17
110:17,23
112:11,12
154:17 194:8
194:10 229:13
229:17 230:1,4
249:12 252:4
258:10 337:16
337:17 338:6
338:10 344:20
346:22 347:2
347:11,12
**sentences**  99:3
99:24 104:2,15
104:22 105:14
105:19 113:19
117:14,22
258:4,9 288:20
304:8,21
311:12 347:13
366:24
**separate**
100:19 121:9
121:16 127:6,7
139:21,23
140:1,4,8 188:9
194:13 241:9
**separated**
322:18
**separately**  54:6
**separation**
122:5

**sequences**
314:15
**sequencing**
25:16 39:5
195:18 197:18
273:6,12,16
322:16 323:9
324:7 325:22
325:22 329:8
332:12,16
**series**  312:16
312:25 318:24
358:17
**serous**  301:24
302:5
**served**  166:20
167:18
**services**  332:14
335:11
**set**  8:21 64:6,10
122:14 123:3
217:12 240:18
241:3 351:6
369:9
**setting**  167:13
219:14,16
355:17
**seven**  128:23,25
277:3,4,10
**several**  60:21
335:20 343:17
**severe**  227:14
**severity**  201:18
**sgo**  52:17
**share**  79:9
318:10

**shaving**  267:3
**shawn**  1:13 4:3
4:11,14 6:5
30:6,12 55:23
372:3,13
**sheet**  208:19,23
208:25 209:2
211:23 318:9
370:6,9,11,14
372:10
**short**  193:2
225:3,13
292:20 310:2
**shorten**  119:17
126:25 128:7
**shorter**  15:4
227:20
**shorthand**
369:3,15
**show**  20:19
49:8 84:8 87:8
132:22 134:13
140:17 142:3
144:9 175:17
180:7,12
196:20 209:10
209:20,21
211:2 213:22
214:7 218:22
221:23 222:3
231:12 264:24
266:21 318:10
**showed**  177:5
318:12
**showing**  209:3
215:18 226:23

**[shown - somebody]**

**shown** 133:1,7
133:10,15,16
133:18 135:10
135:20 141:20
142:14 147:18
148:9 175:20
213:15,16
223:4 228:9
342:9 361:12
**shows** 142:18
230:13 232:1
263:13 266:23
267:3
**shukla** 133:25
**side** 167:2,23
168:15,16,17
170:15 171:11
329:2
**sided** 46:4
**sides** 169:2,6
**sign** 370:8
**signature**
369:22
**significance**
95:15 266:12
288:10,24
321:12,14,25
322:20,21
**significant**
127:23,23
171:2 232:2
259:2,6,20,24
260:9,15
265:10,14,25
266:4,5,17
267:4,8,23

268:5 307:19
322:3 324:24
346:10,23
**significantly**
171:22 172:10
174:4,21
176:18,23
**signing** 370:10
**similar** 72:24
97:21 98:9
111:3 112:13
135:2 165:4
193:16 198:4
271:2 295:25
304:21 305:10
332:9,18
344:10,15,22
345:13,15
**similarities**
116:5
**similarly**
131:20
**simple** 104:5
105:14 174:17
176:7 186:3
198:23,24
305:9 316:22
329:23 330:2
**simply** 166:1
309:18 312:9
322:7
**simultaneously**
11:15 28:17
**single** 37:8
62:24 198:24
203:11 204:9

205:11,20
253:22 254:11
263:15 270:1
274:7 285:3
287:17 304:7
320:19 323:21
344:20 346:22
347:2 366:24
**singular** 304:21
**sir** 10:24 14:10
17:12,16
136:17
**sister** 262:8
268:19
**site** 197:25
217:10 218:5
218:18 294:11
**sites** 51:20
290:18,20
**sitting** 10:2
38:13 93:19
106:18 107:8
271:21
**situation**
169:13 332:18
**six** 36:24 77:4
78:1 89:23
96:22,25
219:21,21
220:8,23 221:3
222:12 223:2
273:21,23
274:5 276:12
276:14 277:3
278:2,5 280:5
299:2,3 315:25

325:10 326:12
**size** 294:7
**skadden** 3:4
**skadden.com**
3:5,6,7
**skin** 190:13
**slate** 3:4
**slides** 45:23
277:12
**slow** 190:9
**small** 180:14
239:17 240:9
250:21,24
290:18
**smith** 56:14
57:15 328:16
**smoked** 275:17
**smoking** 275:19
280:12
**snowball**
130:22,25
317:4
**snowballs**
347:24
**snp** 323:8
**social** 313:19
**society** 51:7,7
52:16
**socioeconomic**
272:23
**soft** 210:15
211:14 212:3
**solely** 237:23
**somatic** 291:5
**somebody**
40:18 100:22

