# EXHIBIT 35

Page 1

1              IN THE UNITED STATES DISTRICT COURT

                    DISTRICT OF NEW JERSEY

2                 MDL NO. 16-2738 (MAS)(RLS)

3

    IN RE:  JOHNSON & JOHNSON          :

4   TALCUM POWDER PRODUCTS             :

    MARKETING, SALES PRACTICES         :

5   AND PRODUCTS LIABILITY             :

    LITIGATION                         :

6

7

8              Remote deposition of JACK

9   SIEMIATYCKI, MSC, Ph.D., taken in the

10  above-entitled matter before Suzanne J. Stotz,

11  a Certified Court Reporter (License No.

12  30XI00184500) and Notary Public of the State of

13  New Jersey, taken on Wednesday, March 27, 2024,

14  commencing at 11:14 a.m. EDT.

15

16

17

18

19

20

21

22

23

24

25

Page 2

1  A P P E A R A N C E S :
2
3  ATTORNEYS FOR PLAINTIFF:
4    (Via videoconference)
     ASHCRAFT & GEREL, LLP
5    BY:  MICHELLE A. PARFITT, ESQ., and
     BY:  PATRICK K. LYONS, ESQ.
6    4900 Seminary Road, Suite 650
     Alexandria, Virginia 22311
7    (844) 680-0339
     mparfitt@ashcraftlaw.com
8    plyons@ashcraftlaw.com
9      - and -
10   (Via videoconference)
     LEVIN PAPANTONIO RAFFERTY, P.A.
11   BY:  CHRISTOPHER V. TISI, ESQ.
     316 South Baylen Street
12   Pensacola, Florida 32502
     (850) 435-7000
13   ctisi@levinlaw.com
14     - and -
15   (Via videoconference)
     GOLOMB LEGAL
16   BY:  RICHARD GOLOMB, ESQ.
     1835 Market Street, Suite 2900
17   Philadelphia, Pennsylvania 19103
     (215) 278-4449
18   rgolomb@golomblegal.com
19
20  ATTORNEYS FOR THE DEFENDANT:
21   (Via videoconference)
     SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
22   BY:  JESSICA DAVIDSON, ESQ., and
     BY:  NOAH EPSTEIN, ESQ.
23   One Manhattan West
     New York, New York 10001
24   (212) 735-3000
     jessica.davidson@skadden.com
25   noah.epstein@skadden.com

Page 3

1          I N D E X
2
3        EXAMINATION        Page No.
4  JACK SIEMIATYCKI, MSC, Ph.D.
5    BY MS. DAVIDSON          10
6    BY MS. PARFITT          208
7    BY MS. DAVIDSON         227
8    BY MS. PARFITT          241
9
10
11        E X H I B I T S
12
13  Exhibit     Description       Page No.
14  Defendant's   Article entitled,     70
    Exhibit D1   "Association Between
15              the Frequent Use of
                Perineal Talcum Powder
16              Products and Ovarian
                Cancer: A Systematic
17              Review and
                Meta-analysis," by
18              Sean A.
                Woolen, MD, MSc,
19              et al.
20  Defendant's   Declaration of      82
    Exhibit D2   Interest for IARC/WHO
21              Experts
22  Defendant's   Letter from Jack      85
    Exhibit D3   Siemiatycki to IARC re
23              Talc/Acrylonitrile
                Monograph 136
24
25

Page 4

1      I N D E X (Continued)
2
3    E X H I B I T S (Continued)
4  Exhibit
     Name     Description      Page No.
5
     Defendant's  Paper entitled,      91
6  Exhibit D4   "Occupational
                environment and
7               ovarian cancer risk,"
                by Lisa Leung, et al.
8
     Defendant's  Paper entitled,      95
9  Exhibit D5   "Genital powder use
                and risk of epithelial
10              ovarian cancer in the
                Ovarian Cancer in
11              Women of African
                Ancestry Consortium,"
12              by Colette P.
                Davis, et al.
13
     Defendant's  Second Amended Expert  106
14  Exhibit D6   Report of Jack
                Siemiatycki, MSc, PhD
15
     Defendant's  Paper entitled,     108
16  Exhibit D7   "Effects of risk
                factors for ovarian
17              cancer in women with
                and without
18              endometriosis," by
                Minh Tung
19              Phung, MPH, PhD,
                et al.
20
     Defendant's  Paper entitled,     123
21  Exhibit D8   "Douching, Talc Use,
                and Risk for Ovarian
22              Cancer and Conditions
                Related to Genital
23              Tract Inflammation,"
                by Iwona M.
24              Gabriel, et al.
25

Page 5

1      I N D E X (Continued)
2
3    E X H I B I T S (Continued)
4  Exhibit
     Name     Description      Page No.
5
     Defendant's  Paper entitled, "A    128
6  Exhibit D9   critical review of
                talc and ovarian
7               cancer," by Julie
                Goodman, et al.
8
     Defendant's  Paper entitled, "Talc  142
9  Exhibit D10  powder and ovarian
                cancer: What is the
10              evidence?" By John P.
                Micha, et al.
11
     Defendant's  Paper entitled,     162
12  Exhibit D11  "Douching and Genital
                Talc Use: Patterns of
13              Use and Reliability of
                Self-reported
14              Exposure," by Katie M.
                O'Brien, et al.
15
     Defendant's  Paper entitled, "Use  168
16  Exhibit D12  of personal care
                product mixtures and
17              incident
                hormone-sensitive
18              cancers in the Sister
                Study:  A U.S.-wide
19              prospective cohort,"
                by Che-Jung
20              Chang, et al.
21  Defendant's   Supplemental Table S4  173
    Exhibit D13
22
23
24
25

2 (Pages 2 - 5)

Page 6

1          I N D E X (Continued)
2
3          E X H I B I T S (Continued)
4  Exhibit
    Name    Description         Page No.
5
    Defendant's  Paper entitled,   194
6  Exhibit D14   "Association of Powder
                Use in the Genital
7               Area With Risk of
                Ovarian Cancer," by
8               Katie M.
                O'Brien, PhD, et al.
9
    Defendant's  Paper entitled,   204
10 Exhibit D15   "Quantitative recall
                bias analysis of the
11              talc and ovarian
                cancer association,"
12              by Julie E.
                Goodman, et al.
13
    Plaintiff's  Pre-Publication Notice  209
14 Exhibit P1
15
16
17
18          (Exhibits attached to transcript.)
19
20
21
22
23
24
25

Page 7

1          MS. PARFITT:  Michelle Parfitt and
2  Chris Tisi are here on behalf of the
3  plaintiff steering committee along with
4  Patrick Lyons from my office.
5          Richard, would you like to
6  introduce yourself.
7          MR. GOLOMB:  Yes.  Richard Golomb
8  for the state court plaintiffs.
9          MS. DAVIDSON:  Hi, Richard.
10 Michelle and Chris and Patrick, are
11 you all in the same room as
12 Dr. Siemiatycki?
13         MS. PARFITT:  We are not.  Chris
14 and I are here with Dr. Siemiatycki.
15 Patrick is in his own office.
16         MS. DAVIDSON:  Got it.  And are you
17 going to go on the camera?
18         MS. PARFITT:  Yes, I'm happy to.
19 Sure.
20         MS. DAVIDSON:  Usually we're all on
21 the camera.
22         MS. PARFITT:  No problem.  No
23 problem.
24         MS. DAVIDSON:  I want to see your
25 pretty face.

Page 8

1          MS. PARFITT:  Most people don't
2  want to see it.  So there you go.  Thank
3  you, Jessica.
4          MS. DAVIDSON:  So you all are in
5  the same room in Canada?
6          MS. PARFITT:  Yeah.  We're all in a
7  conference room.
8          MS. DAVIDSON:  In Canada?
9          MS. PARFITT:  In Canada, yes.
10         MS. DAVIDSON:  Okay.  I'm just
11 getting my bearings.
12         MS. PARFITT:  No, no.  And where
13 are you?
14         You're on the west coast.
15         MS. DAVIDSON:  I'm on the west
16 coast, correct.  That's why we're starting
17 late.
18         MS. PARFITT:  Okay.
19         THE COURT REPORTER:  Would you
20 raise your hand, Doctor.
21         THE WITNESS:  (Complies with
22 request.)
23 J A C K  S I E M I A T Y C K I, MSc, Ph.D.,
24 having first been duly sworn, was examined and
25 testified as follows:

Page 9

1          THE COURT REPORTER:  Thank you.
2          You may proceed.
3          MS. PARFITT:  Jessica, with your
4  permission -- Ms. Davidson, with your
5  permission, we would just like to make a
6  correction to Dr. Siemiatycki's
7  November 15th, 2023, report.
8          It is page 40, Section 8.1.2
9  entitled, "Results of my meta-analyses on
10 Ever/Never exposed to talc powder for all
11 ovarian cancer types combined."
12         And about five lines up from the
13 bottom on that page 40, there is a
14 reference in the sentence that states, "As
15 implied in Table 2, all of the RRs in
16 Figure 1 are to be left of the null value
17 of 1.0."  Dr. Siemiatycki meant to put
18 right.
19         It's interesting, Jessica, if you
20 go back to his 2021 deposition, it was
21 corrected, and then somehow -- and a page
22 substituted, but somehow the error found
23 its way back into the 2023 report.  So
24 that is the correction we wish to make.
25         MS. DAVIDSON:  I still have to go

3 (Pages 6 - 9)

Page 10

1  like this to remember what's the left and
2  what's the right.
3       MS. PARFITT: Okay. All right.
4  Fair enough. Thank you. I appreciate
5  that everyone.
6       MS. DAVIDSON: Okay. Are you ready
7  to get started?
8       MS. PARFITT: Please. Thank you.
9            EXAMINATION
10 BY MS. DAVIDSON:
11     Q.   Good morning, Dr. Siemiatycki.
12     A.   Good morning, Ms. Davidson.
13     Q.   Did I pronounce your name more Or
14 less correctly?
15     A.   You did a very good job.
16     Q.   Okay. Great.
17          Did you bring any materials with
18 you to the deposition today?
19     A.   Oh, I brought some binders of all
20 of the material that was in my bibliography and
21 my written report. And a few scattered
22 articles that hadn't been in the binders but
23 that I wanted to have around, and I -- I have a
24 few -- there are a few articles that I printed
25 that I think are in the binders as well; so

Page 11

1  they are duplicate copies.
2       Otherwise, I have a copy -- copies
3  of my report, including a version that
4  compares -- sort of a compared documents with
5  the previous version of my report.
6       Q.   I'm sorry. I'm not sure I
7  understand what you're saying.
8       MS. PARFITT: Jessica, may I help
9  on that?
10      MS. DAVIDSON: That would be great.
11      MS. PARFITT: Okay. What he has is
12 another report, which would be the date
13 November 15, '23; but what it does, it
14 highlights -- blue or red, I'm not sure
15 what color. It highlights the changes
16 from his earlier report of June 30th, '21.
17 So what it does it --
18      MS. DAVIDSON: It's a redline that
19 you prepared for him?
20      MS. PARFITT: Yes, yes.
21      MS. DAVIDSON: But it's a
22 computer-generated redline not like a
23 handwritten --
24      MS. PARFITT: Oh, no, no, no.
25

Page 12

1  BY MS. DAVIDSON:
2       Q.   Dr. Siemiatycki --
3       MS. PARFITT: Yes.
4       MS. DAVIDSON: Okay.
5  BY MS. DAVIDSON:
6       Q.   Dr. Siemiatycki, do you have notes
7  on any of these documents?
8       A.   I have scribbles on some -- some of
9  the articles and some of the documents.
10      Q.   Okay.
11      A.   I don't have standalone handwritten
12 documents of any sort or commentaries.
13      MS. DAVIDSON: Michelle, we'd like
14 to have those scribbles produced. I think
15 we're still waiting also for the
16 Clarke-Pearson ones that we had asked for
17 at the end of his deposition.
18      So if you could get those both to
19 us together, that would be great.
20      MS. PARFITT: I will make a note --
21 I will make a note of that, Jessica,
22 absolutely. What we'll do after the
23 deposition is, if you don't mind when I
24 get back, take them with me and we'll have
25 copies made in DC and send them off to

Page 13

1  you.
2       MS. DAVIDSON: Great.
3  BY MS. DAVIDSON:
4       Q.   Dr. Siemiatycki, did you review
5  your prior two depositions to prepare for
6  today?
7       A.   Yes.
8       Q.   Is there anything you would change
9  in those two prior depositions?
10      MS. PARFITT: Objection to form.
11      THE WITNESS: No, not that I
12 recall.
13 BY MS. DAVIDSON:
14      Q.   Okay. And you met with Ms. Parfitt
15 and Mr. Tisi to prepare?
16      A.   I'm sorry?
17      Q.   You met with Ms. Parfitt and
18 Mr. Tisi to prepare for this deposition?
19      A.   We met yesterday.
20      Q.   Was that the only time you met to
21 prepare for this deposition?
22      A.   We -- we had a couple of Zoom
23 discussions in the last few weeks, I think
24 maybe a cumulative two hours maybe or something
25 like that of discussion mainly about the

4 (Pages 10 - 13)

Page 14

1  process, but yeah.
2      Q.   You're not supposed to tell me what
3  you talked about.
4          So you had two meetings on Zoom and
5  one live yesterday?
6      A.   That's my recollection at the
7  moment, yeah.
8      Q.   And did they show you any documents
9  that were not on your materials considered
10 list?
11     A.   There was one --
12         MS. PARFITT:  Dr. Siemiatycki,
13     you're not to identify what it is.  The
14     question is whether or not you were shown
15     any documents not on your materials
16     considered list.
17         THE WITNESS:  Yes, yes.
18 BY MR. DAVIDSON:
19     Q.   Okay.  Do you have any documents
20 with you today that are not on your material
21 considered list?
22     A.   Yes.
23     Q.   What is that?
24     A.   Am I supposed to answer that
25 question?

Page 15

1      Q.   Yes.
2          MS. PARFITT:  Jessica, what we can
3      do -- again, there's -- there's
4      duplicative -- I guess it's a little bit
5      more complex.  Some of the ones on his
6      materials considered are documents that he
7      would pull out for you right now.
8          I think it's probably going to be
9      very difficult for him to discern sitting
10     here today.  You can -- we can make them
11     all available to you.  There's nothing new
12     that you haven't seen.
13         If there is during the course of
14     this, we can talk about it, but I'm not
15     sure he's going to be able to discern
16     what's in the materials considered list,
17     part of his bibliography produced prior to
18     in a Dropbox his '21 deposition, and those
19     that Patrick Lyons sent to all of you in a
20     Dropbox of materials that he's continued
21     to review but not necessarily reliance
22     materials because, obviously, those
23     opinions are contained in the '23 report.
24         MS. DAVIDSON:  I think we're
25     entitled before we depose him to know what

Page 16

1  documents he reviewed, and we didn't get
2  an updated reliance list.
3          So if there are new documents that
4  he's reviewed since he's submitted his
5  report, that's all I'm asking.  I'm
6  entitled to know what they are.
7          Dr. Siemiatycki says he has
8  documents in front of him that aren't on
9  his reliance list.  We have to know what
10 those are to proceed.
11         MS. PARFITT:  What he have in front
12 of him are not the reliance materials.  He
13 has and you were provided, I believe three
14 days ago, a Dropbox.  Patrick Lyons made
15 sure that was secured and sent to all of
16 you, which is a Dropbox of any materials
17 he may have considered or not, meaning
18 considered and read them, considered and
19 read part of them.
20         That was made available in advance
21 of this deposition.  So what you should
22 have is a Dropbox; and Jessica, that
23 should have been forwarded to you.
24         MS. DAVIDSON:  All right.  Let's go
25 off the record for a minute, and let me

Page 17

1  figure this out; and I'll be back in two
2  minutes.
3          (Discussion held off the record.)
4          MS. DAVIDSON:  Let's go back on the
5  record.
6          THE WITNESS:  So one is the
7  National Cancer Institute PDQ on
8  ovarian/fallopian tumors.
9  BY MS. DAVIDSON:
10     Q.   Okay.  Uh-huh.
11     A.   I think that -- that was not on my
12 list, but I'm not sure if it's in the Dropbox.
13         And another is a report from EPA, I
14 think, a news release from EPA called
15 "Biden-Harris Administration Finalizes Ban on
16 Ongoing Uses of Asbestos."
17         MS. PARFITT:  Yes, that one.
18         THE WITNESS:  This one?  Yes.
19         The report by Longo from 2023
20 called, "Third MDL Supplemental Report."
21 That's enough.
22         Some of it's -- it's in the list.
23         An article called -- by Kim, K-I-M,
24 is the first author, Chang, Kwon, and
25 Myong, called, "Asbestos Exposure and

5 (Pages 14 - 17)

Page 18

1    Ovarian Cancer, a Meta-Analysis,"
2    published in '23, 2023.
3           MS. PARFITT:  You have to read this
4    into the record.
5           THE WITNESS:  Oh, okay.  Sorry.
6    I'm not sure which ones.
7    Davis article is -- did you see the
8    editorials in this pile?
9           MS. PARFITT:  He has also the
10   Harlow, Cramer editorials to the O'Brien,
11   which again should have been --
12          THE COURT REPORTER:  I'm sorry.
13   Could you say that again?
14   He also has...
15          MS. DAVIDSON:  The Gossett, the
16   Gossett editorial.
17          MS. PARFITT:  That's on his list.
18          MS. DAVIDSON:  Okay.
19          MS. PARFITT:  But in addition to
20   that, he has the -- the Harlow, Cramer
21   editorials, letters to the editorial by
22   O'Brien as well.  I don't know whether
23   they were in the '21 box or the '23 box,
24   but he has those in front of him as well.
25          MS. DAVIDSON:  Okay.

Page 19

1           THE WITNESS:  The Savant article.
2           MS. PARFITT:  The Savant article on
3    inflammation, he has that in front of him.
4           MS. DAVIDSON:  And it's your belief
5    that these were not in the Dropbox?
6           MS. PARFITT:  We'll check.
7
8           MS. DAVIDSON:  We'll compare this
9    to our list.
10          MS. PARFITT:  Yeah.  We can do
11   that.  And, Jessica, if there's a question
12   about anything, let us know.  But you -- I
13   just want to keep moving forward.
14          MS. DAVIDSON:  Is that all of them?
15          MS. PARFITT:  Yeah.  Is there
16   anything else, Doctor?
17          THE WITNESS:  That's all that I can
18   identify quickly.  I think that's all of
19   them; otherwise, they're a binder with
20   materials that --
21   BY MS. DAVIDSON:
22   Q.    Have been previously disclosed?
23   A.    Yeah.
24   Q.    Dr. Siemiatycki, according to my
25   math, you have he been paid $241,000 to date in

Page 20

1    the talc MDL litigation.
2           Does that sound about right to you?
3    A.    I get -- if you got that
4    information from Ms. Parfitt, then the
5    information's correct.
6    Q.    I assume you have some general
7    sense of what you've been paid in your mind.
8           Is it around $241,000?
9    A.    Yeah.  I mean, we're going back a
10   few -- about three or four years or something
11   like that.  Yes, I -- I think that is sounds
12   about right.
13   Q.    Okay.  And you also got paid for
14   state court litigation.
15          Do you know how much in total --
16   you also were paid for your role in some state
17   court talc cases.
18          Do you know how much you have made
19   in total from talc litigation?
20   A.    I'm not sure what that refers to,
21   the "state court."
22          MS. PARFITT:  May -- may I help,
23   again, Jessica, to move it along?
24          MS. DAVIDSON:  Sure.
25          MS. PARFITT:  You testified in

Page 21

1    Echeverria, a state court case, and she's
2    asking --
3           MS. DAVIDSON:  And Oules.
4           MS. PARFITT:  -- and Oules.  Thank
5    you.
6           And she's asking whether or not you
7    have any recollection.  If you do -- your
8    invoices were submitted in the past.
9    She's asking --
10          THE WITNESS:  Sorry.  I -- I don't
11   recall -- I don't recall at this time.
12   BY MS. DAVIDSON:
13   Q.    So you have no sense of
14   approximately how much money you have earned to
15   date in talc litigation in total?
16   A.    I -- I don't have a point estimate,
17   but I guess I could give a minimum/maximum kind
18   of range.
19   Q.    What's that?
20   A.    I would say between 200,000 and
21   400,000.
22   Q.    Well, we know you already got 241
23   from federal court, and there's two other
24   cases.
25   A.    Okay.

6 (Pages 18 - 21)

Page 22

1    Q.    So it would be a lot more than 200.
2    A.    I am estimating that the extra bit
3  that you were talking about.
4    Q.    Oh. So you're saying that in
5  total, it was somewhere between 400 and --
6        MS. PARFITT:  No.  That's not --
7  BY MS. DAVIDSON:
8    Q.    -- and 600?
9        MS. PARFITT:  No.
10        MS. DAVIDSON:  No.  That is what he
11  said. Michelle, don't interrupt.
12  BY MS. DAVIDSON:
13    Q.    Dr. Siemiatycki, I think you were
14  saying that was the additional.
15        So are you estimating that in
16  addition to 241,000, you received another
17  200,000?
18    A.    I mean, I wouldn't contest that,
19  but I -- I can't confirm it either.
20    Q.    Okay.  Do you have an estimate of
21  how much you have earned in total from talc
22  litigation?
23    A.    No.
24    Q.    So whether it was 300, 400, 500,
25  you don't know?

Page 23

1    A.    Right now, no.  I mean, I -- I
2  would have to look it up.
3    Q.    What percentage of your income has
4  talc litigation been over the last several
5  years?
6    A.    I have to do some arithmetic and
7  estimate what my total revenue income has been.
8  So we're going back to 2015, so near eight or
9  nine years; is that right?  2016, I think.
10        So I'd have to figure out what is
11  my total income and then what the talc part of
12  it would be.  It -- it would take me more than
13  a couple of minutes to do that.
14    Q.    So you can't tell me, sitting here
15  today, what percentage of your income this 400
16  or so thousand dollars would have been?
17        MS. PARFITT:  Objection. Asked and
18    answered.
19        THE WITNESS:  No, I can't.  Not --
20    not sitting here this moment.  I could if
21    I took time.  I could take 15 or
22    20 minutes, go off the record maybe, or
23    whatever what you like.
24  BY MS. DAVIDSON:
25    Q.    Are you currently -- are you

Page 24

1  currently have full-time employment?
2    A.    I'm retired from university.
3    Q.    When did you retire?
4    A.    2021.
5    Q.    And other than your -- do you have
6  a pension?
7    A.    Yes, I do.
8    Q.    Other than your pension and your
9  talc earnings, do you have any other earnings?
10        MS. PARFITT:  Objection. Form.
11    You're not entitled to all his other
12    sources of revenue, Jessica.
13        MS. DAVIDSON:  Well, we're trying
14    to understand what percentage of his
15    income is.
16        MS. PARFITT:  He has indicated he
17    can't provide that.
18        MS. DAVIDSON:  I understand.
19  BY MS. DAVIDSON:
20    Q.    But, Dr. Siemiatycki, do you have
21  any other source of income other than your
22  pension and the talc earnings?
23        MS. PARFITT:  Objection. You're
24    not entitled to other forms of his income.
25        MS. DAVIDSON:  I'm not asking for

Page 25

1  the amounts.
2  BY MS. DAVIDSON:
3    Q.    You can answer the question.
4        MS. PARFITT:  You just asked for
5    it.  I object to him divulging other forms
6    of income.  You're not entitled to that.
7    It's irrelevant.
8        THE WITNESS:  If I'm not obliged to
9    divulge all of my sources of income, then
10    I'd prefer not to.
11  BY MS. DAVIDSON:
12    Q.    Dr. Siemiatycki, is your pension
13  and your talc earnings the bulk of your income
14  for the last several years?
15        MS. PARFITT:  Objection. Form.
16        THE WITNESS:  I guess it's part of
17    the same answer.
18  BY MS. DAVIDSON:
19    Q.    You are -- that is a legitimate
20  question, Doctor.  You can't choose what to
21  answer and what not to answer today, with all
22  due respect.
23        Is your pension and your talc
24  earnings the majority of your income over the
25  last several of years?

7 (Pages 22 - 25)

Page 26

1    A.    By "majority, "you mean 50 percent
2  or what?
3    Q.    Well, let's start with 50 percent.
4        Is your pension and your talc
5  earnings more than 50 percent of your earnings
6  in the last several years?
7        MS. PARFITT:  Objection.
8        THE WITNESS:  Yes.
9  BY MS. DAVIDSON:
10    Q.    Is it more than 75?
11        MS. PARFITT:  Objection.
12        THE WITNESS:  I -- yes.
13  BY MS. DAVIDSON:
14    Q.    And despite the fact that your talc
15  earnings are such a substantial portion of your
16  income, you can't remember sitting here today
17  how much you've earned from the talc
18  litigation?
19        MS. PARFITT:  Objection.  Asked and
20    answered.
21        Let's move on, Jessica.  I think
22    you've got your answers.
23        THE WITNESS:  No.
24  BY MS. DAVIDSON:
25    Q.    Are you retained in any other

Page 27

1  litigation at the time -- at the current time?
2        MS. PARFITT:  As an expert?
3        THE WITNESS:  As an expert, you
4    mean?  No.
5  BY MS. DAVIDSON:
6    Q.    Have you been retained as an expert
7  in any other litigation since 2021?
8    A.    There was a Canadian case, but I
9  think that was before 2021.  I think that was
10  mentioned in my report, and I don't remember
11  what the date was.
12    Q.    What did that case involve?
13    A.    It's a similar case.  It's a
14  litigation on behalf of women with ovarian
15  cancer in Canada.
16    Q.    Right.  I'm asking have you been
17  retained in any litigation other than talc in
18  the last several years?
19    A.    Oh, other than talc.  Not -- I --
20  I've --
21        MS. PARFITT:  As an expert.
22        THE WITNESS:  As an expert, no.
23  BY MS. DAVIDSON:
24    Q.    Have you been retained in another
25  capacity in litigation?

Page 28

1        MS. PARFITT:  Objection.  The
2    question -- you're entitled to ask whether
3    he's been retained as an expert in a case,
4    and he's answered.
5  BY MS. DAVIDSON:
6    Q.    Have you served in some other role
7  in litigation other than being an expert?
8        MS. PARFITT:  Objection.
9        THE WITNESS:  I'm not sure if I
10    should answer.
11  BY MS. DAVIDSON:
12    Q.    Yes, you should answer it.  The
13  objection's are for the record.
14        MS. PARFITT:  The objection is:
15    You are entitled to get information about
16    where he has been retained as an expert.
17    That's it.
18        If someone's talked to him, if
19    someone's consulted with him, you're not
20    entitled to that.
21  BY MS. DAVIDSON:
22    Q.    Okay.  I'm not asking for
23  consulting.
24        I'm asking if you have been
25  retained in litigation in some other capacity

Page 29

1  other than as an expert.
2    A.    Only as consultant or --
3    Q.    Okay.
4    A.    -- exploring possibility of
5  participation in cases.
6    Q.    But none of that ended up in your
7  being disclosed as an expert?
8    A.    No, not since 2021, I don't think.
9    Q.    Okay.  And do you still do any work
10  at McGill or University of Montreal?
11    A.    I do some work.  I still have
12  students in the -- sort of going through to the
13  Ph.D.  I still do research and publish and
14  acknowledge my university affiliations when I
15  do that, but I don't -- I don't have a presence
16  on campus.
17    Q.    Now, were you an adjunct, or --
18  were you an adjunct professor at McGill and
19  University of Montreal?
20    A.    I was a full professor at
21  University of Montreal --
22    Q.    Oh, okay.
23    A.    -- and a adjunct professor at
24  McGill University.
25    Q.    Got it.  So your -- your pension

8 (Pages 26 - 29)

Page 30

1  comes from University of Montreal, not McGill?
2      A.   Yes.
3      Q.   Got it.  Okay.
4           Have you authored any publications
5  concerning talc and ovarian cancer since
6  September 2021?
7      A.   No.
8      Q.   Are you a coauthor on a paper
9  called Leung?
10     A.   Called what?
11     Q.   L-E-U-N-G?
12     A.   Oh, yeah.  Lisa Leung, yeah.
13     Q.   Was that published in September
14 2021?
15     A.   I'd have to look that up.
16     Q.   That's okay.  If you don't know,
17 that's fine?
18     A.   Yeah.  If you have it on my CV as
19 September '21, then that's correct.
20     Q.   Did you disclose in that paper that
21 you are plaintiff's expert in the talc
22 litigation?
23     A.   I don't recall --
24          MS. PARFITT:  Let's get the paper
25     in front of him.

Page 31

1           THE WITNESS:  Yeah.  Let -- yes.
2      Let me get the --
3  BY MS. DAVIDSON:
4      Q.   Do you recall whether --
5           MS. DAVIDSON:  Michelle, this is my
6      deposition.
7  BY MS. DAVIDSON:
8      Q.   Dr. Siemiatycki, do you recall
9  whether you disclosed in that paper that you
10 are plaintiff's expert in the talc litigation?
11     A.   No.  I --
12          MS. PARFITT:  He can answer the
13     question when he has the article in front
14     of him.
15          MS. DAVIDSON:  I asked if he
16     recalls.  He doesn't need the paper for
17     that, Michelle.
18          Michelle, I have four hours here
19     today.  Please don't interrupt this
20     deposition, or I'll have to go to the
21     Court and ask for more hours.
22 BY MS. DAVIDSON:
23     Q.   Dr. Siemiatycki, do you recall
24 whether you disclosed that you are an expert in
25 the talc litigation in that paper?

Page 32

1      A.   I don't recall.
2      Q.   Did you have a policy of disclosing
3  in any papers related to talc that you are an
4  expert for plaintiffs in this litigation?
5      A.   I am not sure what you mean by
6  "have a policy."  I don't have any sort of
7  strictly written, notarized policy, but I do
8  disclose and I would disclose in any
9  publications that concern talc and
10 carcinogenicity that I am -- I have been an
11 expert in litigation.
12     Q.   Do you know, sitting here today,
13 why the Leung paper does not include such a
14 disclosure?
15     A.   I'd have to look at the article,
16 see what it was about, and see what the --
17 whether it was relevant to disclose that.
18     Q.   Have you published your views --
19 other than the Leung paper, have you written
20 anything about talc or asbestos since September
21 2021?
22     A.   I don't recall now.  I'd have to
23 look at my CV.
24     Q.   Have you made any public statements
25 concerning talc and ovarian cancer since 2021?

Page 33

1      A.   I don't recall; but again, looking
2  at my CV might refresh my memory about
3  something, but I don't think I did.
4      Q.   Are you currently working on any
5  articles or studies pertaining to talc or
6  ovarian cancer?
7      A.   Well, there is an intention to
8  write -- to do an analysis of perineal talc
9  exposure in the context of a case control study
10 that my colleague has carried out in Montreal,
11 and I would be involved in that article.  So
12 it -- there's an intention for that to happen.
13 It's not currently ongoing yet.
14     Q.   I'm sorry.  I don't understand.
15          You have an intention to publish a
16 new case control study on talc and ovarian
17 cancer?
18     A.   Yes.
19     Q.   And has the research begun on that?
20     A.   Has the research what?
21     Q.   Begun on that?
22     A.   The research began ten years ago,
23 so this is a study that was carried out by my
24 colleague, Anita Koushik, as the principal
25 investigator.  I was at the time involved as

9 (Pages 30 - 33)

Page 34

1  kind of mentor in helping her get funding and
2  designing the study and designing the fieldwork
3  procedures.
4      And the questionnaire that she
5  developed included questions about perineal
6  talc exposure, and the intention -- her
7  intention was always to do an analysis of that
8  data and publish it.
9      Q.   Do you know why it hasn't yet been
10 published?
11     A.   Well --
12         MS. PARFITT: Objection.  Form.
13         THE WITNESS:  -- she had other
14     priorities that were, in part, driven by
15     the principal hypotheses of stated in her
16     grant application and the funding agency.
17     And those were sort of in chronological
18     priority list.
19         It started probably around 2017 or
20     '18 that the data became available to be
21     analyzed.  It takes -- of course, a study
22     that was funded around 2008 or '9, didn't
23     complete the fieldwork and collection of
24     data probably for about five years after
25     that.

Page 35

1      And then getting started with
2  analyses and drafting of papers depended
3  on her priorities and the interests of her
4  students who were the, typically, the
5  first authors of the eventual paper.
6      So she has now -- they have now
7  published -- I don't know -- four or five
8  papers, I think, that have come out of
9  that study.  They haven't yet published
10 anything about perineal talc exposure, and
11 my understanding is that that is coming
12 up.  I don't know if it's next on the list
13 or -- she's also recently moved from one
14 university to another and had disruptions
15 of that sort in her life.
16 BY MS. DAVIDSON:
17     Q.   When is -- when is the last time
18 you discussed this paper -- potential paper
19 with her?
20     A.   A couple of months ago, I would
21 say.  Maybe December or January.
22     Q.   And when do you expect it to come
23 out?
24     A.   To come out?  You never know when a
25 paper is going to come out because you never

Page 36

1  know how -- it'll -- whether it'll be accepted
2  in first iteration or, you know, three
3  iterations of comments from editors and
4  reviewers and so on and so forth.
5      So when it's going to come out is
6  not under the control of the authors and the
7  investigators.  You can control when you're
8  going to submit the paper for -- to a journal.
9      Given that the analyses have not
10 yet been carried out, unless she has started
11 without my knowledge in the last couple of
12 months, and that the writing of the manuscript
13 has not started, I guess it wouldn't happen
14 before manuscript wouldn't be ready for
15 submission before the fall of this year.
16     Q.   Have you seen the data yet?
17         MS. PARFITT:  Seen what?
18         MS. DAVIDSON:  The data.
19         THE WITNESS:  No, not on talc
20     exposure.
21 BY MS. DAVIDSON:
22     Q.   Okay.  Have you done any outreach
23 to any health organizations, any public health
24 organizations about talc use and ovarian cancer
25 since 2021?

Page 37

1      A.   Well, I -- I had reached out to
2  Health Canada when they put out a call for or
3  opinions and input on their proposed report,
4  but I -- it might have been before 2021 or in
5  2020 or something in that ballpark.
6      Q.   Since Health Canada, my question
7  is:  Have you reached out to any public health
8  organizations about talc use and ovarian
9  cancer?
10     A.   Any public health organization?
11         No.  It's -- it's not my practice
12 to reach out to public health organizations
13 about research issues.
14     Q.   Are you familiar with an
15 organization called ACOG?
16     A.   I'm familiar with it.  I'm not a
17 member of it, and I haven't participated in any
18 way.
19     Q.   Do you know whether they list talc
20 use as a risk factor for ovarian cancer?
21     A.   No, I don't.
22     Q.   Have you looked on their website
23 since 2021?
24     A.   No, I haven't.
25     Q.   Are you familiar with the Society

10 (Pages 34 - 37)

Page 38

1  of Obstetricians and Gynecologists of Canada,
2  also known as SOGC?
3      A.   No, I'm not familiar with it.
4      Q.   You've never heard of SOGC?
5          MS. PARFITT:  Objection.
6          THE WITNESS:  Nope.
7          MS. PARFITT:  Asked and answered.
8          THE WITNESS:  With all the acronyms
9      that fly around my desk and my brain, it
10     doesn't ring a bell.  It's not the top of
11     mind.  I don't know if I've --
12  BY MS. DAVIDSON:
13     Q.   I gave it to you without the
14  acronym, actually:  Society of Obstetricians
15  and Gynecologists of Canada.
16     A.   I'm sure there is such a society.
17  So if you're asking me whether I'm surprised
18  that there is such a thing, no, I'm not at all
19  surprised.  I would expect that there would be.
20         But I'm not familiar with it.  I've
21  never been in touch with them.  I've never read
22  any documents from them.  It wouldn't be a
23  go-to place for me to find out about research
24  or risk factors.
25     Q.   And you've never reached out to

Page 39

1  them to express your concerns about talc and
2  ovarian cancer, correct?
3      A.   Correct.
4      Q.   Are you familiar with the Society
5  of Gynecological Oncology in the United States,
6  also known as SGO?
7      A.   Again, I'm -- I'm -- you know, I'm
8  not familiar with the particular combinations
9  of words that go into their name and the
10  acronym; but I am certain there is such a
11  society.
12     Q.   That wasn't my question.
13         Doctor, you mentioned that you had
14  the NCI PDQ in front of you.
15         Have you ever reached out to NCI to
16  raise your concerns about talc and ovarian
17  cancer?
18     A.   No, I haven't.
19     Q.   Have you ever heard of the CDC?
20     A.   Yes, I have.
21     Q.   And have you ever reached out to
22  the CDC to express your concerns about talc and
23  ovarian cancer?
24     A.   No, I haven't.
25     Q.   Have you ever looked on the CDC

Page 40

1  website to see if they list talc as a risk
2  factor for ovarian cancer?
3      A.   No, I haven't.
4      Q.   So you're not aware that the CDC
5  does not identify talc as a risk factor for
6  ovarian cancer?
7          MS. PARFITT:  Objection.  Form.
8          THE WITNESS:  No.  I'm not aware of
9      what's on their website.
10  BY MS. DAVIDSON:
11     Q.   Are you familiar with the American
12  Cancer Society?
13     A.   Yes, I am.
14     Q.   Are you aware that the American
15  Cancer Society has stated that the weight of
16  the evidence does not support an association
17  between ovarian cancer and general exposure to
18  talc-based powder?
19         MS. PARFITT:  Objection.  Form.
20         THE WITNESS:  I am not aware of
21     that statement that you just read.
22  BY MS. DAVIDSON:
23     Q.   Do you disagree with the American
24  Cancer Society?
25         MS. PARFITT:  Objection.  Form.

Page 41

1          You may answer.
2          THE WITNESS:  I would have to see
3      the entirety of their document and
4      their -- whatever they -- whatever they
5      include in their document to support that
6      conclusion before commenting on whether I
7      agree or disagree.
8  BY MS. DAVIDSON:
9      Q.   So you might agree with their
10     statement -- is there a possibility that you
11     would agree with the statement that, "The
12     weight of the evidence does not support an
13     association between ovarian cancer and genital
14     exposure"?
15         MS. PARFITT:  Objection.  Form.
16         THE WITNESS:  I would find it most
17     unlikely that I would disagree with it,
18     but I am open to being persuaded by
19     evidence.  And if they have evidence that
20     I've never seen...
21  BY MS. DAVIDSON:
22     Q.   Who drafted the changes to your
23  2023 report?
24     A.   I'm sorry?
25     Q.   Who drafted the additions in your

11 (Pages 38 - 41)

Page 42

1  2023 report?
2      A.    The additions?
3      Q.    Uh-huh.
4      A.    What -- which additions are you --
5      Q.    Do you remember you have a redline
6  in front of that shows what was added in '23?
7            Who drafted those additions?
8      A.    So just to be clear, there are not
9  additions to the 2023 report.  There were
10  changes to the 2021 report, and that's what is
11  redlined in sort of the correction in the
12  version that -- that I have.
13           Who drafted them?  I did.
14     Q.    Did you identify all the documents
15  that have been added to your reliance list and
16  put in the Dropbox and mentioned today, or were
17  some of them provided to you by the lawyers?
18     A.    Some were provided by the lawyers,
19  and some I found independently.  And at this
20  time I -- I mean, I've never kept a tally of
21  how I found out about different documents or
22  reports.  So I couldn't really identify which
23  ones I came upon and which ones were sent to me
24  by the lawyers; but some were sent by the
25  lawyers, and some I came upon independently.

Page 43

1      Q.    You testified in 2021 that you're
2  not offering an opinion that Johnson's Baby
3  Powder contained asbestos.
4            Is that still your position?
5      MS. PARFITT:  Objection.  Form.
6  Misstates his testimony.
7      THE WITNESS:  I would say that I've
8  seen more evidence in the last couple of
9  years that point in the direction that
10  asbestos has been in -- in the
11  formulations of cosmetic talc.
12           And so I would be much more
13  amenable to the opinion that there has
14  been asbestos.
15  BY MS. DAVIDSON:
16     Q.    You would be more amenable to that
17  opinion, or you're offering that opinion?
18     A.    I'm offering that opinion but based
19  not on my own expertise as a mineralogist or a
20  measurement scientist for asbestos, but the
21  accumulation of evidence from credible sources,
22  including EPA, FDA in the U.S. and some
23  scientists who have measured asbestos fibers in
24  talc, in historic talc preparations, make me --
25  persuade me much more.

Page 44

1      I mean, I make a distinction
2  between evidence that I look at and that I
3  derive and that I hold.  The opinions that I
4  hold are based on my own personal evaluation of
5  the data and the evidence as compared with
6  opinions I hold based on the authoritative
7  opinions of others that I accept.
8      Q.    What documents -- well, let's go
9  back.
10           You said -- referenced EPA.
11           Has EPA ever stated that talc
12  contains asbestos?
13     A.    I'm looking -- I'm looking for the
14  document on that topic.  So the recent EPA
15  document -- it's in this, I think.
16     Q.    Is it your recollection that that
17  document references talc?
18     A.    I'm sorry?
19     Q.    Is it your recollection that that
20  document references talc?
21     A.    It is my recollection that there is
22  mention of asbestos in talc.
23     Q.    Okay.
24     MS. PARFITT:  I can shorten this
25  real quickly and point to the document.  I

Page 45

1  see it in his pile.
2      MS. DAVIDSON:  Michelle, let --
3  let's just let us handle this.
4      MS. PARFITT:  Let me just say this,
5  and we won't have any problems.
6      If you ask him about a document and
7  he says he's looking for it, he's entitled
8  to have it in front of him.
9      I know you're moving it along, but
10  if you're going to ask him questions about
11  a document --
12     MS. DAVIDSON:  Michelle, it is very
13  clear that there is a strategy in this
14  deposition of filibustering because, you
15  know, I only have four hours.  And if I
16  have to, I will go to the Court and ask
17  for more time.
18     MS. PARFITT:  You're remote.  I'm
19  here.
20     MS. DAVIDSON:  I'm telling you --
21     MS. PARFITT:  Filibuster --
22     MS. DAVIDSON:  I will go to the
23  Court and ask for more time because
24  Dr. Siemiatycki is answering simple
25  questions --

12 (Pages 42 - 45)

Page 46

1        MS. PARFITT:  You're not going to
2   get more --
3        MS. DAVIDSON:  You're interrupting
4   me.  You're interrupting me.
5        Dr. Siemiatycki is answering simple
6   questions --
7        MS. PARFITT:  Let me finish.
8        MS. DAVIDSON:  You can finish after
9   I'm finished.  You will finish after I am
10  finished.
11       Dr. Siemiatycki is answering very
12  simple questions with long-winded answers
13  that he was clearly coached to do, and we
14  have very limited time.
15       MS. PARFITT:  Jessica --
16       MS. DAVIDSON:  So --
17       MS. PARFITT:  -- you do not give
18  your tenor to what Dr. Siemiatycki.  He's
19  here to answer your questions.  Make the
20  question so he can give a good answer.
21       And, Jack, if you need look to look
22  at the articles, just tell Ms. Davidson.
23       THE WITNESS:  Thank you.
24  BY MS. DAVIDSON:
25       Q.   Dr. Siemiatycki, other than EPA and

Page 47

1   FDA, what other materials are you relying on
2   for your new opinion that Johnson's Baby Powder
3   contains asbestos?
4        A.   A document written by Dr. Longo,
5   William Longo, November 17, 2023, which
6   included analyses of talc products, historic
7   talc products of various origins, including
8   Chinese and that -- where he demonstrated the
9   presence of asbestos fibers.
10       Q.   Are there any other documents
11  you're relying on?
12       A.   Well, historically, there were
13  reports from Blount about this, relying on my
14  memory.  Let me look in my report and see.
15       Q.   Your report doesn't actually cite
16  anything.  When you say -- when you refer to,
17  quote, "Growing evidence that talc products may
18  have contained asbestos fibers," there's no
19  cite there?
20       MS. PARFITT:  Jessica, I'll also
21  remind you that this area was covered in
22  his prior deposition.
23       MS. DAVIDSON:  It's a new sentence
24  in his report, Michelle.
25       MS. PARFITT:  I understand.  I'm

Page 48

1   just talking generally.
2        MS. DAVIDSON:  I'm just telling you
3   it's a new sentence in his report.
4        MS. PARFITT:  Fair enough.
5   BY MS. DAVIDSON:
6        Q.   Dr. Siemiatycki, sitting here
7   today, can you recall any other documents that
8   you relied on for your opinion, which is
9   uncited in your report, that there is "growing
10  evidence that talc products may have contained
11  asbestos fibers"?
12       MS. PARFITT:  Objection.  Misstates
13  his testimony.
14       THE WITNESS:  I am trying to
15  recall, and right now I can't recall
16  those.  I'd have to spend a couple of
17  minutes looking through the documents.
18  BY MS. DAVIDSON:
19       Q.   Okay.  Dr. Siemiatycki, would you
20  agree with me that it's important for a
21  scientist before reaching any sort of opinions
22  on scientific issues, to consider all the
23  relevant data?
24       A.   Yes.
25       Q.   Dr. Siemiatycki, have you reviewed

Page 49

1   all the documents that J&J produced in this
2   litigation about its robust testing of talc for
3   asbestos?
4        MS. PARFITT:  Objection.  Form.
5        THE WITNESS:  And I'm not sure what
6   you mean by "all the documents that J&J
7   produced."  What's that --
8   BY MS. DAVIDSON:
9        Q.   Have you reviewed all of J&J's
10  documents in which they address the robust
11  testing program for asbestos in its talc
12  products?
13       MS. PARFITT:  Objection.
14       I'll give you a little foundation,
15  but this area was examined as well back on
16  January 31st, '19.
17       MS. DAVIDSON:  We have this new
18  statement in the report, Michelle; and
19  please stop filibustering this deposition.
20  BY MS. DAVIDSON:
21       Q.   Dr. Siemiatycki, do you --
22       MS. PARFITT:  Stop going back in
23  history, or we will have to call the
24  judge.
25       MS. DAVIDSON: Michelle.  Michelle,

13 (Pages 46 - 49)

Page 50

1    it's been four years. He has an opinion.
2    I need to know --
3         MS. PARFITT: Jessica, don't
4    shriek.
5    BY MS. DAVIDSON:
6         Q.   Dr. Siemiatycki, I'm going to ask
7    the question again.
8         Have you reviewed the documents
9    produced by J&J addressing its robust testing
10   program for talc products?
11        MS. PARFITT: Objection.
12        THE WITNESS: I remember reviewing
13   some documents from J&J about this, but I
14   don't know that this is -- was a
15   comprehensive list of documents. I mean,
16   if you -- if there are any new ones, I'd
17   be glad to look at them.
18   BY MS. DAVIDSON:
19        Q.   Are you aware that J&J produced
20   thousands of documents in this litigation about
21   its testing of talc for asbestos?
22        MS. PARFITT: Objection. Asked and
23   answered in his deposition January '19.
24        THE WITNESS: I'm aware they
25   produced documents about this. I don't

Page 51

1    know if -- there were thousands. I have
2    no idea how many, and I don't know what
3    they were total.
4    BY MS. DAVIDSON:
5         Q.   Have you reviewed the expert report
6    of J&J's expert who responds to Dr. Longo and
7    explains the flaws in Dr. Longo's testing?
8         A.   Who would the author be of that
9    report or the timing?
10        Q.   Do you recall reading any such
11   report?
12        A.   I recall reading reports from a --
13   reports from experts for J&J about this, but I
14   don't know if it's the one -- the reports that
15   you have in mind. I don't know.
16        Q.   Have you reviewed the expert report
17   from J&J's microscopist?
18        A.   I have not recently, but I have.
19        Q.   Did you review the report that
20   J&J's microscopist submitted in response to the
21   Longo report you mentioned a few minutes ago?
22        MS. PARFITT: You're talking about
23   the '23 Longo report, for clarity because
24   there's two or many actually?
25        Are you referring to the

Page 52

1    November 17th, 2023, report, Jessica?
2         We need the record to be clear.
3    BY MS. DAVIDSON:
4         Q.   Dr. Siemiatycki, have you reviewed
5    any reports by Mr. Matthew Sanchez?
6         A.   By who?
7         Q.   Mr. Matthew Sanchez.
8         A.   That does not ring a bell.
9         What would the date be on that
10   report?
11        Q.   There would be multiple such
12   reports.
13        A.   Roughly beginning when and ending
14   when?
15        These are from 2023 and --
16        Q.   There -- over the years there have
17   been multiple reports by Mr. Matthew Sanchez.
18        Have you reviewed any of them?
19        A.   I can't recall having reviewed
20   them.
21        Q.   None of them -- none of them are
22   with you here today, correct?
23        A.   Correct.
24        MS. DAVIDSON: Okay. I need to go
25   off the record. I have a quick call, so

Page 53

1    let's take a five-minute break.
2         MS. PARFITT: Okay. Thank you.
3         (Whereupon, a break was taken.)
4    BY MS. DAVIDSON:
5         Q.   Dr. Siemiatycki, other than the
6    materials that you were provided by plaintiff's
7    counsels, did you undertake any research on
8    your own regarding potential asbestos
9    contamination in Johnson's Baby Powder?
10        A.   I'm not sure if I would
11   characterize it as having undertaken
12   independent research on my own; but when I was
13   reading the various documents that I did have,
14   I would sometimes look at references in those
15   documents that may -- that were not submitted
16   to me by -- by the plaintiff's lawyers.
17        But I can't remember if that
18   occurred with this topic, with the topic of
19   asbestos in talc products. But as a general
20   rule, I would explore, read a document; and
21   there may be sort of a stimulus there to look
22   at something else.
23        Q.   Well, today you mentioned an EPA
24   document, an FDA document, Dr. Longo, and
25   Dr. Blount.

14 (Pages 50 - 53)

Page 54

1        Fair to say all those materials
2 were provided to you by plaintiff's counsel?
3        MS. PARFITT:  Objection.  Form.
4 Asked and answered.
5        THE WITNESS:  So the -- I think
6    originally the Blount articles -- and I'm
7    having trouble remembering all the names,
8    but there was another early article from
9    the late -- late '70s or early '80s that
10    addressed the detection of asbestos
11    particles in talc products.  Those were
12    provided originally by the lawyers.
13        The FDA analyses, I'm not sure
14    whether information about that was
15    provided by the lawyers or if I saw that
16    in another report.  So I'm a little bit
17    fuzzy on the historical origin of how I
18    came to know those documents.
19 BY MS. DAVIDSON:
20    Q.    Was the EPA document provided to
21 you by the plaintiff's lawyers?
22    A.    Yeah.  So the EPA document is the
23 recent ban on asbestos, which does not, in
24 fact, concern talc.  I just had a look at it
25 directly.  It doesn't explicitly concern talc,

Page 55

1 but it concerns one of the products that has
2 been detected in talc products, one of them.
3    Q.    So, in fact, the EPA document does
4 not support your new opinion that talc
5 contained asbestos, correct?
6        MS. PARFITT:  Objection.  Misstates
7    his testimony entirely.
8        THE WITNESS:  That's correct.  I
9    would say that's correct, basically.
10 BY MS. DAVIDSON:
11    Q.    Okay.  And the Dr. Longo documents
12 were provided to you by plaintiff's counsel as
13 well, of course?
14    A.    Yeah.
15    Q.    Okay.  Thank you.
16        Are you offering an opinion on
17 heavy metals in this litigation?
18    A.    What do you mean by "an opinion on
19 heavy metals"?
20    Q.    Are you offering an opinion that
21 talc contained -- that Johnson's Baby Powder
22 contained heavy metals?
23        MS. PARFITT:  Objection to the
24    extent it's foundational.  It was covered
25    in his 2019 deposition.

Page 56

1        You may answer, Dr. Siemiatycki.
2        THE WITNESS:  I -- I have read
3    references to the to the detection of
4    metals in talc products.  I -- I can't
5    say.  It certainly not something that I'm
6    relying upon for any opinions about talc,
7    but it's something that I have read.
8 BY MS. DAVIDSON:
9    Q.    Dr. Siemiatycki, did you reach out
10 to IARC and offer yourself as a potential
11 expert on talc issues recently?
12    A.    Yes, I did.
13    Q.    When was that?
14    A.    Probably a year ago or nine months
15 ago.  It was following a call by IARC for
16 experts to volunteer to participate in a new
17 monograph evaluation of talc, and I thought I
18 might be useful to them; and I've had a long
19 association with IARC.  So I -- I did offer
20 myself in that context.
21    Q.    Did you tell the lawyers you were
22 going to do that?
23    A.    I don't think I told them before
24 doing it.  I can't remember at what point I
25 informed them about it.  Maybe only after I had

Page 57

1 learned that IARC was not going to invite me,
2 but we didn't have a discussion about that.
3    Q.    And the reason -- and the reason
4 they didn't include you is because of your
5 conflict of interest as a plaintiff's expert,
6 right?
7    A.    That's right, which --
8    Q.    And --
9    A.    -- I admitted to them front and
10 center when I made my -- when I offered my
11 services.
12    Q.    Did you provide plaintiffs to
13 produce to us the letter you submitted to IARC
14 with your application, so to speak?
15    A.    Can you -- can you repeat that?
16    Q.    Your application to IARC, was it
17 some sort of letter?
18    A.    Yeah, it was a letter.  And I think
19 accompanying the letter, there was a form,
20 actually, explicitly asking the applicant to
21 list any potential conflicts of interest.
22        MS. DAVIDSON:  Michelle, has that
23    been produced to us because we couldn't
24    find it?
25        MS. PARFITT:  It was.  It was.  And

15 (Pages 54 - 57)

Page 58

1    Patrick can confirm that.
2         MS. DAVIDSON: Okay. All right.
3         MR. LYONS: Yeah. It's in the --
4    it's in the Dropbox.
5         MS. DAVIDSON: Okay.
6         MR. LYONS: It's labeled "Letter to
7    IARC on Monograph 136."
8         MS. DAVIDSON: Yeah. I don't know
9    why we didn't find that it.
10        Noah, please find that and make
11   sure we have it.
12        Noah will make sure we have it
13   before the day is over.
14   BY MS. DAVIDSON:
15   Q.   Okay. Dr. Siemiatycki, you're
16   aware that Dr. Woolen found a 1.47 risk ratio
17   for frequent talc use, right?
18   A.   For what?
19   Q.   Dr. Woolen found a 1.47 risk ratio
20   between her definition of frequent talc use and
21   the development of ovarian cancer, correct?
22   A.   Yes, that's correct.
23   Q.   Does that mean that if a woman used
24   perineal talc frequently and developed ovarian
25   cancer, 47 percent of the cause of that ovarian

Page 59

1    cancer would have been her talc use?
2         MS. PARFITT: Objection. Form.
3         THE WITNESS: Sorry. I'm -- I'm
4    not following your algebra.
5    BY MS. DAVIDSON:
6    Q.   Well, I'm asking you if that
7    makes -- I'm asking you.
8    A.   Yes. I understand, but I don't
9    understand what your asking me.
10   Q.   I'm asking you if somebody is a
11   frequent user of talc and then develops ovarian
12   cancer, can the risk ratio in Woolen be turned
13   into an absolute risk such that you can say
14   that 47 percent of this woman's cancer
15   causation relates to ex- -- perineal talc
16   exposure?
17        MS. PARFITT: Objection to form.
18        THE WITNESS: No.
19   BY MS. DAVIDSON:
20   Q.   And why is that?
21   A.   Because that's not the meaning of
22   relative risk.
23   Q.   Can you explain?
24   A.   The relative risk of 1.47 means
25   that for a woman who was a frequent user, her

Page 60

1    chance of developing ovarian cancer was 1.47
2    times greater than the risk for a non user.
3         It can also be restated -- it can
4    also be restated that her chance of getting
5    ovarian cancer was 47 percent higher than for
6    non users, but that's not an optimal way to
7    actually present a risk ratio or a relative
8    risk; but that is sometimes expressed that way.
9         But not in the percentage terms
10   that you indicated in your question.
11   Q.   Are you aware that IARC and NCI
12   issued a report called "Expert Consensus on
13   Future Directions for Ovarian Cancer Research"?
14   A.   What would be the date
15   approximately? The year?
16        I'm not sure what you're talking
17   about.
18        MS. PARFITT: And, Jessica, if you
19   have a copy of that document, perhaps you
20   could share it.
21   BY MS. DAVIDSON:
22   Q.   I'm asking if you're familiar with
23   the document entitled "IARC and NCI Expert
24   Consensus on Future Directions for Ovarian
25   Cancer Research."

Page 61

1    A.   What year approximately?
2         MS. DAVIDSON: Noah, what year is
3    it?
4         MR. EPSTEIN: 2021.
5         MS. DAVIDSON: 2021.
6         MR. EPSTEIN: Do you want me to put
7    it in the chat?
8         MS. DAVIDSON: Not right now.
9         MS. PARFITT: Oh, so you don't want
10   to put it in the chat; so you don't want
11   the doctor to --
12        MS. DAVIDSON: I just want to know
13   if Dr. Siemiatycki is familiar with this
14   document, if he read it before, if it
15   sounds familiar.
16        THE WITNESS: No, I haven't seen
17   it.
18   BY MS. DAVIDSON:
19   Q.   Okay. Thank you.
20        How would you extrapolate from
21   these epi studies to determine what a women's
22   absolute risk is for ovarian cancer from
23   perineal talc use?
24        MS. PARFITT: Objection. Form.
25        You can answer.

16 (Pages 58 - 61)

Page 62

1    THE WITNESS: You mean technically,
2    like the algebraic formula that is used to
3    do that?
4    BY MS. DAVIDSON:
5    Q.    How is it done?
6    I'm just asking generally how it's
7    done.
8    MS. PARFITT: Objection.
9    THE WITNESS: Well, it's sort of a
10   combination of the relative risk and the
11   incidence of the disease in the
12   population. Combining those parameters,
13   you can -- you can figure out the absolute
14   risk due to the exposure.
15   BY MS. DAVIDSON:
16   Q.    Have you done that for talc and
17   ovarian cancer?
18   A.    No, I haven't.
19   Q.    Have you done a systematic review
20   of the literature related to asbestos and
21   ovarian cancer?
22   A.    Have I personally done one?
23   Q.    Yes.
24   A.    No, I haven't.
25   Q.    Do you know how much exposure to

Page 63

1    asbestos is needed to cause ovarian cancer?
2    MS. PARFITT: Objection. Form.
3    THE WITNESS: No, I don't.
4    BY MS. DAVIDSON:
5    Q.    Are you aware that one of the
6    authors of Woolen is a plaintiff's expert in
7    this litigation?
8    A.    Am I aware that one of the authors
9    of the Woolen paper is an expert for the
10   plaintiffs; is that what you're asking?
11   Q.    That is.
12   A.    Let me look at the article.
13   Q.    Without looking at the article, you
14   can't tell me whether one of the authors is an
15   expert?
16   A.    There are 200 articles in my piles,
17   and each one has about ten authors; and I don't
18   remember all the authors on all the papers.
19   So --
20   Q.    You don't -- you don't recall
21   whether the Woolen paper -- whether the senior
22   author on the Woolen paper is a plaintiff's
23   expert in this litigation?
24   MS. PARFITT: Objection.
25   THE WITNESS: I'm not aware -- I'm

Page 64

1    not -- I'm not aware.
2    BY MS. DAVIDSON:
3    Q.    Were you aware that the --
4    MS. PARFITT: Let him finish.
5    THE WITNESS: Maybe -- maybe if you
6    tell me who the senior author is.
7    BY MS. DAVIDSON:
8    Q.    Okay. Are you aware that the
9    Woolen paper grew out of a meta-analysis that
10   was actually done for purposes of this
11   litigation?
12   MS. PARFITT: Objection. Misstates
13   the evidence in the case.
14   THE WITNESS: No, I'm not aware of
15   that.
16   BY MS. DAVIDSON:
17   Q.    Do you know how the Woolen authors
18   chose two times a week as their definition of
19   frequent use?
20   A.    It may be mentioned in the paper.
21   I certainly don't remember it. But
22   establishing cutpoints for continuous variables
23   has an element of arbitrariness always and you
24   typically look for -- if it's a meta-analysis,
25   which this is, you're probably looking for

Page 65

1    cutpoints that have been used by the original
2    authors of the original studies. And so you're
3    a little bit at the mercy of what has been done
4    previously, and you're also trying to look for
5    cutpoints that make sense to you as a cutpoint
6    for the parameter that you're looking for,
7    which is frequency of use.
8    But in this particular case, I
9    don't recall.
10   Q.    Did you check -- when you reviewed
11   Woolen, did you check whether the risk ratios
12   the authors used were actually for
13   two-times-a-week use?
14   A.    Sorry. Did -- was -- did I check
15   whether --
16   Q.    Whether the risk ratios used in the
17   Woolen paper actually reflected
18   two-times-a-week use?
19   A.    No, I didn't. But coincidentally,
20   I carried out an analysis myself along the
21   lines of what's in the Woolen paper some years
22   before they did, and it's in my report. And,
23   in fact, there's a table in my report -- I
24   think it's Table 8 in my report -- which
25   describes my own meta-analysis on that topic

17 (Pages 62 - 65)

Page 66

1  and the studies that I used that I found in the
2  literature to address the question and the
3  relative risk estimates that I used
4  independently of Woolen.
5        As I said, I did it years before
6  they did, came out quite close to the relative
7  risk estimates that they used in their
8  analysis; and my bottom-line result came out
9  very close to theirs. I think the
10  meta-relative risk in my analysis of the high
11  frequency users was 1.39 with a confidence
12  interval that easily included the 1.47 relative
13  risk estimate in the Woolen paper.
14        So the two analyses carried out
15  completely independently of each other,
16  basically, found the same raw material to
17  analyze, carried out the analysis in similar
18  ways and found almost exactly the same
19  bottom-line result.
20     Q.    How many of the studies overlapped
21  between the two papers?
22     A.    I'm sorry. How many?
23     Q.    How many of the studies overlapped
24  between your meta-analysis and hers?
25     A.    I didn't count them, but they

Page 67

1  almost all do.
2     Q.    Okay.
3     A.    I think there was one --
4     Q.    Okay.
5        MS. PARFITT: Let him finish.
6        THE WITNESS: I think one exception
7  was that, if I remember correctly, I
8  included the Terry analysis -- the Terry
9  paper as one of the components.
10        Sorry. I'm just verifying that
11  that is the case.
12        Oh, no. I included the Terry
13  analysis in my Table 6, which is an
14  analogous meta-analysis, but for
15  cumulative exposure not frequency of
16  exposure.
17        So the frequency of use, which is
18  the same parameter that Woolen used -- I
19  mean, I can list the studies, but they
20  were almost identical with the ones that
21  they used.
22  BY MS. DAVIDSON:
23     Q.    Do you know whether there have been
24  other meta-analyses that defined frequency of
25  use different than two times a week?

Page 68

1        MS. PARFITT: Objection. Form.
2        THE WITNESS: Do I know -- right
3  now sitting here, no; but if you told me
4  of another study, I might recognize it.
5  BY MS. DAVIDSON:
6     Q.    And one difference between your
7  paper and the Woolen paper is that she used
8  NHS-1 data right they used NHS-1 data, right?
9        MS. PARFITT: Objection. Form.
10        THE WITNESS: I -- maybe. Maybe
11  that's a distinction. I used O'Brien, I
12  believe; and if they used NHS-1, then that
13  would be a difference.
14        I did not use NHS. I used
15  O'Brien --
16        MS. DAVIDSON: Turn to Table 1.
17        MS. PARFITT: Wait, Jessica. He's
18  finishing his statement. Let him finish.
19        THE WITNESS: I'm just
20  confirming --
21        MS. DAVIDSON: He's answering a
22  question I didn't ask.
23        MS. PARFITT: Yes. Let him finish.
24        THE WITNESS: So I used -- you were
25  asking about studies that overlapped and

Page 69

1  whether I used NHS data, and I'm just
2  trying to answer that question. I did not
3  use NHS.
4        I used the superior data, which is
5  in the O'Brien study, which involved a
6  longer period of follow-up and larger
7  number of cases.
8  BY MS. DAVIDSON:
9     Q.    Where did Woolen get the NHS data?
10     A.    I'm sorry?
11     Q.    Do you know where Woolen got her --
12  where the Woolen authors got their NHS-1 data?
13     A.    Off the top, no. I could look up
14  the article and try to find it, but I -- I
15  don't recall.
16     Q.    Do you recall that they limited
17  their NHS-1 data to patent women?
18     A.    I don't recall specifically, but it
19  doesn't surprise me.
20     Q.    Can we look --
21        MS. DAVIDSON: Noah, can you put up
22  on the screen Table 1 of Woolen, which we
23  just marked as Exhibit 1.
24        MS. PARFITT: Let the doctor get
25  his article.

18 (Pages 66 - 69)

Page 70

1      MS. DAVIDSON:  I'm sorry.
2      MS. PARFITT:  I've asked you to
3  allow Dr. Siemiatycki to --
4      MS. DAVIDSON:  I can't hear you for
5  some reason.
6      MS. PARFITT:  Oh, I'm sorry.  I
7  just simply asked if he has the article.
8  He has it in front of him.
9      THE WITNESS:  Yeah.  I have it in
10 front of me now.
11 BY MS. DAVIDSON:
12     Q.    We're looking at Table 1.
13     A.    Table 1.
14     (Whereupon, Defendant's Exhibit D1,
15     Article entitled, "Association Between the
16     Frequent Use of Perineal Talcum Powder
17     Products and Ovarian Cancer:  A Systematic
18     Review and Meta-analysis," by Sean A.
19     Woolen, MD, MSc, et al., was marked for
20     identification.)
21     THE WITNESS:  Quality assessment
22     table, yeah.
23 BY MS. DAVIDSON:
24     Q.    Are you familiar with the
25 Newcastle-Ottawa Scale?

Page 71

1      A.    I'm familiar with it.
2      Q.    Have you used it before?
3      A.    I'm sorry?
4      Q.    Have you used it before?
5      A.    No.  I -- I don't believe that the
6  quality of epidemiological studies can be
7  summarized in these kind of mono-dimensional
8  scales.  So I'm skeptical about the principle,
9  and I know that I can evaluate the quality of
10 studies better than by using any automated
11 tool, simplistic tool because epidemiological
12 studies are extremely complicated.  And you
13 can't predict ahead of time which dimensions
14 are -- might embody fatal flaws or serious
15 flaws or flaws that are not serious, don't
16 impact the result.
17     But anyways, to answer your
18 question, I'm familiar with the scale.  I've
19 never used it.  I don't believe in it
20 particularly.  I've never had occasion to use
21 it.
22     Q.    Which study does -- do the Woolen
23 authors give the highest score to?
24     MS. PARFITT:  Objection.  Form.
25     THE WITNESS:  To the O'Brien study.

Page 72

1  BY MS. DAVIDSON:
2      Q.    Do you disagree with that?
3      A.    No.  I don't -- neither agree nor
4  disagree.
5      I thought you had said before that
6  they used the NHS study, so I was confused --
7  I'm a little bit confused now about which
8  studies they used.
9      Oh, it's the NHS component of the
10 O'Brien, apparently.  That's, I think, what
11 this table is indicating that was used in --
12 whereas, I used the entire O'Brien study.
13     But it might be -- now that I think
14 about it, it might be that the other components
15 of the O'Brien study, the other cohorts did not
16 include frequency questions in their
17 questionnaire.  I'm not quite sure.  I'd have
18 to read the article to see why they included
19 only the NHS component.
20     Q.    You don't recall sitting here
21 today?
22     A.    I'm sorry?
23     Q.    Sitting here today, you don't
24 recall how they made that decision, correct?
25     A.    Correct.

Page 73

1      Q.    Would you agree or disagree with
2  Woolen's decision to rate the cohort design
3  higher than the case control designs?
4      MS. PARFITT:  Objection to form.
5      THE WITNESS:  I disagree if the
6  implication of the question is that they
7  did it because it was a cohort design.  I
8  would have to consider carefully all of
9  the dimensions that go into determining
10 the validity and quality of a result.
11     And basically, I probably would
12 disagree with it after I did look at all
13 of that because cohort studies have a lot
14 of disadvantages as well as case control
15 studies.
16     And depending on how the Newcastle
17 Scale is weighted by people who developed
18 it 20 years ago and were not familiar with
19 these particular studies but just did it
20 in a very generic, general way, I -- my
21 appreciation -- my understanding of these
22 studies is that the Nurses Health
23 certain -- National Health Study -- so I'm
24 not sure what the National Health Study --
25 is that the Nurses Health Study?

19 (Pages 70 - 73)

Page 74

1     Anyways, you're asking me
2  questions. I'd have to spend a couple of
3  minutes reading the paper to answer them
4  properly because I'm a bit confused now
5  about what was -- what they included.
6  BY MS. DAVIDSON:
7     Q.    Dr. Siemiatycki, what was my
8  question that you're currently answering?
9     A.    I think your question was whether I
10 agree that the highest quality study was the
11 cohort study among these various studies that
12 they've listed. I think that was your
13 question, whether I agree with that.
14    Q.    Please try to respond to the actual
15 questions being asked because you do remember
16 the question, but your response was not related
17 to the question.
18    Dr. Siemiatycki, if a woman is
19 not --
20    A.    What -- you're saying that I
21 already responded to it and then went off
22 script or something.
23    But what -- what response did you
24 get from my first comment about it?
25    I think --

Page 75

1     Q.    Dr. Siemiatycki --
2     A.    -- I explained --
3     Q.    Dr. Siemiatycki, if a woman does
4  not have patent tubes at the time that she is
5  interviewed in a -- if a woman does not have
6  patent tubes at the time she's interviewed for
7  an epidemiological study, does that mean she
8  never used talc while she had patent tubes?
9     MS. PARFITT: Objection. Form.
10    THE WITNESS: Is this in relation
11    to -- is this sequitur to the question
12    that you've just been asking?
13    I don't understand that question.
14 BY MS. DAVIDSON:
15    Q.    Doctor, just answer the question.
16    MS. PARFITT: I think --
17    THE WITNESS: I'm trying to
18    understand the question.
19 BY MS. DAVIDSON:
20    Q.    If a woman is interviewed for
21 epidemiological study and at the time she is
22 interviewed she no longer has patent tubes,
23 does she mean she never used talc at the time
24 when she had patent tubes?
25    A.    No.

Page 76

1     Q.    Correct. Thank you.
2     And do you know the average age at
3  which women start using talc?
4     A.    In a particular study or in
5  general?
6     Q.    Have you seen any studies that
7  identify the average age when women start using
8  talc in their genital areas?
9     A.    I probably have, and I don't recall
10 that particular factum; but I would guess it's
11 somewhere between the ages of 13 and 25.
12    Q.    And do you know the average age at
13 which women have a tubal ligation?
14    A.    I don't know that for a fact. I
15 don't know that for a fact. I could -- I could
16 guesstimate; but if you're asking me for
17 factual information, I don't know.
18    Q.    Is it usually older than 15 to 25?
19    MS. PARFITT: Objection.
20    THE WITNESS: Yes.
21    MS. DAVIDSON: All right. If we
22    could turn to Table 2.
23    MS. PARFITT: For the record, the
24    Woolen article.
25    THE WITNESS: Yes. Sorry. I'm not

Page 77

1  sure if I've lost the audio.
2     MS. PARFITT: Jessica, you went out
3     completely, just so you know.
4  BY MS. DAVIDSON:
5     Q.    The authors state, "We include data
6  on women with intact fallopian tubes to
7  harmonize with other publications."
8     Do you see that at the bottom of
9  Footnote 5? Doctor?
10    A.    Yeah. Sorry. I'm sorry. I'm
11 reading the entire footnote.
12    Q.    I'm asking you about the last
13 sentence in the footnote.
14    Do you see it?
15    MS. PARFITT: Jessica, he's reading
16    the footnote.
17    THE WITNESS: Do you want me to
18    read only -- because my answer to the last
19    sentence only will be I need to read the
20    full footnote.
21    So should I -- should we do it in
22    two steps, or should I start reading the
23    full --
24 BY MS. DAVIDSON:
25    Q.    Doctor, please don't be difficult

20 (Pages 74 - 77)

Page 78

1  here. We're trying to get through this
2  deposition. I'm asking you a question.
3      Do you see that the authors state,
4  "We include data on women with intact fallopian
5  tubes to harmonize with other publications"?
6      Do you see that sentence?
7      MS. PARFITT: I object to your
8      characterization of this witness being
9      difficult. That is unfair, and I
10     challenge that representation, Jessica.
11     Please move forward. Just ask the
12     questions not the commentary.
13 BY MS. DAVIDSON:
14     Q.   Doctor, do you see that sentence,
15 for the third time?
16     A.   I see -- I see that sentence, yes.
17     Q.   Doctor, can you tell me which other
18 publications on this list in Table 2 were
19 limited to women with patent tubes, if any?
20     A.   I don't know. I don't know.
21     Q.   When you evaluated the Woolen
22 study, did you consider whether it was accurate
23 that including data on women with intact
24 fallopian tubes would harmonize this with other
25 publications?

Page 79

1      A.   Well, I have some problem with the
2  formulation of that sentence because -- maybe
3  one of your previous questions hinted at
4  this -- but I think when people talk about
5  intact fallopian tubes and patent reproductive
6  tract and related to exposure to talc, there
7  should really be an appreciation of the
8  temporal relationship between those things.
9      So for sure women who used powder
10 and were -- and then had surgery, you have to
11 understand what the temporal sequence was
12 between these events to understand if there was
13 possible exposure to talc fibers, to talc
14 particles.
15     Q.   Dr. Siemiatycki, what was my
16 question?
17     A.   Could we have the stenographer read
18 back the question?
19     Q.   You don't recall the question?
20     A.   Well, I recall the theme of the
21 question, and I recall what I was trying to
22 convey, that timing is relevant to
23 understanding whether the exposure and the
24 possibility of disease are in harmony in any
25 way.

Page 80

1      Q.   Right. But my question, Doctor,
2  was whether any of the other ten studies in
3  Table 2 limited -- were limited to women with
4  patent tubes.
5      A.   I don't know. I'd have to look
6  through those studies.
7      Q.   And then I asked: When you
8  reviewed this paper, did you look through the
9  studies to determine whether the other papers
10 were limited to women --
11     A.   No.
12     Q.   -- with patent tubes?
13     A.   No, no.
14     Q.   That was my question. Thank you.
15     A.   Okay. The answer's no.
16     Q.   Doctor, if you could look at
17 Table 2, at the -- one, two, three, four,
18 five -- and the sixth column, specification of
19 talc exposure.
20     Do you see that?
21     A.   Yes, I do.
22     Q.   Which of these papers -- which of
23 these -- which of these relative risks used by
24 Dr. Woolen, et al., is limited -- reflects use
25 two times per week?

Page 81

1      A.   Reflects?
2      Q.   Use of two times per week.
3      A.   I don't know. I'd have to go
4  through them, but some of them are expressed in
5  different units; and so they are not expressed
6  in the two-times-per-week metric that you're
7  referring to.
8      Q.   Do you know whether any of these
9  papers included other risk ratios for talc use
10 that more closely approximated two times per
11 week?
12     MS. PARFITT: Objection. Form.
13     THE WITNESS: No, I don't.
14 BY MS. DAVIDSON:
15     Q.   Do you know how many of the papers
16 in Table 2 were not actually limited to
17 perineal talc use?
18     A.   No, I don't.
19     Q.   Are you aware that several of these
20 papers offered six or seven different risk
21 ratios for different specifications of talc
22 exposure?
23     MS. PARFITT: Objection. Form.
24     THE WITNESS: I would have guessed
25     that they do. Every paper usually

21 (Pages 78 - 81)

Page 82

1   provides estimates of risk according to
2   different parameterizations of the
3   exposure variable.  So I'm sure that these
4   studies, most of them, would have done
5   that.
6   BY MS. DAVIDSON:
7       Q.    Did you determine how Woolen chose
8   which risk ratio to use when there were
9   multiple choices in one paper?
10      A.    No, I didn't.
11      MS. DAVIDSON:  All right.  Let's go
12  off the record.
13      (Whereupon, a break was taken.)
14  BY MS. DAVIDSON:
15      Q.    All right.  Let's mark as Exhibit 2
16  your Declaration of Interest that you submitted
17  to IARC.
18      (Whereupon, Defendant's Exhibit D2,
19      Declaration of Interest for IARC/WHO
20      Experts, was marked for identification.)
21  BY MS. DAVIDSON:
22      Q.    Okay.  You're familiar with this
23  document?
24      A.    Yes.
25      Q.    And what's the date of it?

Page 83

1       A.    It says July 28th, 2023.
2       Q.    And that's the same day on which
3   you submitted you're -- that's the same day on
4   which you submitted your letter?
5       A.    I can't say for sure.  I -- if you
6   have my letter, you -- you could show me that;
7   or I could check my e-mail.
8       Q.    Were they submitted at
9   approximately the same time?
10      A.    Yes, yes.
11      Q.    Okay.  Great.  That's my question.
12      A.    Okay.
13      Q.    If we could go to your Statement of
14  Conflict, if you could read what you wrote
15  there because -- at the bottom.
16      A.    Yes.  Okay.
17      It says, "From 2016 to 2020
18  January, I provided paid consultation services
19  to a law firm -- to law firms that were
20  involved in litigation against companies that
21  produced or sold talcum powder products."
22      Q.    And, Dr. Siemiatycki, that's not
23  accurate, correct?
24      MS. PARFITT:  Objection.  Form.
25      THE WITNESS:  What's inaccurate

Page 84

1   about it?
2   BY MS. DAVIDSON:
3       Q.    Is it your testimony today that
4   that's accurate?
5       A.    I'm sorry?
6       Q.    Is it your testimony today that
7   what you wrote here was accurate?
8       A.    At the time that I wrote it, yes.
9       Q.    So at the time that you wrote it in
10  2023, you believed that you had stopped
11  providing paid consultation services in this
12  litigation in 2020?
13      MS. PARFITT:  Objection.  Form.
14      THE WITNESS:  I think so.
15  BY MS. DAVIDSON:
16      Q.    When were you deposed last in this
17  litigation, Dr. Siemiatycki?
18      A.    In 2021.  Yes.  Excuse me.
19      Q.    And you provided a -- did you
20  provide a supplemental expert report in 2021?
21      A.    A supplemental?
22      Q.    Did you provide an expert report in
23  2021?
24      A.    Yes.  Yes, I did.  Yes, I did.
25      Q.    Were you paid for that expert

Page 85

1   report?
2       A.    Yes.
3       Q.    So, in fact --
4       A.    Okay.  Yeah.
5       Q.    -- your statement of declaration is
6   inaccurate, correct?
7       A.    That's correct.
8       Q.    All right.  Can we go to your
9   letter?
10      MS. PARFITT:  Do you want to put
11  that in chat.  I have a copy of it but --
12      MS. DAVIDSON:  We're going to mark
13  the letter as Exhibit 3.
14      MS. PARFITT:  Okay.
15      (Whereupon, Defendant's Exhibit D3,
16      Letter from Jack Siemiatycki to IARC re
17      Talc/Acrylonitrile Monograph 136, was
18      marked for identification.)
19      MS. DAVIDSON:  Noah, are you
20  putting it up on the screen?
21      MR. EPSTEIN:  There you go.
22      MS. DAVIDSON:  Noah, again you
23  forget --
24      MR. EPSTEIN:  I shared it in chat.
25      MS. DAVIDSON:  Can you make it

22 (Pages 82 - 85)

Page 86

1  bigger?
2      MS. PARFITT: Jessica, I have a
3  copy of it.
4      MS. DAVIDSON: I'm sorry. I can't
5  hear you, Michelle.
6      MS. PARFITT: I have a copy of the
7  letter too. I'm going to put it in front
8  of him, unless you object. It's a little
9  bit easier to see. It's hard on the
10  screen.
11      MS. DAVIDSON: Okay.
12      MS. PARFITT: It's the same as you
13  have it on the screen.
14      MS. DAVIDSON: I want it on the
15  screen as well, Noah. I don't know why
16  you pulled it down.
17      MR. EPSTEIN: I'm -- I'm making the
18  bigger.
19      MS. DAVIDSON: You can just zoom.
20  Text Asher; ask him how to do it. He
21  knows how. I can just zoom it on my own
22  screen if everybody else has their --
23      MS. PARFITT: He has a paper copy
24  too. It may good for others that are
25  participating, but I've given him a paper

Page 87

1  copy; and I'll make sure it's provided and
2  Xeroxed.
3      MS. DAVIDSON: Okay.
4  BY MS. DAVIDSON:
5      Q.   If we could go to -- it says, "In
6  the ensuing three years, 2016 to 2019, I
7  contributed reports to a few court cases and
8  was deposed by the lawyers for the defense; and
9  in one case I testified in court," right?
10      A.   Sorry. I'm not sure where
11  you're -- are you reading?
12      Q.   Under legal consultation related to
13  talc --
14      A.   Oh, yes. Yeah.
15      Q.   That -- that statement, 2016 to
16  2019, that's inaccurate as well, correct?
17      MS. PARFITT: Objection. Form.
18      THE WITNESS: Yes. Yes.
19  BY MS. DAVIDSON:
20      Q.   Okay. And if we could continue
21  down, down to conflict of interest.
22      A.   Yes.
23      Q.   It says, "I have not been involved
24  with talc litigation in the past three years,
25  and I do not anticipate any such involvement in

Page 88

1  the future."
2      That's inaccurate as well correct?
3      MS. PARFITT: Objection. Form.
4      THE WITNESS: Yes. The three-years
5  estimate is inaccurate. The next part of
6  the sentence is accurate. At that time I
7  didn't anticipate future involvement.
8  BY MS. DAVIDSON:
9      Q.   When did plaintiff's counsel
10  approach you about the expert report that you
11  submitted in the fall of 2023?
12      A.   It was a few months before --
13  before I submitted it.
14      Q.   How many months?
15      A.   I'm sorry?
16      Q.   How many months before?
17      A.   I -- I can't remember. I -- I'd
18  have to look for evidence in emails or
19  something like that; but off the top of my
20  head, I don't recall. It wasn't like six
21  months before. It was a few -- a few months
22  before.
23      Q.   Okay. Did you have any
24  communications with plaintiff's counsel in this
25  litigation between 2020 and 2023?

Page 89

1      A.   Well, there was -- as you pointed
2  out, the 2021, there was a deposition and the
3  report; so yes.
4      Q.   And after you submitted -- after
5  you were deposed in 2021, have you spoken --
6  did you speak with any plaintiff's counsel
7  between 2021 after you were deposed and the
8  time when you submitted your expert report in
9  the fall of 2023?
10      A.   I don't recall.
11      Q.   Okay. Let's move on.
12      MS. DAVIDSON: Oh, Asher, can you
13  put -- I'm sorry.
14      Noah, can you put up that -- the
15  table?
16      MR. EPSTEIN: Which table?
17      MS. DAVIDSON: On page -- the next
18  page.
19      MR. EPSTEIN: Right there at the
20  bottom?
21      MS. DAVIDSON: Uh-huh. It starts
22  with Oules and Echeverria. Yes.
23  BY MS. DAVIDSON:
24      Q.   Dr. Siemiatycki, is this table
25  accurate?

23 (Pages 86 - 89)

Page 90

1      Let me ask a different question.
2      Is this table complete and
3  accurate?
4      A.   Yeah.  I'm looking at the paper
5  version that Ms. Parfitt just handed me, I
6  think.
7      Q.   I'm just looking at the table
8  that's on the screen.
9      I'm asking you is this table
10  complete and accurate?
11     It's a simple question.
12     A.   I understand, and I'm trying to
13  rack my memory to --
14     Q.   Well, I can make it easy for you.
15  You submitted an expert report in 2021, and you
16  were deposed in 2021, correct?
17     A.   Correct.
18     Q.   And that's not included on this
19  table, correct?
20     A.   That's correct.
21     Q.   So the table is not complete and
22  accurate, correct?
23     A.   That's correct.
24     Q.   Thank you.
25         MS. DAVIDSON:  Let's mark as

Page 91

1  Exhibit 4 the Leung paper.
2         (Whereupon, Defendant's Exhibit D4,
3      Paper entitled, "Occupational environment
4      and ovarian cancer risk," by Lisa
5      Leung, et al., was marked for
6      identification.)
7         MS. DAVIDSON:  Noah will put it in
8  the chat and put it on the screen.
9         MS. PARFITT:  I'll hand you a copy
10  of that.
11        THE WITNESS:  If you have a copy.
12        MS. DAVIDSON:  I can't hear you,
13  Michelle, for some reason.
14        MS. PARFITT:  Oh, that's all right.
15  I said I'm just handing him a completely
16  unedited, nothing on it, which we'll turn
17  over to you.  It's a little bit easier.
18        MS. DAVIDSON:  Noah, if you --
19        MR. EPSTEIN:  I put it on the chat,
20  and here it is on the screen.
21        MS. DAVIDSON:  Okay.
22  BY MS. DAVIDSON:
23     Q.   I'm marking as Exhibit 4
24  "Occupational environment and ovarian cancer
25  risk," on which you're the third author,

Page 92

1  correct?
2      A.   That's correct.
3      Q.   And the final author, Anita
4  Koushik, is that the woman you said that you
5  may be doing another case control paper with?
6      A.   It's another paper using the data
7  from a case control study from this same --
8      Q.   Okay.
9      A.   -- case control study, yes.
10     Q.   Okay.  It's from this very same
11  study?
12     A.   Yes.
13     Q.   So in other words, it's from the
14  same group of women as this?
15     A.   Yes, that's correct.
16     Q.   Okay.  Looking at this paper, does
17  it refresh your recollection as to whether you
18  included a conflict-of-interest statement?
19     A.   Yes.  I see that there were no
20  competing interests declared.
21     Q.   Do you recall why you failed to do
22  that?
23     A.   Because I had no competing
24  interests with the --
25     Q.   Did this paper address --

Page 93

1      A.   Sorry?
2      Q.   Did this paper address talc and
3  ovarian cancer?
4      A.   It doesn't address cosmetic
5  perineal talc, no.  That -- that's -- that was
6  the issue on which I would have had a conflict
7  of interest.
8      Q.   Did you ask the -- did you ask the
9  publishers whether it is accurate and proper to
10  not include your competing interest when the
11  paper addresses talc exposure generally rather
12  than limited to perineal talc?
13        MS. PARFITT:  Objection.  Form.
14        THE WITNESS:  No, I didn't consult
15  anybody.
16  BY MS. DAVIDSON:
17     Q.   Okay.  Do you recall testifying in
18  2021 that you believed it is important for a
19  paid expert in litigation to disclose both the
20  fact that he or she has been retained as an
21  expert and which side he or she is retained on
22  behalf of?
23     A.   Are you asking if I recall saying
24  that, or if I would say --
25     Q.   Well, first, do you recall that?

Page 94

1      A.    No, I don't recall.
2      Q.    Do you disagree with that
3  statement?
4      A.    No, I don't disagree with it.
5      Q.    Let's go to the Davis paper, 2021.
6  Let's mark that as Exhibit 4.
7      A.    Sorry. The Davis paper?
8      Q.    Yes.
9          THE COURT REPORTER: I'm sorry. I
10   think that should be Exhibit 5.
11         MS. DAVIDSON: Oh, okay. Great. I
12   can never get it right. It's a running
13   joke that I can never keep track.
14         All right. We're marking as
15   Exhibit 5 a paper entitled --
16         THE WITNESS: Michelle, are you
17   looking for that or should I --
18         MS. PARFITT: Yeah. Give us one
19   second.
20  BY MS. DAVIDSON:
21     Q.    -- "Genital powder use and risk of
22  epithelial ovarian cancer --
23     A.    Wait. Hold on. Wait. We're
24  looking for the article.
25     Q.    Okay. That's fine. I'm marking it

Page 95

1  as an exhibit.
2      A.    Okay. Thank you. Sorry.
3      Q.    We're marking as Exhibit 5,
4  "Genital powder use and risk of epithelial
5  ovarian cancer in the ovarian cancer in women
6  of African ancestry consortium." First author
7  Davis, published in 2021.
8          (Whereupon, Defendant's Exhibit D5,
9      Paper entitled, "Genital powder use and
10     risk of epithelial ovarian cancer in the
11     Ovarian Cancer in Women of African
12     Ancestry Consortium," by Colette P.
13     Davis, et al., was marked for
14     identification.)
15  BY MS. DAVIDSON:
16     Q.    Can you please turn to the bottom
17  of page 1?
18         MR. TISI: You've got -- you've got
19     to wait until we get the paper. Okay?
20         It's okay for you to identify it.
21         MS. DAVIDSON: I'm sorry. We sent
22     it to you in the chat.
23         MR. TISI: I understand, but --
24         MS. DAVIDSON: Fine. If you're
25     going to take the time to find the

Page 96

1  paper --
2          MR. TISI: What's confusing --
3          MS. DAVIDSON: -- great. Let's go
4  off the record.
5          MR. TISI: Excuse me.
6          MS. DAVIDSON: Chris, we have one
7  person --
8          MR. TISI: Excuse me.
9          MS. DAVIDSON: No. We have one
10   person defending this deposition.
11         MR. TISI: I understand, but it's
12   confusing. It's about 6 inches.
13         MS. DAVIDSON: Okay.
14         MR. TISI: 6 inches. I got to get
15   him the copy of the paper.
16         MS. DAVIDSON: Is it you or
17   Michelle defending this deposition?
18         MR. TISI: Okay. Michelle, will
19   you tell her how big the screen is.
20         MS. DAVIDSON: Let's go off the
21   record while you look for the paper.
22         MR. TISI: Fine. Thank you.
23         (Discussion held off the record.)
24  BY MS. DAVIDSON:
25     Q.    I'd like to read the conflict of

Page 97

1  disclosure statement. It says --
2      A.    Sorry?
3      Q.    It says, "Patricia Moorman has
4  received compensation for work related to
5  litigation in regard to talc and ovarian
6  cancer. All other authors report no conflict
7  of interest."
8          Did I read that correctly?
9      A.    Yes.
10     Q.    Does -- does Ms. -- Dr. Moorman
11  disclose here which side she testified on
12  behalf of?
13         MS. PARFITT: Objection. Form.
14         THE WITNESS: I don't see that
15     indicated, no.
16  BY MS. DAVIDSON:
17     Q.    And do you recall that you
18  testified in 2021 that a proper
19  conflict-of-interest disclosure would say which
20  side you're appearing on behalf of, correct?
21     A.    Yes, yes.
22     Q.    Okay. Thank you.
23         If we could turn to Table 3.
24     A.    Of what? Of the Davis paper?
25     Q.    Yeah. We're still on the Davis

25 (Pages 94 - 97)

Page 98

1   paper.
2       A.   Okay.
3       Q.   Table 3 for African American women,
4   the OR is lower than for all participants and
5   for white participants and also is not
6   statistically significant, correct?
7       A.   I'm still looking for that page.
8   Sorry.
9           Table 3 you said?
10      Q.   Yeah.  It's up on the screen.
11      A.   Yeah.  I'm sorry.  The screen font
12  is too small for me to read.
13          But I have the paper in front of
14  me.
15          Can you repeat your question?
16      Q.   The OR for African American women
17  is lower than the OR for white women, correct?
18      A.   Sorry.  I don't see -- where --
19  where are the results for African American
20  women?
21          Oh, yes, yes.  Okay.  I'm
22  reorienting myself to this particular layout.
23          And which particular -- can you
24  point to particular cells in this table that
25  you are looking at?

Page 99

1       Q.   I'm just asking you,
2   Dr. Siemiatycki, is the OR for African American
3   women lower than the OR for white women?
4       A.   The results here for all cases,
5   high-grade --
6       Q.   All cases.  Let's look at all
7   cases.
8       A.   Okay.  Thank you for that.  So --
9   so the 1.22 for African American women and
10  versus the 1.32 for all participants, is that
11  what you're comparing or asking me?
12      Q.   Doctor, I asked about white women,
13  correct?
14      A.   No.  I -- I didn't remember every
15  word that you used in your preamble.
16          So yes.  Thank you.
17      Q.   It wasn't a preamble.  It was a
18  question.
19          And my question was:  Is the OR for
20  African American women under all cases lower
21  than for white women?
22      A.   The point estimate is lower, yes.
23      Q.   And also, the point estimate for
24  African American women is not statistically
25  significant, while the point estimate for white

Page 100

1   women is statistically significant, correct?
2           MS. PARFITT:  Objection.  Form.
3           THE WITNESS:  That's correct.
4   BY MS. DAVIDSON:
5       Q.   Thank you.
6       A.   The term "statistically
7   significant" has to be qualified.
8           You mean at the .05 level, I
9   assume.
10      Q.   Thank you.
11      A.   Is that correct?
12          To clarify your question.  Because
13  statistical significance --
14          MS. PARFITT:  He's still talking.
15  BY MS. DAVIDSON:
16      Q.   I understand your testimony.
17      A.   -- depends on the level of alpha
18  error that you assume in the test.
19      Q.   The Davis paper did not find a
20  dose-response relationship, right?
21      A.   I -- I don't know.
22          In which -- which table would I
23  find those results?
24      Q.   You don't recall from reviewing
25  this paper?

Page 101

1           When's the last time you looked at
2   this paper, Doctor?
3           MS. PARFITT:  Jessica, I might add
4   that I will give you a little leeway; but
5   back in your '21 deposition -- and I can
6   give you the pages -- Dr. Siemiatycki was
7   examined with regard to the Davis paper on
8   page --
9           MS. DAVIDSON:  Michelle, I'm not
10  going to go through this with every
11  question.  It was added to his 2021 report
12  -- to his 2023.  It wasn't in that report.
13  I'm more than able to ask him about it.
14  If you want to take that to the judge, go
15  ahead because we'll win.
16  BY MS. DAVIDSON:
17      Q.   Dr. Siemiatycki --
18          MS. PARFITT:  Well, Jessica, that's
19  quite conclusory.  But my point being
20  this:  You examined on page 143 of his
21  2021 deposition the Davis article.  Let
22  this record reflect that.  I'll give you a
23  little leeway, Jessica.
24          MS. DAVIDSON:  You're not giving me
25  leeway, Michelle.  That's bullshit.  I

26 (Pages 98 - 101)

Page 102

1  mean, come on.
2      MS. PARFITT: Oh, my goodness,
3  Jessica. You should watch your language.
4      MS. DAVIDSON: Michelle, it's just
5  like this entire deposition, every
6  question I ask, either you're
7  filibustering it or Dr. Siemiatycki's
8  answering a question I haven't asked.
9  It's getting very, very frustrating. It's
10 getting very frustrating.
11     You know very well that he added a
12 section to his report about Davis. I'm
13 sorry for my foul language. I'm just
14 incredibly, incredibly frustrated because
15 I'm asking you guys to just let me ask my
16 questions. Let the doctor answer them.
17     You know there's this in the
18 report. You're not giving me leeway.
19 It's the -- there's no need for leeway
20 because it's added to his report. Like,
21 to suggest that you're giving me leeway,
22 is disingenuous.
23     And, again, I apologize for losing
24 my temper. I apologize for my foul mouth,
25 but you're not giving me any leeway.

Page 103

1      This was added to his report; and
2  obviously it's fair game for questioning,
3  Michelle.
4      And you and I generally get along,
5  so let's just get along today.
6      Again, I'm sorry I lost my temper.
7  BY MS. DAVIDSON:
8   Q.  Dr. Siemiatycki?
9      MS. PARFITT: Let's --
10 BY MS. DAVIDSON:
11  Q.  Dr. Siemiatycki, when is the last
12 time you looked at the Davis paper?
13  A.  I can't recall. I certainly
14 haven't done a sort of an in-depth forensic
15 evaluation of it in at least a month or so or
16 maybe longer, but I -- I probably skimmed it
17 recently; but not -- it's not -- it's not fresh
18 in my memory.
19  Q.  You didn't look at it when you were
20 preparing for your deposition with Ms. --
21  A.  When I --
22  Q.  -- with Ms. Parfitt?
23  A.  When I looked at what?
24  Q.  Did you look at the Davis paper
25 when you were preparing for your deposition

Page 104

1  with Ms. Parfitt?
2   A.  No. I had 200 papers in my
3  binders, and I didn't look at all of them in
4  the last three days. And I looked at the ones
5  that I considered the most important ones, not
6  necessarily the ones -- well, so I would have
7  to look at the paper to answer your questions
8  about it. I can't, by memory, recall
9  everything that's in the paper.
10  Q.  So you do not recall whether the
11 Davis paper found a dose response?
12  A.  Not without looking at it.
13  Q.  If I were to tell you that the
14 Davis paper stated, "Furthermore, there was not
15 a dose-response relationship between frequency
16 or duration of genital powder use and ovarian
17 cancer risk or any significant differences in
18 association by histotype," that does not
19 refresh your recollection?
20     MS. PARFITT: Can you point us to a
21 page, Jessica?
22     MS. DAVIDSON: I'm sorry, Michelle?
23     MS. PARFITT: Maybe -- I'm sorry.
24 If you could just point him to a page.
25     MS. DAVIDSON: Asher -- I keep

Page 105

1  calling Noah Asher. Asher is on vacation.
2      Noah, can you please put up this
3  language?
4      MS. PARFITT: Thank you, Jessica.
5  We appreciate it.
6      MS. DAVIDSON: Of course.
7      THE WITNESS: Am I waiting for you
8  to point out a page?
9      MS. PARFITT: He just put it on the
10 screen.
11 BY MS. DAVIDSON:
12  Q.  "We observed" -- it's in the bottom
13 paragraph there: "We observed no clear
14 dose-response trends for frequency or duration
15 of genital powder use and ovarian cancer risk
16 among AA women or white women."
17     Do you see that?
18  A.  Yes.
19     MS. PARFITT: It's on page 8
20 doctor.
21     THE WITNESS: Yes, I do.
22 BY MS. DAVIDSON:
23  Q.  Did you address that in your
24 report?
25  A.  What do you mean by did I "address

27 (Pages 102 - 105)

Page 106

1  that"?
2      Q.    Did you address in your report the
3  fact that Davis did not find a dose-response
4  relationship?
5      A.    No, I didn't.
6      Q.    Okay.
7      A.    It didn't change anything in my --
8  it wouldn't have changed anything in my report.
9      Q.    So if we could mark your report as
10  Exhibit 6.
11          (Whereupon, Defendant's Exhibit D6,
12      Second Amended Expert Report of Jack
13      Siemiatycki, MSc, PhD, was marked for
14      identification.)
15  BY MS. DAVIDSON:
16      Q.    In the back of your report, Doctor,
17  you have some tables, right?
18      A.    Yes.
19      Q.    And some of those tables address
20  dose response, right?
21      A.    Yes.
22          MS. PARFITT:  He is still looking
23      at the Davis paper.  You've now directed
24      him to the expert report.
25          Jessica, I'll make comment too.  I

Page 107

1      know this is really hard.  He's a little
2      hard of hearing.
3          So just -- just -- I'm being
4      delicate, Doctor.  I'll make that point.
5      She's just told you she's gone to your
6      expert report.
7          THE WITNESS:  Okay.
8          MS. PARFITT:  Thank you, Jessica.
9      I appreciate it.
10          MS. DAVIDSON:  Michelle, nobody has
11      ever complained that my voice is too soft.
12      It's usually the opposite.
13  BY MS. DAVIDSON:
14      Q.    Doctor, did you add the Davis paper
15  to the tables in the back of your report?
16      A.    No, I didn't.  In fact, it's coming
17  back to me.  My recollection is that the data
18  in the Davis paper, in fact, overlaps with the
19  data in some of the other stud- -- some of the
20  other articles that have been written.
21          And if you give me some time, I'll
22  try to figure out which papers it overlaps
23  with.
24      Q.    So, Doctor, your testimony is that
25  the reason you didn't include Davis in your

Page 108

1  tables is that it overlaps with other papers?
2      A.    Yes.
3      Q.    Okay.  Let's move on.
4          Let's look at Phung 2022.
5          MS. PARFITT:  Jessica, we're just
6      grabbing his paper.
7          MS. DAVIDSON:  No problem.  No
8      problem.  Phung 2022 is Exhibit 7.
9          (Whereupon, Defendant's Exhibit D7,
10      Paper entitled, "Effects of risk factors
11      for ovarian cancer in women with and
12      without endometriosis," by Minh Tung
13      Phung, MPH, PhD, et al., was marked for
14      identification.)
15          MS. DAVIDSON:  Let's -- let's mark
16      it as, "Effects of risk factors for
17      ovarian cancer in women with and without
18      endometriosis."  The first author is Phung
19      2022.
20          MR. TISI:  Wait a second.
21          MS. DAVIDSON:  And I want to go
22      down to page -- I want to -- okay.  Sure.
23      I just want to go to page 960.
24          MR. TISI:  We're not listening to
25      you right now because he's finding the

Page 109

1  paper.
2          MS. DAVIDSON:  Understood.
3  Understood.
4          MR. TISI:  Give us a moment, and
5  we'll see if we can find it.
6          MS. DAVIDSON:  I want to go to the
7  authors' conflict statement.
8          For some reason, Noah, I have
9  different page numbers because sometimes
10  one is the one pulled off the web, and one
11  is the one that's not; and I think that's
12  creating some confusion with you.  But
13  yes, this is --
14          MR. EPSTEIN:  Yeah.  I'm seeing
15  that.
16          Am I in the right spot.
17          MS. DAVIDSON:  That was the problem
18  with the Davis paper as well.
19          MR. EPSTEIN:  Sorry about that.
20          MS. DAVIDSON:  I have different
21  versions.  I'm sorry about that, but now
22  you're moving --
23          MR. EPSTEIN:  Okay.  Did I -- did
24  I --
25          MS. DAVIDSON:  You've just gone to

28 (Pages 106 - 109)

Page 110

1    the wrong page. I want to go to the
2    disclosures.
3         It's weird. What you have up here
4    has some Spanish in it. Okay. So here we
5    go. Yeah. Down there.
6         MR. EPSTEIN: Okay.
7    BY MS. DAVIDSON:
8    Q.    If we look at the disclosures
9    acknowledgements, Doctor.
10   A.    I'm sorry. Look at what?
11   Q.    We're looking at the, I believe
12   it's the very last page, acknowledgements.
13        It says -- and I'll read to you,
14   except it's -- you have issues with your ears.
15   I have issues with my eyes. We're a great
16   pair -- we're a great pair here today. But it
17   says --
18   A.    Hear no evil. See no evil.
19   Q.    It says, "D.W.C. reports payments
20   from expert -- for expert testimony from
21   Ferraro Law Firm and Ashcarft and Gerel Law
22   Firm."
23        Do you see that?
24   A.    In the last -- in the paragraph
25   labeled "Acknowledgements"?

Page 111

1    Q.    Yes. So the third paragraph,
2    "Acknowledgements" on line 6.
3    A.    I must not be looking in the right
4    place.
5    Q.    If you look up on the -- on the
6    camera -- on the screen, I will read it to you.
7    A.    Okay. Can you blow up that about
8    threefold?
9    Q.    Fourfold. "D.W.C. reports" --
10   A.    Are we talking about the Phung
11   paper?
12   Q.    I'm reading you the sentence. It's
13   really half a sentence.
14        It says, "D.W.C. reports payment
15   from expert testimony from Ferraro Law Firm and
16   Ashcarft and Gerel Law Firm."
17        Do you see that?
18   A.    Okay.
19        MS. PARFITT: Let the record
20   reflect I have directed the doctor to it.
21        MS. DAVIDSON: Thank you, Michelle.
22        THE WITNESS: Okay.
23   BY MS. DAVIDSON:
24   Q.    Okay. Would the average person
25   reading scientific papers know what the

Page 112

1    Ashcraft and Gerel is or the Ferraro Law Firm?
2    A.    I doubt it but --
3    Q.    Okay. So -- so the average person
4    would not -- who reads this -- who reads
5    medical journals would not know whether
6    Dr. Cramer was a witness for the plaintiffs or
7    for the defense, correct?
8         MS. PARFITT: Objection. Form.
9         THE WITNESS: Correct. Correct.
10   BY MS. DAVIDSON:
11   Q.    Okay. Let's move on.
12        If we could look at Table 2.
13   A.    Of which paper now?
14   Q.    We're on the same paper.
15   A.    Okay.
16   Q.    Table 2.
17        MS. DAVIDSON: You've got to turn
18   it right side up, Noah.
19        MR. EPSTEIN: Yeah. Let me figure
20   out how to do that. Sorry about that.
21        MS. DAVIDSON: Noah has been a
22   lawyer for three months, so let's all give
23   him a kudos for doing a great job.
24        MS. PARFITT: Jessica, we're fine
25   with that.

Page 113

1         MS. DAVIDSON: Noah, it's your
2    first deposition?
3         MR. EPSTEIN: Yes.
4         MS. DAVIDSON: Your last?
5         MR. EPSTEIN: So Table 2. I'm -- I
6    can't get it to --
7         MS. PARFITT: Hey, Noah, we have
8    it.
9         MR. LYONS: I have the paper.
10        MR. EPSTEIN: Okay. Thank you.
11        MR. LYONS: I'm also happy to pull
12   it up if you want. I have the version, I
13   believe, that Dr. Siemiatycki has, which
14   is the final published version, rather
15   than the author manuscript.
16        MS. DAVIDSON: We have it as well,
17   Noah. I'm not sure why you have the
18   author manuscript there.
19   BY MS. DAVIDSON:
20   Q.    Okay. So, Dr. Siemiatycki, what is
21   the reported OR for first-degree family history
22   of ovarian cancer with endometriosis?
23   A.    With endometriosis? So we're
24   looking sort of at the bottom right-hand area
25   of that table, and there is an OR of 1.58.

29 (Pages 110 - 113)

Page 114

1    Is that the one you're looking at?
2    Q.    Okay.  And what is the OR for
3  first-degree family history of ovarian cancer
4  without endometriosis?
5    A.    It looks like it's 2.20.
6    Q.    Why would having endometriosis
7  cause the risk factor of first-degree family
8  history, to go down?
9    MS. PARFITT:  Objection.  Form.
10    THE WITNESS:  Well, I don't know
11  that it does.
12    Among other things, when I -- when
13  I look at relative risk estimates, I also
14  look at the confidence intervals around
15  them to see what the data really means.
16    And if you notice, the upper
17  confidence limit of both of those point
18  estimates that you highlighted are
19  identical -- that's a coincidence -- at
20  2.57; but the important part of the
21  message is that they don't differ very
22  much.  Statistically, they overlap
23  greatly.
24    And so the two point estimates of
25  1.58 that you pointed at and 2.20 that you

Page 115

1  pointed at, although they look different,
2  would not be -- they're not so different
3  that they require theorizing about.
4  BY MS. DAVIDSON:
5    Q.    Okay.  So let me make sure I
6  understand.
7    Are you saying that if two
8  confidence intervals overlap, they're not so
9  different that they suggest an actual effect
10  difference?
11    And forgive me if my language
12  isn't --
13    A.    Yeah.  No.  I -- I -- I forgive you
14  if you forgive me my verbal errors.
15    I'm saying that if you look at two
16  confidence intervals for the same parameter and
17  you're trying to compare them, if they overlap
18  considerably -- and I'm not going to define
19  what I mean by "considerably" -- but if they
20  overlap considerably, then the plausible range
21  of true underlying relative risks for the two
22  entities that you're comparing, the women with
23  first-degree history and the women -- sorry,
24  the women with endometriosis and the women
25  without endometriosis, that they are not as

Page 116

1  different as the point estimates would
2  indicate.
3    Q.    So do these -- do these two
4  confidence intervals overlap considerably?
5    A.    They do overlap considerably.
6    Q.    And how do you define "overlap
7  considerably"?
8    You knew I was going to ask that.
9    A.    Yeah.  So I mean, if you imagine in
10  your mind sort of a little graphic display with
11  one of them showing the odds ratio for women
12  with endometriosis and one without, the middle
13  of the two confidence intervals would be
14  different.
15    One goes from 1.88 to 2.57, so it
16  is -- it covers that part of the graph.  And
17  the other one covers the part of the graph from
18  .97 to 2.57.  And, you know, just by eyeballing
19  it, you can see that they overlap.  Those two
20  ranges overlap considerably.
21    Now, it's possible to do
22  statistical tests to show to what -- whether
23  the amount of overlap is so -- the difference
24  is so great that despite the variability,
25  there's still significant differences between

Page 117

1  them.
2    But in this case I can assure you
3  that if you did such a test, it would show that
4  there is no statistically significant
5  difference between those two estimates.
6    Q.    How is that test done?
7    A.    So I -- I think it started when you
8  asked me to speculate on possible reasons for
9  the differences.  And my answer would be that I
10  wouldn't even go to the point of trying to find
11  an explanation, which might not be -- for
12  something that might not be their, namely a
13  difference between endometri- -- with
14  endometriosis and without endometriosis.
15    Q.    Right.  My question was:  Like,
16  when you use the term "overlap considerably,"
17  is that just sort of subjective of what you
18  see; or is there an actual mathematical test?
19    A.    The actual mathematical test would
20  be a test of the difference between the point
21  estimates of 2.20 and 1.58, the difference
22  between those two, considering the variability
23  of those two estimates or the imprecision.
24  Those two are imprecise estimates.  The
25  imprecision is captured by the 95-percent

30 (Pages 114 - 117)

Page 118

1  confidence interval.
2        And if you do the mathematics to
3  plug in the point estimates and the confidence
4  intervals, that's how you would test the
5  difference between the two.
6        And no, in the past 30 seconds, I
7  have not done such a test; but by experience, I
8  can tell you that it's not even close to
9  statistically significant.
10    Q.   Got it.  So you're saying the
11  difference -- just to make sure I understand,
12  you're saying the difference in the confidence
13  intervals is not statistically significant?
14    A.   No.  I'm saying the difference in
15  the point estimates is -- given the confidence
16  intervals.
17    Q.   Okay.
18    A.   The difference in the point
19  estimates, I'm saying, is not statistically
20  significantly different.
21    Q.   So the difference between 1.58 and
22  2.20 is not statistically significant because
23  there is considerable overlap in the confidence
24  intervals --
25    A.   Yes.

Page 119

1    Q.   -- is that a fair way to put it?
2    A.   That's a fair way to put it.  I
3  mean, the overlap in the confidence intervals
4  is just another way of expressing that there's
5  a lot of statistical imprecision in the two
6  point estimates.
7    Q.   I'm sorry.  Can you explain that
8  again?
9    A.   Yes.  Sorry.  So the -- you know,
10  what -- I use the overlap in the confidence
11  intervals as a shorthand for me because I
12  understand the implications that -- to indicate
13  that the two point estimates are very unstable.
14  They depend on small numbers and they could
15  fluctuate.
16        And, you know, I don't know if you
17  want to go to examples about flipping coins;
18  and, you know, I could sort of conjure
19  up some --
20    Q.   Sorry, Doctor.
21        Is 1.88 to 2.57, that's a wide
22  confidence interval?
23    A.   1.88 to 2.57?
24    Q.   Uh-huh.
25    A.   I'm not saying it's a wide

Page 120

1  confidence interval or not.  It is pretty wide.
2        But I'm saying that the two
3  confidence intervals overlap considerably.
4    Q.   Okay.
5    A.   And that means that a whole range
6  of -- what -- what you're really interested in
7  when you're making these kind of estimates is
8  what is the true underlying relative risk, not
9  what is the relative risk in this sample of
10  women in such and such a city that I happen to
11  interview in such a year or so on.
12        You're trying to make a generic,
13  generalizable estimate of something.  And the
14  something is what is the relative risk among
15  women with endometriosis.
16        Now, you have a small sample of
17  people in -- in these studies, small enough
18  that the -- each -- well, no matter what the
19  size is, each statistical estimate of point
20  estimate embodies a certain degree of
21  precision.  And that degree of precision can be
22  expressed in various forms.
23        And one way of expressing it is in
24  the width of the confidence interval.  And the
25  confidence interval can be -- you can think of

Page 121

1  it as indicating the range of true underlying
2  relative risks that can be -- that could
3  hypothetically be found in the total population
4  if you had, you know, the total population of
5  the United States or an infinite population,
6  even, of women who you've interviewed and you
7  know really, you know, what is the
8  endometriosis status and so on.
9        But the -- you don't have that.
10  You have an estimate from a sample.  And the
11  estimate of 2.20 is your best estimate from
12  this sample of the true underlying relative
13  risk.
14        The confidence interval tells you
15  how good your sample estimate is, how precise
16  it is in capturing the true underlying relative
17  risk.  And it's kind of telling you that with
18  95-percent probability, the true underlying
19  relative risk among the women without
20  endometriosis -- I'm just taking that as the
21  example -- that the true underlying risk,
22  there's a 95-percent probability that it's
23  somewhere in the range from 1.88 to 2.57.
24        So you could have think of the
25  confidence interval as an expression of that

31 (Pages 118 - 121)

Page 122

1  kind of statement. It's -- it's -- what I've
2  just said it's not strictly a hundred percent
3  accurate. It's a more complicated, slightly
4  more complicated statistical issue, but need no
5  need to get in to it.
6        At a first approximation, you can
7  think of the confidence interval as telling you
8  how close your sample -- what is the range of
9  possible underlying true relative risks that
10 are compatible with the data that you've
11 collected.
12       And this is saying that for the
13 without endometriosis women, the true relative
14 risk ranges from -- with 95-percent probability
15 from 1.88 to 2.57; whereas, for with
16 endometriosis, it ran -- the true value ranges
17 from .97 to -- to 2.57. And those two ranges
18 are -- you know, it's just common sense. They
19 overlap a lot. A lot of those two ranges, you
20 know, one -- one is largely subsumed in the
21 other.
22   Q.   Okay. I think I've got it. Thank
23 you.
24   A.   Thank you.
25   Q.   Let's mark as Exhibit 8 the Gabriel

Page 123

1  2019 paper.
2        MS. PARFITT: And, Jessica, just
3  give us a moment to get that paper. I
4  appreciate it.
5        (Whereupon, Defendant's Exhibit D8,
6  Paper entitled, "Douching, Talc Use, and
7  Risk for Ovarian Cancer and Conditions
8  Related to Genital Tract Inflammation," by
9  Iwona M. Gabriel, et al., was marked for
10 identification.)
11       MS. DAVIDSON: This paper.
12       MS. PARFITT: Again, one moment. I
13 don't want to take your time.
14 BY MS. DAVIDSON:
15   Q.   This paper is entitled, "Douching,
16 Talc Use, and Risk for Ovarian Cancer and
17 Conditions Related to Genital Tract
18 Inflammation." The authors are Iwona Gabriel,
19 Allison Vitonis, William Welch, Linda Titus,
20 and Daniel Cramer.
21       Do you see that?
22   A.   Yeah. I'm --
23       MS. PARFITT: One second, Jessica.
24       THE WITNESS: We're just looking
25 for it. Sorry.

Page 124

1        MS. PARFITT: Let the record
2  reflect, I've just handed the doctor a
3  blank copy of the Gabriel paper.
4        MS. DAVIDSON: Okay.
5  BY MS. DAVIDSON:
6    Q.   Doctor, this paper was published in
7  2019. If I read your reports right and the
8  redline, you did not include it in your 2021
9  report; but you included it in your 2023
10 report. Is that correct?
11   A.   I'll take your word for that. I
12 can't remember.
13   Q.   Do you know why you didn't include
14 it originally and included it now?
15   A.   Well, I -- I guess I included it
16 now because I came upon it at some point. And
17 I didn't include it in 2021. I don't know. It
18 might have been an oversight. I -- I can't
19 think that there would have been a -- I'm not
20 sure -- I'm not sure why. I don't see --
21   Q.   Okay. Can we go to the Disclosure
22 of Potential Conflicts of Interest.
23   A.   That's at the back of the article,
24 I think. Oh, yes. I see that.
25   Q.   It says here, "A.F. Vitonis has

Page 125

1  provided statistical programming to support
2  expert testimony for Beasley Allen Law Firm.
3  D.W. Cramer has provided expert testimony for
4  Beasley Allen Law Firm."
5        Do you see that?
6    A.   Yes, I do.
7    Q.   And you'll agree with me that the
8  average person who is reading a journal
9  entitled "Cancer Epidemiology, Biomarkers &
10 Prevention" would not know what the Beasley
11 Allen Law Firm is, correct?
12       MS. PARFITT: Objection. Form.
13       THE WITNESS: Correct.
14 BY MS. DAVIDSON:
15   Q.   So the average person reading this
16 paper would not be able to determine which side
17 Dr. Cramer and Mr. -- or Dr. Vitonis was
18 providing testimony for, right?
19       MS. PARFITT: Objection. Form.
20       THE WITNESS: Correct.
21 BY MS. DAVIDSON:
22   Q.   Okay. Have you ever spoken to
23 either Dr. O'Brien or Dr. Wentzensen?
24   A.   Not that I'm aware of. Not that I
25 recall.

32 (Pages 122 - 125)

Page 126

1    Q.    Are you familiar -- are you
2  familiar with their reputations?
3    A.    I'm familiar with their
4  publications in the -- in the talc domain that
5  are part of the references in my report.
6    Q.    Do you know where they work?
7    A.    I think they work in North
8  Carolina, if I'm not mistaken, at Research
9  Triangle Park for -- maybe for NIEHS; but I'm
10  not positive. I'm just recollecting or
11  guessing. I'm not sure.
12    Q.    And they -- they are not expert
13  witnesses for either side on this litigation,
14  correct?
15        MS. PARFITT: Objection. Form.
16        THE WITNESS: I -- there's no way I
17    would know that. I have no idea.
18  BY MS. DAVIDSON:
19    Q.    Well, have they disclosed any
20  conflicts of interest?
21        MS. PARFITT: Objection. Form.
22        THE WITNESS: Where?
23  BY MS. DAVIDSON:
24    Q.    In their papers.
25        Do you recall seeing any conflicts

Page 127

1  of interest were disclosed in their papers?
2    A.    I haven't memorized all the
3  conflict-of-interest paragraphs in every paper
4  I've looked at. So I don't --
5    Q.    Do you know whether employees of
6  the National Institutes of Health are even
7  allowed to serve as experts in private
8  litigation?
9        MS. PARFITT: No. I have no idea.
10  BY MS. DAVIDSON:
11    Q.    You wouldn't be surprised to learn
12  that ex -- that -- that scientists who work for
13  the federal government are not allowed to serve
14  as experts in litigation, would you?
15        MS. PARFITT: Objection. Form.
16        THE WITNESS: No, I wouldn't be
17    surprised to learn that.
18        MS. DAVIDSON: Okay. Let's go off
19    the record.
20        (Whereupon, a break was taken.)
21  BY MS. DAVIDSON:
22    Q.    We're going to mark as Exhibit 9 a
23  paper entitled, "A critical review of talc and
24  ovarian cancer," by Julie Goodman, et al.
25        And Julie is the corresponding

Page 128

1  author. I think that's the right term, the
2  first author and the corresponding author.
3        (Whereupon, Defendant's Exhibit D9,
4    Paper entitled, "A critical review of talc
5    and ovarian cancer," by Julie
6    Goodman, et al., was marked for
7    identification.)
8        THE WITNESS: It's Julie?
9        MS. PARFITT: Julie.
10  BY MS. DAVIDSON:
11    Q.    Dr. Siemiatycki, your camera is not
12  on --
13    A.    Sorry.
14    Q.    -- which is a problem for a
15  deposition --
16    A.    Which one is it --
17    Q.    Let's first get Dr. Siemiatycki's
18  camera on.
19        Do we need to go off the record for
20  that?
21    A.    No.
22    Q.    There we go.
23    A.    Sorry about that.
24    Q.    Dr. Siemiatycki, do you have the
25  Goodman 2020 paper?

Page 129

1    A.    Not quite, but now I believe I do.
2  Yes. Thank you.
3    Q.    Okay. And you address this paper
4  in your new report, correct?
5    A.    That's correct.
6    Q.    And you did not address it in your
7  2021 report, correct?
8    A.    That's correct.
9    Q.    Did -- were you aware of this paper
10  when you wrote your 2021 report?
11    A.    I may have been aware of it and not
12  considered that it would influence my opinion
13  one way or the other, but I probably adopted a
14  more generous attitude to being inclusive of
15  articles this time than I did before.
16    Q.    Did you do any research as to
17  Dr. Goodman's credentials?
18    A.    I don't recall having done that.
19    Q.    You mentioned in your paper -- in
20  your report that this paper was carried out by
21  a private research firm.
22        Do you recall saying that?
23    A.    I now have my report in front of me
24  as well. And yes, I recall saying that --
25  well, writing it, yes.

33 (Pages 126 - 129)

Page 130

1    Q.    Were you suggesting anything with
2 that language?
3    A.    Yeah.  I can't say that I'm
4 completely naive about the use of that
5 language; so I guess it -- in my mind, reading
6 the article, it felt like it would have been a
7 solicited paper to defend a point of view.
8    Q.    Did you feel that way about
9 Dr. Egilman's letter to the editor responding
10 to other papers?
11        MS. PARFITT:  Objection.  Form.
12        THE WITNESS:  You know, I didn't
13    feel exactly the same way about it.
14 BY MS. DAVIDSON:
15    Q.    And why is that?
16    A.    Sorry?
17    Q.    Why is that?
18    A.    Well, because for one thing, he was
19 on a completely -- he took a completely
20 different editorial opinion to the issues at
21 hand; but I -- I don't know -- I don't know for
22 a fact -- I suspect that Egilman was more of a
23 self-initiated intervenor in this matter.
24 Whereas, a private contract firm would more
25 likely be responding to a request.

Page 131

1    Q.    Do you have any objective basis for
2 that assumption?
3    A.    Which part of it?
4    Q.    The part about Dr. Egilman and the
5 part about this paper?
6    A.    I know Egilman a little bit, and I
7 know that he is a very energetic, active
8 proponent of his scientific beliefs and
9 theories; and he doesn't really -- in my
10 experience, he doesn't need a solicitation from
11 a law firm or a company or an intervenor to --
12 to put forth his opinions.
13        So that would be, you know, the
14 basis for my prejudiced or, you know,
15 subjective view about the motivations.  In that
16 I'm not implying the validity or the quality of
17 either of the points of view.
18    Q.    Does Dr. Egilman have a degree in
19 epidemiology?
20    A.    I'm not sure.  I don't know.
21    Q.    Does Dr. Goodman have a degree in
22 epidemiology?
23    A.    I think -- you know, I'm not sure
24 if it's the one that I remember from sort of a
25 career at Harvard doing epidemiology on various

Page 132

1 kinds of issues, including female cancer risks
2 from various hormonal factors.  But -- so I'm
3 not sure if it's the same person.  I didn't
4 look her up specifically when I saw the name on
5 this article.
6    Q.    So your opinions about the validity
7 of this article are -- are not based on any
8 actual knowledge of Dr. Goodman's background,
9 correct?
10    A.    I guess not.
11    Q.    Is Johns Hopkins --
12    A.    I don't know which Dr. Goodman it
13 was.  I didn't look -- as I said, I didn't look
14 her up to see if it was the one that I recall
15 from previous experience.
16    Q.    Do you know if Johns Hopkins has a
17 strong epidemiology program?
18    A.    Yes.  Quite --
19        MS. PARFITT:  Objection.  Form.
20        THE WITNESS:  Quite strong.
21 BY MS. DAVIDSON:
22    Q.    And do you know whether Dr. Goodman
23 is a fellow of the American College of
24 Epidemiology?
25    A.    If it's the one -- if it's the

Page 133

1 person I'm thinking of, then I would be
2 surprised if she doesn't have that.
3    Q.    Is Dr. Egilman a fellow of the
4 American College of Epidemiology?
5    A.    I have no idea.
6    Q.    Has Dr. Egilman ever taught
7 epidemiology?
8    A.    I have no idea.
9    Q.    Has Dr. Egilman ever been a cancer
10 prevention fellow at NCI?
11    A.    I -- I'm not aware of it.
12    Q.    Does Dr. Egilman have any
13 professional experience in gynecological
14 cancers prior to being a witness in this
15 litigation?
16    A.    I'm unaware.
17    Q.    Are you aware that Dr. Goodman was
18 a cancer prevention fellow at NCI?
19    A.    If it's the person that I'm
20 thinking of, then it wouldn't surprise me if
21 she had all of those pieces on her CV, yeah.
22    Q.    NCI is the National Cancer
23 Institute, right?
24    A.    That's correct.
25    Q.    Are you familiar with that

34 (Pages 130 - 133)

Page 134

1 organization?
2    A.    Yes, I have some familiarity with
3 it.
4    Q.    Is it a respected organization?
5        MS. PARFITT: Objection. Asked and
6    answered.
7        THE WITNESS: Well, it's an
8    enormous beast. It's like asking if the
9    United States has any respect.
10        Yes, NCI is a respected
11    organization; and it's main job is to do
12    research and to fund research.
13        MS. DAVIDSON: Okay. We can take
14    this paper down.
15 BY MS. DAVIDSON:
16    Q.    Dr. Siemiatycki, are you aware that
17 ovarian cancer rates have fallen significantly
18 over the last 20 to 30 years?
19    A.    I'm aware that they've declined.
20    Q.    Do you --
21    A.    But I don't know about
22 significantly. I don't know what you mean by
23 that, but they've -- yes.
24    Q.    How much did they decline?
25    A.    Sorry?

Page 135

1    Q.    Do you know how much they declined?
2    A.    I don't.
3    Q.    Are you aware that the incidence
4 rate for new cases of ovarian cancer fell from
5 14.9 per 100,000 people to 9.6 between 1992 and
6 2019?
7        MS. PARFITT: Objection. Asked and
8    answered.
9        THE WITNESS: I'm not aware of
10    those numbers.
11 BY MS. DAVIDSON:
12    Q.    Do you have an opinion as to why
13 those numbers have fallen?
14    A.    Whenever there are changes in
15 incidence of a disease, one of the first
16 questions that should be asked is whether there
17 have been any changes in diagnostic habits of
18 physicians or pathologists in regard to the
19 disease in question.
20        So -- but having said that, I have
21 no idea and no reason to believe that there
22 have been changes in diagnostic practices or
23 criteria over that period of time that would
24 explain such an apparent decline.
25    Q.    You would agree that's good news

Page 136

1 for public health that the incidence of ovarian
2 cancer fell precipitously over 30 years, right?
3    A.    Yes. If it's completely true, then
4 I think it's great.
5    Q.    During the 30 years when ovarian
6 cancer rates declined precipitously, did that
7 follow a precipitous decline in talcum powder
8 use?
9        MS. PARFITT: Objection. Form.
10        THE WITNESS: I don't know. You
11    know, I guess -- I don't know if anyone
12    has done an analysis of time trends in
13    talcum powder use and in talcum powder
14    composition, and that's what would be
15    required.
16        I believe -- I hope I'm not making
17    this up, but I believe there has been some
18    decline in use of talcum powder by women.
19    And there have certainly been changes in
20    composition of talcum powder since the
21    1980s. There's been less mineral and more
22    of other products that have the same
23    effect.
24        So there's a possibility that some
25    of that has played in to changing

Page 137

1    incidence rates of ovarian cancer, but I
2    wouldn't affirm that.
3 BY MS. DAVIDSON:
4    Q.    What's your basis for saying that
5 the composition of talcum powder has changed
6 since the 1980s?
7    A.    Well, I believe that the companies,
8 I think Johnson & Johnson and other companies,
9 have proclaimed and offered alternatives to the
10 mineral talc in their products and more of
11 the -- what's it called -- corn -- sorry,
12 sometimes words fall out of my vocabulary
13 box -- corn starch -- no. It's corn starch,
14 yeah.
15        So that there's been an increase
16 since about the 1980s -- at least that's what I
17 read. I mean, I haven't done the research into
18 this firsthand research; but everything I've
19 read -- and I don't think it's contested -- is
20 that there's been a shift away from the mineral
21 talc to corn starch and maybe other products as
22 well, other substances as well that have
23 similar cosmetic effects as talc does.
24    Q.    What's the latency period for
25 ovarian cancer?

35 (Pages 134 - 137)

Page 138

1    A.    Well, as with any cancer, there's
2  no single number; but I think the range -- and
3  there -- it's hard to -- especially when you
4  don't have a good grasp on the important risk
5  factors for the disease, it's difficult to
6  affirm with any degree of certainty what the
7  latency period is.
8         But the general feeling is that for
9  epithelial solid tumors, a range from 10 to 20
10 or 25 years is a reasonable estimate of what
11 the latency period is.
12        But with cancer's, there may be
13 early-stage risk factors, later-stage risk
14 factors that -- that come into play.  And these
15 influence latency periods in different ways.
16 But --
17    Q.    Have you done any sort of analysis
18 to determine whether there was a drop in the
19 use of talcum powder with the appropriate
20 latency that it would have affected the drop in
21 ovarian cancer rates over the last 30 years, or
22 are you just speculating?
23        MS. PARFITT:  Objection. Form.
24        THE WITNESS:  I have not done an
25    analysis of this topic.

Page 139

1  BY MS. DAVIDSON:
2    Q.    So fair to say that you're
3  speculating?
4         MS. PARFITT:  Objection. Form.
5         THE WITNESS:  Sorry.  I spoke for
6    about five minutes.  I'm not sure which
7    part of it you are addressing.
8         You're saying it's all --
9    everything I've said is speculation?
10   Is that what your -- asking me?
11 BY MS. DAVIDSON:
12   Q.    You speculated that maybe -- well,
13 first you said changes in talcum powder
14 composition, but then I think you said a move
15 away from talcum powder could have affected
16 precipitous decline in ovarian cancer rates.
17   I'm asking you:  Is that
18 speculation?
19        MS. PARFITT:  Objection. Form.
20        THE WITNESS:  If it's speculation
21   that there's been a drop -- a decline in
22   talcum powder use?
23 BY MS. DAVIDSON:
24   Q.    That would -- Doctor, it's not a
25 difficult question.

Page 140

1         You speculated, correct?
2         You were talking about how women
3  have moved away -- possibly have moved away
4  from talcum powder toward other compositions.
5  At first, you said it was other compositions of
6  talc, but now I think you mean other products
7  all together; and maybe that relates to the
8  precipitous decline in ovarian cancer.
9         My question is:  You don't have any
10 actual evidence for that, correct?
11        MS. PARFITT:  Objection. Form.
12        THE WITNESS:  I mean, I think there
13   are pieces -- I haven't produced any
14   evidence of that, but I've read that
15   there's -- I've seen evidence that there's
16   a decline in usage of talcum powder.
17        I've seen that there have been
18   changes over time in composition of the
19   products that are commonly called talcum
20   powder.
21        And so but -- and there -- it's
22   widely accepted that there is the latency
23   period roughly between 10 and 20 years or
24   so, maybe 5 to 25 years if you want to
25   broaden it, which -- and for between

Page 141

1  exposure and onset of disease.
2         Latency period is a very
3    complicated -- it's an easy term to use,
4    but what it actually means is not obvious.
5    So I don't want to -- I hesitate answering
6    your question about latency period partly
7    for that reason.  But if you want me to,
8    I'll get into why it is so complicated.
9  BY MS. DAVIDSON:
10   Q.    Dr. Siemiatycki, could you try to
11 stick to the question.
12        My question is:  Sitting here
13 today, do you have any evidence that the
14 decline between 1990 and 2020 in ovarian cancer
15 rates relates to a decline in talcum powder
16 use?
17   A.    Okay.
18        MS. PARFITT:  Objection. Form.
19        THE WITNESS:  If that -- if that is
20   your question, then the answer is:  I
21   don't have evidence for that.
22 BY MS. DAVIDSON:
23   Q.    Thank you.
24        Doctor, you criticize in your
25 report a paper called Micha 2022.

36 (Pages 138 - 141)

Page 142

1    Do you recall that?
2    A.   Yes.  Let's -- let's find it.
3    MS. PARFITT:  Page 78, just to move
4  this along.
5    MS. DAVIDSON:  Micha '22, what --
6  Noah, we're marking that as exhibit what?
7    MR. EPSTEIN:  That would be
8  Exhibit 10.
9    MS. DAVIDSON:  Okay.
10    (Whereupon, Defendant's
11  Exhibit D10, Paper entitled, "Talc powder
12  and ovarian cancer:  What is the
13  evidence?"  By John P. Micha, et al., was
14  marked for identification.)
15    MR. EPSTEIN:  I'll put that in chat
16  right you.
17    MS. DAVIDSON:  Great.  With that
18  new heading.
19    MR. EPSTEIN:  Yes.
20  BY MS. DAVIDSON:
21    Q.   "Talc powder and ovarian cancer:
22  What is the evidence?"  John Micha.
23    Dr. Siemiatycki, do you know who
24  John Micha is?
25    MS. PARFITT:  We are just trying

Page 143

1  to grab --
2    MS. DAVIDSON:  While you're looking
3  for the paper, I'm just asking if he knows
4  who John Micha is.
5    THE WITNESS:  I don't know.
6  BY MS. DAVIDSON:
7    Q.   Did you do any investigation as to
8  whether Dr. Micha had any conflicts of interest
9  here?
10    A.   I don't know who he is, and I
11  didn't do any investigations.
12    Q.   Got it.  Did you read who funded
13  the paper?
14    A.   No, I didn't.
15    Q.   I'll read it to you.  "This study
16  was funded by the Women's Cancer Research
17  Foundation, the family of Susan Berg, and the
18  family of Joan and Len Rullo in memory of
19  Elizabeth Johnson."
20    Do you see that?
21    That's on the last page, funding.
22    A.   Yes, I see -- on the last page --
23  oh, yes.
24    Q.   "The authors have no relevant
25  financial or nonfinancial interests to

Page 144

1  disclose."
2    Do you see that?
3    A.   I see that.
4    Q.   Are you aware that Susan Berg,
5  whose family sponsored this paper, was actually
6  a plaintiff in talc litigation?
7    MS. PARFITT:  Objection.
8    Completely misstates the evidence who
9    Susan Berg was.
10    THE WITNESS:  I'm unaware of any of
11    this.
12  BY MS. DAVIDSON:
13    Q.   Okay.  And in contrast to
14  Dr. Micha, Dr. Egilman who responded to this
15  paper does have a conflict of interest,
16  correct?
17    MS. PARFITT:  Objection.  Form.
18    THE WITNESS:  I'm not aware of
19    that.
20  BY MS. DAVIDSON:
21    Q.   You're not aware that Dr. Egilman
22  has a conflict of interest?
23    A.   Correct.  Unless it's -- I'm not
24  aware of it.  It might have been in the paper.
25  He might have stated it.  I'll look at the

Page 145

1  paper if you'd like.
2    Q.   Dr. Siemiatycki, is serving in this
3  litigation a conflict of interest that should
4  be disclosed in the letter?
5    A.   It depends what the letter is
6  about.
7    Q.   I don't understand.  When you say
8  Dr. Egilman didn't have a conflict of interest,
9  are you aware that Dr. Egilman is a plaintiff's
10  expert in talc litigation?
11    A.   I'm -- I'm unaware of that.
12    Q.   I see.  Okay.  We can continue.
13    I'd like to turn to -- back to
14  Exhibit 6, which is your expert report, and I'd
15  like to go to your discussion of Wentzensen
16  paper.
17    MS. PARFITT:  One moment.
18    THE WITNESS:  Which one is it?
19    MS. PARFITT:  The Wentzensen 2021.
20    Right, Jessica?
21    MS. DAVIDSON:  I'm just talking
22  about -- let's -- Noah, can you please put
23  up Exhibit 5 on the screen, page 76 of
24  Dr. Siemiatycki's Second Amended Expert
25  Report?

37 (Pages 142 - 145)

Page 146

1    MR. EPSTEIN: Yes. That's
2  Exhibit 6, correct, Jessica?
3    MS. DAVIDSON: Oh, sorry. Sorry.
4  Exhibit 6. Confusion.
5    MR. EPSTEIN: It should be up now.
6    THE WITNESS: I have -- I have the
7  report in front of me.
8  BY MS. DAVIDSON:
9    Q.   I'd like to ask you a question
10  about your report.
11    You say here, quote, "They debunked
12  the notion expressed by Goodman 2020, Lynch
13  2023, and others that cohorts studies as a
14  class are more valid than case control
15  studies."
16    Do you see that?
17    A.   I see that.
18    Q.   Can you show me where in the paper
19  they debunk that?
20    A.   I'll have to look at the paper.
21  It'll take me a few minutes.
22    So I'm looking at the article --
23    Q.   Uh-huh.
24    A.   -- and on page 4 of the version
25  that I have, but it would be on the -- can you

Page 147

1  find page 4?
2    Q.   Sure.
3    A.   It's 4.2 called "Study Designs."
4    Q.   Uh-huh.
5    A.   There are a few paragraphs there
6  that contrast the strengths and weaknesses of
7  case control versus cohort studies.
8    Q.   Uh-huh.
9    A.   And the --
10    Q.   Can you just point me to the
11  sentence that, quote, "debunks the notion that
12  cohort studies as a class are more valid"?
13    MS. PARFITT: Objection to the
14  question. I think he was in the middle of
15  trying to deliver a response.
16    THE WITNESS: Yeah, yeah. I don't
17  think I said there is a sentence that
18  debunks it. It's this entire section.
19    The entire section, the effect of
20  itself to show that there are strengths
21  and weaknesses of both types of designs.
22  And that's -- and by contrast with some
23  other opinions that make the blanket
24  statement that cohort studies as a class
25  are superior to case control studies,

Page 148

1  which is not true.
2    And that's the point I was trying
3  to make only that they made -- they
4  debunked the notions that these are
5  generic general truths that cohort studies
6  are superior to case control studies.
7    It's the specifics of each type of
8  study -- of each study that determines
9  it's quality, not whether it fits under
10  the umbrella of cohort or case control.
11  BY MS. DAVIDSON:
12    Q.   Do Goodman 2020 and Lynch 2023
13  state that cohort studies have no limitations?
14    A.   Do they state what?
15    Q.   That cohort studies have no
16  limitations.
17    A.   I'll have to go through the two
18  studies to see where -- what I'm contrasting
19  where --
20    Q.   I'm just asking you whether you
21  recall. Obviously we don't have time to go
22  through those two studies.
23    Do you recall whether these two
24  papers state that cohort studies have no
25  limitations?

Page 149

1    A.   I don't recall such statements; but
2  if I put this --
3    Q.   Okay.
4    A.   -- into this report I probably --
5  it was probably based on the impression that I
6  got by reading the entirety of the article that
7  they were downplaying the validity of case
8  control studies by contrast with cohort
9  studies. So it's based on an impression of the
10  entire articles, not a specific sentence.
11    Q.   In fact, O'Brien and Wentzensen
12  published the most comprehensive meta-analysis
13  of cohort studies, correct?
14    MS. PARFITT: Objection. Form.
15    THE WITNESS: Sorry. O'Brien
16  published the most comprehensive -- sorry.
17    Can you repeat that.
18  BY MS. DAVIDSON:
19    Q.   Isn't it true that O'Brien and
20  Wentzensen themselves published the most
21  comprehensive meta-analysis of cohort studies?
22    A.   Of the available cohort studies on
23  talc and ovarian cancer, correct.
24    Q.   That's what we're discussing today.
25  Thank you.

38 (Pages 146 - 149)

Page 150

1    If you go few lines down in your
2   report, you say that, "Women with intact
3   reproductive systems and used -- that the
4   authors found that women with intact
5   reproductive systems and used talcum powder had
6   particularly high risks of ovarian cancer."
7        Do you see that language?
8        MS. PARFITT:  And, again, he was
9    going to the article.
10  BY MS. DAVIDSON:
11   Q.    We're on page 76 of your report.
12        MS. PARFITT:  76.
13  BY MS. DAVIDSON:
14   Q.    It says, "Women with intact
15  reproductive systems and used talcum powder had
16  particularly high risks of ovarian cancer."
17        Do you see that language,
18  "particularly high"?
19   A.    Oh, yes.  I see that now.
20   Q.    Can you show me where in the
21  Wentzensen paper it says that, "Women with
22  intact reproductive systems had particularly
23  high risks of ovarian cancer"?
24        THE WITNESS:  Wentzensen study.
25        MS. PARFITT:  I'm handing him the

Page 151

1   Wentzensen study.
2        THE WITNESS:  So in -- on page --
3   I'm looking for a page number.  I think
4   page 7 --
5   BY MS. DAVIDSON:
6    Q.    Uh-huh.
7    A.    -- above Table 3 --
8    Q.    Uh-huh.
9    A.    -- there's a Section 5.3.  It says,
10  "Patients of genital powder use and ovarian
11  cancer by tubal ligation and hysterectomy
12  and" --
13   Q.    I'm there.
14   A.    Okay.  So a few lines down it
15  says -- well, "As such, it would make sense
16  that women who did not have uteri, either i.e.,
17  hysterectomy or those who had blocked fallopian
18  tubes, would have a markedly reduced risk of
19  developing the disease as a direct consequence
20  of talc use."
21        There are a few other sentences
22  around it, but that sentence captures, I think,
23  the meaning of my sentence that you --
24   Q.    So that sentence says that the
25  studies have found --

Page 152

1    A.    No.
2    Q.    That sentence says that
3   epidemiological studies have found that women
4   with talc -- with intact reproductive systems
5   and who used talcum powder have particularly
6   high risks of ovarian cancer?
7        MS. PARFITT:  He was trying to
8    answer.
9        Go ahead, Doctor.
10       THE WITNESS:  So if I carry on
11  reading in the Wentzensen paper, it says,
12  "As described below, many of these
13  existing studies have attempted to look at
14  this in some way.  However, most were
15  unable to do so with a clear temporal
16  sequence between hysterectomy, tubal
17  ligation, and powder use.  For example, it
18  may not be possible to know whether talc
19  was used prior to hysterectomy and tubal
20  ligation or what a women's combined talc
21  use status was."
22       So that's indicating that the --
23  that there's been insufficient research
24  to -- to sort of lock up this topic,
25  but --

Page 153

1   BY MS. DAVIDSON:
2    Q.    But that's not what you say,
3   Doctor.
4        What you say in your report is
5   that, "The data tend to show that women with
6   intact reproductive systems and used talcum
7   powder have particularly high risks of ovarian
8   cancer."
9        I'm trying to understand -- I've
10  got the report in front of me, the papers at --
11  the paper in front of me too.
12       I'm trying to understand where from
13  Wentzensen do you drive that the authors
14  believed the data show that women who used
15  talcum powder and have intact reproductive
16  systems have particularly high risks?
17       MS. PARFITT:  Jessica, you may not
18  have heard.  He was still talking when you
19  started to talk again.  So please, let him
20  finish.
21       And I realize this is very
22  difficult and challenging being remote,
23  but he was actually talking.
24       You're going to have to raise your
25  voice as well, Doctor.

39 (Pages 150 - 153)

Page 154

1    THE WITNESS:  Yeah.
2    MS. PARFITT:  But please continue
3  your thought and opinion.
4    THE WITNESS:  So as such, it would
5  make sense they say that women who did not
6  have intact reproductive systems would --
7  would have a reduced risk of developing.
8    So if it was blocked, there would
9  be a reduced risk of talc particles
10  reaching the ovaries.  And my sentence
11  says -- so with the intact reproductive
12  systems and the lack of blockage from --
13  from any surgical interventions, that
14  there would be -- oh, particularly high
15  risks.
16    Yes.  So with intact reproductive
17  systems, there would be greater chance of
18  particles reaching the ovaries.
19  BY MS. DAVIDSON:
20    Q.    What you say here is that, "The few
21  studies that have data tend to show that women
22  with intact reproductive systems had
23  particularly high risks."
24    "The few studies that had data."
25    Where do Wentzensen and O'Brien say

Page 155

1  that the few studies that had data tend to show
2  particularly high risks of ovarian cancer?
3    A.    So the article says they were
4  unable to demonstrate this with a clear
5  temporal sequence.  This article is not -- does
6  not make the bold statement that I make in
7  describing the Wentzensen article.
8    Q.    Doctor --
9    A.    Yes.
10    Q.    -- in fact, don't they say only
11  there may be a small positive association
12  between genital powder use and ovarian cancer,
13  which may be limited to women with patent
14  reproductive tracts?
15    Isn't that what they say on page 8?
16    A.    Sorry.  Can you --
17    MS. PARFITT:  Page 8.
18    THE WITNESS:  Yeah.
19  BY MS. DAVIDSON:
20    Q.    In their conclusion, the authors
21  state, "There may be a small positive
22  association between genital powder use and
23  ovarian cancer, which may be limited to women
24  with patent reproductive tracts."
25    That's what they actually say,

Page 156

1  right?
2    A.    Sorry.  Can you -- can you show me
3  where -- where is that last -- yes.  I'm in the
4  conclusions section, which is --
5    MS. DAVIDSON:  Noah, can you put
6  the conclusion of Wentzensen up?
7    MR. EPSTEIN:  Yes.  I'm on it right
8  now.
9    MS. PARFITT:  Thanks, Noah.
10  BY MS. DAVIDSON:
11    Q.    Okay.  We're in the second
12  paragraph of the conclusion.
13    MS. DAVIDSON:  Blow it up, the
14  paragraph that starts with "Taken
15  together.  Blow it up, Noah.
16    MR. EPSTEIN:  I don't know how to
17  do it through Zoom.  I'm sorry.
18    MS. DAVIDSON:  Okay.
19  BY MS. DAVIDSON:
20    Q.    Anyway the authors say, "Taken
21  together, the epidemiological data from case
22  control studies and cohort studies suggests
23  that there may be a small positive association
24  between genital powder use and ovarian cancer
25  which may be limited to women with patent

Page 157

1  reproductive tracts."
2    I read that correctly, right,
3  Dr. Siemiatycki?
4    A.    Yes.
5    Q.    So rather than saying anything
6  about a particularly high risk, the authors
7  actually say "small positive association,"
8  right?
9    MS. PARFITT:  Objection.  Form.
10    THE WITNESS:  So terms like "small"
11  and "high" are not technically defined.  I
12  mean, they don't have -- carry with them
13  any implication of what exactly that means
14  in terms of the magnitude.  And whether
15  you call something -- an effect large or
16  small is rather subjective, and it doesn't
17  mean the same thing in all contexts.
18    So yes, they use the words "small
19  positive association" here; but for many
20  associations that we have in biomedicine
21  and epidemiology and even in talc -- in
22  ovarian cancer epidemiology, there are
23  effects which have relative risks much
24  smaller than the relative risks shown for
25  ovarian -- for talc and ovarian cancer

40 (Pages 154 - 157)

Page 158

1  that are considered quite strong effects.
2      There are very genetic markers that
3  have associations with ovarian cancer
4  where the relative risks are in the order
5  of 1.05 or something like that. And, you
6  know, air pollution has that affect on
7  lung cancer.
8      And so the descriptor, the word
9  that you use to describe the magnitude of
10 a relative risk is somewhat subjective and
11 context dependent.
12     So if I understand your question
13 correctly, you are trying to show that
14 whereas they use the word "small" to
15 describe the association, I used the
16 word -- let me find it again.
17 BY MS. DAVIDSON:
18     Q.   "Particularly high risk," Doctor.
19 I'm trying to --
20     A.   Yeah.
21         MS. PARFITT: Let him finish.
22         THE WITNESS: What I mentally
23 "particularly high" was particularly high
24 compared with women with surgical
25 interventions to interrupt the -- the

Page 159

1  potential entry of talc particles.
2      And so in the contrast, I can't
3  remember what it is; but if I remember, if
4  the overall relative risk is, you know, in
5  the order of 1.3 for talc and ovarian
6  cancer, it might be that that -- that
7  combines a relative risk of 1.4 or 1.5 for
8  women with intact reproductive tracts
9  compared to maybe 1.1 or 1.2 for women
10 without.
11     And so that's the contrast --
12 that's what I meant by "particularly," by
13 contrast with women without intact
14 reproductive tracts, and that's -- so the
15 descriptor "high" was in the comparison of
16 the two groups of women.
17 BY MS. DAVIDSON:
18     Q.   Dr. Siemiatycki, in fact, the
19 authors did not note that women with intact
20 reproductive systems who used talcum powder had
21 particularly high risks of ovarian cancer,
22 right?
23         MS. PARFITT: Objection. Asked and
24     answered.
25

Page 160

1  BY MS. DAVIDSON:
2      Q.   The authors did not note that,
3  correct?
4         MS. PARFITT: Objection. Asked and
5     answered.
6         THE WITNESS: Well, I'll look
7     through the article again to see what
8     triggered my interpretation that they had
9     made such an inference.
10 BY MS. DAVIDSON:
11     Q.   Okay. Doctor, if you look at the
12 top of page 9 of Wentzensen, the authors state,
13 "Independent of the underlying cause, this
14 association between powder use and ovarian
15 cancer risk is weak. The low relative risk
16 translates to a very low risk increase."
17     Do you see that?
18     A.   I see that.
19     Do you want me to comment on it?
20     Q.   No. I'm just asking if you see
21 that language.
22     A.   I see it.
23     Q.   This paragraph 2 does not have any
24 reference or notation to a particularly high
25 risk, correct?

Page 161

1         MS. PARFITT: Objection. Asked and
2     answered.
3         THE WITNESS: Correct.
4         MS. DAVIDSON: Thank you. Let's go
5     off the record.
6         (Whereupon, a lunch was taken.)
7         MS. DAVIDSON: Let's mark as
8     Exhibit 11 "Douching and Genital Talc Use:
9     Patterns of Use and Reliability of
10    Self-reported Exposure," first author
11    O'Brien.
12        MS. PARFITT: It was hard to hear
13    you, Jessica. I'm sorry.
14        MS. DAVIDSON: It's called
15    "Douching and Genital Talc Use: Patterns
16    of Use and Reliability of Self-reported
17    Exposure," first author O'Brien.
18        MS. PARFITT: Give us one moment.
19        MS. DAVIDSON: I'm sorry?
20        MS. PARFITT: Give us one moment.
21        MS. DAVIDSON: No problem. We'll
22    put it up on the screen.
23
24
25

41 (Pages 158 - 161)

Page 162

1      (Whereupon, Defendant's
2  Exhibit D11, Paper entitled, "Douching and
3  Genital Talc Use:  Patterns of Use and
4  Reliability of Self-reported Exposure," by
5  Katie M. O'Brien, et al., was marked for
6  identification.)
7      MR. TISI:  I'm just trying to give
8  him --
9      MS. PARFITT:  Jessica, it's the
10  "Perineal talc use and" --
11      MR. TISI:  No.  It's the Patterns
12  and Reliability the self-exposure.
13      MS. DAVIDSON:  "Douching and
14  Genital Talc Use:  Patterns of Use and
15  Reliability of Self-reported Exposure."
16      MR. TISI:  Hold on.  Let me see if
17  I can get another copy.  All I have is the
18  preprint.  Let me see if I have another
19  copy.
20  BY MS. DAVIDSON:
21      Q.    Dr. Wentzensen [sic], have you read
22  this article before?
23      MS. PARFITT:  You mean
24  Dr. Siemiatycki.
25      MS. DAVIDSON:  Oh, I'm sorry.

Page 163

1      Yeah.  I'm definitely running out of steam
2  here.  I'm so sorry.
3      MS. PARFITT:  No worries.  No
4  worries.  No worries.
5      MS. DAVIDSON:  Fortunately, no
6  contagion on Zoom.
7  BY MS. DAVIDSON:
8      Q.    Dr. Siemiatycki, have you read this
9  article before?
10      A.    I think I have.
11      Q.    What is does this article address?
12      A.    Well, patterns of use and
13  reliability of self-reported exposure of
14  douching and genital talc use by women.
15      Q.    Do you know what the paper looks
16  at?
17      MS. PARFITT:  Objection.  Form.
18      THE WITNESS:  I'm just -- I'm just
19  starting to look at the preprint version.
20  It's not one that I've looked at recently,
21  so it will just take me a minute to
22  refresh my memory about this one.
23      Oh, yes.  It's from the
24  Sister Study.  And it's kind of a
25  descriptive presentation of various

Page 164

1  parameters of talc use and douching in
2  that population.
3  BY MS. DAVIDSON:
4      Q.    Do you recall that the authors were
5  looking at questions of recall bias?
6      A.    Yes.  It's in the title, so I
7  recall that.
8      Q.    And what do the authors determine;
9  do you recall?
10      A.    I don't recall.
11      Q.    Okay.  Dr. Siemiatycki --
12      A.    Yes.
13      Q.    -- the authors state, "If historic
14  use cannot be accurately recalled, measurement
15  error can bias effect estimates, especially if
16  recall reliability differs by outcome status."
17      Do you agree with that statement?
18      A.    So I didn't catch all of what you
19  said.
20      Could you --
21      Q.    It's right here on page 1.
22      A.    Okay.
23      Q.    It's up on the screen.
24      A.    Yeah.
25      Q.    On the right-hand, the last

Page 165

1  sentence of the second paragraph on the right.
2  I'll read it again.
3      "If historic use cannot be
4  accurately recalled, measurement error can bias
5  effect estimates, especially if recall
6  reliability differs by outcome status."
7      Do you agree with that statement?
8      A.    Yes.  I still haven't found the
9  sentence on the page, but I agree with that
10  statement.
11      Q.    This study looked at recall bias
12  with respect to ever use and never use,
13  correct?
14      A.    I guess so.  Again, this article is
15  not fresh in my memory and --
16      Q.    Okay.
17      A.    -- I'm -- I'm just looking at --
18      Q.    Could -- my question is:  Could
19  recall bias also affect reporting of the
20  frequency of use of a product?
21      A.    Yes, it could.
22      Q.    So if you -- do you recall whether
23  O'Brien's paper found that there may be
24  over-reporting of talc use among those with a
25  history of ovarian cancer?

42 (Pages 162 - 165)

Page 166

1    MS. PARFITT: And, Jessica, for
2 clarity, are you still talking about this
3 douching paper or a different O'Brien
4 paper, just for clarity?
5    MS. DAVIDSON: I'm talking about
6 this paper, I believe.
7    MS. PARFITT: Okay. No. That's
8 fine. That's fine.
9    It was really faint, Jessica. I'm
10 sorry. I know you don't -- you're not
11 feeling well, but you're really faint.
12 Okay.
13 BY MS. DAVIDSON:
14    Q.  Dr. Siemiatycki?
15    A.  Yes.
16    Q.  Do the authors of this paper find
17 that there may be over-reporting of talc use
18 among those with a history of ovarian cancer?
19    A.  You know, I -- I can't -- I can't
20 remember, to be honest. I can't remember
21 this --
22    Q.  Okay.
23    A.  -- particularly well.
24    Q.  Okay. That's fair.
25    Do you recall the author saying

Page 167

1 that, "Recall bias is potentially driving some
2 of the previous observed differences in effect
3 estimates between studies collecting genital
4 powder exposure status retrospectively versus
5 prospectively"?
6    A.  So I don't recall that.
7    Q.  Okay.
8    A.  But I don't disagree that it's
9 potentially true.
10    Q.  Okay.
11    A.  The qualifier potentially's the key
12 word in -- in that sentence.
13    Q.  Did you include a discussion of
14 this paper in your -- in your report?
15    A.  Of this paper?
16    Q.  Uh-huh.
17    A.  You know, I don't remember if I did
18 or not.
19    Q.  Okay.
20    A.  I didn't think that it moved of the
21 dial in any way compared to what I already had
22 in the paper. You know, I had a section in my
23 paper -- in my report about different kinds of
24 biases that can affect different kinds of
25 epidemiologic studies, and I included reporting

Page 168

1 bias in that; and I had a discussion of the
2 possible impact that it might have.
3    So I felt -- I feel like I already
4 dealt with this issue in my report. I -- I
5 don't know that this -- this publication
6 changed anything for my report.
7    MS. DAVIDSON: Okay. I'd like to
8 mark as Exhibit 12 a paper entitled, "Use
9 of personal care product mixtures and
10 incident hormone-sensitive cancers in the
11 Sister Study: A U.S.-wide prospective
12 cohort," first author Chang.
13    (Whereupon, Defendant's
14 Exhibit D12, Paper entitled, "Use of
15 personal care product mixtures and
16 incident hormone-sensitive cancers in the
17 Sister Study: A U.S.-wide prospective
18 cohort," by Che-Jung Chang, et al., was
19 marked for identification.)
20    THE WITNESS: C-H-I-A-N-G-E.
21 BY MS. DAVIDSON:
22    Q.  C-H-A-N-G.
23    A.  I'm getting it. It will just take
24 a second before we find it.
25    Q.  Does the paper name sound familiar

Page 169

1 to you?
2    A.  I'm sorry?
3    Q.  Does the paper name sound familiar
4 to you?
5    A.  Yes, vaguely; but again, not fresh
6 in my mind.
7    Q.  Do you recall when you read it?
8    A.  Sorry. Did you say -- did you ask
9 something?
10    Q.  Do you recall when you read this
11 paper?
12    A.  No, I don't, not right now. Not
13 before having seen it. If you can hang on for
14 a couple of minutes, I think we're looking for
15 it.
16    THE WITNESS: Is it missing?
17    MS. DAVIDSON: We'll put it up on
18 the screen, Noah.
19    MS. PARFITT: If you can go -- if
20 you could go ahead and -- thank you very
21 much -- put it up.
22    MS. DAVIDSON: I believe this paper
23 was in the materials you sent us in the
24 Dropbox, Michelle, correct?
25    MS. PARFITT: Correct. That's

43 (Pages 166 - 169)

Page 170

1    correct, yes.
2          MS. DAVIDSON: So I'm asking the
3    doctor when he read it.
4          MS. PARFITT: Yes. The distinction
5    we were making, he's got three binders of
6    articles here; and it is not in his
7    binder. I don't know if it's in the
8    miscellaneous materials that we got.
9          THE WITNESS: I don't remember when
10   I looked at this. It wasn't an important
11   paper in my evaluation.
12   BY MS. DAVIDSON:
13   Q.    Does this paper report a risk
14   estimate for exposure to perineal talc use and
15   the development of ovarian cancer?
16         MS. PARFITT: Objection. Form.
17         If you want to show him what
18   you're --
19         THE WITNESS: I have to read it. I
20   have to read it. I'm sorry. I just
21   don't -- I'm not familiar enough with the
22   article, and I don't remember it very
23   well.
24   BY MS. DAVIDSON:
25   Q.    Okay. It was on your reliance

Page 171

1    list, and it came out in 2024.
2          So you read it pretty recently,
3    correct?
4          MS. PARFITT: It was on materials
5          considered, Jessica, not on reliance.
6    BY MS. DAVIDSON:
7    Q.    Dr. Siemiatycki, this was on your
8    materials considered list and it came out in
9    2024.
10         So you read it pretty recently,
11   correct?
12         MS. PARFITT: Objection.
13         THE WITNESS: Not correct.
14   BY MS. DAVIDSON:
15   Q.    Well, when did you read it?
16   A.    Well, I don't think I read it. I
17   think I glanced at it, decided it was not
18   important to write up or review. So I --
19   Q.    How do you decide that a paper's
20   not important to review just by glancing it
21   without reading it in full?
22   A.    You have to make such decisions
23   when you're reviewing, you know, an enormous
24   volume of material, which ones to go further
25   and dig into and which ones to set aside.

Page 172

1          And if you can point me to where
2    this is an important article with important
3    results, I will certainly consider it if I'm
4    called upon to comment on this again.
5    Q.    So your testimony is that it's in
6    your materials considered list, but you never
7    actually read it?
8    A.    I looked at it in some form, maybe
9    looked at the abstract; but, you know, of the
10   hundreds and hundreds of articles I've looked
11   at in abstracts on this topic and other topics
12   in the past year, I can't say that this one
13   stuck out in any way.
14   Q.    All right. Let's turn to Table S4.
15   A.    To where?
16   Q.    Table S4.
17   A.    Of this article, okay.
18   Q.    Correct.
19   A.    I don't have the article in front
20   of me so --
21   Q.    We're going to put it up on the
22   screen. Don't worry.
23   A.    Yeah.
24         MS. DAVIDSON: We're going to mark
25   Table S4 as Exhibit 13.

Page 173

1          Noah, it is the Supplemental
2    Table S4.
3          MR. EPSTEIN: Yeah. Sorry about
4    that. Let me pull that up.
5          MS. DAVIDSON: Let's mark that as
6    Exhibit 13.
7          (Whereupon, Defendant's Exhibit
8    D13, Supplemental Table S4, was marked for
9    identification.)
10   BY MS. DAVIDSON:
11   Q.    Table S4, which we're putting up on
12   the screen, is titled --
13         MS. PARFITT: Jessica, it's not up
14   yet, just so you know.
15         MS. DAVIDSON: I know. I know.
16   I'm just -- I'm not asking any questions
17   yet. I'm just telling you.
18         Table S4, which is being put up on
19   the screen is entitled, "Associations
20   between one-frequency category increase in
21   use of single personal care product and
22   breast, ovarian, and uterine cancer using
23   Cox proportional hazards models."
24         Noah, I would like to look at the
25   middle column, which is ovarian cancer.

44 (Pages 170 - 173)

Page 174

1    So can you below that up and focus on
2    that.
3        MR. EPSTEIN:  I've looked.  I don't
4    see a way to blow it up.
5        MS. DAVIDSON:  There is a way, but
6    okay.
7        MR. EPSTEIN:  Sorry about that.
8        MS. DAVIDSON:  Did you ask -- do
9    you ask someone?
10       MR. EPSTEIN:  I've reached out to
11   Asher.  I haven't heard back.
12       MS. DAVIDSON:  Okay.  Ask a
13   paralegal.
14       MR. EPSTEIN:  Okay.
15   BY MS. DAVIDSON:
16   Q.   Looking at the bottom -- we'll all
17   just have to strain our eyes a little.
18   In the bottom middle column, it
19   lists for several hygiene products an adjusted
20   hazard ratio for ovarian cancer.
21       Do you see that?
22       It's also been e-mailed to you in
23   the chat if you want to open it up there.
24       MS. PARFITT:  Jessica, I would just
25   object to the extent the doctor has

Page 175

1    already testified.  He looked at an
2    abstract.  He has not reviewed this
3    article --
4        MS. DAVIDSON:  I understand, but
5    I'm -- I'm showing you --
6        MR. TISI:  Do you mind if I can go
7    behind him and see if I can download --
8        MS. DAVIDSON:  Well, do you guys
9    want to just print -- do you want to go
10   off the record and print this?
11       MR. TISI:  We're not in a place
12   where we can do that, Jessica.
13       MS. DAVIDSON:  Oh, okay.
14       MR. TISI:  I'm seeing if I go to
15   the chat --
16       MS. DAVIDSON:  On my computer I'm
17   able to just -- to zoom in.
18       MR. TISI:  Yeah.  He can't do that
19   unless he downloads the document.
20       MS. DAVIDSON:  On my table I can
21   just go on my Zoom, interestingly enough,
22   and just -- on my computer, I can increase
23   it.
24       MR. TISI:  Let's see if we can do
25   that.

Page 176

1        Can you -- are you able to increase
2    it?
3        MR. LYONS:  I mean, if you want me
4    to share, I can zoom.  So I've got the
5    document if you want me to share.
6        MS. DAVIDSON:  Patrick, do you know
7    how to do it?
8        MR. LYONS:  Yes.
9        MS. DAVIDSON:  Great.  Let's have
10   Patrick do it.
11       MR. LYONS:  If that will be
12   helpful.
13       MS. DAVIDSON:  Yes.  That would be
14   amazing, Patrick.
15       So you're going to put -- Patrick,
16   you're going to put up Table S4, the
17   middle table on ovarian cancer.
18       Thank you so much.
19       Michelle, he's useful.  You're
20   lucky.
21       Okay.  Patrick, we want to go to
22   the bottom.  Okay.  And then we're looking
23   at -- right.  We're looking at adjusted
24   hazard ratios for bath gel, deodorant,
25   douche, mouthwash, shaving scream.

Page 177

1        And then if you turn to the next
2    page, talc underarm, talc vaginal, and
3    talc other.
4    BY MS. DAVIDSON:
5    Q.   So I'd like to ask you,
6    Dr. Siemiatycki, of these hygiene products,
7    bath gel, deodorant, douche, mouthwash, shaving
8    cream, talc underarm, and talc vaginal, do any
9    show an age-adjusted hazard ratio that's
10   statistically significant with ovarian cancer?
11       MS. PARFITT:  Objection to the
12   question.
13       The doctor's testified he has not
14   had a chance to review the entire article,
15   and he has not relied on it for the
16   purposes of this --
17       MS. DAVIDSON:  I understand.  We're
18   just looking at this table, Michelle.
19       THE WITNESS:  Well, from just the
20   table, I wouldn't venture a guess as to
21   how -- what I would think if I saw the
22   whole paper.
23       Just as an example -- this is from
24   the Sister Study, correct?
25       In the original publication of the

45 (Pages 174 - 177)

Page 178

1   Sister Study, the published result on
2   perineal use of talc and ovarian cancer
3   showed a relative risk of .73.
4       In the analysis of the Sister Study
5   data by the O'Brien team, they found that
6   the Sister Study data actually showed a
7   relative risk of 1.05.
8       So depending on who did the
9   analysis and how they did the analysis,
10  there's an enormous change in the point
11  estimate.
12      I don't know what this data was
13  based on that you're showing me here in
14  this article. I would need to look at it
15  and understand what -- what subjects it
16  was based on, what subsets of the
17  Sister Study cohort it was based on, what
18  the methods were. So I really can't
19  answer the questions about it.
20  BY MS. DAVIDSON:
21      Q.   Dr. Siemiatycki, you're refusing to
22  tell me which of the risk ratios that are
23  listed here are statistically significant?
24      MS. PARFITT: Objection. Form.
25      THE WITNESS: I could -- I could --

Page 179

1   BY MS. DAVIDSON:
2       Q.   If you're refusing, just tell me
3   that.
4       MS. PARFITT: Objection to the
5   response.
6   BY MS. DAVIDSON:
7       Q.   I asked you in this paper do the
8   authors -- well, let's start with bath gel.
9       Is the adjusted hazard ratio for
10  bath gel and ovarian cancer statistically
11  significant?
12      A.   Well, one thing, I don't know which
13  is the adjusted.
14      Q.   Right here, it says it, 1.06.
15  There's --
16      A.   It doesn't say it on my screen.
17      Q.   It's at the top of the page,
18  Doctor.
19      A.   Well, the top of the page is not
20  visible.
21      Q.   We're happy to show it to you
22  again. We showed it to you already.
23      It says, "Adjusted -- age-adjusted
24  hazard ratio 95 percent confidence interval."
25      Do you see that, Doctor?

Page 180

1       A.   I see that.
2       Q.   Okay. Let's go back down.
3       The adjusted hazard ratio for bath
4   gel is not statistically significant at the
5   95-percent confidence interval, correct?
6       MS. PARFITT: Objection. Form.
7       THE WITNESS: That's correct.
8   BY MS. DAVIDSON:
9       Q.   And the same is true for deodorant
10  mouthwash, shaving cream, talc underarm, and
11  talc vaginal, correct?
12      MS. PARFITT: Objection. Form.
13      THE WITNESS: That's correct.
14  BY MS. DAVIDSON:
15      Q.   And the only -- the only
16  statistically significant --
17      MS. PARFITT: Jessica, let me --
18      THE WITNESS: I don't endorse that
19  those are valid statements.
20  BY MS. DAVIDSON:
21      Q.   I understand. But, you know,
22  that's not my question, with all due respect.
23      And you're happy -- I'm happy for
24  you. When Ms. Parfitt questions you, you can
25  go on and on why you don't endorse this paper,

Page 181

1   but my question is very simple.
2       The only statistically significant
3   hazard ratio in this column is for douching,
4   correct?
5       MS. PARFITT: Objection. Form.
6   And you aren't letting him finish the
7   answer.
8       MS. DAVIDSON: Okay. I understand.
9   BY MS. DAVIDSON:
10      Q.   Dr. Siemiatycki, the only adjusted
11  hazard ratio that is statistically significant
12  is for douching, correct?
13      MS. PARFITT: Objection. Form.
14      THE WITNESS: If by "statistically
15  significant," you mean the confidence
16  interval -- the 95-percent confidence
17  interval does not include one, then that's
18  correct.
19  BY MS. DAVIDSON:
20      Q.   For douching it shows a 1.37;
21  whereas, for talc vaginal, it shows 1.07
22  correct?
23      MS. PARFITT: Objection. Form.
24  He's already testified. He cannot --
25      MS. DAVIDSON: Okay. I understand,

46 (Pages 178 - 181)

Page 182

1    Michelle.  You can have a standing
2    objection to this document.
3  BY MS. DAVIDSON:
4    Q.    For douching shows 1.37 compared to
5  talc vaginal at 1.07, correct?
6        MS. PARFITT:  Objection.  Form.
7        THE WITNESS:  That's what this
8    table -- these numbers in this table show.
9  BY MS. DAVIDSON:
10   Q.    Correct.  And I'm asking you about
11 this table.  That's all I'm asking you about.
12       And for bath and --
13       MS. PARFITT:  Jessica, I don't want
14   to talk over you.
15       MS. DAVIDSON:  No.  I'm not having
16   speeches about this.  I'm asking questions
17   about this document.
18       You can ask him all the questions
19   you want about -- about this paper.
20       MS. PARFITT:  He's --
21 BY MS. DAVIDSON:
22   Q.    Dr. Siemiatycki, am I correct
23 that -- am I correct that the adjusted hazard
24 ratio for bath gel is 1.06 and for talc is
25 1.07; is that correct?

Page 183

1        MS. PARFITT:  Dr. Siemiatycki,
2    would you answer the in the fashion you
3    have been attempting to answer it but have
4    been obstructed by counsel from giving
5    your answer.
6  BY MS. DAVIDSON:
7    Q.    Dr. Siemiatycki, am I correct that
8  in this table the adjusted hazard ratio for
9  bath gel is not statistically significant at
10 1.06, and the adjusted hazard ratio for vaginal
11 talc is not statistically significant at 1.07,
12 correct?
13       MS. PARFITT:  Objection.  Form.
14       Answer as in fulsome a manner as
15   you need to answer the question
16   accurately.
17       THE WITNESS:  Yes.
18 BY MS. DAVIDSON:
19   Q.    Thank you.  And the confidence
20 intervals for bath gel and for vaginal talc
21 use, the confidence intervals listed on this
22 table overlap significantly, right -- or
23 considerably, to use the language you used
24 before?
25       They overlap considerably, right?

Page 184

1        MS. PARFITT:  Objection.  Form.
2        THE WITNESS:  Yes.
3  BY MS. DAVIDSON:
4    Q.    Okay.  Let's go back to the
5  Wentzensen, O'Brien paper 2021.
6        MR. EPSTEIN:  I can take over from
7    here.  Thank you.  I figured out the
8    zooming.  I apologize.
9  BY MS. DAVIDSON:
10   Q.    Oh, Dr. Siemiatycki, you noted
11 earlier that O'Brien had a different risk ratio
12 for the Sister Study than was originally
13 reported in Gonzalez, right?
14   A.    Yes.
15   Q.    And one reason for that is that
16 O'Brien had more years of data, right?
17   A.    Yes.
18   Q.    And the 1.05 risk ratio for the
19 Sister -- for the Sister Study reported in
20 O'Brien was not statistically significant at
21 the 95-percent confidence interval, correct?
22   A.    Correct.
23   Q.    Okay.  If we could look at
24 Wentzensen, O'Brien, going back to --
25       MR. TISI:  I'm trying to get it, so

Page 185

1  just give him a second.
2        MS. DAVIDSON:  Okay.
3        MR. TISI:  Thank you.
4  BY MS. DAVIDSON:
5    Q.    I just have one question on this
6  paper.
7        Dr. Siemiatycki, did the confidence
8    intervals in O'Brien 2021 for the risk ratio
9  for women with patent tubes versus women with
10 non patent tubes, did those confidence
11 intervals overlap considerably?
12       MS. PARFITT:  Objection.  Form.
13       THE WITNESS:  Sorry.  I don't know
14   which paper we're talking about or which
15   table we're talking about.
16 BY MS. DAVIDSON:
17   Q.    In the Wentzensen and O'Brien paper
18 2021, that's what we've been talking about.
19       I'm asking you:  Did the confidence
20 intervals reported by those authors for women
21 with patent tubes and women who didn't have
22 patent tubes, did they overlap considerably?
23       MS. PARFITT:  Jessica, which table
24   are you referring to?
25       He's trying to orient himself.

47 (Pages 182 - 185)

Page 186

1       THE WITNESS: Are you waiting for
2   me to answer a question?
3   BY MS. DAVIDSON:
4   Q.    Yes, of course.
5       MS. PARFITT: All right. We
6   thought --
7   BY MS. DAVIDSON:
8   Q.    There's a question pending.
9       Have you forgotten the question?
10      MS. PARFITT: He did.
11      Suzanne, could you read that.
12      MS. DAVIDSON: I'm sorry. I'm
13  talking to him, Michelle.
14  BY MS. DAVIDSON:
15  Q.    Dr. Siemiatycki, have you forgotten
16  my question?
17  A.    I thought that you were going to
18  point me to a table. I don't know which data
19  you are -- the question pertains to. I thought
20  you were going to indicate --
21  Q.    Doctor, you -- you included the
22  Wentzensen paper in your report, right?
23  A.    Yes.
24  Q.    Okay. I assume you read it,
25  correct?

Page 187

1   A.    Correct.
2   Q.    And you're aware that it provides
3   risk ratios for patent women and non patent
4   women, right?
5   A.    Can you show me which table you're
6   referring to?
7   Q.    I'm not referring to a table. I'm
8   asking you what the results are of the study.
9   A.    I'm asking you which table you are
10  referring to. You're talking about relative
11  risks and overlapping confidence intervals. I
12  don't know what to look at.
13  Q.    Do you know what the results were
14  of the Wentzensen study?
15      MS. PARFITT: Different question.
16      THE WITNESS: Okay.
17      MS. PARFITT: New question, Doctor.
18      THE WITNESS: Okay. Well, I'll
19  look at the final conclusion of their
20  paper, and we went through this paper
21  15 minutes ago. And -- let me go to the
22  abstract, which often has a concise
23  statement of the findings or the
24  conclusions.
25      So they say, "Taken together via

Page 188

1   immunological data from case control
2   studies and cohort studies suggests that
3   there may be a small positive association
4   between genital powder use and ovarian
5   cancer. The causal factors underlying the
6   association are not clear. Proposed
7   factors include talc, other minerals."
8       Do you want me to continue reading
9   their conclusion?
10  BY MS. DAVIDSON:
11  Q.    I didn't ask you to read the
12  conclusions.
13      I asked you whether the confidence
14  intervals reported in this paper for patent
15  women overlap with the confidence interval
16  reported in this paper for non patent women.
17  A.    I don't see --
18  Q.    It is a simple question.
19  A.    I don't see the results that you're
20  alluding to. I don't see results for patent --
21  I think we're talking about different papers.
22      MR. TISI: Which paper are you
23  talking about?
24      We have the Wentzensen 2021.
25      THE WITNESS: Wentzensen,

Page 189

1   O'Brien --
2   BY MS. DAVIDSON:
3   Q.    Excuse me. I don't know who's
4   talking to you, but we don't have lawyers
5   talking to witnesses during a deposition.
6       MR. TISI: Well, no. I'm actually
7   talking to you. I'm trying to figure
8   out --
9       MS. DAVIDSON: Hey, don't talk to
10  me because Michelle's defending this
11  deposition.
12      MR. TISI: Fine. Michelle, would
13  you ask --
14  BY MS. DAVIDSON:
15  Q.    Dr. Siemiatycki --
16      MR. TISI: -- what she's referring
17  to?
18      MS. DAVIDSON: Okay. Hold on.
19  Guys --
20      MR. TISI: I'm trying -- I'm trying
21  to help you.
22      MS. DAVIDSON: Cut.
23      MR. TISI: I'm trying to help you.
24      MS. DAVIDSON: You're not helping
25  me.

48 (Pages 186 - 189)

Page 190

1      MR. TISI:  Okay.
2      MS. DAVIDSON:  Thanks for your
3   help.  I don't want it.
4   BY MS. DAVIDSON:
5      Q.   Dr. Siemiatycki, can you tell me,
6   sitting here, what the -- what the risk ratio
7   reported in this paper was for patent women
8   versus non patent women and whether the
9   confidence intervals overlapped?
10      If you can't, just say you can't.
11      MS. PARFITT:  Jessica, I think
12   there's a little confusion because they're
13   not marked.
14      MS. DAVIDSON:  Excuse me.  There's
15   no confusion.  I've asked the same
16   question --
17      MS. PARFITT:  There actually is.
18      MS. DAVIDSON:  -- six times.
19      MS. PARFITT:  He's -- we're making
20   sure you are talking about the Wentzensen,
21   O'Brien because the one in his hand is
22   Wentzensen, O'Brien, "Talc, body powder,
23   and ovarian cancer:  a summary of the
24   epidemiologic evidence."
25      Are we on the same article.

Page 191

1      MS. DAVIDSON:  We are on the same
2   article, Michelle.
3      MS. PARFITT:  Okay.  That's good.
4   Okay.  That's all.  That's good.
5      Here you go.
6      THE WITNESS:  And are you claiming
7   that there are results here showing the
8   association for women with patent
9   reproductive tracts and non patent; is
10   that what you're saying?
11   BY MS. DAVIDSON:
12      Q.   Well, you testified earlier that
13   you wrote in your paper that these authors
14   reported particularly high risk for patent
15   women.
16      So do you not recall whether
17   there -- this study actually has results for
18   patent and non patent women?
19      A.   Well, as -- as this is a review
20   article, it doesn't necessarily show numerical
21   results for each study that they took into
22   account.  And I'm just looking to see whether
23   they have any numeric -- because you're asking
24   about numerical results, overlaps of confidence
25   intervals and things.  And I at first glance --

Page 192

1      Q.   You don't see it in here?
2      Would you like to look at
3   Wentzensen 2020 for that information?
4      A.   Well, I'll look at whatever you
5   think I should look at, but I'm looking at the
6   one you pointed me at five minutes ago; and I
7   can't find that -- those results.
8      So just point me to the results,
9   and I'm happy to look at it.
10      Q.   If you look on page 8, the authors
11   state --
12      A.   Which -- which paper?  Which paper?
13      Q.   The same one we've been on.
14      A.   Okay, okay.  Because you just
15   switched papers.  But now you're back to the
16   one we've been talking about.  That's fine.
17      Q.   No, I didn't switch papers, Doctor.
18      It says, "A history of genital
19   powder use was associated with an increase of
20   developing incident ovarian cancer.  Hazard
21   ratio 1.13.  Confidence interval 1.01 to 1.26.
22   This association was null among women who did
23   not have patent tubes, 0.99 confidence interval
24   .86 to 1.15."
25      Do those confidence intervals

Page 193

1   overlap?
2      A.   I'm now looking for that sentence.
3   So page 8, the first column, I assume; and
4   you're talking about the first full paragraph
5   on that -- in that column; is that where you're
6   looking, or the second?
7      Q.   Can we make this easier?
8      Do the -- does the confidence
9   interval of 1.01 to 1.26 overlap with a
10   confidence interval of .86 to 1.15?
11      A.   Okay.  Repeat that question.
12      Q.   Does the confidence interval of
13   1.01 to 1.26 overlap with the confidence
14   interval of .86 to 1.15?
15      A.   Yes.
16      Q.   Okay.
17      MS. DAVIDSON:  Now, let's go to
18   O'Brien 2020, and let's mark that as
19   Exhibit --
20      MR. EPSTEIN:  14.
21      MS. DAVIDSON:  -- 14.
22
23
24
25

49 (Pages 190 - 193)

Page 194

1     (Whereupon, Defendant's
2  Exhibit D14, Paper entitled, "Association
3  of Powder Use in the Genital Area With
4  Risk of Ovarian Cancer," by Katie M.
5  O'Brien, PhD, et al., was marked for
6  identification.)
7     MS. DAVIDSON:  Do you guys have
8  that paper in front of you?
9     THE WITNESS:  We're getting it.
10    MS. PARFITT:  And, Jessica, for
11 accuracy, you're talking about the O'Brien
12 paper entitled, "Association of Powder Use
13 in the Genital Area with Risk" --
14    MS. DAVIDSON:  I'm going to --
15 yeah.  I'm going to -- I'm going to mark
16 it as soon as Noah puts it up.
17    Okay.  So, Noah, what number are we
18 on?
19    MR. EPSTEIN:  This is Exhibit 14.
20    MS. DAVIDSON:  Okay.  You have it
21 right up there.  This is great.
22    Chris, you have to credit me with
23 this PDF naming idea.
24 BY MS. DAVIDSON:
25    Q.   Exhibit 14 is, "Association of

Page 195

1  Powder Use in the Genital Area With Risk of
2  Ovarian Cancer," published in JAMA by O'Brien.
3     You're familiar with this paper,
4  right, Doctor?
5     A.   Yes.
6     Q.   And you've testified about this
7  before, and I just have one question for you on
8  this paper.
9     On this paper do the confidence
10 intervals for patent women and non patent women
11 reported by this paper overlap?
12    A.   I'm sorry.  Do they what?
13    Q.   Overlap.  Do the confidence
14 intervals overlap?
15    The same question I've been asking.
16    A.   You want to -- you want to point me
17 specifically to the results in the table, or
18 should I try to find them myself?
19    Do you know in which table those
20 results are found?
21    MS. PARFITT:  We're scrolling to
22 them right now.
23 BY MS. DAVIDSON:
24    Q.   We're scrolling through -- you do
25 have the paper in front of you, correct?

Page 196

1     A.   Correct.
2     MS. PARFITT:  He does.
3     MS. DAVIDSON:  We can go to the
4  conclusion.
5  BY MS. DAVIDSON:
6     Q.   Dr. Siemiatycki, are you looking
7  for -- for this in a hard copy?
8     A.   Yeah.  I have the hard copy of this
9  page that's on the screen.
10    So I don't see any -- I don't see
11 any tables.  This is not a --
12    Q.   Okay.  Doctor, you're -- I assume
13 that you know how to read an epidemiological
14 paper, correct?
15    MS. PARFITT:  Objection.  Form.
16    THE WITNESS:  I'm not sure how to
17 answer that, but yes.
18 BY MS. DAVIDSON:
19    Q.   Okay.  Can you tell me where in
20 this paper it reports confidence intervals for
21 patent and non patent women and whether those
22 confidence intervals overlap?
23    A.   I didn't hear that whole sentence.
24    Can I tell you where they are?
25    Q.   Uh-huh.  You can't find the

Page 197

1  confidence intervals and the reported --
2     MS. PARFITT:  We're having a hard
3  time hearing you between the remote nature
4  and his hearing issue, he is having a hard
5  time hearing you.
6     I'm sorry.  If you want to read it
7  back to him.
8     MS. DAVIDSON:  I don't know.  He's
9  heard me all day.
10    MS. PARFITT:  No, no.  Actually, he
11 hasn't.  That's why I keep interrupting.
12 He hasn't, and my apologies for that; but
13 we are having an issue here.
14    THE WITNESS:  So you want me to
15 read through this page and find the
16 results that you are referring to?
17    It will take me a minute to read
18 through the page, or do you want to say
19 specifically --
20 BY MS. DAVIDSON:
21    Q.   I am asking you:  What are the
22 point estimates in confidence intervals
23 reported in this paper perineal talc use and
24 the development of ovarian cancer for patent
25 women versus non patent women?

50 (Pages 194 - 197)

Page 198

1    A.    And it's on this page?
2    Q.    It's in this paper.
3    A.    It's in the paper.  So it will take
4 me about 10 or 15 minutes to read --
5    Q.    It's going to take you 10 or
6 15 minutes to identify the risk ratios in this
7 paper?
8    A.    To read -- because I would have
9 to -- unless you point me to a specific paper
10 or a page or a specific table and call them, I
11 will read from the beginning the entire paper
12 to try to find what is the nature of the
13 question.
14        I still don't understand the
15 question.  You're asking me to find some
16 results in a paper, in an eight-page paper.
17    Q.    I just want to make sure I
18 understand.
19        It would take you 10 or 15 minutes
20 to find the -- to find the risk -- the point
21 estimates reported by these authors?
22    A.    Yes, or the ones that you are
23 referring to.
24    Q.    Do you recall whether this paper --
25    A.    I'm sorry?

Page 199

1    Q.    Do you recall whether this paper
2 provided risk estimates for patent women versus
3 non patent women?
4        Do you recall that sitting here
5 today?
6    A.    Well, I believe -- I believe it
7 did.  I believe it did.  I'm just looking
8 because this group published several papers in
9 a few years, and I'm not sure which results
10 were presented in which papers.  So I'm just
11 going to look to see if I can find something in
12 this.
13        So I see in Figure -- in the figure
14 on page 54 some results separately by patent
15 and non patent women.
16    Q.    Uh-huh.  Are you looking at
17 Table 2?
18    A.    No.  I'm looking at the figure.
19 But if you --
20    Q.    Okay.
21    A.    -- want me to look at Table 2 --
22    Q.    I don't care where you look,
23 Doctor.  I just want the answer to my question.
24 I don't care where you look.
25    A.    So I'm not a mind reader.  I don't

Page 200

1 know --
2    Q.    I'm not asking you to read my mind.
3 I'm asking you to read the paper.
4    A.    Is the data that you're referring
5 to in Table 2?
6    Q.    Doctor, I'm asking you to tell me
7 what this paper reports in terms of hazard
8 ratio for patent versus non patent women.  I
9 don't care where in the paper you find it.
10        I'm just asking you:  What does it
11 report, and do the confidence intervals
12 overlap?
13    A.    Okay.
14    Q.    Is that too hard?
15        MS. PARFITT:  Objection.  Form.
16        THE WITNESS:  It's hard if I've got
17    to guess where the information is; but if
18    you have time, I'll read through the paper
19    and try to find that information.
20 BY MS. DAVIDSON:
21    Q.    You would have to read this entire
22 paper in order to answer that question?
23        MS. PARFITT:  Objection.  Form.
24        THE WITNESS:  To know which results
25    you're talking about, yes.  I would have

Page 201

1    to at least skim through the entire paper
2    to know what you're talking about.
3 BY MS. DAVIDSON:
4    Q.    Doctor, when you read an
5 epidemiological paper, is that -- you're not --
6 you're not familiar with how to identify risk
7 ratios from tables?
8        MS. PARFITT:  Objection.  Form.
9    Misstates his testimony.
10 BY MS. DAVIDSON:
11    Q.    I'm just trying to understand why
12 it would take you 15 minutes to tell me what
13 the hazard ratios are reported in this paper --
14    A.    Because --
15    Q.    -- which you covered in your
16 report.
17    A.    Because a paper of three or four
18 thousand words with several paragraphs and
19 sections and sentences may have that
20 information that you are interested in buried
21 anywhere in the paper.  So to find it, I need
22 to go through it.
23    Q.    All right.  Well --
24    A.    I don't understand why you can't
25 tell me on which page or table the numbers are

51 (Pages 198 - 201)

Page 202

1  that you are asking me to comment on.
2     Q.   I can point you to it if you really
3  cannot find it on your own.
4        MR. GOLOMB:  Suzanne, how much time
5  is left?  How much time is left?
6        THE COURT REPORTER:  Okay.  One
7  second.
8        MS. DAVIDSON:  Suzanne, let's go
9  off the record.
10       THE COURT REPORTER:  We're off the
11  record.
12       (Discussion held off the record.)
13       MS. DAVIDSON:  Let's go back on the
14  record and let's turn to page 54 of
15  O'Brien.
16       THE WITNESS:  54?
17       MS. DAVIDSON:  Uh-huh.
18       THE WITNESS:  Okay.
19       MS. PARFITT:  There was a question
20  pending, Jessica, when he went off camera
21  is that -- when you went off camera.
22       Is that question still pending are,
23  or are we starting over?
24  BY MS. DAVIDSON:
25     Q.   Dr. Siemiatycki, do you remember

Page 203

1  the question?
2     A.   I think you asked -- were asking if
3  I could describe and comment on the risk
4  estimates, the relative risk estimates for
5  women with patent reproductive tracts and women
6  without, not patent.
7     Q.   Correct.  And the answer is on
8  page 54, right?
9     A.   Well, that's one of the places
10  where the answer -- an answer can be found to
11  that question.
12     Q.   And as I read to you from the last
13  Wentzensen paper, it's actually the same.  The
14  same numbers are reported here, right?
15       1.13 hazard ratio for patent woman
16  with a 1.01 to 1.26 confidence interval; and
17  for non patent women .99 with a .86 to a 1.15
18  confidence interval, correct?
19       MS. PARFITT:  Objection.  Form.
20       THE WITNESS:  So I -- I don't
21  recall the question you asked before about
22  this; but yeah, those are the two numbers
23  that are in this table.
24  BY MS. DAVIDSON:
25     Q.   And those are the same numbers that

Page 204

1  I read to you five minutes ago from the other
2  paper, aren't they?
3     A.   I don't remember.
4        MS. PARFITT:  Objection.  Form.
5  BY MS. DAVIDSON:
6     Q.   Okay.  And these two confidence
7  intervals overlap considerably, correct?
8     A.   Correct.
9     Q.   Okay.  Let's move on.
10       Dr. Siemiatycki, I wanted to mark
11  as our final exhibit a paper entitled,
12  "Quantitative recall bias analysis of the talc
13  and ovarian cancer association."  First author
14  is Goodman.
15       (Whereupon, Defendant's Exhibit
16  D15, Paper entitled, "Quantitative recall
17  bias analysis of the talc and ovarian
18  cancer association," by Julie E.
19  Goodman, et al., was marked for
20  identification.)
21       MS. DAVIDSON:  Noah, would you be
22  so kind as to put that in the chat and on
23  the screen.
24       MR. EPSTEIN:  On it.
25       MS. PARFITT:  Give us one moment

Page 205

1  please.
2        MS. DAVIDSON:  Sure.
3        MS. PARFITT:  It's a different
4  article than the one talked about earlier,
5  and we'll have to look at the screen.  He
6  doesn't have a copy of it.
7        THE WITNESS:  This -- this is
8  very --
9  BY MS. DAVIDSON:
10     Q.   We're marking this paper as
11  Exhibit 15, I believe.
12       Have you seen this paper before,
13  Dr. Siemiatycki?
14     A.   I don't think I have.  It looks
15  like it's a very new -- newly published one.
16     Q.   Dr. Siemiatycki, have you ever
17  done -- I'm sorry.  I didn't turn my camera on.
18  That's not on purpose.
19       Have you ever done any analysis of
20  how much recall bias would be necessary to
21  attenuate the results of the talc ovarian
22  cancer studies to the null?
23     A.   No.
24     Q.   Have you ever seen any papers
25  analyzing that question?

52 (Pages 202 - 205)

Page 206

1    A.    To attenuate to the null?
2          Have I seen any papers?
3          I -- I don't recall any -- seeing
4    it, but it may be that I did; but I don't
5    recall.
6    Q.    Okay.
7          MS. DAVIDSON:  I believe I'm done,
8    but let's just go off the record for three
9    minutes for me to check my notes; and then
10   I'll turn you over to Michelle.
11         MS. PARFITT:  Thank you, Jessica.
12         MS. DAVIDSON:  Okay.
13         (Whereupon, a break was taken.)
14   BY MS. DAVIDSON:
15   Q.    Dr. Siemiatycki, are you aware that
16   your testimony today is on behalf of six
17   specific Bellwether plaintiffs who've been
18   chosen for trial in the MDL proceeding?
19   A.    No, I am not aware.
20   Q.    Have you ever heard the names
21   Ms. Converse, Ms. Newsome, or Ms. Rausa?
22   A.    No, I haven't.
23   Q.    Have you ever heard the names
24   Ms. Carl or Ms. Balderrama?
25   A.    No, I haven't.

Page 207

1    Q.    Have you looked at any records --
2    any medical records or other documents related
3    to the plaintiffs in this -- in these cases?
4    A.    No, I haven't.
5    Q.    Do you know anything about the
6    plaintiff's in these cases usage of talcum
7    powder?
8    A.    No, I don't.
9    Q.    Do you know what other risk factors
10   any of these plaintiffs had for ovarian cancer?
11   A.    No, I don't.
12   Q.    Are you offering an opinion that
13   talcum powder use caused any specific women to
14   develop ovarian cancer?
15         MS. PARFITT:  Objection.  Form.
16         THE WITNESS:  No.  That's not what
17   I'm --
18         MS. DAVIDSON:  Okay.  Subject to
19   any questions Michelle has, I have no more
20   questions at this time.
21         I do just want to before I turn
22   this over to Michelle, as I said earlier,
23   I'm not feeling well; and I did get very
24   frustrated this morning.  I did not think
25   my outburst was particularly professional.

Page 208

1    So I do want to apologize and thank you
2    for your time today.
3          MS. PARFITT:  Oh, thank you,
4    Jessica.  I appreciate that.  We
5    understand you're not feeling well.
6          THE WITNESS:  Thank you.
7          MS. PARFITT:  Okay.  I'm ready to
8    go, so why don't we --
9          MS. DAVIDSON:  Go ahead.
10         MS. PARFITT:  All right.
11         MS. DAVIDSON:  Michelle, can I ask
12   a favor?
13         MS. PARFITT:  Of course.
14         MS. DAVIDSON:  Could we switch
15   the -- could we switch the microphone to
16   you because you are really hard to hear.
17         (Discussion held off the record.)
18              EXAMINATION
19   BY MS. PARFITT:
20   Q.    Dr. Siemiatycki, you'll recall that
21   several hours ago counsel for J&J asked you
22   some questions with regard to an EPA document
23   that recently came out banning chrysotile
24   asbestos.
25         Do you recall that series of

Page 209

1    questions?
2    A.    Yes, I do.
3    Q.    Okay.  Let me show you what's been
4    entitled, "Environmental Protection Agency."
5    It's 40 CFR, Part 751.
6          And specifically, I'd like you to
7    turn to page 14 of that document.  Here you go,
8    Doctor.
9    A.    Thank you.
10   Q.    And if you'll turn to page 14.
11         MS. DAVIDSON:  Can we put that up
12   on the screen as well?
13         MS. PARFITT:  Okay.
14         MS. DAVIDSON:  And should we mark
15   it as an exhibit?
16         MS. PARFITT:  Sure.  We certainly
17   can.  We'll mark it as plaintiff's Exhibit
18   Number 1.
19         (Whereupon, Plaintiff's Exhibit P1,
20   Pre-Publication Notice, was marked for
21   identification.)
22         MS. DAVIDSON:  And, Patrick, if you
23   have a copy of the -- perfect.  Thank you,
24   Patrick.  And that will be marked as
25   plaintiff's Exhibit Number 1.

53 (Pages 206 - 209)

Page 210

1    And page 14, Patrick. Can you
2    share with us page 14?
3        Thank you so much.
4  BY MS. PARFITT:
5    Q.   Okay. And, Dr. Siemiatycki, at the
6  bottom of page 14, specifically, the document
7  says, "Additionally, some talc deposits and
8  articles containing talc have been shown to
9  contain asbestos. Thus, EPA recognizes that
10  certain uses of talc may present the potential
11  for asbestos exposure."
12        Did I read that correctly?
13    A.   Yes.
14    Q.   All right. What is the
15  significance of that statement concerning the
16  fact that talc deposits and articles containing
17  talc have been shown to contain asbestos?
18        What significance does that
19  statement have to your opinions with regard to
20  the relationship of asbestos to the biological
21  plausibility that talc can cause ovarian
22  cancer?
23    A.   Well, my main take away from this
24  is that if the epidemiological evidence
25  demonstrates an association between women's use

Page 211

1  of talc and ovarian cancer, this information
2  provides some potential avenues for biological
3  plausibility that the asbestos might be
4  responsible for excess risks for
5  epidemiologically demonstrated excess risks of
6  ovarian cancer.
7    Q.   Dr. Siemiatycki, some time ago you
8  were also asked whether or not you had done a
9  systematic review of the literature regarding
10  asbestos and ovarian cancer.
11        Do you remember those questions?
12    A.   Yes.
13    Q.   All right. Does the fact that you
14  did not do a complete systematic review of
15  asbestos have prevent you from opining on a
16  relationship of asbestos to be biological
17  plausibility of talcum powder causing ovarian
18  cancer?
19    A.   Not at all.
20    Q.   Why not?
21    A.   Well, there have been now a couple
22  of reviews of the topic. One, the main one by
23  Camargo and colleagues, was carried out by very
24  a competent team. They describe their methods
25  of searching for data of carrying out the

Page 212

1  statistical analyses; and the credibility of
2  that meta-analysis is persuasive to me.
3        I've also seen a recent report -- I
4  can't remember now -- from a Korean group that
5  updated the Camargo analysis because the
6  Camargo analysis only included papers published
7  until about 2010 or 2011; and the new paper,
8  relatively new paper publishes additional
9  papers. And it goes in exactly the same
10  direction. It reinforces the same conclusion.
11    Q.   Did you also review the IARC
12  monograph 2012?
13    A.   Well, I didn't need to review it
14  because I was on the panel.
15    Q.   Does the IARC monograph 2012, does
16  it address talcum powder as a cause of
17  ovarian -- or talc as a cause of ovarian
18  cancer?
19    A.   There is a mention of talc because,
20  although this particular IARC monograph meeting
21  did not include talc as one of the primary
22  exposures to be reevaluated, it did include
23  asbestos.
24        And as part of the asbestos
25  evaluation, there was an evaluation of talc

Page 213

1  containing asbestos form fibers. And so there
2  was an evaluation, which concluded that talc
3  containing asbestiform fibers as carcinogenic.
4    Q.   You were asked questions about
5  reaching out to SGO, ACOG, the NCI PDQ, and
6  other medical and scientific organizations.
7        Do you remember that series of
8  questions?
9    A.   Yes, I do.
10    Q.   Why haven't you, as an
11  epidemiologist, reached out to speak to SGO and
12  ACOG and -- excuse me, the PDQ?
13    A.   Well, that's not the way scientific
14  communication works. I never in my career
15  reached out to organizations like that to give
16  them my opinions or to tell them about my
17  results because they don't really have the
18  capacity to intake opinions and information
19  from every researcher who studies all of the
20  topics in their purview. So it's just not
21  done. I've never heard of researchers doing
22  things like that.
23        The normal and natural and
24  efficient way is to communicate through
25  scientific publications and scientific

54 (Pages 210 - 213)

Page 214

1  meetings. And information, once it -- which it
2  gets into such forums, then gets assimilated
3  into the general medical research community and
4  it ends up influencing those organizations if
5  they have responsibility for communicating
6  information like this to the public.
7          But in my experience -- and I've
8  been president of Association of
9  Epidemiologists. I was on the board of the
10 American College of Epidemiology. And these
11 organizations are not equipped to -- to carry
12 out evaluations of all possible research topics
13 and to communicate all of the possible research
14 issues to the public.
15     Q.   Do scientists like yourself in the
16 epidemiologic community rely on groups like the
17 NCI PDQ and other -- SGO, ACOG, and others for
18 scientific literature as part of their bases
19 for their opinions?
20     A.   No. I've -- I have never seen any
21 of those organizations or NCI PDQ cited as a
22 reference in a scientific journal. I've never
23 heard scientists communicate that some
24 important result is reported in such media as
25 NCI PDQ or some of the websites of

Page 215

1  organizations like this. It's just not part of
2  the infrastructure of knowledge transmission
3  within the scientific community.
4      Q.   I can't recall the precise
5  question, Dr. Siemiatycki, but you were asked
6  specifically whether or not you agreed or
7  disagreed with the American Cancer Society.
8          If, in fact, it was the
9  representation the American Cancer Society that
10 talcum powder was not associated with ovarian
11 cancer and/or there was insufficient evidence
12 to support that talcum powder could cause
13 ovarian cancer or associated with ovarian
14 cancer, would you agree or disagree with that?
15     A.   I would disagree with that.
16     Q.   Doctor, you were asked several
17 questions with regard to a declaration of
18 interest that you filed with IARC as well as a
19 letter that you sent to IARC anticipating their
20 re- review of the talcum powder in 2024.
21         Do you remember those questions?
22     A.   Yes, I do.
23     Q.   And do you remember counsel
24 addressing I believe it's Exhibit 3, 2 or 3,
25 the actual Declaration of Interest,

Page 216

1  specifically at column of questions Numbers 1
2  through 4 and 7 -- and I'll show it to you, and
3  specifically, I'm referencing Number 5 and 6.
4          And in that you stated, "From 2016
5  to 2020 January, I provided, A) consultation
6  services to law firms that were involved in
7  litigation against companies that produced or
8  sold talcum powder products."
9          Do you remember that series of
10 questions?
11     A.   Yes, I do.
12     Q.   Okay. And you represented to
13 counsel that you were incorrect with regard to
14 that -- those dates. All right.
15         How did you prepare this document,
16 and what documents did you rely on for purposes
17 of that statement?
18     A.   I didn't rely on any documents. I
19 did it by memory, and I did it hastily because
20 I didn't think it was important document any of
21 this.
22         I understand how the IARC system
23 works, having been part of it for a period of
24 time. And I -- I sort of wrote things down
25 hastily without carrying out any verifications

Page 217

1  of the dates. I didn't think the dates were
2  important. I put them in here. I'm not sure
3  why, but at that -- when I did this in the
4  summer of 2023, I was recollecting when these
5  things happened; and I got it wrong.
6      Q.   Do you have an understanding that
7  this litigation was in bankruptcy for a period
8  of time?
9      A.   I -- heard about that.
10     Q.   Okay. What was the nature of your
11 work in this case during the period of
12 bankruptcy, if any?
13     A.   I didn't do any during that period.
14     Q.   Is it fair to say that there was a
15 period of a few years where you did no work at
16 all because the case was being stayed in
17 bankruptcy?
18     A.   Yes, that's true.
19     Q.   You were asked about the Goodman
20 article, and specifically the Goodman article
21 that's entitled, "A critical review of talc and
22 ovarian cancer."
23         Do you remember that question? Do
24 you remember that question?
25     A.   Yes, I do.

55 (Pages 214 - 217)

Page 218

1    Q.    Okay.  And specifically, you
2  addressed the Goodman article in your report?
3    A.    Yes, I do.
4    Q.    All right.  Would you turn to your
5  report.  I believe it's page 76.
6        Tell me when you're ready.
7    A.    Yes.
8    Q.    What, if any, methodological flaws
9  did you observe based upon your review and
10  analysis of the Goodman study entitled, "A
11  critical review of talc and ovarian cancer"?
12    A.    Well, I found it methodologically
13  quite flawed, and I didn't take the resulting
14  opinions that they gave very seriously.  I
15  could list some of the problems that -- that I
16  pointed out.
17    Q.    What were they?
18    A.    First, it's curious that they did
19  not conduct a meta-analysis to estimate the
20  relative risk from the unsong of epidemiologic
21  studies that they considered of good quality.
22  That would be a natural thing to do if they
23  had -- they had all the material they needed.
24        Instead, they rely on a fatally
25  flawed method of using statistical significance

Page 219

1  of individual studies and tallying up how many
2  studies are individually statistically
3  significant to guide their overall conclusion.
4    Q.    And what did you mean by that?
5    A.    Well, in the old days, people used
6  to do that.  People used to count up -- do a
7  literature review and count how many studies
8  show a statistically significant association
9  with something and how many don't and use that
10  as a kind of an indicator of whether there's an
11  overall trend that shows an association.
12        And it was painfully clear to
13  sophisticated statisticians and other
14  researchers, clinical as well as
15  epidemiological, that it's hopelessly flawed to
16  count statistical significance studies as a
17  measure of anything.  Statistical significance
18  does not -- is not something that can be
19  counted up between -- among studies.
20        The best way to guarantee that
21  you'll never find an association is to conduct
22  studies with small numbers -- small enough
23  numbers of subjects that none of the results
24  will be statistically significant.  And then
25  you gather together all the studies that have

Page 220

1  done that, and you produce a meta-analysis; and
2  they -- you don't produce a meta-analysis.  You
3  produce a count of how many studies are
4  individually significant or nonsignificance,
5  and you find that most are them or all of them
6  are not significant.
7        Well, that is a hopeless distortion
8  of what statistical significance is about.  But
9  this is what they did in this -- in this paper.
10    Q.    In this Goodman paper?
11    A.    In this Goodman paper.
12    Q.    Any other?
13    A.    They make basic error of asserting
14  that cohort studies across the board are
15  superior in validity to case control studies.
16        This is completely false.  There is
17  no credible epidemiological literature that
18  demonstrates or proves such a proposition.
19  Each study has strengths and weaknesses, and it
20  requires sophistication to tally up the
21  strengths and weaknesses of each study and to
22  find what the results mean.  Whether it's a
23  case control or a cohort study is not a
24  determinant of the quality of and the validity
25  of the results.

Page 221

1        The third problem with the Goodman
2  study -- well, they -- they present a bunch of
3  studies in their list, but some of them are
4  actually subsumed in other -- some of the
5  papers are subsumed in other studies, which
6  were follow-ups and analyses done later.  And
7  this is not how to -- how to do a review of a
8  topic.  It's sort of a double-counting problem.
9        And the next problem was their
10  interpretation of the conformity of the results
11  with Bradford Hill's considerations.  It's
12  their interpretation and their evaluation,
13  their description of how the Bradford Hill
14  considerations apply to the literature.  The
15  studies that they have considered is very
16  subjective, and it's unreliable.  It's not
17  objective and fact-based.
18        Well, and the next point -- my last
19  point was while the they point out many gaps in
20  knowledge regarding the transport of fibers and
21  the mechanisms of carcinogenesis, they tend to
22  interpret the absence of evidence as evidence
23  against an association.  So --
24    Q.    And what does that mean?
25    A.    Well, when -- you know, there are

56 (Pages 218 - 221)

Page 222

1  some areas where there just hasn't been
2  definitive research to demonstrate that certain
3  mechanisms of translocation of -- transport of
4  fibers in the body would support the hypothesis
5  of talc fibers causing ovarian cancer.
6         It's -- it's fine to present data
7  and make an argument that there are gaps in
8  knowledge.  But their conclusion from the gaps
9  of knowledge is that this is evidence against
10 the hypothesis that the particles can be
11 transported to the ovaries, and that's a
12 logical flaw.
13    Q.    Any others that you wish to
14 express?
15    A.    No others that I would express now.
16    Q.    Okay.  Jumping around, let me
17 direct your attention to the -- you can hold on
18 to the report -- direct your attention to the
19 Wentzensen and O'Brien article entitled, "Talc
20 body powder and ovarian cancer:  A summary of
21 an epidemiological test."
22         Do you have that?
23    A.    I have that.
24    Q.    Okay.  Specifically, if you would
25 turn to the conclusions section, which is

Page 223

1  Section 6.  And it spans to the front of
2  page 9 -- the top of page 9.
3         Are you there?
4     A.    Yes, I am.
5     Q.    The sentence starts, "Independent
6  of the underlying cause" --
7     A.    I have it.
8     Q.    "Independent of the underlying
9  cause, the association between powder use and
10 ovarian cancer is weak.  The low relative risk
11 translates to a very low risk increase given
12 the rarity of ovarian cancer."
13         Do you remember that question being
14 asked of you?
15    A.    Yes, I do.
16    Q.    Okay.  And do you agree or disagree
17 with that statement?
18    A.    With the statement that the
19 evidence is weak?
20    Q.    Correct.
21    A.    No, I don't agree with that.
22    Q.    Okay.  How would you describe the
23 evidence in the talcum powder and ovarian
24 cancer based upon the literature review --
25 systematic literature review that you have

Page 224

1  performed and documented in now several
2  reports?
3     A.    I think the associations is of
4  moderate magnitude compared to other cancer
5  risk factors if you look -- or disease risk
6  factors.  And there are well-established cancer
7  risk factors that have relative risks well in
8  the range of 1.3, which is what we're talking
9  about for talc and ovarian cancer or even much
10 lower.  Even for ovarian cancer there are
11 well-established risk factors that have -- that
12 have relative risks in the order of 1.3.
13         So that is certainly not -- you
14 know, these terms "weak, strong, moderate" are
15 not scientifically designed.  There's no
16 convention about what constitutes strong
17 evidence or weak evidence.
18         The -- the original development of
19 risk factor -- modern risk factor epidemiology
20 occurred in the 1950s around the issue of
21 tobacco and lung cancer, and it so happened
22 that the relative risk of that association was
23 about 10 or 15.  And that became kind of a
24 marker for relative risks between risk factors
25 and disease.

Page 225

1         We -- people didn't know at the
2  time that hardly any chance of risk factor
3  would ever be shown to have such strong and
4  high relative risk.  So having that as the
5  first thing that the discipline discovered and
6  latched on to and started developing
7  terminology around and conventions around in a
8  way distorted how subsequent epidemiology of
9  other risk factors was described in the
10 literature and described even in public.
11        But certainly there is -- there are
12 many examples now of risk factors which are in
13 the same range as the talc ovarian cancer
14 relative risk, which are considered strongly
15 supported evidence in epidemiology.
16    Q.    You have stated in your report that
17 the evidence in the talcum powder and ovarian
18 cancer case, based upon your systematic review,
19 is significant.
20        When said "the evidence regarding
21 consistency and strength is significant," what
22 do you mean by that?
23    A.    I'm not sure.  If you could point
24 me to a page.
25        That the evidence is significant?

57 (Pages 222 - 225)

Page 226

1    Q.    Generally, the strength of the
2  evidence and the association of the evidence is
3  significant.
4    A.    Well, I don't remember using that
5  word in that context.  But, you know, I'd say
6  the evidence is persuasive and persuasive
7  because of some of the concepts that we
8  associate with the Bradford Hill
9  considerations; but it's not because it's
10  Bradford Hill, but the strength, the magnitude
11  and the -- especially the consistency of the
12  results from different studies carried out in
13  different countries of different populations of
14  women by different teams of investigators and
15  over a 30-year span by -- published over a 30-
16  or 40-year span; and almost all of them
17  indicate that there is an excess risk.
18        Whether the individual studies are
19  statistically significant at point .05 level or
20  not is moot.  It's not the important thing.
21  But putting all of that together and carrying
22  out appropriate meta-analyses shows that there
23  is incontrovertible evidence that there is a
24  strong association.
25        Going to causality requires a few

Page 227

1  more hoops to demonstrate.
2    Q.    And you have done that in your
3  report, correct?
4    A.    Yes.
5        MS. PARFITT:  All right.  Give
6    me -- Jessica, if you will give me about
7    30 seconds just to make sure -- we can go
8    off real quick to see if I have any
9    further questions, and I think we'll be
10    good.
11        MS. DAVIDSON:  Sure.
12        MS. PARFITT:  Thank you.
13        (Whereupon, a break was taken.)
14        MS. PARFITT:  Thank you.  I have no
15    further questions at this time.
16        EXAMINATION
17  BY MS. DAVIDSON:
18    Q.    I just have a few, Dr. Siemiatycki.
19        Can you point me to any publication
20  that refers to an association between 1.1 and
21  1.3 as, quote, "strong"?
22        MS. PARFITT:  Objection.  Form.
23        THE WITNESS:  I'm sorry.  Are you
24    asking me to point to publications that
25    report such associations or that

Page 228

1    description --
2  BY MS. DAVIDSON:
3    Q.    That describe an association
4  between 1.1 and 1.3 as "strong."
5        MS. PARFITT:  You're referring to
6    talc articles or anything?
7        MS. DAVIDSON:  I think my question
8    stands for itself, Michelle.
9        THE WITNESS:  Well, I assume that
10    your question refers to anything, not just
11    talc.
12  BY MS. DAVIDSON:
13    Q.    Have you ever read a publication
14  that described an association between 1.1 and
15  1.3 as, quote, "strong"?
16        MS. PARFITT:  Objection.  Form.
17        THE WITNESS:  I can't really recall
18    because, you know, that's not how I
19    process and categorize information about
20    associations.
21        But in my report there are
22    several -- there are some examples of
23    associations that have such relative risks
24    that are well accepted as being causal and
25    there are many more.

Page 229

1        But having the authors or somebody
2    using the word "strong," I don't recall.
3    It would require me to have an incredible
4    memory to remember every paper I've ever
5    heard about, you know, cardiovascular
6    disease and hyperlipidemia; and, you know,
7    I just can't recall every single paper
8    I've ever seen and which words they used
9    to categorize an association.
10  BY MS. DAVIDSON:
11    Q.    Would it surprise you to know that
12  I have looked high and low and have never been
13  able to find a published epidemiological paper
14  that uses the word "strong" to describe an
15  association in the one to two -- between in the
16  1 to 2 -- with one- to two-point estimates?
17        MS. PARFITT:  Objection.  Form.
18        THE WITNESS:  Would it surprise me?
19    No, it wouldn't surprise me.
20  BY MS. DAVIDSON:
21    Q.    Okay.
22        MS. PARFITT:  Wait, wait.
23        Do you have anymore.
24        THE WITNESS:  I would start
25    probably by finding a little bit more

58 (Pages 226 - 229)

Page 230

1  about how you did your search; but even if
2  your search was conducted in the most
3  thorough and rigorous way, it wouldn't
4  surprise me.
5      As I indicated, I don't recall
6  every paper I've read and whether which
7  descriptors people use.
8  BY MS. DAVIDSON:
9      Q.  Can we go back to Plaintiff's
10  Exhibit 1?
11      MS. PARFITT:  To help us out with
12  one.
13      MS. DAVIDSON:  Plaintiff's Exhibit
14  1.  I believe it was page 14.
15      MS. PARFITT:  Yeah.
16      MS. DAVIDSON:  Maybe Patrick could
17  put it up since he put it up last time.
18      Is Patrick still here?
19      There he is.  Thank you, Patrick.
20  BY MS. DAVIDSON:
21      Q.  Ms. Parfitt read to you from
22  page 14, and at the bottom of page 14, I
23  believe it was.
24      A.  Yeah.
25      Q.  It says, "Some talc deposits in

Page 231

1  articles containing talc have been shown to
2  contain asbestos."
3      Do you see that?
4      A.  I see that.
5      Q.  Does the paper specify what
6  deposits?
7      A.  I haven't read the rest of this
8  paper, so I don't know if the -- anything in
9  the paper -- this sentence doesn't specify.  I
10  don't know if there's anything else in the
11  paper that would specify.
12      Q.  Does this sentence specify whether
13  they're talking about industrial talc versus
14  cosmetic talc?
15      A.  This sentence does not specify.
16      Q.  And you have no idea whether the
17  deposits and products they're talking about
18  are -- have anything to do with Johnson's Baby
19  Powder, correct?
20      MS. PARFITT:  Objection.  Form.
21      THE WITNESS:  That's correct.
22  BY MS. DAVIDSON:
23      Q.  Do you have an opinion on the
24  biological pathway by which talc causes ovarian
25  cancer allegedly?

Page 232

1      MS. PARFITT:  Objection.  It has
2  been covered in the first deposition.
3      MS. DAVIDSON:  Michelle, you asked
4  about it in your redirect.
5      MS. PARFITT:  That is -- that is
6  fair.
7  BY MS. DAVIDSON:
8      Q.  Are you offering such an opinion,
9  Doctor?
10      A.  Well, I'm hesitating because I
11  don't know how much to say about this.  In my
12  report --
13      Q.  It's a yes-or-no question.
14      MS. PARFITT:  Wait.  Let him
15  finish.  He said in his report.
16      THE WITNESS:  I'm happy to give a
17  yes-or-no answer, but what is the
18  question?
19  BY MS. DAVIDSON:
20      Q.  Are you planning to testify at
21  trial that you know the way by which talc
22  allegedly causes ovarian cancer?
23      MS. PARFITT:  Objection.  Form.
24      THE WITNESS:  Do I know the way
25  it -- the way talc causes ovarian cancer

Page 233

1  is that the question?
2      Do I know the way.
3  BY MS. DAVIDSON:
4      Q.  Do you plan to testify at trial as
5  to how you believe talc allegedly causes
6  ovarian cancer, how, the mechanism, the
7  biological pathway?
8      A.  No, I don't -- I don't plan to
9  testify --
10      Q.  Okay.
11      A.  -- that I know the way.
12      Q.  You testified earlier that you
13  don't typically speak to public health groups.
14      You did, however, speak to Health
15  Canada, correct?
16      A.  I spoke to a Health Canada
17  scientist.
18      Q.  Who is what the scientist?
19      A.  What is his name?  Hancock.
20      Q.  Did you research his credentials?
21      MS. PARFITT:  Objection to the
22  extent --
23      THE WITNESS:  No, I didn't --
24      MS. PARFITT:  -- it was covered in
25  his '21 report.

59 (Pages 230 - 233)

Page 234

1    THE WITNESS: -- research his
2    credentials.
3    BY MS. DAVIDSON:
4    Q.    You said no?
5    A.    I didn't research his credentials.
6    Q.    Did you research the credentials of
7    any of the authors of the Health Canada paper?
8        MS. PARFITT: Objection. Asked and
9    answered and covered in the '21
10   deposition.
11       THE WITNESS: No.
12   BY MS. DAVIDSON:
13   Q.    Are you aware that another
14   plaintiff's expert has reached out multiple
15   times to ACOG and SGO?
16       MS. PARFITT: Objection. Form.
17       THE WITNESS: No, I'm not aware.
18   BY MS. DAVIDSON:
19   Q.    Have plaintiffs shared with you --
20   plaintiff's counsel shared with you the
21   discovery that they sought from ACOG and SGO
22   about their communications with a plaintiff's
23   expert?
24       MS. PARFITT: Objection. Form.
25       THE WITNESS: Sorry. I didn't -- I

Page 235

1    didn't quite understand the question.
2    BY MS. DAVIDSON:
3    Q.    Are you aware that plaintiff's
4    counsel have subpoenaed SGO and ACOG for
5    documents related to talc?
6    A.    No.
7        MS. PARFITT: Objection. Form.
8    BY MS. DAVIDSON:
9    Q.    Did they share those documents with
10   you?
11   A.    No.
12   Q.    Have you ever published any paper
13   in the peer-reviewed literature about asbestos?
14   A.    Yes.
15   Q.    What was that paper?
16   A.    I think there were a few that I was
17   on. I -- I was involved as a research
18   assistant when I started out in a team that was
19   studying cancer risks among asbestos miners and
20   millers in Quebec, and I was included in as a
21   coauthor on a couple of publications that came
22   out of that. It concerned mill workers and
23   occupational exposure and lung cancer and
24   mesothelioma as the possible outcomes.
25       I also carried out or with a

Page 236

1    colleague with a student a study of lung cancer
2    risks among women who resided in the towns of
3    Quebec where asbestos had been mined and milled
4    in order to get an idea of whether
5    environmental exposure to asbestos dust caused
6    an increase in lung cancer risk.
7    Q.    I take it none of those papers
8    related to ovarian cancer?
9    A.    No.
10   Q.    Have you ever published anything in
11   the peer-reviewed literature about asbestos and
12   ovarian cancer?
13   A.    No.
14       MS. PARFITT: Objection. Form.
15   Asked and answered in the '21 deposition.
16   BY MS. DAVIDSON:
17   Q.    Did you ever consider a potential
18   association between asbestos and ovarian cancer
19   before you were hired as an expert in this
20   litigation?
21       MS. PARFITT: Objection.
22       THE WITNESS: Yes, I -- because I
23   was invited to participate in an IARC
24   expert panel that evaluated talc among
25   some other substances in 2006. And as a

Page 237

1    member -- in fact, as the chairman of that
2    review committee, I had occasion to become
3    familiar with talc and ovarian cancer
4    epidemiology.
5        MS. DAVIDSON: Let's go off the
6    record for a minute.
7        (Discussion held off the record.)
8        (Whereupon, a break was taken.)
9    BY MS. DAVIDSON:
10   Q.    Dr. Siemiatycki, you testified in
11   this litigation in 2019 that the cell phone and
12   brain cancer literature is not affected by
13   recall bias.
14       Is that still your position?
15       THE WITNESS: Sorry?
16       MS. PARFITT: Objection. Form.
17       THE WITNESS: Which literature?
18   BY MS. DAVIDSON:
19   Q.    Cell phones and brain cancer.
20   A.    Cell phones and brain cancer?
21       MS. PARFITT: Objection. Form.
22   BY MS. DAVIDSON:
23   Q.    You testified in 2019 that it's not
24   affected by recall bias, that literature. I'm
25   wondering if that's still your position today.

60 (Pages 234 - 237)

Page 238

1    A.    Sorry. I'm trying to resituate my
2 thoughts.
3        So this is in a deposition about
4 talc, right, and ovarian cancer, not in a --
5 not in any litigation around cell phones; is
6 that correct?
7    Q.    Were you ever in litigation around
8 cell phones?
9    A.    No.
10        MS. PARFITT: Objection. Form.
11        THE WITNESS: No. That's why --
12 BY MS. DAVIDSON:
13    Q.    You couldn't have testified to it,
14 right?
15    A.    I don't -- at first glance, I
16 couldn't understand why I would be testifying
17 about cell phones and brain cancer in talc.
18        Okay. So can you restate the
19 question?
20    Q.    What needs to be restated?
21    A.    In a -- so in a deposition in --
22    Q.    Dr. Siemiatycki, let me make it
23 simpler for you.
24        Do you believe that the cell phone
25 cancer literature is affected by recall bias?

Page 239

1        MS. PARFITT: Objection. Form.
2        THE WITNESS: I have to think about
3    that because -- for a minute because any
4    evaluation of recall bias is
5    context-specific. And so I'm trying to
6    resituate myself in the context of the
7    evidence around cell phones and brain
8    cancer.
9        And so I think there's a
10    possibility that it could be affected by
11    recall bias, yes.
12 BY MS. DAVIDSON:
13    Q.    So your opinion on that has changed
14 since 2019, correct?
15        MS. PARFITT: Objection. Form. If
16    you can direct us to his prior opinion and
17    testimony, that would be helpful. Right
18    now it's a guess.
19 BY MS. DAVIDSON:
20    Q.    Dr. Siemiatycki?
21    A.    No. I don't understand --
22 understand the question because are you stating
23 or are you alleging that the in 2019 -- sorry.
24        Do you need to go off the record?
25        Are you okay?

Page 240

1    Q.    I'm fine.
2    A.    Do -- are you alleging that in
3 2019 --
4    Q.    I'm not alleging anything, Doctor.
5 I'm asking a question. "Alleging" I don't
6 think is a fair word.
7    A.    Is the premise of your question
8 that in 2019 I stated that I believe that there
9 is recall bias in studies of cell phones and
10 brain cancer or there is not recall bias in
11 those studies?
12        What are you saying that I said at
13 the time?
14    Q.    Dr. Siemiatycki, I just want to
15 know whether you currently believe that the
16 cell phone brain cancer literature is affected
17 by recall bias?
18        MS. PARFITT: Objection. Form.
19        THE WITNESS: I think it is
20    potentially affected by it, but I'm not
21    confirming or denying anything that you
22    say I said or that you're implying that I
23    said in 2019.
24 BY MS. DAVIDSON:
25    Q.    Do you agree that recall bias

Page 241

1 should be assessed and evaluated when there's a
2 discrepancy between case control studies and
3 cohort studies on a specific exposure?
4        MS. PARFITT: Objection. The topic
5    of recall bias was exhaustively examined
6    in his 2021 deposition prior.
7 BY MS. DAVIDSON:
8    Q.    Go ahead, Doctor.
9        MS. PARFITT: Move on.
10 BY MS. DAVIDSON:
11    Q.    Go ahead, Doctor.
12    A.    I think all sources of bias should
13 be considered when examining any possible
14 association.
15        MS. DAVIDSON: Okay. I have no
16    further questions.
17        MS. PARFITT: I just have one quick
18    one.
19        EXAMINATION
20 BY MS. PARFITT:
21    Q.    Dr. Siemiatycki, you were asked
22 with regard to literature that you had
23 published on the topic of talc and ovarian
24 cancer. Do.
25        You remember question by counsel?

61 (Pages 238 - 241)

Page 242

1          MS. DAVIDSON:  He was not.  He was
2    not asked that.
3          THE WITNESS:  Asbestos.
4          MS. DAVIDSON:  I didn't ask that.
5    I asked about asbestos, Michelle.
6          MS. PARFITT:  Oh, asbestos.
7          MS. DAVIDSON:  I didn't ask about
8    talc.
9          MS. PARFITT:  I have no further
10   questions.
11         MS. DAVIDSON:  Great.  Have a good
12   day everybody.
13         MS. PARFITT:  Suzanne, we are going
14   to read and sign.  Thank you.
15         MS. DAVIDSON:  We just want
16   expedited, but not -- we just want
17   expedited, but not rough.  We're looking
18   for expedites, but not roughs.
19         THE COURT REPORTER:  That's fine.
20   When do you need that by.
21         MS. DAVIDSON:  Monday.
22         THE COURT REPORTER:  Okay.  Thank
23   you.
24         MS. PARFITT:  We'll take one as
25   well.  Thank you.

Page 243

1          THE COURT REPORTER:  Expedited too
2    or regular delivery, Ms. Parfitt?
3          MS. PARFITT:  When you deliver
4    hers, you can deliver mine.
5          (The witness is excused.)
6          (Deposition of Jack Siemiatycki,
7    MSC, Ph.D, concluded at 5:35 p.m. EDT.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 244

1              C E R T I F I C A T E
2
3
4          I, SUZANNE J. STOTZ, a Certified
5    Court Reporter, Registered Professional
6    Reporter, Certified Realtime Reporter, and
7    Notary Public in and for the State of New
8    Jersey, do hereby certify that the foregoing is
9    a true and accurate transcript of the
10   stenographic above-captioned matter.
11
12
                    _Suzanne J., CCR_
13   _____
14      SUZANNE J. STOTZ, CCR, RPR, CRR
15        LICENSE NO. 30XI00184500
16
17
18   DATED:  March 31, 2024
19
20
21   NOTE:  THE CERTIFICATE APPENDED TO THIS
22   TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION
23   OF THE SAME BY ANY MEANS, UNLESS UNDER THE
24   DIRECT CONTROL AND/OR DIRECTION OF THE
25   CERTIFYING COURT REPORTER.

Page 245

1            E R R A T A   S H E E T
2       I have read my testimony in the foregoing
3    transcript and believe it to be true and
4    correct to the best of my knowledge and belief
5    with the following changes:
6    PAGE   LINE      CHANGE
7    _____ _____ _____
8    _____ _____ _____
9    _____ _____ _____
10   _____ _____ _____
11   _____ _____ _____
12   _____ _____ _____
13   _____ _____ _____
14   _____ _____ _____
15   _____ _____ _____
16   _____ _____ _____
17
18   _____  _____
19   WITNESS SIGNATURE          DATE
20
21   Sworn and subscribed to before me this
22   _____ day of _____ , 2024.
23
24   Notary Public of the
25   State of _____.

62 (Pages 242 - 245)

**[& - 2011]**                                                    Page 1

| & | | | |
|---|---|---|---|

**&**   1:3 2:4,21
125:9 137:8

**0**

**0.99**   192:23
**05**   100:8 226:19

**1**

**1**   9:16 68:8,8,12
68:16 69:12,17
69:22,23 70:12
70:13 95:17
164:21 209:18
209:25 216:1
229:16 230:10
230:14
**1.0.**   9:17
**1.01**   192:21
193:9,13
203:16
**1.05**   158:5
184:18
**1.05.**   178:7
**1.06**   182:24
183:10
**1.06.**   179:14
**1.07**   181:21
182:5,25
183:11
**1.1**   159:9
227:20 228:4
228:14
**1.13**   203:15
**1.13.**   192:21

**1.15**   193:10,14
203:17
**1.15.**   192:24
**1.2**   159:9
**1.22**   99:9
**1.26**   193:9,13
203:16
**1.26.**   192:21
**1.3**   159:5 224:8
227:21 228:4
228:15
**1.3.**   224:12
**1.32**   99:10
**1.37**   181:20
182:4
**1.39**   66:11
**1.4**   159:7
**1.47**   58:16,19
59:24 60:1
66:12
**1.5**   159:7
**1.58**   114:25
117:21 118:21
**1.58.**   113:25
**1.88**   116:15
119:21,23
121:23 122:15
**10**   3:5 138:9
140:23 142:8
198:4,5,19
224:23
**100,000**   135:5
**10001**   2:23
**106**   4:13
**108**   4:15

**11**   161:8
**11:14**   1:14
**12**   168:8
**12203**   244:12
**123**   4:20
**128**   5:5
**13**   76:11 172:25
173:6
**136**   3:23 58:7
85:17
**14**   193:20,21
194:19,25
209:7,10 210:1
210:2,6 230:14
230:22,22
**14.9**   135:5
**142**   5:8
**143**   101:20
**15**   11:13 23:21
76:18 187:21
198:4,6,19
201:12 205:11
224:23
**15th**   9:7
**16-2738**   1:2
**162**   5:11
**168**   5:15
**17**   47:5
**173**   5:21
**17th**   52:1
**18**   34:20
**1835**   2:16
**19**   49:16 50:23
**19103**   2:17
**194**   6:5

**1950s**   224:20
**1980s**   136:21
137:6,16
**1990**   141:14
**1992**   135:5

**2**

**2**   9:15 76:22
78:18 80:3,17
81:16 82:15
112:12,16
113:5 160:23
199:17,21
200:5 215:24
229:16
**2.20**   114:25
117:21 118:22
121:11
**2.20.**   114:5
**2.57**   114:20
116:15 119:21
119:23 122:15
**2.57.**   116:18
121:23 122:17
**20**   23:22 73:18
134:18 138:9
140:23
**200**   22:1 63:16
104:2
**200,000**   21:20
22:17
**2006**   236:25
**2008**   34:22
**2010**   212:7
**2011**   212:7

**[2012 - 8]**

**2012**  212:12,15
**2015**  23:8
**2016**  23:9 83:17
  87:6,15 216:4
**2017**  34:19
**2019**  55:25 87:6
  87:16 123:1
  124:7 135:6
  237:11,23
  239:14,23
  240:3,8,23
**2020**  37:5 83:17
  84:12 88:25
  128:25 141:14
  146:12 148:12
  192:3 193:18
  216:5
**2021**  9:20 24:4
  27:7,9 29:8
  30:6,14 32:21
  32:25 36:25
  37:4,23 42:10
  43:1 61:4,5
  84:18,20,23
  89:2,5,7 90:15
  90:16 93:18
  94:5 95:7 97:18
  101:11,21
  124:8,17 129:7
  129:10 145:19
  184:5 185:8,18
  188:24 241:6
**2022**  108:4,8,19
  141:25
**2023**  9:7,23
  17:19 18:2

41:23 42:1,9
47:5 52:1,15
83:1 84:10
88:11,25 89:9
101:12 124:9
146:13 148:12
217:4
**2024**  1:13 171:1
  171:9 215:20
  244:18 245:22
**204**  6:9
**208**  3:6
**209**  6:13
**21**  11:16 15:18
  18:23 30:19
  101:5 233:25
  234:9 236:15
**212**  2:24
**215**  2:17
**22**  142:5
**22311**  2:6
**227**  3:7
**23**  11:13 15:23
  18:2,23 42:6
  51:23
**241**  3:8 21:22
**241,000**  19:25
  20:8 22:16
**25**  76:11,18
  138:10 140:24
**27**  1:13
**278-4449**  2:17
**28th**  83:1
**2900**  2:16

**3**

**3**  85:13 97:23
  98:3,9 151:7
  215:24,24
**30**  118:6 134:18
  136:2,5 138:21
  226:15,15
  227:7
**300**  22:24
**30th**  11:16
**30xi00184500**
  1:12 244:15
**31**  244:18
**316**  2:11
**31st**  49:16
**32502**  2:12

**4**

**4**  91:1,23 94:6
  146:24 147:1
  216:2
**4.2**  147:3
**40**  9:8,13 209:5
  226:16
**400**  22:5,24
  23:15
**400,000**  21:21
**435-7000**  2:12
**47**  58:25 59:14
  60:5
**4900**  2:6

**5**

**5**  77:9 94:10,15
  95:3 140:24
  145:23 216:3

**5.3.**  151:9
**50**  26:1,3,5
**500**  22:24
**54**  199:14
  202:14,16
  203:8
**5:35**  243:7

**6**

**6**  67:13 96:12
  96:14 106:10
  111:2 145:14
  146:2,4 216:3
  223:1
**600**  22:8
**650**  2:6
**680-0339**  2:7

**7**

**7**  108:8 151:4
  216:2
**70**  3:14
**70s**  54:9
**73**  178:3
**735-3000**  2:24
**75**  26:10
**751**  209:5
**76**  145:23
  150:11,12
  218:5
**78**  142:3

**8**

**8**  65:24 105:19
  122:25 155:15
  155:17 192:10
  193:3

[8.1.2 - african]                                                        Page 3

| | | | |
|---|---|---|---|
| **8.1.2**  9:8 | **absolute**  59:13 | **acronym**  38:14 | 93:4 105:23,25 |
| **80s**  54:9 | 61:22 62:13 | 39:10 | 106:2,19 129:3 |
| **82**  3:20 | **absolutely** | **acronyms**  38:8 | 129:6 163:11 |
| **844**  2:7 | 12:22 | **acrylonitrile** | 212:16 |
| **85**  3:22 | **abstract**  172:9 | 3:23 85:17 | **addressed** |
| **850**  2:12 | 175:2 187:22 | **active**  131:7 | 54:10 218:2 |
| **86**  192:24 | **abstracts** | **actual**  74:14 | **addresses**  93:11 |
| 193:10,14 | 172:11 | 115:9 117:18 | **addressing**  50:9 |
| 203:17 | **accept**  44:7 | 117:19 132:8 | 139:7 215:24 |

**9**

| | | | |
|---|---|---|---|
| **9**  34:22 127:22 | **accepted**  36:1 | 140:10 215:25 | **adjunct**  29:17 |
| 160:12 223:2,2 | 140:22 228:24 | **actually**  38:14 | 29:18,23 |
| **9.6**  135:5 | **accompanying** | 47:15 51:24 | **adjusted** |
| **91**  4:5 | 57:19 | 57:20 60:7 | 174:19 176:23 |
| **95**  4:8 117:25 | **account**  191:22 | 64:10 65:12,17 | 177:9 179:9,13 |
| 121:18,22 | **accumulation** | 81:16 141:4 | 179:23,23 |
| 122:14 179:24 | 43:21 | 144:5 153:23 | 180:3 181:10 |
| 180:5 181:16 | **accuracy** | 155:25 157:7 | 182:23 183:8 |
| 184:21 | 194:11 | 172:7 178:6 | 183:10 |
| **960**  108:23 | **accurate**  78:22 | 189:6 190:17 | **administration** |
| **97**  116:18 | 83:23 84:4,7 | 191:17 197:10 | 17:15 |
| 122:17 | 88:6 89:25 90:3 | 203:13 221:4 | **admitted**  57:9 |
| **99**  203:17 | 90:10,22 93:9 | **add**  101:3 | **adopted**  129:13 |

**a**

| | | | |
|---|---|---|---|
| | 122:3 244:9 | 107:14 | **advance**  16:20 |
| **a.f.**  124:25 | **accurately** | **added**  42:6,15 | **affect**  158:6 |
| **a.m.**  1:14 | 164:14 165:4 | 101:11 102:11 | 165:19 167:24 |
| **aa**  105:16 | 183:16 | 102:20 103:1 | **affected**  138:20 |
| **able**  15:15 | **acknowledge** | **addition**  18:19 | 139:15 237:12 |
| 101:13 125:16 | 29:14 | 22:16 | 237:24 238:25 |
| 175:17 176:1 | **acknowledge...** | **additional** | 239:10 240:16 |
| 229:13 | 110:9,12,25 | 22:14 212:8 | 240:20 |
| **above**  1:10 | 111:2 | **additionally** | **affiliations** |
| 151:7 244:10 | **acog**  37:15 | 210:7 | 29:14 |
| **absence**  221:22 | 213:5,12 | **additions**  41:25 | **affirm**  137:2 |
| | 214:17 234:15 | 42:2,4,7,9 | 138:6 |
| | 234:21 235:4 | **address**  49:10 | **african**  4:11 |
| | | 66:2 92:25 93:2 | 95:6,11 98:3,16 |

**[african - apparent]** Page 4

98:19 99:2,9,20
99:24
**age** 76:2,7,12
177:9 179:23
**agency** 34:16
209:4
**ages** 76:11
**ago** 16:14 33:22
35:20 51:21
56:14,15 73:18
187:21 192:6
204:1 208:21
211:7
**agree** 41:7,9,11
48:20 72:3 73:1
74:10,13 125:7
135:25 164:17
165:7,9 215:14
223:16,21
240:25
**agreed** 215:6
**ahead** 71:13
101:15 152:9
169:20 208:9
241:8,11
**air** 158:6
**al** 3:19 4:7,12
4:19,24 5:7,10
5:14,20 6:8,12
70:19 80:24
91:5 95:13
108:13 123:9
127:24 128:6
142:13 162:5
168:18 194:5
204:19

**alexandria** 2:6
**algebra** 59:4
**algebraic** 62:2
**allegedly**
231:25 232:22
233:5
**alleging** 239:23
240:2,4,5
**allen** 125:2,4,11
**allison** 123:19
**allow** 70:3
**allowed** 127:7
127:13
**alluding** 188:20
**alpha** 100:17
**alternatives**
137:9
**amazing**
176:14
**amenable**
43:13,16
**amended** 4:13
106:12 145:24
**american** 40:11
40:14,23 98:3
98:16,19 99:2,9
99:20,24
132:23 133:4
214:10 215:7,9
**amount** 116:23
**amounts** 25:1
**analogous**
67:14
**analyses** 9:9
35:2 36:9 47:6
54:13 66:14

67:24 212:1
221:6 226:22
**analysis** 3:17
6:10 18:1 33:8
34:7 64:9,24
65:20,25 66:8
66:10,17,24
67:8,13,14
70:18 136:12
138:17,25
149:12,21
178:4,9,9
204:12,17
205:19 212:2,5
212:6 218:10
218:19 220:1,2
**analyze** 66:17
**analyzed** 34:21
**analyzing**
205:25
**ancestry** 4:11
95:6,12
**anita** 33:24
92:3
**answer** 14:24
25:3,17,21,21
28:10,12 31:12
41:1 46:19,20
56:1 61:25 69:2
71:17 74:3
75:15 77:18
102:16 104:7
117:9 141:20
152:8 178:19
181:7 183:2,3,5
183:14,15

186:2 196:17
199:23 200:22
203:7,10,10
232:17
**answer's** 80:15
**answered** 23:18
26:20 28:4 38:7
50:23 54:4
134:6 135:8
159:24 160:5
161:2 234:9
236:15
**answering**
45:24 46:5,11
68:21 74:8
102:8 141:5
**answers** 26:22
46:12
**anticipate**
87:25 88:7
**anticipating**
215:19
**anybody** 93:15
**anymore**
229:23
**anyway** 156:20
**anyways** 71:17
74:1
**apologies**
197:12
**apologize**
102:23,24
184:8 208:1
**apparent**
135:24

[apparently - assimilated]                                    Page 5

apparently
  72:10
appearing
  97:20
appended
  244:21
applicant   57:20
application
  34:16 57:14,16
apply   221:14
  244:22
appreciate   10:4
  105:5 107:9
  123:4 208:4
appreciation
  73:21 79:7
approach   88:10
appropriate
  138:19 226:22
approximated
  81:10
approximately
  21:14 60:15
  61:1 83:9
approximation
  122:6
arbitrariness
  64:23
area   6:7 47:21
  49:15 113:24
  194:3,13 195:1
areas   76:8
  222:1
argument
  222:7

arithmetic   23:6
arps   2:21
article   3:14
  17:23 18:7 19:1
  19:2 31:13
  32:15 33:11
  54:8 63:12,13
  69:14,25 70:7
  70:15 72:18
  76:24 94:24
  101:21 124:23
  130:6 132:5,7
  146:22 149:6
  150:9 155:3,5,7
  160:7 162:22
  163:9,11
  165:14 170:22
  172:2,17,19
  175:3 177:14
  178:14 190:25
  191:2,20 205:4
  217:20,20
  218:2 222:19
articles   10:22
  10:24 12:9 33:5
  46:22 54:6
  63:16 107:20
  129:15 149:10
  170:6 172:10
  210:8,16 228:6
  231:1
asbestiform
  213:3
asbestos   17:16
  17:25 32:20
  43:3,10,14,20

43:23 44:12,22
  47:3,9,18 48:11
  49:3,11 50:21
  53:8,19 54:10
  54:23 55:5
  62:20 63:1
  208:24 210:9
  210:11,17,20
  211:3,10,15,16
  212:23,24
  213:1 231:2
  235:13,19
  236:3,5,11,18
  242:3,5,6
ashcarft   110:21
  111:16
ashcraft   2:4
  112:1
ashcraftlaw.c...
  2:7,8
asher   86:20
  89:12 104:25
  105:1,1 174:11
aside   171:25
asked   12:16
  23:17 25:4
  26:19 31:15
  38:7 50:22 54:4
  70:2,7 74:15
  80:7 99:12
  102:8 117:8
  134:5 135:7,16
  159:23 160:4
  161:1 179:7
  188:13 190:15
  203:2,21

208:21 211:8
  213:4 215:5,16
  217:19 223:14
  232:3 234:8
  236:15 241:21
  242:2,5
asking   16:5
  21:2,6,9 24:25
  27:16 28:22,24
  38:17 57:20
  59:6,7,9,10
  60:22 62:6
  63:10 68:25
  74:1 75:12
  76:16 77:12
  78:2 90:9 93:23
  99:1,11 102:15
  134:8 139:10
  139:17 143:3
  148:20 160:20
  170:2 173:16
  182:10,11,16
  185:19 187:8,9
  191:23 195:15
  197:21 198:15
  200:2,3,6,10
  202:1 203:2
  227:24 240:5
asserting
  220:13
assessed   241:1
assessment
  70:21
assimilated
  214:2

**assistant**
235:18
**associate** 226:8
**associated**
192:19 215:10
215:13
**association**
3:14 6:6,11
40:16 41:13
56:19 70:15
104:18 155:11
155:22 156:23
157:7,19
158:15 160:14
188:3,6 191:8
192:22 194:2
194:12,25
204:13,18
210:25 214:8
219:8,11,21
221:23 223:9
224:22 226:2
226:24 227:20
228:3,14 229:9
229:15 236:18
241:14
**associations**
157:20 158:3
173:19 224:3
227:25 228:20
228:23
**assume** 20:6
100:9,18
186:24 193:3
196:12 228:9

**assumption**
131:2
**assure** 117:2
**attached** 6:18
**attempted**
152:13
**attempting**
183:3
**attention**
222:17,18
**attenuate**
205:21 206:1
**attitude** 129:14
**attorneys** 2:3
2:20
**audio** 77:1
**author** 17:24
51:8 63:22 64:6
91:25 92:3 95:6
108:18 113:15
113:18 128:1,2
128:2 161:10
161:17 166:25
168:12 204:13
**authored** 30:4
**authoritative**
44:6
**authors** 35:5
36:6 63:6,8,14
63:17,18 64:17
65:2,12 69:12
71:23 77:5 78:3
97:6 109:7
123:18 143:24
150:4 153:13
155:20 156:20

157:6 159:19
160:2,12 164:4
164:8,13
166:16 179:8
185:20 191:13
192:10 198:21
229:1 234:7
**automated**
71:10
**available** 15:11
16:20 34:20
149:22
**avenues** 211:2
**average** 76:2,7
76:12 111:24
112:3 125:8,15
**aware** 40:4,8
40:14,20 50:19
50:24 58:16
60:11 63:5,8,25
64:1,3,8,14
81:19 125:24
129:9,11
133:11,17
134:16,19
135:3,9 144:4
144:18,21,24
145:9 187:2
206:15,19
234:13,17
235:3

| **b** |

**b** 3:11 4:3 5:3
6:3

**baby** 43:2 47:2
53:9 55:21
231:18
**back** 9:20,23
12:24 17:1,4
20:9 23:8 44:9
49:15,22 79:18
101:5 106:16
107:15,17
124:23 145:13
174:11 180:2
184:4,24
192:15 197:7
202:13 230:9
**background**
132:8
**balderrama**
206:24
**ballpark** 37:5
**ban** 17:15
54:23
**bankruptcy**
217:7,12,17
**banning** 208:23
**based** 40:18
43:18 44:4,6
132:7 149:5,9
178:13,16,17
218:9 221:17
223:24 225:18
**bases** 214:18
**basic** 220:13
**basically** 55:9
66:16 73:11
**basis** 131:1,14
137:4

**[bath - camera]**                                                                    Page 7

**bath**  176:24
177:7 179:8,10
180:3 182:12
182:24 183:9
183:20
**baylen**  2:11
**bearings**  8:11
**beasley**  125:2,4
125:10
**beast**  134:8
**began**  33:22
**beginning**
52:13 198:11
**begun**  33:19,21
**behalf**  7:2
27:14 93:22
97:12,20
206:16
**belief**  19:4
245:4
**beliefs**  131:8
**believe**  16:13
68:12 71:5,19
110:11 113:13
129:1 135:21
136:16,17
137:7 166:6
169:22 199:6,6
199:7 205:11
206:7 215:24
218:5 230:14
230:23 233:5
238:24 240:8
240:15 245:3
**believed**  84:10
93:18 153:14

**bell**  38:10 52:8
**bellwether**
206:17
**berg**  143:17
144:4,9
**best**  121:11
219:20 245:4
**better**  71:10
**bias**  6:10 164:5
164:15 165:4
165:11,19
167:1 168:1
204:12,17
205:20 237:13
237:24 238:25
239:4,11 240:9
240:10,17,25
241:5,12
**biases**  167:24
**bibliography**
10:20 15:17
**biden**  17:15
**big**  96:19
**bigger**  86:1,18
**binder**  19:19
170:7
**binders**  10:19
10:22,25 104:3
170:5
**biological**
210:20 211:2
211:16 231:24
233:7
**biomarkers**
125:9

**biomedicine**
157:20
**bit**  15:4 22:2
54:16 65:3 72:7
74:4 86:9 91:17
131:6 229:25
**blank**  124:3
**blanket**  147:23
**blockage**
154:12
**blocked**  151:17
154:8
**blount**  47:13
53:25 54:6
**blow**  111:7
156:13,15
174:4
**blue**  11:14
**board**  214:9
220:14
**body**  190:22
222:4,20
**bold**  155:6
**bottom**  9:13
66:8,19 77:8
83:15 89:20
95:16 105:12
113:24 174:16
174:18 176:22
210:6 230:22
**box**  18:23,23
137:13
**bradford**
221:11,13
226:8,10

**brain**  38:9
237:12,19,20
238:17 239:7
240:10,16
**break**  53:1,3
82:13 127:20
206:13 227:13
237:8
**breast**  173:22
**bring**  10:17
**broaden**  140:25
**brought**  10:19
**bulk**  25:13
**bullshit**  101:25
**bunch**  221:2
**buried**  201:20

**c**

**c**  2:1 8:23,23
168:20,22
244:1,1
**call**  37:2 49:23
52:25 56:15
157:15 198:10
**called**  17:14,20
17:23,25 30:9
30:10 37:15
60:12 137:11
140:19 141:25
147:3 161:14
172:4
**calling**  105:1
**camargo**
211:23 212:5,6
**camera**  7:17,21
111:6 128:11

[camera - cause]                                                                Page 8

128:18 202:20
202:21 205:17
**campus**  29:16
**canada**  8:5,8,9
27:15 37:2,6
38:1,15 233:15
233:16 234:7
**canadian**  27:8
**cancer**  3:16 4:7
4:10,10,17,22
5:7,9 6:7,11
9:11 17:7 18:1
27:15 30:5
32:25 33:6,17
36:24 37:9,20
39:2,17,23 40:2
40:6,12,15,17
40:24 41:13
58:21,25 59:1
59:12,14 60:1,5
60:13,25 61:22
62:17,21 63:1
70:17 91:4,24
93:3 94:22 95:5
95:5,10,11 97:6
104:17 105:15
108:11,17
113:22 114:3
123:7,16 125:9
127:24 128:5
132:1 133:9,18
133:22 134:17
135:4 136:2,6
137:1,25 138:1
138:21 139:16
140:8 141:14

142:12,21
143:16 149:23
150:6,16,23
151:11 152:6
153:8 155:2,12
155:23 156:24
157:22,25
158:3,7 159:6
159:21 160:15
165:25 166:18
170:15 173:22
173:25 174:20
176:17 177:10
178:2 179:10
188:5 190:23
192:20 194:4
195:2 197:24
204:13,18
205:22 207:10
207:14 210:22
211:1,6,10,18
212:18 215:7,9
215:11,13,14
217:22 218:11
222:5,20
223:10,12,24
224:4,6,9,10,21
225:13,18
231:25 232:22
232:25 233:6
235:19,23
236:1,6,8,12,18
237:3,12,19,20
238:4,17,25
239:8 240:10
240:16 241:24

**cancer's**  138:12
**cancers**  5:18
133:14 168:10
168:16
**capacity**  27:25
28:25 213:18
**captioned**
244:10
**captured**
117:25
**captures**
151:22
**capturing**
121:16
**carcinogeneses**
221:21
**carcinogenic**
213:3
**carcinogenicity**
32:10
**cardiovascular**
229:5
**care**  5:16 168:9
168:15 173:21
199:22,24
200:9
**career**  131:25
213:14
**carefully**  73:8
**carl**  206:24
**carolina**  126:8
**carried**  33:10
33:23 36:10
65:20 66:14,17
129:20 211:23
226:12 235:25

**carry**  152:10
157:12 214:11
**carrying**
211:25 216:25
226:21
**case**  21:1 27:8
27:12,13 28:3
33:9,16 64:13
65:8 67:11 73:3
73:14 87:9 92:5
92:7,9 117:2
146:14 147:7
147:25 148:6
148:10 149:7
156:21 188:1
217:11,16
220:15,23
225:18 241:2
**cases**  20:17
21:24 29:5 69:7
87:7 99:4,6,7
99:20 135:4
207:3,6
**catch**  164:18
**categorize**
228:19 229:9
**category**
173:20
**causal**  188:5
228:24
**causality**
226:25
**causation**  59:15
**cause**  58:25
63:1 114:7
160:13 210:21

[cause - column]                                                    Page 9

212:16,17
215:12 223:6,9
**caused** 207:13
236:5
**causes** 231:24
232:22,25
233:5
**causing** 211:17
222:5
**ccr** 244:14
**cdc** 39:19,22,25
40:4
**cell** 237:11,19
237:20 238:5,8
238:17,24
239:7 240:9,16
**cells** 98:24
**center** 57:10
**certain** 39:10
73:23 120:20
210:10 222:2
**certainly** 56:5
64:21 103:13
136:19 172:3
209:16 224:13
225:11
**certainty** 138:6
**certificate**
244:21
**certified** 1:11
244:4,6
**certify** 244:8
**certifying**
244:25
**cfr** 209:5

**chairman**
237:1
**challenge** 78:10
**challenging**
153:22
**chance** 60:1,4
154:17 177:14
225:2
**chang** 5:20
17:24 168:12
168:18
**change** 13:8
106:7 178:10
245:6
**changed** 106:8
137:5 168:6
239:13
**changes** 11:15
41:22 42:10
135:14,17,22
136:19 139:13
140:18 245:5
**changing**
136:25
**characterizati...**
78:8
**characterize**
53:11
**chat** 61:7,10
85:11,24 91:8
91:19 95:22
142:15 174:23
175:15 204:22
**che** 5:19 168:18
**check** 19:6
65:10,11,14

83:7 206:9
**chinese** 47:8
**choices** 82:9
**choose** 25:20
**chose** 64:18
82:7
**chosen** 206:18
**chris** 7:2,10,13
96:6 194:22
**christopher**
2:11
**chronological**
34:17
**chrysotile**
208:23
**cite** 47:15,19
**cited** 214:21
**city** 120:10
**claiming** 191:6
**clarify** 100:12
**clarity** 51:23
166:2,4
**clarke** 12:16
**class** 146:14
147:12,24
**clear** 42:8
45:13 52:2
105:13 152:15
155:4 188:6
219:12
**clearly** 46:13
**clinical** 219:14
**close** 66:6,9
118:8 122:8
**closely** 81:10

**coached** 46:13
**coast** 8:14,16
**coauthor** 30:8
235:21
**cohort** 5:19
73:2,7,13 74:11
147:7,12,24
148:5,10,13,15
148:24 149:8
149:13,21,22
156:22 168:12
168:18 178:17
188:2 220:14
220:23 241:3
**cohorts** 72:15
146:13
**coincidence**
114:19
**coincidentally**
65:19
**coins** 119:17
**colette** 4:12
95:12
**colleague** 33:10
33:24 236:1
**colleagues**
211:23
**collected**
122:11
**collecting** 167:3
**collection** 34:23
**college** 132:23
133:4 214:10
**color** 11:15
**column** 80:18
173:25 174:18

[column - confidence]                                          Page 10

181:3 193:3,5
216:1
**combination**
62:10
**combinations**
39:8
**combined** 9:11
152:20
**combines** 159:7
**combining**
62:12
**come** 35:8,22
35:24,25 36:5
102:1 138:14
**comes** 30:1
**coming** 35:11
107:16
**commencing**
1:14
**comment** 74:24
106:25 160:19
172:4 202:1
203:3
**commentaries**
12:12
**commentary**
78:12
**commenting**
41:6
**comments** 36:3
**committee** 7:3
237:2
**common**
122:18
**commonly**
140:19

**communicate**
213:24 214:13
214:23
**communicating**
214:5
**communication**
213:14
**communicati...**
88:24 234:22
**community**
214:3,16 215:3
**companies**
83:20 137:7,8
216:7
**company**
131:11
**compare** 19:8
115:17
**compared** 11:4
44:5 158:24
159:9 167:21
182:4 224:4
**compares** 11:4
**comparing**
99:11 115:22
**comparison**
159:15
**compatible**
122:10
**compensation**
97:4
**competent**
211:24
**competing**
92:20,23 93:10

**complained**
107:11
**complete** 34:23
90:2,10,21
211:14
**completely**
66:15 77:3
91:15 130:4,19
130:19 136:3
144:8 220:16
**complex** 15:5
**complicated**
71:12 122:3,4
141:3,8
**complies** 8:21
**component**
72:9,19
**components**
67:9 72:14
**composition**
136:14,20
137:5 139:14
140:18
**compositions**
140:4,5
**comprehensive**
50:15 149:12
149:16,21
**computer**
11:22 175:16
175:22
**concepts** 226:7
**concern** 32:9
54:24,25
**concerned**
235:22

**concerning**
30:5 32:25
210:15
**concerns** 39:1
39:16,22 55:1
**concise** 187:22
**concluded**
213:2 243:7
**conclusion** 41:6
155:20 156:6
156:12 187:19
188:9 196:4
212:10 219:3
222:8
**conclusionary**
101:19
**conclusions**
156:4 187:24
188:12 222:25
**conditions** 4:22
123:7,17
**conduct** 218:19
219:21
**conducted**
230:2
**conference** 8:7
**confidence**
66:11 114:14
114:17 115:8
115:16 116:4
116:13 118:1,3
118:12,15,23
119:3,10,22
120:1,3,24,25
121:14,25
122:7 179:24

[confidence - copy]                                                          Page 11

180:5 181:15
181:16 183:19
183:21 184:21
185:7,10,19
187:11 188:13
188:15 190:9
191:24 192:21
192:23,25
193:8,10,12,13
195:9,13
196:20,22
197:1,22
200:11 203:16
203:18 204:6
**confirm**   22:19
58:1
**confirming**
68:20 240:21
**conflict**   57:5
83:14 87:21
92:18 93:6
96:25 97:6,19
109:7 127:3
144:15,22
145:3,8
**conflicts**   57:21
124:22 126:20
126:25 143:8
**conformity**
221:10
**confused**   72:6,7
74:4
**confusing**   96:2
96:12
**confusion**
109:12 146:4

190:12,15
**conjure**   119:18
**consensus**
60:12,24
**consequence**
151:19
**consider**   48:22
73:8 78:22
172:3 236:17
**considerable**
118:23
**considerably**
115:18,19,20
116:4,5,7,20
117:16 120:3
183:23,25
185:11,22
204:7
**considerations**
221:11,14
226:9
**considered**
14:9,16,21 15:6
15:16 16:17,18
16:18 104:5
129:12 158:1
171:5,8 172:6
218:21 221:15
225:14 241:13
**considering**
117:22
**consistency**
225:21 226:11
**consortium**
4:11 95:6,12

**constitutes**
224:16
**consult**   93:14
**consultant**   29:2
**consultation**
83:18 84:11
87:12 216:5
**consulted**   28:19
**consulting**
28:23
**contagion**
163:6
**contain**   210:9
210:17 231:2
**contained**
15:23 43:3
47:18 48:10
55:5,21,22
**containing**
210:8,16 213:1
213:3 231:1
**contains**   44:12
47:3
**contamination**
53:9
**contest**   22:18
**contested**
137:19
**context**   33:9
56:20 158:11
226:5 239:5,6
**contexts**   157:17
**continue**   87:20
145:12 154:2
188:8

**continued**   4:1,3
5:1,3 6:1,3
15:20
**continuous**
64:22
**contract**   130:24
**contrast**   144:13
147:6,22 149:8
159:2,11,13
**contrasting**
148:18
**contributed**
87:7
**control**   33:9,16
36:6,7 73:3,14
92:5,7,9 146:14
147:7,25 148:6
148:10 149:8
156:22 188:1
220:15,23
241:2 244:24
**convention**
224:16
**conventions**
225:7
**converse**
206:21
**convey**   79:22
**copies**   11:1,2
12:25
**copy**   11:2 60:19
85:11 86:3,6,23
87:1 91:9,11
96:15 124:3
162:17,19
196:7,8 205:6

[copy - d2]

Page 12

209:23
**corn** 137:11,13
137:13,21
**correct** 8:16
20:5 30:19 39:2
39:3 52:22,23
55:5,8,9 58:21
58:22 72:24,25
76:1 83:23 85:6
85:7 87:16 88:2
90:16,17,19,20
90:22,23 92:1,2
92:15 97:20
98:6,17 99:13
100:1,3,11
112:7,9,9
124:10 125:11
125:13,20
126:14 129:4,5
129:7,8 132:9
133:24 140:1
140:10 144:16
144:23 146:2
149:13,23
160:3,25 161:3
165:13 169:24
169:25 170:1
171:3,11,13
172:18 177:24
180:5,7,11,13
181:4,12,18,22
182:5,10,22,23
182:25 183:7
183:12 184:21
184:22 186:25
187:1 195:25

196:1,14 203:7
203:18 204:7,8
223:20 227:3
231:19,21
233:15 238:6
239:14 245:4
**corrected** 9:21
**correction** 9:6
9:24 42:11
**correctly** 10:14
67:7 97:8 157:2
158:13 210:12
**corresponding**
127:25 128:2
**cosmetic** 43:11
93:4 137:23
231:14
**counsel** 54:2
55:12 88:9,24
89:6 183:4
208:21 215:23
216:13 234:20
235:4 241:25
**counsels** 53:7
**count** 66:25
219:6,7,16
220:3
**counted** 219:19
**counting** 221:8
**countries**
226:13
**couple** 13:22
23:13 35:20
36:11 43:8
48:16 74:2
169:14 211:21

235:21
**course** 15:13
34:21 55:13
105:6 186:4
208:13
**court** 1:1,11 7:8
8:19 9:1 18:12
20:14,17,21
21:1,23 31:21
45:16,23 87:7,9
94:9 202:6,10
242:19,22
243:1 244:5,25
**covered** 47:21
55:24 201:15
232:2 233:24
234:9
**covers** 116:16
116:17
**cox** 173:23
**cramer** 18:10
18:20 112:6
123:20 125:3
125:17
**cream** 177:8
180:10
**creating** 109:12
**credentials**
129:17 233:20
234:2,5,6
**credibility**
212:1
**credible** 43:21
220:17
**credit** 194:22

**criteria** 135:23
**critical** 5:6
127:23 128:4
217:21 218:11
**criticize** 141:24
**crr** 244:14
**ctisi** 2:13
**cumulative**
13:24 67:15
**curious** 218:18
**current** 27:1
**currently** 23:25
24:1 33:4,13
74:8 240:15
**cut** 189:22
**cutpoint** 65:5
**cutpoints** 64:22
65:1,5
**cv** 30:18 32:23
33:2 133:21

### d

**d** 3:1 4:1 5:1
6:1
**d.w.** 125:3
**d.w.c.** 110:19
111:9,14
**d1** 3:14 70:14
**d10** 5:9 142:11
**d11** 5:12 162:2
**d12** 5:16 168:14
**d13** 5:21 173:8
**d14** 6:6 194:2
**d15** 6:10 204:16
**d2** 3:20 82:18

**[d3 - davidson]**                                                Page 13

| | | | |
|---|---|---|---|
| **d3** 3:22 85:15 | 12:1,4,5,13 | 82:14,21 84:2 | 142:17,20 |
| **d4** 4:6 91:2 | 13:2,3,13 14:18 | 84:15 85:12,19 | 143:2,6 144:12 |
| **d5** 4:9 95:8 | 15:24 16:24 | 85:22,25 86:4 | 144:20 145:21 |
| **d6** 4:14 106:11 | 17:4,9 18:15,18 | 86:11,14,19 | 146:3,8 148:11 |
| **d7** 4:16 108:9 | 18:25 19:4,8,14 | 87:3,4,19 88:8 | 149:18 150:10 |
| **d8** 4:21 123:5 | 19:21 20:24 | 89:12,17,21,23 | 150:13 151:5 |
| **d9** 5:6 128:3 | 21:3,12 22:7,10 | 90:25 91:7,12 | 153:1 154:19 |
| **daniel** 123:20 | 22:12 23:24 | 91:18,21,22 | 155:19 156:5 |
| **data** 34:8,20,24 | 24:13,18,19,25 | 93:16 94:11,20 | 156:10,13,18 |
| 36:16,18 44:5 | 25:2,11,18 26:9 | 95:15,21,24 | 156:19 158:17 |
| 48:23 68:8,8 | 26:13,24 27:5 | 96:3,6,9,13,16 | 159:17 160:1 |
| 69:1,4,9,12,17 | 27:23 28:5,11 | 96:20,24 97:16 | 160:10 161:4,7 |
| 77:5 78:4,23 | 28:21 31:3,5,7 | 100:4,15 101:9 | 161:14,19,21 |
| 92:6 107:17,19 | 31:15,22 35:16 | 101:16,24 | 162:13,20,25 |
| 114:15 122:10 | 36:18,21 38:12 | 102:4 103:7,10 | 163:5,7 164:3 |
| 153:5,14 | 40:10,22 41:8 | 104:22,25 | 166:5,13 168:7 |
| 154:21,24 | 41:21 43:15 | 105:6,11,22 | 168:21 169:17 |
| 155:1 156:21 | 45:2,12,20,22 | 106:15 107:10 | 169:22 170:2 |
| 178:5,6,12 | 46:3,8,16,22,24 | 107:13 108:7 | 170:12,24 |
| 184:16 186:18 | 47:23 48:2,5,18 | 108:15,21 | 171:6,14 |
| 188:1 200:4 | 49:8,17,20,25 | 109:2,6,17,20 | 172:24 173:5 |
| 211:25 222:6 | 50:5,18 51:4 | 109:25 110:7 | 173:10,15 |
| **date** 11:12 | 52:3,24 53:4 | 111:21,23 | 174:5,8,12,15 |
| 19:25 21:15 | 54:19 55:10 | 112:10,17,21 | 175:4,8,13,16 |
| 27:11 52:9 | 56:8 57:22 58:2 | 113:1,4,16,19 | 175:20 176:6,9 |
| 60:14 82:25 | 58:5,8,14 59:5 | 115:4 123:11 | 176:13 177:4 |
| 245:19 | 59:19 60:21 | 123:14 124:4,5 | 177:17 178:20 |
| **dated** 244:18 | 61:2,5,8,12,18 | 125:14,21 | 179:1,6 180:8 |
| **dates** 216:14 | 62:4,15 63:4 | 126:18,23 | 180:14,20 |
| 217:1,1 | 64:2,7,16 67:22 | 127:10,18,21 | 181:8,9,19,25 |
| **davidson** 2:22 | 68:5,16,21 69:8 | 128:10 130:14 | 182:3,9,15,21 |
| 3:5,7 7:9,16,20 | 69:21 70:1,4,11 | 132:21 134:13 | 183:6,18 184:3 |
| 7:24 8:4,8,10 | 70:23 72:1 74:6 | 134:15 135:11 | 184:9 185:2,4 |
| 8:15 9:4,25 | 75:14,19 76:21 | 137:3 139:1,11 | 185:16 186:3,7 |
| 10:6,10,12 | 77:4,24 78:13 | 139:23 141:9 | 186:12,14 |
| 11:10,18,21 | 81:14 82:6,11 | 141:22 142:5,9 | 188:10 189:2,9 |

**[davidson - deposition]**                                     Page 14

189:14,18,22
189:24 190:2,4
190:14,18
191:1,11
193:17,21
194:7,14,20,24
195:23 196:3,5
196:18 197:8
197:20 200:20
201:3,10 202:8
202:13,17,24
203:24 204:5
204:21 205:2,9
206:7,12,14
207:18 208:9
208:11,14
209:11,14
227:11,17
228:2,7,12
229:10,20
230:8,13,16,20
231:22 232:3,7
232:19 233:3
234:3,12,18
235:2,8 236:16
237:5,9,18,22
238:12 239:12
239:19 240:24
241:7,10,15
242:1,4,7,11,15
242:21
**davis** 4:12 18:7
94:5,7 95:7,13
97:24,25
100:19 101:7
101:21 102:12

103:12,24
104:11,14
106:3,23
107:14,18,25
109:18
**day** 58:13 83:2
83:3 197:9
242:12 245:22
**days** 16:14
104:4 219:5
**dc** 12:25
**dealt** 168:4
**debunk** 146:19
**debunked**
146:11 148:4
**debunks** 147:11
147:18
**december**
35:21
**decide** 171:19
**decided** 171:17
**decision** 72:24
73:2
**decisions**
171:22
**declaration**
3:20 82:16,19
85:5 215:17,25
**declared** 92:20
**decline** 134:24
135:24 136:7
136:18 139:16
139:21 140:8
140:16 141:14
141:15

**declined** 134:19
135:1 136:6
**defend** 130:7
**defendant** 2:20
**defendant's**
3:14,20,22 4:5
4:8,13,15,20
5:5,8,11,15,21
6:5,9 70:14
82:18 85:15
91:2 95:8
106:11 108:9
123:5 128:3
142:10 162:1
168:13 173:7
194:1 204:15
**defending**
96:10,17
189:10
**defense** 87:8
112:7
**define** 115:18
116:6
**defined** 67:24
157:11
**definitely** 163:1
**definition**
58:20 64:18
**definitive** 222:2
**degree** 113:21
114:3,7 115:23
120:20,21
131:18,21
138:6
**delicate** 107:4

**deliver** 147:15
243:3,4
**delivery** 243:2
**demonstrate**
155:4 222:2
227:1
**demonstrated**
47:8 211:5
**demonstrates**
210:25 220:18
**denying** 240:21
**deodorant**
176:24 177:7
180:9
**depend** 119:14
**depended** 35:2
**dependent**
158:11
**depending**
73:16 178:8
**depends** 100:17
145:5
**depose** 15:25
**deposed** 84:16
87:8 89:5,7
90:16
**deposition** 1:8
9:20 10:18
12:17,23 13:18
13:21 15:18
16:21 31:6,20
45:14 47:22
49:19 50:23
55:25 78:2 89:2
96:10,17 101:5
101:21 102:5

103:20,25
113:2 128:15
189:5,11 232:2
234:10 236:15
238:3,21 241:6
243:6
**depositions**
13:5,9
**deposits** 210:7
210:16 230:25
231:6,17
**depth** 103:14
**derive** 44:3
**describe** 158:9
158:15 203:3
211:24 223:22
228:3 229:14
**described**
152:12 225:9
225:10 228:14
**describes** 65:25
**describing**
155:7
**description**
3:13 4:4 5:4 6:4
221:13 228:1
**descriptive**
163:25
**descriptor**
158:8 159:15
**descriptors**
230:7
**design** 73:2,7
**designed**
224:15

**designing** 34:2
34:2
**designs** 73:3
147:3,21
**desk** 38:9
**despite** 26:14
116:24
**detected** 55:2
**detection** 54:10
56:3
**determinant**
220:24
**determine**
61:21 80:9 82:7
125:16 138:18
164:8
**determines**
148:8
**determining**
73:9
**develop** 207:14
**developed** 34:5
58:24 73:17
**developing** 60:1
151:19 154:7
192:20 225:6
**development**
58:21 170:15
197:24 224:18
**develops** 59:11
**diagnostic**
135:17,22
**dial** 167:21
**differ** 114:21
**difference** 68:6
68:13 115:10

116:23 117:5
117:13,20,21
118:5,11,12,14
118:18,21
**differences**
104:17 116:25
117:9 167:2
**different** 42:21
67:25 81:5,20
81:21 82:2 90:1
109:9,20 115:1
115:2,9 116:1
116:14 118:20
130:20 138:15
166:3 167:23
167:24 184:11
187:15 188:21
205:3 226:12
226:13,13,14
**differs** 164:16
165:6
**difficult** 15:9
77:25 78:9
138:5 139:25
153:22
**dig** 171:25
**dimensional**
71:7
**dimensions**
71:13 73:9
**direct** 151:19
222:17,18
239:16 244:24
**directed** 106:23
111:20

**direction** 43:9
212:10 244:24
**directions**
60:13,24
**directly** 54:25
**disadvantages**
73:14
**disagree** 40:23
41:7,17 72:2,4
73:1,5,12 94:2
94:4 167:8
215:14,15
223:16
**disagreed** 215:7
**discern** 15:9,15
**discipline** 225:5
**disclose** 30:20
32:8,8,17 93:19
97:11 144:1
**disclosed** 19:22
29:7 31:9,24
126:19 127:1
145:4
**disclosing** 32:2
**disclosure**
32:14 97:1,19
124:21
**disclosures**
110:2,8
**discovered**
225:5
**discovery**
234:21
**discrepancy**
241:2

[discussed - dr]                                                Page 16

| | | | |
|---|---|---|---|
| **discussed**  35:18 | 102:16 105:20 | 42:14,21 44:8 | 12:6 13:4 14:12 |
| **discussing** | 106:16 107:4 | 47:10 48:7,17 | 16:7 19:24 |
| 149:24 | 107:14,24 | 49:1,6,10 50:8 | 22:13 24:20 |
| **discussion** | 110:9 111:20 | 50:13,15,20,25 | 25:12 31:8,23 |
| 13:25 17:3 57:2 | 119:20 124:2,6 | 53:13,15 54:18 | 45:24 46:5,11 |
| 96:23 145:15 | 139:24 141:24 | 55:11 207:2 | 46:18,25 47:4 |
| 167:13 168:1 | 152:9 153:3,25 | 216:16,18 | 48:6,19,25 |
| 202:12 208:17 | 155:8 158:18 | 235:5,9 | 49:21 50:6 51:6 |
| 237:7 | 160:11 170:3 | **doing**  56:24 | 51:7 52:4 53:5 |
| **discussions** | 174:25 179:18 | 92:5 112:23 | 53:24,25 55:11 |
| 13:23 | 179:25 186:21 | 131:25 213:21 | 56:1,9 58:15,16 |
| **disease**  62:11 | 187:17 192:17 | **dollars**  23:16 | 58:19 61:13 |
| 79:24 135:15 | 195:4 196:12 | **domain**  126:4 | 70:3 74:7,18 |
| 135:19 138:5 | 199:23 200:6 | **dose**  100:20 | 75:1,3 79:15 |
| 141:1 151:19 | 201:4 209:8 | 104:11,15 | 80:24 83:22 |
| 224:5,25 229:6 | 215:16 232:9 | 105:14 106:3 | 84:17 89:24 |
| **disingenuous** | 240:4 241:8,11 | 106:20 | 97:10 99:2 |
| 102:22 | **doctor's**  177:13 | **double**  221:8 | 101:6,17 102:7 |
| **display**  116:10 | **document**  41:3 | **doubt**  112:2 | 103:8,11 112:6 |
| **disruptions** | 41:5 44:14,15 | **douche**  176:25 | 113:13,20 |
| 35:14 | 44:17,20,25 | 177:7 | 125:17,17,23 |
| **distinction**  44:1 | 45:6,11 47:4 | **douching**  4:21 | 125:23 128:11 |
| 68:11 170:4 | 53:20,24,24 | 5:12 123:6,15 | 128:17,24 |
| **distorted**  225:8 | 54:20,22 55:3 | 161:8,15 162:2 | 129:17 130:9 |
| **distortion** | 60:19,23 61:14 | 162:13 163:14 | 131:4,18,21 |
| 220:7 | 82:23 175:19 | 164:1 166:3 | 132:8,12,22 |
| **district**  1:1,1 | 176:5 182:2,17 | 181:3,12,20 | 133:3,6,9,12,17 |
| **divulge**  25:9 | 208:22 209:7 | 182:4 | 134:16 141:10 |
| **divulging**  25:5 | 210:6 216:15 | **download** | 142:23 143:8 |
| **doctor**  8:20 | 216:20 | 175:7 | 144:14,14,21 |
| 19:16 25:20 | **documented** | **downloads** | 145:2,8,9,24 |
| 39:13 61:11 | 224:1 | 175:19 | 157:3 159:18 |
| 69:24 75:15 | **documents** | **downplaying** | 162:21,24 |
| 77:9,25 78:14 | 11:4 12:7,9,12 | 149:7 | 163:8 164:11 |
| 78:17 80:1,16 | 14:8,15,19 15:6 | **dr**  7:12,14 9:6 | 166:14 171:7 |
| 99:12 101:2 | 16:1,3,8 38:22 | 9:17 10:11 12:2 | 177:6 178:21 |

[dr - entitled]                                                                    Page 17

181:10 182:22
183:1,7 184:10
185:7 186:15
189:15 190:5
196:6 202:25
204:10 205:13
205:16 206:15
208:20 210:5
211:7 215:5
227:18 237:10
238:22 239:20
240:14 241:21
**drafted** 41:22
41:25 42:7,13
**drafting** 35:2
**drive** 153:13
**driven** 34:14
**driving** 167:1
**drop** 138:18,20
139:21
**dropbox** 15:18
15:20 16:14,16
16:22 17:12
19:5 42:16 58:4
169:24
**due** 25:22 62:14
180:22
**duly** 8:24
**duplicate** 11:1
**duplicative**
15:4
**duration**
104:16 105:14
**dust** 236:5

**e**

**e** 2:1,1 3:1,11
4:1,3 5:1,3 6:1
6:3,12 8:23
30:11 83:7
168:20 174:22
204:18 244:1,1
245:1,1,1
**earlier** 11:16
184:11 191:12
205:4 207:22
233:12
**early** 54:8,9
138:13
**earned** 21:14
22:21 26:17
**earnings** 24:9,9
24:22 25:13,24
26:5,5,15
**ears** 110:14
**easier** 86:9
91:17 193:7
**easily** 66:12
**easy** 90:14
141:3
**echeverria** 21:1
89:22
**editor** 130:9
**editorial** 18:16
18:21 130:20
**editorials** 18:8
18:10,21
**editors** 36:3
**edt** 1:14 243:7

**effect** 115:9
136:23 147:19
157:15 164:15
165:5 167:2
**effects** 4:16
108:10,16
137:23 157:23
158:1
**efficient** 213:24
**egilman** 130:22
131:4,6,18
133:3,6,9,12
144:14,21
145:8,9
**egilman's** 130:9
**eight** 23:8
198:16
**either** 22:19
102:6 125:23
126:13 131:17
151:16
**element** 64:23
**elizabeth**
143:19
**emails** 88:18
**embodies**
120:20
**embody** 71:14
**employees**
127:5
**employment**
24:1
**ended** 29:6
**endometri**
117:13

**endometriosis**
4:18 108:12,18
113:22,23
114:4,6 115:24
115:25 116:12
117:14,14
120:15 121:8
121:20 122:13
122:16
**endorse** 180:18
180:25
**ends** 214:4
**energetic** 131:7
**enormous**
134:8 171:23
178:10
**ensuing** 87:6
**entire** 72:12
77:11 102:5
147:18,19
149:10 177:14
198:11 200:21
201:1
**entirely** 55:7
**entirety** 41:3
149:6
**entities** 115:22
**entitled** 1:10
3:14 4:5,8,15
4:20 5:5,8,11
5:15 6:5,9 9:9
15:25 16:6
24:11,24 25:6
28:2,15,20 45:7
60:23 70:15
91:3 94:15 95:9

[entitled - evidence]                                              Page 18

108:10 123:6
123:15 125:9
127:23 128:4
142:11 162:2
168:8,14
173:19 194:2
194:12 204:11
204:16 209:4
217:21 218:10
222:19
**entry** 159:1
**environment**
4:6 91:3,24
**environmental**
209:4 236:5
**epa** 17:13,14
43:22 44:10,11
44:14 46:25
53:23 54:20,22
55:3 208:22
210:9
**epi** 61:21
**epidemiologic**
167:25 190:24
214:16 218:20
**epidemiologi...**
71:6,11 75:7,21
152:3 156:21
196:13 201:5
210:24 219:15
220:17 222:21
229:13
**epidemiologi...**
211:5
**epidemiologist**
213:11

**epidemiologi...**
214:9
**epidemiology**
125:9 131:19
131:22,25
132:17,24
133:4,7 157:21
157:22 214:10
224:19 225:8
225:15 237:4
**epithelial** 4:9
94:22 95:4,10
138:9
**epstein** 2:22
61:4,6 85:21,24
86:17 89:16,19
91:19 109:14
109:19,23
110:6 112:19
113:3,5,10
142:7,15,19
146:1,5 156:7
156:16 173:3
174:3,7,10,14
184:6 193:20
194:19 204:24
**equipped**
214:11
**error** 9:22
100:18 164:15
165:4 220:13
**errors** 115:14
**especially**
138:3 164:15
165:5 226:11

**esq** 2:5,5,11,16
2:22,22
**established**
224:6,11
**establishing**
64:22
**estimate** 21:16
22:20 23:7
66:13 88:5
99:22,23,25
120:13,19,20
121:10,11,11
121:15 138:10
170:14 178:11
218:19
**estimates** 66:3
66:7 82:1
114:13,18,24
116:1 117:5,21
117:23,24
118:3,15,19
119:6,13 120:7
164:15 165:5
167:3 197:22
198:21 199:2
203:4,4 229:16
**estimating** 22:2
22:15
**et** 3:19 4:7,12
4:19,24 5:7,10
5:14,20 6:8,12
70:19 80:24
91:5 95:13
108:13 123:9
127:24 128:6
142:13 162:5

168:18 194:5
204:19
**evaluate** 71:9
**evaluated**
78:21 236:24
241:1
**evaluation** 44:4
56:17 103:15
170:11 212:25
212:25 213:2
221:12 239:4
**evaluations**
214:12
**events** 79:12
**eventual** 35:5
**everybody**
86:22 242:12
**evidence** 5:10
40:16 41:12,19
41:19 43:8,21
44:2,5 47:17
48:10 64:13
88:18 140:10
140:14,15
141:13,21
142:13,22
144:8 190:24
210:24 215:11
221:22,22
222:9 223:19
223:23 224:17
224:17 225:15
225:17,20,25
226:2,2,6,23
239:7

**[evil - fact]**                                                    Page 19

| | | | |
|---|---|---|---|
| **evil**  110:18,18 | 94:6,10,15 95:1 | 56:11 57:5 | 93:11 141:1 |
| **ex**  59:15 127:12 | 95:3,8 106:10 | 60:12,23 63:6,9 | 161:10,17 |
| **exactly**  66:18 | 106:11 108:8,9 | 63:15,23 84:20 | 162:4,12,15 |
| 130:13 157:13 | 122:25 123:5 | 84:22,25 88:10 | 163:13 167:4 |
| 212:9 | 127:22 128:3 | 89:8 90:15 | 170:14 210:11 |
| **examination** | 142:6,8,11 | 93:19,21 | 235:23 236:5 |
| 3:3 10:9 208:18 | 145:14,23 | 106:12,24 | 241:3 |
| 227:16 241:19 | 146:2,4 161:8 | 107:6 110:20 | **exposures** |
| **examined**  8:24 | 162:2 168:8,14 | 110:20 111:15 | 212:22 |
| 49:15 101:7,20 | 172:25 173:6,7 | 125:2,3 126:12 | **express**  39:1,22 |
| 241:5 | 193:19 194:2 | 145:10,14,24 | 222:14,15 |
| **examining** | 194:19,25 | 234:14,23 | **expressed**  60:8 |
| 241:13 | 204:11,15 | 236:19,24 | 81:4,5 120:22 |
| **example**  121:21 | 205:11 209:15 | **expertise**  43:19 | 146:12 |
| 152:17 177:23 | 209:17,19,25 | **experts**  3:21 | **expressing** |
| **examples** | 215:24 230:10 | 51:13 56:16 | 119:4 120:23 |
| 119:17 225:12 | 230:13 | 82:20 127:7,14 | **expression** |
| 228:22 | **exhibits**  6:18 | **explain**  59:23 | 121:25 |
| **except**  110:14 | **existing**  152:13 | 119:7 135:24 | **extent**  55:24 |
| **exception**  67:6 | **expect**  35:22 | **explained**  75:2 | 174:25 233:22 |
| **excess**  211:4,5 | 38:19 | **explains**  51:7 | **extra**  22:2 |
| 226:17 | **expedited** | **explanation** | **extrapolate** |
| **excuse**  84:18 | 242:16,17 | 117:11 | 61:20 |
| 96:5,8 189:3 | 243:1 | **explicitly**  54:25 | **extremely** |
| 190:14 213:12 | **expedites** | 57:20 | 71:12 |
| **excused**  243:5 | 242:18 | **explore**  53:20 | **eyeballing** |
| **exhaustively** | **experience** | **exploring**  29:4 | 116:18 |
| 241:5 | 118:7 131:10 | **exposed**  9:10 | **eyes**  110:15 |
| **exhibit**  3:13,14 | 132:15 133:13 | **exposure**  5:14 | 174:17 |
| 3:20,22 4:4,6,9 | 214:7 | 17:25 33:9 34:6 | **f** |
| 4:14,16,21 5:4 | **expert**  4:13 | 35:10 36:20 | |
| 5:6,9,12,16,21 | 27:2,3,6,21,22 | 40:17 41:14 | **f**  244:1 |
| 6:4,6,10,14 | 28:3,7,16 29:1 | 59:16 62:14,25 | **face**  7:25 |
| 69:23 70:14 | 29:7 30:21 | 67:15,16 79:6 | **fact**  26:14 |
| 82:15,18 85:13 | 31:10,24 32:4 | 79:13,23 80:19 | 54:24 55:3 |
| 85:15 91:1,2,23 | 32:11 51:5,6,16 | 81:22 82:3 | 65:23 76:14,15 |

**[fact - first]**                                                          Page 20

85:3 93:20
106:3 107:16
107:18 130:22
149:11 155:10
159:18 210:16
211:13 215:8
221:17 237:1
**factor**  37:20
40:2,5 114:7
224:19,19
225:2
**factors**  4:16
38:24 108:10
108:16 132:2
138:5,13,14
188:5,7 207:9
224:5,6,7,11,24
225:9,12
**factual**  76:17
**factum**  76:10
**failed**  92:21
**faint**  166:9,11
**fair**  10:4 48:4
54:1 103:2
119:1,2 139:2
166:24 217:14
232:6 240:6
**fall**  36:15 88:11
89:9 137:12
**fallen**  134:17
135:13
**fallopian**  17:8
77:6 78:4,24
79:5 151:17
**false**  220:16

**familiar**  37:14
37:16,25 38:3
38:20 39:4,8
40:11 60:22
61:13,15 70:24
71:1,18 73:18
82:22 126:1,2,3
133:25 168:25
169:3 170:21
195:3 201:6
237:3
**familiarity**
134:2
**family**  113:21
114:3,7 143:17
143:18 144:5
**fashion**  183:2
**fatal**  71:14
**fatally**  218:24
**favor**  208:12
**fda**  43:22 47:1
53:24 54:13
**federal**  21:23
127:13
**feel**  130:8,13
168:3
**feeling**  138:8
166:11 207:23
208:5
**fell**  135:4 136:2
**fellow**  132:23
133:3,10,18
**felt**  130:6 168:3
**female**  132:1
**ferraro**  110:21
111:15 112:1

**fibers**  43:23
47:9,18 48:11
79:13 213:1,3
221:20 222:4,5
**fieldwork**  34:2
34:23
**figure**  9:16
17:1 23:10
62:13 107:22
112:19 189:7
199:13,13,18
**figured**  184:7
**filed**  215:18
**filibuster**  45:21
**filibustering**
45:14 49:19
102:7
**final**  92:3
113:14 187:19
204:11
**finalizes**  17:15
**financial**
143:25
**find**  38:23
41:16 57:24
58:9,10 69:14
95:25 100:19
100:23 106:3
109:5 117:10
142:2 147:1
158:16 166:16
168:24 192:7
195:18 196:25
197:15 198:12
198:15,20,20
199:11 200:9

200:19 201:21
202:3 219:21
220:5,22
229:13
**finding**  108:25
229:25
**findings**  187:23
**fine**  30:17
94:25 95:24
96:22 112:24
166:8,8 189:12
192:16 222:6
240:1 242:19
**finish**  46:7,8,9
64:4 67:5 68:18
68:23 153:20
158:21 181:6
232:15
**finished**  46:9
46:10
**finishing**  68:18
**firm**  83:19
110:21,22
111:15,16
112:1 125:2,4
125:11 129:21
130:24 131:11
**firms**  83:19
216:6
**first**  8:24 17:24
35:5 36:2 74:24
93:25 95:6
108:18 113:2
113:21 114:3,7
115:23 122:6
128:2,17

**[first - frustrated]**                                                   Page 21

135:15 139:13
140:5 161:10
161:17 168:12
191:25 193:3,4
204:13 218:18
225:5 232:2
238:15
**firsthand**
137:18
**fits**  148:9
**five**  9:12 34:24
35:7 53:1 80:18
139:6 192:6
204:1
**flaw**  222:12
**flawed**  218:13
218:25 219:15
**flaws**  51:7
71:14,15,15
218:8
**flipping**  119:17
**flom**  2:21
**florida**  2:12
**fluctuate**
119:15
**fly**  38:9
**focus**  174:1
**follow**  69:6
136:7 221:6
**following**  56:15
59:4 245:5
**follows**  8:25
**font**  98:11
**footnote**  77:9
77:11,13,16,20

**foregoing**  244:8
245:2
**forensic**  103:14
**forget**  85:23
**forgive**  115:11
115:13,14
**forgotten**  186:9
186:15
**form**  13:10
24:10 25:15
34:12 40:7,19
40:25 41:15
43:5 49:4 54:3
57:19 59:2,17
61:24 63:2 68:1
68:9 71:24 73:4
75:9 81:12,23
83:24 84:13
87:17 88:3
93:13 97:13
100:2 112:8
114:9 125:12
125:19 126:15
126:21 127:15
130:11 132:19
136:9 138:23
139:4,19
140:11 141:18
144:17 149:14
157:9 163:17
170:16 172:8
178:24 180:6
180:12 181:5
181:13,23
182:6 183:13
184:1 185:12

196:15 200:15
200:23 201:8
203:19 204:4
207:15 213:1
227:22 228:16
229:17 231:20
232:23 234:16
234:24 235:7
236:14 237:16
237:21 238:10
239:1,15
240:18
**forms**  24:24
25:5 120:22
**formula**  62:2
**formulation**
79:2
**formulations**
43:11
**forth**  36:4
131:12
**fortunately**
163:5
**forums**  214:2
**forward**  19:13
78:11
**forwarded**
16:23
**foul**  102:13,24
**found**  9:22
42:19,21 58:16
58:19 66:1,16
66:18 104:11
121:3 150:4
151:25 152:3
165:8,23 178:5

195:20 203:10
218:12
**foundation**
49:14 143:17
**foundational**
55:24
**four**  20:10
31:18 35:7
45:15 50:1
80:17 201:17
**fourfold**  111:9
**frequency**  65:7
66:11 67:15,17
67:24 72:16
104:15 105:14
165:20 173:20
**frequent**  3:15
58:17,20 59:11
59:25 64:19
70:16
**frequently**
58:24
**fresh**  103:17
165:15 169:5
**front**  16:8,11
18:24 19:3
30:25 31:13
39:14 42:6 45:8
57:9 70:8,10
86:7 98:13
129:23 146:7
153:10,11
172:19 194:8
195:25 223:1
**frustrated**
102:14 207:24

**[frustrating - going]**                                                    Page 22

**frustrating**
102:9,10
**full**  24:1 29:20
77:20,23
171:21 193:4
**fulsome**  183:14
**fund**  134:12
**funded**  34:22
143:12,16
**funding**  34:1
34:16 143:21
**further**  171:24
227:9,15
241:16 242:9
**furthermore**
104:14
**future**  60:13,24
88:1,7
**fuzzy**  54:17

**g**

**g**  30:11 168:20
168:22
**gabriel**  4:24
122:25 123:9
123:18 124:3
**game**  103:2
**gaps**  221:19
222:7,8
**gather**  219:25
**gel**  176:24
177:7 179:8,10
180:4 182:24
183:9,20
**general**  20:6
40:17 53:19

73:20 76:5
138:8 148:5
214:3
**generalizable**
120:13
**generally**  48:1
62:6 93:11
103:4 226:1
**generated**
11:22
**generic**  73:20
120:12 148:5
**generous**
129:14
**genetic**  158:2
**genital**  4:9,22
5:12 6:6 41:13
76:8 94:21 95:4
95:9 104:16
105:15 123:8
123:17 151:10
155:12,22
156:24 161:8
161:15 162:3
162:14 163:14
167:3 188:4
192:18 194:3
194:13 195:1
**gerel**  2:4
110:21 111:16
112:1
**getting**  8:11
35:1 60:4 102:9
102:10 168:23
194:9

**give**  21:17
46:17,20 49:14
71:23 94:18
101:4,6,22
107:21 109:4
112:22 123:3
161:18,20
162:7 185:1
204:25 213:15
227:5,6 232:16
**given**  36:9
86:25 118:15
223:11
**giving**  101:24
102:18,21,25
183:4
**glad**  50:17
**glance**  191:25
238:15
**glanced**  171:17
**glancing**
171:20
**go**  7:17 8:2 9:20
9:25 16:24 17:4
23:22 31:20
38:23 39:9 44:8
45:16,22 52:24
73:9 81:3 82:11
83:13 85:8,21
87:5 94:5 96:3
96:20 101:10
101:14 108:21
108:23 109:6
110:1,5 114:8
117:10 119:17
124:21 127:18

128:19,22
145:15 148:17
148:21 150:1
152:9 161:4
169:19,20
171:24 175:6,9
175:14,21
176:21 180:2
180:25 184:4
187:21 191:5
193:17 196:3
201:22 202:8
202:13 206:8
208:8,9 209:7
227:7 230:9
237:5 239:24
241:8,11
**goes**  116:15
212:9
**going**  7:17 15:8
15:15 20:9 23:8
29:12 35:25
36:5,8 45:10
46:1 49:22 50:6
56:22 57:1
85:12 86:7
95:25 101:10
115:18 116:8
127:22 150:9
153:24 172:21
172:24 176:15
176:16 184:24
186:17,20
194:14,15,15
198:5 199:11
226:25 242:13

**[golomb - hear]**

**golomb** 2:15,16
  7:7,7 202:4
**golomblegal....**
  2:18
**gonzalez**
  184:13
**good** 10:11,12
  10:15 46:20
  86:24 121:15
  135:25 138:4
  191:3,4 218:21
  227:10 242:11
**goodman** 5:7
  6:12 127:24
  128:6,25
  131:21 132:12
  132:22 133:17
  146:12 148:12
  204:14,19
  217:19,20
  218:2,10
  220:10,11
  221:1
**goodman's**
  129:17 132:8
**goodness** 102:2
**gossett** 18:15
  18:16
**government**
  127:13
**grab** 143:1
**grabbing** 108:6
**grade** 99:5
**grant** 34:16
**graph** 116:16
  116:17

**graphic** 116:10
**grasp** 138:4
**great** 10:16
  11:10 12:19
  13:2 83:11
  94:11 96:3
  110:15,16
  112:23 116:24
  136:4 142:17
  176:9 194:21
  242:11
**greater** 60:2
  154:17
**greatly** 114:23
**grew** 64:9
**group** 92:14
  199:8 212:4
**groups** 159:16
  214:16 233:13
**growing** 47:17
  48:9
**guarantee**
  219:20
**guess** 15:4
  21:17 25:16
  36:13 76:10
  124:15 130:5
  132:10 136:11
  165:14 177:20
  200:17 239:18
**guessed** 81:24
**guessing**
  126:11
**guesstimate**
  76:16

**guide** 219:3
**guys** 102:15
  175:8 189:19
  194:7
**gynecological**
  39:5 133:13
**gynecologists**
  38:1,15

**h**

**h** 3:11 4:3 5:3
  6:3 168:20,22
  245:1
**habits** 135:17
**half** 111:13
**hancock** 233:19
**hand** 8:20 91:9
  113:24 130:21
  164:25 190:21
**handed** 90:5
  124:2
**handing** 91:15
  150:25
**handle** 45:3
**handwritten**
  11:23 12:11
**hang** 169:13
**happen** 33:12
  36:13 120:10
**happened**
  217:5 224:21
**happy** 7:18
  113:11 179:21
  180:23,23
  192:9 232:16

**hard** 86:9 107:1
  107:2 138:3
  161:12 196:7,8
  197:2,4 200:14
  200:16 208:16
**harlow** 18:10
  18:20
**harmonize** 77:7
  78:5,24
**harmony** 79:24
**harris** 17:15
**harvard** 131:25
**hastily** 216:19
  216:25
**hazard** 174:20
  176:24 177:9
  179:9,24 180:3
  181:3,11
  182:23 183:8
  183:10 192:20
  200:7 201:13
  203:15
**hazards** 173:23
**head** 88:20
**heading** 142:18
**health** 36:23,23
  37:2,6,7,10,12
  73:22,23,24,25
  127:6 136:1
  233:13,14,16
  234:7
**hear** 70:4 86:5
  91:12 110:18
  161:12 196:23
  208:16

**[heard - implying]**                                                          Page 24

**heard** 38:4
  39:19 153:18
  174:11 197:9
  206:20,23
  213:21 214:23
  217:9 229:5
**hearing** 107:2
  197:3,4,5
**heavy** 55:17,19
  55:22
**held** 17:3 96:23
  202:12 208:17
  237:7
**help** 11:8 20:22
  189:21,23
  190:3 230:11
**helpful** 176:12
  239:17
**helping** 34:1
  189:24
**hesitate** 141:5
**hesitating**
  232:10
**hey** 113:7 189:9
**hi** 7:9
**high** 66:10 99:5
  150:6,16,18,23
  152:6 153:7,16
  154:14,23
  155:2 157:6,11
  158:18,23,23
  159:15,21
  160:24 191:14
  225:4 229:12
**higher** 60:5
  73:3

**highest** 71:23
  74:10
**highlighted**
  114:18
**highlights**
  11:14,15
**hill** 221:13
  226:8,10
**hill's** 221:11
**hinted** 79:3
**hired** 236:19
**historic** 43:24
  47:6 164:13
  165:3
**historical** 54:17
**historically**
  47:12
**history** 49:23
  113:21 114:3,8
  115:23 165:25
  166:18 192:18
**histotype**
  104:18
**hold** 44:3,4,6
  94:23 162:16
  189:18 222:17
**honest** 166:20
**hoops** 227:1
**hope** 136:16
**hopeless** 220:7
**hopelessly**
  219:15
**hopkins** 132:11
  132:16
**hormonal**
  132:2

**hormone** 5:17
  168:10,16
**hours** 13:24
  31:18,21 45:15
  208:21
**huh** 17:10 42:3
  89:21 119:24
  146:23 147:4,8
  151:6,8 167:16
  196:25 199:16
  202:17
**hundred** 122:2
**hundreds**
  172:10,10
**hygiene** 174:19
  177:6
**hyperlipidemia**
  229:6
**hypotheses**
  34:15
**hypothesis**
  222:4,10
**hypothetically**
  121:3
**hysterectomy**
  151:11,17
  152:16,19

**i**

**i.e.** 151:16
**iarc** 3:20,22
  56:10,15,19
  57:1,13,16 58:7
  60:11,23 82:17
  82:19 85:16
  212:11,15,20

  215:18,19
  216:22 236:23
**idea** 51:2
  126:17 127:9
  133:5,8 135:21
  194:23 231:16
  236:4
**identical** 67:20
  114:19
**identification**
  70:20 82:20
  85:18 91:6
  95:14 106:14
  108:14 123:10
  128:7 142:14
  162:6 168:19
  173:9 194:6
  204:20 209:21
**identify** 14:13
  19:18 40:5
  42:14,22 76:7
  95:20 198:6
  201:6
**imagine** 116:9
**immunological**
  188:1
**impact** 71:16
  168:2
**implication**
  73:6 157:13
**implications**
  119:12
**implied** 9:15
**implying**
  131:16 240:22

[important - interpret]                                    Page 25

important
  48:20 93:18
  104:5 114:20
  138:4 170:10
  171:18,20
  172:2,2 214:24
  216:20 217:2
  226:20
imprecise
  117:24
imprecision
  117:23,25
  119:5
impression
  149:5,9
inaccurate
  83:25 85:6
  87:16 88:2,5
inches  96:12,14
incidence  62:11
  135:3,15 136:1
  137:1
incident  5:17
  168:10,16
  192:20
include  32:13
  41:5 57:4 72:16
  77:5 78:4 93:10
  107:25 124:8
  124:13,17
  167:13 181:17
  188:7 212:21
  212:22
included  34:5
  47:6 66:12 67:8
  67:12 72:18

74:5 81:9 90:18
92:18 124:9,14
124:15 167:25
186:21 212:6
235:20
including  11:3
  43:22 47:7
  78:23 132:1
inclusive
  129:14
income  23:3,7
  23:11,15 24:15
  24:21,24 25:6,9
  25:13,24 26:16
incontroverti...
  226:23
incorrect
  216:13
increase  137:15
  160:16 173:20
  175:22 176:1
  192:19 223:11
  236:6
incredible
  229:3
incredibly
  102:14,14
independent
  53:12 160:13
  223:5,8
independently
  42:19,25 66:4
  66:15
indicate  116:2
  119:12 186:20
  226:17

indicated  24:16
  60:10 97:15
  230:5
indicating
  72:11 121:1
  152:22
indicator
  219:10
individual
  219:1 226:18
individually
  219:2 220:4
industrial
  231:13
inference  160:9
infinite  121:5
inflammation
  4:23 19:3 123:8
  123:18
influence
  129:12 138:15
influencing
  214:4
information
  20:4 28:15
  54:14 76:17
  192:3 200:17
  200:19 201:20
  211:1 213:18
  214:1,6 228:19
information's
  20:5
informed  56:25
infrastructure
  215:2

initiated  130:23
input  37:3
institute  17:7
  133:23
institutes  127:6
insufficient
  152:23 215:11
intact  77:6 78:4
  78:23 79:5
  150:2,4,14,22
  152:4 153:6,15
  154:6,11,16,22
  159:8,13,19
intake  213:18
intention  33:7
  33:12,15 34:6,7
interest  3:20
  57:5,21 82:16
  82:19 87:21
  92:18 93:7,10
  97:7,19 124:22
  126:20 127:1,3
  143:8 144:15
  144:22 145:3,8
  215:18,25
interested
  120:6 201:20
interesting  9:19
interestingly
  175:21
interests  35:3
  92:20,24
  143:25
interpret
  221:22

interpretation
  160:8 221:10
  221:12
interrupt  22:11
  31:19 158:25
interrupting
  46:3,4 197:11
interval  66:12
  118:1 119:22
  120:1,24,25
  121:14,25
  122:7 179:24
  180:5 181:16
  181:17 184:21
  188:15 192:21
  192:23 193:9
  193:10,12,14
  203:16,18
intervals
  114:14 115:8
  115:16 116:4
  116:13 118:4
  118:13,16,24
  119:3,11 120:3
  183:20,21
  185:8,11,20
  187:11 188:14
  190:9 191:25
  192:25 195:10
  195:14 196:20
  196:22 197:1
  197:22 200:11
  204:7
intervenor
  130:23 131:11

interventions
  154:13 158:25
interview
  120:11
interviewed
  75:5,6,20,22
  121:6
introduce  7:6
investigation
  143:7
investigations
  143:11
investigator
  33:25
investigators
  36:7 226:14
invite  57:1
invited  236:23
invoices  21:8
involve  27:12
involved  33:11
  33:25 69:5
  83:20 87:23
  216:6 235:17
involvement
  87:25 88:7
irrelevant  25:7
issue  93:6 122:4
  168:4 197:4,13
  224:20
issued  60:12
issues  37:13
  48:22 56:11
  110:14,15
  130:20 132:1
  214:14

it'll  36:1,1
  146:21
iteration  36:2
iterations  36:3
iwona  4:23
  123:9,18

**j**

j  1:10 8:23
  244:4,14
j&j  49:1,6 50:9
  50:13,19 51:13
  208:21
j&j's  49:9 51:6
  51:17,20
jack  1:8 3:4,22
  4:14 46:21
  85:16 106:12
  243:6
jama  195:2
january  35:21
  49:16 50:23
  83:18 216:5
jersey  1:1,13
  244:8
jessica  2:22 8:3
  9:3,19 11:8
  12:21 15:2
  16:22 19:11
  20:23 24:12
  26:21 46:15
  47:20 50:3 52:1
  60:18 68:17
  77:2,15 78:10
  86:2 101:3,18
  101:23 102:3

104:21 105:4
  106:25 107:8
  108:5 112:24
  123:2,23
  145:20 146:2
  153:17 161:13
  162:9 166:1,9
  171:5 173:13
  174:24 175:12
  180:17 182:13
  185:23 190:11
  194:10 202:20
  206:11 208:4
  227:6
jessica.davids...
  2:24
joan  143:18
job  10:15
  112:23 134:11
john  5:10
  142:13,22,24
  143:4
johns  132:11,16
johnson  1:3,3
  137:8,8 143:19
johnson's  43:2
  47:2 53:9 55:21
  231:18
joke  94:13
journal  36:8
  125:8 214:22
journals  112:5
judge  49:24
  101:14
julie  5:7 6:12
  127:24,25

[julie - legitimate]

128:5,8,9
204:18
**july** 83:1
**jumping**
222:16
**june** 11:16
**jung** 5:19
168:18

**k**

**k** 2:5 8:23,23
17:23
**katie** 5:14 6:8
162:5 194:4
**keep** 19:13
94:13 104:25
197:11
**kept** 42:20
**key** 167:11
**kim** 17:23
**kind** 21:17 34:1
71:7 120:7
121:17 122:1
163:24 204:22
219:10 224:23
**kinds** 132:1
167:23,24
**knew** 116:8
**know** 15:25
16:6,9 18:22
19:12 20:15,18
21:22 22:25
30:16 32:12
34:9 35:7,12,24
36:1,2 37:19
38:11 39:7 45:9

45:15 50:2,14
51:1,2,14,15
54:18 58:8
61:12 62:25
64:17 67:23
68:2 69:11 71:9
76:2,12,14,15
76:17 77:3
78:20,20 80:5
81:3,8,15 86:15
100:21 102:11
102:17 107:1
111:25 112:5
114:10 116:18
119:9,16,16,18
121:4,7,7
122:18,20
124:13,17
125:10 126:6
126:17 127:5
130:12,21,21
131:6,7,13,14
131:20,23
132:12,16,22
134:21,22
135:1 136:10
136:11,11
142:23 143:5
143:10 152:18
156:16 158:6
159:4 163:15
166:10,19
167:17,22
168:5 170:7
171:23 172:9
173:14,15,15

176:6 178:12
179:12 180:21
185:13 186:18
187:12,13
189:3 195:19
196:13 197:8
200:1,24 201:2
207:5,9 221:25
224:14 225:1
226:5 228:18
229:5,6,11
231:8,10
232:11,21,24
233:2,11
240:15
**knowledge**
36:11 132:8
215:2 221:20
222:8,9 245:4
**known** 38:2
39:6
**knows** 86:21
143:3
**korean** 212:4
**koushik** 33:24
92:4
**kudos** 112:23
**kwon** 17:24

**l**

**l** 30:11
**labeled** 58:6
110:25
**lack** 154:12
**language** 102:3
102:13 105:3

115:11 130:2,5
150:7,17
160:21 183:23
**large** 157:15
**largely** 122:20
**larger** 69:6
**latched** 225:6
**late** 8:17 54:9,9
**latency** 137:24
138:7,11,15,20
140:22 141:2,6
**law** 83:19,19
110:21,21
111:15,16
112:1 125:2,4
125:11 131:11
216:6
**lawyer** 112:22
**lawyers** 42:17
42:18,24,25
53:16 54:12,15
54:21 56:21
87:8 189:4
**layout** 98:22
**learn** 127:11,17
**learned** 57:1
**leeway** 101:4
101:23,25
102:18,19,21
102:25
**left** 9:16 10:1
202:5,5
**legal** 2:15 87:12
**legitimate**
25:19

**len**  143:18
**letter**  3:22
  57:13,17,18,19
  58:6 83:4,6
  85:9,13,16 86:7
  130:9 145:4,5
  215:19
**letters**  18:21
**letting**  181:6
**leung**  4:7 30:9
  30:12 32:13,19
  91:1,5
**level**  100:8,17
  226:19
**levin**  2:10
**levinlaw.com**
  2:13
**liability**  1:5
**license**  1:11
  244:15
**life**  35:15
**ligation**  76:13
  151:11 152:17
  152:20
**likely**  130:25
**limit**  114:17
**limitations**
  148:13,16,25
**limited**  46:14
  69:16 78:19
  80:3,3,10,24
  81:16 93:12
  155:13,23
  156:25
**linda**  123:19

**line**  66:8,19
  111:2 245:6
**lines**  9:12 65:21
  150:1 151:14
**lisa**  4:7 30:12
  91:4
**list**  14:10,16,21
  15:16 16:2,9
  17:12,22 18:17
  19:9 34:18
  35:12 37:19
  40:1 42:15
  50:15 57:21
  67:19 78:18
  171:1,8 172:6
  218:15 221:3
**listed**  74:12
  178:23 183:21
**listening**
  108:24
**lists**  174:19
**literature**  62:20
  66:2 211:9
  214:18 219:7
  220:17 221:14
  223:24,25
  225:10 235:13
  236:11 237:12
  237:17,24
  238:25 240:16
  241:22
**litigation**  1:5
  20:1,14,19
  21:15 22:22
  23:4 26:18 27:1
  27:7,14,17,25

28:7,25 30:22
31:10,25 32:4
32:11 49:2
50:20 55:17
63:7,23 64:11
83:20 84:12,17
87:24 88:25
93:19 97:5
126:13 127:8
127:14 133:15
144:6 145:3,10
216:7 217:7
236:20 237:11
238:5,7
**little**  15:4 49:14
  54:16 65:3 72:7
  86:8 91:17
  101:4,23 107:1
  116:10 131:6
  174:17 190:12
  229:25
**live**  14:5
**llp**  2:4,21
**lock**  152:24
**logical**  222:12
**long**  46:12
  56:18
**longer**  69:6
  75:22 103:16
**longo**  17:19
  47:4,5 51:6,21
  51:23 53:24
  55:11
**longo's**  51:7
**look**  23:2 30:15
  32:15,23 44:2

46:21,21 47:14
50:17 53:14,21
54:24 63:12
64:24 65:4
69:13,20 73:12
80:5,8,16 88:18
96:21 99:6
103:19,24
104:3,7 108:4
110:8,10 111:5
112:12 114:13
114:14 115:1
115:15 132:4
132:13,13
144:25 146:20
152:13 160:6
160:11 163:19
173:24 178:14
184:23 187:12
187:19 192:2,4
192:5,9,10
199:11,21,22
199:24 205:5
224:5
**looked**  37:22
  39:25 101:1
  103:12,23
  104:4 127:4
  163:20 165:11
  170:10 172:8,9
  172:10 174:3
  175:1 207:1
  229:12
**looking**  33:1
  44:13,13 45:7
  48:17 63:13

**[looking - mdl]**                                                Page 29

64:25 65:6
70:12 90:4,7
92:16 94:17,24
98:7,25 104:12
106:22 110:11
111:3 113:24
114:1 123:24
143:2 146:22
151:3 164:5
165:17 169:14
174:16 176:22
176:23 177:18
191:22 192:5
193:2,6 196:6
199:7,16,18
242:17
**looks** 114:5
163:15 205:14
**losing** 102:23
**lost** 77:1 103:6
**lot** 22:1 73:13
119:5 122:19
122:19
**low** 160:15,16
223:10,11
229:12
**lower** 98:4,17
99:3,20,22
224:10
**lucky** 176:20
**lunch** 161:6
**lung** 158:7
224:21 235:23
236:1,6
**lynch** 146:12
148:12

**lyons** 2:5 7:4
15:19 16:14
58:3,6 113:9,11
176:3,8,11

### m

**m** 4:23 5:14 6:8
8:23 17:23
123:9 162:5
194:4
**made** 12:25
16:14,20 20:18
32:24 57:10
72:24 148:3
160:9
**magnitude**
157:14 158:9
224:4 226:10
**mail** 83:7
**mailed** 174:22
**main** 134:11
210:23 211:22
**majority** 25:24
26:1
**make** 9:5,24
12:20,21 15:10
43:24 44:1
46:19 58:10,12
65:5 85:25 87:1
90:14 106:25
107:4 115:5
118:11 120:12
147:23 148:3
151:15 154:5
155:6,6 171:22
193:7 198:17

220:13 222:7
227:7 238:22
**makes** 59:7
**making** 86:17
120:7 136:16
170:5 190:19
**manhattan**
2:23
**manner** 183:14
**manuscript**
36:12,14
113:15,18
**march** 1:13
244:18
**mark** 82:15
85:12 90:25
94:6 106:9
108:15 122:25
127:22 161:7
168:8 172:24
173:5 193:18
194:15 204:10
209:14,17
**marked** 69:23
70:19 82:20
85:18 91:5
95:13 106:13
108:13 123:9
128:6 142:14
162:5 168:19
173:8 190:13
194:5 204:19
209:20,24
**markedly**
151:18

**marker** 224:24
**markers** 158:2
**market** 2:16
**marketing** 1:4
**marking** 91:23
94:14,25 95:3
142:6 205:10
**mas** 1:2
**material** 10:20
14:20 66:16
171:24 218:23
**materials** 10:17
14:9,15 15:6,16
15:20,22 16:12
16:16 19:20
47:1 53:6 54:1
169:23 170:8
171:4,8 172:6
**math** 19:25
**mathematical**
117:18,19
**mathematics**
118:2
**matter** 1:10
120:18 130:23
244:10
**matthew** 52:5,7
52:17
**maximum**
21:17
**mcgill** 29:10,18
29:24 30:1
**md** 3:18 70:19
**mdl** 1:2 17:20
20:1 206:18

**[meagher - minutes]**

**meagher** 2:21
**mean** 20:9
  22:18 23:1 26:1
  27:4 32:5 42:20
  44:1 49:6 50:15
  55:18 58:23
  62:1 67:19 75:7
  75:23 100:8
  102:1 105:25
  115:19 116:9
  119:3 134:22
  137:17 140:6
  140:12 157:12
  157:17 162:23
  176:3 181:15
  219:4 220:22
  221:24 225:22
**meaning** 16:17
  59:21 151:23
**means** 59:24
  114:15 120:5
  141:4 157:13
  244:23
**meant** 9:17
  159:12
**measure**
  219:17
**measured**
  43:23
**measurement**
  43:20 164:14
  165:4
**mechanism**
  233:6
**mechanisms**
  221:21 222:3

**media** 214:24
**medical** 112:5
  207:2 213:6
  214:3
**meeting** 212:20
**meetings** 14:4
  214:1
**member** 37:17
  237:1
**memorized**
  127:2
**memory** 33:2
  47:14 90:13
  103:18 104:8
  143:18 163:22
  165:15 216:19
  229:4
**mentally**
  158:22
**mention** 44:22
  212:19
**mentioned**
  27:10 39:13
  42:16 51:21
  53:23 64:20
  129:19
**mentor** 34:1
**mercy** 65:3
**mesothelioma**
  235:24
**message** 114:21
**met** 13:14,17
  13:19,20
**meta** 3:17 9:9
  18:1 64:9,24
  65:25 66:10,24

  67:14,24 70:18
  149:12,21
  212:2 218:19
  220:1,2 226:22
**metals** 55:17,19
  55:22 56:4
**method** 218:25
**methodological**
  218:8
**methodologic...**
  218:12
**methods**
  178:18 211:24
**metric** 81:6
**micha** 5:10
  141:25 142:5
  142:13,22,24
  143:4,8 144:14
**michelle** 2:5
  7:1,10 12:13
  22:11 31:5,17
  31:18 45:2,12
  47:24 49:18,25
  49:25 57:22
  86:5 91:13
  94:16 96:17,18
  101:9,25 102:4
  103:3 104:22
  107:10 111:21
  169:24 176:19
  177:18 182:1
  186:13 189:12
  191:2 206:10
  207:19,22
  208:11 228:8
  232:3 242:5

**michelle's**
  189:10
**microphone**
  208:15
**microscopist**
  51:17,20
**middle** 116:12
  147:14 173:25
  174:18 176:17
**mill** 235:22
**milled** 236:3
**millers** 235:20
**mind** 12:23
  20:7 38:11
  51:15 116:10
  130:5 169:6
  175:6 199:25
  200:2
**mine** 243:4
**mined** 236:3
**mineral** 136:21
  137:10,20
**mineralogist**
  43:19
**minerals** 188:7
**miners** 235:19
**minh** 4:18
  108:12
**minimum**
  21:17
**minute** 16:25
  53:1 163:21
  197:17 237:6
  239:3
**minutes** 17:2
  23:13,22 48:17

[minutes - nhs]                                          Page 31

| | | **n** | |
|---|---|---|---|

51:21 74:3
139:6 146:21
169:14 187:21
192:6 198:4,6
198:19 201:12
204:1 206:9
**miscellaneous**
170:8
**missing** 169:16
**misstates** 43:6
48:12 55:6
64:12 144:8
201:9
**mistaken** 126:8
**mixtures** 5:16
168:9,15
**models** 173:23
**moderate** 224:4
224:14
**modern** 224:19
**moment** 14:7
23:20 109:4
123:3,12
145:17 161:18
161:20 204:25
**monday** 242:21
**money** 21:14
**mono** 71:7
**monograph**
3:23 56:17 58:7
85:17 212:12
212:15,20
**month** 103:15
**months** 35:20
36:12 56:14
88:12,14,16,21

88:21 112:22
**montreal** 29:10
29:19,21 30:1
33:10
**moorman** 97:3
97:10
**moot** 226:20
**morning** 10:11
10:12 207:24
**motivations**
131:15
**mouth** 102:24
**mouthwash**
176:25 177:7
180:10
**move** 20:23
26:21 78:11
89:11 108:3
112:11 139:14
142:3 204:9
241:9
**moved** 35:13
140:3,3 167:20
**moving** 19:13
45:9 109:22
**mparfitt** 2:7
**mph** 4:19
108:13
**msc** 1:9 3:4,18
4:14 8:23 70:19
106:13 243:7
**multiple** 52:11
52:17 82:9
234:14
**myong** 17:25

**n** 2:1 3:1 4:1
5:1 6:1 30:11
168:20,22
**naive** 130:4
**name** 4:4 5:4
6:4 10:13 39:9
132:4 168:25
169:3 233:19
**names** 54:7
206:20,23
**naming** 194:23
**national** 17:7
73:23,24 127:6
133:22
**natural** 213:23
218:22
**nature** 197:3
198:12 217:10
**nci** 39:14,15
60:11,23
133:10,18,22
134:10 213:5
214:17,21,25
**near** 23:8
**necessarily**
15:21 104:6
191:20
**necessary**
205:20
**need** 31:16
46:21 50:2 52:2
52:24 77:19
102:19 122:4,5
128:19 131:10

178:14 183:15
201:21 212:13
239:24 242:20
**needed** 63:1
218:23
**needs** 238:20
**neither** 72:3
**never** 9:10
35:24,25 38:4
38:21,21,25
41:20 42:20
71:19,20 75:8
75:23 94:12,13
165:12 172:6
213:14,21
214:20,22
219:21 229:12
**new** 1:1,13 2:23
2:23 15:11 16:3
33:16 47:2,23
48:3 49:17
50:16 55:4
56:16 129:4
135:4 142:18
187:17 205:15
212:7,8 244:7
**newcastle**
70:25 73:16
**newly** 205:15
**news** 17:14
135:25
**newsome**
206:21
**nhs** 68:8,8,12
68:14 69:1,3,9
69:12,17 72:6,9

**[nhs - objection's]**                                                              Page 32

72:19

**niehs** 126:9

**nine** 23:9 56:14

**noah** 2:22
58:10,12 61:2
69:21 85:19,22
86:15 89:14
91:7,18 105:1,2
109:8 112:18
112:21 113:1,7
113:17 142:6
145:22 156:5,9
156:15 169:18
173:1,24
194:16,17
204:21

**noah.epstein**
2:25

**non** 60:2,6
185:10 187:3
188:16 190:8
191:9,18
195:10 196:21
197:25 199:3
199:15 200:8
203:17

**nonfinancial**
143:25

**nonsignifican...**
220:4

**nope** 38:6

**normal** 213:23

**north** 126:7

**notarized** 32:7

**notary** 1:12
244:7 245:24

**notation** 160:24

**note** 12:20,21
159:19 160:2
244:21

**noted** 184:10

**notes** 12:6
206:9

**notice** 6:13
114:16 209:20

**notion** 146:12
147:11

**notions** 148:4

**november** 9:7
11:13 47:5 52:1

**null** 9:16
192:22 205:22
206:1

**number** 69:7
138:2 151:3
194:17 209:18
209:25 216:3

**numbers** 109:9
119:14 135:10
135:13 182:8
201:25 203:14
203:22,25
216:1 219:22
219:23

**numeric** 191:23

**numerical**
191:20,24

**nurses** 73:22,25

**o**

**o'brien** 5:14 6:8
18:10,22 68:11

68:15 69:5
71:25 72:10,12
72:15 125:23
149:11,15,19
154:25 161:11
161:17 162:5
166:3 178:5
184:5,11,16,20
184:24 185:8
185:17 189:1
190:21,22
193:18 194:5
194:11 195:2
202:15 222:19

**o'brien's**
165:23

**object** 25:5
78:7 86:8
174:25

**objection** 13:10
23:17 24:10,23
25:15 26:7,11
26:19 28:1,8,14
34:12 38:5 40:7
40:19,25 41:15
43:5 48:12 49:4
49:13 50:11,22
54:3 55:6,23
59:2,17 61:24
62:8 63:2,24
64:12 68:1,9
71:24 73:4 75:9
76:19 81:12,23
83:24 84:13
87:17 88:3
93:13 97:13

100:2 112:8
114:9 125:12
125:19 126:15
126:21 127:15
130:11 132:19
134:5 135:7
136:9 138:23
139:4,19
140:11 141:18
144:7,17
147:13 149:14
157:9 159:23
160:4 161:1
163:17 170:16
171:12 177:11
178:24 179:4
180:6,12 181:5
181:13,23
182:2,6 183:13
184:1 185:12
196:15 200:15
200:23 201:8
203:19 204:4
207:15 227:22
228:16 229:17
231:20 232:1
232:23 233:21
234:8,16,24
235:7 236:14
236:21 237:16
237:21 238:10
239:1,15
240:18 241:4

**objection's**
28:13

**[objective - opinions]**                                    Page 33

| | | | |
|---|---|---|---|
| **objective**  131:1 | 94:11 98:21 | 113:10,20 | 222:24 223:16 |
| 221:17 | 102:2 124:24 | 114:2 115:5 | 223:22 229:21 |
| **obliged**  25:8 | 143:23 146:3 | 118:17 120:4 | 233:10 238:18 |
| **observe**  218:9 | 150:19 154:14 | 122:22 124:4 | 239:25 241:15 |
| **observed** | 162:25 163:23 | 124:21 125:22 | 242:22 |
| 105:12,13 | 175:13 184:10 | 127:18 129:3 | **old**  219:5 |
| 167:2 | 208:3 242:6 | 134:13 141:17 | **older**  76:18 |
| **obstetricians** | **okay**  8:10,18 | 142:9 144:13 | **once**  214:1 |
| 38:1,14 | 10:3,6,16 11:11 | 145:12 149:3 | **oncology**  39:5 |
| **obstructed** | 12:4,10 13:14 | 151:14 156:11 | **ones**  12:16 15:5 |
| 183:4 | 14:19 17:10 | 156:18 160:11 | 18:6 42:23,23 |
| **obvious**  141:4 | 18:5,18,25 | 164:11,22 | 50:16 67:20 |
| **obviously**  15:22 | 20:13 21:25 | 165:16 166:7 | 104:4,5,6 |
| 103:2 148:21 | 22:20 28:22 | 166:12,22,24 | 171:24,25 |
| **occasion**  71:20 | 29:3,9,22 30:3 | 167:7,10,19 | 198:22 |
| 237:2 | 30:16 36:22 | 168:7 170:25 | **ongoing**  17:16 |
| **occupational** | 44:23 48:19 | 172:17 174:6 | 33:13 |
| 4:6 91:3,24 | 52:24 53:2 | 174:12,14 | **onset**  141:1 |
| 235:23 | 55:11,15 58:2,5 | 175:13 176:21 | **open**  41:18 |
| **occurred**  53:18 | 58:15 61:19 | 176:22 180:2 | 174:23 |
| 224:20 | 64:8 67:2,4 | 181:8,25 184:4 | **opining**  211:15 |
| **odds**  116:11 | 80:15 82:22 | 184:23 185:2 | **opinion**  43:2,13 |
| **offer**  56:10,19 | 83:11,12,16 | 186:24 187:16 | 43:17,17,18 |
| **offered**  57:10 | 85:4,14 86:11 | 187:18 189:18 | 47:2 48:8 50:1 |
| 81:20 137:9 | 87:3,20 88:23 | 190:1 191:3,4 | 55:4,16,18,20 |
| **offering**  43:2 | 89:11 91:21 | 192:14,14 | 129:12 130:20 |
| 43:17,18 55:16 | 92:8,10,16 | 193:11,16 | 135:12 154:3 |
| 55:20 207:12 | 93:17 94:11,25 | 194:17,20 | 207:12 231:23 |
| 232:8 | 95:2,19,20 | 196:12,19 | 232:8 239:13 |
| **office**  7:4,15 | 96:13,18 97:22 | 199:20 200:13 | 239:16 |
| **oh**  10:19 11:24 | 98:2,21 99:8 | 202:6,18 204:6 | **opinions**  15:23 |
| 18:5 22:4 27:19 | 106:6 107:7 | 204:9 206:6,12 | 37:3 44:3,6,7 |
| 29:22 30:12 | 108:3,22 | 207:18 208:7 | 48:21 56:6 |
| 61:9 67:12 70:6 | 109:23 110:4,6 | 209:3,13 210:5 | 131:12 132:6 |
| 72:9 87:14 | 111:7,18,22,24 | 216:12 217:10 | 147:23 210:19 |
| 89:12 91:14 | 112:3,11,15 | 218:1 222:16 | 213:16,18 |

**[opinions - page]**

Page 34

214:19 218:14
**opposite**  107:12
**optimal**  60:6
**order**  158:4
    159:5 200:22
    224:12 236:4
**organization**
    37:10,15 134:1
    134:4,11
**organizations**
    36:23,24 37:8
    37:12 213:6,15
    214:4,11,21
    215:1
**orient**  185:25
**origin**  54:17
**original**  65:1,2
    177:25 224:18
**originally**  54:6
    54:12 124:14
    184:12
**origins**  47:7
**ottawa**  70:25
**oules**  21:3,4
    89:22
**outburst**
    207:25
**outcome**
    164:16 165:6
**outcomes**
    235:24
**outreach**  36:22
**ovarian**  3:16
    4:7,10,10,16,21
    5:6,9 6:7,11
    9:11 17:8 18:1

27:14 30:5
32:25 33:6,16
36:24 37:8,20
39:2,16,23 40:2
40:6,17 41:13
58:21,24,25
59:11 60:1,5,13
60:24 61:22
62:17,21 63:1
70:17 91:4,24
93:3 94:22 95:5
95:5,10,11 97:5
104:16 105:15
108:11,17
113:22 114:3
123:7,16
127:24 128:5
134:17 135:4
136:1,5 137:1
137:25 138:21
139:16 140:8
141:14 142:12
142:21 149:23
150:6,16,23
151:10 152:6
153:7 155:2,12
155:23 156:24
157:22,25,25
158:3 159:5,21
160:14 165:25
166:18 170:15
173:22,25
174:20 176:17
177:10 178:2
179:10 188:4
190:23 192:20

194:4 195:2
197:24 204:13
204:17 205:21
207:10,14
210:21 211:1,6
211:10,17
212:17,17
215:10,13,13
217:22 218:11
222:5,20
223:10,12,23
224:9,10
225:13,17
231:24 232:22
232:25 233:6
236:8,12,18
237:3 238:4
241:23
**ovaries**  154:10
    154:18 222:11
**overall**  159:4
    219:3,11
**overlap**  114:22
    115:8,17,20
    116:4,5,6,19,20
    116:23 117:16
    118:23 119:3
    119:10 120:3
    122:19 183:22
    183:25 185:11
    185:22 188:15
    193:1,9,13
    195:11,13,14
    196:22 200:12
    204:7

**overlapped**
    66:20,23 68:25
    190:9
**overlapping**
    187:11
**overlaps**  107:18
    107:22 108:1
    191:24
**oversight**
    124:18
**own**  7:15 43:19
    44:4 53:8,12
    65:25 86:21
    202:3

**p**

**p**  2:1,1 4:12
    5:10 95:12
    142:13
**p.a.**  2:10
**p.m.**  243:7
**p1**  6:14 209:19
**page**  3:3,13 4:4
    5:4 6:4 9:8,13
    9:21 89:17,18
    95:17 98:7
    101:8,20
    104:21,24
    105:8,19
    108:22,23
    109:9 110:1,12
    142:3 143:21
    143:22 145:23
    146:24 147:1
    150:11 151:2,3
    151:4 155:15

**[page - parfitt]** Page 35

| | | | |
|---|---|---|---|
| 155:17 160:12 | 81:25 82:9 | 169:3,11,22 | 130:10 148:24 |
| 164:21 165:9 | 86:23,25 90:4 | 170:11,13 | 153:10 188:21 |
| 177:2 179:17 | 91:1,3 92:5,6 | 177:22 179:7 | 192:15,17 |
| 179:19 192:10 | 92:16,25 93:2 | 180:25 182:19 | 199:8,10 |
| 193:3 196:9 | 93:11 94:5,7,15 | 184:5 185:6,14 | 205:24 206:2 |
| 197:15,18 | 95:9,19 96:1,15 | 185:17 186:22 | 212:6,9 221:5 |
| 198:1,10,16 | 96:21 97:24 | 187:20,20 | 236:7 |
| 199:14 201:25 | 98:1,13 100:19 | 188:14,16,22 | **paragraph** |
| 202:14 203:8 | 100:25 101:2,7 | 190:7 191:13 | 105:13 110:24 |
| 209:7,10 210:1 | 103:12,24 | 192:12,12 | 111:1 156:12 |
| 210:2,6 218:5 | 104:7,9,11,14 | 194:2,8,12 | 156:14 160:23 |
| 223:2,2 225:24 | 106:23 107:14 | 195:3,8,9,11,25 | 165:1 193:4 |
| 230:14,22,22 | 107:18 108:6 | 196:14,20 | **paragraphs** |
| 245:6 | 108:10 109:1 | 197:23 198:2,3 | 127:3 147:5 |
| **pages** 101:6 | 109:18 111:11 | 198:7,9,11,16 | 201:18 |
| **paid** 19:25 20:7 | 112:13,14 | 198:16,24 | **paralegal** |
| 20:13,16 83:18 | 113:9 123:1,3,6 | 199:1 200:3,7,9 | 174:13 |
| 84:11,25 93:19 | 123:11,15 | 200:18,22 | **parameter** 65:6 |
| **painfully** | 124:3,6 125:16 | 201:1,5,13,17 | 67:18 115:16 |
| 219:12 | 127:3,23 128:4 | 201:21 203:13 | **parameterizat...** |
| **pair** 110:16,16 | 128:25 129:3,9 | 204:2,11,16 | 82:2 |
| **panel** 212:14 | 129:19,20 | 205:10,12 | **parameters** |
| 236:24 | 130:7 131:5 | 212:7,8 220:9 | 62:12 164:1 |
| **papantonio** | 134:14 141:25 | 220:10,11 | **parfitt** 2:5 3:6,8 |
| 2:10 | 142:11 143:3 | 229:4,7,13 | 7:1,1,13,18,22 |
| **paper** 4:5,8,15 | 143:13 144:5 | 230:6 231:5,8,9 | 8:1,6,9,12,18 |
| 4:20 5:5,8,11 | 144:15,24 | 231:11 234:7 | 9:3 10:3,8 11:8 |
| 5:15 6:5,9 30:8 | 145:1,16 | 235:12,15 | 11:11,20,24 |
| 30:20,24 31:9 | 146:18,20 | **paper's** 171:19 | 12:3,20 13:10 |
| 31:16,25 32:13 | 150:21 152:11 | **papers** 32:3 | 13:14,17 14:12 |
| 32:19 35:5,18 | 153:11 162:2 | 35:2,8 63:18 | 15:2 16:11 |
| 35:18,25 36:8 | 163:15 165:23 | 66:21 80:9,22 | 17:17 18:3,9,17 |
| 63:9,21,22 64:9 | 166:3,4,6,16 | 81:9,15,20 | 18:19 19:2,6,10 |
| 64:20 65:17,21 | 167:14,15,22 | 104:2 107:22 | 19:15 20:4,22 |
| 66:13 67:9 68:7 | 167:23 168:8 | 108:1 111:25 | 20:25 21:4 22:6 |
| 68:7 74:3 80:8 | 168:14,25 | 126:24 127:1 | 22:9 23:17 |

**[parfitt - past]**                                                    Page 36

| | | | |
|---|---|---|---|
| 24:10,16,23 | 106:22 107:8 | 186:5,10 | 116:16,17 |
| 25:4,15 26:7,11 | 108:5 111:19 | 187:15,17 | 126:5 131:3,4,5 |
| 26:19 27:2,21 | 112:8,24 113:7 | 190:11,17,19 | 139:7 209:5 |
| 28:1,8,14 30:24 | 114:9 123:2,12 | 191:3 194:10 | 212:24 214:18 |
| 31:12 34:12 | 123:23 124:1 | 195:21 196:2 | 215:1 216:23 |
| 36:17 38:5,7 | 125:12,19 | 196:15 197:2 | **participants** |
| 40:7,19,25 | 126:15,21 | 197:10 200:15 | 98:4,5 99:10 |
| 41:15 43:5 | 127:9,15 128:9 | 200:23 201:8 | **participate** |
| 44:24 45:4,18 | 130:11 132:19 | 202:19 203:19 | 56:16 236:23 |
| 45:21 46:1,7,15 | 134:5 135:7 | 204:4,25 205:3 | **participated** |
| 46:17 47:20,25 | 136:9 138:23 | 206:11 207:15 | 37:17 |
| 48:4,12 49:4,13 | 139:4,19 | 208:3,7,10,13 | **participating** |
| 49:22 50:3,11 | 140:11 141:18 | 208:19 209:13 | 86:25 |
| 50:22 51:22 | 142:3,25 144:7 | 209:16,22 | **participation** |
| 53:2 54:3 55:6 | 144:17 145:17 | 210:4 227:5,12 | 29:5 |
| 55:23 57:25 | 145:19 147:13 | 227:14,22 | **particles**  54:11 |
| 59:2,17 60:18 | 149:14 150:8 | 228:5,16 | 79:14 154:9,18 |
| 61:9,24 62:8 | 150:12,25 | 229:17,22 | 159:1 222:10 |
| 63:2,24 64:4,12 | 152:7 153:17 | 230:11,15,21 | **particular**  39:8 |
| 67:5 68:1,9,17 | 154:2 155:17 | 231:20 232:1,5 | 65:8 73:19 76:4 |
| 68:23 69:24 | 156:9 157:9 | 232:14,23 | 76:10 98:22,23 |
| 70:2,6 71:24 | 158:21 159:23 | 233:21,24 | 98:24 212:20 |
| 73:4 75:9,16 | 160:4 161:1,12 | 234:8,16,24 | **particularly** |
| 76:19,23 77:2 | 161:18,20 | 235:7 236:14 | 71:20 150:6,16 |
| 77:15 78:7 | 162:9,23 163:3 | 236:21 237:16 | 150:18,22 |
| 81:12,23 83:24 | 163:17 166:1,7 | 237:21 238:10 | 152:5 153:7,16 |
| 84:13 85:10,14 | 169:19,25 | 239:1,15 | 154:14,23 |
| 86:2,6,12,23 | 170:4,16 171:4 | 240:18 241:4,9 | 155:2 157:6 |
| 87:17 88:3 90:5 | 171:12 173:13 | 241:17,20 | 158:18,23,23 |
| 91:9,14 93:13 | 174:24 177:11 | 242:6,9,13,24 | 159:12,21 |
| 94:18 97:13 | 178:24 179:4 | 243:2,3 | 160:24 166:23 |
| 100:2,14 101:3 | 180:6,12,17,24 | **park**  126:9 | 191:14 207:25 |
| 101:18 102:2 | 181:5,13,23 | **part**  15:17 | **partly**  141:6 |
| 103:9,22 104:1 | 182:6,13,20 | 16:19 23:11 | **past**  21:8 87:24 |
| 104:20,23 | 183:1,13 184:1 | 25:16 34:14 | 118:6 172:12 |
| 105:4,9,19 | 185:12,23 | 88:5 114:20 | |

**[patent - plaintiff's]** Page 37

**patent** 69:17
75:4,6,8,22,24
78:19 79:5 80:4
80:12 155:13
155:24 156:25
185:9,10,21,22
187:3,3 188:14
188:16,20
190:7,8 191:8,9
191:14,18,18
192:23 195:10
195:10 196:21
196:21 197:24
197:25 199:2,3
199:14,15
200:8,8 203:5,6
203:15,17
**pathologists**
135:18
**pathway**
231:24 233:7
**patients** 151:10
**patricia** 97:3
**patrick** 2:5 7:4
7:10,15 15:19
16:14 58:1
176:6,10,14,15
176:21 209:22
209:24 210:1
230:16,18,19
**patterns** 5:12
161:9,15 162:3
162:11,14
163:12
**payment**
111:14

**payments**
110:19
**pdf** 194:23
**pdq** 17:7 39:14
213:5,12
214:17,21,25
**pearson** 12:16
**peer** 235:13
236:11
**pending** 186:8
202:20,22
**pennsylvania**
2:17
**pensacola** 2:12
**pension** 24:6,8
24:22 25:12,23
26:4 29:25
**people** 8:1
73:17 79:4
120:17 135:5
219:5,6 225:1
230:7
**percent** 26:1,3
26:5 58:25
59:14 60:5
117:25 121:18
121:22 122:2
122:14 179:24
180:5 181:16
184:21
**percentage**
23:3,15 24:14
60:9
**perfect** 209:23
**performed**
224:1

**perineal** 3:15
33:8 34:5 35:10
58:24 59:15
61:23 70:16
81:17 93:5,12
162:10 170:14
178:2 197:23
**period** 69:6
135:23 137:24
138:7,11
140:23 141:2,6
216:23 217:7
217:11,13,15
**periods** 138:15
**permission** 9:4
9:5
**person** 96:7,10
111:24 112:3
125:8,15 132:3
133:1,19
**personal** 5:16
44:4 168:9,15
173:21
**personally**
62:22
**persuade** 43:25
**persuaded**
41:18
**persuasive**
212:2 226:6,6
**pertaining** 33:5
**pertains** 186:19
**ph.d** 243:7
**ph.d.** 1:9 3:4
8:23 29:13

**phd** 4:14,19 6:8
106:13 108:13
194:5
**philadelphia**
2:17
**phone** 237:11
238:24 240:16
**phones** 237:19
237:20 238:5,8
238:17 239:7
240:9
**phung** 4:19
108:4,8,13,18
111:10
**physicians**
135:18
**pieces** 133:21
140:13
**pile** 18:8 45:1
**piles** 63:16
**place** 38:23
111:4 175:11
**places** 203:9
**plaintiff** 2:3 7:3
144:6
**plaintiff's** 6:13
30:21 31:10
53:6,16 54:2,21
55:12 57:5 63:6
63:22 88:9,24
89:6 145:9
207:6 209:17
209:19,25
230:9,13
234:14,20,22
235:3

**[plaintiffs - presence]** Page 38

**plaintiffs** 7:8
32:4 57:12
63:10 112:6
206:17 207:3
207:10 234:19
**plan** 233:4,8
**planning**
232:20
**plausibility**
210:21 211:3
211:17
**plausible**
115:20
**play** 138:14
**played** 136:25
**please** 10:8
31:19 49:19
58:10 74:14
77:25 78:11
95:16 105:2
145:22 153:19
154:2 205:1
**plug** 118:3
**plyons** 2:8
**point** 21:16
43:9 44:25
56:24 98:24
99:22,23,25
101:19 104:20
104:24 105:8
107:4 114:17
114:24 116:1
117:10,20
118:3,15,18
119:6,13
120:19 124:16

130:7 147:10
148:2 172:1
178:10 186:18
192:8 195:16
197:22 198:9
198:20 202:2
221:18,19,19
225:23 226:19
227:19,24
229:16
**pointed** 89:1
114:25 115:1
192:6 218:16
**points** 131:17
**policy** 32:2,6,7
**pollution** 158:6
**population**
62:12 121:3,4,5
164:2
**populations**
226:13
**portion** 26:15
**position** 43:4
237:14,25
**positive** 126:10
155:11,21
156:23 157:7
157:19 188:3
**possibility** 29:4
41:10 79:24
136:24 239:10
**possible** 79:13
116:21 117:8
122:9 152:18
168:2 214:12
214:13 235:24

241:13
**possibly** 140:3
**potential** 35:18
53:8 56:10
57:21 124:22
159:1 210:10
211:2 236:17
**potentially**
167:1,9 240:20
**potentially's**
167:11
**powder** 1:4
3:15 4:9 5:9 6:6
9:10 40:18 43:3
47:2 53:9 55:21
70:16 79:9
83:21 94:21
95:4,9 104:16
105:15 136:7
136:13,13,18
136:20 137:5
138:19 139:13
139:15,22
140:4,16,20
141:15 142:11
142:21 150:5
150:15 151:10
152:5,17 153:7
153:15 155:12
155:22 156:24
159:20 160:14
167:4 188:4
190:22 192:19
194:3,12 195:1
207:7,13
211:17 212:16

215:10,12,20
216:8 222:20
223:9,23
225:17 231:19
**practice** 37:11
**practices** 1:4
135:22
**pre** 6:13 209:20
**preamble** 99:15
99:17
**precipitous**
136:7 139:16
140:8
**precipitously**
136:2,6
**precise** 121:15
215:4
**precision**
120:21,21
**predict** 71:13
**prefer** 25:10
**prejudiced**
131:14
**premise** 240:7
**preparations**
43:24
**prepare** 13:5
13:15,18,21
216:15
**prepared** 11:19
**preparing**
103:20,25
**preprint**
162:18 163:19
**presence** 29:15
47:9

**[present - published]**                                                                 Page 39

**present** 60:7
210:10 221:2
222:6
**presentation**
163:25
**presented**
199:10
**president** 214:8
**pretty** 7:25
120:1 171:2,10
**prevent** 211:15
**prevention**
125:10 133:10
133:18
**previous** 11:5
79:3 132:15
167:2
**previously**
19:22 65:4
**primary** 212:21
**principal** 33:24
34:15
**principle** 71:8
**print** 175:9,10
**printed** 10:24
**prior** 13:5,9
15:17 47:22
133:14 152:19
239:16 241:6
**priorities** 34:14
35:3
**priority** 34:18
**private** 127:7
129:21 130:24
**probability**
121:18,22

122:14
**probably** 15:8
34:19,24 56:14
64:25 73:11
76:9 103:16
129:13 149:4,5
229:25
**problem** 7:22
7:23 79:1 108:7
108:8 109:17
128:14 161:21
221:1,8,9
**problems** 45:5
218:15
**procedures**
34:3
**proceed** 9:2
16:10
**proceeding**
206:18
**process** 14:1
228:19
**proclaimed**
137:9
**produce** 57:13
220:1,2,3
**produced** 12:14
15:17 49:1,7
50:9,19,25
57:23 83:21
140:13 216:7
**product** 5:16
165:20 168:9
168:15 173:21
**products** 1:4,5
3:16 47:6,7,17

48:10 49:12
50:10 53:19
54:11 55:1,2
56:4 70:17
83:21 136:22
137:10,21
140:6,19
174:19 177:6
216:8 231:17
**professional**
133:13 207:25
244:5
**professor** 29:18
29:20,23
**program** 49:11
50:10 132:17
**programming**
125:1
**pronounce**
10:13
**proper** 93:9
97:18
**properly** 74:4
**proponent**
131:8
**proportional**
173:23
**proposed** 37:3
188:6
**proposition**
220:18
**prospective**
5:19 168:11,17
**prospectively**
167:5

**protection**
209:4
**proves** 220:18
**provide** 24:17
57:12 84:20,22
**provided** 16:13
42:17,18 53:6
54:2,12,15,20
55:12 83:18
84:19 87:1
125:1,3 199:2
216:5
**provides** 82:1
187:2 211:2
**providing**
84:11 125:18
**public** 1:12
32:24 36:23
37:7,10,12
136:1 214:6,14
225:10 233:13
244:7 245:24
**publication**
6:13 168:5
177:25 209:20
227:19 228:13
**publications**
30:4 32:9 77:7
78:5,18,25
126:4 213:25
227:24 235:21
**publish** 29:13
33:15 34:8
**published** 18:2
30:13 32:18
34:10 35:7,9

**[published - rate]**                                                        Page 40

| | q | | |
|---|---|---|---|
| 95:7 113:14 | | 177:12 180:22 | 215:17,21 |
| 124:6 149:12 | **qualified** 100:7 | 181:1 183:15 | 216:1,10 227:9 |
| 149:16,20 | **qualifier** | 185:5 186:2,8,9 | 227:15 241:16 |
| 178:1 195:2 | 167:11 | 186:16,19 | 242:10 |
| 199:8 205:15 | **quality** 70:21 | 187:15,17 | **quick** 52:25 |
| 212:6 226:15 | 71:6,9 73:10 | 188:18 190:16 | 227:8 241:17 |
| 229:13 235:12 | 74:10 131:16 | 193:11 195:7 | **quickly** 19:18 |
| 236:10 241:23 | 148:9 218:21 | 195:15 198:13 | 44:25 |
| **publishers** 93:9 | 220:24 | 198:15 199:23 | **quite** 66:6 |
| **publishes** 212:8 | **quantitative** | 200:22 202:19 | 72:17 101:19 |
| **pull** 15:7 | 6:10 204:12,16 | 202:22 203:1 | 129:1 132:18 |
| 113:11 173:4 | **quebec** 235:20 | 203:11,21 | 132:20 158:1 |
| **pulled** 86:16 | 236:3 | 205:25 215:5 | 218:13 235:1 |
| 109:10 | **question** 14:14 | 217:23,24 | **quote** 47:17 |
| **purpose** 205:18 | 14:25 19:11 | 223:13 228:7 | 146:11 147:11 |
| **purposes** 64:10 | 25:3,20 28:2 | 228:10 232:13 | 227:21 228:15 |
| 177:16 216:16 | 31:13 37:6 | 232:18 233:1 | |
| **purview** 213:20 | 39:12 46:20 | 235:1 238:19 | r |
| **put** 9:17 37:2 | 50:7 60:10 66:2 | 239:22 240:5,7 | **r** 2:1 244:1 |
| 42:16 61:6,10 | 68:22 69:2 | 241:25 | 245:1,1 |
| 69:21 85:10 | 71:18 73:6 74:8 | **questioning** | **rack** 90:13 |
| 86:7 89:13,14 | 74:9,13,16,17 | 103:2 | **rafferty** 2:10 |
| 91:7,8,19 105:2 | 75:11,13,15,18 | **questionnaire** | **raise** 8:20 39:16 |
| 105:9 119:1,2 | 78:2 79:16,18 | 34:4 72:17 | 153:24 |
| 131:12 142:15 | 79:19,21 80:1 | **questions** 34:5 | **ran** 122:16 |
| 145:22 149:2 | 80:14 83:11 | 45:10,25 46:6 | **range** 21:18 |
| 156:5 161:22 | 90:1,11 98:15 | 46:12,19 72:16 | 115:20 120:5 |
| 169:17,21 | 99:18,19 | 74:2,15 78:12 | 121:1,23 122:8 |
| 172:21 173:18 | 100:12 101:11 | 79:3 102:16 | 138:2,9 224:8 |
| 176:15,16 | 102:6,8 117:15 | 104:7 135:16 | 225:13 |
| 204:22 209:11 | 135:19 139:25 | 164:5 173:16 | **ranges** 116:20 |
| 217:2 230:17 | 140:9 141:6,7 | 178:19 180:24 | 122:14,16,17 |
| 230:17 | 141:11,12,20 | 182:16,18 | 122:19 |
| **puts** 194:16 | 146:9 147:14 | 207:19,20 | **rarity** 223:12 |
| **putting** 85:20 | 158:12 165:18 | 208:22 209:1 | **rate** 73:2 135:4 |
| 173:11 226:21 | | 211:11 213:4,8 | |

**rates** 134:17
136:6 137:1
138:21 139:16
141:15
**rather** 93:11
113:14 157:5
157:16
**ratio** 58:16,19
59:12 60:7 82:8
116:11 174:20
177:9 179:9,24
180:3 181:3,11
182:24 183:8
183:10 184:11
184:18 185:8
190:6 192:21
200:8 203:15
**ratios** 65:11,16
81:9,21 176:24
178:22 187:3
198:6 201:7,13
**rausa** 206:21
**raw** 66:16
**reach** 37:12
56:9
**reached** 37:1,7
38:25 39:15,21
174:10 213:11
213:15 234:14
**reaching** 48:21
154:10,18
213:5
**read** 16:18,19
18:3 38:21
40:21 53:20
56:2,7 61:14

72:18 77:18,19
79:17 83:14
96:25 97:8
98:12 110:13
111:6 124:7
137:17,19
140:14 143:12
143:15 157:2
162:21 163:8
165:2 169:7,10
170:3,19,20
171:2,10,15,16
172:7 186:11
186:24 188:11
196:13 197:6
197:15,17
198:4,8,11
200:2,3,18,21
201:4 203:12
204:1 210:12
228:13 230:6
230:21 231:7
242:14 245:2
**reader** 199:25
**reading** 51:10
51:12 53:13
74:3 77:11,15
77:22 87:11
111:12,25
125:8,15 130:5
149:6 152:11
171:21 188:8
**reads** 112:4,4
**ready** 10:6
36:14 208:7
218:6

**real** 44:25
227:8
**realize** 153:21
**really** 42:22
79:7 107:1
111:13 114:15
120:6 121:7
131:9 166:9,11
178:18 202:2
208:16 213:17
228:17
**realtime** 244:6
**reason** 57:3,3
70:5 91:13
107:25 109:8
135:21 184:15
**reasonable**
138:10
**reasons** 117:8
**recall** 6:10
13:12 21:11,11
30:23 31:4,8,23
32:1,22 33:1
48:7,15,15
51:10,12 52:19
63:20 65:9
69:15,16,18
72:20,24 76:9
79:19,20,21
88:20 89:10
92:21 93:17,23
93:25 94:1
97:17 100:24
103:13 104:8
104:10 125:25
126:25 129:18

129:22,24
132:14 142:1
148:21,23
149:1 164:4,5,7
164:9,10,16
165:5,11,19,22
166:25 167:1,6
169:7,10
191:16 198:24
199:1,4 203:21
204:12,16
205:20 206:3,5
208:20,25
215:4 228:17
229:2,7 230:5
237:13,24
238:25 239:4
239:11 240:9
240:10,17,25
241:5
**recalled** 164:14
165:4
**recalls** 31:16
**received** 22:16
97:4
**recent** 44:14
54:23 212:3
**recently** 35:13
51:18 56:11
103:17 163:20
171:2,10
208:23
**recognize** 68:4
**recognizes**
210:9

**[recollecting - remote]**

Page 42

**recollecting**
126:10 217:4
**recollection**
14:6 21:7 44:16
44:19,21 92:17
104:19 107:17
**record** 16:25
17:3,5 18:4
23:22 28:13
52:2,25 76:23
82:12 96:4,21
96:23 101:22
111:19 124:1
127:19 128:19
161:5 175:10
202:9,11,12,14
206:8 208:17
237:6,7 239:24
**records** 207:1,2
**red** 11:14
**redirect** 232:4
**redline** 11:18
11:22 42:5
124:8
**redlined** 42:11
**reduced** 151:18
154:7,9
**reevaluated**
212:22
**refer** 47:16
**reference** 9:14
160:24 214:22
**referenced**
44:10
**references**
44:17,20 53:14

56:3 126:5
**referencing**
216:3
**referring** 51:25
81:7 185:24
187:6,7,10
189:16 197:16
198:23 200:4
228:5
**refers** 20:20
227:20 228:10
**reflect** 101:22
111:20 124:2
**reflected** 65:17
**reflects** 80:24
81:1
**refresh** 33:2
92:17 104:19
163:22
**refusing** 178:21
179:2
**regard** 97:5
101:7 135:18
208:22 210:19
215:17 216:13
241:22
**regarding** 53:8
211:9 221:20
225:20
**registered**
244:5
**regular** 243:2
**reinforces**
212:10
**related** 4:22
32:3 62:20

74:16 79:6
87:12 97:4
123:8,17 207:2
235:5 236:8
**relates** 59:15
140:7 141:15
**relation** 75:10
**relationship**
79:8 100:20
104:15 106:4
210:20 211:16
**relative** 59:22
59:24 60:7
62:10 66:3,6,10
66:12 80:23
114:13 115:21
120:8,9,14
121:2,12,16,19
122:9,13
157:23,24
158:4,10 159:4
159:7 160:15
178:3,7 187:10
203:4 218:20
223:10 224:7
224:12,22,24
225:4,14
228:23
**relatively** 212:8
**release** 17:14
**relevant** 32:17
48:23 79:22
143:24
**reliability** 5:13
161:9,16 162:4
162:12,15

163:13 164:16
165:6
**reliance** 15:21
16:2,9,12 42:15
170:25 171:5
**relied** 48:8
177:15
**rely** 214:16
216:16,18
218:24
**relying** 47:1,11
47:13 56:6
**remember** 10:1
26:16 27:10
42:5 50:12
53:17 56:24
63:18 64:21
67:7 74:15
88:17 99:14
124:12 131:24
159:3,3 166:20
166:20 167:17
170:9,22
202:25 204:3
211:11 212:4
213:7 215:21
215:23 216:9
217:23,24
223:13 226:4
229:4 241:25
**remembering**
54:7
**remind** 47:21
**remote** 1:8
45:18 153:22
197:3

**[reorienting - result]**                                             Page 43

| | | | |
|---|---|---|---|
| **reorienting** | 200:11 201:16 | **represented** | **researcher** |
| 98:22 | 212:3 218:2,5 | 216:12 | 213:19 |
| **repeat**  57:15 | 222:18 225:16 | **reproduction** | **researchers** |
| 98:15 149:17 | 227:3,25 | 244:22 | 213:21 219:14 |
| 193:11 | 228:21 232:12 | **reproductive** | **resided**  236:2 |
| **report**  4:14 9:7 | 232:15 233:25 | 79:5 150:3,5,15 | **resituate**  238:1 |
| 9:23 10:21 11:3 | **reported**  5:13 | 150:22 152:4 | 239:6 |
| 11:5,12,16 | 113:21 161:10 | 153:6,15 154:6 | **respect**  25:22 |
| 15:23 16:5 | 161:16 162:4 | 154:11,16,22 | 134:9 165:12 |
| 17:13,19,20 | 162:15 163:13 | 155:14,24 | 180:22 |
| 27:10 37:3 | 184:13,19 | 157:1 159:8,14 | **respected**  134:4 |
| 41:23 42:1,9,10 | 185:20 188:14 | 159:20 191:9 | 134:10 |
| 47:14,15,24 | 188:16 190:7 | 203:5 | **respond**  74:14 |
| 48:3,9 49:18 | 191:14 195:11 | **reputations** | **responded** |
| 51:5,9,11,16,19 | 197:1,23 | 126:2 | 74:21 144:14 |
| 51:21,23 52:1 | 198:21 201:13 | **request**  8:22 | **responding** |
| 52:10 54:16 | 203:14 214:24 | 130:25 | 130:9,25 |
| 60:12 65:22,23 | **reporter**  1:11 | **require**  115:3 | **responds**  51:6 |
| 65:24 84:20,22 | 8:19 9:1 18:12 | 229:3 | **response**  51:20 |
| 85:1 88:10 89:3 | 94:9 202:6,10 | **required** | 74:16,23 |
| 89:8 90:15 97:6 | 242:19,22 | 136:15 | 100:20 104:11 |
| 101:11,12 | 243:1 244:5,6,6 | **requires**  220:20 | 104:15 105:14 |
| 102:12,18,20 | 244:25 | 226:25 | 106:3,20 |
| 103:1 105:24 | **reporting** | **research**  29:13 | 147:15 179:5 |
| 106:2,8,9,12,16 | 165:19,24 | 33:19,20,22 | **responsibility** |
| 106:24 107:6 | 166:17 167:25 | 37:13 38:23 | 214:5 |
| 107:15 124:9 | **reports**  42:22 | 53:7,12 60:13 | **responsible** |
| 124:10 126:5 | 47:13 51:12,13 | 60:25 126:8 | 211:4 |
| 129:4,7,10,20 | 51:14 52:5,12 | 129:16,21 | **rest**  231:7 |
| 129:23 141:25 | 52:17 87:7 | 134:12,12 | **restate**  238:18 |
| 145:14,25 | 110:19 111:9 | 137:17,18 | **restated**  60:3,4 |
| 146:7,10 149:4 | 111:14 124:7 | 143:16 152:23 | 238:20 |
| 150:2,11 153:4 | 196:20 200:7 | 214:3,12,13 | **result**  66:8,19 |
| 153:10 167:14 | 224:2 | 222:2 233:20 | 71:16 73:10 |
| 167:23 168:4,6 | **representation** | 234:1,5,6 | 178:1 214:24 |
| 170:13 186:22 | 78:10 215:9 | 235:17 | |

**[resulting - robust]**                                               Page 44

**resulting**
  218:13
**results**  9:9
  98:19 99:4
  100:23 172:3
  187:8,13
  188:19,20
  191:7,17,21,24
  192:7,8 195:17
  195:20 197:16
  198:16 199:9
  199:14 200:24
  205:21 213:17
  219:23 220:22
  220:25 221:10
  226:12
**retained**  26:25
  27:6,17,24 28:3
  28:16,25 93:20
  93:21
**retire**  24:3
**retired**  24:2
**retrospectively**
  167:4
**revenue**  23:7
  24:12
**review**  3:17 5:6
  13:4 15:21
  51:19 62:19
  70:18 127:23
  128:4 171:18
  171:20 177:14
  191:19 211:9
  211:14 212:11
  212:13 215:20
  217:21 218:9

  218:11 219:7
  221:7 223:24
  223:25 225:18
  237:2
**reviewed**  16:1
  16:4 48:25 49:9
  50:8 51:5,16
  52:4,18,19
  65:10 80:8
  175:2 235:13
  236:11
**reviewers**  36:4
**reviewing**
  50:12 100:24
  171:23
**reviews**  211:22
**rgolomb**  2:18
**richard**  2:16
  7:5,7,9
**right**  9:18 10:2
  10:3 15:7 16:24
  20:2,12 23:1,9
  27:16 48:15
  57:6,7 58:2,17
  61:8 68:2,8,8
  76:21 80:1
  82:11,15 85:8
  87:9 89:19
  91:14 94:12,14
  100:20 106:17
  106:20 108:25
  109:16 111:3
  112:18 113:24
  117:15 124:7
  125:18 128:1
  133:23 136:2

  142:16 145:20
  156:1,7 157:2,8
  159:22 164:21
  164:25 165:1
  169:12 172:14
  176:23 179:14
  183:22,25
  184:13,16
  186:5,22 187:4
  194:21 195:4
  195:22 201:23
  203:8,14
  208:10 210:14
  211:13 216:14
  218:4 227:5
  238:4,14
  239:17
**rigorous**  230:3
**ring**  38:10 52:8
**risk**  4:7,9,16,21
  6:7 37:20 38:24
  40:1,5 58:16,19
  59:12,13,22,24
  60:2,7,8 61:22
  62:10,14 65:11
  65:16 66:3,7,10
  66:13 81:9,20
  82:1,8 91:4,25
  94:21 95:4,10
  104:17 105:15
  108:10,16
  114:7,13 120:8
  120:9,14
  121:13,17,19
  121:21 122:14
  123:7,16 138:4

  138:13,13
  151:18 154:7,9
  157:6 158:10
  158:18 159:4,7
  160:15,15,16
  160:25 170:13
  178:3,7,22
  184:11,18
  185:8 187:3
  190:6 191:14
  194:4,13 195:1
  198:6,20 199:2
  201:6 203:3,4
  207:9 218:20
  223:10,11
  224:5,5,7,11,19
  224:19,22,24
  225:2,4,9,12,14
  226:17 236:6
**risks**  80:23
  115:21 121:2
  122:9 132:1
  150:6,16,23
  152:6 153:7,16
  154:15,23
  155:2 157:23
  157:24 158:4
  159:21 187:11
  211:4,5 224:7
  224:12,24
  228:23 235:19
  236:2
**rls**  1:2
**road**  2:6
**robust**  49:2,10
  50:9

**role**  20:16 28:6
**room**  7:11 8:5,7
**rough**  242:17
**roughly**  52:13
 140:23
**roughs**  242:18
**rpr**  244:14
**rrs**  9:15
**rule**  53:20
**rullo**  143:18
**running**  94:12
 163:1

**s**

**s**  2:1 3:11 4:3
 5:3 6:3 8:23
 245:1
**s4**  5:21 172:14
 172:16,25
 173:2,8,11,18
 176:16
**sales**  1:4
**sample**  120:9
 120:16 121:10
 121:12,15
 122:8
**sanchez**  52:5,7
 52:17
**savant**  19:1,2
**saw**  54:15
 132:4 177:21
**saying**  11:7
 22:4,14 74:20
 93:23 115:7,15
 118:10,12,14
 118:19 119:25

120:2 122:12
129:22,24
137:4 139:8
157:5 166:25
191:10 240:12
**says**  16:7 45:7
 83:1,17 87:5,23
 97:1,3 110:13
 110:17,19
 111:14 124:25
 150:14,21
 151:9,15,24
 152:2,11
 154:11 155:3
 179:14,23
 192:18 210:7
 230:25
**scale**  70:25
 71:18 73:17
**scales**  71:8
**scattered**  10:21
**scientific**  48:22
 111:25 131:8
 213:6,13,25,25
 214:18,22
 215:3
**scientifically**
 224:15
**scientist**  43:20
 48:21 233:17
 233:18
**scientists**  43:23
 127:12 214:15
 214:23
**score**  71:23

**scream**  176:25
**screen**  69:22
 85:20 86:10,13
 86:15,22 90:8
 91:8,20 96:19
 98:10,11
 105:10 111:6
 145:23 161:22
 164:23 169:18
 172:22 173:12
 173:19 179:16
 196:9 204:23
 205:5 209:12
**scribbles**  12:8
 12:14
**script**  74:22
**scrolling**
 195:21,24
**sean**  3:18 70:18
**search**  230:1,2
**searching**
 211:25
**second**  4:13
 94:19 106:12
 108:20 123:23
 145:24 156:11
 165:1 168:24
 185:1 193:6
 202:7
**seconds**  118:6
 227:7
**section**  9:8
 102:12 147:18
 147:19 151:9
 156:4 167:22
 222:25 223:1

**sections**  201:19
**secured**  16:15
**see**  7:24 8:2
 18:7 32:16,16
 40:1 41:2 45:1
 47:14 72:18
 77:8,14 78:3,6
 78:14,16,16
 80:20 86:9
 92:19 97:14
 98:18 105:17
 109:5 110:18
 110:23 111:17
 114:15 116:19
 117:18 123:21
 124:20,24
 125:5 132:14
 143:20,22
 144:2,3 145:12
 146:16,17
 148:18 150:7
 150:17,19
 160:7,17,18,20
 160:22 162:16
 162:18 174:4
 174:21 175:7
 175:24 179:25
 180:1 188:17
 188:19,20
 191:22 192:1
 196:10,10
 199:11,13
 227:8 231:3,4
**seeing**  109:14
 126:25 175:14
 206:3

**[seen - siemiatycki]**                                      Page 46

**seen**  15:12
  36:16,17 41:20
  43:8 61:16 76:6
  140:15,17
  169:13 205:12
  205:24 206:2
  212:3 214:20
  229:8
**self**  5:13 130:23
  161:10,16
  162:4,12,15
  163:13
**seminary**  2:6
**send**  12:25
**senior**  63:21
  64:6
**sense**  20:7
  21:13 65:5
  122:18 151:15
  154:5
**sensitive**  5:17
  168:10,16
**sent**  15:19
  16:15 42:23,24
  95:21 169:23
  215:19
**sentence**  9:14
  47:23 48:3
  77:13,19 78:6
  78:14,16 79:2
  88:6 111:12,13
  147:11,17
  149:10 151:22
  151:23,24
  152:2 154:10
  165:1,9 167:12

193:2 196:23
  223:5 231:9,12
  231:15
**sentences**
  151:21 201:19
**separately**
  199:14
**september**  30:6
  30:13,19 32:20
**sequence**  79:11
  152:16 155:5
**sequitur**  75:11
**series**  208:25
  213:7 216:9
**serious**  71:14
  71:15
**seriously**
  218:14
**serve**  127:7,13
**served**  28:6
**services**  57:11
  83:18 84:11
  216:6
**serving**  145:2
**set**  171:25
**seven**  81:20
**several**  23:4
  25:14,25 26:6
  27:18 81:19
  174:19 199:8
  201:18 208:21
  215:16 224:1
  228:22
**sgo**  39:6 213:5
  213:11 214:17
  234:15,21

235:4
**share**  60:20
  176:4,5 210:2
  235:9
**shared**  85:24
  234:19,20
**shaving**  176:25
  177:7 180:10
**shift**  137:20
**shorten**  44:24
**shorthand**
  119:11
**show**  14:8 83:6
  116:22 117:3
  146:18 147:20
  150:20 153:5
  153:14 154:21
  155:1 156:2
  158:13 170:17
  177:9 179:21
  182:8 187:5
  191:20 209:3
  216:2 219:8
**showed**  178:3,6
  179:22
**showing**  116:11
  175:5 178:13
  191:7
**shown**  14:14
  157:24 210:8
  210:17 225:3
  231:1
**shows**  42:6
  181:20,21
  182:4 219:11
  226:22

**shriek**  50:4
**sic**  162:21
**side**  93:21
  97:11,20
  112:18 125:16
  126:13
**siemiatycki**  1:9
  3:4,22 4:14
  7:12,14 9:17
  10:11 12:2,6
  13:4 14:12 16:7
  19:24 22:13
  24:20 25:12
  31:8,23 45:24
  46:5,11,18,25
  48:6,19,25
  49:21 50:6 52:4
  53:5 56:1,9
  58:15 61:13
  70:3 74:7,18
  75:1,3 79:15
  83:22 84:17
  85:16 89:24
  99:2 101:6,17
  103:8,11
  106:13 113:13
  113:20 128:11
  128:24 134:16
  141:10 142:23
  145:2 157:3
  159:18 162:24
  163:8 164:11
  166:14 171:7
  177:6 178:21
  181:10 182:22
  183:1,7 184:10

185:7 186:15
189:15 190:5
196:6 202:25
204:10 205:13
205:16 206:15
208:20 210:5
211:7 215:5
227:18 237:10
238:22 239:20
240:14 241:21
243:6
**siemiatycki's**
9:6 102:7
128:17 145:24
**sign**  242:14
**signature**
244:12 245:19
**significance**
100:13 210:15
210:18 218:25
219:16,17
220:8
**significant**  98:6
99:25 100:1,7
104:17 116:25
117:4 118:9,13
118:22 177:10
178:23 179:11
180:4,16 181:2
181:11,15
183:9,11
184:20 219:3,8
219:24 220:4,6
225:19,21,25
226:3,19

**significantly**
118:20 134:17
134:22 183:22
**similar**  27:13
66:17 137:23
**simple**  45:24
46:5,12 90:11
181:1 188:18
**simpler**  238:23
**simplistic**  71:11
**simply**  70:7
**single**  138:2
173:21 229:7
**sister**  5:18
163:24 168:11
168:17 177:24
178:1,4,6,17
184:12,19,19
**sitting**  15:9
23:14,20 26:16
32:12 48:6 68:3
72:20,23
141:12 190:6
199:4
**six**  81:20 88:20
190:18 206:16
**sixth**  80:18
**size**  120:19
**skadden**  2:21
**skadden.com**
2:24,25
**skeptical**  71:8
**skim**  201:1
**skimmed**
103:16

**slate**  2:21
**slightly**  122:3
**small**  98:12
119:14 120:16
120:17 155:11
155:21 156:23
157:7,10,16,18
158:14 188:3
219:22,22
**smaller**  157:24
**society**  37:25
38:14,16 39:4
39:11 40:12,15
40:24 215:7,9
**soft**  107:11
**sogc**  38:2,4
**sold**  83:21
216:8
**solicitation**
131:10
**solicited**  130:7
**solid**  138:9
**somebody**
59:10 229:1
**someone's**
28:18,19
**somewhat**
158:10
**soon**  194:16
**sophisticated**
219:13
**sophistication**
220:20
**sorry**  11:6
13:16 18:5,12
21:10 33:14

41:24 44:18
59:3 65:14
66:22 67:10
69:10 70:1,6
71:3 72:22
76:25 77:10,10
84:5 86:4 87:10
88:15 89:13
93:1 94:7,9
95:2,21 97:2
98:8,11,18
102:13 103:6
104:22,23
109:19,21
110:10 112:20
115:23 119:7,9
119:20 123:25
128:13,23
130:16 134:25
137:11 139:5
146:3,3 149:15
149:16 155:16
156:2,17
161:13,19
162:25 163:2
166:10 169:2,8
170:20 173:3
174:7 185:13
186:12 195:12
197:6 198:25
205:17 227:23
234:25 237:15
238:1 239:23
**sort**  11:4 12:12
29:12 32:6
34:17 35:15

**[sort - stenographic]**                                    Page 48

42:11 48:21
53:21 57:17
62:9 103:14
113:24 116:10
117:17 119:18
131:24 138:17
152:24 216:24
221:8
**sought** 234:21
**sound** 20:2
168:25 169:3
**sounds** 20:11
61:15
**source** 24:21
**sources** 24:12
25:9 43:21
241:12
**south** 2:11
**span** 226:15,16
**spanish** 110:4
**spans** 223:1
**speak** 57:14
89:6 213:11
233:13,14
**specific** 149:10
198:9,10
206:17 207:13
239:5 241:3
**specifically**
69:18 132:4
195:17 197:19
209:6 210:6
215:6 216:1,3
217:20 218:1
222:24

**specification**
80:18
**specifications**
81:21
**specifics** 148:7
**specify** 231:5,9
231:11,12,15
**speculate** 117:8
**speculated**
139:12 140:1
**speculating**
138:22 139:3
**speculation**
139:9,18,20
**speeches**
182:16
**spend** 48:16
74:2
**spoke** 139:5
233:16
**spoken** 89:5
125:22
**sponsored**
144:5
**spot** 109:16
**stage** 138:13,13
**standalone**
12:11
**standing** 182:1
**stands** 228:8
**starch** 137:13
137:13,21
**start** 26:3 76:3
76:7 77:22
179:8 229:24

**started** 10:7
34:19 35:1
36:10,13 117:7
153:19 225:6
235:18
**starting** 8:16
163:19 202:23
**starts** 89:21
156:14 223:5
**state** 1:12 7:8
20:14,16,21
21:1 77:5 78:3
148:13,14,24
155:21 160:12
164:13 192:11
244:7 245:25
**stated** 34:15
40:15 44:11
104:14 144:25
216:4 225:16
240:8
**statement**
40:21 41:10,11
49:18 68:18
83:13 85:5
87:15 92:18
94:3 97:1 109:7
122:1 147:24
155:6 164:17
165:7,10
187:23 210:15
210:19 216:17
223:17,18
**statements**
32:24 149:1
180:19

**states** 1:1 9:14
39:5 121:5
134:9
**stating** 239:22
**statistical**
100:13 116:22
119:5 120:19
122:4 125:1
212:1 218:25
219:16,17
220:8
**statistically**
98:6 99:24
100:1,6 114:22
117:4 118:9,13
118:19,22
177:10 178:23
179:10 180:4
180:16 181:2
181:11,14
183:9,11
184:20 219:2,8
219:24 226:19
**statisticians**
219:13
**status** 121:8
152:21 164:16
165:6 167:4
**stayed** 217:16
**steam** 163:1
**steering** 7:3
**stenographer**
79:17
**stenographic**
244:10

**[steps - sure]**                                                                 Page 49

| | | | |
|---|---|---|---|
| **steps** 77:22 | 74:11 76:6 80:2 | 168:17 177:24 | **substantial** |
| **stick** 141:11 | 80:6,9 82:4 | 178:1,4,6,17 | 26:15 |
| **stimulus** 53:21 | 120:17 146:13 | 184:12,19 | **substituted** |
| **stop** 49:19,22 | 146:15 147:7 | 187:8,14 | 9:22 |
| **stopped** 84:10 | 147:12,24,25 | 191:17,21 | **subsumed** |
| **stotz** 1:10 244:4 | 148:5,6,13,15 | 218:10 220:19 | 122:20 221:4,5 |
| 244:14 | 148:18,22,24 | 220:21,23 | **suggest** 102:21 |
| **strain** 174:17 | 149:8,9,13,21 | 221:2 236:1 | 115:9 |
| **strategy** 45:13 | 149:22 151:25 | **studying** | **suggesting** |
| **street** 2:11,16 | 152:3,13 | 235:19 | 130:1 |
| **strength** 225:21 | 154:21,24 | **subject** 207:18 | **suggests** 156:22 |
| 226:1,10 | 155:1 156:22 | **subjective** | 188:2 |
| **strengths** 147:6 | 156:22 167:3 | 117:17 131:15 | **suite** 2:6,16 |
| 147:20 220:19 | 167:25 188:2,2 | 157:16 158:10 | **summarized** |
| 220:21 | 205:22 213:19 | 221:16 | 71:7 |
| **strictly** 32:7 | 218:21 219:1,2 | **subjects** 178:15 | **summary** |
| 122:2 | 219:7,16,19,22 | 219:23 | 190:23 222:20 |
| **strong** 132:17 | 219:25 220:3 | **submission** | **summer** 217:4 |
| 132:20 158:1 | 220:14,15 | 36:15 | **superior** 69:4 |
| 224:14,16 | 221:3,5,15 | **submit** 36:8 | 147:25 148:6 |
| 225:3 226:24 | 226:12,18 | **submitted** 16:4 | 220:15 |
| 227:21 228:4 | 240:9,11 241:2 | 21:8 51:20 | **supplemental** |
| 228:15 229:2 | 241:3 | 53:15 57:13 | 5:21 17:20 |
| 229:14 | **study** 5:18 33:9 | 82:16 83:3,4,8 | 84:20,21 173:1 |
| **strongly** 225:14 | 33:16,23 34:2 | 88:11,13 89:4,8 | 173:8 |
| **stuck** 172:13 | 34:21 35:9 68:4 | 90:15 | **support** 40:16 |
| **stud** 107:19 | 69:5 71:22,25 | **subpoenaed** | 41:5,12 55:4 |
| **student** 236:1 | 72:6,12,15 | 235:4 | 125:1 215:12 |
| **students** 29:12 | 73:23,24,25 | **subscribed** | 222:4 |
| 35:4 | 74:10,11 75:7 | 245:21 | **supported** |
| **studies** 33:5 | 75:21 76:4 | **subsequent** | 225:15 |
| 61:21 65:2 66:1 | 78:22 92:7,9,11 | 225:8 | **supposed** 14:2 |
| 66:20,23 67:19 | 143:15 147:3 | **subsets** 178:16 | 14:24 |
| 68:25 71:6,10 | 148:8,8 150:24 | **substances** | **sure** 7:19 11:6 |
| 71:12 72:8 | 151:1 163:24 | 137:22 236:25 | 11:14 15:15 |
| 73:13,15,19,22 | 165:11 168:11 | | 16:15 17:12 |

18:6 20:20,24
28:9 32:5 38:16
49:5 53:10
54:13 58:11,12
60:16 72:17
73:24 77:1 79:9
82:3 83:5 87:1
87:10 108:22
113:17 115:5
118:11 124:20
124:20 126:11
131:20,23
132:3 139:6
147:2 190:20
196:16 198:17
199:9 205:2
209:16 217:2
225:23 227:7
227:11
**surgery** 79:10
**surgical** 154:13
158:24
**surprise** 69:19
133:20 229:11
229:18,19
230:4
**surprised** 38:17
38:19 127:11
127:17 133:2
**susan** 143:17
144:4,9
**suspect** 130:22
**suzanne** 1:10
186:11 202:4,8
242:13 244:4
244:14

**switch** 192:17
208:14,15
**switched**
192:15
**sworn** 8:24
245:21
**system** 216:22
**systematic** 3:16
62:19 70:17
211:9,14
223:25 225:18
**systems** 150:3,5
150:15,22
152:4 153:6,16
154:6,12,17,22
159:20

**t**

**t** 3:11 4:3 5:3
6:3 8:23 244:1
244:1 245:1,1
**table** 5:21 9:15
65:23,24 67:13
68:16 69:22
70:12,13,22
72:11 76:22
78:18 80:3,17
81:16 89:15,16
89:24 90:2,7,9
90:19,21 97:23
98:3,9,24
100:22 112:12
112:16 113:5
113:25 151:7
172:14,16,25
173:2,8,11,18

175:20 176:16
176:17 177:18
177:20 182:8,8
182:11 183:8
183:22 185:15
185:23 186:18
187:5,7,9
195:17,19
198:10 199:17
199:21 200:5
201:25 203:23
**tables** 106:17
106:19 107:15
108:1 196:11
201:7
**take** 12:24
23:12,21 53:1
95:25 101:14
123:13 124:11
134:13 146:21
163:21 168:23
184:6 197:17
198:3,5,19
201:12 210:23
218:13 236:7
242:24
**taken** 1:9,13
53:3 82:13
127:20 156:14
156:20 161:6
187:25 206:13
227:13 237:8
**takes** 34:21
**talc** 3:23 4:21
5:6,8,12 6:11
9:10 20:1,17,19

21:15 22:21
23:4,11 24:9,22
25:13,23 26:4
26:14,17 27:17
27:19 30:5,21
31:10,25 32:3,9
32:20,25 33:5,8
33:16 34:6
35:10 36:19,24
37:8,19 39:1,16
39:22 40:1,5,18
43:11,24,24
44:11,17,20,22
47:6,7,17 48:10
49:2,11 50:10
50:21 53:19
54:11,24,25
55:2,4,21 56:4
56:6,11,17
58:17,20,24
59:1,11,15
61:23 62:16
75:8,23 76:3,8
79:6,13,13
80:19 81:9,17
81:21 85:17
87:13,24 93:2,5
93:11,12 97:5
123:6,16 126:4
127:23 128:4
137:10,21,23
140:6 142:11
142:21 144:6
145:10 149:23
151:20 152:4
152:18,20

[talc - thank]                                                      Page 51

154:9 157:21
157:25 159:1,5
161:8,15 162:3
162:10,14
163:14 164:1
165:24 166:17
170:14 177:2,2
177:3,8,8 178:2
180:10,11
181:21 182:5
182:24 183:11
183:20 188:7
190:22 197:23
204:12,17
205:21 210:7,8
210:10,16,17
210:21 211:1
212:17,19,21
212:25 213:2
217:21 218:11
222:5,19 224:9
225:13 228:6
228:11 230:25
231:1,13,14,24
232:21,25
233:5 235:5
236:24 237:3
238:4,17
241:23 242:8
**talcum**  1:4 3:15
70:16 83:21
136:7,13,13,18
136:20 137:5
138:19 139:13
139:15,22
140:4,16,19

141:15 150:5
150:15 152:5
153:6,15
159:20 207:6
207:13 211:17
212:16 215:10
215:12,20
216:8 223:23
225:17
**talk**  15:14 79:4
153:19 182:14
189:9
**talked**  14:3
28:18 205:4
**talking**  22:3
48:1 51:22
60:16 100:14
111:10 140:2
145:21 153:18
153:23 166:2,5
185:14,15,18
186:13 187:10
188:21,23
189:4,5,7
190:20 192:16
193:4 194:11
200:25 201:2
224:8 231:13
231:17
**tally**  42:20
220:20
**tallying**  219:1
**taught**  133:6
**team**  178:5
211:24 235:18

**teams**  226:14
**technically**
62:1 157:11
**tell**  14:2 23:14
46:22 56:21
63:14 64:6
78:17 96:19
104:13 118:8
178:22 179:2
190:5 196:19
196:24 200:6
201:12,25
213:16 218:6
**telling**  45:20
48:2 121:17
122:7 173:17
**tells**  121:14
**temper**  102:24
103:6
**temporal**  79:8
79:11 152:15
155:5
**ten**  33:22 63:17
80:2
**tend**  153:5
154:21 155:1
221:21
**tenor**  46:18
**term**  100:6
117:16 128:1
141:3
**terminology**
225:7
**terms**  60:9
157:10,14
200:7 224:14

**terry**  67:8,8,12
**test**  100:18
117:3,6,18,19
117:20 118:4,7
222:21
**testified**  8:25
20:25 43:1 87:9
97:11,18 175:1
177:13 181:24
191:12 195:6
233:12 237:10
237:23 238:13
**testify**  232:20
233:4,9
**testifying**  93:17
238:16
**testimony**  43:6
48:13 55:7 84:3
84:6 100:16
107:24 110:20
111:15 125:2,3
125:18 172:5
201:9 206:16
239:17 245:2
**testing**  49:2,11
50:9,21 51:7
**tests**  116:22
**text**  86:20
**thank**  8:2 9:1
10:4,8 21:4
46:23 53:2
55:15 61:19
76:1 80:14
90:24 95:2
96:22 97:22
99:8,16 100:5

**[thank - together]**                                                      Page 52

| | | | |
|---|---|---|---|
| 100:10 105:4 | 56:23 57:18 | 186:6,17,19 | 81:2,6,10 |
| 107:8 111:21 | 65:24 66:9 67:3 | **thoughts** 238:2 | 190:18 234:15 |
| 113:10 122:22 | 67:6 72:10,13 | **thousand** 23:16 | **timing** 51:9 |
| 122:24 129:2 | 74:9,12,25 | 201:18 | 79:22 |
| 141:23 149:25 | 75:16 79:4 | **thousands** | **tisi** 2:11 7:2 |
| 161:4 169:20 | 84:14 90:6 | 50:20 51:1 | 13:15,18 95:18 |
| 176:18 183:19 | 94:10 109:11 | **three** 16:13 | 95:23 96:2,5,8 |
| 184:7 185:3 | 117:7 120:25 | 20:10 36:2 | 96:11,14,18,22 |
| 206:11 208:1,3 | 121:24 122:7 | 80:17 87:6,24 | 108:20,24 |
| 208:6 209:9,23 | 122:22 124:19 | 88:4 104:4 | 109:4 162:7,11 |
| 210:3 227:12 | 124:24 126:7 | 112:22 170:5 | 162:16 175:6 |
| 227:14 230:19 | 128:1 131:23 | 201:17 206:8 | 175:11,14,18 |
| 242:14,22,25 | 136:4 137:8,19 | **threefold** 111:8 | 175:24 184:25 |
| **thanks** 156:9 | 138:2 139:14 | **time** 13:20 | 185:3 188:22 |
| 190:2 | 140:6,12 | 21:11 23:21 | 189:6,12,16,20 |
| **theirs** 66:9 | 147:14,17 | 24:1 27:1,1 | 189:23 190:1 |
| **theme** 79:20 | 151:3,22 | 33:25 35:17 | **title** 164:6 |
| **theories** 131:9 | 163:10 167:20 | 42:20 45:17,23 | **titled** 173:12 |
| **theorizing** | 169:14 171:16 | 46:14 71:13 | **titus** 123:19 |
| 115:3 | 171:17 177:21 | 75:4,6,21,23 | **tobacco** 224:21 |
| **thing** 38:18 | 188:21 190:11 | 78:15 83:9 84:8 | **today** 10:18 |
| 130:18 157:17 | 192:5 203:2 | 84:9 88:6 89:8 | 13:6 14:20 |
| 179:12 218:22 | 205:14 207:24 | 95:25 101:1 | 15:10 23:15 |
| 225:5 226:20 | 216:20 217:1 | 103:12 107:21 | 25:21 26:16 |
| **things** 79:8 | 224:3 227:9 | 123:13 129:15 | 31:19 32:12 |
| 114:12 191:25 | 228:7 235:16 | 135:23 136:12 | 42:16 48:7 |
| 213:22 216:24 | 239:2,9 240:6 | 140:18 148:21 | 52:22 53:23 |
| 217:5 | 240:19 241:12 | 197:3,5 200:18 | 72:21,23 84:3,6 |
| **think** 10:25 | **thinking** 133:1 | 202:4,5 207:20 | 103:5 110:16 |
| 12:14 13:23 | 133:20 | 208:2 211:7 | 141:13 149:24 |
| 15:8,24 17:11 | **third** 17:20 | 216:24 217:8 | 199:5 206:16 |
| 17:14 19:18 | 78:15 91:25 | 225:2 227:15 | 208:2 237:25 |
| 20:11 22:13 | 111:1 221:1 | 230:17 240:13 | **together** 12:19 |
| 23:9 26:21 27:9 | **thorough** 230:3 | **times** 60:2 | 140:7 156:15 |
| 27:9 29:8 33:3 | **thought** 56:17 | 64:18 65:13,18 | 156:21 187:25 |
| 35:8 44:15 54:5 | 72:5 154:3 | 67:25 80:25 | 219:25 226:21 |

**[told - under]**                                                                 Page 53

**told**  56:23 68:3
   107:5
**took**  23:21
   130:19 191:21
**tool**  71:11,11
**top**  38:10 69:13
   88:19 160:12
   179:17,19
   223:2
**topic**  44:14
   53:18,18 65:25
   138:25 152:24
   172:11 211:22
   221:8 241:4,23
**topics**  172:11
   213:20 214:12
**total**  20:15,19
   21:15 22:5,21
   23:7,11 51:3
   121:3,4
**touch**  38:21
**toward**  140:4
**towns**  236:2
**track**  94:13
**tract**  4:23 79:6
   123:8,17
**tracts**  155:14
   155:24 157:1
   159:8,14 191:9
   203:5
**transcript**  6:18
   244:9,22 245:3
**translates**
   160:16 223:11
**translocation**
   222:3

**transmission**
   215:2
**transport**
   221:20 222:3
**transported**
   222:11
**trend**  219:11
**trends**  105:14
   136:12
**trial**  206:18
   232:21 233:4
**triangle**  126:9
**triggered**  160:8
**trouble**  54:7
**true**  115:21
   120:8 121:1,12
   121:16,18,21
   122:9,13,16
   136:3 148:1
   149:19 167:9
   180:9 217:18
   244:9 245:3
**truths**  148:5
**try**  69:14 74:14
   107:22 141:10
   195:18 198:12
   200:19
**trying**  24:13
   48:14 65:4 69:2
   75:17 78:1
   79:21 90:12
   115:17 117:10
   120:12 142:25
   147:15 148:2
   152:7 153:9,12
   158:13,19

162:7 184:25
   185:25 189:7
   189:20,20,23
   201:11 238:1
   239:5
**tubal**  76:13
   151:11 152:16
   152:19
**tubes**  75:4,6,8
   75:22,24 77:6
   78:5,19,24 79:5
   80:4,12 151:18
   185:9,10,21,22
   192:23
**tumors**  17:8
   138:9
**tung**  4:18
   108:12
**turn**  68:16
   76:22 91:16
   95:16 97:23
   112:17 145:13
   172:14 177:1
   202:14 205:17
   206:10 207:21
   209:7,10 218:4
   222:25
**turned**  59:12
**two**  13:5,9,24
   14:4 17:1 21:23
   51:24 64:18
   65:13,18 66:14
   66:21 67:25
   77:22 80:17,25
   81:2,6,10
   114:24 115:7

115:15,21
   116:3,13,19
   117:5,22,23,24
   118:5 119:5,13
   120:2 122:17
   122:19 148:17
   148:22,23
   159:16 203:22
   204:6 229:15
   229:16
**type**  148:7
**types**  9:11
   147:21
**typically**  35:4
   64:24 233:13

**u**

**u**  30:11
**u.s.**  5:18 43:22
   168:11,17
**uh**  17:10 42:3
   89:21 119:24
   146:23 147:4,8
   151:6,8 167:16
   196:25 199:16
   202:17
**umbrella**
   148:10
**unable**  152:15
   155:4
**unaware**
   133:16 144:10
   145:11
**uncited**  48:9
**under**  36:6
   87:12 99:20

**[under - value]**                                      Page 54

148:9 244:23
**underarm**
  177:2,8 180:10
**underlying**
  115:21 120:8
  121:1,12,16,18
  121:21 122:9
  160:13 188:5
  223:6,8
**understand**
  11:7 24:14,18
  33:14 47:25
  59:8,9 75:13,18
  79:11,12 90:12
  95:23 96:11
  100:16 115:6
  118:11 119:12
  145:7 153:9,12
  158:12 175:4
  177:17 178:15
  180:21 181:8
  181:25 198:14
  198:18 201:11
  201:24 208:5
  216:22 235:1
  238:16 239:21
  239:22
**understanding**
  35:11 73:21
  79:23 217:6
**understood**
  109:2,3
**undertake**  53:7
**undertaken**
  53:11

**unedited**  91:16
**unfair**  78:9
**united**  1:1 39:5
  121:5 134:9
**units**  81:5
**university**  24:2
  29:10,14,19,21
  29:24 30:1
  35:14
**unreliable**
  221:16
**unsong**  218:20
**unstable**
  119:13
**updated**  16:2
  212:5
**upper**  114:16
**ups**  221:6
**usage**  140:16
  207:6
**use**  3:15 4:9,21
  5:12,13,15 6:6
  36:24 37:8,20
  58:17,20 59:1
  61:23 64:19
  65:7,13,18
  67:17,25 68:14
  69:3 70:16
  71:20 80:24
  81:2,9,17 82:8
  94:21 95:4,9
  104:16 105:15
  117:16 119:10
  123:6,16 130:4
  136:8,13,18
  138:19 139:22

141:3,16
151:10,20
152:17,21
155:12,22
156:24 157:18
158:9,14
160:14 161:8,9
161:15,16
162:3,3,10,14
162:14 163:12
163:14 164:1
164:14 165:3
165:12,12,20
165:24 166:17
168:8,14
170:14 173:21
178:2 183:21
183:23 188:4
192:19 194:3
194:12 195:1
197:23 207:13
210:25 219:9
223:9 230:7
**used**  58:23 62:2
  65:1,12,16 66:1
  66:3,7 67:18,21
  68:7,8,11,12,14
  68:24 69:1,4
  71:2,4,19 72:6
  72:8,11,12 75:8
  75:23 79:9
  80:23 99:15
  150:3,5,15
  152:5,19 153:6
  153:14 158:15
  159:20 183:23

219:5,6 229:8
**useful**  56:18
  176:19
**user**  59:11,25
  60:2
**users**  60:6
  66:11
**uses**  17:16
  210:10 229:14
**using**  71:10
  76:3,7 92:6
  173:22 218:25
  226:4 229:2
**usually**  7:20
  76:18 81:25
  107:12
**uteri**  151:16
**uterine**  173:22

**v**

**v**  2:11
**vacation**  105:1
**vaginal**  177:2,8
  180:11 181:21
  182:5 183:10
  183:20
**vaguely**  169:5
**valid**  146:14
  147:12 180:19
**validity**  73:10
  131:16 132:6
  149:7 220:15
  220:24
**value**  9:16
  122:16

**[variability - winded]**                                        Page 55

| | | | |
|---|---|---|---|
| **variability** | **volume** 171:24 | 79:25 119:1,2,4 | **went** 74:21 |
| 116:24 117:22 | **volunteer** 56:16 | 120:23 126:16 | 77:2 187:20 |
| **variable** 82:3 | **w** | 129:13 130:8 | 202:20,21 |
| **variables** 64:22 | | 130:13 152:14 | **wentzensen** |
| **various** 47:7 | **wait** 68:17 | 167:21 172:13 | 125:23 145:15 |
| 53:13 74:11 | 94:23,23 95:19 | 174:4,5 213:13 | 145:19 149:11 |
| 120:22 131:25 | 108:20 229:22 | 213:24 219:20 | 149:20 150:21 |
| 132:2 163:25 | 229:22 232:14 | 225:8 230:3 | 150:24 151:1 |
| **venture** 177:20 | **waiting** 12:15 | 232:21,24,25 | 152:11 153:13 |
| **verbal** 115:14 | 105:7 186:1 | 233:2,11 | 154:25 155:7 |
| **verifications** | **want** 7:24 8:2 | **ways** 66:18 | 156:6 160:12 |
| 216:25 | 19:13 61:6,9,10 | 138:15 | 162:21 184:5 |
| **verifying** 67:10 | 61:12 77:17 | **we've** 185:18 | 184:24 185:17 |
| **version** 11:3,5 | 85:10 86:14 | 192:13,16 | 186:22 187:14 |
| 42:12 90:5 | 101:14 108:21 | **weak** 160:15 | 188:24,25 |
| 113:12,14 | 108:22,23 | 223:10,19 | 190:20,22 |
| 146:24 163:19 | 109:6 110:1 | 224:14,17 | 192:3 203:13 |
| **versions** 109:21 | 113:12 119:17 | **weaknesses** | 222:19 |
| **versus** 99:10 | 123:13 140:24 | 147:6,21 | **west** 2:23 8:14 |
| 147:7 167:4 | 141:5,7 160:19 | 220:19,21 | 8:15 |
| 185:9 190:8 | 170:17 174:23 | **web** 109:10 | **when's** 101:1 |
| 197:25 199:2 | 175:9,9 176:3,5 | **website** 37:22 | **white** 98:5,17 |
| 200:8 231:13 | 176:21 182:13 | 40:1,9 | 99:3,12,21,25 |
| **videoconfere...** | 182:19 188:8 | **websites** 214:25 | 105:16 |
| 2:4,10,15,21 | 190:3 195:16 | **wednesday** | **who've** 206:17 |
| **view** 130:7 | 195:16 197:6 | 1:13 | **wide** 5:18 |
| 131:15,17 | 197:14,18 | **week** 64:18 | 119:21,25 |
| **views** 32:18 | 198:17 199:21 | 65:13,18 67:25 | 120:1 168:11 |
| **virginia** 2:6 | 199:23 207:21 | 80:25 81:2,6,11 | 168:17 |
| **visible** 179:20 | 208:1 240:14 | **weeks** 13:23 | **widely** 140:22 |
| **vitonis** 123:19 | 242:15,16 | **weight** 40:15 | **width** 120:24 |
| 124:25 125:17 | **wanted** 10:23 | 41:12 | **william** 47:5 |
| **vocabulary** | 204:10 | **weighted** 73:17 | 123:19 |
| 137:12 | **watch** 102:3 | **weird** 110:3 | **win** 101:15 |
| **voice** 107:11 | **way** 9:23 37:18 | **welch** 123:19 | **winded** 46:12 |
| 153:25 | 60:6,8 73:20 | | |

| | | | |
|---|---|---|---|
| **wish**  9:24 | 136:10 138:24 | 245:19 | 191:8,15,18 |
| 222:13 | 139:5,20 | **witnesses** | 192:22 195:10 |
| **witness**  8:21 | 140:12 141:19 | 126:13 189:5 | 195:10 196:21 |
| 13:11 14:17 | 143:5 144:10 | **woman**  58:23 | 197:25,25 |
| 17:6,18 18:5 | 144:18 145:18 | 59:25 74:18 | 199:2,3,15 |
| 19:1,17 21:10 | 146:6 147:16 | 75:3,5,20 92:4 | 200:8 203:5,5 |
| 23:19 25:8,16 | 149:15 150:24 | 203:15 | 203:17 207:13 |
| 26:8,12,23 27:3 | 151:2 152:10 | **woman's**  59:14 | 226:14 236:2 |
| 27:22 28:9 31:1 | 154:1,4 155:18 | **women**  4:11,17 | **women's**  61:21 |
| 34:13 36:19 | 157:10 158:22 | 27:14 69:17 | 143:16 152:20 |
| 38:6,8 40:8,20 | 160:6 161:3 | 76:3,7,13 77:6 | 210:25 |
| 41:2,16 43:7 | 163:18 168:20 | 78:4,19,23 79:9 | **wondering** |
| 46:23 48:14 | 169:16 170:9 | 80:3,10 92:14 | 237:25 |
| 49:5 50:12,24 | 170:19 171:13 | 95:5,11 98:3,16 | **woolen**  3:18 |
| 54:5 55:8 56:2 | 177:19 178:25 | 98:17,20 99:3,3 | 58:16,19 59:12 |
| 59:3,18 61:16 | 180:7,13,18 | 99:9,12,20,21 | 63:6,9,21,22 |
| 62:1,9 63:3,25 | 181:14 182:7 | 99:24 100:1 | 64:9,17 65:11 |
| 64:5,14 67:6 | 183:17 184:2 | 105:16,16 | 65:17,21 66:4 |
| 68:2,10,19,24 | 185:13 186:1 | 108:11,17 | 66:13 67:18 |
| 70:9,21 71:25 | 187:16,18 | 115:22,23,24 | 68:7 69:9,11,12 |
| 73:5 75:10,17 | 188:25 191:6 | 115:24 116:11 | 69:22 70:19 |
| 76:20,25 77:17 | 194:9 196:16 | 120:10,15 | 71:22 76:24 |
| 78:8 81:13,24 | 197:14 200:16 | 121:6,19 | 78:21 80:24 |
| 83:25 84:14 | 200:24 202:16 | 122:13 136:18 | 82:7 |
| 87:18 88:4 | 202:18 203:20 | 140:2 150:2,4 | **woolen's**  73:2 |
| 91:11 93:14 | 205:7 207:16 | 150:14,21 | **word**  99:15 |
| 94:16 97:14 | 208:6 227:23 | 151:16 152:3 | 124:11 158:8 |
| 100:3 105:7,21 | 228:9,17 | 153:5,14 154:5 | 158:14,16 |
| 107:7 111:22 | 229:18,24 | 154:21 155:13 | 167:12 226:5 |
| 112:6,9 114:10 | 231:21 232:16 | 155:23 156:25 | 229:2,14 240:6 |
| 123:24 125:13 | 232:24 233:23 | 158:24 159:8,9 | **words**  39:9 |
| 125:20 126:16 | 234:1,11,17,25 | 159:13,16,19 | 92:13 137:12 |
| 126:22 127:16 | 236:22 237:15 | 163:14 185:9,9 | 157:18 201:18 |
| 128:8 130:12 | 237:17 238:11 | 185:20,21 | 229:8 |
| 132:20 133:14 | 239:2 240:19 | 187:3,4 188:15 | **work**  29:9,11 |
| 134:7 135:9 | 242:3 243:5 | 188:16 190:7,8 | 97:4 126:6,7 |

**[work - zooming]** Page 57

| | | |
|---|---|---|
| 127:12 217:11 217:15 | 94:18 97:25 98:10,11 | **z** |
| **workers** 235:22 | 109:14 110:5 | **zoom** 13:22 |
| **working** 33:4 | 112:19 115:13 | 14:4 86:19,21 |
| **works** 213:14 | 116:9 123:22 | 156:17 163:6 |
| 216:23 | 130:3 133:21 | 175:17,21 |
| **worries** 163:3,4 | 137:14 147:16 | 176:4 |
| 163:4 | 147:16 154:1 | **zooming** 184:8 |
| **worry** 172:22 | 155:18 158:20 | |
| **write** 33:8 | 163:1 164:24 | |
| 171:18 | 172:23 173:3 | |
| **writing** 36:12 | 175:18 194:15 | |
| 129:25 | 196:8 203:22 | |
| **written** 10:21 | 230:15,24 | |
| 32:7,19 47:4 | **year** 36:15 | |
| 107:20 | 56:14 60:15 | |
| **wrong** 110:1 | 61:1,2 120:11 | |
| 217:5 | 172:12 226:15 | |
| **wrote** 83:14 | 226:16 | |
| 84:7,8,9 129:10 | **years** 20:10 | |
| 191:13 216:24 | 23:5,9 25:14,25 | |
| **x** | 26:6 27:18 | |
| | 33:22 34:24 | |
| **x** 3:1,11 4:1,3 | 43:9 50:1 52:16 | |
| 5:1,3 6:1,3 | 65:21 66:5 | |
| **xeroxed** 87:2 | 73:18 87:6,24 | |
| | 88:4 134:18 | |
| **y** | 136:2,5 138:10 | |
| **y** 8:23 | 138:21 140:23 | |
| **yeah** 8:6 14:1,7 | 140:24 184:16 | |
| 19:10,15,23 | 199:9 217:15 | |
| 20:9 30:12,12 | **yesterday** | |
| 30:18 31:1 | 13:19 14:5 | |
| 54:22 55:14 | **york** 2:23,23 | |
| 57:18 58:3,8 | | |
| 70:9,22 77:10 | | |
| 85:4 87:14 90:4 | | |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.