**[somebody - specifically]**                                                    Page 72

| | | | |
|---|---|---|---|
| 113:4 202:14 | **sound** 48:10 | 109:1 111:22 | **specifically** |
| 272:1 | 89:5 | 112:11 113:18 | 12:9 20:10 24:8 |
| **somewhat** | **sounded** 192:22 | 115:24 116:8 | 24:15 25:14 |
| 200:1 254:12 | **sounds** 22:8 | 117:21 121:9 | 27:14 38:4 |
| 327:13 | 59:5 88:24 | 122:22 132:18 | 41:17 44:2 |
| **soon** 322:18 | 351:20 | 136:8 137:9 | 46:13 47:21 |
| **sophistication** | **source** 112:10 | 149:7 153:4 | 51:15 52:9 |
| 216:14 | 112:17 130:18 | 155:7 158:16 | 60:25 67:11 |
| **sorry** 7:9 9:9 | 182:12 185:25 | 159:9,17 162:7 | 74:9 76:18 88:3 |
| 10:24 11:4 14:1 | 186:16 | 162:16 175:2 | 88:14 90:7 |
| 14:9,15,21,21 | **sources** 98:18 | 176:10 182:16 | 97:15 100:7 |
| 22:18 35:1 | 107:20,22,25 | 184:13,17 | 103:22 104:17 |
| 37:10 48:15 | 112:15 130:19 | 185:5,8,13 | 109:6 115:22 |
| 56:5 61:23 | 187:8 299:12 | 186:6,19,23 | 118:5,16 |
| 79:13 96:2 | 304:15 346:17 | 187:15,19 | 120:11 121:25 |
| 100:21 118:24 | **southeast** | 189:22 192:6 | 127:6,7,14 |
| 118:25 133:6 | 313:10 328:18 | 196:19 197:9 | 135:14 141:4 |
| 140:12 157:19 | **space** 71:22 | 203:8 221:11 | 155:8 156:5,6,7 |
| 173:8 177:19 | 164:3 192:10 | 223:8,9 233:24 | 159:6 164:12 |
| 184:16 185:10 | 219:3 312:13 | 247:19,25 | 179:23 187:6 |
| 207:17 209:12 | 312:14 314:18 | 252:3 269:2 | 187:10,11 |
| 212:18 225:16 | 324:25 370:6 | 284:7,9,20 | 197:7 208:21 |
| 226:2 234:3 | **speak** 126:20 | 288:12,16 | 209:7 210:1 |
| 236:12 250:7 | **speaking** 11:15 | 290:6,15 | 227:5 244:4 |
| 250:22 252:14 | 28:17 149:3 | 291:25 292:12 | 246:6 254:20 |
| 253:5,10 | 177:11 | 297:3 298:19 | 257:9 260:18 |
| 255:19 271:24 | **species** 165:24 | 299:23 305:6 | 264:17 293:8 |
| 274:12 276:3 | 166:6 | 308:20 314:6 | 299:25 300:12 |
| 279:4 285:22 | **specific** 10:16 | 315:25 316:5,6 | 301:20 303:14 |
| 302:10 337:14 | 13:10 20:18 | 319:22 323:15 | 304:19 308:8 |
| 340:5 356:1 | 26:12,21 32:10 | 330:15 347:5 | 310:14 315:9 |
| 357:1 363:16 | 51:18 54:8 | 348:14 350:21 | 318:23,25 |
| **sort** 83:16 | 55:18 65:6,15 | 351:1 353:13 | 319:16,19 |
| 115:19 126:24 | 68:9,15 72:13 | 359:2 360:10 | 320:9,19 |
| 127:25 | 73:8 85:20 94:9 | 360:21 362:14 | 328:20 355:2 |
| | 100:7 104:14 | 368:15 | 358:21 |

**specificity**
67:13 189:13
**specifics** 315:2
**spectrum**
330:11
**spend** 171:1
**spirit** 148:18
150:18 202:22
315:4
**spoken** 42:2
**spontaneous**
291:6
**spot** 175:5
**springer** 95:15
**stability** 290:17
290:19,19
**stable** 166:8
212:1
**staining** 222:12
222:15 223:1
237:23
**stand** 19:20
57:23
**standalone**
210:25
**standard** 73:11
145:5 168:6
173:18,19
299:9 327:13
360:25
**standards**
109:15 110:6
110:14
**standing**
210:16 312:24
359:9

**standpoint**
198:4 359:21
362:20
**stands** 94:25
241:6
**start** 11:11
141:16 150:8
225:19 274:22
**started** 23:1,4
248:13
**starting** 63:18
250:18
**starts** 149:18
229:17
**state** 27:15
104:4 109:11
158:10,12
159:9,14 160:6
160:11,16
161:16,24
162:11,20
164:23 165:6
166:4 177:25
184:25 194:9
214:10 252:6
313:8 316:20
320:1 351:2,5
370:5
**stated** 71:19
98:22 139:22
193:17 209:7
213:10 242:3
251:22 255:15
256:6 260:3,7
288:25 301:1
308:13 309:18

316:3 320:5
335:16 345:16
365:1 367:19
**statement**
51:19 52:17
58:4 109:5
167:7 168:5
182:3 246:16
246:17,20
253:16,23,25
254:10,17
272:12,24,25
277:7 345:20
345:21 349:20
**statements** 42:6
52:24 53:3
150:13 271:3
272:21 288:25
289:2
**states** 1:1 24:21
41:2 50:17
159:11,25
165:9 170:6,10
194:8 197:7
251:1 329:7
369:4
**stating** 251:19
270:25 346:25
360:18 361:9
**statistical** 95:14
266:11
**statistically**
259:1,6,19,24
260:9,14 265:9
265:13,25
266:3,5,17

267:4,8,23
268:5
**status** 163:13
163:21 272:23
275:19 319:4
319:23 326:18
**statuses** 131:13
**stays** 329:22
**stenographer**
160:21 161:21
172:5 239:24
331:9
**stenographic...**
1:18 369:13
**step** 317:19
350:22
**steps** 64:18,25
65:4 72:8 117:3
**steroidal**
336:24
**stones** 325:24
**stood** 58:22
**stop** 11:20
23:12 91:18
107:1
**stopping** 226:6
274:20
**stops** 149:17
**store** 256:22
310:15
**straight** 101:13
**straighten**
354:25
**strategy** 329:24
**street** 2:7,13,19
168:13

**[stress - sufficient]**

Page 74

stress  164:24
strictly  284:11
strong  228:25
  278:14,22
  279:21 321:20
  321:24
strongly  283:25
  326:10
structural
  285:5
structure
  320:23
structures
  121:11 199:7
student  40:7
  105:18,21
  106:5 347:10
students  29:23
  29:24
studied  188:13
studies  27:7
  53:23 54:10,15
  54:19 55:4,13
  55:17 59:4 66:3
  70:8,10 77:4
  78:1 87:18,19
  88:8 131:10,12
  131:14,16
  132:18 133:15
  133:18 134:2
  141:1,2 145:23
  151:25 152:2
  154:14 195:22
  199:19 202:25
  203:20,20
  214:19,21

223:19 227:1,6
229:18 231:1
249:13,22
250:20 251:15
256:21,25
258:12,25
260:19,21
261:3 300:8
301:3,12
305:23 309:8,9
309:14 310:1,1
310:14 337:19
338:8 343:15
348:6,12,23
349:16,25
350:1,12
355:22 356:2,6
357:22 364:10
study  83:17
132:25 133:16
145:8,9 146:6
152:11 153:5
154:19 165:21
171:10 177:17
178:11 181:14
181:18,23
182:7 183:19
184:7,7 185:12
186:4,11,22
187:6 194:13
195:20 198:16
198:20 199:22
199:23,25
200:1,4,12,16
200:17,18,19
201:10,14

202:23 203:5,8
203:9 205:15
207:20 214:13
218:22 219:19
224:18 225:19
226:10,23
228:22 229:5
229:12,22
230:10,13
233:7 239:1
240:15 241:10
241:12,18
249:20 251:13
258:13 259:22
260:2,22,25
261:12,14,20
262:7,8 268:2
268:20 293:11
301:11 302:11
306:22 307:7
310:11,24
324:18 325:2
studying  36:25
186:12
sturpin  3:13
stylistic  101:10
101:21 104:8
subcomponents
121:10 122:6
subject  40:10
65:15 73:9
85:19 114:12
119:19 201:2
370:10
subjective
217:21

subjects  121:23
123:7 156:7
366:21
submission
147:2 333:22
submit  242:10
submits  105:18
347:10
submitted  48:4
146:17,25
subreferences
127:13
subscribed
369:20
subset  54:8
297:12
substance
372:9
substances
186:25
substantial
35:16 99:20
323:25
substantially
234:8 243:24
substrate
218:15 219:1
219:12
succinctly
290:5
suddenly
149:17
suffice  217:2
suffices  213:22
sufficient
145:11 146:9

**[sufficient - synthesize]**                                                    Page 75

148:21,25
221:23 222:3
223:6
**sugarman**
236:24
**suggest**  82:22
250:20 349:20
**suggested**
305:22 314:4
**suggesting**
134:22
**suggests**  300:24
**suite**  1:15 2:13
2:19 3:15
**summarized**
290:22 301:5
301:19
**summarizing**
55:12 130:4
258:21
**summary**
59:20 74:24
83:12 109:3
134:1 239:16
249:3,21
268:11 271:3
300:21,24
305:7 325:8
352:11 363:10
**supervision**
275:8 328:13
**supplemental**
4:24 262:11,16
262:23 263:22
264:4,8,13

**supplementary**
175:21
**support**  120:19
129:5 138:1
179:19,25
195:3 216:19
217:9 242:5
253:23 289:8
348:2,24
349:20 352:1
352:15
**supported**  45:5
88:17 89:11
144:15 254:1
294:12,23
297:12 311:14
328:8 332:15
332:21
**supporting**
7:14,15 131:5
131:21 194:11
230:13 288:20
289:2 298:24
299:20
**supportive**  44:4
44:7 64:12,13
307:13,17
**supports**  195:1
352:21,22
353:17
**suppose**  89:14
123:11
**supposed**  77:17
**sure**  8:13,17
12:24 21:16
27:9 30:17,18

32:1 33:7 35:18
36:6 45:19 49:9
49:24 50:6 51:1
70:16 72:6
78:10 80:22,23
87:13,13 89:6
91:6 101:8,25
104:1 107:21
109:4 112:11
118:3 134:10
134:11 135:14
145:17 161:14
162:13 165:25
176:21 177:15
177:20 187:18
193:24 195:2
212:14 215:16
220:19 235:1
236:21 241:14
247:17,18
248:12,15,17
249:25 250:17
251:4 257:9,13
266:17 283:7
302:14 304:18
311:17 315:19
319:2 327:11
329:22 332:1
335:21 338:11
339:25 340:16
**surface**  163:10
221:21
**surprise**  304:20
**surprised**  25:6
173:22,24
209:6 252:4

335:4
**surprising**
89:14 254:12
324:3
**surrogate**
201:23 290:13
**survival**  303:8
**surviving**
174:14
**survivorship**
200:5,7,10,18
201:9,14,19,23
202:25 205:5
205:10 320:14
**susceptibility**
317:16 339:5
340:2 350:19
354:20 356:11
357:5
**susceptible**
318:4 347:22
349:2 350:10
351:4 353:19
358:20
**sustainably**
195:9
**suzanne**  3:12
**sworn**  6:6
106:19 107:8
369:10
**syndrome**
131:23 271:9
273:8
**synthesize**  64:1
105:10

**[synthesized - talcum]**

**synthesized**
112:8

**system**   159:18
181:19 210:21
211:16 212:6
214:3,6,11
219:17 233:1

**systematic**
62:10 63:3,6,7
63:10 64:4,19
64:25 65:4,7
66:25 67:8,20
68:3,6,11 70:6
70:18 71:9,14
71:17 72:9,19
73:17 86:18
156:9 299:18

**systemic**   62:15

**systems**   1:21
160:8 199:2
369:25

**t**

**t**   283:21 371:1
371:1

**table**   4:24
242:22 243:1
246:4,7 262:11
262:16 263:13
264:2 268:10
301:7,9 302:2
308:8 309:6

**tables**   262:23
263:20,21,22
264:4,4,8,13

**taher**   4:19
61:19 234:22
237:10,19
242:15 244:2,8
245:11 308:4,4

**take**   48:12 49:3
72:2,4 74:1
83:14 84:19
100:10 104:12
108:16 112:16
112:20 128:20
128:22 137:19
144:2 152:12
152:16 153:13
179:7 193:2
194:1 206:12
206:12 219:18
228:16,18,19
237:6 246:22
262:14 269:8
281:19 292:18
292:19 293:6
311:4,5 341:16
363:12

**taken**   1:14
44:25 65:4 74:2
105:19 110:18
129:1 137:21
161:18 178:25
193:4 215:7
247:1 250:18
272:21 292:23
369:8

**takes**   205:19

**talc**   23:5,21
24:5,9 41:20,22

41:24 42:3,7,8
42:17,20 43:9
43:21,22 50:18
50:24 51:9
52:18 53:12,23
61:1,5 67:16
69:10 70:3 83:9
83:24 84:13
85:12,13 87:23
92:11 94:1 97:9
98:12 118:11
118:14,18,20
120:23 121:13
127:8 128:2
130:8,19,24
132:3,13,20
133:2,8,10,18
135:1,10,20
138:2 141:20
142:4,14 152:5
162:5 163:16
166:14,22
167:20 171:20
172:8 174:2,19
175:18 176:17
176:23 177:6
178:1,9,23
180:1,4 181:1
182:13,17,17
182:18 183:24
184:13,20,21
184:21,23,25
185:5,5,8,11,22
185:24,25
186:2,6,11,13
186:15,19,24

187:6,10,12,16
187:19 194:12
195:5,10
196:11,20
199:19 200:6
200:23 201:4,6
202:1,13,20
203:1 205:14
207:25 212:9
221:7 228:11
232:3,3 249:2
249:15 252:8
252:12,25
253:4 256:22
257:1 258:16
259:2,25
260:10,16
267:7,16,22
268:15 276:7
276:19 277:1
277:13,15
298:25 299:21
300:3 301:4,24
302:5 303:1
309:21,23
310:14,15
311:9,13,19,22
312:5,14
315:11,11,20
317:2 326:25
358:23 364:10

**talcum**   1:4
221:1 228:23
229:2,6 230:10
230:17 231:20
232:13,21

**[talcum - testimony]**

233:7
**talk** 77:17
  78:20 166:11
  242:15 244:25
  268:14 281:20
  291:7 295:7
  303:14
**talked** 171:1
  294:7 321:7
  336:15
**talking** 8:22
  23:18 24:1
  45:11 66:14
  126:25 137:16
  148:14 150:7
  156:8,10
  209:14 302:23
  316:12 338:3
  348:6 359:17
  364:19,24
  365:16 366:20
**talks** 260:5
**targeted** 320:10
**targeting**
  320:19
**targets** 290:14
  290:16
**taught** 25:11,18
  25:19 26:4 29:6
**teach** 29:21
**tease** 127:20
**technical**
  104:10 285:1
  314:10
**technically**
  199:13 227:18

**technique**
  195:19
**techniques**
  198:9
**technological**
  314:24
**technologies**
  197:15 287:8
  295:13 314:8
  327:16,17
  330:9
**technology**
  39:4 195:8
  269:6,11
  273:12 329:2,4
  329:21 331:1
**tell** 17:23 18:18
  18:20 25:13
  30:18 38:3 52:8
  60:10,13 72:23
  80:4,22 91:18
  91:24 92:4,25
  121:2 147:25
  167:1 172:24
  173:6 184:12
  184:17 186:5
  186:22 194:25
  196:25 200:7
  200:12 207:16
  207:19 232:12
  252:15 261:16
  327:3 367:18
**telling** 82:16
  91:23 125:13
  126:5 141:11
  149:10,25

151:3,7
**telomeric**
  319:25
**ten** 128:23
  192:25
**term** 60:20
  94:9 135:7
  189:21 217:7
  217:21 239:7
**terminology**
  108:6
**terms** 21:4,7
  25:15 39:5
  44:23 57:4
  60:25 61:16
  62:14 94:3,11
  94:17 96:4
  190:15 191:11
  193:16 195:13
  215:16 217:10
  248:11 299:6
  309:16 314:20
  316:13 320:6
  346:23 353:11
  361:4 362:10
**test** 5:4 93:8
  163:15 252:12
  253:4 272:16
  275:20 289:25
  290:23 291:10
  314:6 319:4,13
  319:20,22
  320:15
**tested** 184:22
  187:20 282:15
  285:25 287:2

287:11 288:2
  326:15
**testified** 6:7
  11:14 90:20
  104:20 133:5
  214:5,8 334:13
  340:18,25
  343:17,23
  344:8 347:20
  350:8 359:6
**testify** 334:16
**testifying** 46:24
  124:5 167:3
  263:24
**testimony** 10:2
  10:19,25 17:9
  17:14 19:2,5,17
  32:19 37:7,22
  40:13 43:19
  51:23 52:3
  53:17 55:2
  59:16 67:23,25
  68:1,22 69:7
  70:17 77:7 78:4
  81:4 90:11,24
  94:19,23 98:7
  99:6,10,14
  100:5 101:18
  102:1,2,16
  104:25 106:2
  106:19 107:8
  107:13 109:19
  111:13 112:25
  113:10,15,22
  113:25 114:7
  114:13 115:25

**[testimony - thought]** Page 78

117:2,8 120:20
121:20 126:13
140:12,16
141:19 142:17
166:22 167:20
178:13 182:1
211:5 212:12
212:23 220:20
220:21 272:18
311:25 321:4
335:14 348:2
354:2 358:7
369:11
**testing** 7:17
9:21 12:20
34:13 54:7
122:6 185:7
272:9,15 273:1
273:7,18 274:3
274:6,7 278:3,6
278:8,10
280:25 281:5
281:11 283:21
284:4,17 285:2
285:14 286:10
287:21 288:5
289:21,23
291:8,12 295:3
299:2 313:4,7
314:3,8,9,12,13
314:18,21
317:12 319:15
321:2 322:17
323:18 325:17
325:18,19,21
326:1,4 330:4

348:20
**tests** 240:17
241:3 273:2,3
278:4
**text** 297:6
**textbook** 72:20
**thank** 14:21
16:4 19:2 49:16
83:22 85:23
93:22 154:9
209:17 255:22
281:19 302:8
308:2 310:12
318:18 331:5,6
332:3,6 367:10
368:19
**thanks** 121:7
**themes** 303:1
**theory** 129:5
131:3,6,22
348:25 352:2
352:23 353:18
**therapies**
320:10
**thereof** 369:16
**thesis** 30:2
**thing** 74:11
108:2 109:13
348:8
**things** 9:22
12:14,21 21:6,7
54:3 61:1 66:12
86:10 94:5
99:23 100:8
108:11 122:3
128:6 129:22

130:20 156:11
163:22 187:25
190:23 191:10
214:22 248:12
254:4 280:12
282:5 309:7
314:16 321:19
330:6 359:15
360:20
**think** 10:5
14:18 15:2
25:19,23 28:8
29:24 31:25
35:22 36:24
40:4,25 62:15
64:22 76:23
77:13 78:24
100:20 103:11
114:10,20
117:25 118:9
131:10,15
132:6,24
133:22 134:6
136:12 145:25
146:8 149:13
158:5,6 169:13
175:8 179:24
180:18 181:23
184:23 187:22
188:5,15 195:2
197:6 198:11
205:2 212:20
213:20 223:21
224:7,11 230:9
231:1,19
236:22,23

242:11,16
244:14 247:19
247:22,25
248:21 250:8
251:11,15
254:10 258:15
258:20 260:2
268:19 269:24
270:19 273:11
274:3 280:21
281:10 286:11
288:25 290:4
294:3,4,5 299:8
300:15 305:7
306:19 308:18
308:22 312:17
312:25 314:5
320:22 325:16
326:17 329:6,9
331:5 332:9
333:8 340:8
351:1,8,20,22
360:24 361:7
361:10 363:2,4
**thinking** 83:11
223:18 274:20
**third** 337:16,17
338:6
**thirty** 370:15
**thompson** 2:6
**thorough** 44:9
53:20 173:17
176:9
**thought** 37:11
125:14,24
138:6 150:9

[thought - transcribed]    Page 79

177:21 185:1
200:3 211:19
214:5 219:20
222:14 223:21
248:9 262:21
303:8 319:10
**three**   20:14
27:10 29:24
102:3,11 127:1
138:3 199:7
204:19 205:12
216:19 219:2
236:6 258:9
309:25 317:7,9
319:24 320:2
321:18
**threshold**   170:3
170:4
**ticket**   317:5,7
348:25 352:2
352:17
**tickets**   347:24
**tie**   292:4
**time**   23:7,8
25:7,11,19,22
28:16,22 44:25
57:17 86:2 96:9
96:20 102:25
103:10,10
104:12,16
105:4,6 106:22
106:23 107:4
109:12 126:11
129:16,21
130:3 171:2
189:5 220:2,4,6

220:8 223:6,9
224:2,9 225:3
225:13 227:3
227:12,13,19
238:11 248:8
262:14 275:6
278:9,11
286:13 300:25
311:5 313:14
322:23 324:5
324:20 333:21
333:25 369:8,9
369:12
**timeline**   88:6
**times**   20:12,14
205:19 218:3
316:4 353:5
**timing**   25:23
39:1 62:2 220:4
220:9,10
223:17 279:16
**tissue**   181:12
191:25 218:15
**tissues**   199:12
276:8,18
277:16
**titanium**
180:22 182:5
182:12,23
183:7,23 187:7
195:11 196:5
196:14 207:25
212:9 221:1,7
**title**   61:6 141:7
141:14 142:7
142:12 197:6

213:11 228:8
228:14,17,18
228:19 300:24
355:4
**titled**   154:19
354:18
**today**   6:20 8:23
10:3 15:21 16:9
16:19 19:14,24
23:18 27:25
34:14 38:3,13
64:23 68:22
70:17 93:19
106:18 107:8
119:18 206:7
212:23 247:4
248:6,14 254:3
255:6 271:21
321:7 334:17
334:25 348:7
359:3 365:16
366:21
**together**   27:11
27:13 248:13
248:14 250:19
**told**   115:12
124:17 235:25
236:10 346:14
**tone**   111:16
**tonight**   182:22
**took**   64:18
117:2 219:23
310:8 315:7,8
**tools**   73:6 108:9
**top**   56:6 130:23
194:7 242:25

249:8 300:18
317:18 351:15
362:13
**topic**   46:1
156:19 157:6
**tor1aip1**   293:13
**totality**   45:25
53:10 118:10
118:14 127:12
128:4 132:13
156:4 159:16
202:19 229:15
230:3 235:17
239:12 240:4
273:18 300:1
304:12 308:18
309:20 317:11
**touch**   23:9 28:2
**towards**   61:13
67:13
**trabert**   154:11
154:18 155:16
157:5,13
305:16 337:25
**traceable**   323:2
**track**   323:21
**traditional**
210:16 212:3
**training**   327:6
**trajectory**
256:8
**trangle**   3:7
**transcribe**
155:6
**transcribed**
369:14

[transcript - tweets]                                                   Page 80

| | | | |
|---|---|---|---|
| **transcript** | 214:9,24 | **treated**  207:24 | 126:13,22,24 |
| 369:15 370:16 | 216:22 217:3,5 | 216:8 224:13 | 127:3,10 |
| 370:17 | 217:6,17,20,21 | 232:3 | 128:10 131:10 |
| **transcription** | 218:2,7,13,16 | **treatise**  352:1 | 133:22 141:16 |
| 158:24 196:7 | 219:5,7,8,24 | **treatises**  348:24 | 149:21 162:2 |
| 372:6 | 220:5,10,12,23 | **treatment** | 173:1 175:1 |
| **transcriptional** | 221:24 223:25 | 162:6 180:20 | 179:7 187:4 |
| 160:5 | 225:12,20 | 204:3 211:4 | 231:6 236:13 |
| **transcriptomic** | 226:18,25 | 221:8 222:24 | 238:25 248:1 |
| 194:22 197:8 | 227:3,11,24 | 222:25 223:4 | 289:22 290:3 |
| **transfer**  199:11 | 228:9,11,24 | 224:14 226:11 | 314:19,23 |
| **transform** | 229:7 230:12 | 226:19 227:8 | 338:9 |
| 219:19 224:12 | 230:18,23 | **treatments** | **tubal**  275:22 |
| **transformation** | 231:21 232:6 | 220:25 227:16 | **tumor**  145:21 |
| 132:4,11,15,21 | 232:15,22 | **tremendous** | 192:5 216:10 |
| 132:23 133:2 | 233:9 235:11 | 50:7 348:16 | 289:20,23 |
| 133:11,14,19 | 237:23 239:4,8 | **trial**  123:3,15 | 290:2,11 |
| 134:7,8,14,20 | **transformative** | 167:24 309:22 | 319:17 320:7 |
| 134:21 135:8 | 135:4 224:16 | **trials**  309:20 | **tumors**  216:9 |
| 135:11,21,22 | **transformed** | **tried**  54:12 | 302:7 |
| 138:2 140:18 | 217:9 220:7 | **triggers**  158:23 | **turn**  55:24 79:5 |
| 141:5,8,21 | 225:8 230:15 | **true**  24:18 | 79:7 89:17 |
| 142:6,15,18 | **transforming** | 240:15 243:23 | 154:10 166:12 |
| 146:6,10 | 145:18 | 317:15 341:5 | 296:13 298:4 |
| 147:19 148:9 | **transition** | 342:21 369:15 | 298:13 300:13 |
| 149:1 151:4,8 | 191:20 320:1 | **trusted**  146:20 | 305:12 308:3 |
| 152:6 188:19 | 330:25 | 147:4,12,17 | 319:2,7 345:24 |
| 188:20 189:10 | **transitioned** | 148:7,13 | 345:25 |
| 189:12,15,21 | 330:2 | **try**  11:10 75:21 | **turned**  139:19 |
| 190:5,15 191:6 | **translates** | 176:8 182:21 | 223:13 |
| 208:1,4 209:4 | 159:1 | 237:17 352:12 | **turpin**  3:12 |
| 209:10,20,22 | **translational** | 366:22 | **tweeted**  272:8 |
| 210:9,10,11,12 | 328:1 | **trying**  36:24 | **tweets**  312:17 |
| 210:18 211:9 | **transparent** | 92:1,7 100:22 | 312:20,23 |
| 211:17 212:5 | 126:14 | 124:10,13 | 313:15,16,25 |
| 213:1,23 214:7 | | 125:10,17,18 | 315:3 |

twice   56:11
two   12:14 14:4
    16:12 20:10,14
    27:10 29:18
    35:5 54:2 55:14
    86:9 87:1,3,12
    88:1 117:14
    126:12 130:14
    138:25 139:23
    140:1,8 141:12
    141:14 150:7
    152:3 169:2,6
    187:7 188:9
    207:24 221:11
    256:20,25
    258:4,11
    269:24 296:21
    297:21 309:5,7
    315:23 316:22
    318:17 332:18
    347:13 357:21
    357:25 368:9
    368:13
type   160:10
    171:24 172:23
    176:14 181:12
    192:5,6 197:9
    333:7 335:7
    346:7 360:23
    361:13
types   186:6,25
    189:18 190:11
    191:14 227:6
    279:17 290:6
    305:11 316:16
    325:18 327:13

362:22
typical   145:5
    214:20
typically   275:2
    297:10
typo   229:6

**u**

uab   26:7 30:2
udn   296:1
uh   32:24 89:9
    91:5 120:14
    158:13 176:5
    222:10 266:14
    290:1 354:23
ultimate   250:4
ultimately
    313:11 334:11
unattainable
    11:16 28:18
unclear   15:22
    15:25
uncommon
    168:12
under   25:1
    36:25 66:3
    105:11 159:11
    177:11,17
    184:2 185:8
    214:13 221:8
    223:8 233:2
    251:14 267:7
    275:8 315:24
    328:13 332:11
    355:17

undergo   227:10
undergone
    295:4
underlying
    180:16 352:23
undersigned
    369:3
understand
    14:7 18:9 43:7
    43:19 70:16
    78:22 81:6
    90:11 92:2,7
    102:1 107:15
    107:17 118:3
    131:2 141:19
    172:21 174:9
    178:16 181:21
    187:13 192:7
    194:4 205:25
    215:14,19,21
    216:1 220:20
    222:2 232:8
    237:11,15
    238:25 244:5
    270:9 271:8
understanding
    15:14 32:18
    109:14 172:25
    187:17 327:18
    359:18,22
    361:11
understood
    272:6 290:13
    347:5
underwent
    291:8

undiagnosed
    33:22 34:4
    35:14,23 294:2
    294:25 324:4
    328:9
unethical   31:20
    32:1 309:22
unexpected
    195:15
unfair   49:12
unfortunately
    286:11
unimportant
    326:18
united   1:1
    50:16 329:7
universe   69:4
university   25:1
    25:12 26:4,11
    26:22 27:18
    28:6,10,23 29:3
    29:16,17 30:5,8
    30:11,14,20
    39:9 40:8 41:1
    294:11
unknown   288:9
    288:24 321:24
unregulated
    190:8
unreliable
    148:4
unstable   166:7
untested
    326:15
unturned
    325:24

**[unusual - veritext]**                                     Page 82

**unusual**  205:15
  205:15 271:4
  279:17
**update**  61:16
  155:1,3,10,24
  156:16,18
  157:1 298:22
**updated**  109:12
  157:13
**updates**  22:23
  54:3 156:11
**urban**  180:22
  183:21
**urine**  39:11
**usages**  200:6
**use**  52:18 53:23
  56:11 80:25
  83:9,24 84:13
  85:12,13
  111:15,18,24
  132:8 135:7
  154:20 156:1
  157:15,21
  165:23 173:7
  179:9 180:3
  181:8 185:24
  186:14 208:5
  211:6 212:25
  229:2,13
  249:16 250:13
  256:22 257:2
  259:2,25
  260:10,16
  263:15 268:15
  269:18,23
  301:4,23 302:5

305:17,24
306:5,23 307:6
307:9 310:15
311:9,14
312:14 317:3,3
321:1 323:7,14
338:15,23
339:4 340:11
343:6,11
354:19 355:5
356:15 357:10
358:14
**used**  6:25 60:20
  63:3 72:14 73:1
  73:4 86:17 94:3
  94:17 148:24
  151:5,9,20
  152:11,15
  162:2 165:11
  180:21,24
  181:18 185:8
  185:11 197:15
  197:22 199:2
  207:12,19,21
  208:7,13,17
  211:25 215:15
  222:18 227:1
  233:1 237:24
  252:11 253:3
  269:11 275:13
  311:19,22
  312:4 320:8
  324:25 345:6
  370:18
**uses**  305:23

**using**  60:25
  62:14 165:14
  180:25 188:16
  195:7,18 239:7
  291:10 316:22
**usual**  359:12
**uterine**  258:2,3
  258:14,23
  259:3,25 260:6
  260:10,16,19
  260:21 261:3
  263:16 312:12
**utilizing**  229:19

**v**

**vagaries**  128:14
**vaginal**  267:16
**vague**  50:20
  51:12 74:8
  270:24 271:16
**validate**  232:5
**validated**  209:2
  209:9,13,20,25
**validation**
  210:3,6
**value**  235:19
  324:24
**vanderbilt**  39:9
  294:10 327:21
  327:22 329:17
**variable**  177:17
**variance**
  287:21
**variant**  288:17
  289:9 291:13
  292:13 321:16

321:25 322:8,8
322:11,13
324:22 325:4
**variant's**
  323:10
**variants**  269:20
  285:4,6 288:21
  288:24 318:1
  320:20 321:11
  321:19,22,24
  322:5,19 323:5
  324:5,10,13
  326:12 351:6
  356:12,13,20
**varied**  278:9
**varies**  278:8
**variety**  37:1
  50:9,24 85:16
  85:18 94:17
  98:12,17
  101:10 103:25
  104:10 107:20
  159:12 200:6
  304:14 316:15
  323:8 324:9
**various**  94:18
  97:22 99:3,25
  142:4 216:14
  290:14
**vast**  335:6
**vastly**  151:25
**verbal**  136:16
**verify**  25:20
  86:12
**veritext**  1:24

**version** 211:13
233:22 234:8
235:1,5,6 236:7
236:9,11,15
237:5 297:17
298:2 304:5,5
362:17
**versus** 145:14
185:5 297:19
361:9
**vesicles** 39:7
**videoconfere...**
1:14
**view** 39:25
110:11
**viewed** 73:10
199:9,15
216:12
**views** 50:18
**violation** 82:6
**vitae** 4:10
294:22 296:11
296:14
**vitonis** 256:24
310:18 311:14
**vitro** 132:19,25
133:12,13,20
134:2,14 141:1
141:2 142:3
145:16,16,22
146:6 151:25
153:4 180:3
192:13,20
197:22 198:1,2
198:7,20,22,25
199:4,14

210:17 211:16
212:6 214:2,6
216:15 217:11
219:14 230:23
233:1 242:5
349:25
**vivo** 132:19
133:17 145:16
152:2 349:25
**vulnerable**
316:23,24
**vus** 288:9 289:8
291:23

**w**

**wait** 244:19
339:11
**waiting** 41:6,7
324:16 325:1
**wall** 168:13
**want** 19:16
22:24 27:9 49:8
75:10 79:8
83:21 85:7 89:6
101:25 107:18
113:18 114:9
114:11 119:4
126:5 128:18
134:11 141:18
144:8 150:8
161:14 193:24
198:18 220:19
228:6 239:5
244:24 246:2
247:18 251:4
252:20 253:12

257:21 262:18
264:5,19 273:8
274:18 283:9
292:17 310:22
318:22 319:7
354:15 357:7
**wanted** 101:14
173:8 242:17
242:21 263:7
265:3 274:14
308:12 354:25
**wants** 245:2
274:21 361:22
**warrant** 241:11
**warrants** 232:4
239:19 240:11
**washington**
1:20 2:14 369:5
369:24
**way** 44:24
86:18 98:20
126:14 142:23
142:24 143:15
144:18,23
162:10,12,19
162:22 163:1
163:15 164:7
211:21 237:7
244:8 252:5
254:13 255:16
263:3 269:7
290:4 316:11
316:16,20
322:2 324:18
**ways** 102:20
217:22 241:5

**we've** 71:25
156:8 192:24
202:7 241:7,7
242:16 254:2
270:5,6,6
287:20 315:24
316:12 321:7
324:7 326:24
328:22 331:9
333:17 348:6
348:12 350:19
351:10 359:16
365:14,15
**web** 65:23
**webb** 306:8
339:17,23
**website** 101:15
102:6,13
105:20 108:17
108:18 110:18
110:19 111:3
305:4 345:1
347:3,4
**websites** 50:23
51:24 66:14
97:22 99:4,25
103:25 304:23
344:16 345:5
**wednesday**
1:17 6:1
**week** 20:15
56:11 80:5
219:22,23
220:1
**weeks** 20:16
248:8

| | | | |
|---|---|---|---|
| **weigh** 176:25 | **widely** 105:14 | 80:10 84:16 | 174:8,25 |
| **weight** 215:10 | 331:1 | 85:16,25 88:14 | 175:14 177:4 |
| 215:13 | **wikipedia** | 89:4,10 90:17 | 178:7 180:11 |
| **weiss** 2:17 | 100:1 105:20 | 90:25 91:13 | 181:17 182:2 |
| **welcome** 16:6 | 106:8 107:22 | 94:24 95:9 | 183:3,12 |
| 38:8,17,21 | 112:15,20 | 97:14 98:9 | 184:16 186:10 |
| 234:15 245:24 | 113:5,11,12,19 | 99:19 100:6 | 187:4 188:5 |
| 264:6 | 113:24 345:7 | 101:19 102:9 | 189:2 191:9 |
| **went** 99:19 | 347:12 | 102:18 103:13 | 193:24 197:4 |
| 186:14 | **winded** 347:20 | 103:17 105:1 | 198:15 200:16 |
| **wentzensen** | **window** 227:16 | 106:4,12 | 201:1 202:6,18 |
| 4:21 248:20 | **witness** 7:19 | 107:17 108:21 | 203:19 204:18 |
| 254:18 256:13 | 9:16 10:22 | 109:20,24 | 204:25 206:6 |
| 300:16,20 | 11:25 13:21 | 110:5,22 | 207:3 211:12 |
| 301:6 363:15 | 14:12 15:2 18:5 | 111:14 112:4 | 212:17 213:6 |
| 363:21 364:3,8 | 20:24 23:15 | 113:3,17 | 214:1 215:5,25 |
| 364:15,25 | 24:8,15 27:21 | 116:15 120:2 | 218:1 223:17 |
| 366:6 367:3,19 | 29:2 31:17,25 | 120:10 121:8 | 224:23 225:18 |
| 368:5 | 32:18 34:23 | 121:21 122:21 | 226:9,22 228:3 |
| **wentzensen's** | 35:10 36:3,12 | 131:9 132:1 | 229:11,25 |
| 80:24 | 36:18 38:25 | 133:6 134:18 | 231:10 232:1 |
| **west** 1:15 3:8 | 40:3,14 43:4 | 136:1 137:3 | 232:25 233:18 |
| **whatsoever** | 44:15,22 46:12 | 139:8 140:22 | 233:21 234:5,7 |
| 180:20 | 47:16 49:13 | 142:1 144:11 | 235:15 238:2 |
| **wheels** 326:14 | 50:1,21 51:13 | 144:18 145:1 | 238:10 240:22 |
| **when's** 25:11 | 52:3,22 54:22 | 146:2,13,23 | 244:14 245:4 |
| **whereof** 369:19 | 56:22 57:8 | 147:7,23 | 245:20 247:14 |
| **whispering** | 58:14 59:12 | 148:12 151:24 | 250:8 251:11 |
| 107:1 | 60:5,13 61:10 | 156:21,25 | 253:10,15 |
| **wholeheartedly** | 61:25 63:14 | 157:9,19 | 255:12,21 |
| 45:3 | 64:9,22 65:10 | 159:22 161:8 | 256:3 260:25 |
| **wide** 37:1 50:8 | 66:7 67:6 68:9 | 161:25 163:4 | 263:11 265:17 |
| 94:6,17 101:20 | 69:2,14 71:13 | 163:19 164:11 | 267:12,19 |
| 103:21,24 | 72:12 73:4,21 | 167:11 169:6 | 268:1,10 |
| 107:20 159:12 | 74:9 75:23 76:7 | 169:25 171:16 | 270:25 271:17 |
| 323:24 | 76:9,24 78:10 | 172:15 173:3 | 273:11 274:14 |

[witness - zoom]                                                    Page 85

276:22 277:19
278:25 279:14
279:24 280:9
280:21 281:25
282:11 284:7
284:20 285:17
286:8 287:15
289:12 332:8
333:5 335:3,16
336:8 338:3
340:16 341:8
341:15 342:15
342:24 343:9
344:4,19
345:11 346:4
346:20 347:17
348:5 349:5,11
350:17 352:9
353:23 360:17
361:24 362:25
363:24 364:14
364:22 365:6
365:14 366:1
366:20 369:9
369:11,19
370:1
**witnesses**  58:17
122:10
**wolf**  14:6 46:9
**wolf's**  45:13
55:11
**woman**  27:6
**woman's**
281:16
**women**  129:23
129:23 256:21

268:15 311:19
311:22 312:4
313:4 315:6
**wondering**
247:9
**woolen**  56:14
58:23 60:22
**word**  62:22
63:3 103:2,9,11
107:10 108:10
132:8 193:9
250:22 269:19
**worded**  254:14
304:21
**wording**  99:1
107:24 112:13
112:14 245:21
305:9 312:10
312:11 345:13
345:15 347:1
**words**  98:4
101:15 102:3
102:12 106:20
231:11
**work**  21:12
22:14 23:5 27:5
27:17,22 34:1
39:8,12 56:18
64:2 152:20
230:3,5 237:14
239:12 240:4
262:8,8 293:23
313:2 332:16
355:9 357:16
**worked**  27:13
273:17,19

329:16
**working**  27:25
41:23 243:12
253:22 308:21
**works**  275:5
**world**  65:12
**worse**  202:2,14
**worth**  180:18
**write**  34:5,7
72:13
**writing**  34:16
98:16 108:1,2,7
110:16 239:16
240:8 242:2
**written**  42:7
72:9,18 109:9
366:7
**wrong**  235:5
236:11 339:8
**wrote**  59:24
106:22,23
107:4 154:25
364:8 365:1,10

**x**

**x**  4:1 317:20
**xenograph**
198:8 216:6
225:1

**y**

**yeah**  32:25
80:11 87:15
90:25 96:6
128:24 134:5
173:8 189:2
208:19 219:22

235:2 243:18
247:14 249:25
253:13 255:4
255:21 258:3
262:20 264:17
264:21 288:4
300:18,18
305:20 319:11
325:16 332:4
338:6 364:20
**year**  330:20
**years**  27:11
35:19 42:12
108:7 271:19
294:14 313:6
313:11
**yesterday**  20:5
21:5
**york**  3:8,8
**younger**  129:20

**z**

**zelikoff**  114:3
115:8 116:10
117:4,12
**zelikoff's**  115:9
115:16,20
116:6
**zero**  32:19
190:10
**zones**  126:11
**zoom**  1:14
20:12,13,14
128:14 149:13
253:12,14

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.